23-2553

IN THE

# United States Court of Appeals

FOR THE THIRD CIRCUIT



UNITED STATES OF AMERICA EX REL.,
STEPHEN A. KRAHLING; JOAN A. WLOCHOWSKI,

*against*

MERCK & CO, INC.,

STEPHEN A. KRAHLING; JOAN A. WLOCHOWSKI,

*Appellants.*

On Appeal from the United States District Court
for the Eastern of District of Pennsylvania
The Honorable Chad F. Kenney, Case No. 2:10-04374-CFK

## JOINT APPENDIX
## VOLUME III OF XLV
## Pages Appx181 to Appx500
## (Filed Under Seal)

VENABLE LLP
750 East Pratt Street, Suite 900
Baltimore, Maryland 21202
410-244-7400

MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, Pennsylvania 19103
215-963-5000

HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
202-637-5600

*Attorneys for Defendant-Appellee*

CONSTANTINE CANNON LLP
355 Madison Avenue, 9th Floor
New York, New York 10017
212-350-2700

KELLER GROVER, LLP
1965 Market Street
San Francisco, California 94103
415-543-1305

*Attorneys for Relators-Appellants*



# **Table of Contents**

**Page**

**Volume III**
**(Filed Under Seal)**

Order of the Honorable Lynne A. Sitarski, dated May 16, 2019
(Doc. 250) ................................................................. Appx181

Statement of Material Facts by Defendant in Support of
Its First Dispositive Motion, dated October 25, 2019
(Doc. 281-3) ............................................................. Appx185

Statement of Material Facts by Defendant in Support of
Its Fourth Dispositive Motion, dated October 25, 2019
(Doc. 287-3) ............................................................. Appx247

Statement of Material Facts by Relators,
dated October 25, 2019 (Doc. 294) .......................... Appx295

Declaration of Gary Reilly, for Relators,
in Support of Motion, dated October 25, 2019 (Doc. 24) ......... Appx396

Exhibit 1 to Reilly Declaration -
Expert Report of Eugene Shapiro, M.D.,
dated March 13, 2018. ........................................... Appx438

Exhibit 2 to Reilly Declaration -
Expert Report of Dr. Robert Malone, M.D.,
dated March 13, 2018 ............................................. Appx460
*(Cont'd in Vol IV)*

**Volume IV**
**(Filed Under Seal)**

Exhibit 3 to Reilly Declaration -
Expert Report of David A. Kessler, M.D.,
dated March 14, 2018, with Schedules
and Appendices ...................................................... Appx551
*(Cont'd in Vol V)*

# Table of Contents
## (Continued)

**Volume V**
**(Filed Under Seal)**

Exhibit 4 to Reilly Declaration -
Deposition Testimony of David Kessler, M.D.,
taken September 28, 2018 ....................................................... Appx1483
*(Cont'd in Vol VI)*

**Volume VI**
**(Filed Under Seal)**

Exhibit 5 to Reilly Declaration -
Expert Report of D. Bruce Burlington, M.D.,
dated June 19, 2018 ............................................................... Appx1588

Exhibit 6 to Reilly Declaration -
Deposition Testimony of D. Bruce Burlington, M.D.,
taken December 13, 2018 ...................................................... Appx1637

Exhibit 7 to Reilly Declaration -
Deposition Testimony of Mark Pallansch, M.D.,
taken October 13, 2017 .......................................................... Appx1715

Exhibit 8 to Reilly Declaration -
Deposition Testimony of Eugene Shapiro, M.D.
taken November 7, 2018 ........................................................ Appx1765

Exhibit 9 to Reilly Declaration -
Deposition Testimony of Alison L. Fisher, Ph.D.,
taken November 1, 2016 ........................................................ Appx1822

Exhibit 10 to Reilly Declaration -
Expert Report of Ann M. Arvin, M.D.,
dated June 11, 2018 ............................................................... Appx1910

Exhibit 11 to Reilly Declaration -
Letter from Dr. Robert Redfield, Director, CDC,
dated May 24, 2018 ............................................................... Appx1945

**Table of Contents**
**(Continued)**

**Page**

Exhibit 12 to Reilly Declaration -
Letter from Dr. Anne Schuchat, Principal Deputy
Director, CDC, dated September 26, 2017 ........................... Appx1950

Exhibit 13 to Reilly Declaration -
Statement of Dr. Jesse Goodman, FDA,
dated April 18, 2007 ............................................................. Appx1956

Exhibit 14 to Reilly Declaration -
Letter from Merck to Jacqueline Little, Ph.D.,
dated March 23, 2006 (MRK-CHA00214088-148) ............... Appx1960
*(Cont'd in Vol VII)*

**Volume VII**
**(Filed Under Seal)**

Exhibit 15 to Reilly Declaration -
Deposition Testimony of Jonathan L. Temte, M.D., Ph.D.,
taken August 17, 2018 .......................................................... Appx2010

Exhibit 16 to Reilly Declaration -
Expert Report of Peter H. Calcott, B.Sc. (Hons.), D.Phil.,
dated March 12, 2018 ........................................................... Appx2061

Exhibit 17 to Reilly Declaration -
Deposition Testimony of Joye L. Bramble, Ph.D.,
taken January 6, 2017 .......................................................... Appx2141

Exhibit 18 to Reilly Declaration -
FDA Warning Letter, dated February 9, 2001
(MRK-CHA00209399-409) ................................................... Appx2220

Exhibit 19 to Reilly Declaration -
Excerpts from Defendant Merck's Answer to
Amended Complaint (ECF No. 62) ....................................... Appx2232

# Table of Contents
## (Continued)

**Page**

Exhibit 20 to Reilly Declaration -
Excerpts from Defendant Merck's Responses and
Objections to Relator's Third Set of Requests for Admission,
dated August 16, 2017 ........................................................... Appx2239

Exhibit 21 to Reilly Declaration -
ProQuadTM (Measles, Mumps, Rubella and Varicella
[Oka/Merck] Virus Vaccine Live)-Original Application
(MRK-CHA00158126-79) ....................................................... Appx2293

Exhibit 22 to Reilly Declaration -
Expert Report of William L. Atkinson, M.D., MPH,
dated June 12, 2018 ............................................................... Appx2348

Exhibit 23 to Reilly Declaration -
Deposition Testimony of Jonathan Hartzel, Ph.D.,
taken June 23, 2017 ............................................................... Appx2380

Exhibit 24 to Reilly Declaration -
Expert Report of Anna Durbin, M.D, dated June 14, 2018  ... Appx2476
***(Cont'd in Vol VIII)***

## Volume VIII
## (Filed Under Seal)

Exhibit 25 to Reilly Declaration -
Expert Report of Marcela Pasetti, Ph.D.,
dated June 14, 2018 ............................................................... Appx2511

Exhibit 26 to Reilly Declaration -
Excerpts of Presentation, Principles of Vaccinology,
produced as "Principles of Vaccination.ppt"
(MRK-CHA01339555) ........................................................... Appx2534

Exhibit 27 to Reilly Declaration -
Deposition Testimony of Mary K. Yagodich,
taken August 18, 2016 ........................................................... Appx2538

**Table of Contents**
(Continued)

Exhibit 28 to Reilly Declaration -
GlaxoSmithKline Application for Priorix
(GSK-MMR-IND-0019450-76) ............................................ Appx2631

Exhibit 29 to Reilly Declaration -
Deposition Testimony of Marcela Pasetti, Ph.D.,
taken December 4, 2018 ....................................................... Appx2659

Exhibit 30 to Reilly Declaration -
Deposition Testimony of Anna P. Durbin, M.D.,
taken October 8, 2018 ........................................................... Appx2699

Exhibit 31 to Reilly Declaration -
Excerpts from Rationale for the M-M-R®II End Expiry
Clinical Studies Presentation (MRK-CHA01893680-730) ... Appx2788

Exhibit 32 to Reilly Declaration -
Letter to the Editor "Comparability of M-M-R™II and
Priorix" from Scott Thaler, M.D., *et al.*, *The Pediatric
Infectious Disease Journal*, September 1999:18(9)
(MRK-CHA00088592-3) ...................................................... Appx2836

Exhibit 33 to Reilly Declaration -
Phase V Clinical Development Plan for M-M-R®II
(MRK-CHA00667054-122) ................................................... Appx2839

Exhibit 34 to Reilly Declaration -
Fax from Yolanda Stewart to Donna Boyce,
dated April 25, 2012 (GSK-MMR-IND-0029256-63) ........... Appx2909

Exhibit 35 to Reilly Declaration -
Letter from Karen L. Goldenthal, M.D. to Angus Grant, Ph.D.,
dated September 2, 1997 (GSK-MMR-IND-0000004-7) ...... Appx2918

Exhibit 36 to Reilly Declaration -
Email from Katalin G. Abraham to Keith D. Chirgwin, M.D.,
dated October 5, 1998 (MRK-CHA00095142) ..................... Appx2923

## **Table of Contents**
## **(Continued)**

Exhibit 37 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449029-40) ........................ Appx2925

Exhibit 38 to Reilly Declaration -
Deposition Testimony of Mark Stannard,
taken December 13, 2016 ....................................................... Appx2938
*(Cont'd in Vol IX)*

### **Volume IX**
### **(Filed Under Seal)**

Exhibit 39 to Reilly Declaration -
Deposition Testimony of Luwy Musey, M.D.,
taken October 7, 2016 .......................................................... Appx3023

Exhibit 40 to Reilly Declaration -
Deposition Testimony of Ann M. Arvin, M.D.,
taken November 12, 2018 ...................................................... Appx3129

Exhibit 41 to Reilly Declaration -
Deposition Testimony of William Nichols,
taken October 25, 2018 .......................................................... Appx3213

Exhibit 42 to Reilly Declaration -
Proposed New Stabilizer for M-M-R®II,
dated July 26, 2022 (MRK-CHA00207690-7735) ................ Appx3249

Exhibit 43 to Reilly Declaration -
M-M-R®II Mumps End Expiry Study: AIGENT Assay Issues
Impact on Study Criteria Regulatory Implications,
dated October 11, 2002 (MRK-CHA00094161-82) .............. Appx3296

Exhibit 44 to Reilly Declaration -
Memo re: Historical Review and Confirmation of Mumps
Virus Potency Formulation Targets in M-M-R®II,
dated April 8, 2011 (MRK-CHA01456760) .......................... Appx3319

**Table of Contents**
**(Continued)**

Page

Exhibit 45 to Reilly Declaration -
Presentation, M-M-R II Mumps End Expiry Trial, produced as
"CDOC presentation November 15-00-draft.ppt"
(MRK-CHA00020396) ......................................................... Appx3321

Exhibit 46 to Reilly Declaration -
Memo re: Stability of Mumps Component in Merck's Live
Virus Vaccines, dated October 5, 2000
(MRK-CHA00587859-62) ...................................................... Appx3419

Exhibit 47 to Reilly Declaration -
Memo re: Stability of Measles, Mumps, and
Rubella Components in Merck's Live Virus Vaccines,
dated October 17, 2000 (MRK-CHA00549487-94) .............. Appx3424

Exhibit 48 to Reilly Declaration -
Email from Katalin G. Abraham to Bonita M. Stankunas,
dated October 5, 2000 (MRK-CHA00284623-9) .................. Appx3433

Exhibit 49 to Reilly Declaration -
Deposition Testimony of Philip S. Bennett,
taken May 24, 2017 ............................................................... Appx3441

**Volume X**
**(Filed Under Seal)**

Exhibit 50 to Reilly Declaration -
Email from Keiko Simon, dated October 2, 2002
(MRK-CHA00615147-74) ...................................................... Appx3501

Exhibit 51 to Reilly Declaration -
Internal Strategy Document regarding M-M-R®II
Regulatory Compliance (MRK-CHA00019225-45) .............. Appx3530

Exhibit 52 to Reilly Declaration -
"Genetic Heterogeneity of Mumps Strains: Potential
Implications in Comparative Neutralization Studies" CBER
Background Information, dated November 1999
(MRK-CHA00020635-42) ...................................................... Appx3552

**Table of Contents**
**(Continued)**

Exhibit 53 to Reilly Declaration -
Draft memo, produced as "Outstanding-
issuesMMRV&MMRII.doc"
(MRK-CHA00198876-91) ..................................................... Appx3561

Exhibit 54 to Reilly Declaration -
Memo re: Mumps neutralization meeting minutes,
dated September 16, 1999 (MRK-CHA00020425-7) ............ Appx3578

Exhibit 55 to Reilly Declaration -
Email from Katalin G. Abraham to Keith D. Chirgwin,
dated February 25, 2000 (MRK-CHA00095143) .................. Appx3582

Exhibit 56 to Reilly Declaration -
Memo re: Team Biologics Close Out – Form FDA 483,
dated October 11, 2000 (MRK-CHA00071265-71) .............. Appx3584

Exhibit 57 to Reilly Declaration -
Email from Dorothy Margolskee, M.D., to
Florian Schodel, M.D., with attachments,
dated February 26, 2001
(MRK-CHA00549510-35) ..................................................... Appx3592

Exhibit 58 to Reilly Declaration -
Email from Joseph F. Heyse with attachments,
dated March 5, 2001
(MRK-CHA00616007-12) ..................................................... Appx3627

Exhibit 59 to Reilly Declaration -
Response to FDA 483 Observation 3
(MRK-CHA00086295-7) ....................................................... Appx3634

Exhibit 60 to Reilly Declaration -
Draft Response to FDA 483 Observation 3
(MRK-CHA00086298-317) ................................................... Appx3638

Exhibit 61 to Reilly Declaration -
Draft Response to FDA 483 Observation 3
(MRK-CHA00562230-41) ..................................................... Appx3659

# Table of Contents
## (Continued)

Exhibit 62 to Reilly Declaration -
Draft Response to FDA 483 Observation 3
(MRK-CHA01440844-64) ..................................................... Appx3672

Exhibit 63 to Reilly Declaration -
Letter from Robert L. McKee, Ph.D. to Steven A. Masiello,
dated March 8, 2001 (MRK-CHA01537603-11) ................... Appx3694

Exhibit 64 to Reilly Declaration -
Deposition Testimony of Dorothy Margolskee, M.D.,
taken April 21, 2017 .............................................................. Appx3704

Exhibit 65 to Reilly Declaration -
Excerpts from Label Claim Compliance M-M-R®II
Peer Review Meeting, dated July 15, 2002
(MRK-CHA00322038-65) ..................................................... Appx3796

Exhibit 66 to Reilly Declaration -
Memo re: Executive Summary-CBER/Merck Meeting
April 4, 2001, dated April 8, 2001
(MRK-CHA01649955-6) ....................................................... Appx3819

Exhibit 67 to Reilly Declaration -
Memo re: Minutes, Meeting with CBER on 4/4/01
Regarding Mumps Stability, dated April 9, 2001
(MRK-CHA00754687-91) ...................................................... Appx3822

Exhibit 68 to Reilly Declaration -
Email from Christopher J. Petroski to Keith D. Chirgwin,
dated January 21, 2002 (MRK-CHA00561350-5) ................. Appx3828

Exhibit 69 to Reilly Declaration -
Presentation, M-M-R®II Mumps Expiry Mumps Potency
Claim in Label (MRK-CHA00334863-8) .............................. Appx3835

Exhibit 70 to Reilly Declaration -
Presentation, Mumps Expiry- Label Claim, produced as
"RMC mumps expiry update.ppt" (MRK-CHA00086318) ... Appx3842

## Table of Contents
### (Continued)

Exhibit 71 to Reilly Declaration -
Memo re: M-M-R®II: Mumps End Expiry label change –
filing strategy, dated August 2, 2001
(MRK-CHA00247149-52) ...................................................... Appx3846

Exhibit 72 to Reilly Declaration -
Email from Keith D. Chirgwin to Manal A. Morsy with
attachment, dated January 22, 2002
(MRK-CHA00019084-5) ...................................................... Appx3851

Exhibit 73 to Reilly Declaration -
Email from Cynthia F. Morrisey, dated September 5, 2002
(MRK-CHA01562819-20) ...................................................... Appx3873

Exhibit 74 to Reilly Declaration -
Email from Roberta L. McKee, Ph.D.,
dated October 31, 2002 (MRK-CHA00094134-5) ................ Appx3876

Exhibit 75 to Reilly Declaration -
Memo, Mumps and Rubella Formulation and Potency Assay
Format Changes to Support Potency through Twenty-four
Month Expiry (MRK-CHA01894982-98) ............................ Appx3879

Exhibit 76 to Reilly Declaration -
Email from Mark S. Galinski to Keiko Simon,
dated August 23, 2004 (MRK-CHA01564065-8) .................. Appx3897

Exhibit 77 to Reilly Declaration -
Email from Alison L. Fisher with attachments,
dated September 20, 2004
(MRK-CHA01574732-8) ...................................................... Appx3902

Exhibit 78 to Reilly Declaration -
Presentation, Accomplishments to Date,
produced as "accomplishments to 5-17-01.ppt"
(MRK-CHA00724288) ......................................................... Appx3910

**Table of Contents**
**(Continued)**

Exhibit 79 to Reilly Declaration -
Draft letter from Roberta L. McKee, Ph.D., to
Michael Angelo, with metadata date of October 17, 2002
(MRK-CHA01649892-3) ...................................................... Appx3917

Exhibit 80 to Reilly Declaration -
Email from Manal Morsy to Keith D. Chirgwin,
dated November 4, 2002 (MRK-CHA00501762-5) .............. Appx3920

Exhibit 81 to Reilly Declaration -
Memo re: Preparations for the Mumps Stability-CBER
discussion, dated March 19, 2001
(MRK-CHA00019430-2) ...................................................... Appx3925

Exhibit 82 to Reilly Declaration -
Email from Philip S. Bennett to Joseph M. Antonello,
dated September 5, 2002 (MRK-CHA00780325-6) .............. Appx3929

Exhibit 83 to Reilly Declaration -
Memo re: Mumps End Expiry study issues,
with Attachment (MRK-CHA00019246-67) ........................ Appx3932

Exhibit 84 to Reilly Declaration -
Draft Presentation, M-M-R II to October 8, 2002 CRRC,
produced as "Draft#1-CRRC 10-08-02 slides.ppt"
(SCHOFIELD_00000201) ...................................................... Appx3955

Exhibit 85 to Reilly Declaration -
Presentation, M-M-R II to October 8, 2002 CRRC,
produced as "CRRC-10-08-02 slides.ppt"
(MRK-CHA00027726) ........................................................ Appx3991
*(Cont'd in Vol XI)*

**Volume XI**
**(Filed Under Seal)**

Exhibit 86 to Reilly Declaration -
Email from Philip S. Bennett with attachment,
dated March 14, 2001 (MRK-CHA00562218-9) ................... Appx4021

**Table of Contents**
(Continued)

Exhibit 87 to Reilly Declaration -
Meeting Agenda, dated March 7, 2002
(MRK-CHA00205854-60) ..................................................... Appx4024

Exhibit 88 to Reilly Declaration -
Email from Manal Morsy, M.D., Ph.D. to Deitra E. Arena,
dated March 27, 2002 (MRK-CHA00064005-12) ................. Appx4032

Exhibit 89 to Reilly Declaration -
Email from Manal Morsy, M.D., Ph.D. to David Krah, M.D.,
dated April 10, 2002 (MRK-CHA00561310-2) ..................... Appx4041

Exhibit 90 to Reilly Declaration -
Spreadsheet for June 10, 2003 Vaccine Assay Committee
meeting (MRK-CHA00440797-811) ..................................... Appx4045

Exhibit 91 to Reilly Declaration -
Minutes of CBER Teleconference, dated December 7, 2001
(MRK-CHA00019434-7) ...................................................... Appx4061

Exhibit 92 to Reilly Declaration -
Draft Summary of Teleconference Notes
(MRK-CHA00024596-9) ...................................................... Appx4066

Exhibit 93 to Reilly Declaration -
Memo re: CBER teleconference (December 7, 2001): Mumps
Inspection results and discussion, dated December 13, 2001
(MRK-CHA00071082-9) ...................................................... Appx4071

Exhibit 94 to Reilly Declaration -
Memo re: Consultation with Dr. William Fairweather
on Vaccine Stability, dated December 14, 2000
(MRK-CHA00590949-58) ..................................................... Appx4080

Exhibit 95 to Reilly Declaration -
Excerpts from Proposed New Stabilizer for M-M-R®II,
dated August 2002 (MRK-CHA01591461-87) ...................... Appx4091

**Table of Contents**
(Continued)

Exhibit 96 to Reilly Declaration -
Email from Manal Morsy, M.D., Ph.D. to Joye L. Bramble,
dated June 11, 2002 (MRK-CHA00494158-61) .................... Appx4117

Exhibit 97 to Reilly Declaration -
M-M-R®11 Defense Action Plan, dated June 1999
(MRK-CHA00285276-96) .................................................... Appx4122

Exhibit 98 to Reilly Declaration -
Memo re: Statement of Interest for ProQuad™ Measles,
mumps, rubella, and varicella virus vaccine live, dated
November 10, 2000 (MRK-CHA00325472-91) .................... Appx4144

Exhibit 99 to Reilly Declaration -
Memo re: Statement of Interest for ProQuad™ Measles,
mumps, rubella, and varicella virus vaccine live,
dated November 10, 2000 (MRK-CHA00671410-28) .......... Appx4165

Exhibit 100 to Reilly Declaration -
Memo re: Minimum Expiry Specification Limit for Mumps
Potency in M-M-R®II, dated July 5, 2001
(MRK-CHA01896349) ........................................................ Appx4185

Exhibit 101 to Reilly Declaration -
Excerpts from Clinical and Regulatory Review Committee
Development Projects, dated October 29, 2002
(MRK-CHA01725276-364) .................................................. Appx4187

Exhibit 102 to Reilly Declaration -
Presentation, MMRII Mumps End Expiry study status &
Regulatory implications, produced as "slides for
GRSRC_MumpsEndExpiry -10-11-02.ppt"
(MRK-CHA00040705) ........................................................ Appx4197

Exhibit 103 to Reilly Declaration -
Presentation, MMRII Mumps End Expiry study status &
Regulatory implications, produced as
"slides for GRSRC -10-11-02.ppt"
(MRK-CHA00094159) ........................................................ Appx4227

**Table of Contents**
**(Continued)**

Exhibit 104 to Reilly Declaration -
Email from Joseph F. Heyse to Keith D. Chirgwin,
dated September 30, 2002 (MRK-CHA01582137-9) ............ Appx4256

Exhibit 105 to Reilly Declaration -
MRL Clinical Study Report, Multicenter Study: A Study of
M-M-R II at Mumps Expiry Potency in Healthy Children 12
to 18 Months of Age (Protocol 007)
(MRK-CHA00224982-26529) ............................................... Appx4260

Exhibit 106 to Reilly Declaration -
Email from Dorothy Margolskee to Keith D. Chirgwin,
dated March 8, 1998 (MRK-CHA00095320-1) ..................... Appx4419

Exhibit 107 to Reilly Declaration -
Slide Deck from M-M-R™ Expiry Investigators Meeting,
dated March 15-16, 1999 (MRK-CHA00017605-12) ........... Appx4422

Exhibit 108 to Reilly Declaration -
Excerpts from Merck Submission to the Department of Justice,
dated April 9, 2012 (MRK-CHA0002549-75) ....................... Appx4431

Exhibit 109 to Reilly Declaration -
Letter from Karen L. Goldethal, M.D. to
Keith Chirgwin, M.D., dated September 8, 1998
(MRK-CHA00001467-9) ...................................................... Appx4459

Exhibit 110 to Reilly Declaration -
Memo re: BB-IND 1016: Summary of discussion with
Dr. Kathryn Carbone and Ms. Luba Vujcic (CBER) regarding
the Mumps neutralization assay, dated February 8, 2000
(MRK-CHA00001255-7) ...................................................... Appx4463

Exhibit 111 to Reilly Declaration -
Memo re: Communication with Dr. Kathryn Carbone (CBER)
on April 12, 200 regarding CBER's meeting (face to face-
March 13, 2000) minutes and the mumps neutralization
and ELISA assays, dated April 12, 2000
(MRK-CHA01927351-5) ...................................................... Appx4467

**Table of Contents**
**(Continued)**

Exhibit 112 to Reilly Declaration -
Response to FDA Request for Information,
dated November 17, 2004 (MRK-CHA00126963-71) .......... Appx4473

Exhibit 113 to Reilly Declaration -
Summary of Findings of Inspection, dated August 6, 2001
(MRK-CHA02021754-61) .................................................... Appx4483

Exhibit 114 to Reilly Declaration -
Meeting Minutes, dated March 14, 2000
(MRK-CHA00001258-61) .................................................... Appx4492

Exhibit 115 to Reilly Declaration -
Deposition Testimony of Emilio Emini, Ph.D.,
taken June 6, 2017 ................................................................. Appx4497
*(Cont'd in Vol XII)*

**Volume XII**
**(Filed Under Seal)**

Exhibit 116 to Reilly Declaration -
Deposition Testimony of Florian Schodel, M.D.,
taken December 22, 2016  ................................................... Appx4592

Exhibit 117 to Reilly Declaration -
Email from Manal Morsy, dated September 13, 2002
(MRK-CHA01386177-82) .................................................... Appx4700

Exhibit 118 to Reilly Declaration -
Email from Keiko Simon with attachments,
dated October 27, 2003
(MRK-CHA00279197-247) ................................................... Appx4707

Exhibit 119 to Reilly Declaration -
Slide Deck from M-M-R™ Expiry Investigators Meeting,
dated March 15-16, 1999 (MRK-CHA01888826-913) ......... Appx4759

**Table of Contents**
**(Continued)**

Exhibit 120 to Reilly Declaration -
Email from Deitra E. Arena with attachments,
dated June 16, 2000
(MRK-CHA00026466-89) ...................................................... Appx4848

Exhibit 121 to Reilly Declaration -
Email from Manal Morsy to Henrietta Ukwu,
dated October 10, 1999 (MRK-CHA01898773-6) ................ Appx4874

Exhibit 122 to Reilly Declaration -
Deposition Testimony of David Krah, M.D.,
taken July 11-12, 2017 ........................................................... Appx4879
*(Cont'd in Vol XIII)*

**Volume XIII**
**(Filed Under Seal)**

Exhibit 123 to Reilly Declaration -
Mumps Neutralization Assay Development
(MRK-CHA00336905-18) ...................................................... Appx5076

Exhibit 124 to Reilly Declaration -
Minutes of CAS Meeting, dated June 20, 2000
(MRK-CHA00209674-8) ........................................................ Appx5091

Exhibit 125 to Reilly Declaration -
Email from Ted L. Staub to George Williams,
dated February 20, 1998 (MRK-CHA00625629-30) ............. Appx5097

Exhibit 126 to Reilly Declaration -
Minutes of Mumps Neutralization Assay Meeting,
dated September 29, 1999 (MRK-CHA00020428-9) ............ Appx5100

Exhibit 127 to Reilly Declaration -
Presentation, MMR II End Expiry Trial,
produced as "MMRII-Neut-fnQPAslides9-27-99.ppt"
(MRK-CHA00025315) ........................................................... Appx5103

**Table of Contents**
(Continued)

Page

Exhibit 128 to Reilly Declaration -
Draft Summary of 8/17/99 meeting by M. Morsy
(MRK-CHA00198869-70) ......................................................Appx5111

Exhibit 129 to Reilly Declaration -
Memo re: Options and proposed path forward for the
Mumps Expiry Trial (MRK-CHA00086292-3) ..................... Appx5114

Exhibit 130 to Reilly Declaration -
Email from Florian P. Schodel to Colleen A. Forsythe,
dated July 7, 1997 (MRK-CHA01648951-6) ........................ Appx5117

Exhibit 131 to Reilly Declaration -
Memo re: Monthly report for August, 2000,
dated August 23, 2000 (MRK-CHA00016632-5) .................. Appx5124

Exhibit 132 to Reilly Declaration -
Virus & Cell Biology Research Procedure
(MRK-CHA00002189-98) .................................................... Appx5129

Exhibit 133 to Reilly Declaration -
Letter from Karen L. Goldenthal, M.D. to Keith D. Chirgwin,
M.D., dated October 26, 1999 (MRK-CHA00761482-4) ...... Appx5140

Exhibit 134 to Reilly Declaration -
Memo re: Filing Strategy for ProQuad,
dated January 31, 2002 (MRK-CHA00818776-81) ............... Appx5144

Exhibit 135 to Reilly Declaration -
Memo re: CBER teleconference (October 16, 2001):
Measles, Mumps and Rubella ELISAs, dated October 19, 2001
(MRK-CHA00331831-6) ...................................................... Appx5151

Exhibit 136 to Reilly Declaration -
Email from Michael L. Dekleva to Alison L. Fisher,
dated October 26, 2004 (MRK-CHA00846454-8) ............... Appx5158

**Table of Contents**
**(Continued)**

Exhibit 137 to Reilly Declaration -
Response to FDA Request for Information,
dated April 13, 2005 (MRK-CHA00000315-60) ................... Appx5164

Exhibit 138 to Reilly Declaration -
Response to FDA Request for Information,
dated November 15, 2006 (MRK-CHA00000393-409) ........ Appx5211

Exhibit 139 to Reilly Declaration -
Response to CBER Comments, dated June 10, 2002
(MRK-KRA00761628-702) ................................................... Appx5229

Exhibit 140 to Reilly Declaration -
Regulatory Liaison FDA Conversation Record,
dated October 5, 2004 (MRK-CHA00846405-15) ................ Appx5305

Exhibit 141 to Reilly Declaration -
Email from Florian Schodel to Michael L. Dekleva,
dated July 3, 2004 (MRK-CHA00791315-9) ........................ Appx5317

Exhibit 142 to Reilly Declaration -
Proposal for Immunogenicity Analyses
(MRK-CHA00561111-2) ...................................................... Appx5323

Exhibit 143 to Reilly Declaration -
Email from David Krah, M.D. to Emilio Emini, Ph.D.,
dated October 9, 2000 (MRK-CHA00065695-703) .............. Appx5326

Exhibit 144 to Reilly Declaration -
Anti-IgG Enhanced Mumps Neutralization Assay-Update,
dated October 24, 2000 (MRK-CHA00026912-8) ................ Appx5336

Exhibit 145 to Reilly Declaration -
Email from Jospeh Antonello to David Krah, M.D.,
dated October 30, 2000 (MRK-CHA00759836-9) ................ Appx5344

Exhibit 146 to Reilly Declaration -
Deposition Testimony of Barbara Kuter,
taken February 9, 2018 ......................................................... Appx5349

**Table of Contents**
**(Continued)**

**Page**

Exhibit 147 to Reilly Declaration -
Email from Steven Rubin to David Krah, M.D.,
dated August 24, 2011 (MRK-CHA00030994-8) .................. Appx5398

Exhibit 148 to Reilly Declaration -
Excerpts from Attachments to 11/18/98 CDOC Meeting
(MRK-CHA01731773-1804) ................................................ Appx5404

Exhibit 149 to Reilly Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
teleconference on methods used for the plaque reduction
neutralization assay, dated February 22, 1999
(MRK-CHA00095050-2) ...................................................... Appx5437

Exhibit 150 to Reilly Declaration -
Extra CDAB Meeting Abstract, dated August 1, 2011
(GSK-MMR-0195819-42) ..................................................... Appx5441

Exhibit 151 to Reilly Declaration -
Performance Characteristics and Validation for Mumps Plaque
Reduction Microneutralization assay
(GSK-MMR-IND-0022195-269) ........................................... Appx5466
*(Cont'd in Vol XIV)*

**Volume XIV**
**(Filed Under Seal)**

Exhibit 152 to Reilly Declaration -
Agenda for CBER Meeting, dated March 13, 2000
(MRK-CHA00016335-43) ..................................................... Appx5542

Exhibit 153 to Reilly Declaration -
Email from David Krah, M.D. to Alan Shaw,
dated August 15, 2000 (MRK-CHA00068546) ..................... Appx5552

Exhibit 154 to Reilly Declaration -
To-Do List, dated August 26, 2000
(MRK-CHA00273243-4) ...................................................... Appx5554

# Table of Contents
## (Continued)

Exhibit 155 to Reilly Declaration -
Deposition Testimony of Stephen Krahling,
taken May 2-3, 2017 ............................................................ Appx5557

Exhibit 156 to Reilly Declaration -
Memo re: Monthly report for May, 2000, dated May 23, 2000
(MRK-CHA01634869-71) ...................................................... Appx5690

Exhibit 157 to Reilly Declaration -
Handwritten Notes in Book 31271, Pages 161-2
(MRK-CHA00064608-9) ........................................................ Appx5694

Exhibit 158 to Reilly Declaration -
Email from David Krah, M.D. to Emilio Emini, Ph.D.,
dated March 30, 2000 (MRK-CHA00336323-5) ................... Appx5697

Exhibit 159 to Reilly Declaration -
Email from Keith D. Chirgwin with attachment,
dated February 26, 2001
(MRK-CHA00549462-72) ...................................................... Appx5701

Exhibit 160 to Reilly Declaration -
Relator Stephen A. Krahling's Responses and Objections
to Merck's Revised First Set of Interrogatories,
dated May 18, 2015 .............................................................. Appx5713

Exhibit 161 to Reilly Declaration -
Deposition Testimony of Joseph Antonello, Ph.D.,
taken August 3, 2017 ............................................................ Appx5780

Exhibit 162 to Reilly Declaration -
Email from Beverly A. Zaber to Cathy W. Wadsworth,
dated August 9, 2001 (MRK-CHA00008835-9) .................... Appx5862

Exhibit 163 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Steve Krahling, dated March 29, 2001
(MRK-CHA00015702-3) ........................................................ Appx5868

**Table of Contents**
**(Continued)**

**Page**

Exhibit 164 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Colleen Barr, dated March 29, 2001
(MRK-CHA00014739-40) ....................................................... Appx5871

Exhibit 165 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Mary Yagodich, dated March 29, 2001
(MRK-CHA00014746-7) ....................................................... Appx5874

Exhibit 166 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Jennifer Kriss, dated March 29, 2001
(MRK-CHA00014829-30) ....................................................... Appx5877

Exhibit 167 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Steve Krahling, dated March 29, 2001
(MRK-CHA00014731-2) ....................................................... Appx5880

Exhibit 168 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Mary Yagodich, dated March 29, 2001
(MRK-CHA00014744-5) ....................................................... Appx5883

Exhibit 169 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Jill DeHaven, dated March 29, 2001
(MRK-CHA00014749-50) ....................................................... Appx5886

Exhibit 170 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Jennifer Kriss, dated March 29, 2001
(MRK-CHA00015719-20) ....................................................... Appx5889

Exhibit 171 to Reilly Declaration -
Memo re: Study KM-248 Phase III-Questionable ELISA
Results in the Comparator Group, dated November 1, 2001
(MRK-CHA00760670-2) ....................................................... Appx5892

**Table of Contents**
**(Continued)**

Exhibit 172 to Reilly Declaration -
Deposition Testimony of Joan L. Wlochowski,
taken June 13-14, 2017 ......................................................... Appx5896
*(Cont'd in Vol XV)*

**Volume XV**
**(Filed Under Seal)**

Exhibit 173 to Reilly Declaration -
Outline for HR Discussion (RELATOR_00000273) ............. Appx6040

Exhibit 174 to Reilly Declaration -
Expert Report of Philip Stark, Ph.D.,
dated March 12, 2018 ......................................................... Appx6042

Exhibit 175 to Reilly Declaration -
Supplemental Expert Report of Philip Stark, Ph.D.,
dated October 16, 2018 ......................................................... Appx6072

Exhibit 176 to Reilly Declaration -
Email from Jospeh Antonello with attachments,
dated March 20, 2002
(MRK-CHA00544820-47) ..................................................... Appx6079

Exhibit 177 to Reilly Declaration -
Excerpts from journal of David Krah, M.D.
(MRK-CHA00489903-490080) ............................................ Appx6133

Exhibit 178 to Reilly Declaration -
Handwritten Log (RELATOR_00001025-6) ......................... Appx6136

Exhibit 179 to Reilly Declaration -
Excerpts from journal of David Krah, M.D.
(MRK-CHA00490592-91038) ............................................... Appx6139

Exhibit 180 to Reilly Declaration -
Memo re: Review of mumps-AIGENT neutralization data,
dated August 1, 2001 (MRK-CHA00026864) ....................... Appx6144

## Table of Contents
(Continued)

Exhibit 181 to Reilly Declaration -
Email from Karen R. McKenney, dated August 7, 2001
(MRK-CHA00052249-53) ..................................................... Appx6146

Exhibit 182 to Reilly Declaration -
General Correspondence and Submission to FDA,
dated February 4, 2002 (MRK-CHA00000410-78) ............... Appx6152

Exhibit 183 to Reilly Declaration -
Assay Log (MRK-CHA00050333-42) .................................. Appx6222

Exhibit 184 to Reilly Declaration -
Handwritten Notes regarding Discarded Plates
(MRK-CHA00055013) ......................................................... Appx6233

Exhibit 185 to Reilly Declaration -
Memo re: Validation of the Anti-IgG Enhanced Mumps Wild
Type Plaque Reduction Neutralization Assay (Virus and Cell
Biology Research Procedure #874.3489), dated
February 27, 2001 (MRK-CHA00016988-17023) ................ Appx6235

Exhibit 186 to Reilly Declaration -
Response to FDA Request for Information,
dated March 12, 2001 (MRK-CHA00017036-115) ............... Appx6272

Exhibit 187 to Reilly Declaration -
Biological Product Deviation Report Form,
dated April 20, 2001 (MRK-CHA00754233-8) ..................... Appx6353

Exhibit 188 to Reilly Declaration -
Background Document: M-M-R®II Protocol 007-Mumps End
Expiry Study: AIGENT Assay Issues and Impact on Study
Criteria (MRK-CHA00615152-74) ....................................... Appx6360

Exhibit 189 to Reilly Declaration -
Supplemental Biologics License Application,
dated January 29, 2004 (MRK-CHA00000032-139) ............. Appx6384

**Table of Contents**
**(Continued)**

Exhibit 190 to Reilly Declaration -
Information Amendment-Clinical, dated November 30, 2001
(MRK-CHA00126233-66) ..................................................... Appx6493
*(Cont'd in Vol XVI)*

**Volume XVI**
**(Filed Under Seal)**

Exhibit 191 to Reilly Declaration -
Email from Mandie Lyon to David Krah, M.D.,
dated August 19, 2004 (MRK-CHA00337141-57) ................ Appx6528

Exhibit 192 to Reilly Declaration -
Email from Barbara J. Kuter to Barbara J. Kuter
with attachment, dated August 5, 2009
(MRK-CHA00121080-82) ..................................................... Appx6546

Exhibit 193 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of October 24, 2011 ..................... Appx6550

Exhibit 194 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of September 26, 2012 ................. Appx6555

Exhibit 195 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of October 17, 2012 ..................... Appx6559

Exhibit 196 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of December 22, 2012 ................. Appx6563

Exhibit 197 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of July 3, 2013 ............................ Appx6567

# Table of Contents
## (Continued)

**Page**

Exhibit 198 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of October 7, 2015 ........................ Appx6571

Exhibit 199 to Reilly Declaration -
CinicalTrials.gov "Background" webpage,
last accessed October 14, 2019 .............................................. Appx6575

Exhibit 200 to Reilly Declaration -
EMEA Scientific Discussion Paper re: M-M-RVAXPRO
and M-M-RII, downloaded October 10, 2019 ........................ Appx6580

Exhibit 201 to Reilly Declaration -
Letter from Dr. Gudrun V. Wangenheim to
D. Wonnacott, Ph.D. (MRK-CHA00626021-2) .................... Appx6616

Exhibit 202 to Reilly Declaration -
Letter from Karen L. Goldenthal, M.D. to Alison Fisher,
Ph.D., dated October 17, 2005 (MRK-CHA00560257-8) ..... Appx6619

Exhibit 203 to Reilly Declaration -
Amendment to Supplemental Biologics License Application
Response to FDA Request for Information,
dated June 5, 2007, with Attachments
(MRK-CHA00000368-82) ...................................................... Appx6622

Exhibit 204 to Reilly Declaration -
Email from Margaret Kanters to Donna Zacholski,
dated January 30, 2009 (MRK-CHA01300697-9) ................. Appx6638

Exhibit 205 to Reilly Declaration -
Approval Letter from FDA, dated December 6, 2007
(MRK-CHA01519087-8) ....................................................... Appx6642

Exhibit 206 to Reilly Declaration -
Memo re: Review of Merck's 7068-214, dated July 27, 2004
(MRK-CHA00846451-3) ....................................................... Appx6645

**Table of Contents**
(Continued)

Exhibit 207 to Reilly Declaration -
ProQuad™ Original Application, dated August 3, 2004
(MRK-CHA00158320-71) ...................................................... Appx6649

Exhibit 208 to Reilly Declaration -
Deposition Testimony of Michael Dekleva,
taken February 9, 2017  ......................................................... Appx6687

Exhibit 209 to Reilly Declaration -
Original Biologics License Application, dated August 27, 2004
(MRK-CHA00157572-3) ........................................................ Appx6760

Exhibit 210 to Reilly Declaration -
Email from Louis H. Washington to Michael L. Dekleva,
dated June 10, 2004 (MRK-CHA00821967-9) ...................... Appx6763

Exhibit 211 to Reilly Declaration -
Information Amendment-Clinical, dated November 27, 2001
(MRK-CHA00152449-67) ...................................................... Appx6767

Exhibit 212 to Reilly Declaration -
Excerpts from Merck's Responses and Objections to
Plaintiffs' First Set of Interrogatories,
dated August 16, 2017 ........................................................... Appx6787

Exhibit 213 to Reilly Declaration -
Excerpts from Merck's Response to Request for Information,
dated May 4, 2005 (MRK-CHA00846087-6404) .................. Appx6798

Exhibit 214 to Reilly Declaration -
Approval Letter, dated September 6, 2005
(MRK-CHA00761865-89) ...................................................... Appx6804

Exhibit 215 to Reilly Declaration -
Supplemental Biologics License Application,
dated June 30, 2004 (MRK-CHA00137854-5) ...................... Appx6830

# Table of Contents
## (Continued)

**Page**

Exhibit 216 to Reilly Declaration -
Excerpts from A Comparison of the Safety, Tolerability, and
Immunogenicity of M-M-R™II Manufactured With
Recombinant Human Albumin (rHA) Versus M-M-R™II
Manufactured with Pooled-Donor Human Serum Albumin
(HSA) in Healthy Children 12 to 18 Months of Age
Protocol 009 (MRK-CHA00140056-41340) ........................ Appx6833

Exhibit 217 to Reilly Declaration -
Excerpts from Measles, Mumps, and Rubella Virus Vaccine,
Live-Replacement of Human Serum Albumin With
Recombinant Albumin (MRK-CHA00138137-72) ............... Appx6908

Exhibit 218 to Reilly Declaration -
Excerpts from Response to FDA Request for Information,
dated June 28, 2004 (MRK-CHA00124554-4690) ................ Appx6931

Exhibit 219 to Reilly Declaration -
Approval Letter, dated August 31, 2005
(MRK-CHA00141909-22) ..................................................... Appx6979

Exhibit 220 to Reilly Declaration -
M-M-R®II Label (April 1999)
(MRK-CHA00757072-6) ....................................................... Appx6994

Exhibit 221 to Reilly Declaration -
M-M-R®II Label (MRK-CHA00757108-11) ........................ Appx7000
*(Cont'd in Vol XVII)*

## Volume XVII
### (Filed Under Seal)

Exhibit 222 to Reilly Declaration -
M-M-R®II Label (2004) (MRK-CHA00757100-3) .............. Appx7005

Exhibit 223 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449260-70) ....................... Appx7010

# Table of Contents
## (Continued)

**Page**

Exhibit 224 to Reilly Declaration -
Current M-M-R®II Label (last revised: 09/2019),
downloaded on October 22, 2019 ........................................... Appx7022

Exhibit 225 to Reilly Declaration -
M-M-R®II Label (1990) (MRK-CHA00757060-3) .............. Appx7034

Exhibit 226 to Reilly Declaration -
Summary of Revisions of M-M-R®II Label
(MRK-CHA00137876-7) ....................................................... Appx7039

Exhibit 227 to Reilly Declaration -
Protocol 006 Clinical Study Report Synopsis,
dated August 16, 2004 (MRK-CHA01580213-19) ................ Appx7042

Exhibit 228 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449029-40) ........................ Appx7050

Exhibit 229 to Reilly Declaration -
Description of ProQuad® (MRK-CHA00177125-36) .......... Appx7063

Exhibit 230 to Reilly Declaration -
ProQuad® Label (MRK-CHA01449181-2) .......................... Appx7076

Exhibit 231 to Reilly Declaration -
Current ProQuad Label (last revised: 09/2019),
downloaded on October 22, 2019 ......................................... Appx7079

Exhibit 232 to Reilly Declaration -
Excerpts from Merck's Responses and Objections to Relators'
First Set of Interrogatories, dated April 9, 2015 .................... Appx7105

Exhibit 233 to Reilly Declaration -
Expert Report of Yonatan Grad, M.D., Ph.D.,
dated June 12, 2018 ............................................................... Appx7114

Exhibit 234 to Reilly Declaration -
Excerpts from "Summary of Notifiable Diseases-United
States, 2006," *MMWR*, 2008:55(53) ...................................... Appx7169

**Table of Contents**
(Continued)

Exhibit 235 to Reilly Declaration -
Excerpts from "Summary of Notifiable Diseases-United
States, 2009," *MMWR*, 2009:58(53) ..................................... Appx7173

Exhibit 236 to Reilly Declaration -
Excerpts from a "Summary of Notifiable Diseases-United
States, 2010," *MMWR*, 2012:59(53) ..................................... Appx7177

Exhibit 237 to Reilly Declaration -
Excerpts from "Summary of Notifiable Diseases-United
States, 2012," *MMWR*, 2014:61(53) ..................................... Appx7181

Exhibit 238 to Reilly Declaration -
Excerpts from "Summary of Notifiable Infectious
Diseases and Conditions-United States, 2013,"
*MMWR*, 2015:62(53) ........................................................... Appx7185

Exhibit 239 to Reilly Declaration -
Excerpts from "Summary of Notifiable Infectious
Diseases and Conditions-United States, 2014,"
*MMWR*, 2016:63(54) ........................................................... Appx7189

Exhibit 240 to Reilly Declaration -
Excerpts from "Summary of Notifiable Infectious
Diseases and Conditions-United States, 2015,"
*MMWR*, 2017:64(53) ........................................................... Appx7194

Exhibit 241 to Reilly Declaration -
National Notifiable Infectious Diseases and Conditions:
United States TABLE 2j. Reported cases of notifiable
diseases, by region and reporting area-United States and
U.S. territories, 2016 ............................................................ Appx7199

Exhibit 242 to Reilly Declaration -
National Notifiable Infectious Diseases and Conditions:
United States TABLE 2j. Reported cases of notifiable
diseases, by region and reporting area-United States and
U.S. territories, 2017 ............................................................ Appx7202

**Table of Contents**
(Continued)

Exhibit 243 to Reilly Declaration -
Nationally Notifiable Infectious Diseases and Conditions,
United States: Weekly Tables; TABLE 1y. Weekly cases of
notifiable diseases, United States, U.S. Territories, and
Non-U.S. Residents weeks ending September 14, 2019
(week 37) .............................................................................. Appx7205

Exhibit 244 to Reilly Declaration -
"Decreased humoral immunity to mumps in young adults
immunized with MMR vaccine in childhood," Rasheed, *et al.*,
PNAS, dated September 17, 2019 116 (38) ........................... Appx7209

Exhibit 245 to Reilly Declaration -
Deposition Testimony of William L. Atkinson, M.D., MPH,
taken January 30, 2019 ......................................................... Appx7216

Exhibit 246 to Reilly Declaration -
Email from Don Latner to William Bellini,
dated July 29, 2010 (BIAOHE000446-53) ............................ Appx7270

Exhibit 247 to Reilly Declaration -
Deposition Testimony of Yonatan Grad, M.D., Ph.D.,
taken October 30, 2018 ......................................................... Appx7279

Exhibit 248 to Reilly Declaration -
Press Briefing Transcripts from CDC,
dated April 19, 2006 ............................................................. Appx7342

Exhibit 249 to Reilly Declaration -
Deposition Testimony of Alan W. Sims,
taken October 12, 2017 ......................................................... Appx7349

Exhibit 250 to Reilly Declaration -
Deposition Testimony of Katalin Abraham,
taken May 18, 2017 .............................................................. Appx7403
*(Cont'd in Vol XVIII)*

**Table of Contents**
**(Continued)**

**Page**

**Volume XVIII**
**(Filed Under Seal)**

Exhibit 251 to Reilly Declaration -
Email from Eric T. Skjeveland to Christopher J. Petroski,
dated June 7, 2012 (MRK-CHA00955961) ........................... Appx7504

Exhibit 252 to Reilly Declaration -
Expert Report of Jonathan Temte, M.D., Ph.D.,
dated June 12, 2018 ............................................................... Appx7506

Exhibit 253 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449243-53) ....................... Appx7556

Exhibit 254 to Reilly Declaration -
Transcription of an MVX (voice mail) from Manal A. Morsy
to Henrietta Ukwu and Keith D. Chirgwin
(MRK-CHA00020421-2) ....................................................... Appx7568

Exhibit 255 to Reilly Declaration -
CDC Presentation, "Mumps-What Happened in 2006?
National Perspective," by Gustavo Dayan,
dated March 5, 2007
(MRK-CHA01372603-33) ..................................................... Appx7571

Exhibit 256 to Reilly Declaration -
"Commentary: Mumps Vaccines: Do We Need A New One?"
by Stanely A. Plotkin, M.D., accepted for publication
December 4, 2012 ................................................................. Appx7603

Exhibit 257 to Reilly Declaration -
"Mumps: A Pain in the Neck," by Stanley A. Plotkin, M.D.,
accepted for publication April 19, 2018 ................................ Appx7606

Exhibit 258 to Reilly Declaration -
"Emerging Mumps Infection," by Rubin, *et al.*,
accepted for publication April 12, 2016 ................................ Appx7609

# Table of Contents
## (Continued)

Exhibit 259 to Reilly Declaration -
"Measles and mumps outbreaks in the United States: Think
globally, vaccinate locally," by Jennifer A. Whitaker,
*Vaccine* 32 (2014) ................................................................. Appx7613

Exhibit 260 to Reilly Declaration -
"Remembering Mumps," by Latner, *et al.*, *PLOS Pathogens*,
published May 7, 2015 ........................................................... Appx7616

Exhibit 261 to Reilly Declaration -
"The resurgence of mumps and pertussis," by Martine Sabbe
and Corinne Vandermeulen accepted for publication
October 22, 2015 ................................................................... Appx7621

Exhibit 262 to Reilly Declaration -
"Mumps Outbreaks in Vaccinated Populations: Are Available
Mumps Vaccines Effective Enough to Prevent Outbreaks?"
by Dayan, *et al.*, accepted for publication May 20, 2008 ...... Appx7631

Exhibit 263 to Reilly Declaration -
Shapiro Deposition Exhibit 25, Program Announcement for
the Department of Defense's Defense Health Program for
Funding Opportunity No. W81XWH-17-PRMRP-CTA ........ Appx7642

Exhibit 264 to Reilly Declaration -
Excerpts from Notice of Grant Award, issued May 7, 2012
(RELATOR_00004392-478) .................................................. Appx7712

Exhibit 265 to Reilly Declaration -
Expert Report of William P. Nichols, dated June 12, 2018 .... Appx7743

Exhibit 266 to Reilly Declaration -
Solicitation Number 2003-N-00734,
issued December 19, 2002 by the CDC ................................. Appx7779

Exhibit 267 to Reilly Declaration -
Solicitation Number 2005-N-01706,
issued January 4, 2005 by the CDC ...................................... Appx7826

# Table of Contents
## (Continued)

**Page**

Exhibit 268 to Reilly Declaration -
Solicitation Number 2007-N-09211,
issued January 23, 2007 by the CDC ..................................... Appx7872

Exhibit 269 to Reilly Declaration -
Solicitation Number 2010-N-11873,
issued January 26, 2010 by the CDC ..................................... Appx7923

Exhibit 270 to Reilly Declaration -
Solicitation Number 2011-N-13043,
issued December 21, 2010 by the CDC ................................. Appx7956

Exhibit 271 to Reilly Declaration -
Solicitation Number 2012-N-14228,
issued December 13, 2011 by the CDC ................................. Appx7987
*(Cont'd in Vol XIX)*

## Volume XIX
### (Filed Under Seal)

Exhibit 272 to Reilly Declaration -
Solicitation Number 2013-N-14972,
issued January 22, 2013 by the CDC ..................................... Appx8013

Exhibit 273 to Reilly Declaration -
Solicitation Number 2014-N-15784,
issued January 24, 2014 by the CDC ..................................... Appx8040

Exhibit 274 to Reilly Declaration -
Solicitation Number 2015-N-16850,
issued January 16, 2015 by the CDC ..................................... Appx8067

Exhibit 275 to Reilly Declaration -
Solicitation Number 2016-N-17693,
issued January, 4, 2015 by the CDC ..................................... Appx8098

Exhibit 276 to Reilly Declaration -
Solicitation Number 2017-N-18099,
issued January 21, 2017 by the CDC ..................................... Appx8127

**Table of Contents**
(Continued)

Exhibit 277 to Reilly Declaration -
Solicitation Number 2018-N-67769,
issued January 10, 2018 by the CDC ..................................... Appx8156

Exhibit 278 to Reilly Declaration -
Solicitation Number 75D301-19-R-67848,
issued January 7, 2019 by the CDC ...................................... Appx8183

Exhibit 279 to Reilly Declaration -
Summary of GSK-CDC MMR/V Vaccine Meeting
(GSK-MMR-0030570-2) ....................................................... Appx8212

Exhibit 280 to Reilly Declaration -
Charter of the Advisory Committee on Immunization
Practices, filed April 1, 2018 .................................................. Appx8216

Exhibit 281 to Reilly Declaration -
Relators' Expert Report of Dr. Thomas McGuire,
dated March 13, 2018 ........................................................... Appx8222

Exhibit 282 to Reilly Declaration - [1]
Transactional data, "1998 Lot Assignment.xlsx"
(MRK-CHA02143443) ........................................................... Appx8369

Exhibit 283 to Reilly Declaration -
Transactional data, "1999 Lot Assignment.xlsx"
(MRK-CHA02143444) ........................................................... Appx8371

Exhibit 284 to Reilly Declaration -
Transactional data, "2000 Lot Assignment.xlsx"
(MRK-CHA02143445) ........................................................... Appx8373

Exhibit 285 to Reilly Declaration -
Transactional data, "2001 Lot Assignment.xlsx"
(MRK-CHA02143446) ........................................................... Appx8375

---

[1] Exhibits 282 through 299 to the Reilly Declaration have been omitted by consent of the parties.

**Table of Contents**
**(Continued)**

**Page**

Exhibit 286 to Reilly Declaration -
Transactional data, "2002 Lot Assignment.xlsx"
(MRK-CHA02143447) ......................................................... Appx8377

Exhibit 287 to Reilly Declaration -
Transactional data, "2003 Lot Assignment.xlsx"
(MRK-CHA02143448) ......................................................... Appx8379

Exhibit 288 to Reilly Declaration -
Transactional data, "2004 Lot Assignment.xlsx"
(MRK-CHA02143449) ......................................................... Appx8381

Exhibit 289 to Reilly Declaration -
Transactional data, "2005 Lot Assignment.xlsx"
(MRK-CHA02143450) ......................................................... Appx8383

Exhibit 290 to Reilly Declaration -
Transactional data, "2006 Lot Assignment.xlsx"
(MRK-CHA02143451) ......................................................... Appx8385

Exhibit 291 to Reilly Declaration -
Transactional data, "2007 Lot Assignment.xlsx"
(MRK-CHA02143452) . ......................................................... Appx8387

Exhibit 292 to Reilly Declaration -
Transactional data, "2008 Lot Assignment.xlsx"
(MRK-CHA02143453) ......................................................... Appx8389

Exhibit 293 to Reilly Declaration -
Transactional data, "2009 Lot Assignment.xlsx"
(MRK-CHA02143454) ......................................................... Appx8391

Exhibit 294 to Reilly Declaration -
Transactional data, "2010 Lot Assignment.xlsx"
(MRK-CHA02143455) ......................................................... Appx8393

Exhibit 295 to Reilly Declaration -
Transactional data, "2011 Lot Assignment.xlsx"
(MRK-CHA02143456) ......................................................... Appx8395

# Table of Contents
## (Continued)

Exhibit 296 to Reilly Declaration -
Transactional data, "2012 Lot Assignment.xlsx"
(MRK-CHA02143457) ......................................................... Appx8397

Exhibit 297 to Reilly Declaration -
Transactional data, "2013 Lot Assignment.xlsx"
(MRK-CHA02143458) ......................................................... Appx8399

Exhibit 298 to Reilly Declaration -
Transactional data, "2014 Lot Assignment.xlsx"
(MRK-CHA02143459) ......................................................... Appx8401

Exhibit 299 to Reilly Declaration -
Transactional data, "2015 Lot Assignment.xlsx"
(MRK-CHA02143460) ......................................................... Appx8403

Exhibit 300 to Reilly Declaration -
Letter from Lisa C. Dykstra to Counsel,
dated April 17, 2017 ............................................................. Appx8405

Exhibit 301 to Reilly Declaration -
Letter from Stan Bernard, M.D., M.B.A. to Kim Haupt,
dated November 9, 2008 (MRK-CHA02063339-45) ............ Appx8407

Exhibit 302 to Reilly Declaration -
Merck's 2004 Vaccine for Children Contract with the CDC
(MRK-CHA01371280-310) .................................................. Appx8415

Exhibit 303 to Reilly Declaration -
Merck's 2003 Vaccine for Children Contract with the CDC
(MRK-CHA01371311-40) ..................................................... Appx8447

Exhibit 304 to Reilly Declaration -
Merck's 2005 Vaccine for Children Contract with the CDC
(MRK-CHA01371341-72) ..................................................... Appx8478
*(Cont'd in Vol XX)*

**Table of Contents**
**(Continued)**

**Page**

**Volume XX**
**(Filed Under Seal)**

Exhibit 305 to Reilly Declaration -
Merck's 2010 Vaccine for Children Contract with the CDC
(MRK-CHA01371373-97) ..................................................... Appx8511

Exhibit 306 to Reilly Declaration -
Merck's 2012 Vaccine for Children Contract with the CDC
(MRK-CHA01371398-421) ................................................... Appx8537

Exhibit 307 to Reilly Declaration -
Merck's 2013 Vaccine for Children Contract with the CDC
(MRK-CHA01371422-44) ..................................................... Appx8562

Exhibit 308 to Reilly Declaration -
Merck's 2014 Vaccine for Adults Contract with the CDC
(MRK-CHA01371445-72) ..................................................... Appx8586

Exhibit 309 to Reilly Declaration -
Merck's 2014 Vaccine for Children Contract with the CDC
(MRK-CHA01371473-96) ..................................................... Appx8615

Exhibit 310 to Reilly Declaration -
Merck's 2011 Vaccine for Children Contract with the CDC
(MRK-CHA01371497-518) ................................................... Appx8640

Exhibit 311 to Reilly Declaration -
Merck's 2011 Vaccine for Adults Contract with the CDC
(MRK-CHA01371519-47) ..................................................... Appx8663

Exhibit 312 to Reilly Declaration -
Merck's 2013 Vaccine for Adults Contract with the CDC
(MRK-CHA01371548-71) ..................................................... Appx8693

Exhibit 313 to Reilly Declaration -
Merck's 2012 Vaccine for Adults Contract with the CDC
(MRK-CHA01371572-603) ................................................... Appx8718

**Table of Contents**
(Continued)

Exhibit 314 to Reilly Declaration -
Merck's 2007 Vaccine for Children Contract with the CDC
(MRK-CHA01371604-23) ..................................................... Appx8751

Exhibit 315 to Reilly Declaration -
Merck's 2006 Vaccine for Children Contract with the CDC
(MRK-CHA01371624-55) ..................................................... Appx8772

Exhibit 316 to Reilly Declaration -
Merck's 2001 Vaccine for Children Contract with the CDC
(MRK-CHA01371656-92) ..................................................... Appx8805

Exhibit 317 to Reilly Declaration -
Merck's 2000 Vaccine for Children Contract with the CDC
(MRK-CHA01371693-727) ..................................................... Appx8843

Exhibit 318 to Reilly Declaration -
Merck's 1998 Vaccine for Children Contract with the CDC
(MRK-CHA01371728-50) ..................................................... Appx8879

Exhibit 319 to Reilly Declaration -
Merck's 1999 Vaccine for Children Contract with the CDC
(MRK-CHA01371751-84) ..................................................... Appx8903

Exhibit 320 to Reilly Declaration -
Merck's 2002 Vaccine for Children Contract with the CDC
(MRK-CHA01371785-816) ..................................................... Appx8938

Exhibit 321 to Reilly Declaration -
Merck's 2008 Vaccine for Children Contract with the CDC
(MRK-CHA01371817-840) ..................................................... Appx8971

Exhibit 322 to Reilly Declaration -
Merck's 2009 Vaccine for Adults Contract with the CDC
(MRK-CHA01371841-879) ..................................................... Appx8996
*(Cont'd in Vol XXI)*

# Table of Contents
## (Continued)

**Page**

**Volume XXI**
**(Filed Under Seal)**

Exhibit 323 to Reilly Declaration -
Merck's 2009 Vaccine for Children Contract with the CDC
(MRK-CHA01371880-1900) .................................................. Appx9036

Exhibit 324 to Reilly Declaration -
Merck's 2010 Vaccine for Adults Contract with the CDC
(MRK-CHA01371901-33) .................................................... Appx9058

Exhibit 325 to Reilly Declaration -
Merck's 2015 Vaccine for Adults Contract with the CDC
(MRK-CHA01371934-61) .................................................... Appx9092

Exhibit 326 to Reilly Declaration -
Merck's 2016 Vaccine for Children Contract with the CDC
(MRK-CHA01371962-89) .................................................... Appx9121

Exhibit 327 to Reilly Declaration -
Merck's 2010 Vaccine for Adults Contract with the CDC
(MRK-CHA01371990-2020) .................................................. Appx9150

Exhibit 328 to Reilly Declaration -
Merck's 2016 Vaccine for Adults Contract with the CDC
(MRK-CHA01372021-44) .................................................... Appx9182

Exhibit 329 to Reilly Declaration -
Merck's 2015 Vaccine for Children Contract with the CDC
(MRK-CHA01372045-72) .................................................... Appx9207

Exhibit 330 to Reilly Declaration -
Invoice, dated March 14, 2012 (MRK-CHA01371253) ........ Appx9236

Exhibit 331 to Reilly Declaration -
Invoice, dated January 3, 2011(MRK-CHA01371256) ......... Appx9238

Exhibit 332 to Reilly Declaration -
Invoice, dated January 6, 2014 (MRK-CHA01371258) ........ Appx9240

# Table of Contents
## (Continued)

**Page**

Exhibit 333 to Reilly Declaration -
Invoice, dated May 20, 2010 (MRK-CHA01371259) ........... Appx9242

Exhibit 334 to Reilly Declaration -
Invoice, dated January 14, 2013 (MRK-CHA01371261) ...... Appx9244

Exhibit 335 to Reilly Declaration -
Invoice, dated February 2, 2011 (MRK-CHA01371262) ...... Appx9246

Exhibit 336 to Reilly Declaration -
Invoice, dated November 17, 2010 (MRK-CHA01371263) . Appx9248

Exhibit 337 to Reilly Declaration -
Invoice, dated November 28, 2012 (MRK-CHA01371264) . Appx9250

Exhibit 338 to Reilly Declaration -
Invoice, dated March 20, 2013 (MRK-CHA01371268-69) ... Appx9252

Exhibit 339 to Reilly Declaration -
Invoice, dated January 22, 2016 (MRK-CHA01371274) ...... Appx9255

Exhibit 340 to Reilly Declaration -
Invoice, dated February 26, 2014 (MRK-CHA01371278) .... Appx9257

Exhibit 341 to Reilly Declaration -
Invoice, dated February 4, 2015 (MRK-CHA01371279) ...... Appx9259

Exhibit 342 to Reilly Declaration -
FDA webpage, "National Drug Code Directory," accessible
online at https://www.fda.gov/drugs/drug-approvals-and-
databases/national-drug-code-directory, last accessed
October 1, 2019 .................................................................. Appx9261

Exhibit 343 to Reilly Declaration -
Email from Jonathan Hartzel to Joseph M. Antonello,
dated October 18, 2005 (MRK-CHA00759061-4) ................ Appx9268

# Table of Contents
## (Continued)

Exhibit 344 to Reilly Declaration -
Email from Joseph M. Antonello to Timothy L. Shofield,
dated May 5, 2005 (MRK-CHA00649638-40) ...................... Appx9273

Exhibit 345 to Reilly Declaration -
Letter from Lisa C. Dykstra to Counsel,
dated September 13, 2018 ...................................................... Appx9277

Exhibit 346 to Reilly Declaration -
Letter from Lisa C. Dykstra to the Honorable
Lynne A. Sitarski, dated June 15, 2015 .................................. Appx9289

Exhibit 347 to Reilly Declaration -
Deposition Testimony of Peter Calcott, Ph.D.,
taken September 7, 2018 ....................................................... Appx9307

Exhibit 348 to Reilly Declaration -
Email from Mandie Lyon, dated May 5, 2006
(MRK-CHA00069026-36) ...................................................... Appx9385

Exhibit 349 to Reilly Declaration -
Presentation, M-M-R II End Expiry, produced as "12-14
CDOC presentation.ppt" (MRK-CHA00021319) ................. Appx9397

Exhibit 350 to Reilly Declaration -
Department of Justice Press Release, dated May 13, 2013 .... Appx9410

Exhibit 351 to Reilly Declaration -
Department of Justice Press Release,
dated October 26, 2010 ........................................................ Appx9414

Exhibit 352 to Reilly Declaration -
Department of Justice Press Release,
dated January 12, 2017 ......................................................... Appx9417

Exhibit 353 to Reilly Declaration -
Department of Justice Press Release,
dated September 24, 2014 ..................................................... Appx9420

# Table of Contents
## (Continued)

Exhibit 354 to Reilly Declaration -
Department of Justice Press Release, dated April 15, 2009 ... Appx9423

Exhibit 355 to Reilly Declaration -
Rule 30(b)(6) Deposition topics, dated December 13, 2016
(Stannard Ex. 3) .................................................... Appx9426

Exhibit 356 to Reilly Declaration -
Department of Justice Press Release,
dated August 8, 2014 ............................................. Appx9443

Exhibit 357 to Reilly Declaration -
FDA Form 483, dated August 6, 2001
(MRK-CHA00000547) .......................................... Appx9446

Exhibit 358 to Reilly Declaration -
Deposition Testimony of Robert Malone, M.D.,
taken September 14, 2018 ...................................... Appx9448
*(Cont'd in Vol XXII)*

## Volume XXII
### (Filed Under Seal)

Exhibit 359 to Reilly Declaration -
Deposition Testimony of Dr. Manal Morsy,
taken August 5, 2016 ............................................. Appx9511

Exhibit 360 to Reilly Declaration -
Atkinson Deposition Exhibit 6, "Recommendations of
the Immunization Practices Advisory Committee Measles
Prevention: Supplementary Statement,"
dated January 13, 1989 .......................................... Appx9621

Declaration of Lisa C. Dykstra in Support of
Defendant's Motions for Summary Judgment,
executed October 25, 2019 (Doc. 295) ................... Appx9625

Exhibit 1 to Dykstra Declaration -
Stephen A. Krahling's Resume (MRK-KRA00331426-7) .... Appx9656

**Table of Contents**
**(Continued)**

Exhibit 2 to Dykstra Declaration -
Excerpts from Deposition Testimony of Stephen Krahling,
taken May 2, 2017 .................................................................. Appx9659

Exhibit 3 to Dykstra Declaration -
Merck Employee Initialization Form for Stephen Krahling
(MRK-KRA00582401) .......................................................... Appx9680

Exhibit 4 to Dykstra Declaration -
Stephen Krahling's November 30, 2001 Separation Agreement
(MRK-KRA00582394-7) ........................................................ Appx9682

Exhibit 5 to Dykstra Declaration -
Excerpts from Relator Stephen A. Krahling's Responses
and Objections to Merck's First Set of Interrogatories,
dated January 28, 2015 .......................................................... Appx9687

Exhibit 6 to Dykstra Declaration -
Excerpts from Relator Stephen A. Krahling's Responses
and Objections to Merck's Revised First Set of Interrogatories,
dated May 18, 2015 ............................................................... Appx9716

Exhibit 7 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Stephen Krahling, taken May 3, 2017 .................................... Appx9783

Exhibit 8 to Dykstra Declaration -
Stephen Krahling's handwritten notes,
dated October 1, 2001 (RELATOR_00001044-5) ................... Appx9792

Exhibit 9 to Dykstra Declaration -
FDA's Summary of Findings, dated August 6, 2001
(RELATOR_00004086-94) ..................................................... Appx9795

Exhibit 10 to Dykstra Declaration -
Merck FDA Inspection Records, dated August 6, 2001
(MRK-KRA01631009-254) ..................................................... Appx9805
*(Cont'd in Vol XXIII)*

**Table of Contents**
**(Continued)**

**Volume XXIII**
**(Filed Under Seal)**

Exhibit 11 to Dykstra Declaration -
Excerpts from the Expert Report of
D. Bruce Burlington M.D.  .................................................... Appx10052

Exhibit 12 to Dykstra Declaration -
Merck's Virus and Cell Biology Organization Chart
(RELATOR_00000902-3) .................................................... Appx10070

Exhibit 13 to Dykstra Declaration -
Excerpts from Relator Stephen A. Krahling's Responses
and Objections to Defendant Merck's Requests for
Admission, dated April 4, 2016  ........................................... Appx10073

Exhibit 14 to Dykstra Declaration -
FDA Form 483 Frequently Asked Questions ....................... Appx10101

Exhibit 15 to Dykstra Declaration -
FDA Re-Inspection Memorandum, dated August 10, 2001
(MRK-KRA00071241-5) .................................................... Appx10104

Exhibit 16 to Dykstra Declaration -
CBER Merck Communications Mumps Expiry,
dated August 8, 2002 (MRK-KRA00623049-51) ............... Appx10110

Exhibit 17 to Dykstra Declaration -
Email Communication with Attachments regarding FDA
Inspection-IND 1016, dated September 14, 2001
(MRK-KRA00063885-8) .................................................... Appx10114

Exhibit 18 to Dykstra Declaration -
FDA Telephone Conversation Memorandum,
dated September 17, 2001 (MRK-KRA00019107)  ............. Appx10119

Exhibit 19 to Dykstra Declaration -
FDA Teleconference-IND 1016 Inspection Follow up,
dated September 25, 2001 (MRK-KRA00071300-1) .......... Appx10121

**Table of Contents**
(Continued)

Exhibit 20 to Dykstra Declaration -
CBER December 7, 2001 Teleconference: Mumps Inspection
results and discussions, dated December 13, 2001
(MRK-KRA00019640-6) ..................................................... Appx10124

Exhibit 21 to Dykstra Declaration -
General Correspondence to FDA in response to CBER
Comments, dated February 4, 2002
(MRK-KRA00025847-916) ................................................. Appx10132

Exhibit 22 to Dykstra Declaration -
General Correspondence to FDA regarding April 18, 2002
Teleconference, dated April 2002
(MRK-KRA00337265-72) ................................................... Appx10203

Exhibit 23 to Dykstra Declaration -
BB-IND 1016 Memorandum regarding Summary of
Discussion with CBER on March 22, 2002 regarding
acceptability of mumps PRN assay data,
dated March 23, 2002 (MRK-KRA00009042) .................... Appx10212

Exhibit 24 to Dykstra Declaration -
Offer Letter to Stephen A. Krahling, dated October 24, 2000
(RELATOR_00001058-60) ................................................. Appx10214

Exhibit 25 to Dykstra Declaration -
Correspondence from Stephen A. Krahling to
Emilio A. Emini, Ph.D., dated April 8, 2001
(RELATOR_00000328-31) ................................................. Appx10218

Exhibit 26 to Dykstra Declaration -
Email communication from Stephen Krahling to
Alan Shaw, dated July 17, 2001 (MRK-KRA00002243) .... Appx10223

Exhibit 27 to Dykstra Declaration -
Email communication from Stephen Krahling to Alan Shaw,
dated September 25, 2001 (RELATOR_00000745) ............ Appx10225

**Table of Contents**
(Continued)

Exhibit 28 to Dykstra Declaration -
Email communications between Stephen Krahling and
Alan Shaw, dated September 27-28, 2001
(RELATOR_00000747) ...................................................... Appx10227

Exhibit 29 to Dykstra Declaration -
Letter from Emilio A. Emini, Ph.D. to Stephen Krahling,
dated October 15, 2001, (RELATOR_00001100-3) ............ Appx10229

Exhibit 30 to Dykstra Declaration -
Letter from Tonia Torquato to Alexis Pinto,
dated October 22, 2001 (MRK-KRA00002033-5) .............. Appx10234

Exhibit 31 to Dykstra Declaration -
Letter from Alexis Pinto to Tonia Torquato,
dated October 19, 2001 (MRK-KRA00002036-9) .............. Appx10238

Exhibit 32 to Dykstra Declaration -
Letter from Tonia Torquato to Alexis Pinto,
dated October 26, 2001 (MRK-KRA00002028-9) .............. Appx10243

Exhibit 33 to Dykstra Declaration -
Letter from Alexis Pinto to Tonia Torquato,
dated October 26, 2001 (MRK-KRA00002017-25) ............ Appx10246

Exhibit 34 to Dykstra Declaration -
Letter from Tonia Torquato to Alexis Pinto,
dated October 29, 2001 (MRK-KRA00002013-16) ............ Appx10256

Exhibit 35 to Dykstra Declaration -
Letter from Axel Johnson to Tonia Torquato,
dated November 26, 2001 (RELATOR_00001086) ............ Appx10261

Exhibit 36 to Dykstra Declaration -
Stephen Krahling Pay Stubs (RELATOR_00001061-7) ...... Appx10263

Exhibit 37 to Dykstra Declaration -
Letter from Axel Johnson to Tonia Torquato,
dated December 20, 2001 (RELATOR_00001090) ............. Appx10271

# Table of Contents
## (Continued)

**Page**

Exhibit 38 to Dykstra Declaration -
CDC Vaccines for Children Program web page
"About VFC," last reviewed on February 18, 2016 ............. Appx10273

Exhibit 39 to Dykstra Declaration -
Advisory Committee on Immunization Practices Charter
approved March 27, 2018 ................................................... Appx10277

Exhibit 40 to Dykstra Declaration -
Excerpts from Expert Report of William P. Nichols ............ Appx10283

Exhibit 41 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Mark Pallansch,
Ph.D., taken October 13, 2017 ............................................ Appx10292

Exhibit 42 to Dykstra Declaration -
1971 MMR Product License (MRK-KRA01972538) ......... Appx10307

Exhibit 43 to Dykstra Declaration -
1995 MMR Product License (MRK-KRA01676252) ......... Appx10309

Exhibit 44 to Dykstra Declaration -
Merck's Establishment License (MRK-KRA01676250) ..... Appx10311

Exhibit 45 to Dykstra Declaration -
Advisory Committee on Immunization Practices Vaccines for
Children Program-Resolution No. 10/17-3, Vaccines to
Prevent Measles, Mumps, Rubella and Varicella,
dated October 25, 2017 ....................................................... Appx10313

Exhibit 46 to Dykstra Declaration -
Vaccines for Children Program-Resolution No. 6/06-1,
Vaccines included in the VFC Program,
dated June 29, 2006 ............................................................ Appx10317

Exhibit 47 to Dykstra Declaration -
Advisory Committee on Immunization Practices, Policies
and Procedures, dated December 2018 ................................ Appx10319

**Table of Contents**
(Continued)

Exhibit 48 to Dykstra Declaration -
"Recommendation of the Advisory Committee on
Immunization Practices for Use of a Third Dose of Mumps
Virus Containing Vaccine in Persons at Increased Risk for
Mumps During Outbreak," *MMWR*,
dated January 12, 2018 ........................................................ Appx10345

Exhibit 49 to Dykstra Declaration -
Excerpts from the Expert Report of
William L. Atkinson M.D., MPH, dated June 12, 2018 ....... Appx10355

Exhibit 50 to Dykstra Declaration -
National Center for Immunization and Respiratory Diseases
(CVG) Fact Sheet .............................................................. Appx10365

Exhibit 51 to Dykstra Declaration -
"Prevention of Measles, Rubella, Congenital Rubella
Syndrome, and Mumps," *MMWR*, dated June 14, 2013 ...... Appx10380

Exhibit 52 to Dykstra Declaration -
CDC's "Measles, Mumps, and Rubella (MMR) Vaccination:
What Everyone Should Know," last reviewed
March 28, 2019 .................................................................. Appx10421

Exhibit 53 to Dykstra Declaration -
"Measles, Mumps and Rubella-Vaccine Use and Strategies for
Elimination of Measles, Rubella and Congenital Rubella
Syndrome and Control of Mumps: Recommendations of the
Advisory Committee on Immunization Practices,"
*MMWR*, dated May 22, 1998 ............................................... Appx10428

Exhibit 54 to Dykstra Declaration -
Merck's 1998 Vaccine for Children Contract with the CDC
(MRK-KRA01371728-50) .................................................. Appx10473

Exhibit 55 to Dykstra Declaration -
Merck's 1999 Vaccine for Children Contract with the CDC
(MRK-KRA01371751-84) .................................................. Appx10497
*(Cont'd in Vol XXIV)*

**Table of Contents**
**(Continued)**

**Volume XXIV**
**(Filed Under Seal)**

Exhibit 56 to Dykstra Declaration -
Merck's 2000 Vaccine for Children Contract with the CDC
(MRK-KRA01371693-1727) ................................................ Appx10532

Exhibit 57 to Dykstra Declaration -
Merck's 2001 Vaccine for Children Contract with the CDC
(MRK-KRA01371656-92) ................................................ Appx10568

Exhibit 58 to Dykstra Declaration -
Merck's 2002 Vaccine for Children Contract with the CDC
(MRK-KRA01371785-816) ................................................ Appx10606

Exhibit 59 to Dykstra Declaration -
Merck's 2003 Vaccine for Children Contract with the CDC
(MRK-KRA01371311-340) ................................................ Appx10639

Exhibit 60 to Dykstra Declaration -
Merck's 2004 Vaccine for Children Contract with the CDC
(MRK-KRA01371280-310) ................................................ Appx10670

Exhibit 61 to Dykstra Declaration -
Merck's 2005 Vaccine for Children Contract with the CDC
(MRK-KRA01371341-72) ................................................ Appx10702

Exhibit 62 to Dykstra Declaration -
Merck's 2006 Vaccine for Children Contract with the CDC
(MRK-KRA01371624-55) ................................................ Appx10735

Exhibit 63 to Dykstra Declaration -
Merck's 2007 Vaccine for Children Contract with the CDC
(MRK-KRA01371604-23) ................................................ Appx10768

Exhibit 64 to Dykstra Declaration -
Merck's 2008 Vaccine for Children Contract with the CDC
(MRK-KRA01371817-40) ................................................ Appx10789

**Table of Contents**
**(Continued)**

**Page**

Exhibit 65 to Dykstra Declaration -
Merck's 2009 Vaccine for Children Contract with the CDC
(MRK-KRA01371880-1900) ............................................... Appx10814

Exhibit 66 to Dykstra Declaration -
Merck's 2010 Vaccine for Children Contract with the CDC
(MRK-KRA01371373-97) .................................................. Appx10836

Exhibit 67 to Dykstra Declaration -
Merck's 2011 Vaccine for Children Contract with the CDC
(MRK-KRA01371497-518) ................................................. Appx10862

Exhibit 68 to Dykstra Declaration -
Merck's 2012 Vaccine for Children Contract with the CDC
(MRK-KRA01371398-421) ................................................. Appx10885

Exhibit 69 to Dykstra Declaration -
Merck's 2013 Vaccine for Children Contract with the CDC
(MRK-KRA01371422-44) .................................................. Appx10910

Exhibit 70 to Dykstra Declaration -
Merck's 2014 Vaccine for Children Contract with the CDC
(MRK-KRA01371473-96) .................................................. Appx10934

Exhibit 71 to Dykstra Declaration -
Merck's 2015 Vaccine for Children Contract with the CDC
(MRK-KRA01372045-72) .................................................. Appx10959

Exhibit 72 to Dykstra Declaration -
Merck's 2016 Vaccine for Children Contract with the CDC
(MRK-KRA01371962-89) .................................................. Appx10988
*(Cont'd in Vol XXV)*

**Volume XXV**
**(Filed Under Seal)**

Exhibit 73 to Dykstra Declaration -
CDC Vaccine Price List for Vaccines for Children Program
as of April 6, 2001 ............................................................ Appx11017

**Table of Contents**
(Continued)

Exhibit 74 to Dykstra Declaration -
Letter from Katherine Norris to Lisa C. Dykstra, dated
November 24, 2015 (MRK-KRA01373392-1373393) ........ Appx11022

Exhibit 75 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Alan Sims,
taken October 12, 2017 ......................................................... Appx11025

Exhibit 76 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Michele Taylor,
taken May 9, 2017 ................................................................. Appx11045

Exhibit 77 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Colleen Duffy,
taken December 12, 2016 ...................................................... Appx11052

Exhibit 78 to Dykstra Declaration -
Letter from Lisa Dykstra to CDC regarding FOIA
request, dated May 18, 2015 ................................................. Appx11058

Exhibit 79 to Dykstra Declaration -
ACIP's Vaccine Recommendations and Guidelines-MMR
Vaccine Recommendations, last reviewed
November 21, 2014 .............................................................. Appx11067

Exhibit 80 to Dykstra Declaration -
FDA's Vaccines Licensed for Use in the United States ........ Appx11069

Exhibit 81 to Dykstra Declaration -
CDC's Mumps Vaccination, last reviewed
March 8, 2019 ...................................................................... Appx11077

Exhibit 82 to Dykstra Declaration -
Excerpts from the Expert Report of
Thomas G. McGuire Ph.D., dated March 13, 2018 ............. Appx11081

Exhibit 83 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Thomas G. McGuire, taken July 2, 2018 ............................. Appx11086

**Table of Contents**
(Continued)

Exhibit 84 to Dykstra Declaration -
Relator Joan Wlochowski's Responses and Objections
to Merck's Revised First Set of Interrogatories,
dated May 20, 2015 ............................................................. Appx11091

Exhibit 85 to Dykstra Declaration -
Relator Joan Wlochowski's Responses and Objections
to Defendant Merck's Request for Admission,
dated April 6, 2016 .............................................................Appx11116

Exhibit 86 to Dykstra Declaration -
"Live, Attenuated Mumps-Virus Vaccine," *New England
Journal of Medicine*, by R. Weibel, *et al.*,
dated February 2, 1967 ........................................................Appx11144

Exhibit 87 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to Alison Fisher, Ph.D.,
dated October 17, 2005 (MRK-KRA00000479-80) .............Appx11152

Exhibit 88 to Dykstra Declaration -
Response to FDA Request for Information,
dated November 15, 2006 (MRK-KRA00000393-409) .......Appx11155

Exhibit 89 to Dykstra Declaration -
Email from Zak Johns to Marlene Koury,
dated February 23, 2017 ......................................................Appx11173

Exhibit 90 to Dykstra Declaration -
Excerpts from the Expert Report of
Ann M. Arvin, M.D., dated June 11, 2018 ...........................Appx11176

Exhibit 91 to Dykstra Declaration -
Excerpts from the Expert Report of
Dipti Gulati, M.S., D. Phil. .................................................Appx11183

Exhibit 92 to Dykstra Declaration -
Excerpts from the Expert Report of Anna Durbin, M.D.,
dated June 14, 2018 .............................................................Appx11194

**Table of Contents**
(Continued)

Exhibit 93 to Dykstra Declaration -
FDA's Guidance for Industry for the Evaluation of
Combination Vaccines for Preventable Diseases: Production,
Testing and Clinical Studies, dated April 1997 .................... Appx11210

Exhibit 94 to Dykstra Declaration -
CDC's How Flu Vaccine Effectiveness and Efficacy is
Measured, last reviewed January 29, 2016 .......................... Appx11234

Exhibit 95 to Dykstra Declaration -
Excerpts from the CDC's Manual for the Surveillance of
Vaccine-Preventable Diseases ............................................. Appx11243

Exhibit 96 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Joseph Antonello, taken August 3, 2017 .............................. Appx11253

Exhibit 97 to Dykstra Declaration -
"Summary of Notifiable Diseases-United States," 2005,
*MMWR*, dated March 30, 2007 ........................................... Appx11258

Exhibit 98 to Dykstra Declaration -
CDC's Mumps Cases and Outbreaks, last reviewed
September 17, 2019 ........................................................... Appx11361

Exhibit 99 to Dykstra Declaration -
CDC's Mumps: For Healthcare Providers, last reviewed
March 15, 2019 ................................................................. Appx11364

Exhibit 100 to Dykstra Declaration -
CDC's Principles of Epidemiology in Public Health Practice,
Third Edition: An Introduction to Applied Epidemiology
and Biostatistics, last reviewed May 18, 2012 .................... Appx11369

Exhibit 101 to Dykstra Declaration -
CDC's Flu Vaccine Effectiveness: Questions and Answers for
Health Professionals, last updated November 27, 2013 ...... Appx11373

**Table of Contents**
(Continued)

Exhibit 102 to Dykstra Declaration -
"Mumps Virus," by Cherry, *et al.*, *Viral Infections*,
(7th Edition, Chapter 180) .................................................. Appx11383

Exhibit 103 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
David Kessler, M.D., taken September 28, 2018 ................. Appx11399

Exhibit 104 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Anna Durbin, M.D., taken October 8, 2018 ......................... Appx11402

Exhibit 105 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Emilio Emini, Ph.D., taken June 6, 2017 ............................. Appx11406

Exhibit 106 to Dykstra Declaration -
January 1998 *Curriculum Vitae* of David L. Krah, M.D.
(MRK-KRA00000695-702) ................................................ Appx11415

Exhibit 107 to Dykstra Declaration -
Excerpts from the Expert Report of
David A. Kessler, M.D. ...................................................... Appx11424

Exhibit 108 to Dykstra Declaration -
FDA Lot Release ............................................................... Appx11429

Exhibit 109 to Dykstra Declaration -
Drugs@FDA Instructions: Health Information ................... Appx11434

Exhibit 110 to Dykstra Declaration -
FDA's Vaccine Safety Questions and Answers ................... Appx11440

Exhibit 111 to Dykstra Declaration -
Excerpts from the Expert Report of
Gary Freed M.D., MPH ...................................................... Appx11447

**Table of Contents**
**(Continued)**

Exhibit 112 to Dykstra Declaration -
"Vaccine Manufacturing," by Philip Gomez
and James Robinson ............................................................ Appx11450

Exhibit 113 to Dykstra Declaration -
Informational Amendment: Clinical, dated September 15, 2011
(GSK-MMR-IND-0022162-3) ............................................. Appx11461

Exhibit 114 to Dykstra Declaration -
Mumps Serology Strategy in Support of Phase III
Development of Priorix®
(GSK-MMR-IND-0022180-6) ............................................. Appx11464

Exhibit 115 to Dykstra Declaration -
Fax from Yolanda Stewart to Donna Boyce,
dated April 25, 2012 (GSK-MMR-IND-0029256-63) ......... Appx11472

Exhibit 116 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Dipti Gulati, M.S., D. Phil., taken December 5, 2018 ......... Appx11481

Exhibit 117 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Amy Keegan,
taken February 9, 2018 ....................................................... Appx11485

Exhibit 118 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
David Krah, M.D., taken July 11, 2017 ............................... Appx11488

Exhibit 119 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
David Krah, M.D., taken July 12, 2017 ............................... Appx11493

Exhibit 120 to Dykstra Declaration -
Excerpts from the Expert Report of
Marcela Pasetti, Ph.D. ........................................................ Appx11497
*(Cont'd in Vol XXVI)*

**Table of Contents**
(Continued)

**Volume XXVI**
**(Filed Under Seal)**

Exhibit 121 to Dykstra Declaration -
M-M-R®II Current Label .................................................. Appx11507

Exhibit 122 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Cynthia Morrisey, taken July 27, 2017 ............................... Appx11519

Exhibit 123 to Dykstra Declaration -
Supplemental Biologics License Application,
dated January 29, 2004 (MRK-KRA00000032-139) ........... Appx11522

Exhibit 124 to Dykstra Declaration -
Amendment to Supplemental Biologics License
Application Response to FDA Request for Information,
dated June 5, 2007, with Attachments
(MRK-KRA00000368-82) .................................................. Appx11631

Exhibit 125 to Dykstra Declaration -
Approval Letter, dated December 8, 2007
(MRK-KRA00000383-4) .................................................... Appx11647

Exhibit 126 to Dykstra Declaration -
Letter from Paul Richman, Ph.D. to Alison Fisher, Ph.D.,
dated May 18, 2007 (MRK-KRA00000385-6) .................... Appx11650

Exhibit 127 to Dykstra Declaration -
Response to Form FDA 483, dated August 20, 2001
(MRK-KRA00000481-539) ................................................ Appx11653

Exhibit 128 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
teleconference regarding clarification of CBER's comments on
the Mumps Expiry trial, dated November 10, 1998
(MRK-KRA00001215-7) .................................................... Appx11713

**Table of Contents**
(Continued)

Exhibit 129 to Dykstra Declaration -
Memo re: Mumps End Expiry trial; November 29th, 2000
CBER teleconference, dated November 29, 2000
(MRK-KRA00001218-21) ..................................................... Appx11717

Exhibit 130 to Dykstra Declaration -
Letter from Manal Morsy, M.D., Ph.D., to Luba Vujcic,
dated December 1, 1999 (MRK-KRA00001222-30) ........... Appx11722

Exhibit 131 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to
Manal Morsy, M.D., Ph.D., dated October 27, 2000
(MRK-KRA00001231-6) ..................................................... Appx11732

Exhibit 132 to Dykstra Declaration -
General Correspondence to FDA, dated November 16, 2000
(MRK-KRA00001237-48) ..................................................... Appx11739

Exhibit 133 to Dykstra Declaration -
Memo re: MMRV (BB-IND 7068): Summary of Pre-Phase III
teleconference discussion on 01/31/00 with CBER,
dated January 31, 2000 (MRK-KRA00001249-52) ............. Appx11752

Exhibit 134 to Dykstra Declaration -
Teleconference Minutes with CBER, dated February 19, 1999
(MRK-KRA00001253-4) ..................................................... Appx11757

Exhibit 135 to Dykstra Declaration -
Memo re: BB-IND 1016: Summary of discussion with Dr.
Kathryn Carbone and Ms. Luba Vujcic (CBER) regarding the
Mumps neutralization assay, dated February 8, 2000
(MRK-KRA00001255-57) ..................................................... Appx11760

Exhibit 136 to Dykstra Declaration -
Meeting Minutes, dated March 14, 2000
(MRK-KRA00001258-61) ..................................................... Appx11764

**Table of Contents**
**(Continued)**

Exhibit 137 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II) and BB-IND 7068
(MMRV); Summary of face-to-face meeting discussion
(3/13/00) with CBER regarding wild type mumps
neutralization and ELISA assays, dated March 13, 2000
(MRK-KRA00001262-5) .................................................... Appx11768

Exhibit 138 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to Keith Chirgwin, M.D.,
dated August 30, 1999 (MRK-KRA00001266-9) ................ Appx11773

Exhibit 139 to Dykstra Declaration -
Letter from M. Carolyn Hardegree, M.D. to
Keith Chirgwin, M.D., dated September 8, 1998
(MRK-KRA00001467-9) .................................................... Appx11778

Exhibit 140 to Dykstra Declaration -
Response to FDA Request for Information,
dated December 30, 1999 (MRK-KRA00001470-1924) ..... Appx11782
***(Cont'd in Vol XXVII)***

**Volume XXVII**
**(Filed Under Seal)**

Exhibit 141 to Dykstra Declaration -
Letter from Loris McVittie, Ph.D. to
Roberta L. McKee, Ph.D., dated August 20, 1999
(MRK-KRA00018614-9) .................................................... Appx12238

Exhibit 142 to Dykstra Declaration -
Memo re: Teleconference with CBER: Mumps End
Expiry trial-BB IND 1016, dated November 8, 2000
(MRK-KRA00025161-2) .................................................... Appx12245

Exhibit 143 to Dykstra Declaration -
FDA Warning Letter, dated February 9, 2001
(PUBLIC0000666-670) ...................................................... Appx12248

**Table of Contents**
(Continued)

Exhibit 144 to Dykstra Declaration -
Memo re: M-M-R®II (BB-IND 1016); Summary of telephone
discussions on 11/23/99 and 12-06-99 with Ms. Luba Vujcic
(CBER) regarding the neutralization assay results and impact
on Equivalence Margin and lower bound criterion of the
M-M-R®II End Expiry Study hypothesis,
dated December 23, 1999 (MRK-KRA00025713-24) ......... Appx12254

Exhibit 145 to Dykstra Declaration -
Memo re: BB-IND 1016: Summary of discussion with
Ms. Luba Vujcic (CBER) regarding the Mumps neutralization
assay, dated January 5, 2000 (MRK-KRA00048855) ......... Appx12267

Exhibit 146 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
teleconference on methods used for the plaque reduction
neutralization assay, dated February 22, 2019
(MRK-KRA00062710-3) .................................................... Appx12269

Exhibit 147 to Dykstra Declaration -
Meeting Minutes with CBER, dated March 13, 2000
(MRK-KRA00062845-53) .................................................. Appx12274

Exhibit 148 to Dykstra Declaration -
Email from David M. Wonnacott to Roberta L. McKee, Ph.D.,
dated May 12, 1999 (MRK-KRA00094960) ....................... Appx12284

Exhibit 149 to Dykstra Declaration -
Email from Katalin G. Abraham to Joye L. Bramble,
dated December 3, 1998 (MRK-KRA00095063) ................ Appx12286

Exhibit 150 to Dykstra Declaration -
Memo re: Teleconference with Dr. Norman Baylor, CBER,
Regarding Meeting on Expiry Titers for M-M-R®II,
dated December 3, 1998 (MRK-KRA00095064) ................ Appx12288

**Table of Contents**
**(Continued)**

Exhibit 151 to Dykstra Declaration -
Memo re: Teleconference with Norman Baylor, CBER,
on 11/16/98, Regarding VARIVAX® and M-M-R®II,
dated November 16, 1998 (MRK-KRA00095065) ............. Appx12290

Exhibit 152 to Dykstra Declaration -
Email from Katalin G. Abraham to Keith Chirgwin, M.D.,
dated October 5, 1998 (MRK-KRA00095142) ................... Appx12292

Exhibit 153 to Dykstra Declaration -
ProQuad™ Original Application, dated August 3, 2004
(MRK-KRA00158320-526) ................................................. Appx12294
*(Cont'd in Vol XXVIII)*

**Volume XXVIII**
**(Filed Under Seal)**

Exhibit 154 to Dykstra Declaration -
Memo re: CBER teleconference (October 16, 2001): Measles,
Mumps and Rubella ELISAs, dated October 19, 2001
(MRK-KRA00201389-91) ................................................. Appx12502

Exhibit 155 to Dykstra Declaration -
Clinical Study Report for the Protocol 007 Study
(MRK-KRA00224982-6529) ............................................. Appx12506
*(Cont'd in Vols XXIX, XXX, and XXXI)*

**Volume XXXI**
**(Filed Under Seal)**

Exhibit 156 to Dykstra Declaration -
Memo re: Supporting Documents for Stephen Krahling,
dated October 10, 2000 (MRK-KRA00331424-33) ............ Appx14055

Exhibit 157 to Dykstra Declaration -
Neutralization Assay Draft faxed on February 19, 1999
(MRK-KRA00336634-6) ................................................... Appx14066

# Table of Contents
## (Continued)

Exhibit 158 to Dykstra Declaration -
Letter from Paul G. Richman, Ph.D. to Alison Fisher, Ph.D.,
dated May 18, 2007 (MRK-KRA00570703-5) .................... Appx14070

Exhibit 159 to Dykstra Declaration -
Response to FDA Request for Information,
dated February 2, 2001 (MRK-KRA00622078-273) ........... Appx14074

Exhibit 160 to Dykstra Declaration -
Response to FDA Request for Information,
dated August 1, 2002 (MRK-KRA00624279-87) ................ Appx14271

Exhibit 161 to Dykstra Declaration -
General Correspondence to FDA, dated June 23, 1998
(MRK-KRA00624345-4446) ............................................... Appx14281

Exhibit 162 to Dykstra Declaration -
Response to FDA Request for Information,
dated February 5, 1999 (MRK-KRA00624448-4589) ......... Appx14384
***(Cont'd in Vol XXXII)***

## Volume XXXII
## (Filed Under Seal)

Exhibit 163 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
telephone conversations on 9/24/98 regarding the revised
M-M-R®II draft label and on 9/29/98 regarding the mumps
expiry protocol, dated September 29, 1998
(MRK-KRA00636592-3) .................................................... Appx14527

Exhibit 164 to Dykstra Declaration -
Biological Product Deviation Report Form,
dated April 20, 2001 (MRK-KRA00754233-8) ................... Appx14530

Exhibit 165 to Dykstra Declaration -
M-M-R®II Label (March 1995)
(MRK-KRA00757060-3) .................................................... Appx14537

# Table of Contents
## (Continued)

Exhibit 166 to Dykstra Declaration -
M-M-R®II Label (April 1999)
(MRK-KRA00757072-6) ..................................................... Appx14542

Exhibit 167 to Dykstra Declaration -
M-M-R®II Label (2004) (MRK-KRA00757100-3) ............ Appx14548

Exhibit 168 to Dykstra Declaration -
Response to FDA Request for Information,
dated November 17, 2004 (MRK-KRA00761530-8) .......... Appx14553

Exhibit 169 to Dykstra Declaration -
Response to CBER Comments, dated June 10, 2002
(MRK-KRA00761628-702) ................................................. Appx14563

Exhibit 170 to Dykstra Declaration -
Email from Charlotte Shay to Michael L. Dekleva,
dated June 30, 2004 (MRK-KRA00791508-10) .................. Appx14639

Exhibit 171 to Dykstra Declaration -
Meeting Minutes from a MMRV Pre-Phase III meeting
with CBER, dated February 16, 2000
(MRK-KRA00821856-61) ................................................. Appx14643

Exhibit 172 to Dykstra Declaration -
Approval Letter, dated September 6, 2005
(MRK-KRA00821906-9) ..................................................... Appx14650

Exhibit 173 to Dykstra Declaration -
Regulatory Liaison FDA Conversation Record,
dated October 5, 2004 (MRK-KRA00846405-15) .............. Appx14655

Exhibit 174 to Dykstra Declaration -
CBER's Clinical Review of Studies submitted in support of
Licensure of ProQuad™ (MRK-KRA01285010-272) ........ Appx14667

Exhibit 175 to Dykstra Declaration -
FDA report on the release of MMR,
dated February 23, 2016 (MRK-KRA01447562) ................ Appx14931

**Table of Contents**
(Continued)

Exhibit 176 to Dykstra Declaration -
Standard Operating Procedure-Preparation, Review and
Shipment of Biological Product Protocols and Samples to
CBER, dated September 23, 2015
(MRK-KRA01448181-207) ................................................ Appx14933

Exhibit 177 to Dykstra Declaration -
Letter from Roberta L. McKee, Ph.D. to Steven Masiello,
dated March 8, 2001 (MRK-KRA01537603-11) ................. Appx14961

Exhibit 178 to Dykstra Declaration -
Letter from Roberta L. McKee, Ph.D. regarding a proposal for
changes to release specifications, dated December 10, 1998
(MRK-KRA01622125) ....................................................... Appx14971

Exhibit 179 to Dykstra Declaration -
Prior Approval Supplement from Roberta L. McKee, Ph.D.
to William Egan, Ph.D., dated June 18, 1999
(MRK-KRA01622463-5) .................................................... Appx14973

Exhibit 180 to Dykstra Declaration -
Minutes from a December 8, 1998 Meeting,
dated January 8, 1999 (MRK-KRA01622468-72) ............... Appx14977

Exhibit 181 to Dykstra Declaration -
Letter from Katalin Abraham to Dr. Suresh Rastogi
(MRK-KRA01622552) ....................................................... Appx14983

Exhibit 182 to Dykstra Declaration -
Letter from David Wonnacott Ph.D. to Dr. Suresh Rastogi,
dated December 16, 1998 (MRK-KRA01622600-1) ........... Appx14985

Exhibit 183 to Dykstra Declaration -
Prior Approval Supplement from Roberta L. McKee, Ph.D. to
William Egan, Ph.D., dated September 15, 1999
(MRK-KRA01622711-2) .................................................... Appx14988

**Table of Contents**
**(Continued)**

Exhibit 184 to Dykstra Declaration -
Attachment 4 to the Prior Approval Supplement from
Roberta L. McKee, Ph.D. to William Egan, Ph.D.,
dated September 15, 1999 (MRK-KRA01622778-9) .......... Appx14991

Exhibit 185 to Dykstra Declaration -
Letter from William Egan, Ph.D. to Roberta L. McKee, Ph.D.,
dated August 20, 1999 (MRK-KRA01624909-10) .............. Appx14994

Exhibit 186 to Dykstra Declaration -
Letter from Barry D. Garfinkle, Ph.D. to Carolyn Hardegree,
M.D., dated January 28, 1998
(MRK-KRA01625508-5639) ............................................. Appx14997
*(Cont'd in Vol XXXIII)*

**Volume XXXIII**
**(Filed Under Seal)**

Exhibit 187 to Dykstra Declaration -
Letter from Peter Patriarca, M.D. to Roberta L. McKee, Ph.D.,
dated February 11, 2000 (MRK-KRA0187091-2) .............. Appx15130

Exhibit 188 to Dykstra Declaration -
MMR Statistical Analysis of Potency on Stability,
dated October 24, 2000 (MRK-KRA01897103-7271) ........ Appx15133

Exhibit 189 to Dykstra Declaration -
Letter from David Wonnacott, Ph.D. to Carolyn Hardegree,
M.D., dated December 5, 1997 (MRK-KRA01972451) ..... Appx15303

Exhibit 190 to Dykstra Declaration -
Various Correspondence between the FDA and Merck,
dated 1969 to 1994 (MRK-KRA01972464-546) ................ Appx15305

Exhibit 191 to Dykstra Declaration -
Various Email Correspondence in 1997
(MRK-KRA01972735-58) .................................................. Appx15389

# Table of Contents
## (Continued)

**Page**

Exhibit 192 to Dykstra Declaration -
Vaccine & Biological Stability Protocol,
dated September 6, 2016 (MRK-KRA02139917-25) .......... Appx15414

Exhibit 193 to Dykstra Declaration -
Chapter "Mumps Vaccine," by Steven Rubin and
Stanley Plotkin ..................................................... Appx15424

Exhibit 194 to Dykstra Declaration -
Stephen Krahling's 2001 Correspondence
(RELATOR_00000736-66) ................................... Appx15453

Exhibit 195 to Dykstra Declaration -
Letter from Axel Johnson to Tonia Torquato,
dated November 30, 2001 (RELATOR_00001036-43) ....... Appx15485

Exhibit 196 to Dykstra Declaration -
Stephen Krahling's 2001 Correspondence and Papers
(RELATOR_00001071-90) .................................. Appx15494
*(Cont'd in Vol XXXIV)*

**Volume XXXIV**
**(Filed Under Seal)**

Exhibit 197 to Dykstra Declaration -
Chapter "Mumps Vaccine," by Steven Rubin,
in Plotkin's Vaccines, 7th edition (2018) ............................ Appx15515

Exhibit 198 to Dykstra Declaration -
Letter from Kevin Malone to Kathleen Hardway,
dated July 31, 2018 ............................................. Appx15548

Exhibit 199 to Dykstra Declaration -
"Live, Attenuated Mumps Virus Vaccine," *New England*
*Journal of Medicine*, by R. Weibel, *et al.*,
dated February 2, 1967 ....................................... Appx15556

**Table of Contents**
(Continued)

Exhibit 200 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Luwy Musey, M.D., taken October 7, 2016 ......................... Appx15565

Exhibit 201 to Dykstra Declaration -
Rule 30(b)(6) Deposition Topics, dated December 13, 2016
(Stannard Ex. 3) ................................................................. Appx15569

Exhibit 202 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Mark Stannard,
taken December 13, 2016 .................................................... Appx15585

Exhibit 203 to Dykstra Declaration -
*Curriculum Vitae* of Joan L. Wlochowski ........................... Appx15595

Exhibit 204 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Joan L. Wlochowski, taken June 13, 2017 ........................... Appx15597

Exhibit 205 to Dykstra Declaration -
FDA/CDC Submission, dated October 23, 2019 ................. Appx15603

Exhibit 206 to Dykstra Declaration -
Excerpts of Defendant Merck's Responses and Objections to
Relators' Third Set of Requests for Admission,
dated August 16, 2017 ........................................................ Appx15719

Exhibit 207 to Dykstra Declaration -
"Vaccine Impact: Benefits for human health,"
by M. Doherty *et al.*, in *Vaccine* 34 (2016) ......................... Appx15722

Exhibit 208 to Dykstra Declaration -
FDA Prescription Drug Labeling Resources ....................... Appx15731

Exhibit 209 to Dykstra Declaration -
ACIP Committee Members ................................................. Appx15738

**Table of Contents**
**(Continued)**

Exhibit 210 to Dykstra Declaration -
"Notice to Readers: Updated Recommendations of the
ACIP for the Control and Elimination of Mumps," *MMWR*,
June 9, 2006/55(22); 629-630 ............................................. Appx15743

Exhibit 211 to Dykstra Declaration -
"Measles Prevention: Recommendations of the ACIP,"
*MMWR*, December 28, 1989 38(S-9); 1-18 ......................... Appx15749

Exhibit 212 to Dykstra Declaration -
"FDA in Brief: FDA reiterates the importance of vaccines
such as MMR vaccine," dated September 6, 2019 .............. Appx15766

Exhibit 213 to Dykstra Declaration -
"Recommendations of the ACIP Mumps Prevention,"
*MMWR*, June 9, 1989/38(22) ............................................. Appx15769

Exhibit 214 to Dykstra Declaration -
"Recommendation of the ACIP Mumps Vaccine,"
*MMWR*, November 26, 1982; 31(46) .................................. Appx15777

Exhibit 215 to Dykstra Declaration -
Statement by Peter Marks M.D., Ph.D., FDA, on FDA's
continued confidence in the safety and effectiveness
of the MMR vaccine, dated April 22, 2019 ......................... Appx15783

Exhibit 216 to Dykstra Declaration -
About CBER ...................................................................... Appx15788

Exhibit 217 to Dykstra Declaration -
Excerpt from FDA's Website on Warning Letters ................ Appx15791

Exhibit 218 to Dykstra Declaration -
Excerpt of FDA's Website with an Index to Warning
Letters for 'M' Companies .................................................. Appx15794

**Table of Contents**
(Continued)

Exhibit 219 to Dykstra Declaration -
"The Immunological Basis for Immunization Series, Module
16: Mumps," by McLean, *et al.*, *Immunization, Vaccines and
Biologicals-World Health Organization* (2010) ................... Appx15817

Exhibit 220 to Dykstra Declaration -
Email from Sue Manoff to Mark Paponia,
dated February 25, 2000 (MRK-KRA00091399-405) ......... Appx15862

Exhibit 221 to Dykstra Declaration -
Memo re: Teleconference with Norman Baylor, CBER, on
11/16/98, Regarding VARIVAX® and M-M-R®II
(MRK-KRA00095065) ....................................................... Appx15870

Exhibit 222 to Dykstra Declaration -
M-M-R®II Label (MRK-KRA00757064-7) ....................... Appx15872

Exhibit 223 to Dykstra Declaration -
M-M-R®II Label (February 2001)
(MRK-KRA00757068-71) ................................................. Appx15877

Exhibit 224 to Dykstra Declaration -
M-M-R®II Label (August 2001)
(MRK-KRA00757077-80) ................................................. Appx15882

Exhibit 225 to Dykstra Declaration -
M-M-R®II Label (February 2006)
(MRK-KRA00757081-4) ................................................... Appx15887

Exhibit 226 to Dykstra Declaration -
M-M-R®II Label (March 1995)
(MRK-KRA00757085-8) ................................................... Appx15892

Exhibit 227 to Dykstra Declaration -
M-M-R®II Label (March 1995)
(MRK-KRA00757089-91) ................................................. Appx15897

Case 23-2553   Document 79-1   Page 70   Date Filed: 11/26/2023

**Table of Contents**
**(Continued)**

Exhibit 228 to Dykstra Declaration - M-M-R®II Label (October 2003) (MRK-KRA00757092-5) ...................................................... Appx15901

Exhibit 229 to Dykstra Declaration - M-M-R®II Label (September 2002) (MRK-KRA00757096-9) ...................................................... Appx15906

Exhibit 230 to Dykstra Declaration - M-M-R®II Label (February 2007) (MRK-KRA00757104-7) ...................................................... Appx15911

Exhibit 231 to Dykstra Declaration - M-M-R®II Label (February 2007) (MRK-KRA00757108-11) ...................................................... Appx15916

Exhibit 232 to Dykstra Declaration - M-M-R®II Label (April 19999) (MRK-KRA01449029-40) ...................................................... Appx15921

Exhibit 233 to Dykstra Declaration - M-M-R®II Label (February 2014) (MRK-KRA01449226-36) ...................................................... Appx15934

Exhibit 234 to Dykstra Declaration - M-M-R®II Label (June 2014) (MRK-KRA01449243-53) ...................................................... Appx15946

Exhibit 235 to Dykstra Declaration - M-M-R®II Label (October 2015) (MRK-KRA01449260-70) ...................................................... Appx15958

Exhibit 236 to Dykstra Declaration - M-M-R®II Label (February 2000) (MRK-KRA01449271-5) ...................................................... Appx15970

Exhibit 237 to Dykstra Declaration - M-M-R®II Label (March 2010) (MRK-KRA01449276-83) ...................................................... Appx15976

## Table of Contents
### (Continued)

Exhibit 238 to Dykstra Declaration -
M-M-R®II Label (December 2010)
(MRK-KRA01449284-91) ................................................... Appx15985

Exhibit 239 to Dykstra Declaration -
M-M-R®II Label (September 2009)
(MRK-KRA01449292-99) ................................................... Appx15994
*(Cont'd in Vol XXXV)*

### Volume XXXV
### (Filed Under Seal)

Exhibit 240 to Dykstra Declaration -
Attachment 1 to Letter from Barry D. Garfinkle, Ph.D.
to Carolyn Hardegree, M.D., dated January 28, 1998
(MRK-KRA01625510-639) ................................................. Appx16003

Exhibit 241 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II) and BB-IND 7068
(MMRV); Summary of Face-to face meeting discussion
(3/13/00) with CBER regarding wild type mumps
neutralization and ELISA assays, dated March 13, 2000
(MRK-KRA00019855-7) .................................................... Appx16134

Exhibit 242 to Dykstra Declaration -
PowerPoint Presentation entitled Immunogenicity
Mumps-Containing Vaccines (MRK-KRA00091408) ........ Appx16138

Exhibit 243 to Dykstra Declaration -
Letter from David M. Wommacott, Ph.D. to
Suresh C. Rastogi, Ph.D., dated December 16, 1998
(MRK-KRA01629294-1629295) ........................................ Appx16152

Exhibit 244 to Dykstra Declaration -
Response to the FDA Form 483, dated October 24, 2000
(MRK-KRA01649535-1649551) ........................................ Appx16155

Exhibit 245 to Dykstra Declaration -
Warning Letters from FDA Website ................................... Appx16173

# Table of Contents
## (Continued)

**Page**

Exhibit 246 to Dykstra Declaration -
MMD Quality Manual Glossary, dated October 5, 2016
(MRK-KRA01679618-1679772) ......................................... Appx16176

Exhibit 247 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Eric Metzger,
taken June 11, 2015 ............................................................ Appx16332

Exhibit 248 to Dykstra Declaration -
Federal Register Vol. 58 No. 137, July 20, 1993 ................. Appx16336

Exhibit 249 to Dykstra Declaration -
FDA Review of Vaccine Labeling Requirements for
Warnings, Use Instructions, and Precautionary
Information, dated October 2004 ......................................... Appx16342

Defendant Merck's Response to Relators' Statement of
Material Facts, dated November 26, 2019 (Doc. 299) .......... Appx16345

## Volume XXXVI
## (Filed Under Seal)

Declaration of Lisa C. Dykstra, for Merck, in Support of
Response to Relators' Statement of Material Facts,
executed November 26, 2019 (Doc. 299) ............................. Appx16501

Exhibit 250 to Dykstra Declaration -
"Mumps Complications and Effects of Mumps Vaccination,
England and Wales, 2002-2006," by Yung, Chee-Fu, *et al.*,
*Emerging Infectious Diseases*, (2011) 17(4):661-667 ......... Appx16513

Exhibit 251 to Dykstra Declaration -
Excerpts from the Deposition Testimony of April Cohen,
taken January 4, 2018 ......................................................... Appx16521

# Table of Contents
## (Continued)

Exhibit 252 to Dykstra Declaration -
"Mumps Virus-Specific Antibody Titers from Pre-Vaccine
Era Sera: Comparison of the Plaque Reduction Neutralization
Assay Enzyme Immunoassays," by Mauldin, Jeremy, *et al.*,
*Journal of Clinical Microbiology*, 2005:43(9):4847-4851 .. Appx16525

Exhibit 253 to Dykstra Declaration -
"Correlates of Protection," by Plotkin and Gilbert,
2018:35-40 ......................................................................... Appx16531

Exhibit 254 to Dykstra Declaration -
FDA, Guidance for Industry: FDA Review of Vaccine
Labeling Requirements for Warnings, Use Instructions, and
Precautionary Information, dated September 2004 ............. Appx16538

Exhibit 255 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Roberta L. McKee, Ph.D., taken March 30, 2017 ............... Appx16547

Exhibit 256 to Dykstra Declaration -
Excerpts from the Expert Report of
Dipti Gulati, MS, D. Phil. .................................................... Appx16551

Exhibit 257 to Dykstra Declaration -
Biological Product Deviation Report Form
submitted by Merck to the FDA, dated March 5, 2001
(MRK-KRA00754239-44) .................................................... Appx16556

Exhibit 258 to Dykstra Declaration -
"Jeryl Lynn Strain Live Attenuated Mumps Virus Vaccine
-Influence of Age, Virus Dose, Lot, and-Globulin
Administration on Response," by Buynak, Eugene, *et al.*,
*Journal of the American Medical Association* (1968)
203(1):63-67 ....................................................................... Appx16563

Exhibit 259 to Dykstra Declaration -
2003 Annual Stability Report for M-M-R®II
(MRK-KRA01632888-945) ................................................ Appx16569

**Table of Contents**
(Continued)

Exhibit 260 to Dykstra Declaration -
"Sensitive Neutralization Test for virus antibody,"
by Sato *et al.*, *Archives of Virology*, (1978) 58:301-311 ...... Appx16628

Exhibit 261 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to Alison Fisher, Ph.D.,
dated December 3, 2004 (MRK-KRA00000361-5) ............. Appx16640

Exhibit 262 to Dykstra Declaration -
Fax from Luba Vujcic to Alison Fisher, Ph.D.,
dated July 20, 2007 (MRK-KRA00141957-8) .................... Appx16646

Exhibit 263 to Dykstra Declaration -
Submission, dated August 8, 2007
(MRK-KRA00000140-225) ................................................ Appx16649

Exhibit 264 to Dykstra Declaration -
Submission, dated December 3, 2007
(MKR-KRA00000226-300) ................................................ Appx16736

Exhibit 265 to Dykstra Declaration -
"Long-Term Persistence of Mumps Antibody after Receipt of 2
Measles-Mumps-Rubella (MMR) Vaccinations and Antibody
Response after a Third MMR Vaccination among a University
Population," by Date, Anand, *et al.*, *Journal of Infectious
Diseases*, (2008) 197:1662-1668 ........................................ Appx16812

Exhibit 266 to Dykstra Declaration -
"Mumps Antibody Levels Among Students Before a Mumps
Outbreak: In Search of a Correlate of Immunity,"
by Cortese, *et al.*, *Journal of Infectious Diseases*, (2011)
204:1413-1422 ................................................................. Appx16820

**Table of Contents**
**(Continued)**

Exhibit 267 to Dykstra Declaration -
"Immunogenicity and Safety of Two Tetravalent (Measles,
Mumps, Rubella, Varicella) Vaccines Coadministered With
Hepatitis A and Pneumococcal Conjugate Vaccines to Children
Twelve to Fourteen Months of Age," by Blatter, *et al.*,
*The Pediatric Infectious Disease Journal,*
(2012) 31:e133-e140 ........................................................... Appx16831

Exhibit 268 to Dykstra Declaration -
Analytical Validation Protocol
(MRK-KRA00337307-18) .................................................... Appx16840

Exhibit 269 to Dykstra Declaration -
Expert Report of Robert Platt, Ph.D.,
dated June 14, 2018 ............................................................. Appx16853

Exhibit 270 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Amy Keegan,
taken April 27, 2017 ............................................................ Appx16992

Exhibit 271 to Dykstra Declaration -
Documentation of Work Activities
(RELATOR_00000272-3) .................................................... Appx16995

Exhibit 272 to Dykstra Declaration -
Work Summary Document (RELATOR_00000274-6) ........ Appx16998
*(Cont'd in Vol XXXVII)*

**Volume XXXVII**
**(Filed Under Seal)**

Exhibit 273 to Dykstra Declaration -
Submission, dated May 5, 2005
(MRK-KRA00176342-176654) ........................................... Appx17002

Exhibit 274 to Dykstra Declaration -
Submission, dated June 30, 2004
(MKR-KRA00137854-55 and 8137-72) ............................. Appx17316

**Table of Contents**
**(Continued)**

Exhibit 275 to Dykstra Declaration -
"Safety and Immunogenicity of Human Serum Albumin-Free
MMR Vaccine in US Children Aged 12-15 months,"
by Mufson, *et al.*, *Journal of Pediatric Infectious Diseases
Society*, (2014) 4:339-348 .................................................. Appx17355

Exhibit 276 to Dykstra Declaration -
Letter from Jerry P. Weir, Ph.D. to Alison Fisher, Ph.D.,
dated December 30, 2004 (MRK-KRA00141670-2) ........... Appx17366

Exhibit 277 to Dykstra Declaration -
Submission, dated February 28, 2005
(MRK-KRA00141676-729) ................................................. Appx17370

Exhibit 278 to Dykstra Declaration -
Submission, dated July 13, 2005
(MRK-KRA00141789-906) ................................................. Appx17425
*(Cont'd in Vol XXXVIII)*

**Volume XXXVIII**
**(Filed Under Seal)**

Exhibit 279 to Dykstra Declaration -
"Summary of Notifiable Diseases-United States 2012,"
*MMWR*, 2014:61(53):1-121 ................................................. Appx17544

Exhibit 280 to Dykstra Declaration -
CDC Publication "Mumps Outbreak-Related Questions
and Answers for Patients," last reviewed March 15, 2019 .. Appx17669

Exhibit 281 to Dykstra Declaration -
CDC Publication "Nationally Notifiable Infectious Diseases
and Conditions, United States: Annual Tables" ................... Appx17672

Exhibit 282 to Dykstra Declaration -
"Characteristics of Large Mumps Outbreaks in the United
States during July 2010-December 2015," by Clemmons,
Nakia *et al.*, *Clinical Infectious Diseases*, (2019) ............... Appx17676

**Table of Contents**
**(Continued)**

Page

Exhibit 283 to Dykstra Declaration -
CDC Publication "Healthy People 2010 Final Review" ...... Appx17684
***(Cont'd in Vol XXXIX)***

**Volume XXXIX**
**(Filed Under Seal)**

Exhibit 284 to Dykstra Declaration -
CDC Publication "Healthy People 2020 Immunization and
Infectious Diseases Objectives" .......................................... Appx18245

Exhibit 285 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.2
Cases of Hib Data" ............................................................. Appx18278

Exhibit 286 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.4
U.S.-acquired cases of Measles Data" ................................. Appx18280

Exhibit 287 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.5
U.S.-acquired cases of Mumps Data" ................................. Appx18282

Exhibit 288 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.9
 U.S.-acquired cases of Rubella Data" ................................ Appx18284

Exhibit 289 to Dykstra Declaration -
CDC Webpage "National Center for Immunization
and Respiratory Diseases" .................................................. Appx18286

Exhibit 290 to Dykstra Declaration -
"Mumps vaccination coverage and vaccine effectiveness in a
large outbreak among college students-Iowa, 2006,"
by Marin, Mona *et al.*, *Vaccine*, (2008) 26:3601-3607 ........ Appx18301

# Table of Contents
## (Continued)

Exhibit 291 to Dykstra Declaration -
"Mumps Outbreak in Orthodox Jewish Communities in the
United States," Barskey, Albert, *et al.*, *New England Journal
of Medicine*, (2012) 367(18):1704-1713 .............................. Appx18309

Exhibit 292 to Dykstra Declaration -
"Impact of a Third Dose of Measles-Mumps-Rubella Vaccine
on a Mumps Outbreak," by Ogbuanu, Ikechukwu, *et al.*,
*Pediatrics*, (2012) 130(6):1-8 ............................................. Appx18320

Exhibit 293 to Dykstra Declaration -
"Epidemiology of a Mumps Outbreak in a Highly Vaccinated
Island Population and Use of a Third Dose of Measles-
Mumps-Rubella Vaccine for Outbreak Control—Guam 2009
to 2010," by Nelson, George, *et al.*, *Pediatric Infectious
Disease Journal*, (2013) 32(4):374-380 .............................. Appx18330

Exhibit 294 to Dykstra Declaration -
"Effectiveness of a Third Dose of MMR Vaccine for Mumps
Outbreak Control," by Cardemil, Cristina, *et al.*, *New England
Journal of Medicine*, (2017) 377(10):947-956 .................... Appx18338

Exhibit 295 to Dykstra Declaration -
"Mumps in a highly vaccinated Marshallese community in
Arkansas, USA: an outbreak report," by Fields, Virgie, *et al.*,
*Lancet Infectious Diseases*,
(Published online January 8, 2019) 1-8 .............................. Appx18349

Exhibit 296 to Dykstra Declaration -
"Antibody Induced by Immunization with the Jeryl Lynn
Mumps Vaccine Strain Effectively Neutralizes a Heterologous
Wild-Type Mumps Virus Associated with a Large Outbreak,"
by Rubin, Steven, *et al.*, *Journal of Infectious Diseases*, (2008)
198:508-515 ....................................................................... Appx18358

Exhibit 297 to Dykstra Declaration -
"Vaccine waning and mumps-re-emergence in the United
States," by Lewnard, Joseph and Grad, Yonatan, *Science
Translational Medicine*, (2018) 10(433):1-10 .................... Appx18367

**Table of Contents**
**(Continued)**

Exhibit 298 to Dykstra Declaration -
"Comment: The changing epidemiology of mumps in a high
vaccination era," by Marshall, Helen and Plotkin, Stanley,
*Lancet Infectious Diseases*, (2019) 19:118-119 ................... Appx18379

Exhibit 299 to Dykstra Declaration -
"Successes and challenges for preventing measles, mumps and
rubella by vaccination," by Bankamp, Bettina, *et al.*, *Current
Opinion in Virology*, (2019) 34:110-116 .............................. Appx18382

Exhibit 300 to Dykstra Declaration -
"Mumps Vaccines Do We Need a New One?," by Rubin,
Steven and Beeler, Judy, *Pediatric Infectious Disease Journal*,
(2013) 32(10):1156-1157 .................................................... Appx18390

Exhibit 301 to Dykstra Declaration -
CDC website listing Measles-related *MMWR* Articles ........ Appx18393

Exhibit 302 to Dykstra Declaration -
CDC website listing Pertussis (Whooping Cough)
Publications ......................................................................... Appx18399

Exhibit 303 to Dykstra Declaration -
CDC website listing Chickenpox (Varicella) References and
Resources .......................................................................... Appx18407

Exhibit 304 to Dykstra Declaration -
CDC webpage: Glossary ..................................................... Appx18411

Exhibit 305 to Dykstra Declaration -
Email from Jeanne Santoli to Eric Skjeveland,
dated June 12, 2012 (MRK-KRA00122172-3) .................... Appx18425

Exhibit 306 to Dykstra Declaration -
CDC webpage, ACIP Workgroups, last reviewed
May 30, 2019 .................................................................... Appx18428

# Table of Contents
## (Continued)

**Page**

Exhibit 307 to Dykstra Declaration -
"Recommendations of the Advisory Committee on
Immunization Practices for Use of Hepatitis A Vaccine
for Persons Experiencing Homelessness,"
*MMWR* 2019:68(6):153-56 ................................................. Appx18435

Exhibit 308 to Dykstra Declaration -
"Human Papillomavirus Vaccination for Adults: Updated
Recommendations of the Advisory Committee on
Immunization Practices," *MMWR* 2019:68(3):698-702 ...... Appx18440

Exhibit 309 to Dykstra Declaration -
"Prevention and Control of Seasonal Influenza with
Vaccines: Recommendations of the Advisory Committee
on Immunization Practices-United States, 2019-20
Influenza Season," *MMWR* 2019:69(3):1-21 ....................... Appx18446

Exhibit 310 to Dykstra Declaration -
"Japanese Encephalitis Vaccine: Recommendations of the
Advisory Committee on Immunization Practices,"
*MMWR* 2019:68(2);1-33 .................................................... Appx18475
***(Cont'd in Vol XL)***

### Volume XL
### (Filed Under Seal)

Exhibit 311 to Dykstra Declaration -
"Prevention of Pertussis, Tetanus, and Diphtheria with
Vaccines in the United States: Recommendations of the
Advisory Committee on Immunization Practices,"
*MMWR* 2018:67(2):1-44 .................................................... Appx18516

Exhibit 312 to Dykstra Declaration -
"Updated Recommendations for Use of Tetanus Toxoid,
Reduced Diphtheria Toxoid and Acellular Pertussis Vaccine
(Tdap) in Pregnant Women and Persons Who Have or
Anticipate Having Close Contact with an Infant Aged <12
Months-Advisory Committee on Immunization Practices
(ACIP), 2011," *MMWR* 2011:60(41):1424-1426 ................. Appx18565

**Table of Contents**
**(Continued)**

Exhibit 313 to Dykstra Declaration -
"Updated Recommendations for the Use of Tetanus Toxoid,
Reduced Diphtheria Toxoid, and Acellular Pertussis Vaccine
(Tdap) in Pregnant Women-Advisory Committee on
Immunization Practices (ACIP), 2012," *MMWR*
2013:62(7):131-135 ............................................................. Appx18569

Exhibit 314 to Dykstra Declaration -
"Immunization in the United States (Chapter 73),"
by Cohn, *et al.*, *Vaccines* 1421-1440 ................................... Appx18575

Exhibit 315 to Dykstra Declaration -
Excerpts from the Expert Report of
Daniel Salmon, Ph.D., MPH ................................................. Appx18596

Exhibit 316 to Dykstra Declaration -
Excerpts from Merck's Supplemental Responses and
Objections to Relators' First Set of Interrogatories,
dated December 12, 2016 ..................................................... Appx18608

Exhibit 317 to Dykstra Declaration -
"The Pertussis Problem," by Plotkin, Stanley, *Clinical
Infectious Diseases*, (2014) 58(6): 830-833 ......................... Appx18618

Exhibit 318 to Dykstra Declaration -
"Establishing a Global Vaccine-Development Fund,"
by Plotkin, Stanley, *et al.*, *New England Journal of Medicine*,
(2015) 373:297-300 ............................................................. Appx18623

Exhibit 319 to Dykstra Declaration -
Chapter 11 "Anthrax Vaccines," by Friedlander, Arthur, *et al.*,
*Vaccines* (2018) ................................................................. Appx18628

Exhibit 320 to Dykstra Declaration -
Chapter 38 "Meningococcal Capsular Group A, C, W, and Y
Conjugate Vaccines," by Harrison, Lee, *et al.*,
*Vaccines* (2018) ................................................................. Appx18646

**Table of Contents**
(Continued)

Exhibit 321 to Dykstra Declaration -
Chapter 52 "Rotavirus Vaccines," by Parashar, Umesh, *et al.*,
*Vaccines* (2018) .................................................................. Appx18673

Exhibit 322 to Dykstra Declaration -
Chapter 60 "Tuberculosis Vaccines," by Hanekom, Willem,
*et al.*, *Vaccines* (2018) ......................................................... Appx18694

Exhibit 323 to Dykstra Declaration -
Excerpts from Expert Report of
Gary L. Freed, M.D., MPH ................................................... Appx18714

Exhibit 324 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Gary L. Freed, M.D., MPH, taken October 18, 2018 .......... Appx18718

Exhibit 325 to Dykstra Declaration -
Excerpts from "2012 CDC Summary of
Notifiable Diseases" ............................................................ Appx18721

Exhibit 326 to Dykstra Declaration -
Excerpts from "1977 Annual Summary,"
*MMWR*, Vol. 26, No. 53, September 1978 .......................... Appx18729

Exhibit 327 to Dykstra Declaration -
Excerpts from "1980 Annual Summary,"
*MMWR*, Vol. 29, No. 54, September 1981 .......................... Appx18734

Exhibit 328 to Dykstra Declaration -
Excerpts from "2013 CDC Summary of
Notifiable Diseases" ............................................................ Appx18742

Exhibit 329 to Dykstra Declaration -
Excerpts from "2014 CDC Summary of
Notifiable Diseases" ............................................................ Appx18747

**Table of Contents**
**(Continued)**

Relators' Responses to Merck's Statements of Material Facts in
Support of Its First and Fourth Summary Judgment Motions
and Their Corresponding Additional Statement of Material
Facts, dated November 26, 2019 (Doc. 300) ........................ Appx18751

Declaration of Gary Reilly in Support of Relators' Oppositions to
Merck's Four Motions for Summary Judgment,
executed November 26, 2019 (Doc. 300) ............................ Appx18984

    Exhibit 361 to Reilly Declaration -
    Deposition Testimony of Amy Keegan,
    taken April 27, 2017 ............................................................ Appx18996
    *(Cont'd in XLI)*

**Volume XLI**
**(Filed Under Seal)**

    Exhibit 362 to Reilly Declaration -
    Memorandum titled "Delay of Filing for Optimized
    GOS/HAS-free Diluent for M-M-R®II" with Attachment,
    dated August 28, 2000 (MRK-CHA01593194-9) ................ Appx19070

    Exhibit 363 to Reilly Declaration -
    The Current Manufacturing Target Titer for the Mumps
    Component of Measles, Mumps, and Rubella Virus Vaccine
    Live M-M-R®II (MRK-CHA00576983-93) ....................... Appx19077

    Exhibit 364 to Reilly Declaration -
    Letter from Robert L. McKee, Ph.D. to Carolyn Hardegree,
    M.D., dated December 10, 1998, with Attachment
    (MRK-CHA00756233-55) .................................................. Appx19089

    Exhibit 365 to Reilly Declaration -
    Excerpts from Clinical and Regulatory Review Committee
    Critical Activities, issued August 15, 2001
    (MRK-CHA01724860-25029) ............................................ Appx19113

**Table of Contents**
(Continued)

Exhibit 366 to Reilly Declaration -
Excerpts from Clinical and Regulatory Review Committee
Critical Activities, issued March 17, 1999
(MRK-CHA01717354-7508) ............................................... Appx19123

Exhibit 367 to Reilly Declaration -
Table (MRK-CHA00280517) ............................................... Appx19142

Exhibit 368 to Reilly Declaration -
Project Management Regulatory Submissions
Schedule for "All Products," from 01-AUG-2002
(MRK-CHA01726084-7) .................................................... Appx19144

Exhibit 369 to Reilly Declaration -
Email from Hentrietta Ukwu to David W. Blois,
dated October 6, 1998, with Attachment
(MRK-CHA00625837-9) .................................................... Appx19149

Exhibit 370 to Reilly Declaration -
Justification of Mumps Component Frequency
(MRK-CHA00032404-7) .................................................... Appx19153

Exhibit 371 to Reilly Declaration -
Email from Alison L. Fisher, Ph.D. to Mark S. Galinski,
dated March 28, 2005 (MRK-CHA00560317-9) ................. Appx19158

Exhibit 372 to Reilly Declaration -
Email from Bonita M. Stankunas to Amy Keegan,
dated October 1, 2010 (MRK-CHA01470854-6) ................ Appx19162

Exhibit 373 to Reilly Declaration -
Presentation titled M-M-R®II
(MRK-CHA00021133-67) ................................................... Appx19166

Exhibit 374 to Reilly Declaration -
Excerpts from Pediatric Measles, Mumps, Rubella &
Varicella-containing Franchise: Integrated Vaccine T-PAC
Review, dated October 28, 2002
(MRK-CHA00233586-3623) ............................................... Appx19202

**Table of Contents**
(Continued)

Exhibit 375 to Reilly Declaration -
Deposition Testimony of April D. Cohen,
taken January 4, 2018 ......................................................... Appx19211

Exhibit 376 to Reilly Declaration -
Minutes of October 6, 1999 Project Team Meeting,
dated October 8, 1999 (MRK-CHA01899074-86) .............. Appx19276

Exhibit 377 to Reilly Declaration -
Draft Memo re: Clinical and Regulator Review Committee
Meeting Summary-October 8, 2002, dated October 11, 2002
(MRK-CHA01728735-8) ..................................................... Appx19290

Exhibit 378 to Reilly Declaration -
Pediatric Live Virus Vaccine Franchise Review,
dated October 28, 2002 (MRK-CHA00207636-83) ............ Appx19295

Exhibit 379 to Reilly Declaration -
Presentation, produced as "M-M-R II and Priorix Profiles
8_19_11F.ppt" (MRK-CHA00955777) ............................... Appx19344

Exhibit 380 to Reilly Declaration -
Deposition Testimony of Tim Schofield,
taken March 20, 2017 ......................................................... Appx19347

Exhibit 381 to Reilly Declaration -
Memo re: Mumps Stability and Potency Estimations,
dated February 27, 2001 (MRK-CHA01896072-3) ............. Appx19449

Exhibit 382 to Reilly Declaration -
Email from Philip S. Bennett to Cynthia Morrisey,
dated January 18, 2002 (MRK-CHA00094849-50) ............. Appx19452

Exhibit 383 to Reilly Declaration -
*Curriculum Vitae* of Manal Anwar Morsy, M.D., Ph.D., MBA
(MORSY00001-10) ............................................................. Appx19455

**Table of Contents**
**(Continued)**

Exhibit 384 to Reilly Declaration -
*Curriculum Vitae* of Cynthia F. Morrisey
(MORRISEY_00000001-6) ................................................. Appx19466

Exhibit 385 to Reilly Declaration -
Memo re: Determination of Minimum Release
Specifications for Mumps and Rubella in M-M-R®II,
dated February 9, 2004 (MRK-CHA00722641-2) ............... Appx19473

Exhibit 386 to Reilly Declaration -
Memo re: Determination of Minimum Release Specifications
for Mumps in M-M-R®II, dated November 4, 2004
(MRK-CHA00722667-8) .................................................... Appx19476

Exhibit 387 to Reilly Declaration -
Email from Philip S. Bennett with attachments,
dated December 4, 2012
(MRK-CHA01580006-15) ................................................... Appx19479

Exhibit 388 to Reilly Declaration -
Email from Kimberly A. Duffy to Amy Keegan,
dated December 5, 2012 (MRK-CHA01579943-5) ............. Appx19490

Exhibit 389 to Reilly Declaration -
*Curriculum Vitae* of Amy Keegan
(MRK-CHA02009507-9) .................................................... Appx19494

Exhibit 390 to Reilly Declaration -
Presentation, MMRII Protocol #007 - Mumps End Expiry
study: AIGENT Assay Issues and Impact on Study Criteria,
produced as "6-30 pm Draft 10-04-02 for CRRC-10-08-02
slides.ppt" (MRK-CHA00025831) ...................................... Appx19498
*(Cont'd in Vol LXII)*

**Table of Contents**
**(Continued)**

**Volume LXII**
**(Filed Under Seal)**

Exhibit 391 to Reilly Declaration -
Gulati Deposition Exhibit 14, Select Pages of Supplemental
Biologics License Application, dated June 30, 2004
(MRK-CHA00137854-55 and
MRK-CHA00138585-708) .................................................. Appx19533

Exhibit 392 to Reilly Declaration -
Regulatory Liaison FDA Conversation Record,
dated May 27, 2005 (MRK-CHA00793082-3) .................... Appx19539

Exhibit 393 to Reilly Declaration -
Submission, dated July 13, 2005
(MRK-CHA00141789-906) ................................................. Appx19542

Exhibit 394 to Reilly Declaration -
Deposition Testimony of Dipti Gulati, M.S., D. Phil.,
taken December 5, 2018 ...................................................... Appx19550

Exhibit 395 to Reilly Declaration -
Merck's Biological Stability Program 2001 Annual Stability
Report for M-M-R®II (MRK-CHA01632745-51) .............. Appx19661

Exhibit 396 to Reilly Declaration -
Biological Stability Program 2004 Annual Stability
Report for M-M-R®II (MRK-CHA01632833-8) ................ Appx19669

Exhibit 397 to Reilly Declaration -
Biological Stability Program 2005 Annual Stability
Report for M-M-R®II (MRK-CHA01634117-22) .............. Appx19676

Exhibit 398 to Reilly Declaration -
Biological Stability Program 2008 Annual Stability
Report for M-M-R®II (MRK-CHA01633948-59) .............. Appx19683

# Table of Contents
## (Continued)

Exhibit 399 to Reilly Declaration -
Response to FDA Request for Information,
dated February 28, 2005 (MRK-CHA02078926-7) ............. Appx19696

Exhibit 400 to Reilly Declaration -
Excerpts from Biological Stability Program 2010
Annual Stability Report for M-M-R®II
(MRK-CHA01458201-6) .................................................... Appx19699

Exhibit 401 to Reilly Declaration -
CDC "Mumps Cases and Outbreaks" webpage,
last accessed November 25, 2019 ........................................ Appx19706

Exhibit 402 to Reilly Declaration -
CDC "Mumps Vaccination" webpage, last reviewed
March 28, 2019 ................................................................... Appx19709

Exhibit 403 to Reilly Declaration -
CDC "Mumps Vaccination" webpage, archived as of
May 30, 2012 ..................................................................... Appx19711

Exhibit 404 to Reilly Declaration -
CDC "Mumps Vaccination" webpage, archived as of
December 8, 2009 ............................................................... Appx19714

Exhibit 405 to Reilly Declaration -
Email from Janet Ernst-Gerner to Alan Modlinger,
dated September 23, 2016 (MRK-CHA02008691-4) .......... Appx19717

Exhibit 406 to Reilly Declaration -
Marked M-M-R®II (Measles, Mumps, and Rubella Virus
Vaccine Live) Literature (MRK-CHA02008695-705) ......... Appx19722

Exhibit 407 to Reilly Declaration -
Email from Mark Papania to Barbara Kuter,
dated February 12, 2010 (MRK-CHA00351988-90) ........... Appx19734

**Table of Contents**
(Continued)

Exhibit 408 to Reilly Declaration -
Email from Chester J. Kitchen, dated February 25, 2010
(MRK-CHA00790153-4) ..................................................... Appx19738

Exhibit 409 to Reilly Declaration -
Email from Chester J. Kitchen to Scott Porreca,
dated February 26, 2010 (MRK-CHA00791347) ................ Appx19741

Exhibit 410 to Reilly Declaration -
FDA Conversation re; PRIOrix™, measles, mumps &
rubella live, attenuated, viral vaccine BB-IND-7229,
dated December 18, 1997 (GSK-MMR-IND-0047687-9) ... Appx19743

Exhibit 411 to Reilly Declaration -
FDA Conversation re: PRIOrix IND submission,
Clinical Hold, dated October 16, 1997
(GSK-MMR-IND-0047654-6) ............................................. Appx19747

Exhibit 412 to Reilly Declaration -
Extra CDAB Meeting Abstract, dated August 1, 2011
(GSK-MMR-019819-42) ..................................................... Appx19751

Exhibit 413 to Reilly Declaration -
Memo re: Minutes of Meeting with CBER on 4/4/01,
dated April 9, 2001 (MRK-CHA00049238-40) ................... Appx19776

Exhibit 414 to Reilly Declaration -
Email from Sally S. Wong to Cathy Hoath,
dated February 26, 2013 (MRK-CHA01556424-8) ............. Appx19780

Exhibit 415 to Reilly Declaration -
Email from Joseph D. Bernardo to Mark J. Stannard,
dated November 30, 2016 (MRK-CHA02101841) ............. Appx19786

Exhibit 416 to Reilly Declaration -
Deposition Testimony of Roberta L. McKee, Ph.D.,
taken March 30, 2017 ......................................................... Appx19788

# Table of Contents
## (Continued)

Exhibit 417 to Reilly Declaration -
Vaccine & Biological Stability Protocol for M-M-R®II
(MRK-CHA01714300-8) ..................................................... Appx19870

Exhibit 418 to Reilly Declaration -
Excerpts from Biological Stability Program 2000
Annual Stability Report for M-M-R®II
(MRK-CHA01633601-6) ..................................................... Appx19880

Exhibit 419 to Reilly Declaration -
Excerpts from Biological Stability Program 2002
Annual Stability Report for M-M-R®II
(MRK-CHA01633529-39) .................................................... Appx19887

Exhibit 420 to Reilly Declaration -
Excerpts from Biological Stability Program 2003
Annual Stability Report for M-M-R®II
(MRK-CHA01632888-95) .................................................... Appx19899

Exhibit 421 to Reilly Declaration -
SOP Active Stability Monitoring of Live Virus Vaccine
Potency Results, effective November 10, 2000
(MRK-CHA00049165-73) .................................................... Appx19908

Exhibit 422 to Reilly Declaration -
SOP Real Time Stability Trend Monitoring, effective
September 21, 2016 (MRK-CHA01714343-54) .................. Appx19918

Exhibit 423 to Reilly Declaration -
Label Claim Compliance of M-M-R®II
(MRK-CHA00322066-73) .................................................... Appx19931

Exhibit 424 to Reilly Declaration -
Proposed New Stabilizer for M-M-R®II,
dated July 12, 2002 (MRK-CHA00239179-99) .................. Appx19940

**Table of Contents**
**(Continued)**

Exhibit 425 to Reilly Declaration -
Clinical and Regulatory Review Committee Agenda,
dated October 8, 2002 (MRK-CHA00780210-65) .............. Appx19962
***(Cont'd in Vol XLIII)***

**Volume XLIII**
**(Filed Under Seal)**

Exhibit 426 to Reilly Declaration -
Analytical Approach for MMR in Japan
(MRK-CHA00719989-20008) ............................................ Appx20019

Exhibit 427 to Reilly Declaration -
Excerpts from Memo re: Mumps neutralizing antibody test vs.
efficacy and effectiveness, dated September 10, 1999
(MRK-CHA00061698-703) ................................................ Appx20040

Exhibit 428 to Reilly Declaration -
Atkinson Deposition Exhibit 2, Letter from Kevin Malone
to Kathleen Hardway, dated July 31, 2018,
and Letter from Robert Redfield to Kathleen Hardway,
dated May 24, 2018 ........................................................... Appx20047

Exhibit 429 to Reilly Declaration -
CDC Publication, Ensuring the Safety of Vaccines in the
United States, last updated July 2011 ................................... Appx20055

Exhibit 430 to Reilly Declaration -
Email from Colleen M. Duffy to Diana DeLong,
dated December 14, 2005 (MRK-CHA00942187-8) ........... Appx20058

Exhibit 431 to Reilly Declaration -
Email from Kevin Agnew to Diana DeLong,
dated March 14, 2014 (MRK-CHA01673057-9) ................. Appx20061

Exhibit 432 to Reilly Declaration -
Letter to CDC Request for Final Proposal to RFP 2014-N-
15784 Consolidated Vaccines for Children Contact,
dated March 7, 2014 (MRK-CHA01655048-93) ................. Appx20065

# Table of Contents
## (Continued)

Exhibit 433 to Reilly Declaration -
Email from Diana DeLong to Cindy Rivera,
dated March 13, 2014 (MRK-CHA01656202-3) ................. Appx20112

Exhibit 434 to Reilly Declaration -
FDA Comments on PRN Assay, dated May 9, 2007
(GSK-MMR-IND-0015993-4) ............................................ Appx20115

Exhibit 435 to Reilly Declaration -
Excerpts from Merck Presentation, dated November 10, 2011
(MRK-CHA0002441-681) ................................................... Appx20118

Exhibit 436 to Reilly Declaration -
Letter from Lisa C. Dykstra to CDC and Office of General
Counsel for Department of Health and Human Services,
dated May 18, 2015 (MRK-CHA01374713-20) ................. Appx20121

Exhibit 437 to Reilly Declaration -
Summary of GSK Vaccines development pipeline meeting
with CDC March 8, 2016 (GSK-MMR-0062025-30) ......... Appx20130

Exhibit 438 to Reilly Declaration -
Email from Ouzama Nicholson to Donna Boyce,
dated May 27, 2010 (GSK-MMR-0058532) ....................... Appx20137

Exhibit 439 to Reilly Declaration -
Memo re: Supporting Documents for Stephen Krahling,
dated October 10, 2000 (MRK-CHA00447565-74) ............ Appx20139

Exhibit 440 to Reilly Declaration -
Excerpts from journal of David Krah, M.D.
(MRK-CHA00490081-591) ................................................ Appx20150

Exhibit 441 to Reilly Declaration -
Minutes of August 8, 2001 Project Team Meeting
(MRK-CHA00209441-53) ................................................. Appx20176

# Table of Contents
## (Continued)

Exhibit 442 to Reilly Declaration -
Deposition Testimony of  Thomas McGuire, Ph.D.,
taken July 2, 2018 ............................................................... Appx20190

Exhibit 443 to Reilly Declaration -
National Vaccine Advisory Committee Report,
The National Vaccine Program 2008 State of the
Program Report, dated February 2009.................................. Appx20274

Exhibit 444 to Reilly Declaration -
"National, State, and Local Area Vaccination Coverage
Among Children Aged 19–35 Months — United States, 2012,"
*MMWR* 2013; 62:733-755, dated September 13, 2013 ........ Appx20289

Exhibit 445 to Reilly Declaration -
"Financing Immunizations in the United States," Hinman
*et al.*, *Clinical Infectious Diseases* 2004; 38:1440-6 ........... Appx20314

Exhibit 446 to Reilly Declaration -
"Program Review, National Immunization Survey (NIS) and
State and Local Area Integrated Telephone Survey (SLAITS),"
dated November 27-28, 2007 .............................................. Appx20322

Exhibit 447 to Reilly Declaration -
"About VFC" webpage ........................................................ Appx20344

Exhibit 448 to Reilly Declaration -
"Medicaid Program; Charges for Vaccine Administration
Under the Vaccines for Children Program,"
Federal Register Volume 59, Issue 190
(October 3, 1994) ............................................................... Appx20347

Exhibit 449 to Reilly Declaration -
Deposition Testimony of Michele Taylor,
taken May 9, 2017 .............................................................. Appx20360

**Table of Contents**
**(Continued)**

**Page**

Defendant Merck's Response to Relators' Additional Statement of
Material Facts in Connection with Defendant's First and Fourth
Summary Judgment Motions, dated December 20, 2019
(Doc. 311) ........................................................................... Appx20427

Defendant Merck's Response to Relators' Additional Statement of
Material Facts in Connection with Defendant's First and Fourth
Summary Judgment Motions, dated December 20, 2019
(Doc. 314) ........................................................................... Appx20486
*(Cont'd in Vol XLIV)*

**Volume XLIV**
**(Filed Under Seal)**

Declaration of Lisa C. Dykstra in Support of Defendant's
Replies and Response to Motions for Summary Judgment,
executed December 20, 2019 (Doc. 315) .............................. Appx20545

  Exhibit 330 to Dykstra Declaration -
  Excerpts from the Deposition Testimony of Amy Keegan,
  taken February 9, 2018 ....................................................... Appx20552

  Exhibit 331 to Dykstra Declaration -
  Email from Paul Lanzetta to Thomas Romanus
  and John Comonitski, dated August 19, 2011
  (MRK-KRA00955764-955765) .......................................... Appx20555

  Exhibit 332 to Dykstra Declaration -
  Excerpts from Deposition Testimony of Cynthia Morrisey,
  taken July 27, 2017 ............................................................ Appx20558

  Exhibit 333 to Dykstra Declaration -
  Table of Contents for Information Submitted with Merck's
  BLA for the replacement of Human Serum Albumin with
  Recombinant Albumin (MRK-KRA00137827-137828) ..... Appx20562

  Exhibit 334 to Dykstra Declaration -
  FDA's Draft Guidance for Industry Stability Testing of
  Drug Substances and Drug Products (June 8, 1998) ............ Appx20565

**Table of Contents**
**(Continued)**

Exhibit 335 to Dykstra Declaration -
WHO's Draft Guidelines on Stability Evaluation of
Vaccines, Expert Committee on Biological Standardization
(October 23-27, 2006) ......................................................... Appx20662

Exhibit 336 to Dykstra Declaration -
Biological Stability Program 1999 Annual Stability
Report for M-M-R®II (MRK-KRA01632656-86) .............. Appx20691

Exhibit 337 to Dykstra Declaration -
Biological Stability Program 2000 Annual Stability
Report for M-M-R®II (MRK-KRA01633601-29) .............. Appx20723

Exhibit 338 to Dykstra Declaration -
Biological Stability Program 2001 Annual Stability
Report for M-M-R®II (MRK-KRA01632745-822) ............ Appx20753

Exhibit 339 to Dykstra Declaration -
Biological Stability Program 2002 Annual Stability
Report for M-M-R®II (MRK-KRA01633529-600) ............ Appx20832

Exhibit 340 to Dykstra Declaration -
Biological Stability Program Annual 2003 Stability
Report for M-M-R®II (MRK-KRA01632888-945) ............ Appx20905

Exhibit 341 to Dykstra Declaration -
Biological Stability Program 2004 Annual Stability
Report for M-M-R®II (MRK-KRA01632833-68) .............. Appx20964

**Volume XLV**
**(Filed Under Seal)**

Exhibit 342 to Dykstra Declaration -
Biological Stability Program 2005 Annual Stability
Report for M-M-R®II (MRK-KRA01633267-99) .............. Appx21001

Exhibit 343 to Dykstra Declaration -
M-M-R®II Stability Data Summary for the 2006
Annual Stability Report (MRK-KRA0163946-83) ............. Appx21035

# Table of Contents
## (Continued)

Exhibit 344 to Dykstra Declaration -
M-M-R®II Stability Data Summary for the 2007
Annual Stability Report (MRK-KRA01633723-31)  ........... Appx21074

Exhibit 345 to Dykstra Declaration -
CDC's Nationally Notifiable Infectious Diseases and
Conditions, United States: Weekly Tables, Table 1y
(October 2019) .................................................................. Appx21084

Exhibit 346 to Dykstra Declaration -
CDC's Nationally Notifiable Infectious Diseases and
Conditions, United States: Weekly Tables, Table 1z
(October 2019) .................................................................. Appx21088

Exhibit 347 to Dykstra Declaration -
CDC's Nationally Notifiable Infectious Diseases and
Conditions, United States: Weekly Tables, Table 1kk
(October 2019) .................................................................. Appx21092

Exhibit 348 to Dykstra Declaration -
"An Assessment of Mumps Vaccine Effectiveness by Dose
during an Outbreak in Canada," by Deeks, Shelley, *et al.*,
*CMAJ*, 183(9) (June 14, 2011) ........................................... Appx21096

Exhibit 349 to Dykstra Declaration -
"Mumps Vaccine Effectiveness and Risk Factors for Disease
in Households during an Outbreak in New York City,"
by Livingston, Kara, *et al.*, Vaccine 32; 369-374 (2014) ..... Appx21104

Exhibit 350 to Dykstra Declaration -
"A Large Outbreak of Mumps in the Postvaccine Era,"
by Wharton, Melinda, *et al.*, *Journal of Infectious Diseases*,
Vol. 158, No. 6 (December 1988) ........................................ Appx21111

Exhibit 351 to Dykstra Declaration -
"Persistence of Mumps Antibodies after 2 Doses of
Measles-Mumps-Rubella Vaccine," by LeBaron, Charles,
*et al.*, *Journal of Infectious Diseases*, 2009:199
(February 15, 2009)  ........................................................... Appx21120

**Table of Contents**
(Continued)

Exhibit 352 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Keith Chirgwin, M.D., taken January 26, 2017 ................... Appx21130

Exhibit 353 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Barbara Kuter, Ph.D., taken December 14, 2016 ................. Appx21137

Exhibit 354 to Dykstra Declaration -
Letter from Manal Morsy, M.D., Ph.D. to Luba Vujcic,
dated March 9, 2000 (MRK-KRA00020409-20410) ........... Appx21141

Exhibit 355 to Dykstra Declaration -
Memorandum from R. Wolchko with the subject "Bridging
Study of the Mumps Legacy ELISA" and "Mumps
'Wild Type' IgG ELISA," dated February 23, 2001
(MRK-KRA00561875-561885) ........................................... Appx21144

Exhibit 356 to Dykstra Declaration -
*Curriculum Vitae* of Emilio Emini, Ph.D. (January 2016)
(EMINI 00001-22) .............................................................. Appx21156

Exhibit 357 to Dykstra Declaration -
General Correspondence to FDA, dated April 23, 2002
(MRK-KRA00000548-553) ................................................ Appx21179

Exhibit 358 to Dykstra Declaration -
"Mumps Epidemiology and Immunity-The Anatomy of a
Modern Epidemic," by Anderson, Larry, *et al.*,
*Pediatric Infectious Disease Journal*, Vol. 27, No. 10
(October 2008) ................................................................... Appx21186

Exhibit 359 to Dykstra Declaration -
IID-1.5 "Reduce cases of mumps (U.S. acquired cases),"
Healthy People 2020 ......................................................... Appx21192

**<u>Table of Contents</u>**
**(Continued)**

<u>**Page**</u>

Defendant's Response to the United States' Statement of
    Interest in Response to the Parties' Summary Judgment
    Briefing, dated January 18, 2021 (Doc. 323)...................... Appx21194

Defendant Merck's Reply to Relators' Response Regarding
    the United States' Statement of Interest (Doc. 328) .......... Appx21206

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,
        *Plaintiffs,*
        v.
MERCK & CO., INC.,
        *Defendant.*

Civil Action No. 10-4374 (CDJ)

IN RE: MERCK MUMPS VACCINE
ANTITRUST LITIGATION

Master File No. 12-03555 (CDJ)

THIS DOCUMENT RELATES TO:
ALL ACTIONS

## O R D E R

**AND NOW**, this ___16th___ day of May, 2019, upon consideration of Plaintiffs' and

Relators' Motion to De-Designate and Unseal Portions of the Deposition of Dr. David Kessler

(ECF No. 205);[1] Defendant's Opposition thereto (ECF Nos. 220, 221); and Plaintiffs' and

Relators' Reply in Support (ECF No. 228); **IT IS HEREBY ORDERED** as follows:

    1.    Plaintiffs' and Relators' Motion is DENIED WITHOUT PREJUDICE;[2]

---

[1] The Court's Electronic Case Filing citations will reflect the documents from *In re: Merck Mumps Vaccine Antitrust Litigation*, Master File No: 2:12-cv-03555.

[2] On December 6, 2018, Plaintiffs and Relators filed the instant Motion seeking "to remove the highly confidential designation from the following excerpts and exhibits from the deposition of Dr. David Kessler: 30:10-32:23; 34:19-20; 119:25-120:13; 225:9-17; 227:10-229:25 and Exhibit 3." (Pls.' Mot. Unseal, ECF No. 205). The Honorable C. Darnell Jones II referred this Motion to me for disposition. (Order, ECF No. 218). Defendant Merck responded in opposition, and Plaintiff replied in further support. (Def.'s Resp., ECF No. 221; Pl.'s Reply, ECF Nos. 227-29). Both parties additionally sent letters to the Court supporting their respective positions. (*See* ECF Nos. 226, 230, 234, 235, 236, 238). On April 22, 2019, I held oral argument on the Motion. (Order, ECF No. 245; Minutes, ECF No. 247).

    Dr. David Kessler is Plaintiffs' and Relators' expert. In forming his expert opinion, Dr. Kessler had access to confidential documents produced by Defendant Merck in this litigation. Dr. Kessler refers to these as "Source Documents," and those Source Documents are "Protected

Material" covered by the Protective Order. (Protective Order, ECF No. 84, at § 3). Based upon the confidential Source Documents he was provided, Dr. Kessler generated a data summary, marked at his deposition as Exhibit 3, and offered deposition testimony. Dr. Kessler testified that "I think there's public health significance to this data." (Pl.'s Reply, ECF No. 229, Ex. A, Tr. Dep. Dr. Kessler, at 31:13-14). Plaintiffs and Relators do not seek to de-designate the Merck's confidential Source Documents provided to Dr. Kessler, they solely seek to unseal these portions of his testimony and his Exhibit 3 summarizing Merck's data. They contend the excerpts of Dr. Kessler's testimony and his Exhibit 3 must be published to the general public to protect the public health.

Plaintiffs' and Relators' Motion is denied without prejudice. Importantly, nothing in the Protective Order prohibits Plaintiffs and Relators from raising Dr. Kessler's concerns with the Department of Health and Human Services (HHS), the Food and Drug Administration (FDA), or the Center for Disease Control and Prevention (CDC). (Protective Order, ECF No. 84, at §§ 7.2(d), 7.3(c)). The Protective Order generally prohibits a Receiving Party from disclosing Protected Material, but certain individuals and entities are specifically exempted from this general prohibition, including, *inter alia*, "[g]overnment employees of FDA, CDC, HHS, or EMA." (*Id.*). Thus, Plaintiffs and Relators can provide Dr. Kessler's report and opinions to these entities, but they have not done so. As described *infra* nn. 3-4, the Parties may disclose Dr. Kessler's Exhibit 3 and testimony to the appropriate public health officials at HHS, FDA, and CDC, as permitted under the Protective Order.

Based on Dr. Kessler's opinion that "there's public health significance to this data," Plaintiffs and Relators contends "[a] single *Pansy* factor overshadows any countervailing arguments: the fourth factor, interest in public health." (Pl.'s Mot. at 12); *see also Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995) ("[W]e recognized several factors, which are neither mandatory nor exhaustive, that may be considered in evaluating whether 'good cause' exists." (citing *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 787-91 (3d Cir. 1994))). Defendant argues there is good cause under the *Pansy* factors to maintain confidentiality over Dr. Kessler's models and the protected Source Documents he relied upon. Defendant also vehemently disagrees with Dr. Kessler's opinion, and proffers its own experts who have opposing views as to what the data shows. (Def.'s Resp. at 18, 22-24). While I agree with Plaintiffs and Relators that this *Pansy* factor weighs heavily in favor of disclosure, I also recognize that the actual public health import of Dr. Kessler's opinion depends on the accuracy of his projections and model. As was acknowledged by Plaintiffs and Relators at oral argument, Dr. Kessler's opinions and conclusions are not uncontroverted. At this stage of the proceedings, and on the record before me, I decline to put the Court's imprimatur on Dr. Kessler's conclusions and opinions. The precise impact on the "public health" is very much disputed, and not for the Court to decide at this juncture, or on the present record.

Accordingly, Plaintiffs and Relators Motion is denied without prejudice. The Court finds it appropriate to first disclose Dr. Kessler's testimony and Exhibit 3 to the public health officials at HHS, FDA, and CDC, as permitted under the Protective Order. Such disclosure will permit the appropriate public health officials to assess, in the first instance, whether a public health issue exists, and to adopt measures, if any, in response to any such issue.

2

Case 2:22-cv-07303-KM-JSA Document 228-53 Filed 11/20/2023 Page 101 of Appx182

2. The Parties shall promptly meet and confer to identify a protocol for relaying Dr. Kessler's opinions and conclusions to the appropriate officials at the Department of Health and Human Services (HHS), the Food and Drug Administration (FDA), and the Center for Disease Control and Prevention (CDC) so that those officials can determine what response, if any, is appropriate to address any potential public health issue;[3] and

3. Upon furnishing agreed-upon materials to the appropriate individual(s) within HHS, FDA, and/or CDC, the Parties shall file with the Court the signed "Acknowledgement and Agreement to Be Bound" (Protective Order, ECF No. 84-1) of those public health officials.[4]

---

[3] Merck represented that it had no objection to Dr. Kessler's testimony and Exhibit 3 being furnished to the appropriate public health officials at the FDA, CDC, and HHS. Rather, Merck objected to Plaintiffs' and Relators' request to publish the portions of Dr. Kessler's testimony and Exhibit 3 to the general public. Merck argued that the appropriate public health officials should be the first to determine whether a public health issue exists. As set forth above, I conclude that the appropriate first step is to stay within the parameters of the Protective Order, and inform the appropriate public health officials of Dr. Kessler's opinions and conclusions so that they may assess Dr. Kessler's concerns in the first instance. This approach is consistent with Dr. Kessler's own testimony: disclosure of his conclusions must be done "as carefully as possible so we don't undermine the American public's confidence in vaccines" and it must be done "thoughtfully and wisely and not create any scares." (Pl.'s Reply, ECF No. 229, Ex. A, Tr. Dep. Dr. Kessler, at 229:18-22). Dr. Kessler thus stated that "certainly at least the secretary of health and human services [should] have this information, and maybe broader." (*Id.* at 31:23-25). Accordingly, I conclude it is appropriate to order disclosure of the data to the appropriate public health officials, at least in the first instance. The Parties shall promptly meet and confer to identify the appropriate public health officials and coordinate a protocol to relay Dr. Kessler's opinions and conclusions.

[4] At oral argument, Merck noted that the United States is a party to this action, and so the "public health officials" already have been alerted to Dr. Kessler's opinions, but have done nothing in response to Dr. Kessler's concerns. This court has no basis to conclude that appropriate officials within the appropriate public health agencies are aware of Dr. Kessler's concerns. On the record before me, I decline to assume that they are.

ꓱꓤꓘꓘꓠ6ꓯ0ꓔ0ꓠ ꓤ Hꓯ8ꓔꓱ Page 3 of 10 Document 233 Filed 11/17/2022 Appx183

BY THE COURT:

_Lynne A. Sitarski_
LYNNE A. SITARSKI
UNITED STATES MAGISTRATE JUDGE

---

Thus, I conclude it is appropriate to (1) allow disclosure of Dr. Kessler's Exhibit 3, testimony, and related documents to the appropriate public health officials at HHS, FDA, and CDC to permit them to assess necessary steps, if any, to address the potential issue; and (2) order the Acknowledgements to be Bound be filed with the Court to inform the Court which public health officials possess Dr. Kessler's Exhibit 3 and testimony.

Case 2:22-mc-00038-PD Document 1-1 Filed 11/02/2023 Page 103 of 103 Appx184

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*, STEPHEN A. KRAHLING and JOAN A. WLOCHOWSKI,<br><br>*Plaintiffs,*<br><br>v.<br><br>MERCK & CO., INC.,<br><br>*Defendant.* | Civil Action No. 10-4374 (CDJ)<br><br>**CONTAINS "CONFIDENTIAL" AND "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" MATERIAL PURSUANT TO PROTECTIVE ORDER** |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF ITS FIRST DISPOSITIVE MOTION:
FOR SUMMARY JUDGMENT ON RELATORS' CLAIMS BASED ON AN
EFFICACY-BASED THEORY OF FALSITY**

Pursuant to the Court's Policies and Procedures for Civil Cases, Defendant Merck Sharp & Dohme Corporation, formerly known as Merck & Co., Inc. ("Merck"), submits this statement of undisputed material facts in support of Merck's motion for summary judgment on the claims based on an efficacy-based theory of falsity in Relators' Amended Complaint.

**I.      RELATORS**

**A.      Stephen A. Krahling**

1.      Stephen A. Krahling is a former Merck employee who received a B.S. in Microbiology from Penn State University in 1995. Ex. 1 (Krahling Resume) at MRK-KRA00331426.

2.      Krahling worked for Merck from March 1999 to August 2000 and December 27, 2000 to November 9, 2001. Ex. 2 (Krahling Dep. Tr. Vol. 1) at 39:15-40:12, 111:2-4 and 171:10-12; Ex. 3 (Merck Employee Initialization Form) at MRK-KRA00582401; Ex. 4 (Krahling

Appx185

Separation Agreement) at MRK-KRA00582394; Ex. 5 (Krahling's Resp. to Def.'s First Set of Interrogatories, Interrogatory No. 6) at 15.

3.      From March 1999 to August 2000, Krahling worked as a contract employee in a Merck research laboratory. Ex. 2 (Krahling Dep. Tr. Vol. 1) at 39:12- 40:12, 41:4-13; Ex. 5 (Krahling's Resp. to Def.'s First Set of Interrogatories, Interrogatory No. 6) at 15.

4.      In December 2000, four months after leaving Merck at the conclusion of his contract work, Krahling returned to Merck as a permanent employee in the same lab. Krahling held this position until November 2001. Ex. 3 (Merck Employee Initialization Form) at MRK-KRA00582401; Ex. 4 (Krahling's Separation Agreement) at MRK-KRA00582394, MRK-KRA00582397; Ex. 2 (Krahling Dep. Tr. Vol. 1) at 180:3-6; Ex. 5 (Krahling's Resp. to Def.'s First Set of Interrogatories, Interrogatory No. 6) at 15.

5.      At Merck, Krahling was a lab technician in a division called Merck Research Laboratories (MRL) under the supervision of Dr. David Krah. Ex. 24 (Krahling Employment Offer) at RELATOR_00001059; Ex. 5 (Krahling's Resp. to Def.'s First Set of Interrogatories, Interrogatory No. 6) at 15.

6.      In that role, Krahling ran cell-based assays to characterize Merck's live virus vaccines, including work in support of the plaque reduction neutralization assay referred to as Protocol 007. Ex. 2 (Krahling Dep. Tr. Vol. 1) at 39:15-43, 55:7-12.

7.      Krahling never worked in the laboratory that ran the enzyme-linked immunosorbent assay (ELISA) for Protocol 007. Ex. 2 (Krahling Dep. Tr. Vol. 1) at 56:20-57:2.

8.      Krahling does not allege scientific impropriety in the original 1960s efficacy studies that supported Merck's mumps vaccine's initial licensure. In fact, neither Krahling nor

**Appx186**

Wlochowski challenge or context the validity of Dr. Hilleman's original clinical trials. Ex. 2 (Krahling Dep. Tr. Vol. 1) at 83:13-84:6.

9.      Krahling never worked in Merck's Manufacturing Division, never had any responsibility for manufacturing the mumps vaccine, and did not run the $TCID_{50}$ assay used to measure the potency of the mumps vaccine. Ex. 13 (Krahling Responses to Def.'s Req. for Admission) at ¶¶ 22-23; Ex. 2 (Krahling Dep. Tr. Vol. 1) at 61:19-25; Ex. 7 (Krahling Dep. Tr. Vol. 2) at 392-393:12-22, 488:21-489:6.

10.     While working for Merck, Krahling was not responsible for communicating with the U.S. Food and Drug Administration (FDA) on Merck's behalf. Ex. 13 (Krahling Responses to Def.'s Req. for Admission) at ¶ 29.

11.     Prior to his participation in this litigation, Krahling never reviewed any of Merck's submissions to foreign regulatory bodies related to Merck's mumps vaccine or Protocol 007. *Id.* at ¶¶ 46-48.

12.     Prior to his participation in this litigation, Krahling never personally communicated with the Centers for Disease Control and Prevention (CDC) about Merck's mumps vaccine or the issues in the Amended Complaint and he was not responsible for communications with CDC. *Id.* at ¶¶ 3, 50-51.

13.     While working for Merck, Krahling was not responsible for drafting, negotiating, or executing any contracting for the sale of Merck's vaccines to CDC. *Id.* at ¶ 54.

14.     Before this lawsuit, Krahling had no personal knowledge of non-public communications between Merck and CDC concerning Merck's mumps vaccine, including no knowledge of communications with CDC concerning Protocol 007. *Id.* at ¶¶ 56-57.

Appx187

15.　Krahling has not spoken with CDC about its decision to purchase Merck's Mumps Vaccine. *Id.* at ¶ 60.

**B.　Joan A. Wlochowski**

16.　Relator Joan L. Wlochowski is a former Merck employee who worked for Merck from 2000 to 2002. Ex. 203 (Wlochowski Resume) at AMGEN_0007.

17.　While working at Merck, Wlochowski was a lab technician in MRL's virus and cell biology laboratory under the supervision of Dr. Krah. *Id.*; Ex. 204 (Wlochowski Dep. Vol. 1) at 60:23-61:1.

18.　In this role, she inoculated assays for the plaque reduction neutralization assay for Protocol 007. Ex. 85 (Wlochowski's Responses to Def.'s Req. for Admission) at ¶¶ 1-2.

19.　As of June 13, 2017, Wlochowski had never had a conversation directly about the mumps vaccine with FDA or with CDC. Ex. 204 (Wlochowski Dep. Tr. Vol. 1) at 123:7-15.

20.　Wlochowski cannot say what CDC does in order to determine whether to purchase the mumps vaccine and she has not personally communicated with CDC about Merck's mumps vaccine or the topics addressed in her complaint. Ex. 204 (Wlochowski Dep. Tr. Vol. 1) at 152:16-153:5; Ex. 85 (Wlochowski's Responses to Def.'s Req. for Admission) at ¶ 4.

21.　Wlochowski never worked in Merck's Manufacturing Division and did not have responsibility for manufacturing the mumps vaccine when she worked at Merck. Ex. 85 (Wlochowski's Responses to Def.'s Req. for Admission) at ¶¶ 23-24.

22.　While working for Merck, Wlochowski was not responsible for communicating with FDA on Merck's behalf and she has never attended any meeting between Merck and FDA relating to Merck's mumps vaccine, Protocol 007, or any neutralization assay. Ex. 85 (Wlochowski's Responses to Def.'s Req. for Admission) at ¶¶ 30, 36-38.

Appx188

23. Prior to her participation in this litigation, Wlochowski never reviewed any of Merck's submissions to foreign regulatory bodies related to Merck's mumps vaccine or Protocol 007. Ex. 85 (Wlochowski's Responses to Def.'s Req. for Admission) at ¶¶ 47, 49.

24. While working for Merck, Wlochowski was not responsible for communications with CDC and was never asked to communicate with CDC on Merck's behalf. Ex. 85 (Wlochowski's Responses to Def.'s Req. for Admission) at ¶¶ 51-52.

25. While working for Merck, Wlochowski was not responsible for drafting, negotiating, or executing any contracting for the sale of Merck's vaccines to CDC. Ex. 85 (Wlochowski's Responses to Def.'s Req. for Admission) at ¶ 55.

26. Before this lawsuit, Wlochowski had no personal knowledge of non-public communications between Merck and CDC concerning Merck's mumps vaccine, including no knowledge of communications with CDC concerning Protocol 007. Ex. 85 (Wlochowski's Responses to Def.'s Req. for Admission) ¶¶ 57-58.

27. Wlochowski has not spoken with CDC about its decision to purchase Merck's Mumps Vaccine. Ex. 85 (Wlochowski's Responses to Def.'s Req. for Admission) at ¶ 61.

## II.    MERCK'S MUMPS VACCINE

28. Mumps, the once ubiquitous childhood disease, generally presents as fever and parotitis (inflammation of one or both parotid (salivary glands)). Ex. 197 (Excerpts of Rubin, *Vaccines* (2018)) at 663.

29. In the pre-vaccine era, "mumps was the leading cause of viral encephalitis and sudden onset deafness in the United States." Ex. 197 (Excerpts of Rubin, *Vaccines* (2018)) at 663.

30. Meningitis and mild meningoencephalitis, the most frequent complications of mumps in children, can result in death, albeit rarely. Ex. 102 (Excerpts of Feigin and Cherry, *Textbook of Pediatric Infectious Diseases*, 8th Ed. (2019)) at 1775.

31. In 1967, Merck's monovalent mumps vaccine, MUMPSVAX®, was first licensed in the United States, containing a version of the "Jeryl Lynn" strain of the mumps virus. Ex. 197 (Excerpts of Rubin, *Vaccines* (2018)) at 669.

32. In 1971, Merck introduced the MMR vaccine, which combined the Mumpsvax vaccine with a measles vaccine and a rubella vaccine in a single "trivalent" vaccine. Ex. 197 (Excerpts of Rubin, *Vaccines* (2018)) at 670.

33. In 1978, Merck obtained approval of second trivalent MMR vaccine, called MMR-II, which included the same measles and mumps vaccines as were in MMR but a different rubella vaccine. Ex. 197 (Excerpts of Rubin, *Vaccines* (2018)) at 672, 979-980.

34. The Jeryl Lynn mumps vaccine is also included in ProQuad, a quadrivalent vaccine licensed by Merck in 2005 that comprises four distinct vaccines—the same measles, mumps and rubella vaccines that are in MMR-II, as well as a varicella (chicken pox) vaccine. Ex. 197 (Excerpts of Rubin, *Vaccines* (2018)) at 672.

35. As a result, the Jeryl Lynn mumps vaccine has been the mumps vaccine administered to children and adults in the United States for more than 50 years.

36. CDC reports that that, "[a]fter the U.S. mumps vaccination program started in 1967, there has been a more than 99% decrease in mumps cases in the United States. Ex. 81 (CDC, *Mumps Vaccination*, https://www.cdc.gov/mumps/vaccination.html).

37. "Before the U.S. mumps vaccination program started in 1967, about 186,000 cases were reported each year, but the actual number of cases was likely much higher due to

Appx190

underreporting." By comparison, in 2018, the provisional number of mumps cases reported in the United States was 2,251—99% fewer cases than were reported annually in the pre-vaccine era. Ex. 98 (CDC, *Mumps Cases and Outbreaks*, https://www.cdc.gov/mumps/outbreaks.html).

38.     In the context of vaccine trials, *efficacy* refers to "[t]he ability of a vaccine to provide protection against disease under ideal circumstances." Ex. 95 (Centers for Disease Control and Prevention, *Manual for the Surveillance of Vaccine-Preventable Disease*, Definition of Terms (5th ed. 2012), http://www.cdc.gov/vaccines/pubs/surv-manual/front-portion.pdf) at ix.

39.     In the context of vaccines, efficacy is typically evaluated by comparing how many people in a clinical trial who were vaccinated got the disease with how many people who were not vaccinated got the disease. Ex. 100 (CDC, *Principles of Epidemiology in Public Health Practice* (3d ed. 2012), https://www.cdc.gov/csels/dsepd/ss1978/lesson3/section6.html) at § 6.

40.     The primary pre-licensure field trial for the Jeryl Lynn vaccine was published in the New England Journal of Medicine. The study was carried out by Dr. Maurice Hilleman and his colleagues in 1965-1966. The investigators found: "The reduction of cases of natural mumps (that is, protective efficacy) resulting from the vaccine was 97 per cent if only the laboratory-proved cases are considered. If, however, the later cases that occurred in families and have not yet been diagnosed in the laboratory are included, the protective efficacy would be about 95 per cent." Ex. 86 (Maurice Hilleman et al., *Live, Attenuated Mumps Virus Vaccine 4. Protective Efficacy as Measured in a Field Evaluation*. 276 New England J. of Medicine (1967)) at 256; *see also* Ex. 199 (Robert Weibel et al., *Live, Attenuated Mumps Virus Vaccine 3. Clinical and Serologic Aspects in a Field Evaluation*, 276 New England J. of Medicine 245 (1967)) at 245-251.

**Appx191**

41.     Neutralizing antibody was induced in 98% of vaccinated participants who were initially seronegative to mumps. Ex. 86 [Maurice Hilleman et al., *Live, Attenuated Mumps Virus Vaccine 4. Protective Efficacy as Measured in a Field Evaluation*. New England Journal of Medicine. 276(5) (1967)] at 256; *see also* Ex. 199 [Robert Weibel et al., *Live, Attenuated Mumps Virus Vaccine 3*. Clinical and Serologic Aspects in a Field Evaluation. New England Journal of Medicine. (1967) 276(5):245-251] at 251.

42.     In the context of vaccines, *effectiveness* "represents the percentage reduction in the frequency of . . . infections among people vaccinated compared to the frequency among those who were not vaccinated." Ex. 101 (CDC, Flu Vacine Effectiveness:  Q&A for Health Professionals) at 1; Ex. 111 (Freed Report) at 13 ¶ 46; *see also* Ex. 95 (CDC, *Manual for the Surveillance of Vaccine-Preventable Disease* (5th ed. 2012), http://www.cdc.gov/vaccines/pubs/surv-manual/front-portion.pdf) at ix (Vaccine effectiveness is the "ability of a vaccine to provide protection against disease when used under field conditions (e.g., use of the vaccine in routine practice).").

43.     The term vaccine *impact* can be used to describe the comparison of the incidence of a disease in a given population before and after the introduction of a vaccine. Ex. 207 (M. Doherty, *Vaccine Impact: Benefits for Human Health*, 2016 *Vaccine* 6707) at 6708.

44.     In part, because impact considers both vaccinated and unvaccinated individuals, it also accounts for effects such as "herd immunity," whereby "circulation of a bacteria or virus may be decreased" because of the vaccine, "which lessens the chance that even someone who has not been immunized will get disease." Ex. 110 (FDA, *Vaccine Safety Questions and Answers* https://www.fda.gov/vaccines-blood-biologics/safety-availability-biologics/vaccine-safety-questions-and-answers).

Appx192

45.     In part because it would be unethical to randomize people into a placebo or no vaccine group after a vaccine has been licensed, it is generally not possible to conduct efficacy studies after a vaccine has been recommended for use. Ex. 94 (CDC, *Flu Vaccine Effectiveness and Efficacy is Measured: Questions and Answers for Health Professionals* (Jan. 29, 2016), http://www.cdc.gov/flu/professionals/vaccination/effectivenessqa.htm) (explaining that universal vaccine recommendations make it unethical to perform randomized clinical control trials because assigning individuals to the placebo-controlled group puts them at risk of infection).

46.     CDC currently reports that "[t]wo doses of mumps vaccine are 88% (range 31% to 95%) effective at preventing the disease; one dose is 78% (range 49% to 91%) effective." Ex. 99 (CDC, *Mumps For Healthcare Providers*, https://www.cdc.gov/mumps/hcp.html) at 3.

47.     The "preponderance of data demonstrate [mumps vaccines] to be highly effective and solely responsible for the near elimination of this once ubiquitous disease in all countries where mumps-containing vaccine is rigorously used." Ex. 197 (Rubin, *Vaccines* (2018)) at 688.

48.     During the first five years of this century, the number of mumps cases reported annually in the United States were at all-time lows, with only 200-300 cases being reported each year. Ex. 97 (CDC, MMWR, *Summary of Notifiable Diseases – United States, 2005* (Mar. 30, 2007), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm5453a1.htm) at 77.

49.     Since 2006, the number of mumps cases reported each year has generally numbered in the hundreds or low thousands—a significant decrease from the 186,000 cases reported each year in the pre-vaccine era. Ex. 99 (CDC, *Mumps For Healthcare Providers*, https://www.cdc.gov/mumps/hcp.html) at 2.

### III.     THE MMR-II LABEL

50.     Consistent with statute and regulations, for the entire time period relevant to this case, the MMR-II vaccine has carried an FDA-approved label. Ex. 226 (March 1995), Ex. 227

Appx193

(March 1995), Ex. 165 (1995), Ex. 166 (Apr. 1999), Ex. 232 (Apr. 1999), Ex. 222 (Oct. 2000),

Ex. 236 (Feb. 2000), Ex. 223 (Feb. 2001), Ex. 224 (Aug. 2001), Ex. 229 (Sept. 2002), Ex. 228

(Oct. 2003), Ex. 225 (Feb. 2006), Ex. 230 (Feb. 2007), Ex. 231 (Feb. 2007), Ex. 167 (Dec.

2007), Ex. 233 (Feb. 2014), Ex. 234 (June 2014), Ex. 235 (Oct. 2015), Ex. 237 (Mar. 2010), Ex.

238 (Dec. 2010), and Ex. 239 (Sep. 2009).

51.     Part of what FDA considers to be labeling is the insert that contains "Prescribing

Information," which is "written for the healthcare practitioner."  The statements about the

mumps vaccine in this Statement and accompanying Motion refer to the label and the Prescribing

Information component of the insert interchangeably. Ex. 208 (FDA, *Prescription Drug Labeling*

*Resources*, https://www.fda.gov/drugs/laws-acts-and-rules/prescription-drug-labeling-resources);

*see* 21 C.F.R. § 201.56(e) (treating the Prescribing Information as contained within "drug

labeling").

### A.     Label statements about efficacy and impact

52.     In discussing efficacy, since 1999, the label has explained:  "Efficacy of measles,

mumps and rubella vaccines was established in a series of double-blind controlled field trials

which demonstrated a high degree of protective efficacy afforded by the individual vaccine

components."  In a footnote, the label cites to the Hilleman and Weibel studies as support for this

statement. Ex. 166 (April 1999 Label) at MRK-KRA00757072; Ex. 167 (December 2004 Label)

at MRK-KRA00757100; Ex. 121 (current label, *available at*

https://www.merck.com/product/usa/pi_circulars/m/mmr_ii/mmr_ii_pi.pdf) at 2.

53.     In discussing evidence of impact, since 1999, the label has explained that:  "The

impact of measles, mumps, and rubella vaccination on the natural history of each disease in the

United States can be quantified by comparing the maximum number of measles, mumps, and

rubella cases reported in a given year prior to vaccine use to the number of cases of each disease

Appx194

reported in 1995. . . .[F]or mumps, 152,209 cases reported in 1968 compared to 840 cases reported in 1995 resulted in a 99.45% decrease in reported cases." Ex. 166 (April 1999 Label) at MRK-KRA00757072; Ex. 167 (December 2004 Label) at MRK-KRA00757100; Ex. 121 (current label) at 1.

**B.      Label statements about seroconversion and immunogenicity**

54.      The MMR-II label has also included statements about seroconversion and immunogenicity, which are distinct from effectiveness, efficacy, or impact. The relevant statements have been substantively the same for the entire relevant period from 1999 to the present. Ex. 166 (April 1999 Label) at MRK-KRA00757072; Ex. 167 (December 2004 Label) at MRK-KRA00757100; Ex. 121 (current label) at 1-2.

55.      *Immunogenicity* provides information about how a subject's immune system responds to different stimuli, including vaccination. Ex. 193 (Plotkin, *Mumps vaccine*) at 430.

56.      In the study of most vaccines, the most common immunological response that is studied is the development of antibodies induced by the vaccine.  Immunological assays are tests that use serum or other samples from test subjects to look for certain kinds of information about the subject's immune system and the immune response to different stimuli, including vaccination.  Ex. 92 (Durbin Report) at 6.

57.      One measure of immunogenicity is *seroconversion*, which refers to the "a person going from being 'seronegative' prior to vaccination, which generally means lacking pathogen specific antibodies, to being 'seropositive' after vaccination, which means possessing such antibodies." Ex. 92 (Durbin Report) at 6.

58.      Immunogenicity and seroconversion can be indirect measures for protection. However, a person observed to be seropositive may not be protected against disease, and someone observed to be seronegative may be protected. In part, this is because production of

Appx195

antibodies is not the only way that the immune system can combat a pathogen, and in part because for most vaccines there is no known level of antibody that reliably indicates actual protection. Ex. 92(Durbin Report) at 8-9; Ex. 90 (Arvin Report) at 24-28.

59.     In discussing seroconversion, the MMR-II label has explained:  "Clinical studies of 284 triple seronegative children, 11 months to 7 years of age, demonstrated that M-M-R II is highly immunogenic and generally well tolerated. In these studies, a single injection of the vaccine induced . . . mumps neutralizing antibodies in 96% . . . of susceptible persons. However, a small percentage (1-5%) of vaccinees may fail to seroconvert after the primary dose." Ex. 121 (current label) at 1.[1]

60.     The label then cites to the Indications and Usage section's Recommended Vaccination Schedule, which states:  "Individuals first vaccinated at 12 months of age or older should be revaccinated prior to elementary school entry. Revaccination is intended to seroconvert those who do not respond to the first dose. The Advisory Committee on Immunization Practices (ACIP) recommends administration of the first dose of M-M-R II at 12 to 15 months of age and administration of the second dose of M-M-R II at 4 to 6 years of age." Ex. 121 (current label) at 2.

61.     The label has also explained that the efficacy established through field trials— citing a 1966 study for the mumps vaccine—"also established that seroconversion in response to vaccination against measles, mumps, and rubella paralleled protection from these diseases."  Ex. 121 (current label) at 2.

---

[1]     Prior to 2006, the label stated that there were 279 triple seronegative children in the studies. In 2006, 279 was changed to 284 to show the correct number of triple seronegative children in the studies.

62.     In 1989, the ACIP effectively recommended a second dose of mumps vaccine when it, for improved measles control, recommended "a second dose of measles-mumps-rubella vaccine for school-aged (i.e., grades K—12) and college students."  Ex. 211 (ACIP, *Measles Prevention: Recommendations of the Immunization Practices Advisory Committee*, MMWR, 1989:38 (S-9):1-18) at 1.

63.     In May 2006, the "ACIP issued updated recommendations for mumps vaccination" with a key change being the express recommendation that in outbreak settings a second dose of mumps vaccine be considered for children aged one to four years and adults at low risk if they are affected by the outbreak. Ex. 210 (ACIP, MMWR, *Notice to Readers: Updated Recommendations of the Advisory Committee on Immunization Practices (ACIP) for the Control and Elimination of Mumps* (2006), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm5522a4.htm). The label also has explained: "Following vaccination, antibodies associated with protection can be measured" by various tests and that "antibodies to . . . mumps . . . viruses are still detectable in most individuals 11-13 years after primary vaccination." Ex. 121 (current label) at 2.

64.     The label has made no further statements about immunogenicity or seroconversion in response to the mumps vaccine. Ex. 121 (current label).

65.     When CDC mumps experts have published on their understanding of the seroconversion rate of Merck's mumps vaccine, they have looked to published literature, not to the MMR label.  Ex. 41 (Pallansch Dep. Tr.) at 80:12-19.

**C.     Label statement about potency**

66.     Included in the FDA-approved label for MMR-II is a statement concerning the *potency* of the MMR II vaccine.  Ex. 121 (current label).

67.     *Potency* in the label describes the concentration of virus in each dose of vaccine. Ex. 122 (Morrisey Dep. Tr.) at 27:23-28:13.

68.     Potency in the label is reported in units of "tissue culture infective dose" ($TCID_{50}$). Potency values expressed using this measurement represent the viral concentration necessary to induce cell death or pathological changes in 50% of inoculated cell cultures. Ex. 91 (Gulati Report) at ¶ 22.

69.     Potency values can be expressed as simple numbers or as log base 10 values (*e.g.*, 20,000 $TCID_{50}$ or 4.3 $\log_{10} TCID_{50}$). Ex. 200 (Musey Dep. Tr.) at 102:2-19.

70.     As of the late 1990s, the MMR-II label stated that "[e]ach 0.5 mL dose contains not less than . . . 20,000 $TCID_{50}$ of mumps virus"—equivalent to 4.3 $\log_{10} TCID_{50}$. Ex. 166 (April 1999 Label), at 1.

71.     The mumps vaccine is a live virus vaccine containing live viral cells, and as such, the volume of live cells in the vaccine (i.e. potency) is known to decrease over time. This degradation can be impacted by environmental conditions, including, for example, the temperature at which the vaccine is stored. Ex. 112 (Excerpts of Phillip L. Gomez & James M. Robinson, *Vaccine Manufacturing* in Stanley Plotkin et al. eds., *Vaccines* (2018 7th ed.) at 54; Ex. 91 (Gulati Report) at ¶ 24.

## IV.     GOVERNMENT PURCHASES OF VACCINES

### A.     How CDC Purchases Vaccines

72.     CDC administers the federal Vaccines for Children (VFC) program. Ex. 38 (About VFC, https://www.cdc.gov/vaccines/programs/vfc/about/index.html (last reviewed Sept. 26, 2019).

Appx198

73.     The VFC program helps "provide vaccines to children whose parents or guardians may not be able to afford them." *Id*. Vaccines available through the VFC program "are those recommended by [ACIP]." *Id*.

74.     VFC is an entitlement program. Under this program, CDC is directed to purchase vaccines that ACIP has included within the VFC program. 42 U.S.C. § 1396s(d)(1) ("[t]he Secretary shall negotiate and enter into contracts with manufacturers of pediatric vaccines . . . to purchase vaccines."); *see also id*. § 1396s(e) ("The Secretary shall use, for the purpose of the purchase, delivery, and administration of pediatric vaccines under this section, the list established (and periodically reviewed and as appropriate revised) by the Advisory Committee on Immunization Practices (an advisory committee established by the Secretary, acting through the Director of the Centers for Disease Control and Prevention)."); *see also* Ex. 39 (ACIP Charter, *available at* https://www.cdc.gov/vaccines/acip/committee/acip-charter.pdf (approved March 27, 2018)) at 2 ("In accordance with Section 1928 of the Social Security Act, the ACIP also shall establish and periodically review and, as appropriate, revise the list of vaccines for administration to children and adolescents eligible to receive vaccines through the Vaccines for Children Program . . . The Secretary, and as delegated CDC Director, shall use the list established by the ACIP for the purpose of the purchase, delivery, and administration of pediatric vaccines in the Vaccines for Children Program."); Ex.40 (Nichols Report) at 8-10.

75.     The purchase of Merck's mumps-containing vaccines by CDC is mandatory because Merck's MMR-II and ProQuad vaccines are licensed by FDA and mumps is included within the VFC program per ACIP resolution. Ex. 41 (Pallansch Dep. Tr.) at 101:6-8 (CDC's Director of the Division of Viral Diseases in the National Center for Immunization and Respiratory Diseases testifying that once a vaccine is recommended by ACIP "then the purchase

Appx199

[by CDC] through VFC . . . is automatic"); Ex. 40 (Nichols Report) at 11; Ex. 42 (1971 MMR

Product License) at MRK-KRA01972538 ; Ex. 43 (1995 MMR Product License at MRK-

KRA01676252; Ex. 44 (Establishment License) at MRK-KRA01676250); *see also* Ex. 45 (ACIP

Resolution 10/17-3 for MMR and Varicella (Oct. 25, 2017) (including vaccine for measles,

mumps, rubella (MMR) and measles, mumps, rubella, varicella (MMRV) within current

recommended ACIP schedule); *see also* Ex. 46 (ACIP Resolution 6/06-1, June 29, 2016) (listing

mumps for inclusion in the list of diseases for which vaccines should be in the VFC program).

## B. ACIP and CDC Evaluations of Mumps Vaccines

76.     "The ACIP includes 15 voting members responsible for making vaccine

recommendations.  The Secretary of the U.S. Department of Health and Human Services

(DHHS) selects these members following an application and nomination process.  Fourteen of

the members have expertise in vaccinology, immunology, pediatrics, internal medicine, nursing,

family medicine, virology, public health, infectious diseases, and/or preventive medicine; one

member is a consumer representative who provides perspectives on the social and community

aspects of vaccination.  In addition to the 15 voting members, ACIP includes 8 ex officio

members who represent other federal agencies with responsibility for immunization programs in

the United States, and 30 non-voting representatives of liaison organizations that bring related

immunization expertise."  (CDC, *ACIP Committee Members*,

https://www.cdc.gov/vaccines/acip/members/index.html)

77.     The ACIP membership includes some of the leading figures in vaccine expertise.

Ex. 41 (Pallansch Dep. Tr.) at 44:11-44:14, 47:20-48:3.

78.     ACIP's charter provides a description of its duties. It states in part:  "Committee

deliberations on use of vaccines to control disease in the U.S. shall include considerations of

disease epidemiology and burden of disease, vaccine efficacy and effectiveness, vaccine safety,

Appx200

the quality of evidence reviewed, economic analyses and implementation issues." Ex. 39 (ACIP

Charter, *available at* https://www.cdc.gov/vaccines/acip/committee/charter.html) at 2; *see also*

Ex. 47 (ACIP Policies and Procedures (Dec. 2018) at 1.

79.    Once a vaccine is licensed, the data most important to ACIP when evaluating the

use of a vaccine to control disease is that regarding the vaccine's safety and effectiveness. Ex. 49

(Atkinson Report) at 16-17.

80.    Evaluations of vaccine effectiveness and the conduct of outbreak investigations

are the responsibility of CDC. The mission statement for the National Center for Immunization

and Respiratory Diseases (NCIRD), one of four Centers within CDC Office of Infectious

Diseases, identifies "respond[ing] to disease outbreaks domestically and abroad" as a

responsibility. The Division of Viral Diseases (DVD), a division of the NCIRD, identifies as its

mission the "prevent[ion of] disease, disability, and death through immunization and by control

of . . . viral diseases."  In furtherance of this mission, the DVD, for example, conducts

surveillance and related activities to monitor the impact of vaccination, estimates vaccine

effectiveness, and consults, supports, and/or participates in investigations of national and

international outbreaks of viral vaccine preventable diseases. Ex. 50 (NCIRD Mission/Function

Statement, https://www.cdc.gov/maso/pdf/NCIRDfs.pdf) at 1, 8.

81.    Consistent with this mission, a "major" responsibility and a "key function" of

CDC is to "measure vaccine effectiveness for both old and new products."  Ex. 41 (Pallansch

Dep. Tr.) at 33:19-21, 101:10-16.

82.    Because "[e]ffectiveness is the [CDC's] single-most important measure in terms

of the impact that a vaccine has on disease in the population," CDC conducts vaccine

effectiveness studies either independently or often times in collaboration with state health

Appx201

departments and/or academics. CDC's role is to "look and evaluate post-marketing how the vaccine is performing in the real world as opposed to clinical trial data, which is . . . the basis that is often used by the FDA for the purpose of licensure." *Id*. at 22:16-23:2, 33:3-5, 42:17-19.

83.     "Vaccine effectiveness studies in general are not often conducted by the manufacturers." CDC also understands that manufacturers are "not obligated to share unpublished data with CDC specifically." *Id*. at 42:15-16; 112:3-14.

84.     CDC has conducted multiple mumps effectiveness studies and after them has concluded that "[t]here has been no significant change in the estimates of vaccine effectiveness for more than 10 years in general"—referring to the 10 year period ending in October 2017. *Id*. at 129:7-11; *see also* Ex. 49 (Atkinson Report) at 8.

85.     CDC has noted that "[c]linical studies conducted before vaccine licensure in approximately 7,000 children found a single dose of mumps vaccine to be approximately 95% effective in preventing mumps disease. However, vaccine effectiveness estimates have been lower in post-licensure studies." Ex. 51 (Huong McLean et al., *Prevention of Measles, Rubella, Congenital Rubella Syndrome, and Mumps, 2013: Summary Recommendations of the [ACIP]*, MMWR, June 14, 2013, 62(4):1-34) at 10.

86.     In 1998, CDC observed that in "controlled clinical trials, one dose of vaccine was approximately 95% efficacious in preventing mumps disease" but the effectiveness of the vaccine observed in field studies was lower ranging from 75% to 95%. Ex. 53 [May 22, 1998 MMWR] (MMWR's *Measles, Mumps and Rubella – Vaccine use and Strategies for Elimination of Measles, Rubella and Congenital Rubella Syndrome and Control of Mumps: Recommendations of the Advisory Committee on Immunization Practices* ) at 6.

87. CDC has known since at least the early 1980s that the vaccine effectiveness estimates for mumps have ranged from 75% to 95%. *See, e.g.*, Ex. 214 [November 26, 1982 MMWR] (Recommendation of the Immunization Practices Advisory Committee Mumps Vaccine) at 2; Ex. 213 [June 9, 1989 MMWR] (Recommendations of the Immunization Practices Advisory Committee Mumps Prevention) at 2.

88. Accordingly, CDC understands "that the effectiveness of the vaccine in the real world application is lower than the efficacy that was found in the initial clinical trials." Ex. 41 (Pallansch Dep. Tr.) at 39:11-20.

89. CDC's current view is that the recommended two doses of the MMR vaccine are "88% effective against mumps." Ex. 52 (CDC, *Measles, Mumps, and Rubella (MMR) Vaccination: What Everyone Should Know*,

https://www.cdc.gov/vaccines/vpd/mmr/public/index.html)at 4.

### C. CDC's Contracts With Merck

90. The CDC Merck's contracts with CDC for its mumps vaccines are negotiated annually, for one-year terms. Ex. 75 (Sims Dep. Tr.) at 80:16-19. CDC's VFC contracts with Merck concerning the purchase of its mumps-containing vaccines do not include any terms that require a vaccine meet or have previously met any specific effectiveness rate, efficacy rate, seroconversion rate, specified potency value, or safety requirements (each of the below collective referred to herein as the "CDC Contracts"):

| Contract Year | Award / Effective Date | Exhibit No. | Bates No. | Mumps Products Included |
|---|---|---|---|---|
| 1998 | 5/5/1998 | 54 | MRK-KRA01371728 | M-M-R II |
| 1999 | 4/1/1999 | 55 | MRK-KRA01371751 | M-M-R II |
| 2000 | 4/1/2000 | 56 | MRK-KRA01371693 | M-M-R II |
| 2001 | 4/1/2001 | 57 | MRK-KRA01371656 | M-M-R II |
| 2002 | 4/1/2002 | 58 | MRK-KRA01371785 | M-M-R II |
| 2003 | 4/1/2003 | 59 | MRK-KRA01371311 | M-M-R II |
| 2004 | 4/1/2004 | 60 | MRK-KRA01371280 | M-M-R II |

| Contract Year | Award / Effective Date | Exhibit No. | Bates No. | Mumps Products Included |
|---|---|---|---|---|
| 2005 | 4/1/2005 | 61 | MRK-KRA01371341 | M-M-R II |
| 2006 | 4/1/2006 | 62 | MRK-KRA01371624 | M-M-R II & ProQuad |
| 2007 | 4/16/2007 | 63 | MRK-KRA01371604 | M-M-R II & ProQuad |
| 2008 | 4/1/2008 | 64 | MRK-KRA01371817 | M-M-R II & ProQuad |
| 2009 | 4/1/2009 | 65 | MRK-KRA01371880 | M-M-R II & ProQuad |
| 2010 | 4/1/2010 | 66 | MRK-KRA01371373 | M-M-R II & ProQuad |
| 2011 | 4/1/2011 | 67 | MRK-KRA01371497 | M-M-R II |
| 2012 | 4/1/2012 | 68 | MRK-KRA01371398 | M-M-R II & ProQuad (as optional) |
| 2013 | 4/1/2013 | 69 | MRK-KRA01371422 | M-M-R II & ProQuad |
| 2014 | 4/1/2014 | 70 | MRK-KRA01371473 | M-M-R II & ProQuad |
| 2015 | 4/1/2015 | 71 | MRK-KRA01372045 | M-M-R II & ProQuad |
| 2016 | 4/1/2016 | 72 | MRK-KRA01371962 | M-M-R II & ProQuad |

91.    CDC makes public the vaccines that it purchases, and the prices that it pays for them. For example, it posts them on a website, and the price list for April 6, 2001 is still available online. *Ex.* 73 (CDC, *CDC Vaccine Price List*, https://www.cdc.gov/vaccines/programs/vfc/awardees/vaccine-management/price-list/index.html) (listing current vaccine contract prices); Ex. 73 (CDC Vaccine Price List as of April 6, 2001, *available at* https://www.cdc.gov/vaccines/programs/vfc/awardees/vaccine-management/price-list/2001/2001-04-06.html); *see also* 48 C.F.R. §§ 5.301, 5.401(b) (requiring publication of certain information about federal contracts in excess of $25,000)

92.    According to CDC, the "[e]fficacy of the vaccine is not a procurement criteria" in CDC's Contracts with Merck for the purchase of mumps-containing vaccine. Ex. 74 (Ltr. from K. Norris to L. Dykstra (Nov. 24, 2015)) at MRK-KRA01373393 (responding to question 2 of Merck's May 18, 2015 set of questions); *see also* Ex. 75 (Sims Dep. Tr.) at 180:20-21 (testifying that " 'efficacy' is not expressly written in the contract as a requirement"); *id.* at 175:12-17 (same); *id.* at 182:21-183:9 (testifying that FDA "is the regulatory agency" and "there are things, I would think those type things [efficacy] maybe go into the licensing . . . FDA is issuing the license, and they're the regulatory agency on that.").

93.     As CDC's contracting officer testified, CDC Contracts do not have express requirements that vaccines meet certain efficacy or effectiveness requirements. Ex. 75 (Sims Dep. Tr.) at 175:18-22 (testifying that effectiveness is not an express term in CDC contracts); *id.* at 109:6-15 (testifying that there is nothing specific in the contract for efficacy), *id.* at 83:10-19 (same for safety); *see also* Ex. 76 (Taylor Dep. Tr.) at 211:1-17; *id.* at 209:22-210:9 (testifying that Merck does not understand there to be any requirement in CDC Contracts for a certain efficacy rate for its mumps-containing vaccines).

94.     Nor are the topics of effectiveness, efficacy, immunogenicity, or potency discussed with CDC in the context of negotiating CDC's purchase of vaccines. Ex. 75 (Sims Dep. Tr.) at 110:20-112:2.

95.     During the course of negotiations with CDC for the purchase of mumps-containing vaccines, Merck and CDC have not and do not discuss how well the vaccine works. Ex. 76 (Taylor Dep. Tr.) at 198:6-11 ("Q: And during the Merck's negotiations with CDC about the purchase of the mumps vaccine, do Merck and CDC discuss how well the vaccine works? . . . A: No, we do not."); *see also* Ex. 77 (Duffy Dep. Tr.) at 269:10-17, 280:23-281:9 (testifying that in the course of negotiations with CDC, clinical information—including efficacy and how well the vaccine works—and safety are not discussed).

96.     Nor do CDC and Merck discuss in the course of their negotiations for CDC's purchase of mumps vaccines "the shelf life," Ex. 76 (Taylor Dep. Tr.) at 195:18-22, the safety, *id*. at 201:6-11, or any outbreaks with respect to mumps, *id*. at 200:20-24.

97.     While CDC requires that any vaccine it purchases have a valid product license issued by FDA, FDA is "the regulatory agency for the vaccine" and CDC only checks "to make

Appx205

sure the vendor . . . has provided the license for [a] vaccine." Ex. 75 (Sims Dep. Tr.) at 73:23-74:6.

98.     To show licensure, a vaccine manufacturer need only submit to CDC the one-page FDA product license. *Id*. at 104:24-107:22, 131:9-132:24, 133:10-16; Ex. 43 (1995 MMR FDA product licenses) at MRK-KRA01676252; Ex. 42 (One-page FDA establishment license) at MRK-KRA01972538; Ex. 44 (FDA establishment license) at MRK-KRA01676250.

99.     Manufacturers are not required "to submit any other regulatory documents during the procurement process, because CDC defers to FDA on the regulation of vaccines." Ex. 40 (Nichols Report) at 14.

100.    CDC does not monitor or enforce FDA's regulations, including whether a vaccine manufacturer such as Merck has complied with FDA's current Good Manufacturing Practices (cGMP) regulations. Ex. 75 (Sims Dep. Tr.) at 77:7-19, 150:20-152:16.

101.    CDC has never modified its contracting decisions because of vaccine manufacturer's failure to meet cGMP. *Id*. at 152:17-23.

**D.      CDC's Purchases of Merck's Mumps Vaccines**

102.    Everything that is material to CDC's decision to purchase Merck's mumps-containing vaccines was set forth in CDC Contracts with Merck. *Ex.* 75 (Sims Dep. Tr.) at 166:10-14 ("Q. Everything that's important or material to your purchasing decision is in the contract; is that fair to say?  A. So that – that's the agreement between Merck and C.D.C., and that's what we're bound to.").

103.    In CDC's negotiations with Merck over the contracts, the issue of efficacy never came up. *Id.* at 111:1-4 ("[D]uring those negotiations do you ever recall the issue of efficacy coming up in the negotiations?  A. I don't recall that coming up.").

104.    In CDC's negotiations with Merck over the contracts, the issue of potency never came up. *Id.* at 111:5-7 ("Q. Do you ever recall an issue of potency coming up in the negotiations of the contract?  A. I don't recall that coming up.").

105.    Dr. Mark Pallansch, CDC's Director of the Division of Viral Diseases in the National Center for Immunization and Respiratory Diseases, explained that potency is "not a factor that comes into consideration." Ex. 41 (Pallansch Dep. Tr.) at 157:11-15.

106.    CDC's negotiations with Merck over the contracts, the issue of seroconversion rates never came up. Ex. 75 (Sims Dep. Tr.) at 111:8-13 ("Q. Do you ever recall the issue of seroconversion rates coming up in the negotiations of the contract?  A. I don't recall that specification . . . term.").

107.    In CDC's negotiations with Merck over the contracts, the issue of immunogenicity never came up. *Id.* at 111:16-21 ("Q. Do you ever recall issues of immunogenicity coming up in contract negotiations?  A. I don't recall that specifically . . . coming up.").

108.    In CDC's negotiations with Merck over the contracts, CDC never requested effectiveness information from Merck. *Id.* at 111:22-112:2 ("Q. Do you ever recall effectiveness levels coming up in the discussions around the contract?  A. I don't recall that . . . coming up.").

109.    CDC contracts with Merck to purchase Merck's mumps-containing vaccines were indefinite quantity contracts for vaccines manufactured under a current establishment and product license issued by FDA and as set forth in the contracts. *Ex.* 54 (1998 VFC Contract)  at MRK-KRA01371731 (noting under heading "Type of Contract" that it is an "[i]ndefinite quantity contract"); Ex. 55 (1999 VFC Contract) at MRK-KRA01371754 (same); Ex. 56 (2000 VFC Contract) at MRK-KRA01371696 (same); Ex. 57 (2001 VFC Contract) at MRK-

KRA01371660 (same); Ex. 58 (2002 VFC Contract) at MRK-KRA01371788 (same);  Ex. 59 (2003 VFC Contract) at MRK-KRA01371314 (same); Ex. 60 (2004 VFC Contract) at MRK-KRA01371284 (same); Ex. 61 (2005 VFC Contract) at MRK-KRA01371344 (same); Ex. 62 (2006 VFC Contract) at MRK-KRA01371627 (same); Ex.63 (2007 VFC Contract) at MRK-KRA01371608 (same); Ex. 64 (2008 VFC Contract) at MRK-KRA01371822  (same); Ex. 65 (2009 VFC Contract) at MRK-KRA01371885 (same); Ex. 66 (2010 VFC Contract) at MRK-KRA01371380  (same); Ex. 67 (2011 VFC Contract) at MRK-KRA01371503  (same); Ex. 68 (2012 VFC Contract) at MRK-KRA01371405 (same); Ex. 69 (2013 VFC Contract) at MRK-KRA01371425 (same); Ex. 70 (2014 VFC Contract) at MRK-KRA01371476  (same); Ex. 71 (2015 VFC Contract) at MRK-KRA01372047 (same); Ex. 72 (2016 VFC Contract) at MRK-KRA01371964 (same).

110.    CDC's 1998 contract with Merck to purchase Merck's mumps-containing vaccines stated:  "Vaccine shall have a minimum shelf life of twelve (12) months remaining upon receipt of the vaccine by the consignee."  Ex. 54 (1998 VFC Contract) at MRK-KRA01371734.

111.    CDC's contracts with Merck from 1999 through 2016 to purchase Merck's mumps-containing vaccines similarly required a minimum shelf life of 12 months remaining upon receipt of or delivery to the consignee.  Ex. 55 (1999 VFC Contract) at MRK-KRA01371759, MRK-KRA01371761; Ex. 56 (2000 VFC Contract) at MRK-KRA-1371702, MRK-KRA01371704; Ex. 57 (2001 VFC Contract) at MRK-KRA-1371667, MRK-KRA01371669; Ex. 58 (2002 VFC Contract) at MRK-KRA01371796, MRK-KRA01371798; Ex. 59 (2003 VFC Contract) at MRK-KRA01371321, MRK-KRA01371323; Ex. 60 (2004 VFC Contract) at MRK-KRA01371291, MRK-KRA01371293; Ex. 61 (2005 VFC Contract) at MRK-

Appx208

KRA01371350, MRK-KRA01371352; Ex. 62 (2006 VFC Contract) at MRK-KRA01371634, MRK-KRA01371638; Ex. 67 (2007 VFC Contract) at MRK-KRA01371607, MRK-KRA01371609; Ex. 68 (2008 VFC Contract) at MRK-KRA01371821, MRK-KRA01371823; Ex. 69 (2009 VFC Contract) at MRK-KRA01371884, MRK-KRA01371886; Ex. 70 (2010 VFC Contract) at MRK-KRA01371378, MRK-KRA01371382; Ex. 67 (2011 VFC Contract) at MRK-KRA01371502, MRK-KRA01371504; Ex. 68 (2012 VFC Contract) at MRK-KRA01371403, MRK-KRA01371406; Ex. 69 (2013 VFC Contract) at MRK-KRA01371428, MRK-KRA01371435; Ex. 70 (2014 VFC Contract) at MRK-KRA01371479, MRK-KRA01371486; Ex. 71 (2015 VFC Contract) at MRK-KRA01372050, MRK-KRA01372059; Ex. 72 (2016 VFC Contract) at MRK-KRA01371968, MRK-KRA01371974.

112.    CDC's 2006 contract with Merck to purchase ProQuad required a minimum shelf life of 8 months remaining upon delivery to the consignee. Ex. 62 (2006 VFC Contract) at MRK-KRA01371636, MRK-KRA01371638.

113.    CDC's contracts with Merck state, under the heading "Product License," that: "The vaccines produced and delivered under this contract shall be manufactured under a current establishment and product license issued by the [FDA] as indicated below. . . . The Current Good Manufacturing Practice Regulations (cGMPR's) (21C.F.R. Parts 210-211) will be the standard to be applied for manufacturing, processing and packing of drugs, chemicals, biologicals, and reagents." The same section of the contract states that the contract "may be terminated" by CDC "in whole or part" if "the item listed under this contract fails to meet CGMPR's." Ex. 54 (1998 VFC Contract) at MRK-KRA01371740; Ex. 55 (1999 VFC Contract) at MRK-KRA01371769, MRK-KRA01371770; Ex. 56 (2000 VFC Contract) at MRK-KRA01371712; Ex. 57 (2001 VFC Contract) at MRK-KRA01371673; Ex. 58 (2002 VFC Contract) at MRK-KRA01371800; Ex.

Appx209

59 (2003 VFC Contract) at MRK-KRA01371325; Ex. 60 (2004 VFC Contract) at MRK-KRA01371295; Ex. 61 (2005 VFC Contract) at MRK-KRA01371354; Ex. 62 (2006 VFC Contract) at MRK-KRA01371640; Ex. 63 (2007 VFC Contract) at MRK-KRA01371611; Ex. 64 (2008 VFC Contract) at MRK-KRA01371825; Ex. 65 (2009 VFC Contract) at MRK-KRA01371887; Ex. 67 (2011 VFC Contract) at MRK-KRA01371505.

114.    CDC contracts from 2010 and 2012 through 2016 contained materially identical provisions with slight wording changes. *Ex.* 66 (2010 VFC Contract) at MRK-KRA01371383; Ex. 68 (2012 VFC Contract) at MRK-KRA01371407; Ex. 69 (2013 VFC Contract) at MRK-KRA01371436; Ex. 70 (2014 VFC Contract) at MRK-KRA01371487; Ex. 71 (2015 VFC Contract) at MRK-KRA01372060; Ex. 72 (2016 VFC Contract) at MRK-KRA01371975.

115.    In CDC contracts, CDC required Merck to include certain information on each invoice. None of CDC's contracts with Merck required specific representations about vaccine efficacy, effectiveness, or the amount of potency in each dose to be included in the invoices for payment submitted to CDC. *Ex.* 55 (1999 VFC Contract) at MRK-KRA01371765-66; Ex. 56 (2000 VFC Contract) at MRK-KRA01371710-11; Ex. 57 (2001 VFC Contract) at MRK-KRA01371677]; Ex. 58 (2002 VFC Contract) at MRK-KRA01371804;  Ex. 59 (2003 VFC Contract) at MRK-KRA01371329; Ex. 60 (2004 VFC Contract) at MRK-KRA01371280; Ex. 61 (2005 VFC Contract) at MRK-KRA01371357; Ex. 62 (2006 VFC Contract) at MRK-KRA01371624; Ex. 63 (2007 VFC Contract) at MRK-KRA01371604; Ex. 64 (2008 VFC Contract) at MRK-KRA01371828; Ex. 65 (2009 VFC Contract) at MRK-KRA01371880; Ex. 66 (2010 VFC Contract) at MRK-KRA01371373; Ex. 67 (2011 VFC Contract) at MRK-KRA01371508; Ex. 68 (2012 VFC Contract) at MRK-KRA01371410; Ex. 69 (2013 VFC Contract) at MRK-KRA01371422; Ex. 70 (2014 VFC Contract) at MRK-KRA01371490; Ex. 71

Appx210

(2015 VFC Contract) at MRK-KRA01372062; Ex. 72 (2016 VFC Contract) at MRK-KRA01371978.

116. CDC contracts require Merck to submit requests for payment electronically. CDC contracts identify the specific data Merck is to include in its requests for payment to CDC via Electronic Data Interchange, which include the following:

(1)     Contractor's name and invoice date;

(2)     Contract number, or other authorization for delivery of property and/or services;

(3)     Description, cost or price, and quantity of property and/or services actually delivered or rendered;

(4)     Shipping and payment terms;

(5)     Other substantiating documentation or information as required by the contract; and

(6)     Name where practicable, title, phone number, and complete mailing address of responsible official to whom payment is to be sent.

(7)     Lot number of vaccine vials shipped;

(8)     Expiration date of vaccine vials shipped; and

(9)     CDC accounting and appropriate date as described on the delivery order.

*Ex.* 54 (1998 VFC Contract) at MRK-KRA01371737 (Addendum B, Paragraph 9 "Invoice Submission")).

117. CDC contracts from 1998 to 2005 required the same data to be submitted in requests for payment *Ex.* 55 (1999 VFC Contract) at MRK-KRA01371765, MRK-KRA01371766; Ex. 56 (2000 VFC Contract) at MRK-KRA01371709, MRK-KRA01371710; Ex. 57 (2001 VFC Contract) at MRK-KRA01371677; Ex. 58 (2002 VFC Contract) at MRK-

KRA01371804;  Ex. 59 (2003 VFC Contract) at MRK-KRA01371329; Ex. 60 (2004 VFC

Contract) at MRK-KRA01371299; Ex. 61 (2005 VFC Contract) at MRK-KRA01371357.

118.    Beginning in 2006, CDC has occasionally changed the list of required information

in invoices. For instance:

- Beginning in 2006, CDC required Merck to add information related to "(10) Taxpayer
  I.D. Number" and "(11) DUNS Number." *Ex.* 62 (2006 VFC Contract) at MRK-
  KRA01371643 (Addendum C, Paragraph 14 ("Invoice Submission")); Ex. 63 (2007 VFC
  Contract) at MRK-KRA01371613 (same); Ex. 64 (2008 VFC Contract) at MRK-
  KRA0137 1828 (same).

- Beginning in 2009, CDC removed the requirement that invoices include "Expiration date
  of vaccine vials shipped." *Ex.* 65 (2009 VFC Contract) at MRK-KRA01371890
  (Addendum C, Paragraph 13).

- Beginning in 2010, CDC added  requirements for an National Drug Code number as well
  "accounting and appropriation data."  *Ex.* 66 (2010 VFC Contract) at MRK-
  KRA01371385, MRK-KRA01371386 (Addendum C, Paragraph 12); Ex. 67 (2011 VFC
  Contract) at MRK-KRA01371508  (same); Ex. 68 (2012 VFC Contract) at MRK-
  KRA01371410 (same).

- Beginning in 2013, CDC added a requirement that invoices include "Electronic Funds
  Transfer (EFT)" and "Taxpayer Identification Number (TIN)." *Ex.* 69 (2013 VFC
  Contract) at MRK-KRA01371439 (Addendum C, Paragraph 13); Ex. 70 (2014 VFC
  Contract) at MRK-KRA01371490 (same); Ex. 71 (2015 VFC Contract) at MRK-
  KRA01372062 (same); Ex. 72 (2016 VFC Contract) at MRK-KRA01371978 (same).

119.   Merck is not required to provide any other information in its requests for payment to CDC other than what is required by CDC contracts. Ex. 75 (Sims Dep. Tr.) at 137:5-13 ("Q … Is Merck required to provide anything else to the C.D.C. when it invoices the C.D.C. for vaccines other than the nine items listed in the contract?  A. Not that I'm aware of….").

120.   A representative set of electronic invoice data includes coding that reflects the National Drug Code  number for the MMR-II vaccine of "ND*00006-4681-00," a quantity of "2880," a unit price of "178.60," a lot identifier of "REF*LT*M040558~," and a lot expiration of "DTM*208*20181003~," as well as logistical data like the invoice issue data, the recipient address, and payment due date. Ex. 89 (Email from Z. Johns to M. Koury (Feb. 23, 2017)).

121.   As reflected in the sample invoice data Merck provided to counsel for Relators, Merck did not and does not include representations regarding efficacy, effectiveness, immunogenicity, safety, or potency of the vaccines sold to CDC. *Id.*

122.   By reference to regulations, CDC contracts with Merck include a requirement that Merck warrant its vaccines are merchantable and fit for their intended purpose. *See* 48 C.F.R. § 52.212-4(o) (Federal Acquisition Regulation (FAR) setting forth contract terms that are referenced in CDC contracts, which include a requirement that:  "The Contractor warrants and implies that the items delivered hereunder are merchantable and fit for use for the particular purpose described in this contract."); *see also*, *e.g.*, Ex. 54 (1998 VFC Contract) at MRK-KRA01371729 (incorporating by reference FAR 52.212-4 and adding an addendum); Ex. 55 (1999 VFC Contract) at MRK-KRA01371762 (same); Ex. 56 (2000 VFC Contract) at MRK-KRA01371707 (same); Ex. 66 (2010 VFC contract) at MRK-KRA01371392 (same); Ex. 69 (2013 VFC Contract) at MRK-KRA01371434 (same); Ex. 70 (2014 VFC Contract) at MRK-

KRA01371485 (same); Ex. 71 (2015 VFC Contract) at MRK-KRA01372058 (same); Ex. 72

(2016 VFC Contract)at MRK-KRA01371974 (same).

123.    CDC's contracting officer interprets the requirements for a warranty to "say that,

essentially the product is merchantable and, you know, completes its intended purpose." Ex. 75

(Sims Dep. Tr.) at 84:10-16.

124.    "Merchantable" means that the product "can be used . . . in a commercially

available setting." *Id*. at 84:17-21. CDC is not aware of any instance where Merck's mumps-

containing vaccines did not meet the warranty of merchantability required under CDC contracts.

*Id*. at 143:4-8.

125.    "Fit for its intended purpose" means that the vaccine has an FDA license, with

CDC deferring to FDA on whether to issue and/or maintain a given license. *Id*. at 84:23-85:12.

Licensure by FDA is the "critical factor" for CDC to determine whether a vaccine is fit for its

intended use. *Id*. at 141:4-12.

**E.    This Suit Has Not Caused FDA Or CDC To Alter Their Behavior Towards
Merck's Mumps Vaccines.**

126.    On April 27, 2010, Relators filed their complaint. Docket, *U.S. ex rel. Krahling v.

Merck & Co., Inc.*, Civ. A. No. 10-4374 (E.D. Pa.) at ECF. No. 20.

127.    On April 27, 2012, two years after Relators' initial complaint was filed, the

United States Department of Justice (DOJ) informed the Court that it would decline to intervene

in Relators' case. United States' Notice of Election to Decline to Intervene, *U.S. ex rel. Krahling

v. Merck & Co., Inc.*, Civ. A. No. 10-4374 (E.D. Pa.),ECF. No. 14.

128.    Counsel for DOJ are included as counsel of record and are copied on submissions

by the parties in this matter. Docket, *U.S. ex rel. Krahling v. Merck & Co., Inc.*, Civ. A. No. 10-

4374 (E.D. Pa.) (listing Gerald B. Sullivan and Joel M. Sweet from the United States Attorney's

Office Eastern District of Pennsylvania as counsel of record); *see also id.* at ECF. Nos. 2 & 3 (docketing entries of appearance for Messrs. Sullivan and Sweet on August 27, 2010).

129.     The protective order in this matter permits disclosure of discovery materials produced by Merck and designated as "Confidential" or "Highly Confidential – Attorneys' Eyes Only" to attorneys at DOJ as well as government employees of FDA, CDC, and the U.S. Department of Health and Human Services (HHS). Protective Order, ECF No. 69, at 7.2(b), (c); *id.* at 7.3(b), (c).

130.     On May 18, 2015, counsel for Merck requested from CDC and HHS certain information that may be relevant in this litigation. Ex. 78 (Ltr. from L. Dykstra to T. Frieden, et al. (May 18, 2015)) at 1.

131.     In its letter, Merck summarized Relators' allegations, including Relators' contentions that "Merck made and continues to make misrepresentations about the efficacy of the mumps vaccine and engages in efforts to conceal the diminished efficacy of the vaccine" and that "Merck's labeling misrepresents the vaccine's efficacy and improperly influenced CDC's decision to purchase the vaccine." *Id.* at 2.

132.     On November 24, 2015, CDC responded to Merck's request for documents. Ex. 74  (Ltr. from K. Norris to L. Dykstra (Nov. 24, 2015)) at MRK-KRA01373393.

133.     On October 12, 2017, Alan Sims, CDC's team lead who supports the National Centers for Immunization and Respiratory Diseases, was deposed in this litigation. Ex. 75 (Sims Dep. Tr.) at 9:16-23. Mr. Sims is the contracting officer for CDC's vaccine contracts. *Id.*

134.     On October 13, 2017, Dr. Mark Pallansch, who is the Director of the Division of Viral Disease in the National Center for Immunization and Respiratory Diseases at CDC, was deposed in this litigation. Ex. 41 (Pallansch Dep. Tr.) at 8:17-20.

Appx215

135.   CDC authorized three former employees to serve as expert witnesses for Merck. Ex. 198, Letter from CDC to K. Hardway (May 24, 2018)) at 3.

136.   On May 16, 2019, the Court entered an order that provided a protocol by which Relators' hired expert, Dr. David Kessler, could interface directly with CDC, FDA, and HHS regarding his assessment of the discovery record and opinions based on those materials. Order (Under Seal), *U.S. ex rel. Krahling v. Merck & Co., Inc.*, Civ. A. No. 10-4374 (E.D. Pa.), at ECF No. 250.

137.   Since this case was filed on April 27, 2010, ACIP has continued to include the mumps vaccine in its recommended schedule for immunization. *E.g.*, Ex. 79 (ACIP, *MMR ACIP Vaccine Recommendations (Measles, Mumps and Rubella)*, https://www.cdc.gov/vaccines/hcp/acip-recs/vacc-specific/mmr.html).

138.   Since this case was filed on April 27, 2010, FDA has continued to license Merck's MMR-II and ProQuad products. *Ex.* 42 (1971 MMR Product License) at MRK-KRA01972538; Ex. 6 (1995 MMR Product License) at MRK-KRA01676252; *see also* Ex. 80 (FDA, Vaccines Licensed for Use in the United States, https://www.fda.gov/vaccines-blood-biologics/vaccines/vaccines-licensed-use-united-states (current as of May 9, 2019)) at 5 (listing Merck's M-M-R II and ProQuad products as currently licensed by FDA).

139.   Since this case was filed on April 27, 2010, CDC has continued to purchase Merck's mumps-containing vaccines. Ex. 75 (Sims Dep Tr.) at 155:1-5.

140.   Since this case was filed on April 27, 2010, CDC has not raised concerns related to the efficacy, effectiveness, seroconversion, immunogenicity, shelf life, or potency of Merck's mumps-containing vaccines. *Id.* at 201:13-25.

141.    FDA has similarly issued statements underscoring its continued view that the MMR vaccine is safe and effective. *See, e.g.*, Ex. 212 (FDA In Brief: FDA reiterates the importance of vaccines such as the Measles, Mumps, and Rubella (MMR) vaccine, Sept. 6, 2019, https://www.fda.gov/news-events/fda-brief/fda-brief-fda-reiterates-importance-vaccines-such-measles-mumps-and-rubella-mmr-vaccine) ("As a public health agency, we want to reiterate our confidence in the safety and efficacy of the MMR vaccine. FDA always strives to use the best available scientific evidence to promote and protect the well-being of individuals and the public health, and the evidence fully supports the safety and effectiveness of this vaccine."); Ex. 215 (Statement from Peter Marks, M.D., Ph.D., director of FDA's Center for Biologics Evaluation and Research, on FDA's continued confidence in the safety and effectiveness of the measles, mumps, and rubella (MMR) vaccine, Apr. 22, 2019, https://www.fda.gov/news-events/press-announcements/statement-peter-marks-md-phd-director-fdas-center-biologics-evaluation-and-research-fdas-continued) ("We do not take lightly our responsibility to ensure the safety and effectiveness of vaccines, and work diligently to assess safety and effectiveness of all licensed vaccines for their intended uses. The MMR vaccine is very effective at protecting people against measles, mumps, and rubella.").

142.    Since this case was filed on April 27, 2010, CDC has continued to recommend administration of the mumps vaccine as part of the schedule for routine vaccination of children. Ex. 41 (Pallansch Dep. Tr.) at 95:6-20.

143.    CDC has stated publicly and believes that Merck's mumps vaccine is "very safe and effective." *Id.* at 26:19-24.

144.    CDC states currently that the mumps vaccine is "safe and effective." Ex. 81 (CDC, *Mumps Vaccination*, https://www.cdc.gov/mumps/vaccination.html (last revised Mar. 8, 2019)) at 1.

145.    CDC is aware that certain studies have found an effectiveness rate as low as 31 percent for the mumps component of Merck's mumps vaccine. Ex 81 (CDC, *Mumps Vaccination*, https://www.cdc.gov/vaccines/vpd/mumps/index.html) ("MMR vaccine is very safe and effective. The mumps component of the MMR vaccine is about 88% (range: 31-95%) effective when a person gets two doses; one dose is about 78% (range: 49%−92%) effective."); *see also* Ex. 41 (Pallansch Dep. Tr.) at 31:20-33:1.

146.    CDC understands that the mumps vaccine in the real world has a lower effectiveness rate than the efficacy rate found in the initial clinical trials conducted in the 1960s. CDC will continue to purchase vaccines, like the influenza and pertussis vaccines even where effectiveness rates are as low as 25% and where protection wanes over time.  Ex. 41 (Pallansch Dep. Tr.) at 39:16-21; Ex. 40 (Nichols Report) at 6, 18.

147.    CDC mumps experts have published on findings of Jeryl Lynn mumps vaccine seroconversion rates as low as 74% and as high as 100%.  *Id.* at 74:4 to 76:11; Ex. 219 Huong McLean et al.  The Immunological Basis for Immunization Series:  Module 16:  Mumps (2010):1-33 at 9).

148.    Merck has presented data to CDC  from a Merck study showing seroconversion rates for Merck's mumps vaccine as low as 53%.  Ex. 220 (email); Ex. 242 (Feb. 25, 2010 presentation) at Slide 11.

149.    CDC has continued to purchase Merck's mumps-containing vaccines despite mumps outbreaks.  Ex. 41 (Pallansch Dep. Tr.) at 60:12-22.

Appx218

150.    CDC has not requested a change its procurement criteria or price during any of the mumps outbreaks. Ex. 77 (Duffy Dep. Tr.) at 39:19-40:17; *see also id.* at 41:24-42:3 (testifying that CDC has not requested discounts on the mumps vaccine due to any outbreaks).

151.    CDC has continued to purchase M-M-R II at the statutory maximum price the entire time since this lawsuit was filed. *Ex.* 76 (Taylor Dep. Tr.) at 225:8-23; Ex. 75 (Sims Dep. Tr.) at 114:8-116:25, 155:1-5; *see also* 42 U.S.C. § 1396s(d)(3)(B)).

152.    ACIP continues to recommend the MMR vaccine—whether in the MMR-II form or the ProQuad form—be administered in both is Vaccines for Children (VFC) and Vaccines for Adults (VFA) programs. The current recommendations were published in June 2013, which was three years after this suit was filed. The recommendation is that the vaccine be administered twice to children, once at age 12-15 months and once at age 4 through 6 years. It also recommends two doses for adults at high risk for exposure and transmission and one dose for other adults over 18 years old. Ex. 51 (*2013: ACIP Summary Recommendations*) at 20; *see also* Ex. 79 (CDC, *MMR ACIP Vaccine Recommendations (Meales, Mumps and Rubella)*, https://www.cdc.gov/vaccines/hcp/acip-recs/vacc-specific/mmr.html) (indicating that the June 14, 2013 recommendation is current).

153.    The only supplementation to ACIP's recommendation has been to recommended a third dose of a mumps virus–containing vaccine for persons "previously vaccinated with 2 doses who are identified by public health authorities as being part of a group or population at increased risk for acquiring mumps because of an outbreak." That recommendation was agreed at ACIP's October 2017 meeting and published in January 2018. Ex. 48 (*Recommendation of the Advisory Committee on Immunization Practices for Use of a Third Dose of Mumps Virus– Containing Vaccine in Persons at Increased Risk for Mumps During an Outbreak*, MMWR, Jan.

12, 2018: 67(1); 33-38 at 1; *see also* Ex. 79 (CDC, *MMR ACIP Vaccine Recommendations (Measles, Mumps and Rubella)*, https://www.cdc.gov/vaccines/hcp/acip-recs/vacc-specific/mmr.html) (indicating that the Jan. 12, 2018 recommendation is current).

154.    Citing studies published from 2007 to 2017, ACIP stated in its Summary of Key Findings in the October 2017 recommendation, that was published in January 2018, that "[t]he median effectiveness of 2 doses of MMR vaccine in preventing mumps is 88%, with estimates ranging from 31% to 95%." Ex. 48 (Jan. 12, 2018 MMWR) at 2.

## V.    MERCK AND FDA DISCUSS THE MEANING OF THE POTENCY STATEMENT ON THE MUMPS VACCINE LABEL IN 1997.

155.    In 1996 and early 1997, Merck and FDA's Center for Biologics Evaluation and Research (CBER) engaged in discussions over how to interpret what the mumps label meant with regard to potency.  Ex. 152 (Oct. 5, 1998 email) at MRK-KRA00095142; Ex. 191 (Jan. 23, 1997 Email at MRK-KRA01972735; Ex. 189 (Dec. 5, 1997 Letter) at MRK-KRA01972451; Ex. 186 (Jan. 28, 1998 Letter at MRK-KRA01625508.

156.    CBER is a center within FDA whose "mission is to protect and enhance the public health through the regulation of biological and related products including blood, vaccines, allergenics, tissues, and cellular and gene therapies."  CBER reviews "new biological products" and "new indications for already approved products," which requires "evaluating scientific and clinical data submitted by manufacturers to determine whether the product meets CBER's standards for approval. After a thorough assessment of the data, CBER makes a decision based on the risk-benefit for the intended population and the product's intended use." Ex. 216 (*About CBER*, U.S. Food and Drug Administration, https://www.fda.gov/about-fda/center-biologics-evaluation-and-research-cber/about-cber).

Appx220

157.    CBER's inquiry was part of a broad program to review a large number of vaccines' labels in the 1990s to carry out the mandate of the National Childhood Vaccine Injury Act. Ex. 93 (FDA, *Guidance for Industry: FDA Review of Vaccine Labeling Requirements for Warnings, Use Instructions, and Precautionary Information* (Sep. 2004), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/fda-review-vaccine-labeling-requirements-warnings-use-instructions-and-precautionary-information) at 3-6.

158.    Merck understood the MMR-II label to state the minimum "release potency"— i.e., the amount of live virus in the vaccine when the vaccine is approved for release to the market by CBER. CBER requested during these discussions that the label state the minimum "end-expiry potency"—i.e., the amount of live virus in the vaccine at the end of its shelf life. Ex.152, (Oct. 5, 1998 email) at MRK-KRA00095142; Ex. 191 (Jan. 23, 1997 Email) at MRK-KRA01972735; Ex. 189 (Dec. 5, 1997 letter) at MRK-KRA01972451; Ex. 186 (Jan. 28, 1998 Letter) at MRK-KRA01625508.

159.    Between 1997 and 1999, Merck and CBER discussed mumps potency labeling and analysis of historical mumps potency data to address the label interpretation issue. Ex. 186 (Jan. 28, 1998 Letter) at MRK-KRA01625508; Ex. 163(Sept. 29, 1998 Letter) at MRK-KRA00636592; Ex. 149 (Dec. 3, 1998 Email) at MRK-KRA00095063; Ex. 151 (Nov. 6, 1998 Email) at MRK-KRA00095065; Ex. 150; Ex. 178 (Dec. 10, 1998 Letter) at MRK-KRA01622125; Ex. 181 (Merck Letter to CBER) at MRK-KRA01622552; Ex. 182 (Dec. 16, 1998 Letter) at MRK-KRA01622600; Ex. 180 (Jan. 8, 1999 letter) at MRK-KRA01622468; Ex. 148 (May 12, 1999 Email) at MRK-KRA00094960; Ex. 179 (Jan. 18, 1999 Letter) at MRK-KRA01622463.

160.     After discussions with Merck and undertaking its own analysis of data, on August 20, 1999, CBER directed Merck to increase the release potency for its mumps-containing vaccines from a minimum release potency of 4.3 $\log_{10}$ $TCID_{50}$ to a minimum release potency of 5.0 $\log_{10}$ $TCID_{50}$, in order for the product to meet, throughout its entire 24 month shelf life, the potency of 4.3 $\log_{10}$ $TCID_{50}$. Ex. 185 (Aug. 20, 1999 Letter) at MRK-KRA01624909.

161.     Since implementation of this change, Merck has manufactured the MMR-II vaccine to a minimum mumps release potency of 5.0 $\log_{10}$ $TCID_{50}$, irrespective of subsequent label changes. Ex. 202 (Stannard Dep. Tr.) at 297:21-298:7; Ex. 117 (Keegan Dep. Tr.) at 24:13-20.

## VI.     PROTOCOL 007

### A.     "Protocol 007" Was A Study Designed To Support A Label Change Application.

162.     In December 1997, Merck discussed with FDA a clinical trial to support a label change of mumps potency lower than 4.3 $\log_{10}$ $TCID_{50}$. The lower potency would be an end-expiry potency. Ex. 186 (January 28, 1998 Letter and Attachment) at MRK-KRA01625508.

163.     Over the course of next several years, Merck and FDA discussed numerous aspects of the clinical trial. Topics of discussion included the specifics of the design of the tests (assays) that were going to be used to measure immune response, the requirements for how the trial would show that a lower potency was an appropriate end-expiry potency, the inclusion of an additional test potency, the number of subjects to participate in the trial, and the manner in which the lots for the test potencies would be created. The discussions took the form of exchanges of correspondence, Merck responses to specific questions posed by FDA, telephone conferences, sharing of data, and an in-person meeting.  Ex. 161 (June 23, 1998 Letter) at MRK-KRA00624345-446; Ex. 139 (Sept. 8, 1998 Letter) at MRK-KRA00001467-469; Ex. 128 (Nov.

38

Appx222

10, 1998 Memo) at MRK-KRA00001215-217; Ex. 162 (Feb. 5, 1999 Response) at MRK-

KRA0062448-589; Ex. 157 (Feb. 19, 1999 Fax) at MRK-KRA00336634-636; Ex. 134 (Feb. 19,

1999 Notes) at MRK-KRA00001253-254; Ex. 146 (Feb. 22, 1999 Memo) at MRK-

KRA00062710-713; Ex. 138 (Aug. 30, 1999 Letter); Ex. 130 (Dec. 1, 1999 Letter) at

KRA00001222-230; Ex. 144 (Dec. 23, 1999 Notes) at MRK-KRA00025713-724; Ex. 140 (Dec.

30, 1999 Letter) at MRK-KRA00001470-924; Ex. 145 (Jan. 5, 2000 Memo) at MRK-

KRA00048855; Ex. 133 (Jan. 31, 2000 Memo) at MRK-KRA00001249-252; Ex. 135 (Feb. 8,

2000 Memo) at MRK-KRA00001255-257; Ex. 147 (March 13, 2000 Minutes) at MRK-

KRA00062845-85; Ex. 137 (March 13, 2000 Memo) at MRK-KRA00001262-265; Ex. 136

(March 14, 2000 Minutes) at MRK-KRA00001258-261; Ex. 131 (Oct. 27, 2000 Letter) at MRK-

KRA00001231-236; Ex. 142 (Notes from Nov. 8, 2000) at MRK-KRA00025161-162; Ex. 132

(Nov. 16, 2000 Letter) at MRK-KRA00001237-248; Ex. 129 (Nov. 29, 2000 Memo) at MRK-

KRA00001218-221; Ex. 159 (Feb. 2, 2001 Response) at MRK-KRA00622078-273.

164.    The result of the negotiations was a study titled "A Study of M-M-R II at Mumps

Expiry Potency in Healthy Children 12 to 18 Months of Age" (Protocol 007). The goal of the

study was to evaluate *non-inferiority*—i.e., to test whether the vaccine at a lower potency would

have similar immunogenic effects as at higher potencies. Ex. 155 (Clinical Study Report (CSR))

at MRK-KRA00224982 at '5021.

165.    The study would be a clinical trial studying the effect of vaccination on children

who had not yet received the vaccine and who would be randomized to receive vaccine lots at

different potencies. *Id.* at '018, '022.

166.    Protocol 007 was *not* a study of vaccine efficacy. Rather, efficacy of the vaccine

was established through the Hilleman studies. Ex. 200 (Musey Dep. Tr.) at 81:2-22; Ex. 104

(Durbin Dep. Tr.) at 62:25-63:9; Ex. 105 (Emini Dep. Tr.) at 128:24-129:6, 130:21-131:3, 311:9-11; Ex. 123 (January 29, 2004 Submission) at MRK-KRA00000032 at '116.

167.    Instead, the study evaluated seroconversion in subjects receiving different potencies to compare whether a lower-potency vaccine would have similar immunogenic effects to the higher-potency vaccine. Ex. 155 (CSR) at MRK-KRA00224982 at '021; Ex. 105 (Emini Dep. Tr.) at 137:23-138:20.

168.    Protocol 007 would not, and could not, be used to corroborate the original Hilleman efficacy results, in part because no subjects had the vaccine entirely withheld, so there would be no way to compare immunized subjects to non-immunized subjects.

169.    Moreover, as CBER has recognized, there is no antibody level known to be protective for the mumps virus, so there is no way definitively to infer protection from antibody levels in individual study subjects. Ex. 137 (March 13, 2000 Memo from Morsy) at MRK-KRA00001263; Ex. 197 (Rubin, *Vaccines* (2018)) at 673.

170.    Two types of assays—i.e., tests—would be used in Protocol 007: a plaque reduction neutralization assay (PRN) and an enzyme linked immunosorbent assay (ELISA). Ex. 155 (CSR) at MRK-KRA002250372.  The ELISA assay was run in a different laboratory.  Ex. 105 (Emilio Dep. Tr.) at 342:3-342:25; Ex. 204 (Wlochowski Dep Tr. (Day 1)) at 206:21-207:18; Ex. 119 (Krah Dep. Tr. (Day 2)) at 467:14-468:3.

## B.    The PRN Assay.

171.    Dr. David Krah was in charge of the lab that developed and performed the PRN assay that was part of Protocol 007. Exs. 118 & 119 (Krah Dep. Tr.) at 91:3-11, 431:6-10.

172.    Dr. Krah began his employment with Merck in 1988 in the Department of Virus and Cell Biology and was promoted to Senior Investigator in 1998. Ex. 106 (Curriculum Vitae of David L. Krah) at MRK-KRA00000696; Ex. 118 (Krah Dep. Tr.) at 54:13-25.

Appx224

173.    During the 1998-2002 time period, Dr. Krah's immediate supervisor was Dr. Alan Shaw, and Dr. Shaw reported to Dr. Emilio Emini. *Id.* at 80:13-20.

    1.    *How PRN Assays Work*

174.    A PRN indirectly measures antibodies based on their capacity to neutralize the virus of interest or the indicator virus. Ex. 92 (Durbin Report) at 9.

175.    In a PRN, a serum or blood sample is incubated with the indicator virus. That mixture is added to a cell monolayer in a clear well. *Id.*

176.    The presence of functional antibodies is evaluated by determining how effectively the serum neutralized the indicator virus. If not neutralized, the virus causes "plaques"—or holes—in the cell monolayer. The plaques are manually counted by a technician. The theory is the more plaques there are, the fewer functional antibodies are present. *Id.* at 9-10.

177.    A PRN is considered a functional assay which has the benefit of measuring antibodies based on their presumed biological relevance—i.e., the ability to neutralize the virus. *Id.* at 10.

178.    But because they require manual counting of plaques, they are time-consuming and subjective. Further, PRNs are complex biological assays involving multiple steps each of which is subject to error. *Id.* at 14-15.

179.    In Protocol 007 PRN, pre-vaccinated serum samples were compared to post-vaccinated serum samples to determine if as a result of vaccination the child developed functional antibodies and can be said to have "seroconverted." Ex. 155 (CSR) at MRK-KRA00224982 at '5021.

180.    As part of Protocol 007, the control group received MMR-II containing 4.8 $\log_{10}$ $TCID_{50}$ per dose of mumps, which represented the release potency, while the other groups received vaccines containing 3.8 $\log_{10}$ $TCID_{50}$ per dose or 4.1 $\log_{10}$ $TCID_{50}$ per dose of mumps,

Appx225

representing the candidate end-expiry potencies. The PRN was used to evaluate the similarity (non-inferiority) of the seroconversion rates across the three different potencies. *Id.* at '5021, '5029.

2.  *Refining The PRN Assay*

181.    The ability of an assay to identify true positives as positive (correctly classifying seropositive samples as seropositive) is known as its *sensitivity*. Ex. 96 (Antonello Dep Tr.) at 64:22-65:6, 101:20-102:3.

182.    CBER set two statistical criteria to determine whether a candidate end-expiry potency would be considered acceptable as compared to the existing release potency. First, for a candidate end-expiry potency to be considered non-inferior to the release potency (the control), the seroconversion rate in the group receiving the candidate end-expiry potency could not be more than 5% less than the seroconversion rate in the group receiving the control. Second, the lower limit of the confidence interval of the seroconversion rate in the group receiving the candidate end-expiry potency would have to be above 90%. Ex. 139 (Sept. 8, 1998 Letter) at MRK-KRA00001467 at '468.

183.    Based on the criteria set by CBER, Merck undertook to develop a sensitive PRN that was capable of detecting a seroconversion rate over 95%. Ex. 119 (Krah Dep. Tr.) at 723:16-724:21.

184.    Further, because the assay was to be used to compare seroconversion rates of subjects receiving three different potencies, the assay had to be sufficiently sensitive to discern a difference in the seroconversion rates elicited by the control and candidate end-expiry potencies. Ex. 105 (Emini Dep. Tr.) at 78:12-79:17.

Appx226

185.    CBER required that Merck use a wild type indicator virus (WT)—i.e., a naturally occurring version of the mumps virus. Ex. 139 (Sept. 8, 1998 Letter) at MRK-KRA 0001468; Ex. 128 (Nov. 10, 1998 Memo) at MRK-KRA00001215.

186.    As part of the development of a highly sensitive PRN, Merck evaluated different mumps indicator strains including:  the Jeryl Lynn vaccine strain, Swiss isolates, New York, Tennessee, South Africa, Jones, Lo1, JL2, and JL5. Ex. 130 (Dec. 1, 1999 Letter) at MRK-KRA00001223.

187.    Focusing its development efforts on Lo1, as suggested by CBER, Merck found in preliminary studies that the seroconversion rate was in the range of 69%-76%. Merck informed FDA of this. Ex. 130 (Dec. 1, 1999 Letter) at MRK-KRA00001224.

188.    During these discussions in 1999 and 2000, Merck also reported to CBER that it was finding seroconversion rates for its mumps vaccine with other indicator strains as low as 56% or even lower.  Ex. 136 (March 14, 2000 Minutes) at MRK-KRA00001259; Ex. 140 (December 30, 1999 Letter) at MRK-KRA00001617.

189.    However, Merck found that when the Jeryl Lynn vaccine strain was utilized as the indicator virus, the seroconversion rate was in the range of 91% to 96% which was in agreement with the original clinical trials. Merck informed FDA of this. Ex. 130 (Dec. 1, 1999 Letter) at MRK-KRA00001203.

190.    Therefore, Merck requested using the Jeryl Lynn vaccine strain as the indicator virus. Ex. 130 (Dec. 1, 1999 Letter) at MRK-KRA00001226.

191.    CBER agreed and later confirmed that certain passages of the Jeryl Lynn strain would be considered wild type and could be used in the PRN. Ex. 137 (March 13, 2000 Memo) at MRK-KRA00001262.

192.     In a face-to-face meeting regarding assay development, CBER suggested the use of anti-human IgG to enhance the sensitivity of the PRN. Ex. 137 (March 13, 2000 Memo) at MRK-KRA00001262; Ex. 105 (Emini Dep. Tr.) at 339:06-21.

193.     That is a common way to enhance PRN assays. Ex. 92 (Durbin Report) at 22-23, Exhibit D; Ex. 104 (Durbin Dep. Tr.) at 148:14-19.

194.     Merck provided data to CBER showing the impact of different dilutions of anti-human IgG in the PRN assay. Ex. 132 (Nov. 16, 2000 Letter) at MRK-KRA00001242.

195.     Prior to beginning testing of clinical samples in Protocol 007, CBER approved the use of the anti-IgG enhanced PRN (AIGENT) assay with Jeryl Lynn passage 8 as the indicator strain. Ex. 129 (Nov. 29, 2000 Memo) at MRK-KRA0001219 .

### 3.     Selecting A Cutoff To Meet CBER Assay Expectations

196.     Another element of designing a PRN was selecting a cutoff to distinguish negative samples from positive samples—i.e., a concentration of serum above which the sample will be deemed "positive" (here, signaling a seropositive sample) and below which it will be "negative" (here, signaling a seronegative sample). Ex. 11 (Burlington Report) at 13, 23.

197.     The choice of a cutoff necessarily involves a trade-off between false negatives (incorrectly classifying as seronegative a sample that should be classified as seropositive) and false positives (incorrectly classifying as seropositive a sample that should be classified as seronegative). The selection of a cutoff to achieve the appropriate balance between sensitivity and specificity depends on the goals of the particular assay. Ex. 11 (Burlington Report) at 13.

198.     As used in Protocol 007, the goal of the AIGENT assay was not to evaluate efficacy of the mumps component of MMRII directly, but to assess similarity (non-inferiority) of two candidate end-expiry potencies to the release potency based on seroconversion rate. This thus required selecting a sufficiently sensitive cutoff so that the assay could detect the assumed

Appx228

seroconversion rate of 96% for children vaccinated with the existing release potency, to serve as a basis for comparison for the lower-potency vaccinations. Ex. 11 (Burlington Report) at 23.

199.    Consistent with CBER's criteria, Merck selected a high-sensitivity cutoff. Ex. 11 (Burlington Report) at 23.

200.    The primary endpoint—or ultimate statistic of interest—for the study was the proportion of subjects who were seronegative to mumps before they got the vaccine who had a greater-than-or-equal-to four-fold rise in the serum concentration separating seronegative from seropositive, as measured by the AIGENT assay, six weeks post-vaccination. Ex. 155 (CSR) at MRK-KRA00225032.

### C.    The ELISA Assay

#### 1.    How ELISAs Work

201.    The second type of assay used in Protocol 007 was an ELISA. ELISAs are performed by adding serum samples to plastic microtiter wells coated with antigens—which are structures that bond to particular antibodies. If the serum contains antigen-specific antibodies, those antibodies will bind to the antigens, which will trigger a secondary reaction that will change the color of the solution. The color can be measured by a device called a spectrophotometer to determine whether or not there has been sufficient color change to identify a positive result. Ex. 120 (Pasetti Report) at 7.

202.    Similar to the PRN assay, ELISAs require selecting a serostatus cutoff to reliably distinguish seronegative and seropositive sera. For an ELISA, that cutoff is the lowest concentration of antibody (Ab) units that must be detected for a serum sample to be classified as seropositive. Ex. 11 (Burlington Report) at 25; Ex. 120 (Pasetti Report) at 13-14.

Appx229

203.     ELISAs have several advantages compared to PRNs: they are easier and faster to perform and are more easily standardized, more objective, and more reproducible because they do not require manual counting. Ex. 120 (Pasetti Report) at 9.

204.     When Protocol 007 was designed, PRNs were the preferred assay for studying mumps in certain circumstances because of the presumed biological relevance of the neutralizing antibodies they are designed to measure. Unlike PRNs, which only measure neutralizing antibodies, ELISAs detect all antibodies capable of binding to a given antigen. Ex. 120 (Pasetti Report) at 8; Ex. 92 (Durbin Report) at 10.

205.     Traditionally, in order to demonstrate the same biological relevance, ELISAs and PRNs were compared and correlated to the satisfaction of the regulatory body. Ex. 154 (Oct. 19, 2001 Memo from Manal Morsy re CBER teleconference) at MRK-KRA00201389-91.

206.     Subsequent scientific developments in the immunogenicity testing of mumps, however, led to the acceptance of ELISA data being used to evaluate the immunogenicity of the MMR II vaccine. Ex. 158 (May 18, 2007 Facsimile from CBER to Merck) at MRK-KRA00570704.

       2.    *Designing the Protocol 007 ELISA and Selecting a Cutoff To Meet CBER Specifications*

207.     Merck and CBER discussed the use of a vaccine-strain-based ELISA to support certain secondary hypotheses of Protocol 007. Ex. 162 (Feb. 5, 1999 BB-IND 1016: MMR™II Serial No. 027) at MRK-KRA00624470-72;  Ex. 155 (CSR) at MRK-KRA00225032.

208.     In early 2000, CBER requested that Merck design an ELISA using a "wild type" mumps virus antigen (WT ELISA). Ex. 11 (Burlington Report) at 25; Ex. 171 (CBER's meeting minutes from Jan. 31, 2000 Merck-CBER teleconference) at MRK-KRA00821860.

Appx230

209.    Merck and CBER engaged in multiple conversations regarding the development of the WT ELISA. Ex. 133 (Jan. 31, 2000 Merck memorandum re Merck-CBER teleconference] at MRK-KRA00001249-52; Ex. 135 (Feb. 8, 2000 Merck memorandum re telephone call with Dr. Kathy Carbone and Luba Vujcic of CBER at MRK-KRA00001255-57; Ex. 171 (CBER meeting minutes from Jan. 31, 2000 Merck-CBER teleconference) at MRK-KRA00821856-61; Ex. 137 (Mar. 13, 2000 Merck memorandum re Merck-CBER in-person meeting) at MRK-KRA00001262-65; Ex. 241 (Merck memorandum re Jan. 13, 2000 Merck-CBER in-person meeting at MRK-KRA00019855-57; Ex. 136 (Mar. 14, 2000 Merck memorandum re Merck-CBER in-person meeting at MRK KRA00001258-924.

210.    In response to a request from CBER, Merck performed a validation of the WT ELISA. Ex. 11 (Burlington Report) at 24-25; Ex. 171 (CBER's meeting minutes from Jan. 31, 2000 Merck-CBER teleconference) at MRK-KRA00821860.

211.    Assay validations, which examine several characteristics of the assay, are performed to provide evidence that the assay, as designed, is reliable and meets the requirements for its intended use. Ex. 120 (Pasetti Report) at 9.

212.    As part of its WT ELISA validation, Merck evaluated its selected cutoff of 10 Ab units by comparing it to an alternative cutoff. Ex. 159 (Feb. 2, 2001 Response to FDA Request for Information) at MRK-KRA00622256.

213.    The comparison supported the proposed cutoff of 10 Ab units, demonstrating greater assay specificity than the alternative cutoff of 5 Ab units. Ex. 11 (Burlington Report) at 26-30; Ex. 159 (Feb. 2, 2001 Response to FDA Request for Information) at MRK-KRA00622256.

Appx231

214.    The data and analysis from this comparison were included in the WT ELISA validation results that Merck submitted to CBER on multiple occasions. Ex. 159 (Feb. 2, 2001 Response to FDA Request for Information) MRK-KRA00622078-273 at '220-'273; Ex. 169 (June 10, 2002 Response to Request for Information) at MRK-KRA00761671-702; Ex. 160 (Aug. 1, 2002 Letter from Merck to CBER re responses to CBER's comments and clarifications) at MRK-KRA00624279-87.

215.    The secondary endpoint for Protocol 007 was therefore selected to be the proportion of subjects who were seronegative at baseline in the ELISA (<10 Ab units) and seropositive (≥10 Ab units) six weeks post vaccination. Ex. 120 (Pasetti Report) at 6; Ex. 155 (CSR) at MRK-KRA00225032.

216.    CBER has acknowledged that there is no "reference standard for a sero-protective level for mumps," meaning there is no universal standard for what cutoff is appropriate to use for an ELISA. Ex. 11 (Burlington Report) at 35; Ex. 154 (Merck memorandum re CBER teleconference on Oct. 16, 2001) at MRK-KRA00201390.

217.    To support the proposed 10 Ab units cutoff, CBER requested additional information, including a correlation analysis to assess the performance of the ELISA using the 10 Ab cutoff and the PRN assay using the 32 cutoff. Ex. 11 (Burlington Report) at 35-36; Ex. 154 (Merck memorandum re CBER teleconference on Oct. 16, 2001) at MRK-KRA00201390.

218.    Merck provided the requested analysis, including the raw data for all 565 subjects, to CBER as part of a June 10, 2002 submission. Ex. 169 [(June 10, 2002 Response to Request for Information) at MRK-KRA00761671-702.

219.    Overall, there was agreement between the PRN assay and the ELISA. There was agreement of 90.4% with respect to samples classified as positive in both assays and negative in

both assays, 93.4% agreement on seroconversion rates, and at least 85% agreement for sensitivity, specificity, and positive and negative predictive value. Ex. 11 (Burlington Report) at 37; Ex. 169 (June 10, 2002 Response to Request for Information) at MRK-KRA00761672.

220.   Over the next two months, Merck and CBER further discussed the choice of a 10 Ab ELISA cutoff. As a result of these discussions, Merck provided additional information regarding the proposed cutoff to CBER in a written submission dated August 1, 2002. Ex. 11 (Burlington Report) at 36-37; Ex. 160 (Aug. 1, 2002 Letter from Merck to CBER re responses to CBER's comments and clarifications) at MRK-KRA00624279-87.

221.   The next day, Merck and CBER participated in a teleconference to further discuss the ELISA cutoff. Following this teleconference, Merck wrote to CBER to provide a summary of the August 2 teleconference and reiterate its understanding "that CBER confirmed the acceptance of the WT Mumps ELISA assay cutoff of 10 Ab units."  Ex. 11 (Burlington Report) at 36-37; Ex. 16 (Aug. 8, 2002 General Correspondence CBER-Merck Communication Mumps Expiry) at MRK-KRA00623050.

## VII.    RELATORS' REPORTS TO FDA AND FDA'S INSPECTIONS

### A.    Krahling Reports Alleged Fraud To FDA.

222.   On June 19, 2001, Krahling called the Philadelphia, Pennsylvania branch of FDA to report concerns he had about "misconduct in Krah's laboratory at Merck," specifically, that he "worked in a lab at Merck and that the lab was committing fraud." Ex. 6 (Krahling's Response to Merck's Revised Interrogatory No. 14) at 44-45; Ex. 2 (Krahling Dep. Tr. Vol. 1) at 242:23-243:15, 293:3-4; Ex. 7 (Krahling Dep. Tr. Vol. 2) at 499:23-500:5; 501:14-16.

223.   Over the next two months, Krahling had "four or five teleconference calls or telephone meetings from the middle of June to the end of July, 2001" with FDA about his "complaints around 007."  He told FDA that he "worked at a lab at Merck and that the lab was

**Appx233**

committing fraud" related to the "Protocol 007 testing." During the last call, he told FDA that "they need[] to come in, that data was being destroyed."  He urged the agency "to conduct an on-site inspection and interview him and his co-workers in Krah's lab."  Ex. 2 (Krahling Dep. Tr. Vol. 1) at 121:12-24, 125: 7, 166:17-19, 243:11-15, 245:16-246:6, 246:18-23, 248:8-18, 295:12-13); Ex. 6 (Krahling's Response to Merck's Revised Interrogatory No. 14) at 44-45.

224.    As Krahling testified at his deposition, he provided FDA "details" about the fraud that was allegedly taking place and asked FDA to visit Merck to investigate his claims. Ex. 2 (Krahling Dep. Tr. Vol 1) at 166:17-19, 245:16-246:6, 246:18-23, 247:7-17, 248:14-18.

225.    Krahling also reported his belief that Krah was destroying PRN assay data by discarding certain cell plates used in the assay. *Id.* at 246:4-6, 246:20-23, 296:14-24; Ex. 6 (Krahling's Response to Merck's Revised Interrogatory No. 14) at 44-45.

226.    In his handwritten notes from September 2001, Krahling wrote that he contacted FDA "several times" during June and July 2001 and that he shared with FDA his concerns about data manipulation—in particular, that Merck was "instituting a policy to fraudulently lower the pre-positive rate" in the PRN assay. Krahling also wrote that he "was responsible" for FDA's subsequent inspection of Krah's lab on August 6, 2001. Ex. 8 (Sept. 21, 2001 Krahling's handwritten notes in Merck lab notebook) at RELATOR_00001044; *see also* Ex. 2 (Krahling Dep. Tr. Vol. 1) at 291:11-292:4 (testifying that these handwritten notes are "accurate").

227.    Krahling viewed FDA as taking his complaints "very seriously."  Ex. 7 (Krahling Dep. Tr. Vol. 2) at 500:23-25.

**B.    FDA's Inspections.**

228.    In response to Krahling's phone calls, FDA Investigator Debra J. Bennett and Supervising Medical Officer Dr. Kathryn M. Carbone conducted an on-site inspection at the Merck laboratory performing the PRN assay under Krah's supervision on August 6, 2001.

Appx234

Bennet was an FDA field force investigator, and Carbone was a CBER medical scientist expert on mumps and the mumps vaccine. As Krahling characterized it in his deposition, after he called, "then they showed up August 6th." Ex. 9 (Aug. 6, 2001 FDA Establishment Inspection Report (EIR)) at RELATOR_00004088; Ex. 10 (Merck file regarding Aug. 6, 2001 FDA Inspection) at MRK-KRA01631029; Ex. 2 (Krahling Dep. Tr. Vol. 1) at 296:13-24; *see also* Ex. 8 (Sept. 21, 2001 Krahling's handwritten notes stating that he was "responsible" for FDA's inspection) at RELATOR_00001044; Ex. 11 (Burlington Report) at 38.

229.     According to FDA records, the purpose of the inspection "was to assure that raw data" from the clinical trial "was accurate and reliable." Ex. 9 (FDA EIR) at RELATOR_00004086.

230.     The on-site inspection lasted nearly eight hours (from 10:05 a.m. to 5:45 p.m.). Ex. 10 (Merck file regarding FDA's Aug. 6, 2001 inspection) at MRK-KRA01631029.

231.     Bennett and Carbone toured Krah's lab, reviewed raw data and other documentation related to the PRN assay, and conducted "an evaluation of laboratory and quality systems." *Id.*; Ex. 9 (FDA EIR) at RELATOR_00004091-92.

232.     During the tour of Krah's lab, Bennett and Carbone inquired about lab practices for collecting data. Ex. 10 (Merck file regarding FDA's Aug. 6, 2001 inspection) at MRK-KRA01631030.

233.     Carbone was "interested in the trigger that would result in re-evaluation of raw assay data," and she and Bennett noted instances where raw data was changed without a documented justification. *Id.*

234.     Carbone also inquired about the procedures for handling pre- and post-vaccination blood samples for the PRN assay. *Id.* at MRK-KRA01631029.

Appx235

235.    Carbone and Bennett reviewed assay documentation, including "the majority of the data" from the PRN assay in Protocol 007, "for frequency and nature of re-checks and corrections." *Id.* at MRK-KRA01631030-31.

236.    During the inspection, Carbone and Bennett collected and made copies of 16 Merck documents totaling over 200 pages, including standard operating procedures and notebooks containing raw assay data. *Id.* at MRK-KRA01631031-254 (listing and attaching copies of all 16 documents collected and reviewed by FDA; *see also* Ex. 9 (FDA EIR) at RELATOR_00004091-92 (listing certain Merck documents collected and attached to EIR as exhibits).

237.    At least six individuals from various departments at Merck were involved in responding to FDA's questions during the August 6, 2001 inspection:  Dr. Alan Shaw (Executive Director, MRL Virus & Cell Biology, who reported directly to Dr. Emini); Dr. David Krah (Senior Investigator for MRL Virus & Cell Biology, who reported directly to Dr. Shaw); Dr. Kelli J. Pardue (Senior GMP Compliance Administrator); Karen R. McKenney (Associate Director, Process R&D GMP Compliance); Cathy W. Wadsworth (Worldwide Quality Assurance Manager); and Denise Ann Williams (Associate Non-Clinical Quality Assurance Auditor). Ex. 9 (FDA EIR) at RELATOR_00004086; Ex.12 (Merck organizational chart) at RELATOR_00000902-3.

238.    Krahling was not interviewed by anyone from FDA during the August 6, 2001 inspection, nor did he speak to anyone from FDA during the inspection. Ex. 13 (Krahling's Answers to Merck's Request for Admissions, Request No. 40) at 18.

239.    Krahling alleges that, when FDA inspectors were speaking with Shaw and Krah in Krah's lab, Krahling overhead approximately 20 minutes—but not the entirety—of their

Appx236

conversation, eavesdropping from a desk located approximately three feet away. Ex. 5

(Krahling's Answers to Merck's Interrogatories, Interrogatory No. 8) at 17; Exhibit 2 (Krahling

Dep. Tr. Vol. 1) at 299:4-302:5.

240.     Krahling was not involved in, and did not witness or overhear, any other portion

of FDA's August 6, 2001 inspection. Ex. 2 (Krahling Dep. Tr. Vol. 1) at 302:25-303:6.

241.     At the conclusion of the inspection, Bennett and Carbone issued Merck an FDA

Form 483. Ex. 10 (FDA Form 483) at MRK- KRA01631018.

242.     A Form 483 "notifies the company's management of objectionable conditions…

and encourages the company to respond and, if necessary, correct the cited conditions." Ex. 14

(FDA Form 483 Frequently Asked Questions, *available at*

https://www.fda.gov/iceci/inspections/ucm256377.htm).

243.     The Form 483 listed four observations. First, FDA observed that raw data was

being changed without justification. Second, it observed that there was no procedure to assess

whether a research lab is suitable for clinical trial testing prior to the start of testing. Third, it

observed that spreadsheets used to determine questionable results and retesting had not been

validated. And fourth, it observed that notebooks did not identify each technician performing

each task. Ex. 10 (FDA Form 483) at MRK- KRA01631018.

244.     On August 10, 2001, Investigator Bennett returned to Merck for a second time to

collect copies of raw data for the initial 600 samples of PRN assay data that Merck had

previously submitted to FDA. Ex. 15 (Merck Memorandum dated August 10, 2001) at MRK-

KRA00071241.

245.     The following individuals at Merck were involved in responding to FDA's

questions during the August 10, 2001 inspection:  Krah; Shaw; Karen McKenney; and Beverly

Appx237

Zaber (from the Quality Assurance department). Ex. 15 (Merck Memorandum dated August 10, 2001) at MRK-KRA00071241.

246.     Krahling did not witness or participate in any aspect of the August 10, 2001 inspection. Ex. 2 (Krahling Dep. Tr. Vol. 1) at 120:9-122:22, 303:7-11; *see also* Ex. 15 (Merck Memorandum dated August 10, 2001) at MRK-KRA00071241-45.

247.     Investigator Bennett returned a third time, on September 14, 2001, to collect Merck's "data and correspondence" related to FDA's investigation of a concern that Merck had contracted with Dr. Richard Ward of Cincinnati Children's Hospital to test samples for the PRN assay, but then rejected his data because it did not align with Merck's. Ex. 9 (FDA EIR) at RELATOR_00004093; Ex. 17 (Merck Memorandum dated Sept. 14, 2001) at MRK-KRA00063886; Ex. 18 (Merck memorandum dated Sept. 17, 2001) at MRK-KRA00019107.

248.     Merck provided the requested documentation and discussed this issue with FDA during its September 14 inspection, and then again during subsequent telephone conferences on September 17 and 25, 2001. Ex. 17 (Merck Memorandum dated Sept. 14, 2001) at MRK-KRA00063886; Ex. 18 (Merck Memorandum dated Sept. 17, 2001) at MRK-KRA00019107; Ex. 19 (Merck Memorandum dated Sept. 25, 2001) at MRK-KRA00071300; Ex. 10 (Oct. 10, 2001 Merck Letter to FDA) at MRK-KRA01631027.

249.     The following individuals at Merck were involved in responding to FDA's questions during the September 14, 2001 inspection and subsequent September 17 and 25, 2001 telephone conferences:  Beverly Zaber; Krah; Shaw; and Dr. Manal Morsy (Merck Associate Director, Worldwide Regulatory Affairs for Vaccines/Biologics). Ex. 17 (Merck Memorandum dated Sept. 14, 2001) at MRK-KRA00063886-88; Ex. 18 (Merck Memorandum dated Sept. 17,

2001) at MRK-KRA00019107; Ex. 19 (Merck Memorandum dated Sept. 25, 2001) at MRK-KRA00071300.

250.    Krahling did not witness or participate in any aspect of the September 14, 2001 inspection and subsequent September 17 and 25, 2001 telephone conferences. Ex. 2 (Krahling Dep. Tr, Vol. 1) at 120:9-122:22, 303:7-11; *see also* Ex. 17 (Merck Memorandum dated Sept. 14, 2001) at MRK-KRA00063886-87; Ex. 18 (Merck Memorandum dated Sept. 17, 2001) at MRK-KRA00019107; Ex. 19 (Merck Memorandum dated Sept. 25, 2001) at MRK-KRA00071300.

### C.    Merck And FDA Engage In Extensive Follow-Up.

251.    Merck responded to the Form 483 observations in an August 20, 2001 letter. It explained that Merck had "retrained" the Protocol 007 lab staff "in proper documentation practices," was retraining all staff "who perform testing of samples from vaccine clinical trials," had reviewed "all historical changes to the" Protocol 007 data, and had  conducted a "reanalysis of the data."  Ex. 10 (CBER Aug. 20, 2001 Correspondence) at MRK01631019-22.

252.    That reanalysis compared the results for the initial 565 subjects using the data as originally recorded with the changed data which the inspectors faulted for lack of documentation. The new analysis showed that "there is no difference between the corrected and uncorrected data sets with respect to seroconversion."  Ex. 11 (Burlington Report) at 40; Ex. 10 (CBER Aug. 20, 2001 Correspondence) at MRK01631019-22).

253.    In fact, the corrected plaque counts as compared to the originally counted plaques led to a slight *decrease* in the seroconversion rates—*i.e.*, the corrected data showed lower seroconversion rates that the original data. Ex. 21 (CBER Correspondence Feb. 4, 2002) at MRK-KRA00025856.

254.    During a teleconference on December 7, 2001, Merck and representatives from FDA (including Carbone) discussed, among other things, the integrity of the data from the PRN assay in Protocol 007 and whether "changes" to some of the data or the discarding of certain cell plates had impacted the study results. Ex. 20 (Merck Memorandum dated Dec. 13, 2001) at MRK-KRA00019640.

255.    FDA expressed concern that because certain cell plates had been discarded or wiped clean and recounted there was no "way to confirm the accuracy of the unchanged data" that Merck previously reported to FDA. *Id.* at MRK-KRA00019644.

256.    Merck responded to and further discussed FDA's concerns in written and telephone communications with the agency in December 2001 through March 2002. *Id.* at MRK-KRA00019640-46; Ex. 21 (Feb. 4, 2002 Merck Letter to FDA) at MRK-KRA00025847-916; Ex. 23 (March 23, 2002 memorandum describing a March 22, 2002 Merck and FDA telephone conference) at MRK-KRA00009042.

257.    Altogether, thirteen individuals at Merck engaged with FDA during its follow-up. Ex. 20 (Merck Memorandum dated December 13, 2001) at MRK-KRA00019640; Ex. 21 (Feb. 4, 2002 Merck Letter to FDA) at MRK-KRA00025847-916; Ex. 23 (March 23, 2002 memorandum describing a March 22, 2002 Merck and FDA telephone conference) at MRK-KRA00009042.

258.    Krahling did not participate in any of the follow-up between Merck and FDA from December 2001 to March 2002  as he had already left Merck by this time. Ex. 2 (Krahling Dep. Tr. Vol. 1) at 42:4-7, 118:25-119:14, 120:9-122:22.

**D.      Merck And FDA Resolve FDA's Concerns.**

259.    Following the initial inspection and in connection with CBER's follow-up visits and questions, Merck provided CBER with extensive data regarding the assay including the PRN

Appx240

plaque counting sheets and data. Ex. 10 (Merck file regarding FDA August 6, 2001 inspection) at MRK-KRA0001631019-1254; Ex. 127, Aug. 20, 2001 Letter) at MRK-KRA00000481-539.

260.     However, because there was no pre-specified protocol for making corrections or recounting, CBER declined to accept the corrected plaque counts. Ex. 20 (Dec. 13, 2001 Memo) at MRK-KR00019640-41.

261.     Instead, CBER accepted Merck's proposal to use the un-corrected, originally recorded AIGENT assay data to support the change in the mumps expiry claim. Ex. 23 (March 23, 2002 Merck Memo) at MRK-KRA00009042; Ex. 22 (April 19, 2002 Letter) at MRK-KRA 00337266.

262.     ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

## VIII.     FDA'S APPROVAL OF AN MMR-II LABEL CHANGE

263.     In January 2004, Merck submitted a supplemental Biologics License Application (sBLA) to FDA requesting to change the label statement of mumps potency from 4.3 $\log_{10}$ (20,000) $TCID_{50}$ per dose to 4.1 $\log_{10}$ (12,500) $TCID_{50}$ per dose. Protocol 007 provided

supporting immunogenicity data to indicate that a mumps vaccine with potency of 4.1 $\log_{10}$ $TCID_{50}$ per dose was comparably immunogenic to a vaccine with potency of 4.8 $\log_{10}$ $TCID_{50}$ per dose. Ex. 123 Jan. 29, 2004 Submission) at MRK-KRA00000032-33.

264.    After several rounds of comments from CBER and responses from Merck, CBER notified Merck in May 2007 that it would not approve the sBLA based on Protocol 007's PRN assay, principally due to an insufficient quantity of data. Ex. 87 (Oct. 17, 2005 Letter) MRK-KRA000000479 at '479; Ex. 88 (Nov. 15, 2006 Letter) MRK-KRA00000393 at '397, '399. Specifically, FDA stated: "Our review finds that the information and data submitted are inadequate for final approval at this time. We cannot accept use of multiple imputation analysis of the PRN data to support the lowering of mumps vaccine end-expiry potency." Ex. 126 (May 18, 2007 Letter) at MRK-KRA00000385. CBER also noted, however, that immunogenicity testing had "substantially evolved since our initial testing requirements" and that "[u]se of ELISA data to evaluate the effect of differences in product potency on immunogenicity is now acceptable." Id. CBER requested that Merck submit a new analysis pooling the control lot from Protocol 007 with two lots from previous studies to create a new control group against which to evaluate the lower-potency immunogenicity. Id.

265.    Merck has presented the ELISA results from Protocol 007 to CDC. Ex. 220 (email); Ex. 242 (Feb. 25, 2010 presentation) at Slide 9.

266.    Merck provided the requested information in June 2007 and follow-up information in August 2007, reporting that the lots were consistent and allowed for a pooled control data set as CBER suggested. Further, the 4.1 $\log_{10}$ $TCID_{50}$ lot from Protocol 007 also met the non-inferiority criteria compared to the pooled control data. Ex. 124 (June 5, 2007 Letter) at MRK-KRA00000374; Ex. 126 (May 18, 2007 Letter) at MRK-KRA00000385-86.

267.     Based on that data, CBER approved Merck's sBLA to change the labeled potency to 4.1 $\log_{10}$ $TCID_{50}$ in December 2007. Ex. 125 (Dec. 8, 2007 letter from FDA) at MRK-KRA00000383.

268.     Despite the approved label change in 2007, Merck has never reduced the release potency specification for the MMR-II vaccines it manufactures, and it continues to use 5.0 $\log_{10}$ $TCID_{50}$ as the minimum potency for release. Ex. 202 (Stannard Dep. Tr.) at 298:4-7 (Q: ". . . [h]as the target manufacturing potency or the release potency changed since . . . September 1999?" A: "It has not."); Ex. 201 (Summary of Potency Topics) at 2 ("Minimum Release Potency for mumps in MumpsVax, MM-Vax and MMR" from October 4, 1999 to the present reported as 5.0 $\log_{10}$ $TCID_{50}$/dose).

## IX.    FDA APPROVES PROQUAD

269.     In 2004, CBER was also considering Merck's application to license the ProQuad vaccine, which would combine measles, mumps, and rubella vaccines with a varicella (chicken pox) vaccine. Ex. 153 (Aug. 3, 2004 Application) at MRK-KRA00158320-526.

270.     In evaluating combination vaccines, CBER's primary question is whether the co-formulation of the individually-approved vaccines would lead to any interference among them that would reduce their effectiveness. Ex. 93 (FDA, *Guidance for Industry, Evaluation of Combination Vaccines for Preventable Diseases: Production, Testing & Clinical Studies, April 1997*, https://www.fda.gov/downloads/biologicsbloodvaccines/guidancecomplianceregulatoryinformation/guidances/vaccines/ucm175909.pdf) at 3, 14.

271.     Merck provided assorted information to answer this question.  CBER, in analyzing whether data from ELISA assays would be accepted to support ProQuad's licensure, then requested information about the degree of agreement between the PRN and ELISA assays

Appx243

from Protocol 007.  Merck responded to the request by noting that this information and analysis had previously been provided in a June 10, 2002 submission. A summary of that submission was also provided. Ex. 170 (June 30, 2004 Email) at MRK-KRA00791508-510; Ex. 173 (FDA Record) at MRK-KRA00846406-07; Ex. 168 (Nov. 17, 2004 Response) at MRK-KRA00761530-538; Ex. 173 (FDA Record) at MRK-KRA00846406-07.

272.    CBER completed its clinical review of the studies submitted to support ProQuad in August 2005. Ex. 174 (Clinical Review) at MRK-KRA01285010.

273.    CBER concluded that Merck had demonstrated "good correlation" between the mumps PRN assay and the ELISA and that Merck's "studies indicated that the ELISAs used to assess antibody response to each of the vaccine antigens in ProQuad would parallel responses that correlated with protection in other studies." *Id.* at '222.

274.    CBER did not require Merck to conduct a new PRN assay to demonstrate non-interference on antibody responses when the four vaccines were combined in ProQuad, and it accepted the endpoint measured by the Protocol 007 ELISA in Merck's studies to support approval of ProQuad; it accepted ELISA data instead. *Id.* at MRK-KRA01285010-272.

275.    ProQuad's license was approved on September 6, 2005. Ex. 172 (Sept. 6, 2005 Letter) at MRK-KRA00821906.

DATED:  October 25, 2019                    Respectfully submitted,

                                            */s/ Lisa C. Dykstra*
                                            Eric W. Sitarchuk
                                            Lisa C. Dykstra
                                            R. Brendan Fee
                                            Margaret E. Rodgers Schmidt
                                            MORGAN, LEWIS & BOCKIUS LLP
                                            1701 Market Street
                                            Philadelphia, PA  19103
                                            Telephone:  215-963-5000
                                            eric.sitarchuk@morganlewis.com
                                            lisa.dykstra@morganlewis.com
                                            brendan.fee@morganlewis.com
                                            margaret.rodgers-schmidt@morganlewis.com

                                            Dino S. Sangiamo
                                            Sally W. Bryan
                                            VENABLE LLP
                                            750 E. Pratt Street, Suite 900
                                            Baltimore, MD  21202
                                            Telephone:  410-244-7400
                                            DSSangiamo@Venable.com
                                            SRBryan@Venable.com

                                            Neal K. Katyal
                                            Jessica Ellsworth
                                            HOGAN LOVELLS US LLP
                                            555 Thirteenth Street NW
                                            Washington, DC  20004
                                            Telephone:  202-637-5600
                                            neal.katyal@hoganlovells.com
                                            jessica.ellsworth@hoganlovells.com

                                            *Counsel for Defendant*
                                            *Merck Sharpe & Dohme, Corp.*
                                            *(f/k/a Merck & Co. Inc.)*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 25, 2019, a true and correct copy of the foregoing under

seal filing was served upon the following counsel of record via electronic mail:

Gordon Schnell
Robert L. Begleiter
Dan Vitelli
Marlene Koury
Hamsa Mahendranathan
CONSTANTINE CANNON LLP
335 Madison Avenue
New York, NY 10017
Telephone: (212) 350-2700
gschnell@constantinecannon.com
rbegleiter@constantinecannon.com
dvitelli@constantinecannon.com
mkoury@constantinecannon.com
hmahendranathan@constantinecannon.com

Jeffrey F. Keller
Kathleen R. Scanlan
KELLER GROVER LLP
1965 Market Street
San Francisco, CA 94103
Telephone: (415) 543-1305
jfkeller@kellergrover.com
kscanlan@kellergrover.com

***Counsel for Relators***

Gerald B. Sullivan
Joel M. Sweet
Office of the U.S. Attorney for the
   Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
gerald.sullivan@usdoj.gov
joel.sweet@usdoj.gov

Holly H. Snow
United States Department of Justice
601 D Street NW, Suite 9909
Washington, DC 20004
holly.h.snow@usdoj.gov

***Counsel for the United States***

Dated: October 25, 2019

     */s/ Lisa C. Dykstra*
      Lisa C. Dykstra

     *Counsel for Defendant*
     *Merck Sharpe & Dohme, Corp.*
     *(f/k/a Merck & Co. Inc.)*

**Appx246**

**THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*, STEPHEN A. KRAHLING and JOAN A. WLOCHOWSKI, <br><br> *Plaintiffs,* <br><br> v. <br><br> MERCK & CO., INC., <br><br> *Defendant.* | Civil Action No. 10-4374 (CDJ) <br><br><br> **CONTAINS "CONFIDENTIAL" AND "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" MATERIAL PURSUANT TO PROTECTIVE ORDER** |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS FOURTH DISPOSITIVE MOTION: TO STRIKE OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT ON, THE UNPLED KESSLER-BASED THEORY**

Pursuant to the Court's Policies and Procedures for Civil Cases, Defendant Merck Sharp & Dohme Corporation, formerly known as Merck & Co., Inc. ("Merck"), submits this statement of undisputed material facts in support of Merck's motion: to strike or, in the alternative, for summary judgment on, the unpled Kessler-based theory.

## I.    RELATORS

### A.    Stephen A. Krahling

1.    Stephen A. Krahling is a former Merck employee who worked for Merck from March 1999 to August 2000 and December 27, 2000 to November 9, 2001. Ex. 2 (Krahling Dep. Tr. Vol. 1) at 39:15-40:12, 111:2-4 and 171:10-12; Ex. 3 (Merck Employee Initialization Form) at MRK-KRA00582401; Ex. 4 (Krahling Separation Agreement) at MRK-KRA00582394; Ex. 5 (Krahling's Resp. to Def's First Set of Interrogatories, Interrogatory No. 6) at 15.

2.    At Merck, Krahling was a lab technician in a division called Merck Research Laboratories (MRL) under the supervision of Dr. David Krah. Ex. 24 (Krahling Employment

1

**Appx247**

Offer) at RELATOR_00001059; Ex. 5 (Krahling's Resp. to Def's First Set of Interrogatories, Interrogatory No. 6) at 15.

3.      In that role, Krahling ran cell-based assays to characterize Merck's live virus vaccines, including work in support of the plaque reduction neutralization assay referred to as Protocol 007.   Krahling was not involved in the design and development of the actual PRN assay. Ex. 2 (Krahling Dep. Tr. Vol. 1) at 39:15-43, 55:7-12; 111:10-18.

4.      Krahling does not allege scientific impropriety in the original 1960's efficacy studies that supported Merck's mumps vaccine's initial licensure. In fact, neither Relator Krahling nor Wlochowski challenge or context the validity of Dr. Hilleman's original clinical trials. Ex. 2 (Krahling Dep. Tr. Vol. 1) at 83:13-84:6.

5.      Krahling never worked in Merck's Manufacturing Division, never had any responsibility for manufacturing the mumps vaccine, and did not run the $TCID_{50}$ assay used to measure the potency of the mumps vaccine.  Krahling also does not know "what amount of virus" Merck uses to manufacture vaccine today.  Ex. 13 (Krahling Responses to Def's Req. for Admission) at ¶¶ 22-23; Ex. 2 (Krahling Dep. Tr. Vol. 1) at 61:19-25; Ex. 7 (Krahling Dep. Tr. Vol. 2) at 392-393:12-22, 488:21-489:6; 484:16-17.

6.      While working for Merck, Krahling was not responsible for communicating with the U.S. Food and Drug Administration (FDA) on Merck's behalf. Ex. 13 (Krahling Responses to Def's Req. for Admission) at ¶ 29.

7.      Prior to his participation in this litigation, Krahling never reviewed any of Merck's submissions to foreign regulatory bodies related to Merck's mumps vaccine or Protocol 007. *Id.* at ¶¶ 46-48.

**Appx248**

8.      Prior to his participation in this litigation, Krahling never personally communicated with the Centers for Disease Control and Prevention (CDC) about Merck's mumps vaccine or the issues in the Amended Complaint and he was not responsible for communications with CDC. *Id.* at ¶¶ 3, 50-51.

9.      While working for Merck, Krahling was not responsible for drafting, negotiating, or executing any contracting for the sale of Merck's vaccines to CDC. *Id.* at ¶ 54.

10.     Before this lawsuit, Krahling had no personal knowledge of non-public communications between Merck and CDC concerning Merck's mumps vaccine, including no knowledge of communications with CDC concerning Protocol 007. *Id.* at ¶¶ 56-57.

11.     Krahling has not spoken with CDC about its decision to purchase Merck's Mumps Vaccine. *Id.* at ¶ 60.

**B.      Joan A. Wlochowski**

12.     Relator Joan L. Wlochowski is a former Merck employee who worked for Merck from 2000 to 2002. Ex. 203 (Wlochowski Resume) at AMGEN_0007.

13.     While working at Merck, Wlochowski was a lab technician in MRL's virus and cell biology laboratory under the supervision of Dr. Krah. *Id.*; Ex. 204 (Wlochowski Dep. Vol. 1) at 60:23-61:1.

14.     In this role, she inoculated assays for the plaque reduction neutralization assay for Protocol 007. Ex. 85 (Wlochowski's Responses to Def's Req. for Admission) at ¶¶ 1-2.

15.     As of June 13, 2017, Wlochowski had never had a conversation directly about the mumps vaccine with FDA or with CDC. Ex. 204 (Wlochowski Dep. Tr. Vol. 1) at 123:7-15.

16.     Wlochowski cannot say what CDC does in order to determine whether to purchase the mumps vaccine and she has not personally communicated with CDC about Merck's

Appx249

mumps vaccine or the topics addressed in her complaint. Ex. 204 (Wlochowski Dep. Tr. Vol. 1) at 152:16-153:5; Ex. 85 (Wlochowski's Responses to Def's Req. for Admission) at ¶ 4.

17.     Wlochowski never worked in Merck's Manufacturing Division and did not have responsibility for manufacturing the mumps vaccine when she worked at Merck. Ex. 85 (Wlochowski's Responses to Def's Req. for Admission) at ¶¶ 23-24.

18.     While working for Merck, Wlochowski was not responsible for communicating with FDA on Merck's behalf and she has never attended any meeting between Merck and FDA relating to Merck's mumps vaccine, Protocol 007, or any neutralization assay. Ex. 85 (Wlochowski's Responses to Def's Req. for Admission) at ¶¶ 30, 36-38.

19.     Prior to her participation in this litigation, Wlochowski never reviewed any of Merck's submissions to foreign regulatory bodies related to Merck's mumps vaccine or Protocol 007. Ex. 85 (Wlochowski's Responses to Def's Req. for Admission) at ¶¶ 47, 49.

20.     While working for Merck, Wlochowski was not responsible for communications with CDC and was never asked to communicate with CDC on Merck's behalf. Ex. 85 (Wlochowski's Responses to Def's Req. for Admission) at ¶¶ 51-52.

21.     While working for Merck, Wlochowski was not responsible for drafting, negotiating, or executing any contracting for the sale of Merck's vaccines to CDC. Ex. 85 (Wlochowski's Responses to Def's Req. for Admission) at ¶ 55.

22.     Before this lawsuit, Wlochowski had no personal knowledge of non-public communications between Merck and CDC concerning Merck's mumps vaccine, including no knowledge of communications with CDC concerning Protocol 007. Ex. 85 (Wlochowski's Responses to Def's Req. for Admission) ¶¶ 57-58.

23.     Wlochowski has not spoken with CDC about its decision to purchase Merck's Mumps Vaccine. Ex. 85 (Wlochowski's Responses to Def's Req. for Admission) at ¶ 61.

## II.     MERCK'S MUMPS VACCINE

24.     Mumps, the once ubiquitous childhood disease, generally presents as fever and parotitis (inflammation of one or both parotid (salivary glands)). Ex. 197 (Excerpts of Rubin, *Vaccines* (2018)) at 663.

25.     In 1967, Merck's monovalent mumps vaccine, MUMPSVAX®, was first licensed in the United States, containing a version of the "Jeryl Lynn" strain of the mumps virus. Ex. 197 (Excerpts of Rubin, *Vaccines* (2018)) at 669.

26.     In 1971, Merck introduced the MMR vaccine, which combined the Mumpsvax vaccine with a measles vaccine and a rubella vaccine in a single "trivalent" vaccine. Ex. 197 (Excerpts of Rubin, *Vaccines* (2018)) at 670.

27.     In 1978, Merck obtained approval of second trivalent MMR vaccine, called MMR-II, which included the same measles and mumps vaccines as were in MMR but a different rubella vaccine. Ex. 197 (Excerpts of Rubin, *Vaccines* (2018)) at 672, 979-980.

28.     The Jeryl Lynn mumps vaccine is also included in ProQuad, a quadrivalent vaccine licensed by Merck in 2005 that comprises four distinct vaccines—the same measles, mumps and rubella vaccines that are in MMR-II, as well as a varicella (chicken pox) vaccine. Ex. 197 (Excerpts of Rubin, *Vaccines* (2018)) at 672.

29.     As a result, the Jeryl Lynn mumps vaccine has been the mumps vaccine administered to children and adults in the United States for more than 50 years.

30.     CDC reports that that, "[a]fter the U.S. mumps vaccination program started in 1967, there has been a more than 99% decrease in mumps cases in the United States."  Ex. 81 (CDC, *Mumps Vaccination*, https://www.cdc.gov/mumps/vaccination.html).

31.    "Before the U.S. mumps vaccination program started in 1967, about 186,000 cases were reported each year, but the actual number of cases was likely much higher due to underreporting." By comparison, in 2018, the provisional number of mumps cases reported in the United States was 2,251—99% fewer cases than were reported annually in the pre-vaccine era. Ex. 98 (CDC, *Mumps Cases and Outbreaks*, https://www.cdc.gov/mumps/outbreaks.html).

32.    In the context of vaccine trials, *efficacy* refers to "[t]he ability of a vaccine to provide protection against disease under ideal circumstances." Ex. 95 (Centers for Disease Control and Prevention, *Manual for the Surveillance of Vaccine-Preventable Disease*, Definition of Terms (5th ed. 2012), http://www.cdc.gov/vaccines/pubs/surv-manual/front-portion.pdf) at ix.

33.    In the context of vaccines, efficacy is typically evaluated by comparing how many people in a clinical trial who were vaccinated got the disease with how many people who were not vaccinated got the disease. Ex. 100 (CDC, *Principles of Epidemiology in Public Health Practice* (3d ed. 2012), https://www.cdc.gov/csels/dsepd/ss1978/lesson3/section6.html) at § 6.

34.    The primary pre-licensure field trial for the Jeryl Lynn vaccine was published in the New England Journal of Medicine. The study was carried out by Dr. Maurice Hilleman and his colleagues in 1965-1966. The investigators found: "The reduction of cases of natural mumps (that is, protective efficacy) resulting from the vaccine was 97 per cent if only the laboratory-proved cases are considered. If, however, the later cases that occurred in families and have not yet been diagnosed in the laboratory are included, the protective efficacy would be about 95 per cent." Ex. 86 (Maurice Hilleman et al., *Live, Attenuated Mumps Virus Vaccine 4. Protective Efficacy as Measured in a Field Evaluation*. 276 New England J. of Medicine (1967)) at 256; *see also* Ex. 199 (Robert Weibel et al., *Live, Attenuated Mumps Virus Vaccine 3. Clinical and*

*Serologic Aspects in a Field Evaluation*, 276 New England J. of Medicine 245 (1967)) at 245-251.

35.      In the context of vaccines, *effectiveness* "represents the percentage reduction in the frequency of . . . infections among people vaccinated compared to the frequency among those who were not vaccinated."  Ex. 94 (CDC, Flu Vacine Effectiveness: Q&A for Health Professionals) at 1; Ex. 111 (Freed Report) at 13 ¶ 46; *see also* Ex. 95 (CDC, *Manual for the Surveillance of Vaccine-Preventable Disease* (5th ed. 2012), http://www.cdc.gov/vaccines/pubs/surv-manual/front-portion.pdf) at ix (Vaccine effectiveness is the "ability of a vaccine to provide protection against disease when used under field conditions (e.g., use of the vaccine in routine practice).").

36.      The term vaccine *impact* can be used to describe the comparison of the incidence of a disease in a given population before and after the introduction of a vaccine. Ex. 207 (M. Doherty, *Vaccine Impact: Benefits for Human Health*, 2016 *Vaccine* 6707) at 6708.

37.      In part, because impact considers both vaccinated and unvaccinated individuals, it also accounts for effects such as "herd immunity," whereby "circulation of a bacteria or virus may be decreased" because of the vaccine, "which lessens the chance that even someone who has not been immunized will get disease." Ex. 110 (FDA, *Vaccine Safety Questions and Answers* https://www.fda.gov/vaccines-blood-biologics/safety-availability-biologics/vaccine-safety-questions-and-answers).

38.      In part because it would be unethical to randomize people into a placebo or no vaccine group after a vaccine has been licensed, it is generally not possible to conduct efficacy studies after a vaccine has been recommended for use. Ex. 94 (CDC, *Flu Vaccine Effectiveness and Efficacy is Measured: Questions and Answers for Health Professionals* (Jan. 29, 2016),

Appx253

http://www.cdc.gov/flu/professionals/vaccination/effectivenessqa.htm) (explaining that universal vaccine recommendations make it unethical to perform randomized clinical control trials because assigning individuals to the placebo-controlled group puts them at risk of infection).

39.     CDC currently reports that "[t]wo doses of mumps vaccine are 88% (range 31% to 95%) effective at preventing the disease; one dose is 78% (range 49% to 91%) effective." Ex. 99 (CDC, *Mumps For Healthcare Providers*, https://www.cdc.gov/mumps/hcp.html) at 3.

40.     The "preponderance of data demonstrate [mumps vaccines] to be highly effective and solely responsible for the near elimination of this once ubiquitous disease in all countries where mumps-containing vaccine is rigorously used." Ex. 197 (Rubin, *Vaccines* (2018)) at 688.

41.     During the first five years of this century, the number of mumps cases reported annually in the United States were at all-time lows, with only 200-300 cases being reported each year. Ex. 97 (CDC, MMWR*, Summary of Notifiable Diseases – United States, 2005* (Mar. 30, 2007), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm5453a1.htm) at 77.

42.     Since 2006, the number of mumps cases reported each year has generally numbered in the hundreds or low thousands—a significant decrease from the 186,000 cases reported each year in the pre-vaccine era. Ex. 99 (CDC, *Mumps For Healthcare Providers*, https://www.cdc.gov/mumps/hcp.html) at 2.

## III.    THE MMR-II LABEL

43.     Consistent with statute and regulations, for the entire time period relevant to this case, the MMR-II vaccine has carried an FDA-approved label. *See* Ex. 226 (March 1995), Ex. 227 (March 1995), Ex. 165 (1995), Ex. 166 (Apr. 1999), Ex. 232 (Apr. 1999), Ex. 222 (Oct. 2000), Ex. 236 (Feb. 2000), Ex. 223 (Feb. 2001), Ex. 224 (Aug. 2001), Ex. 229 (Sept. 2002), Ex. 228 (Oct. 2003), Ex. 225 (Feb. 2006), Ex. 230 (Feb. 2007), Ex. 231 (Feb. 2007), Ex. 167 (Dec.

2007), Ex. 233 (Feb. 2014), Ex. 234 (June 2014), Ex. 235 (Oct. 2015), Ex. 237 (Mar. 2010), Ex. 238 (Dec. 2010), and Ex. 239 (Sep. 2009).

44.     Part of what FDA considers to be labeling is the insert that contains "Prescribing Information," which is "written for the healthcare practitioner." The statements about the mumps vaccine in this Statement and accompanying Motion refer to the label and the Prescribing Information component of the insert interchangeably. Ex. 208 (FDA, *Prescription Drug Labeling Resources*, https://www.fda.gov/drugs/laws-acts-and-rules/prescription-drug-labeling-resources); *see* 21 C.F.R. § 201.56(e) (treating the Prescribing Information as contained within "drug labeling").

### A.     Label statements about efficacy and impact

45.     In discussing efficacy, since 1999, the label has explained: "Efficacy of measles, mumps and rubella vaccines was established in a series of double-blind controlled field trials which demonstrated a high degree of protective efficacy afforded by the individual vaccine components." In a footnote, the label cites to the Hilleman and Weibel studies as support for this statement. Ex. 166 (April 1999 Label) at MRK-KRA00757072; Ex. 167 (December 2007 Label) at MRK-KRA00757100; Ex. 121 (current label, *available at* https://www.merck.com/product/usa/pi_circulars/m/mmr_ii/mmr_ii_pi.pdf) at 2.

46.     In discussing evidence of impact, since 1999, the label has explained that: "The impact of measles, mumps, and rubella vaccination on the natural history of each disease in the United States can be quantified by comparing the maximum number of measles, mumps, and rubella cases reported in a given year prior to vaccine use to the number of cases of each disease reported in 1995. . . .[F]or mumps, 152,209 cases reported in 1968 compared to 840 cases reported in 1995 resulted in a 99.45% decrease in reported cases." Ex. 166 (April 1999 Label) at

Appx255

MRK-KRA00757072; Ex. 167 (December 2007 Label) at MRK-KRA00757100; Ex. 121 (current label) at 1.

### B. Label statement about potency

47. Included in the FDA-approved label for MMR-II is a statement concerning the *potency* of the MMR II vaccine. *See* Ex. 121 (current label).

48. *Potency* in the label describes the concentration of virus in each dose of vaccine. Ex. 122 (Morrisey Dep. Tr.) at 27:23-28:13.

49. Potency in the label is reported in units of "tissue culture infective dose" ($TCID_{50}$). Potency values expressed using this measurement represent the viral concentration necessary to induce cell death or pathological changes in 50% of inoculated cell cultures. Ex. 91 (Gulati Report) at ¶ 22.

50. Potency values can be expressed as simple numbers or as log base 10 values (*e.g.*, 20,000 $TCID_{50}$ or 4.3 $log_{10}$ $TCID_{50}$). Ex. 200 (Musey Dep. Tr.) at 102:2-19.

51. As of the late 1990s, the M-M-R II label stated that "[e]ach 0.5 mL dose contains not less than . . . 20,000 $TCID_{50}$ of mumps virus"—equivalent to 4.3 $log_{10}$ $TCID_{50}$. Ex. 166 (April 1999 Label), at 1. After the FDA approved the change to the label in 2007, the M-M-R II label stated that "[e]ach 0.5 mL dose contains not less than … 12,500 TCID50 of mumps virus"— equivalent to 4.1 $log_{10}$ $TCID_{50}$. Ex. 167 (Current Label) at 1

52. The mumps vaccine is a live virus vaccine containing live viral cells, and as such, the volume of live cells in the vaccine (i.e. potency) is known to decrease over time. This degradation can be impacted by environmental conditions, including, for example, the temperature at which the vaccine is stored. Ex. 112 (Excerpts of Phillip L. Gomez & James M. Robinson, *Vaccine Manufacturing* in Stanley Plotkin et al. eds., *Vaccines* (2018 7th ed.) at 54; Ex. 91 (Gulati Report) at ¶ 24.

10

IV.   **GOVERNMENT PURCHASES OF VACCINES**

A.   **How CDC Purchases Vaccines**

53.      The CDC administers the federal Vaccines for Children (VFC) program. Ex. 38 (About VFC, https://www.cdc.gov/vaccines/programs/vfc/about/index.html (last reviewed Sept. 26, 2019).

54.      The VFC program helps "provide vaccines to children whose parents or guardians may not be able to afford them." *Id*. Vaccines available through the VFC program "are those recommended by [ACIP]." *Id.*

55.      VFC is an entitlement program. Under this program, the CDC is directed to purchase vaccines that ACIP has included within the VFC program. 42 U.S.C. § 1396s(d)(1) ("[t]he Secretary shall negotiate and enter into contracts with manufacturers of pediatric vaccines . . . to purchase vaccines."); *see also id*. § 1396s(e) ("The Secretary shall use, for the purpose of the purchase, delivery, and administration of pediatric vaccines under this section, the list established (and periodically reviewed and as appropriate revised) by the Advisory Committee on Immunization Practices (an advisory committee established by the Secretary, acting through the Director of the Centers for Disease Control and Prevention)."); *see also* Ex. 39 (ACIP Charter, *available at* https://www.cdc.gov/vaccines/acip/committee/acip-charter.pdf (approved March 27, 2018)) at 2 ("In accordance with Section 1928 of the Social Security Act, the ACIP also shall establish and periodically review and, as appropriate, revise the list of vaccines for administration to children and adolescents eligible to receive vaccines through the Vaccines for Children Program . . . The Secretary, and as delegated CDC Director, shall use the list established by the ACIP for the purpose of the purchase, delivery, and administration of pediatric vaccines in the Vaccines for Children Program."); Ex.40 (Nichols Report) at 8-10.

56.     The purchase of Merck's mumps-containing vaccines by CDC is mandatory because Merck's MMR-II and ProQuad vaccines are licensed by FDA and mumps is included within the VFC program per ACIP resolution. Ex. 41 (Pallansch Dep. Tr.) at 101:6-8 (CDC's Director of the Division of Viral Diseases in the National Center for Immunization and Respiratory Diseases testifying that once a vaccine is recommended by ACIP "then the purchase [by CDC] through VFC . . . is automatic"); Ex. 40 (Nichols Report) at 11; Ex. 42 (1971 MMR Product License) at MRK-KRA01972538 ; Ex. 43 (1995 MMR Product License at MRK-KRA01676252; Ex. 44 (Establishment License) at MRK-KRA01676250); *see also* Ex. 45 (ACIP Resolution 10/17-3 for MMR and Varicella (Oct. 25, 2017) (including vaccine for measles, mumps, rubella (MMR) and measles, mumps, rubella, varicella (MMRV) within current recommended ACIP schedule); *see also* Ex. 46 (ACIP Resolution 6/06-1, June 29, 2016) (listing mumps for inclusion in the list of diseases for which vaccines should be in the VFC program).

### B.     ACIP and CDC Evaluations of Mumps Vaccines

57.     "The ACIP includes 15 voting members responsible for making vaccine recommendations.  The Secretary of the U.S. Department of Health and Human Services (DHHS) selects these members following an application and nomination process.  Fourteen of the members have expertise in vaccinology, immunology, pediatrics, internal medicine, nursing, family medicine, virology, public health, infectious diseases, and/or preventive medicine; one member is a consumer representative who provides perspectives on the social and community aspects of vaccination.  In addition to the 15 voting members, ACIP includes 8 ex officio members who represent other federal agencies with responsibility for immunization programs in the United States, and 30 non-voting representatives of liaison organizations that bring related immunization expertise."  Ex. 209 (CDC, *ACIP Committee Members*, https://www.cdc.gov/vaccines/acip/members/index.html)

58.     The ACIP membership includes some of the leading figures in vaccine expertise. Ex. 41 (Pallansch Dep. Tr.) at 44:11-44:14, 47:20-48:3.

59.     ACIP's charter provides a description of its duties. It states in part:  "Committee deliberations on use of vaccines to control disease in the U.S. shall include considerations of disease epidemiology and burden of disease, vaccine efficacy and effectiveness, vaccine safety, the quality of evidence reviewed, economic analyses and implementation issues."  Ex. 39 (ACIP Charter, *available at* https://www.cdc.gov/vaccines/acip/committee/charter.html) at 2; *see also* Ex. 47 (ACIP Policies and Procedures (Dec. 2018) at 1.

60.     Once a vaccine is licensed, the data most important to ACIP when evaluating the use of a vaccine to control disease is that regarding the vaccine's safety and effectiveness. Ex. 49 (Atkinson Report) at 16-17.

61.     Evaluations of vaccine effectiveness and the conduct of outbreak investigations are the responsibility of CDC. The mission statement for the National Center for Immunization and Respiratory Diseases (NCIRD), one of four Centers within CDC Office of Infectious Diseases, identifies "respond[ing] to disease outbreaks domestically and abroad" as a responsibility. The Division of Viral Diseases (DVD), a division of the NCIRD, identifies as its mission the "prevent[ion of] disease, disability, and death through immunization and by control of . . . viral diseases."  In furtherance of this mission, the DVD, for example, conducts surveillance and related activities to monitor the impact of vaccination, estimates vaccine effectiveness, and consults, supports, and/or participates in investigations of national and international outbreaks of viral vaccine preventable diseases. Ex. 50 (NCIRD Mission/Function Statement, https://www.cdc.gov/maso/pdf/NCIRDfs.pdf) at 1, 8.

Appx259

62.     Consistent with this mission, a "major" responsibility and a "key function" of CDC is to "measure vaccine effectiveness for both old and new products." Ex. 41 (Pallansch Dep. Tr.) at 33:19-21, 101:10-16.

63.     Because "[e]ffectiveness is the [CDC's] single-most important measure in terms of the impact that a vaccine has on disease in the population," CDC conducts vaccine effectiveness studies either independently or often times in collaboration with state health departments and/or academics. *Id.* at 33:3-5, 42:17-19.

64.     "Vaccine effectiveness studies in general are not often conducted by the manufacturers." *Id.* at 42:15-16.

65.     The CDC has conducted multiple mumps effectiveness studies and after them has concluded that "[t]here has been no significant change in the estimates of vaccine effectiveness for more than 10 years in general"—referring to the 10 year period ending in October 2017. *Id.* at 129:7-11; *see also* Ex. 49 (Atkinson Report) at 8.

66.     The CDC has noted that "[c]linical studies conducted before vaccine licensure in approximately 7,000 children found a single dose of mumps vaccine to be approximately 95% effective in preventing mumps disease. However, vaccine effectiveness estimates have been lower in post-licensure studies." Ex. 51 (Huong McLean et al., *Prevention of Measles, Rubella, Congenital Rubella Syndrome, and Mumps, 2013: Summary Recommendations of the [ACIP],* MMWR, June 14, 2013, 62(4):1-34) at 10.

67.     In 1998, the CDC observed that in "controlled clinical trials, one dose of vaccine was approximately 95% efficacious in preventing mumps disease" but the effectiveness of the vaccine observed in field studies was lower ranging from 75% to 95%. Ex. 53 (CDC, *MMR—*

*Vaccine Use and Strategies for Elimination of Measles, Rubella, and Congenital Rubella Syndrome and Control of Mumps,* MMWR, May 22, 1998: 47 (RR-8), 1-57) at 6.

68.    The CDC has known since at least the early 1980s that the vaccine effectiveness estimates for mumps have ranged from 75% to 95%. *See, e.g.*, Ex. 214 [November 26, 1982 MMWR] (Recommendation of the Immunization Practices Advisory Committee Mumps Vaccine) at 2; Ex. 213 [June 9, 1989 MMWR] (Recommendations of the Immunization Practices Advisory Committee Mumps Prevention) at 2.

69.    Accordingly, the CDC understands "that the effectiveness of the vaccine in the real world application is lower than the efficacy that was found in the initial clinical trials." Ex. 41 (Pallansch Dep. Tr.) at 39:11-20.

70.    The CDC's current view is that the recommended two doses of the MMR vaccine are "88% effective against mumps."  Ex. 52 (CDC, *Measles, Mumps, and Rubella (MMR) Vaccination: What Everyone Should Know*,

https://www.cdc.gov/vaccines/vpd/mmr/public/index.html)at 4.

C.    **CDC's Contracts With Merck**

71.    The CDC's VFC contracts with Merck concerning the purchase of its mumps-containing vaccines do not include any terms that require a vaccine meet or have previously met any specific effectiveness rate, efficacy rate, seroconversion rate, specified potency value, or safety requirements (each of the below collective referred to herein as the "CDC Contracts"):

| Contract Year | Award / Effective Date | Exhibit No. | Bates No. | Mumps Products Included |
|---|---|---|---|---|
| 1998 | 5/5/1998 | 54 | MRK-KRA01371728 | M-M-R II |
| 1999 | 4/1/1999 | 55 | MRK-KRA01371751 | M-M-R II |
| 2000 | 4/1/2000 | 56 | MRK-KRA01371693 | M-M-R II |
| 2001 | 4/1/2001 | 57 | MRK-KRA01371656 | M-M-R II |
| 2002 | 4/1/2002 | 58 | MRK-KRA01371785 | M-M-R II |
| 2003 | 4/1/2003 | 59 | MRK-KRA01371311 | M-M-R II |
| 2004 | 4/1/2004 | 60 | MRK-KRA01371280 | M-M-R II |

| Contract Year | Award / Effective Date | Exhibit No. | Bates No. | Mumps Products Included |
|---|---|---|---|---|
| 2005 | 4/1/2005 | 61 | MRK-KRA01371341 | M-M-R II |
| 2006 | 4/1/2006 | 62 | MRK-KRA01371624 | M-M-R II & ProQuad |
| 2007 | 4/16/2007 | 63 | MRK-KRA01371604 | M-M-R II & ProQuad |
| 2008 | 4/1/2008 | 64 | MRK-KRA01371817 | M-M-R II & ProQuad |
| 2009 | 4/1/2009 | 65 | MRK-KRA01371880 | M-M-R II & ProQuad |
| 2010 | 4/1/2010 | 66 | MRK-KRA01371373 | M-M-R II & ProQuad |
| 2011 | 4/1/2011 | 67 | MRK-KRA01371497 | M-M-R II |
| 2012 | 4/1/2012 | 68 | MRK-KRA01371398 | M-M-R II & ProQuad (as optional) |
| 2013 | 4/1/2013 | 69 | MRK-KRA01371422 | M-M-R II & ProQuad |
| 2014 | 4/1/2014 | 70 | MRK-KRA01371473 | M-M-R II & ProQuad |
| 2015 | 4/1/2015 | 71 | MRK-KRA01372045 | M-M-R II & ProQuad |
| 2016 | 4/1/2016 | 72 | MRK-KRA01371962 | M-M-R II & ProQuad |

72.     The CDC makes public the vaccines that it purchases, and the prices that it pays for them. For example, it posts them on a website, and the price list for April 6, 2001 is still available online. *See* Ex. 73 (CDC, *CDC Vaccine Price List*, https://www.cdc.gov/vaccines/programs/vfc/awardees/vaccine-management/price-list/index.html) (listing current vaccine contract prices); Ex. 73 (CDC Vaccine Price List as of April 6, 2001, *available at* https://www.cdc.gov/vaccines/programs/vfc/awardees/vaccine-management/price-list/2001/2001-04-06.html); *see also* 48 C.F.R. §§ 5.301, 5.401(b) (requiring publication of certain information about federal contracts in excess of $25,000)

73.     The topics of effectiveness, efficacy, immunogenicity, or potency are not discussed with CDC in the context of negotiating CDC's purchase of vaccines. Ex. 75 (Sims Dep. Tr.) at 110:20-112:2.

74.     During the course of negotiations with CDC for the purchase of mumps-containing vaccines, Merck and CDC have not and do not discuss how well the vaccine works. Ex. 76 (Taylor Dep. Tr.) at 198:6-11 ("Q: And during the Merck's negotiations with CDC about the purchase of the mumps vaccine, do Merck and CDC discuss how well the vaccine works? . . . A: No, we do not."); *see also* Ex. 77 (Duffy Dep. Tr.) at 269:10-17, 280:23-281:9 (testifying that

16

in the course of negotiations with CDC, clinical information—including efficacy and how well the vaccine works—and safety are not discussed).

75.    Nor do CDC and Merck discuss in the course of their negotiations for CDC's purchase of mumps vaccines "the shelf life," Ex. 76 (Taylor Dep. Tr.) at 195:18-22, the safety, *id.* at 201:6-11, or any outbreaks with respect to mumps, *id.* at 200:20-24.

76.    While CDC requires that any vaccine it purchases have a valid product license issued by FDA, the FDA is "the regulatory agency for the vaccine" and CDC only checks "to make sure the vendor . . . has provided the license for [a] vaccine."  Ex. 75 (Sims Dep. Tr.) at 73:23-74:6.

77.    To show licensure, a vaccine manufacturer need only submit to CDC the one-page FDA product license, *id.* at 104:24-107:22, 131:9-132:24, 133:10-16; Ex. 43 (1995 MMR FDA product licenses) at MRK-KRA01676252; Ex. 42 (One-page FDA establishment license) at MRK-KRA01972538; Ex. 44 (FDA establishment license) at MRK-KRA01676250.

78.    Manufacturers are not required "to submit any other regulatory documents during the procurement process, because CDC defers to FDA on the regulation of vaccines." Ex. 40 (Nichols Report) at 14.

79.    CDC does not monitor or enforce FDA's regulations, including whether a vaccine manufacturer such as Merck has complied with FDA's current Good Manufacturing Practices (cGMP) regulations. Ex. 75 (Sims Dep. Tr.) at 77:7-19, 150:20-152:16.

80.    CDC has never modified its contracting decisions because of vaccine manufacturer's failure to meet cGMP. *Id*. at 152:17-23.

**D.    CDC's Purchases of Merck's Mumps Vaccines**

81.    Everything that is material to CDC's decision to purchase Merck's mumps-containing vaccines was set forth in CDC Contracts with Merck. *See* Ex. 75 (Sims Dep. Tr.) at

166:10-14 ("Q. Everything that's important or material to your purchasing decision is in the contract; is that fair to say?  A. So that – that's the agreement between Merck and C.D.C., and that's what we're bound to.").

82.     In CDC's negotiations with Merck over the contracts, the issue of potency never came up. *See id.* at 111:5-7 ("Q. Do you ever recall an issue of potency coming up in the negotiations of the contract?  A. I don't recall that coming up.").

83.     Dr. Mark Pallansch, CDC's Director of the Division of Viral Diseases in the National Center for Immunization and Respiratory Diseases, explained that potency is "not a factor that comes into consideration." Ex. 41 (Pallansch Dep. Tr.) at 157:11-15.

84.     CDC contracts with Merck to purchase Merck's mumps-containing vaccines were indefinite quantity contracts for vaccines manufactured under a current establishment and product license issued by FDA and as set forth in the contracts. *See* Ex. 54 (1998 VFC Contract) at MRK-KRA01371731 (noting under heading "Type of Contract" that it is an "[i]ndefinite quantity contract"); Ex. 55 (1999 VFC Contract) at MRK-KRA01371754 (same); Ex. 56 (2000 VFC Contract) at MRK-KRA01371696 (same); Ex. 57 (2001 VFC Contract) at MRK-KRA01371660 (same); Ex. 58 (2002 VFC Contract) at MRK-KRA01371788 (same);  Ex. 59 (2003 VFC Contract) at MRK-KRA01371314 (same); Ex. 60 (2004 VFC Contract) at MRK-KRA01371284 (same); Ex. 61 (2005 VFC Contract) at MRK-KRA01371344 (same); Ex. 62 (2006 VFC Contract) at MRK-KRA01371627 (same); Ex.63 (2007 VFC Contract) at MRK-KRA01371608 (same); Ex. 64 (2008 VFC Contract) at MRK-KRA01371822  (same); Ex. 65 (2009 VFC Contract) at MRK-KRA01371885 (same); Ex. 66 (2010 VFC Contract) at MRK-KRA01371380  (same); Ex. 67 (2011 VFC Contract) at MRK-KRA01371503  (same); Ex. 68 (2012 VFC Contract) at MRK-KRA01371405 (same); Ex. 69 (2013 VFC Contract) at MRK-

Appx264

KRA01371425 (same); Ex. 70 (2014 VFC Contract) at MRK-KRA01371476  (same); Ex. 71 (2015 VFC Contract) at MRK-KRA01372047 (same); Ex. 72 (2016 VFC Contract) at MRK-KRA01371964 (same).

85.     The CDC's 1998 contract with Merck to purchase Merck's mumps-containing vaccines stated:  "Vaccine shall have a minimum shelf life of twelve (12) months remaining upon receipt of the vaccine by the consignee."  Ex. 54 (1998 VFC Contract) at MRK-KRA01371734.

86.     The CDC's contracts with Merck from 1999 through 2016 to purchase Merck's mumps-containing vaccines similarly required a minimum shelf life of 12 months remaining upon receipt of or delivery to the consignee. Ex. 55 (1999 VFC Contract) at MRK-KRA01371759, MRK-KRA01371761; Ex. 56 (2000 VFC Contract) at MRK-KRA-1371702, MRK-KRA01371704; Ex. 57 (2001 VFC Contract) at MRK-KRA-1371667, MRK-KRA01371669; Ex. 58 (2002 VFC Contract) at MRK-KRA01371796, MRK-KRA01371798; Ex. 59 (2003 VFC Contract) at MRK-KRA01371321, MRK-KRA01371323; Ex. 60 (2004 VFC Contract) at MRK-KRA01371291, MRK-KRA01371293; Ex. 61 (2005 VFC Contract) at MRK-KRA01371350, MRK-KRA01371352; Ex. 62 (2006 VFC Contract) at MRK-KRA01371634, MRK-KRA01371638; Ex. 67 (2007 VFC Contract) at MRK-KRA01371607, MRK-KRA01371609; Ex. 68 (2008 VFC Contract)at MRK-KRA01371821, MRK-KRA01371823; Ex. 69 (2009 VFC Contract) at MRK-KRA01371884, MRK-KRA01371886; Ex. 70 (2010 VFC Contract) at MRK-KRA01371378, MRK-KRA01371382; Ex. 67 (2011 VFC Contract) at MRK-KRA01371502, MRK-KRA01371504; Ex. 68 (2012 VFC Contract) at MRK-KRA01371403, MRK-KRA01371406; Ex. 69 (2013 VFC Contract) at MRK-KRA01371428, MRK-KRA01371435; Ex. 70 (2014 VFC Contract) at MRK-KRA01371479, MRK-KRA01371486;

Appx265

Ex. 71 (2015 VFC Contract)  at MRK-KRA01372050, MRK-KRA01372059; Ex. 72 (2016 VFC

Contract) at MRK-KRA01371968, MRK-KRA01371974.

87.     The CDC's 2006 contract with Merck to purchase ProQuad required a minimum

shelf life of 8 months remaining upon delivery to the consignee. Ex. 62 (2006 VFC Contract) at

MRK-KRA01371636, MRK-KRA01371638.

88.     The CDC's contracts with Merck state, under the heading "Product License," that:

"The vaccines produced and delivered under this contract shall be manufactured under a current

establishment and product license issued by the [FDA] as indicated below. . . . The Current Good

Manufacturing Practice Regulations (cGMPR's) (21C.F.R. Parts 210-211) will be the standard to

be applied for manufacturing, processing and packing of drugs, chemicals, biologicals, and

reagents."  Ex. 54 (1998 VFC Contract) at MRK-KRA01371740; Ex. 55 (1999 VFC Contract) at

MRK-KRA01371769, MRK-KRA01371770; Ex. 56 (2000 VFC Contract)  at MRK-

KRA01371712; Ex. 57 (2001 VFC Contract)  at MRK-KRA01371673; Ex. 58 (2002 VFC

Contract) at MRK-KRA01371800;  Ex. 59 (2003 VFC Contract) at MRK-KRA01371325; Ex. 60

(2004 VFC Contract) at MRK-KRA01371295; Ex. 61 (2005 VFC Contract) at MRK-

KRA01371354; Ex. 62 (2006 VFC Contract) at MRK-KRA01371640; Ex. 63 (2007 VFC

Contract) at MRK-KRA01371611; Ex. 64 (2008 VFC Contract) at MRK-KRA01371825; Ex. 65

(2009 VFC Contract)at MRK-KRA01371887; Ex. 67 (2011 VFC Contract) at MRK-

KRA01371505.

89.     CDC contracts from 2010 and 2012 through 2016 contained materially identical

provisions with slight wording changes. *See* Ex. 66 (2010 VFC Contract) at MRK-

KRA01371383; Ex. 68 (2012 VFC Contract) at MRK-KRA01371407; Ex. 69 (2013 VFC

Contract) at MRK-KRA01371436; Ex. 70 (2014 VFC Contract)at MRK-KRA01371487; Ex. 71

Appx266

(2015 VFC Contract)at MRK-KRA01372060; Ex. 72 (2016 VFC Contract) at MRK-KRA01371975.

90.      In the CDC contracts, CDC required Merck to include certain information on each invoice. None of CDC's contracts with Merck required specific representations about vaccine efficacy, effectiveness, or the amount of potency in each dose to be included in the invoices for payment submitted to CDC. *See* Ex. 55 (1999 VFC Contract) at MRK-KRA01371765-66; Ex. 56 (2000 VFC Contract) at MRK-KRA01371710-11; Ex. 57 (2001 VFC Contract) at MRK-KRA01371677]; Ex. 58 (2002 VFC Contract) at MRK-KRA01371804;  Ex. 59 (2003 VFC Contract) at MRK-KRA01371329; Ex. 60 (2004 VFC Contract) at MRK-KRA01371280; Ex. 61 (2005 VFC Contract) at MRK-KRA01371357; Ex. 62 (2006 VFC Contract) at MRK-KRA01371624; Ex. 63 (2007 VFC Contract) at MRK-KRA01371604; Ex. 64 (2008 VFC Contract) at MRK-KRA01371828; Ex. 65 (2009 VFC Contract) at MRK-KRA01371880; Ex. 66 (2010 VFC Contract) at MRK-KRA01371373; Ex. 67 (2011 VFC Contract) at MRK-KRA01371508; Ex. 68 (2012 VFC Contract) at MRK-KRA01371410; Ex. 69 (2013 VFC Contract) at MRK-KRA01371422; Ex. 70 (2014 VFC Contract) at MRK-KRA01371490; Ex. 71 (2015 VFC Contract) at MRK-KRA01372062; Ex. 72 (2016 VFC Contract) at MRK-KRA01371978..

91.      The CDC contracts require Merck to submit requests for payment electronically. The CDC contracts identify the specific data Merck is to include in its requests for payment to CDC via Electronic Data Interchange, which include the following:

(1)      Contractor's name and invoice date;

(2)      Contract number, or other authorization for delivery of property and/or services;

(3)      Description, cost or price, and quantity of property and/or services actually

delivered or rendered;

(4)      Shipping and payment terms;

(5)      Other substantiating documentation or information as required by the contract;

and

(6)      Name where practicable, title, phone number, and complete mailing address of

responsible official to whom payment is to be sent.

(7)      Lot number of vaccine vials shipped;

(8)      Expiration date of vaccine vials shipped; and

(9)      CDC accounting and appropriate date as described on the delivery order.

*See* Ex. 54 (1998 VFC Contract) at MRK-KRA01371737 (Addendum B, Paragraph 9 "Invoice

Submission")).

92.      CDC contracts from 1998 to 2005 required the same data to be submitted in

requests for payment *See* Ex. 55 (1999 VFC Contract) at MRK-KRA01371765, MRK-

KRA01371766; Ex. 56 (2000 VFC Contract) at MRK-KRA01371709, MRK-KRA01371710;

Ex. 57 (2001 VFC Contract) at MRK-KRA01371677; Ex. 58 (2002 VFC Contract) at MRK-

KRA01371804;  Ex. 59 (2003 VFC Contract) at MRK-KRA01371329; Ex. 60 (2004 VFC

Contract) at MRK-KRA01371299; Ex. 61 (2005 VFC Contract) at MRK-KRA01371357.

93.      Beginning in 2006, the CDC has occasionally changed the list of required

information in invoices. For instance:

- Beginning in 2006, CDC required Merck to add information related to "(10) Taxpayer

  I.D. Number" and "(11) DUNS Number."  *See* Ex. 62 (2006 VFC Contract) at MRK-

  KRA01371643 (Addendum C, Paragraph 14 ("Invoice Submission")); Ex. 63 (2007 VFC

Appx268

Contract) at MRK-KRA01371613 (same); Ex. 64 (2008 VFC Contract) at MRK-KRA0137 1828 (same).

- Beginning in 2009, CDC removed the requirement that invoices include "Expiration date of vaccine vials shipped." *See* Ex. 65 (2009 VFC Contract) at MRK-KRA01371890 (Addendum C, Paragraph 13).

- Beginning in 2010, CDC added requirements for an National Drug Code number as well "accounting and appropriation data." *See* Ex. 66 (2010 VFC Contract) at MRK-KRA01371385, MRK-KRA01371386 (Addendum C, Paragraph 12); Ex. 67 (2011 VFC Contract) at MRK-KRA01371508 (same); Ex. 68 (2012 VFC Contract) at MRK-KRA01371410 (same).

- Beginning in 2013, CDC added a requirement that invoices include "Electronic Funds Transfer (EFT)" and "Taxpayer Identification Number (TIN)." *See* Ex. 69 (2013 VFC Contract) at MRK-KRA01371439 (Addendum C, Paragraph 13); Ex. 70 (2014 VFC Contract) at MRK-KRA01371490 (same); Ex. 71 (2015 VFC Contract) at MRK-KRA01372062 (same); Ex. 72 (2016 VFC Contract) at MRK-KRA01371978 (same).

94.     Merck is not required to provide any other information in its requests for payment to CDC other than what is required by the CDC contracts. Ex. 75 (Sims Dep. Tr.) at 137:5-13 ("Q … Is Merck required to provide anything else to the C.D.C. when it invoices the C.D.C. for vaccines other than the nine items listed in the contract?  A. Not that I'm aware of….").

95.     A representative set of electronic invoice data includes coding that reflects the National Drug Code number for the MMR-II vaccine of "ND*00006-4681-00," a quantity of "2880," a unit price of "178.60," a lot identifier of "REF*LT*M040558~," and a lot expiration

Appx269

of "DTM*208*20181003~," as well as logistical data like the invoice issue data, the recipient

address, and payment due date. Ex. 89 (Email from Z. Johns to M. Koury (Feb. 23, 2017)).

96.     As reflected in the sample invoice data Merck provided to counsel for Relators,

Merck did not and does not include representations regarding efficacy, effectiveness,

immunogenicity, safety, or potency of the vaccines sold to CDC. *Id.*

97.     By reference to regulations, the CDC contracts with Merck include a requirement

that Merck warrant its vaccines are merchantable and fit for their intended purpose. *See* 48

C.F.R. § 52.212-4(o) (Federal Acquisition Regulation (FAR) setting forth contract terms that are

referenced in the CDC contracts, which include a requirement that: "The Contractor warrants

and implies that the items delivered hereunder are merchantable and fit for use for the particular

purpose described in this contract."); *see also*, *e.g.*, Ex. 54 (1998 VFC Contract) at MRK-

KRA01371729 (incorporating by reference FAR 52.212-4 and adding an addendum); Ex. 55

(1999 VFC Contract) at MRK-KRA01371762 (same); Ex. 56 (2000 VFC Contract) at MRK-

KRA01371707 (same); Ex. 66 (2010 VFC contract) at MRK-KRA01371392 (same); Ex. 69

(2013 VFC Contract) at MRK-KRA01371434 (same); Ex. 70 (2014 VFC Contract) at MRK-

KRA01371485 (same); Ex. 71 (2015 VFC Contract) at MRK-KRA01372058 (same); Ex. 72

(2016 VFC Contract)at MRK-KRA01371974 (same).

98.     The CDC's contracting officer interprets the requirements for a warranty to "say

that, essentially the product is merchantable and, you know, completes its intended purpose."

Ex. 75 (Sims Dep. Tr.) at 84:10-16.

99.     "Merchantable" means that the product "can be used . . . in a commercially

available setting." *Id*. at 84:17-21. CDC is not aware of any instance where Merck's mumps-

Appx270

containing vaccines did not meet the warranty of merchantability required under the CDC contracts. *Id*. at 143:4-8.

100. "Fit for its intended purpose" means that the vaccine has an FDA license, with CDC deferring to FDA on whether to issue and/or maintain a given license. *Id*. at 84:23-85:12. Licensure by FDA is the "critical factor" for CDC to determine whether a vaccine is fit for its intended use. *Id*. at 141:4-12.

## E. This Suit Has Not Caused FDA Or CDC To Alter Their Behavior Towards Merck's Mumps Vaccines.

101. On April 27, 2010, Relators filed their complaint. Docket, *U.S. ex rel. Krahling v. Merck & Co., Inc.*, Civ. A. No. 10-4374 (E.D. Pa.) at ECF. No. 20.

102. On April 27, 2012, two years after Relators' initial complaint was filed, the United States Department of Justice (DOJ) informed the Court that it would decline to intervene in Relators' case. United States' Notice of Election to Decline to Intervene, *U.S. ex rel. Krahling v. Merck & Co., Inc.*, Civ. A. No. 10-4374 (E.D. Pa.),ECF. No. 14.

103. Counsel for DOJ are included as counsel of record and are copied on submissions by the parties in this matter. Docket, *U.S. ex rel. Krahling v. Merck & Co., Inc.*, Civ. A. No. 10-4374 (E.D. Pa.) (listing Gerald B. Sullivan and Joel M. Sweet from the United States Attorney's Office Eastern District of Pennsylvania as counsel of record); *see also id*. at ECF. Nos. 2 & 3 (docketing entries of appearance for Messrs. Sullivan and Sweet on August 27, 2010).

104. The protective order in this matter permits disclosure of discovery materials produced by Merck and designated as "Confidential" or "Highly Confidential – Attorneys' Eyes Only" to attorneys at DOJ as well as government employees of FDA, CDC, and the U.S. Department of Health and Human Services (HHS). Protective Order, ECF No. 69, at 7.2(b), (c); *id*. at 7.3(b), (c).

105.    On May 18, 2015, counsel for Merck requested from CDC and HHS certain information that may be relevant in this litigation. Ex. 78 (Ltr. from L. Dykstra to T. Frieden, et al. (May 18, 2015)) at 1.

106.    In its letter, Merck summarized Relators' allegations, including Relators' contentions that "Merck made and continues to make misrepresentations about the efficacy of the mumps vaccine and engages in efforts to conceal the diminished efficacy of the vaccine" and that "Merck's labeling misrepresents the vaccine's efficacy and improperly influenced CDC's decision to purchase the vaccine." *Id.* at 2.

107.    On November 24, 2015, CDC responded to Merck's request for documents. Ex. 74 (Ltr. from K. Norris to L. Dykstra (Nov. 24, 2015)) at MRK-KRA01373393.

108.    On October 12, 2017, Alan Sims, CDC's team lead who supports the National Centers for Immunization and Respiratory Diseases, was deposed in this litigation. Ex. 75 (Sims Dep. Tr.) at 9:16-23. Mr. Sims is the contracting officer for CDC's vaccine contracts. *Id.*

109.    On October 13, 2017, Dr. Mark Pallansch, who is the Director of the Division of Viral Disease in the National Center for Immunization and Respiratory Diseases at CDC, was deposed in this litigation. Ex. 41 (Pallansch Dep. Tr.) at 8:17-20.

110.    CDC authorized three former employees to serve as expert witnesses for Merck. Ex. 198, Letter from CDC to K. Hardway (May 24, 2018)) at 3.

111.    On May 16, 2019, the Court entered an order that provided a protocol by which Relators' hired expert, Dr. David Kessler, could interface directly with CDC, FDA, and HHS regarding his assessment of the discovery record and opinions based on those materials. Order (Under Seal), *U.S. ex rel. Krahling v. Merck & Co., Inc.*, Civ. A. No. 10-4374 (E.D. Pa.), at ECF No. 250.

Appx272

112.     Since this case was filed on April 27, 2010, ACIP has continued to include the mumps vaccine in its recommended schedule for immunization. *E.g.*, Ex. 79 (ACIP, *MMR ACIP Vaccine Recommendations (Measles, Mumps and Rubella)*, https://www.cdc.gov/vaccines/hcp/acip-recs/vacc-specific/mmr.html).

113.     Since this case was filed on April 27, 2010, FDA has continued to license Merck's MMR-II and ProQuad products. *See* Ex. 42 (1971 MMR Product License) at MRK-KRA01972538; Ex. 6 (1995 MMR Product License) at MRK-KRA01676252; *see also* Ex. 80 (FDA, Vaccines Licensed for Use in the United States, https://www.fda.gov/vaccines-blood-biologics/vaccines/vaccines-licensed-use-united-states (current as of May 9, 2019)) at 5 (listing Merck's M-M-R II and ProQuad products as currently licensed by FDA).

114.     Since this case was filed on April 27, 2010, the CDC has continued to purchase Merck's mumps-containing vaccines. Ex. 75 (Sims Dep Tr.) at 155:1-5.

115.     Since this case was filed on April 27, 2010, the CDC has not raised concerns related to the efficacy, effectiveness, seroconversion, immunogenicity, shelf life, or potency of Merck's mumps-containing vaccines. *Id.* at 201:13-25.

116.     FDA has similarly issued statements underscoring its continued view that the MMR vaccine is safe and effective. *See, e.g.*, Ex. 212 (FDA In Brief: FDA reiterates the importance of vaccines such as the Measles, Mumps, and Rubella (MMR) vaccine, Sept. 6, 2019, https://www.fda.gov/news-events/fda-brief/fda-brief-fda-reiterates-importance-vaccines-such-measles-mumps-and-rubella-mmr-vaccine) ("As a public health agency, we want to reiterate our confidence in the safety and efficacy of the MMR vaccine. FDA always strives to use the best available scientific evidence to promote and protect the well-being of individuals and the public health, and the evidence fully supports the safety and effectiveness of this vaccine."); Ex. 215

(Statement from Peter Marks, M.D., Ph.D., director of FDA's Center for Biologics Evaluation and Research, on FDA's continued confidence in the safety and effectiveness of the measles, mumps, and rubella (MMR) vaccine, Apr. 22, 2019, https://www.fda.gov/news-events/press-announcements/statement-peter-marks-md-phd-director-fdas-center-biologics-evaluation-and-research-fdas-continued) ("We do not take lightly our responsibility to ensure the safety and effectiveness of vaccines, and work diligently to assess safety and effectiveness of all licensed vaccines for their intended uses. The MMR vaccine is very effective at protecting people against measles, mumps, and rubella.").

117.     Since this case was filed on April 27, 2010, CDC has continued to recommend administration of the mumps vaccine as part of the schedule for routine vaccination of children. Ex. 41 (Pallansch Dep. Tr.) at 95:6-20.

118.     The CDC has stated publicly and believes that Merck's mumps vaccine is "very safe and effective." *Id.* at 26:19-24.

119.     The CDC states currently that the mumps vaccine is "safe and effective." Ex. 81 (CDC, *Mumps Vaccination*, https://www.cdc.gov/mumps/vaccination.html (last revised Mar. 8, 2019)) at 1.

120.     The CDC is aware that certain studies have found an effectiveness rate as low as 31 percent for the mumps component of Merck's mumps vaccine. Ex 81 (CDC, *Mumps Vaccination*, https://www.cdc.gov/vaccines/vpd/mumps/index.html) ("MMR vaccine is very safe and effective. The mumps component of the MMR vaccine is about 88% (range: 31-95%) effective when a person gets two doses; one dose is about 78% (range: 49%−92%) effective."); *see also* Ex. 41 (Pallansch Dep. Tr.) at 31:20-33:1.

121.    The CDC understands that the mumps vaccine in the real world has a lower effectiveness rate than the efficacy rate found in the initial clinical trials conducted in the 1960s. Ex. 41 (Pallansch Dep. Tr.) at 39:16-21.

122.    CDC mumps experts have published on findings of Jeryl Lynn mumps vaccine seroconversion rates as low as 74% and as high as 100%.   Ex. 41 (Pallansch Dep. Tr.) at 74:4-76:11; Ex. 219 Huong McLean et al. The Immunological Basis for Immunization Series: Module 16: Mumps (2010):1-33 at 9).

123.    Merck has presented to the CDC data from a Merck study showing seroconversion rates for Merck's mumps vaccine as low as 53%.  Ex. 220 (email); Ex. 242 (Feb. 25, 2010 presentation) at Slide 11.

124.    The CDC has continued to purchase Merck's mumps-containing vaccines despite mumps outbreaks. *Id.* at 60:12-22.

125.    The CDC has not requested a change its procurement criteria or price during any of the mumps outbreaks. Ex. 77 (Duffy Dep. Tr.) at 39:19-40:17; *see also id*. at 41:24-42:3 (testifying that CDC has not requested discounts on the mumps vaccine due to any outbreaks).

126.    CDC has continued to purchase M-M-R II at the statutory maximum price the entire time since this lawsuit was filed. *See* Ex. 76 (Taylor Dep. Tr.) at 225:8-23; Ex. 75 (Sims Dep. Tr.) at 114:8-116:25, 155:1-5; *see also* 42 U.S.C. § 1396s(d)(3)(B)).

127.    ACIP continues to recommend the MMR vaccine—whether in the MMR-II form or the ProQuad form—be administered in both is Vaccines for Children (VFC) and Vaccines for Adults (VFA) programs. The current recommendations were published in June 2013, which was three years after this suit was filed. The recommendation is that the vaccine be administered twice to children, once at age 12-15 months and once at age 4 through 6 years. It also

recommends two doses for adults at high risk for exposure and transmission and one dose for other adults over 18 years old. Ex. 51 (*2013: ACIP Summary Recommendations*) at 20; *see also* Ex. 79 (CDC, *MMR ACIP Vaccine Recommendations (Meales, Mumps and Rubella)*, https://www.cdc.gov/vaccines/hcp/acip-recs/vacc-specific/mmr.html) (indicating that the June 14, 2013 recommendation is current).

128.     The only supplementation to ACIP's recommendation has been to recommended a third dose of a mumps virus–containing vaccine for persons "previously vaccinated with 2 doses who are identified by public health authorities as being part of a group or population at increased risk for acquiring mumps because of an outbreak." That recommendation was agreed at ACIP's October 2017 meeting and published in January 2018. Ex. 48 (*Recommendation of the Advisory Committee on Immunization Practices for Use of a Third Dose of Mumps Virus–Containing Vaccine in Persons at Increased Risk for Mumps During an Outbreak*, MMWR, Jan. 12, 2018: 67(1); 33-38 at 1; *see also* Ex. 79 (CDC, *MMR ACIP Vaccine Recommendations (Measles, Mumps and Rubella)*, https://www.cdc.gov/vaccines/hcp/acip-recs/vacc-specific/mmr.html) (indicating that the Jan. 12, 2018 recommendation is current).

129.     Citing studies published from 2007 to 2017, ACIP stated in its Summary of Key Findings that "[t]he median effectiveness of 2 doses of MMR vaccine in preventing mumps is 88%, with estimates ranging from 31% to 95%." Ex. 48 (Jan. 12, 2018 MMWR) at 2.

## V.    MERCK AND FDA DISCUSS THE MEANING OF THE POTENCY STATEMENT ON THE MUMPS VACCINE LABEL IN 1997.

130.     In 1996 and early 1997, Merck and FDA's Center for Biologics Evaluation and Research (CBER) engaged in discussions over how to interpret what the mumps label meant with regard to potency. *See* Ex. 152 (Oct. 5, 1998 Email) at MRK-KRA00095142; Ex. 191 (Jan.

23, 1997 Email) at MRK-KRA01972735; Ex. 189 (Dec. 5, 1997 Letter) at MRK-KRA01972451; Ex. 186 (Jan. 28, 1998 Letter) at MRK-KRA01625508.

131.    CBER is a center within FDA whose "mission is to protect and enhance the public health through the regulation of biological and related products including blood, vaccines, allergenics, tissues, and cellular and gene therapies."  CBER reviews "new biological products" and "new indications for already approved products," which requires "evaluating scientific and clinical data submitted by manufacturers to determine whether the product meets CBER's standards for approval. After a thorough assessment of the data, CBER makes a decision based on the risk-benefit for the intended population and the product's intended use." Ex. 126 (*About CBER*, U.S. Food and Drug Administration, https://www.fda.gov/about-fda/center-biologics-evaluation-and-research-cber/about-cber).

132.    CBER's inquiry was part of a broad program to review a large number of vaccines' labels in the 1990s to carry out the mandate of the National Childhood Vaccine Injury Act. Ex. 250 (FDA, *Guidance for Industry: FDA Review of Vaccine Labeling Requirements for Warnings, Use Instructions, and Precautionary Information* (Sep. 2004), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/fda-review-vaccine-labeling-requirements-warnings-use-instructions-and-precautionary-information) at 3-6.

133.    Merck understood the MMR-II label to state the minimum "release potency"—i.e., the amount of live virus in the vaccine when the vaccine is approved for release to the market by CBER. CBER requested during these discussions that the label state the minimum "end-expiry potency"—i.e., the amount of live virus in the vaccine at the end of its shelf life. Ex. (Oct. 5, 1998 email) at MRK-KRA00095142; Ex. 191 (Jan. 23, 1997 Email) at MRK-

KRA01972735; Ex. 189 (Dec. 5, 1997 letter) at MRK-KRA01972451; Ex. 186 (Jan. 28, 1998 Letter) at MRK-KRA01625508.

134.    Between 1997 and 1999, Merck and CBER discussed mumps potency labeling and analysis of historical mumps potency data to address the label interpretation issue. Ex. 186 (Jan. 28, 1998 Letter) at MRK-KRA01625508; Ex. 163 (Sept. 29, 1998 Letter) at MRK-KRA00636592; Ex. 149 (Dec. 3, 1998 Email) at MRK-KRA00095063; Ex. 221 (Nov. 6, 1998 Email) at MRK-KRA00095065; Ex. 150; Ex. 178 (Dec. 10, 1998 Letter) at MRK-KRA01622125; Ex. 181 (Merck Letter to CBER) at MRK-KRA01622552; Ex. 182 (Dec. 16, 1998 Letter) at MRK-KRA01622600; Ex. 180 (Jan. 8, 1999 letter) at MRK-KRA01622468; Ex. 148 (May 12, 1999 Email) at MRK-KRA00094960; Ex. 179 (Jan. 18, 1999 Letter) at MRK-KRA01622463.

135.    After discussions with Merck and undertaking its own analysis of data, on August 20, 1999, CBER directed Merck to increase the release potency for its mumps-containing vaccines from a minimum release potency of 4.3 $\log_{10}$ TCID$_{50}$ to a minimum release potency of 5.0 $\log_{10}$ TCID$_{50}$, in order for the product to meet, throughout its entire 24 month shelf life, the potency of 4.3 $\log_{10}$ TCID$_{50}$. Ex. 185 (Aug. 20, 1999 Letter) at MRK-KRA01624909.

136.    Since implementation of this change, Merck has manufactured the MMR-II vaccine to a minimum mumps release potency of 5.0 $\log_{10}$ TCID$_{50}$, irrespective of subsequent label changes. Ex. 202 (Stannard Dep. Tr.) at 297:21-298:7; Ex. 117 (Keegan Dep. Tr.) at 24:13-20.

137.    Relators' expert Kessler has suggested that the release potency should have been made higher or the shelf-life shortened to ensure that the potency at end-expiry was above 4.3 $\log_{10}$ TCID$_{50}$. Specifically, Kessler has opined based on a Merck stability model that at the post-

1999 release specification, up to 7% of lots may fall below 4.3 $\log_{10}$ TCID$_{50}$ by the end of a 24-month shelf-life. Ex. 107 (Kessler Report) at 280-282. Dr. Kessler has no data to evidence that any lot manufactured after Merck raised the release potency to 5.0 $\log_{10}$ TCID$_{50}$ actually did fall below 4.3 $\log_{10}$ TCID$_{50}$. *See* Ex. 103 (Kessler Dep. Tr. Vol. 2) at 391:21-392:11.

## VI.   PROTOCOL 007 WAS A STUDY DESIGNED TO SUPPORT A LABEL CHANGE APPLICATION.

138.   In December 1997, Merck discussed with FDA a clinical trial to support a label change of mumps potency lower than 4.3 $\log_{10}$ TCID$_{50}$. The lower potency would be an end-expiry potency. Ex. 186 (January 28, 1998 Letter and Attachment) at MRK-KRA01625508.

139.   The result of additional discussions between FDA and Merck was a study titled "A Study of M-M-R II at Mumps Expiry Potency in Healthy Children 12 to 18 Months of Age" (Protocol 007). The goal of the study was to evaluate *non-inferiority*—i.e., to test whether the vaccine at a lower potency would have similar immunogenic effects as at higher potencies. Ex. 155 (Clinical Study Report (CSR)) at MRK-KRA00225021.

140.   The study would be a clinical trial studying the effect of vaccination on children who had not yet received the vaccine and who would be randomized to receive vaccine lots at different potencies. *Id.* at '018, '022.

141.   Protocol 007 was *not* a study of vaccine efficacy. Rather, efficacy of the vaccine was established through the Hilleman studies. Ex. 200 (Musey Dep. Tr.) at 81:2-22; Ex. 104 (Durbin Dep. Tr.) at 62:25-63:9; Ex. 105 (Emini Dep. Tr.) at 128:24-129:6, 130:21-131:3, 311:9-11; Ex. 123 (January 29, 2004 Submission) MRK-KRA00000116.

142.   Instead, the study evaluated seroconversion in subjects receiving different potencies to compare whether a lower-potency vaccine would have similar immunogenic effects

to the higher-potency vaccine. Ex. 155 (CSR) at MRK-KRA00225021; Ex. 105 (Emini Dep. Tr.) at 137:23-138:20.

143.    Protocol 007 would not, and could not, be used to corroborate the original Hilleman efficacy results, in part because no subjects had the vaccine entirely withheld, so there would be no way to compare immunized subjects to non-immunized subjects.

144.    Moreover, as CBER has recognized, there is no antibody level known to be protective for the mumps virus, so there is no way definitively to infer protection from antibody levels in individual study subjects. Ex. 137 (March 13, 2000 Memo from Morsy) at MRK-KRA00001263; Ex. 197 (Rubin, *Vaccines* (2018)) at 673.

## VII.    FDA'S APPROVAL OF AN MMR-II LABEL CHANGE

145.    In January 2004, Merck submitted a supplemental Biologics License Application (sBLA) to FDA requesting to change the label statement of mumps potency from 4.3 $\log_{10}$ (20,000) $TCID_{50}$ per dose to 4.1 $\log_{10}$ (12,500) $TCID_{50}$ per dose. Protocol 007 provided supporting immunogenicity data to indicate that a mumps vaccine with potency of 4.1 $\log_{10}$ $TCID_{50}$ per dose was comparably immunogenic to a vaccine with potency of 4.8 $\log_{10}$ $TCID_{50}$ per dose. Ex. 123 Jan. 29, 2004 Submission) at MRK-KRA00000032-33.

146.    After several rounds of comments from CBER and responses from Merck, CBER notified Merck in May 2007 that it would not approve the sBLA based on Protocol 007's PRN assay, principally due to an insufficient quantity of data. Ex. 87 (Oct. 17, 2005 Letter) MRK-KRA00000479 at '479; Ex. 88 (Nov. 15, 2006 Letter) MRK-KRA00000393 at '397, '399. Specifically, FDA stated: "Our review finds that the information and data submitted are inadequate for final approval at this time. We cannot accept use of multiple imputation analysis of the PRN data to support the lowering of mumps vaccine end-expiry potency." Ex. 126 (May 18, 2007 Letter) at MRK-KRA00000385. CBER also noted, however, that immunogenicity

Appx280

testing had "substantially evolved since our initial testing requirements" and that "[u]se of ELISA data to evaluate the effect of differences in product potency on immunogenicity is now acceptable." *Id.* CBER requested that Merck submit a new analysis pooling the control lot from Protocol 007 with two lots from previous studies to create a new control group against which to evaluate the lower-potency immunogenicity. *Id.*

147.    Merck has presented the ELISA results from Protocol 007 to the CDC. Ex. 220 (email); Ex. 242 (Feb. 25, 2010 presentation) at Slide 9.

148.    Merck provided the requested information in June 2007 and follow-up information in August 2007, reporting that the lots were consistent and allowed for a pooled control data set as CBER suggested. Further, the 4.1 $\log_{10}$ $TCID_{50}$ lot from Protocol 007 also met the non-inferiority criteria compared to the pooled control data. Ex. 124 (June 5, 2007 Letter) at MRK-KRA00000374; Ex. 126 (May 18, 2007 Letter) at MRK-KRA00000385-86.

149.    Based on that data, CBER approved Merck's sBLA to change the labeled potency to 4.1 $\log_{10}$ $TCID_{50}$ in December 2007. Ex. 125 (Dec. 8, 2007 letter from FDA) at MRK-KRA00000383.

150.    Despite the approved label change in 2007, Merck has never reduced the release potency specification for the MMR-II vaccines it manufactures, and it continues to use 5.0 $\log_{10}$ $TCID_{50}$ as the minimum potency for release. Ex. 202 (Stannard Dep. Tr.) at 298:4-7 (Q: ". . . [h]as the target manufacturing potency or the release potency changed since . . . September 1999?"  A: "It has not."); Ex. 201 [Stannard Dep. Ex. 3] (Summary of Potency Topics) at 2 ("Minimum Release Potency for mumps in MumpsVax, MM-Vax and MMR" from October 4, 1999 to the present reported as 5.0 $\log_{10}$ $TCID_{50}$/dose).

## VIII.  THE GOVERNMENT HAS HAD AMPLE KNOWLEDGE ABOUT THE POTENCY OF THE MERCK MUMPS VACCINE.

151.    Beginning in 1996 and continuing through 2001, Merck and FDA engaged in comprehensive and collaborative discussions about the potency of the mumps vaccine and how to interpret the potency language in the label. *See* Ex. 186 (Jan. 28, 1998 Letter to Hardegree) at MRK-KRA01625508; Ex. 178 (Dec. 10, 1998 Letter to Hardegree) at MRK-KRA01622125; Ex. 180 (Jan. 8, 1999 Letter to Egan) at MRK-KRA01622468.

152.    At this time, the MMR-II label read: "When reconstituted as directed, the dose for injection is 0.5 mL and contains not less than equivalent of . . . 20,000 $TCID_{50}$ [or 4.3 $log_{10}$ $TCID_{50}$] of the U.S. Reference Mumps Virus." *See* Ex. 165 (March 1995) at MRK-KRA00757060.

153.    During these initial discussions, FDA and Merck discussed the fact that Merck had interpreted the label to refer to the minimum release potency, and FDA interpreted the potency listed on the label to refer to the minimum potency at the end of the 24-month shelf life. *See* Ex. 186 (Jan. 28, 1998 Letter to Hardegree) at MRK-KRA01625508; Ex. 178 (Dec. 10, 1998 Letter to Hardegree) at MRK-KRA01622125; Ex. 180 (January 8, 1999 Letter to Egan) at MRK-KRA01622468.

154.    During the 1996-1999 discussion, Merck and FDA discussed the fact that Merck had historically manufactured the mumps vaccine using a target manufacturing potency of 4.9 $log_{10}$ $TCID_{50}$ to assure it would have a minimum release specification of 4.3 $log_{10}$ $TCID_{50}$. *See* Ex. 186 (Jan. 28, 1998 Letter to Hardegree) at MRK-KRA01625508;  Ex. 178 (Dec. 10, 1998 Letter to Hardegree) at MRK-KRA01622125; Ex. 180 (Jan. 8, 1999 Letter to Egan) at MRK-KRA01622468.

Appx282

155.    The "release specification" for potency is the established specification to which a material must conform at the time of its release, meaning that many vaccines would be released with a higher potency. *See, e.g.*, Ex. 246 (MMD Quality Manual Glossary and Commonly Used Acronyms) at MRK-KRA01679729.

156.    Also during these discussions, Merck submitted to FDA all of the mumps stability data in its possession dating back to 1986. For example, on January 28, 1998, Merck presented to FDA data on the average release potencies with the then minimum release potency of 4.3 $\log_{10}$ $TCID_{50}$ and stability data from lots manufactured between 1987 and 1996. *See* Ex. 186 (Jan. 28, 1998 Letter to Hardegree) at MRK-KRA01625508; Ex. 178 (Dec. 10, 1998 Letter to Hardegree) at MRK-KRA01622125; Ex. 180 (Jan. 8, 1999 Letter to Egan) at MRK-KRA01622468.

157.    In stability studies, Merck's manufacturing division measures the potency of the vaccine at different, routine, intervals—usually every three months—through the end of the shelf life, following FDA guidelines. In this way, Merck assesses how much potency is lost at each interval over the course of the vaccine's shelf life. Ex. 192 (Sept, 6, 2016 Vaccine & Biological Stability Protocol) at MRK-KRA02139917; *see also* Ex. 91 (Gulati Report) at 14.

158.    Because Merck manufactures each lot of vaccine to detailed specifications, any lot used for stability testing is representative of other lots on the market manufactured at the same time. Ex. 188 MRK-KRA01897103 at '235-236; *see also* Ex. 91 (Gulati Report) at 23.

159.    Based on the data submitted, FDA was informed that the vaccine's potency could fall below the 4.3 $\log_{10}$ $TCID_{50}$ labeled specification during the vaccine's shelf-life. *See* Ex. 186 (Jan. 28, 1998 Letter and Attachment) at MRK-KRA01625513-14 (slides from presentation stating the "minimum release specification" of 4.3 and the "average release potency" of 4.9), MRK-KRA01625521-23 (slides stating that in a study of 23 lots, the mean expiry titer was 3.9

$\log_{10}$ TCID$_{50}$, with a range of observed potencies between 3.7 $\log_{10}$ TCID$_{50}$ and 4.1 $\log_{10}$

TCID$_{50}$), MRK-KRA01625566 (slide discussing an analysis of recently manufactured lots and a

prediction of a potency of 3.9 $\log_{10}$ TCID$_{50}$ at end-expiry) *see also* Ex. 243 (Dec. 16, 1998 Letter

to Rastogi) at MRK-KRA01629294.

160.     Thus, FDA had information from Merck that mumps vaccine released between

4.9 $\log_{10}$ TCID$_{50}$ and 4.3 $\log_{10}$ TCID$_{50}$ could, and did, fall below the potency of 4.3 $\log_{10}$ TCID$_{50}$

stated on the label. *See* Ex. 186 (Jan. 28, 1998 Letter to Hardegree) at MRK-KRA01625508; Ex.

178 (Dec. 10, 1998 Letter to Hardegree) at MRK-KRA01622125; Ex. 180 (Jan. 8, 1999 Letter to

Egan, N. Baylor, and P. Patriarca) at MRK-KRA01622468; *see also* Ex. 148 (Memo on

Discussions with N. Baylor) at MRK-KRA00094960.

161.     To address the known issue that lots released at or near 4.3 $\log_{10}$ TCID$_{50}$ would

not sustain potency at or above 4.3 $\log_{10}$ TCID$_{50}$ over the 24-month shelf life, on August 20,

1999, FDA directed Merck to increase the minimum release potency to 5.0 $\log_{10}$ TCID$_{50}$ with a

target manufacturing potency of 5.2 $\log_{10}$ TCID$_{50}$. Ex. 141 (Aug. 20, 1999 Letter to McKee) at

MRK-KRA00018614-19.

162.     FDA's August 20, 1999 letter stated:

- "Based on CBER's calculations the average titer of six independent and valid potency

    assays must be at least 5.0 $\log_{10}$ TCID$_{50}$ at the time of release in order to be 95%

    confident that the lot will maintain a potency of 4.3 $\log_{10}$ TCID$_{50}$ for the two years."

- "We understand that you will formulate all mumps-containing vaccine lots manufactured

    (filled) on and after September 13, 1999, to contain at least 5.2 $\log_{10}$ TCID$_{50}$. These lots

    will be released by CBER with a dating period of 24 months based upon the CBER

    potency testing criteria described above."

- "Furthermore, all mumps-containing lots submitted for CBER release, regardless of manufacturing date, will be subject to the described CBER release requirements as of November 8, 1999."

- "Additionally, as we requested in the August 16, 1999 telephone conversation, please submit a list of the approximately 60 currently pending mumps-containing vaccine lots (including the status, i.e., whether the lot has been packaged and dated, or filled by not packaged, or is in the queue for manufacturing with a committed stabilizer). Please identify each lot by lot number, and include the manufacturing date, the mumps titer and lot size (number of doses), if available."

Ex. 141 (Aug. 20, 1999 Letter) at MRK-KRA00018614-15.

163.    Following FDA's direction, Merck increased the target and minimum release potencies to 5.2 and 5.0 $\log_{10}$ $TCID_{50}$, respectively, and on September 15, 1999, Merck submitted to FDA the data requested on the mumps-containing vaccine lots awaiting release. Ex. 183 (Sep. 15, 1999 Letter to Egan) at MRK-01622711-12; *see also* Ex. 91 (Gulati Report) at 42.

164.    In the September 15, 1999 submission, in response to CBER's request for "information regarding the mumps potency testing procedure," Merck provided a "list of lots manufactured prior to September 13, 1999, at the previous target titer of 4.9 $\log_{10}$ $TCID_{50}$/dose and planned for submission for CBER release before the new release specification became effective on November 8, 1999."  The lots described in the submission were filled between October 1998 and September 1999, with a release potency ranging from 4.8 to 5.1 $\log_{10}$ $TCID_{50}$/dose, with one lot slightly higher. Merck further stated that the lots "contain approximately 120,000 vials except for [14 specified lots] that contain approximately 60,000 vials." While several of those lots were tested to have potency near or below 4.3 $\log_{10}$ $TCID_{50}$,

39

FDA did not request that these lots be withdrawn or withheld from the market. *See* Ex. 183 MRK-KRA01622711-12] (Sep. 15, 1999 Letter to Egan) at MRK-KRA01622711-12; Ex. 184 (Attachment #4 to Letter) at MRK-KRA01622778-79.

165.    On September 15, 1999, Merck submitted to FDA a Prior Approval Supplement (PAS) to increase release potency of 5.0 $\log_{10}$ TCID50 along with a Release Protocol. Ex. 183 (Sep. 15, 1999 PAS to Egan) at MRK-KRA01622711-12.

166.    FDA approved the PAS on February 11, 2000. Ex. 187 (Feb. 11, 2000 Letter to McKee) at MRK-KRA01897091.

167.    Approximately six months after FDA's approval of the PAS, FDA's Team Bio conducted an inspection of Merck's manufacturing division. FDA issued Merck a Form 483, citing failures to provide Error and Accident Reports related to certain lots of mumps vaccine that had failed stability tests at various intervals. These failures related solely to lots of vaccine manufactured prior to the increase in release potency. This information was later incorporated into a February 9, 2001 Warning Letter.  A Form 483 "notifies the company's management of objectionable conditions" and encourages the company to respond and, if necessary, correct the cited conditions.  A Warning Letter is a notification FDA gives to manufacturers when it finds a violation of FDA regulations and "makes clear that the company must correct the problem and provides directions and a timeframe for the company to inform FDA of its plans for correction." FDA explains that "[m]atters described in FDA warning letters may have been subject to subsequent interaction between FDA and the recipient of the letter that may have changed the regulatory status of the issues discussed in the letter." *See* Ex. 244 (Merck's Response to FDA Form 483 Observations) at MRK-KRA01649536; Ex. 143 [PUBLIC0000666] (Warning Letter) at PUBLIC0000669; Ex. 14 (FDA Form 483 Frequently Asked Questions, *available at*

40

https://www.fda.gov/iceci/inspections/ucm256377.htm); Ex. 245 (FDA, Warning Letters, *available at* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/compliance-actions-and-activities/warning-letters).

168.    In this period, FDA made warning letters available on its website. As early as January 13, 2004, FDA made the February 9, 2001 warning letter to Merck available in its online "Reference Room," under the link for "Warning Letters."   Ex. 217 (https://web.archive.org/web/20040113051602/http://www.fda.gov/).

169.    Archived webpages from FDA website remain available, and the February 9, 2001 warning letter to Merck remains available through those links today. Ex. 218 (https://web.archive.org/web/20051106012957/http://www.accessdata.fda.gov/scripts/wlcfm/company_archive.cfm?FL=M)

170.    In the Warning Letter, FDA stated that the "investigators reported that the data in your firm's files showed that a number of Mumps Vaccine stability samples representing lots manufactured before the formulation was changed during February 2000 failed to meet the minimum potency specification." Ex. 143 (Warning Letter) at PUBLIC0000666.

171.    FDA continued:  "Product manufactured before February 2000 may still be on the market because the expiry period is two years. Please submit an analysis of Mumps stability data describing the range of potencies you would expect the various Mumps Vaccine products to reach at the two year expiration date."  For this analysis, FDA requested that Merck "assume the initial potency is the minimum release potency specification that was in effect before February 2000" or 4.3 $\log_{10}$ $TCID_{50}$/dose. *Id.* at PUBLIC0000669.

172.    On March 8, 2001, Merck submitted the information requested:  "As stated in our October 24, 2000 communication, we historically considered the MMRII labeled titers to reflect

41

minimum release specifications. As such, measured potency results below the label specification observed during stability monitoring of MMRII were not considered atypical. . . . The average estimated loss rate for mumps stored at 2-8C for 2 years is 0.703 logs as reported in Attachment 8, table 2, page 104 of the October 24, 2000 submission. Thus, if it is assumed that the initial potency is 4.3 $\log_{10}$ $TCID_{50}$/dose, the minimum release specification in effect prior to February 2000, the expected average potency at expiry is 3.6 $\log_{10}$ $TCID_{50}$/dose. In order to estimate the range of potencies around the average loss rate, the standard deviation of the loss rate was calculated and found to be 0.3 logs. Therefore, the 95% upper and lower confidence bounds for mumps potency at the end of a two year expiry is estimated to be 3.9 and 3.3 $\log_{10}$ $TCID_{50}$/dose, respectively." Ex. 177 (Merck's Response to the Warning Letter) at MRK-KRA01537603-11.

173.     Merck informed FDA that, while the average estimated loss was 0.703 $\log_{10}$ $TCID_{50}$ as had been reported in Merck's October 2000 submission, the potential projected loss could be up to 1.0 $\log_{10}$ $TCID_{50}$. Merck characterized this projection as a worst-case scenario because it projects the highest possible potential loss that might occur if the vaccine was administered at the end of 24 months and was freeze-dried and maintained out of refrigeration for the longest permissible time per the labeling instructions prior to administration. *See id.*

174.     At this time, Merck also submitted data on the efficacy of the vaccine at potencies lower than 4.3 $\log_{10}$ $TCID_{50}$/dose, including data from Hilleman's initial licensure studies, Protocol 007, and CDC field effectiveness data showing a 99% decrease in disease. *See id.*

175.     Merck also reported other information related to vaccines with a potency below 4.3 $\log_{10}$ $TCID_{50}$. Specifically, Merck reported that "lots were chosen to be tested . . . based on

Appx288

recent stability analyses . . . [that] predicted [them] to be below 3.7 [$log_{10}$ $TCID_{50}$]." *See* Ex. 164 (April 5, 2001 BPDR) at MRK-KRA00754233.

176. Merck further reported to FDA in April 2001 the following out of specification information regarding vaccine manufactured prior to the potency increase in 1999:

| Lot Number | Number of Doses | Time Point Tested | Release Potency ($log_{10}$ $TCID_{50}$/dose) | Potency Result ($log_{10}$ $TCID_{50}$/dose) | Expiration Date |
|---|---|---|---|---|---|
| 0538J | 117,970 | 24-month | 4.5 | 4.0 | 3/26/01 |
| 0539J | 115,320 | 24-month | 4.5 | 3.9 | 3/26/01 |
| 0926J | 57,720 | 22-month | | 4.3 | 5/28/01 |
| 1070J | 118,040 | 22-month | 4.4 | 4.2 | 5/15/01 |
| 1071J | 117,550 | 22-month | 4.5 | 3.9 | 5/18/01 |

*Id.* at MRK-KRA00754234.

177. Consistent with applicable requirements, Merck investigated these out-of-specification results and reported to FDA on its investigation. *Id.*

178. On April 11, 2001, without taking any action with respect to product still on the market that might fall below the 4.3 $log_{10}$ $TCID_{50}$ labeled specification, FDA closed the Warning Letter. *See* Ex. 206 (Merck's Responses and Objections to Relator's Third Set of Requests For Production No. 143) at 102.

179. While the calculation of a potential 1.0 $log_{10}$ $TCID_{50}$ loss was developed based on an analysis of vaccine manufactured prior to the potency increase, it did not include an analysis of potency test result data from vaccine manufactured after September 13, 1999, at which time Merck had increased the release potency of the vaccine consistent with FDA's direction. *See* Ex. 116 (Gulati Dep. Tr.) at 145-146.

180. CDC testified that, in connection with its decision to purchase the mumps vaccine, it has not raised concerns relating to the potency of the vaccine, or any of the following:

efficacy, effectiveness, seroconversion or immunogenicity, or shelf life. Ex. 75 (Sims Dep. Tr.) at 201:13-25.

## IX.    MERCK'S RELEASE PROGRAM

181.    CBER requires testing as a matter of course for most biological products due to the variable nature of biological products. Under federal regulations, for continued release of each lot to the market, manufacturers are required to submit "samples from all lots of a licensed biological product together with the protocols showing results of applicable tests."  Ex. 91 (Gulati Report at 30 ¶ 110); Ex. 248 (Notice Regarding Guidance on Alternatives to Lot Release for Licensed Biological Products, 58 Fed. Reg. 38,771, at 38,772 (July 20, 1993); 21 C.F.R. §§ 610.1, 610.2(a).

182.    Pursuant to these regulations, in connection with the release of every vaccine lot to the U.S. market, Merck tests the potency of the lot and reports the potency and other product characteristics on a detailed release protocol. Ex. 202 (Stannard Dep. Tr.) at 40:23-41:4 (before vaccine goes to customers, some is sent to CBER and they have to release it), 41:23-42:11 (testing the filled lots and preparing sample vials for CBER), 235:24-236:8 (a granular release protocol is prepared for each lot with potency test results), 247:17-24 (a protocol has to be submitted for every lot that's produced for the U.S. market).

183.    After the release protocol has been completed, it is reviewed and approved/signed by a qualified member of Merck's Quality team and uploaded to a website for electronic submission to CBER. CBER is also sent vials of 30 samples from each batch in order to perform its own testing. Ex. 176 (Sept. 23, 2015 West Point SOP 07-QUR-300X, Preparation, Review and Shipment of Biological Product Protocols and Samples to CBER) at MRK-KRA01448181.

184.    As FDA explains, "[o]nce the Agency has reviewed the lot release protocol, completed any testing of samples, and has found the results acceptable, the Agency will notify

the applicant that that lot has been released."  Ex. 108 ([FDA, Lot Release,

https://www.fda.gov/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/Post-

MarketActivities/LotReleases/default.htm, last accessed Aug. 29, 2019]); *see, e.g.*, Ex. 175 (Feb.

23, 2016 CBER Release letter to Merck for lot 0000485964) at MRK-KRA01447562.

185.    FDA can test the sample (or not) and then notifies Merck if the lot is approved for

distribution. No lot is released to the U.S. market without CBER's approval. Ex. 202 (Stannard

Dep. Tr.) at 40:23-41:4 (before vaccine goes to customers, some is sent to CBER and they have

to release it), 239:18-240:7 (CBER may or may not test concurrently with its review of the

release protocol), and 298:13-18 (Q:  "[I]s it correct to say that there is no product released into

the market that has not, number one, met our release specifications; and number two, been

released by CBER?"  A:  "Correct.").

## X.    MERCK'S STABILITY PROGRAM

186.    Stability refers to the ability of any product, including vaccines, to maintain its

activity or usable form during the time of storage. The mumps vaccine contains live cells and

will degrade over time; the rate at which something degrades can be affected by temperature,

light and other storage conditions. Ex. 91 (Gulati Report) at 7 ¶ 24.

187.    Stability studies are used to ensure potency specifications are met over the

product's shelf-life. Merck tested the potency of the mumps vaccine on multiple lots per year,

depending on the year, and at multiple intervals (at 0 months and then again at 3, 6, 9, 12, 24 and

30 months). Ex. 91 (Gulati Report) at 8 ¶¶ 28-29, at 14 ¶¶ 52-54.

188.    FDA's Office of Compliance and Biologics Quality stated in its 2001 Warning

Letter that "Products must meet their specifications," not historical trends. Ex. 143

[PUBLIC0000666] (Feb. 9, 2001 Warning Letter), at PUBLIC0000669.

189.    For all testing on lots manufactured and released with a release potency at or above 5.0 $\log_{10}$ TCID$_{50}$, the potency testing conducted in Merck's stability program did not reveal any out-of-specification results for any lots at any interval through 24 months. Ex. 202 (Stannard Dep. Tr.) at 308:4-17; Ex. 91 (Gulati Report) at 22 ¶ 82.

190.    In addition to evaluating potency results against the end-expiry potency specification, Merck also uses an Early Warning Evaluation System to monitor data, in real time, to evaluate whether individual lots appear to be losing potency differently than other lots or trending toward a future out-of-specification result. Ex. 91 (Gulati Report) at 15 ¶¶ 57-58.

191.    Under Merck's stability program:  (1) Merck annually places a certain number of lots aside to be tested between release and the end of the shelf-life; (2) Merck develops a protocol for testing each lot and then conducts potency testing at specific intervals; (3) Merck analyzes the results against the end-expiry specification to ensure the lot is within the specification; (4) Merck analyzes the results against all other lots tested on stability to evaluate trends in potency loss and identify whether a lot appears to be losing more potency than expected; (5) Merck prepares an annual stability report to document its findings; and (6) the annual stability reports are available to and consulted during FDA inspections.  Ex. 91 (Gulati Report) at 13-15; Ex. 202 (Stannard Dep. Tr.) at 309:5-8.

192.    On October 23, 2019, Merck and Relators' proffered expert, Dr. Kessler, provided a joint submission to the FDA.  Ex. 205 (Oct. 23, 2019 Joint Submission).

193.    Merck Research Laboratories is involved in vaccine discovery and development through clinical trials.  A separate division, Global Human Health, is involved in sales and marking.  *See* Ex. 247 (Metzger Dep. Tr.) at 25:15-26:8.

Appx292

DATED:  October 25, 2019                          Respectfully submitted,

                                               */s/ Lisa C. Dykstra*

                                               Eric W. Sitarchuk
Lisa C. Dykstra
R. Brendan Fee
Margaret E. Rodgers Schmidt
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103
Telephone:  215-963-5000
eric.sitarchuk@morganlewis.com
lisa.dykstra@morganlewis.com
brendan.fee@morganlewis.com
margaret.rodgers-schmidt@morganlewis.com

Dino S. Sangiamo
Sally W. Bryan
VENABLE LLP
750 E. Pratt Street, Suite 900
Baltimore, MD  21202
Telephone:  410-244-7400
DSSangiamo@Venable.com
SRBryan@Venable.com

Neal K. Katyal
Jessica Ellsworth
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC  20004
Telephone:  202-637-5600
neal.katyal@hoganlovells.com
jessica.ellsworth@hoganlovells.com

*Counsel for Defendant*
*Merck Sharpe & Dohme, Corp.*
*(f/k/a Merck & Co. Inc.)*

Appx293

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2019, a true and correct copy of the foregoing under seal filing was served upon the following counsel of record via electronic mail:

Gordon Schnell
Robert L. Begleiter
Dan Vitelli
Marlene Koury
Hamsa Mahendranathan
CONSTANTINE CANNON LLP
335 Madison Avenue
New York, NY 10017
Telephone: (212) 350-2700
gschnell@constantinecannon.com
rbegleiter@constantinecannon.com
dvitelli@constantinecannon.com
mkoury@constantinecannon.com
hmahendranathan@constantinecannon.com

Jeffrey F. Keller
Kathleen R. Scanlan
KELLER GROVER LLP
1965 Market Street
San Francisco, CA 94103
Telephone: (415) 543-1305
jfkeller@kellergrover.com
kscanlan@kellergrover.com

*Counsel for Relators*

Gerald B. Sullivan
Joel M. Sweet
Office of the U.S. Attorney for the
   Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
gerald.sullivan@usdoj.gov
joel.sweet@usdoj.gov

Holly H. Snow
United States Department of Justice
601 D Street NW, Suite 9909
Washington, DC 20004
holly.h.snow@usdoj.gov

*Counsel for the United States*

Dated: October 25, 2019

    ///s/ Lisa C. Dykstra
       Lisa C. Dykstra

       *Counsel for Defendant*
       *Merck Sharpe & Dohme, Corp.*
       *(f/k/a Merck & Co. Inc.)*

**Appx294**

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

        *Plaintiffs,*

   v.

MERCK & CO., INC.,

        *Defendant.*

Civil Action No. 10-4374 (CDJ)

**FILED UNDER SEAL**

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY"
INFORMATION PURSUANT TO
PROTECTIVE ORDER**

## RELATORS' STATEMENT OF
## UNDISPUTED MATERIAL FACTS UNDER RULE 56

**Appx295**

## <u>Table of Contents</u>

I.   **BACKGROUND OF MUMPS, MUMPS VACCINES, AND CLINICAL TRIAL TESTING OF VACCINES** ............................................................... 1

    A.    **Mumps Disease** ...................................................................................... 1

    B.    **Vaccines Generally** ............................................................................... 2

    C.    **Duties of Vaccine Manufacturers** ...................................................... 4

    D.    **Merck's Mumps Vaccines** ................................................................... 7

    E.    **Clinical Trial Testing of Mumps Vaccines** ........................................ 8

            1.    *PRN Tests* ...................................................................................... 9

            2.    *ELISA Tests* ................................................................................ 10

            3.    *The Need to Correlate ELISA Tests to PRN Tests* ........................ 11

II.  **THE ORIGINS OF MERCK'S PROTOCOL 007 CLINICAL TRIAL AND THE THREATS TO MMR-II** .......................................................... 12

    A.    **FDA's Review of Vaccine Labels Under the National Childhood Vaccine Injury Act ("NCVIA")** ...................................................... 12

    B.    **FDA's Discovery of Merck's Early Mumps Potency Failures** ......... 12

    C.    **Merck's Ongoing Potency Failures and Its Failure to Disclose them to the FDA or the CDC** ............................................................................ 15

    D.    **Merck's Efforts to Continue Selling MMR-II Despite Its Ongoing Potency Failures** .............................................................................. 20

III. **MERCK'S DEVELOPMENT AND DESIGN OF PROTOCOL 007** ..................... 23

    A.    **Protocol 007 Was Supposed to Measure Protection Against Mumps** ........... 23

    B.    **Merck's AIGENT Test** ...................................................................... 26

    C.    **Merck's ELISA Test** ......................................................................... 27

    D.    **Merck's ELISA-AIGENT Correlation** ............................................. 28

IV.  **MERCK'S FAILURES IN PROTOCOL 007** .......................................................... 29

    A.    **The AIGENT Test Did Not Provide a Reliable or Clinically Relevant Measure of Protection** .......................................................... 29

            1.    *Merck Designed the AIGENT to Achieve a 95% Seroconversion Rate* ...................................................................................... 29

            2.    *The AIGENT Did Not Test Against a Circulating Wild-Type Mumps Virus Strain* ................................................................ 31

            3.    *The AIGENT's Use of Anti-IgG Increased the Measured Neutralization and Seroconversion Rates* ..................................... 32

            4.    *The AIGENT Did Not Measure Mumps-Specific Neutralizing Antibodies* .............................................................................. 35

ii

5.   *Merck Cancelled Its Plans to Outsource the AIGENT Testing* ..... 37

6.   *Merck Changed the AIGENT Test Data Through Selective Recounting of Plaques* ........................................................... 39

7.   *Numerous Witnesses and Experts in this Case Confirm the AIGENT Test Did Not Provide a Reliable or Clinically Relevant Measure of Protection*................................................. 44

B.   **Merck's ELISA Test Did Not Provide a Reliable or Clinically Relevant Measure of Protection**........................................................... 49

1.   *The ELISA Did Not Test Against a Circulating Wild-Type Mumps Virus Strain* ................................................................. 49

2.   *Merck Did Not Correlate Its ELISA Test to a Reliable or Clinically Relevant Test*.................................................................... 49

3.   *Numerous Witnesses and Experts in this Case Confirm the ELISA Test Did Not Provide a Reliable or Clinically Relevant Measure of Protection*.................................................................... 50

V.   **MERCK'S SUBMISSION OF AND RELIANCE ON PROTOCOL 007 FOR FDA APPROVALS MISREPRESENTED THE RELIABILITY AND CLINICAL RELEVANCE OF THE AIGENT AND ELISA TESTS**.............................................. 52

A.   **Merck's Submission of Preliminary Subset AIGENT Results to FDA** .......... 52

B.   **Merck's sBLA to Lower the MMR-II Minimum Mumps Potency Specification**........................................................................ 54

C.   **Merck's BLA for ProQuad** ............................................................. 61

D.   **Merck's sBLA for MMR-II with rHA** ............................................. 64

VI.   **MERCK'S MMR-II AND PROQUAD LABELS ARE INACCURATE, FALSE, AND MISLEADING**....................................................................... 66

A.   **Vaccine Labeling Generally** ........................................................... 66

B.   **MMR-II Label** ............................................................................ 68

C.   **ProQuad Label** ........................................................................... 70

VII.   **MUMPS OUTBREAKS** ......................................................................... 72

A.   **Mumps Resurgence Since 2006** ...................................................... 72

B.   **Uncertainty of Causes of Mumps Resurgence**.................................... 74

C.   **Significant Concern Over Mumps Resurgence** ................................... 77

D.   **Merck Has No Reliable or Clinically Relevant Data Demonstrating How Well Its Mumps Vaccines Protect Against Mumps** ............ 79

E.   **Calls for a New Mumps Vaccine**..................................................... 80

VIII.   **MERCK'S SALE OF MUMPS VACCINES TO THE CDC** ..................................... 82

A.   **Overview of CDC Vaccine Purchasing** ............................................. 82

B.   **Role of ACIP In CDC Vaccine Purchasing** ....................................... 85

**Appx297**

**C.**    **Prerequisites for CDC Vaccine Purchases** ............................................................ 87

**D.**    **Additional Issues Material to CDC Vaccine Purchases** ................................. 89

**E.**    **Government Enforcement Against Drug and Vaccine Manufacturers** ......... 91

**F.**    **Merck's Sale of Mumps Vaccines to the CDC** .................................................. 92

**Appx298**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Paragraph D of Judge

Jones's Policies and Procedures for Civil Cases, Relators Stephen A. Krahling and Joan A.

Wlochowski respectfully submit this Statement of Undisputed Material Facts in support of their

motion for summary judgment against Merck & Co., Inc. ("Merck").[1]

## I.  BACKGROUND OF MUMPS, MUMPS VACCINES, AND CLINICAL TRIAL TESTING OF VACCINES

### A.  Mumps Disease

1.      Mumps is a highly contagious disease caused by infection with mumps virus.

Mumps is spread via saliva or mucus of an infected person.  Symptoms of mumps include pain,

tenderness and swelling in the cheek and jaw area, as well as headache, malaise and fever.  For

children who contract mumps, the most common complications include meningitis, sometimes

associated with encephalitis.  Adults with the disease may have more serious complications than

children, including arthritis, inflammation of the breasts or ovaries, pancreatitis, encephalitis,

temporary or permanent hearing impairment, and even death.  Some studies have observed an

increase in miscarriages among women who developed mumps during the first trimester of

pregnancy.  Painful inflammation of one or both of the testicles frequently occurs in post

pubescent males.  Roughly half of the patients with such inflammation experience testicular

atrophy and in rare cases it can lead to sterility.  There is no cure for mumps.[2]

---

[1]  "Ex. _" as used herein refers to the exhibits attached to and identified in the accompanying Declaration of Gary Reilly dated October 25, 2019 ("Reilly Decl.").

[2]  Ex. 1 at 4-5, 7, 16-17 (Report of Relators' Expert Dr. Eugene Shapiro (hereinafter "Shapiro Rep.")) (explaining mumps disease, symptoms, and complications) (citing various academic publications); Ex. 2 at 7-8 (Report of Relators' Expert Dr. Robert Malone (hereinafter "Malone Rep.")) (same); Ex. 3 at Schedule 18 (Report of Relators' Expert Dr. David A. Kessler (hereinafter "Kessler Rep.")) (same).

**Appx299**

### B.     Vaccines Generally

2.      Vaccines are intended to protect recipients against diseases, usually by inducing antibodies to prevent infection or to mitigate the severity of the disease.  To achieve the desired effects of a vaccine, the vaccine must be safe, potent, effective, and induce protection.  For a vaccine administered to children against a virus like mumps, long-lasting protection is important because mumps tends to be more severe in adolescents and adults than in younger children.[3]

3.      In the United States, vaccines are regulated under the Public Health Services Act and the Food, Drug, and Cosmetic Act.[4]

4.      The United States Food and Drug Administration ("FDA") is the agency responsible for licensing and regulating the manufacture and distribution of vaccines in interstate commerce.  As part of the FDA's licensing process, the FDA reviews data from clinical trials to ensure vaccines are safe and effective.  Only FDA-licensed vaccines may be distributed and sold in the United States.[5]

5.      The FDA approves vaccine licenses through Biologic License Applications ("BLAs") or Supplemental Biologic License Applications ("sBLAs").[6]

---

[3]  Ex. 1 at 6-7 (Shapiro Rep.) (explaining purpose of vaccination); Ex. 4 at 89:23-24 (Deposition of Relators' Expert Dr. David A. Kessler (hereinafter "Kessler Dep.")) ("[T]he [Federal Food, Drug, and Cosmetic] Act requires … that vaccines be shown to be effective."); *see also supra* ¶ 1.

[4]  Ex. 5 ¶ 18 (Report of Merck's Expert Dr. D. Bruce Burlington (hereinafter "Merck Expert Burlington Rep.")) (stating vaccines subject to Public Health Service Act and Food, Drug, and Cosmetic Act) (citing 42 U.S.C. § 262; 21 U.S.C. § 355(a), (b); 21 C.F.R. § 201 *et seq.*; and 21 C.F.R. § 314.70); Ex. 4 at 89:23-24 (Kessler Dep.) ("[T]he [Federal Food, Drug, and Cosmetic] Act requires … that vaccines be shown to be effective.").

[5]  Ex. 5 ¶ 18 (Merck Expert Burlington Rep.) ("[B]efore a company can distribute a biological product [including vaccines] in the United States, it must file a Biological License Application (BLA) with the FDA, and the FDA must approve that application.") (footnote omitted); Ex. 3 ¶¶ 105-131 (Kessler Rep.) (explaining FDA's regulation of vaccines); Ex. 1 at 8 (Shapiro Rep.) (explaining role of FDA in vaccine licensing); Ex. 2 at 9 (Malone Rep.) (same).

[6]  Ex. 5 ¶ 18 (Merck Expert Burlington Rep.) ("[B]efore a company can distribute a biological product [including vaccines] in the United States, it must file a [BLA] with the FDA, and the FDA must approve that application.  … Changes to labeling of a biological product require submission of a [sBLA], including supporting data for the proposed change, and usually also require that the supplement be approved before the changes are implemented.") (footnotes omitted); Ex. 4 at 153:1-8 (Kessler Dep.) (affirming that "[b]efore a manufacturer can distribute a vaccine

2

6.      Vaccine manufacturers must demonstrate vaccine effectiveness to obtain FDA approval of BLAs or sBLAs.[7]

7.      To obtain FDA approval of BLAs or sBLAs, vaccine manufacturers must demonstrate sufficient vaccine potency, which is defined as the ability of the product to effect a given result.  If a vaccine lacks sufficient potency, it may not protect against the disease.[8]

8.      Clinical trials on which BLA and sBLA approvals are based must be adequate and well controlled and sufficient to assess the effectiveness of the vaccine.[9]

---

it has to file a biologics license application that needs to be approved by the FDA," and that "any change in [the approved biologic license application] also needs to be approved by the FDA").

[7] Ex. 5 ¶¶ 18, 28 (Merck Expert Burlington Rep.) (BLA and sBLA approval "requires substantial evidence of safety and effectiveness for approval ….") (citing 21 C.F.R. § 201 *et seq.*) ("As a basis for approval, a clinical study must establish evidence of effectiveness ...."); Ex. 6 at 53:3-9, 70:15-72:4, 78:21-79:8 (Deposition of Merck's Expert Dr. D. Bruce Burlington (hereinafter "Merck Expert Burlington Dep.")) (testifying manufacturers must provide evidence of effectiveness for approval of BLAs and sBLAs) ("The vaccine had to be effective for original approval, it has to continue to be effective for the change for which approval was being sought in the supplement.") (With respect to the three mumps BLAs at issue, the "FDA reviewer evaluating and approving or not approving the request for a change in the vaccine has to conclude it's effective.").

[8] Ex. 5 ¶ 21 (Merck Expert Burlington Rep.) ("The basis for the FDA to approve a BLA or sBLA is a finding by the Agency that the biological product is … potent."); Ex. 6 at 58:20-59:11 (Merck Expert Burlington Dep.) ("In the sense of the statutory threshold for approval, potent … means that it has the strength to produce the effect claimed on the label, that it is capable of producing the effect on the label. … So potent means both that it has the strength to achieve the effect and that it's effective in achieving that effect."); Ex. 7 at 156:13-18 (Deposition of CDC's 30(b)(6) Witness Dr. Mark Pallansch (hereinafter "CDC 30(b)(6) Pallansch Dep.")) ("Q. If there had been a change of potency, could that be relevant to how effective the vaccine is?  A. Absolutely.  If you … cut the … amount of virus in the vaccine, that could easily make a lower response."); Ex. 3 ¶¶ 33, 392 (Kessler Rep.) ("Potency is defined as the 'ability of the product ... to effect a given result.'  The potency of a vaccine is connected to how well the vaccine works.  If a vaccine does not have sufficient potency, it may not provide protection from disease.") (quoting 21 C.F.R. § 600.3) ("[B]ecause potency is tied to effectiveness, a risk of lower potency vaccine on the market necessarily includes a risk of less effective vaccine on the market."); Ex. 4 at 230:11-19 (Kessler Dep.) ("[T]here's an issue of potency here … [b]ut that's not the only issue here.  There's an issue of efficacy … [y]ou want a vaccine that has the appropriate strength to be effective …."); Ex. 8 at 162:1-3 (Deposition of Relators' Expert Dr. Eugene Shapiro (hereinafter "Shapiro Dep.")) ("[I]t is pretty obvious that … vaccine[] potency is part of what makes a vaccine work."); Ex. 9 at 282:11-18 (Deposition of Merck Employee Dr. Alison L. Fisher (hereinafter "Fisher Dep.")) (affirming "a minimum amount of mumps vaccine in the shot is to make sure that a kid who gets that shot is actually protected from mumps").

[9] Ex. 5 ¶¶ 23, 31, 38-39 (Merck Expert Burlington Rep.) ("The FDCA and regulations require that clinical trials on which a BLA or sBLA approval is based are adequate and well controlled, including that the [tests] are reliable and that the analysis of the results are adequate to assess the effect of the … biologic.") (citing 21 C.F.R. § 314.126) (For clinical study data to support marketing approval, "the methods of assessment … are well-defined and reliable" and "there is an analysis of the results of the study adequate to assess the effects of the drug.") (citing 21 C.F.R. § 314.126(b)(6) and (7)) ("[T]hrough clinical testing before approval, investigational lots of the product must be shown to be effective. For a new virus vaccine, this usually requires that the sponsor conduct clinical trials demonstrating that the vaccine prevents clinical illness from wild type virus in the population …."); Ex. 6 at 60:25-

9.      The United States Centers for Disease Control and Prevention ("CDC") is the agency responsible for monitoring disease outbreaks and the continued effectiveness of vaccines.[10]  Ensuring vaccines are effective is a "key function" of the CDC.[11]  The CDC also is responsible for purchasing vaccines, including through the agency's Vaccines For Children Program.[12]  The FDA does not involve itself in specific CDC vaccine purchasing decisions.[13]

10.      The CDC's Advisory Committee on Immunization Practices ("ACIP") provides recommendations to the CDC and the medical community on vaccine use.[14]

## C.      Duties of Vaccine Manufacturers

11.      Vaccine manufacturers have a duty to ensure their vaccines are safe and effective.[15]

---

61:21 (Merck Expert Burlington Dep.) (testifying whether "a clinical study [is] adequate and well controlled" means, among other things, providing information that is "relevant to the determination of effectiveness."); Ex. 3 ¶ 128 (Kessler Rep.) (It is "the responsibility of vaccine manufacturers under the Public Health Service Act to establish efficacy by substantial evidence of effectiveness in the form of adequate and well controlled clinical studies.").

[10]  Ex. 10 at 8-9 (Report of Merck's Expert Dr. Ann M. Arvin (hereinafter "Merck Expert Arvin Rep.")) (After licensure, "CDC conducts continuous surveillance of vaccine safety and effectiveness."); Ex. 1 at 8 (Shapiro Rep.) (explaining role of CDC).

[11]  Ex. 7 at 33:2-21, 99:11-17, 101:10-19 (CDC 30(b)(6) Pallansch Dep.) ("Q. Is effectiveness important to the CDC?  A. Effectiveness is our single-most important measure in terms of the impact that a vaccine has on disease in the population. … [Effectiveness] is [the CDC's] major tool of assessment. … [O]ne of the major things we do on the epidemiology side is to measure vaccine effectiveness for both old and new products.") (testifying effectiveness is a "key evaluation criteri[on]" to CDC) (vaccine effectiveness "certainly is evaluated routinely and is a key function of what we do here at CDC").

[12]  Ex. 11 at 2 ("CDC has a major programmatic role in accomplishing reduction in vaccine-preventable infectious disease through the agency's [Vaccines For Children] Program by using scarce public health federal funding to purchase effective vaccines for administration to children by public and private [Vaccines For Children] providers throughout the country.  In that role, CDC is the largest purchaser of mumps vaccine in the United States."); Ex. 12 at 2 (same).

[13]  Ex. 13 at 4 ("To protect and preserve our scientific independence and judgment, FDA does not involve itself in specific HHS contracting decisions to award or terminate contracts.  FDA's longstanding practice is to recuse ourselves from HHS [including CDC] decision making in specific contracting decisions.").

[14]  Ex. 11 at 2 (explaining CDC/ACIP "effectively define the standard of medical care through recommendations on the proper use of pediatric and adult vaccines"); Ex. 12 at 2 (explaining CDC/ACIP "effectively define the standard of medical care through issuance to the medical community of recommendations on proper use of pediatric and adult vaccines").

[15]  Ex. 14 at '088 ("We recognize that [Merck is] the sole supplier to the United States of measles, mumps, rubella and varicella containing vaccines, and as such, we are responsible for ensuring the uninterrupted supply of safe and

**Appx302**

12.    Vaccine manufacturers have a duty to provide the FDA accurate and complete information in connection with their submission of BLAs and sBLA for vaccine licensure.[16]

13.    Vaccine manufacturers have a duty to ensure every vaccine label, which includes the package insert, is not false or misleading.[17]

14.    Vaccine manufacturers have a duty to ensure their vaccines comply with the specifications on the product label, which includes the package insert.[18]

---

efficacious vaccines."); Ex. 3 ¶ 378 (Kessler Rep.) (It is "the manufacturers' responsibility to ensure their vaccines are safe and effective and have labeling that is not false or misleading."); Ex. 4 at 356:14-17 (Kessler Dep.) ("[I]t's [Merck's] responsibility to assure the safety and efficacy of the vaccine."); 21 C.F.R. § 201.57(c)(2) ("All indications [for a drug] shall be supported by substantial evidence of effectiveness based on adequate and well-controlled studies); *Wyeth v. Levine*, 555 U.S. 555, 566 (2009) ("[FDCA] amendments required the manufacturer to prove the drug's effectiveness by introducing 'substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling.'").

[16] Ex. 15 at 191-92 (Deposition of Merck's Expert Dr. Jonathan L. Temte (hereinafter "Merck Expert Temte Dep.")) (testifying manufacturer has obligation to provide accurate information to FDA for licensure); Ex. 3 ¶ 294 (Kessler Rep.) ("Merck had an ongoing obligation to update the sBLA with any new information that it later learned."); Ex. 16 ¶ 35 (Report of Relators' Expert Dr. Peter Calcott (hereinafter "Calcott Rep.")) ("Merck was required to present factual, true, and complete information to the FDA…."); Ex. 358 at 185:4-8 (Deposition of Relators' Expert Dr. Robert Malone (hereinafter "Malone Dep.")) ("[T]he sponsor [is to] provide full and complete disclosure of all relevant information in support of a regulatory submission. The burden is on the sponsor to provide full and complete disclosure."); Ex. 359 at 110:19-111:7 (Deposition of Merck Employee Dr. Manal Morsy (hereinafter "Morsy Dep.")) ("Q. [I]f you had learned after filing [a] BLA … that the PRN [test] that was part of Protocol 007 was unreliable, do you believe you would have been obligated to tell the FDA that?  A. Absolutely.  Merck would have been obligated and Merck would have picked the phone and talked with the FDA and discussed it.  That's the common practice.").

[17] Ex. 5 ¶ 21 (Merck Expert Burlington Rep.) (stating for FDA licensure approval "the product's labeling [must be] accurate and supported by data"); Ex. 3 ¶¶ 129, 378 (Kessler Rep.) (summarizing standards applicable to vaccine labeling from 1972 to present, including that "labeling must be updated when new information becomes available that causes the labeling to become inaccurate, false or misleading.") (citing 21 C.F.R. § 201.56(a)(2)) (It is "the manufacturers' responsibility to ensure their vaccines are safe and effective and have labeling that is not false or misleading."); 42 U.S.C. § 262(b) ("No person shall falsely label or mark any package or container of any biological product"); 21 C.F.R. § 201.56 ("labeling shall … be informative and accurate and … no[t] false or misleading in any particular"); 21 U.S.C. § 352 (a)(1) ("A drug … shall be deemed to be misbranded … [i]f its labeling is false or misleading in any particular."); *see also* 21 U.S.C. § 331(a) (prohibiting "introduction or delivery for introduction into interstate commerce of any … drug … that is adulterated or misbranded"); *Wyeth*, 555 U.S. at 579 ("[T]he FDCA's premise [is] that manufacturers, not the FDA, bear primary responsibility for their drug labeling at all times.").

[18] Ex. 6 at 123:1-8 (Merck Expert Burlington Dep.) ("The manufacturer has the responsibility to comply with the label … [and] with the specifications in the licensing documents."); Ex. 17 at 30:7-10 (Deposition of Merck Employee Dr. Joye L. Bramble (hereinafter "Bramble Dep.")) (affirming Merck's "obligation to comply with what the label said"); Ex. 3 ¶ 417 (Kessler Rep.) ("It is the manufacturer's responsibility to ensure that its products meet the specifications on the label …."); Ex. 18 at '402 (FDA explaining manufacturers are responsible for maintaining compliance with applicable statutes and regulations); Ex. 16 ¶ 30 (Calcott Rep.) (manufacturers must comply with label specifications); Ex. 347 at 89:20-25 (Deposition of Relators' Expert Dr. Peter Calcott (hereinafter "Calcott Dep.")) ("[I]t's the manufacturer's responsibility to assure they have all the complete controls and manufacturing in

15.     Vaccine manufacturers have a continuous duty to report to the CDC all information material to how well the vaccine protects against disease.  This duty includes reporting to the CDC any problems relating to the safety, effectiveness, or potency of the vaccine.[19]

16.     Vaccine manufacturers have a continuous duty to report to the FDA all information material to how well the vaccine protects against disease.  This duty includes reporting to the FDA any problems relating to the safety, effectiveness, or potency of the vaccine.[20]

---

place, and testing, to assure that the product meets what it purports to be through all of its usable time frame, which includes … to the end of expiry."); 21 U.S.C. § 351(a)(1)(B) ("A drug … shall be deemed to be adulterated if … the methods used in … its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug … *has the identity and strength*, and meets the quality and purity characteristics, *which it purports or is represented to possess*") (emphasis added); 21 U.S.C. § 331(a) (prohibiting "introduction or delivery for introduction into interstate commerce of any … drug … that is adulterated or misbranded").

[19]  *Mazur v. Merck & Co.*, 767 F. Supp. 697, 701-03 (E.D. Pa. 1991) (describing Merck's delegation of its duty to warn to the CDC through a provision in the Merck/CDC vaccine purchase contract); Ex. 249 at 143:25-145:4 (CDC 30(b)(6) Sims Dep.) (Merck requests its contracts with CDC include this delegation of its duty to warn to CDC); 42 U.S.C. § 300aa-22 (incorporating into National Childhood Vaccine Injury Act delegation of duty to warn to CDC); *Mazur v. Merck & Co.*, 964 F.2d 1348, 1365-66 (3d Cir. 1992) ("[Merck's] responsibility [to provide accurate and up-to-date safety and efficacy information to the CDC] is continuous, and it must therefore apprise the CDC of any risks it later discovers, or in the exercise of reasonable care, should have discovered."); Ex. 3 ¶¶ 138-39 (Kessler Rep.) (vaccine manufacturers have duty to apprise the government of problems concerning "vaccine efficacy, including duration of protection, immunogenicity … and stability"); *id.* at ¶ 138 (Kessler Rep.) ("To fulfill its obligations under the [National Childhood Vaccine Injury Act] with respect to its duty to warn of potential vaccine risks or hazards, a manufacturer must provide adequate warnings and directions to the intermediary who … provides the information to the vaccine recipient."); *see also infra* ¶¶ 249, 269 (citing evidence of duty to warn).

[20]  Ex. 6 at 55:5-10, 142:19-22, 145:14-21(Merck Expert Burlington Dep.) (testifying lack of efficacy or effectiveness "would be one of the reportable concerns that a manufacturer would have to tell the agency") (testifying if Merck knew it did not comply with potency specification, then "if the product is … within the expiry dating period, they have an obligation to report that to the [FDA], … investigate[,] and … take any appropriate actions."); Ex. 3 ¶ 379 (Kessler Rep.) (The "manufacturer must provide updates with any information it later discovers, or in the exercise of reasonable care, should have discovered about its vaccine … such as vaccine efficacy, including duration of protection, immunogenicity … and stability ...").

### D.    Merck's Mumps Vaccines

17.    Since 1967, Merck has been the only vaccine manufacturer licensed to sell a mumps vaccine in the United States.[21]  That year, Merck obtained a license for the first United States mumps vaccine, Mumpsvax.[22]  In 1971, Merck obtained a license for a combination measles, mumps, and rubella vaccine called MMR.[23]  In 1978, Merck obtained a license for an updated combination measles, mumps, and rubella vaccine called MMR-II, which replaced MMR.[24]  In 2005, Merck obtained a license for a combined measles, mumps, rubella, and varicella vaccine called ProQuad.[25]  In 2009, Merck discontinued the sale of Mumpsvax, leaving MMR-II and ProQuad as the only licensed mumps vaccines sold in the United States.[26]  Merck's Mumpsvax, MMR-II, and ProQuad vaccines all include the "Jeryl Lynn" strain of the mumps virus.[27]

18.    In 1977, ACIP recommended one dose of mumps vaccine for all children 12 months or older.  In 1989, in light of measles outbreaks, ACIP recommended a routine second dose of measles vaccine to be administered in a combined MMR vaccine.  In 2006, in light of mumps outbreaks, ACIP also recommended the routine second dose of mumps vaccine to be administered in a combined MMR vaccine.  In 2017, ACIP recommended a third dose of mumps

---

[21]  Ex. 19 ¶ 11 (Merck Ans.); Ex. 20 at 175 (Merck Responses to Requests for Admission 222-23).

[22]  Ex. 20 at 7 (Merck Responses to Requests for Admission 1, 3).

[23]  Ex. 20 at 8 (Merck Responses to Requests for Admission 4-5).

[24]  Ex. 20 at 8-9 (Merck Responses to Requests for Admission 6-7).

[25]  Ex. 20 at 9 (Merck Responses to Requests for Admission 8-9).

[26]  Ex. 20 at 9 (Merck Response to Request for Admission 10).

[27]  Ex. 20 at 47-48 (Merck Response to Request for Admission 62); Ex. 21 at '129 (ProQuad BLA) (ProQuad "is comprised of … the Jeryl Lynn$^{TM}$ strain of mumps virus …."); Ex. 2 at 9 (Malone Rep.).

**Appx305**

vaccine for vaccinated persons who are identified by public health authorities as being part of a group or population at increased risk for acquiring mumps because of an outbreak.[28]

### E.    Clinical Trial Testing of Mumps Vaccines

19.    Clinical trial testing of vaccines may involve a type of laboratory test referred to as an "immunogenicity test," which, when properly designed and conducted, measures the existence and levels of antibodies produced by the immune system.  "Titers" are a measure of antibodies in a person's serum (blood).  Immunogenicity tests can be used to establish whether a patient's serum is "seropositive," which may indicate the patient has developed a specific and clinically relevant immunologic response, or "seronegative," which may indicate the patient has not developed a specific and clinically relevant immunologic response.  Each immunogenicity test has a defined "serostatus cutoff," which is a dividing line used to determine whether a sample is seropositive or seronegative.  "Seroconversion" occurs when a patient's pre-vaccination serum is seronegative and the patient's post-vaccination serum is seropositive.  A "clinically relevant" response in the context of vaccine testing is one that is connected to protection from the disease.[29]

---

[28]  Ex. 22 at 9, 25 (Report of Merck's Expert Dr. William L. Atkinson (hereinafter "Merck Expert Atkinson Rep.")) (describing ACIP recommendations of mumps vaccines); Ex. 1 at 9 (Shapiro Rep.) (describing ACIP recommendations of mumps vaccines).

[29]  Ex. 23 at 85:18-86:2 (Deposition of Merck Employee Dr. Jonathan Hartzel (hereinafter "Hartzel Dep.")) (defining "seroconversion" as "when somebody who is initially … seronegative, becomes seropositive after receipt of … vaccine"); Ex. 24 at 6 (Report of Merck's Expert Dr. Anna Durbin (hereinafter "Merck Expert Durbin Rep.")) (defining immunological tests, seronegative, seropositive, and seroconversion); Ex. 25 at 6 (Report of Merck's Expert Dr. Marcela Pasetti (hereinafter "Merck Expert Pasetti Rep.")) (defining seroconversion, serostatus thresholds, and referencing serologic tests); Ex. 2 at 11 (Malone Rep.) (defining a "clinically relevant immunologic response" as a response "that provides protection from an adverse effect of exposure to the foreign substance (virus, bacteria, allergen or toxin). … An immunogenicity test can be used as a surrogate for predicting clinical protection, but only if it measures a functional immune response or has been shown to correlate to protection from disease."); Ex. 2 at 10-11, n.16, 13-14 (Malone Rep.); Ex. 3 ¶ 50 (Kessler Rep.) (explaining serostatus cutoff).

**Appx306**

20.     The FDA "defines a correlate of protection as: 'A laboratory parameter that has been shown from adequate and well-controlled studies to be associated with protection from clinical disease.'"[30]

21.     Plaque Reduction Neutralization ("PRN") tests and Enzyme-Linked Immunosorbent Assay ("ELISA") tests are two laboratory tests used to measure immunogenicity in vaccine clinical trial testing.[31]

    1.     *PRN Tests*

22.     PRN tests are considered the "gold standard" for mumps serology testing.  When properly designed and conducted, PRN tests measure the ability of antibodies in serum to neutralize virus.  PRN tests are considered "functional" tests because they are designed to measure only neutralizing antibodies, which are antibodies that bind to a virus and block its ability to infect cells.  Non-neutralizing antibodies may also bind to a virus, but do not block the virus from infecting cells.  To serve as a valid and reliable functional test, a PRN must distinguish between neutralizing and non-neutralizing antibodies.[32]

---

[30] Ex. 26 at 61 (Merck June 2003 presentation titled "Principles of Vaccinology"); *see also* Ex. 22 at 24 (Merck Expert Atkinson Rep.) (A "correlate of protection … is[] the amount of antibody that appears to protect the person from the disease.").

[31] Ex. 2 at 11 (Malone Rep.); Ex. 3 ¶ 49 (Kessler Rep.).

[32] Ex. 24 at 9-10 (Merck Expert Durbin Rep.) ("[A] PRN assay attempts to measure the extent to which test sera contains antibodies that neutralize virus") ("The benefit of PRN assays is … they are focused on the antibodies that are believed to neutralize virus and help to protect us from infection.  They are therefore considered a 'functional' assay because they evaluate the functioning of the antibodies, not merely their presence.  It is believed that not all antibodies neutralize virus, which means that an assay that detects non-neutralizing antibodies might be detecting at least some antibodies that do not protect a person from disease."); Ex. 25 at 8 (Merck Expert Pasetti Rep.) ("PRN assays measure antibodies relying on their functional capacity (i.e., effective virus neutralization that prevents cell infection) ….") ("PRN is generally regarded as gold standard for mumps … serology."); Ex. 27 at 22:13-18 (Deposition of Merck Employee Mary Yagodich (hereinafter "Yagodich Dep.")) ("A functional assay is where a reaction is occurring … where antibody will neutralize a virus."); Ex. 28 at '475 ("Neutralizing antibodies are accepted by [FDA] as a surrogate of protective immunity."); Ex. 2 at 11-12, 48-49 (Malone Rep.) (describing PRN tests).

Appx307

23.     PRN tests are typically conducted as follows.  Pre-vaccination and post-vaccination serum (blood) samples are collected from patients.  The testing lab personnel prepare the serum samples in various dilutions and place the samples in wells (containers).  A measured amount of virus is added to the wells.  The virus is allowed to replicate and spread infection until the testing lab adds chemicals to stop the experiment.  The testing lab personnel examine the wells to identify and count "plaques" (holes), which are created when the virus infects and alters cells.  The number of plaques in a given test sample is compared to the number of plaques in control samples using a pre-defined serostatus cutoff.  This comparison determines whether a particular test sample is seropositive or seronegative.  The patient's pre-vaccination and post-vaccination samples are compared to determine whether the patient has seroconverted (pre-negative to post-positive), according to pre-defined criteria.[33]

24.     Because the plaque counting process is vulnerable to bias, it is critical to establish, document, and abide by proper training processes, procedures, internal controls, and quality assurance.  Without proper processes, procedures, controls, and blinding, a PRN test cannot provide a reliable measure of the number of plaques in a particular sample, the serostatus of a particular sample, or whether a particular patient has seroconverted.[34]

        2.      *ELISA Tests*

25.     ELISA tests measure the ability of antibodies to bind to a virus, irrespective of whether the antibodies neutralize the virus and block its ability to infect cells.  ELISA tests are

---

[33] Ex. 24 at 9-10 (Merck Expert Durbin Rep.) (describing PRN test process); Ex. 25 at 8 (Merck Expert Pasetti Rep.) (same); Ex. 2 at 12-13 (Malone Rep.) (same).

[34] Ex. 24 at 14 (Merck Expert Durbin Rep.) (PRN tests have "features … [that] inject subjectivity and risk of error into the process …."); Ex. 25 at 8 (Merck Expert Pasetti Rep.) ("Functional assays" – like PRN tests – "require infrastructure and skilled personnel; and … are prone to error and results can be quite variable, especially given plaque counting is subjective and results obtained from different operators can be inconsistent."); Ex. 2 at 13 (Malone Rep.) ("The manual plaque counting process is subjective and vulnerable to bias, either conscious or unconscious."); *id.* at 13, 56-57.

**Appx308**

not functional tests because they merely measure binding activity, not whether this binding

activity has any impact on viral infection or replication.  Therefore, ELISA tests do not provide a

clinically relevant measure of how well a vaccine protects against mumps.[35]

      3.    *The Need to Correlate ELISA Tests to PRN Tests*

26.     Because ELISA tests do not distinguish between neutralizing and non-

neutralizing antibodies, an ELISA test cannot provide a clinically relevant measure of how well a

vaccine protects against mumps unless it is correlated to a properly designed and conducted PRN

(or other functional clinical test).[36]  For this reason, the FDA has required vaccine manufacturers

to correlate their mumps ELISA tests to mumps PRN tests to assess protection from disease.[37]

---

[35]  Ex. 25 at 8 (Merck Expert Pasetti Rep.) ("ELISAs detect all antibodies capable of recognizing and binding to an immobilized antigen.  ELISA results provide information on the presence and magnitude of antibodies, but not on biological activity"); Ex. 29 at 69:18-19, 76:20-21 (Deposition of Merck's Expert Dr. Marcela Pasetti (hereinafter "Merck Expert Pasetti Dep.")) ("ELISA measures everything.  ELISA does not allow you to demonstrate function") ("ELISA does not measure protection.  ELISA only measures a level of antibodies."); Ex. 30 at 164:1-4 (Deposition of Merck's Expert Dr. Anna Durbin (hereinafter "Merck Expert Durbin Dep.")) ("ELISAs do not … specifically measure neutralizing antibody.  They measure antibody binding."); Ex. 27 at 99:18-100:3, 104:13-17 (Yagodich Dep.) ("An ELISA just measures antibody binding to an antigen.  There's no functional component….") ("Q. Can you think of any circumstances where it would be appropriate to use an ELISA test to measure how well a vaccine works?  A. No."); Ex. 31 at '715 ("**Mumps ELISA** • Measures all binding antibodies • Not correlated with protection") (emphasis in original).

[36]  Ex. 7 at 127:14-24 (CDC 30(b)(6) Pallansch Dep.) ("In the specific case of mumps … neutralization [PRN] has been the de facto gold standard, so you would want to see ELISA results in categorizing response versus response as measured by neutralization [PRN]."); Ex. 32 at '593 ("[C]orrelation between ELISAs and functional assays such as neutralization [PRN] … must be … demonstrated"; "without demonstrating a correlation between the immunologic response and protection from circulating wild-type mumps infection, we question whether an ELISA assay can be assumed to correlate with protection from wild-type disease"); Ex. 33 at '063 ("For mumps … studies have shown that seroconversion rates based on ELISA [] may not correlate with results from neutralizing [PRN] antibody assays, a more sensitive and clinically relevant assay.  ***For this reason, it is important to test mumps virus antibody levels by neutralization [PRN] assay methods***.") (emphasis in original); Ex. 25 at 18 (Merck Expert Pasetti Rep.) ("Because mumps neutralizing antibodies are the gold standard for mumps, new serological methods are usually compared to serum neutralization assays."); Ex. 29 at 137:6-7 (Merck Expert Pasetti Dep.) ("[W]e always want [ELISA tests] to have an agreement with neutralization assays"); Ex. 2 at 15-16, 48 (Malone Rep.); Ex. 3 ¶ 389 (Kessler Rep.) ("To use an ELISA assay as an appropriate measure of protection against circulating wild-type mumps infection, it must be correlated to an assay that measures protection, such as a neutralization assay.").

[37]  *See infra* ¶¶ 65, 146-49 (citing evidence on FDA requiring Merck to correlate ELISA to AIGENT used in Protocol 007); *see also* Ex. 34 at '260 (FDA informing GSK "In the context of evaluating whether the ELISA can be used as the primary immunogenicity endpoint for pivotal Phase III studies, the [neutralization assay] method should be considered as the reference method."); Ex. 35 at '005 (FDA requiring GSK to provide a "correlation between the titer of antibodies recognized by the [ELISA] and titer of antibodies which neutralize the virus.").

## II.     THE ORIGINS OF MERCK'S PROTOCOL 007 CLINICAL TRIAL AND THE THREATS TO MMR-II

### A.     FDA's Review of Vaccine Labels Under the National Childhood Vaccine Injury Act ("NCVIA")

27.     In 1986, Congress passed the NCVIA (42 U.S.C. §§ 300aa-1-34) to reduce vaccine manufacturers' potential liability due to vaccine injury claims.  Provisions of the NCVIA required the manufacturers to "modernize" their vaccines, and the FDA worked with vaccine manufactures to do so.  As part of the NCVIA, Congress directed the review of vaccine labels to ensure vaccines on the market complied with their specifications, including those relating to efficacy and effectiveness, duration of protection, immunogenicity, stability, and safety. Products that had inaccurate labeling would have to have the labeling revised.  As part of this process, beginning in the mid-1990's, the FDA reviewed Merck's MMR-II vaccine to ensure, among other things, that the vaccine complied with its minimum mumps potency specifications for the full 24-month shelf life of the vaccine.[38]

### B.     FDA's Discovery of Merck's Early Mumps Potency Failures

28.     During the time of the FDA's NCVIA review of MMR-II, the MMR-II label specified that "the dose … contains not less than … 20,000 $TCID_{50}$ of the … Mumps Virus."[39] TCID ("Tissue Culture Infectious Dose") is a measure of vaccine potency.  The FDA and Merck typically convert TCID potency measurements to a $log_{10}$ scale:[40]

---

[38]  Ex. 36 at '142 ("The [NCVIA] … has mandated [FDA] review of all vaccine labelling."); Ex. 6 at 112:12-113:1 (Merck Expert Burlington Dep.) (testifying "origins of the Protocol 7 Clinical Trial" flowed from FDA's NCVIA evaluation of "previously approved vaccines" and FDA scrutinizing "stability information and the label for mumps virus vaccine" and questioning Merck on "the end expiry … infectious particle content"); Ex. 3 ¶¶ 65, 134-35, 141, 380 (Kessler Rep.) (FDA's NCVIA review "was to ensure that vaccines already on the market … complied with their label specifications") (FDA's NCVIA "review focused on … vaccine efficacy, including duration of protection, immunogenicity … and stability"); Ex. 16 ¶¶ 9, 12 (Calcott Rep.).

[39]  Ex. 225 (MMR-II label Mar. 1995); *see also* Ex. 37 at '029 (MMR-II label Apr. 1999).

[40]  Ex. 3 at Schedule 19 (Kessler Rep.).  Relators herein abbreviate "$log_{10}$ $TCID_{50}$/dose" to "log."

| $\sim$TCID$_{50}$ | Log$_{10}$ TCID$_{50}$ |
|---|---|
| 5,000 | 3.7 |
| 10,000 | 4.0 |
| 12,500 | 4.1 |
| 20,000 | 4.3 |
| 80,000 | 4.9 |
| 100,000 | 5.0 |
| 160,000 | 5.2 |
| 316,000 | 5.5 |

The shelf life of MMR-II has always been 24 months. Each MMR-II vaccine vial has an expiration (expiry) date printed on its label, marking the end of the 24-month shelf life.[41]

29.    According to the FDA, this 4.3 log (20,000) figure represented the minimum mumps potency required to be in each dose of MMR-II for the full 24-month shelf life of the product.[42]

30.    The FDA's NCVIA review of MMR-II found Merck was not complying with the minimum mumps potency specification on the MMR-II label.[43]

---

[41] Ex. 20 at 172 (Merck Response to Request for Admission 217) (admitting MMR-II dating period is 24 months); Ex. 38 at 36:21-23 (Deposition of Merck's 30(b)(6) Witness Mark Stannard (hereinafter "Merck 30(b)(6) Stannard Dep.")) (identifying 24-month shelf life for MMR-II); Ex. 39 at 105:9-21 (Deposition of Merck Employee Dr. Luwy Musey (hereinafter "Musey Dep.")) (testifying shelf life is on MMR-II label and has always been 24 months); Ex. 40 at 37:2-10 (Deposition of Merck's Expert Dr. Ann M. Arvin (hereinafter "Merck Expert Arvin Dep.")) (testifying shelf life is "a 'use by' kind of date … which the FDA has said this is usable or not usable"); Ex. 41 at 44:9-14 (Deposition of Merck's Expert William P. Nichols (hereinafter "Merck Expert Nichols Dep.")) ("[M]anufacturer is required by the FDA to establish an expiry date. And just like you would meet at a grocery store as a sell by date … you should administer this vaccine by this date or it should be disposed of."); Ex. 9 at 158:22-159:6 (Fisher Dep.) (testifying every vial of MMR-II stamped with expiration date); Ex. 3 ¶ 38 (Kessler Rep.) ("Each vaccine product has an expiration date printed on its packaging … mark[ing] the end of the dating period ….").

[42] Ex. 42 at '706-07 ("During communications with [FDA] in 1996-98, it became evident that the [FDA] … defined [the label's potency] specifications as end-expiry potencies."); Ex. 43 at '165-66 (same); Ex. 44 at '760 ("In 1990, the mumps virus end-expiry potency for M-M-R$^{TM}$ II was established as 4.3 [log]."); Ex. 17 at 26:15-27:10, 28:2-7 (Bramble Dep.) (testifying FDA's position was potency on label was minimum potency required at end of shelf life); Ex. 3 ¶ 419.3 (Kessler Rep.) ("[A]s long as the MMR-II label stated 'not less than 4.3 [log]' Merck was required to have adequate procedures to assure that MMR-II vaccine had that amount of mumps virus per dose through end expiry.").

[43] Ex. 42 at '706-07 ("It was determined that the mumps component could not meet its specifications if current manufacturing practices were followed."); Ex. 43 at '165-66 (same); Ex. 18 at '402 ("[FDA] investigators reported that the data in [Merck's] files showed that a number of Mumps Vaccine stability samples … failed to meet the minimum potency specification.").

Appx311

31.     One of the reasons for Merck's MMR-II potency failures was that the mumps vaccine was decaying (losing potency) at a faster rate than Merck had historically observed.[44]

32.     The FDA was concerned that MMR-II with below-label mumps potency would not provide sufficient protection against mumps.[45]

33.     The FDA rejected Merck's attempts to persuade the FDA that MMR-II provided sufficient protection against mumps at lower, below-label potencies based on Merck's prior clinical studies and what Merck characterized as the "virtual eradication of disease in the US." Instead, the FDA required Merck to conduct a new clinical trial to demonstrate that MMR-II provided sufficient protection against mumps at lower, below-label potencies.[46]

---

[44] Ex. 45 at 4 ("[FDA] expressed concern over the apparent acceleration in the rate of decay of mumps potency over the shelf-life of M-M-R® II."); Ex. 46 at '859 ("Routine stability study testing has observed an apparent decrease in the stability of the mumps component in Merck's live virus vaccines."); Ex. 47 at '488 ("These stability analyses show a trend to less stabile [sic] [mumps] product in recent years."); Ex. 48 at '623 ("[I]t does appear that there was a statistical shift in losses over time for mumps and that it occurred around 1994."); Ex. 49 at 67:2-19, 78:23-79:9 (Deposition of Merck Employee Philip Bennett (hereinafter "Bennett Dep.")) (testifying to decrease in stability, and greater potency loss during shelf life, of mumps vaccine); Ex. 4 at 185:15-21 (Kessler Dep.) ("[I]f you look at the potency problem that Merck had, my reading of the data is … historically up until 1995, you don't see this potency problem. Something happened around that time that increased that potency problem.").

[45] Ex. 42 at '708 ("In addition, and more seriously, [FDA] challenged the efficacy of marketed product at the lowest predicted potencies (below label claim)."); Ex. 50 at '159 (same); Ex. 51 at '230 (same); Ex. 43 at '167 (same); Ex. 52 at '036 (referencing "concerns raised regarding the immunogenicity of the … mumps strain at vaccine expiry"); Ex. 49 at 164:13-17 (Bennett Dep.) (testifying to FDA concern as to potency of mumps vaccine).

[46] Ex. 42 at '706 (Merck's "[a]rguments for the demonstrated immunogenicity at lower potencies of the monovalents and the apparent effectiveness … due to the virtual eradication of disease in the US … were further rejected [by FDA], because of the small number of children used in the studies, and the circumstantial nature of the justification."); Ex. 50 at '155 (same); Ex. 51 at '226 (same); Ex. 43 at '163 (same); Ex. 50 at '157 ("[T]he minimum immunizing dose studies were performed in a relatively small number of individuals … and have not been repeated in recent years or with the trivalent M-M-R®II vaccine []. Therefore, in order to determine the minimum expiry potency … it was essential to demonstrate the immunogenicity … at the reduced titers expected at expiry."); Ex. 51 at '228 (same); Ex. 53 at '877 (prior clinical studies "were old – based on small number of studies … and furthermore were questioned as to w[he]ther they are still valid in predicting the current protective efficacy …."); Ex. 54 at '425 ("A requirement was set forth by [FDA] to use a functional neutralization assay for [Protocol 007] … due to: 1-The clinical statements in MMR®II label are based on old, limited data and an assay that is no longer used by Merck."); Ex. 31 at '680 ("**Rationale for [Protocol 007]** … • [FDA] believes that additional clinical data are needed to support expiry potencies for mumps.") (emphasis in original); Ex. 2 at 82-83 (Malone Rep.) ("I agree with [the FDA's] assessment that Merck's original mumps efficacy studies, conducted on the monovalent vaccine (not the current trivalent or quadrivalent formulations), with a very small subject sampling, and with what I would consider antiquated testing methods, are not clinically relevant to ProQuad or M-M-R II …."); Ex. 3 ¶ 71 (Kessler Rep.) ("[T]wo … issues emerged from the FDA's … Review of Merck's MMR-II label … Merck needed to assure compliance with the mumps potency claim … that 'each dose contains not less than … [4.3 log] … of mumps'

34.     In the interim, Merck agreed to increase the amount of mumps in each MMR-II dose at the time the vaccine was released to the market (the "Overfill").  Prior to the Overfill, Merck had manufactured MMR-II with a mumps target manufacturing potency of 4.9 log (80,000 infectious dose units).  In September 1999, Merck implemented the Overfill, which doubled its mumps target manufacturing potency, increasing it to 5.2 log (160,000 infectious dose units), with a mumps minimum release potency of 5.0 log (100,000 infectious dose units).  As of December 6, 2007, Merck's maximum mumps potency release specification for MMR-II was 5.5 log (316,000 infectious dose units) and its minimum mumps potency specification at expiry was 4.1 log (12,500 infectious dose units).[47]

### C.     Merck's Ongoing Potency Failures and Its Failure to Disclose them to the FDA or the CDC

35.     After the date Merck implemented the mumps Overfill, Merck continued to identify ongoing potency failures.  On February 9, 2001, the FDA issued a Warning Letter to Merck referencing 10 lots of MMR-II that did not comply with the minimum mumps potency specification.  The FDA's Warning Letter stated "[p]roducts must meet their specifications not the historical trend throughout the labeled expiry period."  The FDA directed Merck to "submit

---

throughout the 24 month shelf life … [and] Merck needed clinical data demonstrating that if a child received a MMRII dose with a potency of less than [4.3 log], it would still be clinically effective.").

[47] Ex. 20 at 18, 32-33, 91 (Merck Responses to Requests for Admission 24, 39-41, 127); Ex. 355 at 2-3 (Merck 30(b)(6) Stannard Dep. Ex. 3); Ex. 42 at '707, '714 ("It was determined that the mumps component could not meet its specifications if current manufacturing practices were followed.  As such, the manufacturing process had to change to increase the amount of mumps component in [MMR-II].") ("Ongoing [FDA] concerns about misbranding result in agreement to increase the minimum release spec[ification] for mumps from 4.3 [log] to 5.0 log[].");  Ex. 51 at '226 ("To maintain the product on the market while [Protocol 007] was in progress, [FDA] specified that the mumps minimum release potency be increased to 5.0 log [] to support an end expiry claim of 4.3 log [].");  Ex. 55 at '143 ("[FDA] will not release lots of M-M-R®II … until the [Prior Approval Supplement to overfill mumps] is resolved.");  *see also* Ex. 155 at 62:14-63:19 (Deposition of Relator Stephen Krahling (hereinafter "Krahling Dep.")) ("[Merck] w[as] putting … [m]ore virus … [in t]he mumps vaccine because it didn't work …  [Dr. Krah] said we were protecting the marquis vaccine and keeping it on the market.");  *id.* at 64:3-7, 66:14 (Krahling Dep.) (testifying Dr. Krah told Relator Krahling that Merck "had to put more [mumps virus] in the vaccine because it degraded and there was potency loss.  And potency loss, lower potency means it doesn't work as well, or at least they didn't have proof that it worked.  …  The loss of efficacy he linked to degradation, meaning a lot of dead virus in the vaccine.").

an analysis of Mumps stability data describing the range of potencies you would expect the various mumps Vaccine products to reach at the two-year expiration date."  The FDA concluded by stating that "[f]ailure to promptly correct these deviations may result in regulatory action … [which might] include license suspension and/or revocation."[48]

36.    While Merck was preparing its response to the FDA's Warning Letter, according to a February 2001 internal Merck email from Dr. Dorothy Margolskee (Merck Research Laboratories ("MRL") SVP) to Dr. Edward Scolnick (MRL President and Merck Board Member) and Dr. Douglas Greene (MRL EVP), among other Merck senior executives, Merck internally identified it had released to market 225 lots (comprising roughly 23 million doses) of MMR-II at risk of falling below the 4.3 log minimum mumps potency specification before the end of the 24-month shelf life.  Merck internally identified that 107 of these 225 lots (comprising roughly 11 million doses) were at risk of falling below 4.0 log at or before the end of the 24-month shelf life.  Merck internally identified that 6 of these 107 lots (comprising roughly 650,000 doses) were at risk of falling below 3.7 log at or before the end of the vaccine's 24-month shelf life.  Merck considered these lots a "compliance issue."[49]

37.    In her email, Dr. Margolskee provided an analysis of these "low potency lots" of MMR-II released to the market.  Dr. Margolskee explained that "a 'Fact Finding' [is] ongoing …

---

[48]  Ex. 18 at '402; Ex. 56 at '65-66.

[49]  Ex. 57 at '518 ("Released Lots" Tab: identifying (i) 225 lots (comprising roughly 23 million doses) where "Est titer End-expiry" is less than or equal to 4.2 log; (ii) 107 lots (comprising roughly 11 million doses) where "Est titer End-expiry" is less than or equal to 3.9 log; and (iii) 6 lots (comprising roughly 650,000 doses) where "Est titer End-expiry" is less than or equal to 3.7 log); *id.* at '510 ("[L]ots in question that have been released in the past ~ 2 years. These lots may still be in circulation with 24 month end-expiry titers that fall below 3.7 [log] (6 lots) or between 4.0 [log] and 3.7 [log] (100 [lots]). … All 106 lots are a compliance issue."); *id.* at '511-12 ("[W]ith the faster mumps potency loss rates seen since at least summer 1998, there are released lots which, at 24 months, are projected to be below 4.0 [log] (100 lots) or 3.7 [log] (6 lots).  This will be a compliance issue with the [FDA].");  *id.* at '513 ("The lowest lot (release of 4.4 [log]) would be at 3.4 [log] at end expiry.").  Although Merck referenced 223 lots at risk of falling below 4.3 log and 106 lots at risk of falling below 4.0 log, the spreadsheet Dr. Margolskee attached to her email identifies 225 and 107 such lots, respectively.

Appx314

[which] is a prelude to potential product recall." Dr. Margolskee also raised the possibility of "potential revaccination of large infant cohorts!"[50]

38.     On March 5, 2001, Dr. Margolskee sent Dr. Scolnick, Dr. Greene, and other Merck senior executives an "update" on these "sub-potent vaccine[s]." Dr. Margolskee described "[i]mplications for children in the field who have received vaccine," including a "[r]isk assessment … being done re how to address children in the field who may have received sub-potent vaccine and who are between the ages of 1 and 6 years old …." Dr. Margolskee concluded by referencing Merck's upcoming response to the FDA's Warning Letter, which Dr. Margolskee stated "[w]ill include stability analyses from [Merck Manufacturing Division] lots … [and] further steps."[51]

39.     Multiple drafts of Merck's response to the FDA's Warning Letter identified these 225 lots at risk of falling below the 4.3 log minimum mumps potency specification.[52] However, Merck deleted from its March 8, 2001 final response to the FDA Warning Letter any mention of these lots.[53]

40.     Merck never disclosed to the FDA or the CDC these 225 lots.[54] When Dr. Margolskee was asked at her deposition whether Merck ever disclosed to the FDA or the CDC

---

[50] Ex. 57 at '510, '513-14.

[51] Ex. 58 at '007-09.

[52] Ex. 59 at '295 (Feb. 27, 2001 *draft*); Ex. 60 at '299 (Mar. 2, 2001 *draft*); Ex. 61 at '231 (Mar. 5, 2001 *draft*); Ex. 62 at '845 (Mar. 5, 2001 *draft*).  Although Merck referenced 223 lots at risk of falling below 4.3 log and 106 lots at risk of falling below 4.0 log, the spreadsheet Dr. Margolskee attached to her email identifies 225 and 107 such lots, respectively.

[53] Ex. 63 (Merck's Mar. 8, 2001 *final* Response to FDA Warning Letter).

[54] Ex. 7 at 148:17-149:10, 156:7-18 (CDC 30(b)(6) Pallansch Dep.) (testifying CDC "not aware of potency changes" with Merck's mumps vaccines); Ex. 4 at 209:5-209:23, 224:20- 225:17 (Kessler Dep.) ("Merck never went in and told the FDA that there would be 60 million doses that were below 4.3 … with the significant number [below] 4.1, and … Merck did not inform FDA that 7 percent of its manufactured doses were believed to fall out of compliance even with the overfill [implemented in September 1999].") ("I could assure you … had Merck … [been] forthcoming[] that 23 million doses were below specification … bells would have been set off at the [FDA].").

the information and data concerning these "sub-potent" MMR-II doses, Dr. Margolskee "d[id] not know," "ha[d] no idea," and "d[id] not recall."[55]

41.      Merck's March 8, 2001 final response to the FDA Warning Letter represented to the FDA that there was no longer a potency problem, that "all products have end-expiry specifications consistent with their label," and according to Merck's characterization "all corrective actions necessary to meet the label claim compliance have been taken."[56]  Merck made similar representations in other exchanges with the FDA.[57]

42.      In addition to the 225 "low potency" lots (comprising roughly 23 million doses), there were millions of additional doses of MMR-II released to market that based on Merck's calculated potency loss projections would fall below the 4.3 log minimum mumps potency specification before the end of the vaccine's 24-month shelf life.[58]

43.      Furthermore, Merck internally acknowledged that even with the mumps Overfill, it could not assure MMR-II would comply with its 4.3 log minimum mumps potency

---

[55] Ex. 64 at 354:4-355:5 (Deposition of Merck Employee Dr. Dorothy Margolskee (hereinafter "Margolskee Dep.")).

[56]  Ex. 63 at '608; *see also* Ex. 42 at '708 ("In February 2001, Merck received a Warning Letter reiterating concerns from the [FDA] inspection.  With regard to M-M-R®II label claim compliance, they stated that 'Products must meet their specifications, not the historical trend throughout the labeled expiry period.'  In addition, and more seriously, they challenged the efficacy of marketed product at the lowest predicted potencies (below label claim).  Merck responded that we agreed with their expectations and reiterated that all corrective actions necessary to meet label claim compliance have been taken."); Ex. 65 at '041 (characterizing same).

[57]  Ex. 63 at '603 ("[Merck] believe[s] that the actions taken to date comprehensively address all concerns raised …."); Ex. 66 at '956 ("[FDA] representatives acknowledged at several points during the discussion that they know that M-M-R II is a 'good product that we don't want to have to recall'.  However, [FDA's] Dr. Carbone stated that we are now 'swimming in new waters', referring to compliance.  [Merck] w[as] able to demonstrate to [FDA] during the meeting that [Merck] h[as] taken [FDA's] concerns seriously and have made appropriate modifications. …  [FDA's Dr. Carbone] said that all the appropriate actions were taken by [Merck] and she was not concerned."); Ex. 67 at '688 (substantially same); Ex. 68 at '350 (pointing to mumps Overfill as basis for FDA "expecting all recent lots [post-Overfill] through expiry").

[58]  Ex. 4 at 32:5-10, 390:10-20 (Kessler Dep.) (describing analysis of subset of Merck's MMR-II release data to which Dr. Kessler had access; testifying "some 60 million doses that have been released that have been subpotent that still have implications for immunity in young adults who get exposed to this disease") (citing Kessler Dep. Ex. 3) (The "projected potency at end expiry column … [it's] based on … the analysis that Dr. Margolskee used, and I used the exact methodology that Dr. Margolskee used."); *see also infra* ¶ 43 n.59 (citing evidence of Merck projections that 7% of lots would fail minimum mumps potency specifications).

specification for the full 24-month shelf life.[59]  Merck calculated it could only assure MMR-II

would comply with its 4.3 log minimum mumps potency specification for 12 months or less.[60]

44.    As a result, Merck internally recognized that MMR-II was "misbranded" and "out

of compliance."[61]

---

[59]  Ex. 69 at '865 ("**Compliance**:  Even with higher mumps target, current stability data suggest 4.3 [log] at expiry cannot be supported.") (emphasis in original); Ex. 70 at 1 ("Stability data do not support current end of shelf life label claim (4.3 log[])"); Ex. 71 at '149 ("[C]urrent stability data do not support an end-expiry mumps potency claim of greater than 4.0 log[].");  Ex. 72 at 10, 15 ("Product still not compliant with labeled mumps potency. … [Merck] must file a Biologic Product Deviation report to [FDA] detailing results of investigation and medical impact (estimate ~7% of lots).") ("[E]xpect ~7% of lots to test below 4.3 [log] at some point."); Ex. 73 at '819 ("We've been lucky with mumps so far, but it's only a matter of time, since we can statistically predict that a certain number of lots will fail on stability."); Ex. 74 at '134 ("[O]ur most recent stability analysis for mumps does not support the current label claim"); Ex. 75 at '985 ("The [enhanced release model] indicated that the current release titers of 5.0 log[] for mumps … are also insufficient to meet the current minimum potencies at expiry of 4.3 [log] …."); Ex. 76 at '066-67 ("[T]he stability model … <u>does not</u> support an expiry of 20,000 [4.3 log] after storage for 24 months"; recognizing "need to remediate the compliance gap for the expiry potency for M-M-R®II product …."); Ex. 77 at '732 ("4.3 log" mumps end expiry potency specification in label "is wrong as [Merck] cannot guarantee this potency in [its] product."); Ex. 78 at 2 ("8% of current product is expected to fail 4.3."); Ex. 79 at '892-93 ("Based on recent stability analyses … we now believe that we do not have adequate (95%) confidence that the current manufacturing process supports the 4.3 log[] label claim.  As such, an immediate corrective action must be taken."); Ex. 80 at '762 (Merck has "no controls to ensure" MMR-II complies with 4.3 log potency for full 24-month shelf life.); Ex. 49 at 211:4-9 (Bennett Dep.) ("[The] analyses that I had performed showed that [the minimum release specification of] 5.0 [log] would not support an expiry of 4.3 [log] based upon the release assays, the stability loss estimates and the variability in the loss estimates."); Ex. 3 ¶¶ 419, 419.14 (Kessler Rep.) ("From at least 1998 – December 2007, Merck did not have adequate procedures to assure that MMR-II vaccine had 'not less than 4.3 [log]' … through end expiry.") ("From May 1998-December 2007, MMR-II was adulterated because Merck was unable to assure the potency specification for mumps of not less than 4.3 [log] … for the shelf life of the vaccine."); Ex. 4 at 281:6-16 (Kessler Dep.) ("[P]roduct manufactured after the [Overfill] was adulterated" because "there was not assurances that it would be within the 4.3 [log] based on Merck's internal representations.")

[60]  Ex. 81 at '430 ("The assessment of shelf life needed to maintain 4.3 [log] was reported … to be limited 12 month only."); Ex. 82 at '325 (calculating "maximum … shelf life of 12 months"); Ex. 50 at '155 ("M-M-R®_II may have to remain at the current expiry dose of 4.3 log[] which would only support <u>< 12 months expiry using current data in the stability model</u>.") (emphasis in original); Ex. 51 at '226 (same); Ex. 83 at '248, '252 ("Outstanding Risks: … M-M-R®II may have to remain at current expiry dose of 4.3 log[] which would only support ≤ 11 months expiry ….") ("[C]urrent estimations suggest a shelf life < 11 month, a potentially non-marketable shelf life[]."); Ex. 50 at '159 ("[C]urrent estimations suggest a shelf life < 12 month, a potentially non-marketable shelf life[]."); Ex. 84 at 22, 28 ("Recent calculations … support an end expiry claim of 4.3 log[] with a shelf life of <u>**< 12 month, a potentially non-marketable shelf life**</u>.") (emphasis in original) ("[C]urrent estimate for shelf-life is < 12 month."); Ex. 85 ("Estimated* shelf-life with 4.3 log[] is <u>**< 12 months, a potentially non-marketable shelf life**</u>.") (emphasis in original); Ex. 86 at '218 ("Our expiry dating needs to be 12 months in order to provide 95% confidence that a lot released at 5.0 [log] will be above 4.3 [log] at expiry."); Ex. 73 at '820 (in response to calculation "yield[ing] the maximum … shelf life of 12 months," Merck's Director of Worldwide Regulatory Affairs stating "[t]his is what I was fearful of – 12 month[s] will be unacceptable"); Ex. 68 at '350 ("Even at the current release specification, approx. 7% of the lots are expected to be < 4.3 [log] at expiry."); Ex. 49 at 155:22-156:10 (Bennett Dep.) ("analysis showed that the shelf life would be 12 months").

[61]  Ex. 87 at '854 ("Mis[]branded – stability continues to be an issue, even with the increase in mumps and reduction of end expiry of 4.0 [log]."); Ex. 88 at '005 ("[W]e are on a very constrained time line to file [the sBLA to lower the minimum mumps potency specification using Protocol 007] this year as we are out of compliance."); Ex. 89 at '310

45.     Merck also internally recognized that it needed to change the MMR-II vaccine or its label in order to avoid a product recall and to continue selling the vaccine.[62]

### D.     Merck's Efforts to Continue Selling MMR-II Despite Its Ongoing Potency Failures

46.     In addition to a potential product recall or the inability to continue selling MMR-II, Merck also faced what it believed was an "imminent" competitive threat from GlaxoSmithKline's ("GSK's") entry into the United States with GSK's competing measles, mumps, and rubella vaccine (Priorix).[63]  Merck viewed this threat as particularly strong given the

---

("[F]iling the mumps end expiry and label change is the highest priority from a regulatory and compliance standpoint - every day delay in the [AIGENT] assay … is a problem for the rest of the team and our ability to resolve this compliance issue which is a concern not only for the US but also for the EU and the rest of the world …."); Ex. 90 at '803 (2003 Merck document) ("**Critical Milestones** … label is out of compliance. **Timing of Critical Milestones … OVERDUE!**") (emphasis in original).

[62]  Ex. 91 at '434 ("[W]e wanted to salv[a]ge the product … alternative was a product recall") ("we were d[e]sp[a]rate to establish 4.0 [log] or 3.7 [log] so that we can support shelf life based on stability"); Ex. 92 at '597 (clinical trial data necessary "to salvage product"); Ex. 93 at '086 (same); Ex. 94 at '950 ("[T]here continues to be an unacceptable risk of current product failure.  This has serious implications for these vaccines, potentially culminating in a recall …."); Ex. 84 at 22 (referencing "a shelf life of **≤ 12 month, a potentially non-marketable shelf life**.") (emphasis in original); Ex. 50 at '159 (same); Ex. 85 (same); Ex. 95 at '465 (discussing "product recall concerns"); Ex. 80 at '763-64 ("[W]e assure ourselves a non viable mumps containing product if 4.0 [log] is not achieved as the end expiry potency.") ("[W]e absolutely have to have an end expiry of 4.0 to be viable" because failure to comply with 4.3 log[] mumps end-expiry potency specification "would mean 'no product' since shelf life estimates reduce to less than 12 month"); Ex. 66 at '956 ("[FDA] representatives acknowledged at several points during the discussion that they know that M-M-R II is a 'good product that we don't want to have to recall'. However, [FDA's] Dr. Carbone stated that we are now 'swimming in new waters', referring to compliance."); Ex. 67 at '688 (substantially same); Ex. 79 at '892-93 ("Based on recent stability analyses … we now believe that we do not have adequate (95%) confidence that the current manufacturing process supports the 4.3 log[] label claim.  As such, an immediate corrective action must be taken."); Ex. 4 at 214:4-14 (Kessler Dep.) ("[Y]ou're dealing with one of the staples … of the American healthcare system, the MMR II vaccine …  No one wants to have to recall MMR-II. Everybody wants a good product that works.  Please fix this issue …  That's what [FDA's Dr. Carbone] is saying."); Ex. 96 at '158 ("[C]oncern with mumps that the issue of short shelf life was of significant concern to marketing … we may not have any other immediate solution to keep product on the market ….").

[63]  Ex. 97 at '279 ("MMR®II is currently the exclusive vaccine in the US …  However the current marketing environment is under threat of significant change and disruption due to the imminent introduction of a similar combination vaccine from [GSK] under the trade name of 'Priorix' in 4Q99"); Ex. 33 at '062 ("The market for M-M-R®II is being challenged with the introduction of [GSK's] … Priorix ….  Licensure of Priorix … is expected within the next year.").

Appx318

lack of any evident weakness of Priorix relative to MMR-II and Priorix's advantage of superior tolerability (less stinging/pain).[64]

47.     Faced with these dual pressures, Merck considered several options for how it could continue to sell MMR-II despite its ongoing mumps potency failures.  One option Merck considered was adding additional mumps virus to MMR-II above the previously instituted Overfill level.  Merck ultimately rejected this option due to supply and safety concerns associated with further increasing mumps potency in the vaccine.[65]

48.     A second option Merck considered was shortening the 24-month shelf life of MMR-II.  Merck ultimately rejected this option because shortening the shelf life would result in a "non-marketable product."[66]

49.     A third option Merck considered was changing the MMR-II label to reflect a lower seroconversion rate on the label ("< 96% protection against mumps by neutralizing

---

[64] Ex. 42 at '696 ("Competitively, GSK exploits the real/perceived tolerability advantage of Priorix versus M-M-R®II.  This positioning has had an impact on market share [in Europe] and is expected to intensify."); Ex. 98 at '480 ("As Priorix seems to have no readily apparent weaknesses, [Merck] expects that GSK will be successful in eroding the U.S. market share for M-M-R®II from a 100% share in 2000 to ~55% in 2003."); Ex. 97 at '281 ("[GSK's] Priorix bears no evident clinical weaknesses compared to M-M-R®II, while reportedly claiming improved local tolerability" (i.e., less stinging)); Ex. 99 at '417 ("GSK is projected to introduce Priorix … to the U.S. market in July 2001 ….  Priorix is currently licensed and selling product in approximately 35 markets/countries outside the U.S.  It is being positioned as a vaccine that is as safe and efficacious as M-M-R®II but with better local tolerability (i.e., less stinging/pain at the injection site).  As Priorix seems to have no readily apparent weaknesses, [Merck] expects that GSK will be successful in eroding the U.S. market share for M-M-R®II from a 100% share in 2000 to ~55% in 2003.").

[65] Ex. 69 at '865 ("**Compliance**: … Further increases in mumps release titer to support 4.3 at expiry not considered feasible.") (emphasis in original); Ex. 70 at 1 (substantially same); Ex. 100 at '349 (referencing "supply and safety concerns associated with higher initial potency"); Ex. 72 at 14 ("Further increase [in mumps target potency beyond 5.2 log] is problematic in terms of safety."); Ex. 50 at '156 (referencing "capacity" and "lack of adequate safety data to support overfill"); Ex. 51 at '227 (same); Ex. 79 at '892-93 (considering "add[ing] more mumps," but finding "Clinical would likely not support another doubling … of the mumps content"); Ex. 49 at 170:25-172:22, 173:23-174:9 (Bennett Dep.) (testifying as to supply and safety concerns).

[66] *See supra* ¶¶ 43, 45 (citing evidence referencing a 12-month shelf life as "potentially non-marketable"); Ex. 79 at '892-93 (considering "shorten[ing] expiry dating"); Ex. 51 at '230 (Merck acknowledging shortening MMR-II shelf life would potentially make it "non-marketable"); Ex. 17 at 105:3-19, 145:7-11 (Bramble Dep.) (testifying shelf life of less than 12 months would be potentially non-marketable "[b]ecause physicians and distribution networks for products need at least 12 months in order to have enough data on the product for its use, practical use") (affirming 12-month shelf life "would have been a marketing concern").

21

antibodies") to account for the fact that vaccines with lower potencies have a decreased ability to

protect against disease. Merck ultimately rejected this option because it would "lower the bar for

competition."[67]

50. Merck concluded its only option was to lower the minimum mumps potency

specification on the MMR-II label by submitting to the FDA a Supplemental Biologics License

Application ("sBLA"). To do so, Merck needed to support its sBLA with a new clinical trial

demonstrating MMR-II sufficiently protected patients from mumps at a mumps potency of 4.0

log or 3.7 log.[68] This new clinical trial was Protocol 007, which was titled "A Study of M-M-

R[TM]II at Mumps Expiry Potency in Healthy Children 12-18 Months of Age."[69]

---

[67] Ex. 101 at '342 ("Change package circular to reflect < 96% protection against mumps by neutralizing antibodies."); Ex. 102 at 26-27 ("Change label to reflect lower than 96% protection … · Change label to reflect antibodies* against mumps in 96% of subjects vaccinated (as measured by ELISA) *not neutralizing antibodies as is currently reflected on the label"); Ex. 103 at 26 (same); Ex. 104 at '138 ("Major argument would be that lowering the seroconversion rate in the label would help GSK."); Ex. 84 at 29 ("Change label to reflect lower than 96% protection • Competitive disadvantage … • … relax[ing] the criteria of success would potentially lower the bar for the competition."); Ex. 50 at '156 ("Change label to reflect lower than 96% protection … however, this would lower the bar for the competition."); Ex. 51 at '227 (same); Ex. 79 at '892-93 ("May have to change label claim highlighting the lower response rate. This is expected to put us at a competitive disadvantage."); Ex. 97 at '278 (Merck's "Competitive Defense Task Force … has succeeded in 'raising the bar' for the competition at every available opportunity," citing a "tactical plan to delay the launch" of GSK's MMR vaccine); Ex. 4 at 363:4-17 (Kessler Dep.) ("The label says that [Merck's] clinical studies have supported 96 percent, and that's what [FDA] holds GSK to and others to[o] … by doing that … Merck has stood in the way of GSK and others …").

[68] Ex. 105 at '5000 (Protocol 007 Clinical Study Report ("CSR")) (the 4.0 log and 3.7 log expiry potencies in Protocol 007 were adjusted to 4.1 log and 3.8 log in 2004 after the "reassignment of the mumps [house standard] potency"). All references to the 4.0 and 3.7 study potencies before the re-assignment are equivalent to the 4.1 and 3.8 potencies after re-assignment.

[69] See supra ¶¶ 33, 45 (citing evidence that label change supported by new clinical study was necessary); see also Ex. 70 at 1 ("[W]e must provide clinical data to support a decrease in the labeled potency."); Ex. 69 at '865 ("Drivers for Mumps Expiry Trial [Protocol 007] … Reduction in the labeled potency for mumps is necessary to ensure compliance with shelf-life claim"); Ex. 100 at '349 ("Given the time and efforts required for new formulations, and the supply and safety concerns associated with higher initial potency, the label change is the most expeditious and sound alternative. This change in mumps expiry specification is feasible only on the basis of clinical efficacy data which is currently being generated [in Protocol 007]."); Ex. 76 at '066-67 ("[T]he stability model that was constructed for predicting the mumps minimum release specification to expiry … does not support an expiry of [4.3 log] after storage for 24 months …. This is why [Protocol 007] is important ….") (recognizing "need to remediate the compliance gap for the expiry potency for M-M-R®II product …."); Ex. 106 at '320 ("I wanted to re-emphasize that there is no question that this trial [Protocol 007] is necessary for regulatory purposes. … We have only limited clinical data at this dose [4.3 log] and no data at all with [MMR] below 4.1 [log]."); Ex. 107 at '607 ("No data exist for mumps at the expiry potency Merck has selected. A clinical immunogenicity trial is necessary to provide these data.").

## III. MERCK'S DEVELOPMENT AND DESIGN OF PROTOCOL 007

### A. Protocol 007 Was Supposed to Measure Protection Against Mumps

51.     Given the FDA's concerns surrounding MMR-II at lower, below-label mumps

potencies, Merck was required to demonstrate through Protocol 007 that MMR-II with lower,

below-label mumps potencies would provide protection against mumps.[70]

52.     From the outset of Protocol 007, the FDA required Merck to use a PRN test

because, when designed and conducted properly, PRN tests are functional tests that are

considered the best clinical measure of protection against disease.[71]

---

[70]  Ex. 108 at '567-69 ("Protocol 007 was designed to determine whether Merck's MMR vaccine would remain effective against mumps if the potency (i.e. concentration) of the mumps component of the vaccine was reduced. The study involved determining 'seroconversion rates' -- which are used as a measure of mumps vaccine effectiveness at different potencies.") (representing purpose of Protocol 007 was to determine if below-label potency vaccine was "comparably protective") (The AIGENT and ELISA tests in Protocol 007 "measured the effectiveness of the vaccine at the potencies being studied.") ("[I]n approving Merck's label change request, the FDA found …. That the vaccine would be adequately protective against mumps even if Merck were to reduce the potency of the mumps component ….."); Ex. 109 at '469 (FDA requiring Merck's Protocol 007 to provide "indicators of protection. … There are concerns about long-term protection against mumps ….."); Ex. 110 at '256 (FDA explaining to Merck "it is important that the immunogenicity at that low end be measured with a neutralization assay that can be reflective of protection."); Ex. 111 at '351 ("[I]n [Protocol 007] we are trying to establish clinical protective efficacy"); Ex. 53 at '878 ("[FDA] requires that [seroconversion rates] reflect protective efficacy."); Ex. 112 at '970 ("[T]he appropriateness of the cutoff employed in the ELISA for seropositivity should be supported by data demonstrating some relevance with protective levels of antibody (e.g., neutralizing antibody)."); Ex. 113 at '756 (FDA referring to Protocol 007 testing as an "immunological correlate for efficacy of mumps vaccination"); Ex. 114 at '259 ("As the PRN assay is an immunological endpoint for protection against wild type disease, [FDA] stated that the virus used in the assay must be wild type (early passage) virus, not attenuated virus vaccine."); Ex. 100 at '349 ("This change in mumps expiry specification is feasible only on the basis of clinical efficacy data which is currently being generated [in Protocol 007]."); Ex. 17 at 60:10-61:2, 118:25-119:8 (Bramble Dep.) (testifying purpose of Protocol 007 was "to determine the effectiveness of the dose levels … [o]r the efficacy"); Ex. 115 at 68:14-69:8 (Deposition of Merck Employee Dr. Emilio Emini (hereinafter "Emini Dep.")) ("The question [in Protocol 007] was … what potency level … should still be present in the vaccine at the end of shelf life that reflects the effectiveness of the vaccine."); Ex. 116 at 32:19-22 (Deposition of Merck Employee Dr. Florian Schodel (hereinafter "Schodel Dep.")) ("Merck had to make sure that whatever was in the vaccine throughout shelf life maintained its efficacy."); Ex. 30 at 114:2-3, 115:22-23 (Merck Expert Durbin Dep.) ("FDA wanted an assay that was reflective of clinical protection") ("FDA wanted an assay that could relate to the clinical outcome of protection."); Ex. 3 ¶¶ 72, 385 (Kessler Rep.) ("FDA required the mumps immunogenicity testing [to support a sBLA to lower the mumps end expiry potency claim for MMR-II] to reflect protection against disease as a result of getting the vaccine") ("The objective of Protocol 007 was to measure MMRII's ability to protect against currently circulating wild-type mumps, especially at a potency lower than … 4.3 [log].").

[71]  *See supra* ¶¶ 22, 26 (citing evidence that when properly designed and conducted PRN tests are functional immunogenicity tests that can assess protection against disease); Ex. 54 at '425 ("requirement was set forth by [FDA] to use a functional neutralization assay"); Ex. 110 at '255 (FDA "can not accept ELISA for the mumps end expiry and only will accept neutralization data … since neutralization reflects protection."); Ex. 117 at '177-78

Appx321

53.     Merck represented to the FDA, to the parents/guardians of patients who participated in Protocol 007, to the Clinical Investigators who worked on Protocol 007, and to the public, that Protocol 007 was designed to determine whether and to what extent MMR-II at lower, below-label potencies protected against mumps.[72]

54.     Merck identified one important benefit of lowering the minimum mumps potency specification was reducing the amount of mumps virus administered with each dose of MMR-II.[73]

55.     In Merck's Protocol 007 testing, the FDA required Merck to use a wild-type mumps virus strain, which is a virus strain circulating in the real world; as opposed to a vaccine strain, which is a weakened form of the virus used in the vaccine.[74]

56.     In order for Merck to support its sBLA to lower the MMR-II minimum mumps potency specification on the MMR-II label, the FDA required Protocol 007 to achieve a 95%

---

("[FDA] considers a neutralization assay essential for establishing efficacy w[h]ere you need to define effectiveness for a product – the mumps end expiry trial [Protocol 007]").

[72]  *See infra* ¶¶ 138-143 (citing evidence of Merck representing Protocol 007 was designed to measure protection against mumps).

[73]  Ex. 118 at '214, '239 (Merck's sBLA to lower mumps end-expiry potency "will reduce amount of unneeded virus given to children while preserving safety and efficacy profiles of the vaccine") ("Important benefit is that you can give vaccine with lower mumps potency and do not need to give more than needed."); Ex. 119 at '849 ("Advantages to Participation in [Protocol 007] for Subjects … Avoid unnecessary exposure in the future to higher levels of mumps vaccine virus.  • Lower doses of mumps may be associated with lower rates of side effects.").

[74]  Ex. 52 at '636 ("[A]t [FDA's] request, the [Protocol 007] study incorporated a wild-type mumps isolate as [an indicator] test strain on the *premise that neutralization of a wild-type isolate would act as a surrogate for protection from disease*.") (emphasis in original); Ex. 120 at '470 ("[FDA] has indicated that the vaccine passage Jeryl Lynn[TM] is not suitable for use in the PRN and has established a requirement to use a 'wild-type' mumps strain to evaluate vaccine-induced immune responses."); Ex. 121 at '775 ("[FDA] has indicated that a functional antibody assay (e.g., [wild type] Neut[ralization]) will be required to establish equivalence."); Ex. 119 at '846 ("[A] wild type mumps strain will be used in the PRN assay to best assess protection from wild mumps infection."); Ex. 114 at '259 ("As the PRN assay is an immunological endpoint for protection against wild type disease, [FDA] stated that the virus used in the assay must be wild type (early passage) virus, not attenuated virus vaccine."); Ex. 31 at '695 ("**[FDA] Response to Merck Mumps Expiry Proposal [Protocol 007]** … • Virus antigens in serologic assays should reflect **efficacy against natural infection; therefore, wild-type antigens are appropriate for serologic assays.**") (emphasis in original).

seroconversion rate (statistical lower bound of 90% using a 95% confidence interval), roughly matching the seroconversion rate on the MMR-II label.[75]

57.     There were three treatment groups in Protocol 007.  The first treatment group (control) received MMR-II vaccines with a mumps potency of 4.9 log.  The second group (candidate) received MMR-II with a mumps potency of 4.0 log.  The third group (candidate) received MMR-II with a mumps potency of 3.7 log.[76]

58.     Protocol 007 had two primary objectives (endpoints): (1) "To demonstrate an adequate immune response [by mumps virus neutralization] among subjects receiving M-M-R$^{TM}$II containing an expiry dose of mumps [4.0 log or 3.7 log] …."; and (2) "To demonstrate a similar immune response to mumps virus by neutralization among subjects receiving M-M-R$^{TM}$II containing an expiry dose of mumps virus [4.0 log or 3.7 log] … compared to subjects receiving M-M-R$^{TM}$II containing a release dose [4.9 log] of mumps …."  A "secondary objective" of Protocol 007 was "[t]o demonstrate similar immune responses to … mumps … (seroconversion rates by ELISA) among children who receive M-M-R$^{TM}$II containing an expiry dose of mumps [4.0 log or 3.7 log] … compared to children who receive M-M-R$^{TM}$II containing a release dose

---

[75] Ex. 122 at 727:2-3 (Deposition of Merck Employee Dr. David Krah (hereinafter "Krah Dep.")) (FDA "indicated the requirement of a 95 percent seroconversion"); Ex. 123 at '906 ("[FDA] requirement to demonstrate ≥95% seroconversion by a neutralization assay (90% lower limit)"); Ex. 124 at '675 ("A mumps neutralization using a wild type virus strain which results in ≥95% seroconversion rate is required for [Protocol 007]."); Ex. 125 at '630 ("We are basing the expected rate of 96% on the package circular [label]"); Ex. 31 at '684 (Protocol 007 "Sample size was based on the seroconversion rate (96%) by neutralization cited in the package circular [label]."); Ex. 5 ¶ 52 (Merck Expert Burlington Rep.) (FDA "indicated that to support a claim of equivalence, they wanted Merck to use serum assay with seroconversion rates not inferior to rates reported at the time of licensure, 96%."); Ex. 6 at 178:20 (Merck Expert Burlington Dep.) (Protocol 007 seroconversion target tied to "label effectiveness of 96 percent").

[76] Ex. 105 at '4999-5000 (Protocol 007 CSR).  The 4.0 log and 3.7 log expiry doses in Protocol 007 were adjusted to 4.1 log and 3.8 log in 2004 after the "reassignment of the mumps [house standard] potency").  All references to the 4.0 and 3.7 study potencies before the re-assignment are equivalent to the 4.1 and 3.8 potencies after re-assignment.

**Appx323**

of mumps [4.9 log] …."   Another "secondary objective" was "[t]o summarize the persistence of antibody to … mumps … 1 year post vaccination in each treatment group."[77]

59.    1,997 healthy children ages roughly 12-18 months from around the United States were enrolled to participate in Protocol 007.[78]

### B.    Merck's AIGENT Test

60.    To meet the FDA's requirement that Merck perform a neutralization test in Protocol 007, Merck initially engaged in preliminary testing with a standard PRN test using its mumps vaccine virus strain (called Jeryl Lynn) as well as several wild-type mumps virus strains as the indicator virus.  In this initial testing, Merck measured standard PRN seroconversion rates of approximately 90% when testing against the mumps vaccine virus strain, and roughly 66% to 75% against the various wild-type mumps virus strains, and as low as 56%.[79]

61.    In light of the seroconversion rates Merck observed when using wild-type mumps viruses in a standard PRN, which were below the Protocol 007 targeted 95% seroconversion rate, Merck considered "[r]elaxing the criteria for success" for Protocol 007 by lowering the targeted seroconversion rate below 95%.  Merck ultimately rejected this option because it might have

---

[77]  Ex. 105 at '5017 (Protocol 007 CSR); *see also* Ex. 109 at '469 ("There are concerns about long-term protection against mumps … by the vaccine ….  As an indicator of duration of protection, the follow-up period should be extended to one year post-vaccination to assure that the vaccine at end-expiry is sufficiently immunogenic.").

[78]  Ex. 105 at '5066-67 (Protocol 007 CSR).

[79]  Ex. 126 at '429 ("Current status Neut[ralization] assays support >90% [seroconversion rate] for [Jeryl Lynn] and a range [of] ~ 70-75% for wild type virus."); Ex. 121 at '774 ("With [Jeryl Lynn] as the [indicator virus], the [seroconversion rate] is ~90%, and with [London-1] as the [indicator virus], the [seroconversion rate] is ~70-75%."); Ex. 111 at '353 ("Merck's current assay showed 90% seroconversion rate for [Jeryl Lynn]"; "66% … for [London-1]"; "56% … for [Jeryl Lynn2]"); Ex. 120 at '471 ("Results of a series of pilot PRN assays of pediatric sera against Jeryl Lynn[TM], [London-1] and [Jeryl Lynn2] mumps strains showed respective seroconversion rates of 91% [], 69% [] and 56% []."); Ex. 127 at 1 ("PRN … : performance: 70-75% Neut[ralization wild type]"); *see also* Ex. 20 at 36-40 (Merck Responses to Requests for Admission 46, 48, 50) (admitting observed seroconversion rates of roughly 60-75% in its standard PRN testing using wild type strains); Ex. 2 at 87 (Malone Rep.) (Merck's "Protocol 006 measured a wide range of M-M-R II seroconversion rates, some as low as 53%.").

required a change to the seroconversion rate represented on the MMR-II label to as low as 75%,

resulting in a "perceived change in efficacy" and "lower[ing] the bar for the competition."[80]

62.    To try to achieve the Protocol 007 targeted 95% seroconversion rate using a

neutralization test, Merck changed the standard PRN assay it used in its preliminary testing in

two ways.  First, Merck used a low-passage mumps vaccine strain (rather than a wild-type strain)

as the indicator virus.[81]  Second, Merck added rabbit anti-human Immunoglobulin G ("anti-IgG")

to the serum samples.[82]  Merck called this new test the Anti-IgG Enhanced Mumps Plaque

Reduction Neutralization Test (the "AIGENT").[83]

### C.    Merck's ELISA Test

63.    Protocol 007 also involved testing the children's serum samples using an ELISA

test.  Merck's ELISA test used the same low-passage mumps vaccine strain that Merck used in its

AIGENT.[84]

---

[80]  Ex. 128 at '869 ("Summary to date → 70% [sero]conversion rate … If this is not resolved and doesn't change → label may have to be changed from 96% to 75%"); Ex. 129 at '292 ("[FDA] insistence on a [wild type] neutralization assay will likely result in [seroconversion rate] of 70-80% … Risks: a) Label may be adversely affected with perceived change in efficacy."); Ex. 85 at 26 ("Relaxing the criteria for success would lower the bar for the competition and facilitate entry into the U.S. market."); Ex. 130 at '952 ("The label currently indicates that a single dose of MMRII results in a mumps seroconversion rate of 96%; if we are held to this as the 'acceptable historical standard' there is a chance that we may have a problem.  We may need to consider the possibility that the [seroconversion] rate at expiry may be lower and plan for this contingency now."); Ex. 359 at 114:7-12 (Morsy Dep.) ("Q. Was there any discussion during your time there that Merck would update the label with its results from Protocol 007?  A. If they proved any different in terms of the efficacy, the FDA would have demanded [it].").

[81]  Ex. 105 at '6160 (Clinical Protocol 007-01) ("**The indicator virus** [used in the AIGENT] **is a low passage (passage 8) Jeryl Lynn™ strain (JL135)** ….") (emphasis in original).  A "low-passage" vaccine strain is "an attenuated (or weakened) version" of the virus used to manufacture the vaccine.  In contrast, a true wild-type virus strain is a virus strain that is circulating in the real world.  Ex. 2 at 47, nn. 145-146 (Malone Rep.); Ex. 3 ¶¶ 28-29 (Kessler Rep.).

[82]  Ex. 105 at '5037-38, '6152, and '6160 (Protocol 007 CSR); Ex. 131 at '632 ("Modification of the standard mumps [neutralization] assay to include … anti-[]IgG … has been evaluated to determine whether the sensitized assay is capable of detecting ≥95% seroconversion in vaccinees.").

[83]  Ex. 132 at '195 (AIGENT SOP) ("The Anti-IgG Enhanced Mumps Plaque-Reduction Neutralization Assay (AIGENT) ….").

[84]  Ex. 105 at '6161 (Clinical Protocol 007-01).

64. Merck used a serostatus cutoff of 10 Ab units in the ELISA test Merck used in Protocol 007.[85]

### D. Merck's ELISA-AIGENT Correlation

65. Before allowing Merck to use its ELISA in the Protocol 007 testing to support Merck's sBLA to lower the minimum mumps potency specification on the MMR-II label, the FDA required Merck to demonstrate a correlation between the results of its ELISA and AIGENT tests. The FDA insisted on this ELISA-AIGENT correlation to ensure Merck's ELISA seroconversion results and the 10 Ab serostatus cutoff Merck used to generate those results were clinically relevant and reflected protection against mumps.[86]

66. Merck submitted and referred to these ELISA-AIGENT correlation results in numerous exchanges with the FDA concerning Protocol 007 and in the years that followed to support FDA decision making with respect to Merck's mumps vaccines, characterizing the ELISA-AIGENT correlation as "excellent," "quite good," and "strong."[87]

---

[85] Ex. 105 at '5044.

[86] Ex. 6 at 251:6-14 (Merck Expert Burlington Dep.) ("[FDA] wanted some sort of functional antibody information to be associated with ELISA seroconversion. … that is clear from the record."); Ex. 133 at '483 ("It is essential that ELISA testing methods be validated against a working neutralization assay …."); Ex. 3 ¶ 383 (Kessler Rep.) ("For Merck to use ELISA … it had to correlate the ELISA to a highly-specific neutralization assay designed as a measure of protection against circulating wild-type mumps infection."); Ex. 112 at '970 (FDA requesting Merck assurances that "the cutoff employed in the ELISA for seropositive should be supported by data demonstrating some relevance with protective levels of antibody (e.g., neutralizing antibody)."); Ex. 134 at '778 ("Justification is required for the new mumps cutoff of 10 ELISA antibody units …. [FDA] requested that the ELISA results be compared to the mumps [PRN] assay. [FDA] would like the rationale for the new cutoff to be linked to a biologically relevant reference standard."); Ex. 135 at '833 (FDA directing Merck to "relate the cutoff … to seroprotection" by "relat[ing] the ELISA cutoff to … the PRN assay"); Ex. 136 at '454 ("We need to convince [FDA] that the ELISA will provide equivalent results to PRN and thus equate (bridge) to protection."); Ex. 121 at '775 ("[E]vidence of a correlation between the current assays and a [wild-type] Neut[ralization] assay, or evidence of correlation with protective efficacy, would allow the current [ELISA]-based assays to be used."); Ex. 105 at '5175 (Merck representing to FDA its "ELISA used in [Protocol 007] was shown to correlate with the [AIGENT] … and previous studies have established a strong correlation between the development of mumps-specific neutralizing antibodies and vaccine efficacy."); Ex. 137 at '331 (Merck responding to FDA's request for justification and clinical relevance of ELISA 10 Ab cutoff by pointing to the ELISA-AIGENT correlation).

[87] Ex. 105 at '5032 (referencing "excellent correlation between mumps PRN and ELISA"); Ex. 138 at '400, '404 (representing "strong correlation (93.6%) between ELISA and PRN serology results") (representing "strong correlation between ELISA and PRN assay"); Ex. 139 at '672-74 (representing "agreement between the ELISA and AIGENT assays was found to be quite good"); Ex. 137 at '331 (Merck responding to FDA's request for justification

67. Years later, Merck represented to the United States Department of Justice that the FDA "never" relied on the AIGENT data as the basis for any decision concerning Merck's mumps vaccine or its labeling.[88]

68. Merck represented to this Court that the FDA never relied on the AIGENT data when evaluating the results of Protocol 007.[89]

## IV. MERCK'S FAILURES IN PROTOCOL 007

### A. The AIGENT Test Did Not Provide a Reliable or Clinically Relevant Measure of Protection

#### 1. *Merck Designed the AIGENT to Achieve a 95% Seroconversion Rate*

69. Clinical trials to support licensure must be adequate and well-controlled. Clinical trials designed to achieve one desired outcome over another, rather than to objectively assess study results and compare differences between study groups, are not adequate and well-controlled studies.[90]

---

and clinical relevance of ELISA 10 Ab cutoff by pointing to the ELISA-AIGENT correlation); Ex. 112 at '963, '967 (Merck referring FDA back to ELISA-AIGENT correlation …, which Merck characterized as "provid[ing] information on the clinical relevance of the chosen ELISA cutoff for seropositivity."); Ex. 140 at '409, '414 (same); Ex. 39 at 87:19-23, 192:14-19 (Musey Dep.) (affirming Merck argued to FDA that "ELISA test was a reliable immunogenicity test because it correlated to the neutralization test") (testifying ELISA-AIGENT correlation was how Merck demonstrated ELISA test was putting forth meaningful results); Ex. 141 at '319 ("[W]e contended that there was reasonably good agreement between the two assays in terms of serostatus classification when using a cutoff of 10Ab …. Concluding that the two assays agree reasonably well was important for the purpose of arguing that the ELISA was an acceptable substitute for the neutralization assay.").

[88] Ex. 108 at '551-52, '568-69 ("FDA **never** relied" on the AIGENT data.) (emphasis in original) (The AIGENT data "has never been relied upon by either the FDA or Merck as the basis for any decision concerning the vaccine or its labeling") ("FDA unquestionably did not rely on the [AIGENT] data to approve any aspect of Merck's MMR vaccine label or anything else about the vaccine.") (The AIGENT data "is wholly irrelevant to the current labeling").

[89] ECF No. 45-1 (Merck's Mem. in Supp. of Mot. to Dismiss) at 33 n.19 ("[T]he FDA relied solely and exclusively on data from a separate and independent [ELISA] assay when evaluating the results of the Study [Protocol 007]….").

[90] *See supra* ¶ 8 (citing evidence that clinical studies for licensure must be adequate and well controlled); Ex. 2 at 44 (Malone Rep.) (citing academic publications); Ex. 27 at 219:3-9 (Yagodich Dep.) ("Q. Would it ever make sense scientifically in your experience to develop an assay based on what a predetermined result it would get? … [A.]: No.").

70.     A study designed with a bias towards achieving a predetermined outcome compromises the risk/benefit balance required to justify exposing patients to the risks and inconvenience of a clinical research study.  A biased study also may provide false information as to the purported benefit (or lack of benefit) the study subject has received from participating in the study, such as whether a vaccine injected into a patient actually provides protection against disease.[91]

71.     Merck designed and developed its AIGENT with "[t]he goal … to create an assay that achieved a 95% seroconversion rate."[92]

72.     Merck also designed and developed its AIGENT to ensure the prepositive rate (the rate of patients whose pre-vaccination samples were seropositive) did not exceed 10%.[93]

---

[91] Ex. 2 at 44-45 (Malone Rep.); Ex. 16 ¶ 24 (Calcott Rep.).

[92] Ex. 122 at 599:15-21, 723:1-724:4 (Krah Dep.) ("My objective and our lab's objective was to develop an assay that would be capable of measuring 95 percent seroconversion.") (testifying goal of AIGENT was "to develop an assay that was capable of detecting a 95 percent seroconversion. … This assay was developed with the requirement to meet the seroconversion target ….") ("My interpretation [of what FDA required with AIGENT testing] was to identify conditions that would allow us to be able to measure the seroconversion rate and not try to have it be the most sensitive assay, but allow us to have the capability of measuring 95 percent seroconversion."); Ex. 51 at '240 ("The goal throughout the development of the [AIGENT] assay was to create an assay that achieved a 95% seroconversion rate."); Ex. 83 at '262 (same); Ex. 142 at '112 (same); Ex. 120 at '470 ("A [PRN] assay … is being optimized … with the goal of providing an assay that permits measurement of a ≥ 95% seroconversion rate."); Ex. 143 at '696 (AIGENT "Objective: Identify a mumps neutralization assay format using 'wild-type' mumps strain that permits measurement of ≥95% seroconversion rate in M-M-R®II vaccines."); Ex. 144 at '912 (same); Ex. 2 at 45 (Malone Rep.) ("Merck designed the AIGENT as a results-oriented test to ensure it achieved its predetermined criteria of a seroconversion rate of at least 95%."); *see also* Ex. 155 at 190:10-14 (Krahling Dep.) (testifying Dr. Krah explained to Relator Krahling that with Protocol 007 Merck selected "a methodology that they knew could give them 95 percent efficacy which is what they needed"); Ex. 155 at 437:8-16 (Krahling Dep.) ("Krah made it clear that Protocol 007 was designed to keep the vaccine on the market … and to maintain its exclusivity so that it wouldn't have competitors.  That was the financial goal of Protocol 007.").

[93] Ex. 145 at '838 (identifying pre-positive rate of "~10%" and a seroconversion rate of ">=95%" as "the metrics that drove [the] development" of the AIGENT); Ex. 143 at '699 (AIGENT "[p]re-positive rate is higher than desirable[;] Continue evaluation of results using optimized anti-IgG amount (target ≤10% pre-positive rate and ≥ 95% seroconversions)"); Ex. 122 at 723:1-14 (Krah Dep.) ("[AIGENT] was developed with the requirement to meet the seroconversion target and a target … pre-positivity rate."); Ex. 3 ¶ 52 n.87 (Kessler Rep.) (defining pre-positive).

2.    *The AIGENT Did Not Test Against a Circulating Wild-Type Mumps Virus Strain*

73.    In designing a test to measure protection against disease, the indicator virus plays a central role in the clinical relevance of the test.[94]

74.    If the purpose of a test is to assess whether a vaccine will provide protection in the real world, then using a wild-type indicator virus will provide the most clinically relevant results.[95]

75.    Years after the AIGENT testing was complete, the FDA's Dr. Steve Rubin opined that Merck's use of the low-passage mumps vaccine strain in the AIGENT testing was "stacking the deck" in favor of higher seroconversion rates.[96]

---

[94] Ex. 2 at 47-48 (Malone Rep.); Ex. 24 at 12 (Merck Expert Durbin Rep.) (stating mumps PRN assays can generate varying results depending on the indicator strain); Ex. 116 at 252:4-7 (Schodel Dep.) ("[I]f you use a different strain and if you use different conditions, you can see seroconversion rates that are different with the same set of sera."); Ex. 146 at 66:17-67:1 (Deposition of Merck's 30(b)(6) Witness Dr. Barbara Kuter (hereinafter "Merck 30(b)(6) Kuter Dep.")) ("Q. Why does the strain tested matter?  A. Because the strain that happens in the field may not be exactly the same strain as we have in the vaccine.  Q. Is the strain that is reflected in the field in the current outbreaks the same as the strain in the vaccine?  A. No."); Ex. 147 at '994-95 (FDA's Dr. Steve Rubin: "[I]t is obvious that different virus strains used in the PRN will yield grossly different seroconversion rates.").

[95] Ex. 24 at 12, 20 (Merck Expert Durbin Rep.) (stating if the question is whether seroconversion rates parallel protection in the real world, it may depend on the use of indicator strain and whether that strain circulates in the real world) (stating seroconversion rates measured against a wild-type strain may be more representative of actual protection from disease than seroconversion rates measured against an attenuated vaccine strain); Ex. 2 at 47 (Malone Rep.); Ex. 4 at 300:2-8 (Kessler Dep.) ("[I]f you went out and said … that you tested this [vaccine] in a PRN with a low passage Jeryl Lynn strain … and you presented that to a group of scientists … everybody would say Well, show me the data against true-wild-type, because that's what's clinical effectiveness."); Ex. 148 at '778 ("Wild-type [virus] in this [Mumps Expiry] assay is important (i.e. interested in protection against wild-type, not vaccine strains)"); Ex. 107 at '611 ("[A] wild type mumps strain will be used in the PRN assay to best assess protection from wild type infection.").

[96] Ex. 147 at '994-95 (FDA's Dr. Steve Rubin: Using the Jeryl Lynn vaccine virus in an assay "would not be an acceptable practice for measuring vaccine immunogenicity as a surrogate for efficacy in a clinical trial ….  Instead, a wild type virus will have to be used.  Many years ago Merck argued for use of a low passage version of [Jeryl Lynn] in such an assay, and we accepted (not my decision, I would not have been in favor of stacking the deck).").

**Appx329**

3. *The AIGENT's Use of Anti-IgG Increased the Measured Neutralization and Seroconversion Rates*

76.     Anti-IgG is not present in humans.[97]  Anti-IgG is rarely used in clinical neutralization testing for mumps and Merck never used the AIGENT before or after Protocol 007.[98]

77.     Anti-IgG binds to any human antibody.  The combination of anti-IgG and non-neutralizing antibodies can acquire the ability to neutralize mumps virus and increase neutralization activity observed in the test.  As a result, anti-IgG enhanced PRN tests measure both human antibodies that neutralize mumps virus and those that do not but are still measured as doing so because of binding with anti-IgG.[99]

---

[97] Ex. 2 at 49, 50, 75-76 (Malone Rep.).

[98] Ex. 27 at 84:2-86:11 (Yagodich Dep.) (testifying AIGENT was only neutralization test in which anti-IgG was used at Merck and could not explain why); Ex. 122 at 588:6-589:14 (Krah Dep.) ("I am not aware or do not recall any other clinical trial in which [anti-IgG] was used."); Ex. 30 at 146:9-19 (Merck Expert Durbin Dep.) (testifying never used anti-IgG in thousands of PRN tests Dr. Durbin has run or overseen); Ex. 30 at 148:22-24 (Merck Expert Durbin Dep.) (Dr. Durbin testifying she is unaware of anti-IgG used in any Phase III clinical trials); Ex. 30 at 326:25-327:6 (Merck Expert Durbin Dep.) (testifying AIGENT never used again after Protocol 007); Ex. 29 at 78:16-19 (Merck Expert Pasetti Dep.) (Dr. Pasetti testifying she has never used anti-IgG in a PRN assay); Ex. 138 at '405 ("The [AIGENT] was developed solely for the purpose of this clinical trial.  It was not used in any previous nor subsequent clinical trials."); Ex. 149 at '050 ("[FDA] does not use either complement or [anti-I]gG to enhance sensitivity [in a PRN assay] and feels that these maneuvers should not be necessary" for Protocol 007.); Ex. 2 at 49 (Malone Rep.) (Merck's use of anti-IgG "is a method of PRN modification rarely, if ever, used in the industry").

[99] Ex. 27 at 240:2-6 (Yagodich Dep.) ("[A]nti-IgG … enhances the ability of antibody present in the sample to neutralize mumps."); Ex. 122 at 454:1-6 (Krah Dep.) ("The anti-IgG is not specific for mumps antibodies so it's capable of binding to other antibodies.  Whether or not it neutralizes … I can't say."); Ex. 30 at 195:3-13 (Merck Expert Durbin Dep.) (admitting anti-IgG can cause false positives by binding with non-mumps antibodies); Ex. 150 at '830 (GSK acknowledging its neutralization assay enhanced with anti-IgG "measure[s] … neutralizing and not neutralizing antibodies"); Ex. 151 at '211 (GSK acknowledging use of anti-IgG "reduces the capacity of the assay to discriminate neutralizing and non-neutralizing antibodies"); Ex. 150 at '821 (GSK acknowledging its neutralization assay enhanced with anti-IgG "provides a higher seroresponse rate of approximately 90% … [h]owever … [they] are likely not reflective of reality."); Ex. 2 at 49-53 (Malone Rep.) ("The artificial boost in reported neutralization [due to anti-IgG] was unrelated to whatever true mumps neutralization was actually caused by the vaccine.") ("Merck did not use anti-IgG for a legitimate scientific purpose."); Ex. 4 at 360:9-18 (Kessler Dep.) ("If you're not dealing with the right indicator virus and you've confounded this test … with [anti] IgG, you've got a mess on your hands. And that's what happened … there was no clinical relevance whatsoever.").

78.     Merck's addition of anti-IgG to serum samples had the effect of boosting observed neutralizations by "~ 100-fold," leading to higher seroconversion rates.[100]

79.     The increase in observed neutralization also led to an increase in the number of pre-positive samples relative to what Merck expected to see in a standard PRN given the low percentage of people who are immune to mumps without exposure to the disease or vaccination.[101]  According to the Protocol 007 testing protocol, pre-positive samples were excluded from the calculation of seroconversion rates.[102]  Merck recognized that too many pre-positives risked raising "red flags" with the FDA as to the reliability of the AIGENT.[103]  It also risked the exclusion of too many pre-positive samples and thereby not having enough enrolled children who seroconverted to pass Protocol 007's criteria for success.[104]

---

[100]  Ex. 123 at '916 ("Enhancement of Neutralization with Anti-[] IgG … Typically enhances [neutralization] titers ~ 100-fold …."); Ex. 152 at '341 (anti-IgG provides "~100-fold enhancement" in neutralization); Ex. 2 at 50 (Malone Rep.) (the "artificial boosting in the neutralizing activity [in] the AIGENT" due to anti-IgG "directly led to a significant increase in the seroconversion rates it measured"); Ex. 153 at '546 (showing increase in seroconversion rates from 76% to 91% between standard PRN without anti-IgG and AIGENT with anti-IgG); Ex. 144 at '913-14 (showing seroconversion rates of 79.5% with standard PRN without anti-IgG using [Jeryl Lynn] strain and 96% with AIGENT with anti-IgG using [Jeryl Lynn] 135 strain); Ex. 131 at '632 (same).

[101]  Ex. 131 at '633 (referencing "unexpectedly high pre-positive rate" of 22%); Ex. 154 at '243 ("[Merck] do[es] not plan to apply this assay [AIGENT] to other development efforts as the pre-pos[itive] rate is relatively high"); Ex. 143 at '700 (showing pre-positive rates of 8-24% depending on dilution of anti-IgG); Ex. 27 at 221:8-17 (Yagodich Dep.) ("Q. You testified earlier that you've worked on hundreds of neutralization tests in your time at Merck. Is that correct?  A. Yes.  Q. Other than in Protocol 007 … was there ever a situation in any of those other tests where there was an issue with pre-positives or a pre-positive rate being higher than desirable?  A. Not that I recall."); Ex. 3 ¶ 52 (Kessler Rep.) ("An assumption of immunogenicity testing is that the pre-vaccination serum samples of most subjects will be negative because they have not yet received the vaccine or been exposed to the virus."); Ex. 2 at 22 (Malone Rep.) ("Merck measured a higher level of seropositive results in the pre-vaccination samples" – "as high as 24% at certain anti-IgG dilutions" – "than had been expected in an unvaccinated population.").

[102]  Ex. 19 ¶ 43 (Merck Ans.); Ex. 105 at '5021 (Protocol 007 CSR).

[103]  Ex. 155 at 269:16-270:5 (Krahling Dep.) (Dr. Krah said high pre-positives "would be a big red flag that the use of [anti-IgG] with an improper control, that this isn't a methodology that is providing reliable data.  The point was to hide … that high pre-positive rate from the FDA so that the Protocol 007 could be a success."); Ex. 30 at 88:10-13 (Merck Expert Durbin Dep.) ("[W]hen you have a disproportionately high number of seropositives prior to vaccination, that … would raise a question mark."); Ex. 2 at 46 n.142 (Malone Rep.) ("An excessively high pre-positive rate might indicate … inadequate test specificity").

[104]  Ex. 2 at 46 (Malone Rep.) ("Since Protocol 007 specified that immune response data from pre-positive subjects would be excluded …, a higher pre-positive rate risked compromising the statistical power of the study.").

80. Merck evaluated different dilutions (concentrations) of anti-IgG to "optimize" the dilution that resulted in the highest percentage of seroconversions and the lowest percentage of pre-positives, with a "target ≤10% pre-positive rate and ≥ 95% seroconversions."[105]

81. Merck's use of anti-IgG in the AIGENT was intended to be a "back-up" only to be used if Merck was unable to achieve the targeted 95% seroconversion rate.[106]

82. According to Dr. Emilio Emini (MRL VP), Merck's use of anti-IgG rendered the neutralizations measured by the AIGENT "very artificial."[107]

83. When Relator Krahling asked Dr. Emini (MRL VP) to provide "a scientific reason" why Merck was using anti-IgG in the AIGENT, Dr. Emini told Relator Krahling "it's a business decision."[108]

---

[105] Ex. 143 at '700 (chart showing pre-positive rates of 8-24% and seroconversion rates of 95-100% depending on anti-IgG dilution); Ex. 145 at '838 (identifying pre-positive rate of "~10%" and seroconversion rate of ">=95%" as "the metrics that drove [the] development" of the AIGENT); Ex. 143 at '699 ("Pre-positive rate is higher than desirable[;] Continue evaluation of results using optimized anti-IgG amount (target ≤10% pre-positive rate and ≥ 95% seroconversions)"); Ex. 156 at '869-870 ("[S]tudies are underway … to determine the amount of anti-IgG that provides optimum enhancement of post-vaccination titers without boosting pre-vaccination titers."); Ex. 120 at '472 ("Current studies are focusing on determining the optimum concentration of anti-IgG to boost post-vaccination titers but not shift pre-vaccination sera to a positive [neutralization] response."); Ex. 157 at '608 (Dr. Krah's AIGENT experiment notebook) (<u>Purpose</u>: Titrate the amount of anti-[]IgG … to determine the maximum amount of anti-IgG that does not provide 'excess' neutralization in pre-vaccination sera.").

[106] Ex. 158 at '324 ("We plan to readdress the use of anti-[]IgG to enhance [neutralization], as a back-up if we fall short of our 90+%").

[107] Ex. 159 at '471 ("In talking with [MRL VP] Emilio [Emini], the neutralization is very artificial because of the [anti-]IgG added; to avoid too many seropositives, very high initial dilutions were required.  Thus, low level responders cannot be distinguished from nonresponders.").

[108] Ex. 155 at 283:18-24 (Krahling Dep.) (describing interaction between Relator Krahling and Dr. Emini); Ex. 160 at 13 (Relator Krahling's Response to Revised Interrogatory 1) ("[Dr.] Emini admitted to Relator [Krahling] that (i) the standard PRN test is a more specific and accurate test of vaccine efficacy; (ii) the addition of [anti-IgG] to the standard PRN was never intended to make the test more accurate, but was instead, a 'business decision' ….").

4.    *The AIGENT Did Not Measure Mumps-Specific Neutralizing Antibodies*

84.    Validation studies are required for clinical trials to ensure testing methods are suitable, reliable, and fit for their intended purpose.  Validation studies measure and characterize various attributes of testing methods, among the most important of which is specificity.[109]

85.    For the AIGENT, specificity meant the ability to assess mumps-specific neutralizing antibodies in the presence of other antibodies and components of the serum and added anti-IgG.  Having a high specificity for the AIGENT was important to ensure measured seroconversion rates reflected only mumps-specific neutralizing antibodies and not also non mumps-specific neutralizing activity or non-neutralizing activity.[110]

86.    Dr. Joseph Antonello, the Merck statistician who co-authored the AIGENT Validation Report, testified that the results of Merck's validation experiments to measure specificity were "peculiar," "unexpected," and "not strong" in demonstrating the mumps specificity of the AIGENT:

- In retrospect, looking at the specificity results in this study, they're peculiar. And I think today I might push back a little more on the lab given these results.  Ex. 161 at 115:6-9 (Antonello Dep.).

- Not the result that I would expect.  Now, why that's happening, I don't -- can't explain.  There may be a biological reason for what's going on, but it's not the expected result.  …  So I don't understand why that would be the case.  So it's an unexpected result.  And just looking at it, I would ask the lab to help me to understand it.  *Id.* at 118:14-120:10.

---

[109]  Ex. 2 at 22-23 (Malone Rep.); Ex. 161 at 20:8-16, 123:25-124:5 (Deposition of Merck Employee Dr. Joseph Antonello  (hereinafter "Antonello Dep.")) (testifying purpose of validation protocol is "[t]o show that the assay is fit for its intended use" and "to conclude with some level of confidence that the assay is specific to the antigen that you're attempting to measure").

[110]  Ex. 148 at '778 ("[A]ssay must be highly specific (100%) for [wild type] neutralizing response"); Ex. 2 at 23 (Malone Rep.); Ex. 359 at 204:14-17 (Morsy Dep.) ("Specificity means that [the test is] specific to whatever it is that you're measuring and it's not picking a lot of garbage and background.").

- This experiment showed that … it couldn't distinguish between competition with mock, measles and rubella markedly different than that with mumps. *Id.* at 132:22-133:1.

- I'd say these results don't show you that it can distinguish measles and rubella. … So there's something going on here that's – I don't understand, because you also see it for the mock. *Id.* at 121:16-122:1.

- [H]aving the results for the mock reduction also points to … an issue with the way this experiment is being performed that makes you question the result. *Id.* at 143:2-6.

- Agreeing for certain samples in the validation study, the AIGENT "was no more specific for mumps than it was for measles or rubella" *Id.* at 117:11-15.

- Agreeing for half the samples in the validation study the specificity was "0 percent" *Id.* at 141:4-12.

- Agreeing that the purpose of the validation report is to conclude with some level of confidence that the assay is specific to the antigen being tested and stating AIGENT validation results "are not strong in that regard." *Id.* at 123:25-124:7.

- In looking back now, I would question this result. … It's not what I expected, would expect now. *Id.* at 128:21-129:2.

- Not the [specificity] result that I would expect. Now, why that's happening, I don't – can't explain. *Id.* at 118:11-16.

87.    With these results, Dr. Antonello further stated he "d[id]n't know what this [AIGENT validation] experiment means in relation to truth."[111]

88.    In July 2004, a few months after Merck submitted the Protocol 007 CSR to the FDA, Dr. Florian Schodel, MRL Executive Director, "[a]gree[d] with Joe [Antonello]- could not overemphasize the weakness of the [AIGENT] (50% specificity!!!!!!)."[112]

---

[111] Ex. 161 at 122:16-17 (Antonello Dep.).

[112] Ex. 141 at '315.

89.     According to Dr. Anna Durbin, one of Merck's experts in this litigation, the AIGENT "d[id]n't distinguish" "between a neutralization that was caused by a mumps-specific neutralizing antibody and caused by the binding of an anti-IgG to an antibody." Dr. Durbin further testified the AIGENT was "not able to distinguish mumps-specific versus non-specific antibody."[113]

90.     A mumps neutralization test that cannot distinguish mumps-specific neutralizing antibodies from non-mumps-specific neutralizing antibodies and non-neutralizing antibodies cannot reliably measure protection from mumps disease.[114]

### 5.  *Merck Cancelled Its Plans to Outsource the AIGENT Testing*

91.     Dr. Krah was the Merck scientist who designed and supervised the AIGENT testing. He was assisted by Mary Yagodich.[115]

92.     Dr. Krah's lab at Merck was a "research lab," not a "clinical testing lab" experienced in conducting tests for clinical trials for vaccine licensure.[116]

93.     Until at least October 2000, Merck planned for Dr. Krah and his staff to outsource a large portion of the AIGENT testing to the lab of Dr. Richard ("Dick") Ward of the Children's Hospital Medical Center in Cincinnati, Ohio.[117]

---

[113]  Ex. 30 at 120:1-7 (Merck Expert Durbin Dep.); *id.* at 130:6-8.

[114]  Ex. 2 at 54 (Malone Rep.) ("A mumps neutralization test with such a low level of specificity would have little, if any, ability to provide a measure of protection from disease ….").

[115]  Ex. 122 at 429:25-430:3, 431:1-10, 598:13-19 (Krah Dep.); Ex. 162 at '835 ("Mary [Yagodich] is effectively 'second in command' in [Dr. Krah's] lab and knows a lot about how things work.").

[116]  Ex. 27 at 55:20-56:17 (Yagodich Dep.) (testifying Dr. Krah's lab was "a basic research lab. We weren't a clinical lab"); Ex. 115 at 300:1-301:3 (Emini Dep.) ("What was unusual … was the fact that we were running these [Protocol 007] clinical assays in … Dr. Krah's laboratory[] … [N]ormally we would have transferred the assay onto a testing laboratory."); Ex. 115 at 297:22-25 (Emini Dep.) ("[V]ery rarely would a research laboratory have been put into a position of running the assay the way in which [the AIGENT] was done.").

[117]  Ex. 20 at 57 (Merck Response to Request for Admission 77); Ex. 27 at 248:13-17 (Yagodich Dep.) (affirming Merck originally planned to outsource Protocol 007 to Dr. Ward's lab); Ex. 143 at '695 ("[T]he SOP for the [AIGENT] and training documents for transfer of the assay to Dick Ward's group have been prepared and are being circulated. Training is scheduled to start next Wednesday and should be completed by the foll[ow]ing Tuesday.").

94.    Dr. Krah, Ms. Yagodich, and other personnel from Dr. Krah's lab trained Dr. Ward's staff in how to perform the AIGENT assay.[118]  After that training, Dr. Krah could not think of anything that made Dr. Ward's staff incapable of conducting the AIGENT test, and Ms. Yagodich was confident they were capable of running the AIGENT test.[119]

95.    Merck ultimately cancelled the planned outsourcing to Dr. Ward's lab, instead deciding to conduct all the AIGENT testing in Dr. Krah's lab despite a "capacity problem."[120]

96.    According to Dr. Alan Shaw, MRL Director, who reported to Dr. Emini and was Dr. Krah's immediate supervisor, Merck cancelled the intended outsourcing due to the "heightened importance" of the AIGENT testing and concerns that given "an unanticipated tightness of data," Dr. Ward's lab would be unable to match the "precision" needed for the AIGENT test:[121]

> Due to an urgent need for high-precision data to support label changes for M-M-R®II, David Krah's laboratory will be carrying out neutralization tests on approximately 3000 infant serum samples over the next five months.  This activity was originally scheduled for transfer to a contract laboratory.  Two things have conspired to make this transfer unacceptable from a strategic perspective.  First, issues arising following [an October 2000 FDA] inspection in [Merck's Manufacturing Division] have placed a heightened importance on this data set.  Second, a preliminary run of about one-third of the serum set has revealed an unanticipated tightness of data from the Krah laboratory.  We doubt that the contract lab would be able to match this level of precision.

---

[118]  Ex. 20 at 58 (Merck Response to Request for Admission 78); Ex. 27 at 249:23-251:14 (Yagodich Dep.) (testifying about training Dr. Ward's staff to perform AIGENT).

[119]  Ex. 122 at 717:10-12, 718:1-4 (Krah Dep.); Ex. 27 at 249:13-18, 259:18-260:25 (Yagodich Dep.).

[120]  Ex. 115 at 197:4-5 (Emini Dep.) ("Yes, there was a capacity problem at the [Krah] lab."); Ex. 163 at '702 ("David Krah's laboratory will be carrying out neutralization tests …. This activity was originally scheduled for transfer to a contract laboratory.").

[121]  Ex. 164 at '739; Ex. 165 at '746 (same); Ex. 166 at '829 (same); Ex. 163 at '702 (same); Ex. 167 at '731 ("The plan for the remaining samples _had_ been to send them to an outside contract laboratory.  Recognizing the tightness of the first data set, we realize that an outside laboratory would not be able to reproduce this kind of precision.") (emphasis in original); Ex. 168 at '744 (same); Ex. 169 at '749 (same); Ex. 170 at '719 (same); _see also_ Ex. 122 at 728:6-25 (Krah Dep.) (Dr. Krah testifying he had no idea what Dr. Shaw was referring to in telling Dr. Emini that with the "unanticipated tightness of the data," Dr. Ward's lab would be unable to match the "level of precision" Dr. Krah achieved); Ex. 27 at 266:9-267:3 (Yagodich Dep.) (same).

6.  *Merck Changed the AIGENT Test Data Through Selective Recounting of Plaques*

97.     In conducting the AIGENT testing, Dr. Krah and the staff in his research lab, including Relators Krahling and Wlochowski, counted the plaques in the pre- and post-vaccination samples.[122]

98.     The plaque counting process in neutralization tests is an important component. Plaques (holes) represent viral infection, the key metric used to measure neutralization. Miscounting plaques compromises the accuracy of the determinations of whether a sample is seropositive or seronegative, the seroconversion rate, and which subjects are pre-positive.[123]

99.     Merck's general policy for clinical trial testing was "not to retest samples on the basis of clinical expectation since selective retesting would introduce bias …."[124]

100.    Drs. Krah and Emini reviewed the plaque counts as they were completed by Dr. Krah and his staff, determined serostatus and seroconversion results for the samples, and ordered recounts of select samples.[125]

---

[122]  Ex. 122 at 418:15-419:23 (Krah Dep.) (describing AIGENT plaque counting process); Ex. 27 at 251:25-253:4 (Yagodich Dep.) (same).

[123]  Ex. 2 at 56 (Malone Rep.); *see also supra* ¶ 23 (citing evidence describing PRN tests and plaque counting process).

[124]  Ex. 171 at '670 ("[I]t is Merck's practice not to retest samples on the basis of clinical expectation since selective retesting would introduce bias …."); *see also* Ex. 27 at 354:21-355:4 (Yagodich Dep.) (affirming it is not good scientific practice to retest a sample because you don't like the result).

[125]  Ex. 122 at 435:12-439:2, 441:17-442:7, 468:15-469:10 (Krah Dep.) (testifying that Drs. Krah and Emini reviewed counting sheets or Excel spreadsheets that contained plaque counts; Dr. Emini directed Dr. Krah to bring him counting sheets so he could check them; Drs. Krah and Emini looked for pre-positives, pre-positives at a single dilution, and post-negatives; the review by Drs. Krah and Emini led to recounts; it was Dr. Emini's idea to recount all pre-positives at a single dilution); Ex. 122 at 627:16-630:20 (Krah Dep.) (testifying once plaque counts were done Dr. Krah and staff calculated seroconversion rates and pre-positives; Dr. Emini requested pre-positive calculations); Ex. 122 at 628:7-11 (Krah Dep.) ("Once the plaque count sheets were available, calculations were done to determine seroconversion rates and also … evaluating the number of pre-positives."); Ex. 122 at 500:16-506:23 (Krah Dep.) (describing electronic workbook used with AIGENT plaque counting, which performed calculations automatically and used flags to identify recounts).

101.    According to Relators and Ms. Yagodich, all of whom participated in the

AIGENT testing, Dr. Krah directed his lab staff running the AIGENT test to selectively recount

pre-positive samples and change pre-positive samples to make them pre-negative.  According to

Relators, Dr. Krah directed his lab staff to falsify data.[126]

102.    Merck's changes to AIGENT plaque counts were disproportionately targeted

towards pre-vaccination samples and increasing the plaque counts for those samples, tending to

reduce the number of pre-positive samples.[127]

---

[126] Ex. 155 at 190:14-24, 192:9-19, 194:14-22 (Krahling Dep.) ("[Dr. Krah told me] that in order to meet the 95 percent efficacy FDA mandate, that we needed to cross out pre-positives when we found them and change them to pre-negatives. … And that the reason we needed to do that is because the FDA might not allow them to use [the AIGENT] unless they change those results …. [Dr. Krah] told me specifically that we were targeting pre-positives. … [Dr. Krah] was pretty clear that the directive was to change the results. … He just said change the results."); *id.* at 197:24-198:9 ("[Mary Yagodich] said we're not trying to change the results of anything other than the pre-positives … I'm not telling you to do it.  This is Dave [Krah].  Dave [Krah] said we need to change these."); *id.* at 284:13-285:21 ("[Dr. Krah] said that it's a red flag to the FDA that we are counting … false positives.  That's one of the reasons [Merck has] to … cross out the false positives, put pre-negatives in where the pre-positives were."); *id.* at 270:2-5 ("The point was to hide … that high pre-positive rate from the FDA so that the Protocol 007 could be a success."); Ex. 172 at 447:15-17, 536:16-537:1 (Deposition of Relator Joan Wlochowski (hereinafter "Wlochowski Dep.")) ("changes were being made on … pre-positives which is falsifying data") ("Dave Krah was asking us to change data.  The meeting with Emilio [Emini] was asking us to…expedite the testing and complete the testing, offering us bonuses.  So … that was being pressured to participate in the fraud."); Ex. 27 at 187:24-188:19, 291:6-293:16 (Yagodich Dep.) (Ms. Yagodich testifying Dr. Krah directed her to recheck pre-positives, but no recollection of him directing her to recheck pre-negatives or post-vaccination samples) (testifying to changing pre-positive to pre-negative); Ex. 173 at '273 (referencing "manipulation of data").

[127] *See infra* ¶ 107 (citing evidence of Relators' audit showing changes to AIGENT data were biased towards changing pre-positives); Ex. 174 ¶¶ 15, 65-67, 70 (Report of Relators' Expert Dr. Philip Stark (hereinafter "Stark Rep.")) (finding "overwhelming statistical evidence" of bias) (the chance of so many changes to pre-vaccination samples 245 times smaller than "chance of winning the jackpot in the Powerball lottery twice by buying a total of 2 tickets") (the chance so many changes to pre-vaccinations samples were increases is "far less than the chance of picking a particular atom from a trillion planets like planet Earth.  It is comparable to the chance of picking a particular atom at random from our entire galaxy"); *see also* Ex. 175 ¶¶ 10-14 (Supplemental Report of Relators' Expert Dr. Philip Stark (hereinafter "Stark Suppl. Rep.")) (pointing to data of Merck expert statistician Dr. Robert Platt as further support for Dr. Stark's findings of bias); Ex. 176 at '828 (Table 2) and '841 (Table 2) (AIGENT preliminary subset showing originally 61 pre-positives that reduced to 38 pre-positives after changes to the plaque counts through selective recounting); Ex. 2 at 60 (Malone Rep.) ("The end result of Merck's uncontrolled and biased plaque counting process was a reduction in the pre-positive rate through targeted and unjustified recounting of undesirable plaque counts.").

103.    According to an entry Dr. Krah wrote in his contemporaneous personal diary, Amy Keegan, Merck's Manager of Global Vaccine Technology and Engineering, said that "[Dr. Krah] had been caught falsifying data."[128]

104.    Relators Krahling and Wlochowski repeatedly raised concerns with Dr. Krah, Dr. Emini, and other Merck employees in Dr. Krah's lab, about the selective recounting process Drs. Krah and Emini instituted.[129]

105.    When Relator Krahling showed Dr. Emini certain AIGENT testing materials to demonstrate Dr. Krah's data manipulation, Dr. Emini "agreed that [Dr.] Krah misrepresented that data …."[130]

106.    Relator Krahling communicated his concerns about the selective recounting to Robert Suter, Merck's Human Resources Director.  Mr. Suter told Relator Krahling "more than once" that Relator Krahling "would go to jail if [he] contacted the FDA."[131]

107.    In July 2001, Relators Krahling and Wlochowski conducted an audit of roughly 20% of the AIGENT counting sheets, finding (i) 45% of the pre-positives had been changed to

---

[128]  Ex. 177 at '018 ("Bob [Lowe] [Merck Quality Control] mentioned that when he told Amy Keegan [Merck Project Scientist and Manager] that he was working with us for the mumps ag study, she said that 'he should be very careful working with me as I had been caught falsifying data'").

[129]  Ex. 155 at 190:2-200:2, 209:8-214:19, 238:4-242:16 (Krahling Dep.) (identifying instances where Relators voiced concerns about AIGENT test and plaque counting to Dr. Krah and other Merck employees); Ex. 172 at 253:3-254:8, 275:16-278:1, 281:11-282:14, 507:10-509:6 (Wlochowski Dep.) (identifying instances where Relators voiced concerns about AIGENT test and plaque counting to Dr. Krah and other Merck employees).

[130]  Ex. 155 at 280:2-282:7 (Krahling Dep.) (describing interaction between Relator Krahling and Dr. Emini); Ex. 160 at 13 (Relator Krahling's Response to Revised Interrogatory 1) ("Relator [Krahling] met with [Dr.] Emini in his office.  Relator brought documents, counting sheets, and experimental cell plates from completed Protocol 007 assays to demonstrate the fraudulent practices he was witnessing in [Dr.] Krah's laboratory.  [Dr.] Emini examined the plates and the counting sheets in front of Relator.  [Dr.] Emini agreed with Relator that the crossed out numbers had been the correct counts, the altered counts were wrong, and that the issue required immediate attention.").

[131]  Ex. 155 at 240:22-241:16 (Krahling Dep.) (describing interaction between Relator Krahling and Mr. Suter); Ex. 160 at 57-58 (Relator Krahling's Response to Interrogatory 14) ("[Mr.] Suter informed Relator [Krahling] that he could be put in jail for sharing information with the FDA. … [A]fter Relator's August 2001 meeting with [Dr.] Emini, [Mr.] Suter waited for Relator outside of [Dr.] Emini's office.  [Mr.] Suter approached Relator and told him point blank that he would be put in jail if he contacted the FDA.").

pre-negative; (ii) no pre-negatives were changed to pre-positive; (iii) no post-positives were changed to post-negative; and (iv) no post-negatives were changed to post-positives.[132]

108.    On August 1, 2001, nine months into the AIGENT plaque counting process and the same day Dr. Krah met with Merck's lawyers, Dr. Krah first formalized a written plaque counting procedure for the AIGENT.[133]

109.    Dr. Krah's only explanation for why it took him nine months to draft a plaque counting or recounting procedure or protocol was that he was "busy" and "did not understand the need to have [the plaque counting and recounting process] documented as we were doing it."[134]

110.    On August 6, 2001, the FDA performed an unannounced inspection of Dr. Krah's lab.[135]

111.    During the FDA's inspection, Dr. Krah represented to the FDA investigators that the original number on the counting sheets represented the original plaque counts before any changes, and that all changes he and his staff made to the plaque counts were for legitimate purposes.[136] Dr. Krah did not disclose the extent of the plaque count changes and that they selectively recounted pre-positive samples.[137]

---

[132]  Ex. 178; *see also* Ex. 172 at 459:9-463:7 (Wlochowski Dep.) (discussing Relators' audit findings); Ex. 155 at 256:25-266:15 (Krahling Dep.) (same); Ex. 179 at '803-04 (Dr. Krah's personal diary) (Relators Krahling and Wlochowski "have rep[or]tedly been ru[m]maging through the files for the initial subset assays of M-M-R®II Protocol 007[.]  Move these to a more secure (locked) location?").

[133]  Ex. 180 at '864; Ex. 122 at 699:15-700:18 (Krah Dep.) (testifying Dr. Krah met with lawyers the same day he wrote his Aug. 1, 2001 AIGENT memo); Ex. 122 at 684:21-685:2 (Krah Dep.) (testifying Aug. 1, 2001 memo written when AIGENT testing almost all complete); *see also* Ex. 155 at 210:10-14 (Krahling Depo.) (Relator Krahling testifying he reported the fraud in Dr. Krah's lab in or around the end of July 2001).

[134]  Ex. 122 at 682:11-17 (Krah Dep.).

[135]  Ex. 20 at 66 (Merck Response to Request for Admission 89); Ex. 181 at '250.

[136]  Ex. 122 at 602:11-17, 742:1-4 (Krah Dep.) (Dr. Krah testifying he told the FDA that the lab maintained original plaque counts and that all changes were for legitimate purposes).

[137]  Ex. 122 at 547:6-549:2 (Krah Dep.) (Dr. Krah testifying he did not disclose extent of plaque count changes or "targeting pre-positives in [] recount"); Ex. 155 at 163:9-12 (Krahling Dep.) ("Krah told us that they were hiding it from the FDA.  That [FDA] w[as]n't to know that the data was being changed.").

Appx340

112.    At the conclusion of the inspection, the FDA issued a Form 483, citing four

deficiencies.  On February 4, 2002, Merck responded to the FDA's Form 483, representing that

Merck's changes to the AIGENT data "were made for appropriate reasons," "improve[d] the

quality of the data obtained," and resulted in "accurate, scientifically sound data for use in

decision making."[138]

113.    After receiving Merck's representations, the FDA concluded Merck did not

"deliberate[ly] attempt to alter data" from the AIGENT.[139]

114.    Merck proposed, and obtained the FDA's agreement, that Merck be allowed to use

the "original" AIGENT data—as opposed to the "corrected" AIGENT data—going forward.

Merck asserted "[a] reliable record of the originally recorded assay results exists, i.e. results

before recounting."[140]

115.    Merck did not maintain a reliable record of AIGENT data for all samples because

(i) numerous AIGENT testing plates were "discarded" before the conclusion of the testing;[141] (ii)

the plaque counts written on the AIGENT testing plates were "erased";[142] and (iii) AIGENT

---

[138] Ex. 357 at '547; Ex. 182 at '418, '421-23.

[139] Ex. 92 at '598.

[140] Ex. 182 at '423; Ex. 88 at '012.

[141] Ex. 183 (listing "discarded" Protocol 007 AIGENT assay plates); Ex. 184 at '013 (listing Protocol 007 AIGENT assay "Plates thrown out"); Ex. 122 at 487:23-489:4, 514:15-515:4, 518:15-519:2 (Krah Dep.) (admitting AIGENT testing plates were "discarded," without quality assurance auditing whether counting sheets accurately reflected plaque counts recorded on testing plates); *id.* at 678:16-679:5 (Dr. Krah testifying he would not be surprised if more than 120 of 172 assays had been destroyed); Ex. 172 at 327:20-328:11 (Wlochowski Dep.) ("[W]hile working in Dave Krah's lab, I did see him discard plates … after some escalations had happened internally.  The very next day after being told that an internal audit would occur, Dave Krah came into the laboratory early in the morning, which he never does, … taking plates and putting them in the autoclave and getting rid of them, which was not something I had ever witnessed him doing in my previous months working there."); Ex. 155 at 295:17-297:21 (Krahling Dep.) (Relator Krahling testifying he saw Dr. Krah "destroyed plates for a study [Protocol 007 AIGENT] that was ongoing," despite Dr. Krah previously telling Mr. Krahling "there was a need or an obligation to preserve the Protocol 007 study results and materials that we were generating").

[142] Ex. 155 at 214:21-25 (Krahling Dep.) (Relator Krahling testifying he saw Dr. Krah and other lab staff wipe plaque counts off the plates "[a]ll the time"); Ex. 172 at 381:6-10 (Wlochowski Dep.) ("[T]here were instances of

43

counting sheets, which were not controlled documents and lacked unique identifiers, were

destroyed.[143]

> 7.   *Numerous Witnesses and Experts in this Case Confirm the AIGENT Test Did Not Provide a Reliable or Clinically Relevant Measure of Protection*

116.   According to Dr. Krah, the Merck scientist who designed and oversaw the

running of the AIGENT test,[144] the AIGENT test did not provide an accurate or reliable measure

of protection against mumps:

- I would not be able to say that the AIGENT assay is the most accurate measure of mumps antibody.  It's an assay that's intended as an imperfect model for looking at immune response in terms of an antibody response to the vaccine.  Whether it's accurate or not, that's beyond my expertise.  Ex. 122 at 754:17-23 (Krah Dep.).

- As far as the … conclusion about whether it was [a] reliable assessment to immunogenicity, I can't say.  *Id.* at 412:5-9.

- I do not agree that the data were designed to indicate whether they were protected or not.  They're looking at immunogenicity and antibody responses, not – to the best of my understanding, not correlating it with protection.  *Id.* at 754:2-7.

- I would say that the AIGENT assay was developed to meet [] a specific requirement … have the capability of measuring antibody responses.  [] I don't have an expectation of what the correlation of that assay would be with protection.  *Id.* at 772:13-20.

- Our – my goal and my understanding for developing the assay was to have an assay that would allow us to have the capability of measuring 95 percent seroconversion and have a pre-positivity rate of approximately 10 percent without – from my personal perspective, without considering the impact on accuracy.  *Id.* at 726:9-17.

---

wiping out the original plaque counts on the plate and repeating the plaque counts. … I consider that the original data was not maintained.").

[143]   Ex. 172 at 328:23-345:24 (Wlochowski Dep.) (Relator Wlochowski testifying AIGENT counting sheets "were not controlled" allowing them to "be generated and destroyed without anybody knowing"; and witnessing lab staff "discarding counting sheets"); Ex. 2 at 63 (Malone Rep.) ("Merck had no controls in place to ensure plaque-counting sheets were not discarded ….").

[144]   Ex. 122 at 598:13-19 (Krah Dep.).

- My objective and our lab's objective was to develop an assay that would be capable of measuring 95 percent seroconversion. The clinical application is something that's beyond my responsibility of assigning. *Id.* at 599:15-21.

- Q. Do you have an opinion as to whether or not the AIGENT assay was a reliable measure of how well the mumps component of MMR II protects vaccine recipients from getting the mumps disease? A. I don't have any opinion on that. *Id.* at 412:11-17.

- Q. Do you have an opinion on how well the mumps component of MMR II works today in protecting vaccine recipients from contracting mumps? A. I don't have an opinion on that. *Id.* at 412:18-22.

- Q. And all the clinical testing that you did while at Merck on the mumps component of MMR II has given you no indication one way or another as to how well the vaccine works at protecting vaccine recipients from contracting mumps? … [A.] That's correct, none of the work – the work that I did was involved in the assay development and using the assay, not in connecting those results to project on how well the mumps component works. *Id.* at 413:8-21.

117.    According to Dr. Antonello, the Merck statistician who co-authored the AIGENT

Validation Report and ran the ELISA-AIGENT correlation study,[145] there were problems with

the AIGENT and it did not measure protection against mumps:

- I don't think [the AIGENT serostatus cutoff] was ever considered a protective level. Ex. 161 at 32:25-33:1 (Antonello Dep.).

- I don't think we knew – you know, it's known what a protective level, antibody level is. … So, no, [the AIGENT serostatus cutoff is] not indicative of protection against the virus. … It just means that if you're above that, your response is likely above the variability in the assay. And it's likely due to having been vaccinated, but it doesn't reflect protection. *Id.* at 151:5-22.

- [A] lot of the … problems associated with the AIGENT … were kind of obscuring the results …. *Id.* at 170:1-3.

- Q. … [Y]ou think … the primary basis for the discordant pairs were problems in the AIGENT test? … [A.] Yes, the -- yes. *Id.* at 243:11-17.

---

[145] Ex. 185 at '988 (AIGENT Validation Report identifying "J.M. Antonello" as an author); Ex. 176 at '836 (ELISA-AIGENT Correlation Report identifying "J.M. Antonello" as the author); Ex. 161 at 113:20-4, 162:2-23 (Antonello Dep.).

**Appx343**

- Agreeing "much higher rate of [pre-positives] in the AIGENT" "raises questions about the AIGENT …" *Id.* at 210:1-7.

- We don't really know what a clinically protective level is in [the AIGENT] assay. Ex. 141 at '319.

- [T]here is no clinical history/expectation/meaning that can be attached to the 90% response level in the PRN assay. Ex. 343 at '061.

118. Dr. Barbara Kuter, Merck's Director of Clinical Research, whom Merck designated as its 30(b)(6) witness to testify on the topic of Merck's understanding of how well its vaccine protects against mumps, testified "I really can't answer" whether "Merck's serology results … have any relationship to protection from disease."[146] Dr. Kuter also testified on behalf of Merck that "[she was] not able to answer" whether there is "an average level of protection that Merck understands is what the mumps component of Merck's mumps vaccines affords to vaccine recipients."[147] Dr. Kuter, on behalf of Merck, also did not know whether anyone at Merck could answer that question.[148] Dr. Kuter further testified on behalf of Merck that she "really can't answer" whether Merck's AIGENT "results in any way inform Merck's understanding of how well its vaccine protects recipients from mumps."[149]

119. Dr. Florian Schodel, Merck's Director of Clinical Vaccine Research, "could not overemphasize the weakness of the [AIGENT] (50% specificity!!!!!!)."[150] Dr. Schodel testified

---

[146] Ex. 146 at 40:14-21 (Merck 30(b)(6) Kuter Dep.) ("Q. … Do Merck's serology results reflect the protection afforded by the mumps component of Merck's mumps vaccines in any way? A. It's not a direct correlate. Q. Does it have any relationship to protection from disease? A. I really can't answer that.").

[147] Ex. 146 at 37:18-38:8 (Merck 30(b)(6) Kuter Dep.) ("Q. Is there an average level of protection that Merck understands is what the mumps component of Merck's mumps vaccines affords to vaccine recipients? … A. I am not able to answer that question. Again, I don't have the expertise. Q. Does Merck know, does anyone at Merck know the answer to that question? … [A.] I don't know.").

[148] *Id.*

[149] Ex. 146 at 69:20-70:3 (Merck 30(b)(6) Kuter Dep.).

[150] Ex. 141 at '315.

Appx344

that the AIGENT was a "very unreliable assay" and that Protocol 007 "does not give you a certainty that you're protected or not."[151]

120.    According to Dr. Emilio Emini, MRL VP, the AIGENT was "very artificial because of the [anti-]IgG added …."[152]

121.    Dr. Michael Dekleva, Merck's Director of World Wide Regulatory Affairs, spoke with Dr. Antonello who "re-emphasized that the precision with the [AIGENT test] was very poor …."[153]

122.    According to Dr. Anna Durbin, one of Merck's experts in this litigation, the AIGENT did not measure protection from mumps disease:

- [T]he purpose of the AIGENT assay is only to measure neutralizing antibody.  It's not to determine whether or not the vaccine protects or not. Ex. 30 at 15:16-19 (Merck Expert Durbin Dep.).

- The [AIGENT] assay doesn't measure protection.  *Id.* at 28:23-24.

- Answering there was "no way" for "AIGENT … seroconversion results" to "distinguish between seroconversion results that were protective against mumps and those that were not"  *Id.* at 40:3-11.

- I can't say definitively that any particular titer [measured by the AIGENT] was protective.  *Id.* at 39:8-10.

- So if you didn't reach that [AIGENT] cutoff, I would say that you're likely not to be protected.  If you did reach that cutoff, … then you are more likely that you are protected than not, but it is not a guarantee.  *Id.* at 55:6-12.

---

[151]  Ex. 116 at 321:16-18 (Schodel Dep.); *id.* at 111:15-16; *see also id.* at 342:23-343:9 (agreeing Merck "do[es]n't really know what a clinically protective level is in either assay [AIGENT or ELISA]").

[152]  Ex. 159 at '471 ("In talking with Emilio [Emini], the neutralization assay is very artificial because of the IgG added; to avoid too many seropositives, very high initial dilutions were required.  Thus, low level responders cannot be distinguished from nonresponders.").

[153]  Ex. 141 at '315.

Appx345

123.     According to Dr. Marcela Pasetti, one of Merck's experts in this litigation,
Protocol 007 "did not measure protection."[154] Dr. Pasetti further testified that Protocol 007 "did
not include a proper analysis of vaccine efficacy," meaning "protection or effectiveness."[155]

124.     According to Dr. William Atkinson, one of Merck's experts in this litigation,
Protocol 007 "would not have really anything to do with effectiveness."[156]

125.     According to Relators' experts in this litigation, Merck's AIGENT test failed to
provide a reliable or clinically relevant measure of protection against mumps.[157]

---

[154] Ex. 29 at 28:10 (Merck Expert Pasetti Dep.).

[155] Ex. 29 at 37:25-38:4 (Merck Expert Pasetti Dep.).

[156] Ex. 245 at 42:7-15 (Deposition of Merck Expert Dr. William Atkinson (hereinafter "Merck Expert Atkinson Dep.")).

[157] Ex. 2 at 6 (Malone Rep.) ("Merck's AIGENT assay failed to provide a reliable or clinically relevant measure of protection against mumps."); Ex. 2 at 46-47 (Malone Rep.) ("By designing and 'optimizing' the AIGENT assay to achieve a predetermined seroconversion and pre-positive rate without regard to whether it provided a clinically meaningful measure of protection, the AIGENT assay failed to meet [the FDA's] critical criterion" of demonstrating protection); Ex. 2 at 60 (Malone Rep.) ("[The AIGENT results] certainly provided no relevant measure of protection from disease …."); Ex. 2 at 74 (Malone Rep.) ("[B]oth the AIGENT and [] ELISA tests were unreliable and had no relevance to efficacy, effectiveness or protection."); Ex. 3 ¶ 421 (Kessler Rep.) ("The AIGENT assay results from Protocol 007 could not be used to provide reliable information about protection from disease."); Ex. 3 ¶ 423 (Kessler Rep.) ("[T]he endpoint measured by the AIGENT had not been demonstrated to have a connection to protection from disease."); Ex. 3 ¶ 424 (Kessler Rep.) ("[T]he assays used in Protocol 007 had not been shown to be connected to protection from disease and therefore the results of the assays could not be used to provide reliable information about the effectiveness of MMR-II with a mumps potency of not less than 4.1 log[]."); Ex. 3 ¶ 425 (Kessler Rep.) ("[T]he seroconversion rates measured by the AIGENT assay had not been shown to relate to protection from disease [and] … unlike the neutralization assay used in the early efficacy studies to support the licensure of mumps vaccines, the seroconversion rate measured by the AIGENT assay did not parallel protection from disease.") (internal quotation omitted); Ex. 3 ¶ 431 (Kessler Rep.) ("Neither the AIGENT nor the [] ELISA [in Protocol 007] measured protection against disease …."); Ex. 4 at 360:9-19 (Kessler Dep.) ("If you're not dealing with the right indicator virus and you've confounded this test … with [anti] IgG, you've got a mess on your hands. And that's what happened. Merck told the [FDA] … the test was fine and that the [] ELISA linked [to the AIGENT] and this was all clinically relevant. And there was no clinical relevance whatsoever … Merck's employees basically said that."); Ex. 16 ¶ 8(1) (Calcott Rep.) ("[T]he data [Merck] generated by [the Protocol 007 AIGENT and ELISA] methods and the correlation lacked technical validity. As such the data and conclusions are meaningless.").

## B. Merck's ELISA Test Did Not Provide a Reliable or Clinically Relevant Measure of Protection

### 1. *The ELISA Did Not Test Against a Circulating Wild-Type Mumps Virus Strain*

126.    Like the AIGENT test, Merck's ELISA used the same low-passage mumps vaccine strain as the indicator virus, as opposed to a circulating wild-type mumps virus.[158]

### 2. *Merck Did Not Correlate Its ELISA Test to a Reliable or Clinically Relevant Test*

127.    A correlation study comparing an ELISA test to a neutralization test that does not reliably measure protection against mumps provides no support that the ELISA reliably measures protection against mumps.[159]  Because the AIGENT was not a reliable or relevant measure of protection against mumps (*see supra* ¶¶ 69-125), Merck's ELISA-AIGENT correlation study provided no support that the ELISA or its 10 Ab serostatus cutoff provided a reliable measure of protection against mumps.[160]

---

[158]  *See supra* ¶¶ 62-63.

[159]  Ex. 161 at 217:20-218:2 (Antonello Dep.) ("[I]f the PRN doesn't necessarily represent truth for every sample, you don't know that those are the correct results.  So I don't think you would want to tie your ELISA cutoff to be as close as possible to the PRN if the PRN is potentially inaccurate."); Ex. 116 at 350:21-351:9 (Schodel Dep.) ("If you compare it to the wild-type ELISA, it may appear very poor because the ELISA is much more reliable [than the AIGENT].  …  You cannot … confirm that something is accurate with a lot of precision with something that in itself is imprecise.").

[160]  Ex. 2 at 66 (Malone Rep.) (concluding because "the AIGENT assay was not reliable or relevant as a measure of protection against mumps," Merck's "[ELISA-AIGENT] correlation … provided no support for the [] ELISA results having any clinical significance or providing any reliable measure of protection."); Ex. 3 ¶ 435 (Kessler Rep.) ("[T]he [] ELISA used in the … clinical studies had not been correlated to an assay that measured protection from mumps."); Ex. 3 ¶ 428 (Kessler Rep.) ("[T]he correlation data comparing the results of Protocol 007 clinical subjects tested by the [] ELISA and AIGENT assays did not demonstrate that the [] ELISA was connected to protection from disease because neither assay had been shown to relate to protection."); Ex. 4 at 375:9-24 (Kessler Dep.) ("[Merck] can't set a cutoff level and expect it to have clinical relevance if [the AIGENT] has no clinical relevance.  [Merck] can't set a [ELISA] cutoff level based on a PRN test if [the] PRN test is inadequate …."); Ex. 4 at 344:15:345:2 (Kessler Dep.) ("[ELISA] needed to be correlated … the justification of ELISA was that it was linked to the PRN test, and the PRN test was linked to clinical relevance.  But we know … those links were broken … you can't justify using the ELISA test … as was done here … The science doesn't support that.").

3. *Numerous Witnesses and Experts in this Case Confirm the ELISA Test Did Not Provide a Reliable or Clinically Relevant Measure of Protection*

128. According to Dr. Antonello, the Merck statistician who ran the ELISA-AIGENT correlation and calculated the ELISA serostatus cutoff, the ELISA test with a 10 Ab serostatus cutoff did not provide an accurate or reliable measure of protection against mumps:

- Q. But in your work in calculating what you thought was the appropriate serostatus cutoff level for the … ELISA assay, did seroprotection play any role in that exercise?  A. Not that I'm aware of ….  Q. So in your work in calculating it, did you take into account in any way the level of seroprotection that would be measured by the particular serostatus cutoff that you were calculating?  A. I don't believe I did.  Q. Why not?  A. Because I don't believe a seroprotective level was defined for mumps.  It was for, I remember, measles and rubella, and we used those for serostatus cutoffs for those assays, but there was not [a] seroprotective level defined for mumps. Ex. 161 at 66:25-67:21 (Antonello Dep.).

- I'm not aware of [10 Ab] being identified as protective level.  *Id.* at 33:21-22.

- Affirming "that the serostatus cutoff of 10Ab used for the … ELISA did not in any way relate to seroprotection" *Id.* at 233:7-12.

- Q. Did the correlation that you performed between the … ELISA assay and the AIGENT assay results provide, in your opinion, any support that the 10Ab serostatus cutoff was relevant to seroprotection?  …  A. I don't know what a protective level is.  So … I can't address what a protective level is and whether that's protective or not protective.  *Id.* at 235:11-23.

- Q. As far as your performing the calculation, did it give you any comfort that the 10Ab serostatus cutoff that you calculated was relevant to seroprotection?  …  A. Yeah, I don't know what is protection.  I did the comparison that was requested and showed how the two assays relate.  What that means beyond that, that's not my area of expertise, how to interpret the results in that sense.  *Id.* at 236:3-14.

- I don't know what a protective level is.  So for me I can't say that 10 [Ab] is the correct protective level …  So [correlation] doesn't give me greater confidence in that sense that 10 [Ab] is a protective level.  *Id.* at 240:9-15.

- We don't really know what a clinically protective level is in either [AIGENT or ELISA] assay.  Ex. 141 at '319.

50

**Appx348**

- Ex. 344 at '638 ("While we have compared the … ELISA to Dave Krah's Mumps AIGENT neutralization assay, I am not aware of any clinical evaluations where 10Ab units has been established as a 'protective' level.").

129. Dr. Florian Schodel testified he agreed Merck does not "really know what a clinically protective level is" in the ELISA.[161] Dr. Schodel further testified "[t]he question as to whether [the serostatus cutoff is] related to protection or not is not one that entered here at all because there is no efficacy study attached to it."[162]

130. According to Merck's experts in this litigation, the ELISA test with a 10 Ab serostatus cutoff did not provide an accurate or reliable measure of protection against mumps:

- Q. [ELISA 10 Ab serostatus cutoff] had nothing to do with protection; is that correct? A. That's correct. This particular number does not relate to a protected status. Ex. 29 at 124:19-22 (Merck Expert Pasetti Dep.).

- Q. So there's no way to tell from the antibodies that are measured by the … ELISA which, if any, of the antibodies, are actually having a protective effect against the mumps; is that correct? A. The ELISA does not measure protective effect. Ex. 29 at 33:8-12 (Merck Expert Pasetti Dep.).

- The ELISA does not measure protection. It only measures an immune response, an antibody response. Ex. 29 at 39:14-16 (Merck Expert Pasetti Dep.).

- [T]he objective of the ELISA was to measure the proportion of subjects that develop an immune response after vaccination. There is no relationship between these antibody levels and actual protection from disease. Ex. 29 at 77:3-7 (Merck Expert Pasetti Dep.).

- As I understand the [test] protocol, all that the ELISA would do is give a measurement of antibody levels. There's no indication of protection with those results. Ex. 29 at 77:17-20 (Merck Expert Pasetti Dep.).

- [ELISA serostatus cutoff] is not a threshold that would indicate clinical protection. Ex. 29 at 112:12-13 (Merck Expert Pasetti Dep.).

- The purpose of selecting the cutoff value for the … ELISA was to define the point where the test could reliably discriminate mumps seronegative and

---

[161] Ex. 116 at 342:21-343:9 (Schodel Dep.).

[162] Ex. 116 at 248:25-249:12 (Schodel Dep.).

seropositive samples; it was not meant to determine seroprotection.  Ex. 25 at 14 (Merck Expert Pasetti Rep.).

- We don't know … the exact biological or functional capability of the antibodies detected [with the ELISA].  Ex. 6 at 237:8-14 (Merck Expert Burlington Dep.).

131.    According to Relators' experts in this litigation, the ELISA test with a 10 Ab serostatus cutoff did not provide an accurate or reliable measure of protection against mumps.[163]

## V.    MERCK'S SUBMISSION OF AND RELIANCE ON PROTOCOL 007 FOR FDA APPROVALS MISREPRESENTED THE RELIABILITY AND CLINICAL RELEVANCE OF THE AIGENT AND ELISA TESTS

### A.    Merck's Submission of Preliminary Subset AIGENT Results to FDA

132.    The AIGENT testing was done in two phases: a preliminary subset phase, which involved roughly one-third of the clinical samples being tested (approximately 600 samples); and a final phase, which involved the balance of the samples.[164]

133.    On March 8, 2001, Merck cited the "corrected" preliminary subset AIGENT data, which incorporated selective plaque count changes made by Dr. Krah and his staff, in Merck's response to the FDA's February 9, 2001 Warning Letter concerning the FDA's finding that certain mumps vaccine products had failed to meet the minimum potency specifications.[165]

---

[163]  Ex. 2 at 6 (Malone Rep.) ("Merck's … ELISA assay failed to provide a reliable or clinically relevant measure of protection against mumps."); Ex. 2 at 70 (Malone Rep.) (concluding the "ELISA assay results were not a reliable or relevant measure of protection against mumps"); Ex. 2 at 74 (Malone Rep.) ("[B]oth the AIGENT and [] ELISA tests were unreliable and had no relevance to efficacy, effectiveness or protection."); Ex. 2 at 83 (Malone Rep.) (The "ELISA test developed in Protocol 007 … provides no clinical support for M-M-R II or ProQuad."); Ex. 2 at 86 (Malone Rep.) (reaching "the firm conclusion that the [] ELISA tests Merck used … provide no support for M-M-R II or ProQuad claims concerning clinical protection"); Ex. 3 ¶ 412 (Kessler Rep.) ("[T]he 10 Ab … ELISA cutoff did not meet the FDA's requirement that it 'relate to seroprotection.'"); Ex. 3 ¶ 427 (Kessler Rep.) ("[T]he seroconversion rates reported using the [] ELISA assay … were not related to protection …."); Ex. 3 ¶ 431 (Kessler Rep.) ("Neither the AIGENT nor the [] ELISA [in Protocol 007] measured protection against disease…."); Ex. 3 ¶ 435 (Kessler Rep.) ("Merck's [] ELISA did not measure protection from mumps ….").

[164]  Ex. 186 at '038 ("Summary of the Mumps End Expiry preliminary subset analysis (n=600)."); Ex. 122 at 421:25-422:5 (Krah Dep.).

[165]  *See supra* ¶ 35; Ex. 63 at '609.

134.    Merck's March 8, 2001 response to the FDA represented that the preliminary

subset AIGENT results, along with other information (i) "provide evidence that M-M-R®II is

effective through the predicted range of potencies post-release within a 2-year expiration date";

and (ii) reflect a "seroconversion rate range" that "is consistent with several older field efficacy

studies that demonstrated seroconversion rates ranging between 83 and 93%, which still afforded

high levels of protection against mumps infection."[166]

135.    On March 12, 2001, Merck submitted to the FDA Merck's analysis of the

"corrected" preliminary subset AIGENT data, representing (i) "Mumps neutralizing antibody

seroconversion rates at mumps vaccine doses of 4.9 and 4.0 log[] are comparable (94.1% and

93.3% respectively)"; (ii) "seroconversion rate at 3.7 log[]… while somewhat lower … is also

well within the historical seroconversion range … that ha[s] been associated with high field

effectiveness in clinical trials"; and (iii) "seroconversion rate range seen in this preliminary data

is consistent with older neutralization data which were associated with high levels (97%) of

protection."[167]

136.    Merck again relied on the "corrected" preliminary subset AIGENT data in its

April 20, 2001 Biologics Product Deviation Report ("BPDR") to the FDA reporting certain

MMR-II lots that failed to comply with the minimum mumps potency specifications.[168]  That

BPDR referred back to the summary of the "corrected" preliminary subset AIGENT data Merck

submitted on March 8, 2001 in response to the FDA's February 9, 2001 Warning Letter.[169]  In

that BPDR, Merck represented to the FDA (i) "based on both historical and recent clinical data

---

[166] Ex. 63 at '609.

[167] Ex. 186 at '045, '048.

[168] Ex. 187.

[169] Ex. 187 at '236.

Appx351

[preliminary AIGENT data] … mumps … at a potency of 3.9 log[] is efficacious and the possibility of seroconverting is essentially equivalent to that of a child who receives a dose at 4.9 or 4.0 log[]"; (ii) "clinical assessment concludes that there would be no public health risk of an increased incidence of mumps in children vaccinated with mumps vaccine with an end expiry potency value of 3.9 log[] or above"; and (iii) "potency values in the range of 3.9 log [] or above are not likely to lead to a lack of immunity against mumps" and that "no further action is warranted" for its out-of-specification lots.[170]

137.    Based on Merck's representations concerning the "corrected" data in the preliminary subset AIGENT analysis, the FDA accepted Merck's response to the FDA's concern of whether below-label mumps potency vaccine provided sufficient protection against mumps.[171]

## B.    Merck's sBLA to Lower the MMR-II Minimum Mumps Potency Specification

138.    On January 29, 2004, Merck submitted to the FDA Merck's sBLA to lower the MMR-II minimum mumps potency specification supported by a single clinical trial, Protocol 007.  Merck's Protocol 007 CSR contained the results of the AIGENT and ELISA testing.[172] Merck identified its sBLA, supported by Protocol 007, as an "Efficacy Supplement" on the face of its application.[173]

---

[170]  Ex. 187 at '236.

[171]  Ex. 42 at '708 ("In addition, and more seriously, [FDA] challenged the efficacy of marketed product at the lowest predicted potencies (below label claim).  …  With regard to product efficacy, we provided an interim analysis of an ongoing mumps end-expiry trial to justify efficacy of lower potency product.  [FDA] accepted the Merck response."); Ex. 188 at '159 (same); Ex. 51 at '230 (same); Ex. 43 at '167 (same); Ex. 65 at '041 ("Provided interim analysis of mumps end-expiry trial data to justify efficacy of lower potency product."); Ex. 63 at '603 ("As we discussed during our meeting of March 1, 2001, we believe that the actions taken to date comprehensively address all concerns raised during the referenced inspection as well as in the subsequent Warning Letter.").

[172]  Ex. 189 at '032, '111 (sBLA to lower the minimum mumps potency specification); Ex. 105 (Protocol 007 CSR).

[173]  Ex. 189 at '038 (sBLA to lower the minimum mumps potency specification).

Appx352

139.    In Merck's Protocol 007 CSR and its sBLA to lower the MMR-II minimum

mumps potency specification, Merck represented to the FDA that Protocol 007, in its design and

results, demonstrated the protection against mumps afforded by MMR-II at a potency of 4.1 log:

- The clinical data described herein demonstrate that … [l]owering the mumps virus potency to 4.1 log[] maintains > 90% seroconversion rate using a mumps neutralization assay, thus preserving the excellent safety and efficacy profile of the vaccine.  Ex. 189 at '110 (sBLA to lower the minimum mumps potency specification).

- The data presented here indicate with a high level of assurance that decreasing the mumps end expiry titer from 4.3 to 4.1 log[] in children 12 to 18 months of age will ensure that M-M-R$^{TM}$II remains a highly effective vaccine.  Ex. 189 at '127 (sBLA to lower the minimum mumps potency specification).

- In agreement with … FDA, the mumps-specific PRN assay [AIGENT] was developed and used as a surrogate for vaccine effectiveness.  Ex. 189 at '116 (sBLA to lower the minimum mumps potency specification).

- **Study Endpoints** … The [AIGENT] assay was used as the primary endpoint because it is a functional assay that measures the ability of the vaccine-induced immune response to inhibit viral replication in vitro, and can, therefore, be considered a surrogate for vaccine effectiveness.  Ex. 189 at '111-12 (sBLA to lower the minimum mumps potency specification).

- "[AIGENT and ELISA results] support the effectiveness of M-M-R$^{TM}$II containing a mumps virus potency of no more than 4.1 log[] and the lowering of the mumps virus end expiry potency from the currently assigned potency of 4.3 log[] to no less than 4.1 log[]."  Ex. 105 at '5175 (Protocol 007 CSR).[174]

---

[174]  *See also* Ex. 105 at '5174 (Protocol 007 CSR) ("Following agreement with [FDA] and in an attempt to demonstrate that mumps virus at end expiry potency was not only immunogenic but *effective in inhibiting viral replication*, a functional assay [AIGENT], aimed at measuring mumps-specific neutralizing antibodies, was developed and validated ….") (emphasis added); Ex. 105 at '5036 (Protocol 007 CSR) ("For the purpose of this study, a functional [AIGENT] assay was developed and used to measure the ability of the vaccine-induced immune response to *inhibit viral replication* ….") (emphasis added); *see supra* ¶¶ 50 n.68, 57 n.76 (references to 4.0 and 3.7 potencies became 4.1 and 3.8 potencies).

140.   At the outset of Protocol 007, Merck represented to the parents/guardians of the

patients and the clinical investigators[175] that Protocol 007 would measure the level of protection

against mumps afforded by MMR-II at below-label potencies:

- The purpose of this study is to compare the ability of the three different formulations of M-M-R[TM]II to make *protective antibodies against disease*. The results of this comparison will be used to determine how much of each of the virus components is necessary at the date of expiration to make a *protective antibody response*. … In order to make sure that the amount of each of the M-M-R[TM]II components is *enough to protect children* even at the end of the vaccine storage period (24 months), or shelf-life, Merck & Co., Inc., could add additional amounts to the vaccine when it is produced. However, this would expose some children to high doses of the vaccine. Merck & Co., Inc., believes a better approach is *to make sure that lower doses of the vaccine will still be effective at stimulating antibodies*. Ex. 105 at '6197 (Protocol 007 Patient Consent Form) (emphasis added).[176]

- Advantages to Participation in this Trial for Subjects • A positive mumps neutralization titer almost certainly ensures protection from wild type infection.  • Avoid unnecessary exposure in the future to higher levels of mumps vaccine virus.  • Lower doses of mumps may be associated with lower rates of side effects.  Ex. 119 at '849 (Merck's Mar. 15-16, 1999 Presentation to Protocol 007 Clinical Investigators).

- [A] wild type mumps strain will be used in the PRN assay to best assess protection from wild mumps infection.  Ex. 119 at '846 (Merck Mar. 15-16, 1999 Presentation to Protocol 007 Clinical Investigators).

---

[175]  The Clinical Investigators were the health care professionals who oversaw the collection of the serum samples from the children participating in Protocol 007 and the administration of the MMR-II vaccine.  Ex. 105 at '5013 (Protocol 007 CSR) ("The investigators were responsible for obtaining the subject's informed consent and medical history from the parent/legal guardian prior to vaccination."); Ex. 23 at 33:24-34:10 (Hartzel Dep.) (testifying and affirming "investigators" and "site personnel" are "the individuals at the clinical sites that are enrolling the patients and observing them for safety and efficacy" and "drawing the blood from the patients").

[176]  *See also* Ex. 190 at '241, '247, '249-50 (Protocol 007 Patient Consent Forms) (representing Protocol 007 results would determine "whether your child is protected from … mumps" or whether "your child needs to be revaccinated.") (stating purpose of Protocol 007 was "to make sure that M-M-R[TM]II vaccine still has enough live viruses at the end of its 24 month storage period or 'shelf-life' to protect children from … mumps … infections.") ("If your child responds to the vaccine with protective antibodies to … mumps…, your child will not need the routine 2nd shot of MMR given before entering school.  You will be given written proof of protection against … mumps … with the date the blood was drawn.").

56

141. At the October 2, 2004 meeting of the Infectious Disease Society of America, Merck represented publicly that the AIGENT test "was used as a surrogate of vaccine efficacy."[177]

142. Through publication on ClinicalTrials.gov, Merck has represented to the public, including the CDC, the FDA, regulators in other countries, Merck's competitors, doctors, and patients, that Protocol 007 was an "Efficacy Study."[178]

143. Years later, Merck represented to the United States Department of Justice that "Protocol 007 was designed to determine whether Merck's MMR vaccine would remain effective against mumps if the potency (i.e. concentration) of the mumps component of the vaccine was reduced. The study involved determining 'seroconversion rates' -- which are used as a measure of mumps vaccine effectiveness at different potencies."[179]

144. In Merck's Protocol 007 CSR and its sBLA to lower the minimum mumps potency specification for MMR-II, Merck represented to the FDA that the AIGENT measured mumps-specific neutralizing antibodies.[180]

---

[177] Ex. 191 at '144; *see also* Ex. 192 at '082 (same).

[178] Exs. 193-198 at 1 (clinicaltrials.gov archives indicating Protocol 007 was an "Efficacy Study"). ClinicalTrials.gov, a website maintained by the National Library of Medicine at the National Institutes of Health, "is a Web-based resource that provides patients, their family members, health care professionals, researchers, and the public with easy access to information on publicly and privately supported clinical studies on a wide range of diseases and conditions." Ex. 199 at 1 (clinicaltrials.gov website, background); *see also* Ex. 200 at 19 (European Medicines Agency "Scientific Discussion": Protocol 007 "focused on the identification of an acceptable end of expiry [potency] of the mumps component … inducing acceptable antibody titers to protect from … mumps ….").

[179] Ex. 108 at '567; *id.* at '567-69 (Protocol 007 was to determine if below-label potency vaccine was "comparably protective") (Protocol 007 "measured the effectiveness of the vaccine at the potencies being studied.") ("[I]n approving Merck's label change request, the FDA found … that the vaccine would be adequately protective against mumps even if Merck were to reduce the potency of the mumps component ….."); Ex. 345 at 2 n.2 ("Protocol 007 compared the potency of the then-current vaccine at end-expiry with two lower potencies to determine whether the lower potencies were equally immunogenic, which can be indicative of protection from disease.").

[180] Ex. 189 at '122 (sBLA to lower the minimum mumps potency specification) ("M-M-R[TM]II with a mumps end-expiry potency of 4.1 log[] … induces acceptable mumps specific antibody responses by [AIGENT] …."); Ex. 105 at '5007 (Protocol 007 CSR) ("M-M-R[TM]II with a mumps expiry dose of 4.1 log[] … induces an acceptable mumps-specific neutralizing antibody [seroconversion rate] … [and] induces comparable [seroconversion rates] for …

Appx355

145.    In Merck's Protocol 007 CSR and sBLA to lower the minimum mumps potency specification for MMR-II, Merck represented to the FDA that the source MMR-II lot used to vaccinate children in Protocol 007, which had an initial potency of 4.8 log (~63,000) was "representative of a mumps potency within the release range for M-M-R™II."[181]  The potency at which a live virus vaccine is released can impact the level of protection it provides at the time of injection.[182]  Defective and inactive virus particles and virus degradation products can interfere with the immune response to the live virus and the protection afforded by live virus vaccines.[183]

146.    On July 27, 2004, during the FDA's review of Merck's sBLA to lower the MMR-II minimum mumps potency specification, the FDA requested assurances that "the cutoff employed in the ELISA for seropositivity should be supported by data demonstrating some relevance with protective levels of antibody (e.g., neutralizing antibody)."[184]

---

mumps-…specific antibodies by ELISA …."); Ex. 105 at '5019 (Protocol 007 CSR) ("All collected serum samples were tested by [Merck] for levels of mumps-specific neutralizing antibodies using the [AIGENT] assay.").

[181]  Ex. 105 at '5000-01 (Protocol 007 CSR); Ex. 105 at '5018, '5024 (Protocol 007 CSR) (control and candidate [lower potency] vaccines used in Protocol 007 originated from same parent source lot).

[182]  Ex. 2 at 76 (Malone Rep.) (citing academic publications).

[183]  Ex. 2 at 76 nn.244-45 (Malone Rep.) (citing academic publications and explaining "Merck's testing in Protocol 007 of samples that had anywhere from 37,000 to 253,000 fewer degraded live virus particles than the product actually on the market (as well as significantly fewer degraded defective virus particles) further undermined the reliability and relevance to protection of the clinical trial results"); see also Ex. 201 at '022 (Aug. 26, 1997 Ltr. from Germany's Paul-Ehrlich-Institut to Merck) ("For several years Paul-Ehrlich-Institut has adopted the attitude that a maximum acceptable level of degradation of a live virus vaccine (in terms of loss of potency) is 0.5 log, i.e. that the maximum acceptable shelf life should ensure that losses of potency go not beyond this figure"; "It is a basic pharmaceutical rule that degradation [of] products should be limited to the strictly inevitable level") (citing International Council for Harmonisation guidelines); Ex. 16 ¶ 13 (Calcott Rep.) ("Allowing products to degrade further than defined by specification could result in sub-par potency and effectiveness and expose patients to excessively degraded products that might pose a safety issue."); see also Ex. 155 at 64:3-7, 66:5-15 (Krahling Dep.) (testifying Dr. Krah told Relator Krahling that "potency loss, lower potency means it doesn't work as well, or at least they didn't have proof that it worked. … The loss of efficacy [Dr. Krah] linked to degradation, meaning a lot of dead virus in the vaccine.").

[184]  Ex. 112 at '963, '967, '970.

58

147.     On November 17, 2004, Merck responded to the FDA by referring the FDA to

Merck's ELISA-AIGENT correlation, which Merck characterized as "provid[ing] information on

the clinical relevance of the chosen ELISA cutoff for seropositivity."[185]

148.     On December 3, 2004, the FDA notified Merck of the FDA's finding that "the

information and data submitted [in the sBLA] are inadequate for final approval at this time."

The FDA requested additional information from Merck before the sBLA could be approved,

including justification for use of ELISA data.[186]

149.     On April 13, 2005, Merck responded to the FDA's request for additional

justification for Merck's Protocol 007 ELISA data.  Merck again pointed to the ELISA-AIGENT

correlation to support the "clinical relevance" of the 10 Ab ELISA serostatus cutoff.[187]  Merck's

April 13, 2005 response to the FDA also represented that Merck used its AIGENT test "as a

surrogate marker for vaccine efficacy."[188]

150.     On October 17, 2005, the FDA found the AIGENT data Merck submitted in

support of its sBLA to lower the minimum mumps potency specification were "inadequate to

support this label change," because, among other reasons, (i) "A substantial amount of sample

data was excluded from the analyses [only 437 out of 672 control group subjects were included]

… preclud[ing] a conclusion of success"; and (ii) "The control lot failed the acceptability

criteria."[189]

---

[185] Ex. 112 at '963, '967, '970.

[186] Ex. 137 at '356.

[187] Ex. 137 at '331 ("[FDA] requested the mumps ELISA seropositive cutoff be justified via use of known mumps neutralizing and non-neutralizing sera.  Merck submitted these data … and believes that they provide helpful supportive information on the clinical relevance of the chosen ELISA cutoff for seropositivity.").

[188] Ex. 137 at '321 ("The purpose … is to provide clinical data supporting a reduction in expiry potency ….  This clinical data provides evidence … based on … [AIGENT] assay used as a surrogate marker for vaccine efficacy.").

[189] Ex. 202 at '257-58; Ex. 6 at 257:22-24 (Merck Expert Burlington Dep.) ("[FDA] reached a conclusion it was inadequate for the final approval").

151.    On November 15, 2006, Merck responded to the FDA's rejection of the AIGENT data by pointing to what Merck characterized as the "strong correlation (96.3%) between ELISA and [AIGENT] serology results."[190]  From this Merck argued the Protocol 007 ELISA results could substitute for the AIGENT in support of its sBLA to lower the MMR-II minimum mumps potency specification.[191]

152.    On May 18, 2007, the FDA issued its final rejection of Merck's AIGENT data submitted in support of its sBLA: "Our review finds that the information and data submitted are inadequate for final approval at this time. …  However, the science related to immunogenicity testing of M-M-R®II has substantially evolved since our initial testing requirements.  Use of ELISA data to evaluate the effect of differences in product potency on immunogenicity is now acceptable."[192]

153.    On June 5, 2007, Merck amended its sBLA to lower the minimum mumps potency specification by providing, along with the Protocol 007 ELISA results, additional ELISA data from other clinical studies Merck conducted using the same ELISA test with the same 10 Ab serostatus cutoff.[193]

154.    On December 6, 2007, the FDA approved Merck's sBLA to lower the minimum mumps potency specification from 4.3 log [20,000] to 4.1 log [12,500].[194]

---

[190] Ex. 138 at '400.

[191] Ex. 138 at '404.

[192] Ex. 203 at '372.

[193] Ex. 203; Ex. 204 at '698 ("We also submitted an additional statistical analysis of ELISA data in place of PRN assay for [FDA] which was key to [FDA] approval" of Merck's sBLA to lower the minimum mumps potency specification).

[194] Ex. 205 at '088.

Appx358

155.    Based on the information Merck provided the FDA in connection with Merck's sBLA to lower the minimum mumps potency specification, the FDA concluded MMR-II adequately protected against mumps at a potency of 4.1 log.[195]

### C.    Merck's BLA for ProQuad

156.    In connection with Merck's ProQuad BLA, the FDA accepted Merck's proposal to conduct clinical studies using the same ELISA test with the same 10 Ab serostatus cutoff that Merck used in Protocol 007.[196]

157.    However, as the FDA did with Protocol 007 and Merck's sBLA to lower the MMR-II minimum mumps potency specification, the FDA requested that the ELISA serostatus cutoff used in Merck's clinical studies supporting the ProQuad BLA "be supported by data demonstrating some relevance with protective levels of antibody (e.g., neutralizing antibody)."[197]

158.    On August 27, 2004, Merck submitted to the FDA Merck's ProQuad BLA.[198]

159.    In support of its ProQuad BLA, Merck submitted the results from clinical trials, which Merck represented were "designed to show that ProQuad[TM] could provide the same level of protection to the same intended population as M-M-R[TM]II and VARIVAX[TM]."[199]

---

[195]    Ex. 108 at '569 ("It is the case that in approving Merck's label change request, the FDA found … that the vaccine would be adequately protective against mumps even if Merck were to reduce the potency of the mumps component ….").

[196]    Ex. 206 at '451; Ex. 207 at '371 (Merck relying on same Protocol 007 ELISA to support ProQuad BLA); Ex. 21 at '138 (same); Ex. 6 at 14:15-20, 249:7-12 (Merck Expert Burlington Dep.) (testifying Merck used same ELISA in Protocol 007 and to support ProQuad BLA); Ex. 29 at 43:9-14 (Merck Expert Pasetti Dep.) (same).

[197]    Ex. 206 at '451; Ex. 208 at 169:23-170:5 (Deposition of Merck Employee Michael Dekleva (hereinafter "Dekleva Dep.")) (affirming FDA required Merck to "correlate or bridge … ELISA data to PRN data" for ProQuad BLA); Ex. 3 ¶ 169 (Kessler Rep.) ("Before Merck could use ELISA assays [to support the ProQuad BLA], FDA required Merck to demonstrate that the ELISA results would have a link to protection against disease.").

[198]    Ex. 209.

[199]    Ex. 21 at '137 (ProQuad BLA).

Appx359

160.     Merck sought and obtained FDA agreement that for its ProQuad BLA, "[e]valuation of immunogenicity using validated assays could be used as a surrogate measure for efficacy."[200]

161.     Merck represented to the parents/guardians of the patients and the clinical investigators that Merck's clinical studies in support of its ProQuad BLA would measure the level of protection against mumps afforded by the vaccine.[201]

162.     According to Merck, "the information it provided to the FDA in connection with the [ProQuad] BLA accurately represented the … efficacy, and effectiveness of the mumps component of ProQuad."[202]

163.     In Merck's ProQuad BLA Merck represented to the FDA that Merck's clinical studies, in their design and results, demonstrated the protection against mumps afforded by ProQuad:

- A formal efficacy trial was not conducted with ProQuad.  The efficacy of the product was determined through the use of serologic correlates of protection previously established in the evaluation of the efficacy of the monovalent … mumps … vaccine[]."  Ex. 21 at '130 (ProQuad BLA).

- The efficacy of ProQuad was established through the use of immunological correlates for protection against … mumps ….  Ex. 21 at '136 (ProQuad BLA).

- Because ProQuad is intended to replace the routine use of M-M-RII and VARIVAX in children, the clinical development program was designed to show that ProQuad could provide the same level of protection to the same

---

[200] Ex. 21 at '135 (ProQuad BLA); *see also* Ex. 210 at '969 (Merck was "banking on immunogenicity data to serve as surrogate markers for efficacy").

[201] Ex. 211 (Merck ProQuad Protocol 012 Consent Form Addendums) at '455 ("The purpose of this addendum consent form is to inform you that your child did not seroconvert (produce sufficient antibodies) to protect him/her against … mumps ….  You will be offered the option of having your child receive an additional dose of the … vaccine(s) as needed.  This additional dose is expected or intended to provide the protection that was not provided by the original dose."); *id.* at '458 (same); *id.* at '462 (same); *id.* at '465 (same)).

[202] Ex. 212 at 13 (Merck Response to Plaintiffs' Interrogatory 4).

intended population as M-M-RII and VARIVAX.  Ex. 21 at '137 (ProQuad BLA).

- More recently, Merck & Co., Inc. has assessed the correlation between neutralizing antibody (as measured in a … [PRN] assay) and a[n] … ELISA … .  The overall agreement rate was 93.6% (480/513).  These data support the use of the results of a[n] ELISA as a correlate for protection.  Ex. 207 at '350 (ProQuad BLA).

- The presence of detectable antibody by the … neutralization assay or [ELISA] for mumps … has generally been shown to have a strong correlation with protection from disease.  Ex. 207 at '365 (ProQuad BLA).

- Because ProQuad$^{TM}$ is intended to replace the routine use of M-M-R$^{TM}$II and VARIVAX$^{TM}$ in children, the clinical development program was designed to show that ProQuad$^{TM}$ could provide the same level of protection to the same intended population as M-M-R$^{TM}$II and VARIVAX$^{TM}$.  Ex. 21 at '137 (ProQuad BLA).

- Clinical data presented in this Application confirm that ProQuad$^{TM}$ is similar (non-inferior) to M-M-R$^{TM}$II and VARIVAX$^{TM}$ given concomitantly (at separate injection sites) with respect to immunogenicity and safety.  These data suggest that ProQuad$^{TM}$ can be used in place of M-M-R$^{TM}$II and VARIVAX$^{TM}$ to prevent … mumps ….  Ex. 21 at '158 (ProQuad BLA).

164.    On October 5, 2004, the FDA requested from Merck "additional data to support the appropriateness of the cutoff employed in the mumps ELISA for seropositivity, relative to the [AIGENT] assay," specifically requesting that the "ELISA seropositive cutoff be justified via use of known mumps neutralizing and non-neutralizing sera."[203]  The FDA requested that Merck's ELISA cutoff "be supported by data demonstrating some relevance with protective levels of antibody."[204]

165.    On November 12, 2004, Merck responded to the FDA's request by referring the FDA to the same ELISA-AIGENT correlation study Merck performed in connection with

---

[203]  Ex. 140 at '405, '409.

[204]  Ex. 140 at '406.

Protocol 007, which Merck characterized as "provid[ing] information on the clinical relevance of the chosen ELISA cutoff for seropositivity."[205]

166.    On May 4, 2005, in responding to additional questions by the FDA concerning Merck's ELISA, Merck again referred the FDA to the same ELISA-AIGENT correlation study Merck performed in connection with Protocol 007, stating "[t]he serostatus cutoff has been evaluated against that of a mumps neutralization assay, and the data show good agreement between assays when using a cutoff of 10 Ab."[206]

167.    On September 6, 2005, FDA approved Merck's ProQuad BLA.[207]

**D.      Merck's sBLA for MMR-II with rHA**

168.    Merck used its same ELISA test with the same 10 Ab serostatus cutoff that Merck used in Protocol 007 again in the clinical study (Protocol 009) it submitted to support Merck's sBLA to begin manufacturing MMR-II with "Recombinant Human Albumin" ("rHA") instead of "pooled human derived serum albumin" ("HSA") in order "[t]o address ongoing safety and sourcing concerns related to human blood-derived products."[208]

169.    As the FDA did with Protocol 007 and Merck's sBLA to lower the MMR-II minimum mumps potency specification, as well as with the clinical studies supporting Merck's ProQuad BLA, on April 28, 2003, the FDA requested in connection with Merck's sBLA for MMR-II with rHA that Merck "provide AIGENT data in support of the ELISA cutoff …."[209]

---

[205]  Ex. 140 at '409, '414.

[206]  Ex. 213 at '090.

[207]  Ex. 214.

[208]  Ex. 215 at '854-55 (Merck using Protocol 007 ELISA test in its sBLA to switch MMR-II from HSA to rHA); Ex. 216 at '079, '109 (Protocol 009 CSR) (same); Ex. 217 at '147 (same).

[209]  Ex. 218 at '609.

170.    On June 28, 2004, Merck responded to the FDA's request by submitting to the

FDA the same ELISA-AIGENT correlation study Merck performed in connection with Protocol

007; by representing "[t]his question was addressed previously, in the course of addressing

comments to [Merck's sBLA to lower the MMR-II minimum mumps potency specification

(Protocol 007)]"; and by stating Merck understood the FDA "accept[ed]" the "ELISA assay

cutoff of 10 Ab units" in connection with Protocol 007.[210]

171.    On June 30, 2004, Merck submitted to the FDA Merck's sBLA for MMR-II with

rHA.[211]

172.    In support of its sBLA for MMR-II with rHA, Merck submitted the results from

Protocol 009.[212]

173.    In Merck's Protocol 009 CSR and sBLA for MMR-II with rHA, Merck

represented to the FDA that Protocol 009, using the same Protocol 007 ELISA test with the same

10 Ab serostatus cutoff, demonstrated that MMR-II with rHA was as effective as MMR-II with

HSA at protecting against mumps:

- Overall, the study results [including ELISA data] suggest that M-M-R[TM]II with rHA is highly immunogenic, well tolerated, and will be as effective as M-M-R[TM]II with HSA in preventing … mumps …. Ex. 216 at '196 (Protocol 009 CSR).

- Serum levels of antibodies to … mumps … will be determined by ELISA. … Protective levels of antibody will be defined as … >10.0 ELISA antibody units for mumps ….. Ex. 216 at '853 (Protocol 009 CSR).

- For a given antigen, at least 477 of the 515 (92.6%) evaluable subjects in the M-M-RII manufactured with rHA group must have 6-week postvaccination titers greater than the protective level in order to meet the acceptability criteria. Ex. 216 at '866 (Protocol 009 CSR).

---

[210] Ex. 218 at '588, '640.

[211] Ex. 215 at '854-55 (sBLA for MMR-II with rHA); Ex. 216 at '079 (Protocol 009 CSR).

[212] Ex. 215 at '854-55 (sBLA for MMR-II with rHA); Ex. 216 at '079 (Protocol 009 CSR).

- Subjects who do not have protective antibody levels to one or more of the components of the study vaccine at the Day 42 bleed will be offered revaccination with currently licensed vaccine. Ex. 216 at '917 (Protocol 009 CSR).

- Given the structural and genetic similarities of HSA and rHA, as well as the excellent and high level of vaccine-induced immune responses observed …, the replacement of HSA with rHA in the bulk manufacturing of M-M-R$^{TM}$II was not expected to affect the efficacy of the vaccine. Ex. 217 at '147 (sBLA for MMR-II with rHA).

- Specific levels of serum antibodies to … mumps … as measured by … neutralizing antibody assays in field efficacy studies have been shown to correlate with protection against these diseases, and thus immunogenicity data can be used as a surrogate marker for vaccine efficacy. Correlation between the current [ELISA] assays … and the assays used in the field efficacy studies (i.e., … serum neutralizing antibody assay) has been established. Ex. 217 at '144-45 (sBLA for MMR-II with rHA) (internal cites omitted).

- The data presented in this application indicate with a high level of assurance that manufacturing … M-M-RII … with rHA in place of HSA … will ensure that M-M-RII remains a highly effective vaccine. Ex. 217 at '157 (sBLA for MMR-II with rHA).

174.    In August 2005, the FDA approved Merck's sBLA for MMR-II with rHA.[213]

## VI.    MERCK'S MMR-II AND PROQUAD LABELS ARE INACCURATE, FALSE, AND MISLEADING

### A.    Vaccine Labeling Generally

175.    Every vaccine dose distributed in interstate commerce in the United States, including MMR-II and ProQuad, is accompanied by labeling, which includes a package insert, that provides information relating to the product shelf life, minimum potency requirements, basis for licensure, and effectiveness, among other things. This includes every vaccine dose the CDC purchases.[214]

---

[213]  Ex. 219 at '909.

[214]   21 U.S.C. § 321(m) ("labeling" means "all labels and other written, printed, or graphic matter upon any article or any of its containers or wrappers, or accompanying such article" and, therefore, includes any package inserts or

**Appx364**

176.    Vaccine manufacturers have a continuous duty to comply with the specifications on the vaccine label and the BLA or sBLA, which constitute the vaccine license.[215]

177.    Vaccine manufacturers have a continuous duty to ensure the product label is accurate and complete and to update the product label with any information the manufacturer later discovers, or in the exercise of reasonable care, should have discovered, such as vaccine efficacy, duration of protection, immunogenicity, and stability.[216]

178.    The CDC reviews and relies on vaccine labels for an understanding about the vaccine's shelf life, potency, clinical trial results, and basis for licensure.[217]

---

information sheets that accompany vaccine products); 21 C.F.R. § 201.57 (specific requirements on content and format of labeling for human prescription drug and biological products).

[215] Ex. 6 at 123:1-8 (Merck Expert Burlington Dep.) ("The manufacturer has the responsibility to comply with the label, although the label doesn't ordinarily have a lot of specifications on it. The specifications are usually in the licensing documents. … [I]t is also the obligation of the manufacturer to comply with the specifications in the licensing documents."); Ex. 6 at 128:18-129:12 (Merck Expert Burlington Dep.) (testifying MMR-II license is final or approved BLA); Ex. 17 at 30:7-10 (Bramble Dep.) (affirming Merck's "obligation to comply with what the label said"); Ex. 16 ¶ 30 (Calcott Rep.) (manufacturers must comply with label specifications).

[216] Ex. 5 ¶ 21 (Merck Expert Burlington Rep.) (stating for FDA licensure approval "the product's labeling [must be] accurate and supported by data"); Ex. 17 at 45:6-7 (Bramble Dep.) (affirming vaccine labels "always need to be right" and "correct"); Ex. 3 ¶ 378 (Kessler Rep.) (It is "the manufacturers' responsibility to ensure their vaccines are safe and effective and have labeling that is not false or misleading."); Ex. 3 ¶ 379 (Kessler Rep.) (The "manufacturer must provide updates with any information it later discovers, or in the exercise of reasonable care, should have discovered about its vaccine … such as vaccine efficacy, including duration of protection, immunogenicity … and stability ..."); Ex. 3 ¶ 417 (Kessler Rep.) ("It is the manufacturer's responsibility to ensure that its products meet the specifications on the label ….").

[217] Ex. 245 at 160:5-9-168:8 (Merck Expert Atkinson Dep.) (testifying he reviewed all vaccine labels as part of his work at the CDC because "there's important information … to describe the studies that led to licensure. … There's important information in all package inserts because of what FDA requires to be included that is helpful in my role as being someone who tries to educate doctors and nurses about the characteristics of any given vaccine.") ("Q. What's the basis of your understanding as to what Merck did to support its application, license application, for ProQuad? A. I reviewed the label.") (testifying label contains "important information I need to know" and that it "oftentimes [is] the best description of how the vaccine was approved. In the case of ProQuad, that was the case.") (testifying CDC's understanding of clinical trial results supporting licensure, shelf life, and potency comes from the label); ECF No. 49-2 (Merck's Reply in Supp. of Mot. to Dismiss) at 2 (the vaccine label is "the definitive source of product information under the FDA's regulatory scheme"); *Mazur v. Merck & Co.*, 964 F.2d 1348, 1367 (3d Cir. 1992) ("The [vaccine label's] intended audience is not the ultimate user, but rather … the CDC, who [is] contractually obligated to develop a meaningful warning for vaccinees or their parents.") ("[T]he [vaccine label's] intended audience here is the CDC, who Merck contractually obligated to develop a warning in lay terms").

B.     **MMR-II Label**

179.   From 1999 to December 2007, the MMR-II label stated that "Each 0.5 mL dose contains not less than … [4.3 log] of mumps virus …."[218]

180.   Since December 2007, the MMR-II label has stated that "Each 0.5 mL dose contains not less than … [4.1 log] of mumps virus."[219]

181.   Since at least 1995, Merck's MMR-II label has stated "Clinical studies of [284] triple seronegative children, 11 months to 7 years of age, demonstrated that MMR-II is highly immunogenic and … a single injection of the vaccine [MMR-II] induced … mumps neutralizing antibodies in 96% … of susceptible persons."[220]

182.   These "[c]linical studies" referenced in Merck's MMR-II label were conducted several decades ago.[221]  They were not conducted on the MMR-II vaccine Merck has sold since 2000 with effectively double the amount of mumps virus at release (with the mumps Overfill) and 2005 when Merck began manufacturing MMR-II with rHA.[222]  And they were not conducted

---

[218]  Ex. 220 at '072; Ex. 221 at '108.

[219]  Ex. 222 at '100; Ex. 223 at '260; Ex. 224 at 1; Ex. 205 at '088 (On Dec. 6, 2007 FDA approved Merck's sBLA to "change … the labeled potency of the mumps component from no less than [4.3 log] to no less than [4.1 log] per dose at end of expiry").

[220]  Ex. 225 at '060; Ex. 223 at '260; Ex. 224 at 1; Ex. 102 at 8 ("note our label specifies a 96% [seroconversion rate] based on mumps neutralizing antibodies").  In more recent versions of the MMR-II label "the number of triple seronegative children was revised from 279 to 284."  Ex. 226 at '876.

[221]  Ex. 39 at 151:4-152:2 (Musey Dep.) ("Q. Is there a seroconversion rate with regard to mumps … listed on the label?  A. Yes.  Q. What is that?  A. I think it's 96 percent.  Q. And that's an accurate statement of the seroconversion rate of the mumps vaccine today?  A. No, that is the current statement of the seroconversion from the study that was done at the time that the study was done with the populations and the assays that were used at that time."); Ex. 146 at 97:16-21 (Merck 30(b)(6) Kuter Dep.) ("Q. So does Merck know that a single dose of MMR II would induce neutralizing antibodies in 96 percent of people today?  A. I can't tell you.  We haven't tested it today."); Ex. 146 at 98:15-21 (Merck 30(b)(6) Kuter Dep.) ("Q. Does Merck know what PRN results it would expect from a test of its mumps vaccine today?  … [A.]: I can't speculate.").

[222]  Ex. 2 at 88 (Malone Rep.).

68

on the MMR-II vaccine Merck has sold since it reduced in 2007 the minimum mumps potency specification on the MMR-II label from 4.3 log to 4.1 log.[223]

183.    Merck has never conducted clinical testing using a functional test such as a PRN test to demonstrate the measure of mumps protection afforded by these more recent formulations of MMR-II.[224]

184.    For MMR-II with mumps potencies at or below 4.1 log, the only clinical testing using a PRN test Merck conducted was the AIGENT, which evaluated MMR-II with HSA.[225]

185.    Since at least 1999, Merck's MMR-II label has stated, "Following vaccination, antibodies associated with protection can be measured by neutralization assays … or ELISA [] tests."[226]

186.    Since at least 1999, Merck's MMR-II label has stated, "Efficacy of [mumps] vaccines was established in a series of double-blind controlled field trials which demonstrated a high degree of protective efficacy ….  These studies also established that seroconversion in response to vaccination against [mumps] paralleled protection from [mumps] disease[]."[227]

187.    The studies upon which Merck relies for its statement that "seroconversion in response to vaccination against [mumps] paralleled protection from [mumps] disease[]" were conducted roughly 50 years ago on the monovalent vaccines, long before Merck added mumps

---

[223]  Ex. 2 at 88 (Malone Rep.).

[224]  Ex. 2 at 88 (Malone Rep.); Ex. 146 at 173 (Merck 30(b)(6) Kuter Dep. Ex. 2) (identifying only PRN results from Protocols 006 and 007, both of which studied MMR-II with HSA not rHA, in describing antibody response rates from clinical trials or serology testing conducted by Merck).

[225]  Ex. 2 at 88 (Malone Rep.); Ex. 146 at 173 (Merck 30(b)(6) Kuter Dep. Ex. 2) (identifying only PRN results from MMR-II Protocols 006 and 007, of which only Protocol 007's AIGENT studied MMR-II at and below 4.1 log); Ex. 227 at '214 (Protocol 006 CSR) (MMR-II used in Protocol 006 had "4.7" log mumps potency); Ex. 349 at 2 ("No clinical data for mumps at < 4.3log[] potency.").

[226]  Ex. 223 at '261; Ex. 224 at 2.

[227]  Ex. 228 at '030; Ex. 224 at 2.

Appx367

Overfill in 2000 and switched in 2005 to its rHA formulation of MMR-II, and long before it

reduced in 2007 the minimum mumps potency specification on the MMR-II label from 4.3 log to

4.1 log.[228]

### C. ProQuad Label

188.    Since 2005, the ProQuad label has stated: (i) "In clinical efficacy studies,

seroconversion in response to vaccination against … mumps … paralleled protection from []

disease[]," and (ii) "Efficacy of the . . . mumps . . . component[] of ProQuad was previously

established in a series of clinical studies with the monovalent vaccines.  A high degree of

protection from infection was demonstrated in these studies."[229]

189.    Merck does not cite the studies upon which Merck relies for its statements that

"seroconversion in response to vaccination against … mumps … paralleled protection from []

disease."  The studies upon which Merck relies for its statement that "[a] high degree of

protection from infection was demonstrated," were conducted roughly 50 years ago, long before

the ELISA tests Merck used to support its ProQuad BLA.[230]

---

[228]  Ex. 20 at 235 (Merck Response to Request for Admission 300) (Merck "admits that the double-blind controlled efficacy trials referenced in the package insert for M-M-R®II were conducted prior to 1970."); Ex. 223 at '261, '268 (references 13-15 citing studies from 1961, 1966, and 1970); Ex. 224 at 2, 9 (references 13-15 citing studies from 1961, 1966, and 1970); Ex. 146 at 106:16-107:2 (Merck 30(b)(6) Kuter Dep.) ("Q. So this information about seroconversion parallel protection from diseases all comes from studies from 1967 or 1968?  A. Yes.  Q. Does Merck have more current information as to whether seroconversion from the mumps vaccine parallels protection from mumps?  A. Again, we have no ability to conduct efficacy studies of this nature, so no."); *id.* at 111:20-24 ("Q. Does Merck have any current information that indicates that seroconversion parallels protection from mumps?  A. Again, we don't have the ability to do that."); Ex. 3 ¶ 44 (Kessler Rep.) ("For Merck's [monovalent] mumps vaccine … Merck conducted efficacy studies and clinical immunogenicity studies in the 1960's when children were not regularly vaccinated for mumps. … The labels for [MMR-II and ProQuad] reference[] the efficacy studies … conducted" in the 1960's.); Ex. 348 at '034-35 ("No formal studies of the efficacy of MMRII have been conducted. The efficacy of MMRII was established in a series of controlled studies [of monovalent mumps vaccine in 1965-66] that demonstrated a high degree of protective efficacy afforded by the individual vaccine components. … These data support our efficacy statements in the circulars for MUMPSVAX and M-M-RII. … Efficacy studies traditionally overestimate vaccine efficacy due to their study design (e.g. limited enrollment criteria, strict adherence to vaccine storage conditions, and strict adherence to the methods for vaccine administration).")

[229]  Ex. 229 at '125-26.

[230]  Ex. 229 at '125-26, '136.

Appx368

190.    Since 2009, the ProQuad label has stated "ProQuad has been shown to induce … mumps-… specific immunity, which is thought to be the mechanism by which it protects against … disease[]."[231]

191.    Since 2009, the ProQuad label has stated "The efficacy of ProQuad was established through the use of immunological correlates of protection against … mumps …."[232]

192.    Merck has never established the efficacy of ProQuad against mumps and claims it is unable to do so.[233]

193.    Merck has never used immunological correlates of protection against mumps in its clinical testing of ProQuad and according to Merck's witnesses and experts "there is no known correlate of protection for mumps."[234]

---

[231] Ex. 230 at '182; Ex. 231 at 16.

[232] Ex. 230 at '182; Ex. 231 at 16.

[233] Ex. 232 at 5, 7 (Merck Response to Relators' Interrogatories 1-2) (stating "there are no 'current efficacy' clinical trials involving Merck's mumps vaccine and … it is not now possible to conduct such double-blind controlled studies") ("after January 1, 1998 [Merck] did not conduct studies to determine the efficacy of its Mumps Vaccine …."); Ex. 212 at 14 (Merck Response to Plaintiffs' Interrogatory 4) ("Merck performed no formal studies to evaluate the clinical efficacy of ProQuad."); Ex. 208 at 45:25-46:13, 142:3-4, 249:2-3 (Dekleva Dep.) ("Q. Was there ever an efficacy trial for ProQuad ...? A. At the time ProQuad studies were done I don't think an efficacy trial was possible. So I have to say, no .... Q. ... So there wouldn't be any efficacy data for ProQuad. Right? A. Right.") ("There were no efficacy data for ProQuad …..") ("There was no efficacy study done for ProQuad."); Ex. 346 at 3 ("Merck has not conducted an efficacy trial for its mumps vaccine since the trials conducted in the 1960s.").

[234] Ex. 24 at 13 (Merck Expert Durbin Rep.) ("[T]here is no known correlate of protection for mumps."); Ex. 22 at 24, 25 (Merck Expert Atkinson Rep.) ("[T]here is not a clear serologic correlate of protection for mumps.") (referencing "absence of a correlate of protection for mumps"); Ex. 10 at 6, 25 (Merck Expert Arvin Rep.) ("For … mumps, we do not have a laboratory test that provides an absolute correlate of protection ….") ("[W]e do not have laboratory [tests] … that are accepted as a definitive correlate with protection" for mumps.); Ex. 233 at 8 (Report of Merck's Expert Dr. Yonatan Grad (hereinafter "Merck Expert Grad Rep.")) (For mumps, "serum neutralization in lab tests do not correlate well with extent of protection."); Ex. 40 at 320:15-321:3 (Merck Expert Arvin Dep.) ("Q. … [Quoting ProQuad label] 'Efficacy was established through immunological correlates for protection against measles, mumps, rubella and varicella.' Do you see that? A. Yes. … Q. But [] there is no correlate of protection against mumps … correct? A. That is correct."); Ex. 146 at 171:11-13 (Merck 30(b)(6) Kuter Dep.) ("Q. Has Merck done any test to establish any correlates of effectiveness? A. No.").

## VII.   MUMPS OUTBREAKS

### A.   Mumps Resurgence Since 2006

194.   Dr. Krah expressed to Relator Krahling Dr. Krah's prediction that mumps outbreaks would continue to occur because the vaccine's efficacy was not high enough to prevent disease outbreaks.[235]

195.   There has been a resurgence in mumps cases and outbreaks since 2006 in vaccinated individuals.[236]

196.   In 2006, there were 6,584 reported cases of mumps in the United States across 45 states, the District of Columbia, Guam, and Puerto Rico.  In 2007, there were 800 reported cases of mumps in the United States.  In 2008, there were 454 reported cases of mumps in the United States.  In 2009, there were 1,991 reported cases of mumps in the United States across 45 states, the District of Columbia and Puerto Rico.  In 2010, there were 2,612 reported cases of mumps in

---

[235]  Ex. 160 at 48 (Relator Krahling's Response to Interrogatory 14) ("In a conversation Relator had with Krah prior to 2001, Krah predicted that mumps outbreaks would continue to occur."); Ex. 160 at 62 (Relator Krahling's Response to Revised Interrogatory 17) ("Krah admitted to Relator that Merck's mumps vaccine is not 95% effective in preventing mumps disease, and that vaccine efficacy is not high enough to prevent disease outbreaks even if every person in the United States were vaccinated with Merck's MMR vaccine. … To further support the idea that the efficacy of the mumps vaccine was not just low, but lowering, [Dr.] Krah predicted that it would continue to get worse, that mumps outbreaks would continue to occur as a result of serial passaging requirements, and that eventually measles outbreaks would also rise in frequency.").

[236]  Ex. 7 at 139:7-9 (CDC 30(b)(6) Pallansch Dep.) ("There clearly has been a resurgence [of mumps cases] particularly from 2006 till present …."); Ex. 40 at 220:20-221:2 (Merck Expert Arvin Dep.) (agreeing there was a 2000% increase in mumps between 2000 and 2017 based on 300 cases reported in 2000 and 6,000 cases in 2017); Ex. 22 at 21 (Merck Expert Atkinson Rep.) ("Several mumps outbreaks have occurred in US since 2006, which has contributed to an increase in the number of reported mumps cases."); Ex. 22 at 27 (Merck Expert Atkinson Rep.) ("Since 2012, the number of mumps cases, incidence, number of outbreaks, proportion of outbreak-associated cases, and number of jurisdictions reporting mumps outbreaks have all increased.  The number of cases reported in 2016 (6,369) and 2017 (5,629[]) are the highest reported in a decade."); Ex. 41 at 82:2-14 (Merck Expert Nichols Dep.) (agreeing "there's been a resurgence in mumps cases since 2006" and "since 2006 there's been an across-the-board increase in mumps cases in individuals … who have received two doses of Merck's mumps-containing vaccines"); Ex. 1 at 9-12 (Shapiro Rep.) (citing publications) ("[S]ince early 2006 there have been numerous, large outbreaks of mumps in the United States, with nearly 15,000 reported mumps cases since 2014."); Ex. 4 at 147:17-149:12 (Kessler Dep.) (The statement that "there's been a 99 percent decrease in mumps cases since the vaccine was introduced in 1967 … would probably be an incomplete statement … the CDC [website says] … 'Although the United States experienced a 99 percent reduction in mumps cases following implementation of the two-dose vaccination program in 1989, mumps has resurged in the past ten years.' … So I think [Merck's] data is correct, but it's somewhat out of date.").

the United States across 44 states, the District of Columbia, Guam and Puerto Rico.  In 2011, there were 404 reported cases of mumps in the United States.  In 2012, there were 229 reported cases of mumps in the United States.  In 2013, there were 584 reported cases of mumps in the United States.  In 2014, there were 1,223 reported cases of mumps in the United States across 42 states and the District of Columbia.  In 2015, there were 1,329 reported cases of mumps in the United States across 38 states, Guam and Puerto Rico.  In 2016, there were 6,369 reported cases of mumps in the United States across 47 states, the District of Columbia, and Puerto Rico.  In 2017, there were 6,109 reported cases of mumps in the United States across 47 states, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands.  In 2018, there were at least 1,882 reported cases of mumps in the United States across 46 states, the District of Columbia and Puerto Rico.  In 2019, as of September 14, 2019, there were 2,424 reported cases of mumps in the United States across 48 states and the District of Columbia.[237]

197.   The majority of mumps cases occurring in the United States since 2006 are among those individuals who had been vaccinated with two doses of Merck's mumps vaccine.[238]

---

[237]  Ex. 234 at Table 2 (2006 CDC Summary of Notifiable Diseases); Ex. 235 at 29 (2009 CDC Summary of Notifiable Diseases); Ex. 236 at 24 (2010 CDC Summary of Notifiable Diseases); Ex. 237 at 105 (2012 CDC Summary of Notifiable Diseases); Ex. 238 at 31 (2013 CDC Summary of Notifiable Diseases); Ex. 239 at 48 (2014 CDC Summary of Notifiable Diseases); Ex. 240 at 53-54 (2015 CDC Summary of Notifiable Infectious Diseases and Conditions); Ex. 241 at Table 2j (2016 CDC Nat'l Notifiable Diseases Surveillance Sys., Annual Tables of Infectious Disease Data); Ex. 242 at Table 2j (2017 CDC Nat'l Notifiable Diseases Surveillance Sys., Annual Tables of Infectious Disease Data); Ex. 243 at Table 1y (2019 CDC Nat'l Notifiable Diseases Surveillance System, Weekly Tables of Infectious Disease Data (Week 37)); Ex. 1 at 9-11 (Shapiro Rep.) (describing mumps outbreaks).

[238]  Ex. 7 at 143:21-22 (CDC 30(b)(6) Pallansch Dep.) ("We have seen a trend over these outbreaks of the number of cases having two doses has gone up."); Ex. 22 at 27 (Merck Expert Atkinson Rep.) ("An increase in mumps outbreaks and cases, particularly among people who received 2 doses of MMR was first noted in 2006."); Ex. 40 at 219:7-9, 227:18-23 (Merck Expert Arvin Dep.) ("[W]e have been seeing these outbreaks in vaccinated populations…."); Ex. 15 at 32:10-18 (Merck Expert Temte Dep.) (testifying recent mumps cases have been "largely[] in fully vaccinated populations"); Ex. 39 at 166:17-20 (Musey Dep.) (affirming mumps outbreaks in vaccinated populations); Ex. 1 at 10-14 (Shapiro Rep.) (reporting on mumps outbreaks in fully vaccinated populations); Ex. 244 at 1 (*Decreased humoral immunity to mumps in young adults immunized with MMR vaccine in childhood*, Proc. Nat'l Acad. Sci. USA 116:19071-19076, Sept. 17, 2019) ("Unexpectedly, in the past decade, multiple mumps outbreaks have been reported in the United States … with a high attack rate among vaccinated young adults").

198.    In 2000, prior to the resurgence of mumps starting in 2006, the CDC set a goal to eliminate mumps disease in the United States by 2010.[239]

199.    In 2010, due to the mumps resurgence since 2006, the CDC revised its total elimination goal to fewer than 500 mumps cases in the United States each year.[240]

### B.    Uncertainty of Causes of Mumps Resurgence

200.    Merck claims it does not know the causes of the mumps resurgence in the United States.[241]

201.    Merck's position is "It is not Merck's job" to formally evaluate the mumps outbreaks or to determine the cause of the mumps resurgence.[242]

202.    The CDC does not know the causes of the mumps resurgence in the United States.[243]

---

[239] Ex. 7 at 24:14-15 (CDC 30(b)(6) Pallansch Dep.) (testifying CDC had goal of mumps elimination by 2010); Ex. 1 at 18 (Shapiro Rep.) ("In 2000, the specific goal for the number of cases of mumps … was zero cases …. Clearly, that did not happen.").

[240] Ex. 7 at 24:14-25:1 (CDC 30(b)(6) Pallansch Dep.) (testifying CDC's mumps elimination goal no longer exists. CDC now has a mumps reduction goal -- a few hundred cases per year; did not meet it last year); Ex. 7 at 151:12-20 (CDC 30(b)(6) Pallansch Dep.) (testifying CDC will not meet goal of a few hundred mumps cases per year: "I can say with certainty we are off track because the last two years have been well off the target numbers."); Ex. 245 at 151:7-11 (Merck Expert Atkinson Dep.) (testifying CDC's goal changed from eliminating mumps to fewer than 500 cases per year).

[241] Ex. 212 at 26 (Merck Response to Plaintiffs' Interrogatory 8) ("[I]t is not clear why Mumps Outbreaks sometimes occur in highly vaccinated populations …."); Ex. 39 at 201:21-24 (Musey Dep.) ("Q. What are the possible factors [causing the mumps outbreaks]…? A. Again, I have no idea. There are many factors."); Ex. 122 at 769:5-10 (Krah Dep.) ("As far as what's actually causing [the outbreaks], I don't have an understanding."); Ex. 146 at 139:2-19 (Merck 30(b)(6) Kuter Dep.) ("[I]t's really not clear why the mumps outbreaks have occurred …."); Ex. 146 at 148:10-13 (Merck 30(b)(6) Kuter Dep.) ("Q. So does Merck have an opinion as to what the possible causes [of outbreaks] are? A. No."); Ex. 146 at 150:3-16 (Merck 30(b)(6) Kuter Dep.) ("Q. So Merck takes no position as to whether … anything is a cause of mumps outbreaks? … [A.]: I can't answer that. That's speculation. … Q. You can't answer it because Merck does not take a position? … [A.]: I don't think I can answer that."); Ex. 146 at 157:6-17 (Merck 30(b)(6) Kuter Dep.) ("Q. Does Merck have an opinion as to whether each of these [possible outbreak] causes is equally likely? A. No, we really don't."); Ex. 15 at 124:10-125:6 (Merck Expert Temte Dep.) ("I don't think anyone has an absolute answer" as to what's causing mumps outbreaks).

[242] Ex. 146 at 130:2-7 (Merck 30(b)(6) Kuter Dep.) ("Q. So Merck has not conducted any formal evaluation of any mumps outbreak? … A. It is not Merck's job."); Ex. 39 at 160:21-24 (Musey Dep.) ("A. But that's not Merck's job … to see what has been the factor leading to … those [mumps] outbreaks.").

[243] Ex. 246 at '446 (CDC: "[T]he overall goal of our proposal is to determine why a surge of nearly 10,000 cases of mumps virus infection have occurred among two dose MMR vaccine recipients in the U.S. during the last four

203.    The public health community does not know the causes of the mumps resurgence in the United States.[244]

204.    The possible causes for the mumps resurgence in the United States include waning immunity, primary vaccine failure, low vaccine potency, and a change in the circulating mumps virus strain.[245]

---

years. The biologic basis for this is not understood and it is of serious public health concern for many reasons."); Ex. 245 at 73:12-18 (Merck Expert Atkinson Dep.) ("I don't think anyone, CDC included, has really been able to sort out which of those [possible outbreak] factors is most important."); Ex. 7 at 164:25-165:6 (CDC 30(b)(6) Pallansch Dep.) (CDC is "becoming convinced that we have several factors that can contribute to the size and duration of outbreaks. We don't know at this point the relative importance of those factors, but we certainly believe they have a role, and we have not explicitly ruled out any of those factors."); Ex. 10 at 18 (Merck Expert Arvin Rep.) ("CDC has been attempting to develop better understanding of this uptick in the number of [mumps] cases."); Ex. 146 at 164:16-22 (Merck 30(b)(6) Kuter Dep.) ("A. … In the ten years of [CDC] evaluating this information [on causes of mumps outbreaks] … they have not come to one specific factor. All these nine are still in play.").

[244] Ex. 15 at 125:5-6 (Merck Expert Temte Dep.) ("I don't think anyone has an absolute answer" as to what's causing mumps outbreaks.); Ex. 1 at 12 (Shapiro Rep.) ("There is no consensus about the reasons for the resurgence in mumps."); Ex. 3 ¶ 439 (Kessler Rep.) ("The causes for the resurgence of mumps cases and mumps outbreaks has not been established."); Ex. 3 at Schedule 17 (Kessler Rep.) (summarizing published research as to the possible causes for the resurgence of mumps cases and outbreaks beginning in 2006).

[245] Ex. 212 at 26 (Merck Response to Plaintiffs' Interrogatory 8) ("Factors that have been considered [to contribute to mumps outbreaks] include … differences between the mumps vaccine strain and the circulating mumps wild type strain, waning immunity, diminished mumps vaccine effectiveness"); Ex. 40 at 232:5-233:18 (Merck Expert Arvin Dep.) (identifying as possible causes primary vaccine failure, low potency, waning immunity, change in the circulating mumps virus strain); Ex. 40 at 235:8-22 (Merck's Expert Arvin Dep.) (testifying sub-potency could be possible cause of resurgence of mumps: "any vaccine … not given … with the level of potency that's needed to induce an immune response, that hypothetical would always be true"); Ex. 7 at 133:17-137:22, 173:17-25 (CDC 30(b)(6) Pallansch Dep.) (identifying primary vaccine failure, waning immunity, insufficient memory B cell response, change in circulating mumps virus strain as possible causes of resurgence of mumps); Ex. 7 at 156:13-18 (CDC 30(b)(6) Pallansch Dep.) ("Q. If there had been a change of potency, could that be relevant to how effective the vaccine is? A. Absolutely. If you … cut the amount of … virus in the vaccine, that could easily make a lower response."); Ex. 247 at 12:19-13:5, 208:1-5 (Deposition of Merck's Expert Dr. Yonatan Grad (hereinafter "Merck Expert Grad Dep.")) (identifying as possible causes a change in the circulating mumps virus strain and waning immunity; also testifying he would be interested in data on vaccine potency in connection with outbreaks); Ex. 8 at 161:2-15, 162:1-5 (Shapiro Dep.) (identifying as possible causes potency, waning immunity, change in circulating mumps virus strain, insufficient memory B cell response; ("[I]t is pretty obvious that … vaccine[] potency is part of what makes a vaccine work. So its ability to induce antibodies, to … induce Memory B cells, all that is related to potency."); Ex. 3 ¶ 439 (Kessler Rep.) ("If … young adults received lower potency vaccines as children this … would be relevant for evaluating potential causes of the resurgence of mumps cases and mumps outbreaks since 2006."); Ex. 155 at 99:8-13 (Krahling Dep.) ((affirming "[Dr.] Krah told [Relator Krahling] that "the vaccine's efficacy or effectiveness has diminished since the time that Hilleman ran his studies on the mumps vaccine.").

205.    The CDC has requested Merck to provide input on the possible causes for the resurgence of mumps.[246]

206.    Merck has never provided the CDC with any information relating to problems with mumps vaccine effectiveness, potency, or shelf life; compliance with the FDA license or label specifications for mumps vaccines; or clinical trial fraud relating to mumps vaccines.[247]

207.    Shortly after the complaint in this case was unsealed, Merck communicated to the CDC that there were no issues with Merck's mumps vaccines.[248]

---

[246] Ex. 7 at 153:21-154:2 (CDC 30(b)(6) Pallansch Dep.) ("Q. So it's fair to say the CDC has reached out to Merck for input in connection with the CDC's investigation of the mumps outbreaks?  A. We have certainly invited them to participate and provide information, just as they do for the ACIP work groups, where they share information that they have.").

[247] Ex. 7 at 117:13-118:19, 142:10-13, 148:7-10 (CDC 30(b)(6) Pallansch Dep.) (Dr. Pallansch testifying he is not aware of Merck disclosing to CDC any manufacturing changes or problems with the effectiveness, potency, shelf life, or compliance with label specifications and licenses of its mumps vaccines); Ex. 7 at 125:20-126:9 (CDC 30(b)(6) Pallansch Dep.) (Dr. Pallansch testifying he is not aware of Merck disclosing to CDC that Merck falsified data or committed fraud); Ex. 7 at 156:2-12 (CDC 30(b)(6) Pallansch Dep.) ("Q. So in terms of possible causes for the resurgence of outbreaks, the … low potency of the mumps-containing vaccines is not one of the issues that the CDC has looked at; is that correct?  A. We have not looked at potency because of the lack of any awareness of a change in potency.  Therefore, as far as our assumptions is the vaccine that was originally licensed for MMR is still the vaccine that we're evaluating for vaccine effectiveness."); Ex. 248 at p.1 (Apr. 19, 2006 CDC Press Briefing Transcript) ("There is a lot of confusion right now about whether or not this [mumps] outbreak is related to some problem with the vaccine, and I really want to emphasize that while we are of course investigating the outbreak and we will learn more about the efficacy of the vaccine in this particular setting, *we have absolutely no information to suggest that there is any problem with the vaccine.*") (emphasis added); Ex. 245 at 192:4-6 (Merck Expert Atkinson Dep.) (Dr. Atkinson testifying he is not "aware of any discussions within CDC" of issues relating to problems with mumps stability or shelf life, compliance with mumps label specifications, fraud in securing mumps vaccine licenses, or misbranding or adulteration of mumps vaccines); Ex. 249 at 111:1-25 (Deposition of CDC's 30(b)(6) Witness Alan Sims (hereinafter "CDC 30(b)(6) Sims Dep.")) (Mr. Sims testifying he does not recall Merck raising issues of "efficacy," "potency," or "effectiveness" during Merck-CDC contract negotiations); Ex. 250 at 165:2-12 (Deposition of Merck Employee Katalin Abraham (hereinafter "Abraham Dep.")) (Dr. Abraham testifying she does not recall any discussions about Merck reporting to CDC mumps products not meeting specifications).

[248] Ex. 251 at '961 (June 7, 2012 – roughly when Relators' Complaint was unsealed – internal Merck correspondence) ("I just got off the phone with Jeanne Santoli at CDC.  I provided her a high-level overview of the situation with MMRII.  She appreciated the heads-up and was relieved to hear there were no issues with safety, quality, supply, etc.  We have scheduled a telecon between Merck and CDC for tomorrow afternoon at 4pm.  Expected attendees from CDC (in addition to Jeanne include): Jane Seward from the Viral Branch, Jesse Wayne (acting Director of Immunization Services branch), and a representative of CDC Public Affairs.").

## C. Significant Concern Over Mumps Resurgence

208. There is significant concern by the CDC over the mumps resurgence in the United States.[249]

209. Mumps outbreaks were discussed at 14 ACIP meetings between May 2006 and February 2018.[250]

210. In early 2017, the CDC's ACIP created a Mumps Working Group to assess the possible causes of, and how best to address, the mumps resurgence in the United States.[251]

211. In 2006, because of the mumps resurgence in the United States, ACIP recommended a two-dose mumps vaccination policy for school-aged children.[252]

212. In 2017, because of the mumps resurgence in the United States since 2006, ACIP recommended a third dose of mumps vaccine for persons previously vaccinated with two doses

---

[249] Ex. 246 at '446 (CDC: the "surge" of mumps cases among vaccinated populations "is not understood and it is of serious public health concern for many reasons."); Ex. 7 at 144:24-145:12 (CDC 30(b)(6) Pallansch Dep.) ("Q. Why is the prevention of these outbreaks of such issue to the CDC?  A. It's disease burden.  I mean, if you look at these outbreaks, they do have not only a disruption for the institutions and populations affected, but you have children who are being hospitalized with complications, some of which include more serious conditions, like deafness, or even some issues around loss of fertility associated with orchitis, as another example.  So these complications are nontrivial.  So there's still significant disease severity associated with mumps, even though it is less than what it was in the pre-vaccine era."); Ex. 7 at 163:25-164:4 (CDC 30(b)(6) Pallansch Dep.) (testifying a "big focus" of the CDC is "the contributing factors to the resurgence and the size of the outbreaks"); Ex. 40 at 213:6, 216:19-217:3 (Merck Expert Arvin Dep.) ("Every outbreak is a concern. … We are concerned about what the burden of disease is.  Q. When you say 'we' who do you mean by 'we'?  A. I mean pediatric infectious disease specialists.  I mean pediatricians.  I mean parents.  I mean the CDC.  I mean, I hope, all of us."); Ex. 1 at 11, 13, 19 (Shapiro Rep.).

[250] Ex. 22 at 15 (Merck Expert Atkinson Rep.).

[251] Ex. 15 at 117:5-14 (Merck Expert Temte Dep.) (testifying ACIP formed Mumps Working Group because of mumps outbreaks); Ex. 22 at 28 (Merck Expert Atkinson Rep.) ("Because of the continued occurrence of mumps outbreaks in highly vaccinated populations, a mumps vaccine Work Group was established in early 2017."); Ex. 245 at 149:2-6 (Merck Expert Atkinson Dep.) (affirming ACIP created mumps work group because of outbreaks); Ex. 1 at 18 (Shapiro Rep.) ("The ACIP created a working group devoted exclusively to the study of the resurgence of mumps and of ways to address the problem.").

[252] Ex. 15 at 88:5-23 (Merck Expert Temte Dep.) ("Q. …[S]ince 2006, ACIP has made two changes in its recommendation for mumps vaccine because of the resurgence of outbreaks; is that correct? … A. Including 2006 there have been two recommendations, one here and then the third dose.  Q. And the reason for those recommendation changes was because of the resurgence in outbreaks, correct? … [A.] In high-risk populations, yes.").

Appx375

who are identified by public health authorities as being part of a group or population at increased risk for acquiring mumps because of an outbreak.[253]

213.    The mumps vaccine is the only vaccine for which ACIP has changed its recommendation twice because of a resurgence of the disease.[254]

214.    There is significant concern by the public health community over the mumps resurgence in the United States.[255]

---

[253]  Ex. 252 at 48 (Report of Merck Expert Dr. Jonathan L. Temte (hereinafter "Merck Expert Temte Rep.")) ("ACIP has now adopted a 3rd dose MMR recommendation for use during outbreaks."); Ex. 22 at 28 (Merck Expert Atkinson Rep.) (ACIP recommended third dose of mumps vaccine during outbreaks based on continued outbreaks in highly vaccinated populations); Ex. 1 at 9, 15 (Shapiro Rep.) ("The inadequacy of two doses of Merck's mumps vaccine is further evidenced by the recent (late 2017) decision of the ACIP to recommend administration of a third dose of mumps vaccine during outbreaks of mumps.  However, the benefit of even a third dose of the vaccine was limited.").

[254]  Ex. 15 at 89:20-90:12 (Merck Expert Temte Dep.) ("Q. … I'm talking about actual changes in recommendations. And there's been none since 2006, other than mumps, for a resurgence of outbreaks, correct?  … [A.] Yeah. I … cannot recall any. … Q. Okay. Then we went further back than 2006, and you came up with one example [measles].  Can you think of any examples where there have been two changes in ACIP's recommendations because of outbreaks for any other vaccine, other than mumps?  … [A.] … [O]ff the top of my head, I can't."); Ex. 245 at 187:20-188:8 (Merck Expert Atkinson Dep.) ("Q. … [Y]ou wrote, 'Prior to October 2017, mumps outbreak investigations did not result in any change in ACIP recommendations for use of MMR.' … But that's not true, right? In 2006 there was a recommendation by ACIP because of mumps outbreaks, correct?  A. That is correct.").

[255]  Ex. 40 at 213:6, 216:19-217:3 (Merck Expert Arvin Dep.) ("Every outbreak is a concern.  …  We are always concerned about break-through infection in vaccine situations, yes.  We are concerned about what the burden of disease is.  Q. When you say 'we' who do you mean by 'we'?  A. I mean pediatric infectious disease specialists. I mean pediatricians.  I mean parents.  I mean the CDC.  I mean, I hope, all of us."); Ex. 1 at 4, 13 (Shapiro Rep.) ("The resurgence of mumps cases and outbreaks in the United States is a significant public health concern.") ("[Mumps outbreaks] have been occurring with markedly increased frequency, are occurring nationwide in highly vaccinated populations, and have become a major public health problem."); Ex. 1 at 16 (Shapiro Rep.) ("The consequences of an imperfect vaccine on patients is well illustrated in studies of complications of mumps, even in the modern era, during outbreaks of mumps, making it clear that such outbreaks are not trivial.  This is particularly true when, as is the case now, those affected are mostly adults who have higher rates of complications from the infection."); Ex. 4 at 120:7-13 (Kessler Dep.) ("Let me again emphasize in the strongest possible terms… this matter … has significant public health import … I would urge that this matter be viewed from a public health perspective and not one of litigation business.").

**D.     Merck Has No Reliable or Clinically Relevant Data Demonstrating How Well Its Mumps Vaccines Protect Against Mumps**

215.     The only efficacy studies Merck performed on its mumps vaccines were the studies Merck conducted in the 1960's in connection with Merck's original licensing of its mumps-only vaccine called MumpsVax.[256]

216.     The original mumps licensing studies provide no reliable or clinically relevant data demonstrating how well MMR-II or ProQuad protects against mumps because the studies were too old, too small, and conducted using the mumps-only vaccine (not MMR-II or ProQuad).[257]

217.     In 1998-1999, Merck measured mumps seroconversion rates around 66% to 75%, and as low as 56% using standard PRN tests.[258]

218.     Merck questioned internally in 1999 whether seroconversion rates of approximately 70% as measured by Merck's standard PRN tests accurately measured the level of protection afforded by the MMR-II vaccine Merck sold at the time.[259]

---

[256]  Ex. 253 at '244 (MMR-II label citing original licensing studies as support for efficacy); Ex. 2 at 86-87 (Malone Rep.); Ex. 3 ¶ 44 (Kessler Rep.).

[257]  *See supra* ¶ 33; Ex. 2 at 83 (Malone Rep.) ("Merck's original licensing studies are not relevant to and provide no clinical support for M-M-R II at potencies below 4.3 log[]. They likewise are not relevant to and provide no support for ProQuad or M-M-R II formulated with rHA.").

[258]  *See supra* ¶ 60.

[259]  Ex. 254 at '421 (Merck's "Dorothy [Margolskee] referred to the Swiss study in which protective efficacy associated with [Jeryl Lynn] was 70 some % and pointed out that if this study and similar data are reflective of true efficacy in the field then the PRN and CPE may be telling us what the neutralization against wild [type virus] truly is."); Ex. 130 at '952 ("The label currently indicates that a single dose of MMRII results in a mumps seroconversion rate of 96%; if we are held to this … we may have a problem. We may need to consider the possibility that the [seroconversion] rate at expiry may be lower and plan for this contingency now."); Ex. 128 at '869 ("Summary to date → 70% conversion rate … If this is not resolved and doesn't change → label may have to be changed from 96% to 75%"); Ex. 128 at '869-870 ("Additional concerns: … vaccine doesn't work – fails neut[ralization] assay????"); Ex. 2 at 88 (Malone Rep.).

219.    Merck's AIGENT and ELISA tests provide no reliable or clinically relevant data demonstrating how well MMR-II or ProQuad protects against mumps.[260]

220.    Merck does not have any reliable or clinically relevant data demonstrating how well its MMR-II or ProQuad vaccines protect against mumps.[261]

221.    Merck has not concluded whether low mumps vaccine effectiveness is contributing to the resurgence of mumps.[262]

### E.    Calls for a New Mumps Vaccine

222.    Merck's mumps vaccines do not provide sufficient protection against disease to prevent continued mumps outbreaks.[263]

---

[260] *See supra* ¶¶ 69-131.

[261] Ex. 146 at 37:18-38:8 (Merck 30(b)(6) Kuter Dep.) ("Q. Is there an average level of protection that Merck understands is what the mumps component of Merck's mumps vaccines affords to vaccine recipients? … A. I am not able to answer that question. … Q. Does Merck know, does anyone at Merck know the answer to that question? … [A.] I don't know."); Ex. 146 at 39:1-9 (Merck 30(b)(6) Kuter Dep.) ("Q. Has Merck done any studies of its own to establish whether the level of protection afforded by the mumps component of Merck's mumps vaccine has changed over time? … [A.]: Not that I'm aware of."); Ex. 146 at 40:14-21 (Merck 30(b)(6) Kuter Dep.) ("Q. Do Merck's serology results reflect the protection afforded by the mumps component of Merck's mumps vaccines in any way? A. It's not a direct correlate. Q. Does it have any relationship to protection from disease? A. I really can't answer that."); Ex. 122 at 412:18-22 (Krah Dep.) ("Q. Do you have an opinion on how well the mumps component of MMR II works today in protecting vaccine recipients from contracting mumps? A. I don't have an opinion on that."); Ex. 122 at 413:8-21 (Krah Dep.) ("Q. And all the clinical testing that you did while at Merck on the mumps component of MMR II has given you no indication one way or another as to how well the vaccine works at protecting vaccine recipients from contracting mumps? … [A.] That's correct ….."); Ex. 2 at 7 (Malone Rep.) ("Merck has conducted no clinical studies that demonstrate or support how well M-M-R II (as of 2005) or ProQuad protect against mumps."); Ex. 2 at 87 (Malone Rep.) ("[T]he only clinical data Merck has used to support the more current formulations of the mumps component of M-M-R II … and ProQuad come from the [] ELISA assay … [N]one of this clinical data is reliable or relevant to clinical protection …. Therefore, Merck has conducted no clinical studies that demonstrate or support how well M-M-R II … or ProQuad protect against mumps.").

[262] Ex. 146 at 151:10-153:21, 170:25-171:10 (Merck 30(b)(6) Kuter Dep.) (testifying that the effectiveness of the mumps vaccine is a possible cause for the outbreaks and Merck has done nothing to investigate or rule out the possibility that vaccine effectiveness is one of the causes); *see also* Ex. 232 at 9 (Merck Response to Relators' Interrogatory 3) ("[A]fter January 1, 1998 [Merck] did not conduct studies to determine an effectiveness rate for Merck's Mumps Vaccine.").

[263] Ex. 7 at 151:1-8 (CDC 30(b)(6) Pallansch Dep.) ("Mumps is potentially something that could be eliminated … … and the [mumps] outbreaks called that assumption into question."); Ex. 1 at 4, 14, 18, 20 (Shapiro Rep.) ("A new mumps vaccine is necessary if we wish to control mumps in the United States.") ("The resurgence of outbreaks has caused many to question the current understanding of how well Merck's mumps vaccine actually protects against disease.") ("use of the current vaccine is not likely to lead to a sustained decrease in the number of cases of mumps ….") ("Merck's mumps vaccine is not adequate to prevent outbreaks.") ("The factors that are associated with these [mumps] outbreaks, waning immunity, antigenic changes in the virus, and inadequate B-cell memory induced by the vaccine, are not likely to change for the better.") ("[T]hese [mumps] outbreaks may continue to increase in both

---

80

Appx378

223.    Several leading mumps and vaccine experts have called for the development of a new mumps vaccine.[264]

224.    In 2017, the United States Department of Defense added "investigation of revaccination strategies and identification of correlates of protection for currently available vaccines (especially mumps)" as one of its priorities.[265]

225.    In 2012, Dr. Biao He received an NIH grant to develop a new mumps vaccine.  In his grant application, Dr. He justified the need for his work by stating "[t]he fact that the [mumps] outbreaks had occurred in populations with over 95% two-dose [mumps] vaccine coverage underscores the urgency for a new and effective [mumps] vaccine to replace the current vaccine."[266]

---

frequency and severity."); Ex. 160 at 8 (Relator Krahling's Response to Revised Interrogatory 1) ("[Dr.] Krah told Relator [Krahling] on multiple occasions that the efficacy rate of the mumps vaccine had significantly diminished since its original licensure. … Krah further told Relator that based on this observation, Krah believed the MMRII vaccine no longer provided adequate immunization, and that the vaccine's diminished efficacy would result in mumps outbreaks in the future."); *see also infra* ¶¶ 223, 225-26 (citing evidence of calls for a new mumps vaccine).

[264]  Ex. 255 at '631 (CDC: "Encourage development of more immunogenic and effective mumps vaccines."); Ex. 256 at 381-2 (2013 S. Plotkin article) ("We need a new mumps vaccine. …  I would argue as others have, that a new vaccine is needed. …  Although the practical difficulties are considerable, so is the cost of continued outbreaks of mumps."); Ex. 257 at 91 (2018 S. Plotkin article) (calling for "radical improvement in the mumps vaccine"); Ex. 258 at 799-801 (2016 S. Rubin article) ("[I]t is clear that other approaches to improve vaccine effectiveness need to be pursued.  Among these, development of new vaccines must be considered."); Ex. 259 at 4703-04 (2014 Whitaker article) ("For mumps … we … need better vaccines."); Ex. 260 1-4 (2015 Latner article) ("A more effective mumps vaccine that provides lifelong immunity is certainly desirable, but before scientifically grounded improvements can be made, it will be essential to better understand which parameters of immunity are required for protection and why the immune response to mumps is characteristically weak."); Ex. 261 at 955-59 (2016 Sabbe article) ("Additional research of the immunological mechanisms is clearly needed to support the development of possible new and more immunological vaccines against mumps …."); Ex. 262 at 1458-467 (2008 G. Dayan article) ("Our findings indicate the need for more-effective mumps vaccines…."); Ex. 1 at 17 (Shapiro Rep.) ("The seriousness of the resurgence of mumps in the United States is reflected in the recognition by many prominent vaccine experts, such as Stanley Plotkin, that there is a need for a new vaccine for mumps …."); Ex. 1 at 20 (Shapiro Rep.) ("[A] new [mumps] vaccine is necessary if we wish to control mumps in the United States."); Ex. 4 at 404:24-405:5 (Kessler Dep.) ("[FDA's Dr.] Steve Rubin as [well as] other great virologists strongly support the develop[ment] of newer more immunogenic mumps vaccine to deal with the issues we currently face as a country.").

[265]  Ex. 263 at 55 (Dept. of Def. Program Announcement, Defense Health Program Overview of Funding Opportunity No. W81XWH-17-PRMRP-CTA) (identifying mumps-related funding under "Emerging Infectious Diseases").

[266]  Ex. 264 at '392, '423 (emphasis removed); Ex. 264 at '403-04 ("The fact that [mumps] outbreaks had occurred in populations with over 95% coverage of two-dose [mumps] vaccine strongly suggests that the current vaccine is not effective. … All these possible causes indicate a need for a new vaccine that is effective against current outbreak

226.    The FDA's Dr. Steven Rubin was a principal supporter of Dr. He's project because, as Dr. Rubin stated in his letter supporting Dr. He's grant application, "The proposed studies are of public health significance and are timely considering the recent resurgence of mumps in highly vaccinated populations in the United States and elsewhere, making it quite clear that newer, more immunogenic vaccines are needed."[267]

## VIII.   MERCK'S SALE OF MUMPS VACCINES TO THE CDC

### A.    Overview of CDC Vaccine Purchasing

227.    The CDC is responsible for purchasing vaccines on behalf of the government and local health authorities, including through the agency's Vaccines For Children ("VFC") Program.[268]

228.    The CDC purchases vaccines to try to eliminate or control the burdens of diseases.[269]

229.    The CDC's VFC vaccine purchase contracts are form contracts based on the Federal Acquisition Regulations ("FAR") with additional terms and conditions specific to particular vaccines or manufacturers.[270]

---

strain of mumps virus.") ("Recently, large outbreaks in vaccinated populations have occurred at increasing frequency.  The outbreaks of mumps virus … infection in vaccinated populations underscore the urgency and importance of developing a new and effective vaccine against mumps virus … that caused current outbreaks.").

[267]  Ex. 264 at '446.

[268]  Ex. 11 at 2 ("CDC has a major programmatic role in accomplishing reduction in vaccine-preventable infectious disease through the agency's [Vaccines For Children] Program using scarce public health federal funding to purchase effective vaccines for administration to children by public and private [Vaccines For Children] providers throughout the country.  In that role, CDC is the largest purchaser of mumps vaccine in the United States."); Ex. 12 at 2 (same).

[269]  Ex. 7 at 96:15-21 (CDC 30(b)(6) Pallansch Dep.) (testifying purpose of CDC vaccine purchases is disease reduction; to eliminate or control disease burden); Ex. 11 at 2 ("CDC has a major programmatic role in accomplishing reduction in vaccine-preventable infectious disease through the agency's [Vaccines For Children] Program using scarce public health federal funding to purchase effective vaccines …."); Ex. 12 at 2 (same).

[270]  Ex. 265 at 12 (Report of Merck's Expert William P. Nichols (hereinafter "Merck Expert Nichols Rep.").

Appx380

230.    The CDC VFC vaccine purchase contract process is as follows.  First, the CDC posts a solicitation (i.e., request for proposal) for vaccines to protect against diseases; the solicitations are not specific to any vaccine brand or manufacturer.  Second, vaccine manufacturers submit responses to the CDC solicitation.  Third, the CDC reviews the manufacturers' submissions and discusses contract terms internally.  Fourth, in response to a request from the CDC, the manufacturers submit their best and final offers on contract terms.  Fifth, the CDC either accepts or rejects the best and final offers.  If the CDC accepts a best and final offer, a vaccine purchase contract is executed.[271]

231.    From at least 2003 to 2010, the CDC's VFC solicitations for vaccine purchase contracts state in the "Evaluation and Award" section "[i]n order to be considered for award, an offeror must … operate in accordance with the Current Good Manufacturing Regulations and provide evidence of a current FDA license … prior to award."  That same section also states "[t]he Government intends to award multiple contracts to responsible offerors that meet the award criteria specified …."[272]

232.    Since at least 2011, the CDC's VFC solicitations for vaccine purchase contracts have stated "[t]he following factors shall be used [by the Government] to evaluate offers: (i)

---

[271]  Ex. 265 at 13 (Merck Expert Nichols Rep.) (describing CDC vaccine purchase contract process); Ex. 41 at 109:2-110:9, 111:2-18, 113:16-114:7, 115:1-4 (Merck Expert Nichols Dep.) (testifying every year the CDC posts solicitation to any manufacturer of FDA-licensed MMR and MMRV vaccines – not just to Merck because the ACIP resolution is disease-specific, not brand-specific) (testifying typical manufacturer response to CDC solicitation provides "you've got a valid license, you can provide product with at least a 12-month shelf life, that you've used [cGMP] as the standard for the manufacture and distribution of these products.  And that the product is merchantable … [t]hat it is basically safe and effective ….") ("[T]he program side of the [CDC] … would review the proposal for technical content.  The contracting officer from the procurement side of the [CDC] would look at it from compliance with [FAR] and ensuring the proposal meets all the stipulations associated with the RFP.") (testifying the CDC either accepts or rejects the manufacturers' final proposals)

[272]  *See, e.g.*, Ex. 266 at 36-37 (2003 CDC Solicitation); Ex. 267 at 36-37 (2005 CDC Solicitation); Ex. 268 at 36-37 (2007 CDC Solicitation); Ex. 269 at 29-30 (2010 CDC Solicitation).

Appx381

technical capability of the item offered to meet the Government requirement; (ii) price; (iii) past

performance."[273]

233.    The CDC's vaccine purchase contracts are negotiated and renewed annually.[274]

234.    The CDC prefers multiple suppliers for each type of vaccine it purchases.[275]

235.    Where multiple manufacturers of a type of vaccine contract with the CDC to

supply the same type of vaccine, health care providers generally choose (through CDC-funded

purchases) the more effective vaccine with less side effects.[276]

236.    The CDC may decline to enter into vaccine purchase contracts with vaccine

manufacturers if the manufacturer cannot or will not comply with CDC purchase requirements,

including the FAR.[277]

---

[273]  Ex. 270 at 28 (2011 CDC Solicitation); Ex. 271 at 21 (2012 CDC Solicitation); Ex. 272 at 23-24 (2013 CDC Solicitation); Ex. 273 at 23 (2014 CDC Solicitation); Ex. 274 at 27 (2015 CDC Solicitation); Ex. 275 at 26 (2016 CDC Solicitation); Ex. 276 at 25 (2017 CDC Solicitation); Ex. 277 at 25 (2018 CDC Solicitation); Ex. 278 at 23 (2019 CDC Solicitation).

[274]  Ex. 249 at 80:16-19, 103:15-20 (CDC 30(b)(6) Sims Dep.).

[275]  Ex. 249 at 30:15-16, 32:3-33:17, 40:14-16, 70:10-71:4, 120:2-20, 168:11-169:5 (CDC 30(b)(6) Sims Dep.) (testifying CDC always wants competition among suppliers; having as many options as possible) (testifying limiting CDC to one source for vaccine can be a problem if there are manufacturing or supply issues) (testifying CDC typically makes vaccine contract awards to all qualified suppliers that submit proposals, have a license, and meet other contractual requirements); Ex. 265 at 13 (Merck Expert Nichols Rep.) ("CDC recognizes importance of having as many manufacturers selling a particular vaccine as possible."  This is important to limit likelihood of shortages and "encourage[] continued investment in research for and development of new vaccines.") ("CDC's basic philosophy is to enter into a contract for the purchase of vaccines from all manufacturers of FDA-licensed vaccines that submit responses to the solicitation."); Ex. 41 at 89:20-90:11, 92:24-93:19 (Merck Expert Nichols Dep.) ("I think the basic philosophy, at least from the procurement perspective, was that the more manufacturers for a particular product the better because of potential issues of supply and competition.") (testifying if GSK obtains licensed MMR vaccine, CDC would try to contract with GSK to purchase the vaccine); Ex. 279 at '570 ("Summary of GSK-CDC MMR/V Vaccine Meeting") ("Confirmation by [CDC's] J Seward that the [CDC] viewed acquisition of a second supplier of MMR/V vaccines to the US as [] vital to mitigate supply interruptions and to foster competition.").

[276]  Ex. 41 at 94:10-96:16 (Merck Expert Nichols Dep.) (testifying health care providers (e.g., state and local health departments) drive CDC purchase decision; when one vaccine option is more effective or has fewer side effects than the other, health care providers prefer the more effective option, which results in the CDC buying more of that option); Ex. 33 at '062 ("Market research … has shown that seroconversion …  and incidence of rash and fever … are the most important features considered by physicians in the selection of trivalent measles, mumps, and rubella vaccines."); *see also* Ex. 41 at 92:5-11 (Merck Expert Nichols Dep.) (testifying ACIP may express preference for one product over another due to better immune response).

[277]  Ex. 41 at 104:6-14 (Merck Expert Nichols Dep.) (testifying circumstances under which CDC may decline to contract for vaccines included in VFC program include manufacturer unable to comply with CDC contract

B.     **Role of ACIP In CDC Vaccine Purchasing**

237.     ACIP provides recommendations to the CDC and the medical community in the

United States on the use of vaccines.[278]

238.     ACIP's recommendations for new vaccines are based on, among other things,

considerations of vaccine efficacy and effectiveness.[279]

239.     ACIP's recommendations for new vaccines are also based on the results of clinical

trials manufacturers submit to the FDA to support vaccine licensure.[280]

---

requirements); Ex. 41 at 115:22-116:6 (Merck Expert Nichols Dep.) ("Q. But if [vaccine manufacturer] cannot or will not comply with the requirements the CDC is imposing, then the CDC will not contract with them. Is that correct? A. I would say that's accurate. Q. And is the same true if [the vaccine manufacturer] cannot or will not comply with the FAR regulations? A. That is correct.").

[278]  Ex. 11 at 2 (explaining CDC and ACIP "effectively define the standard of medical care through recommendations on the proper use of pediatric and adult vaccines"); Ex. 12 at 2 (same); Ex. 249 at 146:3-8, 200:22-201:3 (CDC 30(b)(6) Sims Dep.) (testifying CDC relies on ACIP for recommendations on which vaccines to purchase); Ex. 252 at 12 (Merck Expert Temte Rep.) ("ACIP's role is to provide advice and guidance to the Director of the CDC regarding uses of vaccines and related agents for effective control of vaccine-preventable diseases.").

[279]  Ex. 280 at 2 ("[ACIP] deliberations on use of vaccines to control disease in the U.S. shall include consideration of … vaccine efficacy and effectiveness, vaccine safety, [and] the quality of evidence reviewed, … [ACIP] may revise or withdraw their recommendation(s) regarding a particular vaccine as new information on … vaccine effectiveness or safety … or other data become available."); Ex. 252 at 24 (Merck Expert Temte Rep.) (citing same); Ex. 22 at 19 (Merck Expert Atkinson Rep.) (citing same); Ex. 15 at 44:16-45:9 (Merck Expert Temte Dep.) (testifying CDC tasks ACIP "to carefully evaluate safety, effectiveness, efficacy …"); Ex. 252 at 27 (Merck Expert Temte Rep.) ("Important information necessary for … new or revised vaccine recommendations includes assessments of … efficacy/effectiveness."); Ex. 15 at 135:13-15 (Merck Expert Temte Dep.) (testifying ACIP recommendations based on efficacy, effectiveness, and safety); Ex. 252 at 30-31 (Merck Expert Temte Rep.) ("Several factors are considered in each ACIP vaccine recommendation" including "vaccine efficacy and effectiveness …."); Ex. 22 at 16 (Merck Expert Atkinson Rep.) ("Once vaccines are licensed, the data most important to the ACIP and the CDC is that regarding a vaccine's safety and effectiveness."); Ex. 245 at 34:10-15 (Merck Expert Atkinson Dep.) (testifying besides vaccine safety, "vaccine efficacy … is the … single most important issue[] with vaccine recommendations is the protection that those vaccines provide"); Ex. 7 at 98:21-99:2 (CDC 30(b)(6) Pallansch Dep.) (testifying part of process of generating ACIP recommendations is understanding the benefits and risks of the vaccines CDC purchases).

[280]  Ex. 252 at 29-30 (Merck Expert Temte Rep.) ("New vaccine recommendations … are largely dependent on the results of studies conducted by the manufacturer. These studies are required for licensure by the FDA and include detailed information on safety, efficacy, and other vaccine features."); Ex. 252 at 49 (Merck Expert Temte Rep.) ("ACIP uses clinical trial data for new vaccines."); Ex. 15 at 91:19-92:19 (Merck Expert Temte Dep.) ("With new vaccines for FDA licensure, companies are required to provide clinical trial data to show both safety and efficacy." ACIP is "mandated" by "the [ACIP] charter" to "review those clinical trials and the efficacy and safety data resulting from those trials and uses that information in assessing what recommendations, if any, it's going to make."); Ex. 15 at 97:17-19 (Merck Expert Temte Dep.) ("ACIP will look at the clinical trial data for all new vaccines to evaluate … effectiveness."); Ex. 22 at 22 (Merck Expert Atkinson Rep.) ("Clinical trial data (efficacy and safety) generated by the manufacturer help inform subsequent recommendations made by the ACIP."); Ex. 22 at 23 (Merck Expert Atkinson Rep.) ("Initial vaccine recommendations made by ACIP are based upon … efficacy and safety data

240.     ACIP's recommendation for ProQuad was based on the results of the clinical trials Merck submitted to the FDA to support its BLA for ProQuad.[281]

241.     ACIP may revise or withdraw its recommendation regarding a particular vaccine based on new information on vaccine effectiveness.[282]

243.     Critical to ACIP's vaccine recommendations is vaccine manufacturers providing accurate information on, among other things, vaccine effectiveness.[284]

---

generated by the manufacturer in clinical trials."); Ex. 22 at 23 (Merck Expert Atkinson Rep.) ("ACIP recommendations … will be based upon pre-licensure clinical trials performed by the manufacturer.").

[281] Ex. 245 at 175:3-176:15 (Merck Expert Atkinson Dep.) ("Q. And as part of ACIP's recommendation, did it consider any clinical trial data from Merck with respect to its ProQuad vaccine? … [A.] … [T]hose were the basis for the licensure of ProQuad. And so, yes, those data would have been presented [to ACIP] … [A]nytime you have a new vaccine, ACIP wants to know … why the vaccine is being licensed. … [T]hose were critical information that [ACIP] would need in order to understand how well the vaccine performed relative to vaccines that already existed."); Ex. 15 at 149:9-150:15 (Merck Expert Temte Dep.) (testifying ACIP's ProQuad recommendation, which was based on "evidence suggest[ing] that the [ProQuad and MMR-II + varicella] are equivalent in terms of efficacy, effectiveness, immunogenicity and burden of disease," came from clinical trials Merck used to support its BLA for ProQuad) (citing Temte Ex. 4 "[FDA] CLINICAL REVIEW OF STUDIES SUBMITTED IN SUPPORT OF LICENSURE OF PROQUAD™").

[282] Ex. 280 at 2 ("[ACIP] may revise or withdraw their recommendation(s) regarding a particular vaccine as new information on … vaccine effectiveness or safety … or other data become available."); Ex. 7 at 102:9-11 (CDC 30(b)(6) Pallansch Dep.) (CDC "monitoring vaccine effectiveness is almost always in the context of potential revisions to [ACIP] recommendations based on actual experience."); Ex. 7 at 102:22-103:12 (CDC 30(b)(6) Pallansch Dep.) (testifying new information on vaccine effectiveness can lead to informing ACIP there is a need to reevaluate its recommendation); Ex. 252 at 30, 31, 49 (Merck Expert Temte Rep.) ("Ongoing assessments … on clinical effectiveness … are of critical importance.") ("[V]accine recommendations are not fixed, but can adapt to changes in epidemiology, emerging evidence of vaccine performance and safety, and programmatic issues.") ("ACIP relies on effectiveness data derived from real world experience for reviewing, renewing and revising recommendations for existing vaccines."); Ex. 15 at 80:23-81:2 (Merck Expert Temte Dep.) ("A vaccine recommendation [by ACIP] could change depending on the effectiveness …."); Ex. 22 at 17 (Merck Expert Atkinson Rep.) ("Vaccine effectiveness is monitored after licensure to assure that the efficacy determined during pre-licensure clinical trials continues after the vaccine is widely used. … Post-licensure vaccine effectiveness monitoring has resulted in important changes being made to vaccine recommendations.") (citing 1989 recommendation for second measles dose and 2018 recommendation for third mumps dose during outbreaks resulting from mumps cases among highly vaccinated populations); Ex. 245 at 28:3-17 (Merck Expert Atkinson Dep.) ("[V]accine effectiveness is obviously kind of the most important thing that we deal with ….").

[284] Ex. 11 at 2 ("Critical to [CDC/ACIP recommendations] is the agency receiving accurate information from the vaccine manufacturers to better inform CDC/ACIP guidance"); Ex. 12 at 2 (same); Ex. 15 at 99:4-11 (Merck Expert Temte Dep.) ("Q. … [H]ow important is it to ACIP that the clinical trial data that it is reviewing for newly licensed vaccines be accurate? [A.] There is an assumption that the data emanating from a trial that was implemented for FDA is accurate data.").

## C.    Prerequisites for CDC Vaccine Purchases

244.    The CDC will only purchase a vaccine with a valid FDA license.[285]

245.    The CDC will only purchase a vaccine that ACIP has recommended.[286]

246.    Every CDC vaccine purchase contract requires the vaccine to have a minimum of

12-months of shelf life remaining upon delivery.[287]

---

[285] Ex. 249 at 14:16-15:2, 73:17-74:14, 112:3-19, 165: 3-11, 189:16-22 (CDC 30(b)(6) Sims Dep.) (testifying CDC will not purchase vaccine without valid FDA license); Ex. 249 at 85:7-12, 140:20-23, 170:4-19 (CDC 30(b)(6) Sims Dep.) (testifying vaccine manufacturer maintaining FDA license is "critical" to CDC); Ex. 249 at 164:1-4 (CDC 30(b)(6) Sims Dep.) ("[O]bviously the F.D.A. license … [CDC is] very much relying on that…."); Ex. 249 at 85:19-21 (CDC 30(b)(6) Sims Dep.) ("[C]ertainly [CDC] would want to know if something potentially violates … the licensure"); Ex. 249 at 79:24-80:1 (CDC 30(b)(6) Sims Dep.) ("[C]ertainly [CDC] want[s] F.D.A. licensed products and that they comply with all F.D.A. standards."); Ex. 249 at 190:10-191:8 (CDC 30(b)(6) Sims Dep.) (testifying it is certainly important that vaccine comply with license); Ex. 249 at 198:16-199:8 (CDC 30(b)(6) Sims Dep.) (testifying if manufacturer's misconduct "impacted [the license] then that is something that could impact [the CDC's purchase decision], certainly"); Ex. 265 at 13-14 (Merck Expert Nichols Rep.) ("As a prerequisite to procurement and contract execution, vaccine manufacturers must submit copies of their … licenses for the CDC's review and verification."); Ex. 41 at 19:7-11 (Merck Expert Nichols Dep.) (testifying "valid license issued by FDA" is "required for CDC to procure a vaccine"); Ex. 41 at 19:10-11, 20:12-15 (Merck Expert Nichols Dep.) ("CDC would not release an RFP to get proposals from potential vendors and would not accept a proposal without the product having those qualifications," including a "valid license issued by FDA"); Ex. 41 at 29:22, 30:4-5 (Merck Expert Nichols Dep.) (identifying "valid license" as one of the "prerequisites to a CDC purchase of a [VFC] vaccine"); Ex. 41 at 38:14-17 (Merck Expert Nichols Dep.) ("If FDA were to revoke a license, then obviously that would impact [CDC's] contracting and we would have to terminate the contract."); Ex. 41 at 118:8-15 (Merck Expert Nichols Dep.) ("Q. Now, if that product license had been amended by the FDA, Merck would have been responsible for providing the amended license. Is that correct?  …  [A.] As part of their proposal, they should have, yes.").

[286] Ex. 7 at 166:8-13 (CDC 30(b)(6) Pallansch Dep.) (testifying if ACIP stops recommending a vaccine, CDC will not purchase it); Ex. 22 at 9 (Merck Expert Atkinson Rep.) ("CDC does not purchase any vaccine until there is an ACIP recommendation for use of that vaccine …."); Ex. 41 at 19:6-20:9 (Merck Expert Nichols Dep.) ("CDC would not initiate procurement for a product without [certain] characteristics," including "a recommendation from the [ACIP]"); Ex. 41 at 19:6-20:15 (Merck Expert Nichols Dep.) ("CDC would not release an RFP to get proposals from potential vendors and would not accept a proposal without the product having [certain] qualifications," including "a recommendation from the [ACIP]"); Ex. 41 at 30:11-13 (Merck Expert Nichols Dep.) (testifying CDC will not buy a vaccine not recommended by ACIP); Ex. 41 at 29:23, 30:2-5 (Merck Expert Nichols Dep.) (identifying "recommendation by ACIP" as one of the "prerequisites to a CDC purchase of a [VFC] vaccine"); Ex. 41 at 121:13-17 (Merck Expert Nichols Dep.) ("If the product has changed in such a way that it would impact the ACIP recommendations, then the scientific side of the house would want to know that to talk to the ACIP about it.").

[287] Ex. 249 at 72:25-73:5, 122:22-123:15 (CDC 30(b)(6) Sims Dep.) (testifying CDC requires 12-month shelf life remaining on vaccines it purchases); Ex. 249 at 112:3-19 (CDC 30(b)(6) Sims Dep.) (testifying "shelf life" provisions are among the "important terms, certainly"); Ex. 249 at 75:12-20, 77:1-4, 128:21-23 (CDC 30(b)(6) Sims Dep.) (testifying if vaccine shelf life is less than 12 months after delivery, CDC may ask for money back); Ex. 249 at 76:2-5, 124:17-25 (CDC 30(b)(6) Sims Dep.) (testifying if vaccine unable to meet 12-month shelf life after delivery, manufacturer "would certainly need to let us know"); Ex. 249 at 163:5-12 (CDC 30(b)(6) Sims Dep.) (testifying if manufacturer becomes aware of something that violates contract terms or conditions, like 12-month shelf-life requirement, manufacturer "would notify" CDC); Ex. 265 at 16 (Merck Expert Nichols Rep.) ("CDC contracts require that … Merck's mumps containing vaccines have a 'minimum 12 month shelf life remaining upon delivery' to CDC."); Ex. 41 at 45:1-20 (Merck Expert Nichols Dep.) (testifying CDC contract "could be void" if CDC learned expiration date on vaccine label was not true expiration date); Ex. 41 at 97:13-23 (Merck Expert

87

**Appx385**

247.    Every CDC vaccine purchase contract requires the manufacturer to comply with all applicable current Good Manufacturing Practices ("cGMP") requirements.[288]  Included among the cGMP requirements for vaccines is that the manufacture has adequate assurances that the product meets the minimum potency requirements for the full shelf life of the product.[289]

248.    Every CDC vaccine purchase contract includes a warranty of merchantability that requires the vaccines to be merchantable and fit for purpose.[290]

---

Nichols Dep.) (testifying CDC would never knowingly purchase expired vaccine and health care providers would not use it); Ex. 41 at 19:6-20:9 (Merck Expert Nichols Dep.) ("CDC would not initiate procurement for a product without [certain] characteristics," including "a 12-month shelf life"); Ex. 41 at 19:6-20:15 (Merck Expert Nichols Dep.) ("CDC would not release an RFP to get proposals from potential vendors and would not accept a proposal without the product having [certain] qualifications," including "a 12-month shelf life"); Ex. 41 at 29:24, 30:4-5 (Merck Expert Nichols Dep.) (identifying minimum "12-month shelf life" as one of the "prerequisites to a CDC purchase of a [VFC] vaccine").

[288]  Ex. 249 at 77:7-10 (CDC 30(b)(6) Sims Dep.) (testifying cGMP compliance is key CDC contractual term); Ex. 249 at 193:19-194:2 (CDC 30(b)(6) Sims Dep.) (testifying cGMP violations "[c]ertainly … would be a violation of the terms and conditions of the [CDC] contract, and certainly [CDC would] want to know"); Ex. 249 at 192:20-193:10 (CDC 30(b)(6) Sims Dep.) (testifying if cGMP compliance issue potentially impacts the contract, the CDC certainly would discuss that issue); Ex. 41 at 19:6-20:9 (Merck Expert Nichols Dep.) ("CDC would not initiate procurement for a product without [certain] characteristics," including compliance with cGMP); Ex. 41 at 19:6-20:15 (Merck Expert Nichols Dep.) ("CDC would not release an RFP to get proposals from potential vendors and would not accept a proposal without the product having [certain] qualifications," including compliance with cGMP); Ex. 41 at 30:1-5 (Merck Expert Nichols Dep.) (identifying compliance with "CGMP" as one of the "prerequisites to a CDC purchase of a [VFC] vaccine").

[289]  Ex. 5 ¶ 26 (Merck Expert Burlington Rep.) ("The cGMP regulations and guidances … require stability testing to establish the potency of biological products through their labeled expiry date."); Ex. 3 ¶ 419.3 (Kessler Rep.) ("Merck was required to have adequate procedures to assure that MMR-II vaccine had [the required] amount of mumps virus per dose through end expiry."); see also Ex. 16 ¶ 8(4) (Calcott Rep.) ("Merck failed to maintain its manufacturing operations in a GMP compliant manner over the period 2000-2005, producing Mumps vaccine materials that did not consistently meet the label claim for potency through the shelf life, yet marketing these adulterated products.").

[290]  Ex. 249 at 83:16-84:16, 138:13-139:16 (CDC 30(b)(6) Sims Dep.) (testifying CDC contract incorporates a warranty of merchantability, which requires vaccines to perform their intended purpose); Ex. 249 at 85:19-21 (CDC 30(b)(6) Sims Dep.) (testifying CDC would certainly want to know if something potentially violates warranty clause of CDC contract); Ex. 41 at 19:6-20:9 (Merck Expert Nichols Dep.) ("CDC would not initiate procurement for a product without [certain] characteristics," including "that the product is merchantable"); Ex. 41 at 19:6-20:15 (Merck Expert Nichols Dep.) ("CDC would not release an RFP to get proposals from potential vendors and would not accept a proposal without the product having [certain] qualifications," including "that the product is merchantable"); Ex. 41 at 30:1-5 (Merck Expert Nichols Dep.) (identifying "merchantability" as one of the "prerequisites to a CDC purchase of a [VFC] vaccine").

249.     The CDC's vaccine purchase contracts require manufacturers like Merck to apprise the CDC of any issues relating to the safety or effectiveness of the vaccine so that the CDC can ensure patients are properly warned of the risks and benefits of the vaccine.[291]

### D.     Additional Issues Material to CDC Vaccine Purchases

250.     All terms in the CDC vaccine purchase contracts are significant to the CDC's purchase decision.[292]

251.     It is significant to the CDC that vaccines are properly labeled, that the labels are accurate and not misleading, and that vaccines comply with their labels.[293]

252.     Vaccine potency is significant to the CDC's purchase decision.[294]

253.     Vaccine effectiveness is significant to the CDC's purchase decision.[295]

---

[291]  Ex. 249 at 24:24-26:14, 143:25-145:4 (CDC 30(b)(6) Sims Dep.) (testifying the CDC's duty to warn requirement (of benefits and risks of vaccine) came from Merck); Ex. 249 at 163:9-12 (CDC 30(b)(6) Sims Dep.) (testifying if manufacturer "become[s] aware of something that violates the terms and conditions of the contract," like "shelf life" requirement, manufacturer "would notify [CDC]"); *Mazur v. Merck & Co.*, 767 F. Supp. 697, 701-703 (E.D. Pa. 1991) (describing Merck's delegation of its duty to warn to the CDC through a provision in the Merck/CDC vaccine purchase contract); *Mazur v. Merck & Co.*, 964 F.2d 1348, 1365-66 (3d Cir. 1992) ("[Merck's] responsibility [to provide accurate and up-to-date safety and efficacy information to the CDC] is continuous, and it must therefore apprise the CDC of any risks it later discovers, or in the exercise of reasonable care, should have discovered.").

[292]  Ex. 249 at 165:17-20 (CDC 30(b)(6) Sims Dep.) ("Q. … Are there any other terms that are material in your viewpoint?  A. I think all of them here in the contract are material.").

[293]  Ex. 249 at 188:22-189:15 (CDC 30(b)(6) Sims Dep.) ("Certainly if something was mislabeled [CDC] would … want to know about it ….") ("the vaccine should be properly labeled. And that's part of … what they're required to do is properly label.") ("if it's not properly labeled, then that's very problematic").

[294]  Ex. 7 at 148:17-149:10 (CDC 30(b)(6) Pallansch Dep.) (testifying that potency "affects how [the CDC] interpret[s] data being provided, because we look at data for a specific product as the product hasn't changed unless we're aware of it.  So, again, if we knew the potency change occurred …. we would deliberately analyze data"); Ex. 7 at 156:7-18 (CDC 30(b)(6) Pallansch Dep.) (testifying change of potency could "[a]bsolutely" impact effectiveness: "If you … cut the … amount of virus in the vaccine, that could easily make a lower response."); Ex. 360 at 2 (Merck Expert Atkinson Dep. Ex. 6) (ACIP moving from one-dose to two-dose recommendation for measles vaccine because of "primary vaccine failure," which "may be due to ... less than optimal vaccine storage and handling or to the greater lability of the measles vaccine manufactured before a new stabilizer was used in 1979"); *see also* Ex. 3 ¶ 33 (Kessler Rep.) ("Potency is defined as the 'ability of the product ... to effect a given result.' The potency of a vaccine is connected to how well the vaccine works.  If a vaccine does not have sufficient potency, it may not provide protection from disease.") (quoting 21 C.F.R. § 600.3); Ex. 8 at 162:1-3 (Shapiro Dep.) ("[I]t is pretty obvious that … vaccine[] potency is part of what makes a vaccine work.").

[295]  Ex. 249 at 85:25-86:9 (CDC 30(b)(6) Sims Dep.) (testifying CDC "certainly … want[s] safe and effective vaccines" so they accomplish the "intended purpose" of protecting the public health); Ex. 11 at 2 ("CDC has a major programmatic role in accomplishing reduction in vaccine-preventable infectious disease through the agency's [Vaccines For Children] Program by using scarce public health federal funding to purchase effective vaccines for

254.     The CDC considers technical capability and price when negotiating or awarding vaccine purchases.[296]

255.     The CDC considers a vaccine manufacturer's past performance when negotiating or awarding vaccine purchases.[297]

256.     Whether a vaccine manufacturer engaged in fraud is significant to the CDC's purchase decision.[298]

257.     Vaccine manufacturers providing accurate and complete information to the CDC is significant to the CDC's purchase decision.[299]

---

administration to children by public and private [Vaccines For Children] providers throughout the country."); Ex. 12 at 2 (same); *see also supra* ¶ 9 (citing evidence that "key function" of the CDC is ensuring vaccines are effective).

[296]  *See supra* ¶¶ 231-32 (citing evidence of CDC solicitations); Ex. 249 at 45:20-46:18 (CDC 30(b)(6) Sims Dep.) (testifying major criteria the CDC considers in awarding vaccine contracts include technical capability and price; technical capability is primarily about FDA licensure and meeting the contract terms).

[297]  *See supra* ¶¶ 231-32 (citing evidence of CDC solicitations); Ex. 249 at 45:20-46:7, 48:6-51:13 (CDC 30(b)(6) Sims Dep.) (testifying a major criterion the CDC considers in awarding vaccine contracts includes past performance; past performance includes consideration of whether a vaccine manufacturer has engaged in fraud); Ex. 41 at 106:18-107:20 (Merck Expert Nichols Dep.) (testifying CDC considers vaccine manufacturer's past performance when negotiating vaccine purchases, including "noncompliance with contract stipulations, inability to deliver or perform a particular activity or provide a particular product").

[298]  Ex. 249 at 45:20-46:7, 48:6-51:13 (CDC 30(b)(6) Sims Dep.) (testifying a major criterion CDC considers in awarding vaccine contracts includes past performance; past performance includes consideration of whether vaccine manufacturer has engaged in fraud); Ex. 41 at 107:21-108:9 (Merck Expert Nichols Dep.) (testifying fraud would be relevant factor material to CDC's purchasing decision: "I don't think the CDC would want to contract with a vendor … who had been found guilty of committing fraud previously.").

[299]  Ex. 249 at 94:5-95:19 (CDC 30(b)(6) Sims Dep.) (testifying CDC expects responses to its solicitations to be accurate and CDC wants to know of anything that would impact merchantability or compliance with the contract terms and conditions); Ex. 249 at 96:4-8 (CDC 30(b)(6) Sims Dep.) (testifying CDC certainly wants manufacturers to provide information in accordance with federal laws including Procurement Integrity Act); Ex. 11 at 2 ("CDC and its [ACIP] effectively define the standard of medical care through recommendations on the proper use of pediatric and adult vaccines.  Critical to that is the agency receiving accurate information from the vaccine manufacturers to better inform CDC/ACIP guidance."); Ex. 12 at 2 (same); *Mazur v. Merck & Co.*, 767 F. Supp. 697, 701-703 (E.D. Pa. 1991) (describing Merck's delegation of its duty to warn to the CDC through a provision in the Merck/CDC vaccine purchase contract); *Mazur v. Merck & Co.*, 964 F.2d 1348, 1365-66 (3d Cir. 1992) ("[Merck's] responsibility [to provide accurate and up-to-date safety and efficacy information to the CDC] is continuous, and it must therefore apprise the CDC of any risks it later discovers, or in the exercise of reasonable care, should have discovered.").

E.    **Government Enforcement Against Drug and Vaccine Manufacturers**

258.    The federal government has taken civil and criminal enforcement actions against

entities for distribution and sale of misbranded or adulterated products.[300]

259.    The federal government has also recovered billions of dollars under the False

Claims Act in cases involving the sale of adulterated and misbranded drugs and devices as well

as vaccines that do not comply with CDC contract terms.[301]

---

[300]  *See, e.g.*, *United States v. Merck Sharp & Dohme Corp.*, No. 11-CR-10384 (D. Mass.) (criminal action imposing fines arising from introduction of misbranded drug into interstate commerce); *United States v. Norian Corp.*, No. 2:09-cr-00403-LDD (E.D. Pa.) (criminal action imposing fines arising from introduction of adulterated and misbranded medical devices into interstate commerce); *United States v. McNeil-PPC, Inc.*, No. 2:15-cr-00082-RB (E.D. Pa.) (criminal action imposing fines and forfeiture arising from delivery for introduction of adulterated drugs intended for infants and children into interstate commerce); *United States v Atrium Med. Corp.*, No. 1:15-cv-00041 (D.N.H.) (civil action permanently enjoining introduction of adulterated and misbranded medical devices into interstate commerce and imposing equitable disgorgement); *United States v. Phillips N.A. LLC*, No. 1:17-cv-11955-DJC (D. Mass.) (civil action permanently enjoining the manufacture and sale of certain medical devices until remedial actions to assure compliance are implemented); *United States v. Medtronic, Inc.*, No. 15-cv-02168 (D. Minn.) (same); *United States v. Pharm. Innovations, Inc.*, No. 2-14-cv-06139 (D.N.J.) (criminal and civil action permanently enjoining the introduction of adulterated medical devices into interstate commerce and imposing a forfeiture money judgment); *United States v. Lane Labs-USA, Inc.*, 324 F. Supp. 2d 547, 550-51 (D.N.J. 2004) (civil action requiring restitution to consumers who purchased products and permanently enjoining misbranded and unapproved drugs); *United States v. Universal Mgmt. Servs.*, 191 F.3d 750, 764 (6th Cir. 1999) (same); *United States v. Kaminski*, 501 F.3d 655 (6th Cir. 2007) (criminal action imposing prison sentences and restitution arising from sale of unapproved, misbranded and adulterated drugs); *United States v. Regenerative Scis., LLC*, 741 F.3d 1314 (D.C. Cir. 2014) (civil action permanently enjoining sales of misbranded and adulterated medical product); *United States v. Cole*, 84 F. Supp. 3d 1159 (D. Or. 2015) (same); *United States v. Sene X Eleemosynary Corp.*, 479 F. Supp. 970 (S.D. Fla. 1979) (civil action to enjoin sales of misbranded and adulterated products); *United States v. Endotec, Inc.*, 2009 U.S. Dist. Lexis, 93985 (M.D. Fla. 2009) (same); *United States v. Undetermined Quantities of Articles of Drug*, 145 F. Supp. 2d 692 (D. Md. 2001) (civil action permanently enjoining introduction of adulterated and misbranded drugs into interstate commerce and ordering condemnation of seized product); *United States v. Nichols Inst. Diagnostics*, 1:09-cr-00203-SJ (E.D.N.Y.) (criminal action imposing fines arising from introduction of misbranded diagnostic test kits into interstate commerce); *United States v. GlaxoSmithKline LLC*, No. 12-cr-10206 (D. Mass.) (criminal action imposing criminal fines and forfeiture arising from introduction of adulterated drugs into interstate commerce); *United States v. Ranbaxy USA, Inc.*, No. 13-CR-0238-JFM (D. Md.) (same); *United States v. AmerisourceBergen Specialty Grp., LLC*, No. 17-CR-00507 (NG) (E.D.N.Y.) (same); *United States v. Baxter Healthcare Corp.*, No. 1:17-mj-00010-WCM (W.D.N.C.) (same); *United States v. ev3, Inc.*, No. 1:18-cr-10461 (D. Mass.) (criminal action imposing fines and forfeiture arising from introduction of adulterated medical devices into interstate commerce).

[301]  Ex. 350 (DOJ press release for settlement in *United States ex rel. Thakur v. Ranbaxy Labs. Ltd.* resolving charges Ranbaxy "manufactured, distributed, and sold drugs whose strength, purity, or quality differed from the drug's specifications or that were not manufactured according to the FDA-approved formulation"); Ex. 351 (DOJ press release for settlement in *United States ex rel. Eckard v. GlaxoSmithKline, PLC* resolving charges GSK "sold certain batches, lots or portions of lots of drugs, the strength of which differed materially from, or the purity or quality of which fell materially below, the strength, purity or quality specified in the drugs' FDA applications or related documents"); Ex. 352 (DOJ press release for settlement in *United States ex rel. Wall v. Baxter Int'l, Inc.* resolving charges Baxter "fail[ed] to follow cGMPs" in the manufacture of certain drugs); Ex. 353 (DOJ press release for settlement in *United States ex rel. Torres v. Shire Specialty Pharms.*, resolving FCA charges including

**Appx389**

### F. Merck's Sale of Mumps Vaccines to the CDC

260. The CDC, which contracts with vaccine manufacturers on behalf of public purchasers, is the largest purchaser of mumps vaccines in the United States and accounts for roughly 50% of all childhood vaccine purchases.[302] The CDC purchases millions of doses of Merck's mumps vaccines each year.[303] Since 2000, the CDC has purchased more than $1 billion of Merck's MMR-II vaccines and more than $1.5 billion of Merck's ProQuad vaccines.[304]

261. Merck is the only supplier of mumps-containing vaccines in the United States. If CDC wants a mumps, measles or rubella-containing vaccine, Merck's MMR-II and ProQuad are the only options.[305]

---

that Shire promoted its drug "for certain uses despite a lack of clinical data to support such claims and overstated the efficacy"); Ex. 354 (DOJ press release for settlement in *United States ex rel Cantor v. Quest* resolving FCA charges Quest subsidiary sold test kits that produced "materially inaccurate and unreliable" results and were not the subject of "accurate claims in their labelling."); Ex. 356 (DOJ press release for settlement in *United States ex rel. Fox v. McKesson Corp.* resolving charges McKesson "improperly set temperature monitors used in shipping vaccines under its contract with [CDC]").

[302] Ex. 11 at 2; Ex. 12 at 2; Ex. 281 ¶ 43 (Report of Relators' Expert Dr. Thomas McGuire (hereinafter "McGuire Rep.")).

[303] Ex. 288 (2004 Merck Transactional Data identifying 5,955,837 MMR-II doses sold to CDC); Ex. 289 (2005 Merck Transactional Data identifying 5,570,245 MMR-II doses sold to CDC); Ex. 290 (2006 Merck Transactional Data identifying 4,910,733 MMR-II doses and 1,839,876 ProQuad doses sold to CDC); Ex. 291 (2007 Merck Transactional Data identifying 3,700,870 MMR-II doses and 1,819,837 ProQuad doses sold to CDC); Ex. 292 (2008 Merck Transactional Data identifying 5,942,554 MMR-II doses sold to CDC); Ex. 293 (2009 Merck Transactional Data identifying 5,633,270 MMR-II doses sold to CDC); Ex. 294 (2010 Merck Transactional Data identifying 5,535,990 MMR-II doses and 623,450 ProQuad doses sold to CDC); Ex. 295 (2011 Merck Transactional Data identifying 5,281,400 MMR-II doses and 105,890 ProQuad doses sold to CDC); Ex. 296 (2012 Merck Transactional Data identifying 5,359,430 MMR-II doses and 237,820 ProQuad doses sold to CDC); Ex. 297 (2013 Merck Transactional Data identifying 3,576,060 MMR-II doses and 1,836,530 ProQuad doses sold to CDC); Ex. 298 (2014 Merck Transactional Data identifying 3,883,560 MMR-II doses and 2,988,360 ProQuad doses sold to CDC); Ex. 299 (2015 Merck Transaction Data identifying 2,822,950 MMR-II doses and 2,070,460 ProQuad doses sold to CDC); *see also* Ex. 300 at 1 (Apr. 17, 2017 Ltr. from Merck's Counsel to Relators' Counsel) (Merck stipulating "amounts recorded as being invoiced to the [CDC] in Merck's transactional data for the CDC's purchase of Merck's mumps-containing vaccines were invoiced to CDC and that CDC paid the amounts requested by the invoice").

[304] Ex. 281 ¶ 108, Table 5 (McGuire Rep.); Exs. 282-299 (Merck Transactional Data from 1998-2015); Ex. 300 at 1 (Apr. 17, 2017 Ltr. from Merck's Counsel to Relators' Counsel) (Merck stipulating "amounts recorded as being invoiced to the [CDC] in Merck's transactional data for the CDC's purchase of Merck's mumps-containing vaccines were invoiced to CDC and that CDC paid the amounts requested by the invoice").

[305] Ex. 20 at 175 (Merck Responses to Requests for Admission 222-23); Ex. 249 at 42:23-43:1 (CDC 30(b)(6) Sims Dep.) (agreeing Merck is the only supplier for CDC's purchase of mumps vaccines); Ex. 7 at 115:17-22 (CDC 30(b)(6) Pallansch Dep.) (affirming CDC is limited to buying MMR-II or ProQuad if it wants to buy a mumps vaccine); Ex. 245 at 187:6-19 (Merck Expert Atkinson Dep.) (affirming CDC is limited to buying MMR-II or

92

262.    Since at least 2000, the CDC-Merck contracts have described the Vaccine For Children and Section 317 programs, pursuant to which the CDC purchases vaccines.[306]

263.    Since at least 2000, the CDC-Merck contracts have required Merck to provide "standard commercial vaccines described herein, manufactured under a current establishment and product license issued by the U.S. Food and Drug Administration (FDA) …."[307]

264.    Since at least 2000, the CDC-Merck contracts have described the vaccines purchased, including MMR-II and ProQuad, the packaging and pricing of the vaccines, the vaccine's National Drug Code ("NDC") Number, and the 12-month "Minimum Shelf Life" required by the CDC contract:[308]

---

ProQuad if it wants to buy mumps, measles, or rubella vaccines); Ex. 301 at '341 (Merck consultant characterizing Merck's customers where Merck is the "sole source" of the vaccine as "customers by force" rather than "customers by choice").

[306] Exs. 302-329 (CDC-Merck Annual Contracts from 1998-2016).

[307] Exs. 302-329 (CDC-Merck Annual Contracts from 1998-2016).

[308] Exs. 302-329 (CDC-Merck Annual Contracts from 1998-2016).

| Contract Line Item No. (CLIN) | Vaccine Description | | |
|---|---|---|---|
| | **Measles, Mumps & Rubella Combination Vaccine (MMR) (Solicitation CLIN 0013)** | | |

Maximum Estimated Quantity: 8,000,000 Doses
Guaranteed Minimum: 100 Doses

| Description | Estimated Quantity | Unit Price | Extended Amount |
|---|---|---|---|
| MMR Vaccine Package of 10 Single Dose Vials | 800,000 Pkg. (8,000,000 Doses) | $140.00 | $112,000,000.00 |
| Federal Excise Tax | 800,000 Pkg. (8,000,000 Doses) | $ 22.50 | $ 18,000,000.00 |
| | **800,000 Pkg. (8,000,000 Doses)** | **$162.50** | **$130,000,000.00** |

Product/Brand Name: M-M-R ® II

NDC Number: 00006-4681-00

Minimum Shelf Life: 12 Months

Minimum Order Size: 400 Doses Per Destination

Federal Excise Tax: $2.25 Per Dose

265.    Since at least 2000, the CDC-Merck contracts have contained a provision specific to the vaccine shelf life, stating "Vaccine provided under this contract shall have a minimum shelf life remaining upon delivery to the consignee, as specified within each Contract Line Item Number …."[309]  The CDC's specified minimum shelf life upon delivery for MMR-II is "12 Months."[310]

266.    Since at least 2000, the CDC-Merck contracts have contained a provision stating "The vaccines produced and delivered under this contract shall be manufactured under a current establishment and product license issued by the Food and Drug Administration …."[311]

---

[309] *See, e.g.*, Ex. 302 at '293 (2004 CDC-Merck Contract); Exs. 302-329 (CDC-Merck Annual Contracts from 1998-2016).

[310] *See, e.g.*, Ex. 302 at '291 (2004 CDC-Merck Contract); Exs. 302-329 (CDC-Merck Annual Contracts from 1998-2016).

[311] *See, e.g.*, Ex. 302 at '295 (2004 CDC-Merck Contract); Exs. 302-329 (CDC-Merck Annual Contracts from 1998-2016).

267.    Since at least 2000, the CDC-Merck contracts have required Merck to comply with cGMP:  "The Current Good Manufacturing Practice Regulations (CGMPR's) (21C.F.R. Parts 210-211) will be the standard to be applied for manufacturing, processing and packing of drugs, chemicals, biologicals, and reagents."[312]

268.    Since at least 2000, the CDC-Merck contracts have required Merck to "advise" the CDC "if at any time during the life of the contract, the [vaccine] listed under this contract fails to meet CGMPR's and/or a negative Food and Drug Administration Quality Assurance Evaluation is received, the contract may be terminated, in whole or in part, without further liability to the Government."[313]

269.    Since at least 2000, the CDC-Merck contracts have contained a "**Duty To Warn**," which among other things obligates the CDC to assure that the vaccine is administered (i) "to each patient on the basis of an individualized medical judgment by a physician"; or (ii) "after meaningful warnings related to the risks and benefits of vaccination are provided to such patient …, in form and language understandable … including through use of the appropriate version of the most recent vaccine information materials."[314]

270.    Since at least 2000, the CDC-Merck contracts have required Merck to provide certain information on the invoices or claims for payment to the CDC, including among other things, "Contract number"; "Description, cost or price, and quantity of property and/or services

---

[312]  *See, e.g.*, Ex. 302 at '295 (2004 CDC-Merck Contract); Exs. 302-329 (CDC-Merck Annual Contracts from 1998-2016).

[313]  *See, e.g.*, Ex. 302 at '296 (2004 CDC-Merck Contract); Exs. 302-329 (CDC-Merck Annual Contracts from 1998-2016).

[314]  *See, e.g.*, Ex. 302 at '301-02 (2004 CDC-Merck Contract); Exs. 302-329 (CDC-Merck Annual Contracts from 1998-2016).

95

actually delivered or rendered"; "Lot number of vaccine vials shipped"; and "Expiration date of vaccine vials shipped."[315]

271.    Since at least 2000, Merck has submitted invoices or claims for payment to the CDC for vaccine sales, including sales of MMR-II and ProQuad, Merck has made to the CDC.[316]

272.    Since at least 2000, each invoice or claim for payment Merck has submitted to the CDC for vaccine purchases, including all invoices or claims for payment for MMR-II and ProQuad Merck has submitted to the CDC, contains the following information: Customer Identification, Contract Identification Number, Contract Description, Purchase Order Number, Invoice Number, Invoice Date, Delivery Number, Plant, Item Number/NDC, Product Description, Batch/Lot Number, Batch/Lot Expiration Date, Quantity, Unit Price, Payment Terms, Total Quantity, and Total Amount.[317]  The Item Number/NDC includes a Labeler Code, a Product Code (representing the specific strength, dosage form, and formulation of the product), and a Package Code (representing the product package form and size).[318]

---

[315]  *See, e.g.*, Ex. 302 at '299 (2004 CDC-Merck Contract); Exs. 302-329 (CDC-Merck Annual Contracts from 1998-2016).

[316]  Exs. 330-341 (Merck Sample Invoices to CDC from 2010-2015); Exs. 282-299 (Merck Transactional Data from 1998-2015); Ex. 265 at 9-10 (Merck Expert Nichols Rep.) ("Merck's provision of invoices for the CDC orders follows Merck's shipment of its mumps-containing vaccines to the CDC.").

[317]  *See, e.g.*, Ex. 330 at '253 (2012 Merck Invoice to CDC); Exs. 330-341 (Merck Sample Invoices to CDC from 2010-2015); Exs. 282-299 (Merck Transactional Data from 1998-2015).

[318]  Ex. 342 at 4 ("Each listed drug product is assigned a unique 10-digit, 3-segment number. This number, known as the NDC, identifies the labeler, product, and trade package size. … The second segment, the product code, identifies a specific strength, dosage form, and formulation of a drug for a particular firm.  Different formulations or different strengths of the same formulation should be assigned different product codes.  This means even if the same formulations of a drug product ultimately deliver different strengths of the active ingredient to the recipient, they should be assigned different product codes.  Also, drug products that share the same formulation but have different product characteristics that clearly distinguish one drug product version from another cannot share the same product code ….").

Dated: October 25, 2019                    By: _____

Gordon Schnell
Robert L. Begleiter
Marlene Koury
Daniel J. Vitelli
Hamsa Mahendranathan
CONSTANTINE CANNON LLP
335 Madison Avenue
New York, NY 10017
Tel: (212) 350- 2700
Fax: (212) 350-2701
gschnell@constantinecannon.com
rbegleiter@constantinecannon.com
mkoury@constantinecannon.com
dvitelli@constantinecannon.com
hmahendranathan@constantinecannon.com

Jeffrey F. Keller
Kathleen R. Scanlan
KELLER GROVER LLP
1965 Market Street
San Francisco, CA 94103
Tel: (415) 543-1305
jfkeller@KellerGrover.com
kscanlan@KellerGrover.com

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA ex rel.,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

*Plaintiffs*,

v.

MERCK & CO., INC.,

*Defendant*.

Civil Action No. 10-4374 (CDJ)

**FILED UNDER SEAL**

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL -
ATTORNEY'S EYES ONLY"
INFORMATION PURSUANT TO
PROTECTIVE ORDER**

## DECLARATION OF GARY REILLY IN SUPPORT OF
## RELATORS' MOTION FOR SUMMARY JUDGMENT

I, GARY REILLY, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct:

1.    I am an attorney at Constantine Cannon LLP, which represents Relators Stephen A. Krahling and Joan A. Wlochowski ("Relators") in the above-captioned action.  I respectfully submit this declaration in support of Relators' Motion for Summary Judgment.  I have personal knowledge of the facts stated herein.

2.    Attached as Exhibit 1 is a true and correct copy of Relators' expert report of Dr. Eugene Shapiro, dated March 13, 2018.

3.    Attached as Exhibit 2 is a true and correct copy of Relators' expert report of Dr. Robert Malone, dated March 13, 2018.

4.    Attached as Exhibit 3 is a true and correct copy of Relators' expert report, including appendices and schedules, of Dr. David Kessler, dated March 14, 2018.

5.    Attached as Exhibit 4 is a true and correct copy of the transcript of the deposition of Relators' expert Dr. David Kessler, taken in this matter on September 28, 2018.

6.    Attached as Exhibit 5 is a true and correct copy of Merck's expert report of Dr. D. Bruce Burlington, dated June 19, 2018.

7.    Attached as Exhibit 6 is a true and correct copy of the transcript of the deposition of Merck's expert Dr. D. Bruce Burlington, taken in this matter on December 13, 2018.

8.    Attached as Exhibit 7 is a true and correct copy of the transcript of the deposition of one of the CDC's 30(b)(6) witnesses, Dr. Mark Pallansch, taken in this matter on October 13, 2017.

**Appx397**

9.      Attached as Exhibit 8 is a true and correct copy of the transcript of the deposition of Relators' expert Dr. Eugene Shapiro, taken in this matter on November 7, 2018.

10.     Attached as Exhibit 9 is a true and correct copy of the transcript of the deposition of Dr. Alison Fisher, taken in this matter on November 1, 2016.

11.     Attached as Exhibit 10 is a true and correct copy of Merck's expert report of Dr. Ann Arvin, dated June 11, 2018.

12.     Attached as Exhibit 11 is a true and correct copy of a letter from Dr. Robert Redfield, Director, CDC, dated May 24, 2018.

13.     Attached as Exhibit 12 is a true and correct copy of a letter from Dr. Anne Schuchat, Principal Deputy Director, CDC, dated September 26, 2017.

14.     Attached as Exhibit 13 is a true and correct copy of the statement of Dr. Jesse Goodman, FDA, on FDA's Role in the Regulation of Services, dated April 18, 2007, as retrieved from https://wayback.archive-it.org/4150/20131126185301/http://www.hhs.gov/asl/testify/2007/04/t20070418c.html on October 18, 2019.

15.     Attached as Exhibit 14 is a true and correct copy of excerpts of a document produced by Defendant in this action, bates stamped MRK-CHA00214088-4148.

16.     Attached as Exhibit 15 is a true and correct copy of the transcript of the deposition of Merck's expert Dr. Jonathan Temte, taken in this matter on August 17, 2018.

17.     Attached as Exhibit 16 is a true and correct copy of Relators' expert report of Dr. Peter Calcott, dated March 12, 2018.

18.     Attached as Exhibit 17 is a true and correct copy of the transcript of the deposition of Dr. Joye Bramble, taken in this matter on January 6, 2017.

3

19.     Attached as Exhibit 18 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00209399-9409.

20.     Attached as Exhibit 19 is a true and correct copy of excerpts of Defendant Merck's Answer to Amended Complaint (ECF No. 62).

21.     Attached as Exhibit 20 is a true and correct copy of excerpts of Defendant Merck's Responses and Objections to Relator's Third Set of Requests for Admission, dated August 16, 2017.

22.     Attached as Exhibit 21 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00158126-179.

23.     Attached as Exhibit 22 is a true and correct copy of Merck's expert report, including Attachment 3, of Dr. William Atkinson, dated June 12, 2018.

24.     Attached as Exhibit 23 is a true and correct copy of the transcript of the deposition of Dr. Jonathan Hartzel, taken in this matter on June 23, 2017.

25.     Attached as Exhibit 24 is a true and correct copy of Merck's expert report of Dr. Anna Durbin, dated June 14, 2018.

26.     Attached as Exhibit 25 is a true and correct copy of Merck's expert report of Dr. Marcela Pasetti, dated June 14, 2018.

27.     Attached as Exhibit 26 is a true and correct copy of excerpts of a document produced by Defendant in this action as "Principles of Vaccination.ppt", bates stamped MRK-CHA01339555.

28.     Attached as Exhibit 27 is a true and correct copy of the transcript of the deposition of Mary Yagodich, taken in this matter on August 18, 2016.

29.    Attached as Exhibit 28 is a true and correct copy of a document produced by third-party GlaxoSmithKline plc ("GSK") in this action, bates stamped GSK-MMR-IND-0019450-476.

30.    Attached as Exhibit 29 is a true and correct copy of the transcript of the deposition of Merck's expert Dr. Marcela Pasetti, taken in this matter on December 4, 2018.

31.    Attached as Exhibit 30 is a true and correct copy of the transcript of the deposition of Merck's expert Dr. Anna Durbin, taken in this matter on October 8, 2018.

32.    Attached as Exhibit 31 is a true and correct copy of excerpts of a document produced by Defendant in this action, bates stamped MRK-CHA01893680-3730.

33.    Attached as Exhibit 32 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00088592-93.

34.    Attached as Exhibit 33 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00667054-7122.

35.    Attached as Exhibit 34 is a true and correct copy of a document produced by GSK in this action, bates stamped GSK-MMR-IND-0029256-263.

36.    Attached as Exhibit 35 is a true and correct copy of a document produced by GSK in this action, bates stamped GSK-MMR-IND-0000004-07.

37.    Attached as Exhibit 36 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00095142.

38.    Attached as Exhibit 37 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01449029-040.

**Appx400**

39.     Attached as Exhibit 38 is a true and correct copy of the transcipt of the deposition of one of Merck's 30(b)(6) witnesses, Mark Stannard, taken in this matter on December 13, 2016.

40.     Attached as Exhibit 39 is a true and correct copy of the transcript of the deposition of Dr. Luwy Musey, taken in this matter on October 7, 2016.

41.     Attached as Exhibit 40 is a true and correct copy of the transcript of the deposition of Merck's expert Dr. Ann Arvin, taken in this matter on November 12, 2018.

42.     Attached as Exhibit 41 is a true and correct copy of the transcript of the deposition of Merck's expert William Nichols, taken in this matter on October 25, 2018.

43.     Attached as Exhibit 42 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00207690-7735.

44.     Attached as Exhibit 43 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00094161-182.

45.     Attached as Exhibit 44 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01456760.

46.     Attached as Exhibit 45 is a true and correct copy of a document produced by Defendant in this action as "CDOC presentation November 15-00-draft.ppt," bates stamped MRK-CHA00020396.

47.     Attached as Exhibit 46 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00587859-862.

48.     Attached as Exhibit 47 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00549487-494.

49.     Attached as Exhibit 48 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00284623-29.

50.     Attached as Exhibit 49 is a true and correct copy of the transcript of the deposition of Philip Bennett, taken in this matter on May 24, 2017.

51.     Attached as Exhibit 50 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00615147-174.

52.     Attached as Exhibit 51 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00019225-245.

53.     Attached as Exhibit 52 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00020635-642.

54.     Attached as Exhibit 53 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00198876-891.

55.     Attached as Exhibit 54 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00020425-27.

56.     Attached as Exhibit 55 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00095143.

57.     Attached as Exhibit 56 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00071265-271.

58.     Attached as Exhibit 57 is a true and correct copy of a family of documents produced by Defendant in this action, bates stamped MRK-CHA00549510-535.

59.     Attached as Exhibit 58 is a true and correct copy of a family of documents produced by Defendant in this action, bates stamped MRK-CHA00616007-012.

**Appx402**

60.     Attached as Exhibit 59 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00086295-97.

61.     Attached as Exhibit 60 is a true and correct copy of a document produced by Defendant in this action as "Mumps expiry response to warning letter.doc," bates stamped MRK-CHA00086298-6317.

62.     Attached as Exhibit 61 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00562230-241.

63.     Attached as Exhibit 62 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01440844-864.

64.     Attached as Exhibit 63 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01537603-611.

65.     Attached as Exhibit 64 is a true and correct copy of the transcript of the deposition of Dr. Dorothy Margolskee, taken in this matter on April 21, 2017.

66.     Attached as Exhibit 65 is a true and correct copy of excerpts of a document produced by Defendant in this action, bates stamped MRK-CHA00322038-065.

67.     Attached as Exhibit 66 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01649955-56.

68.     Attached as Exhibit 67 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00754687-691.

69.     Attached as Exhibit 68 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00561350-55.

70.     Attached as Exhibit 69 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00334863-68.

71.     Attached as Exhibit 70 is a true and correct copy of a document produced by Defendant in this action as "RMC mumps expiry update.ppt," bates stamped MRK-CHA00086318.

72.     Attached as Exhibit 71 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00247149-152.

73.     Attached as Exhibit 72 is a true and correct copy of a family of documents produced by Defendant in this action, bates stamped MRK-CHA00019084-85.

74.     Attached as Exhibit 73 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01562819-820.

75.     Attached as Exhibit 74 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00094134-35.

76.     Attached as Exhibit 75 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01894982-998.

77.     Attached as Exhibit 76 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01564065-68.

78.     Attached as Exhibit 77 is a true and correct copy of a family of documents produced by Defendant in this action, bates stamped MRK-CHA01574732-38.

79.     Attached as Exhibit 78 is a true and correct copy of a document produced by Defendant in this action as "accomplishments to 5-17-01.ppt," bates stamped MRK-CHA00724288.

80.     Attached as Exhibit 79 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01649892-93.

81.     Attached as Exhibit 80 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00501762-65.

82.     Attached as Exhibit 81 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00019430-32.

83.     Attached as Exhibit 82 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00780325-26.

84.     Attached as Exhibit 83 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00019246-267.

85.     Attached as Exhibit 84 is a true and correct copy of a document produced in this action as "Draft#1-CRRC 10-08-02 slides.ppt," bates stamped SCHOFIELD_00000201.

86.     Attached as Exhibit 85 is a true and correct copy of a document produced by Defendant in this action as "CRRC -10-08-02 slides.ppt," bates stamped MRK-CHA00027726.

87.     Attached as Exhibit 86 is a true and correct copy of a family of documents produced by Defendant in this action, bates stamped MRK-CHA00562218-19.

88.     Attached as Exhibit 87 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00205854-860.

89.     Attached as Exhibit 88 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00064005-012.

90.     Attached as Exhibit 89 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00561310-12.

91.     Attached as Exhibit 90 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00440797-0811.

Appx405

92.     Attached as Exhibit 91 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00019434-37.

93.     Attached as Exhibit 92 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00024596-99.

94.     Attached as Exhibit 93 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00071082-89.

95.     Attached as Exhibit 94 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00590949-958.

96.     Attached as Exhibit 95 is a true and correct copy of excerpts of a document produced by Defendant in this action, bates stamped MRK-CHA01591461-487.

97.     Attached as Exhibit 96 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00494158-161.

98.     Attached as Exhibit 97 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00285276-296.

99.     Attached as Exhibit 98 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00325472-491.

100.     Attached as Exhibit 99 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00671410-428.

101.     Attached as Exhibit 100 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01896349.

102.     Attached as Exhibit 101 is a true and correct copy of excerpts of a document produced by Defendant in this action, bates stamped MRK-CHA01725276-5364.

103.     Attached as Exhibit 102 is a true and correct copy of a document produced by Defendant in this action as "slides for GRSRC_MiumpsEndExpiry -10-11-02.ppt," bates stamped MRK-CHA00040705.

104.     Attached as Exhibit 103 is a true and correct copy of a document produced by Defendant in this action as "slides for GRSRC -10-11-02.ppt," bates stamped MRK-CHA00094159.

105.     Attached as Exhibit 104 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01582137-39.

106.     Attached as Exhibit 105 is a true and correct copy of excerpts of a document produced by Defendant in this action, bates stamped MRK-CHA00224982-26529.

107.     Attached as Exhibit 106 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00095320-21.

108.     Attached as Exhibit 107 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00017605-612.

109.     Attached as Exhibit 108 is a true and correct copy of excerpts of a document produced by Defendant in this action, bates stamped MRK-CHA0002441-2681.

110.     Attached as Exhibit 109 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00001467-69.

111.     Attached as Exhibit 110 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00001255-57.

112.     Attached as Exhibit 111 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01927351-55.

113.     Attached as Exhibit 112 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00126963-971.

114.     Attached as Exhibit 113 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA02021754-761.

115.     Attached as Exhibit 114 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00001258-261.

116.     Attached as Exhibit 115 is a true and correct copy of the transcript of the deposition of Dr. Emilio Emini, taken in this matter on June 6, 2017.

117.     Attached as Exhibit 116 is a true and correct copy of the transcript of the deposition of Dr. Florian Schodel, taken in this matter on December 22, 2016.

118.     Attached as Exhibit 117 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01386177-182.

119.     Attached as Exhibit 118 is a true and correct copy of a partial family of documents produced by Defendant in this action, bates stamped MRK-CHA00279197-9247.

120.     Attached as Exhibit 119 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01888826-8913.

121.     Attached as Exhibit 120 is a true and correct copy of a family of documents produced by Defendant in this action, bates stamped MRK-CHA00026466-489.

122.     Attached as Exhibit 121 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01898773-76.

123.     Attached as Exhibit 122 is a true and correct copy of the transcript of the deposition of Dr. David Krah, taken in this matter on July 11-12, 2017.

124.     Attached as Exhibit 123 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00336905-918.

125.     Attached as Exhibit 124 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00209674-78.

126.     Attached as Exhibit 125 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00625629-630.

127.     Attached as Exhibit 126 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00020428-29.

128.     Attached as Exhibit 127 is a true and correct copy of a document produced by Defendant in this action as "MMRII-Neut-fnQPAslides9-27-99.ppt," bates stamped MRK-CHA00025315.

129.     Attached as Exhibit 128 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00198869-870.

130.     Attached as Exhibit 129 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00086292-93.

131.     Attached as Exhibit 130 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01648951-56.

132.     Attached as Exhibit 131 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00016632-35.

133.     Attached as Exhibit 132 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00002189-198.

134.     Attached as Exhibit 133 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00761482-84.

14

135.    Attached as Exhibit 134 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00818776-781.

136.    Attached as Exhibit 135 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00331831-36.

137.    Attached as Exhibit 136 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00846454-58.

138.    Attached as Exhibit 137 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00000315-360.

139.    Attached as Exhibit 138 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00000393-409.

140.    Attached as Exhibit 139 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00761628-1702.

141.    Attached as Exhibit 140 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00846405-415.

142.    Attached as Exhibit 141 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00791315-19.

143.    Attached as Exhibit 142 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00561111-12.

144.    Attached as Exhibit 143 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00065695-5703.

145.    Attached as Exhibit 144 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00026912-18.

15

146.     Attached as Exhibit 145 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00759836-39.

147.     Attached as Exhibit 146 is a true and correct copy of the transcript of the deposition of one of Merck's 30(b)(6) witnesses, Dr. Barbara Kuter, taken in this matter on February 9, 2018.

148.     Attached as Exhibit 147 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00030994-98.

149.     Attached as Exhibit 148 is a true and correct copy of excerpts of a document produced by Defendant in this action, bates stamped MRK-CHA01731773-32028.

150.     Attached as Exhibit 149 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00095050-52.

151.     Attached as Exhibit 150 is a true and correct copy of a document produced by GSK in this action, bates stamped GSK-MMR-0195819-842.

152.     Attached as Exhibit 151 is a true and correct copy of a document produced by GSK in this action, bates stamped GSK-MMR-IND-0022195-2269.

153.     Attached as Exhibit 152 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00016335-343.

154.     Attached as Exhibit 153 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00068546.

155.     Attached as Exhibit 154 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00273243-44.

156.     Attached as Exhibit 155 is a true and correct copy of the transcript of the deposition of Relator Stephen Krahling, taken in this matter on May 2-3, 2017.

157.    Attached as Exhibit 156 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01634869-871.

158.    Attached as Exhibit 157 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00064608-609.

159.    Attached as Exhibit 158 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00336323-25.

160.    Attached as Exhibit 159 is a true and correct copy of a family of documents produced by Defendant in this action, bates stamped MRK-CHA00549462-472.

161.    Attached as Exhibit 160 is a true and correct copy of Relator Stephen A. Krahling's Responses and Objections to Merck's Revised First Set of Interrogatories, dated May 18, 2015.

162.    Attached as Exhibit 161 is a true and correct copy of the transcript of the deposition of Dr. Joseph Antonello, taken in this matter on August 3, 2017.

163.    Attached as Exhibit 162 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00008835-39.

164.    Attached as Exhibit 163 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00015702-03.

165.    Attached as Exhibit 164 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00014739-740.

166.    Attached as Exhibit 165 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00014746-47.

167.    Attached as Exhibit 166 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00014829-830.

**Appx412**

168.    Attached as Exhibit 167 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00014731-32.

169.    Attached as Exhibit 168 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00014744-45.

170.    Attached as Exhibit 169 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00014749-750.

171.    Attached as Exhibit 170 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00015719-720.

172.    Attached as Exhibit 171 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00760670-72.

173.    Attached as Exhibit 172 is a true and correct copy of the transcript of the deposition of Relator Joan Wlochowski, taken in this matter on June 13-14, 2017.

174.    Attached as Exhibit 173 is a true and correct copy of a document produced by Relators in this action, bates stamped RELATOR_00000273.

175.    Attached as Exhibit 174 is a true and correct copy of Relators' expert report of Dr. Philip Stark, dated March 12, 2018.

176.    Attached as Exhibit 175 is a true and correct copy of Relators' supplemental expert report of Dr. Philip Stark, dated October 16, 2018.

177.    Attached as Exhibit 176 is a true and correct copy of a family of documents produced by Defendant in this action, bates stamped MRK-CHA00554820-847.

178.    Attached as Exhibit 177 is a true and correct copy of excerpts of a document produced by Defendant in this action, bates stamped MRK-CHA00489903-490080.

179.    Attached as Exhibit 178 is a true and correct copy of a document produced by Relators in this action, bates stamped RELATOR_00001025-26.

180.    Attached as Exhibit 179 is a true and correct copy of excerpts of a document produced by Defendant in this action, bates stamped MRK-CHA00490592-91038.

181.    Attached as Exhibit 180 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00026864.

182.    Attached as Exhibit 181 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00052249-253.

183.    Attached as Exhibit 182 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00000410-478.

184.    Attached as Exhibit 183 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00050333-342.

185.    Attached as Exhibit 184 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00055013.

186.    Attached as Exhibit 185 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00016988-17023.

187.    Attached as Exhibit 186 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00017036-7115.

188.    Attached as Exhibit 187 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00754233-38.

189.    Attached as Exhibit 188 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00615152-174.

Appx414

190.     Attached as Exhibit 189 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00000032-0139.

191.     Attached as Exhibit 190 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00126233-266.

192.     Attached as Exhibit 191 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00337141-157.

193.     Attached as Exhibit 192 is a true and correct copy of a family of documents produced by Defendant in this action, bates stamped MRK-CHA00121080-82.

194.     Attached as Exhibit 193 is a true and correct copy of the ClinicalTrials.gov webpage for the Protocol 007 clinical study, archived as of October 24, 2011 on web.archive.org, accessible at https://web.archive.org/web/20111024070411/http://clinicaltrials.gov/ct2/show/NCT00092391, last accessed October 10, 2019.

195.     Attached as Exhibit 194 is a true and correct copy of the ClinicalTrials.gov webpage for the Protocol 007 clinical study, archived as of September 26, 2012 on web.archive.org, accessible at https://web.archive.org/web/20120926162553/http://www.clinicaltrials.gov/ct2/show/NCT00092391, last accessed October 10, 2019.

196.     Attached as Exhibit 195 is a true and correct copy of the ClinicalTrials.gov webpage for the Protocol 007 clinical study, archived as of October 17, 2012 on web.archive.org, accessible at https://web.archive.org/web/20121017151501/http://www.clinicaltrials.gov/ct2/show/NCT00092391, last accessed October 10, 2019.

197.     Attached as Exhibit 196 is a true and correct copy of the ClinicalTrials.gov

webpage for the Protocol 007 clinical study, archived as of December 22, 2012 on

web.archive.org, accessible at

https://web.archive.org/web/20121222161131/http://clinicaltrials.gov/ct2/show/NCT00092391,

last accessed October 10, 2019.

198.     Attached as Exhibit 197 is a true and correct copy of the ClinicalTrials.gov

webpage for the Protocol 007 clinical study, archived as of July 3, 2013 on web.archive.org,

accessible at

https://web.archive.org/web/20130703082326/http://www.clinicaltrials.gov/ct2/show/NCT00092

391, last accessed October 10, 2019.

199.     Attached as Exhibit 198 is a true and correct copy of the ClinicalTrials.gov

webpage for the Protocol 007 clinical study, archived as of October 7, 2015 on web.archive.org,

accessible at

https://web.archive.org/web/20151007234938/https://clinicaltrials.gov/ct2/show/NCT00092391,

last accessed October 10, 2019.

200.     Attached as Exhibit 199 is a true and correct copy of the ClinicalTrials.gov

"Background" webpage, accessible at https://clinicaltrials.gov/ct2/about-site/background, last

accessed October 14, 2019.

201.     Attached as Exhibit 200 is a true and correct copy of a document "m-m-

rvaxpro-epar-scientific-discussion_en.pdf," downloaded from

https://www.ema.europa.eu/en/documents/scientific-discussion/m-m-rvaxpro-epar-scientific-

discussion_en.pdf on October 10, 2019.

21

**Appx416**

202. Attached as Exhibit 201 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00626021-22.

203. Attached as Exhibit 202 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00560257-58.

204. Attached as Exhibit 203 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00000368-382.

205. Attached as Exhibit 204 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01300697-99.

206. Attached as Exhibit 205 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01519087-88.

207. Attached as Exhibit 206 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00846451-53.

208. Attached as Exhibit 207 is a true and correct copy of excerpts of a document produced by Defendant in this action, bates stamped MRK-CHA00158320-8526.

209. Attached as Exhibit 208 is a true and correct copy of the transcript of the deposition of Michael Dekleva, taken in this matter on February 9, 2017.

210. Attached as Exhibit 209 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00157572-73.

211. Attached as Exhibit 210 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00821967-69.

212. Attached as Exhibit 211 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00152449-467.

213.    Attached as Exhibit 212 is a true and correct copy of excerpts from Merck's Responses and Objections to Plaintiffs' First Set of Interrogatories, dated August 16, 2017.

214.    Attached as Exhibit 213 is a true and correct copy of excerpts of a document produced by Defendant in this action, bates stamped MRK-CHA00846087-6404.

215.    Attached as Exhibit 214 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00761865-889.

216.    Attached as Exhibit 215 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00137854-55.

217.    Attached as Exhibit 216 is a true and correct copy of excerpts of a document produced by Defendant in this action, bates stamped MRK-CHA00140056-41340.

218.    Attached as Exhibit 217 is a true and correct copy of excerpts of a document produced by Defendant in this action, bates stamped MRK-CHA00138137-172.

219.    Attached as Exhibit 218 is a true and correct copy of excerpts of a document produced by Defendant in this action, bates stamped MRK-CHA00124554-4690.

220.    Attached as Exhibit 219 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00141909-922.

221.    Attached as Exhibit 220 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00757072-76.

222.    Attached as Exhibit 221 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00757108-111.

223.    Attached as Exhibit 222 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00757100-03.

Appx418

224.    Attached as Exhibit 223 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01449260-270.

225.    Attached as Exhibit 224 is a true and correct copy of the current MMR-II label (last revised: 09/2019), downloaded from https://www.merck.com/product/usa/pi_circulars/m/mmr_ii/mmr_ii_pi.pdf on October 22, 2019.

226.    Attached as Exhibit 225 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00757060-63.

227.    Attached as Exhibit 226 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00137876-77.

228.    Attached as Exhibit 227 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01580213-19.

229.    Attached as Exhibit 228 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01449029-040.

230.    Attached as Exhibit 229 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00177125-136.

231.    Attached as Exhibit 230 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01449181-82.

232.    Attached as Exhibit 231 is a true and correct copy of the current ProQuad label (last revised: 09/2019), downloaded from https://www.merck.com/product/usa/pi_circulars/p/proquad/proquad_pi_4171.pdf on October 22, 2019.

233.    Attached as Exhibit 232 is a true and correct copy of excerpts of Merck's Responses and Objections to Relators' First Set of Interrogatories, dated April 9, 2015.

234.    Attached as Exhibit 233 is a true and correct copy of Merck's expert report of Dr. Yonatan Grad, dated June 12, 2018.

235.    Attached as Exhibit 234 is a true and correct copy of excerpts of a report from the Centers for Disease Control and Prevention dated March 28, 2008 and titled "Summary of Notifiable Diseases - United States, 2006" downloaded from https://www.cdc.gov/mmwr/pdf/wk/mm5553.pdf on October 22, 2019.

236.    Attached as Exhibit 235 is a true and correct copy of excerpts of a report from the Centers for Disease Control and Prevention dated May 13, 2011 and titled "Summary of Notifiable Diseases - United States, 2009" downloaded from https://www.cdc.gov/mmwr/pdf/wk/mm5853.pdf on October 22, 2019.

237.    Attached as Exhibit 236 is a true and correct copy of excerpts of a report from the Centers for Disease Control and Prevention dated June 1, 2012 and titled "Summary of Notifiable Diseases - United States, 2010" downloaded from https://www.cdc.gov/mmwr/pdf/wk/mm5953.pdf on October 22, 2019.

238.    Attached as Exhibit 237 is a true and correct copy of excerpts of a report from the Centers for Disease Control and Prevention dated September 19, 2014 and titled "Summary of Notifiable Diseases - United States, 2012" downloaded from https://www.cdc.gov/mmwr/pdf/wk/mm6153.pdf on October 22, 2019.

239.    Attached as Exhibit 238 is a true and correct copy of excerpts of a report from the Centers for Disease Control and Prevention dated October 23, 2015 and titled "Summary of Notifiable Infectious Diseases and Conditions - United States, 2013" downloaded from https://www.cdc.gov/mmwr/pdf/wk/mm6253.pdf on October 22, 2019.

Appx420

240.     Attached as Exhibit 239 is a true and correct copy of excerpts of a report from the Centers for Disease Control and Prevention dated October 14, 2016 and titled "Summary of Notifiable Infectious Diseases and Conditions - United States, 2014" downloaded from https://www.cdc.gov/mmwr/volumes/63/wr/pdfs/mm6354.pdf on October 22, 2019.

241.     Attached as Exhibit 240 is a true and correct copy of excerpts of a report from the Centers for Disease Control and Prevention dated August 11, 2017 and titled "Summary of Notifiable Infectious Diseases and Conditions - United States, 2015" downloaded from https://www.cdc.gov/mmwr/volumes/64/wr/pdfs/mm6453.pdf on October 22, 2019.

242.     Attached as Exhibit 241 is a true and correct copy of a report from the Centers for Disease Control and Prevention titled "National Notifiable Infectious Diseases and Conditions: United States TABLE 2j. Reported cases of notifiable diseases, by region and reporting area - United States and U.S. territories, 2016" downloaded from https://wonder.cdc.gov/nndss/static/2016/annual/2016-table2j-H.pdf on October 22, 2019.

243.     Attached as Exhibit 242 is a true and correct copy of a report from the Centers for Disease Control and Prevention titled "National Notifiable Infectious Diseases and Conditions: United States TABLE 2j. Reported cases of notifiable diseases, by region and reporting area - - United States and U.S. territories, 2017" downloaded from https://wonder.cdc.gov/nndss/static/2017/annual/2017-table2j-H.pdf on October 22, 2019.

244.     Attached as Exhibit 243 is a true and correct copy of a report from the Centers for Disease Control and Prevention titled "Nationally Notifiable Infectious Diseases and Conditions, United States: Weekly Tables; TABLE 1y. Weekly cases* of notifiable diseases, United States, U.S. Territories, and Non-U.S. Residents weeks ending September 14, 2019 (week

26

**Appx421**

37)" downloaded from https://wonder.cdc.gov/nndss/static/2019/37/2019-37-table1y-H.pdf on

October 22, 2019.

245.    Attached as Exhibit 244 is a true and correct copy of an article titled

"Decreased humoral immunity to mumps in young adults immunized with MMR vaccine in

childhood", Rasheed et al, PNAS September 17, 2019 116 (38) 19071-19076; first published

September 3, 2019.

246.    Attached as Exhibit 245 is a true and correct copy of the transcript of the

deposition of Merck's expert Dr. William Atkinson, taken in this matter on January 30, 2019.

247.    Attached as Exhibit 246 is a true and correct copy of a document produced in

this action, bates stamped BIAOHE000446-453.

248.    Attached as Exhibit 247 is a true and correct copy of the transcript of the

deposition of Merck's expert Dr. Yonatan Grad, taken in this matter on October 30, 2018.

249.    Attached as Exhibit 248 is a true and correct copy of the transcript of an April

19, 2006 Centers for Disease Control and Prevention Press Briefing on mumps, accessible at

https://www.cdc.gov/media/transcripts/t060419.htm.

250.    Attached as Exhibit 249 is a true and correct copy of the transcript of the

deposition of one of the CDC's 30(b)(6) witnesses, Alan Sims, taken in this matter on October

12, 2017.

251.    Attached as Exhibit 250 is a true and correct copy of the transcript of the

deposition of Katalin Abraham, taken in this matter on May 18, 2017.

252.    Attached as Exhibit 251 is a true and correct copy of a document produced by

Defendant in this action, bates stamped MRK-CHA000955961.

**Appx422**

253.     Attached as Exhibit 252 is a true and correct copy of Merck's expert report of Dr. Jonathan Temte, dated June 12, 2018.

254.     Attached as Exhibit 253 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01449243-253.

255.     Attached as Exhibit 254 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00020421-22.

256.     Attached as Exhibit 255 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01372603-633.

257.     Attached as Exhibit 256 is a true and correct copy of an article by Stanely A. Plotkin, MD, titled "Commentary: Mumps Vaccines: Do We Need A New One?"; accepted for publication December 04, 2012.

258.     Attached as Exhibit 257 is a true and correct copy of an article by Stanley A. Plotkin, MD, titled "Mumps: A Pain in the Neck"; accepted for publication on April 11, 2018.

259.     Attached as Exhibit 258 is a true and correct copy of an article by Steven Rubin, PhD; Richard Kennedy, PhD; and Gregory Poland, MD; titled "Emerging Mumps Infection"; accepted for publication April 12, 2016.

260.     Attached as Exhibit 259 is a true and correct copy of an article by Jennifer A. Whitaker, titled "Measles and mumps outbreaks in the United States: Think globally, vaccinate locally"; dated June 18, 2014.

261.     Attached as Exhibit 260 is a true and correct copy of an article by Donald R. Latner and Carole J. Hickman, titled "Remembering Mumps"; published May 7, 2015.

28

262.     Attached as Exhibit 261 is a true and correct copy of an article by Martine Sabbe and Corinne Vandermeulen, titled "The resurgence of mumps and pertussis"; accepted for publication October 22, 2015.

263.     Attached as Exhibit 262 is a true and correct copy of an article by Gustavo H. Dayan and Steven Rubin, titled "Mumps Outbreaks in Vaccinated Populations: Are Available Mumps Vaccines Effective Enough to Prevent Outbreaks?"; accepted for publication May 20, 2008.

264.     Attached as Exhibit 263 is a true and correct copy of Shapiro Deposition Exhibit 25, which is a Program Announcement for the Department of Defense's Defense Health Program for Funding Opportunity No. W81XWH-17-PRMRP-CTA.

265.     Attached as Exhibit 264 is a true and correct copy of excerpts of a document produced by Relators in this action, bates stamped RELATOR_00004392-4478.

266.     Attached as Exhibit 265 is a true and correct copy of Merck's expert report of William Nichols, dated June 12, 2018.

267.     Attached as Exhibit 266 is a true and correct copy of Solicitation Number 2003-N-00734, issued December 19, 2002 by the Centers for Disease Control and Prevention under the Vaccine for Children (VFC) program.

268.     Attached as Exhibit 267 is a true and correct copy of Solicitation Number 2005-N-01706, issued January 4, 2005 by the Centers for Disease Control and Prevention under the Vaccine for Children (VFC) program.

269.     Attached as Exhibit 268 is a true and correct copy of Solicitation Number 2007-N-09211, issued January 23, 2007 by the Centers for Disease Control and Prevention under the Vaccine for Children (VFC) program.

**Appx424**

270.    Attached as Exhibit 269 is a true and correct copy of Solicitation Number 2010-N-11873, issued January 26, 2010 by the Centers for Disease Control and Prevention under the Vaccine for Children (VFC) program.

271.    Attached as Exhibit 270 is a true and correct copy of Solicitation Number 2011-N-13043, issued December 21, 2010 by the Centers for Disease Control and Prevention under the Vaccine for Children (VFC) program.

272.    Attached as Exhibit 271 is a true and correct copy of Solicitation Number 2012-N-14228, issued December 13, 2011 by the Centers for Disease Control and Prevention under the Vaccine for Children (VFC) program.

273.    Attached as Exhibit 272 is a true and correct copy of Solicitation Number 2013-N-14972, issued January 22, 2013 by the Centers for Disease Control and Prevention under the Vaccine for Children (VFC) program.

274.    Attached as Exhibit 273 is a true and correct copy of Solicitation Number 2014-N-15784, issued January 24, 2014 by the Centers for Disease Control and Prevention under the Vaccine for Children (VFC) program.

275.    Attached as Exhibit 274 is a true and correct copy of Solicitation Number 2015-N-16850, issued January 16, 2015 by the Centers for Disease Control and Prevention under the Vaccine for Children (VFC) program.

276.    Attached as Exhibit 275 is a true and correct copy of Solicitation Number 2016-N-17693, issued  by the Centers for Disease Control and Prevention under the Vaccine for Children (VFC) program.

277.     Attached as Exhibit 276 is a true and correct copy of Solicitation Number 2017-N-18099, issued January 21, 2017 by the Centers for Disease Control and Prevention under the Vaccine for Children (VFC) program.

278.     Attached as Exhibit 277 is a true and correct copy of Solicitation Number 2018-N-67769, issued January 10, 2018 by the Centers for Disease Control and Prevention under the Vaccine for Children (VFC) program.

279.     Attached as Exhibit 278 is a true and correct copy of Solicitation Number 75D301-19-R-67848, issued January 7, 2019 by the Centers for Disease Control and Prevention under the Vaccine for Children (VFC) program.

280.     Attached as Exhibit 279 is a true and correct copy of a document produced by GSK in this action, bates stamped GSK-MMR-0030570-72.

281.     Attached as Exhibit 280 is a true and correct copy of the Charter of the Advisory Committee on Immunization Practices, filed April 1, 2018.

282.     Attached as Exhibit 281 is a true and correct copy of Relators' expert report of Dr. Thomas McGuire, dated March 13, 2018.

283.     Attached as Exhibit 282 is a true and correct electronic copy of a native excel spreadsheet of transactional data, original filename "1998 Lot Assignment.xlsx" produced by Defendant in this action with a slipsheet bates stamped MRK-CHA02143443. Due to its large size this exhibit is being produced in electronic format with a copy of the corresponding slipsheet.

284.     Attached as Exhibit 283 is a true and correct electronic copy of a native excel spreadsheet of transactional data, original filename "1999 Lot Assignment.xlsx" produced by Defendant in this action with a slipsheet bates stamped MRK-CHA02143444. Due to its large

Appx426

size this exhibit is being produced in electronic format with a copy of the corresponding slipsheet.

285. Attached as Exhibit 284 is a true and correct electronic copy of a native excel spreadsheet of transactional data, original filename "2000 Lot Assignment.xlsx" produced by Defendant in this action with a slipsheet bates stamped MRK-CHA02143445. Due to its large size this exhibit is being produced in electronic format with a copy of the corresponding slipsheet.

286. Attached as Exhibit 285 is a true and correct electronic copy of a native excel spreadsheet of transactional data, original filename "2001 Lot Assignment.xlsx" produced by Defendant in this action with a slipsheet bates stamped MRK-CHA02143446. Due to its large size this exhibit is being produced in electronic format with a copy of the corresponding slipsheet.

287. Attached as Exhibit 286 is a true and correct electronic copy of a native excel spreadsheet of transactional data, original filename "2002 Lot Assignment.xlsx" produced by Defendant in this action with a slipsheet bates stamped MRK-CHA02143447. Due to its large size this exhibit is being produced in electronic format with a copy of the corresponding slipsheet.

288. Attached as Exhibit 287 is a true and correct electronic copy of a native excel spreadsheet of transactional data, original filename "2003 Lot Assignment.xlsx" produced by Defendant in this action with a slipsheet bates stamped MRK-CHA02143448. Due to its large size this exhibit is being produced in electronic format with a copy of the corresponding slipsheet.

Appx427

289.    Attached as Exhibit 288 is a true and correct electronic copy of a native excel spreadsheet of transactional data, original filename "2004 Lot Assignment.xlsx" produced by Defendant in this action with a slipsheet bates stamped MRK-CHA02143449. Due to its large size this exhibit is being produced in electronic format with a copy of the corresponding slipsheet.

290.    Attached as Exhibit 289 is a true and correct electronic copy of a native excel spreadsheet of transactional data, original filename "2005 Lot Assignment.xlsx" produced by Defendant in this action with a slipsheet bates stamped MRK-CHA02143450. Due to its large size this exhibit is being produced in electronic format with a copy of the corresponding slipsheet.

291.    Attached as Exhibit 290 is a true and correct electronic copy of a native excel spreadsheet of transactional data, original filename "2006 Lot Assignment.xlsx" produced by Defendant in this action with a slipsheet bates stamped MRK-CHA02143451. Due to its large size this exhibit is being produced in electronic format with a copy of the corresponding slipsheet.

292.    Attached as Exhibit 291 is a true and correct electronic copy of a native excel spreadsheet of transactional data, original filename "2007 Lot Assignment.xlsx" produced by Defendant in this action with a slipsheet bates stamped MRK-CHA02143452. Due to its large size this exhibit is being produced in electronic format with a copy of the corresponding slipsheet.

293.    Attached as Exhibit 292 is a true and correct electronic copy of a native excel spreadsheet of transactional data, original filename "2008 Lot Assignment.xlsx" produced by Defendant in this action with a slipsheet bates stamped MRK-CHA02143453. Due to its large

**Appx428**

size this exhibit is being produced in electronic format with a copy of the corresponding
slipsheet.

294.    Attached as Exhibit 293 is a true and correct electronic copy of a native excel
spreadsheet of transactional data, original filename "2009 Lot Assignment.xlsx" produced by
Defendant in this action with a slipsheet bates stamped MRK-CHA02143454. Due to its large
size this exhibit is being produced in electronic format with a copy of the corresponding
slipsheet.

295.    Attached as Exhibit 294 is a true and correct electronic copy of a native excel
spreadsheet of transactional data, original filename "2010 Lot Assignment.xlsx" produced by
Defendant in this action with a slipsheet bates stamped MRK-CHA02143455. Due to its large
size this exhibit is being produced in electronic format with a copy of the corresponding
slipsheet.

296.    Attached as Exhibit 295 is a true and correct electronic copy of a native excel
spreadsheet of transactional data, original filename "2011 Lot Assignment.xlsx" produced by
Defendant in this action with a slipsheet bates stamped MRK-CHA02143456. Due to its large
size this exhibit is being produced in electronic format with a copy of the corresponding
slipsheet.

297.    Attached as Exhibit 296 is a true and correct electronic copy of a native excel
spreadsheet of transactional data, original filename "2012 Lot Assignment.xlsx" produced by
Defendant in this action with a slipsheet bates stamped MRK-CHA02143457. Due to its large
size this exhibit is being produced in electronic format with a copy of the corresponding
slipsheet.

298.    Attached as Exhibit 297 is a true and correct electronic copy of a native excel spreadsheet of transactional data, original filename "2013 Lot Assignment.xlsx" produced by Defendant in this action with a slipsheet bates stamped MRK-CHA02143458. Due to its large size this exhibit is being produced in electronic format with a copy of the corresponding slipsheet.

299.    Attached as Exhibit 298 is a true and correct electronic copy of a native excel spreadsheet of transactional data, original filename "2014 Lot Assignment.xlsx" produced by Defendant in this action with a slipsheet bates stamped MRK-CHA02143459. Due to its large size this exhibit is being produced in electronic format with a copy of the corresponding slipsheet.

300.    Attached as Exhibit 299 is a true and correct electronic copy of a native excel spreadsheet of transactional data, original filename "2015 Lot Assignment.xlsx" produced by Defendant in this action with a slipsheet bates stamped MRK-CHA02143460. Due to its large size this exhibit is being produced in electronic format with a copy of the corresponding slipsheet.

301.    Attached as Exhibit 300 is a true and correct copy of a letter from Lisa Dykstra dated April 17, 2017.

302.    Attached as Exhibit 301 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA02063339-345.

303.    Attached as Exhibit 302 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371280-1310.

304.    Attached as Exhibit 303 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371311-340.

35

**Appx430**

305.     Attached as Exhibit 304 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371341-372.

306.     Attached as Exhibit 305 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371373-397.

307.     Attached as Exhibit 306 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371398-1421.

308.     Attached as Exhibit 307 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371422-444.

309.     Attached as Exhibit 308 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371445-472.

310.     Attached as Exhibit 309 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371473-496.

311.     Attached as Exhibit 310 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371497-1518.

312.     Attached as Exhibit 311 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371519-547.

313.     Attached as Exhibit 312 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371548-571.

314.     Attached as Exhibit 313 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371572-1603.

315.     Attached as Exhibit 314 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371604-623.

316.    Attached as Exhibit 315 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371624-655.

317.    Attached as Exhibit 316 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371656-692.

318.    Attached as Exhibit 317 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371693-1727.

319.    Attached as Exhibit 318 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371728-750.

320.    Attached as Exhibit 319 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371751-784.

321.    Attached as Exhibit 320 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371785-1816.

322.    Attached as Exhibit 321 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371817-840.

323.    Attached as Exhibit 322 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371841-879.

324.    Attached as Exhibit 323 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371880-1900.

325.    Attached as Exhibit 324 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371901-933.

326.    Attached as Exhibit 325 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371934-961.

327.     Attached as Exhibit 326 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371962-989.

328.     Attached as Exhibit 327 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371990-2020.

329.     Attached as Exhibit 328 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01372021-044.

330.     Attached as Exhibit 329 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01372045-072.

331.     Attached as Exhibit 330 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371253.

332.     Attached as Exhibit 331 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371256.

333.     Attached as Exhibit 332 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371258.

334.     Attached as Exhibit 333 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371259.

335.     Attached as Exhibit 334 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371261.

336.     Attached as Exhibit 335 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371262.

337.     Attached as Exhibit 336 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371263.

338.     Attached as Exhibit 337 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371264.

339.     Attached as Exhibit 338 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371268-69.

340.     Attached as Exhibit 339 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371274.

341.     Attached as Exhibit 340 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371278.

342.     Attached as Exhibit 341 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01371279.

343.     Attached as Exhibit 342 is a true and correct copy of an FDA webpage, "National Drug Code Directory," accessible online at https://www.fda.gov/drugs/drug-approvals-and-databases/national-drug-code-directory, last accessed October 1, 2019.

344.     Attached as Exhibit 343 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00759061-4.

345.     Attached as Exhibit 344 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00649638-40.

346.     Attached as Exhibit 345 is a true and correct copy of a letter (ECF 184-1) from Lisa Dykstra dated September 13, 2018.

347.     Attached as Exhibit 346 is a true and correct copy of a letter (ECF 77) from Lisa Dykstra dated June 15, 2015.

348.     Attached as Exhibit 347 is a true and correct copy of the transcript of the deposition of the Relators' expert Dr. Peter Calcott, taken in this matter on September 7, 2018.

349. Attached as Exhibit 348 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00069026-036.

350. Attached as Exhibit 349 is a true and correct copy of a document produced by Defendant in this action as "12-14 CDOC presentation.ppt," bates stamped MRK-CHA00021319.

351. Attached as Exhibit 350 is a true and correct copy of a Department of Justice press release dated May 13, 2013.

352. Attached as Exhibit 351 is a true and correct copy of a Department of Justice press release dated October 26, 2010.

353. Attached as Exhibit 352 is a true and correct copy of a Department of Justice press release dated January 12, 2017.

354. Attached as Exhibit 353 is a true and correct copy of a Department of Justice press release dated September 24, 2014.

355. Attached as Exhibit 354 is a true and correct copy of a Department of Justice press release dated April 15, 2009.

356. Attached as Exhibit 355 is a true and correct copy of Stannard Exhibit 3, a document produced by Defendant at the December 13, 2016 Rule 30(b)(6) Deposition of Mark Stannard.

357. Attached as Exhibit 356 is a true and correct copy of a Department of Justice press release dated August 8, 2014.

358. Attached as Exhibit 357 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00000547.

40

359.    Attached as Exhibit 358 is a true and correct copy of the transcript of the deposition of the Relators' expert Dr. Robert Malone, taken in this matter on September 14, 2018.

360.    Attached as Exhibit 359 is a true and correct copy of the transcript of the deposition of Dr. Manal Morsy, taken in this matter on August 5, 2016.

361.    Attached as Exhibit 360 is a true and correct copy of Atkinson Deposition Exhibit 6, which is a CDC publication, "Recommendations of the Immunization Practices Advisory Committee Measles Prevention: Supplementary Statement", dated January 13, 1989.

41

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  October 25, 2019
          New York, New York

GARY REILLY

10/25/2019
Declaration of G. Reilly
EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel*., STEPHEN A. KRAHLING and JOAN A. WLOCHOWSKI, | |
| Plaintiffs, | Civil Action No. 10-4374 (CDJ) |
| v. | |
| MERCK & CO., INC., | |
| Defendant. | |
| IN RE: MERCK MUMPS VACCINE ANTITRUST LITIGATION | |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Master File No. 12-3555 (CDJ) |

## REPORT OF DR. EUGENE SHAPIRO

# TABLE OF CONTENTS

I.    QUALIFICATIONS/EXPERIENCE ..................................................................... 2

II.   ASSIGNMENT ................................................................................................ 3

III.  SUMMARY OF OPINIONS ............................................................................. 4

IV.   BACKGROUND .............................................................................................. 4

      A.   Nature of Mumps Disease ...................................................................... 4

      B.   Purpose of Vaccination .......................................................................... 6

      C.   Regulation of Vaccines in the United States ......................................... 8

      D.   Mumps Vaccines in the United States ................................................... 8

      E.   The ACIP Recommendations on Mumps Vaccination .......................... 9

      F.   The Resurgence of Mumps in the United States And Possible Causes ................. 9

V.    FINDINGS ...................................................................................................... 11

      A.   Merck's Mumps Vaccine Does Not Provide Sufficient Protection
           to Prevent Continued Outbreaks .......................................................... 11

      B.   The Resurgence of Mumps Cases and of Outbreaks in the United States
           Is a Significant Public Health Concern ................................................ 16

1

**Appx440**

## I.   QUALIFICATIONS/EXPERIENCE

My name is Eugene Shapiro.  I am a Professor of Pediatrics, Epidemiology and Investigative Medicine at Yale University.  I received a Bachelor of Arts from Yale in 1970 and a Doctor of Medicine from the University of California, San Francisco School of Medicine, in 1976.  I completed a residency in pediatrics at Children's Hospital of Pittsburgh in 1979 and a two-year fellowship in pediatric infectious diseases at Children's Hospital of Pittsburgh in 1981. I completed another two-year fellowship in clinical epidemiology as a member of the Robert Wood Johnson Clinical Scholars Program at Yale in 1983.

I have been on the faculty at Yale since 1983, where I see patients, teach courses, and conduct research.  In addition to my teaching responsibilities, I am also the Vice Chair for Research of Yale's Department of Pediatrics, the Deputy Director of Yale's PhD Program in Investigative Medicine, and Co-Director of Education and Director of Child Health Research for Yale's Center for Clinical Investigation.

I maintain board certifications in both Pediatrics and Pediatric Infectious Diseases.  I served a six-year term, including two as Chair, as a member of the Infectious Diseases sub-board of the American Board of Pediatrics.  I have written over 250 publications, including 150 in peer-reviewed journals, most of which are studies related to vaccines.  I have been the principal investigator of numerous clinical studies, a number of which have been funded by R01 grants from the National Institutes of Health (NIH).  I have also received funding from private foundations and from industry, including from Merck Laboratories.

I have served as a consultant to the World Health Organization, for both the Department of Vaccines and Biologicals and for the Acute Respiratory Infections Control Programme, and Chair of the Advisory Group for the Epidemiology Branch of the National Institute of Child

2

Appx441

Health and Human Development.  I have also served as a Special Advisor to the Food and Drug Administration's Vaccine Advisory Committee.  Additionally, I have been the Chair of the Data Safety and Monitoring Boards for numerous clinical trials, including clinical trials of the efficacy of vaccines, many of which were, or are currently, funded by the NIH.

I have served as a reviewer for grant proposals and awards for the Netherlands Organisation for Health Research and Development, the Department of Health of the United Kingdom, the University of Amsterdam, the Czech Health Research Council and the Karolinska Institute.  In 2014, I received the Stanley A. Plotkin Lectureship in Vaccinology Award for career achievement for research in vaccinology.  In 2017, I received the Pediatric Diseases Society Distinguished Physician Award for "an extensive and distinguished career in pediatric infectious diseases."

I have served as an expert witness hundreds of times on issues related to vaccines and infectious diseases.  A listing of the matters for which I have given deposition or trial testimony in the past five years is attached as Appendix A.  A copy of my current *curriculum vitae,* which includes my publications, is attached as Appendix B.

## II.    ASSIGNMENT

I have been retained by Relators and Private Plaintiffs in the above-referenced actions.  I have been asked by Relators and Private Plaintiffs to provide my expert opinion on the incidence of mumps in the United States and whether Merck's mumps-containing vaccines, MMR II and ProQuad, provide sufficient protection against mumps to prevent continued mumps cases and outbreaks.  In rendering my opinions herein, I have reviewed certain documents produced and testimony taken in these cases as well as publicly available information and academic literature. Attached in Appendix C is a list of the materials I considered or relied upon in reaching my

Appx442

conclusions.  Relators and Private Plaintiffs are compensating me for my work on this matter at an hourly rate of $500 ($600 per hour for testimony).  My compensation does not depend on the outcome of this litigation or my conclusions.

## III.   SUMMARY OF OPINIONS

The summary of my opinions is as follows:

1.   Merck's mumps vaccine does not provide sufficient protection to prevent continued mumps cases and outbreaks in the United States.

2.   The resurgence of mumps cases and outbreaks in the United States is a significant public health concern.

3.   A new mumps vaccine is necessary if we wish to control mumps in the United States.

## IV.   BACKGROUND

### A.   Nature of Mumps Disease

Mumps is a highly contagious disease caused by an RNA virus in the Paramyxoviridae family.  It is a systemic illness characterized by swelling of the parotid salivary glands, known as parotitis.  Mumps is spread via droplets of saliva or mucus from the mouth, throat, or nose of an infected person.  This often occurs when an infected person talks, coughs or sneezes, but the disease can also be spread when an infected person touches surfaces or items without washing their hands and another person touches the contaminated object and rubs their nose or mouth. The incubation period is typically 16 to 18 days, but cases can occur from 12 to 25 days after exposure.   There is no cure for mumps; treatment focuses on relief of symptoms.[1]

---

[1] *See generally* Plotkin, Plotkin's Vaccines, Ch. 40: Mumps Vaccines (Elsevier 7th Ed. 2017); World Health Organization, Mumps, http://www.who.int/biologicals/areas/vaccines/mmr/mumps/en/; Centers for Disease Control and Prevention, Epidemiology and Prevention of Vaccine-Preventable Diseases, Ch. 15: Mumps, 247-260 (Washington D.C. Public Health Foundation 13th Ed. 2015).

Appx443

For children who contract the disease, the most common complications include meningitis, sometimes associated with encephalitis.  Adults with the disease may have more serious complications than children, including arthritis, inflammation of the breasts or ovaries, pancreatitis, thyroiditis, myocarditis, thrombocytopenia, encephalitis, glomerulonephritis, cerebellar ataxia, and either temporary or permanent hearing impairment.  Some studies have observed an increase in miscarriages among women who developed mumps during the first trimester of pregnancy.  Orchitis, painful inflammation of one or both of the testicles, frequently occurs in post pubescent males.  Roughly half of patients with orchitis experience testicular atrophy and in rare cases it can lead to sterility.[2]

Up to one third of persons infected with mumps are asymptomatic, but they still may transmit the virus.  This presents challenges to estimation of the incidence of mumps and to controlling outbreaks.  Further complicating the issue is the fact that other viruses – including influenza A virus, Coxsackie viruses, parainfluenza viruses 1, 2, and 3, Epstein-Barr virus, and adenovirus – can also cause parotitis.  As a result, laboratory testing is critical for confirming mumps cases.  However, mumps can also be difficult to diagnose in highly immunized populations because the immunoglobulin M antibody response that is often used to confirm the diagnosis may not occur or may be present only transiently in persons who had previously received the vaccine but subsequently contract mumps.

---

[2] *See generally* Plotkin, Plotkin's Vaccines, Ch. 40: Mumps Vaccines (Elsevier 7th Ed. 2017); World Health Organization, Mumps, http://www.who.int/biologicals/areas/vaccines/mmr/mumps/en/; Centers for Disease Control and Prevention, Epidemiology and Prevention of Vaccine-Preventable Diseases, Ch. 15: Mumps, 247-260 (Washington D.C. Public Health Foundation 13th Ed. 2015).

Appx444

### B. Purpose of Vaccination

Vaccines have been, by many measures, the most significant, impactful and cost-effective medical intervention to improve public health in the modern era.  The reduction in both mortality and morbidity from vaccine-preventable diseases, such as smallpox, polio, measles, *Haemophilus influenzae* type b, pneumococcus, varicella and others has been enormous.  The goal of a vaccine against an infectious agent like mumps can be divided into different domains: the goal from the perspective of the individual who receives the vaccine (the vaccinee), and the goal from the perspective of the public health of the population of which the vaccinees are members.

For the individual, the role of the vaccine is to induce immunity to the infectious agent, usually by inducing antibodies (though for some infectious agents, cell-mediated immunity may also be important), which either will prevent infection (ideally) or will mitigate the severity of the disease caused by the infection, if it occurs.  From a public health perspective, the purpose is not only to achieve those results for individual vaccinees, but also to increase the proportion of immune individuals in the population.  If the proportion of the population that is immune is high enough, it could result in "herd immunity," because not only would the incidence of infection be substantially reduced in vaccinees, but transmission of the infection in the entire population could also be interrupted.  In effect, unimmunized persons would also be protected from the infection, since if they were not exposed to the infectious agent because of reduced incidence of disease and decreased transmission in the population, they too would not suffer the effects of an infection (and they would not transmit it to others).

For infectious agents for which humans are the only host, it may be possible to eradicate the infectious agent from the world (as has happened with smallpox virus, and is nearing for

**Appx445**

polio virus). For other infections, the level of immunity in the population may be sufficient to reduce the incidence of infection in a country such that endemic transmission of the infection is eliminated, with cases of disease occurring only very rarely, typically in unimmunized individuals who are exposed to cases imported from other countries.

An excellent example of this is the recent epidemiology of measles in the United States. Cases of measles are very rare and generally occur only in sporadic outbreaks among groups with few or no vaccinees (*e.g.*, the Amish). Typically, a susceptible person is exposed to measles in a place where the virus is circulating (*e.g.*, a foreign country). That person then travels to the United States, develops measles and becomes an imported index case of the infection. If the traveler with measles is in contact only with persons who are immune, no one else will develop measles and there will be no outbreak. However, if the infected traveler is in contact with persons most of whom are not immune, then cases of the infection may rapidly develop and spread among other susceptible persons in the group (either among those who are unimmunized or among those whose immunity has waned), and an "outbreak" will ensue.

To achieve the desired effects of a vaccine such as mumps vaccine, it is important for the vaccine to be safe, potent and effective, and for the immunity induced by the vaccine to be long-lasting. In addition, it is important for uptake of the vaccine in the population to be high so that the proportion of people in the population that is immune is sufficient to achieve and to maintain herd immunity. For a vaccine against a virus like mumps, duration of vaccine-induced immunity is important, not only to maintain herd immunity, but also because the disease tends to be more severe in both adolescents and adults than in younger children, sometimes causing painful orchitis or oophoritis, meningitis, encephalitis, infertility, deafness and, rarely, even death. Thus,

7

since the vaccine is administered in early childhood, it is especially important that immunity is long-lasting.

### C.    Regulation of Vaccines in the United States

In the United States, two government agencies are primarily charged with overseeing the licensing of vaccines and the monitoring of vaccine-preventable diseases.  The Food and Drug Administration (FDA) oversees licensure-related testing of a vaccine for safety and effectiveness.  It also reviews data from pivotal clinical trials to assure that the vaccine is efficacious.  After a vaccine is approved, the Centers for Disease Control (CDC) is the primary agency that monitors the epidemiology of the infection in the population, including investigating unexpected outbreaks of disease that occur as well as possible unexpected adverse side effects. Other entities, both government [e.g., the Advisory Committee on Immunization Practices (ACIP)] and non-government (e.g., the Committee on Infectious Diseases of the American Academy of Pediatrics and the American Academy of Family Practitioners), formulate recommendations for vaccine policy (i.e., recommended timing of immunizations).

### D.    Mumps Vaccines in the United States

Since 1967, Merck has been the only vaccine manufacturer licensed to sell a mumps-containing vaccine in the United States.  In 1967, Merck obtained a license for the first United States mumps vaccine, Mumpsvax.  In 1971, Merck obtained a license for a combination measles, mumps and rubella vaccine called MMR.  The next year, Merck obtained a license for an updated combination measles, mumps and rubella vaccine, containing a new strain of the rubella vaccine, called MMR II.  In 2005, Merck obtained a license for a combined measles, mumps, rubella and varicella vaccine called ProQuad.  In 2009, Merck discontinued its

8

monovalent mumps vaccine, leaving MMR II and ProQuad as the only mumps vaccines licensed for sale in the United States today.[3]

### E.      The ACIP Recommendations on Mumps Vaccination

In 1977, the ACIP recommended one dose of mumps vaccine for all children 12 months or older.  In response to multiple measles outbreaks in the 1980s, including a significant 1986 outbreak, the ACIP recommended routine immunization with two doses of MMR II for children, with the first dose being administered between 12 and 15 months of age and the second dose administered between ages four and six years.  The ACIP formally recommended a two-dose mumps vaccination policy for school-aged children in 2006.  In 2017, the ACIP recommended a third dose of mumps vaccine for persons previously vaccinated with two doses who are identified by public health authorities as being part of a group or population at increased risk for acquiring mumps because of an outbreak.[4]

### F.      The Resurgence of Mumps in the United States And Possible Causes

Starting in 1971, after the licensure of Mumpsvax, reported incidence of mumps in the United States decreased annually with few exceptions until 1986.  In 1986 and 1987, there was a marked increase in cases of mumps with 7,790 and 12,848 cases reported, respectively. Subsequently, and coinciding with the ACIP recommendation of a second dose of MMR II in

---

[3]  *See* Centers for Disease Control and Prevention, "Prevention of Measles, Rubella, Congenital Rubella Syndrome, and Mumps, of 2013: Summary Recommendations of the Advisory Committee of Immunization Practices (ACIP)," *Morbidity and Mortality Weekly Report*, 2013 June 14; 62(RR04):1-34.

[4]  *See* Centers for Disease Control and Prevention, "Recommendation of the Advisory Committee on Immunization Practices for Use of a Third Dose of Mumps Virus-Containing Vaccine In Persons at Increased Risk for Mumps During an Outbreak," *Morbidity and Mortality Weekly Report*, 2018 Jan 12;67(1):33–38.

Appx448

1989, the incidence of reported cases of mumps trended downwards once more.  From 1995 to

2005, there were fewer than a thousand reported cases of mumps per year.[5]

However, in the winter of 2006, a large-scale mumps outbreak occurred in the Midwest,

with over 6,500 reported cases.  It was the largest recorded mumps outbreak in the United States

in roughly twenty years.  Most of the cases occurred in college students and in most of the

colleges affected, > 90% of the students had received two doses of mumps vaccine.   Another

group of outbreaks of mumps that affected more than 3,500 people occurred in 2009 and in 2010

in Guam, New York and New Jersey, in addition to more than 1,000 cases of mumps that were

reported elsewhere in the country.  In the New York and the New Jersey outbreaks, 89% of

adolescents (the group with the highest proportion of cases) who contracted mumps had received

two doses of mumps vaccine.  In the Guam outbreak, the highest attack rate was among school-

aged children, and in that group, 93% of those affected had received two doses of mumps

vaccine.[6]

From 2010 to 2015, there were more than 23 outbreaks of at least 20 cases of mumps

reported across 18 states.  Eighteen of these outbreaks occurred at universities, and in half of

them more than 85% of those affected had received two doses of mumps vaccine.   In 2016 and

2017, there were roughly 12,000 reported cases of mumps in 48 states, far surpassing the number

of reported cases of mumps in 2006 and the neighboring years.[7]

---

[5]  *See* Centers for Disease Control and Prevention, <u>Epidemiology and Prevention of Vaccine-Preventable Diseases</u>, Appendix E (Washington D.C. Public Health Foundation 13th Ed. 2015).

[6]  Barskey, "Mumps outbreak in Orthodox Jewish communities in the United States," *New England Journal of Medicine*, 2012 Nov 1;367(18):1704-13; Nelson, "Epidemiology of a Mumps Outbreak in a Highly Vaccinated Island Population and Use of a Third Dose of Measles-Mumps-Rubella Vaccine for Outbreak Control—Guam 2009 to 2010," *Pediatric Infectious Disease Journal*, 2013 Apr;32(4):374-80.

[7]  Marin, "Current Mumps Vaccination Recommendations and Epidemiology in the United States," Presentation to ACIP on February 23, 2017; Centers for Disease Control and Prevention, "2016 Annual Tables of Infectious

The resurgence of mumps has been investigated by, among others, the CDC's Division of Viral Diseases, the ACIP, and state health agencies in an effort to understand why the outbreaks are occurring in highly vaccinated populations. It also has been investigated and written about by numerous academics. As a result of these investigations, a number of theories as to the causes of this resurgence in mumps have been put forward, including (as discussed below) insufficient memory B cell response, antigenic drift of the virus and waning immunity.

## V. FINDINGS

### A. Merck's Mumps Vaccine Does Not Provide Sufficient Protection to Prevent Continued Outbreaks

Following approval of Merck's mumps vaccine in 1967, there was a substantial and sustained decrease in the incidence of mumps. However, beginning in the late 1980s there were a number of outbreaks of mumps in highly vaccinated groups. These outbreaks occurred primarily in secondary schools and in colleges, sometimes in groups in which as many as 95% of the students had received a dose of mumps vaccine. Because of outbreaks of measles in similar populations, in 1989 the ACIP recommended a routine second dose of measles vaccine at 4-5 years of age, but suggested that it be administered as the combined measles, mumps, rubella (MMR) vaccine, also stating, "Mumps revaccination is particularly important." Subsequently, the annual incidence of mumps in the United States dropped to the lowest levels since surveillance began (< 300 cases/year from 2001 to 2005). However, although measles in the

---

Disease Data," *National Notifiable Diseases Surveillance System*, 2017, https://www.cdc.gov/nndss/infectious-tables.html; Centers for Disease Control and Prevention, "National Notifiable Diseases Surveillance System, Weekly Tables of Infectious Disease Data," *National Notifiable Diseases Surveillance System*, 2018, https://www.cdc.gov/nndss/infectious-tables.html; Centers for Disease Control and Prevention, Epidemiology and Prevention of Vaccine-Preventable Diseases, Appendix E (Washington D.C. Public Health Foundation 13th Ed. 2015); Centers for Disease Control and Prevention, "Mumps Cases and Outbreaks," 2018 Mar 6, https://www.cdc.gov/mumps/outbreaks.html.

United States has continued generally to be well controlled (with only sporadic small outbreaks in isolated communities), since early 2006 there have been numerous, large outbreaks of mumps in the United States, with nearly 15,000 reported mumps cases since 2014.

There is no consensus about the reasons for the resurgence in mumps. There is evidence that the number of memory B cells induced by Merck's mumps vaccine may be relatively low. These are the cells that produce and maintain concentrations of antibodies over time and that respond to re-exposure to the pathogen (mumps) by increasing production of protective antibodies. Vaccinees with low numbers of these cells may not be able either to maintain immunity or to respond with a rapid increase of protective antibodies if, years after their last immunization, they are exposed to mumps, or perhaps, even to another dose of the vaccine.

Another possible explanation for the resurgence of mumps in the United States is that surface antigens of new circulating strains of the virus are sufficiently different from antigens of the vaccine strain such that the antibodies induced by the vaccine are not adequate to provide protection against the heterologous (different) strain of the virus circulating in the community. Most of the strains of mumps that have been implicated in recent outbreaks have been genotype G, a different type than the Jeryl Lynn strain (genotype A) from which Merck's mumps vaccine is formulated.

Another important feature of the outbreaks is that the length of time since receipt of the second dose of the mumps vaccine was directly correlated with the attack rate of mumps. For example, during the large outbreak of mumps at the University of Iowa in 2016 through 2017, the attack rate per 1000 population was 1.6, 3.9, 11.3 and 17.6 for those who received the second

12

**Appx451**

dose of mumps vaccine 0-2 years, 3-12 years, 13-15 years or 16-23 years earlier, respectively.[8]

Students who had received the second dose of mumps vaccine 13-15 years earlier had a risk of

contracting mumps that was 7 times higher than of those who had received the second dose of

mumps vaccine < 2 years earlier.  Persons who had received the second dose of mumps vaccine

> 16 years earlier had a risk of contracting mumps that was 11 times higher than of those who

had received the second dose of mumps vaccine < 2 years earlier.  These results are consistent

with findings in other outbreaks of mumps and further suggest that waning immunity is playing

an important role in these outbreaks.

Whatever the reason for the outbreaks, they have been occurring with markedly increased

frequency, are occurring nationwide in highly vaccinated populations, and have become a major

public health problem.  In 2013 there were 584 reported cases of mumps; in 2014 there were

1,223 reported cases; in 2015 there were 1,329 reported cases; in 2016 there were 6,369 reported

cases; and in 2017 there were 5,629 reported cases, though reporting is not yet complete.[9]

The CDC performed a survey of reported cases of mumps that occurred from January

2016 through June 2017 in 52 of its 57 reporting jurisdictions.  With 98% of those jurisdictions

responding, they found that there were 9,200 cases (median age 21 years) reported from 150

---

[8] Cardemil, "Effectiveness of a Third Dose of MMR Vaccine for Mumps Outbreak Control," *New England Journal of Medicine*, 2017 Sep 7;377(10):947-956.

[9] Centers for Disease Control and Prevention, <u>Epidemiology and Prevention of Vaccine-Preventable Diseases,</u> Appendix E (Washington D.C. Public Health Foundation 13th Ed. 2015); Centers for Disease Control and Prevention, "Summary of Notifiable Infectious Diseases and Conditions – United States, 2014," *Morbidity and Mortality Weekly Report*, 2016 Oct 14;63(54):31; Centers for Disease Control and Prevention, "Summary of Notifiable Infectious Diseases and Conditions – United States, 2015," *Morbidity and Mortality Weekly Report*, 2017 Aug 11;64(53):32; Centers for Disease Control and Prevention, "2016 Annual Tables of Infectious Disease Data," *National Notifiable Diseases Surveillance System*, 2017, https://www.cdc.gov/nndss/infectious-tables html; Centers for Disease Control and Prevention, "National Notifiable Diseases Surveillance System, Weekly Tables of Infectious Disease Data," *National Notifiable Diseases Surveillance System*, 2018, https://www.cdc.gov/nndss/infectious-tables.html; Centers for Disease Control and Prevention, "Mumps Cases and Outbreaks," 2018 Mar 6, https://www.cdc.gov/mumps/outbreaks.html.

outbreaks, which occurred in more than three-quarters of the 52 jurisdictions.  Half of the

outbreaks were comprised of fewer than 10 cases, indicating that this is not a problem that

occurred in only a few selected settings.  Indeed, outbreaks occurred not only in universities

(which accounted for the largest outbreaks), but also in communities and in schools other than

universities.[10]

Of course, these are only clinically apparent reported cases.  It is well recognized that a

substantial number of cases of mumps are either subclinical (*i.e.*, the person is not symptomatic

enough to seek medical care) or are not reported.  Moreover, it is likely that at least some persons

with subclinical infections are able to transmit the mumps virus to others, which would tend to

perpetuate outbreaks.

The other remarkable feature of the outbreaks is that in more than half of the outbreaks,

those who developed mumps had received two or more doses of mumps vaccine, and in many

outbreaks more than three-quarters of infected patients had received two doses of the vaccine.

Indeed, in the large recent outbreak at the University of Iowa, before the outbreak, 98% of the

students had received two doses of the vaccine.

Estimates of the effectiveness of two doses of the vaccine during outbreaks have ranged

from 53% to 95%, with an effectiveness of $\leq$ 88% in half of the outbreaks.  Of course, if persons

with subclinical infections were included, the estimates of the vaccine's effectiveness in

outbreaks would be even lower.  The resurgence of outbreaks has caused many to question the

current understanding of how well Merck's mumps vaccine actually protects against disease.

The FDA has pointed to the 2006 outbreak, with its high attack rate among recipients of two

---

[10]  *See* Marin, "Update on Mumps Epidemiology, United States," Presentation to ACIP on October 25, 2017.

doses of the vaccine, as an indication of "lower vaccine efficacy than previously estimated."[11] The median age of persons who developed mumps also is notable. Before the vaccine was introduced, the highest incidence of mumps was in young children. Now, most cases of mumps are occurring in young adults. This is of special concern because serious complications of mumps are more common in adults than in young children.

The inadequacy of two doses of Merck's mumps vaccine is further evidenced by the recent (late 2017) decision of the ACIP to recommend administration of a third dose of mumps vaccine during outbreaks of mumps. However, the benefit of even a third dose of the vaccine was limited. Recipients of the third dose of the vaccine, most of which were administered after the outbreak began, still contracted mumps at a high rate. For example, in the outbreak at the University of Iowa, although the overall attack rate was lower among students who had received three doses of the vaccine (6.7 cases per thousand persons) than among those who had received 2 doses (14.5 cases per thousand persons), the attack rate among recipients of three doses of

---

[11] *See* FDA, Determining the Safety and Efficacy of Vaccines to Protect Against Viruses that Infect the Central Nervous System, Biologics Research Projects, https://www.fda.gov/BiologicsBloodVaccines/ScienceResearch/BiologicsResearchAreas/ucm127315 htm ("In 2006 the US experienced its largest mumps outbreak in 20 years. Multiple independently performed outbreak investigations found that between 70% and 99% of cases had received the recommended 2 doses of mumps-containing vaccine, indicating lower vaccine efficacy than previously estimated."). *See also* Cortese, "Mumps Vaccine Performance among University Students during a Mumps Outbreak, " *Clinical Infectious Diseases*, 2008 April 15;46(8):1172-80 ("Therefore, as was true for the 2006 US resurgence in general, the large size of the outbreak at this institution was unexpected and raised questions about the effectiveness of mumps protection from 2 doses of MMR vaccine."); Dayan, "Mumps Outbreaks in Vaccinated Populations: Are Available Mumps Vaccines Effective Enough to Prevent Outbreaks?," *Vaccines*, 2008 Dec 1;47(11):1458-1467 ("[T]he recent resurgence of mumps in the United States, where outbreaks have occurred in the context of high 2-dose vaccination coverage, raised the question of whether available mumps vaccines are sufficiently effective to prevent outbreaks and achieve disease elimination."); Brunell, Philip, "The Effectiveness of Evaluating Mumps Vaccine Effectiveness," *Clinical Infectious Diseases*, 2007 August 15;45(4):467–469 ("The disappointing performance of mumps vaccine during the recent outbreak has resulted in a reexamination of its efficacy."); Date, "Long-Term Persistence of Mumps Antibody after Receipt of 2 Measles-Mumps-Rubella (MMR) Vaccinations and Antibody Response after a Third MMR Vaccination among a University Population," *The Journal of Infectious Diseases*, 2008 June 15;197(12):1662-68 ("High attack rates among highly vaccinated young adults during this outbreak raised concerns regarding the mumps vaccine failure.").

mumps vaccine was still very high—substantially higher than the overall annual attack rate of <1 per 100,000 persons that was sustained from the mid-1990s through 2004.[12]

B.    The Resurgence of Mumps Cases and of Outbreaks in the United States Is a Significant Public Health Concern

Outbreaks can serve as sentinel events that provide important information about the level of immunity in the population and about the effectiveness of a vaccine over time.  Understanding why outbreaks are occurring might also provide insights into what needs to be done to protect not only individuals but also the health of the population, by being able to take measures to assure that the proportion of immune individuals is high enough to maintain herd immunity

The consequences of an imperfect vaccine on patients is well illustrated in studies of complications of mumps, even in the modern era, during outbreaks of mumps, making it clear that such outbreaks are not trivial.  This is particularly true when, as is the case now, those affected are mostly adults who have higher rates of complications from the infection.  Indeed, that is why a vaccine for mumps was developed in the first place.

For example, investigators who studied complications of mumps in the United Kingdom (where routine administration of 2 doses of the Jeryl Lynn strain of mumps vaccine is recommended), using data from enhanced surveillance, reported that during outbreaks in 2004-2005, 2.9% of patients with mumps had been hospitalized, 6.1% had orchitis, 0.3% had meningitis, and 0.25% had pancreatitis.[13]  Other studies have found that up to 1 in 1000 patients

---

[12]  Cardemil, "Effectiveness of a Third Dose of MMR Vaccine for Mumps Outbreak Control," *New England Journal of Medicine*, 2017 Sep 7;377(10):947-956.

[13]  *See* Yung, "Mumps Complications and Effects of Mumps Vaccination, England and Wales, 2002-2006," *Emerging Infectious Disease*, 2011 April;17(4):661-7.

with mumps develop deafness, which may be permanent.[14]  Investigators found a similar

proportion of people with serious complications of mumps in recent outbreaks in the United

States.  For example, in a report of the large outbreak in 2006 in the United States, among about

4,000 persons with documented infection with mumps, 5% had a serious complication and 2%

were hospitalized.[15]  Complications included encephalitis, orchitis, oophoritis, meningitis,

pancreatitis, mastitis and deafness.

The seriousness of the resurgence of mumps in the United States is reflected in the

recognition by many prominent vaccine experts, such as Stanley Plotkin, that there is a need for a

new vaccine for mumps:

> We need a new mumps vaccine.  I come to that conclusion because of the
> numerous examples we have that mumps is resurgent in older previously
> vaccinated adolescents, particularly when they come together in groups in to
> which mumps virus is introduced.  . . .  The [CDC] attributed the resurgence of
> mumps in the United States to the accumulation of susceptible adolescents from
> rural areas in crowded circumstances such as colleges, with the introduction of
> mumps virus from outside.  However, more recent outbreaks have occurred in less
> rural areas and it is evident that vaccine failure plays a big role in them.  . . .  In
> view of all the above, I would argue as others have, that a new vaccine is needed.
> . . .  Although the practical difficulties are considerable, so is the cost of continued
> outbreaks of mumps.[16]

---

[14]  *See* Hashimoto, "An Office-Based Prospective Study of Deafness in Mumps," *Pediatric Infectious Disease Journal*, 2009 March 1;28(3):173–5.

[15]  *See* Dayan, "Recent Resurgence of Mumps in the United States," *New England Journal of Medicine*, 2008 Apr 10; 358(15):1580-9.

[16]  Plotkin, "Commentary: Mumps Vaccines: Do We Need a New One?," *The Pediatric Infectious Disease Journal*, 2013 Apr;32(4):381-2.  *See also* Rubin, "Emerging Mumps Infection," *The Pediatric Infectious Disease Journal*, 2016 Jul;35(7):799-801 ("[I]t is clear that other approaches to improve vaccine effectiveness need to be pursued. Among these, development of new vaccines must be considered."); Whitaker, "Measles and mumps outbreaks in the United States: Think globally, vaccinate locally," *Vaccine*, 2014 Aug 20;32(37):4703-4 ("For mumps, we can advocate that not only do we need better vaccine coverage, we also need better vaccines."); Latner, "Remembering Mumps," *PLOS Pathogens*, 2015 May 7;1(5):1-4 ("A more effective mumps vaccine that provides lifelong immunity is certainly desirable, but before scientifically grounded improvements can be made, it will be essential to better understand which parameters of immunity are required for protection and why the immune response to mumps is characteristically weak."); Sabbe, "The resurgence of mumps and pertussis," *Human Vaccines and Immunotherapeutics*, 2016 Apr 2;12(4):955-9 ("However, in recent years, many countries including the United States . . . have been confronted with a resurgence of mumps and pertussis, despite high vaccination coverage for

17

The government has also recognized this problem.  At the beginning of each decade, the United States Department of Health and Human Services has issued "ambitious, yet achievable . . . 10-year national objectives for improving the health of all Americans."  In 2000, the specific goal for the number of cases of mumps in the United States, issued in the "Healthy People 2010" report, was zero cases of mumps.  Clearly, that did not happen.  The target goal for number of annual cases of mumps at the end of the decade for "Healthy People 2020," issued in 2010 is 500 cases.  This is remarkable since this number actually is higher than the number of reported cases in the baseline year (2008), and is one of the only (if not the only) infectious disease for which the target "goal" for number of cases of disease was actually higher than the number of cases at baseline.  This is another example of the recognition, clearly borne out by the actual number of cases of mumps being reported, that use of the current vaccine is not likely to lead to a sustained decrease in the number of cases of mumps in the United States.

The government has recently taken numerous other steps in an effort to address the resurgence of mumps, further reflecting the seriousness of this problem.  The Department of Defense, in its announcement of funding opportunities, has added "[i]nvestigation of revaccination strategies and identification of correlates of protection for currently available vaccines (especially mumps)" as one of its priorities.[17]  The ACIP created a working group devoted exclusively to the study of the resurgence of mumps and of ways to address the problem.

---

both vaccines. . . .  Additional research of the immunological mechanisms is clearly needed to support the development of possible new and more immunological vaccines against mumps and pertussis."); Dayan, "Mumps Outbreaks in Vaccinated Populations: Are Available Mumps Vaccines Effective Enough to Prevent Outbreaks?," *Vaccines*, 2008 Dec 1;47(11):1458-1467 ("Our findings indicate the need for more-effective mumps vaccines and/or for review of current vaccination policies to prevent future outbreaks.").

[17]  *See, e.g.,* Department of Defense, Program Announcement, Defense Health Program Overview of Funding Opportunity, Funding Opportunity No. W81XWH-17-PRMRP-CTA, at 55 (identifying mumps-related funding under "Emerging Infectious Diseases").

Appx457

The working group convened biweekly over the past year to review outbreak studies and other scientific evidence relating to the resurgence and presented to the full ACIP committee in February, June, and October of last year.  The CDC and state health agencies are also investigating the outbreaks and have conducted numerous studies on the characteristics and causes of recent mumps outbreaks and of the use of a third dose of mumps vaccine in outbreak settings as one possible solution.[18]

The CDC is also working with the FDA to study responses to a third dose of mumps vaccine among college-age students.[19]  Independently, the FDA is studying the mumps virus to learn more about successful virus attenuation, citing "[t]he present lack of sufficient knowledge in areas of mumps vaccine . . . efficacy [] highlighted by . . . the occurrence of mumps outbreaks in highly-vaccinated populations."[20]  Mumps also was added to the list of emerging infections of the National Institute of Allergy and Infectious Diseases (NIAID), part of the National Institutes of Health.[21]  Indeed, the NIAID has recently funded a study to develop a new mumps vaccine

---

[18] *See, e.g.,* Cardemil, "Effectiveness of a Third Dose of MMR Vaccine for Mumps Outbreak Control," *New England Journal of Medicine*, 2017 Sep 7;377(10):947-956; Livingston, "Mumps vaccine effectiveness and risk factors for disease in households during an outbreak in New York City," *Vaccine*, 2014 Jan 9;32(3):369-74; Cortese, "Mumps Vaccine Performance among University Students during a Mumps Outbreak, " *Clinical Infectious Diseases*, 2008 April 15;46(8):1172-80; Nelson, "Epidemiology of a mumps outbreak in a highly vaccinated island population and use of a third dose of measles-mumps-rubella vaccine for outbreak control—Guam 2009 to 2010," *Pediatric Infectious Disease Journal*, 2013 Apr;32(4):374-80; Ogbuanu, "Impact of a third dose of measles-mumps-rubella vaccine on a mumps outbreak," *Pediatrics*, 2012 Dec;130(6):1567-74; Fiebelkorn, "Mumps antibody response in young adults after a third dose of measles-mumps-rubella vaccine," *Open Forum Infectious Diseases*, 2014 Dec;1(3):1-9; Albertson, "Mumps outbreak at a university and recommendation for a third dose of measles-mumps-rubella vaccine—Illinois, 2015–2016," *Morbidity and Mortality Weekly Report*, 2016 July 29;65(29):731–734.

[19]  FDA, FDA Researchers Advance Science for Vaccines to Prevent Mumps and Whooping Cough, https://www.fda.gov/ForConsumers/ConsumerUpdates/ucm488978.htm.

[20] *See* FDA, Determining the Safety and Efficacy of Vaccines to Protect Against Viruses that Infect the Central Nervous System, Biologics Research Projects, https://www.fda.gov/BiologicsBloodVaccines/ScienceResearch/BiologicsResearchAreas/ucm127315 htm

[21] *See* NIH, NIAID Emerging Infectious Diseases/Pathogen, https://www.niaid nih.gov/research/emerging-infectious-diseases-pathogens (including mumps on its list of Additional Emerging Infectious Diseases/Pathogens

because the recent outbreaks in highly vaccinated populations "strongly suggest[] that the current vaccine is not effective."[22]

In sum, Merck's mumps vaccine is not adequate to prevent outbreaks. These outbreaks are not trivial, as evidenced by the substantial number of persons with mumps who developed complications (5%) and who are hospitalized (2%).[23] The factors that are associated with these outbreaks, waning immunity, antigenic changes in the virus, and inadequate B-cell memory induced by the vaccine, are not likely to change for the better. Indeed, these outbreaks may continue to increase in both frequency and severity. It is clear that a new vaccine is necessary if we wish to control mumps in the United States.

Dated: March 13, 2018

Eugene Shapiro, MD
Professor of Pediatrics, of Epidemiology and of Investigative Medicine
Co-Director of Education, Yale Center for Clinical Investigation/CTSA
Deputy Director, Yale Investigative Medicine Ph.D. Program
Vice Chair for Research, Yale Department of Pediatrics

---

and defining emerging infectious diseases as "infectious diseases that have newly appeared in a population or have existed but are rapidly increasing in incidence or geographic range").

[22] *See* NIH, Project Information 1R01AI097368-01A1, Research Portfolio Online Reporting Tools, https://projectreporter.nih.gov/project_info_description.cfm?aid=8371494&icde=38326202&ddparam =&ddvalue=&ddsub=&cr=14&csb=default&cs=ASC&pball= (NIH Project No. 1R01AI097368-01A1 to Dr. Biao He, University of Georgia, titled Developing a Novel Mumps Vaccine). In his grant application, Dr. He justified the need for his study by pointing to "[t]he fact that the MuV [mumps] outbreaks had occurred in populations with over 95% two-dose MuV vaccine coverage underscores the urgency for a new and effective MuV vaccine to replace the current vaccine." NIH, Notice of Award for Project Number 1R01AI097368-01A1, Developing a Novel Mumps Vaccine, 2012 May 7, at p.26. The FDA's Steven Rubin was one of the project's principal supporters because, as he stated in his letter supporting the grant application: "The proposed studies are of public health significance and are timely considering the recent resurgence of mumps in highly vaccinated populations in the United States and elsewhere, making it quite clear that newer, more immunogenic vaccines are needed." NIH Notice of Award at p. 49.

[23] *See* Dayan, "Recent Resurgence of Mumps in the United States," *New England Journal of Medicine*, 2008 Apr 10; 358(15):1580-9.

Appx459

10/25/2019
Declaration of G. Reilly
EXHIBIT 2

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel., | |
| STEPHEN A. KRAHLING and JOAN A. WLOCHOWSKI, | Civil Action No. 10-4374 (CDJ) |
| Plaintiffs, | |
| v. | |
| MERCK & CO., INC., | |
| Defendant. | |
| IN RE: MERCK MUMPS VACCINE ANTITRUST LITIGATION | |
| | Master File No. 12-3555 (CDJ) |
| THIS DOCUMENT RELATES TO: | |
| ALL ACTIONS | |

**REPORT OF ROBERT MALONE, MD, MS**

*Contains Highly Confidential AEO Materials*

**Appx461**

# TABLE OF CONTENTS

I.   MY BACKGROUND AND QUALIFICATIONS ................................................. 4

II.  SCOPE OF ASSIGNMENT ................................................................................. 6

III. SUMMARY OF OPINIONS ................................................................................ 6

IV. BACKGROUND AND CONTEXT ...................................................................... 7

    A.      **Introduction to Mumps** .............................................................. 7

          1.      Mumps Disease ................................................................ 7

          2.      Mumps Vaccines ............................................................. 8

    B.      **Immunogenicity Assays: PRN and ELISA Tests** ............... 10

          1.      PRN Immunogenicity Assays ...................................... 12

          2.      ELISA Immunogenicity Assays ................................... 13

          3.      The Need to Correlate ELISA to a Functional Test for Mumps Immunogenicity Testing ...................................................... 15

    C.      **Merck's Mumps Immunogenicity Test Protocol 007** ........ 17

          1.      Merck's Development and Design of Protocol 007 ..... 19

          2.      The AIGENT Validation ............................................... 22

          3.      The AIGENT Testing ................................................... 25

          4.      The WT ELISA Validation .......................................... 28

          5.      The AIGENT/WT ELISA Correlation ......................... 29

    D.      **Merck's Submissions of Protocol 007 Data to the FDA** ... 32

          1.      The Interim AIGENT Results ...................................... 32

          2.      The Final AIGENT Results .......................................... 34

          3.      The Final WT ELISA Results ...................................... 34

          4.      Merck's Supplemental Biologics License Application ... 35

    E.      **FDA's Approval of Merck's Supplemental Biologics License Application** ... 38

    F.      **FDA's Approval of ProQuad** ................................................ 39

    G.      **FDA's Approval of M-M-R II with rHA** ............................ 41

V.  MY FINDINGS ................................................................................................... 43

    A.      **Merck's AIGENT Assay Failed to Provide a Reliable or Clinically Relevant Measure of Protection Against Mumps** ... 43

          1.      The AIGENT Assay Was a Results-Oriented Test ...... 43

          2.      The AIGENT Assay Did Not Test Against a True Wild-Type Mumps Strain ... 47

          3.      The AIGENT Assay Did Not Properly Control for the Use of Anti-IgG ... 48

*Contains Highly Confidential AEO Materials*

**Appx462**

4.    The AIGENT Assay Was Not Sufficiently Specific for Measuring Mumps Neutralizing Antibodies ........................ 53

5.    The AIGENT Assay Data Was Changed Through Selective Recounting of Plaques ........................ 56

**B.    Merck's Wild-Type Mumps ELISA Assay Failed to Provide a Reliable or Clinically Relevant Measure of Protection Against Mumps ........................ 65**

1.    The WT ELISA Did Not Test Against a True Wild-Type Mumps Strain ........................ 65

2.    Merck Did Not Correlate the WT ELISA Assay to a Reliable or Relevant Functional Assay ........................ 66

3.    Merck Overstated the AIGENT/WT ELISA Correlation ........................ 66

4.    Merck Did Not Use a Clinically Relevant Serostatus Cutoff ........................ 67

**C.    In Submitting or Relying on Protocol 007 for Its Various Mumps Related FDA Approvals, Merck Misrepresented the Clinical Relevance of the AIGENT and WT ELISA Assays and Results ........................ 71**

1.    Merck Misrepresented the AIGENT Results in Its Submission of the Preliminary Subset Analysis ........................ 71

2.    Merck Misrepresented the Protocol 007 Results in Its sBLA for the M-M-R II Mumps End-Expiry Potency Change ........................ 72

3.    Merck Misrepresented the WT ELISA Results in Its Submission of the BLA for ProQuad ........................ 78

4.    Merck Misrepresented the WT ELISA Results in Its Submission of the sBLA for M-M-R II with rHA ........................ 80

**D.    Merck Has Conducted No Clinical Studies That Provide Reliable or Clinically Relevant Data On How Well Its Mumps Vaccines Protect Against Mumps ........................ 82**

1.    The Original Mumps Studies Supporting Licensure Provide No Clinical Data Demonstrating M-M-R II or ProQuad Protection From Mumps ........................ 82

2.    The WT ELISA Assays Also Do Not Provide Any Clinical Data Demonstrating M-M-R II or ProQuad Protection From Mumps ........................ 83

3.    Merck Has Conducted No Clinical Studies Demonstrating How Well M-M-R II and ProQuad Protect Against Mumps ........................ 86

**E.    The M-M-R II and ProQuad Package Inserts Are Inaccurate, False and Misleading In Claiming and/or Suggesting Merck Has Conducted Clinical Studies Demonstrating These Vaccines Afford Protection Against Mumps ........................ 88**

*Contains Highly Confidential AEO Materials*

**Appx463**

## I.     MY BACKGROUND AND QUALIFICATIONS

I, Robert Malone, am a medical doctor and clinical research scientist with more than 30 years of experience in developing, designing, implementing, reviewing, interpreting and managing vaccine, bio-threat and biologics clinical trials and clinical development strategies. This includes my work on roughly 65 Phase 1, 2 and 3 clinical trials, the vast majority of which I served as the Medicare Director, Medical Monitor and/or Principal Investigator.  This work also includes my direct bench research and research laboratory oversight in the development and performance of a variety of laboratory tests including ELISA and Plaque Assay-based tests.

I have worked on clinical trials relating to, among other things, HIV, Influenza (seasonal and pandemic), Plague, Anthrax, VEE/EEE/WEE, Tularemia, Tuberculosis, Ebola, Zika, Ricin toxin, Botulinum toxin, and engineered pathogens.  This work has included vaccine product development, manufacturing, regulatory compliance, and testing (manufacturing release and clinical) aspects.  My oversight responsibilities have included clinical trial design, regulatory and ethical compliance, and laboratory assay strategy, design, testing and performance.  For many years, I consulted for one of the largest domestic U.S. immunogenicity clinical laboratory testing companies.  I also worked on clinical trials conducted at vaccine-focused Clinical Research Organizations.

I have extensive research and development experience (bench to bedside) in the areas of pre-clinical discovery research, clinical trials, vaccines, gene therapy, bio-defense, and immunology.  I have over twenty years of management and leadership experience in academia, pharmaceutical and biotechnology industries, as well as in governmental and non-governmental organizations.  I have also provided confidential commercial intelligence gathering, evaluation and analysis services under subcontract to three major international vaccine development and manufacturing companies.

At the request of my colleagues at the Department of Defense/Defense Threat Reduction Agency, I managed their Ebola project and developed the contracts necessary to move the PHAC/rVSV ZEBOV vaccine forward quickly.  I recruited organizations to team with USAMRIID/WRAIR to develop the immunoassays, put WHO leadership in touch with Pentagon leadership to expedite the initial WRAIR clinical trials, recruited the government of Norway to help fund the clinical research, recruited a management team, helped write and edit the clinical

*Contains Highly Confidential AEO Materials*

**Appx464**

trials developed by the World Health Organization and led the development of the BARDA and DTRA contracts - yielding over $200M in resources.

I was the Medical Director in Vaccines at Beardsworth Consulting Group, Inc., Director of Clinical Development/Medical Affairs in Influenza at Solvay Pharmaceuticals, Inc. (now AbbVie), Senior Medical Director of Summit Drug Development Services, and an Associate Director in Clinical Research at Dynport Vaccine Company, LLC. I have been a chair, committee member or reviewer on numerous government study sections and research programs (including for the NIH and DOD) relating to vaccines and biodefense. I have also served on the editorial board or as a reviewer on numerous academic journals relating to vaccines and infectious diseases, including serving as Editor in Chief of the *Journal of Immune Based Therapies and Vaccines*. I hold 15 domestic patents and have authored dozens of articles, many of which concern viruses and vaccination. I have been invited to chair or present at over 40 conferences on topics relating to viruses and vaccines.

I have been a professor of topics in biology and laboratory research at University of Maryland (Baltimore School of Medicine in the Department of Pathology), University of California, Davis (Department of Medical Pathology), University of California, San Diego, and Kennesaw State University. At University of Maryland, I set-up and ran a successful immunology research laboratory. At Kennesaw State University, I taught a survey course focused on advanced product development and regulatory aspects of biotechnology and vaccine products. At UC Davis, I taught, among other course, a class in the principles of pharmacology and toxicology. I was also the director and founder of the Gene Therapy program at UC Davis.

I received my MD at Northwestern University and a MS (Master of Science) at University of California, San Diego. I completed a year-long Global Clinical Scholars Research Training Program at Harvard Medical School, and a Clinical Pathology Internship and a Postgraduate Research Fellowship (funded by Bank of America and the Giannini Foundation Medical Research) at UC Davis. I was also trained at the Salk Institute Molecular Biology and Virology laboratories. I maintain an active license to practice medicine in the state of Maryland. A copy of my current curriculum vitae, which includes my publications and a listing of government performance grants and contracts I have received over the last five years, is attached as Appendix A. I have not previously provided expert testimony in any litigation.

*Contains Highly Confidential AEO Materials*

**Appx465**

## II.    SCOPE OF ASSIGNMENT

I was retained by Relators and the Private Plaintiffs in the two above-referenced actions to provide my opinions on the reliability and clinical relevance of the clinical trials Merck conducted in support of its (1) Supplemental Biologics License Application to the FDA to lower the mumps end-expiry potency specification for M-M-R II, (2) Biologics License Application to the FDA for ProQuad, and (3) Supplemental Biologics License Application to the FDA for M-M-R II formulated with rHA.  I also was retained to provide my opinions on the submissions Merck made to the FDA in support of these license applications.

In preparing this report and reaching my conclusions herein, I have reviewed pleadings in this case, documents produced in discovery, deposition transcripts, academic literature and other publicly available material.  Appendix B contains a list of the materials that I have considered or relied upon in reaching my conclusions.  I also have relied on my training, knowledge and experience in vaccine research and clinical trials over the past 30 years.  Relators and Private Plaintiffs are compensating me for my work on this matter at an hourly rate of $350.00/hour. My compensation does not depend on the outcome of this litigation or my conclusions.

## III.    SUMMARY OF OPINIONS

A summary of my opinions is as follows:

1.    Merck's AIGENT assay failed to provide a reliable or clinically relevant measure of protection against mumps.

2.    Merck's wild-type mumps ELISA assay failed to provide a reliable or clinically relevant measure of protection against mumps.

3.    Merck misrepresented the AIGENT results in its submission to the FDA of the preliminary subset analysis.

4.    Merck misrepresented the Protocol 007 results in its Supplemental Biologics License Application to the FDA to lower the mumps end-expiry potency specification for M-M-R II.

5.    Merck misrepresented the wild-type ELISA results in its Biologics License Application to the FDA for ProQuad.

*Contains Highly Confidential AEO Materials*

**Appx466**

6.     Merck misrepresented the wild-type ELISA results in its Supplemental
       Biologics License Application to the FDA for M-M-R II formulated with
       rHA.

7.     Merck has conducted no clinical studies that demonstrate or support how
       well M-M-R II (as of 2005) or ProQuad protect against mumps.

8.     The M-M-R II and ProQuad package inserts are inaccurate, false and
       misleading in claiming and/or suggesting Merck has conducted clinical
       studies demonstrating these vaccines afford protection against mumps.

## IV.   BACKGROUND AND CONTEXT

### A.   Introduction to Mumps

#### 1.   Mumps Disease

Mumps disease is caused by infection with mumps virus, which is a member of the
Paramyxoviridae family of viruses.[1]  Like other Paramyxoviridae viruses such as measles virus
and respiratory syncytial virus, mumps virus has a single-strand structure of RNA that allows it
to mutate easily.[2]  More than one strain of mumps virus can circulate at any given time, and the
type of strain circulating in a given region can change over time.[3]  Currently, there are twelve
identified distinct strains of mumps virus in the world, categorized by variations in their genetic
structure and labeled as different Genotypes.[4]  Genotype A was the predominant strain of
mumps virus roughly fifty years ago, but currently Genotypes C, D, E, G, and H are most
common in the Western Hemisphere while Genotypes B, F and I predominate in Asia.[5]

---

[1] *See* Mumps for healthcare providers, at https://www.cdc.gov/mumps/hcp.html

[2] Rubin, S., M. Eckhaus, L. J. Rennick, C. G. Bamford and W. P. Duprex (2015). "Molecular biology, pathogenesis and pathology of mumps virus." J Pathol 235(2): 242-252.

[3] Jin, L., C. Orvell, R. Myers, P. A. Rota, T. Nakayama, D. Forcic, J. Hiebert and K. E. Brown (2015). "Genomic diversity of mumps virus and global distribution of the 12 genotypes." Rev Med Virol 25(2): 85-101.

[4] Johansson, B., T. Tecle and C. Orvell (2002). "Proposed criteria for classification of new genotypes of mumps virus." Scand J Infect Dis 34(5): 355-357; Jin, L., B. Rima, D. Brown, C. Orvell, T. Tecle, M. Afzal, K. Uchida, T. Nakayama, J. W. Song, C. Kang, P. A. Rota, W. Xu and D. Featherstone (2005). "Proposal for genetic characterisation of wild-type mumps strains: preliminary standardisation of the nomenclature." Arch Virol 150(9): 1903-1909.

[5]  Cui, A., Z. Zhu, Y. Hu, X. Deng, Z. Sun, Y. Zhang, N. Mao, S. Xu, X. Fang, H. Gao, Y. Si, Y. Lei, H. Zheng, J. He, H. Wu and W. Xu (2017). "Mumps Epidemiology and Mumps Virus Genotypes Circulating in Mainland China during 2013-2015." PLoS One 12(1): e0169561; May, M., C. A. Rieder and R. J. Rowe (2018). "Emergent lineages of mumps virus suggest the need for a polyvalent vaccine." Int J Infect Dis 66: 1-4; Nojd, J., T. Tecle, A.

*Contains Highly Confidential AEO Materials*

**Appx467**

Mumps commonly presents with pain, tenderness, and swelling in the cheek and jaw area due to infection of one or both parotid salivary glands.[6]  This swelling, called parotitis, lasts for at least two days, peaks in one to three days, and then subsides during the next week to ten days. The swelling is often preceded by non-specific symptoms such as muscle pain, headache, malaise and fever.  Long term clinical complications associated with childhood mumps include deafness and encephalitis.  Mumps has historically been one of the leading causes of childhood deafness.  In adults, mumps complications include infection and inflammation of the testes (orchitis), ovaries (oophritis) or female breast (mastitis).  Mumps infection during pregnancy carries a spontaneous abortion rate of up to 25%.  Complications of mumps in adults can include infection of the pancreas (pancreatitis), deafness, inflammation of the membranes surrounding the brain and spinal cord (meningitis), and inflammation of the brain (encephalitis).[7]  There is no specific antiviral drug treatment or prevention for mumps infection.[8]

2.    Mumps Vaccines

The first mumps vaccine licensed in the United States used inactivated mumps virus and was available between 1950 and 1978.  This vaccine induced only short-term immunity with low effectiveness in protecting vaccinees from mumps.  Since then, vaccine developers in Japan, the former Soviet Union, Switzerland and the United States have created more than ten different live, attenuated mumps virus vaccines.[9]  A live, attenuated virus vaccine uses an active (live) virus that has been weakened through serial passaging or otherwise to make it less harmful yet still potent enough to stimulate a protective adaptive immune response.  Live, attenuated virus

---

Samuelsson and C. Orvell (2001). "Mumps virus neutralizing antibodies do not protect against reinfection with a heterologous mumps virus genotype." Vaccine 19(13-14): 1727-1731; Kidokoro, M., R. Tuul, K. Komase and P. Nymadawa (2011). "Characterization of mumps viruses circulating in Mongolia: identification of a novel cluster of genotype H." J Clin Microbiol 49(5): 1917-1925.

[6] *See* Mumps for healthcare providers (Avaliable at https://www.cdc.gov/mumps/hcp.html).

[7] *See* WHO position paper on Mumps vaccines, No. 7, 2007, 82, 49–60 (Available at http://www.who.int/immunization/wer8207mumps_Feb07_position_paper.pdf ).

[8] Cox, R. and R. K. Plemper (2015). "The paramyxovirus polymerase complex as a target for next-generation anti-paramyxovirus therapeutics." Front Microbiol 6: 459.

[9] *See* WHO position paper on Mumps vaccines, No. 7, 2007, 82, 49–60 at http://www.who.int/immunization/wer8207mumps_Feb07_position_paper.pdf; Demicheli, V., A. Rivetti, M. G. Debalini and C. Di Pietrantonj (2012). "Vaccines for measles, mumps and rubella in children." Cochrane Database Syst Rev(2): CD004407.

*Contains Highly Confidential AEO Materials*

**Appx468**

vaccines are considered a biological product and are produced by growing and then purifying large amounts of live virus under carefully controlled conditions.

In the United States, the Center for Biologics Evaluation ("CBER") of the Food and Drug Administration ("FDA") licenses and regulates the sale and manufacture of biological products. There are two currently-licensed mumps-containing vaccines available for sale in the United States, M-M-R II and ProQuad. Both are live, attenuated virus vaccines developed and manufactured by Merck. They are both derived from the same "Jeryl Lynn" strain of mumps virus, which Dr. Maurice Hilleman (the Merck scientist who led development of the vaccine) obtained from his daughter in 1963 when she contracted mumps.[10] The Jeryl Lynn strain is a Genotype A strain of mumps. The initial iteration of this vaccine (Mumpsvax, a standalone monovalent mumps vaccine) was originally licensed in 1967 and in one form or another has been the sole mumps vaccine sold in the United States for roughly 50 years. Merck discontinued production of Mumpsvax in 2009.[11]

M-M-R II (Measles, Mumps, and Rubella Virus Vaccine Live), originally licensed in 1978, is a live, attenuated virus vaccine for measles (rubeola), mumps, and rubella (German measles), and was developed by combining the previously licensed monovalent vaccines for these three diseases. This trivalent vaccine is a sterile lyophilized preparation of (1) Attenuvax (Measles Virus Vaccine Live); (2) Mumpsvax (Mumps Virus Vaccine Live); and (3) Meruvax II (Rubella Virus Vaccine Live). From at least 1991 to 2007, the M-M-R II package insert specified that each 0.5 mL dose should contain at least 20,000 $TCID_{50}$ (tissue culture infectious

---

[10] Hilleman, M. R. (1966). "Advances in control of viral infections by nonspecific measures and by vaccines, with special reference to live mumps and rubella virus vaccines." Clin Pharmacol Ther 7(6): 752-762; Hilleman, M. R. (1992). "Past, present, and future of measles, mumps, and rubella virus vaccines." Pediatrics 90(1 Pt 2): 149-153; Hilleman, M. R., E. B. Buynak, R. E. Weibel and J. Stokes, Jr. (1968). "Live, attenuated mumps-virus vaccine." N Engl J Med 278(5): 227-232; Buynak, E. B. and M. R. Hilleman (1966). "Live attenuated mumps virus vaccine. 1. Vaccine development." Proc Soc Exp Biol Med 123(3): 768-775; Hilleman, M. R., R. E. Weibel, E. B. Buynak, J. Stokes, Jr. and J. E. Whitman, Jr. (1967). "Live attenuated mumps-virus vaccine. IV. Protective efficacy as measured in a field evaluation." N Engl J Med 276(5): 252-258.

[11] CDC, Q&As about Monovalent M-M-R Vaccines, https://www.cdc.gov/vaccines/hcp/clinical-resources/mmr-faq-12-17-08 html.

*Contains Highly Confidential AEO Materials*

**Appx469**

doses) of mumps virus.[12]  Since at least 2007, the M-M-R II package insert has specified that each 0.5 mL dose should contain at least 12,500 $TCID_{50}$ of mumps virus.[13]

ProQuad (Measles, Mumps, Rubella and Varicella Virus Vaccine Live), originally licensed in 2005, is also a combined live, attenuated virus vaccine containing measles, mumps, and rubella vaccines, with the addition of a varicella vaccine.  ProQuad is a combination of (1) the components of M-M-R II and (2) Varicella Virus Vaccine Live (the Oka/Merck strain).  The package inserts for ProQuad specify that each 0.5 mL dose of the vaccine should contain at least 4.3 $\log_{10}$ (20,000) $TCID_{50}$ of mumps virus.[14]

### B.    Immunogenicity Assays: PRN and ELISA Tests

Immunogenicity is the ability of a vaccine to elicit a measurable adaptive immune response.[15]  Most immunogenicity assays (tests) measure the existence and relative levels of specific antibodies, which are protective proteins produced by the immune system in response to the presence of a foreign substance.[16]  In the context of vaccine research (as opposed to clinical diagnostic use), an immunogenicity test is typically used to establish whether the serum of a test subject is seropositive or seronegative.  A seropositive test result should indicate that a subject has developed a specific and clinically relevant immunologic response to the foreign substance

---

[12]  MRK-CHA00542860; MRK-CHA01519087, at '088 (CBER approved Merck's sBLA to "include a change in the labeled potency of the mumps component from no less than 20,000 $TCID_{50}$ to no less than 12,500 $TCID_{50}$ per dose at end of expiry" on December 6, 2007).

[13]  MRK-CHA00018611 (FDA approved Merck's request to amend its Product License to revise the minimum potency specification for mumps virus to 20,000 $TCID_{50}$ on December 10, 1990).

[14]  https://www.merck.com/product/usa/pi_circulars/p/proquad/proquad_pi.pdf; https://www.merck.com/product/usa/pi_circulars/p/proquad/proquad_pi_4171.pdf.

[15]  *See* Siegrist C-A. Vaccine immunology. In: Plotkin SA, Orenstein WA, Offit PA, editors. Vaccines, sixth edition. Philadelphia (PA): Elsevier Saunders; 2012, Chapter 2.  For descriptions and definitions of key terms relating to vaccine immunogenicity and efficacy testing, *see* Guidelines on clinical evaluation of vaccines: regulatory expectations; WHO Technical Report Series, No. 1004, 2017, Annex 9 (Available at http://www.who.int/biologicals/expert_committee/WHO_TRS_1004_web_Annex_9.pdf );  Guidelines on procedures and data requirements for changes to approved vaccines; WHO Technical Report Series No. 993, 2015, Annex 4 (Available at http://apps.who.int/medicinedocs/en/m/abstract/Js22021en/ ); and Guidance for Industry; Assay Development and Validation for Immunogenicity Testing of Therapeutic Protein Products.  Office of Communications, Division of Drug Information Center for Drug Evaluation and Research Food and Drug Administration. April 2016 (Available at https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM192750.pdf ).

[16]  Titers are a measure of the amount of antibodies in a person's blood.

*Contains Highly Confidential AEO Materials*

being tested. A clinically relevant immunologic response is one that provides protection from an adverse effect of exposure to the foreign substance (virus, bacteria, allergen or toxin). A seronegative result should indicate that a subject has not developed such a clinically relevant immunologic response. In general, seroconversion occurs when a test subject's pre-vaccination serum is seronegative and post-vaccination serum is seropositive (or has demonstrated a clinically relevant increase in antibodies). An immunogenicity test can be used as a surrogate for predicting clinical protection, but only if it measures a functional immune response or has been shown to correlate to protection from disease. A measurable functional immune response is one that directly relates to a plausible mechanism of action for protection occurring in a patient. The two predominant tests used in mumps immunogenicity testing are the Plaque Reduction Neutralization (PRN) assay and the Enzyme-Linked Immunosorbent Assay (ELISA). [17] PRN assays measure the functional capacity of serum (or other fluids) to neutralize virus infectivity in cells as compared to ELISA assays that only measure the binding capacity against an antigen or mixture of antigens. [18]

---

[17] Örvell, C. (1988). Paramyxoviridae: Mumps Virus. Laboratory Diagnosis of Infectious Diseases Principles and Practice. New York, NY, Springer: 507-524; Bashe, W. J., Jr., T. Gotlieb, G. Henle and W. Henle (1953). "Studies on the prevention of mumps. VI. The relationship of neutralizing antibodies to the determination of susceptibility and to the evaluation of immunization procedures." J Immunol 71(2): 76-85; Linde, G. A., M. Granstrom and C. Orvell (1987). "Immunoglobulin class and immunoglobulin G subclass enzyme-linked immunosorbent assays compared with microneutralization assay for serodiagnosis of mumps infection and determination of immunity." J Clin Microbiol 25(9): 1653-1658; Mauldin, J., K. Carbone, H. Hsu, R. Yolken and S. Rubin (2005). "Mumps virus-specific antibody titers from pre-vaccine era sera: comparison of the plaque reduction neutralization assay and enzyme immunoassays." J Clin Microbiol 43(9): 4847-4851; Berger, R. J., M. (1980). "Comparison of five different tests for mumps antibodies." Infection 8(5): 180–183; Buynak, E. B., J. E. Whitman, Jr., R. R. Roehm, D. H. Morton, G. P. Lampson and M. R. Hilleman (1967). "Comparison of neutralization and hemagglutination-inhibition techniques for measuring mumps antibody." Proc Soc Exp Biol Med 125(4): 1068-1071; Kumakura, S., H. Shibata, T. Isobe, M. Hirose, M. Ohe, N. Nishimura, K. Onoda, A. Nagai and S. Yamaguchi (2013). "Comparison of hemagglutination inhibition assay and enzyme immunoassay for determination of mumps and rubella immune status in health care personnel." J Clin Lab Anal 27(5): 418-421; Pipkin, P. A., M. A. Afzal, A. B. Heath and P. D. Minor (1999). "Assay of humoral immunity to mumps virus." J Virol Methods 79(2): 219-225; Cusi, M. G., S. Fischer, R. Sedlmeier, M. Valassina, P. E. Valensin, M. Donati and W. J. Neubert (2001). "Localization of a new neutralizing epitope on the mumps virus hemagglutinin-neuraminidase protein." Virus Res 74(1-2): 133-137; Orvell, C., T. Tecle, B. Johansson, H. Saito and A. Samuelson (2002). "Antigenic relationships between six genotypes of the small hydrophobic protein gene of mumps virus." J Gen Virol 83(Pt 10): 2489-2496.

[18] Latner, D. R., M. McGrew, N. J. Williams, S. B. Sowers, W. J. Bellini and C. J. Hickman (2014). "Estimates of mumps seroprevalence may be influenced by antibody specificity and serologic method." Clin Vaccine Immunol 21(3): 286-297.

*Contains Highly Confidential AEO Materials*

**Appx471**

1.   PRN Immunogenicity Assays

The PRN test is considered a functional immunogenicity assay.[19]  It is designed to measure the amount of antibody in the test subject's blood (or serum) that will bind to a virus and block its ability to infect cells.  These antibodies are referred to as neutralizing antibodies.  Non-neutralizing antibodies may also bind to a virus but they fail to block the virus from infecting cells.  For a PRN test to serve as a valid functional immunogenicity assay, it must distinguish between neutralizing and non-neutralizing antibodies. [20]

The PRN immunogenicity assay uses pre-vaccination and post-vaccination samples of the test subjects' (patients') blood.  Pre-vaccination samples are taken before the test subjects have been inoculated with the vaccine; post-vaccination samples are taken after inoculation.  The blood is processed to remove blood cells and blood clotting proteins to create serum, which is generally comprised of proteins (including antibodies), electrolytes, carbohydrates, antigens, hormones, and plasma.  Various dilutions of the serum are then mixed with a constant amount of virus.  Then, after sufficient time for the two to interact, the mixture is placed onto the surface of a single layer of cultured cells (cells which are grown in a controlled, artificial environment) inside a clear plastic well.[21]

After the sample is placed in the plastic well, the virus is allowed to replicate and spread infection within the well.  The test is stopped by the addition of chemicals that stop the virus, essentially freezing the process in its tracks, and these chemicals also bind the virus mixture and cell layer to the clear plastic well on which they have grown.  The plastic well is then treated

---

[19] *See* Guidelines on clinical evaluation of vaccines: regulatory expectations; WHO Technical Report Series, No. 1004, 2017, Annex 9 (Available at http://www.who.int/biologicals/expert_committee/WHO_TRS_1004_web_Annex_9.pdf ), p. 518, Section 5.2 Characterization of the immune response ("In general the clinical development programme should include a description of the magnitude of the immune response, including an assessment of functional antibody (for example, antibody that neutralizes viruses or toxins, or antibody that mediates bactericidal activity or opsonophagocytosis) if this can be measured.").

[20] *See* Guidance for Industry (Draft), Assay Development and Validation for Immunogenicity Testing of Therapeutic Protein Products.  U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), Center for Biologics Evaluation and Research (CBER), Center for Devices and Radiological Health (CDRH).  April 2016 (Available at https://www.fda.gov/downloads/Drugs/Guidances/UCM192750.pdf) (FDA regulatory guidance concerning general principles, methods, and confounding factors in developing and validating assays).

[21] There are often several wells in a single plate, so one plate will often contain several test samples.

*Contains Highly Confidential AEO Materials*

**Appx472**

with a stain or dye that helps distinguish the infected and uninfected cells so they can be examined with the naked eye or under a low powered microscope to identify holes or other differences in the cell layer indicating viral infection. These holes, known as plaques, are created when the virus infects and alters cells. The PRN test results typically are read by turning the plastic plate upside down and using a felt-tipped marker to identify each plaque in the wells, although more advanced automated methods are also used.

The number of plaques in a given test sample at various dilutions is used to determine whether the sample is seropositive or seronegative based on comparison to plaque counts in control samples using a pre-defined cutoff value for seropositivity. The dividing line between what is considered a seronegative or seropositive plaque count is referred to as the serostatus cutoff. A sample is considered to have seroconverted when the pre-vaccination sample is seronegative and the post-vaccinations sample is seropositive (or meets a predefined fold-rise increase in titer). For a PRN test to be fit for the purpose of measuring clinically relevant neutralizing antibodies, the serostatus cutoff (or fold-rise increase in titer) must reflect a level of neutralizing antibodies that provides protection from infection or disease. Selecting an appropriate serostatus cutoff is critical to the accuracy, predictive value and clinical relevance of a PRN or any other immunogenicity test.

The manual plaque counting process is subjective and vulnerable to bias, either conscious or unconscious. For this reason, it is critical to establish, document and abide by proper training processes, procedures, internal controls and quality assurance throughout the plaque counting exercise. The plaque counters must be well-trained, blinded to the nature of the sample being tested (including the treatment group and whether it is a pre- or post-vaccination sample), and closely monitored for consistency, precision and accuracy. Without proper procedures, controls and blinding, the PRN assay cannot provide a reliable measure of the number of plaques in the samples being tested. It likewise cannot provide a reliable measure of the serostatus of the sample or of whether a particular test subject has seroconverted.

2. ELISA Immunogenicity Assays

Unlike PRN immunogenicity assays, which are designed to measure only those antibodies that functionally neutralize the subject virus, ELISA immunogenicity assays measure all antibodies that bind to the subject virus or a selected antigen subset of the virus whether or

13                                          *Contains Highly Confidential AEO Materials*

not they actually neutralize the virus. For example, there are many different antibodies in the serum of someone who has been infected with mumps or vaccinated with a live attenuated mumps vaccine which will bind to the many different mumps proteins, and each of these anti-mumps antibodies bind to different proteins (or antigens) and have different binding characteristics, functions and activities.[22] Furthermore, some parts of mumps virus proteins are like those present in related viruses (like measles or respiratory syncytial virus), and antibodies produced in response to those viruses may cross-react with mumps proteins in an ELISA assay.

The typical ELISA assay does not distinguish between these different characteristics, functions and activities, but rather just measures the presence of any and all antibodies present in a sample that bind to whatever antigen is being tested. ELISA assays are not functional assays because they simply measure binding activity, not whether this activity has any impact on viral infection and replication. Like the PRN assay, the ELISA is an assay that uses transparent plastic plates with many separate wells or chambers. There are many different variations of the basic ELISA method.

In a direct ELISA, the subject virus (or a test sample such as serum containing virus) is coated onto a plastic well. Then, antibody is added to the same well. The antibody chosen for this step is attached to a particular enzyme used to measure the results of the test. After allowing the subject virus or serum to interact with the added antibody, the sample is washed off, releasing any unbound antibody and leaving behind only the antibodies bound to the sample. Then, a chemical that changes color in the presence of the linked enzyme is added to the sample. If any of the antibody/enzyme mixture remains bound to the sample after washing, the sample in the plastic well will change color. This color change, which may be quantified in Ab units or as indicating a specific titer, is detected using a machine and interpreted by computer software. Like the PRN, the serostatus cutoff established for a clinical ELISA test can be a single measure of Ab units or a fold-rise increase between pre- and post-vaccination samples and serve as a type of dividing line between what is considered seronegative and seropositive.

---

[22] Latner, D. R., M. McGrew, N. J. Williams, S. B. Sowers, W. J. Bellini and C. J. Hickman (2014). "Estimates of mumps seroprevalence may be influenced by antibody specificity and serologic method." Clin Vaccine Immunol 21(3): 286-297; Orvell, C., T. Tecle, B. Johansson, H. Saito and A. Samuelson (2002). "Antigenic relationships between six genotypes of the small hydrophobic protein gene of mumps virus." J Gen Virol 83(Pt 10): 2489-2496.

*Contains Highly Confidential AEO Materials*

**Appx474**

The indirect ELISA is the type of ELISA typically used to measure the overall antibody response in a given serum sample to a vaccine.  The first step of an indirect ELISA is the same as that of the direct ELISA where the subject virus or antigens derived from the virus are coated onto a plastic well.  Then the serum sample to be tested is added to the well.  The binding antibodies within the serum sample attach to the virus in the well and everything else is washed off.  Then a second set of antibodies linked to a particular enzyme (as in the direct ELISA method) is added to the well.  These antibodies attach to the already bound antibodies in the sample and the excess is washed off.  Finally, a chemical known to change color in the presence of the linked enzyme is added and the resulting color change is detected, measured, and interpreted.

3.      The Need to Correlate ELISA to a Functional Test for Mumps
        Immunogenicity Testing

Since the ELISA does not distinguish between neutralizing and non-neutralizing antibodies, it is generally understood that the ELISA method cannot provide a relevant measure of clinical protection for mumps unless it is correlated to a clinical outcome (e.g., protection from viral disease),[23] PRN or other type of functional assay.  Scientists at the CDC have examined the specific nature of the relationship between the mumps PRN and ELISA and noted, "there is poor correlation between mumps neutralization titers and ELISAs that measure the presence of mumps-specific IgG levels."[24]  These scientists determined that human anti-mumps antibodies predominantly bind to the NP protein in the mumps virus, and that this interaction does not neutralize the mumps virus.  Thus, ELISA assays designed to measure clinically relevant mumps seroconversion need to differentiate among the various mumps virus proteins that are bound by the antibodies in the sample.  If not, the results risk overestimating protection due to an antibody response that has no relationship to neutralization and no known functional significance.  The CDC scientists emphasized this point in their analysis:

---

[23] Sanz, J. C., B. Ramos, A. Fernandez, L. Garcia-Comas, J. E. Echevarria and F. de Ory (2018). "Serological diagnosis of mumps: Value of the titration of specific IgG." Enferm Infecc Microbiol Clin 36(3): 172-174.

[24] Latner, D. R., M. McGrew, N. J. Williams, S. B. Sowers, W. J. Bellini and C. J. Hickman (2014). "Estimates of mumps seroprevalence may be influenced by antibody specificity and serologic method." Clin Vaccine Immunol 21(3): 286-297.

*Contains Highly Confidential AEO Materials*

**Appx475**

One of the most important conclusions from these data is that care must be taken when interpreting ELISA results, especially those based on whole-virus antigen. While it may be reasonable to assume that an individual who is seronegative by ELISA likely does not have neutralizing antibody, no assumptions can be made about the levels of neutralizing antibodies in individuals who are seropositive by ELISA. Measurements of seroconversion that mostly detect NP antibody without taking into account the level of neutralizing antibody may overestimate the level of protection.[25]

Scientists at Merck have reached the same conclusion on the limited utility of the ELISA test in measuring mumps seroprotection unless it is correlated to a functional assay like a PRN. In criticizing an ELISA test SmithKline Beecham performed comparing its MMR product Priorix to Merck's M-M-R II, Drs. Scott Thaler and Joseph Heyse of Merck pointed to the failure of SmithKline to correlate the ELISA to a PRN or other functional assay. They emphasized that a "correlation between ELISAs and functional assays such as neutralization . . . must be individually demonstrated for each vaccine." They pointed to the case of the Swiss Berna vaccine Triviraten for support:

> There is precedent to support our concern about relying solely on ELISA values. For instance in the case of the Swiss Berna vaccine Triviraten, which contains the Rubini mumps strain, and which apparently had excellent ELISA seroconversion rates. However, the efficacy of the vaccine has been estimated to be as low as 20% against wild-type mumps. In one recent publication when several volunteers were vaccinated with Triviraten, all seroconverted according to either ELISA or indirect immunofluorescence results, but none developed neutralizing antibody to wild-type mumps.[26]

Drs. Thaler and Heyse concluded that "without demonstrating a correlation between the immunologic response and protection from circulating wild-type mumps infection, we question whether an ELISA assay can be assumed to correlate with protection from wild-type disease . . .

---

[25]  Latner, D. R., M. McGrew, N. J. Williams, S. B. Sowers, W. J. Bellini and C. J. Hickman (2014). "Estimates of mumps seroprevalence may be influenced by antibody specificity and serologic method." Clin Vaccine Immunol 21(3): 286-297. Dr. Mark Pallansch, the current Director of the Division of Viral Diseases at the CDC similarly testified to the need to correlate ELISA tests to a functional assay like a PRN: "[U]sually you will compare an ELISA to some other reference method to try to achieve some correlation – high correlation with what is considered a gold standard. In the specific case of mumps, there isn't really a true gold standard as it relates to protection. Therefore, neutralization has been the de facto gold standard, so you would want to see ELISA results in categorizing response versus response as measured by neutralization." Pallansch Dep. 127:14-24.

[26]  MRK-CHA00088592, at '593.

*Contains Highly Confidential AEO Materials*

**Appx476**

and that the reliance on ELISA assays alone is insufficient to support the contention that a vaccine such as Priorix will protect against wild-type infection."[27]

Merck apparently took a similar position before the New Zealand regulatory authorities in criticizing Priorix ELISA-based immunogenicity data as not providing any meaningful indicator of protection against disease:

> Priorix immunogenicity . . . has been reported only by ELISA, which measures total antibody levels including non-neutrali[z]ing as well as neutrali[z]ing antibodies. It is important for a vaccine to produce the right type of antibodies for maximum efficacy. The Priorix [package insert] does not mention neutrali[z]ing antibodies . . . . In the case of another mumps vaccine, the Rubini strain, published studies have shown that Rubini vaccine, while it induces high seroconversion rates by fluorescent antibody tests, induces very low rates by neutrali[z]ing antibody tests. It has been shown to confer only about 15% protection against mumps.[28]

### C.    Merck's Mumps Immunogenicity Test Protocol 007

Protocol 007, "A Study of M-M-R$^{TM}$ II at Mumps Expiry Potency in Healthy Children 12 to 18 Months of Age" (NCT00092391), was a Phase III pivotal clinical trial using both a PRN and ELISA to measure the immunogenicity of the mumps component of M-M-R II at various potencies. Merck developed the Protocol in response to CBER's discovery in the late 1990's that the mumps component of M-M-R II was not always meeting the minimum potency of 20,000 TCID$_{50}$ (4.3 log$_{10}$) specified on the product label for the full 24-month shelf life (end-expiry period). CBER learned of this compliance issue when in the course of its review of M-M-R II, Merck disclosed it was treating this potency specification as a minimum release potency, not a minimum expiry potency. This compliance issue was exacerbated by Merck's finding that

---

[27]  MRK-CHA00088592, at '593. *See also* MRK-CHA00667054, at '061 ("These recent developments have increased the governmental agencies awareness of the importance of a functional assay to measure the true efficacy of vaccines. . . . For mumps, ELISA appears to be more sensitive than [PRN]. However, sera positive by ELISA may lack antibody to HN protein, which may be why ELISA is not the preferred assay to assess protection from mumps."); at '063 ("For mumps virus vaccine strains, studies have shown that seroconversion rates based on ELISA GMTs may not correlate with results from neutralizing antibody assays, a more sensitive and clinically relevant assay. *For this reason, it is important to test mumps virus antibody levels by neutralization assay methods.*") (emphasis in original); MRK-CHA00017826, at '826 ("The immunogenicity assessment is a measure of whether or not the vaccinee responded to the vaccination in some detectable way. This response then needs to be correlated with protection from diseases. Historically, the functional assays have been judged to be a good surrogate marker of protection.").

[28]  MRK-CHA00260815, at '816.

*Contains Highly Confidential AEO Materials*

Appx477

since the mid-1990's the mumps component of M-M-R II was decaying at a faster rate than Merck had historically observed.[29]

Protocol 007 was designed to address CBER's stated concern that lots of M-M-R II that failed to meet the mumps end-expiry potency specification did not provide sufficient protection against mumps.[30] This clinical trial was necessary because CBER rejected Merck's proposal to rely on the lack of outbreaks (at the time) together with the original licensure study data to demonstrate the vaccine's effectiveness at potencies below the end-expiry specification.[31]

---

[29] *See* MRK-CHA00207690, at '706-07 ("During communications with CBER in 1996-98, it became evident that the agency did not agree with our proposal that the specifications . . . were the minimum release potencies for M-M-R®$_{II}$. Instead, they defined these specifications as end-expiry potencies. . . . It was determined that the mumps component could not meet its specifications if current manufacturing practices were followed."); MRK-CHA00094161, at '165-66 (same); MRK-CHA00587859, at '859 ("Routine stability study testing has observed an apparent decrease in the stability of the mumps component in Merck's live virus vaccines."); MRK-CHA00284623, at '623 ("[I]t does appear that there was a statistical shift in losses over time for mumps and that it occurred around 1994."); MRK-CHA00549487, at '488 ("These stability analyses show a trend to less stable [mumps] product in recent years."); MRK-CHA00020396, at p. 4 ("CBER expressed concern over the apparent acceleration in the rate of decay of mumps potency over the shelf-life of M-M-R® II.").

[30] *See* MRK-CHA00590949, at '949 ("[I]t was noted that there is an increasing trend in stability losses for mumps in mumps containing vaccines. This trend was addressed initially in several ways: . . . Merck launched a Mumps Expiry Trial, aimed at demonstrating an expiry limit of 3.7 $\log_{10}$ TCID$_{50}$/dose for mumps M-M-R family of vaccines."); MRK-CHA00019225, at '226 ("CBER asked Merck to demonstrate that the mumps 'expiry' specification could be met as per their interpretation. To address this issue . . . Merck committed to a clinical study to evaluate lower end expiry potencies and a new functional antibody assay was developed at the request of CBER to be used for that study."); MRK-CHA00094161, at '163 (same); MRK-CHA00020635, at '036 ("In response to concerns raised regarding the immunogenicity of the Jeryl Lynn™ mumps strain at vaccine expiry, a clinical trial was designed and is presently underway . . . [and] a plaque reduction neutralization (PRN) assay was developed for use in this trial."); MRK-CHA00040705, at p. 4 ("Current manufacturing release specifications for M-M-R®II do not support the minimum effective dose for mumps (4.3 TCID50) . . . . An end expiry trial to establish a lower effective dose was conducted."); MRK-CHA00095320, at '320 ("I wanted to re-emphasize that there is no question that this trial [Protocol 007] is necessary for regulatory purposes. . . . We have only limited clinical data at this dose [4.3] and no data at all with the trivalent below 4.1."); MRK-CHA00334863, at '865 ("Drivers for Mumps Expiry Trial . . . Reduction in the labeled potency for mumps is necessary to ensure compliance with shelf-life claim").

[31] *See* MRK-CHA00020425, at '425 ("A requirement was set forth by CBER to use a functional neutralization assay for [Protocol 007] . . . due to: 1-The efficacy statements in MMR®II label are based on old, limited data and an assay that is no longer used by Merck."); MRK-CHA00207690, at '706 ("Arguments for the demonstrated immunogenicity at lower potencies of the monovalents and the apparent effectiveness of Merck's release strategy, due to the virtual eradication of disease in the US and Finland where the product was used exclusively were further rejected, because of the small number of children used in the studies, and the circumstantial nature of the justification."); MRK-CHA00615152, at '157 (same); MRK-CHA00019225, at '226 (same); MRK-CHA00094161, at '163 (same); MRK-CHA00615152, at '157 ("However, the minimum immunizing dose studies were performed in a relatively small number of individuals . . . and have not been repeated in recent years or with the trivalent M-M-R®$_{II}$ vaccine []. Therefore, in order to determine the minimum expiry potency for M-M-R®$_{II}$, it was essential to demonstrate the immunogenicity of M-M-R®$_{II}$ at the reduced titers expected at expiry."); MRK-CHA00019225, at '228 (same). *See also* MRK-CHA00017605, at '607 ("No data exist for mumps at the expiry potency Merck has selected. A clinical immunogenicity trial is necessary to provide these data.").

*Contains Highly Confidential AEO Materials*

**Appx478**

Protocol 007 was also conducted to support Merck's application to the FDA to lower the mumps end-expiry potency specification. Merck ultimately used the data from this clinical trial to support its Supplemental Biologics License Application (sBLA) to lower the mumps end-expiry potency specification for M-M-R II to 12,500 TCID$_{50}$ (4.1 log$_{10}$).

### 1. Merck's Development and Design of Protocol 007

The Protocol 007 testing was primarily designed to compare by PRN assay the mumps neutralizing immune response elicited by three different doses of M-M-R II: 4.8 log$_{10}$ TCID$_{50}$, the control dose; and 4.1 and 3.8 log$_{10}$ TCID$_{50}$, as the tested end-expiry doses.[32] As set forth in Clinical Study Report (CSR), there were two primary objectives (endpoints) of the study:

> 1. To demonstrate a similar immune response to mumps virus by neutralization among subjects receiving M-M-R™II containing an expiry dose of mumps virus concomitantly with VARIVAX™ in comparison to subjects receiving M-M-R™II containing a release dose of mumps concomitantly with VARIVAX™.

> 2. To demonstrate an adequate immune response by mumps virus neutralization among subjects receiving M-M-R™II containing an expiry dose of mumps concomitantly with VARIVAX™.[33]

To satisfy the first objective (non-inferiority), the control group and expiry potency group "were considered similar if the proportion of children who developed neutralizing antibodies to mumps in the expiry potency group was not more than 5.0 percentage points lower than the proportion of subjects who developed neutralizing antibodies to mumps in the control group."[34] To satisfy the second objective (adequacy), "the lower bound of the 95% two-sided confidence interval on the observed response be >90%, where the observed response is the proportion of children 12 to 18 months of age who develop neutralizing antibodies to mumps."[35]

---

[32] MRK-CHA00224982. The original tested expiry doses were set at 4.0 and 3.7 log$_{10}$ TCID$_{50}$ but were adjusted to 4.1 and 3.8 log$_{10}$ TCID$_{50}$ after the "reassignment of the mumps house standard [] potency". *See* MRK-CHA00224982, at '5005.

[33] MRK-CHA00224982, at '017. Among the secondary objectives of the test was "[t]o demonstrate similar immune responses to measles, mumps, and rubella (seroconversion rates by ELISA) among children who receive M-M-R™II containing an expiry dose of mumps virus concomitantly with VARIVAX™ compared to children who receive M-M-R™II containing a release dose of mumps virus given concomitantly with VARIVAX™." MRK-CHA00224982, at '017.

[34] MRK-CHA00224982, at '014.

[35] MRK-CHA00224982, at '014.

*Contains Highly Confidential AEO Materials*

Based on prospective endpoint statistical power analysis calculations, the study was designed to enroll roughly 1,770 test subjects (590/group). The data analysis plan for the study required exclusion of immune response data from subjects with detectable anti-mumps immunity prior to vaccination (pre-positives). Serum samples were obtained for serologic analysis prior to vaccination, at six weeks post-vaccination, and at one-year post-vaccination. All collected samples were tested at Merck by a PRN (pre-vaccination, and six weeks post-vaccination) and ELISA assay (pre-vaccination, six weeks post-vaccination, and one-year post-vaccination). The study enrollment was initiated on February 26, 1999 and completed on July 20, 2001. The cutoff date for in-house data was October 26, 2001.[36]

In the design and development phase of the study, CBER required Merck to use a functional assay (such as a PRN test) to measure immune responses to mumps vaccine if Merck was going to use the testing results to support a change in the mumps potency end-expiry specifications.[37] In order to support a change in these potency specifications to the 4.1 or 3.8 $\log_{10}$ $TCID_{50}$ Merck was testing, Merck sought to match the 96% seroconversion rate on the M-M-R II label by demonstrating a neutralizing antibody seroconversion rate of at least 95% (with a lower bound of 90% using a 95% confidence interval).[38] Internal Merck documents indicate a

---

[36] MRK-CHA00224982, at '019.

[37] MRK-CHA00001255, at '255 (CBER's Dr. Carbone "can not accept ELISA for the mumps end expiry and only will only accept neutralization data . . . since neutralization reflects protection."); MRK-CHA00020425, at '425 ("requirement was set forth by CBER to use a functional neutralization assay"); MRK-CHA01898773, at '775 ("CBER has indicated that a functional antibody assay (e.g., WT Neut) will be required to establish equivalence."); MRK-CHA00040705, at p. 8 ("New functional antibody assay developed at the request of CBER."); MRK-CHA01386177, at '177 ("CBER considers a neutralization assay essential for establishing efficacy w[h]ere you need to define effectiveness for a product - the mumps end expiry trial . . . ."); MRK-CHA02021754, at '756 (CBER stating, "[a]s the immunological correlate for efficacy of mumps vaccination, Merck has developed an assay to measure anti-mumps antibodies in the serum of vaccinated subjects.").

[38] MRK-CHA00040705, at p. 8 ("note our label specifies a 96% SCR based on mumps neutralizing antibodies"); at p. 13 ("End expiry dose must have an acceptable antibody response[.] Lower bound of the 95% two-sided confidence interval > 90%."); MRK-CHA00137671, at '696 ("We confirm that a lower bound of 90% and a 5 percentage point equivalence margin will be used for the primary acceptability and equivalence hypotheses regarding mumps neutralization."); MRK-CHA00209674, at '675 ("A mumps neutralization using a wild type virus strain which results in ≥95% seroconversions rate is required for the M-M-R®II end-expiry trial."); MRK-CHA00336905, at '906 ("CBER requirement to demonstrate ≥95% seroconversion by a neutralization assay (90% lower limit)"); Krah Dep. 727:2-3 (FDA "indicated the requirement of a 95 percent seroconversion.").

*Contains Highly Confidential AEO Materials*

**Appx480**

concern by Merck that failing to meet this seroconversion rate would require Merck to lower the 96% mumps seroconversion rate on the label.[39]

CBER also insisted that Merck test against a wild-type mumps virus indicator strain, which is one actually circulating in the real world, as opposed to the attenuated Jeryl Lynn mumps virus strain, which is the weakened mumps virus used in the vaccine.[40] Merck engaged in preliminary testing with its standard PRN assay using various indicator virus isolates, including the attenuated Jeryl Lynn mumps virus strain as well as several wild-type mumps virus strains. With this initial developmental testing, Merck measured PRN seroconversion rates of approximately 90% for the Jeryl Lynn vaccine strain, and seroconversion rates of roughly 66% to 75% for the various wild-type strains that were tested.[41]

This original testing did not yield ≥ 95% wild-type PRN seroconversion rates. Therefore, after consultation with CBER, Merck made two fundamental changes to its standard PRN assay.

---

[39] MRK-CHA00198869, at '869 ("Summary to date → 70% conversion rate . . . If this is not resolved and doesn't change → label may have to be changed from 96% to 75%"); MRK-CHA00273309, at '309 ("With JL as the test isolate, the PRN SCR is ~90%, and with L01 as the test isolate, the PRN SCR is ~70-80%. . . . Should CBER raise the issue of the 96% SCR in the current label, the extensive field experience of the vaccine will be emphasized. Should this approach to defending the 96% SCR in the label not be successful, one option may be to propose including the range of observed SCRs in the label."); MRK-CHA00625629, at '630 ('We are basing the expected rate of 96% on the package circular . . . . I selected 94% as the alternative case because the clinical monitor and I feel that if the response to mumps in the control is lower than this, we should generally be concerned (given what is in our circular)."); MRK-CHA00086292, at '292 ("CBER insistence on a WT neutralization assay will likely result in SCR of 70-80% . . . . Risks: a) Label may be adversely affected with perceived change in efficacy."); MRK-CHA00040705, at p. 26-27 ("Short-term options under evaluation • Change label to reflect lower than 96% protection . . . • Change label to reflect antibodies* against mumps in 96% of subjects vaccinated (as measured by ELISA) *not neutralizing antibodies as is currently reflected on the label"); MRK-CHA01725276, at '342 ("Short term options under consideration: . . . Change package circular to reflect < 96% protection against mumps by neutralizing antibodies."); MRK-CHA01648951, at '952 ("The label currently indicates that a single dose of MMRII results in a mumps seroconversion rate of 96%; if we are held to this as the 'acceptable historical standard' there is a chance that we may have a problem. We may need to consider the possibility that the SC rate at expiry may be lower and plan for this contingency now.").

[40] MRK-CHA00026466, at '470 ("CBER has indicated that the vaccine passage Jeryl Lynn™ is not suitable for use in the PRN and has established a requirement to use a "wild-type" mumps strain to evaluate vaccine-induced immune responses."); MRK-CHA00020635, at '636 ("[A]t CBER's request, the study incorporated a wild-type mumps isolate as a test strain on the *premise that neutralization of a wild-type isolate would act as a surrogate for protection from disease*.") (emphasis in original);

[41] *See* MRK-CHA01898773, at '774 ("With JL as the test isolate, the SCR is ~90%, and with LO1 as the test isolate, the SCR is ~70-75%."); MRK-CHA00020428, at '429 ("Current status Neut. assays support >90% SCR for JL and a range up ~ 70-75% for wild type virus."); MRK-CHA01927351, at '353 ("Merck's current assay showed: 90% seroconversion rate for JL[;] 66% . . . for Lo1[;] 56% . . . for JL2"); MRK-CHA00026466, at '471 ("Results of a series of pilot PRN assays of pediatric sera against Jeryl Lynn™, Lo1 and JL2 mumps strains showed respective seroconversion rates of 91% [], 69% [] and 56% [].").

*Contains Highly Confidential AEO Materials*

**Appx481**

The first change was to use a low-passage Jeryl Lynn mumps vaccine strain (rather than a true wild-type strain) as the indicator virus.  Second, Merck added rabbit anti-human Immunoglobulin G (anti-IgG) to the clinical serum samples for the purpose of, as Merck characterized it, enhancing the sensitivity of the assay.[42]  This technique was previously used by Dr. Hiroshi Sato in the 1970s, who found that the addition of anti-IgG yielded up to a 100-fold enhancement in measured plaque neutralization titer responses.[43]  CBER required "appropriate validation" of Merck's use of anti-IgG in the assay.[44]  Merck referred to this modified PRN test, designed specifically for the Protocol 007 study, as the anti-IgG enhanced neutralization test or the AIGENT.

In further development of the AIGENT assay, Merck measured a higher level of seropositive results in the pre-vaccination samples than had been expected in an unvaccinated population.  Merck observed a pre-positive rate as high as 24% at certain anti-IgG dilutions.[45]  Merck tested various dilutions of anti-IgG to identify and select the dilution of anti-IgG that yielded test results indicating a pre-positive rate within Merck's pre-determined target range of 10% or less.[46]

2.    The AIGENT Validation

After Merck completed its design of the AIGENT assay, it conducted a validation study, which is required for primary endpoint tests used in pivotal clinical trials to ensure the AIGENT testing method was suitable and reliable for its intended purpose.[47]  Validation studies measure and characterize various attributes of the assay, the most important of which include assay

---

[42]  MRK-CHA00224982, at '5038.

[43]  Sato, H., P. Albrecht, J. T. Hicks, B. C. Meyer and F. A. Ennis (1978). "Sensitive neutralization test for virus antibody. 1. Mumps antibody." Arch Virol 58(4): 301-311; Sato, H., P. Albrecht, S. Krugman and F. A. Ennis (1979). "Sensitive neutralization test for rubella antibody." J Clin Microbiol 9(2): 259-265.

[44]  MRK-CHA00001258, at '260.

[45]  MRK-CHA00016632, at '633 (referencing "unexpectedly high pre-positive rate" of 22%); MRK-CHA00273243, at '243 ("we do not plan to apply this assay [AIGENT] to other development efforts as the pre-pos rate is relatively high"); MRK-CHA00065695, at '700 (showing pre-positive rates of 8-24% depending on dilution of anti-IgG); MRK-CHA00026912,at '916 (same).

[46]  *See* Sec. V.A.3.

[47]  *See* 2013 *FDA Guidance for Industry regarding Bioanalytical Method Validation* ("For pivotal studies that require regulatory action for approval or labeling . . . the bioanalytical methods should be fully validated.").

*Contains Highly Confidential AEO Materials*

**Appx482**

specificity and reproducibility.  For the AIGENT assay, specificity meant the ability to assess mumps neutralizing antibodies in the presence of other antibodies and components (matrix) of the subject serum and added anti-IgG reagent.  Specificity was a critical parameter in the AIGENT assay to ensure the seroconversion rates being measured reflected only mumps neutralizing antibodies and did not also include non-mumps specific neutralizing activity or non-neutralizing activity.  Reproducibility (or reliability) refers to the consistency of assay results over time under standardized testing conditions.

The AIGENT validation report was completed on February 27, 2001.[48]  The report described the validation studies Merck performed concerning specificity as follows:

> [S]pecificity was assessed by measuring residual mumps neutralization titers following absorption of sera with measles, mumps or rubella virus extracts.  Sera was also absorbed with mock extract or incubated with culture medium.  The mock extract was made from the uninfected vero cells in which each virus was grown, and the culture medium is the medium in which the cells are grown.[49]

With respect to specificity, the validation report provided the following result summary:

> There is a reduction in neutralization titers with the measles and rubella antigens that is similar to the reduction obtained with the mock extract.  Relative to the other antigens tested, absorption with the mumps antigen resulted in a further reduction in neutralization in half of the samples tested, indicating the specificity of the assay for measuring mumps antibodies.[50]

According to the validation report, in the first specificity experiment Merck pre-absorbed four pediatric sera samples using mumps, measles, rubella or mock extracts, or incubated them with culture medium, and tested the pre-absorbed serum samples in the AIGENT assay using serial two-fold dilutions from 1:32 through 1:4,096.[51]  Neutralization was then assessed by the reduction in indicator virus plaques formed after running the AIGENT assay.  Consistent with

---

[48]  MRK-CHA00016988.  The validation report was completed more than two months after Merck began performing the AIGENT assay on Protocol 007 clinical sera.  MRK-CHA00682341 (assay run Dec. 6, 2000).

[49]  MRK-CHA00016988, at '001.

[50]  MRK-CHA00016988, at '989.

[51]  These tests did not include absorbing any sera samples with varicella extracts despite the concomitant administration of the Varivax and M-M-R II vaccines to the subjects in Protocol 007.

*Contains Highly Confidential AEO Materials*

**Appx483**

AIGENT standard operating procedures, the titer was defined as the highest serum dilution providing ≥ 50% reduction in plaques.

For an assay with high specificity, the expected result would be significantly higher neutralizing titers (lower levels of plaque forming virus) in the samples pre-absorbed with measles, rubella, or mock cell extracts, or culture medium, compared to that of the samples pre-absorbed with mumps extract.  The non-mumps extracts should have little or no effect on removing mumps neutralizing antibodies by pre-absorption, so these antibodies would remain in the serum and be detected as inhibiting mumps virus infection and replication during testing. The culture medium used in this test functions as a negative control, which (presumably) lacks antigens available to bind and remove any serum antibodies that might act to block mumps virus infection and replication in the test. Pre-absorption with measles, rubella or mock cell extracts should yield similar results to pre-absorption with culture medium.

Pre-absorption with mumps extract should reduce available mumps-binding serum antibodies in the tested serum samples.  This mumps extract pre-absorption would result in a reduction in neutralizing antibody titers in the pre-absorbed serum sample due to depletion during the initial pre-absorption step of the antibodies capable of binding mumps (they would no longer be available to bind mumps during testing).  Such a result would demonstrate that the observed neutralization is specific to mumps and not related to the presence of antibodies that bind to the measles, rubella or mock extracts or the culture medium during the pre-absorption step.  Merck's results, set forth in the table immediately below, did not show this outcome.[52]

Table 11
Specificity Experiment 1 - Neutralization Titers of Pediatric Sera

| Sample | Medium | Mock | Absorbing Antigen | | |
| | | | Mumps | Measles | Rubella |
| --- | --- | --- | --- | --- | --- |
| 5 - 13 | 512 | <32 | <32 | <32 | <32 |
| 5 - 14 | 2048 | 512 | <32 | 512 | 32 |
| 5 - 16 | ≥4096 | 512 | 256 | 512 | 256 |
| 5 - 26 | 256 | <32 | <32 | <32 | <32 |
| Mock Plaque Average: 24.5 | | | | | |
| MKY Control Titer: 512 | | | | | |

Merck applied the same approach in its second specificity experiment except it used adult sera instead of pediatric sera and tested two of them at more (and higher) dilutions.  The results

---

[52] MRK-CHA00016988, at '002.

*Contains Highly Confidential AEO Materials*

of this experiment, set forth in the table immediately below, likewise did not consistently show the expected outcome of higher titers (akin to those observed when pre-absorbing using culture medium) in the samples absorbed with measles, rubella or mock extracts compared to that of the samples absorbed with mumps extract.[53]

Table 12
Specificity Experiment 2 - Neutralization Titers of Adult Sera

| Sample | Medium | Mock | . | Mumps | Measles | Rubella |
|--------|--------|------|---|-------|---------|---------|
| | | | | **Absorbing Antigen** | | |
| AS | 2048 | 64 | . | <32 | 64 | 256 |
| CM | 8192 | 512 | | <32 | 512 | 128 |
| MKY | 1024 | <32 | | <32 | <32 | <32 |
| DK | <32 | <32 | | <32 | <32 | <32 |
| Mock Plaque Average: 33.8 | | | | | | |
| MKY Control Titer: 1024 | | | | | | |

Dr. Joseph Antonello, a Merck statistician who co-authored the validation report, testified at his deposition that the specificity results were "peculiar," "unexpected," and "not strong" in demonstrating the assay was specific to mumps.[54]

### 3.   The AIGENT Testing

The AIGENT testing was conducted in Dr. David Krah's laboratory at Merck's Research Laboratories Division in Merck's West Point, Pennsylvania facility.  The bulk of the testing involved counting the plaques at the various dilutions being tested in the pre- and post-vaccination samples and the assay controls.  Dr. Krah and his most senior staff virologist Mary Yagodich both directly participated in the plaque counting process and oversaw the plaque counting that was done by the other staff virologists in Dr. Krah's lab.  The plaque counting commenced in December 2000 and was largely completed by July 30, 2001.  The testing was done in two phases: the preliminary subset phase, which involved roughly one-third of the

---

[53]  MRK-CHA00016988, at '002.  These results also showed that one of the adult test subjects (DK) showed a negative neutralization response at all dilutions, including when merely incubated with culture medium, suggesting a significant lack of mumps neutralizing antibodies even at the highest serum concentration tested.

[54]  Antonello Dep. 115:6-9 ("In retrospect, looking at the specificity results in this study, they're peculiar.  And I think today I might push back a little more on the lab given these results."); 118:14-15, 120:6-8 ("Not the result that I would expect. . . . So I don't understand why that would be the case.  So it's an unexpected result."); 121:16-18, ("I'd say these results don't show you that it can distinguish measles and rubella."); 123:25-124:7 (purpose of validation report is to conclude with some level of confidence that assay is specific to antigen being tested and AIGENT validation results "are not strong in that regard"); at 128:21-129:2 ("In looking back now, I would question this result. . . .  It's not what I expected, would expect now.").

*Contains Highly Confidential AEO Materials*

**Appx485**

samples being tested (approximately 600 samples); and the final phase, which involved the balance of the samples.

Merck's original plan was for Dr. Krah and his staff to conduct the preliminary subset phase and to outsource the balance of the testing to the lab of Dr. Richard Ward of the Cincinnati Children's Hospital.  However, Merck ultimately decided to conduct all the testing in Dr. Krah's lab.  According to Alan Shaw, Merck's then Senior Director of Virus and Cell Biology and Dr. Krah's immediate superior, Merck decided against the outsourcing because of the "heightened importance" of the testing and concerns that Dr. Ward's lab would be "unable to match th[e] level of precision" needed for the test:

> Due to an urgent need for high-precision data to support label changes for M-M-R®II, David Krah's laboratory will be carrying out neutralization tests on approximately 3000 infant serum samples over the next five months.  This activity was originally scheduled for transfer to a contract laboratory.  Two things have conspired to make this transfer unacceptable from a strategic perspective.  First, issues arising following a CBER inspection in MMD have placed a heightened importance on this data set.  Second, a preliminary run of about one-third of the serum set has revealed an unanticipated tightness of data from the Krah laboratory.  We doubt that the contract lab would be able to match this level of precision.[55]

As explained by Dr. Krah, the plaque counting process worked as follows.  Starting from the point where the assay plates were stained and the plaques became visible, Dr. Krah or one of his staff members would look at the clinical sera and control plates (typically with a light box to better visualize the plaques), mark the plaques with a pen, and write the plaque count somewhere on the plate.  Then the counter would transcribe the plaque count on a handwritten counting sheet and an Excel spreadsheet where calculations were performed to determine the various plaque counts and titers measured at various dilutions.  These calculations were used to determine whether the assays were valid or invalid and whether the samples were seropositive or

---

[55]  MRK-CHA00014739, at '739; MRK-CHA00014746, at '746; MRK-CHA00014829, at '829; MRK-CHA00015702, at '702.  *See also* MRK-CHA00014731, at '731 ("The plan for the remaining samples had been to send them to an outside contract laboratory.  Recognizing the tightness of the first data set, we realize that an outside laboratory would not be able to reproduce this kind of precision."); MRK-CHA00014744, at '744 (same); MRK-CHA00014749, at '749 (same); MRK-CHA00015719, at '719 (same).

*Contains Highly Confidential AEO Materials*

seronegative.  They also used the calculated results to determine whether paired pre- and post-vaccination samples could be counted towards seroconversion.[56]

For the interim analysis, Drs. Krah along with Emilio Emini, who at the time was Merck's Vice President of Vaccine and Biologics Research, reviewed the plaque counts as they were completed.  When Drs. Emini and/or Krah determined that a recount was warranted, Dr. Krah asked the original counter to recount the particular plate at issue.  The counter would then go back to the assay plate, erase from the plate the original plaque count markings and then rewrite on the plate the new plaque count.  Then the counter would cross out the previously recorded count on the original handwritten counting sheet and record the new counts.  For the majority of the recounts, the counter documented no justification of the reason for the change in the plaque counts.  For the remainder of the testing, the counting and recounting procedure was essentially the same, except the plaque counts were entered into an electronic workbook that automatically flagged samples for recounting.[57]

On August 6, 2001, after the vast majority of the plaque counting process had been completed, two representatives from CBER performed an unannounced on-site inspection of Dr. Krah's lab.  Following the inspection, CBER issued Merck a Form 483 citing several observations relating to the AIGENT testing and plaque counting procedure, including the changing of raw data without justification.[58]  Following the inspection (which included two follow-up visits on August 10 and September 14), CBER described these concerns in more detail, noting (1) "there is no guarantee that the [plaque count] numbers on the worksheet were the original data, even at the time of transfer of count from plate to work sheet," and (2) "a selective re-review of specific assays or wells was undertaken after data analysis of pre- and post-neutralizing antibody titers (e.g., with specific knowledge of matched samples and of pre- or

---

[56] *See generally* Krah Dep. 418-50.

[57] *See generally* Krah Dep. 418-50.

[58] MRK-CHA00052249, at '250.

*Contains Highly Confidential AEO Materials*

post-vaccination status of samples), providing clear opportunity for selective bias to the change."[59]

On February 4, 2002, Merck formally responded to CBER's concerns arising out of the August 6, 2001 inspection. In particular, Merck defended the changes to the AIGENT data with which CBER took issue, stating (1) "the application of the extravariability criteria improves the quality of data obtained and does provide accurate, scientifically sound data for use in decision making," and (2) the changes Merck made to the AIGENT data with which CBER took issue "were made for appropriate reasons," and emphasizing (3) "that laboratory personnel were, and remain, blinded to sample identity other than bleed dates required to pair pre- and post-vaccination sera. This reduces the potential for changes being made which could bias the resulting analysis of the total data set." Nevertheless, Merck proposed and sought CBER's concurrence with "us[ing] the original PRN assay results in the evaluation of the 007 trial," asserting that "[a] reliable record of originally recorded assay results exists, i.e., results before recounting."[60] After consultation with CBER, Merck relied on the "original" AIGENT results going forward.[61]

4.    The WT ELISA Validation

At the same time Merck was working through the AIGENT testing, it also was developing and conducting a mumps "wild-type" (WT) ELISA test as a supporting assay to be used in analysis of Protocol 007 serum samples. The mumps antigens used with this WT ELISA were derived from the same low passage version of the Jeryl Lynn mumps vaccine strain Merck used in the AIGENT. Merck completed development and validation of this WT ELISA assay on December 4, 2000. Merck selected 10 ELISA antibody (Ab) units as the threshold for determining seropositivity (serostatus cutoff) for the WT ELISA.[62] This cutoff value was based

---

[59]  MRK-CHA02021754, at '756-57. *See also* MRK-CHA00052249, at '252 ("Dr. Carbone [CBER] stated that if changes in the data were made after results were calculated and selective wells re-reviewed, then the practices were not consistent with GLP.").

[60]  MRK-CHA00000410, at '418, 421-422 (Serial No. 80).

[61]  MRK-CHA00064011, at '012 ("In these responses, Merck . . . proposed that the original results prior to retesting be used. . . . A decision to accept Merck's proposal was reached the following week . . . .").

[62]  MRK-CHA00761129.

*Contains Highly Confidential AEO Materials*

**Appx488**

on pilot studies that used a panel of 72 selected samples that previously scored as "negative" using Merck's then-existing non-WT ELISA.  Twelve of these samples were post-vaccination negatives in the non-WT ELISA test and the rest were pre-vaccination negatives.

As detailed in the validation report, Merck conducted the validation test using only two test criteria, a 5Ab or 10Ab serostatus cutoff.  Merck did not assess the statistical impact of using higher serostatus cutoff levels on serostatus outcomes and discordance between the two tests.  Using a 5Ab cutoff resulted in a pre-vaccination discordance from the non-WT ELISA of 3 out of 56 samples (5.3%), and a post-vaccination discordance of 3 out of 10 samples (30%).  Using a 10Ab cutoff resulted in a pre-vaccination discordance from the non-WT ELISA of 0 out of 56 samples, and a post-vaccination discordance of 2 out of 10 samples (20%).  These results are set forth in the table below.[63]

Table 5
Comparison of Serostatus Assignments Using Cutoff of 10 and 5 Ab units

| Serostatus Assignment | 10 Ab units | | 5 Ab units | |
|---|---|---|---|---|
| | Pre | Post | Pre | Post |
| Negative | 56 | 8 | 53 | 7 |
| Positive | 0 | 2 | 3 | 3 |

Based on these results, Merck proposed a 10Ab serostatus cutoff for the WT ELISA.[64]

## 5.   The AIGENT/WT ELISA Correlation

Before allowing Merck to use its WT ELISA to support regulatory decision making, CBER required that Merck correlate the assay to results obtained using its AIGENT assay.[65] CBER insisted on this correlation to ensure the WT ELISA seroconversion results and the

---

[63]  For this analysis, 6 of the 72 selected samples were excluded as extravariable.

[64]  MRK-CHA00761129, at '134.

[65]  *See* MRK-CHA00761482, at '483 ("It is essential that ELISA testing methods be validated against a working neutralization assay to demonstrate the absence of such problems [false positive and false negative results].  In addition, the assignment of cut-off values for the ELISA needs to be justified."); MRK-CHA00791315, at '319 ("[W]e contended that there was reasonably good agreement between the two assays in terms of serostatus classification when using a cutoff of 10Ab . . . .  Concluding that the two assays agree reasonably well was important for the purpose of arguing that the ELISA was an acceptable substitute for the neutralization assay."); MRK-CHA01898773, at '775 ("[E]vidence of a correlation between the current assays and a WT Neut assay, or evidence of correlation with protective efficacy, would allow the current EIA-based assays to be used.").

*Contains Highly Confidential AEO Materials*

**Appx489**

serostatus cutoff Merck used to get those results were clinically relevant and reflected actual protection from the disease.[66]

In addressing this CBER requirement, Merck conducted a correlation study between the two assays (WT ELISA/AIGENT) using two versions of the AIGENT data, which Merck characterized as the "original" and "corrected" versions of the AIGENT preliminary subset data. On June 10, 2002, Merck submitted to CBER (in Serial No. 86) the results of the correlation study using the "original" AIGENT data.[67] Merck used the correlation to justify to, and seek concurrence from, CBER in its selection of 10Ab as the serostatus cutoff for the WT ELISA assay.[68] Merck represented to CBER that "agreement between the ELISA and AIGENT assays was found to be quite good."[69] Specifically, Merck represented an overall agreement rate of 90.4%, with agreement rates of 87.3% for pre-vaccination samples and 93.6% for post-vaccination samples. The overall agreement based on seroconversion, but excluding pre-positive samples in either assay, was 93.4%.[70]

---

[66] MRK-CHA00331831, '831 ("CBER requests additional justification for the cutoff chosen for the mumps ELISA. The observation that the ELISA cutoff is sufficiently high to accurately classify pre-vaccination sera as negative is useful, but insufficient by itself as it does not relate to seroprotection."); MRK-CHA00561467, at '467 (same); MRK-CHA00846454, at '454 ("PRN is a functional assay–correlate of protection. ELISA is not a functional assay but an antibody assay. We need to convince CBER that the ELISA will provide equivalent results to PRN and thus equate (bridge) to protection."); MRK-CHA00331831, at '833 ("Biological relevance of the 10Ab ELISA units cutoff: . . . CBER was not satisfied with the rationale as this does not relate the cutoff in any fashion to seroprotection but rather is circular in that Merck is verifying that Merck's historical experience with the legacy ELISA assay is consistent with the outcome of this new assay."); MRK-CHA00818776, at '778 ("Justification is required for the new mumps cutoff of 10 ELISA antibody units . . . . CBER requested that the ELISA results be compared to the mumps Plaque Reduction Neutralization (PRN) assay. CBER would like the rationale for the new cutoff to be linked to a biologically relevant reference standard."); MRK-CHA01583397, at p. 10 ("CBER: Provide biological justification . . . Does the AIGENT assay support the WT ELISA cutoff of 10Ab units?"); MRK-CHA00198876, at '878 ("CBER requires that SCR reflect protective efficacy."); MRK-CHA00126963, at '970 ("[T]he appropriateness of the cutoff employed in the ELISA for seropositivity should be supported by data demonstrating some relevance with protective levels of antibody (e.g., neutralizing antibody)."); MRK-CHA01927351, at '351 ("in the mumps end expiry [] we are trying to establish clinical protective efficacy").

[67] MRK-CHA00761628.

[68] MRK-CHA00761628, at '629-630 ("This submission is in response to CBER's request for additional information regarding the cutoff chosen for the Mumps WT ELISA comparing the ELISA cutoff to the AIGENT assay cutoff . . . . CBER concurrence is requested for . . . Mumps WT ELISA cutoff of 10Ab units.").

[69] MRK-CHA00761628, at '672. *See also* MRK-CHA00224982, at '032 (CSR) (referencing "excellent correlation between mumps PRN and ELISA").

[70] MRK-CHA00761628, at '673-674.

*Contains Highly Confidential AEO Materials*

These correlation results were derived from cross-classification analyses Merck performed comparing the pre- and post-vaccination serostatus of the subject samples as measured in the AIGENT and WT ELISA tests. For three of these calculations, the correlation percentages were based on a ratio of the number of samples with the same serostatus classification measure from both assays to the total number of samples. This was done using a combined pre- and post-vaccination sample set, the pre-vaccination samples alone, and the post-vaccination samples alone. The fourth calculation was a ratio of the number of samples that had the same seroconversion result (either positive or negative) in both assays divided by the total number of samples, excluding any sample that was pre-positive in one or both assays. A summary of these cross-classification analyses is shown in the tables below.

**Table 4**
**Sero-Status Cross-Classification for M-M-R®II 007 Pre- and Post-Vaccination Samples**

| | | AIGENT | | |
|---|---|---|---|---|
| | | >=32 | <32 | Total |
| ELISA | >=10 | 469 | 29 | 498 |
| | <10 | 69 | 456 | 525 |
| | Total | 538 | 485 | 1023 |

**Table 5**
**Sero-Status Cross-Classification for M-M-R®II 007 Pre-Vaccination Samples**

| | | AIGENT | | |
|---|---|---|---|---|
| | | >=32 | <32 | Total |
| ELISA | >=10 | 3 | 7 | 10 |
| | <10 | 58 | 442 | 500 |
| | Total | 61 | 449 | 510 |

**Table 6**
**Sero-Status Cross-Classification for M-M-R®II 007 Post-Vaccination Samples**

| | | AIGENT | | |
|---|---|---|---|---|
| | | >=32 | <32 | Total |
| ELISA | >=10 | 466 | 22 | 488 |
| | <10 | 11 | 14 | 25 |
| | Total | 477 | 36 | 513 |

*Contains Highly Confidential AEO Materials*

**Table 7**
**Sero-Conversion Cross-Classification for M-M-R®II 007**

|  |  | AIGENT | | |
|---|---|---|---|---|
|  |  | >=32 | <32 | Total |
| ELISA | >=10 | 400 | 19 | 419 |
|  | <10 | 10 | 13 | 23 |
|  | Total | 410 | 32 | 442 |

Following Merck's submission of these correlation results, CBER concurred with Merck's proposal to use a WT ELISA cutoff of 10Ab.[71]

> **D.  Merck's Submissions of Protocol 007 Data to the FDA**
>
> 1.  The Interim AIGENT Results

On March 12, 2001, Merck submitted to CBER an interim analysis of the preliminary subset of the AIGENT assay.[72]  The subset covered 600 of the test subjects and was based on what Merck characterized as the "corrected" AIGENT data.  This subset incorporated the plaque count changes Dr. Krah and his staff made as part of the recounting procedure Drs. Krah and Emini had employed during the testing.  Merck reported to CBER (1) "Mumps neutralizing antibody seroconversion rates at mumps vaccine doses of 4.9 and 4.0 $\log_{10}$ $TCID_{50}$ are comparable (94.1% and 93.3% respectively)"; and (2) "The seroconversion rate at 3.7 $\log_{10}$ $TCID_{50}$ . . . while somewhat lower . . . is also well within the historical seroconversion range . . . that have been associated with high field effectiveness in clinical trials."[73]  Merck further reported that the "seroconversion rate range seen in this preliminary data is consistent with other neutralization data which were associated with high levels (97%) of protection."[74]

Merck also submitted the "corrected" interim AIGENT data to CBER in response to a February 9, 2001 Warning Letter concerning CBER's finding that certain mumps vaccine

---

[71]  MRK-CHA00000561, at '561.

[72]  MRK-CHA00017036 (Serial 63).

[73]  MRK-CHA00017036, at '045.

[74]  MRK-CHA00017036, at '048.

*Contains Highly Confidential AEO Materials*

products had failed to meet the minimum potency specifications.[75]  In light of this finding, CBER requested that Merck provide "an analysis of Mumps stability data describing the range of potencies [Merck] would expect the various Mumps Vaccine products to reach at the two-year expiration date."[76]  Among the data and information Merck submitted in this response was a summary of the preliminary results from its AIGENT testing.[77]  Merck concluded that these results, along with the other information it submitted "taken together provide evidence that M-M-R®II is effective through the predicted range of potencies post-release within a 2 -year expiration date."[78]

Merck also relied on its interim analysis of the "corrected" AIGENT data in its April 20, 2001 Biologics Product Deviation Report (BPDR) to CBER on certain M-M-R II lots that failed to comply with the mumps end-expiry potency specifications.[79]  Merck referred back to the summary of the "corrected" AIGENT preliminary results it submitted in response to the February 9 Warning Letter.  Merck stated that M-M-R II with a mumps potency as low as 3.9 is "efficacious and the possibility of seroconverting is essentially equivalent to that of a child who receives a dose at 4.9 or 4.0 $logTCID_{50}$/dose."[80]  Merck told CBER that based on this preliminary data, "potency values in the range of 3.9 $logTCID_{50}$/dose or above are not likely to

---

[75]  MRK-CHA00209399, at '402 ("Our investigators reported that the data in your firm's files showed that a number of Mumps Vaccine stability samples representing lots manufactured before the formulation was changed during February 2000 failed to meet the minimum potency specification.").

[76]  MRK-CHA00209399, at '402.

[77]  MRK-CHA00585231, at '237 ("Preliminary data from end-expiry clinical trials for M-M-R®II . . . have recently become available. . . .  This seroconversion rate range is consistent with several older field efficacy studies that demonstrated seroconversion rates ranging between 83 and 93 %, which still afforded high levels of protection against mumps infection.").

[78]  MRK-CHA00585231, at '237.  *See also* MRK-CHA00207690, at '708 ("In addition, and more seriously, [CBER] challenged the efficacy of marketed product at the lowest predicted potencies (below label claim). . . .  With regard to product efficacy, we provided an interim analysis of an ongoing mumps end-expiry trial to justify efficacy of lower potency product.  CBER accepted the Merck response."); MRK-CHA00615152, at '159 (same); MRK-CHA00019225, at '230 (same); MRK-CHA00094161, at '167 (same); MRK-CHA00322038, at '041 ("Provided interim analysis of mumps end-expiry trial data to justify efficacy of lower potency product.").

[79]  MRK-CHA00754233, at '234 ("Four of the five lots tested yielded results below the label claim of 4.3 log $TCID_{50}$/dose, but higher than the projected worst-case values of less than 3.7 $logTCID_{50}$/dose.").

[80]  MRK-CHA00754233, at '236.

*Contains Highly Confidential AEO Materials*

**Appx493**

lead to a lack of immunity against mumps" and that "no further action is warranted" for its out-of-specification lots.[81]

## 2.    The Final AIGENT Results

On December 19, 2003, Merck submitted to CBER the Protocol 007 Clinical Study Report (CSR), which contained the complete set of AIGENT serum analysis data.[82]  These data were submitted in support of Merck's Supplemental Biologics License Application (sBLA) to lower the end-expiry potency specification for the mumps component of M-M-R II.  The submitted results covered the full universe of test subjects and comprised what Merck characterized as the "original" AIGENT data.  The final AIGENT results Merck reported were as follows: (1) for the candidate mumps expiry dose of $3.8 \log_{10} TCID_{50}$, a seroconversion rate of 89.3% (with a 95% confidence interval range of 86.1-92.0%); (2) for the candidate mumps expiry dose of $4.1 \log_{10} TCID_{50}$, a seroconversion rate of 93.3% (with a 95% confidence interval range of 90.5-95.5%); and (3) for the $4.8 \log_{10} TCID50$ control arm of the study, a seroconversion rate of 92.2% (with a 95% confidence interval range of 89.3-94.6%).[83]

Based on these results, Merck concluded "M-M-R™II with a mumps expiry dose of $4.1 \log_{10} TCID_{50}$ is highly immunogenic and induces an acceptable mumps-specific neutralizing antibody SCR."[84]  Merck further concluded that these results "support the effectiveness of M-M-R™II containing a mumps virus potency of no more than $4.1 \log_{10} TCID_{50}$ and the lowering of the mumps virus end expiry potency from the currently assigned potency of $4.3 \log_{10} TCID_{50}$ to no less than $4.1 \log_{10} TCID_{50}$."[85]

## 3.    The Final WT ELISA Results

The CSR Merck submitted on December 19, 2003 also contained the final WT ELISA results Merck submitted to CBER in support of its end-expiry sBLA.  The final WT ELISA

---

[81]  MRK-CHA00754233, at '236.

[82]  MRK-CHA00224982.

[83]  MRK-CHA00224982, at '005.

[84]  MRK-CHA00224982, at '178.

[85]  MRK- CHA00224982, at '175.

*Contains Highly Confidential AEO Materials*

results Merck reported were as follows: (1) for the candidate mumps expiry dose of $3.8 \log_{10}$ $TCID_{50}$, a seroconversion rate of 94.1% (with a 95% confidence interval range of 91.9-95.9%); (2) for the candidate mumps expiry dose of $4.1 \log_{10} TCID_{50}$, a seroconversion rate of 97.4% (with a 95% confidence interval range of 95.8-98.6%); and (3) for the $4.8 \log_{10} TCID50$ control arm of the study, a seroconversion rate of 98.0% (with a 95% confidence interval range of 96.5-98.9%).[86]

As with its final AIGENT results, Merck reported to CBER that the ELISA results "support the effectiveness of M-M-R™II containing a mumps virus potency of no more than $4.1$ $\log_{10} TCID_{50}$ and the lowering of the mumps virus end expiry potency from the currently assigned potency of $4.3 \log_{10} TCID_{50}$ to no less than $4.1 \log_{10} TCID_{50}$."[87] Merck further represented that the "mumps wild-type ELISA used in this study was shown to correlate with the PRN assay . . . and previous studies have established a strong correlation between the development of mumps-specific neutralizing antibodies and vaccine efficacy."[88]

### 4. Merck's Supplemental Biologics License Application

On January 29, 2004, Merck submitted to CBER the sBLA, which proposed lowering the mumps end-expiry potency specification for M-M-R II.[89] This sBLA included the results of Protocol 007 including the final AIGENT and WT ELISA results contained in the CSR. Merck summarized these results as follows:

> The clinical data described herein demonstrate that M-M-R™II with a mumps virus potency within the release range (based on a vaccine lot containing a mumps virus potency of $4.8 \log_{10} TCID_{50}$ per dose). Lowering the mumps virus potency to $4.1 \log_{10} TCID_{50}$ per dose maintains > 90% seroconversion using a mumps neutralization assay, thus preserving the excellent safety and efficacy profile of the vaccine.[90]

---

[86] MRK-CHA00224982, at '005.

[87] MRK-CHA00224982, at '175.

[88] MRK-CHA00224982, at '175.

[89] MRK-CHA00000032.

[90] MRK-CHA00000032, at '110.

*Contains Highly Confidential AEO Materials*

This sBLA contained several other representations concerning the clinical relevance of the Protocol 007 results, including (1) "The PRN assay was used as the primary endpoint because it is a functional assay that measures the ability of the vaccine-induced immune response to inhibit viral replication in vitro, and can, therefore, be considered a surrogate for vaccine effectiveness";[91] (2) "In agreement with CBER/FDA, the mumps-specific PRN assay was developed and used as a surrogate for vaccine effectiveness";[92] and (3) "Study results showed that M-M-R™II with a candidate mumps end-expiry potency of 4.1 $\log_{10}$ $TCID_{50}$/dose induced acceptable levels of mumps-specific antibodies by PRN assay."[93]

Following Merck's submission of the sBLA, Merck made several additional submissions to CBER that relied on the Protocol 007 data. These were submitted in response to specific CBER questions concerning the clinical relevance of the Protocol 007 data. In particular, on July 27, 2004, CBER requested further assurances that "the cutoff employed in the ELISA for seropositivity should be supported by data demonstrating some relevance with protective levels of antibody (e.g., neutralizing antibody)."[94] Merck responded on November 17, 2004 by referring back to the AIGENT/WT ELISA correlation it provided in Serial 86, which it characterized as "provid[ing] information on the clinical relevance of the chosen ELISA cutoff for seropositivity."[95]

---

[91] MRK-CHA00000032, at '111-112. *See also* MRK-CHA00000315, at '321 (Merck responding to CBER questions seeking additional support for sBLA: "The purpose and underlying of this [sBLA] file is to provide clinical data supporting a reduction in expiry potency of the mumps component of M-M-R®II. This clinical data provides evidence that a mumps end expiry potency of 4.1 log10 TCID50 dose in M-M-R®II at the end of its shelf life is not statistically different to that of the product at release [based on Mumps Plaque Reduction Neutralization (PRN) assay used as a surrogate marker for vaccine efficacy].") (brackets in original); MRK-CHA00030994, at '994 (CBER's Steve Rubin characterizing AIGENT as an assay "for measuring vaccine immunogenicity as a surrogate for efficacy in a clinical trial"). Merck likewise represented to the public that Protocol 007 was a surrogate for clinical efficacy through the poster presentation on Protocol 007 it gave at a October 2, 2004 meeting of the Infectious Diseases Society of America. MRK-CHA00337141, at '144 ("Antibody response measured by mumps-virus specific plaque reduction neutralization (PRN) assay was used as a surrogate of vaccine efficacy.").

[92] MRK-CHA00000032, at '116.

[93] MRK-CHA00000032, at '118. *See also* at '122 ("M-M-R™II with a mumps end-expiry potency of 4.1 $\log_{10}$ $TCID_{50}$/dose . . . [i]s highly immunogenic and induces acceptable mumps specific antibody responses by PRN.").

[94] MRK-CHA00126963, at '970.

[95] MRK-CHA00126963, at '963, 967. Merck made an identical submission on November 12, 2004 in response to CBER's request for similar assurances in connection with Merck's license application for ProQuad. MRK-CHA00846405, at '409, 414 (stating Serial 86 provides "information on the clinical relevance of the chosen ELISA cutoff for seropositivity").

*Contains Highly Confidential AEO Materials*

**Appx496**

Merck again relied on Serial 86 in responding to CBER's questioning on the clinical relevance of the WT ELISA assay it performed.  On December 3, 2004, CBER notified Merck of its finding that the sBLA was insufficient, finding "that the information and data submitted are inadequate for final approval at this time."[96]  As part of its response to CBER's request for additional justification for the WT ELISA data Merck submitted in Protocol 007, Merck again pointed to Serial 86 to support the clinical relevance of the 10Ab serostatus cutoff:

> CBER requested the mumps ELISA seropositive cutoff be justified via use of known mumps neutralizing and non-neutralizing sera.  Merck submitted these data (June 2002, serial # 86) and believes that they provide helpful supportive information on the clinical relevance of the chosen ELISA cutoff for seropositivity.[97]

Merck again relied on Serial 86 in response to CBER's initial rejection of the AIGENT results.  On October 17, 2005, CBER found the AIGENT data Merck submitted in support of the sBLA were "inadequate to support the label change."[98]  Merck responded by pointing to Serial 86 and what it characterized as the "strong correlation (93.6%) between ELISA and PRN serology results."[99]  From this Merck argued that the ELISA results were sufficient to support the sBLA despite the deficiencies CBER found with the AIGENT results.[100]

---

[96]  MRK-CHA00000315, at '356.

[97]  MRK-CHA00000315, at '331.

[98]  MRK-CHA00560257, at '257.  Included among the deficiencies CBER identified were: (1) "A substantial amount of sample data was excluded from the analyses [only 437 out of 672 subjects were included] . . . preclud[ing] a conclusion of success;" and (2) "The control lot failed the acceptability criteria."  CBER recommended that if Merck wanted to pursue the sBLA it "support the proposed label change by correlating these study data and/or other relevant mumps vaccine immunogenicity data with the immunogenicity data from the original efficacy studies."   CBER further stated that Merck "could also consider shortening the [mumps] end-expiry dating period based upon these data."  MRK-CHA00560257, at '257-258.

[99]  MRK-CHA00000393, at '400.  Notably, in citing to Serial 86, Merck appears to misstate to CBER what the actual agreement between the two assays was.  Merck cites a 93.6% correlation rate when Serial 86 provides a 90.4% overall agreement rate and a 93.4% overall agreement rate for seroconversion.  *See* MRK-CHA00761628, at '672.

[100]  MRK-CHA00000393, at '404 ("The observed mumps ELISA results (SCR 98.0%) and the strong correlation between ELISA and PRN assay provide indirect evidence about the likely outcome for the missing data in the 4.8 $\log_{10}$ $TCID_{50}$ mumps potency group.").

*Contains Highly Confidential AEO Materials*

### E.    FDA's Approval of Merck's Supplemental Biologics License Application

On May 18, 2007, CBER issued its final rejection of the AIGENT data Merck submitted

in support of the sBLA:

> Our review finds that the information and data submitted are inadequate for final
> approval at this time.  We cannot accept use of multiple imputation analyses of
> the PRN data to support the lowering of mumps vaccine end-expiry potency.
> However, the science related to immunogenicity testing of M-M-R®II has
> substantially evolved since our initial testing requirements.  Use of ELISA data to
> evaluate the effect of differences in product potency on immunogenicity is now
> acceptable.[101]

CBER stated that Merck's sBLA to the lower the mumps end-expiry potency for M-M-R II

could be supported by two analyses:

### 1.    Product consistency

> We request a demonstration of consistency between Sublot 3 (4.8 $\log_{10}$ $TCID_{50}$
> mumps potency) in the present study [Protocol 007] and two other lots used in
> previous MMR studies, e.g., Protocols 010-012, with mumps potency of at least
> 4.8 $\log_{10}$.
>
> . . .

### 2.    Non-inferiority

> If consistency among the three lots is demonstrated as described above, the
> ELISA results of the three lots are pooled to form a control group (C).  Non
> inferiority of Sublot 2 (4.1 $\log_{10}$ $TCID_{50}$ mumps potency) from this supplement
> will be demonstrated by comparing ELISA results of this sublot (T) with ELISA
> results of the pooled control group which has at least 4.8 $\log_{10}$ mumps potency.[102]

On June 5, 2007, Merck amended this end-expiry sBLA by providing additional

information in support of the consistency and non-inferiority tests CBER outlined above: "These

responses include the statistical analysis requested by CBER for product consistency and non-

inferiority based on the ELISA assay and support the change in mumps end expiry potency to

12,500 $TCID_{50}$."[103]  The data Merck used for the product consistency statistical analysis were the

Protocol 007 WT ELISA results from the 4.8 $\log_{10}$ control lot, the Protocol 009 WT ELISA

---

[101]  MRK-CHA00000368, at '372.

[102]  MRK-CHA00000368, at '372-373.

[103]  MRK-CHA00000368, at '368.

*Contains Highly Confidential AEO Materials*

**Appx498**

results from the subjects vaccinated with M-M-R II without rHA (discussed below), and the Protocol 012 WT ELISA results from the subjects vaccinated with M-M-R II (discussed below). The data Merck used for the non-inferiority statistical analysis were a pool of these three consistency lots which were compared to the Protocol 007 WT ELISA results from the 4.1 $\log_{10}$ testing lot.

On July 20, 2007 CBER requested additional follow up on Merck's sBLA amendment, including the underlying WT ELISA data (from Protocols 007, 009 and 012) supporting the submission.[104]  On August 8, 2007, Merck responded to CBER's request, providing the "XPT file for each study [and] a document describing the contents of the data set."[105]  These were "the same files that were submitted with the original filings of these [Protocol 007, 009, and 012] studies."[106]  For Protocol 007, this included "a description of the immunogenicity analysis data set," and "prevaccination and postvaccination serology results."[107]

On December 6, 2007, CBER approved Merck's sBLA to "include a change in the labeled potency of the mumps component from no less than 20,000 $TCID_{50}$ to no less than 12,500 $TCID_{50}$ per dose at end of expiry."[108]

### F.      FDA's Approval of ProQuad

CBER allowed Merck to conduct a non-inferiority study (compared to M-M-R II) to support its ProQuad Biological License Application (BLA) because in CBER's view "MMRV is essentially composed of licensed products and the efficacy of those products has already been demonstrated."[109]  CBER also accepted Merck's proposal that for its ProQuad BLA, "assays other than virus neutralization, such as the proposed [WT] ELISA, can be used to measure

---

[104]  MRK-CHA00000140, at '145.

[105]  MRK-CHA00000140, at '186.

[106]  MRK-CHA00000140, at '186.

[107]  MRK-CHA00000140, at '161.

[108]  MRK-CHA01519087, at '088.

[109]  MRK-CHA00846451, at '451.

*Contains Highly Confidential AEO Materials*

**Appx499**

mumps virus immunogenicity for this study."[110]  However, as it did with Protocol 007, CBER requested that the serostatus "cutoff employed in the ELISA for seropositivity should be supported by data demonstrating some relevance with protective levels of antibody (e.g., neutralizing antibody)."[111]

On August 27, 2004, Merck submitted its BLA for ProQuad.[112]  In support of its application, Merck submitted the results of five clinical trials (Protocols 009, 011, 012, 013 and 014) "designed to show that ProQuad™ could provide the same level of protection to the same intended population as M-M-R™II and VARIVAX™."[113]  Merck represented that the results of these trials (1) "confirm that ProQuad™ is generally well tolerated and highly immunogenic," and (2) "confirm that ProQuad™ is similar (non-inferior) to M-M-R™II and VARIVAX™ given concomitantly . . . with respect to immunogenicity and safety [and] suggest that ProQuad™ can be used in place of M-M-R™II and VARIVAX™ to prevent measles, mumps, rubella, and varicella."[114]

In relying on these immunogenicity tests, Merck had previously sought and obtained CBER's agreement that for Merck's ProQuad BLA, "[e]valuation of immunogenicity using validated assays could be used as a surrogate measure for efficacy."[115]  For three of the studies (012, 013 and 014), Merck relied on the WT ELISA Merck developed for Protocol 007 using the low-passage Jeryl Lynn mumps vaccine strain and 10Ab serostatus cutoff.[116]  Merck represented these test results could be used as a correlate of protection against mumps:

> Merck [] has assessed the correlation between neutralizing antibody (as measured in a plaque reduction neutralization [PRN] assay) and a wild-type enzyme-linked immunosorbent assay (ELISA) [].  The overall agreement rate was 93.6% [].

---

[110]  MRK-CHA00846451, at '451.

[111]  MRK-CHA00846451, at '451.

[112]  MRK-CHA00157572.

[113]  MRK-CHA00158126, at '137.

[114]  MRK-CHA00158126, at '156, '158.

[115]  MRK-CHA00158126, at '135.  *See also* MRK-CHA00821967, at '969 ("we're banking on immunogenicity data to serve as surrogate markers for efficacy").

[116]  MRK-CHA00158320, at '371; MRK-CHA00158126, at '138.

*Contains Highly Confidential AEO Materials*

**Appx500**