23-2553

IN THE

# United States Court of Appeals

FOR THE THIRD CIRCUIT



UNITED STATES OF AMERICA EX REL.,
STEPHEN A. KRAHLING; JOAN A. WLOCHOWSKI,

*against*

MERCK & CO, INC.,

STEPHEN A. KRAHLING; JOAN A. WLOCHOWSKI,

*Appellants.*

On Appeal from the United States District Court
for the Eastern of District of Pennsylvania
The Honorable Chad F. Kenney, Case No. 2:10-04374-CFK

## JOINT APPENDIX
## VOLUME VI OF XLV
### Pages Appx1501 to Appx2000
### (Filed Under Seal)

VENABLE LLP
750 East Pratt Street, Suite 900
Baltimore, Maryland 21202
410-244-7400

MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, Pennsylvania 19103
215-963-5000

HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
202-637-5600

*Attorneys for Defendant-Appellee*

CONSTANTINE CANNON LLP
355 Madison Avenue, 9th Floor
New York, New York 10017
212-350-2700

KELLER GROVER, LLP
1965 Market Street
San Francisco, California 94103
415-543-1305

*Attorneys for Relators-Appellants*



# Table of Contents

**Page**

**Volume III**
**(Filed Under Seal)**

Order of the Honorable Lynne A. Sitarski, dated May 16, 2019
(Doc. 250) ................................................................. Appx181

Statement of Material Facts by Defendant in Support of
Its First Dispositive Motion, dated October 25, 2019
(Doc. 281-3) ............................................................. Appx185

Statement of Material Facts by Defendant in Support of
Its Fourth Dispositive Motion, dated October 25, 2019
(Doc. 287-3) ............................................................. Appx247

Statement of Material Facts by Relators,
dated October 25, 2019 (Doc. 294) .......................... Appx295

Declaration of Gary Reilly, for Relators,
in Support of Motion, dated October 25, 2019 (Doc. 24) ......... Appx396

Exhibit 1 to Reilly Declaration -
Expert Report of Eugene Shapiro, M.D.,
dated March 13, 2018. ........................................... Appx438

Exhibit 2 to Reilly Declaration -
Expert Report of Dr. Robert Malone, M.D.,
dated March 13, 2018 ............................................ Appx460
*(Cont'd in Vol IV)*

**Volume IV**
**(Filed Under Seal)**

Exhibit 3 to Reilly Declaration -
Expert Report of David A. Kessler, M.D.,
dated March 14, 2018, with Schedules
and Appendices ...................................................... Appx551
*(Cont'd in Vol V)*

**Table of Contents**
**(Continued)**

**Volume V**
**(Filed Under Seal)**

Exhibit 4 to Reilly Declaration -
Deposition Testimony of David Kessler, M.D.,
taken September 28, 2018 ........................................................ Appx1483
*(Cont'd in Vol VI)*

**Volume VI**
**(Filed Under Seal)**

Exhibit 5 to Reilly Declaration -
Expert Report of D. Bruce Burlington, M.D.,
dated June 19, 2018 ............................................................... Appx1588

Exhibit 6 to Reilly Declaration -
Deposition Testimony of D. Bruce Burlington, M.D.,
taken December 13, 2018 ....................................................... Appx1637

Exhibit 7 to Reilly Declaration -
Deposition Testimony of Mark Pallansch, M.D.,
taken October 13, 2017 ........................................................... Appx1715

Exhibit 8 to Reilly Declaration -
Deposition Testimony of Eugene Shapiro, M.D.
taken November 7, 2018 ......................................................... Appx1765

Exhibit 9 to Reilly Declaration -
Deposition Testimony of Alison L. Fisher, Ph.D.,
taken November 1, 2016 .......................................................... Appx1822

Exhibit 10 to Reilly Declaration -
Expert Report of Ann M. Arvin, M.D.,
dated June 11, 2018 ............................................................... Appx1910

Exhibit 11 to Reilly Declaration -
Letter from Dr. Robert Redfield, Director, CDC,
dated May 24, 2018 ............................................................... Appx1945

**Table of Contents**
**(Continued)**

**Page**

Exhibit 12 to Reilly Declaration -
Letter from Dr. Anne Schuchat, Principal Deputy
Director, CDC, dated September 26, 2017 ........................... Appx1950

Exhibit 13 to Reilly Declaration -
Statement of Dr. Jesse Goodman, FDA,
dated April 18, 2007 ............................................................ Appx1956

Exhibit 14 to Reilly Declaration -
Letter from Merck to Jacqueline Little, Ph.D.,
dated March 23, 2006 (MRK-CHA00214088-148) ............... Appx1960
*(Cont'd in Vol VII)*

**Volume VII**
**(Filed Under Seal)**

Exhibit 15 to Reilly Declaration -
Deposition Testimony of Jonathan L. Temte, M.D., Ph.D.,
taken August 17, 2018 .......................................................... Appx2010

Exhibit 16 to Reilly Declaration -
Expert Report of Peter H. Calcott, B.Sc. (Hons.), D.Phil.,
dated March 12, 2018 ........................................................... Appx2061

Exhibit 17 to Reilly Declaration -
Deposition Testimony of Joye L. Bramble, Ph.D.,
taken January 6, 2017 ........................................................... Appx2141

Exhibit 18 to Reilly Declaration -
FDA Warning Letter, dated February 9, 2001
(MRK-CHA00209399-409) ................................................... Appx2220

Exhibit 19 to Reilly Declaration -
Excerpts from Defendant Merck's Answer to
Amended Complaint (ECF No. 62) ....................................... Appx2232

**Table of Contents**
**(Continued)**

Exhibit 20 to Reilly Declaration -
Excerpts from Defendant Merck's Responses and
Objections to Relator's Third Set of Requests for Admission,
dated August 16, 2017 ............................................................ Appx2239

Exhibit 21 to Reilly Declaration -
ProQuadTM (Measles, Mumps, Rubella and Varicella
[Oka/Merck] Virus Vaccine Live)-Original Application
(MRK-CHA00158126-79) ....................................................... Appx2293

Exhibit 22 to Reilly Declaration -
Expert Report of William L. Atkinson, M.D., MPH,
dated June 12, 2018 ................................................................. Appx2348

Exhibit 23 to Reilly Declaration -
Deposition Testimony of Jonathan Hartzel, Ph.D.,
taken June 23, 2017 ................................................................. Appx2380

Exhibit 24 to Reilly Declaration -
Expert Report of Anna Durbin, M.D, dated June 14, 2018 ... Appx2476
*(Cont'd in Vol VIII)*

**Volume VIII**
**(Filed Under Seal)**

Exhibit 25 to Reilly Declaration -
Expert Report of Marcela Pasetti, Ph.D.,
dated June 14, 2018 ................................................................. Appx2511

Exhibit 26 to Reilly Declaration -
Excerpts of Presentation, Principles of Vaccinology,
produced as "Principles of Vaccination.ppt"
(MRK-CHA01339555) ............................................................ Appx2534

Exhibit 27 to Reilly Declaration -
Deposition Testimony of Mary K. Yagodich,
taken August 18, 2016 ............................................................ Appx2538

# Table of Contents
## (Continued)

**Page**

Exhibit 28 to Reilly Declaration -
GlaxoSmithKline Application for Priorix
(GSK-MMR-IND-0019450-76) ............................................. Appx2631

Exhibit 29 to Reilly Declaration -
Deposition Testimony of Marcela Pasetti, Ph.D.,
taken December 4, 2018 ........................................................ Appx2659

Exhibit 30 to Reilly Declaration -
Deposition Testimony of Anna P. Durbin, M.D.,
taken October 8, 2018 ........................................................... Appx2699

Exhibit 31 to Reilly Declaration -
Excerpts from Rationale for the M-M-R®II End Expiry
Clinical Studies Presentation (MRK-CHA01893680-730) ... Appx2788

Exhibit 32 to Reilly Declaration -
Letter to the Editor "Comparability of M-M-R™II and
Priorix" from Scott Thaler, M.D., *et al.*, *The Pediatric
Infectious Disease Journal*, September 1999:18(9)
(MRK-CHA00088592-3) ...................................................... Appx2836

Exhibit 33 to Reilly Declaration -
Phase V Clinical Development Plan for M-M-R®II
(MRK-CHA00667054-122) ................................................... Appx2839

Exhibit 34 to Reilly Declaration -
Fax from Yolanda Stewart to Donna Boyce,
dated April 25, 2012 (GSK-MMR-IND-0029256-63) ........... Appx2909

Exhibit 35 to Reilly Declaration -
Letter from Karen L. Goldenthal, M.D. to Angus Grant, Ph.D.,
dated September 2, 1997 (GSK-MMR-IND-0000004-7) ...... Appx2918

Exhibit 36 to Reilly Declaration -
Email from Katalin G. Abraham to Keith D. Chirgwin, M.D.,
dated October 5, 1998 (MRK-CHA00095142) ..................... Appx2923

**Table of Contents**
**(Continued)**

Exhibit 37 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449029-40) ........................ Appx2925

Exhibit 38 to Reilly Declaration -
Deposition Testimony of Mark Stannard,
taken December 13, 2016 ....................................................... Appx2938
*(Cont'd in Vol IX)*

**Volume IX**
**(Filed Under Seal)**

Exhibit 39 to Reilly Declaration -
Deposition Testimony of Luwy Musey, M.D.,
taken October 7, 2016 ........................................................... Appx3023

Exhibit 40 to Reilly Declaration -
Deposition Testimony of Ann M. Arvin, M.D.,
taken November 12, 2018 ...................................................... Appx3129

Exhibit 41 to Reilly Declaration -
Deposition Testimony of William Nichols,
taken October 25, 2018 ......................................................... Appx3213

Exhibit 42 to Reilly Declaration -
Proposed New Stabilizer for M-M-R®II,
dated July 26, 2022 (MRK-CHA00207690-7735) ................ Appx3249

Exhibit 43 to Reilly Declaration -
M-M-R®II Mumps End Expiry Study: AIGENT Assay Issues
Impact on Study Criteria Regulatory Implications,
dated October 11, 2002 (MRK-CHA00094161-82) .............. Appx3296

Exhibit 44 to Reilly Declaration -
Memo re: Historical Review and Confirmation of Mumps
Virus Potency Formulation Targets in M-M-R®II,
dated April 8, 2011 (MRK-CHA01456760) .......................... Appx3319

**Table of Contents**
**(Continued)**

Exhibit 45 to Reilly Declaration -
Presentation, M-M-R II Mumps End Expiry Trial, produced as
"CDOC presentation November 15-00-draft.ppt"
(MRK-CHA00020396) ........................................................ Appx3321

Exhibit 46 to Reilly Declaration -
Memo re: Stability of Mumps Component in Merck's Live
Virus Vaccines, dated October 5, 2000
(MRK-CHA00587859-62) ................................................... Appx3419

Exhibit 47 to Reilly Declaration -
Memo re: Stability of Measles, Mumps, and
Rubella Components in Merck's Live Virus Vaccines,
dated October 17, 2000 (MRK-CHA00549487-94) .............. Appx3424

Exhibit 48 to Reilly Declaration -
Email from Katalin G. Abraham to Bonita M. Stankunas,
dated October 5, 2000 (MRK-CHA00284623-9) .................. Appx3433

Exhibit 49 to Reilly Declaration -
Deposition Testimony of Philip S. Bennett,
taken May 24, 2017 ............................................................. Appx3441

**Volume X**
**(Filed Under Seal)**

Exhibit 50 to Reilly Declaration -
Email from Keiko Simon, dated October 2, 2002
(MRK-CHA00615147-74) ................................................... Appx3501

Exhibit 51 to Reilly Declaration -
Internal Strategy Document regarding M-M-R®II
Regulatory Compliance (MRK-CHA00019225-45) .............. Appx3530

Exhibit 52 to Reilly Declaration -
"Genetic Heterogeneity of Mumps Strains: Potential
Implications in Comparative Neutralization Studies" CBER
Background Information, dated November 1999
(MRK-CHA00020635-42) ................................................... Appx3552

**Table of Contents**
**(Continued)**

Exhibit 53 to Reilly Declaration -
Draft memo, produced as "Outstanding-
issuesMMRV&MMRII.doc"
(MRK-CHA00198876-91) ..................................................... Appx3561

Exhibit 54 to Reilly Declaration -
Memo re: Mumps neutralization meeting minutes,
dated September 16, 1999 (MRK-CHA00020425-7) ............ Appx3578

Exhibit 55 to Reilly Declaration -
Email from Katalin G. Abraham to Keith D. Chirgwin,
dated February 25, 2000 (MRK-CHA00095143) .................. Appx3582

Exhibit 56 to Reilly Declaration -
Memo re: Team Biologics Close Out – Form FDA 483,
dated October 11, 2000 (MRK-CHA00071265-71) .............. Appx3584

Exhibit 57 to Reilly Declaration -
Email from Dorothy Margolskee, M.D., to
Florian Schodel, M.D., with attachments,
dated February 26, 2001
(MRK-CHA00549510-35) ..................................................... Appx3592

Exhibit 58 to Reilly Declaration -
Email from Joseph F. Heyse with attachments,
dated March 5, 2001
(MRK-CHA00616007-12) ..................................................... Appx3627

Exhibit 59 to Reilly Declaration -
Response to FDA 483 Observation 3
(MRK-CHA00086295-7) ....................................................... Appx3634

Exhibit 60 to Reilly Declaration -
Draft Response to FDA 483 Observation 3
(MRK-CHA00086298-317) ................................................... Appx3638

Exhibit 61 to Reilly Declaration -
Draft Response to FDA 483 Observation 3
(MRK-CHA00562230-41) ..................................................... Appx3659

# Table of Contents
## (Continued)

**Page**

Exhibit 62 to Reilly Declaration -
Draft Response to FDA 483 Observation 3
(MRK-CHA01440844-64) ..................................................... Appx3672

Exhibit 63 to Reilly Declaration -
Letter from Robert L. McKee, Ph.D. to Steven A. Masiello,
dated March 8, 2001 (MRK-CHA01537603-11) ................... Appx3694

Exhibit 64 to Reilly Declaration -
Deposition Testimony of Dorothy Margolskee, M.D.,
taken April 21, 2017 ............................................................... Appx3704

Exhibit 65 to Reilly Declaration -
Excerpts from Label Claim Compliance M-M-R®II
Peer Review Meeting, dated July 15, 2002
(MRK-CHA00322038-65) ..................................................... Appx3796

Exhibit 66 to Reilly Declaration -
Memo re: Executive Summary-CBER/Merck Meeting
April 4, 2001, dated April 8, 2001
(MRK-CHA01649955-6) ........................................................ Appx3819

Exhibit 67 to Reilly Declaration -
Memo re: Minutes, Meeting with CBER on 4/4/01
Regarding Mumps Stability, dated April 9, 2001
(MRK-CHA00754687-91) ...................................................... Appx3822

Exhibit 68 to Reilly Declaration -
Email from Christopher J. Petroski to Keith D. Chirgwin,
dated January 21, 2002 (MRK-CHA00561350-5) ................. Appx3828

Exhibit 69 to Reilly Declaration -
Presentation, M-M-R®II Mumps Expiry Mumps Potency
Claim in Label (MRK-CHA00334863-8) .............................. Appx3835

Exhibit 70 to Reilly Declaration -
Presentation, Mumps Expiry- Label Claim, produced as
"RMC mumps expiry update.ppt" (MRK-CHA00086318) ... Appx3842

# **Table of Contents**
## (Continued)

Exhibit 71 to Reilly Declaration -
Memo re: M-M-R®II: Mumps End Expiry label change –
filing strategy, dated August 2, 2001
(MRK-CHA00247149-52) ...................................................... Appx3846

Exhibit 72 to Reilly Declaration -
Email from Keith D. Chirgwin to Manal A. Morsy with
attachment, dated January 22, 2002
(MRK-CHA00019084-5) ...................................................... Appx3851

Exhibit 73 to Reilly Declaration -
Email from Cynthia F. Morrisey, dated September 5, 2002
(MRK-CHA01562819-20) ...................................................... Appx3873

Exhibit 74 to Reilly Declaration -
Email from Roberta L. McKee, Ph.D.,
dated October 31, 2002 (MRK-CHA00094134-5) ................ Appx3876

Exhibit 75 to Reilly Declaration -
Memo, Mumps and Rubella Formulation and Potency Assay
Format Changes to Support Potency through Twenty-four
Month Expiry (MRK-CHA01894982-98) ............................. Appx3879

Exhibit 76 to Reilly Declaration -
Email from Mark S. Galinski to Keiko Simon,
dated August 23, 2004 (MRK-CHA01564065-8) .................. Appx3897

Exhibit 77 to Reilly Declaration -
Email from Alison L. Fisher with attachments,
dated September 20, 2004
(MRK-CHA01574732-8) ...................................................... Appx3902

Exhibit 78 to Reilly Declaration -
Presentation, Accomplishments to Date,
produced as "accomplishments to 5-17-01.ppt"
(MRK-CHA00724288) ......................................................... Appx3910

**Table of Contents**
**(Continued)**

Exhibit 79 to Reilly Declaration -
Draft letter from Roberta L. McKee, Ph.D., to
Michael Angelo, with metadata date of October 17, 2002
(MRK-CHA01649892-3) ...................................................... Appx3917

Exhibit 80 to Reilly Declaration -
Email from Manal Morsy to Keith D. Chirgwin,
dated November 4, 2002 (MRK-CHA00501762-5) .............. Appx3920

Exhibit 81 to Reilly Declaration -
Memo re: Preparations for the Mumps Stability-CBER
discussion, dated March 19, 2001
(MRK-CHA00019430-2) ...................................................... Appx3925

Exhibit 82 to Reilly Declaration -
Email from Philip S. Bennett to Joseph M. Antonello,
dated September 5, 2002 (MRK-CHA00780325-6) .............. Appx3929

Exhibit 83 to Reilly Declaration -
Memo re: Mumps End Expiry study issues,
with Attachment (MRK-CHA00019246-67) ......................... Appx3932

Exhibit 84 to Reilly Declaration -
Draft Presentation, M-M-R II to October 8, 2002 CRRC,
produced as "Draft#1-CRRC 10-08-02 slides.ppt"
(SCHOFIELD_00000201) ..................................................... Appx3955

Exhibit 85 to Reilly Declaration -
Presentation, M-M-R II to October 8, 2002 CRRC,
produced as "CRRC-10-08-02 slides.ppt"
(MRK-CHA00027726) ......................................................... Appx3991
*(Cont'd in Vol XI)*

**Volume XI**
**(Filed Under Seal)**

Exhibit 86 to Reilly Declaration -
Email from Philip S. Bennett with attachment,
dated March 14, 2001 (MRK-CHA00562218-9) ................... Appx4021

**Table of Contents**
**(Continued)**

Exhibit 87 to Reilly Declaration -
Meeting Agenda, dated March 7, 2002
(MRK-CHA00205854-60) ...................................................... Appx4024

Exhibit 88 to Reilly Declaration -
Email from Manal Morsy, M.D., Ph.D. to Deitra E. Arena,
dated March 27, 2002 (MRK-CHA00064005-12) ................. Appx4032

Exhibit 89 to Reilly Declaration -
Email from Manal Morsy, M.D., Ph.D. to David Krah, M.D.,
dated April 10, 2002 (MRK-CHA00561310-2) ..................... Appx4041

Exhibit 90 to Reilly Declaration -
Spreadsheet for June 10, 2003 Vaccine Assay Committee
meeting (MRK-CHA00440797-811) ...................................... Appx4045

Exhibit 91 to Reilly Declaration -
Minutes of CBER Teleconference, dated December 7, 2001
(MRK-CHA00019434-7) ...................................................... Appx4061

Exhibit 92 to Reilly Declaration -
Draft Summary of Teleconference Notes
(MRK-CHA00024596-9) ...................................................... Appx4066

Exhibit 93 to Reilly Declaration -
Memo re: CBER teleconference (December 7, 2001): Mumps
Inspection results and discussion, dated December 13, 2001
(MRK-CHA00071082-9) ...................................................... Appx4071

Exhibit 94 to Reilly Declaration -
Memo re: Consultation with Dr. William Fairweather
on Vaccine Stability, dated December 14, 2000
(MRK-CHA00590949-58) ..................................................... Appx4080

Exhibit 95 to Reilly Declaration -
Excerpts from Proposed New Stabilizer for M-M-R®II,
dated August 2002 (MRK-CHA01591461-87) ...................... Appx4091

# Table of Contents
## (Continued)

Exhibit 96 to Reilly Declaration -
Email from Manal Morsy, M.D., Ph.D. to Joye L. Bramble,
dated June 11, 2002 (MRK-CHA00494158-61) .................... Appx4117

Exhibit 97 to Reilly Declaration -
M-M-R®11 Defense Action Plan, dated June 1999
(MRK-CHA00285276-96) ..................................................... Appx4122

Exhibit 98 to Reilly Declaration -
Memo re: Statement of Interest for ProQuad™ Measles,
mumps, rubella, and varicella virus vaccine live, dated
November 10, 2000 (MRK-CHA00325472-91) .................... Appx4144

Exhibit 99 to Reilly Declaration -
Memo re: Statement of Interest for ProQuad™ Measles,
mumps, rubella, and varicella virus vaccine live,
dated November 10, 2000 (MRK-CHA00671410-28) .......... Appx4165

Exhibit 100 to Reilly Declaration -
Memo re: Minimum Expiry Specification Limit for Mumps
Potency in M-M-R®II, dated July 5, 2001
(MRK-CHA01896349) .......................................................... Appx4185

Exhibit 101 to Reilly Declaration -
Excerpts from Clinical and Regulatory Review Committee
Development Projects, dated October 29, 2002
(MRK-CHA01725276-364) ................................................... Appx4187

Exhibit 102 to Reilly Declaration -
Presentation, MMRII Mumps End Expiry study status &
Regulatory implications, produced as "slides for
GRSRC_MumpsEndExpiry -10-11-02.ppt"
(MRK-CHA00040705) .......................................................... Appx4197

Exhibit 103 to Reilly Declaration -
Presentation, MMRII Mumps End Expiry study status &
Regulatory implications, produced as
"slides for GRSRC -10-11-02.ppt"
(MRK-CHA00094159) .......................................................... Appx4227

**Table of Contents**
(Continued)

Exhibit 104 to Reilly Declaration -
Email from Joseph F. Heyse to Keith D. Chirgwin,
dated September 30, 2002 (MRK-CHA01582137-9) ............ Appx4256

Exhibit 105 to Reilly Declaration -
MRL Clinical Study Report, Multicenter Study: A Study of
M-M-R II at Mumps Expiry Potency in Healthy Children 12
to 18 Months of Age (Protocol 007)
(MRK-CHA00224982-26529) ............................................... Appx4260

Exhibit 106 to Reilly Declaration -
Email from Dorothy Margolskee to Keith D. Chirgwin,
dated March 8, 1998 (MRK-CHA00095320-1) ..................... Appx4419

Exhibit 107 to Reilly Declaration -
Slide Deck from M-M-R™ Expiry Investigators Meeting,
dated March 15-16, 1999 (MRK-CHA00017605-12) ........... Appx4422

Exhibit 108 to Reilly Declaration -
Excerpts from Merck Submission to the Department of Justice,
dated April 9, 2012 (MRK-CHA0002549-75) ....................... Appx4431

Exhibit 109 to Reilly Declaration -
Letter from Karen L. Goldethal, M.D. to
Keith Chirgwin, M.D., dated September 8, 1998
(MRK-CHA00001467-9) ...................................................... Appx4459

Exhibit 110 to Reilly Declaration -
Memo re: BB-IND 1016: Summary of discussion with
Dr. Kathryn Carbone and Ms. Luba Vujcic (CBER) regarding
the Mumps neutralization assay, dated February 8, 2000
(MRK-CHA00001255-7) ...................................................... Appx4463

Exhibit 111 to Reilly Declaration -
Memo re: Communication with Dr. Kathryn Carbone (CBER)
on April 12, 200 regarding CBER's meeting (face to face-
March 13, 2000) minutes and the mumps neutralization
and ELISA assays, dated April 12, 2000
(MRK-CHA01927351-5) ...................................................... Appx4467

# Table of Contents
## (Continued)

Exhibit 112 to Reilly Declaration -
Response to FDA Request for Information,
dated November 17, 2004 (MRK-CHA00126963-71) .......... Appx4473

Exhibit 113 to Reilly Declaration -
Summary of Findings of Inspection, dated August 6, 2001
(MRK-CHA02021754-61) ..................................................... Appx4483

Exhibit 114 to Reilly Declaration -
Meeting Minutes, dated March 14, 2000
(MRK-CHA00001258-61) ..................................................... Appx4492

Exhibit 115 to Reilly Declaration -
Deposition Testimony of Emilio Emini, Ph.D.,
taken June 6, 2017 ................................................................. Appx4497
*(Cont'd in Vol XII)*

## Volume XII
## (Filed Under Seal)

Exhibit 116 to Reilly Declaration -
Deposition Testimony of Florian Schodel, M.D.,
taken December 22, 2016  ................................................... Appx4592

Exhibit 117 to Reilly Declaration -
Email from Manal Morsy, dated September 13, 2002
(MRK-CHA01386177-82) ..................................................... Appx4700

Exhibit 118 to Reilly Declaration -
Email from Keiko Simon with attachments,
dated October 27, 2003
(MRK-CHA00279197-247) ................................................... Appx4707

Exhibit 119 to Reilly Declaration -
Slide Deck from M-M-R™ Expiry Investigators Meeting,
dated March 15-16, 1999 (MRK-CHA01888826-913) ......... Appx4759

**Table of Contents**
**(Continued)**

Exhibit 120 to Reilly Declaration -
Email from Deitra E. Arena with attachments,
dated June 16, 2000
(MRK-CHA00026466-89) ..................................................... Appx4848

Exhibit 121 to Reilly Declaration -
Email from Manal Morsy to Henrietta Ukwu,
dated October 10, 1999 (MRK-CHA01898773-6) ................ Appx4874

Exhibit 122 to Reilly Declaration -
Deposition Testimony of David Krah, M.D.,
taken July 11-12, 2017 ........................................................... Appx4879
*(Cont'd in Vol XIII)*

**Volume XIII**
**(Filed Under Seal)**

Exhibit 123 to Reilly Declaration -
Mumps Neutralization Assay Development
(MRK-CHA00336905-18) ..................................................... Appx5076

Exhibit 124 to Reilly Declaration -
Minutes of CAS Meeting, dated June 20, 2000
(MRK-CHA00209674-8) ....................................................... Appx5091

Exhibit 125 to Reilly Declaration -
Email from Ted L. Staub to George Williams,
dated February 20, 1998 (MRK-CHA00625629-30) ............. Appx5097

Exhibit 126 to Reilly Declaration -
Minutes of Mumps Neutralization Assay Meeting,
dated September 29, 1999 (MRK-CHA00020428-9) ............ Appx5100

Exhibit 127 to Reilly Declaration -
Presentation, MMR II End Expiry Trial,
produced as "MMRII-Neut-fnQPAslides9-27-99.ppt"
(MRK-CHA00025315) ........................................................... Appx5103

# Table of Contents
## (Continued)

Exhibit 128 to Reilly Declaration -
Draft Summary of 8/17/99 meeting by M. Morsy
(MRK-CHA00198869-70) .......................................................Appx5111

Exhibit 129 to Reilly Declaration -
Memo re: Options and proposed path forward for the
Mumps Expiry Trial (MRK-CHA00086292-3) ..................... Appx5114

Exhibit 130 to Reilly Declaration -
Email from Florian P. Schodel to Colleen A. Forsythe,
dated July 7, 1997 (MRK-CHA01648951-6) ........................ Appx5117

Exhibit 131 to Reilly Declaration -
Memo re: Monthly report for August, 2000,
dated August 23, 2000 (MRK-CHA00016632-5) .................. Appx5124

Exhibit 132 to Reilly Declaration -
Virus & Cell Biology Research Procedure
(MRK-CHA00002189-98) .................................................... Appx5129

Exhibit 133 to Reilly Declaration -
Letter from Karen L. Goldenthal, M.D. to Keith D. Chirgwin,
M.D., dated October 26, 1999 (MRK-CHA00761482-4) ...... Appx5140

Exhibit 134 to Reilly Declaration -
Memo re: Filing Strategy for ProQuad,
dated January 31, 2002 (MRK-CHA00818776-81) ............... Appx5144

Exhibit 135 to Reilly Declaration -
Memo re: CBER teleconference (October 16, 2001):
Measles, Mumps and Rubella ELISAs, dated October 19, 2001
(MRK-CHA00331831-6) ...................................................... Appx5151

Exhibit 136 to Reilly Declaration -
Email from Michael L. Dekleva to Alison L. Fisher,
dated October 26, 2004 (MRK-CHA00846454-8) ................ Appx5158

**Table of Contents**
(Continued)

Exhibit 137 to Reilly Declaration -
Response to FDA Request for Information,
dated April 13, 2005 (MRK-CHA00000315-60) ................... Appx5164

Exhibit 138 to Reilly Declaration -
Response to FDA Request for Information,
dated November 15, 2006 (MRK-CHA00000393-409) ........ Appx5211

Exhibit 139 to Reilly Declaration -
Response to CBER Comments, dated June 10, 2002
(MRK-KRA00761628-702) ................................................... Appx5229

Exhibit 140 to Reilly Declaration -
Regulatory Liaison FDA Conversation Record,
dated October 5, 2004 (MRK-CHA00846405-15) ................ Appx5305

Exhibit 141 to Reilly Declaration -
Email from Florian Schodel to Michael L. Dekleva,
dated July 3, 2004 (MRK-CHA00791315-9) ........................ Appx5317

Exhibit 142 to Reilly Declaration -
Proposal for Immunogenicity Analyses
(MRK-CHA00561111-2) ...................................................... Appx5323

Exhibit 143 to Reilly Declaration -
Email from David Krah, M.D. to Emilio Emini, Ph.D.,
dated October 9, 2000 (MRK-CHA00065695-703) .............. Appx5326

Exhibit 144 to Reilly Declaration -
Anti-IgG Enhanced Mumps Neutralization Assay-Update,
dated October 24, 2000 (MRK-CHA00026912-8) ................ Appx5336

Exhibit 145 to Reilly Declaration -
Email from Jospeh Antonello to David Krah, M.D.,
dated October 30, 2000 (MRK-CHA00759836-9) ................ Appx5344

Exhibit 146 to Reilly Declaration -
Deposition Testimony of Barbara Kuter,
taken February 9, 2018 ......................................................... Appx5349

## Table of Contents
### (Continued)

**Page**

Exhibit 147 to Reilly Declaration -
Email from Steven Rubin to David Krah, M.D.,
dated August 24, 2011 (MRK-CHA00030994-8) .................. Appx5398

Exhibit 148 to Reilly Declaration -
Excerpts from Attachments to 11/18/98 CDOC Meeting
(MRK-CHA01731773-1804) ............................................... Appx5404

Exhibit 149 to Reilly Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
teleconference on methods used for the plaque reduction
neutralization assay, dated February 22, 1999
(MRK-CHA00095050-2) ...................................................... Appx5437

Exhibit 150 to Reilly Declaration -
Extra CDAB Meeting Abstract, dated August 1, 2011
(GSK-MMR-0195819-42) ..................................................... Appx5441

Exhibit 151 to Reilly Declaration -
Performance Characteristics and Validation for Mumps Plaque
Reduction Microneutralization assay
(GSK-MMR-IND-0022195-269) .......................................... Appx5466
***(Cont'd in Vol XIV)***

### Volume XIV
### (Filed Under Seal)

Exhibit 152 to Reilly Declaration -
Agenda for CBER Meeting, dated March 13, 2000
(MRK-CHA00016335-43) ..................................................... Appx5542

Exhibit 153 to Reilly Declaration -
Email from David Krah, M.D. to Alan Shaw,
dated August 15, 2000 (MRK-CHA00068546) ..................... Appx5552

Exhibit 154 to Reilly Declaration -
To-Do List, dated August 26, 2000
(MRK-CHA00273243-4) ...................................................... Appx5554

**Table of Contents**
(Continued)

Exhibit 155 to Reilly Declaration -
Deposition Testimony of Stephen Krahling,
taken May 2-3, 2017 ............................................................. Appx5557

Exhibit 156 to Reilly Declaration -
Memo re: Monthly report for May, 2000, dated May 23, 2000
(MRK-CHA01634869-71) ..................................................... Appx5690

Exhibit 157 to Reilly Declaration -
Handwritten Notes in Book 31271, Pages 161-2
(MRK-CHA00064608-9) ....................................................... Appx5694

Exhibit 158 to Reilly Declaration -
Email from David Krah, M.D. to Emilio Emini, Ph.D.,
dated March 30, 2000 (MRK-CHA00336323-5) ................... Appx5697

Exhibit 159 to Reilly Declaration -
Email from Keith D. Chirgwin with attachment,
dated February 26, 2001
(MRK-CHA00549462-72) ..................................................... Appx5701

Exhibit 160 to Reilly Declaration -
Relator Stephen A. Krahling's Responses and Objections
to Merck's Revised First Set of Interrogatories,
dated May 18, 2015 .............................................................. Appx5713

Exhibit 161 to Reilly Declaration -
Deposition Testimony of Joseph Antonello, Ph.D.,
taken August 3, 2017 ........................................................... Appx5780

Exhibit 162 to Reilly Declaration -
Email from Beverly A. Zaber to Cathy W. Wadsworth,
dated August 9, 2001 (MRK-CHA00008835-9) .................... Appx5862

Exhibit 163 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Steve Krahling, dated March 29, 2001
(MRK-CHA00015702-3) ....................................................... Appx5868

# Table of Contents
## (Continued)

Exhibit 164 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Colleen Barr, dated March 29, 2001
(MRK-CHA00014739-40) ..................................................... Appx5871

Exhibit 165 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Mary Yagodich, dated March 29, 2001
(MRK-CHA00014746-7) ..................................................... Appx5874

Exhibit 166 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Jennifer Kriss, dated March 29, 2001
(MRK-CHA00014829-30) ..................................................... Appx5877

Exhibit 167 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Steve Krahling, dated March 29, 2001
(MRK-CHA00014731-2) ..................................................... Appx5880

Exhibit 168 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Mary Yagodich, dated March 29, 2001
(MRK-CHA00014744-5) ..................................................... Appx5883

Exhibit 169 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Jill DeHaven, dated March 29, 2001
(MRK-CHA00014749-50) ..................................................... Appx5886

Exhibit 170 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Jennifer Kriss, dated March 29, 2001
(MRK-CHA00015719-20) ..................................................... Appx5889

Exhibit 171 to Reilly Declaration -
Memo re: Study KM-248 Phase III-Questionable ELISA
Results in the Comparator Group, dated November 1, 2001
(MRK-CHA00760670-2) ..................................................... Appx5892

**Table of Contents**
**(Continued)**

Exhibit 172 to Reilly Declaration -
Deposition Testimony of Joan L. Wlochowski,
taken June 13-14, 2017 ........................................................ Appx5896
***(Cont'd in Vol XV)***

**Volume XV**
**(Filed Under Seal)**

Exhibit 173 to Reilly Declaration -
Outline for HR Discussion (RELATOR_00000273) ............. Appx6040

Exhibit 174 to Reilly Declaration -
Expert Report of Philip Stark, Ph.D.,
dated March 12, 2018 ........................................................ Appx6042

Exhibit 175 to Reilly Declaration -
Supplemental Expert Report of Philip Stark, Ph.D.,
dated October 16, 2018 ........................................................ Appx6072

Exhibit 176 to Reilly Declaration -
Email from Jospeh Antonello with attachments,
dated March 20, 2002
(MRK-CHA00544820-47) ..................................................... Appx6079

Exhibit 177 to Reilly Declaration -
Excerpts from journal of David Krah, M.D.
(MRK-CHA00489903-490080) ............................................ Appx6133

Exhibit 178 to Reilly Declaration -
Handwritten Log (RELATOR_00001025-6) ......................... Appx6136

Exhibit 179 to Reilly Declaration -
Excerpts from journal of David Krah, M.D.
(MRK-CHA00490592-91038) ............................................... Appx6139

Exhibit 180 to Reilly Declaration -
Memo re: Review of mumps-AIGENT neutralization data,
dated August 1, 2001 (MRK-CHA00026864) ....................... Appx6144

**Table of Contents**
**(Continued)**

Exhibit 181 to Reilly Declaration -
Email from Karen R. McKenney, dated August 7, 2001
(MRK-CHA00052249-53) ..................................................... Appx6146

Exhibit 182 to Reilly Declaration -
General Correspondence and Submission to FDA,
dated February 4, 2002 (MRK-CHA00000410-78) ............... Appx6152

Exhibit 183 to Reilly Declaration -
Assay Log (MRK-CHA00050333-42) .................................. Appx6222

Exhibit 184 to Reilly Declaration -
Handwritten Notes regarding Discarded Plates
(MRK-CHA00055013) ......................................................... Appx6233

Exhibit 185 to Reilly Declaration -
Memo re: Validation of the Anti-IgG Enhanced Mumps Wild
Type Plaque Reduction Neutralization Assay (Virus and Cell
Biology Research Procedure #874.3489), dated
February 27, 2001 (MRK-CHA00016988-17023) ................ Appx6235

Exhibit 186 to Reilly Declaration -
Response to FDA Request for Information,
dated March 12, 2001 (MRK-CHA00017036-115) ............... Appx6272

Exhibit 187 to Reilly Declaration -
Biological Product Deviation Report Form,
dated April 20, 2001 (MRK-CHA00754233-8) ..................... Appx6353

Exhibit 188 to Reilly Declaration -
Background Document: M-M-R®II Protocol 007-Mumps End
Expiry Study: AIGENT Assay Issues and Impact on Study
Criteria (MRK-CHA00615152-74) ....................................... Appx6360

Exhibit 189 to Reilly Declaration -
Supplemental Biologics License Application,
dated January 29, 2004 (MRK-CHA00000032-139) ............. Appx6384

**Table of Contents**
**(Continued)**

Exhibit 190 to Reilly Declaration -
Information Amendment-Clinical, dated November 30, 2001
(MRK-CHA00126233-66) ..................................................... Appx6493
*(Cont'd in Vol XVI)*

**Volume XVI**
**(Filed Under Seal)**

Exhibit 191 to Reilly Declaration -
Email from Mandie Lyon to David Krah, M.D.,
dated August 19, 2004 (MRK-CHA00337141-57) ................ Appx6528

Exhibit 192 to Reilly Declaration -
Email from Barbara J. Kuter to Barbara J. Kuter
with attachment, dated August 5, 2009
(MRK-CHA00121080-82) ..................................................... Appx6546

Exhibit 193 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of October 24, 2011 ..................... Appx6550

Exhibit 194 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of September 26, 2012 ................. Appx6555

Exhibit 195 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of October 17, 2012 ..................... Appx6559

Exhibit 196 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of December 22, 2012 ................. Appx6563

Exhibit 197 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of July 3, 2013 ............................ Appx6567

**Table of Contents**
(Continued)

Exhibit 198 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of October 7, 2015 ........................ Appx6571

Exhibit 199 to Reilly Declaration -
CinicalTrials.gov "Background" webpage,
last accessed October 14, 2019 .............................................. Appx6575

Exhibit 200 to Reilly Declaration -
EMEA Scientific Discussion Paper re: M-M-RVAXPRO
and M-M-RII, downloaded October 10, 2019 ........................ Appx6580

Exhibit 201 to Reilly Declaration -
Letter from Dr. Gudrun V. Wangenheim to
D. Wonnacott, Ph.D. (MRK-CHA00626021-2) .................... Appx6616

Exhibit 202 to Reilly Declaration -
Letter from Karen L. Goldenthal, M.D. to Alison Fisher,
Ph.D., dated October 17, 2005 (MRK-CHA00560257-8) ..... Appx6619

Exhibit 203 to Reilly Declaration -
Amendment to Supplemental Biologics License Application
Response to FDA Request for Information,
dated June 5, 2007, with Attachments
(MRK-CHA00000368-82) ..................................................... Appx6622

Exhibit 204 to Reilly Declaration -
Email from Margaret Kanters to Donna Zacholski,
dated January 30, 2009 (MRK-CHA01300697-9) ................. Appx6638

Exhibit 205 to Reilly Declaration -
Approval Letter from FDA, dated December 6, 2007
(MRK-CHA01519087-8) ....................................................... Appx6642

Exhibit 206 to Reilly Declaration -
Memo re: Review of Merck's 7068-214, dated July 27, 2004
(MRK-CHA00846451-3) ....................................................... Appx6645

**Table of Contents**
(Continued)

Exhibit 207 to Reilly Declaration -
ProQuad™ Original Application, dated August 3, 2004
(MRK-CHA00158320-71) ..................................................... Appx6649

Exhibit 208 to Reilly Declaration -
Deposition Testimony of Michael Dekleva,
taken February 9, 2017 ......................................................... Appx6687

Exhibit 209 to Reilly Declaration -
Original Biologics License Application, dated August 27, 2004
(MRK-CHA00157572-3) ....................................................... Appx6760

Exhibit 210 to Reilly Declaration -
Email from Louis H. Washington to Michael L. Dekleva,
dated June 10, 2004 (MRK-CHA00821967-9) ...................... Appx6763

Exhibit 211 to Reilly Declaration -
Information Amendment-Clinical, dated November 27, 2001
(MRK-CHA00152449-67) ..................................................... Appx6767

Exhibit 212 to Reilly Declaration -
Excerpts from Merck's Responses and Objections to
Plaintiffs' First Set of Interrogatories,
dated August 16, 2017 .......................................................... Appx6787

Exhibit 213 to Reilly Declaration -
Excerpts from Merck's Response to Request for Information,
dated May 4, 2005 (MRK-CHA00846087-6404) .................. Appx6798

Exhibit 214 to Reilly Declaration -
Approval Letter, dated September 6, 2005
(MRK-CHA00761865-89) ..................................................... Appx6804

Exhibit 215 to Reilly Declaration -
Supplemental Biologics License Application,
dated June 30, 2004 (MRK-CHA00137854-5) ...................... Appx6830

## Table of Contents
### (Continued)

Exhibit 216 to Reilly Declaration -
Excerpts from A Comparison of the Safety, Tolerability, and
Immunogenicity of M-M-R™II Manufactured With
Recombinant Human Albumin (rHA) Versus M-M-R™II
Manufactured with Pooled-Donor Human Serum Albumin
(HSA) in Healthy Children 12 to 18 Months of Age
Protocol 009 (MRK-CHA00140056-41340) ......................... Appx6833

Exhibit 217 to Reilly Declaration -
Excerpts from Measles, Mumps, and Rubella Virus Vaccine,
Live-Replacement of Human Serum Albumin With
Recombinant Albumin (MRK-CHA00138137-72) ............... Appx6908

Exhibit 218 to Reilly Declaration -
Excerpts from Response to FDA Request for Information,
dated June 28, 2004 (MRK-CHA00124554-4690) ................ Appx6931

Exhibit 219 to Reilly Declaration -
Approval Letter, dated August 31, 2005
(MRK-CHA00141909-22) .................................................... Appx6979

Exhibit 220 to Reilly Declaration -
M-M-R®II Label (April 1999)
(MRK-CHA00757072-6) ...................................................... Appx6994

Exhibit 221 to Reilly Declaration -
M-M-R®II Label (MRK-CHA00757108-11) ........................ Appx7000
*(Cont'd in Vol XVII)*

### Volume XVII
### (Filed Under Seal)

Exhibit 222 to Reilly Declaration -
M-M-R®II Label (2004) (MRK-CHA00757100-3) .............. Appx7005

Exhibit 223 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449260-70) ....................... Appx7010

**Table of Contents**
**(Continued)**

**Page**

Exhibit 224 to Reilly Declaration -
Current M-M-R®II Label (last revised: 09/2019),
downloaded on October 22, 2019 .......................................... Appx7022

Exhibit 225 to Reilly Declaration -
M-M-R®II Label (1990) (MRK-CHA00757060-3) .............. Appx7034

Exhibit 226 to Reilly Declaration -
Summary of Revisions of M-M-R®II Label
(MRK-CHA00137876-7) ....................................................... Appx7039

Exhibit 227 to Reilly Declaration -
Protocol 006 Clinical Study Report Synopsis,
dated August 16, 2004 (MRK-CHA01580213-19) ................ Appx7042

Exhibit 228 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449029-40) ........................ Appx7050

Exhibit 229 to Reilly Declaration -
Description of ProQuad® (MRK-CHA00177125-36) .......... Appx7063

Exhibit 230 to Reilly Declaration -
ProQuad® Label (MRK-CHA01449181-2) ........................... Appx7076

Exhibit 231 to Reilly Declaration -
Current ProQuad Label (last revised: 09/2019),
downloaded on October 22, 2019 .......................................... Appx7079

Exhibit 232 to Reilly Declaration -
Excerpts from Merck's Responses and Objections to Relators'
First Set of Interrogatories, dated April 9, 2015 .................... Appx7105

Exhibit 233 to Reilly Declaration -
Expert Report of Yonatan Grad, M.D., Ph.D.,
dated June 12, 2018 ............................................................... Appx7114

Exhibit 234 to Reilly Declaration -
Excerpts from "Summary of Notifiable Diseases-United
States, 2006," *MMWR*, 2008:55(53) ..................................... Appx7169

# Table of Contents
## (Continued)

**Page**

Exhibit 235 to Reilly Declaration -
Excerpts from "Summary of Notifiable Diseases-United
States, 2009," *MMWR*, 2009:58(53) ..................................... Appx7173

Exhibit 236 to Reilly Declaration -
Excerpts from a "Summary of Notifiable Diseases-United
States, 2010," *MMWR*, 2012:59(53) ..................................... Appx7177

Exhibit 237 to Reilly Declaration -
Excerpts from "Summary of Notifiable Diseases-United
States, 2012," *MMWR*, 2014:61(53) ..................................... Appx7181

Exhibit 238 to Reilly Declaration -
Excerpts from "Summary of Notifiable Infectious
Diseases and Conditions-United States, 2013,"
*MMWR*, 2015:62(53) ............................................................ Appx7185

Exhibit 239 to Reilly Declaration -
Excerpts from "Summary of Notifiable Infectious
Diseases and Conditions-United States, 2014,"
*MMWR*, 2016:63(54) ............................................................ Appx7189

Exhibit 240 to Reilly Declaration -
Excerpts from "Summary of Notifiable Infectious
Diseases and Conditions-United States, 2015,"
*MMWR*, 2017:64(53) ............................................................ Appx7194

Exhibit 241 to Reilly Declaration -
National Notifiable Infectious Diseases and Conditions:
United States TABLE 2j. Reported cases of notifiable
diseases, by region and reporting area-United States and
U.S. territories, 2016 ............................................................ Appx7199

Exhibit 242 to Reilly Declaration -
National Notifiable Infectious Diseases and Conditions:
United States TABLE 2j. Reported cases of notifiable
diseases, by region and reporting area-United States and
U.S. territories, 2017 ............................................................ Appx7202

**Table of Contents**
(Continued)

Exhibit 243 to Reilly Declaration -
Nationally Notifiable Infectious Diseases and Conditions,
United States: Weekly Tables; TABLE 1y. Weekly cases of
notifiable diseases, United States, U.S. Territories, and
Non-U.S. Residents weeks ending September 14, 2019
(week 37) ............................................................................ Appx7205

Exhibit 244 to Reilly Declaration -
"Decreased humoral immunity to mumps in young adults
immunized with MMR vaccine in childhood," Rasheed, *et al.*,
PNAS, dated September 17, 2019 116 (38) ........................... Appx7209

Exhibit 245 to Reilly Declaration -
Deposition Testimony of William L. Atkinson, M.D., MPH,
taken January 30, 2019 ........................................................ Appx7216

Exhibit 246 to Reilly Declaration -
Email from Don Latner to William Bellini,
dated July 29, 2010 (BIAOHE000446-53) ............................ Appx7270

Exhibit 247 to Reilly Declaration -
Deposition Testimony of Yonatan Grad, M.D., Ph.D.,
taken October 30, 2018 ........................................................ Appx7279

Exhibit 248 to Reilly Declaration -
Press Briefing Transcripts from CDC,
dated April 19, 2006 ............................................................ Appx7342

Exhibit 249 to Reilly Declaration -
Deposition Testimony of Alan W. Sims,
taken October 12, 2017 ........................................................ Appx7349

Exhibit 250 to Reilly Declaration -
Deposition Testimony of Katalin Abraham,
taken May 18, 2017 .............................................................. Appx7403
***(Cont'd in Vol XVIII)***

**Table of Contents**
**(Continued)**

Page

**Volume XVIII**
**(Filed Under Seal)**

Exhibit 251 to Reilly Declaration -
Email from Eric T. Skjeveland to Christopher J. Petroski,
dated June 7, 2012 (MRK-CHA00955961) ........................... Appx7504

Exhibit 252 to Reilly Declaration -
Expert Report of Jonathan Temte, M.D., Ph.D.,
dated June 12, 2018 .............................................................. Appx7506

Exhibit 253 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449243-53) ....................... Appx7556

Exhibit 254 to Reilly Declaration -
Transcription of an MVX (voice mail) from Manal A. Morsy
to Henrietta Ukwu and Keith D. Chirgwin
(MRK-CHA00020421-2) ...................................................... Appx7568

Exhibit 255 to Reilly Declaration -
CDC Presentation, "Mumps-What Happened in 2006?
National Perspective," by Gustavo Dayan,
dated March 5, 2007
(MRK-CHA01372603-33) .................................................... Appx7571

Exhibit 256 to Reilly Declaration -
"Commentary: Mumps Vaccines: Do We Need A New One?"
by Stanely A. Plotkin, M.D., accepted for publication
December 4, 2012 ................................................................. Appx7603

Exhibit 257 to Reilly Declaration -
"Mumps: A Pain in the Neck," by Stanley A. Plotkin, M.D.,
accepted for publication April 19, 2018 ................................ Appx7606

Exhibit 258 to Reilly Declaration -
"Emerging Mumps Infection," by Rubin, *et al.*,
accepted for publication April 12, 2016 ................................ Appx7609

**Table of Contents**
(Continued)

Exhibit 259 to Reilly Declaration -
"Measles and mumps outbreaks in the United States: Think
globally, vaccinate locally," by Jennifer A. Whitaker,
*Vaccine* 32 (2014) ................................................................ Appx7613

Exhibit 260 to Reilly Declaration -
"Remembering Mumps," by Latner, *et al.*, *PLOS Pathogens*,
published May 7, 2015 ........................................................... Appx7616

Exhibit 261 to Reilly Declaration -
"The resurgence of mumps and pertussis," by Martine Sabbe
and Corinne Vandermeulen accepted for publication
October 22, 2015 .................................................................. Appx7621

Exhibit 262 to Reilly Declaration -
"Mumps Outbreaks in Vaccinated Populations: Are Available
Mumps Vaccines Effective Enough to Prevent Outbreaks?"
by Dayan, *et al.*, accepted for publication May 20, 2008 ...... Appx7631

Exhibit 263 to Reilly Declaration -
Shapiro Deposition Exhibit 25, Program Announcement for
the Department of Defense's Defense Health Program for
Funding Opportunity No. W81XWH-17-PRMRP-CTA ........ Appx7642

Exhibit 264 to Reilly Declaration -
Excerpts from Notice of Grant Award, issued May 7, 2012
(RELATOR_00004392-478) ................................................. Appx7712

Exhibit 265 to Reilly Declaration -
Expert Report of William P. Nichols, dated June 12, 2018 .... Appx7743

Exhibit 266 to Reilly Declaration -
Solicitation Number 2003-N-00734,
issued December 19, 2002 by the CDC ................................ Appx7779

Exhibit 267 to Reilly Declaration -
Solicitation Number 2005-N-01706,
issued January 4, 2005 by the CDC ...................................... Appx7826

**Table of Contents**
**(Continued)**

Exhibit 268 to Reilly Declaration -
Solicitation Number 2007-N-09211,
issued January 23, 2007 by the CDC ..................................... Appx7872

Exhibit 269 to Reilly Declaration -
Solicitation Number 2010-N-11873,
issued January 26, 2010 by the CDC ..................................... Appx7923

Exhibit 270 to Reilly Declaration -
Solicitation Number 2011-N-13043,
issued December 21, 2010 by the CDC ................................. Appx7956

Exhibit 271 to Reilly Declaration -
Solicitation Number 2012-N-14228,
issued December 13, 2011 by the CDC ................................. Appx7987
*(Cont'd in Vol XIX)*

**Volume XIX**
**(Filed Under Seal)**

Exhibit 272 to Reilly Declaration -
Solicitation Number 2013-N-14972,
issued January 22, 2013 by the CDC ..................................... Appx8013

Exhibit 273 to Reilly Declaration -
Solicitation Number 2014-N-15784,
issued January 24, 2014 by the CDC ..................................... Appx8040

Exhibit 274 to Reilly Declaration -
Solicitation Number 2015-N-16850,
issued January 16, 2015 by the CDC ..................................... Appx8067

Exhibit 275 to Reilly Declaration -
Solicitation Number 2016-N-17693,
issued January, 4, 2015 by the CDC ..................................... Appx8098

Exhibit 276 to Reilly Declaration -
Solicitation Number 2017-N-18099,
issued January 21, 2017 by the CDC ..................................... Appx8127

**Table of Contents**
(Continued)

Exhibit 277 to Reilly Declaration -
Solicitation Number 2018-N-67769,
issued January 10, 2018 by the CDC ..................................... Appx8156

Exhibit 278 to Reilly Declaration -
Solicitation Number 75D301-19-R-67848,
issued January 7, 2019 by the CDC ...................................... Appx8183

Exhibit 279 to Reilly Declaration -
Summary of GSK-CDC MMR/V Vaccine Meeting
(GSK-MMR-0030570-2) ........................................................ Appx8212

Exhibit 280 to Reilly Declaration -
Charter of the Advisory Committee on Immunization
Practices, filed April 1, 2018 .................................................. Appx8216

Exhibit 281 to Reilly Declaration -
Relators' Expert Report of Dr. Thomas McGuire,
dated March 13, 2018 ............................................................ Appx8222

Exhibit 282 to Reilly Declaration - [1]
Transactional data, "1998 Lot Assignment.xlsx"
(MRK-CHA02143443) .......................................................... Appx8369

Exhibit 283 to Reilly Declaration -
Transactional data, "1999 Lot Assignment.xlsx"
(MRK-CHA02143444) .......................................................... Appx8371

Exhibit 284 to Reilly Declaration -
Transactional data, "2000 Lot Assignment.xlsx"
(MRK-CHA02143445) .......................................................... Appx8373

Exhibit 285 to Reilly Declaration -
Transactional data, "2001 Lot Assignment.xlsx"
(MRK-CHA02143446) .......................................................... Appx8375

---

[1] Exhibits 282 through 299 to the Reilly Declaration have been omitted by consent of the parties.

**Table of Contents**
**(Continued)**

**Page**

Exhibit 286 to Reilly Declaration -
Transactional data, "2002 Lot Assignment.xlsx"
(MRK-CHA02143447) ......................................................... Appx8377

Exhibit 287 to Reilly Declaration -
Transactional data, "2003 Lot Assignment.xlsx"
(MRK-CHA02143448) ......................................................... Appx8379

Exhibit 288 to Reilly Declaration -
Transactional data, "2004 Lot Assignment.xlsx"
(MRK-CHA02143449) ......................................................... Appx8381

Exhibit 289 to Reilly Declaration -
Transactional data, "2005 Lot Assignment.xlsx"
(MRK-CHA02143450) ......................................................... Appx8383

Exhibit 290 to Reilly Declaration -
Transactional data, "2006 Lot Assignment.xlsx"
(MRK-CHA02143451) ......................................................... Appx8385

Exhibit 291 to Reilly Declaration -
Transactional data, "2007 Lot Assignment.xlsx"
(MRK-CHA02143452) . ......................................................... Appx8387

Exhibit 292 to Reilly Declaration -
Transactional data, "2008 Lot Assignment.xlsx"
(MRK-CHA02143453) ......................................................... Appx8389

Exhibit 293 to Reilly Declaration -
Transactional data, "2009 Lot Assignment.xlsx"
(MRK-CHA02143454) ......................................................... Appx8391

Exhibit 294 to Reilly Declaration -
Transactional data, "2010 Lot Assignment.xlsx"
(MRK-CHA02143455) ......................................................... Appx8393

Exhibit 295 to Reilly Declaration -
Transactional data, "2011 Lot Assignment.xlsx"
(MRK-CHA02143456) ......................................................... Appx8395

# Table of Contents
## (Continued)

Exhibit 296 to Reilly Declaration -
Transactional data, "2012 Lot Assignment.xlsx"
(MRK-CHA02143457) .......................................................... Appx8397

Exhibit 297 to Reilly Declaration -
Transactional data, "2013 Lot Assignment.xlsx"
(MRK-CHA02143458) .......................................................... Appx8399

Exhibit 298 to Reilly Declaration -
Transactional data, "2014 Lot Assignment.xlsx"
(MRK-CHA02143459) .......................................................... Appx8401

Exhibit 299 to Reilly Declaration -
Transactional data, "2015 Lot Assignment.xlsx"
(MRK-CHA02143460) .......................................................... Appx8403

Exhibit 300 to Reilly Declaration -
Letter from Lisa C. Dykstra to Counsel,
dated April 17, 2017 ............................................................. Appx8405

Exhibit 301 to Reilly Declaration -
Letter from Stan Bernard, M.D., M.B.A. to Kim Haupt,
dated November 9, 2008 (MRK-CHA02063339-45) ............ Appx8407

Exhibit 302 to Reilly Declaration -
Merck's 2004 Vaccine for Children Contract with the CDC
(MRK-CHA01371280-310) ................................................... Appx8415

Exhibit 303 to Reilly Declaration -
Merck's 2003 Vaccine for Children Contract with the CDC
(MRK-CHA01371311-40) ..................................................... Appx8447

Exhibit 304 to Reilly Declaration -
Merck's 2005 Vaccine for Children Contract with the CDC
(MRK-CHA01371341-72) ..................................................... Appx8478
*(Cont'd in Vol XX)*

**Table of Contents**
**(Continued)**

**Volume XX**
**(Filed Under Seal)**

Exhibit 305 to Reilly Declaration -
Merck's 2010 Vaccine for Children Contract with the CDC
(MRK-CHA01371373-97) ..................................................... Appx8511

Exhibit 306 to Reilly Declaration -
Merck's 2012 Vaccine for Children Contract with the CDC
(MRK-CHA01371398-421) ................................................... Appx8537

Exhibit 307 to Reilly Declaration -
Merck's 2013 Vaccine for Children Contract with the CDC
(MRK-CHA01371422-44) ..................................................... Appx8562

Exhibit 308 to Reilly Declaration -
Merck's 2014 Vaccine for Adults Contract with the CDC
(MRK-CHA01371445-72) ..................................................... Appx8586

Exhibit 309 to Reilly Declaration -
Merck's 2014 Vaccine for Children Contract with the CDC
(MRK-CHA01371473-96) ..................................................... Appx8615

Exhibit 310 to Reilly Declaration -
Merck's 2011 Vaccine for Children Contract with the CDC
(MRK-CHA01371497-518) ................................................... Appx8640

Exhibit 311 to Reilly Declaration -
Merck's 2011 Vaccine for Adults Contract with the CDC
(MRK-CHA01371519-47) ..................................................... Appx8663

Exhibit 312 to Reilly Declaration -
Merck's 2013 Vaccine for Adults Contract with the CDC
(MRK-CHA01371548-71) ..................................................... Appx8693

Exhibit 313 to Reilly Declaration -
Merck's 2012 Vaccine for Adults Contract with the CDC
(MRK-CHA01371572-603) ................................................... Appx8718

**Table of Contents**
(Continued)

Exhibit 314 to Reilly Declaration -
Merck's 2007 Vaccine for Children Contract with the CDC
(MRK-CHA01371604-23) ..................................................... Appx8751

Exhibit 315 to Reilly Declaration -
Merck's 2006 Vaccine for Children Contract with the CDC
(MRK-CHA01371624-55) ..................................................... Appx8772

Exhibit 316 to Reilly Declaration -
Merck's 2001 Vaccine for Children Contract with the CDC
(MRK-CHA01371656-92) ..................................................... Appx8805

Exhibit 317 to Reilly Declaration -
Merck's 2000 Vaccine for Children Contract with the CDC
(MRK-CHA01371693-727) ................................................... Appx8843

Exhibit 318 to Reilly Declaration -
Merck's 1998 Vaccine for Children Contract with the CDC
(MRK-CHA01371728-50) ..................................................... Appx8879

Exhibit 319 to Reilly Declaration -
Merck's 1999 Vaccine for Children Contract with the CDC
(MRK-CHA01371751-84) ..................................................... Appx8903

Exhibit 320 to Reilly Declaration -
Merck's 2002 Vaccine for Children Contract with the CDC
(MRK-CHA01371785-816) ................................................... Appx8938

Exhibit 321 to Reilly Declaration -
Merck's 2008 Vaccine for Children Contract with the CDC
(MRK-CHA01371817-840) ................................................... Appx8971

Exhibit 322 to Reilly Declaration -
Merck's 2009 Vaccine for Adults Contract with the CDC
(MRK-CHA01371841-879) ................................................... Appx8996
*(Cont'd in Vol XXI)*

**Table of Contents**
**(Continued)**

**Page**

**Volume XXI**
**(Filed Under Seal)**

Exhibit 323 to Reilly Declaration -
Merck's 2009 Vaccine for Children Contract with the CDC
(MRK-CHA01371880-1900) .................................................. Appx9036

Exhibit 324 to Reilly Declaration -
Merck's 2010 Vaccine for Adults Contract with the CDC
(MRK-CHA01371901-33) ..................................................... Appx9058

Exhibit 325 to Reilly Declaration -
Merck's 2015 Vaccine for Adults Contract with the CDC
(MRK-CHA01371934-61) ..................................................... Appx9092

Exhibit 326 to Reilly Declaration -
Merck's 2016 Vaccine for Children Contract with the CDC
(MRK-CHA01371962-89) ..................................................... Appx9121

Exhibit 327 to Reilly Declaration -
Merck's 2010 Vaccine for Adults Contract with the CDC
(MRK-CHA01371990-2020) .................................................. Appx9150

Exhibit 328 to Reilly Declaration -
Merck's 2016 Vaccine for Adults Contract with the CDC
(MRK-CHA01372021-44) ..................................................... Appx9182

Exhibit 329 to Reilly Declaration -
Merck's 2015 Vaccine for Children Contract with the CDC
(MRK-CHA01372045-72) ..................................................... Appx9207

Exhibit 330 to Reilly Declaration -
Invoice, dated March 14, 2012 (MRK-CHA01371253) ........ Appx9236

Exhibit 331 to Reilly Declaration -
Invoice, dated January 3, 2011(MRK-CHA01371256) ......... Appx9238

Exhibit 332 to Reilly Declaration -
Invoice, dated January 6, 2014 (MRK-CHA01371258) ........ Appx9240

# Table of Contents
## (Continued)

Exhibit 333 to Reilly Declaration -
Invoice, dated May 20, 2010 (MRK-CHA01371259) ........... Appx9242

Exhibit 334 to Reilly Declaration -
Invoice, dated January 14, 2013 (MRK-CHA01371261) ...... Appx9244

Exhibit 335 to Reilly Declaration -
Invoice, dated February 2, 2011 (MRK-CHA01371262) ...... Appx9246

Exhibit 336 to Reilly Declaration -
Invoice, dated November 17, 2010 (MRK-CHA01371263) . Appx9248

Exhibit 337 to Reilly Declaration -
Invoice, dated November 28, 2012 (MRK-CHA01371264) . Appx9250

Exhibit 338 to Reilly Declaration -
Invoice, dated March 20, 2013 (MRK-CHA01371268-69) ... Appx9252

Exhibit 339 to Reilly Declaration -
Invoice, dated January 22, 2016 (MRK-CHA01371274) ...... Appx9255

Exhibit 340 to Reilly Declaration -
Invoice, dated February 26, 2014 (MRK-CHA01371278) .... Appx9257

Exhibit 341 to Reilly Declaration -
Invoice, dated February 4, 2015 (MRK-CHA01371279) ...... Appx9259

Exhibit 342 to Reilly Declaration -
FDA webpage, "National Drug Code Directory," accessible
online at https://www.fda.gov/drugs/drug-approvals-and-
databases/national-drug-code-directory, last accessed
October 1, 2019 ................................................................... Appx9261

Exhibit 343 to Reilly Declaration -
Email from Jonathan Hartzel to Joseph M. Antonello,
dated October 18, 2005 (MRK-CHA00759061-4) ................ Appx9268

**Table of Contents**
(Continued)

Exhibit 344 to Reilly Declaration -
Email from Joseph M. Antonello to Timothy L. Shofield,
dated May 5, 2005 (MRK-CHA00649638-40) ...................... Appx9273

Exhibit 345 to Reilly Declaration -
Letter from Lisa C. Dykstra to Counsel,
dated September 13, 2018 ...................................................... Appx9277

Exhibit 346 to Reilly Declaration -
Letter from Lisa C. Dykstra to the Honorable
Lynne A. Sitarski, dated June 15, 2015 .................................. Appx9289

Exhibit 347 to Reilly Declaration -
Deposition Testimony of Peter Calcott, Ph.D.,
taken September 7, 2018 ........................................................ Appx9307

Exhibit 348 to Reilly Declaration -
Email from Mandie Lyon, dated May 5, 2006
(MRK-CHA00069026-36) ...................................................... Appx9385

Exhibit 349 to Reilly Declaration -
Presentation, M-M-R II End Expiry, produced as "12-14
CDOC presentation.ppt" (MRK-CHA00021319) ................. Appx9397

Exhibit 350 to Reilly Declaration -
Department of Justice Press Release, dated May 13, 2013 .... Appx9410

Exhibit 351 to Reilly Declaration -
Department of Justice Press Release,
dated October 26, 2010 ......................................................... Appx9414

Exhibit 352 to Reilly Declaration -
Department of Justice Press Release,
dated January 12, 2017 ......................................................... Appx9417

Exhibit 353 to Reilly Declaration -
Department of Justice Press Release,
dated September 24, 2014 ..................................................... Appx9420

# Table of Contents
## (Continued)

Exhibit 354 to Reilly Declaration -
Department of Justice Press Release, dated April 15, 2009 ... Appx9423

Exhibit 355 to Reilly Declaration -
Rule 30(b)(6) Deposition topics, dated December 13, 2016
(Stannard Ex. 3) .................................................................. Appx9426

Exhibit 356 to Reilly Declaration -
Department of Justice Press Release,
dated August 8, 2014 ........................................................... Appx9443

Exhibit 357 to Reilly Declaration -
FDA Form 483, dated August 6, 2001
(MRK-CHA00000547) ......................................................... Appx9446

Exhibit 358 to Reilly Declaration -
Deposition Testimony of Robert Malone, M.D.,
taken September 14, 2018 .................................................... Appx9448
*(Cont'd in Vol XXII)*

## Volume XXII
### (Filed Under Seal)

Exhibit 359 to Reilly Declaration -
Deposition Testimony of Dr. Manal Morsy,
taken August 5, 2016 ........................................................... Appx9511

Exhibit 360 to Reilly Declaration -
Atkinson Deposition Exhibit 6, "Recommendations of
the Immunization Practices Advisory Committee Measles
Prevention: Supplementary Statement,"
dated January 13, 1989 ........................................................ Appx9621

Declaration of Lisa C. Dykstra in Support of
Defendant's Motions for Summary Judgment,
executed October 25, 2019 (Doc. 295) ................................ Appx9625

Exhibit 1 to Dykstra Declaration -
Stephen A. Krahling's Resume (MRK-KRA00331426-7) .... Appx9656

**Table of Contents**
(Continued)

Exhibit 2 to Dykstra Declaration -
Excerpts from Deposition Testimony of Stephen Krahling,
taken May 2, 2017 ................................................................. Appx9659

Exhibit 3 to Dykstra Declaration -
Merck Employee Initialization Form for Stephen Krahling
(MRK-KRA00582401) ......................................................... Appx9680

Exhibit 4 to Dykstra Declaration -
Stephen Krahling's November 30, 2001 Separation Agreement
(MRK-KRA00582394-7) ....................................................... Appx9682

Exhibit 5 to Dykstra Declaration -
Excerpts from Relator Stephen A. Krahling's Responses
and Objections to Merck's First Set of Interrogatories,
dated January 28, 2015 ......................................................... Appx9687

Exhibit 6 to Dykstra Declaration -
Excerpts from Relator Stephen A. Krahling's Responses
and Objections to Merck's Revised First Set of Interrogatories,
dated May 18, 2015 .............................................................. Appx9716

Exhibit 7 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Stephen Krahling, taken May 3, 2017 ................................... Appx9783

Exhibit 8 to Dykstra Declaration -
Stephen Krahling's handwritten notes,
dated October 1, 2001 (RELATOR_00001044-5) ................. Appx9792

Exhibit 9 to Dykstra Declaration -
FDA's Summary of Findings, dated August 6, 2001
(RELATOR_00004086-94) .................................................... Appx9795

Exhibit 10 to Dykstra Declaration -
Merck FDA Inspection Records, dated August 6, 2001
(MRK-KRA01631009-254) ................................................... Appx9805
*(Cont'd in Vol XXIII)*

# Table of Contents
## (Continued)

### Volume XXIII
### (Filed Under Seal)

Exhibit 11 to Dykstra Declaration -
Excerpts from the Expert Report of
D. Bruce Burlington M.D. .................................................... Appx10052

Exhibit 12 to Dykstra Declaration -
Merck's Virus and Cell Biology Organization Chart
(RELATOR_00000902-3) .................................................... Appx10070

Exhibit 13 to Dykstra Declaration -
Excerpts from Relator Stephen A. Krahling's Responses
and Objections to Defendant Merck's Requests for
Admission, dated April 4, 2016 ........................................... Appx10073

Exhibit 14 to Dykstra Declaration -
FDA Form 483 Frequently Asked Questions ....................... Appx10101

Exhibit 15 to Dykstra Declaration -
FDA Re-Inspection Memorandum, dated August 10, 2001
(MRK-KRA00071241-5) .................................................... Appx10104

Exhibit 16 to Dykstra Declaration -
CBER Merck Communications Mumps Expiry,
dated August 8, 2002 (MRK-KRA00623049-51) ............... Appx10110

Exhibit 17 to Dykstra Declaration -
Email Communication with Attachments regarding FDA
Inspection-IND 1016, dated September 14, 2001
(MRK-KRA00063885-8) .................................................... Appx10114

Exhibit 18 to Dykstra Declaration -
FDA Telephone Conversation Memorandum,
dated September 17, 2001 (MRK-KRA00019107) ............. Appx10119

Exhibit 19 to Dykstra Declaration -
FDA Teleconference-IND 1016 Inspection Follow up,
dated September 25, 2001 (MRK-KRA00071300-1) .......... Appx10121

**Table of Contents**
(Continued)

Exhibit 20 to Dykstra Declaration -
CBER December 7, 2001 Teleconference: Mumps Inspection
results and discussions, dated December 13, 2001
(MRK-KRA00019640-6) ..................................................... Appx10124

Exhibit 21 to Dykstra Declaration -
General Correspondence to FDA in response to CBER
Comments, dated February 4, 2002
(MRK-KRA00025847-916) ................................................. Appx10132

Exhibit 22 to Dykstra Declaration -
General Correspondence to FDA regarding April 18, 2002
Teleconference, dated April 2002
(MRK-KRA00337265-72) ................................................. Appx10203

Exhibit 23 to Dykstra Declaration -
BB-IND 1016 Memorandum regarding Summary of
Discussion with CBER on March 22, 2002 regarding
acceptability of mumps PRN assay data,
dated March 23, 2002 (MRK-KRA00009042) .................... Appx10212

Exhibit 24 to Dykstra Declaration -
Offer Letter to Stephen A. Krahling, dated October 24, 2000
(RELATOR_00001058-60) .................................................. Appx10214

Exhibit 25 to Dykstra Declaration -
Correspondence from Stephen A. Krahling to
Emilio A. Emini, Ph.D., dated April 8, 2001
(RELATOR_00000328-31) .................................................. Appx10218

Exhibit 26 to Dykstra Declaration -
Email communication from Stephen Krahling to
Alan Shaw, dated July 17, 2001 (MRK-KRA00002243) .... Appx10223

Exhibit 27 to Dykstra Declaration -
Email communication from Stephen Krahling to Alan Shaw,
dated September 25, 2001 (RELATOR_00000745) ............ Appx10225

**Table of Contents**
(Continued)

Exhibit 28 to Dykstra Declaration -
Email communications between Stephen Krahling and
Alan Shaw, dated September 27-28, 2001
(RELATOR_00000747) ...................................................... Appx10227

Exhibit 29 to Dykstra Declaration -
Letter from Emilio A. Emini, Ph.D. to Stephen Krahling,
dated October 15, 2001, (RELATOR_00001100-3) ............ Appx10229

Exhibit 30 to Dykstra Declaration -
Letter from Tonia Torquato to Alexis Pinto,
dated October 22, 2001 (MRK-KRA00002033-5) .............. Appx10234

Exhibit 31 to Dykstra Declaration -
Letter from Alexis Pinto to Tonia Torquato,
dated October 19, 2001 (MRK-KRA00002036-9) .............. Appx10238

Exhibit 32 to Dykstra Declaration -
Letter from Tonia Torquato to Alexis Pinto,
dated October 26, 2001 (MRK-KRA00002028-9) .............. Appx10243

Exhibit 33 to Dykstra Declaration -
Letter from Alexis Pinto to Tonia Torquato,
dated October 26, 2001 (MRK-KRA00002017-25) ............ Appx10246

Exhibit 34 to Dykstra Declaration -
Letter from Tonia Torquato to Alexis Pinto,
dated October 29, 2001 (MRK-KRA00002013-16) ............ Appx10256

Exhibit 35 to Dykstra Declaration -
Letter from Axel Johnson to Tonia Torquato,
dated November 26, 2001 (RELATOR_00001086) ............ Appx10261

Exhibit 36 to Dykstra Declaration -
Stephen Krahling Pay Stubs (RELATOR_00001061-7) ...... Appx10263

Exhibit 37 to Dykstra Declaration -
Letter from Axel Johnson to Tonia Torquato,
dated December 20, 2001 (RELATOR_00001090) ............. Appx10271

# Table of Contents
## (Continued)

Exhibit 38 to Dykstra Declaration -
CDC Vaccines for Children Program web page
"About VFC," last reviewed on February 18, 2016 ............. Appx10273

Exhibit 39 to Dykstra Declaration -
Advisory Committee on Immunization Practices Charter
approved March 27, 2018 .................................................... Appx10277

Exhibit 40 to Dykstra Declaration -
Excerpts from Expert Report of William P. Nichols ............ Appx10283

Exhibit 41 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Mark Pallansch,
Ph.D., taken October 13, 2017 ............................................ Appx10292

Exhibit 42 to Dykstra Declaration -
1971 MMR Product License (MRK-KRA01972538) ......... Appx10307

Exhibit 43 to Dykstra Declaration -
1995 MMR Product License (MRK-KRA01676252) ......... Appx10309

Exhibit 44 to Dykstra Declaration -
Merck's Establishment License (MRK-KRA01676250) ..... Appx10311

Exhibit 45 to Dykstra Declaration -
Advisory Committee on Immunization Practices Vaccines for
Children Program-Resolution No. 10/17-3, Vaccines to
Prevent Measles, Mumps, Rubella and Varicella,
dated October 25, 2017 ....................................................... Appx10313

Exhibit 46 to Dykstra Declaration -
Vaccines for Children Program-Resolution No. 6/06-1,
Vaccines included in the VFC Program,
dated June 29, 2006 ............................................................ Appx10317

Exhibit 47 to Dykstra Declaration -
Advisory Committee on Immunization Practices, Policies
and Procedures, dated December 2018 ............................... Appx10319

### Table of Contents
### (Continued)

Exhibit 48 to Dykstra Declaration -
"Recommendation of the Advisory Committee on
Immunization Practices for Use of a Third Dose of Mumps
Virus Containing Vaccine in Persons at Increased Risk for
Mumps During Outbreak," *MMWR*,
dated January 12, 2018 ....................................................... Appx10345

Exhibit 49 to Dykstra Declaration -
Excerpts from the Expert Report of
William L. Atkinson M.D., MPH, dated June 12, 2018 ....... Appx10355

Exhibit 50 to Dykstra Declaration -
National Center for Immunization and Respiratory Diseases
(CVG) Fact Sheet ............................................................... Appx10365

Exhibit 51 to Dykstra Declaration -
"Prevention of Measles, Rubella, Congenital Rubella
Syndrome, and Mumps," *MMWR*, dated June 14, 2013 ...... Appx10380

Exhibit 52 to Dykstra Declaration -
CDC's "Measles, Mumps, and Rubella (MMR) Vaccination:
What Everyone Should Know," last reviewed
March 28, 2019 ................................................................. Appx10421

Exhibit 53 to Dykstra Declaration -
"Measles, Mumps and Rubella-Vaccine Use and Strategies for
Elimination of Measles, Rubella and Congenital Rubella
Syndrome and Control of Mumps: Recommendations of the
Advisory Committee on Immunization Practices,"
*MMWR*, dated May 22, 1998 ............................................... Appx10428

Exhibit 54 to Dykstra Declaration -
Merck's 1998 Vaccine for Children Contract with the CDC
(MRK-KRA01371728-50) .................................................. Appx10473

Exhibit 55 to Dykstra Declaration -
Merck's 1999 Vaccine for Children Contract with the CDC
(MRK-KRA01371751-84) .................................................. Appx10497
*(Cont'd in Vol XXIV)*

**Table of Contents**
**(Continued)**

Page

**Volume XXIV**
**(Filed Under Seal)**

Exhibit 56 to Dykstra Declaration -
Merck's 2000 Vaccine for Children Contract with the CDC
(MRK-KRA01371693-1727) ................................................ Appx10532

Exhibit 57 to Dykstra Declaration -
Merck's 2001 Vaccine for Children Contract with the CDC
(MRK-KRA01371656-92) .................................................. Appx10568

Exhibit 58 to Dykstra Declaration -
Merck's 2002 Vaccine for Children Contract with the CDC
(MRK-KRA01371785-816) .................................................. Appx10606

Exhibit 59 to Dykstra Declaration -
Merck's 2003 Vaccine for Children Contract with the CDC
(MRK-KRA01371311-340) .................................................. Appx10639

Exhibit 60 to Dykstra Declaration -
Merck's 2004 Vaccine for Children Contract with the CDC
(MRK-KRA01371280-310) .................................................. Appx10670

Exhibit 61 to Dykstra Declaration -
Merck's 2005 Vaccine for Children Contract with the CDC
(MRK-KRA01371341-72) ................................................... Appx10702

Exhibit 62 to Dykstra Declaration -
Merck's 2006 Vaccine for Children Contract with the CDC
(MRK-KRA01371624-55) ................................................... Appx10735

Exhibit 63 to Dykstra Declaration -
Merck's 2007 Vaccine for Children Contract with the CDC
(MRK-KRA01371604-23) ................................................... Appx10768

Exhibit 64 to Dykstra Declaration -
Merck's 2008 Vaccine for Children Contract with the CDC
(MRK-KRA01371817-40) ................................................... Appx10789

**Table of Contents**
**(Continued)**

**Page**

Exhibit 65 to Dykstra Declaration -
Merck's 2009 Vaccine for Children Contract with the CDC
(MRK-KRA01371880-1900) ................................................ Appx10814

Exhibit 66 to Dykstra Declaration -
Merck's 2010 Vaccine for Children Contract with the CDC
(MRK-KRA01371373-97) ................................................... Appx10836

Exhibit 67 to Dykstra Declaration -
Merck's 2011 Vaccine for Children Contract with the CDC
(MRK-KRA01371497-518) .................................................. Appx10862

Exhibit 68 to Dykstra Declaration -
Merck's 2012 Vaccine for Children Contract with the CDC
(MRK-KRA01371398-421) .................................................. Appx10885

Exhibit 69 to Dykstra Declaration -
Merck's 2013 Vaccine for Children Contract with the CDC
(MRK-KRA01371422-44) ................................................... Appx10910

Exhibit 70 to Dykstra Declaration -
Merck's 2014 Vaccine for Children Contract with the CDC
(MRK-KRA01371473-96) ................................................... Appx10934

Exhibit 71 to Dykstra Declaration -
Merck's 2015 Vaccine for Children Contract with the CDC
(MRK-KRA01372045-72) ................................................... Appx10959

Exhibit 72 to Dykstra Declaration -
Merck's 2016 Vaccine for Children Contract with the CDC
(MRK-KRA01371962-89) ................................................... Appx10988
*(Cont'd in Vol XXV)*

**Volume XXV**
**(Filed Under Seal)**

Exhibit 73 to Dykstra Declaration -
CDC Vaccine Price List for Vaccines for Children Program
as of April 6, 2001 ............................................................. Appx11017

**Table of Contents**
(Continued)

Exhibit 74 to Dykstra Declaration -
Letter from Katherine Norris to Lisa C. Dykstra, dated
November 24, 2015 (MRK-KRA01373392-1373393) ........ Appx11022

Exhibit 75 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Alan Sims,
taken October 12, 2017 ........................................................ Appx11025

Exhibit 76 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Michele Taylor,
taken May 9, 2017 ................................................................ Appx11045

Exhibit 77 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Colleen Duffy,
taken December 12, 2016 ..................................................... Appx11052

Exhibit 78 to Dykstra Declaration -
Letter from Lisa Dykstra to CDC regarding FOIA
request, dated May 18, 2015 ................................................ Appx11058

Exhibit 79 to Dykstra Declaration -
ACIP's Vaccine Recommendations and Guidelines-MMR
Vaccine Recommendations, last reviewed
November 21, 2014 .............................................................. Appx11067

Exhibit 80 to Dykstra Declaration -
FDA's Vaccines Licensed for Use in the United States ....... Appx11069

Exhibit 81 to Dykstra Declaration -
CDC's Mumps Vaccination, last reviewed
March 8, 2019 ...................................................................... Appx11077

Exhibit 82 to Dykstra Declaration -
Excerpts from the Expert Report of
Thomas G. McGuire Ph.D., dated March 13, 2018 ............. Appx11081

Exhibit 83 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Thomas G. McGuire, taken July 2, 2018 ............................. Appx11086

# Table of Contents
## (Continued)

Exhibit 84 to Dykstra Declaration -
Relator Joan Wlochowski's Responses and Objections
to Merck's Revised First Set of Interrogatories,
dated May 20, 2015 ............................................................ Appx11091

Exhibit 85 to Dykstra Declaration -
Relator Joan Wlochowski's Responses and Objections
to Defendant Merck's Request for Admission,
dated April 6, 2016 ............................................................Appx11116

Exhibit 86 to Dykstra Declaration -
"Live, Attenuated Mumps-Virus Vaccine," *New England
Journal of Medicine*, by R. Weibel, *et al.*,
dated February 2, 1967 ........................................................Appx11144

Exhibit 87 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to Alison Fisher, Ph.D.,
dated October 17, 2005 (MRK-KRA00000479-80) .............Appx11152

Exhibit 88 to Dykstra Declaration -
Response to FDA Request for Information,
dated November 15, 2006 (MRK-KRA00000393-409) .......Appx11155

Exhibit 89 to Dykstra Declaration -
Email from Zak Johns to Marlene Koury,
dated February 23, 2017 ......................................................Appx11173

Exhibit 90 to Dykstra Declaration -
Excerpts from the Expert Report of
Ann M. Arvin, M.D., dated June 11, 2018 ...........................Appx11176

Exhibit 91 to Dykstra Declaration -
Excerpts from the Expert Report of
Dipti Gulati, M.S., D. Phil. ..................................................Appx11183

Exhibit 92 to Dykstra Declaration -
Excerpts from the Expert Report of Anna Durbin, M.D.,
dated June 14, 2018 ............................................................Appx11194

## **Table of Contents**
### (Continued)

Exhibit 93 to Dykstra Declaration -
FDA's Guidance for Industry for the Evaluation of
Combination Vaccines for Preventable Diseases: Production,
Testing and Clinical Studies, dated April 1997 .................... Appx11210

Exhibit 94 to Dykstra Declaration -
CDC's How Flu Vaccine Effectiveness and Efficacy is
Measured, last reviewed January 29, 2016 ......................... Appx11234

Exhibit 95 to Dykstra Declaration -
Excerpts from the CDC's Manual for the Surveillance of
Vaccine-Preventable Diseases ............................................. Appx11243

Exhibit 96 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Joseph Antonello, taken August 3, 2017 ............................. Appx11253

Exhibit 97 to Dykstra Declaration -
"Summary of Notifiable Diseases-United States," 2005,
*MMWR*, dated March 30, 2007 ........................................... Appx11258

Exhibit 98 to Dykstra Declaration -
CDC's Mumps Cases and Outbreaks, last reviewed
September 17, 2019 ............................................................. Appx11361

Exhibit 99 to Dykstra Declaration -
CDC's Mumps: For Healthcare Providers, last reviewed
March 15, 2019 ................................................................... Appx11364

Exhibit 100 to Dykstra Declaration -
CDC's Principles of Epidemiology in Public Health Practice,
Third Edition: An Introduction to Applied Epidemiology
and Biostatistics, last reviewed May 18, 2012 .................... Appx11369

Exhibit 101 to Dykstra Declaration -
CDC's Flu Vaccine Effectiveness: Questions and Answers for
Health Professionals, last updated November 27, 2013 ...... Appx11373

**Table of Contents**
(Continued)

Exhibit 102 to Dykstra Declaration -
"Mumps Virus," by Cherry, *et al.*, *Viral Infections*,
(7th Edition, Chapter 180) .................................................... Appx11383

Exhibit 103 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
David Kessler, M.D., taken September 28, 2018 ................. Appx11399

Exhibit 104 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Anna Durbin, M.D., taken October 8, 2018 ......................... Appx11402

Exhibit 105 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Emilio Emini, Ph.D., taken June 6, 2017 ............................ Appx11406

Exhibit 106 to Dykstra Declaration -
January 1998 *Curriculum Vitae* of David L. Krah, M.D.
(MRK-KRA00000695-702) ................................................. Appx11415

Exhibit 107 to Dykstra Declaration -
Excerpts from the Expert Report of
David A. Kessler, M.D. ...................................................... Appx11424

Exhibit 108 to Dykstra Declaration -
FDA Lot Release ................................................................ Appx11429

Exhibit 109 to Dykstra Declaration -
Drugs@FDA Instructions: Health Information ................... Appx11434

Exhibit 110 to Dykstra Declaration -
FDA's Vaccine Safety Questions and Answers .................... Appx11440

Exhibit 111 to Dykstra Declaration -
Excerpts from the Expert Report of
Gary Freed M.D., MPH ...................................................... Appx11447

**Table of Contents**
(Continued)

Exhibit 112 to Dykstra Declaration -
"Vaccine Manufacturing," by Philip Gomez
and James Robinson ............................................................ Appx11450

Exhibit 113 to Dykstra Declaration -
Informational Amendment: Clinical, dated September 15, 2011
(GSK-MMR-IND-0022162-3) ............................................. Appx11461

Exhibit 114 to Dykstra Declaration -
Mumps Serology Strategy in Support of Phase III
Development of Priorix®
(GSK-MMR-IND-0022180-6) ............................................. Appx11464

Exhibit 115 to Dykstra Declaration -
Fax from Yolanda Stewart to Donna Boyce,
dated April 25, 2012 (GSK-MMR-IND-0029256-63) ......... Appx11472

Exhibit 116 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Dipti Gulati, M.S., D. Phil., taken December 5, 2018 ......... Appx11481

Exhibit 117 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Amy Keegan,
taken February 9, 2018 ........................................................ Appx11485

Exhibit 118 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
David Krah, M.D., taken July 11, 2017 ................................ Appx11488

Exhibit 119 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
David Krah, M.D., taken July 12, 2017 ................................ Appx11493

Exhibit 120 to Dykstra Declaration -
Excerpts from the Expert Report of
Marcela Pasetti, Ph.D. ......................................................... Appx11497
*(Cont'd in Vol XXVI)*

**Table of Contents**
**(Continued)**

**Volume XXVI**
**(Filed Under Seal)**

Exhibit 121 to Dykstra Declaration -
M-M-R®II Current Label .................................................... Appx11507

Exhibit 122 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Cynthia Morrisey, taken July 27, 2017 ................................ Appx11519

Exhibit 123 to Dykstra Declaration -
Supplemental Biologics License Application,
dated January 29, 2004 (MRK-KRA00000032-139) ........... Appx11522

Exhibit 124 to Dykstra Declaration -
Amendment to Supplemental Biologics License
Application Response to FDA Request for Information,
dated June 5, 2007, with Attachments
(MRK-KRA00000368-82) .................................................... Appx11631

Exhibit 125 to Dykstra Declaration -
Approval Letter, dated December 8, 2007
(MRK-KRA00000383-4) ..................................................... Appx11647

Exhibit 126 to Dykstra Declaration -
Letter from Paul Richman, Ph.D. to Alison Fisher, Ph.D.,
dated May 18, 2007 (MRK-KRA00000385-6) .................... Appx11650

Exhibit 127 to Dykstra Declaration -
Response to Form FDA 483, dated August 20, 2001
(MRK-KRA00000481-539) ................................................. Appx11653

Exhibit 128 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
teleconference regarding clarification of CBER's comments on
the Mumps Expiry trial, dated November 10, 1998
(MRK-KRA00001215-7) ..................................................... Appx11713

**Table of Contents**
(Continued)

**Page**

Exhibit 129 to Dykstra Declaration -
Memo re: Mumps End Expiry trial; November 29th, 2000
CBER teleconference, dated November 29, 2000
(MRK-KRA00001218-21) .................................................... Appx11717

Exhibit 130 to Dykstra Declaration -
Letter from Manal Morsy, M.D., Ph.D., to Luba Vujcic,
dated December 1, 1999 (MRK-KRA00001222-30) ........... Appx11722

Exhibit 131 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to
Manal Morsy, M.D., Ph.D., dated October 27, 2000
(MRK-KRA00001231-6) .................................................... Appx11732

Exhibit 132 to Dykstra Declaration -
General Correspondence to FDA, dated November 16, 2000
(MRK-KRA00001237-48) .................................................... Appx11739

Exhibit 133 to Dykstra Declaration -
Memo re: MMRV (BB-IND 7068): Summary of Pre-Phase III
teleconference discussion on 01/31/00 with CBER,
dated January 31, 2000 (MRK-KRA00001249-52) ............. Appx11752

Exhibit 134 to Dykstra Declaration -
Teleconference Minutes with CBER, dated February 19, 1999
(MRK-KRA00001253-4) .................................................... Appx11757

Exhibit 135 to Dykstra Declaration -
Memo re: BB-IND 1016: Summary of discussion with Dr.
Kathryn Carbone and Ms. Luba Vujcic (CBER) regarding the
Mumps neutralization assay, dated February 8, 2000
(MRK-KRA00001255-57) .................................................... Appx11760

Exhibit 136 to Dykstra Declaration -
Meeting Minutes, dated March 14, 2000
(MRK-KRA00001258-61) .................................................... Appx11764

**Table of Contents**
**(Continued)**

**Page**

Exhibit 137 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II) and BB-IND 7068
(MMRV); Summary of face-to-face meeting discussion
(3/13/00) with CBER regarding wild type mumps
neutralization and ELISA assays, dated March 13, 2000
(MRK-KRA00001262-5) .................................................... Appx11768

Exhibit 138 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to Keith Chirgwin, M.D.,
dated August 30, 1999 (MRK-KRA00001266-9) ................ Appx11773

Exhibit 139 to Dykstra Declaration -
Letter from M. Carolyn Hardegree, M.D. to
Keith Chirgwin, M.D., dated September 8, 1998
(MRK-KRA00001467-9) .................................................... Appx11778

Exhibit 140 to Dykstra Declaration -
Response to FDA Request for Information,
dated December 30, 1999 (MRK-KRA00001470-1924) ..... Appx11782
***(Cont'd in Vol XXVII)***

**Volume XXVII**
**(Filed Under Seal)**

Exhibit 141 to Dykstra Declaration -
Letter from Loris McVittie, Ph.D. to
Roberta L. McKee, Ph.D., dated August 20, 1999
(MRK-KRA00018614-9) .................................................... Appx12238

Exhibit 142 to Dykstra Declaration -
Memo re: Teleconference with CBER: Mumps End
Expiry trial-BB IND 1016, dated November 8, 2000
(MRK-KRA00025161-2) .................................................... Appx12245

Exhibit 143 to Dykstra Declaration -
FDA Warning Letter, dated February 9, 2001
(PUBLIC0000666-670) ...................................................... Appx12248

**Table of Contents**
**(Continued)**

Exhibit 144 to Dykstra Declaration -
Memo re: M-M-R®II (BB-IND 1016); Summary of telephone
discussions on 11/23/99 and 12-06-99 with Ms. Luba Vujcic
(CBER) regarding the neutralization assay results and impact
on Equivalence Margin and lower bound criterion of the
M-M-R®II End Expiry Study hypothesis,
dated December 23, 1999 (MRK-KRA00025713-24) ......... Appx12254

Exhibit 145 to Dykstra Declaration -
Memo re: BB-IND 1016: Summary of discussion with
Ms. Luba Vujcic (CBER) regarding the Mumps neutralization
assay, dated January 5, 2000 (MRK-KRA00048855) ......... Appx12267

Exhibit 146 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
teleconference on methods used for the plaque reduction
neutralization assay, dated February 22, 2019
(MRK-KRA00062710-3) .................................................... Appx12269

Exhibit 147 to Dykstra Declaration -
Meeting Minutes with CBER, dated March 13, 2000
(MRK-KRA00062845-53) ................................................... Appx12274

Exhibit 148 to Dykstra Declaration -
Email from David M. Wonnacott to Roberta L. McKee, Ph.D.,
dated May 12, 1999 (MRK-KRA00094960) ....................... Appx12284

Exhibit 149 to Dykstra Declaration -
Email from Katalin G. Abraham to Joye L. Bramble,
dated December 3, 1998 (MRK-KRA00095063) ................ Appx12286

Exhibit 150 to Dykstra Declaration -
Memo re: Teleconference with Dr. Norman Baylor, CBER,
Regarding Meeting on Expiry Titers for M-M-R®II,
dated December 3, 1998 (MRK-KRA00095064) ................ Appx12288

**Table of Contents**
**(Continued)**

Exhibit 151 to Dykstra Declaration -
Memo re: Teleconference with Norman Baylor, CBER,
on 11/16/98, Regarding VARIVAX® and M-M-R®II,
dated November 16, 1998 (MRK-KRA00095065) ............. Appx12290

Exhibit 152 to Dykstra Declaration -
Email from Katalin G. Abraham to Keith Chirgwin, M.D.,
dated October 5, 1998 (MRK-KRA00095142) ................... Appx12292

Exhibit 153 to Dykstra Declaration -
ProQuad™ Original Application, dated August 3, 2004
(MRK-KRA00158320-526) ................................................ Appx12294
*(Cont'd in Vol XXVIII)*

**Volume XXVIII**
**(Filed Under Seal)**

Exhibit 154 to Dykstra Declaration -
Memo re: CBER teleconference (October 16, 2001): Measles,
Mumps and Rubella ELISAs, dated October 19, 2001
(MRK-KRA00201389-91) ................................................ Appx12502

Exhibit 155 to Dykstra Declaration -
Clinical Study Report for the Protocol 007 Study
(MRK-KRA00224982-6529) ............................................ Appx12506
*(Cont'd in Vols XXIX, XXX, and XXXI)*

**Volume XXXI**
**(Filed Under Seal)**

Exhibit 156 to Dykstra Declaration -
Memo re: Supporting Documents for Stephen Krahling,
dated October 10, 2000 (MRK-KRA00331424-33) ............ Appx14055

Exhibit 157 to Dykstra Declaration -
Neutralization Assay Draft faxed on February 19, 1999
(MRK-KRA00336634-6) ................................................... Appx14066

**Table of Contents**
**(Continued)**

Exhibit 158 to Dykstra Declaration -
Letter from Paul G. Richman, Ph.D. to Alison Fisher, Ph.D.,
dated May 18, 2007 (MRK-KRA00570703-5) .................... Appx14070

Exhibit 159 to Dykstra Declaration -
Response to FDA Request for Information,
dated February 2, 2001 (MRK-KRA00622078-273) ........... Appx14074

Exhibit 160 to Dykstra Declaration -
Response to FDA Request for Information,
dated August 1, 2002 (MRK-KRA00624279-87) ................ Appx14271

Exhibit 161 to Dykstra Declaration -
General Correspondence to FDA, dated June 23, 1998
(MRK-KRA00624345-4446) ............................................... Appx14281

Exhibit 162 to Dykstra Declaration -
Response to FDA Request for Information,
dated February 5, 1999 (MRK-KRA00624448-4589) ......... Appx14384
*(Cont'd in Vol XXXII)*

**Volume XXXII**
**(Filed Under Seal)**

Exhibit 163 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
telephone conversations on 9/24/98 regarding the revised
M-M-R®II draft label and on 9/29/98 regarding the mumps
expiry protocol, dated September 29, 1998
(MRK-KRA00636592-3) .................................................... Appx14527

Exhibit 164 to Dykstra Declaration -
Biological Product Deviation Report Form,
dated April 20, 2001 (MRK-KRA00754233-8) ................... Appx14530

Exhibit 165 to Dykstra Declaration -
M-M-R®II Label (March 1995)
(MRK-KRA00757060-3) .................................................... Appx14537

**Table of Contents**
**(Continued)**

Exhibit 166 to Dykstra Declaration -
M-M-R®II Label (April 1999)
(MRK-KRA00757072-6) ..................................................... Appx14542

Exhibit 167 to Dykstra Declaration -
M-M-R®II Label (2004) (MRK-KRA00757100-3) ............ Appx14548

Exhibit 168 to Dykstra Declaration -
Response to FDA Request for Information,
dated November 17, 2004 (MRK-KRA00761530-8) .......... Appx14553

Exhibit 169 to Dykstra Declaration -
Response to CBER Comments, dated June 10, 2002
(MRK-KRA00761628-702) ................................................. Appx14563

Exhibit 170 to Dykstra Declaration -
Email from Charlotte Shay to Michael L. Dekleva,
dated June 30, 2004 (MRK-KRA00791508-10) .................. Appx14639

Exhibit 171 to Dykstra Declaration -
Meeting Minutes from a MMRV Pre-Phase III meeting
with CBER, dated February 16, 2000
(MRK-KRA00821856-61) ................................................. Appx14643

Exhibit 172 to Dykstra Declaration -
Approval Letter, dated September 6, 2005
(MRK-KRA00821906-9) ................................................... Appx14650

Exhibit 173 to Dykstra Declaration -
Regulatory Liaison FDA Conversation Record,
dated October 5, 2004 (MRK-KRA00846405-15) .............. Appx14655

Exhibit 174 to Dykstra Declaration -
CBER's Clinical Review of Studies submitted in support of
Licensure of ProQuad™ (MRK-KRA01285010-272) ........ Appx14667

Exhibit 175 to Dykstra Declaration -
FDA report on the release of MMR,
dated February 23, 2016 (MRK-KRA01447562) ................ Appx14931

**Table of Contents**
(Continued)

Exhibit 176 to Dykstra Declaration -
Standard Operating Procedure-Preparation, Review and
Shipment of Biological Product Protocols and Samples to
CBER, dated September 23, 2015
(MRK-KRA01448181-207) ................................................ Appx14933

Exhibit 177 to Dykstra Declaration -
Letter from Roberta L. McKee, Ph.D. to Steven Masiello,
dated March 8, 2001 (MRK-KRA01537603-11) ................. Appx14961

Exhibit 178 to Dykstra Declaration -
Letter from Roberta L. McKee, Ph.D. regarding a proposal for
changes to release specifications, dated December 10, 1998
(MRK-KRA01622125) ....................................................... Appx14971

Exhibit 179 to Dykstra Declaration -
Prior Approval Supplement from Roberta L. McKee, Ph.D.
to William Egan, Ph.D., dated June 18, 1999
(MRK-KRA01622463-5) .................................................... Appx14973

Exhibit 180 to Dykstra Declaration -
Minutes from a December 8, 1998 Meeting,
dated January 8, 1999 (MRK-KRA01622468-72) ............... Appx14977

Exhibit 181 to Dykstra Declaration -
Letter from Katalin Abraham to Dr. Suresh Rastogi
(MRK-KRA01622552) ....................................................... Appx14983

Exhibit 182 to Dykstra Declaration -
Letter from David Wonnacott Ph.D. to Dr. Suresh Rastogi,
dated December 16, 1998 (MRK-KRA01622600-1) ........... Appx14985

Exhibit 183 to Dykstra Declaration -
Prior Approval Supplement from Roberta L. McKee, Ph.D. to
William Egan, Ph.D., dated September 15, 1999
(MRK-KRA01622711-2) .................................................... Appx14988

# Table of Contents
## (Continued)

Exhibit 184 to Dykstra Declaration -
Attachment 4 to the Prior Approval Supplement from
Roberta L. McKee, Ph.D. to William Egan, Ph.D.,
dated September 15, 1999 (MRK-KRA01622778-9) .......... Appx14991

Exhibit 185 to Dykstra Declaration -
Letter from William Egan, Ph.D. to Roberta L. McKee, Ph.D.,
dated August 20, 1999 (MRK-KRA01624909-10) .............. Appx14994

Exhibit 186 to Dykstra Declaration -
Letter from Barry D. Garfinkle, Ph.D. to Carolyn Hardegree,
M.D., dated January 28, 1998
(MRK-KRA01625508-5639) ............................................. Appx14997
*(Cont'd in Vol XXXIII)*

## Volume XXXIII
## (Filed Under Seal)

Exhibit 187 to Dykstra Declaration -
Letter from Peter Patriarca, M.D. to Roberta L. McKee, Ph.D.,
dated February 11, 2000 (MRK-KRA0187091-2) .............. Appx15130

Exhibit 188 to Dykstra Declaration -
MMR Statistical Analysis of Potency on Stability,
dated October 24, 2000 (MRK-KRA01897103-7271) ........ Appx15133

Exhibit 189 to Dykstra Declaration -
Letter from David Wonnacott, Ph.D. to Carolyn Hardegree,
M.D., dated December 5, 1997 (MRK-KRA01972451) ..... Appx15303

Exhibit 190 to Dykstra Declaration -
Various Correspondence between the FDA and Merck,
dated 1969 to 1994 (MRK-KRA01972464-546) ................. Appx15305

Exhibit 191 to Dykstra Declaration -
Various Email Correspondence in 1997
(MRK-KRA01972735-58) ................................................... Appx15389

## Table of Contents
### (Continued)

Exhibit 192 to Dykstra Declaration -
Vaccine & Biological Stability Protocol,
dated September 6, 2016 (MRK-KRA02139917-25) .......... Appx15414

Exhibit 193 to Dykstra Declaration -
Chapter "Mumps Vaccine," by Steven Rubin and
Stanley Plotkin ................................................... Appx15424

Exhibit 194 to Dykstra Declaration -
Stephen Krahling's 2001 Correspondence
(RELATOR_00000736-66) .................................... Appx15453

Exhibit 195 to Dykstra Declaration -
Letter from Axel Johnson to Tonia Torquato,
dated November 30, 2001 (RELATOR_00001036-43) ....... Appx15485

Exhibit 196 to Dykstra Declaration -
Stephen Krahling's 2001 Correspondence and Papers
(RELATOR_00001071-90) .................................... Appx15494
*(Cont'd in Vol XXXIV)*

### Volume XXXIV
### (Filed Under Seal)

Exhibit 197 to Dykstra Declaration -
Chapter "Mumps Vaccine," by Steven Rubin,
in Plotkin's Vaccines, 7th edition (2018) ............................ Appx15515

Exhibit 198 to Dykstra Declaration -
Letter from Kevin Malone to Kathleen Hardway,
dated July 31, 2018 ............................................. Appx15548

Exhibit 199 to Dykstra Declaration -
"Live, Attenuated Mumps Virus Vaccine," *New England
Journal of Medicine*, by R. Weibel, *et al.*,
dated February 2, 1967 ....................................... Appx15556

# Table of Contents
## (Continued)

Exhibit 200 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Luwy Musey, M.D., taken October 7, 2016 ......................... Appx15565

Exhibit 201 to Dykstra Declaration -
Rule 30(b)(6) Deposition Topics, dated December 13, 2016
(Stannard Ex. 3) .................................................................. Appx15569

Exhibit 202 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Mark Stannard,
taken December 13, 2016 ...................................................... Appx15585

Exhibit 203 to Dykstra Declaration -
*Curriculum Vitae* of Joan L. Wlochowski ........................... Appx15595

Exhibit 204 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Joan L. Wlochowski, taken June 13, 2017 ........................... Appx15597

Exhibit 205 to Dykstra Declaration -
FDA/CDC Submission, dated October 23, 2019 ................. Appx15603

Exhibit 206 to Dykstra Declaration -
Excerpts of Defendant Merck's Responses and Objections to
Relators' Third Set of Requests for Admission,
dated August 16, 2017 ......................................................... Appx15719

Exhibit 207 to Dykstra Declaration -
"Vaccine Impact: Benefits for human health,"
by M. Doherty *et al.*, in *Vaccine* 34 (2016) ........................... Appx15722

Exhibit 208 to Dykstra Declaration -
FDA Prescription Drug Labeling Resources ........................ Appx15731

Exhibit 209 to Dykstra Declaration -
ACIP Committee Members .................................................. Appx15738

**Table of Contents**
**(Continued)**

**Page**

Exhibit 210 to Dykstra Declaration -
"Notice to Readers: Updated Recommendations of the
ACIP for the Control and Elimination of Mumps," *MMWR*,
June 9, 2006/55(22); 629-630 .............................................. Appx15743

Exhibit 211 to Dykstra Declaration -
"Measles Prevention: Recommendations of the ACIP,"
*MMWR*, December 28, 1989 38(S-9); 1-18 ......................... Appx15749

Exhibit 212 to Dykstra Declaration -
"FDA in Brief: FDA reiterates the importance of vaccines
such as MMR vaccine," dated September 6, 2019 .............. Appx15766

Exhibit 213 to Dykstra Declaration -
"Recommendations of the ACIP Mumps Prevention,"
*MMWR*, June 9, 1989/38(22) ............................................... Appx15769

Exhibit 214 to Dykstra Declaration -
"Recommendation of the ACIP Mumps Vaccine,"
*MMWR*, November 26, 1982; 31(46) ................................... Appx15777

Exhibit 215 to Dykstra Declaration -
Statement by Peter Marks M.D., Ph.D., FDA, on FDA's
continued confidence in the safety and effectiveness
of the MMR vaccine, dated April 22, 2019 ......................... Appx15783

Exhibit 216 to Dykstra Declaration -
About CBER ...................................................................... Appx15788

Exhibit 217 to Dykstra Declaration -
Excerpt from FDA's Website on Warning Letters ................ Appx15791

Exhibit 218 to Dykstra Declaration -
Excerpt of FDA's Website with an Index to Warning
Letters for 'M' Companies ................................................... Appx15794

**Table of Contents**
**(Continued)**

Page

Exhibit 219 to Dykstra Declaration -
"The Immunological Basis for Immunization Series, Module
16: Mumps," by McLean, *et al.*, *Immunization, Vaccines and
Biologicals-World Health Organization* (2010) ................... Appx15817

Exhibit 220 to Dykstra Declaration -
Email from Sue Manoff to Mark Paponia,
dated February 25, 2000 (MRK-KRA00091399-405) ......... Appx15862

Exhibit 221 to Dykstra Declaration -
Memo re: Teleconference with Norman Baylor, CBER, on
11/16/98, Regarding VARIVAX® and M-M-R®II
(MRK-KRA00095065) ....................................................... Appx15870

Exhibit 222 to Dykstra Declaration -
M-M-R®II Label (MRK-KRA00757064-7) ....................... Appx15872

Exhibit 223 to Dykstra Declaration -
M-M-R®II Label (February 2001)
(MRK-KRA00757068-71) ................................................. Appx15877

Exhibit 224 to Dykstra Declaration -
M-M-R®II Label (August 2001)
(MRK-KRA00757077-80) ................................................. Appx15882

Exhibit 225 to Dykstra Declaration -
M-M-R®II Label (February 2006)
(MRK-KRA00757081-4) ................................................... Appx15887

Exhibit 226 to Dykstra Declaration -
M-M-R®II Label (March 1995)
(MRK-KRA00757085-8) ................................................... Appx15892

Exhibit 227 to Dykstra Declaration -
M-M-R®II Label (March 1995)
(MRK-KRA00757089-91) ................................................. Appx15897

**Table of Contents**
(Continued)

**Page**

Exhibit 228 to Dykstra Declaration -
M-M-R®II Label (October 2003)
(MRK-KRA00757092-5) ..................................................... Appx15901

Exhibit 229 to Dykstra Declaration -
M-M-R®II Label (September 2002)
(MRK-KRA00757096-9) ..................................................... Appx15906

Exhibit 230 to Dykstra Declaration -
M-M-R®II Label (February 2007)
(MRK-KRA00757104-7) ..................................................... Appx15911

Exhibit 231 to Dykstra Declaration -
M-M-R®II Label (February 2007)
(MRK-KRA00757108-11) ..................................................... Appx15916

Exhibit 232 to Dykstra Declaration -
M-M-R®II Label (April 19999)
(MRK-KRA01449029-40) ..................................................... Appx15921

Exhibit 233 to Dykstra Declaration -
M-M-R®II Label (February 2014)
(MRK-KRA01449226-36) ..................................................... Appx15934

Exhibit 234 to Dykstra Declaration -
M-M-R®II Label (June 2014)
(MRK-KRA01449243-53) ..................................................... Appx15946

Exhibit 235 to Dykstra Declaration -
M-M-R®II Label (October 2015)
(MRK-KRA01449260-70) ..................................................... Appx15958

Exhibit 236 to Dykstra Declaration -
M-M-R®II Label (February 2000)
(MRK-KRA01449271-5) ..................................................... Appx15970

Exhibit 237 to Dykstra Declaration -
M-M-R®II Label (March 2010)
(MRK-KRA01449276-83) ..................................................... Appx15976

## Table of Contents
## (Continued)

**Page**

Exhibit 238 to Dykstra Declaration -
M-M-R®II Label (December 2010)
(MRK-KRA01449284-91) .................................................. Appx15985

Exhibit 239 to Dykstra Declaration -
M-M-R®II Label (September 2009)
(MRK-KRA01449292-99) .................................................. Appx15994
*(Cont'd in Vol XXXV)*

**Volume XXXV**
**(Filed Under Seal)**

Exhibit 240 to Dykstra Declaration -
Attachment 1 to Letter from Barry D. Garfinkle, Ph.D.
to Carolyn Hardegree, M.D., dated January 28, 1998
(MRK-KRA01625510-639) ................................................ Appx16003

Exhibit 241 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II) and BB-IND 7068
(MMRV); Summary of Face-to face meeting discussion
(3/13/00) with CBER regarding wild type mumps
neutralization and ELISA assays, dated March 13, 2000
(MRK-KRA00019855-7) .................................................. Appx16134

Exhibit 242 to Dykstra Declaration -
PowerPoint Presentation entitled Immunogenicity
Mumps-Containing Vaccines (MRK-KRA00091408) ........ Appx16138

Exhibit 243 to Dykstra Declaration -
Letter from David M. Wommacott, Ph.D. to
Suresh C. Rastogi, Ph.D., dated December 16, 1998
(MRK-KRA01629294-1629295) ........................................ Appx16152

Exhibit 244 to Dykstra Declaration -
Response to the FDA Form 483, dated October 24, 2000
(MRK-KRA01649535-1649551) ........................................ Appx16155

Exhibit 245 to Dykstra Declaration -
Warning Letters from FDA Website .................................... Appx16173

**Table of Contents**
**(Continued)**

Exhibit 246 to Dykstra Declaration -
MMD Quality Manual Glossary, dated October 5, 2016
(MRK-KRA01679618-1679772) ......................................... Appx16176

Exhibit 247 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Eric Metzger,
taken June 11, 2015 ............................................................. Appx16332

Exhibit 248 to Dykstra Declaration -
Federal Register Vol. 58 No. 137, July 20, 1993 ................. Appx16336

Exhibit 249 to Dykstra Declaration -
FDA Review of Vaccine Labeling Requirements for
Warnings, Use Instructions, and Precautionary
Information, dated October 2004 ......................................... Appx16342

Defendant Merck's Response to Relators' Statement of
    Material Facts, dated November 26, 2019 (Doc. 299) .......... Appx16345

**Volume XXXVI**
**(Filed Under Seal)**

Declaration of Lisa C. Dykstra, for Merck, in Support of
    Response to Relators' Statement of Material Facts,
    executed November 26, 2019 (Doc. 299) ............................. Appx16501

Exhibit 250 to Dykstra Declaration -
"Mumps Complications and Effects of Mumps Vaccination,
England and Wales, 2002-2006," by Yung, Chee-Fu, *et al.*,
*Emerging Infectious Diseases*, (2011) 17(4):661-667 ......... Appx16513

Exhibit 251 to Dykstra Declaration -
Excerpts from the Deposition Testimony of April Cohen,
taken January 4, 2018 ......................................................... Appx16521

# Table of Contents
## (Continued)

Exhibit 252 to Dykstra Declaration -
"Mumps Virus-Specific Antibody Titers from Pre-Vaccine
Era Sera: Comparison of the Plaque Reduction Neutralization
Assay Enzyme Immunoassays," by Mauldin, Jeremy, *et al.*,
*Journal of Clinical Microbiology*, 2005:43(9):4847-4851 .. Appx16525

Exhibit 253 to Dykstra Declaration -
"Correlates of Protection," by Plotkin and Gilbert,
2018:35-40 ........................................................................ Appx16531

Exhibit 254 to Dykstra Declaration -
FDA, Guidance for Industry: FDA Review of Vaccine
Labeling Requirements for Warnings, Use Instructions, and
Precautionary Information, dated September 2004 ............. Appx16538

Exhibit 255 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Roberta L. McKee, Ph.D., taken March 30, 2017 ............... Appx16547

Exhibit 256 to Dykstra Declaration -
Excerpts from the Expert Report of
Dipti Gulati, MS, D. Phil. .................................................. Appx16551

Exhibit 257 to Dykstra Declaration -
Biological Product Deviation Report Form
submitted by Merck to the FDA, dated March 5, 2001
(MRK-KRA00754239-44) .................................................. Appx16556

Exhibit 258 to Dykstra Declaration -
"Jeryl Lynn Strain Live Attenuated Mumps Virus Vaccine
-Influence of Age, Virus Dose, Lot, and-Globulin
Administration on Response," by Buynak, Eugene, *et al.*,
*Journal of the American Medical Association* (1968)
203(1):63-67 ....................................................................... Appx16563

Exhibit 259 to Dykstra Declaration -
2003 Annual Stability Report for M-M-R®II
(MRK-KRA01632888-945) ................................................ Appx16569

**Table of Contents**
(Continued)

Exhibit 260 to Dykstra Declaration -
"Sensitive Neutralization Test for virus antibody,"
by Sato *et al.*, *Archives of Virology*, (1978) 58:301-311 ...... Appx16628

Exhibit 261 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to Alison Fisher, Ph.D.,
dated December 3, 2004 (MRK-KRA00000361-5) ............. Appx16640

Exhibit 262 to Dykstra Declaration -
Fax from Luba Vujcic to Alison Fisher, Ph.D.,
dated July 20, 2007 (MRK-KRA00141957-8) ................... Appx16646

Exhibit 263 to Dykstra Declaration -
Submission, dated August 8, 2007
(MRK-KRA00000140-225) ................................................ Appx16649

Exhibit 264 to Dykstra Declaration -
Submission, dated December 3, 2007
(MKR-KRA00000226-300) ............................................... Appx16736

Exhibit 265 to Dykstra Declaration -
"Long-Term Persistence of Mumps Antibody after Receipt of 2
Measles-Mumps-Rubella (MMR) Vaccinations and Antibody
Response after a Third MMR Vaccination among a University
Population," by Date, Anand, *et al.*, *Journal of Infectious
Diseases*, (2008) 197:1662-1668 ........................................ Appx16812

Exhibit 266 to Dykstra Declaration -
"Mumps Antibody Levels Among Students Before a Mumps
Outbreak: In Search of a Correlate of Immunity,"
by Cortese, *et al.*, *Journal of Infectious Diseases*, (2011)
204:1413-1422 ................................................................. Appx16820

**Table of Contents**
**(Continued)**

Exhibit 267 to Dykstra Declaration -
"Immunogenicity and Safety of Two Tetravalent (Measles,
Mumps, Rubella, Varicella) Vaccines Coadministered With
Hepatitis A and Pneumococcal Conjugate Vaccines to Children
Twelve to Fourteen Months of Age," by Blatter, *et al.*,
*The Pediatric Infectious Disease Journal,*
(2012) 31:e133-e140 .......................................................... Appx16831

Exhibit 268 to Dykstra Declaration -
Analytical Validation Protocol
(MRK-KRA00337307-18) .................................................. Appx16840

Exhibit 269 to Dykstra Declaration -
Expert Report of Robert Platt, Ph.D.,
dated June 14, 2018 ........................................................... Appx16853

Exhibit 270 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Amy Keegan,
taken April 27, 2017 .......................................................... Appx16992

Exhibit 271 to Dykstra Declaration -
Documentation of Work Activities
(RELATOR_00000272-3) .................................................. Appx16995

Exhibit 272 to Dykstra Declaration -
Work Summary Document (RELATOR_00000274-6) ........ Appx16998
*(Cont'd in Vol XXXVII)*

**Volume XXXVII**
**(Filed Under Seal)**

Exhibit 273 to Dykstra Declaration -
Submission, dated May 5, 2005
(MRK-KRA00176342-176654) .......................................... Appx17002

Exhibit 274 to Dykstra Declaration -
Submission, dated June 30, 2004
(MKR-KRA00137854-55 and 8137-72) ............................. Appx17316

**Table of Contents**
**(Continued)**

Exhibit 275 to Dykstra Declaration -
"Safety and Immunogenicity of Human Serum Albumin-Free
MMR Vaccine in US Children Aged 12-15 months,"
by Mufson, *et al.*, *Journal of Pediatric Infectious Diseases
Society*, (2014) 4:339-348 .................................................. Appx17355

Exhibit 276 to Dykstra Declaration -
Letter from Jerry P. Weir, Ph.D. to Alison Fisher, Ph.D.,
dated December 30, 2004 (MRK-KRA00141670-2) ........... Appx17366

Exhibit 277 to Dykstra Declaration -
Submission, dated February 28, 2005
(MRK-KRA00141676-729) ................................................. Appx17370

Exhibit 278 to Dykstra Declaration -
Submission, dated July 13, 2005
(MRK-KRA00141789-906) ................................................. Appx17425
***(Cont'd in Vol XXXVIII)***

**Volume XXXVIII**
**(Filed Under Seal)**

Exhibit 279 to Dykstra Declaration -
"Summary of Notifiable Diseases-United States 2012,"
*MMWR*, 2014:61(53):1-121 ................................................. Appx17544

Exhibit 280 to Dykstra Declaration -
CDC Publication "Mumps Outbreak-Related Questions
and Answers for Patients," last reviewed March 15, 2019 .. Appx17669

Exhibit 281 to Dykstra Declaration -
CDC Publication "Nationally Notifiable Infectious Diseases
and Conditions, United States: Annual Tables" ................... Appx17672

Exhibit 282 to Dykstra Declaration -
"Characteristics of Large Mumps Outbreaks in the United
States during July 2010-December 2015," by Clemmons,
Nakia *et al.*, *Clinical Infectious Diseases*, (2019) ............... Appx17676

**Table of Contents**
**(Continued)**

Exhibit 283 to Dykstra Declaration -
CDC Publication "Healthy People 2010 Final Review" ...... Appx17684
*(Cont'd in Vol XXXIX)*

**Volume XXXIX**
**(Filed Under Seal)**

Exhibit 284 to Dykstra Declaration -
CDC Publication "Healthy People 2020 Immunization and
Infectious Diseases Objectives" ........................................... Appx18245

Exhibit 285 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.2
Cases of Hib Data" ............................................................... Appx18278

Exhibit 286 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.4
U.S.-acquired cases of Measles Data" ................................. Appx18280

Exhibit 287 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.5
U.S.-acquired cases of Mumps Data" .................................. Appx18282

Exhibit 288 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.9
 U.S.-acquired cases of Rubella Data" ................................. Appx18284

Exhibit 289 to Dykstra Declaration -
CDC Webpage "National Center for Immunization
and Respiratory Diseases" ................................................... Appx18286

Exhibit 290 to Dykstra Declaration -
"Mumps vaccination coverage and vaccine effectiveness in a
large outbreak among college students-Iowa, 2006,"
by Marin, Mona *et al.*, *Vaccine*, (2008) 26:3601-3607 ........ Appx18301

**Table of Contents**
**(Continued)**

**Page**

Exhibit 291 to Dykstra Declaration -
"Mumps Outbreak in Orthodox Jewish Communities in the
United States," Barskey, Albert, *et al.*, *New England Journal
of Medicine*, (2012) 367(18):1704-1713 .............................. Appx18309

Exhibit 292 to Dykstra Declaration -
"Impact of a Third Dose of Measles-Mumps-Rubella Vaccine
on a Mumps Outbreak," by Ogbuanu, Ikechukwu, *et al.*,
*Pediatrics*, (2012) 130(6):1-8 ............................................ Appx18320

Exhibit 293 to Dykstra Declaration -
"Epidemiology of a Mumps Outbreak in a Highly Vaccinated
Island Population and Use of a Third Dose of Measles-
Mumps-Rubella Vaccine for Outbreak Control—Guam 2009
to 2010," by Nelson, George, *et al.*, *Pediatric Infectious
Disease Journal*, (2013) 32(4):374-380 .............................. Appx18330

Exhibit 294 to Dykstra Declaration -
"Effectiveness of a Third Dose of MMR Vaccine for Mumps
Outbreak Control," by Cardemil, Cristina, *et al.*, *New England
Journal of Medicine*, (2017) 377(10):947-956 .................... Appx18338

Exhibit 295 to Dykstra Declaration -
"Mumps in a highly vaccinated Marshallese community in
Arkansas, USA: an outbreak report," by Fields, Virgie, *et al.*,
*Lancet Infectious Diseases*,
(Published online January 8, 2019) 1-8 .............................. Appx18349

Exhibit 296 to Dykstra Declaration -
"Antibody Induced by Immunization with the Jeryl Lynn
Mumps Vaccine Strain Effectively Neutralizes a Heterologous
Wild-Type Mumps Virus Associated with a Large Outbreak,"
by Rubin, Steven, *et al.*, *Journal of Infectious Diseases*, (2008)
198:508-515 ....................................................................... Appx18358

Exhibit 297 to Dykstra Declaration -
"Vaccine waning and mumps-re-emergence in the United
States," by Lewnard, Joseph and Grad, Yonatan, *Science
Translational Medicine*, (2018) 10(433):1-10 .................... Appx18367

# Table of Contents
## (Continued)

**Page**

Exhibit 298 to Dykstra Declaration -
"Comment: The changing epidemiology of mumps in a high
vaccination era," by Marshall, Helen and Plotkin, Stanley,
*Lancet Infectious Diseases*, (2019) 19:118-119 ................... Appx18379

Exhibit 299 to Dykstra Declaration -
"Successes and challenges for preventing measles, mumps and
rubella by vaccination," by Bankamp, Bettina, *et al.*, *Current
Opinion in Virology*, (2019) 34:110-116 .............................. Appx18382

Exhibit 300 to Dykstra Declaration -
"Mumps Vaccines Do We Need a New One?," by Rubin,
Steven and Beeler, Judy, *Pediatric Infectious Disease Journal*,
(2013) 32(10):1156-1157 .................................................... Appx18390

Exhibit 301 to Dykstra Declaration -
CDC website listing Measles-related *MMWR* Articles ........ Appx18393

Exhibit 302 to Dykstra Declaration -
CDC website listing Pertussis (Whooping Cough)
Publications ........................................................................ Appx18399

Exhibit 303 to Dykstra Declaration -
CDC website listing Chickenpox (Varicella) References and
Resources .......................................................................... Appx18407

Exhibit 304 to Dykstra Declaration -
CDC webpage: Glossary ..................................................... Appx18411

Exhibit 305 to Dykstra Declaration -
Email from Jeanne Santoli to Eric Skjeveland,
dated June 12, 2012 (MRK-KRA00122172-3) .................... Appx18425

Exhibit 306 to Dykstra Declaration -
CDC webpage, ACIP Workgroups, last reviewed
May 30, 2019 .................................................................... Appx18428

**Table of Contents**
**(Continued)**

**Page**

Exhibit 307 to Dykstra Declaration -
"Recommendations of the Advisory Committee on
Immunization Practices for Use of Hepatitis A Vaccine
for Persons Experiencing Homelessness,"
*MMWR* 2019:68(6):153-56 .................................................. Appx18435

Exhibit 308 to Dykstra Declaration -
"Human Papillomavirus Vaccination for Adults: Updated
Recommendations of the Advisory Committee on
Immunization Practices," *MMWR* 2019:68(3):698-702 ...... Appx18440

Exhibit 309 to Dykstra Declaration -
"Prevention and Control of Seasonal Influenza with
Vaccines: Recommendations of the Advisory Committee
on Immunization Practices-United States, 2019-20
Influenza Season," *MMWR* 2019:69(3):1-21 ....................... Appx18446

Exhibit 310 to Dykstra Declaration -
"Japanese Encephalitis Vaccine: Recommendations of the
Advisory Committee on Immunization Practices,"
*MMWR* 2019:68(2);1-33 .................................................... Appx18475
***(Cont'd in Vol XL)***

**Volume XL**
**(Filed Under Seal)**

Exhibit 311 to Dykstra Declaration -
"Prevention of Pertussis, Tetanus, and Diphtheria with
Vaccines in the United States: Recommendations of the
Advisory Committee on Immunization Practices,"
*MMWR* 2018:67(2):1-44 .................................................... Appx18516

Exhibit 312 to Dykstra Declaration -
"Updated Recommendations for Use of Tetanus Toxoid,
Reduced Diphtheria Toxoid and Acellular Pertussis Vaccine
(Tdap) in Pregnant Women and Persons Who Have or
Anticipate Having Close Contact with an Infant Aged <12
Months-Advisory Committee on Immunization Practices
(ACIP), 2011," *MMWR* 2011:60(41):1424-1426 ................. Appx18565

**Table of Contents**
**(Continued)**

Exhibit 313 to Dykstra Declaration -
"Updated Recommendations for the Use of Tetanus Toxoid,
Reduced Diphtheria Toxoid, and Acellular Pertussis Vaccine
(Tdap) in Pregnant Women-Advisory Committee on
Immunization Practices (ACIP), 2012," *MMWR*
2013:62(7):131-135 ............................................................ Appx18569

Exhibit 314 to Dykstra Declaration -
"Immunization in the United States (Chapter 73),"
by Cohn, *et al.*, *Vaccines* 1421-1440 ................................... Appx18575

Exhibit 315 to Dykstra Declaration -
Excerpts from the Expert Report of
Daniel Salmon, Ph.D., MPH ............................................... Appx18596

Exhibit 316 to Dykstra Declaration -
Excerpts from Merck's Supplemental Responses and
Objections to Relators' First Set of Interrogatories,
dated December 12, 2016 .................................................... Appx18608

Exhibit 317 to Dykstra Declaration -
"The Pertussis Problem," by Plotkin, Stanley, *Clinical
Infectious Diseases*, (2014) 58(6): 830-833 ......................... Appx18618

Exhibit 318 to Dykstra Declaration -
"Establishing a Global Vaccine-Development Fund,"
by Plotkin, Stanley, *et al.*, *New England Journal of Medicine*,
(2015) 373:297-300 ........................................................... Appx18623

Exhibit 319 to Dykstra Declaration -
Chapter 11 "Anthrax Vaccines," by Friedlander, Arthur, *et al.*,
*Vaccines* (2018) ................................................................ Appx18628

Exhibit 320 to Dykstra Declaration -
Chapter 38 "Meningococcal Capsular Group A, C, W, and Y
Conjugate Vaccines," by Harrison, Lee, *et al.*,
*Vaccines* (2018) ................................................................ Appx18646

**Table of Contents**
(Continued)

Exhibit 321 to Dykstra Declaration -
Chapter 52 "Rotavirus Vaccines," by Parashar, Umesh, *et al.*,
*Vaccines* (2018) .................................................................. Appx18673

Exhibit 322 to Dykstra Declaration -
Chapter 60 "Tuberculosis Vaccines," by Hanekom, Willem,
*et al.*, *Vaccines* (2018) ......................................................... Appx18694

Exhibit 323 to Dykstra Declaration -
Excerpts from Expert Report of
Gary L. Freed, M.D., MPH .................................................. Appx18714

Exhibit 324 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Gary L. Freed, M.D., MPH, taken October 18, 2018 .......... Appx18718

Exhibit 325 to Dykstra Declaration -
Excerpts from "2012 CDC Summary of
Notifiable Diseases" ........................................................... Appx18721

Exhibit 326 to Dykstra Declaration -
Excerpts from "1977 Annual Summary,"
*MMWR*, Vol. 26, No. 53, September 1978 .......................... Appx18729

Exhibit 327 to Dykstra Declaration -
Excerpts from "1980 Annual Summary,"
*MMWR*, Vol. 29, No. 54, September 1981 .......................... Appx18734

Exhibit 328 to Dykstra Declaration -
Excerpts from "2013 CDC Summary of
Notifiable Diseases" ........................................................... Appx18742

Exhibit 329 to Dykstra Declaration -
Excerpts from "2014 CDC Summary of
Notifiable Diseases" ........................................................... Appx18747

## Table of Contents
### (Continued)

Relators' Responses to Merck's Statements of Material Facts in
Support of Its First and Fourth Summary Judgment Motions
and Their Corresponding Additional Statement of Material
Facts, dated November 26, 2019 (Doc. 300) ........................ Appx18751

Declaration of Gary Reilly in Support of Relators' Oppositions to
Merck's Four Motions for Summary Judgment,
executed November 26, 2019 (Doc. 300) ............................ Appx18984

Exhibit 361 to Reilly Declaration -
Deposition Testimony of Amy Keegan,
taken April 27, 2017 ............................................................ Appx18996
*(Cont'd in XLI)*

### Volume XLI
### (Filed Under Seal)

Exhibit 362 to Reilly Declaration -
Memorandum titled "Delay of Filing for Optimized
GOS/HAS-free Diluent for M-M-R®II" with Attachment,
dated August 28, 2000 (MRK-CHA01593194-9) ................ Appx19070

Exhibit 363 to Reilly Declaration -
The Current Manufacturing Target Titer for the Mumps
Component of Measles, Mumps, and Rubella Virus Vaccine
Live M-M-R®II (MRK-CHA00576983-93) ...................... Appx19077

Exhibit 364 to Reilly Declaration -
Letter from Robert L. McKee, Ph.D. to Carolyn Hardegree,
M.D., dated December 10, 1998, with Attachment
(MRK-CHA00756233-55) .................................................. Appx19089

Exhibit 365 to Reilly Declaration -
Excerpts from Clinical and Regulatory Review Committee
Critical Activities, issued August 15, 2001
(MRK-CHA01724860-25029) ............................................ Appx19113

# Table of Contents
## (Continued)

Exhibit 366 to Reilly Declaration -
Excerpts from Clinical and Regulatory Review Committee
Critical Activities, issued March 17, 1999
(MRK-CHA01717354-7508) ............................................. Appx19123

Exhibit 367 to Reilly Declaration -
Table (MRK-CHA00280517) ............................................. Appx19142

Exhibit 368 to Reilly Declaration -
Project Management Regulatory Submissions
Schedule for "All Products," from 01-AUG-2002
(MRK-CHA01726084-7) ................................................... Appx19144

Exhibit 369 to Reilly Declaration -
Email from Hentrietta Ukwu to David W. Blois,
dated October 6, 1998, with Attachment
(MRK-CHA00625837-9) ................................................... Appx19149

Exhibit 370 to Reilly Declaration -
Justification of Mumps Component Frequency
(MRK-CHA00032404-7) ................................................... Appx19153

Exhibit 371 to Reilly Declaration -
Email from Alison L. Fisher, Ph.D. to Mark S. Galinski,
dated March 28, 2005 (MRK-CHA00560317-9) ................. Appx19158

Exhibit 372 to Reilly Declaration -
Email from Bonita M. Stankunas to Amy Keegan,
dated October 1, 2010 (MRK-CHA01470854-6) ................ Appx19162

Exhibit 373 to Reilly Declaration -
Presentation titled M-M-R®II
(MRK-CHA00021133-67) .................................................. Appx19166

Exhibit 374 to Reilly Declaration -
Excerpts from Pediatric Measles, Mumps, Rubella &
Varicella-containing Franchise: Integrated Vaccine T-PAC
Review, dated October 28, 2002
(MRK-CHA00233586-3623) ............................................. Appx19202

**Table of Contents**
(Continued)

Exhibit 375 to Reilly Declaration -
Deposition Testimony of April D. Cohen,
taken January 4, 2018 ......................................................... Appx19211

Exhibit 376 to Reilly Declaration -
Minutes of October 6, 1999 Project Team Meeting,
dated October 8, 1999 (MRK-CHA01899074-86) .............. Appx19276

Exhibit 377 to Reilly Declaration -
Draft Memo re: Clinical and Regulator Review Committee
Meeting Summary-October 8, 2002, dated October 11, 2002
(MRK-CHA01728735-8) .................................................... Appx19290

Exhibit 378 to Reilly Declaration -
Pediatric Live Virus Vaccine Franchise Review,
dated October 28, 2002 (MRK-CHA00207636-83) ............ Appx19295

Exhibit 379 to Reilly Declaration -
Presentation, produced as "M-M-R II and Priorix Profiles
8_19_11F.ppt" (MRK-CHA00955777) .............................. Appx19344

Exhibit 380 to Reilly Declaration -
Deposition Testimony of Tim Schofield,
taken March 20, 2017 ......................................................... Appx19347

Exhibit 381 to Reilly Declaration -
Memo re: Mumps Stability and Potency Estimations,
dated February 27, 2001 (MRK-CHA01896072-3) ............. Appx19449

Exhibit 382 to Reilly Declaration -
Email from Philip S. Bennett to Cynthia Morrisey,
dated January 18, 2002 (MRK-CHA00094849-50) ............. Appx19452

Exhibit 383 to Reilly Declaration -
*Curriculum Vitae* of Manal Anwar Morsy, M.D., Ph.D., MBA
(MORSY00001-10) ........................................................... Appx19455

**Table of Contents**
**(Continued)**

**Page**

Exhibit 384 to Reilly Declaration -
*Curriculum Vitae* of Cynthia F. Morrisey
(MORRISEY_00000001-6) ................................................. Appx19466

Exhibit 385 to Reilly Declaration -
Memo re: Determination of Minimum Release
Specifications for Mumps and Rubella in M-M-R®II,
dated February 9, 2004 (MRK-CHA00722641-2) ............... Appx19473

Exhibit 386 to Reilly Declaration -
Memo re: Determination of Minimum Release Specifications
for Mumps in M-M-R®II, dated November 4, 2004
(MRK-CHA00722667-8) ..................................................... Appx19476

Exhibit 387 to Reilly Declaration -
Email from Philip S. Bennett with attachments,
dated December 4, 2012
(MRK-CHA01580006-15) ................................................... Appx19479

Exhibit 388 to Reilly Declaration -
Email from Kimberly A. Duffy to Amy Keegan,
dated December 5, 2012 (MRK-CHA01579943-5) ............. Appx19490

Exhibit 389 to Reilly Declaration -
*Curriculum Vitae* of Amy Keegan
(MRK-CHA02009507-9) ..................................................... Appx19494

Exhibit 390 to Reilly Declaration -
Presentation, MMRII Protocol #007 - Mumps End Expiry
study: AIGENT Assay Issues and Impact on Study Criteria,
produced as "6-30 pm Draft 10-04-02 for CRRC-10-08-02
slides.ppt" (MRK-CHA00025831) ...................................... Appx19498
***(Cont'd in Vol LXII)***

**Table of Contents**
**(Continued)**

**Volume LXII**
**(Filed Under Seal)**

Exhibit 391 to Reilly Declaration -
Gulati Deposition Exhibit 14, Select Pages of Supplemental
Biologics License Application, dated June 30, 2004
(MRK-CHA00137854-55 and
MRK-CHA00138585-708) .................................................. Appx19533

Exhibit 392 to Reilly Declaration -
Regulatory Liaison FDA Conversation Record,
dated May 27, 2005 (MRK-CHA00793082-3) .................... Appx19539

Exhibit 393 to Reilly Declaration -
Submission, dated July 13, 2005
(MRK-CHA00141789-906) ................................................. Appx19542

Exhibit 394 to Reilly Declaration -
Deposition Testimony of Dipti Gulati, M.S., D. Phil.,
taken December 5, 2018  ...................................................... Appx19550

Exhibit 395 to Reilly Declaration -
Merck's Biological Stability Program 2001 Annual Stability
Report for M-M-R®II (MRK-CHA01632745-51) .............. Appx19661

Exhibit 396 to Reilly Declaration -
Biological Stability Program 2004 Annual Stability
Report for M-M-R®II (MRK-CHA01632833-8) ................ Appx19669

Exhibit 397 to Reilly Declaration -
Biological Stability Program 2005 Annual Stability
Report for M-M-R®II (MRK-CHA01634117-22) .............. Appx19676

Exhibit 398 to Reilly Declaration -
Biological Stability Program 2008 Annual Stability
Report for M-M-R®II (MRK-CHA01633948-59) .............. Appx19683

**Table of Contents**
(Continued)

Exhibit 399 to Reilly Declaration -
Response to FDA Request for Information,
dated February 28, 2005 (MRK-CHA02078926-7) ............. Appx19696

Exhibit 400 to Reilly Declaration -
Excerpts from Biological Stability Program 2010
Annual Stability Report for M-M-R®II
(MRK-CHA01458201-6) .................................................... Appx19699

Exhibit 401 to Reilly Declaration -
CDC "Mumps Cases and Outbreaks" webpage,
last accessed November 25, 2019 ........................................ Appx19706

Exhibit 402 to Reilly Declaration -
CDC "Mumps Vaccination" webpage, last reviewed
March 28, 2019 ................................................... Appx19709

Exhibit 403 to Reilly Declaration -
CDC "Mumps Vaccination" webpage, archived as of
May 30, 2012 ....................................................... Appx19711

Exhibit 404 to Reilly Declaration -
CDC "Mumps Vaccination" webpage, archived as of
December 8, 2009 ................................................ Appx19714

Exhibit 405 to Reilly Declaration -
Email from Janet Ernst-Gerner to Alan Modlinger,
dated September 23, 2016 (MRK-CHA02008691-4) .......... Appx19717

Exhibit 406 to Reilly Declaration -
Marked M-M-R®II (Measles, Mumps, and Rubella Virus
Vaccine Live) Literature (MRK-CHA02008695-705) ......... Appx19722

Exhibit 407 to Reilly Declaration -
Email from Mark Papania to Barbara Kuter,
dated February 12, 2010 (MRK-CHA00351988-90) ........... Appx19734

**Table of Contents**
**(Continued)**

**Page**

Exhibit 408 to Reilly Declaration -
Email from Chester J. Kitchen, dated February 25, 2010
(MRK-CHA00790153-4) .................................................... Appx19738

Exhibit 409 to Reilly Declaration -
Email from Chester J. Kitchen to Scott Porreca,
dated February 26, 2010 (MRK-CHA00791347) ................ Appx19741

Exhibit 410 to Reilly Declaration -
FDA Conversation re; PRIOrix™, measles, mumps &
rubella live, attenuated, viral vaccine BB-IND-7229,
dated December 18, 1997 (GSK-MMR-IND-0047687-9) ... Appx19743

Exhibit 411 to Reilly Declaration -
FDA Conversation re: PRIOrix IND submission,
Clinical Hold, dated October 16, 1997
(GSK-MMR-IND-0047654-6) ............................................ Appx19747

Exhibit 412 to Reilly Declaration -
Extra CDAB Meeting Abstract, dated August 1, 2011
(GSK-MMR-019819-42) .................................................... Appx19751

Exhibit 413 to Reilly Declaration -
Memo re: Minutes of Meeting with CBER on 4/4/01,
dated April 9, 2001 (MRK-CHA00049238-40) ................... Appx19776

Exhibit 414 to Reilly Declaration -
Email from Sally S. Wong to Cathy Hoath,
dated February 26, 2013 (MRK-CHA01556424-8) ............. Appx19780

Exhibit 415 to Reilly Declaration -
Email from Joseph D. Bernardo to Mark J. Stannard,
dated November 30, 2016 (MRK-CHA02101841) ............. Appx19786

Exhibit 416 to Reilly Declaration -
Deposition Testimony of Roberta L. McKee, Ph.D.,
taken March 30, 2017 ......................................................... Appx19788

**Table of Contents**
(Continued)

Exhibit 417 to Reilly Declaration -
Vaccine & Biological Stability Protocol for M-M-R®II
(MRK-CHA01714300-8) ..................................................... Appx19870

Exhibit 418 to Reilly Declaration -
Excerpts from Biological Stability Program 2000
Annual Stability Report for M-M-R®II
(MRK-CHA01633601-6) ..................................................... Appx19880

Exhibit 419 to Reilly Declaration -
Excerpts from Biological Stability Program 2002
Annual Stability Report for M-M-R®II
(MRK-CHA01633529-39) .................................................... Appx19887

Exhibit 420 to Reilly Declaration -
Excerpts from Biological Stability Program 2003
Annual Stability Report for M-M-R®II
(MRK-CHA01632888-95) .................................................... Appx19899

Exhibit 421 to Reilly Declaration -
SOP Active Stability Monitoring of Live Virus Vaccine
Potency Results, effective November 10, 2000
(MRK-CHA00049165-73) .................................................... Appx19908

Exhibit 422 to Reilly Declaration -
SOP Real Time Stability Trend Monitoring, effective
September 21, 2016 (MRK-CHA01714343-54) .................. Appx19918

Exhibit 423 to Reilly Declaration -
Label Claim Compliance of M-M-R®II
(MRK-CHA00322066-73) .................................................... Appx19931

Exhibit 424 to Reilly Declaration -
Proposed New Stabilizer for M-M-R®II,
dated July 12, 2002 (MRK-CHA00239179-99) .................. Appx19940

**Table of Contents**
**(Continued)**

Exhibit 425 to Reilly Declaration -
Clinical and Regulatory Review Committee Agenda,
dated October 8, 2002 (MRK-CHA00780210-65) .............. Appx19962
*(Cont'd in Vol XLIII)*

**Volume XLIII**
**(Filed Under Seal)**

Exhibit 426 to Reilly Declaration -
Analytical Approach for MMR in Japan
(MRK-CHA00719989-20008) ............................................. Appx20019

Exhibit 427 to Reilly Declaration -
Excerpts from Memo re: Mumps neutralizing antibody test vs.
efficacy and effectiveness, dated September 10, 1999
(MRK-CHA00061698-703) .................................................. Appx20040

Exhibit 428 to Reilly Declaration -
Atkinson Deposition Exhibit 2, Letter from Kevin Malone
to Kathleen Hardway, dated July 31, 2018,
and Letter from Robert Redfield to Kathleen Hardway,
dated May 24, 2018 ............................................................ Appx20047

Exhibit 429 to Reilly Declaration -
CDC Publication, Ensuring the Safety of Vaccines in the
United States, last updated July 2011 ................................... Appx20055

Exhibit 430 to Reilly Declaration -
Email from Colleen M. Duffy to Diana DeLong,
dated December 14, 2005 (MRK-CHA00942187-8) ........... Appx20058

Exhibit 431 to Reilly Declaration -
Email from Kevin Agnew to Diana DeLong,
dated March 14, 2014 (MRK-CHA01673057-9) ................. Appx20061

Exhibit 432 to Reilly Declaration -
Letter to CDC Request for Final Proposal to RFP 2014-N-
15784 Consolidated Vaccines for Children Contact,
dated March 7, 2014 (MRK-CHA01655048-93) ................. Appx20065

# Table of Contents
## (Continued)

Exhibit 433 to Reilly Declaration -
Email from Diana DeLong to Cindy Rivera,
dated March 13, 2014 (MRK-CHA01656202-3) ................. Appx20112

Exhibit 434 to Reilly Declaration -
FDA Comments on PRN Assay, dated May 9, 2007
(GSK-MMR-IND-0015993-4) ............................................ Appx20115

Exhibit 435 to Reilly Declaration -
Excerpts from Merck Presentation, dated November 10, 2011
(MRK-CHA0002441-681) ................................................... Appx20118

Exhibit 436 to Reilly Declaration -
Letter from Lisa C. Dykstra to CDC and Office of General
Counsel for Department of Health and Human Services,
dated May 18, 2015 (MRK-CHA01374713-20) .................. Appx20121

Exhibit 437 to Reilly Declaration -
Summary of GSK Vaccines development pipeline meeting
with CDC March 8, 2016 (GSK-MMR-0062025-30) ......... Appx20130

Exhibit 438 to Reilly Declaration -
Email from Ouzama Nicholson to Donna Boyce,
dated May 27, 2010 (GSK-MMR-0058532) ....................... Appx20137

Exhibit 439 to Reilly Declaration -
Memo re: Supporting Documents for Stephen Krahling,
dated October 10, 2000 (MRK-CHA00447565-74) ............ Appx20139

Exhibit 440 to Reilly Declaration -
Excerpts from journal of David Krah, M.D.
(MRK-CHA00490081-591) ................................................ Appx20150

Exhibit 441 to Reilly Declaration -
Minutes of August 8, 2001 Project Team Meeting
(MRK-CHA00209441-53) .................................................. Appx20176

# Table of Contents
## (Continued)

Exhibit 442 to Reilly Declaration -
Deposition Testimony of Thomas McGuire, Ph.D.,
taken July 2, 2018 ............................................................... Appx20190

Exhibit 443 to Reilly Declaration -
National Vaccine Advisory Committee Report,
The National Vaccine Program 2008 State of the
Program Report, dated February 2009................................... Appx20274

Exhibit 444 to Reilly Declaration -
"National, State, and Local Area Vaccination Coverage
Among Children Aged 19–35 Months — United States, 2012,"
*MMWR* 2013; 62:733-755, dated September 13, 2013 ........ Appx20289

Exhibit 445 to Reilly Declaration -
"Financing Immunizations in the United States," Hinman
*et al.*, *Clinical Infectious Diseases* 2004; 38:1440-6 ........... Appx20314

Exhibit 446 to Reilly Declaration -
"Program Review, National Immunization Survey (NIS) and
State and Local Area Integrated Telephone Survey (SLAITS),"
dated November 27-28, 2007 ............................................... Appx20322

Exhibit 447 to Reilly Declaration -
"About VFC" webpage ........................................................ Appx20344

Exhibit 448 to Reilly Declaration -
"Medicaid Program; Charges for Vaccine Administration
Under the Vaccines for Children Program,"
Federal Register Volume 59, Issue 190
(October 3, 1994) ............................................................... Appx20347

Exhibit 449 to Reilly Declaration -
Deposition Testimony of Michele Taylor,
taken May 9, 2017 ............................................................... Appx20360

## Table of Contents
## (Continued)

Defendant Merck's Response to Relators' Additional Statement of
Material Facts in Connection with Defendant's First and Fourth
Summary Judgment Motions, dated December 20, 2019
(Doc. 311) ........................................................................... Appx20427

Defendant Merck's Response to Relators' Additional Statement of
Material Facts in Connection with Defendant's First and Fourth
Summary Judgment Motions, dated December 20, 2019
(Doc. 314) ........................................................................... Appx20486
*(Cont'd in Vol XLIV)*

### Volume XLIV
### (Filed Under Seal)

Declaration of Lisa C. Dykstra in Support of Defendant's
Replies and Response to Motions for Summary Judgment,
executed December 20, 2019 (Doc. 315) ............................. Appx20545

Exhibit 330 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Amy Keegan,
taken February 9, 2018 ...................................................... Appx20552

Exhibit 331 to Dykstra Declaration -
Email from Paul Lanzetta to Thomas Romanus
and John Comonitski, dated August 19, 2011
(MRK-KRA00955764-955765) .......................................... Appx20555

Exhibit 332 to Dykstra Declaration -
Excerpts from Deposition Testimony of Cynthia Morrisey,
taken July 27, 2017 ........................................................... Appx20558

Exhibit 333 to Dykstra Declaration -
Table of Contents for Information Submitted with Merck's
BLA for the replacement of Human Serum Albumin with
Recombinant Albumin (MRK-KRA00137827-137828) ..... Appx20562

Exhibit 334 to Dykstra Declaration -
FDA's Draft Guidance for Industry Stability Testing of
Drug Substances and Drug Products (June 8, 1998) ............ Appx20565

## Table of Contents
## (Continued)

**Page**

Exhibit 335 to Dykstra Declaration -
WHO's Draft Guidelines on Stability Evaluation of
Vaccines, Expert Committee on Biological Standardization
(October 23-27, 2006) .......................................................... Appx20662

Exhibit 336 to Dykstra Declaration -
Biological Stability Program 1999 Annual Stability
Report for M-M-R®II (MRK-KRA01632656-86) .............. Appx20691

Exhibit 337 to Dykstra Declaration -
Biological Stability Program 2000 Annual Stability
Report for M-M-R®II (MRK-KRA01633601-29) .............. Appx20723

Exhibit 338 to Dykstra Declaration -
Biological Stability Program 2001 Annual Stability
Report for M-M-R®II (MRK-KRA01632745-822) ............ Appx20753

Exhibit 339 to Dykstra Declaration -
Biological Stability Program 2002 Annual Stability
Report for M-M-R®II (MRK-KRA01633529-600) ............ Appx20832

Exhibit 340 to Dykstra Declaration -
Biological Stability Program Annual 2003 Stability
Report for M-M-R®II (MRK-KRA01632888-945) ............ Appx20905

Exhibit 341 to Dykstra Declaration -
Biological Stability Program 2004 Annual Stability
Report for M-M-R®II (MRK-KRA01632833-68) .............. Appx20964

**Volume XLV**
**(Filed Under Seal)**

Exhibit 342 to Dykstra Declaration -
Biological Stability Program 2005 Annual Stability
Report for M-M-R®II (MRK-KRA01633267-99) .............. Appx21001

Exhibit 343 to Dykstra Declaration -
M-M-R®II Stability Data Summary for the 2006
Annual Stability Report (MRK-KRA0163946-83) ............ Appx21035

# Table of Contents
## (Continued)

Exhibit 344 to Dykstra Declaration -
M-M-R®II Stability Data Summary for the 2007
Annual Stability Report (MRK-KRA01633723-31) ........... Appx21074

Exhibit 345 to Dykstra Declaration -
CDC's Nationally Notifiable Infectious Diseases and
Conditions, United States: Weekly Tables, Table 1y
(October 2019) .................................................................... Appx21084

Exhibit 346 to Dykstra Declaration -
CDC's Nationally Notifiable Infectious Diseases and
Conditions, United States: Weekly Tables, Table 1z
(October 2019) .................................................................... Appx21088

Exhibit 347 to Dykstra Declaration -
CDC's Nationally Notifiable Infectious Diseases and
Conditions, United States: Weekly Tables, Table 1kk
(October 2019) .................................................................... Appx21092

Exhibit 348 to Dykstra Declaration -
"An Assessment of Mumps Vaccine Effectiveness by Dose
during an Outbreak in Canada," by Deeks, Shelley, *et al.*,
*CMAJ*, 183(9) (June 14, 2011) ........................................... Appx21096

Exhibit 349 to Dykstra Declaration -
"Mumps Vaccine Effectiveness and Risk Factors for Disease
in Households during an Outbreak in New York City,"
by Livingston, Kara, *et al.*, Vaccine 32; 369-374 (2014) ..... Appx21104

Exhibit 350 to Dykstra Declaration -
"A Large Outbreak of Mumps in the Postvaccine Era,"
by Wharton, Melinda, *et al.*, *Journal of Infectious Diseases*,
Vol. 158, No. 6 (December 1988) ........................................ Appx21111

Exhibit 351 to Dykstra Declaration -
"Persistence of Mumps Antibodies after 2 Doses of
Measles-Mumps-Rubella Vaccine," by LeBaron, Charles,
*et al.*, *Journal of Infectious Diseases*, 2009:199
(February 15, 2009) ........................................................... Appx21120

# Table of Contents
## (Continued)

Exhibit 352 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Keith Chirgwin, M.D., taken January 26, 2017 .................. Appx21130

Exhibit 353 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Barbara Kuter, Ph.D., taken December 14, 2016 ................ Appx21137

Exhibit 354 to Dykstra Declaration -
Letter from Manal Morsy, M.D., Ph.D. to Luba Vujcic,
dated March 9, 2000 (MRK-KRA00020409-20410) ........... Appx21141

Exhibit 355 to Dykstra Declaration -
Memorandum from R. Wolchko with the subject "Bridging
Study of the Mumps Legacy ELISA" and "Mumps
'Wild Type' IgG ELISA," dated February 23, 2001
(MRK-KRA00561875-561885) ........................................... Appx21144

Exhibit 356 to Dykstra Declaration -
*Curriculum Vitae* of Emilio Emini, Ph.D. (January 2016)
(EMINI 00001-22) ............................................................. Appx21156

Exhibit 357 to Dykstra Declaration -
General Correspondence to FDA, dated April 23, 2002
(MRK-KRA00000548-553) ................................................ Appx21179

Exhibit 358 to Dykstra Declaration -
"Mumps Epidemiology and Immunity-The Anatomy of a
Modern Epidemic," by Anderson, Larry, *et al.*,
*Pediatric Infectious Disease Journal*, Vol. 27, No. 10
(October 2008) ................................................................... Appx21186

Exhibit 359 to Dykstra Declaration -
IID-1.5 "Reduce cases of mumps (U.S. acquired cases),"
Healthy People 2020 ......................................................... Appx21192

**Table of Contents**
(Continued)

**Page**

Defendant's Response to the United States' Statement of
    Interest in Response to the Parties' Summary Judgment
    Briefing, dated January 18, 2021 (Doc. 323)......................  Appx21194

Defendant Merck's Reply to Relators' Response Regarding
    the United States' Statement of Interest (Doc. 328) ..........  Appx21206

Page 66

1  Q. Does it include all your board
2  certifications?
3  A. Yeah. Well, I was board certified. I'm not
4  currently board certified because I didn't take my MOC
5  deliberately. So I was board certified for 30 years.
6  I don't think it has that on it. But not at this
7  time.
8  Q. Does it include all of your academic
9  appointments?
10  A. It should. Yes, I believe it does.
11  Q. Does it include all your publications?
12  A. No, I'm sure there's stuff that -- speeches
13  that get published, other things that get published
14  that may not have been on here. I've just not added.
15  Q. Are there reasons why you haven't added
16  certain publications?
17  A. Sometimes you give a speech and it gets
18  printed. You don't even know that it's printed and
19  published, and you only learn years later that it's
20  on-line. I don't want to misspeak. This has the
21  major publications by all means. There's some other
22  translations of the books that I've done, et cetera.
23  But I mean I think everything that's not on here is
24  minor is what I'm saying.
25  Q. Does it include all of your lectures?

Page 67

1  A. No, not by any means. This just only has the
2  endowed lectures that are on here.
3  Q. Does it include all the research that you've
4  done?
5  A. No, I'm sure not.
6  Q. Does it include all of your licenses that
7  you've held?
8  A. Probably. They're inactive licenses in a
9  number of states that I used to live in that I
10  don't -- I only maintain currently my California
11  license.
12  Q. Is there anything that you wish to add to
13  your CV at this time to make it more complete?
14  A. No. I think it gives you a general sense of
15  my background.
16  Q. What is your current position?
17  A. I'm a professor at University of California
18  San Francisco.
19  Q. Are you currently licensed to practice
20  medicine?
21  A. I am. Happy to give you my license if you
22  want. Take it out of my wallet.
23  Q. Which state are you licensed to practice
24  medicine in?
25  A. California.

Page 68

1  Q. And you said you don't currently hold any
2  board certifications?
3  A. No. I was board certified for 30 years, and
4  I decided not to do my MOC. I may change to do my
5  MOC, but I've not in the last couple of years.
6  Q. It's been about five years -- is that
7  right? -- since you held a board certification?
8  A. Whenever the last MOC that I did. I was
9  recertified three times.
10  Q. How long have you been a professor at
11  University of California San Francisco?
12  A. 2003.
13  Q. What classes do you teach?
14  A. As in medical school I occasionally lecture,
15  but most of the time it's done in research.
16  Q. Do you recall any textbooks that you've used
17  in any of the classes that you have taught?
18  A. I certainly have used the old -- the Hutt and
19  Merrill textbook on food and drug law, and there's
20  additional authors on that.
21  Q. Any of the classes that you teach focused on
22  or related to vaccines?
23  A. I teach -- I certainly give lectures in drug
24  and biologic development. So vaccines is really a
25  part of that.

Page 69

1  Q. Any of the classes that you teach, have they
2  focused on virology?
3  A. I'm giving a lecture at Hopkins -- I'm giving
4  a talk at Hopkins at the end of this month. It's
5  going to be on HIV that will be virology. It's
6  actually an AIDS panel to be exact. It's going to be
7  focused on virology.
8  Q. Is that the only one?
9  A. No. I mean I talk about --
10  Q. I'm sorry. That actually was -- let me go
11  back to my question.
12  Have any of the classes that you've taught
13  focused on virology?
14  A. They certainly have focused on the regulatory
15  intersection of virology.
16  Q. But not on the subject of virology itself;
17  correct?
18  A. My answer is they've been on virology and the
19  regulatory aspects of virology.
20  Q. Have any of the classes that you've taught
21  focused on immunology?
22  A. I've been trained in immunology, but I don't
23  think I've taught about immunology if I'm correct.
24  But I'd have to go back and review all the lectures,
25  but I've been trained in immunology.

18 (Pages 66 - 69)

Appx1501

Page 70

1 Q. You went to law school; right, Dr. Kessler?
2 A. I did.
3 Q. Are you or have you ever been licensed to
4 practice law?
5 A. Never took a Bar deliberately.
6 Q. And you're not providing any legal opinions
7 in this case; correct?
8 A. No. Let me just put a star next to that. Of
9 course I'm not providing any legal opinions. To the
10 extent that the Federal Food, Drug and Cosmetic Act is
11 a statute and has legal import, I'm discussing that,
12 but I leave it -- I mean let me be clear. The
13 ultimate -- if you put the -- certainly any ultimate
14 legal opinions I would not provide on.
15     I mean if you're asking me how a statute --
16 how the Federal Food, Drug and Cosmetic Act as it is
17 applied, I leave it to you to decide how to
18 characterize that opinion.
19 Q. On Pages 6 and 7 of your CV are academic
20 appointments. Is this list accurate and complete?
21 A. Yes, I believe so. Actually, you know, I
22 don't know why it says, "(on leave)" from Albert
23 Einstein College of Medicine. That just has to be a
24 typo. I've never been on -- that's old. That
25 shouldn't say that. I have no relationship with that.

Page 71

1 I was on leave. You know, actually, I'm sorry. I
2 apologize.
3     That is accurate. I was on leave during part
4 of that time at Einstein. So that's why -- I'm not on
5 leave currently. I was on leave during those years.
6 Q. Were any of these academic appointments or
7 positions related to teaching on the topics of
8 vaccines?
9 A. Sure.
10 Q. Which ones?
11 A. Well, I mean as they relate to food, drug,
12 and cosmetics, food and drug law. So Columbia Law
13 School, for example. My lectures on drug development,
14 they all have to do with the intersection of drugs,
15 biologics, vaccines as a component of that.
16 Q. Other than the intersection with vaccines and
17 food and drug law, have any of these academic
18 appointments related to vaccines?
19 A. Again, there may be some in the HIV context,
20 but most are in the intersection, Counsel.
21 Q. And same question with regard to virology.
22 Have any of these academic appointments or positions
23 related to teaching on virology?
24 A. Again, the same answer, Counselor. Certainly
25 the answer is as they relate to the intersection. The

Page 72

1 regulatory intersection of virology biologics as
2 treatments for or prevention of and the regulatory
3 intersections. So I can play on the science. I can
4 play on the regulatory. I can play on the
5 intersection.
6 Q. Any of these academic appointments or
7 positions related to immunology?
8 A. Only to the extent that there's a regulatory
9 interface. So if you're dealing with diagnostics, for
10 example, there would be expertise there. But, again,
11 it's in that regulatory science regulation, and in
12 order to do the regulation, you got to do the science.
13 Q. On Page 7 of your CV, there is a list of
14 research experience. Is this list complete?
15 A. No. I mean especially with regard to -- I
16 mean as relevant to this matter, the answer would be
17 no.
18     MS. SCANLAN: Can I ask is the red blinking
19 light meaning that the phone is on mute, that nobody
20 can hear? What does the red blinking light on the
21 telecom mean?
22     (Pause in proceedings.)
23     MS. SCANLAN: Is anybody on the line?
24     THE MACORETTA: I am. It's John Macoretta.
25     MS. SCANLAN: Sorry, John. I think we had

Page 73

1 you on mute  So you should be able to hear the
2 proceedings  I apologize  But now we've got you
3 live  Thank you
4 BY MS  HARDWAY:
5 Q  So none of these research experiences related
6 to the study of vaccines; correct?
7 A  I don't believe these relate to a vaccine
8 There is research activities related to virology
9 Q  Page 9 contains a list of advisory positions
10 and committees that you've served on  Is this
11 accurate and complete?
12 A  Page 9 is looking at the same -- yes, 8 and
13 9  I would never want to say it's perfect  So I don't
14 see anything that's jumping out here that I am -- that
15 I remember that is not on here  It should be
16 generally complete
17 Q  Were any of these positions related to
18 providing advice or counsel on issues related to
19 vaccines?
20 A  I have to go back and look at some of these
21 The "GOVERNMENT UNIVERSITY INDUSTRY ROUNDTABLE "  To
22 the extent they involve HIV, there was some overlap,
23 but I'd have to go back and look specifically
24 Q  Were any of these positions related to advice
25 or counsel on virology?

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Appx1502

1    A.  Only in the vaccine context, perhaps, and I'd
2  have to go back and look specifically at that
3  roundtable and some of the other HIV activities.
4    Q.  Page 19 of your CV you include a list of
5  publications.  It begins on Page 19.
6    A.  Hold on.
7        (The witness reviewed Exhibit 7).
8        THE WITNESS:  Yes, ma'am.
9  BY MS. HARDWAY:
10    Q.  Were any of these materials or publications
11  related to vaccines?
12    A.  Probably only in the context of as I phrased
13  it.  I mean if there's stuff on the regulatory
14  framework of drugs and biologics, that would be
15  included.  I don't believe any of these are
16  specifically on vaccines.
17    Q.  And same question with regard to virology.
18  Are any of these publications on the topic of
19  virology?
20    A.  Let's see if I list it.  What page are we on?
21    Q.  Starting on Page 19.
22    A.  Yes.
23    Q.  Which ones?
24    A.  So if you go back to the -- on Page 22, the
25  "Kessler, David A., 'Experimental Activation of the

1  Herpes Virus Associated with the Lucke Renal
2  Adenocarcinoma."  So that's virology.
3    Q.  That's an animal experiment?
4    A.  Those were Rous sarcoma virus, Lucke renal
5  ademocarcinoma virus --
6        REPORTER MARTIN:  Slow down, please, sir.
7  Those are -- what?
8        THE WITNESS:  Rous sarcoma virus and "renal
9  adenocarcinoma viruses of the Leopard Frog, Rana
10  Pipiens."
11  BY MS. HARDWAY:
12    Q.  Any others?
13    A.  That's what I recall.
14    Q.  Have you ever been employed by a
15  pharmaceutical company?
16    A.  I'm on the board of -- I've been on the board
17  of several pharmaceutical companies, but I don't
18  believe I've been technically employed, but I've been
19  in fiduciary responsibilities.  So in the leadership
20  of those, but I've never been a W-2 employee.
21    Q.  On which pharmaceutical companies have you
22  sat on the board?
23    A.  So I've been on the board -- I was on the
24  board of Aptalis, which was priorly known as Axcan,
25  which got sold to Forest.

1        I was on the board of Tokai Pharma, which got
2  merged into another entity, Stoke Therapeutics, for a
3  short time which is a start-up.
4    Q.  Any of those companies manufacture vaccines?
5    A.  Not to my knowledge.
6    Q.  You've never worked for a vaccine
7  manufacturer; correct?
8    A.  For a vaccine manufacturer, no.  I've only
9  been in charge of regulating them.
10    Q.  Have you ever worked with a company to
11  develop a vaccine?
12    A.  So there is obviously work -- I have to go
13  back.  There was certainly in the HIV context that we
14  did that.
15    Q.  You advised the company on developing a
16  vaccine for HIV?
17    A.  No.  But there were certainly discussions
18  about HIV with developing companies that I'm sure I
19  was part of those discussions.
20    Q.  Did you ever work with a company to actually
21  develop one of those vaccines?
22    A.  I'd have to go back -- we'd have to go back
23  and look specifically at the record.  I think there
24  were meetings on those issues with companies.  We --
25  I'd have to look at the specific agendas, and we'd

1  have to go back and look in the archives.  But we
2  brought together a certain number of companies to try
3  to work with them in a number of the HIV context.
4    Q.  Have you ever worked with a company to market
5  a vaccine?
6    A.  Well, that's to develop and market, but I've
7  never been involved in "the marketing" of the vaccine.
8  Again, only the regulation of marketing of vaccines.
9    Q.  You spend a portion of your time doing
10  litigation consulting; is that correct?
11    A.  I do.
12    Q.  And a portion of this litigation consulting
13  is serving as an expert as you're doing here today;
14  right?
15    A.  Correct.
16    Q.  What portion of your professional time do you
17  spend consulting?
18    A.  I don't -- I can't give you an exact amount
19  of that.  I've asked my wife, who tends to keep my
20  schedule, what percentage, her estimate.  Again, it
21  was about 20 percent of my time.
22    Q.  20 percent of your time has been doing
23  litigation consulting?
24    A.  But that was her estimate.
25    Q.  Is that accurate as of today?

Page 78

1    A. I don't know exactly the time frame, but I
2 have a lot of other things that I do. Mostly I do my
3 research.
4    Q. Do you own or work with a consulting company?
5    A. You asked me that. Do I own. You asked me
6 the question do I work with.
7    Q. Do you own a consulting company?
8    A. No. For tax purposes, I don't know the way
9 my accountant has set it up, but it would only be me
10 just on how income flows. But I don't have any
11 expertise on that. So I don't own a consulting
12 company.
13    Q. Do you have a financial interest in any
14 companies or organizations?
15    A. Do I have an interest?
16    Q. Financial interest.
17    A. In any companies?
18    Q. Companies.
19    A. Sure. So I have index funds. I'm just
20 trying to think. So I have -- all my investments, I
21 believe, are not in specific companies. They're all
22 index funds. I do have -- I've been on the board of
23 several companies. So I've obviously had equity from
24 the companies that I serve as a fiduciary
25 responsibility for.

Page 79

1    Q. Are you still a director of Immucor, Inc.?
2    A. Yes, I am.
3    Q. And you're the director of Tokai
4 Pharmaceuticals?
5    A. No. Tokai doesn't exist anymore. It's been
6 merged. So I was a -- you said, "the director." I
7 was on the board. So I was a member of the board of
8 directors.
9    Q. And you're not affiliated with them anymore?
10    A. I am affiliated -- Tokai doesn't exist. It
11 was merged. I was on the board of that, and I am on
12 the board of Immucor.
13    Q. And you have an affiliation with Public
14 Citizen?
15    A. Tell me what that is.
16    Q. Do you not know what Public Citizen is?
17    A. I certainly know -- I have dinner with Sid
18 Wolfe often. I mean on -- occasionally. Probably not
19 as much as he'd like, but -- and Suzanne, his wife. I
20 certainly know what Public Citizen is. I don't
21 believe I have any affiliation other than being
22 friends with Sid.
23    Q. Do you recall filing an amicus brief with
24 Public Citizen and the Center for Science in the
25 Public Interest in a case entitled New York State

Page 80

1 Restaurant Association vs. New York City Board of
2 Health?
3    A. Yes. So I am on the board of directors of
4 CSPI, which is part of the amicus -- I'm not on -- no
5 relationship with -- I mean, again, CSPI that I'm on
6 the board of.
7    Q. You worked for the FDA; correct?
8    A. I certainly did.
9    Q. And you were the commissioner from 1990
10 through 1997?
11    A. Correct.
12    Q. And that's an appointed position; right?
13    A. Appointed by the President, confirmed by the
14 senate.
15    Q. What were your general responsibilities as
16 commissioner of the FDA?
17    A. The enforcement of the Federal Food, Drug and
18 Cosmetic Act enacted 1938 and as amended thereon.
19    Q. While you were at FDA, did you work on
20 vaccines or biological products?
21    A. Sure.
22    Q. When you say, "sure," what do you mean?
23    A. I was in charge of vaccines and biological
24 products for close to seven years.
25    Q. You were not involved in the process of

Page 81

1 reviewing and evaluating vaccine labeling as
2 commissioner; correct?
3    MS. SCANLAN: Objection.
4    THE WITNESS: I was involved in overseeing
5 the people who did that.
6 BY MS. HARDAWAY:
7    Q. But you personally were not involved in
8 reviewing and evaluating vaccine labeling, were you?
9    MS. SCANLAN: Objection. Compound.
10    THE WITNESS: We'd have to go back and look.
11 Certainly other people did that. I was in charge of
12 them. So to the extent that they had issues with
13 regard to vaccine labels and other vaccine issues,
14 they would bring them to me.
15 BY MS. HARDAWAY:
16    Q. How often do you recall reviewing a vaccine
17 label with regard to labeling issues that were brought
18 to your attention while you were commissioner of the
19 FDA?
20    A. I recall having multiple conversations and
21 frequent conversations. The office head at that time
22 was Carolyn Hardagree. We spent a considerable amount
23 of time together. I can't recall to what extent, you
24 know. A number of those questions certainly would
25 have involved labeling in the broad sense, but I spent

21 (Pages 78 - 81)

1 a lot of time talking to Carolyn and her seeking my
2 advice.
3     Q. It wasn't your job to work with regulations
4 and enforcement on a daily basis, was it?
5     A. Of course it was. That's ludicrous, that
6 answer. I was in charge of regulations for the
7 entire -- 24 hours a day. I was the one that was
8 responsible to look for compliance.
9     Q. You never performed a for-cause inspection of
10 a research laboratory at a vaccine manufacturer, did
11 you, Dr. Kessler?
12     A. I was the one who those would be discussed
13 with. I would not -- I deliberately made it my policy
14 as commissioner not to go in on inspections. I've
15 been invited multiple times by the field to do those
16 inspections, but there's a down side when the
17 commissioner shows up and does the inspection. But
18 people who did inspections would come in and informed
19 me of those inspections.
20     Q. So it's also the case that you've never
21 performed a GMP inspection of a vaccine manufacturer;
22 right?
23     A. Same. I was responsible for them. Those
24 individuals would report to me or report to their
25 supervisors and report to me. They're certainly -- I,

1 you know, chair the quality committee boards that
2 involve GMP inspections. I'm very familiar with GMP
3 inspections.
4     Q. Dr. Kessler, isn't it true that the biggest
5 thing that you did while at the FDA was the regulation
6 of tobacco, not vaccines?
7     MS. SCANLAN: Objection.
8     THE WITNESS: I appreciate the recognition of
9 the work on tobacco, but I think it's fair to say that
10 maybe the -- from a legacy point of view, it was a big
11 deal, yes, tobacco, but vaccines were certainly very
12 important to the agency, and I spent considerable time
13 with Dr. Hardagree.
14     MS. HARDWAY: I'm going to show you what
15 we're going to mark as the next exhibit.
16     (Deposition Exhibit 8 was marked for
17     identification.)
18 BY MS. HARDWAY:
19     Q. Dr. Kessler, this is a --
20     MS. LERNER: Do you have any copies for us?
21     MS. HARDWAY: I'm sorry. I only have the one
22 copy of this one.
23     Q. This is an excerpt of a trial transcript in
24 the matter of Christina Raquel vs. Abbott
25 Laboratories. Do you see that?

1     A. I see it. I almost need a magnifying glass
2 to read it, but happy to read it with that.
3     Q. Do you recall testifying in this case,
4 Dr. Kessler?
5     A. I certainly testified in a Depakote matter,
6 yes.
7     Q. And if you'd turn with me to Page 419.
8     A. Yes, ma'am.
9     Q. Are you with me?
10     A. Yes. 418, 419. I'm there, ma'am.
11     Q. In the middle of this -- of Page 419 you say,
12 "So probably the biggest thing that we did was the
13 regulation of tobacco. So we went inside the tobacco
14 industry and did the investigation. It took 15 years,
15 but President Obama signed a little legislation that
16 gave FDA the ability to regulate cigarettes,
17 especially sale to young people," and then you go on.
18 Do you see that?
19     A. Yes.
20     (Pause in proceedings.)
21     THE WITNESS: Keep on going.
22 BY MS. HARDWAY:
23     Q. And you continue, "...and that is what's
24 probably the most important achievement along with you
25 go back in the 1980's -- 1990's. I think the other

1 big one when I got there, you know, there was an
2 epidemic of AIDs, and there was only one drug and it
3 was pretty mediocre and it didn't work well for HIV,
4 and by the time we left, you know, seven years later,
5 there were 17 drugs available. Not a perfect cure,
6 right, but it certainly changed I think the course of
7 that disease from something that was an automatic
8 death sentence to something that could be lived with,
9 and now -- but that was -- the pharmaceutical industry
10 deserves credit. The FDA deserves credit. The NIH
11 deserves credit. Everybody worked very, very hard."
12 Do you see that?
13     A. I do.
14     Q. And you didn't mention vaccines as one of
15 your -- the biggest thing that you did while you were
16 commissioner of the FDA, did you, Dr. Kessler?
17     A. That's correct. That wasn't your question.
18     Q. You haven't worked for FDA since you left
19 your position as commissioner in 1997; right?
20     A. Correct.
21     Q. And you haven't been a member of any FDA
22 advisory committees since you left the FDA in 1997;
23 correct?
24     A. I try not to -- I try to let my successors do
25 their job unimpeded, yes.

Page 86

1    Q. You haven't served as a consultant to the FDA
2  in any capacity since you left your position as
3  commissioner?
4    A. Only informally. The commissioners of past
5  would call and ask me for their advice.
6    Q. But you've not advised the FDA in any formal
7  capacity since 1997; correct?
8      MS. SCANLAN: Objection.
9      THE WITNESS: It depends on how you define
10  "formal." When a commissioner calls you, I think
11  that's advising the agency, but I would always that
12  those were more informal. So maybe you're right, but
13  there's some nuances to those words.
14  BY MS. HARDWAY:
15    Q. There are centers within the FDA; correct?
16    A. Yes.
17    Q. Can you identify the centers?
18    A. Sure. Do you want me to tell you their
19  names?
20    Q. Yes, please.
21    A. So there's drugs, biologics, medical devices,
22  vet med, CFSAN, and the National Center of
23  Toxicological Research.
24    Q. What is CBER's responsibility or mission?
25    A. So CBER was created to enforce the --

Page 87

1  originally, the Public Health Act, and some of those
2  provisions, obviously, as you know well, Counselor,
3  that drugs were defined to include biologics
4  initially. So CBER was originally -- was the biologic
5  center. That morphed over the years where CBER and
6  CDER and a few divisions would have overlapping
7  depending on the nature of the review. Again, CBER
8  being more research oriented, having blood cell
9  somatic therapy, as well as vaccines, as well as
10  various type of biotechnology products, and there was
11  an overlap between that and CDER.
12    Q. Vaccines are regulated and licensed through
13  CBER; correct?
14    A. Yes.
15    Q. You never worked at or for CBER; right?
16    A. I was responsible for CBER.
17    Q. But you never worked in that center; correct?
18    A. No. That would be mistaken. I worked very
19  closely -- I mean I would guess certainly a week would
20  not go by, not a day would go by where I wasn't --
21  there's not a separate organization called CBER. It's
22  all part of FDA, and I was responsible for CBER, and I
23  worked very closely with CBER and the office directors
24  there.
25    Q. You're not speaking on behalf of FDA in this

Page 88

1  litigation; right?
2    A. Correct. And underline that. That's very
3  important, Counselor.
4    Q. You don't consider yourself an expert in the
5  development of vaccines, do you, Dr. Kessler?
6    A. Certainly as an expert in the intersection of
7  vaccines and the regulatory -- that interface, I would
8  consider myself. So to the extent that vaccines are
9  developed and regulated, that regulation I would
10  consider myself having expertise in.
11    Q. But you're not a virologist; correct?
12    A. I've been trained in virology. As you know,
13  as you can see from that original paper, I learned a
14  lot of virology in my science, both undergraduate and
15  in medical school.
16    Q. You don't have a degree in virology; correct?
17    A. I have my medical degree, which has -- and
18  have been taught by some of the greatest virologists
19  over the years.
20    Q. Do you have a specific degree in virology?
21    A. No, I have my medical degree.
22    Q. You don't have any specialized training or
23  expertise in vaccines and immunizations, do you?
24    A. I have -- I was responsible for the safety of
25  all immunizations and vaccines for this country for

Page 89

1  seven years. So I have considerable expertise in
2  that.
3    Q. Do you have any specialized training in
4  vaccines and immunizations?
5    A. Well, as a pediatrician I mean I was board
6  certified for 30 years, and I was responsible for
7  overseeing their regulation. So I guess the answer to
8  that question is yes.
9    Q. So as a pediatrician, you received
10  specialized training in vaccines and immunizations?
11    A. Of course.
12    Q. What specialized training was that?
13    A. Part of the core curriculum in any -- in
14  pediatric training -- every pediatrician is going to
15  have training in vaccinations in childhood, infectious
16  disease, and those virological disorders. It's
17  essential. I would guess it's -- I don't know. I
18  mean it's bread and butter of pediatrics.
19    Q. What is an immunogenicity assay?
20    A. Which kind are you talking about?
21    Q. Can you describe one for me generally?
22    A. So immunogenicity assays are surrogates for
23  clinical protection. So, again, what the Act requires
24  is that vaccines be shown to be effective, and there
25  are certain surrogates -- right? -- because not

23 (Pages 86 - 89)

Appx1506

Page 90

1 everyone can do the kind of field clinical trial or
2 epidemiological study where you take a child and you
3 expose them in nature to the environment and, I mean
4 there are times when you can do that and there's still
5 times where if it's done right ethically that can be
6 done and those field trials can be done.
7      But immunogenicity trials are surrogates for
8 that clinical effectiveness.  So you take laboratory
9 measures, take plaque reduction, neutralization, and
10 you want to see the ability of an intervention to
11 effect certain immunological parameters that you hope
12 or have validated that correlate with that clinical
13 data.
14      So you want to see if I give a child a
15 vaccine and they stimulate certain IGM or IDG
16 antibodies, you take that sera and you'll bring that
17 sera to the lab and you will set up an immunogenicity
18 assay to -- whether it's plaque reduction or whether
19 it's ELISA, whether the old HI kind of test to see if
20 you can have a surrogate of that kind of protection.
21      So you're looking to see whether those
22 antibodies in some kind of laboratory test will give
23 you certain results of whether they're -- in fact,
24 those antibodies will effectively neutralize the
25 virus.

Page 91

1      Q.  Have you ever designed or conducted an
2 immunogenicity assay for a clinical trial?
3      MS. SCANLAN:  Objection.  Compound.
4 BY MS. HARDWAY:
5      Q.  Have you ever designed an immunogenicity
6 assay for a clinical trial?
7      A.  I'd have to go back and think whether any --
8 I won't design the diagnostic myself in the ELISA, but
9 to the extent that ELISAs are used to measure a lot of
10 different molecular entities, but I would not have
11 designed the actual neutralization or the ELISA test.
12      Again, those tests, to the extent that those
13 tests are used in diagnosis, we would be involved, I'd
14 be involved in regulating them, but that's on the
15 diagnostic side.
16      Q.  So the answer to my question is no, you've
17 never designed an immunogenicity assay for a clinical
18 trial?
19      MS. SCANLAN:  Objection.  Mischaracterizes
20 testimony.
21      THE WITNESS:  Yeah.  I think I'd have to go
22 back and search my memory and understand all the
23 clinical trials.  I am sure there were ELISA tests
24 that were used in those clinical trials that I've been
25 involved in, but I'd have to go back and look.  I mean

Page 92

1 I was in charge of the whole clinical research centers
2 for over a decade.  So I'd have to go back and look at
3 the record.
4      But, again, to your point, I think if you
5 want to talk about how to design a PRN or an ELISA, I
6 assume there's other experts in this case that will
7 testify on that design, but I -- certainly when it
8 comes to how one uses those in the regulatory
9 framework, I'm comfortable testifying, but on the
10 design, others can talk about that.
11 BY MS. HARDWAY:
12      Q.  And what about conducting an immunogenicity
13 assay for a clinical trial?  Have you ever conducted
14 one?
15      A.  I'm sure at some point I was -- maybe not in
16 the context of a clinical trial, but I'm sure I was
17 trained in PRN, et cetera, initially.
18      Q.  And I didn't ask whether you were trained.  I
19 asked whether you yourself actually conducted an
20 immunogenicity assay for a clinical trial.
21      A.  Yes.  So I'm sure I conducted -- my memory, I
22 would go back and be exact.  The first part is yes.
23 I'm not sure it's in the context of a clinical  trial.
24      Q.  Have you ever designed an assay to evaluate
25 the potency of a vaccine?

Page 93

1      A.  Just used it to regulate it.
2      Q.  Have you ever conducted an assay to evaluate
3 the potency of a vaccine?
4      A.  Just used it to regulate it.
5      Q.  So just to be more specific, you've never
6 designed a PRN assay?
7      MS. SCANLAN:  Objection.  Vague and
8 ambiguous.  If you want to describe PRN.
9      THE WITNESS:  Thank you, Counselor, but I can
10 handle -- I got PRN.  Just to be --
11      MS. SCANLAN:  Just making a clear record.
12      THE WITNESS:  That's fine.  Thank you,
13 Counsel.
14      I don't design the test I use.  I -- anyone
15 from FDA, we would use the results in the assessment
16 of efficacy and effectiveness of the vaccine.
17 BY MS. HARDWAY:
18      Q.  Have you ever conducted a PRN assay?
19      A.  I said I thought I had done plaque reduction
20 in my career.  I'd have to go back and exactly
21 remember.  It's certainly not been -- it's been a
22 while.
23      Q.  Sitting here today, is there any specific PRN
24 assay that you can recall designing?
25      A.  I have some recollection of counting plaques,

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Appx1507

1 but I'd have to go back on plates, but I have to go
2 back and jog my memory. It would be decades ago since
3 the last time I've counted plates.
4     Q. And I didn't ask you whether you recall
5 counting plates. I asked you whether you recalled
6 designing a PRN assay.
7     A. Well, I mean to the extent that I was
8 involved in counting the plates, I may have been
9 involved in designing the PRN. But, again, there are
10 others that will testify that have spent their lives
11 doing this, and I certainly will yield to them on
12 that.
13     Q. Have you ever designed an ELISA?
14     A. No, I don't think I've designed. I've only
15 used it in the regulatory context. So it's the
16 interpretation of that.
17     Q. So you've never had to choose a cutoff in an
18 ELISA?
19     A. To the extent that -- that's not true. In
20 the regulatory context, I mean those cutoffs are
21 absolutely key. Immunocor, as you know, is a blood
22 banking test and uses design cutoffs all the time that
23 come to us. I don't think I do it alone. It's in
24 conjunction with scientists, but it's something I'm
25 very familiar with. And the intersection of those

1 cutoffs and those cutoffs being validated is something
2 that I'm very familiar and have expertise with.
3     Q. That was not my question. Have you ever
4 chosen a cutoff for an ELISA?
5     A. I've discussed cutoffs for ELISA with regard
6 to diagnostic tests in the interface with the
7 regulatory interface, yes. That's my memory. I can
8 go back and have to confirm that, but my recollection
9 is yes.
10     Q. That you have chosen a cutoff? That's your
11 recollection?
12     A. I've been involved in those discussions. I
13 mean I've chosen -- for companies, et cetera, there
14 are cutoffs whenever you're involved in diagnostics,
15 and those issues get brought up and get discussed.
16 And I believe I've been involved in those discussions.
17 I wouldn't want to say I would make the decision by
18 myself, but I have familiarity with that and certainly
19 would get asked those questions in the regulatory
20 context.
21     Q. Sitting here today, do you have a specific
22 recollection of any ELISA in which you've been
23 involved in discussing the cutoff?
24     A. I'd have to go back to be sure. I mean I'd
25 have to refresh my memory and have to do a little

1 homework to answer that question.
2     Q. So you've never done a concordance analysis
3 for an ELISA, have you?
4     A. Certainly have done concordance analyses
5 for -- I'd have to go back and refresh whether it was
6 specifically an ELISA test or not, but they're bread
7 and butter in diagnostics. So I'm familiar -- I've
8 been involved in discussions of those at the corporate
9 level and certainly at the regulatory level. I've got
10 to go back and think about specifically in the ELISA
11 context. I'd have to check.
12     Q. So you can't recall, sitting here today,
13 whether you've done a concordance analysis for an
14 ELISA?
15     A. Correct. I have familiarity, specific
16 recollection of doing concordance analyses of certain
17 diagnostic tests, but I just want to be sure whether
18 it was ELISA or not.
19     Q. Have you ever conducted potency testing of
20 any kind or a vaccine?
21     A. Just involved in -- I would not do it myself.
22 I would use that data to make regulatory decisions.
23     Q. Have you ever conducted stability testing of
24 any kind of a vaccine?
25     A. Again, the same answer. I would not do the

1 stability testing myself, but on a regular basis I'd
2 be involved in decisions on a regulatory context.
3     Q. And you've never created a stability model
4 for a vaccine?
5     MS. SCANLAN: Objection.
6     THE WITNESS: No, I would never do that
7 myself, but again, I would be involved in looking at
8 that data for regulatory context.
9 BY MS. HARDWAY:
10     Q. You've never published on the subject of
11 immunogenicity assays, have you?
12     A. Not that I can recall.
13     Q. Have you ever published on the subject of PRN
14 assays?
15     A. Not that I can recall other than it's a
16 general diagnostic. It's how one regulates
17 diagnostics. And we'd have to go look, but not
18 specifically.
19     Q. Have you ever published on the subject of
20 ELISAs?
21     A. Only to the extent that it would be used as a
22 medical device and that it's under the food and drug
23 context, not specifically.
24     Q. Have you ever published on the subject of
25 potency testing of a vaccine?

25 (Pages 94 - 97)

Appx1508

Page 98

1    A.  Not -- just in the general sense of
2  adulteration.  I mean if you fall below the potency
3  and the impact whether the product was adulterated,
4  we'd go back and look, but it's in that context that I
5  would have published.  It's the relationship of
6  potency and adulteration.
7    Q.  What's that publication or those publications
8  to which you're referring?
9    A.  Well, I'm sure I've defined the term
10  "adulteration" in 321 of the Act and other sections
11  where "adulteration" is defined to include, in
12  essence, potency or strength.  So if you look at a
13  definition, I'm sure I've cited.
14    Q.  Specifically with regard to vaccines though?
15    A.  I don't think it was in this specific
16  context, but you asked me about potency and
17  adulteration.  So I mean it's --
18    Q.  I said have you ever published on the subject
19  of potency testing of a vaccine?
20    A.  So only to the extent that potency is part of
21  adulteration, and I'd have to go -- certainly applied
22  to vaccines, but we'd have to look at specific ways
23  it's phrased.  I mean when I use the word
24  "adulteration."
25    Q.  Have you ever published on the subject of

Page 99

1  stability testing of a vaccine?
2    A.  Published probably not on stability.
3  Probably -- I mean potency is in the definition.
4  Stability is only secondary as it relates to potency
5  obviously.
6    Q.  You don't hold yourself out to be an expert
7  in immunogenicity testing; correct?
8    A.  Only to the extent that it involves the
9  regulatory intersection and is used as a surrogate to
10  measure effectiveness of a drug or biologic.  I would
11  certainly be expert on that regulatory interface of
12  that immunogenicity testing and that regulatory
13  framework.
14    Q.  You're not an expert in economics, are you,
15  Dr. Kessler?
16    A.  No.  I certainly yield on all economic
17  matters.  I've done some pharmacoeconomics.  I've
18  served on boards.  I have an advanced degree in
19  business training and economics -- I mean business
20  training from NYU School of Business, but I will
21  certainly yield -- I mean basic corporate fiduciary
22  responsibilities I know as a board member, the
23  finances, what drives companies.  I have expertise on
24  that as a member of a board.  But on economic models,
25  micro and macroeconomics I yield to others.  I have no

Page 100

1  expertise.
2    Q.  What is the Centers for Disease Control?
3    A.  Well, that's the old name.
4    Q.  What is the new name?
5    A.  There's "prevention" in the name.  So the
6  sister agency of FDA.  It's a member of the public
7  health service.  So CDC is Disease Control and
8  Prevention, is responsible in general for infectious
9  disease, as well as chronic disease, acute and chronic
10  disease in this country.
11    Q.  Does CDC coordinate certain efforts or
12  missions with the FDA?
13    A.  How long do you have for me to answer that
14  question?
15    Q.  Are you aware generally of whether that
16  happens?
17    A.  I would be -- I interacted very frequently
18  with CDC and can tell you on certain things I'd be on
19  phone calls throughout the night, and on certain
20  things they lived in completely different worlds.  So
21  they're two different organizations joined in a sister
22  department, and some things they're great coordinators
23  and great things, and some things they are clueless
24  about what's going on.  It depends on the matter.
25    Q.  ACIP makes recommendations about which

Page 101

1  vaccines children in the United States should receive;
2  correct?
3    A.  Fair.
4    Q.  You've never been asked to serve as a member
5  of ACIP; right?
6    A.  No.
7    Q.  You've never worked for CDC; right?
8    A.  I think if you talked to people at CDC, they
9  would tell you on certain nights they thought I was
10  working with them, for them.  Some very long nights,
11  but officially no.  I was -- my title was FDA, but I
12  was public health service.
13    Q.  So you've never been involved in any
14  negotiation between the CDC and a manufacturer
15  regarding the purchase of a vaccine; correct?
16    A.  That's correct.  That's something that I
17  would -- that I've never been part of.  I leave that
18  to others.
19    Q.  You're a pediatrician, I believe you
20  testified; right?
21    A.  Yes.
22    Q.  And in your report you state in Paragraph 4
23  that you were involved in assessing treatment options
24  in children and weighing the risk and benefits of
25  their case?

26 (Pages 98 - 101)

1    A. Can I just take a look and see my exact
2 quote. I just want to make sure of my exact language.
3 So just give me exactly where.
4    Q. Paragraph 4.
5    A. Paragraph 4. I'm sorry. I was on Page 4.
6 Yes, that's a very fair statement.
7    Q. Have you ever administered or caused to be
8 administered a vaccine to a patient?
9    A. Absolutely, and proud of it.
10   Q. Have you ever administered MMR to a patient?
11   A. Sure.
12   Q. Have you ever administered Proquad to a
13 patient?
14   A. Probably not.
15   Q. Have you ever instructed or suggested that a
16 patient not take a vaccine that was recommended by
17 ACIP?
18   A. Sure. There are exceptions. I mean there
19 are times -- I mean I would deal with very sick kids,
20 but actually, you've got to just be careful on
21 that. I am a strong pro, just so you understand, of
22 ACIP recommendations. But I would deal with very sick
23 children with leukemia, with immuno compromise, and as
24 you know, sometimes those issues become very complex.
25     So I would -- you know, I would try to

1 follow. I mean an ACIP addresses some of those
2 concerns, but there's not always going to be an
3 individual context. But that's rare.
4     I'm a strong believer that one should follow
5 the ACIP, but there are context. An individual sick
6 child where there are constraints that are placed on
7 you, you just got to be careful.
8    Q. But with those exceptions aside, as a
9 pediatrician, you follow the ACIP's recommendations?
10   A. Absolutely. I have always done that in
11 clinical practice.
12   Q. Dr. Kessler, you'd agree with me that an
13 expert witness should not speculate; right?
14   A. Sure, unless you ask me to. I mean you may
15 ask me for an estimate or something like that. So it
16 depends. I've been asked for estimates. I've been
17 asked for my best -- an educated guess by a judge.
18 But I would agree that that's correct.
19   Q. So if I'm not asking you to speculate, you
20 should not speculate; right?
21   A. That's correct. Nor the courts. And, again,
22 I've answered directly. It depends, Counselor, on
23 your -- I mean there are -- as I've been instructed to
24 by courts, there are educated based on experience,
25 what your experience would tell you an answer would

1 be. Whether that's speculation, I leave to others. I
2 don't mean to quibble, but I just want to be careful.
3    Q. Prior to becoming involved in this
4 litigation, had you ever been asked to address the
5 adequacy of MMR's label?
6    A. No.
7    Q. Prior to becoming involved in this
8 litigation, have you ever been asked to address the
9 adequacy of the Proquad label?
10   A. No.
11   Q. Have you ever presented -- have you ever
12 published on MMR?
13   A. Not to my knowledge specifically, no.
14   Q. Have you ever published about Proquad?
15   A. Not to my -- no. Certainly not with regard
16 to Proquad.
17   Q. Have you ever presented on MMR?
18   A. I may have in certain pediatric lectures had
19 the ACIP, other things that may have been a part of my
20 teaching at certain points about that, but it's been a
21 while.
22   Q. Have you ever presented on Proquad?
23   A. Not to my knowledge.
24   Q. Prior to becoming involved in this
25 litigation, had you ever been asked to address the

1 adequacy of the assay or studies conducted by Merck
2 regarding MMR?
3     MS. SCANLAN: Objection. Compound.
4 BY MS. HARDWAY:
5    Q. Prior to becoming involved in this
6 litigation, have you ever been asked to evaluate the
7 adequacy of any assay conducted by Merck relating to
8 MMR?
9    A. Not to my knowledge.
10   Q. Prior to becoming involved in this
11 litigation, had you ever been asked to address the
12 adequacy of any studies conducted by Merck related to
13 MMR?
14   A. Not to my knowledge.
15   Q. Have you ever presented or publicly issued
16 any of the opinions that you've offered in this case
17 prior to offering them in your report?
18   A. Certainly nothing that is case specific. If
19 there's anything general on how the Act operates, the
20 general boilerplate of the Federal Food, Drug and
21 Cosmetic Act, and there's some general definitions in
22 here. I'm sure I've lectured on that, but certainly
23 not in the context of Merck and MMR.
24   Q. You're a professional witness; right,
25 Dr. Kessler?

27 (Pages 102 - 105)

Appx1510

1     MS. SCANLAN: Objection.
2     THE WITNESS: Your characterization, Counsel.
3 BY MS. HARDWAY:
4     Q. So you don't agree that you're a professional
5 witness?
6     A. I'm a professional and I've served as a
7 witness, but I leave it to you to characterize it. I
8 wouldn't characterize myself like that.
9     Q. You testify in court as a paid expert; right?
10     A. That's correct.
11     Q. How is it that you decide what cases you want
12 to take?
13     A. Carefully.
14     Q. When you say, "carefully," what do you mean
15 by that?
16     A. So I had the privilege of being involved in
17 some very large cases, as you can tell, and as has
18 been disclosed. I try very hard to get things right.
19 I am -- as you can see, I am very thorough. I try to
20 be very thorough. I am very careful of what I say. I
21 take testimony enormously seriously. I try not to
22 make mistakes, and I try to issue opinions that I hope
23 that most people would see as helpful and as correct.
24     Q. Are there cases that you've been asked to be
25 an expert witness in that you've turned down?

1     A. Oh, sure.
2     Q. So how is it that you decide which ones to
3 take on?
4     A. Carefully.
5     MS. SCANLAN: Objection. Asked and answered.
6     THE WITNESS: I mean, again, I mean I think
7 you got to be very careful in how one does this.
8 BY MS. HARDWAY:
9     Q. When was the last time you testified at a
10 deposition?
11     A. I testified in a GMP manufacturing case. So
12 maybe a month ago.
13     Q. When you say, "GMP manufacturing case," is
14 that the subject matter of the case?
15     A. Yes.
16     Q. You said about a month ago?
17     A. Uh-huh.
18     Q. What's the name of that case?
19     A. I don't know what's -- if you assure me it's
20 not under seal, or my testimony is not under seal, I'd
21 be happy to tell you that.
22     MS. SCANLAN: Yes, to the extent that
23 Dr. Kessler has matters that he works on that are not
24 a matter of public record where they may be a
25 deposition, where the name of the matter isn't known,

1 that he would be precluded from describing it here.
2 We're not parties to any protective order on any other
3 matter where he might be testifying.
4     THE WITNESS: I just want to check. I'm
5 happy to check with counsel and make sure that the
6 name is disclosable and my participation is
7 disclosable. I assume it is. I'm happy to tell you,
8 Counselor, and I assume there's no reason why I can't,
9 but I'm just thinking it through.
10 BY MS. HARDWAY:
11     Q. If you could check at a break, that would be
12 good.
13     A. I'd have to call outside counsel and make
14 sure I can disclose. Happy to relay that to counsel,
15 and they can relay it to you.
16     Q. Well, if you could inquire as to whether you
17 can just simply give me the case name and the
18 jurisdiction in which it's pending, and provide that
19 after a break, I would appreciate it.
20     A. Sure. I'd be happy -- we'll see if we can
21 get ahold of -- if I can get you the caption.
22     Q. When is the last time you testified in court?
23     A. Probably several months ago.
24     Q. Several months?
25     A. Probably. I'm trying to think. Probably --

1 you know, I'd have to check my calendar.
2     Q. It's true, isn't it, Dr. Kessler, that you
3 rarely, if ever, testify for defendants?
4     A. It depends on how you define "rarely." I've
5 testified for defendants in probably -- in the Prop 65
6 coffee warning case. So I think it's fair to say,
7 Counselor, that I testify primarily on the plaintiff's
8 side, the significant number. But there's four or
9 five cases, some big cases, where I've testified for
10 plaintiffs -- for defendants.
11     Q. In August of this year, August of 2018, you
12 testified for -- in a trial involving -- in the
13 Xarelto litigation; is that right?
14     A. That's the case that I'm remembering.
15     Q. What type of medication is that?
16     A. It's an anticoagulant.
17     Q. What company manufactures it?
18     A. So there were two. It was Janssen and Bayer.
19     Q. And you were testifying on behalf of the
20 plaintiff in that case; right?
21     A. Correct.
22     Q. Do you remember the plaintiff's name?
23     A. I'd have to check.
24     Q. Do you remember what his or her primary
25 injuries were?

28 (Pages 106 - 109)

Page 110

1    A. There was a GI bleed.
2    Q. And you had another Xarelto trial that you
3 testified in April of this year; right?
4    A. Yes.
5    Q. Do you remember the name of the plaintiff in
6 that case?
7    A. There's -- I'd have to go back in specifics.
8 Again, I do not as, you know, counsel, testify in case
9 specific.
10   Q. Do you know the nature of that plaintiff's
11 injuries?
12   A. I'd have to go back to be specific. Again, I
13 was not the case specific -- again, these are internal
14 bleeding cases. I can check what the actual organ
15 was. Again, I don't testify to that.
16   Q. And there's another --
17   A. And, again, I don't involve myself in the
18 medical records of the patients.
19   Q. You don't remember the plaintiff's name in
20 the April 2018 case?
21   A. I don't have it off the top of my mind. I
22 don't want to guess.
23   Q. And there's another Xarelto trial in November
24 of 2017; correct?
25   A. Yes.

Page 111

1    Q. And do you remember the name of the plaintiff
2 in that case?
3    A. I do not, no. Again, I never testify in the
4 case-specific aspects. So I don't review the medical
5 records nor are involved in the actual issues
6 involving the plaintiff.
7    Q. But you don't remember the plaintiff's names?
8    A. I do not remember the plaintiff's name.
9    Q. In April of 2017 you also testified in a
10 Xarelto trial. Do you recall that?
11   A. I testified in a number of Xarelto cases. I
12 don't remember specifically the months that I
13 testified, but I've testified in a number of Xarelto
14 cases.
15   Q. Do you remember the name of the plaintiff for
16 these Xarelto trial in which you testified in April of
17 2017?
18   A. Again, I can't keep these straight. I do
19 have the records. I'm happy to look them up.
20   Q. In May of 2017 you testified in a trial in
21 the Depakote litigation; correct?
22   A. I did.
23   Q. What type of medications is Depakote?
24   A. It's used in a -- it has a number of
25 indications. It's used as an antiepileptic primarily,

Page 112

1 but it has approval in a number of other affective
2 disorders.
3    Q. Do you remember the name of the plaintiff in
4 that case?
5    A. I do not. Well, actually, you have -- this
6 may be the case. Again, I don't have the specific
7 names.
8    Q. And over the last year or so you've also
9 testified in the testosterone replacement therapy
10 litigation?
11   A. In the NDO.
12   Q. What is the product in that case?
13   A. So it's AndroGel.
14   Q. Who manufactures that?
15   A. A number -- AndroGel specifically is Abbott
16 Laboratories.
17   Q. And you testified at trial in July of 2017 in
18 that litigation; right?
19   A. I've testified in a number of the MDL cases
20 that -- yes. I've testified in a host of the MDL.
21   Q. Do you recall the name of any of the
22 plaintiffs in the testosterone replacement therapy
23 litigation in which you've testified?
24   A. I'd have -- let me get back to you,
25 Counselor. I want to be exact. I'd be happy to give

Page 113

1 you the exact names of those if you'd like.
2    Q. It looks like you've testified most recently
3 in March of 2018 in the testosterone replacement
4 therapy litigation; is that right?
5    A. There was a matter this year that I believe I
6 testified in. I think it was a redo of a case, if my
7 memory serves me right.
8    Q. So in 2017 you testified in trials occurring
9 in April, May, July, September, and November all for
10 plaintiffs; right?
11   A. In 2017? I think I also testified -- I think
12 I testified for defendants in February, I believe.
13 Actually, when was the coffee matter? I'd have to
14 double-check in 2017. September -- did you say
15 September?
16   Q. I was asking you in 2017 it looked like you
17 testified in five months, five different months in
18 2017. I was just asking you to confirm that those
19 were all for plaintiffs.
20   A. No. It wouldn't be correct because I believe
21 I testified in September of 2017 for defendants.
22   Q. And this year you've testified in January,
23 March, April, and August, all for plaintiffs; correct?
24   A. I'd have to go back and check your months.
25   Q. But all the times you've testified at trial

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Appx1512

Page 114

1 this year have been for plaintiffs; right,
2 Dr. Kessler?
3    A. Well, I believe there's Xarelto and
4 testosterone. In both of those matters I've testified
5 for plaintiffs, correct.
6    Q. And during this time, during 2017 and 2018,
7 you were also testifying in depositions; correct?
8    A. I may have. You have to -- I don't have my
9 calendar here.
10    Q. And all the depositions that you gave in 2017
11 and 2018 were for the plaintiffs; right?
12    A. I forget when the -- I think the tobacco was
13 also for defendants. We'd have to check the date on
14 that, but I testified for defendants.
15    Q. So one deposition in 2017 and 2018 for
16 defendants?
17    A. Again, I don't have my calendar. I can't be
18 sure, but certainly the tobacco case I testified to --
19 sorry. The coffee case.
20       MS. HARDWAY: I'll show you what we're going
21 to mark as the next exhibit.
22       (Deposition Exhibit 9 was marked for
23       identification.)
24       MS. SCANLAN: Dr. Kessler, take a minute to
25 look at the document and make sure you're familiar

Page 115

1 before she asks you any questions about it.
2       THE WITNESS: Sure.
3 BY MS. HARDWAY:
4    Q. And this is Exhibit B of your report?
5    A. Yes.
6    Q. And this provides a list of prior trial and
7 depositions in the last 7 years; right?
8    A. Actually, it goes probably back -- it's
9 probably what it's labeled, but actually, I think to
10 be accurate, you could look at the dates. I think
11 there's some dates that even go prior to 7 years. So,
12 again, I think maybe it's a little -- 8, 10 perhaps.
13 I try to keep it -- so I think it goes back even
14 before 7 years.
15    Q. Other than what we've discussed, have you
16 testified since March of 2018?
17    A. I think the matter that I will check for you
18 is the matter that comes to mind that I testified in
19 deposition, and I think you've hit the trials,
20 Counsel.
21    Q. Any depositions that you can recall since
22 March of 2018?
23    A. The one that -- about a month ago.
24    Q. Otherwise, would this be a complete and
25 accurate list of all the cases in which you've

Page 116

1 testified since about 2011?
2    A. Going back, I just wouldn't want to make --
3 say there's no errors here. It's a good faith effort
4 to make sure that everything is on this.
5    Q. Reviewing this list, it looks like you've
6 testified in matters in courts in the following
7 states: Pennsylvania, Texas, Oklahoma, Vermont,
8 West Virginia, Delaware, Kentucky, Utah, Louisiana,
9 Texas, Massachusetts, California, Florida, New Jersey,
10 Missouri, Illinois, Indiana, and Virginia. Did I miss
11 any, Dr. Kessler?
12    A. I've testified where -- I'm not sure I recall
13 testifying in Virginia, for example. My memory may be
14 faulty.
15    Q. You've testified that you're heavily involved
16 in the litigation business; right, Dr. Kessler?
17    A. Counsel has referred to litigation as
18 "business." I assume I've been asked that question,
19 but it's always the way counsel phrases it. So that's
20 the way you, I guess, define your own profession.
21 So...
22    Q. When you've been asked that by counsel,
23 you've agreed with her, though; right, Dr. Kessler?
24    A. Do you want to show me the actual quotes?
25 I'd be happy to see the quotes. And, again, if you

Page 117

1 want to disparage your own profession, there's nuances
2 to how you're phrasing it as far as business,
3 et cetera, but I have certainly testified as an expert
4 in court and in court proceedings.
5       (Deposition Exhibit 10 was marked for
6       identification.)
7 BY MS. HARDWAY:
8    Q. Dr. Kessler, the next exhibit is an excerpt
9 of a trial transcript in the in re testosterone
10 replacement therapy product liability litigation --
11    A. Yes.
12    Q. -- case in Chicago, Illinois in January of
13 2018. Do you see that?
14    A. I do.
15       MS. SCANLAN: And, Dr. Kessler, she
16 identified that this is an excerpt of the transcript.
17 So I just want to make sure that you have the
18 opportunity to review what this is, and if you have
19 recollection of this testimony where they might not be
20 the complete record to take a look to make sure that
21 the record you have --
22       THE WITNESS: I'm sure she's going to point
23 me to one sentence, Counsel.
24 BY MS. HARDWAY:
25    Q. Dr. Kessler, can you turn with me to

30 (Pages 114 - 117)

Appx1513

1 Page 1566?

2   A. Yes. Hold on a second. I'm there.

3   Q. Line 18 there's a question:

4      "Q. So a separate topic

5      as a general matter you're

6      heavily involved" --

7   A. Wait. What line, please?

8   Q. 18.

9   A. 18. Yes.

10  Q. You're asked:

11     "Q. So a separate topic.

12     As a general matter, you're

13     heavily involved in the

14     litigation business. Is

15     that fair?"

16  MS. HARDWAY: Your answer:

17     "A. I've testified some

18     30 to 40 times, yes."

19  THE WITNESS: That's exactly what I said,

20 Counselor. Make no mistake about this. Okay? I mean

21 just for the record. That was how counsel was

22 phrasing this. Let me finish my answer. Okay? What

23 should be very clear, okay, you may be involved in the

24 litigation business. This case involves a public

25 health matter, and it's bigger than the litigation

1 business. And I think that it's very important that

2 all involved in this understand that.

3 BY MS. HARDWAY:

4   Q. On Page 1567, Dr. Kessler, of the same

5 transcript --

6   A. 15-?

7   Q. -67.

8   A. Yes.

9   Q. Line 4.

10  A. Yes.

11  Q. You're asked:

12     "Q. Given that, is it

13     fair to say that you're

14     heavily involved in the

15     litigation business?

16     "A. I guess so."

17 BY MS. HARDWAY:

18  Q. Do you see that?

19  A. Yes.

20  Q. And then the questioner says, "Thank you."

21 And then you say, "I mean I do a lot of other things

22 heavily involved. I testify a lot. That's probably

23 the right answer." Do you see that?

24  A. I see exactly what I said.

25  Q. So you agreed with the questioner that you

1 were heavily involved in the litigation business,

2 didn't you, Dr. Kessler?

3   A. To the extent that lawyering involves

4 litigation business and I'm an expert, you can

5 characterize it the way you want, Counselor. My

6 testimony stands.

7      Let me again emphasize in the strongest

8 possible terms, okay, if you take -- this matter that

9 is in front of us has significant public health

10 import. I leave it to you, Counselor, and to your

11 client -- right? -- how you're approaching it. I

12 would urge that this matter be viewed from a public

13 health perspective and not one of litigation business.

14  Q. Dr. Kessler, you've testified about 40 times.

15 Is that fair to say? 40 times at trial.

16  A. That's exactly what my list says. Maybe you

17 can count them up.

18  Q. And you've admitted that you've testified in

19 a significant number of cases; correct?

20  A. Exactly.

21  Q. In fact, as we've been discussing, you've

22 testified in different litigation several times in the

23 last six months. True?

24  A. They are -- as you know, the way the courts

25 have designed these matters, the same matter gets

1 resolved in these multidistrict litigations or in

2 these consolidated cases, which were both, you know,

3 big cases involving the same drug, and that's why

4 they're multiple matters.

5   Q. And as of the spring of 2018 you were an

6 expert in approximately 10 to 15 cases; right?

7   A. Sorry. What does that mean?

8   Q. That as of the spring of 2018 you were

9 actively involved as an expert in 10 to 15 cases?

10  A. I don't know what "actively involved" means.

11  Q. Cases that you were currently working on as

12 of 2018.

13  A. I have no recollection of being involved in

14 10 to 15 matters at one time.

15  Q. Over your career, the litigations that you've

16 worked on have related to a number of pharmaceutical

17 products; right?

18  A. Correct.

19  Q. Fosamax is one?

20  A. I was involved in Fosamax only to the extent

21 on a preemption question.

22  Q. And Risperdal was one?

23  A. An antipsychotic.

24  Q. Zoloft one was?

25  A. A question of birth defects.

Page 122

1    Q. Benicar was one?
2    A. Yes.
3    Q. Xarelto was one?
4    A. For bleeding, yes.
5    Q. Depakote was one?
6    A. For epilepsy and congenital defects, whether
7  the drug caused congenital defects.
8    Q. AndroGel was one?
9    A. Yes.
10    Q. Any others?
11    A. You have the list, and in each one of those,
12  those cases involved major -- I think almost all those
13  cases involved thousands of patients and sometimes
14  very significant adverse events.
15    Q. I believe that you testified recently that
16  about 90 percent of the work that you did in
17  litigation consulting was on behalf of plaintiffs.
18  True?
19    A. That probably is right. I think there are
20  about four or five cases that are defendant. If you
21  added it up, it's probably 10 percent for defendant.
22    Q. And for each of the cases in which you act as
23  an expert, you generally -- or you typically write a
24  report; right?
25    A. Sure. As a rule, I write a report.

Page 123

1    Q. And at this point you've written so many
2  reports that some of them are exactly the same from
3  case to case; right?
4    MS. SCANLAN: Objection.
5    THE WITNESS: If you could -- I think that
6  would be mischaracterizing it. I think that there
7  are -- sometimes there are paragraphs that are
8  applicable that are general FDA paragraphs that are
9  applicable across the board. So you want to be
10  consistent with that. So to the extent that I'm
11  explaining something, I would want to use the same
12  language.
13  BY MS. HARDWAY:
14    Q. There are portions of your report in this
15  case that have been used in previous litigations;
16  right?
17    A. I'd have to go back and look. Certainly
18  nothing to do with anything to do with -- anything to
19  do with MMR and Merck. To the extent that they are
20  general things that I've written before, I try to be
21  consistent.
22    Q. You're paid for your work in this case;
23  right?
24    A. Correct.
25    Q. And you're charging $1,000 an hour?

Page 124

1    A. Correct.
2    Q. Does that fee differ from preparation of
3  report versus testifying here today or at trial?
4    A. No.
5    Q. How much money have you made testifying as an
6  expert?
7    MS. SCANLAN: Objection.
8    THE WITNESS: I don't know the answer to that
9  question.
10  BY MS. HARDWAY:
11    Q. You've testified that you've made millions of
12  dollars testifying as an expert. Isn't that true,
13  Dr. Kessler?
14    A. Yes. But I certainly have no idea of the
15  exact number.
16    Q. I apologize.
17    A. That would be a correct statement.
18    Q. And, in fact, in one case you testified that
19  you've made millions and millions of dollars
20  testifying. Isn't that right?
21    MS. SCANLAN: Objection.
22    THE WITNESS: No. I think the question was
23  phrased like that, but again, "millions" with an "S"
24  is, I guess, millions and millions. So it's the way
25  the questioner phrases it. I think my answer is I

Page 125

1  have made millions of dollars.
2    MS. HARDWAY: I'm going to show you what
3  we're going to mark as the next exhibit.
4    (Deposition Exhibit 11 was marked for
5    identification.)
6  BY MS. HARDWAY:
7    Q. This is -- I'm sorry.
8    MS. SCANLAN: What are we on now? Is that
9  10?
10    REPORTER MARTIN: That's 11.
11  BY MS. HARDWAY:
12    Q. This is a trial transcript of another
13  testosterone replacement therapy case. Mitchell vs.
14  AbbVie from March 12, 2018.
15    A. Right. Involving -- obviously, this is an
16  MDL involving, ultimately, thousands of patients, yes.
17    Q. If you'd turn to Page 826 of this transcript.
18    A. Yes. 8- --
19    Q. 826.
20    A. 826. Thank you, Counselor. Yes.
21    Q. And at the very bottom, Line 25 it says,
22  you're asked,
23    "Q. And over the
24    years, again, setting
25    aside testosterone,

32 (Pages 122 - 125)

Appx1515

Page 126

1    sure, you've made millions
2    and millions of dollars
3    doing this; correct?"
4        MS. HARDWAY:  Your answer is:
5        "A.  Millions and
6    millions of dollars, yes."
7        THE WITNESS:  Yeah.  So this is my good
8 friend, David Bernick asking me.  I think I was
9 repeating the "millions and millions" because the
10 answer is millions.  That is my testimony, but the
11 answer is I've made millions of dollars.  So he uses
12 the phrase.  I was just repeating his phrase.
13 BY MS. HARDWAY:
14    Q.  So do you not stand by your testimony in that
15 trial?
16    A.  I stand by my testimony that I've made
17 millions of dollars.
18    Q.  Did you say you had submitted an invoice
19 for -- or a time sheet to counsel for your work in
20 this litigation?
21    A.  I did.
22    Q.  How many invoices?
23    A.  One.
24    Q.  I believe you said you've spent between 225
25 and 250 hours on your work in this case?

Page 127

1    A.  Through the report, I think was your
2 question.
3    Q.  Did you -- were you able to confirm what that
4 number was at a break?
5    A.  No.  They have to give you the invoice.  I'm
6 happy to look at the invoice if they have it.  I don't
7 have it.  That's my recollection.
8        MS. HARDWAY:  Well, I'd ask that that invoice
9 be produced to us unless the doctor can come up with
10 an exact number.
11        MS. SCANLAN:  We'll check on the break.
12 Thank you.
13 BY MS. HARDWAY:
14    Q.  And since the report, how many hours have you
15 spent working on this case?
16    A.  You asked me that question prior.
17    Q.  And how many hours was that?
18    A.  I said I didn't have an exact number.
19    Q.  Is it --
20    A.  You went through your 50, 100, 200, if you
21 look at the transcript, and I don't know the number.
22    Q.  Have you billed counsel for that time yet?
23    A.  No.
24    Q.  Do you have a time sheet of that time or a
25 record kept of the exact amount of time you've spent

Page 128

1 since your report?
2    A.  I may have squiggles.  I have to go back and
3 see.  I may have certain notes of time.  It's
4 possible.
5    Q.  But you said you've spent hours of hours
6 since you drafted -- or signed your report; right?
7    A.  You have to go back and look at the
8 transcript.  I think you asked me 50.  I said,
9 "Probably more than that."
10        You said, "100?"
11        I said, "I'm not sure."
12        You said, "200?"
13        I said, "Probably not."  So it's in that
14 range.  The answer is I don't know, Counselor.  The
15 answer is you asked me not to speculate, and I don't
16 know the answer to that question.
17    Q.  But you have squiggles of potentially
18 100 hours somewhere?  You're not sure how much?
19    A.  No.  I have squiggles of numbers.  I have
20 squiggles of some numbers I've spent.
21    Q.  And just to be clear, you said you were first
22 contacted about this case in 2015?
23    A.  Yep.
24    Q.  And you submitted your report in this case
25 that's 533 pages with about 500 pages of appendices.

Page 129

1 You submitted that in March of this year; right?
2    A.  Some 160,000 words.  It probably exceeds the
3 size of my book.  Yes.
4    Q.  And that took you only 250 hours to do?
5    A.  That's what I billed for -- as I told you,
6 Counselor, there may be hours that I have spent that I
7 did not bill for.  That's what I billed.
8    Q.  You've testified that the FDA is the gold
9 standard -- right? -- when it comes to drug and device
10 review?
11    A.  I assume you have an exact phrase.  I
12 probably have said -- you can pull it out.  It's
13 probably the most consumer protective agency in the
14 world.  I've also said it gets things wrong.  It tries
15 hard.  It's not perfect.  I've said a lot of things
16 about FDA.
17    Q.  You said that the review process for whether
18 a product is safe and effective is the gold standard;
19 right?
20    A.  Yeah.  I mean that would be -- that's sort
21 of -- I may have or may not -- if you want to quote
22 me, just show me the exact quote so we can be exact.
23    Q.  Dr. Kessler, I apologize I don't know the
24 number, but we've already marked the Nolte vs. AbbVie
25 transcript -- trial transcript.

1    A. You can have my exhibits back. Is this it
2 (indicating)? Is this Nolte?
3    Q. January 19 --
4    A. Yes, I have it.
5    Q. And if you turn with me to Page 1588.
6    A. Yes, ma'am.
7    Q. You say on Line 15, you're asked:
8       "Q. Okay. The FDA
9       review process for whether
10       a product is safe and
11       effective is the gold
12       standard across the
13       world. True?"
14       MS. HARDWAY: And then you answer:
15       "A. FDA -- I was going to
16       say "we," but I'm not speaking
17       for FDA, but yes, and I
18       probably have said that."
19 BY MS. HARDWAY:
20    Q. Do you stand by that testimony?
21    A. Yes.
22    Q. And then going down to Line 24 you were
23 asked:
24       "Q. Throughout your
25       professional career you've

1    always and continue to
2    have every reason to trust
3    the judgment of officials
4    of the FDA; correct?"
5       MS. HARDWAY: And you answer:
6       "A. Enormous respect, yes."
7       THE WITNESS: Yeah. So that would be true
8 but incomplete, Counselor, if you just asked that
9 question. I mean if you go through this transcript
10 and other transcripts on that question, I think that
11 is actually true. I have enormous respect, but I
12 think as you will look, if you look for completeness
13 here, that there are instances where I say, you know,
14 again, what I've testified to -- well, let me just
15 see.
16       MS. HARDWAY: Actually, Dr. Kessler the tape
17 is about to run out. So why don't we take a break.
18       THE WITNESS: Okay. I can pick up, and I can
19 add the answer to that question when we come back.
20       MS. HARDWAY: Okay.
21       THE VIDEOGRAPHER: We're going off the
22 record. This is the end of Media Unit No. 2. The
23 time is 12:28 p.m.
24       (A recess was taken from 12:28 p.m.
25       to 1:11 p.m.)

1       THE VIDEOGRAPHER: We're back on the record.
2 This is the beginning of Media Unit No. 3. The time
3 is 1:11 p.m.
4 BY MS. HARDWAY:
5    Q. Good afternoon, Dr. Kessler. We're back from
6 our lunch break.
7       When we left we were looking at an exhibit
8 from one of the testosterone replacement therapy
9 products liability litigation transcripts, and did you
10 have a chance to look at that further over the break?
11    A. I have not, but I'd like to just put the --
12 just a complete answer.
13       (The witness reviewed the document.)
14       THE WITNESS: Yes, I have the exhibit.
15 BY MS. HARDWAY:
16    Q. And did you wish to add anything to your
17 answer?
18    A. Yeah. So I think if you look at this and we
19 go through this, I think just to make for completeness
20 purposes, one, I think the question was generally
21 about respect for the agency, and I have enormous
22 respect for the agency. I do believe that it's the
23 most important consumer protection agency in the
24 world.
25       But just two points that I'm sure I've made

1 in testimony previously. One is FDA usually -- as a
2 general matter FDA is only as good as a manufacturer,
3 the data that it has from the manufacturer, the data
4 it has on a given matter in general.
5       And, 2, FDA sometimes gets it wrong. Thank
6 you.
7    Q. Dr. Kessler earlier we were talking about how
8 much money you've billed -- how many hours you've
9 billed prior to your report and then after your
10 report. And I believe the time for prior to your
11 report was in the neighborhood of 250 hours. Were you
12 able to confirm that?
13    A. So counsel represented to me that my invoice
14 was for 225. I said, "Exactly?"
15       And they said, "Yes." But I -- you know,
16 that was the representation that was just made to me
17 when I checked.
18    Q. Do you recall issuing a report in the
19 Xarelto, specifically in the Cooney vs. Janssen,
20 et al., matter?
21    A. In Cooney I believe it may have been a
22 supplemental report, if my memory serves me correct.
23 There was an initial report, but I believe Cooney --
24 the subject matter in Cooney was -- again, the general
25 issue is not with regard to Mr. Cooney. It had to do

1 with -- it was a supplemental report.
2    Q.  Do you recall in general what the subject of
3 the supplemental report was or why you needed to do
4 one?
5    A.  Yes.  So the -- it -- I believe the Cooney
6 report had to do with a number of additional issues
7 that may have been the subject of a deposition but
8 that I didn't issue -- weren't in my initial -- I
9 forget exactly the reason for it, but the issues in
10 that case, I believe, were different than the initial
11 issues in the initial matter and they had to do with,
12 among other things, dual and triple aspirin
13 concomitant use.  There were a number of additional
14 matters that were at play.
15    Q.  Do you recall that that supplemental report
16 was about 20 pages long?
17    A.  Approximately.
18    Q.  And do you recall that you were paid $59,000
19 for that 20-page report?
20    A.  Sounds potentially right, my memory.
21    Q.  So to draft a 20-page supplemental report you
22 billed $59,000.  True?
23    A.  In that matter, the amount of time I spent,
24 yes.
25    Q.  And in this matter for a 533-page report with

1 about 500 pages of appendices, that only cost
2 $250,000?
3    A.  That's what I billed, Counsel.
4    Q.  Okay.
5    A.  I've written a 500-page document and have
6 been paid much more when I write my books.  So -- than
7 what I did here.  I make a lot more money per word
8 when I write my books.
9    Q.  So just to be clear, Dr. Kessler -- and
10 you're under oath here.  You understand that.  In the
11 Xarelto litigation, a 20-page report cost $59,000, but
12 nearly 1000-page report with appendices only cost
13 $250,000 --
14    MS. SCANLAN:  Objection.  Argumentative.
15 BY MS. HARDWAY:
16    Q.  -- is that right?
17    A.  Cost?
18    Q.  You only billed $250,000 for 1000 pages --
19    A.  Again, do me a favor.  Just get the invoice
20 so they can see the invoice.  Just ask whoever has --
21 I'd be happy to produce the invoice if you're
22 questioning the invoice.  There's only been one
23 invoice in this matter, and I'd be happy to -- I mean
24 if counsel doesn't object, you can see the invoice if
25 you're questioning it because you apparently don't

1 believe the 225 number.  That's what I billed.
2    Q.  You agree, Dr. Kessler, that dedicated
3 professionals at the FDA don't just rely on what
4 manufacturers tell them; right?
5    MS. SCANLAN:  Objection.  Vague and
6 ambiguous.
7    THE WITNESS:  I think that's probably a fair
8 statement, but in some ways sometimes they're limited
9 to what a manufacturer tells them.  I think they're --
10 in general, they're as good as what -- the data that
11 they get.  Obviously they can see other things.  They
12 could do their own analyses.  But what the
13 manufacturer provides is a big part of what FDA relies
14 on.
15 BY MS. HARDWAY:
16    Q.  And the professionals at FDA, they don't just
17 rely on the conclusions of manufacturers, but they do
18 their own searches of published literature and their
19 own statistical analyses; correct?
20    A.  In certain instances, absolutely.  Not in all
21 instances.  I've seen it done.  Sometimes they -- I've
22 seen medical officer reports where they snip parts of
23 the application.  I've seen medical officer reviews
24 where they will do their own statistical analysis or
25 bring in statisticians.  So I've seen it both ways.

1    Q.  And dedicated professionals at the FDA do
2 their own thorough review of products, don't they,
3 Dr. Kessler?
4    A.  As a team, again, that's a very broad
5 statement.  If you want to quote me, get me the quote
6 and -- so we can put it in full context and not have
7 just generalities.
8    (Pause in proceedings.)
9    MS. HARDWAY:  My apologies, Dr. Kessler.
10    THE WITNESS:  Please take your time.
11    (Pause in proceedings.)
12    MS. HARDWAY:  I'll show you what we're going
13 to mark as the next exhibit.  This is 12.
14    (Deposition Exhibit 12 was marked for
15    identification.)
16 BY MS. HARDWAY:
17    Q.  This is an excerpt of a trial transcript in
18 the Xarelto litigation, Russell vs. Janssen
19 Pharmaceuticals, et al., from April 12, 2018.
20    A.  Yes.
21    Q.  And if you would turn with me to Page 131 --
22    A.  Yes, ma'am.
23    Q.  -- Line 4.
24    A.  Yes.
25    Q.  You're asked:

35 (Pages 134 - 137)

1        "Q. The same dedicated
2   professionals at the FDA,
3   they do their own review;
4   right?
5        "A. Sure. They do
6   their review, yes.
7        "Q. It's a very thorough
8   review; correct?
9        "A. I think that's
10  probably fair.
11       "Q. It's a very
12  thorough review
13  performed by a lot
14  of dedicated individuals;
15  correct?
16       "A. You're probably quoting
17  me and I agree with that."
18  BY MS. HARDWAY:
19       Q. Do you stand by that testimony, Dr. Kessler?
20       MS. SCANLAN: I'm going to object to the
21  extent it's taken out of context.
22       Dr. Kessler, if you need to review the pages
23  before that to understand where the line of questions
24  is, feel free.
25       THE WITNESS: Thank you, Counselor.

1        So just read the sentence before the sentence
2   you read me. And I appreciate your showing me in
3   terms of --
4   BY MS. HARDWAY:
5        Q. I'm sorry. Which are you referring to?
6        A. If you look on the exact page that you read
7   me, if you read the context for that. "In terms of
8   Rocket, they will do their own analysis, yes. So in
9   terms of a Rocket analysis, I would agree with that
10  very much. But don't extrapolate beyond Rocket."
11  Again, that context is one of the biggest clinical
12  trials that was ever done, probably the subject of
13  multiple advisory committee reviews, probably
14  thousands of agency hours is my guess, certainly where
15  the FDA presented its review in the public arena at
16  least once.
17       So I would say that that was the case there.
18  So, again, just to be careful on generalities, does
19  that kind of review happen all the time, no.
20       Q. Does it happen most if not all of the time,
21  Dr. Kessler?
22       A. You've got to give me a context. Let's do it
23  on a case-by-case basis rather than making
24  generalities.
25       Q. Dr. Kessler, you were the commissioner of the

1   FDA from 1990 to 1997. We've established that; right?
2        A. Yes.
3        Q. While you were the commissioner of the FDA,
4   is it your testimony that thorough reviews of
5   submissions by manufacturers were not performed by the
6   men and women you oversaw at that agency?
7        A. I would not want to make -- again, those are
8   generalities and reviews and reviews of what? We got
9   to be more specific, Counselor. I mean what kind of
10  reviews are you talking about?
11       Q. Let's just take BLA submissions.
12       A. Every BLA, supplemental BLAs? I mean, again,
13  there are certain reviews that are more thorough than
14  other reviews. I just don't want to leave -- let me
15  see if I can be helpful to you, Counselor.
16       I think in general the FDA tries to do a good
17  job. It tries to be thorough, but it's like any human
18  organization. Not every review gets the same
19  thoroughness as every other review. Not -- some --
20  some are very thorough. Some are cursory. So, again,
21  you've got to be specific, Counsel.
22       Q. Dr. Kessler, when you were the commissioner
23  of the FDA, were there reviews of BLAs that came to
24  your attention that were not thorough?
25       A. I have no complaints from what I know of what

1   the center did while I was commissioner. That's
2   actually not entirely true, but it's on matters that
3   are irrelevant to this.
4        Q. The FDA has the authority to comment on
5   product labeling if they think it's missing
6   information or misstating information; correct?
7        A. Counselor, as you know well, you used the
8   word "comment." The law changed in 2007. 5050 gave
9   FDA additional authority. I think "comment" is
10  probably a fair word, but as you know, it's a
11  negotiation back and forth.
12       Q. You mentioned earlier that you were in charge
13  of ensuring compliance with regulation and taking
14  enforcement actions where necessary. I'm not sure if
15  those were your exact words, but I'm paraphrasing. Is
16  that consistent with your testimony from earlier?
17       A. Yes.
18       Q. What enforcement actions -- if the FDA
19  determines that there has been a violation of federal
20  regulations, what enforcement actions does the FDA
21  have at its disposal?
22       A. There's a range of enforcement actions.
23       Q. Can you tell me what that range is?
24       A. So the range goes from warning letters to
25  seizures to injunctive relief, and in certain cases

1 civil money penalties.

2    Q.  Any other enforcement actions that the FDA
3 has at its disposal?

4    A.  Those are the general ones under the act.

5       MS. HARDWAY:  I'm going to show you what
6 we're going to mark as our next exhibit.

7       (Deposition Exhibit 13 was marked for
8       identification.)

9 BY MS. HARDWAY:

10    Q.  This exhibit, Dr. Kessler, is a printout from
11 the -- as you see from the bottom, from the FDA's
12 website.  Do you see that?

13    A.  Yes.

14    Q.  And this document represents FDA's
15 enforcement statistics from 2001.  Do you see that?

16    A.  Yes.

17    Q.  Are you familiar with these types of
18 summaries that are on the FDA's website?

19    A.  I'm generally familiar with these kinds of
20 statistics.  I'm not sure I've looked at this specific
21 website, but I did have the nickname Elliott Nesler by
22 the Washington Post.  So enforcement.

23    Q.  And these pages are a summary of FDA's
24 enforcement actions in fiscal year 2001.  Do you see
25 that?

1    A.  Yeah.  So, again, I think that for matters --
2 yes, I see what you're talking about.  I think it's
3 probably -- this is probably -- I'm not sure which
4 office puts this out.  I'm not sure this is legally
5 correct is what I'm saying.  I mean because, for
6 example, it uses recalls, the majority of recalls of
7 voluntary recalls.  They're probably not code
8 enforcement actions.  You could argue that.  So you
9 got to be careful on FDA's listing enforcement
10 statistics, but per the Act, I mean FDA usually
11 doesn't recall products.

12    Q.  This is from the FDA's website.  So I'm just
13 going to go through and read on the first page of this
14 exhibit.  Dr. Kessler, you see that there are a
15 summary of all of the actions taken by FDA in fiscal
16 year 2001.  They include, for example, 12 injunctions
17 Do you see that?

18    A.  My reading -- you're talking legal actions in
19 2001?

20    Q.  Yes.

21    A.  Right.  So if you add those up.  Is that what
22 you're doing?

23    Q.  I'm just the fourth row down under
24 "Statistics" it says, "Injunctions."

25       MS. SCANLAN:  On the first page.

1       THE WITNESS:  I'm sorry.  I thought that was
2 the table of contents.  Yes.

3 BY MS. HARDWAY:

4    Q.  Injunctions filed, 12?

5    A.  Right.

6    Q.  A couple lines down, seizures approved, 27?

7    A.  Correct.

8    Q.  And then seizures accomplished, 25?

9    A.  Yes.

10    Q.  Recalls, you mentioned there are 4,563.  Do
11 you see that?

12    A.  Yes.

13    Q.  Warning letters 1,032?

14    A.  Yes.

15    Q.  Compliance achievements, 12,134.  Do you see
16 that?

17    A.  Yeah.  I don't know what that refers to.

18    Q.  Okay.  483s, you see 7,683?

19    A.  I see those.

20    Q.  And inspection --

21    A.  Those are just reports of investigations.
22 Are they really considered enforcement?  They're field
23 actions.  They're field activities, but they're really
24 not an enforcement action.

25    Q.  Okay.  And the pages that follow, and there

1 are different graphical representations of those
2 enforcement actions.

3    A.  And what page are you -- what part of the
4 website are you referring to because this looks a
5 little more like PR rather than ORA, but...

6    Q.  I don't recall, sitting here.  I mean the
7 link is below.  I'm just not sure exactly what portion
8 of the website.

9    A.  We can look what ICECI stands for.  Again,
10 this is a little more PR than it is legal enforcement
11 actions.

12    Q.  So are you saying that you don't believe this
13 data to be true that's on the FDA website?

14    A.  I'm saying just be careful.  I mean what is
15 enforcement, what is not enforcement under the Act.  I
16 think that the enforcement professionals would quibble
17 with some of the things on this website.  That's why
18 I'm just asking from where it's being put out.

19    Q.  But sitting here today, you don't have reason
20 to believe, Dr. Kessler, that any one of these actions
21 did, in fact, occur, do you?

22    A.  I don't know what these compliance
23 achievements are.  I have information neither one way
24 nor the other.  I have no reason to disbelieve
25 anything.  I mean I have no idea what the database is.

Page 146

1 I've not studied this per se. I've been involved in a
2 number of enforcement actions and know what the Act
3 calls for.
4    Q. These enforcement actions that were taken in
5 2001, these are -- these were enforcement actions that
6 were true throughout the 2000's; right? These were
7 available to the FDA throughout the 2000's; correct?
8    A. Correct. The major ones, again, you can go
9 into court. You can seize a product. You can issue a
10 warning letter. Those are the ones that tend to be
11 "enforcement actions" going into court, seizing a
12 product, warning level, civil money penalties in
13 certain areas where FDA has jurisdiction.
14    Q. When was the mumps vaccine first licensed,
15 Dr. Kessler?
16    A. The actual BLA, it's in my appendix. I think
17 the licensure was in the '60's and '70's.
18    Q. Do you know when the combination vaccine of
19 MMR was first licensed?
20    A. '76. It was in the '70's, I believe.
21    Q. How about the MMR II vaccine?
22    A. Yeah. I have the regulatory history. I'd
23 have to look it up in my report. Happy to do that.
24 But certainly I don't check the exact date. It's in my
25 report. Happy to check it.

Page 147

1    Q. Do you know when Proquad was approved?
2    A. Yeah, mid-2000's, I believe.
3    Q. You say in your report that "Vaccines are
4 vitally important to protect the public health";
5 correct?
6    A. Yes.
7    Q. And you stand by that statement today?
8    A. Absolutely.
9    Q. Vaccinations protect children from serious
10 illness; right?
11    A. Yes.
12    Q. And they help prevent serious disease from
13 spreading through populations. True?
14    A. Yeah. I mean my daughter saw a T-shirt the
15 other day that says, "Vaccines cause adults," and I
16 agree with that.
17    Q. And you wouldn't dispute, would you,
18 Dr. Kessler, that there's been a 99 percent decrease
19 in mumps cases since the vaccine was introduced in
20 1967?
21    A. So that would probably be an incomplete
22 statement. I think more accurately the way I would
23 phrase it, certainly if you look if the '60's -- if
24 you look probably through the early 1990's that number
25 held. Okay? And that's where that number comes from.

Page 148

1 But as CDC -- to be exact, we can quote the CDC
2 exactly. You know, certainly since -- in the recent
3 years, I think that -- let me get my exact data so we
4 can -- I apologize. I apologize. I want to be exact.
5    So here's how the CDC would phrase your
6 answer. "Mumps is an acute viral illness. It
7 classically presents with parotieus. Although the
8 United States experienced a 99 percent reduction in
9 mumps cases following implementation of the two-dose
10 vaccination program in 1989, mumps has resurged in the
11 past 10 years."
12    And they talk about 23 outbreaks within --
13 somewhere between 20 and 485 cases where outbreaks
14 were recorded in 18 jurisdictions. They go through
15 the data. Happy to talk. So I think your data is
16 correct, but it's somewhat out of date. I think we
17 generally thought that the vaccine worked well and
18 certainly was effective against the Jeryl Lynn strain.
19    But I think since the Jeryl Lynn strain, it's
20 really not circulated in the last decade or two. If
21 you look at the epitopes of the current genotypes,
22 they are different than what we were experiencing back
23 in the 19- -- up through the good 1990's where
24 Jeryl Lynn was circulating.
25    So while there's some cross reactivity, and

Page 149

1 if you look at -- about half the epitopes may cross --
2 or be the same, half are different. So by definition,
3 this vaccine -- if you look at the science, this
4 vaccine can't work as effectively as it used to work.
5 You're dealing with a good deal of what we would call
6 antigenic drift. So do not believe for the moment
7 that this current vaccine is 99 percent effective
8 against circulating vaccine.
9    It's much more complex. Your client -- I
10 mean I would strongly urge the development of new or
11 more specific vaccines against the current epitopes,
12 and I would urge that to be done.
13    Q. Just to be clear, Dr. Kessler, my question
14 was, "And you wouldn't dispute, Dr. Kessler, that
15 there's been a 99 percent decrease in mumps cases
16 since the vaccine was introduced in 1967." And I'm
17 going to urge you again, Dr. Kessler, to try to answer
18 my specific questions very specifically.
19    A. I did, Counselor. That is a very specific
20 answer and a very important answer. If you want to
21 represent that this virus results in 99 percent
22 reduction in mumps to the current circulating, you're
23 out of date. Okay? And that needs to be corrected.
24    Q. Do you believe that the CDC website is out of
25 date as well, Dr. Kessler?

38 (Pages 146 - 149)

Page 150

```
 1    A.  I think that the CDC website is never
 2  completely up to date; right?  And I can tell you -- I
 3  quoted you exactly -- I believe I can get you the full
 4  reference, where they talk about the 19- -- the
 5  99 percent, but they talk about the resurgence of
 6  mumps.  So I would go with the exact quote from CDC.
 7  I think it is more accurate.
 8       The problem you've gotten into is your client
 9  is selling a vaccine that's against a circulating
10  strain that doesn't exist anymore, and you can't
11  represent that it works in 96 or 99 percent of the
12  cases.  This is very important, Counselor.  You're not
13  going to resolve -- how you resolve these matters for
14  the public is going to be a recognition that these
15  vaccines are -- the mumps vaccine regrettably, because
16  of the antigenic drift, maybe other reasons, there's
17  potency issues as I'm sure you'll ask me about.
18       But you got to recognize that these vaccines,
19  right, are going against a virus that is no longer --
20  I mean it doesn't have the same epitopes at least by
21  50 percent, as I understand the science, against
22  circulating virus.  So it can't work effectively
23  because you're not stimulating the right epitopes.
24    Q.  Just to be clear, again, Dr. Kessler, my
25  question was "Do you believe the CDC website is out of
```

Page 151

```
 1  date?"  That's a "yes" or "no" question, Dr. Kessler.
 2       MS. SCANLAN:  Objection.  Asked and answered.
 3  You asked him the question.  He's allowed to answer to
 4  the fullest extent he is able to.
 5  BY MS. HARDWAY:
 6    Q.  Dr. Kessler, what is vaccine efficacy?
 7    A.  It depends what your end point is.  It
 8  depends how you define -- you have to give me a
 9  definition of "efficacy" because everybody will define
10  "efficacy" in different terminology.
11    Q.  I'm asking you what your definition is.
12    A.  The vaccine efficacy would be that the --
13  there's adequate and well controlled clinical trials,
14  that it demonstrated that the vaccine can be -- can
15  protect against an infectious agent.  That would be my
16  definition, but I recognize that other people will use
17  other definitions of the words "efficacy,"
18  effectiveness," but that would be my definition.
19    Q.  What is your definition of "vaccine
20  effectiveness"?
21    A.  I generally, as similar under the Act, I tend
22  to use those terms synonymously.  I think efficacy and
23  effectiveness under the Act is adequate and well
24  controlled effect for the intended conditions of use,
25  and, in this case, to protect against the disease
```

Page 152

```
 1  properties of an infectious agent.
 2    Q.  What is your definition of "immunogenicity"?
 3    A.  It's a very broad term.  My definition of
 4  immunogenicity would be -- again, you have to give it
 5  to me in context.  Immunogenicity is simply the
 6  ability to generate an immune response.  That's the
 7  body's ability to do that.
 8    Q.  What is your definition of "seroconversion"?
 9    A.  So seroconversion, again, is a surrogate
10  measure of clinical protection, and it's the ability
11  to mount an immune response against a specific
12  pathogen.
13    Q.  What's a "correlate of protection"?
14    A.  Give me -- what context?
15    Q.  In the context of vaccines, what's a
16  correlative protection?
17    A.  So a correlate of protection is used by
18  people in different -- you have different terms.
19  People have different meanings of that.  To some
20  people it's a level.  To some people it's a -- more of
21  a qualitative term.  So if you have a surrogate, if
22  you have a PRN at a certain titer, that that will
23  correlate with clinical effectiveness, which will --
24  at an end point of protection.  But, again, different
25  people use that term differently.
```

Page 153

```
 1    Q.  Before a manufacturer can distribute a
 2  vaccine, it has to file a biologics license
 3  application that needs to be approved by the FDA;
 4  right?
 5    A.  Correct.
 6    Q.  And any change in that license also needs to
 7  be approved by the FDA; correct?
 8    A.  Correct.
 9    Q.  And FDA regularly reviews these licenses and
10  determines whether or not they should be approved;
11  correct?
12    A.  Correct.
13    Q.  And once a vaccine is licensed, a
14  manufacturer is required to provide ongoing reports of
15  safety related to that vaccine; correct?
16    A.  Your annual reports, they are released
17  depending on what protocol is in the BLA for release
18  criteria, et cetera.  Generally you're correct, yes.
19    Q.  And any changes to a vaccine's labeling
20  requires FDA review and approval; correct?
21    A.  Oh.  I have to go back and look at the CBE
22  requirements.  You're getting into a technical area
23  where the CBE applies to biologics, and it may, but
24  I'd want to read the statute before I'd answer that
25  question.
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Appx1522

1    MS. HARDWAY: I'm going to show you what
2 we're going to mark as the next exhibit.
3    (Deposition Exhibit 14 was marked for
4    identification.)
5 BY MS. HARDWAY:
6    Q. And this is an FDA guidance from September
7 2004 regarding FDA review of vaccine labeling
8 requirements for warnings, use instructions, and
9 precautionary information. Do you see that?
10    A. Yes.
11    Q. Are you familiar with this document,
12 Dr. Kessler?
13    A. I've looked at this at some point in it time.
14    Q. And if we turn to the first page of the
15 document in the introductory section --
16    A. Right.
17    Q. -- it says that "FDA routinely assesses the
18 warnings, use instructions, and precautionary
19 information provided for licensed vaccine based on
20 surveillance of adverse event reporting and other
21 sources. We review the adequacy of labeling, and if
22 necessary, communicate our findings to manufacturers."
23 Do you agree with that? That's what FDA does?
24    A. That's what FDA aspires to do, correct, based
25 on resources, obviously.

1    Q. And if you turn to the last page of this
2 document, Page 6. The second -- or the last paragraph
3 in the document under the "Conclusion" heading, it
4 states, in the second sentence -- well, actually
5 starting with the first sentence, "FDA's continuing
6 review of warnings and precautions and use
7 instructions section of the label" --
8    A. Just -- I apologize. I got where you are.
9 Thank you, Counselor.
10    Q. I'll just start again. "FDA's continuing
11 review of warnings and precaution and use instructions
12 section of the label helps assure that labels and
13 distribution are adequate to inform healthcare
14 providers of the risks of vaccines. FDA continues to
15 review vaccine labeling taking into account timely
16 information provided through, among other things,
17 recommendations and reports of the ACIP,
18 epidemiological information contained in the MMWR,
19 reports in the medical literature and summaries from
20 VAERS." Do you see that?
21    A. Yes, I do.
22    Q. And you'd agree that that's what FDA does
23 when routinely reviewing vaccine labeling; right,
24 Dr. Kessler?
25    MS. SCANLAN: Dr. Kessler, before answering

1 that, if you need to look at any other part of this
2 document to evaluate whether you agree with the
3 ultimate conclusions stated here, feel free to take a
4 look at the document.
5    THE WITNESS: I think as a general matter
6 that's as aspirational. I think the words speak for
7 themselves. The FDA says this. But, again, these are
8 generalities.
9 BY MS. HARDWAY:
10    Q. It doesn't say in here that it's
11 aspirational, does it, Dr. Kessler? It says this is
12 what FDA does.
13    A. Well, of course it's aspirational because it
14 helps assure that labels in distribution are adequate.
15 So, again, that's what FDA aspires to do. But no one
16 believes that FDA is guaranteeing that. It's the
17 manufacturer's responsibility to do that. But this is
18 generally consistent with the goals of the agency. So
19 those goals are aspirational.
20    Q. When you say, "no one believes" -- when you
21 say, "no one believes that that's what's going on,"
22 who are you referring to, Dr. Kessler?
23    A. Wait a second.
24    Q. Who is the "no one"?
25    A. It helps to assure that labels in

1 distribution -- let me get exactly the quote. It's
2 aspirational. It helps assure that labels and
3 distribution are adequate. So it believes that FDA --
4 no one believes that you can guarantee that FDA is
5 guaranteeing that.
6    Q. But you said, "but no one believes that FDA
7 is guaranteeing that." How can you speak for -- is
8 that all -- every citizen in the United States?
9 People in the FDA? Who are you referring to there?
10    A. If anyone thinks -- I mean my experience, no
11 one believes that FDA review guarantees -- right? --
12 that a label is adequate or has all the warnings.
13 It's aspirational. It's something that FDA tries --
14 no one -- it's the manufacturer's responsibility.
15 There are no guarantees here.
16    Q. That's not what the guidance is saying,
17 Dr. Kessler.
18    A. Well, you asked me what I meant by "no one,"
19 and I'm saying it can't guarantee that. Maybe we're
20 saying the same thing because this says, "helps
21 assure." So that, to me, that's aspirational. The
22 FDA is helping to assure. It's not guaranteeing --
23 right? -- that they're adequate. It helps assure
24 them. That was my only phrase.
25    Q. Let me ask you, just so that the record is

Page 158

1 clear, Dr. Kessler, do you believe that the FDA
2 "continues to review vaccine labeling taking into
3 account timely information provided through, among
4 other things, recommendations and reports of the ACIP,
5 epidemiological information contained in the MMWR,
6 reports in the medical literature and summaries from
7 VAERS"?
8    A. I think, again, FDA, as a general matter,
9 tries to do that, but I have no way or would testify
10 that it's complete or that it does that in every
11 instance.
12    Q. How is "a lot" defined in the CFR,
13 Dr. Kessler?
14    A. I'd want to look at it specifically. I
15 wouldn't want to quote the CFR by memory.
16       MS. HARDWAY: I'll show you what we're going
17 to mark as the next exhibit.
18       (Deposition Exhibit 15 was marked for
19       identification.)
20 BY MS. HARDWAY:
21    Q. You see what I've handed you as the next
22 exhibit is an excerpt from the CFR Part 600.
23    A. Have it. Thank you, Counsel.
24    Q. And in 600.3 there are definitions?
25    A. Yes, ma'am.

Page 159

1    Q. And you see 600.3X?
2    A. Let me just get there. Yes.
3    Q. You see that "lot" means "That quantity of
4 uniform material identified by the manufacturers
5 having been thoroughly mixed in a single vessel"?
6    A. Yes.
7    Q. And you'll see above that an "S, 600.3S."
8 The word "potency" is defined. It's interpreted to
9 mean "The specific ability or capacity of the product
10 as indicated by appropriate laboratory tests or by
11 adequately controlled clinical data obtained through
12 the administration of the product in the manner
13 intended to effect a given result." Do you agree with
14 that definition?
15    A. You gave me two definitions. Which one do
16 you want --
17    Q. The potency definition. Do you agree with
18 that one?
19    A. I think generally -- I think generally it's
20 in the ballpark of being correct, yes.
21    Q. Under the federal regulations, CBER prohibits
22 the release of any lot of vaccine until it's been
23 subject to test for conformity to CBER standards;
24 right?
25    A. You got to give me the exact wording of the

Page 160

1 regs. There is specific release requirements. Most
2 of the time its subject to the agreement. Those
3 release requirements in the protocol are part of the
4 BLA.
5       MS. HARDWAY: I'll show you what we're going
6 to mark as the next exhibit.
7       (Deposition Exhibit 16 was marked for
8       identification.)
9 BY MS. HARDWAY:
10    Q. Exhibit 16 is an excerpt from part -- CFR --
11 21 CFR 610.1?
12    A. Right.
13    Q. And Subpart A, "Release Requirements"?
14    A. Yes. As I mentioned, yes.
15    Q. And the first sentence under 610.1, "No lot
16 of any licensed product shall be released by the
17 manufacturer prior to the completion of tests for
18 conformity with standards applicable to such
19 products." Do you see that?
20    A. Yes. As I said, those are usually set out in
21 the release requirements sections of the BLA, yes.
22    Q. And then if you go to 610.2. Next column.
23    A. Yes, ma'am.
24    Q. Under A it states, "General samples of any
25 lot of any licensed product except for radioactive

Page 161

1 biological products together with the protocol showing
2 results of applicable tests may at any time be
3 required to be sent to the director, Center for
4 Biologics Evaluation and Research. Upon notification
5 by the director, Center for Biologics Evaluation and
6 Research, a manufacturer shall not distributor a lot
7 of a product until a lot is released by the director
8 Center for Biologics Evaluation and Research provided
9 that the director Center for Biologics Evaluation and
10 Research shall not issue such notification except when
11 deemed necessary for the safety, purity, or potency of
12 their product." Do you see that?
13    A. Yea. Let me just read it here. I've read
14 this multiple times over the years. I just want to
15 read this.
16       (The witness reviewed the document.)
17       THE WITNESS: Yes. This is general release
18 requirements, and they've changed somewhat over the
19 last 100 years.
20 BY MS. HARDWAY:
21    Q. But for purposes of this case, Dr. Kessler,
22 CBER was required to release each lot. Merck could
23 not market a lot until it was released by CBER;
24 correct?
25    A. So what you have is you got to show me the

41 (Pages 158 - 161)

Page 162

1 protocol of the BLA, and it's exactly the terminology
2 of what was agreed to. The release requirements are
3 in the -- the specific release requirement are in the
4 BLA.
5    Q. So is it your testimony that it's not the
6 case that CBER has to release a lot of the vaccine
7 before it can be marketed?
8    A. It has to be done per the BLA. So let's
9 just -- you have to pull the specific release
10 requirements, and I need those in front of me before I
11 would answer that question.
12    Q. So is it your testimony that the release
13 requirements might, in fact, say that CBER doesn't
14 need to release a lot?
15    A. It's my testimony that if you want to know
16 exact language, let's have the release requirements in
17 the BLA in front of us. That will be generally what
18 is agreed to.
19    Q. Dr. Kessler, this statute states very
20 clearly --
21    A. It's not a statute. This is a reg.
22    Q. A regulation, I apologize. This regulation
23 states very clearly that a manufacturer "shall not
24 distribute a lot of a product until the lot is
25 released by the director, Center for Biologics

Page 163

1 Evaluation and Research.
2    A. Yes. But, again, that's all -- the exact --
3 how that is done is done per the protocol in the
4 BL- -- the release protocol.
5    Q. And I'm not asking about specific to any one
6 vaccine, how that particular protocol -- what that
7 particular protocol might say. What I'm asking is
8 very simply regardless of what test results are
9 required, regardless of the specific language in a
10 particular BLA, CBER still needs to release each lot
11 before it can be manufactured by a distributor; right?
12    MS. SCANLAN: Objection.
13    THE WITNESS: Again, what you exactly mean by
14 that -- when you say, "CBER has to release" it, okay,
15 that process for each vaccine is spelled out in BLA,
16 and you follow that exactly. There's an agreement on
17 that release process.
18 BY MS. HARDWAY:
19    Q. Is it your testimony, Dr. Kessler, that
20 release process might obviate the need for CBER to
21 release a lot?
22    A. The question is what "release" means and the
23 specific requirements. I mean CBER, you know, the
24 issue of how that is done is spelled out in the BLA.
25 That's what I'm saying.

Page 164

1    Q. Any time a manufacturer wants to alter the
2 testing method or manufacturing conditions under which
3 lots are tested, that change has to be approved by
4 CBER; correct?
5    A. In general, yes. I mean we'd have to go see
6 whether there actually are minor changes that are
7 exempting from that, but generally, you're correct.
8    Q. When did FDA/Merck begin engaging in
9 discussions concerning MMR II's labeling and expiry
10 claims?
11    MS. SCANLAN: Objection. Vague and
12 ambiguous.
13    THE WITNESS: Yeah. So, again, the -- under
14 the National Vaccine Act there was review probably --
15 I mean I think probably let's use 1998. I've tried to
16 get the exact -- you know, there's labeling review
17 that was begun probably as 1996, but primarily, I
18 think probably around 1998 is more explicit. It's
19 probably generally with regard to end expiratory and
20 what "end expiratory" means, but within that time
21 frame, '96, '98.
22 BY MS. HARDWAY:
23    Q. And you recall, because it's discussed in
24 your report -- you recall because it's discussed in
25 your report that Merck and FDA were engaging on these

Page 165

1 issues and that Merck submitted a draft proposal for
2 what eventually became Protocol 7; right?
3    A. Yes, ma'am.
4    Q. And that was submitted on December 10, 1998?
5    MS. SCANLAN: Dr. Kessler, she said that it's
6 in your report. So if you feel like you want to go
7 look in your report to identify that exactly --
8    THE WITNESS: I just don't have the exact
9 date. That sounds right.
10    MS. HARDWAY: I'll give you the exact
11 submission. We're going to mark it as the next
12 exhibit.
13    (Deposition Exhibit 17 was marked for
14    identification.)
15 BY MS. HARDWAY:
16    Q. You've reviewed this document; right,
17 Dr. Kessler?
18    A. Yes. I want to review it again if we're
19 going into specific details, but yes.
20    Q. This is the proposal for what eventually
21 became Protocol 7; right?
22    A. Let me just see. Is this the entire --
23    MS. SCANLAN: In the interest of time,
24 Dr. Kessler, I can also point you to Paragraph 147.1.
25    THE WITNESS: Yeah. But is this the complete

42 (Pages 162 - 165)

Appx1525

1 document? I can't tell quite yet. Let me just do
2 this.
3     (The witness reviewed Exhibit 17.)
4     THE WITNESS: Yes, ma'am.
5 BY MS. HARDWAY:
6     Q. I think my question was this became the
7 proposal for what eventually became 007?
8     A. Well, it says, "Enclosed is a proposal." I'm
9 just trying to figure out whether this is the entire
10 document. I just can't tell from looking at it. I
11 don't recall.
12     Q. During this time period Merck provided to the
13 FDA information about some of its lots that were
14 falling below 4.3 at 24 months. True?
15     A. So there's a letter from Goldberger to
16 Hardagree dated 1998 that has certain attachments to
17 that and certain tables in that with some, I don't
18 know, 50-some-odd lots, including MMR, and some lots
19 that I believe the end expiatory were below 4.3 in
20 those attachments that Merck submitted in that letter.
21     MS. HARDWAY: I'm going to show you that
22 submission. We'll mark it as the next exhibit.
23     (Deposition Exhibit 18 was marked for
24     identification.)
25     THE WITNESS: Yes.

1 BY MS. HARDWAY:
2     Q. Is this the letter to which you were just
3 referring, Dr. Kessler?
4     A. Yes.
5     Q. And if you'd turn with me to the page ending
6 in Bates No. -5573.
7     A. -5573. Thank you, Counselor. Yes, ma'am.
8     Q. The title of this table is "Appendix, Single
9 Dose Mump Stability Data 1987 to 1996." Do you see
10 that?
11     A. I see that, ma'am. They're the mumps vacs,
12 yes.
13     Q. And if you look at that first page, -5573, in
14 the second section of that table you'll see --
15     A. Actually, let me go back and understand
16 something. Your question was -- I just all of a
17 sudden realized --
18     (Pause in proceedings.)
19     THE WITNESS: I apologize. I just wanted to
20 see whether you said in 1998 they -- this was dose. I
21 was wondering how you characterized the -- whether
22 this was release or end expiratory. I forgot what you
23 said in your question. I think you used the word
24 "release," whether they were released titers or end
25 expiratory titers.

1 BY MS. HARDWAY:
2     Q. Well, if I did, I misspoke. Let me start
3 again.
4     A. Okay.
5     Q. This appendix is a collection of mumps
6 stability data from 1987 to 1996, and it reflects
7 stability testing at various time points; right?
8     A. Yes.
9     Q. Okay.
10     A. Of specific lots.
11     Q. Specific lots. Right. And if we look at the
12 second section of this first page --
13     A. Yes.
14     Q. -- five lines down you'll see a 12-month test
15 result of a 1988 lot that's 4.1?
16     A. That's correct.
17     Q. And a few more down a 24-month time point
18 that's 4.2?
19     A. A 24-month I see exactly as 4.2, yes.
20     Q. And if you go to the next page --
21     Q. In the third section --
22     A. Yes.
23     Q. Approximately in the middle you'll see an
24 18-month time point that's at 4.2.

1     A. Sorry. 4. --
2     Q. -2.
3     A. There are certainly numbers on this sheet
4 that are below 4.3. I've noted that and see those.
5     Q. And if you look at -- you'll see some -- in
6 the second to the last section of this page, you'll
7 see halfway down a 12 point time point that is at 4.3,
8 but right beneath that an 18 time point that's 4.0?
9     A. I see that.
10     Q. A 19-month time point that's 4.1?
11     A. Yes.
12     Q. A 19-month time point that's 3.8?
13     A. I see that.
14     Q. A 24-month time point that's 3.9?
15     A. Yes.
16     Q. Down at the bottom, the last two lines a
17 12-month time point that's at 4.2?
18     A. I do see that.
19     Q. 18 month time point that's a 4.2?
20     A. Yes.
21     Q. If you'd turn to Page -5575.
22     A. Yes.
23     Q. Second to the last section on this table on
24 this page, a little more than halfway down you see an
25 18-month time point that's 4.2?

1    A. I'm not quite -- the second -- just which
2 lots are -- just tell me the lot numbers and I -- so
3 I'm --
4    Q. 0818W.
5    A. Got it.
6    Q. 18 month time point is 4.2?
7    A. I see that. And then you see a 4.6 and a
8 4.3. So you have some variability there. You're
9 picking out some, but you're also picking out other
10 things that show increased potency afterwards. You
11 just got to be a little careful.
12       MS. SCANLAN: Can I just also mark for the
13 record that that 0818W is a lot of MM VACS. It is not
14 a lot of MMR II.
15       THE WITNESS: I think -- I certainly
16 understood that was the case. Right.
17 BY MS. HARDWAY:
18    Q. And if you go to page Bates ending in -5581.
19    A. Yep.
20    Q. You see at the very bottom, the second line
21 from the bottom a 24-month time point that's at 3.9?
22    A. And you see it at 25 a 4.5. Yep. Yes.
23    Q. Page -5586.
24    A. Yes.
25    Q. An 18-month time point that's at 4.0?

1    A. I'm sure that number is here. I see that
2 number here. Yeah. In 1994? Is that the number?
3    Q. Yes.
4    A. Yes. I see that. There's also one at 30
5 months at 1993. So these go back to prior to 1996.
6    Q. And then if you'd turn to Page -5587 --
7    A. The vast majority -- the vast majority of
8 your MMR, just for the record, if my memory serves me
9 right, because I've studied this list, the vast
10 majority of MMR IIs are within compliance, it looks
11 like. There are few lots -- I believe we can count
12 them up, but the vast majority are in compliance
13 during this time period for MMR II.
14       I believe it was the last two -- there are a
15 few that are below that in '94, I guess, and '96 where
16 they start becoming questionable.
17    Q. So just to round out this particular
18 document, on -5587 just about seven lines up from the
19 bottom, you see MMR II at 18 months at 3.9?
20    A. Yes, I do see that. You know, again, if you
21 look at these last -- these last lots were
22 problematic. The earlier lots were not.
23    Q. And this information, as we've discussed
24 already, was provided to the FDA; correct?
25    A. Yes. I mean it's in some attachment to this

1 letter. There's also a PowerPoint, if I remember it
2 right, in this letter. I don't know whether this was
3 provided and discussed -- provided at the meeting or
4 subsequently. I see it as attached to this letter.
5    Q. And if you go to the letter itself, the
6 January 28, 1998 letter, in the first paragraph it
7 refers to a meeting between Merck and FDA on
8 December 16, 1997?
9    A. Yes.
10    Q. Did you see any evidence, Dr. Kessler, that
11 either at the December 16, 1997 meeting or after the
12 FDA received this particular submission, that there
13 was any discussion at all of recalling these lots that
14 fell below 4.3 at 24 months or earlier?
15    A. So you do have a -- and, again, I just want
16 to be careful on the word "these lots." You have an
17 FDA inspector in certain 483s, in other documents --
18 I'd have to go back and search -- where he says, "Why
19 weren't these lots recalled." So you do have an FDA
20 inspector raising that issue, but I would not -- my
21 guess is it's not specific to this lot, to the lots
22 he's talking about, but an FDA inspector did --
23 basically said to the company, "Why didn't you recall
24 this," I believe from the 483. But, again, I'd have
25 to go back and get that, but it was raised by an FDA

1 inspector.
2    Q. I'm talking about, Dr. Kessler, at either the
3 December 16, 1997 meeting or after receipt of this
4 particular submission, did you see any evidence that
5 the FDA considered recalling any of the lots that were
6 contained in the submission?
7       MS. SCANLAN: Objection. Asked and answered.
8 He described it to you.
9       THE WITNESS: So, Counselor, we need to look
10 at -- you have not given me the minutes of this
11 meeting. I've looked for the minutes of this meeting.
12 So I can't represent what was said at this meeting. I
13 do recall specifically -- and, again, if someone could
14 help me pull up the specific 483s, we can see which
15 lots numbers. I don't have that in my head. But FDA
16 inspector, I mean, in the plant is saying, "Why aren't
17 these lots" -- I'm not saying these lots because we'd
18 have to look at what numbers he's looking at, or he or
19 she is looking at versus what lots are here. But FDA
20 certainly raising that question of recall about lots
21 less than 4.3.
22       MS. HARDWAY: I'll show you what we're going
23 to mark as the next exhibit.
24       (Deposition Exhibit 19 was marked for
25       identification.)

1 BY MS. HARDWAY:
2    Q. Exhibit 19, Dr. Kessler, is a submission from
3 Merck dated January 8, '99 which summarizes a
4 December 18, 1998 meeting and includes attachments.
5 Have you seen this document before?
6    A. I'd have to go back. This site says
7 December 16. This is a different meeting than --
8 these are different sets of meeting minutes than the
9 one I just referred to; right? I was referring to --
10 I have not seen the meeting minutes from December 16,
11 1997; right? I just want to make sure you're not
12 showing me these -- the meeting minutes that I've
13 asked for.
14    Q. No. This is --
15    A. A different set of meeting minutes. No,
16 that's fine.
17    Q. Have you seen this document before?
18    A. I'd have to go back and look specifically.
19 Let me just review it. Just let me double-check. Let
20 me just check my own index. Hold on a second.
21       (Pause in proceedings.)
22       MS. SCANLAN: In the interest of time, can I
23 point him to where it is or do want him to --
24       THE WITNESS: No. No, I will do -- my
25 problem is Bates numbers. My Bates numbers sometimes

1 are different --
2       MS. HARDWAY: Ms. Scanlan can quickly locate
3 it.
4       MS. WYSOCKI: Paragraph 70, Footnote --
5       THE WITNESS: My Bates numbers sometimes are
6 different. Thanks an awful lot for that kindness.
7 Paragraph 70, Footnote -- what was the footnote,
8 please?
9       MS. WYSOCKI: 136.
10       THE WITNESS: Yeah.
11       (The witness reviewed the document.)
12       THE WITNESS: Yes. So now I'm oriented.
13 BY MS. HARDWAY:
14    Q. All right. And if you look at the first page
15 of this letter --
16    A. Yes.
17    Q. -- it lists the participants, and then the
18 first paragraph after that, it lists what is included
19 as attachments to the letter, which are "Copies of
20 overheads used in the Merck presentation, an expanded
21 version of our background package, and a copy of our
22 stability database." Do you see that?
23    A. And "a copy of our stability database." Yes.
24    Q. Do you see that?
25    A. Yes.

1    Q. And if you go with me to -- in this document
2 ending -- Bates page ending in -56471.
3    A. -564-.
4    Q. -71.
5    A. Yeah. Yes.
6    Q. There's a letter to Dr. Rastogi from Katalin
7 Abraham. Do you see that?
8    A. I do, ma'am.
9    Q. And you'll see that she references in this
10 letter, near the bottom of the letter, "Enclosed is a
11 copy of our instability database that was the source
12 for the analyses described in our package. Makita
13 Hardagree sent to Dr. Baylor on 12-11-98.
14    A. Yeah.
15    Q. Do you see that?
16    A. I do.
17    Q. And so attached, you see beginning at page
18 Bates ending in -56478?
19    A. Yes.
20    Q. Merck provided its entire stability database
21 for these products; right, Dr. Kessler?
22    A. Well, let's just -- let me just see if we can
23 be sure of what the dates are this stability database
24 covers.
25       (The witness reviewed the document.)

1       THE WITNESS: So I have mumps vacs from '87.
2 There's a number of these databases through -- you
3 know, you can't tell. I can't tell exactly. I
4 wouldn't want to represent. You'd have to ask the
5 company whether this is all your data for this time
6 period. I've seen these stability data sets in a
7 number of different documents, but this was presented.
8 BY MS. HARDWAY:
9    Q. So this is -- Merck is representing that it
10 is providing its stability database to the FDA in this
11 submission; correct?
12    A. Well, Merck is representing that. I don't
13 believe the end expiratory numbers are here in this
14 database. I'd want to spend a little more time. I
15 don't see end expiratory numbers, but I could be
16 wrong. I see release numbers, but I don't see end
17 expiratory numbers. So I don't see those here.
18    Q. But Merck provided the stability database to
19 FDA in at least as early as 1999; right?
20    A. Merck provided what was provided in this
21 document. You have some potency logs. You have some
22 subset of potency logs also, but I don't believe you
23 have end expiratory in all that stability data.
24       MS. HARDWAY: I'm going to show you what
25 we're going to mark as the next exhibit.

| Page 178 | Page 180 |

**Page 178**

1   (Deposition Exhibit 20 was marked for
2   identification.)
3   BY MS. HARDWAY:
4   Q. Exhibit 20, Dr. Kessler, is a letter to
5   Suresh Rastogi from David Wonnacott -- do you see
6   that -- dated December 16, 1998?
7   A. Yes.
8   Q. And Dr. Wonnacott writes, "Enclosed are
9   stability data tables and graphical analyses which you
10  have requested during our teleconference yesterday for
11  the mumps component of measles, mumps, and rubella
12  virus, vaccine live and associated live virus
13  vaccines. From the 1987 to 1998 stability database
14  including 74 mumps-containing lots. We have
15  identified 16 lots according to the following
16  selection criteria which you specified," and then it
17  lists the criteria.
18  A. Right.
19  Q. Do you see that?
20  A. Yes, ma'am.
21  Q. And if you go to the attachments to this
22  letter, Bates page ending in -9297.
23  A. Yes. -2997?
24  Q. The -9297.
25  A. Yeah. So this is the subset of lots. You

**Page 179**

1   had a similar subset of lots in your prior document.
2   Q. And if you look at about halfway down the
3   page, there is a Lot 612885.
4   A. Of 3.9, yes.
5   Q. 3.9 at 24 months?
6   A. That's what it says.
7   Q. And then the next one down, 613246. Do you
8   see it's 4.1 at 24 months?
9   A. -61- -- which --
10  Q. The very next one down.
11  A. It's 4.1.
12  Q. 4.1 at 24 months?
13  A. I see exactly that. I mean this is what
14  stimulated Merck to make its commitments and do 007.
15  Q. And this is information, as we just read in
16  the cover letter, that was provided to FDA that FDA
17  had; correct?
18  A. Well, again, it was provided to certain
19  individuals at FDA, correct. And it certainly was in
20  this form and led Merck to make certain commitments,
21  and in essence, Merck telling the FDA that it was
22  going to have clinical protocols that would
23  substantiate efficacy at 4.1.
24  Q. Dr. Kessler, did you see any evidence in all
25  of the documents, deposition transcripts, and other

**Page 180**

1   materials that you reviewed that the FDA, after having
2   received this information in 1998 and 1999 regarding
3   lots that were below 4.3 at expiry, that the FDA
4   deemed MMR II to be adulterated?
5   A. I haven't seen anything quite -- in that I do
6   point out, if you look at Dr. Carbone's E-mail, she's
7   asking for -- she's expressing -- you can see there's
8   a great deal of frustration at Merck about not sharing
9   its stability data, I think in 2001 and 2002. We can
10  go back and look at the phrasing of the warning letter
11  because the warning letter -- well, again, the FDA
12  inspector, when he says that "Why weren't these
13  products recalled," I don't think he uses the word
14  "adulterated," but in order to recall, it would fall
15  below the strength, potency, purity of the
16  adulteration standard. So he's raising that by he's
17  asking whether the subpotent lots should be recalled.
18  Q. Dr. Kessler, did you see any evidence in all
19  of the documents, deposition transcripts, and other
20  materials that you reviewed that the FDA, after having
21  received this information in 1998 and 1999 regarding
22  lots that were below 4.3 at expiry, that the FDA in
23  fact deemed MMR II to be adulterated?
24  MS. SCANLAN: Objection. Asked and answered.
25  THE WITNESS: So, again, the FDA inspector

**Page 181**

1   said, "Why aren't these lots recalled." That would
2   mean that they would be adulterated. So, again, we
3   can discuss whether it was deemed. He certainly
4   raised that in his 483.
5   BY MS. HARDWAY:
6   Q. He used the word adulterated in the 483?
7   A. Yeah. Well, Norman Baylor uses the word
8   "non-compliance" and allows it to happen. So that's
9   adulteration, make no mistake.
10  Q. Was there a finding by FDA during this time
11  period, Dr. Kessler, that MMR II was in fact
12  adulterated?
13  A. I don't think that legal determination was
14  made. The FDA inspector raised those questions in
15  their review, but I don't think there was a specific
16  legal determination, but, obviously, if it falls below
17  the potency, it is adulterated. It's FDA 101.
18  MS. HARDWAY: Let's take a break.
19  THE VIDEOGRAPHER: We're going off the
20  record. This is the end of Media Unit No. 3. The
21  time is 2:27 p.m.
22  (A recess was taken from 2:27 p.m.
23  to 2:52 p.m.)
24  THE VIDEOGRAPHER: We're back on the record.
25  This is the beginning of Media Unit No. 4. The time

46 (Pages 178 - 181)

Appx1529

Page 182

1 is 2:52 p.m.
2     MS. HARDWAY: Dr. Kessler, I'm going to show
3 you what we've marked as our next exhibit, which is
4 21.
5     THE WITNESS: Thank you, ma'am.
6     (Deposition Exhibit 21 was marked for
7     identification.)
8 BY MS. HARDWAY:
9     Q. Exhibit 21 is an E-mail from David Wonnacott
10 to Roberta McKee and others dated May 12, 1999,
11 "Subject: MMR II Stability." Do you see that?
12     A. Yes.
13     Q. And if we look at the first paragraph, it
14 says, "Team, I spoke with Dr. Baylor today regarding
15 the compliance status of MMR II relative to the label
16 potency claim."
17     A. Yes.
18     Q. And then the next -- two sentences later it
19 says, "However" -- one sentence later, "However, CBER
20 also understands that the stated titer" dose does
21 not -- "stated titer does not always meet the shelf
22 life titer of MMR II." Do you see that in the first
23 paragraph?
24     A. I see that.
25     Q. And then if we look at the third paragraph --

Page 183

1     A. Yes.
2     Q. -- it state, "I reminded Dr. Baylor we done
3 consider stability titers below the current MMR II
4 label claim as being 'out of specification.'"
5     A. Right.
6     Q. "We have seen values below the label claim in
7 the past and we will continue to see them until we
8 increase the release titer. We do not plan to report
9 these low values as OOS results."
10     A. Yeah.
11     Q. "Dr. Baylor agreed with this approach. If
12 our stability data is within our historical
13 experience, it need not be reported. He knows that in
14 the past CBER has released lots" at -- excuse me --
15 "released lots near or at the minimum shelf life
16 potency (these lots would not meet the label claims
17 through expiry)." Do you see that?
18     A. I see that.
19     Q. And so in May of 1999 CBER knew that there
20 were lots of MMR II that would be below 4.3, which was
21 the label claim, at expiry; correct?
22     MS. SCANLAN: Objection. The document speaks
23 for itself.
24     THE WITNESS: You'd have to ask Dr. Baylor
25 what FDA knew. This is in -- he was there at the

Page 184

1 time. So speak to Dr. Baylor, and ask him what he
2 thinks he knew at the time.
3 BY MS. HARDWAY:
4     Q. Well, we've seen data that was submitted to
5 the FDA in some of the last submissions that we looked
6 at where there were -- there was lots that were below
7 4.3 at 24 months; right? And that data was submitted
8 to the FDA?
9     A. That's correct, Counsel. So if I can just
10 see if I can -- so please understand this in a time
11 period, '98 and '99, where -- as I read the record,
12 where Merck is questioning -- or Merck's
13 interpretation of what "end expiratory" is, what the
14 label says, and whether the label says "end
15 expiratory" or means end expiratory or not. And I
16 have no reason to doubt, just on face value, that up
17 until about this time, approximately '98, '99, Merck's
18 interpretation was the label was not end expiratory.
19     I mean that's what Merck says, and that's
20 what Merck argued to FDA. At about this time FDA
21 says, "No, that's wrong." Merck agrees with
22 that. There's no ambiguity. I would not read the
23 label even before that as not end expiratory. I would
24 read it because that's what it contains. So you have
25 this back and forth; right?

Page 185

1     You do have inconsistencies what should be
2 said. You have Baylor saying this in '99 about well,
3 you don't have to report, but Carbone, and certainly
4 the warning letter says you have to report, and
5 Carbone requesting that Merck notify CBER when it
6 appears that a lot on its stability may go out of
7 specification, noting that if additional data proved
8 otherwise, that should be communicated.
9     So that's inconsistent in this time period
10 with what Norman Baylor is being represented. Again,
11 these are internal Merck documents, but Baylor should
12 speak for himself. But, basically, Carbone is saying
13 something different than what Baylor is saying. This
14 also talks about historical, and I think probably it's
15 fair to say that if you look at the potency problem
16 that Merck had, my reading of the data is that maybe
17 the potency problem -- I don't want to -- don't hold
18 me to this exactly, but historically up until 1995,
19 you don't see this potency problem. Something
20 happened around that time that increased that potency
21 problem.
22     So, again, Merck and FDA are trying to work
23 out -- make sure that everyone understands that end
24 expiratory has to be above 4.3 around this time, and
25 that's what's going on.

47 (Pages 182 - 185)

Appx1530

1 Q. Dr. Kessler, my question was we've seen data
2 that was submitted to the FDA in some of the last
3 submissions that we've looked at where there was --
4 there were lots that were below 4.3 at 24 months;
5 right? That data was submitted to the FDA. That was
6 my question.
7 A. Yes. But -- and you did see that data, but
8 you have to understand that question in context. When
9 you're looking at that data, there was still some --
10 in these early years there was some dispute about
11 the -- what the end ex-- -- what the requirement was.
12 That's all I'm stating. You got to understand the
13 context of that data in those years.
14 Q. What is team biologics?
15 A. Team biologics is when it's a field -- when
16 they go out into the field, they call themselves "team
17 biologics."
18 Q. When was team biologics established?
19 A. I don't know. I've used that phrase -- I
20 don't know exactly the date when that phrase first
21 came into existence.
22 Q. So you're not aware that team biologics was
23 established in 1997?
24 A. I was there when team biologics was -- I left
25 in 1997. I've always used the term, you know, "team

1 biologics" as when they go out into the field is when
2 I talk about it. Again, because it's the unique
3 nature of CBER with your scientists not being
4 traditional enforcement folks.
5 Q. So when you say that you've always used the
6 term "team biologics" as when they go out into the
7 field, who is the "they" that you're referring to?
8 A. FDA.
9 Q. Was there a time that team biologics moved to
10 vaccines after it was created in 1997?
11 A. I'd have to go look and see the actual
12 organizational administrative records to know exactly.
13 Q. Is team biologics part of CBER?
14 A. Sure, and ORA.
15 Q. What is team biologics' responsibility?
16 A. I'd have to look specifically, but it's
17 basically -- I've always viewed it as the compliance
18 side.
19 Q. From August to October 2000, team biologics
20 performed a good manufacturing practices inspection of
21 Merck's biological manufacturing facilities and
22 operations; correct?
23 A. There were a number of inspections throughout
24 the years, yes.
25 Q. I'm referring specifically to the one from

1 August to October 2000. Do you recall that one?
2 A. There's a number of them that are a little
3 blurry in my memory right now, but I know there were a
4 number of inspections that were done.
5 Q. And I'll just refer you to your report in
6 Paragraph 80 of your report, Dr. Kessler.
7 A. Thank you. Paragraph 80 or...
8 Q. I believe so.
9 A. So it's team biological inspection. That's
10 the way I refer to it.
11 (Deposition Exhibit 22 was marked for
12 identification.)
13 BY MS. HARDWAY:
14 Q. I'm going to show you what we're marking as
15 the next exhibit. This is an E-mail from Maureen
16 Grandzol to several people at Merck. "Subject: Team
17 Biologics, 483 Observation, Final Responses" dated
18 October 25, 2000. Do you see that?
19 A. I do.
20 Q. And if you'd turn to page Bates ending in
21 -4032.
22 A. So this is -- let me make sure we got the
23 attachment right. These are not the 483s. These are
24 the responses.
25 Q. Correct. Yeah.

1 A. Yeah. And this is -- if I'm correct, this
2 is -- I can't quite tell. This is still a track
3 changes version.
4 Q. Are you familiar -- have you looked at
5 Merck's response to the 483 and specifically the
6 response to Observation 3?
7 A. Yes, I believe I've looked at that at a point
8 in time. Yes.
9 Q. And you see in the first paragraph under that
10 response to Observation 3, there's a second sentence.
11 It begins, "Since"?
12 A. Right.
13 Q. Actually, let me take a step back.
14 Do you see at the bottom -- well, two-thirds
15 of the way down the prior page, Bates ending in -4031,
16 which is where the observation starts?
17 A. Yes.
18 Q. And there are listed there several lots of
19 mumps vacs and MMR II that failed potency at different
20 time intervals, including at 24 months?
21 A. Right. Probably inspectors generally, I
22 think, identified this, yes.
23 Q. And Merck's response to Observation 3, second
24 sentence starts, "Since 1996 we have had an ongoing
25 dialogue" --

1    A.  Yeah.  I know the sentence that you're
2  quoting.  I know it well.  Go ahead.  Now I see it on
3  the page.
4    Q.  So you're familiar with this response?
5    A.  I am very familiar with this sentence.  It's
6  trying to convince the field that Merck's saying,
7  "Hey, but what's" -- you know, we've -- the center is
8  saying, "You're out of compliance.  These lots have
9  failed potency."  They've even asked about the
10  justification for why this was not recalled, I
11  believe.  If my memory serves me right, I think I have
12  that document somewhere here.
13    And Merck saying, "Well, you know, go talk to
14  the center" is basically what it's saying because
15  we've been in discussions with this, and basically,
16  we've made certain commitments to the center, and this
17  is an ongoing discussion with the center.  That's its
18  defense here.
19    Q.  But CBER itself identified a number of lots
20  that failed potency at several time points, including
21  24 months; right?
22    A.  Well, the inspectors did that; right?
23    Q.  The inspectors from team biologics?
24    A.  Yeah.  There was the inspectors on team
25  biologics.  I believe, if I'm correct -- I'd love to

1  see the 483.  I believe -- well, I got to see who was
2  actually there.  But yeah.  The field is basically
3  saying, "What's going on.  These are subpotent."
4    And Merck's defense here was, "Well, go talk
5  to the center.  We've been in discussions with them."
6  But the field is not buying it, and that's what leads
7  to the warning letter, which I'm sure you'll show me
8  next.
9    (Deposition Exhibit 23 was marked for
10    identification.)
11  BY MS. HARDWAY:
12    Q.  Dr. Kessler, Exhibit 23 is an October 24,
13  2000 submission to the director, to Karen Midthum and
14  the director of the Office of Vaccines Research and
15  Review with several attachments to the letter.
16    A.  Yes.
17    Q.  Are you familiar with this document?
18    A.  I'd have to go back and just cross reference.
19  I can answer that question in a second if you give me
20  a second.  I just want to make sure I can cross
21  reference, if I may.  Let's make sure I'm dealing with
22  this right.
23    (The witness reviewed the document.)
24    THE WITNESS:  I'd have to -- hold on.  I can
25  answer that question in a second.

1    (The witness further reviewed the document.)
2    THE WITNESS:  Yeah.  So this is -- yes.  So
3  I'm familiar with this document.  Let me actually pull
4  up my cross references if I may.
5    (The witness further reviewed the document.)
6    THE WITNESS:  So yes.  Again, I just want to
7  make sure.  Does this have all the appendices in it
8  and Attachment 4?  I can't be sure.  So Appendix 3.
9  You're going to have to point me to the various
10  attachments and appendices just to make sure it's a
11  complete document.  I see Attachment 3.  I see
12  Attachment 4, I assume is in here.
13    Yes, I'm familiar with the document.
14  BY MS. HARDWAY:
15    Q.  And in this document Merck provides a number
16  of things to CBER with regard to the stability of the
17  mumps vaccine; correct?
18    A.  Yes.
19    Q.  Including a new analysis -- a new stability
20  analyses updated from 1987 through 2000; right?
21    MS. SCANLAN:  Objection.  Mischaracterizes.
22    THE WITNESS:  Yeah.  Just show me -- so I see
23  there's the '87 to '96 data, and then there's -- I
24  just want to make sure.  There's a number of different
25  attachments.  You could point me to the ones you want

1  to point to.  I see fills made, 1 through -- '86 to
2  '98, but you can show me the specific cohort that you
3  want.
4  BY MS. HARDWAY:
5    Q.  The second page of the letter, the last
6  bullet --
7    A.  Yes.
8    Q.  -- it talks about Merck having provided
9  "retrospective analyses of stability data for the
10  five-year period preceding the process change to
11  support the higher mumps titer implemented for all
12  lots manufactured on and after September 13, 1999."
13  Do you see that?
14    A.  That's prior to the overflow, yes.
15    Q.  Then in the second to the last paragraph of
16  the letter, it says, "When these analyses requested by
17  CBER were performed, an apparent change in the potency
18  profile for the product was observed"?
19    A.  Exactly what I said.  Probably something
20  happened around '95 or so, or thereabouts, that threw
21  this out of whack, yes.
22    Q.  Then it continues, "It is unclear whether the
23  difference is due to a shift or a trend in the data.
24  It is also not known whether these empirical
25  observations are an artifact of the data collection

Page 194

1 methods."
2 A. Right.
3 Q. "We are further investigating these
4 observations and request an opportunity to discuss our
5 findings with CBER at a face-to-face meeting." Do you
6 see that?
7 A. Right. And so you have -- hold on one
8 second. Let me make sure I get my time frame right
9 here, if I may. Just give me one second. I just want
10 to check one date in my head that I can't...
11 (The witness reviewed the document.)
12 THE WITNESS: So this is all prior to warning
13 letter, et cetera. This is, again, this first phase
14 where we're starting to see some of these titers, but
15 most importantly, in a discussion about what's end
16 expiratory and something's going on I presume with
17 Phase I.
18 BY MS. HARDWAY:
19 Q. So Merck is providing data to the FDA
20 regarding the stability of mumps and is requesting a
21 face-to-face meeting; right?
22 A. That is what it is doing, but for some reason
23 what you have is -- certainly -- what's the date of
24 this? This is October. The thing that I just need is
25 Carbone saying in November of this year, "Given

Page 195

1 Merck's slow and incomplete response to our requests
2 and comments in the past," still have not submitted
3 exactly what their stability program is for MMR."
4 So you see Carbone -- you see this coming in,
5 but you see Carbone's frustration. "I anticipate that
6 after review of the issues and our conclusions, we
7 will need eventual consensus by -- and by management
8 to reviewers and help from management to provide
9 follow-through with our assessment. It took a while
10 to get through to them, but we get the job done."
11 So Carbone is expressing a considerable
12 amount of frustration, as best I can tell here, on
13 what Merck is giving them.
14 Q. What are you reading from? What were you
15 just reading from?
16 A. From an E-mail. It's more a more recent
17 document that just came in after my report. It's
18 FDAFOIA000320. This was a production that I
19 understand was produced by FDA after my report was
20 completed.
21 Q. Have you spoken to Dr. Carbone about this
22 particular E-mail or memo that you just read from?
23 A. I have not.
24 Q. So --
25 A. I mean if you want to release me from

Page 196

1 protective order, I'd be happy to talk to her. It
2 would be helpful if you want to do that, but I was
3 reluctant. I mean this is not protected, but I've not
4 spoken to Dr. Carbone.
5 Q. So you don't know what Dr. Carbone was
6 thinking or feeling when she wrote that; right,
7 Dr. Kessler?
8 A. Hold on a second. I certainly don't want to
9 testify what she was feeling, which is a subjective
10 state of mind. I think I've seen one E-mail from
11 Carbone. I thought she used the word "frustrated,"
12 but I'd have to get that in front of me. That's sort
13 of an objective statement of what she said she felt.
14 But, again, I don't want to get into Dr. Carbone's
15 state of mind, and I can't.
16 Q. Right. Just like you told me I needed to go
17 talk to Dr. Baylor about the prior E-mail, you would
18 need to talk to Dr. Carbone about her state of mind;
19 correct?
20 A. Objectively I can tell you that certainly
21 Dr. Carbone's view at the time was "Merck's slow and
22 incomplete response to our requests and comments."
23 Still don't have what the -- exactly what their
24 stability program is, and that's the next month after
25 this.

Page 197

1 Q. Just to close the loop on this document,
2 Dr. Kessler, if you'd turn with me to Bates page
3 ending in -9199, which is Attachment 8 to this letter.
4 A. -9199. I'm there.
5 Q. And you'll see that this is the statistical
6 analysis of stability data from 1987 through 2000.
7 A. Yeah. So -- well, yes. I mean this was
8 the -- this was the general attempt to get the slope.
9 I forget whether it was a .4, .5. They were trying to
10 get -- to do the stability model at the time.
11 Q. What is a warning letter?
12 A. Warning letter is something that the
13 pharmaceutical industry takes serious, usually
14 addressed to the CEO, or it is usually due to concern
15 about repeat violations in 483s or when a -- when the
16 FDA thinks it's not getting through to a company, or
17 there's a special public health importance to an
18 issue.
19 (Deposition Exhibit 24 was marked for
20 identification.)
21 MS. HARDWAY: I'm going to show you what we're
22 going to mark as our next exhibit.
23 THE WITNESS: Can I make a pile here
24 (indicating)?
25 MS. SCANLAN: Here, Dr. Kessler. Let me help

50 (Pages 194 - 197)

Appx1533

1 you with that because that will help the court
2 reporter downstream too.
3     THE WITNESS: If you could help me clean up a
4 little, that would be helpful.
5     MS. SCANLAN: Do you expect to use any of
6 these right now or that I should keep any in
7 particular out?
8     MS. HARDWAY: Not any in particular.
9     MS. SCANLAN: Okay.
10     (Pause in proceedings.)
11 BY MS. HARDWAY:
12   Q. You're familiar with this document; right,
13 Dr. Kessler?
14   A. I am.
15   Q. This is the warning letter to Merck dated
16 February 9, 2001.
17   A. Yes.
18   Q. Fair to say that FDA takes issues identified
19 in a warning letter very seriously?
20   A. Sure.
21   Q. If you go to page Bates ending in -9402.
22   A. -9402?
23   Q. Uh-huh.
24   A. Thank you, ma'am. Yes.
25   Q. You see the second paragraph consistent with

1 the 483 --
2   A. Wait a second. Just tell me the paragraph.
3   Q. The second paragraph, "Our investigators."
4   A. Sorry. I got that.
5     MS. SCANLAN: And, Dr. Kessler, if you need
6 to take a minute to read the rest of the page or
7 anything else on the document to give you context,
8 feel free to take a minute to read.
9     THE WITNESS: Yes. Thank you, Counsel.
10 BY MS. HARDWAY:
11   Q. The document paragraph starts, "Our
12 investigators reported that the data in your firm's
13 files showed a number of mumps vaccine stability
14 samples representing lots manufactured before the
15 formulation was changed during February 2000 failed to
16 meet the minimum potency specification," and it
17 continues. Do you see that?
18   A. Yes.
19   Q. And it says, "Product manufactured before
20 February 2000 may still be on the market before the
21 expiry period is two years."
22   A. Everyone is getting very concerned right now.
23 There's a level of concern here.
24   Q. If you go to Page 1 of this warning letter --
25 actually, you can look through the whole letter if you

1 want. Nowhere in this letter does the FDA make a
2 finding that MMR II is adulterated, do they,
3 Dr. Kessler?
4   A. So -- hold on one second.
5     So it would not do that in this warning
6 letter. It would wait for the company's response in
7 general is my experience. It may -- you can read the
8 last paragraph, but obviously, it's a warning letter
9 that's asking for a response. So FDA is going to read
10 the response to make any decision.
11     But clearly inconsistent with any prior --
12 the E-mails you showed me earlier about not having to
13 report to MBDR, the biological deviation reports. So
14 there is no finding here. FDA would wait for the
15 response.
16   Q. It's your opinion, Dr. Kessler, that the FDA
17 does not make findings of adulteration or does not
18 state findings of adulteration in its warning letters?
19     MS. SCANLAN: Objection. Mischaracterizes
20 prior testimony.
21     THE WITNESS: So if FDA finds adulteration,
22 usually it makes those conclusion in court. It will
23 go seize the product and go into a United States
24 district court of the United States marshals and put
25 tape around the product, and that's where usually FDA

1 finds it may suggest certain things, but the actual
2 adulteration conclusion usually is judicially --
3 involves judicial proceedings, is my experience. They
4 may suggest certain terms. They make certain
5 suggestions. But in the end, adulteration usually is
6 a determination that's made in court. I mean that's
7 the formal definition.
8 BY MS. HARDWAY:
9   Q. The formal definition of --
10   A. Adulteration is if I want -- again, it's
11 really the product that becomes adulterated, and if
12 you want to be able to take enforcement action against
13 that product you seize it, you enjoin it, or there's
14 criminal prosecution, and usually involves -- the
15 formal determination of adulteration usually involves
16 a judicial proceeding is my experience. This is one
17 step toward that. And FDA can suggest that the
18 product may be adulterated under the Act.
19     (Deposition Exhibit 25 was marked for
20     identification.)
21 BY MS. HARDWAY:
22   Q. Exhibit 25, Dr. Kessler, is Merck's response
23 to the warning letter dated March 8, 2001; right?
24   A. Yes.
25   Q. And if you'd turn with me to page ending in

51 (Pages 198 - 201)

Appx1534

1  -7608.

2      A.  Yes, ma'am.

3      Q.  You'll see CBER's Observation 3 and Merck's

4  response.

5      A.  I know it well.

6      Q.  And, among other things in its response, in

7  Paragraph 3 Merck states, "The average estimated loss

8  rate" --

9      A.  Wait a second.  Let me just see.  Let me get

10  the exact sentence.  This is on Page -608.

11     Q.  Top of -609.

12     A.  Thanks very much.  Yes.

13     Q.  It says, "The average estimated loss rate for

14  mumps stored at 2-" -- I'm just going to read it

15  exactly as it appears -- "8 degrees C for two years is

16  0.703 logs as reported in Attachment 8, table 2

17  Page 104 of the October 24, 2000 submission.  Thus, if

18  it is assumed that the initial potency is 4.3 log

19  TCID 50 per dose, the minimum release mumps potency

20  specification in effect prior to February 2000, the

21  average expected -- "the expected average potency at

22  expiry is 3.6 log TCID 50 per dose.  In order to

23  estimate the range of potencies around the average

24  loss rate, the standard deviation of the loss rate was

25  calculated and found to be 0.3 logs.  Therefore, the

1  95 percent upper and lower confidence limits for mumps

2  potency at the end of a two-year expiry is estimated

3  to be 3.3, 3.9 and 3.3 log TCID 50 dose respectively."

4  Do you see that?

5      A.  Correct.

6      Q.  So Merck was telling the FDA, in March of

7  2001, that lots manufactured prior to the increase in

8  the release specification in February of 2000 could

9  fall as low as 3.3 at 24 months; correct?

10     MS. SCANLAN:  Objection.  Mischaracterizes

11  the document.

12     THE WITNESS:  So I've read that sentence

13  multiple times trying to understand that sentence.

14  The sentence is phrased -- this is the substitution

15  for the Margolsky 225 lots fall below.  So somebody

16  struck -- if my memory serves me right, there's a

17  draft where the Margolsky E-mail substitution -- this

18  was the substitute.  And this is phrased as if it is

19  assumed.  This isn't making any statement about what

20  lots were actually -- they are talking about.  So,

21  again, it's a relatively difficult sentence to parse.

22      I do see and certainly agree that they raise

23  a 3.9 and 3.3, but they assume if the initial potency

24  is that.  That's the way the phrase is stated.  It

25  does not say how many lots that were released would,

1  based on their end expiratory calculations, be there.

2  BY MS. HARDWAY:

3      Q.  But it states that the possibility exists

4  that lots could be as low as 3.3 at 24 months, does it

5  not?

6      A.  I certainly would agree with that, but that's

7  a far cry from saying you release 60 million lots.

8  I'm sorry.  60 million doses.  I apologize.  I got

9  that wrong.  It's a far cry from saying that there was

10  60 million doses or -- yeah.  Approximately that

11  through certainly through 2007 and some 53 million

12  doses prior.  That was not disclosed in this letter.

13      Also understand what Merck is doing at this

14  time, if you -- for sake of completeness, they're

15  saying, "Okay.  If this is, there was."  So it's not

16  clear what there was by the way that's phrased.  But

17  this is still in the time period where Merck says in

18  essence -- we have initial results, if my memory

19  serves me right in the next paragraph.  They start to

20  say -- hold on a second.

21      Put here is where -- after "Don't worry about

22  it, preliminary data from end expiratory clinical

23  trials from MMR II utilizing three different potencies

24  have recently become available.  These data indicate

25  that mumps neutralizing antibody seroconversion rates

1  of mumps at 4.9 and 4.0 are comparable at 94 percent,

2  94.1, and 93 respectfully.  The seroconversion rate

3  was," and he gives certain rates.  And then they say,

4  "the sero rate is consistent with several older field

5  efficacy studies.

6      So -- but they're basically saying they have

7  007.  They have the interim analysis.  They have rates

8  here where 4.0 match 4.9, and that just is -- I mean

9  as we all know, that preliminary data was -- based on

10  007 was -- I mean it was a mess, I guess.  And so --

11  and furthermore, you're at a period of time in 2000

12  where there aren't outbreaks occurring the way they

13  started to occur.

14      So you have this, you know, this 3. -- I will

15  certainly -- I mean if you made certain assumptions

16  you would get to 3.9.  But, in essence, what the

17  company is saying, "We have preliminary data, and that

18  preliminary data says there's not a problem with 4.0."

19     Q.  Dr. Kessler, my question was very specific,

20  and it was but it states that the possibility exists

21  that lots could be as low as 3.3 at 24 months;

22  correct?

23     MS. SCANLAN:  Objection.  Asked and answered.

24     THE WITNESS:  Yeah.  I would be happy to give

25  you have the same answer.  What the company did is

Page 206

1 answered if it was made certain -- if certain
2 assumptions were made. It didn't speak to the number
3 of lots. It didn't disclose the 225 lots. It didn't
4 disclose at that point the 12 million doses, and
5 basically told FDA, "Yes, this may be the case, but in
6 essence, we have preliminary data that shows the
7 effectiveness at seroconversion at 4.0, and that's
8 what reassuring."
9 BY MS. HARDWAY:
10 Q. Upon learning of this information that lots
11 on the market could be as low as 3.3 at 24 months, did
12 CBER inquire of Merck as to how many lots could
13 potentially be on the market at 3.3 at 24 months?
14 A. Yeah. So you have several E-mails from Kathy
15 Carbone. Let me get them in front of me if I may.
16 (Pause in proceedings.)
17 THE WITNESS: So you have Carbone -- I have
18 to put this in context. I believe this is an E-mail
19 in April 9, 2001 in a memo from MMD's Katalin Abraham
20 to the file meeting minutes with CBER on April 4.
21 Dr. Carbone requested that Merck notify CBER when it
22 appears that a lot on stability may go out of
23 specification, noting that if additional data proved
24 otherwise, that should be communicated.
25 So she clearly is asking for -- if the

Page 207

1 company expected the range to go out that you would to
2 CBER.
3 BY MS. HARDWAY:
4 Q. But my question, Dr. Kessler, was upon
5 receiving this response from Merck, did CBER request a
6 list of the total number of lots that could
7 potentially be on the market that would fall below as
8 low as 3.3 at 24 months?
9 A. Yeah. I mean I think that both Carbone as
10 well as the requirement in BPDR is that if you
11 identify a lot below, you have an obligation, under
12 the BPER, to inspect the other lots that are -- that
13 may be out and inform the agency. So you can't stop
14 at just the one lot.
15 So I mean I think Merck's a sophisticated
16 company. It knows that it has a responsibility under
17 the BPDRs, or error and accident, at the time. And
18 Carbone is certainly stating you got to disclose all
19 your lots that are out of compliance. There's no
20 issue there.
21 Q. Is that what Dr. Carbone's E-mail states,
22 Dr. Kessler?
23 A. When it appears that a lot stability may go
24 out of specification, right, Merck notifies CBER when
25 it appears that a lot on stability may go out of

Page 208

1 specification. Of course, Dr. Carbone wants that
2 information.
3 Q. Did CBER take any further enforcement action
4 after receiving Merck's response to the warning
5 letter?
6 A. There's subsequent 483s that are taken, but
7 CBER relied on Merck's commitments and waited for
8 Merck's commitments on the clinical data on
9 Protocol 7.
10 Q. Sir, did CBER take any further enforcement
11 action after receiving Merck's response to the warning
12 letter?
13 MS. SCANLAN: Objection. Asked and answered.
14 THE WITNESS: So there was a subsequent 483
15 based on a follow-up to the BPDRs. There was
16 subsequent to the warning letter, and there was -- and
17 the answer is no, FDA relied on the representations of
18 the clinical data that was in 007 that the company
19 did, and therefore, it didn't take action.
20 BY MS. HARDWAY:
21 Q. And just to be clear, you told me earlier
22 that 483s were not enforcement actions but
23 investigations; correct?
24 A. Again, I told you different people would
25 interpret these things differently. For the sake

Page 209

1 of -- you certainly have a subsequent 483 and a BPDR.
2 But I think you're generally correct. FDA did not
3 take further enforcement action because Merck made
4 certain representations.
5 Q. CBER also knew at this time, did it not,
6 Dr. Kessler, that there were, in fact, lots out that
7 were below 4.3 at 24 months; correct? Those were
8 cited in the 483.
9 MS. SCANLAN: Objection. Mischaracterizes
10 what CBER knows.
11 THE WITNESS: CBER did not know there were
12 60 million doses that were released. CBER believes
13 that -- sorry. CBER has record of certain selected
14 lots that you informed the company they were out.
15 Merck did share its stability model, but Merck never
16 went in and told the FDA that there would be
17 60 million doses that were below 4.3 or -- with the
18 significant number between 4.1, and Merck certainly
19 did not -- and this is critically important because
20 beyond this time period in the 2000 -- up to 2007
21 Merck did not inform FDA that 7 percent of its
22 manufactured doses were believed to fall out of
23 compliance even with the overfill.
24 So even if you take this early period away --
25 and I don't have the complete data. I have asked

53 (Pages 206 - 209)

Appx1536

1 counsel for the data and -- from 2000 to 2007. I've
2 gotten some scanty -- and I've tried to fill in what I
3 could fill in and not even complete your data, but
4 just on the basis of that, there are 7 million doses
5 from 2001 to 2007 after the overfill, and I see no
6 record of Merck maybe shy of, you know, a lot here or
7 there, Merck saying to FDA that Merck cannot assure
8 the 4.3 with the overfill.
9      I mean I looked very hard for that. I mean
10 FDA is relying on the overfill and 007 to correct this
11 problem and believes that that corrects the problem.
12 I mean you should see -- I mean there is an E-mail
13 that is directly on point, right, that I think is
14 where -- I guess this is Petrosky in 2002. "In both
15 cases we stated that we implemented a new mumps
16 release specification of 5.0 to ensure lots at expiry
17 would meet the 4.3 at expiry. Therefore, from CDER's
18 point of view, they may be expecting all recent lots
19 after increasing the mumps content and increasing the
20 release specifications to meet those 4.3 dose through
21 expiratory. This may explain the fact that there have
22 been no negative feedback in response to the BPDRs."
23      And then Merck goes on to say, "Even at the
24 current release specification, approximately 7 percent
25 of the lots are expected to be below 4.3 at expiry.

1 If we were to short-date the product to achieve
2 a 95 percent confidence in meeting 4.3 dose through
3 expiratory, we would have to date the product to
4 approximately 16 months. This would impact our
5 ability to supply the market."
6      There is nothing -- please, I would be very
7 happy to be reassured, right, that this problem was
8 corrected. I see nothing in the record that says that
9 either FDA was informed of this 7 percent reduction,
10 that your client couldn't meet this, and that these
11 children received potent vaccine. Because everything
12 I see, that's not the case, and that's why I am very
13 concerned here.
14 BY MS. HARDWAY:
15      Q. Dr. Kessler, my question was CBER also knew
16 at this time, did it not, that there were, in fact,
17 lots below 4.3 at 24 months; correct? These were
18 cited -- those were cited in the 483. That was my
19 question. Dr. Kessler, I can promise you I have a lot
20 more questions that will allow you to give a lot more
21 testimony, but we are for sure going to need to seek
22 additional time if you continue to give very long
23 answers that have nothing to do with the question that
24 I asked.
25      So I'm going to ask you again, Dr. Kessler,

1 please listen to my question and respond as
2 specifically as you can.
3      MS. SCANLAN: I'm going to object. You've
4 asked the question. He is allowed to answer to the
5 fullest extent and based on the record and his report,
6 which is what he did. He cited the document. He told
7 you what it was that gave him the information that
8 informed his answer.
9      MS. HARDWAY: He went on for about two pages'
10 worth of transcript here in giving his answer, and it
11 was a speech. I'm not going to waste my time on the
12 record arguing about this.
13      MS. SCANLAN: He is allowed to give a full
14 answer. There is no requirement that says that he
15 cannot -- that his answer has to be 30 seconds or
16 less. You asked a question. He answered it.
17      MS. HARDWAY: They're not even close to
18 30 seconds or less.
19      MS. SCANLAN: Well, there's no time limit on
20 how short of an answer he has to give. You're
21 imposing it on him.
22      (Deposition Exhibit 26 was marked for
23      identification.)
24 BY MS. HARDWAY:
25      Q. Dr. Kessler I'm going to show you what we've

1 marked -- we're going to mark as the next exhibit.
2      This exhibit is a memo from Roberta McKee to
3 Bernard Kelley dated April 8, 2001, and it's a summary
4 of the April 4, 2001 meeting between Merck and CBER.
5 Do you see that?
6      A. Yes, I do.
7      Q. Are you familiar with this document?
8      A. I'd have to go back and double-check it. I
9 may have seen this before.
10      Q. If you look at the second page of this
11 document, the first full paragraph begins "Overall"?
12      A. Right.
13      Q. It says, "Overall, the meeting was collegial.
14 CBER represented and acknowledged at several points
15 during the discussion that they know MMR II is a 'good
16 product that we don't want to recall.'
17 However, Dr. Carbone stated that we are now 'swimming
18 in new waters' referring to compliance. Do you see
19 that?
20      A. Yep. They got a problem, and we still got a
21 problem.
22      Q. So Dr. Carbone has told Merck in that meeting
23 that MMR II is a product that they don't want to have
24 to recall; right?
25      A. No one wants to. Please listen to me. Okay?

54 (Pages 210 - 213)

Appx1537

Page 214

1 I know you're involved in a litigation matter and
2 there are very good lawyers around the table. Okay?
3 But this is, as Dr. Carbone is saying here --
4 right? -- you're dealing with one of the staples --
5 right? -- of the American healthcare system, the
6 MMR II vaccine.
7        Counsel at this table has written to the
8 Department of Justice, and I've read it -- right? --
9 where she talks about the importance of how vaccine
10 issues are handled. I agree with that point; right?
11 No one wants to have to recall MMR II. Everybody
12 wants a good product that works. Please fix this
13 issue; right? That's what she's saying. That's what
14 I'm saying today.
15    Q. Are you aware of any discussions within the
16 FDA during this time period or during the time period
17 that -- in which your report covers there were any
18 discussions to revoke the license for MMR within the
19 FDA?
20    A. I'm not -- I do not see any record of that.
21 I'm not aware of those -- of any discussion like that.
22 That would be a great, great problem for this country.
23 I think Carbone is basically saying we don't have to
24 recall this, but there's a great deal of concern about
25 this from that paragraph. But I don't see that, and

Page 215

1 I'm not privy; right? You can ask the people who were
2 involved in this what went on and what the discussions
3 were.
4    Q. Are you aware of any discussions within FDA
5 during this time period to suspend the license for
6 MMR?
7    A. I am not aware -- I'm not privy to those
8 discussions one way or the other. I could only see --
9 I could only see what's in the FOI. The few pieces of
10 data that's certainly -- that are very limited. I see
11 Carbone wondering whether -- not that you'll recall,
12 but whether the outbreaks are due to a low potency.
13    Q. And I'm not asking whether you're privy to
14 the discussions. What I'm asking is whether you're
15 aware of any discussions or have you seen any evidence
16 of any discussions during this time period in which
17 the FDA was considering suspending the license for
18 MMR?
19    A. I can't answer one way or the other, but it's
20 basically not suspending the license -- again, I'm not
21 privy to those discussions. What Carbone is basically
22 saying here, what you put in front of me is look, we
23 want a mumps vaccine. It's traditionally been good,
24 but this is whole new territory, and we don't want to
25 have to recall.

Page 216

1        Now, as you and I talked, we call this not
2 suspension, and I just am not privy to anything to do
3 with suspension.
4    Q. Have you seen any evidence in any of the vast
5 number of materials that you've reviewed that that
6 discussion took place, Dr. Kessler?
7    A. I think I've answered that question.
8    Q. I don't think you have. You said you're not
9 privy to discussions. I'm asking have you seen any
10 evidence in any of the documents that you've reviewed
11 that that discussion ever took place within the FDA?
12    A. "That discussion," just define "that
13 discussion."
14    Q. Whether there was ever a discussion -- let me
15 start again.
16        Have you seen any evidence in any of the
17 documents that you've reviewed, Dr. Kessler, that
18 there was ever a discussion within FDA where the FDA
19 considered suspending the license for MMR?
20    A. I mean I do not see that and am not privy to
21 that.
22    Q. Have you seen any evidence in all of the
23 documents that you've reviewed that there is
24 discussion within the FDA about the possibility of
25 seeking injunctive relief in the form of a consent

Page 217

1 decree regarding MMR?
2    A. I have not seen that.
3    Q. What is a "BPDR"?
4    A. It's a new name for an error and accident
5 report. It's something that's out of -- it's a
6 deviation from specifications in an application.
7        (Deposition Exhibit 27 was marked for
8        identification.)
9 BY MS. HARDWAY:
10    Q. I'm going to show you what we're going to
11 mark as the next exhibit.
12        Exhibit 27 is a document, a BPDR, that was
13 reported on March 5, 2001. Do you see that?
14    A. Yes. What's the BPDR number? This is 003.
15 Okay.
16    Q. If you'd turn to the second page of this
17 document which is ending in Bates -4240?
18    A. Yes. -4240. Yes. Let me see if my notebook
19 has it. I just want to check one thing. Yes, ma'am,
20 I'm listening.
21    Q. A description of the BPD on Page 2 references
22 a Lot No. 0628706.
23    A. Yes.
24    Q. And specifically the 24 months' stability
25 interval test result. Do you see that?

55 (Pages 214 - 217)

Appx1538

1    A.  Yes.

2    Q.  And the value was tested at 4.2, which is

3 below the expiry specifications of 4.3; right?

4    A.  Yes, ma'am.  Hold on one second.  Let me just

5 clean up for a second if I can.

6    (Pause in proceedings.)

7    THE WITNESS:  Yeah.

8 BY MS. HARDWAY:

9    Q.  Following receipt of this BPDR, did the FDA

10 take any further action or request any additional

11 information from Merck?

12    A.  I'd have to double-check that specific

13 question and see what FDA says in the 483 -- the 2002

14 483.  So I just have to double-check that.  I don't

15 have that in my hand.

16    Q.  A 2002 483, sir, is that what you just

17 referenced?

18    A.  Well, there's a subsequent 483.  Hold on a

19 second.  So there's a -- there's an April 2002 483

20 that cites certain deficiencies.  In fact, if someone

21 could do me a favor and just give me that April '02

22 483 because I have them saying it was deficient

23 because Merck only looked at one lot.  But I want to

24 check my 483.  I believe that subsequent 483 did cite

25 deficiencies in this because Merck did not look at the

1 rest of the lots.

2    MS. HARDWAY:  Let's do this.  We've been

3 going for about an hour anyway.  So why don't we take

4 a break now and give you a chance to take a look at

5 that.

6    THE WITNESS:  Thank you very much.

7    (Deposition Exhibit 28 was marked for

8    identification.)

9    THE VIDEOGRAPHER:  We're going off the

10 record.  This is the end of Media Unit No. 4.  The

11 time is 3:52 p.m.

12    (A recess was taken from 3:52 p.m.

13    to 4:24 p.m.)

14    THE VIDEOGRAPHER:  We're back on the record.

15 This is the beginning of Media Unit No. 5.  The time

16 is 4:24 p.m.

17 BY MS. HARDWAY:

18    Q.  Dr. Kessler, you said you wanted to put

19 something on the record?

20    A.  Yeah.  I have a couple of things I just want

21 to put on the record.

22    You asked me earlier -- and again, I don't

23 want to get into subjective states of mind.  But you

24 asked me about Kathy Carbone.  I said earlier that I

25 thought she used the word "frustrated" and just it

1 skipped -- my eyes grazed over it.  Just for the

2 record, at FDAFOIA000320 she ends that E-mail, "Thanks

3 for your help."  This is when -- the one she's talking

4 about given "Merck's slow and incomplete responses to

5 our request."

6    She writes, "Thanks for your help.  Believe

7 me, no one is more frustrated about this than I,"

8 Kathy.  So that was the use of the word "frustrated."

9    Just a second, you asked me about notifying

10 CBER and what CBER asked to be notified in a document.

11 You put in front of me, which I guess is plaintiff --

12 well, this is Exhibit 26.  There is -- you showed me

13 an earlier part of the Page 2, and basically, I think

14 I quoted this from another document, but it says,

15 "Dr. Carbone expressed concern regarding the timing

16 for notification.  She went on to request that Merck

17 notify CBER in advance.  If we predict that, based on

18 a slope analysis, a lot would not meet potency

19 expiratory before any OOS result is obtained."

20    So that's there and -- but specifically as we

21 broke, you had put BPDR 01003, I believe it was, in

22 front of me, and you asked me whether there was any

23 follow-up.  And what I have, I think it's cited my

24 report.  I don't have the actual 483, I don't believe,

25 but I have Merck's response to a 483 dated May 20,

1 2002.  And that starts beginning Bates No.

2 MRK-CHA00783949.

3    And if you go and you look, if I'm correct,

4 in Observation 5 to that and you match the Bates

5 number because the Bates number that was cited in 003

6 was an MMR Lot No. 0628706, and the observation where

7 Merck is just restating the lots -- restating FDA's

8 observation, stability favor investigations redacted

9 dated 1-10-01, 24 months was redaction.  Mumps

10 potency were incomplete in that they did not include a

11 document, an assessment of potential impact of other

12 lots manufactured that were representative of the

13 stability lot.

14    And then they again cite, Lot 0628706

15 represented MMR single dose lots manufactured in 1998.

16 So FDA is following up and saying, "Please tell us

17 about other doses."

18 BY MS. HARDWAY:

19    Q.  Could I see that document, Dr. Kessler, that

20 you were just reading from.

21    A.  Yes, of course, ma'am.

22    Q.  In this response to that 483 on Page -3967 --

23 I'll hand it back to you so you can take a look at it,

24 Dr. Kessler.  This is part of the -- of Merck's

25 response.  It says, "Third, all other reconstitute and

store potency results for the same lot at 24 months," which they're referring to the mumps lot -- the 24 months, "five of the six orientation/incubation time samples were at or above specification limit. These results are consistent with potency values at or near the minimum specification and are within assay variability. Active stability monitoring indicated that the performance of this lot was consistent with the historical performance of previous lots of this product as was evidenced by the fact that the terminal phase slope for this lot showed a loss rate that was at the," and that's redacted.

Then it says, "38.7 percentile ranking for mumps. This analysis therefore showed that this lot was not atypical with respect to its demonstrated measles and mumps potency stability profile at 24 months. This was supported by the manufacturing investigation which reviewed the formulation filing, lyophilization and inspection of this lot and concluded there were no atypical events associated with the manufacture of this lot."

And then I'll just have you -- I'll just read the next paragraph and hand it back. It says, "Based on fact that the potency values in the range of 4.2 log TCID 50 dose for mumps" and redacted, "should not

be expected to lead to a lack of immunity against mumps or measles respectively, and based on the results of the investigation Merck & Company" -- it looks like this is a draft. Conclude. Struck, and determined isn't put in. "...that no further action was warranted for Lot 0628706 or for other lots manufactured in the same time frame as Lot -28706. The results and conclusions of the fact-finding process were reported to CBER via Merck & Company BPDR 01-003 on March 5, 2001."

And once you're done reading this, Dr. Kessler, I'd like to mark it as an exhibit.

A. Do me a favor. Could you put a sticker on where you read so I don't -- would you be so kind so I can -- where you started reading. That would be very kind of you so I can just see.

(Pause in proceedings.)

THE WITNESS: So, again, this is troubling because it says, "all other reconstitute and store potency results for this same lot at 24 months. Five of the six orientation incubation time samples," as we saw in earlier documents, "were at or above the specification limits." So they were above 4.3. No problem, basically, what they're saying here.

But at the same time in this time period, if

you look, and again, in the document that I gave you -- because I believe this lot was from one of the earlier periods. If you just look at the lots released between March 1998 and in October 1999, by my calculations 12 million doses fell below 4.3, and 10 million doses fell below 4.1. That's a far cry from "No problem." And you would expect in a BPDR an obligation not to just talk about one lot, but you would say -- I mean what it's basically saying here is they met minimum specification above 4.3, but I mean there was earlier. This was an earlier lot, I believe than the Margolsky 225 but, you know, again, that's the problem.

You've put another document in front of me. I'm sure you're going to ask me about 005, but -- I believe 5 five lots, and it doesn't talk about the other 220 or so lots that Margolsky analyzed, and that's the omission.

BY MS. HARDWAY:

Q. Dr. Kessler, did the FDA take any enforcement action upon receipt of this response to the 483 -- actually, before answer that, let me mark this as an exhibit.

THE WITNESS: Thanks so much.

MS. SCANLAN: Kathleen, would you just read

the Bates number out for us too so that we all have it for this number.

MS. HARDWAY: Sure.

(Deposition Exhibit 29 was marked for identification.)

MS. HARDWAY: Exhibit 29, Dr. Kessler, for the record is MRKKRA00783949.

MS. SCANLAN: Thank you.

THE WITNESS: So to answer your question, in response to this 483, FDA did not take enforcement action, but in part, Merck told FDA, "No problem. The vast majority of measurements for this lot met minimum specification. I could -- you know, I could assure you, ma'am, that had Merck said in this response, and was forthcoming, that 23 million doses were below specification for '98, '99 time limit, bells would have been set off at the agency.

BY MS. HARDWAY:

Q. First of all, Dr. Kessler, nowhere in that response does Merck say, "no problem"; correct?

A. You're talking -- you're minimizing all other reconstituted and store potency for the same lot at 24 months were at or above the specification limit. This showed that a lot was not atypical; right? This was supported by the manufacturer investigation. And

Page 226

1 I believe you read me and said that there was no
2 atypical events associated with the manufacturer.
3    The company is experiencing increased potency
4 loss during this time frame and you're -- at the very
5 least, you're not being forthcoming that there are
6 other lots that do meet -- do fail to meet the minimum
7 specification, and it's significant.
8    So you are minimizing the problem in that
9 response.
10    Q. Dr. Kessler, my question, you had said that
11 Merck is saying to the FDA that there's no problem,
12 and Merck is not saying that, is it, in this letter,
13 this response?
14    A. I read that -- can I have it back? I read
15 what you're saying -- what you read. If you're -- I
16 mean with regard to this paragraph, we can read the
17 whole document, okay, that nothing should be expected
18 to lead to a lack of immunity against mumps or
19 measles. Okay? I mean at this time -- I mean if you
20 look at, I believe in this time frame -- let me just
21 get it. Merck has undertaken -- I have to get dates.
22    But if you look at the pilot studies that
23 were undertaken against circulating virus in the
24 standard neutralization experiments in the PRN, I mean
25 Merck was getting 69.4 and 76 percent seroconversion

Page 227

1 against wild type, I mean in standard neutralization
2 assays. So I mean there is -- I have to go back and
3 date these exactly, but certainly, there's a problem.
4    And at this time, that's not a forthcoming
5 response. When you get 69 and 76 percent
6 seroconversion rates against London One and you're
7 not forth- -- that's telling you you're not providing
8 effective immunization certainly as the label
9 suggested.
10    Q. Dr. Kessler, as part of your answer, your
11 last answer, you said that "had Merck said in this
12 response and was forthcoming, that 23 million doses
13 were below specification for '98, '99 time limit,
14 bells would have been set off at the agency." What do
15 you mean "bells would have been set off at the
16 agency"?
17    A. I think if I had -- if I were the FDA
18 commissioner and I knew that a staple of the American
19 healthcare framework was subpotent and that I was
20 aware, as FDA commissioner, of 23 million doses that
21 were subpotent that were used, and certainly if I knew
22 seroconversion rates were less in the range that Merck
23 was getting when it was doing its standard
24 neutralization test, I would be in the secretary's
25 office within that -- I would ask to speak to the

Page 228

1 secretary that day, and I would be caucusing with my
2 senior staff about what to do about this because it
3 gives -- I mean it would create to me one of the most
4 important public health conundrums because one wants
5 to support strongly the vaccination of children.
6    This is a very important vaccine. Okay?
7 We're dealing with, historically, a very responsible
8 company. I got a major problem on my hands if I knew
9 there were 23 million doses.
10    Q. Do you have an opinion, Dr. Kessler, as to
11 what recommendation you would have made to the
12 secretary of health and human services about what you
13 describe as a major problem?
14    A. Yeah. So I think there are -- I would ask to
15 get the CEO of Merck on the phone. I would ask to
16 meet -- or speak to the CEO of Merck. I would say we
17 would need to figure out what trace-back is possible
18 on these children.
19    I would convene -- immediately bring public
20 health, those who are real expert on this, and figure
21 out what one does and who is at higher risk. So I'd
22 figure out, No. 1, what could be done with regard --
23 what should be done with regard to the children who
24 had been immunized with subpotent vaccine. That's
25 step one. That's the immediate who's at high risk,

Page 229

1 what's the health assessment. I would ask Merck for
2 all the data that it had available.
3    No. 2, I would make sure that we were fully
4 transparent. I would make sure that the label is
5 cleaned up, that we not stand in the way of any
6 innovation for other newer, more effective vaccines,
7 and I would ask Merck for a commitment and to utilize
8 its great scientific knowledge and talent to develop a
9 more effective vaccine against the modern strains.
10    Again, it's complicated because you don't
11 want to do just certain strains. You got to do it
12 more broadly. You don't want it to be just
13 circulating because then you'll go back to historical.
14 So you're going to need to have a, you know,
15 multi-combinational antigenic stimulation for that
16 virus, and I would get a commitment from Merck that it
17 would be working on a new or more effective vaccine.
18    And I would try to do this as carefully as
19 possible so we don't undermine the American public's
20 confidence in vaccines. So I would make sure, as I've
21 been in other situations, that we do this thoughtfully
22 and wisely and not create any scares but to be
23 transparent and to fix the problem. That's what I
24 would have done now. That's what I would say needs to
25 be done today.

58 (Pages 226 - 229)

Appx1541

Page 230

1  Q. What do you mean by "subpotent"?
2  A. So that -- again, there are a number of
3  different definitions. We can take the potency as
4  defined as the information on the label where the
5  potency is spelled out and the end expiratory potency
6  as one definition. If you're below that, that's a
7  good place to start, but in the end you want to
8  have -- the question is what data do you have
9  currently to assure that the vaccine works against
10  current -- the current circulating types.
11  So I mean you're correct. Just so everyone
12  understands what I'm saying, there's an issue of
13  potency here. Okay? And this is an issue of waning
14  potency. I mean there's no question. But that's not
15  the only issue here. There's an issue of efficacy and
16  the PRN tests and the ELISAs should be against true
17  wild type. So you want a vaccine that has the
18  appropriate strength to be effective against the
19  circulating viruses, circulating mumps.
20  That is doable with the science we have.
21  Dr. Hilleman and Merck deserve a lot of credit back in
22  the 1960's and '70's for doing the work based on the
23  science, but today, these vaccines can be created that
24  are much more specific than companies like your client
25  has -- have the talent to do that. The problem I

Page 231

1  would also say to the secretary is look, the way this
2  has been done for the last 20 years is MMR II has
3  monopolized the field, and we've not created --
4  allowed the -- I mean by that label, by the
5  misstatements in that -- by the omissions in that
6  label, Merck has not -- that has stood in the way of
7  other companies creating newer, more innovative
8  products because MMR II has always been -- again, it's
9  a national icon, certainly among pediatricians.
10  It had been, and please make it that way.
11  Can I take a break?
12  MS. HARDWAY: We can take a break.
13  THE VIDEOGRAPHER: We're going off the
14  record. The time is 4:47 p.m.
15  (A recess was taken from 4:47 p.m.
16  to 5:06 p.m.)
17  THE VIDEOGRAPHER: We're back on the record.
18  The time is 5:06 p.m.
19  BY MS. HARDWAY:
20  Q. Dr. Kessler, we marked something, the last
21  exhibit, and didn't have a chance to talk about it
22  yet, which is an April 20, 2001 BPDR.
23  A. 005.
24  Q. You're familiar with this document?
25  A. I am. I think there's five lots that are

Page 232

1  reported, four lots that are reported, of that nature,
2  yes.
3  Q. And those lots are listed on Bates page
4  ending in -4234; right?
5  A. Yes.
6  Q. Are you aware of whether the FDA took any --
7  actually, those lots that are listed on -54234 are all
8  lots that fell below 4.3 at the 24-month time frame;
9  right?
10  A. Yes.
11  Q. And those -- at least in three instances,
12  those lots were still potentially on the market -- or
13  still had not yet expired and were potentially on the
14  market; correct? The ones that had the expiration
15  date of various days in May?
16  A. That's correct.
17  Q. Are you aware of whether the FDA took any
18  action with regard to those lots following receipt of
19  this BPDR?
20  A. I'd have to go back and check specifically on
21  that. I don't recall on this specific BPDR. Just to
22  be helpful, Counselor, what I tried to do in this
23  composite of all lots, you'll see I mark which ones,
24  and just to be helpful, you'll see which ones have
25  BPDRs associated and these four are marked

Page 233

1  (indicating).
2  Well, again, so this relates specifically to
3  the 7 percent; right? So the reason -- and Merck
4  recognizes this. I mean Merck says the reason why FDA
5  did not conclude there was a problem was that, on a
6  prior approval, that was approved, that included an
7  increase in the mumps release potency to 5.0. They
8  were designed and then there were further steps to
9  improve assay variabilities.
10  So these were implemented -- so these changes
11  were implemented to assure that in the future potency
12  for lots at expiry would meet the current
13  specification of 4.3. So Merck is representing here
14  that we overfill. Again, no problem, and as the Merck
15  E-mail said, the reason why FDA is being silent is
16  they bought the R overfill issue, but that there was
17  still a 7 percent problem that fell below.
18  So you would not -- that's why Merck -- Merck
19  was interested why wasn't there any response, and then
20  they realized well, we reassured FDA.
21  Q. Sir, are you referring to a particular E-mail
22  when you say that Merck said -- someone from Merck
23  said that the FDA "bought" the overfill issue?
24  A. Yeah. So there's an E-mail that
25  specifically -- I'd have to find it -- where "Why are

59 (Pages 230 - 233)

Appx1542

1 we not hearing back from FDA," and the answer was --
2 and I think I read it into the record if my memory
3 serves me right. I can find it again. If you look
4 at -- so this is dated -- this is dated 2001, and in
5 January 2002 -- again, I think I read this to you,
6 Counselor. "Therefore, from CBER's point of view they
7 may be expecting all recent lots, after increasing the
8 mumps content and increasing the respecifications to
9 meet the 4.3 dose through expiratory. That may
10 explain the fact that there has been no negative
11 feedback in response to the BPDRs."
12     And then that E-mail goes on, "Even at the
13 current release specifications, i.e., with the
14 overfill," which is what Merck reassured FDA at this
15 point -- right? -- "Furthermore, changes were made to
16 the potency test." I'm sorry. "On 2-11-2000 a prior
17 approval supplement was approved that included an
18 increase in the mumps release potency" -- right? --
19 "specification for 4.3 to 5."
20     What Merck is saying here internally is even
21 at the current release specification, which is now the
22 new 5.0, approximately 7 percent of the lots are
23 expected to be below 4.3 at expiry.
24     If we were to short-date the product to
25 achieve a 95 percent confidence of meeting 4.3, which

1 is what FDA required through expiratory, we would have
2 to date the product to approximately 16 months.
3 That's not -- I mean that's contrary to what -- that
4 there's not going to be a problem to ensure, in the
5 future, potency for lots that would meet the current
6 specification.
7     Merck's aware that that overfill is not going
8 to do it. You look at Bennett's models, and his
9 models are saying, "We're not going to meet it."
10 That's directly contrary to what Merck is saying to
11 FDA in this BPDR.
12     Q. Dr. Kessler, when the FDA received this PBDR
13 in April of 2001 in which there were five lots that
14 Merck indicated fell below the 4.3 labeled potency at
15 24 months, they did nothing. They took no action with
16 regard to these lots including lots that had not yet
17 expired; correct?
18     A. Based on Merck's representations in this BPDR
19 that in the future potency for lots at expiratory
20 would meet the current specification.
21     Q. I'm not talking about lots in the future,
22 Dr. Kessler. I'm talking about these five lots in the
23 April 20, 2001 BPDR. Did the FDA take any action with
24 regard to these five lots, including three lots that
25 had not yet expired, upon receiving this BPDR?

1     A. No, because your client represented that they
2 fixed the problem. So why should FDA take problems if
3 you're saying you're overfilled and in the future that
4 will ensure specifications.
5     Q. Dr. Kessler, these lots are manufactured
6 prior to the overfill, were they not?
7     A. These lots were manufactured prior, but it's
8 basically saying that "We're going to take care of
9 this in the future." That's what it says.
10     Q. Dr. Kessler, I'm talking about these five
11 lots (indicating).
12     A. FDA -- I'm not aware that FDA takes action on
13 these five lots. All I'm saying is what's
14 represented, it says, in the future.
15     Q. So the FDA knew about lots that were on the
16 market that hadn't yet expired that fell below 4.3 --
17 that had fallen below 4.3 and would fall below 4.3 at
18 expiry and they took no action; correct?
19     A. With the overfill?
20     Q. No, these -- I'm talking about these lots
21 here, Dr. Kessler (indicating.)
22     A. With the overfill.
23     MS. SCANLAN: Can I just suggest why don't
24 you give Dr. Kessler a moment to review the entire
25 BPDR and then ask the question again because I think

1 that you both are talking around each other on what
2 the question is. So give him a minute to review the
3 BPDR and then ask your question again.
4     MS. HARDWAY: I think I've been pretty clear
5 on my question. He just is choosing to answer a
6 different one.
7     (The witness reviewed the document.)
8     THE WITNESS: Yeah. So I mean you start in
9 the first sentence to this. I mean it's --
10 BY MR. HARDWAY:
11     Q. Hang on. Let me ask, have you had a chance
12 to review that document?
13     A. No. I've only had a chance to read the first
14 several sentences.
15     Q. Well, I'm going to have a very specific
16 question. So I can ask it as soon as you're done
17 reading it or I can ask it now.
18     A. Okay. That's fine.
19     (The witness further reviewed the document.)
20     THE WITNESS: Oh, yeah. Got it. I mean I
21 haven't read the whole thing. Yeah. But --
22 BY MS. HARDWAY:
23     Q. Let me ask my question.
24     A. Sure.
25     Q. Upon receipt of this BPDR on April 20, 2001,

Page 238

1 in which Merck told the FDA that five lots had fallen
2 below 4.3 at the 24-month time point, including three
3 lots that had not yet expired, did the FDA take any
4 action with regard to these five lots, Dr. Kessler?
5 A. I'm not aware that FDA took any action. I'd
6 have to review the entire record, but you would not
7 expect FDA to take any actions for two reasons. One,
8 Merck represented that it had the clinical data to
9 support efficacy of this based on 007. And,
10 furthermore, these five lots, while they had an end
11 expiratory of '01 and I missed that at 24 months,
12 these were part of Margolsky's -- these are the
13 pre-overfill lots.
14 So Merck represents that it had fixed the
15 problem with -- as it says here, because these were
16 pre-overfill lots if I'm correct. I can check the lot
17 numbers, but I think that's correct. These are
18 pre-overfill lots, and Merck represents we fixed the
19 problem by the overfill for these lots. So this is
20 not -- this will ensure that in the future potency for
21 lots would meet the 4.3. I wouldn't take any action
22 based on those representations. One that the clinical
23 data of 007 is correct, and 2, you fixed the problem.
24 I believe Merck.
25 The problem is that didn't fix the problem

Page 239

1 because it was still a problem with the overfill of
2 significant proportions.
3 Q. Dr. Kessler, when you say, "fix the problem,"
4 you're referring to the overfill; correct? You're
5 referring to action that was taken after these lots
6 are manufactured; right?
7 A. That was the representation. I mean there's
8 several times throughout date I've used "fix the
9 problem."
10 Q. How is it, sir, that Merck's representation
11 regarding the overfill had anything to do with these
12 five lots that were manufactured prior to the
13 overfill?
14 A. Ma'am, you're a sophisticated FDA lawyer.
15 You understand that if you have a compliance problem,
16 what FDA cares about are incentives for you to fix the
17 problem. That's what the agency is all about; right?
18 So if you're out of compliance on five lots, what FDA
19 cares about is did you fix the problem.
20 Q. So you're saying -- it's your testimony,
21 Dr. Kessler, that the FDA does not care about lots on
22 the market that fell below 4.3 at 24 months?
23 A. So that is not my testimony. I think that in
24 light of several things, in light of no mumps
25 outbreaks at the time; right? In light of the fact

Page 240

1 that Merck is representing the 007 is showing
2 effectiveness, I mean, at 4.0; right? And Merck is
3 saying this vaccine is a good vaccine, right, and no
4 one is seeing any outbreaks. Merck reassured the FDA
5 that this was okay in light of mumps outbreaks, in
6 light of 007 not substantiating clinical effectiveness
7 against a wild type.
8 And, in fact, in light of the seroconversion
9 rates, when you look at the record as a whole, you
10 would be very concerned about this. So the issue is
11 in the context of what Merck's representing and what
12 Merck knew at the time.
13 Q. Would you agree with me that a stability
14 model is the equivalent of a hypothesis?
15 MS. SCANLAN: Objection. Vague and
16 ambiguous.
17 THE WITNESS: Yeah. It depends on -- it
18 depends on whether, in fact, that model has a
19 validation associated with it and how that model was
20 done. So it depends on the validation of that
21 stability model. It has to be relied upon to assure
22 the safety of products. So it's more than a
23 hypothesis.
24 BY MS. HARDWAY:
25 Q. There's no regulation, is there, Dr. Kessler,

Page 241

1 that requires a manufacturer to provide stability
2 models that it might do to the FDA; right?
3 A. They're all right there. If you read the
4 BPDR -- and I have them here. Let me just pull the
5 regulations in front of me on the BPDR. Hang on a
6 second. So just repeat your question if would you be
7 so kind.
8 MS. SCANLAN: We seem to have lost the
9 conference line.
10 MS. HARDWAY: Could we go off the record,
11 please.
12 THE VIDEOGRAPHER: We're going off the
13 record. The time is 5:23 pm.
14 (A recess was taken from 5:23 p.m.
15 to 5:28 p.m.)
16 THE VIDEOGRAPHER: We're back on the record.
17 The time is 5:28 p.m.
18 BY MS. HARDWAY:
19 Q. Dr. Kessler, I'm going to withdraw my last
20 question. I want to ask a different one.
21 Back to this BPDR from April of 2001, the
22 five lots that are on Page -54234 --
23 A. Let me make sure I have that document. Here
24 it is (indicating). Sorry. Yes, ma'am.
25 Q. It's true, is it not, Dr. Kessler, that

61 (Pages 238 - 241)

Page 242

1 despite receiving information that five lots were
2 below 4.3 at 24 months, the FDA took no action with
3 regard to these specific lots, "yes" or "no"?
4     A. I answered that question.
5     Q. Dr. Kessler, I'm entitled to a "yes" or "no"
6 answer to a "yes" or "no" question.
7        Is it true, Dr. Kessler, that the FDA took no
8 action with regard to these five lots that were below
9 4.3 at 24 months?
10     MS. SCANLAN: Objection. You can't
11 contingent his answer on a "yes" or "no." If you're
12 asking a question, you've got to give him the
13 opportunity to give a full answer.
14     MS. HARDWAY: It's a "yes" or "no" question.
15 They either took action or they didn't. It's a simple
16 "yes" or "no" question and --
17     MS. SCANLAN: Then I'm going to object to
18 vague and ambiguous as to what it is to take action.
19     MS. HARDWAY: All right. Fair enough.
20     Q. Dr. Kessler, upon receipt of this information
21 in April of 2001 with regard to these five lots, did
22 the FDA seek to recall any of these lots?
23     A. Did the FDA seek to recall any of these lots.
24 I have to go check. I have to go check what -- the
25 FDA records to answer that question. FDA questioned

Page 243

1 recall on certain lots, and I just -- I've not matched
2 that up. So I can't answer that question until I
3 match up specifically which ones they questioned
4 recall about.
5     Q. And my question is not whether they
6 questioned recall. My question to you is did the FDA
7 seek to recall these five lots after receiving
8 information that they were below 4.3 at 24 months?
9     A. Based on the information that Merck put in
10 here, FDA would not do that and did not do that.
11     Q. Sir, you don't know why the FDA did or did
12 not do anything in 2001; correct? You'd be
13 speculating.
14     A. I know exactly the representations that your
15 company made, and they are false.
16     Q. Dr. Kessler, you do not know why the FDA did
17 or did not take any action about these five lots in
18 2001; correct?
19     A. I know that your company made certain
20 representations in this document and that those
21 representations were false and that, taken as a whole,
22 your company is asserting there's not a problem with
23 these lots. So of course FDA would not take an
24 action.
25     Q. Dr. Kessler, you agreed with me earlier in

Page 244

1 the day that you would not and should not, as an
2 expert, speculate; correct?
3     A. I'm not speculating. I'm giving you -- based
4 on my 40 years of experience -- right? -- if you start
5 off a BPDR and you say an interim analysis from an
6 ongoing clinical trial, these are the first words --
7 right? -- an ongoing clinical trial to evaluate expiry
8 titers for the mumps component has recently been
9 performed in that trial to and expiratory titers were
10 both 4.0 and 3.7, an analysis of serums from
11 approximately one-third of the subjects have been
12 completed. Preliminary results demonstrate that mumps
13 neutralizing antibody seroconversion rates at release
14 and the proposed -- end expiratory of 4.0 are
15 comparable, and you know that that is incorrect --
16 right? -- and there's no justification for that data I
17 mean that's -- you can't hide behind giving FDA faulty
18 information, Counselor.
19     Q. Dr. Kessler, we are talking about five lots
20 in this BPDR that fell below 4.3 -- four that fell
21 below 4.4 at 24 months, and one that was at 4.3 at 22
22 months.
23     A. You're talking about those in the context of
24 this BPDR where you're saying two things: One, we've
25 done 007 and that should -- and that shows that 4.0 is

Page 245

1 fine, and, furthermore, you overfilled.
2     Q. Dr. Kessler, I've been trying to give you the
3 respect of letting you finish your answer, and I'd ask
4 that you not interrupt when I'm in the middle of a
5 question.
6     A. I apologize, Counselor, if I've interrupted
7 you, but you keep on asking the same question.
8     Q. I'm asking you because you're not answering
9 it, Dr. Kessler. I want --
10     A. You may not be getting the answer you want,
11 Counselor, but if you're looking at -- if a company
12 makes a representation on a BPDR of four lots and you
13 say in the future there's not going to be a problem
14 and the clinical data supports no problem and those
15 are, in fact, false statements, of course the FDA is
16 not going to take action unless it's aware that those
17 statements are false.
18     Q. Dr. Kessler, I'm asking whether the FDA
19 recalled these lots upon receiving this information,
20 "yes" or "no"?
21     MS. SCANLAN: Objection. Asked and answered.
22     THE WITNESS: I'm happy to give you the same
23 answer.
24 BY MS. HARDWAY:
25     Q. Were these lots recalled, Dr. Kessler?

Page 246

1 A. Your company did not recall these lots.

2 Q. Did the FDA ask the company to pull these
3 lots from the market?

4 A. I'm not aware that FDA asked nor would I
5 expect FDA to ask based upon the false information
6 that your company gave.

7 Q. There was information that Merck provided to
8 FDA that lots were below the labeled expiry claim;
9 correct?

10 A. True. But an incomplete statement,
11 Counselor. You gave information that lots were below
12 4.3 but in the same breath in the same document you
13 give other information. So your statement is true but
14 an incomplete statement.

15 Q. You state -- in your report you state that
16 you regularly rely on statisticians and
17 biopharmaceutical scientists to provide you with
18 information to support your work; right?

19 A. Sure. Historically that's always been the
20 case.

21 Q. And you go on to state in your report that
22 you relied on the expert opinions of Phillip Stark and
23 Mark Schenerman regarding the stability calculations
24 for -- in the SBLA for RHA for that portion of your
25 opinion; right? And I can refer you to Page 350,

Page 247

1 Paragraph 261.

2 A. That would be great.

3 MS. SCANLAN: Kathleen, I'm going to just
4 reference the errata here. As we discussed earlier
5 this morning, Dr. Schenerman is no longer going to be
6 acting as an expert. So the paragraphs that make
7 reference to Dr. Schenerman are the ones that have
8 been put in the errata where the references to
9 Dr. Schenerman have been deleted.

10 THE WITNESS: What paragraph, please,
11 Counsel?

12 BY MS. HARDWAY:

13 Q. Paragraph 260.

14 A. 260. Thanks.

15 Q. 260 and 261.

16 A. Let me just get that out. Yep. I know this.
17 My favorite subject. The potency model. Hold on a
18 second. Let me get my notes on the potency model.

19 Yes, ma'am.

20 Q. Does this opinion -- this particular opinion
21 refers to a potency model that was done in 2005;
22 right? Stability model.

23 A. This was a potency model that was
24 specifically in the SBLA for ROJ, and it was in a
25 specific section of 8.3.6.3, and it's in a certain

Page 248

1 table. I don't have the date in front of me. I'd
2 have to pull the SBOA to understand exactly when this
3 was done. I'm sure it's in the report.

4 Q. If you turn to Page 338, Paragraph 258.

5 A. 338? Thanks.

6 Q. Paragraph 258 describes a stability model
7 that was done in 2005.

8 A. So I think it's in --

9 Q. Modification stability model?

10 A. It's the modification of the stability model.
11 Do I actually state the date it was done or the date
12 it was submitted? I forget. They submitted, I
13 believe, in July of 2005. My question is I just
14 didn't have in my head when it was done.

15 Q. And so this section of your report is
16 referring to that particular model; correct?

17 A. Yeah. It's referring to the model that is
18 done specifically, and I can tell you that's
19 referenced in the SBLA in Table 8.3.6. -- 8.3.6.3.2.
20 It's that stability model.

21 Q. And going back to Paragraphs 260 and 261.

22 A. 260. Yeah.

23 Q. And you -- in 260 you cite the reports of
24 Drs. Stark and Schenerman regarding their calculations
25 of the slope of loss for storage. Do you see that?

Page 249

1 A. Yes. So that actually is -- again, so I see
2 that, but I wouldn't say that's actually probably
3 fully correct because it was Stark who did the
4 analysis of the slope and I -- Schenerman is no longer
5 in my report as of the errata sheet. So I'm citing
6 Stark for that, and he was the one who did 260. He
7 actually did the slope.

8 Q. And you note that -- in Paragraph 260 you
9 have an opinion that the model is misleading, and I'm
10 quoting from your report here because it represents
11 that the loss rate for storage at 2 to 8 degrees
12 centigrade is calculated over a "duration" of "24
13 months" not over a duration of 30.58 months?

14 A. That is what it was represented to be. It
15 was represented, I believe, to be -- if you look at
16 Table 3.2P83-MMR, you see that the loss rate for that
17 model is given as .4397 over 24 months, and that was
18 inaccurate.

19 Q. And so this particular model, with the help
20 of Dr. -- in this case now Dr. Stark, you believe was
21 done incorrectly is your understanding here?

22 A. Yeah. I'll leave it to Dr. Stark to do the
23 loss rate, but -- and if you -- but I no longer rely
24 on Schenerman. And, again, the calculation, it's
25 pretty straightforward of how to do the total

63 (Pages 246 - 249)

Page 250

1 variance, and he does that for me as I normally asked
2 biostatisticians. I'm a professor of biostatistics,
3 but I like to have a biostatistician who does it full
4 time do these kinds of things.
5     I mean you can clearly see that somebody was
6 trying to back into those numbers, and when FDA raised
7 the question, "Hey, it's not 4.1 that's released.
8 It's 4.3." So that they had a model that came up, the
9 net 4.3, and that required a release that was greater,
10 a fill -- a target fill rate that would have been
11 greater than 5.2, and that wasn't achievable for
12 safety reasons. So that's the importance of this.
13     Q. In going back to Paragraph 258, which is on
14 Page 338 and 339.
15     A. 258. Yes, ma'am.
16     Q. Do you see on Page 339 --
17     A. Yes.
18     Q. -- you state, "The 2005 modification of the
19 stability model time period had the effect of
20 decreasing the overall average loss rate of the model?
21     A. Yes. So if you -- yes. Your question?
22     Q. And so in this particular instance, your --
23 you rely on Dr. Stark and have the criticism that this
24 particular stability model was done incorrectly
25 because it had the effect of decreasing the overall

Page 251

1 average loss rate of the model; right?
2     A. The modified one.
3     Q. Yeah. The one that we're talking about here.
4     A. Well, there's two. I mean so if you compare
5 Table 3.2P83MMR -- right? -- that was part of the --
6 it was then submitted to FDA. The loss rate after
7 they modified it is .4397 over 24 months, but in the
8 prior model it's .54338 over 24 months. I mean, you
9 know, Merck came up -- when it did the first model, I
10 mean it came up with a minimum expiratory of 4.1, and
11 FDA questioned that.
12     And so they ran back and said, "Oh, can't
13 have that come out that way." So somebody obviously
14 went back and did what they did to justify a 4.3 log
15 and a minimum release potency of 5.02, and that's
16 accurate -- that, or at least according to Dr. Stark's
17 regression analysis, and he can testify on the slope
18 that is inaccurate.
19     Q. If you'd turn to Page 331, Paragraph --
20     A. 331.
21     Q. Paragraph 254.
22     A. Yes.
23     Q. You're referring to a 2004 stability model
24 done by Dr. Bennett -- correct? -- in that paragraph
25 and the ensuing paragraph?

Page 252

1     A. So what I'm referring to -- and I'd have to
2 double-check, go back and just make sure I'm reading
3 this. I have it in front of me. I'm referring to the
4 stability model on Page 340. I'm sorry. On
5 specifically Section 8.3.6.3. That's what -- that's
6 the one that I am referring to.
7     Q. But the paragraph starting 254 and continuing
8 through 256 -- if we look at Page 337, Paragraph 255.
9     A. Yes.
10     Q. Are you with me?
11     A. Paragraph 255.
12     Q. Yep.
13     A. Yes.
14     Q. You state, "Mr. Bennett's memos evidence
15 Merck's continued inability to ensure the mumps
16 component of MMR II would meet the not less than 4.3
17 log 10 TCID 50 dose expiry specification"?
18     A. Right.
19     Q. And so in this case, you believe
20 Mr. Bennett -- or Dr. Bennett's model was correctly
21 done; right?
22     A. I'll let Dr. Stark testify on the loss rate
23 and whether that original -- there's several different
24 numbers here because the loss rate that was
25 represented by Merck in Section 8.3.6.3 at 2 to 8

Page 253

1 degrees was .54338 over 24 months. So we would have
2 to look specifically and see which of these models
3 you're talking about and which ones match up. But
4 clearly, you know, the original model that's
5 represented in the RHA shows that it doesn't match.
6 Stark comes and says -- doesn't -- it doesn't meet
7 4.3. Sorry.
8     Q. And if you'd turn to Page 196, Paragraph 199.
9     A. Page 196. Yeah.
10     Q. Paragraph 199.
11     A. Yes. 199.
12     Q. You refer to a memo from Dr. Bennett dated
13 February 27, '01 --
14     A. Right.
15     Q. -- in which he outlines a stability model
16 where the end expiratory would be 4.0?
17     A. Right.
18     Q. And you're not critical of that stability
19 model; right, Dr. Kessler?
20     A. I didn't have Dr. Stark run that stability
21 model. I'd have to ask him whether he has. But
22 clearly, if he's getting that as part of his stability
23 models and Merck's getting that, that's clearly out
24 of -- again, you withdrew the question, but Merck has
25 a responsibility to assure that it's GMP, not just

64 (Pages 250 - 253)

Appx1547

Page 254

1 that your specs are there, but to have assurances that
2 your manufacturing processes assure GMP. So it
3 obviously has to be within your stability models.
4         So, again, the stability models can be what
5 they are. You got to be within them. But you can't
6 jury rig a stability model, which is obviously what
7 was done in the modified because you don't rely on
8 30 months if it's 24 months.
9    Q. But, Dr. Kessler, just to be clear, you're
10 not critical of the stability model that Dr. Bennett
11 did in February of 2001 that predicted that the
12 product would be below 4.1 at 24 months; right?
13   A. I have no data on that to see that that data
14 was incorrectly done. I have data on the stability
15 model as in what's in the modified stability
16 calculations, that that was incorrect. I don't have
17 any reasons -- data to believe that the prior models
18 were incorrect.
19   Q. So just to be clear, did you ask Dr. Stark to
20 analyze the 2001 or 2004 stability models by
21 Dr. Bennett?
22   A. No, I don't believe I asked him to do that.
23 I asked him to run these data.
24   Q. So just to be clear, Dr. Kessler, you are not
25 critical of the two models that Dr. Bennett did in

Page 255

1 which product was predicted to fall below 4.1 at
2 expiry, but you are critical of the model that
3 Dr. Bennett did in which product was not predicted to
4 fall below 4.1 at expiry; is that correct?
5    A. No.
6    Q. Where am I incorrect there?
7    A. You're incorrect because the same data was
8 rerun, as I understand it. The data was rerun and
9 resubmitted when FDA questioned the 4. -- why Merck
10 was saying the minimum expiratory was 4.1. And I'm
11 critical of the fact when I know that the data is in
12 fact based on a 30-month time period. So I have that
13 specific evidence to rely on. So I'm critical of when
14 I have the evidence.
15        If you're aware of other evidence that I
16 missed of misstatements or miscalculations, I'm happy
17 to consider it.
18   Q. Well, did you ask Dr. Stark for those
19 analyses, Dr. Kessler, of the 2001 and 2004 stability
20 models?
21   A. I told you what I asked Dr. Stark for. I
22 asked him to run this because it's striking how
23 there's a modification of -- I think it gets
24 substituted.
25   Q. But you did not -- just to be clear, you did

Page 256

1 not ask him to do an analysis of Dr. Bennett's 2001 or
2 2004 stability models; correct?
3    MS. SCANLAN: Objection. Asked and answered
4 multiple times at this point.
5    THE WITNESS: I've not done that. I'm happy
6 to do that if you'd like, Counselor.
7 BY MS. HARDWAY:
8    Q. Why is it, Dr. Kessler, that you didn't ask
9 him to do an analyses of the 2001 or 2004 stability
10 models?
11   A. Because he did do the stability model that
12 was -- certainly looked, based on the spreadsheet,
13 that looked suspicious. The number jumps out. If you
14 look at the spreadsheet that -- it's part of the
15 stability model that when you have the slope and you
16 look at the number and you just do some basic
17 calculations, I mean that jumps out as being
18 incorrect.
19        So I -- in over 30 months. I'm sure if there
20 are questions that you have that there's other
21 misstatements in here, I'd be happy to look at that
22 further if you're suggesting that these other models
23 are incorrect.
24   Q. Are you assuming that the data to support the
25 models that Dr. Bennett did in 2001 and 2004 are

Page 257

1 correct?
2    MS. SCANLAN: Objection. Can you restate
3 that question?
4 BY MS. HARDWAY:
5    Q. Are you assuming, Dr. Kessler, that the data
6 to support the models that Dr. Bennett did in 2001 and
7 in 2004 was correctly incorporated into the model --
8 models?
9    MS. SCANLAN: Objection.
10   THE WITNESS: I'm not making any assumptions,
11 Counsel.
12 BY MS. HARDWAY:
13   Q. So you're taking -- well, strike that.
14      What is the basis for your assumption for the
15 2001 model that that model is accurate and adequate?
16   MS. SCANLAN: Objection. Mischaracterizes
17 prior testimony.
18   THE WITNESS: So you're missing the point.
19 If you look at the BPDR regs, which require assurance
20 of good manufacturing practices, and if you're looking
21 at Kathy Carbone's instructions to the company that
22 she wants to know about any lots that are predicted,
23 and the word underlined is "predicted," the issue with
24 regard to those models are not whether in fact
25 Dr. Bennett got it right with inside the company.

65 (Pages 254 - 257)

1     The issue is if he did those models and he
2 was getting that data, that meant Merck could not
3 assure good manufacturing practices because his own
4 internal data, rightly or wrongly, raise questions.
5 And that's the issue. You couldn't assure that this
6 product met potency with those models.
7     I leave it to the statisticians to go spend
8 their time, and they can argue what the models are.
9 But the two things that should be clear is if you're
10 doing models and your statistician is saying your
11 shelf life has to be 12 or 16 months and it's being
12 said that we can't do that for marketing reasons --
13 right? -- because I mean if that's what's being said,
14 you could be assured that has major significance.
15 Just the numbers that Dr. Bennett got clearly do not
16 assure good manufacturing practices. It does not
17 guarantee those assurances. That's the key.
18 BY MS. HARDWAY:
19     Q. Dr. Kessler, my question was what is the
20 basis for your assumption that the 2001 model is
21 accurate and adequate. That was my question.
22     MS. SCANLAN: Objection. Asked and answered.
23     THE WITNESS: Yeah, give me the foundation.
24 Show me where I say it was at -- I mean that's not
25 what I said. Read 199. What I say in 199, Counselor,

1 is you're mischaracterizing that. I said, "Merck did
2 not have adequate assurances" -- right? -- "that
3 MMR II could meet the product specification." That's
4 the problem.
5     If your own internal models are predicting
6 less than 4.0, you do not have adequate assurances.
7 You know, Dr. Bennett can testify about his models and
8 Dr. Stark can talk about regressions, but what's clear
9 is that you didn't have assurances that you could meet
10 that, and that's what your internal statisticians are
11 telling you, and you're ignoring that for commercial
12 reasons.
13 BY MS. HARDWAY:
14     Q. Dr. Kessler, you cannot testify to the motive
15 or intent of a company, can you?
16     A. I can testify to the objective evidence that
17 I see. I certainly wonder why -- but the objective
18 evidence, when it states that as we read -- right? --
19 that's what I can testify, is that if Merck --
20 right? -- the fact that if we were to short-date the
21 product because 7 percent of the lots are expected to
22 be less than 7.3, the objective evidence is that this
23 would impact our ability to supply the market.
24     Q. You're just reciting from that document;
25 right, Dr. Kessler?

1     A. No. I'm telling you based on my review of
2 all these documents. I mean what I cannot fathom is
3 why Merck wasn't forthcoming and just put a true shelf
4 life on this product. And what the record shows is
5 Merck did not want to do that for competitive reasons.
6 That's what the record shows. It's in multiple
7 documents that I have read.
8     Q. Dr. Kessler, you cannot testify as to what
9 any one person within Merck thought or felt; right?
10     A. I will not testify with regard to subjective
11 evidence, but I certainly am prepared to testify that
12 it makes no -- that it makes no sense of why this
13 product was not appropriately dated and why Merck
14 insisted on having this at 24 months, and Merck stated
15 reasons and let the evidence speak for itself, and it
16 can. That was for competitive reasons. There's no
17 explanation for that.
18     They didn't want to let someone else into
19 this field. That's the problem.
20     Q. Dr. Kessler, I haven't asked you a question.
21     A. I understand, but the problem is you didn't
22 want to let anyone else into this field. You stood in
23 the way -- right? -- for competitive reasons, and you
24 set back the field 20 years.
25     Q. Is that an opinion that you're adding to your

1 report, Dr. Kessler, that last statement?
2     MS. SCANLAN: Objection. It's not in
3 addition to his report.
4 BY MS. HARDWAY:
5     Q. I didn't see that statement in his report.
6     MS. SCANLAN: The purpose of the deposition
7 is to flush out what his opinions are, and you asked
8 him a question and he's --
9     MS. HARDWAY: I actually didn't ask him a
10 question. He just started continuing --
11     MS. SCANLAN: He didn't --
12     MS. HARDWAY: Yes, he was. He paused, and
13 then he continued, and it was completely unresponsive
14 to my question.
15     Q. Dr. Kessler, do you intend to add an opinion
16 to all of the ones listed in your report that Merck
17 stood in the way for competitive reasons and set back
18 the field 20 years?
19     A. That is my -- that's my answer to your
20 question about -- to your prior questions and the line
21 of questioning you asked me. So that statement
22 stands.
23     Q. Dr. Kessler, my question was you cannot
24 testify as to what any one person within Merck thought
25 or felt; right?

Page 262

1    A. And I'm telling you what Merck did here --
2  right? -- was to monop- -- to use non-IP patent,
3  non-intellectual property barriers to impede
4  competition. That's what Merck did here. I'm not
5  telling you what the company felt or an individual
6  felt. But I'm telling you what the evidence shows
7  that the company did.
8    Q. If the FDA wanted product manufactured at any
9  point dated differently, they could have insisted upon
10  that with Merck; correct?
11    MS. SCANLAN: Objection.
12    THE WITNESS: It raises a complex -- after
13  the product was on the market? Probably not. You
14  own -- I believe you copyright the label. As my
15  friend Sandy Quig has often said, the manufacturer
16  owns the label. It can negotiate with you. Prior --
17  post 2007 -- I'd want to go back and read 5050. Once
18  a product is on the market, the rules change. FDA did
19  not have, certainly up to 2007, the ability to change
20  a label on its own, and I have to read those sections.
21  BY MS. HARDWAY:
22    Q. At any point for product that was not yet on
23  the market, the FDA could have insisted on a different
24  dating period; correct?
25    A. No. FDA could have not approved the product,

Page 263

1  but FDA is in a negotiation on the label.
2    Q. The expiration period, you're saying, is
3  solely a labeling issue? Is that your testimony?
4    MS. SCANLAN: Objection. Mischaracterizes
5  the prior testimony.
6    THE WITNESS: I'm not sure I understand your
7  question.
8  BY MS. HARDWAY:
9    Q. So it's your testimony that at no point prior
10  to 2007 the FDA could have insisted on a shorter
11  dating period for MMR?
12    A. So what I'm saying is that FDA gets to
13  approve a product or not approve a product at the
14  point that an application is submitted. FDA has the
15  ability to go seize a product or enjoin a company from
16  selling that product. Once a product -- if it's
17  adulterated. But FDA doesn't get the ability to come
18  in and change the label. It would be a negotiation
19  with the company.
20    Q. And it can't insist on changes to the
21  manufacturing specifications?
22    MS. SCANLAN: Objection.
23    THE WITNESS: The FDA is not going to --
24  again, FDA can approve a product, not approve a
25  product, take enforcement action. Those are all

Page 264

1  negotiations. FDA would not do that, can't order a
2  manufacturing change. It could take enforcement
3  action and approve a product. I don't think any
4  authority in the Act allows -- gives the commissioner
5  the ability to order a company to manufacture a
6  product a certain way.
7    It could not approve the product. It can try
8  to seize the product if it's adulterated, but the FDA
9  doesn't have specific authority I believe, to change
10  the manufacturing specs.
11    (Pause in proceedings.)
12  BY MS. HARDWAY:
13    Q. Dr. Kessler, on Page 519 of your report,
14  Paragraph 419.
15    A. 519. Yes, ma'am.
16    Q. You state that --
17    A. I'm sorry. Paragraph --
18    Q. 419. You state that "With regard to FDA
19  requirements, a vaccine is adulterated if a
20  manufacturer does not have procedures that are
21  designed to assure that the product has the identity,
22  strength, purity, or potency it purports or represents
23  to have." And then you go on to state that "Merck did
24  not have adequate procedures to assure that MMR II
25  vaccine had not less than 4.3 log 10 TCID 50 per dose

Page 265

1  through end expiratory."
2    Which procedures are you referring to that
3  Merck lacked?
4    A. Well, it's the procedures to assure that you
5  met 4.3.
6    Q. Right. I'm asking which specific procedures
7  are you referring to that Merck lacked?
8    A. The procedures -- I mean if you take -- just
9  take the one January 21, 2002 E-mail at the current
10  release spec. Approximately 7 percent of the lots are
11  expected to be below 4.3. So that obviously means you
12  didn't have the procedures in place to assure that it
13  would meet 4.3.
14    Q. I'm asking -- I realize -- I'm asking for a
15  list of procedures that you're saying Merck lacked.
16  Which procedures are you referring to?
17    A. The procedures to produce a vaccine that met
18  4.3. Whatever you needed to do to assure 4.3. You
19  couldn't assure that 4.3. So obviously you lacked
20  those procedures.
21    Q. It's a circular answer, Dr. Kessler. I'm
22  asking for specific procedures. Which part of the --
23  which part of the procedures, which specific
24  procedures in the production of MMR II was Merck
25  lacking?

67 (Pages 262 - 265)

Page 266

1   A. The procedures to assure 4.3. Whatever was
2 necessary to get to that 4.3, whether it was the use
3 of stabilizer and other agents to assure 4.3. You did
4 not have -- the actual term, I use the term
5 "procedures." Your assurance under the Act is you
6 have to have good manufacturing practice to assure
7 that the drug or biologic meets that standard. Your
8 practice did not meet that standard.
9   Q. But you can't name a specific practice, as we
10 sit here today, as to a specific procedure that Merck
11 lacked; right?
12   A. Yes. You did not have procedures or
13 practices in place -- right? -- to assure that 4.3.
14 You didn't have adequate stabilizers or whatever that
15 was necessary. You didn't have the adequate
16 procedures in place to do that.
17   Q. But you don't know -- you can't name a
18 specific procedure that Merck lacked as we sit here
19 today; right, Dr. Kessler?
20   MS. SCANLAN: Objection. Asked and answered.
21   THE WITNESS: You didn't have appropriate
22 stabilizing. You weren't able to stabilize this
23 vaccine appropriately to assure 4.3.
24 BY MS. HARDWAY:
25   Q. With regard to product that was manufactured

Page 267

1 before the manufacturing release titers were raised in
2 1999, as we've been discussing, the FDA knew that
3 certain lots of MMR II had, in fact, fallen below 4.3
4 at 24 months; right?
5   A. You've asked me that question, Counselor.
6 It's been a long day, and it's going to get longer.
7 But, please, don't ask me -- you showed me data in
8 1998 where there was certain lots that fell below 4.3.
9 You've asked me that question. You spent hours on
10 that.
11   Q. And the FDA never found product manufactured
12 prior to the raising of the release titers, never
13 found MMR II to be adulterated; correct?
14   A. Again, Counselor --
15   MS. SCANLAN: Objection. Asked and answered.
16   THE WITNESS: I don't know if we're at seven
17 hours yet. You want more time. If you're going to
18 just ask me to repeat the exact, same questions, I'm
19 going to object, and I know counsel has to object.
20 Please don't use your time and ask me the exact, same
21 questions that you're asking. You're asking me the
22 same question repeatedly.
23 BY MS. HARDWAY:
24   Q. Dr. Kessler, the reason why you keep hearing
25 me ask a lot of the same questions is because you're

Page 268

1 not giving me answers to those questions.
2   MS. SCANLAN: Objection. He's asked and
3 answered these questions. If you want to go back to
4 the record and look at what he answered this morning,
5 you asked these same questions, and he gave you
6 answers to these this morning.
7 BY MS. HARDWAY:
8   Q. So it's the case, Dr. Kessler, that you
9 disagree with the actions of CBER and the FDA in not
10 finding MMR II to be adulterated prior to the raising
11 of the release titer; correct?
12   MS. SCANLAN: Objection. Mischaracterizes
13 prior testimony.
14   THE WITNESS: And the foundation for saying
15 that I say that is what?
16 BY MS. HARDWAY:
17   Q. I'm asking if you disagree with the FDA's
18 decision not to deem MMR II adulterated.
19   A. I mean it clearly was not in compliance.
20 Norman Baylor says it was not. I mean if you believe
21 that E-mail, Baylor was silent on noncompliance.
22   Q. You're aware that the FDA regulations require
23 vaccine manufacturers to have a stability monitoring
24 program; right?
25   A. Especially in this case when there was a

Page 269

1 commitment to have a stability model. It was made
2 repeatedly by Merck, yes.
3   Q. And Merck had a stability monitoring program;
4 correct?
5   A. And you see Kathy Carbone's E-mail. You've
6 had multiple stability monitoring programs, and as --
7 specifically Carbone says, "Given Merck's slow and
8 incomplete response to our requests and comments in
9 past, STILL" -- and that's all in caps -- "have not
10 submitted exactly what their stability program is for
11 MMR.
12   Q. Dr. Kessler, my question was and Merck had a
13 stability program; correct? "Yes" or "no"?
14   A. At what point in time?
15   Q. At any point in time during the relevant time
16 period. For the time period that your report covers.
17   MS. SCANLAN: Objection. Compound. That's
18 not capable to be answered on a "yes" or "no" basis
19 the way you've asked it.
20 BY MS. HARDWAY:
21   Q. Is there a particular period of time,
22 Dr. Kessler, where you believe Merck did not have a
23 stability monitoring program?
24   A. I think I would want to go back and reread
25 the record. I think early on that in the data that

68 (Pages 266 - 269)

Appx1551

1 you showed me when this early questions came up,
2 FDA -- I'm sorry -- Merck said -- I'd have to look at
3 the language -- said that it would put into place a
4 blank stability program. We'd have to look at the
5 documents.
6    Clearly, there was not a stability program
7 that met -- that met the kind of rigor, even in
8 Merck's eyes initially because it's making a
9 commitment to strengthen that program.
10    Q. You're aware the FDA regulations also require
11 vaccine manufacturers to maintain stability reports;
12 right?
13    A. Yes.
14    Q. Did you ask for Merck's annual stability
15 reports for all of Merck's mumps-containing vaccines?
16    A. Over the last number of days, I believe I've
17 seen some of those stability reports.
18    Q. Which stability reports have you seen,
19 Dr. Kessler?
20    A. There's a production that -- of stability
21 reports, I believe, that Merck made that I may have
22 seen in part.
23    Q. Did you -- I believe my question was did you
24 ask for all Merck's annual stability reports for all
25 of its mumps-containing vaccines? Did you ask for

1 those?
2    A. I don't believe I asked for that exactly that
3 way. I believe I may have seen on-line on a computer
4 certain of those stability reports.
5    Q. Why didn't you ask for all of the stability
6 reports?
7    MS. SCANLAN: Objection to the extent --
8    THE WITNESS: One, you have a GMP expert that
9 is going to testify, and I think after 37 million
10 pages or whatever there is on my hard drive, there's a
11 limit to what one can review, especially, as you've
12 said, within a reasonable period of time. There's
13 just there's so much one can do. I'm happy to go
14 back, and I will do that, Counselor, since you've
15 raised it. I'll look at all the stability models if
16 you want.
17 BY MS. HARDWAY:
18    Q. Well, I'm asking about the stability reports,
19 just to be clear.
20    A. I understand. I'm sorry. I misspoke.
21    Q. Wouldn't it be important to you, Dr. Kessler,
22 to see actual data of every lot of the
23 mumps-containing vaccines on stability to see if any
24 lot actually fell below 4.3 at 24 months?
25    A. So I have -- yes. I mean I think that is

1 very important, and if you can help me -- right? --
2 because I am seeking all that data, and I am trying to
3 fill all that data in on my chart and if -- you know,
4 my strong suggestion is if you see anything that you
5 can add to this chart, please let me know so I can get
6 it right. I would like to know. I am basing it on
7 the best that I can, which is Margolsky's analysis and
8 prior end expiratory and using her data, but I've
9 tried to do here the best -- again, to have the most
10 data, the most complete.
11    And if you have other data, certainly over
12 the next 45 days, that you believe this is incorrect
13 or you can add to this exactly, please let me know and
14 I will be happy to consider it because I think it's
15 absolutely relevant.
16    MS. HARDWAY: All right. We need to change
17 the tape. So let's take a break.
18    THE VIDEOGRAPHER: We're going off the
19 record. This is the end of Media Unit No. 5. The
20 time is 6:17 p.m.
21    (A recess was taken from 6:17 p.m. to
22    7:28 p.m. wherein Court Reporter Nancy Martin
23    was relieved by Court Reporter Christina
24    Hotsko for the remainder of the proceedings.)
25

1    C E R T I F I C A T E
2    VOLUME I OF II
3
4    I do hereby certify that the aforesaid testimony
5 was taken before me, pursuant to notice, at the time
6 and place indicated; that said deponent was by me duly
7 sworn to tell the truth, the whole truth, and nothing
8 but the truth; that the testimony of said deponent was
9 correctly recorded in machine shorthand by me and
10 thereafter transcribed under my supervision with
11 computer-aided transcription; that the deposition is a
12 true and correct record of the testimony given by the
13 witness; and that I am neither of counsel nor kin to
14 any party in said action, nor interested in the
15 outcome thereof.
16
17    _____
    Nancy J. Martin, RMR, CSR
18
19 Dated: September 28, 2018
20
21 (The foregoing certification of this transcript does
22 not apply to any reproduction of the same by any
23 means, unless under the direct control and/or
24 supervision of the certifying shorthand reporter.)
25

69 (Pages 270 - 273)

Appx1552

Page 274

1    INSTRUCTIONS TO WITNESS

2

3        Please read your deposition over carefully
4    and make any necessary corrections. You should state
5    the reason in the appropriate space on the errata
6    sheet for any corrections that are made.
7        After doing so, please sign the errata sheet
8    and date it.  You are signing same subject to the
9    changes you have noted on the errata sheet, which will
10   be attached to your deposition.  It is imperative that
11   you return the original errata sheet to the deposing
12   attorney within thirty (30) days of receipt of the
13   deposition transcript by you.  If you fail to do so,
14   the deposition transcript may be deemed to be accurate
15   and may be used in court.
16
17
18
19
20
21
22
23
24
25   Job No. PA2998208

Page 276

1    ACKNOWLEDGMENT OF DEPONENT

2

3        I, DAVID KESSLER, M.D., do hereby certify
4    that I have read the foregoing pages, _____ to
5    _____, and that the same is a correct transcription
6    of the answers given by me to the questions therein
7    propounded, except for the corrections or changes in
8    form or substance, if any, noted in the attached
9    Errata Sheet.
10
11   _____
12   DATE            SIGNATURE
13
14
15
16   Subscribed and sworn to before me this _____ day
17   of _____, 20___.
18
19
20   My commission expires: _____.
21
22   _____
23   Notary Public
24
25   Job No. PA2998208

Page 275

1        - - - - - - - -
2        E R R A T A
3        - - - - - - - -
4    PAGE   LINE     CHANGE
5    ____   ____   _____
6    ____   ____   _____
7    ____   ____   _____
8    ____   ____   _____
9    ____   ____   _____
10   ____   ____   _____
11   ____   ____   _____
12   ____   ____   _____
13   ____   ____   _____
14   ____   ____   _____
15   ____   ____   _____
16   ____   ____   _____
17   ____   ____   _____
18   ____   ____   _____
19   ____   ____   _____
20   ____   ____   _____
21   ____   ____   _____
22   ____   ____   _____
23   ____   ____   _____
24   ____   ____   _____
25   Job No. PA2998208

70 (Pages 274 - 276)

Appx1553

Page 277

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
    - - - - - - - - - - - - - - x
 3  UNITED STATES OF            :
    AMERICA, ex rel.,           :
 4  STEPHEN A. KRAHLING and     :
    JOAN A. WLOCHOWSKI,         :  Civil Action No.
 5                              :  10-4374 (CDJ)
         Plaintiffs,            :
 6                              :  Volume II of II
       v.                       :  7:28 p.m. - 11:33 p.m.
 7                              :
    MERCK & CO., INC.,          :
 8                              :
         Defendants.           :
 9  - - - - - - - - - - - - - - x
    IN RE: MERCK MUMPS          :  Master File No.
10  VACCINE ANTITRUST           :  12-03555 (CDJ)
    LITIGATION                  :
11                              :
    THIS DOCUMENT RELATES       :  Friday, September 28, 2018
12  TO:  ALL ACTIONS.           :  Washington, D.C.
    - - - - - - - - - - - - - - x
13
    Volume II of the Videotaped Deposition of:
14
                    DAVID KESSLER, M.D.,
15
    called for oral examination by counsel for the
16
    Defendants, pursuant to notice, at the law offices of
17
    Venable, LLP, 600 Massachusetts Avenue, Northwest,
18
    Washington, D.C. 20001, before Christina S. Hotsko,
19
    RPR, CRR, of Veritext Legal Solutions, a Notary
20
    Public in and for the District of Columbia, beginning
21
    at 7:28 p.m., when were present on behalf of the
22
    respective parties:
23
                   VERITEXT LEGAL SOLUTIONS
24                    MID-ATLANTIC REGION
               1801 Market Street - Suite 1800
25                 Philadelphia, PA  19103
```

Appx1554

Page 278

1   A P P E A R A N C E S
2  On behalf of Relators:
     KATHLEEN R  SCANLAN, ESQUIRE
3   SARAH E  WYSOCKI, ESQUIRE
     Keller Grover, LLP
4   1965 Market Street
     San Francisco, California 94103
5   (415) 543-1305
     kscanlan@kellergrover com
6
     GORDON SCHNELL
7   Constantine Cannon, LLP
     335 Madison Avenue, Ninth Floor
8   New York, New York 10017
     (212) 350-2700
9   gschnell@constantinecannon com
10
   On behalf of Private Plaintiffs:
11  KELLIE LERNER, ESQUIRE
     Robins Kaplan, LLP
12  399 Park Avenue, Suite 3600
     New York, New York 10022
13  (212) 980-7400
     klerner@robinskaplan com
14
15 On behalf of Merck Defendant:
16  KATHLEEN S  HARDWAY, ESQUIRE
     MICHAELA F  ROBERTS, ESQUIRE
     JAMAR S  MANCANO, ESQUIRE
17  Venable, LLP
     750 East Pratt Street, Suite 900
18  Baltimore, Maryland 21202
     (410) 528-2842
19  kshardway@venable com
20  LISA C  DYKSTRA, ESQUIRE
     Morgan Lewis & Bockius, LLP
21  1701 Market Street
     Philadelphia, Pennsylvania 19103-2921
22  (215) 963-5699
     lisa dykstra@morganlewis com
23
24 Also Present:
     Gene Aronov, Video Technician
25

Page 280

1 KESSLER DEPOSITION EXHIBITS: *        PAGE
2  Exhibit 40  Submission - Response to FDA    337
     Request for Information
3    15 Nov 2006
     MRK-KRA00000393 - 0409
4
   Exhibit 41  Letter - 18 May 2007           338
5    MRK-KRA00000385 - 0386
6  Exhibit 42  Internal Meeting Minutes       346
     8 May 2007
7    Relator_00005304 - 5305
8  Exhibit 43  21 CFR Part 314                347
9  Exhibit 44  CBER Clinical Review of ProQuad  363
     Licensure Study
10
   Exhibit 45  Merck Submission to CBER       367
11   1 Aug 2002
     MRK- KRA00624279 - 4287
12
   Exhibit 46  Response to FDA Request for     373
13   Information - 10 June 2002
     MRK-KRA00761628 - 1702
14
   Exhibit 47  2015 Science Writers Symposium   382
15   "Mumps Resurgence and Our Work
     to Prevent New Epidemics"
16   18 Sept 2015
17 Exhibit 48  CBER Final Documents with      392
     Attachments
18   MRK-KRA00562539 - 2687
19 Exhibit 49  CBER Request for the Status of   401
     MMR
20   GSK -MMR- 0058533 - 8534
21
22
23
24    * (Exhibits attached to transcript )
25

Page 279

C O N T E N T S

2 EXAMINATION BY:                  PAGE
3  Counsel for Defendant           281
4  Counsel for Private Plaintiffs    399
5
6
7 KESSLER DEPOSITION EXHIBITS: *       PAGE
8  Exhibit 30  Mark Stannard Deposition   282
     Transcript
9
   Exhibit 31  CBER Memo               293
10   MRK-KRA00001258 - 1261
11 Exhibit 32  Memo - 13 March 2000    305
     MRK-KRA00001262 - 1265
12
   Exhibit 33  Response to FDA Request for  311
13   Information - 30 Dec 1999
     MRK-KRA00001470 - 1644
14
   Exhibit 34  Copy of 483 with Memo    326
15   Summarizing Inspection
     MRK-KRA00052249 - 2253
16
   Exhibit 35  Executive Summary - 10 Aug 2001  327
17   MRK- KRA00000557 - 0560
18 Exhibit 36  Response to 483          329
     MRK-KRA00000481 - 0539
19
   Exhibit 37  Memo - 14 Sept 2001      332
20   MRK- KRA00063885 - 3888
21 Exhibit 38  Supplemental Biologics License  334
     Application
22   MRK-KRA00000032 - 0139
23 Exhibit 39  Letter - 13 Apr 2005     337
     MRK-KRA00000315 - 0360
24
25

Page 281

1       P R O C E E D I N G S
2       VIDEO TECHNICIAN:  We are back on the
3  record.  This is the beginning of Media Unit 6.
4  The time is 7:28 p m.
5  BY MS. HARDWAY:
6       Q.  Dr. Kessler, with regard to product
7  that's -- that was manufactured after the
8  manufacturing and release titers were raised in
9  1999, what is the basis of your opinion that
10 product manufactured after the release titers
11 were raised was adulterated?
12      A.  That a company could not assure that
13 the -- that that practice would meet the
14 specifications so there was not assurances that
15 it would be within the 4.3 based on Merck's
16 internal representations.
17      Q.  There's no actual stability data of
18 product manufactured after '99 that fell below
19 4.3 at 24 months, is there?
20      A.  That fell below 4 point --
21      Q.  3 at 24 months.
22      A.  Beyond what date?
23      Q.  There is no actual stability data of
24 product manufactured after the manufacturing and
25 release titers were raised in 1999 that fell --

2 (Pages 278 - 281)

Page 282

1 that product fell below 4.3 at 24 months, is
2 there?
3      MS. SCANLAN: Objection.
4      THE WITNESS: So you have to give me all
5 that data in order -- you have to give me LIMS
6 data in order to answer that or give me your
7 full data set in order to answer that.
8      (Kessler Deposition Exhibit 30 marked
9      for identification and attached to the
10     transcript.)
11 BY MS. HARDWAY:
12   Q. I'm going to show you what we've marked
13 as Exhibit 30.
14   A. And, moreover, adulteration requires
15 assurance of good manufacturing practices, and
16 you didn't have that because, as your company
17 said, and I quote, It's only a matter of time
18 before we can statistically predict that a
19 certain number of lots will fail on stability.
20 And if we increase the number of annual lots
21 that we test like we committed to do, then the
22 probability increases.
23      Your internal company's projected
24 7 percent would be out of compliance. And
25 that -- therefore, you lacked assurances.

Page 283

1 BY MS. HARDWAY:
2   Q. I just note for the record, Dr. Kessler,
3 that I simply marked Exhibit 30. I didn't
4 actually ask you question.
5   A. I was completing the answer to my prior
6 question.
7   Q. What I've handed as Exhibit 30 is a
8 deposition transcript for Mark Stannard from
9 Merck.
10   A. Right.
11   Q. And I'd refer you, Dr. Kessler, to
12 page 308 of this transcript.
13   A. Page 308, yes.
14   Q. Are you there?
15   A. I am.
16   Q. And on line 4 of page 308, the question
17 is put to him: In preparation for today, have
18 you reviewed the annual stability reports?
19      Answer: I have. I have reviewed them
20 all for the products that we are discussing.
21      And since Merck raised its minimum
22 release potency to 5.0, has there ever been an
23 out-of-spec stability finding?
24      There has not been.
25      Product on the market, I should say.

Page 284

1      Product on the market, there has not
2 been. Within that expiry of 24 months, there
3 has not been.
4      Did you consider this testimony in
5 forming your opinion, Dr. Kessler, that product
6 manufactured after the manufacturing and release
7 titers were raised was adulterated?
8   A. Yes. Well, I can -- I considered -- I
9 have to go back and see whether I considered
10 specifically this -- this testimony.
11      I am -- I am -- I do not have, nor do I
12 think Merck provided a data set for all lots. I
13 assume you have that. I assume that's the LIMS
14 database. I assume that is available.
15      What is referenced here are the annual
16 stability reports, right, which are a select
17 number of -- a select number of samples.
18      As you see, what I previously just read,
19 Merck was certainly aware that it was only a
20 matter of time, right, that lots would fall out
21 because its model projected 7 percent.
22      I have -- again, I don't have a full
23 data set. If you want to provide me with that,
24 we can -- we can test this. But, again, Merck
25 is saying that 7 percent will fall out.

Page 285

1      So this is a sample. And if you take
2 this at face value, those things would be
3 inconsistent. The thing that's not inconsist --
4 the thing that matches this is Merck's
5 obviously -- in 2002 is concerned about
6 increasing the number of lots that it samples.
7      So you have to give me -- and I look
8 forward to it if you have it, or please correct
9 my sheet. I can only tell you that after the
10 overfill, Merck projected 7 percent would fall
11 below. If your sampling didn't pick it up, then
12 your sampling may not have been accurate.
13      But at the very least, if your modelling
14 is predicting and you're projecting 7 percent,
15 you can't assure compliance so you're out of
16 assurance.
17   Q. Your opinion that product manufactured
18 after the manufacturing and release titers were
19 raised in 1999 is adulterated is based solely on
20 a stability model, is that correct, Dr. Kessler?
21      MS. SCANLAN: Objection.
22      THE WITNESS: No. No, I'm -- no.
23 Again, you're missing -- missing the point of
24 adulteration. Adulteration isn't that you are,
25 in fact, below 4.3. Adulteration means that you

3 (Pages 282 - 285)

Appx1556

1    are -- you can't assure that.
2        If your stability model and your
3    internal discussions are that it's only a matter
4    of time and that you have 7 percent that will
5    fall below, then you can't assure it. So it's
6    basically you don't have the assurances that you
7    can do that.
8    BY MS. HARDWAY:
9    Q.  Right. And that's -- that opinion of
10   yours, Dr. Kessler, is based on Dr. Bennett's
11   February 2001 stability model; is that right?
12   A.  That is based on Merck's own analysis
13   that says we've been lucky -- among other
14   things, we've been lucky so far, but it's only a
15   matter of time, since we can statistically
16   predict that a certain number of lots will fail
17   on stability.
18       So they know that. So that, by
19   definition, that statement means you don't have
20   assurances in place.
21       You know, again, give me all your --
22   give me the data so -- not just a few lots
23   that's part of your stability program. Right?
24       I mean, I did -- I went back and
25   checked, because I did look at certain

1    stability -- I guess they're called biological
2    stability programs.
3        Give me your data. I mean, put that
4    data on the table. If it's not 7 percent,
5    right, let's know what it is. But Merck's
6    certainly saying it's going -- it's a matter of
7    time before we're out of -- before our sampling
8    picks it up.
9        So -- and obviously -- and if we
10   increase the number of annual lots that we test,
11   like we committed to do, then the probability
12   increases so it's -- again, you can't assure
13   that these lots are in -- are in compliance.
14   Q.  And that's based on Dr. Bennett's
15   February 2001 stability model, is that right,
16   Dr. Kessler?
17   A.  It's based on what Merck's analysis is
18   of its data and what went into its calculation
19   of that 7 percent and the related e-mails that
20   are cited in my report.
21   Q.  If the FDA determined that a product is
22   adulterated, you'd expect that that
23   determination would be explicitly communicated
24   to the manufacturer of that product, correct?
25       MS. SCANLAN: Objection.

1        THE WITNESS: Not if FDA is silent on
2    non-compliance. So that quote, again, that we
3    talked about earlier today, if FD -- why would
4    FDA say it wants to be silent on non-compliance?
5    Right?
6        So if FDA believed there was
7    non-compliance and it was adulterated, right,
8    the FDA can't -- doesn't want to be silent on
9    non-compliance. Obviously, they -- obviously,
10   Dr. Baylor didn't want to convey that if that,
11   in fact, is what is stated in that e-mail is
12   true, and I can only rely on the evidence I have
13   in front of me, you have to ask Dr. Baylor
14   whether he -- those words are, in fact, what he
15   represented to Merck.
16       Because you don't say send me the data,
17   and I'm going to go silent about adulteration.
18   BY MS. HARDWAY:
19   Q.  Dr. Kessler, just to be clear, because
20   you indicated in your last answer that a finding
21   of adulteration was made, and I believe we've
22   established today that the finding -- a finding
23   of adulteration was not made.
24   A.  Dr. Baylor says -- Dr. Baylor is
25   represented as saying by Merck that he wants to

1    be silent on non-compliance.
2        Compliance under the Act, as you know,
3    it all comes down to either something out of
4    compliance results in either misbranding or in
5    adulteration. When you're talking about
6    potency, it's adulteration.
7        So for some reason beyond me, right,
8    Dr. Baylor decides to be -- I mean, if that is
9    correct or if your company is representing
10   Dr. Baylor is correct internally, you are silent
11   about -- FDA is being silent about
12   non-compliance.
13       He's running a little nervous, he says,
14   about the compliance shop, and he has to do some
15   work internally. But obviously, for whatever
16   reason -- again, you're going to have to inquire
17   among others, I mean, what that means.
18       But I would not assume that if -- that
19   FDA, if it were going to see an adulterated
20   product, it was -- he would have communicated
21   that. Because apparently he didn't, so got to
22   ask others.
23   Q.  Does FDA have discretion in terms of
24   whether it takes certain enforcement actions?
25       MS. SCANLAN: Objection.

4 (Pages 286 - 289)

Appx1557

Page 290

1 THE WITNESS: So there -- so there is
2 enforcement discretion among compliance officers
3 that it sometimes makes, but that's usually a
4 decision
5 that -- sorry.
6 It's usually a decision that's not one
7 that's, quote, saying to the company I want to
8 be silent on and I'm nervous about talking to
9 the compliance folks.
10 So something doesn't add up. I mean, if
11 FDA decides that a company is, in good faith,
12 trying to fix a problem, it may give it, give
13 the company a chance. And I think that we can
14 see that at certain points.
15 This was not -- you know, one doesn't
16 say I'm nervous about talking to the compliance
17 folks if one wants to take enforcement
18 discretion, because that's usually a discussion
19 that the enforcement folks make.
20 Q. What is a plaque reduction
21 neutralization assay?
22 A. Oh, you asked what a test of
23 immunogenicity was earlier on in the day. So
24 it's one of the surrogates for -- that are used
25 for immunogenicity.

Page 291

1 So you take certain indicator --
2 indicator viruses, you take antibody, you look
3 at basically the reduction, whether that
4 antibody -- the virus in cells and antibody, you
5 put them together in cell plates, you follow
6 certain protocols, and you try to look at the --
7 it's actually the effect of that antibody on the
8 virus's ability to create plaques in those cell
9 plates.
10 Q. And what is an ELISA?
11 A. So an ELISA -- so a PRN is a functional
12 test where you're looking at kill rate and
13 neutralizing antibodies, and that's one of
14 the -- one of the problems here. PRN, while
15 it's harder to carry out, actually has a
16 clinical -- has a neutralization effect so it's
17 a functional assay.
18 An ELISA just measures -- in this case,
19 it was just antibodies to the mumps virus. And
20 in this case, it was IgG. As the Latner article
21 says, I think the CDC said specifically -- and
22 let me quote, just so we can have it on the
23 record -- if neutralizing antibody is important
24 for protection, it suggests that previous
25 estimates for immunity based on whole virus

Page 292

1 ELISAs may be overstated.
2 So that's the Centers For Disease
3 Control. So one is functional, one measures
4 antibodies. The ELISA does not measure
5 neutralizing antibodies.
6 Q. The FDA was involved in designing and
7 monitoring protocol 007, correct?
8 MS. SCANLAN: Objection.
9 THE WITNESS: Yeah, I wouldn't
10 characterize it that way, Counsel.
11 BY MS. HARDWAY:
12 Q. Was the FDA involved with Merck in
13 designing protocol 007?
14 A. FDA responded to questions by Merck
15 about 007 I think would be a fair way to say it.
16 Q. Did the FDA dictate certain elements of
17 007?
18 MS. SCANLAN: Objection.
19 THE WITNESS: I wouldn't phrase it that
20 way, Counsel.
21 BY MS. HARDWAY:
22 Q. Did the FDA require that certain -- that
23 007 be conducted or certain elements of -- let
24 me strike that.
25 Did the FDA insist on certain aspects of

Page 293

1 the design of 007?
2 MS. SCANLAN: Objection.
3 THE WITNESS: I wouldn't phrase it that
4 way either.
5 BY MS. HARDWAY:
6 Q. Let me show you what we're going to mark
7 as the next exhibit.
8 (Kessler Deposition Exhibit 31 marked
9 for identification and attached to the
10 transcript.)
11 BY MS. HARDWAY:
12 Q. And this is Exhibit 31, I believe, is a
13 memo from -- written by CBER regarding --
14 summarizing a meeting that took place on
15 March 14th, 2000, which lists the attendees on
16 page 1 and discussion points.
17 Do you see that?
18 A. So I don't believe, if I'm correct --
19 hold on a second. Yeah, okay. I see this. I
20 know this document well.
21 Q. If you turn with me to page 2 of the
22 document, which is Bates ending 1238 --
23 A. Uh-huh.
24 MS. SCANLAN: And just for the record,
25 the 1238 that you're referencing is the Merck

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1 EDPA number. If we want to be consistent about
2 using the KRA numbers --
3      MS. HARDWAY: Right. So KRA, it's page
4 ending in 1259, page 2 of the document.
5 BY MS. HARDWAY:
6   Q. Are you with me?
7   A. Yes.
8   Q. And in paragraph 8 --
9   A. Yes.
10   Q. -- it begins, "As the PRN assay is an
11 immunological endpoint for protection against
12 wild-type disease, CBER stated that the virus
13 used in the assay must be wild-type (early
14 passage) virus, not attenuated virus vaccine."
15      Do you see that?
16   A. Yes.
17   Q. So the FDA in this case, isn't it,
18 Dr. Kessler, it is insisting on at least this
19 component of 007, right?
20   A. No.
21      MS. SCANLAN: Objection.
22      THE WITNESS: No, as you -- FDA says
23 this. But as you know, we talked earlier that
24 Steve Rubin said it should be true wild-type.
25 It shouldn't be low. So something, again, is

1 not quite right in this. Rubin says it was not
2 my decision. I would not have approved it.
3 This was stacking of the deck.
4      So that was Rubin. So I don't have a
5 full set of -- to fully comprehend how I put
6 Rubin's own saying, "this is stacking the deck"
7 with this being said.
8 BY MS. HARDWAY:
9   Q. But Dr. Kessler, you've been reading
10 from other Merck documents and taking them at
11 face value and using them to support your
12 opinions. This is a document that was
13 written --
14   A. Counselor --
15   Q. -- by someone at CBER -- Dr. Kessler,
16 I'm still asking my question.
17      This document was written by someone at
18 CBER, and you're telling me you are not going to
19 take at face value and as true the statement
20 that I just read from paragraph 8.
21      MS. SCANLAN: Objection. Argumentative.
22      THE WITNESS: So show me -- show me who
23 wrote this document.
24 BY MS. HARDWAY:
25   Q. Is it -- is it your testimony,

1 Dr. Kessler, that CBER did not write this
2 document?
3   A. That's not my question. My question is
4 just lay the foundation for this document on
5 who -- you're going to show me a document, okay?
6 I'm familiar with this document, okay? But I
7 don't see who authored this document, one.
8      Two, I see -- I see this document. I'm
9 even willing to go along with what you said.
10 I'm just saying I -- except for your slightly
11 pejorative way you've asked the question, what I
12 see -- I see Rubin, who's at this meeting,
13 saying I would never have used a low passage
14 strength.
15      So this is just an inconsistency
16 between, if this is an FDA document, this and
17 Rubin's e-mail. Said I would never have done
18 it, and he's the mumps expert.
19      So the question is, who's doing that,
20 and I can't -- I don't understand exactly what's
21 transpiring other than, you know, Merck
22 presented a review of current data in relation
23 to historical and presented the wild-types and
24 said they were -- the isolate failed to perform,
25 and they were getting poor results.

1      So again, it was based on the
2 representation. So you got to -- I mean, others
3 can testify exactly how you -- this statement
4 about using low passage with Rubin's statement
5 that you would never use low passage because
6 that's stacking the deck. So I can't make sense
7 of it.
8   Q. Dr. Kessler, if we look further in
9 paragraph 8, it says, "CBER agrees that PRN
10 assays using JL passage 7 to 12 would be
11 acceptable for PRN assay for immunogenicity
12 data. In addition, if Merck can develop an
13 ELISA assay using these low passage JL strains
14 that can be validated against the PRN assay to
15 CBER's satisfaction, the ELISA method would also
16 be acceptable."
17      Do you see that?
18   A. Yes. I mean, I've read this document
19 multiple times, counselor. And again, you're
20 failing to recognize that, as I've said, with
21 Rubin there, Rubin considers using that stacking
22 the deck. So something's amiss.
23      Now, what is -- what I would agree is
24 that CBER did say, because you see it
25 consistently, that as long as the data were

Page 298

1  validated, if you could -- if you could validate
2  an ELISA, it could be validated against the PRN.
3       If you can make it -- if you can
4  correlate it, if you had -- and if, in fact, it
5  was evidence of protection, FDA said you could
6  use the ELISA. I mean, but again, it would have
7  to be validated.
8   Q. Kathy Carbone was at this meeting too,
9  right?
10  A. Yes.
11  Q. And she's also a mumps expert; is she
12 not?
13  A. She's not -- she's a different kind of
14 mumps expert. She's a clinical expert. Rubin
15 is certainly the expert on -- I think Kathy --
16 Dr. Carbone,
17 sorry -- has expertise in infectious disease.
18 Rubin has expertise in the molecular biology and
19 these assays.
20     So again, maybe Carbone overruled Rubin.
21 Maybe these minutes don't reflect what happened
22 exactly. I don't know.
23     I just see this because they're very
24 strong language from Rubin when he says that the
25 PRN done, this is stacking the deck, and you

Page 299

1  would never do that if you were interested in
2  clinical efficacy.
3      So I don't know. I can't quite make
4  sense of this, counselor.
5   Q. So do you have -- what is the -- what is
6  your basis for -- well, let me ask you this: Do
7  you have -- do you think the document from which
8  you were reading earlier with regard to
9  Dr. Rubin's comments is more believable than
10 this document that we're looking at now,
11 Exhibit 31?
12  A. I know specifically that the data from
13 Steve Rubin is an authored e-mail. We know
14 that. I have tried to seek out exactly who is
15 the author of this. I'm not sure if I saw this
16 in the FDA production. I have to go back. I
17 just don't know who wrote this. I know the
18 Rubin is authored. This is not. I know that
19 those things -- those statements are
20 inconsistent.
21  Q. And you have no reason, do you,
22 Dr. Kessler, to believe the veracity of one
23 statement over another, right?
24     MS. SCANLAN: Objection.
25     THE WITNESS: I do. I do. Because it's

Page 300

1  just common sense. You know, I mean, any -- I
2  mean, if you went out and said that I test --
3  that you tested this in a PRN with a low passage
4  Jeryl Lynn strain, I mean, and you presented
5  that to a group of scientists, no one would -- I
6  mean, everybody would say, Well, show me the
7  data against true wild-type, because that's
8  what's clinical effectiveness.
9      So what's -- what I think from the
10 beginning of this, so the vera -- this just
11 doesn't -- it doesn't make sense on why one
12 would use a PRN not against the wild-type.
13     That was what was done. Merck presented
14 that, said, Look, we can't present a Tennessee.
15 Originally, Merck scientists were having success
16 with performing the PRN with this, and it's --
17 for unclear reasons, the isolate failed to
18 perform adequately due to a loss of definition.
19     The reality is, when you look at the
20 data on certain of the other wild-types, they
21 were bringing in seroconversion rates that were
22 well below the acceptable range. They are
23 probably accurate, those seroconversion rates.
24     So why use -- I mean, as Rubin says,
25 scientifically, why would you use the wrong

Page 301

1  virus when one talked about protection, and
2  that's the problem. Please use a virus that
3  would talk about protection that's circulating.
4      As I said, please develop that virus.
5  Don't rely on a virus that is not going -- on a
6  vaccine strain that is not in a position to deal
7  with the current environment.
8  BY MS. HARDWAY:
9   Q. Dr. Kessler, the FDA approved the design
10 of protocol 7 with the use of a low passage
11 Jeryl Lynn strain; did it not?
12  A. I'm not sure I used -- FDA doesn't
13 approve. FDA responded to questions.
14  Q. The FDA understood the protocol 007
15 would involve a low passage Jeryl Lynn strain,
16 correct?
17     MS. SCANLAN: Objection.
18     THE WITNESS: So the best that we can
19 say is that Steve Rubin objected to that,
20 thought it was stacking the deck, and that
21 somebody may have overruled it. That they --
22 that, in fact, that someone overruled him. And
23 we can't quite figure out the rest of the story.
24 I can't.
25

7 (Pages 298 - 301)

Appx1560

1 BY MS. HARDWAY:
2    Q. The e-mail that you were reading from is
3 a 2011 e-mail, correct, Dr. Kessler?
4    A. Right.
5    Q. So you have no idea what Steve Rubin
6 thought or whether Steve Rubin objected to the
7 use of a low passage Jeryl Lynn strain during
8 this meeting --
9       MS. SCANLAN: Objection.
10 BY MS. HARDWAY:
11    Q. -- do you, Dr. Kessler?
12       MS. SCANLAN: Objection. Argumentative.
13       THE WITNESS: So what we do know is
14 exactly what he says. Many years ago, Merck
15 argued for the use of a low passage version.
16 Merck argued for -- again, so let's make sure
17 who's making the decision. They argued for use
18 of the low passage strain, and he considers it
19 stacking the deck.
20       That's all I know, counselor. You can
21 ask him the question. You can ask others who
22 were at that meeting. I don't understand what
23 happened here. It doesn't make sense to use
24 a -- to use a non-wild-type to get the answers.
25

1 BY MS. HARDWAY:
2    Q. All right. But you weren't at that
3 meeting, right, Dr. Kessler?
4    A. We can agree on that.
5    Q. And so you can't say, other than looking
6 at meeting minutes from the FDA which summarize
7 the meeting, you can't say what did or did not
8 happen at the meeting, other than what's in this
9 document, correct?
10    A. So normally, meeting minutes are dated,
11 and they're formal documents, and they're stated
12 as formal documents.
13       Do you have a cover sheet that says
14 these are meeting minutes?
15    Q. I do not have a cover sheet with this
16 document, Dr. Kessler.
17    A. Right. So we don't have -- normally --
18 normally, if -- the way I read meeting minutes
19 is the company prepares meeting minutes, the FDA
20 can prepare meeting minutes, and they are
21 shared, and they are accepted, and they are
22 labeled as meeting minutes.
23       These don't have quite that level of
24 identification. So characterize them the way
25 you wish, counselor. I can't, because they're

1 not the way meeting minutes would normally be
2 done, certainly, in my experience.
3    Q. Dr. Kessler, you can't speculate as to
4 what did or did not happen at this meeting on
5 March 14, 2000, correct?
6       MS. SCANLAN: Objection.
7       THE WITNESS: I'm not going to speculate
8 at all about it. I have no desire to speculate
9 on what happened at this meeting.
10 BY MS. HARDWAY:
11    Q. Merck and FDA reached an agreement on
12 the neutralization assay to be used in protocol
13 7, right?
14       MS. SCANLAN: Objection. Lacks
15 foundation.
16       THE WITNESS: You want to show me a
17 document that says that they approved it? I
18 mean, I think -- I think it would be fair to
19 say, from what I can tell is, again, Merck
20 designed it, Merck argued for certain things,
21 and FDA allowed it to -- FDA -- well, it's not a
22 choice, but maybe allowed it to go forward. But
23 either way, it's Merck's decision.
24       Do you have a -- if there's better
25 language, I'd like to see it.

1 BY MS. HARDWAY:
2    Q. In deciding to use a neutralization
3 assay, the FDA and Merck understood that there
4 is no known correlate of protection for mumps,
5 right?
6       MS. SCANLAN: Objection. Lacks
7 foundation.
8       THE WITNESS: Tell me what you mean by
9 "correlate of protection." You're using the
10 term you asked me earlier.
11       (Kessler Deposition Exhibit 32 marked
12       for identification and attached to the
13       transcript.)
14 BY MS. HARDWAY:
15    Q. I'm showing you what we'll mark as
16 Exhibit 32. Tab or, excuse me, exhibit --
17       MS. SCANLAN: Can I -- Dr. Kessler, if
18 you want to take a minute to make sure you
19 recognize the document before she asks you a
20 question, feel free.
21       THE WITNESS: Thanks.
22       Which section? Are you going to ask me
23 about the whole set of minutes, or are you just
24 going to ask me about -- well, I guess the whole
25 thing. I'm sorry.

8 (Pages 302 - 305)

Appx1561

BY MS. HARDWAY:

1 BY MS. HARDWAY:

2 Q. This Exhibit 32, Dr. Kessler, is a memo
3 dated March 13th, 2000, from Manal Morsy to
4 Dr. Ukwu summarizing a meeting between Merck and
5 CBER.

6 Do you see that?

7 A. So -- and that meeting says that this is
8 on March 13th, 2000, correct?

9 Q. Yes.

10 A. Right. And the prior says this is
11 March 14th, 2000. Yes, I see that.

12 Q. If you turn with me to page --

13 A. I haven't finished reading it, but
14 I'll -- you can jump ahead. Let's see if I can
15 do this.

16 Q. Page Bates ending in 1263, second page
17 of the document.

18 A. 1242?

19 Q. 1263 --

20 A. I'm sorry, I'm reading the wrong page.

21 Q. 1263.

22 A. Yes.

23 Q. And this was a discussion concerning
24 007, this meeting, right, Dr. Kessler?

25 A. I believe so, correct.

1 Q. And at the very bottom of --

2 A. Hold on. Yes.

3 Q. And at the very bottom of page 1263, it
4 states, "Dr. Carbone noted that we do not know
5 what level of antibody is protected --
6 protective and, therefore, the appropriate
7 definition of seroconversion or a minimum
8 acceptable post-vaccination response was
9 uncertain.

10 "However, she pointed out that CBER will
11 be engaged in a vaccine clinical trial in
12 Russia, where there is a high circulation of
13 wild-type mumps, to determine what titers
14 correlate with protection but noted that it may
15 be years before these results would be
16 available."

17 Do you see that?

18 A. Right.

19 Q. And so Dr. Carbone is indicating that
20 CBER is well aware that there is no known
21 correlate of protection or, stated another way,
22 there is no known protective level of antibody
23 for mumps, right, Dr. Kessler?

24 MS. SCANLAN: Objection. The document
25 will speak for itself.

1 THE WITNESS: Yeah. So again, the
2 reason I'm asking, you said it was a correlate
3 of protection. Again, as we talked earlier, the
4 question is when you say that, are you talking
5 about a level of protection which is a level in
6 the neutralizing tests that correlate, or are
7 you asking whether kill rate against the virus
8 in the neutralization is a surrogate
9 qualitatively for protection? And those are
10 different.

11 BY MS. HARDWAY:

12 Q. All right. Well, let's use
13 Dr. Carbone's words. She's saying, "We don't
14 know" -- she's saying --

15 MS. HARDWAY: Did someone just join us?

16 MS. DYKSTRA: Kathy, it's just me. It's
17 Lisa Dykstra.

18 MS. HARDWAY: Hi, Lisa.

19 BY MS. HARDWAY:

20 Q. Dr. Carbone is stating she does not
21 know, that CBER does not know which
22 seroconversion rate was -- is protective; which
23 actual level, which seroconversion rate is
24 protective, correct?

25 A. No, you're -- I think you're messing up

1 your term seroconversion rate. What she's
2 talking about is what level of antibody, right,
3 is tied to protection. That's different than
4 seroconversion rate. So one is talking about
5 what titers are in the neutralization test, one
6 is talking about seroconversion rates, and those
7 are different concepts.

8 Q. Well, she can't define -- it is -- CBER
9 is unable to define what the appropriate
10 definition of seroconversion is, right, for
11 mumps?

12 A. She can't define -- she doesn't know
13 what a level of antibody protection is, so what
14 the level of antibodies one needs is.

15 She certainly knows -- I mean, she's
16 talking about, and you can see five paragraphs
17 later, right, she's talking about the clinical
18 implication is -- she refuses to discuss any
19 clinical implication in the setting when asked
20 how one would use the data in
21 the (indiscernible), especially if, after the
22 assay, we were still at 78 percent
23 seroconversion.

24 Dr. Carbone knows the 78 conversion rate
25 is not an acceptable rate, but that's different

Appx1562

1 than the level at antibody protection. You're
2 just messing -- mixing those things up.
3 Q. Dr. Carbone is saying that it is
4 uncertain what the minimum acceptable
5 post-vaccination response is, correct?
6 A. She's reported that we don't know,
7 right? And, therefore, the appropriate
8 definition of seroconversion or a minimal
9 accepted post-vaccination response. Yeah, she
10 says exactly -- she's saying exactly -- I don't
11 doubt that's what Kathy said.
12 She's also a little confused because at
13 certain points, she talks about there's not a
14 problem with the agent test. Clearly, there was
15 a problem with the agent test. So again, I
16 think she's getting a little bit of her
17 immunology backwards, but that's okay.
18 The problem is that you misunderstand.
19 This document -- this is -- Merck is bringing in
20 a seroconversion rate of 78 percent, and
21 everyone's going, What's going on here with the
22 78 percent because that can't be.
23 I mean, and Merck's saying, no, no, no,
24 no. Something's wrong with that test. We'll do
25 a test, and it will be in -- and we'll get to

1 that 96 percent.
2 Q. Dr. Kessler, I did not ask you a
3 question. The question I had asked previously
4 is, Dr. Carbone is saying that it is uncertain
5 what the minimum acceptable post-vaccination
6 response is, correct?
7 A. Yeah.
8 Q. So I'd ask for you to wait for the next
9 question --
10 A. That is the post-vaccination response.
11 The post-vaccination -- she has the data. She
12 knows exactly what the post-vaccination response
13 is that they're getting so it's completely
14 relevant.
15 They're getting -- Merck's walking in
16 with a 78 percent but saying, look, something
17 was wrong with that. That's not -- our vaccine
18 is better than that, when it really is around 78
19 percent or below.
20 Q. I'm going to show you what we're going
21 to mark as the next exhibit.
22 (Kessler Deposition Exhibit 33 marked
23 for identification and attached to the
24 transcript.)
25

1 BY MS. HARDWAY:
2 Q. Dr. Kessler, the next exhibit, 33, is a
3 submission from Merck to CBER dated December 30,
4 1999. And on the very first page of the
5 submission, you can see it's a response to FDA
6 request for information.
7 Do you see that?
8 A. Yes.
9 Q. And in the very first sentence --
10 A. We're moving backwards in time.
11 Q. Very first sentence talks about
12 references made to CBER's comments and questions
13 conveyed in Dr. Karen Goldenthal's August 30,
14 1999 letter regarding protocol 007, quote, A
15 Study of M-M-R II at Mumps Expiry in Healthy
16 Children 12 to 18 Months of Age, unquote, and
17 amendments dated through June 9, 1999.
18 Do you see that?
19 A. Yes.
20 Q. It indicates that responses to each of
21 the comments and questions are provided in
22 attachment 2.
23 A. Merck's responses --
24 Q. Right.
25 A. -- to FDA's comments.

1 Q. Correct.
2 A. Yes.
3 Q. And if you go flip with me to the answer
4 to question 3, which is on Bates ending in 1497.
5 MS. SCANLAN: And just take a minute if
6 you need to familiarize yourself with this
7 beforehand. I just want to make sure you have
8 the opportunity.
9 THE WITNESS: I think we'll be here
10 through the night if I read this whole document,
11 counselor.
12 MS. SCANLAN: What page again, Kathleen?
13 MS. HARDWAY: 1497.
14 THE WITNESS: I'm sorry, I was looking
15 at the wrong -- I'm happy to -- yes, ma'am.
16 BY MS. HARDWAY:
17 Q. And you see that CBER asks a question
18 regarding the statistical justification for a
19 certain subset, for a 20 percent subset, and
20 describe -- and asks Merck to describe how it
21 plans to select this group.
22 Do you see that?
23 A. Yes.
24 Q. Okay. And in this response in
25 paragraph 2, Dr. Chirgwin states, "In contrast

10 (Pages 310 - 313)

Appx1563

Page 314

1 to measles neutralization in which a, quote,
2 seroprotective, unquote, titer has been
3 suggested in the literature as a PRN titer of
4 greater than or equal to 1 to 120" --
5    A. Exactly.
6    Q. -- "we are unaware that any such
7 seroprotective titer level exists for mumps,"
8 correct?
9    A. Exactly.
10    Q. And so --
11    A. They're talking about a titer here,
12 right? That is exactly my point.
13    Q. So you agree that it's unknown that what
14 the protective -- what a seroprotective titer
15 for mumps is, right?
16    A. If you use the term what the titer was,
17 I think that was generally the case. That was
18 generally what was -- I believe that's why
19 Merck -- that's why FDA had always said that you
20 got to correlate it with protection, because we
21 can't just rely on that titer.
22       Now, again, as you know, counselor, your
23 scientists will know that we now know, I mean,
24 that there are certain epitopes for which you
25 can predict much better. And you basically have

Page 315

1 validated today or are close to validating
2 certain of the epitopes. And that would -- I
3 think they probably would qualify as a correlate
4 of protection.
5       But again, that's for -- I mean, as you
6 design a new vaccine, that would be important
7 because you have more data today scientifically.
8    Q. If you can go to, I believe -- I'm not
9 sure. It's the binder that we marked at the
10 beginning of the day.
11    MS. WYSOCKI: Chris, it's Exhibit 4, and
12 it's a small binder at the bottom of the pile.
13    THE WITNESS: This is Dr. Rubin's --
14 BY MS. HARDWAY:
15    Q. Dr. Rubin's and Dr. Carbone's.
16    MS. WYSOCKI: That's the one. Oh, it's
17 6, I'm sorry. I gave you the wrong number, but
18 that's the right binder.
19    THE WITNESS: Yes.
20 BY MS. HARDWAY:
21    Q. And if you could turn with me,
22 Dr. Kessler, to Tab 30 in this binder.
23    A. Yeah. His article in Plotkin.
24    Q. Just go to the Tab 30, if you could.
25 And this is an excerpt from "Plotkin's

Page 316

1 Vaccines," and you're familiar with that book,
2 right?
3    A. I am.
4    Q. And if you go to page ending 663 --
5    A. Which version is this?
6    Q. This is the most recent version.
7    A. This is 2018?
8    Q. It's actually copyright 2018, but it's
9 the seventh edition.
10    A. Yeah, I think ninth.
11    Q. If you go to 663, you'll see the
12 beginning of the mumps vaccine's chapter, which
13 is authored by Dr. Rubin.
14    A. Yeah, I'm familiar with this, Counsel.
15    Q. And if you then turn with me to 674.
16    A. Yes, ma'am.
17    Q. There's a section on page 674 entitled
18 "Correlates of Protection."
19    A. Exactly.
20    Q. And the first sentence states, "The
21 presence of neutralizing antibody is linked to
22 protection; however, numerous attempts to define
23 a level of antibody that correlates with
24 protection have failed."
25       Do you see that?

Page 317

1    A. That's exactly correct. But he goes on
2 in the second paragraph, and we can talk about
3 it.
4    Q. Uh-huh.
5    A. That was exactly my point. I think
6 that's phrased correctly, as opposed to the way
7 Dr. Carbone phrased it.
8    Q. And he says that -- he references a
9 study in that same paragraph. He references a
10 study that was done -- a retrospective study
11 that was done in 2014. Comparing mumps-specific
12 IgG antibody concentrations and pre-outbreak
13 samples from cases and exposed non-cases among
14 students in two Dutch university cities,
15 pre-outbreak IgG concentrations were found to be
16 lower among cases than non-cases, P equals .005,
17 but no serological cutoff could be established.
18       Do you see that?
19    A. Yeah. Let me just get those papers
20 here, if you don't mind.
21    Q. So you've read that paper that Dr. Rubin
22 references?
23    A. I've read the Gouma papers, yes.
24 There's a series -- I have to double-check, but
25 I've read that. There's a number of Gouma

11 (Pages 314 - 317)

Appx1564

Page 318

1 papers here that I have studied.
2 Q. If you go to that second paragraph in
3 the second column on page 674 --
4 A. Just hold on a second. Hold on one
5 second. Yes.
6 Q. So if you go to the second paragraph on
7 the second column on page 674.
8 A. Yes.
9 Q. It says, "In this and other studies, no
10 association has been found between mumps
11 virus-specific IgG concentrations and protection
12 or between any of the numerous investigated cell
13 mediated immune responses and protection."
14 A. Yeah.
15 Q. Do you see that?
16 A. Yeah. That's probably not correct as of
17 today. I'll yield to him on the cell mediated
18 immune response.
19 But if you look at some of the later
20 Gouma papers I'm happy to get into, then you see
21 that if you're doing PRN against the wild-type,
22 true wild-types in the neutralization, there
23 appears to be a correlation with outbreak.
24 So again, the science -- again, if you
25 use the true wild-type, that science is allowing

Page 319

1 people -- again, certainly respect Dr. Rubin
2 immensely for his scientific knowledge, but I
3 think the more recent work in the Netherlands
4 over the last year shows, in fact, that there
5 are beginning to be correlates in protection.
6 Q. So --
7 A. If you use a true wild-type.
8 Q. And so if -- and you're saying that to
9 the extent that that scientific knowledge
10 exists, it has only existed in the last year or
11 so; is that right?
12 A. No. I think what Rubin -- you have to
13 ask what your scientists knew with Merck. I
14 don't want to represent in what Steve knew at
15 Merck.
16 I would say that you do have the ability
17 to develop a much more specific and much more
18 effective vaccine based on the science. When
19 Steve knew about it, when your scientists knew
20 about it, they can testify to that. I'm saying
21 what's in the public literature has identified
22 the newer epitopes that you can develop a
23 vaccine against.
24 Q. Well, certainly as of 2018, or whenever
25 it is that Dr. Rubin completed drafting this

Page 320

1 chapter, which was published in 2018, it was his
2 opinion that no association has been found
3 between mumps virus-specific IgG concentrations
4 and protection or between any of the numerous
5 investigated cell mediated immune responses and
6 protection?
7 A. So to be specific, I mean, with regard
8 to a specific level, I think that would be fair
9 to characterize his view.
10 If you look at his paper -- and again,
11 it's confusing to me because in 2005, Rubin
12 published his paper, a paper that says rely on
13 PRN, don't rely on ELISA. And he's emphatic in
14 that paper. And yet you see CBER and Merck
15 going ahead and relying on ELISA when the PRN
16 falls apart.
17 So again, you'd have to have -- you'd
18 have to ask Rubin what he knew and when he knew
19 it.
20 Q. But certainly as of 2018, or whenever it
21 is that Dr. Rubin drafted this chapter, it was
22 his position, as stated here, that "In this and
23 other studies, no association has been found
24 between mumps virus-specific IgG concentrations
25 and protection or between any of the numerous

Page 321

1 investigated cell mediated immune responses and
2 protection," right?
3 MS. SCANLAN: Objection; asked and
4 answered.
5 THE WITNESS: That's not exactly what he
6 says.
7 BY MS. HARDAWAY:
8 Q. Did I not quote that correctly?
9 A. You quoted that sentence correctly, but
10 you also have to realize he says that the
11 presence of neutralizing antibody is linked to
12 protection; however, it attempts to define a
13 level of antibody that correlate have failed.
14 So there is an association, right,
15 between PRN if done appropriately, as Rubin
16 says, and -- and that's linked to protection.
17 What he's saying is he doesn't have an
18 exact level in the seropositivity. Basically,
19 he says do the PRN right, and that's the test
20 you should use.
21 Q. That's not what he says here, is it,
22 Dr. Kessler?
23 A. He says, "The presence of neutron is
24 linked to protection. However, numerous
25 attempts to define a level." That's what he

12 (Pages 318 - 321)

1 says here.
2    Q. Have failed, right?
3    A. He can't define a level, that's correct.
4        But then he goes on more recently,
5 right, and then he begins to talk about the
6 Gouma paper, and he doesn't cite, again, the
7 more recent Gouma papers that have found the
8 epitopes, et cetera.
9    Q. And those papers are dated when,
10 Dr. Kessler?
11    A. The more recent ones are within the last
12 several months even.
13    Q. If you could turn with me in the same
14 binder to chapter 20.
15        MS. SCANLAN: Do you mean tab 20?
16        MS. HARDWAY: Tab 20, I'm sorry.
17        THE WITNESS: I'm sorry.
18 BY MS. HARDWAY:
19    Q. Tab 20.
20    A. In this binder? Of course.
21    Q. Are you familiar with this textbook,
22 "Harrison's Principles of Internal Medicine"?
23    A. I used it in medical school.
24    Q. And this is the 18th edition, which is
25 copyright 2012.

1        If you turn to page 1608, it's a chapter
2 on mumps that is authored by both Steve Rubin
3 and Kathy Carbone.
4        Do you see that?
5    A. I do.
6    Q. And if you go to page 1610 --
7    A. Yes.
8    Q. The last paragraph on the right-hand
9 column above "Treatment" begins "immunity" --
10    A. I'm sorry. I apologize. Immunity?
11    Q. The last -- yeah, "Immunity to mumps."
12    A. Yes. I'm exactly there.
13    Q. "Immunity to mumps is associated with
14 development of neutralizing antibody, although a
15 specific correlate of protection has not been
16 established."
17        Do you see that?
18    A. That's correct.
19    Q. And so when Dr. Carbone and Dr. Rubin
20 wrote this chapter sometime close to or in 2012,
21 it was their position that a specific correlate
22 of protection had not been established for
23 mumps, right?
24    A. A specific correlate, but as you --
25    Q. A correlate -- let me be true to their

1 words, that "As of 2012, immunity to mumps is
2 associated with the development of neutralizing
3 antibody, although a specific correlate of
4 protection has not been established."
5    A. Correct.
6    Q. That was their position as of 2012,
7 right?
8    A. Yeah. Well, his position also includes
9 recent data indicate declining seropositivity
10 rates at the time since vaccination.
11        And he's talking about antigenic
12 differences between viral isolates have been
13 detected and whether, in fact -- he uses the
14 term "immune escape" or use "vaccine escape."
15        So you basically have a vaccine that --
16 whose effectiveness is being questioned.
17    Q. The FDA -- Dr. Carbone and Rubin, who
18 work at the FDA and worked at the FDA at that
19 time, are stating they can't say what the
20 correlate of protection for mumps is, right,
21 Dr. Kessler?
22    A. They state that they can't do a specific
23 correlate of protection, they can't do a
24 specific titer of protection.
25        But they certainly stated, as you saw,

1 that Carbone was very clear that that's why she
2 wanted it. It correlated, okay, with clinical
3 effectiveness. That's -- that was Merck's job,
4 and she wanted that link to clinical
5 effectiveness.
6        They don't want to just rely on a
7 surrogate. If you're going to say that your
8 lower potency is okay, show us that this is as
9 effective, because you don't have a correlate of
10 protection.
11    Q. Sir, CBER and, specifically, Doctors
12 Rubin and Carbone do not know what the cell
13 mediated immune responses for mumps need to be
14 to confer protection, right?
15    A. We still don't. No scientist knows what
16 the cell mediated responses are. They are
17 hypothesizing that -- they are saying, well,
18 maybe it's -- why are these seroconversion rates
19 lower? But they've always said you have to
20 achieve seroconversion rates that are greater
21 than 95 percent. That's why they asked Merck to
22 do what they asked Merck to do.
23    Q. On August 6, 2001, the FDA conducted an
24 inspection of Dr. Krah's laboratory in which the
25 agent assay was being performed?

13 (Pages 322 - 325)

Page 326

1    A.  Correct.
2    Q.  And during that inspection, Dr. Carbone
3  and Debra Bennett reviewed and inspected the raw
4  data generated by the agent assay, right?
5    A.  Correct.
6    Q.  At the conclusion of that inspection,
7  they issued a 483, right?
8    A.  Correct.
9      (Kessler Deposition Exhibit 34 marked
10      for identification and attached to the
11      transcript.)
12  BY MS. HARDWAY:
13    Q.  What I've handed you, Dr. Kessler, is a
14  copy of the 483, as well as a memo summarizing
15  the inspection.
16    A.  Correct.
17    Q.  What were the issues cited by the FDA in
18  this form 483?
19    A.  There were four.
20    Q.  And what were they?
21    A.  Raw data is being changed with no
22  justification, and cites certain examples.
23      There's no procedure in place to
24  determine when a research lab is assessed to
25  assure suitability for clinical testing prior to

Page 327

1  startup, and they give certain examples.
2      Spreadsheets used to produce
3  questionable results and retesting of clinical
4  samples for IND1016 have not been validated.
5      And notebooks do not identify, and they
6  cross out and use the word "each" technician
7  performing each task.
8    Q.  And following this inspection, the FDA
9  returned two additional times to collect further
10  information, correct?
11    A.  And I know of one in my head, but it's
12  late.  I will take your representation.  I just
13  got to check the record.
14      (Kessler Deposition Exhibit 35 marked
15      for identification and attached to the
16      transcript.)
17  BY MS. HARDWAY:
18    Q.  Exhibit 35.  And this is another
19  visit -- a summary of another visit that FDA
20  made to Merck for additional information on
21  August 10, 2001.
22      Do you see that?
23    A.  Yes.
24    Q.  And underneath executive summary, it
25  states that "Investigator Debra J. Bennett

Page 328

1  returned to the site today to collect copies of
2  raw data supporting information previously filed
3  to IND1016."
4    A.  Correct.
5    Q.  And in the second paragraph, it says
6  that "The inspection was being performed at the
7  request of Dr. Kathryn Carbone for purpose of
8  obtaining copies of raw data from the notebooks
9  for the initial 600 samples of mumps
10  neutralizing data submitted to FDA."
11      Do you see that?
12    A.  Yes.
13    Q.  And she also requested -- further down,
14  "Ms. Bennett also requested a list of plates
15  that had been discarded, and that was provided
16  by Dr. Krah."
17    A.  I'm sorry.  Say that again.
18    Q.  "Ms. Bennett also requested a list of
19  plates that had been discarded, and that was
20  provided by Dr. Krah."
21    A.  I don't see that.  Just tell me what
22  paragraph that is --
23    Q.  Same paragraph we were just in, the
24  second paragraph.
25    A.  Yeah, she's just collecting information.

Page 329

1    Q.  And then under "Significant Findings,"
2  next section down, it says that "No 483
3  was issued at the conclusion of this
4  inspection."
5    A.  It was just -- it was picking up paper.
6    Q.  It was further information that was
7  provided to FDA about the study, right?
8      MS. SCANLAN:  Objection.
9      THE WITNESS:  You're -- it was that --
10  let's put it this way:  It was information that
11  FDA came in to ask for.
12  BY MS. HARDWAY:
13    Q.  And then Merck responded in writing to
14  the 483, right, Dr. Kessler?
15    A.  To this 483, yes.  To the original 483.
16    Q.  I'm going to show you what we're going
17  to mark as Exhibit 36.
18      (Kessler Deposition Exhibit 36 marked
19      for identification and attached to the
20      transcript.)
21  BY MS. HARDWAY:
22    Q.  And in this response to the 483, Merck
23  provides written answers to the observations by
24  FDA, as well as several other pieces of
25  information, right?

14 (Pages 326 - 329)

Appx1567

Page 330

1  A. That's correct.
2  Q. Including attachment 1, and this is on
3  page 0485.
4  A. Yes.
5  Q. It's the research laboratory policy on
6  writing and maintaining laboratory records?
7  A. I'm sorry. This is the attachments?
8  Q. 485.
9  A. Yeah, yes. 485?
10  Q. Yes.
11  A. Yes, yes.
12  Q. And then attachment 2, which is on
13  page 499, they provided an internal memo from
14  Jonathan Hartzel regarding the interim analysis?
15  A. What page, ma'am?
16  Q. Page 499 and 500.
17  A. I'm sorry. I'm looking at the wrong
18  Bates number, I apologize.
19  MS. SCANLAN: The center ones.
20  THE WITNESS: Yeah, I keep on looking at
21  the Merck. 499 --
22  BY MS. HARDWAY:
23  Q. To 500.
24  A. Yes.
25  Q. And that's a memo on the interim

Page 331

1  analysis, correct?
2  A. That's correct.
3  Q. And then attachment 3, which is the next
4  page from where you are, is -- Merck provided
5  the validation of the agent, the validation
6  report of the agent, correct?
7  A. I'm not sure this is the validation.
8  This is a memo. I don't believe this is the
9  full serial on this, if I'm correct, but I'd
10  have to go back and check.
11  Q. So you don't believe this is a
12  validation report?
13  MS. SCANLAN: Objection.
14  Mischaracterizes his testimony.
15  THE WITNESS: Yeah, I'd have to go back
16  and check. This is attachment 3 that says
17  internal memo. And I just have to look at the
18  full serial to know whether this was the entire
19  validation report. I just -- I just don't know,
20  sitting here today. I'd have to pull that up,
21  that document up.
22  BY MS. HARDWAY:
23  Q. And then on Bates ending in 0539, there
24  is a memo from Dr. Krah --
25  A. 05 --

Page 332

1  Q. 39.
2  A. Yeah.
3  Q. There's a memo from Dr. Krah regarding
4  procedures used in the agent?
5  A. Hold on one second.
6  Yes, I see -- I see this.
7  Do you have a question?
8  Q. No. Leading up to one. Show you what
9  we're going to mark as the next exhibit, 37.
10  (Kessler Deposition Exhibit 37 marked
11  for identification and attached to the
12  transcript.)
13  BY MS. HARDWAY:
14  Q. This is a memo by Beverly Zaber and
15  Karen McKenney dated September 14, 2001?
16  A. Right.
17  Q. And this is regarding a second visit
18  following the original inspection by
19  Ms. Bennett.
20  Do you see that?
21  A. Hold on one second. Yeah, I see
22  basically coming to collect certain information.
23  Q. So further information was provided at
24  the request of the FDA on September 14, 2001,
25  right?

Page 333

1  A. FDA came in to request information,
2  correct.
3  Q. And after the original inspection on
4  August 6th, after the visit and request for
5  further information on August 10th, after
6  Merck's written response to the 483 on
7  August 20th, and then after a final visit by FDA
8  on September 14, 2001, no warning letter was
9  issued following these -- following the
10  inspection and the follow-up communications,
11  correct?
12  A. I'm not aware of any.
13  Q. In 2004, Merck submitted a BLA -- an
14  sBLA proposing to change the release potency for
15  MMR from 20,000 TCID50 per vaccine dose to
16  12,500 per vaccine dose, right?
17  A. Correct.
18  Q. And in that submission, Merck provided
19  data from the agent assay as well as from the
20  ELISA, right?
21  A. Right. They relied on the 007 in the
22  submission to FDA.
23  Q. And following this submission, Merck and
24  FDA entered into extensive discussions that
25  transpired over a few years regarding this

15 (Pages 330 - 333)

Appx1568

Page 334

1 submission, right?
2     MS. SCANLAN: Objection. Lacks
3 foundation.
4     THE WITNESS: There were a lot of
5 complete responses that were given.
6     (Kessler Deposition Exhibit 38 marked
7     for identification and attached to the
8     transcript.)
9 BY MS. HARDWAY:
10    Q. Before we actually get to this,
11 Dr. Kessler, I wanted to tie up something that
12 we had been talking about earlier.
13    A. Sure.
14    Q. With regard to the design of 007, I had
15 asked you if Merck and FDA -- if Merck met with
16 FDA and conducted teleconferences to reach
17 agreement on the neutralization assay to be
18 used.
19    A. We discussed that.
20    MS. SCANLAN: I objected to the
21 foundation of that, and you never followed up
22 with anything.
23 BY MS. HARDWAY:
24    Q. So your report, Dr. Kessler, on page
25 36 --

Page 335

1    A. Yes, ma'am. Let me get there. Yes.
2    Q. Paragraph 77 that begins on page 36 and
3 continues on page 37.
4    A. Yes.
5    Q. The last sentence in that paragraph,
6 right before paragraph 78, you state, "As
7 described below, Merck met with FDA and
8 conducted teleconferences to reach agreement on
9 the neutralization assay to be used in protocol
10 007."
11    Do you see that?
12    A. They did conduct teleconferences, yes.
13    Q. And they reached an agreement on 007,
14 correct?
15    MS. SCANLAN: Objection.
16 Mischaracterizes what the statement says.
17    THE WITNESS: Yeah, it says that was the
18 purpose of this. As you know, there are a lot
19 of back and forths. So as I said -- I think I
20 testified Merck allowed it -- Merck. I
21 apologize.
22    FDA allowed it to go forward. But as
23 you know, there's also, there's documentations
24 saying why -- we see no need for you to use IgG
25 at certain points -- anti-IgG, sorry. We see no

Page 336

1 need for that. We don't usually do that.
2    So obviously, Merck is making certain
3 arguments. It's not getting a seroconversion
4 rate that it thinks is acceptable, and it's
5 trying to come up -- make an argument to get a
6 test that works backwards to get to that
7 seroconversion rate.
8 BY MS. HARDWAY:
9    Q. So you're saying that the FDA said that
10 they saw no need for anti-IgG?
11    A. At a certain point, there is that
12 statement at one point in time. That statement
13 is certainly met -- stated "at one point in
14 time." I'm happy to find it, and I think it's
15 in the report.
16    MS. HARDWAY: I think we're going to go
17 ahead and take a break now, Dr. Kessler.
18    THE WITNESS: My pleasure.
19    VIDEO TECHNICIAN: We're going off the
20 record. This is the end of Media Unit 6. The
21 time is 8:45 p.m.
22    (A recess was taken.)
23    VIDEO TECHNICIAN: We're back on the
24 record. This is the beginning of Media Unit 7.
25 The time is 9:06 p.m.

Page 337

1 BY MS. HARDWAY:
2    Q. I'm going to show you what we're going
3 to mark as the next two exhibits.
4    The first one is 39.
5    A. I thought we did 39.
6    MS. SCANLAN: I had 37 as the last one,
7 so what is 38?
8    MS. WYSOCKI: It is 0032.
9    MS. SCANLAN: Oh, got it. Okay, you're
10 right, Kathleen. Sorry.
11    (Kessler Deposition Exhibit 39 marked
12    for identification and attached to the
13    transcript.)
14    MS. HARDWAY: And then Exhibit 40.
15    (Kessler Deposition Exhibit 40 marked
16    for identification and attached to the
17    transcript.)
18    THE WITNESS: Thank you.
19 BY MS. HARDWAY:
20    Q. So what I've marked as Exhibits 39 and
21 40, Dr. Kessler, are responses by Merck to
22 requests that CBER made regarding the 2004 PAS.
23    And specifically, Exhibit 39 is an
24 April 13, 2005, letter from Alison Fisher to
25 Dr. Norman Baylor following up on a December 3,

16 (Pages 334 - 337)

Appx1569

1 2004 letter from CBER.
2     And then Exhibit 40 is a November 15,
3 2006, submission from Merck to Dr. Baylor in
4 response to an October 17th, 2005, request from
5 CBER, right?
6     A. Correct.
7     Q. And this is -- would you describe this
8 back and forth as fairly typical in terms of --
9 or can be fairly typical in terms of follow-up
10 to submissions, with CBER asking questions and
11 sponsors responding to those questions or
12 requests for additional information?
13     A. I think this went on -- my sense is, if
14 you ask me, this went on for a little long.
15 There were -- I forget exactly, I could look it
16 up, the number of complete responses. I'm
17 surprised at the number of complete responses,
18 which was basically denials. That's unusual.
19     Q. I'm showing you what we're going to mark
20 as Exhibit 41.
21     A. Are you asking me questions about this?
22     Q. No.
23     (Kessler Deposition Exhibit 41 marked
24        for identification and attached to the
25        transcript.)

1     THE WITNESS: Do you need me here as a
2 witness, or are you just going to enter
3 documents?
4     Why are you showing me stuff that you're
5 not asking me questions about?
6 BY MS. HARDWAY:
7     Q. Exhibit 41 is a letter from Paul
8 Richmond, who is the acting director of the
9 Division of Vaccines and Related Products
10 Applications to Alison Fisher dated May 18,
11 2007.
12     Do you see that?
13     A. Yes.
14     Q. And this, again, is concerning the
15 2004 PAS. And you see the third paragraph in
16 this letter states that "The science related to
17 immunogenicity testing of M-M-R II has
18 substantially evolved since our initial testing
19 requirements. Use of ELISA data to evaluate the
20 effective differences in product potency on
21 immunogenicity is now acceptable. The change in
22 end-expiry potency can be supported by the
23 following analyses," and then it goes on and
24 lists some requirements.
25     Do you see that?

1     A. I do.
2     Q. And so there was an evolution in
3 thinking, was there not, Dr. Kessler, on CBER's
4 behalf regarding the use of ELISA data --
5     MS. SCANLAN: Object.
6 BY MS. HARDWAY:
7     Q. -- correct?
8     MS. SCANLAN: Objection.
9 Mischaracterizes the document.
10     THE WITNESS: Just because it's late,
11 Sarah, could you -- there's a document that
12 discusses -- it's an internal FDA document with
13 Florence Houn. Can I see that, please? It uses
14 this exact expression.
15     Can I just -- could you kindly pull it?
16 I mean, I could find it, but it's getting late.
17 I believe it's in the ...
18     While she's looking for that, so there's
19 an internal document that I believe -- don't
20 hold me to it; Sarah will find it -- it's an FDA
21 FOI document that I saw.
22     And the paragraph that relates exactly
23 to this paragraph is Dr. Florence Houn suggested
24 that we state basically that the science related
25 to immunogenicity testing of M-M-R II has

1 substantially evolved.
2     Anyone have that document?
3     Or actually -- I don't think I have it.
4 Hold on a second.
5     MS. SCANLAN: I think we have it. Yes,
6 we got it.
7     THE WITNESS: Could you -- can I borrow
8 that?
9     MS. SCANLAN: Here. Let's take it out
10 of the binder.
11     THE WITNESS: So again, this document --
12 and again, this is not dated, this is not
13 signed, but it's an internal meeting. And it's
14 a relater document. But it's from the FOI -- I
15 believe it's an FOI document. And this is dated
16 May 8th, 2007. This is May 18th stamped, 2007.
17 I think that's the date.
18     And it says here, it says, "In order to
19 be able -- in order to justify now accepting
20 ELISA results," and then there's a redaction,
21 "Florence Houn suggested that we add some
22 language to the letter stating that the science
23 has changed since the initiation of this study.
24 She will send some language to me."
25     And that's the language that you

Page 342

1 basically quote, the science related to the
2 immunogenicity has substantially evolved since
3 our initial testing. And it's Dr. Houn who's
4 recommending that.
5     I called Dr. Houn. I know Dr. Houn
6 well. I didn't relate to anything about the
7 matter, but I asked her, since this was not
8 confidential, it was an FDA document, I simply
9 said, you know, do you recall back in 2007 that
10 you suggested that the ELISA results, that the
11 science has changed on ELISA since the
12 initiation of this study, initiation and there
13 was a change in ELISA.
14     And I know, yeah, Dr. Houn very well.
15 I've worked with her and appointed her in a
16 number of her jobs. Just asked that question.
17     I said, you're an expert on ELISA?
18     She said, no.
19     I said, well, you said the science has
20 changed. You're making that suggestion. Is
21 that, in fact, the case?
22     And she says, I don't -- I mean, I don't
23 want to quote her exactly, but basically she had
24 no knowledge that the science had changed.
25     I said, well, why would you say

Page 343

1 something like that?
2     She said, well, we needed a basis in
3 order to -- we said something in the past so we
4 need to say something in the future.
5     So again, it's a rationale that was used
6 but -- to justify this letter, but I certainly
7 wouldn't subscribe to your view that, in fact,
8 the science has changed, and Dr. Houn could not
9 corroborate that the science had changed, even
10 though she was the one who suggested it.
11 BY MS. HARDWAY:
12     Q. When did you place that call to
13 Dr. Houn?
14     A. Several days ago.
15     Q. Why did you -- you issued your report
16 early in 2018, correct, Dr. Kessler?
17     A. Yeah.
18     Q. Why did you wait until several days ago
19 to contact Dr. Houn?
20     A. Because I hadn't seen that document.
21     Q. And why is it -- are you relying on the
22 conversation that you had with Dr. Houn to form
23 your opinions in this case?
24     A. There's no need to. I mean, it's
25 just -- it's supportive of my opinions, but I

Page 344

1 wanted make sure I wasn't missing anything.
2     ELISA did not correlate clinically. It
3 did not have clinical relevance. It didn't
4 correlate well with PRN, certainly around the
5 cutoff. It doesn't measure specific
6 neutralization tests. Because, I mean, if it
7 did, I wanted to know about that. So I wanted
8 to make sure that I wasn't -- that my
9 understanding was right.
10     So I think it's probably best to say
11 Dr. Houn corroborated -- I mean, I didn't
12 understand -- I wanted to know whether there was
13 a basis that I was missing, and the answer is
14 no, there was no basis.
15     The ELISA test is not -- it's not that
16 the science evolved and then it could be used.
17 It needed to be correlated.
18     And as your own expert, Patriarca, says,
19 ELISA -- the justification of ELISA was that it
20 was linked to the PRN test, and the PRN test was
21 linked to clinical relevance.
22     But we know that those things are, in
23 fact -- those links were broken. But you can't
24 just -- you can't justify using the ELISA test,
25 especially against not a true wild-type, as was

Page 345

1 done here with -- in this case. The science
2 doesn't support that.
3     Q. Did you contact Dr. Rubin?
4     A. No, I did not call Dr. Rubin. He's at
5 the agency. I'd be happy to do that and talk to
6 him about this matter if you release me. But
7 Dr. Rubin's name -- well, I don't know -- I
8 don't believe I know Dr. Rubin. I know
9 Dr. Houn.
10     Q. Did you talk to Dr. Carbone?
11     A. No, I did not. You asked me before.
12 The only one I spoke to, I mean, who was at the
13 agency -- and again, not about -- I didn't
14 discuss this matter. I just said I had a
15 specific question. And it was a
16 non-confidential document that I just wanted to
17 know if she had a basis that the science had
18 evolved.
19     MS. HARDWAY: All right. We're going to
20 take a five-minute break.
21     VIDEO TECHNICIAN: We're going off the
22 record. The time is 9:18 p.m.
23     (A recess was taken.)
24     VIDEO TECHNICIAN: Back on the record.
25 The time is 9:27 p.m.

18 (Pages 342 - 345)

Page 346

1          (Kessler Deposition Exhibit 42 marked
2          for identification and attached to the
3          transcript.)
4    BY MS. HARDWAY:
5    Q.   Dr. Kessler, we marked as Exhibit 42 the
6    document that you were referring to prior to our
7    break.
8          The 2004 PAS to change the expiry claim
9    for mumps was ultimately approved by FDA,
10   correct?
11   A.   Correct.
12         MS. SCANLAN:  Objection.  Just for the
13   record it wasn't a PAS.  It was an sBLA.
14   BY MS. HARDWAY:
15   Q.   It was ultimately approved by the FDA,
16   correct?
17   A.   Correct.  Based on what Merck submitted.
18   Based on the data that Merck gave to the agency
19   and the claims made.
20   Q.   Dr. Kessler, you're familiar with 21 CFR
21   Part 314, right?
22   A.   Sure.  You want to give it to me?  If
23   you put it in front of me, it would help.
24
25

Page 347

1          (Kessler Deposition Exhibit 43 marked
2          for identification and attached to the
3          transcript.)
4    BY MS. HARDWAY:
5    Q.   I'll show you what we've marked as
6    Exhibit 43, which is Part 314, 21 CFR Part 314.
7    A.   Yes.
8    Q.   And you know, Dr. Kessler, that this
9    21 CFR Part 314 would apply to the sBLA that
10   Merck submitted in 2004, correct?
11   A.   Among other provisions.
12   Q.   And if you turn with me to 314.126.
13   A.   Yes, ma'am.  Sorry.  26, sorry.
14         MS. SCANLAN:  It's page 149.
15         THE WITNESS:  Point 26.
16   BY MS. HARDWAY:
17   Q.   314.126.
18   A.   126.  I was looking at point 26.  Yes.
19   Q.   And this is entitled "Adequate and
20   Well-Controlled Studies."
21         Do you see that?
22   A.   Yes.
23   Q.   And the characteristics of adequate and
24   well-controlled studies are described in subpart
25   B, right?

Page 348

1    A.   Yes.
2    Q.   If you read, turning to page 150 --
3    actually, I apologize.  Starting before, the
4    very, very bottom of 149, it states, "The
5    characteristics described in paragraph B of this
6    section have been developed over a period of
7    years and are recognized by the scientific
8    community as the essentials of an adequate and
9    well-controlled clinical investigation.
10         "The Food and Drug Administration
11   considers these characteristics in determining
12   whether an investigation is adequate and
13   well-controlled for purposes of Section 505 of
14   the Act."
15         And then subpart B goes on to describe
16   the characteristics of an adequate and
17   well-controlled study, correct?
18   A.   Correct.
19   Q.   And so in order to have approved the
20   2004 sBLA to change the mumps end expiry
21   potency, FDA would have had to have found that
22   protocol 007 was adequate and well-controlled,
23   correct?
24         MS. SCANLAN:  Objection.
25         THE WITNESS:  I think that more

Page 349

1    accurately what I would refer you to is your
2    expert Patriarca, page 73 of his report.
3          And he says the clinical efficacy of
4    Merck's mumps vaccine was proven by the clinical
5    efficacy field trials performed in the 1960s,
6    which in turn was linked to the original PRN
7    developed by Hillman, which in turn was linked
8    to the PRN agent assay, which was in turn linked
9    to Merck's ELISA via BBIND 1086, which in turn
10   allowed CBER OVRR to approve, in 2007, Merck's
11   BLA supplement to change the label potency of
12   the mumps component in M-M-R II from no less
13   than 20,000 to less than 12,500 -- to no less
14   than 12,500.
15         I think that was the basis.  I would
16   agree with Dr. Patriarca's assessment here, and
17   those were the representations that Merck made
18   in the WT ELISA.  It said that it was correlated
19   with the PRN and that it had a clinical
20   relevance.  And on the basis of what Merck told
21   the agency, the agency approved the application.
22         So I -- but as we know, that, as you
23   said, when he says it was in turn linked to
24   Merck's PRN assay, we know all the
25   irregularities in the PRN assay.  We know it

19 (Pages 346 - 349)

Page 350

1 wasn't -- there wasn't a wild-type.
2     We know that Merck did not know and
3 admitted that they didn't know the clinical
4 relevance of their agent PRN assay. And they
5 linked Merck's ELISA, which, again, Merck did
6 not know what a clinically protective level was,
7 and Carbone wanted the ELISA to be correlated
8 with the agent.
9     And Merck represented that it was
10 linked, and that was the basis of approval. So
11 the approval was based on what Merck represented
12 to FDA, and that was the basis of FDA's
13 approval.
14 BY MS. HARDWAY:
15     Q. So is your answer to my question no, the
16 FDA did not find protocol 7 to be adequate and
17 well-controlled?
18     A. I mean, the FDA, as I think you said
19 exactly what you -- it says in that letter that
20 is here somewhere, and let's leave that language
21 what it is. And it relied on Merck's
22 representations and the data given to it that
23 agent -- agent worked, that it was correlated
24 with that agent, that there was a correlation
25 and a cutoff that was clinically meaningful.

Page 351

1 And on the basis of those, that linkage and
2 logic, FDA approved.
3     So I agree with your expert on that.
4     Q. So the answer to my question is --
5     A. Can I see the FDA's letter?
6     Q. So are you saying, Dr. Kessler, that the
7 FDA did not find protocol 7 to be adequate and
8 well-controlled?
9     A. I'm -- I am saying that F -- exactly
10 what I'm saying, that in this sBLA, that they --
11 that their reasoning for this was based on this
12 link in -- in logic. That's the most I can
13 testify to.
14     Q. So the FDA -- is it your testimony that
15 the FDA did not have to make a finding as to
16 whether protocol 007 was adequate and
17 well-controlled?
18     A. Again, I think that it was based on
19 representations that the ELISA -- again, Merck's
20 representations that the ELISA had clinical
21 relevance, that its cutoff had clinical
22 relevance, was correlated to the agent, that the
23 agent had clinical relevance, was a meaningful
24 test, and the meaningful test in agent was
25 linked to Hillman's original.

Page 352

1     So again, I think that was the logic and
2 the basis for the approval.
3     I don't think you can separate this out
4 because that's the -- that was, in fact, the
5 representation that Merck made. And FDA, I
6 think, relied on what Merck was saying, that the
7 ELISA and the agent supported the termination of
8 approval.
9     Q. The FDA had the opportunity, certainly,
10 didn't it, Dr. Kessler, not to approve the sBLA,
11 right?
12     MS. SCANLAN: Objection.
13     THE WITNESS: It had the opportunity,
14 sure, and FDA can make a decision one way or the
15 other.
16 BY MS. HARDWAY:
17     Q. And originally, in its original -- its
18 first response to the 2004 sBLA, the FDA found
19 it to be not approvable at that time, correct?
20     A. That's correct. And Merck makes further
21 representations, and FDA buys those
22 representations ultimately about that the ELISA
23 can be correlated and has a clinically relevant
24 correlate.
25     I think if you go back, it supports the

Page 353

1 application -- is it serial 86? I could be
2 wrong. But those all support the clinical
3 relevance of those tests, in Merck's view, and
4 FDA -- FDA based their decision on what Merck
5 represented.
6     Q. Dr. Kessler, Steve Rubin is an expert on
7 mumps; is he not?
8     A. Yes. On certain aspects of mumps. He's
9 not a clinical doc.
10     Q. And Steve Rubin was in these meetings.
11 Especially with regard to this sBLA, he was
12 reviewing this information; was he not?
13     MS. SCANLAN: Objection. Lacks
14 foundation.
15     THE WITNESS: Yeah. Please talk to
16 Steve Rubin about what he knows, and we've
17 discussed Steve Rubin in his role.
18     Obviously, there are certain
19 representations in Norman Baylor's reports about
20 Steve Rubin's role. I leave it to others who
21 can add. I think I've talked extensively about
22 his role and his questions.
23     And in the end of the day -- at the end
24 of the day, FDA relied on what Merck said to it
25 and approved this.

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Appx1573

Case: 23-2553 Document: 63 Page: 173 Date Filed: 11/16/2023

BY MS. HARDWAY:
Q. There is a mumps laboratory within CBER, isn't there, Dr. Kessler?
A. There's mumps research. That was the basis of the -- why CBER was in the NIH campus, yes.
Q. And Dr. Rubin, in fact, conducted and conducts research on mumps in that laboratory; does he not?
A. Certain aspects of mumps.
Q. Is it your opinion that when Dr. Rubin is reviewing information from Merck with regard to protocol 007, that he is an unsophisticated reviewer of that information?
MS. SCANLAN: Objection to the extent you want to define what unsophisticated is in that context. What's the foundation?
BY MS. HARDWAY:
Q. We've agreed that --
A. You're assuming that he's the reviewer when, at certain points, he says I -- again, not my decision, he says.
So again, you're going to have to sort this out with others. You're going to have to sort this out with others. I can't -- I can't

help you further. That's what the -- the record shows that he -- he did not agree with certain things. You can -- you'd have to ask others.
Q. Could you hand me the exhibit, I think it's 32, that's in front of you right there.
A. Uh-huh.
Q. Steve Rubin was at this meeting on May 8, 2007, regarding protocol 007, right?
A. Yes. With Dr. Houn, yeah.
Q. And, in fact, Dr. Baylor suggested that Dr. Rubin draft a few sentences about bridging the results back to previous studies?
A. Which is what Merck was arguing for, is exactly what Merck said, exactly what Dr. Patriarca said. And, you know, again, I mean, just underscore FDA approved this based on what Merck stated.
And that was exactly the case that Merck was making, and you see that in even Rubin's 2011, "Merck argued for use of a low passage version of JL, and we accepted. Not my decision."
So again, but that decision was made consistent with what Merck relied -- what Merck was arguing.

Q. He was referring -- in that particular e-mail that you're reading from, he was referring to the use of the -- which strain was being used, correct?
A. I mean, he was referring to the heart of both the wild -- both the agent and ELISA that was used. In both the ELISA and the agent, Merck made the case that those were appropriate strains. FDA accepted Merck's representation.
Q. FDA had the opportunity not to ultimately approve the sBLA, right, Dr. Kessler?
MS. SCANLAN: Objection.
THE WITNESS: Correct, but incomplete. Correct in that FDA could ultimately not approve the sBLA, but it's your company's responsibility to assure the safety and efficacy of the vaccine.
That falls on your company -- on your company, ma'am, your client, not the FDA, who has primary responsibility for assuring safety and efficacy.
BY MS. HARDWAY:
Q. You'd agree with me, Dr. Kessler, that because there is no correlate of protection for mumps that, for example, a 92 percent

seroconversion rate generated by a mumps assay does not mean that 92 percent of the people receiving the mumps vaccine will be protected, right?
MS. SCANLAN: Objection. Vague and ambiguous.
THE WITNESS: Yeah. Again, you're mixing seroconversion, antibody titers, and what's meant by correlate of protection.
So let's -- I mean, if you take that -- again, there's an antibody titer that's a correlate of protection that is specific, right? You know, is there 1-to-32? Is there a 1-to-254? I mean, is there a certain titer in the assay that correlates with protection? That's generally, as we saw, how Steve Rubin refers to it.
So you're mixing terminology here. Happy to help and sort this out, if you'd like.
BY MS. HARDWAY:
Q. So --
A. I mean, there's certainly a link. Make no mistake. There's a link between neutralization and protection, okay?
The exact nature of that link, right,

1 there's clearly no link if you're not using the
2 right assays or if your assays are confounded
3 with anti-IgG.
4      You mentioned, just for the record -- do
5 you have the spreadsheet?  Do you have
6 Krah's spreadsheet?
7      I mean, there's data that Krah did not
8 give to FDA when they came to collect.  I don't
9 know if you want to take a picture of it.
10      But the agent, I mean, as you're -- I
11 mean, from the record, your own Merck employees
12 couldn't say what the clinical relevance was or
13 the clinical correlate.
14      THE WITNESS:  Do me a favor, just take a
15 picture --
16      MS. SCANLAN:  I have it in hard copy.
17      THE WITNESS:  Just if you can get it.
18 BY MS. HARDWAY:
19      Q.  Dr. Kessler, I'm trying to ask you
20 about -- well, let me ask you this way:  What,
21 in your opinion, does a 92 percent
22 seroconversion rate from a PRN assay for mumps,
23 what does that number represent?
24      A.  What's the indicator virus?
25      Q.  I'm sorry?

1      A.  What's the indicator virus?
2      Q.  Let's just -- let's take the agent
3 assay.  Let's take the seroconversion rates
4 found from the assay.  What do those
5 seroconversion rates, in your opinion,
6 represent?
7      MS. SCANLAN:  Objection.  Are you
8 talking about the agent assay with the original
9 data or the corrected data?  Which set of data
10 do you want to talk about?
11      MS. HARDWAY:  Either one.  Whichever the
12 doctor prefers.
13      THE WITNESS:  Yeah.  So again, you're
14 not using a true wild-type.  You're confounding
15 it by IgG, anti-IgG.  You have a very
16 significant percentage of pre-vaccination
17 positives.  The way it was conducted raises --
18 and you have, quote, the irregularities in the
19 lab, which is just on top of all that.
20      So the -- if you told me that the
21 wild-type was London strain or Tennessee, if you
22 told me that you had done a standard
23 neutralization test, I would say that that
24 data -- I mean, if you had 95 percent and you
25 were able to correlate it, as Gouma has done --

1 BY MS. HARDWAY:
2      Q.  Just in 2018, right?
3      A.  Well, he's done it on certain viruses,
4 okay, on the newer viruses.  But you're asking
5 me what these mean, right?
6      I mean, you have to be dealing with --
7 it has meaning and certainly is linked to
8 protection if you're dealing with the right
9 virus.  If you're not dealing with the right
10 indicator virus and you've confounded this test
11 just on both your pre-positives -- your
12 pre-vaccinations and post-vaccinations with IgG,
13 you've got a mess on your hands.
14      And that's what happened.  Merck told
15 the company it was fine.  I mean, the test was
16 fine, and that the WT ELISA linked, and this was
17 all clinically relevant.  And there was no
18 clinical relevance whatsoever of this, and
19 Merck's employees basically said that.
20      Joe Antonella said he had no idea what
21 the meaning was.  But if you had done the test
22 properly, I think there would be meaning.  But
23 then it would have required the test to be done
24 the way -- in a standard neutralization test.
25      Q.  So in your opinion, Dr. Kessler, if the

1 test had been done properly -- which are your
2 words -- what would a seroconversion rate from
3 a "proper" study have meant?
4      A.  If you --
5      Q.  What would that have indicated?
6      A.  I mean, if you're doing a PRN and you're
7 doing it against a virus that has clinical
8 relevance and your PRN is, in essence, measuring
9 the epitopes that you're concerned about and you
10 have correlation of that neutralization with
11 clinical data and that has shown -- those
12 epitopes have shown to be linked and validated,
13 you can -- you can draw serious conclusions that
14 there's a -- there's protection.  You may not
15 know the exact level of protection, but
16 certainly you would have that link to
17 protection.
18      The problem is that link was broken in
19 Merck's arguments.  And again, Patriarca is
20 right.  The problem is that those links were not
21 as Merck represented, nor in the data that Merck
22 delivered.
23      Q.  As part of the approval of the 2004
24 sBLA, the FDA approved the proposed labeling,
25 correct?

Page 362

1 A. In 2007?
2 Q. Right. FDA did not make a finding at
3 that point that the M-M-R II label was
4 misleading, did it?
5 MS. SCANLAN: Objection. Lacks
6 foundation.
7 THE WITNESS: No. Because, again, of
8 Merck's representations that there was clinical
9 relevance to the data and that there was support
10 for that 4.1, as well as the fact that that
11 logic that Merck used with FDA that these things
12 were linked got them to be able to be -- say
13 that there was 98 percent -- greater than 96
14 percent. And they submitted results of
15 seroconversion rates between 94 and 98 percent
16 on the WT ELISA, and for 4.1 93 and 92 percent
17 on the agent.
18 So again, what you have is the agency
19 relying on Merck because it believes that the
20 tests that Merck is giving have clinical
21 relevance and that that link, as Patriarca said,
22 was all connected.
23 BY MS. HARDWAY:
24 Q. And, in fact, at no time up through
25 today in September of 2018 has the FDA found the

Page 363

1 M-M-R II label to be misleading, correct?
2 A. You'd have to ask. I mean, there's been
3 no -- there's been no public statements to that
4 that I'm -- that I have seen whatsoever. The
5 label says that their clinical studies have
6 supported 96 percent, and that's what it holds
7 GSK to and others to.
8 And by doing that, again, Merck has --
9 Merck has stood in the way of GSK and others to
10 meet a standard which it, itself, could not
11 meet, except for the logic and the information
12 that the company provided FDA.
13 Q. The FDA approved the ProQuad label when
14 they approved the license for ProQuad, right?
15 A. Yes, ma'am. Again, on the basis of the
16 WT ELISA and the same flawed logic that Merck
17 represented.
18 (Kessler Deposition Exhibit 44 marked
19 for identification and attached to the
20 transcript.)
21 BY MS. HARDWAY:
22 Q. Exhibit 44, Dr. Kessler, is the --
23 A. I don't have that.
24 Q. I'm sorry.
25 A. Oh, I'm sorry. I do have it. Not

Page 364

1 paying attention.
2 Q. Exhibit 44 is CBER's clinical review of
3 the study submitted in support of a licensure of
4 ProQuad, correct?
5 A. Correct.
6 Q. And if you turn with me to page 8 of
7 this.
8 A. Yes, ma'am. FDA page 8?
9 Q. Page 8.
10 A. Yes.
11 Q. This isn't Bates labeled.
12 A. Yes, ma'am.
13 Q. Under Efficacy 3.1.2 --
14 A. Yes.
15 Q. -- the third sentence says, "The
16 efficacy of ProQuad was inferred using
17 immunological assays to demonstrate that
18 vaccine-specific antibody responses for each
19 vaccine antigen, following a single dose of
20 ProQuad, were not inferior to those seen
21 following immunization with licensed M-M-R II
22 and VARIVAX given concurrently at separate
23 sites."
24 A. Yeah. Basically, a bioequivalence
25 study, in essence.

Page 365

1 Q. And then the next paragraph down --
2 A. You notice they don't use the term
3 "adequate and well-controlled trials." They
4 inferred from immunological assays.
5 And obviously, again, this is an
6 equivalence. This is equivalent to MMR, and MMR
7 has these varied layers of how they got to
8 approval.
9 Q. And in the second paragraph, probably
10 about nearly halfway down, it says, "The cutoffs
11 for each assay."
12 A. Yes.
13 Q. "The cutoffs for each assay were chosen
14 to detect levels of antibodies that had been
15 previously associated with protection in other
16 studies."
17 Do you see that?
18 A. As Merck represented.
19 Q. And then it talks about "the positive
20 mumps seroresponse correlated with greater or
21 equal to 10 mumps ELISA antibody units," right?
22 A. Exactly what Merck said to the FDA, that
23 10 was the number. That correlated. Merck
24 didn't tell them that there wasn't any clinical
25 relevance to the 10, as the record shows Merck

23 (Pages 362 - 365)

Page 366

1 was -- Merck stated in testimony.
2    Q.  Merck provided a great deal of data
3 regarding the ELISA during the back and forth
4 with CBER from 2004 to 2011 -- 2007; did it not?
5        MS. SCANLAN:  Objection.  Lack of
6 foundation.
7        THE WITNESS:  Not key data.  I mean, it
8 obscured by the omission of 6C and 6D.  When you
9 look at 6D and -- 6C and 6D, you would not pick
10 10.  AB is the cutoff if you wanted to minimize
11 the discordance.
12       So yeah, it gave data, but the data that
13 it did give really did show that there really
14 was not one -- that there wasn't a basis for --
15 that 10 was not likely to minimize their
16 discordance in -- the discord.
17       And there were other things that Merck
18 did not give, in essence, that was used where it
19 said the ELISA correlated.
20       I can go on, but -- so yes, it gives
21 data, but it didn't give key data here.
22 BY MS. HARDWAY:
23    Q.  I'll show you what we'll mark as the
24 next exhibit.
25

Page 367

1        (Kessler Deposition Exhibit 45 marked
2        for identification and attached to the
3        transcript.)
4        THE WITNESS:  Yes.
5 BY MS. HARDWAY:
6    Q.  This is an August 1, '02 submission to
7 CBER from Merck with certain responses to CBER
8 questions regarding the agent and ELISA, the
9 agent assay and the ELISA, right?
10   A.  This is a response to certain questions,
11 yes.
12   Q.  If you turn with me to page 257 of your
13 report while keeping that exhibit in front of
14 you.
15   A.  Sure.
16   Q.  At the top of 257, those are tables 6C
17 and 6D that you were just referring to, right?
18   A.  Yes.
19   Q.  And if you turn with me to page Bates
20 ending in 24285.
21   A.  24285?  Yes.
22   Q.  And you see there table C there is
23 nearly identical to table 6C on page 257 of your
24 report; is it not?
25   A.  Table 2C --

Page 368

1    Q.  Table C on the August 1st, '02
2 submission is nearly identical to table 6C on
3 page 257 of your report?
4    A.  That's correct.  There are similarities
5 here, that's correct.  But you're -- can I --
6 can I make this easy so you understand -- so
7 you -- I just want to make sure, because it's
8 late.
9        I mean, you can ask me questions but, I
10 mean, the key -- there's no 6D because 6D, just
11 for the sake of the record -- I mean, if I ask
12 you, in looking at table 6D, where to draw the
13 line for discordant, right, you would never draw
14 it at 10, right?  If you wanted to eliminate
15 discordance, you would draw it somewhere between
16 20 and 40.
17       So again, I see 6 -- similarities to 6C,
18 but 6D would be the one that somewhere between
19 20 and 40 would knock out the discordance.
20       This -- you can't -- this is the agent
21 titer.  This is not for the ELISA.  It's not the
22 frequency distribution of the ELISA post-vaccine
23 positive titer.
24    Q.  But we can agree, at least as to table
25 6C, that a nearly identical version was

Page 369

1 submitted in this August --
2    A.  I'm not going --
3    Q.  -- 1, 2002 --
4    A.  Right.  I'm not going to -- but again,
5 this was based on the agent positive.  This was
6 the frequency distribution of the agent
7 post-vaccine positive titers.  It was not the
8 frequency distribution of the ELISA
9 post-vaccination titers.
10       And if you're talking about setting the
11 cutoff -- I don't know if you want to just take
12 a picture -- I mean, you know --
13    Q.  Can I -- let me just --
14    A.  Let me just do this for the camera so
15 the camera can see this.
16       Here's 6C and here's 6D.  Right?  If you
17 want to eliminate -- this is ELISA.  We're
18 talking about setting a cutoff for ELISA, right?
19 We're not talking about setting the cutoff for
20 agent.
21       If you want to eliminate the
22 discordance, right, and you wanted to draw the
23 line, you would never draw the line at 10AB.
24       I'll leave it to others to say what
25 the -- and the mathematicians and the

24 (Pages 366 - 369)

Page 370

1 statisticians could do the analysis. But you
2 have, still at 20, an 11.8 percent and 24
3 percent where you have -- where you see these
4 discordant numbers occurring.
5      So you would -- again, you didn't
6 provide 6D, which, again, if you're setting
7 ELISA at AB cutoffs, you've got to be able to
8 present that data, and you didn't.
9      Q. Just because I don't believe the record
10 is clear -- clean, because I think you
11 interrupted me before I got a chance to finish
12 my last question, I just want to ask it again.
13      We can agree that a nearly identical
14 version of table 6C was submitted in the
15 August 1st, '02 submission, right, Dr. Kessler?
16      A. That table I would agree -- hold on one
17 second.
18      Yeah. I mean, again, it's a little --
19 it's not quite the same table because it talks
20 about the percent mismatched samples of total,
21 so your eye goes to that. And again, it's not
22 the ELISA frequency distribution, which was key
23 here.
24      Q. But it is -- other than that, it's
25 identical. Certainly, the first four columns

Page 371

1 are the exact same. They're not in the same
2 order, but the numbers are all the same, right?
3      A. Right. I mean, but again, if you looked
4 at this and, as your eye goes, you go, well,
5 there's no real way to do the percent mismatch,
6 it makes no difference where the cutoff is.
7      But, in fact, when you look at 6C and
8 6D, you see 17 percent, 6.8 percent, and then it
9 drops. So obviously, you'd want to go below
10 between the 20 and the 40 on agent. But again,
11 the key was ELISA.
12      And again, let's just be clear. Where
13 Florian Schodel says that and recognizes that
14 the large majority of these discordances had
15 ELISA titers less than 40, and one concern is
16 that presenting the data in this fashion may
17 prompt CBER to request that the ELISA cutoff be
18 raised.
19      So, I mean, they knew exactly what they
20 didn't want the ELISA -- Merck didn't want the
21 ELISA cutoff to be raised to 40 or to go to
22 40AB.
23      Where, again, you see 24 percent and
24 11 percent here at 10 and 20, and then you see
25 it drops off here (indicating). So, obviously,

Page 372

1 that's where you eliminate the major part of the
2 discordance.
3      And clearly, Merck's saying that it
4 knows that it -- that CBER is going to request
5 that the ELISA cutoff be raised. If you
6 presented data that way, certainly the FDA was
7 going to raise that question.
8      Q. Dr. Kessler, my question was, but it
9 is -- other than that, it is identical.
10 Certainly, the first four columns are the exact
11 same. They're not in the same order, but the
12 numbers are all the same, right?
13      So, Dr. Kessler, we're getting short on
14 time. I'm again going to ask you please -- that
15 was a very specific question. I asked you if
16 the numbers were the same, and you gave another
17 long answer, most of which was not responsive to
18 my question.
19      MS. SCANLAN: Objection. Asked and
20 answered. He explained exactly what his answer
21 --
22      MS. HARDWAY: I asked him if the numbers
23 were the same, Kate.
24      MS. SCANLAN: And he explained --
25      MS. HARDWAY: It was a yes or no

Page 373

1 question.
2 BY MS. HARDWAY:
3      Q. Are the numbers the same? Yes or no?
4      MS. SCANLAN: His answer was why the
5 numbers -- even the numbers on the page are not
6 identical because of the way they are put
7 forward.
8      MS. HARDWAY: No, that's not what he
9 answered.
10 BY MS. HARDWAY:
11      Q. I'm going show you what we're going to
12 mark as the next exhibit.
13      (Kessler Deposition Exhibit 46 marked
14      for identification and attached to the
15      transcript.)
16 BY MS. HARDWAY:
17      Q. Dr. Kessler, Exhibit 46 is a submission
18 from Merck to CBER dated June 10th, 2002.
19      A. Correct.
20      Q. And this is also a response to CBER
21 comments, you see, at the first page of the
22 letter?
23      A. Yes.
24      Q. And if you turn to page Bates ending in
25 1640 --

25 (Pages 370 - 373)

Appx1578

Page 374

1    A.  Wait.  Yes.
2    Q.  You see a table 8 on page 1640?
3    A.  I see it well, and I know it well.
4    Q.  This table, more so than 6D, would
5  actually allow the FDA to look at the data on an
6  even more granular level, correct?
7    A.  No.  It makes it look like the
8  discordance is expected.
9    Q.  What do you mean by that?
10   A.  Because you're obscuring -- I mean,
11 nowhere can you sit here -- again, let me just
12 show you.
13        If I ask you where's the break in 6D --
14 you may want to just focus on that or go
15 closer -- it's quite clear where the break is.
16 And it's not at 10AB, right?  There's no way you
17 can look at this data and see where the break
18 is, right?  There is no obvious break by looking
19 at this.
20        Again, it's -- so again, the 6D was
21 taken out.  10AB should not have been in the
22 cutoff.  And Merck stated the reasons why it
23 took it out, because it was concerned that based
24 on that data on 6D it would not -- FDA wouldn't
25 buy the 10AB cutoff.

Page 375

1    Q.  Dr. Kessler, you testified that you
2  would leave to the experts what the cutoff
3  should be, right?
4    A.  The exact cutoff.  You want to talk
5  about exactly what the number is, I'm not going
6  to testify exactly what the number is.
7        But when you look at this, there is
8  no -- first of all, let's just put on the
9  record, this whole issue of a cutoff, cutoff,
10 actually, because you've not correlated ELISA
11 with anything, right, it has no -- and you
12 recognize that it doesn't have any clinical
13 relevance, this is sort of a, you know, a minor
14 issue arguing what the cutoff is.
15        I mean, you can't -- you can't set a
16 cutoff level and expect it to have clinical
17 relevance if it has no clinical relevance.  You
18 can't set a cutoff level based on a PRN test if
19 your PRN test is inadequate.
20        So again, we're into the surreal here.
21 I mean, all you can say is that a cutoff will
22 label certain things as positive and certain
23 things as negative, but there's no clinical
24 relevance to this.
25   Q.  Dr. Kessler, you testified earlier today

Page 376

1  that you've never chosen a cutoff in an ELISA,
2  right?
3    A.  It doesn't -- I've -- I certainly have
4  been involved in cutoff issues in other
5  contexts.  And I could tell you, if you want to
6  eliminate a discordance, you don't accept these
7  percentages of 11, these -- these rates of
8  discordance.
9    Q.  So you're of the opinion, Dr. Kessler,
10 that the FDA would be unable to calculate rates
11 of discordance based on table 8?
12   A.  I'm of the opinion that it's your
13 responsibility -- your client's responsibility
14 to provide FDA with adequate data, and it's your
15 client's responsibility to provide a clinically
16 meaningful and adequate and well-controlled set
17 of data that if the cutoff is part of that, that
18 had to be clinically relevant.  And it had to be
19 linked, according to Dr. Patriarca, and that
20 link didn't exist.
21   Q.  Dr. Kessler, are you of the opinion that
22 the FDA would have been unable to calculate
23 rates of discordance using table 8?
24   A.  There was -- I have no opinion on --
25 you'd have to ask FDA whether it could have

Page 377

1  generated table 6D and how it would have
2  generated 6D.  I leave it to others to testify
3  how FDA viewed that or what it would have done.
4        But clearly, again, you don't come up
5  with 10AB when you look at 6D.
6        MS. HARDWAY:  All right.  We're going to
7  take a short break.
8        VIDEO TECHNICIAN:  The we're going off
9  the record.  This is the end of Media Unit 7.
10 The time is 10:18 p.m.
11       (A recess was taken.)
12       VIDEO TECHNICIAN:  We're back on the
13 record.  This is the beginning of Media Unit 8.
14 The time is 10:39 p.m.
15 BY MS. HARDWAY:
16   Q.  Dr. Kessler, if you could take out
17 Exhibit 44, which is the ProQuad clinical
18 review, and turn to page 245 of that review,
19 please.
20   A.  Just hold on one second.  I'd be happy
21 to do that.  I just want to take a quick look.
22       MS. SCANLAN:  Kathryn, would you just
23 say that page number again, please.
24       MS. HARDWAY:  245.
25

26 (Pages 374 - 377)

1 BY MS. HARDWAY:
2     Q.  Actually, I'm going to have you, if
3 you're ready, Dr. Kessler, have you go to a
4 different page for me first, which is page 214.
5     A.  Sure.  Yeah.
6     Q.  If you look at under "General Discussion
7 of Efficacy Endpoints," you look at the second
8 paragraph that begins "ELISA assays."
9         MS. SCANLAN:  And I'm just going to --
10 Dr. Kessler, to the extent this is a -- do you
11 want to read the whole section before you go to
12 that paragraph?
13        THE WITNESS:  Do you want me to read the
14 whole document?
15        MS. SCANLAN:  No, not the whole
16 document, but if you want to read the whole
17 general discussion, feel free to --
18        THE WITNESS:  No.  Just hold on one
19 second.
20     Yes.  ELISA assays to evaluate
21 immunogenicity, correct?  Is that the --
22 BY MS. HARDWAY:
23     Q.  ELISA, yes.  And you'll see it states
24 here that "Each clinical study to support
25 ProQuad was reviewed."  It says, "Please see

1 each clinical study or Mr. Steven Rubin's review
2 for additional information pertaining to the
3 validation of these assays."
4     A.  Correct.
5     Q.  So you'll agree that Dr. Rubin was
6 involved in the review of ProQuad clinical
7 studies, right?
8         MS. SCANLAN:  Objection.
9         THE WITNESS:  Again, you'd have to show
10 me -- is it attached here?
11 BY MS. HARDWAY:
12     Q.  Dr. Rubin's review?
13     A.  Yeah.
14     Q.  It is not.
15     A.  Yeah.  So I wouldn't want to comment on
16 it unless I could see it.
17     I would point you -- or you could ask
18 another question.  But for the sake of
19 completeness, I'd ask you to read the prior
20 paragraph to -- prior paragraphs to that about
21 mumps, or I'd be happy to do that.
22     Q.  This document was written by CBER,
23 right, Dr. Kessler?
24     A.  Yes.
25     Q.  Okay.

1     A.  But again, I think you have to -- it
2 says, "Likewise, in the studies performed in
3 support of licensure" -- let's see.  Where is
4 the mumps actual paragraph?
5     "In studies that demonstrate efficacy
6 amongst vaccine, there was a good correlation
7 with the presence of mumps neutralizing
8 antibodies."
9     There was not a correlation, as Merck
10 represented, when you really look at the data.
11 Certainly in the baseline data, there was no
12 correlation --
13     Q.  Is it --
14     A.  -- as I see it.
15     Q.  Is it your opinion that CBER didn't make
16 its own evaluation of whether there was a good
17 correlation with the presence of mumps
18 neutralizing antibody?
19     A.  No.  It's my opinion that, in fact, CBER
20 is relying on Merck's representation that there
21 was a correlation in the application.
22     Q.  If you look at page 225, Dr. Kessler.
23     A.  Uh-huh, yeah.
24     Q.  Section 13.3 is a section entitled
25 "Labeling."

1     A.  Right.
2     Q.  It states, "The proposed package insert
3 accurately summarizes the immunogenicity and
4 safety data derived from the studies reviewed
5 herein, as well as the summary experience with
6 M-M-R II and VARIVAX vaccines," right?
7     A.  That's correct.
8     Q.  And so the -- and so CBER's determined
9 that the ProQuad label was accurate, right,
10 Dr. Kessler?
11     A.  Based on Merck's representation and
12 Merck's data that ELISA is -- that Dr. Patriarca
13 said that ELISA was a good correlate, clinically
14 relevant, and linked to PRN, which itself had
15 clinical relevance, including the cutoffs of
16 those tests that were linked.  So it was all
17 based on Merck's representation.
18     Q.  So it's your opinion that CBER didn't do
19 its own evaluation of Merck's package insert to
20 determine whether it was accurate?
21     A.  It certainly did its own evaluation, but
22 it bought Merck's argument, as Dr. Patriarca
23 said, that the clinical efficacy of the virus
24 had been established when, in fact, Merck had
25 information that it was -- that there was not

27 (Pages 378 - 381)

Appx1580

Page 382

1 clinical, in fact, relevance of those assays.
2      So my opinion is that Merck didn't share
3 that.
4      MS. HARDWAY: I'll mark the next
5 exhibit.
6      (Kessler Deposition Exhibit 47 marked
7      for identification and attached to the
8      transcript.)
9 BY MS. HARDWAY:
10     Q. Exhibit 47 is a presentation given by
11 Dr. Rubin.
12     A. Yes.
13     Q. Entitled "2015 Science Writers
14 Symposium, Mumps Resurgence and Our Work to
15 Prevent New Epidemics."
16     A. Correct.
17     Q. And it's given on September 18, 2015.
18     And if you look on slide 5,
19 Dr. Kessler --
20     A. Yes.
21     Q. -- Dr. Rubin's statement as to whether
22 mumps outbreaks were attributable to vaccine
23 failure, he says no, right?
24     A. Correct. But understand what he means
25 by vaccine failure, okay? Vaccine failure is

Page 383

1 not really a failure of the vaccine. Vaccine
2 failure is defined in among the trade as whether
3 the individual develops antibodies or whether
4 the individual ends up not
5 dev -- doing antibodies to the virus.
6      Nowhere here does he use the word
7 neutralizing antibodies, I mean, or effective
8 anti -- or the antibodies against the virus.
9      So of course there's going to be
10 antibodies to it. So it's not that the
11 individuals are failing to develop any response.
12 They just obviously are not developing the right
13 response in neutralizing antibodies because
14 either there's antigenic drift and/or there's
15 potency loss and/or a combination of a number of
16 factors.
17     Q. How is it, Dr. Kessler, that for certain
18 statements of Dr. Rubin's, you tell me I need to
19 ask Dr. Rubin what he meant. But with this
20 particular statement about vaccine failure not
21 being a cause of mumps outbreaks, you know what
22 Dr. Rubin meant.
23     A. No. I just know what "vaccine failure"
24 means. That's what I'm just simply saying.
25     Q. So you do know in this instance what

Page 384

1 Dr. Rubin means in this slide when he says
2 vaccine failure?
3      A. The ability to -- whether individuals --
4 not whether the vaccine is so potent. That's
5 not what it is. It's about the ability to
6 affect -- I mean, he says exactly what he says,
7 right? And I agree with that.
8      But he doesn't say anything about
9 neutralizing antibodies, and he's not saying
10 whether it's the correct antibodies. That's all
11 I'm pointing out.
12     Q. If you go to slide 10.
13     A. Just hold on one second. Right.
14     Q. Dr. Rubin states, "The current mumps
15 vaccine is efficacious," right?
16     A. Right. That's what it says here.
17     Q. And he goes on to state that "The
18 occurrence of mumps in vaccinated persons does
19 not mean that the vaccine is not efficacious.
20 It means that the vaccine is not 100 percent
21 effective," right?
22     A. That's what he says there.
23     Q. Then goes on to say that "Field studies
24 show that two doses of vaccine is 88 percent
25 effective (very good)," right?

Page 385

1      A. That's what he says.
2      Q. And Dr. Rubin had known -- had been
3 publishing for years, had he not, about the fact
4 that the vaccine was about 88 percent effective,
5 correct?
6      A. That's what Dr. Rubin says. He does not
7 say what Dr. Carbone had said internally to
8 Steve Rubin in 2006. He doesn't disclose, "Keep
9 in mind that the mumps vaccine is friable. And
10 right around the time I arrived, we were noting
11 that lots were passing at the lowest possible
12 cutoff."
13      So she thinks it's still at the right --
14 at the lowest possible cutoff when she arrives.
15 So she's not even acknowledging that there's
16 anything below the cutoff. And, in fact, that
17 is why we asked Merck to redact it.
18      And then she says, "Is it possible that
19 the kids were vaccinated" -- and this is what
20 she's talking about, a specific mumps outbreak.
21 "Is it possible that the kids were vaccinated
22 with vaccine" -- blank, it's redacted -- "so the
23 vaccine wasn't as effective due to titer decay?"
24      Now, you notice that's not in
25 Dr. Rubin's presentation.

28 (Pages 382 - 385)

1  Q. Right. It's not.
2  A. It's not. So why not, if Carbone's
3  raising this? And, you know, this is not. And
4  we know that, again, 60 million lots are
5  sub-potent in children who are -- now young
6  adults who are in these kind of settings, and
7  that's not in his presentation.
8      So again, I think there's public
9  health -- I mean, any -- I mean, I think any
10 person who was, you know, concerned from a
11 public health point of view would have to answer
12 Dr. Carbone's question, and there's no mention
13 of this.
14 Q. Dr. Kessler, isn't it possible that
15 Dr. Carbone's question was answered -- what was
16 the date of the document you were reading from?
17 A. 2006.
18 Q. Wasn't it possible that Dr. Carbone's
19 question was answered in the negative between
20 2006 and 2015?
21 A. You would expect the record to show
22 that, and this e-mail goes into a black hole.
23 There's nothing in the record that shows this.
24    Merck -- there are -- there are -- Merck
25 attempted -- Merck internally attempted to do

1  this. Let me just finish.
2      Merck attempt -- there are some
3  documents where Merck is concerned about this
4  and basically uses the old Hillman 3.1 number
5  and says, well, it's above 3.1.
6      But we know that Merck also says that it
7  couldn't -- it had not repeated the Hillman
8  number, and that his neutralization test was
9  vastly different. And Merck's not getting
10 numbers at 3.1.
11     So there is no basis to see that -- if
12 you have an analysis that this has been
13 addressed and people have disclosed, and
14 Dr. Plotkin, when he looks at the reasons for
15 the outbreaks, no one -- this is not in any of
16 the most recent editorials or anything. This is
17 not -- I don't see this on the record at all.
18 So my sense is this has not been disclosed.
19 Q. Have you excluded the possibility,
20 Dr. Kessler, that Dr. Carbone's question was
21 answered in the negative sometime between 2006
22 and 2015?
23    MS. SCANLAN: Objection. Asked and
24 answered.
25    THE WITNESS: No, I would -- I would

1  appreciate, right -- and, you know, please take
2  the next ten days to help me figure this out.
3      I will give you another 30, 60 days.
4  If, in fact, the record shows that potency is of
5  no concern, that this has been addressed, that
6  this has been made -- this is transparent and
7  made public as in Dr. Carbone's question, I'm
8  happy to consider it.
9      I've tried very hard to find the answer
10 to that. But at this point, the absence of any
11 record on it, I can't conclude that there was
12 any -- doesn't allow me to conclude that there
13 was any analysis or evidence that this is not a
14 component of the problem.
15 BY MS. HARDWAY:
16 Q. Isn't it also possible, Dr. Kessler,
17 that it's not in Dr. Rubin's presentation in
18 2015 because he disagreed with Dr. Carbone?
19 A. You'd have to -- I mean, that -- again,
20 I don't know the answer to that. If you're
21 going to re -- if you will allow me and you will
22 release me from my protective order tonight, I
23 will be happy to call Dr. Carbone [sic] and
24 present this data and ask him that question.
25     If you want to do that, I'd be happy to

1  answer that question.
2      So I'm asking you, will you release me
3  from my protective order to talk to Dr. Rubin?
4  Q. I'm not going to answer that question,
5  Dr. Kessler.
6  A. Okay. So then I'm going to ask you
7  kindly, as I said before, to advise me -- and
8  both sides advise me on -- I'm going to need to
9  be able to get counsel to help advise me and
10 figure out where we go from here.
11 Q. Dr. Kessler, can we turn to the exhibit
12 that you prepared and brought with you today,
13 the large chart.
14 A. Sure.
15 Q. I can't remember what number we marked
16 that as.
17 A. You didn't mark it.
18 Q. Oh, I didn't?
19 A. No.
20 Q. I thought we had.
21 A. No.
22 Q. All right.
23 A. Do you have a copy?
24 Q. Yeah. That right there.
25 A. Did you mark it?

29 (Pages 386 - 389)

1 MS. WYSOCKI: It's Exhibit 3.
2 THE WITNESS: Is it marked?
3 MS. SCANLAN: It does have an exhibit
4 number on it.
5 THE WITNESS: Oh, I'm sorry.
6 MS. HARDWAY: Exhibit 3.
7 UNIDENTIFIED MALE: Yeah, Exhibit 3.
8 THE WITNESS: I didn't realize.
9 BY MS. HARDWAY:
10 Q. Do you agree, Dr. Kessler, that the
11 projected potency at end expiry column that is
12 throughout this report -- there's a "Projected
13 Potency At End Expiry" column, right?
14 A. Yes.
15 Q. And you'd agree that that projected
16 potency at end expiry is based on a Merck
17 stability model?
18 A. It's based on the Dr. Margolskee -- the
19 analysis that Dr. Margolskee used, and I used
20 the exact methodology that Dr. Margolskee used.
21 Q. But for the projected potency, the
22 specific projected potency, that's based on a
23 Merck stability model, correct?
24 A. That Dr. Margolskee -- again, I used
25 exactly Dr. Margolskee's model and

1 Dr. Margolskee's number.
2 Q. And then there is an "Actual Potency
3 Below 4.3 At End Expiry" column, right?
4 A. Yes.
5 Q. And there are -- most of that column
6 contains question marks, right?
7 A. Correct.
8 Q. With a few exceptions which we'll --
9 A. Yeah, no. I've sought that data. I
10 mean, when I can find those in BPBRs or in other
11 documents, I attempted to fill that in.
12 If you have that data, again, within the
13 next, you know, short period of time, 30 days or
14 so, if you can provide me that, I think that
15 would be helpful. And certainly I'm open to
16 that.
17 I don't know where -- where I can -- I
18 mean, I've sought that. I don't know whether
19 it's in your LIMS database. I don't know which
20 databases it's in to find that data.
21 Q. Okay. Just so that the record is clear,
22 the question mark in the actual potency column
23 reflects that you don't know what the actual
24 potency is at the end of expiry for those lots,
25 right?

1 A. I've sought that answer, and I hope it
2 exists. And if you could share that data with
3 me, I would appreciate it. It's possible I
4 missed it and it's in some documents, but I've
5 tried hard to find it.
6 Q. And so for the lots where you have a
7 question mark, which is a vast majority of the
8 lots in this chart, you don't know whether those
9 lots lost a log -- a 1.0 log over the 24-month
10 expiry period, right?
11 A. That's correct. I'm using exactly what
12 Dr. Margolskee used. And I'm happy to be
13 informed that -- of that data. And if you could
14 share that data with me, I would appreciate it.
15 Q. All right. I'm going to show you what
16 we're going to mark as the next exhibit. I only
17 have one copy. Sorry.
18 (Kessler Deposition Exhibit 48 marked
19 for identification and attached to the
20 transcript.)
21 BY MS. HARDWAY:
22 Q. And if you would turn with me to the
23 Bates ending 2621.
24 A. 2621, 2621. Yes, ma'am.
25 Q. And this is a letter to Karen Goldenthal

1 from Manal Morsy?
2 A. Yes.
3 Q. And it's in reference, as you'll see on
4 the first page, to a November 29, 2000 telephone
5 conference call.
6 A. Correct.
7 Q. And it was a meeting at Merck's request
8 to discuss with Dr. Carbone and her laboratory
9 staff Merck's newly developed mumps antibody
10 neutralization assay and to clarify some of the
11 comments, questions CBER provided Merck in a
12 letter dated October 27, 2000.
13 A. Correct.
14 Q. Do you see that?
15 A. I do.
16 Q. And in the -- you'll see actually again
17 on the first page, right before the bolded text,
18 it says, "The three issues for discussion with
19 CBER scientists in the requested teleconference
20 are: Background attached."
21 Do you see that?
22 A. Yes, I do.
23 Q. And if we go to the attachment, which is
24 Bates ending in 2623 --
25 A. Correct.

1  Q. -- there's a summary section up at the
2  top.
3  A. Right.
4  Q. And it references the newly developed
5  plaque reduction neutralization assay using a
6  wild-type mumps strain.
7  A. Right.
8  Q. And in the second sentence, it says, "As
9  suggested by CBER during the meeting held on
10 March 13th, 2000, the assay sensitivity for
11 measurement of virus neutralizing antibody has
12 been optimized by addition of anti-human IgG."
13    Do you see that?
14 A. I see that.
15 Q. And so it was CBER's suggestion,
16 Dr. Kessler, to use the anti-human IgG in the
17 agent, right?
18 A. No, I --
19    MS. SCANLAN: Objection. The documents
20 will speak for themselves.
21    THE WITNESS: Yeah. Can I -- where did
22 I have my unnecessary -- can you help me? I had
23 my unnecessary open. Just search my --I can do
24 it.
25    How do you spell unnecessary? Who's the

1  speller?
2  BY MS. HARDWAY:
3  Q. Two Ns.
4  A. I had it turned to that page. I lost
5  it. U-n-n-e-c-e -- how many Ns?
6    MS. SCANLAN: Just for the sake of time
7  here, I think that's what you're looking for.
8    THE WITNESS: Not necessary, right.
9  BY MS. HARDWAY:
10 Q. Where are you, Dr. Kessler?
11 A. So I'm at 155.7 in my report.
12 Q. What page is that?
13 A. Page 97.
14    So you can see -- and I can pull it up.
15    THE WITNESS: Do me a favor, just pull
16 up the document, Sarah, if you'd be so kind, on
17 155.7 with the actual quote in here.
18    It says, "CBER does not use either
19 complement or IgG to enhance sensitivity and
20 feels that these maneuvers should not be
21 necessary."
22    So again, I do agree with you that at
23 some point, FDA acquiesced or when Merck came
24 back, but it was -- certainly, they were saying
25 that's not something that should be

1  necessary, nor is it part of the norm to be
2  used.
3    And I don't think you would -- it would
4  be accurate to say that CBER recommended the
5  anti-human IgG. There's some other documents
6  that I have seen where it was raised. And when
7  the seroconversion rates came back what they
8  were, Merck raised the sensitivity -- increasing
9  the sensitivity, and someone at FDA said, well,
10 you can try it.
11    But as you can see from the beginning,
12 FDA said it was not necessary, and it's not
13 normally part of the process.
14 Q. And that was at a meeting in February
15 of '99, right, that you cite in your report?
16 A. Yeah.
17 Q. And the meeting I'm citing in this
18 document is a year later, in March of 2000,
19 right?
20 A. Right. But, you know, again, we can put
21 the entire record together. I think there's
22 some other meeting minutes that I've seen where
23 it gets raised.
24 Q. Your report does not contain any
25 opinions about the assay that Merck uses to

1  measure the potency of its mumps-containing
2  vaccine, right?
3    MS. SCANLAN: Objection. Vague and
4  ambiguous.
5    Can you restate that one?
6    THE WITNESS: The TCID measurements in
7  those ELISAs? Is that what you're referring to?
8  BY MS. HARDWAY:
9  Q. Let me ask the question again, because
10 counsel asked me to.
11    Your report does not contain any
12 opinions about the assay that Merck uses to
13 measure the potency of its mumps-containing
14 vaccines, right?
15 A. Again, I'm not sure which of -- which
16 assays you're talking about. Are you talking
17 about the neutralization assay? Are you talking
18 about wild-type ELISA that's correlated with
19 neutralization? Which assays -- are you talking
20 about the assays to measure the TCID
21 concentration? I'm just not sure which
22 assays -- obviously, my report goes into great
23 depth of the PRN and the wild-type ELISA.
24    If you're talking about how you come up
25 with the TCID number of viral particles, I don't

31 (Pages 394 - 397)

1 believe I took issue with that.
2      But again, you've got to be more
3 specific in your question.
4      Q.  Okay.
5      MS. HARDWAY:  Let's take a short break,
6 and I'm just going to go through my notes.
7      THE WITNESS:  Thank you, Counsel.
8      VIDEO TECHNICIAN:  We're going off the
9 record.  The time is 11:08 p.m.
10     (A recess was taken.)
11     VIDEO TECHNICIAN:  We're back on the
12 record.  The time is 11:24 p.m.
13 BY MS. HARDWAY:
14     Q.  Dr. Kessler, is your report and the
15 errata sheet that you brought with you today,
16 the charts that you brought with you today, and
17 your testimony that you gave today, does all of
18 those things set forth your opinions in this
19 case?
20     A.  I think that's fair, Counsel.  And if
21 you include the testimony today and everything I
22 brought with me today in my report and the
23 errata sheet, yes, I think that's a fair
24 statement.
25     Q.  All right.

1      MS. HARDWAY:  That's all I have.  Thank
2 you.
3      THE WITNESS:  Thank you.  What time is
4 it?  I've never had to opportunity to say this
5 at a deposition.  Good evening.
6      MS. LERNER:  Are we on the record?
7 EXAMINATION BY COUNSEL FOR PRIVATE PLAINTIFFS
8 BY MS. LERNER:
9      Q.  I was looking forward to almost saying
10 good morning, Dr. Kessler, but I'll say good
11 evening.
12     A.  That's right.
13     Q.  I just have a few questions for you.
14 This is Kellie Lerner for private plaintiffs.
15     We previously marked Exhibit 47.  I'm
16 not sure this is a document you have ever seen
17 before.
18     I'll give you my copy.
19     A.  Counsel showed it to me.  I'm not sure
20 I've seen it before.
21     Q.  Given that you have perhaps have never
22 seen it before, I just want to direct your
23 attention to page 9 of the exhibit.
24     A.  Page 9?  Yes.
25     Q.  And there was an earlier question before

1 whether it was possible that in 2006, Steven
2 Rubin was satisfied about Kathy Carbone's
3 concerns about the MMR vaccine; is that fair?
4      MS. HARDWAY:  Object to form.
5      THE WITNESS:  I remember the
6 conversation about was that question answered
7 and resolved.
8 BY MS. LERNER:
9      Q.  Okay.  Looking at page 9, do you have an
10 opinion as to whether, during this time frame,
11 Steven Rubin was fully satisfied about any
12 concerns with Merck's MMR vaccine?
13     MS. HARDWAY:  Object to form and calls
14 for speculation.
15     THE WITNESS:  May I answer?
16 BY MS. LERNER:
17     Q.  Please.
18     A.  So if you look at this document, but
19 also if you look at this document in the context
20 of other documents for GSK, I can tell you
21 what's -- objectively what is said by this.
22     And that -- that I think that this
23 document certainly says what's next, and then
24 there's -- this document says "consideration for
25 the development of better mumps vaccines."  This

1 is based on a Rubin 2012 article, so it's
2 post-Carbone.
3      But, I mean, as important in the 2010
4 frame, what I'm aware of is two e-mails --
5 actually, one letter by Dr. Rubin and one
6 e-mail.  There's an e-mail, if you want to enter
7 it for the record -- I normally don't do this,
8 but I leave it to you.
9      It's an e-mail from a Donna Boyce.  This
10 is an internal GSK e-mail, and let me just read
11 it --
12     Q.  Can I pause you there just so that I can
13 enter it into the record.
14     A.  You have a copy of this?
15     Q.  This is what --
16     A.  You have a copy.  Oh, good.  So you have
17 a copy.
18     Q.  Yes.
19     (Kessler Deposition Exhibit 49 marked
20     for identification and attached to the
21     transcript.)
22     THE WITNESS:  So Ms. Boyce, GSK.  This
23 is -- the subject line -- the date is May 27th,
24 2010.  It's ███████████████████████
25 ███████."

Page 402

1    And it says, "█████████████
████████████████████████████████████
██████████████████" -- as I continue to
5 quote, █████████████████████████
██████████████████████████ .
7    █████████████████████████████
████████████████████████████████████████
██████████████████
██ ████████████████
████████████████████████████████████
████████████████████████████████████
███████████████████████████
████████████████████████████████████
██ ████████████████████████
████████████████████████████████
██ █████████████████
██ ███████████
████████████████████████████████

Page 403

███████████████████████████████
█████████████████████
███ ██████████
4    Then goes on.  He said that "Merck has
5 difficulty making MMRV and has ███████████
████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███ ████████████
11    There's also another -- there's another
12 letter that certainly -- where Steve Rubin
13 writes to Abow Hee on October 19th, and it's a
14 letter of support.
15    And he is strongly supportive as
16 someone -- it's really with regard, "I'm
17 particularly interested in your proposed work.
18 The proposed studies are of public health
19 significance and timely, considering the recent
20 resurgence of mumps in highly
21 vaccinated populations in the United States and
22 elsewhere, making it quite clear that newer,
23 more immunogenic vaccines are needed.
24    "As you know, the history of mumps
25 vaccine developed in this one is inundated with

Page 404

1 safety issues to inadequate attenuation of the
2 more immunogenic vaccines used outside of the
3 United States have been responsible for aseptic
4 meningitis, etc."
5    And he's very supportive of the -- "this
6 work has bearing on other paramyxoviruses as
7 well, which not only provide insights into a
8 general approach to vaccine development for
9 certain members of a virus family but also for
10 the study of paramyxovirus" --
11    MS. HARDWAY:  What --
12    A.  -- "genesis."
13    MS. HARDWAY:  What is -- I'm sorry.
14 What is the year of that letter?
15    THE WITNESS:  So it's 2011.  So
16 obviously --
17    MS. HARDWAY:  And who is it to?
18    THE WITNESS:  It's to Abow He, and it's
19 signed by Steve Rubin.
20    MS. LERNER:  I don't have a copy of that
21 document.  He's reading from his notes.
22    THE WITNESS:  Yeah, it's -- and you can
23 have it.
24    But again, the important point, I mean,
25 in all of this is that Steve Rubin, I think,

Page 405

1 from the record, as, you know, as other great
2 virologists strongly support the develop of
3 newer, more immunogenic mumps vaccine to deal
4 with the issues that we currently face as a
5 country.
6    MS. LERNER:  I have no further
7 questions.
8    Thank you very much for your time,
9 Dr. Kessler.
10    MS. HARDWAY:  Thank you, Dr. Kessler.
11    THE WITNESS:  Thank you.  I think that
12 was the longest depo in one day.  Thank you for
13 your forbearance.
14    VIDEO TECHNICIAN:  Counsel, are we done?
15 Please stand by.
16    We're off the record at 11:33 p.m.  And
17 this concludes today's testimony given by David
18 Kessler.  The total number of media units used
19 was eight and will be retained by Veritext Legal
20 Solutions.
21    (Whereupon, at 11:33 p.m., the
22    videotaped deposition of DAVID KESSLER
23    was concluded.)
24
25

33 (Pages 402 - 405)

**Page 406**

1　　　CERTIFICATE OF NOTARY PUBLIC
2　　　I, CHRISTINA S. HOTSKO, the officer before
3　whom the foregoing deposition was taken, do hereby
4　certify that the witness whose testimony appears in
5　the foregoing deposition was duly sworn by me; that
6　the testimony of said witness was taken by me in
7　stenotypy and thereafter reduced to typewriting under
8　my direction; that said statement is a true record of
9　the proceedings; that I am neither counsel for,
10　related to, nor employed by any of the parties to the
11　action in which this statement was taken; and,
12　further, that I am not a relative or employee of any
13　counsel or attorney employed by the parties hereto,
14　nor financially or otherwise interested in the
15　outcome of this action.
16
17
18　　　　CHRISTINA S. HOTSKO
19　　　　Notary Public in and for the
20　　　　District of Columbia
21　My commission expires:
22　November 14, 2021
23
24
25

**Page 407**

1　USA Ex Rel., Krahling And Wlochowski v. Merck
2　　　David Kessler, M.D. - Volume II
3　　　INSTRUCTIONS TO THE WITNESS
4　　　Please read your deposition over
5　carefully and make any necessary corrections.
6　You should state the reason in the
7　appropriate space on the errata sheet for any
8　corrections that are made.
9　　　After doing so, please sign the errata
10　sheet and date it.
11　　　You are signing same subject to the
12　changes you have noted on the errata sheet,
13　which will be attached to your deposition.
14　　　It is imperative that you return the
15　original errata sheet to the deposing
16　attorney within thirty (30) days of receipt
17　of the deposition transcript by you.  If you
18　fail to do so, the deposition transcript may
19　be deemed to be accurate and may be used in
20　court.
21
22
23
24
25　2998208

**Page 408**

1　USA Ex Rel., Krahling And Wlochowski v. Merck
2　　　David Kessler, M.D. - Volume II
3　　　E R R A T A
4　　　- - - - -
5　PAGE  LINE   CHANGE
6　___ ___ _____
7　Reason:_____
8　___ ___ _____
9　Reason:_____
10　___ ___ _____
11　Reason:_____
12　___ ___ _____
13　Reason:_____
14　___ ___ _____
15　Reason:_____
16　___ ___ _____
17　Reason:_____
18　___ ___ _____
19　Reason:_____
20　___ ___ _____
21　Reason:_____
22　___ ___ _____
23　Reason:_____
24　___ ___ _____
25　2998208

**Page 409**

1　USA Ex Rel., Krahling And Wlochowski v. Merck
2　　　David Kessler, M.D. - Volume II
3　　　ACKNOWLEDGMENT OF DEPONENT
4　　　I, _____, do
5　hereby certify that I have read the foregoing
6　pages and that the same is a correct
7　transcription of the answers given by
8　me to the questions therein propounded,
9　except for the corrections or changes in form
10　or substance, if any, noted in the attached
11　Errata Sheet.
12
13　_____　　_____
14　DATE　　　　SIGNATURE
15
16
17
18
19
20
21
22
23
24
25　2998208

34 (Pages 406 - 409)

10/25/2019
Declaration of G. Reilly
EXHIBIT 5

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

        *Plaintiffs,*

     v.

MERCK & CO., INC.,

        *Defendant.*

Civil Action No. 10-4374 (CDJ)

IN RE: MERCK MUMPS VACCINE
ANTITRUST LITIGATION

THIS DOCUMENT RELATES TO:
ALL ACTIONS

Master File No. 12-3555 (CDJ)

## Expert Report of D. Bruce Burlington, MD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1.      I have been retained by Merck & Co., Inc. ("Merck") to provide expert testimony regarding: 1) the Food & Drug Administration's ("FDA") regulation of clinical studies and licensing of biological products; 2) FDA regulation of biological product approval and laboratory tests used in clinical trials of biological products to support approvals; 3) the concepts of clinical assay specificity and sensitivity; 4) FDA requirements regarding evidence of efficacy for new and existing vaccines; 5) the Merck mumps virus vaccine initial approval; 6) Merck's clinical and clinical laboratory studies of mumps vaccine potency at expiry; 7) The design of Protocol 007, including: the development and use of the AIGENT assay; the sensitivity and specificity of the AIGENT assay; the development and use of the WT ELISA; the sensitivity and specificity of the ELISA; the ≥10 Ab Unit serostatus cutoff used in the ELISA; Merck's ELISA bridging study; 8) the correlation of the AIGENT and WT ELISA; 9) FDA's inspection of Dr. Krah's Laboratory and the resulting Form 483; 10) Merck's supplemental BLA to change the labeled potency of MMRII; and 11) Merck's clinical and clinical laboratory studies of mumps vaccine in combination with varicella vaccine.

2.      I am a board certified internist and infectious disease physician.  I received my undergraduate degree at Louisiana Tech University in 1970 and my medical degree from Louisiana State University in 1976.  Between completion of the course work and clinical rotations for my medical degree, in December 1975 and graduation in May 1976, I conducted original laboratory research under the guidance of Dr. B. Sanders, Head of the LSU Infections Diseases division.

3.      From 1977 to 1999, I served at various times as an emergency medicine practitioner in Colorado, Illinois, West Virginia, and Virginia.  During that time, I also served as

2

**Appx1590**

an instructor of, and preceptor in, emergency medicine at the University of Colorado and Georgetown University, respectively.

4.      From 1981 to 1999, the FDA employed me.  Between 1981 and 1987, I worked in what is now known as the Center for Biologic Research and Review (CBER), first as a staff fellow and subsequently as a staff scientist in the respiratory viruses laboratory of the Division of Virology.  During this time I, like many CBER scientists, had responsibility for research, regulatory testing of vaccines, and review of BLA and IND submissions.  My last appointment in CBER was in the Division of Biologic New Drug Applications (BIND), where I became the Division Director.  In addition, I reviewed and made the Agency's determination on acceptability of B-INDs, provided the medical and scientific review of biological license applications (BLA) and conducted cGMP inspections of virus vaccine manufacturers.

5.      At LSU School of Medicine, during my fellowship in Infections Diseases at the University of Colorado, and while a laboratory-based scientist and reviewer at CBER, I conducted original scientific research on mechanisms of the immune response including to influenza virus infection and research work on enzyme linked immunosorbent assays (ELISA) development.  I gained experience in virus plaque reduction assays to measure interferon type I and to quantitate para-myxoviruses and influenza viruses.  I also learned and conducted hemagglutation inhibition assays for measurement of antibody to influenza virus, personally planning and executing them.  I have authored multiple papers on immunology, virology and regulatory issues.  These are listed in my curriculum vitae, attached as **Exhibit A**.

6.      Between 1988 and 1993, I served as Deputy Director of the Office of Drug Evaluation II in the FDA's Center for Drug Evaluation and Research ("CDER").  In that capacity, I directly supervised the Division of Anti-Infective Drug Products.  During that same

3

period of time, I also served as Director (Acting) of the Office of Generic Drugs for one year; and later as Deputy Center Director for Medical Affairs (Acting) for a year and a half.

7.      During my tenure in CDER, my responsibilities included, at various times, making the Agency's final decision on approval of innovator (New Drug Applications or NDA's) and generic drug applications ("Abbreviated New Drug Applications" or "ANDAs"); reviewing and approving the medical aspects of compliance actions; and reviewing and approving for CDER Agency actions on certain Citizens' Petitions.

8.      My last position at the FDA was as Director of the Center for Devices and Radiological Health ("CDRH"), a position I held from 1993 until 1999.  As Center Director, I supervised and had responsibility for all programs assigned to CDRH, including the regulation of in vitro diagnostic tests.

9.      Between March 1999 and August 2007, Wyeth-Ayerst Laboratories employed me, first as a Senior Vice President and then as an Executive Vice President.  At various times, I was responsible for and supervised Wyeth's global regulatory affairs, manufacturing, clinical study, and regulatory compliance groups, including with regard to the consent decree between Wyeth and the FDA covering Wyeth's vaccine products, auditing with respect to FDA requirements, quality assurance and quality control for all drugs and biologics produced for human use, and pharmacovigilance (human safety) departments.

10.     Since retiring from Wyeth, I have been self-employed, serving on several Boards of Directors for pharmaceutical companies and advising healthcare companies regarding their interactions with the FDA.  Further details regarding my education, training and experience can be found in my curriculum vitae.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY      **Appx1592**

11. From my experiences at the FDA and in the healthcare industry, I have gained expertise with the laboratory and clinical study and regulation of viral vaccines, FDA's Investigational New Drug (IND), New Drug Application (NDA), and Biological License Application (BLA) review and approval processes, FDA guidance documents and processes, and FDA's requirements for, review of, and decisions on, citizen's petitions.

12. I am being compensated for my services in this matter at the rate of $600/hour. My compensation is not contingent on the content of my opinions or the outcome of this case.

13. I have been requested by counsel for Merck to review certain materials produced in the captioned matter. Based on this review, together with my experience and knowledge of the field, I have been asked to offer my expert opinion on certain issues, as set forth above.

14. These materials (listed on **Exhibit B**) include: certain federal laws and regulations; documents related to Merck's mumps virus vaccine products; applications for supplemental BLA approvals for those products; FDA policy and guidance documents; medical and news articles; reports in this case submitted by David A. Kessler, MD, dated March 14, 2018, Thomas L. Copmann, PhD, dated March 13, 2018, and Peter H. Calcott, Bsc(Hons), D Phil, dated March 12, 2018 (retained on behalf of relators); and other documents and depositions produced in this case.

15. In forming my opinions, I have reviewed multiple documents regarding the development and design of the "wild type" enzyme-linked immunosorbent assay ("WT ELISA") and the Anti-IgG Enhanced Mumps Wild Type Plaque-Reduction Neutralization Assay ("AIGENT") used in Protocol 007, including documentation of meetings and teleconferences between Merck and CBER, the exchange of correspondence between Merck and CBER, and

5

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY **Appx1593**

various documents Merck submitted to CBER, such as Protocol 007, the Protocol 007 clinical

study report, and the AIGENT and WT-ELISA validation packages.

16.     The opinions expressed in this report are based on my review of materials; my

training and experience as a laboratory researcher, medical practitioner, and my training and

experiences at the FDA, as a pharmaceutical executive, and as a consultant interacting with

pharmaceutical companies and federal regulators at the FDA.

17.     A list of my deposition and trial testimony during the past 4 years is attached as

**Exhibit C**.

## I.     FDA Regulation of Clinical Studies and Licensing of Biological Products

18.     Under the Public Health Service Act (PHS act), before a company can distribute a

biological product in the United States, it must file a Biological License Application (BLA) with

the FDA, and the FDA must approve that application.[1]  Biological products are also regulated as

drugs under the Food, Drug and Cosmetic Act ("FDCA"),[2] which requires substantial evidence

of safety and effectiveness for approval of marketing applications.  Changes to labeling of a

biological product require submission of a supplemental application (sBLA), including

supporting data for the proposed change, and usually also require that the supplement be

approved before the changes are implemented.[3]

19.     Human studies, conducted in the United States, are necessary to collect the

information for a BLA submission to the FDA.  If these studies are conducted at sites in the

United States, they must ordinarily be run under an Investigational New Drug ("IND")

---

[1] 42 USC § 262; 21 USC § 355(a),(b).
[2] 21 CFR § 201 *et seq.*
[3] 21 CFR § 314.70.

6

**Appx1594**

application.[4]  An IND provides an exemption from the NDA or BLA requirement for drug

approval prior to distribution.  It contains or references the proposed study protocol; applicable

information on the pharmacology, animal testing, and prior clinical studies of the drug; as well

information on protection of the rights and safety of the subjects.  It must usually be submitted to

the FDA for review 30 days before the study begins and, if not put on clinical hold by the FDA,

is said to be in effect after that 30-day period, meaning the study can legally commence.  The

primary objective of the FDA's review of an IND is "to assure the safety and rights" of human

subjects who will receive the study drug.[5]  There are only limited exemptions from the

requirement to submit an IND.[6]

20.     In certain circumstances, an original or supplemental BLA for a new indication

may be based upon in vitro and animal studies under the "Animal Rule," where human efficacy

studies are not ethical or feasible, but this is not generally applicable to vaccines for widespread

use.[7]

## II.     FDA Regulation of Biological Product Approval and Laboratory Tests Used in Clinical Trials of Biological Products to Support Approval

21.     The basis for the FDA to approve a BLA or sBLA is a finding by the Agency that

the biological product is pure, safe, and potent.  A BLA approval implies that the FDA has

concluded that the demonstrated clinical benefits for that use outweigh any identified safety

problems and residual safety concerns;[8] that the data submitted to support the approval have been

evaluated and found to be an adequate basis on which to form that conclusion, including

---

[4] 21 CFR § 312.40.

[5] 21 CFR § 312.22(a).

[6] 21 CFR § 312.2.

[7]  21 CFR §§ 601.90-601.95; Food & Drug Administration, Guidance for Industry, Product Development Under the Animal Rule, October 2015, *available at* https://www.fda.gov/downloads/drugs/guidances/ucm399217.pdf.

[8] 21 CFR § 314.2.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

conformance to the requirements for clinical studies to be adequate and well-controlled;[9] the product's labeling is accurate and supported by data, and, that the biological product is appropriately manufactured and controlled.[10],[11]

22.     The FDA regulates non-clinical studies under current Good Laboratory Practice (cGLP) regulations.[12]  These regulations apply to toxicological and animal safety studies. Specifically, the regulation states that they do "not include studies utilizing human subjects…" Therefore, they do not apply to clinical safety and efficacy studies in humans, or to blood sample clinical laboratory testing conducted as a part of such studies.[13]

23.     The FDCA and regulations require that clinical trials on which a BLA or sBLA approval is based are adequate and well controlled, including that the methods used to assess subjects' responses are reliable and that the analysis of the results are adequate to assess the effect of the investigated drug or biologic.[14]

24.     The FDA regulates the controls and processes for human clinical investigations under various provisions, including those in agreement with the International Conference on Harmonization (ICH) collectively known at current Good Clinical Practice (cGCP) regulations.[15]

---

[9] 21 CFR § 314.126.

[10] 21 CFR § 314.105(c).

[11] *See also* Food and Drug Administration, Vaccines, Blood & Biologics, Development & Approval Process (Biologics), Vaccine Product Approval Process (last updated February 2, 2018), *available at* https://www.fda.gov/BiologicsBloodVaccines/DevelopmentApprovalProcess/BiologicsLicense ApplicationsBLAProcess/ucm133096.htm.

[12] 21 CFR part 58.

[13] 21 CFR § 58.3(d).

[14] 21 CFR § 314.126.

[15] International Conference on Harmonization, Harmonized Tripartite Guideline, Guideline For Good Clinical Practice E6(R1), June 10, 1996 ("ICH Guidelines"), *published in* 62 Fed Reg 25692 (May 9, 1997), *available at* https://www.ich.org/fileadmin/Public_Web_Site/ICH_Products/Guidelines/Efficacy/E6/E6_R1 _Guideline.pdf; Food and Drug Administration, Science & Research, Regulations: Good

8

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

These cGCP and the interpretative guidances for them, address limited documentation, and limited, general requirements for laboratory tests conducted as a part of clinical investigations. They do not, however, set specific or detailed standards for the laboratory, equipment, controls, or processes used in testing blood samples obtained in clinical studies.[16]

26. The ICH Guidelines require that: "[c]linical trials should be scientifically sound";[17] "[a]ll clinical trial information should be recorded, handled, and stored in a way that allows its accurate reporting, interpretation and verification";[18] "[s]ystems with procedures that assure the quality of every aspect of the trial should be implemented";[19] "[t]he sponsor is responsible for implementing and maintaining quality assurance and quality control systems with written SOPs to ensure that trials are conducted and data are generated, documented (recorded), and reported in compliance";[20] and "[q]uality control should be applied to each stage of data handling to ensure that all data are reliable and have been processed correctly."[21]

26. According to the ICH Guidelines, documents "should be available for[] audit by the sponsor's auditor and inspection by the regulatory authority(ies)."[22] Relators' expert, Dr. Peter Calcott, asserts without an adequately identified source or basis, that "[c]linical sample testing occurring in laboratories focuses on testing patient samples and is governed by GMP regulations. (21 CFR 211.)"[23] Yet, the scope of that regulation states: "The regulations in this part contain the minimum current good manufacturing practice for preparation of drug products."

---

Clinical Practice & Clinical Trials (last updated March 30, 2018), *available at* https://www.fda.gov/scienceresearch/specialtopics/runningclinicaltrials/ucm155713.htm.

[16] ICH Guidelines.
[17] ICH Guidelines § 2.5.
[18] ICH Guidelines § 2.10.
[19] ICH Guidelines § 2.13.
[20] ICH Guidelines § 5.1.1.
[21] ICH Guidlines § 5.1.3.
[22] ICH Guidelines § 8.1.
[23] March 12, 2018 Report of Peter H. Calcott, BSc (Hons), D Phil, at p. 11, ¶ 22.

9

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

[emphasis added].[24]  The cGMP regulations and guidances for interpretation of them set forth

extensive and prescriptive requirements for the facilities, equipment, supplies, personnel, and

processes of production, storage, testing, documentation, and control of drugs as well as

specified reporting to the FDA.[25]  They also require stability testing to establish the potency of

biological products through their labeled expiry date.  The biological cGMP similarly address the

manufacture and control of biological products.[26]  Neither the drug cGMP nor the biologics

cGMP regulations address the laboratory testing of clinical trial blood samples.

27.    Dr. Calcott does acknowledge that "[o]ther clinical testing, which is routinely

performed in a hospital or clinic setting, is governed by GCP regulations,"[27] implying this other

testing is not subject to cGMP requirements.  However, he offers no basis or rationale for why he

thinks that a clinical laboratory operated by the sponsor might be subject to cGMP as well as

cGCP, while the same testing, if contracted to and performed by a non-sponsor-operated clinical

testing laboratory, would be regulated under cGCP (and presumably not also cGMP).

28.    IND clinical studies almost always rely on laboratory test results for measurement

of safety parameters and often on clinical laboratory tests for measurements of efficacy end

points.  As a basis for approval, a clinical study must establish evidence of effectiveness on an

endpoint.  The preferred endpoints are direct measurements of improvement in how subjects feel,

function, or survive.  When an endpoint is a laboratory test result, it is referred to as a biomarker,

---

[24] 21 CFR § 211.1(a).
[25] 21 CFR parts 210 & 211.
[26] 21 CFR § 600 *et seq.*
[27] March 12, 2018 Report of Peter H. Calcott, BSc (Hons), D Phil, at p. 12, ¶ 22.

10

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

or a surrogate endpoint. Surrogate endpoints are biomarkers that have been validated to be indirect measures of how subjects feel or function or survive.[28]

29.     Testing of study patients' samples is normally conducted in a local clinical laboratory affiliated with the institution at which the study is being carried out.  For particularly important test results, there may be additional tests or initial testing done by a central laboratory. That may be either an external reference laboratory, or occasionally a laboratory operated by the sponsor, as was the case for the serological testing done in Merck's various clinical studies of its mumps vaccines.  While these clinical laboratory tests are regulated under certain provisions of cGCP, the requirements under cGMP are not applied to these clinical study laboratories.

30.     The cGCP requirements broadly require systems for quality control of the trial, SOPs for conduct of the trial, and data records.[29]  In reference to clinical study laboratory testing of patients' samples, they list essential documents that must be available relating to clinical laboratories processing study samples.[30]  The ICH Guidelines do not set specific or detailed requirements or guidance for the development, validation, procedures for conduct, or analysis of the tests themselves.

31.     Also under cGCP, FDA's regulation, 21 CFR § 314.126 (b) (6) and (7) require that for clinical study data to support marketing approval, "[t]he methods of assessment of subjects' response are well-defined and reliable" and "[t]here is an analysis of the results of the study adequate to assess the effects of the drug."  This regulation does not set specific or detailed

---

[28] Food and Drug Administration, About FDA, FDA Facts: Biomarkers and Surrogate Endpoints (last updated December 21, 2017), *available at* https://www.fda.gov/AboutFDA/Innovation/ucm512503.htm.
[29] ICH Guidelines § 2.13, § 5.1, & § 8.
[30] ICH Guidelines § 8.2.11 & § 8.3.6 (pertaining to normal ranges); § 8.2.12 & § 8.3.7 (pertaining to laboratory/procedure/test certification, accreditation, established quality control, or other validation); § 8.3.25 (pertaining to sample records).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY   **Appx1599**

requirements, nor is there guidance that does so, for the development, validation, procedures for conduct, or analysis of the tests themselves.

32.     In my opinion, there is a clear basis under the regulations for FDA to apply the limited cGCP criteria listed above to Merck's laboratory testing of patients' samples from their clinical studies of mumps vaccines.  But such testing is outside the stated scope of the detailed requirements of cGMP and guidance applicable to it.  Instead, FDA relies on clinical laboratories testing samples from clinical studies to be subject to inspection, and to follow sound medical and scientific principles, exercising appropriate judgment as needed to produce valid test results in support of clinical studies of safety and efficacy.

## III.     Clinical Assay Specificity and Sensitivity

33.     For clinical assays in general, and for serum assays of antibody responses to a vaccine, the term specificity has two separate meanings that are both applicable in this matter, but which must be kept clearly in mind as they refer to different concepts.

34.     First, the term specificity of a virus assay can refer to the narrowness of the range of substances (here mumps or other viruses) with which an antibody containing serum can react. This may be assessed by evaluating the increase in titer to a vaccine virus, or to the wild type virus it is intended to protect against, after immunization of a susceptible individual, compared to any change in titer to related viruses.  This is typically done with the use of single vaccine virus immunization.  An alternative approach uses immunization with a polyvalent vaccine producing post-immunization, polyvalent immune sera and absorption of antibody to the related viruses. Then, the titers before and after absorption are compared to demonstrate that absorption with the homologous virus decreases titers more than with absorption with related viruses.

12

35.     The second meaning of the term specificity refers to the ability of the test, using a defined cut off for a positive vs. negative result, to classify as negative the samples that are truly negative.  This meaning for specificity applies to all in vitro diagnostic tests including Merck's assays for antibody to mumps virus.  This report will use "assay specificity" when this meaning is intended.  The calculation of assay specificity requires knowledge of which serum samples are "truly negative;" in this case: any serum samples that are not expected to contain antibody that will react with the mumps virus, are deemed the true negatives.  When used with this meaning, identification of true negatives, in contrast with the related virus cross-reactive potential comparative use of specific, assay specificity is only concerned with sera that do not contain antibody to mumps virus.

36.     Assay sensitivity for a given assay, which is the ability of the assay to identify true positives, necessarily varies inversely with assay specificity.  This inherent trade-off between assay sensitivity and specificity can be managed by selection of a  cutoff point that differentiates an assay positive result from an assay negative result.  A range of cutoff points is usually possible for any given assay.  The resulting varying degrees of sensitivity and assay specificity define the assay's potential range of performance.  Since any assay will have a range of sensitivities and assay specificities depending on the cutoff chosen, when considering an assay's specificity or sensitivity, it must be done in recognition of the cutoff used in the assay.

37.     In general, within the potential range, the cutoff point for an assay is chosen to obtain the desired performance for the assay's intended use.  That is typically more sensitive (and correspondingly less assay specific) for a screening assay, and more assay specific (less sensitive) for a confirmatory assay.

13

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Appx1601**

## IV.    FDA Requirements Regarding Evidence of Efficacy for New and Existing Vaccines

38.    First, through clinical testing before approval, investigational lots of the product must be shown to be effective.  For a new virus vaccine, this usually requires that the sponsor conduct clinical trials demonstrating that the vaccine prevents clinical illness from wild type virus in the population for which its use is to be indicated.[31]

39.    As an alternative, for some new vaccines, the sponsor can demonstrate that vaccine use produces a state of immunity, as measured by a recognized and validated surrogate endpoint.  Such a validated surrogate endpoint could be measurement of an antibody to the virus, that when present at $\geq$ a given titer is accepted as establishing a protective state against wild type virus infection.[32]

40.    In my experience, the safety and efficacy evidence required by FDA to support approval of a new manufacturer of a given vaccine is generally more extensive and exacting than the evidence that is needed for a change to a previously approved vaccine of established effectiveness and safety.

41.    FDA evaluates proposed product changes, such as changes to the expiry potency specification, on a case-by-case basis, applying their scientific judgment as to what strength of evidence is needed to support the change.[33]

---

[31] Food and Drug Administration, Guidance for Industry, Evaluation of Combination Vaccines for Preventable Diseases: Production, Testing & Clinical Studies, April 1997, *available at* https://www.fda.gov/downloads/biologicsbloodvaccines/guidancecomplianceregulatoryinform ation/guidances/vaccines/ucm175909.pdf.

[32] *Id.* at p. 14; Food and Drug Administration, About FDA, FDA Facts: Biomarkers and Surrogate Endpoints (last updated December 21, 2017), *available at* https://www.fda.gov/AboutFDA/Innovation/ucm512503.htm.

[33] Food and Drug Administration, Guidance, Compliance, & Regulatory Information, Demonstration of Comparability of Human Biological Products, Including Therapeutic Biotechnology-derived Products (last updated March 21, 2018), *available at*

14

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

42.     In my experience, to support significant changes in the manufacturing or controls for a vaccine, FDA usually strongly prefers use of a biomarker or preferably a surrogate endpoint test that correlates with or is statistically associated with clinical immunity to establish that the proposed change is not expected to diminish vaccine efficacy.  In such a test, a positive result on the test is associated with protection from disease, and a negative result is associated with susceptibility to disease in clinical populations at risk for disease at least on a group basis, if not for each individual.

43.     As a clinical study endpoint, such a test may be known as a biomarker or, if it has been validated and accepted as evidence of protection, as a surrogate measure of protection.[34]

44.     In my experience, the scientists at CBER, including the vaccine assay experts, often ask companies to attempt to develop such biomarker tests if they do not already exist. However, CBER's reviewing scientists, in their exercise of scientific judgment on a case-by-case basis, seek a balance between their desire for the highest quality evidence to support a proposed change, and the value of the product's availability to the public.  In reaching this balance, if their initially preferred approach is shown to be not technologically feasible, they are prepared to reconsider what type of evidence can appropriately support a change to an approved product.

## V.     The Merck Mumps Virus Vaccine initial approval

45.     For the Merck mumps vaccine, the pre-licensure clinical studies provided evidence of efficacy against clinical and virologically confirmed mumps disease.  These studies also reported that there was an association between post-vaccination increases in antibody to

---

https://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/ucm122879.htm.

[34] Food and Drug Administration, About FDA, FDA Facts: Biomarkers and Surrogate Endpoints (last updated December 21, 2017), *available at* https://www.fda.gov/AboutFDA/Innovation/ucm512503.htm.

15

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

mumps virus detected by a virus neutralization assay and a hemagglutination inhibition assay.[35] That association did not establish a protective level of antibody as a validated surrogate endpoint by either the neutralization assay or a hemagglutination inhibition assay. CBER's mumps scientists have stated that a widely accepted antibody test and known protective level does not exist for vaccines against mumps virus infections.[36]

## VI. Merck's Clinical and Clinical Laboratory Studies of Mumps Vaccine Potency at Expiry and the Design of Clinical Trial 007

46.　Following CBER's review and consideration of the MMR®II labeling by the Office of Vaccine Research and Review (OVRR), they and Merck engaged in a series of teleconferences and an informal meeting on November 19, 1997, regarding the labeled potency for mumps vaccine, during which "the need to clarify the label claims for potency and to define them in terms of the minimum titers present at expiry became evident."[37] For each lot of vaccine to be distributed in the United States, Merck submitted to CBER protocols that contained the results of Merck's lot release testing, and samples of the MMR®II lots.[38] The results of this testing reflected an average release potency of mumps of 80,000 (4.9 log 10) Tissue Culture Infecting Dose, 50% ("$TCID_{50}$")/dose, and a minimum release potency of 20,000 (4.3 log 10) $TCID_{50}$/dose. [39]

---

[35] Hilleman, *et al.* Live, Attenuated Mumps-Virus Vaccine—Protective Efficacy as Measured in a Field Evaluation. New England J Med 1967; 276: 252-258; Sugg, *et al.* Field evaluation of live virus mumps vaccine. J Pediatrics 1968; 72(4): 461-466.

[36] March 13, 2000 Memorandum from Morsy, MRK-KRA00001265, at 1263-1264; Plotkin, *et al.*, Vaccines 673 (7th ed 2018).

[37] January 28, 1998 letter from Garfinkle to Hardegree, MRK-KRA01625508-639, at 508.

[38] *See* 21 CFR §610.1 and 610.2.

[39] January 28, 1998 letter from Garfinkle to Hardegree, MRK-KRA01625508-639, at 513-514.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY **Appx1604**

47.     In my opinion, the release by CBER of lots with potency at or approaching 4.3 log 10, with their knowledge that potency waned over the expiry period of two years, implies that FDA had found the label potency statement acceptable before the 1997 discussions.

48.     Following additional discussions with CBER regarding how best to determine potency at expiry, Merck, in a submission dated January 28, 1998, proposed a clinical trial studying presumed non-immune children who were randomized to be administered either lots of vaccine with lower $TCID_{50}$ or vaccine with $TCID_{50}$ near the release potency; Merck stated that a clinical trial protocol would be forthcoming.[40]

49.     Seeking CBER's input, in June 1998, Merck submitted a draft protocol for a clinical study, designed to support an expiry claim of lower $TCID_{50}$, to their mumps virus vaccine IND, BB-IND 1016. It was to be a double blind, randomized trial in children 12 to 16 months of age.[41] Protocol 007 was an immunogenicity study conducted to compare the relative immunogenicity of the MMR vaccine at different levels of potency. The Protocol included a set of primary and secondary hypotheses, which were to be supported with data from a plaque reduction neutralization assay (PRN) and an enzyme linked immunosorbent assay (ELISA).[42]

50.     As bio-assays, PRN tests for antibody are labor intensive, slow to process, and tend to be of, at best, moderate precision. Only a subset of indicator viruses will produce readable plaques in the line of cells used. The substrate is a monolayer of cultured cells, which must be homogeneous. The indicator virus is diluted to produce around 20-100 (depending on the well size) plaques in each well (when it is not neutralized by antibody). Random variation in the number of infectious virus particles in each well is consequently one source of imprecision.

---

[40] January 28, 1998 letter from Garfinkle to Hardegree, MRK-KRA01625508-639, at 508.
[41] June 23, 1998 Submission, MRK-KRA00624345-446.
[42] *See* Clinical Study Report, MRK-KRA00224982-6529, at 6054-55.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

The virus is mixed with each diluted serum sample, incubated, and then added to the cell monolayer.  The virus infected cell monolayer usually requires overlaying with auger to limit virus spread to a tightly localized area, producing a plaque.  Often the plaques are not directly visible in the cell monolayer, but require staining to be readable.  Reading and counting plaques can be technically demanding, requiring training and skilled judgment.  For example, they may not be of uniform size, there may be variability in the staining, or plaques may be so close to one another it is hard to decide whether there is one or two plaques present.  Each serum sample must be tested at multiple dilutions, often 8 or more serial two-fold dilutions, typically in duplicate or triplicate, to determine an end point.  Among other problems, if there are tears or holes in the monolayer, or if the serum-free control plaque count is out of range, that is unacceptable for data generation.  When there are a great many plates to count because a large number of serum samples are being titrated, more than one operator may be needed, introducing another source of variability, and great vigilance is required to avoid fatigue-associated counting errors.

51.     Use of ELISA testing would greatly lower the labor and time needed to conduct the serological assessment of the results.[43]   Among other favorable aspects, ELISAs may have many more than 20-30 antibody binding, indicator virus epitopes in each well, improving precision, there are fewer serum dilutions needed (often just one) as each well reads across a range of antibody, and the result is machine, not human operator, read. Further, as Merck demonstrated (see below) it could be highly sensitive to seroconversion.

52.     In their comments on Merck's draft protocol, CBER indicated that to support a claim of equivalence, they wanted Merck to use a serum assay with seroconversion rates not

---

[43] *See* Mauldin, *et al.*, Mumps Virus-Specific Antibody Titers from Pre-Vaccine Era Sera: Comparison of the Plaque Reduction Neutralization Assay & Enzyme Immunoassays.  J Clin Micro 2005; 43(9): 4847-4851.

18

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY **Appx1606**

inferior to the rates reported at the time of licensure, 96%. The new clinical study needed to demonstrate consistent immunogenicity of the lower $TCID_{50}$ vaccines compared with those for the vaccine at the release $TCID_{50}$. CBER commented that this should be done using a validated serological assay that met two criteria: 1) it had to demonstrate seroconversion in at least 90% of the seronegative children; and 2) the equivalence margin could show no more than a 5% decrement from the assumed seroconversion rate of 96% in the positive control arm. Both of these criteria had to be evaluated against the lower boundary of their respective 95% confidence intervals.[44] To achieve those criteria, the assay needed to be highly sensitive to the presence of antibody following immunization.

53. The revised draft protocol for the clinical study, called Protocol 007, consistent with CBER's requests, had objectives of demonstrating a similar immune response to mumps virus by neutralization among subjects receiving lower expiry doses of mumps vaccine, compared to subjects receiving the then-current release dose of mumps vaccine and to demonstrate an adequate immune response in those subjects.[45] Study 007 was designed to be a clinical trial to demonstrate similarity of lower potency vaccine when compared to vaccine at the then-current release potency titer, using a highly sensitive neutralization assay, as a basis to change the MMR®II labeled expiry potency.[46] CBER confirmed this in their comments on Protocol 007.[47]

54. In my opinion, while CBER initially indicated they wanted the study to use a neutralization assay for the primary endpoint, Merck did not intend, nor did CBER expect, study

---

[44] September 8, 1998 letter from CBER, MRK-KRA00001467-69.

[45] February 5, 1999 revised draft protocol, MRK-KRA00624448-589, at 487.

[46] June 6, 2017 Deposition of Dr. Emilio Emini, at 140:2-141:9; January 29, 2004 Supplemental BLA, MRK-KRA00000032-139, at 111.

[47] October 27, 2000 letter from Goldenthal to Morsy, MRK-KRA00001231-36, at 33.

19

Appx1607

Protocol 007 to be an evaluation of vaccine efficacy. The goal and hypotheses were to evaluate mumps vaccine, with lower than the then-current release potency, to support expiry potency lower than 4.3 Log 10 $TCID_{50}$; not to evaluate the vaccine's efficacy against mumps virus.

55.     In order to test those hypotheses, Merck, as directed by CBER, sought a highly sensitive assay relevant to the evaluation of the immune response to the vaccine. CBER required Merck to use a wild type (WT) virus in their assays for study 007. When Merck was unable to develop a PRN with the desired sensitivity, CBER suggested they explore an anti-IgG enhanced assay to increase the sensitivity of their PRN.  Merck did so and CBER accepted Merck's plan to use this AIGENT assay as the basis for evaluating vaccine responses in study 007.[48]

## VII.    Merck's Development and Use of the AIGENT Assay

56.     Merck undertook to develop a new PRN antibody assay.    CBER required Merck to use a wild type indicator virus (WT) in the new PRN.[49]  Merck evaluated several recent WT isolates of mumps virus as they developed the new PRN assay.  However, Merck was unable to reproduce a PRN that consistently measured seroconversion rates as high as the sensitivity CBER had specified.

57.     Merck reported this problem to CBER, along with an analysis of reports of the PRN seroconversion rates, including seroconversion rates against the Lo-1 WT indicator virus of 69.4% and 76% and against an early passage of JL, JL2 from the UK control laboratory, of

---

[48] November 29, 2000 memorandum from Morsy, MRK-KRA00001218-21 (CBER agreed with "the parameters and characteristics of the newly developed wild type mumps neutralization assay[.]").

[49] August 30, 1999 letter, MRK-KRA00001470-924, at 1479; February 5, 1999 Submission, MRK-KRA0062448-589, at 455 ("[v]irus antigens used in serologic assays enable the assessment of immunogenicity which is reflective of efficacy against natural infection; thus, wild-type antigens are appropriate for serologic assays[.]").

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY     **Appx1608**

56%.[50]  Merck then proposed to use the JL vaccine passage indicator virus in the new PRN despite finding point estimates for seroconversion rates with it in their pilot studies that were not consistently 96% (91% and 96.2%).[51]

58.     After additional preliminary work by Merck and discussions with CBER, one of the Agency's mumps virus experts, Dr. Carbone, indicated to Merck that CBER would accept JL as the PRN indicator virus strain if it was an early passage similar to the JL passage 7, which in the initial studies of efficacy was reactogenic.[52]  CBER scientists also suggested that Merck investigate the use of anti-human IgG as a second antibody in the PRN to potentially enhance assay sensitivity.[53]

59.     Following the discussion with CBER's mumps scientists and consistent with a paper written by CBER scientists on use of a second antibody to enhance a mumps neutralization test[54] Merck developed a revised PRN using a second antibody, anti human IgG, to enhance the sensitivity and discussed the revised PRN with CBER on November 29, 2000.[55]  Merck identified and used an indicator virus developed from JL passage-8 in this assay.[56]  CBER's scientists agreed in principle with use of this assay, known as the Anti-IgG Enhanced Mumps Wild Type Plaque-Reduction Neutralization Assay (AIGENT), to test seroconversion rates in the

---

[50] March 14, 2000 Meeting Minutes from meeting between FDA and Merck, MRK-KRA00001258-61, at 59; December 1, 1999 letter to CBER, MRK-KRA00001222-30; December 30, 1999 Submission, MRK-KRA00001470-1924, at 1628.

[51] December 1, 1999 letter to CBER, MRK-KRA00001222-30, at 26.

[52] February 8, 2000 Ukwu memorandum, MRK-KRA00018647-49; March 14, 2000 Meeting Minutes, MRK-KRA00001258-61, at 59.

[53] November 16, 2000, MRK-KRA00001237-1248, at 1240.

[54] Sato, *et al.*  Sensitive neutralization test for virus antibody.  Archives of Virology, 1978; 58(4): 301.

[55] November 16, 2000, MRK-KRA00001237-1248, at 1240; November 29, 2000 Memorandum, MRK-KRA00001218-1221, at 1219.

[56] November 16, 2000, MRK-KRA00001237-1248, at 1240; November 29, 2000 Memorandum, MRK-KRA00001218-1221, at 1219.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Protocol 007 clinical study, with several comments including on the controls and analysis of results.[57]

60.     Consistent with cGCP expectations, Merck's laboratory running samples from study 007 had in place a standard operating procedure (SOP) for the AIGENT assay.[58]

## VIII.   Merck's AIGENT Assay Sensitivity and Specificity

61.     In regard to the first meaning of specificity, that of the assay antibody titer for the intended virus as compared to the titer versus other viruses, the Anti-IgG Enhanced Mumps Wild Type Plaque-Reduction Neutralization Assay ("AIGENT") was evaluated by Merck as a part of its validation.  This was done by absorbing sera against mumps, measles, or rubella virus antigens and then evaluating how much the mumps assay titer was reduced by each of the three viruses or media from the cell substrate when compared with the titer of the non-adsorbed sera.[59]

62.     The results of such testing on known mumps antibody containing sera in the AIGENT assay found a pattern of greater likelihood of a titer reduction after mumps virus adsorption, in about half of the sera, than after adsorption with the other two viruses or mock from the cell culture.[60]  This report was submitted to CBER in support of using the AIGENT assay in the sBLA for the mumps vaccine potency label change.[61]

63.     Based upon my review of the available documentation, the CBER scientists who reviewed the application did not question the AIGENT assay validation.

64.     With regard to the assay specificity of Merck's mumps virus assay, the best available information on which sera were true negatives was the assumption that sera from

---

[57] November 29, 2000 Memorandum, MRK-KRA00001218-1221, at 1220-21.
[58] December 18, 2000 AIGENT SOP, MRK-KRA00002189-198.
[59] Validation Report, MRK-KRA00016988-17023.
[60] *Id.*
[61] March 12, 2001 Submission, MRK-KRA00018864-937.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY   **Appx1610**

roughly one-year-old infants who had not been previously vaccinated against mumps were negative. It was recognized that a small percent of these sera might have residual maternal antibody or have antibody that would react with the indicator mumps virus for some undetermined reason.[62]

65. For the AIGENT assay, Merck's goal, as requested by the CBER, was to design a test with high assay sensitivity. Therefore, the cutoff point was chosen to be highly sensitive.[63] That cutoff point choice resulted in a decreased ability to correctly categorize the (assumed) true negative sera, with more false positive test results among pre-vaccination sera than if the cutoff had been slightly higher and the sensitivity correspondingly lower.[64]

66. In my opinion, this choice of cutoff and assay performance was consistent with the purpose of the AIGENT assay for use in testing the sera obtained under Protocol 007 with a highly sensitive assay in order to evaluate the protocol's stated hypotheses and to meet CBER's expressed expectations.

67. The validation of the AIGENT assay was reported to CBER in a submission to the IND on March 12, 2001. The inter-assay precision was 42.9%, which, in my opinion, considering the inherent variability of a PRN, was quite reasonable, and the cutoff for a positive was the lowest dilution tested, so a positive was any serum with a titer of $\geq$1:32. By this criterion, the pre-positive rate was 12.3% (95% CI 6.3% to 23.7%). Absorption of serum with mumps antigen reduced the neutralization in half the samples beyond the effect of absorption with other antigens. Sera with a titer of < 1:32 were deemed to have a titer of 1:16 and the

---

[62] Protocol MRK-KRA00224982-226529, at 226167; DAP MRK-KRA00224982-226529, at 421.

[63] September 8, 1998 letter, MRK-KRA00001467-69; August 30, 1999 letter, MRK-KRA00001266-1269.

[64] August 3, 2017 Deposition Testimony of Joseph Antonello, 64:22-65:6; 188:1-191:1; 197:2-198:24.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY Appx1611

criteria for seroconversion was an increase in tier of $\geq 4$ fold for both pre-positive and pre-negative sera.[65]

68.     Relators' expert, Dr. Calcott, has raised concerns about the lack of blinding within sera pairs (pre- and post-vaccination) as the AIGENT assay was run and results were recorded.[66]

69.     In my opinion, this concern is misleading and fails to recognize the practical realities of biological assays such as this one.  To minimize variance, such assays are routinely run with paired sera in adjacent sets of wells on the same plate or in adjacent plates.  In such a format where the great majority of pre sera are negative and the great majority of post sera are positive, unblinding of pre vs. post happens from even casual inspection of the results.  Therefore, they are not blinded in this regard.  The important blinding is to clinical study group status and that was maintained in Dr. Krah's laboratory.  Further, in August 2001, it would have been clear to the FDA inspectors in their review of the records for the AIGENT data for Protocol 007 that the pre vs. post sera were not blinded within pairs.  As discussed in more detail, below, there was no finding regarding this following the inspection in August 2001.

## IX.     Merck's Development and Use of the WT-ELISA

70.     With respect to the use of ELISA to support Protocol 007's secondary hypotheses, CBER and Merck began discussing the use of a vaccine-strain-based ELISA ("Legacy ELISA") in Protocol 007.[67]  These discussions occurred at the same time Merck and CBER were communicating about the use of an ELISA to support a separate study, namely for Merck's ProQuad® vaccine BLA.

---

[65] March 12, 2001 Submission, MRK-KRA00018864-937, at 906-907 & 917-920.

[66] March 12, 2018 Report of Peter H. Calcott, BSc (Hons), D Phil, at pp. 38-41, ¶¶ 86-94.

[67] Dec. 19, 2003, MRL Clinical Study Report: Protocol 007 ("CSR") (MRK-KRA00224982 to 226529 at 225017); Feb. 5 1999 M-M-R™II BB-IND 1016 Serial No. 027 (MRK-KRA00001258-924 at 624470 to 624472).

24

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

71.     In early 2000, CBER requested that Merck use a WT mumps virus antigen in their ELISA[68] and discussed Merck conducting a validation analysis to assess the assay's performance.[69]  CBER and Merck engaged in robust discussion regarding the development of a WT ELISA to support BB-IND 1016 (M-M-R®II) and BB-IND 7068 (MMRV®).[70]  On February 2, 2001, Merck submitted the WT-ELISA Validation Memorandum to CBER.[71]

### A.     Merck's WT-ELISA Sensitivity and Specificity

72.     The cutoff for an assay is the lowest result that is determined to detect the presence of the analyte at a reproducible and clinically meaningful level, giving a positive result. As discussed above, the cutoff selected determines what performance regarding the trade off between sensitivity and specificity is consistent with its intended use and acceptable to the assay's designers.

73.     Relators' expert, Dr. Kessler, has raised the issue of whether the WT-ELISA cutoff selected by Merck, $\geq 10$ Ab units, was correct or "too low"[72] and not scoring as many sera samples as possible the same way in the two assays.  However, Merck submitted the results from

---

[68] Feb. 16, 2000, CBER's meeting minutes from Jan. 31, 2000 Merck-CBER teleconference (MRK-KRA00821856 to 821861).

[69] Mar. 13, 2000, Merck memorandum re Merck-CBER in-person meeting (MRK-KRA01619324 to 1619327 at 1619326); Mar. 14, 2000 Merck memorandum re Merck-CBER in-person meeting (MRK-KRA00001258-924).

[70] Jan. 31, 2000, Merck memorandum re Merck-CBER teleconference (MRK-KRA00024906 to 24909); Feb. 8, 2000, Merck memorandum re telephone call with Dr. Kathy Carbone and Luba Vujcic (CBER) (MRK-KRA00018647 to 18649); Feb. 16, 2000 CBER's meeting minutes from Jan. 31, 2000 Merck-CBER teleconference (MRK-KRA00821856 to 821861); Mar. 13, 2000, Merck memorandum re Merck-CBER in-person meeting (MRK-KRA01619324 to 1619327); Mar. 13, 2000, Merck memorandum re Jan. 13, 2000 Merck-CBER in-person meeting (MRK-KRA00019855 to 19857); Mar. 14, 2000, Merck memorandum re Merck-CBER in-person meeting (MRK-KRA00001258-924).

[71] Feb. 2, 2001, BB-IND 1016: MMR®II Serial No. 062 Response to FDA Request for Information (MRK-KRA00622078 to 622273), attaching the Aug. 18, 2000, Mumps "Wild Type" ELISA Validation Protocol ("WT-ELISA Validation Protocol") (MRK-KRA00622221 to 622227) and WT-ELISA Validation Memo (MRK-KRA00622228 to 622250).

[72] Expert Report of David A. Kessler, M.D. ("Kessler Report") at p. 246 n. 554.

25

the comparison, requested by CBER, between the AIGENT and WT-ELISA, to CBER on June

10, 2002.[73]  It reported that the agreement, using a cutoff of ≥ 10 Ab units, was found to be quite

good.  The agreement between the assays exceed 85% for each measure evaluated (sensitivity,

[assay] specificity, positive and negative predictive value, and overall percent agreement).[74]  In

addition, the validation study for the WT-ELISA reported that it was highly specific for antibody

to mumps as compared to antibody for measles, rubella, or varicella.[75]

74.     Dr. Kessler has raised the issue of whether the WT-ELISA cutoff of ≥ 10 Ab units

was incorrect or "too low" and not scoring sera samples the same way as the AIGENT assay.[76]

As an alternative to the ≥ 10 Ab unit serostatus cutoff, Dr. Kessler raises the issue of whether the

WT-ELISA should have required a four-fold increase in antibody between the pre-vaccination

sample and the post-vaccination sample to classify the subject as a vaccine responder.[77]

### B.     The ≥ 10 Ab units serostatus cutoff was appropriate

75.      Merck's submission on February 2, 2001 responding to previous CBER

comments on Protocol 007 and the serological testing for it, included the validation protocol for

the WT-ELISA and results of the analysis.[78]

76.     It is relevant to note that the choice of a four-fold rise in antibody for a response,

while often used, is an artifact of the traditional use of serial two-fold dilutions of the sera,

together with the assumption that the precision of the assay at any one dilution is too low to

---

[73] June 10, 2002 BB-IND 1016: MMR®II Serial No. 086, Response to Request for Information
(Mumps Cutoff Document) ("June 2002 serial No. 086") (MRK-KRA00761628 to 761702).
[74] *Id.* at 761638.
[75] December 4, 2000 WT-ELISA Validation Memo, MRK-KRA00622078-622273.
[76] Kessler Report at p. 246 n. 554.
[77] Kessler Report at pp. 249 to 252.
[78] Feb. 2, 2001, BB-IND 1016: MMR®II Serial No. 062 Response to FDA Request for
Information (MRK-KRA00622078 to 622273), attaching the WT- ELISA Validation and WT-
ELISA Validation.

26

reliably replicate the endpoint of a positive vs. negative result for any single serum dilution.  The WT-ELISA, however, does not use serial serum dilutions.  The validation study for the WT-ELISA cutoff reported that the intra- and inter-assay precisions were 18.9% and 25.3%, respectively,[79] and those were considerably greater than the precision of the AIGENT assay, which had an inter-assay precision of 42.9%.[80]

77.     The WT-ELISA had a limit of detection of 0.24 Ab units with a quantifiable range from 0.5 to 64 Ab units, a cutoff for a positive serum of $\geq 10$ Ab units and precision, inter-assay variability, of 25.3%.[81]  In the validation study results, all but a few of the 66 evaluable negative samples (pre-vaccination sera or WT EIA negative) contained less than 3.125 Ab units, less than one-third of the cutoff of $\geq 10$ Ab units.[82]  Given this and the precision of the assay, there is a high degree of confidence that post vaccination sera with $\geq 10$ Ab units are not erroneously positive results for subjects whose pre-vaccination sera were classed as negative for antibody.  This confidence increases further for sera with increasing measured antibody concentrations greater than $\geq 10$ Ab units.

78.     Of the 1799 subjects from Protocol 007 who had a pre-vaccination WT-ELISA titer <10 Ab units (*i.e.,* were pre-negative), only 65 sera (roughly equally distributed among the arms; 25 in the <3.7 group, 17 in the <4.0 group, and 25 in the <4.9 group) had post-immunization positive WT-ELISA titer to mumps of $\geq 10$ to <20 Ab units.  If 65 is multiplied by 13% (the percentage of pre-negatives with pre-negative titers higher than 3.125 but <10 Ab units) it predicts 8 or 9 sera (fewer than 0.5% of the subjects) would be estimated to have been high pre-negatives.  It would be only in these few subjects where there might plausibly be some

---

[79] WT-ELISA Validation Memo, MRK-KRA00622098-273, at 22228.
[80] Mar. 12, 2001 Submission (MRK-KRA00018864-937, at 906).
[81] WT-ELISA Validation Memo at 622228.
[82] *Id.* at 622238.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

question about their seroconversion status, and most of them would have had post-immunization titers of much greater than 10 Ab units, greatly reducing any such concern.[83]

79.    For the WT-ELISA, the cutoff was chosen to do a good job in classifying likely negative samples as negative and likely positive samples as positive.[84]  CBER recognized the relevance of using un-vaccinated infant pre sera in determining the cutoff for the Merck WT-ELISA.

80.    The expected rate of pre-positive sera, those from unvaccinated infants, was low[85] and the expected rate of post-positives, from 6 weeks after vaccination, was high at 96%. Together with CBER's expectations on the criteria for a successful study, this required selection of a cutoff for the WT-ELISA that resulted in a high assay sensitivity, while not classifying more than a few percent of the presumably negative sera as false positive (assuming pre-vaccination sera testing positive are false positive results.)

81.    As is normal for any assay and as discussed above, more than one potential cutoff for the WT-ELISA were explored before the 10 Ab unit cutoff was selected.[86]  The selected cutoff was chosen to produce a highly sensitive assay that would minimize pre-vaccination positive results.  It was not intended to replicate the results of the AIGENT assay.[87]

---

[83] Sept. 28, 2001, e-mail from Jonathan Hartzel to Manal Morsy et al. (MRK-KRA00561416 to 561417), attaching document titled "Distribution of 6-week Mumps Titers Using the Mumps Wild-type ELISA Assay" (MRK-KRA00561418 to 561421).

[84] Aug. 3, 2017, Joseph Antonello Deposition Transcript at 68:13-24.

[85] CSR at 225055.

[86] *See* WT-ELISA Validation Memo at 622248.

[87] Antonello Depo. Trans. at 66:19-68:24 ("[T]here was not, to my knowledge, a seroprotective level. . . .since one did not exist, it couldn't be used to set the serostatus cutoff. . . . The purpose of the serostatus cutoff was to do a good job classifying likely negative samples as negative and likely positive samples as positive.").

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    Appx1616

82.     As part of the WT-ELISA development process, Merck evaluated potential fixed serostatus cutoff values, including of 5 Ab units and 10 Ab units.[88]  On December 5, 2000, Merck QA approved the final WT-ELISA Validation Memorandum in support of BB-IND 1016, which states that "[t]he data support the proposed serostatus cutoff of 10 Ab units."[89]  In support of this cutoff selection, the Validation Memorandum provided the following information:

**Serostatus Cutoff**

The serostatus cutoff is the lowest antibody concentration that can be reliably distinguished from a panel of negative samples.  A panel of 72 "negative" samples were tested, 12 in each of the 6 assay runs.  Twelve samples were post-vaccinated negatives as determined in the non-WT EIA, and the remaining were pre-vaccinated samples.  Six samples were extravariable, and therefore excluded.  Titers were calibrated as low as 0.3125 Ab units (3.125 after dilution correction) in order to compare the proposed cutoffs of 10 and 5 Ab units.  Results are listed in Attachment V.  Serostatus assignments using the two cutoffs are given in Table 5 and depicted graphically in Figure 3.  Using a cutoff of 5 Ab units resulted in 3 of 56 pre-vaccination positives (5.3%) compared to 0 pre-vaccination positives when using 10 Ab units.  Based on these results, a serostatus cutoff of 10 Ab units is recommended.

Table 5

Comparison of Serostatus Assignments Using Cutoff of 10 and 5 Ab units

| Serostatus Assignment | 10 Ab units | | 5 Ab units | |
|---|---|---|---|---|
| | Pre | Post | Pre | Post |
| Negative | 56 | 8 | 53 | 7 |
| Positive | 0 | 2 | 3 | 3 |

83.     Ultimately Merck selected 10 Ab units as the WT-ELISA serostatus cutoff because it generated fewer pre-positives (0%) than the 5 Ab units cutoff (5.3%).[90]  The choice of 10 Ab, rather than 5 Ab units as the cutoff produced greater assay specificity (*i.e.,* fewer false positives) assuming the pre sera had the expected lack of antibody to mumps virus.[91]  If the 5 Ab units cutoff had been selected it would also have given less separation between the bulk of pre-negative sera, <3.125 Ab units, and the lowest positive ones.  In my opinion, having designed an assay and determined a cutoff that met the expected performance well that also was fit for the

---

[88] WT-ELISA Validation Memo at 622248.
[89] *Id.* at 622228.
[90] *Id.* at 622248.
[91] *See Id.*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY       Appx1617

intended use, it was reasonable and appropriate for Merck to select that cutoff and not further explore alternatives.

84.     Merck's selected serostatus cutoff of 10 Ab units and the data and analyses performed to support its selection were shared with CBER on multiple occasions.  The June 10, 2002 Serial No. 086 submission, which Merck submitted in response to CBER's "request for additional information regarding the cutoff chosen for the mumps WT-ELISA comparing the ELISA cutoff to the AIGENT assay cutoff," attached data that were responsive to CBER's requests.[92]  Notably, Merck included an 11-page attachment with the pre- and post-vaccination titer concentrations for 565 subjects tested in the AIGENT and the WT-ELISA assays.[93]  Discordant pairs were shaded for ease of identification.

85.     Merck also provided CBER with a variety of tables that were generated as a result of the analysis it performed on these samples.[94]  Relators' experts, however, point to two particular tables—Table 6c and 6d, which were created by Merck statistician, Dr. Joseph Antonello—and argue that Merck's decision about how and when to provide the data presented in each table is evidence of Merck attempting to deceive or withhold information from CBER.[95]

86.     Regarding Table 6d, Relators' experts' criticism of Merck's decision to alter the table to create Table 8 and to change the location of the table within the June 10, 2002 Serial No. 086 submission lacks merit.  First, Merck provided all of the raw data for the 565 subjects.[96]  This allowed CBER to analyze the data as they thought most useful.

---

[92] *See* June 2002 Serial No. 086.
[93] *Id.* at 761684 to 761694.
[94] *See id.* at 761635-761638, 761640, 761642, 761646, 761648-49, 761677-81, 761701-02.
[95] Kessler Report at pp. 259 to 280; Report of Peter H. Calcott ("Calcott Report") at ¶ 112.
[96] June 10, 2002 Serial No. 086, MRK-KRA00761628-761694.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY     **Appx1618**

87.    Moreover, as shown below, Table 8, which is also included as Table 2 in Attachment 3 to the Serial No. 086 submission, retains all of the important information from Table 6d and even includes additional relevant data.[97]  Although Relators' experts criticize Merck's decision to expand the number of titer groupings in Table 8 and insinuate that its motivation was to deceive CBER, these groupings (unlike the arbitrary rounded-number groupings in Table 6d) were created on the basis of standard deviations.  Based on my experience, manufacturers responding to CBER requests for information are permitted to present data as they think most scientifically appropriate.  It was within Merck's discretion to arrange this data in the manner it deemed most appropriate.  Where CBER wants data in a specific format, they ask for that.  In this case, CBER had all of the raw data as of June 10, 2002.[98]  Merck's presentation was neither deceptive nor misleading.

### Table 6d
### M-M-R®II 007 Frequency Distribution of ELISA Post-vaccination Positive Titers

| ELISA Titer Ab units | Subset of AIGENT Negative Samples | Number Samples | Percent of Subgroup | Percent of Total |
|---|---|---|---|---|
| 10<=titer<20 | 6 | 25 | 24.0 | 1.2 |
| 20<=titer<40 | 8 | 68 | 11.8 | 1.6 |
| 40<=titer<80 | 5 | 146 | 3.4 | 1.0 |
| 80<=titer<160 | 2 | 161 | 1.2 | 0.4 |
| 160<=titer<320 | 1 | 74 | 1.4 | 0.2 |
| 320<=titer | 0 | 14 | 0.0 | 0.0 |
| | 22 | 488 | | 4.5% |

---

[97] *See id.* at 761640 (Table 8), 761702 (Table 2).
[98] *See id.* at 761684 to 761694.

31

**Table 8**
**Observed and Expected Mismatch Rates as a Function of Distance from the Cutoff**
**in the Context of the Comparison Between the AIGENT and WT ELISA Assays**

| ELISA Titer Grouping | ELISA Titer Grouping | Resampling Procedure | | | | Observed Results | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | ELISA Titer Distribution | No. Mismatched Samples | 95% CI on No. Mismatched Samples | Percent Mismatched Samples | ELISA Titer Distribution | No. Mismatched Samples | Percent Mismatched Samples of Subgroup | Percent Mismatched Samples of Total |
| 10<=titer<1sd | 10<=titer<14.1 | 12.62 | 5.10 | (1,10) | 40.40% | 13 | 4 | 30.77% | 0.82% |
| 1sd<=titer<2sd | 14.1<=titer<20 | 14.64 | 1.96 | (0,5) | 13.40% | 12 | 2 | 16.67% | 0.41% |
| 2sd<=titer<3sd | 20<=titer<28.3 | 29.71 | 0.41 | (0,2) | 1.40% | 31 | 6 | 19.35% | 1.23% |
| 3sd<=titer<4sd | 28.3<=titer<40 | 36.92 | 0.03 | (0,1) | 0.10% | 37 | 2 | 5.41% | 0.41% |
| 4sd<=titer<5sd | 40<=titer<56.6 | 65.74 | 0.00 | (0,0) | 0.00% | 69 | 4 | 5.80% | 0.82% |
| 5sd<=titer<6sd | 56.6<=titer<80 | 78.19 | 0.00 | (0,0) | 0.00% | 77 | 1 | 1.30% | 0.20% |
| 6sd<=titer<7sd | 80<=titer<113.1 | 81.75 | 0.00 | (0,0) | 0.00% | 83 | 0 | 0.00% | 0.00% |
| 7sd<=titer<8sd | 113.1<=titer<160 | 79.62 | 0.00 | (0,0) | 0.00% | 78 | 2 | 2.56% | 0.41% |
| 8sd<=titer<9sd | 160<=titer<226.2 | 51.68 | 0.00 | (0,0) | 0.00% | 49 | 1 | 2.04% | 0.20% |
| 9sd<=titer<10sd | 226.2<=titer<320 | 23.71 | 0.00 | (0,0) | 0.00% | 25 | 0 | 0.00% | 0.00% |
| 11sd<=titer | 320<=titer | 13.43 | 0.00 | (0,0) | 0.00% | 14 | 0 | 0.00% | 0.00% |
| | Totals: | 488 | 7.49 | | | 488 | 22 | | 4.51% |

88.     Similarly, Relators' experts criticize Merck's decision to submit a nearly-identical version of Table 6c in an August 1, 2002 submission instead of including it in the June 10, 2002 Serial No. 086 submission.[99]  As demonstrated below, the two tables report identical information in only slightly differing formats.[100]

**Table 6c**
**M-M-R®II 007 Frequency Distribution of AIGENT Post-vaccination Positive Titers**

| AIGENT Titer Reciprocal Dil. | Subset of ELISA Negative Samples | Number Samples | Percent of Subgroup | Percent of Total |
|---|---|---|---|---|
| ≤256 | 3 | 17 | 17.6 | 0.6 |
| 512 | 4 | 59 | 6.8 | 0.8 |
| 1024 | 1 | 98 | 1.0 | 0.2 |
| 2048 | 3 | 128 | 2.3 | 0.6 |
| >4096 | 0 | 175 | 0.0 | 0.0 |
| | 11 | 477 | | 2.3% |

---

[99] Kessler Report at pp. 259 to 280; Calcott Report at ¶ 112.

[100] Table 6c – Kessler Report at p. 257; Table C – Aug. 1, 2002, Letter from Merck to CBER re responses to CBER's comments and clarifications (MRK-KRA00624279 to 624287 at 624285).

32

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Appx1620

**Table C**
**M-M-R®II  007 Trial Post-Vaccination Results Frequency Distribution of AIGENT titers for all AIGENT Positive Post-Vaccination Samples and the Subset of ELISA Negative and AIGENT Positive Discordant Post-Vaccination Samples**

| AIGENT Titer Grouping | AIGENT Titer Distribution | No. WT ELISA Mismatched Samples | Percent Mismatched Samples of Subgrouping | Percent Mismatched Samples of Total |
|---|---|---|---|---|
| <=256 | 17 | 3 | 17.6% | 0.6% |
| 512 | 59 | 4 | 6.8% | 0.8% |
| 1024 | 98 | 1 | 1.0% | 0.2% |
| 2048 | 128 | 3 | 2.3% | 0.6% |
| >4096 | 175 | 0 | 0.0% | 0.0% |
| Totals: | 477 | 11 | | 2.3% |

89.     Once again, in my opinion, because it provided the raw data to CBER on June 10, 2002, Merck was fully responsive and their exercise of judgment, including for what presentations they did and did not include, was reasonable and appropriate.

90.     Relators' expert, Dr. Kessler, further opines that he would have expected Merck to have submitted tables prepared in March 2001 comparing the results of approximately 60 low level responders in the preliminary subset (from Protocol 007) by AIGENT and WT-ELISA broken out by potency dose.[101]

91.     In my opinion, the table did not show anything new and important.  It supported that the WT-ELISA was more sensitive, as it had been designed to be, and the seroconversion rate was lower by both tests in the 3.7 log 10 $TCID_{50}$ subjects than in the higher potency groups.

92.     Dr. Kessler also expected submission of the results of Merck's exploratory analysis on ten selected sera pairs from eight non-responders and two low responders in the AIGENT assay (nine of which were discordant in the WT-ELISA).[102]  In my opinion, submitting

---

[101] Kessler Report at pp. 279 to 280 (citing MRK-KRA00562247).
[102] Kessler Report at pp. 279 to 280, 517 to 518, 273 n. 595.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY      **Appx1621**

this information would have not only been unnecessary, but it would have also been inappropriate. The use of un-validated assays, as was done here, to develop hypotheses about data is common. But until any findings are confirmed, by being conducted on independent samples under controlled protocols using validated criteria for the assays, they are irrelevant for regulatory decision-making.

93. Dr. Kessler refers to Merck's internal communications over concerns about how a four-fold criteria would lower the WT-ELISA seroconversion rates and the potential impact that could have on the MMRII and ProQuad® submissions.[103] In my opinion, however, based on both my review of the documents and my understanding of CBER's (OVRR's) sophisticated knowledge regarding the calculation of SCRs using both an Ab cutoff and a rise criteria, CBER's scientists would be expected to fully appreciate how a four-fold rise criteria would reduce the WT-ELISA seroconversion rate.

94. Merck had provided CBER with the individual sample data that would allow them to calculate the specific impact of such criteria on the WT-ELISA seroconversion rate.[104] CBER never required a four-fold rise increase in the context of either the MMRII or ProQuad® submissions.

95. In my opinion, the frequency of the communication and the level of transparency involved in the information exchanged between Merck and CBER throughout the development and running of the WT-ELISA indicates that CBER actively participated in the assay's design and was appropriately informed on critical features, such as the 10 Ab serostatus cutoff.

96. In my opinion, given CBER's expressed desire to use a highly sensitive assay, with acceptable assay specificity, for Protocol 007, and the reported high precision of the WT-

---

[103] *Id.* at pp. 249 to 252.
[104] June 10, 2002 Serial No. 086, MRK-KRA00761628-761694.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY **Appx1622**

ELISA using a fixed cutoff was reasonable and scientifically justified. The choice of 10 Ab units cutoff for the WT-ELISA was appropriate for its intended use and resulted in appropriately reliable classification of pre to post seroconversion rates for the intended use in assessment of the sera from Protocol 007.

### A. Merck's ELISA Bridging Study

97. In response to a request from Merck, CBER scheduled a teleconference for October 16, 2001, to "address CBER questions regarding the Mumps Wild Type ELISA."[105] In anticipation of the teleconference, on September 27, 2001, Merck provided CBER with the Bridging Study and a document titled "Background Document for Mumps, Measles, Rubella ELISA," which provided a comprehensive overview of the differences between the Legacy ELISA and the WT-ELISA, including the serostatus cutoffs for the two assays.[106] This study reported that the WT-ELISA was slightly less sensitive than the Legacy ELISA (97.7% vs. 99.3%).[107] During the teleconference, CBER scientists indicated they were generally satisfied with the mumps WT-ELISA.[108]

98. Notably, with regard to the serostatus cutoff, CBER acknowledged that there is no "reference standard for a sero-protective level for mumps."[109] Due to the need for a cutoff, however, CBER requested Merck provide (1) additional justification supporting the chosen mumps ELISA cutoff of 10 Ab; (2) a comparison of the ELISA cutoff used in the PRN assay;

---

[105] Oct. 16, 2001, Merck memorandum re vaccine biometrics research highlights (MRK-KRA005582938 to 5852944 at 582938); Oct. 19, 2001, Merck memorandum re CBER teleconference (Oct. 16, 2001) (MRK-KRA00201389 to 201391).

[106] Sept. 27, 2001, Facsimile cover letter from Merck to CBER (MRK-KRA00561903), attaching Feb. 23, 2001, Bridging Study Memorandum ("Bridging Memo") (MRK-KRA00561875 to 561885), and October 4, 2001 background document, MRK-KRA00561939.

[107] Bridging Memo at 561875.

[108] Oct. 19, 2001, Merck memorandum re CBER teleconference (Oct. 16, 2001) at 201390.

[109] *Id.*

35

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

and (3) the identification of individual titers in the relative range around the cutoff in the PRN assay and the ELISA.[110]

99.     The analysis Merck performed in response to CBER's requests were submitted to CBER in its Serial No. 086 "Response to FDA Request for Information (Mumps Cutoff Document)" on June 10, 2002.[111]  In addition to all of the various analyses included in the Serial No. 086 response, Merck attached the individual pre-vaccination and post-vaccination titer results for both the WT-ELISA and AIGENT assays for 565 subjects from the initial subset of Protocol 007, and drew attention to discordant pairs by shading those results.[112]  In the cover letter, Merck requested CBER's concurrence with "Mumps WT ELISA cutoff of 10 Ab units."[113]

100.     Over the next two months, Merck and CBER engaged in a dialog regarding the proposed cutoff, and Merck provided additional information to CBER in another written submission dated August 1, 2002.[114]  In that submission, Merck, among other things, explained that the 565 subjects were selected because they were the only ones who had pre- and post-vaccination titers in the mumps WT-ELISA; of those, 510 had a reportable AIGENT pre-vaccination titer, and 513 had a reportable AIGENT post-vaccination titer.[115]  Merck also

---

[110] *Id.* at 201389.

[111] *See* June 10, 2002 Serial No. 086, MRK-KRA00761628-702 (Merck included the following three attachments: (1) a report and the underlying data regarding a study performed testing the WT-ELISA standard and control samples in AIGENT assay and vice versa; (2) a report and the underlying data regarding the comparison performed between WT-ELISA and AIGENT assay using "original" AIGENT results; and (3) a report regarding Merck's evaluation of the mismatch classification rates due to assay variability addressing discordant samples around the cutoff.)

[112] *Id.* at 761684 to 761694.

[113] *Id.* at 761630.

[114] Aug. 1, 2002, Letter from Merck to CBER re responses to CBER's comments and clarifications (MRK-KRA00624279 to 624287).

[115] *Id.* at 624281 to 624282.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY     **Appx1624**

responded to CBER's question regarding sera tested between 5 and 25 ELISA cutoffs.[116]

Following another teleconference with CBER on August 2, 2002, on August 8, 2002, Merck

wrote to CBER to provide a summary of the August 2, 2002 teleconference and reiterated its

understanding "that CBER confirmed the acceptance of the WT Mumps ELISA assay cutoff of

10 Ab units."[117]

## X.      The WT-ELISA and AIGENT assays were correlated

101.    As detailed earlier in this report, Merck performed a study comparing the mumps

AIGENT assay and the mumps WT-ELISA results using the AIGENT results from the first,

original, data sheets.  Merck provided the results of this study to CBER in its June 10, 2002

Serial No. 086 submission.[118]  The results show an overall agreement of 90.4% with respect to

samples classified as positive in both assays and negative in both assays.[119]  With respect to

seroconversion rates, the overall agreement between the AIGENT and WT-ELISA assays was

93.4%, "with the ELISA being slightly, though not statistically significantly more likely than the

AIGENT to classify a sample as a [seroconverter]."[120]  In fact, the agreement between the WT-

ELISA and AIGENT assays exceeded 85% for sensitivity, specificity, and positive and negative

predictive value.[121]

102.    In my opinion, Merck was justified stating the following:

There is good agreement between the mumps WT-ELISA and the AIGENT assays in terms of

serostatus classification when using a cutoff of 10 Ab units in the mumps WT-ELISA and a

---

[116] *Id.* at 624282 to 624284.
[117] Aug. 8, 2002 BB-IND 1016: M-M-R®II Serial No. 089, General Correspondence CBER-
   Merck Communication Mumps Expiry (MRK-KRA00623049 to 623051 at 623050).
[118] *See* June 10, 2002 Serial No. 086 at MRK-KRA00761628-761702.
[119] *Id.* at 761629.
[120] *Id.* at 761675.
[121] *Id.* at 761672, 761675.

37

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    **Appx1625**

cutoff of 1:32 in the AIGENT assay. Identification of individual titers in relative range around the cutoffs of both assays confirms that both assays are categorizing sera in comparable fashion.[122]

103. In my opinion, an overall agreement of 90% indicates a high degree of agreement and is certainly adequate, especially when, as was the case in Protocol 007, there is no pre-specified target agreement percentage for success.

104. Relators' expert, Dr. Kessler, argues that alternative serostatus cutoffs would have generated a higher rate of agreement in the cross-classification categories Merck evaluated as part of the comparison.[123] Such arguments are, in my opinion, misguided. It is important to note that the overall agreement between the WT-ELISA and AIGENT assays was already good. Further, selecting the appropriate serostatus cutoff involves a number of considerations and is not simply an exercise in identifying the cutoff that provides the highest overall agreement between the two assays (see above). For the WT-ELISA cutoff the goal was to develop a highly sensitive assay with an acceptably low false positive rate. In my opinion, this was consistent with the expectations set by CBER and appropriate to the objective of Protocol 007.[124]

## XI. FDA's Inspection of Dr. Krah's Laboratory and the Form 483

105. On August 6, 2001, FDA conducted an inspection of the Merck laboratory that was running the AIGENT serology for Protocol 007 under the supervision of Dr. Krah. This

---

[122] *Id.* at 761639.

[123] *See* Kessler Report at pp. 258-259, 268-269.

[124] *See* Antonello Depo. Trans. at 66:19-68:24 ("The purpose of the serostatus cutoff was to do a good job classifying likely negative samples as negative and likely positive samples as positive.")

38

Appx1626

inspection was reportedly triggered by phone calls to FDA from one of Merck's laboratory staff, Mr. Krahling, who complained about the procedures and data recordation in the laboratory.[125]

106.    Drs. Bennett, an FDA field force investigator, and Carbone, a CBER medical scientist expert on mumps and the mumps vaccine, conducted this inspection on August 6, 2001. At its conclusion, they issued Dr. Alan Shaw, who was Dr. Krah's supervisor, an FDA form 483 listing four observations.  These observations stated: 1) raw data was being changed with no justification; 2) there is no procedure to assess whether a research lab is suitable for clinical trial testing prior to start [of testing]; 3) spreadsheets used to determine questionable results and retesting… have not been validated; and 4) notebooks do not identify each technician performing each task.[126]

107.    Merck's notes from that inspection and the FDA's inspection report, signed by Dr. Bennett, record that Dr. Bennett voiced her expectation that the data generated from human subjects should be controlled under the requirements of cGMP.  The report also said that research labs are not typically suited for testing clinical samples because they do not have the required level of cGMP in place.[127]

108.    Dr. Bennett returned to Merck twice in follow up and collected raw data from the laboratory on the initial set of samples of mumps neutralization tests at the request of Dr. Carbone.[128]

109.    Merck responded to the inspection observations on August 20, 2001, in a letter to FDA.[129]  This response included a reanalysis[130] comparing the results, for the initial 565 subjects

---

[125] May 2, 2017 Deposition of Stephen Krahling 242:15-244:15; 294:21-296:24.
[126] MRK-KRA00052250.
[127] August 6, 2001 Memorandum, MRK-KRA00052251-53, at 51; August 6, 2001 EIR, MRK-KRA02021754-61, at 58.
[128] August 10, 2001 Memorandum, MRK-KRA00000557-560; September 14, 2001 Memorandum, MRK-KRA00063885-88.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Appx1627

in Protocol 007, using the data originally recorded vs. the changed data for which the inspectors had objected due to the lack of documentation.  The re-analysis reported no evidence of a difference between the two sets of data and no evidence of bias in the results.  CBER did an independent reanalysis of the results and told Merck it found a 2% increase in the seroconversion rates in each arm; but CBER did not identify a bias favoring any arm of the trial.[131]

110.    Following submission of an analysis of the corrected, compared to originally recorded, plate counts by Merck showing no significant difference in seroconversion rates,[132] and extensive discussions with CBER regarding the procedures used for the AIGENT testing, CBER ultimately accepted the AIGENT PRN data using the un-corrected, originally recorded, results for analysis of the Protocol 007 data.[133]  It should be noted that although the CBER did not disagree in principle with many of the recounting and retesting procedures applied to the testing, they found the use of the original results was necessary for Merck's submission of the Protocol 007 data, based on the timing of when those procedures were implemented.[134]

111.    In my opinion, Dr. Bennett was in error—possibly due to her experience as a field force inspector conducting cGMP inspections of manufacturing facilities—when she indicated that Merck's clinical study laboratory was subject to cGMP.  The scope statements and content of those regulations indicate they apply to drug manufacturing and control, including drug quality control testing laboratories, but they do not mention clinical study laboratories.

112.    In my opinion, the for-cause inspection by FDA was to determine if there was evidence of a significant data integrity problem for Protocol 007.  Further, if FDA had concluded

---

[129] August 20, 2001 letter to CBER, MRK-KRA00000481-539.
[130] *Id.* at 500.
[131] December 13, 2001 Meeting Minutes, MRK-KRA00019640-646, at 41-42.
[132] February 4, 2002 Submission, MRK-KRA00086341-410.
[133] March 23, 2002 Memorandum, MRK-KRA00009042.
[134] December 13, 2001 Memorandum, MRK-KRA00779882-85.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

there was such a problem, they would not have reviewed the AIGENT data. Rather, FDA would have informed Merck that the rejection was because of a lack of assurance of data integrity and would have likely requested corrective action—specifically to address the data integrity—before further review of Merck's sBLA. In my opinion and experience, if FDA had concluded that its data integrity concerns could not be adequately corrected, they would have required a new study, or at a minimum complete retesting of all sera from the existing study.

## XII.   Merck's supplemental BLA to change the labeled potency of MMR II

113.    On January 29, 2004, Merck submitted a supplement to their MMRII BLA to change the label statement of mumps potency from 20,000 $TCID_{50}$ to 12,500 $TCID_{50}$ per dose. As presented in section 2.5.1, Protocol 007 provided the immunogenicity data to support the requested change. The results for the mumps vaccine antibody for the three studied potencies were analyzed using the AIGENT and WT-ELISA. Merck concluded that this data demonstrated that MMRII, with a mumps potency of 4.1 log 10 $TCID_{50}$, was highly immunogenic and comparable to vaccine with a potency of 4.8 log 10 $TCID_{50}$ with persistence of antibody for at least 1 year.[135]

114.    After comments from CBER and responses from Merck (Dec. 3, 2004 and Apr. 13, 2005)[136] on October 17, 2005, CBER responded with a review letter stating the information and data were inadequate for final approval at that time. The identified deficiencies were: 1) a substantial amount of excluded sample data for the PRN assay; 2) vaccine stability data for the

---

[135] January 29, 2004 Submission, MRK-KRA00000032-139, at 119.
[136] December 3, 2004 communication from CBER, MRK-KRA00789957-961; April 13, 2005 Response, MRK-KRA0014733-78.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

three lots evaluated had been assayed at separate times in different formats; and 3) the (release potency) control lot had failed the acceptability criteria.[137]

115.    Merck responded, on November 15, 2006, to each of these deficiencies, including proposing to assess the missing subject data through multiple imputation methods.[138]

116.    On May 18, 2007, CBER notified Merck that it had completed review of the supplement, as amended, and could not approve it at that time. Specifically they rejected the use of multiple imputation analyses for the missing data from the PRN assay.  However, CBER noted that "the science related to immunogenicity testing of M-M-R®II has substantially evolved since our initial testing requirements.  Use of ELISA data to evaluate the effect of differences in product potency on immunogenicity is now acceptable."  They went on to request information on product immunogenicity consistency of the control lot for Protocol 007 with that for two lots used in previous MMR studies.  They also requested, if consistency among the three lots were shown, to pool the results for a (new positive) control group and that the lower potency immunogenicity be evaluated against that pooled control group.[139]

117.    In my opinion, there are two likely reasons for this request to evaluate comparability among the WT-ELISA results across studies, and if it was supported, to pool the data for the control group.  First, the vaccine used in Protocol 007 was not a formulation approved in the United States and an analysis showing that it performed comparably to the U.S. approved formulation was desired.  Second, the use of the pooled (positive) control arm provided additional assurance the study was measuring vaccine responses with high sensitivity, as the

---

[137] October 17, 2005 CBER Response, MRK-KRA00132999-3011, at 132999.
[138] *Id.*, at 133001-133011.
[139] May 18, 2007 letter from CBER, MRK-KRA00000385-86.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    **Appx1630**

control arm for Protocol 007 had, with the AIGENT results, not met the 90% lower bound seroconversion rate target.

118.    Merck responded to CBER's May 18th letter on June 5, 2007, with the requested information reporting success in meeting CBER's request for demonstrating consistency among the three sets of study data, allowing formation of a pooled control data set, and meeting the specified criteria for non-inferiority of the lower potency lot from Protocol 007 to the pooled control data.[140]

119.    Following review by the internal committee including Dr. Rubin, CBER approved Merck's MMR II supplement to change the labeled potency to 12,500 TCID$^{50}$ on December 6, 2007.[141]

120.    In my opinion, FDA's scientific staff at CBER, including the review committee for this sBLA, were informed by Merck about the design, validation, operating features and results for sera from Protocol 007 using the AIGENT and WT-ELISA.  This included the selected cutoff levels for both tests. CBER's reviewers questioned Merck about several aspects of these tests and study results in an extensive exchange of information, receiving answers from Merck to each inquiry.  In addition, a CBER scientist, along with a field force inspector, conducted and on-site inspection of the laboratory in which the AIGENT test was conducted. While there were deficiencies noted during the lab inspection, the acceptance of corrective actions and the subsequent close review of the sBLA establish that CBER was satisfied with the information received and found it to be an adequate basis for approval of the supplement.

---

[140] June 5, 2007 Response to FDA Request for Information, MRK-KRA00000368-82.
[141] MRK-KRA00000383.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Appx1631**

## XIII.   Merck's Clinical and Clinical Laboratory Studies of Mumps Vaccine in Combination with Varicella Vaccine.

121.     In considering combinations of vaccines each of which has separately been shown to be clinically effective, the FDA's principle concern is whether, when co-formulated in single product, they might interfere with the effectiveness of each other.  The manufacturer must show this does not happen by either potential physio-chemical interactions, or by blunting the immune response to one or more of the component individual viruses.[142]

122.     In the context of its review of Merck's ProQuad® submission, CBER contacted Merck in June 2004 to discuss the degree of agreement between the AIGENT and WT-ELISA and the "sera with low antibody titers just above the ELISA cutoff."[143]  After some additional communication, CBER contacted Merck by letter, dated July 27, 2004, requesting data supporting the WT-ELISA cutoff.[144]  Merck provided a written response on November 17, 2004 stating Merck "submitted these data in an information package dated June 10, 2002 (BB-IND 1016 serial number 86) which we believe provided information on the clinical relevance of the chosen ELISA cutoff for seropositivity."[145]  The written response attached a "summary of key points from Merck's June 10, 2002 information package" that it "believe[d] are relevant to [CBER's] most recent information request." [146]

---

[142] Food and Drug Administration, Guidance for Industry, Evaluation of Combination Vaccines for Preventable Diseases: Production, Testing & Clinical Studies, April 1997, at 3 & 14, *available at* https://www.fda.gov/downloads/biologicsbloodvaccines/guidancecomplianceregulatoryinformation/guidances/vaccines/ucm175909.pdf.

[143] June 2004 email string, MRK-KRA00791508-510.

[144] MRK-KRA00846406-07.

[145] MRK-KRA00761530-538.

[146] *Ibid.*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY   Appx1632

123.    In August 2005, CBER completed its clinical review of the studies submitted in support of the licensure of ProQuad® and approved ProQuad®'s licensure.  Of particular relevance here, CBER's clinical review summary provides:

> Merck also demonstrated a good correlation between measles – antibody, mumps neutralizing antibody and rubella – antibody with each respective ELISA.  These studies indicated that the ELISAs used to assess antibody response to each of the vaccine antigens in ProQuad would parallel responses that correlated with protection in other studies.

124.    ELISA assays used to evaluate immunogenicity of ProQuad™ were validated by Merck Research Laboratories.  Please see each clinical study or Mr. Steven Rubin's review for additional information pertaining to the validation of these assays.[147]

125.    CBER treated Merck's application for the combination of MMRII with Varicella vaccine (ProQuad) in accordance with its principle concern and did not require use of a PRN test to demonstrate non-interference on antibody responses when the vaccines were combined.[148] CBER accepted the endpoint measured by the WT-ELISA in Merck's studies to support approval of ProQuad.[149]

126.    Relator's expert, Dr. Kessler, asserts that Merck misrepresented that the measure of immunogenicity in their clinical studies was linked to protection against disease.[150]  He supports this assertion with quotations from the license applications including that for ProQuad: "The data summarized in this clinical summary demonstrate that ProQuad is immunogenic… and as efficacious as its parent products"[151] and "Merck & Co., Inc. has assessed the correlation between neutralizing antibody (as measured in plaque reduction neutralization [PRN] assay) and

---

[147] CBER Clinical Review, MRK-KRA01285010-272, at 222.
[148] January 31, 2000 Memorandum, MRK-KRA00001249-52.
[149] July 27, 2004 Memorandum from CBER, MRK-KRA-00846405-15, at 06-07.
[150] March 14, 2018 Report of David A. Kessler, MD ("Kessler Report"), at pp.451-52, ¶ 337, p. 455, ¶ 348, & p. 525, ¶ 422.
[151] Kessler Report, at p.455, ¶ 351 & n. 918 (references MRK-KRA00158320.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

a wild-type enzyme-linked immunosorbent assay (ELISA). The overall agreement rate was 93.6% (480/513).  These data support the use of the results of a wild-type ELISA as a correlate for protection."[152]  He then offers his opinion that this was misleading because neither assay had been shown to relate to protection and Merck's assessment of the correlation between the assays provided no reliable data from which to conclude that the WT-ELISA results were a correlate for protection.  He goes on to criticize label statements related to these criticisms.

127.    In my opinion, Dr. Kessler is incorrectly interpreting these statements, taking them out of context and failing to acknowledge that CBER's experts, as well as Merck, were fully aware of the strengths and limitations of the WT-ELISA.  CBER's scientists had repeatedly indicated to Merck and stated in the published literature and treatises, there was no agreed upon an *in vitro* test or antibody titer that would predict protection at an individual patient level. As noted above, CBER's reviewers had specifically addressed what data, including the assay used to generate that data, was needed to support the ProQuad application before it was submitted.

128.    Further, CBER's concern was the demonstration of non-interference among the four vaccine components.  In my opinion, a fair reading of Merck's statements, given their context, is that at a group level (i.e., a study arm of several hundred subjects) the components were immunogenic, neutralizing antibody (as measured in a PRN) had a statistical correlation with protective immunization, and WT-ELISA results had a statistical correlation with the PRN results. In my opinion, both Merck and CBER's reviewing scientists understood the evaluation was for non-interference among the components, CBER's mumps vaccine expert scientists concluded that use of the WT-ELISA was adequate to evaluate potential interference in immunogenicity, and that having demonstrated the absence of interference among the

---

[152] Kessler Report, at p. 528, ¶ 428.

46

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

components, a conclusion that the quadrivalent vaccine was as effective as the individual components was justified.

129.    Merck's license application included an annotated label for review by CBER's scientists.[153] Therefore, they would have seen the specific statements made by Merck and by approving the product and its label agreed that they were accurate and not misleading.

130.    In my opinion, CBER's reviewers invariably closely examine submitted labels and, if they do not find adequate evidence that statements in the label are supported by data, they request such data or, if it is not submitted, require changes to the label. Further, in my opinion, CBER's reviewers accept label statements of historical fact, such as the results of the studies supporting the 1967 approval of the mumps vaccine, as not misleading.

131.    I reserve the right to review additional materials pertinent to my opinions as they become available, to supplement this report, and to create demonstrative aids based upon my opinions if necessary.

---

[153] August 2004 Annotated ProQuad Label, MRK-KRA00157542-567.

47

Dated: June 19, 2018        By: D.B. Burke

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY        **Appx1636**

10/25/2019
Declaration of G. Reilly
EXHIBIT 6

1                UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2

3

4     _____
                                    :
5     UNITED STATES OF AMERICA   :
      ex rel., STEPHEN A.         :
6     KRAHLING and JOAN A.        : Civil Action No.
      WLOCHOWSKI,                 : 10-cv-4374 (CDJ)
7                                 :
                  Plaintiffs      :
8                                 :
            v.                    :
9                                 :
      MERCK & CO., INC.,          :
10                                :
                  Defendants.     :
11    _____:
                                    :
12    IN RE: MERCK MUMPS VACCINE:
      ANTITRUST LITIGATION         :
13                                 :
      THIS DOCUMENT RELATES TO: :
14    ALL ACTIONS                  :
      _____:
15
16            Thursday, December 13, 2018
17
18            Videotaped Deposition of D. BRUCE
19    BURLINGTON, MD, taken at the Law Offices of
20    Clark Hill LLP, 1001 Pennsylvania Avenue NW,
21    Suite 1300 S, Washington, D.C., beginning at
22    8:34 a.m., before Ryan K. Black, a Registered
23    Professional Reporter, Certified Livenote
24    Reporter and Notary Public in and for the
25    District of Columbia.
26

Page 2

1 A P P E A R A N C E S :

2

3 CONSTANTINE & CANNON LLP

4 BY: GORDON SCHNELL, ESQUIRE

5    HAMSA MAHENDRANATHAN, ESQUIRE

6 335 Madison Avenue

7 9th Floor

8 New York, New York  10017

9 212.350.2700

10 gschnell@constantinecannon.com

11 hmahendranathan@constantinecannon.com

12 Representing - Ex Relators

13

14 VENABLE LLP

15 BY: KATHLEEN S. HARDWAY, ESQUIRE

16    HARRISON H. TAYLOR, ESQUIRE

17 750 East Pratt Street

18 Suite 900

19 Baltimore, Maryland  21202

20 410.244.7400

21 kshardway@venable.com

22 hhtaylor@venable.com

23 Representing - Merck

24

25

Page 3

1 A P P E A R A N C E S (Cont'd):

2

3 MORGAN LEWIS & BOCKIUS LLP

4 BY: MARGARET ERIN RODGERS SCHMIDT, ESQUIRE

5 1701 Market Street

6 Philadelphia, Pennsylvania  19103

7 215.963.5000

8 margaret.rodgers-schmidt@morganlewis.com

9 Representing - Merck

10

11

12

13

14

15

16

17

18

19

20

21

22 ALSO PRESENT:

23 Tim Howard, Merck In-House Counsel

24 Solomon Francis, Legal Videographer

25

Page 4

1          I N D E X

2 TESTIMONY OF:  D. BRUCE BURLINGTON, MD    PAGE

3 By Mr. Schnell.................................7

4

5       E X H I B I T S

6 EXHIBIT    DESCRIPTION          PAGE

7 Exhibit 1   a copy of Dr. Burlington's

8       Expert Report......................7

9 Exhibit 2   a memo dated April 12th, 2000, from

10       Manal Morsy, Bates Numbered 1927351

11       through 55.......................186

12 Exhibit 3   a document dated May 2007 from the

13       FDA to Alison Fisher at Merck....196

14 Exhibit 4   WITHDRAWN BY COUNSEL..............---

15 Exhibit 5   a packet of materials with the cover

16       page being an August 20, 2001,

17       letter from Merck to the FDA.....217

18 Exhibit 6   a document Bates Numbered 846405

19       through 415......................247

20 Exhibit 7   a document Bates Numbered 393 to

21       409..............................256

22

23

24

25

Page 5

1          THE VIDEOGRAPHER:  Good morning.

2 We're going on the record at 8:34 a m. on

3 December 13th, 2018.  Please note that the

4 microphones are sensitive and make pick up

5 whispering, private conversations and cellular

6 interference.

7          Please turn off all cell phones or

8 place them away from the microphones, as they

9 can interfere with the deposition audio.  Audio

10 and video recording will continue to take place

11 unless all parties agree to go off the record.

12          This is Media Unit 1 of the

13 video-recorded deposition of Dr. Bruce

14 Burlington, taken by counsel for the plaintiff,

15 in the Matter of United States of America, ex

16 relator Stephen A. Krahling and Joan A.

17 Wlochowski, Plaintiffs, versus Merck & Company,

18 Inc., Defendants, filed in the United States

19 District Court for the Eastern District of

20 Pennsylvania, Case Number 10-cv-4374 (CDJ).

21          This deposition is being held at 1001

22 Pennsylvania Avenue Northwest in Washington,

23 D.C.

24          My name is Solomon Francis,

25 from Veritext Legal Solutions, and I'm the

2 (Pages 2 - 5)

Appx1639

Page 6

1 videographer. The court reporter is Ryan Black,
2 of Veritext Legal Solutions.
3        At this time will counsel present
4 please state their appearances and affiliations
5 for the record.
6        MR. SCHNELL: Gordon Schnell,
7 Constantine Cannon, counsel for Relators.
8        MS. MAHENDRANATHAN: Hamsa
9 Mahendranathan, Constantine Cannon, counsel for
10 Relators.
11        MS. HARDWAY: Kathleen Hardway, from
12 Venable, for Merck.
13        MR. TAYLOR: Harrison Taylor, from
14 Venable, for Merck.
15        MS. RODGERS SCHMIDT: Margaret Erin
16 Rodgers Schmidt, from Morgan Lewis, for Merck.
17        MR. HOWARD: Tim Howard, in-house
18 counsel for Merck.
19        THE VIDEOGRAPHER: At this time, will
20 the court reporter please swear in the witness
21 and we can proceed.
22                *  *  *
23 Whereupon --
24        BRUCE BURLINGTON, MD,
25 called to testify, having been first duly sworn

Page 7

1 or affirmed, was examined and testified as
2 follows:
3                EXAMINATION
4 BY MR. SCHNELL:
5        Q.  Good morning, Dr. Burlington.
6        A.  Good morning.
7        Q.  I'm going to start off by handing you
8 a copy of your expert report.
9        MR. SCHNELL: Can you mark this as
10 Exhibit 1?
11        THE REPORTER: Yes.
12        (Burlington Deposition Exhibit No. 1,
13 a copy of Dr. Burlington's Expert Report, was
14 marked.)
15        MR. SCHNELL: We only have two copies
16 of exhibits today. Sorry.
17 BY MR. SCHNELL:
18        Q.  Dr. Burlington, that is a copy of the
19 expert report you've submitted in this matter;
20 is that correct?
21        A.  I believe it is, yes.
22        Q.  And does that contain all of the
23 expert opinions that you're providing in this
24 matter?
25        A.  Well, it contains the expert opinions

Page 8

1 that I have been asked to address. I'm prepared
2 to look at additional material and provide
3 additional opinions, if that comes up.
4        Q.  But as of -- as of today, are there
5 any other expert opinions you have in this
6 matter that are not contained in that report?
7        A.  Well, I don't know if they rise to
8 the level of expert opinions. There, certainly,
9 may be comments and positions taken in regard to
10 materials that I have looked at subsequent to
11 this report.
12        Q.  And what are those materials that
13 you've looked at subsequent to this report being
14 filed?
15        A.  Well, there are a variety of materials
16 that have -- seen in this interval since June.
17 And I -- I'm sure that counsel has a more
18 exhaustive record of them readily available than
19 I do. I would be glad to provide that. They
20 include various depositions that have taken
21 place in that interval, some additional reports,
22 Freedom of Information materials that were
23 supplied by, I believe, your firm, or came
24 through your firm in its disclosure, and various
25 other things.

Page 9

1        Q.  Do you recall which depositions you've
2 reviewed since the filing of this report?
3        A.  Well, I certainly recall
4 Dr. Kessler's. And then there were others, as
5 well, but I -- we'd have to go back and check
6 the list.
7        Q.  Okay. And what about reports?
8 You've mentioned that you've re -- reviewed some
9 reports since filing your report?
10        A.  Yes. I believe there's a statistician
11 for relators, Stark, and a couple other reports,
12 as well.
13        Q.  And your opinions have not changed,
14 I'm assuming, the ones that are contained in
15 your report?
16        A.  Nothing I saw subsequent changed the
17 position that I would have been taking as of the
18 time of this report, that is correct.
19        Q.  Okay. And those opinions are still
20 your opinions?
21        A.  Those are my opinions.
22        Q.  And you stand behind your report in
23 its entirety; is that correct?
24        A.  Well, as I go through it I see certain
25 typos and minor editorial issues, but I stand

3 (Pages 6 - 9)

1 behind the content of the report.
2    Q.   When did Merck retain you in this
3 matter?
4    A.   We are approaching five years now,
5 as I recall, that there was a engagement letter
6 January almost five years now.  I think that's
7 right.
8    Q.   So that would be January of 2014, is
9 that about right?
10    A.   I -- I believe that's correct, but,
11 again, I'd have to go back and check the records
12 to be completely accurate.
13    Q.   And do you have a rough estimate of
14 how many hours you've worked on this matter for
15 Merck?
16    A.   No, I haven't kept a tally.  I
17 can't give you a very accurate number.  It's
18 a substantial number.
19    Q.   Do you know, roughly, how much you've
20 been paid so far?
21    A.   Once again, I haven't kept an exact
22 tally.  A substantial sum of money, perhaps
23 approaching or in the neighborhood of a hundred
24 thousand dollars.
25    Q.   Let's talk about the scope of your

1 engagement.  Can you, at a -- at a high level,
2 tell me what -- what your understanding is as to
3 the scope of -- of your retention on this
4 matter?
5    A.   Well, it is laid out in my report,
6 in fact, I think it's right at the front of the
7 report, the specific items that I was asked to
8 look at and form opinions on.  Those were
9 developed in discussions with counsel.
10    Q.   Okay.  And correct me if I'm wrong,
11 but that -- that assignment scope included the
12 review of what we all refer to as the AIGENT,
13 A-I-G-E-N-T, assay?
14    A.   Yes.
15    Q.   And that's the Plaque-Reduction
16 Neutralization Assay that Merck used in support
17 of its Protocol 007 Clinical Trial; is that
18 correct?
19    A.   It was one of the agency assays
20 used in support of Protocol 007, yes.
21    Q.   And the other assay would be the
22 Wild Type ELISA Assay; is that correct?
23    A.   That was the other assay that was
24 used, yes.
25    Q.   And those were the only two assays

1 that Merck used in support of 007; is that
2 correct?
3    A.   Well, they also used the Legacy ELISA
4 in indirect support of it, and, in addition,
5 there were certain exploratory studies done with
6 exploratory assays developed in the laboratory.
7 I guess, in fairness, though, those, because
8 they were exploratory, were not being used in
9 support of the application.
10    Q.   And as part of your assignment, you
11 reviewed the SBLA, the Supplemental Biologic
12 License Application, that Merck submitted in
13 support of 007; is that correct?
14    A.   Well, I certainly worked through it
15 and saw it and I, you know, did not commit it to
16 memory, by any means.
17    Q.   A thousand pages you didn't commit to
18 memory?
19    A.   No, I did not.
20    Q.   Okay.  Did you --
21    A.   And there were parts of it that were
22 redacted, as well.
23    Q.   Did you review the BLA, the Biologic
24 License Application, that Merck submitted in
25 support of its ProQuad application?

1    A.   The answer is very much the same.
2 I looked through it.  I looked at a high level.
3 I didn't have the entirety of the documentation,
4 so -- and I certainly reviewed the summary in
5 more detail than all of the appendices or back
6 sections.
7    Q.   Okay.  And are -- are -- do you have
8 an understanding that Merck, around the same
9 time frame as the SBLA for -- what do you want
10 to call it, the end expiry SBLA?  Is there
11 another term that -- that you're more
12 comfortable with describing the SBLA
13 Merck submitted in support of 007?
14    A.   If you want to characterize it as the
15 end expiry BLA, that works for me.
16    Q.   Okay.  So around the same time of the
17 end expiry SBLA and the ProQuad BLA, Merck also
18 submitted an SBLA in support of, I'll call it,
19 the RHA change that it made to MMR2.  Are you
20 familiar with that?
21    A.   The recombinant human albumin being
22 substituted for human serum albumin, --
23    Q.   Yes.
24    A.   -- yes, I am.
25    Q.   And did you review any part of that

4 (Pages 10 - 13)

Appx1641

1 SBLA?
2    A.  Yes, to the same extent as I did the
3 other two.
4    Q.  Okay.  And is it your understanding
5 that in support of the RHA, I'm going to keep
6 calling it RHA, because I'll never be able to
7 pronounce it as -- as articulately as you did,
8 are you familiar with the clinical trial that
9 Merck submitted in support of that application?
10    A.  You know, I -- I have read about that
11 clinical trial.  I don't know that I have read
12 anywhere near the detail on that clinical trial
13 or the reports emanating from it as I have
14 on -- on the other two.
15    Q.  With the ProQuad BLA, is it your
16 understanding that Merck used the Wild Type
17 -- the same Wild Type ELISA Assay for that
18 application as it did for the end expiry SBLA?
19    A.  My memory is that that is correct.  It
20 was the same assay used.
21    Q.  And do you have an understanding
22 one way or the other as to whether or not the
23 Wild Type, that same Wild Type ELISA was also
24 used for the RHA application?
25    A.  You know, I -- I would have to go back

1 and check on that.  I'm not certain.  I think,
2 likely, that it was.
3    Q.  Did your -- did the scope of your
4 assignment include the review of any other
5 materials relating to Merck's use of the AIGENT
6 Assay results for anything other than its end
7 expiry SBLA?
8    MS. HARDWAY:  Object to form.
9    THE WITNESS:  I don't have a ready
10 memory in terms of where they may have used the
11 AIGENT Assay.  Outside of that, I certainly did
12 focus on use of the AIGENT Assay in support of
13 the initial submissions of the 007 Supplemental
14 BLA.
15 BY MR. SCHNELL:
16    Q.  Okay.  And -- and I -- it doesn't -- I
17 don't mean to test your memory on it.  I just
18 want to see what you reviewed so we can talk
19 about it, so, yeah --
20    A.  Well, we've included a list of
21 materials that I reviewed.  I'm not -- I mean,
22 these are all materials I've looked at and went
23 through at some point in time over the last
24 nearly five years, and so I don't have all
25 of them readily fresh in my memory.

1    Q.  Okay.  Do you have any recollection
2 of Merck using the AIGENT results in
3 communications with the FDA on issues relating
4 to potency?
5    MS. HARDWAY:  Object to form.
6    THE WITNESS:  I remember that there
7 were communications -- that there were results
8 of the AIGENT Assay used in -- from the first
9 third of the AIGENT Assay used in certain BPDRs
10 and other issues.  But I wasn't asked to be an
11 expert on stability, and my expert opinion on
12 potency extends to the extent that it's relevant
13 to the supplemental BLAs, but it's limited to
14 that.
15 BY MR. SCHNELL:
16    Q.  Okay.  And the first third of the
17 results for the AIGENT Assay, was that -- that
18 was also referred to as the preliminary subset?
19    A.  I believe it is correct that it was
20 referred to as a preliminary subset.
21    Q.  Did the lawyers for Merck provide
22 you with any assumptions for you to make in
23 rendering any of your opinions?
24    Oh, you want to -- you have a little
25 tissue.  Got it.  Okay.

1    A.  Thank you.
2    No.  I don't recall that they did
3 ask me to make any assumptions in forming my
4 opinions or in testifying here today.
5    Q.  And did they provide you with any
6 facts that you're relying on or that you relied
7 on in rendering any of your opinions?
8    A.  Well, to the extent that they
9 supplied me with a substantial number of
10 documents which have factual content, I would
11 say, yes.
12    Q.  Other than that.
13    A.  They didn't ask me to assume or
14 specify facts that were relevant to the case
15 outside the scope of those documents.
16    Q.  Okay.  Have you had any communications
17 with any of the other experts Merck has retained
18 on this matter?
19    A.  Only to the extent that I've read
20 reports and depositions.  I haven't had any
21 additional interaction with other experts
22 retained by Merck.
23    Q.  You haven't spoken with them?
24    A.  No, I don't believe so.
25    Q.  Or communicated with them in any

1 manner?
2    A.  No.
3    Q.  And have you -- have you reviewed
4 all of the other expert reports that Merck has
5 proffered in this case?
6    A.  Well, since I don't know the scope
7 of the expert reports that they've proffered,
8 I don't know whether I have or not.  I think
9 it's quite likely that they have offered expert
10 reports that I have not reviewed and are not
11 within the scope of the questions that I was
12 asked to address by Merck or Merck and counsel.
13    MR. SCHNELL:  So you'll provide us
14 with the list of the additional materials he's
15 reviewed.  I don't think -- I don't think -- did
16 we get -- I don't think we got anything on the
17 additional materials he's reviewed since his
18 expert report.
19    MS. HARDWAY:  Yeah.  I'm happy to put
20 that together.
21    MR. SCHNELL:  Yeah.  That would be
22 great.
23 BY MR. SCHNELL:
24    Q.  You're not relying on any other Merck
25 experts for any of your opinions here, correct?

1    A.  Oh, well, certainly, I do reference
2 other Merck experts and -- and Merck fact
3 witnesses in some of my background for the
4 opinions, and, to that extent, relying in part
5 on them, but I'm not adopting the opinions of
6 other experts.
7    Q.  You would -- that would be clear from
8 your report if you were, I assume?
9    A.  My report I -- I hope is clear on
10 that -- issues such as that, yes.
11    Q.  Did you communicate with any former or
12 current Merck employees in connection with the
13 work on this matter?
14    A.  Not to the best of my memory.
15    Q.  So other than the lawyers on this
16 case, is it fair to say that there's nobody else
17 that you've communicated with or re -- how do I
18 say this?
19    That there's nobody -- that there's no
20 one else you've communicated with with regard to
21 your opinions on this case?
22    MS. HARDWAY:  Object to form.
23    THE WITNESS:  With regard to my
24 opinions, I have only discussed those with
25 counsel, have not communicated with anybody

1 else who's involved in this case with regard
2 to the opinions.  I've had -- had some business
3 interactions with one person who is no
4 relationship to Merck but is involved in
5 the case historically.
6 BY MR. SCHNELL:
7    Q.  And who is that?
8    A.  Dr. Houn, spelled H-o-u-n.
9    Q.  And what's Dr. Houn's relationship to
10 this matter?
11    A.  She was at FDA, and was part of the
12 meeting with the review committee for 007 in
13 2007.  Subsequent to that, she's left FDA, and
14 my interaction with her was because we share
15 positions on the board of directors for a
16 not-for-profit in town here.
17    Q.  And did you discuss your opinions with
18 her?
19    A.  I did not.
20    Q.  Did you discuss this case with her in
21 any way?
22    A.  I did not.
23    Q.  The materials that you cite at the
24 end of your report in your Appendix B, I think
25 it is, yes, those were provided to you by

1 Merck's lawyers?
2    A.  A great many of them were provided by
3 Merck's lawyers.  Some of them were materials
4 that I found through my own internet research.
5    Q.  With respect to the documents that
6 were produced in this case, so those would be
7 the documents that you identified by the KRA
8 prefix, --
9    A.  Mm-hmm.
10    Q.  -- were those all provided to you
11 by -- by coun -- counsel for Merck?
12    A.  I believe that they were all provided
13 by counsel for Merck.
14    Q.  What steps, if any, did you take to
15 assure yourself that you were getting all the
16 relevant materials you needed to render your
17 opinions?
18    A.  Well, I asked counsel for materials
19 that were helpful in understanding the
20 background and addressing the issues.  I asked
21 counsel, specifically, for any documents that
22 were produced in the case that might take a
23 contrary position, or might support a contrary
24 position, so that I could understand those and
25 look at the context, and, to the best of my

6 (Pages 18 - 21)

**Appx1643**

1 knowledge, the -- those documents were supplied
2 to me.
3     Q.  You didn't do any of your own
4 searching on the database for documents of
5 particular interest?
6        MS. HARDWAY:  Object to form.
7        THE WITNESS:  The database that you're
8 referring to is the --
9 BY MR. SCHNELL:
10     Q.  Within this case that has the --
11     A.  -- the produced documents?
12     Q.  The produced documents, yeah.
13     A.  I did not.
14     Q.  You identify among the plaintiff
15 expert reports that you reviewed the reports
16 of Drs Kessler, Calcott and Copmann, and you
17 reviewed those reports, correct?
18     A.  I did.
19     Q.  And you reviewed their depositions?
20     A.  I'd have to go back and check whether
21 I reviewed Tom Copmann's deposition or not.  I
22 reviewed his report for sure.
23     Q.  And how did you decide that you wanted
24 to review those particular experts?
25        Well, let me strike that.

1        Did you ask to review those particular
2 experts or did Merck -- Merck's lawyers give
3 those experts to review?
4     A.  I believe that those were offered to
5 me by Merck's lawyers or supplied to me by
6 Merck's lawyers at their instigation.
7     Q.  Did you ask to review any experts
8 being provide -- being offered by the plaintiffs
9 based on particular subject matter?
10        MS. HARDWAY:  Object to form.
11        THE WITNESS:  I don't remember that
12 I asked for any reports based on subject matter.
13 I do remember that we had discussions about
14 reports that were relevant in terms of -- of
15 biostatistics or the -- particularly, the
16 quality issues and the -- but the Calcott report
17 had been supplied to me already at that point in
18 time.
19        Now having walked through it, I
20 think the answer to your question is, I did not
21 request any specific reports by subject matter
22 area.
23 BY MR. SCHNELL:
24     Q.  Did you review the expert report of
25 Robert Malone?

1     A.  I don't remember offhand having
2 reviewed that report.  I would have to check
3 and see if I did.
4     Q.  It's not listed on your materials
5 reviewed.  So if you had reviewed it, it would
6 have been subsequent to filing your report.
7 So is it safe to assume you have not read that
8 report?
9        MS. HARDWAY:  Object to form.
10        THE WITNESS:  As I said, I could
11 go back and look.  I did not try and commit
12 to memory a list of everything I've looked at.
13 There are a lot of documents in this case.
14 BY MR. SCHNELL:
15     Q.  Do you recall reviewing the deposition
16 of Dr. Malone?
17     A.  My answer would be the same as it was
18 for his report.
19     Q.  Can you think of a reason why you
20 wouldn't have read one of plaintiff's expert
21 reports that dealt with issues that you've dealt
22 with?
23     A.  Again, can I think of a reason why I
24 wouldn't have?
25     Q.  Well, let me reframe it.

1     A.  If I didn't know about it, that would
2 be a reason I wouldn't have.
3     Q.  If you -- if you had known of an
4 expert report that the plaintiffs produced that
5 addressed some of the same issues you addressed,
6 would you have wanted to review that in
7 connection with your report?
8     A.  As I answered to your earlier
9 question, I asked for reports or -- or
10 information that was relevant to the questions
11 that I had been asked to offer an opinion on
12 and any information that was contrary to it.
13 So that leaves it in counsel's hands to form a
14 judgment about whether any given report is -- is
15 relevant to what I've asked for or not.  Then I
16 relied on counsel in terms of the selection of
17 those materials that I was to review.
18     Q.  If there had been an expert report
19 that dealt with the same issues that you dealt
20 with, is it fair to say you would have liked to
21 have reviewed that?
22        MS. HARDWAY:  Object to form.
23        THE WITNESS:  I just answered,
24 essentially, the same question.  My answer
25 hasn't changed.  I asked for the information

7 (Pages 22 - 25)

Appx1644

1 that might be contrary to the positions I was
2 forming and the information that I was using to
3 support my positions and relied on counsel for
4 that.
5 BY MR. SCHNELL:
6     Q.  You've been an expert in litigations
7 before, correct?
8     A.  I have.
9     Q.  Roughly, how many times?
10     A.  I haven't kept a direct tally.
11 Roughly, a dozen, but I don't -- again, I don't
12 have an exact tally.  I would have to go back
13 and consult my records.  This has stretched over
14 more than a decade.
15     Q.  And in those, roughly, a dozen, did
16 you offer expert reports in all or most of them?
17     A.  All or most -- well, most of them, not
18 all of them.
19     Q.  And were you deposed in most of them?
20     A.  I think a -- a majority of them that
21 got to the point of deposition, yes.
22     Q.  Have you been to trial?
23     A.  I have.
24     Q.  How many -- roughly, how many times?
25     A.  Well, counting one matter that

1 went to arbitration, as an expert witness I have
2 probably been to trial three times, but, again,
3 I don't have an exact tally in my head.  I would
4 have to go back and look.  I -- I have this
5 mental habit that when I get finished with a
6 case it gets, sort of, tucked away in some
7 remote corner of my memory, and I would have
8 to refresh to bring things back up.
9     Q.  I have the exact same habit.
10         Have your opinions ever been in any
11 way excluded or rejected by a court in any of
12 your retentions?
13     A.  Not to the best of my knowledge.
14     Q.  At a very, very high level, and then
15 we can get more detailed if we need to, can you
16 tell me what kind of experience you have being
17 directly involved in clinical trials?
18         MS. HARDWAY:  Object to form.
19         THE WITNESS:  I have personally
20 conducted a clinical trial when I was a
21 infectious disease fellow.  I have been
22 involved in the design, execution and analysis
23 of numerous clinical trials when I was working
24 in the pharmaceutical industry.  I have
25 supervised large parts of clinical trials,

1 although not clinical operations, per se.
2 I have reviewed enumerable clinical trials
3 throughout my career.
4         When I was at the FDA, I reviewed
5 the plans for clinical trials as director of the
6 Biologics Investigational New Drug Division at
7 the Center for Biologics.  So I would say over
8 the course of the last 40-odd years of my career
9 I have been involved in almost all phases of
10 clinical trials.
11 BY MR. SCHNELL:
12     Q.  With respect to -- let's -- let's
13 narrow it a bit, now I'm talking about vaccine
14 clinical trials and, specifically, lets start
15 with neutralization tests, Plaque-Reduction
16 Neutralization Tests, roughly, how many
17 PRNs have you been involved in at any level?
18     A.  I'm sure there were quite a number.
19 I don't have a tally.  I was director of
20 biologics IND quite a while ago during the
21 '80s, and Plaque-Reduction, PRNs, are a common
22 dependent variable in clinical trials for
23 vaccines, although vaccines use other
24 immunological assays, as well.  And I'm sure
25 there must have been, but I don't have a ready

1 memory of the events of that era.  I do have a
2 personal experience in the laboratory with
3 Plaque-Reduction Neutralization Assays, as well.
4     Q.  When you would characterize the
5 Plaque-Reduction Neutralization Test as a common
6 dependent variable, I think those were your
7 words, what did you mean by that?
8     A.  Common dependent variable.
9     Q.  Yeah.  What -- what did you mean by
10 that?
11     A.  Well, a dependent variable is one
12 of the outcomes you're looking at in a clinical
13 trial, --
14     Q.  And what --
15     A.  -- or a way of measuring one of the
16 outcomes.
17     Q.  And when you say a dependent
18 variable --
19     A.  Dependent.
20     Q.  Dependent.
21     A.  Yes.  As opposed to independent.
22     Q.  Yeah.  What is -- what is that -- what
23 is the difference -- what is the distinction
24 you're making there by calling it a dependent
25 variable?

8 (Pages 26 - 29)

Appx1645

Page 30

1    A.  Well, perhaps it's clinical trial
2  statis -- statistical jargon, but what it
3  means is it's the result of the clinical trial,
4  as opposed to something that might influence
5  the result.  So that if you're offering an
6  intervention, then what you're testing is, does
7  that intervention change the dependent variable.
8    Q.  You were director of was it CBER, or
9  was it the predecessor to CBER, or was it some
10  offshoot of CBER that you -- you were referring
11  to earlier in the '80s?
12    A.  It was a division within the
13  predecessor organization for CBER, which was,
14  at that time, known as the Bureau of Biologics,
15  and it was the Director of the Division of
16  Biologics, so Biological Investigational of New
17  Drugs.
18    Q.  And what period of time were you in
19  that position?
20    A.  Oh, it's on my curriculum vitae --
21  vitae, but, let's see, I joined the agency in
22  1981.  I was two years as a fellow and then
23  laboratory chief in the Division of Virology,
24  and then I went from there to biological IND.
25  So we're talking, roughly, '83, '84, '87.

Page 31

1    Q.  And you were director for that entire
2  period?
3    A.  I initially joined that division as
4  deputy director, and after I had been there for
5  about five or six weeks the director resigned
6  and I became acting director and then director.
7    Q.  Did you have anything to do with that
8  resignation?
9    Just kidding ...
10    A.  I think I was recruited so he could
11  move on.
12    Q.  I get it.
13    A.  And to that extent, I may have had
14  something to do with it.
15    Q.  When you left that division in around
16  '87, I think, you moved into other areas of the
17  FDA.  And my question is, did any of those other
18  areas in your FDA employment involve vaccines?
19    A.  I don't remember that there were
20  direct issues with vaccines while I was in
21  the Center for Drugs or the Center for Devices
22  -- well, in the Center for Devices, yes, there
23  were, because one of the programs in the
24  Center for Devices is the regulation of in
25  vitro diagnostic tests, and some of those

Page 32

1  would have been related to vaccines.
2    Q.  So other than that work, was there
3  any other work you did with vaccines after you
4  left the division of the -- the predecessor to
5  C -- CBER.  CBER is C-B-E-R.
6    A.  Vaccine issues come up from time
7  to time in other clinical trials in questions
8  of, are individuals vaccinated, that sort of
9  thing.  But they would have been indirect issues
10  in -- in clinical trials being looked
11  at in the Center for Drugs Program.
12    Q.  After 1987, while you were at FDA,
13  did you have any involvement with any
14  Plaque-Reduction Neutralization Tests?
15    A.  It's possible that there may have
16  been issues with Plaque-Reduction Neutralization
17  Tests in in vitro diagnostics, but I don't
18  recall any, and it doesn't seem highly likely
19  that there were.  It's a test that's
20  sufficiently difficult to standardize, but it's
21  not the sort of thing that one would, likely,
22  put into a -- a standardized in vitro
23  diagnostic, receive FDA clearance or approval
24  for it and use it as a widespread laboratory
25  test.

Page 33

1    Q.  After 1987, with regard to your
2  work at the FDA, were you involved in any ELISA
3  testing of vaccines?
4    A.  Limiting it to my time at FDA, I
5  would give a similar answer to that for
6  Plaque-Reduction Neutralization Tests in that
7  they would have come -- to the extent they
8  were standardized and being used widely as an
9  FDA-approved or cleared test, they would have
10  come under the aegis of the Center for
11  Medical Devices and Radiological Health, where I
12  supervised the in vitro diagnostics program.  I
13  don't have ready memory of any examples where
14  that did happen, but ELISA tests are easier to
15  standardize and -- and easier to use across
16  multiple laboratories, and, consequently, would
17  have been more likely to have come through for
18  review at that time period.
19    Q.  You don't recall one way or the other?
20    A.  But I don't recall any specific
21  instance.
22    Q.  Okay.  And you -- after you left
23  -- after you left the FDA, you went to work for
24  Wyeth; is that correct?
25    A.  At that time, Wyeth was a -- or

9 (Pages 30 - 33)

Page 34

1 actually, it was the Wyeth Ayerst division of
2 American Home Products Corporation, they changed
3 names a couple times, but, yes, Wyeth.
4    Q.  And within the -- the scope of your
5 responsibilities, vaccines was -- was -- was
6 part of it; is that correct?
7    A.  Well, I had a variety of different
8 jobs, sort of, added by accretion, while I was
9 at Wyeth.
10    Q.  You got rid of some people, too, like
11 the FDA?
12    A.  But vaccines were part of my
13 responsibility as the global head of
14 regulatory affairs, and also part of my head --
15 responsibility as the head of quality assurance,
16 quality control, the head of compliance, and in
17 this case compliance was, specifically, with --
18 in reference to the consent decree which Wyeth
19 was en -- engaged in with the US government, and
20 head of human safety, as well.
21      Oh, don't want to leave out audit.
22    Q.  And were you involved during your time
23 at Wyeth with any PRN tests?
24      MS. HARDWAY:  Object to form.
25      THE WITNESS:  I'm trying to recall

Page 35

1 whether there were any specific PRN assays
2 being done of which I had any sort of personal
3 involvement, and none springs readily to mind.
4 But PRN assays are used in the vaccine
5 assessment, and so I wouldn't be surprised if
6 going back in retrospect I discovered one.  But
7 I have no ready memory of that.
8 BY MR. SCHNELL:
9    Q.  And what about with ELISA Tests, did
10 you have any involvement in any capacity while
11 at Wyeth?
12    A.  Well, I'm sure we used ELISA tests
13 to measure certain attributes of vaccines or in
14 vaccine clinical trials, and my involvement with
15 them would have been at a high level looking
16 over the trial as a whole, rather than detail
17 of how the ELISA is actually constructed and
18 administered.
19    Q.  Do you recall Wyeth secure --
20 submitting any biologics license applications
21 to FDA for any vaccines while you were there?
22    A.  Yes.
23    Q.  Under your supervision?
24    A.  Yes.
25    Q.  Can you recall which?

Page 36

1    A.  Well, Prevnar.  It is possible that
2 Prevnar was already pending at FDA when I
3 arrived, but, certainly, the execution through
4 to approval of Prevnar -- the original Prevnar 7
5 happened under my responsibility.
6    Q.  Any others?
7    A.  Well, there, certainly, were
8 supplemental submissions for the rotavirus
9 vaccine that Wyeth had, at the time, already
10 approved when I arrived at employment there.
11      There were a number of other
12 vaccines which were already approved that we
13 had supplements going in from time to time,
14 the influenza vaccine, the DPT vaccine,
15 acellular pertussis, haemophilus influenzae
16 B.  Wyeth doing business as Lederle also was,
17 essentially, two big vaccine companies, and
18 so there were lots of applications related to
19 vaccines.
20      I should have said also doing business
21 as Lederle, because American Home Products had
22 acquired Lederle, had acquired Wyeth, and they
23 marketed under both names.
24    Q.  In any of the work that you have done
25 at FDA, Wyeth or otherwise, have you ever done

Page 37

1 any work -- and outside of your work on this
2 matter, have you done any work related to mumps
3 vaccines?
4    A.  I'm sorry.  Could you repeat the
5 question?
6      MR. SCHNELL:  Sure.
7      (Referred-to testimony read back.)
8      THE WITNESS:  Thank you.
9      When I was at FDA and lab chief in
10 the Division of Respiratory Viruses, mumps
11 would have come under the responsibility of that
12 laboratory.  That was a not-terribly-long period
13 of time, and I don't have any clear memory of
14 any mumps issues arising during the interval I
15 was there.  So I can't tell you for certain one
16 way or another yes or no, but I know it was a
17 potential responsibility in that area.
18 BY MR. SCHNELL:
19    Q.  Do you recall anything concrete that
20 you've done with respect to mumps vaccines
21 outside of that answer?
22      MS. HARDWAY:  Object to form.
23      THE WITNESS:  Well, until we get to
24 the current matter, I don't have a direct memory
25 of any particular involvement with mumps virus

10 (Pages 34 - 37)

Appx1647

Page 38

1 vaccines, other than what I have read in mass
2 media or heard in mass media and what I have
3 read in trade press and scientific journals.
4 BY MR. SCHNELL:
5    Q.  You've not done any work in any
6 clinical trials involving mumps; is that
7 correct?
8    A.  I've done work in a great many
9 clinical trials.  I don't remember any of them
10 being directly of mumps or involving mumps
11 vaccine.
12    Q.  And you've never written any
13 publications on mumps?
14    A.  No, I have not written publications on
15 mumps.
16    Q.  Have you made any presentations on
17 mumps?
18    A.  I have not.
19    Q.  Have you worked as an expert for --
20 for Merck in my other matters?
21    A.  I have, since retiring from Wyeth,
22 been employed as an expert by almost all large
23 pharmaceutical companies.  I don't remember
24 if Merck is on that list or not.  It certainly
25 would not have been terribly recently, but

Page 39

1 it's possible that Merck consulted me on
2 some specific issue.  The great book that -- the
3 engagements I had with those pharmaceutical
4 companies was in helping prepare for meetings at
5 FDA, particularly helping prepare for advisory
6 committees at FDA.
7       So it wouldn't have been related
8 to this issue, and I just can't say for sure
9 whether there may have been an engagement with
10 Merck sometime in the past.
11    Q.  Okay.  Any other relationship with
12 Merck, outside of a consulting sphere, just in
13 any capacity?
14       MS. HARDWAY:  Object to form.
15       THE WITNESS:  No ongoing relationship
16 with Merck.  Certainly, Merck was one of the
17 regulated companies when I was at FDA and had
18 substantial interactions with Merck employees
19 during that interval.  And if memory serves,
20 I also inspected Merck's vaccine production
21 facilities at one time.  But that would have
22 been a one-day engagement 35, eight years ago.
23 I have no memory of details of it.
24 BY MR. SCHNELL:
25    Q.  You mentioned a consent decree at

Page 40

1 Wyeth.  Can you give me more detail as to what
2 that was about?
3    A.  Well, I joined Wyeth as head of
4 regulatory affairs when I left the FDA in 1999.
5 There were problems that became apparent in the
6 quality operations of the vaccines program,
7 and FDA inspectors left 483 observations of
8 deficiencies, followed that up with a warning
9 letter.  There had been a couple of warning
10 letters before I arrived.
11       I was asked to take over
12 responsibility for the QA/QC program, and
13 not long after that we got a call that there
14 had been a seizure of certain of our vaccine
15 products.  I called the head of enforcement,
16 Eric Bloomberg, at FDA, and he said, do you want
17 to start negotiating a consent decree now.
18    Q.  What were the issues in -- in a very
19 high level, what were the issues that surrounded
20 this warning letter and ultimate seizure?
21    A.  The issues were quality systems
22 issues in regard to vaccines manufacturing.
23    Q.  And what were the quality issues?
24    A.  Issues related to inspection, breadth
25 of investigations.  It's quite a while.  I would

Page 41

1 have to go back and look at the documents in
2 order to give you an accurate and complete list.
3    Q.  Were the quality issues related to
4 some sort of contamination?
5    A.  A great many quality issues
6 relate to potential contamination.  I remember
7 no contaminants in the sense of infectious
8 particles or adventitious agents that were
9 in issue, but there were always questions of
10 adequacy of assurance of protection against --
11 of sterility, questions about appearance of
12 lyophilized vials and whether the appearance of
13 lyophilized vials was consistent with referent
14 standards on inspection, that sort of issue.
15    Q.  Were there any issues related to
16 potency of the vaccine?
17    A.  I don't recall that there were issues
18 related to the potency of the vaccines, but,
19 again, I would have to go back and check the
20 detailed records to offer you assurances
21 with -- with any great certainty.
22    Q.  Do you recall if there were any issues
23 related to the efficacy of vaccines?
24    A.  To the extent that efficacy is
25 inextricably intertwined with safety and there's

11 (Pages 38 - 41)

Page 42

1 a balance, efficacy questions did come up in
2 regard to the rotavirus vaccine, which, as I
3 said, was withdrawn from the market before
4 I joined -- while I was head of regulatory,
5 but before I was responsible for the quality
6 operations. And it wasn't so much a question
7 of did it work as the tradeoff between does the
8 vaccine protect adequately in order to justify
9 the emerging information on risk of
10 intussusception.
11    Q.  What do you mean efficacy is
12 inextricably intertwined with safety?
13    A.  The Food Drug and Cosmetic Act
14 directs the, without offering a legal opinion
15 and putting this in context of a regulatory
16 opinion, FDA to evaluate effectiveness and
17 safety and to reach a conclusion that a product
18 is safe and is effective before putting it on
19 the market. The FDA recognizes that they can
20 never have complete assurance of safety. Even
21 for the issues that are examined, one has only
22 a limited amount of information, and there's
23 always the question about what might happen that
24 you don't have information on.
25       FDA has -- takes the position

Page 43

1 that they can only reach a conclusion of safety
2 in the context of understanding effectiveness.
3    Q.  And is that because there's a -- a
4 balancing of the benefits and the risks that
5 they must undertake?
6    A.  Those are the words they use, their
7 balancing of efficacy -- effectiveness and risk
8 -- or benefits and risk, yes.
9    Q.  And benefits being efficacy, and risks
10 being safety?
11    A.  Roughly, yes.
12    Q.  Anything else that goes into that
13 equation --
14       MS. HARDWAY:  Object to form.
15 BY MR. SCHNELL:
16    Q.  -- to make it less rough?
17    A.  Well, they don't look at costs, if
18 that's what you're implying. They do look at
19 potential availability of novelty and unmet
20 need as being part of the equation, as well.
21    Q.  Was there a recall that resulted from
22 that warning letter and seizure surrounding the
23 consent decree that we've been discussing?
24    A.  Well, the warning letter and seizure
25 are disconnected in time. There was a recall --

Page 44

1 yes, I believe there was a recall for the
2 seized material. The seized material itself
3 was surrendered and -- and not recovered. The
4 other -- the remainder of that lot, I believe,
5 was recalled, and there were subsequent recalls
6 under the consent decree, but I would have to go
7 back and check the records to give you any
8 substantial detail.
9    Q.  Do you recall any involvement in any
10 other vaccine recalls while either at FDA or
11 Wyeth?
12    A.  I don't have any ready memory of
13 vaccine recalls -- wait. Let me correct that.
14       I do remember a -- I'm trying to
15 refresh my memory. I don't recall whether it
16 was a recall or refusal to release. I think,
17 upon reflection, it was probably refusal
18 to release a vaccine lot which had been
19 manufactured with material that was not
20 dedicated. The license had specified it would
21 be purified using dedicated material, the
22 company asserted they had inadvertently used
23 non-dedicated material, and we had extensive
24 interactions on whether that product should be
25 on the market or not, and eventually reached a

Page 45

1 conclusion it should not.
2    Q.  Do you recall the basis for that
3 conclusion?
4    A.  The potential risk of protein
5 contamination that might have resulted in
6 altering the immunogenicity of the vaccine.
7 The -- the non-dedicated equipment in
8 question had been used with tuberculin and so,
9 potentially, had tuberculin protein residual
10 in it that could have gone -- migrated into the
11 vaccine when it was used to process the vaccine.
12    Q.  You referenced a warning letter that
13 was issued by the FDA in connection with the
14 consent decree while you were at Wyeth, correct?
15    A.  Before the consent decree.
16    Q.  And what is a warning letter?
17    A.  A warning letter is a document
18 that the FDA sends to the company that,
19 basically, says, we have observed behavior
20 -- objectionable circumstances at your company,
21 your objectionable behavior at your -- on your
22 employees, that we have evaluated and have
23 concluded, if not fixed, would, potentially,
24 render the product violative under the law. And
25 the warning letter says, if these observations

12 (Pages 42 - 45)

Page 46

1 and circumstances are not corrected, then the
2 agency is prepared to take enforcement action
3 against your company.
4     Q.   And what are the various enforcement
5 actions that the FDA can take following a
6 warning letter if they're not satisfied with
7 the response?
8     A.   Not being a regulatory lawyer, I
9 will give you my opinion as a regulatory affairs
10 professional, but we could consult the Act and
11 information on the FDA's website for more
12 details.
13     Q.   And the act you're talking -- I'm
14 sorry to interrupt, but the Act, you're talking
15 about the FDCA, Food Drug and Cosmetic Act?
16     A.   I am.  Yes.  Thank you.
17         Warning letters are sometimes
18 classified themselves as enforcement actions,
19 but my memory is that the real authority of FDA
20 is to seek seizures, injunctions and criminal
21 prosecutions either at misdemeanors or felonies,
22 and those can include a variety of penalties,
23 including jail time and substantial fines.
24     Q.   In terms of -- so let's get it
25 out of legal rem -- realm and put it into the

Page 47

1 regulatory realm, which is your bailiwick, what
2 regulatory actions could the FDA take, or has
3 the FDA taken, as far as you're aware, following
4 a response to a warning letter that the FDA
5 found unsatisfactory?
6         MS. HARDWAY:  Object to form.
7         THE WITNESS:  The question is
8 sufficiently broad.  I mean, you're asking me
9 the entire universe of warning letters and --
10 or --
11 BY MR. SCHNELL:
12     Q.   In your experience, I mean, why don't
13 -- why don't we take it in -- with respect to
14 your particular experience, what regula -- what
15 regulatory enforcement actions have -- have you
16 faced, not personally, but when either at the
17 FDA or in -- in the industry, following the
18 FDA's issuance of a warning letter, --
19         MS. HARDWAY:  Object --
20 BY MR. SCHNELL:
21     Q.   -- when the FDA found that its
22 response -- that the response by the
23 manufacturer was unsatisfactory?
24         MS. HARDWAY:  Object to form.
25         THE WITNESS:  The specific experience

Page 48

1 that I was discussing earlier where Wyeth had
2 received a warning letter, FDA subsequently
3 reinspected to freshen the evidence, if you
4 will, seized various Wyeth goods that were in
5 the market, we negotiated a consent decree to
6 resolve that seizure, and as part and parcel
7 of that consent decree undertook third-party
8 supervision of the quality operations.
9         I, as head of quality, was -- and head
10 of regulatory was required to personally release
11 every lot of vaccine for the first year or
12 year-plus of the consent decree until we
13 had reached sup -- the milestones from the
14 external supervisor.
15         There were a variety of subsequent
16 reinspections, and they weren't really
17 enforcement actions, but we negotiated a number
18 of recalls with the FDA.  Recalls -- FDA, at
19 that time, could not direct a company to recall,
20 but they could certainly indicate to the company
21 it was appropriate to recall a product, at which
22 point in time the company, particularly in the
23 context of consent decree, usually went ahead
24 and recalled.
25 BY MR. SCHNELL:

Page 49

1     Q.   And did there come a point in time
2 where the FDA did gain the authority to order a
3 recall?
4     A.   I'd have to go back and check, but
5 there are a number of new authorities that the
6 FDA has, including directing labeled content,
7 and I believe they can also direct a recall now,
8 but I -- I'd have to go back and look.
9     Q.   And is it fair to say, at the time
10 when the FDA could not direct a recall, if the
11 FDA told the manufacturer that a recall was a
12 good idea that the manufacturer would almost
13 certainly comply?
14         MS. HARDWAY:  Object to form.
15         THE WITNESS:  I don't know if I would
16 say almost certainly comply.  There certainly
17 were manufacturers that would choose to take an
18 alternative approach to deal with the issue.
19 The companies I was with -- associated with
20 generally did comply.
21 BY MR SCHNELL:
22     Q.   From the FDA's perspective, based
23 on your experience there, how serious is the
24 issuance of a warning letter?
25         MS. HARDWAY:  Object to form.

13 (Pages 46 - 49)

Page 50

1        THE WITNESS:  I don't understand
2  how to quantify how serious it is.  I mean,
3  is it -- it's -- since it's a statement by
4  the agency that they are prepared to undertake
5  enforcement action if the circumstances cited in
6  the warning letter are not corrected, that is
7  serious, but I don't know how to say how
8  serious.
9  BY MR. SCHNELL:
10       Q.  Fair enough.
11          Are warning letters, based on your
12  experience at the FDA, issued routinely?
13       MS. HARDWAY:  Object to form.
14  BY MR. SCHNELL:
15       Q.  And let's keep it within the vaccine
16  space.
17       A.  I don't know what routinely means.
18       Q.  Is it something that -- that -- that
19  the FDA -- yeah, I guess that's a hard way to --
20  to quantify it.  Well, let's say at Wyeth, how
21  -- how many -- you were at Wyeth for about six
22  or seven years?
23       A.  Seven.
24       Q.  How many warning letters were issued
25  by the FDA regarding vaccines during your tenure

Page 51

1  there?
2       A.  I didn't keep count.  In the single
3  digits.
4       MR. SCHNELL:  I'm about to move on to
5  a new area.  Do you want to take a break, or we
6  can keep going.  It's whatever you want.
7       MS. HARDWAY:  Maybe just five minutes.
8       MR. SCHNELL:  Sure.
9       MS. HARDWAY:  Try to keep the breaks
10  short, if we could.
11       MR. SCHNELL:  Sure.
12       THE VIDEOGRAPHER:  The time is now
13  9:25 a.m.  This completes Media Unit Number 1.
14  We are now off the record.
15          (Recess taken.)
16       THE VIDEOGRAPHER:  The time is 9:42
17  a.m.  This begins Media Unit Number 2.  We're
18  now on the record.
19          Please proceed, Counsel.
20  BY MR. SCHNELL:
21       Q.  Dr. Burlington, if you could please
22  turn to Page 6 of your report.  And starting
23  on Page 6, there's a series of FDA regulations,
24  statutes, guidance and I just want to go through
25  a couple of them with you.  And the first one is

Page 52

1  in Paragraph 18, and it's the second sentence
2  and it reads, "Biological products are also
3  regulated as drugs under the Food Drug and
4  Cosmetic Act, FDCA, which requires substantial
5  evidence of safety and effectiveness for
6  approval of marketing applications."
7          Do you see that?
8       A.  I do.
9       Q.  First of all, what do you mean by
10  marketing applications there?
11       A.  Well, the FD&C Act says before you can
12  introduce into interstate commerce a drug you
13  have to have an approve -- a new drug, you have
14  to have an approval for it, and so it's that
15  approval for the interstate commerce and the new
16  drug that I'm calling the marketing application.
17       Q.  What is the obligation of vaccine
18  manufacturers under this requirement?
19       MS. HARDWAY:  Object to form.
20  Overbroad.
21       THE WITNESS:  Well, the vaccine
22  manufacturer must seek and obtain an approval.
23  In this case, the approval would be for a
24  Biological License Application, which is
25  regarded as the equivalent of an approval

Page 53

1  of a New Drug Application.
2  BY MR. SCHNELL:
3       Q.  Does this requirement only apply to
4  the original Biologics -- Biological License
5  Application, or does it apply to Supplemental
6  Biologics App -- Biological License
7  Applications, as well?
8       A.  It applies to supplemental
9  applications, as well.  There are some changes
10  which do not require prior approval supplements,
11  but most changes to a vaccine do require prior
12  approval supplements.
13       Q.  And once the approval is granted, is
14  there any kind of ongoing obligation under this
15  provision that a vaccine manufacturer has to
16  comply with?
17       MS. HARDWAY:  Object to form.  Broad.
18       THE WITNESS:  Well, I'm not sure I
19  understand the scope of what you mean when
20  you say this provision.  There are ongoing
21  obligations that a vaccine manufacturer or
22  any manufacturer of an approved has, and
23  they include adhering to quality standards and
24  reporting safety issues, com -- compliance with
25  postmarketing commitments and postmarketing

14 (Pages 50 - 53)

Appx1651

Page 54

1 requirements. So there are a number of
2 obligations under the law. I don't know if you
3 mean them -- again, whether that's what you're
4 talking about when you say this provision.
5 BY MR. SCHNELL:
6 Q. Well, what are the ongoing
7 obligations, if any, that a vaccine manufacturer
8 has with respect to the effectiveness of the
9 vaccine?
10 MS. HARDWAY: Object to form.
11 THE WITNESS: The basic scheme to
12 assure the effectiveness of a marketed product
13 is a system to relate the marketed product to
14 the investigational product that was used in
15 the clinical trials, and on which the conclusion
16 of effectiveness was -- was reached. And the
17 way they are related is through the system of
18 Good Manufacturing Practice controls that, if
19 you will, provide the connection that the
20 product now entering the market has the
21 essential characteristics of the product
22 on which effectiveness was established.
23 BY MR. SCHNELL:
24 Q. And what are the obligations, if any,
25 that a manufacturer of vaccines has if it comes

Page 55

1 to learn that the product it's selling is not
2 as effective as it was when it was originally
3 licensed?
4 MS. HARDWAY: Object to form.
5 THE WITNESS: The question of lack
6 of effect -- efficacy or lack of effect in the
7 market arises in the terms of the potential
8 safety reports. That would be one of the
9 reportable concerns that a manufacturer would
10 have to tell the agency about if there were a
11 lack of effect in the field that was reported to
12 the manufacturer.
13 If there is new scientific evidence
14 of lack of effect, that would have to be -- in
15 -- in the published literature, that would have
16 to be submitted to the agency in a periodic
17 report on the vaccine.
18 BY MR. SCHNELL:
19 Q. And in this particular provision that
20 we just read, there was a reference to, as you
21 wrote it, Requires substantial evidence of
22 safety and effectiveness, and what did you mean
23 by substantial evidence?
24 A. Well, a -- there I am using the
25 wording in the Food Drug and Cosmetic Act and in

Page 56

1 the regulations that talk about how to implement
2 the provisions of the Food Drug and Cosmetic
3 Act.
4 Substantial evidence is a quantum
5 that is, basically, reliant on the judgment
6 of the official who has the delegated
7 responsibility to make the decision to approve
8 or not approve a product. The, sort of,
9 indications of what is substantial evidence are
10 laid out in regulations, but in -- in the end,
11 it's a judgment call for the individual who's
12 approving or not.
13 Q. And is it an individual who makes the
14 judgment call --
15 A. It is.
16 Q. -- at the FDA?
17 And which individual is that, not by
18 name, but position?
19 A. It varies on the type of supplement.
20 Their -- their authority is vested in the
21 Secretary, delegated to the Commissioner.
22 Some other authorities under the Food Drug and
23 Cosmetic Act are vested in the Commissioner.
24 There are a system of delegations in the manuals
25 of the FDA that describe which officials have

Page 57

1 authority for which decisions that -- that that
2 other -- that are, sort of, directed to the
3 Commissioner.
4 For New Biological License
5 Applications, and I believe for Supplemental
6 Biological Applications, those are routinely
7 to the office director, Office Director for
8 Vaccines, Office Director for Blood Products
9 or Allergens.
10 In the drug center, for novel
11 molecular entities, it's delegated to the
12 office director or deputy office director. For
13 a supplement or a previously approved molecular
14 entity it's delegated, generally, to the
15 division director. And for some chemistry and
16 manufacturing supplements, it's delegated to the
17 chemistry and manufacturing team leader.
18 Q. And the --
19 A. And, again, it's different in devices.
20 Q. And these various delegations of
21 authority for approval of Biological License
22 Applications, are delegations made by the
23 Commissioner of the FDA?
24 A. From the Commissioner, yes.
25 Q. If you could turn to Page 7 of your

15 (Pages 54 - 57)

1 report, please, in Paragraph 21 on the first
2 sentence you wrote, "The basis for the FDA to
3 approve a BLA or SBLA is a finding by the Agency
4 that the biological product is pure, safe and
5 potent."
6      What do you mean by potent there?
7      A.  Again, this is the use of a word out
8 of the relevant statute, in this case the Public
9 Health Service Act, which describes the -- the
10 products to be marketed in the U.S. must be
11 pure, safe and potent.  And what potent means
12 then becomes a matter of interpretation through
13 regulation, guidance and practice.
14      Q.  And when -- how did you interpret
15 potent when you were at the FDA?
16      A.  Potent is a complicated idea, and one
17 off -- there's a lot of slightly varying terms
18 and often confusing applications of those
19 various terms.
20      In the sense of the statutory
21 threshold for approval, potent has -- means
22 that it has the strength to produce the effect
23 claimed on the label, that it is capable of
24 producing the effect on the label.
25 The analogous term for a drug would be the

1 strength of the chemical entity in the drug.
2      But potent also has acquired a
3 separate meaning, that when the responsibility
4 for the Public Health Service Act Administration
5 of Biological Products transferred to FDA, FDA
6 promulgated regulations saying that potency
7 meant effectiveness as in the effectiveness
8 requirement for drugs.
9      So potent means both that it has the
10 strength to achieve the effect and that it's
11 effective in achieving that effect.
12      Q.  Okay.  Continuing on in that
13 paragraph, you wrote, "A BLA approval implies
14 that the FDA has concluded that the demonstrated
15 clinical benefits for the use outweigh any ident
16 -- any identified safety problems and residual
17 safety concerns, that the data submitted to
18 support the approval have been evaluated and
19 found to be an adequate basis on which to
20 form the con -- that conclusion, including
21 conformance to the requirements for clinical
22 studies to be adequate and well-controlled,
23 products labeling is accurate and supported
24 by data and that the biological product is
25 appropriately manufactured and controlled.

1      Just a couple questions about the
2 language there.  Clinical benefits for use, what
3 does that mean?
4      A.  As we were discussing a few minutes
5 ago, there's the claimed label effect, and
6 that claimed label effect has to be evidence of
7 effectiveness.  Evidence of effectiveness today
8 is regarded as -- by interpretive guidance and
9 standards is how a patient feels, functions or
10 survives.
11      Basically, this is a -- a measure
12 of how we know something favorable to the
13 individual receiving the product has or will
14 be achieved by the use of the product.
15      Q.  And how -- how does that work in the
16 context of vaccines?
17      A.  Well, in the context of vaccines,
18 which are preventative products, then the
19 benefit is that when you have used the product
20 that you will experience the benefit asserted
21 in the label of protection against the vaccine
22 -- the illness against which the vaccine is
23 intended to protect you from.
24      Q.  And what does it mean for a clinical
25 study to be adequate and well-controlled?

1      A.  Well, that's a question of great
2 concern to the FDA, and it's laid out in the
3 regulations, particularly for the Center for
4 Drugs, but there's also the underlying statute
5 authority of adequate and well-controlled
6 studies, but the regulations at 314.126 --
7 decimal 126, describe what the FDA means
8 by adequate and well-controlled studies.
9      Q.  And do you have an understanding of
10 what that means?
11      A.  I do.
12      Q.  Can you tell me at a high level what
13 that means?
14      MS. HARDWAY:  Object to form.
15      THE WITNESS:  Well, there are a
16 variety of controls that are specified, but
17 it -- adequate and well-controlled means
18 the studies are -- are prospective; that they
19 are collecting data systematically; that the
20 information is relevant to the determination
21 of effectiveness; that there is some basis
22 or standard of comparison to look at the
23 experimental group and determine whether there
24 is a difference that is attributable to the
25 product intervention being studied, but -- but

16 (Pages 58 - 61)

Page 62

1 they also require a lot of other details beyond
2 that.
3 BY MR. SCHNELL:
4     Q.  Now, if a clinical trial on which
5 a Biologics -- well, a Biological License
6 Application is based is found not to be adequate
7 and well-controlled, then the FDA won't approve
8 the license, is that -- is that true?
9     A.  If the FDA reached a determination
10 that the product -- that the clinical
11 investigation supporting approval -- necessary
12 to support approval were not adequate and
13 well-controlled, then they would not have a
14 basis to approve the product.
15     Q.  And if the clinical trial for a
16 vaccine for a Biological License Application
17 does not demonstrate that the vaccine is
18 effective at protecting the vaccine recipients
19 from the disease, is it also true that the
20 FDA will not approve the license applications?
21     MS. HARDWAY:  Object to form.
22     THE WITNESS:  For an original license
23 application, of course, it would be necessary to
24 demonstrate effectiveness in -- on the clinical
25 trial data.  For supplements, which are changes

Page 63

1 to the vaccine, effectiveness may not be what's
2 being evaluated in the clinical trial.  So you
3 have to look at the goals of the clinical trial
4 and the hypotheses to determine what is being
5 measured in the trial.
6     Certainly, in this case we have
7 instances where the vaccine is known to be
8 effective based on the historical studies done
9 back in the '60s, and then subsequent changes
10 are not evaluating whether the vaccine is
11 effective, per se.
12 BY MR. SCHNELL:
13     Q.  Are you talking about this case in
14 terms of mumps?  Is that what you're talking
15 about?
16     A.  Yes.  Mumps virus vaccine.
17     Q.  And which Biological License
18 Applications were you referring to there?
19     A.  The three that we discussed
20 earlier, --
21     Q.  So --
22     A.  -- the application over MMR2 potency,
23 I believe as you characterized it, or expiry,
24 I believe is even -- is what you said, the
25 recombinant human serum al -- serum albumin or

Page 64

1 the recombinant albumin -- human albumin, and
2 the ProQuad.
3     Q.  And in those three license
4 applications, is it your opinion that
5 effectiveness was not necessary to be
6 demonstrated by Merck?
7     MS. HARDWAY:  Object to form.
8     THE WITNESS:  The easiest to deal
9 with that question is the latter two, where it
10 is clear that both the Agency and Merck were
11 working on the conclusion that effectiveness
12 -- that the vaccine itself was effective, and
13 they were looking to say, does a change in
14 the vaccine; in the case of ProQuad, does the
15 concomitant administration in one syringe in
16 the varicella vaccine alter the immunogenicity.
17 And in the case of human serum albumin, again,
18 they're looking at the question, does the change
19 from serum albumin to recombinant albumin change
20 the immunogenicity.  And so the underlying
21 question of effectiveness does not arise in
22 either one of those.  You're looking and saying,
23 is -- is there interference or change in the
24 immunological response.
25     The situation with the 007

Page 65

1 Clinical Investigation, the end expiry potency
2 determination is more complicated.  In that
3 case, FDA said, we want you to use as your
4 outcome measure an indication of immunological
5 response that is related to evidence of
6 effectiveness.  That changed over time.
7     I apologize for the longwinded answer.
8 BY MR. SCHNELL:
9     Q.  So when you said, immunological
10 response that is related to evidence of
11 effectiveness that changed over time, what
12 are you referring to?
13     A.  It is clear from looking through the
14 record that, initially, FDA was looking for
15 Plaque-Reduction Neutralization -- Neutralizing
16 Antibody, and that, in the end, FDA approved the
17 vaccine based on ELISA results, the Wild Type
18 ELISA results.  So that represents a change in
19 the assay that was being used to measure the
20 immunological response.
21     Q.  But the immunological response
22 related to evidence of effectiveness, was that
23 an endpoint that was always part of what FDA was
24 requiring for a double -- for the SBLA for the
25 end expiry for MMR2, mumps?

17 (Pages 62 - 65)

Page 66

1     MS. HARDWAY: Object to form.
2     THE WITNESS: It's hard to know
3  what was always required by FDA, other than by
4  looking at the records and saying, what did FDA
5  ask for in the early discussions and what did
6  FDA approve and -- in 2007 when they approved
7  the Supplemental BLA. They, initially, were
8  saying, we want a Plaque-Reduction Assay that
9  -- or a Neutralizing Antibody Assay that we
10  can relate to the original studies done by
11  Hilleman, et al., in the '60s.
12     And then, over time, and discussions
13  and over Merck's attempts to develop such
14  assays and to use such assays, FDA came to the
15  conclusion that they could rely on the Wild Type
16  ELISA Assay as the basis for approval.
17  BY MR. SCHNELL:
18     Q.  In one of your previous answers you
19  said that, Merck and the FDA, with respect to
20  the ProQuad, BLA and the RHA SBLA were both
21  working on the conclusion that the vaccine --
22  the mumps vaccine was effective.
23     Do you remember saying that?
24     A.  Yes.
25     Q.  And what is the basis for your

Page 67

1  understanding that that was the case?
2     A.  Reading the documents in this case.
3     Q.  And what -- what particular documents,
4  I don't mean date, but what were the -- what
5  were the general documents that you reviewed
6  that led you to the conclusion that both Merck
7  and the FDA were working on the conclusion that
8  the vaccine was effective?
9     A.  Well, the hypothesis and objectives
10  set out in the protocols, the con -- records of
11  conversation between Merck and FDA.
12     Q.  And was this a conclusion that Merck
13  and the FDA reached on the mumps vaccine being
14  ineffective or was it an assumption?
15     A.  It was the extension of the previous
16  conclusion on which the product was licensed.
17  There had to be such a conclusion, or the
18  product would not have been licensed back in
19  the '60s, that it carried forward into the new
20  vaccine and the new vaccines are being tested
21  to see if the change combining an additional
22  vaccine agent into the three-dose -- I'm sorry,
23  the -- the -- changing three-agent vaccine to a
24  four-agent vaccine had produced any interference
25  in immunogenicity.

Page 68

1     Q.  And it's your opinion that the FDA
2  had, at some point, concluded that the mumps
3  vaccine that Merck was making in this time
4  frame, which was in the 2000s, was just as
5  effective as the vaccine as originally licensed
6  in the late '60s?
7     MS. HARDWAY: Object to form.
8     THE WITNESS: Well, you inserted
9  the word just. They concluded it was effective.
10  I know of no reason to believe that, or to
11  understand, I've seen nothing to indicate
12  the FDA had concerns about diminution of
13  effectiveness during that interval.
14  BY MR. SCHNELL:
15     Q.  What did you see, if anything, that
16  leads you to the understanding that FDA had
17  concluded that it was effective?
18     MS. HARDWAY: Object to form.
19     THE WITNESS: It's a -- sorry.
20  It -- it is my inference and opinion from
21  understanding how FDA works from having been
22  there and having been an approving official at
23  FDA, from having submitted documents to the FDA
24  in my job as industry, and from reviewing the
25  materials in this case, FDA concluded the

Page 69

1  original product was effective when it was
2  approved. They are looking at the product with
3  subsequent changes to do -- say should it be
4  approved. In reaching a conclusion that the
5  subsequent changes can be approved, FDA is
6  necessarily reaching a conclusion the vaccine is
7  effective.
8  BY MR. SCHNELL:
9     Q.  Were there any clinical trials
10  that you recall reviewing that led FDA to
11  this conclusion that you -- that you're saying
12  FDA had?
13     MS. HARDWAY: Object to form.
14     THE WITNESS: As I mentioned a minute
15  ago, the clinical trials were not evaluating
16  effectiveness. The conclusion of effectiveness,
17  and which you phrased as an assumption of
18  ongoing effectiveness, carries forward.
19  The clinical trials are looking for, is
20  there interference or is there a change in
21  the immunogenicity with the manufacturing change
22  for which approval was sought in these two
23  subsequent market -- supplemental marketing
24  applications.
25  BY MR. SCHNELL:

18 (Pages 66 - 69)

Appx1655

Page 70

1    Q.  So with respect to the -- with the
2 first provision that we read from your report
3 on Page 6, that biological products are also
4 regulated as drugs under the FDCA, which
5 requires substantial evidence of safety
6 and effectiveness for approval of marketing
7 applications, is it your opinion that that
8 provision did not apply to the -- the three
9 Biological License Applications we've been
10 discussing, the potency SBLA, the ProQuad BLA
11 and the RHA SBLA?
12    A.  I have certainly attempted to answer
13 that question in our colloquy over the last few
14 minutes.
15        The vaccine had to be effective
16 for original approval, it has to continue to be
17 effective for the change for which approval was
18 being sought in the supplement.  The supplement
19 does not necessarily have to go back and re-test
20 that underlying effectiveness.  It's testing a
21 change, or -- or it's evaluating whether a
22 change alters the response in such a way as to
23 raise concern about is the vaccine no longer
24 effective.
25        When FDA approves it, they have,

Page 71

1 necessarily, incorporated a conclusion that
2 after the change the vaccine is effective.
3    Q.  So -- so Merck was still under this
4 requirement of providing substantial evidence
5 of the effectiveness of the mumps vaccine in --
6 with respect to these three biological license
7 applications, is that true?
8        MS. HARDWAY:  Object to form.
9        THE WITNESS:  The requirement is that
10 substantial evidence exists.  It existed in 1967
11 based on the Agency's review and determination
12 and conclusions.  The vaccine has that
13 effectiveness conclusion carried forward,
14 and the question in looking at the recombinant
15 human albumin is, does the change from human
16 serum albumin to recombinant human albumin
17 change the immunological response, where the
18 vaccine is evaluating immunological response
19 to say, does it give their experts, who have to
20 sign or not sign the approval, concern that
21 effectiveness -- or concern is not the right
22 word.
23        Does it lead them to a conclusion
24 that effectiveness can no longer be concluded.
25 When they approve, they have reached a

Page 72

1 conclusion that ongoing effectiveness is
2 present even with the change for which they are
3 approving -- even with the change they are
4 approving.
5 BY MR. SCHNELL:
6    Q.  If you could turn to Page 10, please.
7        On Paragraph 28 in the second sentence
8 you wrote, "As a basis for approval, a clinical
9 study must establish evidence of effectiveness
10 on an endpoint."
11        Where does that requirement come from?
12    A.  It comes from my accumulated
13 experience as a regulator and as a member
14 of industry that was being regulated, and a
15 consultant to industry.
16        If you refer back to the regulation,
17 it requires measures of effect, I believe the
18 wording is.  We would have to pull the reg
19 itself to be certain of the wording.  So what
20 is that measures of effect?  It -- it is the
21 endpoint in a clinical trial.  And that's
22 what you're studying in a clinical trial,
23 to determine whether it has evidence of
24 effectiveness or not.
25    Q.  And did this requirement apply to the

Page 73

1 three Biological License Applications at issue
2 that we've been discussing?
3    A.  Yes.
4    Q.  And in what way did it apply to the
5 potency SBLA?
6    A.  I'm sorry.  The expiry?
7    Q.  Yeah.  The end expiry potency, yes.
8    A.  End expiry BLA?
9        It replied as it did, you know, to the
10 others, that there had to be an endpoint in the
11 clinical data set or a measure in the clinical
12 data set which was being evaluated and which
13 FDA could fairly conclude was an adequate and
14 well-controlled trial that showed the effect.
15    Q.  And what was the endpoint in
16 the -- for all three, but let's start with
17 the end expiry potent -- potency SBLA?  What was
18 the endpoint for which Merck was required to
19 establish evidence of effectiveness?
20    A.  Well, it's phrased in a complicated
21 way, and perhaps we should look at the document
22 describing the trial protocol, which, of course,
23 evolved over time, if you want to get into the
24 exact phrasing.  But, basically, they were
25 looking to say -- it was a non-inferiority

19 (Pages 70 - 73)

1 trial. They were looking to say -- to evaluate,
2 do three groups of individuals have evidence on
3 serological assay that the product at a release
4 potency is comparable to a product at expiry
5 potencies which are lower; in this case,
6 4.1 tissue culture -- the log -- Log 10 4.1
7 tissue culture effective dosages or 3.7 tissue
8 cult -- Log 10 tissue culture effective doses.
9 It's called a non-inferiority design in the way
10 it's analyzed.
11     Q.  And the non-inferiority was comparing
12 the 4.1 and 3.7 doses to the control arm, which
13 was the 4.8 dose; is that correct?
14     A.  Right.  It's saying, is the 4.1 tested
15 first non-inferior to the measure in the -- the
16 release strength of the 4.8, and then, if that
17 passes non-inferiority, then evaluating the
18 3.7.  So it's a sequential evaluation of the
19 two.
20     Q.  Well, wasn't there also an adequacy
21 endpoint?
22     A.  There was a hypothesis, and, again, if
23 we want to look at the document, we can get the
24 exact wording, but there was a requirement that
25 the trial look at seroconversion in a certain

1 percent individual with a certain margin of
2 error around the confidence intervals to be
3 evaluated as an adequate trial for the FDA's
4 purposes.
5     Q.  And do you have an understanding of
6 what the adequacy measure was referring to?
7         MS. HARDWAY:  Object to form.
8         THE WITNESS:  I don't understand your
9 question.
10 BY MR. SCHNELL:
11     Q.  Adequate in what sense?
12     A.  Adequate in terms of measuring
13 seroconversion as to a substantial fraction
14 of the individuals to whom the vaccine was
15 administered.
16     Q.  And what were the endpoints for the
17 other two Biological License Applications we've
18 been speaking about, ProQuad and RHA?
19     A.  Again, we probably ought to refer to
20 the protocols and the statistical analyses plans
21 themselves, but my memory is that both of them
22 were being evaluated for non-inferiority using a
23 serological assay.  In those particular cases,
24 it was an ELISA Assay.
25     Q.  Okay.  If you could turn to Page 14,

1 please.
2         And if you could just read paragraphs
3 38 and 39 to yourself.  You don't have to read
4 it out loud.  You can, if you want, but I just
5 have a couple questions about that.
6     A.  I have read those.
7     Q.  So with -- let -- let's -- let's talk
8 about the three Biological License Applications
9 and how what you're saying here applies to each.
10         First of all, would you consider any
11 of the three relating to a new virus vaccine?
12     A.  They were new vaccines in the sense
13 that they are new products requiring separate
14 approval, but they are incorporating previously
15 approved effective vaccine viruses.  And so
16 I guess I wouldn't say they're a new virus
17 vaccine.  Rather, they are new formulations
18 that require separate approval.
19     Q.  And you don't disagree, do you,
20 that with respect to the clinical trials that
21 Merck submitted in support of each of those
22 three Biological License Applications, Merck was
23 required to demonstrate that the clinical trials
24 demonstrated that the vaccine in the formation
25 it was seeking approval for prevented mumps?

1         MS. HARDWAY:  Object to form.
2         THE WITNESS:  The -- I'm sorry.
3 Could you repeat the question?
4 BY MR. SCHNELL:
5     Q.  Do you disagree that -- well, let me
6 make it less of a negative question.
7         Would you agree that, with respect to
8 each of those Biological License Applications,
9 Merck was required to conduct clinical trials
10 that demonstrated that the vaccine that it was
11 seeking approval for was effective in preventing
12 mumps?
13         MS. HARDWAY:  Object to form.
14         THE WITNESS:  As we have been
15 discussing for some time now, the individual
16 components, when originally licensed, had
17 to be effective and had to have evidence
18 of effectiveness ad -- by adequate and
19 well-controlled trials.  The FDA reached
20 the conclusion they did.
21         When you're going to reformulate
22 the vaccine by the change in the albumin, or
23 when you're going to reformulate it by taking a
24 trivalent vaccine and adding a fourth component
25 to it, where both the trivalent and fourth

20 (Pages 74 - 77)

1 component are already known to be effective,
2 then you need evidence of noninterference,
3 and that the evidence of effectiveness of
4 the individual components can then be carried
5 forward so that the FDA can conclude that the
6 4-valent vaccine, or the vaccine with the new
7 albumin in it, is also effective.
8 BY MR. SCHNELL:
9    Q.  And so --
10    A.  And, of course, I should clarify that
11 the albumin is not in the vaccine.  The albumin
12 is in the tank in which the vaccine virus is
13 grown.
14    Q.  And in demonstrating that
15 non-inferiority, is that some kind of surrogate
16 for effectiveness, or, I mean, is that in itself
17 it -- its own independent demonstration that the
18 change in the vaccine hasn't interfered with
19 how effective it is?
20    MS. HARDWAY:  Object to form.
21    THE WITNESS:  The FDA reviewer
22 evaluating and approving or not approving
23 the request for a change in the vaccine has to
24 conclude it's effective.  What evidence it takes
25 in view of the change is a matter of discretion

1 and scientific decision-making on which these
2 are the country's experts, so they're -- they're
3 the people who have to make that decision and
4 are vested with the responsibility.  And they
5 determine what level of evidence they need to
6 reach a conclusion that the new product will be
7 effective when the component products previously
8 have been established to be effective.
9 BY MR. SCHNELL:
10    Q.  So in Paragraph 39 you speak to a
11 surrogate endpoint, and what are you referring
12 to there?
13    A.  I would clarify that, both in terms
14 of this question and the previous question,
15 both of these paragraphs are written about
16 new approvals.  But a surrogate endpoint is a
17 endpoint that measures something other than how
18 a patient feels, functions or survives.  It's a
19 psychometric test, a laboratory test, an image.
20 It's something other than a direct measure of
21 patient benefit.  And there's a broad category
22 of such measures which is called biomarkers.
23 Some biomarkers have been validated as being
24 associated with clinical benefit, feels,
25 functions or survives.  Those are called

1 surrogate endpoints.
2    Here, unfortunately, as in many
3 issues in this particular case, there's sloppy
4 vocabulary, and people use surrogate endpoint
5 more broadly sometimes when they just mean a
6 biomarker that is not a validated surrogate.
7    I try and restrict the use of
8 surrogate to be those biomarkers that have been
9 validated as predictive of clinical benefit.
10    Q.  And what's the relationship, of [sic]
11 any, between a surrogate and a correlate?
12    A.  Correlation and correlate, again, are
13 in the category of terms that get used sometimes
14 loosely and sometimes with different meaning by
15 different people.
16    A correlate of protection, as used
17 in virology or by virologists, means where we
18 have a laboratory test that determines a readout
19 where that readout has been associated with
20 protection of a disease in the individual.
21 So, for instance, in influenza immunization,
22 if one achieves a hemagglutination inhibition
23 titer of 1 to 40, you can be confident that
24 that individual is protected.
25    If you give an influenza vaccine to

1 a large group of people and the median titer is
2 1 to 20, does that mean the vaccine failed and
3 nobody's protected?  No, they may still be
4 protected, but I can't pick individuals with
5 1 to 20 and say, you are protected.  So it --
6 it's moving from a population base to an
7 individual predictor, if you will, when we say
8 it's a correlate of immunity.
9    It also implies that we know the
10 measure has relevance to the existence of
11 immunity and, presumably, although never
12 scientifically certain, the mechanism of
13 immunity.
14    Q.  And how does that differ -- this
15 correlate of protection that you've been
16 describing, how does that differ, if at
17 all, from a surrogate of protection?
18    A.  Well, with mumps we have a -- a great
19 many assays that could be done.  The most common
20 ones are serological assays, but you could also
21 do cell-mediated immunity assays, and you can do
22 a lot of different types of serological assays.
23    In this instance, the serological
24 assays being used are the Wild Type ELISA,
25 the Legacy ELISA and various Plaque-Reduction

21 (Pages 78 - 81)

Appx1658

Page 82

1 Neutralization Assays. Are those surrogates of
2 immunity? Well, they are surrogates of immunity
3 on a population basis, but -- or some of them
4 are. The -- the Plaque-Reduction Neutralization
5 Assays, in -- in their various forms, are
6 accepted as surrogates of immunity. But
7 they -- they have to be related to evidence of
8 immunization in a population, because we don't
9 have, for any single individual, a readout
10 level, a cutoff level that says, okay, you as an
11 individual are protected.
12       And, by the way, if anything, we
13 know they underestimate protection. Protection
14 happens in individuals who don't score positive
15 in such assays based on the original studies.
16    Q.  Now, for mumps there is no correlate
17 of protection; is that correct?
18    A.  There is not a cutoff level -- an
19 assay and a cutoff level for any given assay
20 that is a correlate of protection.
21    Q.  Didn't the original licensing studies
22 provide that kind of cutoff?
23    A.  They did not. They provided -- there
24 -- there were two principal types of assays that
25 were used in the original licensing studies,

Page 83

1 Hemagglutination Inhibition Assays and
2 Plaque-Reduction Neutralization Assays. The
3 Plaque-Reduction Neutralization Assays were
4 used starting with the full serum and going
5 through serial dilutions at relatively low
6 titers, 1 to 2, 1 to 4, 1 to 8, 1 to 16.
7       When you go back and look at those
8 articles, they show that antibody is, as
9 measured in the Plaque-Reductions Neutralization
10 Assay or the Hemagglutination Inhibition Assay,
11 is -- is, on a population basis, predictive of
12 immunity. But it -- there's no cutoff for
13 any one of them that says, this individual is
14 immune.
15    Q.  So there's never been a correlate of
16 protection for mumps; is that correct?
17    A.  It is my understanding that there is
18 not a correlate of protection for mumps, and
19 that is reflected in the scientific literature,
20 including publications by the FDA's experts.
21    Q.  And has that always been
22 well-understood in the industry?
23    A.  I know of no reason to think it is not
24 well-understood in the industry.
25    Q.  I'm talking about has that always been

Page 84

1 well-understood? Was there a point in time
2 where there was no view in the industry one way
3 or the other whether or not there was a mumps
4 correlate of protection?
5       MS. HARDWAY:  Object to form.
6       THE WITNESS:  The question asked me to
7 reach a conclusion about opinions that I have no
8 evidence to evaluate. I can't -- I can't answer
9 that question. I don't know what everybody in
10 the industry thought over time and over history.
11 It's an impossible question.
12 BY MR. SCHNELL:
13    Q.  Now, with respect to surrogate
14 of protection, is it your opinion that the
15 original licensing studies for -- that Merck
16 conducted for its mumps vaccine were -- served
17 as surr -- surrogates of -- of mumps protection?
18       MS. HARDWAY:  Object to form.
19       THE WITNESS:  I'm sorry. Could you
20 repeat the question?
21       (Referred-to testimony read back.)
22       THE WITNESS:  I thought that's what
23 you'd asked.
24       No, they served as a basis for
25 establishing Plaque-Reduction Neutralization

Page 85

1 Assays as a surrogate of infection [sic].
2 BY MR. SCHNELL:
3    Q.  Surrogate of protection?
4    A.  Surrogate of protection.
5    Q.  Yeah.
6    A.  The studies established effectiveness.
7 One of the measures in the studies was
8 Plaque-Reduction Neutralization antibody in
9 the vaccines. That becomes established as a
10 surrogate of protection as a result of the
11 studies.
12    Q.  You mentioned other tests that serve
13 as surrogates of protection for mumps. What
14 other types of tests -- serological tests are
15 there that serve as surrogate of protection for
16 mumps?
17    A.  I intended to measure other -- to
18 talk about other serological tests that measured
19 antibody responses as evidence of vaccine
20 response immunogenicity, as opposed to
21 surrogates of inspect -- of protection; that
22 there are a lot of assays you can do to look
23 and say, did this individual have an immune
24 response to the mumps virus vaccine or to Wild
25 Type Mumps. And some of them are cell-mediated

22 (Pages 82 - 85)

1 assays, there are a variety of serological
2 assays. I mentioned three, various ELISAs,
3 Hemagglutination Inhibition and Plaque-Reduction
4 Neutralization, they're all assays that get to
5 the question of, did this individual respond
6 immunologically.
7         The one that is best accepted as a
8 surrogate is the Plaque-Reduction Neutralization
9 Assay.
10    Q. Is the ELISA Test accepted as a
11 surrogate for protection of mumps also?
12    A. The ELISA Test measures an
13 immunological reaction to the vaccine. In
14 terms of whether it's accepted as a surrogate
15 of infection, you have to look and say, what
16 decisions has FDA made based upon it, and then
17 you get to the question of, in making that
18 decision, did FDA conclude that -- did FDA
19 need to conclude there was ongoing evidence of
20 an immunological reaction to the vaccine, and did
21 they use the ELISA study to reach that
22 conclusion.
23    Q. And so the answer would be, in
24 some instances, then, depending on how the
25 FDA treated a particular ELISA, the ELISA can

1 serve as a surrogate of protection for mumps?
2    A. The ELISA can serve as evidence of
3 immunogenicity of the vaccine where the vaccine
4 is assumed to carry on. And the difficulty with
5 the question as you formulate it is that, if it
6 were accepted as a surrogate of infection, then
7 it, presumably, would be providing the basis for
8 licensure of a new mumps virus vaccine. That's
9 a different question than what evidence does
10 the FDA need to look at a change of a previously
11 licensed vaccine. The quality and quantum of
12 evidence would certainly be higher for a new
13 mumps virus vaccine.
14    Q. But in terms of what you are -- have
15 defined as a surrogate of protection against
16 mumps, is it fair to say that the only accepted
17 serologic test that would fall with that --
18 would fall within that definition is a
19 Plaque-Reduction Neutralization Test?
20        MS. HARDWAY: Object to form.
21        THE WITNESS: The decision evolves --
22 or the basis for a decision for licensure and
23 approval can evolve over time with evolving
24 science. So you're ask -- it sounds as though
25 the question is, essentially, asking me to

1 predict what will FDA do next year. I'm not
2 sure, because I don't know what science FDA will
3 be looking at next year.
4        Could FDA some day approve a mumps
5 virus vaccine based strictly on ELISA results?
6 I don't know. They might. They would have to
7 decide whether the evidence supported that.
8        Today, the best-accepted surrogate of
9 protection, to my understanding of the field, is
10 Plaque-Reduction Neutralization Assays that can
11 be related to Plaque-Reduction Neutralization as
12 done by Hilleman.
13 BY MR. SCHNELL:
14    Q. And when you say --
15        THE REPORTER: As done by what?
16        MR. SCHNELL: Hilleman.
17        THE REPORTER: Okay.
18 BY MR. SCHNELL:
19    Q. When you say that, Today, the
20 best-accepted surrogate of protection, to my
21 understanding of the field, is Plaque-Reduction
22 Neutralization Assays that can be rated --
23 related to Plaque-Reduction Neutralization as
24 done by Hilleman, what do you mean by related?
25    A. That Plaque-Reduction Neutralization

1 is a situation in which you're looking at an
2 indicator virus and its ability to grow in
3 a cell substrate. And whether that virus
4 growth in a cell substrate can be inhibited by
5 antibody, the mechanisms of inhibition can be
6 extremely complicated.
7        The -- there are many ways to do such
8 assays. You could use many different indicator
9 viruses, you could use many different cell
10 substrates, you could use antibody with a
11 variety of treatments, you could use it with
12 added complement, you could use, as in this case
13 with the AIGENT Assay, an added second antibody.
14 So there are a lot of ways to do the study.
15        When we look back at the literature
16 reports on what Hilleman did, we see that they
17 used a different assay than the ones being used
18 today. So whether the assay being used
19 today relates to the one that Hilleman used is a
20 matter of scientific judgment. That judgment is
21 the responsibility of FDA's experts.
22    Q. And it's your opinion in this matter
23 that the FDA concluded that the AIGENT Assay
24 related sufficiently to the PRN used
25 by Hilleman that FDA was comfortable that the

23 (Pages 86 - 89)

1 AIGENT served as a surrogate of protection?
2    A.   In the initial discussions of
3 the plans for the study, FDA asked Merck to
4 develop a functional assay that would be a
5 Plaque-Reduction functional assay, although
6 they didn't specify it had to be a
7 Plaque-Reduction.  Merck said let's look at
8 that.
9         Over time, and Merck did attempt to
10 and worked extensively with the Agency on what
11 they were able to develop and what the
12 limitations were, they eventually settled by
13 mutual agreement, Merck proposing and FDA
14 concurring, in the use of the AIGENT Assay.
15 So the AIGENT Assay was planned for the -- to
16 measure the endpoint in the study.
17        In the end, when FDA reached a
18 conclusion on the adequacy of the 007 study,
19 the AIGENT Assay information was there, but
20 they based their decision on the adequacy of the
21 assay -- I'm sorry, the adequacy of the study
22 based on the Wild Type ELISA.
23    Q.   And is it your opinion that, in doing
24 so, the FDA treated the Wild Type ELISA itself
25 as a surrogate for protection against mumps?

1    A.   I guess I was unclear a few minutes
2 ago.  They didn't have to address that question.
3 That question would have been relevant and
4 necessary for a new mira -- new mumps virus
5 vaccine.  But for a change in manufacturing to
6 an existing virus vaccine, where we know the
7 vir -- mumps virus vaccine is effective, they
8 don't have to directly address that question.
9    Q.   And they did not, is that your
10 opinion?
11    A.   I don't see that they did one way or
12 another.  I, of course, was not party to their
13 discussions.  I -- I only have a limited
14 record of the discussions that took place in the
15 licensing committee and the basis for approval.
16    Q.   And -- and do you have an
17 understanding that you have the full record
18 of those communications?
19        MS. HARDWAY:  Object to form.
20        THE WITNESS:  My understanding is that
21 it's redacted, so I don't have the full record.
22 And I don't know whether there are additional
23 documents that I don't have, so I -- I can only
24 tell you what I do have.
25 BY MR. SCHNELL:

1    Q.   And you only have what Merck's lawyers
2 provided you in this regard; is that correct?
3    A.   That is correct.
4    Q.   Do you know why the FDA originally
5 required Merck to use a functional assay for its
6 007 clinical trial?
7        MS. HARDWAY:  Object to form.
8        THE WITNESS:  Do I know why they
9 required it?  I guess it was their judgment that
10 that would be the best measure of whether there
11 was any change in immunological responsiveness
12 across the three potency -- I said guess.  I
13 guess what I'm really doing here is reaching a
14 reasonable inference as an expert opinion that
15 that's what they were looking at.  But it
16 doesn't give me insight into their state of
17 mind.  I can only make the inference that I
18 just did.
19 BY MR. SCHNELL:
20    Q.   And do you agree that -- well, I guess
21 your answer presumes that it's your opinion that
22 a functional assay is the best measure for
23 measuring immunological responses?
24        MS. HARDWAY:  Object to form.
25        THE WITNESS:  I didn't say that, and I

1 don't agree with that.  I said I was inferring
2 that that was what FDA was looking for.
3 BY MR. SCHNELL:
4    Q.   Do you disagree with -- with what
5 you're inferring FDA was looking for?
6    A.   I don't think FDA was unwise in
7 looking for that.  On the other hand, I also
8 know that as we go through the record of the
9 conduct, evaluation and application for approval
10 and subsequent approval of 007, that FDA got to
11 a point where they said they could rely on the
12 Wild Type ELISA results, and they did, and they
13 approved the product based on that.
14    Q.   So it's your understanding that,
15 originally, FDA did not believe the Wild Type
16 ELISA on its own would have been sufficient for
17 the SBLA for end-expiry potency?
18        MS. HARDWAY:  Object to form.
19        THE WITNESS:  I can't really
20 offer an opinion on FDA's beliefs.  I can make
21 inferences about what they say.  The question is
22 complicated by the fact that the Wild Type ELISA
23 didn't exist at the time that 0007 was being
24 planned.  It's -- it's developed during the
25 course of 007, roughly concurrently with the

Page 94

1  AIGENT assay, and it's developed because FDA
2  is asking for a Wild Type ELISA assay.
3  BY MR. SCHNELL:
4      Q.  Do you know why FDA was asking for a
5  Wild Type ELISA assay?
6      A.  Well, to the extent that the documents
7  I've read reflect that FDA wants an indicator
8  of immunological response to the vaccine, which
9  gives them greater assurance that they're
10  measuring something they can rely on than would
11  be the case if the Legacy ELISA had been used,
12  which would have -- used as an indicator virus,
13  the vaccine virus strain.  So FDA's saying we
14  would have more confidence if the indicator
15  virus were the Wild Type virus.
16      Q.  And do you agree that using the Wild
17  Type ELISA as the indicator, the Wild Type ELISA
18  would have given the FDA more confidence than
19  Legacy ELISA that used the vaccine strain?
20      MS. HARDWAY:  Object to form.
21      THE WITNESS:  Do I agree it would have
22  given them more confidence?  I -- I don't -- I
23  agree they indicated that and that that's the
24  inference from what they're saying.
25  BY MR. SCHNELL:

Page 95

1      Q.  Would it have given you more
2  confidence?
3      MS. HARDWAY:  Object to form.
4      THE WITNESS:  I would have to put
5  myself into the situation and all -- look at all
6  the variables to really formulate a conclusion
7  on that.
8      I think substantial evidence of
9  interference or noninterference would have been
10  achieved with the Wild Type Legacy ELISA using
11  the vaccine virus indicator strain.
12      I think it's scientifically useful to
13  see the Wild Type indicator strain, but I don't
14  know that it's necessary.
15  BY MR. SCHNELL:
16      Q.  So in one of -- in your previous
17  answer you said, To the extent the documents
18  I've read reflect that FDA wants an indicator of
19  immunological response which gives them greater
20  assurance they're measuring something they can
21  rely on, what is it that they're measuring to
22  rely on?
23      MS. HARDWAY:  Object to form.
24      THE WITNESS:  The immunological
25  response to the vaccine in the serum of

Page 96

1  recipients that is being evaluated to see
2  whether they have an immunological response
3  to the vaccine -- those recipients had an
4  immunological reaction.
5  BY MR. SCHNELL:
6      Q.  And when you say immunologic reaction,
7  are you talking about measuring antibodies?
8      A.  Antibodies are one measure of
9  immunological reaction.  As I mentioned
10  previously, there are other things that could
11  be looked at, but antibodies are what's being
12  looked at in this mumps virus vaccine.
13      Q.  And what type of antibodies did the
14  Wild Type ELISA provide a measure of?
15      A.  The type of antibodies is an
16  extraordinarily complex question.  There's all
17  sorts of different ways of looking at what type
18  of antibodies we're talking about here.
19      There -- there are big molecules
20  that do lots of things.  Some of them attach to
21  cells and then change confirmation and become
22  effective that way.  Some of them adhere to
23  proteins or other ligands and provide what's
24  called steric interference.  They get in the
25  way of the ability of that protein or ligand

Page 97

1  to attach to its target.  Some of them change
2  confirmations and change the ligand in such a
3  way that it no longer functions.  Some of them
4  disrupt the virus particle.
5      So, you know, I -- you have to be more
6  specific for me to un -- be able to address what
7  type of antibody.
8      Q.  Well, was the Wild Type ELISA that
9  Merck used in Protocol 7 measuring any type of
10  antibody that gave any kind of association with
11  protection against mumps?
12      MS. HARDWAY:  Object to form.
13      THE WITNESS:  They were measuring
14  antibody that was specific for the mumps virus
15  vaccine, and they were measuring antibody that
16  is evidence of an immunological reaction to the
17  vaccine.  And to that extent, on a population
18  basis, they're showing evidence that the
19  effective vaccine has been responded to and the
20  group of subjects are expected to be protected.
21  BY MR. SCHNELL:
22      Q.  So is it your opinion that the Wild
23  Type ELISA that Merck used in supporting its
24  SBLA in 007 provided a relevant measure of
25  protection against mumps?

25 (Pages 94 - 97)

Appx1662

Page 98

1    A.  I am beginning to try -- to struggle
2 to understand the difference between the
3 question you asked now and the many questions
4 we have just gone through.
5        It -- it is -- it is my opinion
6 that it is a measure of whether there was an
7 immunological reaction to the effective vaccine.
8    Q.  And what's your understanding of how
9 the FDA read that immunological response that
10 gave them comfort to approve the SBLA of the
11 007?
12       MS. HARDWAY:  Object to form.
13       THE WITNESS:  It is my understanding
14 that FDA looked at the data that -- with the
15 Wild Type ELISA and reached a conclusion
16 that the intermediate virus content dose
17 was non-inferior to the release dose, and,
18 therefore, they could approve an expiry potency
19 at the intermediate virus content.
20       They reached a conclusion that the
21 lowest virus content group had not been shown
22 to be non-inferior and so they could not approve
23 the expiry potency at the -- as reflected in the
24 immunological responses in the 3.7 group.
25 BY MR. SCHNELL:

Page 99

1    Q.  And when you say non-inferior,
2 non-inferior based on what?
3    A.  Based on statistical comparison with
4 the reference group, the released strength 4.8.
5    Q.  But non-inferior in terms of what kind
6 of measure?
7    A.  Non-inferior in terms of the
8 seroconversion rate among recipients.
9        Let me amend that.  Of course,
10 in their last cycle of review, FDA asked the
11 control group not just be the 4.8, but be the
12 4.8 expanded by additional groups from previous
13 trials so that it becomes a pooled control
14 group, to which the test group is demonstrated
15 to be non-inferior.
16       Thank you for the pause to allow me to
17 remember that.
18    Q.  I aim to please.
19       The ICH Guidelines that you referred
20 to in your report, are they something different
21 than what you've also just referred to as GCP
22 or Good -- Good Clinical Practice Guidelines?
23 Are they subsumed with one another?
24       The question is, what's the
25 difference, if any, between ICH Guidelines

Page 100

1 and -- and GCP?
2    A.  GCP is a set of requirements
3 embodied in regulations from the Food & Drug
4 Administration, which have been through the
5 Federal Register and following the procedures in
6 the Administrative Practices Act and are rules
7 of the Food & Drug Administration interpreting
8 the underlying statute.
9        Guidance documents are not rules
10 or requirements and are offering readers
11 possible approaches to deal with the underlying
12 questions.  The question of Good Manufacturing
13 Practices is talking about the manufacturing
14 control of the drug substance and drug product.
15       Guidances cover a lot of areas.  The
16 guidances I'm talking about in this instance are
17 guidances that cover clinical investigations,
18 which are different matters than control and
19 manufacture of the drug product.
20       I don't know if that fully explains
21 the difference, because it's a really
22 complicated issue, but ...
23    Q.  With respect to GCP requirements,
24 those are requirements that the FDA imposes for
25 any clinical trial for licensing, is that true?

Page 101

1    A.  Good Clinical Practice requirements?
2    Q.  Yes.
3    A.  Yes.  As embodied in the FDA's
4 regulations at Part 50, et seq.
5    Q.  And so the clinical trials that Merck
6 conducted in support of its -- its end-expiry
7 SBLA, its ProQuad BLA and its RHS BLA, those
8 are all subject to GCP requirements, correct?
9    A.  Good Clinical Practice requirements
10 cover all trials conducted under the aegis of --
11 or conducted in the U.S. under the aegis of the
12 company seeking approval.
13    Q.  And what happens if a particular
14 manufacturer fails to comply with the GCP
15 requirements in connection with clinical trials?
16       MS. HARDWAY:  Objection; overbroad.
17       THE WITNESS:  If there is
18 noncompliance with the Good Clinical Practice
19 requirements, the FDA -- presumably, you're
20 talking about instances where this becomes
21 known to the FDA, the FDA can evaluate and does
22 evaluate the importance of that and whether the
23 deviations impact the reliability of the data
24 and FDA can reject the trial in its entirety or
25 it can reject some subset of data in the trial

26 (Pages 98 - 101)

1 because of deviations from Good Clinical
2 Practice.
3 BY MR. SCHNELL:
4    Q.  While you were that -- at the FDA,
5 did you ever experience a manufacturer failing
6 to comply with any GCP requirements for clinical
7 trials it was conducting?
8    A.  Yes.
9    Q.  And what was the FDA's response in
10 those instances?
11    A.  Well, the most common response was
12 that a subset of the data from the clinical
13 trial would be excerpted and not evaluated in
14 terms of whether the clinical trial established
15 effectiveness of the product.
16    Q.  And suppose the -- were there
17 instances where the GCP failures were pervasive
18 throughout the clinical trial?
19    MS. HARDWAY:  Object to form.
20    THE WITNESS:  Well, I certainly
21 remember instances I have evaluated and been
22 involved in since then where the GCP violations
23 or noncompliance was so widespread that FDA
24 reached a conclusion that the integrity of the
25 data in the trial could not be relied upon and

1 the FDA rejected the trial in its entirety.
2 BY MR. SCHNELL:
3    Q.  And in those instances, did the
4 manufacturer conduct a new clinical trial?
5    A.  Sometimes they gave up and went away.
6 Sometimes they conducted new trials.
7    Q.  And it's your opinion that -- or you
8 disagree with Dr. Calcott, one of plaintiff's
9 experts, with the opinion that with respect to
10 007 clinical trials, that they were also subject
11 to CGMP, Current Good Manufacturing Practices;
12 is that correct?
13    A.  As you've phrased it, it -- it's not
14 correct in its entirety.  The investigational
15 medicinal product used in that trial would have
16 been subject to GMP, because GMP is talking
17 about the manufacture and control of medical
18 products.
19    The clinical aspects of the trial and
20 the testing of the sera obtained in the trial,
21 just as the testing of the sa -- or evaluation
22 of the safety results recorded in the clinical
23 report forms, would not be subject to GMP.
24    Dr. Calcott seems to conflate these
25 and say, no, GMP covers the whole thing, and I

1 disagree with him to that extent.
2    Q.  And you also disagree with the FDA
3 scientist, I believe her name was Bennett, who,
4 when she investigated or inspected Merck in
5 connection with 007, she had an opinion that
6 -- that GMP applied to 007, and you disagree
7 with that, as well; is that -- is that correct?
8    A.  Well, the minor prem -- premise in
9 your question is that she reached a conclusion
10 or said that the GMP applied to 007, and I don't
11 think that's an accurate characterization of
12 what the record shows.
13    I believe she commented that
14 the laboratory was not conducting its assays
15 according to GC -- Good Manufacturing Practices.
16 There certainly were practices in the laboratory
17 which I would agree with her did not fit GMP,
18 though -- but the question here is, then, is
19 GMP the right standard of which to evaluate the
20 operation of the laboratory.
21    This is not a laboratory manufacturing
22 product.  This is a laboratory testing serum
23 using a laboratory-developed test.  It's an
24 in vitro diagnostic, if you will.  Diff --
25 different set of standards.

1    Q.  So then I'm confused, because I
2 thought in your report you -- you -- you
3 criticized -- I don't want to say criticized,
4 but you expressed an opinion that you disagreed
5 with the conclusion reached by this FDA
6 scientist.
7    A.  I'm sorry.  I didn't hear that.
8    Q.  I'm trying to find the page --
9    A.  Oh.
10    Q.  -- so we can speak more specifically
11 to this.
12    MS. HARDWAY:  It's Page 40, I think.
13    MR. SCHNELL:  Page 40?
14    Thank you.
15 BY MR. SCHNELL:
16    Q.  Yeah.  So if you look at Page 40,
17 in Paragraph 111, "In my opinion, Dr. Bennett
18 was in error, possibly due to her experience
19 as a field force inspector conducting CGMP
20 inspections in manufacturing facilities when she
21 indicated that Merck's clinical study laboratory
22 was subject to CGMP."
23    So will you just explain that to me?
24    A.  When I wrote that, it is, in
25 retrospect, imprecisely worded.  She was in

27 (Pages 102 - 105)

1 error to the extent she concluded that it was
2 subject to Current Good Manufacturing Practices.
3 She made statements about, some of the practices
4 in the laboratory were not consistent with
5 Current Good Manufacturing Practices, which is a
6 subtle difference from saying, and they should
7 have been, because that is the requirement that
8 covers this laboratory and its activities.
9     To the extent she was doing the
10 latter, I disagree. I think she was in error.
11     MR. SCHNELL: Okay. We've been going
12 for more than an hour. Why don't we take a
13 break?
14     THE VIDEOGRAPHER: The time is 10:58
15 a m. This completes Media Unit Number 2. We're
16 now off the record.
17     (Recess taken.)
18     THE VIDEOGRAPHER: Time is 11:14 a.m.
19 This begins Media Unit Number 3. We're now on
20 the record.
21     Please proceed, Counsel.
22 BY MR. SCHNELL:
23     Q. Before the break you were discussing
24 linkage, to use the term, and it may not be
25 precise, but the linkage between the clinical

1 trials that Merck was using in support of
2 Biological License Applications and the original
3 licensing studies that -- that Merck performed
4 under Dr. Hilleman. Do you remember that
5 discussion?
6     A. I do.
7     Q. And is it your opinion that the FDA
8 was comfortable with -- ultimately, with relying
9 on the Wild Type ELISA in support of Merck's
10 various mumps Biological License Applications
11 because, your understanding, that the FDA
12 concluded that there was a sufficient link
13 between the Wild Type ELISA and the original
14 mumps efficacy studies performed by Hilleman?
15     MS. HARDWAY: Object to form.
16     THE WITNESS: In terms of the phrasing
17 of your question, the because seems to presume
18 knowing more about FDA. I -- I can conclude
19 that they did reach an approval decision, that
20 it was based on the data using the Wild Type
21 ELISA Assay, although, in memory, some of the
22 studies were also tested with -- with other
23 Legacy ELISA, as well as the Wild Type. And
24 they reached a conclusion to approve, which
25 implies that they reached a conclusion about the

1 adequacy of the data and the appropriateness of
2 the information in front of them, including
3 the assay that had been used to measure
4 noninferiority among groups.
5 BY MR. SCHNELL:
6     Q. And why does that inference that you
7 draw in any way involve Hilleman's original
8 studies?
9     A. The individual components, in this
10 case the individual component mumps virus
11 vaccine, as studied by Hilleman was proven
12 to be effective. That effectiveness carries
13 forward to the approval of the ProQuad, the
14 vaccine that is the 4-Valent formulation, the
15 recombinant human albumin drug manufacturing
16 supplemental BLA and MMR2 in the expiry potency
17 Trial 007.
18     So FDA must have a vehicle to carry
19 that forward and conclude that, even though
20 there are changes, the effectiveness still
21 applies.
22     Q. What do you mean that they must -- the
23 FDA must have a vehicle that the original
24 approval carries forward to?
25     A. Well, to approve the supplement, they

1 have to conclude that the vaccine that goes to
2 the market will be safe, effective, and so the
3 evidence for effectiveness comes -- links back,
4 if you will, to use the word that you had put
5 in your question, to the original evidence of
6 effectiveness as measured by Hilleman.
7     Q. And what, in your opinion, is -- if
8 any, is -- is the link between the original
9 efficacy studies by Hilleman and the Wild Type
10 ELISA Assay that Merck used in support of its
11 Biological License Applications for mumps?
12     A. The vaccine components, the mumps
13 component, is known to be effective. When Merck
14 is using the Wild Type ELISA Assay, they -- in
15 these particular instances, they are looking
16 and saying, is there interference from adding
17 varicella to the trivalent vaccine, is there
18 evidence that the vaccine immunizes differently
19 when the vaccine is manufactured with
20 recombinant human albumin, as opposed to human
21 serum albumin, is there evidence that the
22 vaccine has an adequate immunological response
23 when there are fewer infectious vir -- virus
24 particles in the vaccine as is evaluated
25 in -- in the 007 expiry trial.

28 (Pages 106 - 109)

Page 110

1  So they have the conclusion the
2 vaccine is effective, and are looking for
3 evidence that it would be different under
4 certain circumstances. If they found evidence
5 that it was not established to be the same, they
6 were not going to approve it.
7  Q. I understand all that. I'm talking
8 about the link. What -- what leads you to the
9 conclusion that there's any kind of link between
10 the Wild Type ELISA that was used in these
11 Biological License Applications and the original
12 efficacy studies performed by Hilleman?
13  A. I guess --
14  MS. HARDWAY: Object to form.
15  THE WITNESS: -- I'm not understanding
16 your question, then, because I thought I -- I
17 had just addressed that; that because they --
18 they're reaching a conclusion that the product
19 can be approved and will be effective as
20 approved, that implies there has to be the
21 linkage.
22 BY MR. SCHNELL:
23  Q. That -- yes. And I'm -- I'm asking,
24 do you have a sense -- do you have any
25 understanding of where -- what that link was? I

Page 111

1 mean, was there a direct link from the efficacy
2 studies to the Wild Type ELISA, were there --
3 was the AIGENT assay in the middle of that?
4 What, in your opinion, did FDA rely on to reach
5 a conclusion that you infer was some kind of
6 link between the original licensing studies by
7 Hilleman and the Wild Type ELISA study that was
8 done so many decades later?
9  A. The link is between the effectiveness
10 of the reformulated product and the Hilleman
11 studies. The way that the immunogenicity
12 ineffectiveness is determined in the clinical
13 study is to assess immunological reaction to the
14 vaccine in the recipients using the Wild Type
15 ELISA.
16  Q. And do you have any understanding as
17 to what, if anything, the FDA relied on to reach
18 a conclusion that the Wild Type ELISA could be
19 linked to the original efficacy studies by
20 Hilleman?
21  MS. HARDWAY: Objection. Asked and
22 answered.
23  THE WITNESS: To inform the answer
24 to that question, you have to look and say,
25 what did Merck do, what did they submit to the

Page 112

1 agency, what questions did the agency ask about
2 it and what did the agency record about its
3 decision-making in its licensure committees and
4 approval documentation.
5  And we can delve into those if you
6 want. Again, still struggling to understand the
7 difference between the responses I give and the
8 question, or the line of questions.
9 BY MR. SCHNELL:
10  Q. All right. Let's move on, because
11 maybe we'll get to it later with some documents.
12  Did you have an understanding as to
13 the origins of the Protocol 7 Clinical Trial,
14 the surrounding context as to why Merck
15 undertook that?
16  A. I'm broadly familiar with that.
17  Q. And what's your understanding as to
18 why the clinical trial came to be?
19  A. At -- at a very high level, my
20 understanding is that with the assignment to FDA
21 of the national childhood vaccines reevaluation
22 of previously approved vaccines, FDA looked more
23 closely at the stability information and the
24 label for mumps virus vaccine and raised
25 questions with Merck about the end expiry virus

Page 113

1 content, infectious particle content. And
2 Merck, over a period of years, went back and
3 forth with FDA and reached a conclusion -- Merck
4 reached a conclusion that they would try and
5 provide FDA evidence that a lower virus content
6 vaccine would be immunogenic. And they set
7 about to conduct Trial 007 in order to evaluate
8 whether that lower virus content vaccine would
9 be as immunogenic as the vaccine that was at
10 expiry -- I'm sorry, at release strength or
11 potency.
12  Q. And is it your understanding that, at
13 the time Merck was releasing lots of MMR2 with
14 mumps potency, that was -- that FDA was
15 concerned was falling below the labeled potency?
16  MS. HARDWAY: Object to form.
17  THE WITNESS: Well, again, looking at
18 the objective statements of what FDA is saying,
19 that there was discussion about the virus
20 content of the vaccine at expiry, and FDA
21 was -- told Merck that it needed to meet
22 its labeled virus content at expiry.
23 BY MR. SCHNELL:
24  Q. Is that a requirement of vaccine
25 manufacturers, that they comply with the minimum

29 (Pages 110 - 113)

Page 114

1 potency listed on the label?
2      MS. HARDWAY: Object to form.
3      THE WITNESS: It -- it is today
4 understood to be a requirement. During the
5 late 1990s, there -- or during the 1990s, that
6 requirement was applied in ways it had not been
7 replied -- applied previously. So when the
8 mumps virus vaccine was approved in the '60s,
9 the label, as I understand it, reflects the
10 minimum amount of infectious particles that are
11 in the virus vaccine as then tested and as it
12 was released, as opposed to where it is at
13 expiry.
14      In the 1990s, FDA clearly indicated to
15 Merck, and to other manufacturers, no, we need
16 the strength at expiry to conform -- or the
17 label to conform to the strength at expiry.
18 BY MR. SCHNELL:
19      Q.  Were you ever involved while at FDA or
20 at Wyeth with a circumstance where a particular
21 vaccine did not comply with its labeled potency?
22      A.  Well, we had out-of-specification
23 results when I was at Wyeth.
24      Q.  And what did Wyeth do in those
25 circumstances, if anything?

Page 115

1      A.  We investigated, evaluated whether
2 there would be any clinical implications for the
3 out of specification in terms of virus -- or the
4 readout on the virus potency assay indicating
5 -- the potency-indicating assay, usually a virus
6 count in one way or another. And there was at
7 least one occasion we recalled a vaccine because
8 it was still within dating period and did not
9 meet the specified content on the
10 potency-indicating assay.
11      Q.  Are there any obligations of vaccine
12 manufacturers, in terms of notifying FDA, if a
13 manufacturer doesn't have assurance that its
14 vaccine is meeting its potency requirements --
15 or potency specifications on the label?
16      MS. HARDWAY: Object to form.
17      THE WITNESS: There are requirements
18 to notify when out-of-specification results are
19 obtained. One has to investigate and notify,
20 as a general matter. The threshold for
21 notification can vary and sometimes comes down
22 to an agreement between the manufacturer and the
23 FDA.
24      Your question asked more broadly
25 about the assurance, and I'm unaware of any

Page 116

1 requirement to notify about assurance. There
2 -- there is -- there is a requirement to have
3 assurance, but the notification trigger is -- I
4 -- I'd have to look at any specific requirement
5 or any specific document in order to address
6 that more directly.
7 BY MR. SCHNELL:
8      Q.  And what is the requirement that you
9 referenced that you have to have assurance that
10 you're meeting the potency specifications on the
11 label?
12      A.  Well, that is a GMP requirement
13 that says your vaccine has been to be evaluated
14 for stability at a certain number of lots of
15 vaccine, or any medical product has to be put on
16 stability evaluation. There are a lot of
17 details about how the stability evaluation will
18 be done. And it covers not just the -- the
19 strength of the drug or the potency-indicating
20 assay result for a biologic, but many other
21 attributes, sterility for instance. And if you
22 have an out of -- and you need to not only have
23 the program, but you need to evaluate whether
24 the results of the program are indicating
25 stability for the labeled expiry.

Page 117

1      Q.  What obligations, if any, do the
2 -- does the vaccine manufacturer have if it
3 cannot guarantee or if it -- if it does not
4 have an assurance that it can meet the potency
5 specifications on the label?
6      MS. HARDWAY: Object to form.
7      THE WITNESS: In the instance that
8 the manufacturer, looking at all the available
9 information, reaches a conclusion that it cannot
10 assure the potency or strength of its products,
11 then they need to conduct investigations and
12 take appropriate action to resolve that
13 situation.
14 BY MR. SCHNELL:
15      Q.  When you say appropriate action, what
16 are you referring to?
17      A.  It depends what the results of the
18 investigation show.
19      Q.  Suppose the results show that for
20 a certain percentage of the lots the -- the
21 manufacturer projects that the lots are going to
22 be out of compliance with the label -- with the
23 labeled potency?
24      MS. HARDWAY: Object to form.
25      THE WITNESS: Well, your -- your

30 (Pages 114 - 117)

Page 118

1 question asks about the manufacturer projects.
2 Who at the manufacturer projects?  The
3 manufacturer, collectively, has responsibility
4 to make a product that meets the requirements
5 as specified in the license; that the
6 decision-making is the responsibility, usually,
7 of the head of quality -- it should be the
8 responsibility of the head of quality, who has a
9 reporting chain themselves.  And so, ultimately,
10 the decision-making vests back into the head of
11 the company, but usually dedicated to the head
12 of quality.
13        The head of quality has to collect
14 information about what they conclude the
15 stability program is indicating and has to
16 make decisions for the company about taking
17 what action is necessary to investigate, and,
18 depending on the findings of the investigation,
19 what action is necessary to correct.
20 BY MR. SCHNELL:
21    Q.   When you were at Wyeth and in charge
22 of quality, was there ever an instance where you
23 learned that Wyeth did not have assurance that
24 one of its vaccine products was meeting the
25 specifications of its label?

Page 119

1        MS. HARDWAY:  Object to form.
2        THE WITNESS:  There was a circumstance
3 where questions were raised based on the
4 specifications and the analytical test results,
5 several of them.  We investigated, we evaluated,
6 recommendations on what to do were forwarded to
7 me and I made those decisions.
8 BY MR. SCHNELL:
9    Q.   And what decisions did you make?
10    A.   Well, sometimes I concluded that there
11 was not a problem, that the product would not
12 be unsafe or fail to achieve the effect in its
13 label, and said, what we need to do here is
14 put forward corrective actions to reduce the
15 likelihood that we are going to see this next
16 time.
17        Other times I said the appropriate
18 action is we have to recall this lot, and
19 executed a recall, and had the appropriate people
20 in the mark -- in the supply branch of the
21 company execute the recall.
22    Q.   Did you ever initiate a recall while
23 at Wyeth based on the company -- based on your
24 conclusion that the company didn't have adequate
25 assurance that the product met the potency

Page 120

1 specifications on the label?
2        MS. HARDWAY:  Object to form.
3        THE WITNESS:  I recall no instance
4 where the assurance question is what was
5 evaluated in the investigation and triggered a
6 recall.
7 BY MR. SCHNELL:
8    Q.   So what do you recall in terms of what
9 triggered the recall?
10    A.   The most common recall, and we're
11 using the word differently and too frequently
12 here, would have been for out-of-specification
13 results, which could have been on a variety of
14 attributes for the product.
15        When you look at product
16 specifications, as agreed in the licensing
17 documents, it's common to be looking at 8, 10
18 stability-indicating parameters, and any one
19 of them can go out.  And then -- then you have
20 to re-test and say, okay, now, on further
21 evaluation, when I look at all the data
22 together, is it out of specification.  And then
23 you have to investigate and say, why am I seeing
24 it out of investigation [sic] on this test, is
25 the test accurately representing what's going

Page 121

1 on.  And then you need a evaluation of what is
2 the potential impact of the deviation observed,
3 or the out-of-specification result ob --
4 observed, if it is truly representative of
5 vaccine in the field.  And then you have to put
6 all of that together and make a decision.
7    Q.   And is it fair to say sometimes in
8 those deliberations you would involve the FDA
9 and sometimes you would not?
10        MS. HARDWAY:  Object to form.
11        THE WITNESS:  I'm trying to recall if
12 I ever had occasion to discuss that with FDA.  I
13 might have, but it doesn't come readily to mind.
14        It was my responsibility, the
15 investigations, the evaluations were going on
16 within the company when we executed recall.
17 That is a reportable event, and, certainly,
18 that was discussed with the FDA.  And one
19 of -- recalls happen at different levels.
20 Sometimes you just take the product back from
21 the wholesaler, sometimes you reach down to the
22 retail pharmacy, sometimes you reach down to the
23 medicine cabinet, if you will, to say what's in
24 the doctor's office or what's in the consumer's
25 office -- or consumer's medicine cabinet.  And

31 (Pages 118 - 121)

Page 122

1 that's an FDA decision, so that gets discussed
2 with FDA.
3 　　　And FDA often asks questions about the
4 investigation that was done and the evaluation
5 that you made, but that's not the same as
6 involving them in making the decision. It -- it
7 was my decision.
8 BY MR. SCHNELL:
9 　　Q. And that's because it's the
10 manufacturer's re -- responsibility to make sure
11 it has adequate assurances that it can meet the
12 specifications on the label, correct?
13 　　A. Well, we talked about whether
14 this is adequate assurances or whether this is
15 observations. And in the instances that I was
16 just talking about, as I thought I addressed
17 earlier, where these were, to my best memory,
18 observations and didn't get into the question of
19 what would the future bring based on this trend
20 line, that sort of thing. That -- that didn't
21 come up that I remember.
22 　　Q. But in terms of complying with the
23 specifications on the vaccine label, that's the
24 -- that's the responsibility of the manufacturer
25 of that product, correct?

Page 123

1 　　A. The manufacturer has the
2 responsibility to comply with the label,
3 although the label doesn't ordinarily have a lot
4 of specifications on it. The specifications are
5 usually in the licensing documents. And those
6 are -- it is also the obligation of the
7 manufacturer to comply with the specifications
8 in the licensing documents.
9 　　Q. So for -- when you say licensing
10 documents where the specifications of the
11 product are normally contained, what documents
12 are you referring to, specifically? Is that--
13 are you talking about the Biological License
14 Applications?
15 　　A. The Biologic License Application, as
16 amended and approved. So that, ordinarily, the
17 manufacturer nominates a set of specifications,
18 if you will, at the time of the submission of
19 the original application or a supplement.
20 　　　It is common for there to be back and
21 forth between the agency and the manufacturer on
22 what will be the final accepted specifications.
23 Once that is resolved, the manufacturer then
24 sends in a final set of accepted specifications,
25 which is incorporated in the approval and

Page 124

1 becomes the relevant specifications for
2 control of the product going forward.
3 　　Q. So is that document called anything?
4 Is that -- that's the license, or is there some
5 other name for it?
6 　　A. There may be, but none comes readily
7 to mind.
8 　　Q. So --
9 　　A. License specifications.
10 　　Q. So for MMR2, for example, after the
11 approval by FDA for the end expiry potency SBLA,
12 where would I find what you had characterized as
13 the license for that newly manufactured vaccine?
14 　　A. Well, the FDA and Merck both
15 have archival copies of the amended -- the --
16 the supplemental application as amended during
17 its course and as agreed. There, actually, is a
18 license document that looks like a lot of other
19 licenses you may have seen, but I'm -- that's
20 not what you're talking about, I don't believe.
21 You're talking about the specification sheet
22 that's in the underlying application. So
23 there's going to be a copy of it at FDA, there's
24 going to be a copy of it in the regulatory
25 archives at Merck, and, of course, there will

Page 125

1 be copies of it in the quality assurance
2 organization at Merck, as well.
3 　　Q. That single piece of paper that you
4 referred to that is also called the license,
5 that doesn't change, does it, when there are
6 changes to the product, or is there a new piece
7 of paper that says license on it that's --
8 that's amended each time?
9 　　A. Yeah. And I don't know how often they
10 change the piece of paper. I mean, I know the
11 people that used to do it, Don Hill, Steve
12 Mosiello, et cetera, but I wasn't personally
13 involved in that, and I don't know if they give
14 a new piece of paper or not.
15 　　Q. But in terms of the license, as you
16 used the term, which contains these product
17 specifications that the manufacturer must comply
18 with, that's a different document, which is the
19 final approved Biological License Application;
20 is that correct?
21 　　A. Yes. So that the approved -- the
22 product approval incorporates what has been
23 submitted and agreed to in the application,
24 in -- including the specifications as listed
25 in the chemistry and manufacturing section.

32 (Pages 122 - 125)

Page 126

1    Q.  And are both of those documents,
2  this document you just referred to and then that
3  single piece of paper, are they both referred to
4  as the product license?
5    A.  Unfortunately, yes.  At least I --
6  that's the terminology I'm familiar with it.
7    Q.  Okay.  So the RHA SBLA would have
8  -- would -- would also have a set of documents
9  which, after final approval, would have listed
10 the specifications for MMR2 with that change,
11 and that would have been a license, as well; is
12 that correct?
13   A.  Incorporated in the license approval,
14 yes.
15   Q.  And so if I wanted to find -- and
16 I believe the RHA approval was before the end
17 expiry approval; is that correct?  Do you
18 recall?
19   A.  That is my memory, as well.
20   Q.  And so is it fair to say that the
21 license that was -- was created after the end
22 expiry potency would have subsumed whatever was
23 in the license -- there's -- there's only one
24 license for MMR2 at any one time; is that
25 correct?

Page 127

1    A.  Well, to the extent that a supplement
2  changes the product and there are new lots of
3  product on the market conforming to the changed,
4  old lots of product existing out in the market
5  through expiry before the change, so there may,
6  actually, be two applicable set of standards.
7    Q.  At any one time?
8    A.  Well, with -- within the expiry period
9  following the approval.
10   Q.  Okay.
11   A.  I mean, obviously, over time, that
12 goes away.
13   Q.  And am I safe to -- is it correct
14 that, aside from that nuance, that there aren't
15 multiple biological app -- final Biological
16 License Applications for MMR2 that I would have
17 to read if I wanted to have an understanding of
18 what the product specifications are that Merck
19 has to comply with?
20   A.  You probably would gain a lot from
21 looking at the latest one.  How much you would
22 have to refer back to previous applications --
23 I mean, because we're looking at generations
24 of vaccines here, we have mumps monovalent with
25 several changes over the course of its history,

Page 128

1  mumps monovalent incorporated into the trivalent
2  MMR, and then later MMR2, it then gets
3  incorporated into MMR recombinant human ser --
4  human albumin, and then later ProQuad.  And so
5  if you want to understand everything controlling
6  mumps, unfortunately, you're probably going to
7  have to look at all of that.  It's going to be a
8  complicated business.
9         And, of course, I would have expected,
10 although I have not checked the documents to
11 see, that Merck would conform each subsequent
12 supplemental BLA and each subsequent product to
13 one another so that there is only one standard
14 for the mumps monovalent they're making, and
15 that they're testing the mumps in the polyvalent
16 vaccines, whether MMR2 or ProQuad, the same
17 way and against the same standard.
18   Q.  Did you review the MMR2 license that
19 existed following the FDA's approval of the
20 end expiry Biological License Application?
21   A.  Well, to the extent that I looked
22 at the Supplemental BLA and -- and various
23 amendments to it, I'm then looking at the
24 document to which you refer, but I did not pull
25 up the archival document on the day of approval

Page 129

1  and look at it as one integrated piece.
2    Q.  And, again, is there a name -- other
3  than the license that you've used, is there
4  a name for that, like, has a classic
5  FDA moniker for that type of document?  Like,
6  there's SBLA, BLA, is there a final BLA or final
7  approved BLA or secret new and approved double
8  probation BLA?
9    A.  I guess it's the approved supplement.
10   Q.  Okay.  Or if it's the approved BLA, it
11 would just be the approved BLA?
12   A.  The approved BLA, yes.
13   Q.  And if a vaccine manufacturer does
14 not comply with the specifications in the
15 license -- well, let me take a step back.
16        While you were at FDA, was there ever
17 an instance where a vaccine manufacturer did not
18 comply with the specifications in its product
19 license?
20   A.  The difficulty, as I struggle
21 with your question, revolves around the word
22 compliance.  There, certainly, were instances
23 where there was a determination of a test result
24 that was out of specification, and that, as I
25 said before, needed to be evaluated and needed

33 (Pages 126 - 129)

Appx1670

1  to be reported under error and accident
2  reporting, or, subsequently, under Biological
3  Product Deviation Reports, BPDRs.
4      The question of, is one out of
5  specification result compliant or not is its
6  own complex question.  Ultimately, out of
7  compliance, to me, means a judicial
8  determination that you violated the law.
9      Q.  So that's not a determination the FDA
10  makes?
11     A.  No.  The FDA takes cases to the
12  Department of Justice, who takes cases to court,
13  saying this company is out of compliance, has
14  product that is not -- you know, doesn't meet
15  the requirements of the law and the market and
16  proposes prosecutions.
17     Q.  So short of that, what, if anything,
18  does the FDA do when faced with a -- question
19  as to whether or not a vaccine manufacturer
20  is complying with the specifications in the
21  license?
22     MS. HARDWAY:  Object to form.
23     THE WITNESS:  Short of the enforcement
24  action, which could result in a conclusion of
25  noncompliance with the law, FDA does a lot

1  of work with manufacturers seeking voluntary
2  conformance to the requirements.  Because
3  manufacturers of products know that they are
4  in a regulated industry, and for all sorts
5  of reasons that FDA is the only regulator
6  in the United States, they have to maintain
7  relationships with FDA, there -- they are always
8  -- if we don't meet FDA's expectations, will we
9  be raising product liability issues, et cetera,
10  most companies reach agreement with FDA on what
11  to do.
12  BY MR. SCHNELL:
13     Q.  So going back to the origins of
14  007, when a decision was made by FDA that --
15  well, let's take a step back.
16     Is it your understanding that
17  FDA reached a decision that Merck either
18  had to change its label with regard to potency
19  specification or conduct a clinical trial to
20  demonstrate that the vaccine was just as
21  effective at a lower potency?
22     MS. HARDWAY:  Object to form.
23     THE WITNESS:  I don't know if
24  I would characterize it as FDA reaching a
25  decision.  I know that there was discussion

1  about those alternatives, and I know that Merck
2  decided to conduct a clinical trial saying, if
3  there are fewer infectious virions in the
4  product, will we get a comparable immunological
5  result, and that was a trial on which the
6  product's expiry potency was changed -- labeled
7  expiry potency was changed.
8  BY MR. SCHNELL:
9      Q.  Now, do you have an understanding as
10  to why Merck couldn't just rely on the Hilleman
11  studies at that point to demonstrate that its
12  vaccine was no different immunologically at the
13  lower potency than at the then-current release
14  expiry potency?
15     MS. HARDWAY:  Objection to form.
16     THE WITNESS:  Well, they did rely on
17  the Hilleman studies to dem -- to establish that
18  their vaccine was effective.
19     They also knew that the substrate for
20  measuring -- for the potency-indicating assay
21  had changed; that is, the cell line in which it
22  was measured, and they had a correction factor
23  that they had introduced.  But why were the
24  Hilleman data not enough to say, okay, we
25  can label this lower, that was a matter of

1  discussion, or, implicitly, a matter of
2  discussion between the agency and the FDA.
3  The agency indicated that they wanted a new
4  clinical trial of noninferiority.  Merck agreed
5  to conduct that trial.
6  BY MR. SCHNELL:
7      Q.  And do you have any understanding
8  as to why the FDA was not satisfied with the
9  original Hilleman studies for that purpose?
10     A.  Do I have any understanding?  You
11  know, I -- I don't have insight into the state
12  of mind of the FDA officials conducting those
13  discussions with Merck.  I have the documents I
14  can look at, I have the clear expectation of
15  FDA that the clinical trial be conducted, which
16  leads you to the conclusion that they weren't
17  satisfied -- leads me to that conclusion.  But
18  in terms of why, I don't recall that they
19  addressed that directly.
20     Q.  So the -- your understanding is
21  that the FDA was satisfied that they could rely
22  on -- Merck could rely on the Hilleman studies
23  to show the vaccine was still effective, but
24  couldn't rely on those studies to show that
25  it was still effective at a lower potency?

34 (Pages 130 - 133)

1    A.  They relied on the Hilleman studies
2  to show that the vaccine is effective, as it was
3  manufactured and administered in the clinical
4  trials supporting licensure.
5        As -- over the interval between
6  the '60s, whatever it was, '67 on original
7  licensure, and the 1998/'99 period when this
8  question is being asked, FDA still concluded
9  the vaccine was effective.
10        There were questions raised in
11  discussion, but the collective decision of FDA
12  as reflected in the documents must have been the
13  vaccine was effective, or they would have moved
14  to have taken it off the market.
15        Some of the discussions that took
16  place involved questions of, are there different
17  strains with virus -- with antigenic drift
18  out there that might be affecting the potential
19  effectiveness, how do we look at effectiveness
20  with the vaccine as it has evolved over this
21  30-year interval at that point in time.  But
22  you have to get to the conclusion -- you have to
23  infer from the record that FDA concluded it was
24  effective, but that FDA said it is effective at
25  the labeled strength.

1        If Merck wants to have a labeled
2  strength or a labeled potency of less than 4.3,
3  we're going to need new evidence showing that
4  it's -- this effective vaccine is just as
5  immunogenic, which is carrying through the
6  effectiveness, if you will, to the lower
7  strength.
8    Q.  Do you recall -- in the comm -- in the
9  materials you've read, do you recall that there
10  was, actually, a discussion about whether or not
11  the vaccine needed to be recalled?
12        MS. HARDWAY:  Object to form.
13        THE WITNESS:  I'm glad to look at any
14  specific record you're talking about.  I -- I
15  don't have any clear, sharp or ready memory of
16  recall discussions.  I'm sure there was some
17  mention of that possibility by someone
18  somewhere, but not -- I -- I also do not recall
19  any decision to recall.
20  BY MR. SCHNELL:
21    Q.  But you don't recall reviewing any
22  materials where the FDA raised the issue of
23  potential recall?
24        MS. HARDWAY:  Object to form.
25        THE WITNESS:  I'd be glad to look at

1  any document that you -- we have in which FDA
2  may have raised that issue.  I don't have a
3  clear memory of it here.
4  BY MR. SCHNELL:
5    Q.  If you could turn to Page 17 of
6  your opinion?
7        In Paragraph 47 you wrote, "In my
8  opinion, the release by CBER, C-B-E-R, of lots
9  with potency at or approaching 4.3 log 10, with
10  their knowledge that potency waned over the
11  expiry period of two years, implies that FDA had
12  found the labeled potency statement acceptable
13  before the 1997 discussions."
14        Can you tell me what -- what -- what
15  you mean there?
16    A.  Well, for biological products, there
17  is a general requirement of lot release by the
18  Food and Drug Administration before the lot --
19  product goes to market.  That can be waived.
20  I believe it was in place for mumps vaccine up
21  until the mid '90s, and then there was a period
22  of time when Merck had -- no longer had to get
23  individual lot release but still submitted the
24  data to FDA.
25        Before that period of time, Merck had

1  a -- and, again, this is from memory, I'm sure
2  there are documents we could look at which would
3  give more precise information, had a target
4  potency of, roughly, 4.8 log 10 TCID50, and --
5  but -- but they had manufactured lots with a
6  range around that target, some of which went
7  down to not far above the 4.3 log 10 TCID50.
8  And those were sent to FDA, FDA released them,
9  they went to market.  FDA knew that the
10  potency-indicating assay would change over
11  time as the number of infectious virions in the
12  product changed over time.  FDA found it acc
13  -- because they released them with two-year
14  expiries, FDA found it acceptable.
15    Q.  And you're -- that's you're -- that's
16  what you're in -- inferring because of the
17  materials you've read, correct?
18        MS. HARDWAY:  Object to form.
19        THE WITNESS:  That -- that is my
20  assessment and inference from the documents
21  and my opinion of -- based on the FDA's
22  decisions in release of those lots.
23  BY MR. SCHNELL:
24    Q.  And around the same time, Merck
25  increased, did it not, the potency at which it

35 (Pages 134 - 137)

Appx1672

1 was releasing its -- the mumps potency at which
2 it was releasing MMR2; is that correct?
3      A.  Well, around the same time -- at
4 a point in time, they did increase their
5 target virus content in the formulation -- the
6 trivalent formulation, and they also changed
7 their release specification that was submitted
8 in a prior approval supplement to FDA, and FDA
9 approved that change in -- in the release
10 specification.
11     Q.  Do you know if that was at the
12 direction of FDA or at the helping of
13 the --
14     A.  I -- I -- you know, I don't know if
15 it was at the direction of FDA.  I know FDA and
16 Merck discussed it.  I know Merck decided to do
17 it.  I know that FDA approved it.
18     Q.  And so -- so your opinion speaks --
19 from the passage that we read in Paragraph 47
20 speaks about what the FDA found with regard to
21 labeled poten -- the labeled potency statement
22 before the 1997 discussions.  My question is,
23 do you have any understanding as to whether
24 or not the FDA found the labeled mumps potency
25 statement on the label acceptable after 1997?

1      MS. HARDWAY:  Object to form.
2      THE WITNESS:  Well, FDA discussed with
3 Merck the need for data to support the labeling
4 statement or data to support an alternative
5 labeling statement of potency at expiry, and
6 Merck committed to, as you just -- as we just
7 discussed, increase the target amount and
8 release specification for the vial -- the
9 amount of virus by target in formulation and at
10 release, to better conform to the labeled expiry
11 potency assay determination, and undertook a --
12 the clinical trial to evaluate whether a lower
13 label statement could be supported by data.
14 BY MR. SCHNELL:
15     Q.  I don't know if this was within the
16 scope of your opinion, I didn't set it in here,
17 but I'll ask anyway, do you have an opinion
18 one way or the other as to whether or not,
19 subsequent to this overfill of potency -- well,
20 first of all, do you understand what I'm saying
21 by overfill?
22     A.  I do, and it's another term I don't
23 like because it means so many different things
24 to different people.
25     Q.  Let's pick a term you like.

1      A.  Well, we can use overfill.  Overfill
2 is a term that is used in -- in terms of, when
3 you're filling a vial, do you, literally --
4 instead of half an ML, do you put six-tenths
5 of an ML in it.  That's an overfill.
6      Here what we're really talking about
7 is not changing the volume in the vial, it's
8 changing the infectious virus content in the
9 vial.  But we can call it overfill.
10     Q.  No.  Let's be -- let's be precise.
11 I want to -- I want to make you happy.  So we'll
12 call it an inc -- can we call it an increase in
13 the potency, or do you want to call it an
14 increase --
15     A.  Increase -- increase in release
16 potency, yes, as spec.
17     Q.  Okay.  So do you have an opinion one
18 way or the other as to whether, subsequent to
19 this increase in the potency for the mumps
20 component of MMR2 that occurred in the late
21 1990s, to the period where they got approval
22 to lower the -- the end expiry potency in 2007,
23 so for that roughly 10-year period, do you
24 have an opinion as to whether or not Merck was
25 complying with the potency specification on the

1 label, --
2      MS. HARDWAY:  Object to --
3 BY MR. SCHNELL:
4      Q.  -- the 4 -- the 4.3 potency
5 specification on the label?
6      MS. HARDWAY:  Object to form.
7      THE WITNESS:  A couple questions ago
8 you were asking about -- weren't -- weren't sure
9 whether -- or your question presupposed whether
10 it was within the scope of my opinion or not,
11 and I really wasn't asked to offer opinions on
12 stability and potency.  The issues inevitably
13 come up in terms of the background for the
14 regulatory decision-making on the three
15 supplemental BLAs that we have discussed.  I
16 feel like I'm qualified, but there are a lot of
17 documents on stability I haven't looked at, so
18 I -- I can't offer you opinions and conclusions
19 sitting here today on a bunch of documents I
20 haven't seen and reviewed.
21 BY MR. SCHNELL:
22     Q.  Sure.
23      Do you have any understanding as
24 to whether or not during this period of time,
25 between the increase in the potency and the

36 (Pages 138 - 141)

1 approval of the end expiry SBLA, as to whether
2 or not the FDA had full understanding as to
3 whether or not Merck was complying with its
4 mumps potency specifications for the MM -- MMR2
5 vaccine product?
6     MS. HARDWAY:  Object to form, and
7 calls for speculation.
8     THE WITNESS:  You -- I -- I -- I don't
9 have data from FDA or documents from FDA from
10 which I could even make inferences about what
11 their understanding would have been.  And, you
12 know, I -- you'd have to say what did they
13 have -- how did they evaluate it, what were
14 the conclusions they reached, is that reflected
15 in documents or can we infer that from the
16 documents we have, and I don't have that basis
17 to look.
18 BY MR. SCHNELL:
19     Q.  If Merck during this period knew
20 it was not compliant with the mumps potency
21 specification, did it have -- have an obligation
22 to report that to the FDA?
23     MS. HARDWAY:  I'm going to object to
24 form and -- and put a general objection on the
25 record to the questions concerning stability and

1 potency issues.  As Dr. Burlington has stated
2 just now, he was not asked to offer opinions
3 about them -- about those issues.
4     I've been allowing him to answer
5 several questions about issues that are not
6 contained in his report.  So I'm going to
7 continue to object to these questions.  If he's
8 able to answer them, he can.  But at some point
9 I think we're going way beyond what he was asked
10 to do and what's contained in his report.
11     MR. SCHNELL:  Well, if you listened to
12 the question, the question goes right within his
13 regulatory expertise.  I'm not asking whether or
14 not this was true or not.  I'm saying, if this
15 were the case, were they obligated to report
16 it to FDA.  That is, certainly, within the
17 bailiwick of what he's been retained to opine
18 on.
19     MS. HARDWAY:  I'm not saying that he
20 doesn't have the regulatory expertise to address
21 them.  I'm saying that we -- he -- and as he has
22 said, he, you know, has not reviewed, and was
23 not asked to review, the comprehensive set of
24 documents that addressed these issues.  So if --
25 if, you know, he's able to answer a question

1 based on his own expertise, then -- then he can
2 do that, if he's comfortable doing that.  If
3 it's based on facts that he hasn't reviewed, or
4 documents that he hasn't reviewed, then -- and
5 he's unable to answer it, then -- then he's
6 unable to answer it.  But I'm just saying we've
7 been going on with these questions for quite
8 some time, I do think they're based -- the
9 answers to them are based in documents that he
10 has not reviewed.
11     So, again, I'm -- I'm going to stand
12 by my objection and continue to object on all --
13 to the questions related to the stability and
14 potency issues that you've been -- you've been
15 questioning him about.
16 BY MR. SCHNELL:
17     Q.  So -- and just to preface this,
18 Dr. Burlington, of course, if you're not --
19 if you don't feel qualified or comfortable
20 answering questions, I don't want you to.  I
21 don't want you to speculate.  You do have broad
22 experience within the FDA and regulatory space,
23 and so, you know, it seems to me this is right
24 within that.  But -- I'll repeat the question,
25 if you want, but if you're not comfortable

1 answering, by no means don't answer.
2     A.  I think I remember the question well
3 enough.
4     Q.  Sure.
5     A.  It's a hypothetical question, --
6     Q.  Yeah.
7     A.  -- I suppose, if ...
8     Hypothetical questions are always
9 difficult because there's never enough context
10 to fully understand all the nuances.  And
11 so in looking at that question in any specific
12 circumstance, I would have to know more than is
13 available in -- within the question itself.
14     In the broad sense of, what is
15 Merck required to report when they have an
16 out-of-specification result on a potency assay,
17 if the product is in expiry -- within the expiry
18 dating period, they have an obligation to report
19 that to the agency, or, generally, have that
20 obligation through a BPDR, and they have to
21 investigate and they have to evaluate and they
22 have to take any appropriate actions.
23     And I'm not sure whether that fully
24 addresses your question or not, but ...
25     Q.  It does.  It does.  Thank you.

37 (Pages 142 - 145)

Page 146

1    Now, you -- you indicated you had
2 -- you've read Dr. Kessler's report, correct?
3    A.  I have.
4    Q.  How long did it take you?
5    A.  A long time.  I believe it was,
6 probably, 10 hours, and that was going quickly
7 through some parts of it, and, certainly, not
8 looking at his many exhibits in great detail.
9    Q.  And you reviewed his deposition
10 transcript; is that correct?
11    A.  Also a 10-hour experience -- well,
12 it took 10 hours to generate the deposition.
13 I probably read it a little faster.
14    Q.  Do you recall, and I don't have it
15 with me, because we didn't have enough paper,
16 but -- to make multiple copies, but -- so if you
17 don't recall, that's fine, but do you recall a
18 portion of his opinion relating to the millions
19 of lots of MMR2 that Dr. Kessler opined were
20 released to market at I believe he referred to
21 it as subpotent levels?
22    MS. HARDWAY:  Object to the form,
23 just to the extent that your question isn't a
24 complete -- or completely accurate chracteriz --
25 characterization of his testimony.  It may be

Page 147

1 close, but, to the extent it isn't, I'll just
2 put an objection on the record.
3    MR. SCHNELL:  Is there something
4 specific that you want to correct about it?
5    MS. HARDWAY:  I'm not sure that he
6 says that they were released to market at
7 subpotent levels.
8    MR. SCHNELL:  So let me reframe.
9 BY MR. SCHNELL:
10    Q.  Do you recall his opinions relating
11 to millions of lots of MMR2 that either were
12 released at subpotent levels or projected to be
13 at subpotent levels through the end of shelf
14 life?
15    A.  Well, the first part of it is, I don't
16 recall any discussion of release to market at
17 subpotent levels or out of specification on the
18 potency-indicating assay at the time of release.
19 I do remember that he wrote about stability
20 questions and whether there are a substantial
21 number of lots that, within their market expiry,
22 might have had test results below the potency
23 specification on the label.
24    This starts to get into the area
25 that we just had the discussion of.  I'm not

Page 148

1 intending to offer an opinion today about
2 stability.  I -- I know there are lots of
3 documents sitting behind the stability question
4 that I'd need to look at and evaluate, I feel
5 qualified to do so, I have been in a response --
6 in a position where I was responsible for
7 stability programs in a major pharmaceutical
8 manufacturer, major vaccine manufacturer, but
9 I haven't done the underlying work, so ...
10    Q.  And so -- and to reframe the question,
11 maybe the -- maybe the -- the most precise way
12 of putting it is that I believe his testimony
13 related to -- or his opinions related to
14 millions of lots of MMR2 for which Merck could
15 not provide adequate assurances that they met
16 the end expiry potency specifications.  With
17 respect to those opinions of Dr. Kessler's, do
18 you have any opinion one way or another as to
19 whether or not you agree or disagree with him?
20    MS. HARDWAY:  Object to form.
21    THE WITNESS:  Well, I'm pretty sure
22 it wasn't millions of lots.  But putting that
23 aside, I suspect you meant to frame your
24 question around millions of doses?
25 BY MR. SCHNELL:

Page 149

1    Q.  Yes.  Thank you.
2    A.  But, no, I -- I don't offer an opinion
3 here today either in agreement or disagreement
4 with Dr. Kessler on that specific question.
5    Q.  And do you offer any opinion one way
6 or another relating to his opinion as to how
7 the FDA would have responded had it known about
8 those doses?
9    MS. HARDWAY:  Object to form.
10    THE WITNESS:  The question, sort of,
11 presupposes the validity of the first issue that
12 there were millions of doses, many lots in the
13 market that were subpotent.  And, as I said, I
14 have not evaluated that and I'm not offering
15 an opinion on that.  And then we get into
16 and what would FDA do if they knew about
17 this circumstance he asserts, that I haven't
18 evaluated, and we -- we would -- it would
19 require more information than I have here today
20 to address that with any accuracy or regulatory
21 assessment.
22    I could address the range of
23 theoretical responses of FDA, but I don't have
24 enough information or enough details to be able
25 to offer an opinion on what I think is most

38 (Pages 146 - 149)

Appx1675

1 likely.
2 BY MR. SCHNELL:
3    Q.   So, again, with regard to that issue,
4 you don't take -- you don't have an opinion one
5 way or the other disagreeing or agreeing with
6 Dr. Kessler's opinions; is that correct?
7    A.   Within that issue, I am not offering
8 an opinion here today, and I -- as I said, I
9 feel qualified that I -- I could look into that
10 and make that determination, but it has not been
11 done today.
12   Q.   Now, in your report at Pages 18
13 and 19, it's really at the bottom of -- it's
14 Paragraph 52, which carries over to 19, but
15 you're referencing a 96 percent seroconversion
16 rate.  Do you see that?
17   A.   Well, I'm representing -- representing
18 CBER's comments reflecting a 96 percent
19 seroconversion rate.
20   Q.   And it's your understanding that the
21 96 percent seroconversion rate was the threshold
22 that FDA directed Merck to meet with its AIGENT
23 test for 007?
24   A.   Well, that's not the way a
25 noninferiority study works.  It -- it's not

1 a threshold.  If -- if the point estimate isn't
2 96 percent, you haven't necessarily failed.
3 You -- you have a confidence interval around
4 the data that you produce, and within that
5 confidence interval there will be a point
6 estimate and an upper and lower boundary.
7        And what FDA said, start with 96
8 percent, the boundary -- the lower boundary of
9 the confidence interval you determine must be
10 not less than a 5 percent decrement from that,
11 but the point estimate doesn't have to rise to
12 the 96 percent level.
13   Q.   But the 96 percent level was
14 the benchmark they were using from which the
15 confidence level figures were derived.  I mean,
16 that's what you're saying here, right?
17   A.   It's the target for the evaluation of
18 the study, that with the delta, the permissible
19 decrement and the confidence interval lower
20 bound is the target for the investigation to
21 be undertaken.
22   Q.   And your -- it's your understanding
23 that the 96 percent target seroconversion figure
24 was used by CBER because that's the result that
25 Hilleman achieved in his original licensing

1 study?
2    A.   Well, there were multiple licensing
3 studies, but I believe the largest of them
4 did report a 96 percent field efficacy -- or
5 clinical trial effectiveness, and that was
6 in the label, as I recall.
7    Q.   And that was from the PRN test that
8 Dr. Hilleman used at that time?
9    A.   He did use a PRN stud -- evaluation
10 and a hemagglutination inhibition evaluation
11 in those studies, as I recall.  We could pull
12 the papers and look at them, but I know both
13 were used.  I don't know whether the 96 percent
14 was just that.  In fact, I think the 96 percent
15 -- well, I -- I'd have to go back and look.
16 We'd have to look at the papers.
17   Q.   And, again, just so I understand,
18 it's your opinion that the AIGENT assay, in and
19 of itself, was not used to measure protection;
20 is that correct?
21   A.   It's not used to measure protection in
22 any given individual, no.
23   Q.   Is it -- was it intended to measure
24 protection in any manner?
25   A.   It was intended to indicate whether

1 the group of subjects at that dosage level or
2 at that number of virions in the immunizing
3 vaccine had successfully responded
4 immunologically to the vaccine, to -- and to
5 look, if you will, for the frequency of vaccine
6 failures within that group, and whether those
7 would be too many non-react -- responders in
8 order to reach a conclusion that the vaccine was
9 as immunogenic as it needed to be for approval.
10   Q.   So --
11   A.   And I'm sorry if that sounds
12 convoluted, but it is a convoluted question.
13   Q.   It does sound convoluted, but I do not
14 blame you.
15        So am I correct in understanding that,
16 for any individual test subject, the AIGENT test
17 did not indicate whether or not that individual
18 subject was protected against mumps?
19   A.   It -- it indicates whether they
20 have seroconverted according to the AIGENT
21 Test.  They might seroconvert or not according
22 to another test.  It is not a measure of
23 protection of that individual.  It is used
24 to measure protection across a population of
25 individuals.

39 (Pages 150 - 153)

Page 154

1    Q.  So if I'm a test subject and I take
2  that test and I seroconvert, I don't know, one
3  way or the other, whether or not I'm protected
4  against mumps.  Is that true?
5       MS. HARDWAY:  Object to form.
6       THE WITNESS:  You as an individual
7  test subject would know that you had an
8  immunological response to an effective vaccine.
9  You would not know with confidence whether the
10 test itself -- the AIGENT test itself -- the
11 result of the AIGENT test itself directly
12 predicted protection for you.
13 BY MR. SCHNELL:
14    Q.  So if I'm a test subject and I want
15 to be protected, I want a vaccine that I know is
16 going to protect me against mumps, can I rely on
17 that test, the AIGENT test, or would I need to
18 get some other -- would I need to get the vacc
19 -- well, let me just leave it at that.  Can I
20 rely on that test to tell me whether or not I
21 need to get another vaccination?
22      MS. HARDWAY:  Object to form.
23      THE WITNESS:  One wouldn't ordinarily
24 do that because the AIGENT test is a research
25 tool being used to evaluate a clinical

Page 155

1  investigation.  It's not out in the world as
2  a clinical diagnostic used in practice.  No
3  product is -- or at least I don't know of any
4  product that achieves the intended effect in a
5  hundred percent of the population.  In fact,
6  it's common for pharmaceuticals to be in the
7  teens or twenties.  An occasional pharmaceutical
8  only has an untreatable effect of 5 percent of
9  the population.  Vaccines tend to be higher,
10 but they're not a hundred percent either.
11      So the question on an individual
12 level of are you protected or should you be
13 reimmunized becomes extremely difficult to
14 answer with any scientific confidence.
15      What we know is, you got an infected
16 vaccine, you had an immunological response to
17 it.  You, as a member of the herd were looking
18 for immunity, and are, presumably, protected as
19 the herd is protected.
20      And, again, I don't mean to be
21 pejorative.  That's just the term we use in
22 looking at immunity.
23 BY MR. SCHNELL:
24    Q.  So you're a doctor, right?
25    A.  I -- I'm a medical doctor.

Page 156

1    Q.  If one of your patients' children
2  had been a subject in this test and they
3  seroconverted on the AIGENT Assay, would you
4  have had an opinion one way or another as to
5  whether or not they needed to be vaccinated?
6    A.  I assume you mean revaccinated since
7  conversion implies that they were vaccinated the
8  first time?
9    Q.  Yes.
10   A.  I -- I would -- I would counsel the
11 parent.  I -- I would say, this is an assay that
12 we don't know if it predicts immunity in your
13 child or not.  We know your child, depending on
14 the readout from the assay, either has evidence
15 of a response or doesn't have evidence of a
16 response.  We can't tell you with any great
17 certainty exactly what that means.  The option
18 of getting a reimmunization with the licensed
19 vaccine is here.  I see little risk of harm from
20 that.  If you as a parent want that comfort,
21 that's available.
22   Q.  Would you -- what would your
23 recommendation have been?
24   A.  My recommendation would have been,
25 probably, that this is an effective -- well,

Page 157

1  given the caveat I am an infectious disease
2  internist, I'm not a pediatrician, I don't
3  actually do this with kids.  I immunize adults
4  when I'm out immunizing, and I haven't been
5  doing that for 20 years -- 19, anyway.  So with
6  those caveats, my assessment, based on what I
7  know here today, would probably be, the risk
8  to your child of mumps -- your child having had
9  seroconversion as measured by the AIGENT Assay
10 evidence, mainly immunological response to the
11 vaccine, the risk that your child will get mumps
12 is very small, the safety of another dose in
13 an immune child is very good.
14      Your child is probably, depending on
15 whether we're talking about a first -- well,
16 here we're talking about seroconversion, so we
17 are talking about the first vaccine dose, we're
18 talking about the one-year-old dose, and I would
19 probably recommend, for most children in that
20 circumstance, the wise thing to do is to get
21 their booster dose as they're ready to go
22 to kindergarten, as is recommended by ACIP.
23   Q.  So let's talk a little bit more about
24 the distinction you're making between individual
25 -- a measure of individual protection versus

40 (Pages 154 - 157)

1 group protection. Be easy on me, because
2 I'm not an immunologist, but how -- explain
3 to me how a test can be capable of measuring
4 effectiveness on a group-wide basis when it's
5 not capable of measuring protection on an
6 individual subject basis?
7    A.  The answer to the question really
8 comes into an -- an -- an epistemological issue
9 of how do we know things.  We know the vaccine
10 as developed was effective, because it was
11 studied, and the individuals who got the placebo
12 had more mumps than the individuals who got the
13 vaccine.
14      And then how do you carry forward that
15 knowledge today ... we know the vaccine -- when
16 -- at -- at -- certain levels of virus particles
17 in the vaccine produces an immunological
18 response which is reflective of the
19 effectiveness observed in the field studies.
20      Do we know that the readout on any
21 given assay -- immunological assay that I do
22 today, which is not going to be the one Hilleman
23 did, is predictive of the same thing.  It -- it
24 requires scientific assessment, inference and
25 saying, do we have enough evidence that this

1 vaccine, that we already know is effective, that
2 did produce an immune response, is it predictive
3 of effectiveness going forward.
4      In the end, this becomes a judgment
5 call about the weight of scientific evidence.
6 That's why the decision-making is a sign to
7 the expert scientists who -- in responsible
8 positions at FDA.
9    Q.  But what's the difference in
10 the assessment that's needed for measuring
11 individual protection and what's needed to
12 measure group-wide protection?
13      MS. HARDWAY:  Object to form.
14      THE WITNESS:  I -- I'm not sure I
15 understand the question, other than in the
16 context of the things we've been discussing
17 since we started here.
18 BY MR. SCHNELL:
19    Q.  Let me rephrase.
20      Why is the scientific judgment
21 necessary to make that leap that you described
22 capable of occurring on a group-wide level, but
23 not at the same time on an individual subject
24 level?
25      MS. HARDWAY:  Object to form.

1      THE WITNESS:  It gets into confidence
2 about what happens in the individual.  We know
3 that the vaccine can and does produce an immune
4 state.  We know that the immune state is
5 reflected in two arms of the immune system,
6 basically, the antibody system and the
7 cell-mediated immune system, although there's
8 a third arm called the innate immune system.
9      We -- we know we can measure presence
10 to the response to the vaccine with a variety of
11 tests.  Some of those tests tell us little more
12 than we found an antibody, which, in some way,
13 reacts with the vaccine or antigen, or with the
14 mumps antigen that's not a vaccine's antigen.
15 We don't really know whether that is protecting
16 the individual.
17      How can we reach a conclusion on a
18 population basis?  Well, maybe it's easier if
19 I say -- if you came to me and you said you were
20 severely depressed.  And I said, okay, I got an
21 antidepressant here.  I know it works, but the
22 effectiveness data on it says it really only
23 works about a third of the time.
24      In a clinical study, a third of the
25 patients are going to get well on their own, the

1 placebo effect or whatever, the drug is going to
2 make a difference in the third of them, and a
3 third of them are going to be non-responsive.
4 They're just not going to respond.  You come to
5 me and say, I'm depressed.  I can tell you, if
6 you're one of the third in this vaccine that's
7 going to work -- I mean this antidepressant's
8 going to work in, you're going to get the
9 benefit, you yourself.  If I had a hundred of
10 you, 33 of you would get the benefit.  I don't
11 know whether you will benefit or not.  I have
12 to watch you individually and look at you.
13      An analogous situation is going on
14 with the vaccine.  I don't know whether you,
15 child, are going to be protected, other than
16 when you look at what's happening in the field
17 out there and you say, mumps immunity or mumps
18 outbreaks are monitored.  We don't have
19 outbreaks among kids.  I mean, where we have
20 outbreaks, they're -- they're young adults.
21 They're -- they're not the two, three,
22 five-year-old, six-year-old kids that we used to
23 get endemic and epidemic disease in every year
24 in that -- when I got mumps as a kid.
25      I -- I -- does that help you?

41 (Pages 158 - 161)

1 BY MR. SCHNELL:
2    Q.  Yeah.
3    A.  I mean, I don't know how to make it
4 clearer.
5    Q.  No.  I -- I think so.
6        MR. HARDWAY:  Gordon, we've been going
7 for, like, an hour-and-a-half, and it's 12:30.
8        MR. SCHNELL:  Oh, yeah.  Let me just
9 follow up with one question.
10       MS. HARDWAY:  Okay.  All right.  Good.
11 BY MR. SCHNELL:
12    Q.  So in that long answer, but I don't
13 mean pejoratively, it --
14    A.  Sorry.  Cut me off.
15    Q.  -- there -- there -- you made a -- it
16 might have been the previous long answer, but
17 there was a -- and, again, not pejorative,
18 there was a -- you made a reference that we
19 know that the immunologic response -- you were
20 referring to the AIGENT assay, we know the
21 immunologic response is reflective of
22 effectiveness, I believe that was it.
23       How do we know that?  First of all,
24 did I characterize your words correctly?
25    A.  I meant to imply -- I meant to say and

1 imply that immunological response to the vaccine
2 is associated with effectiveness.  The AIGENT
3 Assay is one way to measure if there is an
4 immunological response.  We don't have a tight
5 connection to say, if I respond to the AIGENT
6 Assay in this way, I have an assurance of
7 effectiveness.  We have this population-based
8 assessment that I've been talking about.
9    Q.  Okay.  So that reflective of
10 effectiveness, that's what I'm trying to get
11 at, so how do we know that the AIGENT Assay
12 is reflective in some way of effectiveness?
13    A.  Only because we know it reflects
14 seroconversion to a established effective
15 vaccine so that when we give individuals the
16 mumps vaccine at the release potency, we know
17 they respond to the AIGENT Assay.
18    Q.  And so you're equating seroconversion
19 in the AIGENT Assay to effectiveness?
20       MS. HARDWAY:  Object to form.
21       THE WITNESS:  No.
22       Sorry.
23       No, I'm not.  I am saying it is a
24 indication that an immunological response to the
25 vaccine has happened.  The vaccine is known to

1 be effective.
2        The immunological response measured
3 by the AIGENT Assay is, certainly, not a perfect
4 measure of effectiveness.  It is the measure of
5 effectiveness that the nation's experts used to
6 look, initially, at the 007 and, subsequently,
7 decided to use the Wild Type ELISA to reach a
8 conclusion on approval or non-approval of
9 it -- of the 007 relabeling study.
10 BY MR. SCHNELL:
11    Q.  Okay.  And my last try, not your
12 fault, my last before we break, and I'm just
13 trying to get at where is that -- what is the
14 basis for there being an inference drawn from
15 those results from the AIGENT and the Wild Type
16 ELISA results that those -- that immunologic
17 response has anything to do with effectiveness?
18 Where are you -- there's this -- what I -- it's
19 a hole in what I'm hearing, and it's -- I'm just
20 -- can you fill that hole in for me?
21    A.  I -- I -- I am hearing you about the
22 tightness of the logical nexus here, and how can
23 you say, if A, then B -- and B -- if A then C.
24    Q.  Exactly.
25    A.  Right.

1        It is a matter of scientific judgment,
2 is the only answer I have for that; that we have
3 expert scientists who spend their whole careers
4 looking at this, they evaluate the data, they
5 form a judgment on whether it is a sufficient
6 level of evidence for them to approve the
7 reformulated product or the relabeled for
8 potency product with a conclusion that it will
9 be effective.
10    Q.  In your scientific judgment, can you
11 connect for me the A, the B, the C?
12    A.  I can tell you that, as a gestalt,
13 that the judgments -- that the decision is
14 sound, it's consistent with the decision
15 that I could have and I think I, likely, would
16 have reached if I had been there at the time,
17 and I did make these decisions for many years.
18       Can I mechanistically link you on
19 an individual basis from A to B to C to D, or
20 however far we're going, I -- we don't have
21 enough information to do that.
22    Q.  Okay.
23    A.  We're dealing with probabilities here,
24 not deterministic system.
25       MR. SCHNELL:  Okay.  Break there.

42 (Pages 162 - 165)

1    MS. HARDWAY:  Okay.
2    THE VIDEOGRAPHER:  Time is 12:34 p.m.
3 This completes Media Unit Number 3.  We're now
4 off the record.
5    (Lunch recess taken.)
6    THE VIDEOGRAPHER:  The time is 1:25
7 p.m.  This begins Media Unit Number 4.  We're
8 now on the record.
9    Please proceed, Counsel.
10 BY MR. SCHNELL:
11    Q.  If you could turn to Page 20 of
12 your report.  Paragraph 55, the last sentence,
13 you wrote, "When Merck was unable to develop a
14 PRN with the desired sensitivity, CBER suggested
15 they explore anti-IgG enhanced assay to increase
16 the sensitivity of their PRN."
17    The desired sensitivity, what are you
18 referring to there?
19    A.  Well, as we discussed this morning,
20 the 007 hypotheses were twofold, that they had
21 to establish that the assay was -- I'm sorry,
22 the -- I was about to say assay sensitivity,
23 which is a different use of the word assay, it's
24 used in clinical trials; that the clinical trial
25 was structured and evaluated in a way that

1 FDA concluded would be appropriate to test
2 the question, do these three different-strength
3 vaccines produce comparable immunological
4 responses.  And they set two criteria, one
5 saying we expect to see serological responses
6 with the more than 90 percent; that is, the
7 lower bound has to be no worse than 90 percent,
8 and we expect to see not more than a 5 percent
9 decrement from the 96 percent target that had
10 been reported in the label.
11    And so they're saying you -- you
12 have to not only test for non-evalu -- for
13 noninferiority between the release lot and the
14 expiry lots, but you also have to test, is your
15 assay sensitive, is what you're measuring is
16 sensitive enough to fairly evaluate the first
17 question.  And that required that the assay
18 be highly sensitive, it has to be -- measure
19 antibody responses in well over 90 percent of
20 the vaccine at release potency population in
21 order to provide assurance that the lower
22 boundary is greater than 90 percent -- lower
23 boundary of the confidence interval.
24    I'm not sure if I fully answered your
25 question, but in order to test that you've gotta

1 have a sensitive assay.
2    Q.  But are -- are you equating sensitive
3 with seroconversion rate here, in some sense?
4    A.  Yes, loosely speaking.  Sensitivity
5 is the ability to find true positives.  The
6 assumption is that an individual who is
7 one year old and has not been immunized or
8 experienced wild mumps is a seronegative.  The
9 assumption is that an individual who has been
10 vaccinated is going to be highly likely to be a
11 seropositive.  So sensitivity is the ability to
12 find true positives.
13    You have to make an assumption
14 about what the underlying truth is before you
15 can measure sensitivity.  In this case, the
16 assumption is vaccinees are presumed to be
17 immunized, and you've gotta find every vaccine
18 with a pos -- every vaccinee with a positive
19 response in your assay.
20    Q.  Okay.  Do you have an understanding as
21 to why Merck wasn't able, with a standard PRN,
22 to reach the desired sensitivity?
23    A.  No, I don't know that.  And I've seen
24 no evidence that Merck was able to understand it
25 either, or FDA for that matter.

1    Q.  Well, was -- was it -- in -- in terms
2 of your understanding of what was going on, was
3 it the FDA's understanding that the inability
4 of the standard PRN to achieve the desired
5 sensitivity a function of the capability of
6 the test itself?
7    A.  Well, sort of.  Your question
8 presupposes that there exists a standard PRN.
9 There does not.  There exists a variety of PRNs.
10 If by standard you meant to say the PRN that
11 doesn't have the second antihuman IgG antibody,
12 there's still a variety of PRN assays.
13    As the documents show, the one that
14 Maurice Hilleman had used back in the '60s no
15 longer existed, and Merck didn't know how to
16 replicate it.  Merck explored a number of
17 PRN assays without a second antibody, using
18 different indicator viruses and various other
19 conditions.  They even explored com -- adding
20 complement and explored different ways of
21 looking at the readout of the assay.  And
22 they -- they couldn't come up with the assay
23 that performed comparably to the one -- with an
24 assay that performed comparably to the one that
25 had been used back in the '60s.

43 (Pages 166 - 169)

Appx1680

Page 170

1      And they went and talked to FDA
2  about this. They were fully disclosing of the
3  information that they had achieved with these
4  attempts and sat down with the FDA and said,
5  okay, now what do we do?
6      Q.  Was the possibility -- from -- from
7  your review of the materials, was -- was the
8  possibility discussed that the reason the --
9  the -- the unenhanced PRN was not reaching
10  the desired seroconversion rates, was it a
11  possibility that it was a function of how well
12  the vaccine was performing against the indicator
13  strains that it was being tested against?
14      MS. HARDWAY:  Object to form.
15      THE WITNESS:  Well, you -- you
16  asked if I remembered that from the documents.
17  I mean, you know, it -- it's -- it's sort
18  of circular in the sense that I'm using an
19  indicator strain, I get a result.  It clearly
20  isn't performing against that indicator strain
21  the way I expected it to to be highly sensitive.
22  And so is it the nonresponse to indicator
23  strain?  Well, yes.  Some indicator strains
24  don't form good plaques.  Some of them seem to
25  have formed plaques at one point in time and

Page 171

1  then later passages didn't form plaques.  Is it
2  the cell substrate you're trying to form plaques
3  in?  Is it the way you're trying to detect
4  plaques?  There are a tremendous number of
5  variables in these assays.  But, in the end,
6  when I am confident my vaccine is immunogenic,
7  at least confident when I've given it the full
8  dose, I'm trying to find a assay that reflects
9  that highly immunogenicity -- the high-frequency
10  of immunogenicity of the vaccine, and I'm not
11  seeing that in the sero assay results, that
12  comes down to the performance of the assay,
13  and -- well, it comes down to the performance
14  of the assay.
15 BY MR. SCHNELL:
16      Q.  Who was confident -- when you say
17  we're confident -- or I'm confident that the
18  vaccine's highly immunogenetic, I assume that
19  you're talking about highly effective, or are
20  you talking about something else?
21      A.  Highly effective as reflected in
22  highway -- high rates of measured immunogenicity
23  by Hilleman in -- in subsequent assays -- a
24  variety of subsequent assays.
25      Q.  So what is the basis -- so it's your

Page 172

1  un -- it's your understanding that the FDA was
2  under -- had the understanding that the vaccine
3  was highly effective at this time; is that
4  correct?
5      MS. HARDWAY:  Object to form.
6      THE WITNESS:  It is my understanding
7  that FDA continued to conclude that the vaccine
8  was highly effective, as reflected in the
9  licensure data and the ongoing label.
10 BY MR. SCHNELL:
11      Q.  And what's your understanding based on
12  that the FDA had that view?
13      A.  Well, you have to look at the whole
14  control system for biologics.  I spoke this
15  morning about the fact that Current Good
16  Manufacturing Practices are a complex scheme
17  of controls to relate what's going to the
18  market today to what was used to establish
19  effectiveness.  It's -- it's the linkage, if
20  you will, that says, here's how we can have
21  confidence today's product, which will never
22  be tested, will produce the same result as the
23  original product.
24      For biologics, the system, if
25  anything, is even more complicated than it

Page 173

1  is for drugs, because you -- you don't get
2  to measure just the active chemically purified
3  pharmaceutical ingredient in the tablet.  With a
4  biological product, you have a system of master
5  cell banks, master virus banks, working virus
6  banks, all of which have to be qualified, that
7  show the original product was two generations
8  away from a starting seed virus and today's
9  product is also two generations away from a
10  starting seed virus.  Because, at the original
11  time of licensure, I put up these master cell
12  banks and I've been taking one vial out and
13  producing multiple working cell banks.  And
14  that's true both for the cell substrate you're
15  growing the virus in, and it's true for the
16  virus seed.  So that's part of what helps with
17  this assurance.
18      Then you have the potency assay,
19  which is -- I'm sorry, potency indicating assay,
20  which is a in vitro, sometimes laboratory animal
21  study, that relates to the effectiveness seen in
22  the original, quote, unquote, trials that helps
23  you -- so you're starting with something that
24  has a direct relationship with what was started
25  30 years ago, and you're measuring is it

44 (Pages 170 - 173)

Appx1681

1 behaving the same way in a biological system,
2 and plus all the other controls. And that --
3 that's how you have the ongoing assurance that
4 your biological product will behave the same way
5 as the investigational product at the time of
6 licensure.
7     Q. But things can happen with the makeup
8 of a vaccine, there could be new circulating
9 strains, there can be stability issues, things
10 can happen that can interfere with the ability
11 of the vaccine to maintain its performance,
12 correct?
13     MS. HARDWAY: Object to form.
14     THE WITNESS: I'm sorry. Could you
15 repeat -- more -- new circulating strains and
16 what else?
17     (Referred-to testimony read back.)
18     THE WITNESS: Well, stability issues
19 is conflating a different question. That's
20 after the -- after the vaccine's released,
21 what happens over time to the released lot.
22 Generally, things are studied very quickly in
23 the investigational medical product used in the
24 clinical trials, so it's -- it's not directly
25 relevant to that question. That -- that's

1 entirely separate.
2     The circulating strain question,
3 yes, virus strains do shift. We see this with
4 influenza every single year. That -- that's why
5 they reformulate the influenza shot almost every
6 year, because the -- the virus strains are
7 changing. And every one of those gets a new
8 approval, by the way.
9     With mumps there has been some
10 evidence of antigenic drift and local outbreaks
11 here and there. There's some countries where
12 they're more widely circulating different
13 antigenic strains. You know, could -- could
14 that be going on in the background? Well, the
15 vaccine is designed and approved against mumps
16 virus as it was circulating. Could the
17 effectiveness of the vaccine drift if the
18 dominant strain to which vaccinees become
19 exposed is antigenically quite different,
20 it could.
21     That's not really so much an FDA
22 question as it's a CDC question, who does the
23 surveillance for vaccines and who looks at the
24 isotypes over time and then would report that in
25 the scientific literature and back to Merck and

1 back to FDA, and then they would have to
2 reevaluate has this risen to the level where
3 we need to think about changing the vaccine.
4 BY MR. SCHNELL:
5     Q. But in terms of the linking we were
6 talking about before lunch, the A to B to C that
7 we were referencing, is it -- is it fair -- is
8 it fair to conclude that whatever was behind
9 the FDA's reasoning, in terms of what it
10 accepted and did not accept for the 007 clinical
11 trial, the trial itself was premised on the
12 FDA's assumption that whatever effectiveness the
13 vaccine had at the time of licensure existed at
14 the time of 007 for whatever the potencies were
15 that were studied in the original licensing?
16     MS. HARDWAY: Object to form.
17     THE WITNESS: The last phrase
18 complicates the rest of the question, but
19 I -- up until then I agree with you that
20 everybody's assuming that 007 is a study of an
21 effective vaccine. Merck -- Merck is assuming
22 that and FDA is assuming that. And the question
23 on the table is how many infective virions or
24 virus particles are necessary in the vaccine to
25 achieve immunological conversion in -- in a --

1 or seroconversion in the subjects in the trial,
2 but it's -- it's -- it's not a study of
3 effectiveness.
4 BY MR. SCHNELL:
5     Q. So it if that assumption were
6 incorrect, so it was incorrect to assume
7 that the vaccine, as originally licensed, was
8 as effective as it was at the time of Clinical
9 Trial 007, then would there have been any basis
10 for the FDA to allow the AIGENT Assay or the
11 Wild Type ELIS -- ELISA Assay to be used to
12 support a change in the label?
13     MS. HARDWAY: Object to form.
14     THE WITNESS: A -- a complicated and
15 complex hypothetical. If the vaccine used
16 to be 96 percent, now we're in a hypothetical
17 situation where there are a lot of different
18 virus serotypes out there, and even if the
19 dominant one is still similar to the original
20 and we now have diminished activity against
21 those various -- or protection against those
22 various virus serotypes, is there a basis, wow,
23 it gets to such a complicated hypothetical with
24 so many sub-issues and sub-questions that the
25 answer sort of goes, well, there might be, but I

45 (Pages 174 - 177)

Appx1682

1 have to get into the details, the really fine
2 details before I could reach a conclusion
3 whether there would be in any given instance or
4 not.
5 BY MR. SCHNELL:
6     Q.   But you don't disagree with the notion
7 that a critical assumption the FDA was making
8 with regard to Clinical Trial 007 was that the
9 vaccine at the time was just as effective as it
10 was when it was originally licenses in the late
11 '60s?
12        MS. HARDWAY:  Object to form.
13        THE WITNESS:  They were assuming it
14 was effective.  The question just an effective
15 -- as effective suggests a quantitative measure
16 around that that really doesn't come into play,
17 other than they say, your sero assay has to be
18 not more than 5 percent -- lower bound of it has
19 to be not more than 5 percent inferior to what
20 your label effectiveness of 96 percent was.  So
21 some measure of that is true, but the just as
22 becomes a statistical question.
23 BY MR. SCHNELL:
24     Q.   Well, the fact that they used the
25 same 96 percent number, doesn't that suggest

1 to you that the FDA was under the -- had the
2 understanding that it was, if not just as
3 effective, pretty close?
4        MS. HARDWAY:  Object to form.
5        THE WITNESS:  It does seem to be
6 saying, we need an assay that measures an
7 immunological response at that level, and
8 implicit in this is that the vaccine is highly
9 effective -- was highly effective then and
10 remains highly effective now.  And -- and
11 how that -- we don't have the information to
12 exactly quantitate it, and I don't have enough
13 information to put myself -- or gain a full
14 understanding of exactly the depth of FDA's
15 thinking about that question.
16 BY MR. SCHNELL:
17     Q.   Do you have an understanding one way
18 or the other as to what communications, if any,
19 occurred between Merck and FDA on the subject of
20 whether or not the mumps component of MMR2
21 was -- was highly effective?
22        MS. HARDWAY:  Object to form.
23        THE WITNESS:  Again, I apologize.
24 Could you repeat how you started that question?
25 BY MR. SCHNELL:

1     Q.   Sure.
2        Do you have an understanding one way
3 or the other as to what communications, if any,
4 occurred between Merck and FDA on the subject of
5 how effective the vaccine -- the mumps component
6 of MMR2 was?
7     A.   I remember documents that had raised
8 some question about drift strains, et cetera,
9 and those would pertain to the question that you
10 just asked.  I don't remember any document that
11 directly addressed the question is the vaccine
12 still effective, you know, or that -- that
13 raised that question.
14        So there's discussion around it that
15 informs that.  It sounds like there's some
16 specific document, you know, that you are
17 alluding to.  Glad -- glad to take a look at
18 it and see if it helps inform my answer.
19     Q.   Yeah.  I'm not.  I'm not.  I mean,
20 my questions here are to get at your opinions
21 and what you relied on.  And you relied on a
22 specific set of documents, and I'm just trying
23 to get ahold of how your opinions were formed
24 based on what you saw.  And what I'm asking you
25 is, within the materials you reviewed, did you

1 see any materials that addressed or that dealt
2 with Merck and FDA communicating on the subject
3 of how effective the mumps vaccine was at the
4 time?
5     A.   Which I just answered, but I will
6 elaborate on that answer and say there were an
7 awful lot of documents that I looked at in this
8 case over a period of four years, four plus,
9 getting close to five years.  I don't have a
10 clear, crisp, cataloged memory of each and every
11 one of them.  I'm glad to look at any specific
12 document and would then be able to evaluate how
13 it contributed or not to the formation of my
14 opinions.
15     Q.   On the same page, this is 20 of your
16 report, in Paragraph 57 you reference, well,
17 I'll read it, "Merck reported this problem to
18 CBER, along with an analysis of reports of the
19 PRN and conversion rates -- seroconversion
20 rates, including seroconversion rates against
21 Lo-1 Wild Type indicator virus of 69.4 percent
22 and 76 percent, et cetera, et cetera."
23        The problem that you're referring to
24 there is what?
25     A.   The problem in the preceding sentence:

46 (Pages 178 - 181)

"However, Merck was unable to reproduce a PRN that consistently measured seroconversion rates as high as the sensitivity CBER had specified."

Q. And do you recall in whatever materials you reviewed on this point what Merck's explanation to FDA was as to why Merck believed it was getting these low seroconversion rates?

A. I don't have a fresh and ready memory of that. I, certainly, am not prepared to try and reproduce what Merck may or may not have said from memory. I -- I just can't do that.

Q. Yeah -- no, and I don't -- I don't want you to.

Do you recall that -- Merck ever communicating to FDA that -- the possibility that these low seroconversion rates were a function of how well the mumps vaccine worked against these viruses?

MS. HARDWAY: Object to form.

THE WITNESS: I don't remember Merck communicating -- well, again, we have the referent for these viruses. Are you talking about the Lo-1 strain?

BY MR. SCHNELL:

Q. The ones where they were getting these low seroconversion rates, yes, London 1 being one of them.

A. You know, I -- I -- I don't remember that. I'm not saying it didn't happen. I'm saying I would have to look at the document and evaluate that. That -- that wouldn't have applied to the Jeryl Lynn, which is the vacc -- the parent strain for the vaccine virus, and it certainly wouldn't have applied to the vaccine virus as an indicator virus.

Q. When you say, that wouldn't have applied, what wouldn't have applied?

A. The question of whether the vaccine is active against that virus.

Q. And that's because they got high seroconversion rates for that; is that correct?

A. They got high seroconversion rates with the Jeryl Lynn vaccine strain, the highly passaged JL virus as the indicator virus, not as high with JL less frequently passaged and, presumably, less attenuated virus.

Q. And then got low seroconversion rates with the all of the Wild Type strains they tested against with the -- with that PRN; is

that correct?

A. Well, I don't know if I'd characterize them as low. I mean, they got what they got. And sometimes it was in the '70s, sometimes the -- the indicator strain just didn't work in the assay, it didn't produce plaques, and so they couldn't really evaluate it, and sometimes it -- it -- it had even lower than 70 percent results.

Q. At the time that Dr. Hilleman conducted his original studies for licensure, Jeryl Lynn was the circulating strain in the United States, correct?

A. Well, it was the one it circulated to his daughter, from whom he isolated it, and, presumably, was reflective of the dominant circulating strain at that time.

Q. And by the time we get to the late '90s, early 2000s, when Clinical 7 -- when Protocol 7 was taking place, there's a different circulating strain in the United States; is that correct?

MS. HARDWAY: Object to form.

THE WITNESS: No, I don't think that is correct, but I haven't looked at de -- in detail at the epidemiology of circulating mumps.

I'm not -- haven't been asked to offer opinions in that area, and it's -- it's like the stability. I know a lot about epidemiology, I've looked at a lot of epidemiology questions. Although I'm not a card-carrying epidemiologist, per se, I know a lot about circulating strains of viruses, mainly from my extensive experience in influenza but other viruses, as well. I feel competent to look at that question, but there are a lot of documents I'd have to look at, and I haven't looked at them, so I can't answer.

BY MR. SCHNELL:

Q. Do you know what genotype the Jeryl Lynn strain was -- what genotype --

A. Genotype.

Q. -- genotype the Jeryl Lynn strain was at the time of the original licensing studies?

A. No. Because we didn't know about genotypes in general at that point in time because that -- that was, basically, coincident with the time that even DNA structure was described, so the genotype determination would have had to happen later. And my understanding from reading is that there are, actually, two

Page 186

1 virus strains in the -- in the Jeryl Lynn
2 vaccine parent, both of which are expressed
3 in the vaccine, but the details are beyond the
4 scope of what I have looked at.
5         MR. SCHNELL: I'd like to mark as
6 Burlington Exhibit 2 a memo dated April 12th,
7 2000, from Manal Morsy, M-a-n-a-l, M-o-r-s-y,
8 Bates Number 1927351 through 55.
9         (Burlington Deposition Exhibit No. 2,
10 a memo dated April 12th, 2000, from Manal Morsy,
11 Bates Numbered 1927351 through 55, was marked.)
12 BY MR. SCHNELL:
13    Q.  With respect to any documents I give
14 you, you should feel free to read as much of it
15 as you want, but I would ask that you let me
16 ask the question first, so, to be efficient
17 time-wise, you know exactly what you need.  But
18 you should always feel free to read as much of
19 it as you want.
20        And my first question, which is going
21 to be my question with any document I hand you
22 is, have you reviewed this before, as far as you
23 know?
24    A.  I have reviewed this before.
25    Q.  Okay.  The question I have is

Page 187

1 in the fourth paragraph on the first page, and,
2 specifically, the long run-on sentence, I don't
3 know where it begins, but the part that I want
4 to focus on, and, again, read as much as you
5 want, but it's kind of a little past halfway
6 down and it says, unlike in the mumps end
7 expiry --
8    A.  I'm sorry.  Could you give me a
9 second?
10        Oh, the phrase that begins, unlike --
11    Q.  Yeah.
12    A.  -- the mumps end ... all right.
13    Q.  It says were, but she -- I'm sure
14 she meant we're -- we are trying to establish
15 clinical protective efficacy and such a
16 requirement would be acceptable ...
17        So if you could just read as much of
18 that or anything else in the document, and I --
19 I just -- I want to ask you if you have an
20 understanding of what -- what Manal Morsy is
21 referring to there.
22    A.  Well, I've read it.
23    Q.  Do you have an understanding of what
24 she's referring to there?
25    A.  Well, my understanding appears to be

Page 188

1 somewhat different from hers.  But as best I can
2 understand from what she has written here, she's
3 saying the level of evidence we need for ProQuad
4 is different than the level of evidence we have
5 been asked for for the expiry trial.  The
6 level of evidence for the expiry trial is more
7 exacting, and so at least as of April 12th,
8 2000, the understanding from communications
9 between her and Kathy Carbone at FDA was that it
10 was reasonable to accept a less-exacting assay
11 as evidence of equivalence for ProQuad than
12 would be necessary to establish the expiry in --
13 in -- in the expiry trial.
14    Q.  And is it your opinion that Dr. Mors
15 -- Dr. Morsy's understanding here is some -- is
16 in some way incorrect?
17        MS. HARDWAY:  Object to form.
18        THE WITNESS:  At least it seems
19 to me that her understanding is -- is somewhat
20 unclear.  She talks about, in the phrase you
21 pointed me to, "unlike in the mumps end expiry
22 where we are trying to establish clinical
23 protective efficacy and such a requirement would
24 be acceptable," that, I don't believe, reflects
25 the collective understanding of Merck at that

Page 189

1 time or of FDA then and subsequent, that it was
2 not a protective efficacy trial.
3 BY MR. SCHNELL:
4    Q.  Do you know what Dr. Morsy's position
5 was at the time?
6    A.  She was working in Regulatory Affairs
7 and I believe reported to Henrietta, who was her
8 boss.
9    Q.  And why do you believe her
10 understanding as to what the purpose of
11 the end expiry study was was incorrect?
12        MS. HARDWAY:  Object to form.
13        THE WITNESS:  Because you have to
14 look at the protocol of the end expiry study to
15 understand the purpose, and the purpose in the
16 protocol and in the hypothesis being tested
17 in the study doesn't correspond, certainly
18 precisely, and, really, in some ways, in
19 general, does not correspond to what she's
20 saying here.
21 BY MR. SCHNELL:
22    Q.  Because it's your opinion that the end
23 expiry study was not about establishing clinical
24 protective efficacy, correct?
25        MS. HARDWAY:  Object to form.

48 (Pages 186 - 189)

Appx1685

1    THE WITNESS: It is my position
2 that it was not about establishing clinical
3 protective efficacy.
4 BY MR. SCHNELL:
5    Q. And do you recall other documents
6 where Dr. Morsy and others at Merck had the same
7 viewpoint as to what they believed the purpose
8 of 007 was?
9    MS. HARDWAY: Object to form.
10    THE WITNESS: The same viewpoint?
11    I remember other documents in which
12 other individuals expressed their viewpoint,
13 sometimes different; for instance, I -- I
14 clearly remember in Dr. Emini's deposition that
15 he expressed quite a different understanding of
16 the purpose of the study.
17 BY MR. SCHNELL:
18    Q. And what was his understanding? Do
19 you recall that?
20    A. His understanding, as I remember
21 and as reflected in his deposition testimony,
22 was that it was a study that presumed
23 effectiveness and was evaluating whether
24 seroconversion happened in comparable
25 frequencies when there were fewer infectious

1 virus particles in the vaccine administered.
2    Q. Now, your opinion as to the purpose
3 of 007 comes from a review of the CSR, is that
4 correct, the Clinical Study Report?
5    A. Well, the protocol, the Clinical Study
6 Report and numerous documents and conversations,
7 but, in large part, is informed by the Clinical
8 Study Report, yes.
9    Q. So you think here Dr. Morsy just got
10 it wrong?
11    MS. HARDWAY: Object to form.
12    THE WITNESS: I disagree with the way
13 this sentence characterizes the purpose of -- or
14 the objective of the mumps end expiry trial.
15 BY MR. SCHNELL:
16    Q. Do you also disagree with her
17 understanding as stated in this paragraph that
18 there was a different level of proof that was
19 being asked of Merck in connection with its
20 ProQuad BLA and its end expiry SBLA?
21    MS. HARDWAY: Object to form.
22    THE WITNESS: Well, a different level
23 of proof. There was -- the issue here is about
24 not what is the success or lack of success
25 criteria in the trial, that was pretty much the

1 same for the two trials, it's what assay am I
2 going to use to measure seroconversion to
3 look at with those statistical tests.
4    So the statistical testing to be done,
5 as I said, is -- is really, pretty much the
6 same, if you look at the protocols side by side.
7 The assays to be used, at this point in time,
8 were different.
9 BY MR. SCHNELL:
10    Q. And do you have an understanding
11 -- and do you agree with her view as to why the
12 assays that FDA was requiring Merck to use at
13 the time were different?
14    MS. HARDWAY: Object to form. Calls
15 for speculation.
16    THE WITNESS: Well, that's sort of the
17 same question we just talked about in terms of
18 does she correctly assess what the intent of the
19 end expiry trial is. There is a difference in
20 the assays. They are our -- at least in 2000
21 the assays are different, and one is the AIGENT
22 Assay to be used in the end expiry trial, and
23 the other is an ELISA Assay to be used in the
24 ProQuad trials, or two different ELISA Assays,
25 actually, in -- in the five trials.

1 BY MR. SCHNELL:
2    Q. If -- and if, in your opinion,
3 the -- the 007, the end expiry trial, wasn't
4 about measuring protective efficacy, why -- why,
5 then, would FDA require a different type of
6 assay for that trial compared to ProQuad?
7    MS. HARDWAY: Object to form.
8    THE WITNESS: Your question about
9 why requires some degree of insight into FDA's
10 thinking, which I can only make reasonable
11 inferences about from the documents I have
12 seen. And the documents I have seen tell me,
13 collectively, that FDA thought a functional
14 antibody assay would be closer, if you will, to
15 the immunological seroconversion evidence that
16 Hilleman than a binding assay such as an
17 ELISA Assay. And at that point in time they
18 thought that the functional assay would be more
19 appropriate to measure the outcome of Trial 007
20    Clearly, when we get around to 2007
21 and they are making an approval decision, they
22 have changed their opinion on that.
23 BY MR. SCHNELL:
24    Q. But why if that was -- if your
25 inference is correct and that was their opinion,

49 (Pages 190 - 193)

Appx1686

1 why wouldn't they -- why wouldn't the FDA have
2 required a same assay be used -- the same
3 functional assay be used for both the ProQuad
4 clinical trials and the end expiry clinical
5 trials?
6     A.  Well, they're -- they're -- they're --
7 measuring different -- evaluating different
8 questions.  And the -- the ProQuad question is
9 saying, I have a marketed MMR vaccine, I have a
10 marketed varicella vaccine, both of them we know
11 are effective.  If I put them together in the
12 same syringe, am I seeing any evidence of
13 interference of one with the other?  Do they
14 interact in some physiochemical way where
15 one of them ceases to be immunogenic?  Do they
16 interact immunologically where, if I give them
17 in separate shots, they do better than in a
18 combined injection?  And FDA has the discretion
19 to determine what kind of evidence that they
20 need to answer that question.
21         They -- they discussed it with Merck
22 and they reached a conclusion that the ELISA
23 study, or the ELISA Assay, would give them the
24 level of evidence they needed to address that
25 question.

1         At least initially, when looking
2 at the question raised by the end expiry trial,
3 they reached a different conclusion about the
4 type of evidence they wanted to see.  They said,
5 no, we want to see evidence in a functional
6 assay, in a neutralizing assay, or some variant
7 of a neutralizing assay.  And as of 2000 they
8 were saying, that's the level of evidence FDA
9 needed to fairly evaluate whether the three
10 groups in -- in the potency assay were
11 comparable or not, or non-inferior or not.
12 And as I've said before, clearly, by the time we
13 get out to the licensure decision in 2007, that
14 has changed.
15     Q.  And you've talked about that change.
16 What -- what was the change in the -- in a
17 -- that you keep referring to that happened
18 in terms of what FDA was requiring for the 007
19 Trial?
20     A.  Well, in terms of what they're
21 requiring.  It's easier to frame the answer in
22 terms of what the regulatory decision was based
23 upon.  And the regulatory decision in terms of
24 approval of the 007 Trial, was based upon using
25 the results of the Wild Type ELISA Assay for the

1 test conditions, the 4.1 immunized group and the
2 3.7 immunized group, and using the same ELISA
3 Assay but against a pooled control group, which
4 included subjects from three different trials,
5 two of which had the vaccine -- licensed vaccine
6 and one of which was the study vaccine at
7 release potency.
8         MR. SCHNELL:  I'd like to mark as
9 Exhibit 3 a document dated May 2007 from the
10 FDA to Alison Fisher at Merck.
11         (Burlington Deposition Exhibit No. 3,
12 a document dated May 2007 from the
13 FDA to Alison Fisher at Merck, was marked.)
14 BY MR. SCHNELL:
15     Q.  You've seen this document before.
16 You've cited it in your report, right?
17     A.  I have seen this before, yes, sir.
18     Q.  And the change that you have re -- you
19 have been referring to at FDA in terms of what
20 they would accept for 007 Trial is captured in
21 this document; is that correct?
22         MS. HARDWAY:  Object to form.
23         THE WITNESS:  It is communicated at
24 a high level to Merck in this document in the
25 second paragraph.

1 BY MR. SCHNELL:
2     Q.  And that paragraph reads, and this is
3 what you quote in your report, however, the
4 science related to immunogenicity testing of
5 MMR2 has substantially evolved since our initial
6 testing requirements.  Use of ELISA data to
7 evaluate the effect of differences in product
8 potency on immunogenicity is now acceptable.
9         And do you have an understanding as
10 to what -- what evolution -- what -- what has
11 substantially evolved as referenced in this
12 paragraph?
13         MS. HARDWAY:  Object to form.
14         THE WITNESS:  This communication gives
15 a summary statement about their understanding of
16 the evidence needed to evaluate the question
17 raised in the 007 Trial.
18         It doesn't give me a basis for which I
19 can say, oh, here's the three studies that they
20 used to conclude it had substantially same --
21 changed.  They -- they just tell us it has
22 substantially changed.
23 BY MR. SCHNELL:
24     Q.  So with respect to your expertise
25 in -- in this field, are you aware of -- and

50 (Pages 194 - 197)

Appx1687

1 this is in the 2007 time period, do you have
2 any understanding as to what science related
3 to immunogenicity testing of MMR2 substantially
4 evolved during this time?
5      MS. HARDWAY: Object to form.
6      THE WITNESS: Do I have any? I have
7 some broad understanding of the evolution of
8 the use ELISA Assays to -- and how they changed
9 over time. I have not looked into the specific
10 scientific publications or other evidence.
11 And, by the way, since this is FDA, it doesn't
12 necessarily have to be published. They get a
13 lot of confidential information from applicants.
14 So I haven't looked into that, I don't know it,
15 I'm not able to independently analyze whether
16 I would also conclude that the science has
17 substantially changed or not.
18      It's their job to make this decision.
19 They did it and communicated it to Merck.
20 BY MR. SCHNELL:
21    Q. Well, this -- this all occurred
22 -- this was following numerous backs and forth
23 between Merck and FDA on the results of the
24 AIGENT Assay and the results of the Wild Type
25 ELISA Assay all in the context of Protocol 7,

1 correct?
2      A. There were numerous documents back
3 and forth both before this Supplemental BLA
4 went into FDA and during the pendency of the
5 Supplemental BLA that talked about the results
6 and interpretation of the AIGENT Assay and the
7 results and interpretation of Wild Type ELISA
8 Assay. There was also the inspection that FDA
9 did of the laboratory that was processing the
10 AIGENT Assay to produce the clinical study
11 data and the follow-up to that inspection,
12 actually, there were three visits from the
13 inspector. So there was a lot of interaction on
14 those questions, yes.
15    Q. And in those interactions, was there
16 anything that you saw that would have brought
17 the FDA to this conclusion?
18      MS. HARDWAY: Object to form.
19      THE WITNESS: A minute ago I said I
20 did not have access to the information, have not
21 individually sought out what might be publicly
22 available, certainly would not know what would
23 not be publicly available that I could use to
24 inform an independent evaluation of whether --
25 what it means to say the sci -- science has

1 substantially changed.
2      I know that Merck sent all the
3 information on the AIGENT, on the ELISA, to FDA.
4 I know that the people on the committee at FDA
5 are bonafide international experts in this
6 matter, who are running comparable assays in
7 their own laboratories, they're sitting on the
8 license committee, they signed off in agreement
9 with -- with these -- this letter going back to
10 Merck, and they signed off on the approval -- or
11 the recommendation to approve the license
12 application in the end.
13      They are the nation's experts.
14 We rely on them. I -- I take them at their
15 word.
16 BY MR. SCHNELL:
17    Q. Yeah. Yeah. I'm not questioning
18 their word or the accuracy of this or the
19 justification. I'm just trying to get a handle
20 on if there's anything you reviewed that gives
21 you some sense of how this came about, and I'm
22 taking that your answer is, no, in the materials
23 you reviewed, that there's nothing that gives
24 you any kind of understanding as to what FDA
25 based this decision on; is that correct?

1      MS. HARDWAY: Objection. Asked and
2 answered.
3      THE WITNESS: It -- it's overly-broad
4 to say there's nothing, I mean, I -- you know,
5 but there's not a direct chain of evidence,
6 there's not this study I can point to that said,
7 ah, here's the study on which FDA decided to
8 change the evaluation standard for 007.
9 BY MR. SCHNELL:
10    Q. Do you think the correlation analysis
11 had anything to do with it?
12      MS. HARDWAY: Object to form.
13 BY MR. SCHNELL:
14    Q. Do you know what I'm referring to by
15 the correlation analysis?
16    A. I know there was an analysis comparing
17 the seroconversion rates with the AIGENT Assay
18 as orig -- the original AIGENT Assay readout
19 data with the Wild Type ELISA readout data, and
20 I know there was back and forth between Merck
21 and the FDA on that.
22      Correlation, concordance, it's really,
23 technically, a concordance assay, as opposed to
24 a correlation assay, because it's looking at a
25 dichotomous evaluation for each, did they

51 (Pages 198 - 201)

**Appx1688**

1 seroconvert or did they not, or is their sero
2 status negative or positive in each case?
3 It -- it's not looking at a continuous readout
4 as would be more appropriately done in a
5 correlation assay.
6        And I -- I apologize if that's
7 overly-technical, but I -- I call it a
8 concordance assay.
9     Q.  Okay.  But my question was do you
10 think that had something to do with -- do with
11 this?
12        MS. HARDWAY:  Object to form.
13        THE WITNESS:  There is no doubt that
14 FDA was aware of that.  There is -- there's no
15 doubt that FDA participated in that back and
16 forth and evaluated the responses that Merck
17 gave them, giving them all the details of both
18 studies.  Did that contribute to this sentence,
19 the science has changed, I -- I don't know,
20 because FDA doesn't tell us.
21 BY MR. SCHNELL:
22     Q.  And does it make sense to you that
23 this spent -- that this -- that this sentence is
24 specific to immunogenicity testing of MMR2 and
25 not more broadly described as being applicable

1 particular mumps vaccine and not more broadly
2 applicable to any mumps vaccine?
3     A.  You have to tailor the type of
4 evidence to the question being asked.  The
5 question being asked with MMR at different
6 potency -- expiry potencies is, how many
7 replicating virions need to be in the vaccine in
8 order to produce an immunological response that
9 FDA can fairly conclude is comparable to the
10 approved effective vaccine.  That's very
11 different than saying, if somebody comes with
12 a new vaccine strain made a different way, what
13 do I need to establish that that vaccine is
14 effective.
15        We talked earlier that the level of
16 evidence needed to establish effectiveness in
17 the beginning is -- maybe and frequently is
18 different than the level of evidence needed to
19 support a change, and this is just one example
20 of how that applies.
21        Furthermore, FDA is a cautious
22 organization.  They've said, we can answer the
23 question, we are at a point in our scientific
24 understanding that we can answer this question
25 for Merck, because we know the vaccine works.

1 to immunogenicity testing of vaccines,
2 generally?
3        MS. HARDWAY:  Object to form.
4        THE WITNESS:  Does that make sense?
5 BY MR. SCHNELL:
6     Q.  Yeah.
7     A.  Absolutely.  For two reasons:  One
8 of them is, when we're looking at Supplemental
9 Biological License Applications for ProQuad and
10 for Recombinant Human Albumin in the vaccine
11 broth, if you will, by this time in 2007 FDA has
12 already approved those based on the Wild Type
13 ELISA.
14        So it doesn't apply in that
15 circumstance within the MMR family.  And then
16 you're looking at the broader question of, would
17 FDA apply this same standard to Sanofi's or GSK
18 or some new applicant's mumps virus vaccine, and
19 FDA is certainly not committing that they would
20 say that for somebody else's vaccine.  And from
21 that perspective it absolutely makes sense.
22     Q.  To follow up your last answer, if --
23 if there had been an -- an evolution in the
24 science of immunogenicity testing for ELISA
25 Assays, why would that be specific to a

1 We -- we are not going to answer it in the
2 abstract for somebody else's vaccine until we
3 have all the information in front of us and then
4 we can evaluate the questions and say, could we
5 look at this same analytical assay for somebody
6 else's vaccine or not.
7     Q.  So it's fair to say -- is it fair
8 to say that, however the FDA reached this
9 conclusion, it was based on the information
10 that had been exchanged between Merck and FDA
11 throughout the Protocol 7 proceedings leading up
12 to this point in time?
13        MS. HARDWAY:  Object to form.  Asked
14 and answered.
15        THE WITNESS:  It was informed by
16 that, but it also, undoubtedly, looked at a
17 broader question of what is the science of
18 ELISA immunoassays and those measures of
19 immunogenicity and seroconversion.  And,
20 as I said, FDA, because they're dealing with
21 confidential information from multiple
22 applicants, has access to additional external
23 information that Merck wouldn't have had access
24 to, and that might -- very well likely is not in
25 published literature.

52 (Pages 202 - 205)

1     So what's the full basis for their
2 conclusion that the science has changed, it's
3 not disclosed to us, we can see little parts of
4 it. We don't know and I can't tell you how they
5 formulated that conclusion. I can tell you that
6 the people who did formulate that conclusion
7 were informed scientific experts who know this
8 field very well.
9 BY MR. SCHNELL:
10    Q. Who were those individuals?
11    A. Well, we can go back and look at
12 who's sitting on the review committee at this
13 time. My recollection is Steve Rubin is on the
14 committee, Dr. Hsu, I guess that's the way you
15 pronounce it, H-s-u -- or H-s-e, statistician.
16 I remember a memorandum indicating that this
17 meeting at which the language in this letter
18 was nominated and discussed had Dr. Ho
19 [phonetic], who I addressed earlier, as being
20 involved, and others at the meeting, including
21 Vujcic, who was the chair of the evaluation
22 committee -- the licensing committee. And
23 I don't remember how she spells her last name,
24 but we'll get that for you.
25    Q. By the way, when you spoke with

1 Dr. Ho, you didn't ask her about this document,
2 did you, not the one I'm giving you, but the one
3 we've just been talking about, Exhibit 3?
4    A. As I said earlier, I did not raise any
5 issue in regard to the Merck case with her and I
6 have not spoken with her about it. We talked
7 socially about family very briefly, and we
8 talked about business of the International
9 Partnership for Microbicides, the organization
10 on which -- on whose board we were sitting. And
11 I say were because I -- that was my last
12 meeting.
13    MR. SCHNELL: Off the record.
14    THE VIDEOGRAPHER: Time is 2:24 p m.
15 We're going off the record.
16    (Brief recess.)
17    THE VIDEOGRAPHER: Time is 2:25 p m.
18 we're back on the record.
19    Please proceed, Counsel.
20 BY MR. SCHNELL:
21    Q. So in your report you -- on the
22 subject of specificity, you identified two
23 different meanings of specificity, correct?
24 We can look at your report on -- it's on Page 12
25 where you discussed this.

1    A. It is correct in the report that
2 I talk about sensitivity -- I mean, sorry,
3 specificity of the assay in terms of the breadth
4 of the response or narrowness of the response,
5 and specificity in terms of assay specificity,
6 which means something substantially different,
7 even though the term specificity is loosely
8 applied to both concepts.
9    Q. And in terms of clinical trials,
10 is it important to have a sufficient level of
11 specificity as it is defined both ways?
12    MS. HARDWAY: Object to form.
13    THE WITNESS: One wants to have
14 adequate specificity as it is defined either
15 way. The specificity in terms of the ability to
16 determine true negatives necessarily trades off
17 with sensitivity, the ability to find true
18 positives. Those two are defined as -- as
19 inversely related. And for any given assay
20 you can set the cutoff any -- for a variety of
21 places to change the sensitivity and
22 specificity.
23    Routinely, the specificity, in terms
24 of the narrowness of the response, travels
25 along with sensitivity. If you have a highly

1 sensitive assay, it may be picking up more
2 extraneous analytes, rather than the intended
3 analyte. But it's not mathematically linked in
4 the same way, it's only linked in the sense of
5 the performance of the assay.
6 BY MR. SCHNELL:
7    Q. And so, again, I'm sorry if I missed
8 this, but in terms of what you've described as
9 the inverse relationship between specificity and
10 sensitivity, in the specificity part of that
11 equation are we talking about what you call
12 assay specificity or just specificity?
13    A. Assay specificity and the relationship
14 between sensitivity -- assay sensitivity and
15 assay specificity. Assay sensitivity is the
16 ability to find true positives, sensitivity.
17 Specificity is the ability to find true
18 negatives. And those are related to one
19 another by what's called the receiver-operator
20 characteristic curve that describes how they
21 change as you modify the cutoff with tradeoff
22 of, raise the cutoff, I'm beginning to lose
23 sensitivity, but I'm getting specificity; drop
24 the cutoff, I'm gaining sensitivity, but at the
25 expense of assay specificity.

53 (Pages 206 - 209)

Appx1690

1    Q.   What is the risk if an assay favors
2  -- if any -- what is the risk, if any, if an
3  assay favors sensitivity too much at the expense
4  of specificity?
5        MS. HARDWAY:  Object to form.
6        THE WITNESS:  Well, the -- the risk
7  can only be evaluated in terms of the purpose of
8  the assay.  We use assays for different reasons.
9  We use screening assays that we give to healthy
10  people where the condition of interest may have
11  relatively low frequency, low prevalence, and
12  because it's a screening assay we want to pick
13  up everybody even if that means carrying along
14  some false positives.
15        When I need to make a diagnosis on
16  which I'm going to base an intervention, then
17  I want to know that that patient really has
18  the underlying issue, and so I want an even more
19  specific assay, correspondingly less sensitive.
20  And so I have to put both the screening and the
21  confirmatory information together, along with
22  external things like clinical judgment and other
23  assessment, before I can figure out what --
24  what's going on with any given individual.
25        So highly sensitive, better for

1  screening; highly specific, better for
2  con -- con -- confirmation -- confirmatory
3  assay.
4  BY MR. SCHNELL:
5    Q.   And is that because, in a confirmatory
6  assay, you want to minimize the number of false
7  positives, and in a screening assay you want to
8  minimize the number of false negatives?
9    A.   In the screening assay you certainly
10  want to -- roughly, yes, yeah.  In a screening
11  assay, again, it -- it's finding all the true
12  positives, but that means that you -- you are
13  also finding fewer false nega -- false
14  negatives.
15    Q.   And what do you mean by a screening
16  assay versus a confirmatory assay?
17    A.   Well, let me give you an example of
18  things that are widely understood and so, often,
19  discussed in the lay press.  You could use
20  either mammography or prostate specific antigen,
21  which are published about a lot.  Prostate
22  specific antigen finds -- elevated prostate
23  specific antigen, particularly an elevated
24  trajectory of PSA, finds a lot of prostate
25  cancer.  It also has a high false positive

1  rate.  But if the purpose is to pick up as many
2  prostate cancers as we can, you accept the fact
3  that it's going to have a false -- high false
4  positive rate.  You then don't rely on it
5  alone.  You do some confirmatory tests.  Now,
6  confirmatory tests is routinely obtaining tissue
7  and looking at it under a microscope.
8        You -- you have to look at a lot
9  of tissue under the microscope from a lot of
10  different individuals before you're able to
11  identify the prostate cancers with great
12  confidence, and so I -- I'm picking up false
13  positives.
14        Mammography, comparable situation.
15  When you do mammography screening, you pick up
16  a fair number of false positives.  You do a
17  confirmatory assay, sometimes an MRI now, but
18  traditionally, it's been a biopsy.  And you look
19  and say, is this a true positive or was that a
20  false positive or is that an indeterminate
21  signal that I might be doing watchful waiting
22  on.  But -- but that's what I mean by a
23  screening assay versus confirmatory assay.
24    Q.   So in the context of vaccine testing,
25  how would this play out, the difference between

1  a screening and a confirmatory assay?
2    A.   Well, FDA told Merck, we want a
3  highly sensitive assay.  And Merck went to great
4  lengths to develop -- design, develop, validate
5  and use highly sensitive assays, sharing all
6  that as they go along with FDA, so FDA is
7  informed about exactly what Merck is doing here.
8    Q.   Would you consider the -- the assays
9  used in -- in Protocol 7, would you consider
10  those confirmatory assays?
11    A.   They had the cutoffs selected, and
12  the nature of the assay were -- were really
13  optimized for looking at detecting of true
14  positives.  There was some concern about false
15  positives, and -- and so there was a setting of
16  the tradeoff between true positives and false
17  positives and true negatives in such a way as to
18  make them highly sensitive.  Then -- then they
19  don't really have the characteristic of
20  confirmatory assays.
21    Q.   Do they have the characteristics of a
22  screening assay?
23    A.   They're intermediate, but they're
24  more like screening assays than they are like
25  confirmatory assays.

54 (Pages 210 - 213)

Appx1691

1    Q.  And is that because of what you're
2  saying FDA told them, or is that -- what you're
3  saying is because of the purpose of what
4  Protocol 7 was about?
5        MS. HARDWAY:  Object to form.
6        THE WITNESS:  FDA instructed me
7  about what to look for in the assay.  They
8  designed an assay that performed according to
9  what the FDA was looking for.  That does relate
10  to the purpose of the use of the assay in
11  Protocol 007.  FDA wanted a highly sensitive
12  assay, Merck designed a highly sensitive assay.
13  Merck used the highly sensitive assay in
14  evaluating 007.  FDA concluded 007 had met
15  standard of evidence necessary for approval
16  and approved it.
17  BY MR. SCHNELL:
18    Q.  And when you say FDA had told Merck
19  that -- to make it a highly sensitive assay,
20  are you drawing that inference from the fact
21  that FDA required a high seroconversion rate,
22  or is it something else?
23    A.  It is fair to characterize this as
24  an inference from FDA telling Merck that they
25  wanted a high seroconversion rate.

1    Q.  Because there's no communications
2  where FDA is telling Merck, hey, make your assay
3  highly sensitive, at least that we have seen.
4  Have you seen any?
5    A.  I don't remember those exact
6  words, but, as I said earlier, there's a lot
7  of documents here and if -- if those -- I don't
8  remember the words, but I can't offer you any
9  great assurance that they were never said by
10  anybody.
11    Q.  I mean, we can show you -- you cite a
12  couple of documents for this point.  We can take
13  a look if you want, but we didn't see in those
14  documents that you cited that direction.  Do you
15  want to look at them or is -- does that sound --
16    A.  No.  I'll take your representation.
17    Q.  But that doesn't change your viewpoint
18  that you inferred that, in asking for or using
19  96 percent as the target seroconversion rate,
20  that FDA was, in effect, asking Merck to make a
21  highly sensitive assay?
22    A.  Not only that, but also looking at the
23  discussion of the Wild Type indicator of viruses
24  that Merck used and the assay results that Merck
25  developed when they were looking at a PRN

1  without a second antibody and discussed with the
2  FDA, and it was pretty obvious that neither
3  Merck nor FDA found those to be adequate, that
4  they weren't picking up the seroconversion rate,
5  they weren't sensitive to response to vaccine
6  in a way that either Merck or FDA was -- found
7  satisfactory.
8    Q.  Do you have an opinion on -- on the
9  level of specificity -- well, first of all,
10  you -- you reviewed the AIGENT validation study,
11  right, or the AIGENT validation report?
12    A.  I did.
13    Q.  And did that measure both -- both
14  forms of specificity that you described?
15    A.  Yes.  It -- within the validation set,
16  it measured both of them.
17    Q.  And from your review of the validation
18  report, did you reach an -- an opinion one way
19  or the other as to the level of specificity
20  that the validation report demonstrated for
21  the AIGENT assay?
22    A.  Well, my memory is, and, again, it
23  would be sharpened if you would want to --
24    Q.  We can look at that.
25    A.  -- look at the report.

1    Q.  Do you want to look at that?
2    A.  Sure.
3        My memory is that they found, of
4  the population who were presumed to represent
5  true negatives as the state of nature, that
6  13.something percent of them scored false
7  positive in the AIGENT assay.
8        THE REPORTER:  Should I mark this one
9  as 4 or 5?  The last one was 4, but that one was
10  withdrawn.
11        MR. SCHNELL:  You can make it five.
12        (Burlington Deposition Exhibit No. 5,
13  a packet of materials with the cover page being
14  an August 20, 2001, letter from Merck to the
15  FDA, was marked.)
16  BY MR. SCHNELL:
17    Q.  So we're marking as Exhibit 5 a packet
18  of materials with the cover page being an August
19  20, 2001, letter from Merck to the FDA.  Bates
20  range of this set is 481 to 539, and the
21  validation -- AIGENT validation begins on 502.
22        So if you want to just a take a
23  minute to -- the only thing I'm going to ask
24  of this validation is on specificity, so ...
25    A.  Sorry.  On page which?

Page 218

1    Q.  It's 502, the last three digits of
2 the --
3    A.  The -- the first page of the
4 validation report.
5    Q.  Oh, this -- there's summary of the
6 specificity finding on Page 2 of the validation,
7 and then specificity discussion begins on
8 Page 14.  And the question I'm going to
9 have -- yeah, I don't want to get into a
10 detailed discussion on specificity, I can't
11 imagine something I'd rather talk about less
12 right now, detailed discussions of specificity
13 with you, but I do want to know if you have an
14 opinion as to -- what your opinion was of the
15 level of specificity as recorded in the -- in
16 the AIGENT Assay in this validation study.  So
17 maybe you don't need to review it at all, but
18 that -- that's the question, and then maybe
19 there's some follow-up.
20    A.  Well, the question is, and -- and this
21 is specificity with the meaning of narrowness
22 of the response, does it pick up the intended
23 ligand, as opposed to other extraneous ligands.
24    Q.  Well, I had asked you originally if
25 both forms of specificity were covered in the

Page 219

1 validation.  I believe you said they were, so
2 whatever specificity discussion, --
3    A.  Well,
4    Q.  -- that's what -- that's what I'm
5 looking for from you.
6    A.  All right.  Specificity in the sense
7 of narrowness of response of the assay, the
8 ability to find positives and discriminate
9 positives from the assay picking up signals from
10 other types of antibody, rather than the mumps
11 antibody.  It was tested in a way that gave
12 meaningful results.  They -- they took sera
13 from individuals who were either -- the adults,
14 I assume, were probably naturally immune, but
15 from the children who were immunized with mumps,
16 adsorbed them with the other viruses that were
17 in the vaccine and said, is there a difference
18 in the residual titer; that is, when I add
19 rubella, does the rubella titer drop more
20 than the mumps titer drops?
21       And in some of the individuals, they
22 found clear evidence that it did.  Others, they
23 had matrix confects that interfered with the
24 assay, and so you couldn't reach a logical
25 conclusion.  You know, did -- does this

Page 220

1 establish specificity?  Again, it -- it's one
2 of those things that there are other ways to
3 evaluate it that might have given a different
4 result, might -- might have more accurately
5 reflected the specificity in terms of narrowness
6 of response.
7       This is what they did.  They shared it
8 with the agency.  The agency's experts who know
9 about these issues, because they run vaccines in
10 their labs, presumably, looked at it, didn't
11 come back and ask questions about that and found
12 it adequate.
13    Q.  And is your review of -- in your
14 review of this validation study, did you find
15 the level of specificity recorded adequate for
16 the purposes of what the AIGENT Assay was to
17 accomplish?
18    A.  This is what Merck reported, this
19 is what the agency accepted.  I accept their
20 judgment.  They have more experience with mumps
21 assays than I do.  My assay experience really
22 focuses largely on other viruses.
23       I found this in -- both the submitter,
24 Merck, and reviewer, FDA, apparently reached a
25 conclusion this was fit for purpose.

Page 221

1    Q.  True.  But I'm asking for your
2 opinion.  I mean, your -- you have enough
3 experience with these types of tests to give
4 an opinion as to what level of specificity was
5 reported here, right?
6       MS. HARDWAY:  Object to form.
7       THE WITNESS:  Well, that's, simply,
8 reading the results.  I mean, what was reported
9 here was that half the sera showed a residual
10 titer higher for mumps after adsorption -- or
11 showed more attenuation of the titer with the
12 other viruses than it did with mumps.
13 BY MR. SCHNELL:
14    Q.  And with that, does that give you any
15 kind of confidence that this assay was -- had a
16 level of specificity that was sufficient for the
17 purpose the AIGENT Assay was intended to serve?
18       MS. HARDWAY:  Object to form.
19       THE WITNESS:  Well, the issue
20 is complicated in two ways.  I think it was
21 adequate for the purposes it was intended to
22 serve, but, of course, in the end the agency
23 made the determination of the approvability
24 based on the results of the Wild Type ELISA,
25 Not based on the AIGENT Assay.  And if you go

56 (Pages 218 - 221)

1 and look at the literature on specificity, it
2 contemplates the situation in which one way of
3 testing specificity may not be able to give a
4 sharp result and you may need to use a second
5 method.
6        There is complementary information on
7 the specificity of the assay derived from the
8 Wild Type ELISA, where it's highly specific to
9 anti-measles antibody -- I'm sorry, anti-mumps
10 antibody, get the virus right here, highly
11 specific to anti-mumps antibody in the sense
12 that it doesn't react to antibodies against
13 either measles or rubella.
14        And since the two sera assays classify
15 seroconversion in very substantially the same
16 way, that's indirect confirmatory evidence
17 supporting the specificity of this
18 determination.
19 BY MR. SCHNELL:
20    Q.  So with respect to the results that
21 were found here with specificity, what did they
22 tell you about the ability of the AIGENT Assay
23 to discriminate between mumps-neutralizing
24 antibodies and non-mumps neutralizing
25 antibodies?

1    A.  I'm sorry.  I'm trying to understand
2 how to formulate an answer to that question.
3 Could I ask you to repeat it one more time?
4        (Referred-to testimony read back.)
5        THE WITNESS:  It tells me that it
6 can detect mump-neutralizing antibodies and
7 that, at least some of the cases, it -- it,
8 clearly, distinguishes mumps-neutralizing
9 antibodies from antibodies that were -- that
10 would react with other ligands.  Now, what --
11 that doesn't mean they would not also react with
12 mumps.  It means that they would react with
13 the ligand in a rubella virus or a matrix
14 condition media or measles virus, and -- but
15 it doesn't mean they don't neutralize mumps.
16 BY MR. SCHNELL:
17    Q.  But does it allow you to understand
18 whether those antibodies do neutralize mumps?
19        MS. HARDWAY:  Object to form.
20        THE WITNESS:  It's not designed to
21 test that, so I wouldn't say that gives me any
22 insight in terms of whether the antibodies being
23 measured are, in fact, neutralizing mumps.
24 That -- that's, sort of, the design principal of
25 the assay, that the plaque count goes down or it

1 doesn't go down.
2        If it goes down, then the mumps
3 ant -- antibody is antibody that neutralized
4 mumps -- the antibody that bound to the mumps
5 indicator virus.
6 BY MR. SCHNELL:
7    Q.  Well, the purpose -- the purpose of
8 the Plaque Reduction Neutralization Test is to
9 assess the level of antibodies that are actually
10 neutralizing mumps, correct?
11        MS. HARDWAY:  Object to form.
12        THE WITNESS:  You know, it's not
13 really.  It -- all assays are artificial
14 constructs.  They're -- they're not happening in
15 the human body, they're not using human cells,
16 they're not using actual mumps virus, they're
17 not using antibody that is present with all
18 the other parts of the immune system acting in
19 concert.  So that all assays, including this
20 one, are attempts to isolate and tease out one
21 part of that and look at it in the laboratory.
22        So it's saying that when there
23 is antibody in the serum, that antibody
24 interferes with the mumps virus replicating
25 in these cells.  You know, does that relate to

1 antibody-neutralizing mumps virus in the human
2 body, I guess there's a working assumption
3 it does.  But it -- it's sort of like we
4 talked about earlier, we -- we don't have a
5 deterministic, logical linkage in which we can
6 say, oh, yeah, this is exactly how it happens in
7 the human body.
8 BY MR. SCHNELL:
9    Q.  But in your view, did this test
10 show that the AIGENT Assay did a good job of
11 identifying the neutralization -- the mumps
12 neutralization that was being caused by the
13 mumps vaccine, as opposed to being caused by
14 other things going on and, you know, whether it
15 was from measles or rubella or other antibodies
16 in the blood?
17        MS. HARDWAY:  Object to form.
18        THE WITNESS:  Well, it's certainly
19 easy to address that in terms of other antibody
20 in the blood.  If the problem were with other
21 antibodies in the blood that were being picked
22 up in the assay, that would have shown up in the
23 pre-vaccine sera, and it didn't.  So -- or if --
24 if it did, it was the false positives or the --
25 the 13 percent.  It -- it wasn't showing up all

57 (Pages 222 - 225)

Page 226

1 the time, by any means. So we can be pretty
2 confident that that's not what's being picked
3 up.
4      The question of the confidence that
5 it's not antibody that was induced by rubella
6 or induced by measles and it's cross-reacting
7 against mumps is a legitimate question. What
8 lines of evidence do we have to say that? Well,
9 number one, I just mentioned the highly specific
10 ELISA antibody that correlates -- is correlated
11 or concordant. Number 2, we have the fact that
12 it discriminates between three vaccine lots, or
13 sublots, with different number of infectious
14 particles in them.
15      If it were all cross-reactive,
16 you would have no reason to expect it to
17 discriminate the 3.7 from the 4.1 from the 4.8,
18 and yet it clearly does discriminate the 3.7 as
19 behaving differently. So you put all the lines
20 of evidence together, you reach a conclusion,
21 yeah, it's measuring mumps antibody.
22 BY MR. SCHNELL:
23    Q.  Mumps-neutralizing antibody, correct?
24    A.  Mumps antibody that neutralizes in
25 this assay.

Page 227

1    Q.  So you, from this validation, were --
2 are comfortable that it was specific enough for
3 the purpose the AIGENT was intended to serve, is
4 that -- is that fair?
5      MS. HARDWAY: Objection. Asked and
6 answered.
7      THE WITNESS: I was comfortable with
8 this validation, and I relied on the judgment of
9 the virologists and vaccine analytical experts
10 at Merck who represented this to the Agency as
11 being adequate, and the judgment of the Agency's
12 experts who are -- spend their higher career
13 looking at issues like this and are extremely
14 knowledgeable and who, apparently, accepted it,
15 as well.
16 BY MR. SCHNELL:
17    Q.  You read the deposition of Joe
18 Antonello, right?
19    A.  I did.
20    Q.  And did you read the portion of his
21 testimony where he discussed his views on the --
22 what the AIGENT validation showed for
23 specificity?
24    A.  Well, since I read the deposition, I'm
25 pretty sure I read that. I don't have any clear

Page 228

1 and sharp memory of the details. Glad -- glad
2 to look at it.
3    Q.  Do you recall that he actually
4 testified that -- and he was the author of
5 this -- or the coauthor of this validation study
6 report, correct?
7    A.  I believe that is correct.
8    Q.  He was.
9    A.  He was, yeah.
10    Q.  Do you recall that he actually
11 testified to what he believed was a specificity
12 showing that he did not think was so strong?
13      MS. HARDWAY: Objection.
14      THE WITNESS: I'm sorry. Showing the
15 what?
16      MS. HARDWAY: Object to form.
17 BY MR. SCHNELL:
18    Q.  That he did not believe was so strong?
19      MS. HARDWAY: Object to form.
20      THE WITNESS: I don't remember the
21 details of that.
22      As I said, I'd be more than glad to
23 look at the transcript of his testimony. I
24 do -- am aware that when he's looking at that
25 question, I -- I don't understand that he is

Page 229

1 taking into consideration the ancillary evidence
2 between discrimination among the sero groups or
3 the -- no, sorry, among the potency groups in
4 the end expiry trial or the information on the
5 Wild Type ELISA.
6      This is one of those situations where
7 you have to put multiple lines of evidence
8 together in order to reach a reasonable
9 scientific conclusion.
10 BY MR. SCHNELL:
11    Q.  And what were the results in the
12 Wild Type ELISA that -- that you're pointing
13 to that gave you more comfort in the level of
14 specificity of the AIGENT Assay?
15    A.  It was very highly specific, in terms
16 of cross-reaction with the other antigens.
17    Q.  And what does that have to do, in
18 terms of giving you comfort, that the AIGENT
19 assay was specific?
20    A.  Because the two assays were highly
21 concordant for seroconversion determination.
22 That's supportive evidence that they're
23 measuring something intimately related; in this
24 case, successful immunization with the mumps
25 virus vaccine.

58 (Pages 226 - 229)

Page 230

1     MS. HARDWAY: Gordon, we've been going
2 about another hour-and-a-half. Do you mind if
3 we take five?
4     MR. SCHNELL: Sure.
5     THE VIDEOGRAPHER: Time is 2:52 p.m.
6 This now completes Media Unit Number 4. We're
7 now off the record.
8     (Recess taken.)
9     THE VIDEOGRAPHER: The time is 3:09
10 p.m. This begins Media Unit Number 5. We're
11 now on the record.
12     Please proceed, Counsel.
13 BY MR. SCHNELL:
14     Q. If you could turn to Page 25 of your
15 report, please.
16     In Paragraph 72 you write, "The
17 cutoff for an assay is the lowest result that
18 is determined to detect the presence of the
19 analyte at a reproducible and clinically
20 meaningful level giving a positive result."
21     Is that the definition of the ELI --
22 of serostatus cutoff as it was used in the Wild
23 Type ELISA, or is that a definition of a cutoff
24 that are more broadly applicable?
25     A. It's really a definition of a cutoff

Page 231

1 that is more broadly applicable and probably is
2 most directly applicable to clinical in vitro
3 and diagnostic assays, of which this is,
4 arguably, one subset, but used in a clinical
5 trial, as opposed to a clinical care setting.
6     Q. Can you explain to me in more lay
7 terms, if you could, what your -- what you mean
8 here in this definition of a -- of a cutoff?
9     A. Well, the cutoff is the level
10 of measurement in the assay that you call a
11 positive or call a negative. And detecting
12 analyte, the analyze is what you're trying to
13 measure, in this case, antibody that reacts with
14 the mumps indicator virus, whether we're talking
15 about the ELISA or we're talking about the
16 AIGENT assay, either one, you know, but
17 different subsets of different antibody
18 reacting in the two assays, undoubtedly.
19     At a reproducible and clinically
20 meaningful level gets to the question we were
21 talking about earlier in terms of tradeoff
22 between assay sensitivity and assay specificity.
23 Am I finding the evidence of the analyte, highly
24 I'm looking for, highly sensitively, every time
25 it's there, even though I'm getting some false

Page 232

1 positives. Or am I finding it only when I
2 really know it's there because I have set the
3 assay cutoff and readout in a way to make
4 sure that I can detect true negatives.
5     Q. When you say clinically meaningful
6 level, what are you referring to?
7     A. It's a judgment, and it's a judgment
8 about the intended use of the assay. It gets
9 back -- sort of circles back to this question of
10 am I using the assay to try and find everybody
11 who can, potentially, have the condition of
12 interest, or am I trying to know with a high
13 level of confidence whether this individual has
14 the condition of interest.
15     Q. So for the Wild Type ELISA, what did
16 you mean by clinically meaningful?
17     A. Well, in this instance, what we're
18 looking for is evidence of seroconversion.
19 We have a effective vaccine virus that we know
20 produces seroconversion in a high frequency of
21 individuals and that that is associated with
22 immunity on a group basis.
23     And so what we're trying to find is,
24 does the vaccine as administered, in any one of
25 these trials we've been talking about, produce

Page 233

1 evidence of seroconversion that allows me to
2 evaluate the comparison built into the trial.
3     Q. How important is it in a clinical
4 assay that the proper cutoff be selected?
5     MS. HARDWAY: Object to form.
6     THE WITNESS: Well, your question,
7 sort of, presupposes the concept that there is
8 a proper cutoff. And as I have been discussing
9 that the -- the cutoff is a variable, that what
10 you have is an assay with certain performance
11 characteristics in a population, and you can
12 put the cutoff at one level or another and it's
13 dependent on the purpose of the assay. I might
14 also add it's also dependent on the data set
15 that's used for validation. You want to
16 validate the assay before you're running the
17 assay to ask questions about the performance
18 of -- of groups. You -- you don't want a
19 circular situation where I run the assay to look
20 at my clinical trial and sera and then also use
21 that to try and back-validate the assay. That
22 -- that becomes circular and scientifically
23 illegitimate.
24     You set it up the assay, you validate
25 it with one set of sera, you apply the assay to

59 (Pages 230 - 233)

Page 234

1 your clinical study question with independent
2 data.
3 BY MR. SCHNELL:
4    Q.  In your opinion, if you go to Page
5 -- oh, by the way, and the -- the serostatus
6 cutoff that Merck used for the wild type ELISA
7 was 10 Ab; right?
8    A.  I believe that's correct.  That there
9 was -- 10 antibody units was deemed positive as
10 the cutoff, and less than 10 was deemed
11 negative.
12    Q.  And that cutoff, though, had --
13 had nothing to do with measuring levels of
14 antibodies that reflected protection and those
15 that did not, correct?
16    MS. HARDWAY:  Object to form.
17    THE WITNESS:  It had something to
18 do with it only in the sense that that cutoff
19 was derived from looking at the seroconversion
20 status of infants who were not vaccinated in
21 their pre-samples and who had vaccine experience
22 and immunological experience in their post
23 experience and were distinguishing
24 seroconversion in them with minimizing the
25 number of false positives in the pre because we

Page 235

1 assumed they were legit -- truly negative, and
2 maximizing the number of positives -- presumed
3 true positives in the post because we assumed
4 that the true stated nature is that they are now
5 immune.
6 BY MR. SCHNELL:
7    Q.  And what is that assumption based on?
8    A.  It's based on the knowledge that the
9 vaccine works.
10    Q.  And so is it your opinion, then,
11 that the 10 Ab cutoff, actually, did represent a
12 dividing line between results that measured
13 protection against the disease against those
14 that did not?
15    MS. HARDWAY:  Object to form.
16    THE WITNESS:  It -- it's not -- it's
17 measuring seroconversion, so it's distinguishing
18 the pre from the post.  It's saying, can I
19 really find seroconversion.  And I have
20 confidence that the seroconverted are protected
21 against disease, but it is not directly
22 measuring protection against disease.
23 BY MR. SCHNELL:
24    Q.  And the confidence that those that are
25 seroconverted are protected from disease comes

Page 236

1 from the assumption that the effectiveness that
2 was measured in the original licensing studies
3 is still applicable to the product that was then
4 current during the timeframe that we're talking
5 about here?
6    MS. HARDWAY:  Object to form.
7    THE WITNESS:  It doesn't require an
8 exact performance level comparison, but it does
9 assume that it is protective against disease.
10 And, of course, there -- there's lots of
11 independent information saying that mumps
12 virus vaccine continues to protect against
13 disease on a population basis.  We -- we just
14 don't have outbreaks in kids the way we did
15 before the mumps vaccine.
16 BY MR. SCHNELL:
17    Q.  Now, this assumption is based on
18 the fact that the serostatus cutoff created a
19 level of division between seroconversions and
20 non-seroconversions that somehow could be linked
21 to the original efficacy studies by Hilleman?
22    A.  It -- it's not based on an assumption.
23 It's based on a finding that it distinguishes
24 pres from posts.  And we know that the vaccine
25 -- out of reference that the release titer is an

Page 237

1 effective vaccine.  That's the assumption
2 that's built into this trial.  And then we
3 are comparing, when there are fewer infectious
4 particles in the dose, does it give a comparable
5 seroconversion rate to when the number of virus
6 particles are at the release potency.  That's
7 the question being tested in the trial.
8    Q.  Now, in the Wild Type ELISA,
9 though, the seroconversion was measuring mumps
10 antibodies regardless of whether they were
11 neutralizing, correct?
12    A.  We don't know the exact nat --
13 the exact biological or functional capability of
14 the antibodies detected.  We know that, because
15 of the nature of the way the assay is set up,
16 that they are reasonably high avidity; that is,
17 they bind fairly strongly to the mumps virus.
18 They won't wash off.  So what we really are
19 looking at is, do they bind to the mumps
20 virus when -- when the mumps is immobilized
21 on -- on the polystyrene surface of the well.
22    Q.  And that is what's being, in your --
23 in your opinion, linked to the -- the seroconver
24 -- what was being measured by the seroconversion
25 rate used in the original PRN tests employed by

60 (Pages 234 - 237)

Page 238

1 Dr. Hilleman in the '60s.
2      MS. HARDWAY: Object to form.
3      THE WITNESS: I don't know how you
4 would construe that as my opinion. That's not
5 what I've said. I've said that the -- the --
6 the vaccine was established as effective by
7 Dr. Hilleman in the '60s. He, obviously, was
8 not doing ELISAs. ELISAs hadn't been invented
9 in the '60s.
10      He was measuring immunological
11 responses to mumps virus vaccine in those
12 studies. He established that the vaccine was
13 protective against circulating wild type virus,
14 that -- where the wellness occurred in control
15 group.
16      He measured serological responses
17 that were correlated with protection in those
18 studies. They were -- were categorically, if
19 you will, corresponding to individuals didn't
20 get mumps.
21      Making the vaccine today in ways that
22 are directly derived from the investigational
23 material that he -- making and controlling the
24 vaccine that had been directly derived from what
25 he used in his clinical investigations gives us

Page 239

1 the confidence that this is an effective
2 vaccine.
3 BY MR. SCHNELL:
4      Q. What I'm trying to understand -- oh,
5 you know, I'll try it one more time.
6      What I'm trying to understand is what
7 is allowing -- what I'm hearing you say is what
8 is -- what is the connection between the Wild
9 Type ELISA used in Protocol 7 and the ProQuad
10 BLA and the RHA SBLA? What, if anything, is in
11 any way connecting that to the original efficacy
12 studies that is -- that gives us any confidence
13 that's what -- what is being measured in the
14 wild type ELISA is comparable to what was being
15 measured in those original studies?
16      A. That's not a question that's being
17 asked in these tests. So, you know, they --
18 they -- if they're not asking that question,
19 then they're not evaluating the answer to it.
20      They're saying that the referenced
21 vaccine is effective. And when I change the
22 vaccine by manufacturing with it Recombinant HA,
23 or adding an additional virus to the vaccine
24 like varicella, have I interfered with
25 the effectiveness as being evaluated by

Page 240

1 seroconversion rates to the vaccine. And that's
2 a question that can be addressed by the study
3 and by the analytical tool applied to the study
4 and is addressed and interpreted by FDA. And
5 the answer FDA found was, yes, for Recombinant
6 Human Albumin, yes -- or it's, actually, a
7 negative question, so, no, not in -- not
8 inferior; no, not inferior. And for the end
9 expiry potency assay, at the 4.1, non-inferior,
10 comparable; at the 3.7, we don't have enough
11 evidence to say that it's not inferior, and so
12 we're not going to let that one go to market.
13      Q. And it wasn't that the Wild Type ELISA
14 measured effectiveness. It merely measured
15 level of antibodies, and it was through that
16 that this assessment is being made?
17      MS. HARDWAY: Object to form.
18      THE WITNESS: It's measuring
19 seroconversion, and -- and that's really what
20 they're looking at, not level of antibody, per
21 se.
22 BY MR. SCHNELL:
23      Q. But the seroconversion is based on
24 mumps antibodies?
25      A. It's based on an understanding of what

Page 241

1 the serostatus of pre and post is, yes.
2      Q. Are you familiar with the term bridge,
3 to bridge from one study to another?
4      I believe in your report you said that
5 there was a bridge between the Wild Type ELISA
6 and legacy ELISA; is that right?
7      A. I -- I believe I did talk about the
8 comparison, the bridging, if you will, between
9 the legacy ELISA, which my understanding is the
10 indicator virus was the Jeryl Lynn vaccine
11 passage, the highly attenuated. And then the
12 low-passage JL as the indicator virus in the
13 ELISA used in the development of the wild --
14 so-called wild type ELISA.
15      Q. And in that context, what -- what do
16 you mean by bridge?
17      A. They're compared in saying how closely
18 do they measure, essentially, the same thing,
19 or --
20      Q. And --
21      A. -- or how different do they measure.
22      Q. And does that -- does it serve a
23 purpose of giving some kind of comfort that
24 one study is analogous to another study in some
25 regard, or what's the purpose of a bridge?

61 (Pages 238 - 241)

Appx1698

Page 242

1    A.   Well, in this instance, the purpose
2  of the bridge is to say we have a fair amount
3  of experience in evaluating serostatus with the
4  legacy ELISA, we now have a new ELISA, the
5  JL low-passage Wild Type ELISA.  It -- it has
6  some different operating -- different design and
7  operating characteristics.  Are they measuring
8  in the same way, do they allow us to extrapolate
9  current test results and say, yeah, these
10 are looking and giving us the same level of
11 understanding of seroconversion that we had
12 over the last years when we were using the
13 legacy ELISA.
14    Q.   And your opinion is that the Wild Type
15 ELISA was bridged to the legacy ELISA, correct?
16    A.   My opinion is that it was, and,
17 apparently, FDA concluded that it was, as well,
18 because they used the Wild Type ELISA as the
19 basis for approval of those supplemental
20 BLA -- BLAs that we've been talking about.
21    Q.   Do you have an opinion as to whether
22 or not the Wild Type ELISA was in any way
23 bridged to the original PRN assay that Hilleman
24 used in the licensing studies in the '60s?
25    A.   Well, that assay doesn't exist

Page 243

1  anymore, so it was bridged only indirectly by
2  virtue of the fact that there had been a number
3  of assays developed over time, and that the
4  underlying vaccine itself is, if you will,
5  bridged to the vaccine that Hilleman used.
6  So there -- there is indirect evidence, but we
7  don't have a direct comparison of Hilleman's PRN
8  assay with the Wild Type ELISA, no.
9    Q.   Is there a bridge between the Wild
10 Type ELISA and the AIGENT Assay?
11    A.   Well, we talked about the concordant
12 analysis that was done, and that does provide
13 information attesting to the fact that they're
14 both detecting seroconversion and with a high
15 level of concordance, not just on seroconversion
16 but on a number of parameters.
17    Q.   And -- and that -- and is that,
18 in your mind, equivalent to being a bridge?
19    A.   Well, it's, certainly, building a
20 bridge.
21    Q.   And is there any kind of bridge
22 between the AIGENT Assay and the underlying PR
23 -- the original PRNs that Hilleman used for the
24 licensing studies in the '60s?
25    A.   There we're dealing with a question

Page 244

1  of the fact that we have a known immunogenic
2  vaccine being tested in the control groups in
3  subsequent studies that is linked through GMP
4  to the vaccine that was being -- that was
5  studied by Hilleman, and the assay is measuring
6  seroconversion to the vaccine.  Hilleman's assay
7  measured seroconversion to the vaccine.
8        So that -- that gives you the evidence
9  that we -- we're measuring something related to
10 seroconversion, to evidence of immunological
11 response with the vaccine, which we know is
12 correlated with protection.
13    Q.   When you say it's linked through the
14 -- through GMP to the vaccine that was studied
15 by Hilleman, I think I'm understanding, but
16 you're not saying that the actual assays
17 themselves are bridged, but you're saying
18 that the vaccine is bridged because they've
19 been -- it's manufactured in the same way?
20    A.   Positive control group vaccine is
21 manufactured in the same way or in ways that
22 themselves have been bridged and -- and found --
23 concluded to be -- concluded by FDA to be
24 comparable so that we can have confidence that
25 today's vaccine is immunogenic and protective,

Page 245

1  yes.  And because they're measuring
2  seroconversions to that vaccine, that's why
3  you -- you're saying, this assay is an adequate
4  tool to look at the question of, do fewer virus
5  particles produce seroconversion at the same
6  rate.
7    Q.   But aren't the assays themselves
8  bridged?  The original efficacy -- the original
9  PRN assay or the original efficacy assay that
10 Hilleman used and the AIGENT Assay, aren't they
11 also bridged?
12    A.   I haven't seen those documents, if
13 they are.
14    Q.   So you don't have an opinion that
15 they're bridged?
16    A.   I thought I explained that there
17 is, both my opinion and by inference from FDA's
18 action, adequate evidence that -- that they
19 relate to the same immunological status.  But,
20 of course, in the end, the AIGENT Assay is not
21 used for making the determination of approval or
22 non-approval, it's the Wild Type ELISA assay.
23 So it really only comes up with the context of
24 the concordance assay.
25    Q.   In your review of the materials

62 (Pages 242 - 245)

Appx1699

Page 246

1 surrounding the selection of the cutoff for
2 the Wild Type ELISA, do you recall any position
3 that FDA took with regard to what would be an
4 appropriate cutoff to be used in the Wild Type
5 ELISA?
6      MS. HARDWAY:  Object to form.
7      THE WITNESS:  Well, a position taken
8 by FDA would imply a corporate decision rather
9 than a comment by one FDA staff member.  The
10 corporate decision they took was the approval,
11 the collective and -- and authoritative
12 determination by the delegated official at FDA.
13 So that -- the only reasonable inference of that
14 is they found the cutoff at 10 Ab units adequate
15 for the decision they needed to make.
16      Before that there were discussions
17 about cutoff, and there was requests for
18 information from Merck, which Merck supplied
19 in great abundance with all the raw data so
20 FDA could do their own calculations.  And FDA
21 said and, again, probably, we ought to pull
22 the document, but my memory is FDA said the
23 evidence of seroconversion rate is -- is good,
24 the discrimination between pres and post is
25 supportive, but we also want further

Page 247

1 justification.
2      Merck responded, gave them additional
3 information.  There were conversations back and
4 forth about what sort of additional information
5 was FDA looking for, Merck supplied what they
6 had.  FDA accepted it.
7      MR. SCHNELL:  Yeah.  Let's look at one
8 of the documents, which I think you cited in
9 your report.
10      THE REPORTER:  That's Number 6.
11      I'd like to mark as Deposition Ex --
12 Burlington Exhibit 6 a set of documents with
13 the Bates Range 846405 through 415, with the top
14 being a document titled, Regulatory Liaison FDA
15 Conversation Record, dated October 5, 2004.
16      (Burlington Deposition Exhibit No. 6,
17 a document Bates Numbered 846405 through 415,
18 was marked.)
19 BY MR. SCHNELL:
20      Q.  Is this one of the documents that you
21 reviewed?
22      A.  Well, there are a couple of different
23 documents here.  There's the transmittal memo
24 internal to Merck that you just referred to.
25 Underlying that is a faxed document from the

Page 248

1 Food & Drug Administration.  And sitting behind
2 that is a Merck document that's response to FDA
3 request for information, dated November 12th,
4 and I have seen these before.
5      Q.  And if you look at the -- the second
6 page of the document, so this is the fax from
7 Steve Rubin and Lev Sirota from FDA, do you know
8 who -- are you familiar with Steve Rubin and
9 Lev?
10      I think you mentioned Dr. Rubin
11 before.
12      A.  I don't really remember if I've ever
13 met him or not.  I'm certainly familiar with his
14 work, his publications and his position at FDA
15 and his involvement in numerous documents and
16 interactions in this case.
17      Q.  So if I can point you to the very
18 bottom of this -- this page, it's Bates Number,
19 I think, 406, it says, "Nonetheless, the
20 appropriateness of the cutoff employed in the
21 ELISA for seropositivity should be supported
22 by data demonstrating some relevance with
23 protective levels of antibody; e.g.,
24 neutralizing antibody."
25      Do you see that?

Page 249

1      A.  I do see that.
2      Q.  And is that the -- is that the -- the
3 issue that was -- that you were referring to a
4 few minutes ago that was back and forth between
5 Merck and FDA in connection with the serostatus
6 cutoff for the Wild Type ELISA?
7      A.  Well, this is in specific regard
8 to the ProQuad.  Most of the back and forth was
9 talking about the serostatus cutoff in terms
10 of the 007 expiry trial.  But it would have
11 -- since it was the same assay, it would have
12 applied to both.
13      Q.  Okay.  So -- and is this what you were
14 referring to before?
15      A.  Well, this is one piece of the
16 back and forth.  There were, certainly,
17 subsequent conversations to this and the
18 exchange of the information about the
19 concordance assay and the additional
20 justification.  So this is not the only
21 document that is part of that conversation,
22 or those conversations.
23      Q.  Do you have an understanding as to why
24 FDA was looking for this additional support of
25 the cutoff being demonstrated to provide some

63 (Pages 246 - 249)

Page 250

1 relevance with protective levels of antibodies?
2     MS. HARDWAY: Objection to form.
3     THE WITNESS: Well, that gets to
4 a point that I raised in my report where my
5 experience both at FDA and subsequent as in
6 industry where I was applying it to FDA is
7 it is not uncommon for FDA to ask for a lot,
8 evaluate what can be done, and make reasonable
9 decisions in the end that we've asked for, the
10 company tried to do what we asked for. And if
11 what they have produced for us is something
12 else, we now have that something else and we
13 have to ask the question, is this enough for the
14 regulatory decision in front of us. And when
15 they reach affirmative decision on the
16 regulatory decision and approve, they have
17 concluded it is enough.
18     Does that answer your question?
19 BY MR. SCHNELL:
20   Q. No. If you could -- my question was
21 do you have an understanding as to why FDA was
22 looking for additional support that the cutoff
23 demonstrated some relevance to protective levels
24 of antibody?
25   A. Well, I can make inference that they

Page 251

1 were looking to say we want the best
2 information, or we want a -- information that is
3 more than what we can reasonably conclude from
4 the ELISA as it then existed, and their
5 understanding of the ELISA that then existed.
6 So they wanted some sort of functional antibody
7 information to be associated with ELISA
8 seroconversion.
9   Q. And do you have an understanding as to
10 why they wanted that given what you've described
11 as the purpose of the assay?
12   A. You know, I take it that they
13 wanted it, and that -- that is clear from the
14 record. The details of why they wanted it, they
15 explained that they wanted a functional assay.
16 One could infer from that that they believed
17 that a functional assay was better reflective
18 of whether the status following immunization was
19 likely to be indicative of protection, but I
20 also know in following through what they
21 received from Merck and what they based their
22 decision on.
23   Q. And did they receive from Merck in
24 anything you saw anything that demonstrated
25 that the serostatus cutoff used in the Wild

Page 252

1 Type ELISA demonstrated relevance with
2 protective levels of antibody?
3   A. Well, we don't know what the
4 protective level of antibody is, do we? And
5 that -- that's been clear throughout all
6 this case. So in any individual circumstance,
7 they -- they did not receive that. So the only
8 reasonable interpretation of this is they're
9 looking at seroconversion rates when they say
10 protective level of antibody use. That's really
11 the only thing it can mean in this context,
12 establishing a state of immunity against an
13 effective vaccine.
14     I know what they received. I know
15 they received the concordance assay between the
16 Wild Type ELISA and the AIGENT. I know they
17 asked for details around the cutoff point for
18 the assays. I know that that was submitted
19 and reviewed, and because they approved the
20 vaccines, it was found to be adequate.
21   Q. Did the correlation between the
22 Wild Type ELISA and the AIGENT assay provide any
23 support that the serostatus cutoff selected for
24 the Wild Type ELISA was relevant to measuring
25 protective antibodies?

Page 253

1     MS. HARDWAY: Object to form.
2     THE WITNESS: I'm trying to understand
3 the distinction between that question and the
4 question we just addressed a minute ago.
5 Can you help me understand if this is -- if
6 you're asking me something different, I didn't
7 understand it was something different.
8 BY MR. SCHNELL:
9   Q. The difference is I'm talking now,
10 specifically, about the correlation analysis.
11 It's the first time I'm asking about it in this
12 context.
13     MR. SCHNELL: Do you want to repeat
14 the question?
15     (Referred-to testimony read back.)
16     THE WITNESS: I guess the best answer
17 I could provide for that is the correlation
18 analysis is what it -- is facially, and it shows
19 that seroconversion between the -- as measured
20 by the AIGENT Assay is happening with a very
21 high degree of overlap with seroconversion as
22 measured by the Wild Type ELISA Assay. Now,
23 does that then lead one to a conclusion that
24 we have evidence of protection based on
25 seroconversion frequency, which is what the

64 (Pages 250 - 253)

Appx1701

Page 254

1 protective antibody can only mean in this
2 context? It does. And it provides that
3 well enough for FDA to reach the regulatory
4 conclusion they did.
5 BY MR. SCHNELL:
6 Q. And how does it provide that
7 information that it does?
8 A. They had all the details, they had
9 all the information, they had the analyses that
10 Merck conducted, but, more importantly, they had
11 the raw data that was developed by Merck. They
12 conduct -- it -- it -- it is the practice of the
13 review team in biologics, throughout FDA,
14 really, to independently analyze the raw data
15 that they receive and look at it. They have
16 to form a conclusion about the adequacy of that
17 data to support the change being sought. They
18 did approve the change being sought, so they
19 found the data adequate to support that change.
20 Q. So your answer as to the correlation
21 supporting the relevance of the Wild Type ELISA
22 cutoff to protection is drawn from the inference
23 that FDA must have concluded that because they
24 approved the ultimate SBLA for Protocol 007?
25 MS. HARDWAY: Object to form.

Page 255

1 THE WITNESS: Well, the words in this
2 memo from FDA about protective antibody, as I
3 said, I can only understand that -- Steve Rubin
4 knows very well, he's published or repeatedly
5 said there is no protective level of antibody.
6 So he can only have meant seroconversion rates.
7 There's no other fair way to read this. In
8 terms of -- it sounds like your question is
9 asking, do I have insight into his state of
10 mind, or do I have records that distill exactly
11 his logic train, and I don't. I have this memo,
12 a lot of other documents, and he's on the
13 license committee that approves the product in
14 the end. And I know that, in order to approve
15 the product, he must have concluded he had the
16 evidence in front of him.
17 BY MR. SCHNELL:
18 Q. Now, you recall in your report on
19 Page 34, Paragraph 94 in the second sentence you
20 wrote, "CBER never required a fourfold rise
21 increase in the context of either the MMR2 or
22 ProQuad submissions."
23 First of all, there was a fourfold
24 rise increase in connection with the cutoff
25 used for the AIGENT Assay in MMR2, correct?

Page 256

1 A. Well, of course, you've taken
2 that sentence out of context. The preceding
3 question makes it specific to the Wild Type
4 ELISA, so you're --
5 Q. Right. I'm just clarifying. So
6 you're just talking about the Wild Type ELISA
7 there?
8 A. Yes. There was a fourfold criteria
9 for the AIGENT Assay.
10 Q. And CBER never required the fourfold
11 rise increase for the serostatus cutoff, but
12 they considered it, correct?
13 MS. HARDWAY: Object to form.
14 THE WITNESS: Merck discussed
15 whether the FDA would be considering it, certain
16 individuals at Merck, not Merck corporately.
17 I -- I don't have ready recollection that we
18 have evidence that FDA considered it, but I can
19 look at that evidence, if -- if you have it
20 here.
21 (Burlington Deposition Exhibit No. 7,
22 a document Bates Numbered 393 to 409, was
23 marked.)
24 BY MR. SCHNELL:
25 Q. I'd like to mark as Burlington Exhibit

Page 257

1 7 a document with the Bates Number 393 to 409.
2 The cover is a letter by Merck, dated November
3 15th, 2006, to the FDA, and my first question is
4 do you know if you've seen this document before?
5 A. Yes. I have seen the cover document
6 and the appendix documents, as well -- well, the
7 appended two documents, really.
8 Q. So if you could look at the document
9 with the Bates Number beginning 397, and this is
10 a document -- one of the documents you've seen,
11 right?
12 A. It is.
13 Q. And this was FDA's letter to Merck
14 finding -- or containing the FDA's finding that
15 the AIGENT data that Merck submitted in support
16 of the SB -- SBLA for the end expiry study was
17 inadequate for final approval; is that correct?
18 A. It says, "Our information finds the
19 information data submitted inadequate for final
20 approval at this time based on the deficiencies
21 below."
22 Yes, so at that point in time they
23 reached a conclusion it was inadequate for the
24 final approval.
25 Q. And Merck never resubmitted its AIGENT

65 (Pages 254 - 257)

Page 258

1  data in -- in this context; is that correct?
2      MS. HARDWAY: Object to form.
3      THE WITNESS: Well, Merck certainly
4  answered this document, and their response to
5  this document is the very next document in this
6  package.
7  BY MR. SCHNELL:
8      Q.  Yeah. I'm not saying they didn't
9  answer. I'm saying that -- that, from
10 this point on, Merck -- at no point in time,
11 actually, did FDA accept Merck's AIGENT data in
12 support of its SBLA for the end expiry potency
13 change, right?
14     A.  Okay. Well, to your earlier
15 question, Merck's response does include an im --
16 imputation analysis about the AIGENT data. So
17 to that extent they are re -- responding further
18 about the AIGENT data.
19     At the end of the day, FDA accepts
20 the Wild Type ELISA data, as we looked at in
21 the document from a few minutes ago, and Merck
22 concentrates on responding to FDA's request for
23 information about the Wild Type ELISA data, and
24 that's what forms the basis for FDA's ultimate
25 approval of this supplement.

Page 259

1      Q.  So they list the three reasons --
2  the FDA lists the three reasons why it doesn't
3  accept the AIGENT data. The first one is, a
4  substantial amount of sample data was excluded
5  from the analyses, the second one is the
6  accelerated stability lots were assayed at a
7  separate time and in a different assay format
8  from the product control lot, and then the
9  third point is the control lot failed the
10 acceptability criteria.
11     What -- what's your understanding as
12 to this third point, that the control lot failed
13 the acceptability criteria?
14     A.  Well, to clarify the premise in your
15 question, the first and third, A and C, will --
16 1A and 1C, refer to the AIGENT data. The second
17 one does not. It -- it's an independent issue.
18     The control lot failed the
19 acceptability criteria as you acknowledge in
20 your April 13th, 2005, response. Well, as Merck
21 makes clear in their response, which is a couple
22 of pages on, there was not a hypothesis about
23 the control data, and by that we have to infer
24 they're talking about the 4.8 log 10 TCID 50
25 release titer vaccine group. That group had

Page 260

1  the lower boundary of the confidence interval
2  excursion below the 90 percent threshold that
3  FDA had been asking for, and I believe and
4  conclude that this comment is taking note of
5  that and FDA is taking, as a consequence,
6  we have questions about whether your study
7  is adequately evaluating differences in
8  immunogenicity between the two test lots
9  and the control lot.
10     Q.  What, if anything, does that tell
11 you about the reliability of the AIGENT Assay
12 itself?
13     MS. HARDWAY: Object to form.
14     THE WITNESS: Essentially, nothing.
15 BY MR. SCHNELL:
16     Q.  Well, it meant something to the FDA,
17 apparently, right?
18     MS. HARDWAY: Object to form.
19     THE WITNESS: I don't know why you say
20 that. I'm sorry. I do not see that.
21 BY MR. SCHNELL:
22     Q.  Well, wasn't that one of the bases for
23 their rejection of the AIGENT data in support of
24 the --
25     A.  This is --

Page 261

1      Q.  -- clinical trial?
2      A.  Sorry. I interrupt -- I spoke over
3  you when you were finishing the statement, or
4  the question.
5      MR. SCHNELL: Sure.
6      Can you repeat that, please?
7      (Referred-to testimony read back.)
8      THE WITNESS: This isn't about the
9  assay. This is about the results produced
10 with the assay. When -- it's important to
11 distinguish questions about the assay and
12 the assay performance, as opposed to the
13 data produced when one is evaluating the
14 hypothesis in the clinical trial. Merck is --
15 is representing and maintains in their response
16 to this that we never had a prior hypothesis
17 that the control, the reference group, needed to
18 have the lower confidence interval above 90.
19     The FDA is saying we have questions
20 about whether the control reference group is
21 adequately immunized because you didn't record
22 data showing that the lower bound was over 90
23 percent.
24     At best, that is indirectly related to
25 the AIGENT Assay, and -- and -- and I guess that

66 (Pages 258 - 261)

Appx1703

1 becomes clear because when -- there -- there are
2 at least marginally different results when that
3 same group of sera are evaluated or a large -- a
4 larger group of sera, that being a subset, are
5 evaluated with Wild Type ELISA data, where
6 there's still some question about, does the
7 lower confidence bound meet FDA's expectation
8 for performance of the vaccine, but FDA says go
9 construct this multi-trial reference group to
10 compare your two test groups against.
11 BY MR. SCHNELL:
12    Q.  And if you read right below this
13 1C, the FDA wrote, "If you intend to pursue
14 the proposed changes in labeled potency, we
15 recommend that you support the proposed label
16 change by correlating these study data and/or
17 other relevant mumps vaccine immunogenicity data
18 with the immunogenicity data from the original
19 efficacy studies.  You could also consider
20 shortening the end expiry dating period based
21 upon these data."
22       Do you have any understanding one way
23 or the other whether or not Merck engaged in
24 either of those two efforts as outlined by the
25 FDA?

1       MS. HARDWAY:  I'm going to object to
2 form.
3       THE WITNESS:  The responses are on the
4 pages that follow, because this is a document
5 that is carried over into Merck's response to
6 this CR letter, FDA's evaluation letter, and my
7 understanding of what Merck did to respond is
8 contained in the following pages.
9 BY MR. SCHNELL:
10    Q.  And is -- what's contained in the
11 following pages, are either of those following
12 these two recommendations that FDA laid out in
13 the passage that I just read?
14    A.  Well, one is a recommendation and the
15 other is a suggestion for consideration.  The
16 suggestion for consideration of short dating,
17 there are other documents that indicate Merck
18 -- some employees at Merck talked about that,
19 evaluated it and Merck elected not to do that.
20 So I guess FDA -- I guess those documents show
21 Merck considered it.  They decided not to.
22       In terms of the relationship
23 and the correlation, these study data, other
24 relevant mumps vaccine immunogenicity data,
25 Merck's response is attempting to build the

1 case, really relying on the other relevant
2 mumps vaccine immunogenicity data.  The -- the
3 response is building that case, and then FDA
4 further evaluates what they have received, and,
5 as we know from our earlier discussion, they
6 reach a conclusion to focus on the Wild Type
7 ELISA Assay results from these same -- the same
8 study, an expanded subgroup or expanded group,
9 because there are not as many invalid tests
10 with -- with the Wild Type ELISA as there were
11 with the AIGENT study.  And then FDA brings in
12 the external data, or asked Merck to bring in
13 the external data from the other studies that
14 were used to create the pool of positive
15 control.
16    Q.  Is -- so what -- in your -- it's
17 your understanding that what follows in this
18 document is Merck's attempt to correlate
19 its immunogenicity data from 007 to the
20 immunogenicity data from the original
21 efficacy studies that Hilleman performed?
22    A.  Well, let me look through the data
23 -- the document.  I know that Merck did prepare
24 such an analysis and submit it.  The first part
25 of their response is focusing on the excluded

1 data and why that data was excluded and their
2 modeling of data using multiple imu --
3 imputations to try and bridge that fairly high
4 fraction of excluded data from the AIGENT assay.
5 They -- they make a case there.  FDA does not,
6 subsequently, accept that case.
7       So the look at the additional
8 information relating the current assays to
9 previous data is an independent document.  It's
10 not in this document.
11    Q.  So it's your -- you -- you recall
12 reviewing some kind of correlation analysis that
13 Merck prepared that correlated immunogenicity
14 data from Protocol 7 to the immunogenicity data
15 from the original efficacy studies that Hilleman
16 performed?
17    A.  I don't recall that.  That's not what
18 I said earlier.  If you go back and look what --
19 at what FDA asked them to do, they said, in
20 correlation and/or other immunogenicity data,
21 and Merck attempted to build the case based
22 on other immunogenicity data and other
23 documents.
24    Q.  But it says, Correlating these study
25 data, meaning the AIGENT Study data, and/or

67 (Pages 262 - 265)

Appx1704

1 other relevant mumps vaccine immunogenicity
2 data, with the immunogenicity data from the
3 original efficacy studies. Are you not reading
4 that as a recommendation that Merck correlate
5 its 007 immuno -- immuno -- immunogenicity
6 data or other relevant mumps vaccine
7 immunogenicity data with the immunogenicity
8 data from the original efficacy studies?
9     A. Well, Merck is building a case that
10 one can look at the original data and look at
11 subsequent immunogenicity data and reach the
12 conclusion that -- that they are measuring an
13 immune state.
14        What Merck knows, and FDA is
15 keenly aware of, they don't have sera to do a
16 cross-study comparison looking at concordance of
17 individual classification. So they're not doing
18 that, because the ability to do that doesn't
19 exist.
20     Q. So what --
21     A. And -- but -- but that's not a
22 surprise to the FDA.
23     Q. So what was the correlation, then,
24 that -- to the original efficacy studies that
25 FDA is asking -- is recommending Merck perform

1 here?
2     A. Well, FDA is asking for evidence that
3 allows them to link. Merck is giving the best
4 evidence that they can develop through looking
5 at historical literature, through looking at how
6 much virus do you need in order to produce an
7 immune state. They have published reports from
8 studies that were relatively small numbers of
9 individuals saying that you don't need a whole
10 lot of virus, two-and-a-half logs produced in
11 immune state. They -- they present that to FDA.
12 They are unsuccessful, if you will, in providing
13 correlation to the AIGENT Assay in response to
14 this comment. But FDA later says, okay, we're
15 now going to look at the Wild Type ELISA.
16     Q. Do you know if Merck provided any
17 correlation -- provided to FDA any correlation
18 between the Wild Type ELISA and the -- strike
19 that.
20        Do you know if Merck provided any
21 correlation between the immunogenicity data
22 measured by the Wild Type ELISA and the
23 immunogenicity data from the original efficacy
24 studies perform by Hilleman?
25     A. The answer is substantially the

1 same to the answer I just gave. They don't have
2 individual sera samples from seroconversion to
3 the original vaccine that they can do a highly
4 structured correlation or concordance analysis
5 with the Wild Type ELISA. What they have done
6 is they've said, the Wild Type ELISA, in the
7 control group and in this post-artificially
8 constructed control group by amalgamating three
9 study sets, where we have a known immunogenic
10 virus and we're measuring seroconversion with a
11 highly -- at a high sensitivity, it allows us
12 to fairly evaluate whether the individual -- the
13 set of individuals immunized with less virus in
14 the vaccine, less infectious particles in the
15 vaccine, are comparable or not. And that's what
16 we have. There's -- an individual concordance
17 analysis is not possible for that study -- for
18 that assay either.
19     Q. Well, that's not what FDA was asking
20 for here, was it?
21     A. As I said, Merck produced what they
22 have, they gave FDA all the data. FDA looked
23 at it, and, obviously, by the time we get to
24 December a year later, this is November of 2006,
25 FDA has -- approves the vaccine based on what

1 they have in front of them. And in the middle
2 of 2007 they reached a conclusion that they
3 would be focusing on the Wild Type ELISA. FDA
4 is asking for one thing here, Merck is providing
5 the best answers they can. FDA says, we're
6 going to look again at the evidence that you
7 have given us and say, is this adequate for the
8 regulatory decision, and FDA says, yes, it is.
9     Q. Where does FDA say we're going to look
10 again at the evidence that you've given us?
11     A. That's an inescapable conclusion and
12 inference from the fact that they say, give us
13 the Wild Type ELISA data, and that they approved
14 based on the Wild Type ELISA data in the end.
15        MR. SCHNELL: Okay. Why don't we take
16 a break?
17        THE VIDEOGRAPHER: Time is 4:04 p.m.
18 This completes Media Unit Number 5. We're now
19 off the record.
20        (Recess taken.)
21        THE VIDEOGRAPHER: Time is 4:22 p.m.
22 this begins Media Unit Number 6. We're now on
23 the record.
24        Please proceed, Counsel.
25 BY MR. SCHNELL:

68 (Pages 266 - 269)

**Appx1705**

Page 270

1    Q.  Dr. Burlington, in your opinion,
2  does the Wild Type ELISA measure antibodies
3  associated with protection?
4    A.  In my opinion, it is almost certain
5  that antibodies with protection would be meas --
6  -- associated with protection would be measured
7  by the Wild Type ELISA.  Whether it measures
8  exclusively those antibodies is a different
9  question.  It measures binding antibodies.
10  One would expect antibodies associated with
11  protection to be binding.  But we don't even
12  know if antibody is, by itself, the mechanism
13  of protection.  We just know that antibody,
14  as evidence of seroconversion, is evidence of
15  successful immunization and that that is what's
16  associated with protection.
17    Q.  When you say evidence of successful
18  immunization is what's associated with
19  protection, what do you mean?
20    A.  I mean, we have an effective vaccine.
21  If you seroconvert to an effective vaccine, at
22  least in the population basis, the presumption
23  is that you are protected.
24    Q.  Are your opinions here today in any
25  way premised on your assumption that the mumps

Page 271

1  component of MMR2 and -- is an effective vaccine
2  at pre -- at preventing mumps?
3    MS. HARDWAY:  Object to form.
4    THE WITNESS:  My opinions here today
5  are based on my own assumption/conclusion, my
6  own confidence that it is an effective vaccine
7  and the inference I make about the actions that
8  FDA and Merck have taken as they have gone
9  through this long process of evaluating the
10  Expiry Trial 007, and that inherent in the
11  conclusions reached is that both Merck and
12  FDA have concluded it's an effective vaccine.
13  BY MR. SCHNELL:
14    Q.  And when I asked you previously about
15  whether the Wild Type ELISA measures antibodies
16  associated with protection and you answered,
17  yes, it does, but it also measures antibodies
18  that are not necessarily associated -- well,
19  let me, actually, strike that.
20    Is that what your answer was, that,
21  yes, it almost certainly measures antibodies
22  associated with protection, but it also measures
23  antibodies that may not be associated with
24  protection?
25    A.  It measures antibodies that would

Page 272

1  bind to the virus.  Presumably, some of those
2  are protective antibodies or part and parcel of
3  protective mechanism, and others of them may not
4  be.  We don't have enough scientific information
5  to know which is which.
6    Q.  And the Wild Type ELISA doesn't give
7  any indication as to which is which; is that
8  correct?
9    A.  It -- it only reflects that the
10  antibodies bound to the mumps virus that is
11  used as the indicator in the Wild Type ELISA.
12    Q.  You wouldn't consider the Wild Type
13  ELISA an immunological correlate of protection
14  against mumps, would you?
15    A.  It -- I would consider it an indirect
16  immunological correlate of protection.  It
17  correlates with protection to the extent that
18  we know it measures seroconversion to a known
19  immunogenic and protective vaccine.
20    Q.  But you just said before that you
21  don't even know if antibodies play any role in
22  protection, right?
23    A.  My prior answer I was using -- I said
24  correlate of infection [sic].  I should have
25  said correlate with infection [sic] -- or with

Page 273

1  -- with protection.  Because there is no
2  correlate of infection, as we have discussed
3  many times, so I want to clarify that.
4    Now, as I'm clarifying my previous
5  answer, I have forgotten your question.  Could I
6  get to you repeat it?
7    Q.  Sure.  I just want to -- you said
8  correlate of infection a couple of times, you
9  only corrected it once, but he never means
10  correlate of infection.  He always means
11  correlate of protection, if I may be so bold as
12  to speak for you.
13    THE WITNESS:  Thank you.  Thank you.
14    MR. SCHNELL:  Could you go back to my
15  original question?
16    THE REPORTER:  Sure.
17    (Referred-to testimony read back.)
18    MR. SCHNELL:  Okay.  So I'll repeat
19  the question, Dr. Burlington.
20  BY MR. SCHNELL:
21    Q.  Dr. Burlington, you wouldn't consider
22  the Wild Type ELISA an immunological correlate
23  of protection against mumps, would you?
24    A.  Well, we discussed earlier today what
25  a correlate of infection [sic] is, and it would

69 (Pages 270 - 273)

1 not only involve a defined assay, it would also
2 involve a measure in that assay of a -- level
3 of antibody to be used as we ordinarily -- or
4 to be reached as we ordinarily use the term
5 correlate of infection [sic]. So you -- you
6 can't really ask is the assay. You have to ask,
7 is the assay measuring the antibody at a certain
8 level of correlate of infection [sic]. But
9 there for the Wild Type ELISA, the answer would
10 be no. But the answer would be no for a PRN,
11 the answer would be no for the AIGENT Assay, the
12 second antibody augment Plaque-Reduction
13 Neutralization Assay. We don't have a correlate
14 of infection [sic] for mumps.
15    Q. And, again, you said correlate
16 of infection, but you meant correlate of
17 protection.
18    A. Well, I said -- yes, you're right.
19 I am sorry. I said infection. I meant
20 protection. Thank you.
21       Must be getting tired.
22    Q. Your opinion is also that we don't
23 know what role, if any, antibodies play -- mumps
24 antibodies play in protection against mumps, am
25 I correct?

1    A. We know they play a role. We
2 don't know if they are sufficient in and of
3 themselves. We know that the immune system is
4 complicated, that it is composed of not just
5 antibody, but antibody cells, cells in
6 antibodies interacting, complement and various
7 other features in the immune -- innate immune
8 response. So it would be truly surprising if
9 someone were to demonstrate -- were to
10 demonstrate that antibody had no role in
11 protection, but we don't know the exact
12 details and how important the role is and
13 whether antibody, in and it itself, is
14 protective, or some class of antibodies.
15    Q. If you could turn to Page 45 of your
16 report, please. In Paragraph 123 you reference
17 a passage from CBER's clinical review summary.
18 And, first off, what is -- what is a CBER
19 clinical review?
20    A. When an application for licensure
21 or supplemental application for licensure is
22 received by the Center for Biologic Evaluation
23 and Research, CBER, the organization that
24 regulates biologics, they assign a review team
25 of specialists that will include clinical

1 specialists, physicians, statisticians, assay
2 people, quality and chemistry and manufacturing
3 control people, who -- and -- and a project
4 manager who form a review committee. The
5 clinician, in conjunction with a statistician,
6 prepare a review of the clinical trial and an
7 analysis from the clinical perspective about
8 the trial, its adequacy and whether it shows
9 evidence of effectiveness and safety. This
10 is then shared with the review committee.
11 They write a document that memorializes their
12 analysis and their conclusion, and it becomes
13 part of the record of review, which,
14 subsequently, is incorporated, in large part,
15 into the summary basis for the approval
16 decision.
17    Q. So this is a document that is
18 typically prepared before a final decision,
19 but it is, typically, what the final decision of
20 approval would be based on. Is that fair?
21    A. This and other documents. I mean, you
22 have to -- there are review documents not just
23 from the clinical -- clinician and statistician,
24 but other review documents, as well, and you
25 need all of them to base the final approval on.

1    Q. Okay.
2    A. And -- and the exact sequence
3 of timing of when they write it. I mean,
4 they've had the meetings, they've had the
5 discussion, they've had the notes. Whether the
6 memorialization takes place before the approval
7 decision or within the week afterward, I'm sure
8 it slides one way or the other.
9    Q. And the passage that you quote in
10 your report at this Paragraph 123 says, "Merck
11 also demonstrated a good correlation between
12 measles antibody, mumps neutralizing antibody
13 and rubella antibody with each respective ELISA.
14 These studies indicated that the ELISA used to
15 assess antibody response to each of the vaccine
16 antigens in ProQuad with parallel responses that
17 correlated with protection in other studies."
18       Is the good correlation that -- that's
19 referenced here between mumps-neutralizing
20 antibody and one of the respective ELISAs that
21 you referenced here, is that the correlation
22 analysis that Merck conducted that is reflected
23 in Serial 86, which I believe is one of the
24 documents you reviewed?
25    A. The analysis that was reported in

Appx1707

Page 278

1 Serial 86 establishing the concordance between
2 seroclassification and seroconversion, as
3 measured with the AIGENT Assay and with the Wild
4 Type -- the mumps-specific Wild Type ELISA.
5   Q.  And that's what -- that's what is your
6 understanding that CBER is referencing here when
7 it's referencing a good correlation between
8 mumps-neutralizing antibody with ELISA?
9   A.  That as evidenced in -- in the
10 document to the IND, Serial 86, as well as
11 subsequent discussions analysis and the raw data
12 supporting that that were -- were separately
13 submitted.
14   Q.  That's the only -- this -- the
15 correlation that was reflected in Serial 86 is,
16 as far as you know, the only correlation that
17 Merck provided to FDA in connection with
18 Protocol 7 and its ProQuad biological license
19 applications?
20   MS. HARDWAY:  Object to form.
21   THE WITNESS:  Well, no.  I mean,
22 they -- they did compare the legacy ELISA and
23 the Wild Type ELISA for mumps.  Protocol 7 was
24 part of the supporting information for ProQuad,
25 but ProQuad had other studies, as well.

Page 279

1 Protocol 7 was the specific document for the
2 later-approved supplemental BLA on expiry.
3 BY MR. SCHNELL:
4   Q.  Fair enough.  Bad question.  Let me
5 reframe it.
6       Was -- was the correlation reflected
7 in Serial 86 the only correlation that you're
8 aware of that Merck has used to compare
9 mumps-neutralizing antibody and an ELISA Assay?
10   A.  I -- I would have to say, yes, in
11 terms of a formal concordance analysis, it is
12 the only one I'm aware of.  But it has to be
13 taken in the context not just with Serial 86,
14 but the subsequent discussion and clarification
15 about what it's showing and the classification
16 and the cross-classification between the two
17 assays, as well.
18   Q.  Now, you've -- you have previously
19 articulated a distinction between a correlation
20 analysis and a concordance analysis, and you
21 seem to be using it interchangeably here.
22 And I -- I want to make sure that there's no
23 meaningful difference between the two in your
24 opinion?
25   A.  Well, in my opinion, there, actually,

Page 280

1 is a meaningful difference between the two.
2 Here we have a quote from FDA that -- this is
3 their use, not mine.  I would prefer to have
4 called it a concordance analysis because each
5 assay is measuring a dichotomous state.  You're
6 either seropositive or you're not seropositive.
7 You either seroconvert or you don't seroconvert.
8 So we have serostatus of the pre, serostatus of
9 the post and seroconversion of the pair, as
10 measured by two assays, but -- but it's -- it's
11 a binary choice.
12       My understanding and usual use
13 of the word correlation analysis would have
14 applied at least a quantitative or a categorical
15 semi-quantitative assay.  And you would have
16 said, do they measure the low antibody the same,
17 do they measure the high antibody the same and
18 do we have a regression line relating the way
19 they measure changes an antibody, as opposed to
20 a dichotomous state of antibody present or not
21 present.
22   Q.  In your opinion, does the -- does
23 the correlation -- does a correlation, as
24 you've defined it, provide any better sense
25 of information than the concordance as -- as --

Page 281

1 as you've described it, when you're comparing
2 the immunogenicity of two assays?
3   A.  Well, it depends exactly how you're
4 using it.  I mean, if you were looking at the
5 immunogenicity where you needed a very high
6 level of antibody or where you had external
7 information that said a very high level of
8 antibody was associate of persistence of
9 immunity, but a lower level of antibody might
10 establish immunity today but didn't associate
11 with persistence of immunity, then it certainly
12 would provide more information.
13       In a situation where you're merely
14 able to ascertain in answer to the question, did
15 a known vaccine produce an immune state, I don't
16 think it produces better information.  I think
17 this -- so it depends on the question you're
18 asking.  For this question -- these sets of
19 questions being asked in these supplemental BLAs
20 the concordance analysis is appropriate.
21   Q.  So continuing on with the passage, the
22 second sentence reads, "These studies indicated
23 that the ELISAs used to assess antibody response
24 to each of the vaccine antigens in ProQuad would
25 parallel responses that correlated with

71 (Pages 278 - 281)

1 protection in other studies."
2      So with respect to the Wild Type
3 ELISA, is it your understanding that what FDA
4 is referring to here, in terms of parallel
5 responses that correlated with protection with
6 other studies, that the other studies they're
7 referring to are the original Hilleman studies?
8      MS. HARDWAY:  Object to form.
9      THE WITNESS:  I have looked at this
10 passage and inferred exactly that, that it has
11 to be the Hilleman licensure studies supported
12 by, you know, external data, field data on
13 effectiveness, reported through CDC, but that
14 that put together has to be what they're talking
15 about with correlate of protection because I
16 don't know what else it could be.
17 BY MR. SCHNELL:
18      Q.  And these studies, just focusing on
19 the mumps comp -- the mumps antigen, is it your
20 understanding that FDA here is referring to the
21 Wild Type ELISA AIGENT Correlation Study, or
22 the Wild Type ELISA Study that is parallel --
23 paralleling responses correlative of protection
24 in the original efficacy studies?
25      A.  There must be a nuance in your

1 question that is escaping me.  I -- I'm not
2 sure I understand the distinction.  They're --
3 they're saying that we have studies that show
4 evidence of protection with these vaccines; that
5 we have looked at the correlation, although I
6 would have said concordance, between the
7 presence of seroconversion with -- as measured
8 by the ELISAs, and this is a conclusion by the
9 regulatory reviewer, the clinical reviewer,
10 that it is a good correlation and it supports
11 evidence of protection because of that
12 association.  You know, it -- these are their
13 words, not mine.
14      Q.  Right.  And I'm just -- if you don't
15 unders -- if you have no understanding of what
16 -- what it means, I'm just trying to get help
17 deciphering it.  The association that you just
18 referenced, the association between what and
19 what?
20      A.  Well, neutralizing antibody
21 seroconversion and ELISA seroconversion, the --
22 the -- the concordance of those two in clinical
23 trial materials.
24      Q.  Okay.  So what in those studies is it
25 your understanding parallels responses in the

1 original efficacy studies?
2      A.  This is an issue that we have
3 struggled with today.  And as I have pointed
4 out repeatedly, there is the knowledge that the
5 vaccine as studied was shown to be effective
6 and the evidence that the vaccine used in the
7 control group in these studies is related to
8 that effective vaccine, and that's what allows
9 the correlation with protection.
10      Q.  And is it the -- is it the fact that
11 the seroconversion numbers were similar?  Is
12 that what is being compared?
13      MS. HARDWAY:  Object to form.  Asked
14 and answered.
15      THE WITNESS:  This is not an
16 effectiveness study.  This is a study saying, do
17 I get worse results, do I get vaccine failures
18 if there is somewhat less -- fewer particles in
19 the vial of replicating virus.  And the --
20 regulatory answer is, well, not if they're a
21 little bit fewer at 4.1 log 10 TCID 50, but
22 we don't have enough confidence that they're
23 comparable if it's the 3.7 based on these
24 results.
25 BY MR. SCHNELL:

1      Q.  Yeah.  And this we're talking
2 about ProQuad, though.  And so with respect to
3 ProQuad, what is -- what is connecting the Wild
4 Type ELISA result that was used to support the
5 ProQuad BLA and the results that Dr. Hilleman
6 found in his original efficacy studies?
7      A.  Thank you for directing my attention
8 to this being the specific to ProQuad.  In
9 ProQuad the question being asked is when you put
10 multiple vaccines in the same syringe, do they
11 interfere with one another?  And FDA reached
12 a conclusion that the Wild Type ELISA was --
13 seroconversion rate as measured in the Wild Type
14 ELISA was adequate to address that question.
15 They determined that when the vaccines are given
16 separately and when the vaccines are given in
17 the same syringe, that the results are
18 comparable, that their non-inferiority is
19 established.  And the clinical reviewer also
20 makes the assessment that the ELISA is an
21 appropriate tool to measure that because
22 of their conclusion that it is -- the
23 correspondence between seroconversion with the
24 ELISA and neutralization assay is sufficient
25 -- this is their explanation for why they've

72 (Pages 282 - 285)

Page 286

1 formed the conclusion they did.
2 Q. And that correspondence between
3 seroconversion with ELISA and neutralization
4 assay is from the correlation Merck performed
5 between the Wild Type ELISA and the AIGENT; is
6 that correct?
7 MS. HARDWAY: Object to form. Asked
8 and answered.
9 THE WITNESS: We have been through
10 that. It -- it is the concordance results as
11 established or submitted to the agency in Serial
12 86 and subsequent interactions between Merck and
13 the agency. The -- the agency asked questions,
14 Merck answered those questions. The agency
15 asked for additional analyses. Those were
16 provided. Merck sent the agency the raw data.
17 The agency reached this conclusion.
18 MR. SCHNELL: Off the record.
19 THE VIDEOGRAPHER: Time is 4:47 p.m.
20 We're going off the record.
21 (Recess taken.)
22 THE VIDEOGRAPHER: Time is 4:57 p.m.
23 We're back on the record.
24 Please proceed, Counsel.
25 BY MR. SCHNELL:

Page 287

1 Q. Page 40 of your report, in Paragraph
2 110, second sentence, you wrote, CBER ultimately
3 accepted the AIGENT PRN data using the
4 uncorrected originally recorded results for
5 analysis of the Protocol 7 data.
6 I know I'm kind of coming out of
7 the blue with this question, but do you remember
8 the context of your -- your opinion? This is
9 following the FDA inspection in August '01, and
10 there was a question about corrected data or
11 changed data versus original data. And my
12 question is, with regard to that sentence,
13 what's your basis for that -- I don't know if
14 that's an opinion or statement or what, but
15 what's your basis for that sentence?
16 A. Well, it's footnoted. The March 23rd,
17 2002, memorandum is, presumably, the relevant
18 document to look at.
19 Q. So that -- that statement is -- is
20 sourced -- that's the source of that -- of that
21 statement?
22 A. Well, if we succeeded in getting
23 the right footnote document and the right
24 identifiers paired up with the source document
25 I was looking at, yes, it should be.

Page 288

1 Q. And is that -- is that your -- is
2 that your recollection, I don't know how much
3 of this is fresh in your memory, but did -- is
4 it your understanding that the AIGENT data that
5 FDA ultimately accepted in its analysis for
6 Protocol 7, at least up until the point where
7 they didn't accept the data that we talked
8 about before, but that they looked at what your
9 understanding is of the AIGENT data that was
10 uncorrected and originally recorded?
11 A. Yeah. I think that is a fair
12 characterization, that they looked at the
13 original data sheets, not -- not the corrections
14 on the data sheets. They said the data as
15 originally represented is what was accepted for
16 submission and review, and with that sense it
17 was accepted by the agency.
18 Q. Now, you -- you looked -- as part of
19 the materials you reviewed, I believe you looked
20 at the depositions of the two relators in this
21 matter, Steve Krahling and Joan Wlochowski.
22 They were virologists who worked in David Krah's
23 lab during this time. Is that true that you
24 looked at deposition testimony?
25 A. I did read their depositions.

Page 289

1 Q. And do you recall testimony that each
2 of them provided that -- of the like, that assay
3 plates were dis -- discarded, counting sheets
4 were discarded and that they had, in their view,
5 that there dis -- that it conflicts with what
6 you're stating here. Do you recall that
7 testimony?
8 A. Well, the testimony that I recall from
9 their depositions was -- would conflict only to
10 the extent that the parenthetical originally
11 recorded that there were questions that they
12 raised about data sheets being discarded, et
13 cetera. I also read other people who were
14 in that laboratory deposition testimony, Ms.
15 Yagoditch and Dr. Krah. They take different
16 positions. And I'm not making an opinion on one
17 versus the other. I'm not offering an opinion
18 on one versus the other. That's not the sort of
19 issue which is subject to an expert opinion so
20 far as I know.
21 Q. So then with regard to this sentence,
22 then you are not taking a position one way or
23 the other as to whether or not the AIGENT data
24 that FDA ultimately accepted used originally
25 recorded data?

73 (Pages 286 - 289)

Appx1710

1    A.   Only to the extent that that is
2  how it was represented by Merck, and based
3  on Merck's representation that it was the
4  originally recorded data sheets and that that
5  was the source data used to analyze the AIGENT
6  Assay.  I'm accepting that as it is.
7    Q.   And do you have an opinion, one way or
8  the other, that if Merck had misrepresented the
9  fact that the AIGENT data was originally
10 recorded what the FDA would have done in
11 response?
12     MS. HARDWAY:  Object to form.
13     THE WITNESS:  I know that FDA visited
14 and inspected the laboratory.  I know that they
15 collected the original data sheets in subsequent
16 revisits in follow-up inspections by Inspector
17 Bennett.  I know that the agency looked at that
18 and evaluated it and accepted it for review.
19 They didn't -- they didn't say -- didn't form
20 a conclusion that the data integrity is so
21 threatened that we cannot accept this assay
22 at all.  So, you know, if FDA during that
23 inspection had found that the data lacked
24 integrity and the assay could not
25 be relied upon, they would have behaved

1  differently.
2  BY MR. SCHNELL:
3    Q.   And how would they have behaved?
4    A.   Whether there's a data integrity
5  question to the extent that the data are
6  unreliable the agency does not use that in
7  forming regulatory conclusions.  They either
8  would have excluded part of the data or all of
9  the data.
10   Q.   If you could turn to Page 46 of your
11 report.
12     The question I have is in Paragraph
13 128.  The second sentence reads, "In my opinion,
14 a fair reading of Merck's statements, given
15 their context, is that, at a group level, i.e.,
16 a study arm of several hundred subjects, the
17 components were immunogenic, neutralizing
18 antibody as measured in a PRN, had a statistical
19 correlation with protective immunization, and
20 Wild Type ELISA results had a statistical
21 correlation with the PRN results.
22     Can you explain that sentence to me,
23 please?
24   A.   Well, the fair reading of Merck's
25 statements here or Merck's discussions with CBER

1  of the contents of their applications, as well
2  as the content of the application itself, and
3  Merck was representing, as I understand it, that
4  when you look at the data for an arm of the 007
5  study taken as a whole, that they are measuring
6  the frequency of successful vaccine
7  immunization, perhaps indirectly, but they're
8  measuring it in a -- in a way that is saying,
9  can we have confidence the vaccine with this
10 much virus in it produced a successful
11 immunization, and that they represented and
12 had a basis for representing that there was
13 an association between successful immunization
14 and protection against -- well, protective
15 immunization; that is, protection --
16 establishing a protective state in the
17 immunized population.
18     They also established the Wild Type
19 ELISA was statistically correlated.  Here I
20 said statistically correlated, but it was a
21 concordance assay, as we've discussed earlier,
22 with the PRN results, and that was what was
23 Merck represented to the agency, Merck gave
24 the agency the data, data -- FDA looked at
25 how Merck had analyzed it, had the raw data and,

1  presumably, looked at their only analyses and
2  reached a conclusion that the supplement could
3  be approved.
4    Q.   So with respect to the part of the
5  passage I read where you wrote in your opinion,
6  neutralizing antibody as measured in a PRN had
7  a statistical correlation with protective
8  immunization, what statistical correlation
9  are you referring to there?
10   A.   The frequency of serostatus and
11 seroconversion between individuals who were
12 susceptible to mumps virus because they had
13 not immunized and individuals who were protected
14 against mumps virus because they had been
15 successfully immunized.
16   Q.   So, first of all, the neutralizing
17 antibody as measured in a PRN, are you talking
18 about a AIGENT Assay there?
19   A.   In this instance, yes.
20   Q.   And the statistical correlation
21 with protective immunization, you're talking
22 about the results of the AIGENT Assay are
23 statistically correlated with protective
24 immunization based on what?  Where is the
25 protective immunization measure coming from?

74 (Pages 290 - 293)

**Appx1711**

Page 294

1    MS. HARDWAY: Object to form. Asked
2 and answered.
3    THE WITNESS: The protective
4 immunization is coming from the knowledge that,
5 if the individual has an immune response to an
6 effective vaccine, that they are immunized, or
7 at least a group of individuals are successfully
8 immunized and are protected, as -- as we have
9 discussed several times relating back to the
10 vaccine that was used in the clinical trials.
11 BY MR. SCHNELL:
12    Q. So you're referring to the original
13 efficacy studies?
14    MS. HARDWAY: Object to form.
15    THE WITNESS: I'm referring to the
16 vaccine as used in these clinical trials and
17 as it connects back to the original efficacy
18 studies.
19 BY MR. SCHNELL:
20    Q. Was this any kind of formal
21 statistical corr -- correlation that was
22 done that compared the AIGENT results with
23 the results in the original efficacy studies?
24    MS. HARDWAY: Object to form, and
25 asked and answered.

Page 295

1    THE WITNESS: The analysis was does
2 the AIGENT measure seroconversion with a known
3 protective vaccine.
4    As discussed previously, the sero
5 samples from the original efficacy studies no
6 longer exist and are no longer available to be
7 assayed in a concurrent concordance between the
8 two assays. Also, the first assay doesn't exist
9 anymore.
10 BY MR. SCHNELL:
11    Q. And what made it a statistical
12 correlation, in your opinion?
13    MS. HARDWAY: Object to form.
14    THE WITNESS: It's a statistical
15 correlation to the extent that we measured
16 the seroconversion rate pre and post. That --
17 that gives us the statistic that we have a
18 immunization -- obviously, this is not a
19 statistical correlation in the sense that it
20 produces a Correlation Coefficient R reading
21 that crosses the threshold, if that's what
22 you're addressing.
23 BY MR. SCHNELL:
24    Q. I'm just trying to get my arms around
25 what you're describing here as the statistical

Page 296

1 correlation.
2    A. The measure of seroconversions.
3    Q. And then with respect to the -- what
4 you wrote as, the Wild Type ELISA results had a
5 statistical correlation with the PRN results,
6 there, again, you're talking about the Serial 86
7 correlation; is that correct?
8    A. Serial 86 --
9    MS. HARDWAY: Object to form.
10    THE WITNESS: -- and the subsequent
11 documents relative to them, yes.
12 BY MR. SCHNELL:
13    Q. The subsequent documents relevant
14 to that you've mentioned a couple times. Which
15 documents, in particular, are you referring to?
16    A. There were requests for information
17 that followed Serial 86. Those were responded
18 to by Merck. There were additional requests
19 for information to look at certain subset of
20 individual sera that had low positive readings
21 in the Wild Type ELISA, and those were looked at
22 and submitted by Merck, as well as an analysis
23 of the predicted concordance submitted by Merck.
24 FDA had all this data. FDA accepted it.
25    Q. And you -- I think you corrected

Page 297

1 yourself that it really wasn't a statistical
2 correlation. It was a concordance. Is -- is
3 that fair?
4    A. That would be a more accurate way to
5 describe it.
6    Q. And why would you describe the
7 comparison between the AIGENT Assay and the
8 Wild Type ELISA as a concordance, but the
9 comparison between the AIGENT Assay and the
10 original efficacy studies as a statistical
11 correlation?
12    MS. HARDWAY: Object to form.
13    THE WITNESS: I have no ready
14 recollection of my choice of those exact terms
15 as I was using this. I have endeavored today to
16 explain my underlying thinking. I don't think
17 those are under informative or inappropriate.
18 I -- I don't think this is a scientific error.
19 It, probably, does represent some difference in
20 the precision of the use of the terms, but we've
21 been through it here today.
22 BY MR. SCHNELL:
23    Q. Is there any difference -- any
24 meaningful difference between the comparison
25 that you're referencing here between the AIGENT

75 (Pages 294 - 297)

Appx1712

Page 298

1 and the Wild Type ELISA and the AIGENT and the
2 original efficacy studies?
3     MS. HARDWAY:  Object to form.
4     THE WITNESS:  Well, they are very
5 different sorts of comparison, if that's what
6 you mean, --
7 BY MR. SCHNELL:
8     Q.  Yeah.
9     A.  -- and we've discussed that several
10 times.
11     Q.  Well, we've discussed it in some
12 contexts, but not in terms of the comparison as
13 it relates to immunogenicity.  I don't -- I'm
14 trying to understand, here in your report you
15 used statistical correlation in describing both
16 sets of comparisons, but you took pains to
17 say, well, it's not really correlation, it's a
18 concordance with respect to the Wild Type ELISA
19 AIGENT comparison.  And I'm just wondering if
20 there is a more precise term you would use in
21 reflection in comparing the AIGENT Assay to the
22 original efficacy studies?
23     A.  As I've represented a minute ago, what
24 I'm referring to here is the statistical ability
25 to detect serostatus, seroconversion and to

Page 299

1 measure the frequency of seroconversion in a
2 population of individuals who are vaccine-naive
3 and who were immunized, and -- and -- and then
4 how that relates back to the evidence of
5 effectiveness because this is a population
6 who had received a known effective vaccine.
7     MR. SCHNELL:  Okay.  That's all I
8 have.
9     MS. HARDWAY:  Thank you.
10     THE VIDEOGRAPHER:  Time is 5:14 p.m.
11 This concludes today's testimony given by
12 Dr. Bruce Burlington.  We are now off the
13 record.
14     (Deposition concluded -- 5:14 p.m.)
15
16
17
18
19
20
21
22
23
24
25

Page 300

1     CERTIFICATE OF DEPONENT
2
3     I have read the foregoing transcript of
4 my deposition and except for any corrections or
5 changes noted on the errata sheet, I hereby
6 subscribe to the transcript as an accurate record
7 of the statements made by me.
8
9
_____
10     D. BRUCE BURLINGTON, MD
11
12     SUBSCRIBED AND SWORN before and to me
13 this _____ day of _____, 20___.
14
15
16
_____
17     NOTARY PUBLIC
18
19
20 My Commission expires:
21
22
23
24
25

Page 301

1 Bruce Burlington, M.D.
2
3     C E R T I F I C A T E
4
5     I do hereby certify that the aforesaid
6 testimony was taken before me, pursuant to
7 notice, at the time and place indicated; that
8 said deponent was by me duly sworn to tell the
9 truth, the whole truth, and nothing but the
10 truth; that the testimony of said deponent was
11 correctly recorded in machine shorthand by me
12 and thereafter transcribed under my supervision
13 with computer-aided transcription; that the
14 deposition is a true and correct record of the
15 testimony given by the witness; and that I am
16 neither of counsel nor kin to any party in said
17 action, nor interested in the outcome thereof.
18
19     W_____ ial seal this
20     28th da
21
22
23     Ryan K. Black
24
25

76 (Pages 298 - 301)

Appx1713

Page 302

```
1    Bruce Burlington, M.D.
2
3
4         INSTRUCTIONS TO THE WITNESS
5         Please read your deposition over
6    carefully and make any necessary corrections.
7    You should state the reason in the appropriate
8    space on the errata sheet for any corrections
9    that are made.
10        After doing so, please sign the errata
11   sheet and date it.
12        You are signing same subject to the
13   changes you have noted on the errata sheet,
14   which will be attached to you deposition.
15        It is imperative that you return the
16   original errata sheet to the deposing attorney
17   within thirty (30) days of receipt of the
18   deposition transcript by you.  If you fail to do
19   so, the deposition transcript may be deemed to
20   be accurate and may be used in court.
21
22
23
24
25
```

Page 303

```
1         ERRATA SHEET
          VERITEXT LEGAL SOLUTIONS
2          330 OLD COUNTRY ROAD
          MINEOLA, NEW YORK 11501
3            516-608-2400
4    NAME OF CASE: USA VS. MERCK & CO., INC.
     DATE OF DEPOSITION: DECEMBER 13, 2018
5    NAME OF DEPONENT: D. BRUCE BURLINGTON, MD
6    PAGE  LINE(S)   CHANGE        REASON
7    ___|_____|_____|_____|_____
8    ___|_____|_____|_____|_____
9    ___|_____|_____|_____|_____
10   ___|_____|_____|_____|_____
11   ___|_____|_____|_____|_____
12   ___|_____|_____|_____|_____
13   ___|_____|_____|_____|_____
14   ___|_____|_____|_____|_____
15   ___|_____|_____|_____|_____
16   ___|_____|_____|_____|_____
17   ___|_____|_____|_____|_____
18   ___|_____|_____|_____|_____
19   ___|_____|_____|_____|_____
20   ___|_____|_____|_____|_____
21       _____
          D. BRUCE BURLINGTON, MD
22
     SUBSCRIBED AND SWORN TO BEFORE ME
23   THIS___DAY OF _____, 20__.
24
     _____     _____
25   (NOTARY PUBLIC)      MY COMMISSION EXPIRES:
```

77 (Pages 302 - 303)

Appx1714

10/25/2019
Declaration of G. Reilly
EXHIBIT 7

Appx1715

HIGHLY CONFIDENTIAL

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF PENNSYLVANIA
 2

 3   UNITED STATES OF AMERICA, ex
     rel., STEPHEN A. KRAHLING and
 4   JOAN A. WLOCHOWSKI,
 5          Plaintiffs,

                                   CIVIL ACTION FILE
 6          vs.
                                   NO. 2:10-CV-04374
 7   MERCK & CO., INC.,
 8          Defendant.             Master File No.
     IN RE:  MERCK MUMPS
 9   VACCINE ANTITRUST            2:12-CV-03555
     LITIGATION
10

11

12          *HIGHLY CONFIDENTIAL*

13

14          VIDEO DEPOSITION OF

15          MARK PALLANSCH, Ph.D.

16       October 13, 2017 - 9:06 a.m.

17       Centers for Disease Control

18          1600 Clifton Road

19          Atlanta, Georgia

20    Robyn Bosworth, RPR, CRR, CCR-B-2138

21

22

23

24

25
```

Appx1716

HIGHLY CONFIDENTIAL

Page 2

1         INDEX TO EXHIBITS
2 EXHIBIT  DESCRIPTION       PAGE
3 Exhibit 1  9/26/17 letter from Dr. Anne
4     Schuchat to Lisa Dykstra and Hamsa
5     Mahendranathan       7
6 Exhibit 2  "Mumps Vaccination One of the
7     Recommended Vaccines by Disease"    25
8 Exhibit 3  "Lesson 3:  Measures of Risk"    26
9 Exhibit 4  MMWR article "Prevention of Measles,
10    Rubella, Congenital Rubella Syndrome,
11    and Mumps, 2013"       36
12 Exhibit 5  "For Health Care Providers"    55
13 Exhibit 6  Slide deck titled Current Mumps
14    Vaccination Recommendations and
15    Epidemiology in the United States
16    from ACIP Meeting February 23, 2017   60
17 Exhibit 7  "Mumps Outbreaks in Vaccinated
18    Populations:  Are Available Mumps
19    Vaccines Effective Enough to Prevent
20    Outbreaks?       61
21 Exhibit 8  Recent Resurgence of Mumps in the
22    United States       61
23 Exhibit 9  The Immunological Basis for
24    Immunization Series       73
25  .

Page 4

1 APPEARANCES OF COUNSEL:
2 On behalf of the Plaintiff United States of America
3 and the Deponent:
4    HOLLY HOWELL SNOW, ESQ.
5    U.S. Department of Justice
6    P.O. Box 261, Ben Franklin Station
7    Washington, DC  20044
8    (202) 616-2879
9    holly.h.snow@usdoj.gov
10
11 On behalf of Relators:
12    GORDON SCNHELL, ESQ.
13    HAMSA MAHENDRANATHAN, ESQ.
14    Constantine Cannon
15    335 Madison Avenue
16    New York, New York  10017
17    (212) 350-2700
18    gschnell@constantinecannon.com
19    hmahendranathan@constantinecannon.com
20 -and
21    KATHLEEN R. SCANLAN, ESQ.
22    Keller Grover
23    1965 Market Street
24    San Francisco, California  94103
25    (415) 543-1305

Page 3

1 Exhibit 10  Long-Term Persistence of Mumps
2    Antibody after Receipt of 2
3    Measles-Mumps-Rubella Vaccinations
4    and Antibody Response after a Third
5    MMR Vaccination among a University
6    Population       81
7 Exhibit 11  String of e-mails, Subj:  Re:  Mumps
8    Research Priorities Meeting February
9    25, 2010       87
10 Exhibit 12  Effectiveness of a Third Dose of MMR
11    Vaccine for Mumps Outbreak Control   132
12 Exhibit 13  Persistence of humoral and cellular
13    immune responses to mumps following
14    age-appropriate immunization with
15    MMR vaccine       174
16 Exhibit 14  String of e-mails, Subj:  Summary
17    of PRN results for Merck serum panel  180
18
19
20
21       INDEX TO EXAMINATION    PAGE
22 By Mr. Sangiamo       8, 179
23 By Mr. Schnell       96, 185
24
25

Page 5

1 APPEARANCES (Continued):
2 On behalf of the Centers for Disease Control
3 Prevention:
4    KEVIN M. MALONE, ESQ.
5    U.S. Department of Health and Human
6    Services
7    1600 Clifton Road, Building 16, Room 4107
8    Atlanta, Georgia  30333
9    (404) 639-7201
10    kmalone@cdc.gov
11
12 On behalf of the Defendant Merck & Co.:
13    LISA C. DYKSTRA, ESQ.
14    MELINA R. DIMATTIO, ESQ.
15    Morgan, Lewis & Bockius
16    1701 Market Street
17    Philadelphia, Pennsylvania  19103
18    (215) 963-5000
19    ldykstra@morganlewis.com
20    melina.dimattio@morganlewis.com
21  .
22  .
23  .
24  .
25  .

2 (Pages 2 - 5)

Appx1717

HIGHLY CONFIDENTIAL

Page 6

1 APPEARANCES (Continued):
2 On behalf of the Defendant Merck & Co.:
3      DINO S. SANGIAMO, ESQ.
4      SALLY W. BRYAN, ESQ.
5      Venable
6      750 East Pratt Street, Suite 900
7      Baltimore, Maryland 21202
8      (410) 244-7400
9      dssangiamo@venable.com
10      ssrbryan@venable.com
11 -and-
12      TIMOTHY HOWARD, ESQ.
13      (In-house counsel for Merck)
14
15 Also Present: Ervin Farkas, videographer
16
17      (Pursuant to Article 10(B) of the Rules
18 and Regulations of the Georgia Board of Court
19 Reporting, a written disclosure statement is
20 submitted by the court reporter to all counsel
21 present at the proceeding.)
22
23
24
25

Page 7

1      (Exhibit 1 marked.)
2      THE VIDEOGRAPHER: Good morning. We're
3 going on the record at 9:06 a.m. on October 13,
4 2017. Please note that the microphones are
5 sensitive and may pick up whispering, private
6 conversations, and cellular interference. Please
7 turn off all cell phones or place them away from the
8 microphones, as they can interfere with the
9 deposition audio. Audio and video recording will
10 continue to take place unless all parties agree to
11 go off the record.
12      This is media unit 1 of the video recorded
13 deposition of Dr. Mark Pallansch taken by counsel
14 for the defendant in the matter of United States of
15 America, ex rel. versus Merck & Company,
16 Incorporated, filed in the United States Court for
17 the Eastern District of Pennsylvania. This
18 deposition is being held at the Centers for Disease
19 Control located at 1600 Clifton Road, Atlanta,
20 Georgia 30329.
21      My name is Ervin Farkas, from the firm
22 Veritext, and I'm the videographer. The court
23 reporter is Robyn Bosworth.
24      I am not related to any party in this
25 action, nor am I financially interested in the

Page 8

1 outcome.
2      Will the court reporter please swear in
3 the witness.
4      MARK PALLANSCH, Ph.D.,
5 having been first duly sworn, was examined and
6 testified as follows:
7      EXAMINATION
8 BY MR. SANGIAMO:
9   Q   Good morning, sir. Could you state your
10 name for the record, please?
11   A   Mark Pallansch.
12   Q   Good morning, Dr. Pallansch. I introduced
13 myself just before we began. I'm Dino Sangiamo. I
14 represent Merck in this action.
15      Sir, are you employed by the CDC?
16   A   Yes, I am employed by the CDC.
17   Q   And your title?
18   A   I'm the director of the division of viral
19 diseases in the National Center for Immunization and
20 Respiratory Diseases.
21   Q   How long have you held that position?
22   A   Six and a half years now.
23   Q   How long have you been working for the
24 CDC?
25   A   33 years in a couple months.

Page 9

1   Q   All right. I'm not going to ask you to
2 tell us every single thing you did over those 33
3 years and several months, but could you just
4 generally tell us the kind of work that you've done
5 while employed at the CDC?
6   A   So I started at the CDC as a section chief
7 overseeing work on picornaviruses from the
8 laboratory point of view, became involved with polio
9 eradication in 1985, spent a good part of my career
10 both on laboratory policy and capacity building
11 globally on polio eradication, became branch chief
12 in 2006, and then division director in 2011.
13   Q   And what is the branch of which you were
14 the -- became the chief in 2006?
15   A   The polio and picornavirus laboratory
16 branch, and that was established following
17 reorganization in 2005.
18   Q   What's your training?
19   A   So I am a virologist. I have Ph.D. in
20 biochemistry, did my thesis work on polio virus
21 beginning in 1977, and postdoc in studying measles
22 virus at Rockefeller University before coming here.
23   Q   How would you describe the work you've
24 done involving mumps virus or the mumps vaccine?
25   A   So most of my work associated with mumps

HIGHLY CONFIDENTIAL

Page 10

1  has been in supporting the programs in our division.
2  So I became much more directly involved in the
3  oversight of the mumps program beginning with my
4  current position.
5       Prior to that, the work was done in the
6  same division and branch that I was in.  So I was
7  aware of my fellow branch chief and the work that
8  they were doing, but, again, not directly overseeing
9  that program.
10  Q   Who was your fellow branch chief?
11  A   Bill Bellini.
12  Q   Have you kept abreast with the literature
13  regarding mumps vaccine that's been published by
14  authors from the CDC over the years?
15  A   So I have been aware as those studies were
16  being done at the time.  Not necessarily complete
17  detail, but I certainly have reviewed the
18  publications that have come out of that group over
19  the last 10 years.
20  Q   Did you review those publications in
21  preparation for today, or did you review them over
22  time as they were coming out?
23  A   So I often reviewed publications from
24  other groups in the division or in the branch during
25  the course of normal duty, and I did reread a few of

Page 11

1  those before this deposition.
2  Q   Did you do anything else to prepare for
3  the deposition?
4  A   So in preparation, I had specific
5  consultation on -- with my leadership in terms of
6  the overall processes that are conducted at CDC, and
7  I had consultation with my subject matter experts on
8  what activities specifically we do in the course of
9  normal duties.
10      I did then have additional consultation
11  with Kevin and Holly in terms of preparation for
12  this deposition, as well as some of the policy
13  people within our center as it relates to ACIP
14  processes.
15  Q   Did you meet with the attorneys for the
16  people who filed this lawsuit, the Relators?
17  A   So the Relators came to CDC --
18      MR. SCHNELL:  I'm going to object to any
19  line of questioning that gets into this.  This is
20  work product and common interest privilege, and
21  you're not entitled to know this stuff.
22      MR. SANGIAMO:  Well, I disagree with that.
23  Let me just ask the question.
24  BY MR. SANGIAMO:
25  Q   Did you meet with the Relators' counsel?

Page 12

1       MR. SCHNELL:  And, again, I'm going to ask
2  the witness not to answer any questions along this
3  line.
4       MR. SANGIAMO:  Even whether they met?
5       MR. SCHNELL:  Uh-huh.  Who we meet with
6  and who we don't meet with is work product.
7       MR. SANGIAMO:  This is a witness here, and
8  apparently you've met with him in preparation for
9  the deposition.
10      MR. SCHNELL:  That has not been
11  established yet, and I don't think it's appropriate
12  to pursue this line of questioning.
13  BY MR. SANGIAMO:
14  Q   Did you meet with counsel for the Relators
15  in preparation for the deposition?
16  A   No.
17      MR. SCHNELL:  Again --
18  BY MR. SANGIAMO:
19  Q   All right.  Then what was the context in
20  which you met in counsel for the Relators?
21      MR. SCHNELL:  Again object to this line of
22  questioning.
23      MS. SNOW:  So if a privilege claim is
24  being made over the substance of the testimony, I
25  think we will instruct the witness not to answer, so

Page 13

1  you all can resolve this issue.
2  BY MR. SANGIAMO:
3  Q   How many times did you meet with counsel
4  for the Relators?
5       MR. SCHNELL:  Dino, it's the same line of
6  questioning.
7       MR. SANGIAMO:  Are you objecting to that
8  too?
9       MR. SCHNELL:  Any line of questioning with
10  regard to whether or not this witness has met with
11  us, yes.
12      MR. SANGIAMO:  Well, we've already
13  established -- I mean, this isn't just whether or
14  not, this is beyond whether or not.  You're saying
15  any question that relates in any way to his meetings
16  with you and other counsel for the Relators are
17  objectionable?
18      MR. SCHNELL:  Any questions relating to
19  anybody we've met with in connection with this
20  litigation is privileged.
21      MR. SANGIAMO:  Including this witness?
22      MR. SCHNELL:  Anybody.
23      Are you going to detail for us everybody
24  you've met with in connection with this litigation?
25  BY MR. SANGIAMO:

4 (Pages 10 - 13)

Appx1719

HIGHLY CONFIDENTIAL

Page 14

1    Q    You said you met with some subject matter
2  experts within CDC in preparation for the
3  deposition?
4    A    Yes.
5    Q    Who were they?
6    A    So that would be the current branch chief,
7  Paul Rota, and the team lead for the mumps serology
8  team, Carole Hickman.
9    Q    Do you have any training in epidemiology?
10   A    No formal training in epidemiology, only
11  experience here at CDC.
12   Q    Do you consider yourself to have a working
13  knowledge of --
14   A    Yes.
15   Q    -- basic principles of epidemiology?
16        What is your understanding of the
17  allegations in this lawsuit?
18   A    So I have just a superficial understanding
19  of the details of the allegations, but they do
20  relate to the -- I guess, the testing that occurred
21  within Merck related to the product, particularly as
22  it relates to establishment of vaccine efficacy and
23  related assays around immunogenicity.
24   Q    Is it your understanding that the testing
25  occurred in context of a clinical trial?

Page 15

1    A    That was the description that was given to
2  me, yes.
3    Q    What was the nature of the clinical trial?
4    A    I believe the outline of what I was
5  provided was, is that -- I do not know the context
6  for why it was conducted, but that it was a small
7  clinical trial looking at the efficacy of the mumps
8  component at some point back in the 1990s.
9        And other than that, the motivation for
10  that trial, I'm not clear on.
11   Q    Did you know -- or do you know much about
12  the design of the trial?
13   A    I do not know a lot about the design. I
14  don't have the details, for example, of the ages of
15  all the subjects in the trial, and I don't know the
16  overall endpoints that were to be established for
17  the results of that trial.
18   Q    Do you know anything at all about the
19  endpoints?
20   A    So I -- all I would know is there are
21  general endpoints, and I don't know if they were
22  explicitly stated in this context.
23   Q    Let me just ask you another question about
24  that, and perhaps your answer will still be that you
25  don't know. Do you know whether the endpoints were

Page 16

1  serological endpoints as distinguished from disease
2  endpoints?
3    A    So I know that the serologic endpoint was
4  part of the clinical trial, and I do not know if it
5  was a primary or a secondary endpoint.
6    Q    Do you know if there were disease
7  endpoints in the trial?
8    A    I do not know that for sure, no.
9    Q    When did you come upon this understanding
10  of the clinical trial?
11   A    That could have been three to four years
12  ago, partly in the context of becoming aware of the
13  particular suit in question.
14   Q    Do you recall who told you about the suit?
15   A    I believe Dr. Bellini was the one who
16  initially informed me about this particular matter.
17   Q    Do you know who else at CDC has
18  information about this lawsuit?
19   A    Probably most of the people I mentioned at
20  the beginning have an awareness that I am giving a
21  deposition in this matter. There are probably not
22  any others that I can think of -- I mean,
23  Dr. Manisha Patel, who is our epi team lead, she
24  would also be aware. And, again, partly because I
25  asked her for references in the context of reviewing

Page 17

1  materials.
2    Q    So your understanding of her awareness is
3  based on your having spoken to her about preparation
4  for this deposition?
5    A    In the -- yes, the context of why I asked
6  for the references was the deposition.
7    Q    Do you have any knowledge about whether
8  she knew about the lawsuit prior to that?
9    A    I don't believe she did based on her
10  reaction.
11   Q    So fair to say that the -- that two people
12  that you know of at CDC knew about the lawsuit prior
13  to your beginning to prepare for this deposition
14  were you and Dr. Bellini, right?
15   A    A minimum, yeah.
16   Q    Minimum. And then do you know of any
17  others besides you and Dr. Bellini who knew of it in
18  that time frame?
19   A    I would not know -- I do not know who
20  Dr. Bellini may have talked with, so.
21   Q    In your time at CDC, have you worked with
22  any immunological assays?
23   A    Yes.
24   Q    Many immunological assays, would you say?
25   A    Well, quite a few, yes.

5 (Pages 14 - 17)

Appx1720

HIGHLY CONFIDENTIAL

Page 18

1  Q   Okay.  All right.  Have you worked with
2  any plaque reduction neutralization assays?
3  A   I have done that on occasion.  That's a
4  specific variation on a neutralization assay, which
5  I have done many.
6  Q   What other kinds of neutralization assays
7  have you done other than plaque reduction
8  neutralization assays?
9  A   So plaque reduction is one specific way to
10 measure an endpoint for the amount of antibody.  You
11 can do it as an endpoint.  You can measure it
12 through different indicators of failure to
13 neutralize virus.
14     So it's -- the concept is the same of
15 mixing virus and antibody, and then measuring
16 whether the virus is killed or not.
17 Q   Have any of these neutralization assays
18 that you've done been in the context of mumps?
19 A   No.
20 Q   Have you done any potency assays?
21 A   Yes.  So most of the potency assays that I
22 have done have been related to polio, but the
23 concept is similar for most viruses.
24 Q   Does CDC routinely do potency assays?
25 A   In general, no.  I can speak for the

Page 19

1  viruses in my division.  There are many other
2  divisions at CDC that work on viruses, so can't
3  speak for the agency as a whole.
4  Q   And is mumps virus contained within your
5  division?
6  A   Yes.
7  Q   All right.  So I'd like to ask you some
8  general questions about the CDC.  Some of them may
9  seem basic to you, but, nevertheless, your answers
10 will be helpful.
11     What is the CDC's role in public health in
12 the United States, how would you describe that?
13 A   So, again, the overall mission, of course,
14 is disease control and prevention.  We do a wide
15 variety of activities that are within that scope,
16 both infectious disease, noninfectious disease.
17     The methods that you use to design
18 interventions, of course, are directly related to
19 the nature of the disease and establishing the
20 effectiveness of interventions.
21     We have elements that are related to
22 developing policy, communications, basic research,
23 immunization activities, which, of course, is in our
24 center, as well as establishing disease burden
25 through surveillance.  I mean, it's actually a very

Page 20

1  long list of things we do in public health sphere.
2  Q   And where does the division of viral
3  disease fit within those overall objectives?
4  A   So the division of viral diseases focuses
5  on some specific viral diseases.  It's not all.  And
6  we have both the portfolio that relates to some of
7  the vaccine-preventable viral diseases such as
8  mumps, as well as measles, rubella, polio,
9  varicella-zoster, rotavirus, but also then other
10 work in nonvaccine-preventable diseases,
11 particularly in the realm of respiratory disease and
12 gastroenteritis, as well as some work on some
13 central nervous system disease.
14 Q   What kind of professionals does the
15 division of viral disease employ?
16 A   Fairly typical for the CDC in that it is a
17 mixture of epidemiologists, laboratorians, program
18 people, public health advisors, communication
19 specialists, administrative staff.  Not very
20 unusual.
21 Q   Can you elaborate a little bit on what
22 CDC's role is as regards vaccine-preventable
23 diseases?
24 A   We have multiple roles, of course.  There
25 are really, in my mind, three types of vaccine

Page 21

1  preventable diseases that we deal with.  One has to
2  do with vaccines that have been on the market for a
3  very long time such as MMR or polio, where we are
4  indeed monitoring the impact, if you will, of
5  vaccination by looking at disease occurrence through
6  surveillance systems and responding to outbreaks to
7  understand the causes of those outbreaks.
8      There are other newly introduced vaccines,
9  say within the last 10 years, and we are looking at
10 the change in the epidemiology of those diseases
11 with the introduction of vaccine.
12     And then, of course, there's the newer
13 vaccines or vaccines that are at various stages of
14 development, usually something that's in phase III
15 trials, where we try to establish the disease
16 burden, so that it's possible in the future to
17 measure impact.
18     We then also conduct research into ways to
19 measure response to vaccines, looking at different
20 assays as applicable to an immunologic response; and
21 then do a lot of work on what we call the molecular
22 epidemiology, where we study the viruses themselves
23 and the genetic changes in those viruses.
24 Q   With regard to the first category of
25 vaccines that you were describing, namely vaccines

HIGHLY CONFIDENTIAL

Page 22

1 which have been on the market for a long time,
2 including the MMR vaccine, is the CDC also a
3 purchaser of vaccines -- of those vaccines?
4    A  CDC is responsible for the public sector
5 procurement.
6    Q  Does that mean the CDC purchases the
7 vaccines or --
8    A  Yes.
9    Q  -- does it mean something slightly
10 different?
11    A  No.  I mean, they have the money.  They
12 buy --
13    Q  Okay.
14    A  -- have contracts, which I think you found
15 out about yesterday.
16    Q  Okay.  How would you compare the CDC's
17 role with regard to vaccine-preventable diseases to
18 the FDA's role?
19    A  So the -- a simple way to look at it is
20 the FDA is regulatory, and CDC is assessment.  So we
21 look and evaluate post-marketing how the vaccine is
22 performing in the real world as opposed to clinical
23 trial data, which is what the basis that is often
24 used by the FDA for the purpose of licensure.
25       So, again, we are a post-marketing

Page 23

1 assessment and evaluation, as opposed to a licensure
2 issue.
3    Q  Fair to say that FDA is the regulatory
4 authority for vaccine manufacturers?
5    A  They are the primary regulatory authority
6 for vaccines and the degree to which that affects
7 the manufacturers.
8    Q  Is the CDC a regulator of the manufacture
9 of vaccines?
10    A  No, not that I'm aware.
11    Q  Has MMR played an important role in public
12 health in the United States?
13    A  Very important role.  Disease burden from
14 measles and rubella and mumps prior to MMR were very
15 significant.  Measles in particular was a major
16 cause of significant morbidity and mortality in the
17 United States prior to vaccine.  And so it was among
18 the most significant cause of childhood disease.
19    Q  Does the CDC have objectives to eliminate
20 measles, mumps, and rubella?
21    A  So the objectives, of course, have changed
22 with time and in a global or regional context.  So
23 at any given point in time, objectives do relate to
24 specific goals, either within the United States,
25 within the American region, for example, setting

Page 24

1 elimination goals for measles and rubella in the
2 American region by the Pan American Health
3 Organization, and then also within global situation.
4       So at this point there is not a global
5 eradication goal for measles or rubella, but the
6 regions of the world have set elimination target
7 dates.  And so at various times the answer to that
8 question can change.
9    Q  Is there either a mumps elimination or
10 mumps reduction or mumps control goal?
11    A  So there is a general desire by
12 vaccination to control disease due to those entities
13 for which there is a vaccine.  There is not specific
14 numbers assigned to control.  For the Healthy People
15 2010, there was a elimination goal set for mumps.
16 That no longer exists in the Healthy People 2020.
17    Q  Is there any goal as regards mumps in
18 Healthy People 2020?
19    A  At this point it's a disease reduction
20 goal, and it had specific numbers by year.  And, of
21 course, for last year we did not meet that target
22 number.
23    Q  Do you know what the goal is for 2020 as
24 regards mumps?
25    A  It was a few hundred, I think, cases per

Page 25

1 year.  I don't remember the exact number off the top
2 of my head.
3       (Exhibit 2 marked.)
4 BY MR. SANGIAMO:
5    Q  Dr. Pallansch, you've just been handed
6 what's been marked as Exhibit 2.  And we printed
7 this off of the CDC website.
8       Before I ask you about that exhibit, is
9 there a general procedure by which materials that
10 are going to be printed on the CDC website are
11 vetted?
12    A  Yes.
13    Q  Could you describe that procedure briefly,
14 please?
15    A  So depending on the nature of the content,
16 one of the divisions within our center often is
17 responsible for generating the content.  The content
18 is then vetted with SMEs.  It is then vetted and
19 cleared through either communication channels and/or
20 policy channels, sometimes both, before it ever gets
21 posted on the website.
22    Q  Do you know who the SMEs would be through
23 whom mumps-related website material would be vetted?
24    A  So currently?
25    Q  Yes, sir.

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Appx1722

HIGHLY CONFIDENTIAL

Page 26

1    A    So currently the SMEs would be both,
2 again, Dr. Patel and Dr. Rota or members of their
3 teams would review all of those material for
4 content. And then the -- it would go through my
5 associate directors for communication and policy,
6 and often myself. And then it goes to the center
7 level, where it is also then reviewed by the
8 associate directors for communication policy at that
9 level.
10    Q    All right. So if we could take a look at
11 Exhibit 2 itself right now. The paragraph I'm going
12 to be asking you about in particular is the third
13 one.
14    A    Uh-huh.
15    Q    And would this paragraph have gone through
16 a vetting procedure such as the one you just
17 described?
18    A    Yes.
19    Q    The first sentence of the third paragraph
20 says: MMR vaccine is very safe and effective.
21    A    Uh-huh.
22    Q    Can we take that to be the CDC's position
23 as regards MMR vaccine?
24    A    Yes.
25         (Exhibit 3 marked.)

Page 27

1 BY MR. SANGIAMO:
2    Q    All right. Dr. Pallansch, you've just
3 been handed what has been marked Exhibit 3, I
4 believe. And the portion of this Exhibit 3 to which
5 I was going to direct your attention appears on the
6 second page.
7    A    Uh-huh.
8    Q    In the section that reads vaccine efficacy
9 or vaccine effectiveness, do you see that?
10    A    I do.
11    Q    All right. I offer that to you as a -- I
12 offer it in case you want to refer to it. Basically
13 what I was going to ask you is the CDC's
14 understanding of the difference between the concept
15 of efficacy and effectiveness. And perhaps you
16 could explain that to us.
17    A    So this is probably a typical way of
18 characterizing the difference between a measurement
19 of efficacy and a measurement of effectiveness.
20 One, of course, the efficacy is often measured in a
21 specific clinical trial setting, where you know who
22 is vaccinated and not, which makes it much simpler
23 to have a controlled set of data.
24         And, again, there's -- the only thing
25 that's here that's different is that it's often also

Page 28

1 applied to a situation of measuring immunogenicity
2 as well as disease in the context of those clinical
3 trials, whereas the vaccine effectiveness is looking
4 functionally in a open setting, uncontrolled, like
5 an outbreak situation, and you're measuring observed
6 disease in the context of a vaccine history.
7         So different structures; one can be done
8 in a controlled environment, and the other is
9 generally something where you don't control all the
10 variables, but is a real world situation.
11    Q    When trying to determine an efficacy rate
12 as distinguished from an effectiveness rate, does
13 one use the same formula?
14    A    No. So, again, the data is different.
15 The analytic approaches are different. This is --
16 and these are not exhaustive descriptions here,
17 obviously, of the ways that you can analyze this
18 type of data. And often publications will go into
19 some of the nuances of the need to adjust data based
20 upon the populations being studied. But,
21 conceptually, this is how we approach this.
22    Q    Would this statement that we're looking at
23 here also have gone through a vetting process as you
24 described it earlier?
25    A    I assume so. This is actually a different

Page 29

1 center. So this is actually a different group at
2 CDC, which is actually trying to be informational
3 about generically how some of the epidemiologic
4 analysis would be done.
5         So it's a different group. This is much
6 more of an educational-type description as opposed
7 to something that would be applied specifically.
8    Q    If you look at the first sentence in the
9 section under vaccine efficacy or vaccine
10 effectiveness, it reads: Vaccine efficacy and
11 vaccine effectiveness measure the proportionate
12 reduction in cases among vaccinated persons.
13         Do you agree with that?
14    A    Yes.
15    Q    And when it says cases, that means cases
16 of disease?
17    A    Yes. But to clarify, that's -- you can
18 indeed estimate on the criteria, for example, of
19 immunogenicity in a efficacy trial. And this is
20 often needed in situations where, of course, disease
21 is not possible to measure because of long time
22 course of disease.
23         So interventions like this with, for
24 example, HPV virus, it will take decades to measure
25 efficacy.

8 (Pages 26 - 29)

Appx1723

HIGHLY CONFIDENTIAL

Page 30

1    Q    So in those settings you attempt to
2  measure efficacy by using immunogenicity as a
3  surrogate endpoint for efficacy?
4    A    Correct.
5    Q    And that's after you've established that
6  you have a measurement of immunogenicity that can
7  reliably predict efficacy, fair enough?
8    A    So that would be ideal.  And so often that
9  is not ultimately known to an exact nature, the
10  relationship between immunogenicity and clinical
11  efficacy, in all situations because there is a time
12  frame.  Immunogenicity you can measure immediately;
13  efficacy may have a time component which makes the
14  outcome more challenging to measure.
15    Q    With regard to the effectiveness rate for
16  the mumps component of MMR --
17    A    Uh-huh.
18    Q    -- could I refer you back to Exhibit 2,
19  which you -- I'm sorry -- yeah, Exhibit 2, which
20  should be in front of you.
21        And directing your attention again to that
22  third paragraph, it reads there that:  The mumps
23  component of the MMR vaccine is about 88 percent
24  (range 66 to 95 percent) effective, when a person
25  gets two doses; one dose is about 78 percent (range

Page 31

1  49 percent to 92 percent) effective.
2        Is that an accurate statement of the
3  effectiveness of the mumps component of MMR?
4    A    That is a summary of multiple studies that
5  have been conducted both in the United States and in
6  other countries that have attempted to measure
7  effectiveness.
8        So the summary number is an average across
9  those studies.  The range is the -- are the range of
10  values that those studies have reported.  So it's
11  not a reflection of the usual confidence interval
12  that any specific study would report.
13    Q    Understood.  So this is not a situation in
14  which 88 percent was found in a specific study, and
15  then the confidence interval for that was 66 to 95.
16    A    Correct.
17    Q    But rather, the 66 to 95 represents the
18  range of point determinations of effectiveness that
19  have been found in the studies?
20    A    Correct.
21    Q    So then I gather this means that for two
22  doses of MMR, the CDC has an understanding that
23  there have been some studies that have found an
24  effectiveness rate as low as 66 percent for the
25  mumps component; is that right?

Page 32

1    A    Correct.
2    Q    And for one dose of MMR, the CDC is aware
3  of the fact that there have been studies that have
4  found an effectiveness rate to be as low as
5  49 percent for the mumps component of MMR?
6    A    Correct.
7    Q    And just to be clear, these are not
8  seroconversion rates, correct?
9    A    These were vaccine effectiveness estimates
10  from specific outbreaks, and, of course, the list of
11  publications document all those reports.  So this
12  represents publicly available studies.
13    Q    Publicly available studies in which the
14  endpoint was disease, mumps disease, correct?
15    A    Correct.
16    Q    Obviously this reflects the fact that the
17  CDC represents -- understands that not everyone who
18  receives two doses of MMR is going to be protected
19  from mumps, correct?
20    A    Correct.
21    Q    Fair to say then the CDC has an
22  understanding that there are going to be some people
23  who are going to get two doses of the vaccine who
24  may very well develop mumps, notwithstanding the
25  fact that they have been vaccinated?

Page 33

1    A    Correct.
2    Q    Is effectiveness important to the CDC?
3    A    Effectiveness is our single-most important
4  measure in terms of the impact that a vaccine has on
5  disease in the population.  It is functionally a way
6  that we can relate the impact to the actual
7  investment in the vaccination program.
8        So in any particular case, we look at the
9  measured effectiveness in terms of how we try to
10  model the overall effect that a program has,
11  particularly as it relates to coverage levels.  As
12  coverage levels increase, we then want to be able to
13  have insight into what reduction in disease burden
14  that might represent.
15        So it is our major tool of assessment,
16  it's just technically challenging to measure.
17    Q    Fair to say that it's one of the CDC's
18  jobs, if you will, to monitor vaccine effectiveness?
19    A    That is one of the major things we do on
20  the epidemiology side is to measure vaccine
21  effectiveness for both old and new products.
22    Q    Do you feel the CDC has the expertise to
23  perform that function?
24    A    Absolutely.
25    Q    If you're going to measure effectiveness

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Appx1724

HIGHLY CONFIDENTIAL

Page 34

1 in an outbreak setting, how do you go about doing
2 that?
3     A    So simple ways to approach this, of
4 course, are you have two different groups, those
5 that get disease during an outbreak and those that
6 don't.  So we establish the risk factors, if you
7 will, related to, you know, are there exposures that
8 are in common, are there situations where there's
9 age that's a key factor.
10         So you look at those basic descriptive
11 epidemiologic features, and then what you can do is
12 then compare the vaccination history of those
13 individuals and look for differences between the
14 groups.
15         With MMR, the additional factors which,
16 you know, we've been looking at for the last decade
17 also have to do with the duration of time since
18 their last MMR vaccine.  So the routine schedule in
19 the United States would basically say that most
20 individuals' last dose occurred on school entry,
21 four to six years of age.  The current outbreaks
22 have had a focus in young adults, particularly in a
23 college setting.  So their earlier dose is indeed,
24 you know, probably 14, 15 years earlier.
25         And so we also look at the issue of does

Page 35

1 vaccine effectiveness have a relationship to other
2 factors like that.  And so it's not just a simple
3 effectiveness measure, but trying to get a sense of
4 are there other factors that affect the measured
5 vaccine effectiveness.
6         The complications are, of course
7 numerous because often young adults don't know their
8 vaccine history, trying to document the quality of
9 the data from making these estimates, these are all
10 the practical challenges of doing an investigation
11 like this in an outbreak setting.
12     Q    Is one of the things that the CDC does --
13 and you may have mentioned this, but I'm not sure --
14 to conduct surveillance of incidence of disease?
15     A    Right.  So there are several different
16 surveillance systems.  And, of course, these
17 surveillance systems have changed over the years,
18 which has made it challenging to compare data long
19 term.
20         But, nonetheless, mumps has been part of
21 surveillance systems at CDC for some time.  And it
22 is recorded within the systems and published
23 annually, the number of cases of mumps reported in
24 the United States.
25     Q    Do you know of any other entity that also

Page 36

1 monitors the number of cases of mumps in the United
2 States?
3     A    There are states that keep track of their
4 own numbers, but there is no other entity that
5 tracks the national numbers.
6     Q    Would you say the CDC is the ultimate
7 authority on the number of mumps cases in any given
8 year?
9     A    The CDC is the only entity that has a
10 national system for determining the number of cases;
11 therefore, by default, it is.
12     Q    The ultimate authority?
13     A    It is the source of the data.
14     Q    All right.
15     A    I'm not sure it's by authority, but
16 anyway.
17     Q    Okay.  Fair enough.  Fair enough.
18         (Exhibit 4 marked.)
19 BY MR. SANGIAMO:
20     Q    Dr. Pallansch, you've been handed what's
21 been marked Exhibit 4, I believe.  Do you know what
22 that is, sir?
23     A    Yeah, this is the summary of the ACIP
24 recommendations, updated periodically.
25     Q    Summary of the ACIP recommendations for --

Page 37

1     A    MM --
2     Q    -- MMR?
3     A    Yeah, basically, MMR.
4     Q    What goes into the publication of an
5 article in MMWR?
6     A    So -- well, there is -- of course, the
7 creation of the document is always the first step.
8 And I don't know if you want this in the context of
9 these ACIP recommendations or generically.
10     Q    Actually, thank you for asking that I
11 clarify.  Yes, it would be in the context of ACIP
12 recommendations.
13     A    Okay.  So, again, the specific
14 recommendations that the ACIP makes are always put
15 in the context of prior ACIP recommendations.
16         So there is a process by which the
17 recommendations are compared to existing texts and
18 where the text needs to be modified to reflect the
19 new changes.
20         In that process, there is often an
21 opportunity to update other information,
22 particularly as it relates to background materials
23 or other information that it becomes out of date.
24 So that's where many of these first pages, putting
25 the context for disease and the program and what

10 (Pages 34 - 37)

Appx1725

HIGHLY CONFIDENTIAL

Page 38

1 data is known about vaccine effectiveness, can also
2 be updated, even though they are only indirectly
3 related to the basic recommendation, but often do
4 reflect information presented to the ACIP during
5 their deliberation.
6        So once those draft -- you know, document
7 is created, then there is a quite extensive vetting
8 process, which is similar to what I described
9 earlier, but, of course, goes back to the ACIP
10 itself for their concurrence that what they have
11 recommended is, you know, compatible with the
12 document.
13       But then the publication cycle then is up
14 to the MMWR. And you schedule when these are to
15 come out and -- but the vetting process is still
16 extensive, as the other processes.
17   Q   All right. I wonder if you could turn to
18 page 10 in this document, please. And I wanted to
19 direct your attention to the bottom of the left-hand
20 column, the heading that reads: Mumps vaccine
21 effectiveness. Do you see that?
22   A   Uh-huh.
23   Q   I'm going to read the first sentence into
24 the record: Clinical studies conducted before
25 vaccine licensure in approximately 7,000 children

Page 39

1 found a single dose of mumps vaccine to be
2 approximately 95 percent effective in preventing
3 mumps disease. That's the end of the quote.
4        Are those the prelicensure studies that
5 you referred to earlier that find an efficacy rate
6 in the traditional controlled sense?
7   A   I'm just double-checking the references.
8 The first two are indeed true, and -- so yes, that's
9 my understanding, those were the publications around
10 those initial clinical trials.
11   Q   All right. And then the next sentence
12 reads: However, vaccine effectiveness estimates
13 have been lower in post-licensure studies.
14       You see that?
15   A   Yes.
16   Q   Does that reflect the CDC's understanding
17 that the effectiveness of the vaccine in real world
18 application is lower than the efficacy that was
19 found in the initial clinical trials?
20   A   Yes. As reflected in our web page cited
21 in the previous exhibit, yeah.
22   Q   All right. And then the next sentence
23 reads: In the estimates -- I'm sorry: In the
24 United States, mumps vaccine effectiveness has been
25 estimated to be between 81 and 91 percent in junior

Page 40

1 high and high school settings, and between
2 64 percent and 76 percent among household or close
3 contacts for one dose of mumps-containing vaccine.
4        Do you see that?
5   A   Yes.
6   Q   Do you know why it is that the -- that the
7 numbers were broken out this way, in a way that
8 differs from what was on the website?
9   A   So this reflects the US-specific data, not
10 the global data. So it was put in the context,
11 because this is US vaccine policy, what is the data
12 in our population, not necessarily incorporating
13 data on other populations, because there are
14 variables that we can't necessarily make things
15 comparable.
16       So -- and, again, this is also put in the
17 context of the age groups for which that type of
18 data is available.
19   Q   Does that mean that the CDC views it being
20 possibly the case that the effectiveness rate may
21 differ depending on what age group is being
22 evaluated?
23   A   Correct. And that's where I mentioned
24 the -- you know, the young adults, the effectiveness
25 appears in these outbreak settings to be lower.

Page 41

1 And, of course, that is the subject of our
2 investigations in these outbreaks that I mentioned.
3        And, again -- and the reason for household
4 data here is because the exposure to mumps may be
5 more intense in a household setting or in a college
6 dormitory or other crowding situations.
7   Q   All right. And then the -- if we skip to
8 the next paragraph, the first sentence reads: Fewer
9 studies have been conducted to assess the
10 effectiveness of two doses of mumps vaccine --
11 sorry -- mumps-containing vaccine. In the United
12 States, outbreaks among populations with a high
13 two-dose coverage found two doses of
14 mumps-containing vaccine to be 80 percent to
15 92 percent effective in preventing clinical disease.
16 That's end of that quote.
17       Once again, these numbers are slightly
18 different here from what we looked at previously
19 because this is limited to US data, and the other
20 was not?
21   A   Yes.
22   Q   Okay. The other, though limited to US
23 data, was data regarding the Jeryl Lynn vaccine that
24 appears in MMR, correct?
25   A   Jeryl Lynn strain is in the mumps

11 (Pages 38 - 41)

Appx1726

HIGHLY CONFIDENTIAL

Page 42

1 component of all the vaccine manufacturers that
2 contributed to these studies.
3    Q   Sorry, you just said vaccine manufacturers
4 that contributed to the studies.  By that, I mean --
5 by that, you meant --
6    A   For example, yes, the Jeryl Lynn strain is
7 used in the vaccines -- mumps vaccines in the UK
8 where some of the global studies were conducted, as
9 opposed to mumps components that were developed in
10 other countries like China, where the specific
11 strain being used is a bit different.
12    Q   Were these studies that have contributed
13 to the CDC's understanding of mumps vaccine
14 effectiveness performed by vaccine manufacturers?
15    A   Vaccine effectiveness studies in general
16 are not often conducted by the manufacturers.  And
17 they can be conducted by CDC, other state health
18 departments, and with or without collaborations of
19 academic collaborators, for example.
20    Q   And here specifically, do you know whether
21 Merck performed any of the vaccine effectiveness
22 studies that have contributed to CDC's
23 understanding?
24    A   I am not aware that they have authored the
25 publications around that.  I have no awareness of

Page 43

1 their involvement in any specific study except for
2 the CDC ones, of course.
3    Q   Merck's involvement in the CDC studies?
4    A   No.
5    Q   So you're not aware of Merck having any
6 involvement in a CDC study, correct?
7    A   Correct.
8    Q   So we've talked a little bit about the
9 ACIP.  That's the Advisory Committee on Immunization
10 Practices, right?
11    A   Yeah.
12    Q   Could you just describe generally what the
13 ACIP is?
14    A   So it is an advisory group to the
15 government, and particularly the recommendations go
16 to the CDC director.  But their job is to be an
17 independent group of -- from the government to
18 assess the data available to make recommendations
19 around the use of licensed products, mostly
20 vaccines.
21    Q   How many people approximately are on the
22 ACIP?
23    A   Very good question.  Having looked at the
24 table around --
25    Q   I did say approximately.

Page 44

1    A   Well, I mean, 20-ish.  I think it's
2 actually slightly more because not everybody attends
3 every meeting.  So it could be 25.  I don't know the
4 exact number.
5    Q   How does someone get appointed to the
6 ACIP?
7    A   So there is a vetting process.  And I am
8 not aware of the details of that process, so I can't
9 actually answer what is the -- who is the final
10 selecting official, if you will.
11    Q   It's fair to say that an appointment to
12 the ACIP is a prestigious appointment?
13    A   From the point of view of immunization,
14 yes.
15    Q   There are liaison representatives on
16 the --
17    A   Correct.  Again that's a lot of different
18 organizations with an interest in vaccination have
19 representatives at that meeting.  And, again, a long
20 list.
21    Q   Are vaccine manufacturers ever represented
22 on the ACIP?
23    A   So they are not on the ACIP.  They are
24 certainly in attendance at the open meetings.  They
25 are often asked to provide information to the ACIP

Page 45

1 work groups, which indeed manufacturers will share
2 information related to particularly new vaccine
3 products and clinical trial data.
4    Q   You said that vaccine manufacturer
5 representatives sometimes attend the ACIP open
6 meetings; is that right?
7    A   Yes.
8    Q   Do they get to vote on any ACIP decisions?
9    A   No.
10    Q   All right.  You mentioned ACIP work
11 groups.  What are they?
12    A   So they are a -- basically a derivative of
13 the ACIP meant to cover a specific vaccine topic
14 related to the recommendations that would be
15 considered by the entire ACIP.  So often they are
16 the group that goes into the details of the
17 individual pieces of data available related to a
18 specific vaccine or vaccine component.
19        So, for example, there is a work group on
20 mumps that is currently functioning.  In fact, there
21 was a work group meeting just yesterday.  And they
22 are the ones that will make sure that all available
23 data is being assessed, and there's a process for
24 dealing with the quality of the data, limitations on
25 the conclusions of studies, synthesizing an overall

12 (Pages 42 - 45)

Appx1727

HIGHLY CONFIDENTIAL

Page 46

1 conclusion, concurring with numbers such as
2 88 percent vaccine effectiveness, and also then
3 posing specific questions to the overall ACIP for
4 the ACIP consideration.
5 And they're also responsible for making
6 sure the content of the presentation to the ACIP
7 reflects the scope of the discussions of the work
8 group.
9 Q Does the work group, in addition to posing
10 questions to the ACIP as a whole, does it also make
11 recommendations to the ACIP as a whole?
12 A As such, it lays the issue to the ACIP,
13 and frames the questions in such a way that the ACIP
14 can consider the different components of the
15 deliberation.
16 Q Is the ACIP work group constituted
17 strictly of members of the ACIP, or does it include
18 others as well?
19 A So it is -- it almost always -- I think
20 always has some members from the ACIP who sit with
21 the work group. In the case of the work groups in
22 my division, it's generally two, three, sometimes
23 four ACIP members.
24 It then has membership, again, from some
25 of the interested groups. American Academy of

Page 47

1 Pediatrics can have somebody from there on the work
2 group, some folks from state and local health
3 departments who work on actual immunization
4 programs, and then often many academic subject
5 matter experts, as well as then our own subject
6 matter experts supporting the work group.
7 Q Sir, if you could turn to page 34 of that
8 MMWR that's in front of you. That page, as you can
9 see, lists members of the ACIP. It lists ex officio
10 members, it lists liaison representatives, and then
11 it also lists the membership of the ACIP measles,
12 rubella, and mumps work group. And it also lists
13 work group contributors from the CDC. Do you see
14 that?
15 A Yes.
16 Q And there's maybe about -- I don't know
17 what that is, maybe eight to 10 names of CDC people
18 on that work group?
19 A Yes.
20 Q Are those subject matters experts, would
21 you say?
22 A Yes. Almost all of them at one time or
23 another were in our division, so yes.
24 Q And I'm looking at some of these names
25 here among the work group members. Are these some

Page 48

1 of the leading figures in vaccine expertise in the
2 United States, would you say?
3 A Yes.
4 Q And is it the case, sir, that all of the
5 people whose names we are looking at here on page 34
6 of this MMWR, the ACIP members, the work group
7 members, the work group contributors, all of them in
8 one way or another had some participation in the
9 final product of this MMWR?
10 A So the group vetting, I don't know the
11 ACIP process, so I cannot vouch that everybody on
12 this list, you know, agreed to the contents of this
13 document. But the group as a whole, in terms of its
14 representing the consensus of the recommendation,
15 indeed has supported that, but I don't know the
16 process of how that is done within the ACIP.
17 Q Do you know the process of review within
18 the CDC of this document?
19 A As I said, again, it is mainly handled by
20 these people who are listed here as supporting the
21 work group creating this document, which is then
22 cleared officially through channel.
23 Q And then -- I'm going to ask you about how
24 frequently the work group met in connection with
25 generating this document. I don't know that you'll

Page 49

1 know that. And I can -- I was going to refer you
2 then to page 2.
3 A Thank you.
4 Q Given your reaction, I sense you don't
5 know that.
6 A Page 2, okay.
7 Q The right-hand column, under methods. If
8 you can just read the first --
9 A Yeah.
10 Q -- just read them to yourself, the first
11 few sentences.
12 A Noted.
13 Q It's your understanding then that the work
14 group met it looks like approximately 18 times
15 monthly in connection with its work leading into
16 this recommendation?
17 A That would be approximately correct, yes.
18 Q We've been going just about an hour. How
19 about if we take a break.
20 THE VIDEOGRAPHER: We're going off the
21 record. The time is 10:06 a.m.
22 (Recess 10:06-10:25 a.m.)
23 THE VIDEOGRAPHER: We're going on the
24 record. The time is 10:25 a.m. Please continue.
25 BY MR. SANGIAMO:

13 (Pages 46 - 49)

Appx1728

HIGHLY CONFIDENTIAL

Page 50

1    Q   Dr. Pallansch, I wanted to ask you a few
2  more questions about the ACIP. There's a chance
3  that some of your answers to these questions are
4  going to overlap with what you've already told me,
5  but I don't think so.
6        What is the role of the ACIP as regards
7  recommendations for how and when vaccines should be
8  administered?
9    A   So the ACIP provides specific
10 recommendations related to, again, target diseases.
11 So whether it's a new vaccine or revisions to an old
12 vaccine matters in how it's approached. Often with
13 new vaccines, of course, there's a lot of new
14 information that would need to be provided to put a
15 context. So there's often much more discussion
16 around disease burden, safety and efficacy
17 information available from the manufacturers,
18 getting into how it would be incorporated into an
19 already established vaccination schedule, again the
20 target age group of harmonizing with other vaccines
21 that are being given to the same age group at the
22 same time.
23       So that makes a difference in how the ACIP
24 works now versus in earlier days, where those new
25 vaccines at the time, the context for the

Page 51

1  deliberations are different.
2        So, for example, when revising
3  recommendations, it's often a much narrower scope.
4  The questions are much more about a revision to a
5  schedule, different groups that may or may not then
6  be added or excluded based upon considerations, or
7  should a vaccine be used in an outbreak setting.
8        So the questions are much narrower on
9  established vaccines, so there's less discussion of
10 background information generally for those.
11   Q   When the ACIP makes a recommendation that
12 a particular vaccine ought to be administered in a
13 particular setting, does the CDC then review the
14 ACIP's recommendation?
15   A   So the recommendation is made
16 specifically, and it is not -- at that point, it is
17 either accepted or it is not. If it is accepted,
18 then the process of implementation begins, and
19 different groups, of course, at CDC have different
20 responsibilities for implementation. And the
21 private sector, of course, then is different as
22 well.
23   Q   I think you just referred to the
24 recommendation being accepted. And I guess my
25 follow-up question to that would be, who does the

Page 52

1  accepting of the recommendations?
2    A   So the recommendations are provided to the
3  CDC director, who then either accepts them or does
4  not.
5    Q   Is there some sort of additional internal
6  review by the CDC in order to advise the CDC
7  director above and beyond the contribution that the
8  members of the CDC have already made to the
9  recommendation itself?
10   A   So I am aware that the CDC director can
11 and often does ask questions to understand the
12 recommendation because they don't necessarily attend
13 the ACIP deliberations; but, again, those are
14 usually clarifying types of questions.
15   Q   As the head of the division of viral
16 disease, do you, yourself, review ACIP
17 recommendations as regards vaccines that fall within
18 your purview?
19   A   So review in that context means we reread
20 them. Usually it is if the ACIP makes changes to
21 the proposed recommendation that the work group
22 provides.
23       So, for example, they can very much change
24 the actual wording of the recommendation that the
25 work group provides to them based upon their

Page 53

1  deliberations, and then we go back and see what the
2  effect of those changes might be.
3    Q   In your time at the CDC, are you aware of
4  the CDC having rejected an ACIP recommendation
5  regarding administration of vaccines?
6    A   In my period of awareness of ACIP
7  recommendations, I do not know of an example, but
8  it's a much more narrow period of time where I would
9  have kept track of all of the ACIP recommendations.
10   Q   Okay. Are you familiar with the Vaccines
11 for Children program?
12   A   Somewhat.
13   Q   Is that the program pursuant to which the
14 CDC purchases vaccines?
15   A   Yes.
16   Q   Does the ACIP recommendation play a role
17 in the determination of what vaccines the CDC will
18 purchase for the --
19   A   So there are two different determinations.
20 So the VFC coverage determination is different than
21 the ACIP process. And so I'm much more aware of the
22 ACIP process than the actual VFC process, but
23 they -- to -- you know, I don't know the degree to
24 which one influences the other.
25   Q   And I'm sorry, what is the one that might

14 (Pages 50 - 53)

HIGHLY CONFIDENTIAL

Page 54

1 influence --
2   A   Oh, how -- I mean, ACIP recommendation is
3 a prerequisite, but I don't know whether they would
4 ever -- you know, how they would follow through in
5 terms of implementation under VFC.
6   Q   You don't know how the ACIP would follow
7 through in terms of the implementation?
8   A   The ACIP doesn't, as far as I'm aware;
9 it's the VFC component, what they do with the ACIP
10 recommendation, how they review it.
11   Q   You've just been speaking in terms of an
12 ACIP recommendation.  Did you have in mind an ACIP
13 recommendation specific to the VFC program, or just
14 the ACIP --
15   A   No.
16   Q   -- recommendation about the vaccine
17 question?
18   A   Vaccine in general, right.  Yeah.
19   Q   Who within the CDC decides whether to
20 purchase vaccines -- whether to purchase vaccines?
21   A   So if it is covered by VFC, it will be
22 purchased.  So who -- I don't know that there is a
23 decision point, and I'm unaware of who would do
24 that.  That sounds like a procurement question.
25   Q   All right.  I want to shift gears a little

Page 55

1 bit and talk in more detail than what we've already
2 alluded to about the outbreaks, the mumps outbreaks
3 that have occurred over the past 10 or so years.
4       First of all, I gather you have an
5 awareness of those outbreaks; is that correct?
6   A   Yes.
7   Q   I want to start by directing your
8 attention to a couple things from the website.
9       (Exhibit 5 marked.)
10 BY MR. SANGIAMO:
11   Q   All right.  Dr. Pallansch, you've just
12 been handed what's been marked as Exhibit 5, which
13 is from the CDC website.  And you see the page has a
14 heading of For Healthcare Providers.
15   A   Uh-huh.
16   Q   And then I was going to direct your
17 attention, if I could, please, to page 5 of the
18 printout.  And I was going to focus your attention
19 at the bottom of that page to the section entitled
20 Mumps in Vaccinated People.
21   A   Uh-huh.
22   Q   That reads:  During mumps outbreaks in
23 highly vaccinated communities, the proportion of
24 cases that occur among people who have been
25 vaccinated may be high, see example below.

Page 56

1       Then it says:  This should not be
2 interpreted as meaning that the vaccine is not
3 effective.
4       Do you agree with that statement?
5   A   In the -- in the sense of the general
6 interpretation of the word, you know, "vaccine
7 effectiveness" as measured in a given population.
8 So in the outbreak setting, the context is different
9 than in a child being vaccinated, where the vaccine
10 effectiveness measure can be different.
11   Q   You know what, sir, I'm going to ask you
12 just to elaborate on that.
13   A   Yeah.
14   Q   I didn't understand it, but I'm not
15 exactly sure why, so --
16   A   Yeah, so there's two messages.  One, of
17 course, is the vaccine is effective.  And so it's a
18 question of quantitatively how the effectiveness
19 might be different.
20       So it's not -- that's why the statement is
21 absolute, meaning that doesn't mean that the vaccine
22 has no effectiveness.  It would be a question of
23 what percent effectiveness as it relates to an
24 outbreak.
25       And so back to some of the issues that I

Page 57

1 mentioned earlier about what we do in outbreak
2 settings looking at the different factors, but it
3 still means that it has effectiveness when we
4 measure it during outbreaks.
5   Q   We were looking earlier at some numbers.
6 Maybe if we look at Exhibit 2, we can take another
7 look at those numbers.
8       The third paragraph of Exhibit 2 is where
9 we saw --
10   A   Yeah.
11   Q   -- the effectiveness rate numbers,
12 including those effectiveness rate ranges.
13       And there we saw that it was an 88 percent
14 average, if you will, with the range of 66 to 95 for
15 two doses.  That 88 percent number along with the
16 accompanying range, that was determined from an
17 outbreak setting; is that correct?
18   A   From multiple different outbreaks, yes.
19   Q   Multiple different outbreaks.  All right.
20   A   Yes.
21   Q   So when we talk about the effectiveness of
22 the vaccine in the outbreak setting, then the
23 numbers seen on Exhibit 2 that I just recited, those
24 would be the numbers of the effectiveness of the
25 vaccine in an outbreak setting; is that right?

15 (Pages 54 - 57)

Appx1730

HIGHLY CONFIDENTIAL

Page 58

1    A   Correct.  In that range, right.
2    Q   In that range, okay.
3        Sticking with Exhibit 2, if we look down
4   towards the bottom of that page, right above
5   where -- see where it says, CDC recommends that
6   children --
7    A   Uh-huh.
8    Q   -- so right above that.
9    A   Yes.
10   Q   There is a reference to outbreaks.
11   A   Uh-huh.
12   Q   It reads:  Mumps outbreaks can still occur
13  in highly vaccinated US communities, particularly in
14  close contact settings such as schools, colleges,
15  and camps.  However, high vaccination coverage helps
16  to limit the size, duration, and spread of mumps
17  outbreaks.
18       Do you agree with that statement?
19   A   Yes.
20   Q   Sir, you testified earlier that -- I
21  believe you testified that you have kept abreast of
22  some of the literature in recent years, particularly
23  literature that has emerged in the context of the
24  mumps outbreaks; is that right?
25   A   Yes, particularly since assuming the

Page 59

1   current position.
2    Q   Okay.  And do you -- are you able to kind
3   of rattle off, off the top of your head, what papers
4   you recall?
5    A   Oh, I'm not that good at that.
6    Q   That's fine.  That's fine.
7    A   That's why there are bibliographies --
8    Q   Understood.
9    A   -- that I always refer to.
10   Q   Understood.  We'll look at some of those
11  in particular.
12       Dr. Pallansch, you've just been handed
13  what's been marked as Exhibit 6, I believe, which is
14  a presentation that was done by a Mona Marin.
15   A   Uh-huh.
16   Q   Do you know Dr. Marin?
17   A   Yes.  So she's on Dr. Patel's team.
18   Q   Would she be --
19   A   In our division, yes.
20   Q   An epidemiologist by training?
21   A   Yes.
22   Q   Okay.  So a medical doctor and an
23  epidemiologist?
24   A   Correct.
25   Q   I wanted to direct your attention to

Page 60

1   page 7 of this slide deck, please.
2        (Exhibit 6 marked.)
3   BY MR. SANGIAMO:
4    Q   And as you can see, this is a depiction of
5   the number of reported mumps cases between 1968 and
6   2016.  Actually, let me ask you, is that what this
7   is?
8    A   Yes.
9    Q   And included on this depiction is the
10  mumps outbreaks in 2006.  Do you see that?
11   A   Yes.
12   Q   And is it the case that after the mumps
13  outbreaks in 2006, the CDC continued to purchase MMR
14  notwithstanding those outbreaks?
15   A   Yes.
16   Q   Then this also depicts the outbreaks in
17  2009 and '10.  CDC continued to purchase MMR
18  notwithstanding those outbreaks as well, right?
19   A   Correct.
20   Q   Same thing is true for the outbreaks in --
21  for example, the one shown here, 2016, in Arkansas?
22   A   Right.
23   Q   So I want to take a look at some of those
24  papers that I referred to a moment ago, starting
25  with a paper, which I'll hand you in a moment,

Page 61

1   authored by Dr. Dayan and others.
2    A   Okay.
3    Q   You familiar with Dr. Dayan's work?
4    A   Gustavo, yeah.
5    Q   Gustavo, okay.
6    A   Yeah.
7        (Exhibit 7 marked.)
8   BY MR. SANGIAMO:
9    Q   Dr. Pallansch, if you could hold off on
10  doing that.  I'm actually going to ask you to look
11  at a different paper, so -- although feel free to --
12  for your reading pleasure.
13       (Exhibit 8 marked.)
14  BY MR. SANGIAMO:
15   Q   All right.  So, sir, you've now been
16  handed a paper entitled Recent Resurgence of Mumps
17  in the United States, and it's authored by multiple
18  people from the CDC; is that correct?
19   A   Correct.
20   Q   And typically when a paper is authored by
21  multiple CDC authors, is it safe to assume that each
22  of the authors has reviewed the content of the
23  paper?
24   A   Yes.
25   Q   Would you also expect that the authors

16 (Pages 58 - 61)

Appx1731

HIGHLY CONFIDENTIAL

Page 62

1 have read the references that are cited in the
2 paper?
3     A    All of the references, probably that would
4 not be a safe assumption.
5     Q    Okay.
6     A    I can't vouch for any author, of course.
7     Q    All right.  Fair enough.
8          And is this a paper you've seen before?
9     A    Yes.
10    Q    I wanted to direct your attention to the
11 bottom of page 1585, where the authors of the paper
12 note that, quote, even at the peak of the epidemic,
13 case counts were far below those of the pre-vaccine
14 era, during which tens of thousands of cases were
15 reported monthly.
16    Q    So which paragraph?
17    Q    I'm sorry, sir.  Sorry.  Very bottom of
18 page 1585.
19    A    Right, left?
20    Q    Right.  Right column.
21    A    Oh, however.  Okay.  Carryover to the next
22 page --
23    Q    Yes, sir.  Yes, sir.
24         Quoting:  However, even at the peak of the
25 epidemic, the case counts were far below the

Page 63

1 pre-vaccine era, during which tens of thousands of
2 cases were reported monthly.
3     A    Yeah.
4     Q    That's the end of the quote.  You agree
5 with that statement, right?
6     A    Yes.
7     Q    And then if you turn to page 1587, there's
8 a paragraph in the middle of the page that begins
9 with:  Besides waning immunity.  Do you see that?
10    A    Uh-huh.
11    Q    Down at the end of that paragraph, the
12 final sentence reads:  Thus, mumps vaccine probably
13 prevented US patients from numbering in the tens or
14 hundreds of thousands.  End of quote.
15         Do you agree with that statement as well?
16    A    Yes.
17    Q    Sir, do you know what the range of
18 activities is in which the CDC has engaged in the
19 context of the mumps outbreaks that have occurred
20 over the past decade?
21    A    So often we provide technical consultation
22 to state and local health authorities.  They are the
23 ones responsible for managing outbreaks.  They
24 sometimes have questions about interventions in
25 those outbreaks.  They review the recommendations

Page 64

1 that CDC makes around the use of the vaccine.
2 Sometimes they will ask for technical advice related
3 to how they might investigate.  And on occasion,
4 they will ask for CDC's direct personnel to be
5 assisting on the ground.
6     Q    Has the CDC received those kinds of
7 requests, that very last kind you mentioned, for any
8 of the mumps outbreaks that have occurred since
9 2006?
10    A    Oh, yes.  For most of the big ones, right.
11    Q    All right.  So most of the big ones were
12 investigated by CDC personnel?
13    A    We had involvement with the
14 investigations.  Again most of the personnel
15 involved are actually state and local health.
16    Q    What was the nature of the CDC
17 involvement?
18    A    So it's a variety of things, primarily as
19 it relates to some of the investigations around
20 vaccine effectiveness that I mentioned previously.
21 So are these outbreaks an opportunity to measure
22 vaccine effectiveness, helping set up those types of
23 studies in the context of an outbreak, so the types
24 of data that would need to be collected, how you
25 might go about collecting that data.  And then after

Page 65

1 outbreak setting is -- you know, the outbreak itself
2 is over, working with the local authorities in terms
3 of analysis and writing up the results for
4 publication.
5     Q    We've heard reference to something called
6 the EIS.  Are you familiar with that term?
7     A    Yes.
8     Q    Another acronym for us?
9     A    Yes, Epidemiology Intelligence Service.
10    Q    All right.  What is the Epidemiology
11 Intelligence Service?
12    A    So it is a two-year program for practical
13 epidemiology training.  So it has been part of the
14 CDC history nearly from the beginning as a tool for
15 training epidemiologists for work in a public health
16 setting as opposed to an academic setting.
17    Q    Is that considered a somewhat elite group
18 in terms of --
19    A    Yes.
20    Q    Okay.
21    A    Highly competitive to get in.
22    Q    I wanted to ask you a little bit about
23 what kinds of studies the CDC has performed in
24 connection with the outbreaks.  I think you've
25 probably already said that there were some studies

17 (Pages 62 - 65)

Appx1732

HIGHLY CONFIDENTIAL

1 looking at effectiveness rates, and I can pull some
2 others out as well, but let me just see first
3 whether you recall other kind of things that the CDC
4 has investigated.
5     A   Well, I mean, the investigations that I
6 mentioned before also include some more general
7 epidemiologic features of an outbreak.
8        In a college setting, is there evidence of
9 specific dormitories involved; is the disease among
10 those living on campus versus off campus, as it
11 might inform where the exposures are occurring; you
12 know, are there specific social events associated
13 with a lot of these point source outbreaks; are
14 there issues around maintaining a cold chain for
15 delivering vaccine that's still been stored
16 properly.
17      So there are additional ancillary
18 programmatic features and classic epidemiologic
19 studies that are also done in part of assessing can
20 a vaccine effectiveness study be done in the
21 specific epidemiologic context.
22     Q   Have there also been studies involving
23 exploring the utility of a third dose of MMR?
24     A   Yes.  So this has come up and is actually
25 part of previous presentations to the ACIP.  And

1 particularly in the past, the ACIP has decided not
2 to make a recommendation.  And this is still an
3 issue that we continue to investigate because local
4 authorities want to intervene to change the course
5 of an outbreak, but it is very challenging to get
6 data specifically on that subject.
7      So it is something that continues to be
8 investigated.  It was brought up 10 years ago
9 following the 2006 outbreak, was that an appropriate
10 strategy for controlling outbreaks.  And so at this
11 date -- to this date, it has been unresolved.
12     Q   You said it's a challenging question to
13 investigate.  Why is that so?
14     A   Because outbreaks on their own usually go
15 away.  So you can intervene at a certain point in
16 time, and you don't know what the outbreak would
17 have done without your intervention versus what you
18 did with your intervention.
19      So often the interventions are late in the
20 outbreak, when the outbreak is already starting to
21 go away.  So it's very difficult to attribute
22 stopping the outbreak to that third dose as opposed
23 to measuring the effectiveness of the third dose for
24 the individuals who are immunized.
25     Q   How about studies to test the hypothesis

1 that the cause of the outbreaks could be waning
2 immunity?
3     A   So generally, as I mentioned earlier, this
4 is done in the context of how long it has been since
5 the most recent dose of MMR.  In some places, for
6 example, they do recommend an additional dose upon
7 college entry.  That makes it easy to sort out those
8 who have literally been only one or two years, or
9 certainly within five years have received a dose,
10 from those who had last received their dose at four
11 to six years.
12      And in that case, it's comparing the rate
13 of disease in the recently immunized to those who
14 were immunized as children, and showing a
15 difference.
16     Q   Have those studies -- have such studies
17 been done?
18     A   Yes.  In fact, we just published recently
19 a study like that, that was done in Iowa during the
20 outbreak there at the university.
21     Q   Okay.  Who was the -- do you recall who
22 the lead author was on that study?  That's fine.
23     A   Like I say, I look them up.
24     Q   All right.  Any other studies done by CDC
25 of that nature, where there was an attempt to

1 measure -- to compare disease rates in those who
2 were vaccinated recently with those who were
3 vaccinated longer ago?
4     A   So basically it has been attempted in
5 several of the outbreaks since 2006.  I mean, the
6 New York City outbreak is one example where that was
7 attempted, but records weren't good enough to really
8 be able to ask that question.
9      So often the question -- we know the
10 question, but we have to have the data to be able to
11 answer the question.  And most of the time, it is
12 either logistically complicated to get that data, or
13 we're too late to get it in a meaningful way.
14     Q   All right, sir.  I want to shift gears a
15 little bit and talk about immunogenicity, which I
16 think we touched on a little bit -- a little bit
17 earlier.
18      First of all, what -- strike that.
19      Is immunogenicity a reference to a body's
20 immune response in response to something new being
21 put into the body, is that good layman's
22 description?
23     A   Yes.  Well, I mean, it's measuring any
24 immunologic response to a presented antigen, like a
25 vaccine.

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Appx1733

HIGHLY CONFIDENTIAL

Page 70

1  Q  Is that typically done by a blood test?
2  A  Yes.
3  Q  And essentially one is looking at -- well,
4  strike that.  Strike that.
5      All right.  I'm going to ask you about a
6  few different examples, I think, of kinds of
7  immunogenicity tests, and ask you if you could
8  explain them, at least somewhat.
9      First there's the concept of
10  seroconversion.
11  A  Uh-huh.
12  Q  And would you consider that to be a
13  description of an immunogenicity event?
14  A  That is a typical measure of a response,
15  yes.
16  Q  All right.  And is it fair to say that
17  that is a measure that inquires into whether the
18  introduction of something such as a vaccine has
19  caused someone to go from lacking immunity to having
20  immunity, is that too simple or outright wrong?
21  A  Well, no, it's correct, but there are
22  limitations to the interpretation of such data
23  because, of course, it assumes that the assay can
24  measure antibody that -- at the pre-vaccine state,
25  and zero means something in that context, and that's

Page 71

1  often not true.
2      So it's often done in the context when you
3  have a naive infant who has never seen either, you
4  know, the natural infection or the vaccine, then the
5  assumption of zero is more robust.  If you have an
6  older child, then you're trying to measure -- you
7  know, it may look like they're negative.  They may
8  or may not be immunologically naive.
9      So, yes, the naive part is what we ideally
10  want to measure, but in young infants that's easier
11  to assume it's correct than with older.  And that's
12  why I mentioned the age range of clinical trials
13  matters to me in terms of interpreting data.
14  Q  With young infants, is another
15  consideration the possibility that they may have
16  antibodies that they inherited from their mothers?
17  A  Yes.  So typically you want to know at
18  what age the study was conducted, or if you have
19  some specific measure of the maternal antibody.  So
20  studies can be done with cord blood, for example, to
21  actually measure the mother's antibody level.  And
22  then for some diseases we know the decay rate of
23  that antibody.
24      But, in general, it also affects
25  recommendations around age of immunization for

Page 72

1  certain vaccines, for example.
2  Q  Because, for example, you would not want
3  to administer a live virus vaccine at a time when
4  the child had too much antibody from the child's
5  mother?
6  A  It's not even restricted to live virus
7  vaccines.
8  Q  Okay.
9  A  So there are concerns around being too
10  early even with inactivated vaccine, but each
11  vaccine has a specific consideration.  So that's
12  part of the complexity of deriving a schedule
13  because each vaccine behaves differently related to
14  maternal antibody.
15  Q  So the ideal month of vaccination for
16  hepatitis B might be different from measles or
17  something like that?
18  A  Right.
19  Q  Now, I think I've seen studies involving
20  the concept of antibody boosting, if I can say it
21  that way.
22  A  Uh-huh.
23  Q  And those will be studies that will not
24  necessarily look at seroconversion per se, but
25  rather will look to see whether administration of

Page 73

1  the vaccine may cause an increase in the antibody
2  level; is that right?
3  A  Correct.  And you have different starting
4  points, of course, but you're looking for some
5  increase in the antibody level following vaccine.
6  And then it's what increase amount is significant is
7  an assay-dependent function.
8  Q  And I think I've also seen seroprevalence
9  studies?
10  A  Yes.
11  Q  What's a seroprevalence study?
12  A  It's basically where you take a group of
13  individuals at a certain point of time and just
14  measure their antibody level.  And seroprevalence
15  means they have some measurable antibody of any
16  description at a certain level that is called
17  positive.  And so it's just the percentage of those
18  you test who are positive, however you define that.
19      (Exhibit 9 marked.)
20  BY MR. SANGIAMO:
21  Q  Dr. Pallansch, you've just been handed
22  what's been marked as Exhibit 10.  9.
23  A  9.
24  Q  Which is a document entitled The
25  Immunological Basis for Immunization Series for

19 (Pages 70 - 73)

Appx1734

HIGHLY CONFIDENTIAL

Page 74

1 Mumps. And this appears to be a WHO document; is
2 that right?
3 A Correct.
4 Q But I notice that if you turn to the page
5 with the number 2, little I, it indicates there that
6 the authors of this document were -- I may
7 mispronounce her first name, but Huong McLean --
8 A Huong McLean, yeah.
9 Q Okay. -- Carole Hickman and Jane Seward.
10 A Yeah.
11 Q They're all from the CDC; is that right?
12 Or they were at the time?
13 A Carole -- yeah, Carole is still there.
14 The other two are not.
15 Q All right. And they all have done work
16 with mumps; is that right?
17 A Correct.
18 Q Would you consider them to be mumps
19 experts?
20 A Yes.
21 Q Are you familiar with this series?
22 A Yes.
23 Q Have you, yourself, written any modules
24 for the series?
25 A No, but I've reviewed some, but I know the

Page 75

1 series. I have not looked at this document in a
2 long time.
3 Q Okay. All right. So you've seen it at
4 one point, but just not recently?
5 A Yeah.
6 Q So I wanted to direct your attention to
7 page 9 of the document. And in particular, that
8 first paragraph, under antibody response following
9 vaccination, you see that?
10 A Uh-huh.
11 Q I was going to ask you about some specific
12 sentences, but if you'd feel more comfortable
13 reading the whole paragraph first, that's certainly
14 fine.
15 A This is all in reference -- okay. Okay.
16 Okay.
17 Q All right. About midway through that
18 paragraph, there's a sentence that reads: However,
19 serological tests. You see that?
20 A Yes.
21 Q However, serological tests available for
22 mumps antibodies are not consistent, and rates vary
23 depending upon the method used.
24 Do you agree with that?
25 A Yes.

Page 76

1 Q And the next sentence says: As a result,
2 seroconversion rates vary widely, from 74 percent to
3 100 percent, for vaccines containing the Jeryl Lynn
4 strain. End of quote. And then it gives
5 seroconversion rates for other strains as well.
6 It's fair to say that the -- those three
7 experts from the CDC were of the view that
8 seroconversion rates for the mumps component of MMR
9 could range from 74 percent to 100 percent?
10 A Yes. I mean, that's the review of the
11 available literature, yes.
12 Q Okay. And then if we look at the MMWR,
13 which we looked at previously and should be before
14 you there.
15 A Number 4.
16 Q Pardon me?
17 A Exhibit 4.
18 Q Yes.
19 A Okay.
20 Q And if you turn to page 10. In the middle
21 left-hand column, there is a section called Immune
22 Response to Mumps Vaccination. You see that?
23 A Yes.
24 Q The first sentence reads: Approximately
25 94 percent of infants and children developed

Page 77

1 detectable mumps antibodies after vaccination --
2 A Right.
3 Q -- with MMR vaccine.
4 And then it gives a range of 89 percent to
5 97 percent, right? And that range, that -- that's
6 like what we were looking at earlier, that's not a
7 confidence interval, but that's a range of results?
8 A Studies, right.
9 Q Range of studies. Okay.
10 Is it -- I note that that's a different
11 presentation of the data as compared to what we saw
12 in the WHO module a moment ago. Would you just
13 attribute that to a reflection of the variation
14 in -- variations in the data and how one might want
15 to present them?
16 A So I would have to compare the references
17 cited here and again in the WHO publication to know
18 where there's overlap in the specific studies that
19 are being represented. And, again, without having
20 compared those, I can't really answer your question.
21 Q That's fair. That's fair.
22 If we could take a minute with regard to
23 those references for both the WHO module and the
24 MMWR that we're looking at right now. I'm going to
25 ask you if you could look at them. And really, my

20 (Pages 74 - 77)

HIGHLY CONFIDENTIAL

Page 78

1 only question to you is going to be whether any of
2 the references are the Merck MMR label.
3        And I can guide you --
4    A   Sure.
5    Q   -- a little bit, if you'd like.
6        So if you're -- if you're working from the
7 MMWR, then it looks to me like, right after that
8 sentence that I read, there's a reference to
9 table 1.
10   A   Right.
11   Q   Although actually, sir, the references are
12 stated right there on the paper.
13   A   Yeah. But that's why I have to go back to
14 it.
15       Okay. So I already see a couple of
16 differences, so -- okay.
17   Q   But, again, my question is just, were any
18 of the references the Merck MMR label?
19   A   So I don't know that that would always be
20 even knowable because of the way vaccine
21 effectiveness is -- or this is for the
22 seroconversion.
23       So if it were done in a clinical trial
24 setting, the label should be known as part of the
25 protocol. And for each reference, in theory, if

Page 79

1 they were writing it correctly, they should state it
2 in the publication.
3        Now, I haven't reviewed each publication
4 to know that they have done that, so.
5    Q   I'm sorry, could you repeat that again?
6    A   Yeah. So, for example, several of these
7 WHO studies have the potential of not only being
8 Merck, but could be GSK, but they should say it.
9    Q   Understood, sir. My only question was
10 whether the item being cited was the label, or was
11 it a study.
12   A   So this is -- so for this particular set
13 of data that's being referred to here, if it was a
14 US study, it would be a Merck product in the study.
15 But if it's some of these -- the WHO reference also
16 would include several European studies that
17 potentially could relate to a different product.
18       Now, if they segregated table 2 -- which
19 they didn't -- that would change the interpretation.
20 So I would have to go back to each of those
21 references to know for sure which product was in
22 this particular data presented.
23   Q   But in each instance, what is being
24 referenced is a study conducted by someone; is that
25 right?

Page 80

1    A   Correct.
2    Q   All right. And what is not being
3 referenced is just the label; agreed?
4    A   Correct. But, I mean, the study will
5 describe which vaccine they used.
6    Q   Right. Right.
7    A   Yes.
8    Q   Understood. All right. And is that true
9 for both the references in the WHO module as well as
10 the references in the MMWR?
11   A   Yes, it should be.
12   Q   All right. So is it fair to say that when
13 the authors who wrote these two documents, the WHO
14 module and the MMWR, were looking to describe their
15 understanding of the seroconversion rates for the
16 mumps component of MMR, they looked to the
17 literature of studies regarding that topic, not to
18 the MMR label itself?
19   A   Correct.
20   Q   Okay. Now, I wanted to dive a little
21 deeper, if we could, into some of the principles
22 surrounding understanding the sero -- immunological
23 data.
24   A   Uh-huh.
25   Q   And in order to do that, I wanted to show

Page 81

1 you a couple of papers written by CDC authors, if I
2 could.
3        (Exhibit 10 marked.)
4        MR. SANGIAMO: Robyn, what number are we
5 up to on exhibits?
6        THE REPORTER: 10.
7        MR. SANGIAMO: That was 10.
8 BY MR. SANGIAMO:
9    Q   All right. Sir, you've been handed what's
10 been marked as Exhibit 10.
11   A   Okay. Sorry.
12   Q   All right?
13   A   Yes.
14   Q   All right. Are you familiar with this
15 paper?
16   A   Somewhat.
17   Q   Okay.
18   A   Yeah. Not -- because this was a
19 multi-organization study, so.
20   Q   Multi-organization in the sense that some
21 of the --
22   A   Meaning we worked with the University of
23 Nebraska. And, again, so I -- it was the context of
24 the outbreak I wasn't really familiar with.
25   Q   Okay.

Page 82

1   A  Yeah.
2   Q  You see that one of the authors of this
3 paper is Steve Rubin from the FDA, do you see that?
4   A  Yes.
5   Q  Are you familiar with Dr. Rubin's work
6 generally?
7   A  Not so much. I certainly know of him, but
8 not the detail of what he's worked on over the
9 years, no.
10   Q  What is it that you know of him?
11   A  No, I think I -- you know, I'm aware of
12 his interest in this topic and that he is consulted.
13 So that's probably the extent of my awareness of his
14 work.
15   Q  Okay. I wanted to direct your attention
16 to page 1667 of the article. And in particular,
17 there were two sentences within the first full
18 paragraph that I was going to ask you about.
19 They're kind of in the middle of that paragraph.
20 Would you like me to direct your attention right to
21 then, or do you want to read the whole paragraph
22 first and then --
23   A  Okay, I'm aware of this.
24   Q  Fair enough. All right.
25   A  Yeah.

Page 83

1   Q  I was going to -- I am going to ask you to
2 focus in on the sentence about halfway down that
3 reads: However, we cannot assume. Do you see that?
4   A  Yeah.
5   Q  However, we cannot assume that the
6 presence of antibody levels necessarily correlates
7 with protection?
8   A  Yes.
9   Q  Unlike measles, for which neutralizing
10 antibody level seems to be a useful correlative
11 protection, a simple antibody measurment correlate
12 for mumps immunity is unclear.
13   Do you see that?
14   A  Yes.
15   Q  Do you agree with that statement?
16   A  Yes.
17   Q  And what are the implications of that
18 statement for interpreting immunological data?
19   A  So twofold primarily. One is that because
20 of the limitations in these different settings, we
21 don't have a good correlate of protection, meaning
22 if we knew that an individual had 200
23 milli-international units of antibody, they would
24 not get disease.
25   So we don't know a number like that for

Page 84

1 mumps. It's much easier to establish with measles
2 for several reasons having to do with the
3 differences in the disease.
4   The second part is related back to the
5 differences in the measure of the antibody being
6 different. So whether it's a neutralization test or
7 an IgG ELISA would make a difference because they
8 would, quote, both be seropositive, but the scale of
9 the antibody measure could be different.
10   And the other reason it may not be easy to
11 establish is biological, in that the single antibody
12 level may reflect something that changes depending
13 upon the nature of the exposure.
14   So if you had the same antibody level in
15 two individuals, and one was exposed to 10 times
16 more virus, they may not be protected, whereas the
17 individual with less exposure may indeed be
18 protected.
19   So there's several reasons that can
20 explain the uncertainty around this correlate of
21 protection for mumps.
22   Q  For example, could that lead to a
23 situation in which you could have two people with
24 the same antibody level, one could be living in say
25 a college dormitory setting, and the other not, and

Page 85

1 the one may actually -- who is living in the college
2 dormitory setting may be more susceptible to mumps
3 because there might be a greater force of infection?
4   A  Right. And force of infection is one way
5 we refer to it, yes.
6   Q  I want to ask you about one other
7 principle, which I think we can see in the Dayan and
8 Rubin paper, which you -- I gave to you before when
9 I didn't mean to. Okay.
10   A  Exhibit 7.
11   Q  Exhibit 7, all right. This time I meant
12 it.
13   And I apologize, sir, if I asked you this,
14 but have you seen this paper before?
15   A  I did see it. I haven't read it.
16   Q  Okay.
17   A  Yeah.
18   Q  And I was going to direct your attention,
19 please, to page 1464. In particular, I wanted to
20 ask you to take a look at the end of the paragraph
21 that carries over from the first column to the
22 second column, and in particular the -- I guess it's
23 the last two sentences. Maybe the last seven or
24 eight lines in that paragraph.
25   A  Okay. So you're --

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL

Page 86

1 Q Beginning with: It is important.
2 A Okay. I am not locating where --
3 Q Okay. It's over here.
4 A Over here, okay. Sorry.
5 Q Sure.
6 A It is important, okay.
7 Q It reads: It is important to mention that
8 a decrease in antibody titer or even an inability to
9 detect antibody does not necessarily imply a loss of
10 immunity. Functional antibody may exist at levels
11 below assay detection limits, and cell-mediated
12 immune responses, which may be protective, have been
13 measured up to 21 years after vaccination, even in
14 seronegative vaccinated persons.
15 A Yes.
16 Q Do you agree with that statement?
17 A Yes.
18 Q Does that mean that you could have
19 situations in which someone could show a low level
20 of antibody, or even show negativity in terms of
21 antibody, but perhaps still be protected from mumps
22 by virtue of cell-mediated immunity?
23 A Right. So yes, this limit of detection
24 issue is assay dependent also. So different assays
25 have different limits of detection. So it's --

Page 87

1 Q Limit --
2 A Right. So making it -- I mean, the
3 statement is true, but then there's the it depends.
4 Q Understood. Okay.
5 All right. I think we've been going about
6 an hour. So I would suggest we take a break at this
7 point, if that sounds agreeable to everyone.
8 THE VIDEOGRAPHER: We're going off the
9 record. The time is 11:18 a.m.
10 (Recess 11:18-11:34 a.m.)
11 THE VIDEOGRAPHER: We're going back on the
12 record. The time is 11:34 a.m. Please continue.
13 BY MR. SANGIAMO:
14 Q All right. Dr. Pallansch, I'm about to
15 ask Robyn if she'll mark that next document as
16 Exhibit 11.
17 (Exhibit 11 marked.)
18 BY MR. SANGIAMO:
19 Q Dr. Pallansch, I definitely do not want to
20 interrupt your review of the document. Let me just
21 let you know in advance that this is a presentation
22 that Merck made to the CDC, and I was going to focus
23 your attention on one slide in particular.
24 A Okay.
25 Q But feel free to look at all of them, if

Page 88

1 you prefer to get that added context.
2 A Well, if you can tell me which one you're
3 going to --
4 Q Will do. It's the second to last slide.
5 A Page 11?
6 Q Oh, yes. I didn't see the page number.
7 Yes, page 11.
8 A I'm just checking to make sure I
9 understand all the acronyms.
10 Q Okay. All right.
11 A Okay.
12 Q All right. And, sir, looking at that
13 chart on page 11, that is describing seroconversion
14 rates, correct?
15 A Yes.
16 Q And it's describing seroconversion rates
17 for Merck's M-M-R II product, right, as well for
18 Priorix, you see that?
19 A Uh-huh.
20 Q And are you familiar with what Priorix is,
21 sir?
22 A Yes.
23 Q Okay. And the chart is showing different
24 seroconversion rates for those two vaccines against
25 various virus strains. You see that?

Page 89

1 A Yes.
2 Q And I wanted to focus your attention on
3 the M-M-R II data that's being shown in that chart.
4 What is that -- what is that data? If you could
5 just tell us what the data is there, in terms of
6 what the seroconversion rates are that are being
7 shown?
8 A Okay. So the -- the rates being shown,
9 the assay that you would use in this case has to
10 choose a specific virus as your test virus. And the
11 assay actually doesn't matter whether it's
12 neutralization or ELISA.
13 And there are different strains of mumps
14 that have been classified as genotypes. The
15 significance of those genotypes is not well
16 understood, but it does represent the variation of
17 mumps virus that occurs naturally in the world.
18 So this particular table, which is not
19 unusual, asks, when you change the antigen in your
20 assay -- or, again, if it's a live virus, if it was
21 a neutralization test -- do you see a difference
22 using the same set of sera, meaning the same
23 children immunized in the specific context.
24 So in this setting, it would be M-M-R II
25 vaccinated individuals and measuring the

23 (Pages 86 - 89)

Appx1738

Page 90

1 seroconversion rate, which, again, is a comparator
2 of a pre and post-vaccination.
3       And so functionally, you're looking at
4 multiple different assays using different virus.
5    Q   All right.  And is it surprising to you
6 that the range of seroconversion rates against these
7 different virus strains is as wide as it is?
8    A   As wide.  The fact that it's different by
9 virus type is not unexpected.  That phenomenon is
10 seen in many different viruses.  So by itself, that
11 is not.
12       The absolute range of values, I would need
13 to know the details of the assay to know whether
14 that's expected or not.
15    Q   Now, would you agree that in this setting
16 Merck is notifying the CDC that it has seen
17 seroconversion rates as low as 53 percent when using
18 certain virus strains in its assay?
19    A   Yes.
20    Q   Okay.  And it's also -- that was in
21 connection with one particular virus strain.
22 There's another on here involving a seroconversion
23 rate of 61.8 percent.  See that as well?
24    A   Yes.
25    Q   And Merck was notifying the CDC of that as

Page 91

1 well; agreed?
2    A   Yes.
3    Q   And another -- just I'll pick one more --
4 the third lowest, which is the Tennessee wild-type
5 strain, that was 65.8 percent?
6    A   Right.  Of genotype H, yes.
7    Q   Genotype H.  All right.
8       And the CDC continued to purchase MMR even
9 after being notified of those seroconversion rates?
10    A   Correct.
11    Q   Does the CDC believe that the
12 seroconversion rate for the mumps component of MMR
13 is equal to the effectiveness rate of the mumps
14 component of MMR?
15    A   That we will not -- would not conclude
16 based on the available data.
17    Q   Okay.  Has the CDC run its own mumps
18 immunological assays to your knowledge?
19    A   Yes.
20    Q   How many times or -- if that makes sense?
21    A   Oh, it's -- I mean, we have a laboratory
22 that routinely does mumps testing for a variety of
23 circumstances.  And we use both our own developed
24 assay, neutralization assay, as well as the plaque
25 reduction neutralization assay.  But currently,

Page 92

1 we're using commercial kits for IgG, IgM.
2    Q   Are those commercial kits ELISA assays?
3    A   Yes.  Although in the past we've run our
4 own as well.
5    Q   Run your own ELISA assays?
6    A   Yeah.
7    Q   All right.  Is the commercial kit the
8 Wampole?
9    A   I don't know.  I can't -- I would --
10 it's --
11    Q   Sure.
12    A   -- defer to the --
13    Q   Okay.
14    A   -- people in the lab.
15    Q   Is it Dr. Bellini -- strike that.
16       Do you know who at CDC has run these
17 assays?  And by these assays, I mean any of the
18 mumps assays you just mentioned.
19    A   Right.  So they would be on Carole
20 Hickman's team.  So who is running it on a specific
21 day, I don't know.
22    Q   Is Carole Hickman a --
23    A   Teammate.
24    Q   -- a replacement for Dr. Bellini?
25    A   No.  She's a team lead in that branch.

Page 93

1 When Dr. Bellini retired, Paul Rota is acting branch
2 chief.
3    Q   I see.  What are the settings in which the
4 CDC has run the assays to which you were just
5 referring, all of those mumps assays?
6    A   So often we are asked for confirmation of
7 cases by the state and local health departments in
8 conjunction with outbreaks, often to do case
9 confirmation as part of the epidemiologic
10 investigation.  Sometimes -- we have done
11 investigations analogous to this, in particular
12 looking at genotype G immunogenicity, so a similar
13 type of approach of looking at strain-specific
14 response.  And we also look at it from the point of
15 view of assay development, in other words, trying to
16 get at this issue of could better immunologic assays
17 be better at a surrogate of protection.
18    Q   Is there a particular person within the
19 CDC who's involved in that last bit of work you were
20 describing, trying to come up with a better assay?
21    A   That's within Carole Hickman's team, yes.
22    Q   You referred to using an assay for
23 confirmation of cases.  Is the idea there is you're
24 going to see if you can detect antibody, and if you
25 can, that might mean that there has been exposure to

24 (Pages 90 - 93)

Appx1739

HIGHLY CONFIDENTIAL

Page 94

1 the disease, and that's --
2     A   So, again, you're looking for presence of
3 IgM as the primary diagnostic.  This has been
4 complicated by preexisting immunity.
5         So in the old days, this used to be
6 actually much more reliable because outbreaks were
7 occurring in unimmunized individuals.  And as the
8 percentage of -- as outbreaks more recently have had
9 higher and higher percentage of two-dose vaccinated
10 individuals, IgM has become less and less reliable
11 for case confirmation.
12        And so in that case, we also heavily rely
13 on PCR for detecting the virus as part of case
14 confirmation.
15    Q   I think you said that the CDC has used
16 some of its own neutralization assays as well as --
17 if I'm misstating, let me know -- as well as done
18 studies that used neutralization assays of other
19 people; is that right?
20    A   No.  So for the ones we do, we are using
21 our assay.  They're conceptually similar, but,
22 again, the exact details would need to be compared.
23 So just because you call it a plaque reduction
24 neutralization test doesn't mean that the test is
25 identical to somebody else's PRNT.

Page 95

1         And that's where going through in
2 scrupulous detail because of the nature of the
3 multiple reagents, the multiple steps in the
4 process, it's critical to know all of those details
5 to compare data done with different assays.
6    Q   Okay.  All right.  So if I could just try
7 to wrap up my initial time here with just a few
8 summary questions, if you will.
9         We've been talking about the CDC's
10 knowledge about effectiveness rates and
11 seroconversion rates, having seen the allegations in
12 this lawsuit -- at least some people at CDC having
13 seen them.  During the time that the CDC has had all
14 that knowledge, has the CDC continued to purchase
15 MMR?
16    A   Yes.
17    Q   Has the CDC continued during all that time
18 to recommend administration of MMR as part of the
19 schedule for routine administration of children?
20    A   Yes.
21    Q   All right.  Thank you.  I think that's all
22 I have for now, and I'll just reserve the remainder
23 of my time.  Thank you very much, Dr. Pallansch.
24        THE VIDEOGRAPHER:  We're going off the
25 record.  The time is 11:48 a.m.

Page 96

1         (Recess 11:48 a.m.-12:44 p.m.)
2         THE VIDEOGRAPHER:  We're going back on the
3 record.  The time is 12:44 p.m.  Please continue.
4             EXAMINATION
5 BY MR. SCHNELL:
6    Q   Good afternoon, Dr. Pallansch.  As I
7 introduced myself earlier, my name is Gordon
8 Schnell, and I'm from Constantine Cannon, and we're
9 counsel for Relators in this action.
10        I'd like to ask some general questions on
11 the mission of the CDC in terms of purchasing
12 vaccines.  So can you just tell me generally, what
13 is the purpose that the CDC is hoping to achieve
14 with its purchase of vaccines?
15    A   So the overall purpose, of course, is
16 disease reduction, and in, as I mentioned earlier,
17 specific instances where we're contributing to
18 elimination eradication goals globally.  But
19 ultimately, the purpose is to eliminate -- or
20 control the disease burden due to
21 vaccine-preventable disease.
22    Q   And how does the CDC hope to accomplish
23 that through its purchase of various vaccines?
24    A   So basically, after the problems in the
25 '80s related to vaccine-preventable disease

Page 97

1 resurgence, there was the Vaccine for Children act
2 that attempted to address some of the disparities
3 related to vaccine coverage.
4         So, again, there's the whole history of
5 the VFC, and that made a public sector component to
6 the vaccine delivery market.  And it's basically
7 been CDC that has administered and, you know, had
8 management over key elements of that program, along,
9 again, with states and providers.
10    Q   And is it the CDC's goal in purchasing
11 vaccines to prevent outbreaks?
12    A   Again the primary purpose is to reduce
13 disease burden.  The individual results can vary
14 depending on the specific vaccine or virus type of
15 disease and how it's transmitted.
16    Q   And is the CDC funded through the national
17 vaccine program for a large portion of its purchase
18 of vaccines?
19    A   So the funding, again, comes through this
20 Vaccine for Children program.  There is other
21 funding available related to immunizations that are
22 more broadly applicable to the infrastructure of
23 vaccine administration and support at the state
24 level.
25    Q   In terms for the -- in terms of the

25 (Pages 94 - 97)

Appx1740

HIGHLY CONFIDENTIAL

Page 98

1 Vaccine for Children program, is that funding coming
2 from Congress?
3  A  So my understanding that at least a key
4 component of the VFC funding is more of an
5 entitlement-type funding scheme.  Some of the
6 funding related to other aspects of vaccination are
7 appropriated funds.
8  Q  And in terms of any of this funding, are
9 there certain requirements that the CDC has to
10 undertake in order to secure the funding?
11  A  I am not aware of the answer to that
12 question.
13  Q  There's also something called a 317
14 program?
15  A  Correct.
16  Q  And what program is that?
17  A  So that's where I was referring to funding
18 that is appropriated to support operational
19 components of vaccine programs at a state and local
20 level.
21  Q  How important is it to the CDC in carrying
22 out its mission of disease reduction to understand
23 the benefits and risks of the vaccines that it's
24 purchasing?
25  A  So, I mean, it is a component of how

Page 99

1 vaccines are assessed.  That's part of the process
2 of generating an ACIP recommendation.
3       So in the workings of the work group,
4 those pieces of information are certainly collected
5 as part of putting together an understanding of how
6 vaccines behave.  And, of course, in the early days
7 when you have new vaccines, it's much more the data
8 is limited to a lot of the initial clinical trials.
9 And then as we go along, we look at the cumulative
10 body of data related to vaccine effectiveness.
11       But certainly, safety and effectiveness
12 are two key evaluation criteria.
13  Q  And why are they two key evaluation
14 criteria?
15  A  Because what you want is a vaccine that
16 maximizes the effectiveness and minimizes the safety
17 risk.  And since there's no absolute, it does depend
18 on the severity of the disease itself, where the
19 benefits can be greater for severe diseases and less
20 for more mild disease, if you will.
21  Q  Other than the effectiveness of a
22 particular vaccine, is there any other
23 characteristic of the vaccine that you would include
24 within the term "benefits"?
25  A  I guess I would have to think about the

Page 100

1 definition of benefits.  Because, of course, the
2 primary benefit of giving vaccine is disease burden.
3 Are there other types of benefits, they're not in
4 the same category.
5  Q  And when you say disease burden, are you
6 just meaning the contracting of the disease?
7  A  So yes, and our reference point usually
8 being a pre-vaccine era estimate of the disease
9 burden.
10  Q  Now, you said the benefits and the risks
11 of the vaccine are two of the key criteria in the
12 CDC's mission to reduce disease, correct?  What are
13 some of the other criteria?
14  A  So then there are -- in terms of the
15 vaccine itself, those are the major things.  I mean,
16 there are issues having to do with, for example, are
17 there additional cold chain requirements for a
18 vaccine that are new and different than current cold
19 chain requirements, so some of the logistic
20 practicalities of a vaccine, are there specific
21 schedule issues that would complicate delivery of
22 vaccine to the target population.  Those are
23 examples of other challenges, but, you know, that's
24 more of an operational type of issue.
25  Q  Is it fair to say that the effectiveness

Page 101

1 of a vaccine is one of the key criteria the CDC
2 looks at in deciding whether to purchase that
3 vaccine?
4  A  That is the key criteria that we monitor.
5 It is certainly not a key element of the decision to
6 purchase.  Once it is a recommended vaccine, then
7 the purchase through VFC, for example, once there is
8 a VFC approval, is automatic.  So that could affect
9 ACIP recommendations, but not purchasing.
10  Q  And is it fair to say that in terms of the
11 ACIP recommendations for a particular vaccine, the
12 effectiveness of the vaccine is one of the key
13 determinants?
14  A  That is -- certainly is evaluated
15 routinely and is a key function of what we do here
16 at CDC.
17  Q  And is that true for vaccines that are
18 already on the market?
19  A  Correct.
20  Q  So just because a vaccine has been
21 recommended by ACIP doesn't mean that the CDC is
22 going to stop assessing whether or not the vaccine
23 is still effective; is that true?
24  A  Correct.
25  Q  What are some of the other factors that go

26 (Pages 98 - 101)

Appx1741

HIGHLY CONFIDENTIAL

Page 102

1 into the ACIP recommendation of whether a particular
2 vaccine should be given?
3     A  I mean, the -- again, safety and efficacy
4 are for new vaccines.  And then, once you have
5 vaccine effectiveness data, that generally comes
6 after the fact in terms of -- sometimes, though, the
7 ACIP could want additional data, but it's usually
8 not effectiveness data.
9         So our monitoring vaccine effectiveness is
10 almost always in the context of potential revisions
11 to recommendations based on actual experience.
12        So I'm not completely sure of the nature
13 of your question, so maybe you might want to ask it
14 again.
15    Q   Well, I can ask a slightly different
16 question.  If there is a determination made by the
17 CDC that a vaccine is not performing at the
18 effective level -- at the effectiveness level it
19 needs, what is the process, if any, that the CDC
20 undertakes to address that issue with its continued
21 purchases of that vaccine?
22    A   Okay.  So the process would be any new
23 data, regardless of positive-negative, would be put
24 together in the scope of the collective body of
25 information.

Page 103

1        The ACIP work group, in addition to, of
2 course, our staff in their normal work, would be
3 trying to understand the new data in the context of
4 previous knowledge.  That can then lead to informing
5 the ACIP is there a necessity to reevaluate a
6 recommendation.
7        So it'll be stepwise process going through
8 the assessment of any new information, does that
9 change the perspective.
10        So the new information can be vaccine
11 effectiveness estimates from outbreaks or some other
12 new information.  It could be new safety
13 information, which has occurred on occasion in the
14 past for other vaccines.
15    Q   And what are the -- what are the array of
16 potential steps that the ACIP would take if it
17 reached the conclusion that the vaccine wasn't as
18 effective as the CDC needed it to be?
19    A   I couldn't speculate on a specific change
20 in their decisions because, again, the process would
21 be followed, and the work group would generate
22 alternatives to -- for the ACIP to consider.  And
23 how they would deliberate upon that, I don't know.
24    Q   In terms of the CDC's decision to purchase
25 a particular vaccine, is the only criteria to which

Page 104

1 it looks is whether ACIP has recommended that
2 vaccine?
3     A   It needs to be a licensed vaccine and part
4 of the recommended immunization schedule.  And then,
5 of course, it's all a procurement process at that
6 point.
7     Q   And are we talking about a -- let's talk
8 about a -- the trivalent mumps, measles, rubella
9 vaccine.  Now, does ACIP recommend a particular
10 brand of that trivalent, or does it just recommend
11 that that's a trivalent that should be given on a
12 certain schedule?
13    A   So it recommends vaccination against a
14 specific agent, and in this particular case there's
15 only one product available; but the point being is
16 it is recommending that children in the United
17 States be routinely vaccinated against MMR.
18    Q   So it's not ACIP's recommendation that
19 children should be given Merck's M-M-R II or GSK's
20 Priorix, they're just recommending an MMR vaccine
21 should be given to children on this schedule?
22    A   Yes.
23    Q   Then how is the decision at the CDC made
24 as to which of the particular types of vaccines that
25 ACIP recommends should be purchased?

Page 105

1     A   That's a procurement issue.
2     Q   Well, are you involved -- or is the
3 substantive side of the CDC like your group involved
4 in assessing which of multiple options of vaccines
5 that are ACIP recommended should be purchased?
6     A   So in general there are two technical
7 reviews, if you will, one during the work group
8 process, where the actual products and the data
9 available for those products are assessed in the
10 same way as a body of literature.  And there can be
11 occasions where there is a product that is superior
12 in performance could get a preferential
13 recommendation, but in general the recommendation is
14 to vaccinate.  So it's often product neutral.
15        Second part -- where I lost -- was back to
16 the procurement part is a technical assessment of
17 the ability to meet the specifications of the RFP.
18 And so that assessment is much more of a business
19 assess -- technical assessment on delivering product
20 according to scheduling and labeling and other
21 requirements.
22    Q   So that's the procurement arm.
23    A   Yeah.
24    Q   And what was the other arm, what would you
25 call it?

27 (Pages 102 - 105)

Appx1742

HIGHLY CONFIDENTIAL

Page 106

1 A Well, I mean, it is part of the ACIP
2 process prior to any consideration; because once the
3 ACIP recommendation, the procurement process then
4 starts.
5 Q So if there are multiple suppliers of a
6 particular vaccine, does the CDC assess each of the
7 products that those suppliers are offering to make
8 sure that they satisfy the CDC's demands?
9 A So there -- I mean, on the supply side,
10 yes, because the -- there is a certain minimum
11 supply needed in the United States. And so the
12 request for proposal would address the ability to
13 deliver enough quantity.
14 From the technical point of view, we still
15 can evaluate multiple products as part of the ACIP,
16 but usually it will come down to is either can meet
17 the specification for disease control.
18 Q And what are the factors the CDC looks to,
19 to see if it can meet those specifications?
20 A The actual properties of the vaccine part
21 of the equation, is that what you're asking?
22 Q Yes.
23 A Yeah. So, I mean, this is still the same
24 evaluation process, where we absolutely are aware of
25 when new clinical trials are conducted. Sometimes

Page 107

1 they're overseas. But more typically, with
2 established vaccines, we are looking at new vaccine
3 effectiveness estimates and how they compare to the
4 body of literature.
5 Q And if there was a source of literature
6 that the CDC believed was problematic in one respect
7 or another, whether it's safety or effectiveness,
8 what would be the next step the CDC would take
9 before deciding to continue purchasing that product?
10 A So, again, separate steps. The ACIP
11 considerations relates to a process, which is now
12 very formalized, where the quality of the data is
13 assessed explicitly according to fixed criteria.
14 It's referred to as the grade process. And so the
15 ACIP now routinely uses that for all deliberations
16 around information supplied to the ACIP.
17 So that's where each new piece of data,
18 regardless of what it is, is also assessed for the
19 quality of the data and the degree, of course, to
20 which it may be generalizable or not generalizable
21 to the US population.
22 And as you look at vaccines that are
23 targeted to more specific subpopulations, that
24 becomes more relevant; but, for general
25 recommendations, the criteria is applied just to

Page 108

1 each individual study on the nature of the study and
2 then the quality of the data, often having to do
3 with things as simple as, okay, the number of
4 children enrolled in the study, for example.
5 Because the smaller the number, the lower the power,
6 the broader the confidence intervals.
7 Q And this grade process, is this something
8 new?
9 A Well, new in the sense of it's been over
10 the last decade introduced into the ACIP work
11 groups. So it wasn't a fixed date in time where all
12 of a sudden all work groups were, you know,
13 converting over to this; but, certainly, all new
14 work group activities, this is required, and the --
15 you know, that's one of the things the ACIP has in
16 its reports is the grade report from the work
17 groups. So it's usually now part of almost all the
18 presentations to the ACIP.
19 Q And what's the end result of the grade
20 process?
21 A It can affect how some of these unusual
22 data are interpreted. So if it's data that's out of
23 line with the mainstream data, but it has a very low
24 grade in terms of the, you know, quality or
25 generalizability of the data, then it will have less

Page 109

1 weight in the deliberation.
2 Q And is there a score at the end of the day
3 that each vaccine receives in the grade process?
4 A Functionally, there is a grade that is
5 assigned, yes, to each of the evaluations.
6 Q And is it a pass or fail, or is it a --
7 you know, some kind of --
8 A It's a tiered.
9 Q And what are the criteria that go into
10 what the ultimate grade result is?
11 A So I can't recite those from memory, but
12 they are certainly published in the ACIP.
13 Q What do they generally relate to?
14 A Again the power of the study, meaning how
15 many subjects enrolled, who they are affects
16 generalizability, whether the study design -- again,
17 whether it's placebo-controlled randomized, you
18 know, study, or it's really a cohort study, they all
19 have different strengths. And, then, of course, the
20 analysis and the endpoints.
21 Q Is the ultimate purpose is to get some
22 kind of measure of how effective the vaccine is at
23 preventing disease?
24 A In aggregate, across all of the studies,
25 yes.

28 (Pages 106 - 109)

Appx1743

HIGHLY CONFIDENTIAL

Page 110

1    Q    And is safety another measure that's part
2  of this grade process?
3    A    Safety data can be considered if there is
4  new information, yes.
5    Q    Anything else in terms of what the
6  ultimate measure of this grading process is supposed
7  to result in?
8    A    I mean, the grading process itself is to
9  try to account for the issue that I brought up
10  earlier in trying to compare studies, you know,
11  across different situations, countries, so that
12  there's a better understanding of the variables that
13  can affect the interpretation, both in the
14  individual study and in aggregate.
15       So the ACIP would be, you know, much more
16  concerned if there was wide variation in what are
17  otherwise good studies than they would be is if most
18  studies largely agree, and there's only one outlier
19  that was done poorly.
20    Q    So -- and I apologize if I'm being daft,
21  but if we have a vaccine that has been recommended
22  by ACIP, flu, let's take the flu --
23    A    Uh-huh.
24    Q    -- is a good example, where there are
25  multiple potential suppliers, now ACIP isn't

Page 111

1  recommending which of the suppliers makes the cut,
2  is it; it's just saying we want a flu vaccine on
3  this schedule?
4    A    So it depends on the individual vaccine
5  meeting the needs of the program.  So if the
6  efficacy is very different, they could come up with
7  a different conclusion.
8       Often, if you have, you know, situations
9  where the vaccine is produced, you know,
10  identically, all the flu vaccines in eggs, there is
11  a precedent on how, of course, you evaluate those.
12  If you have a brand new flu vaccine that is
13  fundamentally different, they're going to not only
14  look at the -- you know, the efficacy and safety of
15  that vaccine, but they will look in the context is
16  it markedly better or is it markedly worse.
17    Q    What role, if any, does the vaccine
18  manufacturer play in terms of the CDC's
19  determination as to whether or not a vaccine is
20  effective enough for purchase?
21    A    So we don't answer the question effective
22  enough.  What we do is use information that
23  manufacturers are willing to provide, often
24  unpublished, that can inform the work group of data
25  relevant to the question of vaccine efficacy or

Page 112

1  effectiveness.  Often it's efficacy that's the data
2  that they have.
3    Q    Now, if the vaccine manufacturer has
4  information that relates to problems with
5  effectiveness, is that information that they are
6  required to give to the CDC?
7    A    So they probably don't have effectiveness
8  data, but the issue would be is if they had efficacy
9  data indicating something different, they are not
10  obligated to share unpublished data with CDC
11  specifically.  But I think if this were a change in
12  the product, then it would probably be more likely
13  the FDA would be the initial official contact, and
14  we could be informed officially or unofficially.
15    Q    Is there an expectation on the part of the
16  CDC that if a vaccine manufacturer that is selling
17  the CDC vaccines has information relevant to the
18  safety and effectiveness of the vaccine, it's going
19  to provide that information to the CDC?
20    A    So there is a separate system for safety
21  issues related to adverse events.  This is external
22  to the programmatic elements of the vaccine program
23  and is jointly managed by FDA and the CDC.  And it
24  also is something where anybody can report adverse
25  events.  And so that monitoring is a separate

Page 113

1  system.
2       Often safety issues are brought up to FDA.
3  CDC becomes aware of them quite quickly.  So there
4  are informal ways that these are communicated on the
5  safety side.
6       The other side on the effectiveness or
7  efficacy is handled in the process that I've
8  described previously, going through the -- you know,
9  the program people often are the ones who inform the
10  work group that there is new data.
11    Q    But in terms of what the vaccine
12  manufacturer might know of any potential problems
13  with the effectiveness of its vaccines, is that
14  information that the CDC expects the manufacturer
15  will share with the CDC?
16    A    I don't know that "expectation" is
17  necessarily the word.  In general, I can't think of
18  examples where we were unaware of something for any
19  prolonged period of time that was of significance.
20  So the only issue is is, you know, how significant
21  a piece of data is, because it's not an either or.
22    Q    So if a vaccine manufacturer had
23  information that significantly -- or that related to
24  a significant problem with its effectiveness, and it
25  did not share that information with the CDC, would

29 (Pages 110 - 113)

Appx1744

HIGHLY CONFIDENTIAL

Page 114

1 that impact the CDC's -- and the CDC ultimately
2 finds out, would that impact the CDC's decision to
3 continue purchasing that vaccine?
4     A    Two-step process.  It's still evaluating
5 the new information in the context, understanding
6 why any new information gives a different answer,
7 and then it would require the ACIP to change its
8 recommendation.
9         So the other side would be the FDA and
10 whether they would have concerns about its -- the
11 licensure of the product.
12     Q    Does the CDC have any kind of duty to warn
13 the public about the safety and effectiveness of the
14 vaccines that it purchases?
15     A    So the safety and effectiveness of the
16 vaccine is part of the vaccine information
17 statement, and that's what CDC uses as its
18 notification.
19     Q    And does the CDC rely on the vaccine
20 manufacturers in any way in putting together those
21 statements?
22     A    So the -- the data in those statements is
23 a compilation of available data both from
24 manufacturers and elsewhere, and is summarized in a
25 way that is helpful to providers in informing their

Page 115

1 patients.  But we have reviewed those documents, of
2 course, every time they are revised.
3     Q    What's the current ACIP recommendation for
4 mumps?
5     A    So the current recommendation is MMRs.
6 And it was only in 2006 that the ACIP formally
7 included the mumps as a rationalization for two
8 dose.  So two-dose MMR, again, recommended 12 to 15
9 months and four to six years is the MMR
10 recommendation for routine use.
11     Q    And the CDC currently does not purchase
12 any mumps monovalent vaccine, correct?
13     A    That is my understanding.
14     Q    Do you know when the last --
15     A    I do not know the last procurement for a
16 VFC program.
17     Q    So if the CDC is going to purchase a mumps
18 vaccine, currently it's limited to purchasing it in
19 the context of either a trivalent MMR or in a
20 quadrivalent ProQuad; is that true?
21     A    Those are the two licensed products that
22 I'm aware of in the US at this moment.
23     Q    So in terms of the consideration of
24 providing a third dose of mumps vaccine that you
25 talked about before lunch, currently if the CDC goes

Page 116

1 down that -- if ACIP goes down that road, it's going
2 to have to be provided along with a third dose of
3 measles and rubella?
4     A    Correct.
5     Q    Does that weigh into the decision as to
6 whether or not there will be a third dose
7 recommended?
8     A    In a indirect way, of course, we then need
9 to review what is known about the safety profile as
10 it relates to the measles and rubella component
11 because the control of measles and rubella in the
12 United States is not contingent on a third dose
13 response to outbreaks, even though it has on
14 occasion been used that way.
15        So the main concern is still going to be
16 third dose vaccine effectiveness data, which is
17 usually collected in the context of outbreaks.
18     Q    And in terms of the CDC's consideration of
19 whether or not a third mumps dose would be
20 worthwhile, is it true that it's only considering it
21 in the context of outbreak control?
22     A    That is the main focus at the moment, but
23 we certainly recognize the more general implication.
24 And there has not been a lot of work to date, but we
25 are certainly aware that, you know, that is a

Page 117

1 question that can be coming up.
2     Q    But it's not a question that the CDC is
3 currently looking at, and that question being
4 whether or not a third dose should be part of the
5 regular regimen of mumps-containing vaccines?
6     A    Correct.  Our current focus is on third
7 dose in an outbreak setting.
8     Q    And the CDC has not come to a conclusion
9 one way or the other as we speak as to whether or
10 not ultimately it's going to recommend a third dose
11 in an outbreak setting, is that true?
12     A    This is ongoing work of the work group.
13     Q    As far as you know, has Merck ever
14 disclosed to the CDC any types of problems with the
15 effectiveness of its mumps-containing vaccines?
16     A    I am not aware certainly in the period
17 where I had more direct access.  And, again, even
18 from '99 to present, I am not aware of a specific
19 issue brought up with that context.
20     Q    Are you aware of Merck ever disclosing to
21 the CDC any issues with the safety of its
22 mumps-containing vaccines?
23     A    No.
24     Q    Are you aware of Merck ever bringing up to
25 the CDC any issues relating to the potency of its

30 (Pages 114 - 117)

Appx1745

HIGHLY CONFIDENTIAL

Page 118

1 mumps-containing vaccines?

2   A  Potency, no.

3   Q  Are you aware of Merck ever bringing up

4 with the CDC any issues relating to the shelf-life

5 of its mumps-containing vaccines?

6   A  No.

7   Q  Are you aware of Merck ever bringing up

8 with the CDC any issues relating to Merck's

9 compliance with the label specifications of the

10 mumps component of its mumps-containing vaccines?

11   A  No.

12   Q  Are you aware of -- and I apologize for

13 the --

14   A  No, no, that's fine.

15   Q  Are you aware of Merck ever bringing up to

16 the CDC any issues with respect to the failure --

17 any issues associated with failing to comply with

18 the FDA license of its mumps-containing vaccines?

19   A  No.

20   Q  Are you aware of Merck ever disclosing to

21 the CDC any warning letters it received from the FDA

22 in connection with its mumps-containing vaccines?

23   A  No, but I may not have been in a position

24 to be aware of it, so -- but I personally have not

25 been aware.

Page 119

1   Q  Are you aware of Merck bringing up to the

2 CDC any issues that it has run into with the FDA in

3 terms of any adverse actions the FDA has taken

4 regarding Merck mumps-containing vaccines?

5   A  So I -- in that narrow sense, no, so.

6   Q  Is there a broader sense in which you have

7 some information?

8   A  Well, I mean, like Exhibit 10, where there

9 were issues with the assay and the change in the

10 assay in 2000 and -- the measurement of the

11 different strains. That is an issue, but it's one

12 that we were investigating anyhow.

13       But, again, that's a -- it's an issue

14 with, okay, why did you change the ELISA, just like

15 when we change we have to document, you know, why we

16 changed something. And so that was more of a

17 question, and part of the consultation was trying to

18 understand that.

19   Q  Now --

20   A  Oh, is it -- 11, excuse me. Exhibit 11,

21 so.

22   Q  Now, was that -- was that connected to any

23 adverse action taken by the FDA?

24   A  Not that I'm aware. It was something

25 volunteered by the company, and, of course, the

Page 120

1 laboratory people were interested.

2   Q  And what exactly was volunteered by Merck?

3   A  So what's in that presentation was what

4 was provided by the company during this

5 consultation.

6   Q  And is this the extent of what Merck

7 shared with the CDC on this issue?

8   A  As far as I know, because I wasn't there

9 for the discussion. They may have verbally included

10 other information, but I'm not aware.

11   Q  Can we take a look at that exhibit?

12   A  Uh-huh.

13   Q  And what change of assay were you

14 referring to?

15   A  So on slide 4, where it refers to legacy

16 ELISA format and current ELISA format.

17   Q  And you said the CDC did its own

18 investigation into that?

19   A  No. So we became aware of this issue --

20 which is related to the question you were asking --

21 we became aware of the issue, but we did not have

22 other information about the context for this change

23 or any practical implication from that change.

24   Q  So CDC wasn't aware as to why Merck

25 changed its ELISA format?

Page 121

1   A  Correct. And I don't think we fully

2 understand even to this day, but changing assays is

3 not unusual.

4   Q  Was the CDC aware of how Merck selected

5 the serostatus cutoff for that ELISA?

6   A  I don't know the details of that, but

7 that's an obvious question.

8   Q  But there's nothing in this presentation

9 at least that discusses how Merck selected the

10 serostatus cutoff that it used for that assay; is

11 that correct?

12   A  From this presentation, that's not

13 discernible. And that's why I was going over the

14 slides earlier, to see if I could find that

15 information in the presentation.

16   Q  And you're not aware of any other

17 information that Merck provided the CDC in

18 connection with its change of ELISA assay outside of

19 what's in this presentation; is that correct?

20   A  I am not aware. There could have still

21 been communication within the work group context

22 trying to explain some of this, but I don't know and

23 can't recall seeing any specific data from the work

24 groups.

25   Q  And if you turn to page 9 of the

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL

Page 122

1 presentation, there's a reference to 007 mumps end
2 expiry.
3    A    Uh-huh.
4    Q    All right.  Are you familiar with what
5 that trial was?
6    A    Yes, vaguely.  Yes.
7    Q    What's your understanding of that trial?
8    A    No, I mean it -- the end of expiry is what
9 sort of response do you get at vaccine at the end of
10 the shelf-life versus at the beginning of
11 shelf-life.
12    Q    Does the CDC have any information, as far
13 as you know, as to why Merck conducted that clinical
14 trial?
15    A    The context, you mean?
16    Q    Yes.
17    A    Yeah, no, I don't think we do.
18    Q    Does the CDC, as far as you know, have any
19 information as to the results of that clinical
20 trial?
21    A    Well, I mean, what's presented here.
22    Q    Outside of what's presented here?
23    A    Would we -- we could have other details
24 from this, because I know it was at least discussed
25 from the point of view of the data that was related

Page 123

1 to the one-year time point, because that was of
2 interest, as opposed to the six-week time point.
3         So I know there was follow-up discussion
4 about the one year, but I'm not so sure they were
5 looking at it from a shelf-life perspective.
6    Q    Did Merck ever share with the CDC that --
7 the results -- are you familiar that this 007
8 clinical trial had an ELISA component and a PRN
9 component?
10    A    That's what I'm concluding from just
11 examining this presentation, because I'm assuming
12 some of the other tables are the same set of sera,
13 but I don't have the details in front of me to
14 confirm that.
15         MR. SANGIAMO:  I'm just going to make an
16 objection that I think questions about protocol 007
17 are outside the scope of this deposition.  I'm
18 looking over the listing of topics as I'm saying
19 this, but I believe it's outside the scope of this
20 deposition.
21         MR. SCHNELL:  I don't think so.  I think
22 anything related to what information Merck has
23 shared with the CDC regarding its mumps vaccine is
24 well within the scope of this deposition.
25         MR. SANGIAMO:  Where do you see that?

Page 124

1         MR. SCHNELL:  In the 50 topics that
2 collectively we've listed, I think it falls well
3 within that.
4         MR. SANGIAMO:  Okay.  Well, you have my
5 position.
6 BY MR. SCHNELL:
7    Q    Now, earlier when -- if you'd turn to
8 page -- slide number 11, and you were asked
9 questions about this table, you responded that you
10 would need to know the details of the assay.  What
11 did you mean by that?
12    A    So the other slides in the presentation
13 all refer to ELISA assays.  And a seroconversion
14 measured by ELISA would require clarification on the
15 how you define seroconversion.  And the fact it's a
16 seroconversion ratio means that there is a unit that
17 is being created which is specific to this assay.
18         And so without the details, I would still
19 be limited on how I would be able to interpret those
20 differences.  So typically what I would need is, of
21 course, raw data and the protocol.
22    Q    So in just presenting this table to the
23 CDC, is it fair to say that it was of limited
24 meaning in terms of evaluating the results of these
25 studies?

Page 125

1    A    For the specific comparison of strains,
2 showing the difference is meaningful.  And it's not
3 different than studies CDC has been conducting
4 itself.  It's just, again, the absolute quantitative
5 number of 61 percent versus, you know, 75 percent,
6 in order to interpret that, there's not sufficient
7 data here.
8    Q    Now, in discussing the protocol 7 clinical
9 trial, as far as you know did Merck ever disclose to
10 the CDC that the FDA basically discarded the results
11 of those -- of that trial for being insufficiently
12 robust?
13         MR. SANGIAMO:  Objection.
14         MS. SNOW:  You can answer if you
15 understand the question.
16    A    Okay.  So, again, without knowing the
17 details of the protocol, we were not informed of any
18 interaction related between Merck and FDA.
19 BY MR. SCHNELL:
20    Q    And I think it's fair to say -- well, ask
21 it, did Merck ever disclose to the CDC, as far as
22 you know, that it falsified data in connection with
23 protocol 7?
24         MR. SANGIAMO:  Objection.  You can answer.
25    A    I have no awareness of any issue like

32 (Pages 122 - 125)

Appx1747

HIGHLY CONFIDENTIAL

Page 126

1 that.
2 BY MR. SCHNELL:
3    Q   And did Merck ever disclose to the CDC
4 that the FDA required Merck to -- I'll strike that.
5        Did Merck ever disclose to the CDC, as far
6 as you know, that it committed any kind of fraud
7 before the FDA in connection with protocol 7?
8        MR. SANGIAMO: Objection.
9    A   I am not aware of any.
10 BY MR. SCHNELL:
11   Q   Now, in terms of an ELISA test, the
12 reliability of an ELISA test is only as valid as --
13 reliable as the serostatus cutoff is, is that a fair
14 statement?
15   A   No, there are other parameters of ELISA
16 tests that affect its reliability.  And the endpoint
17 also matters.  So the use of an ELISA will also
18 affect its reliability.
19        So the endpoint is actually usually an
20 issue of determining sensitivity and specificity,
21 not really reliability.  Reliability usually
22 reflects reproducibility of the test.
23   Q   So let me reframe the question because
24 you -- it was a poorly worded question.  Does it
25 matter to the accuracy of an ELISA test in terms of

Page 127

1 measuring whatever endpoint it is seeking, does it
2 matter what serostatus cutoff is selected?
3    A   It will matter in the interpretation of
4 the result.  In other words, the ELISA assay will
5 give you a number.  How you use that number in the
6 combination with different specimens, different
7 cutoffs, affects the interpretation of either
8 positive or negative.
9    Q   And in terms of the interpretation of the
10 results of an ELISA test, what are some of the ways
11 that an interpretation could be misconstrued if a
12 serostatus cutoff is used which wasn't the
13 appropriate one?
14   A   So it can affect both sensitivity and
15 specificity.  And that's why usually you will
16 compare an ELISA to some other reference method to
17 try to achieve some correlation -- high correlation
18 with what is considered a gold standard.
19        In the specific case of mumps, there isn't
20 really a true gold standard as it relates to the
21 protection.  Therefore, neutralization has been the
22 de facto gold standard, so you would want to see
23 ELISA results in categorizing response versus
24 response as measured by neutralization.  So you
25 would want to see those data side by side.

Page 128

1    Q   If you turn to the conclusion of this
2 presentation -- that's slide 12 -- the first bullet
3 point says:  No evidence of decrease in PD-1
4 immunogenicity since 1993.
5        And I believe PD-1 is -- maybe you know
6 what it is.  I think it's first dose, but is that
7 your understanding?
8    A   So it's defined on slide 3 as post-dose 1
9 immunogenicity.
10   Q   And is that the CDC's current
11 understanding, that there has been no evidence of a
12 decrease in immunogenicity of the mumps component of
13 M-M-R II since 1993?
14   A   We have no data to inform the temporal
15 trend over that period of time.  So the data has all
16 of these limitations that I've referred to, to come
17 up with a specific either is or is not changing over
18 time.
19   Q   Now, we've gone through this morning
20 several publications associated with the CDC where
21 there were certain effectiveness numbers that were
22 given, and they were -- as you explained, they were
23 estimates that were taken from various studies that
24 the CDC was summarizing.
25        Has the CDC done its own effectiveness

Page 129

1 studies for mumps-containing vaccine?
2    A   Yes.  So several of these studies are ones
3 that we were directly involved with.  And all of the
4 ones so far have reflected where we have been
5 actually involved in the outbreak investigation
6 directly.
7    Q   And is it true that since 2010 the range
8 of the effectiveness estimates has widened?
9    A   There has been no significant change in
10 the estimates of vaccine effectiveness for more than
11 10 years, in general.
12        Again, as I pointed out earlier, the
13 context of those estimates changes depending upon
14 the nature of the outbreak.
15   Q   And how does that -- how is that?
16   A   As the outbreaks have gotten into older
17 age groups, the effectiveness as measured in those
18 outbreaks can change as it relates to the time after
19 vaccination.
20   Q   And how have those effectiveness estimates
21 changed?
22   A   So when we have measured them, they have
23 been significantly lower than the average
24 effectiveness of two doses that we have reported in
25 those specific circumstances.

33 (Pages 126 - 129)

Appx1748

HIGHLY CONFIDENTIAL

1    If you, however, look at the recently
2  vaccinated, they're completely consistent with the
3  previous estimates.
4    Q   Now, that hasn't made its way into the CDC
5  literature yet -- or at least the ones we looked at
6  this morning, right?
7    A   So these are older publications.  And as I
8  said, even a couple weeks ago there was this -- you
9  know, we have the new publication on the Iowa
10 results.  And these are where we have been looking
11 in more detail on this issue of potential waning
12 immunity and the effect that that has on these
13 outbreak settings.
14    We're still looking at other issues, like
15 why does the outbreak remain mostly confined to the
16 campus and not in the general community, and this is
17 back to the force of infection question on the
18 table.
19    Q   Now, some percentage of individuals that
20 contract mumps don't show symptoms; is that right?
21    A   Correct.  And, I mean, it was variously
22 estimated as 30 percent in the pre-vaccine era.
23    We have made some attempts to try to see
24 if that number has changed.  And that's also very
25 difficult.  And I'll have to say the last time we

1  tried it, we were unable to get an answer.
2    Q   But the effectiveness estimates that we
3  looked at this morning and that the CDC has on its
4  various publications, does it take into account the
5  fact that there is this significant percentage of
6  individuals who contract mumps but don't show signs?
7    A   Yes.  And, I mean, those -- that issue is
8  specifically mentioned in several of the discussions
9  in those papers we looked at today, that that is a
10 limitation on the study, and that we only look at
11 clinical disease.
12    Q   So the 80 -- whatever that -- whatever
13 the -- here, let's take a look at it.  I think it
14 was Exhibit 2.
15    So these figures, first of all, are only
16 measures of what occurred in outbreak settings,
17 correct?
18    A   So the vaccine effectiveness has almost
19 exclusively been measured in outbreak settings.
20    Q   And so let's take the one-dose measure at
21 78 percent.  Is that just the mean of 49 to 92, or
22 the average, or is it some other -- is there some
23 other way that that number was --
24    A   So it represents multiple independent
25 studies where we have both the mean and the median

1  of those numbers; but it is a summary measure for
2  the studies, not the range within the study.
3    Q   And does that 78 percent figure in any way
4  account for the percentage of individuals who may
5  have contracted mumps but did not show signs?
6    A   So in the calculation it can't.  It would
7  result in an adjustment, but that's -- again, the
8  effectiveness is related to disease.  Counting the
9  other individuals is related to our question around
10 its effect on transmission as a tool to stop
11 outbreaks, for example.
12    So when we talked about the specifics of
13 do you control outbreaks, that asymptomatic or mild
14 subclinical disease would be relevant, but is not
15 specifically relevant to the calculation of
16 effectiveness which focuses on disease.
17    Q   Where did we leave off?  Is it 11?  12.
18    A   I've got 11.
19    (Exhibit 12 marked.)
20 BY MR. SCHNELL:
21    Q   I'd like to mark as Pallansch Exhibit 12
22 an article from The New England Journal of Medicine
23 titled Effectiveness of a Third Dose of MMR Vaccine
24 for Mumps Outbreak Control, with a publication date
25 of September 2017.

1    I think this is the study that you have
2  been referring to?
3    A   Yes.
4    Q   Is this the most recent study by the CDC
5  as it relates to effectiveness of the mumps
6  component of MMR?
7    A   This is our most recent published data,
8  yes.
9    Q   And is it true that with respect to
10 individuals who had been vaccinated more than
11 13 years before the outbreak, that the effectiveness
12 rate measured was 31.8 percent?  That's on --
13    A   That sounds familiar, but --
14    Q   -- page 951.
15    A   So that -- that's where I'm trying to --
16 that's in the text you're referring, yes.
17    Q   Yeah.  It's right above discussion.
18    A   Right, yes.  Uh-huh.
19    Q   Now, is that the lowest effectiveness
20 level for a mumps-containing vaccine that the CDC
21 has ever encountered?
22    A   That I don't know because, again, it's a
23 single arm of a comparison.  And some of the other
24 point estimates, even though with, you know, broad
25 confidence intervals, may have shown up in other

34 (Pages 130 - 133)

Appx1749

HIGHLY CONFIDENTIAL

1 studies where they were underpowered.
2        So I can't say explicitly, but in terms of
3 fairly quality data, that's on the low side for
4 sure.  Now, lowest is a harder thing to be sure of.
5     Q    Was the CDC surprised in this result?
6     A    No, because similar results have been
7 observed in several previous outbreaks in college
8 populations, and that has been mentioned in some of
9 those other studies as well.
10       So this has been an issue that has
11 literally been part of our investigation since the
12 2006 outbreaks.
13    Q    Now, the CDC is continuing to conduct
14 outbreak studies to further assess whether or not a
15 third dose would be useful in that context, correct?
16    A    Uh-huh.
17    Q    Does the CDC have a conclusion one way or
18 another as to whether or not waning immunity is
19 playing a role in these outbreaks?
20    A    We are still investigating that as one of
21 several factors that may be affecting outbreaks, but
22 at this stage we believe it is a factor, but not
23 exclusive.
24    Q    What are some of the other factors that
25 the CDC believes are contributing to mumps

1 outbreaks?
2     A    So I mentioned previously, we are looking
3 at the issue of force of infection in the context of
4 outbreaks occurring in crowded settings being a
5 major contributor.  This was brought up in several
6 of the previous reports that we've had, including
7 New York and earlier college outbreaks.
8        We also believe there could be
9 hypothetically a strain difference, since recent
10 outbreaks have all been genotype G.  And as related
11 to the data in that table, as I said, we have been
12 looking at that issue for the last 10 years as well,
13 is there a difference between A and G that's
14 relevant to the effectiveness of the vaccine.
15       So those are a couple of examples of
16 additional factors that we are actively
17 investigating.
18    Q    Any other factors that the CDC is
19 investigating?
20    A    I mean, as I mentioned earlier, there are
21 many epidemiologic features of outbreaks that we
22 collect data about, so that if there is in that when
23 we're comparing across outbreaks the hint of other
24 possibilities, we also have people who can create
25 scenarios or hypotheses, and if they're testable,

1 then we follow them up.
2        So at this stage, it is part of the
3 analytic process, where we don't have a conclusion,
4 but it's certainly part of just our normal
5 investigation of outbreaks.
6     Q    Are there specific ones that you haven't
7 mentioned that you're looking into?
8     A    Well, I think -- in several of these
9 papers, there are things that are brought up that
10 may be outbreak-specific.  And that's why I say I'm
11 focusing on the ones that we believe are
12 generalizable to the more broad US population.  I
13 mentioned cold chain as being an issue, but that was
14 a very specific issue in, you know, one outbreak.
15       So there often are things we look at, for
16 example, the outbreak in the camps as it was related
17 to the -- you know, the New York outbreak, and
18 trying to understand what other issues could
19 contribute spread within that camp, because it
20 wasn't that crowded, for example.
21       So that's why, you know, we're attempting
22 to collect this data as part of hypothesis
23 generating.  And we certainly have no conclusion at
24 this time, but there is a consistent body of
25 evidence pointing to some of these factors as

1 probably contributing.  Which one's more important
2 than another, we have no conclusion at this time.
3     Q    Are you familiar with memory B cells and
4 how they relate to effectiveness?
5     A    Hypothesized effectiveness, yes.
6     Q    And is the CDC studying the connection, if
7 any, between memory B cells and outbreaks?
8     A    So we are -- when we have the opportunity,
9 partly limited by the availability of specimens, we
10 are looking at cell-mediated immunity broadly as it
11 reflects the protection and measurement of
12 protection related to vaccination.
13       Memory B cells is specifically related to
14 the component having to do with an anamnestic
15 response in that context where somebody is already
16 immune, undetectable antibodies usually, but upon
17 infection can have then an increase in antibody
18 production quickly, so there's a kinetic argument.
19       And it's now possible to separately
20 measure the quantity of these cells in circulation.
21 It's going to be challenging to figure out if that
22 is a better surrogate of protection or not.
23    Q    Before I move on to a new document, I
24 think we've been going an hour, so why don't we take
25 a break.

HIGHLY CONFIDENTIAL

Page 138

1 THE VIDEOGRAPHER: We're going off the
2 record. The time is 1:45 p.m.
3 (Recess 1:45-2:05 p.m.)
4 THE VIDEOGRAPHER: We're going back on the
5 record. The time is 2:05 p.m. Please continue.
6 BY MR. SCHNELL:
7 Q Dr. Pallansch, when did ACIP move to
8 recommend a two-dose mumps vaccine schedule?
9 A So the two-dose MMR schedule was formally
10 recommended, I believe, in the -- was it '89 or so?
11 I don't have the date completely in mind.
12 The mumps, as part of that recommendation
13 explicitly, was 2006, where it was basically made
14 compatible for the components, whereas measles and
15 rubella were earlier.
16 Q Did that coincide with a large mumps
17 outbreak that occurred in that time period?
18 A So the -- this was at the same time as the
19 2006 mumps outbreak, because the two-dose schedule
20 for MMR was driven by measles outbreaks in the late
21 '80s.
22 Q And did the specific move to include mumps
23 in that in 2006 have anything to do with the mumps
24 outbreak that occurred at that time?
25 A Indirectly probably had an effect on the

Page 139

1 timing, but it was something that was already part
2 of the consideration of the two-dose MMR, where the
3 recommendation at the time indicated the benefits to
4 mumps control.
5 Q Has there been a resurgence of mumps cases
6 over the last decade?
7 A There has clearly been a resurgence
8 particularly from 2006 till present compared to the
9 periods in between, which were notable after the
10 introduction both of MMR in general, but also the
11 two-dose schedule. But there were some outbreaks
12 even prior to that, in the mid 1980s, where there
13 was an increase compared to the earlier period in
14 that decade; but not of the equivalent scale
15 compared to the low baseline that's occurring in
16 between outbreaks in the 1990s and 2000s.
17 Q And I understand that you've testified
18 that the CDC is investigating potential causes of
19 the outbreaks. Is the CDC also investigating why
20 there has been a resurgence over the last decade?
21 A I mean, that's the reason we are looking
22 at these outbreaks, to understand the causes,
23 because it is different than the period previously
24 in some sense of they are occurring, and they are
25 larger than the smaller outbreaks that are occurring

Page 140

1 every year. Because most outbreaks in the United
2 States are small, less than 10 cases. So we're
3 trying to understand the anomalous outbreaks.
4 Q And so we've talked about the
5 investigation the CDC is conducting as to potential
6 causes of the outbreaks. My question is, are you
7 also investigating why whatever these causes may be
8 have only manifested themselves over the last
9 decade?
10 A That's part of trying to understand. So
11 we often are looking at it in terms of birth
12 cohorts. For example, the individuals affected,
13 what year were they born, and walking backward to
14 were they born during a period of one-dose policy,
15 two-dose policy.
16 And so we do take into context when they
17 were immunized in an absolute time scale. So we are
18 looking at that part of the trend over time to
19 understand what could contribute.
20 Related to that, of course, is that they
21 no longer get natural immunity from circulating
22 virus. So one of the factors, and the reason we
23 look, is back to the curve that shows how much mumps
24 was in a community at that point in time.
25 Part of the 2006 investigation we reported

Page 141

1 on was why was the outbreak focused in the Midwest
2 So that's giving some other clue that we're trying
3 to understand because, otherwise, the background
4 mumps is nationwide.
5 So there are many factors that we keep
6 looking at for trying to understand why mumps in
7 these places at this time in these individuals.
8 Q Are there other factors that you're
9 looking at on this issue that you haven't discussed?
10 A Well, so that's why I say we collect a
11 wide range of data. And these are -- the factors
12 I'm highlighting are certainly the highest
13 priorities of our investigation because they're
14 generalizable. Things that are outbreak specific
15 have a lower priority in our efforts.
16 Q When you say things that are outbreak
17 specific have a lower priority, what do you mean?
18 A Like we can identify that failure of cold
19 chain in -- one of the outbreaks in the Pacific was
20 cold chain related. Well, cold chain problems are
21 not generic in the United States; so that probably
22 contributed to the outbreak, but it's not something
23 that's a generalizable piece of knowledge.
24 Q Are you looking at any changes that Merck
25 has made in the manufacture of its mumps-containing

36 (Pages 138 - 141)

Appx1751

HIGHLY CONFIDENTIAL

Page 142

1 vaccines?
2    A    We don't review their manufacturing
3 procedures.
4    Q    Have you considered whether any
5 manufacturing changes could be relevant to the
6 resurgence of mumps?
7    A    We don't have that as part of our
8 consideration because we've had no input to that
9 effect.
10    Q    So Merck hasn't disclosed to the CDC any
11 manufacturing changes that it has made to the mumps
12 component of M-M-R II?
13    A    I am not aware of any such disclosure.
14    Q    So since 2006 -- let's just run this
15 through.  In 2006, there was a mumps outbreak in the
16 United States that affected roughly 6,000 or so
17 people?
18    A    Yes.
19    Q    When was the next largest outbreak?
20    A    So then we had -- again, cases showed up
21 in 2009, different outbreaks beginning then through
22 2011 approximately.  Again, partly college related,
23 then community related, and then some -- you know,
24 an outbreak on Guam.
25        Then we probably went for another few

Page 143

1 years with very low levels, until we started to see
2 some outbreaks in 2014 through the present, with, of
3 course, a lot of cases last year, and still this
4 year.
5    Q    And this most recent period, is that the
6 largest number of cases in post-vaccination history?
7    A    It's still roughly comparable to 2006.
8 The difference is we're not making any significant,
9 you know, determination that is -- absolute numbers
10 are of significance.
11    Q    And how, if at all, have the outbreaks
12 changed in terms of the number of states impacted,
13 the demographics, the number of two-dose vaccinated
14 victims?
15    A    So the background mumps cases in the
16 United States are distributed nationwide.  These
17 outbreaks have been geographically more focal than
18 the general distribution of mumps.  So trying to
19 understand that is part of the putting together an
20 explanation.
21        We have seen a trend over these outbreaks
22 of the number of cases having two doses has gone up.
23 And when you go back to, again, the birth cohort and
24 the vaccine coverage in those years, it makes sense
25 because the level of two-dose vaccine coverage has

Page 144

1 been going up steadily over time.  So we do try to
2 align those types of trends, do they still make
3 sense.
4        So those are some of the characteristics.
5 So unlike, for example, outbreaks going on in an
6 equivalent period in the UK, they had many, many
7 that were unvaccinated as part of those outbreaks.
8 That isn't really happening here in the United
9 States.
10    Q    Is there a concern at the CDC that the
11 outbreaks, the mumps outbreaks will continue?
12    A    So at this point in time, we don't predict
13 disease outbreaks.  It's something we've never been
14 that good at.
15        So we know that there will be mumps out
16 there.  We are trying to understand outbreaks, so
17 that we can design preventive measures as well as
18 respond to the outbreaks themselves when they occur.
19        So if we could prevent them, then they
20 would never happen.  And that's why we're focused on
21 trying to understand because responding to outbreaks
22 is always less satisfactory than preventing them in
23 the first place.
24    Q    Why is the prevention of these outbreaks
25 of such issue to the CDC?

Page 145

1    A    It's disease burden.  I mean, if you look
2 at these outbreaks, they do have not only a
3 disruption for the institutions and populations
4 affected, but you have children who are being
5 hospitalized with complications, some of which
6 include more serious conditions, like deafness, or
7 even some issues around loss of fertility associated
8 with orchitis, as another example.
9        So these complications are nontrivial.  So
10 there's still significant disease severity
11 associated with mumps, even though it is less than
12 what it was in the pre-vaccine era.
13    Q    So among the potential solutions the CDC
14 is considering, solutions to addressing the mumps
15 outbreaks -- well, actually, let me not say, let me
16 just ask you, are there potential solutions to
17 preventing the mumps outbreaks in the future that
18 the CDC is currently working on?
19    A    So we are trying to -- working on means
20 that we're trying to look at those particular
21 scenarios, looking at interventions that would be
22 effective.
23        So this is always the interface between
24 hypothetically could be effective, but can you
25 actually show that it would be effective for a

37 (Pages 142 - 145)

Appx1752

HIGHLY CONFIDENTIAL

Page 146

1 policymaker to make a decision.
2     So prevention can be accomplished then by
3 several means. We still have room to improve
4 two-dose coverage of MMR in the United States. That
5 effort is ongoing, but is considerable, and wouldn't
6 be driven by mumps alone because, again, it's a
7 product covering three different diseases.
8     But the issue of can you come up with a
9 scenario with the existing product, then it's again
10 going to be how you can add doses in a schedule
11 which will address the -- where we see outbreaks.
12 So one of the hypotheticals can always be do you add
13 a third dose in the routine? That was brought up
14 earlier.
15     So we can go through these types of
16 hypotheticals, but we're always looking at what's
17 the data to support that it would actually work.
18 And so I mentioned the modeling of these
19 interventions earlier, and that's just one tool we
20 use to at least try to look at different scenarios.
21   Q  Are there scenarios that the CDC is
22 currently exploring?
23   A  So in terms of exploring, it's just
24 hypotheticals that we do as part of hypothesis
25 generating. So are we acting on any of those toward

Page 147

1 changing policy, no.
2   Q  Is the CDC engaged in any research on new
3 vaccines, new mumps-containing vaccines?
4   A  Right. So, no, we're not engaged directly
5 in product development under most circumstances in
6 general, but specifically for mumps the answer is
7 no. We do do some early research on potential new
8 vaccines, but mumps is not one of them.
9   Q  Have you -- has the CDC spoken with any --
10 how should I say -- other suppliers of
11 mumps-containing vaccines in connection with the
12 possibility of selling the CDC another
13 mumps-containing vaccine in addition to Merck's
14 mumps-containing vaccines?
15   A  So I am not -- unaware of anything related
16 to procurement. We certainly have talked with GSK
17 about their product, where it's used, in the context
18 of trying to interpret some of these published
19 studies.
20     So we're well aware there -- globally,
21 there's a different context of what's available.
22   Q  Has the CDC spoken with GSK in terms of
23 GSK supplying a mumps-containing vaccine in the US?
24   A  Not that I'm aware of.
25   Q  Now, if there had been manufacturing

Page 148

1 changes made by Merck to its mumps-containing
2 vaccines, is that information that would have been
3 relevant to the CDC?
4   A  It would have been relevant to the
5 considerations of the ACIP work group in
6 interpreting some of the information that we've seen
7 that have been provided by Merck. Because there's
8 the understanding at this point we are unaware of
9 any change in the product itself, therefore that's
10 part of our presumption when we interpret the data.
11   Q  Now, if there had been manufacturing
12 changes, in what way would that have been relevant
13 to ACIP's determinations?
14   A  It would depend upon the nature of the
15 change, so I don't know. There's not a general
16 answer to that.
17   Q  Suppose there were changes made to
18 potency.
19   A  Again we'd want to know what clinical data
20 was, you know, looked at in terms of a change in
21 potency, and what was FDA's reaction to that.
22   Q  And why would that be relevant?
23   A  I mean, it has to affect -- it affects how
24 we interpret data being provided, because we look at
25 data for a specific product as the product hasn't

Page 149

1 changed unless we're aware of it. So, again, if we
2 knew the potency change occurred at such and such a
3 date, we would deliberately analyze data, you know,
4 with that date in mind.
5   Q  And as far as you know, the CDC has not
6 engaged in any kind of analysis in connection with
7 any potency changes in Merck's mumps-containing
8 vaccines?
9   A  We can't because we're not aware of
10 potency changes.
11   Q  The CDC had an original goal that mumps
12 would be eradicated in the US by 2010, correct?
13   A  It was stated in the Healthy People 2020
14 document from HHS, yes.
15   Q  And what was the basis for that goal?
16   A  I have been unable to find that out. So I
17 have asked former people involved in that process,
18 which occurred in the late 1990s, how that was made,
19 and most of the people involved are no longer at
20 CDC.
21   Q  And you've tried to find that goal out in
22 connection with this deposition?
23   A  With the specific question that came up
24 with the -- when elimination was mentioned, yes.
25   Q  Do you know when that goal was changed?

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Appx1753

HIGHLY CONFIDENTIAL

Page 150

1   A   So it was -- I mean, we can't change the
2   goals midstream, so the 2020 goals were the next
3   opportunity.  And those were then developed in the
4   late 2000s to be -- became then part of the 2020
5   document in 2010 --
6   Q   And --
7   A   -- or '11.
8   Q   -- why did the CDC change its goal from
9   eradicating mumps by 2010 to I believe it's reducing
10  the annual number of mumps cases --
11  A   Right.
12  Q   -- to 500; is that correct?
13  A   I mean, I don't remember the target number
14  itself -- but it was a few hundred for sure, and it
15  was a progressive deescalating number -- because I'm
16  trying to remember from when I looked at the
17  document, you know, back in 2010.
18      So the switch was made partly because
19  there always was a difference of opinion about
20  whether it was practical to eliminate in the United
21  States.  And some of the low numbers, of course,
22  were at least consistent right up through 2006.  And
23  I think the outbreaks that began then had an effect
24  upon whether people considered it practical to
25  achieve elimination.

Page 151

1       Mumps is potentially something that could
2   be eliminated because it fulfills the key
3   requirement that it's only found in humans.  So it
4   does meet that requirement.  However, the other part
5   of the requirement is that it has a vaccine or
6   another intervention that's capable of stopping
7   transmission, and the outbreaks called that
8   assumption into question.
9   Q   Is there a view at the CDC currently
10  whether or not it's going to meet its current goal
11  under the Healthy People 2020 program?
12  A   At this point in 2017, it is clear it is
13  not on track.  So, again, we will monitor the
14  situation, and if there is a Healthy People 2030, it
15  would probably influence any future setting of
16  targets.
17      These are aspirational goals.  That's what
18  the document is.  So I can say with certainty we are
19  off track because the last two years have been well
20  off the target numbers in the document.
21  Q   Has there been some change in the
22  understanding of how effective the current mumps
23  vaccine is at preventing outbreaks between the time
24  the 2020 goal was established and the present?
25  A   So the understanding of these factors that

Page 152

1   we talked about earlier and their contribution to
2   outbreaks has been slowly evolving over time.  And I
3   think that, again, as we use these data to look at
4   its effect on transmission, there is an appreciation
5   that these factors are not straightforward to deal
6   with in a practical sense.
7       So when you look at each of them, you have
8   to then decide, is there a potential intervention,
9   is that intervention practical, is it cost
10  effective?  And that's part of the discussion that's
11  ongoing now.  So I don't know when that may affect
12  any future healthy people targets.
13  Q   In connection with the CDC's investigation
14  of the reasons for the outbreaks, has the CDC worked
15  in any way with Merck?
16  A   In -- can you rephrase?
17  Q   In connection with the investigations
18  surrounding the causes of the mumps outbreaks, has
19  the CDC in any way worked with Merck?
20  A   So in most outbreak investigations, we
21  don't work with manufacturers.  There could be an
22  occasion in which the supply may come up as an
23  issue, if there were an unusually large demand, and
24  that would be handled in terms of the amount of
25  vaccine in the depot, and was it sufficient to be

Page 153

1   able to handle requests, but -- or if there were
2   other, you know, factors.  But usually we don't deal
3   with the manufacturers in any other way related to
4   the investigation.
5   Q   Now, with respect to Exhibit 11 that we
6   looked at, which was the presentation that Merck
7   made to the CDC, wasn't that in connection with the
8   CDC's investigation of the causes of the resurgence
9   of mumps outbreaks?
10  A   So this particular presentation was done
11  in the context of a consultation that was convened
12  based upon the outbreaks, but it was, of course,
13  many different individuals invited to participate
14  and provide what current information was -- they
15  deemed relevant.
16      So, again, they were part of an overall
17  consultation with many parties involved, but they
18  didn't -- this is information shared with CDC, but
19  does not represent part of our investigations of
20  outbreaks.
21  Q   So it's fair to say the CDC has reached
22  out to Merck for input in connection with the CDC's
23  investigation of the mumps outbreaks?
24  A   We have certainly invited them to
25  participate and provide information, just as they do

39 (Pages 150 - 153)

Appx1754

HIGHLY CONFIDENTIAL

Page 154

1 for the ACIP work groups, where they share
2 information that they have.
3    Q    What kind of information does Merck share
4 with the ACIP group when it comes to
5 mumps-containing vaccines?
6    A    Well, it will depend upon what the work
7 group is considering. So, again, if they had
8 information about third dose, then we would ask
9 them, have you done a third dose efficacy trial?
10 And the answer can be yes or no, but that would be
11 an example of, okay, would you be willing to share
12 that with the work group.
13       So it's not a blanket connection. It has
14 to do with the nature of the deliberations of the
15 work group.
16    Q    And is Merck currently involved with
17 providing information to the CDC in connection with
18 the mumps working group?
19    A    I am not aware of any relatively recent
20 interaction with that particular work group.
21    Q    What knowledge, if any, do you have of
22 Merck working with ACIP since 2006 in connection
23 with Merck's mumps-containing vaccines?
24    A    So I think we have -- well, I mean, these
25 are examples of them sharing data. So I don't know

Page 155

1 of the entire scope of potential contact since 2006.
2    Q    Other than the presentation that's
3 contained in Exhibit 11, are you aware of any other
4 meetings that Merck has had with the CDC in
5 connection with mumps-containing vaccines?
6    A    So there are certainly likely to be
7 meetings at which CDC and Merck are both present,
8 but that's different than the CDC convening a
9 specific consultation.
10       So I don't know the exhaustive catalog
11 where there were opportunities for Merck and CDC
12 employees to interact on mumps as the topic.
13    Q    Getting back to your early part of the
14 answer, you said there was certainly -- I forget
15 what you exactly said, but there were certainly
16 opportunities where Merck and the CDC would have
17 been at meetings?
18    A    For example, the National Immunization
19 Conference, some general broad scientific conference
20 that has immunization as a topic of interest.
21       And certainly Merck has had people
22 attending ACIP meetings in the past. I don't know
23 about mumps specifically, but they are certainly
24 present, and some of the same people in vaccine
25 production, and they are present. So I don't know

Page 156

1 the scope of informal discussions at that context.
2    Q    So in terms of possible causes for the
3 resurgence of outbreaks, the low -- potential low
4 potency -- or low potency of the mumps-containing
5 vaccines is not one of the issues that the CDC has
6 looked at; is that correct?
7    A    We have not looked at potency because of
8 the lack of any awareness of a change in potency.
9 Therefore, as far as our assumptions is the vaccine
10 that was originally licensed for MMR is still the
11 vaccine that we're evaluating for vaccine
12 effectiveness.
13    Q    If there had been a change of potency,
14 could that be relevant to how effective the vaccine
15 is?
16    A    Absolutely. If you -- you know, if you
17 cut the amount of vaccine -- amount of virus in the
18 vaccine, that could easily make a lower response.
19       But, again, it's all hypothetical. It's
20 just a generic property of vaccines, because when
21 they're licensed, that's one of the things that's
22 required that the companies produce generically
23 related to vaccine is potency.
24    Q    What about increasing potency, what impact
25 could that potentially have on effectiveness?

Page 157

1    A    Usually it has the effect of better
2 response, at least immunogenicity of the data is
3 quite solid; but in the context often it is a
4 question of does this increase a safety issue rather
5 than a immunogenicity or efficacy issue.
6       Because it's a live virus vaccine, all
7 live virus vaccines have a safety consideration.
8    Q    Is it a goal of the CDC to provide -- to
9 purchase vaccines that have the lowest potency that
10 is sufficient to provide an effective response?
11    A    We do not take that into consideration
12 because the vaccine that we're having a discussion
13 around is already a licensed product at a certain
14 potency, so it's not a factor that comes into
15 consideration.
16    Q    Is there a potential that a higher potency
17 of one component of a multivalent can interfere with
18 the effectiveness of other components?
19    A    This is always a consideration with any
20 multivalent vaccine, and is, of course, an FDA
21 requirement that they demonstrate.
22    Q    Currently Merck's mumps-containing
23 vaccines are the only option for the CDC in terms of
24 its purchase of mumps-containing vaccines; is that
25 correct?

40 (Pages 154 - 157)

Appx1755

HIGHLY CONFIDENTIAL

Page 158

1    A    They are the only licensed product in the
2  United States.
3    Q    Would the CDC like there to be additional
4  options for mumps-containing vaccines?
5    A    Generically, the competition allows for a
6  more reliable supply chain.  The issue of, you know,
7  potential other competitive advantages is more of a,
8  you know, business argument, and isn't really a
9  technical argument that's related to the work we're
10  doing.
11    Q    But is it fair to say that the CDC always
12  wants to have multiple suppliers of a vaccine, if
13  available?
14    A    I don't know that always is something I
15  can answer because there are multiple
16  considerations.  We certainly always want at least
17  one.
18    Q    So with respect to the mumps-containing
19  vaccines, does the CDC -- would the CDC like to see
20  at least one more additional supplier?
21    A    I can't speak on behalf of the ACIP or CDC
22  on the procurement advantages of competitive bids on
23  procurement.
24    Q    Is there any action the CDC can take to
25  facilitate additional vaccine suppliers?

Page 159

1    A    So, in essence, we can help in providing
2  information that we know about on the -- certainly,
3  all of the producers globally.  That's why, for
4  example, we are involved in, you know, helping to
5  produce those WHO monographs, which look at products
6  around the world.  So we do support possibilities
7  along that line by helping to accumulate data
8  relevant to any new potential licensed vaccine in
9  the United States.
10    Q    What about for legacy vaccines?
11    A    The same.  I mean, that's -- it applies
12  generically across all vaccines.  Those monographs
13  exist for multiple different other components of
14  vaccines.
15    Q    Are you aware of any current research
16  going on, on the development of a new mumps vaccine?
17    A    I am not.  And we generally try to keep up
18  with that, even in informal discussions with
19  companies, and very interested in the ideas around
20  new approaches.
21    And so we do keep in routine contact with
22  companies that may potentially develop new vaccines,
23  but I'm unaware that mumps has been part of any of
24  those discussions.
25    Q    Are you aware of any government funding

Page 160

1  that has been made for the development of new mumps
2  vaccine?
3    A    At this point, we can't find any evidence
4  of that.  And we routinely have contacted NIH
5  independently of are they interested in funding
6  those types of activities, because that's the usual
7  path to new vaccine development outside of
8  companies.
9    Q    So you have reached out to NIH to -- in an
10  effort to secure funding for --
11    A    No, to just inquire whether anybody else
12  has received funding from NIH to develop a new mumps
13  vaccine.
14    Q    And you're not -- has there ever been any
15  funding in the last few years, as far as you know?
16    A    Not in the last few years.  So there has
17  been one funding related to the same type of work
18  we're doing on new assays.
19    Q    What funding was that?
20    A    I don't know the details.  It should be in
21  the NIH record.  But I don't know the details of
22  what they had proposed, but it did have mumps as the
23  topic of the assay development.
24    Q    You're familiar with -- and I'm going to
25  get the name wrong, but it's the NIAID, the

Page 161

1  National --
2    A    Uh-huh.
3    Q    -- Immunization Allergy -- no, what's that
4  stand for?
5    A    National Institute for Allergy and
6  Infectious Diseases.
7    Q    Thank you.  They're part of HHS?
8    A    Yes.
9    Q    And what's their relationship, if any,
10  with the CDC?
11    A    At the technical level, scientists here
12  know scientists there.  So there is, among the SMEs,
13  usually a fairly close informal interaction with
14  them.  There are, you know, general distinctions
15  made between basic research in that institute versus
16  more applied research here, but in certain instances
17  there can be some overlap.
18    Q    And are you familiar with that
19  organization's list of emerging pathogens?
20    A    I am vaguely aware, yes.  And it's been
21  updated a few times, so.
22    Q    And are you aware that mumps is on that
23  list?
24    A    I am not aware of that.
25    Q    Do you know what that list is supposed to

41 (Pages 158 - 161)

HIGHLY CONFIDENTIAL

Page 162

1 represent?
2   A   It's supposed to represent priorities
3 within that organization, and directly related to
4 emerging threats.
5   Q   Can you think of a reason why the NIAID
6 would put mumps on their list of emerging pathogens?
7       MR. SANGIAMO:  Objection, calls for
8 speculation.
9   A   So yeah.
10      MS. SNOW:  You can answer if you can.
11  A   So I do not know all of the criteria that
12 they use to put things on that list.
13 BY MR. SCHNELL:
14  Q   What is the CDC's pink book?
15  A   As opposed to the red book.  Okay.  That's
16 an answer I should know and can't pull it out, so I
17 haven't looked at that for a very long time.
18  Q   Are you familiar with where the CDC
19 publishes to the public its estimates of the
20 effectiveness of the vaccines that it purchases?
21  A   So are you asking if there's a single
22 source for such?
23  Q   Just all the sources you're aware of.
24  A   So, again, some of the articles are review
25 articles, the -- certainly, the VIS has several

Page 163

1 references, but probably not exhaustive in the sense
2 of complete evaluation.  Probably the more relevant
3 ones.
4       And each -- the frequency with which such
5 data is updated varies between different viruses.
6 And, again, every year we do evaluate the website
7 and try to update that as it reflects any new
8 information.
9   Q   And presumably it represents the best
10 understanding that the CDC has in terms of the
11 metrics for the vaccine that it's representing?
12  A   It's the best estimate at that moment in
13 time, yes.
14  Q   In terms of the CDC's decision to purchase
15 a particular vaccine, is it relevant how many doses
16 ACIP recommends are necessary to provide protection?
17  A   So the procurement part is based upon
18 whatever the ACIP recommends.  So I don't know
19 the -- there's anything unusual about the
20 procurement relationship.
21  Q   So I want to talk a little bit more about
22 the current investigation the CDC is undertaking in
23 connection with the outbreaks.  I want to get the
24 full scope of what the CDC is investigating.
25      So is it true that the CDC is

Page 164

1 investigating potential causes of the outbreaks?
2   A   Yes, the contributing factors to the
3 resurgence and the size of the outbreaks is a big
4 focus.
5   Q   And is the CDC investigating any potential
6 problems with the vaccine that could be leading to
7 the outbreaks?
8   A   We will indeed look at data where it's
9 available, for example, the cold chain, in specific
10 situations, but that's an indirect issue of the
11 vaccine.  We do not investigate the vaccine itself,
12 and we don't -- we don't have access a lot of the
13 times practically to which lot of vaccine was being
14 used.
15  Q   Is the CDC investigating the duration of
16 protection of the mumps-containing vaccines?
17  A   That's what part of this waning immunity
18 study is addressing explicitly.
19  Q   And is it fair to say the CDC has not
20 reached any definitive conclusions one way or the
21 other in terms of anything it's currently
22 investigating with regard to the mumps-containing
23 vaccines?
24  A   So we -- I think the summary I gave
25 earlier is probably most relevant is, is we are

Page 165

1 becoming convinced that we have several factors that
2 can contribute to the size and duration of
3 outbreaks.  We don't know at this point the relative
4 importance of those factors, but we certainly
5 believe they have a role, and we have not explicitly
6 ruled out any of those factors.
7   Q   Now, right before lunch, you were asked
8 whether the CDC has continued to purchase Merck's
9 mumps-containing vaccine in light of whatever
10 information it has on effectiveness.  Would it be
11 relevant to the CDC's decision to continue
12 purchasing Merck's mumps-containing vaccines if the
13 CDC discovered that there was a problem with the
14 vaccine that was contributing to the outbreaks?
15  A   As I responded earlier, this is part of a
16 process where whatever new information was available
17 would be given to the ACIP work group to evaluate
18 and assess.
19      If that led to a clear conclusion from the
20 work group that the ACIP needed to revisit the
21 recommendation, that would be the next step in the
22 process.  Only then would there be any influence on
23 procurement.
24  Q   And if the ACIP reached the conclusion
25 that there was a problem with the -- with Merck's

42 (Pages 162 - 165)

Appx1757

HIGHLY CONFIDENTIAL

Page 166

1 mumps-containing vaccines, that would potentially
2 impact Merck's decision to continue purchasing the
3 vaccine?
4    A   I would be speculating what the -- you
5 know, the influence it would have would have to do
6 with the nature of the ACIP change in
7 recommendation.
8    Q   So if the ACIP recommendation was that we
9 don't recommend this vaccine anymore, what impact,
10 if any, would that have on the CDC's decision to
11 continue purchasing the vaccine?
12    A   If it's no longer recommended, it's not
13 purchased.  I mean, we have the example of the live
14 attenuated flu.
15    Q   What's that example?
16    A   I mean, they stopped recommending.
17    Q   Now, independent of ACIP's
18 recommendations, shelf-life is a relevant factor in
19 terms of Merck's decision to buy a particular
20 vaccine; is that correct?
21       MR. SANGIAMO:  Object to the form.
22    A   So I'm not sure I understand the question
23 entirely.
24 BY MR. SCHNELL:
25    Q   Sorry, is that what --

Page 167

1    A   Yeah.
2    Q   So let me reframe it.  Let me ask it this
3 way, does the CDC purchase whatever vaccine ACIP
4 recommends, or are there additional criteria that
5 the CDC considers in its purchasing decision?
6    A   I believe purchasing was yesterday, but
7 the request for -- you know, the RFP will go out,
8 and companies are free to respond to the RFP.  There
9 is a technical evaluation on the business side,
10 independent of these technical issues that we were
11 discussing, related to delivery and labeling and
12 other things.
13    Q   And, again, ACIP -- I thought I understood
14 this before, but I'm not sure, and I apologize --
15 but ACIP recommends a particular type of vaccine
16 that's needed, so, for example, MMR --
17    A   Uh-huh.
18    Q   -- but it doesn't recommend Merck's MMR or
19 GSK's MMR or some other manufacturer's MMR; is that
20 true?
21    A   So in most situations there is no specific
22 preferential recommendation.  There can be a
23 preferential recommendation if a specific product is
24 markedly superior to an alternative.  And so it's
25 not that it never happens, but the normal is that

Page 168

1 there isn't a preference stated, but there can be.
2    Q   And in those situations where there can be
3 a preferential decision, how is that decision made?
4    A   On the basis of the work of the work group
5 in assessing the strength of the evidence that
6 product A is markedly better than product B, and
7 assessing it in the context of its public health
8 benefit in the reduction of disease.  And that is
9 then given to the ACIP in the form of possible
10 recommendations it may want to make.
11    Q   You were asked earlier about the
12 allegations in this lawsuit, and I believe you said
13 that you had a superficial understanding of the
14 allegations.
15    A   Uh-huh.
16    Q   Has the CDC, as far as you know, reached a
17 conclusion one way or the other as to the veracity
18 of the allegations in this lawsuit?
19    A   We have made no determination.
20    Q   All right.  Let's take a break now.
21       THE VIDEOGRAPHER:  We're going off the
22 record at 2:52 p.m.
23       (Recess 2:52-3:12 p.m.)
24       THE VIDEOGRAPHER:  We're going back on the
25 record at 3:12 p.m.  Please continue.

Page 169

1       MS. SNOW:  Go ahead, speak up.
2    A   Before we proceed, I do want to say I have
3 somehow overcome my mental block on the pink book,
4 in case you want to follow up on that.  Since it is
5 a CDC document, I better not keep --
6 BY MR. SCHNELL:
7    Q   Sure.  What is the pink book?
8    A   Anyhow, it is a book that summarizes
9 vaccine-preventable diseases, their epidemiology and
10 prevention.  It's directed mainly toward healthcare
11 provider audience.
12    Q   And is it pink?
13    A   It's electronic, so it's got pinkish tones
14 to it, but its cover is a little more complicated
15 than that.
16    Q   And what is the purpose of the CDC
17 publishing information in the pink book?
18    A   It is to put in one place, basically, the
19 considerations around the disease itself, the basic
20 epidemiology, the recommendations around vaccines,
21 and then, of course -- I mean, it's an explanation
22 of a lot of the information that's available
23 elsewhere, but in one place for healthcare
24 providers.
25       It's available, you know, online, so it

43 (Pages 166 - 169)

Appx1758

HIGHLY CONFIDENTIAL

---

Page 170

1 does represent a summary of a lot of what we have
2 talked about. So, I mean, we did have the thing
3 that was information for healthcare providers, age,
4 and it's -- and contains some of that information,
5 as well, but, again, for a more technical audience.
6 But I'll have to admit, I have not read the mumps
7 chapter in a decade or more.
8     Q   Is it the CDC's understanding that Merck's
9 mumps-containing vaccines provide lifelong immunity
10 from mumps?
11    A   That is something where we don't have a
12 specific determination. There are several diseases
13 for which that particular attribution to vaccines is
14 in question because, with the elimination of natural
15 circulation that boosts immunity, it is harder and
16 harder to determine immunity over a very long period
17 of time in the absence of that boosting.
18        So there are certainly scientists who
19 believe that it may not be lifelong. And we've had
20 adult cases of mumps in people who have had both
21 natural mumps and vaccine and older age group,
22 indicating that it is not likely in the case of
23 mumps for it to be lifelong, at least not for
24 everybody.
25    Q   So if the CDC had published in the pink

---

Page 171

1 book that Merck's mumps-containing vaccines provided
2 lifelong immunity, would that have been a
3 misstatement?
4     A   No, I think there's a bit of evolving
5 knowledge, again, related to this disease among
6 vaccinated individuals, as well as data that's
7 becoming evident when you look at age distributions
8 of outbreaks in countries where the background rate
9 of mumps goes away.
10        So you no longer have large -- well, you
11 have large populations in the United States who do
12 not see natural mumps infections for years or
13 longer, and does that allow waning to occur or
14 accelerate to a form where you will become
15 susceptible with time?
16        In the old days when mumps was around all
17 the time, you would get a boost from the natural
18 exposure, even if it was subclinical, that may have
19 allowed for the appearance of immunity to be
20 lifelong. But there are some vaccines where it is
21 very much lifelong.
22    Q   So with respect to the mumps-containing --
23 Merck's mumps-containing vaccine, the CDC's position
24 on the duration of immunity has evolved over time,
25 is that what you're saying?

---

Page 172

1     A   That's a good summary.
2     Q   By that, you mean the CDC's position --
3 I'm sorry, the CDC's understanding on that issue has
4 changed?
5     A   It has certainly evolved and has become
6 less unequivocal. So we have certainly come to
7 appreciate that it's not so clean cut.
8     Q   And could the same be true with the CDC's
9 understanding of the effectiveness of Merck's
10 mumps-containing vaccines?
11    A   So I think it's still the same summary
12 that the effectiveness depends on the context. So
13 we do continue to monitor vaccine effectiveness.
14 Shortly after immunization, we believe the number is
15 certainly high, whether it's 88 or 90 -- you know,
16 we can't tell the difference, but it is high
17 immediately after vaccination.
18        How that may change with time is our
19 evolving understanding related to looking at the
20 outbreaks over the last decade.
21    Q   And in terms of the effectiveness within a
22 relatively short period of time after vaccination --
23 so put to the side the issue you just discussed --
24 is the CDC currently studying that issue?
25    A   That is part of the investigation. Some

---

Page 173

1 of these outbreaks affect all age groups. So we do
2 have the ability to look at, for example, seven to
3 11-year-old who would have been vaccinated only, you
4 know, two to five years prior, comparing those to
5 older cases who were vaccinated 15 years earlier.
6        And so in some of these outbreaks, we do
7 have the opportunity to look at proximity to the
8 vaccination more closely than in college outbreaks.
9     Q   Has the CDC reached a conclusion one way
10 or the other as to whether -- let me take a step
11 back. Are you familiar with the term "primary
12 vaccine failure"?
13    A   Yes.
14    Q   What is that?
15    A   It's basically those who have received
16 vaccine but are not protected.
17    Q   And the CDC is currently investigating
18 what role, if any, primary vaccine failure plays in
19 the resurgence of outbreaks with mumps-containing --
20    A   That's part of the -- yes, that's part of
21 the investigation and why we determine the
22 comparator group, the problem being is that there
23 are very few people who have zero or one dose. So
24 it's getting increasingly difficult to be able to
25 collect data around that.

---

44 (Pages 170 - 173)

HIGHLY CONFIDENTIAL

1    Q   Has the CDC reached a conclusion one way
2  or the other whether primary vaccine failure is
3  playing any role in the resurgence of mumps
4  outbreaks?
5    A   We are considering it to be a lesser
6  factor in the United States at this point in time.
7  It clearly can play a role, as demonstrated in
8  outbreaks in other countries.  It's just, as I
9  mentioned, there are getting to be fewer and fewer
10  opportunities to explicitly study that question.
11    Q   And so is it the CDC's factor that it
12  is -- I'm sorry.  Is it the CDC's conclusion that
13  it's less of a factor in the resurgence of mumps
14  outbreaks as compared to other potential factors, or
15  that it's not a factor at all?
16    A   No, we have not concluded that it's not a
17  factor at all.  And, again, it's can the five to 10
18  percent or 20 percent or whatever the number is
19  primary vaccine failures contribute to an outbreak
20  situation.  So it's something that we cannot exclude
21  as a contributing factor.
22        (Exhibit 13 marked.)
23  BY MR. SCHNELL:
24    Q   I'd like to mark as Pallansch Exhibit 13 a
25  document titled Persistence of Humoral and Cellular

1  Immune Responses to Mumps following Age Appropriate
2  Immunization with MMR Vaccine.  Quite the catchy
3  title.
4    A   Well.
5    Q   Is there a date on this?  Do you have a
6  date?
7    A   This is prepublication as it is.
8    Q   This was produced in this litigation by
9  Merck.  And it's at the metadata that identifies the
10  date in 2014; is that right?  We're not sure.  We
11  think -- we think it was -- this draft was sometime
12  in 2014.
13        In any event, it is a prepublication
14  piece.  And I'm wondering, Dr. Pallansch, if you're
15  familiar with this study.
16    A   I am -- well, it was a collaboration with
17  Emory, I believe, that received the primary support
18  from Merck for their part of the work.
19        I do know that we were involved with some
20  of the assays.  And I would have to review the
21  specifics.  It says here in the methods that the
22  participants were college students, February to
23  August 2010.  So that gives me a time frame for when
24  the original participants were recruited.
25        So, again, this was back when Dr. Bellini

1  was still branch chief.  And he did mention this
2  study to me, but I did not know the details.  And so
3  this is actually my first look at this.
4    Q   Okay.  So I'll just ask you some
5  questions, and if you know the questions, great, and
6  if not.
7    A   Okay.
8    Q   This was a study that was funded by Merck;
9  is that correct?
10    A   So they certainly -- it says, I think,
11  here -- yes, this work was supported by a grant from
12  Merck in terms of the funding listing.  And that
13  funding would have gone to Emory because it's very
14  difficult for us to receive funding under most
15  conditions.
16    Q   And this was a collaborative effort among
17  the CDC, Merck, and the Emory vaccine center; is
18  that right?
19    A   Again, the work would have been at Emory
20  and the CDC.  And, yes, there is a Merck author.
21  And I don't -- well, two Merck authors.
22    Q   And that's Dr. Krah and Dr. Kuter?
23    A   And Marcia -- no, and -- yeah, Kuter,
24  right.
25    Q   Do you know what this study involved?

1    A   So this is related to the topic of trying
2  to measure waning immunity in college age students
3  outside of the context of an outbreak, but also
4  applying other investigational assays, including
5  some cell-mediated immune response targets.
6        And I'd have to go through and figure out
7  which ones they had included.  But I know that was
8  Carole Hickman was doing that, in her group.
9    Q   If you look on the third page of the -- of
10  this paper, in the conclusion it says:  Among young
11  adults with prior receipt of two doses of MMR
12  vaccine, the frequency of MBCs was low.
13        Do you see that?
14    A   Yes.
15    Q   And MBCs stands for memory B cells?
16    A   Yes.
17    Q   And so this study involved, am I correct,
18  a study of memory B cells and how it relates to the
19  effectiveness of the mumps -- of Merck's mumps
20  vaccine?
21    A   It is not addressing the effectiveness
22  issue.  It's addressing the frequency of cells in
23  the target population that has been immunized with
24  two doses.
25        And I think the next sentence says:  The

45 (Pages 174 - 177)

Appx1760

HIGHLY CONFIDENTIAL

Page 178

1 relevance of these findings to mumps susceptibility
2 and hence long-term vaccine effectiveness should be
3 explored.
4      So if these participants were involved in
5 an outbreak, that would be something that would be
6 very advantageous to discuss; however, creating an
7 outbreak for that purpose is not ethical.
8      Q    But this is something that CDC is
9 currently exploring, correct?
10     A    Correct. And I think the method section
11 includes a description of the ELISPOT assay that was
12 used, yes, on page 10.
13     Q    If you could turn to page 17, please. On
14 the very bottom of the page, it says -- this is the
15 last two lines -- the frequency of mumps specific
16 MBC, memory B cells, appears to be lower when
17 compared to other live virus vaccines such as
18 measles, rubella, and small pox.
19     Is that your understanding, is that
20 correct?
21     A    Yes.
22     Q    And does the CDC have any explanation as
23 to why?
24     A    Other than it being a different vaccine
25 and a different virus, so the expectation of them

Page 179

1 being the same isn't the starting premise.
2      Q    Does the CDC consider this issue, the
3 potential impact of memory B cells on immunity, does
4 the CDC consider that to be an important issue for
5 further investigation?
6      A    Yes. So we are actively continuing to
7 investigate this issue, yes.
8      Q    Now, this paper was never published; is
9 that correct?
10     A    I am not aware of it.
11     Q    Can you think of any reason -- first of
12 all, did Dr. Bellini tell you why?
13     A    No.
14     Q    Can you think of any reason why it wasn't
15 published?
16     A    I can't speculate because I haven't read
17 it, so.
18     Q    Okay. That's all the questions I have for
19 now. Thank you.
20         FURTHER EXAMINATION
21 BY MR. SANGIAMO:
22     Q    Dr. Pallansch, I'm just going to have a
23 couple of additional questions. And I think I'll be
24 able to get myself organized quickly enough that
25 it's not worth us taking a break here, unless I just

Page 180

1 jinxed it by saying that.
2         (Exhibit 14 marked.)
3 BY MR. SANGIAMO:
4      Q    Dr. Pallansch, you've just been handed
5 what's been marked as Exhibit 14, I believe.
6      A    Okay.
7      Q    There was some questioning before and some
8 answers by you regarding interaction between Merck
9 and the CDC in connection with the outbreaks. And
10 for completeness, really, I just wanted to show you
11 this document. Can you tell us what this appears to
12 be?
13     A    Correspondence between David Krah at Merck
14 and Bill Bellini, who at the time was the branch
15 chief in the measles, mumps, and rubella laboratory
16 branch.
17     Q    All right.
18     A    Yeah.
19     Q    Have you seen this document before?
20     A    This does not look familiar, no.
21     Q    And can you tell us what it appears to be?
22     A    No.
23     Q    I realize you can't speak to it from
24 personal knowledge, but -- and ultimately, my
25 question is going to be, is this simply something

Page 181

1 you just didn't know about?
2      A    This is certainly something I didn't know
3 about, so --
4      Q    Understood.
5      A    Okay.
6      Q    Okay.
7      A    But it is something that looks like
8 testing of a serum panel in PRN. And it's
9 specifically -- okay, specifically looking at two
10 different strains, which would be interesting, with
11 the outbreak strain in Jeryl Lynn.
12     So then I would need to -- okay. Okay.
13 So what it appears to be is trying to look at the
14 correlation in the ELISA and the neutralization. I
15 didn't -- and I'm assuming -- okay. But it's -- it
16 is part of -- it is equivalent to part of what I was
17 referring to earlier in terms of establishing a
18 correlation, a comparability between two different
19 assay types in assessing endpoints.
20     Q    I realize I'm asking you to speak to
21 something that you had not seen before and lack
22 personal knowledge about, but let me ask you whether
23 it would also be a consistent read of this document
24 that it was just neutralization data comparing --
25 comparing titers against the Jeryl Lynn strain

46 (Pages 178 - 181)

HIGHLY CONFIDENTIAL

Page 182

1 versus the Iowa strain?
2     A    That's -- yes, that's clearly the primary
3 purpose.
4     Q    Okay.
5     A    Now, whether you could extract some other
6 date from this is secondary.
7     Q    Okay.  All right.  Mr. Schnell was asking
8 you some questions about the study involving Emory
9 and the CDC that was funded by Merck, and he asked
10 you about whether the paper has been published.
11         Is it your testimony you just don't know
12 one way or the other if it had?
13     A    I don't know.  I have not seen it come
14 across my desk for clearance, but I haven't -- I
15 have no awareness of its publication status.
16     Q    And you don't know whether it was
17 submitted to any journals and what --
18     A    I don't know.
19     Q    Okay.
20     A    Yeah.
21     Q    Does the -- does the CDC have a view about
22 the similarity between the mumps component of
23 Priorix, GSK's vaccine, and mumps component of
24 Merck's M-M-R II?
25     A    I mean, my understanding was is that

Page 183

1 they're both Jeryl Lynn-derived, but the passage
2 history of viruses can be different.  So we know
3 from other vaccines that, nominally, the same strain
4 can be different.  So I can't attest that they're
5 identical for sure.
6     Q    Have you looked at any data comparing the
7 immunogenicity of the two?
8     A    Other than some of the ones that we
9 summarized that we've already covered, but no
10 additional data beyond what's already published.
11     Q    You were testifying earlier, I think, that
12 in some of the recent outbreaks there have been some
13 complications associated with some of the mumps
14 cases.
15     A    Yes.
16     Q    I'm not sure if complications is
17 technically the term.
18     A    That's how it's -- yeah, I referred to it,
19 right.
20     Q    I gather the rate of those complications,
21 even in the context of those outbreaks, is far lower
22 than what they were prior to introduction of the
23 vaccine; is that fair to say?
24     A    That's the observation, right.  But,
25 again, there is the other trend, which pre-vaccine

Page 184

1 complication rates go up with age.  So age-adjusted
2 complication rates still seem to be lower
3 regardless.
4     Q    Dr. Pallansch, why did you -- why did you
5 come to the CDC?
6     A    Almost by accident.  So the colleague I
7 mentioned earlier came to CDC in 1979.  He was a
8 post doc, and I was a grad student at Wisconsin.
9 And while I was a post doc in New York, he called me
10 up one day and said, there is a vacancy, are you
11 interested.
12         And of course, initially, I said no.  And
13 then a month later, he calls back and says, well,
14 Larry -- who was the, you know, chief at the time --
15 he says you can do whatever you want.  And so then I
16 said, okay, I'll come down and interview.
17         And at that time, molecular biology was a
18 new discipline at CDC.  And so, in my interviewing
19 here, that was my main issue, is CDC serious about
20 improving multidisciplinary approach to public
21 health problems.
22         And what kept me here, though, was this
23 was in the years of HIV, and it demonstrated to me
24 the significance of how scientists can contribute to
25 public health.  And the ability to learn about

Page 185

1 epidemiology, to learn about clinical trials, to
2 learn other disciplines outside of one's own, is
3 intellectually stimulating and satisfying because
4 you're working on practical problems.
5     Q    Are you proud of the work you've done at
6 the CDC?
7     A    Yes.
8     Q    You proud to be associated with the CDC?
9     A    Absolutely.
10     Q    I don't have any more questions.
11         FURTHER EXAMINATION
12 BY MR. SCHNELL:
13     Q    I just have really just a few questions.
14         If Priorix were one of the MMR vaccines
15 that were recommended by ACIP, would the CDC
16 purchase it?
17     A    I do not know about the procurement
18 process from the point of view of competitive bids.
19     Q    Assuming it met all the technical
20 specifications, would the CDC purchase it?
21     A    I am not involved in the procurement
22 process on competitive bids.
23     Q    Excuse me one second.
24         That's all I have.  Thank you.
25         THE VIDEOGRAPHER:  Nothing further?

47 (Pages 182 - 185)

Appx1762

HIGHLY CONFIDENTIAL

---

**Page 186**

1      MR. SANGIAMO: I was just going to state
2 on the record that I'm preserving my disagreement
3 with Mr. Schnell's objection to the foreclosing the
4 questioning about the meeting that Dr. Pallansch had
5 with Relators or their counsel, whichever it was.
6 And so I'm just preserving that.
7      MR. SCHNELL: Just so it's clear, I want
8 to reinforce our objection and strike -- and strike
9 from the record anything that may have come out that
10 shouldn't have, that violated a privilege.
11      MR. SANGIAMO: Of course, we oppose that
12 effort to strike.
13      MS. SNOW: And the government will put on
14 the record that the witness requests to review and
15 sign the transcript.
16      THE VIDEOGRAPHER: Anything further?
17      MR. SANGIAMO: Nothing further.
18      THE VIDEOGRAPHER: This concludes today's
19 deposition of Dr. Mark Pallansch. We're off the
20 record at 3:39 p.m.
21      (Deposition concluded at 3:39 p.m.)
22      (Signature reserved.)
23
24
25

---

**Page 188**

1 - Password-Protected Access: Transcripts and
   exhibits relating to this proceeding will be
2 uploaded to a password-protected repository, to
   which all ordering parties will have access.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 187**

1     The following reporter and firm
  disclosures were presented by me at this proceeding
2 for review by counsel.
3     REPORTER DISCLOSURES
4     The following representations and
  disclosures are made in compliance with Georgia Law,
5 more specifically:
    Article 10 (B) of the Rules and
6 Regulations of the Board of Court Reporting
  (disclosure forms)
7     OCGA Section 9-11-28 (c) (disqualification
  of reporter for financial interest)
8     OCGA Sections 15-14-37 (a) and (b)
  (prohibitions against contracts except on a
9 case-by-case basis)
10 - I am a certified court reporter in the State of
  Georgia
11 - I am a subcontractor for Veritext
  - I have been assigned to make a complete and
12 accurate record of these proceedings
  - I have no relationship of interest in the matter
13 on which I am about to report which would disqualify
  me from making a verbatim record or maintaining my
14 obligation of impartiality in compliance with the
  Code of Professional Ethics
15 - I have no direct contract with any party in this
  action, and my compensation is determined solely by
16 the terms of my subcontractor agreement
17
18     FIRM DISCLOSURES
19 - Veritext was contacted to provide reporting
  services by the noticing or taking attorney in this
20 matter
  - There is no agreement in place that is prohibited
21 by OCGA 15-14-37 (a) and (b) - Any case-specific
  discounts are automatically applied to all parties,
22 at such time as any party receives a discount
  - Transcripts: The transcript of this proceeding as
23 produced will be a true, correct, and complete
  record of the colloquies, questions, and answers as
24 submitted by the certified court reporter
  - Exhibits: No changes will be made to the exhibits
25 as submitted by the reporter, attorneys, or
  witnesses

---

**Page 189**

1      CERTIFICATE
2 STATE OF GEORGIA:
  COUNTY OF FULTON:
3
4     I hereby certify that the foregoing
  transcript was taken down, as stated in the caption,
5 and the colloquies, questions and answers were
  reduced to typewriting under my direction; that the
6 transcript is a true and correct record of the
  evidence given upon said proceeding
7     I further certify that I am not a relative
  or employee or attorney of any party, nor am I
8 financially interested in the outcome of this
  action
9     I have no relationship of interest in this
  matter which would disqualify me from maintaining my
10 obligation of impartiality in compliance with the
  Code of Professional Ethics
11     I have no direct contract with any party
  in this action and my compensation is based solely
12 on the terms of my subcontractor agreement
    Nothing in the arrangements made for this
13 proceeding impacts my absolute commitment to serve
  all parties as an impartial officer of the court
14
15     This the 25th day of October, 2017
16
17
18
19   ROBYN BOSWORTH, RPR, CRR, CCR-B-2138
20
21
22
23
24
25

---

48 (Pages 186 - 189)

Appx1763

HIGHLY CONFIDENTIAL

Page 190

1  To: Holly Snow, Esq
2  Re: Signature of Deponent Mark Pallansch, Ph D
3  Date Errata due back at our offices:        }
4
5  Greetings:
6  This deposition has been requested for read and sign
   by the deponent   It is the deponent's
7  responsibility to review the transcript, noting any
   changes or corrections on the attached PDF Errata
8  The deponent may fill out the Errata electronically
   or print and fill out manually
9
   Once the Errata is signed by the deponent and
10 notarized, please mail it to the offices of Veritext
   (below)
11
   When the signed Errata is returned to us, we will
12 seal and forward to the taking attorney to file with
   the original transcript   We will also send copies
13 of the Errata to all ordering parties
14 If the signed Errata is not returned within the time
   above, the original transcript may be filed with the
15 court without the signature of the deponent
16
17 Please send completed Errata to:
18 Veritext Production Facility
19 11539 Park Woods Circle, Suite 302
20 Alpharetta, GA 30005
21 (770) 343-9696
22
23
24
25

Page 192

1  Page No _____Line No _____Change to_____
2  _____
3  Reason for change_____
4  Page No _____Line No _____Change to_____
5  _____
6  Reason for change_____
7  Page No _____Line No _____Change to_____
8  _____
9  Reason for change_____
10 Page No _____Line No _____Change to_____
11 _____
12 Reason for change_____
13 Page No _____Line No _____Change to_____
14 _____
15 Reason for change_____
16 Page No _____Line No _____Change to_____
17 _____
18 Reason for change_____
19
   _____
20        DEPONENT'S SIGNATURE
21 Sworn to and subscribed before me this____day of
   _____, 20__
22
23 _____
   NOTARY PUBLIC
24
25 My Commission Expires:_____

Page 191

1  ERRATA for ASSIGNMENT #
2  I, the undersigned, do hereby certify that I have
   read the transcript of my testimony, and that
3
4  ___ There are no changes noted
5  ___ The following changes are noted:
6
   Pursuant to Rule 30(7)(e) of the Federal Rules of
7  Civil Procedure and/or OCGA 9-11-30(e), any changes
   in form or substance which you desire to make to
8  your testimony shall be entered upon the deposition
   with a statement of the reasons given for making
9  them   To assist you in making any such corrections,
   please use the form below   If additional pages are
10 necessary, please furnish same and attach
11 Page No _____Line No _____Change to_____
12 _____
13 Reason for change_____
14 Page No _____Line No _____Change to_____
15 _____
16 Reason for change_____
17 Page No _____Line No _____Change to_____
18 _____
19 Reason for change_____
20 Page No _____Line No _____Change to_____
21 _____
22 Reason for change_____
23 Page No _____Line No _____Change to_____
24 _____
25 Reason for change_____

49 (Pages 190 - 192)

10/25/2019
Declaration of G. Reilly
EXHIBIT 8

Appx1765

HIGHLY CONFIDENTIAL

```
                                              Page 1
 1              UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
       _____
 3     UNITED STATES OF AMERICA     )
       ex rel., STEPHEN A. KRAHLING )
 4     and JOAN A. WLOCHOWSKI,      )
                                    )
 5                     Plaintiff, )Civil Action No.
                                    )10-4374(CDJ)
 6     v.                           )
                                    )
 7     IN RE: MERCK MUMPS VACCINE   )
       ANTITRUST LITIGATION         )
 8                                  )Master File
       THIS DOCUMENT RELATES TO     )No. 12-3555(CDJ)
 9     ALL ACTIONS                  )
       _____)
10
11
12      VIDEOTAPED DEPOSITION OF EUGENE SHAPIRO, M.D.
13                  (HIGHLY CONFIDENTIAL)
14
15     DATE:           November 7, 2018
16     TIME:           9:00 a.m.
17     HELD AT:        Morgan Lewis & Bockius
                       1 State Street
18                     Hartford, Connecticut
19
20        By:          Sarah J. Miner, RPR, LSR #238
21
22
23              VERITEXT LEGAL SOLUTIONS
                  MID-ATLANTIC REGION
24          1801 Market Street - Suite 1800
            Philadelphia, Pennsylvania 19103
25
```

Appx1766

HIGHLY CONFIDENTIAL

Page 2

```
1   A P P E A R A N C E S :
2   For Relators:
3   Gordon Schnell, Esq
    Constantine Cannon LLP
4   335 Madison Avenue
    New York, NY  10017
5   gschnell@constantinecannon.com
    and
6   Hamsa Mahendranathan, Esq
    Constantine Cannon LLP
7   335 Madison Avenue
    New York, NY  10017
8   hmahenranathan@constantinecannon.com
9   For the Private Plaintiffs:
10
    Diana J  Zinser, Esq
11  Spector Roseman & Kodroff PC
    1818 Market Street
12  Suite 2500
    Philadelphia, Pennsylvania  19103
13  dzinser@srkattorneys.com
14
    For Merck & Co, Inc :
15
    Dino S  Sangiamo, Esq
16  Sally W  Bryan, Esq
    Venable LLP
17  750 Pratt Street
    Suite 900
18  Baltimore, Maryland  21202
    srbryan@venable.com
19
    and
20
    Lisy Dykstra, Esq  (Appearing telephonically)
21  Morgan Lewis & Bockius
    1701 Market Street
22  Philadelphia, Pennsylvania  19103-2921
    lisa.dykstra@morganlewis.com
23
    Also Present:
24
    Tim Howard
25  Brian Capouch, Videographer
```

Page 4

```
1   Exhibit 15   An Office-Based Prospective    119
                 Study of Deafness in Mumps
2   Exhibit 16   Mumps Vaccines: Do we Need     131
                 a New One?
3   Exhibit 17   Acellular Vaccines and         146
                 Resurgence of Pertussis
4   Exhibit 18   Developing Better Pneumococcal 146
                 Vaccines for Adults
5   Exhibit 19   National Notifiable Infectious 150
                 Diseases: Weekly Tables
6   Exhibit 20   Recent Resurgence of Mumps     152
                 in the United States
7   Exhibit 21   Measles, Mumps and Rubella (MMR) 159
                 Vaccination: What Everyone
8                Should Know
    Exhibit 22   CDC ACIP Recommendation for    162
9                3rd Dose MMR Use During Mumps
                 Outbreaks
10  Exhibit 23   Healthly People 2010           171
                 Final Review
11  Exhibit 24   Immunization and Infectious    174
                 Diseases Data Details
12  Exhibit 25   Clinical Trial Award           181
    Exhibit 26   Clinical Trial Award           189
13  Exhibit 27   NIAID Emerging Infectious      199
                 Diseases/Pathogens
14  Exhibit 28   NIAID Emerging Infectious      200
                 Diseases/Pathogens
15  Exhibit 29   Developing a Novel Mumps       206
                 Virus Vaccine
16
17
18           (The exhibits were included with the
19  original transcript )
20
21
22
23
24
25
```

Page 3

```
1          I N D E X
2   WITNESS:                          Page
3   EUGENE SHAPIRO, M D
    Direct Examination by Mr  Sangiamo    6
4   Cross-Examination by Mr  Schnell    214
5          E X H I B I T S
    Shapiro
6   Deposition
    Exhibits   Description          Marked
7   Exhibit 1   Report of Dr  Eugene Shapiro  29
    Exhibit 2   Current Mumps Vaccination    40
8               Recommendations and
                Epidemiology in the United States
9   Exhibit 3   PLOS Remembering Mumps       42
    Exhibit 4   Plotkin's Vaccines           55
10  Exhibit 5   ESPID Reports and Reviews    66
                Emerging Mumps Infections
11  Exhibit 6   CDC Mumps Vaccination        73
    Exhibit 7   New England Journal of       83
12              Medicine Varicella Vaccine
    Exhibit 8   Abstract, The Effectiveness  83
13              of the Varicella Vaccine
                in Clinical Practice
14  Exhibit 9   JAMA Effectiveness Over      83
                Time of Varicella Vaccine
15  Exhibit 10  JAMA Varicella Disease       83
                After Introduction of
16              Varicella Vaccine in the
                United States, 1995-2000
17  Exhibit 11  New Enland Journal of        94
                Medicine The Protective
18              Efficacy of Polyvalent
                Pneumococcal Polysaccharide
19              Vaccine
    Exhibit 12  JAMA The Protective Efficacy 100
20              of Haemophilus b Polysaccaride
                Vaccine
21  Exhibit 13  Mumps Complications and      105
                Effects of Mumps Vaccination,
22              England and Wales, 2002-2006
    Exhibit 14  Recommendation of the Advisory 110
23              Committee on Immunization
                Practices for Use of a Third
24              Dose of Mumps Virus-Containing
                Vaccine in Persons at Increased
25              Risk for Mumps During an Outbreak
```

Page 5

```
1        THE VIDEOGRAPHER:  Good morning  We are now
2   on the record  My name is Brian Capouch  I am the
3   videographer for Veritext, Incorporated  Today's date
4   is November 7, 2018  The time on the monitor is 9:05
5   a m
6        This deposition is being held at Morgan,
7   Lewis & Bockius, located at 1 State Street, Hartford,
8   Connecticut  The caption of the case is United States
9   of America ex rel, et al  versus Merck & Company  The
10  name of the witness is Eugene Shapiro
11       At this time, the attorneys present, and
12  attending remotely, please identify yourselves and who
13  you represent, after which our court reporter, Sarah
14  Miner, representing Veritext, will swear in the
15  witness
16       MR  SCHNELL:  Gordon Schnell, Constantine
17  Cannon, counsel for relators
18       MS  MAHENDRANATHAN:  Hamsa Mehendranathan,
19  Constantine Cannon --
20       THE COURT REPORTER:  I'm sorry  Can you -- I
21  can't hear you
22       MS  MAHENDRANATHAN:  Oh, sorry  Hamsa
23  Mehendranathahan, Constantine Cannon, counsel for
24  relators
25       MS  ZINSER:  Diana Zinser, Spector, Roseman &
```

HIGHLY CONFIDENTIAL

Page 6

1 Kodroff, for private plaintiffs.
2       MR. SANGIAMO:  Dino Sangiamo, Venable, for
3 Merck.
4       MS. BRYAN:  Sally Bryan, Venable, for Merck.
5       MR. HOWARD:  Tim Howard, in-house counsel for
6 Merck.
7       MS. DYKSTRA:  Lisa Dykstra, Morgan, Lewis,
8 for Merck.
9       EUGENE D. SHAPIRO, M.D.,
10 having first been duly sworn by Sarah J. Miner, LSR, a
11 Notary Public in and for the State of Connecticut, was
12 examined and testified as follows:
13       DIRECT EXAMINATION
14 BY MR. SANGIAMO:
15   Q. Good morning, Dr. Shapiro.
16   A. Good morning.
17   Q. You are a pediatrician, sir?
18   A. Yes.
19   Q. You are board certified in pediatrics?
20   A. Yes.
21   Q. Are you board certified in pediatric
22 infectious disease, as well?
23   A. Yes.
24   Q. How many times have you been named as an
25 expert witness?

Page 7

1   A. I don't know.  Many.
2   Q. Over a hundred?
3   A. Yes.
4   Q. Over 200?
5   A. Yes.
6   Q. Over 500?
7   A. No.
8   Q. Is there any kind of commonality to the
9 subject matter of your testimony when you have been
10 named as an expert?
11   A. Well, there is a lot of variation, but
12 generally it has to do with pediatric infectious
13 diseases, sometimes adult infectious diseases.
14 Generally infectious diseases.  Not always.  Sometimes
15 it is general pediatrics, but most often infectious
16 diseases.
17   Q. How would you describe the split in your
18 experience of testifying for plaintiffs versus
19 defendants?
20   A. It is roughly 50/50.  It is 60/40 in any
21 given year.
22   Q. Have you ever been named as an expert in a
23 case involving vaccines other than this case?
24   A. There have been -- well, I guess I -- what do
25 you mean "involving vaccines"?

Page 8

1   Q. A case in which administration of a vaccine
2 was a significant fact in the case.
3   A. There have been a few times, yes.
4   Q. Were those cases involving the question of
5 whether the vaccine had caused an injury to the
6 plaintiff?
7   A. No.  Generally, the issue is whether the
8 vaccine -- failing to give the vaccine was below the
9 standard of care and led to some injury.
10   Q. With respect to those cases where the
11 question is whether failing to give the vaccine was
12 below the standard of care, how would you describe the
13 split in terms of whether you testified for defendants
14 or plaintiffs?
15   A. I mean, it is only a handful of cases.  I
16 can't remember any recent ones.  So I would say it is
17 the same, you know, there were some on each side.
18   Q. What is your best estimate of how many cases
19 it was?  I know you just said handful.  Would you be
20 more precise, if you can?
21   A. Well, four, five, something like that, three,
22 four, five.
23   Q. For the entirety of your career?
24   A. Correct.  And where the vaccine was the main
25 issue.  I mean, you know, if a child gets meningitis

Page 9

1 and one of the issues is were they vaccinated, that is
2 in many, many cases, but it's not the center of --
3 most of the time, that hasn't been the issue.
4   Q. Have you ever served as an expert in a case
5 in which the question was whether the vaccine had
6 caused an injury?
7   A. I don't believe so.
8   Q. Have you ever served as an expert witness in
9 a case involving Merck's MMR vaccine other than this
10 case?
11   A. No.
12   Q. Could you approximate how much money you have
13 made serving as an expert witness over the last five
14 years?
15   A. I am guessing it is around 70,000 per year,
16 something like that.
17   Q. How did you arrive at that estimate just now?
18   A. Well, I was approximating how much it was
19 each year, and I divided it by five.  I mean, I don't
20 remember the precise, but I know it was generally
21 under $100,000 and it might have been one year 50 or
22 60 and one year 80 or 90.  I multiplied that by five
23 and then divided and that was it, or whatever,
24 algebra.
25       THE COURT REPORTER:  I'm sorry?

3 (Pages 6 - 9)

Appx1768

HIGHLY CONFIDENTIAL

Page 10

1    THE WITNESS: Algebra.
2  BY MR. SANGIAMO:
3    Q. Okay. Got it. How did you get started
4  testifying as an expert witness?
5    A. I guess somebody contacted me and asked me if
6  I would do it. This was many years ago. I barely
7  remember. I mean, I believe I testified something in
8  -- the '80s was probably the first time I did it.
9    Q. Is there any particular malpractice insurer
10  that you regularly are retained by for testifying as
11  an expert?
12    A. No. The insurers generally aren't the ones
13  that -- you know, it's a mystery to me. I guess
14  lawyers go online or something and see cases or there
15  is word of mouth usually, but it is the law firms that
16  contact me, not insurers.
17    Q. Do you have any kind of engagement with an
18  expert witness service that refers you to lawyers --
19    A. No.
20    Q. -- sitting --
21    THE COURT REPORTER: Could you just wait
22  until he finishes?
23    THE WITNESS: I apologize.
24  BY MR. SANGIAMO:
25    Q. Doctor, have you ever been the defendant in a

Page 11

1  lawsuit?
2    A. Well, there is a current lawsuit that I am a
3  defendant in, but I think that is it.
4    Q. That is the only one you can remember?
5    A. Yeah.
6    Q. That current lawsuit involves Lyme disease.
7  Is that right?
8    A. Yes.
9    Q. Could you just summarize generally the
10  allegations in that lawsuit?
11    A. The allegations are that the Infectious
12  Disease Society of America and five physicians who
13  served on panels, volunteer panels for the Infectious
14  Disease Society of America, to develop guidelines for
15  managing patients with Lyme disease, the allegation
16  was that all were -- received large sums of money from
17  medical insurance companies to write guidelines that
18  would save the insurance companies money and deprive
19  plaintiffs of -- of care. That is more or less what
20  the allegation is.
21    Q. What are the allegations specifically as to
22  you?
23    A. Same thing.
24    Q. Have you given a deposition in that case yet?
25    A. No.

Page 12

1    Q. Is one scheduled?
2    A. No.
3    Q. Who is representing you in that case?
4    A. Pillsbury whatever. That is the law firm.
5  That is what you are asking?
6    Q. It is.
7    A. It is a law firm in Washington, D.C.,
8  Pillsbury something.
9    Q. Do you know the specific lawyer?
10    A. Alvin Dunn, D-U-N-N.
11    THE COURT REPORTER: Alvin?
12    THE WITNESS: Yeah.
13  BY MR. SANGIAMO:
14    Q. Can you approximate how much money you have
15  made for your work so far in this case?
16    A. 40 or $45,000, something like that.
17    Q. Do those payments go to you personally?
18    A. Yes.
19    Q. Before you approximated the amount of money
20  you have made over the past five years testifying as
21  an expert witness as about $70,000 per year --
22    A. I wasn't counting this year. I thought you
23  meant the past five years.
24    Q. Understood, sir. And that $70,000 that you
25  were referring to, that is paid to you personally?

Page 13

1    A. Yes.
2    Q. Does that $70,000 per year include times when
3  you are named as an expert but do not testify?
4    A. Yes. You know, when you say "named as an
5  expert," I am just thinking of anytime a law firm
6  contacts me and I -- I charge a certain retainer and
7  they -- I review the record. I might say there is no
8  merit and I don't -- I am probably never named as an
9  expert, but I included that income.
10    Q. You included that income when you gave me the
11  estimate of 70,000 per year. Right?
12    A. Yeah, roughly.
13    Q. Have you ever published about mumps vaccine?
14    A. I don't believe so, not specifically.
15    Q. You just said "not specifically." Does that
16  mean you have in a general way?
17    A. Well, I mean, I can't remember. There may be
18  chapters that I am part of where it says, you know,
19  this is the recommendations to give MMR II or
20  something like that. But there is nothing about mumps
21  or mumps vaccines specifically beyond general
22  recommendations.
23    Q. Do you remember any instances where you are
24  on a chapter that does make those kinds of
25  recommendations?

4 (Pages 10 - 13)

Appx1769

Page 14

1 A. I don't remember anything specifically, no.
2 Q. Have you ever spoken publicly about mumps
3 vaccine?
4 A. What do you mean by "spoken publicly"?
5 Q. Maybe at a conference of your peers.
6 A. No.
7 Q. Is there any other sense in which you have
8 spoken publicly about mumps vaccine?
9 A. Well, we have talked about -- for example, I
10 teach medical students and residents and fellows, and
11 there have been talks where we have spoken about
12 outbreaks of mumps and mumps vaccine. There are
13 Journal Clubs for the faculty in pediatric infectious
14 diseases, and trainees where I have spoken about
15 publications about mumps and mumps vaccine outbreaks.
16 I don't know if you count that as public, but --
17 Q. Anything else that you can think of that
18 might arguably fall within the definition of "public"
19 in your view?
20 A. I don't believe there is anything else.
21 Q. What is the Journal Club?
22 A. So twice a month, members of the faculty and
23 fellows in our section of infectious diseases and
24 other trainees, residents, and medical students, will
25 meet over lunch and one person is assigned to choose

Page 15

1 an article published in a journal or multiple articles
2 and present it. And we discuss -- they are sent to
3 everybody in advance, and we discuss the issues
4 raised.
5 Q. Are you saying that there has been an
6 occasion where you have chosen articles related to
7 mumps for a meeting of the Journal Club?
8 A. Yes.
9 Q. How many times has that happened?
10 A. I think it has happened twice.
11 Q. Do you recall when that happened?
12 A. Once was -- once was after the -- so it was
13 probably 2008 maybe, 2007, 2008, whenever there was a
14 publication about that initial big outbreak in 2006 in
15 the Midwest. And then another time was related to the
16 outbreak in -- in -- at the University of Iowa that
17 was published, I think, earlier this year or late last
18 year.
19 Q. On those occasions, did you select more than
20 one article to present on?
21 A. I think so, yeah. I mean, I think I selected
22 -- I might have selected a -- when there is an
23 editorial that you accompanies the article, and I
24 can't remember about the one in 2008 or whenever it
25 was. I don't remember if there was an editorial.

Page 16

1 Probably not. Oh, I think I did include kind of an
2 opinion piece by Stanley Plotkin along with the
3 article about the outbreak in -- at the University of
4 Iowa, yes.
5 Q. Do you have any notes of the presentations
6 that you made on those two occasions?
7 A. No.
8 Q. Did you have any kind of PowerPoint that you
9 showed to the group?
10 A. I may have, but I -- it has been deleted.
11 Q. You think you did have a PowerPoint?
12 A. I probably did, but the PowerPoint would have
13 been just things like the table that was in the
14 article, things like that, to show the data. I don't
15 think there were, you know, that I put up points or
16 anything.
17 Q. When would you estimate that you did your
18 presentation about the article that was published
19 about the outbreak in Iowa?
20 A. It was relatively shortly after it was
21 published. I would have to look up when it was
22 published. I don't recall.
23 Q. Probably within the last year would you say?
24 A. Yeah, roughly, year, year and a half.
25 Whenever, shortly.

Page 17

1 Q. When you made that presentation, did you do
2 anything other than just summarize the findings of the
3 authors?
4 A. Well, we talked about the issue of -- of
5 mumps outbreaks in general, too.
6 Q. Did you express any opinions about the mumps
7 outbreaks at that presentation regarding the
8 publication about the Iowa outbreak besides just
9 describing what the authors had found?
10 A. What do you mean? Opinions about what?
11 Q. About the mumps outbreaks. Did you express
12 any opinion about the mumps outbreaks at the
13 presentation about the article about the Iowa
14 outbreak?
15 A. I probably said they weren't a good thing.
16 Q. Okay.
17 A. And, you know, that it -- you know, it's an
18 increasing problem. You know, there -- I don't
19 remember the conversation. Typically what happens is
20 other members of the -- who are in attendance, other
21 people in attendance ask questions and raise issues
22 themselves and so on. Honestly, I don't recall
23 everything that went back and forth.
24 Q. But the only opinions you can remember
25 expressing were that it is not a good thing and it is

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL

Page 18

1 increasingly becoming a problem, it being the
2 outbreaks?
3      A. Right. I am sure we talked about potential
4 causes. I don't remember specifics.
5      Q. Do you recall how many people were in
6 attendance at those two presentations that we have
7 been talking about?
8      A. I don't recall exactly. I mean, in general,
9 it would be between eight and 12.
10      Q. Have you ever participated in any mumps
11 related research?
12      A. No.
13      Q. I just used the word "participated." Just to
14 be a little bit broader. Have you ever overseen any
15 mumps related research?
16      A. No.
17      Q. Have you ever served as a reviewer for any
18 mumps related journal articles?
19      A. No.
20      Q. I think you testified earlier that you teach
21 medical students and residents and fellows about
22 mumps. Is that right?
23      A. I think it was more -- I mean, it may come
24 up, mumps, but I was talking about vaccines in
25 general, mumps being one of the ones that gets

Page 19

1 covered, mumps vaccine.
2      Q. What is it that you teach regarding mumps
3 vaccine?
4      A. Well, I talk about -- generally, it is part
5 of the talk about vaccines in general. Often, the
6 talks I am thinking about are specifically to medical
7 students who are usually in their third year, don't
8 know a lot about vaccines or vaccine policy. So I
9 will ask them, "Oh, MMR vaccine, what does that stand
10 for?" "Mumps, measles, rubella." "Mumps what?" What
11 kind of vaccine it is. I make the point it is a live
12 attenuated vaccine. We talk about what the
13 recommendations are for the timing of it.
14      And then, you know, in recent years because
15 of the outbreaks I might talk briefly -- I don't
16 really talk much about it -- about mumps vaccine
17 specifically, although I may say there is a --
18 probably say that there's been a problem with the
19 vaccine because there have been outbreaks in the
20 United States recently, increasing incidents of mumps
21 and large outbreaks. That is probably the essence of
22 it. More than the essence, that is probably the
23 almost the sum total of it. I go into other vaccines
24 in much more detail.
25      Q. You were testifying about the Journal Clubs

Page 20

1 and the occasions where you have discussed mumps
2 vaccines at Journal Clubs. Do you recall any other
3 discussions with your professional colleagues about
4 mumps vaccines?
5      A. No.
6      Q. Outbreaks, mumps outbreaks?
7      A. I don't recall any. It may have been
8 mentioned in passing in some context, but there
9 certainly were no particular long discussions beyond
10 mentioning it in passing.
11      Q. Do you currently see patients?
12      A. Yes.
13      Q. Under what circumstances?
14      A. You mean what is my role?
15      Q. Sure, yes.
16      A. So I see patients in a variety of contexts.
17 I attend in our primary care center, which is where
18 both patients come in for continuity of care, these
19 are mostly indigent patients who are on Medicaid and
20 so on. And they come for regular continuity of care.
21 And then there is also an urgent care corridor where
22 people will come in with a variety of complaints like
23 asthma or colds or rashes or whatever.
24      In addition, I serve as an attending on the
25 infectious diseases service. In that context, I will

Page 21

1 -- while I am on service, all of the consults in the
2 hospital on pediatric cases, I supervise. There is
3 usually a fellow on. There may be residents, and so
4 on. And I -- I am responsible for making and
5 providing a consult about diagnosis and treatment of
6 those patients. In addition, we have one-half day a
7 week an outpatient infectious diseases clinic where
8 patients may be referred, either patients who are --
9 who have been seen in the hospital and are coming back
10 for follow-up, or outpatients that are referred to us,
11 either self-referred or more often a practitioner in
12 the community refers for a consult. And I will see
13 them the week that I am on service.
14      Q. You used the term before, I think it was
15 "continuity of care." Am I right about that?
16      A. Yes.
17      Q. Can you explain what that means?
18      A. Well, it is when a baby is born they come in
19 to see the doctor, usually shortly after they go home
20 from the hospital and then regular periodic visits.
21 Often, we see them at a month, two months, four
22 months, six months. At those visits, we administer
23 immunizations. We -- we do anticipatory guidance
24 about, you know, be careful, don't leave poisons, you
25 know, where they can get them, things like that. In

6 (Pages 18 - 21)

Appx1771

HIGHLY CONFIDENTIAL

Page 22

1 other words, the same patients keep coming back for
2 their regular pediatric care which in the first few
3 years are fairly frequent visits.
4     Q. Is it fair to say in that circumstance you
5 are not functioning as a pediatric infectious disease
6 specialist but more just as a pediatrician. Is that
7 accurate?
8     A. Yes.
9     Q. Do you recommend administration of MMR
10 vaccine to your patients?
11     A. Yes, MMR II.
12     Q. Have you ever treated a patient with mumps?
13     A. Yes.
14     Q. How many?
15     A. Over the years, a handful, five or six,
16 seven, something. Fewer than 10.
17     Q. When did you start seeing patients?
18     A. Well, I was in medical school from 1972 to
19 1976, so as a medical student was the first time.
20     Q. Have you seen patients continuously since you
21 graduated from medical school?
22     A. Yes. I mean, not every day.
23     Q. Understood. You just estimated five or six.
24 I think you said fewer than 10 numbers of mumps cases
25 that you have seen over the years. Do you recall what

Page 23

1 decades those were in?
2     A. We had one, I think, in this decade. A
3 couple last decade. Most of them were in the last two
4 decades. I think there was one or two in the '90s.
5 And definitely I saw some in the '70s and early '80s.
6     Q. Do you know whether any of the patients that
7 you saw with mumps had received their vaccinations on
8 schedule before they got mumps?
9     A. The ones for sure in the last two decades
10 did.
11     Q. Did you see them as part of your continuity
12 care work or did you see them as a pediatric
13 infectious disease specialist?
14     A. Infectious disease specialist.
15     Q. What do you recall about those patients, the
16 ones who were vaccinated, if anything?
17     A. They had mumps.
18     Q. Anything else about their cases that stands
19 out to you?
20     A. They weren't happy. They had some painful
21 swelling of their parotid gland. One of them, I think
22 he had orchitis, inflammation of the testes. Not much
23 beyond that. I mean, that is about it.
24     Q. How old were those patients?
25     A. They were teenagers, the ones in the last two

Page 24

1 decades.
2     Q. Right. Do you have any particular areas of
3 specialty when it comes to research?
4     A. Yes, vaccines and the effectiveness of
5 vaccines. Lyme disease. Those are probably the two
6 main ones. Evaluation of febrile children. I would
7 say those are the three.
8     Q. You have participated as an investigator in
9 studies that were evaluating vaccine effectiveness.
10 Is that right?
11     A. Correct.
12     Q. How many different vaccines would you say you
13 have done that kind of study for?
14     A. At least five.
15     Q. Could you list them?
16     A. Six.
17     Q. Could you list them?
18     A. I could.
19     Q. All right. Please do.
20     A. Lyme vaccine, varicella vaccine, actually,
21 pneumococcal polysaccharide vaccine, pneumococcal
22 conjugate vaccine, Haemophilus influenza Type B
23 vaccine. I was involved a little bit with a BCG
24 vaccine. Oh, there is more. Rotavirus vaccine.
25 Influenza vaccine. That is probably it. So what is

Page 25

1 that eight, something like that.
2     Q. I have eight. Have you published all of that
3 work that you were just referring to?
4     A. Yes. The BCG vaccine, I was helping somebody
5 else so I may not be an author on that one. The
6 others, they are definitely publications. Well, Lyme
7 vaccine, the manuscript should have been written up a
8 long time ago. It has been presented at meetings and
9 it is in the final stages of getting -- finally
10 getting ready for submission, but the others are all
11 published.
12     Q. If there is no way to answer generally this
13 next question, just let me know, but the question is:
14 How did you decide to conduct a study for those
15 various vaccines?
16     A. There is no way to answer generally.
17     Q. Let's take the case of varicella vaccine.
18 Did someone come to you to ask you to do whatever
19 studies you did about varicella vaccine or was it your
20 idea?
21     A. It was my idea. I mean, that's -- so it was
22 my idea for the varicella vaccine. For the
23 pneumococcal polysaccharide vaccine, that was maybe
24 the first one I did. And I had a mentor when I was a
25 fellow at Yale, who had suggested that one then

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL

Page 26

1  originally. And then I generally wrote grants that
2  were funded by the National Institutes of Health to
3  evaluate the -- actually there were two for the --
4  ultimately for the pneumococcal polysaccharide
5  vaccine. There was one for Haemophalis influenza Type
6  B. There were two for varicella vaccine, all of which
7  were investigator initiated grants that I was a
8  principal investigator of.
9     The pneumococcal vaccine one, I let one of my
10  mentees do. That was actually a study. So I might be
11  acknowledged. I don't think I am actually an author
12  on the conjugate vaccine one. Actually, that was
13  conducted by the CDC and the principal investigator
14  from the CDC actually came to Yale to consult with me
15  on the best way to conduct the study. And they used
16  some of the data that I -- for a system that I put in
17  place for surveillance for disease throughout the
18  State of Connecticut that I kind of turned over to the
19  State health department. And that was used to
20  identify cases in Connecticut.
21     Q. How about the Rotavirus vaccine effectiveness
22  study that you did?
23     A. The Rotavirus and the influenza vaccines both
24  were studies that one of my mentees did, but I am a
25  co-author and I helped design the study in both of

Page 27

1  those studies. I think the one on influenza vaccine
2  actually won the award as the best clinical -- the
3  best clinical research article of the year in the year
4  that was published from the Infectious Disease Society
5  of America.
6     Q. You didn't list mumps just now when you went
7  through the list of vaccines for which you have done a
8  vaccine effectiveness study. Is there any particular
9  reason for that?
10     A. Because I was working on other things. I
11  mean, there is no -- it is not like I considered it
12  and said I don't want to do it. I just -- I mean,
13  there are 20 other vaccines that you could also say I
14  didn't do studies of.
15     Q. Did you ever consider it for mumps vaccine?
16     A. No.
17     Q. What was the driver that caused you to want
18  to do it for those other vaccines?
19     A. It varied from vaccine to vaccine. Mostly,
20  it was because there were questions about how well the
21  vaccines were working in practice. It seemed like a
22  worthwhile thing to study, and I had method -- I had
23  ways to access the patients. I mean, I set up systems
24  and there were enough patients available to me to do
25  those studies.

Page 28

1     Q. Would there be enough patients available to
2  you to do a mumps vaccine effectiveness study?
3     A. In outbreak situations, there might be.
4     Q. Okay.
5     A. Yeah.
6     Q. You give statements to the media from time to
7  time on matters of public health. Is that accurate?
8     A. Sometimes, when they contact me. I don't
9  contact them.
10     Q. Are there any particular reporters who
11  contact you more often than others?
12     A. No.
13     Q. Have you ever been asked to give a statement
14  to the media about mumps vaccine?
15     A. No.
16     Q. Have you ever been asked to give a statement
17  to the media about mumps outbreaks?
18     A. No.
19     Q. There were a few reported cases of mumps at
20  Yale in recent years. Is that accurate?
21     A. Well, in New Haven, yeah, and some of the
22  patients came to Yale.
23     Q. I see. Were any of the patients students at
24  Yale?
25     A. Oh, I am thinking of an outbreak. There was

Page 29

1  an outbreak in an orthodox Jewish community at Yale.
2  That is the one I am thinking of. I think there were,
3  now that you mention it. I think there were a couple
4  of cases at Yale that I recall reading about, but I
5  didn't see those. I think the ones I saw were more
6  from the religious community.
7     Q. And you weren't asked to comment about any of
8  the cases at Yale publicly. Is that right?
9     A. No.
10     (Shapiro Exhibit No. 1 marked for
11  identification.)
12  BY MR. SANGIAMO:
13     Q. Dr. Shapiro, I am handing you what has been
14  marked as Exhibit 1, which is a copy of your report.
15  That is your report?
16     A. It appears to be.
17     Q. Could you turn to page 4 of the report,
18  please. That is a summary of your opinions in the
19  case. Correct?
20     A. Correct. The summary is my summary, yes.
21     Q. The first opinion as stated here in your
22  report is that "Merck's mumps vaccine does not provide
23  sufficient protection to prevent continued mumps cases
24  and outbreaks in the United States." Right?
25     A. That is correct.

8 (Pages 26 - 29)

Appx1773

HIGHLY CONFIDENTIAL

Page 30

1    Q. Can you tell me when you formed that opinion?
2    A. No.
3    Q. Do you remember what year it was?
4    A. I believe it was 2018, either that or late
5    2017. I can't remember.
6    Q. Do you remember when you were first contacted
7    to work on this case?
8    A. I think I was contacted late in 2016. I
9    can't remember if I was actually retained then or in
10   early 2017.
11   Q. The second opinion in your summary of
12   opinions is that, "The resurgence of mumps cases and
13   outbreaks in the United States is a significant public
14   health concern."
15      Did I read that accurately?
16   A. You did.
17   Q. Do you know when you formed that opinion?
18   A. Well, these were all sometime early this year
19   or late last year.
20   Q. Same for that third opinion then, "A new
21   mumps vaccine is necessary if we wish to control mumps
22   in the United States." Is that right?
23   A. Yes.
24   Q. You cite a lot of literature in your report.
25   Could you estimate how much of that literature you had

Page 31

1    read prior to your engagement in this matter?
2    A. No.
3    Q. Did you do any literature searches
4    specifically for this matter?
5    A. I did. And the other thing that I typically
6    would do is when I read an article, I will look at the
7    bibliography and see if there are any relevant -- see
8    if there are any relevant articles that I -- that I
9    wasn't aware of.
10   Q. And did that happen here in this engagement
11   for this case?
12   A. Yeah.
13   Q. Am I correct that everything that is cited in
14   your report in support of your opinions is publicly
15   available information. Is that right?
16   A. Yes. Well, yeah, the answer is yes.
17   Q. You didn't do any original research. Is that
18   right?
19   A. Oh, definitely not.
20   Q. You didn't do any meta analysis of
21   preexisting data. Right?
22   A. No.
23   Q. You have served as a WHO consultant. Is that
24   right? W-H-O.
25   A. Yes.

Page 32

1    Q. What years did you do that?
2    A. That was a long time ago. I can't remember.
3    It doesn't say on my CV? You want me to look it up?
4    Q. That would be great, yes.
5    A. It doesn't say. So I think those were in the
6    '80s, I believe.
7    Q. Did any of that consulting work involve
8    mumps, to your recollection?
9    A. Definitely not. It was about pneumococcus.
10   Q. I think your CV also indicates that you
11   served on an advisory group for the epidemiology
12   branch of the NIH. Is that right?
13   A. Yeah, there is a -- there is kind of an
14   external advisory board that would review their -- it
15   was specifically for National Institute of Child
16   Health and Human Disease. And each of the institutes
17   has their own internal researchers. And the role of
18   that board was to review the research that was -- that
19   they were doing internally by the NIH -- at the --
20   NICHD is the acronym for it.
21   Q. Do you recall what years you did that?
22   A. I don't. That might have been in the early
23   '90s.
24   Q. Did any of that work involve mumps?
25   A. No.

Page 33

1    Q. Was that all focused on a particular disease?
2    A. It wasn't focused -- let me get this on. It
3    was not focused on a disease, but rather a lot -- as I
4    recall, a lot of it had to do with studying -- a lot
5    of what they were doing were things like infant
6    mortality and neonatal health and things like that. I
7    am trying to remember. There may have been some
8    infectious disease stuff, but it wasn't mumps.
9    Q. Have you served on any FDA advisory
10   committees?
11   A. Yes.
12   Q. Which ones?
13   A. The vaccine advisory committee.
14   Q. Is that VRBPAC or something different,
15   vaccine related biologics?
16   A. Yes. I mean, I -- I wasn't a regular member
17   of that. I came as a special consultant one time.
18   Q. Okay. Just the one time?
19   A. It was once or twice.
20   Q. Do you recall what you were asked to consult
21   on?
22   A. I believe it was pertussis, acellular
23   pertussis vaccines.
24   Q. At the time of original licensure?
25   A. Yes.

9 (Pages 30 - 33)

Appx1774

HIGHLY CONFIDENTIAL

Page 34

1    Q. What did you think of the acellular pertussis
2  vaccine at the time of original licensure?
3    A. At that time, I thought it was better than I
4  think it is now.
5    Q. You thought it was better in the sense that
6  you thought it was more effective than you think it is
7  now in that sense?
8    A. Well, we learned that it may not be --
9  provide long-lasting immunity.
10    THE COURT REPORTER: Provide long-lasting?
11    THE WITNESS: Immunity.
12  BY MR. SANGIAMO:
13    Q. Which you did not know at the time of your
14  service on the advisory committee?
15    A. Right. There weren't long-term studies yet.
16    Q. Was that in the 1990s?
17    A. I think so.
18    Q. Have you ever served as a grant proposal
19  reviewer?
20    A. Many times.
21    Q. For whom?
22    A. For the Centers for Disease Control, for the
23  National Institutes of Health, for the -- let's see.
24  For the Czech Health Research Council for the
25  Netherlands Organization for Health Research and

Page 35

1  Development, for the Department of Health of the
2  United Kingdom. Frequently for internal grants at
3  Yale that are competitive -- awarded competitively for
4  funds that -- like we have what's called institutional
5  training grants, and also they -- sometimes we have
6  money that they use for pilot studies. And sometimes
7  there are internal competitions for those.
8    Q. Did any of the grant proposals that you
9  reviewed over the years involve mumps?
10    A. Not that I recall.
11    Q. When you serve as a reviewer for NIH, is that
12  limited in some fashion to a particular kind of grant
13  that you are asked to review?
14    A. Well, the way it works -- so it depends -- so
15  there are different ways that it works. So I was a
16  member of a standing study section. Usually you are
17  in that for four years. I was actually in it for five
18  years because it was a new study section, and the
19  first year sort of didn't count. And it was named
20  Clinical Research and Field Studies.
21    And there were -- most of them were related
22  to some sort of infectious disease. But they were a
23  wide variety of studies from studies of malaria in
24  Africa to acute otitis media in children in the United
25  States. And some of them were clinical trials and

Page 36

1  some of them were case controlled studies. So there
2  is a wide variety, but within it they were all related
3  to infectious disease.
4    Q. Did this standing study section make
5  recommendations about what kinds of studies NIH ought
6  to seek out?
7    A. No.
8    Q. What years were you a member of that standing
9  study section?
10    A. I don't remember exactly. It was probably in
11  the early '90s, early, mid '90s. And then there are
12  separately -- I served on other what they call special
13  interest study sections where they -- they would
14  review grant proposals for a variety of other things,
15  again related to infectious diseases generally.
16    Q. Do you have an opinion as to who some of the
17  leading authorities on mumps are today?
18    A. No.
19    Q. Do you have any opinion about Dr. Steven
20  Rubin's expertise in mumps?
21    A. No.
22    Q. Do you have any thoughts on what some of the
23  leading treatises and textbooks are on vaccines?
24    A. What do you mean by "leading"? I don't know
25  what you mean by "leading".

Page 37

1    Q. Do you have any treatises or textbooks on
2  vaccines in your office?
3    A. Yes.
4    Q. Which ones?
5    A. Well, there -- you mean specifically on
6  vaccines alone?
7    Q. Yes.
8    A. Because I have like lots of general textbooks
9  of infectious diseases and of -- I don't think I have
10  any on vaccines per se. Actually, I might have one
11  small -- it is not really a textbook. It is a book
12  about how vaccines are made in general by Stanley
13  Plotkin. That's in my office. And then I have
14  textbooks of pediatrics and infectious diseases,
15  several. And there are chapters about vaccines and
16  often chapters on disease that, you know, part of
17  which is about vaccines. Those are -- that is what I
18  have in my office.
19    Q. Did I hear you say you have textbooks on
20  pediatric infectious disease, or am I misstating what
21  you said?
22    A. I think I said infectious diseases, but you
23  are actually a little more accurate. There are
24  pediatric infectious diseases.
25    Q. Which one ones do you have?

10 (Pages 34 - 37)

Appx1775

HIGHLY CONFIDENTIAL

Page 38

1      A. I have Sarah Long's textbook and I have Jim
2  Cherry's textbook. Bob Baltimore wrote one that I
3  have.
4      Q. I notice you cite Plotkin's Vaccines treatise
5  many times in your report. Do you consider that a
6  reliable source?
7      A. I don't know which treatise you mean. What
8  treatise? Can you show me the specific reference? My
9  guess is, though, my answer when you ask me if
10  something is -- what did you call it, reliable --
11      Q. Reliable source.
12      A. What I would say is things -- almost all --
13  anything that I cite I would say that there are some
14  things that I agree with and there are some things I
15  disagree with in most any of the things I reference.
16  If you point me to a specific passage, I will be happy
17  to tell you my opinion about it.
18      Q. Do you consider Plotkin's Vaccines a reliable
19  source?
20      A. Are you talking about his textbook?
21      Q. Yes.
22      A. Again, there are things in there that I agree
23  with, there are things in there that I disagree with.
24  So if you have a specific question about a specific
25  issue, I am more than happy to give you my opinion

Page 39

1  about it.
2      Q. Do you cite to the Pink Book in your report?
3      A. I don't believe so.
4      Q. Do you use the Pink Book?
5      A. No.
6      Q. Do you have an opinion about the Pink Book?
7      A. No, I don't use it. I don't look at it so I
8  don't have any opinion about it.
9      MR. SANGIAMO: Gordon, I am about to start a
10  new chunk. We can keep going or take a break now.
11      MR. SCHNELL: Want to take a break? It has
12  been about an hour.
13      THE VIDEOGRAPHER: Off the record. The time
14  is 9:58.
15      (Recess taken from 9:58 a.m. to 10:11 a.m.)
16      THE VIDEOGRAPHER: This is the beginning of
17  media Number 2. We are back on the record. The time
18  is 10:11.
19  BY MR. SANGIAMO:
20      Q. I apologize if I asked you this earlier, but
21  how many times did you say you have given a
22  deposition?
23      A. I don't know if I said. I don't remember. I
24  think we talked about -- you said more than 200, but
25  fewer than 500. Was that related? It is somewhere in

Page 40

1  that range. A couple hundred. I am guessing, over
2  many years, whatever it is, 30 years, I think it is
3  probably in the range of two to -- 200, 300, something
4  like that. 250.
5      Q. How many times have you testified in court?
6      A. Fewer than 20 times, 15 times, 12 times
7  something like that.
8      (Shapiro Exhibit No. 2 marked for
9  identification.)
10  BY MR. SANGIAMO:
11      Q. Doctor, you have just been handed what has
12  been marked as Exhibit 2. Do you recognize that
13  document?
14      A. No. I have never seen this document.
15      Q. Never seen it before?
16      A. I don't think so. What it says is -- well,
17  it doesn't look like it is a document. It looks like
18  it is copies of slides and what it says is "current
19  mumps vaccination recommendations and epidemiology in
20  the United States." I think it is probably slides
21  that were used at an ACIP meeting by Mona Merritt. Is
22  that accurate?
23      Q. I am not under oath, but, yeah, that is
24  accurate. You see it says ACIP.
25      A. That's what it says, yeah.

Page 41

1      Q. But you have never seen it before?
2      A. I may have seen it as a document. I may have
3  looked at the slides at some point. I never saw a
4  printout or document of it.
5      Q. You think you did look at the slides?
6      A. I think so, yes.
7      Q. Could you turn to slide 7, please.
8      A. Yes.
9      Q. Okay. Can you describe what that appears to
10  be?
11      A. Reported mumps cases United States vaccine
12  Era 1968 to 2016.
13      Q. Do you know of any reason why that is not a
14  fair depiction of the effective use of Merck's mumps
15  vaccine on disease reduction in the time period shown?
16      A. Yeah, I do.
17      Q. Why is that?
18      A. The -- because the scale is on the left-hand
19  side, the Y axis is geared to -- you know, is the
20  large number of cases that occurred before the -- I
21  mean, let me correct myself. It is not inaccurate,
22  but it is -- visually, it is a little misleading. If
23  you look at the slide right below it, slide 8, and you
24  look at the little inset of the incidents from 2003 to
25  2015, it gives you a little better idea of what has

11 (Pages 38 - 41)

Appx1776

HIGHLY CONFIDENTIAL

Page 42

1  been going on since 2006.
2      All of these I think are probably accurate,
3  but visually -- when you look visually, if you have a
4  scale that goes up to 160,000, but then as you can see
5  there were fewer than 300 cases like in 2000. Then
6  when there are 3,000 cases or 6,000 cases, it's --
7  looks relatively small on there. It is all accurate,
8  it is just visually -- you know, if you showed it to
9  somebody, it could be a little misleading as to what
10  is going on in recent years.
11      Q. If you were to have the same kind of scale as
12  is shown on the inset on slide 8, you wouldn't really
13  be able to show the number of cases in the prevaccine
14  era, would you?
15      A. Right. You just asked me if there was any
16  reason that it looks inaccurate or something, and that
17  is what I answered.
18      Q. Okay.
19      (Shapiro Exhibit No. 3 marked for
20  identification.)
21  BY MR. SANGIAMO:
22      Q. Dr. Shapiro, you have been handed what has
23  been marked as Exhibit 3. Do you recognize that
24  document?
25      A. I don't recall it, no, but I probably have

Page 43

1  read it. I just don't recall it or I may not have
2  read it. I don't remember.
3      Q. Did you read everything that is cited in your
4  report?
5      A. At one point, yeah. I just don't remember
6  precisely everything. That is what happens when you
7  get old.
8      Q. If you could turn to page 2 of this document,
9  which -- I am sorry, I should have said in the record.
10  In fact, I will ask you.
11      What is this document, Doctor?
12      A. It is a publication entitled "Remembering
13  Mumps" by Latner and Hickman published in PLOS
14  Pathogens in May of 2015.
15      Q. Latner and Hickman are with the CDC; is that
16  correct?
17      A. Yes, with the Division of Viral Diseases.
18      Q. Do you know either of them?
19      A. No.
20      Q. Turn to page 2 in the section entitled "How
21  protective is mumps vaccine?" Do you see that?
22      A. Yes.
23      Q. About four lines down, it reads, "As
24  mentioned, a high vaccination coverage has nearly
25  eliminated endemic disease in the United States and

Page 44

1  has limited spread of the virus to settings of high
2  intensity exposure."
3      Did I read that accurately?
4      A. You did.
5      Q. Do you agree with that statement?
6      A. No.
7      Q. What about that statement do you disagree
8  with?
9      A. Well, it is not only in high intensity
10  exposure that the cases are occurring. Well, let me
11  just give you an example. There -- published in the
12  -- I think it was in the last -- I think it was in
13  August maybe, it was published. It was published
14  about an outbreak of mumps in Alaska where they
15  started out by saying that most cases seemed to occur
16  in a particular group of native Alaskans and I think
17  Pacific Islanders.
18      So initially, they recommended -- and this
19  started, I think, in January of 2017 roughly, and they
20  started -- initially recommended just giving it to
21  people in that group. But cases kept occurring, and
22  eventually there were quite a large number of cases
23  among people that did not have direct contact with
24  anybody at any other identified case. So that by, I
25  think it was December of 2017, they actually

Page 45

1  recommended that everybody in the state of Alaska get
2  a third dose of mumps vaccine.
3      So clearly, it wasn't limited only to -- what
4  does it say here -- high intensity exposure because
5  they recommended it for 100 percent of Alaskan
6  residents. So it occurs in a number of different
7  settings, not just in high intensity exposure.
8      Q. Do you know whether any of the cases in
9  Alaska were in settings that were not high intensity
10  exposure?
11      A. I know, yes. As I just told you, they --
12  there were cases in people that had no identified
13  contact that had mumps. So clearly, if you don't know
14  who the contact was, you can't say this was a high
15  intensity exposure. They don't even know what the
16  exposure was. It was just residents of Anchorage.
17      Q. What are you basing your statement on that
18  those were cases in an exposure that was not high
19  intensity exposure?
20      A. Well, we don't know for certain what the
21  exposure was, but generally when you are talking about
22  a high intensity exposure you are saying there are
23  other cases -- like let's say somebody in this room
24  had mumps and we are going to be sitting in this room
25  for numerous hours, that might be considered a high

12 (Pages 42 - 45)

Appx1777

HIGHLY CONFIDENTIAL

Page 46

1 intensity exposure. But you would have to know that
2 somebody had mumps and so it wouldn't occur in
3 somebody -- if I got mumps -- and we knew that
4 somebody else had mumps, you could say, well, it was a
5 high intensity exposure, they were in a little room,
6 not so little, but for a long time.
7 But if we don't know what the contact was,
8 who had it, it's hard -- I don't see how you could
9 identify that as a high intensity exposure. You don't
10 know -- we don't know what the exposure was, but --
11 but if you don't know that there were other cases that
12 this person came in contact with, it is likely that it
13 is not a high intensity exposure if you don't know
14 what the exposure is.
15 Q. What is your understanding of what the term
16 "high intensity exposure" means in the context of
17 discussion of mumps outbreaks?
18 A. Well, generally, high intensity exposure
19 means that you are in contact with other people in a
20 group that was identified as having mumps for a
21 relatively prolonged period of time. And there is no
22 one definition, but usually it means household
23 contacts, dorm room contacts, day care contacts,
24 things where you have got groups of people that tend
25 to be -- where numerous people come together for a

Page 47

1 more prolonged period of time.
2 Q. And do you know whether the cases of mumps in
3 Alaska were in people who did come together for a
4 prolonged group -- periods of time as you just
5 described? Do you know?
6 A. Well, it's when people come together for a
7 long period of time who are exposed to people -- other
8 people with mumps. In other words, it is not just
9 that we're in a room together, but there is somebody
10 in that group that has been identified as having
11 mumps. If the person -- what the article said was
12 that there were --numerous cases occurred in people in
13 whom the exposure could not be identified. So the
14 presumption would be they weren't part of a group in
15 which cases were identified.
16 So I think it is hard to call that a high
17 intensity exposure if you don't know what the exposure
18 is. It is not impossible, but, you know -- you know,
19 but it seems -- that is the way I interpret it.
20 Q. Do you know of others who interpret it that
21 way?
22 A. I don't know. I haven't asked anybody.
23 Q. Do you agree with the first part of the
24 sentence written by Dr. Latner and Dr. Hickman that
25 high vaccination coverage has nearly eliminated

Page 48

1 endemic disease in the United States?
2 A. No. As I said in my report, there are
3 numerous outbreaks. In these outbreaks, the majority
4 in recent years, more than 90 percent of the people,
5 you know, in the Iowa outbreak I think it was 98
6 percent of the people, had received two doses of the
7 vaccine. So obviously, two doses of the vaccine
8 didn't prevent the outbreak. So -- so clearly, this
9 is inaccurate, in my opinion.
10 Q. Do you have a definition of what it means to
11 nearly eliminate a disease?
12 A. I don't know. I guess different people could
13 use different definitions. But I would say in the --
14 there have been many thousands of cases in each of --
15 since 2006, there have been many outbreaks, some of
16 them with 5,000, 6,000 cases in a year. The CDC was
17 concerned enough about it to have special work groups
18 to consider what to do about these outbreaks. There
19 are numerous articles in the literature talking about
20 outbreaks and the -- questioning whether mumps vaccine
21 is effective. So I wouldn't -- by any definition to
22 say it is nearly eliminated seems wrong to me.
23 Q. Do you have a definition for what "nearly
24 eliminated" means?
25 A. If you are asking me -- I don't know what

Page 49

1 these people meant. I could tell you what -- to me
2 "nearly eliminated" would be that there are only rare
3 cases that are occurring, not thousands of cases at a
4 time.
5 Q. So something less than thousands?
6 A. Yeah, I probably wouldn't use that term very
7 much, but near elimination to me would be there would
8 be a case or two or five in a year in the United
9 States. Nearly eliminated would mean that there were
10 very rare cases, not outbreaks that require
11 mobilization of lots of resources.
12 Q. So five cases per year, you would call that
13 nearly eliminated?
14 A. In the United States?
15 Q. In the United States?
16 A. Yeah, I would call that nearly eliminated.
17 Q. Are there any diseases that have been nearly
18 eliminated by vaccination in the United States?
19 A. Haemophilus influenza Type B. I mean, I
20 don't know if that's less than five.
21 THE COURT REPORTER: I'm sorry. What was
22 that?
23 THE WITNESS: You know, I am just giving that
24 as an example. In other words, I wouldn't say that
25 less -- it has to be less than five, otherwise it is

13 (Pages 46 - 49)

Appx1778

HIGHLY CONFIDENTIAL

Page 50

1  rampant, you know. It depends on the context, but as
2  I said I wouldn't use that -- that word.
3  BY MR. SANGIAMO:
4      Q. Well, there is a -- sorry.
5      A. Polio has been eliminated, not nearly
6  eliminated, but eliminated, in the United States, for
7  example. Smallpox has been eliminated.
8      Q. Then as far as diseases that have been nearly
9  eliminated are concerned, you would say Hib?
10     MR. SCHNELL: Objection.
11     THE WITNESS: Again, I -- as I said, I
12 wouldn't use the term "nearly eliminated." I try to
13 be more precise. There has been a 99 percent or more
14 decrease, you know, in recent -- you know, in recent
15 years, there are only sporadic cases. I don't know
16 about -- that I would use the term "nearly eliminated"
17 for anything.
18 BY MR. SANGIAMO:
19     Q. Is it fair to say you just -- what was the
20 last thing you said for anything? Is that what you
21 said?
22     A. Yeah, I mean, it depends on what the context
23 is for nearly eliminated. But, you know, certainly I
24 would not say that mumps is nearly eliminated. I
25 thought I made that clear because there are large

Page 51

1  outbreaks going on. The whole state of Alaska, they
2  are giving a third dose of the vaccine because of a,
3  you know, statewide outbreak. So I would say that
4  this is not accurate.
5      Q. So you disagree with the way those two CDC
6  authors describe the impact of mumps vaccine on the
7  U.S. population. Is that fair?
8      MR. SCHNELL: Object to form.
9      THE WITNESS: What I disagree with is that it
10 says that high vaccination coverage has nearly
11 eliminated endemic disease in the U.S. and that it is
12 limited spread of the virus to spreading of high
13 intensity exposure. I disagree with that.
14 BY MR. SANGIAMO:
15     Q. If you turn to -- back on Exhibit 2, Slide
16 11. The second bullet on that slide reads "2010
17 through 2015, 23 outbreaks with greater than 20 cases
18 reported in 18 states."
19     Do you see that?
20     A. I do.
21     Q. It says, "In 22, 96 percent, occurred in
22 close contact settings, 18 universities."
23     Do you see that?
24     A. I do.
25     Q. Do you have any reason to dispute that

Page 52

1  figure?
2      A. No. However, we can look in my report for
3  more recent data. So in 2000 -- this is on page 13 of
4  my report. It says in 2016 there were 6,369 reported
5  cases; in 2017, 5,629 reported cases. Although at
6  that time the reporting was not that complete, so
7  there were more. They did a survey of reported cases
8  from January 2016 through June 2017. 98 percent
9  responded. They found there were 9,200 cases, 150
10 outbreaks. Half were comprised of fewer than 10 cases
11 indicating that it is a problem -- not a problem that
12 occurred in only a few select settings. That it
13 occurred not only in universities, although those were
14 the largest, but in communities and in schools other
15 than universities.
16     Q. Do you know if those cases were in close
17 contact settings?
18     MR. SCHNELL: Object to form.
19     THE WITNESS: I don't know all of them. The
20 other thing I would say is that --
21 BY MR. SANGIAMO:
22     Q. Do you know any of them?
23     A. What is that?
24     Q. Do you know if any of those cases --
25     A. Definitely.

Page 53

1      Q. -- were in settings other than close contact
2  settings?
3      A. Other than?
4      Q. Yes.
5      A. They don't -- the other -- the other point I
6  would make is that typically it is the outbreaks that
7  get reported. So if there is a single case that
8  occurs in somebody, that is less likely to be reported
9  and noted. I mean, in theory, it should be, but
10 clearly, if you have a thousand cases or 500 cases or
11 40 cases in a defined setting, then that is more
12 likely to be reported. I think other individual cases
13 may be missed. And again, I gave you the example of
14 Alaska.
15     But I mean, whether it is high intensity
16 settings or not, it doesn't really matter. Because
17 the vaccine -- if the vaccine is doing its job, it
18 ought to be working in those settings as well.
19     Q. You were just reading to me a paragraph that
20 carries over from page 13 to page 14 of your report
21 and a little bit of the paragraph before that which
22 was describing cases in 2016 and 2017.
23     A. Correct.
24     Q. My question to you is: Do you know whether
25 any of those cases were in a setting other than a

14 (Pages 50 - 53)

Appx1779

HIGHLY CONFIDENTIAL

Page 54

1  close contact setting?
2      MR. SCHNELL: Object to form.
3      THE WITNESS: I am not certain.
4  BY MR. SANGIAMO:
5      Q. You don't know?
6      A. I don't know. Well, I take it back. There
7  were -- to the extent that the Alaska outbreak is
8  included in that -- well, again, it is the same issue.
9  We don't know -- if they didn't -- I would assume that
10 in most cases if the contact isn't identified, can't
11 be identified, it is probably not likely that it is in
12 the -- that it is in the -- what was the term you
13 used, close contact setting, something like that?
14     Could you read back his question, please?
15     (Requested portion of testimony read.)
16     THE WITNESS: As I said in my answer to
17 the -- when we were talking about Alaska, there may
18 have been close contacts, but it may not be in a high
19 intensity. I thought that is what we started talking
20 about was high intensity setting, not close contact.
21     MR. SCHNELL: Do you want to define what you
22 mean by close contact in these last answers? It seems
23 like there is some confusion.
24 BY MR. SANGIAMO:
25     Q. What is your understanding of what "close

Page 55

1  contact" means?
2      A. I don't know. Different people use it
3  differently.
4      Q. What is your understanding of what "high
5  intensity" means?
6      A. I think I already explained that. Do you
7  want me to read back my answer to him?
8      Q. That is fine, you don't have to read back the
9  answer.
10     Do you have your own definition of what
11 "close contact" would mean in this context?
12     A. Generally, close contact is very similar to
13 the term -- for example, the area in which I am most
14 familiar with it is in close contacts of people, let's
15 say, with H flu Type B or pneumococcal meningitis.
16 And there are specific definitions. People who are in
17 the same household, who spend the night in the same
18 household in which a case occurred, who go to a day
19 care center for at least four hours a day for five
20 days. I would have to look. Something like that
21 would be considered close contact.
22     (Shapiro Exhibit No. 4 marked for
23 identification.)
24 BY MR. SANGIAMO:
25     Q. Dr. Shapiro, you have just been handed what

Page 56

1  is marked as Exhibit 4. Do you recognize that?
2      A. It looks like it is a chapter on mumps
3  vaccines from Plotkin's textbook entitled "Vaccines."
4      Q. You have read that, right, sir?
5      A. Yes.
6      Q. Could you turn to Figure 40.3?
7      A. Do you know what page that is on?
8      Q. Which is on page 667. Do you see that
9  figure, sir?
10     A. I do.
11     Q. Turn back to page 666. And in the second
12 column, the second full paragraph begins with "In
13 1989."
14     Do you see that?
15     A. I do.
16     Q. About halfway down into that paragraph, maybe
17 seven lines down, it says, "Figure 40.3 shows the
18 effect of implementation of a two-dose vaccination
19 schedule on disease incidents in the United States."
20     Do you see that?
21     A. I do.
22     Q. Do you agree with that statement?
23     A. No.
24     Q. And why is that?
25     A. Because, you know, whenever there are changes

Page 57

1  over time -- I mean, this is called an ecological
2  study. Are you familiar with that term?
3      Q. Please define.
4      A. Basically, you are not directly assessing the
5  -- in this case, you are talking about implementation
6  of a second dose of a vaccine, which occurred in
7  whenever it was, 19 -- does it say when it was? I
8  don't remember. 1989. Right? Yeah. And it is
9  implying that any change that occurred after that is
10 due to that.
11     You could overlay, for example, a graph of
12 attendance at NFL football games which probably has
13 gone up since 1989. And say, well, whatever happened
14 since 1989 must be due to all the people going to --
15 the point is that it's not a -- there are other things
16 that happened besides the vaccine. So that may be one
17 thing that happened, but there is better sanitation.
18 There may be difference in reporting. There are all
19 sorts of different things. So attributing any change
20 to implementation of the vaccine, I would say, is
21 wrong.
22     Whenever you do a study of efficacy or
23 effectiveness of a vaccine, you have to have a
24 comparison, concomitant comparison group. It is true
25 that this is the number of reported cases each year

15 (Pages 54 - 57)

Appx1780

HIGHLY CONFIDENTIAL

Page 58

1 since whatever, 1966. That is accurate.
2      Q. It has gone down dramatically, wouldn't you
3 say?
4      MR. SCHNELL: Object to form.
5      THE WITNESS: Well, again, I think if you
6 look -- so this only goes to -- it depends what your
7 base line is. So compare it with 1966, it is low.
8 Compared -- if you look at, say, since 2006 and I
9 might add this doesn't include 2016 and 2017 where it
10 has gone back up quite a bit, there are a lot of
11 cases. We look at the insert. You can see a blip in
12 2006 on this. So it just depends what your comparison
13 is.
14 BY MR. SANGIAMO:
15      Q. How much has it gone back up in 2016 and 2017
16 compared to what it was in the prevaccine era?
17      A. Well, I'm not -- I wouldn't compare it to the
18 prevaccine era. I would compare it to the rates of
19 disease before, say, 2006. I mean, you know, what I
20 would look at is what has happened since 2006.
21      Q. I was asking you to compare it to the
22 prevaccine era.
23      A. Well, the prevaccine era, there were a couple
24 hundred thousand cases.
25      Q. So it has gone down dramatically since the

Page 59

1 prevaccine era. Isn't that true, sir?
2      A. It is lower than it was and it has gone up
3 dramatically since, you know, since -- since 2006.
4      Q. Would you consider the number of cases in
5 2016 -- what did you tell me that was?
6      A. I think it was 6,000 some. Let's take a look
7 so I'm not guessing. 6,369 reported cases.
8      Q. Would you consider that to be dramatically
9 lower than the number of cases in the prevaccine era?
10      MR. SCHNELL: Object to the form.
11      THE WITNESS: Clearly, it is lower than
12 200,000. It is dramatically higher than the three --
13 fewer than 300 cases in 2002.
14 BY MR. SANGIAMO:
15      Q. Would you consider it dramatically lower in
16 2016 than it was in the prevaccine era, the number of
17 mumps cases?
18      MR. SCHNELL: Object to form.
19      THE WITNESS: It is what it is. It's -- the
20 number of cases -- we just said the exact number of
21 cases. So clearly, it is lower than that, but it is
22 higher than the number of cases before -- you know, in
23 the decade -- most of the decade before 2006.
24 BY MR. SANGIAMO:
25      Q. Why are you reluctant to characterize the

Page 60

1 comparison between the number of cases in 2016 and the
2 prevaccine era as dramatically lower?
3      MR. SCHNELL: Object to form.
4 Mischaracterizes his testimony.
5      THE WITNESS: I am not reluctant to. I told
6 you exactly what the -- what the numbers were.
7 BY MR. SANGIAMO:
8      Q. If you turn back to page 666 in Exhibit 4.
9 Exhibit 4 being the chapter in Plotkin's Vaccine.
10      A. Yes.
11      Q. By the way, who wrote the chapter in
12 Plotkin's Vaccines?
13      A. Rubin.
14      Q. Where is he from?
15      A. He worked for Merck.
16      Q. Okay. Now you are checking to see?
17      A. I can't remember where he is. I think he is
18 in more than one place. I would have to look it up.
19 I don't remember.
20      Q. What does Dr. Rubin say back on page 266 in
21 that same paragraph that we were looking at about the
22 reduction of disease incidents? Does he call it
23 dramatic?
24      A. He says, "Despite this dramatic reduction in
25 disease incidents, the large mumps outbreaks still

Page 61

1 occurred even in fully vaccinated populations,
2 indicating that complete protection against mumps
3 using current vaccines and vaccination schedules may
4 not be feasible." That is what he says.
5      Q. Do you agree with him that the reduction has
6 been dramatic?
7      MR. SCHNELL: Object to form. Asked and
8 answered.
9      THE WITNESS: I think we have already gone
10 through this.
11 BY MR. SANGIAMO:
12      Q. Do you think that the prevaccine era estimate
13 of the number of mumps cases as shown, for example, in
14 Figure 40.3 in Exhibit 4 is roughly 200,000 cases, do
15 you think that is an accurate estimate of the number
16 of mumps cases at that time?
17      A. It is an accurate estimate of the reported
18 cases, I would think, yes.
19      Q. So it is probably an underestimate of the
20 actual number of cases?
21      A. All of these are probably underestimates.
22 Every -- every -- reported cases are virtually always
23 underestimated.
24      Q. What is the current process for the reporting
25 of mumps cases to public health authorities?

16 (Pages 58 - 61)

Appx1781

HIGHLY CONFIDENTIAL

Page 62

1     A. Well, usually what happens, I mean it varies
2 from state to state. Typically, you report to the
3 State health department and the state health
4 department sends the information to the CDC.
5     Q. And is that only for specific diseases?
6     A. There -- there are specific reportable
7 diseases, yes.
8     Q. And is mumps one of those?
9     A. Yes.
10     Q. When was mumps first a reportable disease?
11     A. I am not sure.
12     Q. Does whether a disease is a reportable
13 disease impact the accuracy of the number of reported
14 cases as a representation of the true number of cases?
15     A. I don't understand the question.
16     Q. Do you think it is equally likely that the
17 number of reported cases is going to be accurate
18 irrespective of whether a disease is a reportable
19 disease?
20     A. Well, if it is not a reportable disease then
21 there aren't reports of the cases. I mean --
22     Q. What does "reportable disease" mean?
23     A. It means that, in theory, by law, that a
24 doctor or a healthcare provider or laboratory that
25 finds -- identifies somebody with the disease reports

Page 63

1 it to the health -- public health authorities. So if
2 you are not -- if it is not a reportable disease, I am
3 not sure how -- that is why I don't understand your
4 question. You asked me are the reports accurate --
5 less accurate if they are reportable or not
6 reportable. If they are not reportable, there aren't
7 reports.
8     Q. Is that right, sir, if a disease is not
9 reportable, no one knows about any cases of it?
10     MR. SCHNELL: Object to form.
11     THE WITNESS: That is not what I said. What
12 I am trying to understand is your question.
13 BY MR. SANGIAMO:
14     Q. Right.
15     A. Which is the accuracy of reports of not
16 reportable diseases. That seems like an oxymoron to
17 me.
18     Q. I am trying to get at the accuracy of the
19 number assigned to the number of cases of mumps. And
20 my question to you is: Is the accuracy of that number
21 as a reflection of the true number of cases of mumps
22 going to be affected by whether mumps was a reportable
23 disease in the year in question?
24     A. If it is not a reportable disease, I don't
25 understand what the tabulation of reports are of then.

Page 64

1 Do you understand my problem?
2     Q. I don't.
3     A. In other words, if you don't have a report of
4 the disease -- you are asking me if you don't report
5 the disease, how accurate are the reports of the
6 disease. That is what I don't understand. There are
7 no reports if it is not reported.
8     Q. Is that right? But if a disease is not
9 required to be reported, can there still be reports of
10 the disease?
11     A. Presumably there could be, but I don't know
12 if they are tabulated or who reports it or whatever.
13 I mean, it is not -- it -- it just -- I just don't --
14 if it is a reportable disease, then it gets reported
15 and they keep tabulation of the number of reported
16 cases. If it is not a reportable disease, then nobody
17 is saying, okay, here is the -- let's enter these
18 nonreportable diseases into our system of reportable
19 diseases.
20     I mean, there's no -- if it is not
21 reportable, there may be sporadic outbreaks or cases
22 that somebody calls the public health authorities
23 about, but they are not keeping track of it. So it is
24 kind of a -- I just don't understand the question
25 exactly.

Page 65

1     Q. So by your understanding as a public health
2 expert, it must be so that mumps was a reportable
3 disease in 1966 or else there is no way that anybody
4 could have known that there were 220,000 cases of
5 mumps that year. Is that right?
6     A. I don't know how that was reported before the
7 system -- there may have been informal tabulations, so
8 I am not sure where these numbers come from. This
9 says the reported cases. So in the National
10 Notifiable Diseases Surveillance System. So a
11 notifiable disease means a reportable disease. So the
12 implication is that it is reported.
13     Whether I, you know --in 1966, I don't know
14 -- I don't recall or know what the laws or systems
15 were. I suspect they were different than they are
16 now, but it is a notifiable disease. At least this is
17 cited as a notifiable disease, which would imply that
18 they are notified of it. Notifiable and reported to
19 me are interchangeable.
20     Q. So if it were to turn out that in 1966 mumps
21 was not a notifiable or reportable disease, then the
22 estimate of 220,000 cases is probably an
23 underestimate. Is that right?
24     MR. SCHNELL: Object to form.
25     THE WITNESS: That is not what I said. I

17 (Pages 62 - 65)

Appx1782

HIGHLY CONFIDENTIAL

Page 66

1 don't know.
2 BY MR. SANGIAMO:
3    Q. You don't know?
4    A. Honestly, I don't know what the system was
5 back then. I am sure it could be looked up. Maybe
6 you know what it is and you could tell me. But I
7 don't know what the system is.
8    Q. I am going to ask you to assume that in 1966
9 mumps was not a notifiable and reportable disease.
10    A. Okay.
11    Q. If that is so, then the number of 220,000 is
12 likely an underestimate of the number of cases. Isn't
13 tat right?
14    MR. SCHNELL: Object to form?
15    THE WITNESS: I don't know. It's not -- I
16 don't know what system they are using to come up with
17 that number.
18    (Shapiro Exhibit No. 5 marked for
19 identification.)
20 BY MR. SANGIAMO:
21    Q. Dr. Shapiro, you have just been handed what
22 has been marked as Exhibit 5. Do you recognize that
23 document?
24    A. Yes.
25    Q. What is that?

Page 67

1    A. It is an article published in the ESPID
2 Reports & Reviews entitled "Emerging Mumps Infection."
3 Authors are Steve Rubin, Richard Kennedy, and Gregory
4 Poland.
5    Q. Could you take a look at what it says there
6 about where Steve Rubin is and see if that refreshes
7 your recollection as to where he is from?
8    A. He is from the FDA.
9    Q. You said before you thought that he had
10 worked at Merck. Do you have any basis for saying
11 that?
12    A. No, I could well be wrong.
13    Q. You have read this document before. Right?
14    A. Yes.
15    Q. If you turn to page 801. In the middle
16 column, there is a paragraph that starts with
17 "Despite."
18    Do you see that?
19    A. Yes.
20    Q. The sentence on the -- beginning on the
21 fourth line down says, "Data from investigations of
22 recent mumps outbreaks shows the effectiveness of a
23 single dose of the Jeryl Lynn mumps vaccine is about
24 80 percent and that of two doses is about 88 percent."
25    Do you see that?

Page 68

1    A. I do.
2    Q. Then Dr. Rubin writes, "Although imperfect,
3 these are nonetheless very good numbers."
4    Do you agree with Dr. Rubin's statement
5 there?
6    MR. SCHNELL: For any document you are
7 handed, if you feel you need to read any of the
8 surrounding material for context, you should feel
9 free.
10    THE WITNESS: I am sorry. Could you repeat
11 your question again?
12 BY MR. SANGIAMO:
13    Q. Dr. Rubin says, "Although imperfect, these
14 are nonetheless very good numbers," in reference to
15 the effectiveness rates shown there for one and two
16 doses of mumps vaccine. My question is: Do you agree
17 with what Dr. Rubin says?
18    MR. SCHNELL: Object to form.
19    THE WITNESS: That those are good numbers?
20 That that is the effectiveness? What part of it are
21 you asking me do I agree with?
22 BY MR. SANGIAMO:
23    Q. That those effectiveness rates are
24 nonetheless very good numbers.
25    MR. SCHNELL: Object to form. Is he to

Page 69

1 assume those effectiveness rates are accurate?
2 BY MR. SANGIAMO:
3    Q. Answer my question.
4    A. First of all, I don't know what he means by
5 "very good numbers." Does he mean that that degree of
6 effectiveness is very good or does he mean that those
7 estimates are very good and that they are accurately
8 reflecting what the effectiveness is? So I don't
9 understand what the -- what you mean by -- maybe you
10 can clarify what you mean, or maybe you don't know.
11 BY MR. SANGIAMO:
12    Q. Does the fact that he starts the sentence
13 with "Although imperfect" give you any clue as to what
14 he means when he refers to the numbers as being very
15 good numbers?
16    A. Maybe that means that -- maybe -- I would
17 interpret that as meaning that the numbers are
18 accurate reflections of the performance of the
19 vaccines in these outbreaks. That -- is that your
20 understanding as well?
21    Q. It is not. But that is your understanding?
22    A. That is the way I interpret it. What is our
23 understanding?
24    Q. You don't interpret that to mean that he is
25 saying that is very good effectiveness?

18 (Pages 66 - 69)

Appx1783

HIGHLY CONFIDENTIAL

Page 70

1 A. I thought we were talking about what he meant
2 by whether he meant that the quality, the
3 effectiveness is good or whether the numbers are good
4 reflections. And you asked me what I -- about my
5 interpretation of "although imperfect." And my --
6 yeah, I think that -- so, I don't know. It could mean
7 either. I can answer either if you want.
8 Q. I am going to ask you to assume that he means
9 that that is very good effectiveness. Do you agree
10 with that statement if you make that assumption?
11 MR. SCHNELL: Object to form of the question.
12 THE WITNESS: It is not good enough to
13 prevent the outbreaks, clearly. The other thing is I
14 am familiar with these numbers and these are point
15 estimates, and I believe that these are from -- the
16 CDC compiles the -- the estimates of effectiveness in
17 studies of how the vaccine performed in these
18 outbreaks. And 88 percent was the median and it
19 varied.
20 In fact, I use that same number, I believe, in my
21 report, if you notice. Here it is on page 14. And it
22 says -- so I use that same number, estimates of the
23 effectiveness of two doses of the vaccine during
24 outbreaks have ranged from 53 percent to 95 percent
25 with an effectiveness of less than 88 percent in half

Page 71

1 the outbreaks.
2 So that 88 percent number is kind of a median of
3 all the estimates, and that has been going down. So
4 when I wrote this report, the lower end of the
5 estimates was 53 percent. And if you look today, I
6 think it is in the 30 percent. So it is what it is.
7 Whether it is good or bad, that is what it is. As I
8 said in my -- in -- my estimation is that the
9 vaccine's effectiveness is not sufficient to provide
10 -- prevent contingent mumps cases and outbreaks in the
11 United States.
12 So if you think that is good, maybe it is good,
13 but it is not good enough to provide sufficient
14 protection to prevent cases and outbreaks.
15 Q. Well, I am asking you whether you think that
16 is good enough. I am asking whether you agree with
17 Dr. Rubin that that is very good.
18 A. No, it is not good enough.
19 Q. It is not good enough to prevent outbreaks?
20 A. That is right. Cases of ongoing outbreaks.
21 Q. And therefore, it is not very good. Is that
22 your testimony?
23 A. Yeah. I disagree. It is not good enough to
24 do the job we want it to do, which is to prevent cases
25 and outbreaks. So to me, that would mean that it is

Page 72

1 not good enough. It is not -- whether that is very
2 good or extra good or whatever, it is not good enough.
3 Q. So it might be very good, but you are saying
4 it is not good enough to prevent outbreaks. Is that
5 what you are saying, sir?
6 MR. SCHNELL: Object to form.
7 THE WITNESS: What I am saying is that it is not
8 good enough to prevent outbreaks. That's what I'm
9 saying.
10 BY MR. SANGIAMO:
11 Q. And you are not going to take a position one
12 way or the other whether it is very good. Is that
13 fair?
14 A. That is fair.
15 Q. If you could turn to Exhibit 3.
16 A. Yep.
17 Q. And that is the paper written by Dr. Latner
18 and Dr. Hickman from CDC?
19 A. Right.
20 Q. If you turn to the second page of that paper.
21 A. Yep.
22 Q. The paragraph that begins under the heading,
23 "How protective is mumps vaccine?" Do you see that?
24 A. Yes.
25 Q. The first sentence says, "The effectiveness

Page 73

1 of two doses of MMR vaccine is different for each
2 virus component." Second sentence reads, "In contrast
3 to the measles and rubella vaccines which are greater
4 than 95 percent effectiveness, reports of mumps
5 vaccine effectiveness vary from 79 percent to 95
6 percent with a median of 88 percent."
7 Do you see that?
8 A. I do see that.
9 Q. Then Doctors Latner and Hickman say,
10 "Although it is imperfect, the protection afforded by
11 mumps vaccination is effective, valuable and
12 important."
13 Do you agree with what Doctors Latner and
14 Hickman have written there?
15 A. No.
16 Q. Does a vaccine need to be -- strike that.
17 (Shapiro Exhibit No. 6 marked for
18 identification.)
19 BY MR. SANGIAMO:
20 Q. Have you seen this document before,
21 Dr. Shapiro?
22 A. I don't remember. Probably, but I don't
23 remember it.
24 Q. Have you ever spent any time on the CDC
25 website to see what it has to say about mumps

19 (Pages 70 - 73)

Appx1784

HIGHLY CONFIDENTIAL

Page 74

1  vaccination?
2      A. Yes.
3      Q. The third paragraph down begins with the
4  sentence that reads, "MMR vaccine is very safe and
5  effective."
6      Do you see that?
7      A. I do.
8      Q. Then it says, "The mumps component of the MMR
9  vaccine is about 88 percent," and it cites that range
10 of 31 percent to 95 percent.
11     Do you see that?
12     A. Yes, that is what I just told you it was.
13     Q. It appears then that the CDC is still of the
14 view that the median estimate to use for mumps vaccine
15 effectiveness is 88 percent. Right?
16     MR. SCHNELL: Object to form.
17     THE WITNESS: This is what it says, but as I
18 said that range keeps going down. You just cited this
19 paper written in 2015 where the lower end was 79
20 percent. Then when I wrote my report the lower end
21 was 53 percent. And now as I said and as you
22 confirmed here, it is 31 percent. They do still say
23 that the -- that it is about 88 percent. I imagine
24 that they -- for whatever reason, they haven't moved
25 it down. But I don't actually have all the numbers.

Page 75

1  But my guess is that may been going down at some
2  point.
3  BY MR. SANGIAMO:
4      Q. That 88 percent is going to be going down?
5      A. Probably because -- you know, it's -- because
6  I think what it is, that 88 percent is just kind of
7  the median of all the different estimates. We know
8  that the estimates at the bottom are going down.
9  Maybe there have been some at the top, so I don't know
10 for sure, but the number of outbreaks in which the
11 vaccine has performed below 50 percent is going up.
12     Q. All right. Well, what does that 31 percent
13 represent?
14     A. I believe what that represents is somebody
15 did a study of how two doses of a vaccine -- well,
16 yeah, it is about two doses. Two doses of the
17 vaccine, the effectiveness in an outbreak setting and
18 31 percent effectiveness was the lowest of any of the
19 estimates and 95 percent was the highest of any of the
20 studies. These are different studies.
21     Q. What do you recall about what that -- strike
22 that.
23     Do you recall anything else about what that
24 31 percent represented? For example, did it represent
25 a specific subgroup in a particular study?

Page 76

1      A. Oh, I don't think so. I mean, I would have
2  to look it up, but my -- my recollection was that they
3  were different estimates of that, but I am not
4  certain.
5      Q. So as far as your recollection is concerned
6  as you sit here testifying today, you think that that
7  31 percent might have just been the general overall
8  vaccine effectiveness that was found in that
9  particular study. Is that right?
10     A. Yes. I believe that is what they were, but I
11 am not 100 percent certain. I am sure that it's from
12 a report of effectiveness in an outbreak. Whether it
13 is of a subgroup or not, I am not 100 percent certain,
14 but I sort of doubt it.
15     Q. Would that affect your analysis if it was of
16 a particular subgroup?
17     MR. SCHNELL: Object to form.
18     THE WITNESS: What analysis?
19 BY MR. SANGIAMO:
20     Q. Would that affect your testimony here today
21 about your effectiveness of the vaccine?
22     A. No.
23     Q. Doesn't matter whether it was a subgroup or
24 not?
25     A. No.

Page 77

1      Q. That paragraph that we were just looking at
2  here in Exhibit 6 of the CDC website, it says, "MMR
3  vaccine is very safe and effective."
4      Do you agree with that?
5      A. I am sorry. Paragraph 6. I thought this was
6  paragraph 3 we were just looking at. Where are you
7  referring to? On this thing or something different?
8      Q. I am referring to that thing, I think.
9  Either I misspoke or you misheard me. I referred to
10 Exhibit 6.
11     A. I thought you said paragraph 6. Sorry about
12 that.
13     Q. Exhibit 6 is the printout from the CDC
14 website?
15     A. Yes.
16     Q. Third paragraph begins with "MMR vaccine is
17 very safe and effective."
18     Do you agree with that?
19     A. No.
20     Q. Does a vaccine have to be 100 percent
21 effective in order for you to think that it is highly
22 effective?
23     MR. SCHNELL: Object to form.
24     THE WITNESS: So I think you need to define
25 what you mean by "highly effective." So one of the --

20 (Pages 74 - 77)

Appx1785

HIGHLY CONFIDENTIAL

Page 78

1  when you talk about effectiveness, there are a bunch
2  of components to it, one of which is how does it work
3  when you are exposed to the infectious agent. So that
4  you -- you can have no cases of disease in Oklahoma,
5  let's say, for 10 years. That doesn't mean that in
6  people that got the vaccine, that would only have
7  meaning if those people were potentially exposed to
8  the infectious agent.
9      It would be incorrect to say, "Oh, it was 100
10  percent effective" because there were no cases. You
11  can only estimate effectiveness if -- in the context
12  of exposure to -- or at least you have to have a
13  comparison group and a vaccinated group. And both --
14  you know, you have to -- it doesn't have to be the
15  exact same source, they both have to be potentially
16  exposed ideally with the same type of exposure.
17      So these -- the way -- because of the current
18  epidemiology in the United States, these are studies
19  of effectiveness in outbreak settings where there are
20  exposures. So there is a range, but it is clearly not
21  good enough to prevent disease. So when you say very
22  effective or highly effective, you need to define for
23  me effective for what, what do you mean, because --
24  yeah, I will leave it at that.
25      Q. There are different ways to calculate

Page 79

1  effectiveness rates. Right?
2      A. Well --
3      Q. If you are not comfortable with that
4  question. How do you -- how do you measure an
5  effectiveness rate? How do you determine -- strike
6  that.
7      How do you determine an effectiveness rate
8  for a vaccine?
9      A. Well, what you'd like -- the ideal way to do
10  it is to have -- you compare attack rates of people in
11  a similar setting and those who got vaccinated and
12  those who are unvaccinated or those who got two doses
13  versus those who got one dose or three doses versus
14  two doses. You are making a comparison of attack
15  rates, and -- and that is one way to do it. You can
16  also do a case controlled study, which is a slightly
17  different method. But in both cases, you have got --
18  in a case control method, you find people with disease
19  and people without disease and look at the proportion
20  of each that received the vaccine. But in both cases,
21  you have concurrent -- a concurrent comparison group
22  of people that are under relatively similar conditions
23  of potential exposure to the infectious agent.
24      Q. And then you compare those two attack rates
25  and that yields an effectiveness rate. Is that

Page 80

1  correct?
2      A. That is right.
3      Q. Does a vaccine have to have an effectiveness
4  rate of 100 percent for you to consider it to be
5  highly effective?
6      A. No.
7      Q. In fact, you have published papers in which
8  you have used descriptors like highly effective for
9  vaccines that have effectiveness rates in the high to
10  mid 80s. Isn't that right, sir?
11      A. It depends what -- it depends what you are
12  referring to. It depends on context. So I don't
13  disbelieve you, but it all depends on the context you
14  are talking about.
15      Q. What is it about the context that would
16  determine whether an effectiveness rate of 88 percent
17  would qualify as being highly effective?
18      A. Well, I am guessing that the -- well, maybe
19  you can tell me. Can you tell me which study where
20  that was -- where I said that, for what vaccine, for
21  example?
22      Q. Could you first answer my question about it?
23  What is it about the context that would determine
24  whether an effectiveness rate of 88 percent would
25  qualify as being highly effective?

Page 81

1      A. Well, one thing would be it's -- if you are
2  talking about a general population where there is a
3  widespread potential exposure as opposed to -- in an
4  open population as opposed to in an outbreak setting.
5  We have no idea what the effectiveness of mumps
6  vaccine is in the general population. It is only
7  being studied in outbreaks. And clearly, 88 percent
8  is not sufficient to prevent outbreaks and continuing
9  cases of mumps.
10      Q. Is there anything else about the context that
11  would determine whether an effectiveness rate of 88
12  percent would qualify as being highly effective other
13  than whether it was in the general population?
14      THE COURT REPORTER: Other than what?
15  BY MR. SANGIAMO:
16      Q. Whether it was in the general population?
17      A. I don't know. You would have to give me
18  specific examples. It is hard to talk about that in
19  generalities. I need to know specifically. I think I
20  answered your question in terms of mumps and outbreaks
21  and so on, but I am -- you need to give me specific
22  examples of what you are talking about because it is
23  -- highly effective, very effective is subjective, and
24  it really depends on the context in which you are
25  using it.

21 (Pages 78 - 81)

Appx1786

HIGHLY CONFIDENTIAL

Page 82

1    Q. Understood, sir. I asked you what about the
2 context would be relevant. You identified one factor,
3 which is whether it was in the general population
4 where there is widespread exposure. I am asking if
5 you can think of other factors that would be relevant.
6    A. Not at the moment.
7    Q. Could you explain the way in which whether it
8 is being measured -- if I am stating this accurately,
9 whether it is being measured in the general population
10 where there is widespread exposure impacts the
11 question of whether an effectiveness rate of, say, 88
12 percent would qualify as being highly effective?
13    MR. SCHNELL: Object to form.
14    THE WITNESS: I am not going to answer that
15 -- those questions anymore because highly effective,
16 it is totally subjective. And I don't know what --
17 you know, highly effective for what? Highly effective
18 in preventing outbreaks? Highly effective in reducing
19 disease in -- in the general -- it just -- I don't --
20 you need to tell me highly effective for what, and
21 then I can answer, but I don't want to use the
22 term because I think it is so subjective. You need to
23 tie it to something for me to say highly effective.
24 BY MR. SANGIAMO:
25    Q. How about highly effective in preventing

Page 83

1 disease, does the vaccine need to have an
2 effectiveness rate of 100 percent in order for it to
3 be highly effective in preventing disease, in your
4 opinion?
5    A. That's -- by definition, that is what
6 effectiveness is, in preventing. That is what we are
7 talking about, disease, but it needs to be in what
8 context, outbreaks of disease in -- in a situation
9 where -- where the vaccine is -- where there is not --
10 the general population has very little exposure that
11 there isn't a wide circulation? It really depends on
12 that context. So unless you give me that context, I
13 can't answer your question.
14    MR. SCHNELL: Dino, we have been going for
15 more than an hour, so whenever is a good time.
16    MR. SANGIAMO: Now is good.
17    THE VIDEOGRAPHER: Off the record. The time
18 is 11:18.
19    (Recess taken from 11:18 a.m. to 11:39 a.m.)
20    (Shapiro Exhibit Nos. 7, 8, 9, 10 marked for
21 identification.)
22    THE VIDEOGRAPHER: This is the beginning of
23 media Number 3. We are back on the record. The time
24 is 11:39.
25 BY MR. SANGIAMO:

Page 84

1    Q. I am handing you what has been marked as
2 Exhibits 7 through 10, Dr. Shapiro.
3    A. Uh-huh.
4    Q. Exhibit 7, as you will see, is a letter to
5 the editor written by you, Dr. Anne Gershon and
6 Dr. Ann Arvin. Do you see that?
7    A. Yes.
8    Q. Do you recall that letter?
9    A. Yes. I mean, I would have to read it to
10 recall the context.
11    Q. Please do.
12    A. I remember doing this. Yes.
13    Q. The second column of that letter, there is a
14 sentence that reads, "The inference that the immunity
15 wanes may therefore be incorrect and discourage
16 vaccination, enlarging the number of persons who may
17 be susceptible to varicella."
18    Why did you think that an inference of
19 immunity waning would discourage vaccination?
20    A. It says it might. Therefore, some people --
21 so there are people who are very antivaccine people,
22 and one of the arguments conceivably could be that if
23 -- you know, why get the vaccine if its effectiveness
24 goes away after a few years, so --
25    Q. Then the next sentence reads, "Varicella

Page 85

1 vaccine is highly effective."
2    Do you see that?
3    A. I did see that.
4    Q. Then Exhibit 7 through 10 that I have handed
5 you, I believe, are the three citations included there
6 after the sentence in which you and Dr. Gershon and
7 Arvin wrote that varicella vaccine is highly
8 effective. Right?
9    A. Say that again. This was -- yeah, this was
10 really only to do with -- so there are two -- I am
11 sorry. I was looking at these and I didn't hear you.
12 Would you mind reading back the question or --
13    Q. That is not necessary.
14    A. Okay.
15    Q. If you take a look at the letter to the
16 editor, which is Exhibit 7.
17    A. Yes.
18    Q. You see the sentence that says "Varicella
19 vaccine is highly effective."
20    Do you see that?
21    A. Yeah.
22    Q. Then that cites to references 3 through 5?
23    A. These are the citations.
24    Q. Yeah.
25    A. Okay. Uh-huh.

22 (Pages 82 - 85)

Appx1787

HIGHLY CONFIDENTIAL

Page 86

1    Q. Exhibits 7 through 10 -- I'm sorry, Exhibits
2    8 through 10 are the citations and the letter to the
3    editor.  Right?
4        A. Right.
5        Q. Those are the support for the statement made
6    by you and Doctors Arvin and Gershon that varicella
7    vaccine is highly effective.  Right?
8        A. That is what we cited as studies that
9    reported the effectiveness of varicella vaccine.
10       Q. To support the proposition --
11       A. That is correct.
12       Q. -- that it is highly effective.
13       What did those studies show -- and obviously
14   if you need to take a moment, perhaps not, to review,
15   but my question to you will be:  What did those
16   studies show the effectiveness rate of varicella
17   vaccine to be at that time?
18       A. Well, this one says that the effectiveness
19   was overall 85 percent with a confidence interval of
20   95 percent confidence interval and 97 percent
21   effective against severe -- moderately severe and
22   severe disease.  This one --
23       Q. Just to be clear.  Because you were saying
24   this one --
25       A. I'm sorry.  This is Exhibit 8.

Page 87

1        Q. Which is the 2001 study?
2        A. 2001, yes.
3        Q. And that showed 85 percent effectiveness
4    against all disease?
5        A. Uh-huh.
6        Q. With a confidence interval of 78 to 90
7    percent for that figure.  Correct?
8        A. Right.  And the JAMA 2004 article was 87
9    percent with a 95 percent confidence interval of 81 to
10   91 percent.  And then this article in JAMA 2002, was
11   -- this was about cases declined, and so on.  So I am
12   not sure that this -- this is really about trends in
13   disease, not really about effectiveness.
14       Q. When you say this is not --
15       A. I am sorry.  This is the 2002 JAMA article by
16   Stewart, Exhibit 10.
17       Q. So that the two effectiveness studies that
18   you and Doctors Gershon and Arvin cited to support the
19   proposition that the varicella vaccine is highly
20   effective showed an effectiveness rate of 85 percent
21   and 87 percent.  Is that accurate?
22       MR. SCHNELL:  Object to form.
23       THE WITNESS:  That is what we found in this
24   kind -- this is exactly what we were just talking
25   about a few minutes ago, I think, before the break,

Page 88

1    that this is the context of a highly prevalent disease
2    in the population where everybody is exposed, you
3    know, or most everybody was potentially exposed all
4    the time.  So in this context, that is how that was
5    meant, yes.
6        So do you have a question?
7    BY MR. SANGIAMO:
8        Q. And in the -- is there something about that
9    context that differs from the outbreak studies that
10   have led to the CDC's estimate of 88 percent vaccine
11   effectiveness that suggests that 85 and 87 percent
12   could be highly effective in your view as regards
13   varicella but 88 percent would not be highly effective
14   in your view with regard to mumps?
15       MR. SCHNELL:  I am going to object to your
16   characterization of what the CDC believes to be an
17   estimate.
18       THE WITNESS:  So the 88 percent was the
19   median estimate of the effectiveness of two doses of
20   the vaccine.  These, by the way, were one dose of the
21   vaccine in these Exhibits whatever, 7 -- 8 and 9.  And
22   the CDC -- 88 percent was -- I don't think that it is
23   88 percent effective.  I would disagree with that.
24   There are a bunch of different studies that varied
25   from 31 percent to 95 percent in different outbreaks

Page 89

1    and different groups.
2        And -- but the -- so your question -- could you
3    read his question again?
4        (Requested portion of testimony read.)
5        THE WITNESS:  Yes, it is a totally different
6    context.  So these are -- it is exactly what I
7    explained that here we are talking about the context
8    of the general population with a widely circulating
9    virus to which everybody is exposed, whereas the
10   effectiveness in those outbreaks simply tell us
11   that -- so these are not outbreaks, these are sporadic
12   cases that are occurring in the general population.
13       The -- the -- in the outbreak, even though it is
14   88 percent effective was the median, is not good
15   enough to prevent the outbreak.  By definition it
16   isn't.  So it's a -- it is a completely different
17   context.
18   BY MR. SANGIAMO:
19       Q. In both instances, an effectiveness rate is
20   calculated by means of comparing the attack rate in
21   the vaccinated group with the attack rate and the
22   unvaccinated group.  True?
23       A. No.
24       Q. So how is the effectiveness rate calculated
25   for the varicella vaccine?

23 (Pages 86 - 89)

Appx1788

HIGHLY CONFIDENTIAL

Page 90

1    A. In -- in the varicella vaccine studies, there
2    are -- these are both case controlled studies. So you
3    don't calculate an attack rate. There is no attack
4    rate. You take people with disease and people without
5    disease and you look at the proportion in each group
6    that received the vaccine. From that, you calculate
7    an odds ratio and the effectiveness of the vaccine.
8    Totally different.
9        In the -- in the outbreak settings, they are
10   looking -- in many -- in many of the cases, the --
11   because it was such a highly vaccinated population, it
12   was more or less impossible to calculate or very
13   difficult to calculate an effectiveness rate, an
14   attack rate for unvaccinated because like -- I think
15   in the -- as I recall, in the University of Iowa
16   outbreak, there were only -- only 42, or something
17   like that, students who were unvaccinated, and two of
18   them got disease.
19       And the confidence control on the attack rate
20   was -- you know, when they calculated effectiveness,
21   it went -- it went to actually minus 2 percent, minus
22   2.7 percent, implying that it could cause disease. I
23   don't believe it caused disease, but it was very
24   imprecise. So a lot of those estimates are comparing
25   two doses versus one dose, for example. It is -- when

Page 91

1    everybody is vaccinated or almost everybody is
2    vaccinated, it is very difficult to calculate an
3    attack rate in unvaccinated. Some of them, they
4    could.
5        Q. And when they did, they came up with a median
6    of 88 percent. Correct?
7        A. Between 31 percent and 95 percent. That is
8    right.
9        Q. With the median of 88 percent?
10       A. Correct.
11       Q. I guess my question to you is: What is it
12   about the fact that the varicella studies that led to
13   the 85 percent and the 87 percent estimates being case
14   control studies that means that a determination that
15   those effectiveness rates constitute highly effective
16   would not be applicable to the mumps studies?
17       MR. SCHNELL: Object to the form.
18       THE COURT REPORTER: To the what studies?
19   BY MR. SANGIAMO:
20       Q. To the mumps studies.
21       A. Okay. Let me repeat myself. The -- the
22   context is totally different. The -- in these
23   varicella studies, you are looking in a general
24   population in the context of a -- of a widely
25   circulating virus. In the mumps studies, you are

Page 92

1    looking in an outbreak setting. Whatever the
2    effectiveness of the vaccine is, it is not enough to
3    -- it clearly wasn't enough to prevent the outbreak.
4    So it -- so it seems to me obvious that -- I mean, let
5    me read to you again my conclusion.
6        "Merck's mumps vaccine does not provide
7    sufficient protection to prevent continued mumps cases
8    and outbreaks in the United States." That is my
9    opinion. If the context of the estimate of
10   effectiveness is in an outbreak, obviously it didn't
11   -- it's not enough to prevent the outbreak. Right.
12   That is why it's not -- that's why I don't think it is
13   highly effective. Okay.
14       Q. For both your varicella studies and the --
15   strike that.
16       For both the studies of varicella
17   effectiveness that you cited in your letter to the
18   editor and the studies of mumps effectiveness in the
19   outbreak setting, the virus is circulating in the
20   population being studied. Isn't that right?
21       A. In both, they are circulating, but it's --
22   it's -- the outbreak, it is a limited population that
23   they only looked at college students at the University
24   of Iowa, for example, or in an outbreak in a community
25   center, they only looked at people in the community

Page 93

1    center. Whereas, in the varicella studies it is like
2    the whole population of Connecticut or Southern
3    Connecticut, for example. So it is an open -- it's an
4    population as opposed to a closed setting. So it is
5    quite a different context.
6        Q. In both instances, though, the virus is
7    circulate widely. Is that right?
8        MR. SCHNELL: Objection.
9        THE WITNESS: Not widely. It is circulating
10   within the population. It's not widely. It's in the
11   college or the community center or the day care
12   center. That is not widely.
13   BY MR. SANGIAMO:
14       Q. In both instances, the virus is circulating
15   in the population being studied. Correct?
16       A. Correct.
17       Q. What other differences do you point to
18   between the circumstances of the varicella study where
19   you calculate 85 percent and 87 percent and the
20   circumstance of the mumps study where -- I'm sorry,
21   the mumps effectiveness rate studies where an
22   effectiveness rate of 88 percent has been determined?
23       MR. SCHNELL: Do you want to reframe your
24   question?
25   BY MR. SANGIAMO:

24 (Pages 90 - 93)

Appx1789

HIGHLY CONFIDENTIAL

Page 94

1    Q. Other than the fact that the mumps study took
2 place in an outbreak setting?
3        MR. SCHNELL: Object to the form of the
4 question. You might want to reframe it.
5        MR. SANGIAMO: No, I am good.
6        MR. SCHNELL: Object to form. Lacks
7 foundation.
8        THE WITNESS: Could you just read the
9 beginning of that? What are the different -- could
10 you read the beginning of his question?
11        (Requested portion of testimony read.)
12        THE WITNESS: I don't need to point to any
13 differences. That is sufficient.
14 BY MR. SANGIAMO:
15    Q. Just the outbreaks, the fact one is an
16 outbreak setting and the other is not?
17    A. Correct. I mean, I don't know if you are
18 trying to get me to change my what I said. This is my
19 opinion. I am very aware of all the outbreak studies.
20 You are not going to get me to say it is something
21 different. This is all based on my --my assessment of
22 -- of those studies. So -- but by all means,
23 continue.
24        (Shapiro Exhibit No. 11 marked for
25 identification.)

Page 95

1 BY MR. SANGIAMO:
2    Q. Dr. Shapiro, before I was asking you about
3 the studies marked as Exhibit 8 and Exhibit 9, which
4 were varicella effectiveness rate studies. Do you
5 recall that?
6    A. I do recall that.
7    Q. Those were studies that were performed by a
8 group you headed. Is that correct?
9    A. Correct.
10    Q. Handing you what has been marked as Exhibit
11 11. Do you recall this study?
12    A. I do.
13    Q. What was this study about?
14    A. It was about the effective -- it says
15 efficacy, but it is really the effectiveness of
16 polyvalent pneumococcal polysaccharide vaccine in
17 adults.
18    Q. And this paper, if you turn to page 1459, in
19 the left-hand column, the paragraph that carries over
20 from 1458. Ends with the sentence that "The vaccine
21 had substantial protective efficacy in immunocompetent
22 patients according to each method of analysis, but no
23 statistically significant estimates of efficacy were
24 found for the immunocompromised patients."
25        Do you see that?

Page 96

1    A. I do.
2    Q. What was the efficacy rate for
3 immunocompetent patients?
4        MR. SCHNELL: Again, please take as much time
5 to read whatever it is you need to review this to
6 refresh your recollection.
7        THE WITNESS: Sure.
8 BY MR. SANGIAMO:
9    Q. If it helps, I can point you to where I
10 thought I saw it.
11    A. No, I am very familiar with this. I can
12 easily look it up. 61 percent for subgroup of 808
13 immunocompetent patients.
14        THE COURT REPORTER: A subgroup of?
15        THE WITNESS: 808 immunocompetent patients.
16 BY MR. SANGIAMO:
17    Q. So you thought in that context the vaccine
18 had substantial protective efficacy. Right?
19    A. 61 percent.
20    Q. 61 percent constituted substantial protective
21 efficacy?
22    A. In this context, yes.
23    Q. I gather there was something different about
24 this context as compared to the mumps setting that
25 suggests to you that although the vaccine was 61

Page 97

1 percent efficacy as found in your study provided
2 substantial protective efficacy, the mumps vaccine
3 does not?
4        MR. SCHNELL: Object to form.
5        THE WITNESS: It is exactly the same story as
6 with the varicella. This was a totally different
7 kind. It's an open population with a widely --
8 everybody gets exposed to pneumococcus as opposed to
9 an outbreak setting where you would like the vaccine
10 to prevent the outbreak to start with. It is obvious
11 that is not -- it is not -- consistent with my
12 conclusion that it doesn't provide sufficient
13 protection to provide continued cases and outbreak.
14 That is what is studied in an outbreak. So obviously,
15 it is a totally different -- these are very different
16 contexts.
17 BY MR. SANGIAMO:
18    Q. Was it your expectation that with a 61
19 percent -- strike that.
20        Is pneumococcus susceptible to outbreaks?
21    A. Well, pneumococcus is not susceptible to
22 outbreaks, but I think what you mean to ask is does it
23 cause outbreaks. And that is a matter of debate.
24 Probably not. Although occasionally there can be a
25 virulent strain. There is a debate about whether it

25 (Pages 94 - 97)

Appx1790

HIGHLY CONFIDENTIAL

Page 98

1  occurs in -- in day care centers or not.  Probably
2  not.
3      Q. There can be chicken pox outbreaks, though.
4  Right?
5      A. Definitely.
6      Q. Was it your expectation when you found
7  effectiveness rates of 85 percent and 87 percent for
8  chicken pox vaccine, varicella vaccine, that it was
9  going to prevent all cases of chicken pox in an
10  outbreak setting?
11      A. We didn't study outbreaks.
12      Q. What -- what would your expectation be?
13      A. I didn't have any expectation.
14      Q. I mean, by definition, if you find an
15  effectiveness rate of less than 100 percent, that
16  means that some people were vaccinated, exposed to the
17  virus and then developed the disease.  Right?
18      A. Yes.
19      Q. And nevertheless, you found that the vaccine
20  -- varicella chicken pox vaccine was highly effective,
21  notwithstanding the fact there would be such people.
22  Right?
23      A. I found it was whatever I said, 87 percent
24  effective in one of the studies.  That is what I
25  found.

Page 99

1      Q. You found highly -- you said it was highly
2  effective?
3      A. That is what I said.  That is what the
4  article said.
5      Q. That is what you believed at the time?
6      A. Yes.
7      Q. And you believed it was going to be highly
8  effective notwithstanding the fact that people exposed
9  to the virus who were vaccinated would still get the
10  disease notwithstanding the fact that they would had
11  been vaccinated.  True?
12      MR. SCHNELL:  Objection to form.
13  Mischaracterizes.
14      THE WITNESS:  Could you repeat the question?
15  BY MR. SANGIAMO:
16      Q. You concluded that the varicella chicken pox
17  disease was highly effective notwithstanding the fact
18  that some people who were vaccinated and exposed to
19  the virus would develop the disease.  Right?
20      A. We -- we concluded that it was in the -- in
21  that context, that it was 87 percent effective.  I
22  notice that we call -- we used the term highly
23  effective in the article.
24      Q. And you used the term highly effective
25  notwithstanding the fact that you believed that some

Page 100

1  people who were vaccinated and were exposed to the
2  virus were going to get the disease.  Correct?
3      MR. SCHNELL:  Object to form.
4  Mischaracterizes.  Asked and answered.
5      THE WITNESS:  Yeah, I think I already
6  answered the question.
7  BY MR. SANGIAMO:
8      Q. Did you believe that some people who got the
9  vaccine and were exposed to the virus were going to
10  nevertheless develop the disease at the time that you
11  found that the chicken pox varicella vaccine was 85
12  percent -- was highly effective?
13      MR. SCHNELL:  Object to form.
14      THE WITNESS:  It wasn't a question of belief.
15  What we found was what we found.  And there were some
16  people -- there were people who received the vaccine
17  who did develop varicella.
18  BY MR. SANGIAMO:
19      Q. And you nevertheless found the vaccine was
20  highly effective.  Right?
21      A. In that context.
22      Q. Now, you also did a study regarding Hib
23  vaccine.  Isn't that right?
24      A. Yes.
25      (Shapiro Exhibit No. 12 marked for

Page 101

1  identification.)
2      THE WITNESS:  I might not have mentioned
3  these in the earlier --
4      MR. SANGIAMO:  I think you did.
5      THE WITNESS:  There were two different ones.
6  One was a polysaccharide vaccine and one was a
7  conjugate vaccine for Hib.  So I think I only counted
8  it once.  Maybe it takes it up to nine vaccines.  Two
9  different vaccines.  This one is the polysaccharide
10  vaccine.
11  BY MR. SANGIAMO:
12      Q. Did you also do an effectiveness study for
13  Hib conjugate vaccine?
14      A. Yes, I was on the paper that was done in
15  Massachusetts.  I was a co-author on that one.
16      Q. What effectiveness rate did you find in that
17  study?
18      A. For the Haemophilus influenza Type B
19  polysaccharide vaccine was 88 percent overall in three
20  different places.  91 percent, 92 percent and 81
21  percent in Connecticut, Dallas and Pittsburgh.
22      Q. Could you turn to the last page of the
23  article.  In the middle column, the second paragraph
24  begins with "There has been concern."
25      Do you see that?

26 (Pages 98 - 101)

Appx1791

HIGHLY CONFIDENTIAL

Page 102

1    A. Yes, I see it.
2    Q. I'm sorry. If you could look at the
3  subsequent paragraph.
4    A. Subsequent paragraph. Oh, the results?
5    Q. Yes.
6    A. Okay.
7    Q. "The results of this study indicate that
8  Haemophilus B polysaccharide vaccine is highly
9  efficacious."
10    Do you see that?
11    A. Yes.
12    Q. And you believe that your data showed that.
13  Right?
14    A. Yes.
15    Q. Your data showed that notwithstanding the
16  fact that some people that got the vaccine were --
17  also developed the disease?
18    A. Right.
19    Q. And the effectiveness rate of 85 percent -- I
20  am sorry -- 88 percent was comparable to the CDC
21  estimate of mumps vaccine effectiveness. Correct?
22    MR. SCHNELL: Object to form.
23    THE WITNESS: Totally different context.
24  Once again, you know, the other thing I would point
25  out is that these studies of these exhibits you gave

Page 103

1  me were done in the context of a situation where there
2  was a large, high incidence of disease in the general
3  population. Not only was the infectious agent
4  circulating widely but there were many cases of
5  disease.
6    The context of mumps vaccine is totally
7  different. Disease had gone down to very low rates
8  and now it is -- all of a sudden it is going up
9  substantially since about 2006, with many of these
10  outbreaks occurring as we have gone over it. So it is
11  just a totally different context.
12  BY MR. SANGIAMO:
13    Q. Sir, if you could turn to Exhibit 5.
14    A. Yes, got it.
15    Q. Page 801.
16    A. Uh-huh.
17    Q. This is the paper written by Rubin?
18    A. Yes.
19    Q. If you look at the middle column on page 801,
20  we were looking before at the paragraph that begins
21  with the word "Despite."
22    Do you see that?
23    A. Yes.
24    Q. Now I am going to ask you to look at a
25  different sentence slightly more than half the way

Page 104

1  down. It says, "Further, in those cases of mumps and
2  persons with a history of vaccination, disease
3  symptomology has been observed to be mild in
4  comparison to cases in unvaccinated persons. "?
5    Do you see that?
6    A. I do.
7    Q. Do you agree with that -- strike that.
8    Do you have an opinion as to whether that is
9  true?
10    A. I'd have to look at specific articles to --
11  but I don't necessarily dispute that. That could be
12  true.
13    Q. You certainly don't have any data challenging
14  that proposition. Right?
15    A. No.
16    Q. Can mumps lead to complications?
17    A. Yes.
18    Q. That may be serious?
19    A. Yes.
20    Q. Exhibit 3 is the paper written by Doctors
21  Latner and Hickman of the CDC. Right?
22    A. Right.
23    Q. Go to page 2 of that paper. Under the
24  section with the heading "How protective is mumps
25  vaccine?"

Page 105

1    Do you see that?
2    A. Yes.
3    Q. In the first paragraph under that section,
4  about six or seven lines down, there is a sentence
5  that begins with "Furthermore."
6    Do you see that?
7    A. Yes.
8    Q. It says, "Furthermore, as compared to the
9  prevaccine era, there has been a reduction in the
10  frequency of complications among vaccinated
11  individuals which indicates there are important
12  measures of protection that should not be overlooked."
13    Do you see that?
14    A. I do.
15    Q. Do you agree with that statement?
16    A. Again, I -- I would have to look at data. I
17  don't necessarily disagree with it.
18    (Shapiro Exhibit No. 13 marked for
19  identification.)
20  BY MR. SANGIAMO:
21    Q. Dr. Shapiro, I am handing you what has been
22  marked as Exhibit 13.
23    Do you recognize that document?
24    A. Yes.
25    Q. What is that?

27 (Pages 102 - 105)

Appx1792

Case 2:22-cv-03553 Document 79-63 Page 392 Date Filed 11/16/2023

HIGHLY CONFIDENTIAL

| Page 106 | Page 108 |
|---|---|

Page 106

1 A. Mumps complications and effects of mumps
2 vaccination in England and Wales 2002 through 2006.
3 Q. You have read that paper, sir?
4 A. Yes.
5 Q. Turn to table 2, if you could, please. Table
6 2 shows the association between receipt of vaccination
7 and mumps complications adjusted for age and sex. Is
8 that correct?
9 A. I am sorry. Table 2 shows, yeah.
10 Q. Are you with me?
11 A. Yes.
12 Q. If we look at hospitalization, what does that
13 say by way of comparing rates of hospitalization of
14 those who receive two doses of vaccine versus those
15 who are unvaccinated?
16 A. I just want to look at a couple more places
17 in the paper, if I could.
18 Q. Sure.
19 A. Okay. So what was your question?
20 Q. If you look at the hospitalization data in
21 table two what does that tell you about the
22 comparative rates of hospitalization for those who had
23 received two doses of mumps vaccine verses those who
24 were unvaccinated?
25 A. Well, 1.4 percent of those who got two doses

Page 107

1 versus 3.8 percent of those who got zero doses were
2 hospitalized.
3 Q. So lower rate in the group that got two doses
4 of the vaccine. Right?
5 A. Yes.
6 Q. How about for orchitis?
7 THE COURT REPORTER: I'm sorry. What was the
8 question?
9 BY MR. SANGIAMO:
10 Q. How about for orchitis, O-R-C-H-I-T-I-S?
11 A. Lower in those that got two doses than zero
12 doses.
13 Q. How about meningitis?
14 A. Same thing.
15 Q. Pancreatitis?
16 A. Same.
17 Q. If you look up in the text above table 2,
18 looking at the paragraph that carried over from page
19 633 -- I'm sorry, 663 to 664, the last sentence of
20 that paragraph says, "The rate of hospitalization and
21 rate of each meaning mumps complication were lower in
22 those that were vaccinated than in the unvaccinated.
23 Rates were particularly low among those who had
24 received two doses of vaccine."
25 Did I read that accurately?

Page 108

1 A. Yes.
2 Q. Do you agree with that statement?
3 MR. SCHNELL: Object to form.
4 THE WITNESS: Well, what statement?
5 BY MR. SANGIAMO:
6 Q. What the author said?
7 A. They are just describing what we just read.
8 Q. Describing the data?
9 A. Right. The paper also says, I might point
10 out, it could have unestimated rates of complications,
11 on page 665, the last paragraph, because of a
12 substantial number of hospitalizations were coded for
13 mumps alone. So there may be some inaccuracies. What
14 they are saying is that the -- they didn't review the
15 records of these patients, they just used the coded
16 diagnoses. So somebody with orchitis might have just
17 been diagnosed with mumps, not both mumps and
18 orchitis. So they may have been missed. So these are
19 not perfectly accurate probably, according to the
20 authors.
21 Q. Well, you cited the data in your report?
22 A. I am sorry?
23 Q. You cited the data from the Young paper in
24 your report, did you not?
25 A. Yes, but I am talking specifically about

Page 109

1 the --
2 THE COURT REPORTER: Talking specifically
3 about what?
4 THE WITNESS: The accuracy of the rates of
5 complications.
6 BY MR. SANGIAMO:
7 Q. Did the authors make that statement about the
8 enhanced surveillance data or just about the
9 hospitalization data?
10 A. The hospitalization data, I think that is
11 what they are referring to HES.
12 Q. Is table 2 based on the hospitalization data
13 or the enhanced surveillance data?
14 A. Let me see. I think it is probably a
15 combination.
16 Q. Where do you see that?
17 A. Well, I don't -- it doesn't -- let's see.
18 Hold on. I need to look at it. HES, hospital
19 episodes. Oh, I see. This is a different one.
20 You're right, this is the enhanced surveillance. So
21 these are based on case reports, not the HES. Sorry.
22 Q. So the language that you cited on page 665
23 about the HES data, that does not apply to the data in
24 table 2. Right?
25 A. Right, I believe that is true.

28 (Pages 106 - 109)

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Appx1793

HIGHLY CONFIDENTIAL

Page 110

1    Q. Did do you agree that the -- strike that.
2       Could you pull out Exhibit 2, please. And
3 could you take a look at slide 3, please. What does
4 slide 3 show regarding comparative rates of
5 complications in unvaccinated versus vaccinated
6 populations?
7    A. That the -- well, it doesn't -- it is just
8 talking about the prevaccine era and the postvaccine
9 era. And the rates of complications were higher in
10 the prevaccine era. Actually, it is a little hard to
11 tell what this is from. They have unvaccinated. I
12 would have to look at the MMR MWR 2013. So it is hard
13 to tell if that is really the prevaccine era or just
14 reports of unvaccinated patients. They compared
15 unvaccinated patients, however, with -- it looks like
16 from outbreak investigations during the vaccine era.
17 It is hard to tell exactly what the -- what is the
18 unvaccinated are. I would have to look at the McLean
19 thing, but in this table the rates in the unvaccinated
20 were higher than the rates during the vaccine era.
21    Q. The rates of complications. Right?
22    A. Right. For most of them. Encephalitis
23 overlapped.
24       (Shapiro Exhibit No. 14 marked for
25 identification.)

Page 111

1 BY MR. SANGIAMO:
2    Q. Dr. Shapiro, I will hand you what has been
3 marked as Exhibit 14. Do you recognize that document?
4    A. Yes.
5    Q. You have read that before?
6    A. Yes.
7    Q. If you turn to the second page of that
8 document. Down at the bottom of that, the first
9 column, the sentence that reads, "Other investigations
10 also reported significantly lower prevalence of
11 complications among mumps patients who had received
12 two vaccine doses than among unvaccinated patients."
13       Do you see that?
14    A. I do.
15    Q. Do you agree with that statement?
16    A. I don't disagree with that statement.
17    Q. You haven't looked at those papers that are
18 cited there?
19    A. Well, I am looking to see what they are.
20    Q. Okay.
21    A. Yeah, I have seen those. That's what -- I
22 don't disagree with that.
23    Q. There is data then demonstrating that rates
24 of complications from mumps in those who have received
25 two doses of vaccine are lower than rates of

Page 112

1 complications among unvaccinated patients. Is that
2 right?
3    A. Yes.
4    Q. Does that confer an important health benefit
5 for people who are vaccinated even those who do get
6 mumps?
7    A. The rates -- the rates of complications are
8 lower, but, nonetheless, they are still complications
9 of mumps even in -- sometimes in those who are
10 vaccinated. In all of those -- all of the studies you
11 showed me, there was still complications even in the
12 vaccinated groups. So while the rate is lower in
13 those who are vaccinated, there were still
14 complications that occurred, albeit at a lower rate,
15 in people who were vaccinated.
16    Q. Does that confer an important health benefit
17 for people who are vaccinated even though they get
18 mumps?
19    A. Well, my guess is if you ask those people who
20 got vaccinated and got the complications they wouldn't
21 be very happy about it.
22    Q. I am asking you about it.
23    A. Well, I think overall the rate is lower, but
24 unfortunately what -- what would be better is if the
25 vaccine prevented the outbreaks in the first place and

Page 113

1 then nobody would have the complications.
2    Q. Sure.
3    A. So it is -- again, it does -- I mean, I have
4 acknowledged that the rate is lower in those who got
5 vaccinated, but unfortunately because the outbreaks
6 are still occurring there are still complications even
7 among vaccinees. And I would add because the
8 outbreaks are occurring, people who are unvaccinated
9 are getting infected in these outbreaks and having
10 severe complications. So the fact that the vaccine is
11 not preventing these outbreaks is leading to
12 complications even in the unvaccinated.
13    Q. You have acknowledged that the rates are
14 lower for those who are vaccinated as compared to
15 those who are unvaccinated with complications. Right?
16    A. Yes.
17    Q. Is that an important health benefit?
18    A. That's a health benefit. It's --
19    Q. Is it important? You are an infectious
20 disease doctor. Right?
21    A. It might be important. I mean, it's -- what
22 do you mean by "important"? What is important? I am
23 asking what -- you are asking me the question and I
24 don't know what you mean. Tell me what an expert is.
25    Q. You are an expert in infectious disease.

29 (Pages 110 - 113)

Appx1794

HIGHLY CONFIDENTIAL

Page 114

1    A. But you are the lawyer that is asking the
2 questions.
3    Q. Understood.
4    A. Unless you tell me what you mean by
5 "important," I don't know.
6    Q. Is it important to you as you would use that
7 term as an infectious disease doctor that the rates of
8 complications from mumps would be lower than they
9 would otherwise be?
10    A. As an infectious disease doctor, I would like
11 the vaccine to prevent mumps infection and then both
12 -- and prevent outbreaks, in which case both -- when
13 I -- when we give the mumps vaccine to patients, we
14 don't say, "Here, take the vaccine because if you get
15 mumps you are less likely to go deaf." We give it
16 because we hope that it is going to prevent disease.
17    So clearly, if you get -- if you get infected
18 and you have milder -- your complications are less
19 frequent or milder, that is better than having worse
20 complications and more severe disease, but I wouldn't
21 say that that is good. What would be good is if it
22 prevented the outbreaks in the first place so
23 everybody, vaccinees and people who didn't get
24 vaccinated, didn't get the complications.
25    Q. If you go back to Exhibit 3. It is the paper

Page 115

1 by Latner and Hickman.
2    A. I got it.
3    Q. If you look at page 2. The sentence we
4 looked at a few moments ago in that "How protective is
5 mumps vaccine" section first paragraph.
6    A. Uh-huh.
7    Q. The sentence that reads, "Furthermore, as
8 compared to the prevaccine era there has been a
9 reduction in the frequency of complications among
10 vaccinated individuals which indicates there are
11 important measures of protection that should not be
12 overlooked."
13    Do you agree with that last part of that
14 sentence where the CDC doctors say which indicates --
15    A. I am sorry. Oh, I just found it. Okay.
16 Sorry.
17    Q. Do you agree with that last part of that
18 sentence where the CDC doctors say that the fact that
19 there has been a reduction in the frequency of
20 complications among vaccinated individuals indicates
21 there are important measures of protection that should
22 not be overlooked?
23    A. I think I just answered that question. Would
24 you like to read back my long answer?
25    Q. You didn't answer that question. Do you have

Page 116

1 anything to add to your answer other than what you
2 said --
3    A. No.
4    Q. -- in response to my prior question?
5    A. No.
6    Q. Could you take out Exhibit 1, please.
7    MR. SCHNELL: Exhibit 1 is the report. Is
8 that what you want.
9    MR. SANGIAMO: It is.
10    THE WITNESS: Oh, I have got it.
11 BY MR. SANGIAMO:
12    Q. Could you turn to page 16, please.
13    A. Sure.
14    Q. Page 16 is where you discuss the Young paper.
15 Right?
16    A. Yes.
17    Q. And you -- you introduce the discussion of
18 the Young paper by saying, "For example."
19    Do you see that?
20    A. I do.
21    Q. What is that an example of? I didn't
22 understand that in your report.
23    A. Oh. Sure. So the point I am trying to make
24 here is that unlike the prevaccine era when most cases
25 of mumps occurred in children, and the disease tends

Page 117

1 to be -- the rates of complications are much lower in
2 children, nowadays most of the cases are adults who
3 have higher -- if you read above that, it says --
4 here, I will read it to you. "This is particularly
5 true when, as is the case now, those affected" -- by
6 that I mean those who get mumps are mostly adults who
7 have higher rates of complication from the infection.
8    Then it says, "For example," and I describe
9 the rates of complications in that outbreak of people
10 with mumps. So that 2.9 -- there were outbreaks from
11 2004 to 2005 in the UK, 2.9 percent of the patients
12 have been hospitalized, 6.1 percent had orchitis, 0.3
13 percent had meningitis, and 0.25 percent had
14 pancreatitis. Other studies -- yeah, so that's -- did
15 that -- does that answer your question or no?
16    Q. Not really. You included within the data the
17 people who were not vaccinated?
18    A. Yes. Well, I just explained that, but let me
19 try to do it again.
20    Q. Sure.
21    A. If there is no outbreak then the people who
22 are unvaccinated will not get complications of mumps.
23 So the problem is that outbreaks are occurring. This
24 is a change. Outbreaks are occurring, especially in
25 the United States, but in many countries. And -- but

30 (Pages 114 - 117)

Appx1795

Page 118

1  since 2006, there are outbreaks. And I think I talk
2  about further on in -- "reported a large outbreak in
3  2006 among 4,000 persons with documented infected with
4  mumps, 5 percent had serious complication and 2
5  percent were hospitalized." That was in the Dayan
6  publication New England Journal of Medicine that is
7  cited there.
8      So the point is that because the current
9  vaccine is not controlling these outbreaks, these are
10  big outbreaks, people are getting complications of
11  mumps regardless of whether the -- the rate may be
12  lower in the vaccinees than in the unvaccinated, but
13  because these outbreaks are occurring, despite high
14  rates of vaccination, lots of people are getting
15  complications or the percent that I told you, 5
16  percent.
17      Q. In the sentence that carries over from page
18  16 to 17, you cite to the Hashimoto paper?
19      A. Oh, yeah.
20      Q. What role does that paper play in your
21  analysis?
22      A. So the point of this is just saying that --
23  it's the same thing, that -- that if mumps occurred --
24  this is one paper that described the frequency of
25  deafness in patients with mumps. And the point is

Page 119

1  that people with mumps get complications. Deafness
2  potentially being one of them. So it is just another
3  example of what can happen if you get mumps and
4  develop a complication. That is what the point of it
5  is.
6      Q. I see. So that is just saying there are
7  complications from mumps?
8      A. Correct. Deafness being one of them.
9      Q. That paper was in the pediatric population.
10  Right?
11      A. Right.
12      Q. And that was in a society that did not have
13  mumps vaccine. Right?
14      A. Right. But -- right.
15      (Shapiro Exhibit No. 15 marked for
16  identification.)
17  BY MR. SANGIAMO:
18      Q. You have just been handed what has been
19  marked as Exhibit 15, which is the Hashimoto paper.
20  Correct?
21      A. Okay.
22      Q. The second sentence of that paper, direct
23  your attention to that, please.
24      A. Yes.
25      Q. The authors state "Deafness caused by mumps

Page 120

1  is rarely seen in most parts of the world because
2  mumps is uncommon in countries with extensive
3  vaccination programs."
4      Do you agree with that?
5      MR. SCHNELL: Object to form.
6      THE WITNESS: Well, I think what they are
7  saying is that -- that if there isn't any mumps, then
8  you are not going to get deafness. The problem is, as
9  I said in my opinions, that the current vaccine is not
10  controlling outbreaks of mumps. So if mumps occurs,
11  deafness is a potential complications.
12  BY MR. SANGIAMO:
13      Q. Do you agree that deafness caused by mumps is
14  rarely seen in most parts of the world because mumps
15  is uncommon in countries with extensive vaccination
16  programs, as the authors of this paper that you cite
17  state?
18      MR. SCHNELL: Object to form.
19      THE WITNESS: Well, you know, I don't know
20  what "uncommon" means, but, I mean, clearly, compared
21  with the prevaccine era, there are fewer cases of
22  mumps. So -- but when mumps occurs, deafness is a
23  potential complication whether the -- regardless of
24  the vaccination rate.
25  BY MR. SANGIAMO:

Page 121

1      Q. So you don't agree or disagree with the
2  statement made by the authors. Is that right?
3      A. Okay. Yeah. I mean, the problem is I am not
4  sure what he means by how common. I don't know what
5  "uncommon" means, precisely what "uncommon" means. If
6  it is less common than it used to be before the
7  vaccines were introduced, I would agree with it. But
8  how common is uncommon, I am not certain.
9      Q. The word used is "rarely."
10      A. Well, okay. I don't know what he means by
11  "rare." It is clearly lower. I mean, we have gone
12  through that. The complications are lower, but -- I
13  mean, but it is a silly thing I think to argue about.
14  The point is if you get mumps, deafness is a potential
15  complication. Albeit rare, it is definitely not super
16  common.
17      Q. And is deafness rarely seen in most part --
18      A. If you mean permanent deafness.
19      Q. Rarely seen in most parts of the world
20  because mumps is uncommon in countries with extensive
21  vaccination programs?
22      MR. SCHNELL: Objection to form.
23  Mischaracterizes his testimony.
24      THE WITNESS: I think we already went through
25  it. I don't have anything to add.

31 (Pages 118 - 121)

Appx1796

HIGHLY CONFIDENTIAL

Page 122

1    MR. SANGIAMO: This would be a good breaking
2    spot as far as I am concerned.
3         MR. SCHNELL: Sure.
4         THE VIDEOGRAPHER: Off the record. The time
5    is 12:39.
6         (Recess taken from 12:39 p.m. to 1:23 p.m.)
7         THE VIDEOGRAPHER: This is the beginning of
8    media Number 4. We are back on the record. The time
9    is 1:23.
10   BY MR. SANGIAMO:
11        Q. Dr. Shapiro, could you turn to Exhibit 1,
12   which is your report?
13        A. Yes.
14        Q. Turn to page 16, please.
15        A. Got it.
16        Q. The second full paragraph on that page begins
17   with, "The consequences of an imperfect vaccine on
18   patients," and then it goes on. You are referring
19   there to the mumps vaccine. Is that right?
20        A. Yes.
21        Q. Can you give me an example of a perfect
22   vaccine?
23        A. Well, what do you mean?
24        Q. You said this is imperfect. Right? Meaning
25   it is not perfect?

Page 123

1         A. Yeah, that is imperfect.
2         Q. Are there any vaccines that you would
3    consider to be perfect?
4         A. Well, I would say that nothing -- I am the
5    only thing that I know of that is perfect. I don't
6    think -- I am being facetious.
7         Q. I understand.
8         A. I don't know that there are any perfect
9    vaccines.
10        Q. Could you turn to page 12 of your report,
11   please.
12        A. Uh-huh.
13        Q. The first full paragraph says that, "There is
14   no consensus about the reasons for the resurgence in
15   mumps." And it goes on to say that, "There is
16   evidence that the number of Memory B cells induced by
17   Merck's mumps vaccine may be relatively low."
18        Do you see that?
19        A. I do.
20        Q. Do you know of any other mumps vaccine for
21   which that is not true?
22        A. I am just looking at the Merck's vaccine. I
23   haven't studied it for other vaccines, I don't know.
24   I am just referring to Merck's vaccine.
25        Q. Is that also a feature of the mumps virus

Page 124

1    itself, that the number of Memory B cells induced by
2    the virus may be relatively low?
3         A. I don't know.
4         Q. You discuss in your report -- strike that.
5         Could you turn -- pull out Exhibit 14,
6    please.
7         A. Yes.
8         Q. That is the publication of the recommendation
9    of the advisory committee on immunization practices
10   for use of third dose in an outbreak setting. Is that
11   right?
12        A. Yes.
13        Q. Turn to page 34 of that document, which is
14   the second page of the document. The right-hand
15   column begins with the bolded words "Two dose mumps
16   vaccine effectiveness in mumps response."
17        Do you see that?
18        A. Yes.
19        Q. Halfway down that paragraph, there is a
20   sentence that begins with "Limited."
21        Do you see that?
22        A. Yes.
23        Q. It says, "Limited laboratory data on immune
24   response to mumps virus indicate both lower antibody
25   tiers and poorer antibody quality, e.g., lower

Page 125

1    lividity antibodies, failure to generate strong Memory
2    B cell responses, after either natural mumps infection
3    or mumps vaccination compared to the responses to
4    infection in comparisons with mumps and rubella."
5         Do you see that?
6         A. Yes.
7         Q. Did you read that to mean that the limited
8    laboratory data on immune responses to mumps show that
9    failure to generate strong Memory B cell responses is
10   a feature both of mumps vaccination and of mumps
11   virus?
12        A. I don't know. I would have to read the
13   articles.
14        Q. So you don't -- you don't have any reason to
15   dispute that, but you don't have an opinion one way or
16   the other. Is that a fair summary?
17        A. Correct.
18        Q. You discuss in your report the effect of
19   subclinical infection on effectiveness calculations.
20   Right?
21        A. Yes.
22        Q. And you say in the report that estimates - at
23   page 14 of the report, if you want to refer to it.
24        A. Uh-huh. I got it.
25        Q. Got it. All right. The paragraph at the

32 (Pages 122 - 125)

Appx1797

HIGHLY CONFIDENTIAL

Page 126

1  bottom that carries over onto page 15 begins with
2  "Estimates."
3      Do you see that?
4      A. I do.
5      Q. And the second sentence reads, "Of course, if
6  persons with subclinical infections were included, the
7  estimates of the vaccine's effectiveness in outbreaks
8  would be even lower."
9      Do you see that?
10     A. I do.
11     Q. Does the accuracy of that statement depend
12  upon whether the rate of subclinical infection in the
13  vaccinated population differs from the rate of
14  subclinical infection in the unvaccinated population?
15     A. Yes.
16     Q. And do you know how those two rates compare?
17     A. Well, generally, the proportion of
18  subclinical infections -- I am not sure anybody knows
19  because it is difficult to -- to get those data
20  because people -- you know, it is hard to make a
21  diagnosis of mumps.
22     So unless you are doing a very sensitive
23  diagnostic test on everybody in the population, it is
24  difficult to know. So I am not certain.
25     Q. So the accuracy of that statement then that

Page 127

1  if persons with subclinical infections were included,
2  the estimates of the vaccine's effectiveness in
3  outbreaks would be even lower, that depends upon data
4  that we don't have. Is that right?
5      A. Yes.
6      Q. Your third opinion is "A new mumps vaccine is
7  necessary if we wish to control mumps in the United
8  States." Right?
9      A. I am sorry. Where are we? Oh, my opinion?
10     Q. Yes, sir.
11     A. Yes, uh-huh.
12     Q. Could you pull out Exhibit 4, please.
13     A. Got it. What page?
14     Q. Page 668. If you could look at the
15  right-hand column on that page.
16     A. Uh-huh.
17     Q. It is going to direct your attention to a
18  sentence that appears in the paragraph that begins
19  with the first line "Attenuated mumps virus."
20     Do you see that?
21     A. Yes.
22     Q. It goes on to read, "Live vaccines have been
23  adopted."
24     Do you see that?
25     A. Uh-huh.

Page 128

1      Q. "Live vaccines have been adopted into public
2  health practice in most developed countries typically
3  as part of a trivalent vaccine with measles and
4  rubella, i.e. MMR," period. Next sentence reads,
5  quote, "Systematically applied, they have exerted
6  excellent control over the disease, although not as
7  successfully as against measles and rubella," end
8  quote.
9      Do you agree that systematically applied
10  mumps vaccines, including Merck's mumps vaccine, have
11  exerted excellent control over mumps?
12     MR. SCHNELL: Object to form.
13     THE WITNESS: I don't know what
14  "systematically applied" means, do you?
15  BY MR. SANGIAMO:
16     Q. I am going to you to assume systematically
17  applied means administered as part of a vaccination
18  program. If you make that assumption, do you agree
19  that live virus mumps vaccines, including Merck's
20  mumps vaccine, have exerted excellent control over the
21  mumps?
22     MR. SCHNELL: Object to form.
23     THE WITNESS: Definitely not. I mean, there
24  -- look, since 2006, there has been a marked increase.
25  It hasn't -- I just said -- as I have read multiple

Page 129

1  times, I can do it again. I think it doesn't provide
2  sufficient protection to prevent mumps cases and
3  outbreaks.
4  BY MR. SANGIAMO:
5      Q. Could you pull out Exhibit 14, please, which
6  is the ACIP recommendation.
7      A. The one we just had. Yes.
8      Q. Could you turn to page 36, please. If you
9  look at the left-hand column at the top of the page,
10  the ACIP -- strike that.
11     The CDC authors state, quote, "The current
12  routine recommendation for two doses of MMR vaccine
13  appears to be sufficient for mumps control in the
14  general population but insufficient for preventing
15  mumps outbreaks in prolonged close contact settings
16  even where coverage with two doses of MMR vaccine is
17  high," close quote.
18     Do you see that?
19     A. I see it.
20     Q. Do you agree with the first part of the
21  sentence that the current routine recommendation for
22  two doses of MMR appears to be sufficient for mumps
23  control in the general population?
24     A. Definitely not. I don't see how they can
25  know that because there -- there isn't mumps

33 (Pages 126 - 129)

Appx1798

HIGHLY CONFIDENTIAL

Page 130

1 circulating, so I disagree with that.
2      Q. And your disagreement with that is not based
3 on information that only you have. Is that fair to
4 say?
5      A. That is fair to say.
6      Q. Do you know what the ACIP work group
7 recommended as a means of outbreak control as a result
8 of this publication or in connection with this
9 publication?
10      A. I take it you are referring to a third dose
11 of the vaccine?
12      Q. Yes.
13      A. Yeah, yeah.
14      Q. Do you agree with that recommendation?
15      A. I think that is all we can do now. So it is
16 reasonable to try that because there is no
17 alternative. We don't have a better vaccine right
18 now.
19      Q. Do you agree that safety is an important
20 component of the vaccine. Is that right?
21      A. Yes.
22      Q. Is that the most important feature of a
23 vaccine, in your view?
24      A. It is one of multiple important features.
25      Q. Okay. So you wouldn't rank it any higher

Page 131

1 than effectiveness or any lower than effectiveness?
2      A. It is necessary, but not sufficient.
3      Q. Okay. Do you know of a mumps vaccine that is
4 safer than Merck's mumps vaccine?
5      A. No.
6      Q. Do you know of vaccines that are less safe
7 than Merck's mumps vaccine?
8      A. Yes.
9      Q. Which one is that?
10      A. I think Urabe vaccine, I think is one.
11 Leningrad -- Leningrad -- Leningrad, Urabe, especially
12 Urabe. Most of -- the Jeryl Lynn strain is the --
13      THE COURT REPORTER: Jeryl what?
14      THE WITNESS: Jeryl, J-E-R-Y-L, then Lynn,
15 like the name Lynn, strain is I think the only strain
16 that doesn't cause meningitis, does not.
17      (Shapiro Exhibit No. 16 marked for
18 identification.)
19 BY MR. SANGIAMO:
20      Q. Dr. Shapiro, you have just been handed a
21 letter to the editor that responds to a letter to the
22 commentary that Dr. Plotkin had offered about the need
23 for a new mumps vaccine?
24      A. Yes.
25      Q. Would you like me to hand you a copy of

Page 132

1 Dr. Plotkin's commentary for orientation or --
2      A. I am familiar with it.
3      Q. If you look at -- are you familiar also with
4 this letter to the editor written by Dr. Rubin and
5 Judy Beeler?
6      THE COURT REPORTER: And Judy who?
7      MR. SANGIAMO: Beeler, B-E-E-L-E-R.
8      THE WITNESS: I have seen it before, yes.
9 BY MR. SANGIAMO:
10      Q. In the first column about a third of the way
11 into that first paragraph, there is a sentence that
12 begins with "Furthermore."
13      Do you see that?
14      A. Yes.
15      Q. That reads, "Furthermore, over a dozen
16 different mumps vaccine strains of varying genotypes
17 and reactogenicity have been used in numerous
18 countries since the 1960's and nearly all have been
19 found to be of similar effectiveness based on field
20 studies with the exception of the Rubini vaccine
21 strain."
22      Do you see that?
23      A. Yes.
24      Q. Do you agree with what Dr. Rubin and
25 Dr. Beeler of the FDA say there?

Page 133

1      A. Again, I would have to review the studies. I
2 didn't look at it in those terms so I don't -- I don't
3 have an opinion.
4      Q. Are you familiar with the Rubini strain?
5      A. Yes.
6      Q. What is your understanding, if any, of what
7 the experience has been with the Rubini strain?
8      A. It did not work well.
9      Q. When Dr. Rubin says that they all work
10 equally well, I am paraphrasing obviously, with the
11 exception of the Rubini strain, do you understand him
12 to be saying that the Rubini strain did not work as
13 well as the other viruses?
14      A. Yes.
15      Q. Could you pull out Exhibit 3, please.
16      A. Which one is that?
17      Q. That is the paper written --
18      A. This one?
19      Q. Yes.
20      A. Yes. It seems to be your favorite. I think
21 you have come to this more than any of the others.
22      Q. If you go down to the bottom of page 2.
23      A. Uh-huh.
24      Q. The last paragraph on that page begins with
25 "It is reported that."

34 (Pages 130 - 133)

Appx1799

HIGHLY CONFIDENTIAL

Page 134

1     Do you see that?
2     A. Yes.
3     Q. It says, "It is reported that wild-type mumps
4  reinfections can occur more than once in the same
5  individual.  Based on this observation - that not even
6  wild-type mumps infection necessarily confers lifelong
7  immunity - an important question is what level of
8  protection can be reasonably expected of any mumps
9  vaccine?"  Do you see that?
10    A. Yes, I see it.
11    Q. How do you interpret that sentence?
12    A. What do you mean?
13    Q. What do you think it is that Doctors Latner
14 and Hickman are trying to say there, to your
15 understanding?
16    MR. SCHNELL:  Object to form.
17    THE WITNESS:  I think they are asking what
18 level of protection can be reasonably expected of a
19 mumps vaccine.
20 BY MR. SANGIAMO:
21    Q. Would you agree that they are positing that
22 perhaps 100 percent effectiveness is not attainable?
23    MR. SCHNELL:  Object to form.
24    THE WITNESS:  I don't know.
25 BY MR. SANGIAMO:

Page 135

1     Q. That is not the way you interpret that or you
2  just don't have an interpretation one way or the
3  other?
4     A. I can only read what is on the page.  I read
5  -- I understand what it is, but, I mean, I don't know.
6  You'd have to ask them what they meant.
7     Q. Okay.  Next sentence reads, "The more
8  effective mumps vaccine that provides lifelong
9  immunity is certainly desirable.  But before
10 scientifically grounded improvements can be made, it
11 will be essential to better understand which
12 parameters of immunity are required for protection and
13 why the immune response to mumps is characteristically
14 weak."
15    Do you see that?
16    A. I do.
17    Q. Do you agree with that statement?
18    A. No.
19    Q. What aspect of it do you disagree with?
20    A. Well, I think you have to do studies to
21 understand -- I mean, so -- I don't think you
22 necessarily need to understand why the immune response
23 is weak to make a better vaccine.  If you happen to
24 have a -- for example, there are a lot of different
25 approaches.  Like even here, this -- in Rubin article

Page 136

1  Exhibit 5, for example, says "nonetheless, there is
2  room for advancing the science and devising new mumps
3  vaccine candidates."
4     So I think -- this is your own exhibit, but I
5  mean, if he says there is nothing we can do, if that
6  is what it means, I don't know.  I think there is room
7  to -- to explore improved vaccines.
8     Q. Where were you reading from in Rubin?
9     A. I'm sorry.  It is the very last sentence in
10 the article.
11    Q. If you look at the first column in that Rubin
12 paper.
13    A. Uh-huh.
14    MR. SCHNELL:  Same page?
15 BY MR. SANGIAMO:
16    Q. Same page.
17    A. Sorry.
18    Q. About halfway down the page, you see the
19 sentence that begins with "Among"?
20    A. Yes.
21    Q. That follows the clause that reads, "It is
22 clear that other approaches to improve vaccine
23 effectiveness need to be improved."
24    Do you see that?
25    A. Uh-huh, yes.

Page 137

1     Q. Then they write, "Among these, development of
2  new vaccines must be considered."  Then the next
3  sentence reads, "However, such an undertaking requires
4  knowledge of what is responsible for the less than
5  desirable performance of existing vaccines.  Why are
6  levels of mumps specific antibodies secreting cells
7  after vaccination significantly lower than the levels
8  induced by natural infection?  Why does MMR vaccine
9  result in development of far fewer virus specific
10 Memory B cells than measles and rubella specific
11 Memory B cells," and so on and so forth.
12    Do you agree that those are all questions
13 that need to be answered before an improved vaccine is
14 developed?
15    A. No.
16    Q. What -- what criteria would you apply to
17 evaluate whether a new vaccine would be a better
18 vaccine?
19    A. Well, ultimately, it would be whether it can
20 control -- control outbreaks in mumps, you know, to
21 reduce the -- that is the bottom line, is it effective
22 in preventing what is going on right now in preventing
23 what we have seen happening since around 2006 with the
24 increased number of outbreaks and so on.
25    Q. Do you have experience in developing new

35 (Pages 134 - 137)

Appx1800

HIGHLY CONFIDENTIAL

Page 138

1  vaccines?
2      A. No, I have not developed vaccines.
3      Q. Turn to page 7 of your report. The paragraph
4  begins on page 7, but carries over onto page 8.
5  Begins with "To achieve the."
6      A. Yes.
7      Q. "To achieve the desired effects of a vaccine
8  such as mumps vaccine, it is important for the vaccine
9  to be safe, potent and effective and for the immunity
10  induced by the vaccine to be long-lasting," close
11  quote.
12      Do you see that?
13      A. I do.
14      Q. Is it going to be possible to know at the
15  time of licensure of a new vaccine whether the
16  immunity induced by it is going to be long lasting?
17      A. Well, it depends. You would have to wait a
18  long time for that. But this doesn't say anything
19  about immunity. It says it is important for it to be
20  safe, potent and effective. So presumably, I mean,
21  it's -- people don't wait 40 years before -- after
22  developing a product to see if it is -- how long the
23  immunity lasts. It is based on assumptions and then
24  people observe what happens.
25      So I don't think for any vaccine people wait

Page 139

1  for years and years before it is licensed to know, but
2  they -- they make assumptions about it.
3      Q. How long did it take to find out that the
4  acellular pertussis vaccine was going to provide
5  waning -- immunity that wanes?
6      A. Well, it really only became apparent, I
7  think, in -- so it took about 10 years, 10 years or
8  so, something like that, eight to 10 years.
9      Q. You had placed the time of when that became
10  evident when?
11      A. I would have to look to see, but I mean it
12  was -- it had to be in use for a while before we knew.
13      Q. How would we know whether a new vaccine would
14  be able to control outbreaks better than Merck's mumps
15  vaccine?
16      A. That is really not my field. I am not -- I
17  wasn't asked to assess that and that is not something
18  I am prepared to opine about.
19      Q. Does it sometimes happen that a vaccine will
20  be believed to be safe at the time of licensure and
21  then it will turn out to pose unacceptable safety
22  risks after licensure?
23      A. Yes.
24      Q. Can you think of examples when that has
25  occurred?

Page 140

1      A. That occurred with a rotavirus vaccine.
2      Q. Also maybe with the Urabe mumps strain?
3      A. Yes.
4      Q. Of course, if a new mumps vaccine was
5  licensed we wouldn't know at the time of licensure
6  whether there would be a similar problem of safety
7  risks subsequently coming to light that weren't
8  apparent in the clinical trials leading up to
9  licensure. Right?
10      MR. SCHNELL: Object to form.
11      THE WITNESS: That is not necessarily true.
12  BY MR. SANGIAMO:
13      Q. It is not necessarily true that we wouldn't
14  know whether the safety risks --
15      A. Well, it depends on what the formulation of
16  the new vaccine was.
17      Q. No matter what the formulation was, it
18  wouldn't be until it was used in the post marketing
19  environment that we would know what kinds of risks are
20  going to emerge in the post marketing environment?
21      A. I mean, that is true, but -- so, for example,
22  one could conceivably add an adjunct that could --
23  that we know the side effects of that might change the
24  immune response to the vaccine or something that has a
25  pretty good -- we have pretty good data of what the

Page 141

1  side effects of the -- conceivably it could have some
2  weird affect on the virus itself, but that would be
3  different than say having a totally new strain of the
4  virus.
5      Q. So that would be an example of a situation in
6  which -- and tell me if I am miss interpreting, that
7  would be an example of a situation in which we would
8  have some reason to suspect that a side effect might
9  emerge after licensure? Is that what you are saying?
10      A. What I am saying is it might be -- what I am
11  saying is that if we take a current product and you
12  add to it a substance, let's say alum, that is known
13  to be a nonspecific stimulator of immune responses,
14  but we know what the side effects of the alum are,
15  certainly it is not certain that we are going to know
16  every side effect, but it is unlikely that there are
17  going to be surprise side effects than if we took a
18  whole new vaccine.
19      Q. Tell me if you agree with this statement.
20  That development of new vaccines that are hoped to be
21  better than existing vaccines is a standard part of
22  public health disease prevention.
23      Do you agree with that?
24      A. I need to know the context of what you are
25  talking about. There are lots of vaccines that are

36 (Pages 138 - 141)

Appx1801

HIGHLY CONFIDENTIAL

Page 142

1  out there that people aren't trying to develop new
2  vaccines but they aren't worried about the performance
3  of the currents vaccines. So I mean what are you --
4      Q. Do you agree that historically there have
5  been many viruses for which a new vaccine was
6  developed with the hope that it was going to be a
7  better vaccine than the existing vaccine?
8      A. What do you mean by "many"? I don't know
9  what you are talking about.
10     Q. Is rotavirus an example of what you just
11 said?
12     A. Oh, so by "better" -- what do you mean by
13 "better"?
14     Q. Well, in that case, it would be safer.
15     A. Yes, there was a safer -- a little bit safer,
16 not all that much safer, but -- a little bit safer
17 rotavirus vaccine was developed. You said many, anD I
18 can -- and I mean, I can -- you know there are -- I
19 would -- probably. I don't know what you mean by
20 "many." If one is many or two is many, then the
21 answer is yes. There aren't -- there aren't -- I
22 can't think of 20 or 10 or five. I can think of a
23 couple.
24     Q. How about Hib?
25     A. That is not a virus.

Page 143

1      Q. It is a disease that -- for which there is a
2  vaccine. Right?
3      A. Oh, yes, uh-huh.
4      Q. And there was a vaccine that was in use and
5  then a new vaccine came to market that was expected to
6  be better than the vaccine that was in use. Is that
7  right?
8      A. Yes.
9      Q. How about pneumococcus?
10     A. Yes.
11     Q. How about pertussis?
12     A. There was a new vaccine developed, yes.
13     Q. And it was expected to be safer than the
14 preexisting vaccine. Right?
15     A. Yes.
16     Q. How about rubella?
17     A. Yes. There is, yeah.
18     Q. How about shingles?
19     A. Yes.
20     Q. How about measles?
21     A. Yeah.
22     Q. Now, you hold the opinion that there should
23 be new vaccines for more diseases than just mumps.
24 Right?
25     A. It would be good, yes. True.

Page 144

1      Q. Which diseases are those?
2      A. There are lots of diseases it would be nice
3  to have vaccines against.
4      Q. Better vaccines?
5      A. Oh, are you talking about better vaccines for
6  those that are currently in use as opposed to -- I
7  thought you said new vaccines for diseases other than
8  mumps. That is a different question.
9      Q. My question was unclear. I apologize.
10        There are other diseases besides mumps for
11 which there is an existing vaccine but you believe
12 there should be a better vaccine. Correct?
13     A. I don't know to what you are referring to. I
14 can guess. I don't want to guess. Maybe you can
15 refer me. Since you seem to know what I am thinking,
16 maybe you could tell me what it is you are referring
17 to.
18     Q. I am just asking what your opinion is.
19     A. It sounds like you are -- I am asking you to
20 tell me what it is. You seem to say that I -- I mean
21 the only -- so why don't you tell me what it is -- I
22 am sure you are going to ask. Go ahead.
23     Q. We will probably get to that. We may or may
24 not get to that. Right now I am asking you --
25     A. Well, I can't answer because I don't quite

Page 145

1  understand the question of whether -- I mean, I think
2  I know what you are going to come to, but we will see.
3      Q. So what is the answer to my question, sir?
4      A. I already answered it. I can't answer it
5  because I don't quite understand what you're -- you
6  seem to be telling me that I am thinking something and
7  -- or I have stated something. And I just want to
8  know what it is to what you are referring to.
9      Q. I didn't ask you whether you stated
10 something. I just asked you about your opinions.
11     A. About what? About whether there are existing
12 vaccines for which there should be better vaccines
13 developed? Is that what you are saying other than
14 mumps?
15     Q. Yes.
16     A. Well, I have written something to that effect
17 about pneumococcus, although it wasn't -- I think you
18 may be a little bit misinterpreting, and I am talking
19 about more vaccine policy than I am about the vaccines
20 themselves are poor. So it is a little -- that is why
21 I was a little confused. I assume that is to what you
22 are referring, but if it is something else you are
23 going to have to tell me because I don't know what
24 else I am thinking.
25     Q. Any other vaccines for which you hold that

37 (Pages 142 - 145)

Appx1802

HIGHLY CONFIDENTIAL

Page 146

1  opinion?  I realize pneumococcus requires some
2  explanation, which we'll get to.  Any others vaccines
3  for which you hold that opinion?
4      A. There is nothing I can think of right now,
5  but you will have to ask me about the specific vaccine
6  and maybe I can answer.  I know what you are talking
7  about.  Now I know.  We will see.
8      (Shapiro Exhibit No. 17 marked for
9  identification.)
10     THE WITNESS:  Pertussis, yeah, I forgot you
11 were referring to this.
12 BY MR. SANGIAMO:
13     Q. Feel free to look at that if you like.  My
14 question is:  Is it true that you believe that we need
15 a new pertussis vaccine?
16     A. Yes, I do, or yeah, there are different
17 strategies.  Some people think we could go back to
18 using the old vaccine for a first dose and then -- and
19 then the acellular vaccines might work better.
20 Ideally, yes, we should have a new pertussis vaccine.
21     (Shapiro Exhibit No. 18 marked for
22 identification.)
23     THE WITNESS:  I was right about one of them.
24 BY MR. SANGIAMO:
25     Q. All right.  Dr. Shapiro, you have been handed

Page 147

1  Exhibit 18, which is a viewpoint that you published
2  last year in the Journal of the American Medical
3  Association.  Right?
4      A. No.
5      Q. What part of what I said was wrong?
6      A. It is JAMA Internal Medicine.
7      Q. Okay.  And if you look in the second column
8  of the first page of the document under "new conjugate
9  vaccine for adults."
10     Do you see that?
11     A. I do.
12     Q. There you wrote, "A new vaccine exclusively
13 for older adults and those who are immune compromised
14 is needed."
15     Do you see that?
16     A. Yes.
17     Q. Does that represent your view?
18     A. Yes.
19     Q. Can you think of any other diseases for which
20 there is currently a vaccine and you think there
21 should be a better vaccine besides what we already
22 talked about today including mumps?
23     A. Well, we talked about pertussis already.
24     Q. Anything else?
25     A. I don't know how long you want me to -- do

Page 148

1  you have a list of vaccines and I can tell you what
2  there is?  Yeah, it would be good to have a better
3  yellow fever vaccine.
4      Q. Anything else?
5      A. Maybe Japanese encephalitis vaccine.  Lyme
6  vaccine.  It would be good to have a Lyme vaccine.
7  There was an existing vaccine, I guess that would
8  count.  I'd have to think for a while.  There are lots
9  of diseases.  I would have to go through all the live
10 diseases, but a lot of vaccines.
11     Q. How about a chicken pox vaccine, do we need a
12 better chicken pox vaccine?
13     A. Well, do we need a better chicken box
14 vaccine?  Yes, it would be good to have a -- ideally,
15 what would be good, yes, the answer is yes.
16     Q. Okay.  Do you have an opinion as to whether
17 development of a new mumps vaccine would be -- strike
18 that.
19     Do you have an opinion regarding what the
20 priority should be in terms of research dollars for
21 development of a new mumps vaccine?
22     A. I guess I don't know what you mean.  What do
23 you mean, priority, one, two, three, four, five?  I
24 guess I don't understand.
25     Q. I was starting with the proposition, tell me

Page 149

1  if you agree, that there is a limited amount of
2  resources that are going to be developed to
3  development of vaccines as a practical matter.
4      Do you agree with that?
5      A. Well, I don't make the decisions.  If it were
6  up to me, I would probably spend the money on
7  developing new vaccines rather than sending troops to
8  the southern border to protect against migrants coming
9  from Guatemala.  So I -- it depends on what pot of
10 money you are talking about.  But I am not really
11 involved with those decisions so I can't give you very
12 informed answers beyond that, something like that.
13     Q. Okay.  Do you know what the numbers of cases
14 of mumps was in 2017 compared to the number of cases
15 of pertussis?
16     A. There are many more cases of pertussis.  I
17 would have to look up the specific numbers.
18     Q. How about chicken pox?
19     A. There are more cases of chicken pox.
20     Q. Have you looked at what the number of
21 reported cases of mumps is in 2017 -- I am sorry, 2018
22 so far?
23     A. Yes.  It is not -- reporting isn't complete,
24 but it is in the thousands.
25     Q. How does it compare to 2017 at the same time?

38 (Pages 146 - 149)

Appx1803

HIGHLY CONFIDENTIAL

Page 150

1  A. I would have to look. It is a little bit
2  fewer, but there is still lots of -- when you go back
3  before 2006, there were, you know, fewer than 300
4  cases there. Now we are in the thousands. So I would
5  have to look at the website to see the latest, but we
6  really won't know until sometime next year when they
7  compile all the data.
8  (Shapiro Exhibit No. 19 marked for
9  identification.)
10  BY MR. SANGIAMO:
11  Q. Dr. Shapiro, you have been handed what is
12  marked as Exhibit 19.
13  Do you recognize that data format?
14  A. Yes.
15  Q. What is that?
16  A. Weekly table of the -- it is kind of a
17  rolling report of the reported cases for the last 12
18  months, last 52 weeks. That is the cumulative part.
19  And then the -- I guess there must be the medium and
20  maximum reports in a given week.
21  Q. If you look under the "mumps" heading.
22  A. Yes.
23  Q. There is about four or five columns there.
24  The last two are cumulative 2018.
25  A. Right.

Page 151

1  Q. Cummulative 2017. Do you see that?
2  A. Uh-huh.
3  Q. The number for 2018 is just under 2,000. Is
4  that right?
5  A. Yes.
6  Q. And this is through October 27, 2018. Right?
7  A. Right.
8  Q. That appears to be on track at this point to
9  be lower than the number of reported cases for 2017.
10  Right?
11  A. Right, but substantially higher than, you
12  know, before 2006. I mean, part of the reason that
13  there is all this concern about mumps, even with these
14  number of cases, is that it is a marked change. That
15  there have been low numbers and now it has been going
16  up and so -- which is quite different than -- you
17  know, so things like varicella, which you are citing
18  and has been -- went down, and it has been going. It
19  is not that there is an increase in disease since
20  2006.
21  Q. Do you have a theory for why the number of
22  cases for in 2018 of mumps appears to be on track to
23  be lower than the numbers of cases of 2017?
24  A. Year-to-year variation probably. You know,
25  if you went back to 2016 it would be an even higher

Page 152

1  number of cases, but you go back to 2014 it is going
2  to be lower. There is year-to-year variation, but the
3  overall base line is considerably higher than it was
4  before 2006, that is for sure.
5  Q. How would you evaluate the possibility that
6  the reason for the lower number of cases in 2018 is
7  the use of a third dose in outbreak states?
8  A. I'd have to think about that. I think it
9  would be difficult to know. It is possible that it
10  is -- I think you would have to think about it.
11  Q. Okay.
12  (Shapiro Exhibit No. 20 marked for
13  identification.)
14  THE WITNESS: I mean, we have data from the
15  -- from other studies that have been done specifically
16  addressing that question. And we know the reason that
17  that recommendation was made was that the data were
18  that it reduced the number in outbreaks but that the
19  attack rate was still far higher. I mean, I go over
20  that in my report again. If you want me to turn to
21  that, I will. So it says here in the University of
22  Iowa --
23  Q. What page are you on, sir?
24  A. I am sorry. Page 12 and 13. Bottom of page
25  12. So it shows the attack rates for people who

Page 153

1  received a second dose in those years. Maybe I didn't
2  talk about the third dosing here. Apparently, I
3  didn't talk about the third dose. But I can tell you
4  that I believe the attack rate with the third dose was
5  6.7 per thousand. And people who got a third dose,
6  which was lower than the attack rate in the -- those
7  who got two doses but still a very high attack rate
8  compared to the rate in the general population, which
9  was less than one per 100,000. So it may reduce it,
10  but -- in an outbreak setting, but that is the data we
11  have. Oh, no, this is a different article.
12  Q. We can now look at Exhibit 20, please.
13  A. Yeah.
14  Q. Do you recognize that article?
15  A. Yes.
16  Q. That is the paper by Dayan and others
17  entitled "Recent Resurgence of Mumps in the United
18  States." Right?
19  A. Right.
20  Q. This paper describes 2006 outbreaks in the
21  Midwest. Is that right, sir?
22  A. Yes.
23  Q. Do you happen to know any of the authors on
24  this paper? And by "know," I mean know
25  professionally.

39 (Pages 150 - 153)

Appx1804

HIGHLY CONFIDENTIAL

Page 154

1    A. I know Jane Seward somewhat. Probably just
2  Jane Seward.
3    Q. You have read this paper, right, sir?
4    A. Yes.
5    Q. I am going to ask you whether you agree with
6  a few of the statements that are made in the paper.
7  The first one appears on page 1585, at the bottom of
8  that page. Specifically, the sentence that reads,
9  "However, even at the peek of the epidemic, case
10  counts were far below those of the prevaccine era
11  during which tens of thousands of cases were reported
12  monthly."
13    Do you see that?
14    A. Yes.
15    Q. Do you agree with that?
16    A. That is just stating a fact.
17    Q. If you turn to page 1587. If you look down
18  at the bottom of the first full paragraph in the
19  left-hand column. There is a sentence that reads --
20    A. Where?
21    Q. On page 1587, the left-hand column.
22    A. Uh-huh.
23    Q. The first full paragraph begins with
24  "Besides."
25    Do you see that?

Page 155

1    A. First full paragraph on the left-hand column.
2    Q. Yes, sir.
3    A. The first full paragraph that I see says --
4  1587, "We explored the possibility."
5    Q. The paragraph above that.
6    A. The first one from the top, I am going from
7  the bottom. Sorry about that. You said look at the
8  bottom.
9    Q. I see. All right. You see that the
10  paragraph that begins with "Besides"?
11    A. Uh-huh.
12    Q. The last sentence in that paragraph reads,
13  "Thus, mumps vaccine probably prevented U.S. patients
14  from numbering in the tens or hundreds of thousands."
15    Do you see that to be referring to the
16  outbreak in 2006?
17    A. Yes.
18    Q. Do you agree with that statement that the
19  mumps vaccine probably prevented U.S. patients from
20  numbering in the tens to hundreds of thousands in the
21  2006 outbreak?
22    A. I don't know. I haven't done my own
23  analysis. I don't know the answer to that.
24    Q. All right. If you look a little further up
25  in that same paragraph, there is a sentence that

Page 156

1  begins with "Although it is possible."
2    Do you see that?
3    A. Yes.
4    Q. Reads, "Although it is possible that
5  antigenic differences may lead to some decrease in
6  effectiveness, mumps vaccine was highly effective
7  during the U.K. outbreak, during a small outbreak in
8  2005 that was probably caused by genotype G virus and
9  against the circulating strain in the 2006 U.S.
10  outbreak."
11    Do you see that?
12    A. I see it.
13    Q. Do you agree with that statement?
14    A. I haven't investigated that so I would have
15  to go through the data before I could come to any
16  conclusion.
17    Q. What is it that you have not investigated?
18    A. Well, let's see, the U.K. outbreak, I didn't
19  investigate that. I mean, I have to look at the data
20  during a small New York outbreak, I'd have to look at
21  the data.
22    Q. How about the last part of that, "Against the
23  circulating strain in the 2006 U.S. outbreak"?
24    MR. SCHNELL: Object to the form. What is
25  your question?

Page 157

1  BY MR. SANGIAMO:
2    Q. Do you agree that mumps vaccine was highly
3  effective against the circulating strain in 2006 U.S.
4  outbreak?
5    A. Well, it must not have been very effective
6  because there was a big outbreak despite the -- yeah,
7  let's see. I guess, I am not sure how he concluded
8  that it was highly effective. Just looking at
9  temporal patterns, I think. Right? I don't know how
10  effective it is. I don't see how he calculated
11  effectiveness. I don't know how he can. Maybe you
12  can point me to where it is. By quickly looking at
13  it, I don't see vaccination coverage.
14    63 percent of the people who got disease
15  received two or more doses. That doesn't sound so
16  good. From what I can tell, there is no calculation
17  of effectiveness. So what is the -- let's look at
18  that sentence again. It was highly effective.
19    Can you the point to me where in this article
20  it says anything about it shows the results of
21  effectiveness? I don't see it. Maybe I am missing
22  it. Perhaps you can point to where it is other than
23  the statement that he assumes that.
24    Q. I am happy to represent to you that in my
25  reading of it I did not see the calculation of an

40 (Pages 154 - 157)

Appx1805

1 effectiveness rate. No need to accept that
2 representation.
3     A. Then I guess I don't -- then I guess I would
4 have to disagree with it because there is no data
5 about it.
6     Q. Do you think the effectiveness of a vaccine
7 can be evaluated other than by calculation of an
8 effectiveness rate?
9     A. No. I mean, I think you need a concurrent
10 comparison group to calculate effectiveness. So case
11 control -- I think I already went through this. You
12 may not be familiar with case control studies. There
13 is no rate there. You can calculate effectiveness in
14 a case control study without a rate. So the answer to
15 your question is, no, I don't think you need to have a
16 rate necessarily.
17     Q. My question was: Do you think the
18 effectiveness of a vaccine can be evaluated other than
19 by calculation of an effectiveness rate? The answer
20 to that question is yes? It can be calculated by
21 means other than an effectiveness rate. Is that
22 right?
23     A. Specific -- well, I think it can be
24 calculated as long as you have a concurrent comparison
25 group, the answer is yes. So you can do it with a

1 case control study, yes. So the answer is yes.
2     Q. But unless you have a concurrent comparison
3 group, in your view you cannot form an opinion about
4 whether a vaccine is effective?
5     A. Well, you can't calculate --
6     Q. I am asking you if that is your view.
7     A. You can't calculate effectiveness without a
8 concurrent comparison group, correct.
9     Q. And --
10     A. Yes, that is my view.
11     Q. There is no way to evaluate effectiveness
12 without calculating effectiveness. Is that your view?
13     A. Yes.
14     (Shapiro Exhibit No. 21 marked for
15 identification.)
16 BY MR. SANGIAMO:
17     Q. Dr. Shapiro, you have just been handed
18 Exhibit 21. You see that is a printout from the CDC
19 website.
20     Do you see that?
21     A. Yes.
22     Q. I was going to ask you about something that
23 is on page 5 of that document. In particular, you see
24 there are three bullet points at the bottom of that
25 page?

1     A. Yes.
2     Q. The second bullet point reads, "Two doses of
3 MMR vaccine are 88 percent (range 31 percent to 95
4 percent) effective at preventing mumps. Mumps
5 outbreaks can still occur in highly vaccinated U.S.
6 communities, particularly in close contact settings,
7 such as schools, colleges and camps."
8     It's the next sentence I was going to ask you
9 about. The next sentence reads, "However, high
10 vaccination coverage helps limit the size, duration
11 and spread."
12     Do you agree with that sentence that high
13 vaccination coverage helps limit the size, duration and spread
14 of mumps outbreaks?
15     A. I don't know. I would need to see the data,
16 so I would have to know specifically to what it's
17 referring to. If you can point me to an article that
18 shows that I can tell you whether that is true or not.
19 You know, it sounds like an inference rather than
20 data.
21     Q. Do you have opinions as to what the cause may
22 be of the outbreaks in recent years in the United
23 States, mumps outbreaks?
24     A. I think they are caused by mumps virus.
25     Q. Do you know why it is that vaccination is not

1 preventing those outbreaks from occurring?
2     A. We don't -- I don't know, no. I think we
3 mentioned that there are a number of reasons that
4 include -- let me see. I think I actually said it.
5 Again, it need to be potent and effective. I mean,
6 the things that -- people have speculated everything
7 from issues about potency, issues about waning
8 immunity, issues about mismatches between the vaccine
9 strain and the -- the strain in the vaccine and the
10 circulating strain that is causing it, poor -- low
11 numbers of B -- of Memory cells so that it doesn't
12 maintain a high level of antibody or you don't respond
13 rapidly. So it could be any -- any one or combination
14 of those are the ones that people are speculating but
15 nobody knows for certain.
16     Q. And you also do not know for certain. Is
17 that right?
18     A. That is right.
19     Q. Do you have any preferred theory out of all
20 those possibilities?
21     A. No.
22     Q. You said that some people have speculated it
23 could be issues related to potency. Is that right?
24     A. Yes. I mean, sure. Yeah. I am sorry.
25     Q. Do you know who has offered that speculation?

HIGHLY CONFIDENTIAL

Page 162

1    A. I mean, I can't remember, but it is
2  pretty obvious that if you are -- I mean, like the vaccines
3  potency is part of what makes a vaccine work. So its
4  ability to induce antibodies, to -- to induce Memory B
5  cells, all that is related to potency.
6    Q. Do you recall seeing it written anywhere that
7  someone was proffering that as a theory that would
8  explain mumps outbreaks?
9    A. I don't recall anything specifically, but it
10  seems like I saw it somewhere, but I may be wrong.
11    (Shapiro Exhibit No. 22 marked for
12  identification.)
13  BY MR. SANGIAMO:
14    Q. Dr. Shapiro, you have been handed what is
15  Exhibit 22, which is a printout from the CDC website.
16  Right?
17    A. Yes.
18    Q. Then I was wondering if you could take a look
19  at page 6. I was going to ask you about something
20  that appears under heading "Mumps in vaccinated
21  people." And there, the printout from the CDC website
22  says "During mumps outbreaks in highly vaccinated
23  communities, the proportion of cases that occur among
24  people who have been vaccinated may be high. This
25  should not be interpreted as meaning that the vaccine

Page 163

1  is not effective." That is the end of that quote.
2    Do you agree with the CDC that the fact that
3  the proportion of cases that occur among people that
4  have been vaccinated as high should not be interpreted
5  as meaning that the vaccine is not effective?
6    A. I guess it depends on what they mean -- I am
7  not 100 percent certain what they mean by "not
8  effective." If what they mean it may have some
9  efficacy, then -- some effectiveness, then I would
10  agree with it. If it means that it is effective, that
11  it's highly effective or whatever words you used, then
12  I would disagree with it. So it's not -- I would
13  agree that it doesn't mean it has no efficacy. I
14  would not agree it has good efficacy.
15    Q. At page 20 of your report, you say, "The
16  factors that are associated with these outbreaks in
17  reference to the mumps outbreaks, waning immunity,
18  antigenic changes in the virus, and inadequate B cell
19  Memory induced by the vaccine are not likely to change
20  for the better."
21    Do you see that?
22    A. I do.
23    Q. What is the basis for your opinion that
24  waning immunity is not likely to change for the
25  better?

Page 164

1    A. Well, presumably, there is immunity, immunity
2  is waning and, I mean, unless people's immune -- the
3  new children that get vaccinated have different --
4  markedly different immune systems than the ones that,
5  you know, that are now in their young adulthood years,
6  I don't see any reason why if we immunize somebody
7  tomorrow with the vaccine and then -- that their
8  waning immunity would be -- the likelihood that they
9  are going to have waning immunity would be any
10  different than the immunity of somebody that got
11  vaccinated 20 years ago because their immune systems
12  are probably about the same.
13    Q. Do you have an opinion as to whether it is
14  plausible that one of the ways in which vaccinated
15  people develop protection against disease is if they
16  are exposed to the virus and that boosts their immune
17  system?
18    A. Do I have an opinion?
19    Q. As to whether that is plausible.
20    A. As to whether that happens or whether --
21    Q. Yes. Okay. Sure. Whether that happens.
22    A. I think that is plausible.
23    Q. How would you evaluate the plausibility of
24  the possibility that if there is greater mumps disease
25  now then that will -- than there was, say, 15 years

Page 165

1  ago, that will lead to exposure to others in the
2  population which will boost their immune system and
3  possibly dissipate waning immunity?
4    A. Well, there would have to be a lot of mumps,
5  and there would have to be a lot more mumps than there
6  is now, which I think is not a -- you know, the -- the
7  idea that you want to have disease -- a lot of disease
8  going around so we can boost immunity is not a good
9  idea. That would be a bad public health strategy
10  because that would mean all those people that are
11  boosting immunity are at risk of getting mumps and its
12  complications, and it is not -- you know, look at
13  another virus in the same vaccine, measles, the
14  situation is very different with measles.
15    We don't have outbreaks like this. We don't
16  need -- we are not -- we don't want people to get
17  measles. And generally, it isn't happening except in
18  isolated -- in isolated unimmunized population, small
19  communities.
20    Q. Did you interpret my question as implying
21  that I was proffering a proposed public health policy?
22  It sounds like you did.
23    A. I don't know.
24    Q. My question is more factual.
25    A. Oh.

42 (Pages 162 - 165)

Appx1807

HIGHLY CONFIDENTIAL

Page 166

1    Q. I am trying to get at this issue about
2  whether what we are seeing by way of waning immunity
3  today with the mumps vaccination is going to be
4  applicable in the future as well. And I am proffering
5  the possibility that as a result of there being more
6  mumps disease today than there was, say, 15 years ago
7  or 20 years ago, that there will be boosts to the
8  immunity of others in the population such that their
9  immunity to mumps will not wane as much? My question
10  is: Does that sound plausible to you?
11    A. Does it sound plausible in the larger
12  population or in specific individuals who might come
13  in contact with -- I guess I am trying to understand
14  the scope of what you are saying. I already told you
15  that I believe that that is -- one's immunity can be
16  boosted by exposure to somebody with disease. So you
17  must not be asking me about that because I already
18  answered that question. So what is it you're asking
19  me?
20    Q. Would you expect that there would be greater
21  boosting of that type for someone who is vaccinated
22  today than someone who is vaccinated 20 years ago with
23  mumps vaccine?
24    MR. SCHNELL: Object to form.
25    THE WITNESS: I don't understand your

Page 167

1  question. I mean, anybody who -- whether they got
2  vaccinated today or whether they got vaccinated 20
3  years ago, if they came in contact with somebody with
4  disease would either get disease or get boosted, one
5  or the other, potentially.
6  BY MR. SANGIAMO:
7    Q. Was it your view that mumps was more under
8  control 20 years ago than it is today?
9    A. Yes.
10    Q. Wouldn't you expect that today someone is
11  exposed to mumps virus much more than 20 years ago?
12    A. Well, we see the number of cases so -- I am
13  sorry, I guess it sounds like you are trying to get at
14  whether what is going on could lead to boost -- that
15  the scale of what you are talking about is -- would
16  lead to widespread boosting of immunity based on
17  exposure to mumps on a population level. Is that what
18  you are asking me?
19    Q. Sure, yes.
20    A. Okay. The answer is no, there aren't enough
21  cases of mumps.
22    Q. Aren't enough cases of mumps now?
23    A. I mean, you know, there are how many, you
24  know, 300 million or something people in the United
25  States and probably only a small proportion of them at

Page 168

1  the moment are coming in contact with patients with
2  mumps.
3    Q. Right. Okay.
4    MR. SANGIAMO: Gordon, this would be a good
5  time to take a break.
6    MR. SCHNELL: Sure.
7    THE VIDEOGRAPHER: Off the record. The time
8  is 2:37.
9    (Recess taken from 2:37 p.m. to 3:00 p.m.)
10    THE VIDEOGRAPHER: This is the beginning of
11  media Number 5. The time is 3 o'clock.
12  BY MR. SANGIAMO:
13    Q. Dr. Shapiro, you mention in your report a few
14  facts relating to Healthy People 2010, Healthy People
15  2020. Right?
16    A. Yes.
17    Q. What role does that play in your opinions in
18  this case?
19    A. None. I mean, I am just using it as an
20  example of the fact that there is concern about the
21  outbreaks and the new -- the change in the
22  epidemiology of mumps with a lot more cases since
23  around 2006. So that is -- it's just an example of
24  another government agency that is responding to the
25  awareness of that. But it is not -- my opinion would

Page 169

1  be the same with or without Healthy People.
2    Q. In what way is anything related to healthy
3  people an example of government concern?
4    A. Well, I think for every other disease the
5  goal that they set for the future -- like in 2000 they
6  set the goal that by 2010 there would be zero cases of
7  mumps. That didn't occur. In -- in 2008, when they
8  set the Healthy People 2020 goals they actually set it
9  at 500 cases, indicating that -- and that was the only
10  disease for which the goal for the future was actually
11  a higher number of cases than the number of cases
12  reported in the year that they set the goal.
13    So they didn't think -- they recognized that
14  mumps was at least going to go up. It went up from
15  zero to 500. So they realized that mumps is a problem
16  is the only point of it, I think, that I was trying to
17  make there.
18    Q. Who is the "they"?
19    A. I don't know. Whoever -- let's see, it is --
20  I think it comes -- I would have to look it up. I am
21  not certain. It is a government -- government comes
22  up with goals for different diseases. It is under the
23  -- I believe it is under -- I would have to look and
24  see what it is under. I don't know who specifically
25  does it, but it is a government sponsored program.

43 (Pages 166 - 169)

Appx1808

HIGHLY CONFIDENTIAL

Page 170

1      Q. Did you once know and you have simply
2 forgotten?
3      A. Probably. I looked it up. So I went to the
4 website, I believe, where I looked it up. I am pretty
5 sure it was under the Department of Health and Human
6 Services. I don't know that it actually named the
7 people who did it, but it probably did. But I
8 probably didn't pay much attention to and I certainly
9 don't remember it now.
10      Q. The goal for Healthy People 2010 for mumps is
11 not met. Right?
12      A. Right.
13      Q. Is that significant to you?
14      MR. SCHNELL: Object to form.
15      THE WITNESS: What do you mean by
16 "significant"?
17 BY MR. SANGIAMO:
18      Q. Does it -- do you view that as an important
19 part of what you would testify about in this
20 litigation?
21      A. I think I already told you that what -- if I
22 didn't say anything about Healthy People 2010 or 2020
23 it would not in any way change my opinions.
24      Q. Do you attach any significance to the fact
25 that the goal for mumps for 2010 was not met?

Page 171

1      A. What I attach significance to is the fact
2 that there has been an increase in the number of cases
3 and the number of outbreaks of mumps since around
4 2006. As a consequence of that, it wasn't met. But
5 what is important is the outbreaks and the increased
6 number of cases.
7      Q. Were there other diseases for which the 2010
8 goals were not met?
9      A. I don't know. I would have to look and see.
10      Q. Did you ever look?
11      A. No, I didn't go look because I was only
12 looking at mumps.
13      (Shapiro Exhibit No. 23 marked for
14 identification.)
15 BY MR. SANGIAMO:
16      Q. Dr. Shapiro, had you heard of Healthy People
17 2010 before you were engaged in this litigation?
18      A. Yes.
19      Q. Have you ever evaluated the performance of a
20 vaccine based on goals for Healthy People 2010?
21      A. No.
22      Q. Have any of your --
23      A. Nor did -- nor did I do it in this case.
24      Q. Have any of your professional peers ever done
25 that, to your knowledge?

Page 172

1      A. I don't know.
2      Q. Do you recall ever hearing one of your
3 professional peers doing that?
4      A. I don't know.
5      Q. Do you recall?
6      A. I don't recall.
7      Q. What was the setting which you had heard of
8 the Healthy People 2010 before this lawsuit. Do you
9 recall?
10      A. They have it had for a long time, Healthy
11 People. You know, I don't recall. I mean, I have
12 seen things about goals for example for obesity, I
13 think. There are a variety of different conditions
14 that they talk about healthy people, not just
15 infections. So I occasionally see it in various --
16 people talk about it in an abstract way, but I don't
17 recall any specifics.
18      Q. Hand you what has been marked as Exhibit 23.
19 Do you recognize that document?
20      A. It looks to be Healthy People 2010 Final
21 Review, the U.S. Department of Health and Human
22 Services.
23      Q. Have you seen that before?
24      A. I have never seen a printout before. As I
25 told you, I have been to the website before.

Page 173

1      Q. You saw this document on the website?
2      A. I don't know. It didn't look like this
3 document. I saw -- I probably saw some of these,
4 yeah. I saw some of the contents on the website.
5      Q. Could you turn to page 14 -- 15, please.
6 What does that page show about whether the mumps
7 target for 2010 was hit?
8      A. Well, it showed that the target was zero, and
9 the final year there were 421 cases.
10      Q. Were there other diseases for which the
11 target was not hit, vaccine preventable diseases for
12 which the target was not hit?
13      A. Yes.
14      Q. What are some of those?
15      A. Measles is one. Hepatitis B is one.
16 Haemophilus influenza Type B. Diphtheria.
17      Q. How about pertussis?
18      A. Pertussis, yes.
19      Q. How about tetanus?
20      A. That was not met.
21      Q. How about chicken pox?
22      A. Not met.
23      Q. Nothing particularly unusual about Healthy
24 People 2010 target not being met. Do you agree with
25 that statement, sir?

44 (Pages 170 - 173)

Appx1809

HIGHLY CONFIDENTIAL

1     A. Yes.

2     Q. Now, as regards the 2020 Healthy People

3 target, you attribute significance to the fact that

4 the number of cases of mumps in the base line year was

5 lower than the target for 2020. Is that the idea?

6     A. That was one of the points I made, yes. I

7 mean, I think as I told you, this -- my opinions did

8 not rest on this, by any means, but that is what I

9 said, yes.

10     Q. But you put them in your report. Right?

11     A. Yes.

12      (Shapiro Exhibit No. 24 marked for

13 identification.)

14 BY MR. SANGIAMO:

15     Q. Are you in any way retracting your opinions

16 about Healthy People 2010?

17     A. No.

18     Q. Dr. Shapiro, I am showing you what has been

19 marked as Exhibit 24. Does that look familiar to you?

20     A. It looks like it is from the healthy data --

21 Healthy People 2020.

22     Q. All right. If you turn to page 5 of this

23 printout. So if you look at the upper right-hand

24 corner, you will see page numbers.

25     A. Yes.

1     Q. That is the page where the discussion of

2 mumps begins. Right?

3     A. Sort of the title is there. Discussions on

4 the next page.

5     Q. What does that title say?

6     A. "Reduced cases of mumps, U.S. acquired

7 cases."

8     Q. Doesn't that mean that the authors of Healthy

9 People 2020 have the objective of reducing the number

10 of cases of mumps?

11      MR. SCHNELL: Object to form.

12      THE WITNESS: Well, the target is 500. The

13 baseline is 421. So I would say no. I mean, I would

14 say that that -- the target is higher than the base

15 line, so it seems to me that they are not trying --

16 that their target was higher than the base line, not a

17 reduction.

18      So I would say that -- I mean, you would have to

19 ask them what they meant or why it says that, but it

20 is pretty clear that the target is 500, the base line

21 is 421. That is higher not lower.

22 BY MR. SANGIAMO:

23     Q. If you look at the next page, page 6.

24     A. Uh-huh.

25     Q. There is a discussion of the target

1 calculation method. Do you see that? I am going to

2 read that into the record, sir. It reads, "The

3 Healthy People 2020 target for IID-1.5 of 500 mumps

4 cases was set aiming for a realistic target and

5 keeping in mind that the number of mumps cases vary

6 from year to year. The base line year 2008 happened

7 to be a year without an outbreak."

8      Do you see that?

9     A. Oh, I see it, yes. Yes, I do.

10     Q. What do you think they said the base line

11 rate of 2000 a year happened to be a year without an

12 outbreak?

13      MR. SCHNELL: Object to form.

14      THE WITNESS: What I think they meant was

15 that there wasn't an outbreak in 2008 or at least a

16 major outbreak. I don't know what it means beyond

17 that. I can only tell you what it says.

18 BY MR. SANGIAMO:

19     Q. Don't you think a fair reading of the fact

20 the goal is stated as reducing cases of mumps and the

21 language that I just quoted, that the base line year

22 of 2008 happened to be a year without an outbreak

23 reflects the fact that they were trying to pick a

24 target that would amount to a reduction when compared

25 against the outbreak years around 2008?

1      MR. SCHNELL: Object to form.

2 Mischaracterizes the document.

3      THE WITNESS: I don't know what they were

4 thinking. I can't tell you. You would have to ask

5 them. What I can tell you is that their target went

6 from zero in 2010 to 500 in 2020. So that is not a

7 reduction either. That is an increase. To me, that

8 is a recognition that they are not controlling mumps.

9 BY MR. SANGIAMO:

10     Q. As far as what they are thinking is

11 concerned, that you can't speak to. Right?

12     A. Right.

13     Q. Then right above the target calculation

14 method section, there is a section called "methodology

15 notes."

16      Do you see that?

17     A. I do.

18     Q. There the authors of the 2020 Healthy People

19 goals say, "Although the measles, mumps, rubella, MMR

20 vaccine is very effective protection against mumps is

21 not complete."

22      Do you see that?

23     A. Uh-huh.

24     Q. When they say that the vaccine is very

25 effective, does that suggest to you that they have

45 (Pages 174 - 177)

Appx1810

HIGHLY CONFIDENTIAL

Page 178

1 serious concerns about the vaccine?
2     MR. SCHNELL: Object to form.
3     THE WITNESS: I have no idea what they are
4 thinking. Again, you would have to ask them.
5 BY MR. SANGIAMO:
6     Q. Down at the bottom of that methodology
7 section it says, "High vaccination coverage helps
8 limit the size, duration and spread of mumps
9 outbreaks."
10     Do you see that?
11     A. I do.
12     Q. I think your testimony was you don't agree
13 with that or disagree with that, you just don't know.
14 Is that right?
15     A. Right.
16     Q. Did you notice, by the way, that the Healthy
17 People 2020 target for rubella was exactly the same as
18 the base line year?
19     A. No, I didn't.
20     Q. Do you attribute any significance to that?
21     A. No.
22     Q. Did you notice that the Healthy People 2020
23 target pertussis for children one year or younger was
24 2,500, which is only 277 cases less than the number of
25 cases in the base line unit?

Page 179

1     MR. SCHNELL: Before you answer. If you are
2 going to be referring to things in the document, can
3 you please tell him what page it is on see so he can
4 look at it.
5 BY MR. SANGIAMO:
6     Q. My question so far is: Did you notice that?
7     MR. SCHNELL: Well, you haven't given him a
8 chance to read the document. How could he notice
9 that?
10     MR. SANGIAMO: I didn't imply whether he
11 noticed it when he was sitting there. I was asking
12 whether he noticed it when he was previously looking
13 at it.
14     THE WITNESS: Actually, I did notice it
15 because I was reading it when we first turned to page
16 6. So the answer is yes, I did notice it.
17 BY MR. SANGIAMO:
18     Q. Would that be on -- so it is on page 6 and 7.
19 Is that right, sir?
20     A. It is on page 7, yes, the numbers.
21     Q. Is there significance to the fact that the --
22 in your view, that the target year is -- I am sorry --
23 that the target is only slightly lower than the base
24 line year? Is that significant to you?
25     A. No.

Page 180

1     Q. To you, it matters just whether it goes up or
2 not?
3     MR. SCHNELL: Object to form.
4     THE WITNESS: I think I expressed myself.
5 You can read the report.
6 BY MR. SANGIAMO:
7     Q. You also included in your report some
8 information about DOD funding opportunities. Right?
9     A. Yes.
10     Q. What was the significance of that to your
11 report?
12     A. Well, the -- it just is that the Department
13 of Defense was concerned about outbreaks of mumps and
14 that they wanted to -- let me find the page.
15     Q. Okay.
16     A. It is on the same page. It is just that they
17 named investigation of revaccination strategies and
18 identification of correlative protection against
19 currently available vaccines especially mumps as one
20 of its priorities.
21     Q. Why was that significant to you?
22     A. Because they were concerned about mumps. I
23 think the Department of Defense doesn't want their to
24 be outbreaks of mumps among the troops.
25     Q. And your point is that you can look to the

Page 181

1 Department of Defense funding opportunities as a means
2 of trying to determine what diseases are of concern to
3 the Department of Defense Is that right?
4     A That is one possible way, yes They
5 didn't -- yeah
6     (Shapiro Exhibit No 25 marked for
7 identification )
8 BY MR SANGIAMO:
9     Q Dr Shapiro, you have just been handed what
10 has been marked as Exhibit 25 Do you recognize that
11 document?
12     A It is an overview of the funding opportunity
13 in the Department of Defense, yes
14     Q Is this what the statement in your report is
15 based on?
16     A Yes
17     Q If we turn to page 50 of this document, you
18 see the areas of encouragement?
19     Do you see that?
20     MR SCHNELL: I am sorry There is
21 highlighting on the document I don't know if it is
22 work product or not
23     MS MAHENDRANATHAN: Or maybe I got the wrong
24 copy
25     THE WITNESS: I don't have highlighting, if

46 (Pages 178 - 181)

Appx1811

HIGHLY CONFIDENTIAL

Page 182

1  that helps.
2       MR. SCHNELL: I have highlighting on mine
3  too.
4       MR. SANGIAMO: I am about to ask him that
5  anyway.
6       MR. SCHNELL: Got you.
7       THE WITNESS: Yes, mine is highlighted, too.
8  BY MR. SANGIAMO:
9       Q. Thank you again for noting that. On page 50,
10  the areas of encouragement are listed. Is that
11  correct, sir?
12      A. Yes.
13      Q. Did you happen to count up how many areas of
14  encouragement there are?
15      A. No.
16      Q. What does areas of encouragement mean? What
17  is that?
18      A. Well, let's see. I think what they are just
19  saying is that these are topic areas that are of
20  interest to the program.
21      Q. Had you ever looked at DOD funding
22  opportunities prior to your engagement in this
23  lawsuit?
24      A. I have, yes.
25      Q. Have you looked at the equivalent of one of

Page 183

1  these documents for another year?
2       A. I don't know if I looked at this particular
3  -- this is like emerging infections or something like
4  that. I can't remember. Clinical trial award, peer
5  review. Yeah, something similar.
6       Q. But did you happen to count up the number of
7  areas of encouragement that were in 2017, the year
8  that you cited in your report?
9       A. No, I didn't.
10      Q. If I were to tell you there are 296 areas of
11  encouragement listed here in this document, any reason
12  to disagree with that?
13      MR. SCHNELL: Object to form.
14      THE WITNESS: No.
15  BY MR. SANGIAMO:
16      Q. Okay. So mumps was included in one of 296
17  areas of encouragement this year for DOD funding. Is
18  that right?
19      A. Right. Well, under emerging infections,
20  though, yeah, they specifically mention especially
21  mumps. There are a lot of other vaccines they could
22  -- but it is one of -- it is not the only one, for
23  sure. But that's -- it is -- they mention especially
24  mumps.
25      Q. So there are 296 areas of encouragement,

Page 184

1  mumps is mentioned in one of those 296?
2       A. Right.
3       Q. And in that one where mumps is mentioned, it
4  is mentioned or that one could apply to other vaccines
5  in addition to mumps vaccine. Right?
6       MR. SCHNELL: Objection. He is talking about
7  emerging infectious diseases. There were a lot fewer.
8       THE WITNESS: Yeah, it is true. That's true.
9  There are -- one, two, three, four, five, six, seven,
10  eight, nine, 10 -- there are 13 under emerging
11  infections and -- of the bullet points, and in terms
12  of where they mention revaccination strategies and
13  correlative protection in currently available vaccines
14  of which there are many, as we already discussed, the
15  only one they talk about specifically is mumps under
16  that -- that is just one.
17      The category they say especially mumps is just
18  one category where they could have mentioned, you know
19  -- there are many, many other vaccines they could have
20  mentioned.
21  BY MR. SANGIAMO:
22      Q. And as written, it applies to other vaccines
23  as well, that one category, it just doesn't call out
24  the other vaccines?
25      A. Right. It specifically cites one, which I

Page 185

1  would interpret as meaning they're especially
2  interested -- they say especially mumps.
3       Q. That one is one of 13 areas of encouragement
4  for emerging infectious diseases and one of the 296
5  total areas of encouragement?
6       MR. SCHNELL: Objection to form.
7       THE WITNESS: No. The emerging infectious
8  diseases is one of -- in that 296, I would have to go
9  and count. Emerging infectious diseases is a heading
10  under which there were 13. I think your 296 or
11  whatever you are saying are all of those individual
12  ones.
13  BY MR. SANGIAMO:
14      Q. For all the areas, not limited to emerging
15  infectious diseases?
16      A. Right.
17      Q. Now, what is it that led you to believe that
18  this topic was related to the mumps outbreaks?
19      MR. SCHNELL: Object to form.
20  BY MR. SANGIAMO:
21      Q. Is it your opinion that this topic was
22  related to mumps outbreaks?
23      A. Well, what they say is they are particularly
24  interested in investigation of revaccination
25  strategies and identification of correlative

47 (Pages 182 - 185)

Appx1812

HIGHLY CONFIDENTIAL

Page 186

1 protection for currently available vaccines,
2 especially mumps. That is what it says. So
3 apparently, they are interested in mumps in
4 particular. It doesn't explicitly say anything more
5 than that.
6 Q. Okay. But you made the inference that is
7 somehow attributable to the outbreaks. Is that right?
8 A. Well, we are talking about the military. So
9 what they -- you know, you would think that they would
10 be interested in preventing outbreaks because they
11 don't want their fighting forces to be disabled by
12 outbreaks of diseases and so they are talking about
13 revaccination strategies. That is the way I
14 interpreted it, yes.
15 Q. What does revaccination strategies have to do
16 with identification of correlative protection?
17 A. Maybe nothing. It looks like there are two
18 different things they are asking about.
19 Q. Now, there is also the topic area called
20 "Vaccine development for infectious disease." Right?
21 A. What page?
22 Q. 67.
23 A. Yes.
24 Q. What do you interpret that to mean?
25 A. Well, it looks like it has to do with

Page 187

1 developing vaccines or technologies to deliver
2 vaccines against infectious diseases.
3 Q. Is mumps listed there as a vaccine for which
4 they are offering funding opportunities?
5 A. They are not listing it here. They listed it
6 in the other section that we discussed.
7 Q. About revaccination strategies in correlative
8 protection. Right?
9 A. Well, yeah, it was under emerging infectious
10 diseases.
11 Q. Here under vaccine development for infectious
12 diseases, they list a lot of diseases but they don't
13 list mumps. Right?
14     MR. SCHNELL: Object to form.
15     THE WITNESS: They list a bunch of diseases.
16 A lot of these are diseases that are acquired in --
17 overseas, in, you know, other countries.
18 BY MR. SANGIAMO:
19 Q. So if you were going to be drawing inferences
20 about Department of Defense disease related concerns,
21 which is what I understand you to be doing in reliance
22 on the document, would you agree that the appropriate
23 inference is that the Department of Defense does not
24 have an interest in developing a new vaccine for
25 mumps?

Page 188

1 A. No.
2 Q. Would you agree there is nothing in this
3 document that would suggest the Department of Defense
4 has an interest in developing a new vaccine for mumps?
5 A. No.
6 Q. What in this document suggests to you the
7 Department of Defense has -- had in 2017 an interest
8 in developing a new vaccine for mumps?
9 A. I don't know. You would have to ask the
10 Department of Defense, but they are asking about
11 correlative protection. So you had previously said
12 that -- and in some of these exhibits that you had me
13 read from, it talks about needing to know correlative
14 protection to be able to develop a new vaccine.
15 So at least some of these -- like Steve Rubin
16 seemed to imply that was something related to
17 development of new vaccines, other experts here --
18     THE COURT REPORTER: Other what?
19     THE WITNESS: Other experts, other people
20 have talked about knowing correlative protection as
21 something that would be useful for developing a new
22 vaccine.
23 BY MR. SANGIAMO:
24 Q. Do you feel that you are knowledgeable enough
25 about the DOD funding opportunities to speak to the

Page 189

1 issue of whether if the DOD truly wanted a new mumps
2 vaccine it would have listed it under vaccine
3 development for infectious diseases?
4 A. No.
5 (Shapiro Exhibit No. 26 marked for
6 identification.)
7 BY MR. SANGIAMO:
8 Q. Dr. Shapiro, do you know whether the
9 Department of Defense, in fact, funded any mumps
10 related research pursuant to that list of funding
11 opportunities in 2017?
12 A. I do not.
13 Q. Do you know whether anyone applied for that?
14 A. I do not.
15 Q. Do you know whether the Department of Defense
16 included mumps in its funding opportunities for 2018?
17 A. I do not.
18 Q. Did you consider looking into that?
19 A. No.
20 Q. Handing you what has been marked as Exhibit
21 26. If you look at the front page of that document,
22 you see that it is the overview of funding
23 opportunities for invitation to submit applications in
24 July of 2018.
25 Do you see that?

48 (Pages 186 - 189)

Appx1813

HIGHLY CONFIDENTIAL

Page 190

1    A. Yes.
2    Q. If you'd turn to page 56, you see there is a
3  section on emerging infectious diseases.
4    Do you see that?
5    A. I do.
6    Q. That is the corresponding section that you
7  were looking at before in 2017. Right?
8    A. Right.
9    Q. Do you see anything about mumps listed under
10  emerging infectious diseases here in the 2018 DOD
11  funding opportunities document?
12    A. No.
13    Q. What inference do you draw from the fact
14  there is no longer any mention to mumps in the
15  emerging infectious disease in the funding
16  opportunities in the document?
17    A. Well, I would not draw any inference. I
18  don't know what it means.
19    Q. Wouldn't a fair inference be whatever the
20  interest was that the Department of Defense had in
21  mumps in 2017 is no longer present in 2018?
22    MR. SCHNELL: Object to the form.
23    THE WITNESS: No.
24  BY MR. SANGIAMO:
25    Q. Is your view that we can -- is it your view

Page 191

1  that we can look to the DOD funding opportunities
2  document as a means to determining what is of interest
3  to the DOD by way of funding research related to
4  diseases?
5    THE COURT REPORTER: Funding research what?
6  BY MR. SANGIAMO:
7    Q. Related to diseases.
8    A. Well, sometimes they express things -- what I
9  think they say, it is not limited to these. These are
10  often examples that they are giving and specific
11  things that they might be interested in. But let's
12  see, what does it say? There is encouragement -- "The
13  information provided is not exhaustive and applicants
14  are not restricted to submitting applications that
15  address an area of encouragement on this list."
16    Q. So that says if somebody wants to submit an
17  application about something else, they can. Right?
18    A. And that they are interested in other things,
19  not only what -- I mean, for all I know is they -- you
20  know, I would have to look at the last five years and
21  see if -- how much -- I don't know what to infer from
22  it.
23    Q. What would looking at the last five years
24  tell you?
25    A. Your implication is that because it isn't

Page 192

1  there, they aren't still interested in it. And I
2  don't know that that is necessarily true by any means.
3  I am not sure. I would have to talk to somebody at
4  the DOD, I guess, to find out what they are interested
5  in, which I think you can do.
6    Q. Could you turn to Exhibit 1, please. In
7  particular, page 18 of your report.
8    A. Yes.
9    Q. You are here describing -- in this section of
10  your report, you're describing the government's
11  interest in mumps. Is that right?
12    A. Yes.
13    Q. Actually, let me make sure that I have got an
14  understanding of that. On page 18 at the top of that
15  page, you say, "The government has also recognized
16  this problem." It does say that.
17    A. It does say that.
18    Q. And "this problem" is what?
19    A. Well, it is under -- the title of that
20  section is "The resurgence of mumps cases and
21  outbreaks in the United States is a significant public
22  health concern." That is the problem.
23    Q. That is the problem?
24    A. Yes.
25    Q. You are saying these various things show the

Page 193

1  government has recognized?
2    A. Yes.
3    Q. Then you talk about Healthy People 2010 and
4  2020, which we have already discussed. Right?
5    A. Right.
6    Q. Then you talk about Department of Defense
7  funding, which we have also discussed?
8    A. Yes.
9    Q. Then you say, "The ACIP created a working
10  group devoted exclusively to the study of resurgence
11  of mumps and ways to address the problem."
12    A. Right.
13    Q. Isn't that a typical thing for the ACIP to
14  convene a working group about?
15    A. When there is a problem with outbreaks, yeah,
16  it is typical. When a problem arises of public health
17  concerns, that is what they do.
18    Q. There is nothing unusual about -- I am sorry.
19  Finish?
20    A. It is not unusual that they did it, but they
21  didn't convene a working group to look at Haemophilus
22  influenza Type B because there -- and actually, there
23  was a little problem because -- with that. Maybe that
24  is a bad example. It was -- the vaccine supply was
25  down temporarily. But the point is they created --

49 (Pages 190 - 193)

Appx1814

HIGHLY CONFIDENTIAL

Page 194

1  they don't create working groups for every disease, at
2  all times. They create one when they perceive a
3  problem, like the outbreaks. That was the point I was
4  trying to make. It is not unusual that they do it.
5  That that is their -- that is what their task is, that
6  is what they are supposed to do.
7      Q. What is the task of this ACIP work?
8      A. Well, I think they wanted to evaluate --
9  let's see if it says. I would have to look at
10  documents to know exactly. I am not sure what --
11      Q. Take a look.
12      A. I don't know if this says it.
13      Q. You might want to take a look at Exhibit 14
14  and see if that helps you.
15      A. Okay. That is a good idea.
16      Q. Feel free to look at something else.
17      A. Well, this is just about the recommendations
18  of something to do. This isn't what the work group is
19  tasked with. So I mean, I think what I can say is
20  that they looked at the epidemiology of the disease
21  and considered what to do about the increasing number
22  of cases and the outbreaks. That is what the working
23  group did.
24      They ended up -- in the end, they advise --
25  they present their data to the advisory committee and

Page 195

1  they make recommendations about what to do about it.
2      Q. This work group in particular was supposed to
3  evaluate whether to recommend a third dose to -- as a
4  response to the outbreaks. Correct?
5      A. I think that was one of the things they
6  considered, yes. I don't think it was -- I don't -- I
7  am not sure that that was the sole task that they were
8  convened for, but, you know, I think they start out by
9  studying the problem and look for solutions if they
10  can come up with them.
11      Q. In your experience, are ACIP work groups
12  staffed with people who are experts in their field?
13      A. Sometimes there are some people that are
14  experts and some that aren't.
15      Q. How about the ACIP itself, how would you
16  characterize the people on the ACIP?
17      A. Variable.
18      Q. Does the ACIP include some people who you
19  would say are held in high esteem in vaccine work?
20      A. Yes, definitely.
21      Q. You talked a little bit before about the ACIP
22  work group that recommended the third dose as a
23  response to the outbreaks, and I think you testified
24  you thought that was a reasonable thing to try?
25      A. Well, I think I testified that that was the

Page 196

1  only option, really.
2      Q. And do you have any disagreement with
3  anything that that ACIP work group concluded?
4      MR. SCHNELL: Object to form.
5      THE WITNESS: I would have to -- I don't know
6  everything that they included. You would have to
7  present me with a specific question or something
8  specific, and I can tell you whether I agree or
9  disagree with it.
10  BY MR. SANGIAMO:
11      Q. Is it your belief that the ACIP took a hard
12  look at the outbreaks -- sorry. Strike that.
13      Was it your understanding that the ACIP work
14  group that we have been discussing took a hard look at
15  the mumps outbreaks?
16      MR. SCHNELL: Object to form.
17      THE WITNESS: What do you mean by "hard
18  look"? What does that mean? As opposed to soft look?
19  I don't know what a hard look is.
20  BY MR. SANGIAMO:
21      Q. Do you think they gave it a thorough look, in
22  your estimation?
23      A. I think they evaluated the outbreaks, yes.
24      Q. As far as you know, it was a thorough
25  evaluation?

Page 197

1      A. I think so.
2      Q. You said that "The CDC and state health
3  agencies are also investigating the outbreaks and have
4  conducted numerous studies on the characteristics and
5  causes of recent mumps outbreaks and of the use of a
6  third as one possible solution." That is what you
7  said in your report?
8      A. Right.
9      Q. It is the charge of the CDC to investigate
10  outbreaks. Isn't that right?
11      A. Yes.
12      Q. And it is also the charge of state health
13  agencies, by and large, to investigate outbreaks as
14  well?
15      A. Yes.
16      Q. So everything that you are describing here by
17  way of government investigation of outbreaks, that is
18  government agencies doing what they are expected to
19  do. Right?
20      A. Correct.
21      Q. And is it your impression that the look that
22  the CDC has given to mumps outbreaks and their causes
23  has been thorough?
24      A. I think it is thorough up to this time they
25  have looked at it, sure, and they are continuing to

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Appx1815

HIGHLY CONFIDENTIAL

Page 198

1  look at it.
2      Q. On page 19 of your report, you say that
3  "Mumps was also added to the list of emerging
4  infections of National Institute of Allergy and
5  Infectious Disease part of the National Institutes of
6  Health."
7      Do you see that?
8      A. Yes.
9      Q. Why is that significant?
10     A. Well, mumps has been around for a long time.
11  And I think they added it because there are new
12  outbreaks. So since, as I have said numerous times,
13  there seems to be a change in the epidemiology of the
14  disease, there have been a lot of outbreaks and
15  increased number of cases since 2006. So -- and this
16  -- in response to that, they added it to the list of
17  emerging infections because there are no cases
18  emerging -- larger number of cases than we have seen
19  in the past, presumably.
20      I mean, it's not a -- it is not a new -- the
21  virus isn't a brand new virus. Mumps has been around
22  for a long time.
23      Q. So your thought in preparing your report was
24  that you could look to the NIAID list of emerging
25  infectious diseases as a means of assessing whether it

Page 199

1  was concerned about mumps. Is that the idea?
2      A. No.
3      Q. So why did you look to them?
4      A. I just noted that the NIAID has noted --
5  responded to the increased cases by putting it on
6  their list. I don't think whether it is there or not
7  -- whether they put it there or not, it would still be
8  true that there are increased number of cases. It
9  doesn't affect my opinions in any way, shape or form,
10  which are -- I think I can read them to you again, but
11  you are probably well aware of them. It is just
12  another sign that the government responded to these
13  outbreaks. They didn't ignore the fact that something
14  is going on with mumps. That is all.
15      (Shapiro Exhibit No. 27 marked for
16  identification.)
17  BY MR. SANGIAMO:
18      Q. Dr. Shapiro, I hand you what has been marked
19  as Exhibit 27. And is that what you were referring
20  to? Is that the list you are referring to where the
21  NIAID added mumps to the list of emerging infectious
22  diseases?
23      A. I think I was referring to an earlier year
24  before probably, but let's see. Yeah, here we go.
25  Yeah, this is it.

Page 200

1      MR. SCHNELL: Do you know when this was
2  printed?
3      MR. SANGIAMO: If you look at the --
4      THE WITNESS: 3/20/18, it says. On the last
5  page, it lists mumps virus. Is that what you mean?
6      MR. SANGIAMO: It was Gordon's question.
7      MR. SCHNELL: I was just wondering --
8      THE WITNESS: It says 3/28/18. On the bottom
9  of the page.
10      (Shapiro Exhibit No. 28 marked for
11  identification.)
12  BY MR. SANGIAMO:
13      Q. Dr. Shapiro, I am handing you what has been
14  marked as Exhibit 28. When is the last time you
15  checked to see if the mumps was on the NIAID?
16      A. Recently. It is not on there.
17      Q. To round this out, the what I just handed
18  you--
19      A. Was printed in August.
20      Q. And it shows a contents last review date of
21  July 26, 2018. Right?
22      A. Right.
23      Q. What significance do you ascribe to the fact
24  that the NIH took mumps off of the NIAID list of
25  emerging infectious diseases?

Page 201

1      A. None.
2      Q. So it was significant to you when they put it
3  on the list but it is of no significance to you when
4  they take it off the list. Is that the idea?
5      A. Well, I am just -- it doesn't change my
6  opinion. The epidemiology, the number of cases are
7  what they are. All I said -- and I think I said this
8  earlier, was it just shows that the government has
9  noticed what is going on. I don't know what it means
10  that they took it off. You would have to ask the
11  people that make the list.
12      Q. Well, did you know what it meant when they
13  put it on?
14      A. It seemed to mean that they were responding
15  to something. I don't know why that -- what it means
16  beyond the fact that it was on the list or it wasn't
17  on the list. Clearly, the point I was trying to make
18  was simply that the government responded to it. So it
19  doesn't change my opinions in any way, shape or form.
20  It doesn't change the number of cases that are going
21  on, that are occurring, the number of outbreaks, the
22  recommendations of the CDC.
23      Q. And you are even saying it doesn't change
24  your opinion about the level of government interest?
25  Is that what you are saying?

51 (Pages 198 - 201)

Appx1816

HIGHLY CONFIDENTIAL

Page 202

1    A. I don't know what the level of government
2  interest is. I was just citing the fact that I
3  noticed it was on that list at the time, now it is off
4  the list.
5    Q. So you are not -- you're not planning to come
6  in and testify about the government's level of
7  interest in this. Do I have that right?
8    MR. SCHNELL: Objection to form.
9    THE WITNESS: I don't think I am going to
10 testify what the government's level of interest is. I
11 don't know what it is.
12 BY MR. SANGIAMO:
13   Q. And then you say -- back at page 19 of your
14 report -- "Indeed, the NIAID." You see that at the
15 bottom?
16   A. Yes.
17   Q. "Indeed, the NIAID has recently funded a
18 study to develop a new mumps vaccine because the
19 recent outbreaks in highly vaccinated populations,
20 quote, 'strongly suggest that the current vaccine is
21 not effective.'"
22   Do you see that?
23   A. Yes.
24   Q. Are you quoting the NIH when you say that?
25   A. No, I am quoting the -- I believe that was

Page 203

1  from the abstract of the grant that was funded.
2    Q. That was written by the guy seeking the
3  grant?
4    A. Correct.
5    Q. So you don't know that the NIH said that the
6  recent outbreaks in highly vaccinated populations
7  strongly suggest that the current vaccine is not
8  effective. Right?
9    A. Right. It clearly references the project
10 information for the grant, and I am citing the -- if
11 you go to that, that is the abstract of the grant --
12   THE COURT REPORTER: Abstract of the what?
13   THE WITNESS: Of the grant proposal that was
14 funded.
15 BY MR. SANGIAMO:
16   Q. Right. Written by the applicant?
17   A. By the investigator, yes.
18   Q. Are you familiar with requests for proposal?
19   A. Yes.
20   Q. What are they?
21   A. That is a grant mechanism by which the
22 funding institute sets aside funds for a specific
23 purpose where they request proposals to do something.
24   Q. This is for NIH grants. Right?
25   A. Right. Well, I think the CDC might do the

Page 204

1  same thing.
2    Q. Okay. How about requests for application,
3  what are they?
4    A. You know, I have got it wrong. A request for
5  application is what I just described where the funds
6  are set aside. A request for proposal are just this
7  is an area we are interested in, but you are competing
8  with everybody else. An RFA is where the money is
9  specifically set aside for that specific project.
10 That is an RFA. Whereas, a request for proposal is we
11 are interested in this, but you are competing with
12 everybody else that is submitting proposals on other
13 things.
14   Q. How about a program announcement, what is
15 that?
16   A. It could be a lot of things. I am not
17 certain exactly, program announcements. I think it is
18 similar to a -- well, I don't know. I'd have to look
19 it up.
20   Q. To your knowledge, did -- did the grant that
21 was funded for a study to develop a new mumps vaccine
22 that you cite in your report originate in a request
23 for proposal or request for application?
24   A. I don't know.
25   Q. Is it the case that when the NIH has a

Page 205

1  specific interest in funding research for a particular
2  matter it is going to issue a request for proposal or
3  request for application?
4    A. Not necessarily.
5    Q. But at a minimum, if it does -- strike that.
6    If it does issue a request for proposal or
7  request for application, that shows it does have an
8  interest in funding that research. Right?
9    A. Yes.
10   Q. What was the amount of this grant for
11 research?
12   THE COURT REPORTER: Of this grant?
13 BY MR. SANGIAMO:
14   Q. For research.
15   A. I don't know. I don't recall.
16   Q. Did you check at one point?
17   A. I think I saw it. I went on the NIH report
18 where it had it listed, so I am sure I saw it. I just
19 don't remember.
20   Q. Was it a substantial sum in your view in
21 relation to other funding from the NIH?
22   A. I don't remember.
23   Q. You are familiar generally with NIH funding?
24   A. Yes.
25   Q. Is that a big part of what you do, or is that

52 (Pages 202 - 205)

Appx1817

HIGHLY CONFIDENTIAL

Page 206

1  an overstatement?
2      A. I am familiar with it and I deal with NIH
3  funding a fair amount.
4      (Shapiro Exhibit No. 29 marked for
5  identification.)
6  BY MR. SANGIAMO:
7      Q. Dr. Shapiro, you have been handed a document
8  marked as Shapiro Exhibit 29. Do you recognize that
9  document?
10     A. Yes.
11     Q. Does this document show you the amount of
12  funding that went to this grant that you discuss in
13  your report?
14     A. Only for one year.
15     Q. If you flip it over.
16     A. Oh, sorry. Yes, it does.
17     Q. And does that strike you as a substantial sum
18  of money as far as NIH grants are concerned?
19     A. Yes.
20     Q. How do you think it ranked, if you have any
21  basis to predict? And if you don't, then just say so.
22  How do you think it would rank compared to other
23  funding by the NIH for development of -- strike that.
24     How do you think it would rank compared to
25  other funding by NIH for vaccine related research?

Page 207

1      A. Well, I mean, this is not a clinical trial.
2  It all depends on what type of study you are talking
3  about. The NIH funds large clinical trials which are
4  extremely expensive. This looks to me like it would
5  be, for this type of study, probably an average amount
6  roughly, but I don't -- you know, it depends on -- you
7  can't, you know, compare it to, you know, vaccine
8  treatment units. And they are all different kinds of
9  funding mechanisms, so it depends what you are talking
10  about.
11     Q. Who was the investigator for this grant?
12     A. It looks like Biao He.
13     Q. Have you ever spoken to Dr. He?
14     A. No.
15     Q. Do you know what came of his work?
16     A. No.
17     Q. You never followed up on that?
18     A. No.
19     Q. He was trying to develop a new vaccine,
20  wasn't he?
21     MR. SCHNELL: Object to form.
22     THE WITNESS: I think he was looking at
23  different mechanisms. I am not sure that he was -- I
24  think it was sort of underpinnings of a new vaccine.
25  I don't think he -- that anybody expected him at the

Page 208

1  end of five years to have a new vaccine. He was
2  looking at different ways of combining -- I did look
3  at kind of what -- what -- some of the substance of
4  it, and it was kind of underpinnings of a potential
5  new vaccine.
6  BY MR. SANGIAMO:
7      Q. Wouldn't it be important to you as an
8  infectious disease doctor to know the state of
9  Dr. He's efforts to try to develop the underpinnings
10  or a new vaccine?
11     MR. SCHNELL: Object to form.
12     THE WITNESS: I don't really understand your
13  question. Am I interested in it?
14  BY MR. SANGIAMO:
15     Q. You testified that you hadn't followed up.
16  Right?
17     A. Well, I don't know what finally happened with
18  it. I mean, I looked to see if there was anything,
19  but I don't -- I don't really know. I would be
20  interested, but I haven't -- you know, it looked like
21  it was a very early stage of development. So I
22  assumed that if it went further that I would hear
23  about it.
24     Q. Did you read any of the papers that developed
25  as a result of that work?

Page 209

1      A. I looked at one of the papers. That is how
2  -- that's how I was aware of kind of what he was
3  doing, yes. But I don't know where he was going from
4  there.
5      Q. Would you turn to page 16 of your report,
6  please. The second full paragraph on that page begins
7  with "The consequences of an imperfect vaccine."
8      Do you see that?
9      A. Yes.
10     Q. I am going to read the whole paragraph into
11  the record, sir, but it is the last sentence I wanted
12  to ask you about. "The consequence of an imperfect
13  vaccine on patients is well illustrated in studies of
14  complications of mumps even in modern era during
15  outbreaks of mumps making it clear that such outbreaks
16  are not trivial. This is particularly true when, as
17  is the case now, those affected are mostly adults who
18  have higher rates of complications from infection.
19  Indeed, that is why a vaccine for mumps was developed
20  in the first place." That is the end of the quote.
21     When you wrote "that is why a vaccine for
22  mumps was developed in the first place," what is the
23  "that"?
24     A. Yeah, that there were complications. I
25  realized when you are reading this it is maybe a

53 (Pages 206 - 209)

Appx1818

HIGHLY CONFIDENTIAL

Page 210

1 little out of context, but the consequences, the
2 complication of mumps -- the point is that mumps has
3 complications.  If there were no complications of
4 mumps, it wouldn't be so important to develop a
5 vaccine.
6        That is why a vaccine was developed was
7 because it wasn't that people are just infected with
8 mumps, but -- but there are consequences of being
9 infected, like sterility, deafness, meningitis, death,
10 things like that.  So that is why the vaccine was
11 developed.  I wasn't referring to the fact that there
12 were so many -- you know, okay, that is what it was
13 referring to.
14        Q. What is your basis for saying that that is
15 why the vaccine was developed?
16        A. Well, because if infections don't have
17 consequences, we usually don't -- people don't usually
18 develop vaccines against them.  So my point is that if
19 there were no complications of mumps, if you just you
20 got mumps and it didn't affect your -- anything, had
21 no important, acute or long-term consequences, it is
22 unlikely that anybody would have developed a vaccine
23 for it.  That is my -- that's my opinion, let me put
24 it that way.
25        Q. You are just projecting back on the time when

Page 211

1 the vaccine was developed and you are supposing that
2 was the motivation.  Is that fair?
3        A. Well, I would say that is generally true for
4 virtually all vaccines.  People don't -- don't develop
5 vaccines if there are no important health or public
6 health consequences of the infection.
7        Q. Well, for example, one could have developed a
8 mumps vaccine because mumps would cause extended
9 absences from school for children even if they didn't
10 suffer any complications.  Right?
11        MR. SCHNELL:  Object to form.
12        THE WITNESS:  Conceivably, that could be a
13 reason.
14 BY MR. SANGIAMO:
15        Q. And do you have any basis for evaluating the
16 extent to which that was the reason versus fear of
17 complications being the reason or something else being
18 the reason?
19        A. No.  I -- I didn't mean to imply that this
20 was necessarily the only reason.  I would say it is an
21 important reason.
22        Q. Turn to page 18 of your report.  At the end
23 of the full paragraph on that page, you have a
24 sentence that reads, "This is another example of the
25 recognition clearly borne out by the actual number of

Page 212

1 cases of mumps being reported that use of the current
2 vaccine is not likely to lead to a sustained decrease
3 in the number of cases of mumps in the United States."
4 That is the end of the quote.
5        When you say "sustained decrease," you are
6 saying decrease as compared to what?
7        A. I think all I am trying to express there is
8 that there is a recognition that the vaccine isn't
9 going to eliminate mumps.
10        Q. Okay.
11        MR. SANGIAMO:  Gordon, there is a chance I am
12 done.  I just need a few minutes.
13        THE VIDEOGRAPHER:  Off the record.  The time
14 is 4:05.
15        (Recess taken from 4:05 p.m. to 4:19 p.m.)
16        THE VIDEOGRAPHER:  We are back on the record
17 The time is 4:19.
18 BY MR. SANGIAMO:
19        Q. Dr. Shapiro, could you put in front of you
20 Exhibit 1, which is your report?
21        A. Yes.
22        Q. On page 14 of your report, there is a
23 paragraph towards the bottom that begins with the word
24 "Estimates."
25        Do you see that?

Page 213

1        A. Yes.
2        Q. It says, "Estimates of the effectiveness of
3 two doses of the vaccine during outbreaks have ranged
4 from 53 percent to 95 percent," and then it goes on.
5        My question is:  Do you know where you got
6 the 53 percent?
7        A. Yes, I do.
8        Q. Where is that?
9        A. That at the time I wrote the report, that was
10 what the number that was the lower -- the lower number
11 on the CDC website.  That is the same one that now is
12 -- says 31 percent.  And in between -- I mean, I can't
13 remember exactly when it was that I accessed it, but
14 at the time I accessed it, which is around the time I
15 wrote the report, that is --- that's, I believe, what
16 the 53 percent was.
17        Q. Do you remember what part of the CDC website
18 you saw that on?
19        A. If you go to the -- it's about mumps --
20        Q. Right.
21        A. -- and if you go to -- I mean, it is the same
22 page -- I think it is the page where you -- it is one
23 of these pages where -- it is one of the -- I believe
24 it is on one of the clinical -- maybe this is it, for
25 health care providers.  Vaccination.  Here it is.  I

54 (Pages 210 - 213)

Appx1819

HIGHLY CONFIDENTIAL

Page 214

1 think it is -- I think this is where it is, on page 5
2 of Exhibit 22 where it says "vaccination." Do you
3 want to see it here?
4     Q. I got it.
5     A. See where it says 88 percent, range, 31
6 percent to 95 percent. That 31 percent -- I -- I
7 testified to this, that it -- that there was 53
8 percent, then it went down -- actually, an older one
9 was even higher than that, I think. It has been going
10 down. I think that's -- I am 99 percent sure that is
11 where that number came from.
12     Q. Did you keep a copy of that?
13     A. No.
14     MR. SANGIAMO: I don't have any further
15 questions.
16     MR. SCHNELL: I just have a couple of
17 questions.
18          CROSS-EXAMINATION
19 BY MR. SCHNELL:
20     Q. Dr. Shapiro, do you recall this morning you
21 testified that you did not cite to the Pink Book in
22 your report and it is not a source that you rely on in
23 your day-to-day work?
24     A. I don't recall talking about citing, but I
25 recall talking about that it is not something I look

Page 215

1 at. But I mean, I know I cited it somewhere here, I
2 think, as one of the -- I know that it has background
3 information, and also I think in the -- let me see if
4 I can find it. I just rarely use it. I know it is a
5 source if you want to talk about an infection, about
6 what it is like, kind of background information, I
7 threw it in here somewhere. Let's see.
8     Oh, yeah, maybe on page 4. There is no cure
9 for mumps.
10     THE COURT REPORTER: I'm sorry. There's --
11     THE WITNESS: There's no cure for mumps. It
12 was just about the background thing, but it is not
13 something that I use much at all day-to-day, but I
14 know that it has chapters on different infections.
15 BY MR. SCHNELL:
16     Q. And before the break, you testified that you
17 do not know the level of government interest in the
18 resurgence of mumps. Is that right?
19     MR. SANGIAMO: Object to the form.
20     THE WITNESS: That is correct.
21 BY MR. SCHNELL:
22     Q. What did you mean by that testimony?
23     A. Well, I didn't mean that the government was
24 not -- clearly, there is a lot of interest by the
25 government. We talked about the working group, the

Page 216

1 CDC and the ACIP. We have exhibits from the CDC about
2 the mumps outbreaks. I just meant -- I think he asked
3 me about do I know what the level of interest is, and
4 I -- I don't know what the level of interest is
5 They're certainly interested, but I can't testify to
6 what level it is at
7     Q When you say you can't testify to what level
8 the government interest is at, what do you mean by
9 "level"?
10     A Well, I don't -- clearly, they are interested
11 in it, but I don't know if it is their Number 1
12 priority or Number 5 priority or Number 2 priority or
13 what I mean -- and for that matter, government, you
14 know, we talked about four or five or six different
15 government agencies that operate independently So
16 all I am saying is that I don't know -- I know that
17 they are interested, I just don't know exactly what
18 specifically I can't testify as to what their level
19 of interest is beyond the fact that they are clearly
20 -- it is an important issue as evidenced by the -- all
21 the stuff we have in front of us from the government
22     MR SCHNELL: Thank you That is all I have
23     MR SANGIAMO: Nothing for me
24     THE VIDEOGRAPHER: Off the record The time
25 is 4:24

Page 217

1     (Whereupon the deposition adjourned at 4:24 p.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

55 (Pages 214 - 217)

Appx1820

HIGHLY CONFIDENTIAL

<table>
<tr><td colspan="2">

Page 218

1        C E R T I F I C A T E

2      I hereby certify that I am a Notary Public, in

3   and for the State of Connecticut, duly commissioned

4   and qualified to administer oaths.

5      I further certify that the deponent named in the

6   foregoing deposition was by me duly sworn and

7   thereupon testified as appears in the foregoing

8   deposition; that said deposition was taken by me

9   stenographically in the presence of counsel and

10  reduced to typewriting under miy direction, and the

11  foregoing is a true and accurate transcript of the

12  testimony.

13     I further certify that I am neither of counsel

14  nor related to either of the parties to said suit, nor

15  of either counsel in said suit, nor am I interested in

16  the outcome of said cause.

17    Witness my hand and seal as Notary Public the day

18  13th day of November, 2018.

19

20

21  _____

22  Notary Public

23  My Commission Expires:

24  November 30, 2022

25

</td></tr>
</table>

Page 220

1  USA, Ex Rel., Krahling, Stephen A., et al v. Merck & Co.

2  Eugene Shapiro

3      E R R A T A

4     - - - - -

5  PAGE  LINE  CHANGE

6  ___ ___ _____

7  Reason:_____

8  ___ ___ _____

9  Reason:_____

10  ___ ___ _____

11  Reason:_____

12  ___ ___ _____

13  Reason:_____

14  ___ ___ _____

15  Reason:_____

16  ___ ___ _____

17  Reason:_____

18  ___ ___ _____

19  Reason:_____

20  ___ ___ _____

21  Reason:_____

22  ___ ___ _____

23  Reason:_____

24  ___ ___ _____

25  3010612

---

Page 219

1  USA, Ex Rel., Krahling, Stephen A., et al v. Merck & Co.

2  Eugene Shapiro

3    INSTRUCTIONS TO THE WITNESS

4    Please read your deposition over

5  carefully and make any necessary corrections.

6  You should state the reason in the

7  appropriate space on the errata sheet for any

8  corrections that are made.

9    After doing so, please sign the errata

10  sheet and date it.

11    You are signing same subject to the

12  changes you have noted on the errata sheet,

13  which will be attached to your deposition.

14    It is imperative that you return the

15  original errata sheet to the deposing

16  attorney within thirty (30) days of receipt

17  of the deposition transcript by you. If you

18  fail to do so, the deposition transcript may

19  be deemed to be accurate and may be used in

20  court.

21

22

23

24

25  3010612

---

Page 221

1  USA, Rel , Krahling, Stephen A & Wlochowski v Merck & Co

2  Eugene Shapiro

3   ACKNOWLEDGMENT OF DEPONENT

4    I, _____, do

5  hereby certify that I have read the foregoing

6  pages and that the same is a correct

7  transcription of the answers given by

8  me to the questions therein propounded,

9  except for the corrections or changes in form

10  or substance, if any, noted in the attached

11  Errata Sheet

12

13  _____    _____

14  DATE         SIGNATURE

15

16

17

18

19

20

21

22

23

24

25  3010612

56 (Pages 218 - 221)

10/25/2019
Declaration of G. Reilly
EXHIBIT 9

1       IN THE UNITED STATES DISTRICT COURT
      FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

3   UNITED STATES OF AMERICA  : CIVIL ACTION
    ex rel., STEPHEN A.       : NO. 2:10-04374(CDJ)
4   KRAHLING and JOAN A.      :
    WLOCHOWSKI,               :
5         Plaintiffs,         :
                              :
6         vs.                 :
                              :
7   MERCK & CO., INC.,        :
          Defendant.          :
8   _____  : Master File No.
    IN RE:  MERCK MUMPS       : 2:12-cv-03555(CDJ)
9   VACCINE ANTITRUST         :
    LITIGATION                :
10                            :
    THIS DOCUMENT RELATES TO: :
11  ALL ACTIONS               :

12

13               ** CONFIDENTIAL **

14

15               November 1, 2016

16

17          Videotaped deposition of ALISON L.

18  FISHER, PhD, taken at the offices of Spector

19  Roseman Kodroff & Willis, 1818 Market Street,

20  Suite 2500, Philadelphia, Pennsylvania 19103,

21  beginning at 9:35 a.m., before LINDA

22  ROSSI-RIOS, a Federally Approved RPR, CCR and

23  Notary Public.

24

25

Page 2

1 A P P E A R A N C E S :
2
3
    For the Plaintiffs:
4  SPECTOR ROSEMAN KODROFF & WILLIS, P C
    BY:  JOHN A  MACORETTA, ESQUIRE
5        and
        DIANA J  ZINSER, ESQUIRE
6   1818 Market Street
    Suite 2500
7   Philadelphia, PA  19103
    215-496-0300
8   jmacoretta@srkw-law com
    dzinser@srkw-law com
9
10
11 For the Relator:
    CONSTANTINE CANNON LLP
12  BY:  HAMSA MAHENDRANATHAN, ESQUIRE
    335 Madison Avenue
13  New York, NY  10017
    212-350-2700
14  hmahendranathan@constantinecannon com
15
16
    For Non-Party US Government:
17  US DEPARTMENT OF JUSTICE
    BY:  JOEL M  SWEET, ESQUIRE
18  615 Chestnut Street, Suite 1250
    Philadelphia, PA 19106
19  215-861-8581
    joel sweet@usdoj gov
20
21
22
23
24
25

Page 3

1  For the Defendant, Merck & Co., Inc.:
2      MORGAN LEWIS & BOCKIUS LLP
    BY:  LISA DYKSTRA, ESQUIRE
3        and
        MELINA DIMATTIO, ESQUIRE
4    1701 Market Street
    Philadelphia, PA  19103
5    215-963-5000
    lisa.dykstra@morganlewis.com
6
7
    VENABLE LLP
8   BY:  KATHLEEN S. HARDWAY, ESQUIRE
    750 E. Pratt Street
9   Suite 900
    Baltimore, MD  21202
10  410-244-7400
    kshardway@venable.com
11
12
A L S O  P R E S E N T :
13
    TIMOTHY K. HOWARD, ESQUIRE
14  Merck
15  STEPHEN KRAHLING, Relator
16  R. ADAM LAZAROFF, Videographer
17
18
19
20
21
22
23
24
25

Page 4

1          I N D E X
2
WITNESS                    PAGE
3
ALISON L  FISHER, PhD
4
    By Mr  Macoretta        9
5
6
7
          E X H I B I T S
8
    MARKED      DESCRIPTION      PAGE
9
    Fisher-1   3/12/04 Letter with     11
10     attachment,
        MRK-KRA00126893 - 6905
11
    Fisher-2   3/12/04 Letter with     11
12     attachment,
        MRK-KRA00124378 - 4390
13
    Fisher-3   E-mail chain,      29
14     MRK-KRA01481843 - 1846
15  Fisher-4   4/8/11 Memo,      82
        MRK-KRA01456760
16
    Fisher-5   4/13/05 Letter,       87
17     MRK-KRA0141733 - 1778
18  Fisher-6   3/28/05 E-mail,      103
        MRK-KRA00560317 - 0319
19
    Fisher-7   Letter with attachment,   161
20     MRK-KRA00132999 - 3011
21  Fisher-8   11/15/06 Letter with      163
        attachment,
22     MRK-KRA00000393 - 0409
23  Fisher-9   E-mail chain,      169
        MRK-KRA00259768
24
25  Fisher-10  10/6/06 E-mail,       175
        MRK-KRA00046174

Page 5

1  Fisher-11   Letter,       191
        MRK-KRA00000385 & 0386
2
    Fisher-12   E-mail chain,      195
3      MRK-KRA00552862 - 2864
4  Fisher-13   6/5/07 Letter with      200
        attachment,
5      MRK-KRA00000368 - 0382
6  Fisher-14   E-mail chain,      205
        MRK-KRA01583833 & 3834
7
    Fisher-15   E-mail chain,      238
8      MRK-KRA01574732 - 4735
9  Fisher-16   7/27/04 Memorandum,     276
        MRK-KRA00018510 - 8512
10
    Fisher-17   7/3/04 E-mail,      278
11     MRK-KRA00791315 - 1319
12  Fisher-18   E-mail chain,      278
        MRK-KRA00791511 & 1512
13
    Fisher-19   Background information in  291
14     preparation for
        correspondence with CBER,
15     MRK-KRA00782807 - 2810
16  Fisher-20   E-mail chain,      293
        MRK-KRA00846454 - 6458
17
    Fisher-21   PowerPoint,       293
18     MKR-KRA00846460 - 6462
19  Fisher-22   11/17/04 Letter,      310
        MRK-KRA00126963 - 6971
20
    Fisher-23   4/28/14 E-mail,      314
21     MRK-KRA00831247 - 1251
22  Fisher-24   4/6/06 E-mail,      317
        MRK-KRA00018534 & 8535
23
    Fisher-25   Regulatory Liaison FDA    322
24     Conversation Record,
        MRK-KRA00793982 & 3983
25

2 (Pages 2 - 5)

Page 6

1  Fisher-26   6/13/05 E-mail,        322
         MRK-KRA00256875
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1                     - - -
2          VIDEOGRAPHER:  We're now on the
3     video record.  Please note that the
4     microphones are sensitive and may pick
5     up whispering and private
6     conversations.  Please turn off all
7     cell phones or place them away from
8     the microphones as they can interfere
9     with the deposition audio.  Recording
10    will continue until all parties agree
11    to go off the video record.
12          My name is R. Adam Lazaroff,
13    CLVS, representing Veritext Legal
14    Solutions.
15          The date today is November 1,
16    2016, and the time is approximately
17    9:35.  This deposition is being held
18    at Spector Roseman Kodroff & Willis,
19    located at 1818 Market Street,
20    Suite 2500, Philadelphia, PA 19103.
21    The caption of this case is In Re:
22    Merck Mumps Antitrust Litigation,
23    filed in the US District Court for the
24    Eastern District of Pennsylvania, Case

Page 8

1
2     Number 2:10-04374, and the master file
3     2:12-cv-03555.  The name of today's
4     witness is Alison Fisher.
5          At this time all attorneys
6     present in the room will identify
7     themselves and the parties they
8     represent, after which our court
9     reporter, Linda Rossi-Rios
10    representing Veritext, will swear in
11    the witness and we can proceed.
12          MR. MACORETTA:  Good morning.
13    My name is John Macoretta from Spector
14    Roseman Kodroff & Willis.  I'm here
15    for the private plaintiffs.
16          MS. ZINSER:  Diana Zinser from
17    Spector Roseman Kodroff & Willis, also
18    for private plaintiffs.
19          MS. MAHENDRANATHAN:  Hamsa
20    Mahendranathan from Constantine Cannon
21    for Relators.
22          MS. DYKSTRA:  Mr. Krahling, do
23    you want to identify yourself?
24          MR. KRAHLING:  I'm not a lawyer.
25          MR. MACORETTA:  You can put your

Page 9

1
2     name on the record.  You can just --
3          MR. KRAHLING:  Steve Krahling,
4     Relator.
5          MR. HOWARD:  Tim Howard in-house
6     counsel for Merck.
7          MS. HARDWAY:  Kathleen Hardway
8     from Venable for Merck.
9          MS. DIMATTIO:  Melina DiMattio
10    from Morgan Lewis for Merck.
11          THE WITNESS:  Alison Fisher,
12    Merck.
13          MS. DYKSTRA:  Lisa Dykstra,
14    representing Merck from Morgan Lewis.
15                     - - -
16          ALISON L. FISHER, PhD, after
17    having been duly sworn, was examined
18    and testified as follows:
19                     - - -
20          EXAMINATION
21                     - - -
22    BY MR. MACORETTA:
23    Q.    Ms. Fisher, good morning.
24    A.    Good morning.
25    Q.    We met earlier.  My name is John

3 (Pages 6 - 9)

Appx1825

Page 10

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2  Macoretta. I'm going to be asking questions
3  on behalf of all the plaintiffs today.
4          Have you ever had your
5  deposition taken before?
6      A.   Yes.
7      Q.   Okay. So I'll -- I won't go
8  through all the rules again. Let me just say
9  that if you feel like you need to take a
10 break, tell us and we'll take a break. We're
11 going to look at a lot of documents today. If
12 you feel like you need to look at additional
13 pages of a document, many times I'll want to
14 talk about one particular section, if you feel
15 like you want to look at more of the document,
16 that's fine. Okay?
17     A.   Yes.
18     Q.   All right. If you answer -- if
19 you give an answer and I don't understand it,
20 I'm going to ask you to explain it. So by the
21 same token, can we agree now that if I ask a
22 question, and you're not sure what I'm asking,
23 you'll just tell me and I'll try to rephrase
24 it. All right?
25     A.   Yes.

Page 11

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2               - - -
3          (Exhibits Fisher-1, 3/12/04
4      Letter with attachment, Bates
5      MRK-KRA00126893 - 6905 and Fisher-2,
6      3/12/04 Letter with attachment, Bates
7      MRK-KRA00124378 - 4390, were marked
8      for identification.)
9               - - -
10 BY MR. MACORETTA:
11     Q.   Let me show you what we've
12 marked as Exhibits 1 and 2.
13         MS. DYKSTRA: Is there one copy
14     here or two?
15         MR. MACORETTA: That should
16     be -- you know what, I have extra
17     copies for everybody. That should be
18     the marked ones. I don't know what's
19     going on.
20         MS. DYKSTRA: I have one copy of
21     1 -- I'm sorry, two copies of 1 and
22     one copy of 2. So if you have another
23     copy of 2, that would be great.
24     Actually this is the same document.
25         MR. MACORETTA: Make sure the

Page 12

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2  Bates numbers are different. There
3  are two different ones. Yeah, there
4  should be two.
5  BY MR. MACORETTA:
6      Q.   So while we're doing that,
7  Exhibit 1 has a Bates number ending in 126893.
8  That's the number at the bottom right. Do you
9  see that, Ms. Fisher?
10     A.   Uh-huh.
11     Q.   Exhibit 2 has a Bates number
12 ending in 124378. Do you see that?
13     A.   Yep.
14     Q.   Okay. So both of these are
15 letters from Keith Chirgwin to Jessie Goodman
16 at the FDA. The Alison Fisher mentioned in
17 the first sentence of both letters, that's
18 you?
19     A.   Yes.
20     Q.   Okay. March 2004, Mr. Chirgwin
21 tells the FDA that you're going to assume
22 responsibility for routing communications
23 concerning MMR products. Is that right?
24     A.   Yes.
25     Q.   Okay. Is that -- and then

Page 13

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2  attached is your resume which we're going to
3  talk about in a second.
4          Is March 2004 your first
5  involvement with any measles vaccine products
6  at Merck?
7      A.   Yes.
8      Q.   Is this your first time --
9          MS. DYKSTRA: John, just a
10     question, you meant mumps product?
11         MR. MACORETTA: You're right, I
12     did.
13 BY MR. MACORETTA:
14     Q.   Let me try again. Is March 2004
15 your first involvement with any mumps product
16 at Merck?
17     A.   Yes.
18     Q.   All right. Is it fair to say
19 that at this time your job is a regulatory
20 liaison?
21     A.   Yes.
22     Q.   Let's take a look, if we can, at
23 Exhibit 1. If you could flip back four or
24 five pages, it says, "MERCK CURRICULUM VITAE"
25 for Alison Fisher. All right. Everything in

Veritext Legal Solutions

Appx1826

Page 14

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  this curriculum vitae is correct, as far as
3  you know? I'm not going to ask you about all
4  these publications behind it.
5    A.   Yes.
6    Q.   So prior to your position in
7  March of '04 you were a project manager for
8  pediatric combination vaccine program?
9    A.   Yes.
10    Q.   What's the pediatric combination
11 vaccine program?
12    A.   That is a combination product
13 that includes hep B, five component
14 pertussis, polio. It's been a while since
15 I've looked at this. Let's see. And it also
16 includes haemophilus influenza. And it also
17 includes diphtheria and tetanus.
18    Q.   This was a vaccine Merck was
19 working on?
20    A.   Yes.
21    Q.   When you were project manager,
22 did you have any involvement with regulatory
23 affairs?
24    A.   Could you, please, define
25 involvement?

Page 15

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2    Q.   Okay. Let me try -- I mean, I
3  could ask it the other way. What do you do as
4  a project manager for this vaccine
5  specifically?
6    A.   I would project manage all
7  aspects related to this vaccine. So that
8  would include clinical, timelines for
9  clinical, timelines for some of the
10 activities associated with high level
11 milestones for manufacturing and at the time
12 pretty much any high level milestone
13 associated with development of that vaccine.
14    Q.   Those high level milestones
15 including getting various regulatory approvals
16 for the vaccine?
17    A.   That was not my job, but that
18 would be included on a Gantt chart when
19 projected approvals, targeted approvals would
20 occur.
21    Q.   What's a Gantt chart?
22    A.   A Gantt chart is a chart, I
23 believe it's in Microsoft Project, and it's a
24 chart that includes line items and dates
25 associated with those line items.

Page 16

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2    Q.   Is that something you would use
3  regularly at Merck, this kind of Gantt chart?
4    A.   That's something that I used in
5  project management only.
6    Q.   So when you became involved --
7  and we're going to talk about your years from
8  '04 onward working with the MMR products. Was
9  there a similar kind of Gantt chart you used
10 to track what was supposed to happen when?
11    A.   I did not use the Gantt charts.
12 There was another group that supported me
13 that used their own -- their own Gantt chart
14 like programs. Mostly they were, I believe,
15 Excel spreadsheets.
16    Q.   This would be kind of a timeline
17 or a tracking program?
18    A.   Uh-huh. Uh-huh.
19    Q.   What group was that?
20    A.   Regulatory coordination. And,
21 again, the high level milestones would have
22 been captured by project management.
23    Q.   Let me talk about that for a
24 second before I come back to your resume. So
25 for the MMR products, MMR, MMR II was on the

Page 17

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  market then, right, in 2004?
3    A.   Yes. Uh-huh.
4    Q.   So what kind of high level
5  milestones are we talking about that people
6  would be tracking?
7    A.   Well, I wasn't in project
8  management in 2004. I started in regulatory
9  in February, March of 2004. So I can't
10 answer questions about tracking MMR major
11 milestones for project management because I
12 wasn't in project management.
13    Q.   Okay.
14    A.   Does that answer your question?
15    Q.   Well, I thought you said that
16 the reg -- there was a regulatory coordination
17 group, that they had a tracking program?
18    A.   The regulatory coordination
19 group did have a tracking program, yes. I
20 believe it was something like an Excel
21 spreadsheet.
22    Q.   Okay. If we wanted to see that
23 now, do you know -- going back to '04, who
24 would we ask to get that?
25    MS. DYKSTRA: Objection.

5 (Pages 14 - 17)

Page 18

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  BY MR. MACORETTA:
3       Q.   You can answer.
4       A.   Excel spreadsheets that were
5  used for timelines would not be captured in
6  eDossiers.  Official correspondence is
7  captured in eDossiers, official
8  correspondence going back and forth, outgoing
9  to the FDA, incoming from the FDA.
10      Q.   And eDossier is a system you
11 have at Merck to track or pull certain
12 documents.  Right?
13      A.   It doesn't track documents.  It
14 holds documents.
15      Q.   So the timelines, whatever Excel
16 timeline type documents existed in regulatory
17 coordination relating to MMR, you just told me
18 they weren't in eDossier.  Would they be
19 somewhere else at Merck?
20      MS. DYKSTRA:  Objection.
21      THE WITNESS:  I don't know where
22   those tracking sheets would be.  We
23   have a record retention policy and
24   somebody would have to check in a file
25   room or in Iron Mountain.  I don't

Page 19

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2    know the answer to that question.
3  BY MR. MACORETTA:
4       Q.   Okay.  Let me keep going here.
5       So before March of '04, what was
6  your experience being a -- I don't want to say
7  liaison, liaising with the FDA or dealing with
8  the FDA?
9       A.   I did not liaise with the FDA
10 prior to March of 2004.
11      Q.   So did you get any training for
12 this job before you started it in March of
13 '04, this position?
14      A.   Well, I actually started the
15 job in February, and for one month I was
16 working, getting trained and taking training
17 courses.  And then I had a mentor that was
18 working with me.  So there was some training
19 course type training and then some training
20 from Keith Chirgwin.
21      Q.   Is there some kind of policy or
22 guidebook on how to be a regulatory liaison or
23 what you're supposed to do that was available
24 to you at Merck?
25      A.   I know that we had training

Page 20

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  courses.  We had people mentoring us.  I
3  can't recall a specific guidebook.  I know
4  that there were job descriptions, and part of
5  the training involved the job description and
6  the expectations of us.
7       Q.   That's in a job description
8  somewhere?
9       A.   That would be in the job
10 description.
11      Q.   Okay.  But there's not some
12 policy that says this is what you're supposed
13 to do, this is what you're not supposed to do,
14 anything like that as a regulatory liaison?
15      A.   Well, there's SOPs.  There's a
16 lot of SOPs.
17      Q.   Standard operating procedures?
18      A.   Right.  Right.
19      Q.   Okay.  Anything beyond that?
20      A.   I mean, there's -- no.
21      Q.   Okay.  Exhibits 1 and 2, really
22 the difference is in the Re line.  We're
23 talking -- Exhibit talks about BB-IND 1016 and
24 Exhibit 2 talks about BB-IND 1006 -- 76.
25 Right?  Do you see where I'm talking about?

Page 21

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2       A.   Yes, right here, I'm pointing
3  to it.
4       Q.   Okay.  So BB-IND 1016, Exhibit 1,
5  it says the combined live measles, mumps,
6  rubella virus vaccine, that's the IND file for
7  the MMR product, or is it?  Let me try it
8  again:  What does that reference?  What does
9  that line mean?
10      A.   That is just the name of the
11 IND, the Biologics Investigational New Drug
12 Application.  And that's the number that the
13 FDA assigns it.
14      Q.   What product are we referring to
15 here in Exhibit 1, 1016?
16      A.   We're referring to MMR II.
17      Q.   Okay.  So even though the
18 product was on the market by then, it still
19 has an IN -- we're still talking about an IND
20 number here.  Right?
21      A.   Yes.  Yes.
22      Q.   Exhibit 2 has BB-IND 10076.
23 What are we talking about there, what product
24 are we talking about there?
25      A.   This is the same product.

6 (Pages 18 - 21)

Appx1828

Page 22

ALISON L. FISHER, PhD - CONFIDENTIAL

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  However, instead of including human albumin,
3  it includes recombinant human albumin
4  produced in yeast.
5      Q.  So this is a -- the idea being
6  here that you want to change what's in the
7  MMR II from the human albumin to the
8  recombinant human albumin.  Right?
9      A.  Yes.
10     Q.  At that time that hadn't been
11  approved.  This is a separate -- Exhibit 2 is
12  a separate file, or Exhibit 2 speaks to a
13  separate file where you were asking the FDA to
14  okay that change from HSA to rHA.  Right?
15         MS. DYKSTRA:  Objection.
16         THE WITNESS:  This document is a
17     change -- these are both a change of
18     responsibility documents so that when
19     a new person comes in to Merck working
20     as a regulatory liaison, there is an
21     introductory period, in this case
22     about a month.  And then there is an
23     official change of responsibility.
24     And that's what these are for.  In
25     both cases it's for INDs.

Page 23

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  BY MR. MACORETTA:
3      Q.  So there's -- so change are --
4  and these are for two different -- it's not a
5  different -- these are for two different
6  products.  Right?
7      A.  It is the same vaccine, we're
8  just swapping out the human serum albumin
9  with recombinant human albumin.
10     Q.  Or at this time you're asking
11  the FDA for permission to do that, or approval
12  to do that.  Right?
13     A.  The approval here is so that I
14  could be the liaison and take over the
15  responsibility for the work stream associated
16  with getting the recombinant human albumin
17  MMR II approved.  And this one is the
18  predecessor to it, the human albumin MMR II.
19     Q.  So let me try it this way:  I
20  think you're -- we're missing each other.
21  Exhibit 1 represents a product that in
22  March 2004 was on the market and being sold by
23  Merck.  Right?
24     A.  I think where I'm getting
25  confused here is these letters are letters --

Page 24

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  these are change in responsibility letters
3  between Merck and the FDA.  And they're
4  covering two work streams that I'd be
5  responsible for being the one point of
6  contact between Merck and the FDA.  That's
7  what these are.
8      Q.  Okay.  Let me try -- yes, I
9  think that's where we are missing each other.
10  Let me try it this way:  The work stream in
11  Exhibit 1, BB-IND 1016, that talks -- that
12  work stream is for a product that in
13  March 2004 was on the market and being sold by
14  Merck.  Right?  That's the --
15     A.  That is correct.
16     Q.  That's the then existing version
17  of MMR II?
18     A.  Yes.
19     Q.  Exhibit 2, the BB-IND 10076
20  represents a work stream for a product that
21  the FDA has not yet approved.  Correct?
22     A.  That is correct.
23     Q.  Okay.  March of 2004 you become
24  the point of contact for these two work
25  streams?

Page 25

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2      A.  Yes.
3      Q.  Any other work streams you then
4  become the point of contact for relating to
5  MMR or relating to mumps vaccine, I'll be more
6  general?
7      A.  I'm trying to remember back to
8  the time, but back at the time there were two
9  main things that I was working on with MMR.
10  One was the HSA vaccine here, the other one
11  was the rHA vaccine.  There were other ones
12  after that.
13     Q.  So the two -- when you say HSA,
14  is that what we're talking about, Exhibit 1?
15     A.  HSA is BB-IND 1016.  And rHA is
16  this one here.
17     Q.  Okay.  And those were the two
18  main things you were working on with mumps
19  vaccine at that time?
20     A.  At this time in 2004, these
21  were the things that I was working on.
22     Q.  Later on were there some other
23  work streams you were working on for mumps
24  vaccine?
25     A.  I recall later on I was working

7 (Pages 22 - 25)

Page 26

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  on a new measles stock seed.
3      Q.   At the same time was somebody
4  else at Merck working on a different work
5  stream for ProQuad?
6      A.   ProQuad was a completely
7  different person.
8      Q.   That was Mr. Dekleva then?
9      A.   Mike Dekleva.
10     Q.   Dekleva, okay.
11         So concerning -- so for the work
12  stream for MMR, your work was giving the FDA
13  what they wanted or needed to approve the
14  change to rHA, right, generally?
15     A.   Yes.  Again, I'm basically --
16  there are a lot of people working and then
17  I'm the contact between those persons
18  working, putting together files and
19  submissions.  I'm the contact to the FDA.
20     Q.   But as it concerns rHA, the work
21  stream there was towards getting them to
22  approve -- getting the FDA to approve the
23  change to rHA.  Right?
24     A.   That is the main goal, is
25  getting the rHA approved.

Page 27

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2      Q.   Okay.  With the HSA or existing
3  product, what did the work stream involve?
4      A.   The work stream, this is just
5  saying that I have responsibility for MMR
6  with HSA.  But at the time this had to do
7  with a submission that came before me from
8  another liaison who left the company.  And
9  that was for the -- reducing the end expiry
10  potency for the mumps.
11     Q.   Who is that prior person?
12     A.   Manal Morsy.
13     Q.   Okay.  So when you come into
14  this job, you've -- in March of '04, you've
15  inherited a work stream started by Dr. Morsy
16  where Merck is asking the FDA to lower the
17  end-expiry potency for the mumps vaccine.
18  Right?
19         MS. DYKSTRA:  Objection.
20         THE WITNESS:  Merck is not
21     asking the FDA to lower the mumps end
22     expiry potency.
23  BY MR. MACORETTA:
24     Q.   Merck is asking for the FDA's
25  approval to lower the end expiry potency.

Page 28

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  Right?
3         MS. DYKSTRA:  Objection.
4  BY MR. MACORETTA:
5      Q.   Why don't we get up -- what's
6  Merck asking for?  Let me do it this way:  Why
7  should I testify?
8         What's Merck asking for in
9  connection with the end expiry potency for the
10  mumps vaccine?
11     A.   Can you refer me to a certain
12  document that you're talking about?
13     Q.   I'm trying to understand
14  generally.  We got --
15     A.   This is a responsibility
16  document.
17     Q.   This was just the way to
18  understand --
19     A.   Right.
20     Q.   -- generally what you were
21  doing.  We'll come to that in a few minutes.
22     A.   Right.
23     Q.   Okay.  When you took over the
24  file, what did you understand was supposed to
25  be happening with the HSA product?  I mean,

Page 29

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  what was the work stream trying to accomplish?
3  I think we need to understand each other a
4  little better.
5      A.   Yeah, I think -- I mean, it's
6  helpful if you can give me a document.
7  You're asking me a very general question, and
8  I can give you a general answer.  But it's
9  always helpful if you can show me the
10  document that we're referring to to be real
11  specific.
12     Q.   We're going to come to that in a
13  little bit.  Let me -- I want to do a couple
14  of other things before we get to that because
15  I want to talk about a couple of general
16  things.
17         MR. MACORETTA:  Let me show you
18     what we're going to mark as Exhibit 3.
19             - - -
20         (Exhibit Fisher-3, E-mail chain,
21     Bates MRK-KRA01481843 - 1846, was
22     marked for identification.)
23             - - -
24  BY MR. MACORETTA:
25     Q.   Ms. Fisher, there's two

Page 30

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  documents there. You're reading the first
3  one. There's a second one.
4      A.   When you say "a second one," what
5  purpose --
6      Q.   The last two pages, I think, are
7  Bates numbered. The next to last two pages
8  probably end in Bates numbers with a 41 and
9  42. Right? That's a separate e-mail chain.
10 I'm not sure why they're together, but they
11 are. You know what, let me save you some
12 time. I'm not going to ask you about these
13 last two pages. That should not have been a
14 part of this exhibit. I don't really
15 understand. It doesn't matter. Yeah, let's
16 just worry about the first pages that go from
17 Bates numbers 43 to 46. Hold onto that.
18 We'll collect them. We may talk about that
19 later but we're not going to talk about it
20 now.
21     MS. DYKSTRA: John, you want me
22 to take it out of Exhibit 3?
23     MR. MACORETTA: It going to make
24 everybody's life easier if we do that,
25 yes.

Page 31

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  BY MR. MACORETTA:
3      Q.   Let me know when you're ready.
4      A.   I'm ready.
5      Q.   All right. So as with many
6  e-mail chains, the earliest one is at the
7  back. So if we go to the next to the last
8  page at the bottom, it says, "Original
9  Appointment," next to the last page, from --
10 it says Jonelle Rittenhouse to several people
11 including you. Do you see that?
12     A.   Yes.
13     Q.   Okay. And then it's talking
14 about a -- the subject MMR II House Standard
15 assignment?
16     A.   Okay. Okay. I can explain
17 this. So when I was in project management,
18 and again this is a long time ago, one of my
19 other jobs in project management was to be a
20 project manager on the biologic specifications
21 committee. And that job, again, was very
22 high level. I would capture minutes, I would
23 listen to the conversations, and it was a
24 project management job associated with
25 setting specifications. And I completely

Page 32

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  forgot about that when you asked me about
3  project management. So I apologize for that.
4  So other than project managing PR5I, I also
5  was a project manager sitting on the
6  specifications committee. And on this
7  committee you're correct, you know, ProQuad
8  was discussed, MMR was discussed.
9      My role here, again, was just a
10 project manager, so I would keep track of
11 agendas and minutes, some of the timelines.
12 And then all the folks copied on here were
13 all the subject matter experts involved in
14 setting the specifications. I was just the
15 one, again, taking the minutes and acting as
16 a project manager to make sure that the
17 meetings happened on time and things stayed
18 to agenda and so forth.
19     Q.   So on the last page, when it
20 says, "This is a BSEC assignment...,"
21 that's -- what does that mean?
22     A.   Yeah. That's the biologic
23 specifications executive committee. So
24 there's two committees. There's a BSC which
25 involved a lower tier and then the BSEC which

Page 33

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  involved the executives.
3      Q.   Because at this time -- well,
4  Mr. Chirgwin was later your boss, right, in
5  March of '04 when he came on?
6      A.   Yep, that's right. He was not
7  my boss during this time, but he did sit on
8  this committee.
9      Q.   And this committee is talking
10 about the House Standard assignment?
11     A.   Yes.
12     Q.   You know what that is, right?
13     A.   I would have to go back, it's
14 been a while. But I know that -- I have a
15 general knowledge that new House Standards
16 come in and they're assigned. And that's
17 what this was about, assigning that new House
18 Standard. So I'd have to read it in detail
19 to remember precisely what went on here.
20     Q.   I want to talk a little bit
21 about House Standard. So on the last page it
22 says the purpose is "To reach consensus on the
23 M-M-R® II House Standard which is required as
24 part of the move to potency calibration."
25     A.   Uh-huh.

9 (Pages 30 - 33)

Page 34

ALISON L. FISHER, PhD - CONFIDENTIAL

Q.   What's that, what's potency calculation mean here?

A.   It's been so long.  Oh, boy. Let's see.  I think that's just what it says there, it's -- basically it's a standard that's being used to calibrate the potency. In this case it's not saying the potency of what.  So MMR II House Standard for the potency evaluation.  So I'd have to read further to find out which potency they're talking about --

Q.   So what --

A.   -- if it's for all three antigens or one antigen.

Q.   So when it says, "...the move to potency calibration," does that mean that you weren't calibrating the -- Merck wasn't calibrating the potencies of these products before this?

MS. DYKSTRA:  Objection.

THE WITNESS:  It's been a long time since I've looked at this, so I'm hesitant to answer technical questions on this.  But just to let you know, my

Page 35

ALISON L. FISHER, PhD - CONFIDENTIAL

role was a project manager and I can tell you what the roles of all these other people were.  They were the brains in this game.  And I was the project manager again coordinating meetings and timelines.  I would take minutes, put out agendas.  Typically in the minutes if there was something that I wasn't clear about, it was a vehicle to make sure that people fill in the blanks in the minutes to keep the record.  I would imagine that a move to potency calibration, you know, you asked a question, was there nothing before that.  Knowing Merck, there was something before that, but what -- you know, something else was being done, something was being moved from one thing to another.  But at this point of time, it's been so long and without reading this in great detail, I can't answer the question, you know, what came before and what is after.

Page 36

ALISON L. FISHER, PhD - CONFIDENTIAL

BY MR. MACORETTA:

Q.   So who was in charge of this committee at the time?

A.   At the time the BSEC, I believe that the two folks that were key involved in these committees were John Hennessey and Mark Rosolowsky.

Q.   The e-mails in this chain --

A.   I mean, all these folks sat on the committee, but as I recall, as a project manager, the two that were very involved from the technical end, coordinating these meetings, you know, I was -- I would sit and they would say something needs to come on to the agenda, will you schedule a meeting.  At the time it was very administrative what I did.  And Rosolowsky and Hennessey were more of the subject matter experts that would help to pull everybody together.

Q.   What was Ms. McKee's role?  I see -- I mean the e-mail above the one we looked at she's saying here's the agenda and --

A.   Yeah.  Now, Roberta McKee, I

Page 37

ALISON L. FISHER, PhD - CONFIDENTIAL

believe that she was one of the key people on the BSEC, the executive committee, and then Rosolowsky and Hennessey were on the BSC. That was the lower level committee.  I believe Roberta McKee might have been Mark Rosolowsky's boss at that time.

Q.   So I understand it, she's listed as being a vice president in Merck manufacturing.

A.   That's right.

Q.   And you were in Merck research labs?

A.   Yes.

Q.   I'm going to step away from this for a second, I'm going to ask a more general question.  You're a regulatory liaison dealing with certain products like we talked about before.  Right?

A.   Uh-huh.

Q.   Is there an equivalent person doing the regulatory liaison job at Merck Manufacturing Division for the same --

A.   That's correct.

Q.   So who would that have been

10 (Pages 34 - 37)

Page 38

ALISON L. FISHER, PhD - CONFIDENTIAL
1  for --
2      A.   In the Merck --
3      Q.   -- these MMR products?
4      A.   That would have been Mark
5  Rosolowsky.
6      Q.   So he's titled regulatory
7  liaison or some version, or
8  functionally that's what he does -- let me
9  strike that.
10     Mr. Rosolowsky functionally acts
11 as a regulatory liaison at the Merck
12 Manufacturing Division?
13     A.   He's no longer with Merck, but
14 at the time he was in charge of an MMD group
15 that handled regulatory items, conduit to the
16 FDA that were just manufacturing.  They
17 didn't touch labeling.  And they didn't touch
18 clinical.  So Mark was in charge of that
19 group.  I believe Mark at the time was the
20 one that did all the correspondence with the
21 FDA.  However, there could have been others
22 in that group that may have been under him
23 that may have done it as well.  I don't
24 remember precisely how the group was

Page 39

ALISON L. FISHER, PhD - CONFIDENTIAL
1  organized.
2      Q.   So I presume, then, there would
3  be occasions where you would talk to
4  Mr. Rosolowsky and say is this an MRL deal or
5  an MMD issue, or would there have been?
6      MS. DYKSTRA:  Objection.
7  BY MR. MACORETTA:
8      Q.   Try it this way:  Did you ever
9  deal with Mr. Rosolowsky to discuss which one
10 of you was going to handle a certain issue
11 related to an MMR product?
12     A.   Just to let you know, at this
13 point of time, I was not in regulatory.
14     Q.   I mean by --
15     A.   I was a project manager.
16     Q.   No, no, no.  That's why I said I
17 wanted to step away from this document and ask
18 you more general.
19     A.   Okay.
20     Q.   So let's talk about June of
21 2000 -- well, I'll pick a couple of months
22 after you started in regulatory.  From that
23 point forward, would you talk to Mr. Rosolowsky
24 about who was going to do what concerning an

Page 40

ALISON L. FISHER, PhD - CONFIDENTIAL
1  FDA issue with MMR?
2      A.   The question is pretty general
3  so here is how I can answer it:  My role was
4  anything related to MMR that touched clinical
5  studies.  And typically clinical studies are
6  done for a number of reasons, but one big
7  reason is to change something in the label.
8  So my responsibility was around anything that
9  touched a clinical study and anything around
10 a label change related to a clinical study.
11 Mark's area was they would handle strictly
12 manufacturing supplements.  No clinical data,
13 no label changes that related to clinical
14 data or safety data.  There was a very, very
15 clear line between what Mark's group did and
16 what I did.  And, again, it's very clear,
17 like you know if there's a clinical study,
18 anything touching a clinical study would be
19 me.  Anything purely manufacturing would be
20 him.  So there wasn't a conversation back and
21 forth what do you handle, what do I handle.
22 It was very clear what the two of us handle.
23     Q.   Let me make sure I understand
24 what falls on a couple of sides.  We're going

Page 41

ALISON L. FISHER, PhD - CONFIDENTIAL
1  to talk later about a PAS to change the
2  release potency of a product.  Is that your
3  side or Mark's side?
4      A.   That is my side.  And the
5  reason that's my side is even though it
6  involved manufacturing, it involved a
7  clinical study.
8      Q.   Okay.
9      A.   And it also involved a change
10 to a component of the label.  So that was a
11 very clear thing that would come to me.
12     Q.   If a lot is tested before
13 release and for whatever reason fails that
14 test, and that has to be reported to the FDA,
15 that's Mark's side?
16     A.   That's Mark's side.
17     MS. DYKSTRA:  Objection.
18 BY MR. MACORETTA:
19     Q.   Okay.  If for some reason
20 somebody at Merck, there would be a situation
21 where a recall would have to be considered, is
22 that your side or Mark's side or neither?
23 Maybe I missed the --
24     A.   If there is a recall, that

11 (Pages 38 - 41)

Appx1833

Page 42

ALISON L. FISHER, PhD - CONFIDENTIAL
1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  would involve Mark's side and it could
3  involve my side.  It depends, it depends on
4  what's involved with the recall.
5      Q.    Now I'm going to step back and
6  ask you a different set of general questions
7  about this.  So we talked -- and I'm going to
8  talk to you about the file that's kept for
9  communications with the FDA.  We talked
10 earlier, you said there was something called
11 an eDossier.  Right?
12     A.    Yes.
13     Q.    It's my understanding that when
14 you communicate to the FDA or the FDA
15 communicates to you, those documents are all
16 kept together in some separate file.  Is that
17 right?
18     A.    eDossier is an electronic
19 repository of back and forth communication.
20 There was -- so at the time that I was
21 involved with this project, some of the
22 documents that I would get would be from
23 eDossier. However, eDossier only went back
24 to a certain period of time, and I can't
25 remember exactly what that was, but let's say

Page 43

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  it was around 2002.  Then before that, there
3  were different ways of storing documents.
4  So, for example, documents in the '90s, I
5  would see those documents as paper documents.
6      Q.    And all of these documents,
7  whether eDossier or paper, there was some rule
8  at Merck that all the communications with FDA
9  there had to be a record of them and those
10 records had to be kept in a file somewhere.
11 Right?
12     A.    Yes.
13     Q.    Okay.  Now, when we talk --
14     A.    Official records, us to FDA,
15 FDA back to us.  Any official correspondence
16 was retained either in a file or through time
17 and electronic dossier.
18     Q.    Okay.
19     A.    That's official.
20     Q.    So I guess then -- well, you
21 know what I'm going to ask next.  What's
22 the -- what's your distinction for official as
23 opposed unofficial there?
24     A.    Official would be a
25 communication from us to the FDA and the FDA

Page 44

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  back to us.  Another form would be if there
3  was a conversation with the FDA, if that
4  conversation was a conversation that wasn't
5  tracked either in the outgoing or incoming
6  correspondence, then there would be a
7  telephone conversation record.  That
8  record -- I know now those are in eDossier.
9  At the time -- at this time I believe, I
10 can't remember if they were put in another
11 repository or not.  But just to go further on
12 that, typically -- well, I'm just going to
13 stop there.
14     Q.    So if somebody from the FDA
15 calls you and says I have three questions
16 about this file --
17     A.    Uh-huh.
18     Q.    -- you hang up the phone, you're
19 supposed to write a memo or fill out some form
20 about that conversation that goes in the file.
21 Right?
22     A.    Typically --
23          MS. DYKSTRA:  Objection.
24          THE WITNESS:  Typically the FDA,
25     if they have official questions for

Page 45

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2      us, they're going to send those
3      questions to us.  I'm trying to
4      remember how it was done way back
5      when.  But now, for example, there is
6      an electronic -- there's secure e-mail
7      so everything from the FDA comes in
8      secure e-mail.  Back at this time, you
9      know, 14 years ago, I can't remember
10     whether they came to us in secure
11     e-mail or they were faxed to us.  They
12     might have been faxed to us.
13 BY MR. MACORETTA:
14     Q.    But the fax goes in the file,
15 the same file with the official correspondence.
16 Right?
17     A.    Anything from the FDA to us
18 official correspondence should have been kept
19 in a record.
20     Q.    And if there's a phone
21 conversation about a file -- I mean, we're
22 going to look later, there's some -- the FDA
23 called you and talked to Dr. Chirgwin about
24 something --
25     A.    Right.

12 (Pages 42 - 45)

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2    Q.    -- and then we see a memo.
3    A.    It really depends on what it's
4 about.  But anything that's impactful
5 would -- anything that's impactful would be
6 captured in a memo.
7    Q.    And that all goes in some file.
8 Right?
9    A.    That goes in some file.
10    Q.    What do we call -- what do you
11 call that file at Merck, that place where all
12 this communication back and forth with the FDA
13 is?
14    A.    Well, I can tell you now it's
15 all in eDossier.  Back at this point of time,
16 I cannot remember exactly where it was kept.
17    Q.    I'm not asking where you kept --
18 where it's kept, I'm asking what did you call
19 it, meaning here's a letter from the FDA,
20 let's put this in the -- what would you say
21 that file is that holds it all, is it called
22 the FDA regulatory file or the communicate --
23 was there some name you had for this at Merck?
24    MS. DYKSTRA:  Objection.
25 BY MR. MACORETTA:

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2    Q.    Do you understand what I'm
3 asking?
4    MS. DYKSTRA:  Are you asking if
5 there's a file other than eDossier?
6 BY MR. MACORETTA:
7    Q.    Well, is eDossier the name of a
8 file or is it the name of a software?  Let me
9 do it that way.
10    A.    eDossier is an electronic
11 repository of communications from Merck to
12 the FDA and the FDA back to us.
13    Q.    So if you had this regulatory
14 job today and the FDA sent you a letter, you
15 would hand it to your assistant and say put
16 this in eDossier?
17    A.    Yes.
18    Q.    And that's what everybody at
19 Merck understood to be the place where all
20 these communications with the FDA were kept?
21    A.    Yes.
22    Q.    Okay.
23    A.    eDossier or at this time it
24 could have been kept -- we had a file room
25 where all the official files were kept.

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2 Before the time that everything was put into
3 eDossier, I think all those electronic -- all
4 those files, paper files, I think there was
5 some mechanism to eventually scan all those.
6 I think some are kept at Iron Mountain and
7 some were scanned and put into eDossiers.
8    Q.    That eDossier file, does that
9 include communication -- and that eDossier
10 file is kept by either IND or Drug Product.
11 Right?
12    A.    Uh-huh.
13    Q.    So there's a file for MMR.
14 Right?
15    A.    Uh-huh.
16    Q.    And there's some other file for
17 whatever other vaccine there may be.  Right?
18    A.    Uh-huh.
19    Q.    Okay.  That file for MMR, does
20 that include the communications between the
21 FDA and somebody at Merck Manufacturing like
22 Mr. Rosolowsky?
23    A.    I can't comment on Dr. Rosolowsky'
24 file keeping.  I don't know -- I don't know
25 where he put things.  I don't know what --

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2 I'm sure that MMD had some procedure, but I
3 don't know what that procedure was.  I can
4 tell you now what's -- all that goes into
5 eDossiers now.
6    Q.    So there's one eDossier that
7 includes the MRL correspondence with the FDA
8 and the MMD correspondence with the FDA?
9    MS. DYKSTRA:  Objection.
10 BY MR. MACORETTA:
11    Q.    Used a lot of acronyms in that
12 sentence, but yes.
13    A.    Right.  That is what is done
14 now.  14 years ago, 10 years ago, 11 years
15 ago, I can't tell exactly what was done, but
16 that's what is done now, yeah.
17    Q.    Okay.  Fair enough.  Now I'm
18 going to move back to the House Standard for a
19 minute.  Thank you.  That was a -- now I'm
20 going to move back to the House Standard and
21 this e-mail.
22    So you're on the -- this BSEC
23 and there's some discussion about the House
24 Standard?
25    A.    [Reviewing document.]

Page 50

ALISON L. FISHER, PhD - CONFIDENTIAL

Q. Okay. If you look at the e-mail
on the next to the past page from -- that
starts at the top from Ms. McKee, it seems to
suggest that there's some discussion with the
FDA about changing the House -- about the
House Standards for measles, mumps and
rubella. At this time, was there a House
Standard for mumps?

A. Okay. So you're asking me
questions about something that happened quite
a long time ago, and you're also asking me
questions about something that happened at
the time I was a project manager. So I think
if you have detailed questions about the
House Standards and what went on, it's
probably better that you ask these questions
to the subject matter experts that were
involved in making these decisions because as
a project manager that wasn't my role.

Q. Okay. Let me ask you --

A. So I was not a subject matter
expert. I was -- I hate to say it, I was a
glorified secretary. That's what a project
manager for this team was. And, you know,

Page 51

ALISON L. FISHER, PhD - CONFIDENTIAL

all the nitty-gritty substantive
conversations, I mean, I contributed in some
ways to these conversations, but if you
really, really want to go back to recreate
this and understand what happened, I'm not
the right person to ask because this was not
my responsibility.

Q. Sure. And I don't want to talk
in a great level of detail. I want to
understand generally.

A. Right.

Q. I'm only going to -- let me
start with this: If there's a House
Standard -- if Merck assigns a House Standard
for mumps, is that something the FDA has to
approve?

MS. DYKSTRA: Objection.

THE WITNESS: I do not deal with
any types of manufacturing issues.
And even though I think in my head I
may know the answer, I really don't
want to speculate here. I think if
you want to understand this, the best
thing to do would be to, there's a lot

Page 52

ALISON L. FISHER, PhD - CONFIDENTIAL

of names on here, would be -- these
are people that are going to be better
able to answer these questions than me
because I was the project manager.

BY MR. MACORETTA:

Q. Sure. So creating or getting
FDA approval for a House Standard is a Merck
Manufacturing Division issue, not an MRL
issue?

A. That would be a Mark Rosolowsky
issue. If it just was -- it if didn't touch
anything with clinical or anything, you know,
with the clinical study, that would have been
Mark Rosolowsky's area.

Q. Well, let me ask you a more
general question then. What is your
understanding of what the House -- what is the
House Standard?

A. The House Standard is something
that is used to calibrate. So it's -- if
you're looking at a potency of something, you
need to calibrate that against something
else. To the best of my understanding,
that's what a House Standard is used for.

Page 53

ALISON L. FISHER, PhD - CONFIDENTIAL

Now, periodically, to the best
of my understanding, sometimes the House
Standard will run out and you'll have to get
a new one. So -- and, again, this is not my
area of expertise. I can just give you my
general knowledge. Again, if you need
specific knowledge, I'm not the one to ask.

Q. General is okay.

A. But my general understanding is
that when you move from one House Standard to
a new House Standard, then you're going to
have to make sure that there's some sort of
concordance between those two standards. So
there's a very careful assessment going from
the previous one to the new one. I can't
give you any more detail than that. That
would be something that, you know, Mark's
area, somebody would be involved,
statisticians, folks involved in
manufacturing would be involved with that.
In my job, I don't deal with House Standards,
but there are other people that would be
dealing with that. It's not my expertise or
responsibility.

14 (Pages 50 - 53)

Appx1836

Page 54

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2        Q.    So let me stay at a high level
3  here for a minute.  I understand.
4             When you say calibrate, the
5  House Standard is used as a way to calibrate a
6  measurement of potency, right, generally?
7            MS. DYKSTRA:  Objection.
8  BY MR. MACORETTA:
9        Q.    Is that right?
10       A.    A House Standard, it really
11 depends on what you're talking about.  In
12 this instance -- in this instance I would
13 imagine it would be potency, but there are
14 instances that have nothing to do with
15 potency where you would calibrate a House
16 Standard.
17       Q.    Well, for the mumps vaccine
18 we're talking about potency.  Right?
19       A.    I believe --
20            MS. DYKSTRA:  Objection.
21 BY MR. MACORETTA:
22       Q.    You can answer.
23       A.    Yeah.  I believe that's the
24 case, yes.
25       Q.    We're talking about potency,

Page 55

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2  what we mean is the number of virus particles
3  in a certain amount of medium or liquid.
4  Right?
5       A.    Well, I think it's expressed as
6  TCID50.
7       Q.    Okay.  What is that?
8       A.    The 50 percent of the
9  infectious dose.
10       Q.    We're going to look at some
11 documents.
12       A.    Total concentration infectious
13 dose 50 percent.  Something like that.
14       Q.    So what is that -- I'm still not
15 following what that --
16       A.    Oh, boy, you're really --
17 you're trying -- you're really racking my
18 memory here.  This goes way, way back.  I
19 believe that there were a number of different
20 assays that were used, potency assays and
21 they -- different assays have changed over
22 time, so I'd have to go back to documents.
23 Again, this is not my expertise, so I'm
24 really not the right person to ask about
25 this.

Page 56

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2        Q.    No, I understand.  I understand.
3  Let me try generally, because we're going to
4  see some documents later where you used some
5  of these terms.
6             Potency measures the amount of
7  virus in the product at a certain time or does
8  it measure something else?  When we talk about
9  potency, what are we talking about?
10       A.    You're asking me something
11 that's not really in my field but, you know,
12 potency for a virus can be your total IgG or
13 it can be something, you know, functional,
14 which would be something that neutralizes.  A
15 lot of times there's a very high
16 correspondence between something -- you know,
17 your IgG that would be measured in one assay
18 versus a neutralization that would be assayed
19 in another assay.
20       Q.    What's IgG mean?
21       A.    That's immunoglobulin.  So it
22 would be -- you know, if you're exposed to --
23 if you're exposed to a virus, then your
24 immune system will mount an immune response
25 and then you'll get a specific IgG for that

Page 57

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2  particular antigen.  That's just a portion of
3  the immune response.
4       Q.    Okay.  So let's go up a page in
5  this.  I'm looking at the -- it starts with
6  Wednesday, June 11th, its subject "Follow-Up:
7  M-M-R® II House Standard Assignment."
8            "Thank you for your
9  participation in yesterday's discussion."
10            Your role you said mainly was to
11 take notes and keep the minutes, be a
12 glorified secretary, right, at this time?  I'm
13 just using your words.
14       A.    Yeah, I hate to say it, but
15 that's pretty much what project managers do.
16       Q.    So let me ask you a couple of
17 questions about the people here first.  First
18 it says, "Conversation with Phil Krause...."
19 Who is Mr. Krause at this time?
20       A.    FDA.
21       Q.    Okay.  Roberta McKee, vice
22 president vaccine and sterile quality
23 operations -- what was -- at MMD.  What was
24 her role with the House Standard or MMR II
25 here?

15 (Pages 54 - 57)

ALISON L. FISHER, PhD - CONFIDENTIAL

A. All I know is that she was a
vice president in the Merck Manufacturing
Division. She -- and I believe that she had,
you know, a role on setting specifications
and on quality. But honestly, I can't
remember exactly how MMD manufacturing was
organized at the time.

Q. Okay. Then there are some
bullet points in the middle. And these bullet
points are discussing, if you look above, a
complete response letter. Do you see that?

A. Uh-huh.

Q. A complete response letter is a
letter Merck sends back to the FDA responding
to certain questions?

A. Right. This would --

MS. DYKSTRA: Objection.

BY MR. MACORETTA:

Q. You can answer.

A. Right. This would be Mark
Rosolowsky's area. This would be manufacturing.

Q. So this would have been --
whatever complete response letter Merck was
going to send to the FDA would have come out

---

Page 59

ALISON L. FISHER, PhD - CONFIDENTIAL

of manufacturing -- for this issue would have
come out of manufacturing. Is that what
you're saying?

MS. DYKSTRA: Objection.

THE WITNESS: All right. Let me
    take it bullet by bullet. I mean,
    there's a lot of issues here.
    Anything that is purely manufacturing
    that doesn't touch anything clinical
    would come from Mark's lab.

BY MR. MACORETTA:

Q. Okay.

A. Anything that relates to
reducing an expiry, that would involve
something in the package insert, that touches
clinical. And if it touches clinical, then
that would not be Mark Rosolowsky.

Q. That would have been the MRL
side?

A. It would have been, but just to
be clear, like, for example, even today when
we do submissions like a new BLA, a new BLA
not only contains clinical components, it
also contains manufacturing. So typically

---

Page 60

ALISON L. FISHER, PhD - CONFIDENTIAL

even though I'm reporting into the FDA as the
one point of contact, I work with
manufacturing leads because manufacturing,
detailed manufacturing, I understand very
high level things, but the details would be,
there would be a group within manufacturing
that would answer FDA's questions and feed me
those details to respond to questions back to
the FDA.

Q. Gotcha.

A. So for this type of thing, you
know, some of these things can be purely
manufacturing, but some of these things, when
you're talking about an end expiry and
talking about a potency that is going to be
put in a label, then there's manufacturing
involved, but this touches clinical.

Q. So in the "To" list of this
e-mail at the top of the page --

A. Uh-huh.

Q. -- who are the MRL people?

A. Okay. So Keith Chirgwin was my
boss in MRL.

Q. In June of '03?

---

Page 61

ALISON L. FISHER, PhD - CONFIDENTIAL

A. I'm sorry, in '03 he wasn't my
boss. He was -- this is BSEC or BSC. This
was when I was a project manager.

Q. Yes.

A. So Keith Chirgwin was either an
executive director or a VP of MRL regulatory.
Jeff Chodakewitz was either a VP or an
executive director of clinical research.
Barry Garfinkle was in MMD and I believe he
was in manufacturing, but I -- he was in MMD,
something related to manufacturing. But I
don't know exactly what. I'm on here because
I'm the project manager. Joe Heyse is the
MRL statistician. Carl Burke, I can't
remember exactly what he did, but I don't
remember what department he was in. I don't
know whether he was in MRL or MMD. But he
had something to do with formulation.

Mark Rosolowsky, we talked
about him. He was in charge of the group
that would submit, he'd be the point of
contact for the MMD side, manufacturing.

Florian Schodel reported in to
Jeffrey Chodakewitz, and he was executive

---

Page 62

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 director of clinical research.
3 Tim Schofield would have
4 reported in to -- I can't remember, but he
5 was a statistician and worked on not clinical
6 statistics, but he worked on kind of
7 specifications and manufacturing statistics.
8 Phil Bennett worked for Tim
9 Schofield.
10 Mark Galinski I believe worked
11 for Mark Rosolowsky in the MMD group and
12 dealt with some of the regulatory items,
13 although I don't -- I think Mark was the
14 point of contact to the FDA, Mark Rosolowsky
15 and not Mark Galinski. But I can't be sure
16 of that. Mark Galinski could have
17 communicated with the FDA as well.
18 John Hennessey I believe was in
19 some sort of formulation group.
20 Formulation -- let's see, bioanalytical
21 process group. They had something to do with
22 bioanalytical assays and process, but I don't
23 know exactly what.
24 Pete DePhillips I think worked
25 for John Hennessey.

Page 63

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 Bob Sitron, he was an MRL and I
3 believe he was this MRL group that worked --
4 there was some correspondence between this
5 MMR -- MRL group and MMD group with respect
6 to formulation, assay and setting
7 specifications. I vaguely remember that
8 maybe this group developed some of the assays
9 and then they would get transferred over to
10 MMD.
11 Let's see. Lou Linda Johnson.
12 I have no idea who that was.
13 Ann Lee I believe was a VP in
14 that formulations group I was just telling
15 you about.
16 I don't know who Scott Reynolds
17 was.
18 Jonelle Rittenhouse I believe
19 was the secretary to Roberta McKee.
20 Q. So who is the highest level
21 person at MRL on this list?
22 A. The highest level person, well,
23 that's a hard one because I believe that Jeff
24 Chodakewitz -- Jeff Chodakewitz might have
25 been -- he was definitely the highest level

Page 64

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 MRL clinical person. The highest MRL --
3 yeah, he'd be the highest MRL clinical
4 person. Keith Chirgwin, I can't remember
5 whether Keith was the same level as Jeff or
6 not at the time. So I would say Jeff and
7 Keith or perhaps Jeff.
8 Q. So at this time Manal Morsy had
9 the job that you inherited in March of '04.
10 Right? In June of '03.
11 A. At this point in time Manal
12 Morsy would have had that job, yes.
13 Q. And Keith Chirgwin was her boss?
14 A. Yes.
15 Q. Okay. All right. Let me
16 talk -- so now we understand who is who.
17 Well, let me look at the third bullet point
18 here, which the reduction of expiry to
19 18 months, that would have been an MRL issue,
20 right, because it would have gone on the
21 label?
22 MS. DYKSTRA: Objection.
23 THE WITNESS: Well, this would
24 be -- reducing the expiry to
25 18 months, I'd have to go back to the

Page 65

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 label, but I don't recall that the
3 label has shelf life in it. That
4 would be something that would be on
5 the label on the vial, but I don't
6 recall the -- I'd have to look at the
7 patient package insert -- or the
8 physician package insert. I don't
9 think shelf life -- I'd have to go
10 back and look. So I don't want to
11 answer that incorrectly. I'd have to
12 go look at a label. But reducing
13 expiry would go across two parts of
14 the business, it would go across MMD
15 because obviously if you're reducing
16 expiry, there's all kinds of MMD
17 storage and stocking and things of
18 that nature. Reducing it to 18 months
19 as well, I wasn't involved in this, if
20 that's something that -- and I'd have
21 to go back and look at a package
22 insert. If the shelf life was
23 actually in the package insert, then I
24 believe that MRL would be involved in
25 it. Although the reason I'm

17 (Pages 62 - 65)

Appx1839

Page 66

ALISON L. FISHER, PhD - CONFIDENTIAL
1. hesitating a little bit, if there was
2. no clinical study here and there's no
3. clinical study to get to this point,
4. then I'm a bit fuzzy on MMR's role if
5. there's no clinical study that defines
6. this number. If that number is mainly
7. defined by math and assays and things
8. of that nature, that would be more of
9. a manufacturing thing.
10. BY MR. MACORETTA:
11. Q. So you're using expiry and shelf
12. life interchangeably here?
13. A. Expiry -- shelf life is a
14. general term. Expiry is basically what
15. happens at the end of shelf life. So if you
16. say that something has a two-year shelf life,
17. that would be the end expiry. If you have an
18. 18-month shelf life -- so what you want to do
19. guarantee a certain potency. At least things
20. changed over time on this. So not in the
21. '90s but in the 2000 time frame, the potency
22. that's in the label reflects a potency that
23. you can guarantee your product has that
24. potency or above that potency at the end of

Page 67

ALISON L. FISHER, PhD - CONFIDENTIAL
1. shelf life.
2. Q. Which is the expiry?
3. A. Which would be the end expiry.
4. Q. So when it says, "...reduce
5. expiry to 18 months...," that also means
6. reduce shelf life to 18 months. Right?
7. A. This would be -- I wasn't
8. involved in this one, but this would be -- I
9. was copied on it because it was a BSC
10. discussion, but that would mean that you
11. would -- the end of shelf life would be
12. 18 months, yeah. So that means that you
13. would guarantee a certain potency at
14. 18 months.
15. Q. And to change the shelf life is
16. something you have to submit to the FDA and
17. get approval for. Right?
18. MS. DYKSTRA: Objection.
19. THE WITNESS: Yes, you do, to
20. the best of my understanding. And
21. that would be to change a shelf life,
22. if you're not touching anything
23. clinical, that would be a
24. manufacturing -- if you're not

Page 68

ALISON L. FISHER, PhD - CONFIDENTIAL
1. touching -- if you're not a --
2. clinical is not used for that, that
3. would be manufacturing.
4. BY MR. MACORETTA:
5. Q. But either way the FDA would
6. have to approve the change?
7. A. Yes.
8. Q. Okay. And if it's a change on
9. the label, that's got to go through your --
10. the MRL part. Right?
11. A. Yes.
12. Q. Okay. This talks about the
13. House Standard, and then if you look at the
14. following sign that's below, there's a
15. strategy for EU filings. Do you see that?
16. A. Yep.
17. Q. Okay. So when Merck contemplated
18. a House Standard, is there one House Standard
19. for the US and a different House Standard for
20. another part of the world, or is there one as
21. it relates to the mumps vaccine?
22. A. I can answer that question how
23. things are currently. My memory is not such
24. that I can go back, but there'd be one House

Page 69

ALISON L. FISHER, PhD - CONFIDENTIAL
1. Standard for the world.
2. Q. Because the House Standard is
3. something we do to --
4. A. Calibrate.
5. Q. -- to calibrate an assay that
6. we're using to measure potency. Right?
7. MS. DYKSTRA: Objection.
8. THE WITNESS: Yes.
9. BY MR. MACORETTA:
10. Q. And there's no reason the
11. calibration would be different in the US than
12. anywhere else. Right?
13. MS. DYKSTRA: Objection.
14. THE WITNESS: There shouldn't
15. be, at least in today, but back in the
16. '90s, I can't -- I was not in my job
17. in the '90s. I was not in
18. manufacturing in the '90s. I know
19. that there was various things that
20. were done with potency in how it was
21. measured in the cell lines, but I
22. can't speak to that. And the one that
23. would be able to speak to that would
24. probably be -- I mean there's a number

18 (Pages 66 - 69)

Appx1840

Page 70

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2    of people on this list that could
3    probably speak to that with greater
4    recollection because it was in their
5    job function.
6    BY MR. MACORETTA:
7        Q.    Okay.  This bullet point above
8    also talks about the upper specs for mumps and
9    rubella, the third bullet point.  Do you see
10   that, the second one?
11       A.    Yes, uh-huh.
12       Q.    Do you know what that's talking
13   about?
14       A.    The upper specification would
15   be an upper potency.  Let me think.  Upper
16   specs.  This is not my area, but I'm assuming
17   it would be the -- you're filling at a target
18   potency, you've got a minimum release potency
19   and then you've got an upper spec on that
20   potency.  It's not my area but that's what I
21   think they're talking about.
22       Q.    So when the product is
23   released -- and we're going to talk in a
24   minute about what release means.  When the
25   product is released, it has a minimum potency

Page 71

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2    it's supposed to have.  Right?  Let's talk
3    about today for a mumps vaccine.  Right?
4        A.    Yes, there's a minimum release
5    spec.
6        Q.    Is there a maximum release spec?
7        A.    I think it depends on the
8    product.  There may be some products that if
9    you go over the maximum that's been tested in
10   the clinic.
11       Q.    Well, for mumps --
12       A.    Yeah.
13       Q.    -- is there a maximum release
14   spec?
15       A.    The only thing that I recall is
16   a target spec and minimum release spec.  I
17   don't recall anything about a maximum spec.
18   I don't remember.
19       Q.    And what is the -- when we say
20   "release potency," that means -- what does
21   release mean in that sentence?
22       A.    My understanding of it, and
23   again, it's not my -- manufacturing is not my
24   expertise, but my lay understanding of it for
25   what I did as a project manager is that would

Page 72

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2    be the minimum potency that could be released
3    to use out in the field.
4        Q.    And by "release," you mean it
5    leaves the dock at the Merck factory to go
6    wherever it's going?
7        A.    Marketed.  But then there's
8    also release that's done by the FDA.  FDA
9    actually does potency release assays.  So I
10   think for every lot of vaccine that we
11   manufacture, I believe FDA also does a test
12   on it, a release test.  So we do one, they do
13   one.  I think, you know, obviously -- I
14   shouldn't say obviously.  But if something is
15   below the minimum release, then that's
16   something that would not be taken to -- would
17   not be distributed from marketing.
18       Q.    Okay.  We also talk about a
19   target manufacturing potency.  Right?
20       A.    Uh-huh.
21       Q.    And that's different than the
22   release potency.  Right?
23       A.    Yes.
24       Q.    Is the idea that some amount of
25   product is going to be lost or potency is

Page 73

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2    going to go down between the time it's
3    manufactured and the time it's released?
4        A.    I believe there's some -- I
5    don't have the equation in front of me, but I
6    do know that there's various points where the
7    product sits.  And when it sits, there is
8    some -- there is some degradation in the
9    product.  I don't have that in front of me,
10   but I've seen those types of equations where
11   it's manufactured and then it sits at this
12   step and it loses a little bit and it sits at
13   this step.  So to the best of my
14   understanding, the minimum release, again, my
15   knowledge of it is you've got to be at that
16   number or above in order for that product to
17   be released to market.
18       Q.    And there may or may not be some
19   other number you can't be above.  There may or
20   may not be a maximum release potency?
21       MS. DYKSTRA:  Objection.
22       THE WITNESS:  Yeah, honestly,
23   like I said before, I don't remember
24   there being a maximum release potency
25   for mumps.  That doesn't mean there

19 (Pages 70 - 73)

Appx1841

Page 74

ALISON L. FISHER, PhD - CONFIDENTIAL
1  wasn't one. It's just not something I
2  remember.
3  BY MR. MACORETTA:
4      Q. Fair enough. Let me ask you
5  another question on this.
6          Shelf life, when did does the
7  shelf life start? Let's assume the product
8  has a 24-month shelf life. When does that
9  start, when it's manufactured or when it's
10  released?
11          MS. DYKSTRA: Objection. I know
12      we're talking about a lot of
13      manufacturing issues and you weren't
14      in manufacturing. Don't speculate his
15      questions. Just answer them to the
16      best of your knowledge.
17  BY MR. MACORETTA:
18      Q. If you don't know, you can say I
19  don't know. That's always true.
20          So when we talk about a 24-month
21  shelf life?
22      A. Uh-huh.
23      Q. When does that 24-month clock
24  start running?

Page 75

ALISON L. FISHER, PhD - CONFIDENTIAL
1      A. I would have to speculate, so
2  I'm going to say I don't know.
3      Q. Okay. The same question for
4  expiry, when does that start running? When we
5  talk -- well --
6      A. I know what an end expiry is.
7      Q. Okay.
8      A. I know what a minimum release
9  is. Any details more than that, I'm not the
10  right person to ask. You need to ask
11  somebody in manufacturing. They will -- they
12  could talk to you for hours on this.
13      Q. Okay. They may. Okay.
14          And did you ever have any
15  involvement with ProQuad?
16      A. The only involvement that I had
17  was sitting, you know, in the specification
18  committees, a lot of different products would
19  be discussed. ProQuad was one of them.
20  However, in regulatory, my job in regulatory,
21  I did not deal with ProQuad. That was Mike
22  Dekleva.
23      Q. But certain there was some
24  discussion between -- were common issues

Page 76

ALISON L. FISHER, PhD - CONFIDENTIAL
1  between ProQuad and the regulatory MMR issues
2  you were working on. Right?
3          MS. DYKSTRA: Objection.
4          THE WITNESS: The issues that I
5      remember that crossed both ProQuad and
6      MMR, the ones that I was involved with
7      mostly had to do with rHA, the rHA
8      filing.
9  BY MR. MACORETTA:
10      Q. Let me ask you a more general
11  question. So March of '04 you take over the
12  regulatory liaison for MMR?
13      A. Uh-huh.
14      Q. Was there someone else who was
15  the project manager for MMR or the rHA part of
16  MMR?
17      A. The rHA part of MMR, oh, gosh,
18  I think Keiko Simon was the project manager.
19      Q. So there was a project manager?
20      A. For MMR, yes.
21      Q. And would that project manager
22  have also dealt with the change to the end
23  expiry that we talked about earlier?
24      A. The project manager would have

Page 77

ALISON L. FISHER, PhD - CONFIDENTIAL
1  project managed it from the point of
2  timelines and dates and charts.
3      Q. So let me ask you more
4  generally. In March of '04 --
5      A. Uh-huh.
6      Q. -- there was some attempt by
7  Merck to seek FDA approval for change in end
8  expiry. Right?
9      A. I thought it --
10          MS. DYKSTRA: Objection.
11          THE WITNESS: Yeah.
12  BY MR. MACORETTA:
13      Q. Well, that file was pending
14  before the FDA. There was some discussion
15  about changing the end expiry. Right?
16      A. I'm not sure what your question
17  is. The file for end expiry, I believe, was
18  submitted at the end of January of 2004.
19      Q. And the goal of the end
20  expiry --
21      A. That was before I came to
22  regulatory.
23      Q. Sure.
24      A. And Keiko Simon was a project

20 (Pages 74 - 77)

Appx1842

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2  manager. She wasn't a project manager in
3  regulatory, she was just an overall project
4  manager.
5     Q.   And the goal of that submission
6  was to have the FDA approve a change in end
7  expiry from 4.3 log10 to 4.1 log10. Right?
8     MS. DYKSTRA: Objection. You
9     can answer.
10    THE WITNESS: The submission of
11    the SBLA to reduce the end expiry of
12    mumps, that's correct, it was to
13    reduce it from the 4.3 to the 4.1.
14 BY MR. MACORETTA:
15    Q.   So you were responsible for
16 dealing with the FDA in communications
17 relating to that. My question -- right?
18    A.   When -- I didn't submit the
19 file, Manal Morsy started it. And then after
20 she left, I took her place.
21    Q.   So who at Merck had overall
22 responsibility, whether it's the project
23 manager or someone that -- who was in charge
24 of getting this end expiry approved?
25    MS. DYKSTRA: Objection.

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2  BY MR. MACORETTA:
3     Q.   Let me ask it that way.
4     A.   I was in charge of the
5  regulatory interactions back and forth to the
6  FDA. So I'm the point of contact. My boss
7  was Keith Chirgwin. So your question, I
8  don't understand your question. So all I can
9  do is tell you roles. I was the one that was
10 the liaison, you know, I liaised between the
11 FDA. Keith was my manager. So, you know, if
12 you say person in charge, I can't remember.
13 I mean, the person in charge ultimately of
14 everything at the company would be -- so it's
15 a very general question. I don't understand
16 it.
17    Q.   It is. So -- okay. And Keith
18 Chirgwin was in regulatory affairs as well.
19 Right?
20    A.   Yes. Yes.
21    Q.   But it wasn't regulatory
22 affairs' decision that we need to -- we want
23 to change the end expiry from 4.3 to 4.1,
24 right, that was somebody else at Merck made
25 that decision?

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2     MS. DYKSTRA: Objection.
3  BY MR. MACORETTA:
4     Q.   Which is something we should ask
5  for?
6     MS. DYKSTRA: Objection.
7     THE WITNESS: Yes, regulatory
8     doesn't decide what to file. That
9     comes from an evolution of a lot of
10    conversations. In this case it was
11    conversations that I read about, I
12    wasn't part of, but there were things
13    that happened back in the '90s and
14    there was a back and forth between the
15    FDA, lots of transparency and
16    discussion, and it came to the option
17    of submitting this SBLA.
18 BY MR. MACORETTA:
19    Q.   So was there some executive at
20 Merck outside of regulatory who had overall
21 responsibility in March of '04 for getting the
22 end expiry to happen?
23    MS. DYKSTRA: Objection.
24 BY MR. MACORETTA:
25    Q.   Someone short of the president

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2  of the company.
3     A.   Typically these things are
4  decisions that are made by a number of vice
5  presidents. So, again, I wasn't there when
6  this was filed. That committee that I sat
7  on, that wasn't that BSC committee, that was
8  a specifications committee, so I wouldn't
9  have sat as a project manager on the
10 committee that made those decisions. At the
11 time, I don't know what they're called, but
12 there is a high level group. And right now
13 it would be an equivalent to the group, it's
14 called a late development review committee.
15 And there's a number of vice presidents that
16 sit on that committee from all different
17 areas and they would come together to make a
18 decision to do this. It's not just one
19 person.
20    Q.   Okay.
21    MS. DYKSTRA: John, are you okay
22    to take a break?
23    MR. MACORETTA: I am. Why don't
24    I mark this so you can look at it over
25    the break, and then we can take --

Appx1843

Page 82

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2    I'll ask questions about it. It's
3    only a one-page --
4        MS. DYKSTRA: Sure. That sounds
5    fine.
6        MR. MACORETTA: Let me show you
7    what we're going to mark as Exhibit 4.
8        - - -
9        (Exhibit Fisher-4, 4/8/11 Memo,
10   Bates MRK-KRA01456760, was marked for
11   identification.)
12       - - -
13       VIDEOGRAPHER: The time is now
14   10:55. We are off the video record.
15       - - -
16       (A recess was taken.)
17       - - -
18       VIDEOGRAPHER: The time is
19   11:17. We are back on the video
20   record.
21   BY MR. MACORETTA:
22       Q. Dr. Fisher, we're back on the
23   record. Exhibit 4, you've had a chance to
24   look at this?
25       A. Yes.

Page 83

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2        Q. I want to talk about the second
3    paragraph which talks about a virus potency
4    formulation target from 4.9 log10 to 5.2 log10.
5    Do you see that sentence?
6        A. Yes.
7        Q. Then it says this change was
8    effected to support to revised mumps virus
9    minimum release specification of 5.0 log10.
10       Do you see that?
11       A. Yes.
12       Q. And then no other -- this memo
13   is dated April 2011, it says, "No other
14   changes to the mumps virus formulation in
15   M-M-RTM II have been made since September 1999."
16       Do you have any reason to think
17   that sentence is not right?
18       A. This is not my area of
19   expertise. This is manufacturing.
20       Q. So as of the writing of this
21   memo in April of 2011, it says the minimum
22   release specification is 5.0. Right?
23       A. To the best of my understanding,
24   that is correct.
25       Q. Do you have any -- do you have

Page 84

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2    any understanding of whether or not it's any
3    different today?
4        A. To the best of my
5    understanding, it's not different today.
6        Q. Because if it got changed, that
7    would require some approval by the FDA. Right?
8        A. Yes.
9        Q. You would have been involved in
10   that?
11       A. No.
12       Q. Because that's on the
13   manufacturing side. Right?
14       MS. DYKSTRA: Objection.
15   BY MR. MACORETTA:
16       Q. Let me back up.
17       MS. DYKSTRA: Just the final
18   frame.
19   BY MR. MACORETTA:
20       Q. Let me back up. Are you still
21   involved --
22       MS. DYKSTRA: Time frame.
23   BY MR. MACORETTA:
24       Q. I thought you said you were
25   still the person for MMR II?

Page 85

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2        A. Nope.
3        Q. What is your -- when did you
4    stop having any involvement with MMR II?
5        A. I believe was in the 2007-2008
6    time frame.
7        Q. After the end expiry potency
8    change was approved by the FDA?
9        A. It was sometime -- there
10   were -- yes, it was sometime after that.
11       Q. What products are you involved
12   with today?
13       A. I'm involved with two vaccine
14   products at Merck.
15       Q. All right. So in this memo --
16   let me ask you a question. Further down from
17   what we just read it says, "To confirm this
18   statement, a review of all US CMC regulatory
19   supplements and M-M-RTM II targeting
20   procedures was completed."
21       What's a CMC regulatory
22   supplement?
23       A. That would be a manufacturing
24   supplement.
25       Q. What does CMC mean?

22 (Pages 82 - 85)

Appx1844

ALISON L. FISHER, PhD - CONFIDENTIAL

A. Chemistry, manufacturing and controls, I believe.

Q. And that's something manufacturing submits to the FDA?

A. That is something that comes from the manufacturing side of Merck in general.

Q. So let me ask you, we talked about this earlier. Those US CMC regulatory supplements, would they be in the same eDossier folder for MMR as all the other communications with the FDA?

MS. DYKSTRA: Objection.

THE WITNESS: To the best of my understanding, yes.

BY MR. MACORETTA:

Q. What's -- and then it says, "...M-M-RTM II targeting procedures...." do you know what they are?

A. No.

Q. Okay. So this -- so we're talking about a change in 1999 of the formulation target and the minimum release specification. Was this change done just for

ALISON L. FISHER, PhD - CONFIDENTIAL

the US or was it done for the whole world?

A. This change would have been done for the world to the best of my understanding.

Q. Because whatever -- you don't have different release specifications for different parts of the world, right, for MMR II?

MS. DYKSTRA: Objection.

THE WITNESS: That is not my area of expertise.

BY MR. MACORETTA:

Q. So you just don't know?

A. I don't know.

Q. Okay. Fair enough. Okay. Let me show you what we're going to mark as Exhibit 5.

- - -

(Exhibit Fisher-5, 4/13/05 Letter, Bates MRK-KRA0141733 - 1778, was marked for identification.)

- - -

BY MR. MACORETTA:

Q. We're not going to talk about

ALISON L. FISHER, PhD - CONFIDENTIAL

all of it, but you can flip through it if you want.

Okay. Exhibit 5 is a letter from you to Norman Baylor at the FDA. Right?

A. Yes.

Q. Okay. It's responding to an earlier letter from CBER. Right?

A. Yes.

Q. And this -- this relates to MMR end expiry. Right?

A. This relates to the supplemental BLA to reduce the end expiry in MMR of the mumps.

Q. And the back of it is the FDA letter you're responding to?

A. Yes.

Q. Where the FDA has several pages of deficiencies they call them. Right?

A. The letter says that the information and data submitted in the SBLA are inadequate for the final approval at this time.

Q. "...based on the deficiencies described below."

ALISON L. FISHER, PhD - CONFIDENTIAL

A. Yes.

Q. And it lists however many of them, 12?

A. Yes.

Q. Okay. And this is your response. And if we look through this, we see response 1 through 12. Actually we see response 13 as well.

I want to talk to you first about response number 7 which begins on page 11 of your response, which is the Bates-numbered pages -- page that ends in 754.

First of all, before we talk about the detail of this, you're involved in drafting this response as well? Are you?

A. The subject matter experts draft the response. I look at the response to make sure that at a high level it's worded in a reasonable way and is under -- and can be understood.

Q. But it's your signature on the letter up front?

A. Yes.

Q. So here's -- in number 7 we're

Page 90

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  talking again about the House Standard?
3    A.   Yes.
4    Q.   Okay.  So, in fact, in the FDA's
5  question, talking about a module you
6  previously submitted, "...you describe
7  recalculation of the previously assigned
8  potencies for each of the sublots of clinical
9  material used in the study due to a
10  reassignment of the mumps House Standard...."
11  I'm at the top.
12    A.   Okay.
13    Q.   What does House Standard mean
14  here?  What do you understand the FDA to be
15  asking and what do you understand Merck to be
16  saying in response?
17    A.   Okay.  Let me -- I'll have to
18  read this over.
19    Q.   Sure.
20    A.   So what is your question again?
21    Q.   My question is response number
22  7, the FDA asks about House Standard, and
23  paragraph 2 of Merck's response says the mumps
24  House Standard potency.  So can you tell me
25  what House Standard means in connection with

Page 91

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  number 7 and Merck's response?
3    A.   All I can answer is basically
4  what's written here is that the House
5  Standard potency was reassigned and it was
6  raised .1 log and that was based on thousands
7  of assay runs over eight years.  And that the
8  House Standard serves as a control and
9  calibration that normalizes potency values to
10  compensate for the assay, you know, there's
11  some running high and low of the assay on a
12  particular day.
13    Q.   And so your understanding of the
14  House Standard is that it's used to compensate
15  for running high and low of the assays?
16    MS. DYKSTRA:  Objection.
17    THE WITNESS:  So the House
18    Standard -- I mean, I'm going to read
19    to you because this is what I'm aware
20    of.  The House Standard was a quality
21    control and that was assayed with
22    unknowns.  If the assay standard
23    potency fell within control limits,
24    the assay was deemed acceptable for
25    reporting.

Page 92

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  BY MR. MACORETTA:
3    Q.   Let me stop you, Doctor.  Is
4  your testimony that all you know about House
5  Standard is what's written on this page?
6    A.   Well, that is right because
7  this happened back in --
8    Q.   2005.
9    A.   -- 2005, and when the FDA asks
10  a question, I submit that question to -- in
11  this particular case it was submitted to
12  somebody in Mark Rosolowsky's group.  They
13  reach out to the appropriate persons to craft
14  the answer.  I read the answer to make sure
15  that the answer, you know, that the English
16  is appropriate, that it's well explained and
17  that it answers the FDA's question.
18    Q.   But you have no knowledge of the
19  answer beyond that?
20    A.   For this particular case, that
21  is correct because this is -- I would say,
22  yes, that's correct.
23    Q.   So you have no idea if Merck
24  actually did reassign the potency based on
25  3,064 -- 3064 thousand assay runs over eight

Page 93

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  years?
3    MS. DYKSTRA:  Objection.
4    THE WITNESS:  What I can tell
5    you is that I never for one second
6    would think that somebody would make
7    up information to give me.  That
8    never, ever, ever, ever crosses my
9    mind.  Because all the people I work
10    with are very good scientists and
11    they're very, very honest.  And I've
12    never on any of my programs felt for
13    one second that I wasn't submitting
14    something that was honest.
15  BY MR. MACORETTA:
16    Q.   But that's based on the fact
17  that you trust them, not that you actually
18  confirmed anything they said here, in this
19  response anyway?
20    A.   Well, let's take this back a
21  little bit.  Get a question from the FDA.
22  That question gets addressed to somebody in
23  Mark Rosolowsky's group.  Mark Rosolowsky
24  then assigns it to somebody else who
25  basically interacts with the actual people

24 (Pages 90 - 93)

Page 94

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  doing the assays, that are doing the work.
3  So, you know, numbers are not made up. And I
4  was not in the labs at the time, but I can
5  tell you now that every time a response, the
6  manufacturing responses are audited and at
7  that time I do recall there were internal
8  audits of every response that was given to
9  me. I didn't audit it. Somebody else
10 audited it. But never once did I ever think
11 that anything that was given to me was made
12 up or arbitrary. Everything that was given
13 to me was very rigorous from everything that
14 I know.
15    Q.   Or inaccurate in any way?
16    A.   Nothing was inaccurate that I
17 received.
18    Q.   You agree with the last
19 statement here, right, that this change in
20 assigned potency would raise all the
21 calibrated data by .1 log?
22    A.   That is correct.
23    Q.   Okay. The effect of that is
24 something that was measured at, say, 4.2 log
25 under the old standard would now be treated as

Page 95

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  4.3 log. Right?
3        MS. DYKSTRA: Objection.
4        THE WITNESS: I can just read
5    back to you what's here because I
6    didn't do the work.
7  BY MR. MACORETTA:
8    Q.   I understand that.
9    A.   Okay. So, you know, I've
10 answered. I mean, my knowledge is what's in
11 here. And any questions that are beyond
12 that, you know, in some instances I may be
13 able to answer them, but in this particular
14 instance -- in many instances I'm not going
15 to be able to answer detailed questions about
16 manufacturing or about areas that I'm not a
17 subject matter expert of.
18    Q.   Let's take a look at -- let's go
19 back earlier in the document. Response to
20 question -- issue number 1, "Please describe
21 the purpose and underlying rationale for
22 proposing a reduction in potency of the mumps
23 component of the approved product, MMRII."
24        MS. DYKSTRA: I'm sorry, what's
25    your question?

Page 96

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  BY MR. MACORETTA:
3    Q.   I'm sorry, so I'm just reading
4  it. That's the first question the FDA asks.
5  Are you involved in drafting the response to
6  this?
7    A.   Yes.
8    Q.   So this one you have some
9  knowledge about?
10    A.   Yes.
11    Q.   Okay.
12    A.   Some knowledge.
13    Q.   Sure. This begins with a
14 discussion of prior history of communications
15 between Merck and CBER?
16    A.   Yes.
17    Q.   You knew something about that
18 because you went back and looked at those
19 communications?
20    A.   Yes.
21    Q.   Okay. Look at the last bullet
22 point of the second page, the end of it.
23        Well, actually let's start at
24 the beginning. It says a prior approval
25 supplement was filed and approved

Page 97

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  February 2011 to increase the target potency
3  from 4.9 to 5.2 with minimum release potency
4  specification of 5.0.
5        That's the same subject we
6  talked about in Exhibit 4 a few minutes ago,
7  right, this memo?
8    A.   That memo that you just showed
9  me talked about -- has basically target is
10 5.2, and the minimum release is 5. So that's
11 in agreement with this.
12    Q.   Okay. And then the end of this
13 sentence it says, "...CBER noted that the
14 manufacturing change in terms of increased
15 mumps potency was viewed as an interim measure
16 pending completion of the mumps expiry trial."
17        Do you see that?
18    A.   Yes.
19    Q.   Was that Merck's understanding
20 as well at the time, that the increase in
21 mumps potency was used as an interim measure?
22    A.   Yes.
23    Q.   So does that mean that -- and
24 pending completion of the expiry trial,
25 meaning if the expiry trial was successful,

25 (Pages 94 - 97)

Page 98

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  you could lower the end expiry so you could
3  lower the manufacturing potency or the
4  potency. Right?
5      A.    Yes.
6      Q.    And successful here would
7  meaning lowering the end potency from 4.3 to
8  4.1. Right?
9      A.    Could you rephrase the question,
10 please?
11     Q.    Sure. The purpose of the mumps
12 end expiry trial was to determine if a dose of
13 4.1 was just as good as a dose of 4.3. Right?
14 Is that a fair way to say it?
15     MS. DYKSTRA: Objection.
16     THE WITNESS: That's a general
17     way to say it. It's not a very
18     scientific way to say it, but it's a
19     very general way to say it.
20 BY MR. MACORETTA:
21     Q.    So at this -- so what I
22 understand now, we're talking about a release
23 specification of 5.0, and over the shelf life
24 of the product it loses some potency so we
25 have to determine what the end expiry potency

Page 99

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  is. Right?
3      A.    That's correct.
4      Q.    Okay. And at this time, in
5  April of 2005, the label still said the end
6  expiry potency would be at least 4.3. Correct?
7      A.    That's correct.
8      Q.    Okay. How do -- how does Merck
9  figure out how much is lost from release to
10 the end expiry?
11     MS. DYKSTRA: Objection.
12     THE WITNESS: That is not in my
13     job description, but that is something
14     that is done in manufacturing.
15     Manufacturing determines it.
16 BY MR. MACORETTA:
17     Q.    Is that what we call a stability
18 model?
19     A.    Yes.
20     Q.    And the idea of the stability
21 model is some model predicting how much
22 potency will be lost between two points,
23 right, in time, two points in time?
24     A.    That is a way you could say it.
25     Q.    Because in June '05 -- I'm

Page 100

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  sorry, in April of '05, the label says this
3  product is going to have 4.3 log10 of mumps
4  vaccine in it at the end of its shelf life or
5  the end expiry. Right?
6      MS. DYKSTRA: Objection.
7      THE WITNESS: That's what was in
8      our label.
9  BY MR. MACORETTA:
10     Q.    And the way you know that is you
11 know how much it was released at and you have
12 some prediction of how much it's going to lose
13 over time. Right?
14     A.    Yes.
15     Q.    Now, that prediction of how much
16 you're going to lose over time, that stability
17 model, is that based on actually taking a
18 bunch of samples and storing them for
19 24 months and counting up how much is left at
20 the end?
21     MS. DYKSTRA: Objection.
22 BY MR. MACORETTA:
23     Q.    You have to say it. You have to
24 say whatever you're going to say.
25     MS. DYKSTRA: Verbalize. Yes or

Page 101

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  now.
3      MR. MACORETTA: She can't --
4      MS. DYKSTRA: Okay.
5      THE WITNESS: I don't know all
6      the details for the stability model.
7      But it's not just math, it involves
8      real data. Real data is actually put
9      into an equation.
10 BY MR. MACORETTA:
11     Q.    But it's not just real data.
12 There's also some math and some predictive
13 elements to it?
14     A.    It is an equation and there is
15 some math.
16     Q.    Okay.
17     A.    What I can tell you --
18     Q.    Okay.
19     A.    -- interestingly enough, it's a
20 very, very conservative model.
21     Q.    Okay. How do you know that?
22     A.    Because I recall at the time
23 that I did this, was working on this, I asked
24 the manufacturing people what is the end
25 expiry potency of our product at the end of

26 (Pages 98 - 101)

Appx1848

ALISON L. FISHER, PhD - CONFIDENTIAL

1  shelf life. And interestingly enough, they
2  gave me a number of cases where they
3  calculated it actually on a product. And the
4  model is actually a more conservative decay
5  model. The model would predict its losing
6  more than it actually loses when you measure
7  it. And the numbers were well above 4.3. I
8  don't remember exactly what the numbers were,
9  but they were not even at 4.3.
10     Q.   And this would have been -- who
11  did you talk to about that?
12     A.   I talked to the statistician
13  and I talked to somebody from stability to
14  actually ask what the numbers are.
15     Q.   Okay. So at this time, doing
16  the math, you would have a stability model
17  that would assume --
18     A.   Very, very conservative model.
19     Q.   A very -- but you're telling me
20  it's a conservative model that would have
21  assumed .7 log loss. Right? We start at 5.0,
22  we end at 4.3. You would have to assume a .7
23  log loss?
24         MS. DYKSTRA: Objection.

ALISON L. FISHER, PhD - CONFIDENTIAL

1         THE WITNESS: That's correct.
2  BY MR. MACORETTA:
3     Q.   Okay.
4         MS. DYKSTRA: Let him finish his
5      question.
6         THE WITNESS: I'm sorry.
7  BY MR. MACORETTA:
8     Q.   This stability model you're
9  using is something else that gets shown to
10  FDA. Right?
11     A.   To the best of my understanding,
12  yes.
13     Q.   So during your time was there a
14  discussion at Merck about recalculating the
15  stability model or redoing the stability
16  model?
17         MS. DYKSTRA: Objection.
18         THE WITNESS: I don't recall.
19         MR. MACORETTA: Let me show you
20      what we're going to mark as Exhibit 6.
21         - - -
22         (Exhibit Fisher-6, 3/28/05
23      E-mail, Bates MRK-KRA00560317 - 0319,
24      was marked for identification.)

ALISON L. FISHER, PhD - CONFIDENTIAL
         - - -
1  BY MR. MACORETTA:
2     Q.   Are you ready to chat about
3  this, Ms. Fisher -- Dr. Fisher?
4     A.   Yes.
5     Q.   Okay. First, this is a memo --
6  this is an e-mail from you. Right?
7     A.   Yes.
8     Q.   The people it's to, some of whom
9  we've talked about, I don't know if you told
10  us who the people in the CC are. So could you
11  tell us who those people are?
12     A.   Mary worked for Mark. Ercem
13  worked for Keith. He -- Joye was the Product
14  Development Team lead.
15     Q.   But you worked for Keith at the
16  same time. Right?
17     A.   I worked for Keith initially
18  and then I worked for Ercem.
19     Q.   Okay. So at this time was Ercem
20  senior to you or --
21     A.   Yes.
22     Q.   All right. And before we talk
23  about the attempt -- so here is my attempt to

ALISON L. FISHER, PhD - CONFIDENTIAL

1  answer question number 1 for the expiry file.
2  And question number 1 here is the same
3  question the FDA had asked in its earlier
4  letter and which you responded to in
5  Exhibit 5, the April 13th submission. Right?
6     A.   Yep. Yes.
7     Q.   So is it fair to say this is a
8  draft of answered response number 1 in what
9  became the April 13th submission?
10     A.   Some of the information was
11  pulled from this.
12     Q.   Who wrote the actual response in
13  Exhibit 5 to the FDA, you or somebody else for
14  question number 1?
15     A.   I believe I wrote it, but I
16  needed others to check it over. And my guess
17  is they probably had some edits to it.
18     Q.   You say -- and to do this, you
19  looked at the past communications between CBER
20  and Merck on the issue we're talking about
21  here?
22     A.   I looked at some of the paper
23  communications.
24     Q.   What else did you do, anything,

Page 106

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 talk to anybody, do any other research?
3 A. I talked to Keith and I talked
4 to the people on this e-mail. I may have
5 talked to others as well.
6 Q. In the first paragraph you say,
7 "Correspondence cited will be useful for our
8 discussion with Norman Baylor."
9 What discussion is that?
10 A. I don't recall there being a
11 discussion. I recall it being more a
12 response to the first question, the rationale
13 for proposing the reduction. I recall
14 writing this. I don't recall the discussion
15 with Norman Baylor.
16 Q. Because if there was a
17 discussion with Norman Baylor about this
18 subject matter, there should have been some
19 memo or entry in the file for it. Right?
20 A. Right, but I don't -- I don't
21 recall a discussion with Norman Baylor on
22 this. I recall it more, I mean, I'm just
23 going from memory here, I recall this being
24 we need to summarize this for Norman Baylor.
25 Q. So when you said discussion

Page 107

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 here, you weren't thinking of some actual
3 discussion as opposed to this written
4 response, Exhibit 5?
5 A. My memory is the discussion was
6 we needed to talk about what we were going to
7 put in this response. That's my recollection.
8 Q. This says, "...discussion with
9 Norman Baylor," that's why I'm trying to
10 understand.
11 A. Right.
12 Q. But you don't remember any such
13 discussion?
14 A. I don't recall a discussion.
15 Q. Okay. Let's look at the third
16 paragraph of your response under number 1, it
17 begins, "The end expiry trial was initiated...."
18 MS. DYKSTRA: Are you talking
19 about the draft or the --
20 BY MR. MACORETTA:
21 Q. In the draft, I'm sorry. In
22 Exhibit 6. I'm sorry. Your memo, not the --
23 A. This?
24 Q. Okay, your memo. The second
25 sentence says, The mumps end expiry file

Page 108

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 supports an end expiry claim of greater than
3 4.1 log10 --
4 A. Can you tell me where you're
5 reading from?
6 Q. Sure. Sure. The third -- under
7 number 1 in bold, the third paragraph down,
8 first --
9 MS. DYKSTRA: Right here.
10 BY MR. MACORETTA:
11 Q. Right there.
12 A. Okay. Uh-huh.
13 Q. I'm reading the second sentence.
14 It says, The end expiry file supports an end
15 expiry claim of greater than or equal to 4.1
16 log10 through 24-months shelf life.
17 A. Yes.
18 Q. Now, what exactly are you
19 talking about that supports an end expiry
20 claim of 4.1 greater than or equal to 4.1
21 log10? Are you talking about some recent
22 clinical testing by Merck?
23 A. The end expiry clinical trial.
24 Q. Is that also called the 007
25 test?

Page 109

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 A. Yes.
3 Q. So your interpretation now is
4 that that would support an end expiry of 4.1.
5 Right?
6 A. That is the clinical data that
7 would support an end expiry of 4.1.
8 Q. Okay. You'll remember that that
9 end expiry trial had both PRN testing and
10 ELISA testing?
11 A. That is correct.
12 Q. Were you thinking here that both
13 the PRN and the ELISA testing supported a 4.1?
14 A. Yes.
15 Q. The next -- I'm going to go down
16 a paragraph. It begins number 1, PAS,
17 August 20, 1999.
18 Do you see that?
19 A. Yes.
20 Q. In the middle there's a sentence
21 that says, "It was pointed out that the
22 variability of the mumps potency test at CBER
23 is 0.266 log...." Was this a different
24 potency test at CBER than mumps was -- than
25 Merck was using?

28 (Pages 106 - 109)

Appx1850

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2        A.   I don't know any more than what
3   is written here.
4        Q.   Okay.
5        A.   Or I don't recall any more than
6   what's written here.
7        Q.   So here we have, then -- you're
8   reciting -- just essentially reciting past
9   history. Right?
10       A.   That's correct.  Summarizing
11  past documents.
12       Q.   Okay.  And then if we continue
13  that paragraph on the next page, the PAS was
14  filed describing filling to a target potency
15  of 5.2 with a minimum release potency
16  specification of 5.0 based on the assumption
17  of a .7 log loss in potency over 24 months.
18  Do you see that?
19       A.   Yes.
20       Q.   That was whose assumption, the
21  FDA's or Merck's?
22       A.   Let me read the sentence again.
23       Q.   Sure.
24       A.   Filed and approved.  It looks
25  like we filed the PAS, it was approved.  Just

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2   based on reading this sentence, it would seem
3   that this was an approved -- this was
4   approved.  But I wasn't involved.  All I can
5   do is read the words here.
6        Q.   Sure.
7        A.   This was before my time.
8        Q.   And this is -- and Dr. Patriarca
9   was at FDA.  Right?
10       A.   I'm assuming so.  All I know is
11  what I see here on the paper.
12       Q.   Then you have at the bottom a
13  paragraph about -- that starts -- at the
14  bottom of the page, "Minimum Release
15  Specification.  The minimum release
16  specification will remain at 5.0...."
17       Do you see that paragraph?
18       MS. DYKSTRA:  At the very
19  bottom?
20       MR. MACORETTA:  The very bottom
21  of that, yes.
22       MS. DYKSTRA:  Yes.
23  BY MR. MACORETTA:
24       Q.   It says, "This stability model
25  builds in the maximum amount of variability...."

1    What stability model are you talking about
2   there?
3        A.   This would be a model where
4   you're plugging in data and it's a
5   mathematical model that has all the most
6   conservative assumptions built in for storage
7   and for variability, assay variability.
8        Q.   So when you say "this stability
9   model" -- see, what I don't understand is what
10  the "this" refers to in that sentence, because
11  the sentence before it doesn't talk about a
12  stability model.
13       A.   Minimum release spec reduce 40
14  hours, no plan at current time to change the
15  minimum release of the mumps.  Okay.  [Reading.]
16       So this stability model is
17  suggesting or this stability model builds in
18  the maximum amount of variability, highly
19  conservative estimate of the loss over the
20  shelf life.  So it's all the most
21  conservative assumptions for each period
22  where the product sits after it's
23  manufactured and formulated.  And because
24  it's losing according to this model, if you

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2   back calculate to the minimum release of
3   five, and you go by what is included in this
4   model, that this model will guarantee with 95
5   percent certainty that you're going to be
6   greater than or equal to 4.3 log TCID50 at the
7   end of shelf life.
8        Q.   And when we say "this model,"
9   there was like some actual model or thing that
10  did all the things you described in this
11  paragraph?
12       A.   To the best of my recollection,
13  there is a stability model, an equation that
14  takes into account -- that equation estimates
15  the loss in potency over time.
16       Q.   And right.  At least as it
17  refers to this paragraph, that model would
18  have to contemplate .7 log loss or less over
19  24 months.  Right?
20       A.   .7 log loss or less.
21       Q.   Okay.  That model is maintained
22  or done by somebody in manufacturing.  Right?
23       A.   That model was done by a
24  statistician.  And I can't remember whether
25  he was in manufacturing or MRL, but I think

29 (Pages 110 - 113)

Appx1851

ALISON L. FISHER, PhD - CONFIDENTIAL
1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  he was in the MMD space.
3      Q.   So at this time for -- for any
4  Merck product, we're talking about mumps, but
5  for every Merck product is there something
6  called the stability model, meaning the
7  official stability model that we rely and we
8  use for everything?
9      A.   There's a stability model to
10  the best of my understanding, for each
11  product.  And that stability model over time
12  for various reasons can be revised.  But when
13  you refer to the stability model, it would be
14  the approved stability model at the time.
15      Q.   Approved by who?
16      A.   To the best of my
17  understanding -- actually the stability model
18  is not my area, so I would imagine that the
19  FDA would need to approve the stability
20  model, they would see it in our submissions
21  and need to approve it.
22      Q.   So when you write here "This
23  stability model builds in the maximum amount
24  of variability and is a highly conservative
25  estimate..." --

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2      A.   Yep.
3      Q.   -- that's because somebody told
4  you that, not because you actually looked at
5  it and reach that conclusion on your own?
6      A.   I actually did -- actually I
7  did look at the math.  And I remember at the
8  time telling the statistician that I thought
9  his math was too conservative.  And then at
10  that point of time that's when I also
11  asked -- when I saw that model, I asked what
12  actually is -- where are these products at
13  the end of expiry.  What kind of numbers are
14  being measured.  And they were all well above
15  4.3.  And I remember saying to the
16  statistician, I think your model is way, way
17  too conservative.  At the time the thought
18  was the statistician was extremely
19  conservative.  He wanted to make sure that --
20  very, very conservative assumptions in the
21  model.
22      Q.   So what you --
23      A.   So what you actually got, if
24  you actually -- at least what I asked about
25  and saw, those lots were well above 4.3 at

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  the end of expiry as measured.
3      Q.   So a less conservative model
4  would show a smaller loss in potency?
5      A.   Yes.
6      Q.   Now let's go to the next page.
7  "COMMENT ONLY," that means a comment by you,
8  right, this is your memo?
9      A.   I don't remember writing this,
10  but if it's at the end of my memo, I have to
11  trust that it's a part of my memo.
12      Q.   Here it says, "COMMENT ONLY
13  concerning change in Stability Model.  Since
14  that time of the MEE file, the stability model
15  has been refined (0.7 log loss is now
16  estimated to be 0.9 log loss)."
17          Do you see that?
18      A.   Yep, I see it.  Uh-huh.
19      Q.   Okay.  So that's not -- that's
20  even more conservative.  Right?
21      A.   Yes.
22      Q.   Okay.  So where did you get this
23  information from, that the stability model has
24  been refined, .7 is now .9?
25      A.   I either got it from somebody

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  like Mary Macchi or from the statistician.
3      Q.   In the next sentence is really
4  just the math, right?  If the stability model
5  is a .9 log loss, then if you start at 5.0,
6  you can have an expiry of 4.1.
7      A.   Uh-huh.
8      Q.   Right?
9      A.   Uh-huh.
10      Q.   Okay.  So if you have a comment
11  that's the stability model is now .9, then how
12  can what you're saying before about 5.0 and
13  ending at 4.3 be correct, on the prior page?
14      A.   My memory is exactly right
15  here.  So I do remember, I remember many
16  talks of the statistician looking at the math
17  and thinking that the math is way, way, way
18  too conservative.  And if you see here
19  realtime stability data supports that after
20  two years the potency is greater than or
21  equal to 4.3.  That's what I remember, seeing
22  numbers that were -- they weren't 4.3, they
23  weren't 4.4, they were considerably tenths of
24  a log higher than this.  So I do remember
25  talking with the statistician.  And this

Page 118

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2 revised model was a model that they used when
3 they did the rHA filing.
4    Q.    The .9 model?
5    A.    I believe so. It's been filed
6 to CBER as part of the rHA file. So this
7 is -- obviously it's the HSA has been swapped
8 out with rHA. And, you know, I do remember
9 feeling that model was overly, overly
10 conservative. They were making it even more
11 conservative than the other model. I do
12 remember this applying to MMR II with rHA.
13 And I do remember -- again, I'm repeating
14 what I just said, asking, you know, what do
15 you really get? And what we really get is
16 tenths of a log higher than 4.3.
17    Q.    So are -- was there a model that
18 said there was more log loss in rHA than HSA?
19    A.    According to this, and I don't
20 remember everything at the time, but on the
21 surface of it, that's my recollection, that
22 when the model was redone, the model became
23 even more conservative.
24    Q.    Well, at this time it became
25 more conservative, right? Because you said

Page 119

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2 the stability model has been refined, .7 log
3 loss is now estimated to be .9 log loss?
4    A.    Yeah, but this was -- this new
5 model, as I recall, was submitted to the rHA
6 file. And I don't have all the recollection,
7 but I believe -- you know, I don't want to
8 say something -- this is something that
9 you're going to have to ask the manufacturing
10 folks about. But my recollection is this
11 model was updated when we went to rHA.
12    Q.    But in March of '05, you're
13 saying the model is estimated, now estimated
14 to be .9 log loss, aren't you? Isn't that
15 what that says?
16    MS. DYKSTRA: Objection.
17    THE WITNESS: I can answer the
18 question by reading the sentence. The
19 stability model has been filed to CBER
20 in July of 2004, as part of the MMR II
21 rHA file. So you have to understand,
22 there were two files to the best of my
23 recollection -- you know, this is all
24 so long ago, but the mumps end expiry
25 went in and rHA file went in. I don't

Page 120

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2 have a lot of information in my mind
3 because I haven't looked at the
4 documents in 12 years or whatever it's
5 been for rHA, so...
6 BY MR. MACORETTA:
7    Q.    So let me ask you, when you say
8 this stability model that has been filed to be
9 CBER as part of the rHA file, the "this"
10 refers to what you're talking about two
11 sentences above that says, "...0.7 log loss is
12 now estimated to be 0.9...," doesn't it?
13    A.    The best of my recollection is
14 this stability model -- at the time that HSA
15 was filed, this stability model referred to
16 the HSA formulated product. As I mentioned
17 previously --
18    Q.    Wait, wait. Before you do that,
19 the "this" is a .7 or a .9 loss?
20    MS. DYKSTRA: Objection.
21 BY MR. MACORETTA:
22    Q.    In what you just said.
23    A.    Okay. I think all I can do
24 here is read to you what's on this piece of
25 paper. Okay. That's all the information

Page 121

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2 that I can remember. So if you have more
3 questions about this, I'm not the right one
4 to ask.
5    Q.    But you're the one who wrote it.
6 Right?
7    A.    I'm the one that wrote it and
8 at the time 11 or 12 years ago, I understood
9 everything that I was writing. However,
10 right now I'm not recalling everything here.
11 I would need to go back and look at some
12 other documents. What I'd like to do is go
13 back and look at a couple of different
14 documents that I haven't been able to look at
15 because I -- it wasn't clear to me that we'd
16 be getting into the whole rHA thing, but I do
17 remember there being a stability model for
18 HSA and then when we looked at rHA, that is
19 the essentially the same product but you're
20 swapping out HSA for rHA. So any time you're
21 moving that -- you're going to need to -- and
22 we're moving from HSA to rHA. So when do you
23 that, you're going to need to update the
24 stability model. Because we were no
25 longer -- we were actually transitioning from

31 (Pages 118 - 121)

Appx1853

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2  selling MMR II with HSA to MMR II with rHA.
3  So to the best of my recollection, that
4  stability model had to be updated to reflect
5  stability time points of the vaccine
6  formulated with the rHA. And to the best of
7  my recollection, I recall thinking that the
8  stability model was way too conservative,
9  even at .7. The model was way too
10  conservative at .9. That was not my job. I
11  did question the statistician.
12     Q.  Keep going, I'm listening to
13  you. Keep going.
14     A.  I did question the statistician,
15  and this is my only memory. So when you say
16  "this stability model," all I can tell you is
17  I recall there was one for HSA and then there
18  was one for rHA. And the intention was not
19  to keep the HSA on the market, was to
20  transition everywhere in the world to rHA.
21     Q.  When you say "this stability
22  model with a .9 log loss," you're saying that
23  refers to a stability model done for the rHA
24  product?
25     A.  That is my recollection.

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2     Q.  Okay. Was there some discussion
3  at Merck as to why the stability is different
4  for rHA than HSA?
5     MS. DYKSTRA: Objection.
6     THE WITNESS: I do remember
7  there was discussion. I don't
8  remember specifically the discussion,
9  but I do remember looking at the math
10  and questioning the statistician and
11  saying that he was making way too
12  conservative assumptions here and I
13  that didn't agree with his math.
14  That's all I can remember. But it
15  wasn't -- it wasn't -- I can question
16  him all I want. I'm not a
17  statistician, I'm not a mathematician.
18  At the end of the day, you know, that
19  model is that model as determined by
20  the people that get the stability
21  model data, they give that data to the
22  statistician. But I do recall this
23  very vividly, questioning, questioning
24  that model and thinking it was way too
25  conservative. That's my only

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2  recollection of this.
3  BY MR. MACORETTA:
4     Q.  So in June 2004, there's a model
5  for HSA that says there's a .9 log loss.
6  Right?
7     MS. DYKSTRA: Objection.
8     THE WITNESS: No, rHA.
9  BY MR. MACORETTA:
10     Q.  RHA. You're right. There's a
11  model for rHA that says there's a .9 log loss.
12  But at the same time in June 2004 or as late
13  as March of 2005, the model for the HSA says
14  .7 log loss. Right?
15     MS. DYKSTRA: Objection.
16     THE WITNESS: Yes.
17  BY MR. MACORETTA:
18     Q.  Okay. Did you ever have any
19  discussions at Merck about, hey, maybe our HSA
20  model is wrong since we're getting a higher
21  number for rHA?
22     MS. DYKSTRA: Objection.
23     THE WITNESS: This was a long
24  time ago. What I can remember is what
25  I told you already. What I can

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2  remember, and I don't have the
3  documents to prove this, but I do
4  think that at the end of the day the
5  rHA model was actually changed back to
6  .7. But I don't have those documents.
7  But I do recall there was some
8  discussion at Merck, some discussion I
9  had with the statistician on this, and
10  there was a lot of discussion and,
11  again, this is my recollection. It's
12  my recollection after a long time ago.
13     MS. DYKSTRA: That's all he's
14  asking for is your recollection.
15  BY MR. MACORETTA:
16     Q.  That's all I'm asking for.
17     A.  My recollection after a long
18  time ago, is that we actually changed the
19  stability model for the rHA back to .7. Some
20  of that was around the fact that -- and I
21  remember I was one of those voices saying
22  this is ridiculous, your -- the stability
23  model -- to me, the model was so ridiculously
24  conservative that it didn't make sense to me.
25  And I remember flapping my mouth about it a

ALISON L. FISHER, PhD - CONFIDENTIAL
1 lot and talking with a lot of people. And I
2 do remember even having some brief
3 discussions with the FDA on, I believe, with
4 the rHA file. My recollection, and I can't
5 guarantee this is correct, but my
6 recollection is that we resubmitted the
7 stability model and that stability model was
8 .7. That's my recollection.
9    Q.   Because just to do the math now,
10 if you release it 5.0 and there's really a .9
11 log loss, according to your --
12    A.   I know exactly what the math
13 says.
14    Q.   Okay. So then you would be out
15 of compliance with a label that says 4.3.
16 Right?
17       MS. DYKSTRA: Objection.
18       THE WITNESS: I know exactly
19    what you're talking about. And what I
20    can tell you is my recollection was
21    realtime data after two years of
22    mumps, and this is put here right
23    after we talk about this model, the
24    realtime data was greater than or

Page 127

ALISON L. FISHER, PhD - CONFIDENTIAL
1 equal to 4.3. And I remember
2 specifically when all this stuff was
3 discussed, I wanted in my mind to make
4 sure that we could guarantee with 95
5 percent certainty or better that we
6 would be above 4.3 based on seeing
7 these two models. And I remember
8 getting numbers like 4.5, 4.6, very,
9 very high numbers. And I remember
10 even asking the question, why in the
11 world -- I remember even thinking that
12 .7 was way too conservative. So
13 honestly, I never in my mind ever had
14 any concern that we would be out of
15 compliance. That's why I so carefully
16 looked at the equations. That's why I
17 so carefully asked for realtime
18 stability data, because I wanted do
19 know in my mind, I wanted to make sure
20 in my mind, I went over and above what
21 I had to as a regulatory person,
22 pouring through all the mathematics,
23 you know, pushing back on people,
24 asking a lot of questions, I wanted to

Page 128

ALISON L. FISHER, PhD - CONFIDENTIAL
1 make sure at the end of the day that
2 the patient was protected. It's very,
3 very important to me. That's why I'm
4 getting so emotional about it.
5 BY MR. MACORETTA:
6    Q.   So there was never a time when
7 you say, hey, we're out of compliance --
8    A.   Never.
9    Q.   -- with the product?
10    A.   I never, ever. In fact, you
11 know, anything. This was way too
12 conservative a model. I want to -- you know,
13 and I remember doing all this because I was
14 so frustrated, .7 was too conservative, .9
15 was way too conservative.
16       MS. DYKSTRA: Do you want to --
17    can we go off the record for one quick
18    second.
19       THE WITNESS: Yeah, I can calm
20    down. I'm just --
21       MS. DYKSTRA: No. It's okay.
22       THE WITNESS: I just remember
23    this very vividly and I remember
24    being --

Page 129

ALISON L. FISHER, PhD - CONFIDENTIAL
1       MS. DYKSTRA: I'm okay with 4.3.
2       THE WITNESS: -- very, very,
3    very assured --
4       MS. DYKSTRA: I'm sorry to
5    interrupt you.
6       THE WITNESS: -- that the
7    patient was always getting --
8       MR. MACORETTA: We're off the
9    record.
10       VIDEOGRAPHER: We're not off the
11    record yet.
12       MS. DYKSTRA: Are we off the
13    record?
14 BY MR. MACORETTA:
15    Q.   Are you finished your answer,
16 Dr. Fisher?
17    A.   I am passionately finished my
18 answer.
19    Q.   Then we can go off the record.
20       VIDEOGRAPHER: The time is now
21    12:14. Off the video record.
22          - - -
23       (A recess was taken.)
24          - - -

33 (Pages 126 - 129)

Appx1855

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  VIDEOGRAPHER: The time is now
3  12:15. We are back on the video
4  record.
5  MS. DYKSTRA: Are you done with
6  these documents?
7  MR. MACORETTA: No, we're going
8  to keep talking about this for a
9  minute.
10  BY MR. MACORETTA:
11  Q. So, Dr. Fisher, your memo that's
12  Exhibit 6, I want to look at that compared to
13  the final response that was submitted to the
14  FDA which is Exhibit 5.
15  A. Which page?
16  Q. Well, it would be response
17  number 1, I guess, so it would be page --
18  A. What's the number on the
19  bottom?
20  Q. Oh, 738 and 739.
21  A. 1738. Okay.
22  Q. 1738 and 1739.
23  A. Okay.
24  Q. Well, you tell me. This is --
25  your memo responds to -- is trying to respond

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  to the same question number 1 as what we're
3  looking at in Exhibit 5 here. Right?
4  A. Uh-huh.
5  Q. Okay. So obviously what you
6  wrote here was not taken word for word and
7  went to the FDA. Right?
8  MS. DYKSTRA: Objection.
9  BY MR. MACORETTA:
10  Q. I mean, you can look at it but
11  it's -- we agree that there's some changes
12  between your memo and what ultimately went to
13  the FDA. Right?
14  A. Yes.
15  Q. Now I want to talk about a
16  couple of those changes.
17  MS. DYKSTRA: So you probably
18  will need this.
19  BY MR. MACORETTA:
20  Q. We're going to go side by side.
21  In your ultimate -- in what was ultimately
22  submitted to the FDA, we don't have the second
23  paragraph of your summary that talks about
24  minimum release specification. Right?
25  MS. DYKSTRA: I'm sorry, John.

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  Which paragraph are you referring to?
3  BY MR. MACORETTA:
4  Q. Sure. Sure. If we look at the
5  end of your memo before the comment, the last
6  paragraph under the heading "Summary," there
7  is a paragraph that starts, "Minimum Release
8  Specification." Right?
9  A. Right.
10  Q. That didn't make it into the
11  final version that went to the FDA. Right?
12  A. I'd have to look at the
13  versions.
14  Q. Well, I mean, you can, that's
15  why I put them side by side.
16  A. Okay. So I don't -- just upon
17  quick glance, I'm not seeing this in this.
18  Q. Do you know why that is, why
19  that paragraph was taken out in the final
20  version?
21  A. I have no idea.
22  Q. Also not in the final version is
23  anything from your "COMMENT ONLY" on the last
24  page of your --
25  A. No. I mean, I -- my thing to

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  the FDA is basically to tie the whole history
3  together because they ask please describe the
4  purpose. And the purpose -- I'm answering
5  the question on the purpose. So whatever is
6  in here and not in here would not be related
7  to the big picture purpose of the submission.
8  Q. Okay.
9  A. And would not be helpful. It's
10  extra information.
11  Q. If the FDA was operating under
12  the assumption that you had a stability model
13  that showed a .7 log loss and there was a
14  stability model that showed a .9 log loss,
15  wouldn't you think that's something you should
16  tell the FDA?
17  MS. DYKSTRA: Objection.
18  THE WITNESS: The FDA knew all
19  about it.
20  BY MR. MACORETTA:
21  Q. How did they know that?
22  A. Because, again, this all came
23  up in the context of the rHA filing. And the
24  fact that the two models were not in
25  agreement, and I remember -- I remember, and

ALISON L. FISHER, PhD - CONFIDENTIAL
1 I don't have the rHA filing in front of me,
2 but my recollection is that I had to submit
3 an amendment to the rHA supplement that was
4 an update to that conservative stability
5 model that put it back to .7. That's my
6 recollection.
7 Q. So in the -- Exhibit 5 we're
8 talking about the end expiry file and not the
9 rHA filing?
10 A. Right. Right. This would have
11 been -- and these two files were done right
12 around the same time as each other. So
13 that's why I got so passionate there, because
14 I recalled that difference and I wanted to
15 make sure that -- I mean, I said all this
16 before, so I don't want to keep repeating
17 myself, but my recollection is that that
18 model was changed so that the model that was
19 in the rHA file was congruent with the HSA
20 file.
21 Q. But as of March of '05 it
22 wasn't, right, because you're talking about a
23 .9?
24 MS. DYKSTRA: Objection.

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 THE WITNESS: Yeah.
3 BY MR. MACORETTA:
4 Q. Okay. So as per -- and it's not
5 the same people at the FDA doing the end
6 expiry analysis as doing the rHA analysis, is
7 it?
8 MS. DYKSTRA: Objection.
9 THE WITNESS: I don't recall
10 whether it was the same group of
11 people.
12 BY MR. MACORETTA:
13 Q. Because -- just because
14 something is in the file for rHA doesn't mean
15 that everybody working on end expiry is going
16 to see that. Right?
17 A. That is an assumption, that
18 assumption would be correct, that there are
19 two separate files and there could be two
20 separate review groups at the FDA handling
21 those two separate files.
22 Q. So concerning end expiry
23 you didn't tell anybody at the FDA working on
24 end expiry, by the way, we have a different
25 stability model with a greater log loss in

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 rHA?
3 A. The FDA knew that because the
4 two files had the two different stability
5 models in them.
6 Q. I understand, but I thought I
7 just asked you, did you expect that the people
8 working on the end expiry were going to go
9 look through everything in the rHA?
10 A. I can't answer that, I'm not
11 the FDA.
12 Q. I understand that, but I thought
13 you just told me that it was different people
14 working on each file?
15 A. I'm assuming at the FDA, I
16 wasn't there at the time, but in theory
17 different people can be working on different
18 files. At the time I don't know whether
19 different people worked on different files,
20 but it's a possibility.
21 Q. But you -- well, do you remember
22 whether you were dealing with the same people
23 on each file? I thought you just said you
24 were.
25 A. I remember dealing with the

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 same project manager. That doesn't
3 necessarily mean that I was dealing with the
4 same reviewers.
5 Q. So the reason you didn't say to
6 the FDA in connection with the end expiry
7 application and your April 15 -- 13, 2005,
8 letter, by the way, there's a different
9 stability model that says .9 log loss is
10 because that was already given to the FDA in
11 the rHA file.
12 MS. DYKSTRA: Objection.
13 BY MR. MACORETTA:
14 Q. Is that what you're saying?
15 A. My recollection is that the .9,
16 this is just my recollection, was given with
17 that. And my recollection is, like I said
18 before a million times, questioning the
19 statistician, having talks about it, and my
20 recollection is, again, it's my recollection,
21 is that we put in a supplement for .7. But
22 the big picture here is at the end of the
23 day, the mumps end expiry was reduced to 4.1,
24 even though we could still guarantee 4.3 or
25 above. Even though if you really measure the

35 (Pages 134 - 137)

Appx1857

Page 138

ALISON L. FISHER, PhD - CONFIDENTIAL
1 numbers, they're, you know -- so big picture
2 is, even if the stability model hadn't been
3 amended, which I think it did, the .9 log
4 loss guarantees at the end of shelf life to
5 95 percent certainty we're at 4.1 and above.
6     Q.    But that wasn't approved by the
7 FDA until 2007.
8         MS. DYKSTRA:  Objection.
9 BY MR. MACORETTA:
10     Q.    Right?
11     A.    That wasn't approved.  However,
12 however, the big picture is -- and, again, my
13 recollection is this was changed to .7.  So,
14 you know, the big picture is, was the patient
15 ever put in jeopardy.  And the answer is no.
16     Q.    Okay.  That's not the question.
17 Let me ask it this way --
18     A.    That's the important question.
19     Q.    I understand.  But I get to ask
20 all the questions today.  I understand.
21         If in March 2005 there was a
22 stability model for the currently sold HSA
23 mumps product showing a .9 log loss --
24     A.    Uh-huh.

Page 139

ALISON L. FISHER, PhD - CONFIDENTIAL
1     Q.    -- would you agree that that
2 would have taken you out of the label
3 compliance?
4         MS. DYKSTRA:  Objection.
5         THE WITNESS:  That wasn't the
6     case.
7 BY MR. MACORETTA:
8     Q.    I understand.
9     A.    The stability model for the HSA
10 was a .7 log loss.  The HSA contains human
11 serum albumin in the formulation.  The rHA
12 contains recombinant human serum albumin.
13 The stability model for the HSA said a .7 log
14 loss.  That applied to the HSA.  The rHA is a
15 different formulation and a different file.
16     Q.    If that's the case, then why
17 didn't you say that -- why didn't you say the
18 rHA stability model has been refined, you said
19 the stability model in your comment talking
20 about HSA?
21         MS. DYKSTRA:  Objection.
22         THE WITNESS:  The stability
23     model has been filed to CBER as part
24     of rHA.

Page 140

ALISON L. FISHER, PhD - CONFIDENTIAL
1 BY MR. MACORETTA:
2     Q.    That's right.  That's below the
3 part where you say the stability model has
4 been refined, .7 is now .9?
5     A.    Okay.  All I can do is look at
6 this piece of paper and read to you what's on
7 it.  I can't do any more than that.  Other
8 than I've already told you this:  I remember
9 there was an rHA and an HSA.  I remember all
10 the stuff I told you so passionately.  I
11 can't tell you any more than what's here and
12 what I answered before.
13     Q.    Okay.  And now let me ask the
14 hypothetical question again.
15     A.    We'd have to open -- we'd have
16 to rip open the rHA file.
17         MS. DYKSTRA:  Let him finish his
18     question.
19 BY MR. MACORETTA:
20     Q.    Okay.  Let me ask the
21 hypothetical question to you.
22         Well, even if we rip open the
23 rHA file and it has a .9, you're telling me
24 that's a whole separate stability model than

Page 141

ALISON L. FISHER, PhD - CONFIDENTIAL
1 what you were using for HSA?
2     A.    Exactly.  Exactly.
3     Q.    Okay.  And were -- I'm sorry.
4 Were you involved in discussions as to why
5 these two don't reconcile or how can this be
6 different?
7         MS. DYKSTRA:  Objection.
8         THE WITNESS:  I think I already
9     answered that.  I told you that I
10     talked with the statistician and I
11     really pushed back.  I felt that the
12     model was extremely conservative.  And
13     I remember debating with him, and I
14     know it's not my job, but I think
15     that -- I don't agree with your
16     models.
17 BY MR. MACORETTA:
18     Q.    So let me ask the hypothetical
19 question again.  If there was a stability
20 model with a .9 log loss for the HSA product,
21 that would have taken you out of compliance,
22 wouldn't it?
23         MS. DYKSTRA:  Objection.  You
24     don't have to ask hypotheticals and

36 (Pages 138 - 141)

Appx1858

Page 142

ALISON L. FISHER, PhD - CONFIDENTIAL

1       ALISON L. FISHER, PhD - CONFIDENTIAL
2       don't speculate.
3           THE WITNESS: It's hypothetical.
4       It's not the issue. You're asking me
5       something about --
6   BY MR. MACORETTA:
7       Q.   All right.
8           MS. DYKSTRA: Let him ask the
9       question.
10  BY MR. MACORETTA:
11      Q.   In March of 2005, what was
12  Merck's policy when you discovered that a
13  label was out of compliance?
14          MS. DYKSTRA: Objection. If she
15      discovered.
16  BY MR. MACORETTA:
17      Q.   In March of 2005, what were you
18  required to do at Merck if you had discovered
19  a label was out of compliance?
20      A.   That was not my job. So if a
21  label was out of compliance from a
22  manufacturing, this would be from a
23  manufacturing perspective, then that is
24  something that would have been if it was
25  purely manufacturing, that's something that

Page 143

1       ALISON L. FISHER, PhD - CONFIDENTIAL
2   would have come from Mark Rosolowsky's group.
3   If it was something to do with out of
4   compliance to do with something that touched
5   clinical and labeling, that would be -- that
6   would be my role.
7       Q.   Well, so if the label had been
8   out of compliance for some reason relating to
9   labeling, what were you supposed to do, were
10  you supposed to notify the FDA?
11          MS. DYKSTRA: Objection. Did
12      you say -- I'm sorry. If a label had
13      been out of compliance?
14  BY MR. MACORETTA:
15      Q.   Yes.
16      A.   I can't answer that because
17  you're asking me an "if" question and you're
18  asking me a hypothetical question. I was not
19  involved.
20      Q.   I'm not. But okay.
21      A.   Well, I mean, in my take,
22  you're asking me a hypothetical question and
23  I did not have any conversations -- you're
24  asking me a hypothetical question.
25      Q.   I am. I'm asking -- well, no,

Page 144

1       ALISON L. FISHER, PhD - CONFIDENTIAL
1   I'm not.
2       A.   Right.
3       Q.   I'm asking you what were the
4   policies or requirements of your job when a
5   situation arises that you learn that a label
6   is out of compliance?
7           MS. DYKSTRA: Objection.
8           THE WITNESS: You're asking me a
9       hypothetical question. Could you ask
10      me a reality-based question?
11  BY MR. MACORETTA:
12      Q.   I am not. What was the -- no.
13  What were the job responsibilities and roles
14  of a regulatory liaison when a situation
15  occurs that you learn that a label is out of
16  compliance?
17          MS. DYKSTRA: Objection.
18          THE WITNESS: In general, if we
19      learn that something is not in
20      compliance in a label, it depends on
21      who is involved, but let's say it's
22      something from manufacturing, then
23      what we do is we get together and we
24      find out, you know, what is it that we

Page 145

1       ALISON L. FISHER, PhD - CONFIDENTIAL
2       need to do. We discuss -- you know,
3       we get together and talk about it, we
4       talk with the FDA about it. And
5       depending on the situation, we'll
6       either resolve something that is not
7       clear or if it's truly out of
8       compliance, then we're going to
9       re-file something with the FDA. So
10      that is quite a few people involved.
11      That's labeling writers, that's
12      whatever it is, that would be
13      manufacturing experts. I'd be
14      involved in that. I'd be sitting in
15      on any of the labeling discussions. I
16      don't sit in if there's something out
17      of compliance for manufacturing that
18      doesn't touch a label, I would not be
19      sitting in on those discussions. But
20      anything -- you know, and I don't
21      recall any situation where we were out
22      of compliance, but it would be handled
23      through basically the Labeling Team.
24      The Labeling Team has a cross
25      functional group of people on it. The

37 (Pages 142 - 145)

Appx1859

ALISON L. FISHER, PhD - CONFIDENTIAL
1    cross functional people, you know,
2    they -- they're represented from
3    different functional areas of the
4    company.
5 BY MR. MACORETTA:
6        Q.    You're on that team -- you were
7    on that team. Right?
8        A.    I was on the Labeling Team,
9    yes, for this.
10       Q.    Yes. Okay. Everything you just
11   described as to what would happen, is that
12   written down somewhere at Merck, there's a
13   policy, these are the people who were supposed
14   to be involved?
15       MS. DYKSTRA: Objection.
16 BY MR. MACORETTA:
17       Q.    Is there anything like that
18   written down?
19       A.    Well, the Labeling Teams,
20   they're called the Lead Last Teams. And I
21   believe that they have all kinds of
22   procedures and SOPs because I remember when
23   those teams formed, I remember reading SOPs
24   for those teams.

ALISON L. FISHER, PhD - CONFIDENTIAL
1        Q.    Let me try it this way: Had
2    someone walked into your office in March of
3    2005 and said this label is out of compliance,
4    was there a document or documents at Merck
5    that would have told you what to do, call
6    these people, notify this committee, something
7    like that?
8        A.    Yeah, so, for example, if the
9    FDA faxed us and said, Merck, you're out of
10   compliance with XYZ then -- and they faxed
11   that to me, if it was -- if it came to my
12   shop, let's say it came to my shop, so let's
13   say I had something to do with something
14   clinical. Then what I would do is I would
15   convene my team of all the subject matter
16   experts. I'd say this is the FDA's question.
17   Let's discuss how we're going to address this
18   question.
19       I've never had this, I've never
20   gotten a letter from the FDA that I recall
21   saying we were out of compliance, but we
22   would address the question and then if need
23   be, we would have a discussion with the FDA
24   to make sure that everything is clear before

ALISON L. FISHER, PhD - CONFIDENTIAL
1    we submit something. Sometimes it's clear
2    enough that we can just submit something.
3        Q.    Suppose it was not a letter from
4    the FDA but someone at Merck internally
5    discovered there was -- you were somehow out
6    of compliance, the same process apply?
7        A.    Well, I do recall that with
8    this particular item, I do recall getting
9    extremely involved with the statistician and
10   looking at the math of the model. I do
11   recall, you know, now that I'm reading this,
12   it's jogging my memory, but I do recall there
13   being, you know, different models for the two
14   products and, you know, one applying to the
15   rHA one and one applying to HSA. And I do recall
16   wanting to make sure that the models were
17   reflective of reality and that at the end of
18   the day there'd be no harm to the patient.
19   And I do remember, like this is all coming
20   back to me, being concerned about this. And,
21   you know, my first concern was I want to make
22   sure that the patient isn't harmed in any
23   way. That's why I was asking for the
24   realtime data.

ALISON L. FISHER, PhD - CONFIDENTIAL
1        Once I asked for the realtime
2    data and I found that in every case we were
3    well above 4.3, then I went back to the
4    statistician and I remember arguing with the
5    statistician and saying, you know, you're
6    putting in a model here that, you know, the
7    first model was conservative, the first model
8    would have applied perfectly fine to both
9    products. You're giving us a more
10   conservative model. This is concerning to me
11   because I thought the previous model was
12   conservative, and also this model doesn't
13   reflect the realtime stability. And I
14   remember saying, you know, mathematically,
15   when you put together a model, you know, it's
16   certainly great to be conservative, you know,
17   it's prudent to be conservative, but I was
18   concerned that there was so much conservatism
19   here that it didn't reflect reality. I
20   didn't want to be in a situation where we'd
21   be questioned about things. That's what I
22   remember. And I remember that -- I remember
23   working this out, you know, between -- I
24   remember working -- you know, again, I don't

38 (Pages 146 - 149)

Page 150

ALISON L. FISHER, PhD - CONFIDENTIAL
1  have it in front of me, but I do remember for
2  the rHA having to work something out so that
3  at the end of the day the model reflected
4  reality and it reflected what actually, you
5  know, the patient would see at the end of
6  shelf life and not put us in a situation
7  where it's so conservative it's below, you
8  know, what we would see.
9       I felt that the statistician
10  was creating problems for us by giving us a
11  model that was so ridiculously conservative
12  and didn't, in my mind, reflect reality.  So
13  I never remember this ever getting to the
14  point of any kind of noncompliance.
15      Q.    Who was the statistician?
16      A.    I told you before, we worked
17  with two statisticians.
18      Q.    Well, who were the ones -- who
19  was the one you were debating with about these
20  models?
21      A.    Tim Schofield and, I think,
22  Phil Bennett.
23      Q.    And they were Merck
24  Manufacturing or MRL people?

Page 151

ALISON L. FISHER, PhD - CONFIDENTIAL
1      A.    They were statisticians and
2  they did work with MMD, so -- all I know is
3  they did work with MMD.  I don't know whether
4  they sat in MMD or sat in MRL.
5      Q.    So why was this your job to go
6  argue with them about the statistical model on
7  this?
8      A.    When -- it wasn't my job, but
9  when I see something, you know, remember
10  before, I look at things -- I can't
11  understand everything.  But in a former part
12  of my life, I did molecular modeling.  So it
13  was in my previous life.  So I always wanted
14  to see the math.  So I was one of the few
15  people -- in the very beginning of my job, in
16  fact, I was told to stop looking at the math.
17  At the very beginning of my job, I was
18  looking at the math quite frequently.  And
19  it's actually a good thing to look at the
20  math.  And, you know, in this particular
21  case, the math was -- this is a much better
22  scenario than the reverse scenario which I've
23  never seen where the math doesn't reflect
24  reality and the math is risky, so, you know,

Page 152

ALISON L. FISHER, PhD - CONFIDENTIAL
1  just being very, very vigilant and having an
2  interest in math and models, even though it
3  wasn't in my job description to dig this
4  deep, I felt that it was certainly part of my
5  responsibility if I'm looking at things and
6  sending it in to the FDA, and I see something
7  that doesn't seem quite congruous and
8  something that, in my mind, I can't support
9  based on the calculations, then it's in my
10  purview to say, look, I think that this is
11  confusing.
12      Q.    But you didn't say to the FDA
13  here's .9, it's confusing and here's why you
14  shouldn't worry about it --
15          MS. DYKSTRA:  Objection.
16  BY MR. MACORETTA:
17      Q.    -- for end expiry.  Right?
18          MS. DYKSTRA:  Objection.
19  BY MR. MACORETTA:
20      Q.    You just didn't mention the .9
21  in connection with end expiry.
22          MS. DYKSTRA:  Objection.
23          THE WITNESS:  You know, I don't
24  recall all the conversations, but I do

Page 153

ALISON L. FISHER, PhD - CONFIDENTIAL
1  recall the endpoint.  And the endpoint
2  of the whole thing was that -- and
3  again, my recollection is the model
4  was revised back to .7.  We had some
5  good explanation for rising it back.
6  I mean, the model was extremely
7  conservative.  And at the end of the
8  day, we were harmonized basically
9  across all these labels that even
10  though we were going to a lower end
11  expiry potency by virtue of -- you
12  know, and, again, the purpose of this
13  was we were putting more mumps in the
14  product as a result of those
15  conversations in the '90s and the
16  thought was at the very beginning that
17  we would -- that we -- in theory, if
18  we could establish the real end expiry
19  potency for the -- you know, we could
20  in theory maybe slightly reduce the
21  minimum release potency.  Now, that
22  would have been a situation -- if we,
23  in fact, succeeded at 3.7 log at end
24  expiry, that was enough difference

39 (Pages 150 - 153)

| Page 154 |
|---|

ALISON L. FISHER, PhD - CONFIDENTIAL

1 that, you know, let's say that had
2 worked, my guess is, is we probably
3 maybe would have made a manufacturing
4 change. But as you recall, in our
5 study, we didn't quite meet the
6 criteria for 3.7. We met it for 4.1.
7 Again, just my recollection is
8 obviously we put this in the trial and
9 obviously we were hoping to meet this
10 but we didn't.
11       So at the end of the day we met
12 4.1, but to make a long story short, I
13 do remember some of these conversations.
14 I do remember having some concerns
15 about it. And at the end of the day,
16 I do remember it being resolved. So
17 at the end of the day we can
18 guarantee, based on a 4.7 log loss, we
19 could guarantee at the end of the
20 shelf life that we would have greater
21 than 4.3 log TCID50. That's my
22 recollection. And I really
23 honestly --
24       MS. DYKSTRA: You've answered

| Page 155 |
|---|

ALISON L. FISHER, PhD - CONFIDENTIAL

1       the question.
2       THE WITNESS: I wish I could
3 remember more, but that's all I can
4 remember.
5 BY MR. MACORETTA:
6    Q.   I understand. You said
7 harmonized the labels. Part of this effort
8 was to harmonize labels across the world.
9 Right?
10       MS. DYKSTRA: Objection.
11       THE WITNESS: Right. Right.
12 BY MR. MACORETTA:
13    Q.   Okay. I'm going to ask you the
14 same questions I asked you earlier. When we
15 talked about a stability model, there's one
16 for the whole world, right, it's not like
17 there's a stability model for the US and
18 different stability model for the same product
19 in a different country. Correct?
20    A.   To the best of my understanding,
21 there is one stability model for around the
22 world.
23    Q.   We talked a few minutes ago that
24 there's one stability -- there was one

| Page 156 |
|---|

ALISON L. FISHER, PhD - CONFIDENTIAL

1 stability model for rHA and a separate model
2 for the HSA product. Right?
3    A.   Right.
4    Q.   Was that always the case,
5 meaning going forward from April of '05, were
6 there separate stability models maintained for
7 the rHA product versus the HSA product?
8    A.   The way that I can answer your
9 question is the HSA product moved to the rHA
10 product. So the HSA at some point was
11 transitioned out and the rHA was being sold.
12    Q.   But until it was transitioned
13 out, were there two different stability models
14 this whole time?
15    A.   My recollection is that there
16 would be two stability models, one would
17 reflect realtime stability of the rHA product
18 and one would reflect realtime stability of
19 the HSA product. That's to the best of my
20 recollection.
21       MR. MACORETTA: Now is as good a
22 time as any, we can break for lunch.
23       MS. DYKSTRA: Okay. That sounds
24 good.

| Page 157 |
|---|

ALISON L. FISHER, PhD - CONFIDENTIAL

1       VIDEOGRAPHER: The time is now
2 12:40. We are off the video record.
3       - - -
4       (A recess was taken.)
5       - - -
6       VIDEOGRAPHER: The time is now
7 13:39. This begins media three. We
8 are back on the video record.
9 BY MR. MACORETTA:
10    Q.   Dr. Fisher, good afternoon.
11    A.   Good afternoon.
12    Q.   We're back from lunch. I wanted
13 to first follow up on a couple of issues from
14 this morning.
15       At the very beginning you said
16 you had been deposed before. What kind of
17 case was that, or cases?
18    A.   I don't recall.
19    Q.   Was it something to do with
20 Merck or some personal issue?
21    A.   Merck.
22    Q.   More than once?
23    A.   Once.
24    Q.   Also at the very beginning we

40 (Pages 154 - 157)

ALISON L. FISHER, PhD - CONFIDENTIAL
1 looked at your job responsibilities,
2 regulatory liaison for a couple of files with
3 the FDA. Did you have regulatory
4 responsibilities outside the US?
5     A.   Yes.
6     Q.   What were they?
7     A.   I would liaise with a colleague
8 in Europe that would liaise directly with the
9 European Health Authority.
10     Q.   Canada as well?
11     A.   Yes.
12     Q.   Anyplace else in the world?
13     A.   Australia, New Zealand, a
14 couple of different countries.
15     Q.   So you didn't have the whole
16 world but you had other parts of it. Right?
17     A.   I had -- yeah.
18     Q.   Okay. And for the same
19 products, for the MMR products. Right?
20     A.   Yes.
21     Q.   That's the same. Okay. This
22 morning we talked about end expiry dating. So
23 every vial of MMR has a date stamped on it.
24 Right?

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2     A.   To the best of my understanding,
3 yes.
4     Q.   And that's an expiration date.
5 Right?
6     A.   To the best of my understanding.
7     Q.   Okay. Do you know how that date
8 is calculated?
9     A.   I don't have the full details.
10     Q.   Tell me what you do know.
11     A.   I mean, I don't really feel
12 comfortable talking about how that date is
13 arrived at because it's not in my job function.
14     Q.   Wouldn't you consider that vial
15 part of the labeling for the FDA?
16     A.   Yes.
17     Q.   But that wasn't your job
18 function, was it, to be responsible for that
19 labeling?
20     MS. DYKSTRA: Objection.
21 BY MR. MACORETTA:
22     Q.   I mean, you were the person who
23 communicated with the FDA about the labeling.
24 Right?
25     A.   What's in the physician and

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2 patient package insert.
3     Q.   Somebody else communicated with
4 the FDA about what's actually on the vial?
5     A.   My main responsibility is the
6 physician package insert and the patient
7 package insert. I do -- I can't remember if
8 MMR I actually looked at the vial labels or
9 not.
10     Q.   So if it wasn't your
11 responsibility to deal with that date on the
12 vial, whose was it? Is that somebody in
13 manufacturing or --
14     A.   Yes, that would be manufacturing.
15     Q.   If you know, is there some SOP
16 or written procedure at Merck that says when
17 we stamp the date on the vial, this is how we
18 calculate it?
19     A.   I don't know anything about
20 SOPs for putting dates on vials.
21     Q.   Before lunch we had looked at a
22 draft -- at Exhibit 5 which was your
23 submission to the FDA April 13, '05, talking
24 about end expiry. Let me show you what we're
25 going to mark as Exhibit 7.

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2           - - -
3         (Exhibit Fisher-7, Letter with
4     attachment, Bates MRK-KRA00132999 -
5     3011, was marked for identification.)
6           - - -
7 BY MR. MACORETTA:
8     Q.   Let me know when you're ready to
9 chat about that.
10         So, Dr. Fisher, the first two
11 pages of this, at least, are the letter from
12 the FDA back to you concerning your end expiry
13 proposed change. Right?
14     A.   Yes.
15     Q.   Okay. Now, I will tell you that
16 this is the way we got it from Merck, this one
17 document. But what I want to understand first
18 is, everything after the first two pages seems
19 to be a response to this, not part of the
20 FDA's letter to you. Does that seem right to
21 you?
22     A.   Yes.
23     Q.   And so when you get this letter,
24 October 17, 2015, what do you do with it? Do
25 you circulate it to the people at Merck who

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 know the substance of it or --
3 A. Yes.
4 Q. -- do you call a meeting or
5 anything to talk about it?
6 A. Sometimes I call a meeting.
7 Q. So who decides who is going to
8 answer what? Who is in charge of figuring
9 out -- I mean, here there's three subparts, in
10 the last one there were 12. Who makes the
11 decision as to you answer this one, you answer
12 this one?
13 A. A group consensus.
14 Q. It's not your job to farm them
15 out and say you do this, you do that?
16 A. I know what groups to farm them
17 out to, and then they farm them out further
18 to all the subject matter experts to fill in
19 items.
20 Q. Is it your job then to collect
21 all those responses or say to somebody, hey,
22 we're still waiting on yours or something like
23 that?
24 A. Yes.
25 Q. So you don't know why these two

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 are stapled together, the letter is stapled
3 with this response at the moment?
4 A. I don't understand the question.
5 Q. Merck produced this to us as one
6 document. We're trying to understand why a
7 letter from the FDA has this other -- the rest
8 of these pages attached to it.
9 A. This is just for reference when
10 FDA sent the questions.
11 Q. Okay. Let me show you what
12 we're going to mark as Exhibit 8.
13 - - -
14 (Exhibit Fisher-8, 11/15/06
15 Letter with attachment, Bates
16 MRK-KRA00000393 - 0409, was marked for
17 identification.)
18
19 MS. DYKSTRA: John, is this the
20 same letter or do you want her to
21 review this as well?
22 BY MR. MACORETTA:
23 Q. You can take a look at it. I'm
24 going to -- look, what I'm really going to ask
25 is, is this your submission to the FDA's

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 earlier letter, is what I really want to know?
3 I'm not going to -- let me save
4 you some time, Dr. Fisher. I'm not going to
5 ask you about this draft in Exhibit 7. I just
6 wanted to know what it was. I'm not going to
7 do what I did before and compare what's in
8 Exhibit 7 to Exhibit 8.
9 MS. DYKSTRA: Objection. I
10 don't know if this is a draft or not.
11 MR. MACORETTA: Well, but I'm
12 not going to compare whatever it is in
13 Exhibit 7 --
14 MS. DYKSTRA: Okay. No problem.
15 MR. MACORETTA: -- to whatever
16 is in Exhibit 8. I'm not going to ask
17 that line of questioning for this.
18 MS. DYKSTRA: I'm sorry, what is
19 your question?
20 BY MR. MACORETTA:
21 Q. My first question for Exhibit 8
22 is, is this Merck's response to the
23 October 17, 2005, letter from the FDA --
24 MS. DYKSTRA: This one.
25 BY MR. MACORETTA:

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 Q. -- which is the beginning of
3 Exhibit 7?
4 A. Are you asking is this one or
5 is this one?
6 Q. I'm just asking Exhibit 8, the
7 one that says Norman Baylor on the top.
8 A. This looks like the response
9 document that we submitted to the FDA.
10 Q. Okay. And it took you over a
11 year to do that. Right? I mean, the FDA's
12 letter, you're responding to a CBER letter of
13 October 17, 2005, and your response is
14 November 15, 2006.
15 A. Yes.
16 Q. Okay. And as far as we can tell
17 from this, there was no interim response,
18 right, this doesn't say this amends our
19 response of July '05 -- '06 or something like
20 that. Right?
21 A. This is referencing the
22 October 28, 2005.
23 Q. I agree. Then it says all the
24 information -- so we have a two-page letter
25 from you to Norman Baylor, and then we have a

Appx1864

Page 166

ALISON L. FISHER, PhD - CONFIDENTIAL
1    ALISON L. FISHER, PhD - CONFIDENTIAL
2    couple of FDA forms behind that, a couple of
3    pages of FDA forms. Then we have the
4    October 17th CBER letter, and then we have ten
5    pages of text and tables and Merck's response.
6    Right?
7        A.    Yes.
8        Q.    Now, your letter, the first
9    page, second -- third paragraph says, "All of
10   the information is contained on one CD/DVD and
11   is not more than 100 MB...."
12        Do you see that?
13        A.    You're reading?
14        Q.    I'm reading the first page of
15   Exhibit 8, the -- your November 15, 2006,
16   letter to Norman Baylor.
17        MS. DYKSTRA: The last
18        paragraph.
19        THE WITNESS: Yes.
20   BY MR. MACORETTA:
21        Q.    Okay. So what's on the CD is
22   what I'm trying to understand, is it something
23   other than these ten pages of text that are
24   behind this?
25        A.    To the best of my understanding,

Page 167

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2    what is on the CD is the same as this, to the
3    best of my understanding.
4        Q.    Okay. Was that the policy,
5    then, at the time to -- well, let me ask it
6    this way: When you mailed this letter, these
7    paper pack -- these paper pages in the back,
8    these ten pages of response were sent to the
9    FDA as well?
10        A.    I'm trying -- to the best of my
11   recollection, it was paper and CD.
12        Q.    But the only thing that was on
13   the CD was the same as -- was what was sent in
14   paper?
15        A.    To the best of my recollection.
16        Q.    Is that contained somewhere in
17   the eDossier file somewhere, what the contents
18   of the CD were or something?
19        A.    To the best of my recollection,
20   the CD contains the same content as the
21   response.
22        Q.    Okay. So here the FDA asked, I
23   guess it's one question with three subparts in
24   their October 17 letter, and you gave about
25   ten pages of response to their questions.

Page 168

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2    Were you involved in drafting these responses?
3        A.    Yes.
4        Q.    I want to talk -- we're going
5    to -- I want to talk about the detailed
6    response in a little bit.
7        When this letter comes in in
8    October 17, 2005, the FDA says that what you sent
9    us so far is inadequate for final approval of
10   the end expiry change. Were you expecting
11   that response from the FDA or were you
12   expecting them to approve it at that time?
13        A.    I don't remember what I was
14   thinking at the time.
15        Q.    Well, would this have been a
16   shocking development that the FDA said what
17   you sent us was inadequate?
18        MS. DYKSTRA: Objection.
19        THE WITNESS: I don't know how
20        to answer that question. I don't
21        remember what I was thinking at the
22        time.
23   BY MR. MACORETTA:
24        Q.    Let me show you what we're going
25   to mark as Exhibit 9.

Page 169

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2        - - -
3        (Exhibit Fisher-9, E-mail chain,
4        Bates MRK-KRA00259768, was marked for
5        identification.)
6        - - -
7    BY MR. MACORETTA:
8        Q.    Let me know when you're ready to
9    talk about this. My first question is going
10   to be did you send the bottom e-mail?
11        A.    Based on this, it would seem I
12   sent this.
13        Q.    One of the people in this e-mail
14   chain is Luwy Musey. What was his
15   relationship to you in the Merck chain of
16   command at this time?
17        A.    He was the clinical monitor for
18   the 007 clinical study.
19        Q.    This first e-mail is you saying
20   the FDA told me effectively they're going to
21   send me what became Exhibit 7, right, this
22   letter. Right?
23        A.    Yes.
24        Q.    Okay. And at the top Luwy Musey
25   asks a couple of questions about it and I want

Appx1865

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  to -- what I really want to know is your
3  answer to those questions. So the first
4  question he asks is, "Does this affect the
5  rHA/MEE file in EU in any way...." What's the
6  answer to that question?
7      A.    It sounds like you don't have
8  any more e-mails than this.
9      Q.    On this topic?
10     A.    Yeah.
11     Q.    I don't have your answer in an
12 e-mail that I'm going to show you as soon as
13 you tell me your answer. No, I do not. I
14 really don't know the answer. I don't know
15 what you said to Mr. Musey in response. I
16 don't know the answer.
17     A.    So you're asking me what my
18 answer is to this question?
19     Q.    Yes.
20     A.    I don't recall what my answer
21 was to this question.
22     Q.    Well, this would have been --
23 was this your area of responsibility, the
24 rHA/MEE file in the EU?
25     A.    Yes.

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2      Q.    Do you know what Mr. Musey is
3  talking about here? Do you understand his
4  question?
5      A.    I understand the question, yes.
6      Q.    He's saying does the FDA's
7  rejection or non-approval of change in end
8  expiry affect what you're trying to do in
9  Europe. Right?
10     A.    That's the question.
11     Q.    And you just don't know -- as
12 you sit here today, you don't know the answer
13 to that?
14     A.    I can't remember my answer at
15 the time, but my answer now just looking at
16 this would be probably not.
17     Q.    Because whatever you're trying
18 to do in Europe wasn't dependent on changing
19 the end expiry in the United States?
20     A.    That's not true.
21     Q.    Well, okay. Then why? You're
22 right. Why not? Why didn't the FDA's
23 non-approval affect what was happening in the
24 EU?
25     MS. DYKSTRA: Objection.

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2      THE WITNESS: I think what this
3  refers to is in Europe we submitted
4  both files together. In the US we
5  submitted them separately.
6  BY MR. MACORETTA:
7      Q.    Meaning one file asked for a
8  change in end expiry, the other file asked for
9  a change in rHA?
10     A.    Yes.
11     Q.    Okay. But in Europe it asked
12 for both at once?
13     A.    Yes.
14     Q.    Then why would the FDA's refusal
15 to change the end expiry impact your combined
16 file in Europe?
17     MS. DYKSTRA: Objection. You
18 can answer.
19     THE WITNESS: I can't remember
20 back to that time, but in general
21 terms, if one health authority doesn't
22 approve a file, that doesn't
23 necessarily mean there's an impact to
24 the other health authority.
25 BY MR. MACORETTA:

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2      Q.    Do you have an obligation to
3  tell one health authority when the other one
4  makes that decision?
5      MS. DYKSTRA: Objection.
6      THE WITNESS: Today we do that
7  as a courtesy. At that time I can't
8  remember, I can't recall what was done
9  or not as a courtesy.
10 BY MR. MACORETTA:
11     Q.    But you didn't feel like you had
12 some obligation to the EU to tell them what
13 the FDA did?
14     MS. DYKSTRA: Objection.
15     THE WITNESS: I didn't talk
16 directly with the EMA. Another was a
17 liaison directly to the health
18 authority. I don't remember -- I
19 don't remember what might have been
20 said or was not said at the time.
21 BY MR. MACORETTA:
22     Q.    I'm not asking what was or
23 wasn't said. I'm asking your understanding as
24 to whether you had -- there was some
25 requirement that the EU be notified of this

44 (Pages 170 - 173)

Appx1866

Page 174

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 ruling by the FDA?
3 MS. DYKSTRA: Objection.
4 THE WITNESS: At that time and
5 today there is not a requirement.
6 It's considered a courtesy.
7 BY MR. MACORETTA:
8 Q. Does that go in reverse, too, do
9 you have to notify the FDA when the EU makes a
10 decision on something or is that a courtesy?
11 MS. DYKSTRA: Objection.
12 THE WITNESS: It's a courtesy.
13 BY MR. MACORETTA:
14 Q. What's -- the second question
15 Dr. Musey asks is, "Doesn't ProQuad use this
16 MEE spec?" What's the answer to that?
17 A. I believe ProQuad uses the same
18 one. But that's only my recollection.
19 Q. And when we talk about even
20 though the files were de-linked in the US,
21 when you submitted the rHA file, that was with
22 the lower end expiry, right, the 4.1?
23 MS. DYKSTRA: I'm sorry, could
24 you repeat that or read it back?
25 BY MR. MACORETTA:

Page 175

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 Q. Sure. I'll try again.
3 We talked about how in the US
4 the rHA submission was separate then the end
5 expiry submission. Right?
6 A. [Nods yes.]
7 Q. Okay. So my question is for the
8 rHA submission, wasn't the end expiry your --
9 you had in that file 4.1?
10 MS. DYKSTRA: Objection.
11 THE WITNESS: I would have to go
12 back and look at the file to remember
13 accurately.
14 BY MR. MACORETTA:
15 Q. All right. Let me show you what
16 I'll mark as Exhibit 10.
17 - - -
18 (Exhibit Fisher-10, 10/6/06
19 E-mail, Bates MRK-KRA00046174, was
20 marked for identification.)
21 - - -
22 MS. DYKSTRA: Are you done with
23 these?
24 MR. MACORETTA: For the moment.
25 We're going to -- not forever. But

Page 176

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 you don't need it for the questions
3 I'm about to ask.
4 MS. DYKSTRA: Okay. I'm just
5 going to put this here in case you
6 need it.
7 THE WITNESS: Well, this refers
8 to this. Right? I'm assuming. When
9 it talks about these questions, it's
10 referring -- it says 1, 2 and 3.
11 Let's see. These are subparts. All
12 right.
13 BY MR. MACORETTA:
14 Q. All right. So I think you were
15 trying to figure out my first question.
16 Exhibit 10 is an e-mail from you, and you're
17 talking about what would ultimately become
18 Exhibit 8, which is your November 15, 2006,
19 response to the FDA. Right?
20 A. Based on looking at this, yes.
21 Q. Because the subject of your
22 e-mail says, "Protocol 007 CBER Appeal
23 PRN...." Right?
24 A. Yes.
25 Q. Okay. By the way, what does

Page 177

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 that mean, "V205C Protocol 007..."?
3 A. V205C identifies -- that's the
4 compound identifier for MMR II. Protocol 007
5 is just the protocol number.
6 Q. Okay. The couple people on this
7 e-mail that we hadn't heard before, who are
8 Mandie Lyon -- who is Mandie Lyon?
9 A. A clinical scientist.
10 Q. And Kennett Surowitz?
11 A. Ken may have been my boss at
12 the time.
13 Q. Was this your team, the "To" on
14 this, the team that was responding to the
15 FDA's letter?
16 A. Yes. To the best of my
17 recollection, yes.
18 Q. Sure. You want to change the
19 opening or the beginning of number 1 as you
20 propose there. Right?
21 A. That was my suggestion.
22 Q. Okay. And so the FDA, in its --
23 I'm sorry, where's the -- where did it go?
24 I'm looking for, I guess, 7.
25 You know what, let's do it this

45 (Pages 174 - 177)

Page 178

ALISON L. FISHER, PhD - CONFIDENTIAL
1 way: The FDA in their October 17th letter
2 says there's -- there are three problems with
3 the clinical trial, a substantial amount of
4 sample data was excluded, stability lots were
5 assayed at a separate time and a control log
6 failed the acceptability criteria. Right?
7    A.   Yes.
8    Q.   Okay. And when it says a
9 substantial amount of sample data was
10 excluded, they're talking about data on the
11 PRN test, not the ELISA test. Right?
12    A.   To the best of my understanding,
13 it was the PRN.
14    Q.   And the accelerated stability
15 lots and the control lot, that would impact
16 both the PRN and the ELISA tests, or is that
17 specific to one test or the other, points B
18 and C -- 1B and 1C in their letter?
19    A.   I think this is a different
20 assay they're talking about. That's my
21 recollection. These are assays on product
22 and not on sera.
23    Q.   Okay. Well, so in your draft
24 response at the beginning --

Page 179

ALISON L. FISHER, PhD - CONFIDENTIAL
1    A.   That's just my recollection.
2    Q.   That's okay. That's okay. In
3 your draft response at the beginning you say,
4 We acknowledge the deficiency concerning the
5 PRN data, however, there is enough to support
6 the label change. We present a summary of the
7 ELISA data, the PRN data, and the
8 interrelationship between both data sets.
9    Do you see that?
10    A.   Uh-huh.
11    Q.   And that was your goal, to say
12 here's both the PRN and ELISA data and how
13 they interrelate and that should be enough?
14    MS. DYKSTRA: Objection.
15    THE WITNESS: I don't understand
16 the question.
17 BY MR. MACORETTA:
18    Q.   Well, you're right. So the goal
19 of this was to get the FDA to approve your end
20 expiry reduction from 4.3 to 4.1. Right?
21    MS. DYKSTRA: Objection.
22    THE WITNESS: Yes.
23 BY MR. MACORETTA:
24    Q.   The FDA says we don't like your

Page 180

ALISON L. FISHER, PhD - CONFIDENTIAL
1 PRN data in part because there's a lot of
2 missing data?
3    MS. DYKSTRA: Objection.
4 BY MR. MACORETTA:
5    Q.   Right?
6    A.   Yes.
7    Q.   So you say in response we agree
8 there -- "We acknowledge the deficiency
9 concerning the PRN data...." Then is it not
10 Merck's position that -- position or statement
11 to the FDA that you should approve our label
12 change looking at the ELISA data, the PRN data
13 and the interrelationship between both of
14 them?
15    A.   Yes, that was our logic.
16    Q.   Okay. Great.
17    We're going to come back to
18 Exhibit 10 in a minute, but go to Exhibit 8
19 which is your letter to the FDA, and we're
20 going to go into the text of the response for
21 a minute. I want to walk through a couple of
22 things there. I'm on the page Bates number
23 ending 368. That's where I'm going to start.
24 I'm sorry, it's got a -- on the far right it's

Page 181

ALISON L. FISHER, PhD - CONFIDENTIAL
1 got a 368. In the middle of the page it's got
2 a 399.
3    MS. DYKSTRA: Number 1? You're
4 talking about question 1?
5    MR. MACORETTA: I'm talking
6 about question 1, page 1.
7    MS. DYKSTRA: Okay.
8 BY MR. MACORETTA:
9    Q.   And so I'm going to go to the
10 bottom. Well, the whole last paragraph on
11 this page is talking -- that starts with
12 "However...," is talking about ELISA data.
13 Right?
14    MS. DYKSTRA: Objection.
15    MR. MACORETTA: Strike that.
16 BY MR. MACORETTA:
17    Q.   Let's try it this way: Protocol
18 007 you take the same samples and you test
19 them under a PRN and under an ELISA test.
20 Right? Is that a fair statement?
21    MS. DYKSTRA: Objection.
22    THE WITNESS: Yes.
23 BY MR. MACORETTA:
24    Q.   Okay. The argument you're

46 (Pages 178 - 181)

Page 182

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 trying to make -- at least part of the
3 argument you're trying to make in this letter
4 to the FDA is you should look at our ELISA
5 data as a justification for lowering the end
6 expiry. Right?
7 A. No.
8 Q. It's not. You're arguing you
9 should look at our lot -- look, what -- you
10 know, okay. That's fine.
11 Let's go to the next page. Part
12 of what you say here is that for some people
13 there was missing PRN data but there was valid
14 ELISA data. Right?
15 A. Yes.
16 Q. Okay. And then at the end of
17 the paragraph that starts, "Exhibit B...," you
18 say additional analysis performed by Merck has
19 shown a strong correlation between ELISA and
20 PRN serology results suggesting that the
21 majority of the non-evaluable samples would
22 have tested positive by PRN.
23 Do you see that?
24 A. Which sentence?
25 Q. The last sentence in the

Page 183

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 paragraph that starts "Exhibit B...," the
3 middle of the page.
4 A. Yes, I see the sentence.
5 Q. Okay. So the argument you're
6 making there is that for those people with
7 missing PRN data, we have their ELISA date,
8 and since the rest of the ELISA and PRN data
9 correlates, we can presume that the people we
10 had missing PRN data for would have tested
11 positive for their PRN?
12 A. Yes.
13 MS. DYKSTRA: Objection.
14 BY MR. MACORETTA:
15 Q. Okay. Then in the next
16 paragraph you say given that we have ELISA
17 titers, antibody titers for a substantial
18 portion of the subjects with missing (or
19 non-evaluable) PRN data, the observed ELISA
20 results and the strong correlation between
21 ELISA and PRN assay.
22 Do you see that?
23 A. Yes.
24 Q. What's the basis for you saying
25 there's a strong correlation between ELISA and

Page 184

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 PRN?
3 A. Samples were tested in both
4 assays and then you look at the concordance
5 between the two assays for positivity and
6 negativity, and you look for the correlation
7 for seroconversion or full rise.
8 Q. So Merck is saying that the --
9 is the argument you're making here that the
10 FDA can look at the ELISA data in part because
11 it correlates strongly to the PRN data?
12 A. Yes.
13 Q. You're not suggesting to the
14 FDA, don't look at anything except the ELISA
15 data. Right?
16 A. That's correct.
17 Q. Then I'm going to go back a few
18 pages to the page that ends in 4 -- with 404.
19 It's got a c at the top, a small c at the top.
20 I'm going to talk to you about
21 the first bullet point halfway down the page.
22 The first half of that sentence says,
23 "Although virus neutralization assays may be
24 the most predictive method for assessing
25 protective immunity...."

Page 185

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 Do you see that?
3 A. Yes.
4 Q. All right. Was that your belief
5 at the time, that virus neutralization assays
6 were the most predictive method for assessing
7 protective immunity?
8 MS. DYKSTRA: Objection.
9 THE WITNESS: I can only go by
10 what's on this piece of paper.
11 BY MR. MACORETTA:
12 Q. Okay.
13 A. So if that's what we said,
14 then --
15 MS. DYKSTRA: Are you asking her
16 if that was her personal --
17 BY MR. MACORETTA:
18 Q. Well, first of all, I was. I'm
19 asking for Alison Fisher's opinion. Did you
20 write that bullet point? Let's start there.
21 A. Typically these responses are
22 written by subject matter experts. Then I go
23 and I review the responses. And I make
24 modifications if I feel something isn't
25 answering the question or if something isn't

47 (Pages 182 - 185)

Appx1869

ALISON L. FISHER, PhD - CONFIDENTIAL

1 clear.
2
3    Q.    So this wasn't your subject
4 matter expertise, whether virus neutralization
5 assays were the most predictive method of
6 assessing --
7    A.    That's correct.  It wasn't my
8 expertise.
9    Q.    So it's unlikely you wrote that
10 phrase, you got it from somebody else?
11    A.    That's correct.
12    Q.    And so you don't have an opinion
13 on whether or not that's true or not, you
14 Alison Fisher?
15        MS. DYKSTRA:  Objection.
16 BY MR. MACORETTA:
17    Q.    Based on your own knowledge.
18    A.    That's not my area of expertise.
19    Q.    Okay.  The next bullet point --
20 I'm going to go to the next page.  The top of
21 the next page there's a bullet point, "Given
22 the suitability of the internal control
23 group...," I'm not going to -- it talks about
24 "...the true performance of the PRN assay used
25 in this clinical trial should be assessed by

ALISON L. FISHER, PhD - CONFIDENTIAL

1
2 responses observed in the control group rather
3 than by the arbitrary acceptability criteria."
4 Same question.  Is that within your expertise
5 or is that something you got from somebody
6 else?
7    A.    I got that from someone else.
8    Q.    Do you know who you got that
9 from?  You can look at the team memo on
10 Exhibit 10, your one pager.
11    A.    I think what's confusing me
12 about who wrote this is "...set by the
13 applicant."
14    Q.    Okay.
15    A.    So I -- off the top of my head,
16 I don't know who wrote this bullet.  But
17 whoever wrote it would have likely been a
18 statistician.
19    Q.    The same question for the next
20 bullet, the last bullet there, starts with
21 "The PRN assay used in the study...."
22    A.    I don't know who wrote this
23 bullet.
24    Q.    Do you agree with what it says
25 or do you have an opinion on what it says?

ALISON L. FISHER, PhD - CONFIDENTIAL

1
2    A.    I don't have an opinion.
3    Q.    I'm trying to understand what
4 you're trying to convince the FDA of in this
5 last bullet.  Because when you say, "It is
6 therefore difficult to ascertain the real
7 performance of this assay other than in the
8 context of this clinical trial," isn't that
9 calling into question the validity of the PRN
10 assay?
11        MS. DYKSTRA:  Objection.
12        THE WITNESS:  No.
13 BY MR. MACORETTA:
14    Q.    What are you -- what's the
15 purpose of that last bullet?  What are you
16 trying to convince the FDA of by putting that
17 in there?
18        MS. DYKSTRA:  Objection.
19        THE WITNESS:  So what is your
20    question again?
21 BY MR. MACORETTA:
22    Q.    What argument are you trying to
23 advance by putting that bullet in there?
24    A.    I'm not recalling this off the
25 top of my head.  This is in support of

ALISON L. FISHER, PhD - CONFIDENTIAL

1
2 answering this item c about the control lot.
3 But I don't recall any more than that.
4    Q.    Let's go back to Exhibit 10.  I
5 want to ask you about a couple of your one
6 page e-mails.
7        Second point, "For your
8 consideration, we should add some more
9 verbiage about the ELISA to emphasize its
10 importance -- have attempted this."
11        Do you see that?
12    A.    Yes.
13    Q.    Why did you need to add more
14 verbiage to emphasize the importance of ELISA?
15    A.    My recollection is I was trying
16 to make the point there's missing PRN data.
17 And we did a comparison of ELISA and PRN and
18 they were highly concordant.  And, therefore,
19 this provided justification for use of the
20 ELISA data given its predictability of what
21 we would get in the PRN assay.
22    Q.    Okay.  Let me talk to you about
23 number 3.  "John -- excellent job on the stats
24 section...."  I take it that means Jonathan
25 Hartzel?

Appx1870

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2     A.    Yep.
3     Q.    Okay.  Then in the second line
4 you want to -- you have the quote, real data.
5 The "'real' data."  What are you referring to
6 there?
7     A.    I think at the time, I don't
8 remember, but just based on looking at this,
9 I was trying to understand how he used the
10 real data in the simulation.  So I was asking
11 a technical question.
12    Q.    When you say real data, that
13 implies there's some other not real data.
14 That's what I'm trying to understand.
15    A.    For a simulation, you're taking
16 real data and you're doing calculations off
17 of data, in this case to try to predict or
18 impute what missing data would look like.
19 And I think -- I was trying to understand
20 what calculations or simulations he was doing
21 with the real data.  It was more to just
22 explain to a non-statistician.  Does that
23 answer your question?
24    Q.    If that's your explanation of
25 what you meant by real data in that sentence,

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 then yes.
3     A.    Uh-huh.
4     Q.    Okay.  All right.  So you send
5 Exhibit 8 which is the letter, the
6 November 15th letter to the FDA, and then I'm
7 going to show you what we're going to mark as
8 Exhibit 11, which I believe we're going to
9 find out is the FDA's response.
10         - - -
11    (Exhibit Fisher-11, Letter,
12    Bates MRK-KRA00000385 & 0386, was
13    marked for identification.)
14         - - -
15    THE WITNESS:  [Reviewing
16    document.]  Okay.
17 BY MR. MACORETTA:
18    Q.    Dr. Fisher, first question:
19 This letter is now signed by Paul Richman,
20 Acting Director, Division of Vaccines and
21 Related Products.  The earlier letter you sent
22 was Dr. Baylor.  Dr. Baylor left in the
23 interim here?
24    A.    I can't remember if Dr. Baylor
25 was promoted or if at that point he had

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 retired.
3     Q.    Okay.  But Dr. Richman replaced
4 Dr. Baylor.
5     A.    I believe so.
6     Q.    Okay.  In between Exhibit 8,
7 which is your November 15, 2006, letter to the
8 FDA, and Exhibit 11, which is the FDA's
9 May 18th response, were there any other
10 communications between Merck and the FDA on
11 this subject of changing the end expiry?
12    A.    Not that I remember.
13    Q.    If there were, it should
14 probably -- it should be in that eDossier
15 file.  Right?
16    A.    If it was some very impactful
17 communication that came from Merck or from
18 the FDA on this topic, it should be in the
19 file.
20    Q.    So what's the cutoff for very
21 impactful?
22    A.    Well, I should strike that.
23         Official communication from us
24 to the FDA or the FDA back to us.
25    Q.    What is a nonofficial

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 communication then, I guess?
3         You know what, let me do it this
4 way:  If the FDA communicates to you and said
5 we need more information about this or you
6 communicate to the FDA and say here is some
7 more information about end expiry, would you
8 consider that an official communication?
9     A.    I wouldn't do that.  If there's
10 more information about expiry that answers an
11 FDA question, then I would send that in the
12 submission.
13    Q.    So it would go in the eDossier
14 file?
15    A.    If it's answering a question
16 that the FDA has about our file and we're
17 sending it back to the FDA in response to
18 their question, it should go into eDossier.
19    Q.    So paragraph 3 of the FDA's --
20 of Dr. Richman's letter, starts out with --
21 well, actually paragraph two, the end of it
22 says, "We cannot accept use of multiple
23 imputation analyses of the PRN data to support
24 the lowering of mumps vaccine end-expiry
25 potency."

49 (Pages 190 - 193)

Appx1871

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2        Do you see that?
3    A.   Yes.
4    Q.   Okay.  And you interpreted that
5 to mean that the FDA was not going to accept
6 the PRN data as the basis to lower the
7 potency.  Right?
8        MS. DYKSTRA:  Objection.
9 BY MR. MACORETTA:
10   Q.   Or did you?
11   A.   The FDA said that they couldn't
12 accept imputation data to impute missing PRN
13 data.
14   Q.   Then the next sentence -- the
15 next paragraph, "However, the science related
16 to immunogenicity testing of M-M-R® II has
17 substantially evolved since our initial
18 testing requirements.  Use of ELISA data to
19 evaluate the effect of differences in product
20 potency on immunogenicity is now acceptable."
21       Do you see that?
22   A.   Yes.
23   Q.   Do you know what the FDA's basis
24 for that statement was?
25   A.   No.

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2    Q.   Did you ever ask them that?
3    A.   No.
4    Q.   Did you ever discuss this
5 internally at Merck?
6    A.   I don't recall the discussions
7 about this with the FDA.
8    Q.   Were you surprised to get this
9 letter saying we'll accept the ELISA data?
10   A.   I can't comment on how I felt
11 at the time.  It was too long ago.  I don't
12 remember.
13   Q.   This was kind of a big deal,
14 wasn't it, I mean, they -- before they said
15 we're not going to approve it and here it said
16 we will accept ELISA data?
17   A.   This letter is encouraging.
18   Q.   Okay.  Let me show you what
19 we're going to mark as Exhibit 12.
20            - - -
21       (Exhibit Fisher-12, E-mail
22    chain, Bates MRK-KRA00552862 - 2864,
23    was marked for identification.)
24            - - -
25 BY MR. MACORETTA:

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2    Q.   So the first e-mail there is
3 from you to several people.  Right?
4    A.   Yes.
5    Q.   Okay.  Who is Helen?
6    A.   Regulatory coordinator.
7    Q.   She worked for you?
8    A.   She didn't work for me, but she
9 was in an organization that supported me.
10   Q.   And you're enclosing the letter
11 we just talked about as Exhibit 11.  Right?
12   A.   What's your question?
13   Q.   The question is, what you're
14 enclosing here and saying, "Please let me know
15 your thoughts...and your timeline...," is
16 Exhibit 11?
17   A.   I believe so.
18   Q.   Okay.  So you enclose it and
19 Jonathan Hartzel writes back, "Wow.  What a
20 bizarre twist to an already bizarre history
21 for this study."
22       Do you know what he was talking
23 about there?
24   A.   I don't know the full story
25 because I wasn't involved in the protocol

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2 planning and I wasn't involved in the initial
3 submission.
4    Q.   But you had been involved with
5 it for three years by this time, and the first
6 thing you did was look at all the
7 correspondence and do a little history of the
8 prior dealings.  Right?
9        MS. DYKSTRA:  Objection.
10       THE WITNESS:  So what's your
11 question?
12 BY MR. MACORETTA:
13   Q.   Do you know what Mr. Hartzel
14 meant when he said, "What a bizarre twist..."?
15   A.   I don't know specifically what
16 was in Jon's head when he said that.
17   Q.   Did you think it was a bizarre
18 twist?
19   A.   I wouldn't call it bizarre.
20   Q.   What would you call it?
21   A.   It's an evolution in thinking.
22   Q.   You weren't at all surprised by
23 it?
24       MS. DYKSTRA:  Objection.
25       THE WITNESS:  I honestly can't

Page 198

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2    remember at the time if I was
3    surprised. I would say pleased would
4    be the word.
5  BY MR. MACORETTA:
6    Q.    Okay. In your e-mail you say to
7  Luwy Musey and Jonathan Hartzel, "Thanks again
8  for your hard work in bringing the FDA to the
9  conclusion that use of ELISA, to evaluate
10  immunogenicity for the mumps end expiry study,
11  can be acceptable given some further analyses."
12    What hard work were you
13  referring to?
14    A.    The hard work was all the back
15  and forth over the years and that also
16  included work that was done before my time.
17    Q.    So what exactly -- what did
18  you -- what was given by Merck to the FDA to
19  bring them to the conclusion that the use of
20  ELISA could be acceptable?
21    A.    I think you've seen all the
22  information that we sent back to the FDA.
23    Q.    And that's it, right? There's
24  nothing else beyond that?
25    MS. DYKSTRA: Objection.

Page 199

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2    THE WITNESS: Well, I mean --
3    no, I mean, there was what we sent
4    them on concordance testing.
5  BY MR. MACORETTA:
6    Q.    Concordance with the PRN?
7    A.    Yes.
8    Q.    Is that what you mean when you
9  say, "...given some further analyses"?
10    A.    No, I think is referring to the
11  fact that they had gotten beyond the fact
12  that the assays were essentially comparable
13  and then they wanted us to do some further
14  analyses here.
15    MS. DYKSTRA: You're referring
16    to?
17    THE WITNESS: This is where
18    we're pulling the data from our
19    control log with that of protocols 12
20    and 9 for the 4.8 log.
21  BY MR. MACORETTA:
22    Q.    So I want to make sure I
23  understand this. When you say, "Thanks again
24  for your hard work in bringing the FDA to the
25  conclusion that use of ELISA...," you're

Page 200

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  talking about what went into your November 15,
3  2016, submission -- 2006, submission and the
4  submissions before that. Right?
5    A.    The entirety of the submissions.
6    Q.    Okay. And you think Luwy and
7  Jon Hartzel were the guys who did that, who
8  marshalled whatever information there was?
9    A.    They were key players.
10    MS. DYKSTRA: John, just let me
11    know when it's good for you to take a
12    break.
13    MR. MACORETTA: This is a fine
14    time. We can take a break here for a
15    minute.
16    VIDEOGRAPHER: The time is now
17    14:42. We are off the video record.
18    - - -
19    (A recess was taken.)
20    - - -
21    VIDEOGRAPHER: The time is
22    14:58. We are back on the video
23    record. This begins media four.
24    - - -
25    (Exhibit Fisher-13, 6/5/07)

Page 201

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2    Letter with attachment, Bates
3    MRK-KRA00000368 - 0382, was marked for
4    identification.)
5    - - -
6  BY MR. MACORETTA:
7    Q.    Well, we're on the record so
8  I'll just do it. Dr. Fisher, I've handed you
9  what's been marked as Exhibit 13. Take as
10  much time as you need to look at it. But
11  what's been marked as Exhibit 13 is a
12  document, a June 5th letter from you to
13  Norman -- again, to Norman Baylor at the FDA.
14  So let me know when you're ready to talk about
15  this letter and its contents. Are you ready?
16    A.    Yes.
17    Q.    All right. So this is in
18  response to the FDA's May 18th letter of 2007.
19  Right?
20    A.    Yes.
21    Q.    And, again, you're writing to
22  Norman Baylor, although the letter you're
23  responding to came from Dr. Richman. Right?
24    A.    Yes.
25    Q.    Why is that?

51 (Pages 198 - 201)

Appx1873

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2        A.    I don't recall.  In this letter
3    you're answering the questions about the
4    consistency, the various questions asked by
5    the FDA in the May 18th letter, all of which
6    related to ELISA testing.  Right?
7            MS. DYKSTRA:  Objection.
8            THE WITNESS:  What is your
9        question?
10   BY MR. MACORETTA:
11       Q.    The question is, your answers,
12   your substantive answers to this letter are
13   talking about ELISA testing as opposed to PRN
14   testing.  Isn't that right?
15       A.    This refers to ELISA.
16       Q.    And if we -- the goal of sending
17   this response was to get the FDA to agree to
18   let you change the end expiry from 4.3 to 4.1.
19   Right?
20           MS. DYKSTRA:  Objection.
21           THE WITNESS:  The purpose was to
22       support the change in the end expiry
23       potency.
24   BY MR. MACORETTA:
25       Q.    From 4.3 to 4.1?

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2        A.    Yes.
3        Q.    Okay.  And ultimately the FDA
4    agrees that you can do that.  Right?
5        A.    Yes.
6        Q.    But you don't change the end
7    expiry from 4.3 to 4.1?
8            MS. DYKSTRA:  Objection.
9    BY MR. MACORETTA:
10       Q.    Merck leaves the label at 4.3.
11   Right?
12           MS. DYKSTRA:  Objection.  Your
13       question was Merck leaves the label at
14       4.3?
15           MR. MACORETTA:  Yes.
16           THE WITNESS:  I don't understand
17       your question.
18   BY MR. MACORETTA:
19       Q.    Did they -- I mean, I can pull
20   out the final approval letter.  The next day
21   you then change the label immediately to end
22   expiry of 4.1?
23       A.    The next day, no.
24       Q.    Okay.  But do you promptly
25   change it to 4.1?

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2            MS. DYKSTRA:  Objection.  Are
3        you asking if Merck changed the label?
4            MR. MACORETTA:  Yes.  Obviously
5        I --
6            MS. DYKSTRA:  As opposed to the
7        FDA approving its label change?
8            THE WITNESS:  Merck changed the
9        label from 4.3 to 4.1, to the best of
10       my recollection.
11   BY MR. MACORETTA:
12       Q.    Were you involved in that
13   decision to actually change the label from 4.3
14   to 4.1?
15       A.    This was the purpose of the
16   submission.
17       Q.    I understand.  After the
18   submission was approved, Merck -- were you
19   involved in the decision that said, okay,
20   let's go change the label now?
21           MS. DYKSTRA:  Objection.
22           THE WITNESS:  I don't really
23       understand the question.
24   BY MR. MACORETTA:
25       Q.    Okay.  Let me show you what

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2    we're going to mark as Exhibit 14.
3            - - -
4            (Exhibit Fisher-14, E-mail
5        chain, Bates MRK-KRA01583833 & 3834,
6        was marked for identification.)
7            - - -
8    BY MR. MACORETTA:
9        Q.    So Exhibit 14 that I showed you
10   is an e-mail exchange over time between you
11   and a Heather Jones.  First question is, you
12   wrote the e-mails that say from Alison Fisher
13   on there?
14       A.    Okay.
15       Q.    So first question, Dr. Fisher,
16   as usual with an e-mail chain starting at the
17   bottom, the e-mail that starts at the very
18   bottom of page 1 and page 2, you wrote that to
19   Bonita Stankunas?
20       A.    It would seem so.
21       Q.    This is talking -- this e-mail
22   exchange is talking about end expiry in
23   Canada.  Right?
24       A.    This is about Canada and other
25   things.

52 (Pages 202 - 205)

Page 206

ALISON L. FISHER, PhD - CONFIDENTIAL

Q.   What was Ms. Stankunas' job?
A.   Regulatory affairs international.
Q.   International means outside, other than the US?
A.   Outside of the US and some other major market countries.
Q.   Okay. I'm looking at your Monday, February 13, 2006, e-mail to Ms. Stankunas. The first paragraph is discussing when you're going to submit the second round of responses regarding the MEE file to the FDA. I presume what you're talking about there is submitting a response to the FDA's October 17, 2005, letter that we talked about as Exhibit 7 before. Is that right?
MS. DYKSTRA:  I'm sorry, which exhibit?
MR. MACORETTA:  7.
THE WITNESS:  So this -- my e-mail is February 13, 2006.
MS. DYKSTRA:  Here is Exhibit 7 on October 2005.
THE WITNESS:  I believe that

Page 207

ALISON L. FISHER, PhD - CONFIDENTIAL
refers to this.
BY MR. MACORETTA:
Q.   Okay. And then in the next paragraph you say, Please also note that the POS of approval of the MEE file is low, I would say less than 10 percent. What's POS mean in that sentence?
A.   Probability of success.
Q.   So when you wrote that, you thought that the FDA had less than 10 percent chance of approving your change to the end expiry. Right?
A.   Yes.
Q.   Why did you think that?
A.   It was based on these questions on October 17th.
Q.   You concluded that Merck could not give -- you thought it was likely that the answers Merck gave in response to those questions would not be sufficient for the FDA?
MS. DYKSTRA:  Objection.
THE WITNESS:  Yes.
BY MR. MACORETTA:
Q.   Additionally -- the next

Page 208

ALISON L. FISHER, PhD - CONFIDENTIAL
paragraph, "Additionally, we have no plans in the near future to change the minimum release spec for the mumps or implement this change into PQ...." What does PQ mean?
A.   ProQuad.
Q.   And based on our realtime stability and amended stability model that is included in the approved rHA file and soon to be included in the Canadian file, we can guarantee that the end of a two-year shelf life and end expiry potency of 20,000 TCID50 of mumps. Do you see that?
A.   Yes.
Q.   20,000 TCID50 is the same as 4.3 log. Right?
A.   Yes.
Q.   Okay. So in June of '06, you thought that at your current release potency of 5, you had a stability model that would show at the end of two years there would still be 4.3 remaining. Right?
A.   Yes.
Q.   Okay. Then you say, "Thus, based on the fact that we do not plan to

Page 209

ALISON L. FISHER, PhD - CONFIDENTIAL
change manufacturing with respect to.. mumps...," there is really no need to change the MEE specification. Do you see that?
A.   Yes.
Q.   So if you had a stability model that showed you were making it a .5 and you lost .7, therefore you could comply with 4.3, you didn't need to change the end expiry. Right?
MS. DYKSTRA:  Objection.
THE WITNESS:  Yes.
BY MR. MACORETTA:
Q.   Okay. Then why were you trying to change the end expiry?
A.   I don't understand your question.
Q.   You just said in this e-mail that we're okay with a 4.3 end expiry, we don't need to change it. Right?
A.   Yes.
Q.   Okay. Then why were you going through all this effort to convince the FDA to change it from 4.3 to 4.1?

53 (Pages 206 - 209)

**Appx1875**

Page 210

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2    A.    This was a --
3        MS. DYKSTRA: Objection. Go
4    ahead, you can answer.
5        THE WITNESS: This was not my
6    decision. This was a collaborative
7    decision.
8    BY MR. MACORETTA:
9    Q.    So what was the collaborative
10   answer to my question then?
11   A.    The collaborative answer, based
12   on all the stakeholders, was to submit this.
13   Q.    But why? Nobody --
14   A.    To continue.
15   Q.    Okay.
16   A.    I can't comment on all the
17   reasons why.
18   Q.    But if you sent an e-mail that
19   said we don't need to change it, we're fine at
20   4.3. Didn't you ever ask anybody why we're
21   doing this?
22   A.    Yes.
23   Q.    What was the answer you got?
24   A.    I can't recall what the answers
25   were. I mean at one point the thought was

Page 211

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2    that it would give us some latitude in the
3    future perhaps to change it if we needed to.
4    Q.    Was that the only reason?
5    A.    I don't know all the reasons,
6    but that's the reason that I was aware of
7    that including that would allow us to change
8    the minimum release if we ever cared to do
9    it.
10   Q.    So who would know all the
11   reasons?
12       MS. DYKSTRA: Objection.
13       THE WITNESS: Who would remember
14   all the reasons? I remember -- I
15   would say there's some people that
16   might remember some of the reasons,
17   but I don't know all the people that
18   would remember all the reasons for
19   this. And there were quite a few that
20   put their input into this.
21   BY MR. MACORETTA:
22   Q.    The only reason you remember is
23   to give Merck some latitude in the future to
24   change things?
25       MS. DYKSTRA: Objection. You

Page 212

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2    can answer.
3        THE WITNESS: Yes. Yes.
4    BY MR. MACORETTA:
5    Q.    And did you suggest to anybody
6    that why are we taking all this time and
7    effort to do that, just to give ourselves
8    future latitude?
9    A.    I asked some questions about
10   the why.
11   Q.    And what answers did you get?
12   A.    I don't recall all the answers
13   that I got. What I was really focused on was
14   trying to understand how much money we would
15   save by dropping it. It was only my
16   question.
17   Q.    How much money you would save by
18   dropping it. And what's the answer to that
19   question?
20   A.    I think it was around a million
21   dollars a year.
22   Q.    How would that money be saved by
23   dropping the end expiry if you didn't
24   change --
25       MS. DYKSTRA: Objection. I

Page 213

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2    think you're misreading her answer.
3    BY MR. MACORETTA:
4    Q.    I don't understand. How would a
5    million dollars -- oh, you mean by dropping
6    your request to change the end expiry, you
7    would save a million dollars?
8        MS. DYKSTRA: Objection.
9    BY MR. MACORETTA:
10   Q.    I don't understand your last
11   answer, Dr. Fisher. What do you mean by
12   dropping it and a million dollars?
13   A.    That would just mean changing
14   the target potency and the minimum release
15   potency.
16   Q.    So how would a million dollars
17   be saved by doing that or not doing that?
18   A.    It would just mean it would --
19   you'd be putting slightly less mumps in the
20   product.
21   Q.    So somebody did some analysis at
22   Merck that said if we go from 5.0 to whatever,
23   4.9 or 4.8, that will save us a million
24   dollars?
25   A.    Yes.

54 (Pages 210 - 213)

Appx1876

Page 214

ALISON L. FISHER, PhD - CONFIDENTIAL

1        ALISON L. FISHER, PhD - CONFIDENTIAL
2     Q.   But at the time, according to
3  this, you weren't planning to do that?
4     A.   That's correct.
5     Q.   So then the million dollars
6  wasn't going to be saved.  Right?
7     A.   I don't understand your
8  question.
9     Q.   If you weren't actually going to
10  lower the potency, you weren't going to save
11  the million dollars.  Right?
12     A.   In the future it could have
13  happened and it could have saved the money.
14     Q.   But wasn't there a cost to
15  continuing to fight with the FDA about this to
16  generate these detailed submissions and
17  analyses and taking up your valuable time and
18  your whole team?
19        MS. DYKSTRA:  Objection.  I
20       don't mean to interrupt.  You're
21       asking her why she continued with the
22       submission?
23       MR. MACORETTA:  Yes.  I'll ask
24       her my question and ask her that next,
25       but yes.

Page 215

1        ALISON L. FISHER, PhD - CONFIDENTIAL
2        THE WITNESS:  The cost is the
3       resources.
4  BY MR. MACORETTA:
5     Q.   Yes.
6     A.   My salary, some other salaries,
7  part of them.
8     Q.   The opportunity cost of you
9  doing something else for Merck?
10     A.   I wouldn't say that because I
11  was working on other programs around the same
12  time.
13     Q.   Well, other than end expiry, you
14  were working on the rHA file.  Right?
15     A.   And preparing for the new
16  measles stock seed file.
17     Q.   Okay.  So would you say that end
18  expiry is taking up a third of your time then?
19     A.   No.
20     Q.   Less?
21     A.   Yes.
22     Q.   But when you had to put together
23  this November submission, it probably took a
24  lot of your time.  Right?
25       MS. DYKSTRA:  Objection.

Page 216

1        ALISON L. FISHER, PhD - CONFIDENTIAL
2        THE WITNESS:  I can't recall how
3       much of my time this submission took
4       today.  It happened so long ago.
5  BY MR. MACORETTA:
6     Q.   But the reason somebody -- I'm
7  trying to -- let me try it this way:  The
8  reason Merck kept going with the end expiry
9  submission after it got the October 17, 2005,
10  letter which caused you to conclude that it
11  was less than 10 percent chance the thing --
12  that the end expiry lowering was going to be
13  approved was what?
14     A.   What's your question?
15     Q.   Why did you keep working on the
16  submission after you got that October letter
17  and you concluded there was only a 10 percent
18  chance you were going to get an approval?
19     A.   It wasn't my decision. It was
20  a decision of the Product Development Team.
21     Q.   Who was in charge of the Product
22  Development Team then?
23     A.   The project manager was -- let
24  me think.  There are a number of people on
25  that team.  It was a team decision to be

Page 217

1        ALISON L. FISHER, PhD - CONFIDENTIAL
2  made.  I can't say any one person that made
3  the decision.  It was a team decision.
4     Q.   Well, what was your opinion?
5  You had an opinion on this.  If you thought it
6  was less than 10 percent chance of success, do
7  you think you should have kept going with it
8  or not?
9     A.   I put my opinion in this
10  letter.  It's not up to me to decide that.  I
11  can give the team what I think the POS is.
12  That's my opinion.
13     Q.   Well, did you give that to the
14  Product Development Team?
15     A.   I would imagine that I did.
16     Q.   Well, the Product Development
17  Team -- so the Product Development Team had a
18  meeting and they said after receiving this
19  October 17, 2005, letter, what should we do,
20  should we go forward or not?
21       MS. DYKSTRA:  Objection.
22  BY MR. MACORETTA:
23     Q.   Did they?  You're right, I asked
24  the question wrong.
25       Was that discussed?

55 (Pages 214 - 217)

Appx1877

ALISON L. FISHER, PhD - CONFIDENTIAL

1 A. This happened -- right. This
2 happened 11 years ago. I can't remember -- I
3 honestly can't remember the discussions
4 around this.
5 Q. If there had been a discussion
6 at the Product Development Team and a decision
7 as to whether or not to go forward with the
8 end expiry filing, would that have been
9 reflected in writing somewhere?
10 A. Yes.
11 Q. What would that have been? Is
12 there some minutes or notes of the PDT that
13 would have had that?
14 A. It would be the acknowledgement
15 back to the FDA that we're going to amend the
16 supplement.
17 Q. Which came about 10 days --
18 within a month after this?
19 A. Uh-huh.
20 Q. So that would have been -- well,
21 that's a letter to the FDA. Right?
22 A. Uh-huh.
23 Q. But there's no product
24 development, we discussed this, here's what we

ALISON L. FISHER, PhD - CONFIDENTIAL

1 decided?
2 A. I'm sure there were discussions
3 within the team and between me and Keith.
4 Q. But no -- okay. You and who
5 else -- who else was on the team except you
6 and Keith?
7 A. Keith wasn't on the team.
8 Keith was my boss.
9 Q. Okay. So he had a say in
10 whether or not you were going to go forward
11 with this, too?
12 A. He contributed to the
13 pathforward.
14 Q. So who else contributed to the
15 pathforward?
16 A. Luwy Musey. Joye Bramble. I'm
17 sure others contributed, but I remember them
18 the most.
19 Q. Okay. So when we look at this
20 e-mail to Bonita Stankunas, who works in
21 international affairs, is there some similar
22 e-mail from you to people involved in the
23 decision with the FDA saying the POS is less
24 than 10 percent?

ALISON L. FISHER, PhD - CONFIDENTIAL

1 A. I don't recall.
2 Q. Well, would there likely have
3 been a discussion about that?
4 A. There was likely a discussion
5 at a meeting. Bonnie was somebody that
6 didn't go to those meetings. So a lot of
7 times I would communicate to Bonnie in
8 writing but communicate to team members
9 verbally because I would see them a lot face
10 by -- face to face.
11 Q. Because in Canada you reached
12 the opposite conclusion, right, in Canada you
13 just decided to withdraw the end expiry?
14 That's what this e-mail -- the next e-mail in
15 the chain says. Right?
16 A. Uh-huh.
17 Q. Okay. So who was involved in
18 that decision?
19 A. That was a regulatory
20 procedural decision based on Canada's laws.
21 Q. Well, it was a decision -- you
22 got a notice of deficiency letter, you could
23 have responded to it instead of withdrawing.
24 Right?

ALISON L. FISHER, PhD - CONFIDENTIAL

1 A. The notice of deficiency in
2 this particular case, the clearest
3 pathforward was to separate, to debundle the
4 two files.
5 Q. To debundle and then not pursue
6 the end expiry in Canada?
7 A. I can't remember exactly what
8 we pursued and when in Canada. I would have
9 to --
10 Q. Well, you can read Heather
11 Jones' e-mail in the middle of the first page
12 of Exhibit 14.
13 A. I don't remember all this, but
14 I know in Canada --
15 MS. DYKSTRA: You should
16 probably read the full document before
17 you answer.
18 THE WITNESS: Okay.
19 MS. DYKSTRA: At least the top
20 e-mail.
21 THE WITNESS: This one here.
22 Okay. So what is your question again?
23 BY MR. MACORETTA:
24 Q. My question is, in Canada,

56 (Pages 218 - 221)

Appx1878

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2 didn't you just decide to withdraw your
3 request to change the end expiry?
4     A.   If you look at this e-mail, we
5 wanted to get the rHA approved. We didn't --
6 did not want to hold up that approval for the
7 mumps. So the decision was made to debundle
8 the files and file the rHA so that the rHA
9 could be approved.
10     Q.   Yes. And then later in that
11 same e-mail it says, "...in January 2006, we
12 received a Notice of Deficiency Letter and in
13 our May 2006 response, we withdrew the
14 proposed change to the end-expiry spec...."
15     Do you see that? This is the
16 middle e-mail you're reading. No, no, no.
17 The e-mail from Heather Jones to you dated
18 Monday, October 15th.
19     A.   My recollection is we withdrew
20 it because we wanted to get the rHA approved.
21     Q.   But you could have done the same
22 thing you did in the US, right, just treat
23 them as two separate files?
24     MS. DYKSTRA: Objection.
25 BY MR. MACORETTA:

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2     Q.   Couldn't you?
3     A.   A decision was made to bundle
4 the files in Europe, Canada, Australia, and
5 the rest of the world.
6     Q.   Gotcha. And then in 2006 it was
7 made -- a decision was made to unbundle them
8 in Canada?
9     A.   Yes.
10     Q.   And then after that decision, a
11 decision was made in Canada to take half of
12 the unbundled file, meaning the end expiry
13 part, and withdraw it. Right?
14     A.   To get the rHA approved.
15     Q.   Yes. But so in Canada, you did
16 exactly the opposite of what you did in the
17 US. In the US, you kept the rHA file separate
18 and pursued the end expiry.
19     MS. DYKSTRA: Objection to form.
20 BY MR. MACORETTA:
21     Q.   In Canada you kept the rHA file
22 separate and withdrew the end expiry.
23     A.   You know, all I can remember is
24 what's in here. And we wanted to get the rHA
25 approved.

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2     Q.   I understand that. What's in
3 here says you withdrew the end expiry. Right?
4 Do you have some memory that that didn't
5 happen?
6     A.   I answered the question. We're
7 eager to get the rHA file approved. The two
8 files were like this. We wanted to get this
9 half of the file approved very quickly.
10     Q.   Yes.
11     A.   So the quickest way to do that
12 is to re-file and just file the rHA
13 component.
14     Q.   But then you withdrew the end
15 expiry component. Isn't that what this says?
16     A.   Yes, I just explained why we
17 did that.
18     Q.   Why did you withdraw the end
19 expiry component?
20     A.   We withdrew it so that we could
21 get action on the rHA part of the file. We
22 had to debundle them so that we could get the
23 rHA part approved.
24     Q.   But once you debundled them, why
25 couldn't you pursue the end expiry just as the

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2 same way you were doing in the United States,
3 as two separate files?
4     A.   I don't know what the Canada
5 laws are, I can't remember. But at the time
6 the thought was to get the rHA approved and I
7 can't remember, but in some countries, you
8 can't have two files being reviewed at the
9 same time unless they're bundled into one
10 file.
11     Q.   It doesn't say anything about
12 that in here, right, in this e-mail from --
13     A.   Yeah, I honestly remember -- I
14 mean, I didn't remember any of this until
15 seeing this e-mail, and all I can do is state
16 what's in here.
17     Q.   Who was involved in that
18 decision to withdraw the end expiry in Canada?
19 Did you have to approve that or be in it?
20     A.   That was working with Maureen
21 McCormick up in Canada. She was the one that
22 actually interacted with the Canada Health
23 Authority. So she knew the rules, the
24 regulatory rules in Canada to best handle
25 this.

Appx1879

Page 226

ALISON L. FISHER, PhD - CONFIDENTIAL

1   Q.   But did she need your approval
2   to do it?
3   A.   It was a group decision so my
4   input was part of the input concerning the
5   regulatory.  She needed to go to her
6   supervisor.  I needed to go to my supervisor.
7   And the team needed to agree on it.
8   Q.   Go back to your e-mail on the
9   last page, paragraph -- the paragraph in the
10  middle that says, "Thus based on the fact that
11  we do not plan to change manufacturing with
12  respect to the mumps...."  What's the basis
13  for you making that statement?  How did you
14  know that Merck did not plan to change
15  manufacturing with respect to mumps?
16  A.   Well, I say that was the
17  original intention to do that.
18  Q.   Yep.
19  A.   So what is your question?
20  Q.   Well, you -- actually you say as
21  was intended in the late 1990s and up to about
22  2004.  So let me ask a different question
23  then.
24      What change in manufacturing

Page 227

ALISON L. FISHER, PhD - CONFIDENTIAL

1   with respect to mumps was intended up to about
2   2004 that you're referring to here?
3   A.   I think what I'm referring to
4   is back in the '90s, we had to increase our
5   target potency and minimum release.  So the
6   thought was is that once we did an end expiry
7   study, we could revisit that potentially.
8   Q.   And lower the potency?
9   A.   Potentially depending on the
10  clinical results.
11  Q.   So that's the change in
12  manufacture -- the change in manufacturing
13  that you're talking about here was lowering
14  the potency?
15  A.   That would be to lower the
16  minimum release potency.
17  Q.   Okay.  Then "...up to about
18  2004...," why did that -- what happened in
19  2004 to cause Merck to say we're not going to
20  think about doing that?
21  A.   I don't recall the 2004 -- what
22  happened in 2004.  I don't recall.
23  Q.   Okay.  But for whatever reason,
24  by 2006, this idea of lowering potency was not

Page 228

ALISON L. FISHER, PhD - CONFIDENTIAL

1   really being considered.  Right?
2   A.   It's not my decision.  At the
3   time I did not hear that it was being
4   considered.
5   Q.   Okay.  But you --
6   A.   None of this is my decision.
7   Q.   I'm not asking if it's your
8   decision.  I'm asking the basis for what
9   you're saying in this e-mail.  I understand
10  it's not your decision.  So but what you're
11  saying in this e-mail is by 2006, there was
12  not a plan to change manufacturing to lower
13  potency.  Is that right?
14  A.   There was not a definitive plan
15  at that point of time to change the
16  specification at that point of time.
17  Q.   The release potency specification?
18  A.   Uh-huh.
19  Q.   Okay.
20      MS. DYKSTRA:  Say yes or no.
21  BY MR. MACORETTA:
22  Q.   You have to say yes.
23  A.   Yes.
24  Q.   Okay.  And since there isn't a

Page 229

ALISON L. FISHER, PhD - CONFIDENTIAL

1   plan to change the release specification, the
2   last part of your sentence is there's no need
3   to change the end expiry specification.
4   Right?
5   A.   That's -- yes.
6   Q.   Okay.  So if there's no need to
7   change the end expiry specification and the
8   likelihood of it actually working is less than
9   10 percent, why would you go through the
10  hassle of doing it with the FDA?  The answer
11  you told me before is because we might want to
12  change it in the future.  Are there any other
13  reasons you would do that, that Merck was
14  willing to do that?
15      MS. DYKSTRA:  Was willing to
16      continue with --
17  BY MR. MACORETTA:
18  Q.   Was willing to continue with the
19  FDA's submission, yes.
20  A.   I think that's a question that
21  you would have to ask other people on the
22  team.  My only recollection was a logical one
23  that tended back to that early time.  If you
24  lower it, it can save money.

Appx1880

ALISON L. FISHER, PhD - CONFIDENTIAL

1      Q.   But you weren't planning to
2  lower it.
3      A.    At that time, based on the
4  outcome of the clinical study, as you recall,
5  we didn't pass the lowest log.  At that time,
6  the thought was not to change it.  That
7  doesn't mean we would never ever, ever change
8  it in the future.
9      Q.   Can you think of another
10 instance where Merck tried to change the end
11 expiry of a product when it didn't really have
12 any intent to change the manufacturing?
13          MS. DYKSTRA: Objection.  I
14     don't know.
15          THE WITNESS: I don't know the
16     answer to that.  I just know the files
17     I've been involved with.
18 BY MR. MACORETTA:
19     Q.   Well, that's all you can tell
20 me, yes.  Can you tell me an example of when
21 that happened, based on your knowledge?
22     A.    Not for the files I've worked
23 on.
24     Q.   Okay.  So when you say --

ALISON L. FISHER, PhD - CONFIDENTIAL

1          MS. DYKSTRA: Can we just pause
2     for one second, we're having
3     technical --
4          VIDEOGRAPHER: Off the record?
5          MS. DYKSTRA: Sorry.  I
6     apologize.
7          MR. MACORETTA: No.
8          MS. DYKSTRA: Thank you.  I
9     apologize.
10 BY MR. MACORETTA:
11     Q.   All right.  So if it's a team
12 decision to go forward with the request to the
13 FDA to lower the end expiry potency -- you're
14 on the team.  Right?
15     A.    I'm one member.
16     Q.   Tell me every other member on
17 the team.
18     A.    I'm trying to --
19     Q.   Before we do that, when you say
20 "team," are we talking about the Product
21 Development Team or something else?
22     A.    It would be the Product
23 Development Team and those that manage the
24 people that sit on that team.

ALISON L. FISHER, PhD - CONFIDENTIAL

1      Q.   Okay.  So if we look at Product
2  Development Team meeting minutes for that
3  time, there may be an entry that says, you
4  know, continue with that, respond to FDA or
5  pathforward or something like that?
6      A.    I don't recall.  Without seeing
7  the minutes, I can't answer.
8      Q.   So then you know what, you might
9  as well tell me who else -- then I need you to
10 tell me who is on the team, including the
11 Product Development Team members and who their
12 managers were, that made this decision to go
13 forward after the October 2005 letter?
14          MS. DYKSTRA: Objection.
15          THE WITNESS: My recollection is
16     Joye Bramble.  I don't know who her
17     boss was.  Luwy Musey.  I think his
18     boss was Florian.  Keith Chirgwin.  He
19     was either my boss or I reported in to
20     somebody who reported in to him,
21     depending on the time period.  Who
22     else?  I think Mary Macchi might have
23     been on the team.  She was CMC
24     regulatory.  Mary Macchi.  Let's see.

ALISON L. FISHER, PhD - CONFIDENTIAL

1  I can't really remember other than
2  what I said.  I mean, clinical, Kaike
3  Simon, project manager.  CMC.  I think
4  Jean Liptock was on the team.  I think
5  she was an engineer.  Raj Navalade
6  might have been on the team.  I think
7  he was a planner.  I can't remember
8  anybody else on the team.
9  BY MR. MACORETTA:
10     Q.   Was this the kind of team where
11 everybody gets an equal vote or was it whoever
12 the chairperson made the decision?
13     A.    I think by and large it was
14 pretty democratic.  I think the decisions --
15 many times, you know, Luwy and Joye were
16 involved keyly in decisions.
17     Q.   Oh, by the way, so I'm looking
18 at the -- let's look at the second page of
19 your e-mail again.  The next to last paragraph
20 says, As a side note -- in Canada, we are
21 planning to withdrawal the MEE file as we fear
22 it may not be approved based on some of Health
23 Canada's questions.
24          So was that -- did that reflect

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  your thinking at the time in February of 2006?
3       A.   I mean, I don't remember any of
4  this other than reading this.  If I wrote it,
5  then that's what happened.
6       Q.   But then the last paragraph
7  says, "MEE has not been approved in any major
8  countries.  If we get approval in the EU
9  (expected May '06) that will be our first
10 major approval."
11       So did you get approval in the
12 EU for MEE?
13       A.   Yes, we did.
14       Q.   When was that?
15       A.   I don't remember the date.
16       Q.   Well, was it before or after the
17 US?
18       A.   I don't remember.  All I can
19 recollect is what I put here, and they said
20 expected in May of '06.
21       Q.   Were you involved in the
22 submissions to the EU at all?
23       A.   Yes, I was.  The initial
24 submission, no.  I believe that was Manal
25 Morsy.  But when she left, then I took over.

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2       Q.   Was it the same -- was the way
3  you asked the EU for approval of this -- it's
4  the same MEE, right, going from 4.3 to 4.1,
5  that's what you're seeking in the EU.  Right?
6       A.   I believe so.  The reason I say
7  believe -- yeah, I think -- I think that's
8  right.  I know in Canada, as we said here,
9  there was -- they had some different potency
10 based on some different assay.  But I
11 think -- I can't remember honestly.
12       Q.   Okay.  And you -- and when you
13 sought EU approval, you said you used the same
14 PRN and ELISA test results in Protocol 007 for
15 the EU that you used in the United States.
16 Right?
17       A.   My recollection is yes.
18       Q.   Okay.  So when you get the
19 letter from the FDA in October 17, 2015, that
20 says the data is inadequate, do you send that
21 to EU and say this is what the FDA just told
22 us about the same data?
23       MS. DYKSTRA:  Asked and
24       answered.  You can answer again.
25       THE WITNESS:  What is the

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  question?
3  BY MR. MACORETTA:
4       Q.   Sure.  You gave the same data
5  supporting a lowering an end expiry to the EU
6  and the FDA.  Right?
7       A.   Yes.
8       Q.   Okay.  So when the FDA writes
9  back in October 15 -- October 17, 2005, and
10 says that PRN data is not good enough --
11       MS. DYKSTRA:  Objection.
12  BY MR. MACORETTA:
13       Q.   -- did you tell the EU the --
14  what the FDA said in this letter?
15       MS. DYKSTRA:  Objection.  You
16       can answer.
17       THE WITNESS:  You're asking two
18       questions here.
19  BY MR. MACORETTA:
20       Q.   I don't think I am, but okay.
21       A.   The data and the initial filing
22  was the same.
23       Q.   Yes.  Okay.
24       A.   Different countries ask
25  different questions and we answer them.

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2       Q.   Yes.  So when the FDA says it's
3  not approvable --
4       A.   We don't share that with
5  Europe.
6       Q.   Okay.  That's because you don't
7  think you have to?
8       MS. DYKSTRA:  Objection.
9  BY MR. MACORETTA:
10       Q.   Why don't you share that with
11  Europe?  That's just to fix the objection.
12       MS. DYKSTRA:  Objection to that,
13       too.  But you can ask what's -- to the
14       extent you share it or you don't share
15       it.
16       THE WITNESS:  At that time I
17       don't recall that we felt there was
18       the obligation to share all the back
19       and forth with Europe.
20  BY MR. MACORETTA:
21       Q.   You mean the legal obligation?
22       A.   The regulatory -- there's no
23  regulatory obligation then or now.  I can't
24  comment -- what we do is we share responses
25  based on courtesy and knowing that regulators

Appx1882

Page 238

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2  often talk to each other. But I can't
3  comment on what we did then.
4     Q.   Let me show you what we're going
5  to mark as Exhibit 15.
6        MS. DYKSTRA: Are you done with
7     this?
8        MR. MACORETTA: I am.
9              - - -
10       (Exhibit Fisher-15, E-mail
11    chain, Bates MRK-KRA01574732 - 4735,
12    was marked for identification.)
13             - - -
14       MS. DYKSTRA: John, we're going
15    an hour, so just when you're ready to
16    take break before --
17       MR. MACORETTA: Let me get
18    through this document and then we'll
19    take a break.
20       MS. DYKSTRA: Okay. Thank you.
21 BY MR. MACORETTA:
22    Q.   Let me know when you're ready to
23 talk about this, Dr. Fisher.
24    A.   Okay.
25    Q.   All right. The bottom of page

Page 239

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2  1, your e-mail to Guy Demol, the second -- the
3  third paragraph, "As we discussed yesterday,
4  there will be a delay in the launch of MMRII
5  with rHA, which means there is a compliance
6  gap for our current HSA product in some of the
7  countries in the EU."
8        What do you mean by "compliance
9  gap"?
10    A.   The intention is to harmonize
11 all the potencies before we file the rHA.
12    Q.   Which potencies -- the release
13 potency is already harmonized. Right?
14       MS. DYKSTRA: Objection.
15       THE WITNESS: The potency in the
16    label.
17 BY MR. MACORETTA:
18    Q.   So the end expiry potency?
19    A.   Yes.
20    Q.   Okay. So what do you mean by
21 "compliance gap" here?
22    A.   What I meant was that we needed
23 to get the MEE approved before putting that
24 potency in the rHA part.
25    Q.   Getting the MEE approved at 4.1

Page 240

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2  before you put that potency in the rHA part?
3     A.   Uh-huh.
4     Q.   So what do you mean by "a
5  compliance gap for the current HSA product"?
6     A.   Well, I can't remember all
7  this, but there's historically different
8  potencies that were listed depending on what
9  type of cell assay was used. So 5,000 in one
10 assay, that assay was changed to a different
11 assay, that gave us a reading of 20,000.
12    Q.   Where does it say that in this
13 e-mail?
14    A.   That's not in this. That's in
15 some other documents.
16    Q.   So what's the compliance gap
17 you're talking about?
18    A.   I'm not exactly sure what that
19 gap is.
20    Q.   Doesn't the compliance gap mean
21 in certain countries you're not in compliance
22 with the label you have on the product in
23 those countries?
24       MS. DYKSTRA: Objection.
25       THE WITNESS: Well, let's see.

Page 241

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2     I think -- you know, I say in this
3     e-mail some countries have an end
4     expiry of 20,000 and some countries
5     have 5,000. So I think the thought
6     is, is that we need to get the one
7     harmonized potency that data supports
8     in the label.
9  BY MR. MACORETTA:
10    Q.   And the harmonized potency that
11 the data supports is 4.1. Right?
12       MS. DYKSTRA: Objection.
13 BY MR. MACORETTA:
14    Q.   Is that what you're saying?
15    A.   Well, we were trying to get a
16 4.1 in the label but the data actually
17 supports a 4.3.
18    Q.   Then why is there a compliance
19 gap?
20    A.   You know, this was a long time
21 ago. And I can't remember any more than
22 what's on this page.
23    Q.   And this page says there's a
24 compliance gap for our current HSA product in
25 some of the countries in the EU, doesn't it?

61 (Pages 238 - 241)

Appx1883

Page 242

ALISON L. FISHER, PhD - CONFIDENTIAL

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2         A.    That's what it says.
3         Q.    So do you have any reason to
4    believe there was not a compliance gap in the
5    current HSA product in some of the countries
6    in the EU as of September 18, 2004?
7         A.    I'm trying to -- I mean, this
8    has been a while, so I -- you know, the only
9    thing that I can refer to here is that some
10   of these labels had 20,000 in them.  And
11   those would be the ones that we would be
12   referring to.
13        Q.    20,000 is the same as 4.3.
14   Right?
15        A.    That's right.
16        Q.    So the labels that had 20,000 or
17   4.3 were the ones where you were not
18   compliant.  Is that what you're referring to?
19        A.    Well, I think what I was
20   referring to is we're looking for an end
21   expiry potency, we want to put a 4.1 in our
22   label.
23        Q.    Yep.
24        A.    And if some countries have a
25   4.3, a 4.3 is higher than a 4.1.  So it's --

Page 243

1    the labels aren't harmonized, but the minimum
2    release was never changed.  At least in this
3    time frame.  It was changed back in the '90s
4    it was, you know, changed.  So when I wrote
5    this, I was pretty early on the program and I
6    think the words here -- I mean, I can't
7    remember everything honestly, but I think
8    what I'm referring to is that these label
9    potencies are not all harmonized.
10        Q.    But you don't say harmonized,
11   you say compliance gap.
12        A.    Yeah, I don't know why I said
13   compliance gap, I don't remember.
14        Q.    The compliance gap you're
15   talking about here is at 4 -- some countries
16   have a 4.3 on their label?
17        A.    Right.
18        Q.    And if there's a gap, that
19   doesn't mean that they're not really getting
20   4.3 at end expiry?
21        A.    No, no.
22        Q.    What does it mean then?
23        A.    Gap would mean that some labels
24   would have a 4.3 and some labels would have a

Page 244

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2    4.1.  So by virtue of that, one would think
3    that there's less mumps in some of our
4    product versus others which wasn't the case.
5    So it's confusing not from the standpoint of
6    what's in the product, it's confusing in the
7    standpoint of what's in the label.
8         Q.    Yes, I agree.  You're concerned
9    that there's a -- the compliance means
10   complying with the label.  Right?
11        A.    Yes.
12        Q.    So you're concerned that there's
13   a gap in compliance with the label for the
14   current HSA product in countries where there's
15   a 4.3 on the label.  Right?
16        A.    Yeah.  Again, I don't remember
17   everything then, but I look at this more as
18   we wanted to harmonize the potencies in these
19   labels.
20        Q.    It doesn't say anything about
21   harmonizing here, does it?
22        A.    Right.  No, it doesn't.  Nope.
23        Q.    No, it does not.  And then
24   Mr. Demol writes back, "I agree that those
25   with a 20,000 potency end spec should be

Page 245

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2    targeted first, and I think that is the better
3    solution," which is, in fact, what you tell
4    him to do.  Right?
5         A.    Which ones are you referring to
6    now?
7         Q.    I'm reading the second paragraph
8    of Mr. Demol's e-mail above what you wrote to
9    him.
10        A.    Yes, I think he feels that we
11   have to get them all aligned, but he felt
12   that it was more critical that we get the
13   20,000 ones aligned before the 5,000 ones.
14        Q.    That's right.  Because in your
15   e-mail, I'm now going down to the bottom
16   paragraph of your e-mail, you say, "Some of
17   those countries have a mumps end expiry of
18   20,000 in their labels (4.3 log TCID50), which
19   is wrong as we cannot guarantee this potency
20   in our product...."
21        A.    Yeah.
22        Q.    That's what you wrote.  Right?
23        A.    Well, that's what I wrote, but
24   this was when I was in this job not a long
25   period of time.  And later on I actually -- I

62 (Pages 242 - 245)

Appx1884

Page 246

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 mean, this statement is not actually
3 accurate. It is what I wrote and it was my
4 understanding at the time. So in a label
5 when you have something there inherent in
6 that is that you can guarantee that you've
7 got an amount -- that amount in there or
8 more.
9 Q. Which this says you can't
10 guarantee?
11 A. Well, in this e-mail it says --
12 but, again, this was early in my career. And
13 when I learned more about this and actually
14 got the -- looked at the models, and actually
15 asked for some of the logs after expiry, what
16 was in the logs, if I had known here what I
17 had knew later, I wouldn't have written it
18 like this.
19 Q. So you believed it when you said
20 it, but you later concluded that you were
21 wrong?
22 MS. DYKSTRA: Objection.
23 THE WITNESS: When I said it --
24 MS. DYKSTRA: You can answer.
25 THE WITNESS: When I said it,

Page 247

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 that was my understanding, but the way
3 that I worded it was really not -- was
4 really not accurate, because we
5 actually -- because we didn't change
6 anything, we actually could guarantee
7 that we had this in our product.
8 BY MR. MACORETTA:
9 Q. But that's exactly the opposite
10 of what you said here. Right?
11 A. I wouldn't say exactly the
12 opposite.
13 Q. "...is wrong as we cannot
14 guarantee this potency in our product...."
15 A. Right.
16 Q. So when you wrote this, you
17 believed that you could not guarantee a
18 potency of 4.3 log at 24 months in your
19 product, right, mistaken as that belief may
20 later have turned out to be?
21 A. Yeah, at the time I thought
22 that that was true, but once I learned more
23 about this, in looking at that statement now,
24 that statement is not true.
25 Q. So when did you come to this

Page 248

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 revelation that what you had written here was
3 wrong?
4 MS. DYKSTRA: Objection. You
5 don't need to raise your voice to the
6 witness either, John.
7 THE WITNESS: It wasn't a
8 revelation. It was knowing more about
9 the product and having more
10 experience. I can't tell you exactly
11 when I learned this. It was in one
12 of -- I can't tell you the exact same
13 date, but it was later in the course
14 of this that I learned that, in fact,
15 we could guarantee 4.3 or above.
16 BY MR. MACORETTA:
17 Q. So is there an e-mail from you
18 to Mr. Demol saying, hey, ignore what I told
19 you earlier, it was wrong?
20 MS. DYKSTRA: Objection.
21 BY MR. MACORETTA:
22 Q. You can answer that.
23 A. I don't know if there was an
24 e-mail that said that or not.
25 Q. Did you ever tell Mr. Demol

Page 249

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 anything like that?
3 A. What's said here or what
4 later --
5 Q. The opposite saying I was wrong
6 when I said we can't guarantee this potency?
7 A. I don't remember all my
8 conversations with Guy on this. What I do
9 remember is that we had these different
10 potencies in other parts of the world and
11 that we really wanted to get it harmonized to
12 one number, and that was our main goal here
13 because it was very confusing to have all
14 these different potencies when, in fact, our
15 product around the world had the same amount
16 of mumps in it.
17 Q. By the way, so this wasn't just
18 you being wrong about how much potency was in
19 the product. Then if we turn to the next
20 page, Keith stressed to work to remediate
21 labels in countries who are out of compliance
22 with respect to mumps end potency first.
23 MS. DYKSTRA: Objection.
24 BY MR. MACORETTA:
25 Q. That's Keith Chirgwin. Right?

63 (Pages 246 - 249)

Appx1885

Page 250

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 MS. DYKSTRA: Objection.
3 THE WITNESS: You know, I think
4 there's two different things. I think
5 it's --
6 BY MR. MACORETTA:
7 Q. Let me ask first, when you say
8 Keith, you're talking about Keith Chirgwin
9 there?
10 A. Yes.
11 Q. Okay. So you're telling Guy
12 that Keith said to work to remediate labels in
13 countries who are out of compliance with
14 respect to mumps end expiry potency first.
15 Right, that's what that says?
16 A. That's what it says.
17 Q. Okay. Then you say, "...that
18 would be countries with 20,000 TCID50 (4.3
19 log) in the MMRII label." Right?
20 A. That's what I said.
21 Q. Yes. So Keith also said those
22 labels are out of compliance if they have a
23 4.3 in them. Right?
24 MS. DYKSTRA: Objection. You
25 can answer.

Page 251

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 THE WITNESS: Yeah. I mean, I'm
3 just -- I don't remember any of this,
4 but I'm reading it now. So I mean,
5 all I can do is read this. And, you
6 know, if I said this in the e-mail, I
7 said it in the e-mail.
8 BY MR. MACORETTA:
9 Q. Okay. And you have no reason to
10 think that Keith said anything other than what
11 you said he said in this e-mail?
12 A. I'm struggling with the word
13 compliance here. You know, this was early in
14 my career, and, you know, I agree that we
15 needed to remediate the labels. But it's not
16 coming to me right now why these labels would
17 be out of compliance. It's just not coming
18 to my mind, you know, knowing that if we were
19 to take the product and test the product, we
20 never would have fallen below a 4.3.
21 Q. Well, Keith says they're out of
22 compliance --
23 MS. DYKSTRA: Can you let her
24 finish the answer, John, please.
25 MR. MACORETTA: -- because of

Page 252

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 the 20,000 TCID50.
3 MS. DYKSTRA: Can you let her
4 finish her answer?
5 BY MR. MACORETTA:
6 Q. I didn't mean to interrupt. Did
7 you have more to say on that question?
8 A. Yes.
9 MS. DYKSTRA: I don't know that
10 you did. I just didn't -- I wanted
11 you to finish.
12 BY MR. MACORETTA:
13 Q. Why else would the labels have
14 been out of compliance other than that they
15 had had an end expiry potency of 4.3,
16 according to this e-mail?
17 MS. DYKSTRA: Objection.
18 THE WITNESS: Yeah. I mean, I
19 can't say -- I can't say that Keith --
20 what Keith exactly said to me at the
21 time. He may have said the word
22 compliance. He may have said another
23 word. But, you know, I think the big
24 gist of this was, and I can't remember
25 all the nuances, is that we really

Page 253

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 needed to get all these potencies
3 aligned with each other so it doesn't
4 look like some countries are getting
5 more mumps in their product than other
6 countries because that would not be a
7 favorable thing to look across country
8 labels and see different potencies.
9 BY MR. MACORETTA:
10 Q. The point you wanted to align at
11 was 4.1. Right?
12 A. Based on the results of the
13 trial, that was the result, was that the 4.1
14 was as good as the 4.8 and as good as the --
15 you know, essentially, you know, the work was
16 to, based on the clinical trial, put in our
17 label something that was the outcome of that
18 clinical trial.
19 Q. Which you were hoping was 4.1.
20 Right?
21 MS. DYKSTRA: Objection.
22 THE WITNESS: Well, this was
23 before my time. I think the real hope
24 was that it would be 3.7.
25 BY MR. MACORETTA:

64 (Pages 250 - 253)

Appx1886

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2    Q.   Okay.
3    A.   Because I think if it had been
4  that, that would have been a substantial
5  enough change that most likely we would have
6  been able -- we would have been able -- it
7  would have been an advantage to us to change
8  the product if we were to get that 3.7.
9    Q.   If you look down earlier, two
10  days earlier, you send an e-mail to Guy Demol
11  and some other people that says on page 2 that
12  we're submitting a stand-alone end expiry file
13  to Canada, Australia and New Zealand for
14  purposes of updating to 4.1.  Do you see that?
15    MS. DYKSTRA:  I'm sorry, John, I
16  don't see that.  Where are you?
17  BY MR. MACORETTA:
18    Q.   I'm on the Bates-numbered page
19  ending 734.  First full paragraph starts with
20  "As I indicated...."
21    A.   Yes, so, you know, for Canada,
22  that was one of those countries where they
23  had 5,000 listed and that was based -- I
24  can't remember the name of it, that was based
25  on an older assay.  And that assay actually

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  was updated and that same assay in another
3  cell line actually gave 20,000.  So I can't
4  say why that 5,000 remained in the Canada
5  label for so long.
6    Q.   But my point is, you just told
7  Mr. Demol we're trying -- we're changing three
8  other countries to try to get them to 4.1.
9  Isn't that what that says?
10    A.   Yes, we wanted to submit a
11  stand-alone file so that our first intent was
12  to harmonize the labels; and then after that,
13  once we harmonize them, then we can put that
14  number in the rHA label.
15    Q.   And you wanted to harmonize them
16  at 4.1.  Right?
17    A.   Yes.
18    Q.   Okay.  That's why you said --
19  okay.  So if you wanted to harmonize them
20  at -- all right.  So we got that.  So we're
21  harmonized at 4.1.  Great.
22    By the way, when we talked about
23  this early in your career stuff, you had been
24  in your job as a regulator for six months by
25  then.  Right?

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2    A.   Well, I started this in March.
3    Q.   And September is six months
4  later?
5    A.   Uh-huh.
6    Q.   And you had a PhD in chemistry.
7  Right?
8    A.   In chemistry.
9    Q.   Okay.  So let me try again.
10    MS. DYKSTRA:  How much longer do
11  you think you have on this document?
12    MR. MACORETTA:  A few more
13  minutes.
14    MS. DYKSTRA:  Okay.
15  BY MR. MACORETTA:
16    Q.   As we look at this, Keith -- I
17  repeat to Guy Demol that Keith says to
18  remediate labels in countries where we're out
19  of compliance which is countries where there's
20  4.3 log in the product.  Right?  That's what
21  the first paragraph at the top of page 2 says.
22  Right?
23    A.   That's what it says.
24    Q.   You have no reason to think
25  Keith said or believed anything different than

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  that at this time?
3    A.   You know, I can't recall, I
4  mean, if he did use the word compliance, and
5  I have to think that he must have used that
6  word because it's in the document.  I
7  honestly, you know, knowing further along and
8  knowing what I know now, the only thing I can
9  think that he was referring to was basically
10  that none of these labels were harmonized and
11  he wanted to fix the ones that were above the
12  4.1 before fixing the ones that were below
13  the 4.1.
14    Q.   Because the ones above 4.1 were
15  out of compliance and the ones below were not.
16  Right?
17    MS. DYKSTRA:  Objection.
18    THE WITNESS:  Well, honestly, I
19  mean, looking at this today I would
20  say they were both out of compliance.
21  BY MR. MACORETTA:
22    Q.   Okay.  Great.  So if labels at
23  4.3 in Europe were out of compliance -- go
24  ahead.
25    A.   Well, out of compliance with

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  respect to labels, right, because in one
3  label you had 5,000. In another label you
4  had 20,000. The 5,000 actually equated to
5  the 20,000 using a different assay. I
6  think -- you know, what I'm thinking here is
7  that it's incongruous to have labels for the
8  same product all over the world but have
9  different potencies when, in fact, we had the
10  same potency in our product across the world.
11    Q.  It was the same product in every
12  country?
13    A.  It was the same product, right.
14    Q.  Okay.
15    A.  So it's not a good situation to
16  have different potencies in a product because
17  one could say in Canada, well, why are you
18  putting less in our product than you are in
19  another country.
20    Q.  I understand all that. So but
21  when you say 4.3 was out -- and you just
22  agreed that the label at this time said 4.3,
23  it was out of compliance, right, in some of
24  these European countries?
25    A.  Well, what I just said from a

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  labeling standpoint is I would see out of
3  compliance as being, you know, both ways,
4  having something at 5,000 and having
5  something, you know -- I mean, I can't
6  remember why this word was used. What I keep
7  coming back to is that we wanted to harmonize
8  this because we had the same mumps with the
9  same potency all around the world. So it
10  raises questions when different labels say
11  different things when, in fact, the product
12  is the same around the world.
13    Q.  You don't have to convince me
14  that the product was the same. I'm trying to
15  understand. So 4.3 is out of compliance and
16  3.7 or 5,000 is out of compliance. Is that
17  what you're saying?
18    MS. DYKSTRA: Objection. You
19    can use your own words. And I
20    think --
21    THE WITNESS: I'll tell you what
22    I'm saying here. You know, what I'm
23    saying is a more experienced
24    regulatory person is that these labels
25    were not harmonized.

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  BY MR. MACORETTA:
3    Q.  I got that.
4    A.  These labels had values --
5    MS. DYKSTRA: Please don't
6    interrupt the witness.
7    THE WITNESS: -- that were
8    disparate when, in fact, what was in
9    the product was not disparate. And,
10    you know, there was -- this was not --
11    this is not an ideal situation when
12    you have the same product and across
13    the world you have all these potencies
14    in it. So there was a real effort.
15    And I can't explain why -- you know, I
16    can't explain all the whys behind
17    this. I wasn't at the company at that
18    point. But at the end of the day you
19    want to make sure that you have the
20    same shelf life with the same expiry
21    all over the world. You don't want to
22    be having different numbers in this
23    column and different numbers in this
24    column. So, for example, if you look
25    at the measles column, and you look at

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2    the rubella column, all those numbers
3    are harmonized.
4  BY MR. MACORETTA:
5    Q.  And the number Merck wanted to
6  harmonize at for mumps was 4.1. Right?
7    A.  Well, Merck could have
8  harmonized either on 4.3 or on 4.1.
9    Q.  But the number you're trying to
10  harmonize was 4.1?
11    MS. DYKSTRA: Objection.
12    THE WITNESS: The number we were
13    trying to harmonize on was 4.1.
14  BY MR. MACORETTA:
15    Q.  You couldn't have harmonized at
16  4.3 in the European countries because you and
17  Keith Chirgwin both say 4.3 is out of
18  compliance. Right?
19    MS. DYKSTRA: Objection.
20    THE WITNESS: No, that's not
21    true.
22  BY MR. MACORETTA:
23    Q.  Well, okay, let's back it up
24  then. You and Keith Chirgwin both say that
25  4.3 is out of compliance in some countries.

66 (Pages 258 - 261)

Appx1888

Page 262

1       ALISON L. FISHER, PhD - CONFIDENTIAL
2  Right?
3       A.    Keith communicated to me that
4  we need to --
5          MS. DYKSTRA: John, you don't
6     have to laugh at the witness. And we
7     asked you 20 minutes ago to take a
8     break and you keep --
9          MR. MACORETTA: Okay. Well --
10         MS. DYKSTRA: -- hammering the
11    same exact question over and over
12    again.
13         MR. MACORETTA: Okay.
14         MS. DYKSTRA: Which she's
15    already asked and answered.
16         MR. MACORETTA: All right.
17    That's fine. I'll withdraw that
18    question.
19  BY MR. MACORETTA:
20      Q.    If you and Keith Chirgwin both
21  say that a label with 4.3 expiry is out of
22  compliance in certain European countries in
23  September 2004, then why wasn't a label with
24  4.3 expiry in the United States out of
25  compliance at that very same time?

Page 263

1       ALISON L. FISHER, PhD - CONFIDENTIAL
2          MS. DYKSTRA: Objection. You
3     can answer that one.
4          THE WITNESS: I can say that in
5     the 2004 time frame, based on the fact
6     that our target potency was 5.2 and
7     our minimum release potency was 5,
8     that -- and given the fact that you --
9     assay batches that are at the end of
10    expiry, given the fact at the end of
11    the day we weren't going to change --
12    you know, we're changing the potency
13    but we're not changing really what we
14    put in the product, we could have --
15    to the best of my recollection, we
16    could have changed all these labels so
17    that every label said 4.3, because we
18    never changed from the time that FDA
19    asked us to up the target in the
20    minimum release, we never changed
21    anything.
22  BY MR. MACORETTA:
23      Q.    But it's the same product in
24  Europe as US, same manufacturing potency, same
25  release potency. Right?

Page 264

1       ALISON L. FISHER, PhD - CONFIDENTIAL
2       A.    Yes.
3       Q.    So if you thought a label in
4  Europe was out of compliance at 4.3 in
5  September of 2004, why did you not think that
6  the same label with the same product in the
7  United States was out of compliance that said
8  4.3?
9          MS. DYKSTRA: Objection. Asked
10    and answered.
11         THE WITNESS: I never thought,
12    knowing -- when I finally got into all
13    the math and I got into that
14    passionate thing, you know, before the
15    break with you, you know -- what we
16    say in our label is very, very
17    conservative. So the fact that, you
18    know, even 4.3 is conservative. So when
19    I came into this job there were all
20    these disparate potencies. When I
21    came into this job --
22         MR. MACORETTA: I'm going to
23    move to strike this as non-responsive.
24    I mean, come on. Let's try again.
25         So in September --

Page 265

1       ALISON L. FISHER, PhD - CONFIDENTIAL
2          MS. DYKSTRA: John, she already
3     answered your question --
4          MR. MACORETTA: She hasn't
5     answered it. I've asked her five
6     times, she hasn't answered it yet.
7          MS. DYKSTRA: You don't like the
8     way she's answered it.
9          MR. MACORETTA: That's because
10    it's non-responsive.
11         MS. DYKSTRA: Well, that's
12    because you asked it and she's
13    answered it the best she can answer
14    it --
15         MR. MACORETTA: Okay.
16         MS. DYKSTRA: -- and you don't
17    like the answer and you're trying to
18    put words in the mouth.
19         We're going to take a break now.
20    Okay?
21         MR. MACORETTA: No, we're not
22    going to take a break. You don't get
23    to decide.
24         MS. DYKSTRA: We've been going
25    for an hour and 25 minutes now.

67 (Pages 262 - 265)

Page 266

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2         MR. MACORETTA:  Okay.
3  BY MR. MACORETTA:
4    Q.   Is there an e-mail at this time,
5  Ms. Fisher, where you discuss -- by the way,
6  Mr. Demol agrees with you, right, that these
7  are out of compliance and we have to work on
8  them first?
9         MS. DYKSTRA:  Are you referring
10  to the top e-mail?
11        MR. MACORETTA:  Yeah.
12        THE WITNESS:  You know, I can
13  honestly say, I mean, you know, at the
14  time I wrote these e-mails, I wrote
15  these e-mails and I was behind what I
16  was writing.  Now, you know, looking
17  back at these e-mails now, I can't
18  really answer any more questions other
19  than what's in these e-mails.  I don't
20  know why I used the word "compliance."
21  I don't know why we all did.  The only
22  thing that I see in my mind is that
23  knowing what I know, we never were out
24  of compliance with what we put in our
25  product.  We never changed it.

Page 267

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  BY MR. MACORETTA:
3    Q.   And yet you said you were in an
4  e-mail.  There's a couple of e-mail in 2004.
5    A.   Well, I mean, I've said --
6  okay.  I mean, what I'm doing now is 12 years
7  later coming back and answering your
8  questions.  I know that we never changed the
9  amount of mumps we put in our product.  I
10  know that because we never changed it, I know
11  that we can guarantee 4.3 at the end of the
12  shelf life.  I know that we changed it to 4.1
13  as a result of this mumps end expiry.  I know
14  that at the end of the day we wanted to
15  harmonize all these labels to have the same
16  number.  These labels could have said 4.3 or
17  they could have said 4.1.  The point is, is
18  that at the end of shelf life, we could
19  guarantee either one.  So either one that
20  would go in the label, we could guarantee it.
21        MR. MACORETTA:  Okay.  We can
22  take a break now.
23        MS. DYKSTRA:  Thank you.
24        VIDEOGRAPHER:  The time is now
25  16:15.  We are off the video record.

Page 268

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2              - - -
3         (A recess was taken.)
4              - - -
5         VIDEOGRAPHER:  The time is now
6  16:39.  We are back on the video
7  record.  This begins media five.
8         MS. DYKSTRA:  John, I just
9  wanted Alison to clarify -- Dr. Fisher
10  to clarify one thing.  You asked her
11  about the need to continue with
12  supplement, the discussions with the
13  FDA --
14        MR. MACORETTA:  Yeah.
15        MS. DYKSTRA:  -- and she had
16  something she wanted to clarify.  She
17  wanted to make sure her answer was
18  clear.
19  BY MR. MACORETTA:
20    Q.   Go ahead.
21    A.   Okay.  So the team makes these
22  decisions, but there were two people on the
23  team that were very passionate about
24  continuing with this given their long-time
25  effort on conducting the study.  And that

Page 269

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  would be Luwy and Joye.  So they were very
3  committed to following this through.
4    Q.   Is Dr. Krah on this team?
5    A.   No, I don't recall.  I don't
6  recall if he's on this team or not.
7    Q.   What we're talking about here is
8  a decision to keep going forward with the end
9  expiry submission after the October 2005
10  letter from the FDA?
11    A.   Yes.
12    Q.   Okay.  Got it.
13        Let's go back to Exhibit 15
14  which we were looking at before the break.
15  Although I'm not going to ask you about the
16  text.
17        You said several times that this
18  was all about an effort to harmonize end
19  expiry potencies.  Right?
20    A.   Yes.
21    Q.   Okay.  But we haven't seen that
22  in a documents today.  Is there a document
23  that says somewhere that we're doing this
24  because we want to harmonize the potencies?
25    A.   That could be in a 2.2

68 (Pages 266 - 269)

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  introduction.
3      Q.    To what?
4      A.    To one of the filings.
5      Q.    Okay.  Is there anyplace else it
6  would be?
7      A.    It could be in the module 2.5
8  document.
9      Q.    That's also in a regulatory
10 filing?
11     A.    Uh-huh.
12     Q.    But there's not some internal
13 Merck memo directive SOP that says we're going
14 to go push for end expiry around the world to
15 harmonize it?
16     MS. DYKSTRA:  Objection.
17 BY MR. MACORETTA:
18     Q.    Or is there?
19     A.    I can't comment whether there
20 is or there isn't.
21     Q.    You don't know of one?
22     A.    Huh?
23     Q.    You don't know of one, do you?
24     A.    I'm not aware of one other than
25 the one I mentioned that would be in the file

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  in the 2.5 introduction or the 2.5.
3      Q.    Is that how you came to learn of
4  this goal of harmonization?
5      A.    I learned about this in the
6  course of trying to put all this history
7  together.
8      Q.    So I understand your earlier
9  answers, when we talked about harmonization,
10 you said Merck could have harmonized at 4.3.
11 Right?
12     A.    Yes.
13     Q.    Except you say at the bottom
14 paragraph of Exhibit 15, 4.3 is wrong as we
15 cannot guarantee this potency in our product.
16 Right?  Do you see that the bottom of the
17 first page?
18     A.    Yeah.  I just wanted to see is
19 this the same thing that we were looking at
20 before or is it something different?  Or this
21 is the same one?
22     MS. DYKSTRA:  It's the same one.
23 BY MR. MACORETTA:
24     Q.    It should be the same thing.
25 Yes, it's the same thing.

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2      A.    Okay.  Yes, I said that at the
3  time of September when this was put out.
4  However, in looking at this now, I do, in
5  fact, know that we can guarantee 4.3 TCID50 in
6  our product because we haven't changed
7  anything.
8      Q.    But that's not what you thought
9  in September of '04?
10     A.    Yes.  Like I mentioned
11 previously, this is early in my job and I'm
12 not exactly sure what I meant there, but in
13 retrospect, looking back at it now, knowing
14 what I know, we can guarantee that in our
15 products.  We can guarantee that for the
16 mumps given that we didn't change anything.
17     Q.    And at the time you believe you
18 couldn't guarantee 4.3 in Europe, then your
19 belief would have had to have also been you
20 couldn't guarantee 4.3 in the US.  Right?
21     MS. DYKSTRA:  Objection.
22 BY MR. MACORETTA:
23     Q.    In September 2004.
24     A.    You know what, I can't answer
25 that question because this was in a

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  conversation with Guy about harmonizing these
3  labels.  And in the US I know that -- you
4  know, I mentioned previously, I know that we
5  can guarantee 4.3 or greater given the fact
6  that we didn't change anything, we didn't
7  change the target or the minimum release.
8  And further when I asked some of the
9  manufacturing people to give me the potency
10 in the expired lots, they were all well above
11 4.3.
12     Q.    That was after this time?
13     A.    That was after this time.
14     Q.    Okay.  When you send this e-mail
15 on September 18, 2004, none of the people you
16 cc, Keiko Simon, Heather Joseph, Mary Macchi
17 or Mark Galinski write back to you and say
18 you're wrong, what are you talking about,
19 there is no compliance gap, do they?
20     A.    Well, Keiko and Heather
21 wouldn't know the difference.  I can't
22 comment whether Mary and Mark -- I don't
23 know, I mean, I'm just looking at what's in
24 front of me, I don't know what I -- I don't
25 know what else may be out there or not out

Appx1891

Page 274

ALISON L. FISHER, PhD - CONFIDENTIAL
1  there.
2
3      Q.    Let me ask you this way:  You
4  don't remember anybody writing back in
5  response to this e-mail and saying, no, you're
6  wrong, do you?
7      A.    I don't recall anybody
8  challenging what I said here.
9      Q.    Okay.  Now I'm going to change
10  topics.
11          I want to go back for a second
12  to Exhibit 13 which is your June 5, 2007,
13  submission to the FDA.  I'm only going to talk
14  about it a little bit.  All I want to talk
15  about is the response to question number 1
16  which is on the Bates-numbered page that ends
17  374.  Under your response, the end of the
18  paragraph that starts, "Lot Selection," it
19  says, used a seroconversion definition of less
20  than ten ELISA Ab units at baseline to greater
21  than or equal to ten ELISA Ab units at Day 42
22  post-vaccination.
23          Do you see that?
24      A.    Yes.
25      Q.    Okay.  And that -- at least the

Page 275

ALISON L. FISHER, PhD - CONFIDENTIAL
1
2  first part of that is talking about the 10 Ab
3  cutoff in the ELISA test.  Right?
4      A.    Yes, it says here that this was
5  the seroconversion definition.
6      Q.    So what that means is if you
7  take the kids' serum before you give them the
8  vaccine, they need to have less than 10 Ab
9  units in ELISA to count as seronegative.
10  Right?
11      A.    According to this definition,
12  yes.
13      Q.    Yes.  Okay.  And then after you
14  give them the vaccine and you check it on day
15  42, they need to have more than or equal to 10
16  Ab units to count as seroconverted.  Right?
17      A.    According to this sentence.
18      Q.    Okay, according to that
19  sentence.  Well, and that's -- but that's the
20  definition you're giving to the FDA in June of
21  '07.  Right?
22      A.    Uh-huh.
23      Q.    That 10 Ab cutoff was the
24  subject of some discussion internally at Merck
25  and with the FDA before this.  Right?

Page 276

ALISON L. FISHER, PhD - CONFIDENTIAL
1
2      A.    Uh-huh.
3      Q.    And that was part of your role
4  was to be involved in those discussions.
5  Right?
6      A.    I'm not sure what document
7  you're referring to.
8      Q.    Okay.  Well, were you the -- for
9  discussions with the FDA about 10 Ab cutoff,
10  were you the regulatory liaison?
11      A.    It would depend what time frame
12  you're talking about.  If it was after
13  March 2004, I would have been.
14      Q.    Okay.  Let me do it -- that's
15  fair enough.  Let me do it this way:  Let's
16  mark as Exhibit 16.
17          - - -
18          (Exhibit Fisher-16, 7/27/04
19  Memorandum, Bates MRK-KRA00018510 -
20  8512, was marked for identification.)
21          - - -
22  BY MR. MACORETTA:
23      Q.    Let me know when you're ready to
24  talk about this.
25      A.    Okay.

Page 277

ALISON L. FISHER, PhD - CONFIDENTIAL
1
2      Q.    All right.  So at this time were
3  you involved in discussions about the -- you
4  were involved in discussions at this time
5  about this 10 Ab cutoff issue and supporting
6  the ELISA assay.  Right?
7      A.    I mean, I -- this is the first
8  time that I'm seeing this thing.
9      Q.    Okay.
10      A.    And there's a reference in here
11  to IND 1016 and there's a reference to
12  concordance numbers.  And I do recall a
13  document where we had a table where we had
14  concordance numbers between the PRN assay and
15  the ELISA assay.
16      Q.    And Mr. Dekleva was on this
17  because it deals with ProQuad?
18      A.    Yes.
19      Q.    Okay.  Because this use of ELISA
20  assay is an issue that could impact ProQuad
21  and it could impact the end expiry and rHA
22  issues.  Right?
23      A.    All I can say is that the same
24  assay would be used for mumps in -- to the
25  best of my understanding, in ProQuad and MMR

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2 to the best of my understanding. But I'm not
3 an assay expert so you'd need to ask somebody
4 that does the assays to get a definitive
5 answer.
6     Q.   Okay. Let me show you what
7 we're going to mark -- these overlap so we're
8 going to -- we're going to mark as Exhibits 17
9 and 18. 17.
10           - - -
11     (Exhibit Fisher-17, 7/3/04
12     E-mail, Bates MRK-KRA00791315 - 1319,
13     was marked for identification.)
14           - - -
15     MR. MACORETTA: That's 17.
16 Here, it's Fisher-17. And that's
17 Fisher-18 or is about to be.
18           - - -
19     (Exhibit Fisher-18, E-mail
20     chain, Bates MRK-KRA00791511 & 1512,
21     was marked for identification.)
22           - - -
23 BY MR. MACORETTA:
24     Q.   I'm not going to ask you about
25 every e-mail in here, but you should flip

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2 through it.
3         Ready to chat about these, Dr.
4 Fisher? Let's start with the e-mail at the
5 back of Exhibit 17.
6         Joe Antonello to Keith Chirgwin
7 June 29th, you're on the cc list. And there's
8 a discussion -- I'm in the next to the last
9 paragraph, "In that response..." Antonello
10 says to Chirgwin, "...so I'm concerned when
11 you say the two assays are discordant around
12 the cutoff. Concluding that the two assays
13 agree reasonably well was important for the
14 purpose of arguing that the ELISA was an
15 acceptable substitute for the neutralization
16 assay."
17       Do you see that?
18     A.   Wait, where are you reading
19 here? In this one?
20     Q.   The end of the paragraph that
21 says, "In that response...."
22     A.   Can you just point to where
23 you're reading?
24     MS. DYKSTRA: The second
25     paragraph after this e-mail.

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2     THE WITNESS: Okay.
3 BY MR. MACORETTA:
4     Q.   The last sentence, "Concluding
5 the two assays...."
6     A.   Yes.
7     Q.   That sentence is true in 2007
8 when you submit ELISA information to the FDA
9 as well, right, concluding that the ELISA and
10 PRN assays agree reasonably well was important
11 for purpose of arguing that the ELISA was an
12 acceptable substitute?
13     A.   In 2007 that was -- I think it
14 was in May, that was when the FDA said that
15 we could use the ELISA --
16     Q.   Yep.
17     A.   -- comparing the different 4.8
18 lots.
19     COURT REPORTER: Different what?
20     THE WITNESS: The different 4.8
21     lots. And the FDA actually, to the
22     best of my understanding, received a
23     document that looked at the
24     concordance of the two assays. I
25     would have to look to see when that

1     ALISON L. FISHER, PhD - CONFIDENTIAL
2     was sent to the FDA, but according to
3     that document, the assays did agree
4     reasonably well, greater than 90
5     percent.
6 BY MR. MACORETTA:
7     Q.   Okay. And you thought that was
8 something that was a value to tell the FDA, to
9 show them that?
10     A.   That's a value, yes.
11     Q.   Mr. Antonello's final point
12 says, in the next paragraph, Keith, I agree --
13 "I do agree with your key point that: We
14 don't really know what a clinically protective
15 level is in either assay...."
16     Do you see that?
17     A.   Yes.
18     Q.   Is that true?
19     A.   I can't answer that. That
20 would be a better for Joe, Joe or others in
21 the serology labs.
22     Q.   When you saw this, were you
23 concerned about that statement?
24     A.   I don't recall being concerned
25 about this statement.

Page 282

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2    Q.    The whole idea of having an end
3  expiry is to make sure that you have a level
4  that provides actual protection at that level.
5  Right? I mean, that's the whole idea of
6  testing different end expiries. Right?
7          MS. DYKSTRA: Objection.
8          THE WITNESS: I'm not sure I
9      understand your question.
10  BY MR. MACORETTA:
11    Q.    The whole idea of having a
12  minimum amount of mumps vaccine in the shot is
13  to make sure that a kid who gets that shot is
14  actually protected from mumps if he gets that
15  minimum amount. Right?
16          MS. DYKSTRA: Objection.
17          THE WITNESS: That is -- that
18      is -- that's an accurate statement.
19  BY MR. MACORETTA:
20    Q.    Okay. So if you don't know what
21  a clinically protective level is, how do you
22  know what to pick as an end expiry?
23          MS. DYKSTRA: Objection.
24          THE WITNESS: Typically there's
25      a clinical study, the early clinical

Page 283

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2      studies of Hilleman would be efficacy
3      studies.
4  BY MR. MACORETTA:
5    Q.    The '60s?
6    A.    I can't comment on when the
7  studies were.
8    Q.    Okay.
9          MS. DYKSTRA: Keep your voice
10      up.
11          THE WITNESS: Okay. And between
12      the time, the whole evolution of this,
13      I can't comment on all of it, or
14      because I'm just going by my
15      recollection, I don't even remember
16      this document, I was copied on it but
17      I'm seeing it now. So I think that
18      when you do an efficacy trial,
19      typically you try to find a reasonable
20      correlate of protection. And you can
21      look between clinical efficacy data
22      and then you can look at a functional
23      correlate, serologic correlate and
24      then look at another correlate that
25      may be an assay that may be simpler to

Page 284

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2      conduct. And so that's the way that
3      you stitch this together. I don't
4      know the fact that we don't truly know
5      what the protective level is. I can't
6      comment on that comment. Just looking
7      at that comment, I personally based on
8      all the work that was done leading up
9      to this point, that comment doesn't
10      concern -- you know, that's not
11      concerning to me. However, if you
12      need more information about this, I
13      think you need to talk with other
14      people which would be the serology
15      experts and the clinical experts.
16  BY MR. MACORETTA:
17    Q.    So what's your understanding of
18  why you were using PRN and ELISA tests if
19  nobody knew what a clinically protective level
20  was under either test?
21    A.    I don't know the evolution
22  between the clinical trials and the
23  correlates, the clinical correlate assays.
24  All that I'm aware of in my time frame was
25  that a PRN assay was done and that was

Page 285

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  considered a reasonably good correlate to
3  clinical efficacy.
4    Q.    Considered by whom?
5    A.    That would be the general
6  feeling in the field. I can't quote papers,
7  but that would be in the general literature.
8  There was an evolution of things and the PRN
9  assay during my time, was considered
10  according to the literature. And most likely
11  what the CDC writes about, a reasonable
12  clinical correlate.
13    Q.    But if you didn't know what
14  level provided a clinical protection, how
15  could it be a correlate?
16          MS. DYKSTRA: Objection.
17          THE WITNESS: I'm not exactly
18      sure what Joe was getting at here. To
19      the best of my understanding, the PRN
20      assay and then the ELISA, which was
21      concordant with the PRN assay, were
22      deemed to be reasonably predictive
23      clinical correlates. So I can't
24      comment on why Joe made that
25      statement.

72 (Pages 282 - 285)

Appx1894

Page 286

ALISON L. FISHER, PhD - CONFIDENTIAL
1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  MR. MACORETTA: Go ahead. Mr.
3  Sweet may have --
4  MR. SWEET: Let me just ask,
5  reasonable correlates, correlates to
6  efficacy?
7  THE WITNESS: Clinical efficacy.
8  BY MR. MACORETTA:
9  Q. I'm going to skip through a
10  bunch of the e-mails in the chain. But let me
11  suggest that they involve -- let me see if
12  you'll agree.
13  A bunch of the middle e-mails
14  are discussion about we at Merck trying to
15  figure out what we talked to at CBER earlier
16  on about this ELISA assay and correlating the
17  PRN. Is that a fair description of these
18  middle e-mails?
19  I'm going to start by talking
20  about the one on the first page from
21  Mr. Dekleva to Mr. Schodel. Do you see that
22  one?
23  A. Yes.
24  Q. And it says, "Alison and I are
25  pulling it together." Is that what's

Page 287

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  happening, you're pulling together prior
3  communications with CBER about this subject of
4  comparing the PRN and ELISA assays?
5  A. I mean, I don't remember other
6  than looking at this piece of paper. I do
7  remember gathering information on the
8  concordance between the two assays.
9  Q. And some of that information
10  related to whether or not the cutoff of 10 Ab
11  in ELISA was correct. Right?
12  A. I don't have it in front of me,
13  but my recollection, there was a cutoff when
14  they were doing the concordance and they were
15  looking at greater than -- lower than that
16  cutoff. I'd have to actually see the
17  document to see if it was, in fact, ten.
18  Q. And then Mr. Dekleva is relaying
19  a conversation with Mr. Antonello, I'm at the
20  bottom of the e-mail on the first page, it
21  starts with the word -- the paragraph starts
22  with the word "SO...." "I spoke with Joe
23  Antonello yesterday, and he re-emphasized that
24  the precision with the PRN assay was very
25  poor...."

Page 288

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  Do you remember having any
3  discussions about that?
4  A. I'm aware of that.
5  Q. Was that your opinion as well?
6  A. I don't recall having an
7  opinion. I just heard the talk about the
8  assay.
9  Q. Is there any document where you
10  say to the FDA the precision of this assay is
11  really poor?
12  A. I don't recall sending them
13  that type of document.
14  Q. Then above Mr. Dekleva -- or I'm
15  sorry, Mr. Schodel writes back to Mr. Dekleva
16  and says, I Agree with Joe - could not
17  overemphasize the weakness of the PRN,
18  parentheses, 50% specificity, with a bunch of
19  exclamation points.
20  Do you see that?
21  A. Yes.
22  Q. What does 50 percent specificity
23  mean there?
24  A. I'm not sure what's meant by
25  that.

Page 289

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  Q. What do you understand
3  specificity to mean generally when talking
4  about these assays?
5  A. It would be specificity -- I
6  mean, the PRN works differently than some
7  other assays, but when I think of
8  specificity, specificity for the antigen or
9  the subjects -- or the substance that you're
10  measuring. So you want an assay to be
11  specific for that substance and not cross
12  react with other substances.
13  Q. So if it's 50 percent specific,
14  is that good or bad?
15  A. I don't know much about the PRN
16  assay, but just looking at it, on the surface
17  of it without knowing the context, I
18  really -- I can't answer the question. It
19  would be bad for LCMS assay.
20  Q. Did you ask anybody what does
21  this mean, is this bad?
22  A. Well, I didn't ask because I
23  wasn't copied on the e-mail.
24  Q. Let's go to Fisher-18 which is
25  the same first e-mail from Antonello to

73 (Pages 286 - 289)

Appx1895

Page 290

ALISON L. FISHER, PhD - CONFIDENTIAL

1  Chirgwin and then a couple of other e-mails
2  which you are copied on.
3
4  And the first -- the next one
5  which is in the middle of the page from
6  Chirgwin to Antonello, cc to you and a few
7  other people, starts, "Thanks Joe." Skipping
8  a sentence, The question is to what degree are
9  these assays concordant. You are suggesting
10 specific criteria for concordance which I am
11 not sure we could meet.
12 Do you remember any discussions
13 about this being able to meet the concordance
14 criteria suggested by the FDA?
15 A.  No, I don't remember that. I
16 just remember there was concordance testing
17 done and it looked fairly favorable, but I --
18 I'm not recalling the whys behind the
19 sentence.
20 Q.  Then Keith Chirgwin says, "I
21 agree...that we would have difficulty meeting
22 such a criterion. I don't think we could meet
23 90% agreement in assignment for borderline
24 positives within the PRN assay itself."
25 Do you see that?

Page 291

ALISON L. FISHER, PhD - CONFIDENTIAL

1
2  A.  Uh-huh.
3  Q.  Do you know what he's talking
4  about there?
5  A.  You know, based on looking at
6  the concordance data, I can -- just what I
7  remember of it, for borderlines -- I mean,
8  I'm just looking at this and honestly this is
9  really a better question for the serology
10 folks and the statisticians that work with
11 them.
12 Q.  What do you understand
13 borderline positives to mean there?
14 A.  That would be something that
15 would be low enough that it was on the line
16 between being measured as a positive or a
17 negative. So it's like the lower limit of
18 quantitation.
19 Q.  Let me show you what we're going
20 to mark as Exhibit 19.
21 - - -
22 (Exhibit Fisher-19, Background
23 information in preparation for
24 correspondence with CBER, Bates
25 MRK-KRA00782807 - 2810, was marked for

Page 292

ALISON L. FISHER, PhD - CONFIDENTIAL

1
2  identification.)
3  - - -
4  BY MR. MACORETTA:
5  Q.  This is one you wrote. Right?
6  A.  I don't remember it, but it's
7  in front of me, so it says that I wrote it,
8  so...
9  Q.  Okay. And the one, two, three,
10 third paragraph, it says, "In this same
11 correspondence, CBER required Merck to provide
12 additional justification of the cut-off point
13 (limit of assay) of the mump WT ELISA by
14 providing identification of titers around the
15 cut offs...."
16 Do you see that sentence?
17 A.  Yes.
18 Q.  Okay. Did you ultimately give
19 CBER that additional justification?
20 A.  I don't remember it was so long
21 ago. I do remember some concordance work
22 that was sent to CBER, but I don't remember
23 specifically much more than that.
24 Q.  I'm going to show you -- these
25 two go together. I'm going to show you what

Page 293

ALISON L. FISHER, PhD - CONFIDENTIAL

1  we're going to mark as 20 and 21. The
2  PowerPoint is 21. The one on top is 20.
3  - - -
4  (Exhibits Fisher-20, E-mail
5  chain, Bates MRK-KRA00846454 - 6458
6  and Fisher-21, PowerPoint, Bates
7  MKR-KRA00846460 - 6462, were marked
8  for identification.)
9  - - -
10 BY MR. MACORETTA:
11 Q.  Are you ready? All right.
12 Dr. Fisher, would you agree with
13 me that Fisher-21 seems to be the summary that
14 Mr. Dekleva was sending an e-mail in
15 Fisher-20? Starts at the beginning of the
16 page on -- the first page of Fisher-20.
17 A.  So can you tell me what --
18 you're saying that a sentence here refers to
19 this?
20 Q.  If you look at the bottom of
21 page 1 of Fisher-20, there's an e-mail from
22 Mike Dekleva to you saying, "...here's a
23 summary of the CBER memo and what I think
24 they're looking for." Then below that it

74 (Pages 290 - 293)

Page 294

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  says, "File: Mumps ELISA 19Oct2004.ppt."
3      Do you see that?
4      A.   Yes.
5      Q.   Okay.  Now, do you understand
6  that Exhibit Fisher-21 is that summary
7  PowerPoint?
8      A.   It would seem to be.
9      Q.   Great.  All right.  So this is a
10  discussion between you and Mr. Dekleva as to
11  what to say in response to CBER's letter of
12  July.  Right?  This e-mail exchange I should
13  say.
14      A.   I'm not sure I understand your
15  question.
16      MS. DYKSTRA:  Are you referring
17      to this --
18      MR. MACORETTA:  Both exhibits.
19  BY MR. MACORETTA:
20      Q.   Both exhibits are part of a
21  discussion between you and Mr. Dekleva as to
22  what to say in response -- what CBER was
23  asking for in its July 2004 memo and how to
24  respond to it?
25      A.   It would seem that way.

Page 295

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2      Q.   Great.  All right.  In
3  Mr. Dekleva's PowerPoint, the first page under
4  second slide, "History," first bullet point,
5  "CBER recommended."  Then the bullet point
6  under that, "However, justification of mumps
7  ELISA seropositive cutoff by justified via use
8  of known mumps neutralizing and
9  non-neutralizing sera, as requested by CBER,
10  was never provided."
11      Do you see that?
12      A.   Yes.
13      Q.   Do you agree with that?
14      A.   I can't comment because I was
15  not on the program in February of 2001.
16      Q.   Sure.  But you had reviewed all
17  the records of what happened up to then as
18  part of this analysis.  Right?
19      MS. DYKSTRA:  Objection.
20      THE WITNESS:  I don't recall.  I
21      reviewed records, I can't say that I
22      reviewed all the records.
23  BY MR. MACORETTA:
24      Q.   Did you make an attempt to
25  review all the records?

Page 296

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2      MS. DYKSTRA:  Objection.
3      THE WITNESS:  I reviewed the
4      records that were directly involved
5      with the responses we were providing
6      to CBER to their questions.
7  BY MR. MACORETTA:
8      Q.   One of which was how do you
9  justify this 10 Ab cutoff.  Right?
10      A.   I would have to go back to
11  their questions.
12      Q.   I'll withdraw that question.
13      You say to Mr. Dekleva, Thanks
14  for the slides.
15      In my opinion, we looked -- I'm
16  reading now from the top of CBER -- Fisher-20.
17      "In my opinion, I think we need
18  to look at the points just below, at, and
19  above the cut-off and elsewhere there is
20  disagreement between the assays."  That's what
21  you said.  Right?
22      A.   That was my opinion.
23      Q.   And did you do that?
24      A.   I don't know whether that was
25  done or not.

Page 297

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2      Q.   Okay.  You don't remember doing
3  it?
4      A.   I don't run assays.
5      Q.   Well, if you had an opinion that
6  we should do it, did you ask somebody to do
7  it?
8      A.   My responsibility is not
9  assays, so I can suggest things.  That
10  doesn't mean I'm an authority to tell them to
11  do it or not.
12      Q.   Your responsibility was to have
13  an opinion on what to say to the FDA.  Right?
14      A.   My responsibility is to be a
15  point of contact with the FDA, not to have an
16  opinion to give to the FDA.
17      Q.   Then why were you telling
18  Mr. Dekleva we should give to the -- we should
19  look at these points?
20      A.   I don't remember exactly the
21  context of this, but FDA can ask the
22  question.  Sometimes the questions aren't
23  clear.  And we as the liaison can have an
24  opinion on what we think the agency is
25  asking.

75 (Pages 294 - 297)

Page 298

ALISON L. FISHER, PhD - CONFIDENTIAL

1    Q.    So two paragraphs down you say,
2  "We need to convince CBER that the ELISA will
3  provided equivalent results to PRN and thus
4  equate (bridge) to protection."
5         Do you see that?
6    A.    I said this, yes.  And this was
7  in relation to answering some of CBER's
8  questions.
9    Q.    This wasn't just answering
10  CBER's questions, you recognize that Merck's
11  goal was to convince CBER that the ELISA would
12  provided equivalent results to PRN.  Right?
13        MS. DYKSTRA:  Objection.
14        THE WITNESS:  I didn't say that
15        that was Merck's goal.
16  BY MR. MACORETTA:
17    Q.    Who is the "we" in that
18  sentence?
19    A.    This is my opinion that we need
20  to convince CBER.
21    Q.    You and Michael Dekleva don't
22  need to convince anybody of anything, right,
23  CBER of anything, Merck needs to convince CBER
24  of something?  Right?

Page 299

ALISON L. FISHER, PhD - CONFIDENTIAL

1    A.    Right, so we have various
2  opinions on what we think needs to be done.
3    Q.    So it can't be -- we can't
4  replace the we in that sentence with Alison
5  Fisher and Mike Dekleva need to convince CBER,
6  that wouldn't make any sense, right?
7    A.    I can't define what "we" means.
8  I think --
9    Q.    You wrote it, didn't you?
10    A.    Yeah, and it was 2004 I wrote
11  it and now we're in 2016.  So, you know, a
12  lot of these documents you're putting in
13  front of me I don't remember and I'm trying
14  to refresh my memory on it.  I think in
15  general I felt that we, meaning in our
16  responses back to CBER, we needed to do this.
17    Q.    This meaning convince CBER that
18  the ELISA will provide equivalent results to
19  PRN?
20    A.    Yes.
21    Q.    And because it provided
22  equivalent results to PRN, ELISA could be
23  equated to protection.  Right?
24        MS. DYKSTRA:  Objection.

Page 300

ALISON L. FISHER, PhD - CONFIDENTIAL

1         THE WITNESS:  Yes.  I mean, the
2  way you're asking these questions is
3  difficult for me because in vaccine
4  development, this is what we do all
5  the time.  We have efficacy, we find a
6  correlate to efficacy.  Sometimes the
7  correlates are brilliant, sometimes
8  they're not brilliant at all which is
9  not the case here.  For some
10  substances there aren't good clinical
11  correlates.
12         Once we have the best clinical
13  correlate and we discuss that with the
14  FDA, we don't do things in a vacuum,
15  and there is another assay that can be
16  done -- you know, over time assays
17  and -- assays become modernized and
18  more automated and improved.
19         So the ultimate goal here is
20  with this and all of the programs, you
21  don't typically do a clinical study if
22  you have a reasonably good clinical
23  correlate for -- I mean, this is just
24  how things are done in vaccine

Page 301

ALISON L. FISHER, PhD - CONFIDENTIAL

1  development.
2  BY MR. MACORETTA:
3    Q.    So you say above the PRN is a
4  functional assay, correlate of protection.
5  Right?  That's true, right?
6    A.    Yes.  If you look at the
7  literature and you look at many of the
8  articles that were written, the PRN assay is
9  considered a reasonable correlate of
10  protection.
11    Q.    What about the ELISA assay?
12    A.    The ELISA assay, through time,
13  CBER's opinion on the ELISA and the world's
14  opinion on the ELISA has evolved.  But
15  because the ELISA corresponds quite well,
16  over 90 percent, with the PRN, then one could
17  say that PRN is a reasonable correlate of
18  protection.  It's a functional assay.  ELISA
19  compares above 90 percent with the PRN.  So,
20  therefore, since the ELISA is the more modern
21  assay, one can say now as time evolves ELISA
22  now has become an assay that can be used to
23  bridge to efficacy as a clinical correlate of
24  protection.  This is something that's not

76 (Pages 298 - 301)

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  unique to this program.  This happens in our
3  vaccine programs.
4        Q.    And bridge to efficacy meaning
5  we can use efficacy data we got from a PRN
6  test.  And say since -- right?
7        A.    No.  So you basically get
8  efficacy of a vaccine and let's say the
9  original studies, the efficacy data was a
10  certain number.  Then you're going to do,
11  you're going to basically look at assay data.
12  And if assay data gives you a number that's
13  fairly similar to what you actually got in
14  the clinic, then one could say that that
15  serology assay is a good, predictive assay.
16  In this particular case, I don't know the
17  assays before the PRN, but there were a
18  series of assays.
19        My time on the program, the PRN
20  assay and the ELISA assay were both being
21  used and CBER's -- over time CBER's thoughts
22  on the ELISA assay evolved such that at the
23  very end of this, taking all the data into
24  consideration, CBER, back in 2007, I think
25  May, and we looked at that communication,

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  felt that based on all the information that
3  the ELISA could be used as the final
4  analysis.
5        So these conversations don't
6  happen in a vacuum.  They evolve.  And the
7  FDA, the FDA hears what we're saying, there's
8  a give and take back and forth with the FDA.
9        Q.    Where is all that give and take
10  back and forth with the FDA on whether you can
11  use ELISA instead of PRN?  It wasn't in the
12  end expiry file, right, that we looked at
13  earlier?
14        MS. DYKSTRA:  Objection.
15        THE WITNESS:  It was actually.
16        So there were a series of things that
17        we -- back and forth.  And if you look
18        at their letter, and I think it was
19        May of 2007, they came right out and
20        they said that their opinion on this
21        has evolved since the time of the
22        initial submission.  And in that, you
23        know, their opinion evolved.  And, you
24        know, at the very end, they were able
25        to ask us what they felt -- the FDA

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2        gave us a solution to the problem.
3        They proposed it, what we could do in
4        support of approval of a file.
5  BY MR. MACORETTA:
6        Q.    You had already been advocating
7  to use ELISA as a replacement really for PRN
8  in end efficacy.  Right?
9        A.    The FDA makes their own
10  decisions.
11        Q.    I understand, but it's not like
12  they thought it up on their own, you had been
13  suggesting it to them before that?
14        A.    That's not true at all.  That
15  is not true at all.  I mean, there's a lot of
16  literature about PRN and ELISA.  And believe
17  me, you know, if the FDA agreed with
18  everything we said, this thing would have
19  been approved a lot sooner than it was.
20        Q.    When you say efficacy, what does
21  that mean?  Could you give me the definition
22  of efficacy?
23        A.    Efficacy is something that you
24  get in a clinical trial.  So you can't do an
25  efficacy trial anymore with mumps.  It

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  wouldn't be -- with our vaccine.  It wouldn't
3  be ethical to have that against a control
4  with no vaccine.  But back in the day when
5  Hilleman did this work, it was a control with
6  no vaccine versus giving a mumps vaccine and
7  then you look at the cases.
8        Q.    And efficacy measures how well
9  somebody is protected from the disease.
10  Right?
11        A.    Well, efficacy you have a point
12  estimate and then you have a standard
13  deviation around that, or a 95 percent
14  confidence interval.  And, you know, when you
15  look at the point estimate and you look at
16  the confidence interval, that can give you an
17  idea of protection, but that's not alone.
18  There's other component of that is the uptake
19  of the vaccine and how much herd immunity you
20  have and how much viruses is around and how
21  many doses of the vaccine you get.
22        Q.    That is not what Dr. Hilleman
23  was measuring in the '60s or whenever --
24        A.    Yeah.
25        Q.    -- in the early efficacy trials,

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 right, he wasn't measuring herd immunity?
3 A. Well, the point of vaccination
4 is that you develop a vaccine, the vaccine
5 gets approved by a regulatory agency, and
6 then the vaccine becomes recommended such
7 that the pediatricians vaccinate everybody
8 and there's a requirement for everyone to be
9 vaccinated in this country. So that's how a
10 vaccine succeeds, is by the number of people
11 vaccinated.
12 A vaccine doesn't work by just
13 vaccinating one person. You need to
14 vaccinate as many people as you possibly can
15 to reduce the circulating virus in the
16 population.
17 MR. MACORETTA: Could you read
18 my question again.
19 - - -
20 (The court reporter read the
21 pertinent part of the record.)
22 - - -
23 BY MR. MACORETTA:
24 Q. So let's try that again.
25 Dr. Hilleman in the '60s was measuring

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 efficacy. Right?
3 A. He was measuring efficacy.
4 Q. Okay. What does efficacy mean
5 in that sentence?
6 A. Efficacy is how much in that
7 particular study a person was protected.
8 Q. Or what percent of the people in
9 that study were protected. Right?
10 A. The kids --
11 Q. Yes.
12 A. -- that were in that study,
13 what percent of them was protected.
14 Q. Okay. But in 2004 when we use a
15 PRN test, we can't really measure efficacy, we
16 are measuring how much of the mumps antibody
17 shows up in your blood after you get the shot.
18 Right?
19 MS. DYKSTRA: Objection.
20 THE WITNESS: It's measuring
21 your immune response. It's one way of
22 measuring it.
23 BY MR. MACORETTA:
24 Q. How does it measure your immune
25 response, the PRN test?

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 A. I can't answer details about
3 the PRN assay because I didn't run the assay.
4 I do know that it's a plaque neutralization
5 production assay and that you're looking for
6 growths of plaques from people that have been
7 exposed to the virus. So in theory, the more
8 antibody that you have on board, the fewer
9 plaques you should see on your plate.
10 Q. Because the plaques are grown by
11 the mumps virus itself. Right?
12 A. The plaques would be -- to the
13 best of my understanding, they would be live
14 virus.
15 Q. That's right. So the more
16 antibody, the less live virus; the less live
17 virus, the less plaque. Right?
18 MS. DYKSTRA: Objection.
19 THE WITNESS: I'm not an assay
20 person, but that's my high level
21 understanding of it.
22 BY MR. MACORETTA:
23 Q. And that -- so the PRN is a
24 functional assay which means it measures how
25 much mumps antibody you have. Right?

1 ALISON L. FISHER, PhD - CONFIDENTIAL
2 MS. DYKSTRA: Objection.
3 THE WITNESS: It is a way to
4 measure antibodies.
5 BY MR. MACORETTA:
6 Q. So what do you mean by -- PRN is
7 definitely an assay, I agree with that. What
8 do you mean by "functional assay"?
9 A. You're functionally blocking
10 the virus from replicating. You're actually
11 functionally looking at that on the plate.
12 Q. So what is ELISA measuring if
13 it's not looking at that?
14 A. The ELISA -- and, again, I
15 don't do the ELISA. And that's a different
16 type of method. But to the best of my
17 understanding, the ELISA is measuring
18 antibodies. And the antibodies that it's
19 measuring -- and, again, you'd need to talk
20 with an assay person, but it's measuring
21 functional antibody. Antibody that would
22 neutralize the mumps virus.
23 MR. MACORETTA: How much time do
24 we have?
25 VIDEOGRAPHER: You're at about

**Appx1900**

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  6:05.
3  MR. MACORETTA:  Thank you.
4  MS. DYKSTRA:  John, we've been
5  going an hour and ten minutes.  If you
6  want to -- I don't know how much
7  longer you have.  I don't want to
8  interrupt.
9  MR. MACORETTA:  I'm using all of
10  it, but, yeah, we can take break now.
11  MS. DYKSTRA:  Let's take a quick
12  break now then.
13  MR. MACORETTA:  Uh-huh.
14  VIDEOGRAPHER:  Stand by.  The
15  time is now 17:42.  Off the record.
16                   - - -
17  (Exhibit Fisher-22, 11/17/04
18  Letter, Bates MRK-KRA00126963 - 6971,
19  was marked for identification.)
20                   - - -
21  VIDEOGRAPHER:  The time is now
22  17:54.  We are back on the video
23  record.
24  BY MR. MACORETTA:
25  Q.  Dr. Fisher, I'm showing you, I

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  hope, what has been marked as Fisher-22 which
3  is a November 17, 2004, submission to the FDA
4  signed by you.  And it says at the
5  beginning -- I'll let you read it.  I'm not
6  going to ask you about every page.
7  All right.  Dr. Fisher, in your
8  response you talk about a July 27, 2004, CBER
9  memo, I'm skipping a line, CBER requested the
10  mumps ELISA seropositive cutoff be justified
11  via use of known mumps neutralizing and
12  non-neutralizing sera.  Further, CBER
13  recommended an analysis of the ELISA
14  predictive value in identifying sera that
15  tested positive in the neutralization assay.
16  In response to those requests,
17  Merck does not give CBER any new data but
18  simply says see our June 10, 2002, letter,
19  serial number 86 --
20  MS. DYKSTRA:  Objection.
21  BY MR. MACORETTA:
22  Q.  -- which we believe provided the
23  information.  Right?
24  MS. DYKSTRA:  Objection.
25  BY MR. MACORETTA:

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  Q.  Right?
3  A.  Yes.
4  Q.  And indeed, if we look at the
5  response to CBER comments which is back a few
6  pages, which is on the page ending
7  Bates-numbered 967, I'm looking at the
8  introduction paragraph, the next to the last
9  sentence, "The following is a summary of key
10  points from Merck's June 10, 2002 information
11  package that we believe are relevant to your
12  most recent information request."
13  Do you see that?
14  A.  Yes.
15  Q.  So all you're doing here is
16  pointing out things from before, you're not
17  providing CBER any new data.  Right?
18  A.  That is correct.
19  Q.  Okay.  After that, did you give
20  CBER any other data supporting a 10 Ab cutoff?
21  A.  I recall this data, but I can't
22  remember whether there was any more data.
23  Q.  Ultimately did CBER ever send
24  Merck something that says we agree that you
25  can use the 10 Ab cutoff?

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  A.  I don't know.
3  Q.  But as we sit here today, the 10
4  Ab cutoff is indeed what's being used in
5  the -- well, it was used in the ELISA data
6  that you submitted in 2007, right, to support
7  end expiry?
8  A.  I don't know.  But what I do
9  know is that CBER approved or CBER sent us a
10  letter in May of 2007 where they very
11  explicitly said that their opinion on the
12  assays had changed.  And they gave us some
13  analyses to do.  And at the time they asked
14  us to do that they had our validated ELISA
15  data.  So at the point of that letter, they
16  already knew how we were conducting the
17  assay.  That wasn't the question.  The
18  question was to use that assay to include
19  protocol 12 and 9 data to couple with sublot
20  007 4.8 data.
21  Q.  Right.  I'm changing topics now.
22  We're going to forget about the 10 Ab cutoff
23  for a second.
24  I want to talk about a company
25  called PPD that bought and then sold a Merck

Page 314

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  research facility.  Do you know anything about
3  this?
4      A.   I know high level that -- what
5  you just said.
6      Q.   Let me show you what we're going
7  to mark as Exhibit 23.
8              - - -
9          (Exhibit Fisher-23, 4/28/14
10         E-mail, Bates MRK-KRA00831247 - 1251,
11         was marked for identification.)
12             - - -
13 BY MR. MACORETTA:
14     Q.   So first question, Ms. Fisher,
15 what's a VID liaison?
16     A.   Vaccine and infectious disease
17 liaison to the -- liaison to the FDA.
18     Q.   So in April of 2014 you were on
19 the list of vaccine infectious disease
20 liaisons that this was sent to.  Right?
21     A.   Uh-huh.
22     Q.   The first e-mail.  So you were
23 still and you are still vaccine infectious
24 disease liaison.  Right?
25     A.   Yes.

Page 315

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2      Q.   Okay.  If we look at the
3  March 2014 letter from Ercem, is that how you
4  say his name?
5      A.   Ercem.
6      Q.   Ercem.  It lists several -- or
7  it says Merck will discontinue offering -- you
8  know what, let's go back, let's do it in
9  reverse order.  Let's go back to the August 3,
10 2011, letter behind it, where it says,
11 January 1, '09, PPD and Merck announced they
12 had entered into a strategic collaboration
13 involving vaccine testing and assay
14 development.
15         Then the second paragraph says,
16 PPD could use specific assays that were
17 previously validated by Merck and performed at
18 the Wayne facility.  And it lists these,
19 they're all redacted except for the mumps
20 ELISA.  Do you see that?
21     A.   I see it.
22     Q.   Okay.  Do you have any knowledge
23 of this?
24     A.   No.
25     Q.   Okay.  So if I wanted to know

Page 316

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  who Merck -- who PPD had sold the mumps ELISA
3  to or entered into an agreement with, how
4  would I find that out?
5      MS. DYKSTRA:  Objection.
6  BY MR. MACORETTA:
7      Q.   If you know.
8      A.   I'm not clear -- I mean, all I
9  can -- all I know is that I was aware that
10 PPD was doing testing for Merck.  I was aware
11 that there were communications out about it.
12 But I'm not aware of anything beyond that.
13     Q.   So were you aware that PPD was
14 using certain mumps assays and doing testing
15 for other customers besides Merck?
16     A.   I wasn't aware of that until
17 seeing this.
18     Q.   Okay.  We don't need to talk
19 about this one anymore.  Let's talk -- except
20 to say, do you know who would know the answer
21 to what customers PPD was selling these assays
22 to?  Who at Merck would know the answer to
23 that?
24     A.   Who at Merck?  Len Rubinstein
25 potentially.

Page 317

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2      Q.   That's a him or a her?
3      A.   Him.
4      Q.   Okay.  All right.  Okay.
5  Anybody else?
6      A.   Mocio Marchese potentially.
7      Q.   Okay.  Anybody else?
8      A.   Those are the only two I can
9  think of.
10     Q.   Let me show you what we're going
11 to mark Exhibit 24.  I'm changing topics
12 again.
13             - - -
14         (Exhibit Fisher-24, 4/6/06
15         E-mail, Bates MRK-KRA00018534 & 8535,
16         was marked for identification.)
17             - - -
18 BY MR. MACORETTA:
19     Q.   As you get that and look at it,
20 now I'm going to talk to you about mumps
21 outbreaks.  This talks -- this is an e-mail
22 from Lisa Makin on behalf of you, talking
23 about the Iowa outbreaks of mumps in 2006.
24     A.   Okay.
25     Q.   So how did you come to be the

ALISON L. FISHER, PhD - CONFIDENTIAL

1 person sending out an agenda for an Iowa
2 outbreak of mumps meeting in 2006?
3    A.   My recollection is that there
4 were some at Merck that thought that maybe we
5 should update our label with mumps outbreak
6 information. I don't remember the specific
7 document. That's really all I remember in
8 terms of the FDA. And maybe this is
9 something that would be -- I don't know how
10 this is related to that honestly.
11    Q.   Because the agenda doesn't talk
12 about updating the label. Right?
13    A.   No, it doesn't. That's all I
14 remember. So somebody asked me to set up
15 this meeting, I don't remember it, but
16 sometimes I get asked to set up meetings
17 because -- I don't know why I was asked to
18 set this meeting up. But somebody asked me
19 to set up this meeting, so I set it up.
20    Q.   Indeed it's the case that you
21 did submit a label supplement for outbreaks,
22 right, and then I think later withdrew it? Do
23 you recollect this?
24    A.   Yeah, I do.
25

ALISON L. FISHER, PhD - CONFIDENTIAL

1    Q.   Why did you withdraw it?
2    A.   I withdrew it because I can't
3 remember whether I contacted the FDA or the
4 FDA contacted me to say that in the new
5 physician labeling rule, and leading up to
6 that rule, we don't include ACIP information
7 in our labels. Therefore, even though that
8 information might be useful, our position is
9 that ACIP information can be ACIP information
10 and we don't need to include it in our label,
11 and they recommended that I withdraw it.
12    Q.   And so you did?
13    A.   I did.
14    MS. DYKSTRA: They, you mean the
15 FDA?
16    MR. MACORETTA: Yeah.
17    THE WITNESS: They meaning the
18 FDA.
19 BY MR. MACORETTA:
20    Q.   So in 2006 there's an outbreak
21 of mumps in Iowa and you have a meeting about
22 it. You send out an agenda and have a meeting
23 about it. Did you have meetings or
24 discussions about any other mumps outbreaks?
25

ALISON L. FISHER, PhD - CONFIDENTIAL

1    A.   I don't recall. I didn't even
2 remember this one, so...
3    Q.   Okay. But you don't recall any
4 other discussions about other mumps outbreaks?
5    A.   No. All I recall is what we
6 talked about with the label.
7    Q.   Do you know if there is some
8 group of people at Merck now who look at mumps
9 outbreaks and do some analysis around them?
10    A.   I don't know the answer to that
11 question. That's not my area.
12    Q.   If you look at the agenda for
13 this, "Background of recent Iowa Mumps
14 outbreak/potential questions from agencies."
15    So I take it at this time there
16 were no actual questions from the agencies?
17    A.   No, the purpose for something
18 like this is to prepare if questions do come.
19    Q.   Okay. Number 2 says,
20 "Stability/potency manufacturing data
21 available, should the CDC/FDA ask questions --
22 review of work being done in Bill Mullins area
23 so far."
24    What's Bill Mullins' -- who is
25

ALISON L. FISHER, PhD - CONFIDENTIAL

1 Bill Mullins and what's his area?
2    A.   Bill Mullins was in MMD and I
3 believe he was a vice president, he may
4 have had something to do with MMD quality,
5 but that's all I can remember.
6    Q.   Number 4 is any other
7 manufacturing issues during the '80s and '90s
8 that are note -- that is noteworthy. Do you
9 remember discussing any such manufacturing
10 issues that were noteworthy?
11    A.   I don't remember anything about
12 this other than you're putting it in front of
13 me now.
14    Q.   You don't remember if it
15 generated some kind of end product or
16 something?
17    A.   No, I don't remember any of
18 this.
19    Q.   Whether some conclusion was
20 reached as a result of this work?
21    A.   I'm not sure why this is here
22 honestly. I don't know.
23    Q.   Was there some attempt to look
24 at the people who got mumps in Iowa and figure
25

Appx1903

Page 322

ALISON L. FISHER, PhD - CONFIDENTIAL

1 out what vaccine they got when, made by Merck?
2 A. I don't know. That's a
3 possibility, but I don't know.
4 Q. So do you know anything about
5 what Merck did in response to any outbreaks
6 beyond these two pages?
7 A. No, I don't.
8 Q. I'm going to show you --
9 Ms. Fisher, I'm changing topics again. Now
10 we're talking about rHA.
11 I'm going to show you what we'll
12 mark as Exhibits 25 and 26. 25 is on top
13 which says, "Regulatory Liaison FDA
14 Conversation Record."
15 - - -
16 (Exhibits Fisher-25, Regulatory
17 Liaison FDA Conversation Record, Bates
18 MRK-KRA00793982 & 3983 and Fisher-26,
19 6/13/05 E-mail, Bates MRK-KRA00256875,
20 were marked for identification.)
21 - - -
22 BY MR. MACORETTA:
23 Q. Let me know when you're ready to
24 chat about these.

Page 323

ALISON L. FISHER, PhD - CONFIDENTIAL

1 A. Okay.
2 Q. So my first question is whether
3 or not both of these are talking about the
4 same phone call. The subject matter seems to
5 be the same, but the conversation record says
6 it happened on May 27th and the e-mail says it
7 happened on Friday, June 10, 2005. Can you
8 tell if this was two separate phone calls or
9 one?
10 A. I can't comment. I can't
11 answer your question why this has May 27th
12 and this has June 10th.
13 Q. Do you recollect that there were
14 two different phone conversations two weeks
15 apart on the same topic with Daryll Miller?
16 A. I mean, all I can refer to is
17 what you're putting in front of me. This
18 letter talks about two conversations, but I
19 can't string together -- the contents of this
20 seems to be similar to the contents of this.
21 Although there is a bit more in this one than
22 this one. I can't answer any more than that.
23 Q. Let me talk about the second
24 one, Exhibit 26, the e-mail. Who is Heather

Page 324

ALISON L. FISHER, PhD - CONFIDENTIAL

1 Lynn Sinsel?
2 A. She is -- she was my
3 administrative assistant.
4 Q. So in this e-mail that she sends
5 out, the first paragraph says, "Emerging issue
6 - Alison Fisher received a call...." But then
7 in the second paragraph you see the second
8 sentence on the second line says, "I mentioned
9 that there is no difference in the minimum
10 release potency."
11 Do you see that?
12 A. Ms. Daryll Miller at the FDA
13 asked if there was any difference and I
14 answered to say that there was no difference.
15 Q. But the I in that -- the I does
16 not mean Heather Lynn Sinsel there. Right?
17 A. No.
18 Q. She's relating something, a
19 conversation you had with Daryll Miller.
20 Right?
21 A. Yes.
22 Q. Okay. All right. Got that
23 part.
24 So at this time, I'm going to go

Page 325

ALISON L. FISHER, PhD - CONFIDENTIAL

1 back to Fisher-25, the earlier phone call. At
2 this time pending before the FDA was Merck's
3 application to switch to an rHA product and to
4 have an expiry potency for that rHA product of
5 4.1. Right?
6 A. Yes.
7 Q. Daryll Miller calls and says we
8 can't do that, you have to go to expiry
9 potency of 4.3 in your rHA product because
10 your other end expiry file is not approved.
11 Right?
12 A. That's right. That's right.
13 Q. Okay. Then you respond by
14 saying you have an update on approving the end
15 expiry file. Then the answer is no, call
16 Captain Heavener, which you apparently do.
17 So what I don't understand here
18 is that in the middle of this conversation 2,
19 it says, "She confirmed what Ms. Miller said;
20 that the team is very busy reviewing other
21 Merck files. I mentioned that as the Mumps
22 End Expiry and rHA files are linked, it would
23 certainly be helpful to resolve the issues
24 with the Mumps End Expiry file."

82 (Pages 322 - 325)

Appx1904

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  So they were linked at this
3  time?
4  A.  What I meant by that is these
5  were two separate files, but when we
6  submitted the mumps end expiry, the
7  assumption is that the 4.1 would be approved
8  at the time that the rHA would be approved.
9  So my recollection is that the rHA, I
10  believe, I can't remember everything, but
11  what I'm thinking here is that the intention
12  was to apply the same end expiry potency that
13  we got from the mumps end expiry to rHA.  So
14  that would be how the files were linked.
15  They were two separate files.  But initially
16  we thought that the mumps end expiry would be
17  approved before the rHA and there would be no
18  issue including a 4.1 in the label.  But
19  given the timing of these things and the --
20  that this mumps end expiry, the FDA took a
21  lot longer to approve it than initially
22  thought.  We had to go back, you know, just
23  like the FDA said and move this back up to
24  20,000.  And then after the mumps end expiry
25  was approved, then we could move it back down

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  to 4.1.
3  Q.  So you de-linked it?
4  A.  Yes.
5  MS. DYKSTRA:  Objection.
6  BY MR. MACORETTA:
7  Q.  At the bottom of this
8  conversation 2 it says, I offered to drive to
9  the FDA and meet with the reviewers to walk
10  them through our end expiry responses.  Did
11  that happen?
12  A.  No.
13  MR. SWEET:  I have a question.
14  On the -- on this document, the
15  e-mail, who is it, who is the group
16  that it's sent to?  Is there any way
17  for you to know that?
18  MR. MACORETTA:  Presumably
19  Heather Lynn Sinsel was not sending it
20  just to herself.
21  MR. SWEET:  It's a line group
22  apparently, but do you know who you
23  would have sent this e-mail to?
24  MS. DYKSTRA:  Or she could have
25  been sending it to herself and then

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  sending it on later.  I don't know if
3  that answers that.
4  THE WITNESS:  This looks like
5  it's something that is a meeting
6  request.  This is kind of an agenda
7  for a meeting request.  I'm assuming
8  by that time Manal had left, but I
9  can't say for sure.  I would think
10  that there would have been at least
11  one regulatory person in this meeting,
12  or more, so...
13  MR. SWEET:  I'm not asking you
14  to guess, but if there's like a -- is
15  there an MMR group or something that
16  this --
17  THE WITNESS:  This would have
18  gone to --
19  MR. SWEET:  -- would have been
20  sent to a set group of people?
21  THE WITNESS:  This likely would
22  have gone to regulatory folks.
23  BY MR. MACORETTA:
24  Q.  So would this have been the PDT?
25  A.  It could have included some

1  ALISON L. FISHER, PhD - CONFIDENTIAL
2  people on the PDT that were touched by this
3  file.
4  Q.  When the subject of Ms. Sinsel's -
5  can I keep going, Joel --
6  MR. SWEET:  Sure.
7  BY MR. MACORETTA:
8  Q.  So when the subject in Ms. Sinsel'
9  e-mail to herself says.  "Pathforward," is
10  that a Merck term for what are we going to do,
11  or a discussion about what we're going to do?
12  A.  Yeah, that's just the title of
13  the meeting.
14  Q.  Is that a term you used at
15  Merck, pathforward?
16  A.  That term is used sometimes.
17  Q.  And she's calling for a meeting
18  that same day.  Right?  She sends at 11:00 in
19  the morning saying can we have a meeting at
20  4:00 this afternoon.  Right?
21  A.  According to this, this was
22  sent on June 13th, but I received a call from
23  Daryll on Friday, June 10th.  So it seems
24  that maybe, you know, this came to me on
25  June 10th, and the meeting was set up for

Page 330

ALISON L. FISHER, PhD - CONFIDENTIAL
1    June 13th.
2        Q.    So this is kind of a big deal.
3    I mean, it says, "Urgent Meeting."  Right?
4        A.    It's urgent in that I needed to
5    let everybody know that I needed to change
6    the potency on the rHA file, that I needed to
7    send an amendment.
8        Q.    And then as you point out as the
9    emerging issue -- so the text of Heather Lynn
10   Sinsel's e-mail is really you, right, she
11   didn't sit down and write Alison Fisher
12   received a call, Daryll Miller.  Right?
13       A.    I think this was summarizing --
14   this is background for an agenda for
15   discussion of the topics in here.  So the
16   thought was that we -- we're going to need to
17   discuss these topics.
18       Q.    So okay.  And then the first
19   topic is we need to move the rHA submission
20   from an end expiry of 4.1 to 4.3.  Right?
21       A.    Yes.
22       Q.    Okay.  And then the second topic
23   that Daryll Miller also mentioned, that the
24   stability model in the drug product section

Page 331

ALISON L. FISHER, PhD - CONFIDENTIAL
1    would need to be changed to support the
2    potency log of 4.3?
3        A.    That's correct.
4        Q.    Because it says, Currently, the
5    real data supports an ee potency of 4.3,
6    however, the stability model in the drug
7    product section would suggest that we cannot
8    support an end potency of 4.3.  So the
9    stability model on the drug product section
10   means the stability model in the rHA
11   submission.  Right?
12       A.    Yep.
13       Q.    Okay.  And presumably that
14   stability model could support the 4.1 you were
15   asking for?
16       A.    Yes.
17       Q.    Okay.  But whatever it was, it
18   couldn't support a 4.3?
19       A.    The way that the model was put
20   together would make it look like we could not
21   support a 4.3.  But this was a topic that I
22   talked about earlier where the statistician
23   had a very conservative model and the model
24   was even conservative for .7.  And then when

Page 332

ALISON L. FISHER, PhD - CONFIDENTIAL
1    he was doing the model on the rHA, he even
2    came up with the more conservative number,
3    and that refers to those two models that we
4    talked about before.
5        Q.    Yes, I understand.  So and then
6    you say, "Daryll Miller said that in order to
7    have the rHA file approved, we need to change
8    the stability model in the drug product
9    section so that it supports 4.3."  You believe
10   that as well?
11       A.    Yes.  I mean, at the time I
12   knew that that stability model was too
13   conservative and I voiced that opinion to the
14   statisticians and some other folks.  And when
15   Daryll asked me to push this back to 4.3
16   because MMR, the end expiry hadn't been filed
17   yet, and we went through all this, I wasn't
18   concerned about it because I knew that
19   because we hadn't changed the target for
20   minimum release potency and based on the fact
21   that I had actually asked for expired lots
22   and asked what the end expiry potency was on
23   those lots, and it was well above 4.3, I
24   wasn't concerned about this and I saw this as

Page 333

ALISON L. FISHER, PhD - CONFIDENTIAL
1    something that I had to alert the team about,
2    but this helped to get traction for the fact
3    that the stability model that was put
4    together was too conservative and this was a
5    real reason that -- you know, this is a good
6    example of why you don't want a stability
7    model that's not reflective really in any way
8    of the real data.
9        Q.    And we talked this morning about
10   your belief and your discussions that the
11   stability model was too conservative.
12       A.    Yes.
13       Q.    Can you point -- are you aware
14   of any piece of paper where you've expressed
15   this to somebody?
16       A.    I saw the stability model and I
17   did talk with either Tim Schofield or Phil
18   Bennett about it.  I believe I also talked to
19   Mary Macchi about it, who had quite a bit of
20   knowledge about this sort of thing.  And I do
21   remember taking each component of that and
22   saying that I felt that the assumptions were
23   very much too conservative.  And I do
24   remember that, you know, the statisticians

ALISON L. FISHER, PhD - CONFIDENTIAL
1 basically did agree that we could put it back
2 to where it was before. And they did agree
3 that it was too conservative. And I think
4 that in the very beginning when I pushed
5 back, it -- I can't remember, you know, when
6 exactly I got traction with them. But I had
7 actually pushed back with them, I had been
8 pushing back on the model, and I can't
9 remember whether I pushed back -- the exact
10 date that I pushed back.
11     Q.    I understand that. I'm asking
12 if there's any paper that confirms any of what
13 you just said?
14     A.    I do recall looking at papers
15 of the stability model and looking at the
16 math. I think that those -- the stability
17 model was actually in the submission. And
18 that's how I saw the model.
19     Q.    You're answering a different
20 question than I asked.
21           I heard you tell me that you
22 talked to -- you thought it was a too
23 conservative and you talked to the
24 statisticians about changing it.

ALISON L. FISHER, PhD - CONFIDENTIAL
1     A.    Right. Right.
2     Q.    What I'm -- I'll represent to
3 you that we can't find any e-mails between you
4 or any statisticians where you or anybody else
5 says it's too conservative and we've got to
6 change it.
7     A.    I don't --
8     Q.    I'm asking you if you can point
9 me to anything?
10     A.    I don't think I put out an
11 e-mail on it.
12     Q.    So all of this, it's too
13 conservative, we've got to change it was an
14 oral discussion?
15     A.    That was a discussion on the
16 telephone.
17     Q.    Okay. These guys work in the
18 same building as you?
19     A.    They work in a different
20 building. There's two buildings about almost
21 a mile apart.
22     Q.    Okay.
23           - - -
24           (Interruption.)

ALISON L. FISHER, PhD - CONFIDENTIAL
1           - - -
2 BY MR. MACORETTA:
3     Q.    Okay. Do you remember this
4 meeting?
5     A.    I don't remember this meeting.
6     Q.    But ultimately what happened is
7 you submitted a stability model that said only
8 .7 log loss to justify the 4.3. Right?
9     A.    Yes. The statisticians looked
10 at the model again, and I think at my urging
11 and others' urging, they realized that all
12 the assumptions that were put in the model
13 were too conservative, and they put in
14 assumptions that were still conservative but
15 not as conservative.
16     Q.    That generated a .7 log loss?
17     A.    I'm assuming that's what the
18 second model did, but I don't -- you know, I
19 don't have that visual in front of me to
20 confirm that it was a .7 or .69 or whatever.
21     Q.    Well, let me say it this way:
22 rHA was approved at 4.3. Right?
23     A.    It was approved at 4.3 which
24 would lead one to believe that it couldn't

ALISON L. FISHER, PhD - CONFIDENTIAL
1 have been any greater than .7.
2     Q.    Yes. Do you have any
3 recollection it was any less than .7?
4     A.    That's what I said, I don't
5 recall whether it was less or not. My
6 assumption is it's around .7, but I don't
7 know for sure.
8     Q.    So this is -- and at this time,
9 we have a point -- you told us earlier there's
10 a .9 stability model that you gave the FDA for
11 the rHA product, but when we look at the
12 MMR II products on the market, we're using a
13 .7 model. Right?
14     A.    Well, the rHA hadn't been out
15 yet. HSA was our only marketed product. So
16 rHA which wasn't out, wasn't -- you know,
17 wasn't approved or marketed, when that
18 submission initially went in, there was a .9.
19     Q.    And that was made -- how did
20 they come up with .9? There was no product on
21 the market, how would they measure stability?
22     A.    That's not my area of
23 expertise. But what they do is well before
24 you submit a file, they do stability time

Page 338

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  points so that you can actually have the
3  data, you know, before you file the file to
4  give you, to give you shelf life data.
5       Q.    So what I don't understand,
6  then, is how could you have a -- if you had a
7  model that said .9 for rHA and a different
8  model you're using said .7 for HSA, wouldn't
9  that indicate that the products are different
10  in some meaningful way if you get a different
11  stability result?
12       MS. DYKSTRA:  Objection.
13       THE WITNESS:  This is a question
14    that would have to go to Phil Bennett
15    or to Tim Schofield.  I can't comment
16    other than the fact that there was rHA
17    in one and HSA in another.  I can't
18    comment, you know, on why they set up
19    their model the way they did.
20  BY MR. MACORETTA:
21       Q.    Do you ever remember any
22  discussion of, you know, how can we tell the
23  FDA the model for rHA has a greater loss than
24  it does for HSA?
25       MS. DYKSTRA:  Objection.

Page 339

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2       THE WITNESS:  I don't recall
3    anything other than questioning the
4    assumptions in the model.
5  BY MR. MACORETTA:
6       Q.    Both the .7 and the .9 model.
7  Right?
8       A.    My recollection is I felt that
9  both were too conservative.
10       Q.    Why did Merck want to switch
11  from HSA to rHA?
12       A.    That decision was made before I
13  came on board, long before I came on board.
14  And the thought was that they wanted to get
15  rid of anything that was animal including
16  human-derived products.
17       Q.    Okay.
18       A.    And this was based on concern
19  about, you know, emerging adventitious
20  agents.
21       Q.    Did Merck view it as a
22  competitive advantage to get rid of the HSA
23  and go to rHA?
24       A.    I don't think so because, to
25  the best of my understanding, I don't know

Page 340

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2  that the competitors had any albumin in their
3  product.
4       Q.    They already had -- they didn't
5  have HSA or rHA?
6       A.    Yeah.  I mean, I recall that
7  the competitors may have had some other
8  things but not albumin.
9       Q.    Were you involved at all in
10  looking at the competitors' products when you
11  were at Merck?
12       A.    I do remember -- I wasn't
13  involved, but I do remember that in MMD, I
14  believe the competitor's product was looked
15  at to see what protein stabilizer, if any,
16  was in that product.
17       Q.    Who would have been the
18  person -- the people involved in that?
19       A.    I don't remember all the
20  people, but one may have been Mark Galinski.
21  Or wait, Mark Galinski.  I think that's his
22  name.  Galinski, I think, is the last name.
23       MR. MACORETTA:  Why don't we
24    take a break, I think I'm done.  I
25    want to look at a few things to make

Page 341

1    ALISON L. FISHER, PhD - CONFIDENTIAL
2    sure and huddle with everybody here.
3    You guys can stay here, let me just
4    step outside.
5       VIDEOGRAPHER:  The time is now
6    18:36.  Off the record.
7          - - -
8       (A recess was taken.)
9          - - -
10       VIDEOGRAPHER:  The time is
11    18:38.  We're back on the video
12    record.
13       MR. MACORETTA:  Dr. Fisher, I
14    don't have any more questions today.
15    Thank you very much for your time.
16       VIDEOGRAPHER:  The time is now
17    18:39.  This concludes today's
18    videotape deposition of Alison Fisher.
19    We are now off the video record.
20          - - -
21       (Witness excused.)
22       (Deposition concluded at
23    6:41 p.m.)
24
25

86 (Pages 338 - 341)

**Page 342**

1
2          C E R T I F I C A T E
3
4
         I do hereby certify that I am a Notary
5    Public in good standing, that the aforesaid
     testimony was taken before me, pursuant to
6    notice, at the time and place indicated; that
     said deponent was by me duly sworn to tell
7    the truth, the whole truth, and nothing but
     the truth; that the testimony of said
8    deponent was correctly recorded in machine
     shorthand by me and thereafter transcribed
9    under my supervision with computer-aided
     transcription; that the deposition is a true
10   and correct record of the testimony given by
     the witness; and that I am neither of counsel
11   nor kin to any party in said action, nor
     interested in the outcome thereof.
12
         WITNESS my hand and official seal this
13   11th day of November, 2016.
14
15
16
         Linda Rossi-Rios, RPR, CSR,
17       and Notary Public
18
19
20
21
22
23
24
25

**Page 343**

1
2       INSTRUCTIONS TO WITNESS
3
4         Please read your deposition over
5    carefully and make any necessary corrections.
6    You should state the reason in the
7    appropriate space on the errata sheet for any
8    corrections that are made.
9         After doing so, please sign the errata
10   sheet and date it.
11        You are signing same subject to the
12   changes you have noted on the errata sheet,
13   which will be attached to your deposition.
14        It is imperative that you return the
15   original errata sheet to the deposing
16   attorney within thirty (30) days of receipt
17   of the deposition transcript by you.  If you
18   fail to do so, the deposition transcript may
19   be deemed to be accurate and may be used in
20   court.
21
22
23
24
25

**Page 344**

1      ACKNOWLEDGMENT OF DEPONENT
2
3         I have read the foregoing transcript of
4    my deposition and except for any corrections or
5    changes noted on the errata sheet, I hereby
6    subscribe to the transcript as an accurate record
7    of the statements made by me.
8
9    _____
10        ALISON L. FISHER, PhD
11
12        SUBSCRIBED AND SWORN before and to me
13   this _____ day of _____, 20___.
14
15
16   _____
17          NOTARY PUBLIC
18
19
20   My Commission expires:
21
22
23
24
25

**Page 345**

1      E R R A T A   S H E E T
2   IN RE:  USA, ET AL. VS. MERCK
3   DATE:  11/1/2016
4   PAGE   LINE           CORRECTION AND REASON
5   _____  _____  _____
6   _____  _____  _____
7   _____  _____  _____
8   _____  _____  _____
9   _____  _____  _____
10  _____  _____  _____
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18  _____  _____  _____
19  _____  _____  _____
20  _____  _____  _____
21  _____  _____  _____
22  _____  _____  _____
23
24  _____  _____
25  (DATE)         ALISON L. FISHER, PhD

87 (Pages 342 - 345)

Appx1909

10/25/2019
Declaration of G. Reilly

EXHIBIT 10

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

      *Plaintiffs,*

    v.

MERCK & CO., INC.,

      *Defendant.*

Civil Action No. 10-4374 (CDJ)

IN RE: MERCK MUMPS VACCINE
ANTITRUST LITIGATION

THIS DOCUMENT RELATES TO:
ALL ACTIONS

Master File No. 12-3555 (CDJ)

**Expert Report of Ann M. Arvin, MD**

1

CONFIDENTIAL

**Appx1911**

## I.  QUALIFICATIONS

I am a Medical Doctor, with a board certification in Pediatrics.

I received my B.A degree from Brown University, my M.A degree from Brandeis University, and my M.D. degree from the University of Pennsylvania. After graduation from medical school, I did an internship and residency in pediatrics at the University of California, San Francisco ("UCSF"), including a year as Chief Resident at Mt. Zion Hospital. I then spent three years in post-doctoral training in infectious diseases, under the direction of Dr. Thomas C. Merigan at Stanford University and Dr. Moses Grossman at UCSF. Dr. Merigan is recognized internationally for his research on antiviral drugs and his leadership of clinical trials to develop HIV/AIDS therapies. Dr. Grossman was a nationally renowned specialist in pediatric infectious diseases and served as Chief of Pediatrics at the San Francisco General Hospital for 30 years. Following the completion of my post-doctoral training, I was recruited to join the faculty at Stanford University in September, 1978, as an assistant professor in the Department of Pediatrics, Infectious Diseases Division, of the School of Medicine. I have remained at Stanford throughout my career, having been promoted to associate professor and then to my current position as the Lucile Salter Packard Professor of Pediatrics and Professor of Microbiology and Immunology. The faculty who are specialists in pediatric infectious diseases are practicing physicians at the Packard Children's Hospital at Stanford. We provide care to infants and children hospitalized for the diagnosis and treatment of viral, bacterial and fungal infections and for those who have acquired infections as a complication of underlying diseases such as cancer or following surgery. In addition to my own clinical work, I was the Chief of the Pediatric Infectious Diseases Division from 1984 to 2006, overseeing the care provided by the other

2

Appx1912

specialists and trainees in pediatric infectious diseases at the Packard Children's Hospital at Stanford.

From 2001 to the present, I have had a faculty leadership role at Stanford University, serving as Associate Dean of Research until 2006, and then as the Vice Provost and Dean of Research.

My professional career, spanning almost four decades, has been devoted to the study of infectious diseases and microbiology and immunology, focusing on understanding the mechanisms of these diseases, how the immune system responds to viral infections and vaccines, and approaches to their diagnosis, treatment and prevention, especially in infants and children. My research has been funded by the National Institutes of Health ("NIH"). Much of my work has been about varicella zoster virus ("VZV"), which is the virus that causes chickenpox (varicella) and shingles (herpes zoster). I was closely involved with the original NIH program to develop the varicella vaccine, supervising vaccine trials at Stanford and in particular, investigating the immune response to this vaccine in healthy and immunocompromised children and adults, and with subsequent studies of the vaccine by Merck. I carried out the first clinical study to demonstrate that bone marrow transplant patients could be immunized with an inactivated VZV vaccine to reduce their risk of herpes zoster; this observation was the proof of concept for the development of the live attenuated zoster vaccine and other vaccines against shingles. My laboratory also investigated the immune response to the live zoster vaccine in elderly adults.

The investigation of age-related changes in the immune response of infants and children to viruses and vaccines has been a major interest and includes several studies analyzing the humoral and cell-mediated responses to measles and mumps vaccines. I established the

3

**Appx1913**

Stanford-Lucile Packard Children's Hospital (LPCH) Vaccine Program in 1997, which led to several major multi-investigator NIH grants to study immunity induced by viral vaccines, especially vaccines against influenza. I have also published clinical research on other herpesviruses, including herpes simplex and cytomegalovirus infections in pregnancy and the newborn.

I have published 244 peer-reviewed articles, 135 peer-reviewed chapters and monographs, including many on viral vaccines, and edited seven books. Since 1995, I have been an author of the chapter on Varicella Zoster Virus in Fields Virology, which is considered to be the leading text on virology.

I have been elected to the Infectious Disease Society of America, the Pediatric Infectious Disease Society, the American Academy of Pediatrics, the Association of American Physicians, the American Association for Advancement of Science and the American Academy of Microbiology. I was elected to the National Academy of Medicine in 2003 and to the American Academy of Arts & Sciences in 2012, which are considered the most prestigious organizations in my field.

In the course of my career, I have served by invitation on the Food and Drug Administration ("FDA") Vaccines and Related Biological Products Advisory Committee ("VRBPAC") which evaluates evidence related to FDA license applications and makes recommendations to the FDA regarding approval of those applications, and as a consultant for the Center for Biologics Evaluation and Research ("CBER"). From 2001-2004, I was a member of the National Vaccine Advisory Committee ("NVAC"), serving as the chair of the subcommittee on Future Vaccines. The NVAC makes recommendations to the Director of the National Vaccine Program on ways to develop vaccines to prevent infectious disease and prevent

4

**Appx1914**

adverse reactions to vaccines. I was a member of the World Health Organization ("WHO")

Steering Committee on Research Related to Measles Vaccines from 2002-2007 and was the chair

of that committee from 2003-2007. I have served on many national committees including the

Director's Council, National Institute of Allergy and Infectious Diseases (2007-2011) and the

Committee on Science, Technology and Law, National Academy of Science (2014-present).

A copy of my current curriculum vitae is attached at Appendix 1. In addition to the

references cited herein, I have also reviewed the amended complaint in this action.

I have not provided deposition testimony or testified at trial as an expert in the past four

years.

My fee is $500/hour for my work in connection with this matter.

## II. SUMMARY OF OPINIONS

A. Over the years, there have been several failed attempts to develop a mumps vaccine, due either to unacceptable safety risks or poor protection against disease. In contrast, the Merck mumps vaccine, a component of its MMR II (measles-mumps-rubella) and ProQuad (measles-mumps-rubella-varicella) combination vaccines, has been very safe and highly effective during its more than five decades of use in the United States.

B. The fundamental criterion for assessing how well a vaccine works is whether it controls the disease in the population. This assessment is based on comparing rates of disease in people who have received the vaccine to rates of disease in people who have not been vaccinated. The FDA relies on this evidence of vaccine efficacy from clinical trials in deciding whether to approve a vaccine for which there is no vaccine currently available. The CDC relies on effectiveness data obtained by surveillance for disease to evaluate how well a vaccine that has been licensed for use in clinical care is working. Laboratory tests have been developed that can measure various components of the immune response after vaccination but these assays do not give us direct information about disease control. For public health purposes, what matters is whether the vaccine program is helping to control disease in the population at risk.

C. In addition to the fact that controlling disease is the fundamental metric of vaccine effectiveness rather than the results of laboratory tests, their application in an effort to predict disease control is uncertain. The immune mechanisms by which vaccination protects people from disease are poorly understood. Infection with viruses such as mumps or vaccination with live mumps vaccines are known to cause the immune system

5

Appx1915

to make antibodies, referred to as humoral immunity and also to generate T cells that can recognize the virus, referred to as cellular immunity. However, the respective roles of these two components of the immune system in protection from disease are not clearly defined. For viruses like mumps, we do not have a laboratory test that provides an absolute correlate of protection if the person is exposed. Therefore, even if we could be sure that generation of antibodies is the most important immune response for protection from mumps disease, we are not able to determine from the results of a test for mumps antibodies whether a particular person will be protected from disease.

D. For these reasons, although laboratory assays for mumps are used in certain circumstances, such as to compare different mumps vaccine doses or dosage regimens, the results from such an assay cannot be used to determine whether recipients of the vaccine will be protected from disease at that time they are tested, whether it is six weeks or many years after they are given the vaccine. For the same reason, laboratory tests do not reveal whether the capacity of the immune system to prevent mumps disease wanes over time.

E. My lab published a study in 2001 in which we measured the immune responses to vaccination for measles and mumps with the Merck measles, mumps and MMR II vaccines when administered to infants at various ages, including 12 months. The mumps antibody response was measured by a plaque reduction neutralization assay, performed in a laboratory at the California Department of Health directed by Dr. Bagher Forghani. Our results showed a seroconversion rate of 93% for those children vaccinated at 12 months, which I understand was essentially the same seroconversion rate as was found by Merck when it performed a mumps plaque reduction neutralization assay at its laboratory. The fact that our study found a nearly identical seroconversion rate as the Merck study supports the validity of the Merck findings since both assays were used to test U.S. children given MMR II in the same time period.

## III. BACKGROUND

### A. The development of live virus vaccines

Smallpox was the first disease to be controlled by vaccination. Like later viral vaccines,

the development of smallpox vaccine started from observing the pattern of spread of the disease

in communities and what groups were at risk and who was spared. When epidemics occurred,

people who had survived smallpox in previous outbreaks were spared but milkmaids who had

had cowpox also had either no illness or mild smallpox. Therefore cowpox (vaccinia) inoculation

was evaluated as a way to interrupt the transmission of smallpox from an infected to a

6

CONFIDENTIAL

**Appx1916**

susceptible person or to modify the severity of the disease in the vaccinated person. Testing was done first in small numbers of people and then expanded to universal vaccination campaigns. This history illustrates the fundamental principles about how live viral vaccines are developed. The approach is empirical, based on observations in the population at risk, finding or producing a weakened form of a virus that can be tested for effects on transmission of the natural virus in the susceptible population and on evaluating whether symptoms are prevented or less severe after an exposure to the natural virus.

This empirical approach was used to develop polio, measles, mumps, and rubella vaccines in the 1950s and 1960s and most recently the varicella (chickenpox) vaccine. These are referred to as live attenuated vaccines because the natural virus, recovered from an infected person, is the starting material used to produce the weakened vaccine virus. First, the natural virus is used to infect human or animal cells that are grown in culture dishes in the laboratory. The natural virus can multiply in these cells but they are not the types of cells that are usually infected in the human body when the virus causes illness. As a result, the virus must adapt in order to make new virus particles in cells which differ from its typical cell environment in the infected person. The genetic changes that allow adaptation to the abnormal cell environment in the laboratory have the potential to make the virus less infectious for people. This weakening of the capacity of the natural virus to cause illness is called attenuation. However, whether or not the virus has become attenuated can only be determined empirically, by inoculating susceptible individuals and observing for symptoms like those that are associated with the natural virus infection. Some individuals may have mild symptoms due to the vaccine virus but attenuation means the live virus vaccine does not cause the disease that would be observed with natural virus infection. When evidence of attenuation has been obtained in initial small clinical studies, the

7

vaccine is tested in larger cohorts of susceptible individuals who are then monitored for vaccine side effects and, most importantly, for the outcome of exposures to the natural virus. These larger studies, often called field trials, are necessary to establish the efficacy of the vaccine for preventing or reducing the severity of natural virus infection. These studies are designed to determine the risk/benefit profile of the vaccine when compared to the morbidity and mortality caused by the natural virus. Because most live attenuated vaccines must be given to healthy children, minimizing risk is of the utmost importance. Vaccines are judged to be effective based on an assessment of whether people who are vaccinated have either no disease or a mild illness if they encounter the natural virus. By this fundamental criterion, the live virus vaccines used to protect against the consequences of measles, mumps, rubella and varicella have had a tremendous impact on public health, reducing the incidence of illness and deaths caused by epidemics of these previously ubiquitous viral infections to few or none each year in the United States.

Each step involved in creating and testing a live attenuated virus vaccine is undertaken in close consultation and with supervision by the FDA, whether the entity developing the vaccine is a company or a federal agency, because only the FDA can approve a vaccine for use in the United States. The FDA decision is based on the documentation of both safety and efficacy of the vaccine. Recommendations for implementation of the vaccine for clinical care are provided by the Advisory Committee on Immunization Practices ("ACIP") of the Centers for Disease Control ("CDC").

After a live virus vaccine is introduced, the CDC conducts continuous surveillance of vaccine safety and effectiveness. The understanding gained after vaccine approval is essential because widespread use alters the epidemiology of outbreaks caused by the natural virus and the

8

**Appx1918**

dose regimen, age for administering the vaccine or other recommendations may need to be changed in order to optimize the benefits of the vaccine program. Since live virus vaccines are used for childhood immunization programs world-wide, the WHO also makes recommendations for use and monitors vaccine safety and effectiveness.

## B. Immunity to viruses and live viral vaccines

Scientific knowledge about immunity to viruses has expanded dramatically in the decades since the 1980s. Because most live virus vaccines were developed before this time, information about how the human immune system responds to viral infections and to viral vaccines has been acquired in parallel. Although the tools to measure immunity were quite limited in the 1950s and 1960s, the concept that live virus vaccines would be effective against viral infections was based on the idea that attenuated viruses would induce immune responses that were similar to those elicited by the natural virus. This is often referred to as "natural immunity" or "naturally acquired immunity." Since natural immunity was shown to be effective against exposures that occurred in different geographical locations, where there might be some variation in the natural virus strain, live virus vaccines were expected to have the same profile.

Broadly, the control of viral infections is mediated by two arms of the immune system, including B cells which produce antibodies that can inhibit virus infection, and T cells which amplify the B cell response, release antiviral proteins called cytokines, and have the capacity to destroy virus-infected cells, referred to as T cell cytotoxicity. It is important to note that the relatively recent development of more advanced laboratory methods to measure immunity means that live virus vaccines had already eliminated most natural infections caused by these viruses. As a result, there are not many comparisons of natural and vaccine immunity in the same age

9

CONFIDENTIAL

**Appx1919**

group. In fact, much of what is known about viral immunity is from studies of viral vaccine-induced immunity.

Methods to measure antibodies are called serologic tests or tests for humoral immunity; those for T cells are called cellular immunity assays. Antibody and cellular immunity assays typically have a range of sensitivity (precision) for determining whether the person has any immunity to the virus of interest. These methods can be made somewhat more quantitative by measuring antibodies in dilutions of the blood sample, referred to as antibody titers, and cellular immunity assays may be used to determine the frequency of T cells that recognize a particular virus.

While both arms of the immune system contribute, the evidence is that T cell responses are critical for recovery from the first infection with the virus. After an individual has had a particular viral infection, the immune system maintains a "memory" of the virus, so that antibodies and T cells that recognize the virus are already present in the body if the person has a new exposure. The memory responses are high for a period of time after the infection, typically for several months, and then decline, but the immune system remains prepared for a new exposure. In contrast to the first exposure, when the individual had no pre-existing immunity, the outcome of subsequent exposures is either no symptoms or a mild illness. It is possible that some re-exposures result in silent infections that boost the memory immune responses. The level of protection against any signs of illness due to a re-exposure may also vary depending on the virus.

However, since the antiviral immune response is made up of multiple components, it has not been possible to determine which component, if any, can be used as a reliable measure for determining protection. Such a reliable test is referred to as a "correlate of protection." For

10

**Appx1920**

example, some individuals may have no detectable antibodies while others have no detectable T cell response to a virus and yet both may be protected from illness; some may have low antibody levels and be protected while others have signs of infection despite having higher levels of antibodies in their blood. Thus, the goal of defining a test that correlates with either protection or susceptibility to re-infection in a particular individual has proved elusive. Nevertheless, serologic testing of a population can be done to determine the percentage who have or lack antibodies to a virus as a strategy to estimate whether there are likely to be enough susceptible people to sustain an outbreak of the virus. Serologic testing can also have uses in regulatory contexts where the FDA may accept use of immunogenicity data as a surrogate under appropriate circumstances.

As was anticipated, the immune response to live virus vaccines has characteristics like natural immunity in that these vaccines elicit both antiviral antibodies and T cell immunity. The pattern of the response is also similar, with initial antibody and T cell responses being higher and declining over time. However, just as the use of immunologic tests to predict the susceptibility to re-infection of an individual who has naturally-acquired immunity is problematic, it is equally difficult to determine whether live virus vaccine immunity may wane to a level that is no longer protecting the individual using these laboratory methods. When studies have been possible, as in the case of the live varicella vaccine, most breakthrough infections in immunized children have been attributable to failure to respond to the vaccine initially, which is called "primary vaccine failure," rather than waning immunity. Surveillance for outbreaks is the best strategy to determine if a booster dose of a live virus vaccine should be added, rather than using immunologic tests. The same is true more generally for assessing how well the vaccine is working in the population. On-going re-evaluation of the recommended vaccine dose, the

11

number of doses and the age when the vaccine doses should be given is an essential part of how these vaccines are deployed in clinical practice.

## IV. MUMPS

Mumps, the once ubiquitous childhood disease, generally presents as fever and parotitis, or inflammation of one or both parotid (salivary) glands. However, more serious complications can occur. Prior to introduction of MMR, "mumps was the leading cause of viral encephalitis and sudden onset deafness in the United States."[1] The most frequent complications of mumps in children, meningitis and mild meningoencephalitis, can result in death, albeit rarely.[2] Unilateral or bilateral permanent hearing loss has an estimated incidence rate of 0.5 to 5.0 per 100,000 cases of mumps and "the incidence rate of minor degrees of hearing impairment, such as high-tone hearing loss, is probably much higher."[3]

Other complications of mumps include orchitis in post-pubescent males, and less frequently oophoritis in post-pubescent females. Although rare, sterility has resulted after some cases of bilateral orchitis.[4] Mumps has been associated with pancreatitis and it can possibly trigger diabetes mellitus.[5] Severe and fatal nephritis has also been "reported as a rare

---

[1] Rubin, S. Mumps Vaccines (Chapter 40). Plotkin S, Orenstein W, Offit P, Edwards K, Editors. Vaccines. 7th Edition. Philadelphia: Elsevier (2018) 663-688 at 663. Hereinafter referred to as "Rubin."

[2] Cherry J, Quinn K. Mumps Virus. Cherry J, Harrison G, Kaplan S, Steinbach W, Hotez P, Editors. Feigin and Cherry's Textbook of Pediatric Infectious Diseases. 8th Edition. Philadelphia: Elsevier (2019) 1771-1779 at 1775. Hereinafter referred to as "Cherry and Quinn."

[3] Cherry and Quinn at 1776.

[4] Cherry and Quinn at 1775.

[5] Cherry and Quinn at 1775.

12

CONFIDENTIAL

complication of mumps."[6]  Additionally, while there is no evidence that gestational mumps

increases the risk of developmental abnormalities, an increased rate of spontaneous abortion has

been reported in women who contracted mumps during the first trimester of pregnancy.[7]

## V. MUMPS VACCINES

### A. Background

The first mumps vaccines introduced in the United States and elsewhere in the 1950s

were made by inactivating the virus using formalin.  These inactivated mumps vaccines proved

to be poorly protective and were replaced by live attenuated mumps vaccines, including the Jeryl

Lynn strain vaccine manufactured by Merck, in the 1960s.[8]  The Jeryl Lynn strain was combined

with the Merck live attenuated measles and rubella vaccine viruses to make the MMR vaccine,

which was licensed in 1971.  This was followed by MMR II, which was licensed in 1978.  In

2005, Merck's quadrivalent measles, mumps, rubella, and varicella vaccine, ProQuad, (MMR-V)

was licensed in the United States.  Accordingly, the Jeryl Lynn strain mumps vaccine has been

the mumps component of Merck's mumps-containing combination vaccines given to children as

routine pediatric care and to susceptible adults in the United States since the early 1970s.

### B. Safety of the Merck mumps vaccine

As described above, live virus vaccine safety is assessed during clinical trials that are

conducted before the FDA licenses the vaccine and safety data is collected for continual review

---

[6] Cherry and Quinn at 1776.

[7] Cherry and Quinn at 1776.

[8] Rubin at 668, 669.

13

**Appx1923**

by the CDC following licensure. The safety data is more robust and reliable the longer a vaccine

has been in use and the more experience that pediatricians and health authorities have had with

the vaccine. Since the Jeryl Lynn mumps strain has been given to hundreds of millions of people

over more than 50 years, administered either as mumps vaccine alone or as the mumps

component of MMR, MMR II, and MMR-V, the safety of this strain is very well established.

In contrast to the safety profile of the Merck mumps vaccine, other mumps vaccine strains have

been found to be poorly attenuated and have been implicated in aseptic meningitis, which is one

of the complications of natural mumps infection. Mumps vaccines that were made from the

Urabe Am 9 strain have now been withdrawn from clinical use in "Canada, Japan, the United

Kingdom, and several other countries due to the increased incidence of aseptic meningitis

following vaccination;" some data also suggests that the L-Zagreb strain may be associated with

aseptic meningitis.[9] Mumps vaccine strains can also be over-attenuated as shown by the

experience with the Rubini strain which was used as a mumps vaccine by several countries,

replacing the under-attenuated Urabe strain.[10] When experience with Rubini strain mumps

vaccines showed little or no effectiveness in clinical practice, the WHO recommended against

their use and these vaccines have been withdrawn.[11]

---

[9] McClean H, Hickman C, Seward J. The Immunological Basis for Immunization Series: Module 16: Mumps. World Health Organization (2010) at 3, 4. Hereinafter referred to as the "Mumps Module."

[10] Mumps Module at 3.

[11] Mumps Module at 3.

14

In a recent review, CDC experts stated that "MMR vaccine generally is well-tolerated and rarely associated with serious adverse events."[12] Many pediatric infectious disease experts and microbiologists who study mumps virus have published on the safety of vaccines containing the Jeryl Lynn mumps strain. According to FDA experts, MMR vaccines have "an excellent safety profile"[13] and "[o]ver 500 million doses of the Jeryl Lynn-based MuV vaccines have been distributed worldwide, with few serious adverse effects noted."[14]

These assessments of the safety of the Merck mumps vaccine are consistent with my experience and knowledge from more than 35 years as a pediatric infectious disease specialist and an expert in virology and on the immune response to viruses and viral vaccines.

## C. Effectiveness of the Merck mumps vaccine

The fundamental criterion for vaccine effectiveness is the impact of universal vaccination programs on the burden of disease caused by the virus in the population. Although the percent reduction compared to the historical incidence of mumps disease varies slightly year by year in the United States, the overall impact of the mumps vaccine has been dramatic. CDC surveillance

---

[12] McLean H, Fiebelkorn A, Temte J, Wallace G. Prevention of Measles, Rubella, Congenital Rubella Syndrome, and Mumps, 2013: Summary Recommendations of the Advisory Committee on Immunization Practices (ACIP). MMWR Recommendations and Reports. (2013) 62-04:1-34 at 14. Hereinafter referred to as "2013 MMWR."

[13] Rubin at 680.

[14] Rubin S, Sauder C, Carbone K. Mumps Virus. Knipe D, Howley P, Editors. Fields Virology. 6th Edition. Philadelphia: Wolters Kluwer (2013) 1024-1041 at 1037. Hereinafter referred to as "Rubin, Sauder, Carbone."

15

CONFIDENTIAL

shows that mumps disease has been reduced by 99% since the pre-vaccine era.[15] Drs. Cherry and

Quinn described the effectiveness of various mumps strain vaccines as follows:

> In a review of 47 publications documenting the vaccination status of patients during
> 50 outbreaks from 1977 through 2008, Dayan and Rubin calculated that the
> effectiveness of prior vaccination with one dose of vaccine ranged from 72.8% to
> 91% for the Jeryl Lynn strain, from 54.4% to 93% for the Urabe strain, and from 0%
> to 33% for the Rubini strain. Vaccine effectiveness after two doses of mumps vaccine
> was reported in three outbreaks and ranged from 91% to 94.6%. [16]

The current CDC assessment of mumps vaccine effectiveness as set forth on its website is 78%

(range 49% to 92%) for one dose and 88% (range 31% to 95%) for two doses.[17]

   The fact that mumps outbreaks have occurred in recent years even though the

recommended two doses of vaccine have been given to most children in the United States does

not mean that the mumps vaccine is ineffective. This point is emphasized by experts as follows:

"Data from many of these outbreaks indicate that mumps vaccination was effective to a large

degree and likely responsible for limiting outbreak size. In the one study in which it was

possible to calculate, vaccine effectiveness was estimated at 80%, demonstrating a great benefit

to vaccination."[18]  Mumps experts from the FDA have also said that "[u]se of live, attenuated

mumps vaccines have nearly eliminated the disease from countries with high vaccine coverage

rates of a two-dose regimen, although sporadic and sometimes large mumps outbreaks continue

---

[15] CDC Website at https://www.cdc.gov/mumps/vaccination.html (last accessed June 5, 2018).

[16] Cherry and Quinn at 1777.

[17] CDC Website at https://www.cdc.gov/mumps/vaccination.html (last accessed June 5, 2018).

[18] Rubin at 676 (referencing Marin M, Quinlisk P, Shimabukuro T, et al. Mumps vaccination coverage and vaccine effectiveness in a large outbreak among college students—Iowa, 2006. Vaccine. (2008) 26:3601-3607).

16

CONFIDENTIAL

to occur even in highly vaccinated populations."[19] They also note "the dramatic reductions in mumps incidence in countries with high two-dose vaccine coverage"[20] and "the remarkable decline in the incidence of mumps and related sequelae."[21] In the United States, these achievements were accomplished with Merck mumps vaccines containing the Jeryl Lynn strain. Scientists from the CDC and state health departments have published many papers on their investigations of mumps outbreaks. Two reports, each with 20 or more public health authors, were published in the New England Journal of Medicine. In the first paper describing the 2006 Midwest outbreak, the authors noted that "mumps vaccine probably prevented U.S. patients from numbering in the tens or hundreds of thousands."[22] In the second paper describing the 2009-10 mumps outbreak in New Jersey and New York, the authors noted "[t]he fact that the outbreak did not spread to surrounding communities highlights the effectiveness of the two-dose MMR vaccine schedule in most settings."[23]

In addition, limiting the severity of disease when it does occur is an important benefit of vaccination. As reported, "[n]umerous studies indicate that mumps vaccination attenuates the

---

[19] Rubin, Sauder, Carbone at 1024.

[20] Rubin, Sauder, Carbone at 1032.

[21] Rubin, Sauder, Carbone at 1037.

[22] Dayan G, Quinlisk M, Parker A, et al. Recent Resurgence of Mumps in the United States. NEJM. (2008) 358:1580-1589 at 1587.

[23] Barskey A, Schulte C, Rosen J, et al. Mumps Outbreak in Orthodox Jewish Communities in the United States. NEJM. (2012) 367:1704-1713 at 1711.

17

Appx1927

course of disease, complications, and complication severity"[24] and "despite less-than-ideal performance by mumps vaccines, it must be kept in mind that the preponderance of data demonstrate these products to be highly effective and solely responsible for the near elimination of this once ubiquitous disease in all countries where mumps-containing vaccine is rigorously used."[25] In the United States, this near elimination has been accomplished with Merck's Jeryl Lynn mumps strain vaccines.

I agree with the experts from the CDC and the FDA that the Merck mumps vaccine has led to a remarkable reduction in the incidence of mumps disease and its serious complications in the United States. I also agree with the experts from the CDC and the FDA that Merck's mumps vaccine has been documented to remain highly effective even though there have been outbreaks in highly vaccinated populations in recent years. In fact, these outbreaks have had a limited impact on public health because of the effectiveness of the mumps vaccine.

## D. Context for effectiveness evaluation

The incidence of mumps in the United States hit all-time lows in the first five years of this century, with the annual nationwide total being about two or three hundred reported cases.[26] The number of reported cases rose in 2006 to 6,584.[27] In most of the years since then, the

---

[24] Rubin at 676.

[25] Rubin at 688.

[26] 2013 MMWR at 7.

[27] Marin, M, Marlow, M., Moore, K., Patel, M. Recommendation of the Advisory Committee on Immunization Practices for Use of a Third Dose of Mumps Virus-Containing Vaccine in Persons at

18

Appx1928

number of cases reported annually has been in either the hundreds or the low thousands, with no

year exceeding the number of cases in 2006.[28]  The CDC has been attempting to develop a

better understanding of this uptick in the number of cases, recognizing, of course, that the

number of cases being reported remains far below the number of cases reported in the pre-

vaccine era (approximately 186,000 cases annually).[29]  It has also recently recommended use of

a third dose of vaccine in an outbreak setting and indicated that it is also considering use of a

third dose more generally.[30]  Various causes of the mumps outbreaks are being considered by

the CDC, one of which is waning immunity.[31]

---

Increased Risk for Mumps During an Outbreak. MMWR Recommendations and Reports. (2018) 67 (1):33-38 at 33.  Hereinafter referred to as "2018 MMWR."

[28] Centers for Disease Control and Prevention. Summary of Notifiable Diseases—United States, 2012. MMWR (2014) 61 (53): 1-121 at 105 (https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6153a1.htm); Centers for Disease Control and Prevention. Summary of Notifiable Diseases—United States, 2013. MMWR (2015) 62 (53): 1-119 at 31 (https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6253a1.htm); Centers for Disease Control and Prevention. Summary of Notifiable Infectious Diseases and Conditions—United States, 2014. MMWR (2016) 63 (54): 1-152 at 31
(https://www.cdc.gov/mmwr/volumes/63/wr/mm6354a1.htm?s_cid=mm6354a1_w); Centers for Disease Control and Prevention. Summary of Notifiable Infectious Diseases and Conditions—United States, 2015. MMWR (2017) 64 (53): 1-143 at 32
(https://www.cdc.gov/mmwr/volumes/64/wr/mm6453a1.htm?s_cid=mm6453a1_w); Centers for Disease Control and Prevention. National Notifiable Disease Surveillance System. 2016 Annual Tables of Infectious Diseases Data. (Table 1) Atlanta, GA. CDC Division of Health Informatics and Surveillance, 2017. (https://wonder.cdc.gov/nndss/static/2016/annual/2016-table1-H.pdf); Centers for Disease Control and Prevention. National Notifiable Disease Surveillance System. Weekly Tables of Infectious Diseases Data. (Table II) Atlanta, GA. CDC Division of Health Informatics and Surveillance.
(https://stacks.cdc.gov/view/cdc/52258).  All the websites identified in this footnote were last accessed on June 10, 2018.

[29] Mumps Cases and Outbreaks at https://www.cdc.gov/mumps/outbreaks.html (last accessed June 10, 2018).

[30] 2018 MMWR at 36.

[31] 2018 MMWR at 36.

19

Appx1929

The current experience with mumps shares many similarities with our experience with other vaccine-preventable diseases.

First, it is not uncommon to see increases in the incidence of vaccine preventable diseases even after vaccination programs have resulted in substantial decreases. One classic example is pertussis. Figure 1 is a graph showing reported incidence of pertussis since introduction of pertussis vaccine nearly 100 years ago. As can be seen, in 2006, when there were 6,584 reported cases of mumps, there were 15,632 cases of pertussis.[32] In the current decade, the annual number of cases of pertussis reported annually has ranged from 13,278 on the low end to 48,277 on the high end.[33] These numbers exceed the number of reported cases of mumps by several orders of magnitude.

Figure 2 is a graph showing the number of mumps cases reported annually from 1968 to 2017. In comparing Figures 1 and 2, one can see the general similarity, broadly speaking, of increases for several years after preceding years of lower annual totals. In fact, the increase in recent years with pertussis shows a higher number of cases, as compared to mumps. For mumps, as well as for pertussis, the total in recent years is far below that seen in the pre-vaccine era.[34]

---

[32] 2018 MMWR at 33; CDC website at https://www.cdc.gov/pertussis/surv-reporting/cases-by-year.html (last accessed June 10, 2018).

[33] CDC website at https://www.cdc.gov/pertussis/surv-reporting/cases-by-year.html (last accessed June 10, 2018); Centers for Disease Control and Prevention. National Notifiable Disease Surveillance System. Weekly Tables of Infectious Diseases Data. (Table II) Atlanta, GA. CDC Division of Health Informatics and Surveillance. (https://stacks.cdc.gov/view/cdc/52258) (last accessed June 10, 2018).

[34] Rubin at 684; CDC website at https://www.cdc.gov/mmwr/preview/mmwrhtml/rr55e223a1.htm (last accessed June 10, 2018).

20

CONFIDENTIAL

Appx1930

When there is an increase in disease after introduction of a vaccine, CDC and other public health experts explore possible strategies to address the increase. One consideration is often whether to administer another dose of vaccine, as is now being considered for mumps. This occurred with varicella (chickenpox) vaccine. Figure 3 depicts the number of cases of chickenpox reported since 1995 when the vaccine for chickenpox was first licensed in the United States. As can be seen, the number of cases decreased relatively steadily from that time until approximately 2003, when the number of cases increased quite sharply, with approximately twice the number of cases in 2006 and 2007 as compared to the numbers seen between 2001 and 2003. The solution was to recommend a second dose of vaccine for all age groups, which occurred in 2006.[35] That has resulted in a return to a downward trend, although the annual number of chickenpox cases continues to exceed the number of mumps cases.

The CDC has pursued a similar course of adding doses with pertussis, for which it recommended a booster dose in 2005.[36] The booster dose for pertussis has not been as effective as the second dose for chickenpox, and pertussis has proven to be more challenging to control than other diseases, including mumps, as shown by the data presented in Figures 1-3.

---

[35] Marin, M, Guris, D, Chaves, S, Schmid, S, Seward, J. Prevention of Varicella Recommendations of the Advisory Committee on Immunization Practices (ACIP). MMWR Recommendations and Reports. (2007) 56(RR04):1-40, at 22. Hereinafter referred to as "2007 Varicella MMWR."

[36] Broder, K et al. Preventing Tetanus, Diphtheria, and Pertussis Among Adolescents: Use of Tetanus Toxoid, Reduced Diphtheria Toxoid and Acellular Pertussis Vaccines Recommendations of the Advisory Committee on Immunization Practices (ACIP). MMWR Recommendations and Reports. (2006). 55(RR3): 1-34; Kretsinger K et al. Preventing Tetanus, Diphtheria, and Pertussis Among Adults: Use of Tetanus Toxoid, Reduced Diphtheria Toxoid and Acellular Pertussis Vaccine Recommendations of the Advisory Committee on Immunization Practices (ACIP) and Recommendation of ACIP, supported by the Healthcare Infection Control Practices Advisory Committee (HICPAC), for Use of Tdap among Health-Care Personnel. MMWR Recommendations and Reports. (2006). 55(RR17): 1-37.

21

**Appx1931**

When the CDC and other public health experts evaluate increases in disease after initial

decreases from introduction of a vaccine, one consideration is often waning immunity. By its

nature, waning immunity cannot be detected immediately. Pertussis provides another good

comparison with mumps. Waning immunity is one of several factors that have been considered

by public health experts as an explanation for the increase we have seen in incidence of

pertussis.[37] Despite nearly a century of experience with pertussis vaccination, our understanding

of waning immunity of pertussis vaccination is still quite limited.[38] According to the CDC,

> DTaP vaccines are 80% to 90% effective. Among kids who get all 5 doses of DTaP
> on schedule, effectiveness is very high within the year following the 5th dose – at least
> 9 out of 10 kids are fully protected. There is a modest decrease in effectiveness in each
> following year. About 7 out of 10 kids are fully protected 5 years after getting their
> last dose of DTaP and the other 3 out of 10 kids are partially protected – protecting
> against serious disease.
>
> CDC's current estimate is that in the first year after getting vaccinated with Tdap, it
> protects about 7 out of 10 people who receive it. There is a decrease in effectiveness
> in each following year. About 3 or 4 out of 10 people are fully protected 4 years after
> getting Tdap.[39]

---

[37] CDC Website at https://www.cdc.gov/pertussis/about/faqs.html (last accessed June 10, 2018);
Misegades L, Winter K. et al. Association of Childhood Pertussis With Receipt of 5 Doses of pertussis
Vaccine by Time Since Last Vaccine Dose, California, 2010. JAMA (2012) 308(20): 2126-2132 at 2130-
2131.

[38] A December 18, 2013 document entitled, Childhood Whooping Cough Vaccine Protects Most Children
For At Least 5 Years, that is available via a link on the CDC Website at
https://www.cdc.gov/pertussis/about/faqs.html provides in relevant part as follows: "CDC researchers
expected that protection would fade over time, but before now did not have concrete estimates on long-
term duration of protection."

[39] CDC Website at https://www.cdc.gov/pertussis/about/faqs.html (last accessed June 5, 2018). The two
vaccines currently used to protect against pertussis (whooping cough) are DTaP (a pediatric combination
diphtheria, tetanus, and acellular pertussis vaccine administered to infants and children) and Tdap (a
combination tetanus, diphtheria, and acellular pertussis vaccine recommended for use by adolescents and
adults).

22

**Appx1932**

I mentioned above that a decision was made in 2006 to recommend a second dose of chickenpox vaccine. At that time, although some believed that waning immunity could be the cause of the uptick in chickenpox cases that we were seeing,[40] I disagreed with that view.[41] The ACIP's decision to recommend another dose was not based on waning immunity.[42] Nevertheless, this was another example of consideration being given to waning immunity as a possible explanation for an increase in incidence of a vaccine-preventable disease. As noted above, introduction of a second dose has led to a reduction, but not yet a complete eradication, of chickenpox. It remains to be seen whether chickenpox vaccine will lead to a sustained disease reduction comparable to what was documented in past decades with mumps vaccine, whether waning immunity might contribute to an increase in chickenpox incidence in subsequent decades, and whether a third dose of mumps vaccine, if ultimately recommended, will further enhance the dramatic reduction of mumps incidence the way the second dose of chickenpox vaccine appears to have impacted the incidence of chickenpox.

In summary, there is nothing unusual about a pattern of increased disease incidence after a period of reduction due to vaccination. These patterns include observations of disease incidences of vaccine-preventable diseases in the range of what has occurred for mumps in recent years (or higher) and effectiveness rates in the range that we currently estimate for mumps vaccine. Further, it is typical to consider waning immunity as a possible explanation for such an

---

[40] Chaves S, Gariullo P, Zhang J, et al. Loss of Vaccine-Induced Immunity to Varicella over Time. NEJM. (2007) 356:1121-1129, at 1126.

[41] Gershon, A, Arvin, A, Shapiro, E, et al. Varicella Vaccine. NEJM (2007) 356(25):2648-2649.

[42] 2007 Varicella MMWR at 22.

23

CONFIDENTIAL

increase and to consider the addition of another vaccine dose as a possible strategy to address the increase.

### E. Evaluation of mumps immunity

The effort to understand mumps immunity is subject to the general caveats about the

limitations in scientific knowledge concerning the role of different components of the immune

response to natural virus infections and live viral vaccines. As my colleague Professor Sharon

Chen and I have written: "Whether protective immunity is induced by viral vaccines is often

proved conclusively only after widespread implementation of immunization programs, as

illustrated by the impact of vaccines against childhood diseases, such as measles, mumps and

rubella."[43]  As we noted, "serologic assays are used...even though protection is likely to require

adequate T-cell-mediated immunity."[44]  We elaborated on the role of seroconversion in

understanding protection:

> Effective vaccines are expected to elicit seroconversion in most vaccine recipients,
> which may require the administration of several doses.   Nevertheless,
> seroconversion is not invariably a predictable marker of protective immunity...In
> some cases, detection of any antibodies to viral proteins correlates with protection
> whereas in other cases, a "protective" titer is defined as greater than or equal to a
> particular concentration of antibodies.   The appropriate laboratory marker of
> protection may also differ depending upon the nature of the vaccine being
> evaluated.  For example, inactivated vaccines often elicit higher titers of virus-
> specific antibodies that correlate with protection while live attenuated vaccines are
> more likely to induce cellular immunity and lower antibody titers...Live attenuated
> virus vaccines often induce a more persistent cell-mediated immune response,
> which affords protection even when antibody titers fall below the threshold of
> detection in standard serologic assays.[45]

---

[43] Arvin A, Chen S. Vaccines, Viral. Schaechter ME. The Encyclopedia of Microbiology. Oxford:
Elsevier (2009) 796-804 at 802.  Hereinafter referred to as Arvin and Chen.

[44] Arvin and Chen at 802.

24

CONFIDENTIAL

**Appx1934**

Thus, while assays to measure antibodies and cell-mediated immunity are used to evaluate vaccines, we do this with a recognition of the uncertain relationship between what component of the overall immune response is measured by the assay, and whether the person who has been vaccinated will be protected from disease.

This point is particularly relevant to the effort to understand mumps outbreaks in vaccinated populations. As noted above, waning immunity to mumps has been considered a possible factor. It is conceivable that levels of mumps immunity could fall below a threshold for protection but this cannot be determined definitively by immunologic testing without an assay that is known to correlate with protection. As has been noted by many experts, if waning of immunity is occurring, it "may be a consequence of the success of the mumps vaccination program itself in reducing wild-type virus circulation, resulting in reduced opportunities for periodic boosting, which in the past may have served to maintain immunity"[46] and "[o]ne possibility could be, ironically, the success of the vaccine itself; that is, decreased opportunities for periodic natural boosting."[47]

Because we do not have laboratory assays for immune responses that are accepted as a definitive correlate with protection of the individual, it is not surprising that CDC experts have stated that "[t]he immune response to mumps vaccination probably involves both the humoral

---

[45] Arvin and Chen at 802.

[46] Rubin, Sauder, Carbone at 1038.

[47] Rubin at 679.

25

and cellular immune response, but no definitive correlates of protection have been identified."[48]

Latner and colleagues from the CDC recently observed that "it is not known what (if any) specific humoral or cellular components of the anti-mumps immune response may provide reliable assurance of protection against symptomatic wild-type mumps infection. It is also assumed that neutralizing antibody is likely essential for protection, while cell-mediated immunity (CMI) is perhaps necessary but is probably not sufficient."[49] Thus, in addition to uncertainty about what the data from laboratory tests means about protection from disease, we also cannot be sure whether the more meaningful lab tests would be those measuring humoral immunity or those measuring cellular immunity.

As Professor Chen and I noted, "[i]n practice, the definition of immunologic correlates of vaccine protection is rarely straightforward. The immunogenicity of vaccines is usually assessed by comparison with immune responses that follow natural infection with the same virus, but in most instances, specific correlates of protection are not known for naturally acquired immunity."[50] For example, it has been suggested that a measles antibody titer of 120 IU is likely to be a marker of protection but this has not been proved with certainty.[51] With regard to mumps, it has been noted that "results of virus neutralization assay[s] are difficult to interpret

---

[48] 2013 MMWR at 10.

[49] Latner D, McGrew M, Williams N, et al. Estimates of mumps seroprevalence may be influenced by antibody specificity and serologic method. Clinical Vaccine Immunology. (2014) 3:286-297 at 286.

[50] Arvin and Chen at 802.

[51] Chen R, Markowitz L, Albrecht P, et al. Measles Antibody: Reevaluation of Protective Titers. Journal of Infectious Diseases. (1990) 162:1036-1042, at 1039.

26

CONFIDENTIAL

due to the absence of an established neutralizing antibody titer that can be used as a surrogate

marker of protection"[52] and "numerous attempts to define a level of antibody that correlates with

protection have failed."[53]

My lab conducted a study examining the cellular and humoral immune responses of

adults who were vaccinated with MMR as children. In that paper, we stated:

> The immunogenicity of the mumps vaccine depends on the generation of mumps-
> specific antibodies, particularly neutralizing antibodies, and on the development of
> cell-mediated immunity. . . . The contribution of cell-mediated immunity to protection
> against mumps virus infection has not been clearly defined, but evidence supports the
> importance of T lymphocytes as the main protagonist in the recovery from acute viral
> infection and in providing long-lasting protection from the disease.   Although
> neutralizing antibodies most likely represent the first defense against reinfection with
> viruses, individuals lacking humoral immunity appear to be protected against infection
> or severe disease.[54]

The important point here is that assays that measure humoral immunity, such as plaque

reduction neutralization (PRN) assays, do not measure cell-mediated immunity, and vice versa.

PRN assays can be useful in showing that vaccine recipients have developed a memory immune

response to the vaccine, in other words the vaccine was not "dead" in an immunologic sense.

This information is often part of the data set used by regulators when making initial approval

decisions or to compare different vaccine preparations, depending on the vaccine. However, as

noted above, PRN assays do not reflect the level of cellular immunity, a component of memory

---

[52] Rubin at 673.

[53] Rubin at 674.

[54] Hanna-Wakim R, Yasukawa L, Sung P, Arvin A, Gans H. Immune Responses to Mumps Vaccine in Adults Who Were Vaccinated in Childhood. Journal of Infectious Diseases. (2008) 197:1669-1675 at 1670.

27

**Appx1937**

immunity that is thought to be particularly important for long-term protection. In addition, Cortese and colleagues from the CDC and the FDA have noted: "[M]easurements of virus neutralizing antibody in vitro may not be fully predictive of immunological activity in vivo given that Fc-mediated phagocytosis, antibody-dependent cell-mediated cytotoxicity, and other processes that occur in the host are not reflected in the assays used to measure virus viability in vitro."[55]

Therefore, it is always necessary to understand the limits of what laboratory data tell us about protection from disease. It is even more important to do so when attempting to interpret PRN data for a vaccine against a disease such as mumps, for which the immune mechanism of protection is not known and is likely to be the result of both antibody and cellular immunity working together. Caution is especially warranted if we attempt to draw conclusions about long term immunity based on the results of a PRN assay performed on sera drawn six weeks after vaccination.

The necessary consequence of the absence of a laboratory test that reliably predicts protection from disease is that some public health policy decisions, such as whether to add another dose of mumps vaccine at a later age, must be informed by field studies of the incidence of infection in the population. Such decisions have been made with other vaccines, such as rubella and chickenpox vaccines. The need to make these adjustments in the use of a live virus vaccine over time does not mean that the vaccine is ineffective.

---

[55] Cortese M, Barskey A, Tegtmeier G, et al. Mumps Antibody Levels Among Students Before a Mumps Outbreak: In Search of a Correlate of Immunity. Journal of Infectious Diseases. (2011) 204:1413-1422 at 1420.

28

## V. MY OWN STUDY INVOLVING A MUMPS PLAQUE REDUCTION NEUTRALIZATON ASSAY

In addition to the study in which my lab evaluated mumps immunogenicity in adults, I also led a study of mumps immunogenicity in infants the results of which were published in two papers.[56] The primary focus of the study was the immune response when measles vaccine was given to infants at less than 12 months of age and the effect of the maternal antibodies against measles that are present in the blood of infants for a period of 6-12 months after birth. This is a topic of interest because we would like to vaccinate younger infants during outbreak situations and make the period of measles susceptibility as short as possible. However, if we vaccinate too early, maternal antibodies may interfere with the infant's immune response. As part of this study of age-related changes in the infant immune system, my colleagues and I were interested in determining whether any effects that we might observe were unique to measles. Therefore, we also studied antibody and cell-mediated immune responses of infants to mumps vaccine given at different ages and with or without maternal antibodies to mumps. In this study, 6 and 9-month-old infants were vaccinated with measles live virus vaccine or mumps live virus vaccine (they were then also vaccinated with MMR at 12 months) and 12-month-old infants were vaccinated with MMR. Immunologic assays were done just before vaccination and 12 weeks later.

Humoral immunity to both measles and mumps was measured using PRN assays. The measles PRN assay was done by Dr. Judith Beeler, FDA, and the mumps PRN assay was

---

[56] Gans H, Yasukawa L, Rinki M, DeHovitz R, Forghani B, Beeler J, Audet S, Maldonado Y, Arvin A. Immune Responses to Measles and Mumps Vaccination of Infants at 6, 9 and 12 Months. Journal of Infectious Diseases. (2001) 184:817-826; Gans H, DeHovitz R, Forghani B, Maldonado Y, Arvin AM. Measles and mumps vaccination as a model to investigate the developing immune system: passive and active immunity during the first year of life. Vaccine. (2003) 21:3398-3405.

29

CONFIDENTIAL

Appx1939

performed by Dr. Bagher Forghani, California Department of Health. The mumps PRN assay showed that 16% of 6 month old infants, 14% of 9 month old infants, and 12% of 12-month-old infants had passive antibodies to the mumps virus before vaccination. The results for the subgroup of infants without passive antibodies at the time of vaccination (i.e., the seronegative infants), showed seroconversion rates of 93% at 12 months, 91% at 9 months, and 74% at 6 months.

I have reviewed the clinical study report (CSR) for the Merck clinical trial that I understand to be at issue in this lawsuit. Other than reading the CSR, I have not reviewed the specifics of the PRN assay method used by Merck in the study. I do note, however, two similarities between the findings in our study using Dr. Forghani's PRN assay and the findings in the Merck clinical trial using the Merck PRN assay. First, our study showed that 12% of the 12-month old infants had antibodies to mumps prior to vaccination. According to Table 17 in the CSR, 12.5% of the infants tested with the Merck PRN assay were seropositive prior to vaccination. These two pre-positivity rates are nearly identical.[57] Second, the PRN assay used in our study showed a 93% seroconversion rate among 12 month old infants who were seronegative prior to vaccination. According to Table 21 in the CSR, the seroconversion rate obtained with the Merck PRN for infants in the control arm was 92.2%. These two seroconversion rates are also nearly identical.[58]

---

[57] The point estimates are nearly identical. Although there is no need to conduct a statistical analysis for purposes of the point I am making, if a statistical analysis were done, any difference between the two rates would almost certainly be statistically insignificant.

[58] The point made in footnote 57 applies here, as well.

30

**Appx1940**

Dr. Forghani, whose lab performed the PRN assay for our study, is now retired. He was a highly esteemed investigator at the California State Department of Health who was well-known for his expertise in measuring immunity to viruses and vaccines. In my opinion, the fact that the results obtained by his lab in our study of infants who were given the MMR vaccine were comparable to the results obtained in the Merck study of infants of the same age provides strong support for the validity of the Merck results and for the results that we reported as well. This is especially true given the well-known challenges of performing mumps PRN assays.[59]

Our assessment of measles and mumps cell-mediated immunity is of interest because we showed that infants vaccinated at 6, 9, or 12 months had no age-related differences in their memory T cell immunity, whether or not they had maternal antibodies. Although it had been previously thought that these antibodies would block the immune response to live virus vaccines, we found that this cellular immunity arm of the immune system is activated independently. These observations further reinforce the evidence that assessing memory immunity using only serologic methods, such as PRN assays, provides an incomplete picture of an infant's response to a live virus vaccine. Even if neutralizing antibody responses are poor, or maternal antibodies interfere with humoral immunity, the data showed that an initial dose of measles or mumps live virus vaccine prior to the age of one year old elicited T cells that recognize virus-infected cells and would be expected to prime the immune system and potentially protect against severe disease following an exposure to measles or mumps.

Dated: 6/11/18

Ann M. Arvin, MD

---

[59] Mumps Module at 9.

31

CONFIDENTIAL

**Appx1941**

Number of Pertussis Cases Reported Annually (1922 to 2017)

Figure 1[60]



---

[60] Pertussis Cases by Year (1922-2015) located at https://www.cdc.gov/pertussis/surv-reporting/cases-by-year.html; Centers for Disease Control and Prevention. National Notifiable Disease Surveillance System. Weekly Tables of Infectious Diseases Data. (Table II) Atlanta, GA. CDC Division of Health Informatics and Surveillance. (https://stacks.cdc.gov/view/cdc/52258). The websites in this footnote were last accessed on June 10, 2018.

Number of Mumps Cases Reported Annually (1968 to 2017)

Figure 2[61]



[61] Center for Disease Control. Annual Summary 1977. MMWR (1978) 26 (53): 1-77 at 2; Center for Disease Control. Annual Summary 1980. MMWR (1981) 29 (54): 1-128 at 12; Centers for Disease Control and Prevention. Summary of Notifiable Diseases—United States, 2012. MMWR (2014) 61 (53): 1-121 at 105, 107, 109, 111; Centers for Disease Control and Prevention. Summary of Notifiable Diseases—United States, 2013. MMWR (2015) 62 (53): 1-119 at 31; Centers for Disease Control and Prevention. Summary of Notifiable Infectious Diseases and Conditions—United States, 2014. MMWR (2016) 63 (54): 1-152 at 31; Centers for Disease Control and Prevention. Summary of Notifiable Infectious Diseases and Conditions—United States, 2015. MMWR (2017) 64 (53): 1-143 at 32; Centers for Disease Control and Prevention. National Notifiable Disease Surveillance System. 2016 Annual Tables of Infectious Diseases Data. (Table 1) Atlanta, GA. CDC Division of Health Informatics and Surveillance, 2017. (https://wonder.cdc.gov/nndss/static/2016/annual/2016-table1-H.pdf); Centers for Disease Control and Prevention. National Notifiable Disease Surveillance System. Weekly Tables of Infectious Diseases Data. (Table II) Atlanta, GA. CDC Division of Health Informatics and Surveillance. (https://stacks.cdc.gov/view/cdc/52258). The websites identified in this footnote were last accessed on June 10, 2018.

CONFIDENTIAL

**Appx1943**

Number of Varicella Cases Reported Annually (1995 to 2017)

Figure 3[62]



[62] Centers for Disease Control and Prevention. Summary of Notifiable Diseases—United States, 2012. MMWR (2014) 61 (53): 1-121 at 106, 108, 110; Centers for Disease Control and Prevention. Summary of Notifiable Diseases—United States, 2013. MMWR (2015) 62 (53): 1-119 at 31; Centers for Disease Control and Prevention. Summary of Notifiable Infectious Diseases and Conditions—United States, 2014. MMWR (2016) 63 (54): 1-152 at 31; Centers for Disease Control and Prevention. Summary of Notifiable Infectious Diseases and Conditions—United States, 2015. MMWR (2017) 64 (53): 1-143 at 32; Centers for Disease Control and Prevention. National Notifiable Disease Surveillance System. 2016 Annual Tables of Infectious Diseases Data. (Table 1) Atlanta, GA. CDC Division of Health Informatics and Surveillance, 2017. (https://wonder.cdc.gov/nndss/static/2016/annual/2016-table1-H.pdf); Centers for Disease Control and Prevention. National Notifiable Disease Surveillance System. Weekly Tables of Infectious Diseases Data. (Table II) Atlanta, GA. CDC Division of Health Informatics and Surveillance. (https://stacks.cdc.gov/view/cdc/52262). The websites identified in this footnote were last accessed on June 10, 2018.

CONFIDENTIAL

Appx1944

10/25/2019
Declaration of G. Reilly
EXHIBIT 11

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES                    Public Health Service

Centers for Disease Control
and Prevention (CDC)
Atlanta GA 30329-4027

May 24, 2018

Ms. Kathleen S. Hardway
Attorney at Law
Venable LLP
750 E. Pratt Street, Suite 900
Baltimore, Maryland 21202

Re: Request for Deposition Testimony - *United States ex rel. Krahling v. Merck & Co, Inc.*, No.
10-4374 (E.D. Pa.); *In Re: Merck Mumps Vaccine Antitrust Litigation*, No. 12-3555 (E.D. Pa.)

Dear Ms. Hardway:

This is in response to your January 10, 2018 letter requesting testimony from and expert
consultation by two former employees of the Centers for Disease Control and Prevention (CDC)
and two former members of CDC's Advisory Committee on Immunization Practices (ACIP) on
behalf of Merck & Co., Inc. in the above-captioned *Qui Tam* False Claims Act and antitrust
cases regarding Merck's mumps-containing vaccines. The relators and plaintiffs in this
consolidated litigation generally allege that Merck misrepresented the effectiveness of its
mumps-containing vaccines to the U.S. Department of Health and Human Services (HHS) in
terms of Food and Drug Administration licensure of these vaccines, CDC's recommendations on
the use of vaccines, and the vaccines' sale to the CDC for administration in the Vaccines for
Children (VFC) Program. They further allege Merck engaged in anti-competitive practices.

CDC is a component agency of HHS. Pursuant to HHS regulations codified in 45 C.F.R. Part 2,
current and former HHS employees are not authorized to participate, give depositions or trial
testimony, or provide consultation regarding information acquired in the performance of their
official duties in private litigation or other proceedings in which the United States is not a party,
absent authorization by the agency. The bases for this policy, as articulated in Section 2.1(b), are
to minimize the disruption of official duties and the necessity of the Department to maintain
impartiality in disputes between private litigants. In *United States ex rel. Touhy v. Ragen*, 340
U.S. 462 (1951), the Court recognized the authority of federal agencies to limit their employees'
involvement in such actions. The Eleventh Circuit U.S. Court of Appeals has also specifically
recognized HHS's authority to limit the involvement of CDC employees in such litigation. [see
*Moore, et al. v. Armour Pharmaceutical Co., et al.*, 927 F.2d 1194 (11th Cir. 1991)].

**Appx1946**

Section 2.4 of the *Touhy* testimony regulations requires the satisfaction of three criteria before testimony by a current or former HHS employee is allowed. First, the request must be made in writing and state the nature of requested testimony. Second, the request must explain why the testimony is unavailable by any other means. Finally, the request must provide reasons why the testimony would be in the interests of HHS or the Federal Government.

After consulting with the Office of the General Counsel regarding your request, I have determined that the testimony and consultation you seek is in the interest of HHS/CDC to the extent not otherwise available through production of documents through the Freedom of Information Act (FOIA) or through relevant testimony and documents available in the private sector or from other federal agencies. Merck counsel have submitted FOIA requests to CDC and the agency has responded by providing relevant agency materials.

While the U.S. government is not currently a party intervenor to this litigation, CDC has a clear interest in the outcome of the two cases given its public health mission to decrease vaccine-preventable infectious diseases, in particular in pediatric populations, and to do so efficiently at an appropriate cost to the public. CDC and its Advisory Committee on Immunization Practices (ACIP) effectively define the standard of medical care through recommendations on the proper use of pediatric and adult vaccines. Critical to that is the agency receiving accurate information from the vaccine manufacturers to better inform CDC/ACIP guidance. In addition, CDC has a major programmatic role in accomplishing reduction in vaccine-preventable infectious disease through the agency's VFC Program by using scarce public health federal funding to purchase effective vaccines for administration to children by public and private VFC providers throughout the country. In that role, CDC is the largest purchaser of mumps vaccine in the United States.

You have requested testimony on the following matters:

1. The sophistication, knowledge and processes of CDC and ACIP, with specific regard to mumps, the mumps vaccines, and mumps outbreaks.
2. CDC's understanding of the public health consequences if the mumps virus is uncontrolled, and the impact the mumps vaccine has had on the number of reported cases of mumps since the initial introduction of the vaccine.
3. The factors considered by CDC and ACIP in their evaluation of a vaccine, including specifically the mumps vaccine and the role of effectiveness and immunogenicity data in those evaluations.
4. The VFC program, including specifically the basis for CDC vaccine purchases under the program, including the mumps vaccine.
5. CDC's and ACIP's understanding of the safety, efficacy and effectiveness of Merck's mumps vaccine, and the basis for that understanding.
6. CDC's and ACIP's monitoring of the safety and effectiveness of Merck's mumps vaccine.

7.  CDC's and ACIP's recommendations concerning Merck's mumps vaccine, including the basis for those recommendations.

In the interest of CDC in this litigation, I am authorizing requested testimony and consultation by former CDC employees Dr. William Atkinson and Mr. William Nichols, and two former Special Government Employees who are former members of the ACIP, Dr. Jonathan Temte and Dr. Cody Meissner, regarding the matters specified above, subject to the parameters that follow:

1.  The scope of any testimony regarding CDC/ACIP matters shall be limited to that necessary to address the needs of this litigation and in the interest of the public health mission of CDC.
2.  Notwithstanding the way you characterize the requested testimony above, these former CDC employees and ACIP members can only represent their own views and experiences in testimony and reports and cannot represent CDC's or the ACIP's views, including in terms of potential future agency/committee actions. Accordingly, at the outset of any testimony, in deposition or at trial, these four individuals must state for the record that their testimony represents their own views and does not represent the official positions of HHS or the CDC. Further, the witnesses are not authorized to testify about any privileged information they obtained, or privileged communications they had, while working for CDC or serving as a member of the ACIP.
3.  Merck legal counsel shall provide CDC with timely notice of any depositions or trial testimony by any of these four individuals. In addition, agency counsel and U.S. Department of Justice (DOJ) counsel must be allowed to participate in any depositions of these four individuals.
4.  Merck legal counsel must allow CDC and DOJ to review all deposition transcripts and, if appropriate, lodge any legal objections to the witnesses' testimony during the deposition or prior to their being filed with the court or otherwise used in any way in support of this or other litigation.
5.  Further, this *Touhy* approval is conditioned on providing CDC the opportunity for timely review of any expert reports prepared in whole or in part by any of these four individuals prior to use in any testimony or other public use in this litigation.

This limited approval of your *Touhy* requests is not an endorsement by HHS or CDC of the accuracy of any statements that the witnesses may make in a report, a deposition or as witnesses at trial. CDC reserves the right to correct inaccuracies by filing a brief with the court or by otherwise correcting the record in an appropriate manner.

Finally, you have requested that should any of these former CDC employee and/or former ACIP member witnesses become unavailable during the litigation whether you could reach out directly to agency legal counsel Kevin Malone to seek approval of replacement witnesses. I will take that under advisement in concert with the Office of the General Counsel should such a circumstance

**Appx1948**

Hardway – Page 4

present and determine at that time an expeditious way to consider approval of any proposed substitute former CDC employee and/or former ACIP member witnesses.

Please contact Mr. Malone in the Office of the General Counsel with any questions regarding this *Touhy* approval. In addition, this approval is contingent on providing Mr. Malone timely written notice of any depositions and trial testimony, along with other information specified above. You can reach him at KMalone@cdc.gov or (404) 639-7201.

Sincerely,

Robert R. Redfield, M.D.
Director, CDC

cc:    William Atkinson, M.D.
       William Nichols
       Jonathan Temte, M.D.
       Cody Meissner, M.D.
       Nancy Messonnier, M.D.
       Kevin M. Malone, Esq.
       Joel M. Sweet, Esq.
       Gerald B. Sullivan, Esq.
       Holly Snow, Esq.

Appx1949

10/25/2019
Declaration of G. Reilly

EXHIBIT 12

![HHS Logo] U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES      Public Health Service

Centers for Disease Control
and Prevention (CDC)
Atlanta GA 30329-4027

September 26, 2017

Ms. Lisa Dykstra
Attorney at Law
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, Pennsylvania 19103-2921

Ms. Hamsa Mahendranathan
Attorney at Law
Constantine Cannon LLP
335 Madison Avenue
New York, New York 10017

Re:  Requests for Deposition Testimony - *United States ex rel. Krahling v. Merck & Co, Inc.*, No. 10-4374 (E.D. Pa.); *In Re: Merck Mumps Vaccine Antitrust Litigation*, No. 12-3555 (E.D. Pa.)

Dear Ms. Dykstra and Ms. Mahendranathan:

This is in response to your November 18, 2016 and February 22, 2017 letters, respectively, requesting deposition testimony by employees of the Centers for Disease Control and Prevention (CDC) in the above-captioned *Qui Tam* False Claims Act and antitrust cases regarding Merck's mumps-containing vaccines. The relators and plaintiffs in this consolidated litigation generally allege that Merck misrepresented the effectiveness of its mumps-containing vaccines to the U.S. Department of Health and Human Services (HHS) in terms of Food and Drug Administration licensure of these vaccines, CDC's recommendations on use of vaccines, and sale to the CDC for administration in the Vaccines for Children (VFC) Program, and further allege Merck engaged in anti-competitive practices.

CDC is a component agency of HHS. Pursuant to HHS regulations codified at 45 C.F.R. Part 2, HHS employees are not authorized to participate, give depositions or trial testimony, or provide consultation in their official capacities in private litigation or other proceedings in which the United States is not a party, absent authorization by the agency. The bases for this policy, as articulated in Section 2.1(b), are to minimize the disruption of official duties and the necessity of the Department to maintain impartiality in disputes between private litigants. In *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), the Court recognized the authority of federal agencies to limit their employees' involvement in such actions. The Eleventh Circuit U.S. Court of Appeals has specifically recognized HHS's authority to limit the involvement of CDC employees in such litigation. *Moore, et al. v. Armour Pharmaceutical Co., et al.,* 927 F.2d 1194 (11th Cir. 1991).

Section 2.4 of the testimony regulations requires the satisfaction of three criteria before testimony by an HHS employee is allowed. First, the request must be in writing and state the nature of requested testimony. Second, the request must explain why the testimony is unavailable by any other means. Finally, the request must provide reasons why the testimony would be in the interests of HHS or the Federal Government.

After consulting with the Office of the General Counsel regarding your requests, I have determined that

Page 2 – Dykstra and Mahendranathan

the deposition testimony you seek is in the interest of HHS/CDC to the extent not otherwise available through production of documents through the Freedom of Information Act (FOIA) or through relevant testimony and documents available in the private sector or from other federal agencies. Both parties have submitted FOIA requests to CDC and the agency has responded by providing relevant agency materials.

While the U.S. government is not currently a party intervenor to this litigation, CDC has a clear interest in the outcome of the two cases given its public health mission to decrease vaccine-preventable infectious diseases, in particular in pediatric populations and to do so efficiently at an appropriate cost to the public. CDC and its Advisory Committee on Immunization Practices (ACIP) effectively define the standard of medical care through issuance to the medical community of recommendations on proper use of pediatric and adult vaccines. Critical to that is the agency receiving accurate information from the vaccine manufacturers to better inform CDC/ACIP guidance. In addition, CDC has a major programmatic role in accomplishing reduction in vaccine-preventable infectious disease through the agency's VFC Program using scarce public health federal funding to purchase effective vaccines for administration to children by public and private VFC providers throughout the country. In that role, CDC is the largest purchaser of mumps vaccine in the United States.

Therefore, in the interest of CDC in this litigation, I am authorizing deposition testimony of two CDC employees, Dr. Mark Pallansch, Division Director, Division of Viral Diseases; and Mr. Alan Sims, Lead Contract Specialist. These witnesses are each authorized to testify at a deposition not to exceed seven hours.

The two parties have requested deposition testimony as follows:

**Topics from Merck**

**Topic 1**: The basis for CDC's recommendation that children routinely receive two doses of the measles-mumps-rubella vaccine.
- CDC's mission and CDC's strategy for the reduction and/or elimination of mumps in the United States.
- The process through which CDC and the Advisory Committee on Immunization Practices (ACIP) establish and update vaccine recommendations.
- The basis for CDC and ACIP recommendations regarding the measles-mumps-rubella vaccine.
- A description of how CDC monitors the incidence of mumps in the United States.
- CDCs assessment of the impact of Merck's mumps vaccines (defined, consistent with our May 18,2015 requests, as including MumpsVax, MMR®, M-M-R®II, MMR-V and/or ProQuad®) on the reduction in incidence of mumps in the United States from 1966 to the present.
- CDCs assessment regarding whether a new mumps vaccine is needed.

**Topic 2**: CDCs and ACIP's knowledge of and expectations regarding the (a) efficacy, (b) effectiveness, (c) immunogenicity (including analyses of the extent to which vaccine recipients develop antibodies or seroconvert after receiving the vaccine), (d) shelf-life, and (e) safety of Merck's mumps vaccines.
- How CDC defines vaccine efficacy, effectiveness, immunogenicity and shelf-life.
- CDCs and ACIP's knowledge of and understanding regarding the efficacy of Merck's mumps vaccines.
- CDCs and ACIP's knowledge of and understanding regarding the effectiveness of Merck's mumps vaccines.
- CDCs and ACIP's knowledge of and understanding regarding the immunogenicity of Merck's

**Appx1952**

mumps vaccines.

- CDCs and ACIP's knowledge of and understanding regarding the shelf-life for Merck's mumps vaccines.
- CDCs and ACIP's assessment regarding whether Merck's mumps vaccines are safe.
- CDCs assessment of the incidence of vaccine failures associated with Merck's mumps vaccines.
- CDCs assessment of adverse events associated with Merck's mumps vaccines.
- The basis for CDC contract requirements that vaccines have a shelf-life of 12 months.
- CDCs knowledge of and understanding regarding how vaccine efficacy is tested or measured.
- CDCs and ACIP's knowledge of and understanding regarding how vaccine effectiveness is assessed.
- A description of any plaque reduction neutralization (PRN) assays used by CDC to assess the immunogenicity of Merck's mumps vaccine.
- A description of any enzyme-linked immunosorbent assays (ELISA) used by CDC to assess the immunogenicity of Merck's mumps vaccine.
- The basis for CDCs public statements about the efficacy and effectiveness of Merck's mumps vaccines.
- CDCs and ACIP's reliance on Merck representations regarding the efficacy, effectiveness, immunogenicity and shelf-life of Merck's mumps vaccine at the time that CDC recommends routine administration of the measles-mumps-rubella vaccine.
- Studies or monitoring CDC has conducted on its own or funded to measure the efficacy, effectiveness, immunogenicity, and/or shelf-life of Merck's mumps vaccines.
- Communications CDC or ACIP have had with other federal agencies or programs (specifically, FDA, the National Vaccine Program, and the National Institutes of Health) related to the efficacy, effectiveness, immunogenicity, and/or shelf-life of Merck's mumps vaccines.

**Topic 3**: CDC's and ACIP's assessment of the cause of the mumps outbreaks in 2006 and 2009-2010, including the results of any research into the extent to which Merck's mumps vaccine contributed to those outbreaks.

- The results of any studies, monitoring or tests CDC conducted relating to the cause of the outbreaks.
- The results of any studies, monitoring or tests CDC conducted relating to the extent of the outbreaks.
- The results of any studies, monitoring or tests CDC conducted relating to the role of Merck's mumps vaccine in causing or contributing to the outbreaks.
- Discussions and/or communications between CDC / ACIP and Merck or between CDC / ACIP and FDA regarding an investigation into the outbreaks.

**Topic 4**: The basis for CDC's decision to contract for and purchase Merck's mumps vaccine and CDC's assessment of Merck's compliance with the terms of its contracts with CDC.

- A description of the process through which CDC contracts with vaccine manufacturers to purchase vaccines.
- A description of the process through which CDC contracts with Merck to purchase Merck's mumps vaccines.
- An overview of the criteria used in deciding to purchase any vaccine.
- An overview of the criteria used in making the decision to purchase Merck's mumps vaccines.
- Details regarding each implied obligation, requirement, and/or condition of payment that Merck must adhere to under CDC's contracts with Merck for the purchase of Merck's mumps vaccines.

Appx1953

Page 4 – Dykstra and Mahendranathan

- Whether the (a) efficacy, (b) effectiveness, (c) immunogenicity, or (d) potency of Merck's mumps vaccine are express or implied obligations, requirements, and/or conditions of payment that Merck must adhere to in supplying mumps-containing vaccines to CDC pursuant to CDC's contracts with Merck.
- The process through which CDC evaluates whether product has met the shelf-life requirements of a CDC contract.
- Communications between CDC and Merck or between CDC and FDA regarding the shelf-life of Merck's mumps vaccines.
- The extent to which compliance with shelf-life requirements in the CDCs contract has ever impacted CDCs decision to purchase or pay for Merck's mumps vaccine.

**Topic 5**: The factors influencing the price that CDC paid for Merck's mumps vaccines.
- How prices are determined for Merck's mumps vaccines.
- The process through which prices are determined for CDCs purchase of Merck's mumps vaccines.
- The extent of any negotiations between Merck and CDC regarding prices for Merck's mumps vaccines.
- The extent to which efficacy, effectiveness, immunogenicity, and/or potency of Merck's mumps vaccines affect the price CDC is willing to pay for the vaccines.

## Topics from the Relators

1. The importance to, and expectations of, the CDC of the efficacy[1] of Merck's mumps vaccines.[2]
2. The CDC's mumps eradication goals and how they have changed from 2000 to the present.
3. The CDC's understanding in the 2006 timeframe of the efficacy of Merck's mumps vaccines.
4. The CDC's current understanding of the efficacy of Merck's mumps vaccines and how that understanding has changed since 2006.
5. Mumps outbreaks in the U.S. from 2006 to the present and the CDC's understanding as to their causes.
6. The CDC's understanding as to the likelihood of continued U.S. mumps outbreaks and their potential causes.
7. The CDC's view as to the need to research and develop a new mumps vaccine.
8. The CDC's position on having sole suppliers versus multiple suppliers in connection with the purchase of vaccines.
9. The factors the CDC considers in its decisions to purchase vaccines, especially with respect to mumps vaccines.
10. The factors the CDC considers in its mumps vaccine scheduling recommendations.
11. The contractual obligations and other requirements the CDC imposes on Merck in connection with the purchase of Merck's mump vaccines relating to quality, safety, potency, efficacy and shelf-life.
12. The obligation of vaccine manufacturers to disclose to the CDC any issues concerning the safety or efficacy of their vaccines, and the importance that manufacturers comply with that obligation.
13. The obligation of the CDC to disclose to the public any issues concerning the safety or efficacy of their vaccines, and the importance of the CDC to comply with that obligation.

--------------------------------------------------------

[1] References to efficacy also mean effectiveness, immunogenicity, seroconversion rates and any other measure of how well Merck's mumps vaccines protect vaccine recipients from contracting the disease.
[2] References to Merck's mumps vaccines mean the mumps component of any vaccine manufactured by Merck designed to inoculate or otherwise protest the vaccine recipient from contracting mumps, and

Page 5 – Dykstra and Mahendranathan

includes the mumps components of Mumpsvax, MMR, MMRII, ProQuad and MMRVaxpro.

The scope of the depositions of Dr. Pallansch and Mr. Sims and timeframe of the questions shall be limited to that necessary to address the needs of this litigation and in the interest of the public health mission of CDC, and further limited to information not otherwise reasonably available to the parties. The timeframe for questions shall be limited to 1999 to the present or more recently as otherwise limited in the requests above.

The CDC witnesses will not be providing (a) speculation, (b) opinions (as contrasted with what CDC has officially stated), (c) testimony on what is already in the public domain or is otherwise available to the parties, or (d) insights into CDC internal workings that are not already publicly known or would reveal confidential CDC negotiation tactics and other confidential procurement information.

Currently scheduled dates are October 12, 2017, for the deposition of Mr. Sims and October 13, 2017, for Dr. Pallansch's deposition. Please contact Mr. Kevin Malone in the Office of the General Counsel to coordinate scheduling and logistics for the two depositions. You can reach him at KMalone@cdc.gov or (404) 639-7201.

Sincerely,

Anne Schuchat, MD (RADM, U.S. Public Health
   Service)
Principal Deputy Director, CDC

Cc:    Mark A. Pallansch, MD
       Alan Sims
       Kevin M. Malone
       Joel M. Sweet
       Gerald B. Sullivan
       Holly Snow

# 10/25/2019
# Declaration of G. Reilly
# EXHIBIT 13

# HHS.gov

**U.S. Department of Health & Human Services**

---

### Testimony

Statement by
**Jesse Goodman, M.D., M.P.H.**
**Director Center for Biologics, Evaluation and Research**
**Food and Drug Administration**
**U.S. Department of Health and Human Services**

on
**FDA's Role in the Regulation of Vaccines**

before
**Committee on Homeland Security**
**Subcommittee on Emerging Threats, Cybersecurity, and Science and Technology**
**U.S. Department of Health and Human Services**

**Wednesday April 18, 2007**

Good afternoon Mr. Chairman and members of the Committee, I am Jesse L. Goodman, M.D., M.P.H., Director of the Center for Biologics Evaluation and Research (CBER) at the United States Food and Drug Administration (FDA). I am also a practicing infectious diseases physician and a microbiologist. CBER is the Center within FDA that is responsible for the regulation of most biological products, including vaccines, blood and blood products, and cellular, tissue and gene therapies. Thank you for the opportunity to discuss FDA's role in the regulation of vaccines including those intended for use in response to a threat to our national security.

At CBER, enhancing the nation's preparedness is one of our highest priorities, whether it is protecting the safety of our blood supply from emerging threats like West Nile Virus or facilitating the development of vaccines needed to face natural threats or potential deliberate threats, from pandemic flu to smallpox to anthrax. It is essential to do all we can to assure that such products be safe, and that they work. Therefore, while working closely with many partners to achieve our nation's and our global preparedness goals, our most critical and unique responsibility is to also do all that is possible to provide an objective, scientific assessment of the safety and efficacy of these and other biologic products. To help provide perspective, I am going to discuss relevant issues in vaccine development that illustrate the opportunities and challenges faced in developing these important products. As you know, under applicable laws and regulations, information provided to FDA concerning a specific investigational product is not available for public disclosure prior to licensure of the product.

Vaccines are different from most drugs in several respects and achieving the highest quality in manufacturing can be especially challenging and critical. Vaccines production frequently utilizes living cells and organisms, as well as complex growth conditions and materials often derived from living sources. The manufacturing process for vaccines usually includes many steps and requires frequent in-process monitoring of the product and components to assure that the product is safe, pure, and potent.

The production of most vaccines requires the growth of the immunizing agent (i.e. bacteria, virus, etc.) or the genetically engineered expression, in living cells, of recombinant immunizing proteins derived from that agent. The conditions for accomplishing this are complex and subtle, and even undetected or poorly understood changes in process or materials can significantly affect the composition of the vaccine and its safety, efficacy, or both. Thus, the process must be well controlled and monitored, and produce a consistent and well characterized product prior to its licensure. Even after licensure, manufacturers conduct a series of tests on the bulk, intermediate and final vaccine products and typically are required both to meet all product and process specifications and to submit the results of key tests, along with samples of the product to CBER for evaluation prior to CBER's approval of lot release and administration of vaccine. The tests performed on the final product may include those for sterility, identity, purity, and potency to assess immunogenicity and/or antigen content and, depending on the nature of the vaccine and its manufacturing process, additional tests as required by CBER to assure vaccine safety and quality.

Unlike drug products that are most often used to treat an existing illness or condition, vaccines are generally administered to large numbers of healthy individuals in order to prevent infectious diseases. Therefore, the potential adverse effects of vaccines, even if the events are rare, present unique risk-benefit considerations and may give rise to heightened concerns in the public health context.

From a regulatory perspective, there are four major stages in vaccine development. These stages include:

- The preclinical stage which consists of the development and testing of the product prior to the product being tested in humans. Early in the product development process, sponsors test candidate vaccines *in-vitro* (e.g., in laboratory assays, studies in cell lines, etc) and in

Appx1957

animals.  These early nonclinical studies give an indication of whether studies would be reasonably safe to proceed in humans and may also provide information regarding the potential effectiveness of the product.

• The Investigational New Drug (IND) stage consisting of multiple phases where the investigational product is studied in human subjects under well-defined conditions and with careful monitoring. In certain cases where studies to demonstrate efficacy in humans are not ethical or feasible, sponsors may conduct studies to demonstrate efficacy of the product in appropriate animal models.

• The license application stage is when manufacturers submit data and information regarding the results of the clinical and nonclinical studies, as well as complete information regarding the product and its manufacturing process to FDA for a complete review of product manufacturing, safety and effectiveness in support of licensure.

• Finally, for products that are approved, FDA continues its oversight during the post licensure stage to include review of post-marketing safety information from adverse event reports, periodic reports, post-marketing studies, review of lot release information and testing, and inspections of manufacturing facilities.

FDA often provides guidance to sponsors, even prior to submission of an IND, in regard to both the types of preclinical studies needed and the design of the clinical trials needed to assess the intended use(s) of the product.  FDA's guidance is intended both to help protect human subjects and to assure that the studies performed are designed in such a manner that the study results are likely to provide sufficient information to allow a determination of the product's safety and efficacy.

While all medical product development is challenging, vaccine development is especially complex, and we expect that new challenging issues will arise during the development process.  The issues may arise in any number of areas, and may affect product potency, quality, and safety. Such issues can raise safety or study design concerns that may result in FDA placing an IND on clinical hold.  A clinical hold is an order by FDA not to initiate or continue clinical studies until the issues of concern have been satisfactorily addressed.  It is important to note that most clinical hold issues are eventually resolved, allowing product development to proceed.  I'd like to describe some of the more typical reasons for FDA to place a trial on hold; FDA may determine that study participants would be exposed to an unreasonable and significant risk of illness or injury.  Or, the IND application may not have sufficient information for FDA to adequately assess the risk. For later phase studies, FDA may place an IND on hold if the study plan or protocol is deficient in design to meet its stated objectives. Clinical hold is an important human subject protection safeguard and also helps prevent the conduct of studies of investigational products that are unlikely to provide information that is useful in evaluating the product.  FDA staff spends a considerable amount of time interacting with sponsors to resolve clinical hold issues.

FDA strives to develop processes that facilitate product development to meet emerging public health needs, such as protection from terrorist agents and prevention of pandemic influenza and other emerging threats.  The regulation known as the "Animal Rule" provides a mechanism for FDA to approve medical treatments based on effectiveness data from animal studies when human efficacy studies are unethical and/or not feasible. Under the "Animal Rule," effectiveness would be evaluated in adequate and well-controlled animal studies that establish that the product is reasonably likely to produce clinical benefit in humans. Such approvals also require the demonstration of safety in humans.   These safety studies may be conducted concurrently with the animal studies.

An additional tool available to speed product availability is the ability for FDA to allow the use of unapproved products and unapproved uses (so-called "off-label" uses) of approved products, in a declared emergency, under the Emergency Use Authorization (EUA) provision of the Food, Drug, and Cosmetic Act.  This authority was expanded under the Project BioShield Act. To authorize such emergency use, FDA would need to find that the agent can cause a serious or life-threatening disease or condition; that based on the available information it is reasonable to believe that the product may be effective against the disease or condition; that the known and potential benefits of the product's use outweigh the known and potential risks; and that there is no adequate, approved and available alternative.

 FDA works very hard to develop and define innovative and needed pathways and evaluation tools, and to provide technical assistance to facilitate development and availability of needed products that are safe and effective. One of our most critical and core roles is to protect human subjects and to provide an independent scientific assessment of the product, both during the development process, and in reviewing product applications and requests for EUA.

Appx1958

To protect and preserve our scientific independence and judgment, FDA does not involve itself in specific HHS contracting decisions to award or terminate contracts. FDA's longstanding practice is to recuse ourselves from HHS decision making in specific contracting decisions. This was our process at the time of HHS's VaxGen acquisition contract and it remains so today. FDA does provide scientific and technical expertise on various HHS-led interagency counterterrorism working groups, which among other things are involved in defining the needs for medical countermeasures being pursued by HHS for the Strategic National Stockpile. In addition, FDA may provide technical comments to HHS upon request on draft Requests for Proposals for such countermeasures.

At FDA, providing the American public with safe and effective medical products is our core mission. We base important decisions, such as to allow specific human studies of an investigational product, or to approve a vaccine or allow its emergency use, on the available scientific information and a careful evaluation of risks and benefits to patients. We also are fully committed and engaged in continuing to work with our federal partners and with product developers to provide an efficient product development pathway to achieve our nation's high priority public health preparedness goals.

Thank you again for this opportunity to discuss vaccine development with the Committee. I welcome your comments and questions.

Last revised: June 18, 2013

Appx1959

10/25/2019
Declaration of G. Reilly
EXHIBIT 14

Merck & Co., Inc.
P.O. Box 4
West Point, PA 19486-0004

Via Overnight Mail

Via Overnight Mail

23 March 2006



MERCK
Manufacturing Division

Jacqueline Little, Ph.D.
Team Leader, Team Biologics Compliance
U.S. Food and Drug Administration
Office of Enforcement
15800 Crabbs Branch Way, HFC-210/Suite 110
Rockville, MD 20855

RE:    Team Biologics Inspection
       Merck & Co., Inc. – West Point, PA
       07 to 24 February 2006
       Form 483 Response

Dear Dr. Little:

This letter responds to the FDA Form 483 observations presented to us at the conclusion of the Team Biologics portion of the Inspection of our West Point, Pennsylvania facility during the period of 07 to 24 February 2006.

REDACTED – OMP
REDACTED – OMP ................................................................................ From 20 to 24 February, CDER also performed its Biennial Inspection of the Non-Sterile Pharmaceutical area. That inspection led to no 483 observations.

We very much appreciate the professional and insightful manner in which the Investigators conducted the inspection. During the course of the inspection and development of our responses, Mr. Richard Clark, CEO and President of Merck, Mr. Willie Deese, President of the Merck Manufacturing Division, and Dr. Michael Angelo, Senior Vice President of Quality, were kept fully informed. They have all expressed a strong commitment to providing the support necessary to facilitate the implementation of effective corrective actions.

We recognize that we are the sole supplier to the United States of measles, mumps, rubella and varicella containing vaccines, and as such, we are responsible for ensuring the uninterrupted supply of safe and efficacious vaccines. Therefore, we take all FDA Investigators' observations and discussion points very seriously. As such, our response will summarize not only the specific action to each observation, but will also reflect what we are doing to ensure the Quality system associated with each Inspectional finding is

*Information and data submitted herein contain trade secrets, or privileged or confidential business information, and are the property of Merck & Co., Inc. Government agencies are not authorized to make public without written permission from Merck & Co., Inc.*

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA00214088
MRK-CHA00214088

Appx1961

strengthened as a result of the Inspection and discussion with the Investigative team. Specifically, you will find in the response our corrective action plans as described in the following summary:

1. <u>Live Virus Vaccine Cans</u> - We understand the importance of assuring that our stainless steel cans used for the storage of bulk live virus vaccines are integral and have followed our comprehensive can evaluation process since 2002. We have further accelerated the helium leak test assessment of remaining stainless steel cans in order to complete "per-use" testing (helium leak testing before and after use in manufacture) of all cans in use by December 2006. Additionally, we have developed a prioritized assessment, for those specific cans that we believe represent the greatest priority, to be completed by 30 June 2006. It is important to note that our experience has shown that the potential for a can to develop a significant weld defect (that could impact product quality) during use after it has a passing helium leak test in its history is unlikely. Nevertheless, by the end of this year we will have eliminated any future risk of marketed material being implicated by a potential non-integral can. Our control procedures will further ensure that if a can is detected that does not meet our pre-defined can evaluation criteria and affects marketed material during this period, we will carefully evaluate this can in accordance with our can evaluation process (previously shared with the Agency). Should this occur, a formal recommendation regarding the marketed material will be made to the Senior Vice President of Quality, consistent with our Divisional Procedure 10.10. This procedure defines requirements for Quality investigations that affect marketed material. Additional system oriented improvements associated with the management of our stainless steel bulk vaccine storage cans, as described in our response, include the re-evaluation of the can business process and formalization of this process into an approved Quality procedure, implementation of formal controls associated with the reporting of potential non-integrity events and elevation of the decision-making process to senior Quality management at the site.

2. <u>Certification of HEPA Filters</u> - We understand the importance of ensuring investigations for HEPA leaks detected at greater than 0.01% and that these investigations should include reviews of sterility tests and media challenges. We are revising our SOPs associated with HEPA filter testing to require investigations for all HEPA filter repairs greater than 0.01% and to require reviews of sterility failures and media challenge performance since the last HEPA certification. These changes will be fully operational by 31 May 2006.

3. <u>Bulk Biologic Stability Program and Hold Times</u> - We understand the importance of defining all aspects of our bulk biologic stability program and hold times, including ensuring that stability samples adequately reflect the actual production container. Consistent with our internal Quality Assessment regarding bulk biologic stability conducted in 2005, we are committed to implementing these system program changes as more fully described in our response.

4. <u>BPDRs</u> - We understand the importance of timely submission of Biological Product Deviation Reports. As a result, we are reviewing our Quality system relating to such reports in its entirety to ensure that it includes, at a minimum, clearer expectations related to what triggers a report to be filed, when a report should be filed, what information should be reported and the breadth of information to be included in the report. As a result of this review, our procedures relating to reporting Biological Product Deviation Reports, will be enhanced and training completed by 14 April 2006.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA00214089
MRK-CHA00214089

5. <u>Serious Adverse Experience Reports</u> - We understand the importance of investigating serious adverse experiences in a complete manner, including all information associated with the manufacturing of any implicated lot. As a result, our procedures will be revised and training completed by 17 April 2006 to require that in all cases where there is a serious adverse event associated with a lot number, a batch record review and manufacturing investigation review will be conducted.

6. <u>Environmental Monitoring</u> – We understand the importance of environmental monitoring as an important indicator for assurance of an aseptic environment. As a result, throughout our responses we have made a number of specific improvements, such as microbial surface testing at the conclusion of each filling operation associated with Liquid Nitrogen tunnels, a proposed study to evaluate the growth promotion capabilities of the media following exposure to liquid nitrogen tunnel conditions, and a commitment to evaluate the feasibility of sampling and testing of the liquid nitrogen.

7. <u>Sterility investigations</u> – We understand the importance of conducting a thorough sterility investigation in order to identify root causes and understand impact, if any, to marketed product. Therefore, we are improving our Sterility Investigation procedure by 30 April 2006 to include more specific criteria that are to be reviewed as part of each investigation as well as enhancing requirements for a peer review process to ensure consistency.

We remain committed to continuous improvement of our processes and systems. In this respect, in the fourth quarter of 2004, we created a single Quality Unit at the West Point site, combining both the vaccine / sterile area with the pharmaceutical area, which historically had been managed as separate Quality units under different Quality area heads and procedures. This consolidation enabled us to focus our efforts on the examination and strengthening of our Quality systems and procedures across the entire site. Furthermore, a new organization within Quality was created with the sole responsibility to improve all business systems associated with the biologic critical reagents, including direct oversight of critical reagent qualification, which will include timely qualification of all reagents. This group was commissioned in January 2006.

We also wish to thank you for granting us additional time to complete our written responses. As mentioned, *Production System* observation 1, relates to the integrity of the stainless steel containers, currently under investigation, in which we store our bulk live virus vaccines. This utilizes a pre-existing business process that was previously communicated to the Agency in BPDRs 02-010 and 03-004 submitted on 20 November 2002 and 30 October 2003, respectively. We understand the importance of definitively resolving this investigation both internally and from an Agency perspective. While the original business process involved the management of greater than approximately 13,000 cans, as we have described above and provide in further detail in our response that follows, this per-use testing requirement will eliminate any risk that marketed material could be implicated by a potential non-integral can.

While we remain confident in the sterility assurance of all live virus vaccine products that are stored in these stainless steel cans, we recognize the importance of bringing this ongoing investigation to closure once and for all.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA00214090
MRK-CHA00214090

Merck & Co., Inc. 2006 Team Biologics Response Cover Letter

We are fully committed to ensuring that our comprehensive response completely addresses all of the inspectional observations in a thorough and effective manner. If you have no objection, we will follow up with you in approximately two weeks to determine if it would be beneficial to meet to discuss our corrective actions with you and your staff.

Sincerely,

William J. Mullin
Vice President
West Point Quality Operations
Merck Manufacturing Division
Merck & Co., Inc.
215 652-6620

Robert E. Dolan
Vice President
Vaccine & Sterile Operations
Merck Manufacturing Division
Merck & Co., Inc.
215 652-3464

Attachment

Copies:     Michael J. Angelo, Ph.D., Senior Vice President, Quality,
                 Merck Manufacturing Division, Merck & Co., Inc.
            Richard T. Clark, CEO and President, Merck & Co., Inc.
            Willie A. Deese, President, Merck Manufacturing Division, Merck & Co., Inc.
            Barry Garfinkle, Vice President, Vaccine Technology & Engineering,
                 Merck Manufacturing Division, Merck & Co., Inc.
            Peter Kitz, Vice President, Quality Assurance,
                 Merck Manufacturing Division, Merck & Co., Inc.
            Milan Blake, CBER Deputy Director, U.S. FDA
            Thomas Gardine, District Director of the Philadelphia Office, U.S. FDA
            Cynthia Jim, Investigator Core Team Biologics, U.S. FDA
            Mihaly Ligmond, Investigator Core Team Biologics, U.S. FDA
            Vlada Matusovsky, Philadelphia District, U.S. FDA
            Tina Roecklein, Consumer Safety Office, U.S. FDA
            Susan Yu, Medical Technologist CBER, U.S. FDA

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA00214091
MRK-CHA00214091

Appx1964

Restricted
R ® Confidential
limited access

Team Biologics Responses
Inspection Dates: February 7 through 24, 2006

## I. PRODUCTION SYSTEM

I.1  Viral vaccine bulks including **REDACTED – OMP**
**REDACTED – OMP** M-M R 11 (Measles, Mumps, and Rubella Virus Vaccine Live) **REDACTED – OMP**
**REDACTED – OMP**                                        **MUMPSVAX** (Mumps Virus
Vaccine Live) **REDACTED – OMP**
PROQUAD (Measles, Mumps, Rubella, and Varicella Virus Vaccine Live) **REDACTED – OMP**
**REDACTED – OMP**

**REDACTED – OMP**

**REDACTED – OMP**

A. As of 2-7-2006 there were 383 stainless steel multi-use cans in storage containing vaccine bulks for which the integrity of the cans has not been assured by post-use (per-process) helium leak integrity testing. The helium leak test is the initial check used by the firm to determine can integrity, if it passes no further can integrity testing is performed. Currently the firm performs post- use helium leak testing to assure the integrity of the bulk cans.  This post-use leak test procedure has been in place since May 2004 (SOP 287-118X Effective Date 28 MAY 2004) for Measles, Mumps, Rubella, and Varicella manufacturing **REDACTED – OMP**
**REDACTED – OMP**     All of these 383 multi-use cans had at least I passing helium leak test result and were used more than once since the last passing result. Various finished vaccine products that were manufactured with bulks that had been stored in these cans may have been distributed (and may still be within expiry) for which no post-use helium leak tests of the bulk cans were performed because the finished products were manufactured before the initiation (in May 2004 or June 2005) of the post-use helium leak test for the bulk cans.

B. Since 2/9/2004 4 Atypical Process Reports (APRs) (2004-220-0004, 2004-222-0142, 2005-222-0295, and 2006-222-0004) have been initiated due to bulk cans failing per-process (post-use) helium leak testing and subsequently bubble pressure and media challenge testing. These cans were found to be non integral and the following products associated with the non-integral cans were rejected: M-M-RII Lot 2096515 (APR 2004-220-0004) **REDACTED – OMP**

**REDACTED – OMP**



**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA00214092
MRK-CHA00214092

Appx1965

Restricted
R ⊗ Confidential
limited access

Team Biologics Responses
Inspection Dates: February 7 through 24, 2006

REDACTED – OMP

E. Sterility failure investigation SI 2004-004 (APR 2004-285-0071) was conducted because M-M-R II finished product Lot 0650343 failed finished product sterility testing. No root cause was determined. Can use data shows that 3 cans used to store ATTENUVAX HVF Lot 2096037 used in ATTENUVAX Lot 2100111, 5 cans used to store MUMPSVAX HVF Lots 2095124, 2095249, 2096261, or 2096587 used in MUMPSVAX Lot 2097347, and 2 cans used to store MERUVAX HVF Lot 2097631 used in MERUVAX Lot 209929 had no available per-process (post- use) can integrity status by helium leak testing because the cans currently contain frozen product. All of these cans had at least 1 passing previous helium leak test result. These single valent vaccines were mixed to form MMR II Lot 0650343. This lot was rejected.

F. Sterility failure investigation SI 2005-008 (APR 2005-285-0204) was conducted because PROQUAD finished product Lot 0652944 failed finished product sterility testing. No root cause was determined. Can use data shows that 3 cans used to store ATTENUVAX HVF Lot 210126 used in ATTENUVAX Redispensed Lot 2109541, 1 can used to store MUMPSVAX HVF Lot 2096828 used in MUMPSVAX Redispensed Lot 2109540, 1 can of HVF Lot 2097887 used in MERUVAX Redispensed Lot 2109050, 1 can used to store VARIVAX HVF Lot 2085073 used in VARIVAX Pooled Lot 2086856, and 8 cans used to store VARIVAX HVF Lot 2091777 used in VARIVAX Pooled Lot 2093990 had no available per-process (post use) can integrity status by helium leak testing because the cans currently contain frozen product. All of these cans had at least I passing previous helium leak test result. These single valent vaccines were mixed to form PROQUAD Lot 0652994. This lot was rejected.

### *Merck & Co., Inc. Response I.1*

#### *Executive Summary*

*We understand that this observation relates to the concern that there is a lack of sterility assurance with respect to the potential non-integral stainless steel bulk product storage cans used in the production of vaccines distributed worldwide. We would like to emphasize that we understand the importance of sterility assurance, and have, through existing systems as well as continuous improvements, assured that we have the systems in place to ensure the sterility of all vaccine products. Furthermore, we have evaluated current marketed product and believe that we currently have the controls in place to minimize any potential risk to product. Finally, based on our current investigation into the recent stainless steel can integrity failure, we have identified and will implement additional enhancements to our systems to further safeguard the sterility assurance of our vaccine products. The supporting information upon which we have based these conclusions is provided in the detailed response that follows.*

*As additional background, the resolution of this issue which was first identified in 2002, has remained a priority for this site. We hope that the following general summary, as well as the responses to the specific observational issues, reflect our commitment to the wide range of corrective actions employed, our business process which has been followed for reviewing*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00214093
MRK-CHA00214093

Appx1966

Restricted
R ⊕ Confidential
limited access

Team Biologics Responses
Inspection Dates: February 7 through 24, 2006

cans with potential integrity concerns, and what we are doing to bring closure to the issue since it was first identified in 2002.

### Product Quality

We continue to believe that the procedures we have put in place since 2002 have assured product quality and minimized risk. For example:

- Since 2002, we have assured that only cans that have a documented passing helium leak test are used in manufacturing. As compared to 2002, we now have approximately 99 % of the ~13,000 cans in inventory that meet this criterion. The remaining cans in inventory that do not yet have a documented helium leak test are single use cans (only has the potential to affect their current frozen contents) and will be tested at the next intervention point. The product in these cans will not be released until the can integrity is verified.

- As a result of our most recent investigation, we have developed an aggressive plan to ensure the remaining cans in the multi-use category (cans that were used in multiple lots prior to the implementation of the per-use testing program) are subject to per-use helium leak testing. Therefore, by the end of 2006, all cans in inventory will be enrolled into the per-use helium leak testing program.

- Any can identified that has a potential integrity issue and affects marketed product is carefully reviewed in accordance with a well-defined process. To date, the corresponding medical assessment of any potentially affected material has confirmed a remote risk to patients. The elements of the assessment are fully detailed later in our response and can also be found in the corresponding BPDRs that have been issued to the Agency.

### Significance of Available Vaccine Supply

As a worldwide supplier of numerous medically important vaccines, we are acutely aware of our significant responsibility to ensure the uninterrupted supply of safe and efficacious medicines to the world's children. Currently, Merck & Co., Inc. is the sole supplier to the United States market for measles, mumps, rubella and varicella containing vaccines. Additionally, our vaccines for M-M-R®II and VARIVAX® have been distributed in 66 and 24 countries, respectively, since their introduction into the marketplace. Recent supply constraints with some of our competitors has resulted in a reduction in existing safety stock at vaccine distributors in international markets. We are cognizant of the fact that any supply interruption has the potential to impact product availability and public health. Since 2002, we have progressed through our investigative process keeping as our highest priority the product quality algorithm that is detailed later in the response as it relates to stainless steel can integrity. During this period we have made significant progress in improving the sterility assurance controls associated with this algorithm while ensuring availability of these vaccines to the people and markets we serve.

Prior to providing our written response to the first observation, we would now like to provide a general summary of the comprehensive corrective actions we have taken since this issue was first observed in 2002.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00214094
MRK-CHA00214094

Appx1967

R ⊕ Restricted
Confidential
limited access

Team Biologics Responses
Inspection Dates: February 7 through 24, 2006

### I. Background

#### A. Regulatory Communications

*This observation relates to a self-identified issue that was first reported to the Agency in BPDR 02-010 on 20 November 2002 regarding the potential for non-integral stainless steel cans used in vaccine bulk manufacturing. Subsequently, BPDR 03-004 was issued on 30 October 2003, and most recently, we submitted our third BPDR 06-002 on 03 March 2006. We described in these BPDRs, our product quality algorithm for assessing the potential product quality impact associated with a non-integral can. Since we did not receive feedback regarding our filed BPDRs, we continued forward with our process as described in these documents. Our overall process was reviewed in detail during the 2004 Team Biologics Inspection and was again discussed during the recent 2006 Team Biologics Inspection. All of our commitments associated with the 2004 Team Biologics 483 response dated 12 May 2004 and Untitled Letter response dated 18 November 2004 were completed on time, consistent with the target dates established in these responses. The corrective actions from the 2004 regulatory commitments were reviewed during the 2006 Team Biologics Inspection.*

#### B. Stainless Steel Bulk Product Storage Cans and Chronology of Events

*Stainless steel bulk product cans were implemented for use during manufacturing of our Live Virus Vaccine (LVV) products in 1991 and replaced the prior storage container. These stainless steel cans are used to store bulk product during the manufacturing processes for measles, mumps, rubella, and varicella containing vaccines. Additionally, as of 2001, bulk rotavirus vaccine is stored in these cans.*

*In 1992, Merck & Co., Inc. implemented helium leak testing on all new cans in order to ensure integrity. In 2002, due to the discovery of a non-integral stainless steel can, and as an outcome of the associated investigation (described in BPDR 02-010), the use of cans and related procedures for integrity testing were comprehensively evaluated. The fundamental root cause of the non-integral cans was determined (and confirmed during the 2006 investigation which is later discussed) to be the presence of porosity within the welds that is created during the can manufacturing process. The weld defects are of a tortuous, restrictive nature and thus, a sufficient driving force (e.g. significant vacuum within the can), would be required to allow for ingress through the weld defect into the can interior.*

*We also concluded that helium leak testing was the most sensitive and appropriate test to assess the integrity of stainless steel bulk storage cans based in part on the American National Standard E432-91 (re-approved in 1997) "Standard Guide for Selection of a Leak Testing Method" published by the American Society of Testing Materials (ASTM) on Nondestructive Testing. The helium leak test is considered an extremely sensitive test due to: 1) the small size of the helium molecule that can identify leaks not detected by pressure hold tests, 2) the fact that the cans are pressurized during the test, which further contributes to the sensitivity of the analysis and 3) the stringent requirements for allowable helium in the background environment.*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00214095
MRK-CHA00214095

Appx1968

R ⊕ Restricted
Confidential
limited access

Team Biologics Responses
Inspection Dates: February 7 through 24, 2006

*Additional corrective actions that have been deployed prior to and as a result of this assessment, as a means of continuous improvement for assuring can integrity, are as follows:*

- *A plan was initiated to replace all 16 gauge cans with a 14 gauge can design which has a stronger and thicker material of construction.*
- *The can manufacturer, Alloy Products Corporation (APC), implemented corrective actions including annealing of stamped components and improving tooling procedures to reduce fractures and ragged surfaces along the cut edge prior to welding.*
- *The can manufacturer enhanced its helium-leak testing procedures, including the implementation of a new technology helium tester to improve sensitivity.*
- *A quality assurance technician was added to audit and verify manufacturing, testing, and inspection results at the can manufacturer.*
- *The stainless steel bulk cans manufactured and helium leak tested by APC are directly shipped to an external vendor, W.B. Moore, for an additional helium leak test. Stainless steel cans with a passing leak test at W.B. Moore are shipped to Merck where they are cleaned, sterilized, and introduced into manufacturing. It is important to note that since January 2002, the cans subsequently tested by W.B. Moore have never failed the helium leak test; thereby confirming the effectiveness of the corrective actions implemented by the can manufacturer.*
- *Beginning in 2002, we ensured that only cans with a documented helium leak test were used in manufacturing.*
- *Merck now requires helium leak testing of product cans on a per-use basis (testing after each use in manufacturing) as cans are cycled through manufacturing. This per-use testing was initially implemented in 2003 as part of a pilot study to validate our new business processes and database. Following the pilot study, per-use helium leak testing was implemented in May 2004 for cans used in measles, mumps, rubella and varicella manufacturing. In June 2005, this testing was subsequently implemented into rotavirus manufacturing. Rotavirus was prioritized last since all cans utilized within rotavirus bulk manufacturing possessed a passing helium leak test in their history coupled with the fact that the rotavirus bulk product is filtered through a 0.2 μm sterilizing filter as part of intermediate bulk processing.*

*Since the weld defects were first detected, we have aggressively managed the inventory of ~13,000 stainless steel bulk cans to minimize the potential risk to product quality. Since 2002, we have immediately retired any stainless steel can from service that did not conform to our helium leak test requirements. We first focused our testing efforts on those cans that did not have a documented helium leak test on file. Our investigation concluded that this population of cans represents the greatest potential risk of being found non-integral.*

*As of July 2005, all available cans in inventory that did not have a documented helium leak test and impacted multiple product lots were helium leak tested to assess integrity. As stated previously, a given can had the potential to be used in manufacturing, emptied, cleaned, and cycled back into manufacturing for use in a different lot. Therefore, some cans*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00214096
MRK-CHA00214096

Appx1969

Restricted
R ⊖ Confidential
limited access

Team Biologics Responses
Inspection Dates: February 7 through 24, 2006

had the potential to impact multiple product lots. The testing of these cans brought closure to the evaluation of the group of cans deemed to represent the highest potential risk category.

### C. Can Business Process

A comprehensive, progressive investigation methodology was developed and implemented in 2002 for any can that did not demonstrate a passing helium leak test result. We have consistently applied this investigative methodology to all can integrity evaluations as reported in the subject BPDRs.

The investigative efforts have confirmed that the existing helium leak rate failure criteria are conservative and not necessarily indicative of the potential for ingress into a can. Product cans that do not pass helium leak rate test criteria and are associated with product within expiry undergo an extensive product impact analysis. First, an evaluation into the specific use-cycle of that can is performed. If the conclusion of the can use-cycle evaluation indicates the possibility of vacuum formation within the can, a bubble pressure test is executed on the can to determine the driving force required for ingress through the can defect. If the outcome of the bubble pressure test does not exclude the possibility of ingress into the can, a series of three media challenges is performed on the can to definitely determine the potential for product quality impact due to presence of a weld defect in the can. If, at any time, Merck determines that a can has failed any one of the three media challenges and the can was associated with distributed product within expiry, we have and will continue to notify the Agency via a BPDR. Any affected material that has been distributed to the market is reviewed via the documented product quality assessment and a decision made based on the facts associated with that specific can. As a conservative measure, any product within Merck control that has been directly affected by a failed can media challenge has been consistently rejected and subsequently discarded.

### II. Product Quality Impact

As part of the investigation into a potentially non-integral can that affects distributed product, a detailed medical assessment, using worst-case assumptions specific to the can's use in manufacturing, is conducted to determine any potential risk to patients. This comprehensive assessment is based on the following critical elements: the extremely low levels of potential ingress of water (microliters) due to the restrictive nature of the weld defects; the route of vaccine administration to the patient (subcutaneous injection); the low virulence characteristics of the potential microorganisms (based on recovery in the can media challenges); the harsh environment in subsequent manufacturing steps (e.g. sonication, flash freezing, extended frozen intermediate hold times) which would likely contribute to viability loss of potential microbial contaminants; the chilled conditions and tight processing time constraints which would limit proliferation of potential microbial contaminants; and finally, a thorough review of product complaint history and adverse experience reports which indicated no signals of increased risk to patients. Based on the detailed medical assessments for the two instances of a can media challenge failure that affected distributed material (BPDRs 03-004 and 06-002), the potential risk to patient was considered remote.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00214097
MRK-CHA00214097

Appx1970



Restricted
R ⊕ Confidential
limited access

Team Biologics Responses
Inspection Dates: February 7 through 24, 2006

*Additionally our investigation also includes a review of product testing including sterility and safety tests. While individual sterility tests are well known for their inherent limitations, we do believe strongly that the multiple sterility tests used in the vaccine bulk manufacturing process can provide greater insight into the sterility assurance of the bulk product as compared to final container sterility tests and thus cannot be ignored. Bulk sterility samples are taken directly from a homogeneous pool, and thus, are a representative sample of the product as compared to final filled containers. Given the nature of live virus vaccines, additional quality control testing (including egg safety testing, tissue culture safety testing, mycoplasma testing, TB in vitro testing and adult/suckling mouse testing) is extremely sensitive to any potential microbial ingress or growth. In our detailed reviews of these records, we see no indication of any signal that would indicate a decrease in sterility assurance due to potential contaminant ingress.*

*This comprehensive evaluation, for our assessment of non-integral cans is used to support our conclusions regarding the potential impact to product quality. However, in order to further enhance our current system and to further minimize any potential risk to marketed product, we are committed to implementing the action plan described in section III below.*

### III. Per-Use Helium Leak Test Plan

*Given the most recent can investigation (reported in BPDR 06-002), a concerted effort is underway to test cans that have previously passed helium leak testing and were used multiple times prior to the implementation of our per-use testing program. Our multi-year investigation and data generated indicate that this population of cans has a significantly lower risk of potential non-integrity as compared to the population of cans previously reported without an initial documented helium leak results. Nonetheless, we are actively enhancing the original test plan to aggressively test these remaining bulk cans. This approach, as detailed below, utilizes a similar prioritization as performed in 2003-2004:*

- ° *Redispensing is currently underway in rotavirus, measles, mumps, and rubella manufacturing to allow for the cans to be emptied and helium leak tested via the per-use testing program. All cans that affect multiple lots of rotavirus will be tested by 30 June 2006, and all cans that affect multiple lots of measles, mumps, and/or rubella will be tested by 30 September 2006.*

- ° *For varicella, the ability to redispense material is technically infeasible due to the thermal instability of the virus. Thus, cans in this category will require prioritization into pooling and filling to allow for the cans to be emptied and helium leak tested. We have prioritized this process based on our investigative findings, and an action plan is presented in our response to Observation I.1.A below.*

*As demonstrated by our past actions, we have prioritized the completion of can integrity assessments. We have first prioritized cans based upon the associated risk of a potential integrity issue, starting with multi-use cans that did not have a previous documented passing*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00214098
MRK-CHA00214098

Appx1971

Restricted
R ⊛ Confidential
limited access

Team Biologics Responses
Inspection Dates: February 7 through 24, 2006

*helium leak test. To date, approximately 99% of the cans in inventory have at least one documented helium leak test. The remaining untested cans in this category are single-use (only have the potential to affect the current frozen contents) and will be tested at first opportunity via our per-use testing program. These single-use cans do not have the potential to impact current or future distributed materials.*

*Additionally, based on the most recent investigation, we are actively prioritizing the testing of cans that have previously passed helium leak testing, but have been utilized multiple times prior to the implementation of the per-use testing program. Of the existing can inventory, approximately 94% of cans are either single-use or have entered the per-use testing program.*

*Therefore, we believe our actions consistently demonstrate our commitment to minimizing the potential risk to product quality, to remaining fully compliant with cGMPs, and to ensuring an uninterrupted supply of vaccine to the marketplace. Specific responses to the observations during the recent Team Biologics Inspection are included below:*

**_Response I.1.A_**
*At the time of the Team Biologics inspection, the investigation into the integrity failure of can S/N 105818-292 had just initially been reviewed by our Fact Finding Committee. In fact, this initial meeting took place three business days prior to the start of the inspection. As an outcome of the Fact Finding meeting, an effort was initiated to assess our current can inventory to identify testing improvements and to prioritize testing of cans that had been utilized in manufacturing multiple times prior to the implementation of the per-use helium leak test program. Because the investigation remained on-going at the time of the inspection, information was still being collected and verified as part of our current internal investigation. Thus, much of the information available to the Investigator was limited and considered preliminary. Based on our ongoing investigation, we wish to update the actual number of cans identified in the 483 observation without a per-use helium leak test which is not 383, but as of 19 March 2006, is 673 cans. The fact that this number would change was discussed with the Lead Investigator during the inspection since our initial information had not yet been verified as part of our Fact Finding review.*

*Since the completion of the inspection, a thorough analysis of the history of multi-use cans was completed. Below is a summary of the affected cans. Given our active and aggressive efforts to empty and test cans as they become available, the number of cans without per-use testing will decrease on a weekly basis.*

*As of 19 March 2006, there were 673 multi-use cans containing frozen vaccine product, excluding cans used upstream of a final sterile filtration step (specifically Rotavirus Harvested Virus Fluids cans). All 673 multi-use cans have a passing helium leak test result in their history but were used multiple times within manufacturing prior to the initiation of the per-use helium leak test program. The breakdown of the 673 multi-use cans by product is 381 for measles, mumps and rubella bulk, 13 for rotavirus bulk and 279 for varicella bulk.*

*Given our extensive history and knowledge associated with our can population, we know that not all can constructions have the same risk of potential integrity loss during use. Of the*

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA00214099
MRK-CHA00214099

Appx1972

Restricted  Confidential
limited access

*approximately 12,000 cans that have been helium leak tested since December 2002, only ten cans have proceeded through the product quality algorithm to the media challenge step and have failed. All of these cans were constructed of 16-gauge stainless steel. Eight of the cans did not have a documented passing helium leak test in their history and were identified during the initial assessment of container integrity. As discussed previously, the population of cans that did not have a documented passing helium leak test had the greatest potential for the presence of a weld defect. All multi-use cans that did not have a previously documented helium leak test have been fully evaluated as of mid-2005 and thus, this potential risk has been eliminated for existing and future marketed product.*

*For the remaining two cans that failed media challenges, both had previously been helium leak tested prior to use in manufacturing. The investigations (APR 2004-220-0004 and APR 2006-222-0004) into these two can failures were reviewed during the Team Biologics inspections and are discussed in greater detail in the responses to Items I.1.B and I.1.C. The weld defects for these two cans had three common characteristics: 1) both cans were constructed of 16-gauge stainless steel, 2) the area of the weld defect showed evidence of porosity, attributable to the initial welding process at the can manufacturer and 3) both cans exhibited a high likelihood of a subsequent physical stress during use in the general area of the weld defect. Given this knowledge, the remaining 673 multi-use cans were assessed to better understand the probability of these cans being associated with a future integrity failure. While it is our intention to actively test all 673 cans, the priority for testing is focused first on 48 cans outlined in Category 2, then the remaining cans as described in Categories 1 and 2.*

**Category 1:** *Of the 673 multi-use cans, 361 cans are constructed of 14 gauge stainless steel (which is ~20% thicker than 16 gauge stainless steel) via the ASME requirements for welding. There are two sub-sets of cans under Category 1:*

- *Of these 361 cans, 122 cans were manufactured post-January 2002 utilizing the improvements to the welding and testing procedures at the can manufacturer. Of all 14 gauge cans manufactured after January 2002, 6,625 cans have been helium leak tested and none of these cans has ever proceeded to a media challenge. This outcome is expected given that the improved welding procedures have minimized the presence of porosity within the welds; thereby removing the underlying source of weld defect formation. Therefore, the probability that these cans will have a future integrity issue is unlikely.*

- *Of these 361 14 gauge cans, 239 cans were manufactured before January 2002. While these cans were manufactured prior to the improvements in the welding and testing procedures at the can manufacturer, they were constructed via the ASME requirements for welding and have a documented helium leak test in their history. Of all 14 gauge cans manufactured before January 2002, 2,103 cans have been helium leak tested during the per-use testing program. One of these cans has proceeded to media challenge and passed its series of three can media challenges. Given that the remaining 239 multi-use cans in this category have a passing helium leak test in their history, the probability that these cans will have a future integrity issue is unlikely.*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00214100
MRK-CHA00214100

Appx1973

Restricted  Confidential limited access

Team Biologics Responses
Inspection Dates: February 7 through 24, 2006

***Category 2:*** *Of the 673 multi-use cans, 312 of these cans are constructed of 16 gauge stainless steel. While these cans were also manufactured prior to the improvements in the welding and testing procedures at the can manufacturer, all of these cans have a documented passing helium leak test in their history. Given our extensive history associated with use of 16 gauge cans (1992 - present), several factors exist that lessen the potential risk of future integrity failures associated with the Category 2 population:*

- o *Of the Category 2 cans, 264 cans were tested by a highly sensitive helium leak test conducted by the initial external vendor (JTM Associates) or have been tested by our current helium leak test via our robust per-use program. Given that none of the 3,922 cans tested by these methods have proceeded to the media challenge step of our product quality algorithm, the probability that these cans will have a future integrity issue is unlikely.*

- o *The remaining 48 cans in inventory have been previously helium leak tested, but not by the test methodologies described above.*

*We are actively prioritizing the testing of the 48 targeted cans by 30 June 2006. We have developed a very aggressive timeline and are committed to testing the remaining 625 multi-use cans by 31 December 2006.*

*As discussed previously, we concluded that a can without a documented helium leak test in its history had the highest potential for an integrity failure and subsequent can media challenge failure. In addition, our experience has shown that a can with a passing helium leak test in its history has an unlikely chance of developing a significant weld defect (that could impact product quality) during use. Therefore, we believe that the product quality risk associated with these 673 cans is low.*

***Response I.1.B***
*As described previously, a comprehensive and progressive investigation methodology was developed in 2002 to ensure a robust evaluation of the potential impact to product quality of a non-integral stainless steel can. Each can helium leak test failure was thoroughly evaluated via the product quality algorithm. We submit that the investigative methodology functioned as intended and that all corrective actions taken as a result of the investigation were wholly appropriate based on the conservative assumptions employed. Specific details regarding these investigations are included below:*

***Investigations 2004-222-0142 and 2005-222-0295:*** *For investigations 2004-222-0142 (can S/N 105818-223) and 2005-222-0295 (can S/N 105818-073 and can S/N 105818-169), each of these two investigations is associated with a product can that previously did not have a documented passing helium leak test to confirm container integrity, as described previously this was our first priority grouping of cans to remediate. Thus, the first helium leak testing of these three cans was conducted during the per-use testing and found to be failing. Due to the failing helium leak test, the three cans were immediately decommissioned from further use in manufacturing. All vaccine material affected by these can failures were under Merck control at the time of the failed helium leak test. Thus, there was no impact on distributed materials. It is important to note that none of these lots visually showed evidence of contamination and all available sterility, potency and release testing results were passing.*

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA00214101
MRK-CHA00214101

Appx1974

R ⊗ Restricted
Confidential
limited access

Team Biologics Responses
Inspection Dates: February 7 through 24, 2006

Nonetheless, as a conservative measure, the affected lots were rejected and physically discarded.

**Investigation 2004-220-0004:** For investigation 2004-220-0004, 20L can S/N 104176-040 was found to have a failing helium leak test on 09 February 2004 during per-use testing. This particular can passed helium leak testing on 06 January 2003 and was subsequently used only once in manufacturing, prior to being tested via our per-use testing process. The integrity of the can was evaluated at its first availability for per-use testing (following filling of its bulk contents in 25 January 2004) and was found to be non-integral. The can subsequently failed media challenge.

Visual inspection of the weld defect confirmed that this can had a scratch in the vicinity of the weld defect. It is believed that the weld of can S/N 104176-040 contained porosity due to the original welding conditions during can manufacture and was compromised due to a mechanical stress (scratch). Given that this can was tested before and after its use in bulk manufacturing, the potentially affected material was within Merck control. It is important to note that this affected lot showed no evidence of contamination, either visually or via testing. All available sterility, potency and release test results were passing for the bulk and filled materials. Nonetheless, as a conservative measure, the affected lots were rejected and physically discarded.

**Information for investigation 2006-222-0004 is provided below in Section I.1.C.**



REDACTED – OMP

Page 11 of 57

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA00214102
MRK-CHA00214102

Appx1975

Restricted
R ⊘ Confidential
limited access

Team Biologics Responses
Inspection Dates: February 7 through 24, 2006

### Merck & Co., Inc. Response I.2

*Prior to addressing the specific issues presented in this observation, we feel it is important to summarize our overall system for addressing the inspection of containers, closures and final filled product.*

*All of our final liquid and lyophilized product containers are inspected utilizing approved inspection methods. The methods include manual visual inspection, in-line inspection, and automated inspection for critical, major and minor defects. Each operator who performs inspection procedures is trained and qualified through job specific training, re-certified annually via a representative defect set challenge administered by area management and tested for visual acuity. Additionally, all automated inspection methods are supported by validation designed to be at least statistically equivalent to manual inspection capabilities for pre-defined types of defects. The automated inspection methods are further challenged on a per process basis with standard defect sets to confirm proper operation of the equipment. In addition to the initial inspection for product defects, an off-line inspection of a statistically defined sample of previously accepted product vials are reviewed to monitor the performance of the inspection process at the beginning and throughout the processing of each lot. Any defects found are classified for criticality and compared against established Acceptable Quality Levels (AQL) for critical defects (0.0%), major defects (0.4%), and minor defects (2.5%). Exceeding the established AQL results minimally in a re-inspection of impacted material. Additionally, an equivalent statistical review of accepted product is completed immediately following secondary packaging to further evaluate the product quality prior to product release. While we believe that our current system for control, inspection and removal of defective containers, closures, and product are robust and ensure a high quality standard for our product, we acknowledged to the Investigator during the Team Biologics Inspection that the following improvements to inspection programs will provide continuous improvement to our systems.*

### Response to I.2.A.1 - 3

*As stated in the observation, inspection for several of our liquid filled products includes an initial in-line manual inspection post filling for all cosmetic defects, including missing stopper defects, and a subsequent automated inspection on EISAI Inspection Machine # 4. The EISAI Inspection Machine # 4 is validated for removal of missing stoppers and particulates and also performs a review of product volume of fill. The effectiveness of the overall inspection process is dependant on the operators performing the in-line manual inspection at a set speed of 180 vials per minute for a fifty (50) minute shift and confirmation that the EISAI Inspection Machine is utilizing the validated inspection settings.*

*In order to qualify an operator for in-line manual inspection, an operator must pass an initial visual acuity test and must complete our training program that includes four (4) distinct, documented training phases prior to being assigned inspection duties. The four (4) training phases are: 1) review of all Standard Operating Procedures (SOPs) pertinent to in-line manual inspection, 2) instructor led review and discussion of these SOPs, 3) hands-on training for in-line manual inspection with a previously trained operator, and 4) demonstrated performance of in-line manual inspection with oversight from a trained operator. In addition, each operator must pass an in-line manual inspection qualification. Once initially trained, each operator is re-certified annually through the same in-line manual inspection qualification and visual acuity test.*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00214107
MRK-CHA00214107

Appx1976

Restricted
 Confidential
R limited access

Team Biologics Responses
Inspection Dates: February 7 through 24, 2006

*Since the Team Biologics inspection, we have also performed a critical evaluation of industry-wide practices to support the fifty (50) minute time frame allowed for performing manual inspection operations. An industry wide survey was performed by the Parenteral Drug Association (PDA), "A PDA Survey of Industry Practices for the Visual Inspection of Injectable Products". The survey was comprehensive in that it included responses from twenty-seven (27) companies. Based on the information in this survey and previous reviews with several pharmaceutical companies, the allowance for fifty (50) minutes of inspection prior to a break is consistent and aligned with recognized, industry-wide practices. Additionally, it is our practice to allow operators to stop the inspection process and take eye breaks as needed.*

*Finally, controls are also in place to evaluate each lot on a real time basis to ensure that the inspection process is performing as intended. This process is governed by SOP 174-321X "Sterile Filling and Inspection Acceptable Sampling Plan" and requires that a statistically significant number of accepted product containers be removed the inspection process at the beginning and throughout the lot. These samples are individually examined at a manual inspection station and any defects are documented and classified for criticality. Based on the criticality of the defects and the amount of accepted vials that have been reviewed off-line, the performance of the inspection process is compared against established Acceptable Quality Levels (AQLs) for critical, major and minor defects. Exceeding the established AQL will lead to at least re-inspection of impacted material and up to discard of the entire lot. For the combination of in-line manual inspection and automated inspection on EISAI Inspection Machine # 4, a review of data associated with the off-line review of accepted product indicates that from 01 July 2005 to 31 December 2005 out of sixty-eight (68) lots inspected zero (0) lots have demonstrated results outside of the established AQLs. Additionally, over the sixty-eight (68) lots, over 23,500 accepted product containers have been reviewed as part of this off-line inspection with only three (3) minor scratched vial defects being identified for a total percentage of defective product containers of only 0.01%. This further supports the overall effectiveness of the inspection process for these liquid products at a line speed of 180 vials per minute for a fifty (50) minute shift.*

*To further enhance the overall robustness of the in-line manual and EISAI Inspection Machine # 4 inspection process the following actions will be taken:*

*1)  EISAI Inspection Machine #4 is an automated inspection process for liquid filled containers that is currently validated for removal of missing stoppers and particulates. This inspection immediately follows the in-line manual inspection process that also includes the removal of volume of fill defects. As related to observation 2A.1 and to ensure that combination of manual and automated capabilities are maximized, the volume of fill capability of the EISAI Inspection Machine #4 on Line 138 will be validated by 31 May 2006.*

*2)  As related to observation 2A.2 and 2A.3 and to maximize our ability to detect container, closure and product quality defects in our in-line manual inspection step, we will ensure that manual operator qualification requirements include a review of a statistically, representative quantity of acceptable and defective product containers at the normal speed, 180 vials per minute, and in the normal environment of the inspection process. The analysis of the requirements for this qualification will be performed and documented in an approved project plan by 31 March 2006 and implementation of the updated operator qualification requirements and supporting procedures will occur by 31 May 2006.*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00214108
MRK-CHA00214108

Appx1977



### Response to I.2.B.1

The in-line manual inspection process for lyophilized products includes similar controls as for our liquid products. The training program includes the same four (4) phase approach as utilized for liquid products and the conclusion of the training program requires operators to demonstrate the ability to effectively remove defects from a representative set of product containers through an off-line inspection process. We acknowledge that the training program does not specifically qualify operators in the normal operating environment. Therefore, the manual operator qualification requirements will be updated to include a review of a statistically, representative quantity of acceptable and defective product containers at the normal speed, 50 vials per minute, and in the normal environment of the inspection process. The analysis of the requirements for this qualification will be performed and documented in an approved project plan by 31 March 2006 and implementation of the updated operator qualification requirements and supporting procedures will occur by 31 May 2006.

### Response to I.2.B.2

To improve the manual inspection capability for the in-line inspection done on Line 115, a direct light source will be added to the location where the operator performs the inspection of the bottom of the vials. This will be completed by 31 March 2006.



REDACTED – OMP

### Response to I.2.B.4

We acknowledge that the annual vision examination documentation was not available for three (3) employees in 2004. Each of these employees completed the Inspection Qualification program in 2004 and had prior/subsequent acceptable annual vision examinations in both 2003 and 2005. We believe that these employees did not undergo an annual vision examination due to the lack of a robust process for tracking and confirming completion of this requirement. We have verified that this gap does not exist for any other employee and have confirmed that the required current documentation is on file for all employees requiring annual vision assessments. As shared with the inspector, a new mechanism was implemented in 2005 to track and confirm completion of the annual vision examination for all inspector operators. In addition, the annual vision examination will be included in each employee's training file along with the annual inspection qualification to further ensure that all operators are re-certified on an annual basis.

### Response to I.2.B.5

We acknowledge the value of ensuring that the same eye test criteria that are applied to operators are also applied to supervisors. Annual eye exams, to include color perception and visual acuity tests, will be added to the job training profile for all operators and supervisors. The results of these tests, for each operator and supervisor, will be included in

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00214109
MRK-CHA00214109

Appx1978

Restricted
R ◉ Confidential
limited access

Team Biologics Responses
Inspection Dates: February 7 through 24, 2006

*their job training file along with their annual qualification. The job training profile for both operators and supervisors will be updated by 14 April 2006. Additionally, vision exams for all personnel who are responsible for inspecting vials will be completed by 14 April 2006.*



REDACTED – OMP

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA00214110
MRK-CHA00214110

Appx1979





H.  The hold time validation for the -20°C storage of filled product for the following vaccines are deficient in that:

    1.  For MMR, the hold time of 12 months at -20°C is only performed on one lot.

    2.  For Attenuvax, Meruvax, and Mumpsvax, the hold time of 12 months at -20°C was not performed.

    3.  For Varivax, the hold time of 24 months at -20°C was only performed up to 12 months.

***Merck & Co., Inc, Response I.3***

*Historically, Merck's program for process hold time studies for bulk biological and vaccine products was defined as part of developmental activities in research and primarily focused on the evaluation of product potency over the hold time period. Sterility was not typically a part of these studies, and therefore, the container closure system was not considered to be relevant. As such, we acknowledge that sterility testing was not always performed over the hold period and that the container closure systems used were not necessarily representative of those used in production. We acknowledge that a more robust hold time study, more closely representative of current manufacturing should be conducted and we commit to address any existing gaps as part of the plan discussed below. For new vaccines, systems exist today to ensure that the hold time period is supported with the appropriate study to meet the current regulatory expectations. We believe that it is important to note, however, that as part of routine production, down stream in-process and release testing of sterility provides confirmatory final product sterility assurance on a routine basis. Additionally, sterility is performed as part of the annual stability program for final container at expiry.*

*For M-M-R® II and* REDACTED – OMP *hold time studies are ongoing which are compliant to the current regulatory expectations.* REDACTED – OMP

REDACTED – OMP *studies for all three*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00214111
MRK-CHA00214111

Appx1980

Restricted
R ⊗ Confidential
limited access

Team Biologics Responses
Inspection Dates: February 7 through 24, 2006

*products were reviewed with the Investigators during the inspection. We believe that these studies are reflective of current regulatory expectations such that they include the use of simulated production containers, and all critical quality parameters are/have been tested to support the hold times for these products. For vaccines in development, prospective hold time studies have been and continue to be conducted in the appropriate container/closure systems that represent the container/closure systems used in production and all appropriate quality tests are conducted to ensure support of the intermediate hold times. As stated above, we are fully committed to these improvements as a result of our self-assessment regarding the stability program. As such, we have proactively initiated activities and committed to additional activities, following discussions with the Investigators during this inspection, to address the vaccine bulk stability program.*

*Specific responses to each part of the observation (A-H) are described below.*



REDACTED – OMP

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00214112
MRK-CHA00214112

Appx1981

Restricted
R ⊕ Confidential
limited access

Team Biologics Responses
Inspection Dates: February 7 through 24, 2006



REDACTED – OMP

### Response I.3.G

*We acknowledge that the hold time studies for iOMPC and for PRP-iOMPC Conjugate were not conducted in containers/closures system representative of the container/closure system utilized in routine manufacturing, that sterility testing was not performed as a component of the study, and that the results of the p42RP-HPLC do not meet the current specification of 58%.*

*The initial OMPC specification of ≥ 38% was based on the specification for current process OMPC. The specification was calculated as the lower limit of a "99/99" tolerance interval from analysis of 51 lots of OMPC bulk intermediate. As part of reviewing the Supplemental Product License Application for Manufacture of Improved Process OMPC (Reference Number 99-0427, approved January 27, 2000), CBER requested that we revise the p42 specification for OMPC manufactured by the improved process. Data from 16 lots of improved process were evaluated and the lower limit on the "99/99" tolerance interval was determined to be 58%. Therefore, the release specification for % p42 for the improved process OMPC (iOMPC) was revised to ≥ 58%. This specification was based on data at the time of release of the improved process OMPC bulks, and did not take into account the stability profile of the bulk during storage. It should be noted that p42 values of 55% at the 9 month timepoint observed by the Investigators during the inspection, were included in the stability data in the above-reference supplement. In order to address this observation, we*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00214115
MRK-CHA00214115

Appx1982

Restricted
R ⊖ Confidential
limited access


Team Biologics Responses
Inspection Dates: February 7 through 24, 2006



REDACTED – OMP

### Response to I.3.H.1

*The current practice in Operations is to hold filled lots of M-M-R® II at -20C for a period of up to 12 months, followed by storage at 2-8C through product expiry (e.g. 24 months). As discussed with the Investigator during the inspection, we believe that the currently approved hold time at -20C is fully justified and appropriate when you consider the -20C data generated from stability studies (e.g. lots held at -20C and tested for potency through 1 to 3 years). These data were used to calculate -20C loss rates for the Comprehensive Statistical Release Model, which is provided in the Prior Approval License Supplement to the Measles Mumps and Rubella Virus Vaccine Live license to replace human serum albumin with recombinant human albumin (STN# 101069/5068; approved 31 August 2005). M-M-R® II lots used to calculate the loss rates were held at -20C for one to three years; with potency data from 18 lots used to calculate loss rates for the measles, mumps, and rubella virus components. These loss rates demonstrated no statistical significance indicating that there is virtually no loss in potency over time when product is stored at -20C or below.*

*To address the concern related to sterility assurance when moving product from -20C to 2-8C, a transfer hold time study to simulate these allowed storage conditions is underway for M-M-R® II, where the filled product was held at -20C for 18 months, followed by transfer to 2-8C for an additional 30 months (post-expiry interval). Stability data generated to date (18 month at -20C followed by 24 month at 2-8C) is consistent with historical potency loss rates. Sterility testing was performed at the 0, 18, and 24-month intervals following transfer to 2-8C, and the results were satisfactory. Since the 30-month timepoint is post-expiry for this product (e.g. 24 months), sterility testing will not be performed at this interval.*

*An additional developmental transfer study, on lots using the current process was performed and included three lots held at -20C for 12 months, followed by transfer to 2-8C through the 24-month expiry. The potency loss rates were consistent with the historical product profile. Sterility testing was performed at the 12 and 24-month intervals following transfer to 2-8C and the results were satisfactory.*

*Also, three M-M-R® II lots were held at approximately -80C for approximately four months prior to transfer to 10C for 12 months. These lots were exposed to a wider temperature range (from -80C to 10C vs -20C to 2-8C) than was seen in the previous transfer studies. Sterility testing was performed at the 0, 6, and 12-month intervals following transfer to 10C and the results were again satisfactory.*

*Based on the data at -20C and the transfer studies discussed above, we believe that the currently approved hold time at -20C has been demonstrated and there is no impact to*

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA00214116
MRK-CHA00214116

Appx1983

Restricted
R ⊘ Confidential
limited access

Team Biologics Responses
Inspection Dates: February 7 through 24, 2006

*sterility assurance when the product is transferred from -20C to 2-8C and held through expiry. We would welcome additional discussion with the Agency, if needed, on this item.*

### Response to I.3.H.2

*As discussed with the Investigator during the inspection, the sample matrix for M-M-R®II is the same as that for the three monovalent products (ATTENUVAX®, MERUVAX®II, and MUMPSVAX®). As a result, the -20C and transfer study data summarized for M-M-R®II in response 3H.1 supports the 12 month hold time at -20C for each of the monovalent products. We respectfully submit that no further studies to support the monovalent products are necessary.*



REDACTED – OMP

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00214117
MRK-CHA00214117

Appx1984

Restricted
R ⊕ Confidential
limited access

Team Biologics Responses
Inspection Dates: February 7 through 24, 2006



REDACTED – OMP

### Response I.4.B

*In summary, we believe that an alert limit of 10 CFU/ml will appropriately allow for deviations from our historical bioburden control performance to be highlighted and investigated as per existing procedures. Thus, an alert limit of 10 CFU/ml will be established for both products by 01 June 2006 to allow for deviations from our historical bioburden control performance to be highlighted and investigated as per existing procedures for results outside of alert and action limits. We believe that a limit of 10 CFU/ml will provide the opportunity for identification and evaluation of any bioburden value that differs significantly from our historical experience.*

*As background, the alert and action limit specification of 100 CFU/mL is derived from the retention capabilities of the 0.22 micron sterilizing filter utilized in these processes and the maximum batch sizes. The current bioburden specification of 100 CFU/mL is more than four (4) orders of magnitude lower than the validated retention capability of the filter with Brevundimonas dimuta, a worst-case challenge organism. The bioburden specification has not been re-evaluated since implementation in March 2002 since only six (6) lots have been manufactured for each product and typically thirty (30) lots are required to develop statistically based process capability limits.*

*Based on the current forecasted market demand for these products, we do not believe it is feasible or appropriate to wait for the generation of this data set, hence we have adopted the 10 CFU/ml alert level effective with the target date specified above.*



REDACTED – OMP

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA00214118
MRK-CHA00214118

Appx1985

Restricted
R ⊕ Confidential
limited access

Team Biologics Responses
Inspection Dates: February 7 through 24, 2006



REDACTED – OMP

## II. FACILITIES AND EQUIPMENT SYSTEM

II.1 The liquid nitrogen freezing tunnels located on filling lines 118, 122, and 127, used to flash freeze partially stoppered vials (Measles, Mumps, Rubella [MMRII], REDACTED – OMP REDACTED – OMP are not of adequate construction or design to allow for environmental monitoring or maintenance.

A. The freezer tunnels are approximately 15 feet in length and are non-classified environments surrounded by class 100 and class 10,000 environments. No environmental monitoring is conducted within the tunnel while trays of partially stoppered vials are passing through at set temperatures from -83°C to -105°C.

B. The only environmental monitoring conducted is to pass one 100mm x 15mm Trypticase Soy Agar plate through the tunnel 30 minutes after fill and after the liquid nitrogen feed is turned off.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00214119
MRK-CHA00214119

Appx1986

R ⊗ Restricted
Confidential
limited access

Team Biologics Responses
Inspection Dates: February 7 through 24, 2006

    1. The temperature, line speed and fan speed at the time exposure plate is passed through the tunnel is not documented/monitored.
    2. No study has been conducted to demonstrate that the Soybean agar exposure plates exposed to the freezer tunnel does not inhibit growth of microorganisms.

C. The liquid nitrogen is introduced into the tunnel through a .2 μm hydrophobic polytetrafluoroethylene membrane filter made of Teflon fluoropolymer resin.
    1. The filter manufacturer recommends use of the filters at 25° to 150°C. No studies have been conducted to qualify use of filters at -105°C.
    2. Filters are not pre or post integrity tested.
    3. Filters are changed once every 6 months, but no studies have been conducted to ensure that the filters exposed to temperatures of -105°C will remain integral through out the six month time frame.
    4. Liquid nitrogen is not tested upon receipt or prior to use.

D. There are no engineering drawings of the freezer tunnels located in filling rooms 118, 122, or 127.

### *Merck & Co., Inc. Response II.1*

*We acknowledge the Investigator's recommendation that we enhance our environmental monitoring program, characterization of the liquid nitrogen delivery system and ongoing maintenance procedures. As additional background and as discussed with the Investigator, the liquid nitrogen tunnels have been the subject of discussions with CBER and CDER since the early 1990's. Where possible, we have committed and successfully eliminated the use of the tunnels for several products through the implementation of a shelf-freezing process. Additionally, one key element in all the discussions regarding the tunnels is the lack of available technology for the monitoring and handling of liquid nitrogen in an aseptic environment. Thus, it has been our ongoing commitment to continuously evaluate new technology for improvement of this process. Our specific enhancements are fully detailed below following some additional background we have provided that summarizes our existing controls and performance with respect to the filling lines that are detailed in the observation.*

*The liquid nitrogen tunnels are approximately 15 feet in length and they are utilized to flash freeze products requiring immediate transition to a frozen state at temperatures below -50°C. The entrance and the exit of the tunnels are located in Class 100 areas. Although the body of the tunnel is located within a Class 10,000 area, it should be noted that the inside of the tunnel is tested to Class 100 microbial limits for the media challenge and exposure plate environmental monitoring. One of the longitudinal sides of the tunnel, within the Class 10,000 area, is designed with two doors. These doors run the length of the tunnel and are hinged to allow access to the full interior of the unit. These doors are gasketed and remain in the closed and sealed position during process operations. Each tunnel contains three fans, two nitrogen nozzle manifolds and a conveyor belt. All of this internal equipment is accessible when the side doors of the tunnel are opened. The tunnel doors are opened for the disinfection of the unit and for visual inspection of the interior components. These doors are also utilized to provide access to the interior surfaces of the tunnel for environmental contact plate sampling at the completion of media challenges. During process operations, liquid nitrogen passes through a 0.2 micron filter and is introduced into the tunnel where it vaporizes and cools the internal temperature of the tunnel to -83°C to -105°C and at these temperatures no microbial replication is possible. This creates an environment that is detrimental to the survival of most microorganisms. An exhaust fan runs continuously throughout operation to remove the gaseous nitrogen from the tunnel.*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00214120
MRK-CHA00214120

Appx1987

Restricted
R ⊕ Confidential
limited access

Team Biologics Responses
Inspection Dates: February 7 through 24, 2006

*Trays of partially stoppered vials are placed on the liquid nitrogen tunnel conveyor at the tunnel entrance; the entry door is opened briefly to introduce each tray into the tunnel. The tray travels through the tunnel and the exit door is opened briefly to allow removal of each tray. While the trays of vials are being transported and frozen inside the tunnel, the environment within the tunnel is free of human intervention. The tunnel is designed so that the only potential personnel exposure with the trays of vials is during the loading or unloading operation. During process operations, the liquid nitrogen tunnels are cleaned and disinfected following each use, periodically during idle time, and within 24 hours of initiating the filling operation for a product which will utilize the liquid nitrogen tunnel for freezing. The disinfection procedure entails a complete decontamination of the interior and exterior tunnel surfaces using a 5.25% Hypo-Chlor® solution, followed by two (2) subsequent rinses with Water for Injection.*

*The liquid nitrogen tunnels are utilized to flash freeze partially stoppered vials containing measles, mumps, rubella, and varicella products that include M-M-R®II, REDACTED – ProQuad®, REDACTED – OMP It is important to note, that despite evaluation of alternative options, flash freezing via the nitrogen tunnel is the only demonstrated method that maintains appropriate potency for Merck's measles, mumps, rubella and varicella containing products. REDACTED – OMP*



REDACTED – OMP

*The environmental monitoring program for the liquid nitrogen tunnels includes a media challenge program, per-process exposure plate that is passed through the tunnel, microbial testing from the Class 10,000 area of the room, and microbial testing performed in the tunnel after the media challenges. Data from the environmental monitoring program were shared with the inspector, including: six (6) years of media fill data representing 508,922 vials filled with 99.999% satisfactory vials, these media challenges cover the filling, vial freezing, vial transport and loading into the lyophilization cabinets. The tunnel operation process is fully simulated as part of the media challenge program, which is performed twice annually on each of the three (3) tunnels. It should be noted that, in order to ensure a worst case environment related to the temperature for microbial activity, liquid nitrogen is not utilized during the media challenge to maintain ambient temperature conditions. The 2004 and 2005 per-process nitrogen tunnel exposure plate testing included 570 tests, with only one (1) excursion. The 2004 and 2005 data from the Class 10,000 microbial testing of the three filling rooms (Rooms 118, 122, and 127) and the lyophilization aisle (aisle 115) associated with the media challenges includes 5843 tests with 3 excursions. The 2004 and 2005 media challenge environmental testing of the nitrogen tunnel included 272 tests with zero excursions.*

*Based on the historical results of our environmental monitoring program as well as our system controls (described above), we believe that the operational controls related to these*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00214121
MRK-CHA00214121

Appx1988

Restricted  R Confidential
limited access

Team Biologics Responses
Inspection Dates: February 7 through 24, 2006

*tunnels and our disinfection process have produced effective environmental monitoring and media challenge results ensuring the sterility of our products.*

### Response II.1.A
*To enhance the monitoring program, microbial surface testing of the nitrogen tunnel will be performed at the conclusion of each filling operation. The results from this monitoring will be incorporated into the Critical Site Review program and will be evaluated as part of the release of the associated lot. All appropriate procedural updates and associated training for this change will be completed prior to its implementation on 31 May 2006.*

*Additionally, we will evaluate the technical feasibility of taking a microbial air sample from the nitrogen tunnel during process operations at the extreme cold temperatures. This evaluation will be conducted by 29 September 2006. If feasible, a plan for implementation will be developed by 30 October 2006.*

### Response II.1.B.1
*As discussed with the Investigator, both the tunnel fan speed and the tunnel belt speed are checked prior to the start of operations and documented within the batch record. The tunnel temperature is currently monitored throughout the processing of each batch via an automated temperature monitoring system (Delta V). Procedures will be revised such that the temperature, belt speed and fan speed of the nitrogen tunnel will be recorded and verified to be within the appropriate operating ranges prior to placing the exposure plate in the nitrogen tunnel following the prescribed thirty (30) minute wait time after completion of filling operations. All appropriate procedural updates and associated training for this change will be completed prior to the implementation on 31 May 2006.*

### Response II.1.B.2
*As part of our environmental monitoring program for the Department 285 Liquid Nitrogen Tunnel, a soybean casein digest exposure plate (also known as trypticase soy agar) is passed through the liquid nitrogen tunnel approximately 30 minutes after normal processing (flash freezing) in order to assess the environmental condition of the tunnel. In a 1996 study, a growth promotion test was performed on soybean casein digest liquid (contained in ampoules) following exposure within the liquid nitrogen tunnel to a temperature of -105°C. The results were acceptable and met the growth promotion criteria. Note: the soybean casein digest liquid evaluated in the study was considered to be equivalent to the composition of the agar within the exposure plate, therefore confirming the growth promotion of the agar media. Additionally, the ampoule study was considered a worst-case study given that during normal processing the agar plate does not get exposed to the -105°C environment.*

*To enhance the data set supporting our environmental monitoring program, a draft study protocol was developed and presented to the Investigator. This study protocol will be implemented to further evaluate the growth promotion capabilities of the actual trypticase soy agar plates used for monitoring following exposure to the tunnel conditions. The study will be completed by 30 June 2006. We will proceed to evaluate the results of this study and contingent on the protocol outcome develop an implementation plan by 31 July 2006 for revision of the time between the completion of processing and passing the exposure plate through the tunnel.*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00214122
MRK-CHA00214122

Appx1989

Restricted  Confidential
R   limited access

Team Biologics Responses
Inspection Dates: February 7 through 24, 2006

### Response II.1.C.1 – 4

*The filter utilized on the liquid nitrogen tunnels is intended to serve as a precaution against potential contamination in the liquid nitrogen supply. Based on the environmental monitoring results presented previously, we are confident that the filters are serving this intended purpose and the liquid nitrogen supply does not present a contamination risk to the product. However, the following enhancements and evaluations of the liquid nitrogen and filtration system specific to the examples provided in this observation will provide continuous improvement to our systems.*

*While we acknowledge the Investigator's observation, we were not aware previously of any filter currently available that is rated for use or that allows for filter integrity testing at -196°C, the mean temperature of liquid nitrogen. However, we are currently performing a comprehensive review of available technology and this will be completed by 28 April 2006. Data from this survey will be utilized to define best practices with any determined actions documented in a project implementation plan, which will be completed by 30 June 2006. The project implementation plan will specifically evaluate the ability to pre and post use integrity test the filter as well as establish the rationale for routine replacement of the filter.*

*In addition to the review of the liquid nitrogen supply Certificate of Analysis from the vendor upon receipt to ensure adherence to specifications, we will evaluate the feasibility of taking either a liquid nitrogen sample or a gaseous (vaporized) sample from the liquid nitrogen supply at the extreme cold temperatures to complete identity and microbial testing. This evaluation will be completed by 29 September 2006.*

*As additional background, the filter for the liquid nitrogen supply to the freeze tunnels is a 0.2 micron filter with 100% Teflon® membrane construction. The specification information for this filter (Mykrolis Wafergard PF-40 filter) was shared with the Investigator and includes a temperature rating of 25°C – 125°C with a maximum temperature of 150°C. However, according to the Teflon® manufacturer, Teflon® has a thermal range of -240°C to 310°C, suggesting the filter membrane is compatible with the liquid nitrogen environment.*

### Response II.1.D

*The observation is valid in that we have been unable to locate the original construction drawings for the tunnels. Current Process and Instrumentation Diagrams (P&IDs) for both the liquid nitrogen system and the tunnel control systems are available and were shared with the Investigator during the review of this equipment. Additionally, schematic drawings for the tunnel are available.*

*To more fully detail the design of the tunnel, as-built drawings for all three nitrogen tunnels will be developed and completed by 29 September 2006.*

II.2 Regarding the certification of HEPA filters:

A. As per SOP No.: 262-477X entitled "Certification of Laminar Flow Clean Air Devices" Atypical Process Reports (APRs) are initiated for "non-routine" HEPA filter certifications of "critical devices". A "critical device" is defined as "laminar flow hoods or laminar flow rooms where product or components are exposed and no further sterilization is performed. A "non routine" certification is defined in part as "if upon initial certification a leak is found that exceeds 1% of the upstream concentration under routine scanning rate

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00214123
MRK-CHA00214123

Appx1990

**R** ⊕ **Restricted**
**Confidential**
**limited access**

Team Biologics Responses
Inspection Dates: February 7 through 24, 2006

of 2 inches per second with the nozzle of the probe no more than 1 inch from the filter surface: APRs are not routinely initiated when leaks of >0.01 % to 1% of upstream aerosol concentration are found during scheduled HEPA filter certifications for critical devices. No retrospective review of products manufactured in the critical device is conducted to determine the potential product impact of leaks >0.01% to 1%. Media Challenge Lot 654106 (fill date 12-20- 2005, Filling Room 122) had 1 contaminated vial out of 5462 vials evaluated. The subsequent HEPA certification for this area performed on 12-28-2005 showed that 1 HEPA filter had a leak of 0.36%

B. Investigations into HEPA filter failures (APRs are written when the leak found exceeds 1% of upstream aerosol concentration in a critical device as per SOP 262-477X) do not always include a review of product sterility failures for products manufactured under these HEPA filters. The results of media fills conducted under these filters are also not always reviewed. For example: APRs 2004-285-0072, 2004-222-0222 and 2005-222-0136. SI 2004-004 (APR 2004-285-0071) was associated with APR 2004-285-0072. SI 2004-004 (APR 2004-285-0071) was initiated because finished product M-M-R II Lot 0650343 failed sterility. No root cause was identified from the investigation. This SI was not mentioned in APR 2004-285-0072 even though leaks were detected during the certification of the HEPA filters in Room 127 (the filling room for this lot). Media Challenge Lot 651957 (fill date 12-15-2004, Filling Room 118) had 1 contaminated vial out of 5355 vials evaluated. The subsequent HEPA certification for this area performed on 12-17-2004 documented leaks in 2 filters greater than 1% and APR 2004-285-0134 was initiated for this failure. It did not mention the Media Challenge 651957.

C. When leaks in FIEPA filters greater that 1% of upstream aerosol concentration are found, part of the APR investigation involves a retrospective environmental data review since the last previous HEPA certification. If the rate of environmental monitoring action levels found during the review was less than 1% and the rate of environmental monitoring alert levels during the review was less than 5% the area was deemed to be under appropriate environmental conditions. For example, APRs 2004- 285-0072, 2004-222-0222 and 205-222-0136. There is no written justification for these 1% and 5% criteria. Additionally, the investigations into failures of HEPA filters do not state the size of the leaks detected. For example, APRs 2004-285-0072, 2004- 222-0222 and 205-222-0136 only state that leaks greater than 1% were detected.

D. There is no documented justification for aseptic area HEPA filters average airflow velocity specification of more then or equal to 80 feet per minute with no individual reading of less then 70 feet per minute. In addition, there is no upper limit specification and no specification for the uniformity of airflow distribution.

E. The HEPA filter leak rate data obtained during the HEPA filter certification air intrusion/induction test (leak testing) is not recorded for leaks that don't exceed the rate of 1% of upstream aerosol concentration prior to the leak repairs being performed on the individual HEPA filters.

**Merck & Co., Inc. Response II.2.A**
*As a critical component of clean room maintenance, the HEPA filter certification program is designed to ensure the proper maintenance and function of HEPA filters and to assess the potential for impact to critical areas when HEPA filter equipment defects are noted. Consistent with FDA guidance and standard industry practice, it is our current procedure to repair (in a limited area) or replace any HEPA filter with a leak greater than 0.01% of the*

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA00214124
MRK-CHA00214124

Appx1991

R ⊕ Restricted
Confidential
limited access

Team Biologics Responses
Inspection Dates: February 7 through 24, 2006

*upstream aerosol concentration. The HEPA filter leak test is a worst case challenge of filter integrity, involving an upstream challenge aerosol generally in the concentration range of two to thirty million particles per cubic foot. Our experience has been that even with leaks greater than 1%, we have not noted a corresponding increase in environmental excursion rates that may be attributed to the HEPA filter leak.*

*However, we recognize that we do not have a documented rationale for the use of the 1% threshold which triggers the retrospective review. Therefore, to enhance our HEPA filter certification program, we will initiate a documented evaluation of critical room environmental data back to the previous satisfactory certification for any HEPA filter with a leak test result greater than 0.01% of the upstream aerosol concentration. This evaluation will also include a review of media challenge performance as well as a review of any sterility failures during the review period. These changes will be incorporated into SOP 262-477X "Certification of Laminar Flow Clean Air Devices". The SOP update and associated training will be completed by 31 May 2006.*

*With regard to the specific examples provided in the observation, we acknowledge that a separate investigation was not initiated for the leak rate identified in the Line 122 HEPA filter certification performed on 28 December 2005. Atypical Process Report 2006-285-0022, initiated in response to the single contaminated vial in Media Challenge 0654106, evaluated the leak identified during the Line 122 HEPA filter certification performed on 28 December 2005. The investigation concluded that the HEPA filter leak was not located over any critical components and that the HEPA filter leak was not a likely root cause for the single contaminated vial identified in Media Challenge 0654106. This conclusion is supported by the absence of any microbial isolates in over 300 environmental samples taken for the challenge. To further assess any potential impact from the HEPA filter leak identified on 28 December 2005, a review of all Fill Line 122 microbial environmental data since the previous satisfactory HEPA filter certification (August 2005) was performed as part of this response. The review revealed 2 action level excursions out of 966 samples. The action levels were from a liquid nitrogen exposure plate and a 40 minute SMA microbial air sample at the stoppering location. The single organism identified in both excursions was related to personnel and neither excursion site was directly beneath the HEPA filter identified with the leak. Therefore, we concluded from this review that Line 122 was operating in an acceptable state of environmental control between the HEPA filter certifications performed in August and December 2005, which includes Media Challenge 0654106.*

### Response II.2.B
*As a result of discussions with the Investigator, we recognize the value of including a review of product sterility failures and media challenge performance since the last HEPA filter certification when conducting assessments in response to HEPA filter leaks. SOP 262-477X "Certification of Laminar Flow Clean Air Devices" will be revised and associated training completed by 31 May 2006 to include this requirement.*

*With regard to the specific examples provided in the observation, Atypical Process Report 2004-285-0072, initiated for a Line 127 HEPA filter leak identified during certification on 17 July 2004, did not reference Sterility Investigation SI 2004-004 or the associated manufacturing investigation 2004-285-0071. The filling activities associated with SI 2004-004 occurred on Line 127 on 04 June 2004. There is no evidence of a link between the Line 127 sterility failure from 04 June 2004 and the leaks identified during the 17 July 2004 HEPA*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00214125
MRK-CHA00214125

Appx1992

Restricted
R ⊕ Confidential
limited access



Team Biologics Responses
Inspection Dates: February 7 through 24, 2006

filter certification. Both investigations examined filling room controls and environmental data and concluded that the area was in a state of control. We certainly recognize the value in evaluating sterility failures in an area in conjunction with HEPA filter leak investigations. It should be noted however, that a subsequent review of Investigations SI 2004-004, 2004-285-0071, and 2004-285-0072 did not identify any additional information leading to a likely root cause attributed to a HEPA filter leak.

Similarly, Atypical Process Report 2004-285-0134, initiated for leaks identified during Line 118 HEPA filter certification on 17 December 2004, did not reference Line 118 Media Challenge 0651957 filled on 15 December 2004. The media challenge yielded a single vial contaminated with an environmental isolate. It should be noted, however, that the investigation into the single contaminated vial for Media Challenge 0651957 did assess the leaks identified in the HEPA filter certification performed on 17 December 2004. The investigation concluded that the HEPA filter leaks were not located over open components and were not a likely root cause for the contaminated vial. Although this investigation did not identify any association between the contaminated media challenge vial and the HEPA filter leaks, we recognize the value of documenting this review as part of our investigation procedure. Atypical Process Reports 2004-222-0136 and 2004-222-0222, both initiated for leaks identified during HEPA filter certifications, did not reference the media challenge and sterility failure performance for Room 14 in between satisfactory certifications. A retrospective review performed as part of this response did not identify any sterility failures and confirmed only passing media challenges for this area. While these additional reviews further confirm our initial conclusions that the HEPA filter leaks did not compromise the environment or lead to failing media challenge or sterility results, we will revise SOP 262-477X, "Certification of Laminar Flow Clean Air Devices" to include reviews of applicable sterility failures and media challenge performance for the areas that do not meet the acceptance criteria during HEPA filter certifications. This procedure will be revised and training completed by 31 May 2006.

### Response II.2.C
We recognize the value of recording the actual leak rate for any HEPA filter exhibiting a leak greater than 0.01% of the upstream aerosol concentration. As such, we will update SOP 262-477X "Certification of Laminar Flow Clean Air Devices" to record the leak rate for any HEPA filter with a leak test result greater than 0.01% of the upstream aerosol concentration. This procedure will be revised to include this requirement and training completed by 31 May 2006.

Regarding the determination of control of an area following HEPA filter leaks, we have historically used 1% action levels and 5% alert levels as an indicator that an area has drifted from its normal operating range in terms of environmental performance. As noted during the inspection, we do not have a documented rationale for the use of these criteria when performing assessments of HEPA filter leaks. Therefore, to enhance the effectiveness of our environmental data trending, we will evaluate the appropriate action and alert levels to assess acceptable environmental performance and document the justification for such values. This evaluation will be completed by 30 June 2006.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA00214126
MRK-CHA00214126

Appx1993

Restricted
R ⊕ Confidential
limited access

Team Biologics Responses
Inspection Dates: February 7 through 24, 2006

### Response II.2.D
*Our use of the average velocity lower specification of 80 feet per minute with no individual reading lower than 70 feet per minute is based on FDA guidance[2]. We acknowledge the inspector's observation that we do not have a documented justification for our average airflow velocity specification and that we do not have an upper airflow velocity specification. However, we have a robust airflow visualization study program where the adequacy and uniformity of airflow has been visually confirmed and recorded for each of our critical Class 100 laminar flow hoods under both the static and dynamic conditions. Nevertheless, in an effort to further assess airflow velocities and their impact on unidirectional airflow, we have updated SOP 262-330 "Airflow Visualization Studies", effective 27 February 2006, to require documentation of airflow velocity readings at the filter face as well as at the working level in Class 100 areas during the airflow visualization studies. The readings will help establish a relationship between airflow velocity/uniformity and the satisfactory airflows observed in the visualization study.*

### Response II.2.E
*We understand this observation to be related to the HEPA Filter leak test. We recognize the value of recording the actual leak rate for any HEPA filter with a leak rate greater than 0.01% of the upstream aerosol concentration. As indicated above, SOP 262-477X "Certification of Laminar Flow Clean Air Devices" will be revised to record any leak test result greater than 0.01% of the upstream aerosol concentration during HEPA filter certifications by 31 May 2006.*

## III. QUALITY SYSTEM

III.1 Inadequate Failure Investigations:

A.  Atypical Investigation # 2004-231R-0012 was initiated 08/02/2004 because the first Pneumococcal 23 Valent bulk formulation using polysaccharide powders all sourced from the new polysaccharide building 38A required extended filtration times in comparison with filtration of polysaccharide powders sourced from building 28C. Historically, 28C powders were filtered within 60 minutes versus the first three lots of 38A powder which required up to 308 minutes.

1.  The investigation was closed with a conclusion of no product impact although the root cause was not identified.

2.  The determination of no product impact resulted in a conclusion that extended filtration times should not be considered atypical and not investigated.

3.  Since the Investigation # 2004-231R-0012 was closed. 45 lots of 38C powders have been filtered with all filter times exceeding 60 minutes and with the longest filtration time of 880 minutes.

4.  Since September 2004, 36 of 45 lots have been released.

---

[2] Guidance for Industry: Sterile Drug Products Produced by Aseptic Processing – Current Good Manufacturing Practice, Section IV.A, footnote #5.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00214127
MRK-CHA00214127

Appx1994

Restricted
R Confidential
limited access

Team Biologics Responses
Inspection Dates: February 7 through 24, 2006



REDACTED – OMP

### *Merck & Co., Inc. Response III.2*

*As discussed with the Investigators, although adverse experience reports are reviewed by a Physician, no routine requirement existed procedurally require to automatically require a batch record review for serious adverse experience reports with a lot number provided which were deemed of interest or concern. Therefore, to further enhance our lot check process, we commit to updating WPS Standard Operating Procedure (SOP) 1330 "Lot Checks for Merck Products" and the WPCU SOP 022-322 "Processing of Adverse Experience Reports" by 17 April 2006 to reflect that a batch record review and a summary of investigations will be requested from the West Point Complaint Unit and provided to the Worldwide Product Safety department for:*

1. *All reports of deaths associated with a specific lot number.*

2. *All reports of life threatening adverse experiences associated with a specific lot number.*

3. *All lots that are associated with a serious adverse experience and deemed of interest or concern by the reporting health care provider or as a result of internal review.*

*These procedures will also be updated to require a summary of investigations to be provided to the Worldwide Product Safety department for all other lots deemed of interest or concern by the reporting health care provider or as a result of internal review.*
*All lots that require a batch record review and/or summary of investigations will undergo a medical review. In addition, all adverse experiences associated with lots sourced from batches deemed of interest or concern will undergo a medical review.*

*Furthermore, we commit to incorporating an additional procedure, whereby, a threshold number of adverse experience reports will be established for each biologic product. If that is reached, it will trigger an automatic batch record review from the West Point Complaint Unit.*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00214130
MRK-CHA00214130

Appx1995

Restricted
R (C) Confidential
limited access

Team Biologics Responses
Inspection Dates: February 7 through 24, 2006

*A medical review of all adverse experience reports associated with lots sourced from batches deemed of concern will also be performed.*

*As background, we have been fully committed to ensuring full compliance with 21 CFR 211.198 "Complaint Files" wherein written procedures describing the handling of all written and oral product complaints must be "established and followed".*

*To address the observation noted above, we wish to acknowledge that we provided and reviewed with the Investigators during the inspection, four (4) written Standard Operating Procedures (SOPs) for processing product quality complaints which involve adverse experiences, specifically West Point Complaint Unit SOP 022-321 "West Point Priority Processing of Product Quality Complaints and Adverse Experience Reports", WPCU SOP 022-322 "Processing of Adverse Experience Reports", WPS SOP 1330 "Lot Checks for Merck Products", and WPS SOP 1335 "Biological Products Lot Trending Procedure".*

*Specifically, WPS SOP 1330, currently requires that a lot check be requested of the WPCU for reasons including but not limited to: "the reporter indicates or implies that an adverse experience is related to the quality of the product and/or a specific lot number", "all adverse events that involve death or that have been deemed immediately life threatening, where a lot number and/or returned drug sample has been provided", or a medical review of the individual adverse experience report determines that a lot check is necessary.*

*In addition, WPS SOP 1335, is the procedure wherein Worldwide Product Safety, Clinical Risk Management and Safety Surveillance and the West Point Complaint Unit perform semi-annual lot trending analysis to review and assess all reported adverse experiences associated with all product quality complaints reported to the Company in a given time period. As part of the semi-annual lot trending analysis, lots with recorded adverse experiences and product quality complaints are closely examined. If adverse experience/product quality complaint relationships are established for a given product, further investigation may be requested by Worldwide Product Safety or the West Point Complaint Unit, where deemed appropriate.*

*We believe that the enhancements to our procedures will fully address the concerns raised by the Investigators and will serve to improve our system for the investigation of adverse experience reports.*



REDACTED – OMP

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00214131
MRK-CHA00214131

Appx1996

Restricted
R ⊕ Confidential
limited access

Team Biologics Responses
Inspection Dates: February 7 through 24, 2006

REDACTED – OMP



### IV. PACKAGING AND LABEL SYSTEM

IV.1 Labeling materials, such as package inserts and cartons containing product information, used in packaging of sterile pharmaceutical and biologic products, are not stored under secured and controlled conditions.

### *Merck & Co., Inc. Response IV.1*
*To further ensure the secure storage of package inserts and cartons in the Building 62 Warehouse, the appropriate controls will be formalized to ensure that all cartons and package inserts are physically stored in Automatic Storage and Retrieval System (ASRS)*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00214133
MRK-CHA00214133

Appx1997

Restricted
R ⊕ Confidential
limited access


Team Biologics Responses
Inspection Dates: February 7 through 24, 2006

*locations on a per receipt basis. These controls will include a system update to all labeling material item codes in the warehouse management system (MARC) that will reflect a 'Special Handling Code' for clear messaging that package inserts and cartons are to be stored in the ASRS. Additionally, our current SOP 165-450X "Receiving" will be updated to reflect these requirements and all appropriate personnel will be trained on the updated procedure. All changes and training will be fully implemented by 31 March 2006.*

*We acknowledge that 21 CFR 211.122(d) requires "Labels and other labeling materials for each different drug product, strength, dosage form, or quantity of contents shall be stored separately with suitable identification. Access to the storage area shall be limited to authorized personnel." Package inserts and cartons containing product information are exclusively stored in the Building 62 Warehouse at the West Point site and no other labeling materials are stored in this area. Two (2) levels of control are currently in place to limit access of the package inserts and cartons to authorized personnel in this area. First, the main entrances to the Building 62 Receiving Warehouse are secured at cardkey access points. Additionally, pallets of package inserts and cartons are stored in the ASRS. The ASRS is an automated system utilizing high speed crane and robot applications to store and retrieve materials and, as such, is not physically accessible to personnel. The automated system that controls the ASRS requires login names and passwords, available only to authorized warehouse personnel, for removal of material from the physical storage locations. The security requirements of this system establish the controls and security of the automated crane and robot applications. Thus, any pallets stored and/or retrieved within the surrounding environment are controlled by this secure automated system. All components stored in the ASRS remain where originally stored until they are deemed released by Quality and then processed for outbound shipments to the user departments.*

## V. LABORATORY CONTROL SYSTEM

V.1. Media Challenges are conducted with diluted growth promotion media:

A. Bulk media challenges are conducted with CM8O (buffered salt solution) to represent product and buffers used during normal manufacturing. At the end of formulation, CM8O batch is added to bottles containing CM490 (Soybean Casein Digest medium) at a ratio of 60% CM8O to 40% CM490. A study was conducted in 2000 to determine the viability of microoganisms in CM8O and the ability of the 60/40 mixture to promote growth.

   1. The study was not able to demonstrate consistent viability at all temperatures, and showed reduced viability over time. **Bacillus subtilis** did not meet acceptance criteria at hour 48. **Staphylococcus epidermidis** did not meet acceptance criteria at hour 72. **Candida albicans** did not meet acceptance criteria at hour 12.

   2. The study concluded that CM8O can be blended with CM490 within 72 hours from initiation of use for all temperatures evaluated which is contrary to study results.

   3. Uncharacteristic viability results of "TNTC" and "Lawn" were not verified by positive identification.

   4. Turbidity was reported as indication of growth for a few organisms while their associated plate count numbers were zero. Growth of inoculated organisms was not verified through positive identification.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA00214134
MRK-CHA00214134

Appx1998

Restricted
R ⊕ Confidential
limited access

Team Biologics Responses
Inspection Dates: February 7 through 24, 2006

5. The study's protocol provided two contrary acceptance criteria for growth as evidenced by turbidity. The first criteria required evidence of growth for bacteria by day three and by day five for fungi. The second criteria required detection of turbidity for all organisms within 14 days.



REDACTED – OMP

C. There are no procedures in place to address how samples should be collected for growth promotion at the end of incubation. CM8O/CM490 collected in bulk containers and samples collected in 100 mL Schott bottles are submitted for incubation. There is no instruction to submit a sample for growth promotion from the product bottle or submit a Schott bottle, which can be collected anywhere on the process stream.

D. The 2005 media challenge requalification was conducted to verify absence of microbial ingress during the PRP-iOMPC Conjugated Bulk process and Preservative Free Bulk Liquid Alum Adsorption Pedvax HIB process from sterile filtration through bulk dispensing. The batch records for the media challenge provided instructions to collect CM8O and CM490 in Schott bottles at a 50/50 ratio. Submission of a sample of a 50/50 ratio for growth promotion is not representative of CM8O/CM490 in the product bottles.

**_Merck & Co., Inc. Response V.1_**
*As background, prior to addressing the specific issues presented in the observation, we would like to provide some additional information.*

*For some of our bulk biological media challenges, a non-inhibitory buffer, buffered saline solution (hereafter referred to as Culture Media 80 or CM80), is utilized as the medium to challenge the aseptic connections and/or vessels associated with the product manufacturing process. Following the conclusion of the process challenge, the buffer is blended with a growth promoting medium, Soybean Casein Digest (hereafter referred to as Culture Media 490 or CM490), at a ratio of 60% CM80 and 40% CM490 to allow for visual detection of any recovered microorganism. To support the use of CM80 and the 60% / 40% mixture for the media challenge program, a viability / growth promotion study was performed and submitted to CBER in September 2000. The study, which was included as part of the Biologics License Application for the West Point Hepatitis B purification facility (STN BL101066/1091), evaluated the viability of organisms in CM80 over time and the growth promotion capability of the mixture. The viability portion of the study was conducted by inoculating individual bottles of CM80 with microorganisms and holding at temperatures which represented the actual manufacturing process temperatures. Subsequently, at various intervals during the hold period (up to 96 hours) a sample bottle was pulled from each temperature, filtered via membrane filtration, plated onto growth promoting agar and incubated to produce a plate*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00214135
MRK-CHA00214135

Appx1999

Restricted
R ⊕ Confidential
limited access

Team Biologics Responses
Inspection Dates: February 7 through 24, 2006

*count result. In parallel, the growth promotion portion of the study was conducted utilizing the same design, however, instead of filtering the CM80 it was combined with CM490 to create the 60% / 40% growth promoting mixture (as is done during the actual media challenge process). The mixture was then incubated and visually examined for the presence/absence of growth (evidenced by turbidity).*

*Following a review of the study by CBER and a request for additional supporting documentation, the media challenge program and license application were approved on 14 August 2001.*

*The study design and results were reviewed with the investigator; however, we would like to provide further clarification for several points which were included as subparts of this observation.*

### Response V.1.A.1-2
*While the observation is accurate in that the organisms listed in the observation demonstrated no microbial plate counts for the time periods specified, we do wish to note that in the study conclusion section, the correspondence with CBER, and in discussions with the investigator, it was acknowledged that the viability results (plate counts) did not consistently correlate with the growth promotion results (CM80/CM490 mixture), in that turbidity was seen in the CM80/CM490 mixture over the duration of the study. Although the plate count data provide a means of evaluating organism viability over time, the data are not representative of the media challenge process. The study conclusion indicates that the growth promotion portion of the study provided a more clear indication of organism recovery in a media challenge – either growth is present (turbid), or not present (clear). The media challenge process does not rely on enumeration of organisms, but in fact, a turbid container results in failure.*

*The inconsistent plate counts were attributed to the sensitivity of the filtration test and plating method. As noted, the growth promotion results, which were the basis of the recommended CM80 hold time, demonstrated consistent positive turbidity results for all organisms at each temperature for the 72-hour hold period. Given that the growth promotion portion of the study simulates the actual media challenge process by combining the CM80 with CM490 following a hold time, the 72-hour hold period was supported by growth promotion data.*

### Response V.1.A.3
*The observation accurately states that the results of "TNTC" (Too Numerous To Count) and "Lawn" (spreading growth across the entire plate) were not identified to confirm if the growth present was the original inoculated organism or extrinsic contamination. However, it should be noted that for this study, if the colony morphology for the specific organism was not different than the control plate, the growth was not considered atypical and therefore not sent for identification. In instances where growth is considered atypical in comparison to the positive controls, the difference is noted and growth identified to confirm validity of the sample.*

### Response V.1.A.4
*As presented in Item A.1-A.2, there were several time points where the growth promotion sample was reported as positive growth but the corresponding viability plate count was zero. It was acknowledged and communicated to CBER in the December 2000 teleconference*

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA00214136
MRK-CHA00214136

Appx2000