23-2553

IN THE

# United States Court of Appeals

### FOR THE THIRD CIRCUIT



UNITED STATES OF AMERICA EX REL.,
STEPHEN A. KRAHLING; JOAN A. WLOCHOWSKI,

*against*

MERCK & CO, INC.,

STEPHEN A. KRAHLING; JOAN A. WLOCHOWSKI,

*Appellants.*

---

*On Appeal from the United States District Court*
*for the Eastern of District of Pennsylvania*
*The Honorable Chad F. Kenney, Case No. 2:10-04374-CFK*

---

## JOINT APPENDIX
## VOLUME XIV OF XLV
## Pages Appx5501 to Appx6000
## (Filed Under Seal)

---

VENABLE LLP
750 East Pratt Street, Suite 900
Baltimore, Maryland 21202
410-244-7400

MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, Pennsylvania 19103
215-963-5000

HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
202-637-5600

*Attorneys for Defendant-Appellee*

CONSTANTINE CANNON LLP
355 Madison Avenue, 9th Floor
New York, New York 10017
212-350-2700

KELLER GROVER, LLP
1965 Market Street
San Francisco, California 94103
415-543-1305

*Attorneys for Relators-Appellants*



# **Table of Contents**

**Page**

**Volume III**
**(Filed Under Seal)**

Order of the Honorable Lynne A. Sitarski, dated May 16, 2019
(Doc. 250) ................................................................ Appx181

Statement of Material Facts by Defendant in Support of
Its First Dispositive Motion, dated October 25, 2019
(Doc. 281-3) ............................................................ Appx185

Statement of Material Facts by Defendant in Support of
Its Fourth Dispositive Motion, dated October 25, 2019
(Doc. 287-3) ............................................................ Appx247

Statement of Material Facts by Relators,
dated October 25, 2019 (Doc. 294) ........................... Appx295

Declaration of Gary Reilly, for Relators,
in Support of Motion, dated October 25, 2019 (Doc. 24) ......... Appx396

Exhibit 1 to Reilly Declaration -
Expert Report of Eugene Shapiro, M.D.,
dated March 13, 2018. ........................................... Appx438

Exhibit 2 to Reilly Declaration -
Expert Report of Dr. Robert Malone, M.D.,
dated March 13, 2018 ............................................ Appx460
***(Cont'd in Vol IV)***

**Volume IV**
**(Filed Under Seal)**

Exhibit 3 to Reilly Declaration -
Expert Report of David A. Kessler, M.D.,
dated March 14, 2018, with Schedules
and Appendices .................................................... Appx551
***(Cont'd in Vol V)***

# **Table of Contents**
## **(Continued)**

**Page**

### **Volume V**
### **(Filed Under Seal)**

Exhibit 4 to Reilly Declaration -
Deposition Testimony of David Kessler, M.D.,
taken September 28, 2018 ...................................................... Appx1483
*(Cont'd in Vol VI)*

### **Volume VI**
### **(Filed Under Seal)**

Exhibit 5 to Reilly Declaration -
Expert Report of D. Bruce Burlington, M.D.,
dated June 19, 2018 ............................................................... Appx1588

Exhibit 6 to Reilly Declaration -
Deposition Testimony of D. Bruce Burlington, M.D.,
taken December 13, 2018 ...................................................... Appx1637

Exhibit 7 to Reilly Declaration -
Deposition Testimony of Mark Pallansch, M.D.,
taken October 13, 2017 ......................................................... Appx1715

Exhibit 8 to Reilly Declaration -
Deposition Testimony of Eugene Shapiro, M.D.
taken November 7, 2018 ........................................................ Appx1765

Exhibit 9 to Reilly Declaration -
Deposition Testimony of Alison L. Fisher, Ph.D.,
taken November 1, 2016 ........................................................ Appx1822

Exhibit 10 to Reilly Declaration -
Expert Report of Ann M. Arvin, M.D.,
dated June 11, 2018 ............................................................... Appx1910

Exhibit 11 to Reilly Declaration -
Letter from Dr. Robert Redfield, Director, CDC,
dated May 24, 2018 ............................................................... Appx1945

**Table of Contents**
**(Continued)**

Exhibit 12 to Reilly Declaration -
Letter from Dr. Anne Schuchat, Principal Deputy
Director, CDC, dated September 26, 2017 ........................... Appx1950

Exhibit 13 to Reilly Declaration -
Statement of Dr. Jesse Goodman, FDA,
dated April 18, 2007 ............................................................. Appx1956

Exhibit 14 to Reilly Declaration -
Letter from Merck to Jacqueline Little, Ph.D.,
dated March 23, 2006 (MRK-CHA00214088-148) ............... Appx1960
*(Cont'd in Vol VII)*

**Volume VII**
**(Filed Under Seal)**

Exhibit 15 to Reilly Declaration -
Deposition Testimony of Jonathan L. Temte, M.D., Ph.D.,
taken August 17, 2018 .......................................................... Appx2010

Exhibit 16 to Reilly Declaration -
Expert Report of Peter H. Calcott, B.Sc. (Hons.), D.Phil.,
dated March 12, 2018 ........................................................... Appx2061

Exhibit 17 to Reilly Declaration -
Deposition Testimony of Joye L. Bramble, Ph.D.,
taken January 6, 2017 ........................................................... Appx2141

Exhibit 18 to Reilly Declaration -
FDA Warning Letter, dated February 9, 2001
(MRK-CHA00209399-409) ................................................... Appx2220

Exhibit 19 to Reilly Declaration -
Excerpts from Defendant Merck's Answer to
Amended Complaint (ECF No. 62) ....................................... Appx2232

# Table of Contents
## (Continued)

Exhibit 20 to Reilly Declaration -
Excerpts from Defendant Merck's Responses and
Objections to Relator's Third Set of Requests for Admission,
dated August 16, 2017 ........................................................... Appx2239

Exhibit 21 to Reilly Declaration -
ProQuadTM (Measles, Mumps, Rubella and Varicella
[Oka/Merck] Virus Vaccine Live)-Original Application
(MRK-CHA00158126-79) ...................................................... Appx2293

Exhibit 22 to Reilly Declaration -
Expert Report of William L. Atkinson, M.D., MPH,
dated June 12, 2018 ............................................................... Appx2348

Exhibit 23 to Reilly Declaration -
Deposition Testimony of Jonathan Hartzel, Ph.D.,
taken June 23, 2017 ............................................................... Appx2380

Exhibit 24 to Reilly Declaration -
Expert Report of Anna Durbin, M.D, dated June 14, 2018  ... Appx2476
*(Cont'd in Vol VIII)*

## Volume VIII
## (Filed Under Seal)

Exhibit 25 to Reilly Declaration -
Expert Report of Marcela Pasetti, Ph.D.,
dated June 14, 2018 ............................................................... Appx2511

Exhibit 26 to Reilly Declaration -
Excerpts of Presentation, Principles of Vaccinology,
produced as "Principles of Vaccination.ppt"
(MRK-CHA01339555) .......................................................... Appx2534

Exhibit 27 to Reilly Declaration -
Deposition Testimony of Mary K. Yagodich,
taken August 18, 2016 ........................................................... Appx2538

**Table of Contents**
(Continued)

Exhibit 28 to Reilly Declaration -
GlaxoSmithKline Application for Priorix
(GSK-MMR-IND-0019450-76) ............................................ Appx2631

Exhibit 29 to Reilly Declaration -
Deposition Testimony of Marcela Pasetti, Ph.D.,
taken December 4, 2018 ....................................................... Appx2659

Exhibit 30 to Reilly Declaration -
Deposition Testimony of Anna P. Durbin, M.D.,
taken October 8, 2018 .......................................................... Appx2699

Exhibit 31 to Reilly Declaration -
Excerpts from Rationale for the M-M-R®II End Expiry
Clinical Studies Presentation (MRK-CHA01893680-730) ... Appx2788

Exhibit 32 to Reilly Declaration -
Letter to the Editor "Comparability of M-M-R™II and
Priorix" from Scott Thaler, M.D., *et al.*, *The Pediatric
Infectious Disease Journal*, September 1999:18(9)
(MRK-CHA00088592-3) ...................................................... Appx2836

Exhibit 33 to Reilly Declaration -
Phase V Clinical Development Plan for M-M-R®II
(MRK-CHA00667054-122) .................................................. Appx2839

Exhibit 34 to Reilly Declaration -
Fax from Yolanda Stewart to Donna Boyce,
dated April 25, 2012 (GSK-MMR-IND-0029256-63) ........... Appx2909

Exhibit 35 to Reilly Declaration -
Letter from Karen L. Goldenthal, M.D. to Angus Grant, Ph.D.,
dated September 2, 1997 (GSK-MMR-IND-0000004-7) ...... Appx2918

Exhibit 36 to Reilly Declaration -
Email from Katalin G. Abraham to Keith D. Chirgwin, M.D.,
dated October 5, 1998 (MRK-CHA00095142) ..................... Appx2923

**Table of Contents**
**(Continued)**

Exhibit 37 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449029-40) ....................... Appx2925

Exhibit 38 to Reilly Declaration -
Deposition Testimony of Mark Stannard,
taken December 13, 2016 ....................................................... Appx2938
*(Cont'd in Vol IX)*

**Volume IX**
**(Filed Under Seal)**

Exhibit 39 to Reilly Declaration -
Deposition Testimony of Luwy Musey, M.D.,
taken October 7, 2016 .......................................................... Appx3023

Exhibit 40 to Reilly Declaration -
Deposition Testimony of Ann M. Arvin, M.D.,
taken November 12, 2018 ...................................................... Appx3129

Exhibit 41 to Reilly Declaration -
Deposition Testimony of William Nichols,
taken October 25, 2018 .......................................................... Appx3213

Exhibit 42 to Reilly Declaration -
Proposed New Stabilizer for M-M-R®II,
dated July 26, 2022 (MRK-CHA00207690-7735) ................ Appx3249

Exhibit 43 to Reilly Declaration -
M-M-R®II Mumps End Expiry Study: AIGENT Assay Issues
Impact on Study Criteria Regulatory Implications,
dated October 11, 2002 (MRK-CHA00094161-82) .............. Appx3296

Exhibit 44 to Reilly Declaration -
Memo re: Historical Review and Confirmation of Mumps
Virus Potency Formulation Targets in M-M-R®II,
dated April 8, 2011 (MRK-CHA01456760) .......................... Appx3319

**Table of Contents**
**(Continued)**

Exhibit 45 to Reilly Declaration -
Presentation, M-M-R II Mumps End Expiry Trial, produced as
"CDOC presentation November 15-00-draft.ppt"
(MRK-CHA00020396) ......................................................... Appx3321

Exhibit 46 to Reilly Declaration -
Memo re: Stability of Mumps Component in Merck's Live
Virus Vaccines, dated October 5, 2000
(MRK-CHA00587859-62) ..................................................... Appx3419

Exhibit 47 to Reilly Declaration -
Memo re: Stability of Measles, Mumps, and
Rubella Components in Merck's Live Virus Vaccines,
dated October 17, 2000 (MRK-CHA00549487-94) .............. Appx3424

Exhibit 48 to Reilly Declaration -
Email from Katalin G. Abraham to Bonita M. Stankunas,
dated October 5, 2000 (MRK-CHA00284623-9) .................. Appx3433

Exhibit 49 to Reilly Declaration -
Deposition Testimony of Philip S. Bennett,
taken May 24, 2017 ............................................................. Appx3441

**Volume X**
**(Filed Under Seal)**

Exhibit 50 to Reilly Declaration -
Email from Keiko Simon, dated October 2, 2002
(MRK-CHA00615147-74) ..................................................... Appx3501

Exhibit 51 to Reilly Declaration -
Internal Strategy Document regarding M-M-R®II
Regulatory Compliance (MRK-CHA00019225-45) .............. Appx3530

Exhibit 52 to Reilly Declaration -
"Genetic Heterogeneity of Mumps Strains: Potential
Implications in Comparative Neutralization Studies" CBER
Background Information, dated November 1999
(MRK-CHA00020635-42) ..................................................... Appx3552

## **Table of Contents**
## **(Continued)**

Exhibit 53 to Reilly Declaration -
Draft memo, produced as "Outstanding-
issuesMMRV&MMRII.doc"
(MRK-CHA00198876-91) ..................................................... Appx3561

Exhibit 54 to Reilly Declaration -
Memo re: Mumps neutralization meeting minutes,
dated September 16, 1999 (MRK-CHA00020425-7) ............ Appx3578

Exhibit 55 to Reilly Declaration -
Email from Katalin G. Abraham to Keith D. Chirgwin,
dated February 25, 2000 (MRK-CHA00095143) .................. Appx3582

Exhibit 56 to Reilly Declaration -
Memo re: Team Biologics Close Out – Form FDA 483,
dated October 11, 2000 (MRK-CHA00071265-71) .............. Appx3584

Exhibit 57 to Reilly Declaration -
Email from Dorothy Margolskee, M.D., to
Florian Schodel, M.D., with attachments,
dated February 26, 2001
(MRK-CHA00549510-35) ..................................................... Appx3592

Exhibit 58 to Reilly Declaration -
Email from Joseph F. Heyse with attachments,
dated March 5, 2001
(MRK-CHA00616007-12) ..................................................... Appx3627

Exhibit 59 to Reilly Declaration -
Response to FDA 483 Observation 3
(MRK-CHA00086295-7) ....................................................... Appx3634

Exhibit 60 to Reilly Declaration -
Draft Response to FDA 483 Observation 3
(MRK-CHA00086298-317) ................................................... Appx3638

Exhibit 61 to Reilly Declaration -
Draft Response to FDA 483 Observation 3
(MRK-CHA00562230-41) ..................................................... Appx3659

# Table of Contents
## (Continued)

**Page**

Exhibit 62 to Reilly Declaration -
Draft Response to FDA 483 Observation 3
(MRK-CHA01440844-64) ..................................................... Appx3672

Exhibit 63 to Reilly Declaration -
Letter from Robert L. McKee, Ph.D. to Steven A. Masiello,
dated March 8, 2001 (MRK-CHA01537603-11) ................... Appx3694

Exhibit 64 to Reilly Declaration -
Deposition Testimony of Dorothy Margolskee, M.D.,
taken April 21, 2017 .............................................................. Appx3704

Exhibit 65 to Reilly Declaration -
Excerpts from Label Claim Compliance M-M-R®II
Peer Review Meeting, dated July 15, 2002
(MRK-CHA00322038-65) ..................................................... Appx3796

Exhibit 66 to Reilly Declaration -
Memo re: Executive Summary-CBER/Merck Meeting
April 4, 2001, dated April 8, 2001
(MRK-CHA01649955-6) ....................................................... Appx3819

Exhibit 67 to Reilly Declaration -
Memo re: Minutes, Meeting with CBER on 4/4/01
Regarding Mumps Stability, dated April 9, 2001
(MRK-CHA00754687-91) ..................................................... Appx3822

Exhibit 68 to Reilly Declaration -
Email from Christopher J. Petroski to Keith D. Chirgwin,
dated January 21, 2002 (MRK-CHA00561350-5) ................. Appx3828

Exhibit 69 to Reilly Declaration -
Presentation, M-M-R®II Mumps Expiry Mumps Potency
Claim in Label (MRK-CHA00334863-8) .............................. Appx3835

Exhibit 70 to Reilly Declaration -
Presentation, Mumps Expiry- Label Claim, produced as
"RMC mumps expiry update.ppt" (MRK-CHA00086318) ... Appx3842

**Table of Contents**
(Continued)

Exhibit 71 to Reilly Declaration -
Memo re: M-M-R®II: Mumps End Expiry label change –
filing strategy, dated August 2, 2001
(MRK-CHA00247149-52) ...................................................... Appx3846

Exhibit 72 to Reilly Declaration -
Email from Keith D. Chirgwin to Manal A. Morsy with
attachment, dated January 22, 2002
(MRK-CHA00019084-5) ...................................................... Appx3851

Exhibit 73 to Reilly Declaration -
Email from Cynthia F. Morrisey, dated September 5, 2002
(MRK-CHA01562819-20) ...................................................... Appx3873

Exhibit 74 to Reilly Declaration -
Email from Roberta L. McKee, Ph.D.,
dated October 31, 2002 (MRK-CHA00094134-5) ................ Appx3876

Exhibit 75 to Reilly Declaration -
Memo, Mumps and Rubella Formulation and Potency Assay
Format Changes to Support Potency through Twenty-four
Month Expiry (MRK-CHA01894982-98) ............................. Appx3879

Exhibit 76 to Reilly Declaration -
Email from Mark S. Galinski to Keiko Simon,
dated August 23, 2004 (MRK-CHA01564065-8) .................. Appx3897

Exhibit 77 to Reilly Declaration -
Email from Alison L. Fisher with attachments,
dated September 20, 2004
(MRK-CHA01574732-8) ...................................................... Appx3902

Exhibit 78 to Reilly Declaration -
Presentation, Accomplishments to Date,
produced as "accomplishments to 5-17-01.ppt"
(MRK-CHA00724288) ......................................................... Appx3910

**Table of Contents**
**(Continued)**

Exhibit 79 to Reilly Declaration -
Draft letter from Roberta L. McKee, Ph.D., to
Michael Angelo, with metadata date of October 17, 2002
(MRK-CHA01649892-3) ...................................................... Appx3917

Exhibit 80 to Reilly Declaration -
Email from Manal Morsy to Keith D. Chirgwin,
dated November 4, 2002 (MRK-CHA00501762-5) .............. Appx3920

Exhibit 81 to Reilly Declaration -
Memo re: Preparations for the Mumps Stability-CBER
discussion, dated March 19, 2001
(MRK-CHA00019430-2) ...................................................... Appx3925

Exhibit 82 to Reilly Declaration -
Email from Philip S. Bennett to Joseph M. Antonello,
dated September 5, 2002 (MRK-CHA00780325-6) .............. Appx3929

Exhibit 83 to Reilly Declaration -
Memo re: Mumps End Expiry study issues,
with Attachment (MRK-CHA00019246-67) ........................ Appx3932

Exhibit 84 to Reilly Declaration -
Draft Presentation, M-M-R II to October 8, 2002 CRRC,
produced as "Draft#1-CRRC 10-08-02 slides.ppt"
(SCHOFIELD_00000201) ...................................................... Appx3955

Exhibit 85 to Reilly Declaration -
Presentation, M-M-R II to October 8, 2002 CRRC,
produced as "CRRC-10-08-02 slides.ppt"
(MRK-CHA00027726) .......................................................... Appx3991
*(Cont'd in Vol XI)*

**Volume XI**
**(Filed Under Seal)**

Exhibit 86 to Reilly Declaration -
Email from Philip S. Bennett with attachment,
dated March 14, 2001 (MRK-CHA00562218-9) ................... Appx4021

# Table of Contents
## (Continued)

Exhibit 87 to Reilly Declaration -
Meeting Agenda, dated March 7, 2002
(MRK-CHA00205854-60) ...................................................... Appx4024

Exhibit 88 to Reilly Declaration -
Email from Manal Morsy, M.D., Ph.D. to Deitra E. Arena,
dated March 27, 2002 (MRK-CHA00064005-12) ................. Appx4032

Exhibit 89 to Reilly Declaration -
Email from Manal Morsy, M.D., Ph.D. to David Krah, M.D.,
dated April 10, 2002 (MRK-CHA00561310-2) ..................... Appx4041

Exhibit 90 to Reilly Declaration -
Spreadsheet for June 10, 2003 Vaccine Assay Committee
meeting (MRK-CHA00440797-811) ...................................... Appx4045

Exhibit 91 to Reilly Declaration -
Minutes of CBER Teleconference, dated December 7, 2001
(MRK-CHA00019434-7) ....................................................... Appx4061

Exhibit 92 to Reilly Declaration -
Draft Summary of Teleconference Notes
(MRK-CHA00024596-9) ....................................................... Appx4066

Exhibit 93 to Reilly Declaration -
Memo re: CBER teleconference (December 7, 2001): Mumps
Inspection results and discussion, dated December 13, 2001
(MRK-CHA00071082-9) ....................................................... Appx4071

Exhibit 94 to Reilly Declaration -
Memo re: Consultation with Dr. William Fairweather
on Vaccine Stability, dated December 14, 2000
(MRK-CHA00590949-58) ...................................................... Appx4080

Exhibit 95 to Reilly Declaration -
Excerpts from Proposed New Stabilizer for M-M-R®II,
dated August 2002 (MRK-CHA01591461-87) ...................... Appx4091

# **Table of Contents**
## **(Continued)**

Exhibit 96 to Reilly Declaration -
Email from Manal Morsy, M.D., Ph.D. to Joye L. Bramble,
dated June 11, 2002 (MRK-CHA00494158-61) .................... Appx4117

Exhibit 97 to Reilly Declaration -
M-M-R®11 Defense Action Plan, dated June 1999
(MRK-CHA00285276-96) .................................................... Appx4122

Exhibit 98 to Reilly Declaration -
Memo re: Statement of Interest for ProQuad™ Measles,
mumps, rubella, and varicella virus vaccine live, dated
November 10, 2000 (MRK-CHA00325472-91) .................... Appx4144

Exhibit 99 to Reilly Declaration -
Memo re: Statement of Interest for ProQuad™ Measles,
mumps, rubella, and varicella virus vaccine live,
dated November 10, 2000 (MRK-CHA00671410-28) .......... Appx4165

Exhibit 100 to Reilly Declaration -
Memo re: Minimum Expiry Specification Limit for Mumps
Potency in M-M-R®II, dated July 5, 2001
(MRK-CHA01896349) ......................................................... Appx4185

Exhibit 101 to Reilly Declaration -
Excerpts from Clinical and Regulatory Review Committee
Development Projects, dated October 29, 2002
(MRK-CHA01725276-364) ................................................... Appx4187

Exhibit 102 to Reilly Declaration -
Presentation, MMRII Mumps End Expiry study status &
Regulatory implications, produced as "slides for
GRSRC_MumpsEndExpiry -10-11-02.ppt"
(MRK-CHA00040705) ......................................................... Appx4197

Exhibit 103 to Reilly Declaration -
Presentation, MMRII Mumps End Expiry study status &
Regulatory implications, produced as
"slides for GRSRC -10-11-02.ppt"
(MRK-CHA00094159) ......................................................... Appx4227

**Table of Contents**
(Continued)

Exhibit 104 to Reilly Declaration -
Email from Joseph F. Heyse to Keith D. Chirgwin,
dated September 30, 2002 (MRK-CHA01582137-9) ............ Appx4256

Exhibit 105 to Reilly Declaration -
MRL Clinical Study Report, Multicenter Study: A Study of
M-M-R II at Mumps Expiry Potency in Healthy Children 12
to 18 Months of Age (Protocol 007)
(MRK-CHA00224982-26529) ............................................... Appx4260

Exhibit 106 to Reilly Declaration -
Email from Dorothy Margolskee to Keith D. Chirgwin,
dated March 8, 1998 (MRK-CHA00095320-1) ..................... Appx4419

Exhibit 107 to Reilly Declaration -
Slide Deck from M-M-R™ Expiry Investigators Meeting,
dated March 15-16, 1999 (MRK-CHA00017605-12) ........... Appx4422

Exhibit 108 to Reilly Declaration -
Excerpts from Merck Submission to the Department of Justice,
dated April 9, 2012 (MRK-CHA0002549-75) ....................... Appx4431

Exhibit 109 to Reilly Declaration -
Letter from Karen L. Goldethal, M.D. to
Keith Chirgwin, M.D., dated September 8, 1998
(MRK-CHA00001467-9) ...................................................... Appx4459

Exhibit 110 to Reilly Declaration -
Memo re: BB-IND 1016: Summary of discussion with
Dr. Kathryn Carbone and Ms. Luba Vujcic (CBER) regarding
the Mumps neutralization assay, dated February 8, 2000
(MRK-CHA00001255-7) ...................................................... Appx4463

Exhibit 111 to Reilly Declaration -
Memo re: Communication with Dr. Kathryn Carbone (CBER)
on April 12, 200 regarding CBER's meeting (face to face-
March 13, 2000) minutes and the mumps neutralization
and ELISA assays, dated April 12, 2000
(MRK-CHA01927351-5) ...................................................... Appx4467

## Table of Contents
### (Continued)

Exhibit 112 to Reilly Declaration -
Response to FDA Request for Information,
dated November 17, 2004 (MRK-CHA00126963-71) .......... Appx4473

Exhibit 113 to Reilly Declaration -
Summary of Findings of Inspection, dated August 6, 2001
(MRK-CHA02021754-61) ..................................................... Appx4483

Exhibit 114 to Reilly Declaration -
Meeting Minutes, dated March 14, 2000
(MRK-CHA00001258-61) ..................................................... Appx4492

Exhibit 115 to Reilly Declaration -
Deposition Testimony of Emilio Emini, Ph.D.,
taken June 6, 2017 .................................................................. Appx4497
***(Cont'd in Vol XII)***

### Volume XII
### (Filed Under Seal)

Exhibit 116 to Reilly Declaration -
Deposition Testimony of Florian Schodel, M.D.,
taken December 22, 2016  .................................................... Appx4592

Exhibit 117 to Reilly Declaration -
Email from Manal Morsy, dated September 13, 2002
(MRK-CHA01386177-82) ..................................................... Appx4700

Exhibit 118 to Reilly Declaration -
Email from Keiko Simon with attachments,
dated October 27, 2003
(MRK-CHA00279197-247) ................................................... Appx4707

Exhibit 119 to Reilly Declaration -
Slide Deck from M-M-R™ Expiry Investigators Meeting,
dated March 15-16, 1999 (MRK-CHA01888826-913) ......... Appx4759

## Table of Contents
### (Continued)

Exhibit 120 to Reilly Declaration -
Email from Deitra E. Arena with attachments,
dated June 16, 2000
(MRK-CHA00026466-89) ...................................................... Appx4848

Exhibit 121 to Reilly Declaration -
Email from Manal Morsy to Henrietta Ukwu,
dated October 10, 1999 (MRK-CHA01898773-6) ................ Appx4874

Exhibit 122 to Reilly Declaration -
Deposition Testimony of David Krah, M.D.,
taken July 11-12, 2017 ........................................................... Appx4879
*(Cont'd in Vol XIII)*

### Volume XIII
### (Filed Under Seal)

Exhibit 123 to Reilly Declaration -
Mumps Neutralization Assay Development
(MRK-CHA00336905-18) ...................................................... Appx5076

Exhibit 124 to Reilly Declaration -
Minutes of CAS Meeting, dated June 20, 2000
(MRK-CHA00209674-8) ........................................................ Appx5091

Exhibit 125 to Reilly Declaration -
Email from Ted L. Staub to George Williams,
dated February 20, 1998 (MRK-CHA00625629-30) ............. Appx5097

Exhibit 126 to Reilly Declaration -
Minutes of Mumps Neutralization Assay Meeting,
dated September 29, 1999 (MRK-CHA00020428-9) ............ Appx5100

Exhibit 127 to Reilly Declaration -
Presentation, MMR II End Expiry Trial,
produced as "MMRII-Neut-fnQPAslides9-27-99.ppt"
(MRK-CHA00025315) ........................................................... Appx5103

## Table of Contents
### (Continued)

Exhibit 128 to Reilly Declaration -
Draft Summary of 8/17/99 meeting by M. Morsy
(MRK-CHA00198869-70) .......................................................Appx5111

Exhibit 129 to Reilly Declaration -
Memo re: Options and proposed path forward for the
Mumps Expiry Trial (MRK-CHA00086292-3) ..................... Appx5114

Exhibit 130 to Reilly Declaration -
Email from Florian P. Schodel to Colleen A. Forsythe,
dated July 7, 1997 (MRK-CHA01648951-6) ........................ Appx5117

Exhibit 131 to Reilly Declaration -
Memo re: Monthly report for August, 2000,
dated August 23, 2000 (MRK-CHA00016632-5) .................. Appx5124

Exhibit 132 to Reilly Declaration -
Virus & Cell Biology Research Procedure
(MRK-CHA00002189-98) .................................................... Appx5129

Exhibit 133 to Reilly Declaration -
Letter from Karen L. Goldenthal, M.D. to Keith D. Chirgwin,
M.D., dated October 26, 1999 (MRK-CHA00761482-4) ...... Appx5140

Exhibit 134 to Reilly Declaration -
Memo re: Filing Strategy for ProQuad,
dated January 31, 2002 (MRK-CHA00818776-81) ............... Appx5144

Exhibit 135 to Reilly Declaration -
Memo re: CBER teleconference (October 16, 2001):
Measles, Mumps and Rubella ELISAs, dated October 19, 2001
(MRK-CHA00331831-6) ...................................................... Appx5151

Exhibit 136 to Reilly Declaration -
Email from Michael L. Dekleva to Alison L. Fisher,
dated October 26, 2004 (MRK-CHA00846454-8) ............... Appx5158

**Table of Contents**
**(Continued)**

Exhibit 137 to Reilly Declaration -
Response to FDA Request for Information,
dated April 13, 2005 (MRK-CHA00000315-60) ................... Appx5164

Exhibit 138 to Reilly Declaration -
Response to FDA Request for Information,
dated November 15, 2006 (MRK-CHA00000393-409) ........ Appx5211

Exhibit 139 to Reilly Declaration -
Response to CBER Comments, dated June 10, 2002
(MRK-KRA00761628-702) ................................................... Appx5229

Exhibit 140 to Reilly Declaration -
Regulatory Liaison FDA Conversation Record,
dated October 5, 2004 (MRK-CHA00846405-15) ................ Appx5305

Exhibit 141 to Reilly Declaration -
Email from Florian Schodel to Michael L. Dekleva,
dated July 3, 2004 (MRK-CHA00791315-9) ........................ Appx5317

Exhibit 142 to Reilly Declaration -
Proposal for Immunogenicity Analyses
(MRK-CHA00561111-2) ...................................................... Appx5323

Exhibit 143 to Reilly Declaration -
Email from David Krah, M.D. to Emilio Emini, Ph.D.,
dated October 9, 2000 (MRK-CHA00065695-703) .............. Appx5326

Exhibit 144 to Reilly Declaration -
Anti-IgG Enhanced Mumps Neutralization Assay-Update,
dated October 24, 2000 (MRK-CHA00026912-8) ................ Appx5336

Exhibit 145 to Reilly Declaration -
Email from Jospeh Antonello to David Krah, M.D.,
dated October 30, 2000 (MRK-CHA00759836-9) ................ Appx5344

Exhibit 146 to Reilly Declaration -
Deposition Testimony of Barbara Kuter,
taken February 9, 2018 ......................................................... Appx5349

**Table of Contents**
**(Continued)**

Exhibit 147 to Reilly Declaration -
Email from Steven Rubin to David Krah, M.D.,
dated August 24, 2011 (MRK-CHA00030994-8) .................. Appx5398

Exhibit 148 to Reilly Declaration -
Excerpts from Attachments to 11/18/98 CDOC Meeting
(MRK-CHA01731773-1804) ................................................ Appx5404

Exhibit 149 to Reilly Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
teleconference on methods used for the plaque reduction
neutralization assay, dated February 22, 1999
(MRK-CHA00095050-2) ...................................................... Appx5437

Exhibit 150 to Reilly Declaration -
Extra CDAB Meeting Abstract, dated August 1, 2011
(GSK-MMR-0195819-42) ...................................................... Appx5441

Exhibit 151 to Reilly Declaration -
Performance Characteristics and Validation for Mumps Plaque
Reduction Microneutralization assay
(GSK-MMR-IND-0022195-269) .......................................... Appx5466
*(Cont'd in Vol XIV)*

**Volume XIV**
**(Filed Under Seal)**

Exhibit 152 to Reilly Declaration -
Agenda for CBER Meeting, dated March 13, 2000
(MRK-CHA00016335-43) ...................................................... Appx5542

Exhibit 153 to Reilly Declaration -
Email from David Krah, M.D. to Alan Shaw,
dated August 15, 2000 (MRK-CHA00068546) ..................... Appx5552

Exhibit 154 to Reilly Declaration -
To-Do List, dated August 26, 2000
(MRK-CHA00273243-4) ...................................................... Appx5554

**Table of Contents**
(Continued)

Exhibit 155 to Reilly Declaration -
Deposition Testimony of Stephen Krahling,
taken May 2-3, 2017 ............................................................. Appx5557

Exhibit 156 to Reilly Declaration -
Memo re: Monthly report for May, 2000, dated May 23, 2000
(MRK-CHA01634869-71) ...................................................... Appx5690

Exhibit 157 to Reilly Declaration -
Handwritten Notes in Book 31271, Pages 161-2
(MRK-CHA00064608-9) ........................................................ Appx5694

Exhibit 158 to Reilly Declaration -
Email from David Krah, M.D. to Emilio Emini, Ph.D.,
dated March 30, 2000 (MRK-CHA00336323-5) ................... Appx5697

Exhibit 159 to Reilly Declaration -
Email from Keith D. Chirgwin with attachment,
dated February 26, 2001
(MRK-CHA00549462-72) ...................................................... Appx5701

Exhibit 160 to Reilly Declaration -
Relator Stephen A. Krahling's Responses and Objections
to Merck's Revised First Set of Interrogatories,
dated May 18, 2015 ............................................................... Appx5713

Exhibit 161 to Reilly Declaration -
Deposition Testimony of Joseph Antonello, Ph.D.,
taken August 3, 2017 ............................................................ Appx5780

Exhibit 162 to Reilly Declaration -
Email from Beverly A. Zaber to Cathy W. Wadsworth,
dated August 9, 2001 (MRK-CHA00008835-9) .................... Appx5862

Exhibit 163 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Steve Krahling, dated March 29, 2001
(MRK-CHA00015702-3) ........................................................ Appx5868

**Table of Contents**
**(Continued)**

Page

Exhibit 164 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Colleen Barr, dated March 29, 2001
(MRK-CHA00014739-40) ..................................................... Appx5871

Exhibit 165 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Mary Yagodich, dated March 29, 2001
(MRK-CHA00014746-7) ..................................................... Appx5874

Exhibit 166 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Jennifer Kriss, dated March 29, 2001
(MRK-CHA00014829-30) ..................................................... Appx5877

Exhibit 167 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Steve Krahling, dated March 29, 2001
(MRK-CHA00014731-2) ..................................................... Appx5880

Exhibit 168 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Mary Yagodich, dated March 29, 2001
(MRK-CHA00014744-5) ..................................................... Appx5883

Exhibit 169 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Jill DeHaven, dated March 29, 2001
(MRK-CHA00014749-50) ..................................................... Appx5886

Exhibit 170 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Jennifer Kriss, dated March 29, 2001
(MRK-CHA00015719-20) ..................................................... Appx5889

Exhibit 171 to Reilly Declaration -
Memo re: Study KM-248 Phase III-Questionable ELISA
Results in the Comparator Group, dated November 1, 2001
(MRK-CHA00760670-2) ..................................................... Appx5892

**Table of Contents**
**(Continued)**

Exhibit 172 to Reilly Declaration -
Deposition Testimony of Joan L. Wlochowski,
taken June 13-14, 2017 ......................................................... Appx5896
*(Cont'd in Vol XV)*

**Volume XV**
**(Filed Under Seal)**

Exhibit 173 to Reilly Declaration -
Outline for HR Discussion (RELATOR_00000273) ............. Appx6040

Exhibit 174 to Reilly Declaration -
Expert Report of Philip Stark, Ph.D.,
dated March 12, 2018 ........................................................... Appx6042

Exhibit 175 to Reilly Declaration -
Supplemental Expert Report of Philip Stark, Ph.D.,
dated October 16, 2018 ......................................................... Appx6072

Exhibit 176 to Reilly Declaration -
Email from Jospeh Antonello with attachments,
dated March 20, 2002
(MRK-CHA00544820-47) ..................................................... Appx6079

Exhibit 177 to Reilly Declaration -
Excerpts from journal of David Krah, M.D.
(MRK-CHA00489903-490080) ............................................. Appx6133

Exhibit 178 to Reilly Declaration -
Handwritten Log (RELATOR_00001025-6) ......................... Appx6136

Exhibit 179 to Reilly Declaration -
Excerpts from journal of David Krah, M.D.
(MRK-CHA00490592-91038) ............................................... Appx6139

Exhibit 180 to Reilly Declaration -
Memo re: Review of mumps-AIGENT neutralization data,
dated August 1, 2001 (MRK-CHA00026864) ....................... Appx6144

**Table of Contents**
**(Continued)**

Exhibit 181 to Reilly Declaration -
Email from Karen R. McKenney, dated August 7, 2001
(MRK-CHA00052249-53) ..................................................... Appx6146

Exhibit 182 to Reilly Declaration -
General Correspondence and Submission to FDA,
dated February 4, 2002 (MRK-CHA00000410-78) ............... Appx6152

Exhibit 183 to Reilly Declaration -
Assay Log (MRK-CHA00050333-42) .................................. Appx6222

Exhibit 184 to Reilly Declaration -
Handwritten Notes regarding Discarded Plates
(MRK-CHA00055013) ......................................................... Appx6233

Exhibit 185 to Reilly Declaration -
Memo re: Validation of the Anti-IgG Enhanced Mumps Wild
Type Plaque Reduction Neutralization Assay (Virus and Cell
Biology Research Procedure #874.3489), dated
February 27, 2001 (MRK-CHA00016988-17023) ................ Appx6235

Exhibit 186 to Reilly Declaration -
Response to FDA Request for Information,
dated March 12, 2001 (MRK-CHA00017036-115) ............... Appx6272

Exhibit 187 to Reilly Declaration -
Biological Product Deviation Report Form,
dated April 20, 2001 (MRK-CHA00754233-8) ..................... Appx6353

Exhibit 188 to Reilly Declaration -
Background Document: M-M-R®II Protocol 007-Mumps End
Expiry Study: AIGENT Assay Issues and Impact on Study
Criteria (MRK-CHA00615152-74) ....................................... Appx6360

Exhibit 189 to Reilly Declaration -
Supplemental Biologics License Application,
dated January 29, 2004 (MRK-CHA00000032-139) ............. Appx6384

## Table of Contents
### (Continued)

**Page**

Exhibit 190 to Reilly Declaration -
Information Amendment-Clinical, dated November 30, 2001
(MRK-CHA00126233-66) ..................................................... Appx6493
*(Cont'd in Vol XVI)*

## Volume XVI
### (Filed Under Seal)

Exhibit 191 to Reilly Declaration -
Email from Mandie Lyon to David Krah, M.D.,
dated August 19, 2004 (MRK-CHA00337141-57) ................ Appx6528

Exhibit 192 to Reilly Declaration -
Email from Barbara J. Kuter to Barbara J. Kuter
with attachment, dated August 5, 2009
(MRK-CHA00121080-82) ..................................................... Appx6546

Exhibit 193 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of October 24, 2011 ..................... Appx6550

Exhibit 194 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of September 26, 2012 ................. Appx6555

Exhibit 195 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of October 17, 2012 ..................... Appx6559

Exhibit 196 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of December 22, 2012 ................. Appx6563

Exhibit 197 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of July 3, 2013 ............................ Appx6567

**Table of Contents**
(Continued)

Exhibit 198 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of October 7, 2015 ....................... Appx6571

Exhibit 199 to Reilly Declaration -
CinicalTrials.gov "Background" webpage,
last accessed October 14, 2019 ............................................. Appx6575

Exhibit 200 to Reilly Declaration -
EMEA Scientific Discussion Paper re: M-M-RVAXPRO
and M-M-RII, downloaded October 10, 2019 ........................ Appx6580

Exhibit 201 to Reilly Declaration -
Letter from Dr. Gudrun V. Wangenheim to
D. Wonnacott, Ph.D. (MRK-CHA00626021-2) .................... Appx6616

Exhibit 202 to Reilly Declaration -
Letter from Karen L. Goldenthal, M.D. to Alison Fisher,
Ph.D., dated October 17, 2005 (MRK-CHA00560257-8) ..... Appx6619

Exhibit 203 to Reilly Declaration -
Amendment to Supplemental Biologics License Application
Response to FDA Request for Information,
dated June 5, 2007, with Attachments
(MRK-CHA00000368-82) ..................................................... Appx6622

Exhibit 204 to Reilly Declaration -
Email from Margaret Kanters to Donna Zacholski,
dated January 30, 2009 (MRK-CHA01300697-9) ................. Appx6638

Exhibit 205 to Reilly Declaration -
Approval Letter from FDA, dated December 6, 2007
(MRK-CHA01519087-8) ....................................................... Appx6642

Exhibit 206 to Reilly Declaration -
Memo re: Review of Merck's 7068-214, dated July 27, 2004
(MRK-CHA00846451-3) ....................................................... Appx6645

# Table of Contents
## (Continued)

Exhibit 207 to Reilly Declaration -
ProQuad™ Original Application, dated August 3, 2004
(MRK-CHA00158320-71) ...................................................... Appx6649

Exhibit 208 to Reilly Declaration -
Deposition Testimony of Michael Dekleva,
taken February 9, 2017  ........................................................ Appx6687

Exhibit 209 to Reilly Declaration -
Original Biologics License Application, dated August 27, 2004
(MRK-CHA00157572-3) ...................................................... Appx6760

Exhibit 210 to Reilly Declaration -
Email from Louis H. Washington to Michael L. Dekleva,
dated June 10, 2004 (MRK-CHA00821967-9) ...................... Appx6763

Exhibit 211 to Reilly Declaration -
Information Amendment-Clinical, dated November 27, 2001
(MRK-CHA00152449-67) ...................................................... Appx6767

Exhibit 212 to Reilly Declaration -
Excerpts from Merck's Responses and Objections to
Plaintiffs' First Set of Interrogatories,
dated August 16, 2017 .......................................................... Appx6787

Exhibit 213 to Reilly Declaration -
Excerpts from Merck's Response to Request for Information,
dated May 4, 2005 (MRK-CHA00846087-6404) .................. Appx6798

Exhibit 214 to Reilly Declaration -
Approval Letter, dated September 6, 2005
(MRK-CHA00761865-89) ...................................................... Appx6804

Exhibit 215 to Reilly Declaration -
Supplemental Biologics License Application,
dated June 30, 2004 (MRK-CHA00137854-5) ...................... Appx6830

**Table of Contents**
**(Continued)**

Exhibit 216 to Reilly Declaration -
Excerpts from A Comparison of the Safety, Tolerability, and
Immunogenicity of M-M-R™II Manufactured With
Recombinant Human Albumin (rHA) Versus M-M-R™II
Manufactured with Pooled-Donor Human Serum Albumin
(HSA) in Healthy Children 12 to 18 Months of Age
Protocol 009 (MRK-CHA00140056-41340) ......................... Appx6833

Exhibit 217 to Reilly Declaration -
Excerpts from Measles, Mumps, and Rubella Virus Vaccine,
Live-Replacement of Human Serum Albumin With
Recombinant Albumin (MRK-CHA00138137-72) ............... Appx6908

Exhibit 218 to Reilly Declaration -
Excerpts from Response to FDA Request for Information,
dated June 28, 2004 (MRK-CHA00124554-4690) ................ Appx6931

Exhibit 219 to Reilly Declaration -
Approval Letter, dated August 31, 2005
(MRK-CHA00141909-22) ..................................................... Appx6979

Exhibit 220 to Reilly Declaration -
M-M-R®II Label (April 1999)
(MRK-CHA00757072-6) ....................................................... Appx6994

Exhibit 221 to Reilly Declaration -
M-M-R®II Label (MRK-CHA00757108-11) ........................ Appx7000
*(Cont'd in Vol XVII)*

**Volume XVII**
**(Filed Under Seal)**

Exhibit 222 to Reilly Declaration -
M-M-R®II Label (2004) (MRK-CHA00757100-3) .............. Appx7005

Exhibit 223 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449260-70) ....................... Appx7010

# Table of Contents
**(Continued)**

Exhibit 224 to Reilly Declaration -
Current M-M-R®II Label (last revised: 09/2019),
downloaded on October 22, 2019 .......................................... Appx7022

Exhibit 225 to Reilly Declaration -
M-M-R®II Label (1990) (MRK-CHA00757060-3) .............. Appx7034

Exhibit 226 to Reilly Declaration -
Summary of Revisions of M-M-R®II Label
(MRK-CHA00137876-7) ....................................................... Appx7039

Exhibit 227 to Reilly Declaration -
Protocol 006 Clinical Study Report Synopsis,
dated August 16, 2004 (MRK-CHA01580213-19) ................ Appx7042

Exhibit 228 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449029-40) ........................ Appx7050

Exhibit 229 to Reilly Declaration -
Description of ProQuad® (MRK-CHA00177125-36) .......... Appx7063

Exhibit 230 to Reilly Declaration -
ProQuad® Label (MRK-CHA01449181-2) .......................... Appx7076

Exhibit 231 to Reilly Declaration -
Current ProQuad Label (last revised: 09/2019),
downloaded on October 22, 2019 .......................................... Appx7079

Exhibit 232 to Reilly Declaration -
Excerpts from Merck's Responses and Objections to Relators'
First Set of Interrogatories, dated April 9, 2015 .................... Appx7105

Exhibit 233 to Reilly Declaration -
Expert Report of Yonatan Grad, M.D., Ph.D.,
dated June 12, 2018 ............................................................... Appx7114

Exhibit 234 to Reilly Declaration -
Excerpts from "Summary of Notifiable Diseases-United
States, 2006," *MMWR*, 2008:55(53) ..................................... Appx7169

**Table of Contents**
(Continued)

Exhibit 235 to Reilly Declaration -
Excerpts from "Summary of Notifiable Diseases-United
States, 2009," *MMWR*, 2009:58(53) ..................................... Appx7173

Exhibit 236 to Reilly Declaration -
Excerpts from a "Summary of Notifiable Diseases-United
States, 2010," *MMWR*, 2012:59(53) ..................................... Appx7177

Exhibit 237 to Reilly Declaration -
Excerpts from "Summary of Notifiable Diseases-United
States, 2012," *MMWR*, 2014:61(53) ..................................... Appx7181

Exhibit 238 to Reilly Declaration -
Excerpts from "Summary of Notifiable Infectious
Diseases and Conditions-United States, 2013,"
*MMWR*, 2015:62(53) ........................................................... Appx7185

Exhibit 239 to Reilly Declaration -
Excerpts from "Summary of Notifiable Infectious
Diseases and Conditions-United States, 2014,"
*MMWR*, 2016:63(54) ........................................................... Appx7189

Exhibit 240 to Reilly Declaration -
Excerpts from "Summary of Notifiable Infectious
Diseases and Conditions-United States, 2015,"
*MMWR*, 2017:64(53) ........................................................... Appx7194

Exhibit 241 to Reilly Declaration -
National Notifiable Infectious Diseases and Conditions:
United States TABLE 2j. Reported cases of notifiable
diseases, by region and reporting area-United States and
U.S. territories, 2016 ........................................................... Appx7199

Exhibit 242 to Reilly Declaration -
National Notifiable Infectious Diseases and Conditions:
United States TABLE 2j. Reported cases of notifiable
diseases, by region and reporting area-United States and
U.S. territories, 2017 ........................................................... Appx7202

**Table of Contents**
(Continued)

Exhibit 243 to Reilly Declaration -
Nationally Notifiable Infectious Diseases and Conditions,
United States: Weekly Tables; TABLE 1y. Weekly cases of
notifiable diseases, United States, U.S. Territories, and
Non-U.S. Residents weeks ending September 14, 2019
(week 37) .............................................................................. Appx7205

Exhibit 244 to Reilly Declaration -
"Decreased humoral immunity to mumps in young adults
immunized with MMR vaccine in childhood," Rasheed, *et al.*,
PNAS, dated September 17, 2019 116 (38) ........................... Appx7209

Exhibit 245 to Reilly Declaration -
Deposition Testimony of William L. Atkinson, M.D., MPH,
taken January 30, 2019 ......................................................... Appx7216

Exhibit 246 to Reilly Declaration -
Email from Don Latner to William Bellini,
dated July 29, 2010 (BIAOHE000446-53) ............................ Appx7270

Exhibit 247 to Reilly Declaration -
Deposition Testimony of Yonatan Grad, M.D., Ph.D.,
taken October 30, 2018 ......................................................... Appx7279

Exhibit 248 to Reilly Declaration -
Press Briefing Transcripts from CDC,
dated April 19, 2006 .............................................................. Appx7342

Exhibit 249 to Reilly Declaration -
Deposition Testimony of Alan W. Sims,
taken October 12, 2017 .......................................................... Appx7349

Exhibit 250 to Reilly Declaration -
Deposition Testimony of Katalin Abraham,
taken May 18, 2017 ............................................................... Appx7403
***(Cont'd in Vol XVIII)***

**Table of Contents**
**(Continued)**

**Page**

**Volume XVIII**
**(Filed Under Seal)**

Exhibit 251 to Reilly Declaration -
Email from Eric T. Skjeveland to Christopher J. Petroski,
dated June 7, 2012 (MRK-CHA00955961) ........................... Appx7504

Exhibit 252 to Reilly Declaration -
Expert Report of Jonathan Temte, M.D., Ph.D.,
dated June 12, 2018 ............................................................... Appx7506

Exhibit 253 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449243-53) ....................... Appx7556

Exhibit 254 to Reilly Declaration -
Transcription of an MVX (voice mail) from Manal A. Morsy
to Henrietta Ukwu and Keith D. Chirgwin
(MRK-CHA00020421-2) ....................................................... Appx7568

Exhibit 255 to Reilly Declaration -
CDC Presentation, "Mumps-What Happened in 2006?
National Perspective," by Gustavo Dayan,
dated March 5, 2007
(MRK-CHA01372603-33) ..................................................... Appx7571

Exhibit 256 to Reilly Declaration -
"Commentary: Mumps Vaccines: Do We Need A New One?"
by Stanely A. Plotkin, M.D., accepted for publication
December 4, 2012 ................................................................. Appx7603

Exhibit 257 to Reilly Declaration -
"Mumps: A Pain in the Neck," by Stanley A. Plotkin, M.D.,
accepted for publication April 19, 2018 ................................ Appx7606

Exhibit 258 to Reilly Declaration -
"Emerging Mumps Infection," by Rubin, *et al.*,
accepted for publication April 12, 2016 ................................ Appx7609

# Table of Contents
## (Continued)

Exhibit 259 to Reilly Declaration -
"Measles and mumps outbreaks in the United States: Think
globally, vaccinate locally," by Jennifer A. Whitaker,
*Vaccine* 32 (2014) ................................................................ Appx7613

Exhibit 260 to Reilly Declaration -
"Remembering Mumps," by Latner, *et al.*, *PLOS Pathogens*,
published May 7, 2015 .......................................................... Appx7616

Exhibit 261 to Reilly Declaration -
"The resurgence of mumps and pertussis," by Martine Sabbe
and Corinne Vandermeulen accepted for publication
October 22, 2015 ................................................................... Appx7621

Exhibit 262 to Reilly Declaration -
"Mumps Outbreaks in Vaccinated Populations: Are Available
Mumps Vaccines Effective Enough to Prevent Outbreaks?"
by Dayan, *et al.*, accepted for publication May 20, 2008 ...... Appx7631

Exhibit 263 to Reilly Declaration -
Shapiro Deposition Exhibit 25, Program Announcement for
the Department of Defense's Defense Health Program for
Funding Opportunity No. W81XWH-17-PRMRP-CTA ........ Appx7642

Exhibit 264 to Reilly Declaration -
Excerpts from Notice of Grant Award, issued May 7, 2012
(RELATOR_00004392-478) .................................................. Appx7712

Exhibit 265 to Reilly Declaration -
Expert Report of William P. Nichols, dated June 12, 2018 .... Appx7743

Exhibit 266 to Reilly Declaration -
Solicitation Number 2003-N-00734,
issued December 19, 2002 by the CDC ................................. Appx7779

Exhibit 267 to Reilly Declaration -
Solicitation Number 2005-N-01706,
issued January 4, 2005 by the CDC ...................................... Appx7826

## Table of Contents
### (Continued)

**Page**

Exhibit 268 to Reilly Declaration -
Solicitation Number 2007-N-09211,
issued January 23, 2007 by the CDC ..................................... Appx7872

Exhibit 269 to Reilly Declaration -
Solicitation Number 2010-N-11873,
issued January 26, 2010 by the CDC ..................................... Appx7923

Exhibit 270 to Reilly Declaration -
Solicitation Number 2011-N-13043,
issued December 21, 2010 by the CDC ................................. Appx7956

Exhibit 271 to Reilly Declaration -
Solicitation Number 2012-N-14228,
issued December 13, 2011 by the CDC ................................. Appx7987
*(Cont'd in Vol XIX)*

### Volume XIX
### (Filed Under Seal)

Exhibit 272 to Reilly Declaration -
Solicitation Number 2013-N-14972,
issued January 22, 2013 by the CDC ..................................... Appx8013

Exhibit 273 to Reilly Declaration -
Solicitation Number 2014-N-15784,
issued January 24, 2014 by the CDC ..................................... Appx8040

Exhibit 274 to Reilly Declaration -
Solicitation Number 2015-N-16850,
issued January 16, 2015 by the CDC ..................................... Appx8067

Exhibit 275 to Reilly Declaration -
Solicitation Number 2016-N-17693,
issued January, 4, 2015 by the CDC ..................................... Appx8098

Exhibit 276 to Reilly Declaration -
Solicitation Number 2017-N-18099,
issued January 21, 2017 by the CDC ..................................... Appx8127

# Table of Contents
## (Continued)

**Page**

Exhibit 277 to Reilly Declaration -
Solicitation Number 2018-N-67769,
issued January 10, 2018 by the CDC ..................................... Appx8156

Exhibit 278 to Reilly Declaration -
Solicitation Number 75D301-19-R-67848,
issued January 7, 2019 by the CDC ...................................... Appx8183

Exhibit 279 to Reilly Declaration -
Summary of GSK-CDC MMR/V Vaccine Meeting
(GSK-MMR-0030570-2) ........................................................ Appx8212

Exhibit 280 to Reilly Declaration -
Charter of the Advisory Committee on Immunization
Practices, filed April 1, 2018 .................................................. Appx8216

Exhibit 281 to Reilly Declaration -
Relators' Expert Report of Dr. Thomas McGuire,
dated March 13, 2018 ............................................................. Appx8222

Exhibit 282 to Reilly Declaration - [1]
Transactional data, "1998 Lot Assignment.xlsx"
(MRK-CHA02143443) ........................................................... Appx8369

Exhibit 283 to Reilly Declaration -
Transactional data, "1999 Lot Assignment.xlsx"
(MRK-CHA02143444) ........................................................... Appx8371

Exhibit 284 to Reilly Declaration -
Transactional data, "2000 Lot Assignment.xlsx"
(MRK-CHA02143445) ........................................................... Appx8373

Exhibit 285 to Reilly Declaration -
Transactional data, "2001 Lot Assignment.xlsx"
(MRK-CHA02143446) ........................................................... Appx8375

---

[1] Exhibits 282 through 299 to the Reilly Declaration have been omitted by consent of the parties.

**Table of Contents**
**(Continued)**

**Page**

Exhibit 286 to Reilly Declaration -
Transactional data, "2002 Lot Assignment.xlsx"
(MRK-CHA02143447) ......................................................... Appx8377

Exhibit 287 to Reilly Declaration -
Transactional data, "2003 Lot Assignment.xlsx"
(MRK-CHA02143448) ......................................................... Appx8379

Exhibit 288 to Reilly Declaration -
Transactional data, "2004 Lot Assignment.xlsx"
(MRK-CHA02143449) ......................................................... Appx8381

Exhibit 289 to Reilly Declaration -
Transactional data, "2005 Lot Assignment.xlsx"
(MRK-CHA02143450) ......................................................... Appx8383

Exhibit 290 to Reilly Declaration -
Transactional data, "2006 Lot Assignment.xlsx"
(MRK-CHA02143451) ......................................................... Appx8385

Exhibit 291 to Reilly Declaration -
Transactional data, "2007 Lot Assignment.xlsx"
(MRK-CHA02143452) . ......................................................... Appx8387

Exhibit 292 to Reilly Declaration -
Transactional data, "2008 Lot Assignment.xlsx"
(MRK-CHA02143453) ......................................................... Appx8389

Exhibit 293 to Reilly Declaration -
Transactional data, "2009 Lot Assignment.xlsx"
(MRK-CHA02143454) ......................................................... Appx8391

Exhibit 294 to Reilly Declaration -
Transactional data, "2010 Lot Assignment.xlsx"
(MRK-CHA02143455) ......................................................... Appx8393

Exhibit 295 to Reilly Declaration -
Transactional data, "2011 Lot Assignment.xlsx"
(MRK-CHA02143456) ......................................................... Appx8395

# Table of Contents
## (Continued)

**Page**

Exhibit 296 to Reilly Declaration -
Transactional data, "2012 Lot Assignment.xlsx"
(MRK-CHA02143457) ......................................................... Appx8397

Exhibit 297 to Reilly Declaration -
Transactional data, "2013 Lot Assignment.xlsx"
(MRK-CHA02143458) ......................................................... Appx8399

Exhibit 298 to Reilly Declaration -
Transactional data, "2014 Lot Assignment.xlsx"
(MRK-CHA02143459) ......................................................... Appx8401

Exhibit 299 to Reilly Declaration -
Transactional data, "2015 Lot Assignment.xlsx"
(MRK-CHA02143460) ......................................................... Appx8403

Exhibit 300 to Reilly Declaration -
Letter from Lisa C. Dykstra to Counsel,
dated April 17, 2017 ............................................................. Appx8405

Exhibit 301 to Reilly Declaration -
Letter from Stan Bernard, M.D., M.B.A. to Kim Haupt,
dated November 9, 2008 (MRK-CHA02063339-45) ............ Appx8407

Exhibit 302 to Reilly Declaration -
Merck's 2004 Vaccine for Children Contract with the CDC
(MRK-CHA01371280-310) .................................................. Appx8415

Exhibit 303 to Reilly Declaration -
Merck's 2003 Vaccine for Children Contract with the CDC
(MRK-CHA01371311-40) ..................................................... Appx8447

Exhibit 304 to Reilly Declaration -
Merck's 2005 Vaccine for Children Contract with the CDC
(MRK-CHA01371341-72) ..................................................... Appx8478
*(Cont'd in Vol XX)*

**Table of Contents**
**(Continued)**

**Volume XX**
**(Filed Under Seal)**

Exhibit 305 to Reilly Declaration -
Merck's 2010 Vaccine for Children Contract with the CDC
(MRK-CHA01371373-97) ..................................................... Appx8511

Exhibit 306 to Reilly Declaration -
Merck's 2012 Vaccine for Children Contract with the CDC
(MRK-CHA01371398-421) .................................................. Appx8537

Exhibit 307 to Reilly Declaration -
Merck's 2013 Vaccine for Children Contract with the CDC
(MRK-CHA01371422-44) ..................................................... Appx8562

Exhibit 308 to Reilly Declaration -
Merck's 2014 Vaccine for Adults Contract with the CDC
(MRK-CHA01371445-72) ..................................................... Appx8586

Exhibit 309 to Reilly Declaration -
Merck's 2014 Vaccine for Children Contract with the CDC
(MRK-CHA01371473-96) ..................................................... Appx8615

Exhibit 310 to Reilly Declaration -
Merck's 2011 Vaccine for Children Contract with the CDC
(MRK-CHA01371497-518) .................................................. Appx8640

Exhibit 311 to Reilly Declaration -
Merck's 2011 Vaccine for Adults Contract with the CDC
(MRK-CHA01371519-47) ..................................................... Appx8663

Exhibit 312 to Reilly Declaration -
Merck's 2013 Vaccine for Adults Contract with the CDC
(MRK-CHA01371548-71) ..................................................... Appx8693

Exhibit 313 to Reilly Declaration -
Merck's 2012 Vaccine for Adults Contract with the CDC
(MRK-CHA01371572-603) .................................................. Appx8718

# Table of Contents
## (Continued)

**Page**

Exhibit 314 to Reilly Declaration -
Merck's 2007 Vaccine for Children Contract with the CDC
(MRK-CHA01371604-23) ...................................................... Appx8751

Exhibit 315 to Reilly Declaration -
Merck's 2006 Vaccine for Children Contract with the CDC
(MRK-CHA01371624-55) ...................................................... Appx8772

Exhibit 316 to Reilly Declaration -
Merck's 2001 Vaccine for Children Contract with the CDC
(MRK-CHA01371656-92) ...................................................... Appx8805

Exhibit 317 to Reilly Declaration -
Merck's 2000 Vaccine for Children Contract with the CDC
(MRK-CHA01371693-727) ...................................................... Appx8843

Exhibit 318 to Reilly Declaration -
Merck's 1998 Vaccine for Children Contract with the CDC
(MRK-CHA01371728-50) ...................................................... Appx8879

Exhibit 319 to Reilly Declaration -
Merck's 1999 Vaccine for Children Contract with the CDC
(MRK-CHA01371751-84) ...................................................... Appx8903

Exhibit 320 to Reilly Declaration -
Merck's 2002 Vaccine for Children Contract with the CDC
(MRK-CHA01371785-816) ...................................................... Appx8938

Exhibit 321 to Reilly Declaration -
Merck's 2008 Vaccine for Children Contract with the CDC
(MRK-CHA01371817-840) ...................................................... Appx8971

Exhibit 322 to Reilly Declaration -
Merck's 2009 Vaccine for Adults Contract with the CDC
(MRK-CHA01371841-879) ...................................................... Appx8996
*(Cont'd in Vol XXI)*

**Table of Contents**
**(Continued)**

**Volume XXI**
**(Filed Under Seal)**

Exhibit 323 to Reilly Declaration -
Merck's 2009 Vaccine for Children Contract with the CDC
(MRK-CHA01371880-1900) .................................................. Appx9036

Exhibit 324 to Reilly Declaration -
Merck's 2010 Vaccine for Adults Contract with the CDC
(MRK-CHA01371901-33) ...................................................... Appx9058

Exhibit 325 to Reilly Declaration -
Merck's 2015 Vaccine for Adults Contract with the CDC
(MRK-CHA01371934-61) ...................................................... Appx9092

Exhibit 326 to Reilly Declaration -
Merck's 2016 Vaccine for Children Contract with the CDC
(MRK-CHA01371962-89) ...................................................... Appx9121

Exhibit 327 to Reilly Declaration -
Merck's 2010 Vaccine for Adults Contract with the CDC
(MRK-CHA01371990-2020) .................................................. Appx9150

Exhibit 328 to Reilly Declaration -
Merck's 2016 Vaccine for Adults Contract with the CDC
(MRK-CHA01372021-44) ...................................................... Appx9182

Exhibit 329 to Reilly Declaration -
Merck's 2015 Vaccine for Children Contract with the CDC
(MRK-CHA01372045-72) ...................................................... Appx9207

Exhibit 330 to Reilly Declaration -
Invoice, dated March 14, 2012 (MRK-CHA01371253) ........ Appx9236

Exhibit 331 to Reilly Declaration -
Invoice, dated January 3, 2011(MRK-CHA01371256) ......... Appx9238

Exhibit 332 to Reilly Declaration -
Invoice, dated January 6, 2014 (MRK-CHA01371258) ........ Appx9240

**Table of Contents**
(Continued)

Exhibit 333 to Reilly Declaration -
Invoice, dated May 20, 2010 (MRK-CHA01371259) ........... Appx9242

Exhibit 334 to Reilly Declaration -
Invoice, dated January 14, 2013 (MRK-CHA01371261) ...... Appx9244

Exhibit 335 to Reilly Declaration -
Invoice, dated February 2, 2011 (MRK-CHA01371262) ...... Appx9246

Exhibit 336 to Reilly Declaration -
Invoice, dated November 17, 2010 (MRK-CHA01371263) . Appx9248

Exhibit 337 to Reilly Declaration -
Invoice, dated November 28, 2012 (MRK-CHA01371264) . Appx9250

Exhibit 338 to Reilly Declaration -
Invoice, dated March 20, 2013 (MRK-CHA01371268-69) ... Appx9252

Exhibit 339 to Reilly Declaration -
Invoice, dated January 22, 2016 (MRK-CHA01371274) ...... Appx9255

Exhibit 340 to Reilly Declaration -
Invoice, dated February 26, 2014 (MRK-CHA01371278) .... Appx9257

Exhibit 341 to Reilly Declaration -
Invoice, dated February 4, 2015 (MRK-CHA01371279) ...... Appx9259

Exhibit 342 to Reilly Declaration -
FDA webpage, "National Drug Code Directory," accessible
online at https://www.fda.gov/drugs/drug-approvals-and-
databases/national-drug-code-directory, last accessed
October 1, 2019 ................................................................ Appx9261

Exhibit 343 to Reilly Declaration -
Email from Jonathan Hartzel to Joseph M. Antonello,
dated October 18, 2005 (MRK-CHA00759061-4) ................ Appx9268

# Table of Contents
## (Continued)

Exhibit 344 to Reilly Declaration -
Email from Joseph M. Antonello to Timothy L. Shofield,
dated May 5, 2005 (MRK-CHA00649638-40) ...................... Appx9273

Exhibit 345 to Reilly Declaration -
Letter from Lisa C. Dykstra to Counsel,
dated September 13, 2018 ...................................................... Appx9277

Exhibit 346 to Reilly Declaration -
Letter from Lisa C. Dykstra to the Honorable
Lynne A. Sitarski, dated June 15, 2015 .................................. Appx9289

Exhibit 347 to Reilly Declaration -
Deposition Testimony of Peter Calcott, Ph.D.,
taken September 7, 2018 ....................................................... Appx9307

Exhibit 348 to Reilly Declaration -
Email from Mandie Lyon, dated May 5, 2006
(MRK-CHA00069026-36) ...................................................... Appx9385

Exhibit 349 to Reilly Declaration -
Presentation, M-M-R II End Expiry, produced as "12-14
CDOC presentation.ppt" (MRK-CHA00021319) ................. Appx9397

Exhibit 350 to Reilly Declaration -
Department of Justice Press Release, dated May 13, 2013 .... Appx9410

Exhibit 351 to Reilly Declaration -
Department of Justice Press Release,
dated October 26, 2010 ......................................................... Appx9414

Exhibit 352 to Reilly Declaration -
Department of Justice Press Release,
dated January 12, 2017 ......................................................... Appx9417

Exhibit 353 to Reilly Declaration -
Department of Justice Press Release,
dated September 24, 2014 ...................................................... Appx9420

**Table of Contents**
**(Continued)**

Exhibit 354 to Reilly Declaration -
Department of Justice Press Release, dated April 15, 2009 ... Appx9423

Exhibit 355 to Reilly Declaration -
Rule 30(b)(6) Deposition topics, dated December 13, 2016
(Stannard Ex. 3) .................................................................... Appx9426

Exhibit 356 to Reilly Declaration -
Department of Justice Press Release,
dated August 8, 2014 ............................................................ Appx9443

Exhibit 357 to Reilly Declaration -
FDA Form 483, dated August 6, 2001
(MRK-CHA00000547) .......................................................... Appx9446

Exhibit 358 to Reilly Declaration -
Deposition Testimony of Robert Malone, M.D.,
taken September 14, 2018 ..................................................... Appx9448
*(Cont'd in Vol XXII)*

**Volume XXII**
**(Filed Under Seal)**

Exhibit 359 to Reilly Declaration -
Deposition Testimony of Dr. Manal Morsy,
taken August 5, 2016 ............................................................ Appx9511

Exhibit 360 to Reilly Declaration -
Atkinson Deposition Exhibit 6, "Recommendations of
the Immunization Practices Advisory Committee Measles
Prevention: Supplementary Statement,"
dated January 13, 1989 ......................................................... Appx9621

Declaration of Lisa C. Dykstra in Support of
Defendant's Motions for Summary Judgment,
executed October 25, 2019 (Doc. 295) .................................. Appx9625

Exhibit 1 to Dykstra Declaration -
Stephen A. Krahling's Resume (MRK-KRA00331426-7) .... Appx9656

**Table of Contents**
(Continued)

Exhibit 2 to Dykstra Declaration -
Excerpts from Deposition Testimony of Stephen Krahling,
taken May 2, 2017 ................................................................. Appx9659

Exhibit 3 to Dykstra Declaration -
Merck Employee Initialization Form for Stephen Krahling
(MRK-KRA00582401) ......................................................... Appx9680

Exhibit 4 to Dykstra Declaration -
Stephen Krahling's November 30, 2001 Separation Agreement
(MRK-KRA00582394-7) ...................................................... Appx9682

Exhibit 5 to Dykstra Declaration -
Excerpts from Relator Stephen A. Krahling's Responses
and Objections to Merck's First Set of Interrogatories,
dated January 28, 2015 ......................................................... Appx9687

Exhibit 6 to Dykstra Declaration -
Excerpts from Relator Stephen A. Krahling's Responses
and Objections to Merck's Revised First Set of Interrogatories,
dated May 18, 2015 .............................................................. Appx9716

Exhibit 7 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Stephen Krahling, taken May 3, 2017 ................................... Appx9783

Exhibit 8 to Dykstra Declaration -
Stephen Krahling's handwritten notes,
dated October 1, 2001 (RELATOR_00001044-5) ................. Appx9792

Exhibit 9 to Dykstra Declaration -
FDA's Summary of Findings, dated August 6, 2001
(RELATOR_00004086-94) ................................................... Appx9795

Exhibit 10 to Dykstra Declaration -
Merck FDA Inspection Records, dated August 6, 2001
(MRK-KRA01631009-254) .................................................. Appx9805
*(Cont'd in Vol XXIII)*

**Table of Contents**
**(Continued)**

**Volume XXIII**
**(Filed Under Seal)**

Exhibit 11 to Dykstra Declaration -
Excerpts from the Expert Report of
D. Bruce Burlington M.D. .................................................... Appx10052

Exhibit 12 to Dykstra Declaration -
Merck's Virus and Cell Biology Organization Chart
(RELATOR_00000902-3) .................................................... Appx10070

Exhibit 13 to Dykstra Declaration -
Excerpts from Relator Stephen A. Krahling's Responses
and Objections to Defendant Merck's Requests for
Admission, dated April 4, 2016 ........................................... Appx10073

Exhibit 14 to Dykstra Declaration -
FDA Form 483 Frequently Asked Questions ....................... Appx10101

Exhibit 15 to Dykstra Declaration -
FDA Re-Inspection Memorandum, dated August 10, 2001
(MRK-KRA00071241-5) .................................................... Appx10104

Exhibit 16 to Dykstra Declaration -
CBER Merck Communications Mumps Expiry,
dated August 8, 2002 (MRK-KRA00623049-51) ............... Appx10110

Exhibit 17 to Dykstra Declaration -
Email Communication with Attachments regarding FDA
Inspection-IND 1016, dated September 14, 2001
(MRK-KRA00063885-8) .................................................... Appx10114

Exhibit 18 to Dykstra Declaration -
FDA Telephone Conversation Memorandum,
dated September 17, 2001 (MRK-KRA00019107) ............. Appx10119

Exhibit 19 to Dykstra Declaration -
FDA Teleconference-IND 1016 Inspection Follow up,
dated September 25, 2001 (MRK-KRA00071300-1) .......... Appx10121

**Table of Contents**
(Continued)

Exhibit 20 to Dykstra Declaration -
CBER December 7, 2001 Teleconference: Mumps Inspection
results and discussions, dated December 13, 2001
(MRK-KRA00019640-6) ...................................................... Appx10124

Exhibit 21 to Dykstra Declaration -
General Correspondence to FDA in response to CBER
Comments, dated February 4, 2002
(MRK-KRA00025847-916) ................................................. Appx10132

Exhibit 22 to Dykstra Declaration -
General Correspondence to FDA regarding April 18, 2002
Teleconference, dated April 2002
(MRK-KRA00337265-72) .................................................. Appx10203

Exhibit 23 to Dykstra Declaration -
BB-IND 1016 Memorandum regarding Summary of
Discussion with CBER on March 22, 2002 regarding
acceptability of mumps PRN assay data,
dated March 23, 2002 (MRK-KRA00009042) .................... Appx10212

Exhibit 24 to Dykstra Declaration -
Offer Letter to Stephen A. Krahling, dated October 24, 2000
(RELATOR_00001058-60) .................................................. Appx10214

Exhibit 25 to Dykstra Declaration -
Correspondence from Stephen A. Krahling to
Emilio A. Emini, Ph.D., dated April 8, 2001
(RELATOR_00000328-31) .................................................. Appx10218

Exhibit 26 to Dykstra Declaration -
Email communication from Stephen Krahling to
Alan Shaw, dated July 17, 2001 (MRK-KRA00002243) .... Appx10223

Exhibit 27 to Dykstra Declaration -
Email communication from Stephen Krahling to Alan Shaw,
dated September 25, 2001 (RELATOR_00000745) ............ Appx10225

# Table of Contents
## (Continued)

Exhibit 28 to Dykstra Declaration -
Email communications between Stephen Krahling and
Alan Shaw, dated September 27-28, 2001
(RELATOR_00000747) ...................................................... Appx10227

Exhibit 29 to Dykstra Declaration -
Letter from Emilio A. Emini, Ph.D. to Stephen Krahling,
dated October 15, 2001, (RELATOR_00001100-3) ............ Appx10229

Exhibit 30 to Dykstra Declaration -
Letter from Tonia Torquato to Alexis Pinto,
dated October 22, 2001 (MRK-KRA00002033-5) .............. Appx10234

Exhibit 31 to Dykstra Declaration -
Letter from Alexis Pinto to Tonia Torquato,
dated October 19, 2001 (MRK-KRA00002036-9) .............. Appx10238

Exhibit 32 to Dykstra Declaration -
Letter from Tonia Torquato to Alexis Pinto,
dated October 26, 2001 (MRK-KRA00002028-9) .............. Appx10243

Exhibit 33 to Dykstra Declaration -
Letter from Alexis Pinto to Tonia Torquato,
dated October 26, 2001 (MRK-KRA00002017-25) ............ Appx10246

Exhibit 34 to Dykstra Declaration -
Letter from Tonia Torquato to Alexis Pinto,
dated October 29, 2001 (MRK-KRA00002013-16) ............ Appx10256

Exhibit 35 to Dykstra Declaration -
Letter from Axel Johnson to Tonia Torquato,
dated November 26, 2001 (RELATOR_00001086) ............ Appx10261

Exhibit 36 to Dykstra Declaration -
Stephen Krahling Pay Stubs (RELATOR_00001061-7) ...... Appx10263

Exhibit 37 to Dykstra Declaration -
Letter from Axel Johnson to Tonia Torquato,
dated December 20, 2001 (RELATOR_00001090) ............. Appx10271

# Table of Contents
## (Continued)

Exhibit 38 to Dykstra Declaration -
CDC Vaccines for Children Program web page
"About VFC," last reviewed on February 18, 2016 ............. Appx10273

Exhibit 39 to Dykstra Declaration -
Advisory Committee on Immunization Practices Charter
approved March 27, 2018 ................................................... Appx10277

Exhibit 40 to Dykstra Declaration -
Excerpts from Expert Report of William P. Nichols ............ Appx10283

Exhibit 41 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Mark Pallansch,
Ph.D., taken October 13, 2017 ............................................ Appx10292

Exhibit 42 to Dykstra Declaration -
1971 MMR Product License (MRK-KRA01972538) ......... Appx10307

Exhibit 43 to Dykstra Declaration -
1995 MMR Product License (MRK-KRA01676252) ......... Appx10309

Exhibit 44 to Dykstra Declaration -
Merck's Establishment License (MRK-KRA01676250) ..... Appx10311

Exhibit 45 to Dykstra Declaration -
Advisory Committee on Immunization Practices Vaccines for
Children Program-Resolution No. 10/17-3, Vaccines to
Prevent Measles, Mumps, Rubella and Varicella,
dated October 25, 2017 ....................................................... Appx10313

Exhibit 46 to Dykstra Declaration -
Vaccines for Children Program-Resolution No. 6/06-1,
Vaccines included in the VFC Program,
dated June 29, 2006 ............................................................ Appx10317

Exhibit 47 to Dykstra Declaration -
Advisory Committee on Immunization Practices, Policies
and Procedures, dated December 2018 ................................ Appx10319

# Table of Contents
## (Continued)

Exhibit 48 to Dykstra Declaration -
"Recommendation of the Advisory Committee on
Immunization Practices for Use of a Third Dose of Mumps
Virus Containing Vaccine in Persons at Increased Risk for
Mumps During Outbreak," *MMWR*,
dated January 12, 2018 ........................................................ Appx10345

Exhibit 49 to Dykstra Declaration -
Excerpts from the Expert Report of
William L. Atkinson M.D., MPH, dated June 12, 2018 ....... Appx10355

Exhibit 50 to Dykstra Declaration -
National Center for Immunization and Respiratory Diseases
(CVG) Fact Sheet ................................................................ Appx10365

Exhibit 51 to Dykstra Declaration -
"Prevention of Measles, Rubella, Congenital Rubella
Syndrome, and Mumps," *MMWR*, dated June 14, 2013 ...... Appx10380

Exhibit 52 to Dykstra Declaration -
CDC's "Measles, Mumps, and Rubella (MMR) Vaccination:
What Everyone Should Know," last reviewed
March 28, 2019 .................................................................. Appx10421

Exhibit 53 to Dykstra Declaration -
"Measles, Mumps and Rubella-Vaccine Use and Strategies for
Elimination of Measles, Rubella and Congenital Rubella
Syndrome and Control of Mumps: Recommendations of the
Advisory Committee on Immunization Practices,"
*MMWR*, dated May 22, 1998 ............................................... Appx10428

Exhibit 54 to Dykstra Declaration -
Merck's 1998 Vaccine for Children Contract with the CDC
(MRK-KRA01371728-50) ................................................... Appx10473

Exhibit 55 to Dykstra Declaration -
Merck's 1999 Vaccine for Children Contract with the CDC
(MRK-KRA01371751-84) ................................................... Appx10497
*(Cont'd in Vol XXIV)*

**Table of Contents**
**(Continued)**

**Volume XXIV**
**(Filed Under Seal)**

Exhibit 56 to Dykstra Declaration -
Merck's 2000 Vaccine for Children Contract with the CDC
(MRK-KRA01371693-1727) ................................................. Appx10532

Exhibit 57 to Dykstra Declaration -
Merck's 2001 Vaccine for Children Contract with the CDC
(MRK-KRA01371656-92) ................................................. Appx10568

Exhibit 58 to Dykstra Declaration -
Merck's 2002 Vaccine for Children Contract with the CDC
(MRK-KRA01371785-816) ................................................. Appx10606

Exhibit 59 to Dykstra Declaration -
Merck's 2003 Vaccine for Children Contract with the CDC
(MRK-KRA01371311-340) ................................................. Appx10639

Exhibit 60 to Dykstra Declaration -
Merck's 2004 Vaccine for Children Contract with the CDC
(MRK-KRA01371280-310) ................................................. Appx10670

Exhibit 61 to Dykstra Declaration -
Merck's 2005 Vaccine for Children Contract with the CDC
(MRK-KRA01371341-72) ................................................. Appx10702

Exhibit 62 to Dykstra Declaration -
Merck's 2006 Vaccine for Children Contract with the CDC
(MRK-KRA01371624-55) ................................................. Appx10735

Exhibit 63 to Dykstra Declaration -
Merck's 2007 Vaccine for Children Contract with the CDC
(MRK-KRA01371604-23) ................................................. Appx10768

Exhibit 64 to Dykstra Declaration -
Merck's 2008 Vaccine for Children Contract with the CDC
(MRK-KRA01371817-40) ................................................. Appx10789

**Table of Contents**
**(Continued)**

Exhibit 65 to Dykstra Declaration -
Merck's 2009 Vaccine for Children Contract with the CDC
(MRK-KRA01371880-1900) ................................................ Appx10814

Exhibit 66 to Dykstra Declaration -
Merck's 2010 Vaccine for Children Contract with the CDC
(MRK-KRA01371373-97) ................................................... Appx10836

Exhibit 67 to Dykstra Declaration -
Merck's 2011 Vaccine for Children Contract with the CDC
(MRK-KRA01371497-518) .................................................. Appx10862

Exhibit 68 to Dykstra Declaration -
Merck's 2012 Vaccine for Children Contract with the CDC
(MRK-KRA01371398-421) .................................................. Appx10885

Exhibit 69 to Dykstra Declaration -
Merck's 2013 Vaccine for Children Contract with the CDC
(MRK-KRA01371422-44) ................................................... Appx10910

Exhibit 70 to Dykstra Declaration -
Merck's 2014 Vaccine for Children Contract with the CDC
(MRK-KRA01371473-96) ................................................... Appx10934

Exhibit 71 to Dykstra Declaration -
Merck's 2015 Vaccine for Children Contract with the CDC
(MRK-KRA01372045-72) ................................................... Appx10959

Exhibit 72 to Dykstra Declaration -
Merck's 2016 Vaccine for Children Contract with the CDC
(MRK-KRA01371962-89) ................................................... Appx10988
*(Cont'd in Vol XXV)*

**Volume XXV**
**(Filed Under Seal)**

Exhibit 73 to Dykstra Declaration -
CDC Vaccine Price List for Vaccines for Children Program
as of April 6, 2001 ............................................................. Appx11017

# Table of Contents
## (Continued)

**Page**

Exhibit 74 to Dykstra Declaration -
Letter from Katherine Norris to Lisa C. Dykstra, dated
November 24, 2015 (MRK-KRA01373392-1373393) ........ Appx11022

Exhibit 75 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Alan Sims,
taken October 12, 2017 ........................................................ Appx11025

Exhibit 76 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Michele Taylor,
taken May 9, 2017 ................................................................ Appx11045

Exhibit 77 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Colleen Duffy,
taken December 12, 2016 ..................................................... Appx11052

Exhibit 78 to Dykstra Declaration -
Letter from Lisa Dykstra to CDC regarding FOIA
request, dated May 18, 2015 ................................................ Appx11058

Exhibit 79 to Dykstra Declaration -
ACIP's Vaccine Recommendations and Guidelines-MMR
Vaccine Recommendations, last reviewed
November 21, 2014 ............................................................... Appx11067

Exhibit 80 to Dykstra Declaration -
FDA's Vaccines Licensed for Use in the United States ....... Appx11069

Exhibit 81 to Dykstra Declaration -
CDC's Mumps Vaccination, last reviewed
March 8, 2019 ....................................................................... Appx11077

Exhibit 82 to Dykstra Declaration -
Excerpts from the Expert Report of
Thomas G. McGuire Ph.D., dated March 13, 2018 ............. Appx11081

Exhibit 83 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Thomas G. McGuire, taken July 2, 2018 ............................. Appx11086

**Table of Contents**
(Continued)

Exhibit 84 to Dykstra Declaration -
Relator Joan Wlochowski's Responses and Objections
to Merck's Revised First Set of Interrogatories,
dated May 20, 2015 ............................................................. Appx11091

Exhibit 85 to Dykstra Declaration -
Relator Joan Wlochowski's Responses and Objections
to Defendant Merck's Request for Admission,
dated April 6, 2016 ............................................................. Appx11116

Exhibit 86 to Dykstra Declaration -
"Live, Attenuated Mumps-Virus Vaccine," *New England
Journal of Medicine*, by R. Weibel, *et al.*,
dated February 2, 1967 ....................................................... Appx11144

Exhibit 87 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to Alison Fisher, Ph.D.,
dated October 17, 2005 (MRK-KRA00000479-80) ............. Appx11152

Exhibit 88 to Dykstra Declaration -
Response to FDA Request for Information,
dated November 15, 2006 (MRK-KRA00000393-409) ........ Appx11155

Exhibit 89 to Dykstra Declaration -
Email from Zak Johns to Marlene Koury,
dated February 23, 2017 ..................................................... Appx11173

Exhibit 90 to Dykstra Declaration -
Excerpts from the Expert Report of
Ann M. Arvin, M.D., dated June 11, 2018 ........................... Appx11176

Exhibit 91 to Dykstra Declaration -
Excerpts from the Expert Report of
Dipti Gulati, M.S., D. Phil. ................................................. Appx11183

Exhibit 92 to Dykstra Declaration -
Excerpts from the Expert Report of Anna Durbin, M.D.,
dated June 14, 2018 ............................................................ Appx11194

**Table of Contents**
(Continued)

Exhibit 93 to Dykstra Declaration -
FDA's Guidance for Industry for the Evaluation of
Combination Vaccines for Preventable Diseases: Production,
Testing and Clinical Studies, dated April 1997 .................... Appx11210

Exhibit 94 to Dykstra Declaration -
CDC's How Flu Vaccine Effectiveness and Efficacy is
Measured, last reviewed January 29, 2016 ......................... Appx11234

Exhibit 95 to Dykstra Declaration -
Excerpts from the CDC's Manual for the Surveillance of
Vaccine-Preventable Diseases ............................................ Appx11243

Exhibit 96 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Joseph Antonello, taken August 3, 2017 ............................. Appx11253

Exhibit 97 to Dykstra Declaration -
"Summary of Notifiable Diseases-United States," 2005,
*MMWR*, dated March 30, 2007 ........................................... Appx11258

Exhibit 98 to Dykstra Declaration -
CDC's Mumps Cases and Outbreaks, last reviewed
September 17, 2019 ............................................................ Appx11361

Exhibit 99 to Dykstra Declaration -
CDC's Mumps: For Healthcare Providers, last reviewed
March 15, 2019 .................................................................. Appx11364

Exhibit 100 to Dykstra Declaration -
CDC's Principles of Epidemiology in Public Health Practice,
Third Edition: An Introduction to Applied Epidemiology
and Biostatistics, last reviewed May 18, 2012 .................... Appx11369

Exhibit 101 to Dykstra Declaration -
CDC's Flu Vaccine Effectiveness: Questions and Answers for
Health Professionals, last updated November 27, 2013 ...... Appx11373

**Table of Contents**
(Continued)

Exhibit 102 to Dykstra Declaration -
"Mumps Virus," by Cherry, *et al.*, *Viral Infections*,
(7th Edition, Chapter 180) .................................................... Appx11383

Exhibit 103 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
David Kessler, M.D., taken September 28, 2018 ................. Appx11399

Exhibit 104 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Anna Durbin, M.D., taken October 8, 2018 ......................... Appx11402

Exhibit 105 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Emilio Emini, Ph.D., taken June 6, 2017 ............................. Appx11406

Exhibit 106 to Dykstra Declaration -
January 1998 *Curriculum Vitae* of David L. Krah, M.D.
(MRK-KRA00000695-702) ................................................. Appx11415

Exhibit 107 to Dykstra Declaration -
Excerpts from the Expert Report of
David A. Kessler, M.D. ....................................................... Appx11424

Exhibit 108 to Dykstra Declaration -
FDA Lot Release ................................................................. Appx11429

Exhibit 109 to Dykstra Declaration -
Drugs@FDA Instructions: Health Information ................... Appx11434

Exhibit 110 to Dykstra Declaration -
FDA's Vaccine Safety Questions and Answers ................... Appx11440

Exhibit 111 to Dykstra Declaration -
Excerpts from the Expert Report of
Gary Freed M.D., MPH ...................................................... Appx11447

**Table of Contents**
(Continued)

Exhibit 112 to Dykstra Declaration -
"Vaccine Manufacturing," by Philip Gomez
and James Robinson ............................................................ Appx11450

Exhibit 113 to Dykstra Declaration -
Informational Amendment: Clinical, dated September 15, 2011
(GSK-MMR-IND-0022162-3) ............................................. Appx11461

Exhibit 114 to Dykstra Declaration -
Mumps Serology Strategy in Support of Phase III
Development of Priorix®
(GSK-MMR-IND-0022180-6) ............................................. Appx11464

Exhibit 115 to Dykstra Declaration -
Fax from Yolanda Stewart to Donna Boyce,
dated April 25, 2012 (GSK-MMR-IND-0029256-63) ......... Appx11472

Exhibit 116 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Dipti Gulati, M.S., D. Phil., taken December 5, 2018 ......... Appx11481

Exhibit 117 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Amy Keegan,
taken February 9, 2018 ....................................................... Appx11485

Exhibit 118 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
David Krah, M.D., taken July 11, 2017 ............................... Appx11488

Exhibit 119 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
David Krah, M.D., taken July 12, 2017 ............................... Appx11493

Exhibit 120 to Dykstra Declaration -
Excerpts from the Expert Report of
Marcela Pasetti, Ph.D. ........................................................ Appx11497
*(Cont'd in Vol XXVI)*

**Table of Contents**
**(Continued)**

**Volume XXVI**
**(Filed Under Seal)**

Exhibit 121 to Dykstra Declaration -
M-M-R®II Current Label .................................................. Appx11507

Exhibit 122 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Cynthia Morrisey, taken July 27, 2017 ............................... Appx11519

Exhibit 123 to Dykstra Declaration -
Supplemental Biologics License Application,
dated January 29, 2004 (MRK-KRA00000032-139) ........... Appx11522

Exhibit 124 to Dykstra Declaration -
Amendment to Supplemental Biologics License
Application Response to FDA Request for Information,
dated June 5, 2007, with Attachments
(MRK-KRA00000368-82) .................................................. Appx11631

Exhibit 125 to Dykstra Declaration -
Approval Letter, dated December 8, 2007
(MRK-KRA00000383-4) .................................................... Appx11647

Exhibit 126 to Dykstra Declaration -
Letter from Paul Richman, Ph.D. to Alison Fisher, Ph.D.,
dated May 18, 2007 (MRK-KRA00000385-6) .................... Appx11650

Exhibit 127 to Dykstra Declaration -
Response to Form FDA 483, dated August 20, 2001
(MRK-KRA00000481-539) ................................................ Appx11653

Exhibit 128 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
teleconference regarding clarification of CBER's comments on
the Mumps Expiry trial, dated November 10, 1998
(MRK-KRA00001215-7) .................................................... Appx11713

**Table of Contents**
**(Continued)**

**Page**

Exhibit 129 to Dykstra Declaration -
Memo re: Mumps End Expiry trial; November 29th, 2000
CBER teleconference, dated November 29, 2000
(MRK-KRA00001218-21) .................................................... Appx11717

Exhibit 130 to Dykstra Declaration -
Letter from Manal Morsy, M.D., Ph.D., to Luba Vujcic,
dated December 1, 1999 (MRK-KRA00001222-30) ........... Appx11722

Exhibit 131 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to
Manal Morsy, M.D., Ph.D., dated October 27, 2000
(MRK-KRA00001231-6) .................................................... Appx11732

Exhibit 132 to Dykstra Declaration -
General Correspondence to FDA, dated November 16, 2000
(MRK-KRA00001237-48) .................................................... Appx11739

Exhibit 133 to Dykstra Declaration -
Memo re: MMRV (BB-IND 7068): Summary of Pre-Phase III
teleconference discussion on 01/31/00 with CBER,
dated January 31, 2000 (MRK-KRA00001249-52) ............. Appx11752

Exhibit 134 to Dykstra Declaration -
Teleconference Minutes with CBER, dated February 19, 1999
(MRK-KRA00001253-4) .................................................... Appx11757

Exhibit 135 to Dykstra Declaration -
Memo re: BB-IND 1016: Summary of discussion with Dr.
Kathryn Carbone and Ms. Luba Vujcic (CBER) regarding the
Mumps neutralization assay, dated February 8, 2000
(MRK-KRA00001255-57) .................................................... Appx11760

Exhibit 136 to Dykstra Declaration -
Meeting Minutes, dated March 14, 2000
(MRK-KRA00001258-61) .................................................... Appx11764

**Table of Contents**
**(Continued)**

Exhibit 137 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II) and BB-IND 7068
(MMRV); Summary of face-to-face meeting discussion
(3/13/00) with CBER regarding wild type mumps
neutralization and ELISA assays, dated March 13, 2000
(MRK-KRA00001262-5) .................................................... Appx11768

Exhibit 138 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to Keith Chirgwin, M.D.,
dated August 30, 1999 (MRK-KRA00001266-9) ................ Appx11773

Exhibit 139 to Dykstra Declaration -
Letter from M. Carolyn Hardegree, M.D. to
Keith Chirgwin, M.D., dated September 8, 1998
(MRK-KRA00001467-9) .................................................... Appx11778

Exhibit 140 to Dykstra Declaration -
Response to FDA Request for Information,
dated December 30, 1999 (MRK-KRA00001470-1924) ..... Appx11782
*(Cont'd in Vol XXVII)*

**Volume XXVII**
**(Filed Under Seal)**

Exhibit 141 to Dykstra Declaration -
Letter from Loris McVittie, Ph.D. to
Roberta L. McKee, Ph.D., dated August 20, 1999
(MRK-KRA00018614-9) .................................................... Appx12238

Exhibit 142 to Dykstra Declaration -
Memo re: Teleconference with CBER: Mumps End
Expiry trial-BB IND 1016, dated November 8, 2000
(MRK-KRA00025161-2) .................................................... Appx12245

Exhibit 143 to Dykstra Declaration -
FDA Warning Letter, dated February 9, 2001
(PUBLIC0000666-670) ...................................................... Appx12248

**Table of Contents**
**(Continued)**

Exhibit 144 to Dykstra Declaration -
Memo re: M-M-R®II (BB-IND 1016); Summary of telephone
discussions on 11/23/99 and 12-06-99 with Ms. Luba Vujcic
(CBER) regarding the neutralization assay results and impact
on Equivalence Margin and lower bound criterion of the
M-M-R®II End Expiry Study hypothesis,
dated December 23, 1999 (MRK-KRA00025713-24) ......... Appx12254

Exhibit 145 to Dykstra Declaration -
Memo re: BB-IND 1016: Summary of discussion with
Ms. Luba Vujcic (CBER) regarding the Mumps neutralization
assay, dated January 5, 2000 (MRK-KRA00048855) ......... Appx12267

Exhibit 146 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
teleconference on methods used for the plaque reduction
neutralization assay, dated February 22, 2019
(MRK-KRA00062710-3) .................................................... Appx12269

Exhibit 147 to Dykstra Declaration -
Meeting Minutes with CBER, dated March 13, 2000
(MRK-KRA00062845-53) ................................................. Appx12274

Exhibit 148 to Dykstra Declaration -
Email from David M. Wonnacott to Roberta L. McKee, Ph.D.,
dated May 12, 1999 (MRK-KRA00094960) ....................... Appx12284

Exhibit 149 to Dykstra Declaration -
Email from Katalin G. Abraham to Joye L. Bramble,
dated December 3, 1998 (MRK-KRA00095063) ................ Appx12286

Exhibit 150 to Dykstra Declaration -
Memo re: Teleconference with Dr. Norman Baylor, CBER,
Regarding Meeting on Expiry Titers for M-M-R®II,
dated December 3, 1998 (MRK-KRA00095064) ................ Appx12288

**Table of Contents**
**(Continued)**

Exhibit 151 to Dykstra Declaration -
Memo re: Teleconference with Norman Baylor, CBER,
on 11/16/98, Regarding VARIVAX® and M-M-R®II,
dated November 16, 1998 (MRK-KRA00095065) ............. Appx12290

Exhibit 152 to Dykstra Declaration -
Email from Katalin G. Abraham to Keith Chirgwin, M.D.,
dated October 5, 1998 (MRK-KRA00095142) ................... Appx12292

Exhibit 153 to Dykstra Declaration -
ProQuad™ Original Application, dated August 3, 2004
(MRK-KRA00158320-526) ................................................ Appx12294
*(Cont'd in Vol XXVIII)*

**Volume XXVIII**
**(Filed Under Seal)**

Exhibit 154 to Dykstra Declaration -
Memo re: CBER teleconference (October 16, 2001): Measles,
Mumps and Rubella ELISAs, dated October 19, 2001
(MRK-KRA00201389-91) ................................................ Appx12502

Exhibit 155 to Dykstra Declaration -
Clinical Study Report for the Protocol 007 Study
(MRK-KRA00224982-6529) ............................................. Appx12506
*(Cont'd in Vols XXIX, XXX, and XXXI)*

**Volume XXXI**
**(Filed Under Seal)**

Exhibit 156 to Dykstra Declaration -
Memo re: Supporting Documents for Stephen Krahling,
dated October 10, 2000 (MRK-KRA00331424-33) ............ Appx14055

Exhibit 157 to Dykstra Declaration -
Neutralization Assay Draft faxed on February 19, 1999
(MRK-KRA00336634-6) .................................................... Appx14066

# Table of Contents
## (Continued)

**Page**

Exhibit 158 to Dykstra Declaration -
Letter from Paul G. Richman, Ph.D. to Alison Fisher, Ph.D.,
dated May 18, 2007 (MRK-KRA00570703-5) .................... Appx14070

Exhibit 159 to Dykstra Declaration -
Response to FDA Request for Information,
dated February 2, 2001 (MRK-KRA00622078-273) ........... Appx14074

Exhibit 160 to Dykstra Declaration -
Response to FDA Request for Information,
dated August 1, 2002 (MRK-KRA00624279-87) ................ Appx14271

Exhibit 161 to Dykstra Declaration -
General Correspondence to FDA, dated June 23, 1998
(MRK-KRA00624345-4446) ............................................... Appx14281

Exhibit 162 to Dykstra Declaration -
Response to FDA Request for Information,
dated February 5, 1999 (MRK-KRA00624448-4589) ......... Appx14384
***(Cont'd in Vol XXXII)***

## Volume XXXII
## (Filed Under Seal)

Exhibit 163 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
telephone conversations on 9/24/98 regarding the revised
M-M-R®II draft label and on 9/29/98 regarding the mumps
expiry protocol, dated September 29, 1998
(MRK-KRA00636592-3) .................................................... Appx14527

Exhibit 164 to Dykstra Declaration -
Biological Product Deviation Report Form,
dated April 20, 2001 (MRK-KRA00754233-8) ................... Appx14530

Exhibit 165 to Dykstra Declaration -
M-M-R®II Label (March 1995)
(MRK-KRA00757060-3) .................................................... Appx14537

# Table of Contents
## (Continued)

**Page**

Exhibit 166 to Dykstra Declaration -
M-M-R®II Label (April 1999)
(MRK-KRA00757072-6) ...................................................... Appx14542

Exhibit 167 to Dykstra Declaration -
M-M-R®II Label (2004) (MRK-KRA00757100-3) ............ Appx14548

Exhibit 168 to Dykstra Declaration -
Response to FDA Request for Information,
dated November 17, 2004 (MRK-KRA00761530-8) .......... Appx14553

Exhibit 169 to Dykstra Declaration -
Response to CBER Comments, dated June 10, 2002
(MRK-KRA00761628-702) ................................................. Appx14563

Exhibit 170 to Dykstra Declaration -
Email from Charlotte Shay to Michael L. Dekleva,
dated June 30, 2004 (MRK-KRA00791508-10) .................. Appx14639

Exhibit 171 to Dykstra Declaration -
Meeting Minutes from a MMRV Pre-Phase III meeting
with CBER, dated February 16, 2000
(MRK-KRA00821856-61) ................................................. Appx14643

Exhibit 172 to Dykstra Declaration -
Approval Letter, dated September 6, 2005
(MRK-KRA00821906-9) .................................................... Appx14650

Exhibit 173 to Dykstra Declaration -
Regulatory Liaison FDA Conversation Record,
dated October 5, 2004 (MRK-KRA00846405-15) .............. Appx14655

Exhibit 174 to Dykstra Declaration -
CBER's Clinical Review of Studies submitted in support of
Licensure of ProQuad™ (MRK-KRA01285010-272) ........ Appx14667

Exhibit 175 to Dykstra Declaration -
FDA report on the release of MMR,
dated February 23, 2016 (MRK-KRA01447562) ................ Appx14931

**Table of Contents**
(Continued)

Exhibit 176 to Dykstra Declaration -
Standard Operating Procedure-Preparation, Review and
Shipment of Biological Product Protocols and Samples to
CBER, dated September 23, 2015
(MRK-KRA01448181-207) ................................................ Appx14933

Exhibit 177 to Dykstra Declaration -
Letter from Roberta L. McKee, Ph.D. to Steven Masiello,
dated March 8, 2001 (MRK-KRA01537603-11) ................. Appx14961

Exhibit 178 to Dykstra Declaration -
Letter from Roberta L. McKee, Ph.D. regarding a proposal for
changes to release specifications, dated December 10, 1998
(MRK-KRA01622125) ....................................................... Appx14971

Exhibit 179 to Dykstra Declaration -
Prior Approval Supplement from Roberta L. McKee, Ph.D.
to William Egan, Ph.D., dated June 18, 1999
(MRK-KRA01622463-5) .................................................... Appx14973

Exhibit 180 to Dykstra Declaration -
Minutes from a December 8, 1998 Meeting,
dated January 8, 1999 (MRK-KRA01622468-72) ............... Appx14977

Exhibit 181 to Dykstra Declaration -
Letter from Katalin Abraham to Dr. Suresh Rastogi
(MRK-KRA01622552) ....................................................... Appx14983

Exhibit 182 to Dykstra Declaration -
Letter from David Wonnacott Ph.D. to Dr. Suresh Rastogi,
dated December 16, 1998 (MRK-KRA01622600-1) ........... Appx14985

Exhibit 183 to Dykstra Declaration -
Prior Approval Supplement from Roberta L. McKee, Ph.D. to
William Egan, Ph.D., dated September 15, 1999
(MRK-KRA01622711-2) .................................................... Appx14988

# Table of Contents
## (Continued)

**Page**

Exhibit 184 to Dykstra Declaration -
Attachment 4 to the Prior Approval Supplement from
Roberta L. McKee, Ph.D. to William Egan, Ph.D.,
dated September 15, 1999 (MRK-KRA01622778-9) .......... Appx14991

Exhibit 185 to Dykstra Declaration -
Letter from William Egan, Ph.D. to Roberta L. McKee, Ph.D.,
dated August 20, 1999 (MRK-KRA01624909-10) .............. Appx14994

Exhibit 186 to Dykstra Declaration -
Letter from Barry D. Garfinkle, Ph.D. to Carolyn Hardegree,
M.D., dated January 28, 1998
(MRK-KRA01625508-5639) .............................................. Appx14997
*(Cont'd in Vol XXXIII)*

## Volume XXXIII
## (Filed Under Seal)

Exhibit 187 to Dykstra Declaration -
Letter from Peter Patriarca, M.D. to Roberta L. McKee, Ph.D.,
dated February 11, 2000 (MRK-KRA0187091-2) .............. Appx15130

Exhibit 188 to Dykstra Declaration -
MMR Statistical Analysis of Potency on Stability,
dated October 24, 2000 (MRK-KRA01897103-7271) ........ Appx15133

Exhibit 189 to Dykstra Declaration -
Letter from David Wonnacott, Ph.D. to Carolyn Hardegree,
M.D., dated December 5, 1997 (MRK-KRA01972451) ..... Appx15303

Exhibit 190 to Dykstra Declaration -
Various Correspondence between the FDA and Merck,
dated 1969 to 1994 (MRK-KRA01972464-546) ................. Appx15305

Exhibit 191 to Dykstra Declaration -
Various Email Correspondence in 1997
(MRK-KRA01972735-58) ................................................... Appx15389

## Table of Contents
### (Continued)

**Page**

Exhibit 192 to Dykstra Declaration -
Vaccine & Biological Stability Protocol,
dated September 6, 2016 (MRK-KRA02139917-25) .......... Appx15414

Exhibit 193 to Dykstra Declaration -
Chapter "Mumps Vaccine," by Steven Rubin and
Stanley Plotkin .................................................................... Appx15424

Exhibit 194 to Dykstra Declaration -
Stephen Krahling's 2001 Correspondence
(RELATOR_00000736-66) .................................................. Appx15453

Exhibit 195 to Dykstra Declaration -
Letter from Axel Johnson to Tonia Torquato,
dated November 30, 2001 (RELATOR_00001036-43) ....... Appx15485

Exhibit 196 to Dykstra Declaration -
Stephen Krahling's 2001 Correspondence and Papers
(RELATOR_00001071-90) .................................................. Appx15494
*(Cont'd in Vol XXXIV)*

### Volume XXXIV
### (Filed Under Seal)

Exhibit 197 to Dykstra Declaration -
Chapter "Mumps Vaccine," by Steven Rubin,
in Plotkin's Vaccines, 7th edition (2018) ............................ Appx15515

Exhibit 198 to Dykstra Declaration -
Letter from Kevin Malone to Kathleen Hardway,
dated July 31, 2018 ............................................................. Appx15548

Exhibit 199 to Dykstra Declaration -
"Live, Attenuated Mumps Virus Vaccine," *New England
Journal of Medicine*, by R. Weibel, *et al.*,
dated February 2, 1967 ....................................................... Appx15556

# Table of Contents
## (Continued)

**Page**

Exhibit 200 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Luwy Musey, M.D., taken October 7, 2016 ......................... Appx15565

Exhibit 201 to Dykstra Declaration -
Rule 30(b)(6) Deposition Topics, dated December 13, 2016
(Stannard Ex. 3) ................................................................. Appx15569

Exhibit 202 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Mark Stannard,
taken December 13, 2016 .................................................... Appx15585

Exhibit 203 to Dykstra Declaration -
*Curriculum Vitae* of Joan L. Wlochowski ........................... Appx15595

Exhibit 204 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Joan L. Wlochowski, taken June 13, 2017 ........................... Appx15597

Exhibit 205 to Dykstra Declaration -
FDA/CDC Submission, dated October 23, 2019 ................. Appx15603

Exhibit 206 to Dykstra Declaration -
Excerpts of Defendant Merck's Responses and Objections to
Relators' Third Set of Requests for Admission,
dated August 16, 2017 ........................................................ Appx15719

Exhibit 207 to Dykstra Declaration -
"Vaccine Impact: Benefits for human health,"
by M. Doherty *et al.*, in *Vaccine* 34 (2016) ........................... Appx15722

Exhibit 208 to Dykstra Declaration -
FDA Prescription Drug Labeling Resources ........................ Appx15731

Exhibit 209 to Dykstra Declaration -
ACIP Committee Members .................................................. Appx15738

# Table of Contents
## (Continued)

Exhibit 210 to Dykstra Declaration -
"Notice to Readers: Updated Recommendations of the
ACIP for the Control and Elimination of Mumps," *MMWR*,
June 9, 2006/55(22); 629-630 .............................................. Appx15743

Exhibit 211 to Dykstra Declaration -
"Measles Prevention: Recommendations of the ACIP,"
*MMWR*, December 28, 1989 38(S-9); 1-18 ......................... Appx15749

Exhibit 212 to Dykstra Declaration -
"FDA in Brief: FDA reiterates the importance of vaccines
such as MMR vaccine," dated September 6, 2019 .............. Appx15766

Exhibit 213 to Dykstra Declaration -
"Recommendations of the ACIP Mumps Prevention,"
*MMWR*, June 9, 1989/38(22) ............................................... Appx15769

Exhibit 214 to Dykstra Declaration -
"Recommendation of the ACIP Mumps Vaccine,"
*MMWR*, November 26, 1982; 31(46) .................................. Appx15777

Exhibit 215 to Dykstra Declaration -
Statement by Peter Marks M.D., Ph.D., FDA, on FDA's
continued confidence in the safety and effectiveness
of the MMR vaccine, dated April 22, 2019 ......................... Appx15783

Exhibit 216 to Dykstra Declaration -
About CBER ....................................................................... Appx15788

Exhibit 217 to Dykstra Declaration -
Excerpt from FDA's Website on Warning Letters ................ Appx15791

Exhibit 218 to Dykstra Declaration -
Excerpt of FDA's Website with an Index to Warning
Letters for 'M' Companies ................................................... Appx15794

# Table of Contents
## (Continued)

Exhibit 219 to Dykstra Declaration -
"The Immunological Basis for Immunization Series, Module
16: Mumps," by McLean, *et al.*, *Immunization, Vaccines and
Biologicals-World Health Organization* (2010) ................... Appx15817

Exhibit 220 to Dykstra Declaration -
Email from Sue Manoff to Mark Paponia,
dated February 25, 2000 (MRK-KRA00091399-405) ......... Appx15862

Exhibit 221 to Dykstra Declaration -
Memo re: Teleconference with Norman Baylor, CBER, on
11/16/98, Regarding VARIVAX® and M-M-R®II
(MRK-KRA00095065) ....................................................... Appx15870

Exhibit 222 to Dykstra Declaration -
M-M-R®II Label (MRK-KRA00757064-7) ....................... Appx15872

Exhibit 223 to Dykstra Declaration -
M-M-R®II Label (February 2001)
(MRK-KRA00757068-71) .................................................. Appx15877

Exhibit 224 to Dykstra Declaration -
M-M-R®II Label (August 2001)
(MRK-KRA00757077-80) .................................................. Appx15882

Exhibit 225 to Dykstra Declaration -
M-M-R®II Label (February 2006)
(MRK-KRA00757081-4) .................................................... Appx15887

Exhibit 226 to Dykstra Declaration -
M-M-R®II Label (March 1995)
(MRK-KRA00757085-8) .................................................... Appx15892

Exhibit 227 to Dykstra Declaration -
M-M-R®II Label (March 1995)
(MRK-KRA00757089-91) .................................................. Appx15897

**Table of Contents**
**(Continued)**

Exhibit 228 to Dykstra Declaration -
M-M-R®II Label (October 2003)
(MRK-KRA00757092-5) ...................................................... Appx15901

Exhibit 229 to Dykstra Declaration -
M-M-R®II Label (September 2002)
(MRK-KRA00757096-9) ...................................................... Appx15906

Exhibit 230 to Dykstra Declaration -
M-M-R®II Label (February 2007)
(MRK-KRA00757104-7) ...................................................... Appx15911

Exhibit 231 to Dykstra Declaration -
M-M-R®II Label (February 2007)
(MRK-KRA00757108-11) .................................................... Appx15916

Exhibit 232 to Dykstra Declaration -
M-M-R®II Label (April 19999)
(MRK-KRA01449029-40) .................................................... Appx15921

Exhibit 233 to Dykstra Declaration -
M-M-R®II Label (February 2014)
(MRK-KRA01449226-36) .................................................... Appx15934

Exhibit 234 to Dykstra Declaration -
M-M-R®II Label (June 2014)
(MRK-KRA01449243-53) .................................................... Appx15946

Exhibit 235 to Dykstra Declaration -
M-M-R®II Label (October 2015)
(MRK-KRA01449260-70) .................................................... Appx15958

Exhibit 236 to Dykstra Declaration -
M-M-R®II Label (February 2000)
(MRK-KRA01449271-5) ...................................................... Appx15970

Exhibit 237 to Dykstra Declaration -
M-M-R®II Label (March 2010)
(MRK-KRA01449276-83) .................................................... Appx15976

# Table of Contents
## (Continued)

**Page**

Exhibit 238 to Dykstra Declaration -
M-M-R®II Label (December 2010)
(MRK-KRA01449284-91) .................................................... Appx15985

Exhibit 239 to Dykstra Declaration -
M-M-R®II Label (September 2009)
(MRK-KRA01449292-99) .................................................... Appx15994
*(Cont'd in Vol XXXV)*

## Volume XXXV
## (Filed Under Seal)

Exhibit 240 to Dykstra Declaration -
Attachment 1 to Letter from Barry D. Garfinkle, Ph.D.
to Carolyn Hardegree, M.D., dated January 28, 1998
(MRK-KRA01625510-639) ................................................. Appx16003

Exhibit 241 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II) and BB-IND 7068
(MMRV); Summary of Face-to face meeting discussion
(3/13/00) with CBER regarding wild type mumps
neutralization and ELISA assays, dated March 13, 2000
(MRK-KRA00019855-7) .................................................... Appx16134

Exhibit 242 to Dykstra Declaration -
PowerPoint Presentation entitled Immunogenicity
Mumps-Containing Vaccines (MRK-KRA00091408) ........ Appx16138

Exhibit 243 to Dykstra Declaration -
Letter from David M. Wommacott, Ph.D. to
Suresh C. Rastogi, Ph.D., dated December 16, 1998
(MRK-KRA01629294-1629295) ........................................ Appx16152

Exhibit 244 to Dykstra Declaration -
Response to the FDA Form 483, dated October 24, 2000
(MRK-KRA01649535-1649551) ........................................ Appx16155

Exhibit 245 to Dykstra Declaration -
Warning Letters from FDA Website .................................... Appx16173

**Table of Contents**
**(Continued)**

Exhibit 246 to Dykstra Declaration -
MMD Quality Manual Glossary, dated October 5, 2016
(MRK-KRA01679618-1679772) ......................................... Appx16176

Exhibit 247 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Eric Metzger,
taken June 11, 2015 ............................................................ Appx16332

Exhibit 248 to Dykstra Declaration -
Federal Register Vol. 58 No. 137, July 20, 1993 ................. Appx16336

Exhibit 249 to Dykstra Declaration -
FDA Review of Vaccine Labeling Requirements for
Warnings, Use Instructions, and Precautionary
Information, dated October 2004 ......................................... Appx16342

Defendant Merck's Response to Relators' Statement of
    Material Facts, dated November 26, 2019 (Doc. 299) .......... Appx16345

**Volume XXXVI**
**(Filed Under Seal)**

Declaration of Lisa C. Dykstra, for Merck, in Support of
    Response to Relators' Statement of Material Facts,
    executed November 26, 2019 (Doc. 299) ............................. Appx16501

Exhibit 250 to Dykstra Declaration -
"Mumps Complications and Effects of Mumps Vaccination,
England and Wales, 2002-2006," by Yung, Chee-Fu, *et al.*,
*Emerging Infectious Diseases*, (2011) 17(4):661-667 ......... Appx16513

Exhibit 251 to Dykstra Declaration -
Excerpts from the Deposition Testimony of April Cohen,
taken January 4, 2018 ....................................................... Appx16521

**Table of Contents**
(Continued)

Exhibit 252 to Dykstra Declaration -
"Mumps Virus-Specific Antibody Titers from Pre-Vaccine
Era Sera: Comparison of the Plaque Reduction Neutralization
Assay Enzyme Immunoassays," by Mauldin, Jeremy, *et al.*,
*Journal of Clinical Microbiology*, 2005:43(9):4847-4851 .. Appx16525

Exhibit 253 to Dykstra Declaration -
"Correlates of Protection," by Plotkin and Gilbert,
2018:35-40 ......................................................................... Appx16531

Exhibit 254 to Dykstra Declaration -
FDA, Guidance for Industry: FDA Review of Vaccine
Labeling Requirements for Warnings, Use Instructions, and
Precautionary Information, dated September 2004 ............. Appx16538

Exhibit 255 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Roberta L. McKee, Ph.D., taken March 30, 2017 ............... Appx16547

Exhibit 256 to Dykstra Declaration -
Excerpts from the Expert Report of
Dipti Gulati, MS, D. Phil. .................................................... Appx16551

Exhibit 257 to Dykstra Declaration -
Biological Product Deviation Report Form
submitted by Merck to the FDA, dated March 5, 2001
(MRK-KRA00754239-44) .................................................... Appx16556

Exhibit 258 to Dykstra Declaration -
"Jeryl Lynn Strain Live Attenuated Mumps Virus Vaccine
-Influence of Age, Virus Dose, Lot, and-Globulin
Administration on Response," by Buynak, Eugene, *et al.*,
*Journal of the American Medical Association* (1968)
203(1):63-67 ....................................................................... Appx16563

Exhibit 259 to Dykstra Declaration -
2003 Annual Stability Report for M-M-R®II
(MRK-KRA01632888-945) .................................................. Appx16569

**Table of Contents**
(Continued)

Exhibit 260 to Dykstra Declaration -
"Sensitive Neutralization Test for virus antibody,"
by Sato *et al.*, *Archives of Virology*, (1978) 58:301-311 ...... Appx16628

Exhibit 261 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to Alison Fisher, Ph.D.,
dated December 3, 2004 (MRK-KRA00000361-5) ............. Appx16640

Exhibit 262 to Dykstra Declaration -
Fax from Luba Vujcic to Alison Fisher, Ph.D.,
dated July 20, 2007 (MRK-KRA00141957-8) ................... Appx16646

Exhibit 263 to Dykstra Declaration -
Submission, dated August 8, 2007
(MRK-KRA00000140-225) ................................................. Appx16649

Exhibit 264 to Dykstra Declaration -
Submission, dated December 3, 2007
(MKR-KRA00000226-300) ................................................. Appx16736

Exhibit 265 to Dykstra Declaration -
"Long-Term Persistence of Mumps Antibody after Receipt of 2
Measles-Mumps-Rubella (MMR) Vaccinations and Antibody
Response after a Third MMR Vaccination among a University
Population," by Date, Anand, *et al.*, *Journal of Infectious
Diseases*, (2008) 197:1662-1668 ........................................ Appx16812

Exhibit 266 to Dykstra Declaration -
"Mumps Antibody Levels Among Students Before a Mumps
Outbreak: In Search of a Correlate of Immunity,"
by Cortese, *et al.*, *Journal of Infectious Diseases*, (2011)
204:1413-1422 ................................................................. Appx16820

**Table of Contents**
**(Continued)**

Exhibit 267 to Dykstra Declaration -
"Immunogenicity and Safety of Two Tetravalent (Measles,
Mumps, Rubella, Varicella) Vaccines Coadministered With
Hepatitis A and Pneumococcal Conjugate Vaccines to Children
Twelve to Fourteen Months of Age," by Blatter, *et al.*,
*The Pediatric Infectious Disease Journal,*
(2012) 31:e133-e140 ........................................................... Appx16831

Exhibit 268 to Dykstra Declaration -
Analytical Validation Protocol
(MRK-KRA00337307-18) .................................................... Appx16840

Exhibit 269 to Dykstra Declaration -
Expert Report of Robert Platt, Ph.D.,
dated June 14, 2018 ............................................................. Appx16853

Exhibit 270 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Amy Keegan,
taken April 27, 2017 ............................................................ Appx16992

Exhibit 271 to Dykstra Declaration -
Documentation of Work Activities
(RELATOR_00000272-3) .................................................... Appx16995

Exhibit 272 to Dykstra Declaration -
Work Summary Document (RELATOR_00000274-6) ........ Appx16998
*(Cont'd in Vol XXXVII)*

**Volume XXXVII**
**(Filed Under Seal)**

Exhibit 273 to Dykstra Declaration -
Submission, dated May 5, 2005
(MRK-KRA00176342-176654) ........................................... Appx17002

Exhibit 274 to Dykstra Declaration -
Submission, dated June 30, 2004
(MKR-KRA00137854-55 and 8137-72) ............................. Appx17316

# Table of Contents
## (Continued)

Exhibit 275 to Dykstra Declaration -
"Safety and Immunogenicity of Human Serum Albumin-Free
MMR Vaccine in US Children Aged 12-15 months,"
by Mufson, *et al.*, *Journal of Pediatric Infectious Diseases
Society*, (2014) 4:339-348 .................................................. Appx17355

Exhibit 276 to Dykstra Declaration -
Letter from Jerry P. Weir, Ph.D. to Alison Fisher, Ph.D.,
dated December 30, 2004 (MRK-KRA00141670-2) ........... Appx17366

Exhibit 277 to Dykstra Declaration -
Submission, dated February 28, 2005
(MRK-KRA00141676-729) ................................................. Appx17370

Exhibit 278 to Dykstra Declaration -
Submission, dated July 13, 2005
(MRK-KRA00141789-906) ................................................. Appx17425
***(Cont'd in Vol XXXVIII)***

## Volume XXXVIII
## (Filed Under Seal)

Exhibit 279 to Dykstra Declaration -
"Summary of Notifiable Diseases-United States 2012,"
*MMWR*, 2014:61(53):1-121 ................................................. Appx17544

Exhibit 280 to Dykstra Declaration -
CDC Publication "Mumps Outbreak-Related Questions
and Answers for Patients," last reviewed March 15, 2019 .. Appx17669

Exhibit 281 to Dykstra Declaration -
CDC Publication "Nationally Notifiable Infectious Diseases
and Conditions, United States: Annual Tables" ................... Appx17672

Exhibit 282 to Dykstra Declaration -
"Characteristics of Large Mumps Outbreaks in the United
States during July 2010-December 2015," by Clemmons,
Nakia *et al.*, *Clinical Infectious Diseases*, (2019) ............... Appx17676

## Table of Contents
### (Continued)

**Page**

Exhibit 283 to Dykstra Declaration -
CDC Publication "Healthy People 2010 Final Review" ...... Appx17684
*(Cont'd in Vol XXXIX)*

### Volume XXXIX
### (Filed Under Seal)

Exhibit 284 to Dykstra Declaration -
CDC Publication "Healthy People 2020 Immunization and
Infectious Diseases Objectives" .......................................... Appx18245

Exhibit 285 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.2
Cases of Hib Data" .............................................................. Appx18278

Exhibit 286 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.4
U.S.-acquired cases of Measles Data" ................................. Appx18280

Exhibit 287 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.5
U.S.-acquired cases of Mumps Data" .................................. Appx18282

Exhibit 288 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.9
 U.S.-acquired cases of Rubella Data" ................................. Appx18284

Exhibit 289 to Dykstra Declaration -
CDC Webpage "National Center for Immunization
and Respiratory Diseases" ................................................... Appx18286

Exhibit 290 to Dykstra Declaration -
"Mumps vaccination coverage and vaccine effectiveness in a
large outbreak among college students-Iowa, 2006,"
by Marin, Mona *et al.*, *Vaccine*, (2008) 26:3601-3607 ........ Appx18301

**Table of Contents**
**(Continued)**

Exhibit 291 to Dykstra Declaration -
"Mumps Outbreak in Orthodox Jewish Communities in the
United States," Barskey, Albert, *et al.*, *New England Journal
of Medicine*, (2012) 367(18):1704-1713 .............................. Appx18309

Exhibit 292 to Dykstra Declaration -
"Impact of a Third Dose of Measles-Mumps-Rubella Vaccine
on a Mumps Outbreak," by Ogbuanu, Ikechukwu, *et al.*,
*Pediatrics*, (2012) 130(6):1-8 ............................................. Appx18320

Exhibit 293 to Dykstra Declaration -
"Epidemiology of a Mumps Outbreak in a Highly Vaccinated
Island Population and Use of a Third Dose of Measles-
Mumps-Rubella Vaccine for Outbreak Control—Guam 2009
to 2010," by Nelson, George, *et al.*, *Pediatric Infectious
Disease Journal*, (2013) 32(4):374-380 .............................. Appx18330

Exhibit 294 to Dykstra Declaration -
"Effectiveness of a Third Dose of MMR Vaccine for Mumps
Outbreak Control," by Cardemil, Cristina, *et al.*, *New England
Journal of Medicine*, (2017) 377(10):947-956 .................... Appx18338

Exhibit 295 to Dykstra Declaration -
"Mumps in a highly vaccinated Marshallese community in
Arkansas, USA: an outbreak report," by Fields, Virgie, *et al.*,
*Lancet Infectious Diseases*,
(Published online January 8, 2019) 1-8 .............................. Appx18349

Exhibit 296 to Dykstra Declaration -
"Antibody Induced by Immunization with the Jeryl Lynn
Mumps Vaccine Strain Effectively Neutralizes a Heterologous
Wild-Type Mumps Virus Associated with a Large Outbreak,"
by Rubin, Steven, *et al.*, *Journal of Infectious Diseases*, (2008)
198:508-515 ...................................................................... Appx18358

Exhibit 297 to Dykstra Declaration -
"Vaccine waning and mumps-re-emergence in the United
States," by Lewnard, Joseph and Grad, Yonatan, *Science
Translational Medicine*, (2018) 10(433):1-10 .................... Appx18367

# Table of Contents
## (Continued)

Exhibit 298 to Dykstra Declaration -
"Comment: The changing epidemiology of mumps in a high
vaccination era," by Marshall, Helen and Plotkin, Stanley,
*Lancet Infectious Diseases*, (2019) 19:118-119 ................... Appx18379

Exhibit 299 to Dykstra Declaration -
"Successes and challenges for preventing measles, mumps and
rubella by vaccination," by Bankamp, Bettina, *et al.*, *Current
Opinion in Virology*, (2019) 34:110-116 .............................. Appx18382

Exhibit 300 to Dykstra Declaration -
"Mumps Vaccines Do We Need a New One?," by Rubin,
Steven and Beeler, Judy, *Pediatric Infectious Disease Journal*,
(2013) 32(10):1156-1157 .................................................... Appx18390

Exhibit 301 to Dykstra Declaration -
CDC website listing Measles-related *MMWR* Articles ........ Appx18393

Exhibit 302 to Dykstra Declaration -
CDC website listing Pertussis (Whooping Cough)
Publications ....................................................................... Appx18399

Exhibit 303 to Dykstra Declaration -
CDC website listing Chickenpox (Varicella) References and
Resources .......................................................................... Appx18407

Exhibit 304 to Dykstra Declaration -
CDC webpage: Glossary ..................................................... Appx18411

Exhibit 305 to Dykstra Declaration -
Email from Jeanne Santoli to Eric Skjeveland,
dated June 12, 2012 (MRK-KRA00122172-3) .................... Appx18425

Exhibit 306 to Dykstra Declaration -
CDC webpage, ACIP Workgroups, last reviewed
May 30, 2019 .................................................................... Appx18428

# Table of Contents
## (Continued)

**Page**

Exhibit 307 to Dykstra Declaration -
"Recommendations of the Advisory Committee on
Immunization Practices for Use of Hepatitis A Vaccine
for Persons Experiencing Homelessness,"
*MMWR* 2019:68(6):153-56 ................................................ Appx18435

Exhibit 308 to Dykstra Declaration -
"Human Papillomavirus Vaccination for Adults: Updated
Recommendations of the Advisory Committee on
Immunization Practices," *MMWR* 2019:68(3):698-702 ...... Appx18440

Exhibit 309 to Dykstra Declaration -
"Prevention and Control of Seasonal Influenza with
Vaccines: Recommendations of the Advisory Committee
on Immunization Practices-United States, 2019-20
Influenza Season," *MMWR* 2019:69(3):1-21 ....................... Appx18446

Exhibit 310 to Dykstra Declaration -
"Japanese Encephalitis Vaccine: Recommendations of the
Advisory Committee on Immunization Practices,"
*MMWR* 2019:68(2);1-33 .................................................... Appx18475
*(Cont'd in Vol XL)*

**Volume XL**
**(Filed Under Seal)**

Exhibit 311 to Dykstra Declaration -
"Prevention of Pertussis, Tetanus, and Diphtheria with
Vaccines in the United States: Recommendations of the
Advisory Committee on Immunization Practices,"
*MMWR* 2018:67(2):1-44 .................................................... Appx18516

Exhibit 312 to Dykstra Declaration -
"Updated Recommendations for Use of Tetanus Toxoid,
Reduced Diphtheria Toxoid and Acellular Pertussis Vaccine
(Tdap) in Pregnant Women and Persons Who Have or
Anticipate Having Close Contact with an Infant Aged <12
Months-Advisory Committee on Immunization Practices
(ACIP), 2011," *MMWR* 2011:60(41):1424-1426 ................. Appx18565

**Table of Contents**
**(Continued)**

Exhibit 313 to Dykstra Declaration -
"Updated Recommendations for the Use of Tetanus Toxoid,
Reduced Diphtheria Toxoid, and Acellular Pertussis Vaccine
(Tdap) in Pregnant Women-Advisory Committee on
Immunization Practices (ACIP), 2012," *MMWR*
2013:62(7):131-135 ............................................................ Appx18569

Exhibit 314 to Dykstra Declaration -
"Immunization in the United States (Chapter 73),"
by Cohn, *et al.*, *Vaccines* 1421-1440 ................................... Appx18575

Exhibit 315 to Dykstra Declaration -
Excerpts from the Expert Report of
Daniel Salmon, Ph.D., MPH ................................................ Appx18596

Exhibit 316 to Dykstra Declaration -
Excerpts from Merck's Supplemental Responses and
Objections to Relators' First Set of Interrogatories,
dated December 12, 2016 .................................................... Appx18608

Exhibit 317 to Dykstra Declaration -
"The Pertussis Problem," by Plotkin, Stanley, *Clinical
Infectious Diseases*, (2014) 58(6): 830-833 ......................... Appx18618

Exhibit 318 to Dykstra Declaration -
"Establishing a Global Vaccine-Development Fund,"
by Plotkin, Stanley, *et al.*, *New England Journal of Medicine*,
(2015) 373:297-300 ........................................................... Appx18623

Exhibit 319 to Dykstra Declaration -
Chapter 11 "Anthrax Vaccines," by Friedlander, Arthur, *et al.*,
*Vaccines* (2018) ................................................................. Appx18628

Exhibit 320 to Dykstra Declaration -
Chapter 38 "Meningococcal Capsular Group A, C, W, and Y
Conjugate Vaccines," by Harrison, Lee, *et al.*,
*Vaccines* (2018) ................................................................. Appx18646

**Table of Contents**
(Continued)

Exhibit 321 to Dykstra Declaration -
Chapter 52 "Rotavirus Vaccines," by Parashar, Umesh, *et al.*,
*Vaccines* (2018) .................................................................. Appx18673

Exhibit 322 to Dykstra Declaration -
Chapter 60 "Tuberculosis Vaccines," by Hanekom, Willem,
*et al.*, *Vaccines* (2018) ......................................................... Appx18694

Exhibit 323 to Dykstra Declaration -
Excerpts from Expert Report of
Gary L. Freed, M.D., MPH .................................................. Appx18714

Exhibit 324 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Gary L. Freed, M.D., MPH, taken October 18, 2018 .......... Appx18718

Exhibit 325 to Dykstra Declaration -
Excerpts from "2012 CDC Summary of
Notifiable Diseases" ........................................................... Appx18721

Exhibit 326 to Dykstra Declaration -
Excerpts from "1977 Annual Summary,"
*MMWR*, Vol. 26, No. 53, September 1978 .......................... Appx18729

Exhibit 327 to Dykstra Declaration -
Excerpts from "1980 Annual Summary,"
*MMWR*, Vol. 29, No. 54, September 1981 .......................... Appx18734

Exhibit 328 to Dykstra Declaration -
Excerpts from "2013 CDC Summary of
Notifiable Diseases" ........................................................... Appx18742

Exhibit 329 to Dykstra Declaration -
Excerpts from "2014 CDC Summary of
Notifiable Diseases" ........................................................... Appx18747

**Table of Contents**
**(Continued)**

Relators' Responses to Merck's Statements of Material Facts in
Support of Its First and Fourth Summary Judgment Motions
and Their Corresponding Additional Statement of Material
Facts, dated November 26, 2019 (Doc. 300) ........................ Appx18751

Declaration of Gary Reilly in Support of Relators' Oppositions to
Merck's Four Motions for Summary Judgment,
executed November 26, 2019 (Doc. 300) ............................ Appx18984

    Exhibit 361 to Reilly Declaration -
    Deposition Testimony of Amy Keegan,
    taken April 27, 2017 ............................................................ Appx18996
    *(Cont'd in XLI)*

**Volume XLI**
**(Filed Under Seal)**

    Exhibit 362 to Reilly Declaration -
    Memorandum titled "Delay of Filing for Optimized
    GOS/HAS-free Diluent for M-M-R®II" with Attachment,
    dated August 28, 2000 (MRK-CHA01593194-9) ................ Appx19070

    Exhibit 363 to Reilly Declaration -
    The Current Manufacturing Target Titer for the Mumps
    Component of Measles, Mumps, and Rubella Virus Vaccine
    Live M-M-R®II (MRK-CHA00576983-93) ...................... Appx19077

    Exhibit 364 to Reilly Declaration -
    Letter from Robert L. McKee, Ph.D. to Carolyn Hardegree,
    M.D., dated December 10, 1998, with Attachment
    (MRK-CHA00756233-55) .................................................. Appx19089

    Exhibit 365 to Reilly Declaration -
    Excerpts from Clinical and Regulatory Review Committee
    Critical Activities, issued August 15, 2001
    (MRK-CHA01724860-25029) ............................................ Appx19113

**Table of Contents**
(Continued)

Exhibit 366 to Reilly Declaration -
Excerpts from Clinical and Regulatory Review Committee
Critical Activities, issued March 17, 1999
(MRK-CHA01717354-7508) ............................................... Appx19123

Exhibit 367 to Reilly Declaration -
Table (MRK-CHA00280517) ............................................... Appx19142

Exhibit 368 to Reilly Declaration -
Project Management Regulatory Submissions
Schedule for "All Products," from 01-AUG-2002
(MRK-CHA01726084-7) ..................................................... Appx19144

Exhibit 369 to Reilly Declaration -
Email from Hentrietta Ukwu to David W. Blois,
dated October 6, 1998, with Attachment
(MRK-CHA00625837-9) ..................................................... Appx19149

Exhibit 370 to Reilly Declaration -
Justification of Mumps Component Frequency
(MRK-CHA00032404-7) ..................................................... Appx19153

Exhibit 371 to Reilly Declaration -
Email from Alison L. Fisher, Ph.D. to Mark S. Galinski,
dated March 28, 2005 (MRK-CHA00560317-9) ................. Appx19158

Exhibit 372 to Reilly Declaration -
Email from Bonita M. Stankunas to Amy Keegan,
dated October 1, 2010 (MRK-CHA01470854-6) ................ Appx19162

Exhibit 373 to Reilly Declaration -
Presentation titled M-M-R®II
(MRK-CHA00021133-67) ................................................... Appx19166

Exhibit 374 to Reilly Declaration -
Excerpts from Pediatric Measles, Mumps, Rubella &
Varicella-containing Franchise: Integrated Vaccine T-PAC
Review, dated October 28, 2002
(MRK-CHA00233586-3623) ............................................... Appx19202

**Table of Contents**
(Continued)

Exhibit 375 to Reilly Declaration -
Deposition Testimony of April D. Cohen,
taken January 4, 2018 .......................................................... Appx19211

Exhibit 376 to Reilly Declaration -
Minutes of October 6, 1999 Project Team Meeting,
dated October 8, 1999 (MRK-CHA01899074-86) .............. Appx19276

Exhibit 377 to Reilly Declaration -
Draft Memo re: Clinical and Regulator Review Committee
Meeting Summary-October 8, 2002, dated October 11, 2002
(MRK-CHA01728735-8) ..................................................... Appx19290

Exhibit 378 to Reilly Declaration -
Pediatric Live Virus Vaccine Franchise Review,
dated October 28, 2002 (MRK-CHA00207636-83) ............ Appx19295

Exhibit 379 to Reilly Declaration -
Presentation, produced as "M-M-R II and Priorix Profiles
8_19_11F.ppt" (MRK-CHA00955777) ............................... Appx19344

Exhibit 380 to Reilly Declaration -
Deposition Testimony of Tim Schofield,
taken March 20, 2017 .......................................................... Appx19347

Exhibit 381 to Reilly Declaration -
Memo re: Mumps Stability and Potency Estimations,
dated February 27, 2001 (MRK-CHA01896072-3) ............. Appx19449

Exhibit 382 to Reilly Declaration -
Email from Philip S. Bennett to Cynthia Morrisey,
dated January 18, 2002 (MRK-CHA00094849-50) ............. Appx19452

Exhibit 383 to Reilly Declaration -
*Curriculum Vitae* of Manal Anwar Morsy, M.D., Ph.D., MBA
(MORSY00001-10) ............................................................. Appx19455

# Table of Contents
## (Continued)

Exhibit 384 to Reilly Declaration -
*Curriculum Vitae* of Cynthia F. Morrisey
(MORRISEY_00000001-6) ................................................. Appx19466

Exhibit 385 to Reilly Declaration -
Memo re: Determination of Minimum Release
Specifications for Mumps and Rubella in M-M-R®II,
dated February 9, 2004 (MRK-CHA00722641-2) ............... Appx19473

Exhibit 386 to Reilly Declaration -
Memo re: Determination of Minimum Release Specifications
for Mumps in M-M-R®II, dated November 4, 2004
(MRK-CHA00722667-8) ..................................................... Appx19476

Exhibit 387 to Reilly Declaration -
Email from Philip S. Bennett with attachments,
dated December 4, 2012
(MRK-CHA01580006-15) ................................................... Appx19479

Exhibit 388 to Reilly Declaration -
Email from Kimberly A. Duffy to Amy Keegan,
dated December 5, 2012 (MRK-CHA01579943-5) ............. Appx19490

Exhibit 389 to Reilly Declaration -
*Curriculum Vitae* of Amy Keegan
(MRK-CHA02009507-9) ..................................................... Appx19494

Exhibit 390 to Reilly Declaration -
Presentation, MMRII Protocol #007 - Mumps End Expiry
study: AIGENT Assay Issues and Impact on Study Criteria,
produced as "6-30 pm Draft 10-04-02 for CRRC-10-08-02
slides.ppt" (MRK-CHA00025831) ...................................... Appx19498
***(Cont'd in Vol LXII)***

**Table of Contents**
**(Continued)**

**Volume LXII**
**(Filed Under Seal)**

Exhibit 391 to Reilly Declaration -
Gulati Deposition Exhibit 14, Select Pages of Supplemental
Biologics License Application, dated June 30, 2004
(MRK-CHA00137854-55 and
MRK-CHA00138585-708) ................................................. Appx19533

Exhibit 392 to Reilly Declaration -
Regulatory Liaison FDA Conversation Record,
dated May 27, 2005 (MRK-CHA00793082-3) .................... Appx19539

Exhibit 393 to Reilly Declaration -
Submission, dated July 13, 2005
(MRK-CHA00141789-906) ................................................ Appx19542

Exhibit 394 to Reilly Declaration -
Deposition Testimony of Dipti Gulati, M.S., D. Phil.,
taken December 5, 2018 ...................................................... Appx19550

Exhibit 395 to Reilly Declaration -
Merck's Biological Stability Program 2001 Annual Stability
Report for M-M-R®II (MRK-CHA01632745-51) .............. Appx19661

Exhibit 396 to Reilly Declaration -
Biological Stability Program 2004 Annual Stability
Report for M-M-R®II (MRK-CHA01632833-8) ................ Appx19669

Exhibit 397 to Reilly Declaration -
Biological Stability Program 2005 Annual Stability
Report for M-M-R®II (MRK-CHA01634117-22) .............. Appx19676

Exhibit 398 to Reilly Declaration -
Biological Stability Program 2008 Annual Stability
Report for M-M-R®II (MRK-CHA01633948-59) .............. Appx19683

**Table of Contents**
(Continued)

Exhibit 399 to Reilly Declaration -
Response to FDA Request for Information,
dated February 28, 2005 (MRK-CHA02078926-7) ............. Appx19696

Exhibit 400 to Reilly Declaration -
Excerpts from Biological Stability Program 2010
Annual Stability Report for M-M-R®II
(MRK-CHA01458201-6) .................................................... Appx19699

Exhibit 401 to Reilly Declaration -
CDC "Mumps Cases and Outbreaks" webpage,
last accessed November 25, 2019 ........................................ Appx19706

Exhibit 402 to Reilly Declaration -
CDC "Mumps Vaccination" webpage, last reviewed
March 28, 2019 ................................................... Appx19709

Exhibit 403 to Reilly Declaration -
CDC "Mumps Vaccination" webpage, archived as of
May 30, 2012 .................................................... Appx19711

Exhibit 404 to Reilly Declaration -
CDC "Mumps Vaccination" webpage, archived as of
December 8, 2009 ............................................... Appx19714

Exhibit 405 to Reilly Declaration -
Email from Janet Ernst-Gerner to Alan Modlinger,
dated September 23, 2016 (MRK-CHA02008691-4) .......... Appx19717

Exhibit 406 to Reilly Declaration -
Marked M-M-R®II (Measles, Mumps, and Rubella Virus
Vaccine Live) Literature (MRK-CHA02008695-705) ......... Appx19722

Exhibit 407 to Reilly Declaration -
Email from Mark Papania to Barbara Kuter,
dated February 12, 2010 (MRK-CHA00351988-90) ........... Appx19734

**Table of Contents**
(Continued)

Exhibit 408 to Reilly Declaration -
Email from Chester J. Kitchen, dated February 25, 2010
(MRK-CHA00790153-4) .................................................... Appx19738

Exhibit 409 to Reilly Declaration -
Email from Chester J. Kitchen to Scott Porreca,
dated February 26, 2010 (MRK-CHA00791347) ................ Appx19741

Exhibit 410 to Reilly Declaration -
FDA Conversation re; PRIOrix™, measles, mumps &
rubella live, attenuated, viral vaccine BB-IND-7229,
dated December 18, 1997 (GSK-MMR-IND-0047687-9) ... Appx19743

Exhibit 411 to Reilly Declaration -
FDA Conversation re: PRIOrix IND submission,
Clinical Hold, dated October 16, 1997
(GSK-MMR-IND-0047654-6) ............................................ Appx19747

Exhibit 412 to Reilly Declaration -
Extra CDAB Meeting Abstract, dated August 1, 2011
(GSK-MMR-019819-42) .................................................... Appx19751

Exhibit 413 to Reilly Declaration -
Memo re: Minutes of Meeting with CBER on 4/4/01,
dated April 9, 2001 (MRK-CHA00049238-40) ................... Appx19776

Exhibit 414 to Reilly Declaration -
Email from Sally S. Wong to Cathy Hoath,
dated February 26, 2013 (MRK-CHA01556424-8) ............. Appx19780

Exhibit 415 to Reilly Declaration -
Email from Joseph D. Bernardo to Mark J. Stannard,
dated November 30, 2016 (MRK-CHA02101841) ............. Appx19786

Exhibit 416 to Reilly Declaration -
Deposition Testimony of Roberta L. McKee, Ph.D.,
taken March 30, 2017 ........................................................ Appx19788

# Table of Contents
## (Continued)

Exhibit 417 to Reilly Declaration -
Vaccine & Biological Stability Protocol for M-M-R®II
(MRK-CHA01714300-8) ..................................................... Appx19870

Exhibit 418 to Reilly Declaration -
Excerpts from Biological Stability Program 2000
Annual Stability Report for M-M-R®II
(MRK-CHA01633601-6) ..................................................... Appx19880

Exhibit 419 to Reilly Declaration -
Excerpts from Biological Stability Program 2002
Annual Stability Report for M-M-R®II
(MRK-CHA01633529-39) .................................................... Appx19887

Exhibit 420 to Reilly Declaration -
Excerpts from Biological Stability Program 2003
Annual Stability Report for M-M-R®II
(MRK-CHA01632888-95) .................................................... Appx19899

Exhibit 421 to Reilly Declaration -
SOP Active Stability Monitoring of Live Virus Vaccine
Potency Results, effective November 10, 2000
(MRK-CHA00049165-73) ................................................... Appx19908

Exhibit 422 to Reilly Declaration -
SOP Real Time Stability Trend Monitoring, effective
September 21, 2016 (MRK-CHA01714343-54) .................. Appx19918

Exhibit 423 to Reilly Declaration -
Label Claim Compliance of M-M-R®II
(MRK-CHA00322066-73) ................................................... Appx19931

Exhibit 424 to Reilly Declaration -
Proposed New Stabilizer for M-M-R®II,
dated July 12, 2002 (MRK-CHA00239179-99) .................. Appx19940

**Table of Contents**
**(Continued)**

**Page**

Exhibit 425 to Reilly Declaration -
Clinical and Regulatory Review Committee Agenda,
dated October 8, 2002 (MRK-CHA00780210-65) .............. Appx19962
*(Cont'd in Vol XLIII)*

**Volume XLIII**
**(Filed Under Seal)**

Exhibit 426 to Reilly Declaration -
Analytical Approach for MMR in Japan
(MRK-CHA00719989-20008) ............................................ Appx20019

Exhibit 427 to Reilly Declaration -
Excerpts from Memo re: Mumps neutralizing antibody test vs.
efficacy and effectiveness, dated September 10, 1999
(MRK-CHA00061698-703) ................................................. Appx20040

Exhibit 428 to Reilly Declaration -
Atkinson Deposition Exhibit 2, Letter from Kevin Malone
to Kathleen Hardway, dated July 31, 2018,
and Letter from Robert Redfield to Kathleen Hardway,
dated May 24, 2018 ............................................................ Appx20047

Exhibit 429 to Reilly Declaration -
CDC Publication, Ensuring the Safety of Vaccines in the
United States, last updated July 2011 ................................... Appx20055

Exhibit 430 to Reilly Declaration -
Email from Colleen M. Duffy to Diana DeLong,
dated December 14, 2005 (MRK-CHA00942187-8) ........... Appx20058

Exhibit 431 to Reilly Declaration -
Email from Kevin Agnew to Diana DeLong,
dated March 14, 2014 (MRK-CHA01673057-9) ................. Appx20061

Exhibit 432 to Reilly Declaration -
Letter to CDC Request for Final Proposal to RFP 2014-N-
15784 Consolidated Vaccines for Children Contact,
dated March 7, 2014 (MRK-CHA01655048-93) ................. Appx20065

# Table of Contents
## (Continued)

Exhibit 433 to Reilly Declaration -
Email from Diana DeLong to Cindy Rivera,
dated March 13, 2014 (MRK-CHA01656202-3) ................. Appx20112

Exhibit 434 to Reilly Declaration -
FDA Comments on PRN Assay, dated May 9, 2007
(GSK-MMR-IND-0015993-4) ............................................ Appx20115

Exhibit 435 to Reilly Declaration -
Excerpts from Merck Presentation, dated November 10, 2011
(MRK-CHA0002441-681) ................................................... Appx20118

Exhibit 436 to Reilly Declaration -
Letter from Lisa C. Dykstra to CDC and Office of General
Counsel for Department of Health and Human Services,
dated May 18, 2015 (MRK-CHA01374713-20) .................. Appx20121

Exhibit 437 to Reilly Declaration -
Summary of GSK Vaccines development pipeline meeting
with CDC March 8, 2016 (GSK-MMR-0062025-30) ......... Appx20130

Exhibit 438 to Reilly Declaration -
Email from Ouzama Nicholson to Donna Boyce,
dated May 27, 2010 (GSK-MMR-0058532) ....................... Appx20137

Exhibit 439 to Reilly Declaration -
Memo re: Supporting Documents for Stephen Krahling,
dated October 10, 2000 (MRK-CHA00447565-74) ............ Appx20139

Exhibit 440 to Reilly Declaration -
Excerpts from journal of David Krah, M.D.
(MRK-CHA00490081-591) ................................................ Appx20150

Exhibit 441 to Reilly Declaration -
Minutes of August 8, 2001 Project Team Meeting
(MRK-CHA00209441-53) .................................................. Appx20176

**Table of Contents**
(Continued)

Exhibit 442 to Reilly Declaration -
Deposition Testimony of Thomas McGuire, Ph.D.,
taken July 2, 2018 ................................................................ Appx20190

Exhibit 443 to Reilly Declaration -
National Vaccine Advisory Committee Report,
The National Vaccine Program 2008 State of the
Program Report, dated February 2009 ................................... Appx20274

Exhibit 444 to Reilly Declaration -
"National, State, and Local Area Vaccination Coverage
Among Children Aged 19–35 Months — United States, 2012,"
*MMWR* 2013; 62:733-755, dated September 13, 2013 ........ Appx20289

Exhibit 445 to Reilly Declaration -
"Financing Immunizations in the United States," Hinman
*et al.*, *Clinical Infectious Diseases* 2004; 38:1440-6 ........... Appx20314

Exhibit 446 to Reilly Declaration -
"Program Review, National Immunization Survey (NIS) and
State and Local Area Integrated Telephone Survey (SLAITS),"
dated November 27-28, 2007 ............................................... Appx20322

Exhibit 447 to Reilly Declaration -
"About VFC" webpage ........................................................ Appx20344

Exhibit 448 to Reilly Declaration -
"Medicaid Program; Charges for Vaccine Administration
Under the Vaccines for Children Program,"
Federal Register Volume 59, Issue 190
(October 3, 1994) ............................................................... Appx20347

Exhibit 449 to Reilly Declaration -
Deposition Testimony of Michele Taylor,
taken May 9, 2017 .............................................................. Appx20360

**Table of Contents**
**(Continued)**

**Page**

Defendant Merck's Response to Relators' Additional Statement of
Material Facts in Connection with Defendant's First and Fourth
Summary Judgment Motions, dated December 20, 2019
(Doc. 311) .......................................................................... Appx20427

Defendant Merck's Response to Relators' Additional Statement of
Material Facts in Connection with Defendant's First and Fourth
Summary Judgment Motions, dated December 20, 2019
(Doc. 314) .......................................................................... Appx20486
*(Cont'd in Vol XLIV)*

**Volume XLIV**
**(Filed Under Seal)**

Declaration of Lisa C. Dykstra in Support of Defendant's
Replies and Response to Motions for Summary Judgment,
executed December 20, 2019 (Doc. 315) ............................. Appx20545

Exhibit 330 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Amy Keegan,
taken February 9, 2018 ....................................................... Appx20552

Exhibit 331 to Dykstra Declaration -
Email from Paul Lanzetta to Thomas Romanus
and John Comonitski, dated August 19, 2011
(MRK-KRA00955764-955765) .......................................... Appx20555

Exhibit 332 to Dykstra Declaration -
Excerpts from Deposition Testimony of Cynthia Morrisey,
taken July 27, 2017 ............................................................ Appx20558

Exhibit 333 to Dykstra Declaration -
Table of Contents for Information Submitted with Merck's
BLA for the replacement of Human Serum Albumin with
Recombinant Albumin (MRK-KRA00137827-137828) ..... Appx20562

Exhibit 334 to Dykstra Declaration -
FDA's Draft Guidance for Industry Stability Testing of
Drug Substances and Drug Products (June 8, 1998) ............ Appx20565

**Table of Contents**
**(Continued)**

Exhibit 335 to Dykstra Declaration -
WHO's Draft Guidelines on Stability Evaluation of
Vaccines, Expert Committee on Biological Standardization
(October 23-27, 2006) ......................................................... Appx20662

Exhibit 336 to Dykstra Declaration -
Biological Stability Program 1999 Annual Stability
Report for M-M-R®II (MRK-KRA01632656-86) .............. Appx20691

Exhibit 337 to Dykstra Declaration -
Biological Stability Program 2000 Annual Stability
Report for M-M-R®II (MRK-KRA01633601-29) .............. Appx20723

Exhibit 338 to Dykstra Declaration -
Biological Stability Program 2001 Annual Stability
Report for M-M-R®II (MRK-KRA01632745-822) ............ Appx20753

Exhibit 339 to Dykstra Declaration -
Biological Stability Program 2002 Annual Stability
Report for M-M-R®II (MRK-KRA01633529-600) ............ Appx20832

Exhibit 340 to Dykstra Declaration -
Biological Stability Program Annual 2003 Stability
Report for M-M-R®II (MRK-KRA01632888-945) ............ Appx20905

Exhibit 341 to Dykstra Declaration -
Biological Stability Program 2004 Annual Stability
Report for M-M-R®II (MRK-KRA01632833-68) .............. Appx20964

**Volume XLV**
**(Filed Under Seal)**

Exhibit 342 to Dykstra Declaration -
Biological Stability Program 2005 Annual Stability
Report for M-M-R®II (MRK-KRA01633267-99) .............. Appx21001

Exhibit 343 to Dykstra Declaration -
M-M-R®II Stability Data Summary for the 2006
Annual Stability Report (MRK-KRA0163946-83) ............. Appx21035

# Table of Contents
## (Continued)

Exhibit 344 to Dykstra Declaration -
M-M-R®II Stability Data Summary for the 2007
Annual Stability Report (MRK-KRA01633723-31)  ........... Appx21074

Exhibit 345 to Dykstra Declaration -
CDC's Nationally Notifiable Infectious Diseases and
Conditions, United States: Weekly Tables, Table 1y
(October 2019) ................................................................. Appx21084

Exhibit 346 to Dykstra Declaration -
CDC's Nationally Notifiable Infectious Diseases and
Conditions, United States: Weekly Tables, Table 1z
(October 2019) ................................................................. Appx21088

Exhibit 347 to Dykstra Declaration -
CDC's Nationally Notifiable Infectious Diseases and
Conditions, United States: Weekly Tables, Table 1kk
(October 2019) ................................................................. Appx21092

Exhibit 348 to Dykstra Declaration -
"An Assessment of Mumps Vaccine Effectiveness by Dose
during an Outbreak in Canada," by Deeks, Shelley, *et al.*,
*CMAJ*, 183(9) (June 14, 2011) ........................................... Appx21096

Exhibit 349 to Dykstra Declaration -
"Mumps Vaccine Effectiveness and Risk Factors for Disease
in Households during an Outbreak in New York City,"
by Livingston, Kara, *et al.*, Vaccine 32; 369-374 (2014) ..... Appx21104

Exhibit 350 to Dykstra Declaration -
"A Large Outbreak of Mumps in the Postvaccine Era,"
by Wharton, Melinda, *et al.*, *Journal of Infectious Diseases*,
Vol. 158, No. 6 (December 1988) ........................................Appx21111

Exhibit 351 to Dykstra Declaration -
"Persistence of Mumps Antibodies after 2 Doses of
Measles-Mumps-Rubella Vaccine," by LeBaron, Charles,
*et al.*, *Journal of Infectious Diseases*, 2009:199
(February 15, 2009) ........................................................... Appx21120

**Table of Contents**
(Continued)

Exhibit 352 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Keith Chirgwin, M.D., taken January 26, 2017 ................... Appx21130

Exhibit 353 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Barbara Kuter, Ph.D., taken December 14, 2016 ................. Appx21137

Exhibit 354 to Dykstra Declaration -
Letter from Manal Morsy, M.D., Ph.D. to Luba Vujcic,
dated March 9, 2000 (MRK-KRA00020409-20410) ........... Appx21141

Exhibit 355 to Dykstra Declaration -
Memorandum from R. Wolchko with the subject "Bridging
Study of the Mumps Legacy ELISA" and "Mumps
'Wild Type' IgG ELISA," dated February 23, 2001
(MRK-KRA00561875-561885) ........................................... Appx21144

Exhibit 356 to Dykstra Declaration -
*Curriculum Vitae* of Emilio Emini, Ph.D. (January 2016)
(EMINI 00001-22) .............................................................. Appx21156

Exhibit 357 to Dykstra Declaration -
General Correspondence to FDA, dated April 23, 2002
(MRK-KRA00000548-553) ................................................. Appx21179

Exhibit 358 to Dykstra Declaration -
"Mumps Epidemiology and Immunity-The Anatomy of a
Modern Epidemic," by Anderson, Larry, *et al.*,
*Pediatric Infectious Disease Journal*, Vol. 27, No. 10
(October 2008) .................................................................... Appx21186

Exhibit 359 to Dykstra Declaration -
IID-1.5 "Reduce cases of mumps (U.S. acquired cases),"
Healthy People 2020 .......................................................... Appx21192

### Table of Contents
### (Continued)

**Page**

Defendant's Response to the United States' Statement of
Interest in Response to the Parties' Summary Judgment
Briefing, dated January 18, 2021 (Doc. 323)......................  Appx21194

Defendant Merck's Reply to Relators' Response Regarding
the United States' Statement of Interest (Doc. 328) ..........  Appx21206



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022229

Appx5501



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022230

Appx5502



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022231

Appx5503



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022232

Appx5504



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Appx5505**



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022234

**Appx5506**



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022235

Appx5507



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022236

Appx5508



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022237

Appx5509



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022238

Appx5510



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022239

Appx5511



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022240

**Appx5512**



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022241

Appx5513



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022242

Appx5514



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022243

Appx5515



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022244

Appx5516



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022245

Appx5517



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022246

Appx5518



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022247

Appx5519



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022248

Appx5520



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022249

Appx5521



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022250

Appx5522



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022251

Appx5523



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022252

Appx5524



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022253

Appx5525



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022254

Appx5526



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022255

Appx5527



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022256

Appx5528



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022257

Appx5529



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022258

Appx5530



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022259

Appx5531



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022260

Appx5532



GSK-MMR-IND-0022261

Appx5533



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022262

Appx5534



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022263

Appx5535



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022265

Appx5537



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022266

Appx5538



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022267

Appx5539



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022268

Appx5540



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022269

Appx5541

10/25/2019
Declaration of G. Reilly
EXHIBIT 152

**Appx5542**

**Face-to-Face CBER Meeting Monday, March 13, 2000**

Agenda for Discussion:

1-Wild-type mumps neutralization assay for use in the MMR® II mumps end expiry trial (BB-IND 1016).

    A. Review of current data in relation to historical - Dr. Hilleman's data.

    B. Review of Merck's PRN assay
       i)  Identify assay differences likely to affect sensitivity
       ii) Determine CBER method of titer calculation and definition of seroconversion
       iii) Gain concurrence on a test format that will provide optimum assessment of SCR
       iv) CBER's assessment of what constitutes a WT strain and it's assay suitability
       v)  Gain concurrence on Merck's protocol for validation and optimization of our neutralization assay.

    C. Review Dr. Forghani's assay and outcome of discussion.
       i)  Discuss Dr. Forghani's assay and reach agreement on its acceptability.
       ii) Discuss Dr. Forghani's observations, SCR may not be as high as CBER suggested on 1/31
       iii) Discuss the uncertain definition of SCR.

2-Wild-type mumps ELISA assay for use in the MMRV Phase III studies (BB-IND 7068).

    A. Determine wild-type virus for assay.  Merck proposes to use wild-type Jeryl Lynn at low passage as suggested by CBER.

    B. Gain concurrence on assay methodology and protocol for validation and optimization of our ELISA assay.

3-Confirm how data will be used (metric for determination of equivalence).

Specific questions:

*What are the basic steps of CBER's neutralization procedure?
*How does CBER calculate titers?
*What proportions of CBER's pre-sera are positive?
*What criteria does CBER use to determine seroconversion?
*In CBER's experience, what assay parameters affect sensitivity?
*Has CBER evaluated different virus indicator strains in their assay?

**CONFIDENTIAL**



Note: Verification for
vaccination or natural disease
is not available. Subjects
involved stated their vaccination
status. CWW

QA
CWW
22-DEC-1999
99DOC 256

During the development of the neutralization assay we explored several parameters which could, theoretically, influence the sensitivity of the assay. We concentrated primarily on the questions of heat-inactivation and the influence of complement, and on the characteristics of the various wild type virus preparations which appeared to vary in sensitivity to antibody.

1. Heat inactivation and complement. Although complement may play a role in control of virus infections *in vivo,* most neutralization assays described in the literature include a heating step to inactivate complement. The reason given for heating is to reduce non-specific effects attributed to complement. We investigated four sources of complement (guinea pig, baby rabbit, pig and trout) for their capacity to enhance neutralization of mumps virus by human antisera. In all four cases, we found that the complement alone had a concentration-dependent capacity to inactivate mumps virus in the absence of antibody (Table 1). Once this effect was eliminated by dilution, there was only a marginal enhancement of antibody-mediated neutralization of mumps virus.

2. Virus growth characteristics. We had obtained wild-type mumps virus isolates from several sources (ATCC, NIBSC, CDC, Switzerland). These were all supplied in small volumes with variable titers. In order to create stocks of each isolate, we grew each virus in Vero cells as described. All of the isolates grew well in Vero cells, and all isolates grew comparably in the preparation of virus stocks (Table 2).

3. Virus plaque size and morphology. The various isolates produced different sized and shaped plaques on Vero cells. In addition, certain strains failed to produce plaques in a reliable manner.

   The London 1 (Lo1) strain produced easily-visualizable plaques with good morphology. This strain was chosen for further use, in part because of it plaque properties and in part due to historical experience at CBER and at NIBSC.

Having settled on the Lo1 isolate for further use, we investigated several aspects of the virus preparation itself with respect to cell substrate and virus antigen content.

The Jeryl Lynn house standard is a typical monovalent vaccine lot prepared on chick cells. The wild-type viruses (with the exception of the Enders and Jones strains from the ATCC) had all been propagated on Vero cells. The JL-2 preparation, originally obtained from the NIBSC, had also been grown on Vero cells, and then on chick cells in our laboratories. An Lo1 stock was also prepared in chick cells to provide a common substrate for growth of JL-2 and Jeryl Lynn™ viruses. This chick cell grown Lo1 was used in the majority of subsequent neutralization studies.

We also examined the effect of clarification of the virus stocks on sensitivity to human antisera. The hypothesis was that a virus preparation with more viral antigen not associated with infectious virus might be less sensitive to antibody than one with less antigen. Virus stocks clarified by low speed centrifugation or filtration were compared with crude stocks, and no increase in sensitivity was noted. A valid assay for mumps virus antigen was not available at the time this work was carried out.

In summary, we have noted that different mumps virus isolates have different sensitivity to human anti-mumps sera. These differences are seen with sera from infants vaccinated with M-M-M®II as well as with sera from adults vaccinated many years previously (sera DW, DK, CM, CK and KS from Table 3) and adults who had wild-type mumps (sera AS and PK from Table 3) before the vaccine became available. This difference in sensitivity was also seen with a reference serum obtained from CBER. This is shown in Table 3.

David Krah  Dec 22, 1999

**CONFIDENTIAL**

## TABLE 1

### Use of exogenous sera as a source of C'

| Serum | dilution | % pfu reduction of LO1 by C' serum |
|---|---|---|
| Guinea pig | 1:10 | >99 |
| | 1:20 | >99 |
| | 1:40 | >99 |
| | 1:80 | 99 |
| | 1:160 | 89 |
| | 1:320 | 63 |
| | 1:640 | 19 |
| | 1:1280 | 0 |
| Baby Rabbit | 1:10 | >99 |
| | 1:20 | >99 |
| | 1:40 | >99 |
| | 1:80 | 98 |
| | 1:160 | 47 |
| | 1:320 | 15 |
| | 1:640 | 15 |
| | 1:1280 | 16 |
| Trout | 1:10 | 29 |
| | 1:20 | 17 |
| | 1:40 | 15 |
| | 1:80 | 19 |
| | 1:160 | 10 |
| | 1:320 | 4 |
| | 1:640 | 4 |
| | 1:1280 | 11 |
| Pig | 1:10 | 98 |
| | 1:20 | 94 |
| | 1:40 | 93 |
| | 1:80 | 87 |
| | 1:160 | 55 |
| | 1:320 | 38 |
| | 1:640 | 15 |
| | 1:1280 | 26 |

CONFIDENTIAL

MRK-KRA00016338
MRK-CHA00016338

Appx5546

CONFIDENTIAL

## TABLE 2

### Description of "Wild-Type" Indicator Viruses Used in Mumps Neutralization Studies

| Strain | Source | Substrate (at MRL) | Inoculum amount | Harvest day and temperature (days post-infection) |
|--------|--------|--------------------|-----------------|----------------------------------------------------|
| Lo1 | Afzal/NIBSC | Vero<br>Chick embryo | 0.2 mL undiluted/150 cm$^2$<br>2.5 mL 1:1000/490 cm$^2$ | 4 days, 35°C<br>4 days, 37°C |
| TN | Rota/CDC | Vero | 0.1 mL undiluted/150 cm$^2$ | 5 days, 35°C |
| SA | Rota/CDC | Vero | 0.1 mL undiluted/150 cm$^2$ | 5 days, 35°C |
| Swiss isolates | IKMI | Vero | 0.1 or 0.2 mL undiluted/150 cm$^2$ | 4 to 7 days, 35°C |
| Jones | ATCC | Vero | 0.1 mL undiluted/150 cm$^2$ | 6 days, 35°C |
| NY | Rota/CDC | Vero | 0.2 mL undiluted/150 cm$^2$ | 6 days, 35°C |
| Enders | ATCC | Vero | 0.1 mL undiluted/150 cm$^2$ | 6 days, 35°C |

MRK-KRA00016339<br>MRK-CHA00016339

Appx5547

## TABLE 3

### Effect of Virus Indicator Strain on Mumps Nt Sensitivity

| Virus | Expt Number | Titer for indicated test serum | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | AS | PK | DW | DK | OM | CK | KS | Ref IG | Ref IG(ΔHI) |
| HS (Jeryl Lynn) | 478-99 | 64 | ≥256 | 1024 | 4 | ≥128 | 32 | 32 | 512 | 512 |
| | 480-99 | 64 | ≥256 | 1024 | <4 | ≥128 | 64 | 64 | 512 | 256 |
| | 481-99 | 64 | ≥256 | 512 | 4 | ≥128 | 32 | 32 | ≥1024 | 512 |
| | 499-99 | 64 | ≥256 | 1024 | 4 | ≥128 | 32 | ≥128 | ≥1024 | ≥1024 |
| Lo1 | 478-99 | 16 | 64 | 512 | 4 | 32 | 32 | 32 | 128 | 128 |
| | 480-99 | 64 | ≥256 | 512 | 8 | ≥128 | ≥128 | 64 | 256 | 256 |
| | 481-99 | 32 | 128 | 512 | 8 | 64 | ≥128 | 32 | 256 | 256 |
| | 499-99 | ≥128 | 128 | 1024 | 16 | ≥128 | 64 | ≥128 | 256 | 128 |
| JL2 | 478-99 | <16 | <32 | 256 | <4 | 16 | 16 | <16 | 256 | 128 |
| | 480-99 | <16 | <32 | 256 | <4 | 16 | <16 | <16 | 128 | 128 |
| | 481-99 | <16 | <32 | 256 | <4 | 16 | <16 | <16 | <128 | 128 |
| NY | 478-99 | 32 | <32 | 512 | <4 | 32 | 32 | 16 | 256 | 128 |
| | 480-99 | 32 | 64 | 512 | 16 | 64 | 64 | 64 | 256 | 256 |
| | 481-99 | 16 | <32 | 256 | <4 | 32 | 16 | 16 | 128 | 128 |
| | 499-99 | 32 | 64 | 256 | <4 | 16 | 16 | 32 | 256 | 128 |
| Sw1 | 478-99 | <16 | <64 | <256 | <4 | <16 | <16 | 16 | <128 | <128 |
| | 480-99 | <16 | <32 | <256 | <4 | <16 | <16 | <16 | <128 | <128 |
| | 481-99 | <16 | <32 | <256 | <4 | <16 | <16 | <16 | <128 | <128 |
| | 499-99 | <16 | <32 | <256 | <4 | <16 | <16 | <16 | <128 | <128 |
| TN | 478-99 | ≥128 | 64 | 1024 | <4 | 32 | 16 | 32 | 256 | 512 |
| | 481-99 | 64 | 64 | 512 | 4 | 32 | 16 | nt | 512 | 256 |
| | 499-99 | 64 | 32 | 512 | 8 | 32 | 64 | 16 | 256 | 256 |

Ref IG = FDA reference immune globulin, lot 176
Sw1 = Swiss isolate #1
ΔHI = heat-inactivated FDA reference immunoglobulin. All other sera were heat-inactivated
nt = not tested
Virus stock titers were approximately $10^6$ (Jeryl Lynn™, diluted prior to filling; NY), $10^8$ (Lo1, JL2, Sw1) and $10^7$ (TN) pfu/mL

CONFIDENTIAL

MRK-KRA00016340
MRK-CHA00016340

## Factors evaluated for effects on Mumps Nt sensitivity

- Indicator virus
  - Jeryl Lynn™
  - Swiss isolates
  - NY
  - TN
  - SA
  - Jones
  - Enders
  - Lo1
  - JL2
  - JL5
  - SBL-1
  - Select viruses passaged in CEF vs Vero (Lo1, TN, Enders, Jones)

- Incubation time and temperature of virus and serum

- Virus concentration

- Virus harvest fractions and clarification methods

- Cell substrate for virus stock growth

- Staining method for plaque visualization

- Virus attachment time

- Enhancements to Nt
  - Complement ($\leq$8-fold enhancement)
  - anti-human IgG (~100-fold enhancement)

3/10/00
DK, 7/26/99

CONFIDENTIAL

MRK-KRA00016341
MRK-CHA00016341
Appx5549

## TABLE 3

### Seroconversion Rates Observed Using the MPS Plaque-Reduction Assay

| Series | Sera | Indicator strain | Seroconversion #/total (%) |
|--------|------|------------------|----------------------------|
| 1 | 006 | Jeryl Lynn™ | 5/7  (71%) |
| 2 | 045 | Jeryl Lynn™ | 18/20  (90%) |
|   |     | Lo1/Vero | 16/20  (80%) |
| 3 | 045 | Jeryl Lynn™ | 19/20  (95%) |
|   |     | Lo1/Vero | 13/20  (65%) |
|   |     | JL2 | 10/10  (100%) |
| 4 | - | Jeryl Lynn™ | 4/5  (80%) |
|   |     |  | 8/8  (100%) |
|   |     |  | 8/9  (89%) |
|   |     |  | [total ≙ 20/22  (91%)] |
|   |     | Lo1/CEF | 3/5  (60%) |
|   |     |  | 5/8  (63%) |
|   |     |  | 4/9  (44%) |
|   |     |  | [total = 12/22  (55%)] |
|   |     | JL2 | 1/5  (20%) |
|   |     |  | 4/8  (50%) |
|   |     |  | 3/9  (33%) |
|   |     |  | [total = 8/22  (36%)] |
| OVERALL |  | Jeryl Lynn™ | 62/69  (90%) |
|   |     | Lo1 | 41/62  (66%) |
|   |     | JL2 | 18/32  (56%) |

Note: Lo1/Vero = Lo1 mumps grown in Vero cells
Lo1/CEF = Lo1 mumps grown in chick embryo cell culture

CONFIDENTIAL

# Preliminary Analysis of Titer Distribution from
## Protocol 006 Nt Testing

| Pre titer | Post titer | Number of sera for virus | | |
|---|---|---|---|---|
| | | JL (%) | Lo1 (%) | JL2 (%) |
| <2 | <2 | 5 (3) | 21 (13) | 52 (37) |
| | 2 | 4 (2) | 19 (12) | 10 (7) |
| | 4 | 10 (6) | 18 (11) | 31 (22) |
| | 8 | 13 (8) | 13 (8) | 25 (18) |
| | 16 | 20 (12) | 21 (13) | 9 (6) |
| | 32 | 40 (25) | 35 (22) | 6 (4) |
| | 64 | 64 (39) | 20 (13) | 1 (1) |
| <4 | <2 | 0 | 0 | 4 (3) |
| | 4 | 1 (1) | 0 | 0 |
| | 8 | 0 | 1 (1) | 0 |
| 2 | <2 | 0 | 1 (1) | 0 |
| | 8 | 1 (1) | 1 (1) | 0 |
| | 16 | 1 (1) | 1 (1) | 0 |
| | 32 | 0 | 1 (1) | 0 |
| | 64 | 2 (1) | 1 (1) | 0 |
| >4 | 4 | 1 (1) | 0 | 0 |
| | 16 | 0 | 1 (1) | 0 |
| | 32 | 1 (1) | 2 (1) | 1 (1) |
| | 64 | 0 | 1 (1) | 0 |

DK, 11/16/99

CONFIDENTIAL

MRK-KRA00016343
MRK-CHA00016343

Appx5551

10/25/2019
Declaration of G. Reilly
EXHIBIT 153

## Krah, David

| | |
|---|---|
| **From:** | Krah, David |
| **Sent:** | Tuesday, August 15, 2000 6:38 PM |
| **To:** | Shaw, Alan |
| **Cc:** | Yagodich, Mary; Kriss, Jennifer A.; Milliken, Colleen; Yancoskie, Elizabeth A.; Haas, Kristin |
| **Subject:** | Update on mumps Nt |

Alan,

We have completed testing 2 sets of pediatric sera in the anti-IgG enhanced mumps Nt assay to provide an estimate of the seroconversion rate achievable with this test format. The first set was from protocol 006 (before we realized the change in position to not test this set), and included a subset biased toward the low-titer and non-responders to Jeryl Lynn in the previous (non-enhanced) testing. The second set was a panel of 60 paired pediatric sera received from Bev Rich's group. All sera were tested from 1:32 thru 1:4096 dilutions, using JL135 low-passage mumps virus as the indicator and a 1:4 dilution of anti-human IgG (identified in previous experiments as providing good sensitivity while not providing excess pre-vaccination positive results). Sera were tested once, and sera providing no Nt at any tested dilutions were assigned a value of "<32, negative". Titers for sera providing Nt were assigned to the highest tested dilution providing >=50% Nt relative to a mock serum control.

For the protocol 006 set, 26 sera were positive and 3 were negative by standard and enhanced Nts, and 5 sera were positive by enhanced Nt but negative by standard Nt. The seroconversion rate for this set (again biased toward Jeryl Lynn Nt [-] responses) was 26/34 = 76% to Jeryl Lynn (historical value), and 31/34 = 91% by the enhanced Nt. In this serum set, 3 pre-vaccination sera were positive by standard Nt and another were pre-positive in the enhanced Nt. Pre-positive serum values were not included in the seroconversion calculations.

In the second serum set, 47/47 pre-negative sera showed seroconversion (all post-vaccination titers have been >=128 = 8-fold increase from pre-negative values). Thirteen serum pairs were pre-positive (13/60 = 22%). Several of the pre-positive pairs are on retest to confirm pre-positive titers (7 of these were "barely" positive). Retesting of the pre-positive sera from other serum sets has shown that the pre-positives often do not repeat (although post-positives do repeat). Although it would likely drive the testing lab mad, a retest policy on all sera might reduce the pre-positive rate. We are also readdressing the anti-IgG concentration to see if we can reduce the assay sensitivity to reduce the pre-positive rate while maintaining sensitivity to detect seroconversions.

If the 2 sets of data re combined, we achieved 78/81 seroconversions = 96%.
Stephanie indicated that the 95% CI for this value is ~92.2%.

From today's Mumps et al assay subteam, it was decided to go ahead and start training of Dick Ward's staff (timing = ??). Bill Long will coordinate their end. We also proposed to not do the validation in our group, but rather to transfer the assay and have the eventual operators (Dick Ward's lab) do the validation. This eliminates us from doing validation for an assay that we don't plan to run to support clinical studies and avoids the need for qualification of the operators after validation.

Ongoing studies in our lab to wrap up the Nt include:
-reassaying pre-positive pairs to confirm serostatus
-refine anti-IgG concentration to reduce pre-positives
-test a panel of 20 additional sera @ 1:2 thru 1:4096 dilutions to gain more information on results in the 1:2 thru 1:16 range and obtain 20 more seroconversion values
-wrap up a small subset evaluation using differet wt mumps strains (Barnes, Lo1, TN) for comparison to JL135 Nt sensitivity.

Stephanie Olsen also asked if I could send her the results for the protocol 006 sera that were tested to see how the breakout of vaccines falls in this set. I will forward these, but I will remain blinded to the vaccine used for the set.

Dave

CONFIDENTIAL

MRK-KRA00068546
MRK-CHA00068546
Appx5553

10/25/2019
Declaration of G. Reilly
EXHIBIT 154

**TO DO LIST 8-26-00**

| | **MMRV** | **Status/Assignments** | |
|---|---|---|---|
| 1 | CMC WMA Prep/Tracking: | 1. define scope of effort for validation (worst case scenario),<br>2. dev tracking timeline for 9/01 filing | 2. |
| 2 | CBER Letter Responses | 1. Sero-cutoff proposal/rationale sent to DM 8/24<br>2. All other responses complete – MM to verify | 2. |
| 3 | ELISA dilutability and validation; CBER communications | 1. Regulatory input provided to DHVS on 8/23 that dilutability not likely to be a regulatory concern because this under-estimates responses. Recommendation: 1) keep vzv the same (link with efficacy database); 2) use higher measles cutoff (21.3) for MMRV frozen – consider extending std curve with new dilution and revalidating later.<br>**Assignment: confirm recommendation with rationale for this in memo**<br><br>2. SOPs provided in CBER response 12/99 contain incorrect information on dilutions used in assay.<br>**Assignment: Determine timing and mechanism for correcting this**<br><br>3. Mumps validation data (WT Ag) promised to CBER; T-9/00.<br>**Assignment: Track completion of this and submission**<br>REDACTED – OMP | 4. |
| 4 | Clinical references | 1. Status report on CSRs<br>2. Decision on abbreviated CSRs for old studies | 2. |
| 5 | Regulatory strategy | Update the regulatory strategy memo, MMRV 4 degree, rHA roll-in | |
| | | | |
| | **M-M-R II** | | |
| 1 | MMRII BWP presentation on 10/10 | 1. Internal meeting to confirm agenda was scheduled 9/5 CANCELLED??<br>**Assignment: reschedule consensus mtg; and rehearsal /review overheads** | |
| 2 | Kaketsuken visit | **Assignments**<br>1. Finalize agenda<br>2. Arrangements with MVD/Mahmoud | 2. |
| 3 | Japan Regulatory strategy | **Assignment: finalize memo** | |
| 4 | RHA – US | **Assignments:**<br>1. Prepare background document from the Request for Sci Ad<br>2. Confirm communication plan (Liaison vs BioLic) | 2. |
| 5. | Mumps expiry | **Assignment:**<br>CBER communication re Optimized PRN assay description; need to convey following: 1) Estimated SCR >90%, pre-pos higher than ELISA (?20%); 2) plan to proceed and will want to apply results from this trial in OGOS to GOS and to MMRV for end-expiry; 3) we do not plan to apply this assay to other development efforts as the pre-pos rate is relatively high; 5) if the expiry trial criteria for success are not met we will overfill indefinitely | |
| 6 | Mumps overfill – WAES | Post-mortem on failure to follow through | |
| | | | |
| | REDACTED – OMP | | |

MRK-KRA00273243<br>MRK-CHA00273243

**Appx5555**

| | REDACTED – OMP | |
|---|---|---|
| 4 | CBER comm of 048 and sequence data | 1. Draft cover letter |
| | | |
| | **RECOMBIVAX** | |
| | BTMC submission | |
| | EU filing | |
| | MMF task force | 1. CBER letter communicating roll-out of label changes re our alum adjuvant; refer to tabular summary from HU (RZ) |
| | | |
| | | |
| | REDACTED – OMP | |

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

10/25/2019
Declaration of G. Reilly
EXHIBIT 155

Appx5557

```
1          IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2

     UNITED STATES OF AMERICA  : CIVIL ACTION
3    ex rel., STEPHEN A.       : NO. 2:10-04374(CDJ)
     KRAHLING and JOAN A.      :
4    WLOCHOWSKI,               :
            Plaintiffs,        :
5                              :
            vs.                :
6                              :
     MERCK & CO., INC.,        :
7          Defendant.          :
     _____  : Master File No.
8    IN RE:  MERCK MUMPS       : 2:12-cv-03555(CDJ)
     VACCINE ANTITRUST         :
9    LITIGATION                :
                               :
10   THIS DOCUMENT RELATES TO: :
     ALL ACTIONS               :
11                      -   -   -
12                    May 2, 2017
13    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
14                      -   -   -
15          Videotaped deposition of STEPHEN
16   KRAHLING, taken at the offices of Morgan Lewis
17   & Bockius, 1701 Market Street, Suite 18-F,
18   Philadelphia, Pennsylvania 19103, beginning at
19   9:37 a.m., before LINDA ROSSI-RIOS, a
20   Federally Approved RPR, CCR and Notary Public.
21
22                      -   -   -
             VERITEXT LEGAL SOLUTIONS
23              MID-ATLANTIC REGION
          1801 Market Street - Suite 1800
24             Philadelphia, PA  19103
25
```

Page 2

1  A P P E A R A N C E S :
2
3  On behalf of the Private Plaintiffs
4      SPECTOR ROSEMAN KODROFF & WILLIS, P C
       BY:  JOHN A  MACORETTA, ESQUIRE
5      1818 Market Street
       Suite 2500
6      Philadelphia, PA  19103
       215 496 0300
7      jmacoretta@srkw-law com
8
       On behalf of the Relators
9
       KELLER GROVER LLP
10     BY:  JEFFREY F  KELLER, ESQUIRE
       1965 Market Street
11     San Francisco, CA  94103
       415 543 1305
12     jfkeller@kellergrover com
13
14  On behalf of Relators and the Witness
    Stephen Krahling
15
       CONSTANTINE CANNON LLP
16     BY:  GORDON SCHNELL, ESQUIRE
       and
17       MARLENE KOURY, ESQUIRE
       335 Madison Avenue
18     New York, NY  10017
       212-350-2700
19     gschnell@constantinecannon com
       mkoury@constantinecannon com
20
21
22
23
24
25

Page 3

1  A P P E A R A N C E S  (cont'd ):
2
3  On behalf of the Defendant, Merck & Co ,
   Inc
4
       MORGAN LEWIS & BOCKIUS LLP
5      BY:  LISA DYKSTRA, ESQUIRE
       and
6        MELINA R  DiMATTIO, ESQUIRE
       1701 Market Street
7      Philadelphia, PA  19103
       215 963 5000
8      lisa dykstra@morganlewis com
       melina dimattio@morganlewis com
9
10
11  On behalf of the Defendant, Merck & Co ,
    Inc
12
       VENABLE LLP
13     BY:  DINO S  SANGIAMO, ESQUIRE
       750 E  Pratt Street
14     Suite 900
       Baltimore, MD  21202
15     410 244 7400
       dssangiamo@venable com
16
17  A L S O  P R E S E N T :
18
19
20     TIMOTHY K  HOWARD, ESQUIRE
       Merck in-house counsel
21     AMANDA HEARY, Videographer
22
          - - -
23
24
25

Page 4

1        I N D E X
2
   WITNESS              PAGE
3
   STEPHEN KRAHLING
4
   By Ms  Dykstra       10
5
6
       E X H I B I T S
7
   MARKED     DESCRIPTION     PAGE
8
   Krahling-1  10/10/00 Memo,      24
9      MRK-KRA00331424 - 00331433
10 Krahling-2  CDC Manual for the   75
       Surveillance of
11     Vaccine-Preventable
       Diseases
12
   Krahling-3  Amended Complaint for   80
13     Violations of the Federal
       False Claims Act
14
   Krahling-4  MMR II label,      87
15     RELATOR_00002094 - 00002105
16 Krahling-5  6/23/98, IND submission,  112
       MRK-KRA00624345 - 00624446
17
   Krahling-6  Relator Stephen A    116
18     Krahling's Responses and
       Objections to Defendant
19     Merck's Requests for
       Admission
20
   Krahling-7  6/21/16 Letter      117
21
   Krahling-8  Letter,        123
22     MRK-KRA00001446 - 00001469
23 Krahling-9  12/1/99 Letter,     131
       MRK-KRA00001222 - 00001230
24
   Krahling-10  12/30/99 IND submission,  139
25     MRK-KRA00001470 - 00001924

Page 5

1        E X H I B I T S  (cont'd )
2  Krahling-11  3/12/11 Response to FDA  155
       Request for Information,
3      MRK-KRA00018864 - 00018937
4  Krahling-12  8/1/00 Letter,     171
       MRK-KRA00048418
5
   Krahling-13  Employee Initialization,  174
6      MRK-KRA00582401
7  Krahling-14  10/24/00 Letter,    176
       RELATOR_00001058 - 00001060
8
   Krahling-15  E-mails,        215
9      MRK-KRA00048342
10 Krahling-16  Compilation of e-mails,  218
       RELATOR_00000731 - 00000735
11
   Krahling-17  4/8/01 Letter,     223
12     RELATOR_00000328 - 00000331
13 Krahling-18  7/17/01 E-mail,     251
       MRK-KRA00002243
14
   Krahling-19  Handwritten notes,    272
15     RELATOR_00001068 - 00001070
16 Krahling-20  Resume,        287
       RELATOR_00002770 & 00002771
17
   Krahling-21  Relator Stephen A    290
18     Krahling's Responses and
       Objections to Merck's
19     Revised First Set of
       Interrogatories
20
   Krahling-22  Handwritten notes,    304
21     RELATOR_00001072 - 00001080
22 Krahling-23  9/25/01 E-mail,     318
       RELATOR_00000745
23
   Krahling-24  E-mail string,     320
24     RELATOR_00000747
25

2 (Pages 2 - 5)

Appx5559

Page 6

1          E X H I B I T S (cont'd.)
2   Krahling-25 Handwritten notes,      291
              RELATOR_00001044 - 00001047
3
    Krahling-26  10/29/01 Letter,        327
4         MRK-KRA00002013 - 00002016
5   Krahling-27  Letters,               332
              RELATOR_00001086 - 00001090
6
    Krahling-28  11/30/01 Agreement,     336
7         MRK-KRA00582394 - 00582397
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1               DEPOSITION SUPPORT INDEX
2
3   DIRECTION TO WITNESS NOT TO ANSWER
4   Page  Line
5   (None)
6
7
8
9   REQUEST FOR PRODUCTION OF DOCUMENTS
10  Page  Line
11
12  331   9
13
14
15  STIPULATIONS
16  Page  Line
17  (None)
18
19
20
21  QUESTIONS MARKED
22  Page  Line
23  (None)
24
25

Page 8

1   STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2               - - -
3          VIDEOGRAPHER:  We are now on
4   the record.  Please note microphones
5   are sensitive and may pick up private
6   conversations.  Please turn off all
7   cell phones and place them away from
8   the microphones as they can interfere
9   with the deposition's audio.
10         My name is Amanda Heary
11  representing Veritext Legal Solutions.
12         The date today is May 2, 2017,
13  and the time is 9:37 a.m.  This
14  deposition is being held at Morgan,
15  Lewis & Bockius, located at 1701 Market
16  Street, Philadelphia, Pennsylvania.
17  The caption of this case is In Re:
18  Merck Mumps Vaccine Antitrust
19  Litigation and United States of America
20  ex rel. Stephen A. Krahling and Joan
21  Wlochowski versus Merck & Co., Inc.
22  This case is being held in the United
23  States District Court for the Eastern
24  District of Pennsylvania.  The Case
25  Number 2:12-cv-03555(CDJ).  The name of

Page 9

1   STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2   the witness is Stephen Krahling.
3          At this time attorneys present
4   in the room and everyone attending will
5   identify themselves and the parties
6   they represent.
7          MR. SCHNELL:  Gordon Schnell
8   from Constantine Cannon.  Counsel for
9   Mr. Krahling.
10         MR. KELLER:  Jeffrey Keller
11  from Keller Grover.  Counsel for the
12  Relators.
13         MS. KOURY:  Marlene Koury from
14  Constantine Cannon.  Counsel for
15  Relators.
16         MS. DYKSTRA:  Lisa Dykstra from
17  Morgan Lewis.  Counsel for Merck.
18         MS. DIMATTIO:  Melina DiMattio
19  from Morgan Lewis.  Also for Merck.
20         MR. SANGIAMO:  Dino Sangiamo,
21  Venable, for Merck.
22         MR. HOWARD:  Timothy Howard,
23  in-house counsel for Merck.
24         VIDEOGRAPHER:  Our court
25  reporter Linda Rossi representing

3 (Pages 6 - 9)

Page 10

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 Veritext Legal Solutions, will swear in
3 the witness and we can proceed.
4 - - -
5 STEPHEN KRAHLING, after having
6 been first duly sworn, was examined and
7 testified as follows:
8 - - -
9 EXAMINATION
10 - - -
11 BY MS. DYKSTRA:
12 Q. Good morning, Mr. Krahling.
13 Krahling, right?
14 A. Krahling, right.
15 Q. Krahling. I'm going to go over
16 some just general information just to make
17 sure we're on the same page as far as how
18 we're going to proceed today. We have two
19 full days of deposition. We'll take breaks
20 whenever you need them. You'll let us know us
21 know if you need a break. If you need a
22 break, we'll take a break.
23 If I speak too quickly because
24 sometimes I do or you don't understand a
25 question and you need me to repeat it, just

Page 11

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 let me know as we go forward. Okay?
3 A. Yes.
4 Q. You have to make verbal answers
5 so the court reporter can get that down.
6 I need you to respond to each
7 question fully to the best that you're able
8 to. I don't want you to guess. But if you
9 don't know the answer, that's okay. But give
10 me your best answer and your most honest
11 answer. Okay?
12 A. I understand.
13 Q. We'll try not to speak over
14 each other so the court reporter can get
15 everything down, make sure she gets it down
16 accurately. If I ask you a question and you
17 answer it, I'm going to assume that you
18 understand it. So if you don't understand my
19 question, I'm happy to rephrase it or have her
20 read it back to you. Okay?
21 A. Okay.
22 Q. You understand what being under
23 oath means. Correct?
24 A. Yes, I do.
25 Q. That you must tell the truth,

Page 12

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 and if not, you're violating the law?
3 A. I got that.
4 Q. We can take breaks, as I said,
5 but not when a question is pending, so we'll
6 take them appropriately.
7 A. I understand that also.
8 Q. Let me ask you a couple of
9 questions. Have you ever testified before in
10 a deposition?
11 A. I don't think so, no.
12 Q. Have you ever testified under
13 oath before?
14 A. I don't recall. I don't think
15 so.
16 Q. Have you ever been involved in
17 a -- as a plaintiff or a defendant in any
18 other lawsuits?
19 A. I mean, those are legal terms.
20 I don't think that I have.
21 Q. Have you ever sued anybody?
22 A. No. It's crossing my mind as
23 traffic ticket type stuff. No.
24 Q. Have you ever filed any other
25 cases under the False Claims Act other than

Page 13

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 this one?
3 A. No.
4 Q. Have you ever discussed with
5 the Department of Justice any other cases
6 potentially to be filed under the False Claims
7 Act other than this one, even if it wasn't
8 necessarily filed?
9 A. If I had done that, it would
10 have been with these guys present, my counsel.
11 But I don't recall doing that.
12 Q. Okay. Well, if you do recall
13 later on and it comes to your mind, you can
14 let us know.
15 A. You mean if I recall outside of
16 conversations with my lawyers?
17 Q. No. You can tell me if you had
18 a conversation with the Department of Justice
19 about a potential False Claims Act case,
20 whether it was filed or not. Just don't tell
21 me the content, just tell me whether the
22 conversation occurred.
23 A. Outside of my lawyers being
24 present?
25 Q. No. With your lawyers or

Page 14

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  without.  That's not a privileged statement
3  whether it occurred or not.
4        A.    I got it.  I didn't mean to
5  speak over you.
6            That, I don't quite recall
7  because it's a legal thing whether a case
8  would go forward.  I don't recall.
9            MR. SCHNELL:  I don't think he
10       understands.  She's talking about other
11       than this case.  Do you understand
12       that?
13           THE WITNESS:  Yeah.  I don't
14       believe we did, but we talked about
15       other Merck products and we didn't talk
16       about anything else except this case.
17       So I don't think my memory is
18       responsive to the question.  I don't
19       believe we did, but to say flat out
20       no -- do you understand my answer?
21  BY MS. DYKSTRA:
22       Q.    Not entirely.
23       A.    I believe that we didn't, but I
24  don't know what would be responsive because
25  Merck has more than one vaccine.  So, for

Page 15

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  instance, mumps, MMR, ProQuad, and you start
3  talking about anything else I see or happened
4  in the context of other litigation, I don't
5  believe those conversations took place, but I
6  was discussing them in front of the Department
7  of Justice with my lawyers there, they're
8  lawyers and I'm not, so I don't understand --
9       Q.    Let me ask --
10       A.    -- what legal avenue any of
11  that was running down, but we focused on this
12  case or the issues of this case.
13       Q.    Let me ask this:  Have you ever
14  had a conversation with the Department of
15  Justice about another pharmaceutical company
16  in connection with a potential False Claims
17  Act case?
18       A.    No.
19       Q.    Have you ever had discussion
20  with the Department of Justice or any other
21  government agency in connection with a
22  potential False Claims Act case other than
23  related to a mumps product?
24       A.    What are you getting at there,
25  I don't -- can you --

Page 16

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2       Q.    Have you ever had a discussion
3  with the government about a potential False
4  Claims Act case unrelated to the mumps
5  vaccines, related to another product?
6            MR. SCHNELL:  Are you talking
7       about outside the discussions involving
8       this case?
9            MS. DYKSTRA:  Correct.  I'm
10       trying to say other vaccines to
11       clarify.  We're not talking about mumps
12       vaccines or this case.
13  BY MS. DYKSTRA:
14       Q.    Any other situation where you
15  pursued or had discussions about a potential
16  False Claims Act case putting aside anything
17  related to the mumps vaccine?
18       A.    I'm pretty sure the answer to
19  that is no, if I am understanding you
20  correctly.
21       Q.    Let me ask -- let's turn to
22  something else about your preparation for
23  today.
24            So tell me what you did to
25  prepare for today.  Without discussing what

Page 17

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  you talked with your counsel about, tell me
3  who you met with and when.
4       A.    So you want to know who I met
5  with and when?
6       Q.    To prepare for today.
7       A.    I met with Marlene and Gordon
8  who are both there, in New York City, Midtown
9  Manhattan.  I think it was exactly a week ago
10  today.  Today is Tuesday, right?
11       Q.    Yes.
12       A.    So it would have been Tuesday.
13  Maybe I drove on Tuesday.  For three days last
14  week.  I drove home on a Friday.
15       Q.    Where do you live?
16       A.    The middle of Pennsylvania,
17  State College, PA.
18       Q.    About how long did you meet
19  each day, all day long for three days?
20       A.    What do you mean "all day
21  long"?  Business hours?
22       Q.    Business hours.
23       A.    A little late start each day
24  for the first two days and then an early
25  cutoff each day.  Friday was just a couple of

5 (Pages 14 - 17)

Page 18

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 hours because I wasn't going to drive in the
3 morning traffic and I wanted to miss the
4 evening traffic. So just to get in in the
5 afternoon, maybe two or three hours Friday,
6 the final day.
7     Q.   Other than --
8     A.   I have one more. That was
9 that. We also got into town Sunday, two days
10 ago, and I met with Marlene, Gordon and
11 Jeffrey who are all here, and we -- that
12 would -- yesterday, for -- I think we got a
13 late start again. And we cutoff a little
14 early. That was yesterday. And that's the
15 entire time I met with them for preparation
16 for this deposition.
17     Q.   Thank you. I assume you looked
18 at documents during those sessions?
19     A.   Yeah, I looked at some documents.
20 I review documents.
21     Q.   Did any documents in particular
22 refresh your recollection about what occurred
23 in connection with this lawsuit?
24     A.   I reviewed the complaint.
25     MR. KELLER: I don't --

Page 19

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2     THE WITNESS: I reviewed the
3 complaint. I think they showed me the
4 package insert, but I didn't review it.
5 I didn't look at the interrogatories.
6 I didn't look at the RFAs. Those are
7 the two -- well, I reviewed -- had the
8 complaint in my hands. That was the
9 only document I had that I reviewed.
10 So to what -- I mean, I don't
11 understand your question. Refreshed
12 memory, can you be more specific?
13 BY MS. DYKSTRA:
14     Q.   That's okay. I think that's a
15 good enough answer for right now.
16     Let me ask you a question about
17 when you filed the complaint. When you filed
18 the complaint originally, did you draft the
19 complaint or did your lawyers draft the
20 complaint?
21     MR. SCHNELL: Object to form.
22     THE WITNESS: What do you mean
23 by "draft"?
24 BY MS. DYKSTRA:
25     Q.   Put pen to paper and write the

Page 20

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 words out on the page or type it up?
3     MR. SCHNELL: Object to form.
4     THE WITNESS: I don't know that
5 anybody put pen to paper, but you're
6 talking type it up. If you can define
7 content, what do you mean, who came up
8 with certain sentences or the
9 sentences?
10 BY MS. DYKSTRA:
11     Q.   How did you draft the
12 complaint? Let me ask you that. How was the
13 complaint drafted?
14     MR. SCHNELL: Object to form.
15     THE WITNESS: I mean, the most
16 general way I can say is I worked with
17 my law team to draft the complaint. If
18 there's anything I can answer more
19 specific than that, I don't quite
20 understand. I was involved heavily in
21 it.
22 BY MS. DYKSTRA:
23     Q.   And was Joan involved heavily
24 in preparing the complaint as well?
25     A.   I can't speak to that.

Page 21

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2     Q.   Was she not in the meetings
3 with you and your attorneys when you drafted
4 the complaint or prepared what would be in the
5 complaint generally?
6     A.   The reason behind some of those
7 decisions would reveal the decisions made by
8 my counsel and I. Should I answer that?
9     Q.   I don't want to know -- I just
10 want to know whether when you met with your
11 counsel and talked about -- to your counsel
12 about drafting the complaint, whether Joan was
13 part of those discussions or meetings?
14     A.   She was involved in drafting
15 the complaint, but my lawyers did a very good
16 job of trying not to bias what we were saying
17 by keeping us apart so that we told our
18 stories and didn't try to coordinate or rely
19 on each other. So I didn't get to see her or
20 understand what she was saying. They kept us
21 completely separate.
22     Q.   When you drafted -- when you
23 helped to draft or prepare the complaint, did
24 you review the package inserts in connection
25 with that work?

6 (Pages 18 - 21)

Page 22

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2      A.   I don't recall.
3      Q.   Other than meeting with your
4  counsel for today to prepare, did you do
5  anything else, like on your own or with
6  friends or with colleagues, did you do
7  anything else to prepare yourself for today?
8      A.   Could you be more specific?
9  Like I did the laundry.
10     Q.   Did that prepare you for today?
11     A.   Yeah, because I had three
12  outfits to wear in case a bird crapped on me
13  on the way here.  I mean, you want something
14  more than that.  I don't understand what
15  you're asking for more than that or aside from
16  that.
17     Q.   Did you review any other
18  documents on your own?
19     A.   No.
20     Q.   Did you talk to any of your
21  colleagues about what happened in the lab in
22  preparation for today?
23     A.   No.
24     Q.   Did you talk to your family or
25  friends about getting ready for today?

Page 23

1      A.   I mean, I had talked to my son
2  about the reason I couldn't golf 18 holes with
3  him on Saturday.  That's about the extent of
4  that, because I wanted to not be around the
5  hustle and bustle of a normal Saturday when I
6  was leaving the next day.  Are you looking for
7  something more than that?
8      Q.   If there is anything more than
9  that, that's --
10     A.   No.
11     Q.   Let me go through, if I can,
12  your educational and -- your education and
13  your work experience so I can understand the
14  chronology of that.
15         MS. DYKSTRA:  Speaking to
16      counsel for a second.  As you know in
17      this case we had labeled some of the
18      rHA documents highly confidential AEO.
19      There was a document that was labeled
20      that way.  I'm going to de-designate it
21      for purposes of this deposition because
22      his resume was attached to it.
23         So we are marking as Exhibit
24      Krahling-1.

Page 24

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2          - - -
3         (Exhibit Krahling-1, 10/10/00
4      Memo, MRK-KRA00331424 - 00331433, was
5      marked for identification.)
6          - - -
7  BY MS. DYKSTRA:
8      Q.   This is a document relating to
9  your hiring at Merck, and your resume is
10  attached to it.  So if you can just -- you
11  don't have to read the whole letter, I'm not
12  going to ask you about the front page, I'm
13  just going to focus on your resume and your
14  grades which are attached.
15     A.   Can I read the whole thing?
16     Q.   The front letter?
17     A.   All of it.
18     Q.   Sure.  You may read anything
19  you need to.
20         MS. KOURY:  Lisa, are you
21      redesignating this confidential?
22         MS. DYKSTRA:  Confidential,
23      yes.
24  BY MS. DYKSTRA:
25     Q.   I'm not going to go past the --

Page 25

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2      A.   There it is.
3      Q.   I'm not going past this page.
4  I'm not going to look at the rest of it.
5      A.   This?
6      Q.   Just that, yeah.
7      A.   It's hard to read.
8      Q.   I'm not going to ask questions
9  about anything else in the document.
10     A.   That's fine.  I don't have to
11  look at that page.
12     Q.   And I'm not going to ask
13  questions about that either.
14     A.   We don't want this to refresh
15  my memory at all?
16     Q.   No, it has nothing to do with
17  the --
18     A.   I shouldn't read it?
19     Q.   -- rest of the questions.
20     A.   I don't know.
21         MR. SCHNELL:  Ask your question
22      and if you think you need to, then you
23      can read it.
24         THE WITNESS:  Maybe I didn't
25      write this page.  Oh, this is a letter

7 (Pages 22 - 25)

Appx5564

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2     of recommendation, isn't it?
3   BY MS. DYKSTRA:
4     Q.   Yes, you have the letter of
5  recommendations attached, and I'm not going to
6  ask --
7     A.   Okay. So you're not going to
8  ask me about this letter of recommendation?
9     Q.   I'm not going to ask you about
10  any of the letters of recommendation.
11     A.   I don't have to review that.
12     Q.   So the first page is your
13  resume.
14     A.   The first page is --
15     Q.   Not the letter, the first --
16  second page is your resume.
17     A.   The first page looks like
18  something David Krah wrote.
19     Q.   Correct.
20     A.   So we're moving to the second
21  page?
22     Q.   Yes. Did you prepare this
23  document to provide to Merck when they were
24  going to hire you or when you were looking for
25  a job?

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2     A.   I don't recall when I prepared
3  this document. It likely was something I had.
4  But I believe that I gave this to Dave Krah to
5  apply for a permanent position in his lab.
6     Q.   And your education here states
7  that you went to Penn State and have a BS in
8  microbiology. Is that accurate?
9     A.   That is accurate.
10     Q.   Do you have any other degrees?
11     A.   Beyond a bachelor's degree?
12  What do you --
13     Q.   Yes, beyond a bachelor's or in
14  addition to another BS from another school.
15     A.   No.
16     Q.   Have you taken any college
17  courses, graduate courses or any other type of
18  post-college courses past this time frame of
19  1995 when you graduated from Penn State?
20     A.   No.
21     Q.   If you turn to the second page
22  which is your transcript, it says at the
23  bottom -- halfway down there's an intro to
24  micro lab that you got a D in. Have you taken
25  any other classes at all with respect to

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  microbiology?
3     A.   Hold on. I'm looking for it.
4     Q.   Sure.
5     A.   So now what's your question?
6     Q.   If you've taken any other
7  microbiology classes other than this one?
8     A.   I did not take any classes
9  other than what is listed in this transcript.
10     Q.   If you go all the way to the
11  bottom, it says you have a D in viruses. Do
12  you see that?
13     A.   Yep.
14     Q.   And I assume you took no other
15  classes in viruses other than what's here?
16     A.   These are the classes I took at
17  Penn State.
18     Q.   If you go back to your resume,
19  which is 1426 at the bottom, is this resume
20  that you submitted to Merck an accurate
21  representation of your work experience?
22     MR. SCHNELL: Object to form.
23     THE WITNESS: Yes. At the
24  time, yes, it would have been.
25  BY MS. DYKSTRA:

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2     Q.   And it lists all the places you
3  worked when you applied?
4     A.   All the places that I worked
5  that were relevant.
6     Q.   So you worked at Penn State for
7  approximately five years. Is that correct?
8     MR. SCHNELL: Object to form.
9     THE WITNESS: At the time I had
10  worked at Penn State for five years.
11  BY MS. DYKSTRA:
12     Q.   From 1993 to 1998?
13     A.   Yeah, but I mean, beyond that,
14  that's actually the amount of time I was --
15  because I wasn't getting paid. In 1993 to
16  1995 I worked summers and got paid a wage for
17  doing that. During the semester, I got class
18  credit for working there. So when you say
19  work, I'm not -- I mean, there's different
20  ways of being compensated for your labor.
21     From 1995, when I graduated,
22  until 1998, I got paid as a professional.
23  When I left there and went to Merck, I was
24  still available to help the graduate students
25  with the projects they were doing, teaching

Appx5565

Page 30

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 them techniques and things like that. So that
2 would be considered work, but I didn't draw a
3 wage for it.
4        Q.    What generally did you do at
5 Penn State? If there's different positions
6 that you had, describe those for me, what your
7 responsibilities were.
8        A.    I think I only had one position
9 there, as a research technician. I mean, the
10 label may have changed from an undergraduate,
11 but I worked on the same project which was
12 what the lab was working on in support of
13 that. Generally speaking, we were trying to
14 characterize the mechanics of the phospholipid
15 membrane bilayer in eukaryotic cells. Do you
16 want some more depth than that?
17       Q.    No. That's fine, thanks.
18            After you left Penn State, did
19 you have another position, another work
20 experience after you left Penn State in 1998?
21       A.    Yes.
22       Q.    Where did you go after Penn
23 State? Who were you employed by after Penn
24 State?

Page 31

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1        A.    A company called ViroPharma.
2        Q.    How long were you at ViroPharma?
3        A.    About six months.
4        Q.    What did you do there?
5        A.    I did tissue culture work in
6 support for cell-based assays.
7        Q.    And I'm sorry, why did you
8 leave Penn State in 1998?
9        A.    I was young. I had gone to
10 college there. I kept getting a year older,
11 everyone else stayed the same age. Just felt
12 like I should leave at some point.
13       Q.    Did you leave on good terms?
14       A.    Very good terms.
15       Q.    When you took the job at
16 ViroPharma, what was the position that you had
17 there?
18       A.    I don't remember off the top of
19 my head what the title would be, but it was
20 applicable to the experience I had from Penn
21 State.
22       Q.    Why did you decide only to
23 remain there for six months?
24       A.    Why didn't I spend my entire

Page 32

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 career there?
2        Q.    Why did -- what made you leave
3 after six months? Or why did you leave after
4 six months?
5        A.    I guess the best way to say it
6 was that it was a lateral move at best from
7 Penn State, and it was a small company and
8 they were expanding and having more and more
9 work done. So I was doing more and more work
10 in support of other people's assays, not
11 running many assays. And I was young and
12 mobile. So I thought I could move or find
13 another position that would be something more
14 in the line of doing research. So, I guess,
15 the best answer was there wasn't enough to
16 keep me there. It wasn't a higher level
17 research job like Penn State's.
18       Q.    Were you running assays at
19 ViroPharma?
20       A.    Yes.
21       Q.    What type of assays did you
22 work on?
23       A.    They were cell-based assays.
24       Q.    Any more detail than that?

Page 33

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1        A.    I had an agreement with them
2 not to disclose what I was working on.
3        Q.    Let me ask it this way so we
4 won't tread there: Were any of the assays you
5 worked on plaque neutralization assays?
6        A.    No.
7        Q.    Were any of the assays you
8 worked on ELISA assays?
9        A.    May have been. They were
10 cell-based assays with viruses and viral
11 infection assays, potency toxicity. Generally
12 that's all I can say. That's the kind of
13 thing that companies do.
14       Q.    What do you mean "that's the
15 kind of thing" --
16       A.    I don't want to say specifically
17 what chemical -- what they were trying to do
18 with a chemical because I signed -- that's
19 what I mean. I did assays and I want to
20 define them in a way that -- they're general
21 assays. People -- when you say ELISA, I don't
22 know what you mean by ELISA necessarily, we
23 haven't defined the term. But I assume you're
24 speaking very generally. So I very generally

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  did assays that would require you to put cells
3  on tissue culture plates.
4       Q.   Were you fired from ViroPharma?
5       A.   I don't think you could
6  characterize it like that.
7       Q.   Were you -- did somebody at
8  ViroPharma tell you need to leave or ask you
9  to leave?
10      A.   I went in and tried to resign,
11  and they had given me -- when I started there,
12  they had given me, like, money to be able to
13  move there but it was like a loan so that I
14  would pay it back out of each paycheck.  When
15  I tried to resign, they said I would have to
16  pay the balance of that back to them.  And I
17  couldn't so I had to stay until the six
18  months.  And then they informed me that time
19  to go.  So it was my idea to leave.  I don't
20  know how they took that.  But then when the
21  money was close to where it could be paid off,
22  I felt it was a mutual agreement that you can
23  go, you don't want to be here, go.
24      Q.   When did you first tell them
25  that you -- when did you make the decision and

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  tell them you wanted to leave?
3       A.   That was a long time ago.
4       Q.   How many months were you there
5  or weeks were you there?
6       A.   I was there six months.  So the
7  best guess -- no, I shouldn't guess.  Before
8  they came to me and said, all right, you can
9  go.
10      Q.   Where was ViroPharma located
11  that you had to relocate?
12      A.   That's off the turnpike.  I got
13  this.  I think I took the Exton exit of the
14  turnpike.  Somewhere around there.  It was
15  where Route 100 closes the turnpike, very
16  close to that.
17      Q.   When you left ViroPharma -- let
18  me ask one question.  Sorry.
19           Why did you not list ViroPharma
20  on your application or your resume that you
21  provided to Merck in connection with your
22  application to work at Merck?
23      A.   There were other jobs I also
24  didn't list.  My experience at Penn State was
25  so strong, if you look at the publications, I

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  had averaging more than one publication per
3  year since I had graduated with a BS.  When I
4  interviewed at Merck, I remember one guy
5  saying you have more publications than I do.
6  And he was running the interview.  So this is
7  apparently very impressive.  Working at six
8  months for some other place where you only did
9  basic tissue culture isn't really a strong
10  point.  It didn't add anything to the resume.
11      Q.   And, I guess, it could have
12  taken something away that you were only there
13  for six months?
14           MR. SCHNELL:  Object to form.
15           THE WITNESS:  I disagree with
16      that characterization.  By the time I
17      had turned this in to Dave Krah, I had
18      already worked at Merck for a year and
19      a half.
20  BY MS. DYKSTRA:
21      Q.   After ViroPharma, where did you
22  go for employment?
23      A.   It was a contract agency.  I
24  don't know how to describe it.  Merck hired
25  people through -- people call it a temp agency

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  or a contract agency.  And I think that agency
3  set up -- gosh, actually I don't recall how I
4  got there, but I got to Warner-Lambert.  I'm
5  not sure if it was through the contract agency
6  that mediated meeting Merck or not.
7       Q.   But after you left ViroPharma,
8  your next position as a professional was at
9  Warner-Lambert?
10      A.   Yeah.
11      Q.   What did you do at Warner-Lambert?
12      A.   I was only there a week.  I
13  don't recall what I did for a week.
14      Q.   Why were you only there a week?
15      A.   Because I was offered the job
16  at Merck.  Merck was in research.  If I
17  recall, Warner-Lambert was more quality
18  control perhaps.  Merck was much more aligned
19  with my experience at the time.
20           Just to volunteer information,
21  I didn't feel that that was negative either.
22  It didn't matter so I didn't put it on the
23  resume, one week.  But I left there with very
24  positive feelings.  I went to the people at
25  Warner-Lambert at the time and said it's been

10 (Pages 34 - 37)

Page 38

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  one week, I feel bad leaving after a week.
2  And they said, you know what, we understand.
3  This is more in line with your experience, you
4  got to do it. I would do it too. So even
5  though I left after only one week, it was on
6  very good terms.
7       Q.   And then from Warner-Lambert
8  you went to your first position at Merck?
9       A.   Yes.
10      Q.   What was the title of that
11  position?
12      A.   I don't recall because it was
13  through a contract agency. So that the people
14  at Merck called them -- sometimes they
15  officially called them contract employees,
16  sometimes they called them temps. So I don't
17  know if that -- they -- how that would be
18  designated.
19      Q.   Who did you work for when you
20  first went to Merck?
21      A.   I'm pretty sure it was Dave
22  Krah.
23      Q.   Anyone else?
24      A.   Nope.
25

Page 39

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1       Q.   And tell me about your first
2  experience at Merck working for Dave Krah.
3            MR. SCHNELL: Object to form.
4            THE WITNESS: That's really
5  general. What do you mean "first
6  experience"?
7  BY MS. DYKSTRA:
8       Q.   When you first went to work for
9  David Krah, what did you do?
10      A.   What did I do?
11      Q.   And this was -- what year are
12  we in, beginning of 2000?
13      A.   1999.
14      Q.   1999. So what did you do
15  working Dave Krah when you were at Merck in
16  1999?
17      A.   Formed cell-based assays to
18  characterize Merck's live virus vaccines.
19      Q.   What was your job? What
20  specifically did you do?
21      A.   Ran the cell-based assays. We
22  did VZV, varicella zoster virus potency
23  assays. I helped out with the -- some early,
24  I don't know whether he characterize them
25

Page 40

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  validation, but he was doing -- Dave Krah was
2  doing experiments with neutralization assays.
3  Cultured cells. My responsibilities from when
4  I worked at Merck the first year and a half
5  to -- are you ready?
6       Q.   Yes, I'm sorry.
7       A.   I wanted to make sure you heard
8  it.
9            My job responsibilities as a
10  contract employee to the second part where
11  they hired me full time didn't change. It was
12  the same position, it's just Merck formally
13  qualified it as staff virologist. I did all
14  the same things, all the same things were
15  expected of me. Krah told me that the reason
16  Merck hired people as contract employees first
17  was so that they could get an idea if they
18  could work there, if they were good. And that
19  if they weren't, it was easier to fire them if
20  they were contract employees. That once
21  someone is permanent, it's a little tougher to
22  fire them.
23           So Merck was using this idea of
24  having temps as a way to filter out people
25

Page 41

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  that they didn't think would be good at the
2  job.
3       Q.   So the entire time you were at
4  Merck, either as a contract employee or as a
5  full-time permanent employee, you always
6  reported to David Krah?
7       A.   I reported to David Krah up --
8  what do you mean by "reported"?
9       Q.   Was he your direct supervisor?
10      A.   There you go. Okay. So direct
11  supervisor from the time I started until
12  October 2001. There was a time I came back
13  for a few weeks where it was somebody else.
14      Q.   What time frame are you talking
15  about?
16      A.   The time that Merck's lawyers
17  contacted me and told me I had to come back.
18      Q.   Toward the end, I guess, of
19  October -- September, October, best time
20  frame?
21      A.   It could have been November. I
22  can only bookend it by between October and
23  December.
24      Q.   Who did you report to at that
25

11 (Pages 38 - 41)

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1
2 time?
3     A.    I don't know his name.
4     Q.    Let me ask you before we go
5 into your employment at Merck, you left Merck
6 in 2001. Correct?
7     A.    Yes.
8     Q.    Between 2001 and today, tell me
9 chronologically what other positions you held
10 for employment.
11     A.    I went back to Penn State, the
12 lab I had worked at before, and helped develop
13 graduate students in Dr. Schlegel's lab.
14     Q.    What time frame was that?
15     A.    2002 and then to 2004. I
16 believe we had a publication in 2004. And
17 then it faded as in I was -- I made myself
18 available if they had questions, but I didn't
19 draw a wage. There was no other place of
20 employment after that.
21     Q.    So between 2004 and 2017 you've
22 been unemployed?
23     A.    What do you mean by that
24 characterization? Doesn't that imply seeking
25 employment?

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1
2     Q.    I'm not implying that.
3     A.    I didn't have a job that paid a
4 wage.
5     Q.    What did you do between 2004
6 and 2017?
7     A.    Got married, had kids. Can I
8 ask a quick question?
9     Q.    Sure.
10     A.    That sun is blasting off of
11 that, can we close that blind?
12     Q.    Absolutely.
13     A.    If I could just -- you can open
14 it later when the sun leaves, but it's
15 blasting into my eyes so I can't look over
16 this way. I didn't want to do it while a
17 question was pending. Thank you.
18                  - - -
19           (A discussion off the record
20           occurred.)
21                  - - -
22 BY MS. DYKSTRA:
23     Q.    Is that better?
24     A.    Yes. Still seeing something.
25 It will clear up in a bit. I just can't see

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1
2 clearly out of my left eye.
3     Q.    So between 2004 and 2017, were
4 you looking for employment outside the home?
5     A.    No.
6     Q.    When did you get married?
7     A.    I should be able to answer this
8 faster.
9     Q.    You should.
10     A.    2002. October 26, 2002.
11     Q.    How many children do you have?
12     A.    Two.
13     Q.    When were they born?
14     A.    November 19, 2003.
15 February 18, 2006.
16     Q.    Are you the primary caretaker
17 of your children?
18     A.    Yes.
19     Q.    Are you still married?
20     A.    Yes.
21     Q.    What does your wife do?
22     A.    She's a pharmacy owner and a
23 pharmacist.
24     Q.    So between 2004 and 2017 you
25 weren't looking for employment outside the

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1
2 home?
3     A.    Not that I recall. I may have
4 thought about it from time to time, but I
5 didn't actively say I need to get a job.
6     Q.    When did you first consider
7 bringing a case against Merck in connection
8 with your work in Dr. Krah's lab?
9     A.    Can you define what you mean by
10 "case"?
11     Q.    When did you consider filing a
12 complaint of any kind against Merck in
13 connection with your work in Dr. Krah's lab?
14     A.    Can you be more specific?
15 There's two answers to that. When I worked at
16 Merck and Shaw informed me that Dave was going
17 to continue to make life hell for me and he
18 said I could maintain that status quo -- he
19 gave me two options, Shaw said you can
20 maintain the status quo, in which case I
21 wouldn't get paid bonuses that were owed, and
22 that Dave would most likely give me a poor
23 performance review and that things would be
24 very stressful for me. He advised me not to
25 do that. He said take option number two and

Page 46

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    you can resign voluntarily.
3         As a rebuttal to that, I told
4    him that I felt that if he understood that
5    Krah was retaliating against me, that perhaps
6    I had a harassment claim. And he told me that
7    he wanted me to consider voluntarily resigning
8    and that they would give me the double bonus
9    that Emini spoke of. I rejected that and said
10   I had to maintain status quo for now. He was
11   adamant that I needed to at least admit that I
12   would consider taking the double big bonus and
13   resigning. And we left it unresolved at that
14   point.
15        So that would be responsive to
16   your question, but that's not the same as this
17   case. So you also want to know when I first
18   thought of bringing this type of case?
19   Q.   Yes.
20   A.   That would have been in 2003
21   when I met a lawyer who made me aware that
22   these type of cases exist.
23   Q.   What do you mean by these types
24   of cases?
25   A.   Qui tam lawsuit. I didn't know

Page 47

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    what these were. I didn't know it was an
3    avenue I could go forward with.
4    Q.   Who is the lawyer you met in
5    2003 that made you aware of these cases?
6    A.   Jim Moody.
7    Q.   I'm sorry, how do you spell his
8    last name?
9    A.   Jim Moody.
10   Q.   Moody?
11   A.   Yes.
12   Q.   Did you retain him as your
13   counsel?
14        MR. SCHNELL: Object to form.
15        THE WITNESS: I'm not sure what
16   you mean by "retain." I sought legal
17   counsel from him and I viewed him as my
18   lawyer, but I'm not sure what you mean
19   by "retain."
20   BY MS. DYKSTRA:
21   Q.   That's fine. As your lawyer,
22   did you and Mr. Moody draft a complaint or do
23   anything else to pursue a qui tam action in
24   2003 or thereafter?
25        MR. SCHNELL: At this point, I

Page 48

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    just want to caution the witness not to
3    disclose what could be confidential
4    attorney-client communications or work
5    product. If you want to be more
6    specific. That's kind of a question
7    that can get --
8         THE WITNESS: I can answer
9    whether we were doing that?
10   BY MS. DYKSTRA:
11   Q.   Uh-huh.
12   A.   I was working with him to
13   pursue that.
14   Q.   That was in 2003?
15   A.   2003.
16   Q.   And how long did you work with
17   Mr. Moody?
18   A.   In or around 2009. Maybe 2008.
19   That's give or take a year.
20   Q.   Did Mr. Moody file a false
21   claims or qui tam complaint on your behalf
22   with any court or any government agency?
23   A.   No.
24   Q.   Why not?
25        MR. SCHNELL: Again, I want to

Page 49

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    caution the witness not to get into
3    areas that may disclose confidential
4    communications or work product.
5         THE WITNESS: I can't answer
6    that.
7    BY MS. DYKSTRA:
8    Q.   In 2008 or 2009, did you fire
9    Mr. Moody or stop using him as your counsel?
10   A.   I moved on to find counsel that
11   would be more effective in bringing the case
12   right around that 2009 mark.
13   Q.   Who was your next counsel in
14   connection with the case?
15   A.   Jeffrey Keller. Gordon
16   Schnell, Constantine Canon. Keller Grover,
17   Melissa Hartnett.
18   Q.   That was around 2009 that they
19   became your counsel?
20   A.   Yeah. I'm not sure if it
21   started 2008. Definitely by 2009.
22   Q.   Let me go back to your -- come
23   back to that. Let me go back to your work.
24   Actually, let me go back -- let me stay on
25   this topic for a second.

13 (Pages 46 - 49)

Page 50

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2        Tell me in general your -- why
3 you are bringing this case against Merck, in
4 your own words.
5     A.   That's such a broad question.
6 I mean, you want me to boil it down to the
7 most fundamental aspect of the case?
8     Q.   Sure.
9     A.   Back then?  The reason I
10 brought the case is because it seemed the most
11 effective avenue forward to expose the fraud
12 that was committed at Merck and to get
13 information in front of the FDA and CDC which
14 are the regulatory agencies that I felt would
15 be better served having that information,
16 which I knew they didn't have.
17     Q.   And "that information," you
18 mean what?
19     A.   Oh, God, that's so broad.
20 Everything in -- a lot of it is outlined in
21 the allegation if you want to go through it.
22 I mean, I imagine we can spend two days
23 talking about it.
24     Q.   Is it fair to say that the
25 complaint generally focuses on your work at

Page 51

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 Merck for Dr. Krah and running the plaque
3 neutralization assay, and that was where you
4 believe the fraud to have occurred?
5        MR. SCHNELL:  Object to form.
6        THE WITNESS:  It didn't focus
7     on that.  It encompassed the company
8     and what they called their marquis
9     vaccine.  I mean, when they call it a
10     marquis vaccine, they're talking about
11     the entire image of the company and
12     what it is.  And it didn't encompass
13     just that time there.  It encompasses
14     right now today.
15 BY MS. DYKSTRA:
16     Q.   Were you aware of any fraud in
17 any other lab other than the one that Dr. Krah
18 ran at Merck?
19        MR. SCHNELL:  Object to form.
20        THE WITNESS:  Do you mean fraud
21     as a legal term or do you mean
22     scientific misconduct?
23 BY MS. DYKSTRA:
24     Q.   I mean scientific misconduct.
25     A.   People told me about scientific

Page 52

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 misconduct, but if you want to talk about what
3 I saw with my own eyes, I'd have to really sit
4 and think about it.  But I was aware of
5 scientific misconduct in other labs.
6     Q.   Which other labs were you aware
7 of scientific misconduct that other people
8 told you about?
9     A.   I don't recall what the lab
10 name would be.  But it was the lab where they
11 developed their HPV vaccine.  I'm really
12 saying scientific misconduct in a general
13 sense.  What I knew is that one of the women
14 that was helping develop the vaccine was
15 uncomfortable with the vaccine or how the data
16 was being used.  That type of thing.
17     Q.   Let's focus for the moment on
18 the mumps vaccine.  When I say mumps vaccine,
19 can we agree that it includes any vaccine
20 Merck manufactures that contains the mumps
21 component that would include MMR II, Mumpsvax
22 and ProQuad generally?
23     A.   That's a great definition.
24     Q.   So are you aware of, you worked
25 in Dr. Krah's lab in connection with the mumps

Page 53

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 vaccine running the plaque neutralization
3 assay.  Correct?
4     A.   That was one of the things that
5 I worked on in connection with mumps vaccine.
6     Q.   What else did you work on in
7 connection with the mumps vaccine at Merck
8 other than the plaque neutralization assay?
9     A.   Well, you're designing the
10 assay as if the assay exists by itself.  But I
11 worked on the Protocol 007 testing which was
12 used to characterize so many different things.
13 For instance, Krah made us aware that the
14 neutralization assays were used -- that we
15 worked closely with manufacturing because the
16 neutralization assays were used to change
17 process development.  That the Protocol 007
18 testing that his lab and the results from it,
19 that we worked closely with release testing,
20 which is manufacturing, and that we worked
21 with process development in general closely.
22 And also that we had to work closely with
23 regulatory.
24        So I think it would be a
25 mischaracterization to say I focused on doing

Page 54

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 an assay and the assay was the end result of
2 the assay. Not that you were characterizing
3 like that, but that's my -- that's how it
4 sounded.
5 Q. No, that's okay. I just want
6 to make sure I understand your testimony and
7 what you're saying.
8 So you worked on the plaque --
9 let's go through it one by one. You worked on
10 the plaque neutralization assay with Dr. Krah
11 or reporting to Dr. Krah. Correct?
12 A. That was one of the things I
13 worked on in his lab.
14 Q. So you ran -- you worked on the
15 plaque neutralization assay as part of
16 Protocol 007 with Dr. Krah. Correct?
17 A. I worked on -- it would be more
18 accurate to say I worked on Protocol 007
19 testing with Krah and the other members of his
20 lab. Now, by Protocol 007 testing, that means
21 the PRN assay which -- if I call it a PRN,
22 that's plaque reduction neutralization assay,
23 and I'm talking about the mumps neutralization
24 assay.

Page 55

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 So we worked on the PRN assay.
2 We also worked to validate the ELISA assay.
3 It was the same thing. So when I say Protocol
4 007 testing, I mean the PRN and the ELISA
5 testing.
6 Q. When you say you worked on the
7 PRN assay, you actually worked in running the
8 assay itself, conducting the assay. Correct?
9 A. If you mean by running we
10 handled the plates that had the cells, the
11 supernatant in it, yes.
12 Q. What do you mean when you say
13 you worked to validate the ELISA assay?
14 A. Krah let me know that the PRN
15 assay is time consuming, bulky, requires lots
16 of materials. The idea was that they would
17 only have to do this PRN assay this one time
18 and the ELISA would be pegged to it. So the
19 PRN was used to validate the assay but he
20 often used the word "calibrate," because the
21 PRN assay was used to be able to read the
22 ELISA. There's two results that come out of
23 an ELISA when the test is done correctly,
24 positive or negative. The PRN determined what

Page 56

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 was positive or negative in the ELISA. In his
2 words, it was fundamental to the ELISA and it
3 was important and our lab was entrusted with
4 it. The PRN also -- how did he say it? The
5 ELISA -- the indicator strain used in the
6 ELISA had to match the PRN. So all of the
7 validation testing done for the PRN to choose
8 an indicator strain was also choosing the
9 strain that would be used in the ELISA.
10 So the two assays were so
11 fundamentally connected that we didn't talk
12 like you do and, oh, you did PRN, you didn't
13 do ELISA. I was told that we were validating
14 use of the ELISA so that in future studies
15 protocols after 07, they wouldn't have to do
16 the PRN again because the ELISA would have
17 been linked to a functional, better assay such
18 as the PRN.
19 Q. When you say that the PRN was
20 used to calibrate the ELISA, let's put that
21 aside for a second, did you actually work in
22 the ELISA lab running the ELISA assay?
23 A. The ELISA plates and running
24 them through a plate reader, that was not

Page 57

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 done, I did not partake in that.
2 Q. That was in a separate lab.
3 Correct?
4 A. I don't recall.
5 Q. But that was not run by Dr. Krah,
6 the ELISA testing?
7 A. I don't know if it was run by
8 him or not.
9 Q. But you didn't take part in
10 that testing, the actual running of the assay
11 itself?
12 A. If running of the assay itself
13 means running the plates through the reader, I
14 took part in the sense that I validated and I
15 helped do the assays for how you read those
16 results. But I didn't shove them through the
17 plate reader, no.
18 Q. Just to be clear, the PRN assay
19 was run in Dr. Krah's lab. Correct?
20 A. Yes.
21 Q. The ELISA assay was run in a
22 different lab?
23 MR. SCHNELL: Objection. Asked
24 and answered.

15 (Pages 54 - 57)

Appx5572

Page 58

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

BY MS. DYKSTRA:

Q.   Are you aware --

A.   I don't know that.

Q.   You're not aware where the ELISA assay was run? That's fine. You're not aware of where the ELISA assay was run itself, the actual running of the plates and counting --

A.   When you say run, I don't know what you're talking about. I'm defining run as that last step where -- ah, you know what, the other way they were linked. They had to be run on the same serum. So we had to show in the PRN that using these same serum, using the same indicator strain, that PRN, a functional, more specific assay, the ELISA could correlate to it so that in the future they wouldn't have to keep doing the PRN. So all of the results from the ELISA were unreliable because they were based on the PRN.

So when you say -- I'll tell you this: The plate reader was in a different lab probably that they used. I don't know. I cannot say for certain the plate reader they used. So I don't want to keep jumping back to

Page 59

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

some generalization. I don't know where the plate reader was that they used for the ELISA assays.

Q.   You also noted in your answer that you worked closely with release testing and manufacturing. Can you explain what you mean by that?

A.   That's hard to say.

MR. SCHNELL: Objection. I'm sorry, in his answer?

MS. DYKSTRA: Just now.

THE WITNESS: I did --

MS. DYKSTRA: Just in his answer here.

THE WITNESS: Krah provided us with that information on what exactly our -- the importance of our lab was. So he would -- he wrote that down and gave it to us and said this is what we do, we work closely with that. So he would have to communicate with manufacturing because they relied on information he had.

BY MS. DYKSTRA:

Page 60

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

Q.   When you say Dr. Krah wrote that down, what do you mean, he wrote what down?

A.   He wrote it down. It's in a document. We -- it's got to be in a document somewhere. I'm sure we produced it. He -- to our lab, he would give us, it looked like outlines. They would say how our lab fits in it, why it's important, how we make money for -- you know, implied how we make money and how we incorporate to the rest of the company. And he stressed that we work closely with manufacturing release testing. He wanted to show us, in his words, why we mattered to the rest of the company. Which was a good thing in my eyes, that he would let us know how we functioned with the rest of the company.

Q.   But you said in your request in connection with discovery in this case that you never worked in the manufacturing division at Merck. Correct?

MR. SCHNELL: Objection to form. If you're going to refer to something, you should really --

Page 61

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

BY MS. DYKSTRA:

Q.   Did you ever work in the Merck manufacturing division?

A.   It depends on what you mean by "division." I just said that --

Q.   Did you ever work for anybody who reported up through Merck's manufacturing division?

A.   Reported up? I don't know the chain of command. Here's what I can tell you: According to Krah and according to what I understand, the work we were doing impacted manufacturing. How much goes into the vaccine. To that level. So what they would report to regulatory. But there's a building somewhere where they make it. My job was not to report to that building and make it.

Q.   That's fair. So you didn't have any responsibility in the actual manufacturing process of the vaccine?

A.   That's too broad. Any responsibility? The work we were doing impacted what happened in that building. I just didn't personally go to the building.

Page 62

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1
2    Q.   You understand that there is a
3 manufacturing division of Merck that actually
4 creates the vaccine, mechanically creates a
5 vaccine and markets that vaccine. Correct?
6    A.   That's a good characterization,
7 yeah. Mechanically makes it.
8    Q.   You weren't involved in that
9 process of manufacturing the vaccine itself?
10    A.   See, now you're saying process.
11 Krah said that what we do in that lab affects
12 how much goes in the vial because they were
13 putting too much -- he didn't say too much.
14 He said they were putting more in it.
15    Q.   More what?
16    A.   More virus.
17    Q.   In what?
18    A.   The mumps vaccine because it
19 didn't work.
20    Q.   When did he tell you that?
21    A.   Starting in around 2000.
22    Q.   Tell me again what he said.
23    A.   He said it so many times, where
24 do you want to start?
25    Q.   Well, tell me how it came up

Page 63

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1
2 the first time and exactly what he said about
3 what Merck was doing.
4    A.   He said it in support of the
5 reason we were doing the testing in the first
6 place. He said that there was an FDA mandate,
7 they call it a mandate. We had to show this
8 vaccine worked at lower potencies because they
9 were putting more in the vaccine, that it
10 degraded. I mean, I could talk about this all
11 day. So I can only give you an ostensive
12 example right now. If you want me to
13 enumerate at all, we should go through the
14 interrogatories. There's a lot of meat there.
15 I mean, every day this is what we're doing.
16 He indicated that he was under stress from
17 those above him to get it done by fall. He
18 said we were protecting the marquis vaccine
19 and keeping it on the market.
20    Q.   What did Dr. Krah tell you
21 about why Merck was putting more virus in the
22 vaccine and when?
23    A.   I remember one conversation in
24 particular, and it had to do with why I
25 wouldn't cross out results on the assay. And

Page 64

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1
2 he was going back to something he had already
3 discussed, that they had to put more in the
4 vaccine because it degraded and there was
5 potency loss. And potency loss, lower potency
6 means it doesn't work as well, or at least
7 they didn't have proof that it worked. And he
8 had theories for the effect of those degraded
9 vaccines. I don't know if those were the
10 company's theories or not. But he indicated
11 that when the vaccine was passaged more or at
12 least more recently manufactured vaccine, had
13 more potency degradation in it.
14        I pointed out that that might
15 not be the only reason. That maybe it didn't
16 work that well to begin with regardless of the
17 potency, meaning the release testing might not
18 work either. And he said regardless, we
19 needed to show that this vaccine had 95
20 percent efficacy or Merck would lose its
21 exclusive licensing rights to this vaccine.
22 He even said -- he stressed what an important
23 project this was because he normally worked on
24 research and development which is trying to
25 bring a vaccine to market, but he said that

Page 65

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1
2 this was so important because it was a vaccine
3 that was already on the market.
4    Q.   Do you know whether Merck put
5 more vaccine in its product during this time
6 frame because the FDA required that?
7    A.   When you say "more vaccine,"
8 you --
9    Q.   You used the word "more
10 vaccine" to make the vaccine more potent,
11 that's what he told you?
12    A.   Well, then let's be clear on
13 that.
14    Q.   Okay. Let's.
15    A.   He said that they had to put
16 more mumps virus in the vaccine.
17    Q.   Correct. I'm sorry, I
18 misspoke. Yes.
19    A.   No, no. I may have said
20 vaccine, I don't know, but let's clear that
21 term out.
22    Q.   More virus in the vaccine to
23 make it more potent.
24    A.   Okay. So can you -- sorry to
25 talk over each other.

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Appx5574

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 Can you restate your question --
3 Q. Sure.
4 A. -- with that cleared up?
5 Q. Dr. Krah -- let me start it
6 this way: Dr. Krah told you that Merck had to
7 put virus in the vaccine to make it more
8 potent. Correct?
9 A. He indicated that they had
10 recently had to put more virus in the vaccine
11 to cover for a loss of efficacy. The loss of
12 efficacy he linked to degradation, meaning a
13 lot of dead virus in the vaccine. And he used
14 the word potency. So sometimes he would say
15 we have a problem with degradation. That
16 means a lower potency because the potency is
17 less. So to cover for a loss of potency which
18 he tied to efficacy because that's the test we
19 were doing, we were doing efficacy test, it
20 had to be more in -- had to be more mumps
21 virus in the vaccine.
22 So the importance of our lab
23 was to be able to say that this thing worked
24 at lower amounts because that would affect how
25 much goes in the vaccine.

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 Q. Are you aware one way or the
3 other whether the FDA approved putting more
4 virus in the vaccine at that time?
5 MR. SCHNELL: Object to form.
6 THE WITNESS: What do you mean
7 by "approved"?
8 BY MS. DYKSTRA:
9 Q. Whether the FDA was aware and
10 approved putting more virus in the vaccine.
11 A. Let's go with aware. Krah
12 indicated that they were aware of it. And
13 that was the point of why we had to show that
14 this thing worked at lower potencies.
15 MS. DYKSTRA: Should we take a
16 quick break?
17 MR. KELLER: Sure.
18 MS. DYKSTRA: Great.
19 VIDEOGRAPHER: The time is
20 10:40. We're going off the video
21 report.
22 - - -
23 (A recess was taken.)
24 - - -
25 VIDEOGRAPHER: The time is

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 10:56. We're back on the video record.
3 BY MS. DYKSTRA:
4 Q. Mr. Krahling, I have a couple
5 of follow-up questions on what we just
6 discussed.
7 Did you and Mr. Moody file a
8 False Claims Act case anywhere when he was
9 your lawyer?
10 A. No.
11 Q. Did he recommend against it?
12 MR. SCHNELL: Objection. That's
13 pure attorney-client communication.
14 THE WITNESS: I can't answer
15 it.
16 BY MS. DYKSTRA:
17 Q. Did you want to file a case
18 when he was your lawyer? Did you want to file
19 a False Claims Act case between the period of
20 '03 and '08 while Mr. Moody was your lawyer?
21 A. That's a well stated question.
22 Yes, I did.
23 Q. You said you started working
24 with Mr. Moody in or around 2003?
25 A. It was in the year 2003.

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 Q. Did you retain and save all of
3 your documents that you took from Merck or
4 related to your work at Merck since that time?
5 MR. SCHNELL: Object to form.
6 THE WITNESS: I didn't take
7 documents from Merck.
8 BY MS. DYKSTRA:
9 Q. You produced documents that you
10 took from Merck. Correct?
11 MR. SCHNELL: Object to form.
12 THE WITNESS: God, I didn't
13 take documents from Merck. How could I
14 produce something I didn't have? You
15 can define documents. I didn't take
16 documents.
17 BY MS. DYKSTRA:
18 Q. Documents in my mind mean
19 pieces of paper, lab notebooks, e-mails, assay
20 runs. Did you take any of that type of
21 information from Merck when you left?
22 A. When I was at Merck I preserved
23 photocopies of documents that I had in my
24 possession.
25 Q. And you retained them when you

18 (Pages 66 - 69)

Appx5575

Page 70

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1 left Merck?
2    A.   I retained the photocopies of
3 documents that were being destroyed in Merck's
4 lab when I left -- I had them before I left
5 Merck, I had them after I left Merck.
6    Q.   And did you produce to your
7 counsel in connection with requests for
8 documents in this discovery in this case all
9 of the documents that you had photocopied
10 while you were at Merck?
11    A.   Yes.
12    Q.   You also mentioned that you
13 worked at ViroPharma for a short period of
14 time, six months?
15    A.   Yes.
16    Q.   Did you ever make any
17 accusations when you were there of any
18 scientific misconduct?
19    A.   I don't recall.
20    Q.   You don't recall if you ever --
21 did you witness any scientific misconduct at
22 ViroPharma?
23    A.   I wasn't there that long.  I
24 don't recall much about the job except that I

Page 71

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1 worked in cell-based assays.
2    Q.   So you don't recall one way or
3 the other whether there was scientific
4 misconduct or you made allegations of
5 scientific misconduct while were you there?
6    A.   What I'm saying is I -- I don't
7 recall very much about the time I worked
8 there.
9    Q.   You also noted that you said
10 you had heard from other people, not witnessed
11 yourself, that there were scientific
12 misconduct in other Merck laboratories.
13 Correct?
14    A.   Yeah, defining scientific
15 misconduct as the person talking to me wasn't
16 happy with how the data was coming in being
17 interpreted.
18    Q.   And you mentioned that
19 occurred -- by the way, you heard that
20 information from somebody in HPV lab?
21    A.   My understanding was that's
22 where she worked.  That's the vaccine she
23 was -- said she was working on and talking
24 about.

Page 72

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1    Q.   Who was this person?
2    A.   DeeMarie Skulsky.  No, wait.
3 DeeMarie Watson was her name when I first met
4 her.  She got married and it became DeeMarie
5 Skulsky.
6    Q.   Was there anybody else who ever
7 told you about scientific misconduct in any
8 other lab, not Dr. Krah's lab, but any other
9 lab at Merck?
10    A.   I need a moment to think about
11 that.  So any other lab, not Krah's lab other
12 than DeeMarie.  I can't recall any other off
13 the top of my head.
14    Q.   Did anybody that worked in the
15 lab that was working on the ELISA assay as
16 part of Protocol 007, ever tell you that they
17 thought that assay was being run improperly?
18    A.   But I told you I don't know who
19 was doing the ELISA in the context of using
20 the plate reader.  If we define it as did
21 anyone that used the plate reader reading the
22 assay, reading the ELISA plates communicate
23 with me, I don't know who was doing that
24 testing.

Page 73

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1    Q.   So no one that was doing that
2 testing on the ELISA assay, reading the plates
3 and running the assay in that other
4 laboratories, nobody ever told you -- you
5 never talked to anybody in that other
6 laboratory, I guess, is my question?
7    A.   I don't know who worked there.
8 How would I know because I can't define who
9 did that?
10    Q.   So the answer is no?
11    A.   It's not a simple no.  Here's
12 how I encompass it:  I did not -- I was not
13 aware or I don't recall any reports of
14 scientific misconduct from people who hadn't
15 worked in Krah's lab.  Now, you can figure out
16 who worked in Krah's lab and then you should
17 be able to figure out it wasn't the other
18 people.  DeeMarie.
19    Q.   Being the one exception?
20    A.   No, she's not an exception.
21    Q.   Well, she didn't work in Krah's
22 lab?
23    A.   Yes, she worked in Krah's lab.
24    Q.   All right.  You mentioned

19 (Pages 70 - 73)

Appx5576

Page 74

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1
2  that -- tell me if I got this correct, that
3  you were doing efficacy testing in Krah's lab.
4  Is that correct?
5      A.   Where do I say that?
6      Q.   You just said that earlier
7  today.
8      A.   Yeah.  Yes.
9      Q.   How do you define efficacy, a
10  clinical efficacy study?
11      A.   How do I define it?  When I'm
12  using the term?
13      Q.   Yes.
14      A.   I'm defining efficacy the way
15  we use it in the complaint, as how well the
16  vaccine works.
17      Q.   The CDC uses the following
18  definition.  And I want you to tell me if you
19  agree with this definition.  They define
20  efficacy as the ability of a vaccine to
21  provide protection against disease under ideal
22  circumstances, for example, during a clinical
23  trial.  Do you agree with that definition of
24  efficacy?
25          MR. SCHNELL:  I object to form.

Page 75

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1
2  If you're reading it from something, a
3  website or a book, he should see what
4  you're reading it from, because it
5  could be different definitions in
6  different contexts.
7          MS. DYKSTRA:  Sure.  Hold on
8  one second.
9          Can we mark this?
10          - - -
11          (Exhibit Krahling-2, CDC Manual
12  for the Surveillance of
13  Vaccine-Preventable Diseases, was
14  marked for identification.)
15          - - -
16  BY MS. DYKSTRA:
17      Q.   What I've given you is a CDC
18  Manual for the Surveillance of Vaccine
19  Preventable Diseases.  I'm going to ask you --
20  obviously this covers a lot of different
21  acronyms, but I'm going to ask you if the last
22  page, it has vaccine efficacy is the last term
23  defined in the CDC manual.  In that the CDC
24  states that vaccine efficacy is "The ability
25  of a vaccine to provide protection against

Page 76

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1
2  disease under ideal circumstances (for
3  example, during a clinical trial)."  [As
4  read.]  I want to know whether you agree with
5  that definition?
6      A.   What page are you on?
7      Q.   The very last page, very last
8  term.
9          MR. SCHNELL:  Are you
10  introducing this as an exhibit?
11          MS. DYKSTRA:  Yes.
12          THE WITNESS:  Where is
13  chapter 9?  There's a table of contents
14  and there's a chapter 9 that says
15  "Mumps."  I don't see chapter 9 here.
16  BY MS. DYKSTRA:
17      Q.   I don't have chapter 9 here.
18  I'm just going to the CDC's definition of
19  terms.  So the entire manual is not here.
20  It's just portions of the manual.  The last
21  page is a definition of terms that the CDC
22  uses.
23      A.   They produced an entire chapter
24  on mumps.  And you're just showing me
25  something that is not in that chapter.  Is

Page 77

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1
2  this in chapter 9 where they talk about mumps?
3      Q.   No.
4      A.   Do you have chapter 9 with you?
5      Q.   No.
6      A.   How do I know that they don't
7  use some different term in chapter 9?
8      Q.   To define efficacy, is that
9  your question?
10      A.   My question is, how do I know
11  what's in chapter 9, it's not here?  Here's
12  what I can give you.
13      Q.   Okay.
14      A.   Chapter 9, there's a whole
15  chapter on it.  I can't tell you what this
16  cherry picked thing means when the entire
17  chapter is missing.  I don't feel comfortable
18  talking -- of giving you an interpretation
19  what the CDC meant based on just what looks to
20  be a glossary.
21      Q.   Putting aside the glossary, do
22  you agree that an efficacy trial or efficacy
23  itself is the ability of a vaccine to provide
24  protection against disease under ideal
25  circumstances?  Do you agree with that

Page 78

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 statement?
2     A.   I agree that's one definition
3 of efficacy.
4     Q.   What's other definitions of
5 efficacy that you have?
6     A.   In my pocket?
7     Q.   In your head.
8     A.   I mean, they're published.
9 They're published. I mean, there's actually
10 reviews written on all the different ways the
11 term is used and applied. And then there's
12 practical uses also. I could tell you how
13 Krah used the word.
14     Q.   Sure. Why don't you tell me
15 that.
16     A.   He meant how well the vaccine
17 worked and what we were doing in our lab.
18 Immunogenicity is a bit of a burdensome word,
19 so he used the word efficacy. Sometimes he
20 used the word efficacy when he was talking
21 about potency because we weren't doing potency
22 assays, we were doing efficacy assays and his
23 focus was on getting 95 percent efficacy. To
24 him he said that we had an FDA mandate to show

Page 79

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 that the efficacy was 95 percent as reflected
2 in the label. That was the reason that the
3 entire Protocol 007 project existed. And also
4 it's important to safeguarding the marquis
5 vaccine. So there was a practical sense in
6 which he used efficacy. And in the complaint
7 we used it as how the vaccine works. But I
8 can admit that there are more definitions of
9 efficacy and that they're published in
10 research of the different ways that the term
11 is used. Hopefully that answers your
12 question.
13     Q.   Do you understand that there is
14 a difference between immunological testing,
15 testing for seroconversion and actual efficacy
16 trial where you are providing a placebo to one
17 arm and a vaccine to the other?
18     A.   I understand that there are
19 different usages of the word efficacy. I do
20 understand that there are immunogenicity tests
21 that can test for immunological markers. And
22 I am aware of -- that you can have trials
23 where a placebo is used.
24     Q.   In your complaint you used the

Page 80

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 term "diminished efficacy." Can you tell me
2 what you mean by that?
3     A.   Can you show me in the
4 complaint where I may have used that term?
5     Q.   Sure.
6     MS. DYKSTRA: Mark this,
7 please.
8     - - -
9     (Exhibit Krahling-3, Amended
10 Complaint for Violations of the Federal
11 False Claims Act, was marked for
12 identification.)
13     - - -
14 BY MS. DYKSTRA:
15     Q.   So we've marked as Exhibit 3
16 your amended complaint. Correct? You may
17 take that off, yes. Is that what you were
18 asking?
19     A.   Yes. And yes.
20     Q.   So there's many places where
21 you use the term diminished efficacy. I think
22 the first may be paragraph 3. You state that
23 "...Merck knew about the vaccine's diminished
24 efficacy."

Page 81

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1     A.   All right. So what's the
2 question?
3     Q.   What do you mean when you use
4 the term diminished efficacy?
5     A.   I mean efficacy as in how well
6 the vaccine works and I mean diminished as in
7 -- that it has changed from something that was
8 relatively higher to something that is
9 relatively lower.
10     Q.   So when you use the term
11 efficacy, you're using it in the phrase, I
12 think I'm quoting you, "how well the vaccine
13 works"?
14     A.   Yes.
15     Q.   Do you equate, then, the term
16 efficacy with the term effectiveness?
17     A.   Equate is -- I can't say I
18 equate it.
19     Q.   What's the difference in your
20 mind between efficacy and effectiveness?
21     A.   Practical usage that in Merck's
22 lab the terms efficacy and effectiveness were
23 often interchangeable, and the word efficacy
24 was most often used, best practical usage,

21 (Pages 78 - 81)

Appx5578

Page 82

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 that I was familiar with in the lab.
2     Q.   If we stick looking at your
3 complaint for a moment, in paragraph 19 on
4 page 6, you note that "In order to obtain its
5 original government approval to sell the mumps
6 vaccine, Merck conducted field studies of
7 vaccinated children and concluded that the
8 vaccine had an efficacy rate of 95 percent or
9 higher." [As read.]
10     Do you see that?
11     A.   I do see it.
12     Q.   What are you referring to here?
13     A.   This line refers to the package
14 label. Well, it would be the package insert,
15 I guess you'd call it.
16     Q.   Are the studies that you are
17 talking about here Dr. Hilleman's studies back
18 in the late '60s and '70s?
19     A.   I believe that's what they're
20 referring to.
21     Q.   Do you allege that there was
22 any fraud in connection with those studies?
23     A.   I can't say, I wasn't there
24 back then.

Page 83

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1     Q.   So you don't have any reason to
2 believe that there was fraud in connection
3 with those studies in the late '60s, early
4 '70s that warranted the product's original
5 approval?
6     A.   Are you talking about legal
7 fraud?
8     Q.   Scientific misconduct.
9     A.   I don't have reason to know or
10 not know. I couldn't make a claim one way or
11 the other.
12     Q.   So you're not making a claim
13 today that Dr. Hilleman's studies in the late
14 '60s, early '70s, were conducted in any
15 improper way? That's not what you're alleging
16 here?
17     A.   I'm not alleging that those
18 people who ran those tests did something
19 improper like mentally they were doing
20 something that we've been referring to or I've
21 been referring to as scientific misconduct.
22 What happened back then, what I would claim or
23 what I -- what is true is that the testing
24 methods available to them back then were less

Page 84

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 rigorous than what are available today. The
2 sample size run are smaller than the things
3 Merck did in Protocol 007. So less rigorous,
4 not as good a test or accurate a test isn't
5 scientific misconduct.
6     Q.   You understand that Dr. Hilleman
7 ran a double-blinded clinical trial where one
8 arm received a vaccine and the other arm
9 received a placebo. Correct?
10     A.   That's referenced in that
11 package insert?
12     Q.   Yes. You understand that, right?
13     A.   Yes.
14     Q.   Do you understand that that
15 type of clinical trial where you give one arm
16 of children placebo and one arm vaccine for
17 mumps could not be run today in the United
18 States. Correct?
19     A.   You can replicate the same
20 thing. You can get information about that
21 without having not to inject the child.
22 That's what a pre-vaccination sample is. It
23 represents a child that hasn't had the vaccine
24 yet. So in lieu of a placebo control, that

Page 85

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 gives you information that is relevant to what
2 Hilleman found back then. But Hilleman also
3 didn't have large sample sizes either. But I
4 understand that according to some guidelines,
5 I think research guidelines, that it's
6 unethical to withhold a vaccine today, it
7 would be unethical to withhold the vaccine and
8 do the placebo, clinically controlled placebo
9 trial that you're talking about.
10     Q.   So to boil that down to my
11 question, you understand that it would be
12 unethical today to do a double-blinded
13 clinical trial where there were two arms, one
14 given a placebo and one given the mumps
15 vaccine?
16     A.   If you knew that the vaccine
17 worked, yes.
18     Q.   You're not aware of any other
19 double-blinded clinical trial of the mumps
20 vaccine other than the one Dr. Hilleman did in
21 the United States, are you?
22     MR. SCHNELL: Object to form.
23 BY MS. DYKSTRA:
24     Q.   I'll restate.

22 (Pages 82 - 85)

Appx5579

Page 86

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2      Are you aware of any other
3  clinical trial following Dr. Hilleman's of the
4  mumps vaccine in the United States?
5          MR. SCHNELL: Object to form.
6          THE WITNESS: Yes.
7  BY MS. DYKSTRA:
8      Q.    Clinical -- I'm sorry, clinical
9  efficacy trial?
10     A.    It depends on how you're doing
11  the -- Krah said that what we were doing was a
12  clinical efficacy trial. I mean, I'm aware of
13  the one I worked on and 13 or 14 more that
14  Merck published.
15     Q.    You stated that the trial you
16  were working on was in lieu of a
17  placebo-controlled trial. Correct?
18     A.    I said that the pre-vaccination
19  serum can be used in lieu of not having a
20  placebo control to give you a good idea of the
21  same information, especially when on the
22  package label the field efficacy is linked
23  specifically to immunogenicity data.
24          MS. DYKSTRA: Mark this as the
25      next exhibit.

Page 87

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2              - - -
3          (Exhibit Krahling-4, MMR II
4      label, RELATOR_00002094 - 00002105, was
5      marked for identification.)
6              - - -
7  BY MS. DYKSTRA:
8      Q.    What we've marked as Exhibit 4
9  is the MMR II label prior to 007. Are you
10  familiar with this label?
11     A.    Yes, I've seen it before.
12          MR. SCHNELL: Can we get copies
13      of it?
14          Did you say what year this was?
15          THE WITNESS: 2007.
16          MS. DYKSTRA: This is prior to
17      submission of the 007 results.
18  BY MS. DYKSTRA:
19     Q.    Did you look at this label
20  prior to filing your complaint?
21     A.    The 2007 one? I looked at the
22  labels available to me at the time.
23     Q.    Can you point to me in this
24  label the language that you believe
25  misrepresents the efficacy of the product?

Page 88

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2      A.    How are you using efficacy?
3  Strike that.
4          I'll tell you what, I can go
5  through this and give you the language that I
6  think misrepresents the product --
7      Q.    That would be great.
8      A.    -- including efficacy.
9      Q.    Yes, please do.
10     A.    I'm going to need time to read
11  it.
12     Q.    Well, you raised the complaint
13  and you wrote the complaint. I just want you
14  to tell me what in this complaint misrepresents
15  the efficacy or effectiveness or
16  immunogenicity of the vaccine?
17     A.    My question was can I read the
18  complaint -- can I read the package insert or
19  do you want me to just pull it out from the
20  last time I've seen it?
21     Q.    Well, we can go off the record
22  if you want to read the entire package insert,
23  yes.
24     A.    Here's what I can do: I can
25  read it front to back and when I see one, I

Page 89

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  can point it out.
3      Q.    Why don't we go off the record
4  because the entire label doesn't relate to
5  efficacy. There's all sorts of things about
6  precautions and contraindications and
7  warnings.
8      A.    But I said I could give you the
9  language that misrepresents the product
10  including the way it represents efficacy and
11  you said that was okay to do.
12     Q.    I would like you to focus right
13  now on what language, you think, in this label
14  that misrepresents the efficacy, effectiveness
15  or immunogenicity of the vaccine.
16     A.    What were the three things?
17     Q.    Effectiveness, efficacy or
18  immunogenicity.
19     A.    Limited to your definitions of
20  those terms?
21     Q.    However you define those terms
22  is fine. I want you to tell me what you think
23  with respect to those three terms is false in
24  the label.
25     A.    But -- okay. I'd like to do

23 (Pages 86 - 89)

Page 90

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 that, but you don't want me to read the whole
2 thing.
3 Q. You can. We'll go off the
4 record if you think you need to read the
5 entire label to identify those statements.
6 A. No, I'll take a run at it. Can
7 I write on this or not? This is your copy.
8 I'll just go through front to -- start to
9 back. 20,000 TCID50 of mumps.
10 Q. You're reading the one, two,
11 three, four, fifth paragraph?
12 A. It might be. It's in the first
13 section.
14 Q. The paragraph beginning, "The
15 reconstituted vaccine..."?
16 A. Yes.
17 Q. What is false and misleading
18 around statements that the vaccine contained
19 20,000 TCID50 of mumps virus?
20 A. But that is linked to how well
21 the vaccine works. The statement on here is
22 that the vaccine provides protection at that
23 level and Krah said that it didn't. That's
24 why we had to show that it worked at a lower

Page 91

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 level. So that level, 20,000 TCID50 of mumps,
2 does not provide protection. Not only that,
3 but Krah said there was a problem that there
4 wasn't that much in the vials when it expired.
5 Which is why we had to show that the lower
6 amounts in the vial still worked according to
7 this label.
8 Q. Thank you. Now, can I ask you
9 a specific question, please? Is the statement
10 that each .5-milliliter dose -- I'm reading
11 right above that, "Each .5 milliliter dose
12 contains not less than...," [as read] I'll
13 skip the measles, "...20,000 TCID50 of mumps
14 virus...," is that a true or false statement
15 according to you?
16 MR. SCHNELL: Object to form.
17 THE WITNESS: First of all,
18 that number is linked to the efficacy
19 claims in the next section. Second of
20 all, the label says that there's a
21 24-month expiry. Krah told me that
22 some of the lots don't have that much
23 in them when they expire. So it would
24 be false for two reasons. Not every

Page 92

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 lot had that much in it when it
2 expired. And they had no proof, which
3 he was trying to find, that it would
4 work at the lower amounts that might be
5 in it. So that's the first false
6 statement.
7 BY MS. DYKSTRA:
8 Q. Okay. The second?
9 A. ".. mumps neutralizing
10 antibodies in 96 percent...." [As read.]
11 Q. That's the very last paragraph?
12 A. Yes.
13 Q. So is the statement clinical
14 studies of 284 triple seronegative children
15 11 months to 7 years of age demonstrated that
16 MMR II is highly immunogenetic and generally
17 well tolerated? Is that true or false, in
18 your opinion?
19 A. It omits the fact that Merck
20 had more recent data with a larger sample size
21 and a more specific test or accurate test that
22 that number was not true, that the number was
23 significantly lower than that.
24 Q. So it's not that this number --

Page 93

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 I didn't read the whole thing. Let me read
2 the whole thing.
3 "Clinical studies of 284 triple
4 seronegative children, 11 months to 7 years of
5 age, demonstrated that M-M-R II is highly
6 immunogenetic and generally well tolerated.
7 In these studies, a single injection of the
8 vaccine induced.. mumps neutralizing
9 antibodies in 96 percent...." [As read.]
10 You're saying that that
11 statement is not false on its face, it's just
12 false by -- because it omits other more recent
13 information?
14 A. I can't make a claim to whether
15 the -- whether they really got 96 percent
16 antibodies in an immunogenicity test back
17 then. What I'm saying is that Merck had more
18 recent data with an assay methodology they
19 considered better on a larger sample size and
20 they got nowhere close to that number.
21 Q. Any other misstatements in this
22 portion of the label?
23 A. Yeah. Page 2, third paragraph
24 down, the setup is the first sentence where it

24 (Pages 90 - 93)

Page 94

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 discusses efficacy of measles, mumps, and
3 rubella in that double-blind controlled field
4 trials. And then the next sentence says,
5 "These studies also establish that
6 seroconversion in response to vaccination
7 against measles, mumps, and rubella paralleled
8 protection from these diseases." Merck has
9 more recent information that seroconversion
10 does not parallel what Hilleman found back
11 then.
12     Q.    So your -- just so I am clear,
13 your allegation is not that the language in
14 paragraph 3 of the label regarding
15 Dr. Hilleman's studies is false, it's just
16 that there is more information beyond that
17 that should be in the label as well?
18         MR. SCHNELL: Object to form.
19         THE WITNESS: Yeah, they know
20     that the second part is false today.
21     They know that -- I don't know if you
22     want to call it false or outdated, they
23     know that that is completely
24     inaccurate, because they're saying we
25     have efficacy, and now in the second

Page 95

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2     part, and our seroconversion results
3     parallel that.
4 BY MS. DYKSTRA:
5     Q.    Well, it actually doesn't say
6 that. It says, these studies also established
7 that seroconversion rate in response to
8 vaccination paralleled protection. It was
9 talking about these studies in its footnote.
10 So we're talking about Dr. Hilleman's studies.
11 I understand --
12     A.    That's what I said.
13     Q.    No, it's not what you said.
14 Are you saying that Dr. Hilleman's studies
15 were false or are you saying that the label is
16 false because it does not include additional
17 information from later studies?
18         MR. SCHNELL: Object to form.
19         THE WITNESS: What I said was
20     that the second part, which is
21     reference 13 to 15, is Merck knows that
22     that's not true today. It may have
23     been true back then, I don't know. But
24     Maurice Hilleman's studies where the
25     seroconversion of Hilleman paralleled

Page 96

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2     what Hilleman found in the field.
3 Merck knows that the second part, which
4 is Hilleman and is what I said, is not
5 true today because they have a more
6 accurate test they claim and they have
7 -- where they measured seroconversion
8 and it no longer parallels what
9 Hilleman found. So they had --
10 Hilleman found what he considered high
11 efficacy and high immunogenicity. And
12 that second statement is Hilleman
13 saying these parallel each other,
14 they're both high. I imagine the point
15 of that connection is that they
16 paralleled each other. So now with
17 Protocol 007, Merck has immunogenicity
18 data that says they're nowhere near the
19 number that Hilleman found. There is
20 no parallel anymore. That's -- so this
21 makes this a false statement. They
22 know that this statement by Hilleman --
23 that they reference in Hilleman, the
24 second sentence, no longer accurately
25 describes or does not accurately

Page 97

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2     describe the product they're putting on
3     the market today.
4 BY MS. DYKSTRA:
5     Q.    Because there are more recent
6 studies that show lower rates of seroconversion?
7     A.    Protocol 007.
8     Q.    Are there any other tests that
9 you believe show lower seroconversion rates of
10 the mumps vaccine besides Protocol 007?
11     A.    It's tough to say. I don't
12 know. I can't think of any off the top of my
13 head. But I don't know that a lot have been
14 done.
15     Q.    You don't know that a lot of
16 tests of the mumps vaccine have been done
17 since --
18     A.    A lot of tests have been done
19 where they can replicate this.
20     Q.    Say that again, I missed it?
21     A.    I'll make it clear. I know
22 that Merck tested their mumps vaccine after
23 this and did immunogenicity trials. But they
24 used the Protocol 007 ELISA, the one that was
25 validated and used according to the PRN. So

25 (Pages 94 - 97)

Appx5582

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1    when there are protocols after 007, they're
2    using that wild type ELISA which used the PRN
3    to establish the cutoff.  So the Merck assays
4    which would look at immunogenicity are
5    unreliable.  The data from those is unreliable
6    because it relied on the falsified PRN results
7    of Protocol 007.  Are there others done by
8    other companies on other products, I don't
9    know.
10       Q.    You haven't looked at any other
11   studies by other companies that have tested
12   other products including the Merck's mumps
13   vaccine?
14       A.    Not that I can recall today
15   sitting here.
16       Q.    I think you said this, but I'm
17   not sure so I want to make sure I understand.
18   Why is it that you believe the mumps vaccine,
19   the efficacy or the effectiveness of the
20   vaccine, however you define it, is diminished
21   since Hilleman's studies?
22       A.    You're moving on from my list
23   of false statements here.  Are we done?
24       Q.    No, we'll go back to that in a
25

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1    second.
2            I just want to understand why
3    you think these statements are false?
4        A.    So we're putting this aside for
5    a second.  Can you repeat the question,
6    please?  Sorry.
7        Q.    Sure.  Sure.  Why is it that
8    you think the vaccine's efficacy or
9    effectiveness has diminished since the time
10   that Hilleman ran his studies on the mumps
11   vaccine?
12       A.    Krah told me it did.  We were
13   working to try and -- I shouldn't say we.  He
14   and his lab and some members of his lab were
15   working to try and say the vaccine worked as
16   well as they state it did in the label.  He
17   said the FDA mandate that we show 95 percent
18   efficacy was based on what they were
19   representing in the label.  And that if they
20   couldn't show it, they would either have to
21   change the label or they would lose their
22   market, their exclusive license for it.  So I
23   mean, do you want reasons beyond that he told
24   me?

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1        Q.    Yes, I would like to know
2    whether there are any other reasons beyond
3    what Dr. Krah told you that you believe the
4    vaccine has a diminished efficacy or a
5    diminished effectiveness?
6        A.    Emini mentioned the same thing.
7    He said we had to use rabbit secondary
8    antibodies in order to get these results
9    combined with Krah doing his thing with these
10   data so that they could get the results for
11   financial reasons.
12       Q.    Any other -- what other
13   information, if any, are your allegations
14   based on if the vaccine has diminished
15   efficacy other than what Dr. Krah and
16   Dr. Emini told you?
17       A.    You want an enumerative
18   response on that?
19       Q.    Yes.
20       A.    It could take a while.  The
21   continued mumps outbreaks in highly vaccinated
22   populations.  The fact that the number of
23   reported mumps cases to the CDC since I left
24   work have increased over 1,000 percent.  The

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1    fact that I saw seroconversion numbers
2    reported to the European medicine agency that
3    were based on Protocol 007 that said the
4    vaccine worked when the statements given to me
5    at the lab I worked at said that it didn't
6    work.  So I know those falsified numbers were
7    being reported and the outbreaks are happening.
8        Q.    How do you know that there has
9    been reports to the CDC that outbreaks have
10   increased over 1,000 percent?
11       A.    Because mumps is a notifiable
12   disease and the CDC tracks it.
13       Q.    So the CDC is aware of the
14   number of outbreaks and the diminished
15   efficacy of the vaccine?
16           MR. SCHNELL:  Object to form.
17   BY MS. DYKSTRA:
18       Q.    Based on your statement, is the
19   CDC aware of the outbreaks of the vaccine --
20   of the virus?
21       A.    The CDC is aware of the number
22   of reported cases of mumps in the United
23   States.  They track it.
24       Q.    Is the CDC aware of the,

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  quote/unquote, diminished efficacy or
3  diminished effectiveness, as you refer to it
4  in your complaint?
5      MR. SCHNELL: Object to form.
6      THE WITNESS: Diminished, I
7  don't think the CDC is aware of the
8  problems with the vaccine which is one
9  of the reasons to bring the case. I
10  don't think they have enough
11  information to make a decision about
12  the vaccine.
13  You know what, that's not
14  perfectly accurate. I think if they
15  had the information I had, they
16  wouldn't buy it. Perhaps the FDA
17  would -- Merck would lose their
18  exclusive license that Krah was afraid
19  of. That's all I got.
20  BY MS. DYKSTRA:
21      Q. I'm going to move on for a
22  second to finish the label. Is there anything
23  else in the label, we don't have to go past
24  the -- into the indications and usage. Let's
25  focus right now on the clinical pharmacology.

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  Is there any other statements in the clinical
3  pharmacology section that you believe is false
4  or misleading?
5      MR. SCHNELL: If you're going
6  to talk about that section, it's only a
7  page, should he read it so he can be
8  complete or do you want him to read it
9  at the next break?
10      MS. DYKSTRA: The clinical
11  pharmacology section. He can read it
12  in full. I think he has read --
13      MR. SCHNELL: The description
14  in the clinical pharmacology section.
15      MS. DYKSTRA: I think -- I
16  thought he did read the description.
17  BY MS. DYKSTRA:
18      Q. I thought that you were going
19  through it line by line what you thought was
20  false and misleading.
21      A. No. You told me that -- I was
22  doing a quick scan.
23      Q. Why don't you take time to read
24  the description in clinical pharmacology and
25  other than the sections you've identified, the

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  three, let me know if there's anything false
3  or misleading in those sections?
4      A. Stopping at "INDICATIONS AND
5  USAGE."
6      Q. Correct.
7      VIDEOGRAPHER: The time is
8  11:37. We're going off the video
9  record.
10      - - -
11      (A recess was taken.)
12      - - -
13      VIDEOGRAPHER: The time is
14  11:39. This begins disc two in the
15  videotape deposition of Stephen
16  Krahling.
17  BY MS. DYKSTRA:
18      Q. Mr. Krahling, is there
19  something else other than the paragraph you've
20  identified that you believe is false and
21  misleading in the section of -- description of
22  clinical pharmacology of the MMR II label?
23      A. Second to the last paragraph,
24  before indications and usage start.
25  "Following vaccination, antibodies associated

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  with protection can be measured by
3  neutralization assays, HI, or ELISA (enzyme
4  linked immunoabsorbent assay) tests.
5  Neutralizing and ELISA antibodies to measles,
6  mumps, and rubella viruses are still
7  detectable in most individuals 11 to 13 years
8  after primary vaccination."
9  I think that's misleading.
10      Q. In what way is that misleading?
11      A. The ELISA tests that Merck uses
12  today are based on unreliable data because of
13  the falsified PRN. So it's unclear to me
14  whether, when they make this reference,
15  they're trying to refer to the testing done in
16  Krah's lab with that ELISA because it says
17  reference 16 to 18, and 17 isn't a real
18  citation. It says unpublished files.
19      Q. So you're not sure whether
20  section -- paragraph 17 in that referenced
21  footnote might relate to Dr. Krah's tests?
22      A. Merck has more updated recent
23  information with their Protocol 007 testing
24  that shows -- that may show neutralizing
25  antibodies or ELISA antibodies aren't

27 (Pages 102 - 105)

Appx5584

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 detectible. Krah informed me that the testing
2 done on samples one year after vaccination and
3 in the future on any after the PRN would be
4 using the ELISA based on the Protocol 007 PRN
5 calibration. So this seems to be misleading
6 and then it's unpublished.
7     Q.    We're going to move on --
8     A.    I'm not done.
9     Q.    Okay.
10    A.    The first page, the package
11 insert is making a retrospective claim that
12 the vaccine appears to have quality based on
13 the decline in incidents of reported diseases.
14 And it says, "...cases reported in a given
15 year prior to vaccine use...." And then if
16 you go to mumps it says, "152,209 cases
17 reported in 1968 compared to 840 cases
18 reported in 1995 resulted in a 99.45 percent
19 decrease in reported cases...." [As read.]
20        1968 is not a year before the
21 vaccine was used -- licensed. It looks like
22 that number is cherry picked from an outbreak
23 year so that you can pick a high year and then
24 a low year after it. So it's misleading in

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 the sense that the number of reported cases
2 did decline and it was after the fact that the
3 vaccine was licensed. But if you pick any
4 other section of time, it's increased.
5     Q.    I'm sorry, you think --
6     A.    Not any other section of time,
7 but, for instance, this says any given year.
8 Well, let's pick the year I left Merck versus
9 last year for which there is the most recent
10 -- that there's full data. It's gone up.
11    Q.    Do you believe that there was a
12 year prior to licensing of the product when
13 the vaccine was not available on the market
14 that it had more -- it had less -- I'm sorry,
15 let me restate that.
16        Are you aware that the CDC
17 monitors outbreaks of mumps?
18    A.    I'm aware that they will
19 monitor reported cases.
20    Q.    Correct. CDC tracks reported
21 cases of mumps?
22    A.    Got it.
23    Q.    And you're aware they've
24 tracked reported cases prior to the licensing

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 of the vaccine and for every year after.
2 Correct?
3     A.    I don't think that's true.
4 What did you say?
5     Q.    They tracked the number of
6 reported cases prior to licensing and compared
7 it to the number of cases they've tracked
8 every year after licensing?
9     A.    Are we talking about MMR II?
10    Q.    Yes.
11    A.    Okay. They have tracked that,
12 yes.
13    Q.    Are you aware that according to
14 the CDC, the incidence of mumps has decreased
15 over 95 percent from prior licensure of any
16 mumps vaccine to post licensure of any mumps
17 vaccine? Are you aware of that or not?
18    A.    You just switched it.
19    Q.    It's a new question. Are you
20 aware of that or not?
21        MR. SCHNELL: Object to form.
22        THE WITNESS: The MMR was
23 licensed in 1977. The drop there is
24 not 95 percent. That would make this

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 statement false. If you go by the
2 number reported here of 152,209 in
3 1968, that is not a year that is before
4 the monovalent was licensed. So in
5 that sense, this statement is false.
6 BY MS. DYKSTRA:
7     Q.    How about answering my question?
8     A.    I thought I did.
9     Q.    My question is that you're
10 aware the CDC tracks reported mumps cases
11 every year. Correct?
12    A.    Yes, they do.
13    Q.    Okay. Are you aware that they
14 have measured the decrease in mumps since any
15 Merck mumps vaccine has been licensed to
16 today?
17        MR. SCHNELL: Object to form.
18        THE WITNESS: You're saying
19 they have monitored any Merck mumps
20 vaccine since any Merck mumps vaccine
21 has been licensed?
22 BY MS. DYKSTRA:
23    Q.    You know what, we'll skip it,
24 I'll get you an exhibit and you can look at it

Page 110

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 and tell me if you agree.
3    A.   But I can tell you right here.
4    Q.   Is there anything else in the
5 label that you want to point to that you think
6 is false and misleading?  I want to make sure
7 we get it all.
8    A.   I want to be clear on this.
9 Cases reported in a given year prior.  1968 is
10 not prior.  That's all I'm getting at.  We can
11 argue why it says that or how it's a mistake.
12 But we're done with that on the package insert
13 up to indications and usage.
14    Q.   Nothing else you want to point
15 to that you think is false and misleading
16 other than the things you've just identified?
17    A.   Not in those two first
18 sentences right now off the top of my head.
19    Q.   First two sections, right?
20    A.   Yeah, first two sections.
21    Q.   We'll come back to that.
22        I want to switch over to the
23 development of the assay.  So you joined Merck
24 you said in 2000?
25    A.   1999.

Page 111

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    Q.   And what was the date of your
3 employment, when you first were hired?
4    A.   I think it was March 1999.
5    Q.   And you left in November of
6 2001?
7    A.   I think at some point during
8 November 2001 may have been the last time I
9 was physically present at the place.
10    Q.   To what extent, if at all, were
11 you involved in the design and development of
12 the actual PRN assay?
13        MR. SCHNELL:  Object to form.
14        THE WITNESS:  That's such a
15    broad question.  I mean, the design and
16    development of the assay, I worked
17    there when it was designed and
18    developed by Krah in his lab.
19 BY MS. DYKSTRA:
20    Q.   I'm going to show you a series
21 of documents that some predate your employment
22 but I want to just confirm that you were not
23 involved in these particular discussions with
24 the FDA around the development of 007.  The
25 first one I'm going to show you we'll mark as

Page 112

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 Krah-5.
3        MR. SCHNELL:  Krahling.
4        MS. DYKSTRA:  Krahling-5.
5    Sorry.
6               - - -
7        (Exhibit Krahling-5, 6/23/98,
8    IND submission, MRK-KRA00624345 -
9    00624446, was marked for identification.)
10               - - -
11 BY MS. DYKSTRA:
12    Q.   This is a June 23, 1998, IND
13 submission from Merck to the FDA.  Can you
14 take a look at that, you don't have to read
15 the whole thing.  I just want to know, this is
16 before you were employed by the company.
17 Correct?
18    A.   June 23, 1998, is before I was
19 employed at the company.
20    Q.   Do you know whether you've ever
21 seen this document before?  Just by looking at
22 it right now, can you tell me one way or the
23 other?
24    A.   Just looking at the front page?
25 I can't tell by looking at the front page

Page 113

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 alone.
3    Q.   Can you tell me prior to Merck
4 producing this document as part of discovery
5 in this case you've ever seen this document?
6    A.   We're talking about the front
7 page.  I mean, how much do you -- are you
8 going to let me look through it --
9    Q.   Yes.
10    A.   -- to figure out what I've seen
11 of it?
12    Q.   Yes.  And I want to know what
13 you've seen of it other than what you've seen
14 as part of this litigation?
15    A.   I have to look at every page
16 then.
17    Q.   We'll go off the record and you
18 can look at every page.
19    A.   For God's sake.  If you want an
20 accurate answer, I've got to look at it.
21        MS. DYKSTRA:  Could we go off
22    the record for a moment?
23        VIDEOGRAPHER:  The time is
24    11:49.  We're going off the video
25    record.

29 (Pages 110 - 113)

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 - - -
3 THE WITNESS: I want to be back
4 on the record so I can ask -- it's
5 going to be a long day. I've got to
6 look at it. I'm just looking to see if
7 I recognize it. I'm not reading it.
8 It would take two hours.
9 MR. SCHNELL: You can go back
10 on the record and ask your question.
11 - - -
12 VIDEOGRAPHER: The time is
13 11:52. We're back on the video record.
14 THE WITNESS: I'm on page 25
15 and I'm whipping through this, not
16 reading it. I'm just trying to see if
17 I recognize any pages, and I'm pretty
18 sure, based on what I'm looking at,
19 there's a package -- there are sections
20 I have seen before in here, basically
21 the package insert. Other than the
22 package insert, I don't know if I've
23 ever seen this document before.
24 BY MS. DYKSTRA:
25 Q. This document, do you see it's

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 authored by Keith Chirgwin on the second page?
3 A. I don't -- I mean, I trust that
4 you're saying that this page represents the
5 entire document. If so, then I do see that.
6 Q. Did you have any discussions
7 with Keith Chirgwin when you were an employee
8 at the company?
9 A. Not that I'm aware of.
10 Q. Did you work with Keith
11 Chirgwin -- I don't mean to be this
12 duplicative, I just want it to be clear. Did
13 you work with Keith Chirgwin on any regulatory
14 submissions to the FDA in connection with the
15 mumps vaccine?
16 A. I can't say I worked with him
17 in person because I don't know who he is. But
18 to say -- I can't exclude that he didn't rely
19 on the data from our lab.
20 Q. I understand. Do you recall
21 ever working directly with Keith Chirgwin or
22 discussing with Keith Chirgwin any regulatory
23 submissions to the FDA?
24 A. I don't know who he is. As far
25 as I know I've never talked to him.

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 Q. So that would be a no?
3 A. I'm trying to be clear.
4 Q. You don't know who he is and
5 you've never talked to him?
6 A. As far as I know. I mean, it's
7 possible I met someone who talked to me and
8 didn't tell me he was Keith Chirgwin. But it
9 seems to me I don't know who the guy is.
10 Q. I'll pull it out if you want,
11 but we asked you in your request for admission
12 to admit that during your employment with
13 Merck you were never asked to communicate with
14 the FDA directly on behalf of Merck and you
15 admitted that.
16 A. Can you show me the RFA?
17 Q. Sure. Yes, I can.
18 A. Can I put this one away or I
19 need to leave it open?
20 Q. Leave it open for a second.
21 - - -
22 (Exhibit Krahling-6, Relator
23 Stephen A. Krahling's Responses and
24 Objections to Defendant Merck's
25 Requests for Admission, was marked for

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 identification.)
3 - - -
4 BY MS. DYKSTRA:
5 Q. I'm marking as Exhibit 6
6 Relator Stephen Krahling's Responses and
7 Objections to Defendant Merck's Requests for
8 Admissions.
9 I'm marking as Exhibit 7 the
10 amendments to your responses to Merck's
11 requests for admissions, revised June 21st.
12 - - -
13 (Exhibit Krahling-7, 6/21/16
14 Letter, was marked for identification.)
15 - - -
16 BY MS. DYKSTRA:
17 Q. I'm giving you 6 and 7 because
18 you changed your answer so I want to make sure
19 I understand.
20 If you look at request for
21 admission 30 in both of them, in both
22 Krahling-6 and Krahling-7. Our question to
23 you was, admit that during your employment at
24 Merck you were never asked to communicate with
25 the FDA directly on behalf of Merck. You

Page 118

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 originally denied it and then you admitted it.
2 Correct?
3     A.    I see that, yes.
4     Q.    Do you know why you originally
5 denied it?
6     A.    You mean beyond what's written
7 here?
8     Q.    Well, you changed your answer
9 from deny to admitted, so I want to understand
10 why.
11    A.    Well, the definition of Merck
12 includes Relators and other former employees.
13 I was asked to contact the FDA by my co-workers.
14    Q.    Who asked you to do that?
15    A.    Suzie Maahs, Joan and Jon was
16 shaking his head yes and agreed with it.  Jill
17 DeHaven.  Frank Kennedy.
18    Q.    So other contact -- other than
19 contacting the FDA, which I'm assuming you're
20 talking about 2001 in connection with the FDA
21 inspection.  Correct?
22    A.    Can you restate that a little
23 slower?
24    Q.    Assuming -- other than the

Page 119

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 conversations you may have had with the FDA
2 that led to the inspection that you're
3 referring to here, other than those
4 conversations, were you ever asked to, during
5 your employment with Merck, to communicate
6 with the FDA directly on behalf of the
7 company?
8     A.    On behalf of the company, no.
9 I believe that's why it switched over.  The
10 loss of ambiguity on that and we can admit
11 that.  As part of my job duties, it wasn't my
12 job to communicate with the FDA on behalf of
13 Merck.
14    Q.    What about with the CDC, were
15 you ever -- was it ever part of your job
16 duties to communicate with the CDC on behalf
17 of Merck?
18    A.    No, it was not.
19    Q.    Have you ever communicated with
20 the CDC in connection with this case or your
21 allegations here?
22    A.    I can't know -- other than not
23 knowing if I'm talking to someone who is at
24 the CDC, but I don't believe that I have.

Page 120

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1     Q.    Putting aside you might have
2 met somebody on the street that happened to
3 work for the CDC and you didn't realize it,
4 have you ever talked to somebody in their
5 capacity as an employee of the CDC about the
6 allegations in this case?
7     A.    No.
8     Q.    If you also look at your
9 request for admissions numbers 34.  I'm sorry,
10 in the first RFA, I think that's number 6,
11 Krahling-6.  Number 34.  We asked you to admit
12 that you've never attended any meetings
13 between Merck and the FDA and you denied that.
14 Correct?
15    A.    Yes, denied the request.
16    Q.    And why did you deny it?
17    A.    Merck is a company, the FDA is
18 a regulatory agency, so if you're -- if those
19 two things subsume all the people that work
20 there, that can be taken to mean did I attend
21 any meeting by an employee at Merck and
22 employee at the FDA.  I did.
23    Q.    And which meetings did you
24 attend?

Page 121

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1     A.    I attended a meeting in person
2 that occurred in Krah's lab.
3     Q.    Other than that meeting -- I'm
4 assuming you're talking about August 2001?
5     A.    Yes.
6     Q.    Other than that August 2001
7 meeting, have you ever attended a meeting
8 between Merck and the FDA?
9     A.    I attended a telephone
10 conference meeting.
11    Q.    When was that and with whom?
12    A.    It was four or five teleconference
13 calls or telephone meetings from the middle of
14 June to the end of July, 2001.
15    Q.    They were between you and the
16 FDA.  Is that correct?
17    A.    Yes.
18    Q.    That was in connection with
19 your complaints around 007?
20    A.    Yeah, it was in connection with
21 the fraud that I reported, that Joan and I
22 reported and the rest of the lab with the
23 Protocol 007 testing in Krah's lab.
24    Q.    Other than those complaints

31 (Pages 118 - 121)

Appx5588

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2   about what was happening in Krah's lab in
3   2001, have you ever attended a meeting between
4   Merck and the FDA?
5        A.   In person or on the phone, I
6   don't believe I did.
7        Q.   And I have the same question
8   for number 35.  We ask, admit that you've
9   never attended any meeting between Merck and
10  the FDA concerning Merck's mumps vaccine?
11       Aside from the complaints you
12  made to the FDA and the FDA inspection in
13  2001, have you ever attended any meetings
14  between Merck and the FDA concerning its mumps
15  vaccine?
16       A.   So this is the same as 34?
17       Q.   Essentially.
18       A.   Yes.  So we denied it because
19  the meeting I attended in their lab, if you
20  exclude the same things that were excluded in
21  request 34, I don't believe that I did attend
22  any other meetings.
23       Q.   You can put those admissions
24  aside for a moment.
25       I'm going to show you what I'm

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2   going to mark as Krahling-8.
3              - - -
4       (Exhibit Krahling-8, Letter,
5    MRK-KRA00001446 - 00001469, was marked
6    for identification.)
7              - - -
8   BY MS. DYKSTRA:
9       Q.   This is a September 8, 1998,
10  letter from the FDA to Dr. Chirgwin at Merck.
11  Have you ever seen this document before?
12       A.   It's only two pages, can I read
13  it?
14       Q.   You may.  My question is just
15  going to be have you seen this before or had
16  any involvement with discussions about it with
17  Dr. Chirgwin or anybody else at Merck?
18       A.   I have not seen it before.  But
19  the first page which I'm done with, yes, I've
20  had discussions with Krah about item point
21  number 1.  I had discussions with him about
22  3(a) which were related to 3(b).  We talked
23  about number 4.
24       Q.   You and Dr. Krah?
25       A.   Yeah.  Well, I mean, not just

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2   me and Dr. Krah, but Dr. Krah, Dave and the
3   lab, Krah and the lab, he talked about it in
4   front of the lab members.  So not exclusively
5   to me.  Definitely number 5.  He alluded to
6   number 8 but tangentially in a way.  So I
7   mean, quite a bit was discussed about this,
8   but I haven't seen the document before you
9   giving it to me.
10       Q.   Other than people in -- Dr. Krah
11  or in Dr. Krah's lab, did you ever have any
12  discussions about those -- the topics raised
13  in that letter with anybody else at Merck or
14  the FDA?
15       A.   So broad.  These cover everything.
16       Q.   My question is, other than people
17  in the lab that you referred to including
18  Dr. Krah, did you ever talk to anybody else at
19  the company about those issues?
20       A.   These issues are broad.  They
21  cover the entire clinical study.  Alan Shaw,
22  Emilio Emini certainly.  These issues are so
23  broad.  This is everything about how the --
24  not everything, but these are quite broad
25  issues.

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2       Q.   So is there anybody else
3   besides Dr. Emini, Dr. Shaw, or Dr. Krah and
4   people in his lab that you talked about these
5   issues at the company?
6       A.   A lot of -- this is Protocol
7   007.  I talked to the FDA about Protocol 007.
8   Now we're talking outside of the company?
9       Q.   No, I'm talking about the
10  company right now.
11       A.   Okay.  Not that I can think of.
12       Q.   Outside the company who did you
13  talk to about 007 other than the FDA and
14  Merck?
15       A.   And outside of my lawyers?
16       Q.   Yes.
17       MR. SCHNELL:  I want to
18       instruct you, though, to the extent
19       that counsel was present or that it
20       discloses attorney-client
21       communications, work product, you
22       should not answer.
23       THE WITNESS:  No one at this
24       level.
25  BY MS. DYKSTRA:

32 (Pages 122 - 125)

Appx5589

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1
2    Q.   I'm sorry, what do you mean "no
3 one at this level"?
4    A.   I didn't talk to anyone outside
5 of lawyers or people at Merck to the degree of
6 specificity we're talking about here about
7 that he -- you know, using heat to degrade the
8 virus, things like that.  No one.
9    Q.   You said, I just want to make
10 sure I'm correct, you did not discuss -- other
11 than your discussions with the FDA in 2001
12 when you complained about what was happening
13 in Dr. Krah's lab, you did not discuss the
14 development of the assay with anyone at the
15 FDA.  Correct?
16    A.   That's so broad.
17    Q.   It's not really broad at all.
18    A.   Can you say it slower then?
19    Q.   Absolutely.  Other than your
20 complaints to the FDA in 2001 about what was
21 occurring in Dr. Krah's lab, have you ever
22 talked to anybody at the FDA about the
23 development of the assay?
24    A.   That's a great question.  The
25 word "development," what do you mean by that?

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 The rest of the question is pretty good.  What
2 are we defining as development?  From the
3 first time they said we have to do this
4 clinical study or we may lose our license or
5 have to change the label, to them turning it
6 into regulatory agencies, or are we talking
7 about something more narrow?
8    Q.   I think you stated already that
9 the only time you talked to the FDA about
10 anything related to 007 were those
11 conversations in 2001 about what happened in
12 Dr. Krah's lab.  Is that not accurate?
13    A.   That's accurate, but the
14 question is about what you're defining as
15 development so that I can say whether I talked
16 about it or not.
17    Q.   Well, if the only conversations
18 you had with the FDA around 007 at all were in
19 2001 and around what happened in his lab, then
20 the answer to my question, I believe, is, no,
21 you never talked to them about anything else
22 other than those few conversations?
23    A.   We talked about these specifics
24 of Protocol 007.

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1
2    Q.   I'm talking about the FDA, to
3 the FDA.
4    A.   I know.  But you're saying
5 about the specifics of Protocol 007 and now
6 you're talking about the development.  I just
7 want you to define development.
8    Q.   Let me do it this way:  The
9 conversations you had with FDA in 2001, let's
10 put them in two buckets.  There were a couple
11 of times you called the FDA.  Correct?
12    A.   More than a couple.
13    Q.   Four times I believe you say in
14 your complaint.
15    A.   Four or five.
16    Q.   So you called the FDA four or
17 five times, and that was in 2001?
18    A.   Yes.
19    Q.   And your conversations with the
20 FDA which we'll go through were about what was
21 occurring in Dr. Krah's lab.  Correct?
22    A.   Yes.
23    Q.   And then you also met with the
24 FDA when they inspected the lab on August 6,
25 2001?

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1    A.   I was in the room when the
2 meeting took place, so...
3    Q.   You were present when the FDA
4 came?
5    A.   Uh-huh.
6    Q.   Other than your telephone calls
7 we just talked about and the August 6, 2001,
8 inspection, have you had any conversations at
9 all with the FDA around 007?
10    A.   Any conversation with him about
11 Protocol 007 at all around that -- other than
12 the ones where I talked to him.
13    Q.   Other than the two situations
14 you just identified, the complaint --
15    A.   No.
16    Q.   So then I don't understand why
17 you had a problem answering the question did
18 you ever talk about the development other than
19 those times.
20    A.   Whether I talked about the
21 development of --
22    Q.   Other than those specific
23 instances we just discussed.
24    A.   Because we were developing the

33 (Pages 126 - 129)

Appx5590

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  assay as we were running it. You're using a
3  definition of development that you're not
4  giving me.
5      Q.   I'm trying to exclude four
6  phone calls you made to the FDA to complain
7  about the assay and the FDA's inspection.
8      A.   Okay. You can exclude those
9  things but your definition of development
10  seems to be things that didn't happen in
11  Krah's lab or happened before. Krah was
12  developing, altering, changing the assay as we
13  worked on it.
14      Q.   I understand.
15      A.   I used that as a definition of
16  development, and I think I said the only
17  problem I had with your question was your
18  definition of development.
19      Q.   I understand.
20      MR. SCHNELL:  We've been going
21      more than an hour so whenever is a good
22      time to break.
23      MS. DYKSTRA:  Yeah, give me one
24      second, let me just --
25  BY MS. DYKSTRA:

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2      Q.   Let me ask you about one more
3  document and then we'll take a break.
4          - - -
5      (Exhibit Krahling-9, 12/1/99
6  Letter, MRK-KRA00001222 - 00001230, was
7  marked for identification.)
8          - - -
9  BY MS. DYKSTRA:
10      Q.   We're going to mark as
11  Krahling-9 a December 1, 1999, letter from
12  Ms. Manal Morsy to Ms. Vujcic at FDA. Here
13  you go, I'll give you that. Before you read
14  it, let me just ask some initial questions.
15          Have you ever worked -- have
16  you ever talked to or do you know Dr. Manal
17  Morsy?
18      A.   I know who she is. I think she
19  said something to me, but I didn't say
20  anything back to her.
21      Q.   Why do you remember that
22  conversation? Was that in recent times with
23  her deposition?
24      A.   Yes.
25      Q.   Let's focus on when you were

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  working with Merck. At any other time other
3  than your [sic] deposition, have you ever
4  talked to or worked with Manal Morsy?
5      A.   I never met her or talked to
6  her in person. I don't know whether my work
7  would consider -- I don't know if she used my
8  work in part of her work or not at the time.
9      Q.   You can take a couple minutes
10  to look through this letter. We can go off if
11  you want to review the whole thing, I just
12  want to ask you one specific question before
13  we break.
14      A.   Just one question?
15      Q.   I'll show you where I'm going
16  to talk and then you can take time to look at
17  this over the break.
18          On page 2 of Merck's letter to
19  the FDA, Merck inserts a table with
20  seroconversion rates using Jeryl Lynn and
21  London-1 strain of the vaccine -- of the
22  virus. Do you see that chart?
23      A.   I see the chart.
24      Q.   Are you aware that Merck
25  submitted this data to the FDA in 1999?

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2      A.   Krah told me that -- he
3  indicated that the FDA had known something
4  along this line with LO-1 strain.
5      Q.   What did he specifically say to
6  you?
7      A.   He said that the LO-1 was the
8  best they could get against any wild type
9  strain and that the rest were -- the efficacy,
10  seroconversion against the other strains was
11  worse.
12      Q.   So you were aware that Merck
13  submitted to the FDA seroconversion rates with
14  LO-1 that were as low as 54 percent?
15      A.   I can't say specifically, but
16  he said that they were sharing their best case
17  scenario of a wild type -- of the test against
18  the wild type with Merck, not with -- you
19  know, Merck was sharing it with the FDA as
20  rationale for a need to change the assay or to
21  do more. He considered it a failure. But,
22  you know, he was clear that the other stuff
23  was worse, that the seroconversion they were
24  seeing against Swiss isolate and some of the
25  other strains was much worse. I haven't even

34 (Pages 130 - 133)

Appx5591

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 read the document, I'm just looking at the
3 table.
4       MS. DYKSTRA: Why don't we take
5    a break and you can -- you want to take
6    a lunch break, I guess?
7       MR. SCHNELL: I think we should
8    go one more hour.
9       MS. DYKSTRA: That's fine. Why
10   don't we take a 15-minute, 10-minute
11   break, whatever, you can read this
12   document during the break before we go
13   back on.
14       VIDEOGRAPHER: The time is
15   12:15. We're going off the video
16   record.
17       - - -
18    (A recess was taken.)
19       - - -
20       VIDEOGRAPHER: The time is
21   12:34. We're back on the video record.
22 BY MS. DYKSTRA:
23    Q.   Mr. Krahling, do you have the
24 letter from Merck dated December 1, 1999, from
25 Manal Morsy in front of you?

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    A.   Exhibit 9?
3    Q.   Yes.
4    A.   Yes, I have it.
5    Q.   I think you stated you did not
6 work with Manal Morsy directly when you were
7 at Merck. Correct?
8    A.   Yeah, I didn't directly work
9 with her face to face, no.
10    Q.   Are you -- and you said, I
11 think, I don't want to put words in your
12 mouth, that you're aware based on discussions
13 with Dr. Krah that Merck had disclosed to the
14 FDA that the LO-1 vaccine strain was producing
15 lower seroconversion rates than the Jeryl Lynn
16 strain?
17    A.   He said that they had reported
18 some result of the PRN assay against the LO-1
19 strain because the LO-1 strain was the best
20 case scenario for a wild type strain and that
21 they needed to switch the indicator strain to
22 the vaccine strain.
23    Q.   Are you aware that Merck
24 reported to the FDA the information found at
25 page 2 of Exhibit 8 -- 9. I'm sorry,

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 Exhibit 9. That the LO-1 strain had
3 seroconversion rates as low as 54.5 percent.
4 Are you aware of that fact?
5    A.   Right now?
6    Q.   Were you aware of it before
7 this meeting, this deposition?
8    A.   I can't recall when I saw this.
9 At the time I worked there, I wasn't aware of
10 the exact numbers other than that they were
11 significantly lower against LO-1 than the
12 label claim which is why Krah gave us the
13 rationale for needing to switch the indicator
14 strain so that we would get results that would
15 match the label.
16    Q.   But you were not aware when you
17 were working in the lab that Merck had
18 disclosed these specific rates to the FDA in
19 December of 1999. Correct? These meaning the
20 rates on page 2 of Exhibit 9.
21    A.   Krah indicated at the time that
22 they had to disclose the best case scenario
23 for the wild type strain as a rationale to
24 change the indicator strain. And I knew at
25 the time because I -- these things -- my best

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 memory is that these things were done by Krah
3 in our lab. So, I mean, I saw the original
4 data that LO-1 was London-1. That's what I
5 remember. Does it say London-1? That that
6 was the best case scenario that Merck could
7 get in Krah's lab for a PRN testing against a
8 wild type.
9    Q.   Were you aware when you worked
10 in Krah's lab that Merck disclosed to the FDA
11 seroconversion rates with LO-1 that were as
12 low as 54.5 percent?
13       MR. SCHNELL: Object to form.
14       THE WITNESS: I don't know the
15    actual number reported.
16 BY MS. DYKSTRA:
17    Q.   So you don't know whether Merck
18 disclosed that information when you were
19 working there?
20       MR. SCHNELL: Object to form.
21       THE WITNESS: I mean, I
22    answered the question. Krah --
23 BY MS. DYKSTRA:
24    Q.   Let me ask the question again
25 to make sure I'm clear.

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2      Prior to filing the complaint
3 in this case, were you aware that Merck
4 disclosed to the FDA seroconversion rates
5 using the LO-1 virus strain, using a PRN assay
6 that showed seroconversion rates as low as
7 54.5 percent? Were you aware that that was
8 disclosed to the FDA?
9      A.   Everything about your question
10 is fantastic. The number 54.5 percent,
11 replace that with a number against exactly
12 everything you said that is significantly
13 lower than Merck is reporting on their label.
14 And then, yes, I did know that.
15      Q.   Did you -- if you look at page
16 4 of this letter marked Exhibit 9, were you
17 aware that Merck proposed to the FDA based on
18 the PRN assay results, that they should use a
19 Jeryl Lynn virus as the target strain in the
20 PRN assay?
21      A.   Krah indicated to me that the
22 rationale for giving them the best case
23 scenario against LO-1 is that they had to
24 report something as a prelude to requesting
25 permission to test against the vaccine strain

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 because they couldn't possibly match the
3 seroconversion on the label without testing
4 against the vaccine strain. In that sense,
5 yes, I was aware.
6      Q.   If you look at page -- actually
7 I think we're good with that document. You
8 can put that one away for now.
9           I'm going to show you a very,
10 very gigantically large document. I'm only
11 going to ask you about one table in the middle
12 of it. I don't want to take it apart to keep
13 the integrity of the document together. But
14 this is a December 30, 1999, IND submission
15 from Merck to the FDA, Bates-labeled 01449.
16 That -- I'm sorry, that's Krahling-10.
17           - - -
18      (Exhibit Krahling-10, 12/30/99
19      IND submission, MRK-KRA00001470 -
20      00001924, was marked for identification.)
21           - - -
22 BY MS. DYKSTRA:
23      Q.   And I just -- I don't want to
24 ask you anything about this document other
25 than one or two specific questions. If you

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 turn -- so I'm not asking about the content,
3 I'm not asking if you know anything about it.
4 If you turn to what's Bates-labeled at the
5 bottom KRA 1618, the middle Bates label. Not
6 the one on the right. The middle one.
7 There's a Bates label in the middle and on --
8      A.   Oh.
9      Q.   There's a two-page, or, I
10 guess, four-page double-sided chart called:
11 "Table 1: Summary of published studies on
12 clinical efficacy and field effectiveness of
13 Jeryl Lynn."
14      A.   We're talking two sheets of
15 paper?
16      Q.   Yes. If you look at this
17 table, this "Table 1: Summary of published
18 studies on clinical efficacy and field
19 effectiveness of Jeryl Lynn," you'll see that
20 the sixth column is called: "Efficacy
21 Estimates." You have to kind of hold it
22 right. You'll see the sixth column is called:
23 "Efficacy Estimates"?
24      A.   What page are you on?
25      Q.   The very first page on the top.

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2      A.   Okay. Got you.
3      Q.   Do you see where it says,
4 "Efficacy Estimates"?
5      A.   Is it above the table or in it?
6 Oh, on number one?
7      Q.   One, two, three, four, five,
8 the heading on the sixth column.
9      A.   "Efficacy Estimate," I see that
10 column.
11      Q.   You see in that column the
12 efficacy estimates reading down 97 percent,
13 88 percent, 96.5 percent, 37 percent,
14 52 percent, 65 percent, 70 percent,
15 74 percent, 85 percent. That's the first
16 page. Do you see that?
17      A.   Yeah. If we're going to -- if
18 the question is going to be about like a
19 column running down, I have to -- I'm going to
20 have to look at --
21      Q.   That's fine. What I want to
22 know, I'll tell you the question, then you can
23 take time to look at this, is whether you were
24 aware -- and I'll just note that there are
25 three other pages of different efficacy rates

36 (Pages 138 - 141)

Appx5593

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 on here, you can look at those as well --
3 whether you were aware that Merck submitted
4 this table to the FDA? That's all I want to
5 know, whether you were aware prior to filing
6 the complaint that Merck submitted this data
7 to the FDA?
8 A. Those are two different
9 questions. The data or the table?
10 Q. Either one.
11 A. Okay.
12 MR. SCHNELL: Counsel could
13 direct the witness if he feels he needs
14 to, the page preceding the table
15 explains the context of the table.
16 MS. DYKSTRA: Bates-labeled 1617?
17 MR. SCHNELL: 1616 and 1617 --
18 MS. DYKSTRA: Sure.
19 MR. SCHNELL: -- is what
20 precedes the table and explains what it
21 is. I don't know if that helps or not.
22 But it might be useful in understanding
23 the table.
24 THE WITNESS: I think I
25 understand the table. I'm good to go.

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 BY MS. DYKSTRA:
3 Q. Were you aware prior to filing
4 this lawsuit that Merck provided this data in
5 this form or any other to the FDA?
6 A. I was aware that Merck reported
7 data similar to this, if not this exact data,
8 along with reasons why they didn't agree that
9 the lower numbers accurately characterized
10 their vaccine as a prelude to be able to
11 switch the indicator strain to the vaccine
12 strain which would match Hilleman's data.
13 Q. But this is a just a summary of
14 published clinical efficacy data. So why they
15 submitted it, putting that point aside, you
16 weren't aware that we submitted this -- you
17 were aware that we submitted this type of data
18 to the FDA?
19 MR. SCHNELL: Objection. Asked
20 and answered.
21 THE WITNESS: I was aware --
22 I'll answer it. I mean, Krah made it
23 clear that if -- that they could not
24 get 95 percent efficacy without testing
25 against the vaccine strain and that

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 they needed to try to make an argument
3 of why they needed to do that.
4 BY MS. DYKSTRA:
5 Q. I take it you did not help
6 prepare that table in any way that's in front
7 of you?
8 A. I don't know. I don't know
9 if -- well, we should be able to figure it
10 out.
11 Q. Well, do you remember preparing
12 that table or you don't? That's my only
13 question.
14 A. I was going to say I don't know
15 if work that I did went into this table.
16 Q. Do you remember preparing that
17 table?
18 A. No, I do not.
19 Q. You can put that aside.
20 Have you ever had any -- I
21 don't mean to belabor the point, but have you
22 ever had any discussions at any point in time
23 other than related to the FDA inspection of
24 Merck in 2001 with Dr. Carbone of the FDA, Dr.
25 Kathryn Carbone?

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 A. I don't recall.
3 Q. What about Dr. Luba Vujcic?
4 A. I don't recall any conversations.
5 Q. Are you aware that CBER
6 considered an early passage of the Jeryl Lynn
7 virus -- are you aware that if Merck used an
8 earlier passage of the Jeryl Lynn virus
9 similar to passage 7, that CBER would accept
10 that to be a wild type virus strain?
11 A. I understood that Krah
12 indicated that we were not going to be
13 permitted to test against the fully passage
14 vaccine strain, so that they were trying to
15 come up with a way to use something that was
16 attenuated, Merck was trying to come up with a
17 way to use a strain that was attenuated so
18 that they could get a better response.
19 Q. Are you aware that CBER
20 considered passage 7 of the Jeryl Lynn strain
21 to be similar to a wild type?
22 A. I was aware -- wait, what was
23 the question again?
24 Q. Are you aware that CBER
25 considered passage 7 of the Jeryl Lynn strain

37 (Pages 142 - 145)

Appx5594

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  to be used in the neutralization assay as a
3  wild type virus strain?
4         MR. SCHNELL: Object to form.
5         THE WITNESS: That sounds like
6     the -- that might have been written
7     into the protocol, the AIGENT assay
8     protocol. And I was aware that CBER
9     would see that protocol.
10 BY MS. DYKSTRA:
11    Q.   So independently of that
12 answer, did you have any independent knowledge
13 prior to filing this lawsuit that CBER
14 confirmed and considered passage 7 of the
15 Jeryl Lynn strain to be a wild type virus
16 strain?
17        MR. SCHNELL: Object to form.
18        THE WITNESS: I can't speak to
19    what the CDC thought of that strain.
20 BY MS. DYKSTRA:
21    Q.   I'm just asking whether you
22 knew, whether you were aware that CBER
23 believed passage 7 of the Jeryl Lynn strain to
24 be considered a wild type strain?
25    A.   I don't know that CBER thought

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  that was a wild type strain.
3     Q.   Are you -- were you aware prior
4  to filing this complaint that CBER and Merck
5  discussed the use of antihuman IgG to
6  potentially enhance the PRN assay?
7     A.   Can you read that question
8  again? I'm still on the first one with the
9  wild type.
10    Q.   I'll ask more questions about
11 that later.
12        Are you aware that Merck and
13 CBER discussed the use of using an antihuman
14 IgG to potentially enhance the PRN assay?
15    A.   I'm aware that the anti-IgG was
16 written into the protocol that we used and
17 that CBER okayed it, okayed the protocol.
18    Q.   Okay.
19    A.   I should clarify that.
20    Q.   Let me ask you a question
21 about --
22    A.   Can I clarify that?
23    Q.   Sure.
24    A.   When I said protocol, the
25 protocol was transient and kept changing. So

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  the most I can really say is that the FDA,
3  from what I understand from Krah, said that
4  the FDA okayed some version that we started to
5  use of that protocol. But the protocol
6  changed as we were doing that. So I don't
7  think the word "protocol" is clear. I was
8  aware from what -- what Krah said was that the
9  FDA knew that anti-IgG was to be incorporated
10 in some form. And he tied that, that
11 conversation came about when Jenny Kriss asked
12 him why we were changing the pre-positives.
13 And he said that if we didn't change the
14 pre-positive rates and lower them, that would
15 be a red flag that the protocol was a problem,
16 that it was a thing. So we had to lower the
17 pre-positive rate.
18        So in that sense, I don't know
19 that the FDA approved the usage, because I
20 don't know what you mean by usage. I think
21 they were aware that the product was bought
22 and used in some manner, but they certainly
23 didn't know how it was used or how the results
24 were being manipulated so they wouldn't
25 understand how it was being used.

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2     Q.   Are you aware that Merck
3  provided data around the use of the anti-IgG,
4  a different dilution, that they provided that
5  data to CBER?
6         MR. SCHNELL: Object to form.
7         THE WITNESS: What do you mean
8     by "data"?
9  BY MS. DYKSTRA:
10    Q.   Are you aware that Merck
11 produced data related to the use of the
12 anti-IgG for dilutions?
13    A.   I'm pretty certain they
14 produced something you could call data. One
15 of the things in that data would be different
16 dilutions of anti-IgG used.
17    Q.   So I understand from your
18 answers that a lot of your information around
19 what Merck communicated with and produced to
20 CBER was through Dr. Krah. Is that correct?
21    A.   A good amount of it originated
22 there.
23    Q.   Did you review documents
24 submitted to CBER and CBER's responses to
25 those documents such as the protocol, before

38 (Pages 146 - 149)

Appx5595

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  you filed this complaint?
3      A.   What are we asking?
4      Q.   Did you review Merck's
5  submissions to the FDA and CBER's questions
6  back to Merck around the development of the
7  assay?
8      A.   So I don't know what you mean
9  by "submissions." And then, again, you're
10  using development. The thing was developed in
11  our lab.
12     Q.   Did you review documents and
13  protocols that Merck submitted to CBER, CBER's
14  questions back and our answers to CBER's
15  questions, the written forms, did you review
16  those?
17     A.   What time period?
18     Q.   Prior to filing the complaint,
19  did you review Merck's written submissions to
20  CBER and CBER's questions back and Merck
21  answers back to CBER around the assay?
22     A.   It's not clear to me what
23  constitutes as submission. But the protocol,
24  I believe, is a submission, and I would have
25  seen that. I did see it. So in that sense I

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  knew something of at least some submission if
3  you include the definition that includes
4  protocols.
5      Q.   What's in front of you, the
6  large document, Exhibit 10 right there, did
7  you see that document prior to this litigation?
8      A.   Come on.
9      Q.   It's not a difficult question.
10     A.   Yeah, I have to look at it. I
11  have to go through it.
12     Q.   Sitting here today without
13  going through it, you don't know whether you
14  looked at it or not? You would need to go
15  through it to say whether you looked at it
16  prior to filing this complaint?
17     A.   Looking at this front page, I
18  didn't see the front page that I know of. But
19  I mean, I don't know what is contained in
20  here. You said to look at just the middle
21  part. I can't speak to the rest of the
22  document.
23     Q.   Other than -- when you talk
24  about protocol, what are you characterizing as
25  the protocol?

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2      A.   That's a good question because
3  they kept changing.
4      Q.   What do you generally mean a
5  protocol to be?
6      A.   The protocol standard operating
7  procedure, how -- what you would be doing as a
8  methodology to run an assay.
9      Q.   Other than the protocol, did
10  you see any submissions, meaning documents
11  that Merck wrote to CBER around 007?
12     A.   Yes.
13     Q.   What did you see?
14     A.   I saw the -- I saw -- what's
15  your time frame?
16     Q.   Before the filing of the
17  complaint.
18     A.   I saw a CBER review of the
19  biological license application for ProQuad.
20     Q.   Anything related to 007 other
21  than the protocol?
22     A.   Ton of things related to
23  Protocol 007.
24     Q.   Are you suggesting that
25  Protocol 007 was used in connection with the

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  approval of ProQuad?
3      A.   I'm not just suggesting it, it
4  absolutely was.
5      Q.   Why do you think that?
6      A.   I know that.
7      Q.   Why do you know that, on what
8  basis?
9      A.   Do you have the BLA with you,
10  I'll go through it?
11     Q.   We will later. Just give
12  me your answer.
13     A.   The basis? The immunogenicity
14  testing was validated against the Protocol 007
15  PRN. The immunogenicity data used in there
16  was calibrated against falsified PRN data that
17  Merck knew was unreliable. Not only that, but
18  the ProQuad, because like you said, it's
19  unethical to withhold the mumps vaccine once
20  people have the perception that it works, a
21  lot of the things in the ProQuad BLA
22  bootstrapped to MMR. MMR II.
23     Q.   Other than ProQuad BLA and the
24  007 protocol, did you see any documents
25  submitted by Merck to CBER in connection with

39 (Pages 150 - 153)

Appx5596

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    Protocol 007?
3        A.    I mean, I knew of information
4    that was submitted.  I knew that Protocol 007
5    was a completed trial.
6        Q.    I'm not talking about information
7    you may have heard.  I'm asking whether you
8    actually saw submissions from Merck to CBER or
9    their questions back around 007 other than the
10   protocol itself or the ProQuad BLA?
11       A.    From Merck to CBER?
12       Q.    Yes.
13       A.    Submissions, you're talking
14   about the final form, like the day it went out
15   or are you talking about content?
16       Q.    I'm talking about actual
17   documents that Merck sent to CBER.  Whether
18   you saw those documents.  Other than the
19   protocol or the BLA for ProQuad, have you
20   seen, prior to filing this lawsuit, any
21   documents Merck sent to CBER?
22       A.    After the August visit,
23   inspection by the FDA, Krah was compiling
24   documents to respond to that.  So I think that
25   would qualify as I was aware of some of the

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    content, but to say like a final form
3    submission, like the day it went out, I'm not
4    recalling anything at the moment that went
5    right from Merck to the FDA in some sort of
6    final form --
7        Q.    Can we look at -- sorry.
8            I'm going to show you --
9        A.    -- prior to filing any lawsuit.
10       Q.    I'm going to mark as
11   Krahling-11 a March 12, 2001, response to the
12   FDA request for information from Merck.
13            - - -
14           (Exhibit Krahling-11, 3/12/11
15       Response to FDA Request for Information,
16       MRK-KRA00018864 - 00018937, was marked
17       for identification.)
18            - - -
19   BY MS. DYKSTRA:
20       Q.    And before we go through the
21   whole document, I just have a couple of
22   initial questions.
23           So to your point earlier, this
24   is the kind of document you would not have
25   seen on March 12, 2001, letter to the FDA --

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2            MR. SCHNELL:  Object to form.
3    BY MS. DYKSTRA:
4        Q.    -- from Merck?
5            MR. SCHNELL:  Object to form.
6            THE WITNESS:  First of all, I
7    would have to --
8    BY MS. DYKSTRA:
9        Q.    Let's just start with the
10   initial letter itself.
11       A.    How long is that?
12       Q.    Two pages.  One and a half.
13   That letter.  Just that letter, the front
14   letter, March 12, 2001.  This is the type of
15   communication I was referring to as submission
16   from Merck to the FDA.  This is the kind of
17   document you said you would not have seen
18   prior to filing this lawsuit?
19       A.    I don't know that I said that.
20   I would not have seen this cover page in its
21   final form.  I would have seen content that
22   was in these documents because documents
23   generally that went to regulatory contained
24   data and content from our labs.  Krah was
25   pretty clear that we worked closely with

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    regulatory, which meant regulatory and Merck,
3    the people that would send things to
4    regulatory.  So I know that our information
5    was used in submissions.  I haven't looked at
6    this one to know if anything from our lab was
7    used -- cited in any way.
8        Q.    Again, I want to show you,
9    without taking the document apart, a chart,
10   let me find it -- may have given you the wrong
11   document.  Hold on.  There is a chart in this
12   document at Bates label 18872.  Table 1 which
13   is the "M-M-R®II Protocol 007:  Mumps End
14   Expiry Preliminary Summary of the Percent of
15   Subjects Who Develop Neutralizing Antibodies
16   to Mumps."
17           Do you see that?
18       A.    I see the table on that page,
19   yes.
20       Q.    Do you recall if you had any
21   input into developing this table?
22       A.    I can't read the rest of the
23   document?
24       Q.    Well, if you think you need to
25   to talk about this table, that's okay.  We can

40 (Pages 154 - 157)

Appx5597

Page 158

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1    go off the record and look at it.
2        A.    Well, tables are usually
3    supplemental to information contained in the
4    document. I don't want to read the whole
5    thing. Are you okay if I read up to the table
6    and see if that's good enough? It's only a
7    couple of pages. Otherwise, I have to pick
8    apart this table.
9        Q.    It's only three pages. Read
10   that if you need to. I have two questions
11   while you read that so you can think about
12   them when you're reading it to answer them.
13   Number one, whether you had any assistance in
14   developing this particular table itself,
15   preparing this table for submission to CBER,
16   and whether you knew prior to filing this
17   complaint that this table was presented to
18   CBER?
19       A.    Can you restate the question?
20       Q.    Yes. First, did you have any
21   assistance in developing this table itself,
22   preparing it for CBER?
23       A.    Did I have assistance?
24       Q.    Yes.

Page 159

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1        MR. SCHNELL: Object to form.
2    BY MS. DYKSTRA:
3        Q.    Did you help prepare this table
4    that was submitted to CBER?
5        A.    Absolutely.
6        Q.    What did you do?
7        A.    The experiments that it cites.
8        Q.    Did you prepare the table
9    itself, though, the document?
10       A.    I define prepare to mean I
11   provided the labor that went into the
12   experiments. The numbers wouldn't be what
13   they were without me working there.
14       Q.    Do you see in the seroconversion
15   rates identified in this table the 4.0 log10
16   TCID50 mumps potency had an observed response
17   rate of 93.3?
18       A.    Yes.
19       Q.    Was that based on the work that
20   you did at Merck?
21       A.    That was based on the fraud
22   that was perpetrated at Merck while I was
23   there.
24       Q.    So you think it was -- the real

Page 160

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1    result was lower than 93.3?
2        A.    I mean real result. I mean,
3    the data is gone. I mean, that's based on
4    fraudulent data.
5        Q.    This 93.3 percent you're saying
6    is based on fraudulent data?
7        A.    Absolutely.
8        Q.    Did you review this table
9    before it went to CBER?
10       A.    In its final form like this?
11       Q.    Yes.
12       A.    No.
13       Q.    So you didn't review this
14   correspondence that went to CBER then, either?
15       A.    I don't believe I reviewed that
16   correspondence at all. It wouldn't have been
17   my job to review it.
18       Q.    Let me go -- put the documents
19   away for a second and pull out the complaint
20   which is labeled Exhibit 3. If you turn to
21   page 10, paragraph 29 of your complaint, you
22   state in paragraph 29 that Merck "...did not
23   test the vaccine for its ability to protect
24   against a wild-type mumps virus." Correct?

Page 161

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1        A.    Can I read 29?
2        Q.    Of course, yes.
3        A.    Got it.
4        Q.    So you asserted in your
5    complaint that Merck did not test the vaccine
6    for its ability to protect against a wild type
7    mumps virus. Correct?
8        A.    As we defined wild type virus.
9        Q.    We who?
10       A.    Well, it's right here. Wild
11   type virus is a disease-causing virus. Your
12   statement is correct as wild type virus is
13   defined in this paragraph in this complaint.
14       Q.    Do you disagree that CBER
15   defined a wild type virus as a Jeryl Lynn
16   passage 7 virus?
17       A.    I don't know what CBER defined
18   as a wild type virus.
19       Q.    If you go to paragraph 30 --
20   I'm sorry, 35.
21       A.    Did you say paragraph or page?
22       Q.    Paragraph 35. You can read
23   that paragraph.
24       A.    Okay.

41 (Pages 158 - 161)

Appx5598

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2        Q.    You state that "Merck added
3    animal antibodies to both the pre and
4    post-vaccination blood samples." And "The use
5    of animal antibodies in laboratory testing is
6    not uncommon."
7        A.    Uh-huh.
8        Q.    Are you aware that CBER approved
9    the use of animal antibodies, generally
10   speaking?
11       A.    I don't know what you mean by
12   "approved."
13       Q.    Are you aware that CBER knew
14   that Merck was using animal antibodies in the
15   running of PRN?
16       A.    CBER didn't know how Merck was
17   using them.
18       Q.    What did CBER believe Merck was
19   doing?
20       A.    I don't know what CBER
21   believed. I can't speak to that as much as I
22   knew what Krah was hiding from CBER.
23       Q.    If you don't know what CBER
24   knew or didn't know, I'm not sure how you know
25   whether they knew what Merck was doing, but

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    tell me what --
3            MR. SCHNELL: Object to form.
4            THE WITNESS: How do you know?
5    BY MS. DYKSTRA:
6        Q.    How do you know CBER did not
7    know Merck -- how Merck was using the anti-IgG
8    in connection with the PRN assay?
9        A.    Because Krah told us that they
10   were hiding it from the FDA. That they
11   weren't to know that the data was being
12   changed.
13       Q.    Is that what he said?
14       A.    Yes.
15       Q.    Tell me what you mean when you
16   say Merck added animal -- I'm sorry, tell me
17   what you mean when you say, "The use of animal
18   antibodies in laboratory testing is not
19   uncommon."
20       A.    That means when you're doing an
21   enzyme immunoassay, secondary antibodies are
22   used to identify and quantify primary
23   antibodies.
24       Q.    And that's an appropriate
25   methodology?

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2        A.    As long as you're aware of what
3    you're measuring. Secondary antibodies can be
4    a tool to measure primary antibodies. You're
5    doing a binding assay. You're just trying to
6    see if the antibodies are there. But as Krah
7    pointed out, it's no longer a functional
8    assay. The point of the PRN, according to
9    Krah and according to what -- I mean, it's
10   textbook, is that you're simply mixing the
11   child's serum with a virus and then seeing if
12   that child's serum can neutralize, kill the
13   virus. Once you add -- these are rabbit
14   antihuman antibodies. Human bodies don't make
15   those normally. They're not in the real
16   world. When you add something exogenous like
17   that, it's not a functional assay anymore. So
18   if you're willing to say this is a binding
19   assay, which is what an enzyme immunoassay is,
20   then, yes, secondary antibodies can be an
21   appropriate tool for saying is there an
22   antibody there or not. But it doesn't tell
23   you in the real world whether that antibody
24   can neutralize the virus because it's not a
25   functional assay.

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2        Q.    So it's your position that
3    animal antibodies can be appropriately used in
4    an ELISA assay but not in a PRN assay?
5        A.    That's not what I said. I'm
6    just saying it changes what the assay is. And
7    that was Merck's representation to me also.
8        Q.    Is it appropriate ever to use
9    an anti-IgG antibody in a PRN assay?
10       A.    I can't speak to that. I mean,
11   you're talking -- under what conditions would
12   it be appropriate, I don't know. But you have
13   to be clear about what you're measuring. It's
14   not a functional -- rabbit antihuman, goat
15   antihuman, sheep antihuman, the reason it's
16   some other animal is because humans don't make
17   those antibodies. It's not going to be in the
18   kid's blood when the kid is out there and
19   contracting the mumps virus. It's not a
20   functional assay of whether the child's blood
21   alone can neutralize that disease virus.
22   That's all I'm saying.
23       Q.    But you concede that CBER knew
24   that Merck was using anti-IgG in its PRN
25   assay?

42 (Pages 162 - 165)

Appx5599

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 MR. SCHNELL: Object to form.
3 THE WITNESS: You keep going to
4 the word use. They don't know how
5 Merck was using it. Krah represented
6 that if they knew how we were using it,
7 they wouldn't let us do it.
8 BY MS. DYKSTRA:
9 Q. Did you ever have discussions
10 with CBER about how Merck was using the
11 anti-IgG in the PRN assay?
12 A. Can you repeat that?
13 Q. Did you ever have any
14 discussions with CBER about how Merck was
15 using the anti-IgG in the PRN assay?
16 A. That's a little bit open ended.
17 I remember that I called the FDA to report
18 fraud in our lab, hoping they would come in
19 and investigate it and find everything out.
20 Q. Other than those phone calls to
21 the FDA, did you ever have discussions with
22 CBER about how Merck was using the anti-IgG in
23 its PRN assay?
24 MR. SCHNELL: Object to form.
25 THE WITNESS: No.

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 BY MS. DYKSTRA:
3 Q. Can you look at your RFAs that
4 we marked in front of you? It's 6 and 7.
5 Exhibits 6 and 7.
6 A. Exhibit 6 and 7.
7 Q. Can you look at RFA number 6,
8 request for admission number 6. Yeah, the
9 number 6. They're both denied in both
10 answers.
11 A. I didn't know if you meant
12 Exhibit 6.
13 Q. I'm sorry, request number 6.
14 You have to go past the objection. The actual
15 question. It's denied in both, you just need
16 it in one. You don't need to look at both.
17 So the question is: Admit that
18 prior to filing this lawsuit, you had no
19 knowledge of the seroconversion rates Merck
20 reported to the FDA for the mumps component of
21 M-M-R®II in connection with Merck's
22 development of the PRN assay.
23 So tell me what knowledge you
24 did have since you denied that request?
25 A. I had some knowledge of the

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 seroconversion rates that -- the ProQuad BLA.
3 Q. Other than development of
4 the PRN assay in Protocol 007.
5 A. You're going by development of
6 PRN assay. The development and the running
7 are run simultaneously. The knowledge I have
8 of that is that the testing that came
9 afterward was based on the development of the
10 PRN. If you're looking for knowledge of the
11 seroconversion rates reported to the FDA,
12 yeah, I mean, I knew that the seroconversion
13 rates based on the ProQuad BLA, for one, were
14 at or above 90 percent.
15 Q. Let's -- you can put those
16 exhibits away for the moment. We'll come back
17 to them.
18 I want to talk about when you
19 first joined Dr. Krah's lab.
20 A. Can we just like take a short
21 two-minute bathroom break?
22 Q. Absolutely.
23 MR. SCHNELL: It's 1:15, what
24 do you want to do for --
25 MR. KELLER: Let's break for

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 lunch.
3 THE WITNESS: My stomach is
4 growling, so I wouldn't mind that.
5 MS. DYKSTRA: That's fine. We
6 can do that.
7 VIDEOGRAPHER: The time is
8 1:17. We're going off the video
9 record.
10 - - -
11 (A recess was taken.)
12 - - -
13 VIDEOGRAPHER: The time is
14 2:09. This begins disc three in the
15 videotape deposition of Stephen
16 Krahling.
17 BY MS. DYKSTRA:
18 Q. Mr. Krahling, before you worked
19 at Merck in March 1999 had you ever ran a PRN
20 assay previously?
21 A. A plaque reduction neutralization
22 assay where you measure the ability of serum
23 to neutralize virus in a cell-based assay, no.
24 Q. And since your work at Merck,
25 have you ever had an opportunity to run a

Appx5600

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  plaque reduction neutralization assay since
3  November 2001?
4       A.   By the same definition, no.
5       Q.   And the same question for an
6  ELISA assay, have you ever run -- prior to
7  your work at Merck, did you ever run an ELISA
8  assay?
9       A.   Yes.
10      Q.   And after your work at Merck,
11 did you ever run an ELISA assay?
12      A.   Yes.
13      Q.   In what context after Merck did
14 you run an ELISA assay?
15      A.   Penn State.  At Penn State the
16 department of molecular and cell biology that
17 I worked at.
18      Q.   What time frame was that again?
19      A.   2002 to 2004.
20      Q.   Since 2004, have you ever run
21 an ELISA assay?
22      A.   No.
23      Q.   I'm going to show you what's
24 marked as Exhibit 12.
25              - - -

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2        (Exhibit Krahling-12, 8/1/00
3     Letter, MRK-KRA00048418, was marked for
4     identification.)
5              - - -
6  BY MS. DYKSTRA:
7       Q.   This is August 1, 2000, letter
8  from you to Dr. Krah.
9       A.   Got it.
10      Q.   So you -- did you leave Merck
11 in mid-August 2000 to head to Penn State?
12      A.   I did.
13      Q.   Did you participate in a
14 graduate school program at Penn State?
15      A.   If I recall correctly, I was
16 going to enroll in taking some classes and
17 continue working in Dr. Schlegel's lab with
18 the possibility that I might pursue a PhD.
19      Q.   And did you do that work in
20 Dr. Schlegel's lab at Penn State and work
21 towards a PhD?
22      A.   I did work in Dr. Schlegel's
23 lab, but I ended up coming back to Merck just
24 a few months later.
25      Q.   Why did you not stay at Penn

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  State and participate in the graduate program?
3       A.   Met Dr. Krah.  Dave and I --
4  Colleen got married, Colleen Milliken got
5  married, became Colleen Barr with two Rs.  And
6  at her wedding, I think it was in October of
7  2000, Dave and I spent a lot of time talking,
8  we were seated at the same table and he said
9  that he wanted me to come back, he said things
10 weren't the same since I left.  And he asked
11 me -- you know, he asked why I left, we left
12 on such good terms.
13          I told him that, I said, Well,
14 you never had offered me that permanent
15 position.  There wasn't much keeping me there.
16          He said, What if I offered you
17 that, would you come back and say yes and work
18 there.
19          I said, You got to offer it and
20 see.  You got to take a chance.
21          But he and I got along well
22 enough that, I believe it was the next week or
23 two, the letter was sent, and I thought we
24 were on good enough terms, you know, he
25 basically made the offer sound really good to

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  come back and work at Merck.  He wanted me
3  back, so I came back.
4       Q.   So you left Merck in -- I guess
5  was, in fact, your last day at Merck
6  August 17th as this letter indicates --
7       A.   I have no idea.
8       Q.   -- or sometime mid-August of
9  2000?
10      A.   I really don't know.
11      Q.   So you left Merck sometime in
12 the summer of 2000, let's say.  Is that fair?
13      A.   I mean, this letter would say
14 the second half of August.
15      Q.   And between that point and when
16 you saw Dr. Krah at Colleen Barr's wedding in
17 October of 2000, had you already enrolled and
18 started in the graduate program at Penn State?
19      A.   I'm not sure what the criteria
20 are for what enrollment would be.
21      Q.   Had you taken any classes or
22 participated in any studies at Penn State?
23      A.   Well, I was doing research and
24 I believe I may have enrolled for some
25 classes.

Appx5601

Page 174

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1
2     Q.    What kind of research were you
3  doing?
4     A.    It's outlined on my resume, if
5  you want to go over it again.
6     Q.    I'll go back to that in a
7  second.
8          So you thoroughly enjoyed
9  working with Dr. Krah in his lab during your
10  first period at Merck from March 1999 to
11  August 2000?
12     A.    Absolutely.  That's why I came
13  back.  That's why his offer sounded good.
14     Q.    Do you remember how much you
15  made at Merck in your position as a full-time
16  employee?
17     A.    I don't remember.
18     Q.    Was it above or below $50,000?
19     A.    I don't remember.  You can try
20  over and under some other -- I don't know.  I
21  can't narrow it down.
22          - - -
23          (Exhibit Krahling-13, Employee
24     Initialization, MRK-KRA00582401, was
25     marked for identification.)

Page 175

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1
2
3  BY MS. DYKSTRA:
4     Q.    I'm going to mark as Krahling-13
5  your employee initialization and has in here
6  compensation.  This is dated 12/27/00 as your
7  hire date.
8     A.    Can I look over it?
9     Q.    Sure.
10     A.    Okay.
11     Q.    Does this refresh your
12  recollection that your base rate was a rate of
13  $3,670 per month for an equal -- for a yearly
14  equivalent of $44,000?
15     A.    It doesn't refresh my memory.
16  I don't remember what I made, but...
17     Q.    Does that sound about right?
18     A.    It does.  I mean, I -- it could
19  be right.
20     Q.    Do you have any reason to
21  believe that it's not right?
22     A.    Base for benefits.  I don't
23  know what base for benefits means.  Base rate.
24  I don't really know how to read this chart.
25  So I mean, I really just don't know.

Page 176

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1
2     Q.    I'm going to show you one more
3  exhibit on this issue.
4          - - -
5          (Exhibit Krahling-14, 10/24/00
6     Letter, RELATOR_00001058 - 00001060,
7     was marked for identification.)
8          - - -
9  BY MS. DYKSTRA:
10     Q.    Krahling-14.  Take a look at
11  that just to refresh your memory and your
12  salary.  This is an October 24, 2000, offer
13  letter from MRL human resources, and it states
14  your yearly salary is $44,004.  Does that
15  refresh your recollection as to your yearly
16  salary?
17     A.    It doesn't refresh my
18  recollection, but I mean, I --
19     Q.    But you believe that to be
20  accurate?
21     A.    If it's off, it doesn't seem
22  like it would be far off.  Can I read the
23  thing if you want me to confirm that?
24     Q.    No, that's fine.
25          So tell me what training you

Page 177

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1
2  did receive, since you had not run a plaque
3  neutralization assay prior to joining Merck,
4  when did you first receive training on a
5  plaque neutralization assay at Merck?
6     A.    What do you mean by "training"?
7     Q.    Instruction on how to develop
8  and run a plaque neutralization assay.
9     A.    1999.
10     Q.    How did you -- what kind of
11  training did you receive?
12     A.    It's hard to remember what kind
13  of training.  Whatever training Krah was
14  showing me back then and the lab members at
15  the time.  I was trained in Krah's lab on how
16  to do the assays.
17     Q.    Who trained you?
18     A.    I don't recall specifics.
19  Whoever would have been working at the time
20  and Krah himself.
21     Q.    Can you give me a little bit
22  more detail about what your training involved,
23  what did they teach you to do?
24     A.    You want me to run through the
25  protocol of the assay?

45 (Pages 174 - 177)

Appx5602

Page 178

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  Q.   If that's how you learned how
2  to work on the assay, sure.
3     A.   I don't think that's how I
4  learned, but that's how I would describe how
5  you run the assay. I'm not quite sure what
6  you're asking. There's a difference between
7  like how I trained and the methodology and
8  like -- I don't understand quite what you're
9  asking.
10    Q.   You got to Dr. Krah's lab and
11 you had never run a plaque neutralization
12 assay. How did you learn how to work on the
13 assay? Who taught you and what did you do?
14    A.   First of all, a plaque
15 reduction neutralization is dependent on
16 methods that you don't learn from scratch
17 there. So understanding how to culture cells
18 is a critical part of running the assay. I
19 didn't learn that in Krah's lab. I had
20 already known how to do that. So that element
21 of it, they just -- they could give you a
22 protocol, say here's how you culture these
23 cells. I already knew how to do that, easy to
24 adapt to it. So I'm not sure what you're

Page 179

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  looking, like is there a certain element how I
2  was trained? The thing as a whole, I'm not
3  sure I can describe how I was trained.
4  There's different -- you learn them as you do
5  them. They show you how to do them. When
6  they feel comfortable that you're doing them
7  however the protocol is set up, you run the
8  assays.
9     Q.   So what were your
10 responsibilities in the lab?
11    A.   As given to me by Krah?
12    Q.   Well, did somebody else give
13 you job responsibilities in the lab other than
14 Dr. Krah?
15    A.   In the beginning you could get,
16 I could get instructions through, say, Mary
17 Yagodich who would be speaking for Krah. So I
18 could get them indirectly.
19    Q.   So what did -- instruction did
20 you get from Dr. Krah or Mary Yagodich about
21 what you were to do?
22    A.   Generally or any one time?
23    Q.   You were in the lab for a year
24 and a half?

Page 180

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1     A.   Yeah.
2     Q.   Well, you were in -- well, you
3  actually joined Dr. Krah's lab again, and what
4  was your hire date, the second hire date?
5     A.   December 2000.
6     Q.   December. So from
7  December 2000 until we'll just say
8  November 2001, although I know you left
9  physically being in the lab before then, what
10 were your job responsibilities in the lab?
11 What did you do day to day?
12    A.   Before we were talking about
13 1999.
14    Q.   Okay. Well, what did you --
15 well, I was talking about when you came back.
16 Okay. But the first time you ever did a
17 plaque neutralization assay in Dr. Krah's lab
18 was when you were there as a contractor then.
19 Correct?
20    A.   I believe so, yes.
21    Q.   What did you do day to day as a
22 contractor in Dr. Krah's lab?
23    A.   It depends on the day.
24 Sometimes we did VZV assays, potency assays.

Page 181

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  Sometimes you assisted with -- Krah and Mary
2  were doing plaque reduction neutralization
3  assays against wild type mumps. They were
4  doing things that they considered validation
5  of the mumps neuts that were possibly coming.
6  Stuff like that. I mean, do you want every
7  single thing I did in his lab?
8     Q.   What was the majority of your
9  time spent on?
10    A.   Cell-based assays and support
11 for cell-based assays that would characterize
12 Merck's live virus vaccines.
13    Q.   What was your job in cell-based
14 assay? What did --
15    A.   To do that.
16    Q.   -- you actually do?
17    A.   To do that.
18    Q.   Explain to me what that means,
19 "to do that."
20    A.   That's a lot of work to explain
21 that. Well, I mean for varicella, you had to
22 know how to culture MRC-5 cells because the
23 human diploid cells and varicella grows in
24 that so those assays were based on doing that

46 (Pages 178 - 181)

Appx5603

Page 182

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1  cell line.  You had to know how to run Vero
2  cell lines which is a different cell line, had
3  some different requirements, and you have to
4  know how to do all the things in support of
5  growing those cells to run assays.  You have
6  to know how to use the gelatin which overlays
7  mumps virus assays because they act as a solid
8  barrier to keep the plaques in place.  VZV you
9  could use a liquid medium because varicella is
10  cell-associated infectivity.  So it doesn't
11  need the gelatin to spread.  It's already
12  constricted so you didn't have to have that
13  type of thing.  All of those intricacies were
14  learned in the first few months over time of
15  how to do the things.  And by the time Krah
16  hired me, he knew I could do those things.  So
17  I'm not sure what else instead of -- that can
18  answer your question.
19      Q.   What portion of your time was
20  spent actually counting plaques with respect
21  to the mumps virus and the neutralization
22  assay?
23      A.   I couldn't guess at a percentage.
24      Q.   A lot, a little?  One day a

Page 183

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1  week, most of the time?
2      A.   I don't even know how to even
3  guess at that.  I can tell you that to
4  count one assay, to count all the plaques for
5  one assay would take in the ballpark of half a
6  day.
7      Q.   Do you know how many assays you
8  counted at the time you were at Dr. Krah's
9  lab?
10      A.   I don't know.
11      Q.   Did you ever work in Bill
12  Long's lab?
13      A.   Bill Long?  I don't know that
14  I -- I don't recognize the name.
15      Q.   Do you know Pam Burke?
16      A.   I don't recognize the name.
17      Q.   How about Beverly Rich?
18      A.   I do not recognize the names
19  you're saying.
20      Q.   Do you know Rocio Marchese?
21      A.   That name sounds familiar.
22      Q.   But you don't recall working
23  with her?
24      A.   I think I recall her being

Page 184

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1  discussed.
2      Q.   What about do you recall
3  working with Laura Millett?
4      A.   I don't recognize that name.
5  The name before, I think Krah worked with that
6  woman.  What was her name again?
7      Q.   Rocio Marchese.
8      A.   That's a woman, right?
9      Q.   Yes.
10      A.   I think Krah worked with her.
11      Q.   You don't recall directly
12  working with her?
13      A.   I think she worked with Krah on
14  the stuff that we were doing.
15      Q.   But you don't recall working
16  directly with her yourself?
17      A.   What do you mean by "directly"?
18      Q.   Did you have discussions with
19  her?  Do you recall talking to her, you
20  talking to her?
21      A.   Not on that level.  But I think
22  she worked with our -- I think she worked in
23  our lab.  Not in our lab.  I think Krah worked
24  with her.  I think he discussed her, that he

Page 185

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1  had -- I'm not sure what capacity.  That name
2  is familiar.
3      Q.   Now, you mentioned -- strike
4  that.
5          Explain to me the configuration
6  of the lab.  Who was in the lab day to day
7  with you and where -- who was in the lab with
8  you day to day?
9      A.   The physical configuration?
10      Q.   Yes, who was there and who were
11  you working with?
12      A.   I think I can answer that, but
13  it changed over time because there was what I
14  would consider protocol and other people say
15  the employee high turnover rate.  So if I say
16  where somebody's desk was at, I mean, at what
17  point in time are we talking about?
18      Q.   Tell me the first period you
19  were there as a contractor, who did you work
20  with in Dr. Krah's lab besides Dr. Krah?
21      A.   Kevin Szczypiorski, Kristin
22  Tirpak.  Her married name was Kristin Haas.
23  DeeMarie, I mentioned before.  Colleen Barr.
24  She was Milliken at the time.  Mary, Dave, Sam

Page 186

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    Calarco, Larry Doolittle. I'm probably
3    missing somebody. When I showed up and worked
4    there, those people were all there.
5         I've got more. The
6    configuration of the lab, the building,
7    there's a hallway that runs the outside.
8    There's a middle hallway that runs through the
9    lab that connects all the labs, it's like a
10   common area. Dave's office was on the front
11   end of that. Mary's office was on the back
12   end of that. Everybody else's desks were
13   scattered in between.
14        Q.   When you came back for your
15   full-time employment in December 2000, was it
16   the same list of people or different people?
17        A.   Different people.
18        Q.   Who was in the lab then?
19        A.   Some of them are different.
20   Dave and Mary were still there. Colleen was
21   still there. Jill DeHaven would have been a
22   full-time employee, or she was an employee, I
23   believe, back when I worked there the first
24   time but she was on leave. So when I came
25   back, she was there. A new hire Frank Kennedy

Page 187

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    was there.
3         Can you go through who I
4    mentioned? I missed one, on the second one,
5    just on the second part.
6         - - -
7         (The court reporter read the
8    pertinent part of the record.)
9         - - -
10        THE WITNESS: Jenny Kriss was
11   either there at the time or showed up
12   shortly after. Joan showed up shortly
13   after. And there were -- there may
14   have been contract employees. I'm sure
15   I'm not getting everyone.
16   BY MS. DYKSTRA:
17        Q.   Did you have a romantic
18   relationship with anybody in the lab?
19        A.   No.
20        Q.   At any point in time?
21        A.   No.
22        Q.   Did Dr. Krah have a romantic
23   relationship with anybody in the lab?
24        A.   I was told -- what do you mean
25   by with anyone in the lab?

Page 188

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2         Q.   The people that you just went
3    through.
4         A.   I don't know that he had --
5    okay. Can you just restate the question?
6         Q.   Was it your understanding that
7    Dr. Krah had a romantic relationship with
8    anybody in the lab?
9         A.   No.
10        Q.   Why did you hesitate before?
11        A.   Because the sister of someone
12   in the lab.
13        Q.   Who was that?
14        A.   Colleen and Mary said that Dave
15   dated Mary's older sister.
16        Q.   And you said Dr. Krah reported
17   to Dr. Alan Shaw. Is that correct?
18        A.   My understanding at the time
19   was that Alan had authority over Dave.
20        Q.   Did you work with Dr. Shaw,
21   have direct contact with Dr. Shaw?
22        A.   I did have direct contact with
23   Dr. Shaw.
24        Q.   What was your relationship with
25   Dr. Shaw?

Page 189

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2         A.   Pretty amicable to start with.
3    I mean, how much do you want me to go into
4    detail there?
5         Q.   Well, tell me why it was
6    amicable and if when it changed, if it did?
7         A.   I don't know why it was
8    amicable. He liked me, I thought he was okay.
9    I know why it changed, because I pointed out
10   the fraud that Krah was committing in the lab.
11   That soured my relationship with Krah, too.
12        Q.   When did you first point out
13   the fraud in Dr. Krah's lab to anyone, and to
14   whom did you do that?
15        A.   I pointed it out to Krah
16   sometime in the first half of January of 2001.
17   Maybe toward the middle front of January 2001.
18        Q.   What did you tell him at that
19   time?
20        A.   Well, there was a prelude to
21   that. I mean, if you understand that
22   conversation, you have to go back to the
23   conversation before where he instructed me to
24   commit fraud. Do you just want the second
25   part of that?

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 Q. Why don't you tell me when he
2 allegedly instructed you to commit fraud?
3 A. That was December 2000.
4 Q. What did he say?
5 A. Said quite a bit. That was my
6 first week back and he was running -- he was
7 counting plates in the front lab. And he was
8 excited because he was explaining to me that
9 the mumps neutralization assay, that Protocol
10 007 was going forward in his lab and that they
11 got an indicator strain and a methodology that
12 they knew could give them 95 percent efficacy
13 which is what they needed. He was counting
14 plates at the time and he said that in order
15 to meet the 95 percent efficacy FDA mandate,
16 that we needed to cross out pre-positives when
17 we found them and change them to
18 pre-negatives. He said that we had to target
19 a 10 percent pre-positive rate. And that the
20 reason we needed to do that is because the FDA
21 might not allow them to use that protocol or
22 method including the rabbit antihuman IgG
23 unless they change those results.
24 He then showed me an example of

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 what I was supposed to do. He took a plate
2 that had four pre-positives on it. He had
3 counted it. There were four pre-positives.
4 He took and wiped the numbers off the plates
5 with an alcohol wipe. I'm sorry, he -- that
6 time he wiped with alcohol the plate
7 identification number and switched it with the
8 plate identification number for the next
9 plate, because all of the ones on the next one
10 were positive -- or they were negative. So he
11 had a plate that he counted that was
12 pre-vaccine, they were all positive. The
13 sample after it was the post for that same
14 kid, and those were all negative. And so he
15 crossed out the identification, switched the
16 plates. He kept -- he had to switch those
17 numbers on his counting sheet so he crossed
18 them all out. And then he wrote in the next
19 numbers fresh for the next plate. When he did
20 that, he took a second look at the dilution
21 above that plate and he noticed that it was
22 also pre-positive. And he was like, damn.
23 Because the whole thing was still pre-positive
24 because of that one dilution. So he crossed

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 it out.
2 He said, This is what you have
3 to do. You have to cross out these results
4 and write in a pre-negative.
5 I just repeated, We're supposed
6 to just cross out the results.
7 And he said, If you need to,
8 you can recount the plaques, but if you
9 recount the plaques, you have to count very
10 liberally and make sure that you count more
11 plaques so that the result would switch from
12 pre-positive to pre-negative.
13 And then he wrote down on the
14 sheet, rechecked plaques. But he was pretty
15 clear that the directive was to change the
16 results. He didn't order me to have to
17 recount the plaques. He just said change the
18 results.
19 Q. Let me break that down a little
20 bit. So this is in December of 2000 when you
21 first started?
22 A. It was the week between
23 Christmas and New Year's.
24 Q. And how did he -- you're saying

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 he changed the plates themselves and then
2 crossed out the numbers on the counting sheet?
3 A. Start with the plate
4 identification number. The plate identification
5 number would have identified the first plate
6 he was counting, the pre-vaccination sera as a
7 pre-vaccination sample. All of those were
8 positive. All the dilutions were positive.
9 He counted that and wrote them on the counting
10 sheet. He noticed that the next plate were
11 all negative in the post. There was a
12 comment, I said, oh, that's -- I mean, that's
13 a seroconversion in reverse. Basically the
14 kid had immunity, got Merck's vaccine and lost
15 his immunity. I asked, that's a weird result.
16 He said it was due to the artificial nature of
17 the anti-IgG. That whenever he sees that, he
18 just switches the plates.
19 So he crossed out the
20 identification number that would identify it
21 as a pre-vaccine versus a post-vaccine and
22 switched them so that all the positives went
23 to the post. Now, because he did that, he had
24 to cross out all the results he had just

Page 194

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    written down. But because he was doing it in
3    realtime with a calculator next to him, the
4    next plate which is the other one that he had
5    switched, he could write the numbers fresh
6    onto the counting sheet.
7           Now, after he did that, there
8    was still one pre-positive dilution in a
9    different plate above the first one he had
10   switched. That pre-positive would have made
11   the whole sample pre-positive. All that work
12   switching the plates would have been for
13   nothing. They still couldn't have used it.
14   So he crossed out the numbers and said,
15   "Change the results."
16          I said, You just cross out the
17   numbers.
18          And that's when he said, You
19   can recount these if you need to, but you have
20   to change the results.
21          He told me specifically that we
22   were targeting pre-positives. If you recount
23   them, you need to count very liberally and
24   find as many plaques as you can in order to
25   switch the result from pre-positive to

Page 195

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    pre-negative.
3    Q.    And when he told you all of
4    this, who did you report it to?
5    A.    Right back to him.
6    Q.    What does that mean?
7    A.    What does that mean? That was
8    in December of 2000. Like the last week of
9    December. A few weeks later Mary had
10   challenged me because I wasn't doing that.
11   And when I refused to do that, she took the
12   counting sheet to Dave and Dave confronted me
13   over it. And I told him I couldn't do that.
14   Q.    And did you report this fraud,
15   this alleged fraud or recounting to Dr. Shaw
16   in December of 2000?
17   A.    I reported it to him in July of
18   2001.
19   Q.    Did you report this fraud to
20   anybody else between -- well, did you report
21   this fraud to anybody else other than Dr. Krah
22   in December of 2000?
23   A.    In December of 2000 it was one
24   week, the week between Christmas and New
25   Year's. I think only Krah and I were working

Page 196

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    there. Maybe Joe had come in once. Most
3    everybody was taking vacation. So I didn't
4    have the opportunity to say much during that
5    week.
6    Q.    Did you report this alleged
7    fraud to anybody in January of 2001 other than
8    Dr. Krah?
9    A.    When you mean report, you mean
10   talk about in any way?
11   Q.    Let's go there first. Did you
12   talk about this what you viewed as fraud to
13   anybody else in -- anybody else other than
14   Dr. Krah in January of 2001?
15   A.    Let's start with, and you may
16   have to come back to more, but Mary, I told
17   her -- I reported to her and she was
18   considered my superior. So I talked to her
19   about it.
20   Q.    What did she say to you in
21   response?
22   A.    She came to me with an
23   accounting sheet for an assay that I had
24   counted. I was gloved up in the front lab.
25   So I'm in the fume hood doing work with gloves

Page 197

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    on and everything. And she walked into the
3    lab with a counting sheet and said, Steve, you
4    have a pre-positive in this assay, can you
5    change the count?
6           I said -- you know, I said
7    something to the effect, wait, let me -- I
8    said, What do you mean I have a pre-positive?
9           She said, Well, you have a
10   pre-positive and you've -- you know, you have
11   to change this. If you try to look, you can
12   find more plaques.
13          I said, How do you know that?
14          She said, Well, I recounted it
15   and if I look at it, I can find more plaques
16   if I try.
17          I said, Did you recount all of
18   my results or just that one?
19          And she said, I just counted
20   that one.
21          I said to her, How do you know
22   that you wouldn't find more plaques in any of
23   the other results in the rest of that assay?
24          And she said, We're not trying
25   to change the results of anything other than

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Appx5607

Page 198

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    the pre-positives.
3         I told her that I didn't think
4    I could do that. I told her I wouldn't do
5    that based on her telling me to.
6         She seemed to think that I
7    thought that was coming from her, so she said,
8    I'm not telling you to do it. This is Dave.
9    Dave said we need to change these.
10        I told her that I wasn't
11   comfortable with changing results just because
12   Dave wasn't -- didn't like the result. At one
13   point she said she would leave it on my desk
14   for me to change, and I said I wouldn't change
15   it.
16        I found out later she had gone
17   to Krah and told -- and reported to him what
18   transpired there, that I refused to change the
19   result she had identified. Krah called me in
20   to -- up to his front office to talk about it,
21   which brings us back to your original question
22   way back when of when I first officially
23   reported, complained about the fraud to my
24   superior Dave Krah.
25        Q.   Did you ever complain to Dr. Shaw

Page 199

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    about the alleged fraud before July 2001?
3         A.   I'm not sure what you mean by
4    "complain," but...
5         Q.   About the recounting and the
6    fraud you just described, did you ever
7    complain about those activities to Dr. Shaw
8    prior to July 2001, which is the date you gave
9    me just a second ago?
10        A.   I'm not sure if you're using it
11   in a legal sense. What I did is, I wasn't
12   sure if the things I was saying to Shaw had
13   impacted, that he fully understood the
14   complaint I was making. So I made it very,
15   very clear, I don't remember the exact day, at
16   some point in July that the entire -- not the
17   entire lab. There were several of us in the
18   lab had accused Krah of committing fraud at a
19   lab meeting. That was my complaint where I --
20   unequivocally knew I was saying there was
21   fraud being committed.
22        Q.   That was in July of 2001?
23        A.   Yeah. I was reporting to him
24   about a lab meeting where Joan had stood up
25   and called Krah a fraud right in the middle of

Page 200

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    the lab meeting.
3         Q.   So would it surprise you if
4    some of your colleagues had said you actually
5    aren't competent at counting plaques?
6         MR. SCHNELL: Object to form.
7         THE WITNESS: I don't know what
8    you're getting at. Like, are you
9    talking about what they would have said
10   back then when we were co-workers or --
11   BY MS. DYKSTRA:
12        Q.   Yes.
13        A.   -- what they're saying now?
14        Q.   What they were saying back
15   then.
16        A.   Back then before August 2001?
17   Here's what I know: Emini had an internal
18   audit to investigate our allegations that Krah
19   was committing fraud. Merck had a lawyer
20   there that was threatening the workers. And
21   Suzie, Jill, both came and talked about how
22   afraid they were of that, afraid they were of
23   retaliation. So in light of that kind of
24   context, I wouldn't be surprised by too much
25   of anything.

Page 201

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2         Q.   Did you think Dr. Shaw was
3    trustworthy?
4         A.   That would be situational.
5         Q.   Well, you must have thought he
6    was trustworthy if you took your complaints to
7    him in July of 2001.
8         A.   That's not necessarily true.
9         Q.   Did you think he was trustworthy
10   in July of 2001 when you took your complaints
11   to him?
12        A.   I don't know what to think of
13   him and his trustworthiness. Bob Suter, human
14   resources, said if I wanted to get anywhere up
15   the chain of command, I had to go through the
16   chain of command. There's no way I would get,
17   ever get a face to face with Emilio if I
18   didn't talk to Shaw first.
19        Q.   So you complained to Dr. Shaw
20   in 2001, and what did Dr. Shaw say in response?
21        A.   He started talking about these
22   big bonuses we were supposed to receive. He
23   said, You already earned the money to get it,
24   you're going to get a lot of money, just
25   basically do as you're told. He didn't want

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Appx5608

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  to engage in the conversation.
3    Q.    So after July 2001 when you
4  complained to Dr. Shaw about this alleged
5  fraud, what did you do then?
6    A.    A lot of things.
7    Q.    Tell me what you did.
8    A.    If you can be more specific.
9    Q.    Well, what did you do in
10 connection with your concerns about lab
11 misconduct?
12    A.    There was so much going on
13 between January and October that it's -- for
14 me to sit here and lay out the story, I mean,
15 we can go through it piece by piece with the
16 interrogatories, but that's such a broad
17 question. I couldn't recite it from memory.
18 I mean, I had -- there were so many
19 conversations with Krah alone about Protocol
20 007.
21    Q.    Other than complaints to
22 Dr. Krah and your complaint to Dr. Shaw in
23 2001, did you complain to Dr. Emini about the
24 fraud?
25    A.    Can you read that back? Can I

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  ask her to read it back?
3    Q.    Sure.
4             - - -
5         (The court reporter read the
6    pertinent part of the record.)
7             - - -
8         THE WITNESS: I wasn't sure if
9    you said complaints plural to Krah
10    because we -- I was trying all the
11    time. There were many complaints to
12    him. There were complaints to my
13    co-workers. See, I don't know if you
14    count those as complaints since some of
15    them are equal to me. But Mary was
16    above me. So there were complaints
17    there. But in addition to the
18    complaints to Krah and how my
19    co-workers and I, some of us were
20    working together to try and stop the
21    fraud, I complained to Mary, Alan and
22    Emini and Bob Suter. Several
23    complaints to -- well, at least two
24    complaints to Bob Suter because he
25    refused to talk about it.

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  BY MS. DYKSTRA:
3    Q.    So other than Dr. Krah and your
4  colleagues in the lab, you complained about
5  this alleged fraud to Bob Suter, Alan Shaw,
6  Emilio Emini and Mary Yagodich. Correct?
7    A.    Does complain -- are we defining
8  that to include discussed and notified?
9    Q.    Yes.
10    A.    Former members of the lab also.
11 Kevin Szczypiorski who had left. DeeMarie who
12 was out. Kristin Haas who is no longer there.
13 Those people also.
14    Q.    What was the atmosphere in the
15 lab between January and July 2001?
16    A.    Such a -- atmosphere, variable.
17    Q.    I mean, you thought there was
18 this ongoing fraud. Is that correct?
19    A.    There was an ongoing fraud.
20    Q.    But you continued to work there
21 from January to July 2001?
22    A.    I was trying to stop it.
23    Q.    But you didn't go to Alan Shaw
24 until July 2001?
25    A.    I was told by Bob Suter not to

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  even e-mail him.
3    Q.    When did you first raise
4  concerns to Bob Suter about the fraud?
5    A.    My best guess is in the area of
6  February 2001.
7    Q.    And Bob Suter told you -- I'm
8  sorry, what did he say in response to you
9  raising concerns?
10    A.    That was a whole conversation.
11    Q.    What was that conversation?
12    A.    The conversation was that he's
13 not a scientific guy, that I need to go
14 through the chain of command. And I said, I
15 had already gone to Krah to discuss it and I
16 felt that there was some tension there.
17         He told me -- and if you'll
18 remember what e-mail was like back then, it
19 was -- an e-mail was treated as a more formal
20 medium. He told me that I should never, under
21 any circumstances, e-mail Emilio or Alan about
22 this and I shouldn't talk to them about it.
23 He said he would serve as a conduit of
24 information of things, that if he felt they
25 were necessary, could make it in front of

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 Emilio.
3     So he said I could only e-mail
4 Krah about this, and that I had to keep my
5 e-mails to Krah about administrative personnel
6 issues. And that if there were waves in areas
7 like that where it could affect, you know, the
8 company getting the things done they needed to
9 do, maybe Emilio could hear my other concerns.
10 But he would not let me talk to Emilio or run
11 through there unless I had gone to Dave first
12 and up through the chain of command.
13     Q. Why did it take you from
14 January to July 2001 to talk to Dr. Shaw about
15 these concerns?
16     MR. SCHNELL: Object to form.
17     THE WITNESS: I just told you
18     that the route that -- I was going
19     through Dave Krah and when I went to
20     Bob Suter to say I think I should go to
21     Alan with this and up the chain of
22     command from there, he said, don't
23     e-mail them, you have to go exhaust
24     your things through Dave before you do
25     things like that.

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 BY MS. DYKSTRA:
3     Q. So you're saying it took you
4 six months to exhaust your things through Dave
5 before you could talk to Alan Shaw about this
6 alleged fraud?
7     A. Six months.
8     Q. January to July you said?
9     A. No. Absolutely not. I wrote a
10 letter to Emilio before that.
11     Q. And did that letter to Emilio
12 discuss count changes and pre-positive and
13 fraud?
14     A. Suter directed me to write the
15 letter and give it to him. He said I had
16 better not make any allegations against people
17 above me or it could ruin my career. He said
18 stick to anything administrative because he's
19 a human resources guy. If I want to get a
20 face to face with Emilio, there had to be
21 human resources reasons why he would go to
22 Emilio with it.
23     He said, Anything you can think
24 of. Anything to you complain about,
25 administrative related, human resources, put

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 it in the letter and maybe it will be enough
3 that Emilio would want to talk to you.
4     He said, Keep the science out
5 of it.
6     He directed me to write the
7 letter, give it to him anonymously.
8     Q. So what you're telling me is
9 that Bob Suter told you that if you wrote HR
10 administrative concerns to Emini you might get
11 an audience, but if you wrote fraud
12 allegations you would not?
13     A. That's not what he said. He
14 told me not to write to Emini. He told me to
15 write up this letter, which would basically be
16 a human resources tool. And that if there
17 were problems in the lab that impacted the
18 ability to get this Protocol 007 done, maybe
19 it would rise to the level of where Emini
20 would see it. He told cross -- Suter
21 specifically said that it would be career
22 suicide to make an allegation of fraud up the
23 chain of command.
24     Q. But your testimony is that you
25 did tell Suter, Bob Suter in February of 2001

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 that there was fraud in the lab?
3     A. I told him that there was data
4 manipulation going on in the lab. I'm not
5 sure what terms I used. But I described it in
6 the terms of it's creating friction in the
7 lab.
8     Q. And in -- and I'm sorry, when
9 was that discussion about data manipulation
10 with Mr. Suter?
11     A. It's hard to peg it. I believe
12 it was around February of 2001. I know that
13 it was before the letter to Emilio
14 because that letter was written at the
15 direction of Suter, told what I was supposed
16 to put in it and told I was supposed to give
17 it to Bob, but that it wouldn't be going to
18 Emilio. I decided to not listen to Bob's
19 advice as far as I pegged -- I didn't like the
20 idea of complaining about administrative
21 issues, so I pegged everything to getting
22 Protocol 007 done. So there were several
23 places in the letter where I said this impacts
24 our ability to get the results he said we
25 wanted to get. I signed it so that Emilio

Page 210

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1      knew it was me, and I was hoping to get a face
2 to face so that I could report the fraud to
3 his face.
4      Q.    But you stated you did report
5 the fraud to Dr. Shaw's face in July of 2001
6 first?
7      A.    That was the first time I told
8 Shaw about it, in July.
9      Q.    When was the first time you
10 told Emilio Emini about the fraud in the lab?
11      A.    To his face?
12      Q.    Yes.
13      A.    The end of July.
14      Q.    Do you know how much time is
15 between those two discussions, the one with
16 Shaw and the one with Emini?
17      A.    They both occurred in July.
18      Q.    July 2001?
19      A.    Uh-huh. And the one with Shaw
20 was first.
21      Q.    Why did you stay in the lab
22 between January 2000 and July -- January 2001
23 and July of 2001 if you thought there was data
24 manipulation going on?


1 knew it was me, and I was hoping to get a face
2 to face so that I could report the fraud to
3 his face.
4 Q. But you stated you did report
5 the fraud to Dr. Shaw's face in July of 2001
6 first?
7 A. That was the first time I told
8 Shaw about it, in July.
9 Q. When was the first time you
10 told Emilio Emini about the fraud in the lab?
11 A. To his face?
12 Q. Yes.
13 A. The end of July.
14 Q. Do you know how much time is
15 between those two discussions, the one with
16 Shaw and the one with Emini?
17 A. They both occurred in July.
18 Q. July 2001?
19 A. Uh-huh. And the one with Shaw
20 was first.
21 Q. Why did you stay in the lab
22 between January 2000 and July -- January 2001
23 and July of 2001 if you thought there was data
24
25 manipulation going on?

---

Page 211

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1
2      A.    To stop it.
3      MR. SCHNELL: Objection.
4      THE WITNESS: Sorry. First of
5 all, I had agreed to go back there
6 because I wanted a career at Merck. I
7 was excited to go there. The reason I
8 didn't just quit like Shaw told me to
9 was because I thought I could stop the
10 fraud in the lab. I thought we could.
11 I mean, it wasn't just me. There
12 were -- the people I named before, we
13 would meet and talk about it, like this
14 has to stop. We were the ones doing
15 the assays, we thought we could stop
16 it.
17      So it's tough to give you a
18 reason I didn't quit. The reason I
19 continued to work there and the reason
20 I continued to not commit fraud, they
21 are what they are. I wasn't going to
22 commit fraud and we tried to stop it.
23 BY MS. DYKSTRA:
24      Q.    Which other lab members that
25 you worked with also agreed with you, to the

---

Page 212

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 best of your knowledge, that there was data
2 manipulation in that lab?
3      A.    Jill DeHaven, Suzie Maahs, Jon
4 Gombola, Frank Kennedy, Joan Wlochowski and
5 myself used to meet and talk about it. Some
6 of them were under a lot of pressure. They
7 didn't like -- Suzie did not like Krah coming
8 up and telling her what data to change and
9 telling her how many plaques to find. So they
10 discussed it a lot as in what do we do, what
11 do we do.
12      In a discussion with all of
13 them, Suzie and Joan were talking about
14 somebody has to tell the FDA. Suzie said I
15 should do it. And everybody agreed that if
16 the FDA knew, they would stop it.
17      Q.    So you discussed talking to the
18 FDA with these colleagues?
19      A.    We discussed the potential of
20 going the FDA, that we should go to the FDA
21 because everyone thought it was fraud.
22      Q.    The people that you mentioned
23 just thought it was fraud. Correct? You
24 mentioned --

---

Page 213

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1      A.    During the discussions there --
2 I mean, Suzie said cheating a lot. This is
3 cheating. He can't tell you to change the
4 data.
5      Q.    You said Jill DeHaven, Suzie
6 Maahs, Frank Kennedy and Joan Wlochowski and
7 you. Correct?
8      A.    Can you read those again?
9      Q.    Sure. Jill DeHaven, Suzie
10 Maahs, Frank Kennedy, Joan and you.
11      A.    Jon Gombola --
12      Q.    And Jon Gombola.
13      A.    -- was he in there? To the
14 best of my knowledge, yeah, that was the
15 group.
16      MR. SCHNELL: I think you
17 interrupted him in the middle of an
18 answer. Did you finish the answer
19 before --
20      THE WITNESS: I wanted to go
21 back.
22      MR. SCHNELL: Read back where
23 he was before the interjection.
24      - - -

---

54 (Pages 210 - 213)

Appx5611

Page 214

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2          (The court reporter read the
3     pertinent part of the record.)
4               - - -
5          THE WITNESS: I'm using fraud
6     to cover their use of the word cheating
7     and not liking Krah to tell them to
8     change data, that they didn't like, you
9     know, having to throw away their
10    counting sheets after they counted an
11    assay just because he didn't like the
12    results. Retesting results they didn't
13    like. There was so much about it. A
14    lot of it is in the allegation or the
15    complaint. A lot of the allegations
16    are in the complaint.
17         So I mean, I can't give you an
18    enumerative list on what they said was
19    fraud or what they thought was fraud.
20    BY MS. DYKSTRA:
21         Q.   Other than witnessing Dr. Krah
22    wipe those numbers off the plate, did you
23    witness other employees in the lab wipe
24    numbers off the plates?
25         A.   All the time. All the time.

Page 215

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2     We can go through example by example.
3          Q.   Who else in the lab did you
4     identify wiping numbers off the plates?
5          A.   Jenny Kriss, Mary Yagodich,
6     Colleen. Some of the other people that I
7     mentioned were told to do things like that.
8     They were told to throw away counting sheets.
9     Mary, Colleen and Jenny followed Krah's
10    instructions to do that. The other people did
11    it when Krah stood over them and told them. I
12    witnessed that.
13         Q.   I want to show you what I'm
14    going to mark as Exhibit 15.
15              - - -
16         (Exhibit Krahling-15, E-mails,
17         MRK-KRA00048342, was marked for
18         identification.)
19              - - -
20    BY MS. DYKSTRA:
21         Q.   This is an e-mail between you
22    and Dr. Krah and others, a couple of e-mails
23    in March of 2001. So in the bottom e-mail, if
24    we start there first, read the bottom e-mail.
25         A.   And not the top one or just do

Page 216

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2     it all at once?
3          Q.   The bottom one is shorter, just
4     talks about needing to hold up on vacation.
5     Correct?
6          A.   Okay.
7          Q.   Do you recall -- you can read
8     the top two as your responses back and forth
9     with Dr. Krah. Do you recall these discussions?
10         A.   Hold on. Now you want me to
11    read the top one?
12         Q.   Yes, please.
13         A.   Okay.
14         Q.   What do you recall about this
15    issue? Do you recall these e-mails?
16         A.   When I look at this, what I see
17    is doing what Suter told me to do. He said I
18    have to go to Dave first. I had to stick to a
19    personnel issue. I need to -- that I need to
20    go through him, keep any other accusation
21    about -- except for administration of this
22    thing through Dave.
23         It looks like it's kind of
24    cordial. I know that deteriorates as it goes
25    on, but this is me trying to do as Suter

Page 217

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2     directed me to do, which was jump through some
3     hoops. He described it, he gave me a big
4     World War I analogy. He said, You know when
5     Germany invaded France in World War I and then
6     they set up a line of trenches for years?
7     It was a stalemate. He said that there is
8     trench warfare. And he said, You know what
9     happened when people stuck their head up? He
10    said, They got killed.
11         I said, I hope you're talking
12    metaphorically. But he called it a trench
13    policy. And he said, You need to keep your
14    head down. Don't accuse anything of fraud.
15    Make sure you're talking about administrative
16    things, challenge Krah on any administrative
17    policy that might make its way through Suter
18    to Emini, and I should be nice about it. This
19    was me following Suter's orders.
20         Q.   Mr. Suter is in Merck -- was in
21    Merck HR at the time?
22         A.   That was my understanding.
23    When I went to the human resources, that's --
24    he was there.
25         Q.   Did you talk to anybody else in

55 (Pages 214 - 217)

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 Merck's HR department about your concerns?
3 A. I don't recall.
4 Q. So your testimony is that you
5 went to Merck HR about concerns around data
6 manipulation and Mr. Suter in Merck's HR told
7 you not to complain to Dr. Krah about data
8 manipulation but rather to complain only about
9 administrative issues?
10 A. That's not -- no. He said to
11 make sure I don't archive any allegations that
12 could hurt Dave's career in an e-mail. He
13 didn't say I couldn't complain to his face.
14 He's saying e-mails were much more formal.
15 And you did not write an e-mail to your boss
16 saying anything that could look like you're --
17 that could -- well, Bob called it career
18 suicide for me to even say anything like that.
19 In addition to that, he said I should never
20 e-mail Shaw or Emini.
21 - - -
22 (Exhibit Krahling-16,
23 Compilation of e-mails, RELATOR_00000731 -
24 00000735, was marked for identification.)
25 - - -

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 BY MS. DYKSTRA:
3 Q. I'm going to show you what's
4 marked as Krahling-16. This is a compilation
5 of e-mails, so it looks like March 22nd,
6 March 26th -- a couple of March 26th e-mails
7 and then it looks like, and I need you to
8 explain to me what this is, a list of HR-type
9 complaints. I think maybe you wrote this to
10 Bob Suter, but I'm not clear.
11 A. This is March 26th, right? The
12 previous exhibit is March 26th, and we have
13 March 26th here.
14 Q. Yeah, the first e-mail on
15 Krahling-15 is the same e-mail on Krahling-16,
16 but the rest of it is all different.
17 A. Where are those ones the same?
18 Q. This bottom e-mail here --
19 A. Yes.
20 Q. -- is the same as the first
21 e-mail here.
22 A. Got it.
23 Q. And then there's an additional
24 e-mail that follow.
25 So can you tell me when you

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 look through this, after you've had a chance,
3 who you prepared this for, what was the
4 purpose or who you gave it to or sent it to?
5 A. Okay. What's your question?
6 Q. Did you put these e-mails
7 together and write this section following
8 e-mails that's a list of grievances?
9 A. I'm not sure putting the
10 e-mails together, but this look like Suter's
11 assignment that he gave me. Told me to just
12 compile as many human resource things that I
13 could, give it to him, that maybe he could
14 discuss some of the points anonymously -- that
15 I would be anonymous. To give it to Suter and
16 that maybe he could pick one or two points out
17 to talk to Emini and then maybe Emini would
18 meet me face to face. This looks like Suter's
19 assignment that he gave me.
20 Q. So you prepared this and you
21 provided it to Mr. Suter. Is that correct?
22 A. Yeah, I don't recall with that
23 detail. I'm just saying what it looks like.
24 It likes like -- based on the fact that it
25 says please allow me to maintain my anonymity,

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 wherever that is. I know that when I wrote
3 the letter to Emilio I signed it. That would
4 make it an earlier draft. But this looks like
5 Suter's assignment he gave me. He asked
6 for me to do this.
7 Suter also told me that if I
8 were going to say something that could reflect
9 negatively on Dave in this, that I should go
10 out of my way to say something positive about
11 Shaw who is one up from us so it didn't look
12 bad. He said, if you're going to say
13 something negative become Krah, try and say
14 something positive about Shaw.
15 So this looks like my
16 assignment for Suter that he asked for. I
17 don't remember -- I don't think I would have
18 given it to Suter because I decided to do a
19 little bit of what he told me about put those
20 HR complaints in, but I wrote a letter to
21 Emilio where I linked this to the Protocol 007
22 testing. And I brought up Protocol 007
23 testing right away in that letter, if I
24 recall. I haven't looked at it.
25 Q. I'm going to show it to you.

56 (Pages 218 - 221)

Appx5613

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2        A.    The point was so that I could
3    get a face to face with Emini so that I could
4    tell him about the fraud going on in the lab.
5        Q.    So you did -- when you wrote --
6    so what you're saying is you sent these
7    complaints to Emini but you did list the fraud
8    in addition to these HR complaints?
9        A.    That's not what I said.
10       Q.    I'm sorry, I thought that's
11   what you just said?
12       A.    That's not what I said at all.
13   I said this is like a rough draft that Suter
14   asked me for.  Suter wanted only human
15   resource type complaints against Dave.  He
16   said I had to come out with as many as I could
17   possibly think from, give the list anonymously
18   to Bob Suter.  And he might pick out a few,
19   discuss them with Emini and if Emini had
20   concerns, that Emini might want to interview
21   me and I could get that face-to-face meeting.
22   I don't believe I gave this to Bob Suter
23   because I know that at some point I said I
24   wasn't comfortable with just HR complaints, I
25   wanted to talk about Protocol 007 testing.

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2        So I did a little bit of what
3    Bob wanted because he said that if I were
4    going to make a complaint, I needed to show
5    that I would listen and obey the rules he was
6    giving me.  That was part of his trench
7    policy.  So I had to do as I was told.  So I
8    tried -- I didn't e-mail Shaw right away.  I
9    didn't e-mail Emini, you know.  So what I did
10   was I said I'm going to link this to Protocol
11   007 because that's what I want to talk about.
12   And I believe I talked about Protocol 007
13   testing generally in there, that this could
14   impact the company.  And then I signed the
15   letter and I put it in Emilio's mailbox.
16                - - -
17       (Exhibit Krahling-17, 4/8/01
18       Letter, RELATOR_00000328 - 00000331,
19       was marked for identification.)
20                - - -
21   BY MS. DYKSTRA:
22       Q.    I'm going to mark Krahling-17
23   which I believe is the letter you're referring
24   to that you gave to Emini in his mailbox.  Can
25   you just confirm that that is your letter to

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    Mr. -- Dr. Emini?
3        A.    If we're going to talk about
4    it, I'd like to read it.
5        Q.    That's fine.
6        A.    So what's the question?
7        Q.    Is Krahling-17 a letter that
8    you wrote to Emilio Emini complaining about
9    issues you had in the lab?
10       A.    This looks like it.  Yeah.
11   That's my signature.
12       Q.    So in this letter, in the first
13   paragraph, last sentence you complain about
14   procedural inequalities.
15       A.    Where are we at?
16       Q.    The last line of the first
17   paragraph.
18       A.    Okay.
19       Q.    The first line of the second
20   you say, "Dave has developed highly personal
21   relationships with a few of his female
22   employees.  This often manifests itself in the
23   form of personal gifts that he unashamedly
24   delivers in the presence of those employees
25   who are to receive nothing.  I have personally

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    witnessed several of these events which
3    include but are not limited to: holiday gifts,
4    work anniversary gifts and gifts for no
5    occasion.  Last Easter Dave prepared and
6    handed out four baskets of candy to four
7    female employees while four contract
8    employees, one permanent male employee and one
9    permanent female employee received nothing."
10       So is this all accurate of what
11   you observed in the lab?
12       A.    I don't remember.  The
13   paragraph didn't even exist for any of that.
14   The paragraph existed because my departure
15   will likely affect the timely completion of
16   the mumps testing.  That was the point of the
17   first paragraph.
18       Q.    I'm sorry, where does that say
19   that?
20       A.    Second sentence.
21       Q.    The second sentence of the
22   first paragraph?
23       A.    Yeah.  The other -- all those
24   other things are just what Suter told me to
25   do.

Page 226

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

Q. So did these other things happen or did you make them up?

A. I don't remember. You know what, I don't think I lied at the time. I'm sure they happened, I just don't really remember a whole lot of these little things that happened. They were -- the point of the first paragraph was to say to, you know -- Suter pointed out that my only value to the company was in getting this testing done. He pointed out that I wasn't pregnant because that was valuable to the company because I could work with live virus whereas pregnant women could not. He said if you demonstrate your value, maybe these human resource quibbles will rise to the level of getting a face to face with Emini.

So this was part of Suter's assignment of list every human resources thing you could list. The point of this was to say if I leave, this could affect the company's mumps testing.

Q. Do you --

A. The other little things --

Page 227

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

Q. Go ahead.

A. -- I'm sure they were true, but I don't remember them.

Q. Do you think that your departure from the lab would have actually impacted the timing of the completion of the mumps testing given that you are only one of many employees in that lab?

A. One of many employees, Krah told me that the reason he wanted me to come back -- when we were at Colleen's wedding, one of the reasons he wanted me to come back was he wasn't sure he could get it done without me. That's what he said. So, yeah, I believed him.

Q. Were you a faster worker than other people? Did you complete more assays than other people in the lab?

A. Two of the women in the lab were pregnant. They couldn't do the assays. Jill worked part time. Colleen worked part time. He -- Dave wanted to fire Frank and Joan and didn't want them running any assays. So they weren't even allowed to do it. At the

Page 228

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

time we didn't even have the interns yet. I'm trying to think of another full-time employee besides me that was working in the test. Maybe there is -- I think I was the only one. Was there another one?

Q. So you believed your departure would impact the timing of the mumps?

A. Krah told me if I didn't come back, it could impact it.

Q. It could. And you believe that these personal gifts and holiday gifts and the work anniversary gifts and the baskets of candy and these procedural inequalities, they all occurred. Correct? You didn't make them up, they actually occurred?

A. I wouldn't have lied in here but I don't remember any of that stuff too well. I mean, it's --

Q. A little further down in the second paragraph you say that Dave -- it's like the fifth line from the bottom. "Dave's discrimination functions as a constant source of strain and tension between lab members...." Can you explain that to me, how that came out

Page 229

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

in the lab?

A. It's just part of Bob Suter saying you're never going to be heard by upper management if you don't make a complaint. So I don't know. If you keep putting down, what you see is mumps testing, mumps testing; the last two paragraphs you see mumps testing; over here, mumps neutralization assays.

Q. I'd like to focus on my questions first.

In the second paragraph, can you describe the strain and tension that occurred in the lab?

A. As a result of the fraud or as a result of this, whatever is here?

Q. Well, the only thing mentioned in this paragraph is these gifts and inequalities. So explain to me whatever strain and tension was in the lab at the time.

A. The strain and tension in the lab had to do with the fraud being committed. This was just part of Suter saying make an HR complaint or you can't write to Dave. Or actually this was to Emini. But make an HR

58 (Pages 226 - 229)

Appx5615

Page 230

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

complaint to Bob anonymously. And I decided
to sign it. I was following Bob's advice.

Q.    And then the third paragraph
you talk about problems with Dave keeps many
of us unintentionally [sic] uninformed about
work schedules and policy changes. Is that
accurate?

A.    Yeah, I think that's true.

Q.    And then a couple of lines down
you say, "He has no schedule for when he
arrives in the morning." And "This is very
upsetting, to me at least...." Is that true?

A.    I know that he came in to work
late. Well, you see the whole point of this
is about work schedules, mumps neutralization
assay. The point of the paragraph is to get a
meeting with Emini so that we can discuss the
mumps neutralization assays, getting it done
and I can tell him what's going on in the lab.

Q.    So the purpose of this letter
was to get -- tell him enough HR complaints to
get a meeting with him so you could then
report fraud?

A.    No. I was following Bob's

Page 231

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

order to compile a list. I wanted to get a
face to face so that I could report the fraud
to Emini, that he would hear it and I could
see his reaction. I didn't want to write some
e-mail and even at Suter's -- Suter said you
can't put an allegation against fraud in
there. You have to talk to people's face.
You don't memorialize it in an e-mail.

So I was following Suter's
orders. Where I disobeyed Suter was signing
my name to it, giving it to Emini instead of
Suter and linking everything and talking about
the mumps neutralization assays, Protocol 007
testing in here.

Q.    My question was, you wrote this
letter and put as many HR complaints as you
could reasonably identify into a letter to
Emini, Dr. Emini so that you could then get a
face-to-face meeting with Dr. Emini to report
fraud?

A.    That's not quite right. I
followed Bob Suter's order about making
certain HR complaints, but the letter was to
talk about the impact of the testing getting

Page 232

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

done and to get -- the underlying goal was to
get a face to face with Emini so that I could
report the fraud.

Q.    Did you ever consider filing a
Title VII complaint against the company for
discriminatory practices?

A.    What's a -- is that what a
Title VII complaint is?

Q.    Yes.

A.    I remember that Shaw came up to
the lab and he pointed at me and waived me
over and we walked down to his office. And he
said, you have two options. You can maintain
the status quo in which case Dave is going
to -- things are going to keep getting worse,
Dave is going to give you a poor review and
life is going to be hell for you. He said,
or and -- he said, and you're never going to
get that bonus.

He said option -- and option
two is you voluntarily resign, you can get the
bonus. He said, you're just not going to be
able to maintain the status quo.

In response to that I said, it

Page 233

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

sounds like, you know, you're telling me Dave
is going to retaliate against me because I'm
not following his orders, because Bob Suter is
big on following orders. They're, like, you
follow the orders. And Shaw said no, no, no,
I'm just telling you what I think Dave is
going to do.

And then I said, well, that --
because you're aware of it, isn't that
harassment, wouldn't I be able to file
something like that? And he warned me be
very, very careful, don't threaten -- you
know, don't threaten a lawsuit. He said I --
you know, don't threaten a lawsuit, think
about resigning. I said, I don't even want to
think about resigning. I don't want to do
that. There's got to be other ways. And I
said, why can't I transfer out of Krah's lab
but still stay at Merck.

He -- at the time he didn't see
it as a viable option. He said, your best bet
is to voluntarily resign.

Q.    Did you or did you not consider
filing a Title VII Discrimination complaint

59 (Pages 230 - 233)

Appx5616

Page 234

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  against the company?
3      A.   I don't think I seriously
4  considered it at all.  I used it in defense of
5  his seeming support of Dave Krah's treatment
6  of me.  And he demanded that I take it back.
7  So I think later on I may have -- I'm not
8  sure.  I mean, I may have said something
9  about, you know, not doing that.
10     Q.   On the top of the page
11 RELATOR_330 --
12     A.   Yeah.
13     Q.   -- you state, Our lab has been
14 assigned a critical project which does not
15 allow me to remain silent about what is
16 happening, or to leave without adversely
17 affecting people I respect.  I had all
18 intentions of going to HR and then leaving
19 when the mumps test was finished.  I planned
20 to stay because of the inordinate amount of
21 respect Dr. Shaw showed to our entire lab,
22 visiting with us and talking to us almost
23 every day on the project.  His actions boosted
24 lab morale whereas Dave's silence on the same
25 issues only served to isolated us.  Mary has

Page 235

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  also been a mitigating factor.
3        Is that all accurate?
4      A.   Yes.  As part of Bob's
5  assignment, he said, if you do anything that
6  sounds like a complaint against Krah, you
7  better say something positive about Shaw.  And
8  so that -- I mean, that's me trying to say
9  something positive about Alan Shaw.  But the
10 very first line, our lab has been assigned a
11 critical project.  Protocol 007 does not allow
12 me to remain silent about what is happening.
13 That's an allusion to the fraud.  If I leave,
14 it will adversely affect the people I respect.
15 They'll have to carry more of the weight.  But
16 the -- as I said throughout this, maybe the
17 project doesn't get done.  The point was
18 Emini -- according to Bob, Emini might care
19 enough to talk to me face to face.  So at
20 Bob's assignment, I tried to say some positive
21 things about Dave and Mary.
22     Q.   I want to show you back to the
23 complaint which we've marked Exhibit 3.  Can
24 you go back to that for a moment?
25     A.   Am I leaving this open?

Page 236

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2      Q.   You can leave that open, sure.
3        If you look on paragraphs 54
4  and 55 which are on page 19, please.
5      A.   54 and 55?
6      Q.   Yes.  Look at those and then
7  let me know when you're done.
8      A.   All right, I'm good.
9      Q.   So in your complaint you state
10 that, in paragraph 54, In July 2001, after
11 completing a secret audit, you and Joan
12 Wlochowski openly accused -- well, Joan
13 Wlochowski openly accused Krah during a lab
14 meeting of committing fraud in the mumps
15 testing.
16        Paragraph 55 says, "Relator
17 Krahling then met with Bob Suter."
18        So this complaint makes it
19 sound as if you met with Mr. Suter following
20 that July 2001 meeting.  Is that accurate or
21 inaccurate?
22     A.   They're in different
23 paragraphs.
24        MR. SCHNELL:  Object to form.
25        THE WITNESS:  You're cherry

Page 237

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  picking the first -- there's a
3  different paragraph.
4  BY MS. DYKSTRA:
5      Q.   The whole first paragraph says,
6  "In July 2001, ...Joan Wlochowski openly
7  accused Krah during a lab meeting of
8  committing fraud in the mumps testing."  You
9  then met with Shaw and confronted him.  Is
10 that accurate, that you met with Shaw after
11 that July meeting?
12     A.   These paragraphs don't
13 necessarily --
14     Q.   I'm reading the first two lines
15 of the paragraph 54.
16     A.   Can I finish?
17     Q.   Sure.
18     A.   These paragraphs don't
19 necessarily occur in chronological order
20 throughout this complaint.  54 is a
21 self-contained paragraph.  You're taking the
22 front part of 54 and trying to go, ah, you
23 went to Suter first.  That's not what this
24 says.
25     Q.   Let's just look at paragraph

Page 238

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  54, then, in its entirety. How about that?
2      A.    I'm good with that.
3      Q.    Okay. Paragraph 54 says, In
4  July 2001, after completing the secret audit,
5  Relator Wlochowski openly accused Krah during
6  a lab meeting of committing fraud. Relator
7  Krahling then met with Shaw, the Executive
8  Director of Vaccine Research and confronted
9  him about the fraudulent testing.
10         Do you see those two lines?
11     A.    Yes, I do.
12     Q.    Are those accurate?
13     A.    They are accurate.
14     Q.    So you met with Dr. Shaw
15 sometime in July 2001 as you testified
16 previously?
17     A.    You're talking softly. What is
18 that?
19     Q.    I'm sorry. You met with
20 Dr. Shaw and confronted him about the
21 fraudulent testing in July 2001?
22     A.    When Joan accused Krah of fraud
23 at that lab meeting, he was quiet. And then
24 he said, I can't be committing fraud. I don't

Page 239

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  know -- I'm blinded as to the -- as to the --
2  he said he was blinded. I shot back, You're
3  not blinded as to what's the pre and post and
4  you're changing pre-positives.
5         He was just dead silent. He
6  was very uncomfortable. And it was long and
7  there was pizza sitting in the middle of the
8  table. I got up and walked to Alan Shaw's
9  office and said, We just accused Krah of
10 committing fraud in that lab meeting. That's
11 paragraph 54.
12     Q.    Was that the first time you
13 directly discussed fraud in the lab with
14 Dr. Shaw?
15     A.    That was the first time I
16 unequivocally said it so that I knew 100
17 percent he knew what I was saying.
18     Q.    Paragraph 54 goes on to say
19 that you told Shaw the falsification of the
20 pre-positive data. You also confronted Shaw
21 about improper use of animal antibodies to
22 inflate post-vaccination neutralization
23 counts.
24         "Shaw responded that the FDA

Page 240

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  permitted the use of the animal
2  antibodies...that should be good enough for
3  Krahling." And "Shaw refused to discuss
4  anything further about the matter. Instead,
5  Shaw talked about the significant bonuses that
6  Emini had promised to pay the staff...."
7         Is that all accurate?
8      A.    That's very accurate.
9      Q.    In next paragraph says,
10 "Relator Krahling then met with Bob Suter,
11 Krahling's HR representative at Merck.
12 Krahling told Suter about the falsification of
13 data...." [As read.] Is that accurate?
14     A.    "Krahling told Suter about the
15 falsification...," I told him again about
16 that. That's not the first time I had
17 mentioned it. I told him again about the
18 falsification of data. Remember Suter had
19 said don't talk to me about that. I went back
20 to him again.
21     Q.    So the first time you went to
22 Mr. Suter about falsification of data was when
23 again?
24     A.    February 2001. In or about

Page 241

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  there. It was definitely before I wrote that
2  letter. I think it was February.
3      Q.    In paragraph 55 you say that
4  Mr. Suter told you you would go to jail if you
5  contacted the FDA. Is that true?
6      A.    He said that more than once.
7      Q.    Who would put you in jail if
8  you contacted the FDA?
9      A.    He didn't say who would put me
10 in jail. I assume he meant the police. He
11 just said you'd go to jail.
12     Q.    Did he say why you would go to
13 jail if you contacted the FDA?
14     A.    No. He just said you'll go to
15 jail.
16     Q.    Did you ask him why would I go
17 to jail if I contacted the FDA?
18     A.    I responded bullshit.
19     Q.    Did you believe it was bullshit?
20     A.    I had hoped it was bullshit.
21     Q.    Did you think you would be
22 arrested if you contacted the FDA?
23     A.    I wasn't certain, but I had --
24 was trying to call his bluff, if indeed it was

61 (Pages 238 - 241)

Appx5618

Page 242

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 a bluff. I didn't know for sure.
2     Q.  When you said "bullshit," what
3 did he say in response?
4     A.  I think he basically reiterated
5 it, but that was the end of the conversation.
6 I was walking away at that point, if I recall
7 correctly. Tell you what sticks out in my
8 mind is him saying you'll go to jail and me
9 saying bullshit. And then -- I don't know
10 that there was much conversation after that.
11 That was the first time that he said that. He
12 mentioned that I would go to jail when -- the
13 time that I was also -- when I went in to have
14 a meeting where he actually said I would get
15 to meet with Emini.
16     Q.  So at some point you clearly
17 made the decision that you were going to
18 contact the FDA. Correct?
19     A.  Yes. Because I did contact
20 them, I must have made a decision to do it,
21 sure.
22     Q.  Tell me about your discussions
23 with the FDA. When was the first time you
24 contacted the FDA about the fraud in

Page 243

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 connection with 007?
2     A.  The middle of June 2001 was the
3 first time I called.
4     Q.  Middle of June?
5     A.  Middle of June, right around
6 June 19.
7     Q.  What did you tell -- who did
8 you talk to, do you know?
9     A.  Whoever answered the phone.
10     Q.  What did you tell them in that
11 conversation?
12     A.  I said that I worked at a lab
13 at Merck and that the lab was committing
14 fraud.
15     Q.  Did you give them detail around
16 the -- your allegation of fraud?
17     A.  I remember she sounded stunned.
18 And she wanted information on who I was, how
19 she could contact me, you know, affirming
20 that, you know, this is a real thing. And I
21 told her where I worked. So basically where
22 is the company, things like that. It only
23 lasted -- I mean, it didn't -- it wasn't a
24 very long call. She basically ended up with

Page 244

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 setting up, okay, we're going to have to talk
2 again.
3     Q.  So she could get more
4 information about your allegations?
5     A.  I don't recall. She was just,
6 we're going to have to talk again.
7     Q.  How long before your second
8 call with the FDA? When was your second call
9 with the FDA?
10     A.  So four or five phone calls
11 that all occurred between -- around June 19,
12 2001 and August 1st, 2001. I can't give you
13 exact dates, but there's about four or five
14 calls in there during that time period.
15     Q.  So the first call was about how
16 long?
17     A.  I can't -- I mean, isn't
18 this -- isn't this in the interrogatories if
19 you want an exact time? It was short.
20     Q.  Who did you talk to on the
21 second call?
22     A.  I think it was the same woman.
23     Q.  You think it was the same
24 woman?

Page 245

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1     A.  I think it was. I don't know.
2     Q.  How did you -- did she arrange
3 the call or did she get ahold of you, what did
4 she do?
5     A.  I don't remember. We
6 exchanged -- I'm sure we must have exchanged
7 contact information. It was a series of
8 calls, the second one I remember was
9 predicated on the first one. They weren't
10 independent things, now who am I going to talk
11 to this time. There were a series of phone
12 calls.
13     Q.  How long was the second call?
14     A.  Short.
15     Q.  What did you say during the
16 second call to the FDA?
17     A.  The totality of the phone calls
18 went -- I was getting to the person I believe
19 she needed to put -- the person who answered
20 the phone obviously isn't -- probably not that
21 high up. But she was trying to get me in
22 front of someone who could hear it. And so
23 the series of four phone calls I didn't get to
24 tell them too much. I told them that fraud

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Appx5619

1 　　STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 was occurring, they should come in.
3 　　So I'm not sure of the content
4 so much as there was fraud happening. And the
5 last phone call I said they needed to come in,
6 that data was being destroyed.
7 　　Q. How much detail did you give
8 the FDA about what kind of fraud was
9 occurring? Or did you just say fraud and they
10 said, Well, okay, we'll come. Or did you say,
11 Let me explain to you plaque neutralization
12 assay, for example, and what was actually
13 occurring?
14 　　A. Isn't this in the interrogatories?
15 　　Q. I'm just asking what you
16 remember.
17 　　A. I wasn't able to tell them too
18 much. The point was to get them in there so
19 they could investigate it and see it. I told
20 them that there was fraud occurring. My last
21 call was they needed to come in, that Krah was
22 destroying plates. He was destroying
23 evidence.
24 　　Q. So you recall telling them that
25 he was destroying evidence and destroying

1 　　STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 plates. Do you recall telling them that data
3 was being falsified in connection with the PRN
4 assay?
5 　　A. I think that the -- well, come
6 on, now, you had to go and add that last part.
7 What are -- you know, the very first phone
8 call I reported that fraud was occurring. The
9 last phone call I said they needed to come in
10 quickly. The details that I remembered, I
11 believe we put in interrogatories, but sitting
12 here today to say -- I mean, I know that I --
13 there was so much going on, there's no
14 possible way I could have detailed everything
15 to them over a phone call. But I gave them
16 details and I believe that the details that I
17 could remember were in the interrogatories and
18 there wasn't much outside of that. There
19 wasn't a lot of time to talk.
20 　　Q. Were you honest with the FDA,
21 and truthful?
22 　　A. Of course I was.
23 　　Q. Did you leave anything out of
24 your allegations?
25 　　A. It's not --

1 　　STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 　　Q. -- in reporting to the FDA?
3 　　MR. SCHNELL: Object to form.
4 　　THE WITNESS: Yeah. Look, it's
5 not that I left it out. I didn't have
6 time to tell them everything. I
7 couldn't put together some big
8 presentation. We were over the phone
9 and they needed to come in and
10 investigate it. That's a big project,
11 Protocol 007 testing. They needed to
12 come in and investigate. I couldn't
13 lay out point for point everything of
14 misconduct I saw. I tried to get the
15 point across that fraud was happening
16 in this lab, the FDA did not know about
17 it, it was -- and they should come in and
18 investigate it.
19 BY MS. DYKSTRA:
20 　　Q. So you understood that in order
21 for them -- strike that.
22 　　It was your belief that for
23 them to fully investigate the fraud, they
24 needed to come in and do an investigation of
25 Dr. Krah's lab?

1 　　STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 　　A. What I know is that I wanted
3 them to come in and investigate it because
4 fraud was happening and we were not able to
5 stop it in the lab.
6 　　MS. DYKSTRA: Why don't we take
7 a break.
8 　　VIDEOGRAPHER: The time is
9 3:40. We're going off the video
10 record.
11 　　- - -
12 　　(A recess was taken.)
13 　　- - -
14 　　VIDEOGRAPHER: The time is
15 4:05. This begins disc four in the
16 videotape deposition of Stephen
17 Krahling.
18 BY MS. DYKSTRA:
19 　　Q. Mr. Krahling, I just want to
20 make sure I understood one of the things you
21 said previously correctly. You stated that
22 you met with Mr. Suter and originally
23 complained of fraud in February of 2001.
24 Correct?
25 　　A. I said that I believe it was

63 (Pages 246 - 249)

Page 250

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    probably February 2001, based on the fact that
3    that letter to Emilio was whenever it was and
4    I had already talked to Bob before that a few
5    times.
6        Q.    The letter to Emilio is dated
7    April 8, 2001?
8        A.    Uh-huh.
9        Q.    You believe you talked to
10   Mr. Suter two months before you wrote the
11   letter to Dr. Emini?
12           MR. SCHNELL: Object to form.
13           THE WITNESS: What I remember
14       is that I originally went to Bob based
15       on the fact that there was fraud
16       happening in the lab. He didn't want
17       to listen to it. He didn't want me to
18       document it in e-mails. That I had
19       some number of meetings with him that
20       started to involve more of the fraud
21       and people in the lab that were trying
22       to resist the fraud also.
23           So in March there was this --
24       Krah instituted error reports. He said
25       he was instituting error reports so

Page 251

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2        that he could fire Frank and Joan.
3        Frank and Joan were two people who
4        weren't -- wanted to resist the fraud,
5        and I didn't want those two getting
6        fired, number one, because they were
7        resisting the fraud; but number two, it
8        just seemed the right thing to do. So
9        my conversations with Bob at some point
10       included those. That happened in
11       March. I know Krah instituted those
12       error reports in early March. That's
13       why I'm saying I was most likely
14       talking to Bob in February because I
15       had already talked to him once at
16       least.
17               - - -
18           (Exhibit Krahling-18, 7/17/01
19       E-mail, MRK-KRA00002243, was marked for
20       identification.)
21               - - -
22   BY MS. DYKSTRA:
23       Q.    I'm going to show you what I'm
24   marking as Krahling-18. Take a look at that.
25   It's a July 17, 2001, e-mail from you to

Page 252

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    Dr. Shaw.
3        A.    All right.
4        Q.    Can you explain to me, was this
5    e-mail written by you following your
6    discussion with Dr. Shaw where you allege that
7    there was lab misconduct in Dr. Krah's lab?
8        A.    If you'll recall back when I
9    said that Alan came up and pointed at me, told
10   me to follow him and took me to his office,
11   that conversation where he gave me two
12   options, option one and option two, and said I
13   couldn't have option one. Option one he
14   called status quo. Option two is he said you
15   should voluntarily resign. That idea that he
16   said that Dave was going to continue to
17   retaliate against me and I brought up the idea
18   that couldn't I sue for that. And he said,
19   you don't even say that, you need to take that
20   back.
21           He said, I want you to consider
22   voluntarily resigning. That's the only way
23   you'll get this bonus.
24           I rejected that out of hand.
25           He said, I want you to come

Page 253

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    back to me and tell me you'll consider this as
3    an option. I don't want to hear any more talk
4    that you'll sue.
5        That meeting there, this
6    appears to be an e-mail that was a follow up
7    to that, as far as I can tell.
8        Q.    And you say in this e-mail that
9    you want to let him know that if a severance
10   package is put together including a bonus for
11   completion of the mumps project, my July
12   salary and severance pay for lost wages and
13   benefits, I will resign -- I will voluntarily
14   resign from Merck even though I don't have
15   another job lined up. I would have approached
16   HR but you said to come to you if I wanted to
17   get things done. This is my idea of a peace
18   offering.
19           So this is -- was this your
20   proposal of how to reach a resolution with the
21   company so that you could leave with a
22   package?
23       A.    No.
24       Q.    It was not your proposal?
25       A.    No. This was in response to

64 (Pages 250 - 253)

Appx5621

Page 254

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  him telling me that I need you to admit
3  that -- or I need you to consider and tell me
4  you're going to consider voluntarily quitting.
5  This was a change in nomenclature. I was
6  giving him what he wanted. Listen, we can
7  have that as an option on the table but don't
8  use the nomenclature giving me this double
9  bonus and options. It says options. Not like
10 this is the only option. He wanted me to not
11 talk about suing the company, and at least put
12 that option on the table, because he did not
13 want me to keep the status quo. This is a
14 follow-up e-mail. So I -- I mean, I don't
15 think it's a follow up to another e-mail. I
16 believe it's a follow up to the meeting where
17 he said those things.
18     Q.   I think you lost me there. I
19 understand he gave you two options; one,
20 status quo, meaning you would continue to work
21 in Dr. Krah's lab?
22     A.   But that life would continue to
23 get worse. That Krah would give me a poor
24 performance review. And that I would not get
25 the bonus that he said Emini had promised us,

Page 255

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  we had already earned.
3     Q.   The another option was to work
4  out a severance deal?
5     A.   No. The other option was a
6  voluntary resignation where they paid the
7  double bonus. And he wanted me to just say
8  that I would accept it as an option or
9  consider it as an option. I didn't give him
10 that when I left that meeting. He was very
11 concerned with the fact that I said, you know,
12 if Krah is going to retaliate and you don't
13 step in to do it and you know he's going to do
14 it, then don't I have a right to sue over
15 that.
16          He said, I want you to
17 basically take that back and just say you'll
18 consider this.
19          My peace offering was that I'm
20 saying, okay, I'll say I'll consider this as
21 -- if you change the nomenclature as one of
22 the options. But at this time in the middle
23 of July, I was still holding out hope, naively
24 albeit in retrospect, that I could move out of
25 Krah's lab and remaining at Merck after I had

Page 256

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  stopped the fraud. Or we, we had stopped the
3  fraud, because there were active efforts by
4  people in the lab to stop this fraud.
5     Q.   What were those efforts?
6     A.   I believe some of them or many
7  of them are detailed in either the
8  interrogatories, the complaint or both.
9     Q.   What were the steps people took
10 to stop the fraud as you say?
11     A.   You want to item -- you want me
12 to itemize things that happened on a daily
13 basis --
14     Q.   You said there were active --
15     A.   -- over half a year?
16     Q.   You said there were active
17 efforts by people in the lab to stop this
18 fraud, and I'd like to know what you mean by
19 that?
20     A.   What I mean by that is
21 everything we were doing every day to stop it
22 as outlined partially in the complaint, in the
23 interrogatories. I can't recite for you the
24 things we did every day.
25     Q.   Why don't you recite for me

Page 257

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  what you can remember you did -- or not you,
3  what people were doing to stop the fraud, the
4  active efforts people were taking in the lab
5  to stop the fraud?
6     A.   Well, it was Suzie and Jon's
7  idea that they should be photocopying counting
8  sheets and giving them to me or someone should
9  be preserving them so that they didn't get
10 destroyed. They also wanted the counting
11 sheets preserved in case changes were made on
12 them. They started the idea of
13 countersigning, having people countersign
14 their own counting sheets. So if Suzie did a
15 count, she would have Jon Gombola countersign
16 it so that there would be two signature saying
17 when it did. So if Krah came in and changed
18 data, there would be two signatures and you'd
19 know -- you would have a solid time point from
20 which Krah's change happened after. Those
21 were their -- one of their ideas to archive
22 and preserve the fraud. That's one.
23          Obviously one of the other ones is that they
24 said that the FDA needed to be notified what
25 was going on because they could come in and

65 (Pages 254 - 257)

Appx5622

Page 258

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 stop it.
2          Another effort was Joan and I's
3 decision to audit the data to make sure that
4 there was statistical proof of fraud in the
5 data because then we knew for certain that our
6 allegations that the pre-positives at least
7 were being changed, could survive independently
8 of us saying, well, we saw it here on this
9 one, we saw it here on that one. There's
10 another one. We were fighting all the time
11 not to have the controls manipulated and
12 changed. I had one disagreement with Krah in
13 front of the lab members about what he called
14 spots in the cell control. If there were
15 plaques in the cell control, the entire assay
16 had to be redone. Krah said that when we had
17 favorable results, you simply never see
18 plaques in the cell control. You should --
19 don't even count it. And I said there are
20 plaques in this one.
21          He said, doesn't matter. He
22 goes, you know what, those are spots.
23          I said, what's the difference
24 between a spot and a plaque.

Page 259

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 He said, well, I can tell.
2          I said to him, how come there
3 aren't spots in the rest of the assay? How --
4 if we can't tell a spot from a plaque, we had
5 a bit of a debate about spots versus plaques,
6 but he wanted to salvage favorable data when
7 controls indicated a retest. And he also
8 wanted to dump undesirable data when several
9 data points in one assay proved to be
10 undesirable. It was easier for him to just --
11 for him to manipulate a control and say it
12 needs a retest.
13          Now, a lot of the times he did
14 that right on the plates. But sometimes the
15 first count that would happen on the tissue
16 culture plate would get archived on the sheet
17 and he had to make the cross out on the sheet.
18 So Joan and I looked at the fraud which made
19 it to the counting sheets and said was there
20 enough there to indicate statistical evidence
21 of fraud.
22          Those are just a few of the
23 ways that we were doing this on a daily basis.
24 There were more. I can't sit here off the top

Page 260

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 of my head and just recite them verbatim when
2 we detailed quite a few of them, I believe, in
3 both the interrogatories and the complaint.
4          Q.   Do you believe that you were as
5 good as or better a plaque counter than
6 Dr. Krah?
7          A.   The implication of your
8 question is that he was rechecking and
9 recounting plaques. He wasn't. He told us --
10 the directive from him was to change the
11 results. He didn't say we had to recount the
12 plaques.
13          Q.   That wasn't my question.
14          A.   I know. I identified the
15 implication of your question.
16          Q.   Can you answer my question? Do
17 you believe you were as good at or a better
18 plaque counter than Dr. Krah?
19          A.   I don't even know what that
20 means.
21          Q.   Do you think that experience
22 helps you more accurately recognize a plaque
23 from some other rip or degradation in the cell
24 culture?

Page 261

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1          A.   The question makes no sense to
2 me. Krah was recounting his own assays later
3 in the day. That would be like me asking,
4 Krah, what was it about the lunch you had
5 today that made you better able to count
6 plaques in the afternoon than the morning when
7 you changed your own counts, when you change
8 six pre-positives in a row. That questions
9 doesn't make sense to me. He had lunch. He
10 had coffee. Did he not use his glasses? I
11 don't know what Krah did in the afternoon that
12 made him better at counting his own plaques
13 than when he first counted them during the
14 day.
15          Q.   Do you think that counting
16 plaque is subjective in nature?
17          A.   There's an element of
18 subjectivity to counting plaques.
19          Q.   Do you think that experience in
20 counting plaques make -- can make you a more
21 accurate plaque counter in the PRN context?
22          A.   I have no idea.
23          Q.   Can you look at Exhibit 3, the
24 complaint again. Paragraph 33 on page 11,

66 (Pages 258 - 261)

Appx5623

Page 262

1       STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2   we'll start there.
3       A.   Just that paragraph?
4       Q.   Yes.
5       A.   Okay.
6       Q.   In the last paragraph you state
7   that you and Joan were -- well, it says, "In
8   fact, each was significantly pressured by Krah
9   and other senior Merck personnel to participate
10  in the fraud."
11          I understand you already
12  described Dr. Krah's instructions to you.  Did
13  anybody else above Dr. Krah or senior to you,
14  other than Mary and Dr. Krah, instruct you to
15  change plaque counts?
16      A.   Emini met with our entire lab
17  and instructed us to follow Krah's orders.  He
18  said that the only way we would get Protocol
19  007 testing done is if we followed Krah's
20  orders.  And he said if we did that, he would
21  double the amount of a bonus that we had
22  already earned.  So Emini for sure.
23      Q.   Did Emini say something
24  specific to counting plaques or did he just
25  use the words follow Krah's orders?

Page 263

1       STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2       A.   When he said follow the --
3   follow Krah's orders, I was pretty clear that
4   meant do what Krah said needed to be done to
5   get that assay done by the fall.  And Krah
6   many times told us that one of the reasons we
7   had to change the pre-positives was because it
8   was reducing the sample size, that we might
9   not -- that we would not get the results we
10  needed and that in order to avoid retest and
11  stretch the testing out -- or to avoid
12  retesting which would stretch the testing out,
13  he had to manipulate controls to save assays
14  that were invalid when the assays -- when the
15  rest of the assay had data that he liked and
16  was favorable and wanted to keep.  So I
17  thought it was very clear that Emini was
18  telling us to follow Krah's orders no matter
19  what those orders were.
20      Q.   How is it that Dr. Krah knew
21  which pre-vaccination samples were
22  pre-positive?
23      A.   Because he did the results and
24  calculated the results on a calculator as he
25  counted them.

Page 264

1       STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2       Q.   What exactly did he calculate?
3       A.   The results of the assay.  He
4   would start by calculating -- he would count
5   the mock control and calculate the value of
6   the mock control because that's the standard
7   for what is seroconversion.  Then he counted
8   the rest of the plates, write down numbers and
9   he would know the results before he even moved
10  on to count the next result.  That way,
11  according to him, he could change the numbers
12  or change the data on the plate without
13  leaving a residue on the counting sheet.  So
14  he had the capacity to know the results.  And
15  he did that.  The pre-vaccine and the
16  post-vaccine sera for each kid was ran right
17  next to each other.  He even at one point was
18  excited about an Excel sheet that they have
19  developed so that people could just plug in
20  numbers and the undesirable results, and he
21  called them undesirable results, would light
22  up and you could identify them.
23      Q.   Can you go to paragraph 49,
24  please, in the complaint.  In this paragraph
25  you state that, ".. none of the 'recounting'

Page 265

1       STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2   or 'retesting' that Krah and his staff
3   performed as part of the 'enhanced' testing
4   was performed on any post-vaccination samples
5   or...any pre-vaccination samples that were
6   pre-negative."
7          Do you see that?
8       A.   Yes.
9       Q.   So are you saying that no
10  recounting was done at all on pre-vaccination
11  negatives or post-vaccination positives?
12      A.   Let me clarify that for you.
13  This refers to the audit that Joan and I had
14  done because at the time we filed that
15  lawsuit, that's all we had access to to know
16  that this would be like this.  So what Joan
17  and I found when we audited sheets that
18  represented something like 30,000 plaque
19  counts, was that all of that -- and you see
20  the recounting and retesting are in quotes,
21  the recounting and retesting wasn't the
22  directive.  The directive was to change the
23  results.  So the recounting and retesting that
24  changed results, that changed the serostatus
25  of what you could see in the original number

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Appx5624

Page 266

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1 on the counting sheet -- when I say
2 "original," I mean the first time it was
3 recorded on the counting sheet, ultimately
4 it's not the original number that's on the
5 plate. But when a serostatus change occurred,
6 what we found is every single one was a
7 pre-positive changed to a pre-negative. There
8 were no pre-negatives changed to -- there were
9 no pre-negative change, there were no
10 post-negative change, no post-positive change.
11 All the changes were pre-positive. Now, your
12 question, though, says -- can you read her
13 question back because there was another part
14 to it?
15        - - -
16        (The court reporter read the
17 pertinent part of the record.)
18        - - -
19        THE WITNESS: She said, am I --
20 your question is basically, am I saying
21 that no recounts were done at all on
22 these things -- on the post-sera. And
23 when you say "at all," one time at
24 least to Mary and a couple of times to

Page 267

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1 Dave, I pointed out that you are only
2 recounting the pre-positives. And that
3 if -- even if you were going to claim
4 that we were bad counters, you're only
5 recounting the data you don't want to
6 keep.
7        Krah adapted the fraud
8 according to our complaints. So by the
9 end of this, he adapted and said you
10 should write check marks by -- he was
11 telling the auditors to write check
12 marks by things they weren't going to
13 change to make it look like they had
14 checked them. The instruction was
15 still change the pre-positives, but he
16 would pepper in the checkmarks and
17 backdate them sometimes to make it look
18 like he had checked some results.
19 Those only happened later. I mean, I
20 don't know if he's going in and
21 peppered more in, but in the beginning,
22 yeah, the serostatus changes were only
23 pre-positive to pre-negative that Joan
24 and I found. But I can't say if he

Page 268

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1 ever went back and claimed to have
2 looked at -- checked post-sera because
3 he started to direct the auditors that
4 they should put an indication that
5 maybe they looked at it.
6 BY MS. DYKSTRA:
7     Q.   When you say "auditors," who
8 are you referring to?
9     A.   That's a good question. We
10 should define that. Krah assigned Colleen,
11 Mary and Jenny and himself. He defined them.
12 He had a meeting with us to say that these
13 people are going to be auditors now and they
14 have the right to look at your counting sheet
15 and make changes to them.
16     Q.   Did you see them make changes
17 to counting sheets, the auditors?
18     A.   All the time.
19     Q.   And did they -- and what you're
20 saying is they changed -- originally they only
21 changed the pre-positives and later on they
22 went back and changed the post?
23     A.   I'm saying I don't know what
24 they went back and did. But originally Krah

Page 269

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1 directed them and us that if you get a
2 pre-positive result, you go back and you
3 change it.
4        One time Jenny counted, she
5 counted a pre-positive and it was still a
6 pre-positive. She took an alcohol wipe,
7 destroyed her data. Counted it again. Still
8 got a pre-positive. Destroyed her data. She
9 did it like five times. And she actually said
10 can anybody else count this, I can't find
11 enough plaques to switch this to a
12 pre-negative. And I said, look at -- I said,
13 why are we even trying to change
14 pre-positives.
15        She went and asked Krah the
16 question, Why are we even trying to change the
17 pre-positive anyway.
18        Krah said, Because kids aren't
19 normally immune to mumps before they've had a
20 vaccine or before they've been exposed to a
21 disease. And this would be a big red flag
22 that the use of antibodies with an improper
23 control, that this isn't a methodology that is
24 providing reliable data.

68 (Pages 266 - 269)

Page 270

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1      The point was to hide those
2  pre-positive -- that high pre-positive rate
3  from the FDA so that the Protocol 007 could be
4  a success.  And -- yeah.
5      Q.    Did you ever challenge them,
6  meaning these auditors, on what they were
7  doing?
8      A.    Yes.
9      Q.    What did you say?
10     A.    Well, I just told you what I
11 said to Jenny.  I tried to -- I said, Why are
12 you trying to just change the result?  And she
13 seemed to think that was a good question which
14 is why she redirected it to Krah.  So there's
15 your one time.  But I was friends with these
16 people.
17     I didn't go out and say, Jenny,
18 you're a horrible person.  I was like, what
19 are you doing, why aren't you recounting this?
20     I pointed out to her that when
21 she used an alcohol wipe to erase all the
22 markers on there, that she's destroying the
23 first count.  That the second, third, fourth
24 count that she destroyed, those are all -- I
25

Page 271

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  mean, she's -- the fifth count goes to the
2  counting sheet or, you know, the data is being
3  changed.  The counting sheets aren't archiving
4  the information, you know.  The same with
5  Colleen.  I was like should you be ripping up
6  your counting sheet and getting a new counting
7  sheet when you have to make 10 or 20 changes
8  in one counting sheet.  She said it looks ugly
9  to have that many changes on a counting sheet,
10 you know.  And then Mary, I challenged the
11 very first time she brought me an assay and
12 said change the result.  The rest of the lab
13 was against it and didn't want to do it.  But
14 they -- a lot of them -- I mean, they
15 submitted to the pressure.  Dave stood over
16 them and said change the plaque count, sign
17 your initials to it.  He wouldn't even let
18 them sign it.  Dave had told them to make the
19 change.  He told Suzie, change the plaque
20 count.  He stood over her until she pretended
21 to see more plaques and change it.  When he
22 left the room, she said that, you know, I had
23 the feeling he wasn't going to leave until I
24 changed it.  Things like that.  I mean,
25

Page 272

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  that's -- those are some ostensive examples.
2  It's not enumerative.  I think we pointed out
3  examples in -- right here, so...
4            - - -
5      (Exhibit Krahling-19,
6      Handwritten notes, RELATOR_00001068 -
7      00001070, was marked for identification.)
8            - - -
9  BY MS. DYKSTRA:
10     Q.    I'm going show you what's been
11 marked Krahling-19.  You can take a look at
12 that.
13     A.    Are we done with this one for
14 now?
15     Q.    Yes, we are.
16     A.    Okay.
17     Q.    Can you tell me what this is?
18     A.    I think the first page might
19 just be something I wrote out to figure some
20 things out.  The second page is a list of
21 things I wanted to have in front of me when I
22 met with Bob Suter to push for a meeting with
23 Emini.  I mean, it's a photocopy of it.
24     Q.    But you prepared this in
25

Page 273

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  preparation of your meeting with Mr. Suter.
2  Correct?
3      A.    The second -- oh, I didn't see
4  the back of this one.  It looks to be the same
5  thing.  Yeah.  I'm not sure that the front --
6  I mean, that's basically scratch paper.  It's
7  calculations.
8      Q.    So you're saying pages
9  Bates-labeled 1069 and 1070 were your notes in
10 preparation for your meeting with Mr. Suter?
11     A.    Were these originally on the
12 same sheet?  Weren't these different pages?
13     Q.    Well, they were produced to us
14 in this order, so...
15     A.    Yeah, for sure this and this
16 are part of the same list.
17     Q.    69 and 70?
18     A.    Yeah.  And I would have had
19 this or -- I would have had this with me when
20 I met with Suter in late July when I was
21 pushing for a face to face with Emini.
22     Q.    So in late July 2001, in
23 preparation for your meeting for Suter, did
24 you walk through each of these issues with
25

69 (Pages 270 - 273)

Appx5626

Page 274

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    Mr. Suter when you met with him?
3        A.    No.
4        Q.    Did you -- the options that you
5    listed, status quo, voluntary resignation,
6    expose David to liability.  Did you walk
7    through those with Mr. Suter?
8        A.    What I remember is that I
9    started with the options Alan had given.  See,
10   it's right there.  Status quo, voluntary
11   resignation.  Alan contacted me.  So, yes, I
12   remember talking about the options Alan had
13   handed me.  And then I remember having first
14   on my list something that would indicate it
15   was an example of fraud but it was this error
16   report fraud where he was trying to fire Joan
17   and Frank.  And he was backdating, he was
18   not -- Krah wasn't filing error reports.  And
19   then when I called him on it, he was
20   backdating them to make them look like they
21   were filed in time.  So I wanted to start off
22   with that.
23          The middle things I had because
24   Suter said I was not allowed to bring this --
25   complaints of scientific misconduct to him.

Page 275

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    So I had to have examples in there, otherwise
3    he's -- he questions why I'm there.  But I
4    wanted to use the very first thing on that
5    list there to get that face to face with
6    Emini.
7        Q.    The error report?
8        A.    Yeah.
9        Q.    What did you say the error
10   report was?  What is this error report,
11   March 7, 2001, referring to?
12       A.    That's a whole digression.  You
13   want to go into that now?
14       Q.    Sure.
15       A.    Okay.  In March Dave met with
16   Colleen, myself, I don't know if Mary was
17   there at the time.  But he said that he wanted
18   to institute a policy of error reports so that
19   he could compile evidence to fire Frank and
20   Joan, that he'd have a reason to do it.  He
21   said since they weren't contract employees, he
22   can't fire them.  So in March he instituted
23   error reports.
24          Later down the road -- it's not
25   even down the road, what is it, in April?

Page 276

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    Colleen -- at some point Dave informed us that
3    those error reports were only for Frank and
4    Joan.  If something happened, he said we
5    didn't even have to file an error report.  We
6    didn't have to do that.  It was only for Frank
7    and Joan.
8          After I sent the letter to
9    Emilio, shortly after that, Colleen informed
10   me that Dave had made an error in an assay
11   that they were doing and that it was a
12   significant error.  And I said, What happened
13   to the assay?  She said, ah, we just incubated
14   it.
15          So I waited a week because the
16   error reports had to be filed within one week.
17   On the seventh day, I went to Dave and asked
18   him for the error report.  And Colleen had
19   told me it hadn't been written.
20          I went to Colleen first and
21   said, Did you write an error report?
22          She said, No, why would we?
23   Those are only for Frank and Joan.
24          When I knew for sure that she
25   hadn't written one, I went to Dave and asked

Page 277

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    if he had written an error report for the
3    error he had made because Colleen said it was
4    his.  He directed -- he said no, and then went
5    and directed Colleen to write one and backdate
6    it.  And that's what they did.
7        Q.    And then these complaints,
8    Working weekends in June, Colleen's Memorial
9    Day week, candy in mailboxes, Jenny's B-day
10   lunch, discussing my behavior with co-workers
11   but not me, yells at me in front of my
12   co-workers - reviewing data, made me remove a
13   project from my objectives that I had already
14   completed, new project on MRC-5 cells -
15   amended to include rubella.  Did you review
16   these issues with Mr. Suter?
17       A.    I don't recall.  I did not go
18   through the whole list.  When I started on the
19   first one, he said he didn't want to hear it.
20   And then I had to go to the last one and say,
21   listen, he's committing fraud and I have to
22   make that complaint official to you because he
23   said he didn't want to hear it.  Then
24   immediately he said you can meet with Emini.
25       Q.    So this time when you

70 (Pages 274 - 277)

Page 278

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1  officially made a complaint, he immediately
2  let you meet with Emini?
3      A.   I made complaints before.  He
4  said he wouldn't listen to it.  But I had to
5  say it so unequivocally.  I said, oh, I -- I
6  mean, I told him I was going to call the FDA
7  if I couldn't see Emini about it.  So I mean,
8  I made it so unequivocal that I -- that we
9  were going to stop this fraud.  And if we had
10 to go to the FDA to get the fraud stopped, we
11 would do that.
12     Q.   Then you got a meeting -- he
13 arranged a meeting with Emini?
14     A.   Yes.  That's beyond the scope
15 of this letter, or whatever this is, this
16 list.
17     Q.   Yes.  If you look at again the
18 complaint, paragraph 56.
19     A.   Can you put it in the right
20 order?
21          I'm good with this paragraph.
22     Q.   So in early August 2001 you met
23 with Dr. Emini.  Correct?
24     A.   It seemed like early August.

Page 279

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1  It turns out it was the very end of July.
2      Q.   How do you know that?
3      A.   I've since seen documents that
4  said it was the end of July.
5      Q.   What documents did you see?
6      A.   I can't recall.  I mean it
7  was -- I don't know.  Maybe I didn't see the
8  documents.  I mean, somebody pointed out to me
9  that that meeting would have been -- that I
10 was very, very close with my time, that it was
11 actually -- there's 31 days in July.  It was
12 the very end of July.  The reason I was --
13 when we wrote this complaint that I'm putting
14 early August is because the FDA came in on
15 August 6th, and I knew it was about a week or
16 within a week of that meeting with Emini.
17     Q.   It says here that you
18 "...brought actual testing samples and plaque
19 counting sheets to demonstrate to Emini the
20 fraudulent testing that Krah was directing."
21 And "Emini agreed that Krah had falsified the
22 data."
23          Can you describe in more detail
24 what happened at that meeting with Dr. Emini?

Page 280

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1      A.   I took in a control plate in
2  which I had originally counted it.  Krah had
3  changed the data by saying there was a tore
4  monolayer.  I had had some fellow lab members
5  recount it without saying what they were
6  counting.  So they count this and then could
7  you just tell me what it is and sign it.
8          So I walked in with my original
9  count, possibly what I had in my count.  I
10 walked in for sure with my co-workers'
11 recounts, with Krah's counting of my sheet and
12 the plate itself, among a few other things.
13 Okay.  And then the first thing Emini tried to
14 say, he tried to say something cordial and I
15 walked up to him, I said, I need you to look
16 at this plate.
17         He tried to say, well, I wanted
18 to -- I said, no, we got to start -- you have
19 to look at this plate.  I pointed to the one
20 well.  I said, could you count -- I said just
21 count how many plaques are in that, that well.
22 And he looked at it.  He could see there were
23 four plaques there.  He said four.  I said,
24 That's what I saw, too.  And then I showed him

Page 281

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1  the sheet and said that's what my co-worker
2  saw.
3          I said, Krah says those four
4  plaques aren't there, that they're a torn
5  monolayer.  And because this was the mock
6  control, his elimination of that four lowered
7  the standard for seroconversion for that
8  assay.  That was one of the assays which Krah
9  had said he was recounting which prompted me
10 to call the FDA.
11         So I wanted to show Emini an
12 example of the fraud.  He agreed that Krah
13 misrepresented that data, that there were not
14 four -- I mean, there were four plaques there
15 because the cell monolayer was there.  Krah
16 was saying no cell monolayer, torn cell
17 monolayer.  You couldn't accept four plaques,
18 that the cells were missing.
19     Q.   What else did you discuss with
20 Emini after that?
21     A.   I think we answered this pretty
22 detailed in an interrogatory.  I can go
23 through that and confirm that everything we
24 said there was true.

71 (Pages 278 - 281)

Appx5628

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2     Q.   Just what you remember.
3     A.   I remember that we put the
4 answer pretty well in an interrogatory, but
5 here you go.
6     So Emini said, yeah, he
7 misrepresented the data. And I explained that
8 Krah was committing fraud. That amongst other
9 things, he was falsifying the pre-positive
10 rate. I can't get the exact order probably
11 correct on this, but Emini's response was to
12 order me not to call the FDA because he knew
13 my solution was to have the FDA come in and
14 set this straight. He ordered me not to call
15 the FDA. He said instead he would put
16 together an independent investigation. I
17 objected that he couldn't possibly put
18 together an independent investigation because
19 if people were receiving their paychecks from
20 Merck, that biased it. And besides, the FDA
21 was the best to do an independent
22 investigation. He told me that under no
23 circumstances should I call the FDA.
24     I tried to explain to him that
25 Krah was under a lot of pressure; that the

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 reason he had to falsify the data, that he was
3 supposed to get this done, he had to get the
4 right answer, and that they were using a
5 control that counted a lot of nonspecific
6 effects. So they were counting false
7 positives. I said Krah would not have to
8 falsify the data perhaps if they used a
9 non-immune serum control. He pointed out to
10 me something to the effect that, look, the FDA
11 is aware of the protocol. You don't need to
12 tell them about it. And my rebuttal was they
13 certainly don't know that Krah is committing
14 fraud in the lab so that they could use that
15 protocol.
16     He said, You will not call the
17 FDA.
18     I just said, you know, if you
19 can give me a scientific reason why we're
20 using the rabbit antibodies without a
21 non-immune serum control such to cause Krah to
22 falsify that data, I said I won't call them.
23     He said it's a business
24 decision. And then I was moving towards the
25 door. He said, You will not call the FDA.

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2     I'm sure I left a few nuggets
3 out of that, but it was that type of meeting.
4 As soon as I walked out the door, Suter was
5 there saying, You'll go to jail if you call
6 the FDA.
7     I mean, that's just off the top
8 of my head. If you want to give me the
9 interrogatory, maybe -- I don't know.
10     Q.   In what situation would the use
11 of anti-IgG be appropriate, you said if we had
12 used a non-immune serum control?
13     A.   What I said was if Krah, if the
14 assay had involved a non-immune serum control
15 instead of a mock control, it would not have
16 counted such a high amount of nonspecific
17 interactions. It wouldn't have been so
18 nonspecific. Nonspecific interactions are
19 when virus neutralization occurs by
20 anti-bodies which are not mumps antibodies,
21 are not specific mumps antibodies. Krah was
22 very aware that the assay had a very low
23 specificity. I mean, the -- that the low
24 specificity was required to get a high amount
25 of virus neutralization. And as Krah said,

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 we, meaning Merck, want that in the
3 post-vaccine results. So they took that
4 nonspecific bump in the post-vaccine results.
5 But when it also occurred in the pre-vaccine
6 results, it looked incredibly artificial, very
7 artificial. He said that it's a red flag to
8 the FDA that we're counting non-specific
9 effects, that we're counting false positives.
10 That's one of the reasons we have to cross out
11 the false positive, we meaning Merck, cross
12 out the false positives, put pre-negatives in
13 where the pre-positives were. The other
14 reason was to save sample size. That if the
15 sample size wasn't large enough, they might
16 fail the criteria for success for Protocol 007
17 for the PRN test. And that was absolutely
18 critical to get this stuff successful so that
19 they could, what did I say, correlate ELISA to
20 it so that they wouldn't have to do this PRN
21 anymore.
22     Q.   Are you aware of whether or not
23 Dr. Emini did put together an independent
24 investigation at the company into your
25 allegations?

Page 286

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1    A.   Yes, I had to testify before
2 it. And I'm not using the legal term testify,
3 because we weren't under oath, but that's what
4 it seemed like.
5    Q.   So you were interviewed by the
6 individuals involved or running the
7 investigation?
8    A.   Yeah. Yeah. There was -- do
9 you want me to tell you who was there at it?
10    Q.   Uh-huh.
11    A.   I mean, do you want me to tell
12 you who was at the internal audit?
13    Q.   I want to know if you were
14 interviewed by --
15    A.   I was interviewed.
16    Q.   Did you provide truthful
17 information in that interview?
18    A.   Oh, my God, yes.
19    Q.   You said you had conversations
20 with your other lab colleagues following the
21 interviews?
22    A.   And before it. They were very
23 nervous. Suzie said that she was just a
24 contract employee. If she went in there and

Page 287

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1 told the truth, she'd be fired. Everybody was
2 nervous about it. Frank was like, I can't
3 afford to lose my job. Jill was nervous.
4 Jill had some sort of -- she had some sort of
5 injury and she said that Alan was giving her a
6 tough time about how she would get paid,
7 things like that. She felt that her -- it
8 might get denied if she said anything. And
9 so, you know, it was like everybody do what
10 you want. We're like, we understand whether
11 you're going to tell the truth or not.
12         After the meeting, Suzie came
13 out and said I told the truth, I told them the
14 truth about it and they threatened to fire me.
15 And then we had a meeting with that. That's
16 the most adamant thing I remember because she
17 was so upset that they threatened to fire her.
18 But she stuck to her guns and told the truth.
19         - - -
20         (Exhibit Krahling-20, Resume,
21    RELATOR_00002770 & 00002771, was marked
22    for identification.)
23         - - -
24
25 BY MS. DYKSTRA:

Page 288

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1    Q.   I'm going to show you what I'm
2 going to mark as Krahling-20.
3    A.   Can I review it?
4    Q.   Yes, you can.
5    A.   Okay.
6    Q.   Can you tell me what this is
7 and whether you created it?
8    A.   I definitely created this.
9 This is me updating my resume, I think you
10 referred to it as a CV, after my employment at
11 Merck concluded.
12    Q.   And what did you use this for?
13    A.   Didn't use it for anything. I
14 never sent it to anyone, never gave it to
15 anyone.
16    Q.   So why did you create it?
17    A.   I was updating it. I have more
18 publications on the back.
19    Q.   I'm sorry?
20    A.   I mean, there's a lot more
21 publications on the back than the one you
22 showed me earlier.
23    Q.   You updated your work at Merck
24 I see. Correct?

Page 289

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1    A.   Yes.
2    Q.   And you described your work as
3 manufactured data to protect Merck's exclusive
4 license rights and you have extensive lab
5 experience and experience identifying
6 eliminating bias including methodology
7 designed specifically to produce a
8 pre-determined result, ad hoc manipulation,
9 and confirming bias.
10         What was the purpose of putting
11 this resume together with that information?
12    A.   To update my resume.
13    Q.   But you never did anything with
14 it?
15    A.   No. I didn't use it to apply
16 for a job. I just updated it. The statements
17 are true.
18    Q.   That wasn't really a question,
19 but I understand that you think that they are
20 true.
21         I want to go to your revised
22 interrogatories where you delineate your
23 descriptions -- I mean, your telephone calls
24 with the FDA. I'll mark these as Krahling-21.

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 - - -
3 (Exhibit Krahling-21, Relator
4 Stephen A. Krahling's Responses and
5 Objections to Merck's Revised First Set
6 of Interrogatories, was marked for
7 identification.)
8 - - -
9 BY MS. DYKSTRA:
10 Q. So it looks like interrogatory
11 14 which appears on page 44, begins on
12 page 39. But I want to focus on your
13 discussions with the FDA. I believe those
14 begin at the bottom -- actually the top of 44.
15 A. So what interrogatory number is
16 it?
17 Q. 14.
18 A. So I'd like to read it.
19 Q. Sure. Take your time. I'm
20 going to ask you about your discussions with
21 the FDA.
22 A. You mean I can skip the I spoke
23 with -- that stuff?
24 Q. Yeah, you can skip it the other
25 people. I just want to focus on your

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 conversations with the FDA at the moment.
3 A. Okay.
4 Q. I'm going to mark one
5 additional document we're going to look at at
6 the same time as that, which is Krahling-25,
7 which also discusses your conversations with
8 FDA.
9 A. I read it.
10 - - -
11 (Exhibit Krahling-25,
12 Handwritten notes, RELATOR_00001044 -
13 00001047, was marked for identification.)
14 - - -
15 BY MS. DYKSTRA:
16 Q. So in your -- in the document
17 that we labeled 25, you note in the second
18 paragraph that "In July 2001 I notified Bob
19 Suter, Human Resources, and Emilio Emini,
20 vice-president of Vaccine Research, that I
21 intended to call the FDA to report Merck for
22 falsifying data. At the time, I had already
23 contacted the FDA twice and reported Merck for
24 instituting a policy to fraudulently lower the
25 pre-positive rate in the mumps anti-IgG

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 neutralization assay."
3 Is that accurate?
4 A. I think it's accurate.
5 Q. And in your response to the
6 revised interrogatories on page 44, in answer
7 -- in describing your discussions with the
8 FDA, you say you spoke to two unidentified
9 employees at the Philadelphia branch of FDA
10 about topics related to the allegations in the
11 amended complaint regarding the mumps vaccine.
12 A. Where are you at on this?
13 Q. In the middle of the page on
14 page 44.
15 A. What does it start with?
16 Q. "Relator spoke..."
17 A. Okay. Can you go again?
18 Q. I just read the first line, you
19 spoke to two people at the FDA. You say the
20 first contact was with the Philadelphia branch
21 of FDA on June 19, 2001?
22 A. Yeah. Yes.
23 Q. And remind me what you conveyed
24 to the FDA during that first phone call. And
25 I'm giving you this in case this refreshes

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 your recollection.
3 A. That Krah's lab was committing
4 fraud, Merck was committing fraud.
5 Q. Did you identify any other
6 individuals other than Dr. Krah in that phone
7 call?
8 A. I don't remember. It was such
9 a short call.
10 Q. You say it was 15 to 20 minutes.
11 A. Yeah, but a lot of that was who
12 is calling, what's your contact information,
13 where do you work, the address of the place.
14 Things like that. A lot of it was setting up
15 a way that we would be able to contact again
16 when she had a more appropriate person for me
17 to talk to.
18 Q. So she, the FDA employee,
19 contacted you or you contacted her a second
20 time about a month later?
21 A. Probably within the next month.
22 I'm not sure. What I can say is there were at
23 least another phone call to set up -- she was
24 setting me -- trying to set up a conference
25 call where I'd be talking to her and someone

Appx5631

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 she said would be more appropriate to talk to
3 than someone who answered the phones there.
4     Q.   Do you know who you talked to
5 in that second call or who the person that
6 was --
7     A.   I have no idea.
8     Q.   -- more experienced?
9     A.   I don't recall.
10     Q.   You didn't take any notes of
11 those phone calls?
12     A.   I was holding the phone and
13 talking.
14     Q.   Where did the phone call --
15 where were you at the time you made these
16 calls?
17     A.   In the parking lot, Merck's
18 parking lot in my car.
19     Q.   You don't have any notes of the
20 phone calls?
21     A.   Well, the first couple of phone
22 calls there wouldn't have been any notes. But
23 I was reporting to them what I knew to try and
24 get them to come in and do an investigation.
25 I wasn't detailing for them every step of

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 scientific misconduct or fraud I saw. The
3 point was to say fraud is occurring, this is
4 where it's at, come in and investigate it.
5     Q.   And then at the top of page 45,
6 your answer, you state that "Relator urged her
7 to get the FDA to conduct an on-site
8 inspection and interview him and his
9 co-workers in Krah's lab. She told him...,"
10 you, "...that putting together an FDA
11 inspection...to visit Merck would take a few
12 days." Is that accurate?
13     A.   Yes.
14     Q.   Any other conversations with
15 the FDA prior to the inspection?
16     A.   No.
17     Q.   At the bottom of page 44 in one
18 of your phone calls it says that you called
19 the Philadelphia branch and reported that Krah
20 was destroying garbage bags full of
21 experimental plates from the mumps 007 testing
22 project. Is that accurate?
23     A.   Where are you at on this?
24     Q.   It's the bottom. It says,
25 "Several weeks later, after Relator...,"

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 bottom of page 44. I'm there.
3     A.   Okay, I'm there.
4     Q.   You "...witnessed Krah
5 destroying garbage bags full of experimental
6 plates..."
7     A.   Uh-huh.
8     Q.   You again called the
9 Philadelphia branch office of the FDA and
10 spoke the woman who you spoke with on previous
11 occasions and reported what was happening?
12     A.   Yes.
13     Q.   Is that accurate?
14     A.   Well, I reported that the --
15 that evidence was being destroyed. So the FDA
16 needs to come in and review it so that he
17 couldn't destroy all the evidence. Krah was
18 destroying the evidence the morning after I
19 met with Emini. So things went fast there. I
20 met with Emini, Krah shows up early, is
21 destroying stuff. I called the FDA and said
22 you need to come in, evidence is being
23 destroyed. She said it took a few days and
24 then they showed up August 6th.
25     Q.   So Krah didn't -- Krah didn't --

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 according to you, Krah did not start
3 destroying evidence until after you meet with
4 Emilio Emini?
5     MR. SCHNELL: Object to form.
6     THE WITNESS: The first time I
7     ever saw him show up early to work that
8     early, the first time I saw him
9     autoclave, destroyed plates for a study
10     that was ongoing, was the day after I
11     met with Emini. And Krah had
12     previously told me that there was a
13     need or an obligation to preserve the
14     Protocol 007 study results and
15     materials that we were generating. So
16     I knew that was irregular for a
17     few different reasons. At the very
18     least I wanted to call the FDA because
19     the very obvious thing was that the
20     plates were destroyed after he ran the
21     autoclave.
22 BY MS. DYKSTRA:
23     Q.   If you go back to the
24 complaint. If you can go back to the
25 complaint, we can go -- we're done with that

75 (Pages 294 - 297)

Appx5632

Page 298

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  document.
3      A.   Isn't this the complaint?
4      Q.   Those are your interrogatory
5  answers.
6          MR. SCHNELL:  Lisa, we've been
7          going an hour, so whenever a good time
8          for a break.
9  BY MS. DYKSTRA:
10     Q.   When you -- you document in
11  your complaint the FDA's inspection on
12  August 6th.  Correct?
13     A.   Where is that at?
14     Q.   That's on page 20, paragraph 59.
15     A.   20, paragraph 59.  Okay.
16     Q.   Describe to me what happened
17  when the FDA came to Merck.
18     A.   Do you want me to read
19  paragraph 60?
20     Q.   If you think it would help you
21  refresh your recollection, you can.
22  Otherwise, you can just describe it as you
23  recall it.
24     A.   60 describes it.
25     Q.   Okay.

Page 299

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2      A.   You want, like, where I was at?
3      Q.   Yes, where were you standing,
4  where was Dr. Krah.  Explain in your own words
5  what happened when the FDA arrived.
6      A.   Suzie came back, I was in the
7  back lab and Suzie came back and said the FDA
8  was here, I had to come up to the front lab.
9  And I was kind of shocked, and she grabbed me
10 by the arm and drug me and said I had to go to
11 the front lab which is where my desk was.  So
12 I went to my desk which was right where the
13 meeting was happening.  It was right -- my
14 desk was, desk/office computer, was right
15 where Krah and Shaw were being questioned by a
16 woman from the FDA.  So I sat down and just
17 started taking notes.
18     Q.   Was it one woman or more than
19 one person?
20     A.   I know one woman was talking.
21 I think a second woman was there.  But I
22 didn't -- I hadn't recognized the woman, so I
23 don't know if she's from the CDC or Merck at
24 the time.  CDC -- whether she was from FDA or
25 Merck at the time.  There was one woman from

Page 300

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  the FDA that did the talking.
3      Q.   How long was the conversation
4  between the FDA -- how long -- what happened,
5  you witnessed the FDA interviewing Dr. Shaw
6  and Dr. Krah?
7      A.   They were questioning Krah, and
8  Shaw was standing there.  And I was writing
9  notes as fast as I could on what the FDA
10 person was saying and what Krah was answering.
11 And then when Krah ran out of the room, Shaw
12 tried to cover an answer and I just kept
13 writing what I had.  I mean, the fact that I
14 was taking contemporaneous notes of exactly
15 what I heard, we should go to those.  I mean,
16 can't -- that would be a pretty good record of
17 what happened.
18     Q.   How long was that conversation
19 about, approximately?
20     A.   I couldn't guess.  My
21 adrenaline was rushing.  Is that written
22 somewhere?
23     Q.   Well, in paragraph 62 of your
24 complaint you say that "The entire interview
25 with Krah and Shaw was short, probably less

Page 301

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  than half an hour."
3      A.   I was going to say I thought it
4  was less than half an hour.  It wasn't -- I
5  mean, I didn't sit there for an hour.
6      Q.   So less than a half an hour?
7      A.   Yeah.
8      Q.   The FDA interviewed Dr. Krah
9  and Dr. Shaw for less than half an hour?
10     A.   Yeah.  20 minutes, half an
11 hour.  Maybe 20 minutes-ish.  Less than half
12 an hour.
13     Q.   And the FDA did not talk to you
14 or Joan Wlochowski or other members of the
15 staff at that time.  Is that correct?
16     A.   No, they didn't talk to us at
17 that time.
18     Q.   Following the interview -- so
19 you were there for the entire interview.
20 Correct?
21     A.   I don't know.  But they were
22 already talking when I went there, so I would
23 say I wasn't there for the whole interview
24 since --
25     Q.   So you missed the beginning of

76 (Pages 298 - 301)

Appx5633

Page 302

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 the interview?
3    A.    I don't know how much I missed,
4 but I must have missed at least however it
5 started.  I don't know when I picked it up.
6    Q.    What happened after you
7 witnessed that interview?
8    A.    What do you mean after?
9    Q.    You took notes of the FDA's
10 interview, you said Dr. Krah left the room?
11    A.    He left the room and at some
12 point he came back.  And toward the end of
13 that interview, they were still walking
14 around.  They walked through the lab somewhere
15 and left.  They at least left where the lab
16 was.
17    Q.    The FDA left the lab?
18    A.    Yeah.  I don't know if they
19 left the premises.  They may have been
20 inspecting some other area.  They left where I
21 was, and they weren't in the back lab either.
22 So I don't know where they went.  But they
23 walked away.  The FDA with Krah and Shaw,
24 those people moved out.
25    Q.    Are you aware of any other

Page 303

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 portion of the FDA inspection that they did on
3 August 6th, or did you witness any other
4 portion of an inspection on August 6th?
5    A.    I didn't witness any other part
6 of the inspection.
7    Q.    Did you witness any other
8 inspections on any other days by the FDA in
9 connection with your allegations?
10    A.    I didn't witness any other
11 inspections.
12    MR. KELLER:  Lisa, it's been
13 over an hour, can we take a break?
14    MS. DYKSTRA:  Let me ask one
15 more.
16    THE WITNESS:  She can get done
17 with this.
18 BY MS. DYKSTRA:
19    Q.    Did you compile any data -- did
20 the FDA request any data from Merck in
21 connection with your allegations?
22    A.    I wouldn't know that.  Wait.
23 No, I mean, Krah indicated that they had to
24 respond to it.  So I mean, I would know that
25 they had to do something in response to it.

Page 304

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 But, I mean, I was cut off from seeing data at
3 that point.
4    MS. DYKSTRA:  Okay.  We can
5 take a break.
6    VIDEOGRAPHER:  The time is
7 5:10.  We're going off the video
8 record.
9    - - -
10    (A recess was taken.)
11    - - -
12    VIDEOGRAPHER:  The time is
13 5:27.  We're back on the video record.
14    - - -
15    (Exhibit Krahling-22,
16 Handwritten notes, RELATOR_00001072 -
17 00001080, was marked for identification.)
18    - - -
19 BY MS. DYKSTRA:
20    Q.    Mr. Krahling, I'm marking as
21 Exhibit 22 what I believe might be your notes
22 of the conversations you overheard with
23 Dr. Krah, Dr. Shaw and the FDA.  Can you just
24 take a look and confirm that that's what that
25 is?  Can I see that for one second?  Is that

Page 305

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 the highlighted version?  Let me give you a
3 cleaner version.  Put a clean version there.
4 There you go.  Thanks.
5    A.    All right.
6    Q.    Are these your notes?
7    A.    They're all my notes, yes.
8    Q.    Are these the notes you took
9 during the FDA inspection on August 6, 2001?
10    A.    The first five pages are.
11    Q.    What are the other pages, 1077,
12 78, 79 and 80?
13    A.    I could guess.  Do you want me
14 to guess what they are?
15    Q.    Well, are these your notes?
16    A.    They're notes, but they're not
17 from when the FDA people were standing right
18 there.
19    Q.    Okay.  Do you recall what these
20 are from, these notes?
21    A.    No.  The second ones?
22    Q.    Yes, the second 1077 to 1078.
23    A.    Yeah, the neater ones.  No, I
24 don't recall what those were.
25    Q.    It look like it says FDA and

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  Dave, FDA and Dave. Is this not a recitation
3  of what occurred between the FDA and David
4  Krah and Alan Shaw?
5      A.   They're not the contemporaneous
6  notes I took at the time. The first five
7  pages are.
8      Q.   You can put that aside. If you
9  go back to --
10     A.   The whole document aside?
11     Q.   Yes, the whole document.
12          If you could go back to
13  Exhibit 6 and 7 which are your responses and
14  objections to Merck's requests for admissions
15  and your supplemental -- or amendments to
16  those?
17     A.   6 and 7?
18     Q.   Yes.
19     A.   I have 6 and 7.
20     Q.   In response to request number
21  41 which is on page 18 of your original
22  answers, request 41 states, "Admit that you
23  were not involved with responding to the FDA
24  on behalf of Merck following the FDA's
25  inspection of Merck's facilities in August

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  and/or September 2001." And you deny that
3  request.
4          Can you tell me the basis for
5  your denial? There's no -- nothing in the
6  supplemental response that I saw?
7      A.   Okay. I'm going to read that.
8      Q.   Sure.
9      A.   Okay. Now, what's the question
10  again?
11     Q.   We asked you to admit that you
12  were not involved with responding to the FDA
13  on behalf of Merck following the FDA's
14  inspection of the Merck facilities in August
15  or September of 2001, and you denied that.
16  Can you tell me the basis of why you denied
17  that?
18     A.   I can tell you one of the
19  bases. Krah's lab was expected to do some
20  work in response to the FDA inspection. I'm
21  not sure what that was because he wasn't
22  talking to me too much, but I still had to do
23  work around providing him data or things to
24  that to -- for him to submit or talk to his
25  superiors. Also -- you want as many as I can

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  think of or just --
3      Q.   Let's go one by one so I can
4  follow up on what you just noted and then you
5  can think of another, we can talk about that
6  too.
7          You said that Krah was going to
8  provide some work in response to the FDA
9  inspection. You're not sure what that was
10  because you were working around providing him
11  data. So is it you're not sure of anything
12  that you did may have been given to FDA or you
13  don't know what he gave to the FDA so you
14  can't answer?
15     A.   He told us that in response to
16  the FDA coming in, they may have to do some
17  things like you're talking about gathering
18  counting sheets or doing things like that. I
19  would have been involved in gathering the
20  data. I don't know how he used it.
21     Q.   Do you recall gathering data
22  for Dr. Krah following the inspections?
23     A.   I don't specifically recall
24  what I would have done in support of doing
25  that, no.

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2      Q.   Do you remember, is there
3  anything else that you think you may have done
4  to respond to the FDA's questions following
5  their inspections in August or September 2001?
6      A.   Yeah.
7      Q.   What else did you do?
8      A.   There were meetings held
9  throughout Merck that we were informed that we
10  had to attend one of the meetings. The
11  meetings were to tell us what and how to
12  respond the FDA if they talked to us. So they
13  were impromptu assemblies and we were being, I
14  wouldn't say lectured, but we were being told
15  what we need to do, what we're allowed to not
16  do. We were being coached on how to talk to
17  the FDA or deal with the FDA in the event that
18  they came and talked to us and wanted data.
19     Q.   Who held that meeting? Who
20  held that meeting and who spoke at the meeting?
21     A.   What I remember about the
22  meeting is that we were told we had to go to
23  it. Wherever we went, we ended up walking to
24  it. And I ended up -- we ran into DeeMarie
25  who was in a different lab. So her lab, she

Page 310

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1    was attending the same meeting we did. So it
2    was -- I can't say it was company wide, but it
3    wasn't restricted to Krah's lab. So I believe
4    Joan might have been at that one, too. And we
5    sat with a group of, you know, more than just
6    Krah's lab. I mean, there was a larger group
7    of people. I don't know who the person was
8    talking, but he was trying to -- he was giving
9    a discussion of how to talk to the FDA if they
10   come in and ask for data. And I remember
11   someone approached him, took over the thing,
12   took over speaking and said the FDA has no
13   right to look at my notes. And he was saying
14   my meaning his notes. He was lecturing on
15   they don't have the right, what gives them the
16   right. They can't look at this data.
17       Q.    You don't remember who that
18   was?
19       A.    No.
20       Q.    But somebody from Dr. Krah's
21   lab?
22       A.    No, no, someone I didn't know.
23   I don't think he was a designated speaker.
24   They were just -- it wasn't very organized.

Page 311

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1    People started talking about what rights do we
2    have, do we have to show the FDA stuff, things
3    like that. How to respond to it.
4        Q.    Was there anything that you did
5    that you actually prepared documentation wise
6    to submit to the FDA in response to their
7    inspections in August and September of 2001
8    other than pull together counting sheets?
9        A.    Can you repeat that?
10       Q.    Yes. Was there anything that
11   you did, that you actually prepared,
12   documentation -- any -- I'm sorry, I'll strike
13   that.
14           Was there any documentation
15   that you prepared to be provided to the FDA in
16   response to their questions raised in the FDA
17   inspection in August and September of 2001?
18       A.    So I didn't start gathering --
19   I gathered information like photocopying
20   counting sheets and preserving them. When
21   Krah was destroying plates, I tried to salvage
22   some and hide them so they wouldn't be
23   destroyed. So those things I did before the
24   FDA came in, trying to preserve them.

Page 312

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1        Q.    And after the FDA came in?
2        A.    I put the plates back because
3    it wasn't my place to have them out of where
4    they were designated. I still saved
5    photocopies of the counting sheets and
6    protocols that I had to preserve them. And
7    some of the question is broad to the fact that
8    I did a lot after I left Merck to try and
9    preserve -- lot, that's vague, too. I tried
10   to preserve the information I had in case I
11   would be able at some point in the future to
12   show the FDA or CDC.
13       Q.    What information are you
14   talking about you preserved after you left
15   Merck?
16       A.    The hard copies of documents,
17   photocopies of documents.
18       Q.    Did you ever provide those to
19   the FDA or the CDC, those hard copies of
20   documents you took or photocopied from Merck?
21       A.    After I left Merck?
22       Q.    Yes.
23       A.    No.
24       Q.    Did you ever provide those

Page 313

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1    photocopies of Merck -- were they photocopies
2    of Merck counting sheets?
3        A.    A lot of it was the produced
4    documents that you've seen.
5        Q.    But did you ever provide it --
6    other than providing it to us in litigation,
7    did you provide that to FDA or CDC at any
8    point in time?
9        A.    Well, when I worked there,
10   those things would have been available to the
11   FDA if we looked at them. So I was preserving
12   them then. But I didn't independently go and
13   show those documents to anyone outside of
14   counsel.
15       Q.    You can put these aside for the
16   moment.
17           Following the FDA inspection on
18   August 6th, were you still discussing with
19   Dr. Shaw or Dr. -- or Mr. Suter leaving the
20   lab and negotiating some kind of severance
21   agreement?
22       A.    I'm not sure what you're
23   talking about by severance agreement. I think
24   I know what you're talking about. After the

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Appx5636

Page 314

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 August inspection by the FDA, I still had
2 communications with Bob Suter and Alan Shaw
3 about how I could get out of Dave's lab.
4     Q.    And did you look for other
5 opportunities at Merck?
6     A.    What to you mean by "opportunities"?
7     Q.    Other places within the company
8 to work other than Dave's lab.
9     A.    I did look to try to move to a
10 lab outside of Dave's lab and outside -- I
11 believe it was outside of Alan's jurisdiction.
12 I'm not sure that's the right word, but to
13 move out of there but still stay at Merck.
14 There was a period of time were I sought that
15 as a solution to be able to stay there.
16     Q.    Did you interview in other labs
17 at Merck? Did you interview for other lab
18 positions at Merck other than Dr. Krah's lab?
19     A.    Can you define interview? You
20 mean like a formal where I applied for it or
21 how do you mean that?
22     Q.    I think you said you were
23 looking for work within Merck but outside of
24 Dr. Krah's law. Is that correct?
25

Page 315

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1     A.    Yes.
2     Q.    What did you do to that end?
3     A.    Well, let me give you an
4 example. Shaw forced me to take an interview
5 with some guy, I think his name is Conley.
6 So -- I mean, I don't know if I count that as
7 an interview because Conley in the interview
8 said he had no option but to interview me and
9 I was told that I had to go for the interview.
10 It wasn't really an interview because he just
11 said, If you want to work here, you're hired.
12     And I asked him, I said, Why
13 would you hire me? I don't have the kind of
14 background that's real specific to what he's
15 doing.
16     He said, you know, when the
17 executive director, vice president calls you
18 up and tells you to hire somebody or they'll
19 come to your lab, you do it. And I said -- I
20 really appreciated his honesty. I said, I
21 can't take a position in your lab.
22     Q.    So you were offered a position
23 in Dr. Conley's lab but you decided not to
24 take that position?
25

Page 316

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1     A.    I would not characterize that
2 as offered. He was forced to try and take me
3 there. And Shaw was forcing me to go there.
4     Q.    What do you mean forcing you to
5 go there?
6     A.    Shaw said I had to go and take
7 that interview. And Conley said that he was
8 forced to have me work there.
9     Q.    What did Dr. Conley's lab do?
10     A.    I don't remember.
11     Q.    Did you interview or talk to
12 any other employees at Merck about working in
13 another lab other than Dr. Conley?
14     A.    Wait, what was that again?
15     Q.    Did you interview with somebody
16 called Dr. Sepp-Lorenzion or talk to
17 Dr. Sepp-Lorenzion about working in his lab?
18     A.    That name sounds familiar.
19 Yeah. I found my own interview or I found a
20 place that I wanted to go. At one point Shaw
21 was for it. At another point he informed me
22 that that would never happen. So I don't know
23 the chronology of that. But at some point he
24 said I'm never going there.
25

Page 317

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1     Q.    What lab was that? What
2 position was that?
3     A.    It may have been -- it was a
4 place that I had found the interview for. I
5 can't really say. It may have been that or it
6 may not have been that. I shouldn't guess at
7 that point.
8     Q.    But you found another position
9 at Merck that you wanted to take?
10     A.    I don't recall the exact
11 details, but when Alan said that I can remain
12 in the lab and have Dave continue to retaliate
13 or I can quit and take the money, I said that
14 there was -- you know, in addition to trying
15 to defend myself by saying that he shouldn't
16 support Krah's retaliating against me, I said
17 that there should be an option for me to move
18 outside of Krah's lab but stay at Merck. He
19 said I had one of the two options he named,
20 and I couldn't take the first one. And he
21 wanted me to come back and at least
22 acknowledge as an option that taking money and
23 leaving was an option that I should pursue.
24 But for a while in there, I thought naively

80 (Pages 314 - 317)

Page 318

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1     that maybe I could move out of Krah's lab into
2     another lab and still remain at Merck after
3     the rest of us in Krah's lab had been able to
4     stop the fraud. Beyond that with -- the name
5     you said, I'm not -- I mean, I don't remember
6     all the details.
7        Q. So you were offered a job with
8     Dr. Conley but you did not take that offer?
9        A. I'm pretty sure that I said I
10    would not characterize it as being offered a
11    job.
12       Can you read back my response
13    to the first time she asked that? I thought I
14    did. I want to be correct.
15          - - -
16       (A discussion off the record
17    occurred.)
18          - - -
19       (Exhibit Krahling-23, 9/25/01
20    E-mail, RELATOR_00000745, was marked
21    for identification.)
22          - - -
23    BY MS. DYKSTRA:
24        Q. I'm going to mark as what I

Page 319

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1    think is Exhibit 23 is a September 25, 2001,
2    e-mail from you to Dr. Shaw. Take a look at
3    that.
4        A. Okay.
5        Q. So in this e-mail you state in
6    the middle of the paragraph, The company is
7    not in a position to fire me and I am not in a
8    position to be unemployed. However, if you
9    put together a package that includes a fair
10   severance and also the 'bonus' that I'm sure
11   everyone will get after I'm gone, I will in
12   turn -- I will in return give you a letter of
13   resignation and a signature stating I will
14   never pursue litigation against the company.
15      Do you recall writing that?
16       A. I don't recall writing this
17   exact thing, but this looks right.
18       Q. Did you discuss this with Shaw,
19   Dr. Shaw at this time as well or just e-mail
20   him this information?
21       A. We discussed this in person
22   beforehand when he said that I had to -- that
23   my only solution was to voluntarily resign and
24   take the double bonus.

Page 320

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1       Q. Did you discuss something --
2   after you sent this e-mail, did you discuss it
3   with Dr. Shaw?
4       A. September 25th, that is late.
5   I don't know. This was after I refused the
6   push to Conley's lab and he was -- he pushed
7   me to at least accept as an option getting
8   paid to leave. And I changed the
9   nomenclature. My proposal was to change the
10  nomenclature and say if that's the way I have
11  to go forward, you can't call it a double
12  bonus, you have to call it a severance.
13         - - -
14      (Exhibit Krahling-24, E-mail
15  string, RELATOR_00000747, was marked
16  for identification.)
17         - - -
18  BY MS. DYKSTRA:
19       Q. I'm going to show you what I've
20  marked as Exhibit 24. It is a September 28,
21  2001 -- September 27th and 28th, 2001, e-mail
22  between you and Dr. Shaw. In the first e-mail
23  at the bottom, when you've read that...
24       A. First e-mail on the bottom?

Page 321

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1       Q. Uh-huh.
2       A. What do you got?
3       Q. So other than these e-mails
4  back and forth, did you discuss with Dr. Shaw
5  in person at this time your proposal for a
6  severance package?
7       A. I don't recall if I talked to
8  him in person around the end of September.
9       Q. And then it says at the top of
10  the page, If you are seriously considering my
11  proposal, then I need to know before I meet
12  with my lawyer this afternoon.
13      Do you see that?
14       A. I see that.
15       Q. Who was your lawyer that you
16  retained?
17       A. When I was leaving Merck, I
18  obtained a lawyer, her name is Tonia Torquato,
19  but this -- my proposal was really, it was my
20  acceptance of Alan's push to voluntarily
21  resign. My proposal was to change the
22  nomenclature.
23       Q. But it says this was your
24  proposal, and I think in the September 25th

81 (Pages 318 - 321)

Appx5638

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  e-mail you stated that if you put together a
2  package that includes a fair severance and
3  also the "bonus" I'm sure everyone else will
4  get, I will in return give you a letter of
5  resignation. Wasn't that your proposal?
6     A.    That's his proposal.
7     Q.    That's his proposal.
8     A.    He said if I stayed in the lab,
9  I wouldn't get the money that Emini promised
10 me we had already earned. Emini had promised
11 us a double bonus when it was finished. Alan
12 was saying if I stayed there, I'd never get
13 that money. And he said if I leave, you can
14 have the -- that I could have the double
15 bonus.
16    Q.    My proposal was that it -- you
17 know, he wanted me to accept that just as an
18 option before I left the meeting, and I didn't
19 do that back in July.
20    Q.    Do you know what the value of
21 the double bonus was?
22    A.    Can I finish my answer on that
23 one?
24    Q.    Sure. I thought you were done.

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1     A.    No. That was -- the proposal
2  to take money to leave Merck was Alan's. My
3  idea was that in order for me to accept this
4  as an option and talk about it, you can't call
5  it a double bonus and leave. You have to --
6  you could say bonus, severance. I didn't like
7  the nomenclature. But I was trying to tell --
8  show him I was playing ball because he said, I
9  want you to come back to me and tell me that
10 you won't sue us, that you take that back, and
11 this was in mid July, and that you'll at least
12 consider taking money to voluntarily resign,
13 to consider it. I said you have to change the
14 nomenclature to severance. And by this time
15 in late September, I was seriously concerned
16 over staying there physically.
17    Q.    Were you threatened physically?
18    A.    Different Merck employees told
19 me that I should be scared for my physical
20 well-being.
21    Q.    Who told you that?
22    A.    Frank Kennedy and Kevin
23 Szczypiorski at two different times. Well,
24 Frank Kennedy numerously. Kevin Szczypiorski

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  met with me to tell me I need to be careful,
2  that I should be worried.
3     Q.    Who did they think was going to
4  hurt you physically?
5     A.    They didn't say who. They just
6  said I should be concerned about my physical
7  safety because what had happened was such a
8  big deal and people were very -- Szczypiorski
9  said very pissed off and that I should be very
10 concerned. I was talking to Kevin at the bar
11 right next to the -- right next to Merck.
12 And, you know, that was when I previously told
13 you I had talked to him about the allegations
14 of fraud in the lab. A lot of that happened
15 then. He said, I told you. He said, I told
16 you all along you have to be careful of
17 Colleen and Mary and things like that. He was
18 very concerned about my safety. I thought I
19 was -- you know, he's a good guy to warn me.
20 I'm not saying I agree with him. But that
21 stuff weighs on your mind, you keep hearing
22 it. Frank said that I would be -- he said he
23 would never get in the car with me because he
24 thought it would blow up.

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  So, yeah, by the end of
2  September I was willing to say, Alan, I will
3  listen to -- you say I have to leave and take
4  money. Call it a severance and let's talk. I
5  wanted to go out of there. The FDA had come
6  in.
7     Q.    So you retained -- what was
8  your lawyer's name again, Tonia?
9     A.    I think Tonia -- I don't know
10 how to say her last name.
11    Q.    Tonia Torquato, T-O-R-Q-U-A-T-O --
12    A.    Sounds right.
13    Q.    -- from Donaway Weyandt in
14 State College, Pennsylvania, near where you
15 live?
16    A.    I believe she was in State
17 College. I don't remember all the details.
18    Q.    How many times did you meet
19 with her in connection with your severance
20 agreement or your separation agreement from
21 Merck?
22    A.    Not very often. But I don't
23 recall the exact number of times.
24    Q.    My understanding is Emini --

82 (Pages 322 - 325)

Appx5639

Page 326

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    Dr. Emini initially proposed a $15,000
3    severance agreement to you.  Do you recall
4    that?
5        A.    What are you saying?
6        Q.    My understanding is that Merck
7    initially proposed a $15,000 severance
8    agreement to you through your counsel.  Do you
9    recall that?
10       A.    I do not recall that.
11       Q.    Do you recall that you
12   countered with a $150,000 severance proposal?
13       A.    I do not recall those details.
14       Q.    Do you recall that you
15   ultimately agreed on a severance package in
16   the amount of $22,224?
17       A.    I don't remember the details.
18   The one thing I remember is that I was
19   supposed to go back to Merck while it was
20   happening, and I was isolated in a small lab
21   and told not to have a cell phone.  I
22   had my -- my co-workers were telling me I
23   needed to be worried about my life and I
24   wanted to get away from -- I wanted to
25   physically be away from Merck.

Page 327

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2        Q.    I'm going to mark as 26.
3              - - -
4        (Exhibit Krahling-26, 10/29/01
5        Letter, MRK-KRA00002013 - 00002016, was
6        marked for identification.)
7              - - -
8    BY MS. DYKSTRA:
9        Q.    Take a look at that, that's a
10   letter from your counsel to Merck's counsel,
11   October 29, 2001.
12       A.    Who did you say it's to or
13   from?
14       Q.    From your counsel Tonia
15   Torquato to Alexis Pinto at Merck.  On the
16   second page under number 2 in consideration -- it
17   states that "In consideration for your
18   agreement to accept and abide by the terms of
19   this Agreement, Merck agrees to issue a check
20   payable to you in the amount of...$150,000."
21             Do you recall that you made
22   that proposal to Merck?
23       A.    I don't recall seeing this
24   document.
25       Q.    You were copied on this

Page 328

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    document.  Correct?
3        A.    Does that mean cc Stephen
4    Krahling?
5        Q.    That means copied.  That means
6    receive a copy.
7        A.    Sent as an e-mail.
8        Q.    I don't know if it was sent as
9    an e-mail or hard copy.
10       A.    Merck had control of my e-mail.
11   I don't recall ever seeing this.
12       Q.    So you don't recall ever having
13   conversations with your counsel about these
14   negotiations at all or just this particular one?
15       A.    I don't recall my conversations
16   from back then.  I remember I wanted to
17   physically be away from Merck.  I don't recall
18   seeing this document.
19       Q.    You don't recall making a
20   demand to Merck of $150,000 for a severance
21   agreement --
22       A.    I did not make a demand.
23       Q.    -- through your counsel?
24       A.    I didn't make a demand for
25   $150,000.  What I'm telling you is I don't

Page 329

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    recall seeing this document.
3        Q.    Do you recall having discussions
4    with your counsel about making a demand to
5    Merck for a severance agreement and some
6    number of dollars, whether you don't remember
7    150 or not, do you remember that discussion?
8        A.    I don't remember a discussion
9    with counsel about any number of 150.  I
10   didn't make a demand.  What I'm telling you is
11   I don't remember seeing this document.  I
12   don't remember ever seeing this document.  But
13   I didn't tell my lawyer -- can I say what I
14   didn't tell my lawyer to do?
15       Q.    That's up to you.
16       A.    I did not make a $150,000
17   demand of Merck.
18       Q.    Are you saying you didn't
19   authorize your attorney or you just don't
20   remember whether you authorized with your
21   attorney to make a demand of $150,000 to
22   Merck?
23       A.    What I know is that I was told
24   I had to go back, that Merck wanted me back in
25   Merck's labs while this negotiation was going

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Appx5640

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1. on and that I was told I couldn't have a cell
2. phone. So I couldn't talk to my lawyer during
3. the day.
4.     Q.   I'm going to ask my question
5. again. I need you to answer my question.
6.     A.   I thought I just answered it.
7.     Q.   No, you didn't.
8.          I want to know whether or not
9. you authorized your attorney to make a
10. $150,000 demand to Merck or you just don't
11. remember authorizing your attorney to do that?
12.    A.   I don't recall ever seeing the
13. number $150,000.
14.    Q.   Do you recall having any
15. discussions with your attorney Ms. Torquato
16. about your severance agreement at all?
17.    A.   I don't recall a lot of the
18. details back then. But I understand -- I
19. remember saying I would like the money that
20. they're withholding from me, that Emini had
21. said I had already earned. And then this
22. money was -- Shaw said you can be paid that
23. money when you voluntarily resign. That's
24. what I remember about it. And that I had to

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1. sign -- there was a letter sent that I had to
2. sign in order to physically be away from
3. Merck. I think that does answer your question.
4.     Q.   I'm sorry, I don't know about
5. any letter you had to sign. Did you produce
6. that in discovery?
7.     A.   I'm sure you have it.
8.          MS. DYKSTRA: We don't have a
9. letter so can you produce that?
10.         THE WITNESS: You have it.
11.         MS. DYKSTRA: That you have to
12. stay away from Merck?
13.         THE WITNESS: That's not what I
14. said.
15. BY MS. DYKSTRA:
16.    Q.   That you physically be away
17. from Merck?
18.    A.   I had to sign a letter in order
19. to be physically away from Merck because I
20. wanted to leave.
21.    Q.   So after Ms. Torquato sends
22. this letter, Merck responds. I'm going to
23. show you the response. Actually I'm going to
24. show you a letter in between.

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1.     - - -
2.          (Exhibit Krahling-27, Letters,
3.     RELATOR_00001086 - 00001090, was marked
4.     for identification.)
5.     - - -
6. BY MS. DYKSTRA:
7.     Q.   So in November 26, 2001, your
8. counsel -- Axel Johnson, counsel for Merck,
9. writes to your counsel on November 26, 2001.
10.    A.   First page or all of it?
11.    Q.   You can just look at the first
12. page first. We'll get to the second letter
13. after.
14.    A.   Who is this second one from?
15. The second one is from who?
16.    Q.   The second letter is your
17. counsel to Axel Johnson, November 27, 2001.
18. This is how they were produced to us.
19.    A.   What's your question?
20.    Q.   So the first letter dated
21. November 26, 2001, Mr. Johnson from Merck
22. writes to your counsel asking that -- well,
23. the first -- in the first paragraph stating
24. that the Company is willing to modify the

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1. draft Agreement by modifying paragraph 11 to
2. include an obligation by the Company to instruct
3. Dr. Emini, Dr. Shaw and Dr. Krah not to
4. disparage your client, but they're not willing
5. to agree to a "positive employment reference."
6.          Do you recall asking your
7. attorney to have that amendment added to your
8. severance agreement?
9.     A.   I don't remember the details
10. of -- I asked her -- I wanted to get out and I
11. said I wanted to get away from Merck. I don't
12. remember all the details.
13.    Q.   Do you remember that we, the
14. company, asked for, in the second paragraph,
15. that your client return all company property,
16. your client signed out notebooks as follows
17. MMRV331-01: notebook 31688, page 217, 218,
18. from September 21, 2001. These notebook pages
19. are missing. Your client must return these
20. pages or identify where they may be found in
21. the lab.
22.          Do you see that?
23.    A.   I see it.
24.    Q.   Did you take that -- those

Page 334

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 notebook pages out of the lab and not return
2 them?
3      A.   I didn't take original notebook
4 pages out of the lab.  I had photocopied
5 documents that I had in my possession.  But
6 these are referring to primary notebook pages.
7 And I returned, not returned, I never left
8 Merck with them.  Those were put in two safe
9 spots in Merck.  One was on Krah's desk and
10 the other was the place where you get the
11 notebooks.  These are conversations --
12      Q.   You're sure you never took
13 original documents outside of Merck?  I want
14 to make sure you stick to that answer.
15           MR. SCHNELL:  Do you want to
16 finish your answer?
17           THE WITNESS:  Let me finish
18 this.  Is this the -- you're talking
19 about correspondence back and forth
20 between the lawyers and you're asking
21 me every little detail.  We can talk
22 about the specifics of this, but I
23 haven't seen these documents.  I don't
24 recall seeing them.  What was your

Page 335

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 question about this?
2 BY MS. DYKSTRA:
3      Q.   Is it your position that you
4 never took original documents outside of the
5 company?
6      A.   What are you talking about
7 taking?  When I worked at Merck, I had
8 photocopies of documents.  And one of the
9 reasons I had that is because -- well, the
10 main reason I had those is because Suzie and
11 others were asking me to preserve those
12 documents, but I saw documents being destroyed
13 and ripped up such as counting sheets.  So I
14 was preserving them while I worked there.
15 These are photocopies of documents.  After I
16 left Merck, I continued to preserve those
17 photocopies of those documents.
18      Q.   If you look at the document,
19 the letter Bates-stamped 1088 to 1089.
20      A.   Sure.
21      Q.   Which is a letter from your
22 counsel back to Axel.  It states -- your
23 counsel writes on your behalf,
24 "Additionally...," the second paragraph,

Page 336

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 "...with regard to the notebook pages you
2 referenced my client has assured me he does
3 not have any company documents.  He has
4 indicated and assured me he has absolutely
5 placed all documents in their appropriate
6 places...."
7           Do you recall having a
8 discussion with your counsel about that?
9      A.   I don't recall a discussion,
10 but this looks true.  I did not have whatever
11 we're defining there as company documents.  I
12 had photocopies of documents.
13      Q.   So you understood this to mean
14 originals, not photocopies?
15      A.   I don't know what I thought
16 about it back then.  What I'm saying is I
17 didn't take any original documents.  I didn't
18 deprive Merck of the data they had.  I was
19 trying to preserve the data so that they
20 wouldn't continue destroying it.
21           MS. DYKSTRA:  Mark this one.
22                - - -
23           (Exhibit Krahling-28, 11/30/01
24           Agreement, MRK-KRA00582394 - 00582397,

Page 337

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1           was marked for identification.)
2                - - -
3 BY MS. DYKSTRA:
4      Q.   I'm going to show you what I'm
5 marking as Exhibit 28.  This is a November 30,
6 2001, agreement.  Is that your signature on
7 the bottom of page 4?
8      A.   Do you want me to read it?
9      Q.   You may read it, yes, if you
10 want.
11      A.   Okay.
12      Q.   Is that your signature on page
13 4, dated December 6, 2001?
14      A.   That is my signature.
15           MS. DYKSTRA:  Can we take a
16 quick two-minute break -- five-minute
17 break?
18           MR. SCHNELL:  Take five minutes.
19           VIDEOGRAPHER:  The time is
20 6:13.  We're going off the video record.
21                - - -
22           (A recess was taken.)
23                - - -
24           VIDEOGRAPHER:  The time is

85 (Pages 334 - 337)

Appx5642

Page 338

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2        6:21.  This begins disc five in the
3    videotape deposition of Stephen Krahling.
4        MS. DYKSTRA:  Thank you,
5    Mr. Krahling, we are finished for
6    today.  I think tomorrow if it works,
7    we're not going to go a full seven
8    hours tomorrow.  If it works for
9    everybody, we would propose starting at
10   10:00 tomorrow instead of 9:30.
11       MR. SCHNELL:  How long do you
12   think you'll -- I'm not going to hold
13   you to it, so we can travel -- make
14   travel plans.
15       MS. DYKSTRA:  I don't think
16   more than five hours.
17       MR. KELLER:  Appreciate it.
18       VIDEOGRAPHER:  The time is
19   6:21.  This concludes today's videotape
20   deposition of Stephen Krahling.
21          - - -
22       (Witness excused.)
23          - - -
24       (Deposition concluded at
25   6:21 p.m.)

Page 340

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2        INSTRUCTIONS TO WITNESS
3        Please read your deposition over
4    carefully and make any necessary corrections.
5    You should state the reason in the appropriate
6    space on the errata sheet for any corrections
7    that are made.
8        After doing so, please sign the errata
9    sheet and date it.
10       You are signing same subject to the
11   changes you have noted on the errata sheet,
12   which will be attached to your deposition.
13       It is imperative that you return the
14   original errata sheet to the deposing attorney
15   within thirty (30) days of receipt of the
16   deposition transcript by you.  If you fail to
17   do so, the deposition transcript may be deemed
18   to be accurate and may be used in court.
19
20
21
22
23
24
25

Page 339

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2        C E R T I F I C A T E
3
4
     I do hereby certify that I am a Notary
5    Public in good standing, that the aforesaid
     testimony was taken before me, pursuant to
6    notice, at the time and place indicated; that
     said deponent was by me duly sworn to tell the
7    truth, the whole truth, and nothing but the
     truth; that the testimony of said deponent was
8    correctly recorded in machine shorthand by me
     and thereafter transcribed under my
9    supervision with computer-aided transcription;
     that the deposition is a true and correct
10   record of the testimony given by the witness;
     and that I am neither of counsel nor kin to
11   any party in said action, nor interested in
     the outcome thereof
12
     WITNESS my hand and official seal this
13   4th day of May, 2017
14
15

16   _____
     Linda Rossi-Rios, RPR, CSR
17   Notary Public
18
19
20
21
22
23
24
25

Page 341

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2        - - - - -
         E R R A T A
3        - - - - -
4    PAGE   LINE   CHANGE
5    ___  ___  _____
6    Reason for Change:
7    _____
8    ___  ___  _____
9    Reason for Change:
10   _____
11   ___  ___  _____
12   Reason for Change:
13   _____
14   ___  ___  _____
15   Reason for Change:
16   _____
17   ___  ___  _____
18   Reason for Change:
19   _____
20   ___  ___  _____
21   Reason for Change:
22   _____
23   ___  ___  _____
24   Reason for Change:
25   _____

86 (Pages 338 - 341)

Page 342

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

2        ACKNOWLEDGMENT OF DEPONENT

3        I, _____, do

4    hereby certify that I have read the foregoing

5    pages and that the same is a correct

6    transcription of the answers given by me to

7    the questions therein propounded, except for

8    the corrections or changes in form or

9    substance, if any, noted in the attached

10   Errata Sheet.

11

12   _____      _____

13   DATE            SIGNATURE

14

15   Subscribed and sworn to before me this

16   _____ day of _____, 2017.

17

18   My commission expires: _____

19

20   _____

21   Notary Public

22

23

24   Assignment:  PA 2587889

25

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Appx5644

Page 343

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2

    UNITED STATES OF AMERICA  : CIVIL ACTION
3   ex rel., STEPHEN A.       : NO. 2:10-04374(CDJ)
    KRAHLING and JOAN A.      :
4   WLOCHOWSKI,               :
            Plaintiffs,       :
5                             :
            vs.               :
6                             :
    MERCK & CO., INC.,        :
7         Defendant.          :
    _____  : Master File No.
8   IN RE:  MERCK MUMPS       : 2:12-cv-03555(CDJ)
    VACCINE ANTITRUST         :
9   LITIGATION                :
                              :
10  THIS DOCUMENT RELATES TO: :
    ALL ACTIONS               :
11                    -  -  -
12                  May 3, 2017
13    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
14                    -  -  -
15        Continued videotaped deposition of
16  STEPHEN KRAHLING, taken at the offices of
17  Morgan Lewis & Bockius, 1701 Market Street,
18  Suite 18-F, Philadelphia, Pennsylvania 19103,
19  beginning at 10:09 a.m., before LINDA
20  ROSSI-RIOS, a Federally Approved RPR, CCR and
21  Notary Public.
22
23                    -  -  -
              VERITEXT LEGAL SOLUTIONS
24              MID-ATLANTIC REGION
           1801 Market Street - Suite 1800
25             Philadelphia, PA  19103

Appx5645

Page 344

```
1   A P P E A R A N C E S :
2
3   On behalf of the Private Plaintiffs
4       SPECTOR ROSEMAN KODROFF & WILLIS, P C
            BY:  JOHN A  MACORETTA, ESQUIRE
5       1818 Market Street
        Suite 2500
6       Philadelphia, PA  19103
        215 496 0300
7       jmacoretta@srkw-law com
8
    On behalf of the Relators
9
    KELLER GROVER LLP
10      BY:  JEFFREY F  KELLER, ESQUIRE
        1965 Market Street
11      San Francisco, CA  94103
        415 543 1305
12      jfkeller@kellergrover com
13
14  On behalf of Relators and the Witness
    Stephen Krahling
15
    CONSTANTINE CANNON LLP
16      BY:  GORDON SCHNELL, ESQUIRE
            and
17          MARLENE KOURY, ESQUIRE
        335 Madison Avenue
18      New York, NY  10017
        212-350-2700
19      gschnell@constantinecannon com
        mkoury@constantinecannon com
20
21
22
23
24
25
```

Page 345

```
1   A P P E A R A N C E S (cont'd ):
2
3   On behalf of the Defendant, Merck & Co ,
    Inc
4
    MORGAN LEWIS & BOCKIUS LLP
5       BY:  LISA DYKSTRA, ESQUIRE
            and
6       MELINA R  DiMATTIO, ESQUIRE
        1701 Market Street
7       Philadelphia, PA  19103
        215 963 5000
8       lisa dykstra@morganlewis com
        melina dimattio@morganlewis com
9
10
11  On behalf of the Defendant, Merck & Co ,
    Inc
12
    VENABLE LLP
13      BY:  MICHAELA F  ROBERTS, ESQUIRE
        750 E  Pratt Street
14      Suite 900
        Baltimore, MD  21202
15      410 244 7400
        mfroberts@venable com
16
17
18  A L S O   P R E S E N T :
19
    AMANDA HEARY, Videographer
20
21          - - -
22
23
24
25
```

Page 346

```
1           I N D E X
    WITNESS                    PAGE
2
    STEPHEN KRAHLING
3
4     By Ms  Dykstra            348
5
6       E X H I B I T S
7   MARKED     DESCRIPTION       PAGE
8   Krahling-29  E-mail chain,      381
                RELATOR_00002632 & 00002633
9
10  Krahling-30  1/29 E-mails       381
                RELATOR_00002631
11  Krahling-31  1/29/04 Supplemental   433
                Biologics License
12              Application,
                MRK-KRA00000032 - 00000139
13
    Krahling-32  Update:  Multistate   460
14              Outbreak of Mumps ---
                United States, January
15              1--May 2, 2006
16  Krahling-33  About the Vaccine    465
                printout from CDC website
17
    Krahling-34  Mumps Outbreak --- New   474
18              York, New Jersey, Quebec,
                2009
19
    Krahling-35  8/20/99 Letter with    486
20              attachments,
                MRK-KRA00018614 - 00018619
21
    Krahling-36  E-mail chain,       497
22              MRK-KRA00002281 & 00002282
23  Krahling-37  9/7/01 E-mail,      501
                RELATOR_00000746
24
    Krahling-38  9/11/01 E-mail,     509
25              RELATOR_00000750
```

Page 347

```
1   DEPOSITION SUPPORT INDEX
2   DIRECTION TO WITNESS NOT TO ANSWER
3   Page   Line
4   366    10
        405     3
5
6
7
8   REQUEST FOR PRODUCTION OF DOCUMENTS
9   Page   Line
10  (None)
11
12
13
14
    STIPULATIONS
15
    Page   Line
16
    (None)
17
18
19
20  QUESTIONS MARKED
21  Page   Line
22  (None)
23
24
25
```

2 (Pages 344 - 347)

Page 348

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2                    - - -
3            VIDEOGRAPHER:  We are now on
4    the record.
5            Today's date is May 3, 2017,
6    and the time is 10:09 a.m.  This is the
7    continuation deposition of Stephen
8    Krahling.  The witness was previously
9    sworn in.
10                   - - -
11           STEPHEN KRAHLING, after having
12   been previously duly sworn, was
13   examined and testified as follows:
14                   - - -
15           EXAMINATION
16                   - - -
17   BY MS. DYKSTRA:
18       Q.   Hi, Mr. Krahling.  Good morning.
19       A.   Good morning.
20       Q.   You are still under oath, you
21   understand that?
22       A.   Yes.
23       Q.   Yesterday we spoke about your
24   departure from Merck.  When was the last time
25   you physically worked at the company?  I

Page 349

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    understand you signed a separation agreement,
3    but when was the last time you were physically
4    at Merck?
5        A.   I don't recall the exact dates.
6    I know it was after October 1st and before I
7    signed -- or before the date on the letter
8    that was signed.
9        Q.   So before your separation
10   agreement, but after October 1st, sometime in
11   there was the last time you were at --
12   physically at the company?
13       A.   Definitely it was sometime
14   between October, November, December 2001.
15   Hard to narrow it down further than that.
16       Q.   Since -- we'll just use
17   December 1 for the purposes of the discussion.
18   Since that time, December 1, have you spoken
19   to any people employed by Merck?
20       A.   Yes.
21       Q.   Can you tell me who and when
22   you spoke to them?
23       A.   The who certainly.  The when is
24   going to be -- let's start, Jon Gombola, Suzie
25   Maahs, Joan.  Jill did -- well, let's start

Page 350

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    with that group there because I saw them all
3    together.  I'm not sure when, but it was very
4    shortly -- they still worked there and I
5    didn't.  So that's the window for that group.
6        Q.   Anybody else that you had
7    spoken with that was still employed by Merck?
8        A.   Jill DeHaven, but I don't -- I
9    have no -- I don't recall when.  Not anything
10   remotely recently.
11       Q.   Okay.
12       A.   Kristin Haas.  The question is
13   when I saw them in person, communication,
14   right?
15       Q.   Communication, right.
16       A.   So the general idea here is
17   that I knew them well when I worked there, so
18   when I left, I was probably talking to them
19   regularly and then that faded.  So the most
20   recent contact with Kristin would be that up
21   until recently, and it may even be including
22   last year, we still exchanged Christmas cards
23   at the holidays.
24       Q.   That was Kristin Haas you were
25   talking about?

Page 351

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2        A.   Yeah.  And then DeeMarie Watson
3    was her maiden name, Skulsky was her married
4    name.
5        Q.   When did you talk to her -- or
6    when did you communicate with her last?
7        A.   I communicated with her
8    somewhat frequently for the first few years.
9    I can't remember if we sent Christmas cards or
10   not.  But probably by the time of 2010.
11   Definitely by 2010 I wasn't -- I don't know,
12   it would have been before that.  I would just
13   say contact within the first few years after
14   that, not really.  It's hard to put an end
15   date.  I know I wasn't talking to them after
16   2009.  Even in -- other than to send Christmas
17   cards.
18       Q.   How do you know that date, is
19   there something specific about 2009 or you
20   just recall?
21       A.   Well, that's the year -- I'm
22   pretty sure that's the year or the year before
23   that I met these guys, and they said -- I
24   mean, they -- I can't say what they said.
25           Oh, I have something more to

3 (Pages 348 - 351)

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 add.
3 Q. Sure.
4 A. Because I haven't looked in
5 forever, but I think I'm Facebook friends with
6 some of them. So I kind of just left that
7 hang. So I'm not sure that counts as
8 communication in the sense that -- I don't
9 know how that counts as communication, but...
10 Q. So in 2009 when you were
11 referring to when your communication with the
12 employees in the lab ceased, you're referring
13 to when you retained your current counsel. At
14 that point --
15 A. Before you move on, I want to
16 make sure that --
17 Q. Sure.
18 A. Because I met with Kevin --
19 Q. Kevin?
20 A. -- Szczypiorski, S-C-Z
21 something, something P-I-O-R-S-K-I.
22 But, I believe I was still
23 employed at the time. However, that's --
24 certainty on that is maybe 70 percent. So it
25 may not have been. It was in 2001, though.

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 Sam Calarco is another one.
3 Q. When do you think you last
4 communicated with Sam?
5 A. I saw him after I left at least
6 one time that I remember. Maybe more. But at
7 least one time. And that was at Penn State.
8 He came up, he had gone to school there and he
9 came up to go out to the bars. We went out,
10 had some drinks, hung out.
11 Q. Anybody else?
12 A. That worked at Merck. It's
13 limited to who worked at Merck. Right?
14 Q. Yes.
15 A. And at the moment I don't
16 recall any.
17 Q. The group that you mentioned
18 you spoke with, I believe you said all
19 together, Jon Gombola, Suzie Maahs, Joan
20 Wlochowski and Jill DeHaven --
21 A. I have another one. Frank
22 Kennedy was at that one.
23 Q. At this meeting we were just
24 talking about with these four people together?
25 A. Yeah. Yes, yes.

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 Q. So we have Frank Kennedy, Jill
3 DeHaven, Joan Wlochowski, Suzie Maahs and Jon
4 Gombola?
5 A. Can you read the list again?
6 Q. Yes.
7 A. Slowly.
8 Q. Jon Gombola, Suzie Maahs, Joan
9 Wlochowski, Jill DeHaven and Frank Kennedy.
10 A. I'm not sure that Jill DeHaven
11 was at that -- I don't remember. The other
12 ones were definitely there. I don't know
13 whether Jill DeHaven was at that when we got
14 together that time.
15 Q. When you got together this
16 gathering, where was it and when did it
17 happen?
18 A. I wanted to point out Frank
19 Kennedy since we just added him. That was --
20 I didn't see him after that time.
21 Q. So that was -- this meeting,
22 can we call it a meeting?
23 A. Yeah, I don't see why we can't
24 call it a meeting.
25 Q. I just don't want to use the

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 wrong phrase.
3 A. It's fine.
4 Q. The meeting that you know Jon
5 Gombola, Suzie Maahs, Joan Wlochowski and
6 Frank Kennedy were at, and possibly Jill
7 DeHaven, that occurred when?
8 A. I think the best I can say is
9 that I think they still worked there. I'm not
10 sure of the contract employees like Jon and
11 Suzie because they may still have been in
12 school. I'm not sure their -- I'm not sure
13 their status. And also that they were
14 contract employees. But I seem to remember
15 that I wasn't at Merck anymore and they were.
16 And to what degree -- I can give you some
17 items that I remember that inform on it, but I
18 don't want to say that I'm guessing.
19 Q. No, what can you remember
20 discussing?
21 A. I remember Joan's husband
22 brought flowers in and sat them on the table.
23 I'm trying to think if that was for some
24 occasion. And we played croquet, so it was
25 warm enough to be outside and play croquet.

Appx5648

Page 356

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  So it seems unlikely it was January. Do you
3  want the temperature?
4      Q.   Sure.
5      A.   It was above 50 degrees and it
6  was below 90. It wasn't July.
7      Q.   Where were you when you met
8  with them?
9      A.   Wherever Joan lived at the
10  time. It was her -- I mean, I don't know if
11  she owned it, house. Her residence.
12      Q.   So you were in her residence,
13  you were at Joan's residence?
14      A.   Her residence.
15      Q.   Okay. Was it just a gathering
16  of friends? Was it some other event?
17      A.   You'll think that's -- I
18  offered the temperature and you wanted it. I
19  should say that I'm talking about the high for
20  the day. I don't know how cool it got at
21  night, but that's just a stupid thing. Go
22  ahead with your question, because you can
23  actually narrow down how many months it was
24  for after that, so I'm trying to be accurate.
25      Q.   I appreciate that. The meeting

Page 357

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  or the gathering was at Joan's residence, you
3  said?
4      A.   Yep. Yes.
5      Q.   Was it just for you all to get
6  together to meet or was there some other event
7  that she was having in her house?
8      A.   She just had people over.
9      Q.   This was on just one occasion
10  that you met with them at Joan's house?
11      A.   That was the only time I recall
12  being at Joan's house. So outside of that...
13      Q.   So I assume you were sitting
14  outside?
15      A.   That was the only time I
16  remember being at Joan's residence when she
17  lived there.
18      Q.   What are you distinguishing
19  from, you were somewhere when she lived
20  somewhere else?
21      A.   Yes.
22      Q.   Tell me about that.
23      A.   Jeff and I went out to see her.
24      Q.   When was that?
25      A.   Sometime between the time I met

Page 358

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  him and before we filed the lawsuit.
3      Q.   You went to Joan's house with
4  Jeff at that -- to meet with Joan?
5      A.   It was to meet with her.
6      Q.   Had you had communication with
7  Joan -- let me go back to the meeting.
8          The meeting in, probably sometime
9  in 2002 at Joan's residence with this group of
10  people?
11      A.   I think we can call it 2002.
12      Q.   In 2002, what did you, Jon,
13  Suzie, Joan, Frank and possibly Jill talk
14  about?
15      A.   Actually you bring up a good
16  point. There's a possibility considering that
17  I left in October, on October 1st, there's a
18  probability that it occurred in October. So I
19  shouldn't narrow that down because when I left
20  in October I had hoped or felt that I wouldn't
21  be back. So it's quite possible we met in
22  October when I still worked there. I mean, I
23  actually can't narrow it down past that. I
24  know they all worked there. So if Jon and
25  Suzie weren't working there back when it

Page 359

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  started to get warm, then it would have had to
3  have been October, November. So I actually
4  can't tell you with any certainty. It would
5  be after October 1st and before it got cold
6  again the next year. Sorry about that.
7      Q.   That's fine. What did you talk
8  about at this meeting at the end of October --
9  at the end of 2001, beginning of 2002,
10  whatever that time frame is, what did you talk
11  about?
12      A.   We didn't really -- whatever
13  happened to be going on at the time. Like
14  Joan had kids. One or both of Suzie or Jon
15  was going to, maybe it was Villanova. You
16  know, light things.
17      Q.   Did you talk about what had
18  occurred in Dr. Krah's lab or your work in
19  Dr. Krah's lab?
20      A.   Not that I recall. But I don't
21  think so. I'm not sure. I don't think
22  anybody wanted to talk about that at that
23  point. Take a day off, who wants to ruin a
24  weekend. So I don't recall.
25      Q.   Did you talk about the FDA

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Appx5649

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1   inspection?
2   
3       A.   At that meeting?
4       Q.   Yes.
5       A.   I think that would be encompassed
6   under I don't recall.  I mean, I can guess.
7       Q.   I don't want you to guess.  If
8   you have like an educated guess or you think
9   you're right.
10      A.   Educated guess, I know I
11  wouldn't have wanted to talk about it.  But --
12  so when I say I don't recall, I have reason to
13  believe I don't recall because it didn't
14  happen.
15      Q.   I assume this may fall under
16  the same topic of your work in Dr. Krah's lab,
17  but you also didn't talk to them about your
18  discussions with the company around your
19  separation or any type of severance agreement
20  or anything like that?
21      A.   I remember that Joan's husband
22  brought flowers, put them on the table.  I
23  asked what occasion it was.  And he said
24  something like "I just get my wife flowers."
25  I remember meeting Joan's kids and playing

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1   
2   croquet.  I remember that it was warm enough
3   not to be that -- feel that cold playing
4   croquet.  And it was mostly sunny.  Beyond
5   that, I remember who was there, minus that I'm
6   a little fuzzy on Jill or not.  So I don't
7   know.  Beyond that, really nothing.
8       Q.   And you said you met with Jill
9   DeHaven and Kristin Haas as well beyond this
10  one meeting at Joan's house?
11      A.   No, not at Joan's house.  No,
12  these are separate things.
13      Q.   That was at --
14      A.   These would be -- now put that
15  meeting aside.
16      Q.   Put that meeting aside, right.
17  Then did you -- who else did you meet with?
18  You said you met with -- did you meet with
19  Jill DeHaven after the meeting at Joan's
20  house?
21      A.   I don't know if I met with her.
22  There were communications.  I just have the
23  feeling we stayed in touch for a bit because I
24  remember someone getting ahold of me saying,
25  you know, Jill was -- you know, you haven't

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1   
2   stayed -- Jill mentioned you haven't stayed in
3   touch.  And having the memory that, oh, yeah,
4   we tried to stay in touch, but... So I have
5   reason to believe, like, because you're
6   getting along with people, you don't just
7   leave and never talk to them again.
8       Q.   Did you talk to any of the
9   people that you had worked with in Dr. Krah's
10  lab following your departure from the company
11  about what had -- the misconduct that you
12  allege in your complaint?
13      A.   You mean after the time that I
14  was employed there?
15      Q.   Yes.
16      A.   Outside of counsel?
17      Q.   Yes.
18      A.   No.
19      Q.   Did you talk -- this is a yes
20  or no because I don't want to know the
21  substance of the conversations to get into
22  privilege.  But did -- who did you and your
23  counsel meet with to discuss the allegations
24  in the complaint from -- I'm going to restate
25  this.

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1       Identify the people that you
2   and your counsel met with to discuss your
3   allegations of fraud after you left the
4   company?
5           MR. SCHNELL:  You're excluding
6       experts, consultants and all that I
7       assume?
8   BY MS. DYKSTRA:
9       Q.   Yes, I'm talking about the
10  people -- I'm sorry.  I'm talking about the
11  people in the lab.  Who did you and your
12  counsel meet with from Merck?
13      A.   Could you provide an example
14  that would be responsive to that?
15      Q.   Yes.
16      A.   I can't think of one.
17      Q.   It's a badly worded question.
18      A.   No, it's fine, I just want to
19  make --
20      Q.   So you and Jeff Keller went to
21  visit Joan?
22      A.   Yes.
23      Q.   You talked to Joan?
24      A.   Yes.

Page 364

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2        Q.    About timing and substance?
3        A.    He made sure her husband was
4    out of the room.
5        Q.    Who else did you and your
6    counsel meet with that had been at Merck?
7        A.    Oh, at Merck.  Did we call Jon
8    Gombola?  Did I call him or did you call him?
9    There was something about reaching out to Jon
10   Gombola.  We're restricting to work at Merck
11   so I don't have to think wider than that.
12       Q.    Just current or former employees
13   of Merck.
14       A.    Oh, he would have been former,
15   maybe, I think.
16           MR. KELLER:  I would not --
17       just to be clear, anybody that you know
18       or participated in, not something that
19       you may have learned from discussions
20       with your counsel, those are
21       privileged, so...
22           THE WITNESS:  I don't really
23       remember anything except maybe I talked
24       to him on the phone because for some
25       reason you said --

Page 365

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2           MR. KELLER:  Don't disclose
3       anything you and I talk about.  That's
4       privileged.
5           THE WITNESS:  I'm not sure I
6       remember.  I think I talked to him on
7       the phone.
8           Can I move on to start to think
9       of the other people?
10   BY MS. DYKSTRA:
11       Q.    Sure.
12       A.    All right.  That worked at
13   Merck at some point?
14       Q.    Correct.
15           MR. SCHNELL:  I want to interrupt
16       for a second.
17           MS. DYKSTRA:  Sure.
18           MR. SCHNELL:  So you're
19       asking -- just so we're clear on the
20       question, you're asking who -- other
21       people he met with counsel?
22           MS. DYKSTRA:  Any meeting that
23       Mr. Krahling had with counsel and a
24       current or former employee of Merck.
25           THE WITNESS:  Wait.  Are you

Page 366

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2       saying with counsel?
3           MR. KELLER:  That's the point.
4    BY MS. DYKSTRA:
5        Q.    Just if meetings occurred and
6    with whom.  So if you and your counsel met
7    with a current or former employee of Merck, I
8    want you to identify who those current
9    employees or formers are.
10           MR. SCHNELL:  I think this is
11       work product, who we may have discussed
12       and decided was worth talking to.  So
13       I'm going to object and instruct the
14       witness not to answer.
15   BY MS. DYKSTRA:
16       Q.    I assume you're going to follow
17   your attorney's instruction?
18       A.    Definitely.  He doesn't object
19   very often.  I'm not trying to make a joke.  I
20   mean that.
21       Q.    Other than meetings with your
22   counsel, did you independently and
23   individually, putting aside meetings with your
24   counsel, did you meet with any current or
25   former employees of Merck following your

Page 367

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    departure from the company other than the
3    meeting you disclosed at Joan's residence?
4        A.    Yes.
5        Q.    Go through those people and
6    tell me what you talked about and when.
7        A.    You're talking meet in person?
8        Q.    Any communication.  I'm trying
9    to put aside the meeting at Joan's house.
10       A.    Yeah.  So we're moving on to
11   the next people on the list.
12       Q.    To the next people, okay.
13       A.    Who do you want to go with
14   next?
15       Q.    So I guess DeeMarie Watson
16   Skulsky.
17       A.    Yes, DeeMarie.
18       Q.    DeeMarie.
19       A.    She e-mailed me often.  Well, I
20   mean, she e-mailed me while I worked at Merck.
21   So when I leave, you know, I leave Merck,
22   people still e-mail you.  So if you think of
23   it in terms of -- it's not like -- I wasn't
24   shunned, everybody liked -- well, a lot of
25   people there liked me.  So I still stayed in

7 (Pages 364 - 367)

Page 368

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1  touch with her. I met her in person at least
2  one time. I would say it was within the
3  following year or two. And I think it's
4  because her husband may have gone to Penn
5  State or they had friends at Penn State, but
6  she was up at Penn State, knew I was there,
7  and she invited us over to go, I don't know if
8  it was a tailgate or just a party at her
9  friend's place. But it was her and her
10  husband and her friend and maybe somebody who
11  he -- her, those friends she knew, and it was
12  at her friend's place and it was just outside
13  of -- might have been in the boroughs they
14  called it. It was at Penn State.
15      Q.   At that time, did you discuss
16  anything that had occurred in Dr. Krah's lab
17  with DeeMaria?
18      A.   DeeMarie.
19      Q.   DeeMarie.
20      A.   No.
21      Q.   Did you talk or communicate
22  with DeeMarie any other time after that
23  occasion?
24      A.   I think so. I'm not sure when

Page 369

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1  our communications ended. That kind of
2  trailed off. I don't know that I can guess at
3  a stop date. I mean, I think she's a friend
4  of mine on Facebook. So -- but we don't
5  really message on Facebook or do anything like
6  that. I don't do -- try not to do that. I
7  mean, I think the last I heard from her, she
8  was saying that something about, you know, she
9  had talked to Jill and Jill wondered why I
10  didn't write to her anymore. Something like
11  that. But I -- that had to be -- I mean, I
12  don't know that I can narrow that down other
13  than mid 2000s.
14      Q.   Okay. That's fine.
15      A.   It was before -- I'm not sure.
16  I can't narrow that down.
17      Q.   And I think the other two
18  people you identified that you had met with
19  who were current or former employees at Merck
20  were Kevin Szczypiorski and Sam Calarco?
21      A.   Start with Kevin Szczypiorski.
22      Q.   Sure.
23      A.   I hung out with him at that bar
24  that is right next to Merck's facility that a

Page 370

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1  lot of Merck employees go to.
2      Q.   Did you talk about anything
3  that had occurred in Dr. Krah's lab?
4      A.   I'm pretty sure I still worked
5  there at the time, because I certainly
6  wouldn't have driven up there just to hang out
7  at that bar. So I'm certain -- I'm reasonably
8  certain it was after August 2001 but before
9  December 2001.
10      Q.   Did you talk about what
11  occurred in Dr. Krah's lab?
12      A.   Yes.
13      Q.   Tell me the substance of the
14  conversation to the extent that you remember
15  it?
16      A.   Mostly he was informing me of
17  things. So I didn't have to tell him much of
18  anything because he already knew the FDA came
19  in. So he was telling me about how the kind
20  of scientific misconduct he sees in that lab
21  has been going on long before I was there,
22  when he was there.
23          And he said, Why do you think I
24  got out? He said, you know -- he told me

Page 371

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1  that, he said, you always liked Colleen and
2  got along with Colleen. I told you she was
3  like this. But I still defended Colleen as a
4  friend. I thought she was good. But I
5  appreciated that he was -- he wanted to meet
6  with me, he was concerned. And then he said
7  that what he heard, that this was a very, very
8  big deal with the FDA and I should really be
9  concerned about my physical safety.
10      Q.   In what way should you be
11  concerned about your physical safety?
12      A.   He said I could be killed. He
13  thought they'd kill -- like somebody would
14  kill me. That it was costing the -- it was
15  costing the company so much money.
16      Q.   What was list position at the
17  time that you met with him? Where was he
18  working within Merck?
19      A.   I don't know. He was not in
20  Krah's lab anymore. I was under the
21  impression -- I mean, it's not like he got
22  kicked out of Krah's lab. He was a permanent
23  employee during that first year and a half
24  where I was a contract employee. So he would

8 (Pages 368 - 371)

Appx5652

Page 372

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 have been -- he and Colleen were two of the
2 real workhorses in that lab when I first
3 showed up. And so they were basically equal
4 status under Mary. Or I guess you could call
5 it seniority. And Kevin was one of the people
6 when you talked just about training, he would
7 have been like sit down with me, here's how we
8 culture MRC-5 cells, here's how we do VZV
9 potency assays, things like that. So that
10 was -- were you asking his position?
11     Q.    Yes.
12     A.    Yeah, that was his position. I
13 don't --
14     Q.    Do you know what lab he worked
15 in at the time that you were meeting with him?
16     A.    No.
17     Q.    Not Dr. Krah's lab?
18     A.    No, I was going to give you the
19 end of that is I don't recall him doing the
20 PRN testing. So he left -- well, gives you a
21 window. I'm not sure when he left.
22     Q.    Do you know where -- I'll just
23 call him Kevin. Do you know where Kevin works
24 now or lives now?

Page 373

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1     A.    I have no clue about him now.
2     Q.    When he made the comment that
3 this was a big deal, and the FDA's inspection
4 was a big deal and you should be, I think you
5 said, afraid for your life --
6     A.    He said something like they're
7 going to -- they'll kill you. It wasn't
8 like -- guys don't talk like, oh, you should
9 be afraid. He's like, dude, don't you worry
10 they're going to kill you. They'll kill you.
11     Q.    Did you think that he was
12 serious that you might actually be -- your
13 life might be in danger?
14     A.    I try not to give into things
15 like that because I was -- yeah, I was still
16 there at the time because he was warning me to
17 get out. I had to have still worked there.
18 But you know what, I mean, even if you think
19 there's only a 15 percent chance he's true,
20 man, it's your life, it starts to gnaw on you.
21 Then you hear it from someone else that says
22 -- Frank Kennedy said I will never get in the
23 car with you. You got to be -- you should
24 look under there every time, it's going to

Page 374

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 blow up. And, you know, I was like, are you
2 joking? I said, Don't say things like that.
3 I don't need that stuff on my mind.
4         He's like, I'm dead serious, I
5 will never get in the car with you. So, yeah,
6 I mean part of you says, ah, these are these
7 guys guessing. But they're Merck employees
8 and this is their employer and they're saying
9 people are upset. This is a big deal, you're
10 costing people money. So it weighs on your
11 mind even if you have every reason to believe,
12 ah, that wouldn't happen.
13     Q.    Did you do anything about --
14 with this information, for example, did you go
15 to the authorities?
16     A.    I just tried to leave Merck. I
17 didn't want to be there.
18     Q.    So, no, you did not report
19 it -- this?
20     A.    That my friends thought I might
21 get killed?
22     Q.    Yes, did you report that to
23 anybody?
24     A.    That didn't seem reportable.

Page 375

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 What's there to report?
2     Q.    And Sam Calarco, when did you
3 last speak to him?
4     A.    Sometime within a year or two
5 after I left Merck.
6     Q.    And did you talk about things
7 that had occurred in Dr. Krah's lab?
8     A.    My God, no. No way.
9     Q.    Why do you say it like that?
10     A.    Because he was up for the
11 weekend. We went out to the bars, didn't talk
12 about Merck.
13         Am I speaking loudly enough?
14         MR. KELLER: Yes, they can hear
15     you.
16 BY MS. DYKSTRA:
17     Q.    So we've gone through the
18 people that you spoke with who were former and
19 current Merck employees about your -- about
20 what occurred in Dr. Krah's lab or who you met
21 with who were former or current employees.
22 Who did you speak to, if anyone, about your
23 allegations or the issues raised in your
24 complaint that were from the media?

Page 376

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2         MR. SCHNELL:  Object to the
3    form.
4         THE WITNESS:  Can you be
5    more -- allegations.  Wait.
6    Allegations.  So you're --
7    BY MS. DYKSTRA:
8         Q.    Did you speak to anybody in the
9    media about the issues raised in your complaint?
10        A.    The issues raised in my
11   complaint which could still be prior to the
12   complaint being filed.
13        Q.    Correct.
14        A.    Yes.
15        Q.    Who did you speak to that was a
16   member of the media?
17        A.    I believe we listed it in the
18   interrogatories.
19        Q.    I think it's Exhibit 6 if you
20   want to refresh your recollection.
21        A.    We have it?  I had have it?
22        Q.    It's already marked.
23        A.    Sharyl Attkisson.  Right?
24        Q.    Yep.
25        A.    What page?

Page 377

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2         Q.    Page 41, I believe.
3         MR. SCHNELL:  It's not Exhibit 6.
4         THE WITNESS:  There's no page 41.
5         MR. SCHNELL:  It's not Exhibit 6.
6         MS. DYKSTRA:  It's not Exhibit
7    6.  I didn't mark my copy.  We'll get a
8    copy for you.
9         MR. SCHNELL:  It's 21, Exhibit 21.
10   BY MS. DYKSTRA:
11        Q.    Your reference to Sharyl
12   Attkisson is on page 41 of your interrogatories,
13   if that will help you refresh your recollection.
14        A.    Page 41?
15        Q.    Yes.
16        A.    Refreshes my recollection when
17   it was.
18        Q.    Do you remember any details of
19   your conversation with Ms. Attkisson?
20        A.    I remember she -- we spoke
21   about -- I remember she introduced me to a
22   producer and the guy didn't have time to talk
23   because a journalist had been kidnapped in the
24   Middle East and they had information about him
25   which wasn't public yet or break -- they were

Page 378

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    on some story like that.  So things were real
3    short.  And I remember when she walked me down
4    when I was leaving, she asked some questions
5    about the HPV vaccine.  That's about all I
6    recall.
7         Q.    What did she ask you about the
8    HPV vaccine?
9         A.    I can't remember.  I just
10   remember she seemed interested in the HPV
11   vaccine.
12        Q.    Did you have an opportunity to
13   tell her about your allegations or the issues
14   raised in your complaint?
15        A.    Did I have an opportunity?  I
16   mean, I don't recall what we talked about
17   other than that Middle Eastern thing broke in
18   the middle of it.
19        Q.    Did you have any other
20   conversations with her after this initial
21   conversation?
22        A.    I don't recall, but I don't
23   think so.  I don't think I did.  I believe
24   that I don't recall because I did not.
25        Q.    Other than -- putting aside for

Page 379

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    the moment the meetings that you may have had
3    with the Department of Justice and your
4    counsel, have you talked to anybody from the
5    government?
6         A.    Government.  That's a really --
7         Q.    Yes.
8         A.    The guy who delivers my mail
9    works for the government.
10        Q.    Putting aside the postal service.
11        A.    That's one small section.  I
12   mean, can you be more specific, government?
13        Q.    No.
14        A.    I don't know who works for the
15   government and who doesn't.  Doesn't the
16   government -- one of the largest employers of
17   people in the country?  I mean -- oh, you're
18   talking about allegations in the lawsuit,
19   though, being specific?
20        Q.    Yes.  Any conversations about
21   the issues raised in your lawsuit with any
22   conversations with people who were employed by
23   the government?
24        A.    So what I'd have to do is go
25   through the interrogatories and see if the

10 (Pages 376 - 379)

Page 380

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 people we listed there worked for the
3 government.
4     Q.    Well, I think that the only
5 person you list in your interrogatories seems
6 to be employed by the government currently or
7 formerly is Dr. Silvia Stojanov?
8     A.    Okay.  Well, then -- she works
9 for -- does she work for the NIH?
10     Q.    According to your interrogatory
11 answer, yes.  According to your --
12     A.    I didn't look at that yet.
13 Should we go there then?  Yes.  I e-mailed --
14 did I e-mail -- yeah, I -- I think I reached
15 out to her.
16     Q.    It's on page 57 of your request
17 if you'd like to look at the paragraph.
18     A.    57?
19     Q.    57, yes.
20     A.    Obviously there must be an
21 e-mail somewhere, but I think I know the
22 content of it without looking at it.
23     Q.    We'll show it to you.  We will
24 mark it Exhibit 29.
25                 - - -

Page 381

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2         (Exhibit Krahling-29, E-mail
3     chain, RELATOR_00002632 & 00002633, was
4     marked for identification.)
5                 - - -
6         MS. DYKSTRA:  And Exhibit 30
7     because there's two.
8                 - - -
9         (Exhibit Krahling-30, 1/29
10     E-mails RELATOR_00002631, was marked
11     for identification.)
12                 - - -
13 BY MS. DYKSTRA:
14     Q.    Exhibit 29 is dated January 26th
15 and has two e-mails and Exhibit 30 is dated
16 January 29th.  If you could take a look at
17 those.
18     A.    So you're saying there's three
19 e-mails?
20     Q.    There's two e-mails on Exhibit 29
21 and then there's one e-mail on Exhibit --
22 well, two e-mails on Exhibit 30 I guess.
23     A.    There's not an October e-mail?
24     Q.    There's an October e-mail on
25 the bottom of Exhibit 29.

Page 382

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2     A.    I didn't see the back.
3     Q.    That's okay.  It starts on the
4 bottom of Exhibit 29.
5         MR. KELLER:  Lisa, which
6     exhibit is which?
7         MS. DYKSTRA:  Exhibit 29 is the
8     January 26th and October 26th chain and
9     Exhibit 30 is just the January 29th at
10     the top.
11         THE WITNESS:  All right.
12 BY MS. DYKSTRA:
13     Q.    So on the first e-mail on
14 Exhibit 29 dated October 26th, I think you
15 represented yourself to be Dr. Pequot,
16 P-E-Q-U-O-T?
17     A.    I don't think so.
18     Q.    Who is Dr. Pequot?  Is that not
19 you?
20     A.    It's nobody.
21     Q.    It's nobody?
22     A.    I don't know any Dr. Pequot.
23 I'm not Dr. Pequot.
24     Q.    So you produced these to us.
25 Do you know who wrote these e-mails?

Page 383

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2     A.    I wrote this e-mail.  That's my
3 e-mail address.
4     Q.    Pequot@cyber-rights net?
5     A.    Yes, that was my e-mail at the
6 time.
7     Q.    On Exhibit 30 it's signed
8 Dr. Pequot.
9     A.    Oh, that may be because she
10 made the mistake of calling me that so I went
11 with it.  Yeah, because she took that out of
12 my e-mail, so I just stuck with it.
13     Q.    Have you ever used that name
14 any other time?
15     A.    No.  It's a weird name.  She
16 just saw Pequot and figured that was my name.
17     Q.    So you just went with it?
18     A.    What am I going to sign?
19     Q.    At the e-mail on Exhibit 29
20 that you wrote -- so you wrote this e-mail on
21 Exhibit 29 at the bottom, dated October 26th?
22     A.    See, I didn't sign it
23 Dr. Pequot on that one.  That was her
24 response.  Wait, what are you saying, I signed
25 it?

11 (Pages 380 - 383)

Page 384

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1     Q.   I just want you to focus on the

2 e-mail at the bottom, October 26th, right, it

3 goes to the next page.

4     A.   Got it.

5     Q.   You say at the beginning that

6 you're a virologist in vaccine research.

7

8     A.   Uh-huh.

9     Q.   And this is in 2008. Were you

10 doing vaccine research at this time?

11     A.   Published a paper in 2007. I

12 consider myself a virologist.

13     Q.   And who did you work on to

14 publish the paper in 2007? Who did you work

15 with, I'm sorry?

16     A.   It's on the resume that you had

17 yesterday. It was in Schlegel's lab at Penn

18 State.

19     Q.   That was published in 2007?

20     A.   Uh-huh.

21     Q.   What did you do, what kind of

22 work did you do to publish that paper?

23     A.   Cell-based assay. I was an

24 author on it. One of the authors of the

25 paper.

Page 385

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1

2     Q.   What work did you do? Did

3 you --

4     A.   I did cell-based assays and I

5 wrote part of the manuscript.

6     Q.   Are you still writing manuscripts?

7     A.   That was the last publication I

8 had.

9     Q.   Why did you give up writing

10 publications?

11     A.   Why did I give it up? I don't

12 understand the question.

13     Q.   You said 2007 was the last

14 publication you had. Correct?

15     A.   Yeah.

16     Q.   Did you -- are you still

17 writing manuscripts?

18     A.   That was the last publication I

19 had.

20     Q.   So you're not working on

21 manuscripts -- did you work on any manuscripts

22 following this 2007 publication?

23     A.   I may have -- I made myself

24 available for people's questions or help in

25 Schlegel's lab, but I mean, that's just what

Page 386

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1

2 you do as a courtesy. So I didn't publish any

3 papers after that.

4     Q.   Are you working on any papers

5 currently?

6     A.   What do you mean by "papers"?

7 Does the complaint count as a paper?

8     Q.   No. Something that's going to

9 be published in a journal or other scientific

10 medium.

11     A.   No, I'm not working on any --

12 I'm not working on that right now, I'm busy

13 with other things.

14     Q.   What other things?

15     A.   What we're doing here today

16 keeps me pretty busy.

17     Q.   Other than working on this

18 litigation against Merck, what else do you do

19 with your time?

20     A.   I take care of my children.

21     Q.   How old are they again?

22     A.   13 and 11.

23     Q.   Girls or boys?

24     A.   One of each.

25     Q.   Anything else that you do with

Page 387

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1

2 your time?

3     A.   Well, I mean, you want my

4 recreational activities?

5     Q.   Sure.

6     A.   The kids, my wife and I like to

7 look at birds. They like golfing. My

8 daughter is really good at tennis. She's

9 left-handed, she has got a nice backhand.

10 There's all sorts of things.

11     Q.   Any other I'll call it

12 professional work that you're doing other than

13 taking care of your children and this

14 litigation?

15     A.   There's not much time left

16 after this. This is probably, other than

17 taking care of my kids, is the most important

18 thing I'm doing.

19     Q.   Going back to these exhibits,

20 did you have any other communications with

21 Ms. Stojanov after this in January 2009?

22     A.   I have no reason to believe I

23 did. I think this is it.

24     Q.   Did you speak with anybody else

25 or communicate with anybody else from the

12 (Pages 384 - 387)

Appx5656

Page 388

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  government about the issues raised in your
3  complaint other than the communications you
4  may have had with your counsel?
5      A.    If I did, it would be in the
6  interrogatories if they worked for the
7  government.  I don't know who does and doesn't
8  work for the government.
9      Q.    And you've said previously, I
10 think, you've never had communications with
11 the FDA or the CDC about the issues raised in
12 your complaint putting aside the issues you
13 discussed with the FDA in 2001?
14     A.    Start with putting aside, can
15 you rephrase it, putting aside so that I can
16 mentally put it aside and then ask your
17 question?
18     Q.    Sure.  Putting aside the
19 discussions you had with the FDA in 2001 --
20     A.    Yes, okay.
21     Q.    -- I believe you testified
22 previously that you have had no discussions
23 with the CDC or the FDA around the issues in
24 your complaint?
25     A.    I think that's accurate.

Page 389

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2      Q.    I know you said you talked to
3  and you retained counsel prior to your current
4  counsel, Mr. Moody?
5      A.    Yes.
6      Q.    Did you provide Mr. Moody any
7  documentation related to the issues and
8  concerns raised in your complaint?
9      A.    He went through the same things
10 these guys did.  They preserved the documents,
11 don't talk to anyone and then provide him a
12 copy of the copies I had, all of them to make
13 sure I had them all to preserve them.  Like
14 preservation.  I'm not sure, but he gave me
15 directions to make sure they're in one place,
16 make sure people don't share them, things like
17 that.
18     Q.    Are there any documents that
19 Mr. Moody received from you related to the
20 issues in the complaint that you have not
21 produced here in this litigation?
22          MR. SCHNELL:  Are you talking
23 about outside of work product?
24          MS. DYKSTRA:  Yes, outside of
25 his work product.

Page 390

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2          THE WITNESS:  What's work
3  product?  What are you talking about?
4  You're looking for something that maybe
5  I gave him that these guys didn't get
6  that wouldn't have been produced to
7  you?
8  BY MS. DYKSTRA:
9      Q.    Yes.
10     A.    No.  No.  These guys have it
11 all.  These men and women.
12     Q.    I missed what you said, I'm
13 sorry?
14     A.    Guys, men and women.
15     Q.    I think I just want to clarify
16 a couple of other things you mentioned
17 yesterday before we proceed on to another
18 topic.
19          You had said that you had --
20 you obviously have complaints about what
21 occurred in Dr. Krah's lab, and you said you
22 had heard from another employee at Merck that
23 there were issues or concerns in an HPV lab.
24 Correct?
25     A.    You could generally characterize

Page 391

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  it as that.
3      Q.    I just want to make sure there
4  were no other concerns or issues raised that
5  you heard or you know about with respect to
6  any other labs at Merck?
7      A.    Any other labs or any other
8  products?
9      Q.    Any other labs.
10     A.    I think so.  But I mean, it
11 depends on what you're talking about labs,
12 because Krah's lab worked with other labs so
13 the product itself was the problem, and it was
14 worked on in both labs.
15     Q.    Both labs meaning?
16     A.    Whatever the other lab was.
17 They were working on the HIV adenoviral vector
18 vaccine and they had a big problem with it.
19     Q.    I'm not sure I follow.  Are you
20 saying that Dr. Krah was involved in that
21 work?
22     A.    I was, too.
23     Q.    I just want to make sure I know
24 the full scope of where you believe there may
25 have been scientific misconduct.  So anything --

13 (Pages 388 - 391)

Appx5657

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1
2     A.   I don't want to use the word
3 fraud.  There's legal stuff there.  Misconduct,
4 there were problems.
5     Q.   So Dr. Krah's lab, the HP --
6 lab working on the HPV vaccine you mentioned.
7     A.   I would just say that the HIV
8 adenoviral vaccine product would be responsive
9 to your question if you're talking about
10 potential scientific misconduct.  I can't
11 make -- legal fraud, I don't know.
12     Q.   Did you ever work in Merck's
13 laboratory operations group in Merck's
14 manufacturing division?
15     A.   I don't know what the -- I
16 don't know what the laboratory operations
17 group is.  If you're talking about the
18 physical, wherever it is -- I don't recognize
19 the name.  I did work that supported
20 manufacturing.
21     Q.   You mean the work you did in
22 Dr. Krah's lab may have supported manufacturing?
23     A.   No, it did.  He explained how.
24     Q.   But other than the work in
25 Dr. Krah's lab, you never worked in any of the

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1
2 manufacturing facilities?
3     A.   My labor was not physically
4 present -- I don't even know where that place
5 is.  But I -- my labor was done in Krah's lab
6 other than that one time they stuck me in
7 another room.
8     Q.   Have you ever reviewed Merck's
9 quality manuals, SOPs, policies or procedures
10 that are used by Merck's manufacturing
11 division?
12     A.   If I was required to review
13 them for the job, then I reviewed them.  I
14 don't recall.
15     Q.   In your work at Merck, did you
16 ever run a TCID50 assay?
17     A.   You're talking about a potency
18 assay?
19     Q.   A specific TCID50 assay.
20     A.   To determine the amount of
21 virus that's present.  I don't think I did.  I
22 don't recall.  I don't think I did, though.
23     MS. DYKSTRA:  Let take a break
24 and we'll switch topics.
25     VIDEOGRAPHER:  The time is 11:00.

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1
2     We're going off the video record.
3     - - -
4     (A recess was taken.)
5     - - -
6     VIDEOGRAPHER:  The time is 11:17.
7     We're back on the video record.
8 BY MS. DYKSTRA:
9     Q.   Mr. Krahling, tell me how and
10 where you met Mr. Moody.
11     A.   I met him in Pittsburgh.  And I
12 met him through an intermediary.
13     Q.   Who is the intermediary?
14     A.   Liz Birt.
15     Q.   What does Liz Birt do?  What is
16 her profession?
17     A.   I don't know.
18     Q.   How do you know Liz Birt?
19     A.   I don't know her anymore.
20     Q.   Well, how did you -- how did
21 she become an intermediary to introduce you to
22 Mr. Moody?
23     A.   How did I meet her?
24     Q.   Yes.
25     A.   I don't recall how I met her.

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1
2     Q.   Who is she, Liz Birt?
3     A.   In what sense, I don't know
4 what --
5     Q.   You said she introduced you to
6 Mr. Moody.  Who is -- in what context did you
7 know her?
8     A.   I mean, I was communicating
9 with her, so I knew her in the sense that we
10 communicated.
11     MS. DYKSTRA:  What Exhibit is
12 that?  21?
13 BY MS. DYKSTRA:
14     Q.   She's mentioned in your
15 interrogatory responses if that will refresh
16 your recollection.  I just want to know who
17 she is, how you met her and how she came to
18 introduce you to Mr. Moody.
19     A.   I don't remember how I met her.
20     Q.   And you don't remember what she
21 did for a living?
22     A.   For a living?  No.
23     Q.   Do you know what profession she
24 was in at all?
25     A.   I don't know what profession

Appx5658

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    she was in.
3        Q.    Did you contact her about
4    meeting Mr. Moody?
5        A.    No.
6        Q.    How did you come in contact
7    with Ms. Birt?  In your interrogatory answers,
8    if it helps you to refresh your recollection,
9    you state that you spoke with now deceased
10   Elizabeth Birt, former staff person to former
11   Congressman Dan Burton, in early May 2003 in
12   Chicago, Illinois about topics relating to
13   your allegations in the amended complaint
14   regarding the mumps vaccine.  The two met at
15   the Autism One conference held at Loyola.  You
16   spoke to Ms. Birt about your concerns
17   regarding the efficacy of the mumps vaccine.
18           MR. SCHNELL:  What page is
19       that, please?
20           MS. DYKSTRA:  That is on
21       page 43, I believe.
22           THE WITNESS:  Okay.  So what's
23       the question?
24   BY MS. DYKSTRA:
25       Q.    Is that answer accurate?  Does

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    that refresh your recollection at all about
3    your conversation with Ms. Birt?
4        A.    It doesn't refresh my
5    recollection with my conversations with her,
6    no.
7        Q.    Do you recall anything other --
8    anything about your conversations with her
9    other than the fact that you spoke to her in
10   May of 2003 about the allegations in your
11   complaint?
12       A.    She introduced me to Dan Burton
13   just to say hi.  I can't remember if I knew at
14   the time or if she worked at the time.  Like
15   former staff person, I don't know what that
16   refers to, if it was former back then or
17   former now.
18       Q.    Well, she's deceased, so she --
19       A.    Still former.  Well --
20       Q.    You don't remember how you
21   first came to know Ms. Birt?
22       A.    No.
23       Q.    You don't remember any detail
24   of the conversations you may have had with
25   Ms. Birt?

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2        A.    The only thing I can say for
3    certain is that she knew I had previously
4    worked at Merck.  Other than that, I don't
5    recall.
6        Q.    Do you know whether you reached
7    out to her or she reach out to you in the
8    first instance?
9        A.    I don't recall.
10       Q.    Do you know how many times you
11   spoke to her?
12       A.    Two times that I remember.
13       Q.    Tell me about the conversations.
14       A.    I don't remember the first one
15   other than that she introduced me to Dan
16   Burton.  The second one she introduced me to
17   my lawyer.  So that conversation occurred in
18   front of my lawyer.
19       Q.    Which conversation, the
20   introduction?
21       A.    The second time I would have
22   seen her.
23       Q.    How did she know that you were
24   looking for a lawyer?
25       A.    I don't know.

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2           MR. SCHNELL:  I'm going to
3       object to that question.
4           THE WITNESS:  It assumes I was
5       looking for a lawyer.  I don't even
6       recall that -- I can't even -- I can't
7       affirm that that's true.
8    BY MS. DYKSTRA:
9        Q.    She introduced you to Dan
10   Burton you said.  Is that correct?
11       A.    Yes.
12       Q.    Who is Dan Burton?
13       A.    Who is he now?
14       Q.    Who was he at the time when she
15   introduced you in 2003?
16       A.    Congressman Dan Burton,
17   Republican Indiana.  I don't know if he was a
18   congressman at the time.  I had the impression
19   that he was a congressman at the time.
20       Q.    Do you remember your discussion
21   with Mr. Burton?
22       A.    I remember he said -- it was
23   very short and he said hi.  If you need
24   anything or whatever, talk to Liz.  He was --
25   something like that.  Like he was -- she

Page 400

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  introduced me to him, he was letting me know
3  that she knew him. That was it.
4       Q.   Did you talk to him about your
5  concerns that are raised in your complaint?
6       A.   That was the extent of the
7  conversation.
8       Q.   How long was your conversations
9  with Liz Birt?
10      A.   I have no idea. I don't recall.
11      Q.   Do you know, was it at -- did
12 you meet Liz Birt and/or Dan Burton at an
13 Autism One conference?
14      A.   I met them in Chicago.
15      Q.   Did you meet Liz Birt or Dan
16 Burton -- Liz Birt or Dan Burton at an Autism
17 One conference?
18      A.   I think they were -- I don't
19 know their involvement. I have the impression
20 he was involved in it. I didn't attend the
21 conference.
22      Q.   Your interrogatory answer says
23 the two met, meaning you and Ms. Birt, at the
24 Autism One conference. And you spoke to Birt
25 about your concerns about the mumps vaccine.

Page 401

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  Is that accurate?
3       A.   I have no reason to believe
4  that's not accurate except for it was probably
5  at the hotel where that might have been. He
6  didn't attend the conference. I think he was
7  speaking at it or he was involved in it. The
8  point was that's where he was.
9       Q.   You said you did not attend the
10 Autism One conference in 2003. Is that correct?
11      A.   I didn't attend it in the sense
12 that I didn't go to any of the -- what do they
13 have, well, talks or whatever. I didn't
14 attend any of the talks.
15      Q.   Did you attend any of the
16 events other than the speaking engagements?
17 Did you attend, for example, cocktail hours or
18 presentations otherwise?
19      A.   I didn't say I attended any
20 speaking engagements.
21      Q.   I'm just talking about what you
22 attended at the conference and what you didn't
23 attend at the conference.
24      A.   I didn't attend any informational
25 things at that conference that they do. I

Page 402

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  didn't go there to attend the conference.
3       Q.   What did you go there to do?
4       A.   I was in information gathering
5  mode. I think I had known Liz Birt before
6  that, and I can't remember if she invited me
7  or not.
8       Q.   You think you knew Ms. Birt
9  before the conference, is that what you said?
10      A.   I don't -- no, I don't recall.
11 I don't want to guess on why I went there. I
12 know what happened when I was there and the
13 fact that she introduced me to Dan. That's
14 the extent of that.
15      Q.   What happened when you were
16 there at the conference? What do you remember?
17      A.   What do I remember?
18      Q.   Well, you just said you know
19 what happened when you were there, you don't
20 remember why you went there, I think is what
21 you said. So I want to understand what
22 happened when were you at the conference that
23 you recall?
24      A.   I don't recall what the
25 motivation was for if someone invited me, if I

Page 403

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  thought to go, if I knew before. I know that
3  at some point -- I mean, what I remember is
4  that Liz Birt introduced me to Dan Burton
5  that -- he introduced himself in a way to let
6  me know that I should talk to Liz Birt
7  about -- you know, that I should talk to her,
8  that basically letting me know that he knew
9  her. That was the extent of my talk with Dan
10 Burton at that conference, or in the hotel
11 where I believe the conference was that he was
12 speaking at, if he was speaking at it.
13      Q.   Do you believe vaccine causes
14 autism?
15      A.   I have no opinion on that.
16      Q.   You don't know one way or the
17 other or you don't have a belief one way or
18 the other?
19      A.   I don't study autism. I don't
20 know. So I have no opinion.
21      Q.   Do you vaccinate your children?
22           MR. SCHNELL: I'm going to
23 object to getting into privacy matters.
24 I don't know what the relevance of that
25 is.

16 (Pages 400 - 403)

Appx5660

Page 404

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 MS. DYKSTRA: Well, if you
3 believe or you don't know whether
4 vaccines cause autism, it informs your
5 decision about whether you vaccinate
6 your children generally.
7 MR. SCHNELL: I don't see the
8 relevance and I don't want to get into
9 privacy. You've already tried that
10 information, we objected and we moved
11 on and we're going to maintain that
12 objection.
13 MS. DYKSTRA: Whether or not
14 his children are vaccinated you think
15 is a significant enough issue under the
16 confidentiality and protective order
17 entered in this case that he can't
18 answer that question?
19 MR. SCHNELL: It's a privacy
20 issue.
21 BY MS. DYKSTRA:
22 Q. Are you going to follow your
23 attorney's advice?
24 A. Yes.
25 Q. Well, he didn't instruct you

Page 405

1 not to answer just to be clear. He objected.
2 MR. SCHNELL: No, I am
3 instructing him not to answer. If you
4 believe that that invades your privacy,
5 then I instruct you not to answer. If
6 you don't believe it invades your
7 privacy, then you're free to answer.
8 THE WITNESS: I'm not answering
9 the question.
10 BY MS. DYKSTRA:
11 Q. You said you were in information
12 gathering mode?
13 A. Uh-huh.
14 Q. What information were you
15 gathering at the Autism One conference?
16 A. I didn't say -- I was -- from
17 the time I left Merck until I found a lawyer,
18 I was curious about what information I knew,
19 what the public knew. I was curious if there
20 was information that the vaccine didn't work,
21 wasn't safe, things like that.
22 Q. What information did you gather
23 at the 2003 autism conference?
24 A. I don't recall.

Page 406

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 Q. Did you talk to -- you said you
3 talked to Liz Birt about the allegations in
4 your complaint. Correct?
5 A. Well, we want to be very
6 responsive when we write these things, and I
7 knew she knew I worked at Merck.
8 Q. Yes.
9 A. So I believe I may have to some
10 degree, but I don't recall what I discussed
11 with her.
12 Q. Did you talk about the
13 allegations in your complaint or the issues
14 that you saw at Dr. Krah's lab with anybody
15 else at the Autism One conference in 2003 or
16 in the vicinity of the Autism One conference
17 in 2003?
18 A. I believe it's listed here but
19 there were two different points, Kimberly
20 Green, Andrea Rock, they had heard that I
21 worked at Merck.
22 Q. Who is Kimberly Green?
23 A. I remember she said she did
24 something about with film. That's all I
25 remember about her career.

Page 407

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 Q. Who is Andrea Rock?
3 A. I think she said she was --
4 well, it's got to say in here. What page are
5 we at? It's in here somewhere.
6 Q. I believe it's on page 55.
7 A. It says she's a journalist or
8 at least was a journalist.
9 Q. What did you talk to Ms. Green
10 and Ms. Rock about? Did you talk to them
11 together actually?
12 A. No.
13 Q. What did you talk to Ms. Green
14 about?
15 A. The only thing I recall is that
16 they knew I had worked at Merck. And I didn't
17 deny that. So I felt it was responsive to put
18 it in here.
19 Q. Do you recall speaking with
20 Ms. Green about the allegations in your
21 complaint?
22 A. Like specifics of --
23 Q. What happened in Dr. Krah's
24 lab.
25 A. I don't recall that.

17 (Pages 404 - 407)

Appx5661

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 Q. Do you recall speaking about
3 Dr. Krah's lab and what you saw there with
4 Ms. Rock?
5 A. No, I don't recall that.
6 Q. You said you were in information
7 gathering mode, and you defined that as being
8 curious about whether the vaccine didn't work
9 or wasn't safe. And in that capacity who did
10 you speak to about whether the vaccine worked
11 or was safe?
12 MR. SCHNELL: Object to the
13 form.
14 THE WITNESS: I didn't seek out
15 information. I wanted to hear what
16 everyone else was saying.
17 BY MS. DYKSTRA:
18 Q. You didn't ask people at the
19 conference whether they thought the vaccine
20 was effective or safe?
21 A. I was a fly on the wall.
22 Q. Did you learn anything about
23 the vaccine's effectiveness at the conference?
24 A. I don't recall.
25 Q. You don't recall?

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 A. I don't know why I would have,
3 but I don't recall, no. I don't -- can I
4 answer that -- we're talking about public
5 perception.
6 Q. Did you do anything else to
7 investigate or in your information gathering
8 mode other than -- well, wait. I'm sorry.
9 Strike that.
10 You said you were listening to
11 what other people had to say about the vaccine
12 as opposed to seeking out answers. Correct?
13 A. Yeah, people walk by in
14 hallways, do whatever. But meet Dan Burton,
15 go home, see what the general feel there is.
16 I don't recall. Because I wasn't there to be
17 taught by whatever they have at the --
18 whatever the -- I'm not sure how the
19 conference is set up.
20 Q. So you went on an information
21 gathering trip from Pittsburgh to Chicago but
22 you didn't attend any of the informational
23 sessions at the conference?
24 A. No, that's -- the reason is Dan
25 Burton was there and he's a representative and

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 he's concerned about vaccine safety which is
3 tied straight with vaccine efficacy and
4 effectiveness. I mean, if you want to say a
5 motivation, it would be to meet somebody with
6 a potential power to do something if that were
7 a possible avenue. Information gathering
8 mode, you're sticking on the part where it's
9 like finding out what people think, whatever.
10 It's also if this fraud is still going on,
11 what options are there. That's information
12 gathering mode. That doesn't require me to go
13 say, hey, do you have an idea. It's what's
14 going on. I have a lot of knowledge from
15 Merck and I don't know what's public and I
16 don't know what's hidden.
17 Q. So did you or did you not
18 attend any of the informational sessions at
19 the Autism One conference?
20 A. I didn't attend those.
21 Q. Where did you meet Mr. Burton,
22 you said in the hotel at the conference?
23 A. A hallway somewhere.
24 Q. And that was --
25 A. I think it was in the hotel.

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 Q. That was the purpose of your
3 visit, to meet Mr. Burton?
4 A. I wouldn't say the purpose. I
5 mean, I don't recall whether I -- I don't
6 recall. I mean, there's no purpose. There's
7 no purpose that I recall, like, I went out
8 there.
9 Q. You said the reason is Dan
10 Burton was there and he's a representative and
11 concerned about the vaccine. If you want to
12 say motivation, it would be to meet somebody
13 with potential power to do something. So I'm
14 asking is that what you're saying, that you
15 went to the conference to meet Mr. Burton?
16 A. I know I met him there and I
17 thought this guy has power, that's a possible
18 thing, but I didn't know there was an avenue
19 to go forward there or not, because I still
20 didn't know what the FDA was doing at the
21 time. So I didn't want to do anything, I
22 didn't have an avenue forward to stop the
23 fraud if I had any evidence that it was still
24 going on other than the fact that I didn't see
25 it stopped. It's really hard to apply a

18 (Pages 408 - 411)

**Appx5662**

Page 412

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  motivation to something I don't recall. I
3  remember I met the guy, he seemed powerful and
4  maybe there was an option there. He empowered
5  Liz, like I know this woman, yes. And then
6  that was it.
7      Q.  Did you disclose to him in your
8  brief conversation with him that you witnessed
9  fraud at Merck's laboratories?
10     A.  No, I did not.
11     Q.  Why not?
12     A.  Because I talked to him for
13  about 20 seconds. He produced himself and
14  empowered Liz.
15     Q.  Did you tell Liz I witnessed
16  fraud in Merck's laboratories?
17     A.  I don't recall what I talked to
18  her about.
19     Q.  When did she introduce you to
20  Mr. Moody?
21     A.  2003.
22     Q.  Was it at or around this
23  conference, this Autism One conference in
24  Chicago?
25     A.  It was in Pittsburgh.

Page 413

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2      Q.  Okay. Tell me about the meeting
3  and how she introduced you.
4      A.  She was sitting at a table and
5  she introduced Jim Moody. And then Jim Moody
6  started talking.
7      Q.  Where was this? Where did this
8  occur?
9      A.  Pittsburgh.
10     Q.  I know Pittsburgh. Where in
11  Pittsburgh?
12     A.  Downtown.
13     Q.  Where downtown?
14     A.  My best guess would be a hotel,
15  but I'm not sure.
16     Q.  Did Ms. Birt live in Pittsburgh
17  or did she fly to Pittsburgh to meet with you?
18     A.  No idea.
19     Q.  But she arranged the meeting
20  with Mr. Moody?
21     A.  From what I understand.
22     Q.  And you, Ms. Birt and Mr. Moody
23  met in Pittsburgh in 2003 potentially at a
24  hotel?
25     A.  I can't -- I shouldn't guess.

Page 414

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2      Q.  Was it a restaurant? Was it an
3  office?
4      A.  There was no one else around,
5  we were at a table.
6      Q.  And what did you -- the three
7  of you discuss at the initial meeting before
8  you retained him as your counsel?
9          MR. SCHNELL: Well, even if
10     it's before retention, it could still
11     be privileged if they're talking about
12     a potential retention. I wasn't there,
13     I don't know. But I'm going to caution
14     the witness you cannot disclose
15     attorney-client communication to the
16     extent he ultimately became his lawyer.
17         THE WITNESS: I can't answer
18     that, it's privileged.
19  BY MS. DYKSTRA:
20     Q.  When you were meeting with
21  Mr. Moody, was Ms. Birt present?
22     A.  I think to start the meeting.
23     Q.  Tell me about what happened
24  while Ms. Birt was present.
25         MR. SCHNELL: I'm still not

Page 415

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2     sure that changes anything, because I
3     don't know what capacity Ms. Birt was
4     there.
5         THE WITNESS: She introduced
6     him by name and me and he immediately
7     started talking.
8  BY MS. DYKSTRA:
9      Q.  Was she still sitting there
10 while he started talking?
11     A.  I don't recall. At some point
12 she wasn't there.
13     Q.  Tell me, to the extent that you
14 recall siting here today, the conversation you
15 had with Mr. Moody and Ms. Birt?
16     A.  It was immediately privileged.
17     Q.  Is Ms. Birt a lawyer?
18     A.  No, Jim Moody was my lawyer.
19     Q.  But Ms. Birt is there, it's not
20 privileged.
21         MR. SCHNELL: Well, we don't
22     know what -- was she working for the
23     Congressman at the time?
24         THE WITNESS: I have no idea.
25         MS. DYKSTRA: She wasn't

19 (Pages 412 - 415)

Page 416

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 working for his lawyer at the time, so
3 it's --
4 MR. SCHNELL: We don't know if
5 she was a consultant. Could have been.
6 I'm not trying to be difficult. I just
7 don't know what her capacity was at the
8 time.
9 THE WITNESS: She introduced me
10 by name, he started talking, she
11 disappeared.
12 MR. SCHNELL: Well, do you
13 recall what part of the conversation
14 occurred when she was still there?
15 THE WITNESS: When she spoke
16 and said -- and introduced us. She
17 didn't talk again.
18 MR. SCHNELL: But when did she
19 leave? We're trying to separate was
20 there any time she was there when you
21 were talking substantively to Moody?
22 THE WITNESS: He was talking
23 substantively to me.
24 MR. SCHNELL: It doesn't
25 matter.

Page 417

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 THE WITNESS: Okay. She left
3 at some point. I mean, I don't know
4 when. She introduced us. He started
5 talking. She disappeared.
6 MR. SCHNELL: We could quibble
7 about whether she's covered or not, but
8 I would be willing to let him talk
9 about when she was there because I -- I
10 don't know.
11 MR. KELLER: As long as you
12 agree that it's not a waiver to any
13 kind of privilege.
14 MS. DYKSTRA: I would agree
15 that it's not a waiver of his
16 conversation with Mr. Moody after he
17 retained him.
18 BY MS. DYKSTRA:
19 Q. Do you recall in the initial
20 portion of the conversation what Mr. Moody was
21 saying to you prior to Ms. Birt leaving the
22 table?
23 A. Yes. The very first thing he
24 did was hand me some document that described
25 what a qui tam lawsuit was. I had never heard

Page 418

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 of it. He explained it. She wasn't there by
3 the end of that.
4 Q. So at some point during his
5 explanation of what a qui tam lawsuit was she
6 left the table?
7 A. Yeah, that took a while.
8 Q. How long did that take?
9 A. She was gone before he was done
10 with that. I don't know. Probably about the
11 time he was talking about Abraham Lincoln.
12 But that's -- yeah, he talked about Abraham
13 Lincoln.
14 Q. During the meeting with Mr. Moody,
15 was that when you actually retained him as
16 your counsel?
17 A. He said that very quickly.
18 MR. KELLER: I want you to be
19 very careful.
20 BY MS. DYKSTRA:
21 Q. Just kind of a yes or no to the
22 extent that you can answer.
23 MR. KELLER: No. Very
24 carefully. When you sat down with
25 Mr. Moody, were you seeking legal

Page 419

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 advice?
3 THE WITNESS: Yes.
4 MR. KELLER: That's it.
5 BY MS. DYKSTRA:
6 Q. From the time that you met with
7 Mr. Moody at that time, from that point
8 forward, did he become your counsel?
9 A. Yes.
10 Q. He was your counsel from 2003
11 to 2009?
12 A. I'm not sure the end date. I'm
13 not sure how -- the timing of the transition.
14 Q. Did you file -- I apologize if
15 I asked this yesterday, I don't recall.
16 MR. SCHNELL: You did.
17 MS. DYKSTRA: Do you mind if I
18 ask again just to be clear?
19 MR. SCHNELL: No.
20 BY MS. DYKSTRA:
21 Q. Prior to retaining Mr. Keller
22 and Mr. Schnell, did you file a False Claims
23 Act or a whistleblower complaint in any
24 jurisdiction?
25 A. I did answer that yesterday.

20 (Pages 416 - 419)

Appx5664

Page 420

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2        MR. SCHNELL: You can answer.
3        THE WITNESS: No.
4  BY MS. DYKSTRA:
5        Q.   Did you and Mr. Moody attend
6  Autism One conferences together?
7        A.   No.
8        Q.   Did you attend any other Autism
9  One conferences?
10       A.   Define attend.
11       Q.   Either attend an informational
12  session or any other portion of the conference.
13       A.   No.
14       Q.   Did you go to the hotel where a
15  conference was held at the time the conference
16  was held?
17       A.   Yes.
18       Q.   Which -- in what instances, at
19  what times did you do that?
20       A.   I can't recall each year.
21       Q.   How many conferences did you
22  attend in the broad way we're speaking?
23       A.   I don't know the exact number.
24       Q.   Can you give me an approximate
25  number?

Page 421

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2        A.   Less than half a dozen.
3        Q.   Do you know what years you
4  attended these meetings?
5        A.   I don't know which years.
6        Q.   I think the only one you
7  disclosed in addition to the 2003 is a 2009
8  conference in your answers to discovery. Do
9  you recall attending the 2009 autism
10  conference in Chicago?
11       A.   I'm not sure of the exact year,
12  but I didn't attend it, I went to Chicago
13  because that's where Jim Moody was. To meet
14  with Jim Moody.
15       Q.   Did you also speak with Stan
16  Kurtz? You have in your answers to
17  interrogatories he's an independent researcher
18  of vaccines and other childhood issues, and
19  you spoke to him and his wife Michelle about
20  topics related to the allegations in your
21  amended complaint at the Autism One conference
22  in 2009. That's on page 53.
23       A.   It was in the hotel where the
24  conference was at in 2009 in Chicago, yes.
25       Q.   Can you give me any details

Page 422

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  about your conversation with Mr. Kurtz? Tell
3  me what details you remember about your
4  conversations with Mr. Kurtz.
5        A.   I remember he said that if I
6  needed new counsel, that he could -- he knew
7  people he could put me in contact with.
8        Q.   Did you tell Mr. Kurtz that you
9  were unhappy with your counsel, meaning
10  Mr. Moody?
11       A.   I don't recall, but I shouldn't
12  guess at it. I don't recall the details of
13  why he would have said if you need new counsel
14  or if you need counsel. I don't even know
15  that he said new counsel. He basically said
16  he could be an intermediary and get me in
17  touch with lawyers. I'm not sure of the
18  circumstances beyond that.
19       Q.   You don't recall what you said
20  that would have instigated that response from
21  Mr. Kurtz?
22       A.   No.
23       Q.   You don't recall anything else
24  about your conversation with Mr. Kurtz other
25  than he said if you need a lawyer, I can find

Page 423

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  one for you?
3        A.   The take-home message, from
4  what I remember, was that he had a possible
5  avenue to be able to talk to another lawyer.
6  That's what I remember about it.
7        Q.   And you don't remember one way
8  or the other whether you told him you were
9  dissatisfied with your current lawyer?
10       A.   I don't recall.
11       Q.   Did you tell Mr. Kurtz that you
12  had been trying to pursue an action against
13  Merck for five or so years?
14       A.   I don't remember the details of
15  why he offered to be an intermediary to talk
16  to another lawyer.
17       Q.   Would you recommend Mr. Moody
18  as counsel to somebody else?
19       A.   For what kind of -- what are we
20  talking about? I mean --
21       Q.   If they had a potential False
22  Claims Act case.
23       A.   I don't have a whole lot of
24  experience with lawyers to recommend one way
25  or the other.

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Appx5665

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    Q.   Would you recommend Mr. Moody
3  as counsel to somebody else if they had a
4  potential False Claims Act case?
5    A.   I would always recommend these
6  guys first.
7    Q.   You're not answering my
8  question.  Would you or would you not
9  recommend Mr. Moody to somebody else if they
10  had a False Claims Act case?
11    A.   Not with a better option
12  available.  I'd recommend these, Constantine
13  Cannon, Keller Grover.
14    Q.   Other than the 2003 and 2009
15  autism conferences, did you attend any other
16  autism conferences in the broad sense we're
17  speaking, meaning go to the area where the
18  conference is held?
19    A.   I'm not sure.  I think I
20  may have gone to Chicago to meet Jim
21  Moody.  I don't know the number of times.
22    Q.   Did your wife attend the trips
23  to Chicago with you?
24    A.   No.
25    Q.   Mr. Krahling, you left Merck in

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  November/December 2001.  Following your
3  departure from the company, did you ever see,
4  other than in connection with this case, any
5  of the submissions Merck made to the FDA
6  around Protocol 007?
7    MR. SCHNELL:  Object to form.
8    THE WITNESS:  What do you mean
9  in connection with the case?
10  BY MS. DYKSTRA:
11    Q.   I know you produced in this
12  case, the company has produced in this case a
13  lot of submissions and filings that the
14  company had with the FDA over a long period of
15  time.  You weren't at the company for that
16  entire period of time.  So what I'm asking you
17  is other than things that you may have seen
18  through the course of discovery in this case,
19  have you ever seen the actual submissions that
20  Merck made to the FDA in connection with
21  Protocol 007 that postdated your employment?
22    A.   Those overlap.  If you can
23  rephrase it as prior to filing the lawsuit
24  what submissions would I have seen, then we
25  cut out anything I've seen first time since

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  then.
3    Q.   Prior to filing the lawsuit.
4    A.   Now, what do you mean by
5  "submissions"?
6    Q.   Anything that Merck provided to
7  the FDA related to 007.
8    A.   Prior to filing the lawsuit, on
9  clinicaltrials.gov Protocol 007 was listed as
10  a completed trial.  I had the ProQuad BLA, and
11  I -- there was the language around the label
12  change from 20,000 to 12,500 TCID50.  There
13  was an EMA submission -- there was an EMA
14  document that cited an EMA submission that
15  listed Protocol 007 as a pivotal study and it
16  had the final seroconversion rates in it.  It
17  was listed as a completed study.  So I had at
18  least those things.  I can't remember off the
19  top of my head more submissions.
20    Q.   Let me just make sure I have
21  those correctly.  So prior to filing the
22  lawsuit, you went on clinicaltrials.gov and
23  based on information on clinicaltrials.gov,
24  you had the ProQuad BLA, an EMA submission and
25  I think you said the new label?

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    A.   Are you saying I got them off
3  of clinicaltrials.gov?
4    Q.   That's what it sounded like
5  your answer was.
6    A.   No, it was a separate thing.  I
7  got the ProQuad BLA from an Internet search.
8    Q.   Okay.
9    A.   Clinicaltrials.gov is a
10  website.  The EMA document that cites the EMA
11  submission off the Internet.
12    Q.   So BLA you got off the Internet?
13    A.   The CDC contract.
14    Q.   The CDC contract, okay.
15    A.   I might be leaving something
16  out, but I think we have it detailed in the
17  complaint if you want to go through it.
18    Q.   If you think looking at the
19  complaint would be helpful, that's fine.
20    A.   No.  That's what I got off the
21  top of my head here 17 years later.
22    Q.   So you said you got the ProQuad
23  BLA off an Internet search.  Correct?
24    A.   Yes.
25    Q.   I just want to break it down.

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2     A.   Sure.
3     Q.   And you got the CDC contract
4  where?
5     A.   Someone on our legal team found
6  that.  I'm not sure I found it.  I don't
7  recall how I had that in front of me.
8     Q.   Which legal team are you
9  talking about?
10    A.   Which legal team?  Do I need to
11  make the distinction?
12    Q.   Yes, you do.
13    A.   These guys.  Oh, wait.  I got
14  more.  The FDA 483 report.
15    Q.   Where did you get that?
16    A.   Counsel.  The first one.
17    Q.   Mr. Moody?
18    A.   Yes.
19    Q.   How did he get it?
20    A.   I have no idea.
21     MR. SCHNELL:  I just want to
22  instruct the witness going forward not
23  to identify documents that your counsel
24  may have provided you.  So if we can
25  carve out of your answer going forward

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  those documents, please do.
3     THE WITNESS:  Are these the
4  ones I found on my own?
5  BY MS. DYKSTRA:
6     Q.   My question was prior to filing
7  this lawsuit, what did you see?
8    A.   Everything I saw prior to 2010.
9    Q.   So the ProQuad BLA you
10  mentioned you found yourself from an Internet
11  search?
12    A.   I don't know if counsel found
13  it independently, but I remember when I found
14  it, it lit a fire under me.
15    Q.   Tell me about that, when did
16  you find it and what did you think?
17    A.   I think that they were using --
18  it cited the PRN from Protocol 007 to justify
19  the cutoff for the ELISA.  And they were
20  bringing ProQuad to market based on unreliable
21  data that was falsified.  So I knew for
22  certain the fraud was ongoing.
23    Q.   You don't know whether you
24  found the ProQuad BLA from your own Internet
25  search or Mr. Moody gave it to you?

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    A.   No, I know I found it.
3    Q.   You found it yourself?
4    A.   Absolutely.
5    Q.   And so that was -- you found
6  that, I'm sorry, on the Internet somewhere?
7    A.   Internet search engine somehow.
8    Q.   The CDC contract, did you also
9  find that from Internet search or you think
10  you may have got that from counsel?
11    A.   I don't recall --
12    Q.   I'm trying not to -- I'm trying
13  to say did you find --
14    A.   I don't recall how I got it in
15  front of me.  The reason I remember the
16  ProQuad BLA so much is it was easily
17  identifiable that they were using Protocol 007
18  ELISA which was absolutely predicated and
19  inextricably linked to that PRN falsification.
20  I know I saw the seroconversion data in that
21  EMA document that talked about the EMA
22  submission.  It was a completed study.  They
23  weren't looking at some small sample size.
24  Those stand out quite well.  At some point I
25  was looking at a CDC contract.  I don't know

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  who found it or supplied it.
3    Q.   And I think you mentioned the
4  483.  Do you know whether you found that by
5  yourself on some FOIA request or an Internet
6  search?
7    A.   Let's clarify.  I don't recall,
8  I remember that I had it in front of me before
9  I met them.  Whether counsel provided me, I
10  don't think I provided it.  I mean, I have to
11  identify who provided it?  I shouldn't guess.
12    Q.   I don't want you to guess.  I'm
13  just asking if you recall how you got it?
14    A.   I recall seeing it.
15    Q.   What data did you get off of
16  clinicaltrials.gov related to the mumps
17  vaccine?
18    A.   One of the most important
19  pieces was that Protocol 007 was a completed
20  study which means the seroconversion rates I
21  was seeing were final.  They weren't based off
22  of some interim measure, or however Merck
23  described it.
24    Q.   Did you see -- did you pull off
25  of clinicaltrials.gov the final seroconversion

23 (Pages 428 - 431)

Appx5667

Page 432

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  rates from 007 that were submitted to the FDA?
2      A.   I don't know if they were on
3  there.  I don't recall that.  I recall seeing
4  the final seroconversion rates listed in the
5  EMA submission that the EMA discussed.
6      Q.   Other than the documents you
7  just identified, did you see -- let me ask
8  specifically.  Again, I'm excluding what
9  you've seen in connection with this
10 litigation.
11     A.   Prior to 2010.
12     Q.   Prior to discovery in this
13 litigation, had you ever seen the supplemental
14 biological license application that Merck
15 submitted to the FDA on January 29, 2004?
16         MR. SCHNELL:  Do you have the
17 document?
18         THE WITNESS:  I'd have to look
19 at it to know.
20 BY MS. DYKSTRA:
21     Q.   Do you recall seeing it?
22     A.   Well, you listed a title.  If I
23 saw a document and didn't remember the title?
24     Q.   I'm asking you if you recall

Page 433

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  seeing --
2      A.   I can't say either way.
3      Q.   You don't remember one way or
4  the other?
5      A.   No, I didn't say that.  I said
6  without seeing the document, I can't know
7  whether I saw it before or not.
8          - - -
9          (Exhibit Krahling-31, 1/29/04
10 Supplemental Biologics License Application,
11 MRK-KRA00000032 - 00000139, was marked
12 for identification.)
13         - - -
14 BY MS. DYKSTRA:
15     Q.   I'm going to mark as Exhibit 31
16 a January 29, 2004, Supplemental Biologics
17 License Application.  And you can -- all I
18 want to know is whether or not you saw this
19 document prior to discovery in this lawsuit.
20 I'm not asking if there's a label attached and
21 you may have seen the label.  I'm talking
22 about the full submission to the FDA.
23     A.   I have seen this document.  I
24 don't recall when I first saw it because so

Page 434

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  many pieces of it are familiar.
2      Q.   You just looked at the first
3  page.
4      A.   I looked through it.  There's
5  nothing that looks foreign here.  I know that
6  I've seen all this.  The question is, which
7  isn't helping you, is, I don't know when I
8  first saw this.  I saw this years ago.
9      Q.   But you don't know when you
10 first saw it?
11     A.   I can't say for certain whether
12 I saw it prior or not.  I don't know.
13     Q.   Mr. Krahling, you had answered
14 a series of requests for admissions related to
15 the CDC already stating that you were never
16 asked to communicate with the CDC during your
17 employment at Merck and your job duties did
18 not include directly communicating with the
19 CDC.  Do you recall that?
20     A.   What exhibit is that?
21     Q.   I have no idea.  It's
22 Exhibit 6.  The supplemental requests for
23 admissions number 50 and 51.
24         Do you see number 50 you state

Page 435

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  that your job duties did not include directly
2  communicating with the CDC.  You were never
3  asked to communicate with the CDC during your
4  employment at Merck, and prior to the lawsuit
5  you had no personal knowledge of any nonpublic
6  communications between Merck and the CDC.
7      A.   I see those.
8      Q.   And the last one I'll point to
9  is number 57, you admitted that you had no
10 personal knowledge of any communications at
11 all regarding Protocol 007 between Merck and
12 the CDC?
13     A.   Yeah.
14     Q.   In addition, is it also correct
15 that you never negotiated any contract with
16 the CDC on behalf of Merck?
17     A.   Hold on.  Wait a minute.
18 You're talking about request number 57 now?
19     Q.   No.  I'm not asking you in
20 addition to those.
21     A.   Okay.
22     Q.   I have another question.
23     A.   Okay.
24     Q.   Is it also true that you never

24 (Pages 432 - 435)

Appx5668

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  negotiated any contract on behalf of Merck
3  with the CDC?
4       A.    What do you mean by negotiate?
5       Q.    I'm not really sure how to
6  define that term other than discuss with the
7  CDC the terms and provisions that go into a
8  final agreement.
9       A.    In person or over the phone?
10      Q.    In any way.  In person, over
11 the phone, communicate in writing?
12      A.    I provided content that went
13 into those negotiations.  But I did not
14 personally talk to CDC representatives, CDC
15 representatives in person to negotiate prices.
16      Q.    What content did you provide
17 that went into the CDC negotiations?
18      A.    According to Krah, we would
19 have lost the exclusive licensing right to
20 market that vaccine, which means the CDC
21 wouldn't have bought it.  So I was in the lab
22 that committed fraud and the information would
23 have been safety and efficacy information
24 because the CDC -- from what I understand from
25 Krah and generally, that's how the CDC works,

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  they want the vaccine to be both safe and
3  effective.
4       Q.    Have you ever participated in a
5  meeting with the CDC in any form around the
6  contract?
7       A.    In person and over the phone,
8  no.  Krah made it clear that Protocol 007 was
9  designed to keep the vaccine on the market,
10 protect the shelf life so that they could
11 make -- first of all, it was to keep it on the
12 market because it could be removed.  Protect
13 the label so that it wouldn't be changed and
14 to maintain its exclusivity so that it
15 wouldn't have competitors.  That was the
16 financial goal of Protocol 007.  He made it
17 clear that you don't start working on a
18 scientific objective unless you understand the
19 financial goal that that exists in pursuit of.
20 I think I cited it in an e-mail to him.
21      Q.    So just to be clear, Dr. Krah
22 told you that Protocol 007 was necessary to
23 keep MMR II on the market?
24      A.    Yes.  Not only that, but they
25 had to take a -- they had to get an early read

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  on it to keep it on the market.  Because
3  the -- it couldn't maintain its shelf life.
4       Q.    You're aware that your
5  complaint is public.  Correct?
6       A.    You mean published in the
7  public sphere?
8       Q.    Publicly available --
9       A.    Yeah.
10      Q.    -- to people on the Internet?
11      A.    Yes.
12      Q.    And you're aware that the DOJ
13 talked to the CDC about your complaint?
14          MR. SCHNELL:  Object to the
15      form.
16          THE WITNESS:  I don't know --
17      what do you mean talked to them?
18 BY MS. DYKSTRA:
19      Q.    Communicated the information in
20 your complaint.
21          MR. SCHNELL:  Object to form.
22 BY MS. DYKSTRA:
23      Q.    Are you aware that the DOJ --
24 that the CDC is aware of your allegations?
25          MR. SCHNELL:  Object to form.

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2          THE WITNESS:  In what sense are
3      they aware?  I mean, you mean they've
4      read the complaint?
5  BY MS. DYKSTRA:
6       Q.    Are you aware that the CDC is
7  in any way aware of your allegations?
8       A.    You're talking about the CDC as
9  an institution or people there?
10      Q.    Well, it has to be people
11 there.  The CDC doesn't work other than
12 through people.
13      A.    Am I aware of which people
14 there have read it?
15      Q.    Are you aware that anyone at
16 the CDC is aware of your allegations?
17      A.    If you said it's public and
18 that they are there to do their job, I can
19 only infer that they've read it, but the DOJ
20 didn't inform me of anything.
21      Q.    Do you know whether the CDC has
22 in any way changed its purchasing of the mumps
23 vaccine since you filed your complaint?
24      A.    What do you mean changed the
25 purchasing?

25 (Pages 436 - 439)

Appx5669

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1    Q.   Changed any of the terms of
2  their purchasing?
3    A.   I'd have to see the CDC
4  contracts to know that.
5    Q.   I'm asking you if you know
6  sitting here today whether the CDC changed any
7  of its purchasing terms with respect to the
8  mumps vaccine since you filed your complaint?
9    A.   CDC, I haven't communicated
10  with the CDC in any sense about their
11  purchasing terms, have I? I don't think so.
12  I haven't reviewed any CDC contracts other
13  than the one I saw before we filed.
14    Q.   So you don't know one way or
15  the other whether the CDC has changed any of
16  its purchasing terms even though your
17  complaint is public?
18        MR. SCHNELL: Object to form.
19        THE WITNESS: What do you mean
20    even though the complaint is public? I
21    know the CDC changed their website
22    about how well the vaccine works. That
23    seems like a pretty substantial
24    material change.

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  BY MS. DYKSTRA:
2    Q.   What did they -- what do you
3  know about that?
4    A.   It changed the efficacy from
5  saying it worked really well to it doesn't
6  work so well. The number went down
7  significantly.
8    Q.   Which number?
9    A.   The number that they list for
10  how well it works.
11    Q.   The effectiveness rate?
12    A.   I don't know what they refer to
13  it on the website. The website used to -- the
14  website, the pink book, I believe it cited
15  possibly the package insert number, something
16  high. They don't cite it anymore. They cite
17  a lower real world effectiveness.
18    Q.   When did you first become aware
19  of this?
20    A.   Prior to -- well, it was after
21  the lawsuit because the change happened after
22  the lawsuit was filed.
23    Q.   Do you believe that your
24  litigation and your lawsuit had any effect on

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  the CDC such that it lowered its real world
2  effectiveness rating or the numbers around
3  real world effectiveness on its website?
4    A.   I can't speak for the CDC but
5  you're asking if I believe. I think so. IEC
6  changed their number, too.
7    Q.   What did they change their
8  number to?
9    A.   A much lower number than the
10  package insert states.
11    Q.   When you talk about the package
12  insert, you're talking about the 96 percent
13  seroconversion rate that's referenced in the
14  package insert?
15    A.   Whatever number they had before
16  which was in the 90s. I can't say
17  definitively what it referred to. I don't
18  remember when that dropped.
19    Q.   What did they -- you don't know
20  what the IAC or the CDC changed on their
21  website specifically, what number they changed
22  it to, just a lower number?
23    A.   They changed it to a number
24  that was in the 90s that represented how well

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  the vaccine worked to a lower real world
2  effectiveness. I don't recall what citations,
3  but they changed the number.
4    Q.   You understand -- you
5  understand the CDC realizes that the vaccine
6  is not 100 percent effective?
7    A.   What is that? I can't accept
8  that characterization. What do you mean
9  "realize"?
10    Q.   Do you believe the CDC -- well,
11  you said already that the CDC has a lower real
12  world effectiveness on their website.
13    A.   Here's what I realize, that a
14  package insert comes with the product they buy
15  and Merck sticks by their claim on that
16  package insert that just one shot produces
17  96 -- produces mumps neutralizing antibodies
18  in 96 percent of people who get one shot. And
19  CDC is looking at outbreaks, writing papers
20  saying that the 2006 outbreak was
21  characterized by two-dose failure, meaning the
22  kids had two doses of that vaccine.
23        MR. SCHNELL: Lisa, we've been
24    going about an hour, so whenever is a

26 (Pages 440 - 443)

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2        good time for a break.
3    BY MS. DYKSTRA:
4        Q.    Do you know what the CDC pays
5    for the Merck's mumps vaccine?
6        A.    Too much.  It doesn't work.
7    Any amount is too much.
8        Q.    Do you think it has zero
9    effectiveness, the vaccine?
10       A.    I know from talking to Krah and
11   publications he gave me that having low
12   vaccine efficacy can actually make a disease
13   more dangerous.  So when you say any
14   effectiveness, there's kind of an implication
15   there that a lower amount is just a lower
16   amount of a good thing.  A lower amount of
17   antibodies that don't neutralize the virus can
18   actually make the disease more severe.  He
19   gave me publications that documented that this
20   has already occurred in the measles vaccine
21   and he was concerned about that low efficacy
22   in measles.  So, yeah, I mean, a low amount of
23   non-neutralizing antibodies can be a very
24   dangerous thing.
25       Q.    Do you know how -- you used the

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    term "diminished efficacy," and you talk about
3    the vaccine having a lower effectiveness.
4    What is your understanding of how effective
5    the vaccine is today?
6        A.    It's not effective against wild
7    type strains and that the efficacy is so low
8    that there's a theoretical potential to make
9    the disease worse.
10       Q.    Can you give me a number that
11   you think that the vaccine is effective, a
12   percentage?
13       A.    A percentage that it works?
14   I'm telling you that once it gets low, you
15   don't characterize it in terms of works.
16       Q.    What do you believe to be the
17   vaccine's effectiveness today?
18       A.    I think the vaccine sucks.
19       Q.    What do you believe to be the
20   vaccine's effectiveness today in numbers?
21       A.    It doesn't work.  There are
22   outbreaks in highly vaccinated populations
23   where the kids have had two doses of the shot.
24   I think we need an effective mumps vaccine and
25   we don't have one.

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2        Q.    Can you give me a number with
3    respect to what you believe to be the
4    vaccine's effectiveness today?
5        A.    I can give you a relative
6    number.  It's significantly below what Merck
7    claims it is.
8        Q.    Can you give me a range or an
9    estimate of what you believe the vaccine's
10   effectiveness to be today?
11       A.    I can give you a range based on
12   what I saw in Krah's lab.  He had tested using
13   a standard PRN against a panel of wild types,
14   he saw efficacy, you know, 70, 60 percent.  He
15   saw efficacy as low as zero percent against
16   some wild type strains.  So against some it
17   doesn't work at all.  Against some there may
18   be a neutralizing response but we don't know
19   if it's in the danger zone.
20       Q.    Yes, we looked at some of that
21   yesterday for --
22       A.    Absolutely none of the wild
23   type strains were anywhere near 90 percent.
24   Krah said that's the reason they needed to
25   test against the vaccine strain.  When they

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    were able to negotiate calling a low passage a
3    wild type strain even he didn't believe it.
4    In his own documents he put wide type in
5    quotes.  I said, why did you put wild type in
6    quotes?  And he said, because it's not a
7    vaccine -- or it's not a wild type strain,
8    it's a vaccine strain.  His rationale, the
9    AIGENT assay, his rationale, the objective
10   listed it as identify a mumps neutralization
11   assay format testing against a, in quotes,
12   wild type mumps strain that will permit
13   measurement of greater than or equal to 95
14   percent seroconversion in MMR II vaccinees.
15   That, I said why is wild type in quotes.  He
16   said because it's not wild type.  Low passage
17   is not wild type.
18            So I don't believe that the
19   results they got against the low passage
20   represent what they would have got against the
21   wild type strains when he tested against those
22   wild type strains, got nowhere near 90
23   percent.  Some of them were as low as zero.
24   That's my belief of why the efficacy rates or
25   how well it works is so much significantly

27 (Pages 444 - 447)

Appx5671

Page 448

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  lower than what Merck claims is delivered by
2  their product with just one shot. I hope that
3  answers your question.
4      Q.  Not necessarily. You saw
5  yesterday, we showed you documents that Merck
6  had shared with the FDA its seroconversion
7  rates with the LO-1 wild type strain, and we
8  saw numbers that were zero and 50 percent. Do
9  you recall that?
10     A.  I recall that the Swiss isolate
11  wasn't in there where there was zero percent.
12  I also remember saying Krah had -- they had
13  to -- the FDA knew they were testing against
14  wild type. They had to go to the FDA with
15  their best case scenario against a wild type
16  so that they could argue to test against the
17  vaccine strain. Not the low passage, they
18  wanted to test against the full throttle
19  vaccine strain. Because -- and the rationale
20  was that's the only way they could get the
21  number that he targeted that they must have
22  beforehand.
23     Q.  You're aware that CBER approved
24  a low passage Jeryl Lynn strain to be used in

Page 449

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  the PRN assay?
2      A.  I don't know what you mean by
3  "approved."
4      Q.  That CBER said it was okay for
5  Merck to use a lower passage Jeryl Lynn strain
6  in the PRN assay?
7      A.  They were aware that Merck was
8  going to test against that low passage, yes.
9      Q.  Can you tell me what you
10  believe the effectiveness of the vaccine to be
11  today in numbers, what percentage?
12     MR. SCHNELL: Object to form.
13  He's already asked and answered that
14  several times.
15     MS. DYKSTRA: He hasn't give me
16  a single percentage. He just said it
17  sucks.
18     THE WITNESS: I said more than
19  it sucks. I gave you that whole panel
20  of wild type. It's as low as zero
21  percent against some wild types. You
22  know, you talked about the FDA
23  approving or being aware of the use.
24  Krah let us know that. Of course we

Page 450

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  knew that. And yet he still put wild
2  type in quotes after he knew that we
3  were going to be able to do it. I
4  asked him after the FDA was letting
5  them do that, he's putting wild type in
6  quotes. He did not believe it was a
7  wild type virus. And I agree with him.
8  The reason they chose it is because
9  they couldn't get the answer they
10  wanted without it.
11     VIDEOGRAPHER: There's five
12  minutes left on the tape.
13     MS. DYKSTRA: We can take a
14  break then if the tape is running out.
15     VIDEOGRAPHER: The time is
16  12:21. We're going off the video
17  record.
18         - - -
19     (A recess was taken.)
20         - - -
21     VIDEOGRAPHER: The time is
22  12:40. This begins disc two in the
23  videotape deposition of Stephen
24  Krahling.

Page 451

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  BY MS. DYKSTRA:
2      Q.  Mr. Krahling, are you familiar
3  with ACIP as part of the CDC?
4      A.  What do you mean by familiar
5  with it?
6      Q.  Do you know what ACIP is?
7      A.  Generally speaking, I think so.
8      Q.  What is your understanding of
9  ACIP?
10     A.  I think one of the things they
11  do is talk about recommendations for
12  vaccination. Other than that, I'm not really
13  familiar with them.
14     Q.  Are you aware that the CDC
15  currently recommends two doses of MMR II be
16  given to children in the first 12 to 15 months
17  and the second in the four to six years? The
18  first dose in children 12 to 15 months and the
19  second dose in children four to six years?
20     A.  I haven't looked at it, but I
21  don't think you're wrong. That sounds -- I
22  mean if you're reading it, that sounds right,
23  two doses.
24     Q.  Do you know whether the CDC has

28 (Pages 448 - 451)

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  changed its recommendation for immunization in
3  the context of mumps?
4      A.  I saw some -- maybe some
5  publications that were by people from the CDC
6  where they were talking about discussion of
7  the possibility of needing a third dose of MMR
8  because two doses wasn't protecting and
9  preventing outbreaks of the disease.
10     Q.  Do you have an opinion whether
11 a third dose is appropriate at this point in
12 time?
13     A.  A third dose of an ineffective
14 vaccine would not be appropriate.  I think
15 they need an effective vaccine.
16     Q.  What in your mind would you
17 characterize as an effective vaccine?
18     A.  Such a broad question.
19     Q.  When you say they need an
20 effective vaccine, what do you mean?
21     A.  You're talking in terms of the
22 CDC.  I can give you an ostensive example that
23 the CDC monitors outbreaks and they identified
24 mumps as an eradicable disease and they said
25 an elimination goal to have mumps eradicated

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  by 2010 and they believe they can do that
3  based on Merck's claim of how well the vaccine
4  works.  2010 has come and gone and the number
5  of cases, of reported cases of mumps has
6  increased in the last 15 years.
7      Q.  But what in your mind would be
8  an effective vaccine?
9      A.  When the CDC identifies that a
10 disease can be eradicated and disease can go
11 down, it should do what they think it can do
12 from the CDC's point of view.
13     Q.  Do you think a mumps vaccine
14 that is 70 percent effective or has an
15 effectiveness rate of 70 percent is -- qualifies
16 as an effective vaccine?
17     A.  The CDC published a document
18 that said a vaccine with effect that low
19 wouldn't be able to eradicate disease.
20     Q.  I understand that.  Do you
21 think that a vaccine with an effectiveness
22 rate of 70 percent in real world effectiveness
23 terms is an effective vaccine?
24     A.  So in the example I gave you of
25 what the CDC stated as an elimination goal and

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  what they needed for a effective vaccine, that
3  would not be able to get the job done in that
4  example.
5      Q.  I understand that you're saying
6  it wouldn't eradicate the disease.  A vaccine
7  that's 70 percent effective.  Correct?
8      A.  All right.
9      Q.  I understand that.  I
10 appreciate that answer.  Do you think a mumps
11 vaccine that is 70 percent effective qualifies
12 as an effective vaccine?
13         MR. SCHNELL:  Object to form.
14         THE WITNESS:  That's so vague.
15     There's not even a vaccine out there.
16     Do we even know if there's a vaccine
17     that's 77 percent effective?  We're
18     talking about real world data?
19 BY MS. DYKSTRA:
20     Q.  What do you believe to be the
21 real world data with respect to the mumps
22 vaccine?
23     A.  Real world?
24         MR. SCHNELL:  Object to form.
25 BY MS. DYKSTRA:

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2      Q.  Yes.
3      A.  Real world data?  Can you
4  rephrase that?
5      Q.  Yeah, sure.  You said the CDC
6  monitors reported cases of mumps.  Correct?
7      A.  They do, yes.
8      Q.  Do you know what the CDC
9  believes to be, what has stated to be the real
10 world effectiveness of the mumps vaccine?
11         MR. SCHNELL:  Object to the
12     form.
13         THE WITNESS:  You're talking
14     about the CDC as an agency?
15 BY MS. DYKSTRA:
16     Q.  Uh-huh.  Yes.
17     A.  I can't speak for them.
18     Q.  But you believe the mumps
19 vaccine -- I'm sorry, I didn't mean -- strike
20 that.
21         What do you believe to be the
22 effectiveness of the current mumps vaccine?
23         MR. SCHNELL:  Object to form.
24     Asked and answered.
25         THE WITNESS:  You keep

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 rephrasing that question. I think it
3 doesn't work. It doesn't prevent
4 outbreaks even when the population is
5 highly vaccinated. That's an
6 observation the CDC made even when the
7 kids have had two shots of it.
8 BY MS. DYKSTRA:
9 Q. Based on your experience with
10 the mumps vaccine, can you tell me what range
11 of effectiveness the vaccine has? I'm looking
12 for a number.
13 A. You're saying effectiveness
14 now, talking real world. My experience in the
15 lab was lab immunogenicity as a surrogate for
16 efficacy, that's a different thing.
17 Q. What do you believe -- can you
18 give me either one in terms of a percentage
19 what you believe real world effectiveness is
20 or what you believe the true immunogenicity is
21 of the current mumps vaccine?
22 MR. SCHNELL: Object to the
23 form.
24 THE WITNESS: First of all,
25 you're looking for a number.

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 BY MS. DYKSTRA:
3 Q. Yes, or a range.
4 A. Exactly. You're looking for a
5 range that includes zero according to the wild
6 type data we saw in Krah's lab, but that's
7 not -- that's immunogenicity data that is a
8 surrogate for efficacy. You're talking about
9 real world efficacy where everybody is getting
10 two doses. Do you want real world
11 effectiveness of one shot?
12 Q. Why don't we start there.
13 A. Well, everybody is getting two
14 shots, so there's not even -- where is your
15 population that's getting one shot? How could
16 you even speak to effectiveness when everybody
17 is getting two, and like you pointed out or
18 somebody pointed out the CDC is debating
19 whether there should be a new vaccine or a
20 third shot of the one that's not working.
21 That was my characterization at the end there.
22 But the observation by the CDC was that 2006
23 outbreak was characterized by two-dose
24 failure.
25 Q. So can you give me your

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 estimate of the effectiveness rate of two
3 doses of the vaccine, of the current vaccine?
4 MR. SCHNELL: Objection. Asked
5 and answered.
6 THE WITNESS: I don't know how
7 many times they can go over this.
8 BY MS. DYKSTRA:
9 Q. I want you to give me a
10 percentage, a range that you believe Merck's
11 mumps current vaccine has in real world
12 effectiveness terms?
13 MR. SCHNELL: Objection. Asked
14 and answered.
15 BY MS. DYKSTRA:
16 Q. You can answer.
17 A. I've already answered.
18 Q. You haven't given -- you said
19 it sucks. You said it doesn't work.
20 A. Well, that's my -- I answered
21 way more than that.
22 Q. But I want to know what you --
23 you said that Merck represents vaccine to
24 impact children by protecting them and causing
25 96 percent seroconversion rate. And you say,

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 in fact, the real world effectiveness is
3 significantly less than that. Correct?
4 A. Efficacy is significantly less
5 than that.
6 Q. What do you believe efficacy to
7 be of the vaccine?
8 A. I've gone over this every
9 possible way I can. I've cited Krah's
10 immunogenicity data which is supposed to be a
11 surrogate of efficacy. This shows a range of
12 seroconversion rates against wild type
13 circulating diseases -- disease strains that
14 are significantly below what they claim in
15 their label. In the real world the CDC said
16 if this vaccine worked as well as Merck said
17 it does, we should be able to eradicate the
18 disease. They set a goal. The goal was seven
19 years ago. It's not eradicated. The rates
20 have been going up since then. The real world
21 observation is that it is not working. It's
22 not preventing -- it certainly can't eradicate
23 disease. It's not even preventing outbreaks.
24 There's your real world observation. The
25 numbers in the lab show that it doesn't have

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  the immunogenicity that parallels their label
3  claim from the 1960s. And on the label they
4  say specifically that that 96 percent number
5  parallels what they found in field efficacy
6  trials. They know that's not true. They have
7  more accurate information that says it no
8  longer parallels it. In fact, that number,
9  whatever it may be, would be significantly
10 lower. The number that they tested in the lab
11 against wild type was as low as zero percent.
12 That's a pretty thorough answer.
13                    - - -
14           (Exhibit Krahling-32, Update:
15        Multistate Outbreak of Mumps --- United
16        States, January 1--May 2, 2006, was
17        marked for identification.)
18                    - - -
19 BY MS. DYKSTRA:
20      Q.  I'm going to mark as Exhibit 124,
21 Krahling-32. This is Exhibit 32. It's the
22 May 26, 2006, MMWR report from the CDC.
23      A.  Do you want me to read it?
24      Q.  Have you ever looked at these
25 types of reports issued by the CDC discussing

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  -- this one in particular is an update on
3  mumps outbreaks from 2006?
4      A.  I've seen some things like this
5  MMWR. I don't recall if I've seen this exact
6  one.
7      Q.  You'll note, if you can, look
8  at the third page.
9      A.  I want to read the whole thing.
10     Q.  Okay.
11     A.  Thanks. Okay.
12     Q.  Can I direct your attention,
13 please, to page 4 of 9.
14     A.  Yes.
15     Q.  At the top of this page in the
16 first full paragraph, the CDC states that
17 "High vaccination coverage with 2 doses of MMR
18 vaccine, especially in school-aged populations
19 in the United States, likely prevented
20 thousands of additional cases of mumps in this
21 outbreak."
22         Do you agree or disagree with
23 that statement?
24     A.  I see the qualification likely,
25 and in the second --

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2      Q.  I think I read that in --
3      A.  Yeah.
4      Q.  Yes, okay.
5      A.  That's a qualification, it's
6  not a statement of certainty. But in the
7  second to the last paragraph it says, "The
8  data presented in this report are
9  preliminary...." And in the page before it
10 says, "...no data on implementation and
11 evaluation of the 2-dose college admission
12 requirement are available...."
13         So with this being preliminary
14 data and this saying that "...implementation
15 and evaluation of 2-dose college admission
16 requirement are available.... Thus...," this
17 is preliminary stuff. I would think that the
18 CDC review of this outbreak which was
19 published a couple of years later where they
20 said that this outbreak was characterized by
21 two-dose failure, would supersede pretty much
22 everything here. We should look at a more
23 current review of this outbreak if we want
24 accurate information, which was also published
25 by the CDC, it's more recent than this. So I

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  wouldn't take a qualified statement like
3  likely. I would go to the more recent review
4  of that outbreak. That's what I think of that
5  sentence.
6      Q.  In the next sentence it says,
7  "Postlicensure studies conducted in the United
8  States during 1973 and 1989 determined that 1
9  dose of mumps or MMR vaccine was 75 to 91
10 percent effective in preventing mumps with
11 parotitis that lasted less than two days...."
12 [As read.]
13         Do you agree with that data?
14         MR. SCHNELL: Object to form.
15         THE WITNESS: So those are
16    retrospective observational studies.
17    Those aren't the same as clinical
18    efficacy studies, so I'm not going
19    to -- that statement exists there.
20 BY MS. DYKSTRA:
21     Q.  Are you familiar with those
22 post-licensure studies?
23     A.  What do you mean by "familiar"?
24     Q.  Have you looked at any
25 post-licensure studies other than the PRN

Page 464

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  assay that you ran -- that you worked on?
3      A.   That's not a post -- oh, that's
4  a clinical study.  These aren't clinical
5  studies I don't think they're citing.
6      Q.   What do you think that they're
7  citing here?
8      A.   I'll tell you, let's look at 5.
9  Where are the references?
10     Q.   Page 5 of 9 is the references.
11     A.   That's a textbook.  I don't
12 know what they're citing here, but --
13     Q.   Do you -- go ahead.
14     A.   I don't know what they're -- I
15 don't know what they're citing as
16 post-licensure studies.  I know that if you
17 want the most accurate information on this
18 outbreak and you want use CDC as a source, you
19 should go to the review they wrote once all
20 the data came in.
21     Q.   What do you recall of that
22 review?
23     A.   That the author said that the
24 outbreak was characterized by two-dose
25 failure.

Page 465

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2      Q.   Do you recall anything else
3  about their conclusion?
4      A.   If I read the document.  It was
5  a public document.  I'm not citing the
6  research.  I'm not going to sit here and try
7  and see how much I remember of one document.
8  What I know is it's more recent than this, and
9  it doesn't say -- it doesn't talk about
10 these -- you know, it's more recent and would
11 supersede this.
12            -  -  -
13         (Exhibit Krahling-33, About the
14     Vaccine printout from CDC website, was
15     marked for identification.)
16            -  -  -
17 BY MS. DYKSTRA:
18     Q.   I'm going to give you what's
19 been marked as Krahling-33 from the CDC's
20 website.  In the middle of the page is where
21 I'm going to -- well, you can read the whole
22 document, it's comparatively short.
23     A.   What date was it downloaded?
24     Q.   This was downloaded on
25 November 22, 2016.

Page 466

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2      A.   It's short.  I can look over
3  it, right?
4      Q.   Yes, you may.
5      A.   Okay.
6      Q.   Do you see that the CDC
7  characterizes the effectiveness of the mumps
8  MMR II vaccine as -- mumps component of the
9  MMR II vaccine as 78 percent effective for
10 mumps, range 49 percent to 92 percent?
11     A.   I see that line.
12     Q.   Then you see for two doses the
13 CDC states that the MMR II -- MMR, two doses,
14 has an 88 percent effectiveness for mumps
15 ranging between 66 to 95 percent?
16     A.   You have read the document
17 accurately.  I see that line also.
18     Q.   Do you agree that those are
19 valid rates of effectiveness, of effectiveness
20 for the Merck mumps vaccine?
21        MR. SCHNELL:  Object to form.
22        THE WITNESS:  These lines don't
23     indicate the conclusion you're making,
24     you're reading into that.
25 BY MS. DYKSTRA:

Page 467

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2      Q.   I'm not sure I understand your
3  answer.
4      A.   You drew a conclusion from two
5  lines.
6      Q.   I was explaining --
7      A.   Do I agree with your
8  interpretation of those two lines?
9      Q.   Sure.
10     A.   I don't know what the CDC -- I
11 mean, read it again.  If you're asking if I
12 agree with your conclusion about what those
13 two lines mean, rephrase it like that.
14     Q.   I'm just reading what the CDC
15 published on their website and asking if you
16 agree with the CDC's conclusion?
17     A.   There are no conclusions.
18 Where is the conclusion, you read two lines?
19 That was your conclusion.  Where did you read
20 me a conclusion?
21     Q.   I'm stating what the CDC
22 published as its determination of vaccine
23 effectiveness.
24     A.   I see those two lines.
25     Q.   Do you agree that that is an

32 (Pages 464 - 467)

Appx5676

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1 accurate statement of the vaccine's
2 effectiveness?
3         MR. SCHNELL: Object to form.
4         THE WITNESS: What -- this is
5 2016.
6 BY MS. DYKSTRA:
7     Q.   Yes, November 22, 2016.
8     A.   Where is the screenshot from
9 before our lawsuit was filed?
10     Q.   I'm sorry, can you repeat your
11 question to me? I didn't hear you.
12     A.   I thought I was supposed to
13 answer your questions.
14     Q.   I know, but you asked me a
15 question.
16     A.   I was saying you have --
17     Q.   You wanted me to provide a
18 screenshot before your lawsuit was filed?
19     A.   Yes.
20     Q.   I do not have the CDC's
21 screenshot before the lawsuit --
22     A.   How do you know the numbers
23 didn't change in any way?
24     Q.   They may have. I'm not

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1 suggesting that they didn't change. I'm not
2 suggesting one way or the other whether they
3 changed. I'm just saying this -- and I'm
4 going to correct the record. This was not
5 printed on November 22, 2016. This is last
6 updated November 22, 2016, just to be clear.
7 So we printed this more recently, but the CDC
8 website was updated November 22, 2016, and
9 these are the effectiveness ranges that the
10 CDC posted on its website. What I'm asking
11 you is whether you agree that these are the
12 effectiveness rates for the mumps vaccine?
13     A.   I can agree that these are not
14 efficacy rates and I can agree that these are
15 not the efficacy rates that Merck claims how
16 well their vaccine works with just one shot.
17     Q.   I'm going to ask my question
18 again and I want you to answer my question and
19 then you can explain whatever you would like
20 to explain on the record. What I would like
21 to know is, the CD -- this Exhibit 36 is a
22 printout of the CDC's -- I'm sorry, Exhibit 33
23 is a printout from the CDC's website last
24 updated November 22, 2016. On this website

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1 the CDC has posted the vaccine effectiveness
2 for one dose and two dose of MMR. What I'm
3 asking is if you agree that the vaccine is
4 78 percent effective for mumps with one dose
5 and 88 percent effective for mumps with two
6 doses as posted on the CDC's website?
7         MR. SCHNELL: Object to the
8     form.
9         THE WITNESS: No. Let me
10     explain why you're drawing a
11     conclusion. These are effectiveness
12     rates, and you seem to be implying that
13     there is no other data that the CDC
14     relies on. These are two lines printed
15     here.
16 BY MS. DYKSTRA:
17     Q.   I'm not saying anything about
18 what the CDC relies on. I'm just telling you
19 that this is on the CDC's website and I want
20 to know whether you agree with the CDC's
21 publication?
22     A.   I can agree --
23         MR. SCHNELL: Object to form.
24         THE WITNESS: I can agree that

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1     these two lines are written here. The
2     conclusions you're drawing from them
3     that imply there's no other data or
4     that perhaps this is the end-all,
5     be-all of that data, these are
6     effectiveness rates that are usually
7     retrospective. These aren't efficacy
8     rates.
9 BY MS. DYKSTRA:
10     Q.   I did not say that they were
11 efficacy rates. I'm asking you whether or not
12 you agree that these are the right
13 effective -- the accurate effectiveness rates
14 for the mumps vaccine?
15         MR. SCHNELL: Object to form.
16         THE WITNESS: Effectiveness as
17     in what studies are they citing? I
18     mean, I can agree they're printed
19     there. I don't know what the CDC
20     relies on to draw the conclusion you're
21     making, or even if they draw that
22     conclusion. It looks to me like they
23     printed a range to encompass what might
24     happen in the real world. I don't see

33 (Pages 468 - 471)

Appx5677

Page 472

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2      anything beyond that.
3  BY MS. DYKSTRA:
4      Q.   Do you agree that the CDC has
5  posted on its website a range of effectiveness
6  for one dose of 49 to 92 percent and a range
7  of effectiveness of 66 to 95 percent for two
8  doses per mumps vaccine?
9      A.   If you read that right, that's
10  what this says here.  A range would -- I mean,
11  a range would -- a range indicates that based
12  on whatever type of study that is, they might
13  get a range in there.  These aren't efficacy
14  rates.
15     Q.   When we first started our
16  discussion yesterday, you used the term
17  efficacy and effectiveness interchangeably and
18  you said that's how they're discussed in the
19  lab.  Correct?
20     A.   I don't agree with that.
21     Q.   Can you tell me the difference --
22     A.   I did not --
23     Q.   -- between efficacy and
24  effectiveness then?
25     A.   I did not use them interchangeably.

Page 473

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  What I said is when I was speaking of
3  efficacy, I was using it the way we did in the
4  complaint, which to me means generally how
5  well the vaccine works.
6      Q.   So what is the difference
7  between efficacy and effectiveness?
8      A.   Did we use effectiveness in the
9  complaint?
10     Q.   Yes.
11     A.   Can you show me where?
12     Q.   No.  Just tell me what you
13  believe the difference between effectiveness
14  and efficacy --
15     A.   I don't know that I -- I don't
16  know that I believe that we used it in the
17  complaint.  I'd have to see it.
18     Q.   I don't -- I'm not referring to
19  the complaint.  Do you believe -- you stated
20  there was a difference between efficacy and
21  effectiveness.  I need you to explain that to
22  me, what you believe the difference to be.
23     A.   Where did I state that there
24  was a difference?
25     Q.   Just now.

Page 474

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2      A.   Uh-uh.  I said I didn't use
3  them interchangeably.  I did't confirm
4  whether they were interchangeable or not.
5      Q.   Do you believe that there is a
6  difference between efficacy and effectiveness?
7      A.   I believe, I know that there
8  are different definitions of efficacy used so
9  much so that publications come out that
10  delineate the different way efficacy can be
11  used as a definition, which is why I'm trying
12  to be real clear with how I use the definition
13  of the word efficacy.  I don't want you to
14  equivocate effectiveness with how I'm using
15  the word efficacy which is how we used it in
16  the complaint which is to say generally how
17  well Merck's vaccine works.
18     Q.   Let's look at what we'll mark
19  Exhibit 34.
20          -  -  -
21          (Exhibit Krahling-34, Mumps
22          Outbreak --- New York, New Jersey, Quebec,
23          2009, was marked for identification.)
24          -  -  -
25  BY MS. DYKSTRA:

Page 475

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2      Q.   You can put that on the bottom
3  of your document, please.  Thank you.
4          You can read as much of this as
5  you want.  I'm going to be asking you about
6  page 4 of 8.
7      A.   Are you focusing just on this
8  second paragraph so I don't have to read the
9  whole thing?
10     Q.   The second paragraph of page 4,
11  yes.
12     A.   You're not going go outside
13  that?
14     Q.   I'm not going to ask you about
15  anything else other than that.
16     A.   All right.  We're good.
17     Q.   In this study of the mumps
18  outbreak published November 12, 2009, the CDC
19  states that "Mumps vaccine effectiveness has
20  been estimated at 73 percent to 91 percent for
21  1 dose and 76 percent to 95 percent for 2
22  doses."  [As read.]
23          Do you see that?
24     A.   Yes.
25     Q.   Do you agree that those are

34 (Pages 472 - 475)

Appx5678

1      STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2   valid or reasonably accurate effectiveness
3   rates for the vaccine?
4           MR. SCHNELL: Object to form.
5           THE WITNESS: Obviously valid
6      and reasonably, but let me try to
7      answer the question so that we keep --
8      don't keep going around in circles.
9      This is a range. This is effectiveness.
10     What I know is that Krah said if we
11     don't produce immunogenicity data as a
12     surrogate for vaccine efficacy, that
13     didn't match the label and wasn't 95
14     percent effective, they wouldn't be
15     able to sell their vaccine. They
16     would -- and not only that, they would
17     lose their exclusive right to be the
18     only one on the market. That's what I
19     know about. How the CDC interprets or
20     the decisions they make from this, I
21     can't speak for the CDC.
22  BY MS. DYKSTRA:
23     Q.   What do you mean when you say,
24  "exclusive right to be the only one on the
25  market"?

1      STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2      A.   What I mean that is how I heard
3   Krah use it, which was if they didn't get 95
4   percent efficacy, and he used the term
5   efficacy, seroconversion rates for Protocol
6   007, that they wouldn't be able to -- they
7   wouldn't be able to maintain the shelf life in
8   the short term and they wouldn't be able to be
9   the sole provider of the vaccine long term.
10  Exclusive rights mean they're the only one on
11  the market. We spoke and we used the word
12  market.
13          He also said that Protocol 007
14  was necessary, and he wrote this and I cited
15  this so many times, that the mumps
16  neutralization assays were to support process
17  changes. The process changes is a
18  manufacturing change that we're not just
19  talking about Protocol 007 testing to get 95
20  percent efficacy. He needed 95 percent
21  efficacy at those lower doses so they could
22  stop putting so much virus in the vaccine.
23  That's the process change. So it's not
24  just -- they're not out there to say at this
25  release dose it works this well. They were

1      STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2   there to try and say it worked as well as they
3   claim on the package insert at a lower dose
4   because he said they had to put -- recently
5   they had to put more into it and they wanted
6   to stop putting more into it because upper
7   management had questions that the vaccine
8   wasn't safe.
9      Q.   Do you know how much more virus
10  the company put into the vaccine prior to
11  finishing 007?
12     A.   Prior to it, I didn't know how
13  much. I only knew that he represented it as
14  an amount so high that it had never been
15  clinically tested in a perspective
16  clinically -- like the kids -- where the kids
17  knew what they were getting and had informed
18  consent before they got their dose. He said
19  the only information they had, and that upper
20  management was doing a wait and see strategy
21  which was the stuff they had sent out at the
22  highest doses which had never been clinically
23  tested, they were going to wait and see what
24  adverse reports came back to see if it was
25  safe.

1      STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2      Q.   Did you know --
3      A.   And that was one of the
4   important aspects of Protocol 007. Because if
5   they could show that it was effective, 95
6   percent efficacy at this lower dose and Krah
7   was aiming originally for 3.7, they could stop
8   putting so much virus, mumps virus, in the
9   vaccine.
10     Q.   Do you know whether the company
11  ever stopped, quote/unquote, putting so much
12  mumps virus in the vaccine, end quote?
13     A.   I know that they -- that that
14  overfill lasted well beyond the time that I
15  worked there. I don't know that -- that's all
16  I can say about that.
17     Q.   How do you know that the
18  overfill lasted well beyond the time you
19  worked there?
20     A.   I saw the documents you
21  produced that say that you're putting -- some
22  of the documents say as much as 400,000
23  TCID50, some say as much as 500,000 TCID50.
24     Q.   So based on what you've seen in
25  this litigation, you understand that the

Appx5679

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 company continued to overfill the vaccine
3 higher than 4.3 TCID50?
4     A.    I don't know that they overfill
5 it at 4.3 TCID50.
6     Q.    I just said higher than.
7     A.    Oh, higher than.
8     Q.    Overfill --
9     A.    Could you repeat the question
10 then?
11     Q.    Sure.  You talked about the
12 company was putting more virus in the vaccine
13 pending the outcome of 007.  That was my
14 words.  Is that a fair assessment of what you
15 said?
16     A.    That's somewhat accurate, yeah.
17     Q.    You said you looked at
18 documents to -- and it's your understanding
19 that the company continued to overfill the
20 vaccine.  Do you know whether the company
21 still does that?
22     A.    I can't say for sure if they're
23 doing it today.  Back then I knew that they
24 were overfilling and it was a lot.  Now I have
25 a number.  The other thing I have -- I'm not

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 going to volunteer it.  You'll see it.
3     Q.    What's the other thing you
4 have?  This is your deposition.  This is your
5 opportunity to explain it.
6     A.    I don't want to talk about
7 produced documents, that you produced that say
8 that Krah was right in all the things he was
9 stressed out about.
10     Q.    I'm sorry, I'm not sure what
11 you're talking about.  A document that Krah
12 was right about all the things he was stressed
13 out about.  What document are you talking
14 about?
15     A.    Is there a question pending?
16     Q.    Yes.  What document are you
17 talking about?
18     A.    Which document?  No, I didn't
19 say he's stressed out about.  That's my
20 experience with him.  I didn't see a document
21 that said he was stressed out.  He was
22 stressed out over completing the Protocol 007
23 trial by fall.  And stressed out, you know, he
24 said this is the most important thing he was
25 working on in his life.  In his life it was

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 the most important thing because it was
3 Merck's marquis vaccine and it was already on
4 the market, he was protecting it.
5     Q.    You never conducted any studies
6 of the vaccine at this higher potency meaning
7 the vaccine that included the overfill.
8 Correct?
9     A.    Can you redefine that?
10     Q.    You mentioned that the company
11 put more virus in the vaccine --
12     A.    Yes.
13     Q.    -- while Krah's test was still
14 ongoing before the label was changed?
15     A.    Before.  You got one thing
16 wrong in it, but I don't want to tell you what
17 you got wrong.
18     Q.    Tell me what I got wrong.
19     A.    Say it again.
20     Q.    Well, I'll tell you what I just
21 said and then you can tell me what I got
22 wrong.
23     A.    You may have corrected it.
24     Q.    Well, okay.  I said, you never
25 conducted any studies of the vaccine at the

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 higher potency, meaning the vaccine that
3 included the overfill that you referenced.
4     A.    You rephrased that.  What do
5 you mean I didn't -- now, you got rid of the
6 other point.  Can you read that again?
7     Q.    Yes.
8     A.    I need the definition of higher
9 potency because I don't know what you're
10 saying there.
11     Q.    Let's talk about that first.
12     A.    Yeah.
13     Q.    You understand that the company
14 put more virus in the vaccine?
15     A.    More mumps virus in the MMR
16 vaccine.
17     Q.    Yes, put more mumps virus in
18 the MMR vaccine.
19     A.    Yes.
20     Q.    Do you know when that increase
21 occurred?
22     A.    Krah talked to me about it
23 around 1999 or 2000, and he spoke of it in
24 terms of it being very recent.  So I don't
25 know the exact day, but back during the year

Page 484

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  and a half when he and I got along very well,
3  that's when he notified me. So he would have
4  told me about that before 2001 when I came --
5  no, 2000 December. It would have been before
6  December 2000 that he told me that Merck had
7  to put more mumps in the mumps vaccine.
8      Q.   So let's use the 1999-2000 time
9  frame. So in that time frame you understand
10 that Merck put more virus in the mumps -- more
11 mumps virus in the MMR II vaccine. Correct?
12     A.   Yes.
13     Q.   Do you know whether Merck today
14 continues to include that same amount of virus
15 in the mumps vaccine?
16     A.   I do not know today what amount
17 of virus they are filling with today.
18     Q.   Do you know, did you ever run
19 tests on the mumps component of the MMR II
20 vaccine at this higher potency with this
21 overfill?
22     A.   Which higher potency?
23     Q.   The one that began in 1999.
24     A.   You're not being clear enough.
25 There's degradation all through the process.

Page 485

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  Some lots are released at different potencies.
3  Nobody did a clinical safety study of the
4  highest amount Merck was releasing. A
5  prospective clinically gathered study, not
6  only did Krah say that, and that's why they
7  were concerned about safety -- well, let me
8  just stick with that's what Krah said because
9  it's been borne out by the documents.
10     Q.   What has been borne out by the
11 documents?
12     A.   That the highest dose that
13 Merck had any clinical safety study for was
14 5.2. At least at that time. Just like Krah
15 was saying they were doing a wait and see,
16 they were simply relying on passage
17 surveillance to see if any kids got hurt from
18 the higher dose. The kids didn't know they
19 were getting that high of a dose when they got
20 it, nor did their parents.
21     Q.   Just to be clear, just so the
22 record is clear, I think it may be mistyped,
23 you said highest dose that Merck had any
24 clinical safety for was 5.2?
25     A.   There's a document that you

Page 486

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  produced that said the highest dose that they
3  have clinical safety data for is 5.2.
4      Q.   Give me one second, please.
5  Grab something.
6      A.   That's 5.2 log.
7          MR. SCHNELL: About another
8      five, ten minutes and then break for
9      lunch?
10         MS. DYKSTRA: Sure.
11              - - -
12         (Exhibit Krahling-35, 8/20/99
13     Letter with attachments,
14     MRK-KRA00018614 - 00018619, was marked
15     for identification.)
16              - - -
17 BY MS. DYKSTRA:
18     Q.   We're going to mark as
19 Krahling-35 a letter from the FDA dated
20 August 20, 1999, and there's an attachment to
21 this letter dated June 30, 1999, and a prior
22 approval supplement dated June 18, 1999. I'm
23 only going to be talking about the first
24 letter in this stack, but you can take as much
25 time to review this as you need. I will tell

Page 487

1  STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  you my question so that you can hear it before
3  you review the document and then you can
4  decide how much you need to review; first of
5  all, have you ever seen this before; and
6  second, to confirm that you understand that
7  CBER understood that Merck was going to
8  formulate all mumps-containing vaccine lots
9  manufactured on or after September 13, 1999,
10 to contain at least 5.2 log10 TCID50.
11     A.   The first question, I have seen
12 this before.
13     Q.   Do you know when you've seen
14 this?
15     A.   I may have, I'm not sure of the
16 rest of this, but I may have seen this while I
17 was at Merck. I'm not sure. But I have
18 definitely seen it since then.
19     Q.   And just so we can clarify what
20 we're talking about with respect to the
21 increased potency, in the middle of this
22 letter CBER states, We understand that you
23 will formulate all mumps-containing vaccine
24 lots manufactured (filled) on or after
25 September 13, 1999, to contain at least 5.2

37 (Pages 484 - 487)

Appx5681

1　　　STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2　log10 TCID50. These lots will be released by
3　CBER with a dating period of 24 months based
4　upon the CBER potency testing criteria
5　described above. Furthermore, all
6　mumps-containing lots submitted for CBER
7　release, regardless of the manufacturing date,
8　will be subject to the described CBER release
9　requirements as of November 8, 1999.
10　　　　You see that, correct?
11　　　A.　Sure.
12　　　Q.　Is this the overfill clinically
13　that we were talking about in your -- talking
14　about in your answers?
15　　　A.　I don't want to narrow the
16　overfill to just that, but this is an example
17　of an overfill. And this -- I mean, this is
18　an overfill of the vaccine in around 1999. I
19　think this is probably quite correct at this
20　point.
21　　　Q.　My question is, have you ever
22　done any potency testing at all on vaccine
23　that contained this overfill?
24　　　A.　Potency testing?
25　　　Q.　Yes.

1　　　STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2　　　A.　Just to determine how much is
3　in the vaccine?
4　　　Q.　Yes.
5　　　A.　I didn't do potency tests to
6　see how much is in the vaccine. All I was
7　getting at with that high dose was that Krah
8　said they were very concerned about the fact
9　that they had no clinical safety data. I
10　don't know if they shared that. I mean, all
11　this confirmed is that Krah was right in the
12　first part of it, that they did overfill. I
13　wasn't making -- yeah. I mean, that's --
14　　　　MS. DYKSTRA: I think we can
15　　　break for lunch.
16　　　　VIDEOGRAPHER: The time is
17　　　1:29. We're going off the video
18　　　record.
19　　　　　- - -
20　　　　(A recess was taken.)
21　　　　　- - -
22　　　　VIDEOGRAPHER: The time is
23　　　2:22. We're back on the video record.
24　BY MS. DYKSTRA:
25　　　Q.　Mr. Krahling, I want to follow

1　　　STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2　up on a couple of things we talked about prior
3　to lunch.
4　　　　You mentioned -- I don't want
5　you to disclose any communications from
6　counsel or anything that's privileged. You
7　mentioned, though, that you met with Joan
8　Wlochowski and your counsel around 2009, 2010.
9　Is that accurate?
10　　　A.　Yeah, about that time frame.
11　　　Q.　Did you meet with any other
12　former lab members and your counsel, without
13　telling me what occurred during that time
14　frame?
15　　　　MR. SCHNELL: I already
16　　　objected to that line of questioning.
17　　　　MS. DYKSTRA: Who he met with?
18　　　　MR. SCHNELL: Yeah, who counsel
19　　　decided was worth meeting or not worth
20　　　meeting is work product.
21　　　　MS. DYKSTRA: I disagree. So
22　　　you're not going to disclose who you
23　　　met with, who you and Mr. Krahling
24　　　talked to about the allegations in his
25　　　complaint?

1　　　STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2　　　　MR. KELLER: Why don't you do
3　　　it this way.
4　　　　MS. DYKSTRA: Sure.
5　　　　MR. KELLER: Do it in the
6　　　negative. Did you meet with anybody
7　　　else with your counsel.
8　BY MS. DYKSTRA:
9　　　Q.　Okay. Did you meet with
10　anybody else that used to work in the lab with
11　your counsel around the allegations in the
12　complaint?
13　　　A.　No.
14　　　　MR. KELLER: Just trying to
15　　　shortcut it.
16　　　　MS. DYKSTRA: That's fine. I
17　　　appreciate that.
18　BY MS. DYKSTRA:
19　　　Q.　Did you meet with Joan
20　regarding the issues in your complaint without
21　your counsel present?
22　　　A.　I don't recall. I had the
23　meeting that I described. I met with her with
24　Jeffrey who is my counsel. Outside of that,
25　no. But at that first meeting, as I pointed

38 (Pages 488 - 491)

Appx5682

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 out, we didn't talk about anything.
3 Q. Did you ever reach out to
4 Dr. Krah around your concerns about what
5 occurred in the lab after you left Merck?
6 A. No.
7 Q. Did you ever reach out to
8 Emilio Emini or Dr. Shaw about your concerns
9 in the lab after you left Merck?
10 A. No.
11 Q. How about Dr. Suter -- Mr. Suter?
12 A. Same question?
13 Q. Same question.
14 A. No.
15 Q. One of your interrogatory
16 answers you noted that you talked to your -- a
17 colleague or professor at Penn State about
18 your allegations. Do you recall that?
19 A. Where is it at? 21? Exhibit 21?
20 Q. Yes.
21 A. Page 55?
22 Q. Yes. There's two notes here.
23 One you talk -- on page 54 you say you talked
24 with University of Helsinski Professor Heikki
25 Peltola via e-mail. On page 55 you note that

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 you talked with Robert Schlegel, your lab
3 supervisor at Penn State. Can you go through
4 each of those, what you recall the discussions
5 with each of those individuals?
6 A. Start with the Heikki Peltola.
7 I think we produced the e-mails. That was the
8 extent of it.
9 Q. Other than those e-mails, you
10 didn't have any verbal communications with
11 her?
12 A. With who?
13 Q. With Heikki Peltola.
14 A. Did you say her?
15 Q. I don't know. Is she a man?
16 A. I don't know. I was
17 thinking -- I didn't think it was a woman.
18 Q. Did you have any verbal
19 communications with Heikki Peltola other than
20 the e-mail communications?
21 A. No, I wasn't even sure the
22 gender there. When you said her, I thought
23 you knew.
24 Q. I don't.
25 A. I don't either.

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 Q. Did you -- tell me about your
3 communication with -- well, tell me who
4 Dr. Robert Schlegel is and how long you worked
5 with him.
6 A. He was the former head of the
7 molecular and cell biology department at Penn
8 State University. And I worked in his lab, if
9 you would go look at the CV, for the years
10 described there.
11 Q. You spoke to him in person
12 between 2002 and 2004 about your concerns
13 around the efficacy of the vaccine?
14 A. I don't know what we talked
15 about, but we may have -- I don't recall what
16 we talked about, but I know we wanted to be
17 responsive to this so we listed it. I don't
18 remember the details of it.
19 Q. Do you remember whether you
20 told him that you were going to -- looking or
21 interested in filing a complaint against the
22 company?
23 A. I don't remember the details.
24 I talked to him over a thousand times in my
25 life and I was seeing him almost every day

1 STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2 back then, so -- I don't know the details.
3 Q. Did you provide any data or any
4 other document, any documents related to your
5 work at Merck to Mr. Schlegel -- Dr. Schlegel?
6 A. No.
7 Q. Did you -- okay. Other than
8 the conversations between 2002 and 2004, did
9 you talk to Dr. Schlegel after that about this
10 litigation, or even recently?
11 A. I haven't seen him recently.
12 So no.
13 Q. Other than in connection with
14 discussions with your counsel and your experts
15 in this case, have you talked to anybody, any
16 professors or any of your colleagues at Penn
17 State around this litigation?
18 A. Outside of counsel and everyone
19 I've spoken to in any way is listed in the
20 interrogatories, and these are accurate, that
21 I don't have any people to add to it.
22 Q. I know you showed us, we went
23 through some of the documents that you
24 photocopied from Merck's lab. Do you recall
25 those documents, the counting sheets and the

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  like that you produced in this litigation?
3        A.   I don't even remember them.
4  Yeah, I -- if you're going to ask a question,
5  yes, I understand.
6        Q.   Did you share those documents
7  with anybody outside of the company?  And if
8  so, who?
9        A.   I did not share them or show
10 them to anyone outside of counsel.
11       Q.   So outside of Mr. Moody and
12 outside of your current counsel, you did not
13 share that data with anybody?
14       A.   No.
15       Q.   Mr. Krahling, when you were
16 considering leaving the lab in June of 2001,
17 you informed David Krah that you were looking
18 for a job at Penn State but then informed him
19 that you did not get the job at Penn State.
20 What job were you looking for and what job did
21 you apply for?
22       A.   I'm not sure what you're
23 talking about.
24       Q.   I'll try and find the document
25 to produce it to you, but there's a June 19th

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  e-mail from you to Dave Krah.
3        A.   In 2001?
4        Q.   In 2001.  That states -- I'll
5  wait until we get it.
6                -  -  -
7            (Exhibit Krahling-36, E-mail
8            chain, MRK-KRA00002281 & 00002282, was
9            marked for identification.)
10               -  -  -
11 BY MS. DYKSTRA:
12       Q.   I'm going to mark this as
13 Krahling-36.  Your e-mail is the first in the
14 chain.
15       A.   Which means where?
16       Q.   The bottom.
17       A.   And back?
18       Q.   Yes.
19       A.   What's your question?
20       Q.   In your e-mail you state that
21 you did not get the job at PSU.  I was
22 wondering what job that was you were applying
23 for?
24       A.   I have no idea what that refers
25 to.  This is -- I have no idea what that

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  refers to.
3        Q.   You don't recall applying to a
4  job at Penn State during this time?
5        A.   No, I don't.  I don't -- what I
6  remember about June 19th is that I called the
7  FDA.
8        Q.   What time of day did you call
9  the FDA on June 19th?
10       A.   The morning.
11       Q.   The same day that you wrote
12 this e-mail to David Krah?
13       A.   It was written on June 19th.
14       Q.   So you called the FDA the same
15 day you said to him "I think lab lunches are a
16 good idea...," and --
17       A.   You don't think I called the
18 FDA?  Suter told me that I had to play ball
19 and archive things in e-mails that showed I
20 was playing ball and being decent toward these
21 people.  I know that June 19th I was concerned
22 with stopping fraud and I called the FDA to
23 get that done.  That's what I remember about
24 June 19th.
25       Q.   Do you have any documentation

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2  of your call on June 19th?
3        A.   No.
4        Q.   In this e-mail you state that
5  you think lab lunches are a good idea but I
6  have to agree with Joan's sentiments about
7  what happened at Jenny's B-day lunch.  It
8  contributed to a hostile work environment.
9  What happened at Jenny's B-day lunch?
10       A.   I have no idea.
11       Q.   Is it true that you thought you
12 were living in a hostile work environment?
13       A.   I don't remember this e-mail.
14 I told you what I remember about June 19th.
15 June 19, 2001.
16       Q.   Do you remember in detail
17 anything specifically that you told the FDA on
18 that one call?
19           MR. SCHNELL:  Object to form.
20           THE WITNESS:  Can you restate
21       it?
22 BY MS. DYKSTRA:
23       Q.   Do you remember anything
24 specific about what you told the FDA on
25 June 19, 2001?

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1    A.    Specific?  What I told the FDA
2  was that Krah and Merck were committing fraud.
3  That I worked in a lab where fraud was being
4  committed.
5    Q.    Any more detail or is that the
6  two sentences you --
7    A.    I think we went over this
8  yesterday.
9    Q.    We did.
10    A.    It was a short call.  That was
11  the main point.  We exchanged contact
12  information so we could get back to me.
13    Q.    Were you disappointed that the
14  FDA wasn't taking you seriously?
15    A.    Come on.  Your characterization.
16  When did I ever say they weren't taking me
17  seriously?
18    Q.    That was a question.  Were you
19  disappointed that -- did you think the FDA was
20  not taking you seriously?
21    A.    You said was I disappointed
22  they weren't taking it seriously.  At no time
23  did ever I think they weren't taking it very
24  seriously.

1    A.    Specific?  What I told the FDA
2  was that Krah and Merck were committing fraud.
3  That I worked in a lab where fraud was being
4  committed.
5    Q.    Any more detail or is that the
6  two sentences you --
7    A.    I think we went over this
8  yesterday.
9    Q.    We did.
10    A.    It was a short call.  That was
11  the main point.  We exchanged contact
12  information so we could get back to me.
13    Q.    Were you disappointed that the
14  FDA wasn't taking you seriously?
15    A.    Come on.  Your characterization.
16  When did I ever say they weren't taking me
17  seriously?
18    Q.    That was a question.  Were you
19  disappointed that -- did you think the FDA was
20  not taking you seriously?
21    A.    You said was I disappointed
22  they weren't taking it seriously.  At no time
23  did ever I think they weren't taking it very
24  seriously.

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

2    Q.    So you understood -- it was
3  your belief that the FDA was taking your
4  complaint seriously?
5    A.    Absolutely.
6    Q.    In this e-mail you also state
7  to Dr. Krah that as far as weekend work goes,
8  you are available for some weekend work but
9  you won't work a sixth and seventh day during
10  any week until all employees are expected to
11  consistently work a fifth.  Can you explain a
12  little more about what that means?
13    A.    I can't speak to this e-mail.
14  What I remember about June 19th is that I
15  called the FDA and reported Merck for
16  committing fraud.
17            - - -
18        (Exhibit Krahling-37, 9/7/01
19    E-mail, RELATOR_00000746, was marked
20    for identification.)
21            - - -
22  BY MS. DYKSTRA:
23    Q.    I'm going to mark as Krahling
24  Exhibit 37 a September 7, 2001, e-mail to
25  Mr. Suter.  If you can take a look at this

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  e-mail.
2    A.    Okay.
3    Q.    You state that you wanted an HR
4  representative to be present if you speak to
5  David Krah.  Is that accurate?  Is that
6  accurate what was happening at the time?
7    A.    I recall the purpose of this
8  e-mail.  The purpose of this e-mail was that
9  Suter had informed me in person that no one
10  knew I had called the FDA.  And I pointed out
11  to him that I told Emini I was going to call
12  the FDA.  I said, of course, they know.
13  Colleen knows I called the FDA.  And other
14  people in the lab knew I had called the FDA.
15  Dave had told me he knew I had called the FDA.
16  And then sometime around now Dave switched
17  gears and said nobody knows who called the
18  FDA.  Suter told me to avoid putting anything
19  in an e-mail where I said that I called the
20  FDA or that Dave knew I called the FDA.  "He
21  also denied knowing why the FDA was here even
22  though yesterday he told me they were here
23  because of me."  The entire e-mail exists for
24  that sentence.  Suter told me I could not go

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1  to him for any reason unless I had an HR
2  complaint.  That's why that e-mail exists.
3    Q.    You mean Suter told you
4  couldn't go to Suter with allegations of
5  fraud, only allegations of HR issues?
6    A.    He said he wouldn't talk to me
7  unless I had a human resource complaint which
8  is why he always made me bring lists or do
9  lists of something that I could say about
10  personnel or administrative things in the lab.
11    Q.    Did Mr. Suter tell you he would
12  not listen to your concerns around data
13  manipulation or lab fraud?
14    A.    The very first time I met him,
15  he said that was -- said something to that
16  effect, that he wasn't going to be able to --
17  he couldn't -- he could only listen to
18  administrative complaints.
19    Q.    Did you speak to anybody else
20  in HR when he told you that or any other time?
21    A.    I don't recall.
22    Q.    So you don't recall?
23    A.    If there was anyone else
24  present or -- I don't recall, no.

41 (Pages 500 - 503)

**Appx5685**

Page 504

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2     Q.   When you got an answer that you
3 didn't like from Mr. Suter, did you go to
4 anyone else in HR?
5     A.   Who said I got an answer that I
6 didn't like?
7     Q.   Did you find Mr. Suter's advice
8 helpful?
9     A.   In what sense helpful? Suter
10 turned out to be a way to get a face to face
11 with Emini. I like that aspect of how it
12 worked out.
13     Q.   Did you talk to anybody else in
14 HR?
15     A.   I don't know. I don't recall.
16     Q.   So all of the complaints, the
17 HR-type administrative complaints that are in
18 your letter to Dr. Emini that we looked at and
19 in your other correspondence with Mr. Suter,
20 those are real complaints or fake complaints?
21     A.   What do you mean fake
22 complaints?
23     Q.   Well, were they real HR issues
24 or were they just HR issues you made up to put
25 in e-mails?

Page 505

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2     A.   I did not make up any issues.
3     Q.   So they were real HR issues?
4     A.   I don't recall those things.
5 What I know is that Suter said you can't
6 come -- that I couldn't come to him unless I
7 had an HR-related complaint. And he gave me
8 an assignment to compile things. That's what
9 I remember about that.
10     Q.   And your compilation of HR-type
11 issues were real, accurate HR issues?
12     A.   I have no reason to believe
13 they wouldn't be accurate, but I don't know
14 what they are.
15     Q.   Well, they're the ones that we
16 went through in the letter you wrote to
17 Dr. Emini.
18     A.   What I'm saying is looking at
19 these, I can't detail what they're referring
20 to or what they are.
21     Q.   Why don't we look back at the
22 letter to Dr. Emini which is Exhibit -- the
23 August 8, 2001, letter, if you can find it in
24 that stack. I don't have it in front of me.
25     MR. SCHNELL: 17?

Page 506

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2     MR. KELLER: 17.
3     MR. SCHNELL: 17, I think.
4     THE WITNESS: Okay.
5 BY MS. DYKSTRA:
6     Q.   In your letter to Dr. Emini of
7 August 8, 2001, you list a series of HR-type
8 complaints. For example, you state that Dave
9 has highly personal relationships with female
10 employees, he gives gifts, holiday gifts, work
11 anniversary gifts, gifts for no reason,
12 baskets of candy, that is causing strain and
13 tension. Is that accurate or inaccurate?
14     A.   What I remember about this
15 letter is that these HR related things are
16 what Bob Suter wanted. And that Bob Suter
17 wanted me to bring these things to him so that
18 he might talk about some of them with Emini,
19 and that I was to do it anonymously. I jumped
20 through Bob Suter's hoop with these details.
21 And what I did is signed the letter, put it
22 directly in Emini's mailbox and talk about
23 mumps testing all throughout this letter.
24 That's the part that I remember because that's
25 the part that mattered.

Page 507

1     STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2     Q.   I'm going to read my question
3 back to you and can you answer it, please?
4     In your letter to Dr. Emini of
5 August 8, 2001, you list a series of HR-type
6 complaints, for example, you state that Dave
7 has personal relationships with female
8 employees, he gives work anniversary gifts,
9 gifts for no reason, and is causing strain and
10 tension. Is that an accurate statement or
11 not?
12     A.   I don't have anything further
13 to add to my previous answer.
14     MS. DYKSTRA: Are you going to
15 permit him not to answer the question
16 whether it's accurate or not?
17     MR. SCHNELL: He answered all
18 these questions yesterday, so...
19     MS. DYKSTRA: I just want to
20 know whether it's accurate or not.
21     MR. SCHNELL: He answered that
22 yesterday and he told you.
23     MS. DYKSTRA: He did not tell
24 me yesterday.
25     THE WITNESS: She's saying

42 (Pages 504 - 507)

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1
2     accurate. I did answer it. I said I
3     don't have a recollection of the HR
4     things that Bob assigned to me to jump
5     through that hoop. What I do recall --
6     BY MS. DYKSTRA:
7         Q. I'm not asking -- maybe there's
8     miscommunication. I'm not asking about what
9     Bob assigned to you.
10        MR. KELLER: Let him finish.
11        MS. DYKSTRA: I'm going to --
12    let me clarify my question.
13    BY MS. DYKSTRA:
14        Q. I'm not asking what Bob
15    assigned you or didn't assign you. I'm asking
16    if what you wrote in the letter to Dr. Emini
17    are accurate representations of what you
18    experienced in the lab?
19        A. Not recollecting the HR details
20    I was told to list, I have no reason to
21    believe they would be inaccurate.
22        Q. Did you seek any therapy for
23    the constant source of strain and tension
24    caused in the lab?
25        MR. SCHNELL: Objection. Come

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1
2     on.
3     BY MS. DYKSTRA:
4         Q. I'm serious. You can say yes
5     or no, you don't have to tell me the details
6     of that. I'm just asking --
7         MR. SCHNELL: If you don't want
8     to answer it, you don't have to.
9         THE WITNESS: But she's
10    serious. I'm not answering that.
11        - - -
12    (Exhibit Krahling-38, 9/11/01
13    E-mail, RELATOR_00000750, was marked
14    for identification.)
15        - - -
16    BY MS. DYKSTRA:
17        Q. I'm going to mark as Exhibit 38
18    a September 11, 2001, e-mail.
19        A. What's the question?
20        Q. Do you remember this e-mail?
21        A. It was September 11, 2001. I
22    remember the day.
23        Q. Yes, it was 2:30 on September 11,
24    2001. Do you remember writing this e-mail to
25    Mr. -- Dr. Krah?

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1
2         A. I wrote this e-mail so that I
3     could hand it to HR because Dave was
4     continuing to just yell at me all the time,
5     things like that. I wanted to be able to
6     get -- this is after the FDA came in, and I
7     was trying to get away from the lab or at
8     least get out and start to feel safe with
9     things. So I felt like I needed to document
10    something there for HR. It was quite an
11    emotional day that day.
12        Q. You state that you're writing
13    this e-mail in response to the verbal abuse
14    and hostility you bestowed upon me during our
15    last meeting. Do you remember that meeting
16    that you're referring to?
17        A. I remember him yelling again on
18    September 11th, but I don't remember the
19    details.
20        Q. Do you remember what he was
21    yelling about?
22        A. No.
23        Q. Do you remember whether it was
24    about your work in the lab or something
25    completely extraneous to the lab?

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
1
2         A. No. I don't remember what it
3     was about. I remember the day. That's the
4     only reason I can anchor that e-mail.
5         Q. I'm assuming you remember the
6     day because it was September 11th, not for
7     some other reason?
8         A. Yeah, that's why I remember the
9     day. I didn't feel like getting yelled on
10    that day.
11        Q. What you wrote here, though,
12    even though you said that this was -- you were
13    documenting this so that you could send it to
14    HR, your statements in the e-mail, are they
15    accurate or inaccurate?
16        A. What I remember is that
17    September 11, 2001, was happening and Krah was
18    yelling at me while those buildings were about
19    to collapse. I didn't feel like being yelled
20    at and I thought I'm just going to document
21    this and hand it to HR. That's the reason I
22    can remember the fact that I wanted to just
23    write that and do that so I didn't have to
24    deal with him that day.
25        Q. Did you work the whole day on

43 (Pages 508 - 511)

Appx5687

Page 512

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    September 11, 2001?
3        A.    No.
4        Q.    When did Dr. Krah laugh at you
5    and said you -- tell you you have no
6    intelligence?
7        A.    I wouldn't know what day that
8    was.
9        Q.    Sometime before this e-mail?
10       A.    If you're talking about it
11   being documented here, I would guess.  I don't
12   know.  I can't speak to the detail.  I just
13   know why I wrote it and turned it in to HR.
14       Q.    Did Dr. -- did you see Dr. Krah
15   yell at anybody else in the lab?
16       A.    I'm sure he did occasionally.
17       Q.    Did you see Dr. Krah yell at
18   anybody else in the lab?
19       A.    I think I detailed one instance
20   of that in the letter I sent to -- the letter
21   given to Emini.  I only remember that because
22   I read it yesterday.  I mean, I don't pick it
23   out right now off the top of my head.
24       Q.    The lawyer that you used for
25   your separation agreement, Tonia Torquato, did

Page 513

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    you ever use her for any other legal work
3    other than in connection with your separation
4    agreement?
5        A.    What are you referring to as a
6    separation agreement?
7        Q.    The agreement pursuant to which
8    you received payment from the company.  We can
9    point to it, we marked it as an exhibit.
10       A.    Did you mark it as an exhibit?
11       Q.    Yes, we did.  I'll give you the
12   number in a second.  That's it.  What number
13   is that, Mr. Krahling?
14       A.    Exhibit 28.
15       Q.    Yes.  Did you work with that
16   lawyer who represented you in that -- in
17   connection with that agreement, did you work
18   with her at any other time in connection with
19   any other legal matter?
20       A.    I don't recall.
21       Q.    You don't recall?
22       A.    No, I don't recall.
23             MS. DYKSTRA:  Can we take a
24   two-minute break?  We may wrap up.
25             VIDEOGRAPHER:  The time is

Page 514

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2    2:56.  We're going off the video
3    record.
4             - - -
5        (A recess was taken.)
6             - - -
7             VIDEOGRAPHER:  The time is
8    3:01.  We're back on the video record.
9             MS. DYKSTRA:  Mr. Krahling,
10   thank you for your time.  We don't have
11   any additional questions.
12             MR. KELLER:  Thank you.
13             MR. SCHNELL:  Thanks.
14             VIDEOGRAPHER:  The time is
15   3:02.  This concludes the videotape
16   deposition of Stephen Krahling.
17             - - -
18       (Witness excused.)
19             - - -
20       (Deposition concluded at
21   3:02 p.m.)
22
23
24
25

Page 515

1    STEPHEN KRAHLING - HIGHLY CONFIDENTIAL
2         C E R T I F I C A T E
3
4
     I do hereby certify that I am a Notary
5    Public in good standing, that the aforesaid
     testimony was taken before me, pursuant to
6    notice, at the time and place indicated; that
     said deponent was by me duly sworn to tell the
7    truth, the whole truth, and nothing but the
     truth; that the testimony of said deponent was
8    correctly recorded in machine shorthand by me
     and thereafter transcribed under my
9    supervision with computer-aided transcription;
     that the deposition is a true and correct
10   record of the testimony given by the witness;
     and that I am neither of counsel nor kin to
11   any party in said action, nor interested in
     the outcome thereof
12
        WITNESS my hand and official seal this
13   5th day of May, 2017
14
15
16   _____
       Linda Rossi-Rios, RPR, CSR
17     Notary Public
18
19
20
21
22
23
24
25

44 (Pages 512 - 515)

Page 516

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

INSTRUCTIONS TO WITNESS

3     Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the appropriate
6  space on the errata sheet for any corrections
7  that are made.
8     After doing so, please sign the errata
9  sheet and date it.
10    You are signing same subject to the
11  changes you have noted on the errata sheet,
12  which will be attached to your deposition.
13    It is imperative that you return the
14  original errata sheet to the deposing attorney
15  within thirty (30) days of receipt of the
16  deposition transcript by you.  If you fail to
17  do so, the deposition transcript may be deemed
18  to be accurate and may be used in court.
19
20
21
22
23
24
25

Page 518

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

ACKNOWLEDGMENT OF DEPONENT

3     I, _____, do
4  hereby certify that I have read the foregoing
5  pages and that the same is a correct
6  transcription of the answers given by me to
7  the questions therein propounded, except for
8  the corrections or changes in form or
9  substance, if any, noted in the attached
10  Errata Sheet.
11
12  _____       _____
13  DATE             SIGNATURE
14
15  Subscribed and sworn to before me this
16  _____ day of _____, 2017.
17
18  My commission expires: _____
19
20  _____
21  Notary Public
22
23
24  Assignment:  PA 2587892
25

Page 517

STEPHEN KRAHLING - HIGHLY CONFIDENTIAL

2      - - - - -
       E R R A T A
3      - - - - -
4  PAGE  LINE   CHANGE
5  ___ ___ _____
6  Reason for Change:
7  _____
8  ___ ___ _____
9  Reason for Change:
10  _____
11  ___ ___ _____
12  Reason for Change:
13  _____
14  ___ ___ _____
15  Reason for Change:
16  _____
17  ___ ___ _____
18  Reason for Change:
19  _____
20  ___ ___ _____
21  Reason for Change:
22  _____
23  ___ ___ _____
24  Reason for Change:
25  _____

45 (Pages 516 - 518)

Appx5689

10/25/2019
Declaration of G. Reilly
EXHIBIT 156

Appx5690

MEMO                          May 23, 2000

TO: Alan Shaw

FROM: Dave Krah

SUBJECT: <u>Monthly report for May, 2000.</u>

I. VZV



II. Measles, Mumps and Rubella
   A. Mumps serum neutralization (Nt) assay (plaque-reduction Nt).
1. Efforts for this month have continued to focus on attempts to increase the
assay sensitivity to provide Nt sensitivity for a "wild-type" strain that is
comparable to the sensitivity previously observed using the Jeryl Lynn™ vaccine
strain as the indicator virus. The primary studies ongoing include re-evaluation of
Nt sensitivities using an immunostaining method to detect virus plaques and
evaluation of two additional indicator viruses (low-passage Jeryl Lynn™ and the
Barnes strain) in the current general Nt 12-well plate assay format, and
evaluation of the use of anti-human IgG to enhance Nt sensitivity.

2. A series of assays was done using adult lab volunteer sera and Barnes, TN,
Lo1, low-passage (lot 135, P8) Jeryl Lynn™ and vaccine passage Jeryl Lynn™
mumps as indicator viruses to determine the relative Nt for the different viruses.
Nt titers to the low-passage lot 135 Jeryl Lynn™ mumps were comparable to
those obtained using the vaccine-passage virus, and greater by 2-4-fold than
those to Lo1, TN or Barnes mumps. TN and Lo1 titers were comparable and
approximately 2-fold higher than those to the Barnes strain of mumps. Screening
of a panel of 23 pediatric sera (selected to have a titer ≥128 to permit assay
using small serum volumes) showed that Nt titers to the vaccine-passage virus
were approximately 2-fold higher than those to the low-passage Jeryl Lynn™ and
approximately 4-fold higher than those to Lo1. The low-passage Jeryl Lynn™
virus therefore provides Nt sensitivity most close to the vaccine-passage virus.

3. Two assays were done using pediatric sera from protocol 006 to evaluate the
effect of treatment with anti-human IgG on Nt titers. The goal of these studies is

**CONFIDENTIAL**

to determine if anti-IgG can boost seroconversion rate measurements.  Previous studies demonstrated that this enhancement boosted post-vaccination titers, but the effect on pre-vaccination titers was not previously measured.  In the current studies, undiluted anti-human IgG provided positive titers to 75% of the pre-vaccination sera (9/12: titers ranging from 32-128) and 8-64-fold increases in post-vaccination titers, while lower amounts (1:2, 1:4 or 1:8 dilutions) of anti-IgG provided comparable enhancement of post-vaccination titers, but retained negative titers for 3/3 pre-vaccination sera.  Follow-up studies are underway using additional pediatric sera to determine the amount of anti-IgG that provides optimum enhancement of post-vaccination titers without boosting pre-vaccination titers.

4.  An issue in the handling of sera for mumps Nt assays is whether or not sera can be frozen and thawed without affecting Nt titers.  The flow of samples for testing may require ELISA testing, then refreezing prior to later testing on site or shipment to an outside testing lab.  To evaluate the effect of freeze-thaw cycles, a panel of three adult lab volunteer sera (low, mid and high-titer samples) was subjected to up to 5 freeze-thaws (quick-freeze in liquid nitrogen or dry ice/ethanol, or a "slow-freeze" in a -70°C freezer) and Nt titers were determined.  Titers for all sera were maintained using up to 5 freeze-thaw treatments.  Efforts are underway to obtain pediatric sera to confirm the stability of titers over multiple freeze-thaws for this serum set.

5. The mumps component of Priorix (SKB measles-mumps-rubella vaccine) was amplified in chick cells to provide a virus stock (approximately $3x10^5$ pfu/mL) for use in comparative studies with other mumps strains.  Two applications of this material would be to compare sequences and Nt sensitivity against other indicator viruses (including Jeryl Lynn™ from which this was reportedly derived) and determine the relationship of the mumps from Priorix with other strains.

B.  One batch each of Barnes (a wild-type virus obtained from Dr. Forghani) and Swiss isolate #1 (an isolate that provided poor Nt titers) mumps was prepared in Vero cells and transferred to DHVS for possible use in development of a "wild-type" mumps antibody ELISA.

C.  Recombinant human albumin (rHA) studies.
1. A series of six measles and seven mumps growth experiments have been completed as part of an evaluation of the utility of the "new" 20% rHA formulation as a replacement for HSA in virus growth media.  All growth experiments included triplicate roller bottles for each condition and one harvest for mumps and 16 harvests for measles per run.  Samples from these are being submitted in blocks to MMD Vaccine Technology and Engineering (VTE) for measurement of virus yields by TCID50 assays.

This series of experiments also included an evaluation of the effect of using a small initial volume for virus attachment (10 mL) instead of the standard 86 mL volume, to determine if the infection efficiency is increased using a lower

MRK-KRA01634870
MRK-CHA01634870
**Appx5692**

inoculum volume.  One experiment evaluated measles and mumps virus attachment (virus remaining unattached in the medium) over time, and a parallel experiment included a test of virus growth curves using these two different attachment volumes.  Samples from these are on test (plaque assay).

D.  Measles neutralization assay development.



E. Virus characterization and assay.

1. As reported in the last two monthly reports, the MMD Testing Laboratories have recently reported a reduction in measles titers in the TCID50 assay (including both test samples and the reference virus) that appears to be linked to a change in assay culture medium lots.  Collaborative studies in MMD and our lab over the last 3 months have evaluated different lots of media (CM457) and the effect of sodium bicarbonate spiking on measles titers.  Completed plaque assay data have been forwarded to MMD BAD for analysis.

*Notebook references*: Book 17748: pp. 43-47, 87, 103, 107, 111, 139, 143, 147, 149, 151, 153, 159, 167, 171-175, 211, 215.

III. Rotavirus.



Dave

cc:   Lab staff
      Paul Keller

MRK-KRA01634871
MRK-CHA01634871

10/25/2019

Declaration of G. Reilly

EXHIBIT 157

Book **31271** Page **161**

Project No. V203     Project Page _MMRV-502-00_

Investigator _D. Krah_     Date _August 4, 2000_

Subject _MPS Nt assay: ped sera, anti IgG titration_

Filed in Book Number/Title _MMRV File 2000 (H)_

Purpose: Titrate the amount of anti-human IgG in the mumps neutralization
assay to determine the effect of the anti-IgG concentration on
Nt activity of selected pre-vaccination sera (1 serum that registered pre(+)
& 1 pool of 2 sera the registered pre(-) in previous testing). This is being done
to determine the maximum amount of anti IgG that does not provide "excess"
neutralization in pre-vaccination sera.
See attached pages for serum dilutions, virus dilution, incubation conditions
& box & plate order. David Krah 8/4/00

8/7/00   Fix cells with 90% acetone/10% water & hold @ 2-8°C for immunostaining. D Krah 8/7/00

Countersigned by

Date

MERCK & CO., INC./MRL
A49765 (12/97)

**CONFIDENTIAL**

**MRK-KRA00064608**
**MRK-CHA00064608**
**Appx5695**

Book **31271** Page **162**   Project No. _____ Project Page _____

DO NOT BEGIN NEW EXPERIMENTS ON THIS PAGE.

Countersigned by _____

Date _____

**CONFIDENTIAL**

**MRK-KRA00064609**
**MRK-CHA00064609**
**Appx5696**

10/25/2019
Declaration of G. Reilly
EXHIBIT 158

Appx5697

**Krah, David**

| | |
|---|---|
| From: | Emini, Emilio |
| Sent: | Thursday, March 30, 2000 8:17 PM |
| To: | Krah, David |
| Subject: | RE: Update on Mumps Nt studies |

Thanks. Looks good....

---------

| | |
|---|---|
| From: | Krah, David |
| Sent: | Thursday, March 30, 2000 11:37 AM |
| To: | Emini, Emilio; Shaw, Alan; Yagodich, Mary |
| Subject: | Update on Mumps Nt studies |

Emilio and Alan,
As an update, we are focusing on several aspects of the mumps Nt assay currently to see if we can achieve Nt sensitivity for a "wild-type" virus comparable to that we have seen for Jeryl Lynn. The key aspects we have tested (and continue to evaluate) are:

1) Use of immunostaining as an alternative to Coomassie Blue staining to visualize plaques
2) Evaluation of Dr. Forghani's Nt format (comparison of well formats-12- vs 24- vs 48-well plates)
3) Use of low-passage Jeryl Lynn mumps
4) Continued evaluation of other wild-type strains

For 1), all mumps strains tested so far (basically all of the strains we have) have formed well defined plaques 3 days after infection. Rather than use the monoclonal antibody (in limited supply and expensive) that Dr. Forghani uses, we have been using a goat anti-mumps polyclonal serum, which works fine. Ealry results showed that we may be missing 10-20% of the plaques for Jeryl Lynn or Lo1 by Coomassie Blue staining 6 days after infection (the standard stain) vs immunostaining 3 days after infection. The difference in detection appears to be virus strain specific-One example from experiment 164-00 is included here:

| | PFU | | PFU |
|---|---|---|---|
| Mumps | Immunostained | | Coomassie Blue |
| Jeryl Lynn "house std" | 29.4 | | 26.0 |
| Jeryl Lynn lot 135 | 25.2 | | 22.4 |
| Jeryl Lynn lot 137 | 23.4 | | 15.2 |
| TN | 25.8 | | 6.2 |
| Lo1 | 44.3 | | 21.6 |

In this example, Jeryl Lynn plaques were detected OK by both methods, but Lo1 detection was lower by Coomassie Blue staining (probably due to coalescence of plaques)

2) Experiments have been done and need to be repeated to evaluate Nt sensitivity in different plate formats
experiment 189-00:
12-well plates

| | JL house std | | JL lot 135 |
|---|---|---|---|
| MKY | 8 | | 4 |
| CM | 256 | | 64 |
| DW | 1024 | | 1024 |

48-well plates:

| | JL house std | | JL lot 135 |
|---|---|---|---|
| MKY | 8 | | >16 |
| CM | 128 | | 64 |
| DW | 1024 | | >2048 |

experiment 181-00

CONFIDENTIAL

MRK-KRA00336323
MRK-CHA00336323
Appx5698

12-well plates

|        | JL house std | JL lot 135   |
|--------|--------------|--------------|
| MKY    | 8/8*         | 8/>16        |
| CM     | 128/256      | 64/>256      |
| DW     | 1024/1024    | >2048/>2048  |
| # plaques @ mock | 21.8/21.8 | 25.8/30.8 |

48-well plates:

|        | JL house std | JL lot 135   |
|--------|--------------|--------------|
| MKY    | >16/>16      | >16/>16      |
| CM     | >256/128     | >256/>256    |
| DW     | 1024/1024    | >2048/??     |
| # plaques @ mock | 8.7/6.0 | 10.8/7.6 |

*Values are the titer leaving the inoculum in the plate and the titer with the inoculum removed before overlaying.

The ab Nt titers are higher in 48-well plates, but the plaquing efficiency is reduced (both sets received the same amount of virus/well).

3) Use of low-passage Jeryl Lynn
We received a copy of the release protocol for a series of mumps lots which confirms that lot 135 mumps is passage 7. This was amplified to P8 in CEF and is being used for the current studies.

The "lot 135 mumps" and other wild-type strains have been evaluated using lab volunteer sera. In addition to the results given above, the following titers have been obtained:
from xperiment 149-00

|              |    | Nt titer for |          |          |          |          |
|--------------|----|--------------|----------|----------|----------|----------|
| virus        |    | AS (std Nt)  | AS (EIA) |          | CM (std) | CM (EIA) |
| JL house std |    | 32           | 64       |          | 128      | 128      |
| Lo1          | 16 |              | 32       | 64       | 32       |          |
| JL135        |    | 32           | 32       |          | 64       | 256      |

| # plaques for mock | std Nt | EIA  |
|--------------------|--------|------|
| JL house std       |        | 16.8 | 12.5 |
| Lo1                | 11.4   | 21.6 |
| JL135              | 14.0   | 14.7 |

from experiment 151-00
(all immunostained)

|              |    | Nt titer for serum |     |      |
|--------------|----|--------------------|-----|------|
| virus        |    | MK                 | AS  | DW   |
| JL house std |    | 16                 | 64  | 1024 |
| JL135        |    | 8                  | 64  | 1024 |
| TN           | 2  | 32                 | 512 |      |
| Lo1          | 8  | 32                 | 1024|      |

A small assay of residual prediatric sera (that were tested previously by the standard Nt) is underway.

The majority of our effort is now on the immunostaining method, with bridges to the standard staining method.

The overall results look promising for the low-passage lot 135 mumps. We are still waiting for the Barnes strain from Dr. Forghani.
The plate format may play a role in Nt sensitivity, and this is being looked at-There may be a balance of sensitivity and ease of use/reproducibility.

Separately, Joe Antonello is looking into the use of the Spearman-Karber method to calculate titers. This can be done "unlinked" to the generation of raw data for the Nt assay.

We also plan to readdress the use of anti- human IgG to enhance Nt, as a back-up if we fall short of our 90+%

Page 2

CONFIDENTIAL

target.

Thanks,
Dave

CONFIDENTIAL

MRK-KRA00336325
MRK-CHA00336325
Appx5700

10/25/2019
Declaration of G. Reilly
EXHIBIT 159

**To:**     Heyse, Joseph F.[heysej@NorthAmerica.msx.merck.com]; Matthews,
Holly[mattholl@NorthAmerica.msx.merck.com]; Chan, Ivan S.F. Siu
fung[chaniv@NorthAmerica.msx.merck.com]; Hartzel,
Jonathan[Hartzjon@NorthAmerica.msx.merck.com]; Schodel,
Florian[Schodefl@NorthAmerica.msx.merck.com]
**From:**   Chirgwin, Keith D.
**Sent:**   Mon 2/26/2001 2:34:29 PM
**Importance:**       Normal
**Subject:**   FW: Information concerning the efficacy of the mumps component of MMRII at potency levels
below release
<u>Information concerning the efficacy of the mumps component of MMRII at potency levels below</u>
release.doc

Here is Jerry's piece with various edits and some comments

   -----Original Message-----
**From:**      Chirgwin, Keith D.
**Sent:**      Monday, February 26, 2001 2:32 PM
**To:**        Margolskee, Dorothy; Sadoff, Jerald C.; Emini, Emilio A; Ukwu, Henrietta
              N
**Subject:**   RE: Information concerning the efficacy of the mumps component of
              MMRII at potency levels below release

Jerry, Dorothy,

A couple of comments/clarifications:

1) For the older studies from the 1960's, the reported potency values were typically from the earlier
TCID50 assay which I believe used a different cell line.  There is a conversion factor when going between
these 2 assays - it is necessary to multiply the older assay numbers by 4 (or add 0.6 log) to convert the
number obtained in the earlier assay to what we would get in today's assay.  Has this been done?  Your
argument is still sound, but the margin between the potencies of the older monovalent lots and the current
lots may not be as large as indicated.

2) The WAES reports from Stan Music relate to the period beginning Jan 1999 to the present and refer
specifically to WAES reports where we have lot identifing information.  In the context of the mumps overfill
safety reports WPSE has been making an extra effort (for the period starting 1/99) to obtain lot identifying
information by calling clinics and physicians offices so that we can better correlate lot potencies to AE
reports.  Even with this effort, we still only have lot # in about a third of reports.  So the denominator for
the one case of mumps is only about one third of all WAES reports during this interval.  I have asked Stan
to provide a listing of all mumps reports, irrespective of whether lot identifying information is availabale -
he will provides this to me today.  We can assume that the actual number of reported mumps cases will
probably be higher.  Therefore we need to be careful how we word the statement about reported mumps
cases during this time frame.  I have reworded this to qualify what the one case really means.   The main
point is that the only reported case for which we have lot # in this time period was not associated with low
potency vaccine.

Over the weekend I checked the CDC webpage for the tabular listings of reportable diseases and the
cumulative total of mumps cases for 2000 was 68.  These reports are not broken out by vaccinated
versus unvaccinated.   One option might be to look at the CDC's reported mumps trend over the past
several years.  My impression from the literature is that reported mumps cases in the US have generally
continued to trend downward over time, but we need to confirm this.  If true this would provide additional
reassurance that a change in the stability profile of mumps in more recent years has not had any impact

**MRK-KRA00549462**
**MRK-CHA00549462**
Appx5702

in on breakthroughs.

Keith

-----Original Message-----
**From:** Margolskee, Dorothy
**Sent:** Sunday, February 25, 2001 6:22 PM
**To:** Sadoff, Jerald C.; Chirgwin, Keith D.; Emini, Emilio A
**Subject:** Information concerning the efficacy of the mumps component of MMRII at potency levels below release

Jerry et al

I like the logic - I've edited mostly for clarity.  Couple of questions -see within.
Emilio, I think we need a section re further analyses of the samples: see page ?9,
bold type...what do you think?  Will try to reconvene the gang for discussion tomorrow
a.m.....

Dorothy

**CONFIDENTIAL**

**EXECUTIVE SUMMARY:**

Information concerning the efficacy of the mumps component of M-M-R-II at potency levels below the currently accepted end-expiry titer of 4.2 $\log_{10}$ TCID$_{50}$ is discussed.

The information we have is based upon:
- Early efficacy and immunogenicity studies performed on monovalent Merck Jeryl Lynn strain vaccine;
- The lack of any demonstrated interference in immunogenicity of Jeryl Lynn in the MMR combination, which permits us to relate the early efficacy findings to M-M-R-II;
- Partial data from a recent end expiry study which utilized M-M-R-II at three mumps potencies: within the release range (4.9 $\log_{10}$ TCID$_{50}$) and at two potential end-expiry titers: …4.0 $\log_{10}$ TCID$_{50}$ and …3.7 $\log_{10}$ TCID$_{50}$; and
- Preliminary analysis of epidemiologic adverse experience data from our worldwide adverse experience surveillance (WAES) database, focussing on reports of mumps during a period when marketed material with projected end expiry potencies at or below 4.2 $\log_{10}$ TCID$_{50}$ may have been used.

A review of the literature indicates that mumps vaccine potencies of $\geq 3.5$ $\log_{10}$ TCID$_{50}$ should provide high levels of clinical protection against mumps. In addition, these studies demonstrated that seroconversion rates as low as ~83%, measured by *in vitro* neutralization assays, are associated with >95% clinical effectiveness. Finally, interim analysis of the mumps end-expiry trial for M-M-R-II (protocol 007) demonstrate that mumps potencies of 3.7 to 4.9 $\log_{10}$ TCID$_{50}$ are associated with seroconversion rates of 88.2- 94.1%, as measured by *in vitro* neutralization of a wild type Jeryl Lynn strain.

Taken together, this review supports the clinical effectiveness of marketed M-M-R-II lots administered during shelf life with potencies at or above 3.7 $\log_{10}$ TCID$_{50}$.

**Early Immunogenicity, Dose ranging and Field Effectiveness of Monovalent Jeryl Lynn Mumps Vaccine.**

In the mid 1960's, several studies under the direction of Dr. Maurice Hilleman were performed to assess the immune responses and protection induced by the Merck Jeryl Lynn mumps vaccine strain.[1]
- In an initial study, 12 children ages 1.5 to 20 years (average 5 years), who were all initially seronegative for mumps, received 4.5 $\log_{10}$ TCID$_{50}$ Jeryl Lynn mumps vaccine; 17 children in the same age distribution who were all seronegative for mumps received 4.2 $\log_{10}$ TCID$_{50}$ Jeryl Lynn mumps vaccine. The geometric mean neutralizing antibody titer in the group receiving a 4.5 $\log_{10}$ TCID$_{50}$ dose was 1:8. All children (except one who was not tested) responded with titers between 1:2 and 1:32 (2 in the 1:2 group). The geometric mean neutralizing titer in children receiving 4.2

---

[1] Stokes J. et al , Pediatrics: 39:3363-71, 1967

MRK-KRA00549464
MRK-CHA00549464

Appx5704

$\log_{10}$ TCID$_{50}$ Jeryl Lynn mumps vaccine was 1:6, with all children responding (titers 1:2 –1:32, 6 with titers of 1:2).

- A dose response was then performed in 63 children, initially seronegative for mumps, who ranged in age from 11 months to 12 years (average age 4 years). All children developed neutralizing antibody following mumps vaccine virus administration in amounts ranging from 4.5 to as little as 2.5 $\log_{10}$ TCID$_{50}$ units. As can be seen in Table 1, the distribution and geometric mean titers of neutralizing antibody titers are quite similar throughout the groups, suggesting very little dose response across this broad range of titers contained in the vaccine.

Table 1. Titration of Jeryl Lynn strain Live Mumps Virus Vaccine in Mumps Seronegative Children for Serologic Response

| | | Number of subjects with neutralizing antibody titer Following Vaccination | | | | | | | Total No. | GMT |
|---|---|---|---|---|---|---|---|---|---|---|
| Reciprocal dilution endpoint | | #1 | 1 | 2 | 4 | 8 | 16 | 32 | 64 | | |
| TCID$_{50}$ | $\log_{10}$ | | | | | | | | | | |
| 31,700 | 4.5 | 0 | 2 | 0 | 3 | 6 | 2 | 3 | 0 | 16 | 8 |
| 10,000 | 4 | 0 | 2 | 2 | 1 | 4 | 2 | 1 | 0 | 12 | 5 |
| 3,170 | 3.5 | 0 | 0 | 2 | 2 | 2 | 3 | 2 | 1 | 12 | 10 |
| 1,000 | 3.0 | 0 | 1 | 2 | 1 | 2 | 2 | 1 | 1 | 10 | 7 |
| 317 | 2.5 | 0 | 0 | 2 | 2 | 7 | 1 | 0 | 1 | 13 | 7 |

The neutralizing antibody tests in these studies were performed in chick embryo cell cultures employing the Jeryl Lynn strain virus which had been passed a total of 7 times in embryonated hens eggs and in chick embryo cell culture. The sera were inactivated at 56 degrees Centigrade for 30 minutes prior to test and 30-100 TCID$_{50}$ of virus were employed as a test dose. The test were read for hemadsorption on the fifth day following incubation at 32 degrees Centigrade and the titer was the highest initial dilution of serum which showed total absence of hemaglutination.[2] Note that seroconversion was considered positive at any serum dilution, including 1:1.

Subsequent field efficacy studies demonstrated that the vaccine was highly efficacious, on the order of 97% protection against mumps infection.[3] In these efficacy studies, children aged less than 1-2 years old to 11 years old were vaccinated and the overall seroconversion rate by neutralization assay was 97%. The age distribution in relation to seroconversion is given in Table 2.

Table 2. Neutralizing Antibody Response According to Age Following Jeryl Lynn Vaccination in Children Initially Seronegative for Mumps

[2] Buynk, E.B. and Hilleman, M. R., Pro. Soc. Exp. Biol. and, Med., :123(3):768-75,1966.
[3] Weibel, R.E. *et. al.* N. Eng. J. Med, 276⊗5),245-51, 1967.

CONFIDENTIAL

MRK-KRA00549465
MRK-CHA00549465

| Age range in years | # of subjects | # Neutralization (+) | Percent positive |
|---|---|---|---|
| | | | |
| # 1-2 | 24 | 20 | 83 |
| 3-4 | 70 | 69 | 99 |
| 5-6 | 58 | 57 | 98 |
| 7-8 | 17 | 17 | 100 |
| 9-10 | 4 | 4 | 100 |
| 11- | 4 | 4 | 100 |
| | | | |
| Total | 177 | 171 | 97 |

As can be seen in the 24 children between ages 1-2, only 83% were positive by neutralization assays for mumps neutralizing antibody. The 4 children that did not respond were all aged 2 years and were seronegative at the time of vaccination. Since approval in the 1960's, the Jeryl Lynn mumps vaccine has been used widely in the 1-2 year old population and has been associated with high levels of subsequent protection in field effectiveness studies. Taken together, these two observations suggest that seroconversion levels related to mumps neutralization above 80% are associated with excellent levels of field effectiveness.

An example of the lack of one-to-one correlation between effectiveness and *in vitro* neutralization activity was described in the original efficacy field trial reports (ref). At that time it was noted that one child who did not have detectable mumps antibody - even at a titer of 1:1 after vaccination - did not contract mumps upon apparent heavy exposure to the natural disease. This experience with live viral vaccines, where children who are vaccinated fail to make a detectable immune response but are subsequently protected, has been seen in field trials with measles as well.[4] The explanation for this phenomenon is most likely related to sensitivity of the *in vitro* neutralizing antibody assay methodology utilized.

**Early Studies on MMR Showing Lack of Interference of Mumps Neutralizing Antibody in the Combination.**

Early serologic studies of the induction of mumps neutralizing antibody by trivalent MMR demonstrate no apparent effect on the immunogenicity of the Jeryl Lynn mumps vaccine when put in combination as compared to historical controls.[5]

---

[4] Hilleman M.R. et al, Am. J. Dis. Child. 103:373-79, 1962.
[5] Stokes J.Jr. et al, JAMA, 218:1, p57-61, 1971.

**CONFIDENTIAL**

**MRK-KRA00549466**
**MRK-CHA00549466**

Table 3. Neutralizing Antibody Responses against Mumps among Initially Seronegative Children Vaccinated with Trivalent compared to monovalent Vaccines.

| Study No. | Vaccine | No. of Subjects | Age Range | Mean Age (years) | Titer Range | GMT |
|-----------|---------|-----------------|-----------|------------------|-------------|-----|
| 232 | MMR | 24 | 11 months - 3 yrs. | 1.4 | 1 - 128 | 15.1 |
| | | | | | | |
| 71 | Jeryl Lynn | 25 | 2-5 yrs. | 4.3 | 2 - 256 | 8.7 |

Despite the small numbers in the study and the use of historical controls, there is no suggestion of inhibition of mumps responses. Note the older age group of children in the historical monovalent control. Comparison of the test group to responses in this historical group, in which there is a tendency to respond better based upon the distribution of antibody responses related to age (shown previously), would also tend to bring out differences if inhibition of neutralizing responses were present in the combination.

This lack of apparent inhibition of mumps responses in the vaccine combination permits us to relate neutralizing antibody responses in the combination to neutralizing antibody responses seen in the pivotal efficacy and dose ranging trials for monovalent Jeryl Lynn mumps vaccine. The dose ranging trials show that doses as low as 2.5 and 3 $\log_{10}$ $TCID_{50}$ Jeryl Lynn mumps vaccine are highly immunogenic with no indication that there was a difference in distribution of titers through that range. With no demonstrable inhibition in the combination, it seems reasonable that a dose of 3.5 $\log_{10}$ $TCID_{50}$ Jeryl Lynn mumps vaccine in MMRII would represent an acceptable end expiry dose associated with a high level of protection.

**Mumps Neutralizing Antibody Titers in Early Studies of MMR.**

Data from early trials, in which mumps neutralization assays were performed in a similar manner to those in the pivotal efficacy and dose ranging trials for Jeryl Lynn, allow us to examine the mumps neutralizing titers following vaccination of children with MMR vaccine lots at or near their release potencies. In two field trials in Costa Rica-San Salvadore[5] in children who were seronegative to all 3 vaccines contained in MMR and utilizing different lots of vaccine, point estimates of mumps neutralizing antibody seroconversion rates were as low as 91% (132/145) and 93% (144/155). The lower bounds on the confidence intervals for these point estimates were certainly well below 90%, yet the vaccine performed extremely well at release and beyond. This study demonstrates that seroconversion rates of <90%, based upon neutralization results, are associated with high levels of protection.

---

[5] Stokes J.Jr. et al, JAMA, 218:1, p57-61, 1971.

**CONFIDENTIAL**

MRK-KRA00549467
MRK-CHA00549467

**Mumps immunogenicity of vaccine at various potencies: Recent studies of M-M-R-II**

Most of the recent studies concerning the immunogenicity of M-M-R-II have been performed with ELISA binding assays utilizing Mumps Jeryl Lynn vaccine as a source of antigen. Merck has conducted two clinical trials, COMVAX™ Protocol 009 and M-M-R™ II Protocol 007, in which M-M-R™ II containing a low potency of mumps was administered to study subjects.

The primary purpose of COMVAX™ Protocol 009 was to evaluate the concomitant administration of COMVAX™, M-M-R™ II, and Varivax™. During the conduct of Protocol 009, one of the M-M-R™ II lots (Lot 1271B) passed its labeled expiry date of June 26th, 1996. A total of 268 subjects were vaccinated with M-M-R™ II Lot 1271B from March 14th, 1996 to March 20th, 1997. These immunizations therefore occurred approximately 1 year after the end of the expiry-dating period. The mumps potency at the time of release for Lot 1271B was ~4.6 $\log_{10}$ TCID$_{50}$ / dose. Following the conclusion of Protocol 009, Lot 1271B was re-tested in December of 1997 (approximately 6 months after its use in the clinic) and the mumps potency was found to be ~4.1 $\log_{10}$ TCID$_{50}$ / dose. For those subjects who were included in the per-protocol population and were initially seronegative to mumps, Table 4 summarizes the seroconversion rates (SCRs) and geometric mean titers (GMTs), based on an ELISA assay, for subjects receiving M-M-R™ II Lot 1271B. It is apparent that the observed response rate of 98.2% with 95% confidence intervals of 95.5 to 99.5% represents a very high response rate as measured in this assay.

Table 4. **COMVAX™ Protocol 009: M-M-R™ II Lot 1271B**
Summary of Mumps Seroconversion Rates (SCRs) and Geometric Mean Titers (GMTs)
6 Weeks Postvaccination and Associated 95% Confidence Intervals in Initially Seronegative Subjects

| Parameter | N | Observed Response | 95% CI |
|---|---|---|---|
| SCR[†] | 222 | 98.2% (218/222) | (95.5%, 99.5%) |
| GMT[†] | 222 | 48.8 | (42.1, 56.1) |
| [†] Based on a mumps ELISA assay. | | | |
| N = Number of initially seronegative subjects with postvaccination serology. | | | |
| CI = Confidence Interval. | | | |

To further examine the immunogenicity of the Jeryl Lynn mumps component of M-M-R™ II at lower potencies, we designed a study (Protocol 007) to immunize children 12-18 months of age with vaccine having mumps potencies of ~4.9 $\log_{10}$ TCID$_{50}$ / dose (release potency), ≤4.0 $\log_{10}$ TCID$_{50}$ / dose, or ≤3.7 $\log_{10}$ TCID$_{50}$ / dose.

Initially we attempted to utilize filled lots of material still out in the field, which had been stored under the conditions appropriate for the vaccine being stored in the clinic and kept

**CONFIDENTIAL**

for the length of time that should have provided the appropriate $TCID_{50}$ / dose. After an extensive search of inventory and distribution centers, we were unable to find any lots that were at the end expiry $TCID_{50}$ / doses required for this study, despite the length of time they had been stored. **HMMMM…JERRY: DO YOU MEAN THAT THE LOTS WERE AT END OF SHELF LIFE BUT NOT LOW ENOUGH OR THAT WE COULDN'T FIND OLD LOTS?**

Because of the conservative nature of the stability and end expiry model calculations that Merck uses to project end-expiry potency and to set release specifications for marketed product, we found that it was impossible to find lots that had aged to potencies at or below 4.0 $\log_{10}$ $TCID_{50}$ / dose during the stated shelf life and under natural storage conditions.

**I THINK THE PRIOR PARAGRAPH WOULD IN GENERAL APPLY, BUT COULD LOTS LIKE THOSE 6 VERY LOW ONES BEEN MISSED GIVEN THEIR LOW FREQUENCY AMONG ALL THE OTHER LOTS?**

We therefore took an alternative approach to achieve combination vaccine containing mumps vaccine of appropriate potency. After extensive preliminary work to characterize decay curves for measles, mumps and rubella when M-M-R™ II is artificially decayed at 20 degrees centigrade, we were able to produce aged lots of appropriate potencies for the clinical study. Each of the two lower dose vaccines utilized in the clinic was derived from the same lot that was also utilized as the release dose. The sub-lots were simultaneously aged for different times to attain the appropriate target potencies. The potencies were targeted so that we could guarantee that the upper bound of the 95% confidence interval on the assay potency was lower than the declared $TCID_{50}$ / dose. This guaranteed with 95% confidence that immunogenicity induced by these vaccines was due to a potency of mumps that was not higher than the stated value. For example, the point estimate of the potency of ≤4.0 $\log_{10}$ $TCID_{50}$ / dose was 3.98 $\log_{10}$ $TCID_{50}$ / dose.

Approximately 1770 subjects were randomized to receive 1 of the 3 lots of M-M-R™ II as described above. The primary immunogenicity endpoint for this study was the percent of initially seronegative subjects who developed neutralizing antibodies to mumps 6 weeks postvaccination. This was measured with a new assay that required development and validation. It utilizes a low passage Jeryl Lynn mumps strain as a target, which when originally tested in children was still reactogenic and therefore qualifies as a wild type strain. Because this particular assay has not been extensively utilized before, response to vaccine will also be measured by a standard ELISA, utilizing antigen from this strain as a target. This provides another relevant measure of an immune response that can be compared to the extensive database that has been developed for M-M-R™ II in recent clinical studies.

The study enrollment, safety and immunogenicity follow-up visits have already been completed, and a preliminary analysis of approximately one third of the data has been performed. Table 5 summarizes the percent of initially seronegative subjects who developed neutralizing antibodies to mumps 6 weeks postvaccination and the GMTs for

**MRK-KRA00549469**
**MRK-CHA00549469**
Appx5709

each treatment group, along with the associated 95% confidence intervals. Since approximately 33% of the subjects had 6-week titers greater than the final dilution of 1:4096, the median titers for each treatment group are also provided in Table 7. For initially seronegative subjects, Figure 1 displays the reverse cumulative distribution functions of the 6-week titers by treatment group. In addition, Table 8 provides the distribution of 6-week titers by treatment group for those subjects who were initially seropositive to mumps at baseline.

**NOTE: TABLES 6-8 & FIGURE 1 NEED TO BE ADDED**

### TABLE 5. M-M-R™ II Protocol 007: Mumps End Expiry

Preliminary Summary of the Percent of Subjects Who Develop Neutralizing Antibodies to Mumps[†], Geometric Mean Titers (GMTs), and Median Titers 6 Weeks Postvaccination and Associated 95% Confidence Intervals in Initially Seronegative Subjects[‡]

| Parameter | Treatment Group | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | ~4.9 $\log_{10}$ TCID$_{50}$ Mumps Potency (N = 186) | | | ≤4.0 $\log_{10}$ TCID$_{50}$ Mumps Potency (N = 196) | | | ≤3.7 $\log_{10}$ TCID$_{50}$ Mumps Potency (N = 183) | | |
| | n | Observed Response | 95% CI | n | Observed Response | 95% CI | n | Observed Response | 95% CI |
| SCR | 169 | 94.1% (159/169) | (89.4%, 97.1%) | 179 | 93.3% (167/179) | (88.6%, 96.5%) | 169 | 88.2% (149/169) | (82.3%, 92.6%) |
| GMT | 169 | 1262.2 (32.0%)[‖] | (1026.2, 1552.6) | 179 | 1363.8 (35.2%)[‖] | (1107.6, 1679.3) | 169 | 1049.5 (32.0%)[‖] | (809.6, 1360.6) |
| Median Titer | 169 | 2048.0 | (1580.0, 2654.6) | 179 | 2048.0 | (1577.8, 2658.2) | 169 | 2048.0 | (1479.2, 2835.5) |

[†] ≥4-fold rise in antibody titer, i.e., and 1:16 to 1:64 where 1:16 is assigned to titers below 1:32, the limit of detection.

[‡] Regardless of protocol violations or day ranges.

[‖] Percentage of subjects with 6-week titer >4096

N = Number of subjects vaccinated in each treatment group.

n = Number of initially seronegative subjects in each treatment group with postvaccination serology.

CI = Confidence Interval.

As can be seen from the preliminary data, high response rates are seen at each of the potencies with point estimates well above the high 80% range; we predict from the older neutralization data that these potencies will be associated with high levels of protection. The Geometric Mean Titers are very similar and the percentage with titers >1:4096 was identical for children immunized with the vaccine at release, ~4.9 $\log_{10}$ TCID$_{50}$ / dose and the lowest potency vaccine, ≤3.7 $\log_{10}$ TCID$_{50}$ / dose. This similarity is also reflected in the reverse distribution curves, which are overlapping at the higher titers. While the ≤3.7 $\log_{10}$ TCID$_{50}$ / dose group mounted adequate responses that should be associated with high levels of protection, the point estimate of those making 4 fold rises was lower than

**CONFIDENTIAL**

those seen with the ~4.9 $\log_{10}$ TCID$_{50}$ / dose (release potency) and the ≤4.0 $\log_{10}$ TCID$_{50}$ / dose groups, which were virtually identical.

**NEEDS A SECTION RE ASSAY DESIGN & PERFORMANCE ISSUES:  EMILIO TO PROVIDE (I'LL CALL HIM)**

**In talking with Emilio, the neutralization assay is very artificial because of the IgG added; to avoid too many seropositives, very high initial dilutions were required. Thus, low level responders cannot be distinguished from nonresponders.  To address this, two approaches will be taken.  First, ELISA assays will be performed, along with appropriate controls, which will allow us to benchmark against our usual assay and experience base.  In addition, the neutralization assay using JL vaccine strain without the IgG step will be utilized, to detect low level neutralization responses.  In this way we will better approach Maurice's initial studies where seroconversion was declared at very low titers.**

In order to examine the children in each group that did not respond to the vaccine with 4 fold rises and therefore did not achieve a titer of 1:64, ELISA assays were run on the sera from these children plus appropriate controls.  This was done to determine if these children were low responders beyond the limits of sensitivity of our new neutralization assay or if they were non-responders. There were 10 such children in the ~4.9 $\log_{10}$ TCID$_{50}$ / dose group, 12 such children in the ≤4.0 $\log_{10}$ TCID$_{50}$ / dose group and 20 such children in the ≤3.7 $\log_{10}$ TCID$_{50}$ / dose group.  The result is shown in the table below and indicates ……

**Examination of the WAES database for increased evidence of  Mumps**.

Children are given their primary vaccination at ages 12 to 18 months with a booster at School Entry.  It is highly unlikely that an immunization  of slightly lower potency at end expiry would have any effect on the immune response to a booster in an already primed child.  Children immunized with lots at or near end expiry which were released in the time frame in question would still not be at the peak of their exposure to mumps.  An unknown percentage of children do receive vaccine off schedule and could be in a susceptible age range.  The number of such children that might have also received vaccine at or near end expiry is, however,  probably quite small. Nevertheless, examination of our worldwide adverse experience surveillance data base (WAES) has revealed only one case since January 1999 where lot identifying information is available that might be considered a vaccine failure.  This individual (WAES # 00080343) received vaccine approximately 5 months after release with a mumps release potency of 4.6 $\log_{10}$ TCID$_{50}$ / dose, and estimated mumps potency at the time of administration would have been ≥4,3 $\log_{10}$ TCID$_{50}$ / dose.  Therefore at the present time there is no signal from our passive surveillance system that vaccine failures are occurring due to administration of vaccine of low potency at or near end expiry.

**CONFIDENTIAL**

**Summary**

Data from historical early dose ranging and immunogenicity studies suggests that 3.7 $\log_{10}$ TCID$_{50}$ / dose should be very adequate to induce appropriate levels of neutralizing antibody. These studies also suggest that seroconversion rates in the high 80% as measured by *in vitro* neutralization assays have been associated with high levels of protection.

Preliminary data on all three doses tested in the recent end expiry trial of M-M-R™ II all reach or exceed this level of seroconversion. The children who do not respond with a 4-fold rise in neutralizing antibody when measured by a wild type ELISA …….

There has been no evidence to date that increased rates of mumps due to immunization with M-M-R™ II at or near expiry has occurred, although it is still early for such data to be definitive. Prospective studies in Health care systems where lot numbers and dates of immunization can be associated with the occurrence of mumps may be required for a definitive epidemiologic answer. The inability to find lots with actual potencies close to the theoretical end expiry levels our models project; the rapid use of vaccine in the field; and the adequate immune responses that we are seeing at these lower potency levels make vaccine failure highly unlikely.

**MRK-KRA00549472**
**MRK-CHA00549472**

10/25/2019
Declaration of G. Reilly
EXHIBIT 160

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel*., | :     Civil Action No. 10-4374 (CDJ) |
| STEPHEN A. KRAHLING and JOAN A. WLOCHOWSKI, | **RELATOR STEPHEN A. KRAHLING'S RESPONSES AND OBJECTIONS TO MERCK'S REVISED FIRST SET OF INTERROGATORIES** |
|          Plaintiffs, | |
|          v. | |
| MERCK & CO., INC., | |
|          Defendant. | |

In accordance with Federal Rules of Civil Procedure 26 and 33, Relator Stephen A. Krahling ("Relator") by and through his undersigned counsel, hereby responds and objects to Merck's Revised First Set of Interrogatories to Relator Stephen A. Krahling (the "Revised Interrogatories"), as follows:

<p align="center"><strong><u>PRELIMINARY STATEMENT</u></strong></p>

1.     Discovery in this action is in its infancy, and Relator's investigation and development of all facts and circumstances relating to this action are ongoing.  As per the parties' agreement, Relator's Responses and Objections to the Revised Interrogatories (the "Responses and Objections") are based on the information available as of the filing date of the Amended Complaint.  It is anticipated that further discovery and independent investigation will supply additional facts, add meaning to known facts and establish new factual conclusions. Consequently, these responses are given without prejudice to Relator's and his counsel's right to produce at the time of trial any and all discovered evidence or facts that Relator may later

<p align="center">1</p>

Appx5714

discover or recall relating to presently known material facts, and to produce all evidence, whether subsequently discovered or relating to the proof of subsequently discovered material facts.  The answers contained herein are made in a good faith effort to supply as much factual information as was known at the time the Amended Complaint was filed, but should in no way prejudice Relator in relation to further discovery, recollection, research or analysis.

2.      Relator expressly reserves the right to use, or introduce at any hearing and/or trial, documents or information that are responsive to the Revised Interrogatories, but are discovered or recalled subsequent to these responses, including, but not limited to, any documents or information obtained in discovery in this case from other parties or non-parties.

3.      Except for explicit facts admitted herein, no incidental or implied admissions are intended hereby.  The fact that Relator has answered any Revised Interrogatories should not be taken as an admission that Relator accepts or admits the existence of any facts set forth or assumed by such Interrogatory, or that such response constitutes admissible evidence.  The fact that Relator has answered part or all of any Interrogatory is not intended and shall not be construed to be a waiver by Relator of all or any part of any objection to any Interrogatory made by Relator.

4.      By making the accompanying responses and objections to the Revised Interrogatories, Relator does not waive, and hereby expressly reserves, his right to assert any and all objections as to the admissibility of such responses into evidence in this action, or in any proceedings, on any and all grounds including, but not limited to, competency, relevancy, materiality, privilege, and scope.  Further, Relator makes the responses and objections herein without in any way implying that he considers the Revised Interrogatories, and responses to the Revised Interrogatories, to be relevant or material to the subject matter of this action.  Relator

2

330236 3

**Appx5715**

expressly reserves the right to: (i) object on any ground to the use of any information or documents provided in response to the Revised Interrogatories at any time and in any proceeding in this case or any other cases; and (ii) assert further objections to the discoverability, relevance and/or admissibility of any such information or documents on any and all grounds.

5.     Relator expressly reserves the right to clarify, revise, or correct any and all of the responses and objections herein.

6.     Each and every date stated in response to any Interrogatory is hereby represented as being approximate, and not precise.

7.     Relator will respond to each particular Interrogatory as he understands them.  If Defendant subsequently asserts an interpretation that differs from Relator's, Relator reserves the right to change and/or supplement his objections and responses.

8.     This Preliminary Statement is incorporated by reference into each and every response below, as though fully set forth therein.

## GENERAL OBJECTIONS

9.     Relator's responses to Defendant's Revised Interrogatories, set forth below, are provided subject to the following General Objections, which apply to each and every Interrogatory for which a response is provided below, and which are incorporated into each and every response as if set forth in full therein.  The failure to mention any of the following objections in the specific responses shall not be deemed a waiver of such objection.

10.     Relator objects to the Revised Interrogatories to the extent that they purport to impose upon Relator obligations greater than or different than those authorized by Federal Rules of Civil Procedure 26 or 33, the Local Rules of the Eastern District of Pennsylvania, or other

3

applicable law.  Relator expressly disclaims any such obligations and objects to any attempt by Defendant to impose such obligations on Relator.

11.     Relator objects to the Revised Interrogatories to the extent that they seek information or materials protected by Federal Rule of Civil Procedure 26(b), the attorney-client privilege, the attorney work product doctrine, or any other applicable privileges or protections. The fact that Relator does not specifically object to an individual Interrogatory on the ground that it seeks such privileged or protected information or materials shall not be deemed a waiver of the protection afforded by Federal Rule of Civil Procedure 26(b), the attorney-client privilege, attorney work product doctrine, or any other applicable privilege or protection.  Inadvertent production of any documents, information, or communications in response to the Revised Interrogatories shall not constitute a waiver of any privilege or any other ground for objection held by Relator.  Relator reserves the right to demand that Defendant return any documents (along with all copies thereof) inadvertently produced by Relator in response to these Revised Interrogatories.

12.     Relator objects to the Revised Interrogatories to the extent that they seek information that is not relevant to the subject matter of this action and are not reasonably calculated to lead to the discovery of admissible evidence.

13.     Relator objects to the Revised Interrogatories to the extent that they seek discovery of confidential personal information protected by Relator's privacy rights.

14.     Relator objects to the Revised Interrogatories to the extent that they seek the production of documents, information, or communications not within Relator's possession, custody, or control.

4

330236 3

**Appx5717**

15.     Relator objects to the Revised Interrogatories to the extent that they purport to impose a burden upon Relator to furnish information and materials that are not available to Relator or are equally or more readily available to Defendant.

16.     Relator objects to the Revised Interrogatories to the extent that they are vague, ambiguous, or incomprehensible.

17.     Relator objects to the Revised Interrogatories as a whole, and in combination with the other written discovery requests served on Relators in this action, to the extent that they are repetitive, overbroad, unduly burdensome, oppressive, and harassing.

18.     Relator objects to the Revised Interrogatories to the extent that they are overly broad, unduly burdensome, do not identify with sufficient particularity the information sought, exceed the scope of inquiry permitted by the applicable Federal Rules of Civil Procedure, and call for an extensive and exhaustive narrative of communications and events regarding many subject matters over a substantial time period.

19.     Relator objects to the Revised Interrogatories to the extent that they cover subject matters which would be better and more efficiently disclosed during a deposition.

20.     Relator objects to the Revised Interrogatories to the extent that they mischaracterize the actions, conduct, and/or obligations of Relator, Relator Wlochowski, real parties, third parties, and/or Defendant.

21.     Relator objects to the Revised Interrogatories to the extent that they call for the identification of documents or communications to or from Relator's counsel, or to or from any of counsel's employees, agents, experts, or consultants, on the ground of burden and that they seek information protected by the attorney-client privilege and/or attorney work product doctrine.

330236 3

Appx5718

Relator declines to produce or identify any such documents and communications to the extent they exist.

22.     Relator objects to Defendant's definitions of "concerning," "concern," "all," "each," "relate," and "relating," and the terms referenced therein, to the extent that they are vague, ambiguous, unduly burdensome, overly broad, and not reasonably calculated to lead to the discovery of admissible evidence.

## RESPONSES TO REVISED INTERROGATORIES

### REVISED INTERROGATORY NO. 1:

Identify the factual basis for the allegation in Paragraphs 152 and 153 of the Complaint that Merck "billed the [G]overnment for its purchases of a mumps vaccine that, among other things, (i) was significantly less effective than Merck represented it to be, (ii) did not provide the product the [G]overnment contracted to purchase, [and] (iii) was mislabeled, misbranded, adulterated and falsely certified."  In responding to this Interrogatory, please identify all invoices or bills that Merck submitted to the Government of which you have knowledge, or state that you do not have knowledge of any.  If, in responding to this Interrogatory, you identify particular bills or invoices that Merck submitted to the Government, then for each bill or invoice, identify the date and amount of the bill, the name and address of the person who submitted it, and whether it related to M-M-R®II or ProQuad® or both.

### RESPONSE TO REVISED INTERROGATORY NO. 1:

Relator incorporates the Preliminary Statement and General Objections stated above. With respect to the request to identify particular bills or invoices, Relator objects to this Interrogatory to the extent that it seeks information that is within Defendant's possession, custody or control, or in the possession, custody or control of the government or a third-party

330236 3

that is equally available to Defendant. Relator further objects to Revised Interrogatory No. 1 to the extent that it seeks relators' legal theories behind how Merck's mumps vaccine "did not provide the product the [G]overnment contracted to purchase" and "was mislabeled, misbranded, adulterated and falsely certified." Responding to these portions of this Interrogatory would require Relator "to articulate theories of [his] case not yet fully developed." *United States v. Educ. Mgmt. LLC*, No. 2:07–cv–00461, 2013 WL 3854458, at *20 (W.D. Pa. May 14, 2013). An early response to this Interrogatory would prejudice the Relator in later discovery and is not appropriate prior to meaningful fact discovery or document production in this action. *See id.*

Subject to and without waiving the foregoing objections, Relator responds as follows:

1. Krah told Relator on multiple occasions that Merck needed to report a 95 percent or higher seroconversion rate for the mumps component of Merck's MMRII vaccine or Merck would risk losing its *de facto* exclusive license to sell the vaccine in the U.S. Furthermore, Krah told Relator that Merck needed to use a plaque-reduction neutralization (PRN) test to measure mumps vaccine efficacy.

In 1999-2000, Krah was performing validation studies on a standard mumps PRN test. Krah told his lab group that the goal of the validation studies was to identify a testing methodology which would measure a 95% seroconversion rate in children vaccinated with MMRII. In conducting these initial tests, Krah used an attenuated Jeryl-Lynn strain of the mumps virus, not a wild-type virus, to boost the seroconversion rate he could measure in the lab. Krah told Relator that standard PRN testing against various wild-type mumps strains had yielded unsatisfactory results, and that PRN testing against an attenuated Jeryl-Lynn vaccine strain had yielded better, but still unsatisfactory results. Krah told Relator that, as a result, more changes to the methodology were required in order to meet the pre-determined objective of measuring 95% seroconversion.

7

Krah informed his lab group that once a procedure was devised to measure a 95% seroconversion rate the project would be scaled up to include all of the virologists in Krah's lab. Later, in or around December 2000, Krah told Relator the FDA required Merck to demonstrate a 95% seroconversion rate and this mandate was the impetus for including rabbit anti-human antibodies in the testing methodology eventually used in the Protocol 007 testing. To Relator, and to the lab group, Krah referred to rabbit anti-human antibodies as secondary enzyme antibodies that were added to the standard PRN test to provide "secondary" virus neutralization. Krah told Relator, and the lab group, that the exogenous virus-killing provided by the rabbit enzyme antibodies was necessary because the children's serum by itself did not adequately neutralize mumps virus. Krah told Relator and the lab group that 95% seroconversion could not be measured without the added amount of virus neutralization provided by the rabbit enzyme antibodies.

2. Krah told Relator on multiple occasions that the efficacy rate of the mumps vaccine had significantly diminished since its original licensure. On one occasion, Krah told Relator that the efficacy of the mumps vaccine diminishes with each passage of the vaccine virus, and provided Relator with Merck research supporting the observation. Krah further told Relator that based on this observation, Krah believed the MMRII vaccine no longer provided adequate immunization, and that the vaccine's diminished efficacy would result in mumps outbreaks in the future. *See* Relator's Response to Interrogatory 17.

3. Krah's validation studies on a standard mumps PRN test measured seroconversion rates well below the 95 percent threshold Merck was seeking, the FDA was requiring, and the 96 percent level identified on the package insert.

In or around December 2000, Krah gave Relator a document from the validation studies Krah had been conducting using a standard mumps PRN test indicating a seroconversion rate of 79.5%. This number was used as a baseline vaccine efficacy measurement to test the boosting effect of secondary rabbit enzyme antibodies. Relator was told by Krah that the point was to test

8

330236 3

samples that were originally vaccine failures (by the standard PRN test) in order to find the

concentration of rabbit enzyme antibodies that would cause the children's serum results to switch

from negative to positive.

4. Merck abandoned the standard mumps PRN methodology Krah was developing in
   1999-2000 because it measured seroconversion rates well below the 95 percent
   threshold Merck was seeking, and the 96 percent level identified on the package
   insert.

5. Merck replaced the standard mumps PRN test with an "enhanced" PRN test explicitly
   designed to permit the measurement of a seroconversion rate of 95 percent or higher.
   With the "enhanced" test Merck continued to use an attenuated Jeryl Lynn strain of
   the virus rather than a wild-type but it also included the use of rabbit enzyme
   antibodies.  Addition of the rabbit enzyme antibodies made the PRN test a *de facto*
   enzyme immunoassay.  As a result, the enzyme-"enhanced" PRN was less specific
   than the standard PRN.  Furthermore, Merck did not utilize a negative serum control
   required for enzyme assays.  In fact, Merck did not use a negative serum control at
   all.

In or around December 2000, Krah told Relator that with the use of rabbit enzyme

antibodies in the "enhanced" Protocol 007 PRN testing methodology, Merck was able to measure

seroconversion rates of nearly 100%.  However, because the test was less specific, and because

Merck did not use a negative serum control, the rabbit enzyme antibodies boosted neutralization

in all the test samples, those collected before administration of the vaccine, and those collected

after.  Krah told Relator, and showed Relator evidence, that the rabbit enzyme antibodies boosted

virus neutralization in the pre-vaccine serum samples.  On multiple occasions to both Relator,

and to the lab group, Krah described the boost in pre-vaccine serum samples as a problem.

6. Merck needed to falsify the results of the "enhanced" PRN test to ensure it achieved
   what would be perceived as a valid seroconversion rate of 95 percent or higher.

Krah told Relator that the enzyme-"enhanced" PRN test caused a pre-positive rate that

was too high.  Krah told Relator, and showed Relator evidence, that the rabbit enzyme antibodies

boosted virus neutralization in the pre-vaccine serum samples, causing an increased number of

9

pre-vaccination positives. Krah told Relator and the lab group that the high pre-positive rate elicited by the rabbit enzyme antibodies implied that the children were immune to mumps before they got the vaccine, and that the level of pre-positives being measured was well above what could be regarded as realistic (i.e. if true, the high level of pre-vaccine immunity would obviate the need for a vaccine). On multiple occasions to both Relator, and to the lab group, Krah described the boost in pre-vaccine serum samples as a problem that needed to be fixed. Because a high pre-positive rate could invalidate the results of the enzyme-"enhanced" PRN test, Krah's lab group was set to work eliminating them. Krah told his lab group to re-check pre-positive samples in an effort to convert pre-positives to pre-negatives. When Relator objected to changing his pre-positive results, Krah initially told Relator that he would be exempt from this requirement. But Relator later learned that other members of Krah's lab, including Mary Yagodich, were reviewing and altering his coding sheets, without his knowledge, to achieve their pre-determined results. During this time period, Relator witnessed Krah approach other lab members to make them change their results.

Later, Krah enacted an auditing policy in which some lab members were permitted to inspect and alter counting sheets completed by other scientists. Krah told Relator, and Relator observed, that these auditors were only checking and changing pre-positives.

As the deadline for completing the mumps testing neared, Krah used additional methods to isolate and alter the pre-positive results. He pooled the pre-positive samples to re-run assays on only those samples. He implemented the use of a spreadsheet in auditing that instantly calculated the assay results and highlighted the pre-positives. Krah told his lab that the spreadsheet was created to quickly locate pre-positives for recount. Around this time, Krah told Relator to forward all of his results to Krah so Krah could recount and change all of Relator's

10

330236 3

assays.  Krah also prohibited his lab members from recording plaques in the cell control of each

assay because this indicated a viral contamination which invalidated the assay and required an

automatic retest.  Retesting the samples would take time and could have prevented the project

from being completed before the deadline.

7.   There were significant mumps outbreaks in 2006 and 2009 in highly vaccinated
      populations, just as Krah had predicted.

For many years, there was an average of 265 cases of mumps reported per year.  But in

2006, more than 6,500 cases of mumps were reported in highly vaccinated populations.  This

was the largest mumps outbreak in almost twenty years.  In a study of the 2006 outbreak, Dr.

Gustavo Dayan predicted that another outbreak would occur three years later, based on trends

observed before wide-spread mumps vaccination.  As predicted, there were approximately

5,000 confirmed cases of mumps in 2009.

8.   Despite being fully vaccinated against mumps as a child, Relator needed to be
      revaccinated before he was permitted to work on the MMR testing at Merck because
      blood tests showed he lacked sufficient antibodies to protect him from disease.
      Others in Krah's lab who had previously been vaccinated also needed to be
      revaccinated because they too lacked sufficient antibodies to ensure adequate
      protection.  The high rate of vaccine failure observed in new employees became an
      ongoing source of ironic amusement because those same employees were then set to
      work on a project to prove the vaccine was highly effective.

9.   Industry studies and commentary subsequent to the mumps outbreaks raised questions
      on whether Merck's mumps vaccine provides adequate immunization and whether
      there is a need for a new vaccine.

For example, Dr. Gustavo Dayan, then a doctor at the CDC, did not know if the problem

with the vaccine was waning immunity, primary vaccine failure or some other reason which

would make the vaccine no longer effective in preventing mumps disease in highly vaccinated

populations.  Dayan concluded in a study he conducted after the 2006 outbreak that "[a] more

effective mumps vaccine or changes in vaccine policy may be needed to avert outbreaks and

11

330236 3

achieve elimination of mumps."  Gustavo H. Dayan, "Recent Resurgence of the Mumps in the United States," *New England Journal of Medicine*, 358;15 (Apr. 10, 2008) 1580.  *See also* Philip Brunell, "The Effectiveness of Evaluating Mumps Vaccine Effectiveness," *Clinical Infectious Diseases*, 2007:45 (15 August) ("the disappointing performance of mumps vaccine during the recent [2006] outbreak has resulted in a reexamination of its efficacy"); Anand Date, "Long-Term Persistence of Mumps Antibody After Receipt of 2 MMR Vaccinations," *Journal of Infectious Diseases*, 2008:197 (15 June) ("The failure of the available mumps vaccine in preventing disease transmission among populations with high 2-dose vaccination coverage levels raises a question regarding the necessity of . . . the development of a more effective vaccine.").

    10. There is industry recognition that testing against the Jeryl Lynn strain of the mumps virus rather than the wild-type strain will overstate the ability of the vaccine to provide protection against mumps.

For example, in another study following the 2006 mumps outbreak, several scientists questioned the practice of testing serum for its ability to neutralize an attenuated Jeryl Lynn strain, instead of the wild-type virus.  They noted that failing to test a person's blood against the wild-type virus significantly overstated vaccine efficacy because "good results can be obtained that do not reflect the actual ability of the vaccine to provide protection from disease.  A vaccine failure is investigated properly only if, in addition to avidity testing, the ability of antibodies to neutralize wild mumps virus has been checked."  Heikki Peltola, *et. al.*, "Mumps Outbreaks in Canada and the United States: Time for New Thinking on Mumps Vaccine," *Clinical Infectious Diseases*, 2007:45 (15 Aug. 2007) 459, 463.

    11. The government pushed back indefinitely its original 2010 date for eradicating the disease because the outbreaks raised questions about the efficacy and duration of protection of the vaccine.

<div align="center">12</div>

330236 3

12. Merck has engaged in multiple efforts to conceal from the government the significantly diminished efficacy of its mumps vaccine, including Krah's destruction of cell plates to cover up the fraudulent testing and results, and the misrepresentations by Krah and Shaw to the FDA during its on-site inspection. *See* Relator's Response to Interrogatory 4 regarding Krah's destruction of cell plates and Krah and Shaw's misrepresentations to the FDA during the inspection.

13. Emini admitted to Relator that (i) the standard PRN test is a more specific and accurate test of vaccine efficacy; (ii) the addition of rabbit enzyme antibodies to the standard PRN was never intended to make the test more accurate, but was instead, a "business decision;" (iii) the changes made to the counting sheets were fraudulent.

Relator met with Emini in his office. Relator brought documents, counting sheets, and experimental cell plates from completed Protocol 007 assays to demonstrate the fraudulent practices he was witnessing in Krah's laboratory. Emini examined the plates and the counting sheets in front of Relator. Emini agreed with Relator that the crossed out numbers had been the correct counts, the altered counts were wrong, and that the issue required immediate attention. Relator explained to Emini that Krah was altering data in order to lower the pre-positive rate. Relator threatened to call the FDA and report the falsification of data. Emini directed Relator not to call the FDA. Relator told Emini that he would go to the FDA unless Emini provided an honest explanation. In response to Relator, Emini admitted to Relator that (i) the standard PRN test is a more specific and accurate test of vaccine efficacy and (ii) the addition of rabbit enzyme antibodies to the standard PRN was never intended to make the test more accurate, but was instead, a "business decision." Emini then ordered Relator not to call the FDA.

14. Krah repeatedly updated his lab group about Merck's plan to outsource the Protocol 007 PRN mumps efficacy testing to Dr. Ward's lab at Cincinnati Children's Hospital Medical Center. In the spring of 2001, Krah told his lab group that two of them needed to go to Dr. Ward's lab to direct them in conducting the assay. Barr was one of the employees who made the trip. When they returned Barr told Relator that Dr. Ward's lab was unable to obtain results that matched what they were producing in Krah's lab. Sometime later Krah confirmed to the lab group that Ward was having difficulty with the testing and informed them that, as a result, Krah's lab would do all the testing.

13

**Appx5726**

15. Merck failed to communicate to the FDA or CDC what it knows about the significantly diminished efficacy of its mumps vaccine. *See* Relator's Response to Interrogatories 2 and 4 regarding Merck's concealment of the vaccines' diminished efficacy in its applications for approval of ProQuad and a labeling change for MMRII and during the mumps outbreaks, and Merck's misrepresentations during the FDA's on-site inspection in August, 2001 and on the MMRII label and its website.

16. Merck failed to communicate to the Immunization Action Coalition what it knows about the significantly diminished efficacy of its mumps vaccine.

Merck provides funding to the Immunization Action Coalition, an organization that works with the CDC to educate health professionals about U.S. vaccine recommendations. For many years, the Immunization Action Coalition's website asserted that Merck's mumps vaccine has an efficacy rate of 97%, while Merck knew, and failed to disclose, that this representation was inaccurate in light of the significantly diminished efficacy of its mumps vaccine.

\* \* \*

In terms of the bills and invoices Merck submitted to the CDC in connection with the government's purchase of MMRII and ProQuad, all these bills and invoices since at least 2000 are the subject of the fraud alleged in this case and constitute false and fraudulent claims. For all times relevant, from at least 2000 to the present, CDC has purchased from Merck up to 8 million doses of MMRII and ProQuad vaccines each year. As an example of a typical purchase, in April 2010 the CDC placed an order for the MMR vaccine under Solicitation number 200-2010-34037 with an estimated price of $559,983.00. Three months later, the CDC placed another order for the MMR vaccine under the same contract with an estimated price of $36,760.00. All of the invoices and bills associated with these purchases constitute false and fraudulent claims.

**REVISED INTERROGATORY NO. 2:**

Identify the factual basis for the allegation in Paragraphs 154 and 155 of the Complaint that Merck knowingly made, used, or caused to be made or used, false records, statements, or

330236 3

Appx5727

certifications related to its Mumps Vaccine. In responding to this Interrogatory, please identify all false records, statements, or certifications of which you have knowledge, or state that you do not have knowledge of any. If, in responding to this Interrogatory, you specify particular false records, statements, or certifications that Merck made or submitted, then identify the date each was made, its content, the person who made it, and whether it was related to M-M-R®II or ProQuad® or both.

## RESPONSE TO REVISED INTERROGATORY NO. 2:

Relator incorporates the Preliminary Statement and General Objections stated above. Relator objects to this Interrogatory to the extent that it seeks information that is within Defendant's possession, custody or control. Relator further objects to Revised Interrogatory No. 2 to the extent that it seeks Relators' legal theories regarding how "Merck knowingly made, used, or caused to be made or used, false records, statements, or certifications related to its Mumps Vaccine." Responding to this portion of this Interrogatory would require Relator "to articulate theories of [his] case not yet fully developed." *United States v. Educ. Mgmt. LLC*, No. 2:07–cv–00461, 2013 WL 3854458, at *20 (W.D. Pa. May 14, 2013). An early response to this Interrogatory would prejudice the Relator in later discovery and is not appropriate prior to meaningful fact discovery or document production in this action. *See id.*

Subject to and without waiving the foregoing objections, Relator identifies the following false records, statements and certifications made or caused to be made by Merck:

1. Merck's MMRII package inserts since at least 2000 have identified for the mumps component of the vaccine a seroconversion rate of 96 percent and a "high degree of protective efficacy" when Merck has known the vaccine does not afford this level of protection. Moreover, the language in the package inserts is based on studies conducted decades ago when Merck has more current knowledge, including more current studies which have failed to produce similar seroconversion rates, information Krah told to Relator in 2000 relating to the significantly diminished efficacy of the

15

**Appx5728**

vaccine, information Emini told to Relator that the low efficacy results obtained from the standard PRN – children's serum tested against wild-type mumps virus with no added non-human secondary antibodies – were a more accurate characterization of the vaccine's real world efficacy, and information Emini told to Relator that the more accurate testing procedure was abandoned – rabbit enzyme antibodies were added – as the result of a business decision.

2.  Merck's website -- https://www.merckvaccines.com/Products/Mmr/Pages/ seroconversionrates -- for years has also identified for the mumps component of MMRII a "high" seroconversion rate of 96 percent when Merck has known the vaccine does not afford this level of protection.  Moreover, the language on the website cites studies conducted decades ago when Merck has more current knowledge, including more current studies which have failed to produce similar seroconversion rates, information Krah told to Relator in 2000 relating to the significantly diminished efficacy of the vaccine, information Emini told to Relator that the low efficacy results obtained from the standard PRN were a more accurate characterization of the vaccine's real world efficacy, and information Emini told to Relator that the more accurate testing procedure was abandoned as the result of a business decision.

3.  The CDC's website -- http://www.cdc.gov/vaccines/pubs/pinkbook/mumps.html -- for years has identified an efficacy rate of 95 percent for the mumps component of MMRII when Merck (i) has known, and failed to inform the CDC, the vaccine does not afford this level of protection, (ii) has misrepresented through its package inserts, website and otherwise an efficacy rate significantly higher than it actually is and (iii) has more current knowledge, including information Krah told to Relator in 2000 relating to the significantly diminished efficacy of the vaccine, information Emini told to Relator that the low efficacy results obtained from the standard PRN were a more accurate characterization of the vaccine's real world efficacy, and information Emini told to Relator that the more accurate testing procedure was abandoned as the result of a business decision.

4.  The website for the Immunization Action Coalition for many years until sometime in 2012 identified the mumps component of MMRII as being 97 percent effective when Merck (i) knew, and failed to inform the IAC which it funded, the vaccine does not afford this level of protection, (ii) misrepresented through its package inserts, website and otherwise, an efficacy rate significantly higher than it actually is, and (iii) has more current knowledge, including information Krah told to Relator in 2000 relating to the significantly diminished efficacy of the vaccine, information Emini told to Relator that the low efficacy results obtained from the standard PRN were a more accurate characterization of the vaccine's real world efficacy, and information Emini told to Relator that the more accurate testing procedure was abandoned as the result of a business decision.

16

5. During the CDC's investigation of the 2006 mumps outbreak, the CDC's then Director Julie Gerberding stated in an April 19, 2006 press briefing the CDC's view that nothing was wrong with the mumps vaccine: "I have to emphasize that the best protection against mumps is the vaccine. There is a lot of confusion right now about whether or not this outbreak is related to some problem with the vaccine, and I really want to emphasize that while we are of course investigating the outbreak and we will learn more about the efficacy of the vaccine in this particular setting, we have absolutely no information to suggest that there is any problem with the vaccine." *See* http://www.cdc.gov/media/transcripts/t060419.htm. Ms. Gerberding made these statements when Merck (i) knew, but failed to inform the CDC, the vaccine did not afford this level of protection, (ii) misrepresented through its package inserts, website and otherwise, an efficacy rate significantly higher than it actually was, and (iii) Krah, the Merck scientist working on mumps efficacy testing, predicted that outbreaks would happen because of the declining efficacy of the vaccine.

6. Numerous studies of the 2006 and 2009 mumps outbreaks hypothesized about possible causes for the outbreaks other than the significantly diminished efficacy of the vaccine even though (i) Merck knew the vaccine did not provide adequate immunization, (ii) Merck knew its significantly diminished efficacy was a cause of the outbreaks, (iii) Merck continued to misrepresent through its package inserts, website and otherwise, an efficacy rate significantly higher than it actually was and (iv) Krah, the Merck scientist working on mumps efficacy testing, predicted that outbreaks would happen because of the declining efficacy of the vaccine. *See* paragraphs 9 and 10 in Relator's Response to Interrogatory 1.

For example, an article by Dr. Gustavo Dayan and Dr. Steven Rubin noted that "primary vaccine failure in recipients of 2 doses of vaccine appears to be an unlikely cause of mumps outbreaks among vaccines," and hypothesized that the "high potential for transmission [of the disease] in densely packed environments," and "antigenic variation among mumps viruses" were factors in the recent large-scale mumps outbreaks. Gustavo H. Dayan, "Mumps Outbreaks in Vaccinated Populations: Are Available Mumps Vaccines Effective Enough to Prevent Outbreaks?" *Clinical Infectious Diseases*, 47:1458-67 (Oct. 29, 2008); *see also* Steven Rubin, "Serological and phylogenetic evidence of monotypic immune responses to different mumps virus strains," *Vaccine*, 24:2662-2668 (Nov. 8, 2005) ("However, a growing number of reports of cases of mumps virus reinfection, mumps outbreaks in highly vaccinated populations and

330236 3

laboratory data demonstrating virus strain-specific neutralizing epitopes, have led some researchers to speculate on the possible existence of multiple mumps virus serotypes or, specifically, the emergence of new mumps virus strains that can escape neutralization by existing antibody"); Steven A. Rubin, "Recent Mumps Outbreaks in Vaccinated Populations: No Evidence of Immune Escape," *Journal of Virology*, 86(1):615-620 (Nov. 9, 2011) ("[D]evelopment of new mumps vaccine strains, as some have suggested, is not a likely solution to the problem.  Rather, revaccination during adolescence to combat waning immunity might be the most effective measure.").

7. Merck falsified the results of the Protocol 007 PRN efficacy testing.

8. Merck altered, falsified and destroyed, counting sheets and lab documents used in the Protocol 007 PRN efficacy testing to ensure it reached its targeted efficacy results, and to conceal its manipulation of the Protocol 007 PRN efficacy testing.

9. Krah and Shaw misrepresented to the FDA during its August 6, 2001 onsite inspection, the fraudulent Protocol 007 testing in which Merck engaged, including the targeted elimination of the pre-positive data.

10. The FDA's August 6, 2001 483 Report following its onsite inspection failed to identify Merck's fraudulent activity because of Merck's efforts to conceal its fraudulent conduct through the misrepresentation of Krah and Shaw, and Krah's destruction of documents and cell plates.

11. Merck failed to disclose the significantly reduced efficacy of its mumps vaccine, or the fraud in the Protocol 007 PRN efficacy testing, in its applications to the EMA for approval to sell MMRVaxpro and ProQuad in Europe, and submitted the falsified Protocol 007 PRN test results in its application.  Merck's joint venture partner Sanofi S.A. submitted the requests for EMA review on June 4, 2004, for MMRVaxpro, and on October 18, 2004, for ProQuad.

12. Merck submitted the falsified Protocol 007 PRN test results in its application to the FDA to change the MMRII label to reflect a reduction in the minimum potency of the mumps vaccine component.

13. Merck submitted the falsified Protocol 007 PRN test results in its August 31, 2004 application to the FDA for approval to sell ProQuad in the U.S.

18

14. Merck made numerous false certifications in its FDA Form 365H submissions in connection with its Protocol 007 testing and in its applications for ProQuad approval and for a labeling change on the potency of the mumps component of MMRII.  These certifications were false in light of what Merck knew about the significantly diminished efficacy of its mumps vaccine.  They included certifications that the information on the MMRII and ProQuad package inserts, and on its website, accurately represent the efficacy of Merck's mumps vaccine.

FDA Form 365H certifies that the submitting contractor "agree[s] to update this application with new safety information about the product that may reasonably affect the statement of contraindications, warnings, precautions, or adverse reactions in the draft labeling" and "comply with all applicable laws and regulations that apply to approved applications, including, but not limited to," "Good manufacturing practice regulations in 21 CFR Parts 210, 211 or applicable regulations, Parts 606, and/or 820"; "Biological establishment standards in 21 CFR Part 600"; "Labeling regulations in 21 CFR Parts 201, 606, 610, 660, and/or 809"; "In the case of a prescription drug or biological product, prescription drug advertising regulations in 21 CFR Part 202"; and "Regulations on Reports in 21 CFR 314.80, 314.81, 600.80 and 600.81."

In each of Merck's submissions of FDA Form 365H in connection with its Protocol 007 testing and in its applications for ProQuad approval and for a labeling change on the potency of the mumps component of MMRII, Merck falsely certified (1) the information on the MMRII and ProQuad package inserts and on its website accurately represent the efficacy of Merck's mumps vaccine, even though it knew of the vaccine's significantly diminished efficacy; and (2) its Protocol 007 PRN testing complied with applicable regulatory requirements even though it knew of the widespread falsification of the Protocol 007 PRN test results and records.

15. Merck made numerous false certifications in its FDA Form 1571 submissions in connection with its Protocol 007 testing and in its applications for ProQuad approval and for a labeling change on the potency of the mumps component of MMRII.  These certifications were false in light of what Merck knew about the falsification of the test results and records of the Protocol 007 PRN test.

19

330236 3

**Appx5732**

FDA Form 1571 certifies that the submitting contractor "agree[s] to conduct the investigation in accordance with all other applicable regulatory requirements."

In each of Merck's submissions of FDA Form 1571 in connection with its Protocol 007 testing and in its applications for ProQuad approval and for a labeling change on the potency of the mumps component of MMRII, Merck falsely certified that its Protocol 007 PRN testing complied with applicable regulatory requirements even though it knew of the widespread falsification of the Protocol 007 PRN test results and records.

   16. Merck made numerous false certifications in its FDA Form 1572 submissions in connection with its Protocol 007 testing and in its applications for ProQuad approval and for a labeling change on the potency of the mumps component of MMRII. These certifications were false in light of what Merck knew about the significantly diminished efficacy of its mumps vaccine and the falsification of the test results and records of the Protocol 007 PRN test.

FDA Form 1572 certifies that the submitting contractor "agree[s] to maintain adequate and accurate records in accordance with 21 CFR 312.62 and to make those records available for inspection in accordance with 21 CFR 312.68." FDA Form 1572 also certifies that the submitting contractor "agree[s] to comply with all other requirements regarding the obligations of clinical investigators and all other pertinent requirements in 21 CFR Part 312."

In each of Merck's submissions of FDA Form 1572 in connection with its Protocol 007 testing and in its applications for ProQuad approval and for a labeling change on the potency of the mumps component of MMRII, Merck falsely certified that it would maintain "accurate records" of its Protocol 007 PRN testing even though it knew of the widespread falsification of the Protocol 007 PRN test results and records. In each of the FDA Form 1572 submissions relating to the labeling change of MMRII or the approval of ProQuad, Merck also falsely certified that the vaccines' respective package inserts "shall not bear any statement that is false or

20

330236 3

misleading in any particular," even though Merck knew the efficacy of its mumps vaccine was significantly less than what it represented on the respective package inserts.  *See* 21 CFR § 312.6.

> 17. Merck made numerous false certifications in each of its contracts with the CDC for the purchase of vaccines containing Merck's mumps vaccine.  These certifications were false in light of what Merck knew about the significantly diminished efficacy of its mumps vaccine.

For example, the CDC 2010 Adult Vaccine Solicitation required contractors, including Merck, to certify "this amount is correct and proper for payment."  Merck's contract also contained a "Duty to Warn" clause that required Merck to disclose all available data and information regarding the safety and efficacy of the vaccine.  In selling its mump vaccine—or a combination vaccine containing its mumps vaccine—to the CDC under this contract, Merck falsely certified that the CDC payments for Merck's mumps vaccine were "correct and proper," even though Merck knew it failed to disclose all available data and information regarding the efficacy of the vaccine and was supplying the CDC with a vaccine that was significantly less effective than the CDC had contracted to purchase.

**INTERROGATORY NO. 3:**

Identify all Persons who have knowledge of, information concerning, or opinions relating to any of the facts, circumstances, damages or allegations described in your Complaint, including but not limited to the identity of the Person(s) who provided you with information relating to the allegations concerning events after your separation from Merck, including Merck's reporting to FDA regarding the results of Protocol 007 testing, Merck's representations to the European Medicines Agency regarding the efficacy of its mumps vaccine, and the mumps outbreaks in 2006, and, for each Person, describe in detail the nature of his or her knowledge or information.

If any such Person offered an opinion regarding the damages or allegations described in your Complaint, your answer should include the substance of the opinion and a summary of the grounds for each opinion.

## RESPONSE TO INTERROGATORY NO. 3:

Relator directs Merck to its response to Interrogatory No. 3 in Relator Stephen A. Krahling's Responses and Objections to Merck's First Set of Interrogatories (the "Responses and Objections to the First Set of Interrogatories").

## REVISED INTERROGATORY NO. 4:

Identify with particularity all information that you allege in the Complaint was concealed from the Government relating to Merck's mumps vaccine, including, but not limited to, information concerning the design and methodology of the mumps neutralization assay used in Protocol 007 and information regarding the efficacy or seroconversion rate of Merck's mumps vaccine. In responding to this Interrogatory, specify from which Government agency the information was concealed, to which particular Merck Mumps Vaccine the concealment applied, and how you learned of this information. *See*, e.g., Complaint ¶¶ 60, 128-29, 154.

## RESPONSE TO REVISED INTERROGATORY NO. 4:

Relator incorporates the Preliminary Statement and General Objections stated above. Relator objects to this Interrogatory to the extent that it seeks information that is within Defendant's possession, custody or control.

Subject to and without waiving the foregoing objections, Relator, identifies the following categories of information Merck concealed from the FDA, CDC, NVP and EMA:

1. Merck has continually concealed what it knows about the significantly diminished efficacy of Merck's mumps vaccine and the fact it does not provide adequate immunization. *See* Relator's Responses to Interrogators Nos. 1, 2, and 17.

22

2. Merck concealed from the FDA that the Protocol 007 PRN testing using the "enhanced" methodology was only able to measure seroconversion rates at or above 95 percent because of the addition of the rabbit enzyme antibodies and Merck's targeted alteration of the pre-positive data. Any seroconversion rates Merck reported failed to disclose the falsification of the pre-positives.

Relator participated in the "enhanced" Protocol 007 PRN testing and witnessed first-hand Merck's manipulation of both the test methodology and then the actual testing. Merck used secondary rabbit enzyme antibodies and neglected to control for the non-specific serum neutralization the rabbit antibodies caused. He also witnessed first-hand Merck's efforts, led by Krah and Shaw, to conceal this manipulation through falsifying the test results. Krah told Relator in late 2000 that the high pre-positive rate in the PRN testing was a "problem" that needed to be fixed or the FDA would question the study and its results. *See also* Relator's Responses to Interrogatories Nos. 1 and 4.

3. Merck concealed from the FDA its falsification of the Protocol 007 PRN test results.

Relator witnessed first-hand in early August 2001 Krah's destruction of garbage bags full of cell plates used in its Protocol 007 PRN testing which prevented future inspection and comparison of the number of physical plaques on those plates, to the number of plaques recorded on the corresponding counting sheets. In addition, in their August 6, 2001 interview with the FDA, Relator witnessed Krah and Shaw misrepresent the criteria Merck employed for recounting plaques. Krah and Shaw concealed both the purpose and procedures for Merck's targeting and falsification of pre-positive results. Relator witnessed Krah and Shaw give false and misleading responses to the FDA that effectively concealed the process by which Merck manufactured a seroconversion rate of 95 percent unencumbered by a disproportionately high number of pre-

23

330236 3

positives that would have undermined the validity of both the testing procedure, and the testing results.  *See also* Relator's Responses to Interrogatories Nos. 1, 2, and 4.

    4.  Merck has concealed what it knows about the significantly diminished efficacy of its mumps vaccine through its failure to disclose on its package insert the existence of studies that yielded seroconversion rates significantly lower than that represented on the package insert.  *See* Relator's Response to Interrogatory No. 11.

    5.  Merck has concealed what it knows about the significantly diminished efficacy of its mumps vaccine through its failure to disclose on its website the existence of studies that yielded seroconversion rates significantly lower than that represented on the website.

Merck has for many years, and based on a many decades old study, represented on its website a seroconversion rate of 96 percent.  Yet, Merck has also known for many years that this seroconversion rate is not an accurate representation of the vaccine's efficacy, the vaccine's efficacy is significantly lower than this representation, and that the vaccine's low efficacy would lead to mumps outbreaks notwithstanding high levels of vaccination.  *See also* Relator's Response to Interrogatory No. 11.  Merck's failure to update its website to account for information Merck knows about its vaccine's low efficacy, while continuing to reference an old test on its website as a representation of the vaccine's efficacy, makes the website inaccurate, false and/or misleading.

    6.  Merck concealed from the FDA in its 2004 application for ProQuad approval what it knew about the Protocol 007 fraud in which it engaged.

In its application for FDA approval of ProQuad, Merck represented a vaccine efficacy rate of 95 percent or higher through its submission of studies that led the FDA to conclude "[c]linical efficacy of . . . mumps . . . vaccine strain was w[as] shown previously . . . using [the] monavalent.  [T]he vaccine response rates were 95.8 to 98.8% for mumps."  However, Merck did

24

330236 3

not disclose the fraud, manipulation, misrepresentations and destruction of evidence in which it engaged in its Protocol 007 testing in order to reach the 95 percent efficacy threshold.

7. Merck concealed from the EMA in its applications for MMRVaxpro and ProQuad approval what it knew about the significantly diminished efficacy of its mumps vaccine and the Protocol 007 fraud in which it engaged.

In its application for EMA approval of MMRVaxpro, for which it was granted a license in 2006, Merck submitted its Protocol 007 test results which the EMA pointed to as a "pivotal clinical study" in support of its decision to grant approval. However, Merck did not disclose the fraud, manipulation, misrepresentations, and destruction of evidence in which it engaged in its Protocol 007 testing in order to reach the 95 percent efficacy threshold. Merck likewise concealed this information from the EMA in Merck's application around the same time for approval to sell ProQuad in Europe. Relying on the information Merck submitted, the EMA found "no major concern" about the efficacy of the mumps component of the vaccine. In neither application did Merck disclose what it knew generally about the diminished efficacy of its mumps vaccine -- as Krah explained to Relator -- which would lead to continued mumps outbreaks.

8. Merck concealed from the FDA in its application for a labeling change on the potency of the mumps component of MMRII what it knew about the Protocol 007 fraud in which it engaged.

In its application for a labeling change on the potency of the mumps component of MMRII for which it received approval in 2007, Merck did not disclose the fraud, manipulation, misrepresentations, and destruction of evidence in which it engaged in its Protocol 007 testing in order to reach the 95 percent efficacy threshold. Merck was thus representing throughout the approval process that it could reduce the amount of virus put into each vaccine dose and still maintain its represented 95 percent efficacy when it knew that it was only able to measure

25

seroconversion rates at or above 95 percent with the addition of the rabbit enzyme antibodies and targeted falsification of the pre-positive data.

9.  Merck concealed as a key cause of the 2006 and 2009 mumps outbreaks the significantly diminished efficacy of the mumps vaccine and its failure to provide adequate immunization.  *See* Relator's Responses to Interrogatories Nos. 1 and 17.

Krah told Relator in late 2000 that the efficacy of Merck's mumps vaccine had dropped significantly from when it was originally licensed, no longer provided adequate immunization, that this reduced efficacy would lead to mumps outbreaks in the future, and that Merck needed to and would conceal this reduced efficacy from the government or it would risk losing its *de facto* exclusive license to sell the vaccine in the U.S.  Merck continued to conceal this information in the aftermath of the mumps outbreaks as is evident from the absence of any statements by Merck identifying reduced efficacy as a cause of the outbreaks; the April 2006 statement by the CDC that the agency had no information suggesting there was any problem with the vaccine and no evidence of any waning immunity; and Merck's continued representations on its package inserts and website that a single administered dose of their vaccine results in a mumps seroconversion rate of 95 percent or higher.

## REVISED INTERROGATORY NO. 5:

Identify all Communications, or Documents reflecting such Communications, of which you have knowledge between Merck and the Government, or between Merck and any other person or entity, concerning, relating to, and/or referencing the allegations in the Complaint, including, but not limited to, the Communication between Merck and the Government that is alleged in Paragraph 68 of the Complaint.  In responding to this Interrogatory, identify and describe the substance, date, place, and manner of the alleged Communication, as well as all persons making and receiving the Communication.

26

**RESPONSE TO REVISED INTERROGATORY NO. 5:**

Pursuant to agreements made during the meet and confers regarding these Interrogatories, Relator will respond to this Interrogatory with respect to Relator's knowledge of Communications between Merck and the Government about representations Merck made about the efficacy or potency of its Mumps Vaccine.

Relator incorporates the Preliminary Statement and General Objections stated above. Relator objects to this Interrogatory to the extent that it seeks information that is within Defendant's possession, custody or control, or in the possession, custody or control of the government or a third party that is equally available to Defendant.

Subject to and without waiving the foregoing objections, Relator identifies the following communications between Merck and the Government relating to the efficacy or potency of Merck's mumps vaccine:

1. Merck had multiple communications with the FDA in the 1999 to 2001 timeframe on the Protocol 007 testing methodology and results.

Krah relayed to Relator numerous communications -- both written and verbal -- that Merck had with the FDA in the 1999-2001 timeframe in connection with its Protocol 007 testing. Relator knows these communications occurred and that these communications did not disclose what Merck knew about the significantly diminished efficacy and what steps it was taking to conceal this from the FDA. However, Relator cannot identify the specific dates of these communications and the Merck and FDA individuals involved, all of which is within Defendant's possession, custody or control, or in the possession, custody or control of the FDA. *See also* Relator's Response to Revised Interrogatory No. 14.

2. Krah and Shaw met with an FDA representative on August 6, 2001 to answer questions the FDA had about Merck's Protocol 007 testing methodology, and in

27

particular, its process for recounting plaques. *See* Relator's Response to Interrogatory No. 8.

3. Merck communicated to the FDA the fraudulent results of the Protocol 007 efficacy testing. *See* Relator's Response to Revised Interrogatory No. 4, ¶ 2.

4. Merck engaged in numerous communications with the EMA in connection with Merck's applications for approval to sell MMRVaxpro and ProQuad in Europe. *See* Relator's Response to Revised Interrogatory No. 4, ¶ 7.

5. Merck engaged in numerous communications with the FDA in connection with Merck's application for approval of ProQuad. *See* Relator's Response to Revised Interrogatory No. 4, ¶ 6.

6. Merck engaged in numerous communications with the FDA in connection with Merck's application for approval of a label change on the potency of MMRII. *See* Relator's Response to Revised Interrogatory No. 4, ¶ 8.

## INTERROGATORY NO. 6:

Describe in detail your complete employment history, including the name and address of each employer, the nature of your duties for each employment, the inclusive dates of each employment, the reason for leaving each employment, the name of your immediate supervisor for each employment, and, if you were self-employed, the dates of self-employment, the type of work you performed, and your annual salary.

## RESPONSE TO INTERROGATORY NO. 6:

Relator directs Merck to its response to Interrogatory No. 6 in the Responses and Objections to the First Set of Interrogatories.

## REVISED INTERROGATORY NO. 7:

Identify the specific Documents or other information that you allege in Paragraph 156 of the Complaint that the Government relied upon when making decisions about Merck's mumps vaccine that concern, relate to, or reference the allegations in the Complaint.

28

330236 3

**RESPONSE TO REVISED INTERROGATORY NO. 7:**

Relator incorporates the Preliminary Statement and General Objections stated above. Relator objects to this Interrogatory to the extent that it seeks information that is within Defendant's possession, custody or control, or in the possession, custody or control of the government or a third-party that is equally available to Defendant.

Subject to and without waiving the foregoing objections, Relator directs Merck to its responses to Revised Interrogatories Nos. 1, 2, 4, and 5 above. In addition, Relator responds as follows:

Relator does not allege in Paragraph 156 of the Complaint any reliance by the Government on documents or information when making decisions about Merck's mumps vaccine. Instead, Relator alleges that Merck's fraud, misrepresentations and omissions were material to the Government's purchases of and payments for Merck's mumps vaccine. This materiality is reflected in:

1. Merck's contractual and statutory duties to disclose to the government all information regarding the safety and efficacy of its mumps vaccine.

2. Merck's multiple intentional violations of these duties.

3. The responsibility of the CDC, FDA and NVP to ensure that all vaccines manufactured and sold in the U.S. are safe and effective.

4. The CDC's responsibility to provide health care professionals and the public with accurate and up-to-date information on the safety and efficacy of vaccines.

5. The FDA's requirement that Merck conduct an end-expiry study of its mumps vaccine and demonstrate a seroconversion rate of 95 percent or higher.

6. Merck's abandonment of the 1999 PRN methodology in favor of a methodology that would yield better results when Merck did the testing in Protocol 007.

29

330236 3

Appx5742

7. Merck's improperly controlled use of rabbit anti-human enzyme antibodies to increase the amount of virus neutralization recorded in human serum samples tested for Merck's Protocol 007.

8. Merck's targeted elimination of the increase in virus neutralization caused by the rabbit anti-human enzyme antibodies in the pre-vaccination serum samples – the pre-positive test data it viewed as undesirable – so that Merck could measure and report the higher seroconversion rates it wanted and needed when Merck did the PRN testing in Protocol 007.

9. Merck's multiple efforts to conceal what it knew about the significantly diminished efficacy of its mumps vaccine.  *See* Response to Revised Interrogatory No. 4.

10. The CDC's continued belief in the face of the 2006 outbreak that there was nothing wrong with Merck's vaccine and that it should continue to be used.  This included CDC's then Director, Julie Gerberding, stating in an April 19, 2006 press briefing the CDC's view that nothing was wrong with the mumps vaccine: "I have to emphasize that the best protection against mumps is the vaccine. There is a lot of confusion right now about whether or not this outbreak is related to some problem with the vaccine, and I really want to emphasize that while we are of course investigating the outbreak and we will learn more about the efficacy of the vaccine in this particular setting, we have absolutely no information to suggest that there is any problem with the vaccine." *See* http://www.cdc.gov/media/transcripts/t060419.htm.

11. The call by at least one CDC doctor for a new vaccine if the Merck vaccine was not effective in preventing outbreaks.

12. The prominent publication of mumps efficacy information by the Immunization Action Coalition on its website.

13. Merck's continuing efforts to improperly maintain its monopoly of the U.S. market for mumps vaccine through its false representation of an inflated efficacy rate.

14. The representation on the CDC website of what the CDC believes to be the current efficacy of the mumps component of MMRII.

15. The representations by the CDC in its Pink Book and its regularly published MMWR.

16. Merck's own recognition that it would lose its *de facto* exclusive license to sell mumps vaccine if it did not measure and report at least a 95 percent seroconversion rate in the mumps efficacy testing conducted in Krah's lab as part of Protocol 007.

17. Merck's reference to seroconversion rates and efficacy on its package insert and on its website.

30

330236 3

18. The Department of Health and Human Services' report to Congress after the 2006 and 2009 outbreaks that the CDC did not meet the 2010 goal for the eradication of mumps disease and that additional funding from Congress would be required to continue to buy MMRII as a part of the National Vaccine Program while working to the new target eradication date of 2020.

19. Merck provided the FDA the results of Protocol 007, including false data from its fraudulent manipulation of the test results using the rabbit enzyme-"enhanced" PRN assay, as part of its application for a label change to reduce the potency of the mumps vaccine.

20. Merck also provided the EMA the results of Protocol 007, including false data from its fraudulent manipulation of the test results using the enzyme-"enhanced" PRN assay, as part of applications for approval to sell MMRVaxpro and ProQuad in Europe.  Significantly, the EMA cited Protocol 007 as a "pivotal clinical study" in support of its decision to grant approval of MMRVaxpro and as a "supportive clinical study" in its decision to grant approval of ProQuad.

## INTERROGATORY NO. 8:

Describe in detail how you learned of each of the allegations contained in your Complaint relating to the August 6, 2001 on-site meeting between Merck and the FDA. Your answer should include, but not be limited to, detailed descriptions of how you learned of the following allegations contained in your Complaint:

(a) "[T]he FDA agent asked whether there was any ad hoc revisiting of plaque counts."

(b) "Krah falsely responded that plaque counts were being rechecked only for verification, controls and to check hypervariability."

(c) "Krah also misrepresented to the FDA that they did not change the data after it was entered in the excel workbook."

(d) The FDA "pressed Krah on the criteria for changing original counts on the counting sheets."

(e) Krah left the meeting without answering the question described in (d) above.

31

(f) "In Krah's absence, Shaw informed the FDA agent that a memo would be added to the standard operating procedure to address changes."

(g) "The FDA agent then asked Shaw why they had not taken care of this before the project started."

(h) "Shaw offered that Krah and another Merck employee had identified 'trends' and 'problems' with the original counts without ever explaining what those 'trends' and 'problems' actually were."

## RESPONSE TO INTERROGATORY NO. 8:

Relator directs Merck to its response to Interrogatory No. 8 in the Responses and Objections to the First Set of Interrogatories.

## REVISED INTERROGATORY NO. 9:

Specify, as a percentage, the "true efficacy rate" of Merck's mumps vaccine (*see* Complaint ¶¶ 7, 24, 34, 101), and describe the factual basis for how you derived or determined this efficacy rate.

## RESPONSE TO REVISED INTERROGATORY NO. 9:

Relator incorporates the Preliminary Statement and General Objections stated above. Relator objects to this Interrogatory to the extent that it seeks information that is within Defendant's possession, custody or control.

Subject to and without waiving the foregoing objections, Relator responds as follows:

The "true efficacy rate" of Merck's mumps vaccine is a percentage significantly less than that represented on Merck's MMRII package insert and on Merck's website. *See* Response to Interrogatory No. 1.

32

Appx5745

**REVISED INTERROGATORY NO. 10:**

Specify, as a percentage, the true seroconversion rate of Merck's mumps vaccine, and describe the factual basis for how you derived or determined this seroconversion rate.

**RESPONSE TO REVISED INTERROGATORY NO. 10:**

Pursuant to agreements made during the meet and confers regarding these Interrogatories, Merck has withdrawn this Interrogatory.

**REVISED INTERROGATORY NO. 11:**

Identify the factual basis for the allegation in Paragraph 71 of the Complaint that the M-M-R®II label is inaccurate.

**RESPONSE TO REVISED INTERROGATORY NO. 11:**

Relator incorporates the Preliminary Statement and General Objections stated above. Relator objects to this Interrogatory to the extent that it seeks information that is within Defendant's possession, custody or control. Relator further objects to Revised Interrogatory No. 11 to the extent that it seeks Relators' legal theories regarding how "the M-M-R®II label is inaccurate." *United States v. Educ. Mgmt. LLC*, No. 2:07–cv–00461, 2013 WL 3854458, at *20 (W.D. Pa. May 14, 2013). An early response to this Interrogatory would prejudice the Relator in later discovery and is not appropriate prior to meaningful fact discovery or document production in this action. *See id.*

Subject to and without waiving the foregoing objections, Relator responds as follows:

Merck has for all times relevant, and based on decades-old studies, represented on its package insert a seroconversion rate of 95 percent and a "high degree" of protective efficacy. Yet, Merck has known for many years that the vaccine's efficacy is significantly lower than originally reported for its vaccine licensure, and that the vaccine's low efficacy would lead to

33

mumps outbreaks notwithstanding high levels of vaccination.  Krah explained this to Relator in 2000.  Krah told Relator that the attenuated Jeryl-Lynn vaccine strain lost efficacy each time it was passaged to make more virus, and that this was the likely reason the vaccine had a low efficacy.  *See also* Relator's Response to Revised Interrogatory No. 17.  Merck's knowledge was further confirmed during the development of the methodology for mumps efficacy testing in Protocol 007 and the Protocol 007 testing in which Relator was involved where Merck could not achieve the 95 percent seroconversion rate identified on the package insert without Merck's fraud and manipulation, including testing vaccine efficacy against the attenuated Jeryl-Lynn strain instead of a wild-type strain, adding rabbit enzyme antibodies without adequate controls in order to increase post-vaccination positive results, and manipulating counting sheets in the lab to reduce the accompanying, but unwanted, increase in pre-vaccination positive results.  In a meeting with Relator, Emini acknowledged the vaccine does not provide adequate immunization when he told Relator it was a "business decision" to conduct the Protocol 007 testing in the way Merck did, with fraud and manipulation, and without which Merck knew it could not measure the 95 percent seroconversion rate.  *See also* Response to Interrogatory No. 1.  In addition, Merck has conducted and is aware of other more recent efficacy studies which measured seroconversion rates significantly lower than that represented on the package insert.  Merck's failure to update its package insert to account for information Merck knows about its vaccine's low efficacy, while continuing to reference the two tests (conducted upwards of 50 years ago) identified on the package insert as an accurate statement of efficacy, makes the label inaccurate, false and/or misleading.

34

330236 3

**REVISED INTERROGATORY NO. 12:**

Identify the factual basis for the allegation in Paragraphs 25-51 of the Complaint that the alleged changes to Protocol 007 study data had an effect on the outcome of Protocol 007, including, but not limited to, specifying each such effect.

**RESPONSE TO REVISED INTERROGATORY NO. 12:**

Relator incorporates the Preliminary Statement and General Objections stated above. Relator objects to this Interrogatory to the extent that it seeks information that is within Defendant's possession, custody or control.

Subject to and without waiving the foregoing objections, Relator responds as follows:

Merck approved and used an enzyme-"enhanced" PRN test to conduct the Protocol 007 PRN testing. The methodology used by Merck tested the children's serum samples for their ability to neutralize the attenuated Jeryl-Lynn strain of the virus rather than a wild-type strain, and added rabbit anti-human enzyme antibodies which boosted the amount of virus neutralization measured in human serum samples. These deliberate manipulations of the testing methodology were designed to enable Merck to achieve its pre-targeted seroconversion rate of 95 percent or higher. However, because the uncontrolled use of the rabbit enzyme antibodies also increased virus neutralization in the pre-vaccine serum samples, causing an increase in the pre-positive rate, Merck had to manipulate the pre-positive data to reduce the number of pre-positives while still giving the appearance of measuring the targeted seroconversion rate of 95 percent or higher. But for Merck's fraud and manipulation, Merck would not have been able to measure such a high seroconversion rate because of the significantly low or diminished efficacy of the vaccine. In addition, without the targeted changes to the pre-positive data caused by the

35

uncontrolled use of the rabbit enzyme antibodies, there would have been a significantly elevated

level of pre-positives that would have invalidated the test results.  Relator knows this because:

1.  Krah told Relator that the vaccine had a significantly diminished efficacy, no longer
    provided adequate immunization and would lead to outbreaks in highly vaccinated
    populations.

2.  Krah provided Relator with results of validation studies Krah conducted using a PRN
    test which showed seroconversion rates significantly lower than 95 percent.

3.  *See* Response to Interrogatory No. 1 for additional bases supporting the allegations
    that Merck's mumps vaccine has an efficacy rate significantly lower than that
    represented on the package insert and Merck's website.

4.  Krah told Relator that the uncontrolled use of rabbit enzyme antibodies in Protocol
    007 elevated the post-positives, achieving close to a 100 percent seroconversion rate,
    but also elevated the level of pre-positives, which was described by Krah as a
    "problem" they would have to fix.

5.  Krah gave Relator a document from an October 2000 Merck presentation which
    identified that the objective of the "enhanced" PRN Protocol 007 testing was to come
    up with a testing format that would yield a seroconversion rate of 95 percent or
    higher.  The presentation also identified the purpose of adding rabbit enzyme
    antibodies to the PRN test was to increase virus neutralization and thereby increase
    seroconversion rates.  The presentation also indicated that the uncontrolled use of
    rabbit enzyme antibodies resulted in a seroconversion rate that crossed this threshold,
    but also led to a pre-positive rate that was similarly boosted.  The conclusion was to
    come up with a testing procedure that optimized the use of rabbit enzyme antibodies
    to yield a pre-positive rate less than or equal to 10 percent, and a seroconversion rate
    greater than or equal to 95 percent.

6.  Relator witnessed first-hand the Protocol 007 testing performed in Krah's lab at
    Merck, and Merck's inability to get both a pre-positive rate of less than or equal to 10
    percent and a seroconversion rate of 95 percent or higher using the rabbit enzyme-
    "enhanced" PRN methodology.

7.  Relator witnessed first-hand the efforts by Krah and other members of Krah's staff to
    falsify and manipulate the test results to report a pre-positive rate of below 10
    percent.  This included: (i) Krah directing his staff to re-check any sample found to be
    pre-positive to see if more plaques could be found to change the result to pre-negative
    so it could be included in the seroconversion count; (ii) Krah and Yagodich falsifying
    plaque counts, and directing other staff members -- including Relator -- to do the
    same, to convert pre-positives to pre-negatives so they could be included in the
    seroconversion counts; (iii) Krah instituting several measures to isolate the pre-

36

330236 3

positive samples to facilitate their conversion to pre-negatives; and (iv) Krah deleting test results and replacing counting sheets to cover up the falsification and manipulation.

8. For example, on one particular occasion, Krah called Relator into this office to discuss an incident between Relator and Yagodich regarding recounting data. Krah reprimanded Relator for making Yagodich "feel bad" for asking him to recount his counting sheets. Relator told Krah that he could not recount data simply because the results were unfavorable. Krah responded that the pre-positive rate was too high and needed to be corrected in order for the mumps testing project to succeed. Relator replied that if the study stopped using rabbit secondary antibodies, the high pre-positive rate issue would be resolved. Krah explained that secondary antibody "enhancement" with anti-human antibodies was necessary to achieve the 95% seroconversion rate targeted by Merck and the FDA. The addition of rabbit anti-human antibodies increased the seroconversion rate of the assay.

9. Relator, together with Relator Wlochowski, conducted an internal audit of the changes to the counting sheets made by Krah and his staff for the rabbit enzyme-"enhanced" Protocol 007 PRN assay. Of the sampling they reviewed, they found 45 percent of the pre-positive data had been crossed out and changed to make it pre-negative. The audit also found that *only* the pre-positives were changed: no pre-negatives were changed to pre-positives; no post-positives were changed to post-negatives; and no post negatives were changed to post-positives.

Relator went to Emini to report the fraud and manipulation happening in Krah's lab and threatened to go to the FDA if it continued. *See also* Relator's Response to Interrogatory 1. Soon thereafter, Relator saw Krah destroying garbage bags full of the completed experimental plates used by the scientists in Krah's lab to count plaques which could have been used as proof that the plaque counts in the counting sheets had been fraudulently altered to change the pre-positive plaque counts documented in Merck's counting sheets.

## REVISED INTERROGATORY NO. 13:

Identify the factual basis for the allegation in Paragraph 81 of the Complaint that "[c]learly, if the FDA had known the truth about the vaccine's efficacy it would not have approved the labeling change to reduce the minimum potency."

37

## RESPONSE TO REVISED INTERROGATORY NO. 13:

Relator incorporates the Preliminary Statement and General Objections stated above. Relator objects to this Interrogatory to the extent that it seeks information that is within Defendant's possession, custody or control, or in the possession, custody or control of the government that is equally available to Defendant. Relator further objects to Revised Interrogatory No. 13 to the extent that it seeks relators' legal theories. Responding to these portions of this Interrogatory would require Relator "to articulate theories of [his] case not yet fully developed." *United States v. Educ. Mgmt. LLC*, No. 2:07–cv–00461, 2013 WL 3854458, at *20 (W.D. Pa. May 14, 2013). An early response to this Interrogatory would prejudice the Relator in later discovery and is not appropriate prior to meaningful fact discovery or document production in this action. *See id.*

Subject to and without waiving the foregoing objections, Relator responds as follows: Relator refers to his Response to Revised Interrogatory No. 7 which identifies the numerous factual bases for the efficacy of Merck's mumps vaccine being material to the Government in its regulation of and the approval process for mumps vaccine. Vaccine manufacturers like Merck have numerous contractual and statutory duties to disclose to the FDA (and other governmental bodies) all information regarding the safety and efficacy of their vaccines. It is likewise responsible for ensuring their vaccine labeling is not inaccurate, false or misleading and to seek changes in their labeling when new information becomes available that causes the labeling to become inaccurate, false or misleading.

These multiple duties reflect the critical role accurate and truthful information about efficacy and potency plays in the FDA's regulation of vaccines and in its oversight of vaccine labeling. They also follow from the FDA's overarching responsibility to ensure that all vaccines

330236 3

**Appx5751**

manufactured and sold in the U.S. are safe and effective and that all associated labeling is accurate, complete and not misleading. The FDA required Merck to conduct efficacy testing in connection with its end-expiry study measuring a seroconversion rate of 95 percent or higher in a PRN test as part of these overarching responsibilities. It is likewise the basis for the allegation that had the FDA known of the significantly diminished efficacy of Merck's mumps vaccine at the current potency, it never would have approved Merck's request for a labeling change to reduce the potency even further.

**INTERROGATORY NO. 14:**

Describe in detail all Communications you have had with anyone, including, but not limited to, any current or former employee of Merck; Relator Wlochowski; Plaintiffs or their counsel in In re: Merck Mumps Vaccine Antitrust Litigation, Case No. 2:12-cv-03555; or anyone at the CDC, FDA, DOJ, any other government agency (domestic or foreign), or any third-party (individual or entity), about the issues involved in this action; the allegations of your Complaint; mumps and any mumps outbreaks; any mumps vaccine including, but not limited to M-M-R®II and ProQuad®; vaccine safety; vaccine efficacy; and vaccines generally. In responding to this Interrogatory, identify for each Communication the Person with whom you communicated and any other party to the Communication, the time, place and circumstances of the Communication, whether the Communication was oral or in writing, what was communicated, the response received, if any, and any Documents concerning, relating to and/or referencing the Communication. Your answer should include, but not be limited to, detailed descriptions of your "repeated calls" and complaints to the FDA regarding the fraud alleged in your Complaint.

330236 3

## RESPONSE TO INTERROGATORY NO. 14:

Pursuant to agreements made during the meet and confers regarding these Interrogatories, Relator will respond to this Interrogatory only with respect to the existence of any Communications about allegations in the Amended Complaint regarding the mumps vaccine that Relator had with (1) the Government, (2) Merck, (3) persons in the pharmaceutical industry, and (4) vaccine advocacy groups. Merck has defined a vaccine advocacy group as an organization which uses forms of communication (through any medium, including but not limited to print, electronic communications, the internet, and speaking engagements) to influence public opinion and/or policy with respect to the use, disuse, trust or distrust of vaccines. For any Communications Relator had on this subject with other individuals, Relator will merely identify that such Communication occurred.

Relator incorporates the Preliminary Statement and General Objections stated above. Relator objects to this Interrogatory on the ground that it calls for information not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the foregoing objections, Relator responds as follows:

Relator spoke with Kay Angstadt, Relator's prior roommate, in Spinnerstown, Pennsylvania about topics relating to allegations in the Amended Complaint regarding the mumps vaccine. These in-person communications occurred in 2001. Ms. Angstadt is retired and lives on Spinnerstown Road in Spinnerstown, Pennsylvania.

Relator spoke with his friend Jeff Angstadt about topics relating to allegations in the Amended Complaint regarding the mumps vaccine. These in-person communications occurred

40

between 2000 and 2010.  Mr. Angstadt is the vice president of operations at the Foreman Group.

Mr. Angstadt lives on Wild Deer Drive in Stevens, Pennsylvania.

 Relator spoke with his friend Jim Angstadt about topics relating to allegations in the

Amended Complaint regarding the mumps vaccine.  These communications occurred in person

between 2000 and 2010.  Mr. Angstadt is the manager of bioprocessing validations at Fujirebio

Diagnostics, Inc.  Mr. Angstadt lives on Angus Drive in Stevens, Pennsylvania.

 Relator spoke with Sharyl Attkisson, author and former reporter for CBS News, about

topics relating to allegations in the Amended Complaint regarding the mumps vaccine.  He spoke

to her in person in Washington, D.C. in 2009.  They generally discussed Relator's experiences

while working at Krah's laboratory at Merck's facility in West Point, Pennsylvania.  Relator does

not know her current or last known address.

 Relator spoke with his former Merck colleague Colleen Milliken Barr about topics

relating to allegations in the Amended Complaint regarding the mumps vaccine.  These

communications took place in person when they both were working at Merck's facility in West

Point, Pennsylvania between December 2000 and December 2001.  Relator recalls one

conversation with Barr during this period relating to the work she and another Merck employee

did in the spring of 2001 in an outside laboratory in Cincinnati, Ohio run by Richard Ward of

Cincinnati Children's Hospital Medical Center.  They were supposed to assist Ward's lab in

setting up the Protocol 007 efficacy testing in Ward's lab for Merck's mumps vaccine.  When

they returned, Barr told Relator her frustration that Ward's lab could not replicate the results

obtained in Krah's lab.  Barr expressed concern that she would have to go back to Ward's lab for

another visit to assist them in obtaining proper results.  Relator asked Barr what the problem was

in Ward's laboratory.  Barr was not sure but thought it had something to do with the failure to

<div align="center">41</div>

330236 3

achieve a sufficiently high seroconversion rate.  Relator does not know Ms. Barr's current or last known address but understands her to still be employed at Merck.

Relator spoke with former Merck colleague Sam Calarco about topics relating to allegations in the Amended Complaint regarding the mumps vaccine.  These communications took place in person when they both were working at Merck's facility in West Point, Pennsylvania between 1999 and 2001.  Relator recalls one conversation with Calarco in particular.  During Relator's first week of employment at Merck in 1999, he was required to take a blood test to ensure that he was immune to measles, mumps, and rubella.  All of the virologists in David Krah's laboratory were required to demonstrate immunity to these viruses to work with the MMR vaccine.  Despite being vaccinated as a child, Relator had to be re-vaccinated in order to work in the laboratory because blood tests showed he lacked sufficient antibodies to protect him from the diseases.  Calarco joked with Relator that all of the virologists in the lab, who had previously been vaccinated with MMR, needed to be revaccinated because testing showed they, too, lacked sufficient antibodies to protect them from disease.  Relator does not know Calarco's current or last known address but understands he is still employed at Merck.

Relator spoke with former Merck colleague Jill DeHaven about topics relating to allegations in the Amended Complaint regarding the mumps vaccine.  These communications took place in person when they both worked at Merck's facility in West Point, Pennsylvania between December 2000 and December 2001.  In particular, Relator recalls having regular discussions with DeHaven regarding the fraudulent methods mandated by Krah for the Protocol 007 testing and ways of avoiding compliance with these mandates.  Relator does not know DeHaven's current or last known address but understands she is still employed at Merck.

42

330236 3

Relator spoke with Ryan Draft, his former colleague in Dr. Schlegel's lab at Penn State University, in State College, Pennsylvania about topics relating to allegations in the Amended Complaint regarding the mumps vaccine. These communications occurred in person between 2002 and 2004. He spoke to Draft about Relator's concerns regarding the efficacy of the mumps vaccine. Relator does not know Draft's current address. His last address was in or near Harvard University in Cambridge, Massachusetts where Draft was finishing his PhD.

Relator spoke with now deceased Elizabeth Birt, former staff person to former Congressman Dan Burton (R - Indiana), in early May 2003 in Chicago, Illinois about topics relating to allegations in the Amended Complaint regarding the mumps vaccine. The two met at the Autism One conference held at Loyola University. He spoke to Birt about his concerns regarding the efficacy of the mumps vaccine.

Relator spoke with Emilio Emini about topics relating to allegations in the Amended Complaint regarding the mumps vaccine. These communications took place in person at Merck's facility where they worked in West Point, Pennsylvania in April and August of 2001. Relator recalls two communications in particular. First, in April of 2001, Relator and the other members of Krah's laboratory had a meeting with Emini in his office. Emini told the laboratory members to follow Krah's orders on the Protocol 007 testing to achieve the project's goal and achieve it on time. Emini also informed them that they had all earned very large bonuses for their commitment and sacrifice to the mumps testing project. He said that he had been prepared to give them these large bonuses that day, but decided to hold off and instead pay them a double bonus if they successfully completed the mumps testing by the fall of 2001. The meeting ended with nothing else being discussed.

43

**Appx5756**

Second, in early August, 2001, Relator met with Emini in his office.  Relator brought documents, counting sheets, and experimental cell plates from completed Protocol 007 assays to demonstrate the fraudulent practices he was witnessing in Krah's laboratory.  Emini examined the plates and the counting sheets in front of Relator.  Emini agreed with Relator that the crossed out numbers had been correct counts, the altered counts were wrong, and that the issue required immediate attention.  Relator explained to Emini that Krah was altering data in order to lower the pre-positive rate.  Relator threatened to call the FDA and report the falsification of data.  Emini directed Relator not to call the FDA.  Relator told Emini that he would go to the FDA unless Emini provided an honest explanation.  In response to Relator, Emini admitted to Relator that (i) the standard PRN test is a more specific and accurate test of vaccine efficacy and (ii) the addition of rabbit enzyme antibodies to the standard PRN was never intended to make the test more accurate, but was instead, a "business decision."  Emini then ordered Relator not to call the FDA.

Relator spoke to two unidentified employees at the Philadelphia branch of the FDA about topics related to allegations in the Amended Complaint regarding the mumps vaccine.  These communications occurred over the phone.  Relator first contacted the Philadelphia branch of the FDA on June 19, 2001, after looking up the phone number in the phone book.  In a phone call that lasted approximately 15-20 minutes, Relator spoke to a woman about his concerns of misconduct in Krah's laboratory at Merck.  Relator spoke to this same woman a second time to arrange a conference call.  Relator had the conference call with the same woman and a man from the FDA a month or so later where again he raised concerns about misconduct in Krah's lab.  Several weeks later, after Relator witnessed Krah destroying garbage bags full of experimental plates from the mumps Protocol 007 testing project, Relator again called the Philadelphia branch office of the FDA and spoke to the same woman to whom he had spoken on the previous

44

330236 3

occasions and reported what was happening. Relator urged her to get the FDA to conduct an on-site inspection and interview him and his co-workers in Krah's lab. She told him that putting together an FDA inspection team to visit Merck would take a few days.

Relator spoke with former Merck colleague Jon Gombola about topics relating to allegations in the Amended Complaint regarding the mumps vaccine. These communications took place in person where they worked at Merck's facility in West Point, Pennsylvania between December 2000 and December 2001. In particular, Relator recalls having regular discussions with Gombola regarding the fraudulent methods mandated by Krah for the Protocol 007 testing and ways of avoiding compliance with these mandates. Relator has no information on Gombola's current or last known address and has no information about where he currently works.

Relator spoke with documentary film maker Kimberly Green at the Autism One conference held at Loyola University in Chicago, Illinois in early May, 2003. Relator spoke to Green about his concerns regarding the efficacy of Merck's mumps vaccine. He recalls speaking again with Green in the Fall of 2003 in a small town along the Delaware River on the border of Pennsylvania and New York. Again the topic was related to his concerns over the efficacy of Merck's mumps vaccine. Relator does not know Green's current or last known address or where she works.

Relator spoke with former Merck colleague Kristen Tirpak Haas about topics relating to allegations in the Amended Complaint regarding the mumps vaccine. These communications took place in person at the Merck facility at which they worked in West Point, Pennsylvania between December 2000 and December 2001. Relator does not know Haas' current or last known address but understands she is still employed at Merck.

45

330236 3

Relator spoke with former Merck colleague Frank Kennedy about topics relating to allegations in the Amended Complaint regarding the mumps vaccine. These communications took place in person at the Merck facility at which they both worked in West Point, Pennsylvania between December 2000 and December 2001. In particular, Relator recalls having discussions with Frank Kennedy regarding the fraudulent methods mandated by Krah for the Protocol 007 testing and ways of avoiding compliance with these mandates. Relator does not know Kennedy's current or last known address but understands he is still employed at Merck.

Relator had multiple communications with David Krah about topics relating to allegations in the Amended Complaint regarding the mumps vaccine. These communications took place in person at the Merck facility at which they both worked in West Point, Pennsylvania, or over email, between March 1999 and December 2001. Relator does not know Krah's current or last known address but understands he is still employed at Merck. Relator recalls several conversations between himself and Krah in detail.

Between 1999 and 2000, Krah informed his laboratory staff on multiple occasions that the Protocol 007 mumps efficacy study's goal was to measure a 95% mumps seroconversion rate in children vaccinated with MMRII. During the preliminary testing which did not yield those results, Krah informed his laboratory group that once a procedure was devised to achieve a 95% seroconversion rate, the project would be scaled up to include the rest of the lab group.

On or about December 28, 2000, Krah gave Relator a copy of the new rabbit antibody-enhanced PRN test and a document from the validation studies. These documents stated the objective for adding rabbit secondary antibodies to the 1999 PRN Assay was to permit measurement of 95% seroconversion. Krah explained that the 95% seroconversion rate had been mandated by the FDA and the 1999 PRN Assay format had been abandoned because it failed to

46

**Appx5759**

yield that targeted result. Krah then explained that the addition of rabbit secondary antibodies had achieved a nearly 100% seroconversion rate against mumps but was resulting in a high pre-positive rate. Krah described the high pre-positive rate as a "problem" that had to be fixed. Krah said that scientists counting assays were expected to recount each pre-positive to see if more plaques could be found that would change the result to a pre-negative. While they were talking, Krah was counting an assay and he counted a plate that contained four pre-positives. After he wrote the numbers down he noticed that the next plate containing the post-vaccination serum sample were all negative. Krah erased the plate identification numbers on both plates and switched them so that on his counting sheet the four pre-positives became pre-negatives, and the four post-negatives became post-positives. After Krah switched the plates he noticed a single pre-positive in the plate preceding the plates he switched. Since just a single pre-positive makes the entire sample pre-positive this meant that his switching of the plates did not solve the pre-positive problem in that particular child's serum sample. Krah entered the numbers into a calculator that he kept at his side while counting. He cursed when his calculations verified the pre-positive and he immediately recounted the data. He found more plaques the second time he counted, and then crossed out his original data and wrote in his recounted data. He wrote on the counting sheet that he re-checked his plaque count. This resulted in the entire sample switching from pre-positive to pre-negative. Krah made these changes in front of Relator and also explained what he was doing as he made the changes. He did this to give Relator an example of what was expected of him. Krah said to Relator, "here's what you do when you find pre-positives." Krah told Relator that he needed to recount his data whenever his original counts resulted in pre-positive results.

47

On or about January 8, 2001, Krah called Relator into his office and reprimanded him for making Mary Yagodich "feel bad" for asking Relator to recount his data.  Krah said that Relator made Yagodich "feel like she was doing something wrong."  Relator responded that she was doing something wrong.  He beseeched Krah as a scientist and told him that they could not recount data simply because the results were unfavorable.  Krah explained to Relator again that the pre-positive rate was too high and needed to be corrected in order for the mumps testing project to succeed.  Relator made the observation to Krah that if they stopped using rabbit secondary antibodies, the high pre-positive rate would go away.  Krah said he understood but the rabbit antibody "enhancement" was necessary to get the 95% seroconversion rate the FDA wanted.  Krah explained that the efficacy of Merck's Jeryl Lynn mumps vaccine had diminished over time due to the vaccine's continued propagation.  This was not the first time Relator and Krah had discussed this issue.  Krah had previously explained that diminished efficacy was a general feature of live-virus vaccines because the vaccine virus became further attenuated as it was continually passaged to produce more vaccine for distribution.  In a conversation Relator had with Krah prior to 2001, Krah predicted that mumps outbreaks would continue to occur. During the January 8, 2001 discussion, Krah again addressed the MMR vaccine's diminished efficacy as he pressed Relator on the need to alter the pre-positives so Merck could report a 95% seroconversion rate to the FDA.  This would give the FDA the impression that Merck's mumps vaccine was still effective.  Relator asked why they didn't just report the findings from the 1999 PRN Assay even if it showed the MMR vaccine was less effective.  Krah explained that Merck's mumps vaccine was already licensed, on the market, and making money, and besides, people had to use something.  Krah asked Relator, "what else are they going to use?"  Relator pointed out that if the FDA or the public knew the vaccine didn't work very well, it would spur the

48

development of a new, effective vaccine.  Krah disagreed by telling Relator that's exactly what Merck didn't want to happen.  Krah said that Merck's Jeryl Lynn strain was the safest mumps vaccine and because of this, a loss in efficacy was acceptable, even if it meant that outbreaks of mumps would periodically continue to occur.  The conversation was amicably resolved with Krah informing Relator that he would not have to change his own data, and that he would be exempt from being required to alter pre-positive results.

After this conversation, Krah instituted a new policy that he called auditing.  Krah said his new policy was designed to more efficiently change pre-positives.  Relator questioned him on the scientific rationale for changing data points within an assay.  Relator warned Krah that if the auditors randomly re-checked data to look for more plaques that they'd also decrease the number of post-positives which would in turn lower the seroconversion rate.  Krah agreed but explained that the auditors were only re-checking the pre-positives.

On another occasion in the early 2001 timeframe, Jennifer Kriss, another member of the laboratory, seemed frustrated with recounting pre-positives.  Relator asked her why the pre-positive rate needed to be changed at all.  She replied that she didn't know, but that it was a good question.  Krah walked into the room and Kriss redirected the question to him.  Krah explained that they had to lower the pre-positive rate because it contradicted reality.  He said that in real life the pre-positive rate is not that high.  Relator pointed out that in real life the seroconversion rate isn't that high either.  Relator then asked Krah why they don't similarly lower the post-positive rate.  Krah responded that his policy was intended to re-check only the pre-positives and that this policy was acceptable because we were re-checking pre-positive samples that were only positive at a single dilution.  Relator pressed Krah further by asking him why they didn't also re-check the post-positives that were positive at a single dilution.  Krah did not respond.

49

During the spring of 2001, Krah repeatedly updated the laboratory about the situation to outsource the remainder of mumps testing to the outside laboratory in Cincinnati, Ohio run by Richard Ward of Cincinnati Children's Hospital Medical Center.  Krah said it would be necessary for two of Krah's employees to travel to Ward's laboratory to direct them in the proper way to do the assay.  Krah later informed his lab group that Ward's laboratory was unable to obtain results that matched their laboratory's results, and, because of this, Krah's lab would be doing the entirety of the testing.

On another occasion during this timeframe, Krah came into the back laboratory and asked if anyone would stay late with him to run an assay that was a re-test of pooled pre-positives. Relator looked at the Merck notebook sheet he was holding and it was titled "retest of pre-positives."  Relator asked Krah why he was retesting the pre-positives.  Krah replied that he was trying to find conditions under which the samples would yield pre-negative results.  Relator then asked Krah if he was pooling any post-positives to re-test.  Krah did not respond.  Krah frequently expressed concern about the necessity to complete the mumps testing before summer ended.  On June 19, 2001, Relator became aware that his exemption from having his data altered was formally revoked.  Relator was not asked to change data.  Instead, Krah informed Relator that his counting sheets would now need to be forwarded to Krah for review before being filed, and that Krah intended to recount and change Relator's assays. Krah informed Relator that he had already recounted two of Relator's assays and discarded the original data.

Relator confronted Krah with the plate from his assay containing the uninfected cell control.  In front of the other members of the laboratory, Relator asked Krah to look at the plate and note that there were plaques in the uninfected cell control.  Krah looked at the plate and told Relator that they were not plaques, they were spots.  Relator asked Krah to define the difference

50

330236 3

**Appx5763**

between a plaque and a spot.  Krah responded that he could just tell the difference.  Krah spoke to the group and said that if anyone were to see plaques in the uninfected cell control, that person was not to record the results.  Instead, the person was to bring the plate to Krah so Krah could determine if the plate contained plaques or spots.

On another occasion during this timeframe, Relator convinced Maahs to ask Krah, in Relator's presence, why rabbit secondary antibodies were used in the assay.  Krah told her that the rabbit secondary antibodies made the assay better by making the assay more sensitive. Relator disagreed with Krah by pointing out that the rabbit secondary antibodies made the assay less specific which made the assay worse than the standard PRN test.  Relator explained that the rabbit enzyme-"enhanced" assay generated more positives because of the drop in specificity. There were more positives in both the post and the pre-vaccination sera but they were false positives, which was why the pre-positive rate was so high.  Relator continued by explaining how the absence of human serum in the negative control exacerbated the problem by establishing an artificially low benchmark for determining seroconversion.  The ineffective benchmark caused even more false positives to be counted.  Krah did not respond.  He left and walked into his office.

In or around July, 2001, at a laboratory meeting involving all members of the laboratory, including Krah, Relator Wlochowski accused Krah of "cheating" because he was changing the data.  Krah protested that he couldn't be "cheating" because he was blinded—he did not know which sera samples represented the high, medium, or low dose.  Relator immediately pointed out to Krah that he was not blinded as to which samples were pre-vaccination and post-vaccination, and that's where he was committing the fraud.  Krah made no response and there was a long, uncomfortable silence.  Shortly thereafter, Krah called Relator into his office to tell him he was

51

330236 3

no longer permitted to work on the mumps testing project. Relator was not permitted to have copies of mumps testing protocols or handle any data related to the project. Krah gave Relator no reason for the decision.

Relator spoke with former Merck colleague Jennifer Kriss about topics relating to allegations in the Amended Complaint regarding the mumps vaccine. These communications took place in person at the Merck facility where they both worked in West Point, Pennsylvania between December 2000 and December 2001. In particular, Relator recalls discussing the impact of the fraudulent practices mandated by David Krah on the results of the Protocol 007 study. On one occasion, Relator sat next to Kriss as she audited her own counting sheet for one particular assay. According to her original counts, the positive control was negative which invalidated the entire assay. Invalid assays required retesting. Krah told them that because the deadline to complete mumps testing was approaching, they needed to minimize the number of retests. Krah made it policy to re-check and recount invalid controls in order to make assays valid and avoid retesting. This is what Kriss did with this assay. The positive control had tested negative but Kriss felt it was wrong to change the negative result by looking for fewer plaques than she had counted the first time. She explained that while it was okay to look for more plaques in order to switch positives to negatives, it was not okay to subtract plaques in order to switch negatives to positives. So instead of recounting the positive control, Kris recounted and changed the mock (negative) control, the benchmark for seroconversion, in order to lower the bar for what is considered positive. The positive control became positive as a result. Relator pointed out to Kriss that changing the benchmark changes all the data in the experiment because the benchmark is the standard by which seroconversion is determined for all the tested sera samples. Relator told her that by reducing the standard for what is defined as "positive," she may have

52

330236 3

inadvertently created post-positives that shouldn't exist, and she may have inadvertently created more pre-positives.  She came back the next day to check the prevaccination samples and change the pre-positives to pre-negatives by finding additional plaques.  Relator does not know Kriss' current or last known address but understands she is still employed at Merck.

Relator has spoken with Stan Kurtz, independent researcher of vaccines and other childhood health issues, and his wife Michelle, about topics relating to allegations in the Amended Complaint regarding the mumps vaccine.  Relator met the Kurtzs at the Autism One conference in May 2009 in Chicago, Illinois.  He and Stan Kurtz discussed Relator's concerns about the efficacy of Merck's mumps vaccine.

Relator had multiple communications with former Merck colleague Suzanne Maahs about topics relating to allegations in the Amended Complaint regarding the mumps vaccine.  These communications took place in person at the Merck facility where they both worked in West Point, Pennsylvania between December 2000 and December 2001.  Relator does not know Maahs' current or last known address, or where she works.  In particular, Relator recalls having discussions with Maahs regarding the fraudulent methods mandated by Krah for the Protocol 007 testing and ways of avoiding compliance with these mandates.  On one occasion in or around the Spring of 2001, Relator sat across from Maahs in the front laboratory as she counted an assay.  Krah approached her with a counting sheet and a single plate from an assay that she had previously counted.  Krah told her to recount a specific set of data on the plate because he said she originally recorded the wrong number of plaques.  She recounted the data but came up with the same number of plaques as her original count.  Krah told her to recount the data again.  She did and for a third time came up with the same number of plaques.  Krah explained to her that she needed to find four more plaques and told her to count the data again.  Krah stood over

53

Maahs until finally she tapped the plate four times and said she saw the plaques.  He told her to cross out her original data, fill in the new data and sign her initials to it.  After Krah left, Relator approached Maahs.  Before he could say anything, she admitted to him that she didn't actually see four additional plaques.  Maahs said she tapped the plate four times because she thought Krah would not leave until she said she saw the four plaques.  Relator agreed with her conclusion and asked if she understood why Krah would demand such a thing.  She said she did not know. Maahs still had the counting sheet so Relator showed her how to calculate the value for the mock control and explained that this value was the standard for determining seroconversion.  They then looked at her original count.  Relator showed her how to calculate the result.  It was a pre-positive.  They then calculated the revised count containing four additional plaques.  The result was now a pre-negative.  Then, they calculated what would have happened if she had found only three more plaques—the result would have remained a pre-positive.

On another occasion in 2001, after Emini's internal audit, Relator Wlochowski, Frank Kennedy, Maahs, Jon Gombola, Jill DeHaven and Relator met privately to debrief about their experiences before the Merck auditors.

Relator communicated with University of Helsinki professor Heikki Peltola, via email on October 16, 2007 about topics relating to allegations in the Amended Complaint regarding the mumps vaccine.  Specifically, Relator asked Dr. Peltola about what he knew about Merck's methodologies for, and the data resulting from, its studies of the efficacy of the mumps vaccine. This was in connection with an article Dr. Peltola wrote on the 2006 mumps outbreaks in the U.S.  Relator does not know Dr. Peltola's current or last known mailing address, but his last known email address is Heikki.Peltola@hus.fi.

330236 3

Appx5767

Relator spoke with Alexis Pinto, an attorney at Merck, about topics relating to allegations in the Amended Complaint regarding the mumps vaccine. These communications took place in person at Merck's facility in West Point, Pennsylvania in the Summer of 2001 in connection with the internal audit Emini ordered following his meeting with Relator where he raised his concerns about misconduct in Krah's lab. Relator does not know Pinto or the other auditors' current or last known address.

Relator spoke with Andrea Rock, a journalist now with *Consumer Reports*, about topics relating to allegations in the Amended Complaint regarding the mumps vaccine. He spoke to her in person at the Autism One conference at Loyola University in Chicago, Illinois in early May 2003. They discussed Relator's concerns over the efficacy of Merck's mumps vaccine. Relator does not know Rock's current or last known address.

Relator spoke with Dr. Robert Schlegel, his lab supervisor at Penn State University in State College, Pennsylvania about topics relating to allegations in the Amended Complaint regarding the mumps vaccine. These communications occurred in person between 2002 and 2004. He spoke with Dr. Schlegel about his concerns over the efficacy of Merck's mumps vaccine. Dr. Schlegel is the former head of the Molecular and Cell Biology Department at Penn State University. He is now retired and lives on Deerfield Drive in State College, Pennsylvania.

Relator spoke with former Merck colleague Kevin Sczcpiorski about topics relating to allegations in the Amended Complaint regarding the mumps vaccine. He spoke to him in person at the Merck facility where they worked, and at a bar adjacent to the Merck facility, in West Point, Pennsylvania during the 2000-2001 timeframe. He spoke with Sczcpiorski about his concerns over the efficacy of Merck's mumps vaccine. Relator does not know Sczcpiorski's current or last known address or where he is employed.

55

330236 3

Relator spoke with Alan Shaw about topics relating to allegations in the Amended Complaint regarding the mumps vaccine.  These communications took place in person at the Merck facility where they worked in West Point, Pennsylvania, or over email, between December 2000 and December 2001.  Relator does not know Shaw's current or last known address or where he is employed.  Relator recalls speaking with Shaw in July, 2001.  After Relators conducted their secret audit of the Protocol 007 data, Relator confronted Shaw about the fraudulent testing methods mandated by Krah.  Relator told Shaw that he came to speak with him to make him officially aware of the ongoing fraud.  Relator told Shaw that Krah's policy of retroactively lowering the pre-positive rate was fraud.  Relator told Shaw that it was obvious the rabbit enzyme antibodies were causing the high pre-positive rate, and that Merck shouldn't be using the rabbit enzyme antibodies without a negative serum control, or even at all.  Shaw refused to discuss the matter with Relator.  Relator demanded to know why Krah's laboratory was using the rabbit enzyme antibodies when the 1999 PRN Assay had already provided an answer—in fact, a more accurate answer—as to the efficacy of the mumps vaccine.  Shaw refused to talk about the specifics of the assay.  Shaw changed the subject to the bonuses that Emini had promised to give the members of Krah's laboratory.  He said that it was unusual for Emini to get personally involved with distributing bonuses to virologists such as Relator.  Shaw said he didn't know how large Relator's bonus would be, but it would likely be very significant. Relator refused to engage in discussion of bonuses.  Shaw refused to talk about what was occurring in Krah's laboratory.  Shaw offered to transfer Relator out of Krah's laboratory. Relator declined.  He left Shaw's office without resolution.

Relator spoke with former colleague DeeMarie Watson Skulsky about topics relating to allegations in the Amended Complaint regarding the mumps vaccine.  He spoke to her in person

330236 3

at the Merck facility where they worked in West Point, Pennsylvania in August 2001.  They

discussed Relator's efforts to alert the Government to Merck's fraud.  Relator does not know

Skulsky's current or last known address but understands that she is still employed at Merck.

Relator communicated with Dr. Silvia Stojanov, currently with the NIH, on October 26,

2008 and January 26, 2009, via email, about topics relating to allegations in the Amended

Complaint regarding the mumps vaccine.  Specifically, Relator asked about the methodology

Aventis used in its study of the efficacy of the mumps vaccine.  Relator does not know Dr.

Stojanov's current or last known mailing address, but her last known email address is

stojanos@mail.nih.gov.

Relator spoke with former Merck Human Resources employee Bob Suter about topics

relating to allegations in the Amended Complaint regarding the mumps vaccine.  These

communications took place in person at Merck's facility in West Point, Pennsylvania, or over

email, between December 2000 and December 2001.  Relator does not know Suter's current or

last known address or where he is employed.  At one point in July 2001, Relator met with Bob

Suter in an effort to gain an audience with Emini.  Suter represented that he would be Relator's

personal representative in any conflict Relator might have with the company.  Relator told Suter

that Krah was falsifying data, and that this was the sort of egregious behavior that should be

brought to the FDA's attention.  Suter told Relator not to call the FDA.  Relator told Suter that he

had confronted Shaw but had gotten no satisfaction from his answers.  Relator repeated his

intention to seek answers from the FDA.  Suter informed Relator that he could be put in jail for

sharing information with the FDA.  Suter offered to set up a private meeting between Relator and

Emini to discuss Relator's concerns.  Relator accepted his invitation.

57

330236 3

**Appx5770**

Later, after Relator's August 2001 meeting with Emini, Suter waited for Relator outside of Emini's office. Suter approached Relator and told him point blank that he would be put in jail if he contacted the FDA. Relator walked away without responding to him.

Relator had multiple communications with Relator Wlochowski about topics relating to allegations in the Amended Complaint regarding the mumps vaccine between 2001 and 2010. Most of these communications took place in person at the Merck facility where they worked in West Point, Pennsylvania. In particular, Relator recalls having regular discussions with Relator Wlochowski while they were both employed at Merck regarding the fraudulent methods mandated by Krah for the Protocol 007 testing and ways of avoiding compliance with these mandates. Relator also met with Relator Wlochowski several times after they both left Merck at Relator Wlochowski's home in Pennsylvania and then her home in Connecticut.

In or around June 2001, Relator, Wlochowski, Gombola, Maahs, Dehaven, and Kennedy met privately to discuss the ongoing fraud in Krah's lab. Gombola and Maahs were vocal about finding ways to actively resist the fraud. Dehaven and Kennedy agreed that Krah's instructions to falsify data needed to be resisted, but both voiced concerns about losing their jobs. Relator asked the group if they'd talk to the FDA in the event the FDA raided the lab. All of them said yes, but Dehaven and Kennedy pointed out that the FDA would need to interview them privately so they could speak freely without fear of losing their jobs.

During another meeting shortly thereafter, Wlochowski, Gombola, and Maahs discussed their desire to more actively resist Krah's policy of fraudulently altering the counting sheets. Relator suggested they copy their original counting sheets and keep them archived somewhere safe. The group agreed to report to each other any and all instances of data manipulation and fraud that they witnessed.

58

330236 3

**Appx5771**

On another occasion in this timeframe, Relator was working in the back laboratory next to Relator Wlochowski. She showed Relator her counting sheet that contained 11 pre-positives. Relator grabbed a calculator and figured out that the finding equaled an 84% pre-positive rate. Relator Wlochowski and Relator joked sarcastically about the unlikely possibility the data would survive the day. Krah overheard their conversation and came over to look at the plates. He told Relator Wlochowski that the plaques were too faint to count and ordered her to throw away her counting sheet because he intended to retest the entire assay. Relator Wlochowski protested that the plaques were not too faint to count, citing as evidence the fact that she had already counted them. Krah ordered her again to throw out the counting sheet and she complied.

During the same timeframe, Relator privately confided to Relator Wlochowski that he wanted to obtain more evidence of the fraud. Relator wanted statistical evidence that the changes being made to the data were fraudulent. Relator Wlochowski suggested they use the completed files to do an analysis on a very large sample size of the data to see if they could measure any statistically significant trends. Relators set out to do this during the first week of July 2001. The finalized data was kept in an unlocked filing cabinet in Krah's laboratory. Relator Wlochowski suggested they take tracts of files, review them, and then exchange them for more files.

Relator spoke with former Merck employee Mary Yagodich about topics relating to allegations in the Amended Complaint regarding the mumps vaccine. These communications took place in person at the Merck facility where they worked in West Point, Pennsylvania between December 2000 and December 2001. Relator does not know Yagodich's current or last known address but understands that she now works for GlaxoSmithKline. Relator recalls one communication with Yagodich in particular. On January 8, 2001, Yagodich approached Relator

59

330236 3

**Appx5772**

while he was performing an assay.  Yagodich said that she found a pre-positive in one of the

assays Relator had counted and that after counting the pre-positive herself, she believed there

were more plaques.  Yagodich requested that Relator change his data to reflect her observed

increase in the number of plaques.  Relator told her that he was in the middle of doing an assay.

Yagodich requested that Relator stop what he was doing to substitute her recounted data for his

original data on the counting sheet and sign his name to it.  Relator asked her if she recounted his

entire assay or just the pre-positive.  She replied that she only recounted the pre-positive.  Relator

asked Yagodich how she knew that he hadn't missed plaques elsewhere in the assay.  She

responded that "we're" only interested in changing the pre-positives.  Relator told Yagodich that

he didn't feel comfortable signing his name to data that she had counted.  She responded that she

would leave the counting sheet on his desk for him to recount the pre-positives.  Relator told

Yagodich that he was satisfied with his original count and that he did not feel comfortable with

her request to look for more plaques to eliminate pre-positives.  Yagodich responded that it was

Krah's request.  Relator said he understood but he still did not feel comfortable changing the data

simply because the results were not what Krah had hoped for.  Yagodich left with the counting

sheet.

**INTERROGATORY NO. 15:**

 Identify every Document or Tangible Thing that you removed from Merck during your

employment or at the time of your separation from Merck.

**RESPONSE TO INTERROGATORY NO. 15:**

 Relator incorporates the Preliminary Statement and General Objections stated above.

Relator objects to the term "removed" as vague and ambiguous and calling for speculation.

60

330236 3

Relator further objects to this Interrogatory as overbroad as it refers to "every Document or Tangible Thing" without limitation.

Subject to and without waiving the foregoing objections, Relator responds as follows:

Relator will produce documents obtained during the course of Relator's employment at Merck, which he still has in his possession, in response to this request.  Further, Relator obtained an employee badge during the course of his employment at Merck, which he still has in his possession.  Relator has not used the employee badge since he left Merck.

**REVISED INTERROGATORY NO. 16:**

Identify any admissions against interest made by Merck of which you have knowledge. In responding to this Interrogatory, identify each Document or Communication containing each such admission, as well as the time, place, and circumstances of each such admission.

**RESPONSE TO REVISED INTERROGATORY NO. 16:**

Pursuant to agreements made during the meet and confers regarding these Interrogatories, Merck has withdrawn this Interrogatory.

**REVISED INTERROGATORY NO. 17:**

Identify the factual basis for the allegation in Paragraph 21 of the Complaint that "the continued passaging of the attenuated [mumps] virus to make more vaccine for distribution has altered the virus and degraded the efficacy of the product."

**RESPONSE TO REVISED INTERROGATORY NO. 17:**

Relator incorporates the Preliminary Statement and General Objections stated above. Relator objects to this Interrogatory to the extent that it seeks information that is within Defendant's exclusive possession, custody or control.

Subject to and without waiving the foregoing objections, Relator responds as follows:

61

Krah admitted to Relator that Merck's mumps vaccine is not 95% effective in preventing mumps disease, and that vaccine efficacy is not high enough to prevent disease outbreaks even if every person in the United States were vaccinated with Merck's MMR vaccine. On at least two occasions, Krah attempted to explain to Relator why the mumps vaccine had a low efficacy. Krah told Relator that diminished efficacy is a general feature of live-virus vaccines because the vaccine virus becomes further attenuated as it is continually passaged to produce more vaccine for distribution. Relator raised with Krah the possibility the vaccine was not very good to begin with because a wild-type boosting effect masked the low efficacy. Maurice Hilleman's research was not good enough to correct for the effect, and therefore his pilot studies overestimated vaccine efficacy. Krah admitted the possibility, but rejected its significance in favor of his previous statement that the efficacy of the vaccine had been higher in the past, but diminished over time due to the continued passaging of vaccine virus. Krah gave Relator research by Hilleman that supported Krah's contention. To further support the idea that the efficacy of the mumps vaccine was not just low, but lowering, Krah predicted that it would continue to get worse, that mumps outbreaks would continue to occur as a result of serial passaging requirements, and that eventually measles outbreaks would also rise in frequency. On a different occasion, Krah again described to Relator how diminished efficacy is a general feature of live-virus vaccines. Relator asked Krah why, given that diminishing efficacy is an unavoidable situation, Merck was going to such lengths to hide the diminished efficacy of its mumps vaccine. Why not just report the more accurate results obtained with a standard PRN testing methodology to the FDA. Krah pointed out that Merck's vaccine was the only vaccine licensed for use in the U.S., and said "what else are they going to use." Relator told Krah that if Merck reported an accurate vaccine efficacy measurement using standard PRN testing methdology, it would alert

62

330236 3

**Appx5775**

the FDA that a new mumps vaccine needs to be made.  Krah replied that such a possibility is exactly what "we" don't want because Merck would lose their exclusive licensing rights.  Krah said Merck needed to report 95% seroconversion to the FDA or run the risk of facing that unwanted scenario.

## REVISED INTERROGATORY NO. 18:

Identify the factual basis for the allegations in Paragraphs 22 and 139 of the Complaint that Merck took actions to "foreclose[] potential competitors from entering the market with a new mumps vaccine." In responding to this Interrogatory, identify each action you allege was taken by Merck in support of your allegations and every manufacturer you allege was foreclosed by Merck from entering the U.S. market for the Mumps Vaccine.

## RESPONSE TO REVISED INTERROGATORY NO. 18:

Relator incorporates the Preliminary Statement and General Objections stated above. Relator objects to this Interrogatory to the extent that it seeks information that is within Defendant's exclusive possession, custody or control.

Subject to and without waiving the foregoing objections, Relator directs Merck to its responses to Revised Interrogatories Nos. 1, 2, 4, 11, 12 and 14 for the factual bases supporting the allegations that Merck engaged in fraud and concealment to misrepresent the significantly diminished efficacy of its mumps vaccine, maintain its exclusive license to sell the mumps vaccine in the U.S., and foreclose other manufacturers from selling mumps in the U.S.  Relator cannot identify "every" manufacturer foreclosed because of Merck's fraud and concealment in representing an artificially high efficacy rate because it would involve predicting how the mumps market would have operated over the past fifteen years in the absence of Merck's fraud and concealment, but the list of potential manufacturers could include other vaccine manufacturers

63

such as GlaxoSmithKline (which sells a mumps vaccine in Europe, Canada and Australia);

Novartis AG; Pfizer, Inc.; Sanofi S.A.; Netherlands Vaccine Institute; Sevapharma, Inc.; Institute

of Biological Products, Shanghai, Beijing and Lanzhou, China; Institute of Immunology of

Zagreb; Serum Institute of India; Berna Biotech; Kitasato Institute; Takeda Chemicals; Chiba

Serum Institute; Center for Infectious and Parasitic Diseases (Bulgaria); Biogenetech Co., Ltd.;

and any number of pharmaceutical companies, universities or research institutions that are

currently working on developing a new mumps vaccine, or would have worked on developing a

new vaccine had Merck not engaged in the challenged fraud and concealment.


Dated:  May 18, 2015

**KELLER GROVER LLP**
Jeffrey F. Keller
Kathleen R. Scanlan
1965 Market Street
San Francisco, CA  94103
(415) 543-1305 (telephone)
(415) 543-7861 (facsimile)

*Counsel for Relators*

**CONSTANTINE CANNON LLP**
Gordon Schnell
Robert L. Begleiter
Marlene Koury
Hamsa Mahendranathan
335 Madison Avenue
New York, NY  10017
(212) 350-2700 (telephone)
(212) 350-2701 (facsimile)

Jason Enzler
1001 Pennsylvania Avenue, NW
Washington DC  20004
(202) 204-3500 (telephone)
(202) 204-2701 (facsimile)

*Counsel for Relators*

330236.3

**Appx5777**

## VERIFICATION OF STEPHEN A. KRAHLING

I, **STEPHEN A. KRAHLING**, hereby certify under penalty of perjury that I have reviewed **RELATOR STEPHEN A. KRAHLING'S RESPONSES AND OBJECTIONS TO MERCK'S REVISED FIRST SET OF INTERROGATORIES** and it is true and correct to the best of my knowledge. Executed on May _18_ , 2015, in _Boalsburg_ (insert city), in the state of Pennsylvania.

**STEPHEN A. KRAHLING**

## CERTIFICATE OF SERVICE

I, Hamsa Mahendranathan, am employed in the County of New York, State of New York.  I am over the age of eighteen and not a party to the within action.  My business address is 335 Madison Ave., 9th Floor, New York, NY 10017.  On May 18, 2015, I served the foregoing document(s): **RELATOR STEPHEN A. KRAHLING'S RESPONSES AND OBJECTIONS TO MERCK'S REVISED FIRST SET OF INTERROGATORIES** on the interested party(ies) as set forth below:

Lisa Dykstra                                            *Attorneys for Defendant*
Eric Sitarchuk
Brandon R. Fee
Coleen M. Meehan
Melina R. DiMattio
Margaret E. Rodgers Schmidt
MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
ldykstra@morganlewis.com
esitarchuk@morganlewis.com
bfee@morganlewis.com
cmeehan@morganlewis.com
mdimattio@morganlewis.com
mrodgersschmidt@morganlewis.com

Sally Bryan
Dino Sangiamo
VENABLE LLP
750 E. Pratt Street, Suite 900
Baltimore, MD 21202
srbryan@venable.com
dssangiamo@venable.com
mfroberts@venable.com

☒      (BY ELECTRONIC SERVICE) by electronically mailing a true and correct copy in PDF format through our electronic mail system to the email address(es) set forth above, or as stated on the attached service list per agreement between the parties.

☒      (FEDERAL) I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on **May 18, 2015**, at New York, New York.


_____*/s/ Hamsa Mahendranathan*_____
Hamsa Mahendranathan

330236 3

**Appx5779**

10/25/2019
Declaration of G. Reilly
EXHIBIT 161

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
                                              Page 1

 1       IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2

    UNITED STATES OF AMERICA  : CIVIL ACTION
 3  ex rel., STEPHEN A.       : NO. 2:10-04374(CDJ)
    KRAHLING and JOAN A.      :
 4  WLOCHOWSKI,               :
         Plaintiffs,          :
 5                            :
         vs.                  :
 6                            :
    MERCK & CO., INC.,        :
 7       Defendant.           :
    _____   : Master File No.
 8  IN RE:  MERCK MUMPS       : 2:12-cv-03555(CDJ)
    VACCINE ANTITRUST         :
 9  LITIGATION                :
                              :
10  THIS DOCUMENT RELATES TO: :
    ALL ACTIONS               :
11

12

13  * HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

14

15              August 3, 2017

16

17       Videotaped deposition of JOSEPH
18  ANTONELLO, taken at the offices of Spector
19  Roseman & Kodroff, 1818 Market Street, Suite
20  2500, Philadelphia, Pennsylvania 19103,
21  beginning at 9:02 a.m., before LINDA
22  ROSSI-RIOS, a Federally Approved RPR, CCR and
23  Notary Public.
24

25
```

Appx5781

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 2

```
1  A P P E A R A N C E S :
2
3  On behalf of the Private Payor Plaintiffs
4     SPECTOR ROSEMAN & KODROFF, P C
          BY:  DIANA J  ZINSER, ESQUIRE
5         1818 Market Street
          Suite 2500
6         Philadelphia, PA  19103
          215 496 0300
7         dzinser@srkw-law com
8
9  On behalf of the Relators
10    CONSTANTINE CANNON LLP
          BY:  GORDON SCHNELL, ESQUIRE
11          DANIEL VITELLI, ESQUIRE
              and
12          GARY REILLY, ESQUIRE
          335 Madison Avenue
13        New York, NY  10017
          212-350-2700
14        gschnell@constantinecannon com
          dvitelli@constantinecannon com
15        greilly@constantinecannon com
16
17
      On behalf of the Defendant, Merck & Co ,
18  Inc
19    MORGAN LEWIS & BOCKIUS LLP
          BY:  LISA C  DYKSTRA, ESQUIRE
20            and
          LINDSEY T  MILLS, ESQUIRE
21        1701 Market Street
          Philadelphia, PA  19103
22        215-963-5000
          ldykstra@morganlewis com
23        lindsey mills@morganlewis com
24
25
```

Page 3

```
1  A P P E A R A N C E S (cont'd) :
2
3   On behalf of the Defendant, Merck & Co ,
   Inc  and the Witness
4
      VENABLE LLP
5         BY:  CRAIG A  THOMPSON, ESQUIRE
              and
6          MELISSA M  FUKUSHIMA, ESQUIRE
          750 East Pratt Street
7         Suite 900
          Baltimore, MD  21202
8         410-244-7400
          cathompson@venable com
9         mfukushima@venable com
10
11  A L S O  P R E S E N T :
12
      STEPHEN A  KRAHLING
13
14    TINA BARTON, ESQUIRE
      Merck in-house counsel
15
      RUSS STRAIN, Videographer
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1           I N D E X
2
   WITNESS              PAGE
3
   JOSEPH ANTONELLO
4
    By Mr  Schnell       8, 310
5
    By Mr  Thompson      306
6
7
        E X H I B I T S
8
    MARKED    DESCRIPTION      PAGE
9
   Antonello-1  E-mails,         16
10      94884 - 94909
11 Antonello-2  12/4/00 Validation of    80
       Mumps 'Wild Type' IgG
12      ELISA,
        0076 1129 - 0076 1152
13
   Antonello-3  2/27/01 validation of   113
14      Anti-IgG Enhanced Mumps
        Wild Type Plaque
15      Reduction Neutralization
        Assay,
16      0001 6988 - 0001 7023
17 Antonello-4  2/23/01 Memo,          154
        0077 9589 - 0077 9599
18
   Antonello-5  3/20/02 E-mail with     161
19      attachment,
        544820 - 544847
20
   Antonello-6  4/16/02 E-mail with     215
21      attachment,
        0002 5762 - 0002 5763-008
22
   Antonello-7  3/12/01 E-mail,         222
23      0061 5920 & 0061 5921
24 Antonello-8  10/2/01 E-mail,         224
        0056 1393
25
```

Page 5

```
1         E X H I B I T S (cont'd )
2  Antonello-9  10/6/01 E-mail with     231
       attachment,
3      0056 1451 - 0056 1454
4  Antonello-10  E-mail chain,          244
       0056 1416 - 0056 1421
5
   Antonello-11  E-mail chain,          263
6      0079 1511 & 0079 1512
7  Antonello-12  Serial Number 86,      271
       0076 1628 - 0076 1702
8
   Antonello-13  9/14/15 E-mail with    273
9      attachment,
       0064 8043 - 0064 8045
10
   Antonello-14  3/13/02 E-mail with    286
11     attachments,
       0002 5749 - 0002 5754
12
   Antonello-15  12/18/01 E-mail with   293
13     attachment,
       0075 9085 - 0075 9089
14
   Antonello-16  5/7/02 E-mail,         310
15     0054 4296
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

Appx5782

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 6

1      - - -
2      VIDEOGRAPHER:  We're now on the
3  record.
4      My name is Russ Strain
5  representing Veritext Legal Solutions.
6      The date today is August 3,
7  2017.  The time is approximately
8  9:02 a.m.  This deposition is being
9  held at the office of Spector Roseman,
10  1818 Market Street, Philadelphia, PA.
11  The caption of this case is United
12  States of America ex rel. versus Merck
13  & Company, Incorporated, et al., filed
14  in the US District Court for the
15  Eastern District of Pennsylvania, Case
16  Number 10-04374.
17      The name of the witness is
18  Joseph Antonello.
19      If counsel at this time would,
20  please, introduce themselves for the
21  record?
22      MR. SCHNELL:  Gordon Schnell,
23  Constantine Cannon, counsel for
24  Relators.
25      MR. VITELLI:  Daniel Vitelli,

Page 7

1  Constantine Cannon, counsel for
2  Relators.
3      MR. REILLY:  Gary Reilly,
4  Constantine Cannon, counsel for
5  Relator.
6      MR. VITELLI:  We're joined by
7  Relator Steve Krahling.
8      MR. THOMPSON:  Craig Thompson
9  from Venable, on behalf of Merck.
10      MS. FUKUSHIMA:  Melissa
11  Fukushima also from Venable, on behalf
12  of Merck.
13      MS. MILLS:  Lindsey Mills from
14  Morgan & Lewis, on behalf of Merck.
15      MS. GONZALEZ:  Tina Gonzalez
16  Barton, Merck.
17      MS. DYKSTRA:  Lisa Dykstra, on
18  behalf of Merck.
19      VIDEOGRAPHER:  The court
20  reporter is Linda Rossi of Veritext.
21      Would the court reporter,
22  please, swear in the witness?
23      - - -
24      JOSEPH ANTONELLO, after having
25  been duly sworn, was examined and

Page 8

1  testified as follows:
2      - - -
3      VIDEOGRAPHER:  Testimony can now
4  proceed.
5      - - -
6      EXAMINATION
7      - - -
8  BY MR. SCHNELL:
9      Q.   Good morning, Dr. Antonello.
10      A.   Good morning.
11      Q.   As I said, my name is Gordon
12  Schnell.  I'm with Constantine Cannon and
13  we're counsel for Relators.
14      Could you just state your full
15  name and address for the record, please?
16      A.   Joseph Mark Antonello.  My
17  address is 1030 Blue Rock Lane, Blue Bell, PA.
18      Q.   What's your -- you're currently
19  employed at Merck?
20      A.   Yes.
21      Q.   What's your current title?
22      A.   I'm a senior principal
23  scientist.
24      Q.   When did you join Merck?
25      A.   I joined June 1, 1984.

Page 9

1      Q.   Just very, very briefly take me
2  through your various positions at Merck from
3  the time you joined until now.
4      A.   I started as a statistician,
5  that was the title.  And then promoted to
6  senior statistician.  You just want the job
7  titles?
8      Q.   Yes.
9      A.   Then from there, biometrician,
10  senior biometrician, associate director,
11  director.  And then they changed the title to
12  senior principal scientist.
13      Q.   In the time that you worked at
14  Merck, what kind of work, if any, did you do
15  involving the MMR II vaccine?
16      A.   In regard to this issue, I
17  provided statistical support for the PRN
18  assay, the AIGENT assay, and also for the
19  mumps wild type ELISA.
20      Q.   What was the time period during
21  which you provided that support?
22      A.   Approximately 1999 to 2005.
23      Q.   Since 2005, have you done any
24  work in connection with Merck's MMR II
25  vaccine?

3 (Pages 6 - 9)

Appx5783

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 10

1   A.   Yes.
2   Q.   What work have you done?
3   A.   I support the clinical assays,
4   support the labs that run the clinical assays.
5   So the labs that do the testing for the
6   measles, mumps, rubella vaccine, I provided
7   statistical support to them.
8   Q.   What kind of statistical support
9   have you provided?
10   A.   For like measles and rubella
11   assays, they --
12   Q.   You can limit it to mumps.
13   A.   Oh, limit it to mumps, okay.
14   Q.   Yeah.
15   A.   For the mumps assay, just
16   whenever there's -- if there's a need for a
17   reagent qualification or qualifying
18   technician, that sort of thing, provide that
19   support.
20   Q.   When you say "reagent
21   qualification," what do you mean?
22   A.   A reagent is something used in
23   the assay.  It could be a new lot of antigen
24   or new lots of plates, those sorts of things,
25   that they'll test to see if they're performing

Page 11

1   similar to a prior -- to the prior lot.  Or if
2   a control sample becomes depleted, they may
3   have to implement a new control.  So that
4   controls could also be considered reagents,
5   and they'd want to qualify that control in the
6   assay.
7   Q.   In your time at Merck, roughly
8   how many clinical trials have you done support
9   work for?
10   A.   I support the labs, so the labs
11   do the testing for the clinical trials, but I
12   don't get involved with the clinical trial
13   aspect of it.  I just -- I support the lab.
14   So they're doing the testing on behalf of the
15   clinical trials, but I don't really know the
16   particulars of how many trials or which
17   trials.
18   Q.   So you don't know roughly how
19   many clinical trials you provided support work
20   while at Merck?
21   A.   I don't know that.
22   Q.   Are you familiar with the term
23   "correlation"?
24   A.   Yes.
25   Q.   What is a correlation?

Page 12

1   A.   Correlation, an association
2   between two factors, and it could be a
3   positive or a negative association between the
4   factors.
5   Q.   What would be a positive -- what
6   would be a positive correlation?
7   A.   In the case we're talking
8   assays, an increase in response in one assay
9   is associated with an increase in response
10   with the other -- with another assay.
11   Q.   And a negative association would
12   be the opposite?
13   A.   Where you would have an increase
14   in response in one assay but a decrease in
15   response with the other assay.
16   Q.   You performed correlation
17   studies while at Merck?
18   A.   Yes.
19   Q.   Approximately how many?
20   A.   Over my career, I'd say dozens.
21   Q.   Approximately how many
22   correlation studies have you done at Merck in
23   connection with mumps?
24   A.   With mumps, I know of one in
25   particular.

Page 13

1   Q.   Which one is that?
2   A.   Correlation between the PRN and
3   the wild type ELISA.
4   Q.   The PRN, are you referring to
5   the AIGENT --
6   A.   Yes.
7   Q.   -- A-I-G-E-N-T?
8   A.   Yes.
9   Q.   Okay.  So I think for both of
10   us, if you're okay with it and you're okay
11   with it, when you use or I use the word "PRN"
12   in this deposition, we'll assume that we're
13   talking about that AIGENT assay?
14   A.   Yes.
15   Q.   And if it's unclear, obviously
16   you'll speak up, but I'll try to use the word
17   AIGENT just so we're clear.
18   A.   Yes.  I will try also.
19   Q.   The correlation that you just
20   referred to, the correlation study that you
21   did for the AIGENT assay, and it was the wild
22   type mumps ELISA assay.  Is that correct?
23   A.   Correct.
24   Q.   And was there one correlation
25   study you did in that regard or were there

4 (Pages 10 - 13)

Appx5784

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 14

1 more than one?
2 A. I mean, you can view even
3 bridging studies as correlation studies,
4 comparisons between assays. So in the regard
5 between those two assays, I'd say that one.
6 But we also -- when we developed the mumps
7 wild type ELISA, we also compared it to the
8 existing ELISA, called the legacy ELISA. So
9 you're also doing a comparison between the
10 assays there.
11 Q. Would you use the term "bridging
12 study" and "correlation study" interchangeably
13 or are there differences?
14 A. Yeah, I -- people use different
15 terms. We've used concordance, bridging,
16 correlation. I think in all these cases we're
17 referring to a comparison between two assays.
18 So I would say, you know, not to confuse
19 terms, but just it's a comparison between two
20 assays. I think some people may make the
21 distinction concordance meaning, oh, it's got
22 to be equivalent, concordant, perfectly
23 equivalent. Whereas, a bridging study, some
24 people may take that to mean we're going to
25 compare the two assays and we'll bridge them.

Page 15

1 They don't necessarily have to be equivalent,
2 there may be a difference between the two
3 assays, but we're just going to, you know,
4 estimate that difference and quantify that
5 difference and be able to say what that
6 difference is. So the bridge, some people
7 might say that is not necessarily considered
8 equivalence, whereas concordance they maybe
9 view it as equivalence.
10 Q. When you're doing a correlation
11 study, do you generally have -- so a
12 correlation study between two studies is --
13 A. Between two assays.
14 Q. Between two assays, do you use
15 one assay as the frame of reference and then
16 the other one you're comparing it to or how
17 does it work in that regard?
18 A. Yeah. You can -- if there's a
19 gold standard, you can use that one assay as
20 the frame of reference. If there's not a gold
21 standard, a lot of times if there's
22 variability in both assays, the one measure,
23 the one assay isn't true, then we won't do
24 just a regular correlation analysis, a regular
25 regression, we may do an errors and variable

Page 16

1 regression.
2 Q. So for the correlation study you
3 did between the AIGENT and the wild type
4 ELISA, did you use one as a frame of reference
5 versus the other?
6 A. For that study I would have to
7 go back and look at the report. But I
8 think -- yeah, I would have to look at the
9 report.
10 Q. Okay.
11 - - -
12 (Exhibit Antonello-1, E-mails,
13 94884 - 94909, was marked for
14 identification.)
15 - - -
16 BY MR. SCHNELL:
17 Q. I'd like to mark as Antonello
18 Exhibit 1 a set of documents with the Bates
19 number range 94884 through 94909. There's a
20 lot of material in here that I don't care
21 about for the purposes of today. And just to
22 further --
23 MR. THOMPSON: You can feel free
24 to read.
25 BY MR. SCHNELL:

Page 17

1 Q. Whatever you need, but I don't
2 think -- you'll see what the questions are and
3 then you'll see what you need to look at.
4 The cover e-mail is from
5 Dr. Antonello, and it's dated November 28,
6 2000, and it's to Alan Shaw. And I'll just
7 tell you what my questions are going to be,
8 and then you can look at what you think you
9 need to look at. But I think if you look at
10 the first e-mail from you and then on the
11 second page there's another e-mail from you.
12 I have a couple of questions on that. I don't
13 have any questions on the David Krah e-mail.
14 And then I want to ask you some further
15 questions on the memo that's attached ending
16 in Bates number 897 -- I'm sorry, beginning on
17 Bates number 897. And then there's also
18 attached a validation protocol for the mumps
19 wild type ELISA. So if you could just take
20 a -- what you need to refresh yourself and
21 then I have a few questions on that.
22 A. Okay. Thank you.
23 MR. SCHNELL: Is it not
24 complete? It should be complete.
25 MS. MILLS: You said 897. Is it

5 (Pages 14 - 17)

Appx5785

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 18

1 887?

2 MR. THOMPSON: There's an 897
3 but there's a break in the Bates
4 numbers.

5 MR. SCHNELL: Is there -- is
6 something missing? It should be
7 contiguous.

8 BY MR. SCHNELL:

9 Q. I think what might be useful for
10 this and as we go forward, if I ask you a
11 question or two, then you'll know -- because
12 they're going to be pretty targeted, and if
13 you feel like you can't answer it or you need
14 to read more, and you should, I don't want you
15 to waste your time and mine with you reading
16 stuff that I'm not going to ask about, if
17 that's okay.

18 A. Okay.

19 Q. So first of all --

20 MR. THOMPSON: But if it helps
21 you to read beforehand --

22 MR. SCHNELL: Absolutely.

23 MR. THOMPSON: -- feel free to
24 do that.

25 MR. SCHNELL: I'm not trying to

Page 19

1 trick you or anything. I just have
2 questions about a bunch of documents
3 today. Maybe I'm going to try to trick
4 you a little bit. But not really.
5 Just kidding.

6 BY MR. SCHNELL:

7 Q. So first of all, do you
8 recognize what you've seen so far?

9 A. I don't recall this cover page,
10 that particular e-mail.

11 Q. So this e-mail -- let's look at
12 the e-mail that you wrote to David Krah on
13 October 30, 2000. You start out by saying,
14 "Dave, To help in preparing the Mumps PRN
15 Validation Protocol, two recently completed
16 validation protocols are attached." So we're
17 talking about the AIGENT test there. Is that
18 correct?

19 A. Yes.

20 Q. And do you recall assisting
21 Dr. Krah in any way with the validation
22 protocol for that assay?

23 A. Yes.

24 Q. What kind of assistance did you
25 provide?

Page 20

1 A. Statistical support.

2 Q. What kind of statistical support
3 did you provide for the AIGENT validation
4 protocol?

5 A. Design support. What parameters
6 to evaluate and how they would be evaluated.
7 And analysis of the data.

8 Q. What is a validation protocol
9 for a clinical assay?

10 A. Yeah. I think it's a
11 documentation exercise documenting the
12 performance characteristics of the assay.

13 Q. What's the purpose of the
14 validation protocol?

15 A. To show that the assay is fit
16 for its intended use.

17 Q. Are there occasions where the
18 validation protocol will -- well, let me take
19 a step back.

20 So what is the normal flow in
21 terms of the development of a clinical assay
22 starting with the standard operating procedure
23 through the validation process?

24 MR. THOMPSON: Objection to the
25 form.

Page 21

1 THE WITNESS: The flow -- the
2 normal flow, meaning the practice
3 utilized today or the practice utilized
4 in 2000?

5 BY MR. SCHNELL:

6 Q. Both if it's different.

7 A. Yeah. I think it's different
8 now. I think that there is clearer
9 expectations now than there was in 2000. So I
10 can speak to how it is now. I can speak to
11 how it is now.

12 Q. Well, if you don't mind, I'd
13 rather -- I'm more interested in what it was
14 then. And then to the extent it's different,
15 we can talk about now. But for the AIGENT
16 assay, what was the flow of the development
17 starting with the standard operating
18 procedure --

19 MR. THOMPSON: Same --

20 BY MR. SCHNELL:

21 Q. -- the SOP?

22 MR. THOMPSON: I'm sorry. Same
23 objection.

24 THE WITNESS: Yeah. I don't
25 recollect the exact flow of the order,

6 (Pages 18 - 21)

Appx5786

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 22

1    you know, of events.
2  BY MR. SCHNELL:
3      Q.    Who drafted the SOP for the
4  AIGENT assay?
5      A.    I don't know.
6      Q.    Were you involved in that?
7      A.    No.
8      Q.    And then after the SOP for the
9  AIGENT assay, was the validation protocol the
10  next document along the way in the development
11  of that assay?
12      A.    I don't know the order of
13  events.
14      Q.    So after the validation protocol
15  for the AIGENT assay was developed, were there
16  then validation experiments carrying out the
17  validation protocol?
18      A.    Yes.
19      Q.    Were you involved in that?
20      A.    Not the experiments.
21      Q.    Who ran the experiments?
22      A.    It was Dave Krah's lab. I don't
23  know who in particular.
24      Q.    Then following the experiments,
25  was there a validation report that was

Page 23

1  written?
2      A.    Yes.
3      Q.    Were you involved in that?
4      A.    Yes.
5      Q.    And what was the purpose of the
6  validation report for the AIGENT assay?
7      A.    To report the results, to
8  document the results of the validation
9  experiments.
10      Q.    Then after the validation report
11  is -- for the AIGENT assay was prepared, then
12  a clinical assay goes forward. Is that what
13  happened?
14      A.    After the validation report was
15  prepared?
16      Q.    Yes.
17      A.    It was submitted to CBER. And
18  CBER approved the validation. I guess there
19  was some back and forth with CBER following
20  that. So it was submitted to CBER.
21      Q.    Do you recall CBER finding any
22  issues with the validation report?
23      A.    Not with the report itself, no.
24      Q.    Did they find any issues with
25  anything in connection with the validation?

Page 24

1      A.    My recollection with the
2  validation, well, CBER came in and did an
3  inspection, but I don't think anything there
4  was related to the validation.
5      Q.    Do you recall them having any
6  concerns with when the validation was done or
7  how it was done?
8      A.    No. The concern that I knew
9  CBER had was in regard to a processing
10  workbook that was not validated.
11      Q.    Okay. So if you look -- and
12  then you said that there are clearer
13  exportations -- clearer expectations now when
14  it comes to the validation exercise. What did
15  you mean by that?
16      A.    We've gotten feedback from CBER
17  on other assays since that time. And so
18  they've given us clearer direction on what
19  their expectations are.
20      Q.    And what is that direction that
21  CBER has provided you?
22      A.    That the validation should be
23  done before testing any Phase III samples.
24  That's one thing in particular.
25      Q.    Anything else?

Page 25

1      A.    Things such as the controls
2  should be -- the control limit should be
3  specified, set before performing the
4  validation.
5      Q.    Anything else?
6      A.    Not offhand.
7      Q.    So with respect to the
8  validation being completed before Phase III
9  testing, was that not how it was done with the
10  AIGENT assay?
11      A.    It was not completed before
12  Phase III testing was initiated.
13      Q.    So the Phase III testing had
14  commenced before the validation was completed?
15      A.    That's my understanding.
16      Q.    And with regard to the control
17  set before the validation that CBER had since
18  directed Merck to do with the AIGENT study,
19  were the controls not set before the
20  validation was completed?
21      A.    That's correct. And just to
22  clarify, I mean, when we received those
23  directions, it was in regard to validation of
24  another assay, probably about 2007 where we
25  had that expectation conveyed to us.

7 (Pages 22 - 25)

Appx5787

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 26

1    Q.    And what assay was that?
2    A.    It was actually a -- it's a
3 pneumococcal ELISA.  Actually ECL methodology.
4    Q.    So with the AIGENT assay, if the
5 clinical testing commenced before the
6 validation was completed, did that in any way
7 undermine the purpose of the validation?
8        MR. THOMPSON:  Objection to
9    form.
10       THE WITNESS:  I don't see how it
11    did.
12 BY MR. SCHNELL:
13   Q.    Well, the validation is supposed
14 to set the parameters of the clinical testing.
15 Right?
16   A.    Set the parameters of the
17 clinical testing?
18   Q.    Yeah.
19       MR. THOMPSON:  Same objection.
20       THE WITNESS:  I don't know what
21    you mean by that.
22 BY MR. SCHNELL:
23   Q.    What is the purpose of the
24 validation exercise?
25   A.    To document the performance

Page 27

1 characteristics of the assay.
2    Q.    And is there a particular
3 document that -- so let's say the validation
4 shows that the performance isn't sufficient or
5 is lacking in some way, what does that then
6 require in terms of the clinical testing
7 that's supposed to proceed?
8        MR. THOMPSON:  Objection to
9    form.
10       THE WITNESS:  Can you repeat the
11    question?
12       MR. SCHNELL:  Can you repeat the
13    question, please?
14       - - -
15       (The court reporter read the
16    pertinent part of the record.)
17       - - -
18       THE WITNESS:  I think it -- how
19    it performs would have to be viewed by
20    the clinical -- the clinical group who
21    are getting the data.  And what its
22    impact is on the clinical data would
23    have to be taken into consideration
24    there.
25 BY MR. SCHNELL:

Page 28

1    Q.    So if you can go back to this
2 e-mail we were looking at in Exhibit 1, in the
3 first paragraph to Dr. Krah you wrote that
4 "I've...listed some of the items to be
5 addressed in the protocol."
6        Do you see that?
7    A.    Which page are we on?
8    Q.    The e-mail, it's the second page
9 of the document.  It's the e-mail from you to
10 Dr. Krah.
11   A.    Yes, I've listed some of the
12 items here.
13   Q.    And so what were you doing here
14 in terms of what you were hoping to provide
15 Dr. Krah?
16   A.    Just to identify some of the
17 parameters, some of the measures that should
18 be evaluated in the validation study.
19   Q.    And in the next paragraph after
20 number 2, you wrote, "Determine a
21 statistically meaningful fold increase in
22 titer when comparing pre and post-vaccination
23 results."
24       Do you see that?
25   A.    Paragraph 2.

Page 29

1    Q.    The very next paragraph.
2    A.    Yes, I see it.
3    Q.    What did you mean there?
4    A.    An increase that a
5 post-vaccination relative to pre that would be
6 unlikely to occur by chance alone or just by
7 assay variability.  So you could have a small
8 increase that may be just due to assay
9 variability.  So you'd need it to be a
10 sufficient increase such that it's unlikely
11 that just the variability in the assay would
12 produce it.
13   Q.    And what's the purpose of having
14 a statistically meaningful fold increase in
15 titer in a protocol?
16   A.    It's for an individual sample.
17 Just to determine the rise that's unlikely to
18 be due to chance alone and likely to be
19 produced by vaccination.
20   Q.    And in the AIGENT assay, did
21 that end up being part of the protocol?
22   A.    Yes, I think we looked at fold
23 rise.
24   Q.    And in the wild type mumps ELISA
25 assay, was that also part of the protocol?

8 (Pages 26 - 29)

Appx5788

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 30

1    A.    I don't know.
2    Q.    When would you -- would you ever
3  not have a statistically meaningful fold
4  increase in titer as part of an assay
5  attempting to measure seroconversion?
6    A.    I think -- for validations, I
7  think you do things that are appropriate.  You
8  may not always do exactly the same thing.  You
9  do what's appropriate for the program.  So if
10  it's appropriate for the program, it would be
11  included.  If it wasn't appropriate for the
12  program, it wouldn't be included.
13    Q.    What are the circumstances under
14  which having a statistically meaningful fold
15  increase be part of the program?
16    A.    I think if it was something that
17  clinical was interested in seeing.  I know in
18  some cases we've done it, in some cases we
19  haven't.  If clinical would be interested in
20  that, we'd provide it.
21    Q.    What's a serostatus cutoff?
22    A.    It's a concentration, a point at
23  which you may classify a sample as either
24  positive or negative.
25    Q.    Positive or negative what?

Page 31

1    A.    Positive or negative antibody
2  response.
3    Q.    So it's a -- am I correct that
4  it is a dividing line below which you would
5  consider it a negative antibody response and
6  above it you would consider it a positive
7  antibody response?
8    A.    You could -- again, it depends
9  on the situation.  You may have different
10  cutoffs for different purposes.  But in
11  particular cases, yes, you could use it to say
12  below this we'll classify that as a negative.
13  Above it, we'll classify as a positive.  And
14  it's just -- it could just be in the assay.
15  It doesn't necessarily have to be tied to a
16  particular protective level.  That might be
17  defined through epidemiology studies, a
18  protective level.  But we could also define --
19  if you don't have a protective level, you
20  might define the serostatus cutoff as just
21  some level of response in the assay.
22    Q.    And what do you mean by
23  protective level?
24    A.    That in epidemiology studies,
25  you could look to see people who have an

Page 32

1  antibody response above that level, what
2  fraction of those people get the disease
3  versus the fraction below -- the percent below
4  that, what percentage of those get disease.
5  They can look at the different levels and say,
6  oh, people above this -- at this level and
7  above have a much lower incidence of the
8  disease than people who are below this level.
9  So in terms of getting the disease, that level
10  say, hey, above this, you have a good chance
11  of being protected from the disease.  Below
12  it, you know, you're more susceptible.
13    Q.    So protective level means
14  protection from the disease?
15    A.    Yes.  And it's not 100 percent.
16    Q.    Do you recall what serostatus
17  cutoff was used in the AIGENT assay?
18    A.    I believe it was 32.  A titer of
19  32.
20    Q.    Was that serostatus cutoff a
21  protective level above which there was a view
22  that you would be protected from the disease
23  and below which you would not?
24    A.    Yeah, I don't believe any --
25  they had that information.  So I don't think

Page 33

1  it was ever considered a protective level.
2    Q.    And was there a -- also a fold
3  increase that was part of the AIGENT assay?
4    A.    I don't know.
5    Q.    Now, for the wild type mumps
6  ELISA assay, and, again, if I slip up
7  throughout the deposition or if you aren't
8  complete, for the purposes of this deposition
9  can we agree that when we say "ELISA," we're
10  talking about the wild type mumps ELISA that
11  you worked on --
12    A.    Yes.
13    Q.    -- or that you supported?
14    A.    That would be good.
15    Q.    So what was the serostatus
16  cutoff that was used for the wild type mumps
17  ELISA?
18    A.    I believe it was 10 antibody
19  units.
20    Q.    Was that a protective level?
21    A.    No.  I don't -- I'm not aware of
22  it being identified as protective level.
23    Q.    Do you recall -- do you recall
24  if there was also any kind of fold increase
25  that was part of the wild type mumps ELISA

9 (Pages 30 - 33)

**Appx5789**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 34

1 assay?
2　　A.　I don't recall.
3　　Q.　If I could bring you back to
4 this document. This is two-thirds of the way
5 down, do you see under "Assay Quality Control
6 Measures"?
7　　A.　Yes.
8　　Q.　And then the last bullet point
9 you wrote, "The pre- and post-vaccination
10 pediatric sample results will be used to
11 evaluate a retest scheme for 'equivocal'
12 samples."
13　　　First of all, what did you mean
14 by pre- and post-vaccination samples?
15　　A.　There are samples taken from the
16 same subject before they receive a vaccine and
17 after they receive a vaccine.
18　　Q.　Pre is before and post is
19 after --
20　　A.　Yes.
21　　Q.　-- receiving the vaccine?
22　　A.　Yes.
23　　Q.　You continue, "The proposed
24 scheme is to retest equivocal samples, where
25 equivocal is defined as neutralizing at only

Page 35

1 one dilution. Samples will be tested a
2 maximum of three times with a 2 out of 3 rule
3 applied."
4　　　Now, that was a suggestion that
5 you made to Dr. Krah. Correct?
6　　A.　Correct.
7　　Q.　Did he adopt that suggestion?
8　　A.　I don't believe so.
9　　Q.　What was the reason you had for
10 making that suggestion?
11　　A.　This is 2000. And at that time,
12 I mean, we looked at -- one of the things we
13 were considering -- I say we, I was reported
14 to a manager. And one of the things we were
15 looking at was for samples that were, let's
16 say, close to a cutoff, either slightly below
17 or slightly above a cutoff, to retest those
18 samples in the assay and use a 2-out-of-3
19 rule. So if it was just above the cutoff,
20 you'd say, oh, we'll retest it again. If we
21 get that same result we might say it's
22 positive. And you go with the first result or
23 you could go with the average of the two. If
24 it came back negative, then you would test a
25 third time and do the third result.

Page 36

1　　　So I think it was a suggestion
2 to kind of get an accurate result for an
3 individual sample, but I think in practice, I
4 mean, we had floated that suggestion for other
5 assays. It's -- would be a nightmare for the
6 labs in practice. And to be pulling samples,
7 retesting them, first result, second result,
8 third result. And decisions were made
9 subsequent to that that we'll only test a
10 sample one time. If it's from a valid run,
11 that's what gets used. So I think this was a
12 suggestion being floated, but it wasn't
13 adopted. And I think for other programs and
14 everything else, I think that the path that --
15 of just testing a sample one time, if it's a
16 valid run, that's the result, is the practice
17 that we used.
18　　Q.　Did Dr. Krah tell you why he
19 didn't want to adopt this suggestion?
20　　A.　I don't recollect.
21　　Q.　Why have a 2-out-of-3 rule? Why
22 not just if it's equivocal, test it one more
23 time and then take the second test?
24　　A.　What if they're discrepant?
25 Which one is the correct one, the first or the

Page 37

1 second? So that was -- the third one would be
2 the tie breaker.
3　　Q.　Did you ever discuss with
4 Dr. Krah the plaque counting procedure in
5 which he and his staff engaged as part of the
6 AIGENT testing?
7　　A.　I don't recollect specifics of
8 that.
9　　Q.　Do you recall that Dr. Krah and
10 his staff changed plaque counts that they
11 thought were incorrect?
12　　A.　In --
13　　　MR. THOMPSON: Objection to
14　　form.
15　　　THE WITNESS: Yeah, in -- from
16　　the CBER inspection that I became aware
17　　that he, Dave or his lab reviewed the
18　　-- it's almost like a second scientist
19　　review of the counts by people in the
20　　lab.
21 BY MR. SCHNELL:
22　　Q.　Well, you also -- didn't you
23 assist him in terms of creating a workbook for
24 him that actually identified by flags certain
25 samples that were considered to be worthy of a

10 (Pages 34 - 37)

Appx5790

Page 38

1 recount?
2     A.   I provided Dave with a workbook
3 that flagged results that -- where you had
4 patterns in the response profile that were,
5 I'm going to say atypical.
6     Q.   Once they were flagged, was
7 the -- wasn't the procedure to recount those
8 samples?
9     A.   I don't recollect what the
10 procedure was.
11     Q.   Now, in the course of your
12 learning about this plaque recounting process,
13 do you know if Dr. Krah engaged in a
14 2-out-of-3 rule like the one that you had
15 proposed here?
16     A.   I don't know. I don't believe
17 he did.
18     Q.   You said at the time you
19 reported to someone. Who did you report to?
20     A.   Tim Schofield.
21     Q.   Now, wasn't one of the factors
22 that was part of the workbook that you created
23 to identify by a flag certain samples, wasn't
24 one of them if there was a neutralization at a
25 single dilution?

Page 39

1     A.   I don't recollect exactly what
2 was in the workbook, but I believe -- you
3 know, the typical pattern you might expect is
4 that at a low serum dilution, that it would
5 neutralize. And then -- or if you're looking
6 at plaque counts, you would -- at a low serum
7 dilution should neutralize. You'd have low
8 plaque counts and then it would go up. If you
9 were looking at just plaque counts, not
10 reduction. But it would go up and as you
11 diluted out the serum. But you could have --
12 if you had cases where, let's say, at a low
13 serum dilution, you didn't have reduction, but
14 then as you diluted it, you got a reduction in
15 the counts and then it went back up, that
16 would be an atypical curve. I believe that
17 that's the kind of thing that the workbook
18 flagged.
19     Q.   With respect to these what you
20 called equivocal samples where there was a
21 neutralization at only one dilution, where did
22 you typically see that occurring?
23        MR. THOMPSON: Objection to
24 form.
25        THE WITNESS: I don't recollect.

Page 40

1 BY MR. SCHNELL:
2     Q.   Was it something that you saw
3 just as likely on the pre side as the post
4 side?
5        MR. THOMPSON: Same objection.
6        THE WITNESS: Yeah. I don't
7 recollect.
8 BY MR. SCHNELL:
9     Q.   Okay. If we could flip to your
10 memo which is -- the first page is on the one
11 Bates number ending 897. And this is the memo
12 from Dr. Antonello to Dr. Krah and Ms. Yagodich.
13     A.   897.
14        MR. THOMPSON: Right there.
15 BY MR. SCHNELL:
16     Q.   You know what I mean by Bates
17 number. Right?
18     A.   Yes.
19     Q.   So this was a memo you did
20 reporting on a correlation study you did
21 between the legacy mumps ELISA test and the
22 AIGENT test. Correct?
23     A.   Yes. Legacy mumps ELISA.
24     Q.   And you did this with 55 paired
25 samples of pre- and post-vaccination samples?

Page 41

1     A.   Yes.
2     Q.   And do you recall -- first of
3 all, where did these samples come from?
4     A.   I don't know.
5     Q.   Do you recall why you did this
6 correlation study?
7     A.   I was probably asked to do it.
8        MR. THOMPSON: Have you had a
9 chance to read it?
10        THE WITNESS: No.
11 BY MR. SCHNELL:
12     Q.   Do you recall who asked you to
13 do this?
14     A.   It would be either Dave or Mary
15 Yagodich because it's to them.
16     Q.   And this was done in the
17 November 2000 time frame which was just around
18 the time the AIGENT testing had commenced. Is
19 that right?
20     A.   I don't know exactly when that
21 testing commenced.
22     Q.   I'm sorry, did you say you don't
23 recall why they asked you to do this?
24     A.   I said I was asked. Yeah, I
25 don't recall why they asked.

11 (Pages 38 - 41)

Appx5791

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 42

1    Q.    Okay.  And your results found, I
2   think you wrote good agreement.  Right?  Let's
3   see.  On the bottom you said while "...the
4   ELISA and PRN assays yield discrepant results
5   for selected individual samples, on average
6   there is good agreement...."  Right?
7        A.    Uh-huh.
8        Q.    So in a lot of the documents
9   that I've looked at and that we're going to
10  talk about today, there's a lot more
11  adjectives thrown about, good, strong, very
12  strong.
13            When you describe a correlation
14  result, do you typically do it in words, do
15  you typically do it in percentages?  What's
16  the best way of describing how strong, or
17  whatever word you choose, a correlation is?
18       A.    Yeah.  I will provide estimates,
19  and this memo -- I mean, the correlation that
20  I was referring to before was the mumps wild
21  type and the AIGENT.  This is now the mumps
22  legacy which I did not recollect.  But, you
23  know, apparently I did this in November of
24  2000.  But -- so we'll assess it, we'll
25  provide estimates of the agreement, the

Page 43

1   correlation.  So it can be judged based on
2   those estimates.  And then we'll also provide
3   a word description as to what we interpret,
4   our interpretation.
5        Q.    Does the sample size in any way
6   affect the reliability of the correlation
7   result?
8        A.    It can.
9        Q.    Do you account for that in your
10  conclusion as to how strong a particular
11  correlation is?
12       A.    We would in the interpretation,
13  yes.
14       Q.    And would you do that with some
15  kind of statistical power analysis where you
16  have an upper and lower bound confidence
17  level?
18       A.    The estimates usually we provide
19  will have confidence intervals.
20       Q.    So I don't -- you did it here.
21  You -- while the overall agreement percentage,
22  if you flip to page -- a couple of pages, you
23  see Figure 1, you have an agreement --
24       MR. THOMPSON:  What Bates number
25       are we looking at?

Page 44

1   BY MR. SCHNELL:
2        Q.    900.  It ends in 900.  I'm
3   always giving you the last three numbers of
4   the Bates number.
5            And you see under Figure 1 --
6        A.    Uh-huh.
7        Q.    -- you have a 93.6 percent
8   agreement rate.  Do you see that?
9        A.    Yes.
10       Q.    And, now, is that -- was that in
11  any way qualified by any kind of statistical
12  power or confidence interval?
13       A.    We -- in this case, that 93.6
14  percent, doesn't look like I provided a
15  confidence interval for it.  Something that
16  could be calculated.
17       Q.    And what goes into -- aside from
18  the number of samples that are in the
19  correlation study, is there anything else that
20  would weigh into the -- I want to make sure I
21  use the right lingo, the statistical power
22  analysis?
23       A.    Yeah, I think there is.  Another
24  thing is the concentration range of the
25  samples that you use, that can have a large

Page 45

1   influence on a correlation analysis.  If
2   you're testing samples that are all of a
3   similar concentration, so in -- if you don't
4   have that broad range in concentration, you're
5   just looking, they all have a similar
6   concentration, you could compare the same
7   assay to itself, but if all -- if the range is
8   very narrow in concentration, you're just
9   going to get a big cloud.  You get no
10  correlation because you're comparing the
11  same -- even if you are comparing the same
12  assay to itself, you don't have a range of
13  response.  But when you have a range of
14  response, now I've got some low and some high,
15  that helps you see the relationship between
16  the two assays.
17            So we try to study when we do
18  these assessments a broad range of antibody
19  concentration in the sample so we can get a
20  better assessment of the correlation, or the
21  lack of correlation, between the assays.
22       Q.    And just so I'm -- so I make
23  sure I'm understanding this, by concentration
24  range, you're talking about level of
25  antibodies in the samples?

12 (Pages 42 - 45)

Appx5792

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 46

1    A.    Yes.
2    Q.    And that would be both pre- and
3    post-vaccination?
4    A.    You look at both pre, look at
5    post.  And with post, a range of response
6    typically.  Pre sometimes can be less
7    informative.  If they're -- you know, in some
8    assays they may be all negative in both.  So
9    it doesn't do you a whole lot of good to test
10   tons of pres if the response is going to be
11   negative in both.  There's a lot of extra
12   information there.
13   Q.    And, again, just so I'm making
14   sure I understand, the reason why this would
15   be relevant to a statistical power analysis is
16   because you would have more comfort that
17   you're counting for variability if you have a
18   wider range of concentrations in the samples
19   that you're testing?
20   A.    It would be that you would get a
21   better estimate, a better assessment of the
22   relationship between the two assays.
23   Q.    So we talked about concentration
24   range, we talked about sample size.  Any other
25   factors that would weigh into a statistical

Page 47

1    power analysis of the correlation study?
2    A.    Other things that we do in terms
3    of the design of the study, you would want --
4    let's say we're comparing not necessarily two
5    assays, but different reagents, things we try
6    to do to reduce the variability in the study
7    is have -- the samples may be prepared
8    together so that if you're testing a different
9    antigen lot, everything is the same and test
10   the -- the plates are coded with different
11   antigen lots, you do everything the same.
12   Prepare the samples and plate them on both
13   plates.  Run them in the assay so in this
14   way -- in the same assay run, so this way you
15   keep everything as consistent as possible
16   except for the antigen coding.
17   So there are things we do
18   through the design of the studies to try to
19   eliminate variable -- other sources of
20   variability.  And we focus on the difference
21   that we're -- the parameters or the factors
22   that we're interested in comparing.
23   Q.    Any other factors that would
24   weigh into a statistical power analysis of a
25   correlation study?

Page 48

1    A.    Of a correlation study?  Not
2    offhand.
3    Q.    Just to take the flip side to
4    make sure I'm exhausting this question, the
5    purpose of a statistical power analysis is to
6    account for variability.  Correct?
7    A.    For -- I mean, there are
8    different power analyses for different
9    applications.  I think in this case it's just
10   you want to have enough samples and have a
11   good selection of samples so that you can get
12   a good -- make a good assessment of the
13   relationship between the two assays.
14   Q.    And so if you had done a
15   statistical power analysis for this
16   correlation study, would you have had here is
17   the overall agreement, and then here is the
18   lower bound of the percentage and the higher
19   bound of the percentage based on a 95 percent
20   confidence interval?
21   MR. THOMPSON:  Objection to the
22   form.
23   THE WITNESS:  Can you repeat the
24   question?
25   BY MR. SCHNELL:

Page 49

1    Q.    I can rephrase.
2    So the end result of having a
3    statistical power analysis is you don't have a
4    single answer, you have a range, a lower bound
5    of the confidence interval and the upper bound
6    of the confidence interval and then, I guess,
7    the average.  Is that right?
8    A.    I think you may be confusing
9    power analysis with confidence interval.
10   Usually a power analysis is something done
11   before and to ensure that your estimates will
12   be -- you'll have -- your estimates will be
13   close to truth and to -- so it's kind of done
14   before the study.  Your confidence interval
15   after you've done the study, you're saying
16   here's the estimate and here is this
17   confidence interval about it, how reliable
18   that estimate is.
19   Q.    Okay.  So the same question now,
20   because we were talking about statistical
21   power analysis before, now let's talk about a
22   confidence interval.  You can have a
23   confidence interval based on any percentage.
24   Right?
25   A.    Yeah.

13 (Pages 46 - 49)

Appx5793

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 50

1    Q.    So typically in your work, you
2  would use 95 percent for a confidence
3  interval?
4    A.    90 percent or 95 percent.  I
5  think we migrated for a lot of the assays
6  certain things to 90 percent.
7    Q.    And when you have a 90 percent
8  confidence interval, what does that mean?
9    A.    You're 90 percent confident that
10  it will contain -- that that interval contains
11  the true estimate.
12    Q.    When you have a confidence
13  interval, then you have the estimated number
14  and then you have a lower bound and an upper
15  bound number?
16    A.    Yes.
17    Q.    And did you do a confidence
18  interval for this correlation study?
19    A.    On looks like for the
20  concordance slope I provided one.  This --
21  let's see.  So for concordance slope we
22  provided one.  Also for the fold difference,
23  the average fold difference we provide one.
24  For the agreement rate, looks like just the
25  93.6 percent I didn't provide a confidence

Page 51

1  interval, but that's something that could be
2  calculated from the data.
3    Q.    What would determine for you
4  whether or not to perform a statistical power
5  analysis and a confidence interval for a
6  correlation study?
7    A.    We just provide estimates of the
8  agreement between the two assays and a
9  confidence interval on that estimate.
10    Q.    And why not, at least for this
11  one, would it be important to do, before you
12  do the study, a statistical power analysis?
13    MR. THOMPSON:  Objection to
14    form.
15    THE WITNESS:  Yeah.  I mean, it
16    may be that these are all the samples
17    he had available to test.
18  BY MR. SCHNELL:
19    Q.    Is the result of a statistical
20  power analysis any kind of metric that gauges
21  how much confidence you have in the result?
22    A.    Again, I guess the power
23  analysis goes into designing the experiment or
24  the study.  And you want to have enough sample
25  size, enough -- have it designed so that you

Page 52

1  can trust your estimates.
2    Q.    But how in this instance would
3  you know if you could trust your estimates if
4  you hadn't done a statistical power analysis?
5    A.    We provided confidence intervals
6  afterwards, so that tells you how reliable the
7  estimates are, the confidence intervals.
8    Q.    So you could use them
9  interchangeably to gauge the confidence in the
10  result?
11    A.    Yeah, you would, before the
12  study, let's say, talk in terms, say you do
13  this a lot for the clinical studies.  You'll
14  do a power analysis.  Let's say I want to
15  detect a difference between two groups, if
16  there really is a difference between two
17  treatment arms, let's say, that's twofold.
18  Say, well, and I'm going to get an estimate
19  from my study and I -- if that -- let's say
20  there -- well, let's say if the difference is
21  really twofold, how many -- how many subjects
22  do I need in each arm to be able to detect
23  that difference with a high degree of
24  confidence.  So that's going into the study,
25  you design it so that you're able to detect

Page 53

1  certain difference if it exists with a certain
2  probability or power.  So that says, oh, I
3  need this many samples, depending on the
4  variability and what size difference and that
5  sort of thing.  So all that goes into before.
6  At the end of the study, though, you're going
7  to put a confidence interval on that.  And
8  that will be your result.  The power just
9  tells you how likely you are to achieve it
10  going in.  The confidence interval is kind of
11  afterwards what did you get.
12    Q.    Based on this study, you
13  can't -- just sitting here, I don't know how
14  complicated the calculation is, but you can't
15  give me the confidence interval for this
16  overall agreement rate, can you?
17    A.    96.3 percent?  No, but I could
18  back in my office.
19    Q.    Okay.  So this -- if you look at
20  Figure 1 again, this is a -- would you call
21  this -- I've seen the term cross-classification
22  chart.  Is that what you call this?
23    A.    Cross-classification table, yes.
24    Q.    And basically it sets up on one
25  axis, one of the assays you're comparing in

14 (Pages 50 - 53)

Appx5794

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 54

1 the study and on the other axis the other
2 study. Correct?
3     A.   The one assay versus the other
4 assay, correct.
5     Q.   Is there any significance as to
6 which study in the X axis and which is in the
7 Y axis?
8     A.   No.
9     Q.   Then you have negative and
10 positive on each axis and negative represents
11 a -- well, why don't you tell me what the
12 negative and positive represents?
13     A.   Yeah.  In the memo it said
14 that -- so we're comparing the legacy ELISA
15 and we used a cutoff of two antibody units for
16 the legacy ELISA.  So if a sample was tested
17 in the assay and it gave a result less than
18 two, it would be classified negative.  If it
19 gave a result greater than two, classified
20 positive.  For the PRN assay, if a sample gave
21 a result that was less than 32, classified
22 negative; greater than 32, positive.
23     Q.   And for this study, were the 2
24 Ab and the 32 respectively determined to be
25 the serostatus cutoffs that you were using for

Page 55

1 this correlation study?
2     A.   Yes.
3     Q.   Okay.  And then the last
4 document in this package that I wanted to talk
5 about begins on the Bates number ending 904.
6 It's the Validation Protocol for the Mumps
7 Wild Type ELISA Assay.
8     A.   Okay.
9     Q.   And you didn't develop this
10 protocol.  Correct?
11     A.   I did not.  I assisted in its
12 writing.
13     Q.   And you provided this to
14 Dr. Krah as a sample of what a validation
15 protocol for an assay might look like?
16     A.   Oh, okay.  This is for the wild
17 type ELISA.  It's part of -- it was part of
18 that e-mail?
19     Q.   Right.
20     A.   Okay.  I was -- I'm sorry.  I
21 misunderstood.
22         MR. THOMPSON:  Take your time
23     and read what you need to.
24 BY MR. SCHNELL:
25     Q.   If you look at the e-mail we

Page 56

1 looked at earlier, this is the second page of
2 the packet, your October 30, 2000, e-mail, you
3 wrote to Dr. Krah, "To help in preparing a
4 Mumps PRN Validation Protocol, two recently
5 completed validation protocols are attached."
6 This is one of them.  Right?
7     A.   Okay.
8     Q.   So you did not assist in this
9 protocol.  Correct?
10     A.   I don't recollect.
11     Q.   Which protocol --
12         MR. THOMPSON:  Still take time
13     to read whatever you need to.
14         THE WITNESS:  Okay.  Yes.  Thank
15     you.
16 BY MR. SCHNELL:
17     Q.   Which protocol did you think I
18 was referring to?
19     A.   I thought we were referring to a
20 PRN protocol.
21     Q.   The AIGENT protocol?
22     A.   Yes, I'm sorry.
23     Q.   Okay.  So in the background, it
24 says, do you see on the first page under
25 "Background," "In order to infer vaccine

Page 57

1 protection to naturally occurring mumps virus,
2 CBER has mandated that a 'Wild Type'.. mumps
3 virus strain must be used to determine
4 seroconversion rates in patient serum
5 immunized with ProQuad"?
6         Do you see that?
7     A.   Uh-huh.
8     Q.   Are you familiar with any
9 discussions that Merck had with CBER in terms
10 of the type of mumps virus strain to be used
11 in the AIGENT testing?
12     A.   The mumps virus strain in the
13 AIGENT testing.  For the mumps AIGENT testing
14 I don't believe I was involved or had
15 familiarity with that pre, you know, for the
16 AIGENT, no.  For the ELISA, yes, I was aware
17 that that was -- that that was the case.  And
18 it may be, I'm trying to -- past memos, I may
19 have done -- I know I did analyses where I
20 looked at different strains, where we
21 evaluated different strains of virus, not just
22 the Jeryl Lynn or the early passage of Jeryl
23 Lynn.  I believe I did that for the wild type
24 ELISA and I don't recollect if I had done that
25 for the AIGENT assay or not.  I know -- I

15 (Pages 54 - 57)

Appx5795

Page 58

1 believe for the ELISA. I'm not certain for
2 the AIGENT. There would be memos that would
3 indicate whether I did or did not.
4     Q.   And what, if anything, does the
5 type of virus strain used in a clinical assay
6 have to do with inferring vaccine protection?
7     A.   I think you want to use a
8 strain, my understanding, is that you'd want
9 to use a strain that would be representative
10 of what the population might be exposed to.
11     Q.   And why is that?
12     A.   For protection against that
13 strain.
14     Q.   So that if you were measuring or
15 using a vaccine strain as part of your
16 clinical assay, would it not give as good
17 representation of what the actual vaccine
18 protection would be?
19         MR. THOMPSON:  Object to the
20     form.
21         THE WITNESS:  Yeah, I don't know
22     that. It may or it may not.
23 BY MR. SCHNELL:
24     Q.   As part of the discussion of
25 which strain to use for the wild type ELISA

Page 59

1 assay, do you recall why Merck made a decision
2 for that assay to use a wild type strain
3 versus the strain they used in the legacy
4 ELISA test?
5         MR. THOMPSON:  Objection to
6     form. Foundation.
7         THE WITNESS:  Can you repeat the
8     question?
9 BY MR. SCHNELL:
10     Q.   The original, do you recall what
11 strain was used in the legacy ELISA assay?
12     A.   The Jeryl Lynn house strain.
13     Q.   And the strain that was used in
14 the wild type ELISA assay was different than
15 that. Correct?
16     A.   It was an earlier passage of the
17 Jeryl Lynn.
18     Q.   What's the difference between
19 those two strains?
20     A.   My understanding is that they
21 attenuate the virus. They weakened it through
22 passages. So this was an earlier passage. So
23 a less attenuated virus.
24     Q.   And was the view at Merck that
25 using the wild type strain or the earlier

Page 60

1 passage strain would provide a better measure
2 of actual protection from the disease?
3         MR. THOMPSON:  Objection.
4         THE WITNESS:  Can you repeat the
5     question?
6         MR. SCHNELL:  Can you repeat it,
7     please?
8             - - -
9         (The court reporter read the
10     pertinent part of the record.)
11             - - -
12         MR. THOMPSON:  Same objection.
13         THE WITNESS:  I don't know what
14     the view of Merck was.
15 BY MR. SCHNELL:
16     Q.   What was your view?
17         MR. THOMPSON:  Objection to the
18     form.
19         THE WITNESS:  My understanding
20     is that CBER wanted to use -- us to use
21     either an earlier strain or a different
22     strain of the virus, and evaluations
23     were done, performed, and that's what
24     we did and it was approved by CBER.
25 BY MR. SCHNELL:

Page 61

1     Q.   And is it your understanding
2 that Merck wanted -- I'm sorry, that CBER
3 wanted that so that it could be assured that
4 the assay was actually going to measure
5 vaccine protection?
6         MR. THOMPSON:  Objection to the
7     form of the question.
8         THE WITNESS:  I can't speak for
9     CBER.
10 BY MR. SCHNELL:
11     Q.   No, but from your understanding
12 of the time where you said you were aware of
13 the issues back and forth, do you have any
14 understanding as to whether that was where
15 CBER was coming from?
16         MR. THOMPSON:  Same objection.
17         THE WITNESS:  My understanding
18     was that it was something mandated by
19     CBER and we made the switch.
20 BY MR. SCHNELL:
21     Q.   Okay. If you could flip to page
22 4 of this protocol, which is the Bates number
23 ending 906.
24         MR. THOMPSON:  Counsel, would
25     this be the last series of questions on

16 (Pages 58 - 61)

Appx5796

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 62

1 this document? We've been going a
2 little over an hour.
3 MR. SCHNELL: Just this page.
4 BY MR. SCHNELL:
5 Q. Under number 3 it says,
6 "Serostatus Cutoff." The "lowest antibody
7 concentration (titer) which can be reliably
8 distinguished from a panel of negative
9 samples."
10 Do you see that?
11 A. Yes.
12 Q. Is that, in your view, an
13 accurate definition of serostatus cutoff as it
14 was used in the mumps wild type ELISA testing?
15 MR. THOMPSON: Objection to
16 form.
17 THE WITNESS: It seems
18 reasonable.
19 BY MR. SCHNELL:
20 Q. And was that -- is that also a
21 reasonable definition of serostatus cutoff as
22 it was used in the AIGENT testing?
23 A. We did use a panel of negative
24 samples, I believe, to set the cutoff in the
25 AIGENT assay as well.

Page 63

1 Q. In terms of selecting the
2 serostatus cutoff, what's the best way to -- I
3 want to keep it specific to the wild type
4 ELISA assay. Because you were involved in
5 setting the serostatus cutoff, correct?
6 A. Yes.
7 Q. What was your goal in terms of
8 selecting what you thought was the most
9 appropriate serostatus cutoff?
10 MR. THOMPSON: Objection to
11 form.
12 BY MR. SCHNELL:
13 Q. First of all, was that your
14 goal? In being tasked with calculating
15 serostatus cutoff, what was your goal?
16 MR. THOMPSON: Same objection.
17 THE WITNESS: My goal, I mean,
18 the goal was to identify a level that
19 discriminated between expected
20 negatives and expected positives.
21 BY MR. SCHNELL:
22 Q. When you say "discriminated,"
23 what do you mean?
24 A. That classified expected
25 negatives, a high percentage of them as

Page 64

1 negative and classify a high percentage of
2 expected positives as positive.
3 Q. As high a percentage as
4 possible?
5 A. They're competing goals. So I
6 could make on the one end as high a percentage
7 as possible, 100 percent, but then do a poor
8 job for the other goal. Or I can make one 100
9 percent but do a poor job on the other. So
10 it's two competing goals of -- so to strike a
11 balance.
12 Q. And just so I understand the
13 balance that you were trying to strike, is
14 having the highest percentage of accurately
15 classifying negatives and positives. Is that
16 right?
17 MR. THOMPSON: Objection to
18 form.
19 THE WITNESS: The goal was to do
20 a good job overall.
21 BY MR. SCHNELL:
22 Q. But what were the competing
23 goals that you were talking about?
24 MR. THOMPSON: Same objection.
25 THE WITNESS: Sensitivity, I

Page 65

1 guess, and specificity. You want to
2 have high sensitivity, probability of
3 identifying a positive as a positive
4 and have high specificity probability
5 of identifying a negative as negative,
6 a true negative as negative.
7 MR. SCHNELL: I do have a few
8 more questions on this document, but
9 it's probably going to take a few more
10 minutes, so if you want to take a break
11 now, it's fine.
12 MR. THOMPSON: Let's do that.
13 VIDEOGRAPHER: Off the record at
14 10:11. This will end disc number one.
15 - - -
16 (A recess was taken.)
17 - - -
18 VIDEOGRAPHER: Back on the
19 record at 10:26. The beginning of disc
20 number two.
21 BY MR. SCHNELL:
22 Q. Dr. Antonello, before the break
23 we were talking about the serostatus cutoff
24 that you calculated for the mumps wild type
25 ELISA. You had spoken about a balance that

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 66

1 you were looking to strike in reaching that
2 calculation. And I want to better understand
3 the balance that you were referring to. So
4 you had mentioned -- first of all, it says in
5 this protocol that the "...serostatus cutoff
6 does not infer seroprotection." Is that
7 correct with the 10 Ab serostatus cutoff that
8 you calculated for the wild type ELISA assay?
9      A.    That is correct.
10     Q.    What does that actually mean,
11 that the 10 Ab serostatus cutoff that you
12 calculated for the wild type mumps ELISA assay
13 did not infer or does not infer seroprotection?
14     A.    Right. That if you have an
15 antibody level that's above 10, that you're
16 protected from disease. And if you're not
17 antibody level below 10, that you're not
18 protected from disease.
19     Q.    Is the 10 Ab serostatus cutoff
20 that you calculated in any way relevant to the
21 seroprotective level?
22     A.    I don't know what the sero -- I
23 don't know a seroprotective level for mumps or
24 what the seroprotective level is so...
25     Q.    But in your work in calculating

Page 67

1 what you thought was the appropriate
2 serostatus cutoff level for the mumps wild
3 type ELISA assay, did seroprotection play any
4 role in that exercise?
5      A.    Not that I'm aware of.
6      Q.    Well, you were the one that
7 calculated it. Right?
8      A.    Yes. Right.
9      Q.    So in your work in calculating
10 it, did you take into account in any way the
11 level of seroprotection that would be measured
12 by the particular serostatus cutoff that you
13 were calculating?
14     A.    I don't believe I did.
15     Q.    Why not?
16     A.    Because I don't believe a
17 seroprotective level was defined for mumps.
18 It was for, I remember, measles and rubella,
19 and we used those for serostatus cutoffs for
20 those assays, but there was not seroprotective
21 level defined for mumps.
22     Q.    And so because of that, you
23 didn't think it was in any way useful to
24 account for seroprotection in setting the
25 serostatus cutoff --

Page 68

1           MR. THOMPSON: Objection.
2 BY MR. SCHNELL:
3      Q.    -- for that assay?
4           MR. THOMPSON: Misstates the
5      record.
6           THE WITNESS: I was not -- there
7      was not, to my knowledge, a seroprotective
8      level. So -- for mumps. It so it
9      couldn't be used -- since one did not
10     exist, it couldn't be used to set the
11     serostatus cutoff.
12 BY MR. SCHNELL:
13     Q.    So if the purpose of the
14 serostatus cutoff was irrelevant to
15 seroprotection, what was the purpose in terms
16 of your work in setting it?
17          MR. THOMPSON: Objection to the
18     form.
19          THE WITNESS: What was the
20     purpose in setting it? The purpose of
21     the serostatus cutoff was to do a good
22     job in classifying likely negative
23     samples as negative and likely positive
24     samples as positive.
25 BY MR. SCHNELL:

Page 69

1      Q.    And when you say "likely
2 negative samples" and "likely positive
3 samples," what do you mean by "likely
4 negative" and "likely positive"?
5      A.    It's difficult -- it depends on
6 the vaccine that you're studying, the virus
7 that you're studying. A good example I could
8 give might be for HPV infection. And there
9 likely negatives -- they study young girls who
10 had no prior sexual experience. So we could
11 study a likely negative group. Did not --
12 they were likely never exposed to the virus.
13 And the likely positive group may have
14 subjects who had many sexual partners and
15 there was PCR evidence that they were infected
16 by the disease. So in some cases you do have
17 a likely negative and a likely positive group
18 that you can study. For HPV, like I said,
19 that's a good example.
20          For the mumps, the likely
21 negative group would be subjects, pediatric
22 subjects who never received the vaccine. And
23 the likely positives would be subjects that
24 received the vaccine.
25     Q.    And so in setting the serostatus

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 70

1  cutoff, was it your attempt to pick the point
2  at which the most -- or really the dividing
3  line where the highest percentage of samples
4  below would be negative and the highest
5  samples, highest percentage of samples above
6  would be positive?
7      MR. THOMPSON:  Objection to
8  form.
9      THE WITNESS:  That's not
10     possible.  You can't have the highest
11     for both.  So it's a balance between
12     the two.
13 BY MR. SCHNELL:
14     Q.    So this gets --
15     A.    I can have 100 percent in zero,
16 or zero and 100 percent.  Those would be the
17 highest for each.
18     Q.    So what -- I'm sorry.
19     A.    So it's a balance between the
20 two.
21     Q.    And the balance that you're
22 looking for is what exactly?
23     A.    I think we can do -- we do, too,
24 typically is report alternative levels I think
25 probably more so now, but give a range of

Page 71

1  responses and involve the other groups as far
2  as what is the level to move forward with.
3      Q.    When you say "a range of
4  responses," what do you mean?
5      A.    Alternative serostatus cutoffs.
6  So you could look at -- in this case we talked
7  about the wild type ELISA, we went with 10.
8  We can look at 5, 6, 7, 8, 9, 10, 11, 12, 20,
9  40.  So you would say, well, you could choose
10 different cutoffs and see what proportion of
11 the negatives -- using that cutoff, what
12 proportion of the expected negatives are
13 negative, what proportion of the expected
14 positives are positive, and evaluate across a
15 range of cutoffs.
16     Q.    Is that what you did for the
17 wild type mumps ELISA exercise in choosing the
18 serostatus cutoff?
19     A.    If it's not in the report, then
20 probably -- we may have looked at it, but I
21 don't recollect in that case.  We probably --
22 we're talking about the wild type ELISA?
23     Q.    Yes.
24     A.    We probably evaluated 5, 10, 20,
25 and in that range, and settled on 10.

Page 72

1      Q.    Now, you also, before the break,
2  mentioned precision and specificity as
3  weighing into the process, of your process in
4  selecting the serostatus cutoff for the wild
5  type mumps ELISA assay.  Do you recall --
6      MR. THOMPSON:  Objection to the
7  form.
8      THE WITNESS:  The assay
9  variability --
10     MR. THOMPSON:  There's no
11     question yet.
12     THE WITNESS:  I'm sorry.
13 BY MR. SCHNELL:
14     Q.    Do you recall that?
15     A.    You're saying precision and
16 specificity?
17     Q.    Yes.
18     A.    I don't recall saying that in
19 the prior hour.
20     Q.    So do precision and -- first of
21 all, let's look at you have some of these in
22 this document that are defined.  Looking at
23 "Precision," it says in this document it's a
24 quantitative measure of the random variation
25 between repeated measurements from multiple

Page 73

1  sampling including Inter-Assay Variability and
2  intra-assay variability.  Is that an accurate
3  definition of precision in terms of how you
4  used it in the work you did on the mumps wild
5  type ELISA assay?
6      A.    Yes.
7      Q.    Is that a standard definition of
8  precision as it's used generally in the
9  correlation studies that you conducted while
10 at Merck?
11     A.    In the validation studies?
12     Q.    Well, I asked correlation, but
13 you can answer it for validation.
14     A.    For validation studies, yes.
15     Q.    What about for correlation
16 studies?
17     A.    Correlation studies, I mean, we
18 may have as -- correlation we're just
19 comparing the two assays, but we may evaluate
20 as part of that, have each lab or each assay
21 test the samples multiple times and evaluate
22 precision as part of the correlation study.
23     Q.    Do you recall doing that as part
24 of the wild type mumps ELISA and AIGENT assay
25 correlation?

19 (Pages 70 - 73)

Appx5799

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 74

1    A.    I do not recall doing that as
2  part of that correlation assessment.
3    Q.    So precision generally speaking,
4  how would you describe it in more lay terms
5  than it's defined here, if you can?
6    A.    You are -- for an assay, any
7  time you test a sample, you would never get
8  the exact -- you wouldn't get the exact same
9  result typically.  There is variability in the
10  assay.  So to evaluate that, we'll test the
11  same sample multiple times within a run and
12  multiple times across runs.  So you get kind
13  of between run variability and within run
14  variability and you estimate that.
15    Q.    And precision is measured by a
16  percentage.  Correct?
17    A.    Yes.
18    Q.    And is it -- they call it an RSD
19  percentage generally?
20    A.    Relative standard deviation.
21    Q.    Am I correct that perversely, at
22  least from my standpoint, a lower
23  percentage -- a lower precision percentage
24  means a higher precision?
25    A.    Correct.

Page 75

1    Q.    And when you're doing the
2  validation or when you did the validation for
3  the mumps wild type ELISA, was there a
4  particular precision percentage that you were
5  looking to meet?
6    A.    For an ELISA, I believe the
7  typical expectation now is around less than
8  25 percent for an ELISA-based assay.
9    Q.    And if the precision is above
10  that percentage, what does it say, if
11  anything, about the reliability of the assay?
12    A.    It's all to degrees.  I mean, if
13  it's 24 percent, you know, it's not that
14  different than 26 percent.  But the target is
15  generally less than 25 percent.  It's, I
16  think, maybe standard expectation for an ELISA
17  if it's being performed properly.  If it's
18  much higher than that, it could mean that
19  there's more variability in your assay than
20  what is typically seen.
21    Q.    And have you been involved in
22  validations while at Merck where the precision
23  you calculated was higher than 25 percent?
24    A.    Yes.
25    Q.    And in those instances, did

Page 76

1  Merck go forward with that clinical trial
2  anyway?
3    A.    Well, I mean, different classes
4  of assays have different expected precisions.
5  For something like the neutralization assay,
6  50 percent, 60 percent is expected, or not
7  unexpected.  So an assay like that would have
8  much higher expected variability for an ELISA,
9  less than 25 percent for other types of assays
10  where they're measuring product and that sort
11  of thing.  I don't work with the HPLC assays
12  but other types of chemical assays, much lower
13  than that.
14    Q.    So the expectation for a
15  neutralization assay for precision is roughly
16  less than 60 percent, is that -- is that --
17    A.    As far as an expectation for a
18  neutralization assay, yes, that's what I'll
19  typically use in evaluating.
20    Q.    And for an ELISA you'll use?
21    A.    Less than 25 percent.
22    Q.    So why is the expected
23  variability of a neutralization assay so much
24  higher than the expected variability for an
25  ELISA assay?

Page 77

1    A.    A neutralization assay is a more
2  difficult assay to run.  My understanding is
3  that for an ELISA, I mean, you're just coating
4  the well with antigen basically and adding the
5  serum and seeing if the antibody in the serum
6  binds.  And then doing a wash and a detection.
7  There are several wash steps involved.  But
8  it's basically antigen coated to the well and
9  serum, and does the antibody in the serum
10  bind.  So it's a simple -- a simpler assay to
11  run.
12        The neutralization assay
13  involves, it involves live cells, again, this
14  is my understanding, but the neutralization of
15  an assay involves live cells that you need to
16  have healthy and feed and then you're
17  infecting those cells with virus.  So there is
18  this whole biology going on there.  So what
19  you're -- how healthy your cells are, how your
20  cells are, the virus that you're infecting
21  them with is another variable because that's
22  not constant.  And then you're introducing
23  serum and how that serum and that antibody
24  interplays with all those things, makes it a
25  much more complicated assay and a difficult

20 (Pages 74 - 77)

Appx5800

Page 78

1 assay to run.
2     Q.  Are there any other factors that
3 are present in a neutralization assay that are
4 not present in an ELISA assay that contributes
5 to the relatively higher expected variability
6 in a neutralization assay?
7     A.  I'm not the expert on that. I
8 think you would have to ask people who work in
9 the lab.
10     Q.  But any others that you're aware
11 of other than the ones you mentioned?
12     A.  No.
13     Q.  Now, specificity is also listed
14 here as "the ability of the test
15 method to measure accurately a specific
16 antibody...."
17     Do you see that?
18     A.  Uh-huh.
19     Q.  Is that an accurate definition
20 of specificity as it relates to the validation
21 work that you did -- you've done at Merck?
22     MR. THOMPSON: Objection to
23     form.
24     THE WITNESS: I mean, just as a
25     general statement, it's just a general

Page 79

1     description.
2 BY MR. SCHNELL:
3     Q.  So how would you define
4 precision in connection with the validation
5 work you did on the mumps wild type ELISA?
6     MR. THOMPSON: Precision or
7     specificity?
8     MR. SCHNELL: I'm sorry. Thank
9     you.
10 BY MR. SCHNELL:
11     Q.  Specificity.
12     A.  I would like to see the report
13 and see how we evaluated it in that report.
14     Q.  Do you recall like with the
15 expected precision rates, are there expected
16 specificity rates for ELISA tests versus
17 neutralization tests?
18     A.  Not that I'm aware of.
19     Q.  So why are there expected rates
20 for precision but not for specificity?
21     MR. THOMPSON: Objection to
22     form.
23     THE WITNESS: We have a lot of
24     experience -- I mean, experience with
25     the different, with the ELISA with

Page 80

1 precision. Specificity depends what
2 you're competing with. Going into the
3 experiment there are probably
4 expectations.
5 BY MR. SCHNELL:
6     Q.  But you don't recall what your
7 expectations were with respect to the
8 validation work you did on the mumps wild type
9 ELISA?
10     A.  No, I'd have -- no, I do not.
11     Q.  Was about with the work you did
12 on the validation of the AIGENT assay?
13     A.  I do not.
14     Q.  Okay. That's all I have for
15 this one.
16     - - -
17     (Exhibit Antonello-2, 12/4/00
18     Validation of Mumps 'Wild Type' IgG
19     ELISA, 00761129 - 00761152, was marked
20     for identification.)
21     - - -
22 BY MR. SCHNELL:
23     Q.  I'd like to mark as Antonello
24 Exhibit 2 a document titled: "Validation of
25 Mumps 'Wild Type' IgG ELISA," dated

Page 81

1 December 4, 2000, from R. Wolchko, the last
2 name W-O-L-C-H-K-O, and Dr. Antonello. The
3 Bates range is 761129 through 152. I don't
4 suggest you read the whole thing. I think I
5 should ask some questions, because I'm only
6 asking on some very targeted, but obviously to
7 the extent you need to review whatever you
8 need to answer the question I'd like you to.
9 But do you recognize this document?
10     A.  Yes.
11     Q.  What is this document?
12     A.  It's -- we refer to it as a
13 validation report. It's documenting the
14 results of the validation testing for the
15 mumps wild type IgG ELISA.
16     Q.  And this was prepared by you and
17 Dr. Wolchko?
18     A.  Wolchko, yes.
19     Q.  Wolchko. And on the first page
20 is the summary of your validation results. Is
21 that correct?
22     A.  Yes.
23     Q.  Do you recall how large a
24 sampling of samples you used to write this
25 report?

21 (Pages 78 - 81)

Appx5801

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 82

1     A.   It would be in the report.  So
2  whatever it says in the report.
3     Q.   Where would -- if you can help
4  me find it.  I see it talks about assay runs.
5  Does that give you a sense of how many
6  samples?
7     A.   No.  Look at the "Precision"
8  section, would indicate how many samples.
9  Precision, 1135.  Well, actually it's
10  mentioned in "...Ruggedness to Operator," in
11  that section on page 1134, for Precision looks
12  like we used "6 'low,' 6 'medium,' 6 'high'."
13     Q.   So you used a different number
14  of samples for each metric?
15     A.   For the Precision and
16  Ruggedness, that's -- we used looks like those
17  18 samples.  For Serostatus Cutoff it looks
18  like we used 72 samples.
19     Q.   Who determined how many
20  samples -- strike that.
21          Was it you and Dr. Wolchko who
22  determined how many samples would be part of
23  your validation report?
24     A.   In conjunction with the lab.
25     Q.   Did you do any kind of

Page 83

1  statistical power analysis beforehand so you
2  knew exactly how many samples you felt
3  comfortable reporting on?
4     A.   Probably not a power analysis.
5  But at the end of the study, we provide
6  confidence interval estimates probably.  I
7  don't know for this.  But probably not a
8  formal power analysis going into it, just more
9  based on experience.
10     Q.   And then for serostatus cutoff,
11  it says the data support the proposed
12  serostatus cutoff of 10 Ab units.  That was --
13  that was your finding from one of your
14  findings from this validation report.
15  Correct?
16     A.   Correct.  And probably made in
17  conjunction with the lab, yes.
18     Q.   And it says proposed serostatus
19  cutoff.  Who proposed the serostatus cutoff of
20  10 Ab?
21     A.   It's what we did.
22     Q.   So it wasn't that someone gave
23  you 10 Ab to look at and then you reported
24  back that you think this is a proper
25  serostatus cutoff.  You were tasked with just

Page 84

1  finding whatever serostatus cutoff you thought
2  was appropriate?
3     A.   Yes.
4     Q.   So if we go to that section
5  which is on page 6 of your report, or the
6  Bates ending 134, I see in Table 5, I see 10
7  Ab units and I see 5 Ab units.  Other than 10
8  and 5 Ab, did you consider any other potential
9  serostatus cutoff?
10     A.   We may have looked at other
11  potential cutoffs, but this does speak to the
12  comment that I made before for as far as
13  evaluating alternative cutoff.  So here it is
14  10 and 5.
15     Q.   Other than 10 and 5, do you
16  recall any other potential serostatus cutoff?
17     A.   I do not recall.
18     Q.   Going back to the first page,
19  you have a percentage cutoff of 18.9 for
20  intra-assay precision and 25.3 for inter-assay
21  precision.  Do you see that?
22     A.   Yes.
23     Q.   Is that typically how precision
24  is reported in two distinct methods?
25          MR. THOMPSON:  Objection to the

Page 85

1     form.
2          THE WITNESS:  Yeah, the
3     inter-assay precision probably includes
4     intra.  It's probably like a total
5     assay precision.  But, yeah, it will
6     typically report as within assay or
7     between assay or intra and inter, yes.
8  BY MR. SCHNELL:
9     Q.   So your measure here fell just
10  over the expected 25 percent that you want to
11  see with ELISA test.  Is that right?
12     A.   Yes.  And that expectation, the
13  25 percent is, I think, more now with
14  experience with ELISAs, the expectation,
15  today's expectation, yes.
16     Q.   What was the expectation at the
17  time you prepared this report in December 2000?
18     A.   Probably at that time I may not
19  have had expectations or enough experience to
20  make those sorts of statements.
21     Q.   And then under "Specificity,"
22  you wrote, "Evaluating DOD responses from the
23  four MMRV antisera individually supports a
24  specific response to mumps."
25     A.   Uh-huh.

22 (Pages 82 - 85)

**Appx5802**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 86

1  Q.   The presence of measles,
2  rubella, or varicella antisera in addition to
3  the mumps antisera had little effect on DOD
4  response to mumps.
5       So what does that all mean as it
6  relates to what you were looking for or
7  measuring -- I'm sorry, what you were
8  measuring for specificity?
9  A.   Right. So I just want to turn
10 to the specificity section.
11 Q.   That's on page 10 of the report,
12 Bates number 138.
13 A.   What page Bates number?
14 Q.   138.
15 A.   So it looks like for this study
16 we evaluated specificity. We took
17 samples that were positive for just measles,
18 rubella, and varicella that may be received
19 only those -- the subjects only received those
20 vaccines, not -- did not receive
21 mumps-containing vaccines, and showed that
22 they tested negative in the assay, but when
23 you added mumps, mumps antibody that -- to
24 those samples came up positive. So for this
25 particular study and how it was run, evaluated

Page 87

1  specificity, the expectation was obtained that
2  measles, rubella, and varicella gave you looks
3  like a negative result. Mumps gave you a
4  positive. And that when you added the mumps
5  to those samples, mumps antibody, you got a
6  positive result.
7  Q.   And is -- am I correct that the
8  specificity measurement is attempting to
9  identify how much of the antibody activity is
10 mumps specific versus specific to some
11 non-mumps virus?
12 A.   Yes.
13 Q.   Did you record a percentage for
14 the specificity that you found here?
15 A.   No.
16 Q.   Is specificity typically
17 measured as a percentage?
18     MR. THOMPSON: Objection to
19     form.
20     THE WITNESS: The way it was
21     evaluated here could be evaluated
22     differently for alternative assays. It
23     can be expressed as a percent reduction
24     in response. I think most typically
25     that's how it's expressed.

Page 88

1  BY MR. SCHNELL:
2  Q.   When it's expressed in that way,
3  what does it mean? Let's say you have a 20 --
4  an 80 percent specificity, what does that mean
5  when you're measuring it in the way you just
6  testified?
7  A.   Right. That if you competed a
8  sample, let's say, a mumps sample positive for
9  mumps, if you competed it with the mumps
10 antigen, competed the sample with mumps
11 antigen and tested it in the assay, you'd get
12 an 80 percent reduction in the measured
13 response. So if that sample, without any
14 competition, had a titer or concentration of
15 100, you competed with a certain concentration
16 of the mumps antigen, now you test it in the
17 assay and instead of getting 100, you get 20.
18 Say, oh, there's an 80 percent reduction in
19 response.
20 Q.   So that would mean that
21 80 percent of the antibodies are targeting
22 mumps and 20 percent are not?
23 A.   No, it's just that you can -- in
24 that example I gave -- there are different
25 ways to evaluate it, but in that example I

Page 89

1  gave, that the -- that your -- the mumps
2  antigen can compete out the mumps antibody
3  response. And you could compete it with other
4  things. I mean, you might compete it with
5  measles antigen and then test it in the assay
6  and see if that causes a reduction in response
7  or not.
8  Q.   And in this exercise that we're
9  looking at, you competed it against measles,
10 rubella, and varicella. Is that right?
11 A.   Actually it doesn't look like
12 this was a competition type of an experiment.
13 This actually looks like -- let's see, we
14 actually have samples. This is not something
15 that you typically have where you have a
16 sample that only received the one antigen, so
17 it's a -- typically a different way to
18 evaluate it. Usually you're not -- don't have
19 this sort of situation.
20     So in this case, we're not
21 competing. We're just running samples that
22 only receive the measles vaccine and see how
23 that responds in the assay. You know,
24 apparently they didn't get the mumps vaccine.
25 So the expectation is that the response would

23 (Pages 86 - 89)

Appx5803

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 90

1 be negative and you get a negative result.
2 Same with rubella, they only got rubella
3 vaccine and they didn't get a mumps vaccine
4 and varicella. So it's a different way than
5 what we typically evaluate because usually
6 we're not -- don't have these types of
7 samples.
8     Q.    And doing this measurement gave
9 you the confidence that this validation was
10 sufficiently specific to measuring mumps
11 antibodies?
12     A.    It was one way to evaluate it
13 and -- that the results supported, supported
14 moving forward with the assay, the specificity
15 of the assay.
16     Q.    If you could turn back to page 6
17 of the report under "Serostatus Cutoff," Bates
18 number ending 134.
19     A.    Uh-huh.
20     Q.    So, again, your goal with
21 respect to this particular validation was to
22 do what with respect to measuring a serostatus
23 cutoff?
24     A.    The serostatus cutoff? Pick a
25 level that discriminates well between likely

Page 91

1 negatives and likely positives.
2     Q.    And from this report you did an
3 experiment with 5 Ab and with 10 Ab. And
4 that's what we wrote the results of here.
5 Correct?
6     A.    No. We evaluated using 10 Ab as
7 a cutoff and 5 Ab as a cutoff. That's what
8 this is saying. We evaluated both of those
9 cutoffs and chose to move forward or proposed
10 10.
11     Q.    And you don't recall if you
12 looked at 15 or 20 or any other one. Right?
13     A.    I don't recall. We likely did,
14 but I do not recall.
15     Q.    Because -- you say you likely
16 did. Why?
17     A.    I mean, if 10 was -- I think
18 we'd consider the spectrum, and, you know, if
19 10 was a horrible choice or 5 was a horrible
20 choice, we would have looked to 20 or 40 or
21 something like that.
22     Q.    And you tested -- well, you took
23 a panel of 72 negative samples. Correct?
24     A.    Yes.
25     Q.    And negative is in quotes. Why

Page 92

1 is that?
2     A.    I think that they're -- probably
3 because it's expected negative. We don't know
4 that a sample is a true negative. Also
5 samples, this pediatric age, I don't know,
6 they could have maternal antibodies. So
7 they're expected negative, but we don't truly
8 know that they're negative.
9     Q.    Do you know where these samples
10 came from?
11     A.    No.
12     Q.    And of these 72, 6 were excluded
13 as extra variable. Correct?
14     A.    I just want to see where it says
15 that. Yes, it says that.
16     Q.    The remaining 66, 56 were
17 pre-vaccination samples and 10 were
18 post-vaccination samples. Right?
19     A.    Yeah. I think two, the negative
20 may have been based on tests as determined in
21 the non-wild type ELISA. So I'm sorry. In
22 the paragraph it says, Twelve samples were
23 post-vaccinated negatives as determined in the
24 non-wild type EIA, and the remaining were
25 pre-vaccination samples.

Page 93

1     So the negative two, even though
2 they received vaccine, they were -- they
3 tested negative in the legacy assay. So I
4 think that's also why there are quotes around
5 it.
6     Q.    And what you did here, if I'm
7 reading this right, is that you did a
8 comparison of the serostatus assignments using
9 both 10 and 5 Ab units?
10     A.    Correct.
11     Q.    And what was the goal in doing
12 that comparison?
13     A.    To see how the samples fell out
14 relative to those cutoffs, how they were
15 classified relative to those cutoffs.
16     Q.    For 5 Ab, you found that there
17 was -- and, again, you took these samples and
18 ran them through the wild type mumps ELISA?
19     A.    Correct.
20     Q.    You wanted to see if the results
21 came out negative?
22     A.    Uh-huh, relative to this --
23 these choices for cutoffs.
24     Q.    So would you consider this a
25 correlation study that you did?

24 (Pages 90 - 93)

Page 94

1    A.    No, I wouldn't consider it a
2  correlation.  I think we're just evaluating
3  alternative cutoffs.
4    Q.    And the goal, was the goal to
5  pick the cutoff that gave you the highest
6  confidence that the wild type mumps ELISA was
7  finding negative -- was finding the highest
8  percentage of negative samples -- I'm sorry.
9    A.    I wouldn't say highest
10  percentage.  Again, it's a balance, but you
11  want it -- to classify a negative sample, a
12  likely negative as negative, a high proportion
13  of them, and a likely positive as positive.
14    Q.    So with the 5 Ab with the
15  pre-vaccination samples, running those samples
16  through the wild type ELISA you found 53 were
17  indeed negative, but three came out positive.
18  Is that correct?
19    A.    Yes.
20    Q.    And so that was a 5.3 percent
21  rate of discordance?  Is that what you found,
22  or whatever term you would use?
23    A.    Right.  Yeah.  I'd say that
24  probably, I don't know if it's 5.3, it looks
25  like 3 out of 56.  Maybe that is 5.3 percent.

Page 95

1    Q.    Yeah, you say it in the last
2  sentence.
3    A.    Okay.  Yep.  Okay.  So I'd say
4  that 5.3 percent of those samples tested
5  positive if you were to use a cutoff of 5 Ab
6  units.
7    Q.    And then for the same test using
8  10 Ab, you found that all 56 were negative?
9    A.    Correct.
10    Q.    And based on that comparison,
11  you concluded that a serostatus cutoff of 10
12  Ab units is recommended?
13    A.    Yes.
14    Q.    In your analysis, though, you
15  don't talk about the post-vaccination samples.
16  Why is that?
17    A.    The post-vaccination samples
18  that there -- I mean, there's the one sample
19  difference.  Post-vaccination, 8 of them
20  tested negative, two positive.  The results
21  are in the table.  So in this case, I mean,
22  before 10 of -- probably all 10 of them
23  historically tested negative in the EIA.  Now
24  8 out of the 10 are testing negative.  I think
25  there isn't much to say about it.  And it's in

Page 96

1  the table.
2    Q.    I guess my question is, if 5.3
3  percent was too high for you to be comfortable
4  with 5 Ab, why would 20 percent, 2 out of 10
5  differing with 10 Ab on the post-vaccination
6  side, why would you be comfortable with that
7  if you're trying to find the most accurate
8  serostatus cutoff?
9    A.    I think in this case you know
10  that they had received vaccine and they
11  were -- to get a positive result on someone
12  who received the vaccine is not unexpected.
13  So to get 20 percent of those, even though
14  they tested negative in the legacy assay to be
15  positive is -- it's not a negative result or a
16  bad result or -- and probably, too, if you
17  take those 10 samples and were to test them
18  again in the legacy assay, they may not all
19  test negative if you tested them a second
20  time.  A couple of them may come up positive.
21    Q.    You didn't test them a second
22  time, though, for this analysis?
23    A.    No.  It's probably compared to
24  historical -- let's see, unless it says, I'm
25  assuming a negative is determined in a

Page 97

1  non-wild type EIA.  It's probably a historical
2  result.
3    Q.    But are you saying that the
4  post-vaccination samples that you looked at
5  here weren't really relevant for your
6  analysis?
7    A.    The post-vaccination samples in
8  this case are relevant to the analysis.
9  Because we know that they received vaccine.
10  Just originally in the EIA, even though they
11  received vaccine, they tested negative and we
12  tested them here, 2 out of the 10 came up
13  positive.  That's not that unexpected a
14  result.  So it's not -- it's not -- it's
15  interesting, but it -- we could have had 10-0
16  or 9-1 or 8 -- or 7-3.  It's not that critical
17  to the interpretation.
18    Q.    Doesn't it suggest that 10 Ab is
19  too low?
20    A.    No, not at all.
21    Q.    Well, if a higher serostatus
22  cutoff would have made the post-vaccination
23  samples be 10 out of 10 negative as you were
24  expecting --
25    A.    Right.

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 98

1    Q.   -- wouldn't that show that
2  that's a more reliable serostatus cutoff, at
3  least for the exercise you were performing
4  here?
5    A.   Yeah.
6        MR. THOMPSON:  Objection.
7        THE WITNESS:  We made
8      modifications to the wild type ELISA,
9      things to try to improve it over the
10     legacy ELISA.  So it's not an
11     unexpected result, not a negative
12     result.  Not -- 10-0 wouldn't have been
13     necessarily a better result or a worse
14     result.  It's just a comparison.  And
15     this is the result of the comparison.
16 BY MR. SCHNELL:
17   Q.   So is 56 out of 56 a better
18 result than 53 out of 56?
19   A.   Yes.
20       MR. THOMPSON:  Objection to
21     form.
22 BY MR. SCHNELL:
23   Q.   Is 8 out of 10 a better result
24 than 7 out of 10?
25       MR. THOMPSON:  Same objection.

Page 99

1        THE WITNESS:  In that case, no,
2      it's not -- I don't view it as a better
3      result for the post-vaccination
4      samples.
5  BY MR. SCHNELL:
6    Q.   So, again, you're putting more
7  weight, then, in your pre-vaccination
8  measurement than in your post-vaccination
9  measurement.  Is that correct?
10   A.   For this evaluation, yes.
11   Q.   Why did you even consider
12 post-vaccination samples at all?
13   A.   I guess it gains -- it provides
14 some additional information.  It also provides
15 some information relative to the legacy assay.
16 And I know we did a formal comparison between
17 the two assays.  And that was done in a lot
18 greater detail.
19   Q.   Now, if you flip to
20 Attachment 5, which is page 21 of the report
21 with the Bates number ending 149, you actually
22 have written out here the estimated titer
23 findings from your calculation?
24   A.   I'm sorry, what page?
25   Q.   Bates number ending 149.

Page 100

1    A.   Okay.
2    Q.   And if you look at the
3  attachment, you've actually highlighted the 2,
4  4, 6, 8, the 10, the post samples versus the
5  pre.  Some of the pres are highlighted, too.
6  But if you look at -- if you look at the third
7  sample and the eighth sample, those are the
8  two that were identified in your table under
9  10 Ab units of being positive.  Correct?
10   A.   Uh-huh.
11       MR. THOMPSON:  You have to say
12     yes or no.
13       THE WITNESS:  Yes.
14 BY MR. SCHNELL:
15   Q.   So if you had done this
16 comparison with a serostatus cutoff of 25 Ab
17 instead of 10 Ab, then this post table would
18 have gone from 8-2 to 10-0?
19   A.   Correct.
20       MR. THOMPSON:  Object to the
21     form.
22 BY MR. SCHNELL:
23   Q.   But that, to you, doesn't
24 suggest to you that 25 Ab for the purposes of
25 this experiment would have been a more

Page 101

1  appropriate serostatus cutoff?
2    A.   It does not, because the
3  subjects received vaccine, and the fact that
4  you get a positive result on a subject who
5  received vaccine is not atypical or
6  unexpected.
7    Q.   So you had more confidence,
8  then, that the pre-vaccination samples were
9  truly negative than the post-vaccination
10 samples?
11   A.   Yes.
12   Q.   So what kind -- does that weigh
13 into this analysis in any way?
14       MR. THOMPSON:  Objection to
15     form.
16       THE WITNESS:  It always into the
17     selection of 10 as the cutoff to move
18     forward with.
19 BY MR. SCHNELL:
20   Q.   Do you think 10 is a better
21 cutoff than 25, based on this calculation that
22 you did here?
23   A.   Yes, I do.  Because there is
24 competing priorities.  There is the
25 specificity, not classifying a negative as

26 (Pages 98 - 101)

Appx5806

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 102

1 positive, but there is also sensitivity which
2 is classifying a positive, true positive as
3 positive.
4     Q.    So how -- I'm sorry.
5     A.    Yeah.  So you can, I mean,
6 make -- raise the cutoff to 1,000, but you'll
7 do a bad job on the sensitivity.  Might do a
8 better job for specificity.
9     Q.    So how did you balance that all
10 out here?
11    A.    You know, what we do is we
12 provide the results and say here are the
13 results and this seems like a reasonable thing
14 to move forward with.  And these reports get
15 reviewed by the scientists and will be
16 discussed with clinical and there will be a
17 consensus on what to move forward with.  So
18 it's based on the data that's generated and
19 the input of several groups.  We don't set it
20 in isolation.
21    Q.    Did you do any kind of
22 statistical power analysis on this exercise
23 to give you confidence that you had enough
24 samples to make this a reliable calculation?
25    A.    No.  We probably used what was

Page 103

1 available to us at the time, all the samples
2 that were available at the time.
3     Q.    Did you do any kind of
4 confidence interval to measure any kind of
5 variability in the samples that were provided?
6     A.    We assessed the variability
7 precision of the samples.  That typically
8 doesn't have a confidence interval, but we
9 evaluated the precision of the assay in the
10 validation study.  We looked at other aspects,
11 maybe put some confidence intervals on other
12 aspects like the ruggedness to operate, I see
13 that has it.  And dilutability has it.
14    Q.    I'm talking, though, about the
15 panel of 72 negative samples that were tested,
16 that was different from the samples that were
17 used for some of these other metrics.  Right?
18    A.    Right.  We can put a confidence
19 interval on the 0 percent and a confidence
20 interval on, you know, the 5.3 percent.  It
21 doesn't change anything.
22    Q.    Why doesn't it change anything?
23    A.    Because these are the results.
24 I mean --
25    Q.    Did you ever consider measuring --

Page 104

1 or in your calculation of the serostatus
2 cutoff here, did you ever consider a split
3 cutoff?  Do you know what a split cutoff is?
4     A.    No.
5     Q.    Where you have a lower cutoff
6 and a higher cutoff, a lower cutoff being the
7 cutoff for negatives and the higher cutoff
8 being the cutoff for positives?
9     A.    I've never heard of a split
10 cutoff.
11    Q.    Did you in this exercise test
12 any samples of expected positives?
13    A.    In this exercise it does --
14 well, I mean, the precision samples would be
15 probably a set of expected positives.
16    Q.    For the serostatus cutoff?
17    A.    For the serostatus cutoff, it
18 does not appear that we included a set of
19 expected positives.
20    Q.    And wouldn't that have made the
21 measure more reliable in the sense that you
22 were trying to balance the competing objectives
23 of finding the proper serostatus cutoff?
24    A.    We could have included those.  I
25 guess we had a history, too, with the assay.

Page 105

1 We also did a very formal comparison between
2 the two.  So we knew how the positives -- we
3 had a good idea that -- how the positives
4 would respond in the assay.
5     Q.    What kind of comparison are you
6 talking about?
7     A.    There was a comparison between
8 the legacy wild type and the -- I mean the
9 legacy mumps ELISA and the wild type ELISA.
10 It was a formal comparison between the two
11 where samples were tested in both and we
12 compared the results.
13    Q.    How would that have assisted you
14 in determining the serostatus cutoff?
15    A.    I think you had asked me, we
16 didn't include those positive samples here in
17 this study.  And my answer was that we already
18 have experience with the assay.  We've been
19 running the EIA, we knew how it compared with
20 the wild type.  So we already had information
21 on how post-vaccination samples performed in
22 the assay.  So it wasn't necessary.  It wasn't
23 value -- it would not be value added.
24    Q.    So doing the same kind of
25 exercise with 66 samples that you expected to

27 (Pages 102 - 105)

Appx5807

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 106

1 be positive and seeing how the comparison was
2 between various serostatus cutoffs would have
3 provided no additional value in terms of
4 selecting the proper serostatus cutoff?
5 A. If we had another set of --
6 you're saying if we had used positive samples,
7 an additional set of positive samples?
8 Q. Yes.
9 A. I mean, it could have been done.
10 It would have been more information, not a bad
11 thing. But, again, we had history with this
12 assay, was sent -- and we made some
13 modifications with the wild type, but we have
14 a good idea, you know, how these two assays
15 correspond. So we already had information on
16 how these post-vaccination samples you get
17 similar and you have to refer to that report,
18 but it provided similar responses. So we knew
19 what we were getting already in regards to the
20 post-vaccination samples. It's going to
21 respond like the old assay for the most part.
22 Q. But that's the same with the
23 pre-vaccination samples, too. Right?
24 A. The pre-vaccination samples, we
25 needed to include just to demonstrate that

Page 107

1 they're testing negative. Post-vaccination
2 samples, I guess that's more on us that
3 they're not included. I don't think -- and we
4 already know how they were going to respond.
5 So I think we were taking the risk in not
6 including them.
7 Q. What do you mean you were taking
8 the risk in not including them?
9 A. Let's say if all the
10 post-vaccination -- when we went with this
11 assay, all the post-vaccination samples test
12 negative in the assay, we would be stuck with
13 an assay where our post-vaccination samples
14 test negative because we didn't evaluate them
15 here. So in that sense we would be taking the
16 risk because we have approved an assay that
17 doesn't perform well for its intended use.
18 And my point was that we didn't include them
19 because we already knew. It's not like this
20 is a totally -- wasn't a totally different
21 assay than the legacy. We already knew that
22 you'd obtain similar responses for
23 post-vaccination samples.
24 Q. So you knew that if you had
25 taken 72 samples or some number of samples

Page 108

1 from the legacy ELISA that had tested
2 positive, you knew that they all tested
3 positive with above 10 Ab?
4 A. The cutoff in the legacy, and if
5 we have that report, it documents the
6 comparison between the two assays. So I would
7 defer to that report. But my recollection is
8 that the legacy assay actually used a lower
9 cutoff of two antibody units. This 10
10 antibody units is a higher cutoff.
11 The legacy assay also had -- as
12 far as a difference between the assays. So
13 we're using a higher cutoff in the wild type
14 ELISA than the legacy. And then the other
15 thing is that in the wild type ELISA, we're
16 using a higher dilution of the sample. We use
17 a greater dilution of the sample. In the
18 legacy assay it was 1 to 100 and in this assay
19 we dilute the samples 1 to 1,000.
20 Q. Didn't that difference make any
21 kind of comparison between the 2 Ab cutoff
22 there and the 10 Ab cutoff here, an apples to
23 oranges comparison?
24 A. Not apples to orange. In the
25 evaluation we did -- it's not -- using the

Page 109

1 different dilutions does make a difference in
2 the end result because the 1 to 100 dilution
3 causes some -- there's some matrix
4 interference associated with that. So it kind
5 of depressed the response. But when we did
6 that formal comparison, we looked at both the
7 1 to 100 dilution and we looked at 1 to 1,000
8 dilution in both assays or in the legacy
9 assay, the 1 to 1,000. And what we saw was we
10 had really good agreement at -- when the both
11 assays are run at 1 to 1,000. And where you
12 see some differences is where you have that
13 matrix interference at 1 to 100.
14 So there are two things, you
15 know, that different cutoffs, 2 versus 10, and
16 then also the different dilutions of the
17 serum.
18 Q. If we went back to the study
19 results and we randomly selected 66 samples
20 that in the legacy ELISA that had been
21 recorded as positive, and then we looked at
22 that result in the mumps wild type and we
23 found that of the 66, say three or four were
24 positive, let's say at -- actually say that
25 the majority of them weren't positive until 20

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 110

1  Ab. So of the 66, say 60 of the 66 were
2  positive only at 16 or 20. Would that weigh
3  into your calculation that maybe the 10 Ab was
4  too low?
5        MR. THOMPSON: Objection to
6  form. Calls for speculation.
7        THE WITNESS: I'm sorry, I got
8  lost in there.
9  BY MR. SCHNELL:
10      Q.   So if you had done the same
11  exercise you did here in this validation but
12  with samples that were likely positive, and
13  you found that the bulk of them had titers
14  significantly higher than 10 Ab, would that
15  weigh into --
16      A.   In --
17      Q.   -- in fact, the new assay or in
18  wild type assay, would that weigh into your
19  calculation of the serostatus cutoff?
20        MR. THOMPSON: Same objection.
21        THE WITNESS: Yeah. I don't
22  think we have to talk about
23  hypothetical. There is a report that
24  has all the data in it and a
25  comparison. You know, I think it would

Page 111

1  make most sense to refer to that report
2  and look at that report. Because it
3  details the, you know, everything as
4  far as the comparison between the
5  legacy and the wild type is there.
6  BY MR. SCHNELL:
7      Q.   But would that even be relevant
8  if you took samples and -- where the titers
9  were those positive samples?
10      A.   I'm sorry, I wasn't paying
11  attention to the question because I -- you
12  know, I know that there is a report that shows
13  the comparison, but your question is?
14      Q.   That would it have even been
15  relevant for you to look at a sampling of
16  positive -- not negative, you looked at
17  negative. But would it have been relevant to
18  your determination of a serostatus cutoff --
19        MR. THOMPSON: Objection to
20  form.
21  BY MR. SCHNELL:
22      Q.   -- to look at a sampling?
23      A.   Yeah.
24      Q.   Positive samples?
25      A.   We did do that in that

Page 112

1  comparison between the legacy and the wild
2  type. It was done, not here, but outside of
3  the validation study, a separate study, we
4  evaluated it. Yes, it's relevant to know
5  how -- since we made changes to the assay, how
6  it compared to the historical assay. Yes,
7  it's relevant.
8      Q.   But you didn't consider that for
9  this calculation that you did in this
10  validation report of the serostatus cutoff?
11        MR. THOMPSON: Objection. Asked
12  and answered.
13        THE WITNESS: It wasn't
14  considered here in this validation
15  report because we knew already the
16  outcome.
17  BY MR. SCHNELL:
18      Q.   The outcome that you already
19  knew was that 10 Ab was the proper cutoff?
20      A.   No, no. Just how the two assays
21  compared for post-vaccination samples.
22        MR. SCHNELL: That's all I have.
23        MR. THOMPSON: If we're shifting
24  to a new document, we've been going a
25  little over an hour.

Page 113

1        MR. SCHNELL: Sure.
2        MR. THOMPSON: Good time for a
3  break.
4        VIDEOGRAPHER: Off the record at
5  11:29. This will end disc number two.
6        - - -
7        (A recess was taken.)
8        - - -
9        VIDEOGRAPHER: Back on the
10  record at 11:51. Beginning of disc
11  number three.
12        - - -
13        (Exhibit Antonello-3, 2/27/01
14  validation of Anti-IgG Enhanced Mumps
15  Wild Type Plaque Reduction Neutralization
16  Assay, 00016988 - 00017023, was marked
17  for identification.)
18        - - -
19  BY MR. SCHNELL:
20      Q.   I'd like to mark as Antonello
21  Exhibit 3 a document dated February 27, 2001,
22  from Drs. Wolchko and Antonello titled:
23  "Validation of Anti-IgG Enhanced Mumps Wild
24  Type Plaque Reduction Neutralization Assay,"
25  Bates range 16988 through 17023.

29 (Pages 110 - 113)

Appx5809

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 114

1  Dr. Antonello, this is the
2 validation report you did for the AIGENT
3 assay. Is that correct?
4  A.  Yes, Robin and myself.
5  Q.  And if -- on the first and
6 second pages is the summary of your
7 conclusions. Is that correct?
8  A.  It's a summary, yes.
9  Q.  And here you found the 38.7
10 percent and 42.9 percent precision rate?
11  A.  Yes.
12  Q.  And that was under what you --
13 your expectation of what a good precision
14 rate, that was -- that met what you set or
15 what you had an expectation as for a good
16 precision rate for this kind of test. Is that
17 correct?
18  A.  Yeah. It was acceptable
19 variability.
20  Q.  Did you later find that the
21 variability was more than you estimated in
22 this validation report?
23  A.  I don't recollect that.
24  Q.  So as far as you recollect, the
25 AIGENT test had a precision rate that was

Page 115

1 satisfactory to you?
2  A.  In this validation study, the
3 results of this validation study, yes.
4  Q.  And it also had a specificity
5 that you were satisfied with as well?
6  A.  In retrospect, looking at the
7 specificity results in this study, they're
8 peculiar. And I think today I might push back
9 a little more on the lab given these results.
10  Q.  The results that were in the
11 validation report?
12  A.  Yes.
13  Q.  So at the time you found these
14 results, you were satisfied and did not
15 provide any pushback to the lab, but in
16 retrospect you're saying you would have?
17  A.  In retrospect now, yeah, I think
18 I would. At the time probably I didn't have
19 enough experience to know to push back on
20 that.
21  Q.  When did you join Merck?
22  A.  I joined in 1984.
23  Q.  So you had been at Merck, what
24 was that, 17 years at that point and you
25 didn't have enough experience?

Page 116

1  A.  16 years. I wasn't doing
2 clinical assay validations at that time.
3  Q.  So what is it about the
4 specificity of the AIGENT assay that you now
5 believe you should have pushed back on?
6  A.  Table 11, Table 12. For the --
7 in Table 11 is in pediatrics, Table 12 is in
8 adults. I think that the responses for the
9 medium control, that would be the expected
10 response without any competition. And then
11 the responses for the mumps is what you would
12 expect to see, that when you compete with
13 mumps antigen, that the titers in these
14 samples would drop considerably. I think the
15 things that I would not expect to see is that
16 the mock, measles, and rubella would also
17 reduce the titers relative to the medium.
18  Q.  In several of these samples, it
19 reduced it the exact same amount it reduced it
20 for mumps. Correct?
21  A.  No. I think -- well, if you
22 look at a particular instance, that may be the
23 case, but I think we had looked more closely
24 and the mumps had reduced it further on
25 average or overall than the mock, measles, or

Page 117

1 rubella.
2  Q.  Well, sample 513 and 526, for
3 example, doesn't that show that it's less than
4 32 for the mock, for mumps, for measles, and
5 rubella in both samples?
6  A.  Yes.
7  Q.  So what does that tell you about
8 the specificity in those samples?
9  A.  That the result for mock,
10 measles, and rubella are not expected.
11  Q.  So that would tell you that this
12 assay in those samples was no more specific
13 for mumps than it was for measles or rubella.
14 Correct?
15  A.  For those samples, yes. Now,
16 you could look, too, at the individual
17 responses at each dilution. You may see a
18 further reduction with mumps when you look at
19 the actual counts, but in terms of the titer,
20 there is no difference. And the mumps results
21 is what I would expect to see. The mock,
22 measles, and rubella are not what I would
23 expect to see.
24  Q.  What would you expect to see?
25  A.  Something closer to the medium

30 (Pages 114 - 117)

Appx5810

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 118

1 result.
2 Q. So something in the thousands?
3 A. For sample 516, something closer
4 to the medium result, in that case 4096. 514,
5 2048. And for 513, 512. 526, 256.
6 Q. So in none of those samples did
7 you find the specificity that you would
8 expect. Is that correct?
9 A. For the mumps antigen, yes. For
10 the mock, measles, and rubella, no.
11 Q. No meaning that you did not get
12 the result you would expect for an assay that
13 has good specificity?
14 A. Not the result that I would
15 expect. Now, why that's happening, I don't --
16 can't explain. There may be a biological
17 reason for what's going on, but it's not the
18 expected result.
19 Q. And is the same true with the
20 second experiment you did that's identified in
21 Table 12?
22 A. I didn't do the experiment, but
23 it's the same outcome, yes.
24 Q. And that outcome being that in
25 none of those samples did you get for your

Page 119

1 mock, measles, or rubella, what you would
2 expect if the assay were sufficiently specific
3 for mumps. Correct?
4 A. One exception being the DK
5 sample. Because it tested less than 32 with
6 the medium. But for the AS, the CM and MKY, I
7 would not have expected the reduction for
8 mock, measles, and rubella.
9 Q. So sitting here today, if this
10 were the validation report that you were
11 tasked to perform and these were the results
12 that you found, what would you -- what step
13 would you take in terms of your conclusion
14 in -- for the specificity of this assay?
15 MR. THOMPSON: Objection to
16 form.
17 THE WITNESS: Can you repeat the
18 question?
19 - - -
20 (The court reporter read the
21 pertinent part of the record.)
22 - - -
23 THE WITNESS: I think the
24 conclusion that is here, what is
25 written is accurate, it's an accurate

Page 120

1 description of the data. So for this
2 data, the conclusion wouldn't change,
3 but I think I may ask the lab to maybe
4 help explain the reason for it. And
5 it's interesting, measles and rubella
6 reduced but also did the mock. So I
7 don't understand why that would be the
8 case. So it's an unexpected result.
9 And just looking at it, I would ask the
10 lab to help me to understand it.
11 BY MR. SCHNELL:
12 Q. And what possible explanation
13 could there be, based on your experience, for
14 getting these kinds of results?
15 MR. THOMPSON: Objection to
16 form. Calls for speculation.
17 THE WITNESS: Yeah. It's a
18 neutralization assay, a complicated
19 assay involving the cells, the virus,
20 adding this, the serum. There may be
21 some interplay there that is going on
22 that I don't understand what's
23 happening.
24 BY MR. SCHNELL:
25 Q. What does this testing result

Page 121

1 tell you about the ability of this assay to
2 detect mumps neutralizing antibodies?
3 MR. THOMPSON: Objection to
4 form.
5 THE WITNESS: In this case, I
6 mean, we saw a big reduction with the
7 mumps antigen. So it is giving the
8 intended response for mumps.
9 BY MR. SCHNELL:
10 Q. Let me rephrase. With these
11 results, what do they tell you about the
12 ability of this assay to distinguish between
13 mumps neutralizing antibodies, measles
14 neutralizing antibodies and rubella
15 neutralizing antibodies?
16 A. Yeah. I'd say these results
17 don't show you that it can distinguish measles
18 and rubella. However, you also see the same
19 result for mock where there is no measles or
20 rubella antigen. So where there is no antigen
21 you're seeing the same result for mock. So if
22 it was specifically measles or rubella, you'd
23 see reductions there. But not in the mock.
24 So there's something going on here that's -- I
25 don't understand, because you also see it for

31 (Pages 118 - 121)

**Appx5811**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 122

1 the mock. So it's not demonstrating
2 conclusively that these -- that it's specific
3 for these, but it's more complicated than
4 that.
5     Q. What do these results tell you
6 about the ability of this assay to measure --
7 strike that.
8       What do these results tell you
9 about the ability of this assay to distinguish
10 between mumps neutralizing antibodies and
11 antibodies that neutralize anything else?
12     A. Right. Now, this is an
13 experiment and you're competing serum with
14 these antigens. And I don't know if this
15 means the assay, you know, if it's not
16 specific. I don't know what this experiment
17 means in relation to truth. So it's an
18 experiment to evaluate it. The fact that you
19 didn't get the intended result or the expected
20 result doesn't mean that if someone has
21 measles antibody, and not mumps, it's going to
22 reduce the -- you'll get a titer in the assay.
23     Q. Did the results of your
24 specificity experiments give you any
25 confidence that the AIGENT assay was able to

Page 123

1 reliably distinguish between mumps neutralizing
2 antibodies and non-mumps neutralizing
3 antibodies?
4     MR. THOMPSON: Objection to the
5     form.
6     THE WITNESS: Can you repeat the
7     question?
8         - - -
9     (The court reporter read the
10     pertinent part of the record.)
11         - - -
12     THE WITNESS: To a degree. I
13     mean, you had general further reduction
14     with the mumps. But in this -- from
15     this experiment, it's not -- it's not
16     strong evidence certainly that the
17     response, that there's no response to
18     measles or rubella. Again, it's just
19     an experiment. It doesn't necessarily
20     reflect that if someone actually had
21     measles antibody and not mumps, that
22     that would be a false signal in the
23     mumps assay, in the AIGENT assay.
24 BY MR. SCHNELL:
25     Q. Isn't the purpose of the

Page 124

1 validation report as it relates to specificity
2 to conclude with some level of confidence that
3 the assay is specific to the antigen that
4 you're attempting to measure?
5     A. Yes. And I think that looking
6 back, the results are not strong in that
7 regard. Now, too, these results were
8 submitted to the FDA, the validation was
9 submitted to the FDA. They viewed it as
10 acceptable and approved the assay. You know,
11 perhaps, you know, their understanding, I
12 don't know enough about the biology to say
13 that maybe there is an explanation for this,
14 for this result.
15     Q. Now, in your conclusion you
16 wrote there is a reduction in neutralization
17 titers with the measles and rubella antigens
18 that is similar to the reduction obtained with
19 the mock extract.
20     A. Uh-huh.
21     Q. What significance does that have
22 to those precision measurements, if any?
23     A. It's saying the reduction in
24 measles and rubella is similar to what you got
25 for the mock. That measles and rubella are

Page 125

1 behaving like the mock. I mean, you would not
2 expect the mock to be reduced. And you're
3 getting comparable results for measles and
4 rubella. So I don't think it means
5 necessarily that it's specific measles,
6 specific rubella. You're introducing these
7 other cells, these -- the vero cells. And,
8 again, that's causing something as well. Not
9 even other antigen. Just other cells.
10     Q. Didn't you conclude here that
11 there was specificity in the assay based on
12 your measurements?
13     A. It says that there's a reduction
14 in neutralization titers with measles, rubella
15 similar to that with the mock. Relative to
16 the other antigens tested, absorption with
17 mumps antigen resulted in further reduction
18 neutralization in half the samples tested,
19 indicating the specificity of the assay for
20 measuring mumps antibody.
21     So I'm reporting -- we're just
22 reporting the result, that there was a further
23 reduction in half of the sample. So it's just
24 reporting the result.
25     Q. So --

32 (Pages 122 - 125)

Appx5812

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 126

1    A.    I don't think there's a -- you
2  know, there's not a judgment.  It's just
3  reporting the result.
4    Q.    And the result that you're
5  referring to there is not sample 513.
6  Correct?
7    A.    Correct.
8    Q.    Not sample 526.  Correct?
9    A.    Correct.
10    Q.    Not sample MKY?
11    A.    Yes to sample 514, yes to sample
12  516 in the case of mock and measles.
13    Q.    Okay.
14    A.    And then the next group?
15    Q.    Yeah.  Which ones are you
16  referring to in the next group?
17    A.    AS, CM.  AS and CM.
18    Q.    And so --
19    A.    And in the conclude -- well, in
20  that summary it said half of the samples.
21    Q.    Okay.  With respect to those
22  four samples that you just identified, you
23  expected that the measure for measles and
24  rubella would be equivalent to the medium
25  measure.  Is that correct?

Page 127

1    A.    That would be my expectation,
2  yes.  Near, you know, approximately.
3    Q.    And in none of those samples
4  were the measles and rubella measured even
5  close to measuring the medium, as you would
6  expect.  Correct?
7          MR. THOMPSON:  Objection to
8    form.
9          THE WITNESS:  In the samples
10    there was a reduction in the measles
11    and rubella that was more than I would
12    have expected.
13  BY MR. SCHNELL:
14    Q.    But none of that is reflected in
15  your conclusion.  Right?
16    A.    In that summary statement it
17  says that it's reflected accurately what the
18  results are.  It says those are reduction
19  neutralization titers with measles and rubella
20  similar to reduction titers obtained in mock.  And
21  that, relative to other antigens, there was a
22  further reduction in neutralization in half of
23  the samples with the mumps.  So it's just
24  describing the results.
25    Q.    Do you believe that your

Page 128

1  ultimate sense -- your ultimate opinion on the
2  specificity of this assay is accurately
3  reflected in what you wrote in the summary?
4          MR. THOMPSON:  Objection to
5    form.
6          THE WITNESS:  I think that the
7    summary accurately reflects the
8    results.
9  BY MR. SCHNELL:
10    Q.    Does it accurately reflect your
11  view of the specificity of this assay as you
12  measured it in this validation study?
13          MR. THOMPSON:  Same objection.
14          THE WITNESS:  Can you repeat the
15    question?
16          - - -
17          (The court reporter read the
18    pertinent part of the record.)
19          - - -
20          THE WITNESS:  I think it
21    accurately reflects the results.  In
22    looking back now, I would question this
23    result.  Again, it's an experiment.
24    It's the result of an experiment.
25    So -- and I would question the result.

Page 129

1    It's not what I expected, would expect
2    now.
3  BY MR. SCHNELL:
4    Q.    Isn't the purpose of the
5  validation study supposed to make sure that
6  the assay is a reliable assay?
7    A.    Make sure that it's fit for its
8  intended use.
9    Q.    And do you believe with this
10  level of specificity this assay was fit --
11  this AIGENT assay was fit for its intended
12  use?
13    A.    These are the results of that
14  experiment.  I think it was, you know,
15  evaluated by not just myself but by other
16  people, clinicians, regulatory, sent down to
17  CBER and it was considered acceptable.  Why,
18  for what reason, you know, they judged it
19  acceptable, that would be, you know, to
20  them -- this is just the one experiment.  I
21  mean, it's not two.  There are other aspects
22  of it, of the validation.  But it was
23  considered acceptable by everyone else.
24    Q.    But I'm asking your opinion as
25  the author of this validation report, do you

33 (Pages 126 - 129)

**Appx5813**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 130

1  believe that the specificity results you
2  measured rendered this assay reliable for its
3  intended use?
4         MR. THOMPSON: Objection to
5  form. Asked and answered.
6         THE WITNESS: Yeah, I -- it
7  would be my job to provide the results
8  accurately, present them and then
9  whether someone, you know, judges it
10  acceptable or not, it's not my role to
11  say you can't use this assay. Here are
12  the results, and the decision to
13  proceed with it, say, was not solely my
14  decision. It was other groups and also
15  CBER accepted the results.
16         MR. SCHNELL: Can you read the
17  question, please? I just want you to
18  listen to the question and answer this
19  question.
20            - - -
21         (The court reporter read the
22  pertinent part of the record.)
23            - - -
24         MR. THOMPSON: Same objection.
25  Asked and answered.

Page 131

1         THE WITNESS: I don't think that
2  the results demonstrate that the
3  specificity evaluation didn't give the
4  intended result as far as my
5  expectation. Now, whether or not that
6  alone is not sufficient to say that the
7  assay is not fit for its intended use.
8  BY MR. SCHNELL:
9     Q.   So you don't have an opinion one
10  way or the other?
11     A.   I think -- I think there was,
12  you know, something peculiar about the way
13  this experiment is executed that gives this
14  unintended result or unexpected result. But I
15  think it's an experiment. It's not
16  necessarily reflective of what's really
17  happening with serum. And that I don't see
18  that alone as grounds to consider the assay
19  without having more information. It's not
20  grounds to say the assay is unacceptable for
21  its intended use.
22     Q.   So an assay that -- is it your
23  opinion that an assay that cannot distinguish
24  between mumps neutralizing antibodies and
25  non-mumps neutralizing antibodies would be a

Page 132

1  reliable assay in measuring mumps neutralizing
2  antibodies?
3         MR. THOMPSON: Objection to
4  form. Calls for speculation.
5         THE WITNESS: That's not what
6  this experiment shows. This is an
7  experiment. It's not that that is the
8  case, that an assay that couldn't
9  distinguish between measles or rubella,
10  that it's that assay. It's the result
11  from an experiment seeking to answer
12  that question, but it's an experiment
13  that -- that's a step out of
14  how samples are really tested.
15  BY MR. SCHNELL:
16     Q.   But it's true, isn't it, that
17  the results of this experiment demonstrated,
18  at least for this experiment, that the assay
19  could not distinguish reliably between mumps
20  neutralizing antibodies and non-mumps
21  neutralizing antibodies?
22     A.   This experiment showed that in
23  the way that the experiment was performed,
24  that it couldn't distinguish between
25  competition with mock, measles and rubella

Page 133

1  markedly different than that with mumps. It's
2  what this experiment shows that you're taking
3  it to a different place.
4     Q.   So you're suggesting that even
5  though that's what this experiment shows, it
6  doesn't necessarily show how the actual AIGENT
7  assay was run. Is that right?
8     A.   It doesn't necessarily show that
9  if you took a -- took serum that only had
10  measles antibody, that that would give you a
11  no mumps response, that it would give you a
12  positive result in the assay. I think that's
13  your concern. That would be the concern that
14  if someone was vaccinated with just measles
15  and rubella vaccine, that they would give you
16  a positive response in this assay.
17     Q.   Well, isn't there also a concern
18  that what the assay is registering as mumps
19  neutralizing antibodies are really antibodies
20  that are neutralizing something completely
21  different from mumps?
22         MR. THOMPSON: Objection to
23  form.
24         THE WITNESS: Again, it's an
25  experiment conducted in a certain way.

34 (Pages 130 - 133)

**Appx5814**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 134

1 And I think, you know, you're kind of
2 leaping to conclusions based on these
3 results.
4 BY MR. SCHNELL:
5 Q. So with these results and the
6 issues that we are talking about with
7 specificity, did you raise them with anybody
8 at Merck after you had done this validation
9 study?
10 MR. THOMPSON: Objection. Asked
11 and answered.
12 THE WITNESS: I don't recollect.
13 BY MR. SCHNELL:
14 Q. Do you recall if Ms. Wolchko
15 raised these issues with anyone?
16 A. I do not recollect.
17 Q. How long had Ms. Wolchko been at
18 Merck at this point in time?
19 A. I don't know exactly when she
20 started.
21 Q. And this was your first
22 validation study?
23 A. Probably not, although I don't
24 have a record of which validation studies I
25 worked on prior to this.

Page 135

1 Q. Was it your first clinical study
2 that you supported as a statistician?
3 A. I support the labs. So the labs
4 do testing for the clinical studies. So I
5 don't support the clinical studies as much as
6 the labs.
7 Q. This wasn't your first time
8 supporting the labs on a clinical study, was
9 it?
10 A. Excuse me?
11 Q. This wasn't your first time
12 supporting a lab at Merck on a clinical study,
13 was it?
14 A. I had probably provided support
15 to the labs prior to this for the clinical
16 assays.
17 Q. So was this the only validation
18 report you prepared for the AIGENT assay?
19 A. I don't recollect. There may
20 have been earlier versions of the assay. I
21 don't know.
22 Q. Were there any other validation
23 studies that you're aware of that measured the
24 specificity of the AIGENT assay?
25 A. No, not offhand.

Page 136

1 Q. Do you have any confidence one
2 way or the other that the specificity of the
3 AIGENT assay was sufficient for rendering a
4 reliable result?
5 MR. THOMPSON: Objection to the
6 form. Asked and answered.
7 THE WITNESS: I think for me the
8 fact that, too, that within Merck it
9 was accepted and that CBER accepted it,
10 yes, that gives me confidence that it
11 was an acceptable assay for its use.
12 BY MR. SCHNELL:
13 Q. Do you have any confidence that
14 the specificity of the AIGENT assay was
15 sufficient for its intended use?
16 MR. THOMPSON: Same objection.
17 THE WITNESS: Based on the fact
18 that other groups and CBER accepted it,
19 I have confidence in the specificity
20 result based on the acceptance of it by
21 the government and within Merck.
22 BY MR. SCHNELL:
23 Q. So do you believe looking back,
24 then, that your calculations were incorrect?
25 MR. THOMPSON: Objection.

Page 137

1 THE WITNESS: No, I don't see
2 anywhere where calculations are
3 incorrect.
4 BY MR. SCHNELL:
5 Q. So you stand behind these
6 calculations?
7 MR. THOMPSON: Same objections.
8 THE WITNESS: These are the
9 results of the study. And I stand
10 behind the -- what was done, what we
11 did in reporting the results.
12 BY MR. SCHNELL:
13 Q. Did you ever complain to anyone
14 at Merck that you believe that the specificity
15 of this AIGENT test was insufficient to render
16 a reliable result?
17 MR. THOMPSON: Objection. Asked
18 and answered.
19 THE WITNESS: I do not recollect
20 ever complaining -- making that
21 complaint.
22 BY MR. SCHNELL:
23 Q. Do you recollect ever telling
24 anyone at Merck that you believe that the
25 specificity of this AIGENT test was

35 (Pages 134 - 137)

Appx5815

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 138

1  insufficient?
2      A.   Actually, I don't recollect.
3          MR. THOMPSON: Objection. Asked
4      and answered.
5  BY MR. SCHNELL:
6      Q.   Do you recall ever telling
7  anyone that you believe the specificity of
8  this AIGENT was poor?
9          MR. THOMPSON: Same objection.
10     You can answer if you can.
11         THE WITNESS: I don't recollect.
12 BY MR. SCHNELL:
13     Q.   Now, what percentage -- based on
14 these experiments, what -- can you assign a
15 level of, a percentage for the level of
16 specificity these experiments found?
17     A.   You could in terms of if you
18 want to say what was the percent reduction in
19 titer relative to the medium.
20     Q.   How would you do that?
21     A.   It's hard considering that you
22 have less thans. But say if we took the less
23 than 32s as 32s, so for the mumps you could
24 say if you would provide an estimate, say 5 --
25 32 divided by 512 and 1 minus that would give

Page 139

1  you the percent reduction.
2      Q.   How do you account for the same
3  result in at least for sample 513, the same
4  result that occurred for the mock, measles,
5  and rubella?
6      A.   It would be calculated
7  similarly.
8      Q.   So for that sample, and then if
9  you wanted to measure the level of specificity
10 between mumps and other antigens, then how
11 would you -- you would compare those two
12 measures?
13         MR. THOMPSON: Objection.
14 BY MR. SCHNELL:
15     Q.   So, for example, let's say you
16 divided, as you said, you divided 32, let's
17 take sample 513. So you divide 32 --
18     A.   By 512.
19     Q.   Let's just do it. Okay. So 32
20 divided by 512 equals .0625.
21     A.   Right. One-sixteenth. And one
22 minus that.
23     Q.   So then one minus .0625 equals
24 .9375. So that tells you that for that
25 sample, assuming that the less than 32 is

Page 140

1  treated as a 32, that it was 93.75 percent
2  specific?
3      A.   Uh-huh. It had 93.75 percent
4  reduction in titer when competed with the
5  mumps antigen.
6      Q.   Now you would get the same
7  figures for the mock, for the measles, and for
8  rubella?
9      A.   For that sample, correct.
10     Q.   So then how to -- is there a way
11 to have an overall specificity percentage?
12     A.   You could average over the
13 samples.
14     Q.   And so what's that -- that is
15 saying that it's just as specific for mumps as
16 it is for measles, as it is for rubella, as it
17 is for the mock?
18     A.   It's -- again, you know, I
19 would -- whether you give them as the numbers
20 here or as percentages, the summary is the
21 same. So the results are the same whether you
22 expect -- express them as titer values or as
23 percentages.
24     Q.   So if you were trying to
25 calculate the level of specificity for this

Page 141

1  sample as it relates to measuring mumps
2  neutralizing antibodies versus non-mumps
3  neutralizing antibodies, would the percentage
4  be 0 percent?
5          MR. THOMPSON: Objection.
6          THE WITNESS: Can you repeat the
7      question?
8              - - -
9          (The court reporter read the
10     pertinent part of the record.)
11             - - -
12         THE WITNESS: Yes, I would say
13     what we said that, you know, for this
14     sample you didn't get a further
15     reduction with mock, measles, or
16     rubella relative to mumps. For half of
17     the samples we did not get a further
18     reduction. For half of the samples we
19     got mumps -- a further reduction with
20     mumps. That's what I would say.
21 BY MR. SCHNELL:
22     Q.   For the David Krah sample, DK,
23 I'm assuming that's David Krah, it's less than
24 32 across the board. Do you see that?
25     A.   Uh-huh.

36 (Pages 138 - 141)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 142

1    Q.   What does that tell you, if
2  anything?
3    A.   David doesn't have -- or that
4  this -- he either doesn't have neutralizing, a
5  high level neutralizing antibody to mumps or
6  this assay isn't able to detect a positive
7  result in David.  He may have it, but the
8  assay may be giving a false negative.
9    Q.   When you got these measurements,
10 did you consider taking more samples to get --
11 to get more information -- to give you more
12 information in terms of your specificity
13 conclusions?
14       MR. THOMPSON:  Objection.
15       THE WITNESS:  I don't recollect
16    that.  And apparently not.  But I think
17    probably I would have looked -- if we
18    were to do those evaluations, I'd
19    probably look more at the design of the
20    study and try to understand more the
21    design because let's say you're getting
22    reduction with mock, too, which is no
23    antigen, so there's something else
24    going on here that is not understood.
25    So I think doing further studies is --

Page 143

1    would be warranted, but I think, too,
2    that having the results for the mock
3    reduction also points to there is an
4    issue with the way this experiment is
5    being performed that makes you question
6    the result.
7  BY MR. SCHNELL:
8    Q.   Well, there was the use of
9  anti-IgG in this -- in the AIGENT test.
10 Correct?
11   A.   That's my understanding.
12   Q.   And that was present in the mock
13 or was it not present in the mock?
14   A.   I don't know.
15   Q.   Would its presence in the mock
16 potentially contribute to the results that
17 you're questioning now?
18       MR. THOMPSON:  Objection to
19    form.
20       THE WITNESS:  It's not present
21    in the mock.  The mock or the -- I
22    think it refers to the cells that the
23    virus has grown up in.  I think the IgG
24    is something that's added to the
25    sample.  So probably it was added to

Page 144

1  these samples.
2  BY MR. SCHNELL:
3    Q.   But not to the mock?
4    A.   The mock is just something that
5  you're competing with -- you're competing the
6  sample with.  So you don't add the IgG to the
7  measles or rubella for -- when you're testing
8  the sample.  You add it to the sample.
9    Q.   And what's in the mock?
10   A.   The mock -- I think in the
11 report it says what the mock is.  "The mock
12 extract was made from the uninfected Vero
13 cells in which each virus was grown, and the
14 culture medium is the medium in which the
15 cells are grown."
16       So the mock are the uninfected
17 cells.  So you're introducing that to the --
18 into the sample.  There's no added virus in
19 the mock.
20   Q.   And the vero cells that are in
21 the mock, are they the same types of cells in
22 which the Jeryl Lynn mumps virus is grown?
23   A.   Yeah.  I'm just thinking, okay.
24 The vero cells, yes, it's the same type of
25 cell that the virus is grown in.

Page 145

1    Q.   So would the anti-IgG that's
2  added to the samples, could that be a possible
3  reason why you got the unexpected results you
4  got here?
5        MR. THOMPSON:  Objection.  Asked
6    and answered.  Sorry to interrupt.
7        THE WITNESS:  Yeah, I think that
8    that would be speculation.  Also if
9    the -- if it was -- if everything was
10    IgG driven, the pre-vaccination samples
11    would be testing positive in the assay
12    as well.  We'd have, you know, huge
13    response in the pre-vaccination
14    samples.  If it was being strictly
15    driven by IgG because the
16    pre-vaccination samples also receive
17    IgG.  So, no, I don't believe that the
18    IgG is solely responsible for driving
19    responses in the assay.
20 BY MR. SCHNELL:
21   Q.   You said "solely responsible."
22 Is it your opinion that it could have been
23 partially responsible from the use of
24 anti-IgG?
25        MR. THOMPSON:  Objection to

37 (Pages 142 - 145)

**Appx5817**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 146

1   form.
2       THE WITNESS:  I don't know, I
3   can't say specifically what
4   contribution the IgG made.  I know that
5   there were evaluations performed and
6   those were -- went through CBER, back
7   and forth discussions with CBER on the
8   development of the assay and what they
9   used to was agree -- what they used in
10  the assay was what was agreed to by
11  both Merck and CBER.
12  BY MR. SCHNELL:
13      Q.    You had mentioned another type
14  of validation experiment that could be done
15  where you were measuring injecting someone
16  just with mumps or just with measles, not with
17  the combination vaccine.  Did you ever do
18  that?
19      A.    No, not that I'm aware of.  I
20  don't know -- no.  Not that I recollect ever
21  analyzing or seeing.
22      Q.    If you could turn to the portion
23  of your report where you talk about the
24  serostatus cutoff, that's on page 12, Bates
25  number ending 999.

Page 147

1       A.    Uh-huh.
2       Q.    You calculated 32 as what you
3   believe to be the appropriate serostatus
4   cutoff.  Is that correct?
5       A.    We used 32 as a serostatus
6   cutoff, yeah.  I mean, we could have possibly
7   looked at other ones as well, but 32 was
8   the -- what came out of the study and what was
9   used moving forward.
10      Q.    And it was -- in terms of
11  measuring positive neutralization versus
12  negative neutralization, it wasn't just 32,
13  right, it was 32 for the initial cutoff and
14  then a fourfold rise increase from 32.  Is
15  that correct?
16      A.    I mean -- can you repeat the
17  question?
18              - - -
19      (The court reporter read the
20  pertinent part of the record.)
21              - - -
22      THE WITNESS:  Yeah, I don't
23  know -- I know the 32 serostatus
24  cutoff.  I don't know in the clinical
25  trials if they required a fourfold

Page 148

1   rise.
2   BY MR. SCHNELL:
3       Q.    You refer to a fourfold rise.
4       A.    We may have evaluated how many
5   samples achieved a fourfold rise.
6       Q.    If you look at the -- your
7   summary on the first page, you mentioned a
8   four -- the second page, sorry, you mentioned
9   a fourfold rise.
10      A.    Okay.  Yeah.  Yes.
11      Q.    So what is the -- what did you
12  do here in terms of the serostatus cutoff in
13  terms of using both a single cutoff of 32 and
14  then a fourfold increase?
15      MR. THOMPSON:  Objection to
16  form.
17      THE WITNESS:  We evaluated the
18  data and if you used a cutoff of 32, I
19  think we tested pre- and post-vaccination
20  samples, we, with the cutoff of 32,
21  looked to see what percentage of those
22  pres tested negative versus positive,
23  around 32; post-vaccination, what
24  percentage pre- versus positive.  Their
25  results, around 32.  And we calculated

Page 149

1   the fold rises post over pre and
2   reported those results.
3   BY MR. SCHNELL:
4       Q.    Why did you do that?
5       A.    That was a measure that would be
6   of interest to the clinical group.
7       Q.    Of what interest would that
8   measure be?
9       A.    To see what proportion of
10  subjects achieve a fourfold rise or higher in
11  response.
12      Q.    Did you come up with the
13  fourfold rise or were you told to use a
14  fourfold rise?
15      A.    I don't recollect being told or
16  what -- a fourfold rise, just the general
17  concept.  For endpoint dilution assays, you do
18  twofold dilutions of the sample and generally
19  just a general view out in research and
20  government to see a fourfold rise in response
21  from pre to post.  Generally that's above
22  assay variability, and that's what a lot of
23  people are interested in seeing as a
24  meaningful response.
25      Q.    Meaningful meaning it gives some

38 (Pages 146 - 149)

Appx5818

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 150

1  measure of whether there is a result that is
2  relevant to being protected from the disease?
3       MR. THOMPSON: Objection to
4       form.
5       THE WITNESS: Not protected.
6  Because we don't know what a protective
7  level is. But meaningful in the sense
8  that an individual responded to vaccine
9  and that response is more likely than
10 what you'd see just due to assay
11 variability or noise. So the fourfold
12 rise is above what you'd likely to --
13 to be obtained due to the variability
14 in the assay. So let's say, hey,
15 there's evidence here that this subject
16 is responding to the vaccine.
17 BY MR. SCHNELL:
18      Q.   Was there any relevance to
19 protection from the disease that came from the
20 serostatus cutoff calculation that you
21 performed?
22      MR. THOMPSON: Objection to
23      form.
24      THE WITNESS: Can you repeat the
25      question?

Page 151

1       - - -
2       (The court reporter read the
3       pertinent part of the record.)
4       - - -
5       THE WITNESS: No. I don't think
6  we knew -- you know, it's known what a
7  protective level, antibody level is.
8  Even that depends on which assay and
9  which standard, what you need a
10 standard to judge that. So, no, it's
11 not indicative of protection against
12 the virus.
13 BY MR. SCHNELL:
14      Q.   Is the fourfold increase from
15 the 32 serostatus cutoff in any way indicative
16 of protection from the virus?
17      A.   To me that's the same question.
18 Is fourfold as opposed to serostatus? No. It
19 just means that if you're above that, your
20 response is likely above the variability in
21 the assay. And it's likely due to having been
22 vaccinated, but it doesn't reflect protection.
23      Q.   Now, the 32 that you used for
24 the serostatus cutoff, the 32 is referring to
25 titers. Correct?

Page 152

1       A.   Correct. So dilution of serum.
2       Q.   And titers is also another term
3  for antibodies. Is that correct?
4       A.   Titer is a measure of antibody
5  level. And the higher the titer, the higher
6  the antibody level.
7       Q.   Now, is this 32 that was used as
8  serostatus cutoff supposed to represent mumps
9  titers?
10      A.   Yes.
11      Q.   And do you have any confidence
12 that it did in this AIGENT assay?
13      MR. THOMPSON: Objection to
14      form.
15      THE WITNESS: Do I have any
16      confidence that it did represent --
17 BY MR. SCHNELL:
18      Q.   Mumps titers?
19      A.   Yes. I have a certain degree of
20 confidence that the assay was doing what it
21 was intended to do.
22      Q.   Some of those titers might have
23 been non-mumps titers, though. Correct?
24      A.   I don't know.
25      Q.   Now, the serostatus cutoff

Page 153

1  analysis that you did here was very different
2  than the one you did for the wild type mumps
3  ELISA assay. Correct?
4       A.   Very different? No.
5       Q.   Well, how did you determine 32?
6       A.   We tested a panel of pre- and
7  post-vaccination sera. In the IgG ELISA we
8  didn't test the post-vaccination sera. There
9  were 10 samples, we went through that, but we
10 didn't test as large a panel in that because
11 we knew how those post-vaccination would
12 respond based on comparisons and knowledge
13 with the legacy assay. So here we tested both
14 the pre and the post.
15      Q.   You also used a fourfold
16 increase here, but you didn't use that in the
17 ELISA validation. Correct?
18      A.   Correct. Because we didn't have
19 the paired samples in the ELISA. We didn't
20 have the post-vaccination pair in the wild
21 type ELISA.
22      Q.   But you could have, couldn't you
23 have?
24      A.   We could have, but we didn't
25 because we knew how the assay performed on

39 (Pages 150 - 153)

Appx5819

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 154

1 post-vaccination samples. We had done an
2 extensive study comparing the EIA, the legacy
3 assay to the wild type assay.
4 　　　　MR. THOMPSON: Are we going to
5 　　another document, Counsel?
6 　　　　MR. SCHNELL: We may still -- I
7 　　just want to introduce one document
8 　　while we're talking on the subject.
9 　　　　MR. THOMPSON: We've been going
10 　　about an hour.
11 　　　　MR. SCHNELL: That should be
12 　　correct.
13 　　　　(Exhibit Antonello-4, 2/23/01
14 　　Memo, 00779589 - 00779599, was marked
15 　　for identification.)
16 　　　　　- - -
17 BY MR. SCHNELL:
18 　　Q. I'd like to mark as Antonello-4
19 a memo dated February 23, 2001, from
20 Ms. Wolchko, Bates range 779589 through 599.
21 　　　　Is this the study that you keep
22 referring to?
23 　　A. It is.
24 　　Q. The date of this study is
25 February 23, 2001, but the date of your wild

Page 155

1 type mumps ELISA validation is December 4,
2 2000, a couple of months earlier. So I'm
3 wondering how you were comfortable leaving the
4 post-vaccination side of the equation out of
5 your calculations when you hadn't even done
6 the analysis yet?
7 　　A. We would have done -- before we
8 did the validation, we would have done
9 comparisons between the legacy and the wild
10 type ELISA. So we would have known going into
11 the validation how it compared.
12 　　Q. And so this report that you did
13 a couple of months later, that was just
14 finalizing what had already been done?
15 　　A. There may have been other
16 evaluations performed where we had the data.
17 This may have been done after. I don't know.
18 Or the data may have been generated, we just
19 never -- didn't write the report. I don't
20 know. But either way, we had an idea of how
21 the wild type would have compared to the
22 legacy prior to going into validation.
23 　　Q. And you were assuming it was 100
24 percent concordance. Correct?
25 　　A. No, nothing is 100 percent

Page 156

1 concordant. If you compare the same assay to
2 itself, it's not 100 percent concordant.
3 　　Q. But you're assuming that the
4 correlation would have been high enough that
5 you didn't even need to bother even measuring
6 the post-vaccination samples. Is that
7 correct?
8 　　　　MR. THOMPSON: Objection to
9 　　form.
10 　　　　THE WITNESS: It wasn't a
11 　　requirement for the validation. It
12 　　wasn't necessary to the validation.
13 BY MR. SCHNELL:
14 　　Q. Was it necessary to the
15 validation for the AIGENT test to look at
16 post-vaccination samples?
17 　　A. Yes. I think to understand how
18 the assay was performing, yes. Because it's a
19 new assay, it's a difficult assay and there
20 was a lot of unknown.
21 　　Q. Wasn't the wild type mumps ELISA
22 assay a new assay also?
23 　　A. Same, similar to the other
24 assay, to the legacy assay which had been run
25 for years and years. Differences were the

Page 157

1 passage of the virus for the antigen and the
2 dilution. And I believe there were other
3 changes to make it amenable for automation.
4 So there were a number of changes, but not --
5 you know, we weren't moving into great
6 unknown. There was a lot of experience and
7 then, too -- I mean, there would have been
8 evaluations, like I said, prior to the
9 validation to give us confidence that we're
10 generating similar results.
11 　　　　MR. SCHNELL: I have maybe a few
12 　　minutes more, do you want to keep
13 　　going? Are you all right? Just a
14 　　couple minutes more.
15 　　　　MR. THOMPSON: A couple minutes.
16 　　　　MR. SCHNELL: On this document.
17 　　So really it's a lot of --
18 　　　　MR. THOMPSON: If you're okay
19 　　going a couple minutes. We've been
20 　　going for a while, Counsel.
21 　　　　THE WITNESS: I'm okay.
22 BY MR. SCHNELL:
23 　　Q. So on page 16, back to the
24 AIGENT validation. And it's the Bates number
25 ending 003. It's Exhibit 3.

40 (Pages 154 - 157)

**Appx5820**

Page 158

1        Under "Titer Assignment," do you
2    see at the bottom of the page?
3        A.    Yeah.
4        Q.    You talk about non-monotonicity.
5    Can you explain to me what that is?
6        A.    A monotonic response would be
7    with each dilution you'd get a progressive
8    increase. So monotonic meaning one trend.
9    Non-monotonic would be you may have a
10   progressive increase and then a decrease. And
11   then followed by increase.
12       Q.    And did you find that in your
13   validation the AIGENT assay was proving to be
14   non-monotonic?
15       A.    Yes. I think that there was
16   evidence that prozone effect where you could
17   have matrix interference with response in the
18   assay.
19       Q.    So how did that relate to the
20   Spearman-Karber method not being recommended
21   for estimating endpoint dilution?
22       A.    Yes. The Spearman-Karber
23   method, that has to do with calculating a
24   50 percent response. But it uses all the data
25   from the -- it uses all the data from the

Page 159

1    curve. But you may have response at early
2    dilutions that may be high because of the
3    prozone effect and then drop down and then
4    come back up. And because of the response
5    distribution in this assay, it wasn't a
6    nice -- typically for each sample, a nice
7    response. You could have some of these
8    samples with this prozone effect that was
9    determined not to be a good way to calculate
10   the 50 percent point using that method.
11       Q.    Is the Spearman-Karber method
12   the usual method used to calculate -- or
13   estimating endpoints in dilution?
14       A.    It was developed probably a long
15   time ago. And I think it may have been used
16   early on for certain assays, but now, the
17   predominant method is either to -- either to
18   fit a curve, if you have a nice monotonic
19   response, you can fit a curve and calculate a
20   50 percent point, that's what's often used
21   now; or to do a linear calibration between the
22   dilutions, the bracket, the 50 percent point.
23   I think Spearman-Karber was something --
24   again, it was a method used a long time ago,
25   and I think it was something that CBER maybe

Page 160

1    asked us to evaluate.
2        Q.    What method did you ultimately
3    use for estimating the endpoint dilution?
4        A.    Just the dilution where it
5    dropped below 50 percent point. I think
6    that's what was ultimately used.
7        Q.    And did the --
8        A.    An endpoint dilution.
9        Q.    Did the prozone effect interfere
10   with the ability for that method to accurately
11   measure the end point dilutions?
12       A.    It may have in some samples,
13   yes.
14       Q.    And in the AIGENT testing did
15   it?
16       A.    We're referring to AIGENT
17   testing?
18       Q.    Yeah.
19       A.    It may have in some samples,
20   yes.
21       Q.    And how could you account for
22   that possibility in interpreting the results
23   of the AIGENT test?
24       A.    Yeah. Yeah. I don't -- I don't
25   think it could properly be fully accounted

Page 161

1    for, correctly accounted for, knowing which
2    sample and to what degree it influenced the
3    result.
4        MR. SCHNELL: Okay. We can take
5    a break now.
6        VIDEOGRAPHER: Off the record at
7    12:54. This will end disc number
8    three.
9              - - -
10       (A recess was taken.)
11             - - -
12       VIDEOGRAPHER: The time now is
13   2:02. Back on the record. Beginning
14   of disc number four.
15       MR. SCHNELL: I'd like to mark
16   as Antonello Exhibit 5 an e-mail from
17   Dr. Antonello, dated March 2002, with a
18   bunch of attachments. And the Bates
19   range for the packet is 544820 through
20   847.
21             - - -
22       (Exhibit Antonello-5, 3/20/02
23   E-mail with attachment, 544820 -
24   544847, was marked for identification.)
25             - - -

41 (Pages 158 - 161)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 162

1 BY MR. SCHNELL:
2 Q. Dr. Antonello, I've handed you
3 what purports to be an e-mail that you wrote
4 to Dr. Shaw and others, which attaches what I
5 believe you referred to, correct me if I'm
6 wrong, but your correlation study between the
7 AIGENT and the wild type mumps assay for a,
8 quote/unquote, corrected data, set for a,
9 quote/unquote, original data set. And then
10 there is also attached a set of tables which I
11 believe are the underlying data. Did I
12 correctly describe what this packet is?
13 A. Yes.
14 Q. And can you tell me -- first of
15 all, did I use the proper term? Was it a
16 correlation study that you performed of the
17 AIGENT test and the wild type mumps ELISA
18 test?
19 A. Yeah, I may refer to it as a
20 concordance or refer to it as a correlation.
21 I think we're referring to the same thing.
22 It's an assay comparison, a comparison between
23 the two assays.
24 Q. Is there any difference in the
25 meaning of concordance and correlation?

Page 163

1 A. A correlation is just an
2 estimate of the association between two
3 assays, and it has like a specific -- there's
4 a specific calculation for a correlation
5 coefficient. So if you just say, well, what's
6 the correlation between the two numbers. You
7 might expect, call it an R value, that's the
8 correlation, that would be the estimate, the
9 number. Concordance, I think, too, we look
10 for more than just a correlation and R value,
11 but looking throughout the range of the assay,
12 the range is a response. What the association
13 is between the two assays across the range of
14 response. And maybe more -- I guess more full
15 examination than just a correlation
16 coefficient.
17 Q. So is a concordance analysis a
18 more precise analysis than a correlation
19 analysis is if you're comparing two different
20 assays?
21 A. I mean, it's all based on what
22 someone is expecting. If I just provide a
23 correlation coefficient, it's just one value,
24 an R value. I could -- we could compare two
25 assays. I could provide you just with a

Page 164

1 correlation coefficient and be done. But that
2 wouldn't tell you as much as if you looked
3 across the range, how does the responses
4 differ with the lower end versus the high end.
5 And you could have a high degree of
6 correlation between two assays, but it may not
7 necessarily have a slope one.
8 So I'm just -- I'm not trying to
9 be difficult, but just saying what the
10 expectation is. So I think that what's
11 provided is a full comparison between the two
12 assays, not just a correlation coefficient.
13 Q. And when you say "what's
14 provided," you're talking about what's
15 provided in this document?
16 A. Yes.
17 Q. And what brought you to perform
18 these analyses?
19 A. I was probably asked to do so.
20 Q. And actually in your cover
21 e-mail in the second sentence, it says, "Per
22 Keith and Patrick, I compared the two assays
23 using both the 'original' and 'corrective'
24 AIGENT results."
25 A. Uh-huh.

Page 165

1 Q. So is it -- am I correct that
2 Keith and Patrick were the ones that directed
3 you to do these analyses?
4 A. I don't recollect specifically,
5 but they may have asked me to do both,
6 original and corrected.
7 Q. And Keith is Keith Chirgwin. Am
8 I correct?
9 A. Yes.
10 Q. And who is Patrick?
11 A. Patrick is Patrick Brill-Edwards.
12 Q. What were -- what was his
13 position at the time this -- that you prepared
14 this?
15 A. They're both regulatory affairs.
16 Q. Do you recall why they asked you
17 to do this?
18 A. To see the results how the two
19 assays compared.
20 Q. Do you know why they wanted to
21 find out how the two assays compared?
22 A. No.
23 Q. No recollection whatsoever?
24 A. I mean, I have -- I can
25 speculate but -- and make guesses, but I don't

42 (Pages 162 - 165)

Appx5822

Page 166

1 know exactly what they were thinking.
2     Q.    Now, what is the difference
3 between the original AIGENT results and the
4 corrected AIGENT results?
5     A.    My understanding is that the
6 original results were the results prior to
7 performing -- prior to assessing the data for
8 things like excessive variability or
9 unexpected response patterns. It also was
10 prior to the second scientist review of the
11 data. So my understanding is that those were
12 the original results.
13     Q.    When you say "second scientist
14 review of the data," what are you referring
15 to?
16     A.    I guess laboratory -- well, my
17 understanding is review of the data by the lab
18 managers. It may have included Dave Krah. I
19 don't know, I was not in the lab. That's just
20 my understanding.
21     Q.    And where is that understanding
22 from?
23     A.    I think the CBER, there was the
24 483 and coming from that.
25     Q.    You're talking about the

Page 167

1 inspection --
2     A.    Yes.
3     Q.    -- that CBER conducted --
4     A.    Yes.
5     Q.    -- on the AIGENT testing?
6     Why did you put original in
7 quotes?
8     A.    It's just to highlight original
9 versus not original.
10     Q.    And is it your understanding
11 that the original data would have been the
12 data that was recorded before any kind of
13 change was implemented to the data at all?
14     A.    I don't know what you mean by a
15 change to the data.
16     Q.    Well, you just differentiated
17 between original and corrected by saying that
18 the corrected was after there was a second
19 review of the data. So is it -- were there
20 changes that were made between the original
21 and the corrected?
22     A.    I don't know if changes were
23 made or not. My -- I'm saying it was made
24 prior to the second scientist review.
25     Q.    Okay. And then if you look at

Page 168

1 the second paragraph, you wrote, ".. my sense
2 was that on the whole, the 'corrected' AIGENT
3 results are 'cleaner/closer to the truth' than
4 are the 'original' results and provide for a
5 more accurate comparison between assays."
6     What did you mean there?
7     A.    Can you -- just want to say
8 where you are?
9     Q.    It's the first sentence.
10     A.    "Having performed these
11 analyses, my sense was that on the whole, the
12 'corrected' AIGENT results are 'cleaner/closer
13 to the truth' than are the 'original' results
14 and provide for a more accurate comparison
15 between assays."
16     It looks like I explained
17 further, "To check that assertion, I created
18 the following two tables...show...ELISA
19 results for samples...which...'original' and
20 'corrected' titers differed (all 'Deleted'
21 results were excluded from...comparison).
22 While for the post-vaccination samples there
23 is little difference between 'original' and
24 'corrected' results, for the pre-vaccination
25 samples, the ELISA titers suggest that the

Page 169

1 'corrected' results are more accurate than the
2 'original' results, and therefore there is
3 some benefit to implementing the QC
4 procedures."
5     So, I mean, that explains the
6 statement above it pretty well.
7     Q.    My question is, how did you draw
8 that conclusion that the corrected results
9 were cleaner/closer to the truth than the
10 original results?
11     MR. THOMPSON: Objection. Asked
12 and answered.
13     THE WITNESS: It was based on
14 the comparison to the ELISA results,
15 the wild type ELISA results. And there
16 is an assumption there that the wild
17 type ELISA results are more accurate
18 than the PRN results.
19 BY MR. SCHNELL:
20     Q.    And what's that assumption based
21 on?
22     A.    It's a much simpler assay to
23 run. And less variability and that -- just
24 comparing kind of a difficult assay to perform
25 versus a much simpler kind of cleaner assay,

43 (Pages 166 - 169)

Appx5823

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 170

1 the expectation was that a lot of the noise
2 and problems associated with the AIGENT, you
3 know, were kind of obscuring the results and
4 were actually getting more accurate result in
5 the ELISA.
6     Q.    So is it your opinion that the
7 wild type mumps ELISA assay was a more
8 reliable assay than the AIGENT assay?
9        MR. THOMPSON:  Objection to
10 form.
11        THE WITNESS:  In my opinion,
12 it's a less variable assay.  I think it
13 will produce more consistent results
14 than the AIGENT assay.  And in that
15 regard -- in that sense it's a
16 preferred assay.
17 BY MR. SCHNELL:
18     Q.    Which assay, if either, do you
19 believe offers a better measure of actual
20 protection from the disease?
21        MR. THOMPSON:  Objection to the
22 form.
23        THE WITNESS:  I couldn't answer
24 that.  I don't know.
25 BY MR. SCHNELL:

Page 171

1     Q.    Is it your opinion that the --
2 you said it was your opinion that the wild
3 type mumps ELISA offered more consistent
4 results than the AIGENT assay.  Correct?
5     A.    Better precision.
6     Q.    My question is, which, if
7 either, do you believe provided more reliable
8 results in terms of measuring mumps
9 neutralizing antibodies?
10        MR. THOMPSON:  Objection to
11 form.
12        THE WITNESS:  In terms of
13 measuring mumps neutralization
14 antibodies?  The wild type ELISA
15 doesn't necessarily measure
16 neutralizing antibody, it measures
17 binding antibody.  The AIGENT is
18 intended to measure neutralizing
19 antibody.
20 BY MR. SCHNELL:
21     Q.    So which of the two tests, if
22 either, do you believe provides a more
23 accurate way of measuring mumps binding
24 antibodies?
25        MR. THOMPSON:  Same objection.

Page 172

1        THE WITNESS:  Mumps binding
2 antibodies?  Again, I think the ELISA
3 will be more consistent.  I maybe trust
4 the titers, the antibody measures
5 coming out of the ELISA more.  And, I
6 guess, that's reflected here because I
7 was comparing PRN to ELISA and using
8 the ELISA as probably the more, you
9 know, the more correct result in my
10 evaluation.  So in that sense the ELISA
11 assay is better.
12        Now, do I know if that's giving,
13 you know, absolute truth and are those
14 antibodies protective, is the
15 neutralization absolute truth and those
16 antibodies are reflecting protective, I
17 don't know that.  Alls I'm doing is
18 comparing the results between the two
19 assays.
20 BY MR. SCHNELL:
21     Q.    And is it fair to say that the
22 basis for your conclusion here that the
23 corrected AIGENT results are cleaner/closer to
24 the truth is because those results were -- had
25 a higher correlation to the wild type mumps

Page 173

1 ELISA assay results than did the original
2 AIGENT results?
3     A.    I think -- you know, you used
4 the term closer to the truth.  I think -- I
5 mean, we don't know truth and I think I say
6 here "While for the post-vaccination samples
7 there is little difference between 'original'
8 and 'corrected' results..."  So for the
9 post-vaccination samples, there was, you know,
10 very little difference between original and
11 corrected.  For the pre-vaccination samples,
12 the ELISA titer suggests that the corrected
13 results are more accurate.  If you look at the
14 ELISA titers, it's suggesting and believe that
15 the ELISA titers are the more accurate, are
16 accurate than the corrected results because
17 they're closer to the ELISA for these
18 pre-vaccination set.  And where there were
19 disagreement, it was closer to the ELISA.
20 That suggests that maybe the corrected results
21 were better in that sense or more accurate.
22 They correlated more closely with the ELISA.
23 So it is what it says.
24     Q.    And, again, that's based on your
25 assumption that the wild type mumps ELISA is

44 (Pages 170 - 173)

**Appx5824**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 174

1 an accurate assay?
2 A. Yes, that -- and that's what it
3 says there.
4 Q. So if we look -- let's first
5 look at your analysis of the corrected
6 results, and that begins on Bates number
7 ending 823. And you calculated an overall
8 agreement of 92.3 percent. Correct?
9 A. Uh-huh.
10 Q. And what does that mean --
11 MR. THOMPSON: You have to say
12 yes or no.
13 THE WITNESS: I'm sorry. Yes.
14 BY MR. SCHNELL:
15 Q. What does that mean, "an overall
16 agreement of 92.3 percent"?
17 A. That in terms of classification,
18 I'm just going to look to make sure, using
19 cutoffs of 10 Ab units in the wild type ELISA
20 and 32 in the AIGENT, that the overall
21 agreement rate between the two assays, so it
22 refers to Table 1, which is page 828, that
23 where they agreed the 503 and 519, that over
24 that sum divided by the total number of
25 samples, so give you that 92.3 percent, so

Page 175

1 that's that agreement rate.
2 Q. And staying on that page, just
3 so my understanding is clear, Table 1 is the
4 cross-classification of pre- and
5 post-vaccination samples between the corrected
6 AIGENT results on the one hand and the wild
7 type mump ELISA results on the other.
8 Correct?
9 A. That's my understanding, yes.
10 Q. And this wasn't the full data
11 set of the AIGENT study, it was just the
12 preliminary subset. Is that correct?
13 A. I believe you are correct. I'm
14 looking for where it says that in the report.
15 But I believe that is correct.
16 Q. And it's your recollection that
17 that's what you were testing, right, the
18 preliminary subset and not the complete data
19 set?
20 A. I was testing what I was
21 provided from Jon.
22 Q. Are you referring to Mr. Hartzel?
23 A. Yes.
24 Q. Dr. Hartzel, sorry.
25 A. Yes.

Page 176

1 Q. And so the total number of
2 subjects in this comparison was 565. Is that
3 correct?
4 A. If it was paired results, yes.
5 But it looks like there were 1,107 samples, so
6 we had both pre and post. So there's a number
7 of subjects but then the number of samples.
8 Q. So it would be -- 565 is
9 referring to the number of paired samples?
10 A. Correct. That's what it says.
11 Q. So going back to Table 1, so we
12 have the wild type mumps ELISA on the left and
13 the AIGENT results on the top.
14 A. Uh-huh.
15 Q. Am I correct that the way you
16 read this is that the 503 figure for Table 1
17 refers to the number of pre-vaccination and
18 post-vaccination samples that were positive in
19 both the AIGENT and the ELISA test. Is that
20 correct?
21 A. I'm sorry, what number?
22 Q. 503.
23 A. Yes, they're positive in both
24 assays. Correct.
25 Q. The 39 refers to the number of

Page 177

1 samples that were positive in the ELISA test
2 but negative in the AIGENT test. Is that
3 correct?
4 A. Correct. And positive meaning
5 greater than or equal to 10. Right.
6 Q. Right. And then the 46 would be
7 the number of samples that were positive in
8 the AIGENT assay but negative in the ELISA
9 assay. Correct?
10 A. Yes.
11 Q. And the 519 would be the total
12 number of pre- and post-vaccination samples
13 that were negative in both?
14 A. Correct.
15 Q. And so that gives you a total
16 number of correlated pairs, would you say?
17 I'm looking at the 1,022. So if you add 503
18 and 519 you get 1,022, that would be the total
19 number of pre- and post-vaccination samples
20 that were --
21 A. Similarly classified between the
22 two assays.
23 Q. So that was the number that
24 measured the same, either negative or
25 positive, but in both tests?

45 (Pages 174 - 177)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 178

1    A.    Yeah. And that's just around
2  the cutoff, positive/negative, based on those
3  cutoffs.
4    Q.    And then the 46 and 39 for a
5  total of 78, that would be the number of
6  discordant pairs?
7    A.    Yeah. It's actually --
8    Q.    I'm sorry, 85. 46 and 39, 85.
9  That would be the number of pairs that
10  measured one way in one test and then the
11  opposite way in the other test?
12    A.    Correct.
13    Q.    And so by dividing 1,022 by the
14  total number of pre- and post-vaccination
15  samples, which is 1,107, that's where you get
16  the 92.3 overall agreement?
17    A.    Correct.
18    Q.    Table 2 you did the same
19  exercise but just for the pre-vaccination
20  samples?
21    A.    Correct.
22    Q.    Table 3 you did the same
23  exercise for just the post-vaccination
24  samples?
25    A.    Yes.

Page 179

1    Q.    And then Table 4 you did the
2  same kind of exercise but with how they --
3  whether or not they seroconverted based on
4  their respective cutoffs. Is that correct?
5    A.    It appears that way, yes.
6    Q.    Now, for the seroconversion
7  table, you excluded from that calculation any
8  sample that was pre-positive in either test or
9  both. Is that correct?
10    A.    I would have to look at the
11  report and see what it says. So, yes, there's
12  a section on page 825. It says, "Subjects
13  that are pre-vaccination positive in either
14  the ELISA or AIGENT...are dropped from the
15  assessment of seroconversion."
16        It says, "For the wild type
17  ELISA, a subject is defined..." --
18        COURT REPORTER: You have to
19    read slower so I can understand you.
20        THE WITNESS: Oh, you have to
21    record if I'm out loud?
22  BY MR. SCHNELL:
23    Q.    Yes, you might want to read it
24  to yourself.
25    A.    I'll read to myself. Okay.

Page 180

1    Q.    So am I correct that the
2  seroconversion cross-classification table
3  excluded those samples that were pre-positive
4  in either test or both?
5    A.    Yes.
6    Q.    And then another way you could
7  double check that, am I correct, is that if
8  you go back to Table 2, you could count up how
9  many pre-positive samples there were in the
10  data set and that would be 46. Correct? 35
11  plus 8 plus 3.
12    A.    Yes.
13    Q.    And then if you subtract that 46
14  from the 552, you get 506 which is in Table 4.
15    A.    Yes.
16    Q.    So that's just another way to
17  double check so we're on the same page.
18        Now, for the seroconversion
19  classification table, you counted as a
20  seroconversion in the ELISA test if it went
21  from pre-negative to a post-vaccination
22  neutralization of greater than 10. Greater
23  than or equal to 10. Correct?
24    A.    Uh-huh. That's what it says.
25    Q.    And then for the AIGENT test you

Page 181

1  counted a seroconversion if it was a
2  pre-negative and it was greater than or equal
3  to 32 on the post-vaccination sample. Is that
4  correct?
5    A.    Is that what it says?
6    Q.    I believe so.
7    A.    It says, For the AIGENT assay, a
8  subject is defined to respond to vaccine if
9  they are pre-vaccination negative and have a
10  post-vaccination titer than is greater than or
11  equal to 64.
12    Q.    64. That's accounting for the
13  fourfold rise. Is that correct?
14    A.    That's what it says. And that
15  also means you're treating the 30 -- less than
16  32 as a 16, yes.
17    Q.    Okay. So these are the four
18  measures represented in Table 1 through 4 that
19  you calculated to give your view of the
20  concordance between the two assays, the
21  correlation between the two assays,
22  comparison, what would you say?
23    A.    Yeah. This is just around the
24  cutoff, the serostatus. I guess I might call
25  this part, you know, agreement around the --

46 (Pages 178 - 181)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 182

1 agreement using the serostatus cutoffs.
2      Q.   You picked these four measures
3 or were you told to do these four measures?
4      A.   You know, I don't recollect
5 specifically. I think -- when you say four
6 measures, you mean the combined pre and post
7 set -- pre/post?
8      Q.   Yes.
9      A.   I think it's just a way to try
10 to evaluate the data as fully as possible.
11      Q.   And do either of these four
12 measures stand out in your mind as reflecting
13 most confidently your opinion of the agreement
14 between the two assays?
15           MR. THOMPSON:  Object to the
16      form.
17           THE WITNESS:  Can you repeat the
18      question?
19 BY MR. SCHNELL:
20      Q.   I can reframe it.
21      A.   Yes.
22      Q.   Are any of these measures, in
23 your opinion, better than the others in terms
24 of representing what the agreement is that you
25 were trying to measure between the two assays?

Page 183

1      A.   I think the -- for me just
2 looking at it, Table 2 and Table 3, it's
3 important to break out Table 2 and Table 3
4 from Table 1 to show how these particular
5 subsets are performing. I think Table 1 alone
6 could be a little misleading in its result.
7 So that Table 2 and Table 3 provide a more
8 full explanation of how the assays are
9 comparing.
10      Q.   Why do you think Table 1 could
11 be misleading in its result?
12      A.   Because of the discrepancies in
13 Table -- if you look in Table 1, it's fairly
14 balanced between the two. In Table 2 there
15 are more discrepancies with the -- more
16 discrepancies that are ELISA negative for the
17 pre and AIGENT positive, and in Table 3 there
18 are more discrepancies that are ELISA positive
19 and AIGENT negative.
20      Q.   And with Table 1 it kind of
21 covers up that distinction so you don't really
22 know where the discrepant pairs are occurring.
23 Is that what you're saying?
24      A.   Yes.
25      Q.   What about Table 4, what value

Page 184

1 is there to doing a seroconversion
2 cross-classification in terms of understanding
3 how these two assays compare?
4      A.   If someone was interested in
5 that result, this shows how the two assays
6 compare.
7      Q.   But it excludes the pre-positive
8 samples. Correct?
9      A.   Yes.
10      Q.   So would it be more accurate if
11 someone was interested in that result to also
12 include those situations where there was a
13 seroconversion with one test but a
14 pre-positive in the other?
15      A.   Yeah, I think all the data are
16 here. So those evaluations could be
17 performed. I think I may have been trying and
18 this is -- I don't know exactly or recollect
19 exactly, but I'm suspecting that I was
20 analyzing it in a manner that clinical would
21 be interested or how they would view the data.
22      Q.   Did you not think they would be
23 interested in how often there were instances
24 where one sample seroconverted with one of the
25 assays but was pre-positive in the other?

Page 185

1           MR. THOMPSON:  Objection to
2      form.
3           THE WITNESS:  I mean, all the
4      results are here so I don't understand
5      the question.
6 BY MR. SCHNELL:
7      Q.   If I wanted to -- if I wanted to
8 find out the true seroconversion agreement
9 between these two assays, wouldn't I want to
10 include those discrepant pairs where it did
11 seroconvert in one but was pre-positive in the
12 other?
13           MR. THOMPSON:  Objection to
14      form.
15           THE WITNESS:  I think maybe this
16      relates to how clinical summarizes the
17      data in their analyses. So they may
18      treat pre-positives, they may break out
19      samples that are pre-positive and
20      pre-negative, so they evaluate them
21      separately. I think all that's being
22      done here is trying to provide clinical
23      or provide people with a measure that
24      might be meaningful to them. And if
25      someone wanted to see it differently, I

47 (Pages 182 - 185)

Appx5827

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 186

1    would get a note that said, hey, Joe,
2    can you redo this analysis, provide
3    that or whatever. So I'm just doing an
4    analysis that was providing the
5    results. If someone wanted to see it
6    differently, that could be requested
7    and could be added. And probably
8    there's -- there's probably data
9    appended -- yeah, there's data listings
10   appended. I mean, those analyses could
11   be performed if someone was really
12   interested in a particular question
13   that wasn't being directly assessed
14   here.
15  BY MR. SCHNELL:
16    Q.   In terms of -- a discrepant pair
17  is where you get one result in one and a
18  different result in the other. Right?
19    A.   Right. And that's what we have
20  in these tables. It's just --
21    Q.   So for purposes of
22  seroconversion, would you consider a sample
23  that seroconverted in the wild type mumps
24  ELISA test but was a pre-positive in the
25  AIGENT test, would you consider that a

Page 187

1  discrepant pair?
2    A.   I don't know what you're asking.
3  The data are here. Where it's discrepant is
4  identified. So I'm just a little at a loss
5  for what you're addressing.
6    Q.   The data in Table 4, though,
7  doesn't identify those situations, that's what
8  I'm saying. It doesn't identify a situation
9  where you have a seroconversion in the
10  AIGENT -- I'm sorry, a seroconversion in
11  the -- in either assay and a pre-positive in
12  the other. Right?
13       MR. THOMPSON: Objection to
14    form.
15       THE WITNESS: I think if there
16    are other sorts of analyses that you're
17    interested in, and this is what I would
18    say to someone else, what is it -- what
19    would you like to see and here is all
20    the data, and I'll construct that table
21    for you. So anything that anyone would
22    want to see that we could construct
23    from the data, I could -- I would
24    construct.
25  BY MR. SCHNELL:

Page 188

1    Q.   So looking at Table 2, and this
2  is the pre-vaccination samples table, you had
3  11 ELISA pre-positives. Correct?
4    A.   Uh-huh.
5    Q.   And 38 AIGENT pre-positives.
6  Correct?
7    A.   Correct.
8    Q.   And three of those in each group
9  overlapped?
10    A.   Correct.
11    Q.   So was there any significance in
12  your mind to the fact that there were more
13  than three times the number of pre-positives
14  in the AIGENT samples than in the ELISA
15  samples?
16       MR. THOMPSON: Objection to
17    form.
18       THE WITNESS: Yeah, that table
19    indicates that the AIGENT assay was
20    more likely to classify a
21    pre-vaccination sample as positive than
22    the wild type ELISA.
23  BY MR. SCHNELL:
24    Q.   More than three times likely.
25  Correct?

Page 189

1    A.   Yes.
2    Q.   Did that have any significance
3  in your mind as to the reliability of the two
4  tests?
5    A.   Right. And I wanted to just
6  take a step back, too. Part of these
7  comparisons also depend on the sample set that
8  you selected. So when you say more than three
9  times, it depends on the sample set that
10  you've selected. Meaning that if you
11  evaluate, let's say, samples that are -- a set
12  of samples that were, you know, dead negatives
13  let's just say in both assays, you might get
14  0 percent. If you only looked at samples that
15  that were super high positive in the
16  comparison, you might have super agreement.
17  But if your sample set has samples that are
18  close to the cutoff and if there's an
19  abundance of samples that are close to the
20  cutoff, you could compare the same assay
21  against itself and you could have a poor
22  agreement rate. Because if they're right
23  at -- say both assays are using a cutoff of
24  10, even for an assay that has high precision,
25  if I test 100 samples that are truly 10, my

Veritext Legal Solutions
www.veritext.com
212-279-9424           212-490-3430

**Appx5828**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 190

1  agreement rate is only going to be 50 percent,
2  or actually worse.  Well, 50 percent between
3  the two assays, if my sample set is very
4  close.  Turn out if I have super high
5  positives and dead negatives, I'm going to
6  look like I have a great agreement rate.  So
7  you can compare -- the sample set contributes
8  to the results.
9      Q.    But this sample set wasn't
10 limited to just those samples --
11     A.    No.  No.
12     Q.    This was --
13     A.    I think the --
14         MR. THOMPSON:  Let him finish
15 his question.
16         THE WITNESS:  I'm sorry.
17 BY MR. SCHNELL:
18     Q.    This was the full preliminary --
19 this was -- included every sample that was in
20 the preliminary subset analysis regardless of
21 where the sample fell with regard to the
22 cutoff.  Correct?
23     A.    Right.  And I do believe that
24 the PRN or the AIGENT had a higher
25 pre-positivity rate than the wild type ELISA,

Page 191

1  yes, but I just wanted to qualify.
2      Q.    Now, did you do any kind of
3  statistical power analysis in connection with
4  this study to give yourself comfort that you
5  had enough samples to make -- to give you
6  confidence in the results?
7          MR. THOMPSON:  Objection to
8  form.
9          THE WITNESS:  No, there was no
10 power analysis.  I think these were the
11 sample set that was provided to me.
12 And in this case there is a large, what
13 I would consider a large number of
14 samples, so...
15 BY MR. SCHNELL:
16     Q.    Did you do any kind of
17 confidence interval analysis with your
18 results?
19     A.    For test estimates of agreement
20 rate, no.  It's not listed here.
21     Q.    Now, the variability between the
22 two assays you said was very different.
23 Right?
24     A.    The variability was greater for
25 the neutralization assay, yes, the AIGENT.

Page 192

1      Q.    Did you account for that in any
2  way in this correlation?
3      A.    This is just how they performed
4  around the cutoffs.  So it's just showing how
5  the two assays performed around the cutoff.
6  So, no, it doesn't account for assay
7  variability.  You're just classifying samples,
8  positive, negative.
9      Q.    But if there's a greater
10 likelihood that the AIGENT results may be
11 subject to variability compared to the ELISA
12 results, does that -- doesn't that impact your
13 analysis here?
14     A.    No, not -- it impacts the
15 results coming out of the assay.  But it
16 doesn't impact my analysis.  I'm just
17 summarizing the results coming out of the
18 assay.  The variability will impact the
19 results.  If they, you know, redid this
20 experiment, my expectation would be the ELISA
21 results may be more similar to their original
22 results and the AIGENT may differ more from
23 their original results.
24     Q.    Did you do any additional
25 comparison studies between the AIGENT and the

Page 193

1  wild type mumps ELISA other than that
2  contained here?
3      A.    I think we looked at the --
4  these are the corrected results.  I think we
5  looked at the original results as well.
6      Q.    And that also was only on the
7  preliminary subset.  Is that correct?
8      A.    It would be on the same set of
9  samples that had original results.
10     Q.    Other than these two analyses on
11 the preliminary subset of AIGENT results, did
12 you do any other comparisons between the two
13 assays with a different set of results from
14 the AIGENT study?
15     A.    Not that I recollect.  I didn't
16 recollect the legacy comparison to the AIGENT.
17 So I don't recollect.
18     Q.    If you look at Table 3 --
19     A.    Table 3?
20     Q.    Back on page ending 828.
21     A.    Yes.
22     Q.    Do you see the 31 in the upper
23 right-hand corner?
24     A.    Yes.
25     Q.    And that is an instance -- and

49 (Pages 190 - 193)

Appx5829

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 194

1  this is post-vaccination samples. And that
2  reflects the number of samples that recorded a
3  positive neutralization in the ELISA test but
4  a negative neutralization in the AIGENT test.
5  Correct?
6      A.   Correct. A positive antibody
7  response in the ELISA based on 10 and a
8  negative response in the AIGENT based on 32,
9  yes.
10     Q.   And since it was positive in the
11  ELISA and negative in the AIGENT, did you
12  refer to that kind of result as a false
13  positive?
14     A.   No. I mean, in Table 3 we're
15  looking at?
16     Q.   Yes.
17     A.   Table 3 -- and this is important
18  to break out Tables 2 and 3. Table 3 are all
19  post-vaccination samples. So at this point
20  the individuals had received the vaccine so
21  one might expect that they might respond
22  positively to the vaccine. So the fact that
23  you're getting a positive response in the
24  ELISA here with post-vaccination sample, I
25  wouldn't call that a false positive.

Page 195

1      Q.   Would you call it a false
2  negative, then, because it was negative in the
3  AIGENT?
4      A.   In the AIGENT, no. I don't know
5  truly positive, truly negative. It's just
6  saying that you've got a negative result in
7  those samples for the AIGENT. Would it be a
8  false negative? You know, it depends what the
9  truth is. But I do take these results given
10  that, you know you have pre-vaccination and
11  post-vaccination samples, and there's much
12  fewer of the pre-vaccination samples testing
13  positive in the ELISA than in the AIGENT,
14  which is in the direction one would expect.
15  For the post-vaccination, you have a lot of
16  the sample testing negative in the AIGENT and
17  not positive in the ELISA which is the
18  direction you'd expect. I mean, one could
19  look at this and say the ELISA assay is a more
20  sensitive and more specific assay than the
21  AIGENT assay. That's certainly an
22  interpretation that one could give to these
23  results.
24     Q.   When you say "more sensitive and
25  more specific," what do you mean?

Page 196

1      A.   More sensitive in that it will
2  pick up a higher proportion of the expected
3  positives and more specific in that it will
4  pick up a higher proportion of the expected
5  negatives.
6      Q.   This is expectation based on
7  what?
8      A.   Based on having received the
9  vaccine or not having been administered the
10  vaccine.
11     Q.   And that the vaccine is doing
12  its job?
13         MR. THOMPSON: Objection to
14     form.
15         THE WITNESS: It's assuming that
16     the vaccine is eliciting an antibody
17     response.
18  BY MR. SCHNELL:
19     Q.   Now, if you look at Table 5a --
20     A.   For the pre-vac -- that would be
21  true for the post-vaccination samples, not for
22  the pre-vaccination samples because they
23  weren't given the vaccine. So that only tells
24  you that the vaccine is doing its job. So
25  that only applies to the post-vaccination

Page 197

1  samples.
2      Q.   But the fact that there were
3  more pre-positives in the pre-vaccination
4  samples coming from the AIGENT results, does
5  that tell you that the AIGENT test for the
6  pre-vaccination samples was more sensitive?
7      A.   That's not what you said. What
8  you said was -- what that discussion was was
9  that the vaccine was doing its job. And my
10  point was that for the pre-vaccination
11  samples, the vaccine has no relevance there
12  because they didn't receive the vaccine. So
13  that assumption doesn't apply for the
14  pre-vaccination samples.
15     Q.   Understood. This was a new
16  question. The question is the fact that there
17  was a disproportionately high number of
18  pre-positive samples from the AIGENT results
19  in the pre-vaccination testing, does that
20  suggest to you that when it comes to
21  pre-vaccination samples, the AIGENT test is
22  more sensitive than the wild type mumps ELISA
23  test?
24         MR. THOMPSON: Object to the
25     form.

50 (Pages 194 - 197)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 198

1 THE WITNESS: More sensitive,
2 no. Potentially more false positives,
3 yes. Sensitive would be we can measure
4 low and true positives. But this --
5 these pre-vaccination samples you would
6 expect them to be negative. So the
7 fact that I'm getting more negatives
8 with the ELISA than with the AIGENT
9 tells me that maybe these positives in
10 the AIGENT are potentially false
11 positives.
12 BY MR. SCHNELL:
13 Q. So if you look at Table 5a,
14 these are the pre-vaccination discordant
15 pairs?
16 A. Right. But it doesn't tell me
17 that it's a more sensitive assay. It actually
18 says it may be a less specific assay.
19 Q. Less specific in the sense that
20 it's picking up non-mumps antibodies?
21 A. It's picking -- it's assigning
22 positive to pre-vaccination samples. It's
23 assigning them as positive as having mumps
24 neutralizing antibody.
25 Q. So for 5a and 5b, those are the

Page 199

1 pre-vaccination discordant pairs. Correct?
2 A. 5a and 5b. Yes.
3 Q. And 5a there's a total of 8
4 there and that reflects those samples that
5 were AIGENT negative and ELISA positive.
6 Correct?
7 A. Correct.
8 Q. And you see that in Table 2.
9 And that identifies what the pre- and
10 post-titers were. And for the pre-titers, it
11 identifies why they were recorded as AIGENT
12 negative and ELISA positive. Right? And all
13 of these were greater than 10, 10 or greater,
14 and that's why they were recorded as positive.
15 Correct?
16 A. Correct. And some are very
17 close to that 10, yes.
18 Q. And if you had used a different
19 cutoff than 10 Ab, for example, if you had
20 used a cutoff of 22, then all of these would
21 have become negative and they would not have
22 been discordant anymore. Is that correct?
23 MR. THOMPSON: Objection to the
24 form.
25 BY MR. SCHNELL:

Page 200

1 Q. I'm sorry, all except for two?
2 A. Correct.
3 Q. So 6 of the 8 discordant pairs
4 would have been removed if the 10 Ab
5 serostatus cutoff had been raised beyond 21.
6 Is that correct?
7 MR. THOMPSON: Same objection.
8 THE WITNESS: Yes.
9 BY MR. SCHNELL:
10 Q. If you look at Table 6a and
11 (b) --
12 A. And if we raised it to 200, they
13 would all be removed.
14 Q. Right, because the highest one
15 is 191?
16 A. Correct.
17 Q. Then if you look at Table 6a and
18 6b, those are the same tables that you
19 prepared but for the post-vaccination samples.
20 Correct?
21 A. Yes.
22 Q. And for 6a, those are the
23 discrepant pairs -- or discordant pairs that
24 were AIGENT negative and ELISA positive.
25 Correct?

Page 201

1 A. Correct.
2 Q. Again, if you look at the titers
3 that are in the "Post Titer ELISA" column, if
4 you had used a different serostatus cutoff,
5 that would have -- if you had raised it, that
6 would have eliminated -- depending on how far
7 you raised it, it would have eliminated these
8 discrepant pairs. Assume you rose -- if you
9 increase the serostatus cutoff beyond what the
10 titers are that are listed here?
11 A. Yes.
12 Q. So, for example, if you had used
13 a 40 Ab cutoff instead of 10, you would have
14 eliminated all of these discrepant pairs that
15 had a post-titer ELISA measure of under 40?
16 A. Correct.
17 Q. If you flip the page to Table 6c
18 and 6d, what are those tables?
19 A. It says it's frequency
20 distribution for Table 6c AIGENT
21 post-vaccination positive titers. So there's
22 a subset of ELISA negative samples and all
23 samples. So post-vaccination positive. Here
24 we are.
25 So I'm just trying to piece it

51 (Pages 198 - 201)

**Appx5831**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 202

1 together. So here there are 511, at least I'm
2 looking in the "All Samples" column. So there
3 are 511 samples listed in Table 6c. And that
4 corresponds to the 511 post-vaccination
5 positive samples in Table 3. So that 511
6 refers to the 511 in Table 3 that were
7 positive, post-vaccination samples positive in
8 the AIGENT. And then the left-most column,
9 the AIGENT titer, shows how many samples of
10 that 511 that were positive, 17 were less than
11 256, 62 were 512 and so on. That gives you
12 the 511.
13      So that shows you the
14 distribution of the post-vaccination positive
15 titers. So you might look at that and say 1,
16 2, 200, 300, 400, you know, maybe look at it
17 the other way, 90 out of 50 is less than 10
18 percent. You know, 90 percent of your -- I
19 shouldn't say that. 90 out of 50 is closer to
20 20 percent. Over 80 percent of your samples
21 had a titer greater than 1,024 that were
22 positive, I mean. So that's just the
23 distribution of the results, post-vaccination
24 results.
25      Then in the column that says,

Page 203

1 "Subset of ELISA Negative Samples," it's just
2 telling you of those post-vaccination samples
3 that were positive in the AIGENT, there were
4 17, three of those were negative in the ELISA.
5 Of those that were 512, there were 62, four
6 were negative in the ELISA. And so on.
7      The last column are the
8 percentages. In this case it's the three
9 divided by the 17, will give you that 17.6
10 percent. Four divided by 62, 6.5 percent and
11 so on.
12      So what this is kind of telling
13 you is that where there are discordances,
14 where it's post-vaccination positive in the
15 AIGENT, that the highest percentage of
16 discordances are occurring with the low
17 titered AIGENT samples. So that percentage
18 moves down as you get to the higher titered
19 samples. So you're less likely to have a
20 misclassification for a low titered sample
21 than a high titered sample between the two
22 assays, which makes sense. That if they're --
23 you're going have a misclassification, it's
24 more likely to occur for a low titered sample
25 than a high titered sample.

Page 204

1      Q.    So that the likelihood of a
2 misclassification which is also the same as a
3 discordant pair --
4      A.    Yes.
5      -- is more likely to happen
6 around the cutoff than it is when you get
7 farther away from the cutoff. Is that
8 correct?
9      A.    Yes.
10      Q.    So looking at Table 6d, it's the
11 converse of what you did. Here you did it for
12 post-vaccination ELISA positives where the
13 AIGENT tests were negative. Is that correct?
14      A.    Where the -- correct. Where the
15 ELISA gave you a positive. So there's the
16 whole distribution of the ELISA positives and
17 the AIGENT negatives and where those AIGENT
18 fell along that distribution of ELISA
19 positives.
20      Q.    If I'm reading this correctly,
21 then of all the ELISA positives that had a
22 titer count in their post-vaccination sample
23 between 10 and 20, there were 30 of them. And
24 of those 30, 9 of them were negative in the
25 AIGENT test. Is that correct?

Page 205

1      A.    Correct.
2      Q.    So 30 percent of the ELISA
3 positives between 10 and 20 Ab were discordant
4 with the AIGENT test?
5      A.    30 percent of those samples were
6 classified as negative in the AIGENT assay.
7      Q.    Then with respect to the 74
8 ELISA positive post-vaccination samples, 13 of
9 them, or 17.6 percent of them, were actually
10 negative in the AIGENT test. Is that correct?
11      A.    That's correct.
12      Q.    And then so on down the line.
13 Again, this demonstrates, does it not, that
14 the likelihood of a discordant pair occurring
15 between the AIGENT test and the wild type
16 mumps ELISA test is close to the cutoff?
17      A.    The closer you get to the
18 cutoff, the lower the antibody titer in the
19 sample, the more likely you are to have a
20 discordant result. And that would be
21 consistent with expectation.
22      Q.    And why is that consistent with
23 expectation?
24      A.    Again, you know, if I tested all
25 samples, let's just say that a titer of

52 (Pages 202 - 205)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 206

1   10,000, I'm more likely to classify the two as
2   positive. Even though I'm comparing the same
3   assay within itself. So ELISA, wild type
4   ELISA versus wild type ELISA, a thousand, you
5   know, I'm going to get 100 percent. But even
6   within that wild type ELISA, now if my sample
7   set is close to 10 and now I have 100 samples
8   that have a titer of 10, well, I got 50/50
9   chance in this run of the assay of calling a
10  positive. I got a 50/50 chance in this run.
11  So now my agreement rate is going to drop down
12  to 50 percent because my samples are close to
13  the cutoff. So the closer you are to the
14  cutoff, the more likely you are to have a
15  discordant result between the two assays.
16      Q.   Does that reinforce how
17  important it is to pick a proper cutoff?
18          MR. THOMPSON: Objection to
19      form.
20          THE WITNESS: I think this is
21      just showing how the two assays compare
22      based on these particular cutoffs.
23  BY MR. SCHNELL:
24      Q.   Now, if different cutoffs were
25  used, the correlation calculations might have

Page 207

1   been very different. Correct?
2       A.   You would get different results,
3   different numbers if you use different
4   cutoffs. So those tables would look different
5   depending on the cutoff selected, yes.
6       Q.   So this analysis that we just
7   went through, then, for the corrected data,
8   you did the identical analysis for the
9   original data set. Correct?
10      A.   Yes.
11      Q.   And that's the analysis that is
12  attached here starting at Bates number 544836.
13  Correct?
14      A.   544836. Yes. I didn't realize
15  they were both here.
16      Q.   So this was the same analysis,
17  same data set -- I'm sorry, same analysis,
18  same wild type -- yeah, same data set but
19  using the original AIGENT results rather than
20  the corrected results?
21      A.   Yes. One question. I just
22  noticed that these are draft reports. So I
23  don't know, like, where in the process these
24  reports were. They're not the final issued
25  reports.

Page 208

1       Q.   Did you do -- did you do a first
2   set of analysis and then change some of the
3   calculations?
4       A.   Oh, my gosh. I don't recollect.
5   But, you know, drafts versus the final
6   results, the final report, there could have
7   been a difference in there. So I just want to
8   caution that these are not -- it's not the
9   final report.
10      Q.   Understood. We do have
11  ultimately what was submitted to CBER and
12  they're the same, but we can pull that out.
13  We can double check.
14          MR. THOMPSON: Counsel, if
15      you're going to ask questions about
16      this section, probably a good time to
17      take a break. We've been going a
18      little over an hour.
19          MR. SCHNELL: Sure.
20          VIDEOGRAPHER: Off the record at
21      3:05. This will end disc number four.
22          - - -
23          (A recess was taken.)
24          - - -
25          VIDEOGRAPHER: The time now is

Page 209

1   3:28. Back on the record. Beginning
2   of disc number five.
3   BY MR. SCHNELL:
4       Q.   Dr. Antonello, staying with the
5   Exhibit 5 that we were looking at before the
6   break, if you could turn to the portion
7   dealing with the original data, and the part
8   where you have the tables which is Bates
9   number ending 841?
10      A.   Yes.
11      Q.   So if you look at Table 2, there
12  you recorded that there were 10 pre-positives
13  in the ELISA test and 61 pre-positives in the
14  AIGENT test. Is that correct?
15      A.   Yes. And I just want to -- yes.
16      Q.   And only three of those were
17  common to both tests. Correct?
18      A.   Yes. Three of those were
19  positive in both tests, yes.
20      Q.   Does that -- what does that tell
21  you about how these two tests compare with
22  this original set of data?
23      A.   That there were more -- I guess
24  these are the pre-vaccination samples, that
25  subset. So there were -- when I look at this

53 (Pages 206 - 209)

**Appx5833**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 210

1 table, say there were many more much higher
2 rate of pre-vaccination samples were positive
3 in the AIGENT than in the wild type ELISA.
4     Q.    Does that suggest to you
5 anything about the reliability of either test?
6     A.    It raises questions about the
7 AIGENT, the pre-positivity rate is much higher
8 than in the ELISA.
9     Q.    And what questions does it
10 raise?
11     A.    That the specificity -- I
12 should -- yeah, the specificity of the ELISA
13 appears better than the specificity of the
14 AIGENT assay.
15     Q.    And that's based on what?
16     A.    Based on the assumption that
17 pre-vaccination samples would test negative in
18 the assay, the vast majority of them would be
19 negative in the assay.
20     Q.    And if you look at the Table 1,
21 there are 98 discordant pairs represented
22 there adding 69 and 29. Right?
23     A.    Yes.
24     Q.    But there are many more on the
25 AIGENT positive, ELISA negative side?

Page 211

1     A.    Table 1?
2     Q.    Yeah.
3     A.    Yes.
4     Q.    Compared to the AIGENT negative,
5 ELISA positive side?
6     A.    Uh-huh.
7     Q.    Is this what you were getting at
8 earlier when you used the term "balance of
9 discordant pairs"?
10     A.    Yes, balance would be that the
11 discordant pairs in each of the, say, the off
12 diagonal, so from the main diagonal, the off
13 diagonal, that you would have similar numbers
14     Q.    In -- I'm sorry.
15     A.    In the discordance you would
16 have similar numbers.
17     Q.    So when you're assessing --
18 strike that.
19     When you're correlating two
20 assays, do you consider not only the number of
21 discrepant pairs but also how they balance in
22 terms of whether they're positive or negative?
23     A.    Yes. Or imbalance positive or
24 negative. The degree of imbalance.
25     Q.    Is the goal -- if you're looking

Page 212

1 for the highest correlation possible, is the
2 goal not only to have the lowest number of
3 discrepant pairs but also to have the best
4 balance of the discrepant pairs that you do
5 have?
6     A.    You say if your goal is to get
7 the highest rate of agreement. But I don't
8 think the goal here is to compare the two
9 assays. The goal isn't to make the highest
10 rate of agreement. It's to say, well, how do
11 these two assays compare with these cutoffs.
12     Q.    But if you were comparing two
13 different correlation studies with the goal of
14 deciding which showed the highest correlation,
15 would you -- you would consider both the
16 number of discrepant pairs and the balance of
17 discrepant pairs. Correct?
18     A.    If that was the goal, yes. I
19 don't believe the goal in setting, say, the
20 wild type ELISA cutoff was to match the AIGENT
21 results. That was not the goal. If that was
22 a goal, then yes, but that was not the goal
23 here.
24     Q.    What was the goal here?
25     A.    The goal here is to show how the

Page 213

1 two assays compare using a cutoff of 10 in the
2 wild type ELISA and a cutoff of 32 in the
3 AIGENT.
4     Q.    And did they compare better in
5 the study using the corrected set or the
6 original set?
7     A.    Did they compare better? I
8 mean, it's how they compare. I think looking
9 at these results versus the first statement we
10 read here, I said in that e-mail, I'm just
11 trying to tie together what was said in the
12 e-mail with the results. These are the
13 original results. So I said, well, for the
14 post-vaccination samples there's limited
15 difference between original and corrected for
16 the pre-vaccination samples. The ELISA titers
17 suggest the corrected results are more
18 accurate than the original results. And
19 looking at the Table 2 there and Table 2 here,
20 I'm referring to the pre-vaccination results,
21 and there's more pre-positives with the
22 original data with the AIGENT than with the --
23 on the original data than compared to the
24 corrected results. Of those that were ELISA
25 negative was 58 versus 35. So 23 more. So

54 (Pages 210 - 213)

**Appx5834**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 214

1 that's what that statement in the e-mail was
2 referring to.
3     Q.   Did you perform these correlation
4 studies because CBER wanted Merck to justify
5 that the 10 Ab serostatus cutoff it was using
6 on the wild type mumps ELISA by comparing it
7 to the AIGENT results?
8         MR. THOMPSON:  Objection to
9     form.
10        THE WITNESS:  Yeah, I did the
11     comparison.  I think it was, if not
12     requested by Merck internally,
13     requested by CBER.  So I did the
14     comparison because I was asked to do
15     it.
16 BY MR. SCHNELL:
17     Q.   But do you have any
18 understanding as to why you were asked to do
19 it?
20     A.   The motivation for it?  To see
21 how the two assays compared.  Beyond that, how
22 that information was going to be used, no.
23     Q.   You don't have any recollection
24 that CBER wanted Merck to support the 10 Ab
25 serostatus cutoff by doing a correlation to

Page 215

1 the AIGENT test?
2     A.   I don't recall specifics of why
3 the comparison and, you know, who was
4 specifically interested in what.
5         - - -
6         (Exhibit Antonello-6, 4/16/02
7     E-mail with attachment, 00025762 -
8     00025763-008, was marked for
9     identification.)
10        - - -
11 BY MR. SCHNELL:
12     Q.   I'd like to mark as Antonello
13 Exhibit 6 an e-mail from Dr. Antonello dated
14 April 16, '02, to Manal Morsy, attaching what
15 appears to be presentation.  Bates range is
16 25762 and 3.
17     Do you recall this e-mail and
18 presentation?
19     A.   I don't recall the specific
20 e-mail, this e-mail, but I do recall, and I
21 recognize these slides as being -- summarizing
22 the comparison.  So I don't -- can't say, oh,
23 yeah, I did this on this date or anything like
24 that.  But I recognize the slides.
25     Q.   So you wrote that in the second

Page 216

1 sentence, A wild type ELISA cutoff of 16
2 balances misclassifications between assays.
3 As I recall, the recommendation at CAS was to
4 stick with 10 Ab units.
5     First of all, what does CAS
6 stand for?
7     A.   I believe that word is clinical
8 assay sub-team.
9     Q.   What is that?
10     A.   Let me say it again.  Maybe a
11 team, sub-team of individuals from the
12 different areas, statistics, the lab.  And I'm
13 not sure of the acronyms at that time.  So
14 that's what I think it's referring to, but I
15 couldn't say exactly who was represented.
16 Most likely statistics, the lab, potentially
17 clinical, potentially regulatory.  But I don't
18 specifically -- I don't recollect who was
19 there.
20     Q.   Do you recall doing the same
21 kind of comparison between the wild type ELISA
22 assay and the AIGENT assay that we just
23 discussed by using a 16 Ab cutoff instead of a
24 10 Ab cutoff?
25     A.   I don't have that recollection,

Page 217

1 but I think I looked at it.  It's, you know,
2 maybe evaluated, we could evaluate using
3 different cutoffs.  And here it says, this is
4 from me, that I did look at the 16 and you had
5 better overall agreement between the two
6 assays with 16 than you did with 10.
7     Q.   Given that, do you have any
8 understanding as to why the recommendation
9 that CAS was to stick with 10 Ab?
10        MR. THOMPSON:  Objection to
11     form.
12        THE WITNESS:  I don't have
13     definitive recollection, but I would
14     think that you would use 10 because the
15     cutoff in the ELISA would be based on
16     the performance in the ELISA.  That's
17     how the cutoff was determined.  Not
18     necessarily -- not on what cutoff gives
19     the best agreement to the PRN.  For the
20     reason that if the PRN, if the PRN
21     doesn't necessarily represent truth for
22     every sample, you don't know that those
23     are the correct results.  So I don't
24     think you would want to tie your ELISA
25     cutoff to be as close as possible to

55 (Pages 214 - 217)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 218

1    the PRN if the PRN is potentially
2  inaccurate.
3  BY MR. SCHNELL:
4    Q.    And in what way did the 10 Ab
5  cutoff provide a better performance in the
6  wild type mumps ELISA assay?
7    A.    The 10 Ab cutoff was selected on
8  the basis that it provided in that assay good
9  specificity and good sensitivity.  It provided
10 a good balance based on itself, its own
11 performance.
12   Q.    But did you ever attempt to
13 measure the specificity and precision using
14 anything other than 10 Ab?
15   A.    In the ELISA?
16   Q.    Yes.
17   A.    Yes.  In that report, I think we
18 looked at -- in the wild type ELISA, we looked
19 at 5 and 10 was documented in that report.
20 So, yes, we looked at something other than 10.
21 We looked at 5.
22   Q.    Did you look at 16?
23   A.    For this evaluation, for this
24 comparison?
25   Q.    No, for the comparison of how

Page 219

1  well --
2    A.    For the wild type ELISA?
3    Q.    Yes.
4    A.    I can't -- I think if 10 worked
5  well, if 10 is classifying the pre-vaccination
6  samples as negative, there wouldn't be a
7  reason to go higher than 10 because you're
8  going to have reduced sensitivity.  So I mean,
9  why go higher than 10 if 10 is doing a good
10 job classifying pre-vaccination samples as
11 negative.
12   Q.    How do you know that going
13 higher than 10 would result in reduced
14 specificity?
15   A.    Well --
16   Q.    Did you say specificity or
17 sensitivity?
18   A.    Reduced sensitivity.
19   Q.    So how did you know -- how would
20 you know that it would automatically go --
21 that going higher than 10 Ab would result in
22 reduced sensitivity?
23   A.    By definition, the higher that
24 we increased the cutoff, the less likely
25 samples are going to be above that.  It will

Page 220

1  test positive.  It will have a lower and lower
2  fraction the higher you go above 10.  And the
3  higher you go above 100, 1,000, you'll have
4  less samples testing positive.  So it's just
5  by definition.
6    Q.    Are you talking about both the
7  pre-vaccination and post-vaccination?
8    A.    No, I'm talking post.  In terms
9  of sensitivity, true positives.
10   Q.    So you're saying for the
11 post-vaccination side, the higher the
12 serostatus cutoff, the lower the sensitivity?
13   A.    Yes.  And it doesn't have to be
14 post-vaccination.  It could be just let's say
15 people who didn't receive the vaccine who got
16 exposed and they have mumps antibody in their
17 system, just the higher we make the cutoff,
18 the lesser those people are going to test
19 positive, or test above that cutoff the higher
20 you make it.
21   Q.    So in trying to determine what
22 the most appropriate serostatus cutoff was for
23 the wild type mumps ELISA assay, you did not
24 test for a serostatus cutoff above 10 Ab.  Is
25 that correct?

Page 221

1    A.    We did not test?  I mean, you
2  just pick different cutoffs and you can
3  evaluate.
4    Q.    And so the question is, did you
5  evaluate --
6        MR. THOMPSON:  Were you finished
7    your answer?
8  BY MR. SCHNELL:
9    Q.    Sorry.
10   A.    You can pick different cutoffs
11 and you can evaluate.  Whether we did evaluate
12 above 10 and chose not to use it, or even if
13 we didn't evaluate above 10, it wouldn't be
14 necessary because 10 was sufficiently high,
15 that gave us a low pre-positivity rate.  And
16 we could make it higher but then you're going
17 to hurt on the other end in terms of
18 sensitivity.  You're going to pay a penalty
19 there.
20   Q.    And that conclusion was based on
21 the study you did and the validation report of
22 those 66 samples?
23   A.    Probably not only that.
24 Probably also the comparisons that were
25 performed to the legacy ELISA as well.  All

56 (Pages 218 - 221)

Appx5836

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 222

1 that factored into the decision that 10 was
2 sufficient.
3    Q.    Anything else -- sorry.
4    A.    No.
5    Q.    Anything else factor into that
6 decision?
7    A.    Not that I can recollect.
8         - - -
9        (Exhibit Antonello-7, 3/12/01
10    E-mail, 00615920 & 00615921, was marked
11    for identification.)
12         - - -
13 BY MR. SCHNELL:
14    Q.    I'd like to mark as Antonello
15 Exhibit 7 an e-mail from Dr. Antonello, dated
16 March 12, 2001, Bates number 615920 and 21.
17        Do you recall the circumstances
18 surrounding this meeting -- I'm sorry, these
19 e-mails?
20    A.    Let me just take a little bit
21 more time to look at it, please.
22    Q.    Sure.
23    A.    What does "REDACTED - OMP" mean?
24    Q.    Your counsel has redacted
25 certain things in the document that they don't

Page 223

1 want us to see because it relates to other
2 Merck products besides mumps.
3    A.    Okay. So let me continue. I
4 was trying to piece it together. Okay.
5    Q.    So do you recall the
6 circumstances surrounding this e-mail, these
7 two e-mails?
8    A.    No, I don't recall.
9    Q.    Do you recall ever discussing at
10 Merck the use of a fourfold rise cutoff with
11 the wild type mumps ELISA?
12    A.    I don't recollect.
13    Q.    You don't recall ever doing any
14 work in calculating what a fourfold rise
15 increase would be for the serostatus cutoff in
16 a wild type mumps ELISA?
17    A.    Yes, I think in the report we
18 reported fourfold rise results.
19    Q.    So just to correct, that was for
20 the AIGENT ELISA. I'm talking about -- THE
21 AIGENT test. I'm talking about the wild type
22 mumps ELISA.
23    A.    For the wild type mumps ELISA,
24 right. I'm just looking at the validation
25 report to see if fourfold rise was in there.

Page 224

1 We didn't look at post-vaccination samples.
2 So it wouldn't be in there.
3        So the question is?
4    Q.    Do you recall ever doing work on
5 a fourfold rise increase for the wild type
6 mumps ELISA?
7    A.    I don't recall it, but -- I
8 don't recall it.
9    Q.    I'll give you another e-mail you
10 wrote, maybe that will help refresh your
11 recollection.
12         - - -
13        (Exhibit Antonello-8, 10/2/01
14    E-mail, 00561393, was marked for
15    identification.)
16         - - -
17 BY MR. SCHNELL:
18    Q.    I'd like to mark as Antonello
19 Exhibit 8 an e-mail from Dr. Antonello dated
20 October 2, 2001, Bates number 561393.
21    A.    Okay.
22    Q.    So does this at all refresh your
23 recollection as to your calculation of a fold
24 rise in connection with the wild type mumps
25 ELISA?

Page 225

1    A.    It doesn't refresh my
2 recollection, but, you know, it says what it
3 says and what was done.
4    Q.    So you calculated that a
5 statistically meaningful fold increase for the
6 wild type mumps ELISA from the serostatus
7 cutoff would be 3.7. Is that correct?
8    A.    Yes.
9    Q.    And you rounded that up to
10 practically being a fourfold increase?
11    A.    Correct.
12    Q.    And what did that mean with
13 respect to the serostatus cutoff for the
14 purposes of the wild type mumps ELISA?
15    A.    What did that mean? That in the
16 wild type mumps ELISA, one of the things we
17 tried to do is get away from matrix
18 interference, sample the -- you test the
19 sample at a dilution. If you test it neat, it
20 will interfere with the assay result. So you
21 want to dilute the sample.
22        In the legacy ELISA we were
23 diluting 1 to 100, but even at that dilution,
24 it was interfering with the ability to read
25 the antibody level. So I move into the new

57 (Pages 222 - 225)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 226

1 ELISA, the wild type ELISA. We wanted to
2 increase the dilution from 1 to 100 to 1 to
3 1,000. So that would get us away from the
4 matrix interference problem so that we get a
5 more accurate reading of the antibody level.
6 It would be less subject to the dilution that
7 you're testing. But if you dilute the sample
8 further, then you can't read as low levels.
9       So there's a -- with these
10 things, there's always a balance and a
11 compromise. So you wanted to dilute the
12 sample more to be able to remove the dilution
13 effect, get a more accurate result. But the
14 consequence of that is you can't read as low.
15 So in the legacy assay, we could read down to
16 2 Ab units or use that as approximately 2 for
17 the cutoff. Whereas, in the new assay, it was
18 not set as low. We set it higher. We set it
19 at 10. Part of that was because we wanted to
20 go higher dilution so we could get a more
21 accurate result. So there's a balance that
22 has to be struck between them.
23       So now because you can't measure
24 as low in the assay, you know, as low as we
25 can measure is 10, then before if a sample

Page 227

1 gave a result of less than 2 pre-vaccination,
2 post-vaccination if they got an 8, we would
3 say, oh, that's a fourfold rise. Well, now,
4 if you're less than -- if you're using 10 as
5 your lowest, then you need a 40 to get a
6 fourfold rise. So before an 8 was a fourfold
7 rise, now you need a 40.
8       So I'm just pointing out that,
9 you know, the consequence here of using this 1
10 to 1,000 dilution is we can't read as low.
11 And before if you, you know, 8s were positive
12 fourfold rise, now you require a 40. So it's
13 going to be a much harder bar to achieve a
14 fourfold rise for low titered samples with
15 this if we go with the 1 to 1,000 dilution
16 because we're limited in how low we can read.
17 Had we run the samples at a 1 to 100 dilution,
18 we could read down to one and then a fourfold
19 rise. But the issue with that is now you're
20 only diluting the sample 1 to 100, you're not
21 getting as accurate a titer. So it's a
22 balance between trying to get away from the
23 dilution effect, get an accurate titer, but
24 losing sensitivity.
25       Q.    You write in the very end of

Page 228

1 your e-mail, ...if we are required to have
2 greater than 90 percent of subjects vaccinated
3 show a fourfold rise in titer, then it appears
4 that the only way this can be achieved under
5 the current testing scheme would be to
6 incorporate testing of samples at dilutions
7 that are at least fourfold less than 1 to
8 1,000.
9       So why would Merck ever be
10 required to adopt a fourfold rise in titer for
11 the wild type mump ELISA?
12       MR. THOMPSON:  Object to the
13 form.
14       THE WITNESS:  If CBER required
15 that, that would be the case. Or if
16 clinicians at Merck said all that
17 matters is a fourfold rise in titer,
18 not positive/negative around the
19 cutoff. So if that was something that
20 would be required by CBER, I'm just
21 saying, hey, now if we're at the higher
22 dilution, less sensitivity, it's a
23 tougher bar to achieve, and we could
24 achieve it, but there are different
25 things that you'd have to do. You'd

Page 229

1 have to not dilute it 1 to 1,000. We
2 get more back into the matrix
3 interference problem, and that would,
4 you know, you can pick your -- pick
5 your -- I don't want to say poison,
6 it's not poison, but it's just pick
7 where your balance is. We can do this
8 but then you have that problem. We can
9 read lower, but dilution interference.
10 Or we can get away from the dilution
11 interference and not read as low.
12 BY MR. SCHNELL:
13       Q.    You also mentioned that you
14 recalculated, it appears, the precision for
15 the wild type mumps ELISA?
16       A.    Just take it -- also, I mean,
17 things are done in collaboration. If you make
18 a change to an assay, there are effects,
19 ripple effects. So it has to be considered.
20 Any sorts of changes need to be considered.
21 What is the impact downstream of those things
22 And so it's not me who says this is how it has
23 to be. It's, hey, here are the different
24 options we have, and here is the pros and
25 here's the negatives with each option. And we

58 (Pages 226 - 229)

Appx5838

Page 230

1  need clinical statistics, regulatory need to
2  decide, you know, what's the path that is the
3  least problematic, the best path, the most
4  correct path to take. So that's what this is.
5      Q.   So on the precision percentage
6  that had originally been calculated at
7  25.3 percent, you recalculated it after having
8  been exposed to more assay runs at
9  48.8 percent. Correct?
10     A.   That's based on the low positive
11  control on that sample.
12     Q.   Now, 48.8 percent precision is
13  a -- represents a significantly higher
14  variability than a 25.3 percent precision.
15  Correct?
16     MR. THOMPSON: Objection to
17     form.
18     THE WITNESS: It's higher than
19     25 percent, yes. And now, too, is
20     could be more representative of the
21     assay, but it's also just one sample.
22     Certain samples can be more variable
23     for sure in an assay than other
24     samples. So it could have been partly
25     due to the -- it could have been

Page 231

1      reflecting the assay variability or it
2      could have been reflecting that that's
3      a more variable sample.
4  BY MR. SCHNELL:
5      Q.   But you believed it to be a more
6  reliable measure than the original 25.3 percent
7  that you calculated in the validation. Correct?
8      A.   I probably felt like it was a
9  more defensible measure that -- more
10  defensible measure than what was in the
11  validation, and I would -- yeah, having a
12  higher variability makes it, it's more
13  conservative. If I used the 25 percent, I
14  would have come up to something closer to a
15  twofold rise as being statistically
16  significant. So I think, if anything, I
17  wanted to err on the side of conservatism to
18  use higher variability, kind of a worst case
19  scenario.
20          - - -
21      (Exhibit Antonello-9, 10/6/01
22      E-mail with attachment, 00561451 -
23      00561454, was marked for identification.)
24          - - -
25  BY MR. SCHNELL:

Page 232

1      Q.   I'd like to mark as Antonello
2  Exhibit 9 an e-mail from Manal Morsy, dated
3  November 6, 2001, to Dr. -- to Henrietta Ukwu,
4  U-K-W-U, with a copy to Dr. Antonello and
5  numerous other individuals. It attaches what
6  appear to be minutes from a meeting or a CBER
7  teleconference, and the memo of the minutes is
8  dated October 19, 2001. Bates range for the
9  package is 561451 through 54.
10         This purports to detail a
11  teleconference with CBER that several
12  individuals, including yourself, had on the
13  issue of the ELISA serostatus cutoff in the
14  October 2001 time frame. Do you remember
15  participating in a teleconference with CBER on
16  this subject in and around that time frame?
17     A.   I don't recollect.
18     Q.   Okay. Let me -- let me look
19  at -- let's discuss some of these minutes as
20  they were reported here and see if that helps.
21         If you look under number 2 on
22  the first page of the minutes, under "Mumps
23  ELISA assay."
24     A.   Yes.
25     Q.   It says, "CBER requests

Page 233

1  additional justification for the cutoff chosen
2  for the mumps ELISA. The observation that the
3  assay cutoff is sufficiently high to
4  accurately classify pre-vaccination sera as
5  negative is useful, but insufficient by itself
6  as it does not relate to seroprotection."
7         You acknowledged already that --
8  previously today that the serostatus cutoff of
9  10 Ab used for the wild type mumps ELISA did
10  not in any way relate to seroprotection.
11  Correct?
12     A.   That's correct.
13     Q.   Do you recall CBER having that
14  same understanding and wanting Merck to
15  provide additional support for why the 10 Ab
16  serostatus cutoff was the proper one?
17     A.   It says so here. So --
18     Q.   But you don't have any
19  independent recollection?
20     A.   No.
21     Q.   You have no independent
22  recollection whatsoever of any position CBER
23  took with regard to the serostatus cutoff that
24  you had calculated at 10 Ab?
25     A.   Things that you're asking

59 (Pages 230 - 233)

Appx5839

Page 234

1 occurred in 2001, 16 years ago, so I don't
2 have specific recollection. I would have to
3 look at things that are provided and what was
4 said, what was written, what I said, what
5 reports. So specific recollections, no.
6 Specific recollections of e-mails from
7 16 years ago, no.
8    Q.    So will you take a moment, then,
9 to read these minutes and see if that helps
10 refresh your recollection.
11    A.    There's a lot in here.
12    Q.    Does any of it refresh your
13 recollection as to discussions that Merck had
14 during this time with CBER about the
15 appropriateness of the 10 Ab serostatus cutoff
16 that you calculated?
17    A.    The recollection, no. But
18 things that we've discussed today, yes.
19    Q.    So --
20    A.    I mean, I can see how it relates
21 to things we've discussed today.
22    Q.    So what, if anything, does it
23 tell you as to why you were asked to perform a
24 correlation between the wild type mump ELISA
25 assay using a 10 Ab serostatus cutoff and the

Page 235

1 AIGENT assay results?
2    A.    It says, "Because neutralization
3 assay results were correlated with
4 seroprotection in early efficacy trials, CBER
5 recommends that the ELISA cutoff be compared
6 with the cutoff used in the PRN assay."
7    Q.    And that's what you did.
8 Correct?
9    A.    That is correct. And that's
10 what the memo we looked at addressed.
11    Q.    Did the correlation that you
12 performed between the wild type mump ELISA
13 assay and the AIGENT assay results provide, in
14 your opinion, any support that the 10 Ab
15 serostatus cutoff was relevant to
16 seroprotection?
17       MR. THOMPSON: Object to the
18    form.
19       THE WITNESS: I don't know what
20    a protective level is. So I don't -- I
21    can't address what a protective level
22    is and whether that's protective or not
23    protective. It just showed the
24    relationship between the two assays.
25    CBER inferred that to mean that's

Page 236

1    good. That's not my role.
2 BY MR. SCHNELL:
3    Q.    As far as your performing the
4 calculation, did it give you any comfort that
5 the 10 Ab serostatus cutoff that you
6 calculated was relevant to seroprotection?
7       MR. THOMPSON: Same objection.
8       THE WITNESS: Yeah, I don't know
9    what is protection. I did the
10    comparison that was requested and
11    showed how the two assays relate. What
12    that means beyond that, that's not my
13    area of expertise, how to interpret the
14    results in that sense.
15 BY MR. SCHNELL:
16    Q.    Did you gain any greater
17 confidence in -- that your selection of 10 Ab
18 was the appropriate serostatus cutoff for the
19 wild type mumps ELISA from the correlation you
20 made between the AIGENT and ELISA tests?
21       MR. THOMPSON: Object to the
22    form.
23       THE WITNESS: Can you repeat the
24    question?
25          - - -

Page 237

1       (The court reporter read the
2    pertinent part of the record.)
3          - - -
4       THE WITNESS: In the sense that
5    testing that we looked at
6    pre-vaccination samples and
7    post-vaccination samples in the ELISA,
8    that it did a good job discriminating
9    in the ELISA, PRN aside, just within
10    the ELISA itself, gives me
11    confidence -- gave me confidence in the
12    wild type ELISA. Not because of how it
13    related to the PRN but how it performed
14    on pre-vaccination and post-vaccination
15    samples.
16 BY MR. SCHNELL:
17    Q.    So is your testimony that it
18 gave you greater confidence because using the
19 10 Ab serostatus cutoff provided --
20    A.    Was able to discriminate.
21       MR. THOMPSON: Let him finish
22    his question.
23 BY MR. SCHNELL:
24    Q.    I'm not following how, if you're
25 putting the AIGENT part of the comparison to

60 (Pages 234 - 237)

Appx5840

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 238

1 the side and you're just focusing on the
2 ELISA, how did that give you greater
3 confidence that the 10 Ab used in the ELISA
4 was the appropriate cutoff?
5 A. AIGENT aside -- I mean, AIGENT
6 could have been, you know, let's just say
7 nonsense results, everything in the AIGENT
8 comes out negative, pre and post. Everything
9 in the AIGENT comes out positive pre/post. So
10 regardless of what I got in the AIGENT, I
11 tested, you know, 1,000 samples in the wild
12 type ELISA and the pres, it called very high
13 percentage of those negative, and the posts it
14 called a high percentage of those positive.
15 So I've got 1,000 samples that I just tested,
16 I knew pre and post, and it performed well in
17 the wild type ELISA. So that gives me
18 confidence in the ELISA. How it performed
19 relative to the AIGENT is a separate question.
20 The AIGENT could have been -- could be truth
21 or it could be off base. That doesn't make
22 the ELISA right or wrong.
23 Q. I want you to focus on the
24 comparison. My question is specific to the
25 comparison. Did the comparison you performed

Page 239

1 between the wild type mumps ELISA and the
2 AIGENT assay, did that comparison in any way
3 give you greater confidence that your 10 Ab
4 serostatus cutoff for the wild type mumps
5 ELISA was the proper cutoff?
6 A. What I can tell you is that it
7 gave CBER, who asked us to do that comparison,
8 greater confidence in 10 Ab. So it gave --
9 CBER is the one who requested it, it appears,
10 and we performed that evaluation, and it gave
11 CBER that confidence.
12 For me, personally, like I say,
13 the AIGENT -- the wild type ELISA results
14 stand on their own. Now, maybe that might
15 give someone -- those results may give someone
16 greater confidence in the AIGENT assay, but
17 what gives me greater confidence in the wild
18 type ELISA is how it performed for those 1,000
19 samples, or however many.
20 Q. I'm going to ask the question
21 again, because you gave me the answer with
22 respect to CBER. I'm asking for your opinion,
23 you. Did it give you greater confidence that
24 you had -- that -- start again.
25 Did the comparisons you made

Page 240

1 between the AIGENT test and the wild type mump
2 ELISA test give you greater confidence that
3 the 10 Ab serostatus cutoff for the wild type
4 mumps ELISA was the proper ELISA -- was the
5 proper cutoff?
6 MR. THOMPSON: Objection. Asked
7 and answered. He did answer for
8 himself.
9 THE WITNESS: I don't know what
10 a protective level is. So for me I
11 can't say that 10 is the correct
12 protective level. I don't know what
13 the protective level is. So it doesn't
14 give me greater confidence in that
15 sense that 10 is a protective level.
16 BY MR. SCHNELL:
17 Q. And, again, my question had
18 nothing to do with protective level. My
19 question is merely this: You calculated a 10
20 Ab serostatus cutoff because I'm assuming you
21 thought it was the proper cutoff to use for
22 the wild type mumps ELISA. Correct?
23 A. Because it did a good job
24 discriminating between positives and --
25 between pre-vacs and post-vacs and expected

Page 241

1 positives and negatives. Correct.
2 Q. My question, again, is did the
3 comparisons that you made between the ELISA
4 test and the AIGENT test give you any greater
5 confidence that you picked the right cutoff in
6 10 Ab for the wild type mumps ELISA?
7 MR. THOMPSON: Objection. Asked
8 and answered.
9 THE WITNESS: Yeah, I would --
10 my answer is the same. Yes, in that
11 the wild type ELISA assay performed, I
12 think, well on that set of samples.
13 And, yes, it gave me greater confidence
14 by doing that comparison because we
15 tested 1,100, however many samples, in
16 the wild type ELISA and it performed
17 well. My answer is not going to
18 change.
19 BY MR. SCHNELL:
20 Q. So you're talking about just the
21 ELISA results. Correct?
22 A. Yes.
23 Q. And I'm saying the ELISA results
24 compared to the AIGENT results, and whatever
25 correlations you found from that, did that

61 (Pages 238 - 241)

Appx5841

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 242

1 increase your confidence that 10 Ab was the
2 proper cutoff?
3        MR. THOMPSON: Same objection.
4        THE WITNESS: I don't know what
5    the proper cutoff is, but I've --
6    certainly the data from that study
7    didn't indicate that 10 Ab was a poor
8    choice.
9 BY MR. SCHNELL:
10    Q.    And, again, that's only with
11 respect to the ELISA results. Correct?
12    A.    Correct.
13    Q.    Is there anything in the AIGENT
14 results that one way or the other gave you --
15 was relevant to your view as to whether or not
16 10 Ab was the proper cutoff for the ELISA
17 assay?
18    A.    To the extent that CBER was
19 pleased with the results, yes. I say pleased
20 with the results, but they were satisfied
21 with the results, yes.
22    Q.    Any confidence yourself, putting
23 aside your interpretation --
24    A.    Confidence in the wild type
25 ELISA, additional confidence?

Page 243

1    Q.    Any additional confidence
2 putting aside whatever interpretation you read
3 from CBER.
4    A.    Yes, I think, you know,
5 generally, there was generally negatives --
6 negative in both assays, positive in both
7 assays and I think the majority of
8 deficiencies or discordances were due to more
9 issues with the AIGENT assay than with the
10 ELISA.
11    Q.    You're saying that the -- you
12 think the discordance -- the primary basis for
13 the discordant pairs were problems in the
14 AIGENT test?
15        MR. THOMPSON: Objection.
16    Misstates the record.
17        THE WITNESS: Yes, the -- yes.
18        MR. THOMPSON: Are we shifting
19    gears, Counsel?
20        MR. SCHNELL: You want to take a
21    break?
22        MR. THOMPSON: We've been going
23    about an hour.
24        MR. SCHNELL: Sure.
25        VIDEOGRAPHER: Off the record at

Page 244

1    4:24. This will end disc number five.
2        - - -
3        (A recess was taken.)
4        - - -
5        VIDEOGRAPHER: The time now is
6    4:50. Back on the record. The
7    beginning of disc number six.
8        - - -
9        (Exhibit Antonello-10, E-mail
10    chain, 00561416 - 00561421, was marked
11    for identification.)
12        - - -
13 BY MR. SCHNELL:
14    Q.    I'd like to mark as Antonello
15 Exhibit 10 an e-mail, an e-mail chain
16 beginning with the top one from Jonathan
17 Hartzel, dated September 28, 2001. And the
18 Bates range for the packet is 561416 through
19 21. Dr. Antonello is among the numerous
20 recipients of this e-mail. I'm sorry,
21 Dr. Antonello is.
22        Dr. Antonello, can you just take
23 a moment to give this a review?
24    A.    Yes.
25        MR. THOMPSON: If you could just

Page 245

1 confirm the Bates range?
2        MR. SCHNELL: Did I say it
3 wrong?
4        MR. THOMPSON: You started.
5        MR. SCHNELL: 561416 through
6 421.
7        MR. THOMPSON: I didn't hear,
8 I'm sorry.
9 BY MR. SCHNELL:
10    Q.    Do you see the attachment,
11 "Distribution of 6-week Mumps Titers Using the
12 Mumps Wild-type ELISA Assay"?
13    A.    I do, and I was looking at that
14 and wondering -- it appears to me that that
15 was provided by Jon Hartzel.
16    Q.    Right. It was attached to his
17 e-mail?
18    A.    Okay. I just didn't spend
19 enough time with this to digest it all. But I
20 was looking at it thinking -- I mean you
21 don't -- is this something that I had
22 generated.
23    Q.    It sounds -- it seems like you
24 did because on the second page there's a
25 special thanks to Tim Schofield, you, and

Appx5842

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 246

1 Dr. Wolchko, so --
2 A. And I think -- again, I just
3 spent two minutes.
4 Q. Sure.
5 A. But I think she's just referring
6 to the whole package, not to this attachment.
7 Q. That's fine. That's fine. I
8 just have a couple of questions, you either
9 know or you don't know. That's fine. Just
10 tell me when you've -- when you've read that.
11 A. Okay. I'm just going to read
12 the message from Jon. Okay.
13 Q. So referring to this document
14 with the title, "Distribution of 6-week Mumps
15 Titers Using the Mumps Wild-type ELISA Assay,"
16 were you involved in preparing that?
17 A. I don't have a recollection of
18 being involved in preparing this.
19 Q. So there -- in the -- in that
20 document it says, "There is some concern that
21 CBER may require a fold rise in titers (from
22 pre- to post-vaccination) in order to
23 demonstrate that seroconversion has occurred."
24 A. Okay. Now, I see -- you're in
25 the first paragraph?

Page 247

1 Q. Yes. Do you recall CBER having
2 that concern?
3 A. No.
4 Q. Do you recall being involved in
5 any discussions at Merck addressing such a
6 concern from CBER?
7 MR. THOMPSON: Objection.
8 THE WITNESS: No.
9 BY MR. SCHNELL:
10 Q. And at the bottom -- well,
11 actually the next -- very next sentence says,
12 "So that, a subject who has a pre-vaccination
13 titer of 9.9 and a post-vaccination titer of
14 10.1 (the difference being within the
15 variability of the assay) would not be
16 considered a seroconverter."
17 Do you see that?
18 A. Yes.
19 Q. And that's true. Correct?
20 A. That's true.
21 Q. So --
22 A. By that definition, yes.
23 Q. And do you recall there being
24 some discussion within Merck about CBER being
25 interested when it was assessing the validity

Page 248

1 of the 10 Ab serostatus cutoff, assessing how
2 the samples performed in or around that 10 Ab
3 cutoff?
4 A. Can you repeat the question?
5 - - -
6 (The court reporter read the
7 pertinent part of the record.)
8 - - -
9 MR. THOMPSON: Objection to
10 form.
11 THE WITNESS: Yeah. I'm sorry,
12 I don't understand the question.
13 I'm -- just if you -- in general
14 recollection about the fourfold cutoff,
15 I don't have recollections of, you
16 know, detailed items at that time. I
17 can only go from me, the reports and
18 what's written and the documents that I
19 provided. So I can talk from those
20 things. But I can't go back and say,
21 oh, yes, I recollect that.
22 BY MR. SCHNELL:
23 Q. The bottom, the last sentence on
24 this page says, If CBER required a fourfold
25 rise in titer (defined as less than 10 to

Page 249

1 greater than or equal to 40), the
2 seroconversion rates for these studies would
3 range from 80.9 percent to 85.2 percent.
4 Do you see that?
5 A. Yes.
6 Q. Is that a correct statement?
7 A. To the extent that Jon is
8 correct, yes. I mean, it's Jon's message.
9 Q. And you have no reason to doubt
10 his math, do you?
11 A. Jon? No.
12 Q. So if you turn over the page,
13 there's actually a table.
14 A. Yes.
15 Q. And tell me if you understand
16 the table as I'm about to describe. The
17 left-most column is various serostatus cutoffs
18 from less than 10 all the way up to greater
19 than or equal to 40. And then the columns
20 that follow identify the number of
21 seroconversions that would occur at those
22 various serostatus cutoffs in the various
23 potencies that were run in the wild type mumps
24 ELISA assay. Is that a fair statement of what
25 this table shows?

63 (Pages 246 - 249)

**Appx5843**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 250

1     A.   I'm sorry, I was thinking at the
2 time. If you could repeat the question,
3 please?
4         - - -
5       (The court reporter read the
6     pertinent part of the record.)
7         - - -
8     THE WITNESS: Yeah. I think
9     just looking at it, it looks like it's
10     giving, out of 591 subjects, how many
11     tested less than 10 for each group, how
12     many tested exactly 10 or 11 or 12 and
13     so on. So it's giving the distribution
14     of results. I don't think it's -- it's
15     just giving the distribution of
16     results. It's not -- you can say if it
17     was -- if we did use a serostatus
18     cutoff of 19, you could sum up all
19     those results less than 19 and you say,
20     well, that's the percentage that tested
21     less than and the percentage above. So
22     it could be used in the manner that you
23     stated.
24 BY MR. SCHNELL:
25     Q.   And, in fact, if you look back

Page 251

1 at what the memo we just looked at said, it
2 said for a serostatus cutoff greater than or
3 equal to 40, the seroconversion rates would
4 range from 80.9 percent to 85.2 percent, and
5 that's exactly what it shows in the bottom row
6 right above the total in this table.
7     A.   It says if CBER required a
8 fourfold rise in titer defined as a serostatus
9 cutoff of less than 10, not a serostatus
10 cutoff of 40. I think you had said serostatus
11 cutoff of 40. But a serostatus cutoff defined
12 as less than 10 and seroconversion pre less
13 than 10, post greater than or equal to 40,
14 then the rates for the study would range from
15 80.9 to 85.2 percent, yes.
16     Q.   And is it your understanding
17 that if Merck had selected for its wild type
18 mumps ELISA assay a serostatus cutoff higher
19 than 10 Ab, then the seroconversion rates that
20 it measured in the assay would have decreased?
21     A.   Yes. The higher you set the
22 serostatus cutoff, the lower seroconversion
23 rate. If you define seroconversion rate as a
24 fourfold rise, the lower the seroconversion
25 rate would have gone the higher you said set

Page 252

1 the cutoff.
2     Q.   Even if you don't define it as a
3 fourfold rise, if the Merck had decided to use
4 a 20 Ab serostatus cutoff instead of 10 Ab,
5 the seroconversion rates it measured would
6 have been lower than the rates it actually
7 measured. Correct?
8     A.   Yes. And if you had defined it
9 as 200, it would be even lower. And if you
10 defined it as 2,000, it would be even lower.
11     Q.   Now, did --
12     A.   Yeah.
13     Q.   I'm sorry.
14     A.   And that speaks to the balance
15 between specificity and sensitivity. I mean,
16 we use 10 because the pre-vaccination samples,
17 a high percentage of those tested negative.
18 So there wasn't a reason to set it higher than
19 10.
20     Q.   Now, when you are talking about
21 conversion rates and specificity and
22 sensitivity, are you using those terms
23 interchangeably?
24     A.   No. I'm saying that how you set
25 the cutoff defines the sensitivity and

Page 253

1 specificity of the assay. And how you set the
2 cutoff if you required a fourfold rise as
3 being the definition of a seroconverter, that
4 where the cutoff is set also impacts the
5 seroconversion rate.
6     Q.   And did the relationship between
7 the serostatus cutoff and what seroconversion
8 rate would result from that serostatus cutoff
9 weigh into your assessment as to what the
10 proper serostatus cutoff was for the mumps
11 wild type ELISA assay?
12     A.   I think here it appears Jon is
13 just showing the impact that if we chose to go
14 with a cutoff of 10, and we -- and CBER
15 required a fourfold rise, that that
16 combination would reduce seroconversion rates.
17     There are alternative -- I mean,
18 again, you look at the situation, there is
19 also alternative ways to approach it. If we
20 wanted to, let's say, hey, we'll increase the
21 dilution, we increased it to 1,000 to get
22 completely free from the matrix, seromatrix
23 interference issue. We can say, well, let's
24 not set it at 1,000, let's set it at 500
25 because that gets us 80 percent of the way

64 (Pages 250 - 253)

**Appx5844**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 254

1 there with the matrix interference and it's
2 much less than at 100, maybe it's not as good
3 as 1,000, but we'll set that, we'll do the
4 dilution at 500. So now you're -- you can
5 read down to 5 with the 1 to 500 dilution of
6 the sample. So there could be a trade-off
7 there where it will say, okay, maybe we'll
8 accept a little bit of matrix interference,
9 and now we'll do the dilutions not at 1 to
10 1,000 but 1 to 500. And now we can set the
11 cutoff at 5. Or maybe we'll use 1 to 250 if
12 that shows little matrix interference there.
13 We'll set the cutoff at 2.5. Now, a 10 is a
14 fourfold rise.
15    So any -- you know, we can be up
16 front with, you know, this is what we're
17 doing, why we're doing it. Convey that
18 information to CBER. You know, if that's --
19 if they said, well, all that matters to us is
20 a fourfold rise, we say, hey, this is the
21 issue, we may have lower positivity rates if
22 we're here and run the assay this way. We can
23 slightly modify the assay. Here you'll have a
24 little bit more dilution effect, but you want
25 to use the fourfold rise criteria, we'll still

Page 255

1 achieve 90 percent samples positive, and
2 everyone may agree that that's the way to go.
3    So here, I mean, if it appears
4 that CBER never came back and said the only
5 thing that is meaningful to us is fourfold
6 rise, if they had said that, we would have
7 said, hey, here's some issues with running the
8 assay this way. We can tweak the assay so
9 that you can achieve a fourfold rise and, you
10 know, we'll have these rates. We're better
11 than before because we're away from -- you
12 know, we're not doing 1 to 100 but 1 to 250.
13 That could be a very happy solution for the
14 company that CBER, you know, agreed to, that
15 that's a scientifically proper way to move
16 forward.
17    So here, I mean, he's just
18 pointing out the issue. And then the next
19 question is, well, CBER never forced us to use
20 a fourfold rise, but if they had, we would
21 look at the alternatives and probably would
22 have went a different way if they had required
23 a fourfold rise. Or maybe they look at these
24 rates and say, okay, this is fine. So there
25 are different ways to approach it.

Page 256

1    Q.    So my question, though, with
2 respect to this serostatus cutoff, the 10 Ab
3 that you calculated and the balance that you
4 talked about in terms of you're accounting for
5 in setting 10 Ab, did the seroconversion rate
6 weigh into that balance?
7    A.    At the time it was set, I don't
8 believe so. From what I -- as far as timing,
9 this memo is 9/28, the validation I believe
10 was done -- oh, for the wild type ELISA, I'm
11 not sure when that was done.
12    Q.    The validation was --
13    A.    December 4, 2000.
14    Q.    Right.
15    A.    So this came a year and 10
16 months after, 11 months. So, no, I don't
17 believe that this was what drove the 10 Ab
18 when we selected 10 Ab.
19    Q.    I'm not talking about this table
20 specifically. I'm talking about -- I'm trying
21 to just understand the balance that you keep
22 referring to that went into the calculation
23 you made of 10 Ab as the proper cutoff for the
24 wild type mumps assay. And you mentioned
25 specificity. You mentioned precision in

Page 257

1 trying to get the best balance. My question
2 is, in that balance, did you also consider
3 where the -- whatever serostatus cutoff you
4 picked, where it would go in terms of the
5 seroconversion rate?
6    A.    I don't have a recollection of
7 doing that at the time of the wild type ELISA.
8 And just -- and this is just coming from what
9 we're looking at today and the questions
10 you're asking. But we didn't include like
11 post-vaccination samples in that validation.
12 So we weren't evaluating it in terms of fold
13 rise. We were just looking at the
14 pre-vaccination. I think we were confident in
15 the -- that we would get similar results as
16 the previous EIA to the degree that the assays
17 agreed. So I don't believe fold rise was a
18 component in setting the 10 Ab cutoff.
19    Q.    Now, we -- I showed you a
20 document earlier in the day where you had
21 discussed with CAS, C-A-S, a 16 Ab serostatus
22 cutoff and the decision was -- with CAS to
23 go with the 10 Ab instead.
24    A.    Right.
25    Q.    Do you know if what weighed into

65 (Pages 254 - 257)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 258

1 CAS's decision was the relative seroconversion
2 rates that would have resulted between using
3 the 10 Ab and the 16 Ab as the cutoff?
4     A.    I don't know, can't speak for
5 CAS, but for myself the 16 that we discussed,
6 that made better agreement between the wild
7 type ELISA and the AIGENT assay.  It gave
8 better overall agreement between the two
9 assays.  For me, the goal in setting the 10 Ab
10 cutoff wasn't to choose the cutoff that gave
11 the best agreement with the AIGENT assay.  It
12 was to choose the right cutoff, I don't want
13 to say the right, but based on the wild type
14 ELISA, not based on how the wild type ELISA
15 compared to the neutralization assay.  So I
16 think, my opinion, don't change the cutoff for
17 the ELISA to 16 so that it agrees with the
18 AIGENT.  I would think the decision would be
19 to keep it at 10 because that's the cutoff
20 that was -- that seems appropriate for that
21 assay in and of itself.
22     Q.    But in the -- in the assessment
23 you made in trying to find what you thought
24 was the best serostatus cutoff, you don't even
25 recall whether you considered 16 Ab.  Right?

Page 259

1     A.    Again, we're talking about the
2 wild type ELISA.  I don't recollect -- I don't
3 recollect 16, I don't recollect 17 or 18.  But
4 the point there is if 10 does a good job, it
5 doesn't make sense to keep increasing because
6 you're going to lose in terms of sensitivity.
7 So if 10 is doing the job within that assay,
8 why increase to 20 -- why increase to 16, why
9 increase to 20, why increase to 200.  10 is
10 sufficiently low.
11     Q.    So when you say going above 10
12 would increase the sensitivity --
13     A.    Going above 10 would decrease
14 sensitivity.
15     Q.    Decrease sensitivity --
16     A.    I'm sorry.
17     Q.    I think it was my mistake.
18         So going above 10 would decrease
19 the sensitivity in what way?
20     A.    That a true positive that maybe
21 has low antibody titer, you would classify
22 that as a negative.
23     Q.    But don't you run the risk if
24 the serostatus cutoff is two low of
25 classifying a true negative as a positive?

Page 260

1     A.    Absolutely.
2     Q.    So why does increasing a
3 serostatus cutoff make it more reliable when
4 you're increasing the possibility of coming up
5 with a false positive?
6     A.    Increasing the cutoff doesn't
7 make it more likely that you'll get a false
8 positive.  Increasing the cutoff decreases the
9 probability that you'll get a false positive.
10     Q.    And how does it do that?
11     A.    So we're talking false positive.
12 So a sample is really negative.  So if I
13 increase the cutoff from -- let's say I have a
14 cutoff of 10, the sample is really negative.
15 If I increase the cutoff from 10 to 20, that
16 sample is less likely to test positive.  So
17 increasing the cutoff reduces the probability
18 of a false positive.
19     Q.    Well, suppose you have a sample
20 that's negative but it has 12 titers.  So at
21 10 it's going to be counting as a positive but
22 at 20 it's going to count as a negative.  So
23 in that situation, the higher cutoff is less
24 reliable in terms of measuring accurately that
25 example.  Right?

Page 261

1     A.    You said it's negative but it
2 has a 12 titer.  Or, you know, it doesn't --
3 it doesn't -- if it's negative, it may test 12
4 in the assay and that would be a false
5 positive.  If I increased the cutoff, it's
6 less likely to have a -- to be a false
7 positive.  If it's truly negative.  I think,
8 too, there is -- you have to distinguish
9 between, okay, you have to make an assumption
10 of what's true for the sample versus the
11 results you get in the assay.  So I think we
12 just have to be careful when you say -- you
13 have to say a true negative, true positive
14 versus the results in the assay.
15     Q.    So in your opinion, when you're
16 talking about rising -- or increase in
17 serostatus cutoff decreases sensitivity,
18 you're assuming a perfect world where
19 everything is measured 100 percent accurately
20 in terms of titers and how they relate to
21 being negative or positive.  Is that correct?
22     A.    I'm just saying a general
23 principle that increasing the cutoff, you'll
24 reduce sensitivity, the ability -- and it all
25 depends, you know, where you are in the

66 (Pages 258 - 261)

**Appx5846**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 262

1  spectrum and that sort of thing. But
2  increasing the cutoff, you're less likely to
3  classify a true positive as positive.
4  Decreasing the cutoff, the problem that you
5  have there is that you're more likely to
6  classify a negative as a positive. I don't
7  want to -- that's what I'm saying. I think,
8  you know, your question is kind of jumping
9  around back and forth and it's confusing.
10     Q.    And you were trying to find the
11  balance between those two scenarios where it
12  would be too low and too high. Is that
13  correct?
14     A.    I'm trying to -- I'm giving
15  options, evaluating. We can evaluate at
16  whatever level anyone wants. But trying to
17  strike a balance between the two, that's
18  correct, that is agreeable by clinical, people
19  who understand the assay, the laboratory,
20  regulatory, all of those groups weigh in and
21  consider the impact of where you set the
22  cutoff. All that has to be considered in the
23  decision of what to move forward with.
24     Q.    So if you were trying to strike
25  the best balance, not setting the serostatus

Page 263

1  cutoff too high and not setting it too low,
2  why didn't you at least considered 16 Ab or
3  anything higher than 10 Ab as a potentially
4  more accurate cutoff for the wild type mumps
5  ELISA --
6          MR. THOMPSON: Object.
7  BY MR. SCHNELL:
8     Q.    -- assay?
9          MR. THOMPSON: I'm sorry.
10  Objection to form.
11          THE WITNESS: I think I've
12  answered this several times. At 10 it
13  did a good job of identifying expected
14  negatives as negative. We didn't need
15  to go higher than 10. If you go higher
16  than 10, the trade-off is reduced
17  sensitivity. So I don't have in these
18  reports 20 or 30 or 40 because it
19  wouldn't be a smart option if 10 is
20  sufficiently high.
21              - - -
22          (Exhibit Antonello-11, E-mail
23  chain, 00791511 & 00791512, was marked
24  for identification.)
25              - - -

Page 264

1  BY MR. SCHNELL:
2     Q.    I'd like to mark as Antonello
3  Exhibit 11 an e-mail chain with the top one
4  being from Dr. Antonello, dated June 30, 2004,
5  and the Bates range is 791511 and 2.
6     A.    Uh-huh.
7     Q.    Do you --
8     A.    I'm sorry, I'm just reading,
9  uh-huh, to myself. Sorry.
10     Q.    Did you get a chance to look at
11  it all?
12     A.    No, I didn't. I just need
13  another minute.
14     Q.    Sure.
15     A.    Okay.
16     Q.    Do you recall the circumstances
17  surrounding these e-mails?
18     A.    No.
19     Q.    So the bottom e-mail you're
20  responding to an MVX. Is that a -- was is
21  that?
22     A.    That's a telephone message. So
23  in the bottom message I received a phone
24  message.
25     Q.    Okay. You're responding -- that

Page 265

1  phone message was from Keith Chirgwin
2  presumably?
3     A.    Presumably.
4     Q.    And you wrote, I'm at -- this is
5  the middle paragraph on the back, the last
6  sentence, "Concluding that the two assays
7  agree reasonably well was important for the
8  purpose of arguing that the ELISA was an
9  acceptable substitute for the neutralization
10  assay."
11     A.    Okay.
12     Q.    What did you mean there?
13     A.    I don't recollect, but it says
14  that the ELISA could be used in place of the
15  neutralization assay. So that's what I meant.
16     Q.    You don't recall one way or the
17  other that one of the purposes for your
18  conducting the ELISA AIGENT comparison was for
19  the purpose of arguing that the ELISA was an
20  acceptable substitute for the neutralization
21  assay?
22     A.    I don't recollect that, no.
23     Q.    And if you flip back to the
24  first -- in the e-mail from Chirgwin to you,
25  he references Steve Rubin who works at the

67 (Pages 262 - 265)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 266

1  FDA. Correct?
2      A.   Uh-huh.
3          MR. THOMPSON:  You have to say
4  yes or no.
5          THE WITNESS:  I believe so.
6  Yes.
7  BY MR. SCHNELL:
8      Q.   And according to Chirgwin, Rubin
9  was suggesting that Merck focus on sera with
10 low antibody titers just above the ELISA
11 cutoff, and he would like to see no more than
12 10 percent of such ELISA low positive sera
13 score negative in the PRN.
14         Do you recall this discussion or
15 any discussion on this subject?
16     A.   Do I recollect this?
17     Q.   Uh-huh.
18     A.   No.
19     Q.   You responded to that that it
20 would be difficult to meet that criteria.  "I
21 don't think we could meet 90 percent agreement
22 in assignment for borderline positives within
23 the PRN assay itself."  [As read.]  And you
24 have no reason to doubt that you were correct
25 in that judgment, do you?

Page 267

1      A.   We did such a subset analysis...
2          MR. THOMPSON:  Objection to
3  form.
4          THE WITNESS:  This is 2004.  I
5          would think that this data addresses
6          the comparison between the two assays.
7  BY MR. SCHNELL:
8      Q.   So if you could pull out what we
9  marked as Exhibit 5, it's the comparison that
10 you did?
11     A.   Yes.
12     Q.   And if you could turn to -- I
13 believe this relates to Table 6d, so if you
14 could pull out 6d?
15     A.   Of?
16     Q.   Exhibit 5, of either the
17 corrected data or the original data, it
18 doesn't matter.
19     A.   6d, yes.  I'll go to the
20 original data just to -- what page do you have
21 for that?
22     Q.   That would be the Bates ending
23 845.
24     A.   Yes, I'm there.
25     Q.   So is this what your

Page 268

1  understanding is of what Dr. Rubin was talking
2  about where he is mentioning that focus on
3  sera with low antibody titers, just above the
4  ELISA cutoff, and he would like to see no more
5  than 10 percent of such ELISA low positive
6  sera score negative in the PRN?  So is my
7  understanding correct that he's talking about
8  this very kind of information?
9      A.   Yes.
10     Q.   And with respect to the first
11 bracket or bucket of samples, and that would
12 be the 25 ELISA positive samples that had
13 between 10 and 20 titers, 6 of which were
14 negative in AIGENT, that was a 24 percent
15 discordant rate.  So that's above the 10
16 percent that is referenced here by Dr. Rubin.
17 Is that correct?
18     A.   Uh-huh.
19     Q.   And --
20         MR. THOMPSON:  You have to say
21 yes or no.
22         THE WITNESS:  I'm sorry, yes.
23 BY MR. SCHNELL:
24     Q.   The next bucket 20 to 40, 8 out
25 of the 68 or 11.8 percent were found to be

Page 269

1  ELISA positive and AIGENT negative.
2      A.   Yes.
3      Q.   Which, again, is outside the 10
4  percent -- closer, but still outside the 10
5  percent.
6      A.   Yes.
7      Q.   So is that consistent with what
8  your response was, that I don't think we could
9  meet 90 percent agreement in assignment for
10 borderline positives within the PRN assay
11 itself?
12     A.   I say, "...this seems like a
13 problematic approach as the percent
14 'false-positive' would depend on which
15 specific sera are selected for inclusion in
16 such an analysis."
17         Apparently didn't, in responding
18 to his MVX, think of this.  But this
19 essentially does point to what Dr. Rubin is
20 seeking.
21     Q.   Right, but not showing the 10
22 percent number that he's suggesting he wants.
23 Is that correct?
24     A.   He said he'd like to see that,
25 and the percentages here are what they are.

68 (Pages 266 - 269)

Page 270

1    Q.    And if you look to the corrected
2  data, Table 6d, that's on the page with the
3  Bates number ending 832, it's a 30 percent
4  discordant rate for those ELISA positive
5  samples in the 10 to 20 titer range.  Correct?
6    A.    Uh-huh.
7    Q.    And a 17.6 percent discordant
8  rate in those ELISA positive samples that are
9  in the 20 to 40 titer range.  Correct?
10   A.    What page?
11   Q.    The Bates ending 832.
12   A.    832.  Yes.
13   Q.    And so at least for these two
14  buckets of samples, they also fall outside
15  the -- what had been referenced here as Rubin
16  suggested, 10 percent threshold.  Is that
17  correct?
18   A.    You're saying Rubin suggested 10
19  percent threshold.  In that message it says
20  it's something that Rubin would like to see.
21  So whether that's, you know, a threshold that
22  11 percent or 15 percent or 24 percent he
23  would consider unacceptable or not, you know,
24  I don't like -- I wouldn't go there.  But the
25  percent in that group in that is higher than

Page 271

1  10 percent, what he would like to see.  If he
2  saw these results and said, hey, I'm
3  comfortable with this, then he may be
4  comfortable with this.  It may be higher than
5  he'd like to see, but it might still be
6  acceptable.  I thought these reports were
7  submitted to CBER back during this time frame.
8    Q.    Well, let's look at what you
9  submitted to CBER.
10          - - -
11     (Exhibit Antonello-12, Serial
12     Number 86, 00761628 - 00761702, was
13     marked for identification.)
14          - - -
15  BY MR. SCHNELL:
16   Q.    I'd like to mark as Antonello
17  Exhibit 12 what is referenced by Merck as
18  serial number 86, dated June 2, 2002, which is
19  a submission Merck made to CBER.  And if you
20  look at both of the comparisons that we've
21  been talking about, that of the -- actually,
22  just the original one was submitted.  The
23  corrected was not.  And that begins on page
24  Bates number ending 672.  Just to confirm that
25  we're talking about the same comparison --

Page 272

1  tell me when you're there.
2    A.    I'm at 672.
3    Q.    So if you look at the overall
4  agreement rate it's 90.4 percent, and that's
5  the same overall agreement rate you have with
6  the comparison that we've been looking at in
7  J-5.  Does that tell you that this is the same
8  analysis?
9    A.    Yes.
10   Q.    And then if you look at the
11  tables that are attached, it goes up to 6b,
12  but 6c and 6d were omitted.  Do you know why?
13   A.    No.  They should not have been
14  omitted.
15   Q.    Can you think of any reason why
16  they were omitted?
17   A.    No.  Is all the data still part
18  of it?  Like Table 7.  What page was that
19  again?
20   Q.    Table 7 and (a) and (b) is
21  there.
22   A.    So the data Table 7a and (b).
23  Okay.
24   Q.    So, actually, if you go back and
25  compare the two documents, the one that you

Page 273

1  had done and the one submitted to CBER, Tables
2  1, 2, 3, 4, are in both.  5a and (b) are in
3  both.  6a and 6b are in both.  And 7a and 7b
4  are in both.  Correct?
5    A.    I wasn't checking, but yes.
6    Q.    So the only tables that were
7  omitted in this submission were Tables 6c and
8  6d.  Correct?
9    A.    It appears that way.  I would
10  have included those tables.  I included them
11  in the report.  I think it was specifically to
12  address the CBER comments that we were looking
13  at.  I think -- so yeah, I would have included
14  it.
15          - - -
16     (Exhibit Antonello-13, 9/14/15
17     E-mail with attachment, 00648043 -
18     00648045, was marked for identification.)
19          - - -
20  BY MR. SCHNELL:
21   Q.    I'd like to mark as Antonello
22  Exhibit 13 an e-mail, dated September 14,
23  2015, from Theresa Morley, M-O-R-L-E-Y --
24   A.    Yes.
25   Q.    -- to Dr. Antonello and several

69 (Pages 270 - 273)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 274

1 others, Bates range 648043 through 45. It
2 attaches a -- what are described as minutes
3 from a meeting that occurred, and the subject
4 line is "VCA Touchbase Minutes." Do you know
5 what this is referring to?
6     A.    This is September 2015?
7     Q.    Yes.
8     A.    VCA is, I believe, vaccine
9 clinical assay group. Touchbase minutes.
10 Wow. Attendees. 2015. Wow. I have to take
11 a look at this. I don't have a recollection
12 of this even though it's 2015.
13     Q.    My questions are -- let me tell
14 you what I --
15         MR. THOMPSON: Take your time.
16 BY MR. SCHNELL:
17     Q.    To be more efficient, though,
18 because I only have questions on a couple of
19 these, let me tell you what my questions are.
20     A.    Okay.
21         MR. THOMPSON: He did say he
22 needed to read it.
23         MR. SCHNELL: No, I understand.
24 I don't want to keep him from reading
25 it. I just don't want him to, you

Page 275

1     know, waste time if it's not going to
2     be relevant. But whatever you need to
3     do.
4 BY MR. SCHNELL:
5     Q.    My questions are, there's a
6 reference to GSK and a meeting with GSK and a
7 concern about something and an investigation,
8 and there's a reference to CBER being involved
9 and then there's reference to notebooks. I
10 guess I'm asking about mostly all of it.
11     A.    Right.
12     Q.    So maybe you should just take a
13 minute to review and then --
14     A.    Okay.
15     Q.    -- unless it sounds like maybe
16 you've had a recollection of something.
17     A.    Yeah. Let me think. I have --
18 now it -- you know, refreshed, all the details
19 I don't have, but I know the issue. Okay.
20     Q.    So what do you recall of this
21 issue?
22     A.    Right.
23         MR. THOMPSON: What issue?
24 BY MR. SCHNELL:
25     Q.    Do you understand the question?

Page 276

1     A.    What do I recall of the issue?
2 I didn't even look at this. But let me see, I
3 just -- let me see what it says here. Okay.
4         So the PPD lab was originally --
5 the labs were removed -- it's a longer issue.
6 The labs moved from the West Point site down
7 to the Wayne facility for clinical testing,
8 clinical testing labs, to make it less of a
9 research environment and more of a production,
10 test lab, clinical testing environment. So
11 that was a while ago. Labs moved down there.
12 And then Merck sold that facility and the
13 testing to PPD, and they then -- it wasn't run
14 by Merck but run by PPD, which was a
15 professional clinical testing lab. So that
16 refers to PPD. So PPD has been running the
17 mumps wild type ELISA. And when we run the
18 assay, we have a control sample on each plate,
19 but not a standard curve on each plate. We
20 don't run the reference standard on each
21 plate. We run the controls and we run the
22 standard on the first plate along with
23 controls. But on the plates after the first
24 plate, it doesn't include the standard, it
25 just has the controls and test samples.

Page 277

1         So Merck -- PPD, and I guess
2 with Merck approval, had contracted with GSK.
3 GSK did -- could -- I don't know their trial,
4 I don't know any details, but they -- maybe
5 they were doing concomitant use with a Merck
6 vaccine. So they were going to test their
7 vaccine, whatever product, together with the
8 Merck vaccine to see if there's any
9 interference. It's like a concomitant use
10 study. So rather than GSK develop a mumps
11 wild type ELISA on their own, they contracted
12 with PPD to, and I assume with Merck approval,
13 to test their samples from their trial in the
14 mumps wild type ELISA run by PPD, at PPD.
15         What they do is they -- one of
16 the scientists at PPD identified that the
17 control sample across the plates with the
18 later plates -- so you could run as many as 10
19 plates in a run, 9 plate -- it might be 9
20 plates or 10 plates. The control samples,
21 when you got to the later plates, end runs
22 that it contained as many as 9 plates drifted
23 down a little bit. The titers dropped some.
24         So they made a, you know, a note
25 about that and said, hey, the control on plate

70 (Pages 274 - 277)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 278

1 9 tends to be lower than the control on plate
2 1. So within a run you may have had a
3 little -- some drift in the assay on plate 9
4 versus plate 1. So the suggestion here is and
5 what's being implemented now is to include a
6 standard on each plate. So all the samples on
7 that plate will be read against the standard
8 on that same plate. So if there would be --
9 if there is any reason for drift, everything
10 on that plate would be affected similarly.
11 You wouldn't be reading against the standard
12 on plate 1. So that was -- that's a
13 modification we're going to put into effect.
14 But because -- also because this affected GSK,
15 it became important for Merck to notify GSK --
16 or for PPD and Merck to notify GSK, hey, we
17 have this issue.
18       Now, we did a thorough
19 evaluation of what's the impact of that issue,
20 and it's negligible. But in like a full
21 disclosure, we, Merck contacted CBER, Merck
22 contacted GSK, and said, hey, you know, this
23 is an issue that came up with the assay and we
24 want to let you know about it. And we did an
25 impact evaluation as well and we provided that

Page 279

1 to CBER and we provided that to GSK. And so
2 we -- that's what this is in reference to.
3       Q.    And are we talking about the
4 wild type mumps ELISA assay?
5       A.    Yes.
6       Q.    The one with the 10 Ab
7 serostatus cutoff?
8       A.    Yes.
9       Q.    And GSK uses that same assay
10 through PPT [sic]?
11       A.    Through PPD for that -- a
12 particular trial. Again, it may have been
13 with concomitant use. So it might have been
14 Merck's MMR vaccine and their -- some other
15 vaccine. And what you want to see in those
16 trials is that the MMR -- because kids may be
17 vaccinated at the same time or proximal, you
18 want to see that the MMR vaccine doesn't
19 interfere with the GSK respond -- GSK vaccine
20 response and, conversely, that the GSK vaccine
21 doesn't interfere with the responses for the
22 Merck vaccine.
23       Q.    Do you know how long GSK has
24 been using the wild type mumps ELISA assay?
25       A.    No. This is the only -- I

Page 280

1 wouldn't know PPD's business, who they test
2 for. Or I wouldn't know any of that. I was
3 only involved because this was an assay issue
4 and I had to assess the impact. The impact
5 was negligible. And in addition to that, most
6 of the assay runs were only five plates or
7 fewer. So that it was even more -- runs
8 didn't -- there weren't many runs that
9 extended out to 9. So the evaluations showed
10 that the impact was negligible. GSK and CBER
11 agreed.
12       Q.    PPT --
13       A.    PPD.
14       Q.    PPD is not part of Merck.
15 Correct?
16       A.    That's correct.
17       Q.    At one point it was. Correct?
18       A.    PPD was never part of Merck.
19 PPD is its own company. Merck moved the labs
20 that performed the clinical assays down to a
21 Wayne facility. And the intent of that was to
22 move it from, say, a research environment mode
23 more to a -- I don't want to say research
24 word, but more of a testing lab, a dedicated
25 test lab, a facility that was dedicated to

Page 281

1 clinical -- to testing clinical samples.
2       Q.    When Merck performed the wild
3 type mumps ELISA assay as part of Protocol
4 007, was that done through PPD?
5       A.    Were we down in Wayne at the
6 time? Was it owned by PPD at the time? No.
7 It was -- I don't believe it was a PPD
8 facility. We'd have to see the exact year
9 that Merck sold to PPD. I'm estimating 2007.
10 So the wild type ELISA for 007 was done, I'm
11 not sure, but I think it was done prior to
12 2004. So I think that it was done by -- the
13 facility was still owned by Merck and it was
14 still PPD. PPD had no involvement.
15       Q.    Since Merck developed the wild
16 type mumps ELISA assay, has Merck always used
17 that assay for any studies it has since done
18 for mumps?
19       MR. THOMPSON: Objection to the
20 form.
21       THE WITNESS: I don't know
22 that -- what studies have been
23 performed, so I can't say how many
24 studies. But that has been the assay.
25 Up until now it has not changed but

71 (Pages 278 - 281)

Appx5851

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 282

1　because of this issue and for many of
2　our other assays, we'll include a
3　standard curve on each plate. We're
4　modifying the assay to include a
5　standard curve on each plate.
6　　So, to my knowledge, from the
7　period it was developed to 2000 to now,
8　it has not changed but now we are
9　looking to change it to include a
10　standard curve on each plate because of
11　this issue. Or because it was
12　identified as a potential issue.
13　BY MR. SCHNELL:
14　　Q.　And as far as GSK goes, you --
15　your understanding is only that within the
16　time frame that this issue arose, that
17　Merck -- I'm sorry, that GSK was using the
18　same wild type mumps ELISA assay, but you
19　don't know whether they were using it before
20　or since. Is that correct?
21　　A.　I only know for this trial. I
22　don't know what they did previously or after.
23　Yes.
24　　Q.　And the time frame of this trial
25　that GSK conducted was what?

Page 283

1　　A.　I'm assuming because of these
2　meeting minutes, 2015, so it was probably
3　about two years ago. And I think it's
4　important to know that -- again, state that we
5　notified them, we notified CBER, we assessed
6　the impact, gave those assessments to GSK,
7　gave those assessments to CBER, and they
8　agreed that it was not a problem, not an
9　issue. And to my knowledge, they used the
10　results from the wild type ELISA for their
11　clinical evaluation.
12　　Q.　How many plates per run did you
13　use in the wild type mumps ELISA validation?
14　　A.　Oh, in the validation? We'd
15　have to look at it to see.
16　　Q.　That's Exhibit 2.
17　　　MR. THOMPSON: Counsel, after
18　　you ask questions about this, it might
19　　be a good time for a break.
20　　　MR. SCHNELL: Sure.
21　BY MR. SCHNELL:
22　　Q.　Did you find where --
23　　A.　No.
24　　Q.　-- if there's a reference there
25　to how many plates?

Page 284

1　　A.　Yes.
2　　Q.　There it is. I see five plates.
3　　A.　Yes.
4　　Q.　And would that -- would the
5　number of plates that would be used for a
6　validation come from the validation protocol?
7　　A.　Yes, the number of plates used
8　in the validation is indicated here. Five.
9　　Q.　Did you come up with that number
10　of plates to use or was it provided to you by
11　the validation protocol?
12　　A.　It was -- I didn't come up with
13　that number. That's what the -- in order to
14　test the number of samples, for the precision
15　assessment, it required five plates.
16　　Q.　But would there be any reason to
17　deviate when it comes to the number of plates
18　from what the validation protocol provides?
19　　　MR. THOMPSON: Objection to
20　　form.
21　BY MR. SCHNELL:
22　　Q.　If, for example, the validation
23　protocol said to use 10 plates or 20 plates,
24　would there be any reason not to use that
25　number in the actual validation experiment?

Page 285

1　　　MR. THOMPSON: Same objection.
2　　　THE WITNESS: There would be a
3　　protocol and you would follow the
4　　protocol. If there was a reason to
5　　deviate the protocol, and I'm speaking
6　　now, our practice, if there's a
7　　deviation from the protocol, that's
8　　noted in the validation report. So if
9　　there was a reason to deviate from the
10　　protocol, it would be noted in the
11　　report.
12　BY MR. SCHNELL:
13　　Q.　And what about in the
14　standing -- in the standard operating
15　procedure, the SOP, would that give some
16　indication of how many plates should be run in
17　the validation experiment?
18　　A.　In a validation experiment? Now
19　if we do a validation experiment, we would
20　include in the validation experiment, try to
21　include the maximum number of plates that the
22　SOP would allow.
23　　Q.　And is that because the greater
24　the number of plates, the more reliable the
25　test is?

72 (Pages 282 - 285)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 286

1    A.    No. It's just to document the
2 performance of the assay. I mean, if the SOP
3 said you could run however many plates, I
4 think we tried to include that in the
5 validation to show that you got good results
6 across that number of plates.
7        MR. SCHNELL:  Okay. We can take
8 a break.
9        VIDEOGRAPHER:  Off the record at
10 5:59. This will end disc number six.
11        - - -
12    (A recess was taken.)
13        - - -
14        VIDEOGRAPHER:  Back on the
15 record at 6:20. Beginning of disc
16 number seven.
17        - - -
18    (Exhibit Antonello-14, 3/13/02
19 E-mail with attachments, 00025749 -
20 00025754, was marked for identification.)
21        - - -
22 BY MR. SCHNELL:
23    Q.    I'd like to mark as Antonello
24 Exhibit 14 an e-mail from Dr. Antonello, dated
25 March 13, 2002, to Patrick Brill-Edwards

Page 287

1 attaching, among other things, a memo from
2 Dr. Antonello to Alan Shaw, dated March 6,
3 2002. The Bates range is 25749 through 25755.
4        MR. THOMPSON:  Ours end at 54.
5        MR. SCHNELL:  I'm counting this
6 table, I think is that -- that's part
7 of 54?
8        MR. VITELLI:  That's at 54.
9        MR. SCHNELL:  Oh, this isn't
10 part of it?
11        MR. VITELLI:  I don't think so.
12        - - -
13    (A discussion off the record
14 occurred.)
15        - - -
16        MR. SCHNELL:  It doesn't matter,
17 I don't have a question on that part
18 anyway, so...
19        MR. THOMPSON:  It would be good
20 for the record to clear it up.
21        MR. SCHNELL:  We'll clear it up.
22 BY MR. SCHNELL:
23    Q.    The only question I have on this
24 document is on your memo and the chart. This
25 geographic mean titer chart is on the second

Page 288

1 page of the document.
2    A.    Maybe I don't have the same
3 thing.
4        MR. SCHNELL:  Where's the rest
5 of it?
6 BY MR. SCHNELL:
7    Q.    Oh, okay. It's out of order.
8 Do you have -- so what I'm looking at is this.
9 This memo on the back which is the Bates
10 ending 751. It's a complete document, it's
11 out of order in my copy. The big long table
12 is in the middle of the e-mail and then the
13 attached memo. So for the record the Bates
14 range is 25749 through 54. And the question I
15 have is on the first page of the memo that
16 begins Bates range ending 751. Do you see the
17 geometric mean titer table?
18    A.    Yes.
19    Q.    And first of all, do you recall
20 just from the title of this memo what it was?
21    A.    Yes. And from reading the CBER
22 requests, I believe CBER requested -- I'd like
23 to go back to it to get it exact, but they
24 tested us -- they asked us to either run
25 the -- they may have asked to run the ELISA

Page 289

1 controls in the AIGENT assay. Maybe we did
2 that. And then we also ran the AIGENT -- we
3 ran controls from one assay and the other and
4 the one assay and the other. So going back to
5 CBER response we did what they requested and
6 looks like we did even more than they
7 requested.
8    Q.    The question I have is, and I
9 think it's referenced in your cover e-mail, in
10 your cover e-mail, which is the first page of
11 this document, you wrote in the middle of that
12 first paragraph, The only "unexpected" outcome
13 is that the PRN titers for the ELISA standard,
14 high positive control, and low positive
15 control..., and then there's the numbers,
16 "...do not follow the same rank order as the
17 ELISA titers for these samples...." And you
18 can see on the table that we were just looking
19 at in your memo, what you're talking about
20 there is for the ELISA high positive control
21 run in the AIGENT test you got a figure of
22 4,257 with a lower bound 3,355 and an upper
23 bound 5,401. For the ELISA low positive
24 control, you got a 948 with the 749 lower
25 bound and the 1,203 upper bound. And then for

73 (Pages 286 - 289)

Appx5853

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 290

1 the ELISA standard in the run in the AIGENT
2 assay you got a 7,298, lower bound 5,753,
3 upper bound 9,259. Am I correct that that is
4 an unexpected result because the 7,298 titer
5 measure for the ELISA standard was
6 significantly higher than the 4,257 measure
7 you got for the ELISA high positive control?
8     MR. THOMPSON: Objection to
9     form.
10     THE WITNESS: Yeah, in the
11     message, I'm saying that the rank
12     ordering doesn't follow in the two
13     assays.
14 BY MR. SCHNELL:
15    Q. What should the order be?
16    A. What should the order be? I
17 mean, I don't know what is the correct result
18 or what the order should be, but just an
19 expectation might be if the two assays
20 provided perfect agreement on every sample,
21 you would expect to see the lowest in the one
22 assay be the lowest in the other. The next,
23 the middle be middle in both and that the
24 highest be highest in both. So this result
25 deviates from that expectation. What

Page 291

1 should -- you know, what is the right result,
2 I don't know what the right result is. Just
3 pointing out that they both don't follow the
4 same rank ordering.
5    Q. What, if any, conclusion, did
6 you draw from that as it relates to the
7 exercise you were engaged in here?
8    A. The exercise we were engaged in
9 was to test these ELISA samples in the AIGENT
10 assay. So that was the exercise. And for
11 CBER to asked us to provide those results, and
12 that's what we did.
13    Q. Now, in the cover e-mail you
14 raise the question that does such a cover mail
15 imply that in addition to measuring
16 neutralizing antibody, the ELISA may also be
17 measuring antibody that does not neutralize.
18 Did you think that that was one possible
19 explanation for this unexpected result?
20    A. That was something I was
21 offering up apparently. Just a question to
22 the lab. I was looking for the lab response.
23 I don't see one here.
24    Q. You don't recall whether they
25 responded or not?

Page 292

1    A. No.
2    Q. Did you ever get to the bottom
3 of why that unexpected result occurred?
4     MR. THOMPSON: Objection to
5     form.
6     THE WITNESS: We didn't get the
7     same rank ordering. I don't know about
8     get to the bottom. It doesn't imply
9     anything, just the observation that we
10     didn't get the same rank ordering for
11     those three samples.
12 BY MR. SCHNELL:
13    Q. Now, other than the possibility
14 that the ELISA assay, wild type mumps ELISA
15 assay was measuring antibodies that do not
16 neutralize, are there any -- is there any
17 other possible explanation for that unexpected
18 result?
19     MR. THOMPSON: Objection to
20     form.
21     THE WITNESS: Yeah, I have -- I
22     was asking a question and I don't have
23     an answer. And I wouldn't want to just
24     sit and speculate why that was the case
25     between the two assays. I really --

Page 293

1 BY MR. SCHNELL:
2    Q. But at the time that was the
3 only possible explanation you thought of for
4 explaining that unexpected result?
5    A. It was -- at the time it was a
6 question that I asked the lab. Why do you
7 think we don't have the same rank ordering.
8 There's nothing -- it's a nothing burger.
9    - - -
10    (Exhibit Antonello-15, 12/18/01
11 E-mail with attachment, 00759085 -
12 00759089, was marked for identification.)
13    - - -
14 BY MR. SCHNELL:
15    Q. By the way, have you ever heard
16 of Jabber?
17    A. Yes.
18    Q. Do you use Jabber at work?
19    A. To communicate now with other
20 employees I have used it.
21    Q. And how does it work?
22    A. From Jabber you can type in
23 someone's name and send them an instant
24 message. It's instant messaging.
25    Q. Is Jabber an internal system

74 (Pages 290 - 293)

Veritext Legal Solutions
www.veritext.com
212-279-9424        212-490-3430

Appx5854

Page 294

1 that Merck uses for instant messaging?
2    A.   Yes.
3    Q.   With respect to your practice,
4 when would you use Jabber versus a regular
5 text message or an e-mail or some other medium
6 of communication?
7    A.   For me, most of the time I'll
8 use Jabber is when I want to speak with
9 someone on the phone or ask them a quick
10 question, I'll send them an IM that may say do
11 you have five minutes we can discuss to talk
12 on the phone.  That's how I most often use it.
13    Q.   I didn't introduce this yet.
14 This is Antonello Exhibit 15.  It's an e-mail
15 from Dr. Antonello, dated December 18, 2001,
16 to Alan Shaw and others, and it attaches what
17 purports to be a draft letter.  And the Bates
18 range is 759085 to 759089.
19       Do you recall the circumstances
20 surrounding your drafting this?
21    A.   I do not.
22    Q.   Do you recall subsequent to the
23 483 report that you referenced earlier in the
24 day that there was some back and forth between
25 Merck and CBER with regard to how it prepared

Page 295

1 the validation report for the AIGENT assay?
2    A.   There was back and forth with
3 CBER.  I acknowledge there was back and forth
4 with CBER regarding the AIGENT assay, yes.
5    Q.   And were you involved in that
6 back and forth in terms of how it related to
7 whether or not the validation report and the
8 validation exercise generally had been
9 properly carried out?
10       MR. THOMPSON:  Objection to
11    form.
12       THE WITNESS:  Can you repeat the
13    question?
14          - - -
15       (The court reporter read the
16    pertinent part of the record.)
17          - - -
18       THE WITNESS:  Yeah, I couldn't
19    speak to how things were performed in
20    the laboratory.  I would not speak to
21    that.
22 BY MR. SCHNELL:
23    Q.   My question was about the
24 validation study, the validation experiment
25 and the validation study.

Page 296

1    A.   Right.
2    Q.   And do you recall there being
3 some discussion as to whether or not that had
4 been properly carried out?
5    A.   I don't recollect.  I don't
6 recollect, just what's available through the
7 documentation.
8    Q.   So on the page 2 of your draft
9 letter, which is with the Bates number ending
10 087, in that top paragraph, the second
11 sentence, "While the physical operation of the
12 assay was not changed, Merck did attempt to
13 implement analytic criteria that were not
14 specified in the original SOP."
15       What did you mean there?
16    A.   Probably the rules for extra
17 variability and rules for flagging atypical
18 response patterns.
19    Q.   And those practices were
20 instituted --
21    A.   I'm sorry.  Just read on.  It
22 says they pertain to the assessment,
23 procedures recounting plaque.  So it goes on
24 to say -- one of the things, I think this may
25 have been, you know, a message from me to

Page 297

1 assist, but I may have taken things from other
2 documents that had been prepared by others and
3 assembled it into this form.  So I may not
4 have been the originator of everything that's
5 said here.  Other people may have written
6 things and I just assembled it into kind of
7 just an initial draft train of thought.  So I
8 may not be and don't believe that I'm the
9 originator of everything that's written here.
10 I assembled.
11    Q.   Do you have any opinion as to
12 whether the original AIGENT results are more
13 or less reliable than the corrected AIGENT
14 results?
15       MR. THOMPSON:  Objection to
16    form.
17       THE WITNESS:  Do I have an
18    opinion on it?  In the memo that we
19    looked at earlier, I had indicated at
20    that time that I thought that perhaps
21    the corrected results did a better job
22    in classifying the pre-vaccination
23    samples as negative than the original
24    results.  So in that sense, I thought
25    that the corrected results may have

75 (Pages 294 - 297)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 298

1    been more accurate in that sense
2    because of the agreement with the wild
3    type ELISA.
4    BY MR. SCHNELL:
5        Q.    Other than that, do you have any
6    basis for an opinion one way or another?
7        A.    No.
8        Q.    Now, at the second paragraph,
9    the very last sentence you wrote, "As
10   previously noted, these rules were implemented
11   for the purpose of enhancing the reliability
12   of the test sample results being reported."
13           Do you have any understanding as
14   to what you meant there?
15       A.    Uh-huh.  Just the idea of
16   samples at a particular dilution were tested
17   in triplicate and things like that extra
18   variability rule.  The idea was that -- to
19   identify when those triplicates were
20   inconsistent, because that may signal that one
21   or more of them may have been an inconsistency
22   in the results.  So that was the purpose, just
23   to flag statistical anomalies and to retest in
24   those instances.
25       Q.    So if you flag an anomaly and

Page 299

1    you retest it, and then you use that one, does
2    that automatically mean it's more reliable
3    than the first one?
4        A.    No.  I think that we had gone
5    over, you know, testing, retesting, testing a
6    third time.  So that was something that was
7    rejected as a path forward.  So can you repeat
8    the question?
9        Q.    So if you are engaging in one
10   test and for whatever reason you don't trust
11   the results so you do it again, and then you
12   use that one, statistically is there any -- is
13   there any higher probability that the second
14   one is going to be more reliable than the
15   first one?
16           MR. THOMPSON:  Objection.  Form.
17           THE WITNESS:  Within an assay
18       typically you'll have controls included
19       on the plate, standard curve included
20       on the plate.  And you have criteria,
21       acceptance criteria, pass/fail.  And
22       you follow the rules.  If it doesn't
23       meet the acceptance criteria, the rule
24       would be to repeat.  If it does pass
25       the acceptance criteria, use the

Page 300

1    result.  So it's a matter of following
2    the rules.  If you had a -- you know,
3    it depends on the deviation, the
4    magnitude of the deviation, how little
5    confidence I would have in the result
6    would depend on that.  But we don't
7    evaluate that way, we just have rules
8    and follow the rules.
9    BY MR. SCHNELL:
10       Q.    So let's take plaque counting,
11   for example, you're familiar with the plaque
12   counting exercise that was part of the AIGENT
13   test?
14       A.    I'm not familiar.  I don't --
15   didn't -- I wasn't involved in plaque
16   counting.
17       Q.    But you know that as part of the
18   AIGENT test David Krah and his staff counted
19   plaques on the cell plates.  Right?
20       A.    Yes.
21       Q.    And there are instances where
22   those plaque counts were redone, for whatever
23   reason, there was some question about the
24   original plaque count.  Correct?
25       A.    That's my understanding.

Page 301

1        Q.    So if an original plaque count
2    is done and then it's redone and the second
3    plaque count is put in, and that's the one
4    that is used, is there any more reliability in
5    the second plaque count than there is in the
6    first plaque count?
7            MR. THOMPSON:  Objection to form
8        and foundation.
9            THE WITNESS:  It depends on what
10       the procedure is for the lab.
11   BY MR. SCHNELL:
12       Q.    Let me speak to you as a
13   statistician, not that I'm a statistician, but
14   speak to you as someone in statistics.  If
15   you're really trying to find the most accurate
16   plaque count, and for whatever reason you
17   question the first plaque count, so you redo
18   it, and the second plaque count is different,
19   if you really want to be sure you're getting
20   an accurate read, wouldn't it make sense to do
21   it a third time and do the 2-out-of-3 rule at
22   least like you had proposed?
23           MR. THOMPSON:  Objection to form
24       and foundation.  Calls for speculation.
25           THE WITNESS:  I'm not advocating

76 (Pages 298 - 301)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 302

1    any of that. What the lab does with
2    the plaque counts is in that spectrum.
3    So, you know, I'm not involved with
4    that aspect of the assay.
5    BY MR. SCHNELL:
6        Q.    Let's just take any counting
7    exercise. If you were tasked to come up with
8    a reliable count, you were given something and
9    you were told to count, and you counted it and
10   you did a series of these counts and then you
11   wanted to double check your work and you
12   double checked your work and you found that
13   some of them you had a new count the second
14   time, would you stop there?
15       MR. THOMPSON: Objection. Calls
16   for speculation. Lack of foundation.
17   Improper for this witness who says he's
18   never done this.
19       THE WITNESS: I've never done
20   it. I think I would look for someone
21   who is expert in plaque counting and
22   acknowledged as the expert in plaque
23   counting and use their counts as the
24   baseline in evaluating others.
25   BY MR. SCHNELL:

Page 303

1        Q.    So what was the basis for your
2    proposing a 2-out-of-3 rule?
3        A.    The basis was for samples that
4    are close to the cutoff. For an individual
5    sample, if you wanted to have confidence in
6    your assignment, greater confidence in the
7    assignment, to test it a second time. If it
8    confirmed, you had greater confidence in the
9    original result. If you got something
10   different, you had less confidence, retest it
11   a third time. I think that was a suggestion.
12   It's not a practical -- and it has its own
13   problems and criticisms. It's not necessary
14   and it's not practical. It was a suggestion
15   made at the time that say the negatives in
16   moving forward with that approach outweigh the
17   positives.
18       Q.    In terms of what?
19       A.    In terms of now you've got to
20   test the sample three times. I think the
21   approach that the lab takes, and I'm speaking
22   now just as a general -- as a philosophy, is
23   to test the sample once. If the run is valid,
24   that's the result. If the run is invalid, the
25   sample has to be repeated. And not look at

Page 304

1    how close a sample is to the cutoff or not.
2    The result that you get from a valid run is
3    the final result.
4        Q.    Last question I have on this
5    document is on the page 3, in your
6    parentheses.
7        A.    Page?
8        Q.    Page 3. It's the last --
9    "(*Might be worthwhile to add a section
10   indicating that we have all of the original
11   assay results for each test samples - tie an
12   issue with 'deleting' original results due to
13   alcohol wipe.)"
14       Did -- are you aware whether or
15   not Merck maintained all of the original assay
16   results for each test sample?
17       A.    I don't know. I'm assuming the
18   original results are the original results. I
19   don't know the details of what happened in the
20   lab.
21       Q.    Why are you assuming the
22   original results are the original results?
23       A.    In all the documentation they're
24   referred to as the original results.
25       Q.    What original results are you

Page 305

1    talking about? Are you talking about the
2    counting sheets? Are you talking about assay
3    plates? What are you talking about?
4        A.    I'm not involved with the
5    details. I'm assuming the original results
6    refer to not what was recounted by Dave or any
7    of his other staff but what was originally
8    counted by the people in the lab. That's my
9    understanding. I was not in the lab and I
10   don't know the details of what went on in the
11   lab.
12       Q.    So what you wrote here, you were
13   talking about the counting sheets, the
14   original results as they appeared on the
15   counting sheets?
16       A.    I don't know counting sheets.
17   So I assume that they're original results
18   because they're always referred to as original
19   results.
20       MR. SCHNELL: That's all the
21   questions I have. Thank you.
22       THE WITNESS: Okay.
23       MR. THOMPSON: Off the record.
24       VIDEOGRAPHER: Off the record at
25   6:50.

77 (Pages 302 - 305)

Appx5857

Page 306

1         - - -
2         (A recess was taken.)
3         - - -
4         VIDEOGRAPHER:  Back on the
5     record at 6:56.
6         - - -
7         EXAMINATION
8         - - -
9  BY MR. THOMPSON:
10        Q.    Dr. Antonello, I have a couple
11   of questions.
12        In response to Mr. Schnell's
13   questions to you regarding Merck's submission
14   of data to CBER, you responded to one of his
15   questions about various charts and testified
16   that charts 6c and 6d should have been
17   submitted to CBER.  Do you recall that
18   testimony?
19        A.    Yes.
20        Q.    Are you aware of whether the
21   data reflected in 6c and 6d was, in fact, or
22   were, in fact, submitted to CBER?
23        A.    Yes, they were.  They weren't in
24   that submission, but they were in subsequent
25   submissions.

Page 307

1         Q.    And how were you aware of that?
2         A.    In reviewing the CBER submissions.
3         Q.    With regard to 6c, what, if any,
4    document did you see that reflected the data
5    from 6c being submitted?
6         A.    6c, I think it's one of the
7    submissions to CBER.  So it's there.
8         Q.    If I could direct your attention
9    to Exhibit 12, which is the June 10, 2002
10   response.  Do you have it in front of you?
11        A.    Yes.
12        Q.    If I could ask you to turn to
13   Attachment 3, Table 2 which is on Bates number
14   761702.
15        A.    Attachment 12?
16        Q.    Attachment 3.
17        A.    I'm sorry.
18        Q.    Exhibit 12.
19        A.    Exhibit 12, Attachment 3,
20   number?
21        Q.    The Bates number is 761702 right
22   at the end.
23        A.    761 --
24        Q.    The last page.
25        A.    I'm sorry.  Yes.

Page 308

1         Q.    After reviewing that table, can
2    you tell me what your understanding is of what
3    that data reflects?
4         A.    Okay.  This was submitted to
5    CBER.  Correct?
6         Q.    Correct.
7         A.    Do you have what was Table 6d so
8    we can look at that?
9         Q.    Exhibit 5.
10        A.    Exhibit 5.
11        Q.    Turn to page 544845.
12        A.    845.  So that's Table 6d and
13   this Table 2 --
14        Q.    Yes, sir.
15        A.    -- on 702 in the CBER submission
16   contains the information that's presented in
17   6d, contains additional information.  But the
18   subset of ELISA positive -- of a subset of
19   AIGENT negative samples that were ELISA
20   positive are indicated here under the column
21   says, "Observe Results," number of mismatched
22   samples.
23        So the only difference -- well,
24   there's additional information, but another
25   difference between the tables is that the

Page 309

1    ELISA titer groupings, it's a little finer
2    grouping.  So each -- one group in Table 6d
3    corresponds to two groups in Table 2.  So if
4    you look at the first two groups in the ELISA
5    titer grouping, 10 to 14 and 14 to 20, that's
6    the 10 to 20.  And in Table 6d, it's indicated
7    there were 6 samples that were AIGENT
8    negative.  If you look at the observed
9    results, number of mismatched in those first
10   two rows, it sums to 6.  The next two rows
11   cover the 20 to 40 titer range.  And looking
12   at the number of 6 mismatched samples, it's 8
13   in that range, and 8 is what's indicated in
14   Table 6d.  40 to 80 are the next two
15   groupings.  And there it's five samples, and
16   that corresponds to the five.
17        So although Table 6c and 6d
18   weren't included in that particular
19   submission, they are included in subsequent
20   submissions.  The 6c, I think, in its exact
21   form.  6d in just a different breakdown of the
22   ELISA titer grouping, but the same information
23   and -- the same information is there.
24        MR. THOMPSON:  Thank you.
25        That's all I have.

78 (Pages 306 - 309)

Page 310

1    MR. SCHNELL:  I have just a
2 couple of follow-up questions.
3         - - -
4    (Exhibit Antonello-16, 5/7/02
5 E-mail, 00544296, was marked for
6 identification.)
7         - - -
8    THE WITNESS:  Is this follow up
9 in regards to his particular question?
10        - - -
11   FURTHER EXAMINATION
12        - - -
13 BY MR. SCHNELL:
14   Q.   Yes.
15   A.   Okay.  Or follow up for the
16 whole day?
17   Q.   Just this narrow subject.
18        I'd like to mark as
19 Antonello-16, an e-mail, dated 5/7/2002 from
20 Keith Chirgwin to Florian Schödel, Bates
21 number 544296.  And it seems to cut and paste
22 an e-mail that was sent to you, Dr. Antonello,
23 but it's not clear when or how, but it's cut
24 and paste onto this e-mail from Keith
25 Chirgwin.  And the sentence that I want you to

Page 311

1 focus on it says:  "Joe, I removed tables 6 c
2 and 6 d and information referring to them from
3 the 007 ELISA and PRN comparison document
4 (Attachment 2) - too distracting."
5        Do you remember getting this
6 e-mail?
7    A.   I don't remember it.
8    Q.   Is there anything, in your
9 opinion, that is distracting about Table 6c
10 and 6d as you originally intended them to be
11 included in your AIGENT wild type mumps ELISA
12 assay comparison?
13        MR. THOMPSON:  Objection to
14   form.
15        THE WITNESS:  No, I do not
16   consider those tables distracting.
17 BY MR. SCHNELL:
18   Q.   Isn't it true, Dr. Antonello,
19 that it had been discussed with you about
20 replacing your tables with the table that you
21 just looked at that your counsel showed you,
22 and you still believed that Table 6c and 6d
23 should have been included to any CBER
24 submission?
25   A.   I don't recollect those

Page 312

1 discussions, but I think that 6c and 6d should
2 have been included in that one submission and
3 happy or comforted in the fact that they were
4 subsequently sent to CBER.  So I personally
5 don't find them distracting.  And I, at the
6 time, may have argued to include them.  And
7 subsequently they were included apparently.
8    Q.   Well, not Table 6c and 6d?
9    A.   Yes, we just went through that.
10   Q.   That wasn't Table 6c and 6d.
11   A.   6c we looked at, 6d was the same
12 data, the table we looked at contained the
13 same data that is in 6d.  I can go through how
14 it's the same thing.  We just had different --
15 not the same ELISA groupings.  We just broke
16 each of those levels into two levels.  But
17 it's the same data, same result, same thing,
18 just broken out into two levels.  So 6d was
19 submitted in that form, two levels, and 6c --
20 6c was also submitted.  There was another CBER
21 submission.  I don't know if you can provide
22 it.  I don't have it on me.  But there was
23 another CBER submission where I believe we
24 submitted 6c.
25   Q.   Now, you don't know the

Page 313

1 submission that you're referring to.  Right?
2    A.   No, not offhand I can't state
3 it.
4    Q.   And the table that you're saying
5 the same information was submitted in was not
6 attached to your comparison memo that you had
7 originally intended it to be attached to.
8 Correct?
9    A.   I'm confused by that question.
10   Q.   Well, in the document you were
11 just looking at where -- this is Exhibit -- I
12 apologize.  Exhibit 12.  Now, Attachment 2 to
13 this Exhibit 12 which is where your comparison
14 analysis is --
15   A.   Right.  That corresponds to --
16 the observed results in that table corresponds
17 to the results in 6d.  What was I just looking
18 at?  I was just looking at something else
19 where it matched up.  Yeah, but four and two
20 is six.  That's -- oh, this might be for
21 uncorrected or versus corrected.  The original
22 versus corrected.  Maybe that's where that is
23 not matching up.  So where I was saying we had
24 the wild type ELISA compared to the corrected
25 results and wild type ELISA compared to the

79 (Pages 310 - 313)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 314

1 uncorrected, that's why it wasn't aligning. I
2 wasn't looking at the wild type versus
3 original results. I was looking at wild type
4 versus corrected. So 6d here, what's here in
5 6d is here in Table 2 that was submitted to
6 CBER. It's there.
7     MR. THOMPSON: Where are we with
8 time?
9     VIDEOGRAPHER: 30 seconds.
10     MR. SCHNELL: So this is
11 redirect. This is different. I'm
12 almost done.
13 BY MR. SCHNELL:
14     Q.    So the Table 6c and 6d was put
15 in a different form in a different part of the
16 submission. Is that correct?
17     A.    Apparently Manal didn't submit
18 it with my report when she did that submission
19 that we looked at, but then it was submitted
20 in a later submission. 6c was, I believe, in
21 the same form. 6d is submitted in a form
22 where these ELISA titer groups are just,
23 instead of one group, it's just split into
24 two. So each group is split into two. So
25 where you have ELISA titers between 10 and 20,

Page 315

1 how many samples there were, 25, six of those
2 were negative in the AIGENT. Those six
3 samples are identified in this table. You
4 have ELISA titers between 10 and 20 in the
5 first two rows. There were six mismatched
6 samples in the AIGENT. The 20 to 40 are the
7 next two rows, rows 3 and 4. There are eight
8 samples identified in Table 2. There are
9 eight samples identified in 6d. The next two
10 rows are between 40 and 80 in this table.
11 Between 40 and 80 there are five samples that
12 were -- had ELISA titers between 40 and 80
13 that were mismatched in the AIGENT, that gave
14 negative results in the AIGENT. And there's
15 five listed here. So this table, although it
16 wasn't in the original submission to CBER,
17 was -- this data and the results of the
18 mismatches in relation to the ELISA titer was
19 given to CBER in this submission, June 10,
20 2002, in this Table 2.
21     Q.    Now, you knew -- you had been --
22 discussed this issue with Manal Morsy. Isn't
23 that correct?
24     MR. THOMPSON: This is the last
25     question.

Page 316

1     MR. SCHNELL: No, it's not. You
2 don't get to limit my time on the issue
3 you opened up.
4     MR. THOMPSON: It's your time on
5 the record.
6     THE WITNESS: From here it looks
7 like Manal made the decision to exclude
8 those 6c and 6d from that submission
9 because she felt it was too distracting.
10 She would have final say, and so that
11 appears to have been what happened.
12 And then it also appears that in
13 subsequent submissions, they were
14 provided to CBER. So although it
15 wasn't in that original submission, it
16 was provided to CBER in subsequent
17 submissions, 6c and the data 6d.
18     MR. SCHNELL: That's all I have.
19     THE WITNESS: Thank you.
20     VIDEOGRAPHER: No other
21 questions?
22     The time now is 7:13. This
23 concludes the deposition. End of disc
24 seven of seven.
25         - - -

Page 317

1     (Witness excused.)
2     (Deposition concluded at
3 7:13 p.m.)

80 (Pages 314 - 317)

---

10/25/2019
Declaration of G. Reilly
EXHIBIT 162

**To:**     Wadsworth, Cathy W.[wadswoca@NorthAmerica.msx.merck.com]; Hencken, Karen
M[HENCKEN@NorthAmerica.msx.merck.com]; Shaw, Alan[Shawal@NorthAmerica.msx.merck.com]
**Cc:**     Gresh, James P.[GRESHJAM@NorthAmerica.msx.merck.com]; Ditzler, Warren
D.[DITZLER@NorthAmerica.msx.merck.com]; Ukwu, Henrietta
N[ukwuhe@NorthAmerica.msx.merck.com]; Emini, Emilio A[eminie@NorthAmerica.msx.merck.com]
**From:**   Zaber, Beverly A.
**Sent:**   Thur 8/9/2001 8:03:38 AM
**Importance:**      Normal
**Subject:**   FW: FDA Inspection Results

Alan,

Thanks for the information.  We will work with Kati, Dave and Mary to arrange the audit.  We may want to
include the fact that the audit will be performed as part of the response to show corrective action taken for
the cited area.  Also, the reveiw to ensure that no other lab has been missed should be included to
indicate that we have evaluated the finding for impact on similar areas.

Cathy,

Please coordinate the inspection with the lab.  Also, please insure that our SOP is updated to reflect that
signatures showing individual accountability for steps performed must be in place as part of
documentation requirements if more than one analyst is involved with the assay.  This should be done
prior to the audit. If the audit cannot be completed prior to finalizing the response, we will need a
reasonable target date (and one which will not change) for completion.

Karen,

Please generate the listing of audits performed and/or scheduled, and confirm completeness with Alan.
This must be done prior to finalizing the response so that we can hopefully make the statement that
audits have been completed for other Vaccine Research labs doing clinical testing.

Thanks,

Bev

-----Original Message-----
**From:**    Shaw, Alan
**Sent:**    Wednesday, August 08, 2001 9:36 PM
**To:**      Ukwu, Henrietta N; Emini, Emilio A; Zaber, Beverly A.
**Cc:**      Hencken, Karen M; Wadsworth, Cathy W.
**Subject:**    RE: FDA Inspection Results

Bev,

The labs are wrapping up the testing of samples (or entire assays) that had been previously flagged as
invalid.  The crush of wet work should be winding down now.  I would suggest that people from your
group plus Kati Abraham fix a time with Dave Krah and Mary Yagodich to make your audit.  Mary is
finishing up her maternity leave and would be available to come in with some reasonable notice to
arrange child care.  Mary is effectively the "second in command" in the lab and knows a lot about how
things work.  she would also benefit from seeing what you do.

Alan

----------

**CONFIDENTIAL**

**MRK-KRA00008835**
**MRK-CHA00008835**
Appx5863

**From:** Zaber, Beverly A.
**Sent:** Wednesday, August 8, 2001 4:53 PM
**To:** Ukwu, Henrietta N; Shaw, Alan; Emini, Emilio A
**Cc:** Hencken, Karen M; Wadsworth, Cathy W.
**Subject:** RE: FDA Inspection Results

Henrietta,

The SOP to do the evaluation exists (although, based on preliminary response information, we will be updating to add that individual accountability in sign off will be reviewed as part of the audit plan.) The labs will be generating an SOP to formalize the notification process that a lab will be initiating clinical testing and requires an audit. This should cover us with regards to the observation. Since the labs inspected were not previously audited and we are currently auditing data generated, we can schedule an audit of the facility as soon as a time agreeable to both areas can be found. This is recommended if the lab will continue to perform testing. We are also reviewing audit schedules to identify if any other laboratories are due for inspection. We believe they are up to date, but will verify this. The only area we know where an audit has been delayed from our original schedule is for CAR&D, as we were planning the audits after the move to MRL Wayne.

Alan,

Let me know whom we should contact to schedule the audits in 16 , if needed, and we'll follow-up. Also, we will provide a listing of labs we have audited. I'd like you to review to confirm that we haven't missed any other labs which are performing clinical testing.

Thanks,
Bev

-----Original Message-----
**From:** Ukwu, Henrietta N
**Sent:** Wednesday, August 08, 2001 3:36 PM
**To:** Shaw, Alan; Emini, Emilio A
**Cc:** Zaber, Beverly A.
**Subject:** RE: FDA Inspection Results

Thanks Alan. We will have to develop the SOP for assessing the suitability of a lab for clinical testing and implement in the bldg 16 labs ASAP to cover all operations in the lab. The QA group can help . Bev what are your thoughts? HU

-----Original Message-----
**From:** Shaw, Alan
**Sent:** Wednesday, August 08, 2001 3:13 PM
**To:** Ukwu, Henrietta N; Emini, Emilio A

CONFIDENTIAL

**Subject:** RE: FDA Inspection Results

We are finishing off the last retests of invalid assays and invalid single samples at this time.  I have advised the lab to continue to test but not to do any data analysis, only data recording on worksheets (with appropriate sign-off and notation of reasons for ANY changes).  The actual assay is not in question here, only the machinery for handling the data.

Alan

> ----------
> **From:**      Ukwu, Henrietta N
> **Sent:** Wednesday, August 8, 2001 2:40 PM
> **To:**      Emini, Emilio A; Shaw, Alan
> **Cc:**      Zaber, Beverly A.; McKee, Roberta L.; Margolskee, Dorothy J;
>              Blois, David W.
> **Subject:**      RE: FDA Inspection Results
>
> Thanks a lot ,Emilio.  Beverly Zaber and Gerry Lohan's groups will be helping you ensure that your reviews are complete and the SOP development have captured all the necessary steps. The 483 triggers a review of the training procedures in place in the QA groups, to ensure that all personnel involved have received and continue to receive appropriate training for cGMP/GLP.  Bev can elaborate and can also help with the wording of the draft response to indicate the existing practice to assure the agency of our practices.
>
> Just a quick question ?are data currently being generated from the rooms in bldg 16 that were cited , hopefully not, .  Could you please get back to me on this question.  thanks a lot. Henrietta
>
> > -----Original Message-----
> > **From:**      Emini, Emilio A
> > **Sent:** Wednesday, August 08, 2001 1:44 PM
> > **To:**      McKee, Roberta L.; Ukwu, Henrietta N; Blois, David W.
> > **Subject:**      FW: FDA Inspection Results
> >
> > FYI...Alan should have the first draft to circulate foir your consideration by tomorrow (Thursday).
> >
> > Emilio
> >
> > > -----Original Message-----
> > > **From:**      Emini, Emilio A
> > > **Sent:** Wednesday, August 08, 2001 1:42 PM
> > > **To:**      Emini, Emilio A; Ford-Hutchinson, Anthony; Kim, Peter S
> > > **Cc:**      Verhoeven, Tom R; Margolskee, Dorothy J; Scolnick, Edward M.
> > > **Subject:**      RE: FDA Inspection Results

**MRK-KRA00008837**
**MRK-CHA00008837**

This message is a brief informational follow-up to my original message (below) concerning the FDA "483" notices of violation. We are kindly being assisted in our responses to these notices, and in the development of our corrective actions, by (among many others) Roberta McKee and Henrietta Ukwu.

Each of these notices reflects a compliance system failure. An immediate inspection of our adherence to the appropriate rules and validation procedures in each of our clinical assay labs has failed to uncover any evidence of a widespread problem. We have documentation of compliance to cGMP/GLP requirements for the large majority of our ongoing assay operations. As I noted in my original message, the inspectors focused on an assay operation that was being performed by a research lab. We obviously failed in that we do not have procedures in place that would assure that such a lab is appropriately trained in all cGMP/GLP requirements prior to assay performance. Most of the requirements were met, but certainly not all. Accordingly, the following corrective actions will be implmented:

- An SOP will be developed that clearly delineates the steps and procedures that need to be followed by any lab running a clinical assay to assure that all requirements are met and understood prior to start of operation.
- We will immediately conduct detailed internal inspections of all assay operations in the department to assure that compliance is maintained. Needs for corrective action will be identified.
- We will develop and implement a formal internal training program for all department personnel associated with clinical assay operations.

This will be done rapidly and the responsibility will be mine.

The points in this note will be captured by Alan Shaw in the draft of the responses to each of the individual notices of violation.

Emilio

-----Original Message-----
**From:** Emini, Emilio A
**Sent:** Tuesday, August 07, 2001 8:47 AM
**To:** Ford-Hutchinson, Anthony; Kim, Peter S
**Cc:** Verhoeven, Tom R; Margolskee, Dorothy J; Scolnick, Edward M.
**Subject:** FDA Inspection Results

Yesterday (Monday, August 6th), FDA inspectors payed an unannounced visit to Virus and Cell Biology to inspect the laboratories and records associated with the performance of the mumps antibody neutralization assay. The data from this assay have not yet been formally submitted to the agency and will be used to support the mumps end-expiry study. Following a day-long analysis, the inspectors issued the following four "483" notices of violation.

1. A certain number of data entry corrections occurred without the notation of appropriate justification.

CONFIDENTIAL

MRK-KRA00008838
MRK-CHA00008838
Appx5866

2. The physical laboratory had not been formally validated by the QA group for the performance of the assay.

3. The data spreadsheet had not been formally validated for the flagging of assay re-runs.

4. Certain operations noted within the lab notebooks were not appropriately signed by the lab personnel.

It should be noted that this assay was being performed by the research personnel who developed the assay and in the research laboratory in which the assay was developed. Typically, the assay would have been transferred to a testing lab follwing its development. The testing labs are fully experienced with regard to GMP compliance issues. Unfortunately, given the unanticipated timing requirements of the program, it was necessary at the time to validate the assay in the developing research lab and run the assay in place with existing personnel. All GMP requirements were believed to have been met at the time and this was indeed the case with regard to assay performance.

Of the four notices of violation, #2 and #3 do not affect assay results or data validity. Notice #4 deals with lab notebook entries relating to cell culture maintenance and, therefore, also do not affect the data. These violations reflect an imbalance in the degree of experience throughout the area with regard to appropriate procedures for the performance of clinical assays. In recognition of this, and in anticipation of an increase in the number of assays to be performed by the research labs given the current contraints, I constituted a formal GMP compliance group within Virus and Cell Biology a couple of months ago. Unfortunately, this was after the performance of the assay in question. This compliance group will correct deficiencies 2,3 and 4 within this lab and will immediately assure full compliance by all labs involved in clinical assays within the area.

Violation #1 is potentially more serious as it will likely affect the validity of the data in question. We will discuss corrective measures with the CBER group responsible for the IND for which the assay was performed. It should be noted that all samples were tested, per-protocol, with the lab personnel blinded to sample identification. The resulting data were submitted to the clinical statistical group who correlated the neut assay results with the results of an independently performed ELISA. The correlation was excellent, suggesting that there are no global problems with the neut assay data set. I will keep you informed if the required corrective action adversely affects the established program time-line.

Emilio

MRK-KRA00008839
MRK-CHA00008839
Appx5867

10/25/2019
Declaration of G. Reilly
EXHIBIT 163

**Appx5868**

MEMO                                              29 March 2001

TO:        Emilio Emini

FROM:      Alan Shaw

SUBJECT:   Supplemental Activities for Mumps Neuts, Protocol 005, Steve
Krahling


Due to an urgent need for high-precision data to support label changes for M-M-R®II, David Krah's laboratory will be carrying out neutralization tests on approximately 3000 infant serum samples over the next five months. This activity was originally scheduled for transfer to a contract laboratory. Two things have conspired to make this transfer unacceptable from a strategic perspective. First, issues arising following a CBER inspection in MMD have placed a heightened importance on this data set. Second, a preliminary run of about one-third of the serum set has revealed an unanticipated tightness of data from the Krah laboratory. We doubt that the contract lab would be able to match this level of precision. Testing will begin mid-April; scale-up activities in preparation have already started.

Steve Krahling (Virologist, Grade 9) will spread his efforts across all of the practical aspects of this exercise. The mumps neut assay is a highly "tuned", labor-intensive test requiring extensive coordination of parallel activities. This includes cell substrate propagation and management, virus application, serum dilution, sample tracking, immunostaining, counting plaques, and data management. One pre-post vaccination serum pair consumes four 24-well tissue culture plates. Assay cycle time is 3 days for the virus neut part plus a couple of days for plaque counting and data entry. Therefore, this operation which handles 40+ serum pairs per assay run must be carried out 7 days a week in order to accommodate the 1430 patients' sera in a reasonable time-frame. Obviously, this means that the lab staff will sacrifice weekends and work longer-than-normal hours during the week from mid-April to mid-September. They will miss their normal summer vacations as well.

Between October of 2000 and January of this year, 570 serum pairs were tested as an emergency response to a CBER citation during an inspection in MMD questioning the validity of our specifications for M-M-R®II. This was a high profile, high-pressure task that produced an exceptional set of data as noted above. The lab staff worked nights and weekends across the Thanksgiving, Christmas and New Year holidays in order to meet the deadlines imposed on them. The plan for the remaining samples had been to send them to an outside contract laboratory. Recognizing the tightness of the first dataset, we realize that

**CONFIDENTIAL**

an outside laboratory would not be able to reproduce this kind of precision. Therefore we are asking the group to run the rest of the sample series, more than twice the original number, under even tighter time constraints. This is strenuous, tedious, repetitive work with a huge burden of data tracking and auditing for FDA submission. In addition, we are delaying the start of a new project that the lab staff have been looking forward to. This group has played a supporting role for product development for the past decade, and asking them to jump back in this kind of testing is a further delay to the start of a new beginning.

Steve is a relatively junior member of the lab group, having joined us this past December after several months as a contract employee. Steve has proved to be a tireless, careful worker who can do a good job across all of the various part of this test. He will team with Colleen, Jill, Mary and Jenny for the critical parts of this exercise. His hours are likely to be among the longest since he has the fewest family responsibilities. Steve should be rewarded for his extra effort.

**CONFIDENTIAL**

10/25/2019
Declaration of G. Reilly
EXHIBIT 164

Appx5871

MEMO                                              29 March 2001

TO:       Emilio Emini

FROM:     Alan Shaw

SUBJECT:  Supplemental Activities for Mumps Neuts, Protocol 005, and
Colleen Barr


Due to an urgent need for high-precision data to support label changes for M-M-R®II, David Krah's laboratory will be carrying out neutralization tests on approximately 3000 infant serum samples over the next five months. This activity was originally scheduled for transfer to a contract laboratory. Two things have conspired to make this transfer unacceptable from a strategic perspective. First, issues arising following a CBER inspection in MMD have placed a heightened importance on this data set. Second, a preliminary run of about one-third of the serum set has revealed an unanticipated tightness of data from the Krah laboratory. We doubt that the contract lab would be able to match this level of precision. Testing will begin mid-April; scale-up activities in preparation have already started.

Colleen Barr (Staff Virologist, Grade 8) will lead the practical aspects of this exercise. The mumps neut assay is a highly "tuned", labor-intensive test requiring extensive coordination of parallel activities. This includes cell substrate propagation and management, virus application, serum dilution, sample tracking, immunostaining, counting plaques, and data management. One pre-post vaccination serum pair consumes four 24-well tissue culture plates. Assay cycle time is 3 days for the virus neut part plus a couple of days for plaque counting and data entry. Therefore, this operation which handles 40+ serum pairs per assay run must be carried out 7 days a week in order to accommodate the 1430 patients' sera in a reasonable time-frame. Obviously, this means that the lab staff will sacrifice weekends and work longer-than-normal hours during the week from mid-April to mid-September. They will miss their normal summer vacations as well.

Between October of 2000 and January of this year, 570 serum pairs were tested as an emergency response to a CBER citation during an inspection in MMD questioning the validity of our specifications for M-M-R®II. This was a high profile, high-pressure task that produced an exceptional set of data as noted above. The lab staff worked nights and weekends across the Thanksgiving, Christmas and New Year holidays in order to meet the deadlines imposed on them. The plan for the remaining samples had been to send them to an outside contract laboratory. Recognizing the tightness of the first dataset, we realize that

CONFIDENTIAL

an outside laboratory would not be able to reproduce this kind of precision. Therefore we are asking the group to run the rest of the sample series, more than twice the original number, under even tighter time constraints. This is strenuous, tedious, repetitive work with a huge burden of data tracking and auditing for FDA submission. In addition, we are delaying the start of a new project that the lab staff have been looking forward to. This group has played a supporting role for product development for the past decade, and asking them to jump back in this kind of testing is a further delay to the start of a new beginning.

Colleen will provide most of the operational organization for this effort. Colleen has shown exceptional leadership capability during the running of the first third of the serum set, and I am confident we will see the same level of effort and attention during this critical exercise. She should receive supplemental compensation commensurate with her extra effort.

**CONFIDENTIAL**

10/25/2019
Declaration of G. Reilly
EXHIBIT 165

MEMO                                      29 March 2001


TO:        Emilio Emini

FROM:      Alan Shaw

SUBJECT:   Supplemental Activities for Mumps Neuts, Protocol 005,  Mary
Yagodich


Due to an urgent need for high-precision data to support label changes for M-M-R®II, David Krah's laboratory will be carrying out neutralization tests on approximately 3000 infant serum samples over the next five months.  This activity was originally scheduled for transfer to a contract laboratory.  Two things have conspired to make this transfer unacceptable from a strategic perspective.  First, issues arising following a CBER inspection in MMD have placed a heightened importance on this data set.  Second, a preliminary run of about one-third of the serum set has revealed an unanticipated tightness of data from the Krah laboratory.  We doubt that the contract lab would be able to match this level of precision.  Testing will begin mid-April; scale-up activities in preparation have already started.

Mary Yagodich (Research Virologist, Grade 7) will manage the organizational aspects of this exercise.  The mumps neut assay is a highly "tuned", labor-intensive test requiring extensive coordination of parallel activities.  This includes cell substrate propagation and management, virus application, serum dilution, sample tracking, immunostaining, counting plaques, and data management.  One pre-post vaccination serum pair consumes four 24-well tissue culture plates.  Assay cycle time is 3 days for the virus neut part plus a couple of days for plaque counting and data entry.  Therefore, this operation which handles 40+ serum pairs per assay run must be carried out 7 days a week in order to accommodate the 1430 patients' sera in a reasonable time-frame.  Obviously, this means that the lab staff will sacrifice weekends and work longer-than-normal hours during the week from mid-April to mid-September.  They will miss their normal summer vacations as well.

Between October of 2000 and January of this year, 570 serum pairs were tested as an emergency response to a CBER citation during an inspection in MMD questioning the validity of our specifications for M-M-R®II.  This was a high profile, high-pressure task that produced an exceptional set of data as noted above.  The lab staff worked nights and weekends across the Thanksgiving, Christmas and New Year holidays in order to meet the deadlines imposed on them.  The plan for the remaining samples had been to send them to an outside contract laboratory.  Recognizing the tightness of the first dataset, we realize that

MRK-KRA00014746
MRK-CHA00014746
Appx5875

an outside laboratory would not be able to reproduce this kind of precision. Therefore we are asking the group to run the rest of the sample series, more than twice the original number, under even tighter time constraints. This is strenuous, tedious, repetitive work with a huge burden of data tracking and auditing for FDA submission. In addition, we are delaying the start of a new project that the lab staff have been looking forward to. This group has played a supporting role for product development for the past decade, and asking them to jump back in this kind of testing is a further delay to the start of a new beginning.

Mary is in the 7th month of pregnancy and will go out on maternity leave sometime in May. She has been the prime mover in the lab for the first third of the testing, and she continues to provide organizational leadership. She anticipated our decision to run the remainder of the sera in-house and initiated several activities such as cell scale-up from a fresh ampoule of Vero cells so as to get us a head start. She also provides emotional stability to the lab under stress. Mary will perform whatever lab functions (no live viruses) she can for the next month or so, and she will take the minimum maternity leave so as to rejoin the effort as soon as possible. Mary is theoretically working a job-share, but her share partner left us a while ago. She currently works more than her allotted 60% of the week; we would have to shoot her to stop her. Mary has been, and will continue to be, a stellar performer, and she should be rewarded for this extra effort.

**CONFIDENTIAL**

**MRK-KRA00014747**
**MRK-CHA00014747**

10/25/2019
Declaration of G. Reilly
EXHIBIT 166

MEMO                                         29 March 2001

TO:        Emilio Emini

FROM:      Alan Shaw

SUBJECT:   Supplemental Activities for Mumps Neuts, Protocol 005, Jennifer
           Kriss


Due to an urgent need for high-precision data to support label changes for M-M-R®II, David Krah's laboratory will be carrying out neutralization tests on approximately 3000 infant serum samples over the next five months.  This activity was originally scheduled for transfer to a contract laboratory.  Two things have conspired to make this transfer unacceptable from a strategic perspective.  First, issues arising following a CBER inspection in MMD have placed a heightened importance on this data set.  Second, a preliminary run of about one-third of the serum set has revealed an unanticipated tightness of data from the Krah laboratory.  We doubt that the contract lab would be able to match this level of precision.  Testing will begin mid-April; scale-up activities in preparation have already started.

Jennifer Kriss (Biologist, Grade 9) will handle much of the non-virus aspects of this exercise.  The mumps neut assay is a highly "tuned", labor-intensive test requiring extensive coordination of parallel activities.  This includes cell substrate propagation and management, virus application, serum dilution, sample tracking, immunostaining, counting plaques, and data management.  One pre-post vaccination serum pair consumes four 24-well tissue culture plates.  Assay cycle time is 3 days for the virus neut part plus a couple of days for plaque counting and data entry.  Therefore, this operation which handles 40+ serum pairs per assay run must be carried out 7 days a week in order to accommodate the 1430 patients' sera in a reasonable time-frame.  Obviously, this means that the lab staff will sacrifice weekends and work longer-than-normal hours during the week from mid-April to mid-September.  They will miss their normal summer vacations as well.

Between October of 2000 and January of this year, 570 serum pairs were tested as an emergency response to a CBER citation during an inspection in MMD questioning the validity of our specifications for M-M-R®II.  This was a high profile, high-pressure task that produced an exceptional set of data as noted above.  The lab staff worked nights and weekends across the Thanksgiving, Christmas and New Year holidays in order to meet the deadlines imposed on them.  The plan for the remaining samples had been to send them to an outside contract laboratory.  Recognizing the tightness of the first dataset, we realize that

CONFIDENTIAL                                    MRK-KRA00014829
MRK-CHA00014829

an outside laboratory would not be able to reproduce this kind of precision. Therefore we are asking the group to run the rest of the sample series, more than twice the original number, under even tighter time constraints. This is strenuous, tedious, repetitive work with a huge burden of data tracking and auditing for FDA submission. In addition, we are delaying the start of a new project that the lab staff have been looking forward to. This group has played a supporting role for product development for the past decade, and asking them to jump back in this kind of testing is a further delay to the start of a new beginning.

Jenny is in the fifth month of her first pregnancy and will be going out on maternity leave in August, about the time Mary Yagodich expects to be back. Jenny will handle much of the cell culture, immunostaining, and plaque counting activity during the bulk of the testing period. Jenny is particularly adept at the plaque counting part of the test, not a trivial matter as the immunostained plaques are very small and easily mistaken for background specks. Jenny has been an extraordinary performer during the first third of the testing, even while fighting morning sickness. She will continue in this vein until we carry her off to the delivery room. Jenny should be rewarded for her efforts.

**CONFIDENTIAL**

**MRK-KRA00014830**
**MRK-CHA00014830**
**Appx5879**

10/25/2019
Declaration of G. Reilly
EXHIBIT 167

MEMO                                                    29 March 2001

TO:        Emilio Emini

FROM:      Alan Shaw

SUBJECT:   Supplemental Activities for Mumps Neuts, Protocol 005, Steve
Krahling

During the course of the year 2000 David Krah and his lab group developed two
plaque-reduction neutralization tests to measure functional antibody in vaccinee
sera. The first assay a straightforward plaque reduction assay, was used in a
head-to-head clinical study of M-M-R®II and Glaxo SmithKline's Priorix®.
David's assay demonstrated the apparent superiority of the original Jeryl Lynn™
strain in our vaccine over the cloned derivative in GSK's vaccine. These results
have been presented in several international meetings and are being submitted
for publication. In the middle of this activity we received an FDA mandate to
define the end-expiry dose on mumps virus in M-M-R®II. To meet this
requirement, David's group developed an enhanced version of the neut assay in
order to meet the strict statistical requirements included in the FDA's mandate.
Between October of 2000 and January of this year, 570 serum pairs were tested
in order to get an interim set of data in time for a projected meeting with the FDA.
At the same time, the FDA's "Team Bio" GMP inspection of MMD also
questioned the mumps specifications and stability monitoring system, further
heightening the interest in this assay. As a consequence, the neut testing
became a high profile, high-pressure task. In response to the challenge, the lab
group produced an exceptional set of data with statistical precision greater than
anticipated.

The lab staff worked nights and weekends across the Thanksgiving, Christmas
and New Year holidays in order to meet the deadlines imposed on them. The
plan for the remaining samples had been to send them to an outside contract
laboratory. Recognizing the tightness of the first dataset, we realize that an
outside laboratory would not be able to reproduce this kind of precision.
Therefore we are asking the group to run the rest of the sample series, more than
twice the original number, under even tighter time constraints. This is strenuous,
tedious, repetitive work with a huge burden of data tracking and auditing for FDA
submission. In addition, we are delaying the start of a new project that the lab
staff have been looking forward to. This group has played a supporting role for
product development for the past decade, and asking them to jump back in this
kind of testing is a further delay to the start of a new beginning.

CONFIDENTIAL

Steve Krahling (Virologist, Grade 9) will spread his efforts across all of the practical aspects of this exercise. The mumps neut assay is a highly "tuned", labor-intensive test requiring extensive coordination of parallel activities. This includes cell substrate propagation and management, virus application, serum dilution, sample tracking, immunostaining, counting plaques, and data management. One pre-post vaccination serum pair consumes four 24-well tissue culture plates. Assay cycle time is 3 days for the virus neut part plus a couple of days for plaque counting and data entry. Therefore, this operation which handles 40+ serum pairs per assay run must be carried out 7 days a week in order to accommodate the 1430 patients' sera in a reasonable time-frame. Obviously, this means that the lab staff will sacrifice weekends and work longer-than-normal hours during the week from mid-April to mid-September. They will miss their normal summer vacations as well.

Steve is a relatively junior member of the lab group, having joined us this past December after several months as a contract employee. Steve has proved to be a tireless, careful worker who can do a good job across all of the various part of this test. He will team with Colleen, Jill, Mary and Jenny for the critical parts of this exercise. His hours are likely to be among the longest since he has the fewest family responsibilities. Steve should be rewarded for his extra effort.

**CONFIDENTIAL**

**MRK-KRA00014732**
**MRK-CHA00014732**
Appx5882

10/25/2019
Declaration of G. Reilly
EXHIBIT 168

MEMO                                                    29 March 2001

        TO:        Emilio Emini

        FROM:      Alan Shaw

        SUBJECT:   Supplemental Activities for Mumps Neuts, Protocol 005,  Mary
Yagodich

During the course of the year 2000 David Krah and his lab group developed two
plaque-reduction neutralization tests to measure functional antibody in vaccinee
sera.  The first assay a straightforward plaque reduction assay, was used in a
head-to-head clinical study of M-M-R®II and Glaxo SmithKline's Priorix®.
David's assay demonstrated the apparent superiority of the original Jeryl Lynn™
strain in our vaccine over the cloned derivative in GSK's vaccine.  These results
have been presented in several international meetings and are being submitted
for publication.  In the middle of this activity we received an FDA mandate to
define the end-expiry dose on mumps virus in M-M-R®II.  To meet this
requirement, David's group developed an enhanced version of the neut assay in
order to meet the strict statistical requirements included in the FDA's mandate.
Between October of 2000 and January of this year, 570 serum pairs were tested
in order to get an interim set of data in time for a projected meeting with the FDA.
At the same time, the FDA's "Team Bio" GMP inspection of MMD also
questioned the mumps specifications and stability monitoring system, further
heightening the interest in this assay.  As a consequence, the neut testing
became a high profile, high-pressure task. In response to the challenge, the lab
group produced an exceptional set of data with statistical precision greater than
anticipated.

The lab staff worked nights and weekends across the Thanksgiving, Christmas
and New Year holidays in order to meet the deadlines imposed on them.  The
plan for the remaining samples had been to send them to an outside contract
laboratory.  Recognizing the tightness of the first dataset, we realize that an
outside laboratory would not be able to reproduce this kind of precision.
Therefore we are asking the group to run the rest of the sample series, more than
twice the original number, under even tighter time constraints.  This is strenuous,
tedious, repetitive work with a huge burden of data tracking and auditing for FDA
submission.  In addition, we are delaying the start of a new project that the lab
staff have been looking forward to.  This group has played a supporting role for
product development for the past decade, and asking them to jump back in this
kind of testing is a further delay to the start of a new beginning.

Mary Yagodich (Research Virologist, Grade 7) will manage the organizational
aspects of this exercise.  The mumps neut assay is a highly "tuned", labor-

MRK-KRA00014744
MRK-CHA00014744
Appx5884

intensive test requiring extensive coordination of parallel activities. This includes cell substrate propagation and management, virus application, serum dilution, sample tracking, immunostaining, counting plaques, and data management. One pre-post vaccination serum pair consumes four 24-well tissue culture plates. Assay cycle time is 3 days for the virus neut part plus a couple of days for plaque counting and data entry. Therefore, this operation which handles 40+ serum pairs per assay run must be carried out 7 days a week in order to accommodate the 1430 patients' sera in a reasonable time-frame. Obviously, this means that the lab staff will sacrifice weekends and work longer-than-normal hours during the week from mid-April to mid-September. They will miss their normal summer vacations as well.

Mary is in the 7th month of pregnancy and will go out on maternity leave sometime in May. She has been the prime mover in the lab for the first third of the testing, and she continues to provide organizational leadership. She anticipated our decision to run the remainder of the sera in-house and initiated several activities such as cell scale-up from a fresh ampoule of Vero cells so as to get us a head start. She also provides emotional stability to the lab under stress. Mary will perform whatever lab functions (no live viruses) she can for the next month or so, and she will take the minimum maternity leave so as to rejoin the effort as soon as possible. Mary is theoretically working a job-share, but her share partner left us a while ago. She currently works more than her allotted 60% of the week; we would have to shoot her to stop her. Mary has been, and will continue to be, a stellar performer, and she should be rewarded for this extra effort.

**MRK-KRA00014745**
**MRK-CHA00014745**
**Appx5885**

10/25/2019
Declaration of G. Reilly
EXHIBIT 169

MEMO                                          29 March 2001

     TO:      Emilio Emini

     FROM:    Alan Shaw

     SUBJECT:   Supplemental Activities for Mumps Neuts, Protocol 005, Jill
DeHaven

During the course of the year 2000 David Krah and his lab group developed two
plaque-reduction neutralization tests to measure functional antibody in vaccinee
sera.  The first assay a straightforward plaque reduction assay, was used in a
head-to-head clinical study of M-M-R®II and Glaxo SmithKline's Priorix®.
David's assay demonstrated the apparent superiority of the original Jeryl Lynn™
strain in our vaccine over the cloned derivative in GSK's vaccine.  These results
have been presented in several international meetings and are being submitted
for publication.  In the middle of this activity we received an FDA mandate to
define the end-expiry dose on mumps virus in M-M-R®II.  To meet this
requirement, David's group developed an enhanced version of the neut assay in
order to meet the strict statistical requirements included in the FDA's mandate.
Between October of 2000 and January of this year, 570 serum pairs were tested
in order to get an interim set of data in time for a projected meeting with the FDA.
At the same time, the FDA's "Team Bio" GMP inspection of MMD also
questioned the mumps specifications and stability monitoring system, further
heightening the interest in this assay.  As a consequence, the neut testing
became a high profile, high-pressure task. In response to the challenge, the lab
group produced an exceptional set of data with statistical precision greater than
anticipated.

The lab staff worked nights and weekends across the Thanksgiving, Christmas
and New Year holidays in order to meet the deadlines imposed on them.  The
plan for the remaining samples <u>had</u> been to send them to an outside contract
laboratory.  Recognizing the tightness of the first dataset, we realize that an
outside laboratory would not be able to reproduce this kind of precision.
Therefore we are asking the group to run the rest of the sample series, more than
twice the original number, under even tighter time constraints.  This is strenuous,
tedious, repetitive work with a huge burden of data tracking and auditing for FDA
submission.  In addition, we are delaying the start of a new project that the lab
staff have been looking forward to.  This group has played a supporting role for
product development for the past decade, and asking them to jump back in this
kind of testing is a further delay to the start of a new beginning.

**CONFIDENTIAL**

**MRK-KRA00014749**
**MRK-CHA00014749**
Appx5887

Jill DeHaven (Virologist, Grade 9) will be the senior "full-time" technician for this work with particular attention to virus and serum dilution and application, the steps most directly related to assay precision and reproducibility. The mumps neut assay is a highly "tuned", labor-intensive test requiring extensive coordination of parallel activities. This includes cell substrate propagation and management, virus application, serum dilution, sample tracking, immunostaining, counting plaques, and data management. One pre-post vaccination serum pair consumes four 24-well tissue culture plates. Assay cycle time is 3 days for the virus neut part plus a couple of days for plaque counting and data entry. Therefore, this operation which handles 40+ serum pairs per assay run must be carried out 7 days a week in order to accommodate the 1430 patients' sera in a reasonable time-frame. Obviously, this means that the lab staff will sacrifice weekends and work longer-than-normal hours during the week from mid-April to mid-September. They will miss their normal summer vacations as well.


Jill is currently working part-time on a rehabilitation program following severe neck injuries due to an auto accident. She will be graduating to full-time activity by the start of testing. She will also be the most senior technician not pregnant and capable of handling live wild-type viruses. Jill's extra effort will be crucial to the success of this project, and she should be compensated accordingly.

**CONFIDENTIAL**

**MRK-KRA00014750**
**MRK-CHA00014750**

Appx5888

10/25/2019
Declaration of G. Reilly
EXHIBIT 170

MEMO                                                    29 March 2001

TO:         Emilio Emini

FROM:       Alan Shaw

SUBJECT:    Supplemental Activities for Mumps Neuts, Protocol 005, Jennifer
Kriss

During the course of the year 2000 David Krah and his lab group developed two
plaque-reduction neutralization tests to measure functional antibody in vaccinee
sera.  The first assay a straightforward plaque reduction assay, was used in a
head-to-head clinical study of M-M-R®II and Glaxo SmithKline's Priorix®.
David's assay demonstrated the apparent superiority of the original Jeryl Lynn™
strain in our vaccine over the cloned derivative in GSK's vaccine.  These results
have been presented in several international meetings and are being submitted
for publication.  In the middle of this activity we received an FDA mandate to
define the end-expiry dose on mumps virus in M-M-R®II.  To meet this
requirement, David's group developed an enhanced version of the neut assay in
order to meet the strict statistical requirements included in the FDA's mandate.
Between October of 2000 and January of this year, 570 serum pairs were tested
in order to get an interim set of data in time for a projected meeting with the FDA.
At the same time, the FDA's "Team Bio" GMP inspection of MMD also
questioned the mumps specifications and stability monitoring system, further
heightening the interest in this assay.  As a consequence, the neut testing
became a high profile, high-pressure task. In response to the challenge, the lab
group produced an exceptional set of data with statistical precision greater than
anticipated.

The lab staff worked nights and weekends across the Thanksgiving, Christmas
and New Year holidays in order to meet the deadlines imposed on them.  The
plan for the remaining samples had been to send them to an outside contract
laboratory.  Recognizing the tightness of the first dataset, we realize that an
outside laboratory would not be able to reproduce this kind of precision.
Therefore we are asking the group to run the rest of the sample series, more than
twice the original number, under even tighter time constraints.  This is strenuous,
tedious, repetitive work with a huge burden of data tracking and auditing for FDA
submission.  In addition, we are delaying the start of a new project that the lab
staff have been looking forward to.  This group has played a supporting role for
product development for the past decade, and asking them to jump back in this
kind of testing is a further delay to the start of a new beginning.

Jennifer Kriss (Biologist, Grade 9) will handle much of the non-virus aspects of
this exercise.  The mumps neut assay is a highly "tuned", labor-intensive test

MRK-KRA00015719
MRK-CHA00015719
Appx5890

requiring extensive coordination of parallel activities. This includes cell substrate propagation and management, virus application, serum dilution, sample tracking, immunostaining, counting plaques, and data management. One pre-post vaccination serum pair consumes four 24-well tissue culture plates. Assay cycle time is 3 days for the virus neut part plus a couple of days for plaque counting and data entry. Therefore, this operation which handles 40+ serum pairs per assay run must be carried out 7 days a week in order to accommodate the 1430 patients' sera in a reasonable time-frame. Obviously, this means that the lab staff will sacrifice weekends and work longer-than-normal hours during the week from mid-April to mid-September. They will miss their normal summer vacations as well.

Jenny is in the fifth month of her first pregnancy and will be going out on maternity leave in August, about the time Mary Yagodich expects to be back. Jenny will handle much of the cell culture, immunostaining, and plaque counting activity during the bulk of the testing period. Jenny is particularly adept at the plaque counting part of the test, not a trivial matter as the immunostained plaques are very small and easily mistaken for background specks. Jenny has been an extraordinary performer during the first third of the testing, even while fighting morning sickness. She will continue in this vein until we carry her off to the delivery room. Jenny should be rewarded for her efforts.

**CONFIDENTIAL**

10/25/2019

Declaration of G. Reilly

EXHIBIT 171

 **MERCK**

**Vaccine Biometrics Research**                                    **DRAFT: November 1, 2001**

| TO: | M. Morsy | WP75-200 |
|-----|----------|----------|
| **FROM:** | J. M. Antonello | WP37C-305 |
| | B. H. Rich | WP16-118 |
| | J. Hartzel | UNA-102 |

**SUBJECT:   Study KM-248 Phase III – Questionable ELISA Results in the Comparator Group**

CC:  J. Bramble, P. Burke, K. Chirgwin, N. Chirmule, T. Green, J. Heyse, H. Matthews, R. Mogg, F. Schodel, T. Schofield, M. Severino, BR, VBR, PF, Stat File, RIWP

Within Study KM-248 Phase III, the subjects in the Comparator group did not receive a mumps containing vaccine. Of the 106 subjects tested in the Comparator group, eleven subjects had Mumps ELISA titer results that were not consistent with clinical expectation in that seven of the subjects were pre-vaccination negative and post-vaccination positive, and four of the subjects were pre-vaccination positive and post-vaccination negative. Titer results for these eleven subjects are shown in Table 1. With the exception of Sample 183-362, whose pre-vaccination titer was 14.3 Ab units, the positive titers for these subjects were extremely low, ranging from 2.2 to 4.2 Ab Units.

Due to the nature of the assay, within a given assay run, there is the potential (1) for a small proportion of truly "negative" samples to be misclassified as "positive," where the response exceeds that of the cutoff by a small amount; and (2) for extremely low "positive" samples to be misclassified as "negative," where the response fails to exceed that of the cutoff. Therefore, with the exception of Sample 183-362, the results observed in this study are not considered highly atypical for this assay.

Samples 104-266 and 183-362 were retested in the assay. The results of the retest are also displayed in Table 1. The retest results suggest that Sample 104-266 is most-likely pre-vaccination negative and Sample 183-362 is most-likely post-vaccination positive. Although the retest results comport with clinical expectation, we recommend that the original results, and not the retest results, be used in the analyses since (1) with the exception of Sample 183-362, the results observed in this study are not highly atypical for this assay (note that for Sample 183-362, there is no difference between using the original result and the retest result since this sample would be excluded from the analysis in either case); (2) there is no justification for invalidating the original assay runs since the internal assay controls (positive and negative) behaved appropriately and there was no evidence of sample handling error (e.g., date mix up etc...); and (3) it is Merck's practice not to retest samples on the basis of clinical expectation since selective retesting would introduce bias and complete retesting would likely result in similar discrepancies based on assay variability.

To this point, all discussion has been limited to the Comparator Group, however, the potential for assay variability to influence measured titers within the M-M-R®II Group also exists. One might then question the potential impact of assay variability on the primary analysis, that being that the 95% lower bound on the M-M-R®II sero-conversion rate (SCR) exceed 85%. Using the measured assay results, the SCR (based on initially seronegative subjects) is 96.2% (177/184) with 95% lower bound 93.4%. To assess the potential impact of assay variability, a worst-case analysis was performed in which all subjects who were negative at baseline but <10 at 5 weeks

were re-classified as non-converters (assuming that they were above the cut-off because of assay variability), and all subjects who were positive at baseline, but <10 at 5-weeks were re-classified as negative at baseline and as non-converters (assuming their baseline and 5 week values were positive do to assay variability). In all, ten subjects such subjects were identified and these subjects are shown in Table 2. Given this extreme case, the SCR would be 90.9% (170/187) with a 95% lower bound of 86.8%. Thus, under this worst-case scenario, the lower bound of 85% would still be met, and therefore it can be concluded that the potential for misclassification due to assay variability is not sufficient to impact the primary study hypothesis.

U:\ANTONELL\PRODUCT\MUMPS\KAKETSUKEN\STUDY KM-248



2

**MRK-KRA00760671**
**Appx5894**

Table 1
Study KM-248 Phase III
Unanticipated ELISA Results for the Comparator Group

|  | Original Titer (Ab Units) | | Retest Titer (Ab Units) | |
|---|---|---|---|---|
| Sample ID (Pre-Post) | Pre | Post | Pre | Post |
| 100-259 | <2 | 2.2 | NT | NT |
| 81-290 | <2 | 3.3 | NT | NT |
| 319-320 | <2 | 2.4 | NT | NT |
| 199-342 | <2 | 3.5 | NT | NT |
| 162-388 | <2 | 3.4 | NT | NT |
| 385-526 | <2 | 4.2 | NT | NT |
| 392-567 | <2 | 3.7 | NT | NT |
| 3-69 | 3.5 | <2 | NT | NT |
| 515-614 | 3.9 | <2 | NT | NT |
| 104-266 | 2.1 | <2 | <2 | <2 |
| 183-362 | 14.3 | <2 | 17.5 | 18.3 |

NT – Not Tested

Table 2
Study KM-248 Phase III
M-M-R®II Subjects Re-classified as Non-Converters Under the Worst-Case Scenario

|  | Titer (Ab Units) | | Subject Classification | |
|---|---|---|---|---|
| Sample ID (Pre-Post) | Pre | Post | Actual | Worst-Case |
| 25-123 | <2 | 5.7 | + | - |
| 73-240 | <2 | 2.8 | + | - |
| 120-288 | <2 | 9.3 | + | - |
| 275-464 | <2 | 3.7 | + | - |
| 331-509 | <2 | 9 | + | - |
| 419-542 | <2 | 7.4 | + | - |
| 446-577 | <2 | 9.8 | + | - |
| 159-340 | 4.3 | 4.6 | NC | - |
| 338-503 | 2.9 | <2 | NC | - |
| 511-617 | 3.6 | 8.9 | NC | - |

NC – Not Classified due to pre-vaccination positive titer.
+/- = Converter/Non Converter

3

Business
Confidential
B ⊕ use only

10/25/2019
Declaration of G. Reilly

EXHIBIT 172

Appx5896

                                          1

1        IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2

UNITED STATES OF AMERICA  : CIVIL ACTION
3  ex rel., STEPHEN A.      : NO. 2:10-04374(CDJ)
   KRAHLING and JOAN A.     :
4  WLOCHOWSKI,              :
         Plaintiffs,        :
5                           :
         vs.                :
6                           :
   MERCK & CO., INC.,       :
7        Defendant.         :
   _____ : Master File No.
8  IN RE:  MERCK MUMPS      : 2:12-cv-03555(CDJ)
   VACCINE ANTITRUST        :
9  LITIGATION               :
                            :
10 THIS DOCUMENT RELATES TO: :
   ALL ACTIONS              :
11                 -  -  -
12              June 13, 2017
13   HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
14                 -  -  -
15        Videotaped deposition of JOAN L.
16 WLOCHOWSKI, taken at the offices of Morgan &
17 Lewis, 1701 Market Street, Philadelphia,
18 Pennsylvania 19103, beginning at 9:36 a.m.,
19 before LINDA ROSSI-RIOS, a Federally Approved
20 RPR, CCR and Notary Public.
21
22                 -  -  -
           VERITEXT LEGAL SOLUTIONS
23             MID-ATLANTIC REGION
         1801 Market Street - Suite 1800
24           Philadelphia, PA  19103

Page 2

```
 1  A P P E A R A N C E S :
 2
 3   On behalf of the Private Payor Plaintiffs
 4      SPECTOR ROSEMAN & KODROFF, P.C.
          BY:  DIANA J. ZINSER, ESQUIRE
 5       1818 Market Street
          Suite 2500
 6       Philadelphia, PA  19103
          215.496.0300
 7       dzinser@srkw-law.com
 8
 9   On behalf of the Relators
10      CONSTANTINE CANNON LLP
          BY:  ROBERT L. BEGLEITER, ESQUIRE
11          and
            MARLENE KOURY, ESQUIRE
12       335 Madison Avenue
          New York, NY  10017
13       212-350-2700
          rbegleiter@constantinecannon.com
14       mkoury@constantinecannon.com
15
16   On behalf of the Relators
17      KELLER GROVER LLP
          BY:  JEFFREY F. KELLER, ESQUIRE
18       1965 Market Street
          San Francisco, CA  94103
19       415.543.1305
          jfkeller@kellergrover.com
20
21
22
23
24
```

Page 3

```
 1
 2  A P P E A R A N C E S (cont'd ):
 3
 4   On behalf of the Defendant, Merck & Co ,
       Inc
 5
       MORGAN LEWIS & BOCKIUS LLP
 6      BY:  LISA C  DYKSTRA, ESQUIRE
            and
 7        MARGARET ERIN RODGERS SCHMIDT, ESQUIRE
          1701 Market Street
 8       Philadelphia, PA  19103
          215-963-5000
 9       ldykstra@morganlewis.com
          margaret rodgers-schmidt@morganlewis com
10
11
       On behalf of the Defendant, Merck & Co ,
12       Inc
13      VENABLE LLP
          BY:  DINO s  SANGIAMO, ESQUIRE
14          and
            MICHAELA F  ROBERTS, ESQUIRE
15       750 East Pratt Street
          Suite 900
16       Baltimore, MD  21202
          410-244-7400
17       dssangiamo@venable com
          mfroberts@venable com
18
19  A L S O   P R E S E N T :
20
       TIMOTHY K  HOWARD, ESQUIRE
21      Merck in-house counsel
22      DANIEL GRBICH, Videographer
23
            - - -
24
```

Page 4

```
 1              I N D E X
 2
       WITNESS                    PAGE
 3
     JOAN L  WLOCHOWSKI
 4
 5     By Mr  Sangiamo           9
 6
 7           E X H I B I T S
 8
       MARKED      DESCRIPTION       PAGE
 8
     Wlochowski-1  Curriculum vitae    18
 9        Bates AMGEN_0007
10   Wlochowski-2  Curriculum vitae    18
11   Wlochowski-3  Detection of Herpes   46
          Simple Virus in Clinical
12        Specimens by
          Cytospin-Enhanced Direct
13        Immunofluorescence
          article
14
     Wlochowski-4  Protective efficacy of  62
15        intranasal cold-adapted
          influenza A/New
16        Caledonia/20/99 (H1N1)
          vaccines article
17
     Wlochowski-5  Applied for job openings  119
18
     Wlochowski-6  Amended Complaint for   153
19        Violations of the
          Federal False Claims Act
20
     Wlochowski-7  Relator Joan Wlochowski's  158
21        Responses and Objections
          to Merck's Revised First
22        Set of Interrogatories
23   Wlochowski-8  MMR II label      166
24   Wlochowski-9  Documentation of Work    210
          Activities
25        Bates 00000272
```

Page 5

```
 1          E X H I B I T S (cont'd.)
 2   Wlochowski-10  Outline for HR        236
          discussion
 3        Bates 00000273
 4   Wlochowski-11  Work summary         236
          Bates 00000274
 5
     Wlochowski-12  E-mail exchange       266
 6        Bates 00048441 &
            00048442
 7
     Wlochowski- 13  E-Mail Exchange       273
 8        Bates 00000067
 9   Wlochowski-14  E-mail exchange       280
          Bates 00000072
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 6

6

1  DEPOSITION SUPPORT INDEX
2
3  DIRECTION TO WITNESS NOT TO ANSWER
4  Page  Line
5   12   14
    64    1
6   83   13
   126    3
7  127   18
   154   18
8  160    5
9
10 REQUEST FOR PRODUCTION OF DOCUMENTS
11 Page  Line
12 (None)
13
14
15
   STIPULATIONS
16
   Page  Line
17
   (None)
18
19
   QUESTIONS MARKED
20
   Page  Line
21
   (None)
22
23
24

## Page 7

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 7

1           - - -
2        VIDEOGRAPHER:  We are now on
3   the record.  Please note the
4   microphones are sensitive and may pick
5   up whispering and private
6   conversations.  Please turn off all
7   cell phones and place them away from
8   microphones as they can interfere with
9   the deposition audio.
10       My name is Daniel Grbich,
11  representing Veritext.
12       The date today is June 13,
13  2017.  The time is approximately
14  9:36 a.m.  This deposition is being
15  held at Morgan Lewis, located at 1701
16  Market Street, Philadelphia,
17  Pennsylvania.  This is In Re:  Merck's
18  Mumps Vaccine Antitrust Litigation and
19  Wlochowski versus Merck & Company, Inc.
20       The name of the witness is Joan
21  Wlochowski.
22       At this time will the attorneys
23  identify themselves and the parties
24  they represent, after which our court

## Page 8

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 8

1   reporter, Linda Rossi of Veritext, will
2   swear in the witness and we can
3   proceed.
4        MR. KELLER:  Jeffrey Keller
5   from Keller Grover on behalf of the
6   Relator.
7        MS. KOURY:  Marlene Koury,
8   Constantine Cannon, on behalf of the
9   Relator.
10       MR. BEGLEITER:  Robert Begleiter,
11  Constantine Cannon, Relators.
12       MR. SANGIAMO:  Dino Sangiamo
13  from Venable on behalf of Merck.
14       MS. ROBERTS:  Michaela Roberts
15  from Venable on behalf of Merck.
16       MR. HOWARD:  Timothy Howard,
17  in-house counsel for Merck.
18       MS. DYKSTRA:  Lisa Dykstra,
19  Morgan Lewis for Merck.
20           - - -
21       JOAN L. WLOCHOWSKI, after
22  having been duly sworn, was examined
23  and testified as follows:
24           - - -

## Page 9

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 9

1   EXAMINATION
2           - - -
3   BY MR. SANGIAMO:
4       Q.   Good morning, ma'am.  Could you
5   state your name for the record, please?
6       A.   Joan Wlochowski.
7       Q.   Hello, Ms. Wlochowski.  I'm
8   Dino Sangiamo.  I represent Merck in this
9   matter.
10       You understand that you are
11  here this morning to have your deposition
12  taken.  Correct?
13       A.   Correct.
14       Q.   You recognize that you are
15  under oath to tell the truth to the best of
16  your ability.  You understand that, right?
17       A.   I do.
18       Q.   Let me just mention a couple of
19  ground rules that will facilitate a better
20  flow today.  First it's going to be important
21  that all of your answers are audible.  So a
22  nod of the head or a shake of the head won't
23  do.  If you want to say yes or no, you have to
24  say yes or no.  Understood?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL | 10

1    A.    Understood.
2    Q.    Another thing that you and I
3 should both be on the lookout for is we should
4 be sure to let each other finish. So you
5 should not start answering a question until
6 I've completed the question. And I will also
7 undertake not to ask my next question until
8 you have completed your answer. Fair enough?
9    A.    Sounds good.
10   Q.    If you don't understand any
11 question I ask you, then, please, ask me to
12 clarify and I'll do my best to restate it in a
13 way that makes sense.
14   A.    Okay.
15   Q.    Are you under any medications
16 that might impair your ability to testify
17 today, as far as you know?
18   A.    No.
19   Q.    Any other reason you can think
20 of why your ability to testify truthfully
21 today might be impaired?
22   A.    No.
23   Q.    Ms. Wlochowski, could you tell
24 us what you did to prepare for this

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL | 11

1 deposition? And in answering my question,
2 please don't disclose the content of any
3 conversations you had with your attorneys.
4    A.    I reviewed the Complaint as
5 well as --
6    Q.    Actually --
7        MR. KELLER: Don't disclose
8    what you looked at. Just say you
9    looked at documents or what else you
10   did --
11       THE WITNESS: I looked at --
12       MR. KELLER: -- but don't
13   disclose what you looked at.
14       THE WITNESS: I looked at
15   documents.
16 BY MR. SANGIAMO:
17   Q.    Those are documents that were
18 provided to you by your counsel?
19   A.    Yes.
20   Q.    Did you look at any documents
21 that you selected on your own?
22   A.    No.
23   Q.    Did you also meet with your
24 counsel?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL | 12

1    A.    Yes.
2    Q.    Is that with Mr. Keller?
3    A.    Yes.
4    Q.    Others were present as well?
5    A.    Yes.
6    Q.    How many times would you say
7 you met with Mr. Keller and other attorneys to
8 prepare for the deposition?
9    A.    Three days.
10   Q.    Three full days?
11   A.    Yes.
12   Q.    Was Mr. Krahling in attendance
13 at any of those meetings?
14   A.    No.
15   Q.    Have you spoken to Mr. Krahling
16 at all about your deposition outside the
17 presence of your attorneys?
18   A.    No. About the deposition?
19   Q.    Yes, ma'am.
20   A.    I haven't spoken to him about
21 the deposition.
22   Q.    Understood. Your point is you
23 may have spoken to him about other things but
24 not the deposition. Correct?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL | 13

1    A.    Correct.
2    Q.    Have you discussed the
3 deposition with anyone besides your attorneys?
4    A.    Aside from my husband and my
5 immediate family and my children, no.
6    Q.    Have you ever had your
7 deposition taken before?
8    A.    No.
9    Q.    Since the time that this
10 lawsuit was filed, how many times have you
11 spoken with Mr. Krahling outside the presence
12 of your attorneys?
13   A.    Since the lawsuit was filed?
14   Q.    Yes. Which I think was
15 approximately the fall of 2010.
16   A.    I have not spoken with Steve
17 without my attorneys.
18   Q.    Since that time?
19   A.    Since the case was filed, yes.
20   Q.    We have it that you were born
21 November of 1969. Is that right?
22   A.    Correct.
23   Q.    And you're married?
24   A.    Correct.

4 (Pages 10 - 13)

Appx5900

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL14

1    Q.   You have two children. Is that
2  correct?
3    A.   Correct.
4    Q.   One is Jacob, approximately age
5  23 and one is Julia, approximately age 21. Is
6  that accurate?
7    A.   Correct.
8    Q.   Have you -- strike that.
9        Did you have Jacob and Julia
10  vaccinated --
11        MR. KELLER: Objection.
12  BY MR. SANGIAMO:
13    Q.   -- with MMR?
14        MR. KELLER: Objection. I'm
15  going to instruct you not to answer.
16  Violates her right to privacy.
17        MR. SANGIAMO: I'm not agreeing
18  with you, but I understand your
19  objection and I'll move on.
20  BY MR. SANGIAMO:
21    Q.   Have you advised either of them
22  to get revaccinated with MMR based on concerns
23  about the efficacy of the mumps component of
24  MMR?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL15

1        MR. KELLER: Hold on a second.
2  You can answer.
3        THE WITNESS: No, I have not.
4  BY MR. SANGIAMO:
5    Q.   Have you advised them to get
6  their mumps titer checked based on concerns
7  about the efficacy of MMR?
8    A.   No, I have not.
9    Q.   Do you have concerns about the
10  efficacy of the mumps component of MMR?
11    A.   I do.
12    Q.   Is there any particular reason
13  why you have not advised Jacob and Julia
14  either to get revaccinated or to get their
15  titers checked?
16        MR. KELLER: Objection to the
17  form. You can answer.
18        THE WITNESS: I don't know that
19  the -- by having the revaccination will
20  actually help them at this point.
21  BY MR. SANGIAMO:
22    Q.   And that explains why you have
23  not advised them to get revaccinated. Is that
24  the idea?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL16

1        MR. KELLER: Objection to form.
2        THE WITNESS: Yes.
3  BY MR. SANGIAMO:
4    Q.   Does it also explain why you
5  have not advised them to get their titers
6  checked?
7        MR. KELLER: Same objection.
8  BY MR. SANGIAMO:
9    Q.   I didn't hear your answer?
10    A.   Yes.
11    Q.   I'm guessing the answer is no,
12  but do you have any grandchildren?
13    A.   No.
14    Q.   Have you ever been a party to
15  any other lawsuits?
16    A.   No.
17    Q.   Have you ever been named as an
18  expert witness in any lawsuit?
19    A.   No.
20    Q.   Have you ever been approached
21  about being an expert witness in any lawsuit?
22    A.   No. Aside from this case.
23    Q.   Have you ever contemplated
24  bringing any whistleblower lawsuits other than

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL17

1  the one you have brought here?
2        MR. KELLER: Not knowing if
3  anything -- if you filed any -- not
4  commenting on whether or not you filed
5  any other whistleblower lawsuits, if
6  any of those lawsuits are under seal,
7  you cannot breach that seal. So,
8  therefore, to the extent that you can
9  answer without breaching the seal, you
10  can answer.
11        If there's a lawsuit, a
12  whistleblower lawsuit that's filed
13  under seal, not saying that there is
14  one or not, she can't testify and
15  breach that seal, so...
16        MR. SANGIAMO: I think the
17  question so far is just whether she had
18  ever contemplated filing. How about an
19  answer to that precise question?
20        MR. KELLER: You can answer
21  that.
22        THE WITNESS: I have not.
23        MR. KELLER: Dino, I'll let you
24  ask if she's filed a lawsuit. Just

5 (Pages 14 - 17)

Appx5901

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 18

1　can't identify the content. If you
2　want to do that.
3　　　　MR. SANGIAMO: I'm guessing if
4　she hasn't contemplated, she hasn't
5　done it.
6　BY MR. SANGIAMO:
7　　Q. Have you ever filed, again,
8　another whistleblower lawsuit other than this
9　one?
10　　A. No.
11　　　　- - -
12　　　　(Exhibits Wlochowski-1,
13　Curriculum vitae, AMGEN_0007 and
14　Wlochowski-2, Curriculum vitae, were
15　marked for identification.)
16　　　　- - -
17　BY MR. SANGIAMO:
18　　Q. We've just had marked as
19　Exhibits 1 and 2, two copies of a CV for you.
20　In Exhibit 1 the most recent experience shown
21　is your employment at Pfizer?
22　　A. Uh-huh.
23　　Q. And for Exhibit 2 the most
24　recent experience shown is your employment at

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 19

1　Alexion?
2　　A. Uh-huh.
3　　Q. Are you able to give us an
4　approximate date of when you created Exhibit 2?
5　　A. It would have been between, I
6　guess, between 2009 and -- let me just see
7　this. Actually 2013 and 2016.
8　　Q. I see. You can't pinpoint it
9　any better than that?
10　　A. No. I know it was before this
11　year, but I don't know exactly when.
12　　Q. I wanted to ask you some
13　questions about your employment history. I
14　may from time to time refer to Exhibits 1 and
15　2 in my questions. You should certainly feel
16　free to refer to Exhibits 1 and 2 in your
17　answers whether I ask about them or not, if
18　that helps you, your memory.
19　　　　Do I have it right that your
20　first job out of college was working at Yale
21　New Haven Hospital? Is that correct?
22　　A. Correct.
23　　Q. And you worked there from 1991
24　to 1998?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 20

1　　A. Yes. You said out of college,
2　right? Is that what you said?
3　　Q. I did, yes.
4　　A. Okay. Yeah.
5　　Q. And I have the years right of
6　your employment?
7　　A. Yes.
8　　Q. Could you tell us what your
9　positions were there?
10　　A. I was a medical technologist in
11　the virology laboratory.
12　　Q. Was medical technologist your
13　official title?
14　　A. Yes.
15　　Q. That was your title the whole
16　time you were there?
17　　A. Yes.
18　　Q. Were there any promotions while
19　you were there?
20　　A. No, not that I recall.
21　　Q. Now, do I have it right that
22　New Haven Hospital is a hospital but it has
23　some affiliation with Yale University Medical
24　School? Is that right?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 21

1　　A. It does, yes.
2　　Q. Were you employed by Yale
3　Medical School or were you employed by New
4　Haven Hospital?
5　　A. New Haven Hospital.
6　　Q. Did you engage in any research
7　while you were at New Haven Hospital?
8　　A. Can you explain what you mean
9　by "research"?
10　　Q. Why don't we come back to that
11　and first you can tell me what it is that you
12　did as a medical technologist and a virologist.
13　　A. My primary responsibility was
14　testing human samples from the hospital for
15　viral detection; viral antibody titers.
16　　Q. Looking for viral antibody
17　titers for a diagnostic purpose, is that the
18　idea?
19　　A. Correct.
20　　Q. The theory being that if there
21　were antibodies to a particular virus present,
22　then that might be one criterion for trying to
23　evaluate whether the person was suffering from
24　that disease?

Page 22

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 22

1      A.    Correct.
2      Q.    Were there any particular
3  diseases that you were focused on?
4      A.    There were specific tests we
5  did, but I wouldn't say that anything that we
6  were focused on.
7      Q.    What was your role specifically?
8      A.    Again, to run the assays in the
9  lab.
10     Q.    I'm going to describe what it
11  might have been, you tell me if this is
12  accurate; and if not, how it's inaccurate.
13  Was it the case that a serum sample would be
14  brought to the lab where you worked.  Is that
15  right?
16     A.    Correct.
17     Q.    And then you would run the
18  serum sample through the assay.  Is that
19  correct?
20     A.    Correct.
21            MR. KELLER:  Objection to form.
22  BY MR. SANGIAMO:
23     Q.    And then you would report the
24  results from running the sample through the

Page 23

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 23

1  assay back to someone.  Is that right?
2            MR. KELLER:  Objection to form.
3            THE WITNESS:  What do you mean
4  by "report the results"?
5  BY MR. SANGIAMO:
6      Q.    What would you do with the
7  results?
8      A.    The results would get entered
9  into the file for the patient that was being
10  tested.
11     Q.    After that somebody other than
12  you would evaluate the results?
13     A.    Yes.
14     Q.    Fair to say that you were not
15  the person who ultimately decided whether
16  clinically it appeared that the patient did or
17  did not have the virus?  True?
18     A.    That is true.
19     Q.    Did any of the tests -- these
20  tests were, would you call them assays?
21     A.    Yes.
22     Q.    Did you run any assays at New
23  Haven Hospital involving mumps?
24     A.    We had the capability of

Page 24

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 24

1  detecting mumps.
2      Q.    Do you ever recall running one
3  of those tests yourself?
4      A.    We did viral cultures so any
5  given sample that came in could potentially
6  have been run for a screen for mumps.
7      Q.    Could you describe what you
8  mean by doing viral cultures?
9      A.    We took the patient serum
10  and/or patient culture, I should say, and
11  inoculated into monolayers in a cell culture
12  tube for growth of virus.
13     Q.    What would you do next in the
14  procedure?
15     A.    So the culture tubes would get
16  incubated to allow for virus growth.
17     Q.    I'm sorry, to allow for what,
18  virus growth?
19     A.    Uh-huh.  Replication.
20     Q.    What would you do, then, to
21  determine what viruses, if any, were present
22  in the cultures?
23     A.    The cultures were read at
24  periodic times throughout the course of the

Page 25

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 25

1  incubation and were read for cytopathic
2  effect.
3      Q.    Would reading for cytopathic
4  effect enable you to determine what virus the
5  person had?
6      A.    No, then there would be
7  identification following the CPE.
8      Q.    And the identification would be
9  a process involving the detection of antibodies?
10     A.    It would be -- we would remove
11  the cell monolayer to test the cells in the
12  virus within the culture.  So not, no, not
13  necessarily running the titers.
14     Q.    So how would you determine what
15  viruses were present?
16     A.    There were different immunoassays
17  that would -- you would run through and have
18  detection, either fluorescence detection or
19  there were different types of -- it was an
20  antibody against the virus that would detect
21  and a signal that was confirmed that it was
22  present.
23     Q.    Would you run every sample
24  through every immunoassay?

7 (Pages 22 - 25)

Appx5903

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 26

1　A.　No.

2　Q.　In other words, is it correct

3　that the doctor would have had a suspicion as

4　to what the disease might have been.  Correct?

5　A.　Yes.

6　Q.　And then you would run the

7　sample through the assays for those conditions?

8　A.　Yes.

9　Q.　And you were not the one who

10　would decide --

11　A.　Right.

12　Q.　-- which conditions to run the

13　assay through.  Right?

14　A.　That is correct.

15　Q.　So do you recall ever running

16　sample through the mumps assay?

17　A.　I don't recall specifically.

18　Q.　How many medical technicians

19　were there in the New Haven Hospital virology

20　lab at any given time?

21　A.　I would say maybe five technicians.

22　Q.　Did you run any assays while

23　you were at New Haven Hospital that were

24　designed to detect whether a particular

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 27

1　patient had an immune response to vaccination?

2　A.　No, I did not.

3　Q.　Did you run any assays at New

4　Haven Hospital that were designed to detect

5　whether a patient had an immune response to

6　some other form of therapy?

7　　MR. KELLER:  Objection to form.

8　　THE WITNESS:  And I'm actually

9　　rethinking my previous answer

10　　because -- sorry, I apologize.

11　BY MR. SANGIAMO:

12　Q.　Sure.

13　A.　So we did test for rubella.  We

14　did do titer testing for -- which would be an

15　indication of vaccination.

16　Q.　Because if there was a rubella

17　titer, that would suggest that the patient had

18　been vaccinated, is that the idea?

19　A.　Well, I guess it's -- it would

20　be to determine whether or not the patient had

21　antibodies.  I don't know that the criteria

22　was to see whether or not the patient had been

23　vaccinated.  So to clarify, it wasn't so much

24　as to see whether or not the patient had been

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 28

1　vaccinated, just to confirm that the patient

2　had immunity.

3　Q.　Do you know how you would

4　figure out if you saw rubella antibodies in a

5　patient, whether that was a result of

6　vaccination as opposed to being the result of

7　active rubella disease or something else?

8　A.　No.

9　Q.　Would you consider that to be

10　something beyond your expertise?

11　A.　Yes.

12　Q.　When you were at New Haven

13　Hospital, did you run any assays in which you

14　ran a patient sample prior to vaccination and

15　ran a patient sample after vaccination in

16　order to determine whether the patient had an

17　immune response to vaccination?

18　A.　I don't recall specifically

19　that I had done one.

20　Q.　If you look at Exhibit 1, there

21　is a reference within the section on your time

22　at Yale New Haven Hospital.  In the fourth

23　bullet point to performing "antiviral testing

24　by plaque reduction assay."

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 29

1　　Do you see that?

2　A.　Uh-huh.

3　Q.　What's that a reference to?  Is

4　that something different from what -- than

5　what you just described to us today so far?

6　A.　I believe so, yes.

7　Q.　What is that a reference to?

8　A.　So your question was whether or

9　not I tested prior to being vaccinated and

10　after being vaccinated.  That was your

11　original question?

12　Q.　Yes.

13　A.　And I don't believe that, at

14　least to my knowledge, that I was given

15　samples prior to vaccination and then

16　following vaccination.  I can't recall the

17　specifics around the testing, but I -- I can't

18　recall.

19　Q.　I think I know what you're

20　saying, but I just want to make sure the

21　record is clear.  Let me ask this question and

22　then you tell me your answer.  Do you know

23　what your CV is referring to where it states

24　that you "Performed antiviral testing by

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 30

1  plaque reduction assay," when you were at New
2  Haven Hospital?  Do you know what that's
3  referring to?
4       A.    That I did perform the plaque
5  reduction assay.  We were given samples to
6  test and we ran that assay.
7       Q.    What was that an assay for?
8       A.    For the detection of antibodies
9  against a virus.
10      Q.    What is the reduction part?
11      A.    The plaque reduction?
12      Q.    Yes, ma'am.
13      A.    So it's to basically -- if the
14  antibodies were present, they would neutralize
15  the virus and reduce the plaque count.
16      Q.    Reduce it from what?
17      A.    From the presence of not having
18  antibodies.
19      Q.    I'm sorry, I don't understand.
20  So what would you -- so could you describe in
21  more detail how that assay would work?
22      A.    Again, I don't remember the
23  specifics of running the assay.  The
24  methodology is that virus is added to plates.

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 31

1  If they're in the presence of no antibodies,
2  there would be plaques that would form.  If
3  there were antibodies that were present, they
4  would reduce the number of plaques.  So
5  typically a control is running the assay that
6  would show the presence of no antibodies and
7  what that would look like versus a positive
8  control.
9       Q.    Are there also plaque reduction
10  assays for antiviral drugs, to your knowledge?
11          MR. KELLER:  Objection to form.
12          THE WITNESS:  I do not know.
13  BY MR. SANGIAMO:
14      Q.    For example, could there be a
15  plaque assay involving taking a clinical
16  isolate and to see whether exposure to a
17  particular antiviral therapy might have a
18  cytopathic effect on whatever was in that
19  isolate as a means of trying to evaluate what
20  would be a good therapy for a given possible
21  virus, for example, herpes simplex virus?
22          MR. KELLER:  Objection.
23  BY MR. SANGIAMO:
24      Q.    Are you familiar with any assay

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 32

1  like that?
2          MR. KELLER:  I apologize.  You
3  can answer.
4          THE WITNESS:  Can you repeat
5  that question again?
6  BY MR. SANGIAMO:
7       Q.    Are you familiar with any
8  plaque assays for antiviral drugs as
9  distinguished from or vaccines?
10      A.    So in this case, that was what
11  I believe was not being tested versus a
12  vaccination.
13      Q.    So you think -- sorry.
14      A.    So the patient response to the
15  antiviral.  Not the --
16      Q.    If I understand your testimony
17  correctly, then, your best recollection right
18  now of the plaque reduction assay that you did
19  when you were at New Haven Hospital was an
20  assay to test patient response to antiviral
21  therapies.  Is that right?
22      A.    That is my -- what I can
23  recall.
24      Q.    And you think that that testing

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 33

1  had nothing to do with immune response to
2  vaccination based on your best recollection
3  right now.  Is that right?
4       A.    Correct.
5       Q.    But the antiviral therapy
6  assay, which is what you now believe this was,
7  did involve the counting of plaques?
8       A.    Yes.
9       Q.    Would you, yourself, count
10  those plaques?
11      A.    Yes.
12      Q.    Do you recall there being an
13  antiviral therapy assay that you used at that
14  time for viruses other than herpes simplex?
15          MR. KELLER:  Objection to form.
16          THE WITNESS:  Can you ask the
17  question again?
18  BY MR. SANGIAMO:
19      Q.    Do you recall that one of the
20  plaque reduction assays referred to there in
21  your CV from your time at New Haven Hospital
22  was an assay for herpes simplex antiviral
23  therapies?  Do you recall that?
24      A.    I can't remember which assay it

9 (Pages 30 - 33)

Appx5905

Page 34

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTALI34

1 was, what it is that we were testing
2 specifically.
3        Q.    Do you know if the assay that
4 was being used at New Haven Hospital was an
5 off-the-shelf assay?
6              MR. KELLER:  Objection to form.
7              THE WITNESS:  What do you mean
8 by "off-the-shelf"?
9 BY MR. SANGIAMO:
10       Q.    Do you know if it was designed
11 at New Haven Hospital?
12       A.    I do not know if it was
13 designed there.
14       Q.    I gather you had nothing to do
15 with designing the assay?
16       A.    Correct.
17       Q.    Can I assume from your answer
18 that you don't know whether New Haven Hospital
19 purchased it from a supplier?
20       A.    I believe parts, components of
21 it were purchased, but the entire assay I
22 cannot say.
23       Q.    Was there an SOP for that assay?
24       A.    There was -- I can't remember

Page 35

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTALI35

1 the test method that we ran it against, but
2 there was a procedure in place that we would
3 perform our test.
4        Q.    A written SOP?
5        A.    Again, I can't remember the
6 documentation that was used for conducting
7 those tests.
8        Q.    Are you sure there was any?
9        A.    That would -- we would have had
10 procedures, yes, to run a method against.
11       Q.    Well, are you sure you had a
12 written procedure that you followed?
13             MR. KELLER:  Objection.  Asked
14       and answered.
15             THE WITNESS:  Yes.
16 BY MR. SANGIAMO:
17       Q.    You are sure of that?
18       A.    Yes.
19       Q.    But you're just not sure
20 whether it was an SOP?
21             MR. KELLER:  Objection to form.
22             THE WITNESS:  What do you mean
23       by "SOP"?
24 BY MR. SANGIAMO:

Page 36

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTALI36

1        Q.    Do you have an understanding
2 from your work in the industry of what an SOP
3 is?
4        A.    I do.
5        Q.    And what is that?
6        A.    It's a standard operating
7 procedure.  So working in the industry, the
8 pharmaceutical industry, there's different
9 requirements than working in a hospital
10 laboratory.
11       Q.    What are the requirements for
12 an SOP in a hospital laboratory?
13       A.    Again, I can't remember the
14 exact methodology that they referred to.  I
15 believe we had binders of procedures that were
16 kept that we would refer to.
17       Q.    For the plaque reduction assays
18 that you ran at New Haven Hospital for these
19 antiviral therapies, was there ever any checking
20 of plaque counts by a second scientist?
21       A.    No.
22       Q.    What was the nature of the
23 training you received as regards counting of
24 plaques, if any?

Page 37

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTALI37

1        A.    I was trained by my supervisor.
2        Q.    What was the nature of that
3 training?
4        A.    The -- I mean, I can't remember
5 the specifics around the training program, but
6 he worked pretty closely with us as he trained
7 us through the different tests within the
8 laboratory.
9        Q.    He was training you on all
10 aspects of the assay?
11       A.    Yes.
12       Q.    And do you have any recollection
13 of the nature of the portion of the training,
14 if there was any, that was focused on the
15 counting of plaques?
16       A.    If I recall correctly,
17 typically the trainer would count the plaques
18 and the trainee would then count the plaques
19 to determine if there was consistency in the
20 plaque counts.
21       Q.    Was there a rigid formula that
22 would determine whether there was sufficient
23 amount of consistency?
24       A.    I don't recall the specific

10 (Pages 34 - 37)

Appx5906

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 38

1 formula.
2     Q.   But there was one?
3     A.   Yes.
4     Q.   So it's not the case that the
5 trainer could just kind of impressionistically
6 assess whether the trainee's plaque counting
7 was adequate, there was actually a mathematical
8 formula?
9      MR. KELLER: Objection. Form.
10      THE WITNESS: Yeah. What do
11   you mean by "mathematical formula"?
12 BY MR. SANGIAMO:
13     Q.   Well, for example, was there a
14 certain percentage that the trainee's plaque
15 count had to be within the trainer's plaque
16 count in order for the trainee to be deemed
17 trained?
18     A.   Typically that's the criteria
19 for training and consistency, yes.
20     Q.   Was it at New Haven Hospital?
21     A.   I believe so.
22     Q.   You're sure?
23     A.   I can't remember the specifics,
24 but, yes, I do believe that that is how we

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 39

1 were trained.
2     Q.   Let me just make sure I
3 understand your testimony. So your testimony
4 is you do think that there was some percentage
5 within which the trainee's plaque count had to
6 come as compared to the trainer's plaque count
7 for the trainee to be deemed adequately
8 trained in plaque counting, but you just don't
9 recall what that percentage is. Is that your
10 testimony?
11     A.   I don't recall what the
12 percentage is. To the best of my recollection,
13 there would be a percentage criteria that we
14 would have to meet in order to show
15 consistency.
16     Q.   How many assays did you have to
17 count in this comparison process before you
18 could be deemed adequately trained?
19     A.   I don't recall.
20     Q.   More than one?
21     A.   I don't recall. It would be
22 my -- I don't recall.
23     Q.   For this assay that you ran,
24 the plaque reduction assay at New Haven

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 40

1 Hospital, were the plaques in wells?
2     A.   Yes.
3     Q.   And the wells were in plates, I
4 assume?
5     A.   Yes.
6     Q.   Do you recall how many wells
7 there were in any given assay run?
8      MR. KELLER: Objection.
9 overbroad.
10      THE WITNESS: When you refer to
11   wells in an assay run, can you be more
12   specific?
13 BY MR. SANGIAMO:
14     Q.   Do you have an understanding
15 what I mean by "assay run"?
16     A.   That -- if you could define
17 assay run, yes, that's my question. Thank
18 you.
19     Q.   You'll have to tell me if my
20 question makes sense because I expect you have
21 a lot more expertise in this than I do. But
22 I'm envisioning a certain number of plates
23 that are run simultaneously through an assay.
24 Does that make sense?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 41

1     A.   Yes.
2     Q.   Does that sound like a reasonable
3 definition of an assay run for our purposes
4 right now?
5     A.   Yes.
6     Q.   Do you recall how many wells
7 there would be in any given assay run for the
8 plaque reduction assay that you ran at New
9 Haven Hospital?
10      MR. KELLER: Objection.
11 Overbroad.
12      THE WITNESS: So when -- can
13   you repeat the question again?
14 BY MR. SANGIAMO:
15     Q.   For the plaque reduction assay
16 that you ran at New Haven Hospital, how many
17 wells were there in any given assay run?
18      MR. KELLER: Objection.
19 Overbroad.
20      THE WITNESS: So I believe per
21 plate there were 24 wells. I do not
22 know, remember how many plates we would
23 run in a -- perform at the same time in
24 a given run.

11 (Pages 38 - 41)

Appx5907

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 42

1      MR. SANGIAMO: Jeff, why did
2  you think it was overbroad? I'm going
3  to see if I can correct it.
4      MR. KELLER: Because you're
5  talking about all assays she ran
6  instead of -- are you talking about
7  when she was certified? Are you
8  talking about -- you know, she ran
9  different assays over time and she was
10  at New Haven seven years. I don't know
11  if the assays changed over time.
12  That's why I objected, overbroad.
13      MR. SANGIAMO: Understood.
14  BY MR. SANGIAMO:
15    Q.  My question was directed at the
16  plaque reduction assay referred to on your CV
17  as having been run at New Haven Hospital. You
18  understood that?
19    A.  Yes.
20    Q.  My sense of your recollection
21  is that all that you recall about what that
22  assay was is that it was an assay used not to
23  evaluate response to vaccination or not even
24  to evaluate antibodies but used to evaluate

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 43

1  antiviral therapies. Is that right?
2    A.  I believe it was their antibody
3  response to antiviral therapies. So it was
4  still detection of antibodies but after viral
5  therapies treatment.
6    Q.  You don't recall how many such
7  assays there were. Right?
8    A.  I believe there was only one
9  that I recall and I can't remember -- I can't
10  remember what the specific virus we were
11  testing it against.
12    Q.  Do all antiviral therapies work
13  by generating antibodies?
14      MR. KELLER: Objection.
15  Overbroad.
16      THE WITNESS: I do not know.
17  BY MR. SANGIAMO:
18    Q.  How about the antiviral
19  therapies that were at issue when you were
20  running the plaque reduction assay at New
21  Haven Hospital?
22    A.  So I -- can you ask the
23  question again, sorry?
24    Q.  Did the antiviral therapies

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 44

1  that were at issue when you were running the
2  plaque reduction assay at New Haven Hospital
3  work by generating antibodies to a virus?
4    A.  Not necessarily. It was an
5  immune response to the disease that the
6  patient had.
7    Q.  If there's simply a cytopathy
8  effect of the antiviral therapy on the isolate
9  from the patient, is that an immune response?
10      MR. KELLER: Objection to form.
11      THE WITNESS: Can you repeat
12  the question?
13  BY MR. SANGIAMO:
14    Q.  If there's a cytopathic effect
15  of the antiviral therapy on the isolate from
16  the patient, is that an antibody immune
17  response? Slightly different question but
18  that's my question.
19      MR. KELLER: Same objection.
20      THE WITNESS: Is a cytopathic
21  effect an antibody immune response?
22  The question doesn't make sense to me.
23  I'm not -- the cytopathic effect is
24  caused by the virus. The actual immune

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 45

1  response would reduce the cytopathic
2  effect through neutralization of the
3  virus.
4  BY MR. SANGIAMO:
5    Q.  Can the antiviral therapy that
6  was being tested in the plaque reduction assay
7  that you ran at New Haven Hospital accomplish
8  that by a means other than an antibody immune
9  response?
10      MR. KELLER: Objection. Form.
11      THE WITNESS: I do not know the
12  answer to that question.
13  BY MR. SANGIAMO:
14    Q.  For sure the plaque reduction
15  assay that you ran at New Haven Hospital was
16  not a plaque reduction neutralization assay.
17  Right?
18      MR. KELLER: Objection to form.
19      THE WITNESS: Again, I can't
20  remember the specifics of the assay. I
21  do remember running a plaque assay.
22  BY MR. SANGIAMO:
23    Q.  You don't remember it well
24  enough to answer my question just asked?

12 (Pages 42 - 45)

Appx5908

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 46

1    A.    Correct.
2            - - -
3            (Exhibit Wlochowski-3, Detection of
4    Herpes Simple Virus in Clinical Specimens by
5    Cytospin-Enhanced Direct Immunofluorescence
6    article, was marked for identification.)
7            - - -
8    BY MR. SANGIAMO:
9    Q.    Ms. Wlochowski, you've just
10   been handed a document marked as Exhibit 3.
11   Do you recognize this document?
12   A.    I do.
13   Q.    This is a medical journal
14   article on which you are one of the authors.
15   Right?
16   A.    Correct.
17   Q.    Is it correct that there are
18   two such -- sorry, try that again.
19           Is it correct that you are
20   listed as an author on two medical journal
21   articles total?
22   A.    I believe so, yes.
23   Q.    Can you tell us what this
24   article is describing?  And let me just tell

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 47

1    you what my ultimate question is going to be,
2    if that helps, is I wanted to find out what
3    your personal role was in either the research
4    described here or the writing of the article.
5    A.    Okay.
6            MR. KELLER:  There's two
7    questions.  I'm not sure which one you
8    want her to answer.
9            MR. SANGIAMO:  Well, actually
10   all I was doing just now, Jeff, is I
11   was trying to give her a little
12   guidance on how much she needs to look
13   at that article.
14           MR. KELLER:  Okay.
15           MR. SANGIAMO:  But that's a
16   fair point.
17   BY MR. SANGIAMO:
18   Q.    The first question I'll ask
19   you, then, is what your role was in the work
20   that is described in this article?
21   A.    My role was conducting the
22   testing of the samples in the article.
23   Q.    So you didn't come up with the
24   hypothesis that cytocentrifugation could be

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 48

1    helpful in trying to achieve whatever it is
2    that's being described in this article.  Is
3    that right?
4    A.    That is correct.
5    Q.    Was that Dr. Landry's idea?
6    A.    Yes.
7    Q.    Did you come up with the
8    experimental design to test that hypothesis?
9    A.    I believe I worked with both
10   Dr. Landry and Dave Ferguson.
11   Q.    Did they come up with the
12   experimental design or was that you?
13   A.    They advised the experimental
14   design and I worked with them on that.
15   Q.    You worked with them to
16   implement it?
17   A.    Yes.
18   Q.    How about in the writing of the
19   article, what was your role in that?
20   A.    I don't recall my writing, if I
21   was involved in the writing of the article
22   other than providing probably the writing the
23   data tables to the article.
24   Q.    How did you get involved in

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 49

1    this?
2            MR. KELLER:  Objection to form.
3            THE WITNESS:  What do you mean
4    by how did I get involved?
5    BY MR. SANGIAMO:
6    Q.    How did you get involved in the
7    work that's described in this article?
8    A.    So my -- as I mentioned
9    earlier, my primary responsibility was testing
10   clinical samples within the laboratory, so
11   routine samples that came in on a day-to-day
12   basis.  Based on, you know, learning the skill
13   sets I had to do the routine work, I asked to
14   be involved in additional studies that were
15   going on in the laboratory as a development
16   opportunity for me.
17   Q.    To whom did you make that
18   request?
19   A.    Dave Ferguson was my manager at
20   the time.
21   Q.    You were giving some testimony
22   earlier about -- some testimony earlier about
23   being trained by a supervisor?
24   A.    Uh-huh.

13 (Pages 46 - 49)

Appx5909

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTAL 50

1  Q.  Was that Dave Ferguson?
2  A.  Correct.
3  Q.  Do you know if he is still at
4  Yale New Haven Hospital?
5  A.  I do not know.
6  Q.  How about this Dr. Landry, is
7  she a pretty well reputed researcher, to your
8  knowledge?
9  A.  Yes, to my knowledge.
10  Q.  She would be a pretty good
11  source of virology expertise generally, would
12  you say?
13  A.  Yes.
14  MR. KELLER:  Objection to form.
15  BY MR. SANGIAMO:
16  Q.  Did you, in your discussions
17  with, is it Dr. Ferguson?
18  A.  Dave Ferguson.
19  Q.  I don't want to disrespect him.
20  A.  Yes.
21  Q.  In your discussions with
22  Dr. Landry or Mr. Ferguson about the design of
23  the testing, did you make specific suggestions
24  to them?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTAL 51

1  A.  I don't recall.
2  Q.  Your next employment, I
3  believe, was at Charles River.  Is that right?
4  A.  Correct.
5  Q.  I said Charles River because
6  that's easier to say than the other word.
7  What is the pronunciation of the other word?
8  A.  Tektagen.
9  Q.  Tektagen, okay.
10  At the time, was that part of
11  Charles River when you worked there?
12  A.  Yes.
13  Q.  Why did you leave New Haven
14  Hospital?
15  A.  My husband took another job out
16  of state.
17  Q.  I'm sorry, one of the questions
18  back at New Haven Hospital, did you get
19  involved in any other research beyond what is
20  described in the article that is Exhibit 3
21  while you were at New Haven?
22  A.  So there -- as you mentioned,
23  there was another article, so I believe that
24  also was another methodology, basically a

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTAL 52

1  method.  It depends on what you, again, mean
2  by research.  So -- but it was -- I did get
3  involved in other activities outside of my
4  routine testing.
5  Q.  I don't want to misstate your
6  testimony.  I thought I heard you say before
7  that you got involved in the work that's
8  described in Exhibit 3 because you made it
9  known to your supervisor that you were
10  interested in other what I think you said was
11  research opportunities for developmental
12  purposes.  Is that right?
13  A.  I said development opportunities.
14  Q.  Okay.  Were there any other
15  development opportunities that you pursued
16  that you would consider to be research?
17  A.  Yes, I do believe I did work on
18  other methodology enhancements while I was
19  there.
20  Q.  Do you remember what those
21  were?
22  A.  I do not.
23  Q.  Any of them involve mumps?
24  A.  Not that I recall, no.

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTAL 53

1  Q.  Any of them involve vaccine
2  development?
3  A.  No.
4  Q.  Any of them involve vaccines in
5  any way?
6  A.  No.
7  Q.  When you took your job at
8  Charles River, are you good with that?
9  A.  Yep.
10  Q.  Which was around March of 2000,
11  does that sound right?
12  A.  That sounds right, yes.
13  Q.  Was that intended to be a
14  permanent position?
15  A.  I believe that was a temporary
16  position.
17  Q.  When you say "temporary position,"
18  what do you mean specifically?
19  A.  I believe, I can't recall, but
20  I believe I was hired as a temporary employee.
21  Q.  Serving as a contractor of sorts?
22  A.  I believe so.  I can't recall.
23  MR. KELLER:  Objection to form.
24  BY MR. SANGIAMO:

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 54

1    Q.  How long were you at Charles
2  River?
3    A.  I think it was, I want to say
4  maybe five months.
5    Q.  Is it possible that it was --
6  strike that.
7         What did you do at Charles
8  River?
9    A.  I worked in their cell culture
10  laboratory, so I maintained the cell lines.
11  Charles -- yeah.
12    Q.  Did you run any assays?
13    A.  No, I did not.
14    Q.  Were those cell lines used for
15  just one purpose or were they used for many
16  different purposes?
17    A.  They were used for many
18  different purposes.
19    Q.  Clinical purposes?
20        MR. KELLER:  Objection.
21  Overbroad.
22        THE WITNESS:  What do you mean
23  by "clinical purposes"?
24  BY MR. SANGIAMO:

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 55

1    Q.  Diagnostic purposes?
2        MR. KELLER:  Same objection.
3        THE WITNESS:  What do you mean
4  by "diagnostic purposes"?
5  BY MR. SANGIAMO:
6    Q.  To support assays or other
7  testing intended to be used to diagnose
8  conditions in humans.
9    A.  I believe that was what they
10  were used for.  We prepared cell banks that
11  were also for clients.  So I can't say
12  specifically what those clients were using
13  them for.
14    Q.  Did you encounter any issues
15  there in the nature of group dynamic problems
16  while you were working at Charles River?
17    A.  No.
18    Q.  Everybody seemed to get along
19  fine with everybody else?
20    A.  Yes.
21    Q.  You got along fine with
22  everybody?
23    A.  To what I recall, yes.
24    Q.  Do you have a recollection of

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 56

1  telling anybody anything different about your
2  time at Charles River?
3    A.  I do not.
4    Q.  Is your recollection of your
5  time at Charles River vivid enough that you
6  could comfortably dismiss out of hand anyone
7  who would say that you once said that you ran
8  into problems at group dynamics there?
9    A.  Meaning when I told somebody
10  after I left Charles River or --
11    Q.  Yes.
12    A.  I do not recall saying that.
13    Q.  Are you confident that that's
14  something you just would not have said because
15  of your recollection of your time at Charles
16  River?
17        MR. KELLER:  Objection.  Asked
18  and answered.
19        THE WITNESS:  Am I confident
20  that's something that I said because of
21  what I recall now?
22  BY MR. SANGIAMO:
23    Q.  Uh-huh.
24    A.  I guess I could have said anything.

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 57

1  I mean, there's always dynamics between people
2  so I can't say that I didn't necessarily say
3  anything that was positive or negative either
4  way.
5    Q.  But right now you don't have
6  any recollection of any dynamics problems at
7  Charles River.  Is that right?
8    A.  Not specifically, no.
9    Q.  Who was your supervisor at
10  Charles River?
11    A.  I don't remember his name.
12    Q.  Your next position was at
13  Merck?
14    A.  Yes.
15    Q.  Is there about a half year
16  period there between when you left Charles
17  River and when you started at Merck?  Does
18  that sound about right?
19    A.  Yes.
20    Q.  Were you employed at all during
21  that time period?
22    A.  No.
23    Q.  Were you trying to get
24  employment anywhere other than Merck during

Page 58

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 58

1 that time period?
2      A.   I can't recall.  I may have been.
3      Q.   How did you find out about --
4 strike that.
5           What prompted you to seek
6 employment at Merck?
7      A.   I was looking for a permanent
8 position.
9      Q.   Why Merck?
10      A.   They were close to where I
11 lived currently and they're a big reputable
12 company in my mind at the time.
13      Q.   Still today?
14      A.   That -- based on my experience,
15 I may not have the same opinion.
16      Q.   What's your sense of Merck's
17 reputation generally in the pharmaceutical
18 industry?
19           MR. KELLER:  Objection.
20      Overbroad.
21           THE WITNESS:  My sense in the
22      pharmaceutical industry?  Can you
23      explain what you mean by that?
24 BY MR. SANGIAMO:

Page 59

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 59

1      Q.   When you were at Pfizer, did
2 you hear people talk about Merck in any way?
3      A.   When you're in the
4 pharmaceutical industry, many people talk
5 about many different companies.  So, yes, I
6 would have to -- I can't remember anything
7 specifically --
8      Q.   How about generally, reputationally,
9 what do you remember about what people would
10 say about Merck when you were at Pfizer?
11           MR. KELLER:  Objection to form.
12           THE WITNESS:  When you say --
13      so people at Pfizer that would -- can
14      you repeat the question?
15 BY MR. SANGIAMO:
16      Q.   What do you remember generally
17 about what people would say about Merck's
18 reputation while you were at Pfizer, if
19 anything?
20           MR. KELLER:  Objection.  Lack
21      of foundation.
22           THE WITNESS:  I cannot
23      remember.
24 BY MR. SANGIAMO:

Page 60

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 60

1      Q.   How about Amgen, same question
2 at Amgen?
3      A.   I cannot remember.
4      Q.   How about at Alexion?
5      A.   I don't recall anybody saying
6 anything specific.
7      Q.   When you applied for your
8 positions at -- strike that.
9           When you applied for your
10 position at Pfizer, did you get any impression
11 from the interview process as to what the
12 people interviewing you thought of Merck?
13           MR. KELLER:  Objection as to
14      form.
15           THE WITNESS:  I cannot speak to
16      what other people thought about Merck
17      as I was being interviewed.  I think
18      the expectation is that I work in the
19      pharmaceutical industry so I come with
20      the experience that would carry across
21      other pharmaceutical companies.
22 BY MR. SANGIAMO:
23      Q.   Your work at Merck began in
24 Dr. Krah's lab.  Correct?

Page 61

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 61

1      A.   Correct.
2      Q.   He's the one who interviewed
3 you?
4      A.   Correct.
5      Q.   Did you interview with others
6 as well?
7      A.   I believe I interviewed with
8 Mary Yagodich as well.
9      Q.   Anyone else?
10      A.   HR.  I don't recall if I
11 interviewed with others.
12      Q.   Do you recall who it was at HR
13 with whom you interviewed?
14      A.   I want to say it was somebody
15 named Naomi Yerkes.
16      Q.   We'll talk obviously about your
17 time in Dr. Krah's lab.  But after you left
18 Dr. Krah's lab, you went to a different lab.
19 Right?
20      A.   Correct.
21      Q.   Whose lab was that?
22      A.   Dr. Palker.
23      Q.   What did you do in Dr. Palker's
24 lab?

16 (Pages 58 - 61)

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTALI62

1    A.   I was working with the DNA and
2  RNA probes for -- and doing PCR testing while
3  I was there.
4    Q.   Was this vaccine-related work?
5    A.   Yes.
6    Q.   For any particular vaccines?
7    A.   We were working on HPV.
8    Q.   Anything else?
9    A.   Probably, but I can't recall
10 what it was.
11   Q.   We're going to talk about some
12 of the allegations of wrongdoing that you've
13 made regarding Dr. Krah's lab.
14        Do you believe that there was
15 any kind of wrongdoing in Dr. Palker's lab?
16   A.   I do not.
17        MR. KELLER:  We've been going
18   about an hour, the next logical --
19        MR. SANGIAMO:  I think we'll
20   hit one in a moment.
21            - - -
22        (Exhibit Wlochowski-4, Protective
23   efficacy of intranasal cold-adapted
24   influenza A/New Caledonia/20/99 (H1N1)

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTALI63

1  vaccines article, was marked for
2    identification.)
3            - - -
4  BY MR. SANGIAMO:
5    Q.   Ms. Wlochowski, you've just
6  been handed what's been marked as Exhibit 4,
7  which is a journal article on which you're one
8  of the listed authors.  Right?
9    A.   Yes.
10   Q.   So this is the other journal
11 article on which you are a listed author.
12 Right?
13   A.   Yes.
14   Q.   This was written along with
15 some co-authors from Merck.  True?
16   A.   Correct.
17   Q.   It looks like there is about 14
18 or so total authors on there.  Can you tell me
19 what your role was in the work that's
20 described in this paper?
21   A.   I believe I performed some of
22 the -- well, the laboratory testing as well as
23 some of the animal studies that would support
24 this.

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTALI64

1    Q.   What was your role in the
2  hypothesis being explored in this paper?
3        MR. KELLER:  Objection to form.
4    If you need to read it to refresh your
5    memory.
6  BY MR. SANGIAMO:
7    Q.   Do you recall as you sit here
8  today what -- whether this paper involved
9  exploration of a particular hypothesis?
10   A.   I do not recall.
11   Q.   Whatever that hypothesis was,
12 do you recall whether you developed the
13 hypothesis?
14   A.   No.
15   Q.   Were you consulted about the
16 development of a hypothesis?
17   A.   I do not recall.
18   Q.   Did you play any role in the
19 experimental design?
20   A.   Not that I recall, no.
21   Q.   How about the writing of the
22 article, what role did you play there, if any?
23   A.   Again, I may have generated
24 some of the data that was used to support that

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTALI65

1  I recall.
2    Q.   Do you recall anything beyond
3  that in the writing of the article?
4    A.   I do not recall any other role
5  in writing the article.
6        MR. SANGIAMO:  Want to take a
7    break?
8        MR. KELLER:  Yes.
9        VIDEOGRAPHER:  The time is now
10   10:40.  Going off the video record.
11           - - -
12       (A recess was taken.)
13           - - -
14       VIDEOGRAPHER:  The time is now
15   10:58.  This begins disc two.  You may
16   proceed.
17       MR. SANGIAMO:  I want to go
18   back and clear up one thing, Jeff.  I'm
19   going to pose this question, but I
20   can't remember whether you objected or
21   instructed her not to answer.
22 BY MR. SANGIAMO:
23   Q.   Ms. Wlochowski, did you have
24 your children vaccinated with MMR?

17 (Pages 62 - 65)

Appx5913

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 66

1     MR. KELLER: Objection. I
2  instruct her not to answer that
3  question under right to privacy.
4  BY MR. SANGIAMO:
5     Q.  Are you going to follow your
6  counsel's instruction?
7     A.  Yes.
8     Q.  What did you think of Dr. Palker
9  as a boss?
10     MR. KELLER: Objection as to
11  form.
12     THE WITNESS: What do you mean
13  by what do I think of him as a boss?
14  BY MR. SANGIAMO:
15     Q.  Did you like working for him?
16     MR. KELLER: Same objection.
17     THE WITNESS: Explain what you
18  mean by "like working for him."
19  BY MR. SANGIAMO:
20     Q.  You don't know what that means,
21  that concept has no meaning to you, to like
22  working for somebody?
23     A.  So --
24     MR. KELLER: Same objection.

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 67

1     THE WITNESS: There's, you
2  know, different concepts of working for
3  somebody. There's many aspects of
4  that, so...
5  BY MR. SANGIAMO:
6     Q.  What are they?
7     A.  It could be a personal
8  relationship with somebody versus the work
9  or -- that is given. I guess I'm looking for
10  you to explain what it is you're asking
11  specifically about.
12     Q.  Are you finished, I couldn't
13  tell?
14     A.  Yes.
15     Q.  Did he seem like a nice man?
16     MR. KELLER: Same objection.
17     THE WITNESS: He seemed like a
18  nice person.
19  BY MR. SANGIAMO:
20     Q.  How would you describe your
21  personal relationship with him?
22     A.  He was my boss. That was my
23  relationship with him.
24     Q.  Do you think he respected your

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 68

1  work?
2     MR. KELLER: Objection. Calls
3  for speculation.
4     THE WITNESS: I can't say what
5  he thought of my work in general. The
6  feedback he provided me was positive.
7  BY MR. SANGIAMO:
8     Q.  Were there others who worked in
9  his lab?
10     A.  Yes.
11     Q.  How would you describe the
12  relationships amongst those people --
13     MR. KELLER: Objection. Vague.
14  BY MR. SANGIAMO:
15     Q.  -- including yourself?
16     A.  Again, what do you mean by
17  "relationship"?
18     Q.  You can interpret it however
19  you like.
20     MR. KELLER: Same objection.
21     THE WITNESS: We were co-workers.
22  BY MR. SANGIAMO:
23     Q.  Did you form any friendships?
24     A.  I did have friends in the lab,

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 69

1  yes.
2     Q.  Did you feel that there was a
3  click that you were left out of in that lab?
4     MR. KELLER: Objection. Vague
5  and ambiguous.
6     THE WITNESS: I don't -- as far
7  as a click in the lab, I'm not sure
8  what you would mean by that.
9  BY MR. SANGIAMO:
10     Q.  Do you know what the term
11  "click" means?
12     A.  A group of people. There were
13  only three of us at the time that reported in
14  to Dr. Palker.
15     Q.  Are you able to comment one way
16  or the other on whether the three of you got
17  along well or is that too vague a question
18  from your perspective?
19     MR. KELLER: Objection.
20  Argumentative.
21     THE WITNESS: Again, I, myself,
22  feel that we got along fine.
23  BY MR. SANGIAMO:
24     Q.  Why did you leave employment at

18 (Pages 66 - 69)

Appx5914

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 70

1  Merck?
2      A.    We were moving back out of
3  state.
4      Q.    Where were you moving to?
5      A.    Connecticut.
6      Q.    All right.  So where did you
7  apply to work when you left Merck?
8      A.    Pfizer.
9      Q.    Is that the only place?
10     A.    I can't recall.  I believe so.
11     Q.    You were at Pfizer for how
12  long?
13     A.    I would say about nine months.
14     Q.    Why did you leave the position
15  at Pfizer?
16     A.    The position I had was moving
17  to Kalamazoo, Michigan, and I did not -- that
18  was not my family's choice to move to
19  Kalamazoo, Michigan.
20     Q.    Your CV that is Exhibit 1, in
21  the first bullet reads:  "Perform large-scale
22  clinical assays (e.g. serum neutralization,
23  virus isolation) using automated equipment
24  such as Sci-Clone...," if I'm pronouncing that

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 72

1      A.    I don't think so.  But, again,
2  I don't recall.
3            MR. KELLER:  Object to the
4      form.
5  BY MR. SANGIAMO:
6      Q.    Do you have an agreement with
7  Pfizer that limits your ability to disclose
8  certain things about your employment there?
9      A.    Yes, I believe I have a
10  confidentiality agreement with them.
11     Q.    Do you intend to honor that
12  agreement?
13     A.    Yes.
14     Q.    Are those agreements important?
15           MR. KELLER:  Objection.  Vague
16     and ambiguous.
17           THE WITNESS:  Again, which
18     agreements?  What do you mean by
19     "important"?
20  BY MR. SANGIAMO:
21     Q.    Why are you reluctant to answer
22  that question, Ms. Wlochowski?
23           MR. KELLER:  Argumentative.
24     Important to who, to her, to the

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 71

1  correctly, "...BioMek and MultiMek in support
2  of vaccine formulation trials."  That says
3  trials, plural.  I take it there was more than
4  one trial in which you performed those
5  clinical assays?
6      A.    I believe so, yes.
7      Q.    How many trials were there?
8      A.    I don't recall.
9      Q.    Were all the trials for the
10  same vaccine product?
11           MR. KELLER:  Be careful not to
12     disclose anything that would violate
13     any agreement you had with Pfizer with
14     respect to confidentiality.  So if you
15     want to testify, you can testify
16     generally.  If there is something
17     specific you want to ask, we can cross
18     that bridge, but start with that.
19           THE WITNESS:  So you asked if
20     there was more than one trial?  Is that
21     the question?
22  BY MR. SANGIAMO:
23     Q.    I asked if all the trials were
24  for the same vaccine product?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 73

1  company?
2            MR. SANGIAMO:  She can testify.
3            THE WITNESS:  Are you asking if
4      it's important to me or are you asking
5      if it's important to the company?
6  BY MR. SANGIAMO:
7      Q.    I'm asking if they're
8  important.  You need to slice that up?
9            MR. KELLER:  Objection.
10     Overbroad.
11           THE WITNESS:  Yes, they're
12     important.
13  BY MR. SANGIAMO:
14     Q.    Do you think it's okay to
15  disregard those agreements?  Is that okay in
16  your view?
17           MR. KELLER:  Objection.  Form.
18     Lack of foundation.
19           THE WITNESS:  I don't think
20     it's appropriate to violate those
21     agreements, but I also -- it depends on
22     the -- if the company themselves have
23     violated any of their guidances as
24     well.

19 (Pages 70 - 73)

Appx5915

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL74

BY MR. SANGIAMO:

2    Q.   Any of their what?

3    A.   The guidances or regulations

4 that they're required to follow.

5    Q.   So your view is if the company,

6 in your opinion, has violated a guidance or

7 regulation, then it's okay to go ahead and

8 disclose their confidential information. Is

9 that your view?

10       MR. KELLER: Objection.

11 Mischaracterizes her testimony.

12       THE WITNESS: No, I'm not

13 saying that specifically, but, again,

14 in this case with Pfizer, the

15 confidentiality agreement was important

16 and it -- I agree with it in the case

17 of Pfizer.

18 BY MR. SANGIAMO:

19    Q.   So your view is each employee

20 should decide for him or herself whether he or

21 she wants to honor the confidentiality

22 agreement when they leave an employer. Is

23 that a fair summary?

24       MR. KELLER: Objection.

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL75

1 Argumentative. Vague and ambiguous.

2       MR. SANGIAMO: Jeff, the mere

3 fact that she doesn't want to have to

4 answer a question is not a basis to

5 object to it.

6       MR. KELLER: You can ask your

7 questions. I'll object as I deem

8 appropriate.

9       THE WITNESS: So I -- again,

10 in -- it depends, yes, I believe that

11 it depends on the circumstances that

12 surround that agreement.

13 BY MR. SANGIAMO:

14    Q.   Have you told any of your

15 subsequent employers after Merck that that's

16 how you plan to go about honoring your

17 confidentiality obligation?

18    A.   No, I have not.

19    Q.   Do you think they're entitled

20 to know that?

21    A.   I think they're entitled to be

22 honest to me as I am to them.

23    Q.   My question is, are they

24 entitled to know that you're going to make

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL76

1 your own judgment about whether or not you

2 have to honor the confidentiality agreements

3 that you owe to them?

4       MR. KELLER: Objection. Form.

5 Calls for speculation.

6       THE WITNESS: Right. I don't

7 think that -- I can't say what they're

8 entitled to know. So, yeah, it depends

9 on the situation that occurs while I'm

10 employed by them. The expectation is

11 that they are -- you know, if they tell

12 me they're running under GMP

13 regulations, then that is their promise

14 to me. My promise to them is I keep it

15 confidential.

16 BY MR. SANGIAMO:

17    Q.   Have you included that

18 provision in any of your agreements with your

19 subsequent employers?

20       MR. KELLER: Objection.

21       THE WITNESS: Again, that's a

22 confidentiality agreement. I can't --

23 then I would be breaking the

24 confidentiality agreement if I told you

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL77

1 what was in the agreement.

2 BY MR. SANGIAMO:

3    Q.   So you're not going to answer?

4 So you're saying that maybe you did include a

5 provision in your agreements with your other

6 employers about your compliance being

7 conditioned upon them complying with the CGMP,

8 maybe you did, you're just not going to tell

9 us. Is that what you're saying?

10       MR. KELLER: Objection.

11 Argumentative.

12       MR. SANGIAMO: Understood,

13 Jeff, you made your objection.

14       THE WITNESS: Yes.

15 BY MR. SANGIAMO:

16    Q.   Do you have copies of your

17 confidentiality agreement with Wyeth -- I'm

18 sorry, with Pfizer?

19    A.   I believe I do, yes.

20    Q.   And how about with Amgen?

21    A.   I think I do. I can't confirm.

22    Q.   Were the vaccines that are

23 under study in the trials to which you refer

24 in the first bullet point of your description

20 (Pages 74 - 77)

| Page 78 | Page 80 |
|---|---|
| JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL| 78 | JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL| 80 |

**Page 78**

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL| 78

1  in Exhibit 1 of your work with Pfizer, were
2  they already marketed by the time of those
3  studies?
4        MR. KELLER: That's a yes or
5  no. Overbroad. Objection. Overbroad.
6        MR. SANGIAMO: Overbroad how?
7  Were they already marketed at the time
8  of the studies, why is that overbroad?
9        MR. KELLER: There could be
10  some that are marketed, some that
11  aren't marketed. She hasn't said
12  whether or not there was more than one
13  vaccine and others, if you want to be
14  precise. Object to the question.
15        THE WITNESS: I don't know, I
16  think some were marketed at the time.
17  BY MR. SANGIAMO:
18    Q.  Which ones?
19    A.  I can't say which ones.
20    Q.  Because you don't remember or
21  because you think you're prohibited from doing
22  so by your confidentiality agreement with
23  Pfizer?
24    A.  Again, I think probably a

**Page 79**

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL| 79

1  little bit of both. That I wouldn't say which
2  vaccines on top of -- I don't recall exactly
3  which ones.
4    Q.  So is it your belief that your
5  confidentiality agreement with Pfizer
6  precludes you from telling us about work you
7  did on a clinical trial on a marketed product?
8  Is that your recollection or understanding of
9  your confidentiality agreement with Pfizer?
10        MR. KELLER: Objection. Seeks
11  a legal conclusion, and I will instruct
12  you not to disclose any communications
13  you had with your counsel with respect
14  to anything that may be provided in
15  those confidentiality agreements to the
16  extent that you discussed them with
17  your counsel.
18        THE WITNESS: With the work
19  that's described within my CV to speak
20  to what I did on a particular product,
21  I wouldn't disclose that at this time.
22        MR. SANGIAMO: Do you plan to
23  have her to testify at trial about the
24  work she has done at Pfizer? Are you

**Page 80**

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL| 80

1  going to stipulate now that she will
2  testify?
3        MR. KELLER: I didn't stipulate
4  anything. Ask your question. If you
5  want to make a motion, make a motion.
6  We're not under any obligation.
7  BY MR. SANGIAMO:
8    Q.  Can you describe whether any of
9  the serum neutralization assays involved
10  plaque reduction as a means of measuring an
11  immune response?
12    A.  I don't think we performed
13  plaque reduction.
14    Q.  You understood my question just
15  now was in reference to the work you did at
16  Pfizer. Right?
17    A.  Pfizer.
18    Q.  If not a plaque reduction serum
19  neutralization assay, then what kind of serum
20  neutralization assay was it?
21    A.  I believe they were conducted
22  on an ELISA format.
23    Q.  What was your role in running
24  these ELISA serum neutralization assays?

**Page 81**

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL| 81

1    A.  I performed the assays.
2    Q.  Did you work in a lab that was
3  running the assays?
4    A.  Yes, I did.
5    Q.  How many other people were
6  working in that lab?
7    A.  I think two other people.
8    Q.  I assume that lab ran assays on
9  multiple trials?
10    A.  To my recollection, yes.
11    Q.  Did that lab run any plaque
12  reduction neutralization assays while you were
13  at Pfizer?
14    A.  Not that I recall, no.
15    Q.  Was the -- strike that.
16    Were the serum neutralization
17  assays that you were running at Pfizer
18  measuring the immune response to vaccination?
19    A.  Yes, I believe so.
20    Q.  Were they measuring seroconversion
21  or were they measuring some other kind of
22  immune response?
23        MR. KELLER: Objection.
24  Compound.

21 (Pages 78 - 81)

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 82

1      THE WITNESS: I don't recall
2   the specifics.
3  BY MR. SANGIAMO:
4    Q.  Do you recall the answer to my
5  question as to whether they were measuring
6  seroconversion as distinguished from some
7  other kind of immune response?
8      MR. KELLER: Same objection.
9      THE WITNESS: I do recall your
10  question. I don't recall the intent of
11  the assay that we were performing.
12  BY MR. SANGIAMO:
13    Q.  It could have been either?
14    A.  Uh-huh. I mean, I guess in the
15  case of you're saying neutralization, you're
16  saying immune response which could be the
17  same, could also be the same endpoint if
18  you're looking at end response and
19  neutralization as an endpoint to detect it.
20    Q.  My question was whether it was
21  seroconversion or some other kind of immune
22  response?
23    A.  Okay.
24    Q.  I understand your answer to be

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 83

1  you're not sure.
2    A.  Right.
3    Q.  Were the vaccines live virus
4  vaccines?
5      MR. KELLER: Hold on a second.
6    You can answer.
7      THE WITNESS: I don't remember
8  if they're a live virus or not.
9  BY MR. SANGIAMO:
10    Q.  Do you remember whether any of
11  the vaccines was a mumps vaccine?
12    A.  No.
13      MR. KELLER: I instruct her not
14  to answer that question.
15      MR. SANGIAMO: Right now you're
16  asserting Pfizer's rights, is that what
17  you're asserting?
18      MR. KELLER: I'm asserting, I
19  don't want her to violate that
20  confidentiality agreement.
21      MR. SANGIAMO: Have you seen
22  the agreement?
23      MR. KELLER: I've reviewed the
24  agreements.

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 84

1      MR. SANGIAMO: Are you ready to
2  certify that would be a violation of
3  that confidentiality agreement?
4      MR. KELLER: I'm not certifying
5  anything. You can ask your questions.
6  I believe she answered it anyway.
7      MR. SANGIAMO: You didn't let
8  her answer it.
9      MR. KELLER: I think she
10  answered it.
11  BY MR. SANGIAMO:
12    Q.  Were any of the vaccines that
13  you worked on at Pfizer a mumps vaccine?
14      MR. KELLER: You can answer.
15      THE WITNESS: No, they were
16  not.
17  BY MR. SANGIAMO:
18    Q.  Did you design any of the
19  assays that you ran at Pfizer?
20    A.  What do you mean by design the
21  assay?
22    Q.  Did you play any role in
23  developing the assay methodology for any of
24  those assays?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 85

1    A.  I believe I worked on
2  developing assays while I was there.
3    Q.  When you say you worked on
4  developing assays while you were there, does
5  that include the assays that were used in
6  vaccine clinical trials as described on your
7  CV?
8    A.  Not that I recall, no.
9    Q.  So you worked on developing
10  other assays while you were at Pfizer. Is
11  that the idea?
12    A.  Correct.
13    Q.  What kind of assays were those?
14    A.  I have listed there that I
15  developed a PCR assay, worked on that
16  development in the -- that's all that I
17  recall.
18    Q.  What was that PCR assay used
19  for?
20      MR. KELLER: You can describe
21  it without identifying the products
22  that it was used in.
23      THE WITNESS: It was used to
24  measure proviral load and viremia in

22 (Pages 82 - 85)

Appx5918

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 86

1    study samples per my description there.
2 BY MR. SANGIAMO:
3        Q.    What's viremia?
4        A.    Again, the -- I can't explain
5 to you the specifics of that right now.
6        Q.    What is the definition of
7 viremia?
8        A.    Virus or viral infection in
9 blood samples.
10       Q.    So viremia can refer to many
11 different viruses?
12       A.    Yes, it could.
13       Q.    It's not a definition of a
14 particular virus.  Do I have that right?
15       A.    Correct.
16       Q.    Was mumps among the viruses
17 that were related to the PCR assay that you
18 described there in your time at Pfizer?
19            MR. KELLER:  At this point I'm
20       going to -- she's already testified
21       that she hasn't worked on a mumps
22       vaccine at Pfizer.  You're getting into
23       what specific work she's doing on
24       different products at Pfizer.  She has

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 87

1       a confidentiality agreement.  You're
2       trying to get her to breach that
3       confidentiality agreement, so I'm going
4       to instruct her not to answer that.
5            MR. SANGIAMO:  The thing she
6       testified to, if I remember the
7       testimony correctly, is that the
8       vaccine trials that she -- for which
9       she ran a large scale clinical assays
10      that you referred to in the first
11      bullet point in her CV about Pfizer,
12      that those did not involve mumps
13      vaccine.  Right?  Right now I'm asking
14      her about a different part of her work
15      at Pfizer, mainly the development of
16      this PCR assay and whether any of that
17      work was directed at mumps virus.
18            MR. KELLER:  I'm not trying to
19      talk over you.  Why don't you ask if
20      she worked on mumps virus at all at
21      Pfizer generally?
22 BY MR. SANGIAMO:
23       Q.    Did any of your work at Pfizer
24 involve mumps virus?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 88

1        A.    No.
2        Q.    Where did you -- what other
3 kinds of work did you do at Pfizer?
4        A.    Again, I was there for nine
5 months so what is listed on my CV is what I
6 conducted over that period.
7        Q.    Are you familiar with the term
8 "basic research" as used in the pharmaceutical
9 industry?
10       A.    Can you describe what you mean
11 by that?
12       Q.    I was hoping you would.  I'm
13 trying to come up with one summary way of
14 describing what your work at Pfizer was and
15 I'm asking if it was all in the nature of
16 basic research?
17       A.    It was part research; part, if
18 we were supporting clinical trials, clinical
19 work.
20       Q.    Clinical work, namely serology
21 work.  Right?
22       A.    Correct.
23       Q.    Did you do any work while you
24 were at Pfizer that you would characterize as

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 89

1 regulatory?
2        A.    The work conducting the studies
3 for the clinical assays to support regulatory
4 or could support anything that regulatory
5 would use.
6        Q.    Was there anything else you did
7 at Pfizer that you could say was regulatory in
8 nature besides the work supporting the
9 clinical studies?
10       A.    What is it that you're
11 referring to by regulatory that I --
12       Q.    Did any of your work at Pfizer
13 involve you personally interacting with the
14 FDA?
15       A.    No.
16       Q.    Did it involve you personally
17 interacting with any other regulatory body?
18       A.    No.
19       Q.    Did it involve you authoring
20 submissions to be made to the FDA?
21       A.    What do you mean by "authoring"?
22       Q.    Let's break that down.  Did it
23 involve you generating data that was going to
24 be included in a submission to the FDA?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL190

1    A.    Yes, potentially.
2    Q.    Did it include any other kind
3 of involvement on your part in an FDA
4 submission?
5         MR. KELLER: Objection. Vague
6    and ambiguous. Overbroad.
7         THE WITNESS: What do you mean
8    by any other part besides generating
9    data? What are you looking --
10 BY MR. SANGIAMO:
11    Q.    I'm asking about what you did.
12    A.    I can't think of anything
13 besides the -- my work in the clinical
14 studies. Anything in basic research could
15 potentially down the road be used for
16 something further down development to support
17 regulatory. So as a whole, it is a vague
18 question because as a whole there could be
19 further development that leads into something
20 that would be used in a regulatory submission
21 at a later point.
22    Q.    Do you know if that occurred in
23 any of the basic research that you did?
24    A.    I do not.

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL191

1    Q.    Did you provide any input into
2 product labeling while you were at Pfizer?
3         MR. KELLER: Objection. Vague
4    and ambiguous. Lack of foundation.
5         THE WITNESS: When you say
6    "input," what are you looking for?
7 BY MR. SANGIAMO:
8    Q.    Does that word have any meaning
9 to you, "input"?
10    A.    It could mean any number of
11 things. And I can say that, again,
12 potentially the work I performed in the
13 clinical study would be used to support a
14 label.
15    Q.    Did you review drafts of
16 labeling?
17    A.    I did not.
18    Q.    Did you draft label language?
19    A.    I did not.
20    Q.    Was your opinion solicited by
21 co-workers regarding how wording should be
22 phrased in a label?
23    A.    Not that I recall, no.
24    Q.    After Pfizer you went to Amgen?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL192

1    A.    Correct.
2    Q.    One more question on Pfizer.
3 Did you have a single supervisor when you were
4 at Pfizer?
5    A.    Yes.
6    Q.    Who was that?
7    A.    Jay Thompson.
8    Q.    First name Jay, J-A-Y?
9    A.    Yes.
10    Q.    Do you know if he's still at
11 Pfizer?
12    A.    I do not.
13    Q.    Was the name of the group that
14 you were in biologics development?
15    A.    Yes.
16    Q.    Your next stop was at Amgen.
17 Correct?
18    A.    Correct.
19    Q.    Could you describe your work
20 obligations at Amgen?
21    A.    I worked in the analytical
22 laboratory at -- when I first started at Amgen
23 for process development. I later moved to the
24 product quality team where I provided

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL193

1 oversight to the QC testing labs and
2 monitoring and trending the data for the labs.
3    Q.    During the time that you were
4 there, did Amgen make vaccines?
5    A.    No.
6    Q.    Did you work on any vaccines in
7 development while you were at Amgen?
8    A.    No.
9    Q.    Did you work on any antiviral
10 products while you were at Amgen?
11    A.    No.
12    Q.    Did you work on any immunotherapy
13 products while you were at Amgen?
14    A.    When you say work on the products,
15 what do you mean?
16    Q.    Was any of the work that you
17 did related to such products?
18    A.    Yes, I believe so.
19    Q.    Did you do any work at Amgen
20 related to the mumps virus?
21    A.    No.
22    Q.    My handwriting is too sloppy, I
23 may not get this right. Do I have it right
24 that you worked in the -- at first in the

24 (Pages 90 - 93)

Appx5920

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL194

1 analytical laboratory for product development?

2 Is that what you said?

3    A.   Process development.

4    Q.   Process development?

5    A.   Yep.

6    Q.   What does the analytical

7 laboratory for process development at Amgen do

8 or what did it do at that time?

9    A.   It was further developing the

10 process for one of their products.

11    Q.   It was just a single product

12 that you were working on when you were in the

13 analytical laboratory for process development?

14    A.   Yes.

15    Q.   What kind of product was that?

16    MR. KELLER:  Answer generally.

17 Was it a drug?  Was it a vaccine?

18    THE WITNESS:  Biologic.

19 BY MR. SANGIAMO:

20    Q.   Is it currently a marketed

21 product?

22    A.   Yes.

23    Q.   What's the name of the product?

24    MR. KELLER:  You can answer

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL195

1 that.

2    THE WITNESS:  Enbrel.

3 BY MR. SANGIAMO:

4    Q.   What does it do?

5    A.   It treats rheumatoid arthritis.

6    Q.   How does it do that?

7    MR. KELLER:  Objection.

8 Overbroad.

9    THE WITNESS:  I can't explain

10 the mechanism.

11 BY MR. SANGIAMO:

12    Q.   Because you don't know?

13    A.   Yeah, I can't explain it at

14 this time.

15    Q.   I need clarification.  You're

16 saying you can't explain it because you don't

17 know what it is.  Is that your testimony?

18    A.   I don't remember how the

19 mechanism works.  Yes.

20    Q.   And what specifically did you

21 do in the analytical laboratory for process

22 development?

23    A.   I ran the test methods on the

24 product that was being generated as part of

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL196

1 the product development.

2    Q.   What kind of test methods did

3 you run?

4    A.   I would say mainly I performed

5 the ELISAs.

6    Q.   Anything else?

7    A.   General test. PH, osmo, some

8 HPLC.

9    Q.   What was the purpose of the --

10 I'm sorry, were you about to say something

11 else?

12    A.   SDS-page staining, Coomassie

13 staining.

14    Q.   What was the purpose of the

15 ELISAs that you were running?

16    A.   I can't remember.

17    Q.   Is it possible the purpose of

18 the ELISA was to detect the absence of

19 antibody development?

20    MR. KELLER:  Objection. Calls

21 for speculation.

22    THE WITNESS:  No, because this

23 was a product that wasn't -- it was

24 basically the detection of proteins.

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL197

1 BY MR. SANGIAMO:

2    Q.   That's what the ELISA was for?

3    A.   Yes.

4    Q.   Detecting proteins by looking

5 for antibodies to that protein?

6    MR. KELLER:  Objection. Lack

7 of foundation.

8    THE WITNESS:  Yeah, I can't

9 remember the assay that was -- the

10 intent of the assay.

11 BY MR. SANGIAMO:

12    Q.   You can't remember what?

13    A.   I can't remember exactly the

14 assay, what it was measuring.

15    Q.   You said you also ran assays to

16 measure pH. Did I have that right?

17    A.   Yes.

18    Q.   What was the purpose of that?

19    A.   The product needs to be

20 maintained within a certain pH.

21    Q.   And then you mentioned an HPLC

22 assay?

23    A.   Uh-huh.

24    Q.   What was the purpose of that?

25 (Pages 94 - 97)

Appx5921

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 98

1    A.   To identify the purity of the
2  product.
3    Q.   You mentioned something about
4  Coomassie staining?
5    A.   Yes.
6    Q.   What was the purpose of that?
7    A.   Also, I believe, purity.
8    Q.   Was any of this in the nature
9  of stability testing?
10   A.   Not that I recall, no.
11   Q.   How long were you in the
12 analytical laboratory for process development
13 at Amgen?
14   A.   Two years.
15   Q.   I gather then 2005 is when you
16 moved to the product quality team?
17   A.   Correct.
18   Q.   Did you work on more than one
19 product while you were in the product quality
20 team?
21   A.   No.
22   Q.   What product did you work on
23 there?
24   A.   Enbrel.

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 99

1    Q.   What specifically was your
2  role?
3    A.   Again, the -- providing the
4  oversight to the QC laboratories for their
5  method development and transfer comparability
6  as well as trending and data that was
7  generated.
8    Q.   What is method development?
9    A.   It basically is developing a
10 method based on an order to be able to test a
11 specific criteria.
12   Q.   In what way did you oversee the
13 QC lab?  What was your job function?
14   A.   So if there were challenges
15 with method performance I would provide some
16 oversight to investigate the issues around the
17 performance and help to work with the analysts
18 on the -- any further development or
19 optimization that's needed for the performance
20 of the assay.
21   Q.   Did you provide the subject
22 matter expertise for that process?
23   A.   Partially, yes.
24   Q.   What else did you provide?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 100

1    A.   I'm not sure what you mean by
2  what else did I provide.
3    Q.   Did you provide -- was it your
4  function to provide organizational coordination
5  as challenges were being encountered with
6  methods?
7        MR. KELLER:  Objection.  Vague
8    and ambiguous.
9        THE WITNESS:  I'm not sure I
10   understand.  Can you ask the question
11   again?
12 BY MR. SANGIAMO:
13   Q.   Was it your responsibility to
14 see to it that the relevant portions of the
15 product quality team met appropriately to
16 resolve a particular issue that's an example
17 of what I'm talking about other than actual
18 subject matter expertise?
19   A.   Yes, there was a team that
20 would meet to review the data and we would
21 work together cross functionally.
22   Q.   Looking at Exhibit 2, your
23 description of your time at Amgen has two
24 bullet points?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 101

1    A.   Uh-huh.
2    Q.   Is it the case that the work in
3  the analytical laboratory for process
4  development is what's described in the first
5  bullet point?
6    A.   That is more based on the -- my
7  role in product quality.
8    Q.   Is your work in the analytical
9  laboratory for process development described
10 anywhere on this CV at Amgen?
11   A.   The second bullet is more
12 relating to my analytical laboratory work.
13   Q.   What's a site maturity model?
14   A.   It's based on the performance
15 of the systems, the robustness of the systems.
16 So they had a maturity model of where we were
17 at with developing the systems that managed
18 our processes.
19   Q.   Does your reference in that
20 first bullet point to validation, what is that
21 referring to?
22   A.   Method validation.
23   Q.   Can you describe what method
24 validation amounts to?

26 (Pages 98 - 101)

Appx5922

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL102

1    A.   It shows the method is suitable
2 for its intended use, in this case an GMP
3 environment.  That it would be accurate,
4 specific, precision and repeatability.
5    Q.   Is there any validation work
6 for any ELISA assays that you did?  I'm sorry,
7 let me try that question again.
8        Did you do any validation work
9 on ELISA assays when you were at Amgen?
10    A.   I do not -- I did not.
11    Q.   Did you get along with your
12 co-workers while you were at Amgen?
13        MR. KELLER: Objection.  Vague
14 and ambiguous.
15        THE WITNESS:  Again, co-workers
16 meaning who?
17 BY MR. SANGIAMO:
18    Q.   So you feel you need to divide
19 that up a little bit?
20        MR. KELLER:  Same objection.
21        THE WITNESS:  Yes.
22 BY MR. SANGIAMO:
23    Q.   Were you ever told in your
24 reviews that there was an issue about how you

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL103

1 were getting along with your co-workers?
2    A.   There could have been an
3 example of feedback of different -- working
4 with different people throughout the company;
5 yes.
6    Q.   Did any of that feedback
7 suggest that that was an area that you needed
8 to work on, improving your relationships with
9 co-workers?
10    A.   Well, I think everybody needs
11 to work on that because there are different
12 personalities within an organization.  So
13 there could always be conflict between
14 personalities.
15    Q.   Were there such conflicts
16 between personalities in your case when you
17 were at Amgen?
18    A.   None that impaired my work, no.
19    Q.   But there was some that just
20 didn't impair your work?
21    A.   There was nothing that actually
22 was detrimental to my performance.
23    Q.   Why did you decide to leave
24 Amgen?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL104

1    A.   Looking for a new opportunity.
2    Q.   Were you asked to leave Amgen?
3    A.   No.
4    Q.   Did you apply to anyplace other
5 than Alexion when you were deciding to leave
6 Amgen?
7    A.   I probably did.  I don't recall.
8    Q.   If we could talk a little about
9 your work at Alexion --
10    A.   Amgen had also a reduction in
11 workforce.  So they were going through a major
12 reduction in their workforce which I was not
13 part of.  So I was still a part of Amgen at
14 the time.  As part of the, again, reason for
15 leaving is the morale had dropped, so that was
16 my reason for looking for a new opportunity.
17    Q.   Morale had dropped and you
18 attribute that drop in morale to reduction of
19 force.  Right?
20    A.   Yes.  Yes.
21    Q.   If we could talk now about your
22 work at Alexion.  Are you currently employed
23 there?
24    A.   Yes.

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL105

1    Q.   Has all of your work at Alexion
2 been in the quality area?
3    A.   Yes.
4    Q.   What does that mean to say it
5 was in the quality area?
6    A.   I am overseeing compliance to
7 GMP regulations for the specific areas I
8 oversee.
9    Q.   Does Alexion make any vaccines?
10    A.   No.
11    Q.   Does any of your work at
12 Alexion ever involve vaccines?
13    A.   No.
14    Q.   Has it ever involved the mumps
15 virus in any way?
16    A.   No.
17    Q.   Do you oversee compliance for
18 GMP for a specific portion of Alexion?
19    A.   Yes.
20    Q.   What portion of that?
21    A.   Are you asking for my current?
22    Q.   Yes.
23    A.   Okay.  I oversee the
24 manufacturing of clinical products as well as

27 (Pages 102 - 105)

Appx5923

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 106

1  the internal product development laboratories.
2    Q.  Who do you report to?
3    A.  I have an interim manager at
4  the moment. I report to Brian Molloy.
5    Q.  What's Brian Molloy's title?
6    A.  Executive director of quality
7  operations.
8    Q.  Is there someone more senior
9  than him within quality operations?
10    A.  Currently we have chief of
11  quality.
12    Q.  Is he the only executive
13  director of quality operations?
14    A.  Yes.
15    Q.  Are there other people who
16  report directly to Brian Molloy besides
17  yourself?
18    A.  Yes.
19    Q.  How many?
20    A.  I want to say probably five
21  others.
22    Q.  How many products does Alexion
23  manufacture?
24    A.  Commercially?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 107

1    Q.  Yes.
2    A.  Three.
3    Q.  What are they just very
4  generally?
5    A.  They support rare diseases,
6  blood disorders, that sort of thing.
7    Q.  Does any of your work
8  involve -- strike that.
9       Has any of your work at Alexion
10  involved clinical trials?
11    A.  Yes.
12    Q.  In what way?
13    A.  The manufacturing of the
14  clinical product that we use are used in
15  clinical trials.
16    Q.  Used in clinical trials being
17  performed by Alexion?
18    A.  Yes.
19    Q.  Have you had any other
20  involvement in clinical trials while at
21  Alexion other than your role related to the
22  manufacturing of the product?
23    A.  I'm trying to think how -- no,
24  just as far as quality oversight for the

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 108

1  product is my role in clinical trials.
2    Q.  That's quality oversight with
3  regard to the manufacturing of the product?
4    A.  Correct.
5    Q.  When you were at Amgen, did
6  you, yourself, interact with the FDA?
7    A.  I don't think so.
8    Q.  When you were at Pfizer, did
9  you, yourself, interact with the CDC?
10    A.  No.
11    Q.  At Amgen did you interact with
12  the CDC?
13    A.  No.
14    Q.  Do you interact with the FDA or
15  have you -- strike that.
16       Have you interacted with the
17  FDA during your time at Alexion?
18    A.  Yes.
19    Q.  How frequently?
20    A.  I would say -- it depends on
21  what you mean by interacting because I
22  interact on different levels.
23    Q.  What are they?
24    A.  So I have been directly

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 109

1  involved in inspections by the FDA where I
2  speak directly to the FDA. I currently
3  support any data that's used to submit
4  information to the FDA, so I do review
5  documents that are submitted to the FDA. We
6  do have responses, questions from the FDA that
7  we have commitments to that I work towards as
8  far as quality oversight, ensuring that those
9  are completed.
10    Q.  So that's three different thing
11  you just described? I couldn't tell whether I
12  was dividing them up.
13    A.  Yeah, in general -- that's in
14  general what I do.
15    Q.  Have there been any 483s issued
16  in any of these inspections at Alexion when
17  you've been interacting with the FDA?
18       MR. KELLER: If any of those
19    483s are public, you can testify to it.
20    If they're not public, then you cannot
21    pursuant to your confidentiality
22    agreement with Alexion.
23       THE WITNESS: For the
24    inspections that I supported directly

28 (Pages 106 - 109)

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 110

1  we were not issued 483s for the GMP
2  manufacturing.
3  BY MR. SANGIAMO:
4      Q.   Were there 483s that you were
5  involved indirectly in that were issued as a
6  result of FDA inspections at Alexion?
7          MR. KELLER:  Again, the caveat
8      is if that 483 is publicly available,
9      you can answer.  If it's not publicly
10     available, I instruct you not to answer
11     pursuant to your confidentiality.
12         THE WITNESS:  I do not know the
13     status.  And, you know, as far as, I
14     guess indirectly is pretty broad.  I
15     work for the company.
16 BY MR. SANGIAMO:
17     Q.   It was your term.
18     A.   So I can't say to the status of
19 the answer of that question based on
20 confidentiality, whether or not it's public.
21     Q.   So the 483 is issued but you
22 can't describe them because you don't know
23 whether they are public.  Is that a fair
24 summary of what you're saying?  Yes?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 111

1      A.   Yes.
2      Q.   A second area of FDA-related
3  work that you identified at Alexion was
4  supporting data used to submit information to
5  the FDA.  Right?
6      A.   Yes.
7      Q.   What's the nature of that data
8  support work?
9      A.   The manufacturing process.  So
10 we would describe the manufacturing process of
11 the product.  The support is reviewing the
12 data that's submitted related to the
13 manufacturing.
14     Q.   You also referred to questions
15 and then responses -- strike that.
16         You referred to questions from
17 the FDA and responses to the FDA.  That would
18 also be about the manufacturing processes?
19     A.   Correct.
20     Q.   Are Alexion's products biologics?
21     A.   Yes.
22     Q.   Do you have any involvement in
23 stability programs at Alexion -- sorry, try it
24 again.

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 112

1          Have you had any responsibility
2  for stability programs at Alexion?
3          MR. KELLER:  Objection to form.
4          THE WITNESS:  What do you mean
5      by "responsibility"?
6  BY MR. SANGIAMO:
7      Q.   Have you had any involvement in
8  stability programs at Alexion?
9          MR. KELLER:  Same objection.
10         THE WITNESS:  Can you elaborate
11     on "involvement"?
12 BY MR. SANGIAMO:
13     Q.   What are some of the aspects of
14 the stability program at Alexion?
15     A.   What are some of the aspects?
16     Q.   And then if you could tell me
17 which ones of those you were involved in, that
18 would be helpful?
19     A.   So the -- I provide quality
20 oversight for the testing that is conducted in
21 support of stability.
22     Q.   What does it mean to provide
23 quality oversight of that testing?
24     A.   So that I ensure that any

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 113

1  stability data -- or my team ensures that any
2  stability data that's generated is reviewed,
3  quality reviewed.  Any events that occur
4  during the testing, stability testing, would
5  be documented within a deviation and we
6  provide quality oversight for that.  Any
7  changes to the stability program would be
8  submitted through change control and provide
9  quality oversight for that as well.
10     Q.   Do you play a role in defining
11 the terms of the stability program?
12         MR. KELLER:  Objection.
13         THE WITNESS:  What role are you
14     referring to?
15 BY MR. SANGIAMO:
16     Q.   Any role.
17     A.   The stability program, the
18 definition or the parameters that are set by
19 the stability, for stability is proposed by
20 the subject matter experts and the information
21 or criteria being presented is reviewed by
22 quality.
23     Q.   Do you participate in that
24 review?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL114

1   A.   Yes.
2   Q.   What's the nature of your
3   participation?
4   A.   We verify that the data being
5   submitted would provide the appropriate
6   justification for the parameters.
7   Q.   Is that a team of people in
8   quality who review the proposals from the
9   subject matter experts?
10  A.   Yes.
11  Q.   You're one member of that team?
12  A.   Yes.
13  Q.   How many people are on that
14  team?
15  A.   There -- you're just speaking
16  specifically to quality members?
17  Q.   I'm speaking to quality members
18  who review the proposals from the subject
19  matter experts about the parameters of the
20  stability program.
21  A.   I can't say that it's defined
22  how many members.  There's at least two
23  quality representatives.  Actually it would
24  then -- it depends, again, upon the extent of

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL115

1   the review.  It would go up to the chief of
2   quality for anything that's submitted for any
3   changes in the parameters of the program.
4   Q.   Are there people other than
5   those in quality who review changes in
6   parameters of the stability programs?
7   A.   Yes.  It would be the head of
8   the product development team as well as
9   regulatory would be part of the cross
10  functional team.
11  Q.   How does the approval of
12  changes in the parameters for the stability
13  program ultimately get decided, is that by
14  consensus of this team?
15  A.   Yes, I would say so.
16  Q.   How many times in your tenure
17  at Alexion have you participated in this kind
18  of review of the parameters of the stability
19  program?
20  A.   Are we talking about new
21  parameters or changes to parameters?
22  Q.   Either.  Or both I should say.
23  A.   I'm trying to think.  I would
24  say -- so the question is how many times

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL116

1   during my time at Alexion?
2   Q.   Yes.
3   A.   I would say maybe a dozen times.
4   Q.   Have you ever interacted with
5   the CDC during your time at Alexion?
6   A.   No.
7        MR. SANGIAMO:  Jeff, now would
8   be a good time to break from my
9   perspective.
10       MR. KELLER:  It's been an hour.
11  Let's take a break.
12       VIDEOGRAPHER:  The time is now
13  11:58.  Going off the video record.
14            - - -
15       (A recess was taken.)
16            - - -
17       VIDEOGRAPHER:  The time is now
18  12:13.  This begins disc three.  You
19  may proceed.
20  BY MR. SANGIAMO:
21  Q.   Ms. Wlochowski, your CV
22  describing your time at Alexion refers several
23  times to product disposition.  What does that
24  mean?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL117

1   A.   I released the product to the
2   market or to the clinical sites.
3   Q.   You said "I released the
4   product," you mean --
5   A.   Release or reject.
6   Q.   Your group does?
7   A.   Yes.
8   Q.   Did you attempt in 2004 about a
9   year into your tenure at Amgen to get rehired
10  by Pfizer?
11  A.   Check on the dates.  I may have
12  applied to a position there.
13  Q.   Did you get rejected?
14  A.   I didn't get called for an
15  interview, if that's what you're referring to.
16  Q.   Do you know -- strike that.
17       Do you recall what the position
18  was that you were applying for?
19  A.   No, I do not.
20  Q.   Was there any particular reason
21  you wanted to leave Amgen at that time?
22  A.   Because I was commuting an hour
23  to Amgen.
24  Q.   You got no response from Pfizer

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL118

1 other than just they didn't get back to you.
2 Is that right?
3     A.    I don't know if they sent me a
4 response.
5     Q.    You have no recollection of the
6 reason they offered for not pursuing it
7 further with you.  Is that right?
8     A.    That's right.
9     Q.    Did you apply to Pfizer again
10 in October of 2007?
11     A.    I could have.
12     Q.    What happened that time?
13     A.    Again, same reason.  I'm still
14 commuting.  I think -- I would -- as far as I
15 recall be the reason I would have applied
16 again.
17     Q.    How long was that commute when
18 you were working at Amgen?
19     A.    It was an hour.
20     Q.    How long was the Pfizer
21 commute?
22     A.    20 minutes.
23     Q.    How long was the commute to
24 Alexion?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL119

1     A.    Currently it's half-hour.
2     Q.    Did you apply to Pfizer again
3 in 2013?
4     A.    Potentially I could have.
5     Q.    You're not sure?
6     A.    No, I don't recall.
7            - - -
8         (Exhibit Wlochowski-5, Applied
9     for job openings, was marked for
10     identification.)
11            - - -
12 BY MR. SANGIAMO:
13     Q.    Ms. Wlochowski, I've shown you
14 a document that has been marked as Exhibit 5
15 which was produced to us by Pfizer.  And I
16 have no reason to believe that you've seen
17 this document, but to the extent it might
18 refresh your recollection about whether you
19 applied for a position with Pfizer in 2013 I
20 thought I would show it to you.
21     A.    Okay.
22        MR. KELLER:  What's the
23     question -- before you go on, I have a
24     question.  Have you ever produced this

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL120

1 document to us pursuant to your
2 obligations?
3        MR. SANGIAMO:  I assume we
4     have, but I can't -- I'm not --
5        MR. KELLER:  We've never seen
6     this document based on my
7     understanding.  Anybody here can
8     confirm this has been produced to us
9     pursuant to our agreements?  There's
10     four lawyers here.
11        MS. DYKSTRA:  Do you want me to
12     confirm whether this has been produced
13     to you similar to the documents that
14     you provided to us that haven't been
15     produced to us?  I'm not sure --
16        MR. SANGIAMO:  We've all agreed
17     to produce third-party discovery to
18     each other.  So we've asked you
19     specifically to produce all documents
20     regarding any third-party subpoenas
21     you've issued.  Is this produced
22     voluntarily or pursuant to a
23     third-party subpoena?
24        MS. DYKSTRA:  I don't personally

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL121

1 know, I'll have to find out.  Sitting
2 here today at this moment, I don't
3 know.
4        MR. KELLER:  Are there any
5     other documents that you plan to use
6     with her that haven't been produce to
7     us?  It's certainly unfair to our
8     witness to get documents pursuant to
9     agreement to provide them to us and not
10     provide them to us in preparation for a
11     client's -- a witness' deposition.  So
12     if you're going to produce any other
13     documents that you have from Pfizer
14     that you haven't provided to us, we'd
15     like to know and have an opportunity to
16     look at it.
17 BY MR. SANGIAMO:
18     Q.    We'll set aside the document
19 for now.  I'll just ask you, Ms. Wlochowski
20 about your recollection of applying for a
21 position at Pfizer in 2013.  Do you know
22 whether you did?  A moment ago I think you
23 said you're unsure.  My question to you is,
24 did you?

31 (Pages 118 - 121)

Page 122

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL122

1      A.    According to this document,
2    that's what it's showing here.
3      Q.    Do you have a recollection of
4    that?
5      A.    It's likely that this job
6    description would be something that -- or job
7    title would be something that I would be
8    interested in and apply to.
9      Q.    Do you recall what happened
10   after you applied for that position?
11     A.    I do not recall.
12     Q.    Do you recall why you applied
13   for it?
14     A.    Again, it's a job description
15   title that I would have been interested in.
16     Q.    Are you presently seeking a new
17   job?
18     A.    I currently am not, no.  I have
19   not applied.
20     Q.    Have you had any discussions
21   about the mumps vaccine with anyone from the
22   federal government?
23     A.    Have I had discussions with
24   them?

Page 123

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL123

1      Q.    Yes.
2            MR. KELLER:  Objection.
3    Overbroad.
4            THE WITNESS:  Can you clarify
5    discussions?
6    BY MR. SANGIAMO:
7      Q.    A conversation where you spoke
8    words to a representative of the federal
9    government about the mumps vaccine.
10     A.    I don't -- I'm trying to think.
11   I can't recall a conversation.  I don't think
12   that I have had a conversation directly about
13   the mumps with -- directly with the FDA.
14     Q.    How about with the CDC?
15     A.    No, I have not.
16     Q.    You qualified your answer as to
17   the FDA by saying directly.  Do you need that
18   same qualification for the CDC or can you say
19   without that qualification you have not had
20   any conversations with the CDC about the mumps
21   vaccine?
22     A.    I have not had any direct
23   conversations with the CDC about the mumps
24   vaccine.

Page 124

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL124

1      Q.    Do you believe you may have had
2    some indirect conversations with the CDC about
3    the mumps vaccine?
4      A.    I believe I may have had
5    indirect input to information provided to the
6    CDC.
7      Q.    When did that occur?
8      A.    While I was at Merck.
9      Q.    How about as regards the FDA,
10   do you believe you may have had indirect input
11   to information that was provided to the FDA?
12     A.    Yes.
13     Q.    And if that were to have
14   occurred, would that have occurred while you
15   were at Merck?
16     A.    Yes.
17     Q.    How about since you have left
18   Merck, have you had any communication, direct
19   or indirect, with the federal government about
20   the mumps vaccine?
21           MR. KELLER:  All agencies of
22   the federal government?
23           MR. SANGIAMO:  Yes.
24           MR. KELLER:  Lack of

Page 125

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL125

1    foundation.  Vague and ambiguous.
2            THE WITNESS:  So all agencies
3    of the federal government, have I had
4    direct or indirect information provided
5    to them regarding the mumps vaccine is
6    what you stated?
7    BY MR. SANGIAMO:
8      Q.    Yes, all as in -- the question
9    encompasses all agencies.  So if there is any
10   agency of the federal government with whom
11   you've had conversations about the mumps
12   vaccine since you left Merck, that's what I'm
13   asking about?
14           MR. KELLER:  Objection to form.
15           THE WITNESS:  I have -- so I
16   did meet with a Department of Justice
17   about the mumps vaccine.
18   BY MR. SANGIAMO:
19     Q.    All right.  Any other
20   conversations besides the one with the
21   Department of Justice?
22     A.    I don't recall any other
23   conversations with the government agencies.
24     Q.    What can you tell us about the

32 (Pages 122 - 125)

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL126

1  discussion you had with the Department of
2  Justice?
3         MR. KELLER: I object. Her
4     discussion with the Department of
5     Justice -- give us a second.
6         You can ask her generally about
7     when she spoke with the DOJ, who was at
8     that meeting, how many times she met at
9     that meeting, but I'm going to instruct
10    her not to answer any questions
11    regarding what was discussed at that
12    meeting with the Department of Justice.
13 BY MR. SANGIAMO:
14    Q.   How many times have you met
15 with the Department of Justice?
16    A.   I met with them once.
17    Q.   When was that?
18    A.   Between 2010 and 2012, I think
19 it is. I think it was 2012. I can't
20 remember.
21    Q.   Who was present at the meeting?
22    A.   Actually I guess it was --
23 yeah, I guess it was more -- yeah, okay. I
24 can't recall the date, but between 2010 and

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL127

1  2012.
2     Q.   Who was present at the meeting?
3     A.   My legal counsel was present as
4  well as a representative from the DOJ.
5     Q.   You say your legal counsel was
6  present. Is that Mr. Keller?
7     A.   Yes.
8     Q.   Who was the representative from
9  the DOJ, if you remember?
10    A.   Joel was his first name.
11    Q.   Anyone else present?
12    A.   I don't -- there were a room of
13 people. I don't remember who they were.
14    Q.   Were they lawyers?
15    A.   That's my understanding, yes.
16    Q.   What was discussed at the
17 meeting?
18         MR. KELLER: I'm going to
19    instruct the witness not to answer.
20    Attorney-client privilege, work
21    product. Prosecution.
22 BY MR. SANGIAMO:
23    Q.   Ms. Wlochowski, do I have it
24 right that you are a college graduate? Is

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL128

1  that right?
2     A.   Yes.
3     Q.   What was your degree in?
4     A.   Medical technology.
5     Q.   That's a Bachelor of Arts degree?
6     A.   Yes.
7     Q.   Did you ever apply to graduate
8  school?
9     A.   No.
10    Q.   Did you ever think about
11 applying to graduate school?
12    A.   No.
13    Q.   Do you know if Mr. Krahling
14 ever applied to graduate school?
15    A.   I do not know.
16    Q.   You have something called a
17 medical technologist certification from the
18 American Society for Clinical Pathology. Is
19 that right?
20    A.   Correct.
21    Q.   When did you get that?
22    A.   When I -- at the time I
23 graduated I took that certification.
24    Q.   Does that entitle you to do

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL129

1  anything in particular that you could not do
2  without the certification?
3     A.   Yes, I believe the
4  certification allows you to be a medical
5  technologist level versus without it you
6  would, I think the -- at least at the time I
7  was working in that field, I think they called
8  it a medical laboratory technician. So an MLT
9  versus an MT. There's different -- without
10 the certification, it's a lower level position
11 that you can perform in the lab.
12    Q.   Is that a matter of state
13 licensing requirements or is that just
14 something else?
15    A.   I think it's just based on -- I
16 don't know the licensing requirements. It was
17 just a certification that the hiring staff
18 would be looking for.
19    Q.   We've been talking a lot this
20 morning about what you did and did not do at
21 your prior jobs. I want to see if I've got it
22 right on a few specific points. Is it correct
23 that other than at Merck, you have never run a
24 plaque reduction neutralization assay to test

33 (Pages 126 - 129)

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 130
1  response to vaccination?
2      A.   That's correct.
3      Q.   Other than at Merck, you have
4  never run any assay to test response to
5  vaccination other than the ELISA assay that
6  you ran at Pfizer.  Is that correct?
7      A.   Correct.
8      Q.   At none of your jobs have you
9  interacted with the CDC.  Is that correct?
10     A.   Correct.  Directly.
11     Q.   Subject to the limitation you
12 described a few minutes ago?
13     A.   Correct.
14     Q.   And your only direct interactions
15 with the FDA at any job have been related to
16 manufacturing issues.  Is that fair?
17     A.   Correct.
18     Q.   I asked you some questions
19 specific to one of your jobs, and honestly
20 right now I can't remember which one it was,
21 about any role in product labeling.  Let me
22 just ask you more generally, for any of the
23 positions that you have held at any
24 pharmaceutical company, have you reviewed

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 131
1  drafts of labeling?
2      A.   Yes.
3      Q.   Were any of the drafts of
4  labeling that you reviewed related to labeling
5  for vaccine efficacy?
6      A.   No.
7      Q.   Were any of them related to
8  labeling for vaccine effectiveness?
9      A.   No.
10     Q.   Were any of them related to
11 labeling for vaccine immunogenicity?
12     A.   No.
13     Q.   Have you, as part of your work,
14 ever been called upon to decide -- strike
15 that.
16          Have you, as part of your work,
17 ever been called upon to review vaccine
18 labeling on any topic?
19     A.   Have I been called upon to
20 review vaccine labeling on any topic?
21     MR. KELLER:  As part of her job
22 duties?
23     MR. SANGIAMO:  Yes.
24     THE WITNESS:  In any job that

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 132
1      I've had?
2  BY MR. SANGIAMO:
3      Q.   Yes.
4      A.   I guess I might be a little
5  unclear about that.  So if I was at Merck,
6  the -- again, the testing I was performing at
7  Merck would -- could potentially be used to
8  support a product labeling.
9      Q.   Did anyone, while you were at
10 Merck, ask you to review the labeling as part
11 of your job function?
12     A.   Specifically the document
13 itself?
14     Q.   Yes.
15     A.   No.
16     Q.   Did I hear you testify that you
17 have reviewed some draft labeling at one of
18 your jobs?  Is that right?
19     A.   Yes.
20     Q.   Which job was that?
21     A.   Alexion.
22     Q.   What was the draft labeling
23 that you reviewed?
24     A.   What was it?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 133
1      Q.   Yes.
2      A.   The product insert as well as
3  the carton and the label.
4      Q.   What were the circumstances of
5  that review?
6      A.   I provide quality oversight for
7  the approval of the changes that are made in
8  the document.
9      Q.   What do you mean by providing
10 quality oversight for that?
11     A.   The -- again, the changes that
12 are being made would be supported by other
13 documentation that would allow for the change.
14 So I would verify that the information is
15 supported and that the content is correct.
16     Q.   Did any of those changes
17 involve product efficacy?
18     A.   I can't recall.  I don't recall
19 that there was a specific change for efficacy.
20     Q.   There wouldn't be any reason
21 for you in your position to review label
22 change related to product efficacy, would
23 there, at Alexion?
24     MR. KELLER:  Objection.  Calls

34 (Pages 130 - 133)

Appx5930

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL134

1    for speculation.
2        THE WITNESS:  So at the time
3    that I did have oversight for the
4    labels, I would provide a review of any
5    label change from a quality perspective.
6    BY MR. SANGIAMO:
7        Q.    Would you be involved in a
8    decision as to whether efficacy information in
9    a label accurately described the efficacy of
10   the product?
11       MR. KELLER:  If that was the
12   label change that was going to happen?
13       THE WITNESS:  Can you repeat
14   that again?  Sorry.
15   BY MR. SANGIAMO:
16       Q.    Would you be involved in a
17   decision as to whether efficacy information in
18   a label accurately described the efficacy of
19   the product?
20       MR. KELLER:  Again, the same.
21   It's vague and ambiguous.
22       THE WITNESS:  If the label
23   change was for efficacy, you're asking
24   if I would be involved in the decision,

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL135

1    whether that was acceptable?
2    BY MR. SANGIAMO:
3        Q.    Yes.
4        A.    The -- as far as -- yes, there
5    would be some element of a quality oversight
6    to ensure that the data was verified and
7    supported the change that was being made.
8        Q.    Did that ever happen with
9    regard to an efficacy label change?
10       A.    I think that you had asked that
11   question previously that I didn't -- wasn't,
12   that I can recall, involved in any label
13   change with regard to efficacy.
14       Q.    Are you familiar with the
15   regulations that govern descriptions of
16   efficacy on vaccine labeling?
17       A.    I am not currently familiar
18   with the specific regulations.
19       Q.    You once were?
20       A.    I do have knowledge of some,
21   you know, regulations that require that the
22   data that is being generated should be
23   represented on the label.  So the label should
24   be an accurate representation of the product.

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL136

1    So it's my basic knowledge of requirements for
2    a label.
3        Q.    What are those regulations as
4    they pertain to descriptions of vaccine
5    efficacy, if you know?
6        A.    I don't -- I mean, I don't know
7    the specific CFRs.  I do know that there is
8    GMP requirements to ensure that your label is
9    an accurate representation of the product.
10       Q.    Is it your testimony that GMP
11   requirements are applicable to descriptions of
12   efficacy on vaccine labeling?
13       A.    Yes.
14       Q.    What section -- do you know the
15   section of the code that imposes that
16   obligation?
17       A.    Not off the top of my head, no.
18       Q.    Do you have any training in
19   your view that would qualify you to opine on
20   the cause of an outbreak?
21       A.    To --
22       MR. KELLER:  Objection as to
23   form.
24       THE WITNESS:  So you're asking

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL137

1    if I could determine the cause of an
2    outbreak?
3    BY MR. SANGIAMO:
4        Q.    I'm asking if you had any
5    training that would put you in a position to
6    make those determinations?
7        MR. KELLER:  Same objection.
8        THE WITNESS:  Have I had
9    training to determine the cause of an
10   outbreak?  I basically wouldn't have --
11   I don't have any information related to
12   an outbreak to be able to determine
13   what it is.  It's not -- I'm not in a
14   position to do that.
15   BY MR. SANGIAMO:
16       Q.    If you had that information, do
17   you have the training in order to make the
18   assessment?
19       MR. KELLER:  Same objection.
20       THE WITNESS:  That is not -- I
21   do not hold a role that would make
22   me -- so basically I'm not, in that
23   sense, trained to do a role that would
24   be determining that.

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL138

BY MR. SANGIAMO:

2      Q.   Do you have any training that

3   would position you to determine the efficacy

4   of a vaccine?

5          MR. KELLER: Objection. Vague

6      and ambiguous. Overbroad.

7          THE WITNESS: Do I have

8      training to determine the efficacy of a

9      vaccine?

10  BY MR. SANGIAMO:

11     Q.   Uh-huh.

12         MR. KELLER: Same objection.

13         THE WITNESS: I guess I would

14     ask to elaborate on that because

15     there's, as far as being able to

16     generate data to determine efficacy, I

17     do have training around that.

18  BY MR. SANGIAMO:

19     Q.   What methodology would you use

20  to determine a vaccine efficacy rate?

21         MR. KELLER: Objection.

22         THE WITNESS: So I guess --

23         MR. KELLER: Wait. Let me

24     finish the objection.

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL139

1          THE WITNESS: I'm sorry.

2          MR. KELLER: Objection. Vague

3      and ambiguous. Lack of foundation.

4      Overbroad. You can answer.

5   BY MR. SANGIAMO:

6      Q.   Mr. Keller makes a good point,

7   that did lack foundation.

8          Do you know the methodologies

9   that are used to determine the efficacy of a

10  vaccine?

11         MR. KELLER: Again, objection.

12     Vague and ambiguous. Overbroad.

13         THE WITNESS: So in your

14     question with efficacy, can you define

15     what you're referring to as efficacy?

16  BY MR. SANGIAMO:

17     Q.   Efficacy as the FDA would

18  define it, do you know what that is?

19     A.   I do not have that in front of

20  me at this time, so I do not, can't explain

21  it.

22     Q.   Have you ever as part of your

23  job responsibilities at any employer had to be

24  cognizant of how the FDA would define efficacy

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL140

1   for purposes of a vaccine?

2      A.   Would I have to understand what

3   the requirements were by the FDA? I' sorry, I

4   missed the first part of the question.

5      Q.   At any job, would it have been

6      part of your job responsibilities to be aware

7   of how the FDA defines efficacy for a vaccine?

8          MR. KELLER: Lack of foundation.

9          THE WITNESS: Is it a

10     requirement of my job, is that what

11     you're asking me?

12  BY MR. SANGIAMO:

13     Q.   Okay. Yes.

14     A.   I don't know that it would be

15  the -- for a vaccine, the requirement of my

16  job to know that at the time. Basically the

17  only time I would be doing that would be at

18  Merck. It wasn't the expectation of the level

19  that I was performing the work that I would

20  have that understanding of what the FDA

21  defined as efficacy.

22     Q.   The same question as to the

23  CDC, at any job would it have been a

24  requirement for you to have an understanding

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL141

1   of how the CDC defines vaccine efficacy?

2          MR. KELLER: Objection. Lack

3      of foundation.

4          THE WITNESS: So, again, my

5      only work with vaccines was while I was

6      at Merck as well as Pfizer, and the --

7      it was not, based on the work I was

8      performing in the laboratory, not a

9      requirement for me to have that

10     understanding or the knowledge of the

11     definition defined by CDC.

12  BY MR. SANGIAMO:

13     Q.   You've given testimony today

14  describing your experiences as running

15  serology tests. Correct?

16     A.   Correct.

17     Q.   Has any part of your job duties

18  including evaluating the clinical significance

19  of the results of those serology results at

20  any job?

21         MR. KELLER: Objection. Vague

22     and ambiguous. Lack of foundation.

23         THE WITNESS: When you say

24     clinical significance, meaning? Can

36 (Pages 138 - 141)

Appx5932

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL142

1    you elaborate on that?
2 BY MR. SANGIAMO:
3        Q.   Implications for the relationship
4 between the serology findings and human disease.
5        A.   Was it my responsibility between
6 serology -- to define or understand the
7 serology findings -- sorry, I'm getting
8 confused.  And --
9             I'm sorry.  Can you repeat it
10 again?
11       Q.   I was asking you earlier today
12 about your work at New Haven Hospital.
13       A.   Yes.
14       Q.   And you were describing tests
15 that you ran on clinical samples.  I think I
16 asked you whether it was up to you or up to
17 the doctor to figure out what those test
18 results implied for disease.  Right?
19       A.   Yes.
20       Q.   I think you told me that was
21 told by the doctor?
22       A.   Correct.
23       Q.   I'm asking the same kind of
24 question now for your other jobs, as to

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL143

1 whether it's your role in any job to determine
2 what the clinical significance was from a
3 human disease perspective --
4        A.   I got you.
5        Q.   -- of the serology work that
6 you did?
7        A.   No, I was not the decision-maker
8 on the output of the data that was provided
9 from the testing that we performed in the
10 laboratory.
11       Q.   You wouldn't be qualified to do
12 that.  Right?
13       A.   I wouldn't --
14            MR. KELLER:  Objection.  Vague
15 and ambiguous.
16            THE WITNESS:  I mean, I do have
17       qualifications, I have a basic
18       understanding of what the outputs mean.
19       But it wasn't my responsibility at that
20       level to be doing that.
21 BY MR. SANGIAMO:
22       Q.   Do you have any training in
23 understanding what the clinical significance
24 is of serology results?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL144

1        A.   Yes, I understand what the
2 different results would mean in the clinical
3 setting.
4        Q.   You have training in that?
5        A.   I have basic training for
6 understanding what the methods are that we
7 were performing.
8        Q.   What the methods of the assays
9 were?
10       A.   Yes.
11       Q.   Do you have any training in
12 understanding -- strike that.
13            Do you have any training in
14 evaluating what the clinical significance is
15 of the results of those methods?
16       A.   Based on training that I was
17 provided potentially by my supervisor or
18 information that was provided to me during the
19 course of conducting the studies, I have been
20 trained in that sense.
21       Q.   That was information that was
22 provided to you not in order for you to do
23 your job, just provided to you as additional
24 information.  Is that right?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL145

1            MR. KELLER:  Objection.
2       Overbroad.
3            THE WITNESS:  I mean, there are
4       requirements of me to be trained in
5       order to do my job as well as any
6       information that was provided to me
7       while I was at my job.
8 BY MR. SANGIAMO:
9        Q.   But your job consisted of
10 running the serology.  Right?
11       A.   That was my responsibility at
12 the time, yes.
13            MR. KELLER:  Are we just
14       talking about Yale, or are we -- I'm
15       confused.
16            MR. SANGIAMO:  No, we're
17       talking about all of her involvement.
18       I think she understands.
19 BY MR. SANGIAMO:
20       Q.   You've been answering for all
21 your jobs.  Right?
22       A.   Yes.
23       Q.   Would you know a methodology to
24 use if were you were trying to evaluate what

37 (Pages 142 - 145)

Appx5933

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL146

1 the clinical significance was of, say, a
2 seroconversion rates from a vaccine clinical
3 trial?
4          MR. KELLER: Objection. Vague
5 and ambiguous. Lack of foundation.
6 Overbroad.
7          THE WITNESS: Yeah, I mean, it
8 depends on what you're trying to
9 measure. So there's no different types
10 of methodology. Different types of
11 methodology works better for one
12 vaccine or virus versus the other,
13 so...
14 BY MR. SANGIAMO:
15   Q.   Can you provide some examples?
16          MR. KELLER: Objection. Calls
17 for speculation. Overbroad. Lack of
18 foundation.
19          THE WITNESS: I mean, again,
20 even just within the plaque assay
21 itself we could be seeing different
22 strains of virus. There could be, you
23 know, any type of other assay that, you
24 know, whether it's hemagglutination

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL147

1 assay or some other type of assay that,
2 you know, would be tacting [ph] based
3 on the different type of virus.
4 BY MR. SANGIAMO:
5   Q.   You've just described different
6 ways in which an assay could be run. Correct?
7   A.   Or different assays.
8   Q.   Or different assays. My
9 question is, what methodology would you use to
10 determine what the clinical significance was
11 of the output of those assays?
12          MR. KELLER: Objection. Vague
13 and ambiguous.
14          THE WITNESS: When you say
15 "methodology," you're not referring
16 to -- so, I guess, define methodology
17 in your sentence there.
18 BY MR. SANGIAMO:
19   Q.   Do you not know what a
20 methodology would be in order to determine the
21 clinical significance of serology results?
22   A.   I mean, are we talking about
23 the general protocol that would be used with
24 different types of measures and outcomes to --

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL148

1 because there is also that that's involved.
2   Q.   If you run a serology test, you
3 get information about the serum that was
4 tested from that individual. Right?
5          MR. KELLER: Objection. Vague
6 and ambiguous. Lack of foundation.
7          THE WITNESS: I guess
8 information is very general there. So
9 it's very limited information.
10 BY MR. SANGIAMO:
11   Q.   That's the point. Whatever the
12 information you get, it's about the serum.
13 Right?
14          MR. KELLER: Same objections.
15          THE WITNESS: On the -- the
16 serum is typically a number that
17 identifies the serum.
18 BY MR. SANGIAMO:
19   Q.   And what that information about
20 the serum means clinically for the patient is
21 a different question entirely. Right?
22          MR. KELLER: You guys are
23 talking past each other. Vague and
24 ambiguous. Lack of foundation.

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL149

1          THE WITNESS: What the serum
2 means for the patient?
3 BY MR. SANGIAMO:
4   Q.   What the information about the
5 serum means clinically for the patient is an
6 entirely different question. Correct?
7          MR. KELLER: Vague and
8 ambiguous. Overbroad.
9          THE WITNESS: Once we test the
10 serum --
11 BY MR. SANGIAMO:
12   Q.   Yes.
13   A.   -- the results are -- does
14 relate back to the patient. I guess I'm not
15 understanding what you're trying to ask
16 specifically.
17   Q.   Have you ever undertaken to
18 figure out whether a certain antibody level
19 correlates with protection from disease?
20          MR. KELLER: Objection.
21 Overbroad. Vague and ambiguous.
22          THE WITNESS: I have been -- I
23 have been involved in running assays
24 that would help to determine the

38 (Pages 146 - 149)

Appx5934

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL150

1    correlation of the antibody, yes, level
2    in a serum.
3    BY MR. SANGIAMO:
4        Q.   Have you ever been involved in
5    the determination of whether those antibody
6    levels, whatever they are, are correlated with
7    protection from disease?
8        A.   In the sense that I perform the
9    assay, that's my involvement.
10       Q.   Any other involvement?
11       A.   Not that I can think of, no.
12       Q.   Have you ever designed a
13   clinical trial?
14       A.   No.
15       Q.   Do you know anything about the
16   CDC's decision-making process when it decides
17   whether to purchase a vaccine?
18           MR. KELLER:  Objection.
19   Overbroad.
20           THE WITNESS:  I know that -- I
21   know that they would --
22   BY MR. SANGIAMO:
23       Q.   It's a yes or no question.  Do
24   you know?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL151

1        A.   All right.  Can you state the
2    question again?
3        Q.   Do you know anything about the
4    CDC's decision-making process regarding the
5    purchasing of vaccines?
6        A.   Yes.
7        Q.   What's your basis of that
8    knowledge?
9        A.   I know that they receive --
10       Q.   What's your basis?
11       A.   What's my basis?
12           MR. KELLER:  Vague.  Argumentative.
13   And the extent that the information
14   that you have you learned from counsel,
15   I instruct you not to answer the
16   question, any communications with your
17   counsel.  To the extent you have
18   information that's independent of
19   discussions you had with counsel, you
20   can answer.
21   BY MR. SANGIAMO:
22       Q.   So the question is, do you know
23   anything about the CDC's decision-making
24   process regarding the purchasing of vaccines

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL152

1    but you should exclude from your answer
2    anything that you've learned from your
3    counsel?
4        A.   Do I know anything is the
5    question?
6        Q.   Yes.
7        A.   Right, I do.
8        Q.   Where did you learn that other
9    than from your counsel?
10       A.   I know that the label is
11   public, so that information is available to
12   the CDC in determining a decision on whether
13   or not to purchase a product.
14       Q.   Anything else?
15       A.   I think that's it.
16       Q.   Do you know whether the CDC, in
17   fact, looks to the label in order to determine
18   whether to purchase the product?
19           MR. KELLER:  Objection.  Vague
20   and ambiguous.
21           THE WITNESS:  I cannot say what
22   the CDC does.
23   BY MR. SANGIAMO:
24       Q.   Because you just don't know.

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL153

1    Right?
2            MR. KELLER:  Same objection.
3    BY MR. SANGIAMO:
4        Q.   Right?
5        A.   Yes.
6            - - -
7            (Exhibit Wlochowski-6, Amended
8    Complaint for Violations of the Federal
9    False Claims Act, was marked for
10   identification.)
11           - - -
12   BY MR. SANGIAMO:
13       Q.   Ms. Wlochowski, you've been
14   handed what's been marked as Exhibit 6.  Are
15   you familiar with that document?
16       A.   Yes.
17       Q.   What is it?
18       A.   This is a copy of the Complaint.
19       Q.   Did you play any -- you should
20   be very careful now when you answer my
21   questions because I want to make sure I don't
22   invade the attorney-client privilege.
23           Right now my question is -- you
24   need to make sure to give Mr. Keller a chance

39 (Pages 150 - 153)

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL154

1 to object.
2       My question is, did you play
3 any role in the drafting of this Complaint?
4       A.   Yes.
5       Q.   Did you draft any of the
6 original language in the Complaint?
7       MR. KELLER: You can answer it
8       yes or no.
9       I'm going to object. Vague and
10      ambiguous. Objection.
11      THE WITNESS: I guess by
12      original I did provide information that
13      was used in the drafting of this
14      Complaint.
15 BY MR. SANGIAMO:
16      Q.   Do you recall what information
17 you provided?
18      MR. KELLER: Objection. I'm
19      going to instruct you not to answer.
20 BY MR. SANGIAMO:
21      Q.   Did you review that Complaint
22 prior to -- sorry, strike that.
23      Did you review a final version
24 of that Complaint prior to it being filed?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL155

1       A.   Yes.
2       Q.   Was there anything in there
3 that appeared to be inaccurate to you?
4       A.   With the exception of the
5 initial of my first name, no.
6       MR. KELLER: Take full
7       responsibility for that.
8       THE WITNESS: I should say my
9       middle initial.
10 BY MR. SANGIAMO:
11      Q.   Other than that?
12      MR. KELLER: Color it out.
13      THE WITNESS: No, I didn't see
14      anything inaccurate.
15 BY MR. SANGIAMO:
16      Q.   Can you vouch for the accuracy
17 of everything that is in there?
18      MR. KELLER: Objection. Vague
19      and ambiguous.
20 BY MR. SANGIAMO:
21      Q.   Do you understand how it's
22 different from the last question I asked you?
23      A.   Yes.
24      Q.   So there are certain sections

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL156

1 of the Complaint that refers to information
2 provided by Steve Krahling that I can only say
3 that it's accurate based on what he has
4 provided.
5       MR. KELLER: I assume you're
6       going to ask her if she understands the
7       legal jargon that's also in this
8       Complaint, as to the accuracy of the
9       legal jargon as well? Are you asking
10      about the facts or are you asking --
11 BY MR. SANGIAMO:
12      Q.   I'm asking about the facts, and
13 I heard your answer which I understood to be
14 that there are some things in there factually
15 that you know to be true. There are other
16 things in there factually that to the extent
17 you know anything about them, you know it from
18 Mr. Krahling. Is that right?
19      A.   Correct.
20      Q.   Could you identify what
21 portions of the Complaint fall into that
22 latter category?
23      MR. KELLER: Do we have a week
24      to do that? Sure.

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL157

1       MR. SANGIAMO: Is it all from
2 Krahling?
3       MR. KELLER: Excuse me?
4       MR. SANGIAMO: So much of it
5       was from Krahling that it would take a
6       long time to identify?
7       MR. KELLER: There's how many
8       paragraphs in this Complaint? It's
9       your deposition. If you want to ask
10      her questions as to every line that --
11      of information that she knows, can
12      verify herself.
13 BY MR. SANGIAMO:
14      Q.   Are there any that you know of
15 that fall into that latter category?
16      MR. KELLER: Feel free to
17      review the Complaint.
18 BY MR. SANGIAMO:
19      Q.   I'm not asking for an
20 exhaustive list. If there are any that come
21 to mind.
22      MR. KELLER: Objection.
23      THE WITNESS: Not that I know
24      of offhand without looking through the

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL158

1    document.

2 BY MR. SANGIAMO:

3    Q.   You just have a recollection of

4 having looked at it previously and seeing

5 there were some things in there that Krahling

6 knew about, but you, yourself, didn't know

7 about. Is that fair?

8    A.   The only way I knew about it

9 was through Krahling, yes.

10          - - -

11      (Exhibit Wlochowski-7, Relator

12    Joan Wlochowski's Responses and

13    Objections to Merck's Revised First Set

14    of Interrogatories, was marked for

15    identification.)

16          - - -

17 BY MR. SANGIAMO:

18    Q.   Ms. Wlochowski, you've been

19 handed what's been marked as Exhibit 7. My

20 question to you is whether you recognize that

21 document?

22    A.   Yes, I do recognize this

23 document.

24    Q.   What is that document?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL159

1    A.   This is the Interrogatories

2 that were submitted that we have responded to.

3    Q.   If you go to the second to the

4 last page, you see there is a verification

5 there.

6    A.   Yes.

7    Q.   Is that your signature?

8    A.   Yes.

9    Q.   When you signed that, did you

10 review the final version prior to signing?

11    A.   Yes.

12    Q.   Is everything in the final

13 version accurate?

14    A.   Yes. According to my signature

15 and, again, according to what I know from

16 Steve.

17    Q.   Where there was information in

18 these answers that derived from Steve, did you

19 make that evident, the substance of the

20 answer?

21    A.   I would have to go back and

22 look at that.

23    Q.   You just don't have a

24 recollection one way or the other?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL160

1    A.   Right.

2    Q.   Did your attorneys draft these

3 answers and then you approved them or did you

4 draft the answers?

5      MR. KELLER: Objection. It's

6    vague and ambiguous. Overbroad.

7    Invades work product. I'm going to

8    instruct the witness not to answer that

9    question.

10      MR. SANGIAMO: On the basis of

11    attorney-client privilege?

12      MR. KELLER: And work product,

13    yes.

14 BY MR. SANGIAMO:

15    Q.   Did anyone other than you and

16 your attorneys participate in drafting these

17 answers?

18    A.   So the --

19      MR. KELLER: His question is,

20    did anybody other than you and your

21    attorneys draft this without telling

22    him who drafted each of the two groups

23    or together?

24      THE WITNESS: So there were two

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL161

1 sets of Interrogatories, as I recall,

2 one was for myself and one was for

3 Steve. Most of the questions were the

4 same. So we did a --

5      MR. KELLER: I want you to be

6    very careful. Do not describe -- his

7    question to you is did anybody other

8    than your lawyers and yourself prepare

9    these responses. He's asking for

10    anybody else.

11      MR. SANGIAMO: Exhibit 7.

12      MR. KELLER: Yes. Not anything

13    about what was written down. Do you

14    understand the question?

15      THE WITNESS: Yes. I guess

16    it's a little, you know -- so Steve was

17    involved in discussions but as far as

18    the responses, that was my agreement,

19    my signature on this document.

20 BY MR. SANGIAMO:

21    Q.   Steve was involved in discussions

22 about what the content of the answer should

23 be. Is that correct?

24    A.   In the instances where it

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL162

1  applied to both of us.
2      MR. KELLER:  His question
3  was -- the answer is that Steve
4  Krahling was involved in responding to
5  these interrogatories as well.
6  Correct?
7      THE WITNESS:  When --
8      MR. SANGIAMO:  Yes or no.  Very
9  specific because it's a privilege
10  question.  Yes or no.
11     THE WITNESS:  Yes for the
12  questions that referred -- that were
13  posed to both of us.
14  BY MR. SANGIAMO:
15     Q.   Could we look at Interrogatory
16  Number 5 which is on page 10.  This is an
17  Interrogatory that is directed at you, not to
18  both of you.  Right?
19     A.   Right.
20     Q.   Did Mr. Krahling provide any of
21  the information that went into the response to
22  Interrogatory Number 5?
23     MR. KELLER:  Hold on a second.
24  I'll let you answer that.

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL163

1      THE WITNESS:  So the answer is
2  no, Steve did not.  The only response --
3  the response to Question Number 5 --
4  sorry, it's been a while.  The response
5  to Question Number 5 was by myself.
6  BY MR. SANGIAMO:
7      Q.   With no contribution from
8  Mr. Krahling?
9      A.   Correct.  During the drafting
10  of the response.
11     Q.   Right.  Understood.
12     MR. SANGIAMO:  Jeff, I'm going
13  to suggest we go ahead and break for
14  lunch now.  Before we do that, I just
15  want to mention that there was some
16  discussion earlier about Exhibit 5 and
17  whether it had been produced, and looks
18  like it was produced on March 20, 2017.
19     MR. BEGLEITER:  Is this the
20  full document?
21     MS. DYKSTRA:  Yes.
22     MR. KELLER:  It wasn't Bates
23  numbered, so it's hard for me to
24  tell --

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL164

1      MS. DYKSTRA:  It's how we
2  received it.
3      MR. KELLER:  Thank you.
4      VIDEOGRAPHER:  The time is
5  1:08.  Off the video record.
6              - - -
7      (A recess was taken.)
8              - - -
9      VIDEOGRAPHER:  The time is now
10  2:08.  This begins disc four.  You may
11  proceed.
12  BY MR. SANGIAMO:
13     Q.   Ms. Wlochowski, is it your
14  belief that there has been significantly
15  diminished efficacy for the mumps component of
16  the MMR?
17     MR. KELLER:  Objection.
18  Overbroad.
19     THE WITNESS:  So in the sense
20  you're referring to efficacy in which
21  definition?
22  BY MR. SANGIAMO:
23     Q.   I'm asking you if those words
24  reflect your belief, do they or not?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL165

1      MR. KELLER:  Objection.  Vague
2  and ambiguous.  Overbroad.  Lack of
3  foundation.
4      THE WITNESS:  So again.
5      MR. SANGIAMO:  Definitely agree
6  with that last objection.
7      MR. KELLER:  Excuse me.
8      MR. SANGIAMO:  I said I
9  definitely agree with that last
10  objection.
11     MR. KELLER:  Are you testifying
12  now?  Is that a question?  I'm confused.
13     THE WITNESS:  So going back to
14  the question is whether the mumps --
15  did you say mumps vaccine?
16  BY MR. SANGIAMO:
17     Q.   Yes, the mumps component of
18  MMR, has it had a significantly diminished
19  efficacy, in your view?
20     MR. KELLER:  Objection.
21  Overbroad.  Lack of foundation.  Vague
22  and ambiguous.
23     THE WITNESS:  If you're referring
24  to the efficacy component of the mumps

42 (Pages 162 - 165)

Appx5938

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL166

1    vaccine, whether or not it's effective
2    in protecting against mumps, based on
3    my experience working in Dave Krah's
4    lab, I did see that the testing that
5    was conducted while I was there showed
6    results that were not aligned with
7    what's being reported in the label
8    currently.
9    BY MR. SANGIAMO:
10    Q.   So is it your belief that there
11  has been a significantly diminished efficacy
12  of the mumps component of MMR?
13        MR. KELLER: Objection. Asked
14    and answered. Vague and ambiguous.
15    Overbroad.
16        THE WITNESS: So, again, the --
17    based on the data and information that
18    was provided while I was working in
19    Dave Krah's lab, it did show that there
20    was less than what's being reported in
21    the label.
22        - - -
23    (Exhibit Wlochowski-8, MMR II
24    label, was marked for identification.)

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL167

1    - - -
2  BY MR. SANGIAMO:
3    Q.   Ms. Wlochowski, you've been
4  handed Exhibit 8 and that is a copy of the
5  MMR II label. Right?
6    A.   Yes. From -- it appears that
7  it's from the 2009 -- let's see. 2000 -- it
8  was issued December 2010.
9    Q.   Where are you reading that from?
10    A.   The page 12.
11    Q.   Is it your belief that what you
12  witnessed in Dr. Krah's lab showed that there
13  was efficacy below what's described in the
14  label?
15    A.   So I need to take a look at
16  this version of the label. And then your
17  question again was?
18    Q.   Let me first ask you, what does
19  the label say about efficacy?
20    A.   So the label currently has what
21  I would consider two indications of efficacy.
22  There's a general statement that says the
23  efficacy of measles, mumps and rubella vaccine
24  was established in a series of double blind

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL168

1    controlled field trials which demonstrated a
2    high degree of protected efficacy afforded by
3    the individual components, and it references
4    studies that were done with the original
5    approval of the mumps component of the product
6    back in 1967 in support of that statement.
7    And then there is another statement within the
8    label that says that the MMR II is highly
9    immunogenic and generally well tolerated. And
10    the studies for that showed that there was
11    mumps neutralizing antibody in 96 percent of
12    vaccinees. I should say -- yes, sorry, of the
13    susceptible persons in that statement.
14    Q.   Is it your belief that the
15  information there about the detection of mumps
16  neutralizing antibodies in 96 percent of
17  susceptible persons, so that's a statement
18  about efficacy?
19    A.   In my definition of efficacy it
20  shows -- is how well, how effective the
21  product is and in neutralizing antibodies does
22  correlate with an immune response in a patient.
23    Q.   What do you base that last
24  statement on?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL169

1    A.   The assay is designed to --
2  it's a biological assay so it's designed to
3  replicate what would happen as far as the
4  vaccine or the human antibody being able to
5  neutralize the virus.
6    Q.   Does it?
7    A.   Does it?
8        MR. KELLER: Objection.
9  BY MR. SANGIAMO:
10    Q.   It was designed for that
11  purpose, does it do that?
12    A.   The assay that I performed
13  while I was in Dave Krah's lab had also an
14  addition of animal antibodies which wouldn't
15  be the same as what would happen in a human.
16  It's enhanced.
17    Q.   Do you have --
18        MR. KELLER: Let me interpose
19    an objection. I object that the label
20    speaks for itself.
21  BY MR. SANGIAMO:
22    Q.   Do you have the expertise to
23  assess whether seroconversion as measured in a
24  neutralization assay correlates with

43 (Pages 166 - 169)

Appx5939

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL170

1    protection from disease?
2        MR. KELLER: Objection. Vague
3    and ambiguous. Overbroad.
4        THE WITNESS: Do I have the
5    expertise? I have -- so I do know that
6    you're reporting the neutralizing
7    antibodies here as a means to say that
8    it's highly immunogenic. And so based
9    on even what's written in the label, it
10   suggests that the neutralizing antibody
11   supports immunogenicity.
12       MR. KELLER: Objection. Lack
13   of foundation as well.
14   BY MR. SANGIAMO:
15   Q.   My question is, do you have the
16   expertise do assess whether seroconversion as
17   measured in a neutralization assay correlates
18   with protection from disease. What's your
19   answer to that question?
20       MR. KELLER: Objection. Asked
21   and answered. Lack of foundation.
22   Vague and ambiguous. Overbroad.
23       THE WITNESS: So as part of my
24   experience working in Dave Krah's lab,

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL171

1    we were running the neutralization
2    assay to show seroconversion rates and
3    that the results of what we performed
4    during the testing was an indication of
5    seroconversion in a patient.
6    BY MR. SANGIAMO:
7    Q.   Does that seroconversion
8    correlate with protection from disease as
9    measured in that assay?
10       MR. KELLER: Same objections.
11       THE WITNESS: It provides the
12   information about how effective the
13   vaccine, it provides some information
14   about how effective the vaccine is at
15   neutralizing the virus. Which would
16   indicate that it's providing information
17   around how well the product is
18   protecting against the virus.
19   BY MR. SANGIAMO:
20   Q.   I think you said provides some
21   information, is that what you said?
22   A.   Uh-huh.
23   Q.   Does it correlate with
24   protection, seroconversion, does it correlate

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL172

1    with protection?
2        MR. KELLER: Objection. Vague
3    and ambiguous. Lack of foundation.
4        THE WITNESS: Does it correlate
5    with protection?
6    BY MR. SANGIAMO:
7    Q.   Yes.
8    A.   Against the mumps virus?
9    Q.   Against disease, mumps disease.
10       MR. KELLER: Are you asking
11   about the label or are you asking just
12   in general?
13       MR. SANGIAMO: I'm asking if it
14   correlates with protection.
15       MR. KELLER: Same objections.
16       THE WITNESS: Again, I think my
17   understanding, my answer to that was
18   that based on having neutralizing
19   antibodies, that it would correlate to
20   some extent in protection.
21   BY MR. SANGIAMO:
22   Q.   Have you ever studied that
23   issue of whether neutralizing antibody to
24   mumps correlates to protection in disease?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL173

1        MR. KELLER: Objection. Vague
2    and ambiguous.
3        THE WITNESS: What do you mean
4    by study the issue?
5    BY MR. SANGIAMO:
6    Q.   Read literature on it.
7    A.   I have read some literature.
8    Q.   Was it ever a part of your job
9    responsibility anywhere to figure out whether
10   seroconversion in a mumps neutralization assay
11   correlates with protection from disease?
12   A.   That was not part of my job
13   description.
14   Q.   What is the most you can tell
15   me about your training that would show you to
16   have the expertise in order to assess whether
17   seroconversion in a mumps neutralization assay
18   correlates with protection from disease?
19       MR. KELLER: Let me just --
20       MR. SANGIAMO: Don't testify,
21   Jeff. Let her answer the question.
22       MR. KELLER: Protect my
23   privilege, Dino. Excuse me.
24       In answering this question, you

44 (Pages 170 - 173)

Appx5940

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL174

1 can answer to the extent that you don't
2 disclose any communication you had with
3 your counsel. You don't disclose any
4 information that was provided to you in
5 part of those communications in
6 answering his question. So other than
7 communications that you had with
8 counsel or information that you
9 received from counsel regarding this
10 issue, you can answer.
11 THE WITNESS: So the training
12 I've had to determine whether or not
13 this correlates to -- seroconversion
14 correlates to protection against the
15 mumps disease. So I do have training
16 in basic science, so I have an
17 understanding of how that works. And,
18 again, my understanding based on my
19 training and documents that I've seen
20 is that there is a correlation between
21 antibody response and protection
22 against disease.
23 BY MR. SANGIAMO:
24 Q. What documents?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL175

1 MR. KELLER: Other than
2 documents that you've reviewed or were
3 provided to you by counsel.
4 BY MR. SANGIAMO:
5 Q. Were the documents that you
6 referred to in your last answer strictly
7 documents that were provided to you by
8 counsel?
9 MR. KELLER: Answer yes or no.
10 THE WITNESS: No.
11 BY MR. SANGIAMO:
12 Q. Okay. Which documents were you
13 referring to that were not provided to you by
14 counsel?
15 A. So I can't think off the top of
16 my head.
17 Q. Now, the label does mention
18 efficacy itself as you pointed out on page 2
19 here of Exhibit 8.
20 A. Uh-huh.
21 Q. And it refers to a high degree
22 of protective efficacy. Is it your testimony
23 that when you were in Dr. Krah's lab, you
24 learned that the efficacy of the mumps

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL176

1 component was significantly diminished from
2 this high degree of protective efficacy?
3 A. I believe that the data was
4 showing from running the plaque reduction
5 neutralization assay that the results did not
6 reflect the actual seroconversion rates that
7 were occurring in the patient population.
8 And --
9 Q. I'm sorry, the results of the
10 neutralization assay did not reflect the
11 actual --
12 A. Correct, because they were
13 being changed. So the original results that
14 we had generated by performing the assay were
15 being changed to provide information that
16 basically the testing was biased and the
17 results for pre-positive sample would be
18 changed in order to represent something that
19 was pre-negative. So that it showed a
20 different rate of seroconversion than what
21 would have been reported out with the original
22 results.
23 Q. What was the difference in the
24 rate?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL177

1 A. I do not know the actual
2 difference in the rate.
3 Q. Did you ever calculate it?
4 A. I did not calculate the entire
5 study, no.
6 Q. Did you ever calculate the
7 difference in the seroconversion rate that
8 resulted from whatever these practices are to
9 which you take exception in the running of the
10 assay?
11 A. Did I ever calculate the
12 difference in -- I was aware of data that
13 showed that there was a percentage of the
14 portion that we looked at that was different
15 than the original results.
16 Q. Seroconversion rate was
17 different?
18 A. That the pre-positive rate was
19 different so which would lead to either those
20 results being -- those results, you know,
21 being excluded from a seroconversion rate.
22 Q. What was the impact on the
23 seroconversion rate, did you ever calculate
24 that?

45 (Pages 174 - 177)

Appx5941

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL178

1     A.   No.  I don't believe, no.  I
2 don't believe we calculated the difference in
3 the seroconversion rate.
4     Q.   So even if we accept your
5 premise that seroconversion rate correlates
6 with efficacy, how do you know that anything
7 you saw in the lab suggests that the efficacy
8 has been significantly diminished from a,
9 quote, high degree of protective efficacy?
10         MR. KELLER:  Objection.  Lack
11 of foundation.  Vague and ambiguous.
12 Overbroad.
13         THE WITNESS:  So the results
14 were -- if the results -- the original
15 results are used, the actual
16 seroconversion and the titer or the
17 neutralizing titer would be higher
18 based on the enhancement of using
19 rabbit antibodies in the assay.
20 Previous studies during the assay
21 development also showed a lower rate of
22 seroconversion which would indicate
23 that there is also some other issues
24 with the seroconversion rate that would

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL180

1 PRN using the anti-rabbit -- or the rabbit
2 anti-IgG antibodies.  They performed different
3 studies to determine an appropriate dilution
4 to use with the rabbit antibodies and the
5 challenge with the development of that was as
6 they were trying to reach the desired outcome
7 of the greater than 95 percent seroconversion,
8 the enhancement was also causing greater than
9 10 percent of pre-positive rate which, from
10 what I've been told, in the general population
11 the expectation is around a 10 percent
12 pre-positive.  So going above that would -- is
13 not expected.
14     So after conducting a few
15 studies they reached conclusion on the optimal
16 dilution to use with the rabbit antibodies,
17 and that would obtained their desired outcome
18 of having a greater than 95 percent
19 seroconversion and less than 10 percent
20 pre-positive rate.
21     Q.   Do you have the -- strike that.
22     Do you consider yourself to
23 have the expertise to evaluate which of
24 several assay designs for a mumps

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL179

1 make it -- make the product less
2 effective.
3 BY MR. SANGIAMO:
4     Q.   Did you participate in those
5 earlier studies?
6     A.   I did not.
7     Q.   How did you hear about them?
8     A.   I was provided a document, a
9 Merck document, a copy of a Merck document
10 that showed information from those previous
11 studies.
12     Q.   Who gave it to you?
13     A.   Steve gave it to me, Steve
14 Krahling.
15     Q.   When did he give it to you?
16     A.   Probably in the spring of 2001.
17     Q.   What do you remember about the
18 content of that document besides what you've
19 already told us?
20     A.   That the original assay that
21 was being performed itself didn't meet the
22 desired outcome of a 95 percent seroconversion
23 rate.  It was lower.  And in that case a new
24 method was developed to -- with the enhanced

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL181

1 neutralization assay would better correlate
2 with protection from disease?
3         MR. KELLER:  Objection.
4 Overbroad.
5         THE WITNESS:  So which
6 methodology would have a better
7 correlation to the disease?
8 BY MR. SANGIAMO:
9     Q.   To protection from disease.
10     A.   Protection from disease?
11 Again, I believe that biological assays such
12 as the plaque reduction assay would correlate
13 better to protection from the disease than an
14 ELISA.
15     Q.   How about as between two
16 different biological assays, do you have the
17 expertise to short out which of those two
18 would yield a seroconversion rate that
19 correlates better to protection from disease?
20         MR. KELLER:  Objection.  Vague
21 and ambiguous.  Overbroad.  Lack of
22 foundation.
23         THE WITNESS:  My expertise at
24 least would point me towards that if

46 (Pages 178 - 181)

Appx5942

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL182

1    you were developing an assay, you would

2    look to have a known control that would

3    lead you to demonstrate a correlation

4    against a known population.

5  BY MR. SANGIAMO:

6    Q.   Correlation of protection from

7  disease?

8    A.   Yes.

9    Q.   And is there such a thing for

10  mumps?

11    A.   I'm not aware.

12    Q.   Then how could you form an

13  opinion that one assay format was better than

14  the other --

15        MR. KELLER: Objection.

16    Argumentative.

17  BY MR. SANGIAMO:

18    Q.   -- if you don't know that

19  fundamental piece of information?

20        MR. KELLER: Objection.

21  Argumentative. Lack of foundation.

22  Overbroad.

23        THE WITNESS: Again, I'm not --

24  my experience, I've not seen the use of

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL184

1    foundation.

2        THE WITNESS: So the actual

3    response in the assay of an antibody

4    neutralizing the virus on its own

5    versus having an enhanced rabbit

6    antibody that wouldn't be present,

7    rabbit antibody potentially giving

8    nonspecific neutralization in the assay

9    would indicate to me that it wouldn't

10    provide the same correlation that it

11    would without.

12  BY MR. SANGIAMO:

13    Q.   That sounds like your logic. I

14  understand what your argument is. My question

15  is, what is it about your experience that

16  would support that?

17        MR. KELLER: She's already

18    testified about her experience --

19  BY MR. SANGIAMO:

20    Q.   You referred to your experience

21  being a basis for your conclusion. Now I'm

22  asking what is your experience that you're

23  referring to?

24        MR. KELLER: Asked and

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL183

1    rabbit antibodies in a biological assay

2    to enhance the reaction. And based on

3    that, the rabbit antibody wouldn't be

4    present in a human reaction. It

5    doesn't necessarily correlate to

6    protection against the disease.

7  BY MR. SANGIAMO:

8    Q.   You've been involved in one

9  plaque reduction neutralization assay in your

10  life. Right?

11    A.   When you say "involved," you

12  mean performed in the assay?

13    Q.   Yes.

14    A.   That would be -- yes, that is

15  probably correct, yes.

16    Q.   And that one assay used rabbit

17  antihuman IgG. Right?

18    A.   Yes.

19    Q.   So what is it about your

20  experience that would suggest to you that an

21  assay would correlate better if it did not use

22  rabbit antihuman IgG?

23        MR. KELLER: Objection. Asked

24    and answered. Overbroad. Lack of

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL185

1    answered. This is like the fifth time

2    around. If you want to answer it

3    again, you can answer it again.

4        THE WITNESS: I do have

5    experience performing other --

6    performing ELISAs where rabbit anti --

7    sorry, rabbit antibody is used. I have

8    performed other plaque assays. We

9    haven't used animal antibody. So

10    that's the basis of my response.

11  BY MR. SANGIAMO:

12    Q.   Do you have a belief as to what

13  the efficacy rate is for the mumps component

14  of the MMR?

15        MR. KELLER: Objection.

16    Overbroad. Lack of foundation.

17        THE WITNESS: I believe that

18    the true efficacy rate has not been

19    reported based on the current

20    information that's been generated from

21    Dave Krah's lab.

22  BY MR. SANGIAMO:

23    Q.   What's the information from

24  Dave Krah's lab that you say if reported would

47 (Pages 182 - 185)

Appx5943

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL186

1 affect the efficacy rate?

2     A.   So --

3         MR. KELLER: Objection. Asked

4 and answered. You can answer again.

5         THE WITNESS: So while I was at

6 Dave Krah's lab, we performed testing

7 related to what was referred to as

8 Protocol 007 which is the clinical

9 study to determine the seroconversion

10 rates in different strengths of the

11 vaccine, of the mumps vaccine. And

12 based on that information and that

13 protocol being completed and data being

14 generated, the -- what I believe to be

15 the end result of that study has not

16 been reported as how effective the

17 product is even at a decreased

18 strength.

19 BY MR. SANGIAMO:

20     Q.   So it's your belief that the

21 end result of that study has not been

22 reported? Is that what you just said?

23     A.   I believe that the -- well, I

24 know that the original data was being changed

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL187

1 as we were performing the testing. There was

2 data that's been destroyed and, therefore,

3 what hasn't been reported is the original

4 results that should have come out of that

5 study.

6     Q.   If you turn to Exhibit 6 which

7 is the Complaint. If you look at the bottom

8 of the first page. Paragraph 2 reads:

9 "Specifically, in an effort to maintain its

10 exclusive license to sell the vaccine and its

11 monopoly of the U.S. market for mumps vaccine,

12 Merck has fraudulently represented and

13 continues to falsely represent in its labeling

14 and elsewhere that its mumps vaccine has an

15 efficacy rate of 95 percent or higher."

16         Can you show me where on the

17 label Merck says that the efficacy rate is 95

18 percent or higher?

19         MR. KELLER: Objection. Seeks

20 a legal conclusion. You're having her

21 interpret a legal document. You can

22 answer.

23         THE WITNESS: So in terms of --

24 I guess I can answer just in the fact

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL188

1 that what's being reported in the label

2 is that there's 96 percent neutralizing

3 antibodies in a study that was -- in a

4 different study that was done. And

5 what -- what has not been reported is

6 how effective the product is with the

7 results that were coming out of the

8 Protocol 007 study.

9 BY MR. SANGIAMO:

10     Q.   Can you show me where in the

11 label it says that the efficacy rate is 95

12 percent?

13     A.   The label says that there's

14 96 percent mumps neutralizing antibodies and

15 96 percent from that study that was done. And

16 which is -- which to me is a demonstration of

17 the effectiveness of product and, therefore,

18 based on newer data that we have about the

19 effectiveness and the neutralizing antibodies,

20 that data is not represented here.

21     Q.   And, of course, you don't know

22 whether the FDA would also interpret that

23 96 percent as representative of the efficacy

24 of the product because I know you testified

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL189

1 this morning that you don't know how the FDA

2 defines efficacy. Right?

3         MR. KELLER: Objection. Lack

4 of -- calls for speculation. Lack of

5 foundation.

6 BY MR. SANGIAMO:

7     Q.   Right, ma'am?

8         MR. KELLER: Let me finish my

9 objection, Dino. I give you the

10 courtesy of letting you ask -- finish

11 your questions.

12         You can answer.

13         THE WITNESS: I do know that

14 the label says 96 percent neutralizing

15 antibodies which is not the percentage

16 of neutralizing antibodies that would

17 be concluded based on the assay that

18 the PRN that was being performed as

19 part of Protocol 007.

20 BY MR. SANGIAMO:

21     Q.   My question is, you don't know

22 whether the FDA would interpret that

23 96 percent seroconversion rate as being

24 representative of the efficacy rate because I

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL190

1    think you testified this morning you don't
2    know how the FDA defines efficacy. Right?
3          MR. KELLER: Objection. Lack
4    of foundation. Calls for speculation.
5          THE WITNESS: And in the
6    Complaint I didn't say that this was
7    the FDA's definition of efficacy.
8    BY MR. SANGIAMO:
9          Q.   So whose definition is it?
10         A.   It's based on what we filed,
11   myself and Steve who filed the Complaint, is
12   the effectiveness with the product.
13         Q.   So it's your definition?
14         MR. KELLER: Objection. Calls
15   for a legal conclusion. Calls for
16   speculation. Lack of foundation.
17   Seeks an expert opinion from a lay
18   witness. You can answer now.
19         THE WITNESS: Yes, based on how
20   the Complaint was written.
21   BY MR. SANGIAMO:
22         Q.   Why did you file this lawsuit?
23         MR. KELLER: Objection. Vague
24   and ambiguous. You can answer.

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL191

1          THE WITNESS: I filed it
2    because based on what I saw in Dave
3    Krah's lab of falsifying data and
4    knowing that that was wrong, knowing
5    that the protocol was conducted and
6    completed, that protocol supported a
7    label change to reduce -- to allow for
8    a reduction in the strength of end
9    expiry of the product. And that was
10   what was being measured as a part of
11   the protocol during my time in Dave
12   Krah's lab.
13   BY MR. SANGIAMO:
14         Q.   What did you hope to accomplish
15   by filing the lawsuit?
16         MR. KELLER: Objection. Vague
17   and ambiguous. Calls for speculation.
18   Lack of foundation. Seeks a legal
19   conclusion. You can answer.
20         THE WITNESS: So I wanted to be
21   able to bring awareness to the fact
22   that the data that was found was not
23   being reported so that the children who
24   are being vaccinated and their parents

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL192

1    or guardians could make a decision on
2    the basis of the data that is available
3    for the product.
4    BY MR. SANGIAMO:
5          Q.   How did you think this lawsuit
6    was going to accomplish that?
7          MR. KELLER: Objection. You
8    can answer that question as long as you
9    don't disclose any communications with
10   your counsel. To the extent that you
11   can answer the question without
12   disclosing communications with your
13   counsel, you can answer. If you
14   cannot, do not answer that question.
15         THE WITNESS: That's a lot of
16   information.
17         I guess in the simplest form is
18   that if we raise a complaint to
19   identify something that's wrong, it's
20   my belief that it would be -- that the
21   just thing would be accomplished and it
22   would be corrected.
23   BY MR. SANGIAMO:
24         Q.   Now, you're seeking recovery

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL193

1    for losses that you say the CDC incurred.
2    Right?
3          MR. KELLER: Objection. Seeks
4    a legal conclusion. You can answer.
5          THE WITNESS: That is what is
6    filed in the Complaint, yes.
7    BY MR. SANGIAMO:
8          Q.   You're not out of pocket any
9    money based on what's alleged here in this
10   Complaint. Right?
11         A.   Correct.
12         Q.   Why didn't you just go tell the
13   CDC?
14         MR. KELLER: Objection. Calls
15   for speculation. I will, again,
16   instruct you not to disclose any
17   communications you had with counsel
18   that you would have to disclose in
19   order to answer that question. If you
20   can answer the question without
21   disclosing communications you had with
22   counsel, you can.
23         THE WITNESS: I don't know if I
24   thought about it much. I mean, it

49 (Pages 190 - 193)

Page 194

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL194

1     wasn't about what the CDC was doing but
2     more about what Merck was doing. So I
3     wanted to be able to address it
4     directly with Merck.
5     BY MR. SANGIAMO:
6        Q.   When did you first contact a
7     lawyer about filing this lawsuit?
8        A.   I want to say 2009, 2010.
9        Q.   What were you doing 2002, 2003,
10    2004, 2005 where all these parents you said
11    were not able to make an informed decision and
12    you had all this information, why didn't you
13    just disclose it then?
14       MR. KELLER: Objection. Calls
15    for -- you can answer. Objection to
16    form.
17       THE WITNESS: When my time that
18    I worked at Merck, while I was there, I
19    did raise and elevated the issue within
20    Merck. After I had left Merck, I still
21    was working full time, raising a
22    family. At the time when the label
23    change came out in 2007, which is,
24    again, based on the Protocol 007 being

Page 195

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL195

1     the information that was available at
2     the time of the submission, the -- that
3     drawing the conclusion of allowing for
4     the label change based on that data led
5     me to raising the case at that point.
6     BY MR. SANGIAMO:
7        Q.   2007?
8        A.   Yeah, after 2007.
9        Q.   I thought it was in 2001 when
10    you discovered that as a result of what you
11    were seeing in the lab, that the vaccine had
12    significantly diminished efficacy. Isn't that
13    what you told me before?
14       A.   Yes.
15       Q.   So why didn't you let the CDC
16    know at that time?
17       MR. KELLER: Objection. Lack
18    of foundation.
19       THE WITNESS: At that time the
20    FDA was contacted, not the CDC.
21    BY MR. SANGIAMO:
22       Q.   How about after that?
23       MR. KELLER: Same objection.
24       THE WITNESS: I had left the

Page 196

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL196

1     laboratory. I wasn't aware of what was
2     being done with the data after I had
3     left.
4     BY MR. SANGIAMO:
5        Q.   Now, if you had simply told the
6     CDC what you knew, then that wouldn't lead to
7     any financial benefit for you. Right?
8        MR. KELLER: Objection. Lack
9     of foundation. You can answer.
10       THE WITNESS: Again, I don't
11    know what it would have led to, but as
12    far as making the implication that I
13    would be getting financial -- I guess
14    in settling the case, getting a
15    financial, I want to call it
16    reimbursement or whatnot, that's not
17    the reason I filed the case.
18    BY MR. SANGIAMO:
19       Q.   That played no role in your
20    thought process. Right?
21       A.   No. Again, I work in the
22    industry so I'm really putting myself out
23    there by being a part of this case.
24       Q.   What do you mean when you say

Page 197

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL197

1     you're putting yourself out there by being
2     part of this case?
3        A.   The fact that I would raise a
4     concern or an issue to a lawsuit is something
5     that could be viewed by others as -- I guess
6     could question my -- I don't know what to
7     say -- my loyalty to a company. It depends on
8     the company or the way that they view it
9     versus -- I can't say what others would think,
10    but I do know that it does allow an
11    opportunity for others to make judgment.
12       Q.   Has anyone made such judgments,
13    to your knowledge?
14       A.   No.
15       Q.   So the reason you think you're
16    putting yourself out there is based on
17    speculation that somebody might make such a
18    judgment. Is that a fair statement?
19       A.   Yes.
20       MR. KELLER: Objection.
21    BY MR. SANGIAMO:
22       Q.   If you go to page 7 -- I'm
23    sorry, Exhibit 7, page 16, third paragraph
24    down, I'm going to read it into the record,

50 (Pages 194 - 197)

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL198
1  "Relator had multiple communications with
2  Relator Krahling about topics relating to
3  allegations in the Complaint regarding the
4  mumps vaccine between 2001 and 2010. Most of
5  these communications took place in person at
6  Merck's facility where they worked in
7  West Point, Pennsylvania. In particular,
8  Relator recalls having...discussions with
9  Relator Krahling while they were both employed
10 at Merck regarding the fraudulent methods
11 mandated by Krah for the Protocol 007 testing
12 and ways of avoiding compliance with these
13 mandates. Relator also met with Relator
14 Krahling at Relator's home in Pennsylvania
15 after Krahling left Merck, and several times
16 at her home in Connecticut after they both
17 left Merck."
18       That's the end of that quote
19 which is from your response to Interrogatory
20 Number 5, not the entire response, but it's a
21 portion of the response.
22    A.   Uh-huh.
23    Q.   How many times in total do you
24 think you met with Mr. Krahling after he left

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL200
1  times it was the two of you along with some
2  other people from the lab at Merck?
3     A.   Yes.
4     Q.   Do you remember who those other
5  people were?
6     A.   I would say, I believe, Frank
7  Kennedy was there, Suzanne Maahs and Jon
8  Gombola.
9     Q.   Is that it?
10    A.   That's all I recall.
11    Q.   If you have to provide an
12 approximation of the dates of those two
13 meetings, what would your best approximation
14 be?
15    A.   I would say the meeting, the
16 first meeting with a group of people was
17 either late 2001 or -- it was probably late
18 2001, I'm thinking. When I met with Steve
19 when he came to my house in Connecticut
20 sometime I'm going to say after 2007, prior to
21 2009 around.
22    Q.   Have you ever been represented
23 in this litigation by a man named James Moody?
24    A.   Not that I -- no.

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL199
1  Merck?
2     A.   In person?
3     Q.   Yes.
4     A.   I would say a handful of times,
5  if that.
6     Q.   Five or less, is that fair?
7     A.   Yes.
8     Q.   Was anyone else present at any
9  of those meetings?
10    A.   So the first couple of times
11 that we met while I was still in Pennsylvania.
12 Or at least there was at least one instance
13 where there were other co-workers from Dave
14 Krah's lab who were in attendance. After
15 that, we didn't meet again until he came to my
16 house in Connecticut and he came -- I believe
17 he came by himself one time and then came with
18 my legal counsel.
19    Q.   You met twice with him after he
20 left Merck prior to him appearing with legal
21 counsel. Is that right?
22    A.   Yes.
23    Q.   One of those two times it was
24 just the two of you, and one of those two

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL201
1     Q.   When Mr. Krahling came to visit
2  you in 2007, was that a meeting that was at
3  his suggestion or your suggestion?
4     A.   At his suggestion.
5     Q.   Had the two of you spoken at
6  all between that 2001 meeting at your house
7  and the 2007 meeting at your house in
8  Connecticut?
9     A.   Not that I recall, no.
10    Q.   Had you exchanged e-mails?
11    A.   No.
12    Q.   Did he just call you in 2007
13 and suggest that you meet?
14    A.   Yes.
15    Q.   Did he say why?
16    A.   He talked about the -- what we
17 experienced, again, in Dave Krah's lab with
18 the falsification of the data, and we talked
19 about the protocol being completed and also to
20 discuss the label change as well.
21    Q.   What else do you recall about
22 those discussions?
23    A.   I don't recall much. I know
24 that I basically told them I still supported

51 (Pages 198 - 201)

Page 202

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 202

1  what I did when I was there, that it was wrong
2  what was being conducted in the laboratory.
3      Q.   Did he tell you that he was
4  contemplating a lawsuit?
5      A.   Yes.
6      Q.   Did he tell you that he had
7  been contemplating that for some time?
8      A.   I don't recall.
9      Q.   Did he give you any indication
10  at all about how long he had been contemplating
11  that?
12      A.   I know he was following
13  information around the vaccine.  That's all I
14  know.
15      Q.   I thought you said a minute ago
16  he was contemplating a lawsuit?
17          MR. KELLER: Objection.
18          Mischaracterizes her testimony.
19  BY MR. SANGIAMO:
20      Q.   Did you have any basis for
21  thinking he was contemplating filing a lawsuit
22  besides the fact that he was following the
23  vaccine?
24      A.   Just following the vaccine does

Page 203

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 203

1  not necessarily mean he would file a lawsuit.
2      Q.   I thought you had -- perhaps I
3  got it wrong.  I thought you had said that
4  your impression when you met with him in 2007
5  was that he had been contemplating filing a
6  lawsuit?
7      A.   At that time, yes, versus what
8  he had been doing prior to that.
9      Q.   What did he tell you about that
10  effort to file a lawsuit or that contemplation
11  of filing a lawsuit?
12          MR. KELLER: Objection. Lack
13          of foundation.
14          THE WITNESS: That he was
15          looking into finding legal representation.
16  BY MR. SANGIAMO:
17      Q.   Did he tell you he had been
18  trying to do that?
19      A.   I don't know if he might have
20  mentioned that he reached out to somebody else
21  previously.  I think that's what he said.
22      Q.   To another attorney?
23      A.   Yes.
24      Q.   Did he tell you what that

Page 204

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 204

1  attorney had told him about the viability of
2  any lawsuit?
3      A.   No.
4      Q.   How much time between when you
5  had that meeting at your house and when he
6  subsequently met with you with legal counsel?
7      A.   Again, it was in the span of
8  between 2007 to 2009.
9      Q.   Would it be fair to say that
10  Mr. Krahling persuaded you to join this
11  lawsuit?
12          MR. KELLER: Objection.
13  BY MR. SANGIAMO:
14      Q.   Would that be a fair
15  characterization in your view?
16      A.   I wouldn't characterize it as
17  persuasion, as informing me of the
18  developments.  As far as whether or not I
19  wanted to participate was my decision.
20      Q.   Did you have discussions about
21  that outside the presence of counsel?
22          MR. KELLER: With whom?
23          THE WITNESS: Right.
24  BY MR. SANGIAMO:

Page 205

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 205

1      Q.   With Mr. Krahling.
2      A.   I can't recall.
3      Q.   Do you recall Mr. Krahling
4  identifying any pros, advantages for you if
5  you joined the lawsuit?
6      A.   No.
7          MR. KELLER: How long have we
8  been going?  Whenever you get to a
9  comfortable change, just a restroom
10  break.  We've been going an hour.
11          MR. SANGIAMO: At this time, we
12  can do it right now.
13          VIDEOGRAPHER: The time is
14  3:02.  Going off the video record.
15          - - -
16          (A recess was taken.)
17          - - -
18          VIDEOGRAPHER: The time is now
19  3:21.  This begins disc five.  You may
20  proceed.
21  BY MR. SANGIAMO:
22      Q.   Ms. Wlochowski, in general
23  terms, what projects did you work on in
24  Dr. Krah's lab?

52 (Pages 202 - 205)

Appx5948

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL206

1      A.   General terms, I worked on
2   testing for Protocol 007 as well as I was
3   conducting some supplemental testing for the
4   mumps neutralization assay. I also conducted
5   some assays for VZV studies, and I believe
6   that was -- that I can recall what I worked on
7   generally.
8      Q.   What was the supplemental
9   testing for the mumps neutralization assay?
10      A.   There were some different --
11   from what I can remember, there were some
12   different testing we did on passage, whether
13   it was high or low passage of the cell lines
14   that we were using. That's all I can remember
15   at this point.
16      Q.   The Protocol 007 testing that
17   you referred to, that's a reference to running
18   the plaque reduction neutralization assay?
19      A.   Correct. As well as the
20   supplemental testing.
21      Q.   You did not work on the mumps
22   ELISA assay during your time at Merck. Correct?
23         MR. KELLER: Objection. Vague
24         and ambiguous.

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL207

1         THE WITNESS: Can you define
2      what you mean by work on the ELISA
3      assay?
4   BY MR. SANGIAMO:
5      Q.   Is there some sense of the
6   meaning of the term "work on" that would fit
7   what you did on the ELISA assay?
8      A.   So the ELISA assay was based,
9   the development was based on correlation to
10   the PRN assay that I performed. So to the
11   extent that the correlation was based on the
12   work I did, was my involvement with the ELISA
13   assay at that time.
14      Q.   Your involvement, then, with
15   the ELISA assay consisted of running of the
16   plaque reduction neutralization assay.
17   Correct?
18      A.   Correct.
19      Q.   When is it that you came into
20   the belief that the ELISA assay was correlated
21   to the plaque reduction neutralization assay?
22         MR. KELLER: Hold on a sec.
23         Objection to form. Lack of foundation.
24         You can answer.

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL208

1         THE WITNESS: I'm trying to
2      think.
3   BY MR. SANGIAMO:
4      Q.   I can make this easier for you,
5   Ms. Wlochowski. Was it while you were working
6   at Merck?
7      A.   Yes.
8      Q.   Was it while you were in
9   Dr. Krah's lab?
10      A.   Yes.
11      Q.   How did you hear about that?
12      A.   The part of the -- I'm trying
13   to recall. Part of the information that
14   talked about the development of the PRN also
15   talked about the ELISA.
16      Q.   You just said part of the
17   information that talked about the development
18   of the PRN. Are you referring there to the
19   document that you testified about earlier that
20   Mr. Krahling showed you?
21      A.   Correct.
22      Q.   Did that document say that the
23   correlation had actually occurred?
24      A.   No.

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL209

1      Q.   That wouldn't make any sense,
2   right?
3      A.   Right.
4      Q.   Because you hadn't run the
5   plaque reduction neutralization yet?
6      A.   Right.
7      Q.   So do you know if that
8   correlation ever occurred?
9         MR. KELLER: Objection.
10         Overbroad.
11         THE WITNESS: While I was at
12      Merck?
13   BY MR. SANGIAMO:
14      Q.   Right now the question is do
15   you know?
16         MR. KELLER: Overbroad.
17         THE WITNESS: Currently I do
18      know.
19   BY MR. SANGIAMO:
20      Q.   When did you learn that?
21      A.   As part of the case.
22      Q.   So you learned that in
23   conjunction with this lawsuit? Yes?
24      A.   Yes.

53 (Pages 206 - 209)

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL210

1    Q.    What specifically did you do on
2  the plaque reduction neutralization assay in
3  Dr. Krah's lab other than the supplemental
4  testing that you were describing related to
5  the passaging of cell lines?
6    A.    I believe I performed the assay
7  in its entirety so I set up the serum
8  dilutions, I inoculated the plates.  I fixed
9  and stained the plates and I performed
10  counting on the plates.
11        - - -
12    (Exhibit Wlochowski-9,
13    Documentation of Work Activities,
14    00000272, was marked for identification.)
15        - - -
16  BY MR. SANGIAMO:
17    Q.    Ms. Wlochowski, you've just
18  been handed what's been marked as Exhibit 9.
19  Do you recognize this document?
20    A.    Yes, I do.
21    Q.    What is it?
22    A.    This is just a document I
23  created for myself to outline the activities
24  of work that I conducted in the lab from my

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL211

1  start date in January through April.
2    Q.    Are you sure that you created
3  it -- strike that.
4        Do you know when you created
5  it?
6    A.    I don't recall exactly when,
7  but based on the last date entry there, it's
8  April 11th, it's around that time frame.
9    Q.    I'm sorry, I don't mean to
10  nitpick on this.  But do you have a basis to
11  believe it was around April 11th other than
12  seeing that date there?
13    A.    If there -- if it was late --
14  well, obviously if it was earlier, I couldn't
15  have written the other dates, but if it was
16  later in time, I would have likely filled in
17  more information up to the date that it was
18  being documented.
19    Q.    Why is it that you wanted to
20  document your work activities from your start
21  date until whenever it was that you prepared
22  this document?
23    A.    I was seeing things in the
24  laboratory that I wasn't comfortable with,

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL212

1  that in my work experience had not been
2  exposed to before and I wanted to document the
3  activities that were occurring.
4    Q.    And that's what this document
5  does.  Right?
6    A.    Correct.
7    Q.    Did you end up showing this
8  document to anybody?
9    A.    While I was at Merck?
10    Q.    Yes.
11    A.    No.
12    Q.    Did you intend to show it to
13  someone when you first created it?
14    A.    My intent was really my record
15  when I created this.
16    Q.    Why did you want a record?
17    A.    So, again, I could keep track
18  of the activities because I felt like there
19  were things that were being done wrong in the
20  lab and I wanted at least to have information
21  around that.
22    Q.    Were you contemplating filing a
23  lawsuit based on what's described here in this
24  document?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL213

1    A.    No.
2    Q.    Maybe we can go through some of
3  the concerns you express in the document.  At
4  the top there is a section that begins with
5  "Start date," and the first entry there reads:
6  "offered no direction or training."  I gather
7  that's a statement that neither Dr. Krah nor
8  anyone else in the lab provided you with what
9  you consider to be the adequate direction or
10  training?
11    A.    I believe it was more geared
12  towards receiving no training from my
13  supervisor which was Dave Krah.
14    Q.    Did you receive training from
15  others?
16    A.    From what I can recall, I
17  received training from, when I first started
18  there, from another co-worker in the
19  laboratory.
20    Q.    Who is that?
21    A.    Frank Kennedy.
22    Q.    What did he train you on?
23    A.    When I first started working
24  there, we were maintaining cell lines,

54 (Pages 210 - 213)

Appx5950

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL214

1   passaging cell lines, so he trained me on
2   that.
3       Q.   Were you working on anything
4   else when you first started working there?
5       A.   I can't recall.  My recollection
6   is mainly working on the passaging and
7   maintaining of cell lines.  I also, I think,
8   was involved in performing the VZV assays.  I
9   originally was not involved in performing the
10  mumps assays because when I joined Merck, I
11  was tested for mumps antibody titers and I
12  was -- I didn't have the seroconversion needed
13  for -- to be able to work with the virus so I
14  needed to receive a booster of the vaccine.
15      Q.   Did you start working on the
16  VZV assays right when you arrived at Merck in
17  January?
18      A.   I cannot recall when I started
19  conducting those assays.
20      Q.   So it's possible that the only
21  thing you were actually working on at the
22  beginning of your tenure at Merck was just
23  maintaining the cell lines.  Right?
24      A.   It's possible, yes.

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL215

1       Q.   You did receive training on
2   that, but it was your belief that the training
3   should have come from Dr. Krah, not from
4   Mr. Kennedy.  Is that a fair statement, fair
5   summary of your view?
6       A.   That the training should have
7   come from him?
8       Q.   Uh-huh.
9       A.   I think that it wasn't that he
10  needed to train me on that specific duty, but
11  to provide more guide -- I would have expected
12  more guidance from my manager at the time.
13      Q.   Do you feel that you were
14  adequately trained on maintaining the cell
15  lines?
16      A.   As far -- yes, I mean, that
17  basic -- yes.
18      Q.   That was right in your
19  wheelhouse, wasn't it?
20      A.   Yes.
21      Q.   The next line reads:  work
22  hindered by social dynamics in the lab.  What
23  does that mean?
24      A.   There were, I guess, certain --

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL216

1   I'm just trying to think about the timeline.
2   Basically there was certain relationships in
3   the lab where people were -- seemed to receive
4   more information or different items such as
5   gifts or exchanges of things that I wouldn't
6   necessarily expect to occur in a workplace.
7   That kind of from my perspective felt like I
8   wasn't being treated the same as my co-workers.
9       Q.   So the concerns about the
10  social dynamic were in the nature of people
11  getting more information than you and people
12  receiving gifts that you weren't receiving?
13  Right?  You mentioned those two things?
14      A.   Yup.
15      Q.   Was there anything else?
16      A.   That's -- yeah, again, people
17  weren't -- in my opinion, people weren't all
18  being treated the same.
19      Q.   Can you give me an example of
20  information that you perceived that was being
21  withheld from you?
22      A.   So there were instances, from
23  what I understand, that the procedure related
24  to the assays were being provided to certain

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL217

1   people that worked in the laboratory,
2   background on the assays that were being
3   performed were being provided to certain
4   people in the laboratory as well.
5       Q.   You said that was your
6   understanding.  What was that understanding
7   based on?
8       A.   I had some conversations with
9   Steve Krahling and others in the laboratory.
10  I would, you know, discover somebody got
11  something and -- yeah.
12      Q.   Who else besides Mr. Krahling?
13      A.   Probably Jill DeHaven.  I --
14  you know, it's a small laboratory.  Overhearing
15  conversations with different people, whether
16  it's Colleen Barr, people like that.
17      Q.   I think you said, tell me if I
18  have it wrong, I think you said that two
19  examples of the information were procedures
20  about certain experiments and background on
21  assays?
22      A.   Uh-huh.
23      Q.   Are you referring there
24  specifically to the mumps PRN assay?

55 (Pages 214 - 217)

Appx5951

Page 218

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL218

1    A.   Yes.
2    Q.   For both of those?
3    A.   Yes.
4    Q.   You were not actually running
5    the mumps PRN assay at the time.  Right?
6        MR. KELLER:  Objection.  Vague
7        and ambiguous.
8        THE WITNESS:  It depends on
9        what timeline you are referring to.  I
10       believe at a certain point in time I
11       was performing the counting of the
12       mumps assays.
13   BY MR. SANGIAMO:
14   Q.   Was it your view that you
15   needed to see the SOP for how the assay was
16   run in order to perform the counting?
17   A.   I did not need to see the SOP
18   to perform the counting.  However, it would be
19   beneficial for me to have an understanding of
20   the method that I am generating results for.
21   Q.   Would it make for -- I'm sorry.
22   A.   With that, the SOP does speak
23   to how you report the results, whether it's,
24   you know, document where, you know, the -- I'm

Page 219

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL219

1    not sure about the documentation, but
2    basically that there is an Excel spreadsheet
3    file that's utilized in calculating the final
4    results.  And so it's all -- the results are
5    part of the method.  So, therefore, I should
6    have had them in my hand.
7    Q.   Well, you can do the counting
8    without knowing what was done with the
9    counting output.  Right?
10   A.   I could do the counting, but I
11   should know what I should be doing with that
12   data once I generate that data, especially
13   since the data is being generated for a
14   clinical trial protocol; that there should be
15   more oversight and control of the data so that
16   original data is not lost.
17   Q.   You had never worked on a
18   clinical trial at that stage of your career.
19   Right?
20   A.   Not directly, no.
21   Q.   Indirectly you did?
22   A.   If I was maintaining cell lines
23   for other clients, yes, I could have
24   potentially indirectly been supporting

Page 220

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL220

1    clinical trials prior to.
2    Q.   That's pretty indirect, isn't
3    it?
4        MR. KELLER:  Objection.  Vague
5        and ambiguous.
6        THE WITNESS:  It still follows
7        regulations.
8    BY MR. SANGIAMO:
9    Q.   Can you give me some examples
10   of these gifts that some were receiving that
11   you didn't get?
12   A.   From what I was told, you know,
13   jelly beans or Easter baskets were being given
14   to people within the laboratory.  I don't -- I
15   don't know more than that.
16   Q.   Presumably that didn't happen
17   until April, I would imagine?
18   A.   Correct.
19   Q.   So then as of January, the only
20   social dynamics issue in the lab was just that
21   people were receiving information about the
22   PRN assay that you weren't getting.  Is that
23   fair?
24   A.   So you said that the only thing

Page 221

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL221

1    that was hindering my work in the lab was the
2    fact that I didn't get the procedure.  Is that
3    correct?
4    Q.   Yes, but I was being slightly
5    more specific than that.  I was saying the
6    only thing related to this work being hindered
7    by social dynamics in the lab was the fact
8    that you didn't get the procedures and the
9    background for the PRN assay.
10   A.   And the overall guidance that
11   I, you know, would -- again, going back to the
12   direction provided by my supervisor.
13   Q.   Anything else by way of the
14   social dynamics in the lab at the start of
15   your tenure there?
16   A.   Meaning what time frame?
17   Q.   January let's say.
18   A.   Just the -- again, going back
19   to not being treated the same as everybody
20   else basically.
21   Q.   Because you didn't get those
22   procedures?
23   A.   As far as communication and,
24   yeah, interaction.

56 (Pages 218 - 221)

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL222

1    Q.    Were people being nasty to you?
2    A.    I guess it depends on -- it was
3  more of an exclusion than being nasty.
4    Q.    Were there certain people in
5  particular that you thought were excluding you
6  more than other people were?
7    A.    I guess I look at it the
8  opposite way and there was more people --
9  there was people that I was more --
10  interacting more with or felt comfortable
11  interacting more than others.
12    Q.    Who were they?
13    A.    So Jill DeHaven sat next to me
14  and I was comfortable working with her.
15  The -- as far as how we operated within the
16  laboratory, typically we worked in -- if we
17  were in working in a BSC, we were typically
18  working in pairs together so we would be in a
19  small room together and I was typically paired
20  up with either Frank Kennedy or Steve Krahling
21  based on the fact that I worked, as well as
22  they did, five days a week, eight-hour shifts.
23  So we were on the same shifts.  So typically
24  we were paired together.  So I also felt

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL223

1  comfortable with them.  When we had -- we had
2  a couple of interns that had started and also
3  felt comfortable with them as well.
4    Q.    Those were Jon Gombola and
5  Suzie Maahs?
6    A.    Correct.
7    Q.    Were there others in the lab
8  who worked five days a week, eight-hour shifts
9  besides the people you've mentioned?
10    A.    Well, Dave Krah worked full
11  time.  He came in typically later than
12  everybody else.  He worked kind of odd hours.
13  But as far as 8:00 to 4:30, from what I
14  recall, five days a week was myself, Steve and
15  Frank as well as the interns.
16    Q.    Did Colleen Barr work a
17  five-day-a-week schedule?
18    A.    She had a different schedule
19  based on a family need.
20    Q.    Did you find that irksome?
21    A.    No.
22    Q.    Continuing on in the document
23  under March it says, "Dave went on vacation
24  unannounced for 2 weeks."

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL224

1    A.    Uh-huh.
2    Q.    Is that a complaint?
3    A.    That's, again, just my
4  documentation to myself that typically when
5  your manager is out of the office for an
6  extended time, you're notified in advance of
7  that just in case you need to prepare or ask
8  about preparing for anything while they're
9  out.  So that was my reason for that
10  documentation.
11    Q.    Do you think he told other
12  people?
13    A.    That I do not know.
14    Q.    Would that have been adequate
15  if he had told other people in the lab?  Would
16  that have addressed your concerns?
17        MR. KELLER:  Objection.  Calls
18    for speculation.
19        THE WITNESS:  No, because I
20    really -- unless he told those people
21    to tell me.  But, again, I don't think
22    that as a manager, again, should treat
23    his staff equally and informed all
24    staff the same.

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL225

1  BY MR. SANGIAMO:
2    Q.    When you say he sent an e-mail
3  during that time period stating there would be
4  no vacation allowed until after August --
5    A.    Correct.
6    Q.    -- is your concern there that
7  there was not going to be any vacation allowed
8  until after August or was your concern that he
9  was sending such an e-mail while he, himself,
10  was on vacation?
11    A.    A little bit of both.
12    Q.    There's then a reference in the
13  next paragraph, if you will, about requesting
14  error reports from you for aspiration of media
15  from the wrong assay tray which does not
16  adversely affect results.  Do you remember
17  that incident?
18    A.    I do vaguely recall it, yes.
19    Q.    Only vaguely?
20    A.    Again, I don't recall the
21  actual event itself, but I recall the context
22  around the event.
23    Q.    Do you remember being angry
24  about it?

57 (Pages 222 - 225)

Appx5953

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL226

1    A.    To myself internally, yeah.
2  Again, I felt like I was being signaled out or
3  treated differently than others in the
4  laboratory.
5    Q.    How so?
6    A.    Because there were -- there are
7  incidents of people making errors including
8  Dave Krah where I didn't see the same type of
9  report having to be done.  Again, this was
10  something that was just instituted at this
11  time, was, you know, people make mistakes in
12  conducting laboratory work so to think that
13  this wasn't in place prior to that was a
14  little -- the timing, I guess, again, felt
15  like I was being singled out.
16    Q.    Did you ever form any belief as
17  to why Dr. Krah was singling you out this way?
18    A.    I do not know why, no.
19    Q.    I know you don't know because
20  that would be speculation.  Right?
21    A.    Correct.
22    Q.    Did you ever form a suspicion?
23          MR. KELLER:  Same objection.
24    Calls for speculation.

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL227

1          THE WITNESS:  Isn't that the
2    same?
3  BY MR. SANGIAMO:
4    Q.    I'm not asking you to state
5  definitively what his motivation was.  I'm
6  asking if you have a suspicion as to what his
7  motivation was?
8          MR. KELLER:  Again, that calls
9    for speculation.
10          MR. SANGIAMO:  Calls for
11    speculation as to whether she, in fact,
12    had a suspicion?
13  BY MR. SANGIAMO:
14    Q.    Don't speculate about whether
15  you had a suspicion.  Just did you have a
16  suspicion, that's my question?
17    A.    I don't know if it was based on
18  what other people said about me.  I mean,
19  that's the only thing that -- I don't know if
20  that's speculation, but that's the only thing.
21    Q.    Was it your impression that
22  people were saying derogatory things about you
23  behind your back in this, let's say, the first
24  three months that you were working there in

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL228

1  the lab?
2    A.    That was my feeling just based
3  on walking, you know, into a room and the mood
4  changing, yes.
5    Q.    Were there certain people in
6  particular who would be in the room in that
7  kind of circumstance where the mood would
8  change when you walked in?
9    A.    Yeah, there were certain
10  incidents of particular people aside from the
11  people that I mentioned previously that
12  were -- I worked with and was comfortable
13  with.
14    Q.    So who were those people where
15  those incidents occurred?
16    A.    So Colleen Barr would be one of
17  them.  Again, nothing -- I don't have anything
18  against her, but I'm just, again, telling you
19  my observation of what I saw when I walked in
20  the room.  She would mostly in the lab space
21  area that we worked in, Jenny Kriss would also
22  be in the room there, too.
23    Q.    Did you have anything against
24  Jenny Kriss?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL229

1    A.    No.
2    Q.    Do you think the same standards
3  about error reports ought to apply to the lab
4  supervisor as it would apply to people working
5  the lab?
6    A.    Yes.
7    Q.    Reading down further it says
8  you were left a note on your desk that you had
9  entered an incorrect lot number on a
10  worksheet.  Do you see that?
11    A.    Yes.
12    Q.    You did make that mistake.
13  Right?
14    A.    Correct.
15    Q.    And yet you thought that that
16  was -- I don't want to put words in your
17  mouth.  Did you think it was an injustice that
18  he had left that note on your desk?
19    A.    Based on the fact that there
20  were other errors made by other people, again,
21  it would suggest that I'm being singled out.
22    Q.    Down at the bottom there is
23  some handwritten comments.  Is that your
24  handwriting?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL230

1    A.  Yes.
2    Q.  First thing there is "mumps
3  protocol." Is that a reference to what we
4  were discussing earlier about you not getting
5  the SOP until later than you thought you
6  should have gotten it?
7    A.  I think that that may have also
8  referred to the experience I had witnessing
9  changes to data while I was conducting the PRN
10  or performing the counting of the PRN assay.
11    Q.  That's what that refers to?
12    A.  Yes.
13    Q.  When did you write that?
14    A.  Again, going back to after
15  April time frame.
16    Q.  But you don't know when?
17    A.  No.
18    Q.  Did you think there was
19  research fraud going on at the time?
20    A.  Research fraud?
21    Q.  Yes.
22    MR. KELLER: Objection. Vague
23  and ambiguous.
24    THE WITNESS: What do you mean

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL231

1  by "research fraud"?
2  BY MR. SANGIAMO:
3    Q.  Did you think that that was
4  going on at the time fit the description of
5  what you would have called research fraud?
6    MR. KELLER: Same objection.
7  Lack of foundation.
8    THE WITNESS: I don't know that
9  I would call something research fraud.
10  The data was being falsified.
11  BY MR. SANGIAMO:
12    Q.  So data could be falsified but
13  that might not be fraud, is that what you're
14  saying?
15    MR. KELLER: Objection.
16  Mischaracterizes her testimony. Lack
17  of foundation. Seeks a legal conclusion.
18    THE WITNESS: So to, I guess,
19  make the clarification between fraud
20  and data falsification which you're
21  referring to, I guess my interpretation
22  at that time is this data, again, was
23  being conducted as part of a clinical
24  trial that if the data that was

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL232

1  reported the way it was being reported
2  would be fraudulent.
3  BY MR. SANGIAMO:
4    Q.  It was your opinion that the
5  data being reported was fraudulent?
6    A.  If it was -- yes, if the intent
7  was to use the data for the trial, then it
8  would be fraud, yes.
9    Q.  You knew that the intent was to
10  use the data for the trial. Right?
11    A.  It was my assumption, that's my
12  expectation.
13    Q.  The way you captured is very
14  serious -- strike that.
15    You agree that that's quite
16  serious, isn't it, if you're using data
17  fraudulently for a clinical trial?
18    A.  Yes.
19    Q.  Extraordinarily serious, isn't
20  it?
21    A.  Yes.
22    Q.  So the way you captured it on
23  this document was you wrote the words "mumps
24  protocol?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL233

1    A.  Yes.
2    Q.  Is that your testimony?
3    MR. KELLER: Asked and
4  answered. Argumentative.
5    THE WITNESS: Yes.
6  BY MR. SANGIAMO:
7    Q.  Right above where you wrote the
8  thing about the jelly bean?
9    A.  Yes.
10    Q.  Why didn't you provide more
11  detail about the fraud that you say you were
12  witnessing?
13    A.  So this document, again, was an
14  outline of my activities that I was
15  conducting. I believed I used this as part of
16  my -- to provide some background into a
17  discussion that I was raising internally with
18  HR about my work in the laboratory with the
19  treatment of -- the treatment from my
20  supervisor and amongst my co-workers.
21    Q.  What is this here about acetone
22  log, what's that?
23    A.  I don't remember.
24    Q.  Discrimination, what's that a

59 (Pages 230 - 233)

Appx5955

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL234

1 reference to?
2    A.    Again, being -- not being
3 treated the same as the others in the laboratory.
4    Q.    So that wasn't -- strike that.
5    Did you have in mind gender-based
6 discrimination?
7    A.    No.
8    Q.    Is there some other group that
9 you feel that you're a part of that was
10 discriminated against as a group in the lab or
11 was this just discrimination as to you
12 personally?
13    A.    I guess the -- if I could use
14 the word "click" as you had before, maybe
15 discrimination of being in the click or not
16 the click.
17    Q.    This is a click consisting of
18 whom?
19    A.    Those who Dave seemed to
20 interact with on a regular basis versus those
21 who didn't.
22    Q.    Who were they?
23    A.    Mary Yagodich, Colleen Barr,
24 Jenny Kriss.  That's kind of, I guess, the

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL235

1 extent.
2    Q.    Right below discrimination it
3 says, "hostile."  Is that referring to
4 anything other than what we've been talking
5 about?
6    A.    No.
7    Q.    What's the word underneath
8 that?
9    A.    It says -- I think it says,
10 "injust."
11    Q.    What's that a reference to?
12    A.    I can't remember.  I don't
13 know.
14    Q.    I apologize, Ms. Wlochowski.  I
15 think but I'm not sure that your testimony
16 might have been inconsistent on this, but
17 ultimately the transcript will tell us.  But
18 I'll nevertheless ask again just so I'm clear.
19    Did you testify that you
20 created this document, the one we were just
21 looking at, in preparation for a meeting with
22 HR or did I get that wrong?
23    A.    I think maybe not in the
24 initial intent of creating the document but as

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL236

1 I kept the log or kept this information or
2 defined this outline, I believe that I used
3 this as a supporting document when I went to
4 have a discussion with HR.
5    - - -
6    (Exhibits Wlochowski-10,
7    Outline for HR discussion, 00000273 and
8    Wlochowski-11, Work summary, 00000274,
9    were marked for identification.)
10    - - -
11 BY MR. SANGIAMO:
12    Q.    Ms. Wlochowski, you've just
13 been handed documents marked as Exhibits 10
14 and 11.  And I'm just going to go through them
15 with you.  Before we do that, I just wonder if
16 you could shed any light on something.  The
17 documents have these numbers we call Bates
18 numbers down at the corner that the lawyers
19 put on before they produce documents.
20    A.    Okay.
21    Q.    These two are sequential.
22 Exhibit 10 is 273 and Exhibit 11 is 274.  And
23 then Exhibit 11 down in the bottom right --
24 sorry, bottom left-hand corner says, "Page 2

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL237

1 of 2."  Do you think that these two pages were
2 part of the same document?
3    A.    I don't -- I don't think so.  I
4 think they were independent of each other.  I
5 think the page number is -- it's not
6 representative of any other page to this
7 document.  Meaning that there was no other --
8 there was no page 1.
9    Q.    Did you create these documents
10 on your home computer or did you create them
11 in work?  And by "these," I mean Exhibits 9,
12 10 and 11.
13    A.    I believe I created them at
14 home, my home computer.
15    Q.    Did you create them all at one
16 sitting or did you revise them from time to
17 time?  What do you recall in that regard?
18    A.    No, I think they were under
19 separate documents at separate times.  Part of
20 what I was going through in the laboratory or
21 kind of my internal feelings was to write
22 things down and keep a log of what was
23 happening.
24    Q.    Is it fair to say you were very

Page 238

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL238

1 unhappy during your time at Merck during these
2 first three months that were -- three and a
3 half months that were described in Exhibit 9?
4     A.    Unhappy in what regard?
5     Q.    I'm sorry, unhappy about your
6 job.
7     A.    Unhappy about my job?
8         MR. KELLER: Objection. Vague
9 and ambiguous.
10 BY MR. SANGIAMO:
11     Q.    Do you know what unhappy means?
12     A.    Yes, I know what unhappy means.
13 Yes, I think that it was a challenge to be in
14 this environment. So for me, I also -- I took
15 my job very seriously and wanted to be
16 recognized for the work that I do. So part of
17 this I, again, felt like there was a threat to
18 my position there. So part of it was
19 documentation if there ever came some other
20 information that was in conflict with what I
21 perceived as my performance in the laboratory.
22     Q.    You were worried about getting
23 fired. Is that what you're saying?
24     A.    I don't know that I was worried

Page 239

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL239

1 about being fired so much as my reputation in
2 the workplace.
3     Q.    Your reputation at Merck, is
4 that what you mean?
5     A.    At the time, yes. Or for my
6 career in general. If there were things that
7 were going to be documented about me in my
8 file, my employee file, could be -- impact
9 future, my career.
10     Q.    Had you done this at other
11 jobs, make a record of the things that you
12 found dissatisfactory about the job during
13 your first few months there?
14     A.    As far as this, no, I have not
15 done documentation outlined like this.
16     Q.    Have you done anything similar
17 to that?
18     A.    I've saved e-mails, exchanges.
19     Q.    In connection with other jobs?
20     A.    Yes.
21     Q.    Saved them for what purpose?
22     A.    If questions came up in the
23 future, that I would be able to refer back to
24 an e-mail.

Page 240

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL240

1     Q.    Questions about things you
2 might have done wrong?
3     A.    No.
4     Q.    Questions about things you
5 might have been accused of?
6     A.    No, just -- no, not about me.
7     Q.    If we look at Exhibit 10, the
8 first section is called "Poor Management." Is
9 that a reference to Dr. Krah?
10     A.    Yes, at the time I worked for
11 Dave Krah.
12     Q.    You felt you were getting a
13 lack of respect and recognition. Is that
14 right?
15     A.    I did feel that way, yes.
16     Q.    You felt that he was a poor
17 communicator?
18     A.    Yes.
19     Q.    It says, "lack of trust (does a
20 lot of lab work himself)." Was it your belief
21 that he did not trust any of the people in the
22 lab or just that he didn't trust you?
23     A.    Both. I think there were
24 things that he conducted on his own to have

Page 241

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL241

1 that, I guess, just direct interaction with it
2 versus, you know, also it seemed to be as far
3 as what he delegated for me to work on was
4 also less than what he, you know, would assign
5 to other people in the lab.
6     Q.    You found the work assignments
7 you were getting degrading. Is that right?
8         MR. KELLER: Objection.
9         THE WITNESS: I felt that I
10     wasn't being challenged.
11 BY MR. SANGIAMO:
12     Q.    You considered them degrading,
13 didn't you?
14         MR. KELLER: Asked and
15 answered. This is harassing.
16         MR. SANGIAMO: She didn't
17     answer.
18         THE WITNESS: I don't --
19         MR. KELLER: She's answered.
20         THE WITNESS: If you interpret
21     not being challenged as degrading,
22     yeah.
23 BY MR. SANGIAMO:
24     Q.    Would you use that term to

61 (Pages 238 - 241)

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 242

1 describe it?
2 A. To the extent that -- of the
3 work that I was assigned to do, yeah, at
4 times, yes.
5 Q. Did you think that you were
6 more skilled than the other people in the lab?
7 A. No, I didn't think that I was
8 or I wasn't. I felt them their equivalence.
9 Q. You felt you were as skilled as
10 the other people in the lab but not more
11 skilled. Is that fair?
12 A. Yes, I felt like -- yes.
13 Q. Under "Favoritism" back on
14 Exhibit 10, it says, "unable to separate
15 social versus professional relationship with
16 certain employees." It says, "i.e. birthday
17 luncheon, gifts, etc."
18 Gifts, is that the thing for
19 the Easter baskets and jelly beans?
20 A. Yes.
21 Q. Where it says, "birthday
22 luncheon," what's that mean?
23 A. He would take certain staff
24 members, when it was their birthday, take them

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 243

1 out to lunch with other staff members.
2 Q. How many times did that happen?
3 A. I can't recall how many times.
4 Q. More than one?
5 A. Not that I can recall.
6 Q. Just one you can recall?
7 A. Yes.
8 Q. And what happened, you didn't
9 get invited to that?
10 A. Me and others didn't get
11 invited.
12 Q. Did you find that insulting?
13 A. As coming from a manager, yes.
14 Q. Then under "Discrimination,"
15 there are, looks like, five starred items and
16 within the first one there are two bullets, if
17 you will, the second of which reads: "left
18 out of the loop to protect others who feel
19 threatened by my experience." There's no
20 subject in that sentence. Were you saying
21 that Dr. Krah left you out of the loop in
22 order to protect others who feel threatened by
23 your experience?
24 A. So can you repeat the question?

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 244

1 Sorry.
2 Q. Is the correct interpretation
3 what is written there that you felt that
4 Dr. Krah was leaving you out of the loop in
5 order to protect others who feel threatened by
6 your experience?
7 A. That was my feeling at the time.
8 Q. Who were the others?
9 A. Those that -- potentially those
10 that were considered part of his click.
11 Q. What made you think that they
12 felt threatened by your experience?
13 A. It was just, again, the
14 perception I had based on that there wasn't
15 that interaction between myself and my
16 co-workers to say, to help me get oriented in
17 the lab as I started working there. Typically
18 when, you know, I'm used to working in an
19 environment with others who will provide you
20 guidance because you just started. Basically
21 to show you the ropes of what we were all
22 working together as a team to do.
23 Q. A couple of lines down it says,
24 ERROR REPORTS -- specifically designed with

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 245

1 the intent to facilitate your departure. Do
2 you see that?
3 A. Yes.
4 Q. Did you believe that the error
5 report policy was specifically designed with
6 the intent to facilitate your departure from
7 Merck?
8 A. Based on my discussion with
9 others in the laboratory.
10 Q. That was your belief?
11 A. Uh-huh.
12 Q. What were those discussions
13 that you were just referring to?
14 A. That they were set up to have
15 me -- basically to have -- to get rid of me as
16 a worker within the laboratory.
17 Q. Who told you that?
18 A. Steve had the conversation
19 because he was also involved in the
20 conversation with the others in the
21 laboratory. So Steve had discussed it with
22 myself as well as Frank.
23 Q. So Steve told you and Frank
24 that the error report policy was set up to

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 246

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL246

1  facilitate your departure?
2      A.    My departure.  I can't remember
3  if he also told Frank it was also focused on
4  him as well.
5      Q.    How would that facilitate your
6  respective departures?  By creating a record
7  of you having made mistakes, is that the idea?
8      A.    Yes.
9      Q.    Did anyone else tell you that
10 that was Dr. Krah's intent besides Mr. Krahling?
11     A.    Again, I saw comments being
12 made by Dave how I made this error, but, you
13 know, I'm not going to have to do an error
14 report.  So it basically, you know, suggested
15 to me, again, that this was singling me out in
16 the laboratory just based on what I heard from
17 others within the laboratory that, you know,
18 there's a -- the laboratory itself had a high
19 turnover rate for people that worked there.
20 So this wasn't, you know, just this type of
21 treatment wasn't like something new to other
22 people who had worked in the laboratory.
23     Q.    You felt that Dr. Krah set up
24 the error report policy to facilitate your

Page 247

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL247

1  departure based on the fact that Mr. Krahling
2  told you that's why Dr. Krah did it, and the
3  fact that other people did not have to write
4  up error reports under circumstances similar
5  to yours when you had to write up error
6  reports.  Right?
7      A.    Uh-huh.
8          MR. KELLER:  Mischaracterizes
9      her testimony.  Go ahead.  Sorry, you
10     weren't finished.
11 BY MR. SANGIAMO:
12     Q.    Anything else?
13         MR. KELLER:  Mischaracterizes
14     her testimony.
15         THE WITNESS:  Not that I can
16     recall at this time.
17 BY MR. SANGIAMO:
18     Q.    Did Dr. Krah ever try to put
19 you on probation?
20     A.    No.
21     Q.    How do you rate the possibility
22 that Mr. Krahling was lying to you when he
23 told you that that was Dr. Krah's intent with
24 regard to the error report policy?

Page 248

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL248

1          MR. KELLER:  Objection.  Calls
2      for speculation.  Lack of foundation.
3          THE WITNESS:  Again, just based
4      on different discussions within the
5      laboratory about people saying,
6      admitting that they wouldn't have to do
7      that report when I would.
8  BY MR. SANGIAMO:
9      Q.    How many times did that happen?
10     A.    I can remember once specifically.
11     Q.    Any others?
12     A.    Not that I can recall.
13     Q.    The next line says -- or the
14 next star says, "degrading work, restricted
15 from running assays."  So the fact that you
16 were restricted from running assays, you
17 consider to be degrading.  Right?
18     A.    Yes.
19     Q.    You felt you were above the
20 work of whatever it was that you were doing,
21 the maintaining the cell lines?
22         MR. KELLER:  Objection.
23         THE WITNESS:  I felt like I had
24     more to offer and contribute to the

Page 249

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL249

1      laboratory as a whole.
2  BY MR. SANGIAMO:
3      Q.    Isn't maintaining cell lines
4  exactly what you were doing at your last job?
5      A.    For the temporary position, yes.
6      Q.    Weren't you running the VZV
7  assay at the beginning of your tenure at
8  Merck?
9      A.    Again, I don't recall when I
10 started running them, but I do know that the
11 workload was not the same, the assignments of
12 the workload was not the same across the other
13 workers in the laboratory.
14     Q.    Do you take issue with the
15 policy of you not being allowed to work with
16 the mumps virus for the plaque reduction
17 neutralization assay until you had
18 demonstrated a positive titer?
19     A.    No.
20     Q.    You think that's a good policy?
21     A.    Yes.
22     Q.    Then you have a section
23 "Injustice/Hostile Work Environment."
24     Do you see that?

63 (Pages 246 - 249)

Appx5959

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL250

1   A.   I'm sorry?
2   Q.   Do you see that section?
3   A.   Yes.
4   Q.   The second starred item there
5  is "unacceptable behavior as a supervisor."
6  Under that you have ridiculed past employees,
7  has made derogatory comments about, quote,
8  myself, which is a reference to you,
9  Ms. Wlochowski. Right?
10   A.   Uh-huh.
11   Q.   What were the derogatory
12  comments he had made about you?
13   A.   I don't recall what he made
14  about me, what comments he made about me.
15   Q.   How did you know that he had
16  made them?
17   A.   So I know that, again, in my
18  discussions with Steve but also going back to
19  the previous point of ridicules past
20  employees, I, myself have heard him, you know,
21  make comments about other employees who have
22  worked there. So for me that was, you know,
23  again, not something that I have observed with
24  previous or -- employers or, you know,

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL251

1  current. That I wouldn't expect a supervisor
2  to be talking about his employees to other
3  staff members.
4   Q.   But did I hear you to say that
5  your basis for believing that he had made
6  derogatory comments about you is Mr. Krahling
7  had told you that?
8   A.   Yes, Mr. Krahling told me that.
9  And, again, I also have had conversations with
10  Jill and, you know, she would also acknowledge
11  that as well.
12   Q.   Ms. DeHaven told you that
13  Dr. Krah had made derogatory comments about
14  you?
15   A.   She would be part of conversations
16  with myself and Steve where she would
17  acknowledge that as well.
18   Q.   Could you explain what you mean
19  by "she would acknowledge that"?
20   A.   Any as far as discussions that
21  we had and Steve made comments about, I spoke
22  about derogatory comments, Jill also
23  acknowledged them.
24   Q.   Said, yes, I heard Dr. Krah say

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL252

1  that, did you say that kind of thing?
2   A.   Yes.
3   Q.   She did say that. She affirmed
4  what Mr. Krahling was saying about Dr. Krah
5  having made derogatory comments about you?
6   A.   Yes.
7   Q.   But sitting here, you don't
8  recall what any of those derogatory comments
9  were that were reported to you. Right?
10   A.   Right.
11   Q.   You said he "readily gives out
12  confidential information about employees."
13  What's that?
14   A.   That, I can't remember what
15  specifics were around that.
16   Q.   Are you the one who heard him --
17   A.   Yes.
18   Q.   -- giving out confidential
19  information about employees?
20   A.   Yes.
21   Q.   Do you remember what --
22   A.   No.
23   Q.   Do you remember what category
24  of confidential information you had in mind

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL253

1  there?
2   A.   No, I do not.
3   Q.   Now, this document was written,
4  Exhibit 10 here was written sometime after
5  July 26, 2001. Does that sound right? I can
6  tell you why I say that if it speeds things up
7  at all.
8   A.   Tell me why you say it.
9   Q.   There's a reference in the
10  middle of the document right around the
11  "Discrimination" section which says, "RECEIVED
12  OUTLINE OF HOW TO DO MUMPS ASSAY...JULY 26,
13  2001!!!!!!"
14   A.   Okay.
15   Q.   Does seeing that enable you to
16  pinpoint any more when it is that you may have
17  written this document?
18   A.   Probably shortly after that
19  because I believe I did have a discussion with
20  HR at the end of July.
21   Q.   Did you present this document
22  to HR when you had that discussion?
23   A.   Again, not that I recall. I
24  don't think I have provided this copy. It was

64 (Pages 250 - 253)

Appx5960

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL254

1   just my thoughts in my head for a discussion
2   with HR.
3      Q.   You didn't come into that
4   meeting with any documents?
5      A.   I don't believe I did.
6      Q.   Was this a meeting with Bob
7   Suter?
8      A.   Yes.
9      Q.   Was anyone else present at that
10   meeting?
11      A.   Not that I recall.
12      Q.   If you take a look at
13   Exhibit 11. Do you know when that document
14   was prepared? Can you approximate that?
15      A.   Again, just going on the
16   timeline that this goes through, September, I
17   would say at the end of September.
18      Q.   Towards the end of the first
19   paragraph which is describing events of
20   January and February, the last two sentences
21   read -- well, last three sentences read: "I
22   tried to keep an open mind about the situation
23   and maintain a respectful professional
24   relationship with everyone. This however was

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL255

1   to no avail since far too many premature
2   judgments were made against me. The demands
3   for social acceptance outweighed any asset I
4   could bring to the table career wise."
5      What are the premature
6   judgments that you're referring to there?
7      A.   I think just from the start I
8   felt as though I wasn't accepted right into
9   the lab and working with others. So I don't
10   know, to this day I don't know what the
11   judgments are against me, but, again, I think
12   it just prevented a working relationship with
13   my co-workers.
14      Q.   Did you develop a personal hatred
15   of Dr. Krah for the way he was treating you?
16      A.   I don't think I would call it
17   hatred.
18      Q.   Well, you felt he was trying to
19   get you fired. Right?
20      A.   Well, yes, and I know you asked
21   me that question previously and I saw that, I
22   guess, you know, looking now, I didn't think
23   that, but I did write that at the time. So,
24   yes, I was -- had that -- I guess I had that

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL256

1   feeling that that was part of his plan, so I
2   felt compelled to defend myself and stand up
3   for myself. I, again, wouldn't define that
4   into hatred as much as, you know, disrespect
5   for what he, you know, I felt should have been
6   doing as a supervisor of a staff.
7      Q.   Well, you also thought he was
8   making derogatory comments about you. Right?
9      A.   Uh-huh.
10      Q.   You thought he was giving you
11   degrading assignments. Right?
12      A.   Uh-huh.
13      Q.   And you thought he was
14   facilitating your social exclusion from the
15   lab. Right?
16      A.   Yes.
17      Q.   And whatever you felt in
18   response to that stopped short of hatred or
19   was it hatred?
20      MR. KELLER: Objection. Asked
21   and answered. Argumentative.
22      THE WITNESS: I would say
23   stopped short of hatred.
24   BY MR. SANGIAMO:

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL257

1      Q.   Did you feel anger?
2      MR. KELLER: Same objection.
3      THE WITNESS: Uh-huh. As I
4   mentioned before, I was -- you know,
5   internally, yes, I had some anger.
6      MR. KELLER: Let's take a
7   break. It's been an hour.
8      VIDEOGRAPHER: The time is now
9   4:26. Going off the video record.
10      - - -
11      (A recess was taken.)
12      - - -
13      VIDEOGRAPHER: The time is
14   4:42. This begins disc six. You may
15   proceed.
16   BY MR. SANGIAMO:
17      Q.   Ms. Wlochowski, when you were
18   working in Dr. Krah's lab, was there an
19   occasion when you requested an adjustment in
20   your work hours?
21      A.   Yes, I did.
22      Q.   That happened twice. Right?
23      A.   I don't recall. Are you saying
24   there's two separate adjustments or --

65 (Pages 254 - 257)

Appx5961

Page 258

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL258

1    Q.    That is what I was saying.  Is
2  that your recollection?
3    A.    I don't recall that, no.
4    Q.    You just recall one?
5    A.    Yes.
6    Q.    Do you recall what the
7  precipitating event was for that one request?
8    A.    Based on -- sorry, what, why I
9  needed different hours?
10    Q.    Yes.
11    A.    So my husband was taking
12  classes at the time so I wanted to be able to
13  fit my work schedule around being able to be
14  home for my children.
15    Q.    Did Dr. Krah accommodate that?
16    A.    He did not immediately.  There
17  was not an immediate response to the request,
18  as far as I can recall.
19    Q.    How long did it take him to
20  respond to the request?
21    A.    I believe he had me submit some
22  different documentation around that.  I can't
23  remember the details.
24    Q.    Didn't he grant the request

Page 259

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL259

1  while the documentation was being submitted
2  and evaluated?
3    A.    I would -- I can't remember off
4  the top of my head.
5    Q.    You just don't remember one way
6  or the other?
7    A.    Yes.
8    Q.    The other request for a change
9  in your hours that I was recalling was several
10  years -- I'm sorry, several months prior to
11  what you were just describing.  Does that jog
12  your -- does my saying that jog your
13  recollection in any way?
14    A.    No.
15    Q.    Is it the case that others in
16  Dr. Krah's lab were working on weekends?  Do
17  you recall that?
18    A.    There were some time required
19  for others for the lab to work on weekends,
20  yes.
21    Q.    I'm sorry, I don't understand
22  that.
23    A.    I don't recall that there was
24  anybody scheduled, you know, as a routine to

Page 260

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL260

1  work on the weekends other than that schedules
2  were rearranged to accommodate weekend
3  coverage.
4    Q.    Did he request volunteers to
5  work on the weekend, to your recollection?
6    A.    I believe so.
7    Q.    Did you ever volunteer to work
8  on the weekends?
9    A.    I do not recall.
10    Q.    You don't recall ever
11  volunteering or you don't recall whether you
12  ever volunteered?  Do you see the distinction
13  I'm drawing?
14    A.    No.
15    Q.    You do not have a recollection
16  of having volunteered.  Right?
17    A.    I do not recall if I volunteered
18  or not.
19    Q.    Do you recall other members of
20  the lab complaining to you about you making
21  sexually inappropriate comments?  Do you
22  remember that?
23    A.    No.
24    Q.    Do you have a recollection of

Page 261

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL261

1  telling Dr. Krah at one point that you were
2  uncertain if you were counting plaques
3  correctly?
4    A.    I don't recall making that
5  statement that I was uncertain.
6    Q.    Did you ever seek his guidance
7  for counting plaques?
8    A.    I don't know if I sought out
9  his guidance as he would provide guidance.
10    Q.    So just to be clear, you don't
11  have a recollection of you ever seeking out
12  his guidance.  Right?
13    A.    On plaque counting?
14    Q.    Correct.
15    A.    I guess it depends on guidance
16  because if there was a particular assay that
17  had a different look to it, I would bring it
18  to his attention.
19    Q.    When you were at New Haven
20  Hospital, did you ever have an occasion where
21  you were uncertain about a plaque count when
22  you were running the plaque reduction assay
23  for the antiviral therapies?
24    A.    I don't recall if I did.

66 (Pages 258 - 261)

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL262

1    Q.    Was there a procedure in place
2  for what you were to do at New Haven Hospital
3  in that circumstance?
4    A.    If I had a question about a
5  plaque count, about a procedure about that?  I
6  don't know if there was a procedure about
7  questions about plaque counts, but essentially
8  in my work experience, if there is something
9  that I see that I have a question about or
10  think is an issue, I would raise it to my
11  manager.
12    Q.    Would you include plaque counts
13  within that category of the kind of thing that
14  you would raise with your manager if you had a
15  question?
16      MR. KELLER:  Objection.  Calls
17  for speculation.
18      THE WITNESS:  Yeah, I guess,
19  again, when you say raise a question
20  about a plaque count, can you be more
21  specific?
22  BY MR. SANGIAMO:
23    Q.    Did you ever have uncertainty
24  as to whether the well you were looking at

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL263

1  had, for example, seven plaques versus six
2  plaques?  I'm referring now to the work you
3  did at New Haven Hospital.
4    A.    I don't recall.  Again, my
5  experience, I would be trained to perform
6  something during my training period.  Yes, I
7  would have questions that I would rely on
8  either my co-workers or my management to
9  provide me feedback on any questions that I
10  would have.
11    Q.    Were the plaques for the plaque
12  reduction assay that you counted -- sorry,
13  strike that.
14      Were the plaques for the plaque
15  reduction assay that you ran at New Haven
16  Hospital easier to count than the plaques in
17  the mumps plaque reduction neutralization
18  assay, harder to count or roughly the same?
19      MR. KELLER:  Objection.  Vague
20  and ambiguous.
21      THE WITNESS:  I don't know if I
22  can make a comparison.  They were
23  different.
24  BY MR. SANGIAMO:

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL264

1    Q.    Do you feel that your aptitude
2  as a plaque counter for the mumps plaque
3  reduction neutralization assay improved over
4  the time period that you worked at Merck?
5    A.    Yes, like any skill, your
6  aptitude would improve.  I do know, though,
7  that there were many others in the laboratory
8  that also conducted plaque counts that would
9  raise questions, it still would continue to
10  raise questions on plaque counts.  As a
11  general rule, as we were counting plaques in
12  the laboratory, it was known across the lab
13  staff that anything that we found pre-positive
14  was unexpected.  And so there was, you know, a
15  feeling across the lab members that if the
16  results of the plaque counting would give you
17  something that would generate a pre-positive
18  result, they would continue to look for
19  plaques to find additional plaques in order to
20  get the result that was expected as far as not
21  having a pre-positive.  The statement that,
22  you know, Krah explained that I recall during
23  my training is that, you know, in the patient
24  population you wouldn't expect that people

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL265

1  would have -- that there isn't that level of
2  having antibodies to mumps prior to
3  vaccination, at least in, you know, a majority
4  of the population and, therefore, it's not
5  expected to see that result.  That's what I
6  recall as part of my training.
7    Q.    When did you get this training?
8    A.    Again, it was part of -- it was
9  throughout the course of us conducting the
10  plaque counting in the laboratory.
11    Q.    Did you get it -- I'm sorry.
12    A.    So Dave would, you know, look
13  at the plates, be in the lab when we were
14  counting.  So he would provide guidance to
15  various members within the laboratory.
16    Q.    Did you get that training from
17  him before you did your first plaque counts on
18  the mumps plaque reduction neutralization
19  assay?
20    A.    I don't recall.
21    Q.    Now, I'm going to have to reask
22  a question I asked you a moment ago, because
23  you gave a long answer, but it didn't -- I'm
24  not sure I got the answer to the very specific

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 266

1 question I asked you, which is, do you feel
2 that your aptitude as a plaque counter
3 improved as regards to mumps plaque reduction
4 neutralization assay over the course of your
5 time at Merck?
6   A.  Yes.
7     MR. KELLER:  Asked and answered.
8     - - -
9     (Exhibit Wlochowski-12, E-mail
10    exchange, 00048441 & 00048442, was
11    marked for identification.)
12    - - -
13 BY MR. SANGIAMO:
14   Q.  Ms. Wlochowski, you've just
15 been handed what has been marked as
16 Exhibit 12, which is an e-mail exchange
17 between you and Dr. Krah.
18    MR. KELLER:  Take a minute to
19    read the e-mail.
20    MR. SANGIAMO:  I'm sorry, what
21    did you say, Jeff?
22    MR. KELLER:  I'm asking her to
23    review the e-mail if you're going to
24    ask questions about it.

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 267

1 BY MR. SANGIAMO:
2   Q.  You've read it?
3   A.  Yes.
4   Q.  Do you have a recollection of
5 this e-mail exchange?
6   A.  Yes.  Because I read it.
7   Q.  I'm sorry?
8   A.  Because I read it, yes.
9   Q.  If we look at the first e-mail
10 from Dr. Krah to you dated June 20th at 4:04,
11 it begins with.  "As follow-up from today's
12 meeting I wanted to be sure that you knew that
13 if you need to leave early or if any of the
14 work is going over the regular hours for our
15 mumps Nt assays and you need or want to leave
16 for the day, please let me know and we can
17 cover the balance of the work with the
18 remaining people, or I would be happy to cover
19 this myself.  This applies to everyone in the
20 lab."
21    Do you remember what it is that
22 you had -- strike that.
23    Do you remember what it is that
24 had been discussed at the meeting that served

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 268

1 as the context for this first paragraph here?
2   A.  Discussed at the meeting.  I
3 don't recall exactly what was discussed at the
4 meeting.  I believe that my discussion with
5 him would be about being able to complete the
6 amount of work that was assigned in the
7 eight-hour day and being able to leave on
8 time.
9   Q.  This is your boss here offering
10 to complete any projects --
11   A.  Right.
12   Q.  -- that you may not be able to
13 complete in the workday.  Right?
14   A.  Yes.
15   Q.  That's a pretty generous thing
16 for a boss to do, don't you agree?
17   A.  I agree.  I think that, you
18 know, it was not my intent for him to complete
19 my work in the middle of me performing
20 something.  So, you know, again, it's -- yeah,
21 it's a generous offer for him to do that.
22 However, that was not the intent of what I was
23 asking for.
24   Q.  Did you thank him for it in

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 269

1 your response?
2   A.  Not in this particular response, no.
3   Q.  Down at the bottom of his
4 e-mail, four lines from the bottom he says,
5 "Some reports, such as the one that you
6 generated, did not provide a proposed
7 suggestion of steps to avoid occurrence, so I
8 did not feel that there was information to
9 pass along to anyone."
10   A.  Correct.
11   Q.  I gather the background there
12 is that you had written an error report that
13 he did not pass along the rest of the lab?  Is
14 that correct?
15   A.  I think my questions were --
16 you know, in my response there was more around
17 that he didn't distribute another error report
18 made by somebody else to the rest of the lab
19 where a suggestion of how we could prevent the
20 issue was made.  So, again, I was not informed
21 of a change in our practices.
22   Q.  But is it the case that you had
23 written an error report that he did not
24 distribute to the rest of the lab about an

68 (Pages 266 - 269)

Appx5964

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL270

1 error that you had made?
2 A. I don't know if he didn't pass
3 it along. He said he didn't feel the need to
4 pass it along, but I don't know if he did or
5 did not pass it along to other people in the
6 laboratory.
7 Q. Do you have a recollection of
8 finding out that it was passed along?
9 A. I do not recall.
10 Q. Well, if he didn't --
11 A. I do know that others were
12 aware that I was being made to write an error
13 report.
14 Q. Well, there were two error
15 reports. Right?
16 A. Yes.
17 Q. That you had to write?
18 A. That I recall, yes.
19 Q. Do you know if others were made
20 aware of this particular error report that,
21 from the way Dr. Krah's e-mail is phrased, it
22 sounds like he did not circulate to the lab?
23 A. He -- again, if everybody
24 already knew what the error was and that I was

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL271

1 required to write a report for it, they did
2 know that.
3 Q. But you don't know whether the
4 error report that he's referring to there is
5 an error report that was made known to the
6 entire lab. Right?
7 A. Right.
8 Q. Then his next sentence says,
9 "Again, if you feel that there are other
10 reports that should have been written, please
11 let me know and I will either request one or
12 clarify why one is not needed."
13 Looking at this now, would you
14 say that that's an appropriate and responsible
15 response by the boss to an inquiry from a
16 member of his staff?
17 MR. KELLER: Objection. Lack
18 of foundation.
19 THE WITNESS: That is an
20 appropriate e-mail response, yes.
21 BY MR. SANGIAMO:
22 Q. Did you identify -- strike that.
23 Did you take him up on his
24 offer to identify other reports that should

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL272

1 have been written?
2 A. I did not in this e-mail response.
3 Q. Did you ever?
4 A. I may have verbally based on my
5 notes.
6 Q. But you don't have a recollection
7 of that?
8 A. I do not.
9 Q. He responds to your e-mail and
10 at the beginning he says, "Please feel free at
11 all times to ask about any questions that come
12 up."
13 A. Uh-huh.
14 Q. Did you take him up on that
15 offer as a general proposition?
16 A. Yes, I did.
17 Q. Did he engage when you would
18 present questions to him?
19 A. Typically he would respond to
20 questions that I had. It wasn't always an
21 immediate response, but, yes, he did respond
22 to questions I had. He also makes note that,
23 you know, here he did confirm that he passed
24 on information to certain members of the lab

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL273

1 group but had stated that he may have missed
2 providing it to me. You know, so that's just
3 another example of him providing certain
4 pieces of information to certain pieces --
5 certain people within the laboratory and just
6 saying, you know, I left you out. And just,
7 you know, in general from, again, all this
8 interaction between myself and Dave and --
9 Dave Krah and the laboratory, based on the
10 Exhibit 10, in addition to the other
11 information that I documented for my outline
12 for discussion with HR, I also documented
13 that, you know, manipulation of data was also
14 occurring at that time. So a mix of the
15 interactions with his unprofessional behavior
16 the way I saw it with the other events that
17 were happening in the laboratory, had, you
18 know, had played into my responses and
19 interactions with Dave Krah.
20 Q. Okay. I'm going to need to --
21 I guess what I'll do is I'll move to strike
22 that answer and then I'll just ask you the
23 question again.
24 Would he engage when you would

69 (Pages 270 - 273)

Appx5965

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL274

1 present questions to him?
2     A.   And I believe I answered that
3 question.
4     Q.   I know but then you inserted
5 some other things about manipulation of data
6 so I need to -- and including that in some
7 prior documents.  I need a clean answer to my
8 question, which was would he engage when you
9 would present questions to him?
10     A.   Again, he would engage with a
11 delayed response.
12         MR. SANGIAMO:  Dino, you don't
13     like her answers, I know you selectively
14     are picking things out of exhibits,
15     but, you know, if you want to make a
16     motion to strike, this is not the
17     appropriate venue.  You can do that in
18     front of a judge who can get the full
19     record in front of you.  She testified
20     and answered your question.  Appreciate
21     you didn't like her answer, but we
22     don't agree with your motion to strike.
23     If you want to make that motion, bring
24     it before the court.

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL275

1 BY MR. SANGIAMO:
2     Q.   In looking at the third
3 sentence or, I'm sorry, his 8:54 response, he
4 says "Regarding the report that you provided,
5 I fully...," underlined, "...appreciate and
6 accept that it was an accident."
7         Do you question whether he
8 fully appreciated and accepted that it was an
9 accident?
10     A.   I questioned the reason I would
11 be called out on an accident if other
12 accidents occur in the laboratory and, again,
13 I don't see a consistency in what requires an
14 error report versus what doesn't.  So that was
15 my question back to him.
16     Q.   You said you had a meeting with
17 Bob Suter which you thought was on July 31,
18 2001.  Is that right?
19     A.   The end of July.
20     Q.   The end of July.  Can you tell
21 me what you recall about that meeting?
22     A.   I don't recall much about the
23 discussion other than the information that was
24 presented in Exhibit 10 was what I had

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL276

1 prepared and, you know, put together in
2 preparation for the discussion.
3     Q.   But you don't remember what you
4 said to him at the discussion?
5     A.   I don't remember the conversation,
6 no.
7     Q.   How long -- do you remember how
8 long it lasted?
9     A.   I do not.  I do not.
10     Q.   Do you recall what it was that
11 you were hoping to accomplish in the
12 discussion?
13     A.   I just wanted to -- again, I
14 felt that as if there were any documentation
15 that -- or records that Dave was -- Dave Krah
16 was maintaining on me, I also wanted to put on
17 record my experience in the laboratory.
18     Q.   Fair to say it was a defensive
19 action on your part to protect yourself should
20 it be the case that you were at risk of some
21 sort of adverse action being taken against
22 you?  Is that fair?
23     A.   I don't know if it was, you
24 know, defensive, but also part of it making a

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL277

1 statement about the professionalism and the
2 handling of the data within the laboratory.
3     Q.   Do you recall whether Mr. Suter
4 gave you any particular guidance?
5     A.   I don't recall that he gave me
6 any guidance at that time.
7     Q.   Do you recall if he ever gave
8 you any guidance?
9         MR. KELLER:  Overbroad.
10         THE WITNESS:  What I do recall
11     is that, you know, shortly after this
12     time period there were some exchanges
13     of Bob Suter arranging for me to
14     interview and transfer to another
15     laboratory within Merck.
16 BY MR. SANGIAMO:
17     Q.   Do you recall if there was a
18 subsequent meeting between you and Mr. Suter
19 after January 31, 2001?
20     A.   I do not recall a specific
21 meeting.  I know we exchanged some -- a
22 discussion about whether or not, you know, at
23 least setting up or arranging for the
24 transfer.  I can't recall if he was involved

Appx5966

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL278

1 in setting up an interview or how that occurred.
2     Q.   In particular I gather you
3 don't recall whether any of his activities in
4 that regard were done by e-mail versus meeting
5 versus telephone? Is that accurate?
6     A.   I believe that I had e-mailed
7 him about the actual transfer itself. There
8 was an e-mail, but as far as phone call
9 discussions or anything further than that, I
10 don't recall.
11     Q.   Did you form an impression of
12 Mr. Suter as a professional?
13     MR. KELLER: Objection. Vague
14   and ambiguous.
15     THE WITNESS: I don't have an
16   opinion about him one way or the other.
17 BY MR. SANGIAMO:
18     Q.   Is it your recollection that he
19 handled the conversation with you responsibly?
20     MR. KELLER: Same objection.
21     THE WITNESS: I don't recall
22   that there was much action after my
23   discussion with him immediately, but,
24   you know, the circumstances following

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL279

1 that, there was, you know, actions that
2 were -- that occurred based on the
3 additional findings of data
4 manipulation within the laboratory.
5 BY MR. SANGIAMO:
6     Q.   You just referred to some
7 finding of data manipulation.
8     A.   I guess not necessarily
9 findings, but reporting of manipulation of
10 data within the laboratory.
11     Q.   What do you mean reporting of
12 manipulation of data within the laboratory?
13     A.   Maybe, sorry, I'm not being
14 clear. So the -- going back to counting of
15 plaques, again, the -- what I experienced
16 while I was there is that people were
17 recounting the plaques on the plates and
18 focused on counting the pre-positives because,
19 again, it was not the expected and did not
20 lead to the desired outcome. And based on
21 that, the -- I had, you know, questioned Dave
22 about the data manipulation that was occurring
23 in the laboratory.
24     Q.   So before you said something

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL280

1 about a finding of data manipulation. You're
2 just talking about you having questioned Dave
3 regarding your view that there was data
4 manipulation? Is that what you're referring
5 to?
6     A.   Yes. Yep.
7     - - -
8     (Exhibit Wlochowski-13, E-mail
9   exchange, 00000067, was marked for
10   identification.)
11     - - -
12 BY MR. SANGIAMO:
13     Q.   So Ms. Wlochowski, you've been
14 handed what has been marked as Exhibit 13. Is
15 that correct?
16     A.   Yes.
17     Q.   This is an e-mail exchange
18 between you and Mr. Suter?
19     A.   Yes.
20     Q.   Down at the bottom of the
21 e-mail we see -- sorry, mark this as 14.
22     - - -
23     (Exhibit Wlochowski-14, E-mail
24   exchange, 00000072, was marked for

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL281

1   identification.)
2     - - -
3 BY MR. SANGIAMO:
4     Q.   Strike the question I was just
5 asking. Sorry, I've generated some exhibit
6 confusion here. What I was hoping you would
7 look at, Ms. Wlochowski, is the document that
8 has the Bates number that ends in 72, which I
9 think is Exhibit 14. Do you have that?
10     A.   Yes.
11     Q.   Down at the bottom of that
12 e-mail there's an -- e-mail exchange, there's
13 an e-mail from you to Mr. Suter, dated
14 August 13, 2001. And it refers to having met
15 with him on July 31, 2001. Do you see that?
16     A.   Yes.
17     Q.   And that's the meeting that you
18 were describing in your testimony a few
19 minutes ago. Right?
20     A.   Yes.
21     Q.   And then he responds to you a
22 week later after your initial e-mail in which he says,
23 "I meet...," I guess he meant I met, "...with
24 Emilio on Friday. Per direction of Legal, all

71 (Pages 278 - 281)

Appx5967

Page 282

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 282

1   aspects of your situation are on hold pending
2   resolution of their investigation.  I'll keep
3   you informed."
4            Do you see that?
5       A.   Yes.
6       Q.   And then you then got back to
7   him on September 6th asking if there's any new
8   information?
9       A.   Correct.
10      Q.   Then he replied to you that day
11  on that occasion, he replied to you the same
12  day asking if you were free to talk that
13  morning?
14      A.   Correct.
15      Q.   Is the gap in time between
16  July 31st and, say, September 6th, is that the
17  delay, I don't know if that's the word you
18  used, but the delay in him responding to you
19  in following up after the meeting that I think
20  you referred to in your testimony?
21      A.   Yes.
22      Q.   Now, I think when that line of
23  questioning began, I had asked you whether you
24  felt that Mr. Suter had responded -- strike

Page 283

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 283

1   that.
2            I think when that line of
3   questioning began, I asked if you thought that
4   Mr. Suter had acted in a responsible manner in
5   his meeting with you on July 31st.
6       A.   Uh-huh.
7       Q.   I think you -- in your answer
8   you mentioned this delay, I believe.  But
9   other than that, do you feel that he handled
10  the meeting with you in a responsible manner?
11           MR. KELLER:  Objection.
12  Mischaracterizes her testimony.  Go
13  ahead and answer.
14           THE WITNESS:  Again, I don't
15  recall exactly what he did with the
16  information that I presented to him at
17  that meeting.  There were other things
18  that transpired between my meeting with
19  him on July 31st until September 6th
20  that if, you know, had not occurred,
21  may not have had the same result.  I
22  don't know if that influenced the
23  actions taken after our meeting.
24  BY MR. SANGIAMO:

Page 284

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 284

1       Q.   Did Mr. Krahling ever say to
2   you that Mr. Suter told him that he would go
3   to jail if he were to call the FDA?
4       A.   He did tell me that, yes.
5       Q.   Do you know if anyone was a
6   witness to that alleged statement by Mr. Suter?
7       A.   I do not know if anyone was a
8   witness.
9       Q.   Does that ring true to you?
10           MR. KELLER:  Objection.  Vague
11  and ambiguous.
12           THE WITNESS:  What do you mean
13  by "does that ring true"?
14  BY MR. SANGIAMO:
15      Q.   You've been in the pharmaceutical
16  industry for almost two decades, I guess.
17  Does that sound right, that an HR representative
18  in the pharmaceutical industry would threaten
19  someone they're going to go to jail if they
20  call the FDA?
21           MR. KELLER:  Objection.  Calls
22  for speculation.  Vague and ambiguous.
23  Lack of foundation.
24           THE WITNESS:  To me, I don't --

Page 285

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTIAL 285

1   to answer, I would not expect HR to say
2   that, but I also would not necessarily
3   use HR as the primary decision-maker on
4   whether or not information needed to be
5   reported to the FDA.
6           MR. SANGIAMO:  Okay.  Jeff,
7   could we take a break now, I want to
8   talk to the team here.
9           VIDEOGRAPHER:  The time is now
10  5:23.  Going off the video record.
11           - - -
12  (A recess was taken.)
13           - - -
14           VIDEOGRAPHER:  The time is now
15  5:28.  Back on the video record.
16           MR. SANGIAMO:  We have more
17  questions to cover with Ms. Wlochowski,
18  but we have up to two days for deposition,
19  so we're going to suspend for the day
20  and resume tomorrow morning.  Thank you.
21           VIDEOGRAPHER:  The time is now
22  5:28.  This concludes the video
23  deposition.
24           - - -

72 (Pages 282 - 285)

Appx5968

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTAL286

Page 286

1    (Witness excused.)

2    - - -

3    (Deposition concluded at

4    5:28 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTAL287

Page 287

1    C E R T I F I C A T E

2

3

    I do hereby certify that I am a Notary

4  Public in good standing, that the aforesaid
testimony was taken before me, pursuant to

5  notice, at the time and place indicated; that
said deponent was by me duly sworn to tell the

6  truth, the whole truth, and nothing but the
truth; that the testimony of said deponent was

7  correctly recorded in machine shorthand by me
and thereafter transcribed under my

8  supervision with computer-aided transcription;
that the deposition is a true and correct

9  record of the testimony given by the witness;
and that I am neither of counsel nor kin to

10  any party in said action, nor interested in
the outcome thereof

11

    WITNESS my hand and official seal this

12  20th day of June, 2017

13

14

15  _____
    Linda Rossi-Rios, RPR, CSR

16    Notary Public

17

18

19

20

21

22

23

24

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTAL288

Page 288

1    INSTRUCTIONS TO WITNESS

2    Please read your deposition over

3  carefully and make any necessary corrections.

4  You should state the reason in the appropriate

5  space on the errata sheet for any corrections

6  that are made.

7    After doing so, please sign the errata

8  sheet and date it.

9    You are signing same subject to the

10  changes you have noted on the errata sheet,

11  which will be attached to your deposition.

12    It is imperative that you return the

13  original errata sheet to the deposing attorney

14  within thirty (30) days of receipt of the

15  deposition transcript by you.  If you fail to

16  do so, the deposition transcript may be deemed

17  to be accurate and may be used in court.

18

19

20

21

22

23

24

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTAL289

Page 289

1    - - - - -

    E R R A T A

2    - - - - -

3  PAGE  LINE  CHANGE

4  ___ ___ _____

5  Reason for Change:

6  _____

7  ___ ___ _____

8  Reason for Change:

9  _____

10  ___ ___ _____

11  Reason for Change:

12  _____

13  ___ ___ _____

14  Reason for Change:

15  _____

16  ___ ___ _____

17  Reason for Change:

18  _____

19  ___ ___ _____

20  Reason for Change:

21  _____

22  ___ ___ _____

23  Reason for Change:

24  _____

Appx5969

Page 290

JOAN L. WLOCHOWSKI -HIGHLY CONFIDENTAL290

1    ACKNOWLEDGMENT OF DEPONENT

2        I, _____, do

3    hereby certify that I have read the foregoing

4    pages and that the same is a correct

5    transcription of the answers given by me to

6    the questions therein propounded, except for

7    the corrections or changes in form or

8    substance, if any, noted in the attached

9    Errata Sheet.

10

11    _____    _____

12    DATE           SIGNATURE

13

14    Subscribed and sworn to before me this

15    _____ day of _____, 2017.

16

17    My commission expires: _____

18

19    _____

20    Notary Public

21

22

23    Assignment:  PA 2632736

24

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Appx5970

HIGHLY CONFIDENTIAL

Page 292

```
 1        IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
      UNITED STATES OF AMERICA  : CIVIL ACTION
 3    ex rel., STEPHEN A.       : NO. 2:10-04374(CDJ)
      KRAHLING and JOAN A.      :
 4    WLOCHOWSKI,               :
            Plaintiffs,         :
 5                              :
            vs.                 :
 6                              :
      MERCK & CO., INC.,        :
 7         Defendant.           :
      _____  : Master File No.
 8    IN RE:  MERCK MUMPS       : 2:12-cv-03555(CDJ)
      VACCINE ANTITRUST         :
 9    LITIGATION                :
                                :
10    THIS DOCUMENT RELATES TO: :
      ALL ACTIONS               :
11                  -  -  -
12              June 14, 2017
13     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
14                  -  -  -
15        Continued videotaped deposition of
16    JOAN L. WLOCHOWSKI, taken at the offices of
17    Morgan & Lewis, 1701 Market Street,
18    Philadelphia, Pennsylvania 19103, beginning at
19    9:30 a.m., before LINDA ROSSI-RIOS, a
20    Federally Approved RPR, CCR and Notary Public.
21                  -  -  -
              VERITEXT LEGAL SOLUTIONS
22              MID-ATLANTIC REGION
          1801 Market Street - Suite 1800
23            Philadelphia, PA  19103
24
```

Appx5971

Page 293

1   A P P E A R A N C E S :
2
3
    On behalf of the Relators
4
      CONSTANTINE CANNON LLP
5     BY:  ROBERT L BEGLEITER, ESQUIRE
        and
6       MARLENE KOURY, ESQUIRE
      335 Madison Avenue
7     New York, NY  10017
      212-350-2700
8     rbegleiter@constantinecannon com
      mkoury@constantinecannon com
9
10
    On behalf of the Relators
11
      KELLER GROVER LLP
12     BY:  JEFFREY F KELLER, ESQUIRE
      1965 Market Street
13     San Francisco, CA  94103
      415 543 1305
14     jfkeller@kellergrover com
15
16 On behalf of the Defendant, Merck & Co ,
   Inc
17
      MORGAN LEWIS & BOCKIUS LLP
18     BY:  LISA C DYKSTRA, ESQUIRE
      1701 Market Street
19     Philadelphia, PA  19103
      215-963-5000
20     ldykstra@morganlewis com
21
22
23
24

Page 294

1   A P P E A R A N C E S (cont'd ):
2
    On behalf of the Defendant, Merck & Co ,
3   Inc
4     VENABLE LLP
      BY:  DINO s SANGIAMO, ESQUIRE
5       and
      MICHAELA F ROBERTS, ESQUIRE
6     750 East Pratt Street
      Suite 900
7     Baltimore, MD  21202
      410-244-7400
8     dssangiamo@venable com
      mfroberts@venable com
9
10   A L S O  P R E S E N T :
11
12     DANIEL GRBICH, Videographer
13
        - - -
14
15
16
17
18
19
20
21
22
23
24

Page 295

1         I N D E X
    WITNESS          PAGE
2
    JOAN L WLOCHOWSKI
3     By Mr Sangiamo      296
4
    By Mr Keller       556
5
6         E X H I B I T S
7     MARKED      DESCRIPTION      PAGE
8   Wlochowski-15 Mumps AIGENT Processing   362
        Workbook, Bates
        RELATOR_00000716 to 721
9
  Wlochowski-16 Plate Layout Sheet,     364
10       Bates MRK-KRA00680674
11   Wlochowski-17 Virus & Cell Biology    369
        Research Procedure, Bates
12       MRK-KRA00064382 to 4391
13   Wlochowski-18 Notebook page, Bates   373
        MRK-KRA00680669 & 670
14
  Wlochowski-19 Counting sheet,      375
15       Bates MRK-KRA00680676
16   Wlochowski-20 Sensitive Neutralization 431
        Test for Virus Antibody
17       article
18   Wlochowski-21 Handwritten document,  461
        Bates RELATOR_00001025 & 26
19
  Wlochowski-22 Assay Counts, Bates   481
20       RELATOR_00001014 to 1024
21   Wlochowski-23 Handwritten document,  523
        Bates RELATOR_00000707
22
  Wlochowski-24 Responses and Objections 530
23       to Merck's First Set of
        Interrogatories
24

Page 296

1         - - -
2       VIDEOGRAPHER:  We are now on
3 the record.  The date today is June 14,
4 2017.  This begins disc one of the
5 continuation of the deposition of Joan
6 Wlochowski.  You may proceed.
7       - - -
8       JOAN L. WLOCHOWSKI, after
9 having been previously sworn, was
10 examined and testified as follows:
11       - - -
12       EXAMINATION
13       - - -
14 BY MR. SANGIAMO:
15    Q.   Good morning, Ms. Wlochowski.
16    A.   Good morning.
17    Q.   You understand that you are
18 still under oath from yesterday.  Right?
19    A.   I do.
20    Q.   Did you have an understanding
21 at the time that you were working in
22 Dr. Krah's lab of what the purpose was of
23 running the plaque reduction neutralization
24 assay?

2 (Pages 293 - 296)

HIGHLY CONFIDENTIAL
JOAN L. WLOCHOWSKI - HIGHLY CONFIDENTIAL

Page 297

1          MR. KELLER:  Objection.  Vague
2    and ambiguous.
3          THE WITNESS:  Can you elaborate
4    on the plaque reduction assay?
5    BY MR. SANGIAMO:
6     Q.    Was there more than one plaque
7    reduction neutralization assay that you were
8    running in Dr. Krah's lab?
9     A.    There were different versions
10   of -- different purposes for running the
11   plaque reduction neutralization assay.
12    Q.    Okay.  What were they?
13    A.    So in regards to mumps --
14    Q.    I'm sorry, this is -- I'm
15   asking about your understanding at the time
16   that you were working in the lab.
17    A.    Okay.  In regards to the mumps
18   neutralization assay -- sorry, PRN, the
19   multiple purposes we were running it for was
20   for Protocol 007 testing as well as there were
21   some supplemental assays that we were running
22   for looking at different passage levels of
23   cell lines.  And for Protocol 007, the
24   intention, again, was to try to achieve

Page 298

1    greater than 95 percent seroconversion rate
2    while maintaining also a less than 10 percent
3    pre-positive rate.
4     Q.    What was the source of your
5    understanding that the purpose of running the
6    assay was to support Protocol 007?
7     A.    The -- there was multiple
8    sources.  So there was a document that
9    provided some history on the development of
10   the assay and what the desired outcome was.
11   Dave Krah himself had told us on multiple
12   occasions that we were also to -- that the
13   pre-positive results are unexpected and not a
14   desired outcome for -- as a result of the
15   assay.
16    Q.    Is it that document to which
17   you just referred that told you that the
18   purpose of the running the assay was to
19   support Protocol 007?
20    A.    Our lab, our laboratory
21   notebooks would refer to Protocol 007.
22    Q.    Did your understanding of the
23   purpose of running the assay change at all
24   during the course of your time within Dr.

Page 299

1    Krah's lab?
2     A.    No.
3     Q.    Has it changed since?
4     A.    There are -- yeah, there's
5    different information that I'm aware of now
6    that Protocol 007 was used to support.  I do,
7    I guess, have additional information about
8    Protocol 007.
9     Q.    Is that information that you
10   got after your departure from Merck?
11    A.    Yes.
12    Q.    Is that information that you
13   got in connection with this lawsuit?
14    A.    Prior to and with connection
15   with the lawsuit.
16    Q.    What is the information that
17   you got prior to the lawsuit that indicated to
18   you that Protocol 007 had additional purposes?
19    A.    What information I received
20   prior to is that I was aware that there was a
21   label change for Protocol 007 which supported
22   an end expiry claim with decreased strength of
23   the product.
24    Q.    Did you have an understanding

Page 300

1    while you were working in Dr. Krah's lab of
2    what the purpose of Protocol 007 was?
3          MR. KELLER:  Asked and answered.
4    Vague and ambiguous.
5          THE WITNESS:  Again, to the
6    extent that I explained what I knew of
7    the protocol in the previous questions.
8    BY MR. SANGIAMO:
9     Q.    The previous questions you were
10   telling me what you understood the purpose of
11   running the assay was, and I think you
12   testified that the purpose was -- one of the
13   purposes was to support Protocol 007.  Right?
14    A.    Correct.
15    Q.    And now I'm asking you what
16   your understanding was at the time, if you had
17   an understanding while you were working in the
18   lab, of what the purpose of Protocol 007 was?
19    A.    I don't believe I had a full
20   understanding of what Protocol 007 was at the
21   time I was in the lab.
22    Q.    Did you have a partial understanding?
23    A.    I did have a partial understanding.
24    Q.    What was the source of that

3 (Pages 297 - 300)

Appx5973

HIGHLY CONFIDENTIAL
JOAN L. WLOCHOWSKI - HIGHLY CONFIDENTIAL

Page 301

1  partial understanding?
2      A.   Again, the original outcome or
3  the results of the assay was to determine
4  seroconversion, and we were testing pediatric
5  sera.
6      Q.   Did you have any understanding
7  of the purpose of Protocol 007 at the time you
8  were working in Dr. Krah's lab beyond what you
9  just said?
10     A.   That we were basically --
11  again, with seroconversion, that we were
12  testing pediatric sera for pre- and post-
13  vaccinated children. So to basically, you
14  know, to test the effectiveness of the vaccine.
15     Q.   To test the effectiveness of
16  the vaccine?
17     A.   Yes.
18     Q.   What was the basis of that part
19  of your understanding?
20     A.   So a seroconversion would show
21  that the vaccine -- is an indicator that the
22  vaccine is effective.
23     Q.   In your opinion?
24     A.   Yes.

Page 302

1      Q.   Was your opinion the only
2  source of your understanding that the purpose
3  of Protocol 007 was to test the effectiveness
4  of the vaccine?
5      A.   Again, from our direction from
6  Dave Krah who would also reiterate to us about
7  the testing of what is expected when you
8  vaccinate a child that they are pre-negative
9  and convert to pre-positive based on dosing
10  with the vaccine.
11     Q.   Is that the entirety of the
12  information you had regarding the purpose of
13  Protocol 007 at the time you worked in Dr.
14  Krah's lab?
15     A.   I believe so.
16     Q.   Did you know what the study
17  objectives were for Protocol 007 at the time
18  you were working in Dr. Krah's lab?
19         MR. KELLER: Objection. Vague
20         and ambiguous.
21  BY MR. SANGIAMO:
22     Q.   How many clinical studies have
23  you been involved with to your knowledge over
24  your career?

Page 303

1      A.   Multiple.
2      Q.   More than five?
3      A.   Yes.
4      Q.   More than ten?
5      A.   Yes.
6      Q.   Are you familiar with the
7  notion of a clinical study having an objective?
8      A.   Yes.
9      Q.   Do you know what the -- did you
10  have an understanding when you were working in
11  Dr. Krah's lab what the objective was of
12  Protocol 007?
13     A.   I don't believe I had full
14  understanding of the objective.
15     Q.   Did you have any understanding
16  of the objective beyond what you already
17  testified to this morning?
18     A.   Not that I recall, no.
19     Q.   Did you have any understanding
20  at the time you worked in Dr. Krah's lab of
21  what the hypothesis to be tested in Protocol
22  007 was?
23         MR. KELLER: Objection. Vague
24         and ambiguous. Lack of foundation.

Page 304

1  BY MR. SANGIAMO:
2      Q.   Ma'am, are you familiar with the
3  notion of a clinical study having a hypothesis?
4      A.   Yes.
5      Q.   Did you have an understanding
6  at the time that you were working in Dr.
7  Krah's lab of what the hypothesis was for
8  Protocol 007?
9      A.   I can't recall if I had at that
10  time the understanding of what the hypothesis
11  was beyond what I've already told you.
12     Q.   Are you familiar with the notion
13  of clinical trials often having different arms?
14     A.   Yes.
15     Q.   What does that mean?
16     A.   There's different study groups
17  within the clinical protocol.
18     Q.   Did you have an understanding
19  at the time that you were working in Dr.
20  Krah's lab of what the different study groups
21  were that were being evaluated in Protocol
22  007?
23     A.   I don't recall if I had the
24  knowledge of the different study groups.

4 (Pages 301 - 304)

Appx5974

HIGHLY CONFIDENTIAL
JOAN L. WLOCHOWSKI - HIGHLY CONFIDENTIAL

Page 305

1    Q.    Did you know, at the time that
2  you were working in Dr. Krah's lab, how many
3  study groups there were?
4    A.    Again, I don't think I did have
5  that knowledge at that time.
6    Q.    Did you know at the time that
7  you were working in Dr. Krah's lab whether
8  there was more than one study group?
9    A.    No, I don't think so.
10   Q.    Have you, since your departure
11 from Dr. Krah's lab, developed more of a sense
12 of what the objective of Protocol 007 was?
13   A.    Yes, I have a sense of the
14 objective, yes.
15   Q.    And do you have a sense
16 developed since you left Dr. Krah's lab of
17 what the study groups were in Protocol 007?
18   A.    Yes, I do.
19   Q.    And what is your current
20 understanding of what the objective was in
21 Protocol 007?
22   A.    To determine the end expiry
23 claim for the product.
24   Q.    Did you testify, correct me if

Page 306

1  I'm wrong, did you testify that you learned of
2  that purpose in conjunction with hearing about
3  a label change?
4    A.    Yes.
5    Q.    Could you be more specific
6  about what it was that you were told that
7  linked the label change to Protocol 007?
8    A.    At the time, Protocol 007 was
9  the only protocol, clinical trial protocol
10 that would support the seroconversion of
11 patients with a lower potency product.
12   Q.    Who told you that?
13        MR. KELLER:  I'm going to
14   instruct the witness not to disclose
15   any communications she may have had
16   with counsel.  If she learned this
17   through communications with counsel, I
18   will instruct her not to answer.  If
19   you can answer the question without
20   disclosing communications you had with
21   counsel, you may answer.
22        THE WITNESS:  In my initial
23   discussion with Steve we talked about
24   the label change.

Page 307

1  BY MR. SANGIAMO:
2    Q.    Who told you that there was a
3  linkage between Protocol 007 and the label
4  change?
5    A.    Again, in my initial discussion
6  with Steve, we talked about that this was the
7  only protocol currently that was reported
8  completed at the time.
9    Q.    How did you know?
10   A.    This was just through my
11 initial discussion with Steve.
12   Q.    Did Steve tell you?
13   A.    Yes.
14   Q.    Were you reluctant to tell me
15 that Steve told you?  I don't understand.
16   A.    Yes, at that time my knowledge
17 was through my initial discussion with Steve.
18   Q.    Because he told you?
19   A.    Yes, he told me.
20   Q.    You didn't have any source of
21 that knowledge at that time other than
22 Mr. Krahling.  Right?
23   A.    Correct.
24   Q.    Have you had any source of that

Page 308

1  knowledge since then other than Mr. Krahling
2  or what you've heard from your attorneys?
3    A.    It's posted on the
4  clinicaltrial.gov website.
5    Q.    When did you check -- I'm
6  sorry, did you finish your answer?
7    A.    Yes.
8    Q.    When did you check that and see
9  that it was posted there?
10   A.    I can't recall.  During the
11 course of the case it was --
12   Q.    Do you have an understanding of
13 why Merck decided to explore the hypothesis of
14 the immunogenicity of the mumps component of
15 MMR at various potencies?
16   A.    Can you define at what time?
17   Q.    Currently.
18        MR. KELLER:  Again, I don't
19   want you to disclose any communications
20   you had with your counsel.  To the
21   extent you can answer without
22   disclosing communications you had with
23   your counsel, you may answer.
24        THE WITNESS:  Can you repeat

5 (Pages 305 - 308)

HIGHLY CONFIDENTIAL
JOAN L. WLOCHOWSKI - HIGHLY CONFIDENTIAL

Page 309

1  the question again, then?
2  BY MR. SANGIAMO:
3     Q.   Other than anything that you
4  heard from your attorneys, do you have an
5  understanding currently of why Merck decided
6  to explore the hypothesis regarding
7  immunogenicity of the mumps component of MMR
8  at various potencies?
9     A.   Other than what I discussed
10  with counsel, going back to the information I
11  had at the time when I was in the laboratory,
12  that they had conducted studies for the
13  development of the assay. They were finding
14  seroconversion rates that were much lower than
15  what was reported in the label. So that -- at
16  that time, before my discussions with counsel,
17  was my understanding of running additional
18  studies to determine what the current
19  seroconversion rate is.
20     Q.   What is the source of that
21  understanding?
22     A.   The documentation regarding the
23  development of the assay. Was
24     Q.   You said documentation. Was

Page 310

1  that just one document?
2     A.   Yes.
3     Q.   And was that document provided
4  to you by Mr. Krahling?
5     A.   Yes, it was.
6     Q.   Was that document that was
7  provided to you by Mr. Krahling, is that the
8  entirety of the source of your understanding?
9     A.   Yes, it was.
10     Q.   Did you have an understanding
11  of why Merck was running those assays that are
12  described in that document?
13     A.   I did not have an understanding.
14  That was before my time. Again, my knowledge
15  in the lab as to what we were doing is very
16  limited. My discussions with Dave Krah was
17  very limited. So basically I was running the
18  assay. I did know, again, during the course
19  of running the assay we weren't getting the
20  desired results. People were told to recheck
21  counts. People were changing data in order to
22  meet the results of what the desired outcome
23  was as outlined in the original development of
24  the assay. There was data that was being

Page 311

1  tossed out, changed, manipulated, you know,
2  all tied into likely the reason between myself
3  and me questioning Dave Krah as to why maybe I
4  was given limited information at the time I
5  was working in the laboratory.
6     Q.   Do I have it right that you did
7  not have an understanding of why Merck was
8  running the assays that are described in that
9  document at the time that you were working in
10  Dr. Krah's lab?
11     A.   Again --
12        MR. KELLER: Objection. Vague
13  and ambiguous.
14        THE WITNESS: Again, that
15  was -- that predated me. Steve had
16  worked in the lab before I did, so he
17  had more knowledge about information
18  and discussions. Before I joined the
19  lab, Steve -- Dave Krah spoke to Steve
20  regularly and provided him all
21  background information. So, you know,
22  based on just my interactions with
23  Steve, I felt that he was very
24  informative. I trusted the information

Page 312

1  that he was providing. There was, you
2  know, legitimate information that he
3  was providing over to me. It wasn't
4  just that he was telling me information
5  and I was, you know, using that as the
6  basis of -- the basis of my belief.
7  BY MR. SANGIAMO:
8     Q.   Did Mr. Krahling tell you his
9  understanding of why it is that Merck was
10  running those assays that were described in
11  that document?
12     A.   I can't recall, I can't recall
13  if it was even outlined in the development
14  document at that time. I can't recall what I
15  knew at that time. It's blurred with what I
16  know now.
17     Q.   Understood. Do you recall
18  whether Mr. Krahling said anything to you
19  about why Merck was running those assays?
20     A.   No, I don't recall.
21     Q.   I believe you may have answered
22  this in response to an earlier question, but I
23  want to make sure I have it right. Did Dr.
24  Krah ever tell what you the purpose was of

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Appx5976

Page 313

1    Protocol 007?
2        MR. KELLER: Objection. Vague
3    and ambiguous.
4        THE WITNESS: Again, to what
5    I've already explained about the
6    seroconversion rates, that's all I can
7    recall at this time.
8    BY MR. SANGIAMO:
9        Q.   And specifically what is it
10   that you heard from Dr. Krah regarding the
11   seroconversion rates?
12       A.   What was expected was that the
13   pre-vaccinated samples would be negative,
14   seronegative and we were looking for the
15   endpoints in the vaccinated samples.
16       Q.   What did he say about
17   seroconversion rates?
18       A.   That the pre-positives were
19   expected to be less than 10 percent.
20       Q.   Do you have anything else to
21   tell me about what he said to you about
22   seroconversion rates?
23       A.   I don't think so.
24       Q.   At the time that you left Dr.

Page 314

1    Krah's lab, had the assay testing for Protocol
2    007 been completed? I'm sorry, strike that.
3    Let me ask that question again.
4        Do you know what sera samples were
5    -- serum samples were supposed to be tested
6    beyond the fact that some were pre-vaccination
7    and some were post-vaccination at the time you
8    worked in Dr. Krah's lab?
9        MR. KELLER: Objection. Vague
10   and ambiguous.
11       THE WITNESS: Can you repeat
12   that question?
13   BY MR. SANGIAMO:
14       Q.   It's your understanding that
15   the subjects of Protocol 007 had blood draws
16   done prior to vaccination and post-vaccination.
17   Correct?
18       A.   Correct.
19       Q.   Do you know whether there was
20   more than one blood draw done after
21   vaccination for the subjects in Protocol 007?
22       A.   Currently, I do.
23       Q.   Did you know at the time you
24   were working in Dr. Krah's lab?

Page 315

1        A.   No.
2        Q.   What was your understanding at
3    the time that you left Dr. Krah's lab
4    regarding whether seroconversion rates had
5    been calculated for the subjects in Protocol
6    007?
7        A.   They had been calculated to the
8    extent that there was an Excel workbook that
9    we could enter results of the plaque count
10   into to tell whether or not there was a
11   positive or a negative result.
12       Q.   That would tell you whether
13   there was a positive or negative result for
14   any one subject. Right?
15       A.   Correct.
16       Q.   And did you have an
17   understanding at the time that you were
18   working in Dr. Krah's lab of whether a
19   cumulative or aggregate seroconversion rate
20   was going to be calculated in Protocol 007?
21       A.   Can you repeat that? I missed
22   parts of that question.
23       Q.   I tried to set the question up,
24   perhaps unsuccessfully, by asking you, and I

Page 316

1    think you agreed, that the Excel worksheet
2    would show whether any individual patient
3    seroconverted?
4        A.   Correct.
5        Q.   Did you have an understanding
6    as to whether there was going to be a
7    calculation of a seroconversion rate that was
8    designed to capture the aggregate of all of
9    the patients in Protocol 007?
10       A.   The result of the aggregate?
11   Did I have an understanding of the result of
12   the aggregate?
13       Q.   Okay. Yes.
14       A.   Is that the question?
15       Q.   Yes.
16       A.   I did not have an understanding
17   of the result of the aggregate at the time
18   because the testing was not completed when I
19   left the laboratory. Again, my feeling, my
20   strong feelings about this is that not all the
21   data that was -- not all of the serum that was
22   tested did have data reported on it. So
23   whether -- in conclusion of the study, I feel
24   like it was inconclusive or it showed results

7 (Pages 313 - 316)

Appx5977

Page 317

1   that were not representative of what was the
2   actual testing or the actual -- yeah, the
3   actual results of the sera that was tested.
4      Q.   Had the seroconversion rate for
5   the aggregate of the patients in the study
6   been calculated at the time you left the lab?
7      A.   No.
8      Q.   Do you have a current understanding
9   of what the seroconversion rates that were
10  determined in Protocol 007 are?
11     A.   I do.
12     Q.   What were those rates?
13     A.   I may not remember the numbers
14  exactly, but I believe two of the study groups
15  had a level that was higher than the target
16  based on what was reported.  But, again, I
17  feel as though the information that was
18  reported is not the whole story or the whole
19  information.
20     Q.   How many study groups were
21  there in total?
22     A.   Three.  To my understanding.
23     Q.   So I gather one of the study
24  groups did not reach the target.  Right?

Page 318

1      A.   Yes.
2      Q.   Do you know what that target
3   was?
4      MR. KELLER:  Today or --
5   objection.  Overbroad.
6   BY MR. SANGIAMO:
7      Q.   Do you have a current understanding
8   of what that target was?
9      A.   I have an understanding.  I
10  can't remember, I can't give you the exact
11  number off the top of my head.  I would have
12  to refer back.
13     Q.   When you say a target, are you
14  talking about a seroconversion rate target?
15     A.   I was actually referring to the
16  strength of the product.  But both, you know,
17  as far as numbers of results of seroconversion
18  rates versus the strength target.  Or I
19  shouldn't say target, but what was used in the
20  study.
21     Q.   Could you give me your best
22  current understanding of what the objective
23  was for Protocol 007?  I think that might
24  facilitate me understanding your last answer.

Page 319

1      A.   So, again, it was to determine
2   the zero -- it was to determine the end expiry
3   claim of different -- yeah, that's basically
4   what it was for the objective.
5      Q.   Do you know what the criteria --
6   strike that.
7          Was it your understanding
8   that -- strike that again.
9          Is it your current understanding
10  that each of the study arms represented
11  different potencies of the mumps component of
12  MMR?
13     A.   Yes.
14     Q.   Was it your understanding --
15  strike that.
16          Is it your current understanding
17  that two of those study arms were being
18  tested, being compared to the third study arm
19  as a control study arm?  Is that current
20  understanding?
21     A.   That is not my current
22  understanding.
23     Q.   Is it your current understanding
24  that there was no control study arm?

Page 320

1      A.   It was my understanding that
2   there were three study groups.
3      Q.   With no control?
4      A.   That I --
5      MR. KELLER:  Objection.  Vague
6   and ambiguous.
7      THE WITNESS:  Yeah, can you
8   explain what you mean by the control
9   group?
10  BY MR. SANGIAMO:
11     Q.   Are you familiar with clinical
12  trials sometimes having a control group?
13     A.   Yes.
14     Q.   That is practically every
15  clinical trial you are familiar with had a
16  control group.  Right?
17     A.   Yes.
18     Q.   Based on your understanding of
19  Protocol 007, was there a control group?
20     A.   I don't know which one was the
21  control group in the study.
22     Q.   What were the criteria for
23  success for Protocol 007 that would enable one
24  to determine whether one of the potencies

Appx5978

HIGHLY CONFIDENTIAL
JOAN L. WLOCHOWSKI - HIGHLY CONFIDENTIAL

Page 321

1  being tested was adequate?
2       MR. KELLER: Objection. Vague
3    and ambiguous. Are you talking today
4    or are you talking in the past?
5       MR. SANGIAMO: I'm asking for
6    her current understanding.
7       THE WITNESS: My current
8    understanding, and, again, my
9    understanding, I would have to go back
10   and check the data, I believe it was to
11   be greater than 90 percent seroconversion.
12  BY MR. SANGIAMO:
13   Q.   So if the seroconversion rate
14  within a study arm was greater than 90
15  percent, your current understanding, subject
16  to you having to go back and check the data,
17  then that would be deemed successful. Is that
18  it?
19   A.   Yes.
20   Q.   Based on your current understanding,
21  was there also a criterion for success that
22  entailed the seroconversion rate of a study
23  arm being comparable to the seroconversion
24  rate of another study arm?

Page 322

1       MR. KELLER: Objection. Vague
2    and ambiguous. Do you want to show her
3    the protocol? You're asking her
4    questions about a very, very technical
5    document, to be fair, but you can
6    answer if you can.
7       THE WITNESS: I don't have the
8    information in front of me to be able
9    to answer that.
10  BY MR. SANGIAMO:
11   Q.   So as of now, you don't have
12  any knowledge of there being a comparability
13  criterion of success? Did I state it
14  accurately?
15      MR. KELLER: Objection.
16   Mischaracterizes her testimony.
17      THE WITNESS: I don't have that
18   without having the protocol.
19  BY MR. SANGIAMO:
20   Q.   You said maybe a couple of
21  times that you don't think that the data that
22  were reported, I believe was the term you
23  used, for Protocol 007 were accurate. Did I
24  say that right or no?

Page 323

1    A.   Yes.
2    Q.   Why is it that you think --
3  strike that.
4       When you say that, are you
5  referring to the data that were reported to
6  the FDA?
7    A.   The data that was reported as
8  part of the clinical protocol.
9    Q.   Reported to the FDA?
10   A.   It was reported, yes, to the
11  FDA. Or as through the clinical study report.
12   Q.   What is the basis of your
13  knowledge that a clinical study report was
14  reported to the FDA?
15      MR. KELLER: Again, I'm going
16   to --
17  BY MR. SANGIAMO:
18   Q.   Other than what you've learned
19  from your attorneys.
20   A.   Then I can't elaborate on that.
21   Q.   Let's try this.
22   A.   Other than --
23   Q.   Other than what you have
24  learned from your attorneys, do you know

Page 324

1  whether a clinical study report was submitted
2  to the FDA?
3    A.   I do know that the report
4  was -- the protocol was completed. I do know
5  that Protocol 007 was referenced in, I
6  believe, the EMA submission.
7       That's the extent of my
8  knowledge without -- other than what I've
9  discussed with my counsel.
10   Q.   Is it correct that the reason
11  why you think that the data that Merck
12  reported to the FDA in connection with
13  Protocol 007 was inaccurate is that plaque
14  counts had been changed when the assay was
15  being run?
16   A.   Correct. As well as original
17  data being discarded. Again, this is a Phase
18  III clinical trial. The data integrity is an
19  important piece of any clinical trial that is
20  being run on human subjects. You know, the
21  expectation is that the method itself would be
22  validated prior to running any testing on
23  human subjects and, therefore, any following
24  validation of an assay, the analysts that are

9 (Pages 321 - 324)

Appx5979

HIGHLY CONFIDENTIAL
JOAN L. WLOCHOWSKI - HIGHLY CONFIDENTIAL

Page 325

1 performing the assay would be qualified to run
2 that validated method and be able to generate
3 validated results. That would be withheld to
4 data integrity standards.
5 Q. Does the fact that data was
6 discarded, you say, mean that the data that
7 were reported were inaccurate?
8 A. If there was no reason to go
9 back and retest or recount plaques, then, yes,
10 if the original raw data is being discarded
11 and not used as an original result, then the
12 data is flawed in that there is data that is
13 being omitted from the study.
14 Q. So your concern there as regards
15 accuracy is not the fact that data were
16 discarded, it's the fact that the original
17 results were not being reported. Do I have
18 that right?
19 MR. KELLER: Objection.
20 Mischaracterizes her testimony.
21 MR. BEGLEITER: Argumentative.
22 MR. KELLER: Argumentative.
23 MR. SANGIAMO: Good objection,
24 Bob. I don't agree with the objection.

Page 326

1 Please answer the question.
2 MR. KELLER: I do.
3 THE WITNESS: So it -- all
4 right. Repeat the question again?
5 Sorry.
6 BY MR. SANGIAMO:
7 Q. I was asking you questions
8 about your contention that original data were
9 discarded and what the implications were for
10 the accuracy of what was reported to the FDA.
11 Right?
12 A. Correct.
13 Q. Your concern as regards
14 accuracy in that regard is not that the data
15 were discarded, per se, but it's that you
16 claim that the data being reported were not
17 the original data. Is that right?
18 MR. KELLER: Mischaracterizes
19 her testimony. You can answer.
20 THE WITNESS: My concern as a
21 scientist working in the laboratory is
22 that, first, a concern over data
23 integrity, that the original data set
24 is not being maintained. The second

Page 327

1 piece is that because the data was
2 being manipulated or changed, that the
3 results that are being reported are not
4 accurate. Again, going back to if the
5 method was validated prior to running
6 testing on human subjects, the accuracy
7 of the method would already be defined
8 and there would be parameters for which
9 we would follow in order to either
10 reject or accept a test or counts that
11 were being performed at the time.
12 MR. KELLER: Interpose an
13 objection. Compound.
14 BY MR. SANGIAMO:
15 Q. If an assay was counted
16 accurately and that accurate count was
17 reported to the FDA, would it matter in terms
18 of the accuracy that the FDA received if the
19 well plate was discarded?
20 A. The well plate is the original
21 data in this case. It would be a means to
22 preserve the original raw data, maintain it
23 through the end of the study. So, in my
24 experience, while working in Dave Krah's lab,

Page 328

1 I did see him discard plates which had been
2 sitting there since I had started in January
3 through July after some escalations had
4 happened internally. The very next day after
5 being told that an internal audit would occur,
6 Dave Krah came into the laboratory early in
7 the morning, which he never does, I was in,
8 taking plates and putting them in the
9 autoclave and getting rid of them, which was
10 not something I had ever witnessed him doing
11 in my previous months working there.
12 Q. If an assay was counted
13 accurately and that count was reported to the
14 FDA, would it matter in terms of the accuracy
15 of the data that the FDA is receiving if the
16 plate was subsequently discarded?
17 MR. KELLER: Objection. Calls
18 for speculation. Asked and answered.
19 THE WITNESS: So I'll further
20 elaborate that if the plates were
21 discarded, again, that is not
22 maintaining or preserving the raw data
23 for the assay, but further the counting
24 sheets that were used were not

10 (Pages 325 - 328)

Appx5980

HIGHLY CONFIDENTIAL
JOAN L. WLOCHOWSKI - HIGHLY CONFIDENTIAL

Page 329

1  controlled counting sheets. So unlike
2  the laboratory notebook, which was
3  controlled pages where you could see if
4  data was omitted, the counting sheets
5  were a blank piece of paper that an
6  analyst could write on the paper and if
7  they didn't like it because they made
8  too many cross-outs, would be able to
9  toss out that piece of paper and
10 rewrite their results.
11 BY MR. SANGIAMO:
12 Q.    Suppose an assay was counted
13 and for a given well a determination was made
14 that there were 15 plaques, and suppose that
15 the data were reported to the FDA that way
16 with 15 plaques in that well, would that count
17 of 15 plaques in that well become inaccurate
18 if the well plate were discarded?
19      MR. KELLER: Objection. Vague
20 and ambiguous. Calls for speculation.
21      THE WITNESS: That well count
22 would not be able to be confirmed
23 against its original raw data point.
24 BY MR. SANGIAMO:

Page 330

1  Q.    Would it be inaccurate?
2       MR. KELLER: Objection. Vague
3  and ambiguous.
4       THE WITNESS: I can't answer
5  that question. You know, if it was an
6  original data point transcribed from
7  the plates, there could have been a
8  transcription error from the plate to
9  the counting sheet.
10 BY MR. SANGIAMO:
11 Q.    Other than there being a
12 transcription error, is there something about
13 the discarding of the plate that makes the
14 prior count inaccurate?
15      MR. KELLER: Objection. Vague
16 and ambiguous. Lack of foundation.
17 Overbroad.
18      THE WITNESS: Again, it depends
19 on the -- what was written on the cell
20 counting sheet. I can't say. Some of
21 them may have been. Some of them may
22 have not if there were cross-outs. It
23 may not be an accurate reporting.
24      Additionally, the plates

Page 331

1  themselves could, once the plaques were
2  counted, the plaque counts could be
3  erased from the plate and recounted and
4  then transcribed to a counting sheet.
5       So, therefore, again, I can't
6  claim that there was accuracy on any
7  given counting sheet at any time. If
8  the method had described what the
9  requirements were for reporting plaque
10 counts, and the criteria for which it
11 was acceptable to perform an additional
12 count, may have given some more
13 information around that. The procedure
14 itself did not have that information
15 until the FDA had audited where there
16 were revisions around the procedures to
17 put some more definitions around what
18 the criteria would be. But by that
19 time the majority of Protocol 007 had
20 already been executed.
21 BY MR. SANGIAMO:
22 Q.    You just referred to the
23 procedure itself. Are you referring to the
24 SOP?

Page 332

1  A.    Correct.
2  Q.    Is it your belief that the SOP
3  should specify what the criteria are for when
4  a count should be checked? Is that right?
5  A.    I believe that a count should
6  not have to be rechecked. If the assay is
7  validated and the analysts are trained, the
8  original results should suffice. If during
9  the course of the validation they had some
10 other criteria that they needed to add, then
11 that should have been defined. But it wasn't.
12 It's my understanding that the validation did
13 not occur prior to the initiation of the
14 testing.
15 Q.    What was the -- what is the
16 source of that understanding?
17      MR. KELLER: Again, I will
18 instruct you not to answer any --
19 answer the question if in the answer
20 you have to disclose communication
21 you've had with counsel. If you can
22 answer the question without disclosing
23 communications with counsel, you may
24 answer.

11 (Pages 329 - 332)

Appx5981

HIGHLY CONFIDENTIAL
JOAN L. WLOCHOWSKI - HIGHLY CONFIDENTIAL

Page 333

1        THE WITNESS:  I cannot answer
2    the question.
3    BY MR. SANGIAMO:
4        Q.    Did you know anything about the
5    timing of the validation of the assay at the
6    time that you were working in Dr. Krah's lab?
7        A.    The development information
8    that was provided spoke to concurrent
9    validation with running the human test sera.
10       Q.    What information was this?
11       A.    In the development presentation
12   information or document.
13       Q.    Is it the same document we've
14   been talking about --
15       A.    Yes.
16       Q.    -- that you got from Mr. Krahling?
17       A.    Yes.
18       Q.    That told you what was planned
19   for validation?
20       A.    It stated that there would be
21   concurrent validation to testing of the sera.
22       Q.    Do you know if that is, in
23   fact, what happened?
24       A.    I cannot.

Page 334

1        Q.    Strike that.  Did you know at
2    the time you were working in Dr. Krah's lab
3    whether that is, in fact, what happened?
4        A.    I did not know that at the time
5    I was working in the laboratory.
6        Q.    You said a few minutes ago that
7    counts should never have to be rechecked in an
8    assay such as the one being run in Dr. Krah's
9    lab.  Right?
10       A.    I believe what I stated was I
11   believe that if the assay was validated, the
12   robustness of the assay should allow for a
13   single plaque count, again, based on
14   validation and training qualification of the
15   analyst performing the assay.
16       Q.    Now, you've never run -- strike
17   that.
18            You've never been part of a
19   plaque reduction neutralization assay in your
20   entire career other than what you did in Dr.
21   Krah's lab.  Right?
22            MR. KELLER:  Objection.
23   Mischaracterizes her testimony.
24            THE WITNESS:  I don't

Page 335

1    necessarily need to have expertise on
2    plaque reduction neutralization assays
3    in order to make that statement.
4    Again, appropriate method validation
5    should be able to demonstrate
6    robustness, reputability, precision,
7    accuracy that would allow for that.
8    BY MR. SANGIAMO:
9        Q.    What is it that qualifies you
10   to make that statement as it pertains to
11   plaque reduction neutralizations?
12            MR. KELLER:  Asked and answered.
13            THE WITNESS:  I believe I've
14   already answered that.
15   BY MR. SANGIAMO:
16       Q.    You've told me what qualifies
17   you for that?
18       A.    My experience in working in the
19   industry and as an analyst performing method
20   validation, that that is what gives me the
21   basis for that response.
22       Q.    Is it your experience that --
23   strike that.
24            Have you ever seen an SOP for a

Page 336

1    plaque reduction neutralization assay other
2    than the one that was run in Dr. Krah's lab?
3        A.    I can't recall that I have.
4        Q.    So, therefore, you have no idea
5    whether SOPs for plaque reduction
6    neutralization assays typically do or do not
7    address the question of whether it's
8    appropriate to check plaque counts.  Right?
9            MR. KELLER:  Can you read the
10           question back?
11                 - - -
12           (The court reporter read the
13           pertinent part of the record.)
14                 - - -
15           MR. KELLER:  You can answer
16   that question.
17           THE WITNESS:  Again, I stated
18   previously if there were to be a reason
19   to have to recheck, my expectation is
20   that that would be defined in the SOP
21   based on the validation.
22   BY MR. SANGIAMO:
23       Q.    That expectation is not based
24   on having seen any actual SOPs for plaque

12 (Pages 333 - 336)

Appx5982

HIGHLY CONFIDENTIAL
JOAN L. WLOCHOWSKI - HIGHLY CONFIDENTIAL

Page 337

1    reduction neutralization assays. Right?
2        A.    I cannot recall that I've seen
3    another SOP.
4        Q.    You've made some comments about
5    the plaque counting sheets not being controlled.
6    Right?
7        A.    Correct.
8        Q.    And your point was that the --
9    that by not being controlled, the data, in
10   your view, is compromised in some way. Right?
11            MR. KELLER: Objection.
12   Mischaracterizes -- strike that.
13            You can answer.
14            THE WITNESS: Can you repeat
15       the question?
16   BY MR. SANGIAMO:
17       Q.    Is it your view that because
18   you say the plaque counting sheets are not
19   controlled, the data is, therefore,
20   compromised in some way?
21            MR. KELLER: Objection to form.
22            THE WITNESS: The data can be
23       compromised. There is no way of
24       ensuring that it hasn't been

Page 338

1        compromised.
2    BY MR. SANGIAMO:
3        Q.    Why is that?
4            MR. KELLER: Asked and answered.
5            THE WITNESS: The -- as I
6       explained earlier, the laboratory
7       notebook pages are all numbered. You
8       can tell if there is missing
9       information. The counting sheet is not
10      in any way controlled with a numbering.
11      It can be generated and destroyed
12      without anybody knowing.
13   BY MR. SANGIAMO:
14       Q.    Did you witness any counting
15   sheets being destroyed?
16       A.    I did.
17       Q.    How many times?
18       A.    Several times.
19       Q.    What is your best estimate?
20       A.    I would say maybe less than a
21   dozen times.
22       Q.    Less than five?
23       A.    No.
24       Q.    Somewhere between five and a

Page 339

1    dozen? Yes.
2        A.    Yes.
3        Q.    Who did you see destroy a
4    counting sheet?
5        A.    I'm trying to remember who it
6    was. I don't recall who exactly it was.
7        Q.    Was it a man or a woman?
8            MR. KELLER: Objection.
9    Compound. Or both.
10           THE WITNESS: I'm trying to
11      remember. I believe I saw Colleen Barr
12      and Jen Kriss. I believe I was told to
13      discard an assay as well.
14   BY MR. SANGIAMO:
15       Q.    Did you witness someone else
16   destroying counting sheets other than Colleen
17   Barr and Jenny Kriss?
18       A.    I can't remember.
19       Q.    Did you see them doing it
20   together?
21       A.    No.
22       Q.    How many occasions did you see
23   this happen?
24           MR. KELLER: Asked and answered.

Page 340

1            THE WITNESS: Yes, I --
2    BY MR. SANGIAMO:
3        Q.    Before you testified that you
4    think it happened between five and a dozen
5    times. Does that mean somewhere between five
6    and a dozen counting sheets or would that mean
7    something else?
8        A.    Five and a dozen counting
9    sheets, yes.
10       Q.    Did that all occur on one
11   single occasion?
12       A.    No.
13       Q.    How many occasions?
14       A.    The same amount of occasions.
15       Q.    So one counting sheet on 5 to
16   12 occasions. Do I have it right?
17       A.    Yes.
18       Q.    How did they destroy them?
19       A.    In some cases it was just a
20   matter of the sheet became messy, so it was
21   just a transcription of what their end results
22   were and the transcription to that. And then
23   getting rid of the original document. Again,
24   in my case I was told to just get rid of an

13 (Pages 337 - 340)

HIGHLY CONFIDENTIAL
JOAN L. WLOCHOWSKI - HIGHLY CONFIDENTIAL

Page 341

1  assay based on the results being faint when I
2  read the -- after I completed reading the
3  entire assay.
4      Q.   Let's continue to focus on the
5  occasions when you saw Colleen Barr and Jenny
6  Kriss discard a counting sheet.  I think you
7  said that -- actually, let's focus in on the
8  ones that Colleen Barr discarded.  Okay?
9      A.   [Witness nods.]
10     Q.   Were some of the ones that they
11 discarded based on the fact that the original
12 counting sheet was messy?
13     A.   Yes.
14     Q.   All of them?
15     A.   I can't recall because sometimes
16 it wasn't necessarily me seeing them but
17 conversations that were had in the laboratory.
18     Q.   So sometimes you saw it happen?
19     A.   Uh-huh.
20     Q.   When you refer -- you have to
21 say yes.
22     A.   Yes.
23     Q.   When you refer to 5 to 12
24 occasions previously, which I understand was

Page 342

1  your estimate, those were 5 to 12 times when
2  you saw it happen?
3      A.   Between seeing it happen and
4  hearing about it happen.
5      Q.   How many times did you see it
6  happen?
7      A.   I would have to say, from what
8  I recall, less than five times from what I
9  recall.
10     Q.   Less than three?
11     A.   At most it was three I can
12 think of.  Three.
13     Q.   You said you can think of three?
14     A.   Yeah.
15     Q.   Who did it on those three
16 occasions, was it just Colleen, just Jenny or
17 both.
18     A.   The three that I -- the three
19 examples I provided previously.  Colleen,
20 Jenny and myself.
21     Q.   So in terms of others discarding
22 counting sheets, you've seen it happen twice
23 that you can recall, once by Colleen and once
24 by Jenny.  Right?

Page 343

1      A.   Yes.
2      Q.   On the occasion that you saw
3  Colleen do it, where were you in relation to
4  Colleen?
5      A.   We sit in the same area so I
6  was sitting near her in the laboratory.
7      Q.   Did she throw it in the garbage
8  can?  Is that how she discarded it?
9      A.   Yes.
10     Q.   Was this an instance of the
11 count sheet that ultimately got discarded
12 being too messy?
13     A.   Yes.
14     Q.   How do you know that?
15     A.   Just because she was
16 transcribing it from one to the other.
17     Q.   Did she say something that led
18 you to believe that it was an issue of
19 messiness?
20     A.   I could see that the counting
21 sheet had many cross-outs on it.
22     Q.   Do you know anything about the
23 accuracy of the transcription done by Colleen
24 from the prior counting sheet to the newer

Page 344

1  counting sheet?
2      A.   I do not.
3      Q.   So as far as you know, the
4  transcription was accurate.  Fair statement?
5          MR. KELLER:  Objection.
6      Argumentative.
7          THE WITNESS:  I do not know if
8      it's accurate or not accurate.
9  BY MR. SANGIAMO:
10     Q.   How about on the one occasion
11 where you saw Jenny Kriss discard a counting
12 sheet, where were you in relation to Ms. Kriss?
13     A.   Again, in the laboratory.  She
14 sits across from me.
15     Q.   How did she discard it?
16     A.   She, I believe, also discarded
17 it in the trash.
18     Q.   What information do you have
19 about why she discarded it?
20     A.   I don't know why she discarded
21 it.
22     Q.   I think you said you also heard
23 conversations about people discarding counting
24 sheets.  Is that right?

14 (Pages 341 - 344)

Appx5984

Page 345

1    A.    Yeah, conversations about just,
2  again, transcribing or making the data
3  cleaner.  And I guess transcribe it to a
4  different data sheet.
5    Q.    I'm asking about conversations
6  about discarding counting sheets?
7    A.    Okay.
8        MR. KELLER:  Objection.  Form.
9  Mischaracterizes her testimony.
10       MR. SANGIAMO:  Let's back up.
11  BY MR. SANGIAMO:
12    Q.    You testified to an occasion
13  when you saw Colleen Barr discard a counting
14  sheet.  Correct?
15    A.    Correct.
16    Q.    On another occasion you saw
17  Jenny Kriss discard a counting sheet?  Correct?
18    A.    Correct.
19    Q.    Your belief is there were more
20  discarding of counting sheets beyond those two
21  occasions and whatever the occasion was
22  regarding yourself which we'll get to shortly.
23  Right?
24    A.    Right.

Page 346

1    Q.    You think in total, some number,
2  you estimate between 5 and 12 counting sheets
3  were discarded.  Right?
4    A.    Correct.
5    Q.    And the basis for your belief
6  that there was additional discarding of
7  counting sheets beyond what you witnessed
8  Ms. Kriss do and beyond what you witnessed Ms.
9  Barr do and beyond what you, yourself, did is
10  conversations you heard.  Correct?
11    A.    Correct.
12    Q.    Please tell me what those
13  conversations were in which people talked
14  about discarding counting sheets?
15    A.    Again, the transcription of the
16  data into a clean counting sheet was what I
17  recall, which the data itself or data packet
18  would be -- basically would maintain one
19  counting sheet.  So, therefore, and maybe this
20  is an assumption, drawing a conclusion that if
21  it was transcribed, the original was being
22  destroyed.
23    Q.    What you heard was people
24  saying that they had transcribed data from one

Page 347

1  counting sheet to another counting sheet.
2  Right?
3    A.    Yes.
4    Q.    You are inferring that that
5  means that they discounted the earlier
6  counting sheet.  Right?
7    A.    Yes.
8    Q.    But you did not actually hear
9  them say that they discarded the earlier
10  counting sheet?
11    A.    Not that I recall.
12    Q.    Who is it that you heard say
13  these things about transcribing data from one
14  counting sheet to another counting sheet?
15    A.    I can't say that I can pinpoint
16  it.  It was just conversations within the
17  laboratory.
18    Q.    Now, is this a situation where
19  Mr. Krahling told you he heard this or did
20  you, yourself, hear these conversations?
21    A.    Myself.
22    Q.    Do you recall the gender of the
23  person who was making these statements?
24    A.    There was both men and women in

Page 348

1  the laboratory.  Again, we all sat in a
2  general area and so I can't -- I just can't
3  recall.
4    Q.    I gather on those occasions
5  that you heard about people transcribing data
6  from one counting sheet to another counting
7  sheet, you have no information about whether
8  the transcription was accurate.  Right?
9    A.    Right.  That's correct.
10    Q.    Now, you, yourself, discarded a
11  counting sheet once?
12    A.    From what I recall, yes.  I
13  recall a specific assay that I ran that was --
14  I completed, I counted the entire assay, had
15  valid results from the counting.  The staining
16  was faint on that but I was still able to
17  count and get a valid result.  So that assay
18  had a high pre-positive rate on the original
19  counts that I had conducted, and based on
20  that, Dave Krah had made a statement that the
21  assay was no good and to discard it.
22    Q.    What is it that Dr. Krah told
23  you to discard?
24    A.    I believe the -- I can't

15 (Pages 345 - 348)

Appx5985

HIGHLY CONFIDENTIAL
JOAN L. WLOCHOWSKI - HIGHLY CONFIDENTIAL

Page 349

1  remember exactly what he said, but I believe
2  we discarded the plates and the counts.
3      Q.   You discarded the plates and
4  the counts?
5      A.   The -- I did not discard the
6  plates.
7      Q.   Who discarded the plates?
8      A.   I do not know.  If they --
9      Q.   How do you know -- sorry.
10     A.   I can't confirm if they were
11 discarded.
12     Q.   Do you think they were?
13     A.   I think they were, but I don't
14 know.
15     Q.   What is the basis of your
16 thinking that?
17     A.   That -- just the basis that he
18 had said to discard it.
19     Q.   Didn't you just tell me you
20 don't remember what he said?
21     A.   He said -- I said he -- you
22 asked me if he said exactly what he told me to
23 discard.  And I know he told me to discard it,
24 but I don't know exactly what he was referring

Page 350

1  to as far as discarding.
2      Q.   So you don't know whether he
3  was referring to the plate?
4           MR. KELLER:  Argumentative.
5           MR. SANGIAMO:  This makes no
6      sense, Jeff.  I'm just trying to get to
7      the bottom of it.
8           MR. KELLER:  Makes perfect
9      sense.
10          MR. SANGIAMO:  She's accusing a
11     scientist of committing fraud.  I'm
12     entitled to find out what the basis is
13     of her accusation.
14          MR. KELLER:  You sure can.  But
15     you're not entitled to argue with her.
16     You can ask your questions.  The
17     argument is inappropriate.  I object.
18     Argumentative.
19          You can answer the question.
20          THE WITNESS:  He asked me to
21     discard, discard the assay.  Based on
22     that, the outcome of whether or not the
23     plates were destroyed, I do not know.
24 BY MR. SANGIAMO:

Page 351

1      Q.   Did you discard the counting
2  sheet?
3      A.   I believe so.
4      Q.   Just threw it in the garbage?
5      A.   I believe so.
6      Q.   What was the procedure in the
7  lab as regards to the -- what was done with
8  the counting sheet once the plaque was --
9  sorry, once the assay was counted?  Do you
10 understand my question?  That wasn't phrased
11 very well.
12     A.   Yeah, can you elaborate on
13 that?
14     Q.   I'm asking about the process
15 for documentation of plaque counts when
16 running the plaque reduction neutralization
17 assay in Dr. Krah's lab.  My question
18 specifically was supposed to be, after you
19 complete the count and after you finish
20 filling in the counting sheet, what would you
21 do with it then?
22     A.   Based on the mumps procedure or
23 do you want me to explain what we as analysts
24 did?

Page 352

1           MR. KELLER:  Objection.
2           MR. SANGIAMO:  You can't object
3      to her answer.
4           MR. KELLER:  I can interpose an
5      objection to your question.
6  BY MR. SANGIAMO:
7      Q.   I'm asking you what you did,
8  you personally did after you completed filling
9  in the plaque counting sheet, what did you do
10 with the sheet?
11          MR. KELLER:  Objection.  Vague
12     and ambiguous.
13          THE WITNESS:  With the sheet
14     itself?
15 BY MR. SANGIAMO:
16     Q.   Yes.
17     A.   Aside from entering results
18 into the Excel workbook, the sheets, I want to
19 say, were added to the file for the experiment
20 as far as I can recall.
21     Q.   If you continued an assay, are
22 you the one who would then enter the content
23 of the counting sheet into the Excel workbook?
24          MR. KELLER:  Objection.

16 (Pages 349 - 352)

Appx5986

HIGHLY CONFIDENTIAL
JOAN L. WLOCHOWSKI - HIGHLY CONFIDENTIAL

Page 353

1    Overbroad.
2         THE WITNESS:  From what I
3    recall, I did enter some.  I don't know
4    that all of the data was entered by the
5    analyst who conducted the testing.  Or
6    sorry, conducted the counting.
7    BY MR. SANGIAMO:
8         Q.    Again, I'm just referring to
9    your practice.
10        A.    Okay.
11        Q.    Did I hear you to say that
12   sometimes if you did the count of the assay,
13   you would then enter the numbers into the
14   Excel worksheet?
15        A.    Correct.
16        Q.    But sometimes you wouldn't?
17        A.    I want to say that there were
18   occasions that somebody else would enter it as
19   far as I recall.
20        Q.    Was the place where you would
21   enter the data into the Excel worksheet, was
22   that right at your desk?
23        A.    Yes.
24        Q.    Was it the same place where you

Page 354

1    would do the plaque counts?
2         A.    Right near it, yes.
3         Q.    So after you entered the data
4    into the Excel worksheet, what would you do
5    with the counting sheet?
6         A.    Again, from what I recall, it
7    would get entered into the file for the
8    experiment.
9         Q.    By you?
10        A.    Yes.  If I had entered it into
11   the Excel work file, yes.
12        Q.    Would you do that right away
13   after you were done entering into the Excel
14   work file?
15        A.    I believe so, yes.
16        Q.    You would never give them to
17   Leah Gottlieb?
18        A.    No.
19        Q.    Have you ever given a counting
20   sheet to Leah Gottlieb?
21        MR. KELLER:  Objection.  Lack
22   of foundation.
23        THE WITNESS:  Not myself
24   directly that I recall.

Page 355

1    BY MR. SANGIAMO:
2         Q.    Where was this file physically
3    in relation to where you entered the
4    information into the Excel worksheet?
5         A.    It was next to my desk.
6         Q.    Was it a single repository for
7    all the assays or was it just limited to the
8    assays that you were counting?
9         MR. KELLER:  Objection.
10   Compound.
11        THE WITNESS:  Can you repeat
12   that question?
13   BY MR. SANGIAMO:
14        Q.    I'm trying to figure out the
15   location of the file into which you would put
16   the counting sheet.  I think you said it was
17   right next to your desk?
18        A.    Yes.
19        Q.    What I'm trying to figure out
20   is, whether that thing that was right next to
21   your desk simply held the files for the assays
22   that you were counting or did it hold the
23   files for all the assays no matter who counted
24   them or what?

Page 356

1         A.    It would contain all the files.
2         Q.    On this occasion when Dr. Krah
3    told you to discard something in connection
4    with the assay that you were counting, what is
5    your best recollection of how much time
6    elapsed between when you entered the data into
7    the Excel worksheet and when you had this
8    conversation with Dr. Krah?
9         MR. KELLER:  Objection.  Vague
10   and ambiguous.  Overbroad.  Lack of
11   foundation.
12        MR. SANGIAMO:  You know what, I
13   need to go back.
14   BY MR. SANGIAMO:
15        Q.    On this particular occasion
16   that you're describing where Dr. Krah told you
17   to discard something in connection with the
18   assay, do you recall whether you were the one
19   who entered the information into the Excel
20   worksheet?
21        MR. KELLER:  Objection.  Lack
22   of foundation.
23        THE WITNESS:  I can't recall.
24   BY MR. SANGIAMO:

17 (Pages 353 - 356)

Appx5987

Page 357

1    Q.   When you were the one to enter
2  the information into the Excel worksheet,
3  would you do that immediately after completing
4  the count?
5         MR. KELLER: Objection. Compound.
6         THE WITNESS: Yeah, I don't
7    know what your definition of
8    "immediately" is.  But I don't -- I
9    don't think that it was consistent, the
10   time of entry for different plaque
11   counting.
12 BY MR. SANGIAMO:
13   Q.   Even within your own practice
14 it was not consistent?
15   A.   As far as I recall.
16        MR. KELLER: Dino, we've been
17   going about an hour.  Can we take a
18   break?
19        MR. SANGIAMO: Give me one or
20   two more, Jeff.
21 BY MR. SANGIAMO:
22   Q.   I asked you before whether you
23 would do it immediately, and you appropriately
24 asked for what would one mean by immediately.

Page 358

1  I guess I meant would it be the next thing on
2  your to-do list?
3         MR. KELLER: Objection.
4         THE WITNESS: I'm trying to
5    think.  As far as I can recall, it
6    would be the next thing, yes.
7         MR. SANGIAMO: Okay.  Take a
8    break now.
9         VIDEOGRAPHER:  The time is now
10   10:43.  Off the video record.
11           - - -
12        (A recess was taken.)
13           - - -
14        VIDEOGRAPHER:  The time is now
15   11:02.  This begins disc two.  You may
16   proceed.
17 BY MR. SANGIAMO:
18   Q.   Ms. Wlochowski, before the
19 break we were talking about an occasion on
20 which you discarded a counting sheet.  I
21 wonder if I could ask you to take a look at
22 Exhibit 7 which is one of the exhibits we
23 looked at yesterday from that stack right
24 there.  Exhibit 7 is your Answers to Merck's

Page 359

1  revised first set of Interrogatories.  I
2  wonder if I could ask you to turn to page 18.
3  And I'd like to direct your attention to the
4  paragraph at the bottom of page 18 that
5  carries over to page 19.  I'm going to start
6  to read that into the record.
7         "On another occasion, Relator
8  was working in the back laboratory next to
9  Relator Krahling.  She showed Relator Krahling
10 her counting sheet that contained 11
11 pre-positives.  Relator Krahling calculated
12 this equaled an 84 percent pre-positive rate.
13 Relator joked sarcastically about the unlikely
14 possibility the data would survive the day.
15 Krah overheard their conversation and came
16 over to look at the plates.  He told Relator
17 that the plaques were too faint to count and
18 ordered her to throw away her counting sheet
19 because he intended to retest the entire
20 assay.  Relator protested that the plaques
21 were not too faint to count, citing as
22 evidence the fact that she had already counted
23 them.  Krah ordered her again to throw out the
24 counting sheet and she complied."

Page 360

1         That's the end of the quote
2  from the Interrogatory answer.  Is what is
3  described in that paragraph that I just read
4  the incident about which you were testifying
5  just before the break?
6    A.   Yes.
7    Q.   When you prepared the answer to
8  this Interrogatory, how did you know that the
9  number of pre-positives from that assay run
10 was 11?
11        MR. KELLER: Objection.  Strike
12   my objection.  In answering this
13   question do not disclose any
14   communications you had with your
15   counsel or any communications that may
16   have occurred in order to answer this
17   question.  So if you can answer the
18   question without disclosing
19   communication you had with your
20   counsel, by all means do so.  If you
21   can't, then I instruct you not to
22   answer.
23        THE WITNESS:  Can you repeat
24   the question, please?

18 (Pages 357 - 360)

Appx5988

HIGHLY CONFIDENTIAL
JOAN L. WLOCHOWSKI - HIGHLY CONFIDENTIAL

Page 361

1  BY MR. SANGIAMO:
2      Q.    Let me come at it a different
3  way.  If you take a look at the second to the
4  last page of Exhibit 7, I see your Verification
5  there.  Right?
6      A.    Correct.
7      Q.    And in that Verification you
8  say that you certify under the penalty of
9  perjury that you've reviewed these responses
10 and the content is true and correct to the
11 best of your knowledge.  Right?
12     A.    Correct.
13     Q.    When you did that review, were
14 you also certifying to the accuracy of the
15 fact that there were 11 pre-positives on the
16 particular assay that we've been discussing?
17     A.    Yes.
18     Q.    Are you sure it was 11?
19         MR. KELLER:  Objection.
20     Argumentative.  Vague and ambiguous.
21         THE WITNESS:  Based on the
22     information that I had at that time,
23     yes.
24 BY MR. SANGIAMO:

Page 362

1      Q.    At the time you certified?
2      A.    Yes.
3      Q.    What was that information?
4          MR. KELLER:  Do not disclose
5      any communications with counsel.  If
6      you can answer without disclosing
7      communications with counsel, you may do
8      so.
9          THE WITNESS:  I cannot provide
10     additional information on that.
11 BY MR. SANGIAMO:
12     Q.    Did you have any documents that
13 -- associated with this assay at the time that
14 you verified?
15     A.    I cannot remember.
16             - - -
17     (Exhibit Wlochowski-15, Mumps
18     AIGENT Processing Workbook, Bates
19     RELATOR_00000716 to 721, was marked for
20     identification.)
21             - - -
22         MR. KELLER:  What exhibit
23     number is this?
24         MR. SANGIAMO:  15.

Page 363

1  BY MR. SANGIAMO:
2      Q.    Ms. Wlochowski, you've just
3  been handed what has been marked as
4  Exhibit 15.  This is -- what is this document?
5      A.    This is the Excel worksheet
6  that was used to calculate the titers.
7      Q.    This was contained in the
8  production of documents that we received from
9  the Relators.  We're checking our records to
10 confirm, but I'll just ask you, do you know if
11 this document was in your possession as
12 distinguished from Mr. Krahling's possession
13 at the time the litigation began?
14     A.    I'm sorry, I didn't hear.
15     Q.    This document was either in
16 your possession or Mr. Krahling's possession
17 at the time the litigation began.  We're
18 trying to confirm right now, but if you know,
19 it will save us a minute or two.
20     A.    I can't remember.
21     Q.    I believe based on the
22 information we've been provided by your
23 attorneys, this was in Mr. Krahling's
24 possession, not in your possession, at the

Page 364

1  time we requested documents in this
2  litigation.  That's all background, providing
3  that information.
4          This particular assay run shows
5  nine pre-positives if I'm reading this correctly.
6  Would you be able to confirm that easily?  I
7  don't want to take up a whole bunch of time.
8          MR. KELLER:  Take the time.
9      Are you representing there is nine
10     pre-positives?
11         MR. SANGIAMO:  I am.  You know
12     what, let's...
13         MR. KELLER:  I don't disagree
14     with you, but I haven't taken the time
15     to...
16         MR. SANGIAMO:  I counted nine,
17     but perhaps it's better if Ms.
18     Wlochowski confirms.
19         MR. KELLER:  You don't have the
20     counting sheets for this?
21         MR. SANGIAMO:  I'm about to
22     give her the plate layout sheet.
23             - - -
24     (Exhibit Wlochowski-16, Plate

19 (Pages 361 - 364)

Appx5989

HIGHLY CONFIDENTIAL
JOAN L. WLOCHOWSKI - HIGHLY CONFIDENTIAL

Page 365

1    Layout Sheet, Bates MRK-KRA00680674,
2    was marked for identification.)
3              - - -
4    BY MR. SANGIAMO:
5    Q.    You've just been handed what
6    has been marked as Exhibit 16. Ms.
7    Wlochowski, do you recognize that document?
8    A.    Yes.
9    Q.    What is that?
10   A.    That is the plate layout sheet
11   with the corresponding serum IDs.
12   Q.    If you take a moment, can you
13   see that the assay being referred to in both
14   Exhibit 16 and Exhibit 15 is Assay 211?  Do
15   you see that?
16   A.    Yes.
17   Q.    With the aid of the plate
18   layout sheet, Exhibit 16, can you now tell me
19   how many pre-positives you believe are
20   reflected on Exhibit 15, the Excel workbook?
21   Ms. Wlochowski, we have a ruler
22   here. Will that help at all?
23   A.    Yes. Thank you.
24   MR. KELLER:  Do you have the

Page 366

1    actual counting sheets?
2    MR. SANGIAMO:  She said she
3    discarded it.
4    MR. KELLER:  Are you
5    representing this is the assay that --
6    MR. SANGIAMO:  That's what I'm
7    trying to find out.
8    To be clear, I have a counting
9    sheet for an assay. But I'm trying to
10   have her help me understand it all.
11   THE WITNESS:  I'm just getting
12   confused because the data is not lining
13   up. I'm not seeing it right. My eyes
14   are bugging out.
15   BY MR. SANGIAMO:
16   Q.    Ms. Wlochowski, can I -- I
17   don't know whether to call it a suggestion or
18   what to call this, but is it correct that it
19   would essentially alternate by --
20   A.    Yes.
21   Q.    And if it helps you to put a
22   little check mark after you've identified each
23   one that might be pre-positive. Actually is
24   that color ink? Is that blue ink?

Page 367

1    MR. KELLER:  It's blue ink.
2    THE WITNESS:  Okay.
3    BY MR. SANGIAMO:
4    Q.    I suggest you put a check mark
5    next to each one that is pre-positive.
6              - - -
7    (A discussion off the record
8    occurred.)
9              - - -
10   THE WITNESS:  I am like
11   having -- I would have to go back and
12   refer to our procedures for counting
13   because I'm having trouble recalling
14   the calculation for figuring out which
15   one is which.
16   BY MR. SANGIAMO:
17   Q.    When you say which one is
18   which, what do you mean?
19   A.    Again, the numbers are just
20   confusing me as far as reporting the outcome.
21   Q.    Why don't we walk through a
22   couple of these, see if that helps any. If we
23   look at Exhibit 16 which is the plate layout
24   sheet --

Page 368

1    A.    Correct.
2    Q.    -- the first row in which there
3    is handwriting underneath the case number
4    column --
5    A.    Uh-huh.
6    Q.    -- it says 1452. That's the
7    case number. Right?
8    A.    Yes.
9    Q.    And then right next to that it
10   says "pre." Right?
11   A.    Yes.
12   Q.    If you continue to read across
13   to the right, you come to plate numbers 181
14   and 182. Right?
15   A.    Correct.
16   Q.    SO then if we look at Exhibit 15,
17   we see the corresponding reference there to
18   plate 182 and 181. Right?
19   A.    Correct.
20   Q.    Then if you look over to the
21   right, right next to the column that says
22   "Plate," there is a column that says "Titer"?
23   A.    Correct.
24   Q.    And the titer there is 512?

20 (Pages 365 - 368)

Appx5990

HIGHLY CONFIDENTIAL
JOAN L. WLOCHOWSKI - HIGHLY CONFIDENTIAL

Page 369

1  A.  Yes.
2  Q.  Is what -- so that would be a
3  pre-positive.  Correct?
4  A.  Again, I'm trying to go through
5  in my head.  I don't want to get it backwards.
6  So, again, I can't --
7  Q.  Ms. Wlochowski, I'm going to
8  suggest something to you and see if it jogs
9  your memory at all.  What I'm going to suggest
10  to you is that a titer was considered positive
11  if it was 32 or greater.  Does that sound
12  right to you?
13  MR. KELLER:  Objection.  Lack
14  of foundation.  Do you want to show her
15  the protocol?
16  THE WITNESS:  Again, I would
17  need to go back to the protocol.
18  - - -
19  (Exhibit Wlochowski-17, Virus &
20  Cell Biology Research Procedure, Bates
21  MRK-KRA00064382 to 4391, was marked for
22  identification.)
23  - - -
24  BY MR. SANGIAMO:

Page 370

1  Q.  Ms. Wlochowski, I've just
2  handed you what has been marked as Exhibit 17.
3  Do you recognize that document?
4  A.  Yes.  That is the SOP.
5  MR. KELLER:  Take your time to
6  review that.
7  BY MR. SANGIAMO:
8  Q.  Ms. Wlochowski, I'm going to
9  suggest an alternative approach to this.  If
10  you could look back again to Exhibit 15 which
11  is the workbook printout?
12  A.  Uh-huh.
13  Q.  Do you know whether you
14  referred to that document when you were
15  verifying your Answers to Interrogatories?
16  MR. KELLER:  Objection.  Lack
17  of foundation.
18  THE WITNESS:  I believe that I
19  referred to a data set in order to come
20  up with the number at the time.
21  BY MR. SANGIAMO:
22  Q.  When you say at the time, you
23  mean at the time you verified the Answers to
24  Interrogatories?

Page 371

1  A.  Yes.
2  Q.  Was the data set more than just
3  a printout from the Excel spreadsheet?
4  A.  I can't remember.
5  Q.  The Answers to Interrogatories
6  were verified some 15 years or so after the
7  assay was actually counted.
8  A.  Yes.
9  Q.  With that in mind, I'm just
10  trying to gauge your level of certainty as
11  regards 11 being the number of pre-positives
12  in that particular assay.  Could you comment
13  on that?
14  MR. KELLER:  Objection.
15  Argumentative.  Vague and ambiguous.
16  You can answer.
17  THE WITNESS:  If I recall, I
18  would have had the data to confirm
19  that.
20  BY MR. SANGIAMO:
21  Q.  Would you very confidently
22  exclude the possibility that there are
23  actually 9 pre-positives in that assay?
24  MR. KELLER:  Objection.

Page 372

1  Argumentative.  Vague and ambiguous.
2  Calls for speculation.
3  THE WITNESS:  I can't say.
4  BY MR. SANGIAMO:
5  Q.  The Answer to Interrogatory
6  says that you were working in the back
7  laboratory next to Relator Krahling.  Is that
8  different from your desk?
9  A.  Where are you referring to?
10  Sorry.
11  Q.  On page 18.
12  A.  Okay.  Got it.  That wouldn't
13  be at my desk but near my desk.
14  Q.  The next sentence says you
15  showed Relator Krahling your counting sheet
16  that contained 11 pre-positives.  I gather at
17  that point the determination had been made as
18  to what the titers were for the sample in the
19  assay?
20  A.  They may have been, but they --
21  it was also at that time easier for us to
22  eyeball the difference between the mock
23  control and the, what would be a pre-positive.
24  Q.  Just from the counting sheet?

21 (Pages 369 - 372)

Page 373

1    A.    You could eyeball it.
2    Q.    You could eyeball it?
3    A.    Meaning that it's a comparison
4  of the reduction against the control, the mock
5  control. So just based on the number of
6  plaques in the control, and the number you
7  were counting as a pre-positive, it was -- at
8  the time you were counting could have a feel
9  for whether it was going to be pre-positive or
10  not.
11    Q.    You could have a feel for it,
12  but you could be off by a little bit. Right?
13    A.    Yes.
14    Q.    Do you recall any occasions
15  other than this one when Dr. Krah told you
16  that an assay needed to be rerun because the
17  plaques were too faint?
18    A.    I can't recall, no.
19          - - -
20          (Exhibit Wlochowski-18,
21    Notebook page, Bates MRK-KRA00680669 &
22    670, was marked for identification.)
23          - - -
24    MR. SANGIAMO: That is 18, I

Page 374

1  believe.
2  BY MR. SANGIAMO:
3    Q.    Do you recognize Exhibit 18,
4  Ms. Wlochowski?
5    A.    Yes. It is a page from the
6  laboratory notebook.
7    Q.    And what assays are you
8  referring to?
9    A.    It is referring to the mumps
10  AIGENT assay for Protocol 007.
11    Q.    What assay number?
12    A.    The MMRV-211-01.
13    COURT REPORTER: Could you keep
14    your voice up, please?
15    THE WITNESS: The MMRV-211-01.
16  BY MR. SANGIAMO:
17    Q.    That was the assay for which we
18  were looking at the Excel spreadsheet there in
19  Exhibit 15. Right?
20    A.    Yes.
21    Q.    And then if you take a look on
22  the first page of Exhibit 18 there is an entry
23  dated June 29 of '01. Do you see that?
24    A.    Yes.

Page 375

1    Q.    And that reads, "Large amount
2  of plates in assay showed faint staining. See
3  counting sheet for details. This assay will
4  be repeated per Dave Krah's request." And
5  it's signed by you. Right?
6    A.    Yes.
7    Q.    Do you think this assay 211 is
8  the one that you were describing in your
9  Answers to Interrogatories at page 18?
10    A.    This could be the one, yes.
11    Q.    And you have a vivid recollection
12  of discarding the counting sheet for that
13  assay. Right?
14    A.    I recall being told to discard
15  it. Yes.
16    Q.    Did you discard it?
17    A.    To the best of my recollection.
18          - - -
19          (Exhibit Wlochowski-19,
20    Counting sheet, Bates MRK-KRA00680676,
21    was marked for identification.)
22          - - -
23  BY MR. SANGIAMO:
24    Q.    Ms. Wlochowski, you've just

Page 376

1  been handed what has been marked as
2  Exhibit 19. Do you recognize that document?
3    A.    That is a counting sheet.
4    Q.    Counting sheet for which assay?
5    A.    For 211-01.
6    Q.    Do you see a reference to very
7  faint plaques on the counting sheet?
8    A.    I do.
9    Q.    Is that your handwriting?
10    A.    Yes.
11    Q.    Does that mean that on or
12  around the time that you were counting plaques
13  for this assay you noted that the plaques were
14  very faint?
15    A.    That -- yes.
16    Q.    Based on the documents that
17  have been presented to you, as of right now is
18  it your best belief that the assay being
19  referred to in your Answers to Interrogatories
20  on page 18 is assay 211?
21    MR. KELLER: Objection.
22    Mischaracterizes her testimony.
23    You can answer.
24    THE WITNESS: I do not know.

22 (Pages 373 - 376)

Appx5992

HIGHLY CONFIDENTIAL
JOAN L. WLOCHOWSKI - HIGHLY CONFIDENTIAL

Page 377

1    It could be.
2    BY MR. SANGIAMO:
3        Q.    How would you describe the fact
4    that we have this counting sheet if you
5    discarded it?
6            MR. KELLER:  Objection.
7        Argumentative.
8            THE WITNESS:  I don't know if
9        it is the one that was being referred
10        to at the time.
11    BY MR. SANGIAMO:
12        Q.    I'm sorry?
13        A.    I don't know if this is the
14    assay that we were referring to in the
15    Complaint.
16        Q.    In the Answers to Interrogatories,
17    is that what you meant?  Just now you said
18    Complaint.
19        A.    Sorry, yes.  The Interrogatories,
20    yes.
21        Q.    If you go back to Exhibit 18,
22    do you see down at the bottom of the page
23    there is an entry dated July 23, 2002.  Do you
24    see that?

Page 378

1        A.    Yes.
2        Q.    It reads, "See assay results,"
3    maybe the next word is "summary."  "Obtained
4    using Mumps AIGENT Processing Template."
5            Not confident I read every word
6    correctly in that sentence.  Some of the
7    handwriting is hard to read.  But the next
8    sentence reads, "The assay is valid (all
9    controls are valid)."  Right?
10            MR. KELLER:  Objection.  Lack
11        of foundation.
12    BY MR. SANGIAMO:
13        Q.    Is that how it reads?
14        A.    Yes.
15        Q.    "Results are being reported to
16    the clinical database."  Do you see that?
17        A.    I see that, yes.
18        Q.    Now, this happened after you
19    had left the lab.  Right?
20        A.    Left, when I transferred out of
21    David Krah's lab?
22        Q.    Yes.
23        A.    No.  Sorry, it's 2002.  Sorry.
24    Yes.

Page 379

1        Q.    The next sentence reads, "The
2    faint plaque appearance was not described
3    specifically in the SOP for the assay as a
4    reason to invalidate a sample or the assay.
5    There were no documented technical errors
6    during the...," next word is hard to read,
7    "...to account for the faint plaques...Therefore,
8    the assay and the individual sample results
9    are considered valid."  Right?
10            MR. KELLER:  That's not exactly
11        what it reads, but you can answer.  The
12        document speaks for itself.
13            THE WITNESS:  Yes.  So the
14        assay was repeated in June of 2001 and
15        the entry that was entered by Dave Krah
16        about the assay being valid and
17        reporting to -- the results to the
18        clinical database was made in 2002, a
19        year later.
20    BY MR. SANGIAMO:
21        Q.    And sitting here right now, you
22    don't know whether the results that were
23    submitted to the clinical database were the
24    results from the running of the assay as

Page 380

1    counted by you or the running of the assay
2    subsequently.  Right?
3        A.    Right.  I don't know because
4    there is a different assay number here for 248
5    for the repeat assay, so I don't know what
6    happened to those results.
7        Q.    Right.  So as far as you know,
8    you just don't know one way or the other, the
9    results of assay 211 could have been reported
10    to the clinical database.  Right?
11            MR. KELLER:  Objection.  Lack
12        of foundation.  Argumentative.  Calls
13        for speculation.
14            THE WITNESS:  That is correct,
15        I do not know what was reported into
16        the clinical database.
17    BY MR. SANGIAMO:
18        Q.    You gave testimony about
19    discarding of counting sheets which we've gone
20    over.  Do you have any other belief that
21    original data was not retained in the running
22    of the assay generally?
23            MR. KELLER:  Objection.
24        Overbroad.

23 (Pages 377 - 380)

Appx5993

HIGHLY CONFIDENTIAL
JOAN L. WLOCHOWSKI - HIGHLY CONFIDENTIAL

Page 381

1    THE WITNESS: When I had
2 mentioned earlier about the discarding
3 of the plates is an example of not
4 retaining the original data as well as
5 when analysts would read or count the
6 plaques, there were instances of wiping
7 out the original plaque counts on the
8 plate and repeating the plaque counts.
9 So, therefore, again, I consider that
10 the original data was not maintained.
11 BY MR. SANGIAMO:
12    Q.   Did you witness that occurring?
13    A.   Yes.
14    Q.   Did you, yourself, do that?
15    A.   I believe in the beginning I
16 may have done that, yes.
17    Q.   How many times did you do it?
18 Just to be clear -- my question is unclear.
19 What I had in mind was how many times did you
20 wipe the plate clean and then do the count
21 over again?
22    A.   I can't recall how many times.
23    Q.   More than five?
24    A.   I can't recall.

Page 382

1    Q.   How many times did you see it
2 done by others?
3    A.   I don't know.  Again, conversations
4 in the lab of people questioning their own
5 results, going back and, you know, either
6 starting over and trying again or an instance
7 where the data is being reviewed by Dave Krah
8 and he comes back and he asks analysts to
9 count plates.  An instance where Suzie Maahs
10 was told there should be more plaques in the
11 pre-positive result where she would --
12 basically as a college intern was being --
13 with her supervisor standing over her shoulder
14 telling her she needs to find more was kind
15 of, as she described it, tap the plate four
16 more times in order to, you know, add more
17 plaques because he was stating that there
18 should be more.
19    Q.   Did you witness any instance in
20 which -- I'm sorry, strike that.
21    So how many times, is it your
22 testimony that you don't recall how many times
23 you saw someone wipe the plate clean?
24    A.   Yes.

Page 383

1    Q.   Can you give me your best
2 approximation?
3    MR. KELLER: Objection to form.
4    THE WITNESS:  I cannot because
5 there's instances of discussions as
6 well as, you know, somebody actually
7 doing it.  There was, you know, alcohol
8 wipe in the lab and you could easily
9 just wipe off the counts.
10 BY MR. SANGIAMO:
11    Q.   And, of course, that's standard
12 practice for when you want to check a count in
13 a plaque reduction neutralization assay.
14 Right?
15    MR. KELLER: Objection.  Lack
16 of foundation.
17 BY MR. SANGIAMO:
18    Q.   Do you know whether that is
19 standard practice when you want to check a
20 count in a plaque reduction neutralization
21 assay?
22    MR. KELLER:  Same objection.
23    THE WITNESS:  I would go back
24 to my original statement that, again,

Page 384

1 the assay should be validated to be
2 able to read a plate and generate the
3 results.
4 BY MR. SANGIAMO:
5    Q.   So your belief about wiping
6 plates clean is based on two different kinds
7 of information, what you saw and what you
8 heard discussions about.  Correct?
9    A.   Correct.
10    Q.   So let's focus in on what you
11 saw and that's where I'm asking for your best
12 approximation of the number of times you saw
13 that happen, not heard discussion about it,
14 saw it happen.
15    MR. KELLER:  Calls for
16 speculation.  You're not entitled --
17 he's not entitled to have you guess at
18 numbers.  If you have an understanding
19 or a reasonable basis that you saw
20 somebody wiping plates, you can testify
21 to that.
22    THE WITNESS:  I can't give you
23 an exact number, if I saw it once or
24 saw it not at all.  The whole, you

24 (Pages 381 - 384)

Appx5994

Page 385

1　know, basis of the plaque counting,
2　what I was, you know, conducting in the
3　lab at that time I was not comfortable
4　with. I, you know -- again, this may
5　be some of the reason why there were
6　different people who conformed who
7　agreed, yes, we'll count again, we'll
8　change our results, we are not blinded
9　to what is pre-vaccination versus
10　post-vaccination sera so we could, you
11　know, go back and make that
12　determination and able to change those
13　results. If we didn't know -- if we
14　were just given prepared serum and
15　didn't know what was pre and post, I
16　think our -- you know, what we
17　conducted in the lab would be handled a
18　lot differently. We would not be
19　targeting specific, specific plaque
20　counts to go back and recheck based on
21　it was not expected.
22　　　　MR. SANGIAMO: Move to strike
23　that answer.
24　BY MR. SANGIAMO:

Page 386

1　　　Q.　Ma'am, how many times did you
2　witness someone wiping a plate clean?
3　　　A.　I cannot give you a number.
4　　　Q.　It could be zero. Right?
5　　　A.　I wouldn't say it would be
6　zero.
7　　　Q.　Did you definitely see it,
8　ma'am?
9　　　　MR. KELLER: Argumentative.
10　She's already testified.
11　　　　THE WITNESS: Yes.
12　BY MR. SANGIAMO:
13　　　Q.　But it could have been just
14　once. Is that your testimony?
15　　　　MR. KELLER: Objection.
16　Mischaracterizes her testimony.
17　　　　THE WITNESS: It could have
18　been once or more.
19　BY MR. SANGIAMO:
20　　　Q.　On that occasion, although
21　you're not sure of it, but on that occasion --
22　　　　MR. KELLER: Objection.
23　BY MR. SANGIAMO:
24　　　Q.　-- did you -- strike that.

Page 387

1　　　Q.　On that occasion, do you know
2　whether the person had already recorded the
3　plaque counts on a counting sheet?
4　　　A.　I do not know.
5　　　Q.　Who was it on that one occasion
6　that you may remember?
7　　　A.　I would have to say it was
8　Jenny Kriss.
9　　　Q.　So you remember that?
10　　　A.　Yes.
11　　　Q.　Now, you said you also heard
12　discussions about people wiping the plate
13　clean. Right?
14　　　A.　Yes.
15　　　Q.　How many times did you hear
16　that discussed?
17　　　A.　Again, I can't give you a
18　number. We all sat in the same laboratory, we
19　-- counting plates together. A group of
20　people, a group of staff in the laboratory,
21　there's different conversations going on. I
22　remember instances of, you know, someone
23　saying I can't find more plaques, you know,
24　asking somebody else to look at it. And being

Page 388

1　frustrated because they can't find more
2　plaques but they know they need to.
3　　　Q.　Do you have a recollection of
4　people discussing wiping the plate clean?
5　　　A.　Yes.
6　　　Q.　Can you give me any approximation
7　right now how many times you heard that or
8　would you just be guessing?
9　　　　MR. KELLER: Objection.
10　　　　THE WITNESS: I cannot give you
11　an approximation.
12　BY MR. SANGIAMO:
13　　　Q.　Is that because you would have
14　to speculate?
15　　　　MR. KELLER: Objection.
16　Argumentative. Asked and answered.
17　　　　THE WITNESS: Yes.
18　BY MR. SANGIAMO:
19　　　Q.　On those occasions when you
20　heard people talking about wiping the plate
21　clean, did those people comment one way or the
22　other as to whether they had already recorded
23　the plaque counts on the counting sheet at the
24　time that they wiped the plate clean?

25 (Pages 385 - 388)

HIGHLY CONFIDENTIAL
JOAN L. WLOCHOWSKI - HIGHLY CONFIDENTIAL

Page 389

1      A.    I'm sorry, can you repeat that
2  question?
3      Q.    On the occasions when you heard
4  people commenting on wiping the plate clean,
5  did they say anything one way or the other
6  whether they had already recorded the plaque
7  counts on the counting sheet at the time they
8  wiped the plate clean?
9      A.    I cannot recall, no.
10     Q.    Do you have an understanding as
11 to whether the data that Merck used in support
12 of its submission for Protocol 007 was the
13 data as originally counted versus the data as
14 it stood after recounts had been done?
15          MR. KELLER:  Objection.  Vague
16     and ambiguous.  Overbroad.
17          THE WITNESS:  I cannot say
18     whether original data was submitted.
19     If it was, it would be very difficult
20     to determine what original data was.
21     In some cases there could be
22     transcription errors on a counting
23     sheet that if you went back to the
24     original data, then you would be

Page 390

1      accounting for a transcription error.
2      So, you know, if that was the case,
3      then the reliability of the results,
4      again, would be questioned.
5  BY MR. SANGIAMO:
6      Q.    So is it the case that you have
7  no understanding as to whether the data as
8  submitted by Merck to the FDA in support of
9  Protocol 007 was the data as originally
10 counted versus the data as it stood after the
11 counts had been changed?
12          MR. KELLER:  Objection.  Asked
13     and answered.  She just answered that
14     question.  Vague and ambiguous.
15          MR. SANGIAMO:  I asked her what
16     her understanding was.  She then threw
17     in some stuff about transcription
18     errors.  Do you have an understanding,
19     that's my question.
20          MR. KELLER:  Not having defined
21     what original is.  She testified as to
22     -- you have a different definition of
23     original.  So she's already answered
24     the question.

Page 391

1  BY MR. SANGIAMO:
2      Q.    Do you have anything to add to
3  your last answer?
4      A.    No.
5      Q.    Is it your testimony that
6  because there could possibly be transcription
7  errors, we can't know what the original data
8  was?
9          MR. KELLER:  Objection.
10     Overbroad.  Argumentative.
11          THE WITNESS:  That is part
12     of -- yes, not knowing the original
13     data.
14 BY MR. SANGIAMO:
15     Q.    Are there any other reasons why
16 we wouldn't know what the original data is?
17          MR. KELLER:  Objection.  Asked
18     and answered.  You can answer.
19          THE WITNESS:  Again, if
20     there -- if plates are being tossed
21     out, if data is being changed before
22     it's entered onto the sheet, if data --
23     if the sheet itself is not the original
24     sheet, it would be very difficult to

Page 392

1      say if you would be able to provide
2      original data.
3  BY MR. SANGIAMO:
4      Q.    Would there always be a risk of
5  a transcription error?
6          MR. KELLER:  Objection.
7     Overbroad.  Lack of foundation.
8     Argumentative.
9          THE WITNESS:  I'm not sure what
10     you mean by that.
11 BY MR. SANGIAMO:
12     Q.    What did you mean by
13 transcription errors?
14     A.    If somebody is taking the count
15 off of a plate and entering it into the
16 counting sheet, they could write the number
17 incorrectly, they could enter it into the
18 wrong line.  That type of transcription error.
19     Q.    Is it your view that there
20 should have been some check to assure the
21 transcription errors did not occur?
22          MR. KELLER:  Objection to form.
23          THE WITNESS:  Transcription
24     error can occur, but if it is

26 (Pages 389 - 392)

HIGHLY CONFIDENTIAL
JOAN L. WLOCHOWSKI - HIGHLY CONFIDENTIAL

Page 393

1    documented as a transcription error,
2    then it would be detectable. If it's
3    not documented that that is what the
4    cross out is, then it's not necessarily
5    detectable.
6  BY MR. SANGIAMO:
7    Q.    If Merck submitted the data as
8  originally counted in support of the label
9  change application associated with Protocol
10 007, then who has been harmed as a result of a
11 plaque recounts having been done?
12           MR. KELLER: Objection. Calls
13      for expert opinion. Calls for
14      speculation. Lack of foundation.
15      Incomplete hypothetical. Vague and
16      ambiguous. Legal conclusion.
17           THE WITNESS: Can you repeat
18      the question?
19 BY MR. SANGIAMO:
20    Q.    If Merck submitted the data in
21 support of the label change associated with
22 Protocol 007 based on the plaques as
23 originally counted rather than the counts as
24 recounted, who has been harmed as a result of

Page 394

1  the recounts?
2           MR. KELLER: Objection. Same
3      objection as the last question.
4           THE WITNESS: Again, I guess I
5      would question the methodology that is
6      being employed, that there would be a
7      recount being done and all that time
8      spent on recounts based on guidance by
9      Dave Krah and then coming back a year
10     later to say we're going to go back to
11     what we can find as, or what we
12     consider to be, the original data.
13          During the time that this was
14     happening, I did, you know, question
15     Dave Krah about it. So it wasn't
16     corrected at the time. So for it to
17     come back at a later time, to me just
18     wasn't realtime conducting the
19     methodology that should have been
20     employed from the start. So it's hard
21     to say whether or not there was control
22     over the study as a whole, if you
23     resort back afterwards. To me, it was
24     just lack of control during the course

Page 395

1    of executing the testing. Originally
2    while I was there, originally the assay
3    was to be transferred and outsourced,
4    so transferred to an outside laboratory
5    which I believe may have been set up to
6    conduct this type of study in a
7    controlled manner. That didn't occur
8    as far as I knew because the transfer,
9    we could not transfer it. It didn't
10   qualify in that laboratory. So, to me,
11   that's -- I would just, as a matter of
12   compliance, question it.
13 BY MR. SANGIAMO:
14    Q.    Can you identify a party that
15 has been misled as a result of the counting
16 rechecks and the recounts?
17           MR. KELLER: Objection. Seeks
18      a legal conclusion. Vague and
19      ambiguous. Lack of foundation.
20      Seeking expert testimony from a lay
21      witness. Vague and ambiguous.
22      Overbroad. Objection to form.
23           THE WITNESS: I would say from
24      being there, I was misled.

Page 396

1  BY MR. SANGIAMO:
2    Q.    Anybody else?
3    A.    Everybody that was in that lab
4  was misled.
5    Q.    Anyone else?
6           MR. KELLER: Same objections.
7           THE WITNESS: It can go on from
8      there.
9  BY MR. SANGIAMO:
10    Q.    Who else?
11           MR. KELLER: Same objections.
12      Argumentative.
13           THE WITNESS: In general, to
14      allow this practice to occur is
15      misleading to the public for, you know,
16      a product that you're distributing out
17      for vaccination of children.
18 BY MR. SANGIAMO:
19    Q.    Did the public know about the
20 recounts to your knowledge?
21           MR. KELLER: Objection.
22           THE WITNESS: That's why I'm
23      here today.
24           MR. KELLER: Let me interpose

27 (Pages 393 - 396)

HIGHLY CONFIDENTIAL
JOAN L. WLOCHOWSKI - HIGHLY CONFIDENTIAL

Page 397

1    an objection.  Lack of foundation.
2    Argumentative.
3    BY MR. SANGIAMO:
4        Q.    So do you believe the public
5    was misled by the recounts?
6        A.    Yes.
7        Q.    And do you have any knowledge
8    of the public knowing about the recounts other
9    than you having filed this lawsuit?
10       A.    What I have --
11           MR. KELLER:  Objection.  Lack
12    of foundation.  Overbroad.  Calls for
13    speculation.
14           THE WITNESS:  What I have
15    knowledge of is it would be the
16    public's expectation that the
17    manufacturing site would be complying
18    with the regulations set forth by the
19    health authorities.
20    BY MR. SANGIAMO:
21       Q.    You gave some testimony about
22    another lab that was supposed to run the assay
23    at one point.  What lab was that?
24       A.    It was a lab out in Ohio.  I

Page 398

1    believe it was Dr. Ward's lab.
2        Q.    When did you first learn about
3    the idea of Dr. Ward's lab running the assay?
4        A.    I can't remember.  I believe it
5    was springtime or early on while I was there.
6        Q.    You're referring to 2001?
7        A.    Yes.
8        Q.    Who did you hear that from?
9        A.    I want to -- I do know that it
10    was part of a document that -- again, about
11    the development of the assay.  I want to say
12    that Dave was -- had also discussed and
13    provided information that it was going to be
14    transferred.  I do know from discussions
15    within the laboratory that Colleen Barr was --
16    I can't remember if she had already gone out
17    there or was going out there, but I do
18    remember her being part of that.
19       Q.    So the basis for your knowledge
20    that it was going to be transferred is the
21    document to which you previously referred that
22    you got from Mr. Krahling, statements that Dr.
23    Krah made and your knowledge about Colleen
24    Barr going out to that lab?

Page 399

1        A.    Yes.
2        Q.    Did Dr. Krah tell you exactly
3    what testing that lab was going to do?
4        A.    I believe, to the best of my
5    knowledge, that he was referring to the PRN
6    assay.
7        Q.    In which samples, did he say?
8        A.    For Protocol 007.
9        Q.    Was he any more specific than
10    that?
11       A.    No.
12           MR. KELLER:  We've been going
13    about an hour.  Do you want to take a
14    break?
15           MR. SANGIAMO:  Why don't we
16    finish up this.  I don't think it will
17    take long.
18    BY MR. SANGIAMO:
19       Q.    Did you have an understanding
20    at the time that you worked in Dr. Krah's lab
21    regarding why Dr. Ward's lab was not going to
22    run any assay samples?
23       A.    While I was in Dr. Krah's lab,
24    I don't -- I didn't have an understanding why

Page 400

1    it wasn't going -- it wasn't carried out.
2        Q.    Have you developed an understanding
3    since then?
4        A.    I can't recall.
5        Q.    Do you have a current
6    understanding of why there was --
7        A.    I can't recall if it's
8    speculation or based on information that I
9    know today.  So I don't want to say.  My
10    belief is, again, that it didn't -- they
11    weren't able to transfer it, they weren't able
12    to qualify it in that laboratory.  There
13    were -- we were held to, you know, a very
14    strict timeline to complete Protocol 007 by
15    August.  We were being, you know, told that if
16    we were able to complete it by August, that we
17    would get bonuses for completion of that work
18    on time.  So I think it was a matter of being
19    able to meet the timeline and having the assay
20    qualified in the laboratory, the outsourced
21    laboratory.
22       Q.    What is the basis of your
23    belief that there was a problem with the
24    outside laboratory, namely Dr. Ward's lab

28 (Pages 397 - 400)

Appx5998

HIGHLY CONFIDENTIAL
JOAN L. WLOCHOWSKI - HIGHLY CONFIDENTIAL

Page 401

1  being qualified?
2      A.   That's the piece I can't
3  recall, can't confirm.
4      Q.   Would it be fair to say that
5  you simply don't know why it is that the assay
6  was not performed in Dr. Ward's lab?
7          MR. KELLER:  Objection.  Asked
8      and answered.  Argumentative.
9          You can try to answer again.
10         THE WITNESS:  If it was a
11     matter of timing in order to complete
12     the assay transfer and complete the
13     testing in that timeline, that would
14     be -- that would suggest that that was
15     part of the reason.
16 BY MR. SANGIAMO:
17     Q.   Is it your testimony that that
18 was part of the reason?  I'm just trying to
19 understand your testimony, ma'am.
20         MR. KELLER:  Objection.  Asked
21     and answered.  She just testified to
22     it.
23         THE WITNESS:  I truly don't
24     know as I sit here today.  I can't

Page 402

1      confirm one way or the other.
2  BY MR. SANGIAMO:
3      Q.   As to what the reason was that
4  Dr. Ward's lab did not run any testing on the
5  assay.  Right?
6      A.   Yes.
7          MR. SANGIAMO:  Why don't we
8      take a break.
9          VIDEOGRAPHER:  The time is now
10     12:11.  Going off the video record.
11             - - -
12         (A recess was taken.)
13             - - -
14         VIDEOGRAPHER:  The time is now
15     1:22.  This begins disc three.  You may
16     proceed.
17 BY MR. SANGIAMO:
18     Q.   Ms. Wlochowski, when you were
19 working in Dr. Krah's lab, did you have any
20 belief at that time that there were
21 improprieties associated with the design of
22 the plaque reduction neutralization assay?
23         MR. KELLER:  Objection.  Vague
24     and ambiguous.

Page 403

1          THE WITNESS:  Can you elaborate
2      on that?
3  BY MR. SANGIAMO:
4      Q.   Do you have an understanding
5  what the word design might mean in the context
6  of an assay?
7      A.   Can you define what you mean by
8  that?
9      Q.   Suppose I were to use the term
10 parameters, the parameters for the assay,
11 would that have any better meaning for you?
12         MR. KELLER:  Same objection.
13         THE WITNESS:  Again, do you
14     want to describe which parameters
15     you're referring to?
16 BY MR. SANGIAMO:
17     Q.   What term would you use to
18 describe the methodology of an assay as well
19 as the reagents to be used in the assay?
20         MR. KELLER:  Objection.
21         THE WITNESS:  So I think I know
22     what you're referring to as far as
23     design.  I guess to me that would be
24     the procedure itself that has already

Page 404

1      been defined.
2  BY MR. SANGIAMO:
3      Q.   And that would be distinct from
4  the running of the assay?
5      A.   Not sure.
6          MR. KELLER:  Objection.  Vague
7      and ambiguous.  I think the problem is
8      you're missing multiple steps in the
9      development of an assay.  There's
10     protocols, there's validations.
11         MR. SANGIAMO:  You're getting
12     closer, Jeff.  Why don't you back off.
13 BY MR. SANGIAMO:
14     Q.   Did you have any concerns about
15 the methodology of the assay?
16         MR. KELLER:  Objection.  Vague
17     and ambiguous.  Lack of foundation.
18         THE WITNESS:  So we had talked
19     before about the use of the enhanced --
20     using the rabbit antibodies, the
21     enhancement that was incorporated into
22     the assay that was used.
23 BY MR. SANGIAMO:
24     Q.   Anything else?

29 (Pages 401 - 404)

Appx5999

HIGHLY CONFIDENTIAL
JOAN L. WLOCHOWSKI - HIGHLY CONFIDENTIAL

Page 405

1     A.    I think we also talked about
2 the use of what was called a wild type
3 actually being the vaccine strain as a concern
4 as well.
5     Q.    Any others?
6     A.    Let me think.  So I think that
7 those are the key points with the addition of
8 concerns over the assay not being fully
9 validated before it was being used in testing.
10     Q.    Anything else?
11     A.    Can I look at one of my SOPs
12 that's here?
13     Q.    Yes.
14     A.    I guess in general, as I sit
15 here today, when I look through the way the
16 procedure is written, in some areas it's not
17 very clear what exactly is being conducted.
18 And in some cases, you know, it calls not
19 used for routine testing.  So it kind of lays
20 it open to what you mean by routine testing,
21 but yes, it was in a procedure that was used
22 for testing in the clinical protocol.
23     In this procedure, at least I'm
24 not seeing it right now, as I look at it

Page 406

1 doesn't describe the methodology for
2 performing the counting.  That's my overview
3 of the methodology.
4     Q.    Do you have any other concerns
5 about the methodology other than what you've
6 just told us?
7     MR. KELLER:  Objection.
8     Overbroad.  Vague and ambiguous.
9     THE WITNESS:  Based on --
10     MR. KELLER:  Sorry.  Lack of
11     foundation.  Seeking testimony from a
12     lay witness.
13     THE WITNESS:  Based on what I
14     looked at, at this time, that those are
15     the key points.
16 BY MR. SANGIAMO:
17     Q.    So you can't think of any
18 others right now.  Is that a fair statement?
19     A.    Yes.
20     Q.    Let's talk about the virus that
21 was used in the assay.  What is a wild type
22 virus?  What does that mean?
23     A.    It's the strain that would be
24 in the population.  Different types of strains.

Page 407

1     Q.    Have you ever run an assay that
2 used a wild type virus?
3     A.    I cannot recall.
4     Q.    Does the wild type virus have
5 to be passaged before it can be used in a
6 plaque reduction neutralization assay?
7     MR. KELLER:  Objection.  Lack
8     of foundation.
9     THE WITNESS:  Does a wild type
10     virus have to be passaged before it can
11     be used in an assay.  Is that your
12     question?
13 BY MR. SANGIAMO:
14     Q.    Yes.
15     MR. KELLER:  Same objection.
16     THE WITNESS:  I don't know that
17     it has to be.  Typically -- it's my
18     understanding that typically it would
19     be.
20 BY MR. SANGIAMO:
21     Q.    That it would be passaged?
22     A.    Yes.
23     Q.    Before it could be used in an
24 assay?

Page 408

1     A.    That it would be.
2     Q.    How many times can a virus be
3 passaged before it is no longer a wild type
4 virus?
5     MR. KELLER:  Objection.  Lack
6     of foundation.  Seeks testimony from a
7     lay witness.
8 BY MR. SANGIAMO:
9     Q.    Do you have the expertise to
10 answer that question?
11     A.    I do not.
12     Q.    Was the virus that was used in
13 the plaque reduction neutralization assay in
14 Protocol 007 a wild type virus?
15     MR. KELLER:  Objection.  Lack
16     of foundation.  Seeks expert --
17 BY MR. SANGIAMO:
18     Q.    If you don't have the expertise
19 to answer that, just say so.
20     A.    It was a strain of virus that
21 at one point was a wild type virus in my
22 understanding.
23     Q.    Had it been passaged since that
24 time?

30 (Pages 405 - 408)

Appx6000