## 23-2553

IN THE

# United States Court of Appeals

### FOR THE THIRD CIRCUIT

>>◄◄

UNITED STATES OF AMERICA EX REL.,
STEPHEN A. KRAHLING; JOAN A. WLOCHOWSKI,

*against*

MERCK & CO, INC.,

STEPHEN A. KRAHLING; JOAN A. WLOCHOWSKI,

*Appellants.*

*On Appeal from the United States District Court
for the Eastern of District of Pennsylvania
The Honorable Chad F. Kenney, Case No. 2:10-04374-CFK*

## JOINT APPENDIX
## VOLUME XXV OF XLV
## Pages Appx11001 to Appx11500
## (Filed Under Seal)

VENABLE LLP
750 East Pratt Street, Suite 900
Baltimore, Maryland 21202
410-244-7400

MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, Pennsylvania 19103
215-963-5000

HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
202-637-5600

*Attorneys for Defendant-Appellee*

CONSTANTINE CANNON LLP
355 Madison Avenue, 9th Floor
New York, New York 10017
212-350-2700

KELLER GROVER, LLP
1965 Market Street
San Francisco, California 94103
415-543-1305

*Attorneys for Relators-Appellants*

 PHP (212) 719-0990
appeals@phpny.com

**Table of Contents**

**Page**

**Volume III**
**(Filed Under Seal)**

Order of the Honorable Lynne A. Sitarski, dated May 16, 2019
    (Doc. 250) ................................................................ Appx181

Statement of Material Facts by Defendant in Support of
    Its First Dispositive Motion, dated October 25, 2019
    (Doc. 281-3) ............................................................ Appx185

Statement of Material Facts by Defendant in Support of
    Its Fourth Dispositive Motion, dated October 25, 2019
    (Doc. 287-3) ............................................................ Appx247

Statement of Material Facts by Relators,
    dated October 25, 2019 (Doc. 294) .......................... Appx295

Declaration of Gary Reilly, for Relators,
    in Support of Motion, dated October 25, 2019 (Doc. 24) ......... Appx396

    Exhibit 1 to Reilly Declaration -
    Expert Report of Eugene Shapiro, M.D.,
    dated March 13, 2018. ........................................... Appx438

    Exhibit 2 to Reilly Declaration -
    Expert Report of Dr. Robert Malone, M.D.,
    dated March 13, 2018 ............................................. Appx460
    *(Cont'd in Vol IV)*

**Volume IV**
**(Filed Under Seal)**

    Exhibit 3 to Reilly Declaration -
    Expert Report of David A. Kessler, M.D.,
    dated March 14, 2018, with Schedules
    and Appendices ...................................................... Appx551
    *(Cont'd in Vol V)*

**Table of Contents**
**(Continued)**

**Page**

**Volume V**
**(Filed Under Seal)**

Exhibit 4 to Reilly Declaration -
Deposition Testimony of David Kessler, M.D.,
taken September 28, 2018 ..................................................... Appx1483
*(Cont'd in Vol VI)*

**Volume VI**
**(Filed Under Seal)**

Exhibit 5 to Reilly Declaration -
Expert Report of D. Bruce Burlington, M.D.,
dated June 19, 2018 .............................................................. Appx1588

Exhibit 6 to Reilly Declaration -
Deposition Testimony of D. Bruce Burlington, M.D.,
taken December 13, 2018  ..................................................... Appx1637

Exhibit 7 to Reilly Declaration -
Deposition Testimony of Mark Pallansch, M.D.,
taken October 13, 2017  ........................................................ Appx1715

Exhibit 8 to Reilly Declaration -
Deposition Testimony of Eugene Shapiro, M.D.
taken November 7, 2018  ....................................................... Appx1765

Exhibit 9 to Reilly Declaration -
Deposition Testimony of Alison L. Fisher, Ph.D.,
taken November 1, 2016  ....................................................... Appx1822

Exhibit 10 to Reilly Declaration -
Expert Report of Ann M. Arvin, M.D.,
dated June 11, 2018 .............................................................. Appx1910

Exhibit 11 to Reilly Declaration -
Letter from Dr. Robert Redfield, Director, CDC,
dated May 24, 2018 ............................................................... Appx1945

**Table of Contents**
**(Continued)**

**Page**

Exhibit 12 to Reilly Declaration -
Letter from Dr. Anne Schuchat, Principal Deputy
Director, CDC, dated September 26, 2017 ........................... Appx1950

Exhibit 13 to Reilly Declaration -
Statement of Dr. Jesse Goodman, FDA,
dated April 18, 2007 ............................................................. Appx1956

Exhibit 14 to Reilly Declaration -
Letter from Merck to Jacqueline Little, Ph.D.,
dated March 23, 2006 (MRK-CHA00214088-148) ............... Appx1960
***(Cont'd in Vol VII)***

**Volume VII**
**(Filed Under Seal)**

Exhibit 15 to Reilly Declaration -
Deposition Testimony of Jonathan L. Temte, M.D., Ph.D.,
taken August 17, 2018 ........................................................... Appx2010

Exhibit 16 to Reilly Declaration -
Expert Report of Peter H. Calcott, B.Sc. (Hons.), D.Phil.,
dated March 12, 2018 ........................................................... Appx2061

Exhibit 17 to Reilly Declaration -
Deposition Testimony of Joye L. Bramble, Ph.D.,
taken January 6, 2017 ........................................................... Appx2141

Exhibit 18 to Reilly Declaration -
FDA Warning Letter, dated February 9, 2001
(MRK-CHA00209399-409) ................................................... Appx2220

Exhibit 19 to Reilly Declaration -
Excerpts from Defendant Merck's Answer to
Amended Complaint (ECF No. 62) ....................................... Appx2232

# Table of Contents
## (Continued)

**Page**

Exhibit 20 to Reilly Declaration -
Excerpts from Defendant Merck's Responses and
Objections to Relator's Third Set of Requests for Admission,
dated August 16, 2017 ............................................................ Appx2239

Exhibit 21 to Reilly Declaration -
ProQuadTM (Measles, Mumps, Rubella and Varicella
[Oka/Merck] Virus Vaccine Live)-Original Application
(MRK-CHA00158126-79) ....................................................... Appx2293

Exhibit 22 to Reilly Declaration -
Expert Report of William L. Atkinson, M.D., MPH,
dated June 12, 2018 ................................................................. Appx2348

Exhibit 23 to Reilly Declaration -
Deposition Testimony of Jonathan Hartzel, Ph.D.,
taken June 23, 2017 ................................................................. Appx2380

Exhibit 24 to Reilly Declaration -
Expert Report of Anna Durbin, M.D, dated June 14, 2018  ... Appx2476
***(Cont'd in Vol VIII)***

### Volume VIII
### (Filed Under Seal)

Exhibit 25 to Reilly Declaration -
Expert Report of Marcela Pasetti, Ph.D.,
dated June 14, 2018 ................................................................. Appx2511

Exhibit 26 to Reilly Declaration -
Excerpts of Presentation, Principles of Vaccinology,
produced as "Principles of Vaccination.ppt"
(MRK-CHA01339555) ........................................................... Appx2534

Exhibit 27 to Reilly Declaration -
Deposition Testimony of Mary K. Yagodich,
taken August 18, 2016 ............................................................ Appx2538

**Table of Contents**
**(Continued)**

**Page**

Exhibit 28 to Reilly Declaration -
GlaxoSmithKline Application for Priorix
(GSK-MMR-IND-0019450-76) ............................................ Appx2631

Exhibit 29 to Reilly Declaration -
Deposition Testimony of Marcela Pasetti, Ph.D.,
taken December 4, 2018 ....................................................... Appx2659

Exhibit 30 to Reilly Declaration -
Deposition Testimony of Anna P. Durbin, M.D.,
taken October 8, 2018 ........................................................... Appx2699

Exhibit 31 to Reilly Declaration -
Excerpts from Rationale for the M-M-R®II End Expiry
Clinical Studies Presentation (MRK-CHA01893680-730) ... Appx2788

Exhibit 32 to Reilly Declaration -
Letter to the Editor "Comparability of M-M-R™II and
Priorix" from Scott Thaler, M.D., *et al.*, *The Pediatric
Infectious Disease Journal*, September 1999:18(9)
(MRK-CHA00088592-3) ....................................................... Appx2836

Exhibit 33 to Reilly Declaration -
Phase V Clinical Development Plan for M-M-R®II
(MRK-CHA00667054-122) ................................................... Appx2839

Exhibit 34 to Reilly Declaration -
Fax from Yolanda Stewart to Donna Boyce,
dated April 25, 2012 (GSK-MMR-IND-0029256-63) ........... Appx2909

Exhibit 35 to Reilly Declaration -
Letter from Karen L. Goldenthal, M.D. to Angus Grant, Ph.D.,
dated September 2, 1997 (GSK-MMR-IND-0000004-7) ...... Appx2918

Exhibit 36 to Reilly Declaration -
Email from Katalin G. Abraham to Keith D. Chirgwin, M.D.,
dated October 5, 1998 (MRK-CHA00095142) ..................... Appx2923

**Table of Contents**
**(Continued)**

**Page**

Exhibit 37 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449029-40) ....................... Appx2925

Exhibit 38 to Reilly Declaration -
Deposition Testimony of Mark Stannard,
taken December 13, 2016 ...................................................... Appx2938
*(Cont'd in Vol IX)*

**Volume IX**
**(Filed Under Seal)**

Exhibit 39 to Reilly Declaration -
Deposition Testimony of Luwy Musey, M.D.,
taken October 7, 2016 .......................................................... Appx3023

Exhibit 40 to Reilly Declaration -
Deposition Testimony of Ann M. Arvin, M.D.,
taken November 12, 2018 ..................................................... Appx3129

Exhibit 41 to Reilly Declaration -
Deposition Testimony of William Nichols,
taken October 25, 2018 ......................................................... Appx3213

Exhibit 42 to Reilly Declaration -
Proposed New Stabilizer for M-M-R®II,
dated July 26, 2022 (MRK-CHA00207690-7735) ................ Appx3249

Exhibit 43 to Reilly Declaration -
M-M-R®II Mumps End Expiry Study: AIGENT Assay Issues
Impact on Study Criteria Regulatory Implications,
dated October 11, 2002 (MRK-CHA00094161-82) .............. Appx3296

Exhibit 44 to Reilly Declaration -
Memo re: Historical Review and Confirmation of Mumps
Virus Potency Formulation Targets in M-M-R®II,
dated April 8, 2011 (MRK-CHA01456760) .......................... Appx3319

**Table of Contents**
**(Continued)**

Exhibit 45 to Reilly Declaration -
Presentation, M-M-R II Mumps End Expiry Trial, produced as
"CDOC presentation November 15-00-draft.ppt"
(MRK-CHA00020396) ........................................................ Appx3321

Exhibit 46 to Reilly Declaration -
Memo re: Stability of Mumps Component in Merck's Live
Virus Vaccines, dated October 5, 2000
(MRK-CHA00587859-62) ................................................... Appx3419

Exhibit 47 to Reilly Declaration -
Memo re: Stability of Measles, Mumps, and
Rubella Components in Merck's Live Virus Vaccines,
dated October 17, 2000 (MRK-CHA00549487-94) .............. Appx3424

Exhibit 48 to Reilly Declaration -
Email from Katalin G. Abraham to Bonita M. Stankunas,
dated October 5, 2000 (MRK-CHA00284623-9) .................. Appx3433

Exhibit 49 to Reilly Declaration -
Deposition Testimony of Philip S. Bennett,
taken May 24, 2017 .............................................................. Appx3441

**Volume X**
**(Filed Under Seal)**

Exhibit 50 to Reilly Declaration -
Email from Keiko Simon, dated October 2, 2002
(MRK-CHA00615147-74) ................................................... Appx3501

Exhibit 51 to Reilly Declaration -
Internal Strategy Document regarding M-M-R®II
Regulatory Compliance (MRK-CHA00019225-45) .............. Appx3530

Exhibit 52 to Reilly Declaration -
"Genetic Heterogeneity of Mumps Strains: Potential
Implications in Comparative Neutralization Studies" CBER
Background Information, dated November 1999
(MRK-CHA00020635-42) ................................................... Appx3552

**Table of Contents**
**(Continued)**

Exhibit 53 to Reilly Declaration -
Draft memo, produced as "Outstanding-
issuesMMRV&MMRII.doc"
(MRK-CHA00198876-91) ..................................................... Appx3561

Exhibit 54 to Reilly Declaration -
Memo re: Mumps neutralization meeting minutes,
dated September 16, 1999 (MRK-CHA00020425-7) ............ Appx3578

Exhibit 55 to Reilly Declaration -
Email from Katalin G. Abraham to Keith D. Chirgwin,
dated February 25, 2000 (MRK-CHA00095143) .................. Appx3582

Exhibit 56 to Reilly Declaration -
Memo re: Team Biologics Close Out – Form FDA 483,
dated October 11, 2000 (MRK-CHA00071265-71) .............. Appx3584

Exhibit 57 to Reilly Declaration -
Email from Dorothy Margolskee, M.D., to
Florian Schodel, M.D., with attachments,
dated February 26, 2001
(MRK-CHA00549510-35) ..................................................... Appx3592

Exhibit 58 to Reilly Declaration -
Email from Joseph F. Heyse with attachments,
dated March 5, 2001
(MRK-CHA00616007-12) ..................................................... Appx3627

Exhibit 59 to Reilly Declaration -
Response to FDA 483 Observation 3
(MRK-CHA00086295-7) ....................................................... Appx3634

Exhibit 60 to Reilly Declaration -
Draft Response to FDA 483 Observation 3
(MRK-CHA00086298-317) ................................................... Appx3638

Exhibit 61 to Reilly Declaration -
Draft Response to FDA 483 Observation 3
(MRK-CHA00562230-41) ..................................................... Appx3659

**Table of Contents**
**(Continued)**

**Page**

Exhibit 62 to Reilly Declaration -
Draft Response to FDA 483 Observation 3
(MRK-CHA01440844-64) ...................................................... Appx3672

Exhibit 63 to Reilly Declaration -
Letter from Robert L. McKee, Ph.D. to Steven A. Masiello,
dated March 8, 2001 (MRK-CHA01537603-11) ................... Appx3694

Exhibit 64 to Reilly Declaration -
Deposition Testimony of Dorothy Margolskee, M.D.,
taken April 21, 2017 ............................................................... Appx3704

Exhibit 65 to Reilly Declaration -
Excerpts from Label Claim Compliance M-M-R®II
Peer Review Meeting, dated July 15, 2002
(MRK-CHA00322038-65) ...................................................... Appx3796

Exhibit 66 to Reilly Declaration -
Memo re: Executive Summary-CBER/Merck Meeting
April 4, 2001, dated April 8, 2001
(MRK-CHA01649955-6) ......................................................... Appx3819

Exhibit 67 to Reilly Declaration -
Memo re: Minutes, Meeting with CBER on 4/4/01
Regarding Mumps Stability, dated April 9, 2001
(MRK-CHA00754687-91) ........................................................ Appx3822

Exhibit 68 to Reilly Declaration -
Email from Christopher J. Petroski to Keith D. Chirgwin,
dated January 21, 2002 (MRK-CHA00561350-5) ................. Appx3828

Exhibit 69 to Reilly Declaration -
Presentation, M-M-R®II Mumps Expiry Mumps Potency
Claim in Label (MRK-CHA00334863-8) .............................. Appx3835

Exhibit 70 to Reilly Declaration -
Presentation, Mumps Expiry- Label Claim, produced as
"RMC mumps expiry update.ppt" (MRK-CHA00086318) ... Appx3842

**Table of Contents**
**(Continued)**

**Page**

Exhibit 71 to Reilly Declaration -
Memo re: M-M-R®II: Mumps End Expiry label change –
filing strategy, dated August 2, 2001
(MRK-CHA00247149-52) ..................................................... Appx3846

Exhibit 72 to Reilly Declaration -
Email from Keith D. Chirgwin to Manal A. Morsy with
attachment, dated January 22, 2002
(MRK-CHA00019084-5) ...................................................... Appx3851

Exhibit 73 to Reilly Declaration -
Email from Cynthia F. Morrisey, dated September 5, 2002
(MRK-CHA01562819-20) .................................................... Appx3873

Exhibit 74 to Reilly Declaration -
Email from Roberta L. McKee, Ph.D.,
dated October 31, 2002 (MRK-CHA00094134-5) ................ Appx3876

Exhibit 75 to Reilly Declaration -
Memo, Mumps and Rubella Formulation and Potency Assay
Format Changes to Support Potency through Twenty-four
Month Expiry (MRK-CHA01894982-98) ............................ Appx3879

Exhibit 76 to Reilly Declaration -
Email from Mark S. Galinski to Keiko Simon,
dated August 23, 2004 (MRK-CHA01564065-8) .................. Appx3897

Exhibit 77 to Reilly Declaration -
Email from Alison L. Fisher with attachments,
dated September 20, 2004
(MRK-CHA01574732-8) ...................................................... Appx3902

Exhibit 78 to Reilly Declaration -
Presentation, Accomplishments to Date,
produced as "accomplishments to 5-17-01.ppt"
(MRK-CHA00724288) ......................................................... Appx3910

**Table of Contents**
**(Continued)**

Exhibit 79 to Reilly Declaration -
Draft letter from Roberta L. McKee, Ph.D., to
Michael Angelo, with metadata date of October 17, 2002
(MRK-CHA01649892-3) ....................................................... Appx3917

Exhibit 80 to Reilly Declaration -
Email from Manal Morsy to Keith D. Chirgwin,
dated November 4, 2002 (MRK-CHA00501762-5) .............. Appx3920

Exhibit 81 to Reilly Declaration -
Memo re: Preparations for the Mumps Stability-CBER
discussion, dated March 19, 2001
(MRK-CHA00019430-2) ....................................................... Appx3925

Exhibit 82 to Reilly Declaration -
Email from Philip S. Bennett to Joseph M. Antonello,
dated September 5, 2002 (MRK-CHA00780325-6) .............. Appx3929

Exhibit 83 to Reilly Declaration -
Memo re: Mumps End Expiry study issues,
with Attachment (MRK-CHA00019246-67) ........................ Appx3932

Exhibit 84 to Reilly Declaration -
Draft Presentation, M-M-R II to October 8, 2002 CRRC,
produced as "Draft#1-CRRC 10-08-02 slides.ppt"
(SCHOFIELD_00000201) ..................................................... Appx3955

Exhibit 85 to Reilly Declaration -
Presentation, M-M-R II to October 8, 2002 CRRC,
produced as"CRRC-10-08-02 slides.ppt"
(MRK-CHA00027726) ......................................................... Appx3991
***(Cont'd in Vol XI)***

**Volume XI**
**(Filed Under Seal)**

Exhibit 86 to Reilly Declaration -
Email from Philip S. Bennett with attachment,
dated March 14, 2001 (MRK-CHA00562218-9) ................... Appx4021

**Table of Contents**
**(Continued)**

Exhibit 87 to Reilly Declaration -
Meeting Agenda, dated March 7, 2002
(MRK-CHA00205854-60) ..................................................... Appx4024

Exhibit 88 to Reilly Declaration -
Email from Manal Morsy, M.D., Ph.D. to Deitra E. Arena,
dated March 27, 2002 (MRK-CHA00064005-12) ................. Appx4032

Exhibit 89 to Reilly Declaration -
Email from Manal Morsy, M.D., Ph.D. to David Krah, M.D.,
dated April 10, 2002 (MRK-CHA00561310-2) ..................... Appx4041

Exhibit 90 to Reilly Declaration -
Spreadsheet for June 10, 2003 Vaccine Assay Committee
meeting (MRK-CHA00440797-811) ..................................... Appx4045

Exhibit 91 to Reilly Declaration -
Minutes of CBER Teleconference, dated December 7, 2001
(MRK-CHA00019434-7) ...................................................... Appx4061

Exhibit 92 to Reilly Declaration -
Draft Summary of Teleconference Notes
(MRK-CHA00024596-9) ...................................................... Appx4066

Exhibit 93 to Reilly Declaration -
Memo re: CBER teleconference (December 7, 2001): Mumps
Inspection results and discussion, dated December 13, 2001
(MRK-CHA00071082-9) ...................................................... Appx4071

Exhibit 94 to Reilly Declaration -
Memo re: Consultation with Dr. William Fairweather
on Vaccine Stability, dated December 14, 2000
(MRK-CHA00590949-58) ..................................................... Appx4080

Exhibit 95 to Reilly Declaration -
Excerpts from Proposed New Stabilizer for M-M-R®II,
dated August 2002 (MRK-CHA01591461-87) ...................... Appx4091

**Table of Contents**
**(Continued)**

**Page**

Exhibit 96 to Reilly Declaration -
Email from Manal Morsy, M.D., Ph.D. to Joye L. Bramble,
dated June 11, 2002 (MRK-CHA00494158-61) .................... Appx4117

Exhibit 97 to Reilly Declaration -
M-M-R®11 Defense Action Plan, dated June 1999
(MRK-CHA00285276-96) ..................................................... Appx4122

Exhibit 98 to Reilly Declaration -
Memo re: Statement of Interest for ProQuad™ Measles,
mumps, rubella, and varicella virus vaccine live, dated
November 10, 2000 (MRK-CHA00325472-91) .................... Appx4144

Exhibit 99 to Reilly Declaration -
Memo re: Statement of Interest for ProQuad™ Measles,
mumps, rubella, and varicella virus vaccine live,
dated November 10, 2000 (MRK-CHA00671410-28) .......... Appx4165

Exhibit 100 to Reilly Declaration -
Memo re: Minimum Expiry Specification Limit for Mumps
Potency in M-M-R®II, dated July 5, 2001
(MRK-CHA01896349) ......................................................... Appx4185

Exhibit 101 to Reilly Declaration -
Excerpts from Clinical and Regulatory Review Committee
Development Projects, dated October 29, 2002
(MRK-CHA01725276-364) ................................................. Appx4187

Exhibit 102 to Reilly Declaration -
Presentation, MMRII Mumps End Expiry study status &
Regulatory implications, produced as "slides for
GRSRC_MumpsEndExpiry -10-11-02.ppt"
(MRK-CHA00040705) ......................................................... Appx4197

Exhibit 103 to Reilly Declaration -
Presentation, MMRII Mumps End Expiry study status &
Regulatory implications, produced as
"slides for GRSRC -10-11-02.ppt"
(MRK-CHA00094159) ......................................................... Appx4227

**Table of Contents**
**(Continued)**

Exhibit 104 to Reilly Declaration -
Email from Joseph F. Heyse to Keith D. Chirgwin,
dated September 30, 2002 (MRK-CHA01582137-9) ............ Appx4256

Exhibit 105 to Reilly Declaration -
MRL Clinical Study Report, Multicenter Study: A Study of
M-M-R II at Mumps Expiry Potency in Healthy Children 12
to 18 Months of Age (Protocol 007)
(MRK-CHA00224982-26529) ............................................... Appx4260

Exhibit 106 to Reilly Declaration -
Email from Dorothy Margolskee to Keith D. Chirgwin,
dated March 8, 1998 (MRK-CHA00095320-1) ..................... Appx4419

Exhibit 107 to Reilly Declaration -
Slide Deck from M-M-R™ Expiry Investigators Meeting,
dated March 15-16, 1999 (MRK-CHA00017605-12) ........... Appx4422

Exhibit 108 to Reilly Declaration -
Excerpts from Merck Submission to the Department of Justice,
dated April 9, 2012 (MRK-CHA0002549-75) ....................... Appx4431

Exhibit 109 to Reilly Declaration -
Letter from Karen L. Goldethal, M.D. to
Keith Chirgwin, M.D., dated September 8, 1998
(MRK-CHA00001467-9) ...................................................... Appx4459

Exhibit 110 to Reilly Declaration -
Memo re: BB-IND 1016: Summary of discussion with
Dr. Kathryn Carbone and Ms. Luba Vujcic (CBER) regarding
the Mumps neutralization assay, dated February 8, 2000
(MRK-CHA00001255-7) ...................................................... Appx4463

Exhibit 111 to Reilly Declaration -
Memo re: Communication with Dr. Kathryn Carbone (CBER)
on April 12, 200 regarding CBER's meeting (face to face-
March 13, 2000) minutes and the mumps neutralization
and ELISA assays, dated April 12, 2000
(MRK-CHA01927351-5) ...................................................... Appx4467

**Table of Contents**
**(Continued)**

Exhibit 112 to Reilly Declaration -
Response to FDA Request for Information,
dated November 17, 2004 (MRK-CHA00126963-71) .......... Appx4473

Exhibit 113 to Reilly Declaration -
Summary of Findings of Inspection, dated August 6, 2001
(MRK-CHA02021754-61) ..................................................... Appx4483

Exhibit 114 to Reilly Declaration -
Meeting Minutes, dated March 14, 2000
(MRK-CHA00001258-61) ..................................................... Appx4492

Exhibit 115 to Reilly Declaration -
Deposition Testimony of Emilio Emini, Ph.D.,
taken June 6, 2017 .................................................................. Appx4497
*(Cont'd in Vol XII)*

**Volume XII**
**(Filed Under Seal)**

Exhibit 116 to Reilly Declaration -
Deposition Testimony of Florian Schodel, M.D.,
taken December 22, 2016 .................................................... Appx4592

Exhibit 117 to Reilly Declaration -
Email from Manal Morsy, dated September 13, 2002
(MRK-CHA01386177-82) .................................................... Appx4700

Exhibit 118 to Reilly Declaration -
Email from Keiko Simon with attachments,
dated October 27, 2003
(MRK-CHA00279197-247) .................................................. Appx4707

Exhibit 119 to Reilly Declaration -
Slide Deck from M-M-R™ Expiry Investigators Meeting,
dated March 15-16, 1999 (MRK-CHA01888826-913) ......... Appx4759

**Table of Contents**
**(Continued)**

Exhibit 120 to Reilly Declaration -
Email from Deitra E. Arena with attachments,
dated June 16, 2000
(MRK-CHA00026466-89) ..................................................... Appx4848

Exhibit 121 to Reilly Declaration -
Email from Manal Morsy to Henrietta Ukwu,
dated October 10, 1999 (MRK-CHA01898773-6) ................ Appx4874

Exhibit 122 to Reilly Declaration -
Deposition Testimony of David Krah, M.D.,
taken July 11-12, 2017 ........................................................... Appx4879
*(Cont'd in Vol XIII)*

**Volume XIII**
**(Filed Under Seal)**

Exhibit 123 to Reilly Declaration -
Mumps Neutralization Assay Development
(MRK-CHA00336905-18) ..................................................... Appx5076

Exhibit 124 to Reilly Declaration -
Minutes of CAS Meeting, dated June 20, 2000
(MRK-CHA00209674-8) ........................................................ Appx5091

Exhibit 125 to Reilly Declaration -
Email from Ted L. Staub to George Williams,
dated February 20, 1998 (MRK-CHA00625629-30) ............. Appx5097

Exhibit 126 to Reilly Declaration -
Minutes of Mumps Neutralization Assay Meeting,
dated September 29, 1999 (MRK-CHA00020428-9) ............ Appx5100

Exhibit 127 to Reilly Declaration -
Presentation, MMR II End Expiry Trial,
produced as "MMRII-Neut-fnQPAslides9-27-99.ppt"
(MRK-CHA00025315) ........................................................... Appx5103

**Table of Contents**
**(Continued)**

Exhibit 128 to Reilly Declaration -
Draft Summary of 8/17/99 meeting by M. Morsy
(MRK-CHA00198869-70) ......................................................Appx5111

Exhibit 129 to Reilly Declaration -
Memo re: Options and proposed path forward for the
Mumps Expiry Trial (MRK-CHA00086292-3) ..................... Appx5114

Exhibit 130 to Reilly Declaration -
Email from Florian P. Schodel to Colleen A. Forsythe,
dated July 7, 1997 (MRK-CHA01648951-6) ........................ Appx5117

Exhibit 131 to Reilly Declaration -
Memo re: Monthly report for August, 2000,
dated August 23, 2000 (MRK-CHA00016632-5) .................. Appx5124

Exhibit 132 to Reilly Declaration -
Virus & Cell Biology Research Procedure
(MRK-CHA00002189-98) ..................................................... Appx5129

Exhibit 133 to Reilly Declaration -
Letter from Karen L. Goldenthal, M.D. to Keith D. Chirgwin,
M.D., dated October 26, 1999 (MRK-CHA00761482-4) ...... Appx5140

Exhibit 134 to Reilly Declaration -
Memo re: Filing Strategy for ProQuad,
dated January 31, 2002 (MRK-CHA00818776-81) ............... Appx5144

Exhibit 135 to Reilly Declaration -
Memo re: CBER teleconference (October 16, 2001):
Measles, Mumps and Rubella ELISAs, dated October 19, 2001
(MRK-CHA00331831-6) ....................................................... Appx5151

Exhibit 136 to Reilly Declaration -
Email from Michael L. Dekleva to Alison L. Fisher,
dated October 26, 2004 (MRK-CHA00846454-8) ............... Appx5158

**Table of Contents**
**(Continued)**

Exhibit 137 to Reilly Declaration -
Response to FDA Request for Information,
dated April 13, 2005 (MRK-CHA00000315-60) ................... Appx5164

Exhibit 138 to Reilly Declaration -
Response to FDA Request for Information,
dated November 15, 2006 (MRK-CHA00000393-409) ........ Appx5211

Exhibit 139 to Reilly Declaration -
Response to CBER Comments, dated June 10, 2002
(MRK-KRA00761628-702) .................................................... Appx5229

Exhibit 140 to Reilly Declaration -
Regulatory Liaison FDA Conversation Record,
dated October 5, 2004 (MRK-CHA00846405-15) ................ Appx5305

Exhibit 141 to Reilly Declaration -
Email from Florian Schodel to Michael L. Dekleva,
dated July 3, 2004 (MRK-CHA00791315-9) ........................ Appx5317

Exhibit 142 to Reilly Declaration -
Proposal for Immunogenicity Analyses
(MRK-CHA00561111-2) ....................................................... Appx5323

Exhibit 143 to Reilly Declaration -
Email from David Krah, M.D. to Emilio Emini, Ph.D.,
dated October 9, 2000 (MRK-CHA00065695-703) .............. Appx5326

Exhibit 144 to Reilly Declaration -
Anti-IgG Enhanced Mumps Neutralization Assay-Update,
dated October 24, 2000 (MRK-CHA00026912-8) ................ Appx5336

Exhibit 145 to Reilly Declaration -
Email from Jospeh Antonello to David Krah, M.D.,
dated October 30, 2000 (MRK-CHA00759836-9) ................ Appx5344

Exhibit 146 to Reilly Declaration -
Deposition Testimony of Barbara Kuter,
taken February 9, 2018 ......................................................... Appx5349

## Table of Contents
## (Continued)

**Page**

Exhibit 147 to Reilly Declaration -
Email from Steven Rubin to David Krah, M.D.,
dated August 24, 2011 (MRK-CHA00030994-8) .................. Appx5398

Exhibit 148 to Reilly Declaration -
Excerpts from Attachments to 11/18/98 CDOC Meeting
(MRK-CHA01731773-1804) ................................................ Appx5404

Exhibit 149 to Reilly Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
teleconference on methods used for the plaque reduction
neutralization assay, dated February 22, 1999
(MRK-CHA00095050-2) ...................................................... Appx5437

Exhibit 150 to Reilly Declaration -
Extra CDAB Meeting Abstract, dated August 1, 2011
(GSK-MMR-0195819-42) ...................................................... Appx5441

Exhibit 151 to Reilly Declaration -
Performance Characteristics and Validation for Mumps Plaque
Reduction Microneutralization assay
(GSK-MMR-IND-0022195-269) .......................................... Appx5466
***(Cont'd in Vol XIV)***

**Volume XIV**
**(Filed Under Seal)**

Exhibit 152 to Reilly Declaration -
Agenda for CBER Meeting, dated March 13, 2000
(MRK-CHA00016335-43) ...................................................... Appx5542

Exhibit 153 to Reilly Declaration -
Email from David Krah, M.D. to Alan Shaw,
dated August 15, 2000 (MRK-CHA00068546) ..................... Appx5552

Exhibit 154 to Reilly Declaration -
To-Do List, dated August 26, 2000
(MRK-CHA00273243-4) ...................................................... Appx5554

**Table of Contents**
**(Continued)**

Exhibit 155 to Reilly Declaration -
Deposition Testimony of Stephen Krahling,
taken May 2-3, 2017 ............................................................ Appx5557

Exhibit 156 to Reilly Declaration -
Memo re: Monthly report for May, 2000, dated May 23, 2000
(MRK-CHA01634869-71) ..................................................... Appx5690

Exhibit 157 to Reilly Declaration -
Handwritten Notes in Book 31271, Pages 161-2
(MRK-CHA00064608-9) ....................................................... Appx5694

Exhibit 158 to Reilly Declaration -
Email from David Krah, M.D. to Emilio Emini, Ph.D.,
dated March 30, 2000 (MRK-CHA00336323-5) ................... Appx5697

Exhibit 159 to Reilly Declaration -
Email from Keith D. Chirgwin with attachment,
dated February 26, 2001
(MRK-CHA00549462-72) ...................................................... Appx5701

Exhibit 160 to Reilly Declaration -
Relator Stephen A. Krahling's Responses and Objections
to Merck's Revised First Set of Interrogatories,
dated May 18, 2015 .............................................................. Appx5713

Exhibit 161 to Reilly Declaration -
Deposition Testimony of Joseph Antonello, Ph.D.,
taken August 3, 2017 ........................................................... Appx5780

Exhibit 162 to Reilly Declaration -
Email from Beverly A. Zaber to Cathy W. Wadsworth,
dated August 9, 2001 (MRK-CHA00008835-9) .................... Appx5862

Exhibit 163 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Steve Krahling, dated March 29, 2001
(MRK-CHA00015702-3) ....................................................... Appx5868

**Table of Contents**
**(Continued)**

**Page**

Exhibit 164 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Colleen Barr, dated March 29, 2001
(MRK-CHA00014739-40) ..................................................... Appx5871

Exhibit 165 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Mary Yagodich, dated March 29, 2001
(MRK-CHA00014746-7) ..................................................... Appx5874

Exhibit 166 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Jennifer Kriss, dated March 29, 2001
(MRK-CHA00014829-30) ..................................................... Appx5877

Exhibit 167 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Steve Krahling, dated March 29, 2001
(MRK-CHA00014731-2) ..................................................... Appx5880

Exhibit 168 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Mary Yagodich, dated March 29, 2001
(MRK-CHA00014744-5) ..................................................... Appx5883

Exhibit 169 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Jill DeHaven, dated March 29, 2001
(MRK-CHA00014749-50) ..................................................... Appx5886

Exhibit 170 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Jennifer Kriss, dated March 29, 2001
(MRK-CHA00015719-20) ..................................................... Appx5889

Exhibit 171 to Reilly Declaration -
Memo re: Study KM-248 Phase III-Questionable ELISA
Results in the Comparator Group, dated November 1, 2001
(MRK-CHA00760670-2) ..................................................... Appx5892

**Table of Contents**
**(Continued)**

**Page**

Exhibit 172 to Reilly Declaration -
Deposition Testimony of Joan L. Wlochowski,
taken June 13-14, 2017 ......................................................... Appx5896
*(Cont'd in Vol XV)*

**Volume XV**
**(Filed Under Seal)**

Exhibit 173 to Reilly Declaration -
Outline for HR Discussion (RELATOR_00000273) ............. Appx6040

Exhibit 174 to Reilly Declaration -
Expert Report of Philip Stark, Ph.D.,
dated March 12, 2018 .......................................................... Appx6042

Exhibit 175 to Reilly Declaration -
Supplemental Expert Report of Philip Stark, Ph.D.,
dated October 16, 2018 ........................................................ Appx6072

Exhibit 176 to Reilly Declaration -
Email from Jospeh Antonello with attachments,
dated March 20, 2002
(MRK-CHA00544820-47) ................................................... Appx6079

Exhibit 177 to Reilly Declaration -
Excerpts from journal of David Krah, M.D.
(MRK-CHA00489903-490080) ............................................ Appx6133

Exhibit 178 to Reilly Declaration -
Handwritten Log (RELATOR_00001025-6) ......................... Appx6136

Exhibit 179 to Reilly Declaration -
Excerpts from journal of David Krah, M.D.
(MRK-CHA00490592-91038) .............................................. Appx6139

Exhibit 180 to Reilly Declaration -
Memo re: Review of mumps-AIGENT neutralization data,
dated August 1, 2001 (MRK-CHA00026864) ....................... Appx6144

**Table of Contents**
**(Continued)**

**Page**

Exhibit 181 to Reilly Declaration -
Email from Karen R. McKenney, dated August 7, 2001
(MRK-CHA00052249-53) .................................................... Appx6146

Exhibit 182 to Reilly Declaration -
General Correspondence and Submission to FDA,
dated February 4, 2002 (MRK-CHA00000410-78) ............... Appx6152

Exhibit 183 to Reilly Declaration -
Assay Log (MRK-CHA00050333-42) .................................. Appx6222

Exhibit 184 to Reilly Declaration -
Handwritten Notes regarding Discarded Plates
(MRK-CHA00055013) ......................................................... Appx6233

Exhibit 185 to Reilly Declaration -
Memo re: Validation of the Anti-IgG Enhanced Mumps Wild
Type Plaque Reduction Neutralization Assay (Virus and Cell
Biology Research Procedure #874.3489), dated
February 27, 2001 (MRK-CHA00016988-17023) ................ Appx6235

Exhibit 186 to Reilly Declaration -
Response to FDA Request for Information,
dated March 12, 2001 (MRK-CHA00017036-115) ............... Appx6272

Exhibit 187 to Reilly Declaration -
Biological Product Deviation Report Form,
dated April 20, 2001 (MRK-CHA00754233-8) ..................... Appx6353

Exhibit 188 to Reilly Declaration -
Background Document: M-M-R®II Protocol 007-Mumps End
Expiry Study: AIGENT Assay Issues and Impact on Study
Criteria (MRK-CHA00615152-74) ....................................... Appx6360

Exhibit 189 to Reilly Declaration -
Supplemental Biologics License Application,
dated January 29, 2004 (MRK-CHA00000032-139) ............. Appx6384

**Table of Contents**
**(Continued)**

**Page**

Exhibit 190 to Reilly Declaration -
Information Amendment-Clinical, dated November 30, 2001
(MRK-CHA00126233-66) .................................................... Appx6493
***(Cont'd in Vol XVI)***

**Volume XVI**
**(Filed Under Seal)**

Exhibit 191 to Reilly Declaration -
Email from Mandie Lyon to David Krah, M.D.,
dated August 19, 2004 (MRK-CHA00337141-57) ................ Appx6528

Exhibit 192 to Reilly Declaration -
Email from Barbara J. Kuter to Barbara J. Kuter
with attachment, dated August 5, 2009
(MRK-CHA00121080-82) .................................................... Appx6546

Exhibit 193 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of October 24, 2011 ..................... Appx6550

Exhibit 194 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of September 26, 2012 ................. Appx6555

Exhibit 195 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of October 17, 2012 ..................... Appx6559

Exhibit 196 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of December 22, 2012 ................. Appx6563

Exhibit 197 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of July 3, 2013 ............................ Appx6567

**Table of Contents**
**(Continued)**

Exhibit 198 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of October 7, 2015 ....................... Appx6571

Exhibit 199 to Reilly Declaration -
CinicalTrials.gov "Background" webpage,
last accessed October 14, 2019 ............................................. Appx6575

Exhibit 200 to Reilly Declaration -
EMEA Scientific Discussion Paper re: M-M-RVAXPRO
and M-M-RII, downloaded October 10, 2019 ........................ Appx6580

Exhibit 201 to Reilly Declaration -
Letter from Dr. Gudrun V. Wangenheim to
D. Wonnacott, Ph.D. (MRK-CHA00626021-2) .................... Appx6616

Exhibit 202 to Reilly Declaration -
Letter from Karen L. Goldenthal, M.D. to Alison Fisher,
Ph.D., dated October 17, 2005 (MRK-CHA00560257-8) ..... Appx6619

Exhibit 203 to Reilly Declaration -
Amendment to Supplemental Biologics License Application
Response to FDA Request for Information,
dated June 5, 2007, with Attachments
(MRK-CHA00000368-82) ..................................................... Appx6622

Exhibit 204 to Reilly Declaration -
Email from Margaret Kanters to Donna Zacholski,
dated January 30, 2009 (MRK-CHA01300697-9) ................. Appx6638

Exhibit 205 to Reilly Declaration -
Approval Letter from FDA, dated December 6, 2007
(MRK-CHA01519087-8) ....................................................... Appx6642

Exhibit 206 to Reilly Declaration -
Memo re: Review of Merck's 7068-214, dated July 27, 2004
(MRK-CHA00846451-3) ....................................................... Appx6645

**Table of Contents**
**(Continued)**

**Page**

Exhibit 207 to Reilly Declaration -
ProQuad™ Original Application, dated August 3, 2004
(MRK-CHA00158320-71) ...................................................... Appx6649

Exhibit 208 to Reilly Declaration -
Deposition Testimony of Michael Dekleva,
taken February 9, 2017 ......................................................... Appx6687

Exhibit 209 to Reilly Declaration -
Original Biologics License Application, dated August 27, 2004
(MRK-CHA00157572-3) ....................................................... Appx6760

Exhibit 210 to Reilly Declaration -
Email from Louis H. Washington to Michael L. Dekleva,
dated June 10, 2004 (MRK-CHA00821967-9) ...................... Appx6763

Exhibit 211 to Reilly Declaration -
Information Amendment-Clinical, dated November 27, 2001
(MRK-CHA00152449-67) ...................................................... Appx6767

Exhibit 212 to Reilly Declaration -
Excerpts from Merck's Responses and Objections to
Plaintiffs' First Set of Interrogatories,
dated August 16, 2017 .......................................................... Appx6787

Exhibit 213 to Reilly Declaration -
Excerpts from Merck's Response to Request for Information,
dated May 4, 2005 (MRK-CHA00846087-6404) .................. Appx6798

Exhibit 214 to Reilly Declaration -
Approval Letter, dated September 6, 2005
(MRK-CHA00761865-89) ...................................................... Appx6804

Exhibit 215 to Reilly Declaration -
Supplemental Biologics License Application,
dated June 30, 2004 (MRK-CHA00137854-5) ...................... Appx6830

**Table of Contents**
**(Continued)**

Exhibit 216 to Reilly Declaration -
Excerpts from A Comparison of the Safety, Tolerability, and
Immunogenicity of M-M-R™II Manufactured With
Recombinant Human Albumin (rHA) Versus M-M-R™II
Manufactured with Pooled-Donor Human Serum Albumin
(HSA) in Healthy Children 12 to 18 Months of Age
Protocol 009 (MRK-CHA00140056-41340) ........................ Appx6833

Exhibit 217 to Reilly Declaration -
Excerpts from Measles, Mumps, and Rubella Virus Vaccine,
Live-Replacement of Human Serum Albumin With
Recombinant Albumin (MRK-CHA00138137-72) ............... Appx6908

Exhibit 218 to Reilly Declaration -
Excerpts from Response to FDA Request for Information,
dated June 28, 2004 (MRK-CHA00124554-4690) ................ Appx6931

Exhibit 219 to Reilly Declaration -
Approval Letter, dated August 31, 2005
(MRK-CHA00141909-22) .................................................... Appx6979

Exhibit 220 to Reilly Declaration -
M-M-R®II Label (April 1999)
(MRK-CHA00757072-6) ....................................................... Appx6994

Exhibit 221 to Reilly Declaration -
M-M-R®II Label (MRK-CHA00757108-11) ........................ Appx7000
*(Cont'd in Vol XVII)*

**Volume XVII**
**(Filed Under Seal)**

Exhibit 222 to Reilly Declaration -
M-M-R®II Label (2004) (MRK-CHA00757100-3) .............. Appx7005

Exhibit 223 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449260-70) ....................... Appx7010

**Table of Contents**
**(Continued)**

**Page**

Exhibit 224 to Reilly Declaration -
Current M-M-R®II Label (last revised: 09/2019),
downloaded on October 22, 2019 ......................................... Appx7022

Exhibit 225 to Reilly Declaration -
M-M-R®II Label (1990) (MRK-CHA00757060-3) .............. Appx7034

Exhibit 226 to Reilly Declaration -
Summary of Revisions of M-M-R®II Label
(MRK-CHA00137876-7) ....................................................... Appx7039

Exhibit 227 to Reilly Declaration -
Protocol 006 Clinical Study Report Synopsis,
dated August 16, 2004 (MRK-CHA01580213-19) ................ Appx7042

Exhibit 228 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449029-40) ........................ Appx7050

Exhibit 229 to Reilly Declaration -
Description of ProQuad® (MRK-CHA00177125-36) .......... Appx7063

Exhibit 230 to Reilly Declaration -
ProQuad® Label (MRK-CHA01449181-2) .......................... Appx7076

Exhibit 231 to Reilly Declaration -
Current ProQuad Label (last revised: 09/2019),
downloaded on October 22, 2019 ......................................... Appx7079

Exhibit 232 to Reilly Declaration -
Excerpts from Merck's Responses and Objections to Relators'
First Set of Interrogatories, dated April 9, 2015 .................... Appx7105

Exhibit 233 to Reilly Declaration -
Expert Report of Yonatan Grad, M.D., Ph.D.,
dated June 12, 2018 .............................................................. Appx7114

Exhibit 234 to Reilly Declaration -
Excerpts from "Summary of Notifiable Diseases-United
States, 2006," *MMWR*, 2008:55(53) ...................................... Appx7169

**Table of Contents**
(Continued)

Exhibit 235 to Reilly Declaration -
Excerpts from "Summary of Notifiable Diseases-United
States, 2009," *MMWR*, 2009:58(53) ..................................... Appx7173

Exhibit 236 to Reilly Declaration -
Excerpts from a "Summary of Notifiable Diseases-United
States, 2010," *MMWR*, 2012:59(53) ..................................... Appx7177

Exhibit 237 to Reilly Declaration -
Excerpts from "Summary of Notifiable Diseases-United
States, 2012," *MMWR*, 2014:61(53) ..................................... Appx7181

Exhibit 238 to Reilly Declaration -
Excerpts from "Summary of Notifiable Infectious
Diseases and Conditions-United States, 2013,"
*MMWR*, 2015:62(53) ........................................................... Appx7185

Exhibit 239 to Reilly Declaration -
Excerpts from "Summary of Notifiable Infectious
Diseases and Conditions-United States, 2014,"
*MMWR*, 2016:63(54) ........................................................... Appx7189

Exhibit 240 to Reilly Declaration -
Excerpts from "Summary of Notifiable Infectious
Diseases and Conditions-United States, 2015,"
*MMWR*, 2017:64(53) ........................................................... Appx7194

Exhibit 241 to Reilly Declaration -
National Notifiable Infectious Diseases and Conditions:
United States TABLE 2j. Reported cases of notifiable
diseases, by region and reporting area-United States and
U.S. territories, 2016 ........................................................... Appx7199

Exhibit 242 to Reilly Declaration -
National Notifiable Infectious Diseases and Conditions:
United States TABLE 2j. Reported cases of notifiable
diseases, by region and reporting area-United States and
U.S. territories, 2017 ........................................................... Appx7202

## Table of Contents
### (Continued)

Exhibit 243 to Reilly Declaration -
Nationally Notifiable Infectious Diseases and Conditions,
United States: Weekly Tables; TABLE 1y. Weekly cases of
notifiable diseases, United States, U.S. Territories, and
Non-U.S. Residents weeks ending September 14, 2019
(week 37) ............................................................................ Appx7205

Exhibit 244 to Reilly Declaration -
"Decreased humoral immunity to mumps in young adults
immunized with MMR vaccine in childhood," Rasheed, *et al.*,
PNAS, dated September 17, 2019 116 (38) ........................... Appx7209

Exhibit 245 to Reilly Declaration -
Deposition Testimony of William L. Atkinson, M.D., MPH,
taken January 30, 2019 ......................................................... Appx7216

Exhibit 246 to Reilly Declaration -
Email from Don Latner to William Bellini,
dated July 29, 2010 (BIAOHE000446-53) ............................ Appx7270

Exhibit 247 to Reilly Declaration -
Deposition Testimony of Yonatan Grad, M.D., Ph.D.,
taken October 30, 2018 ......................................................... Appx7279

Exhibit 248 to Reilly Declaration -
Press Briefing Transcripts from CDC,
dated April 19, 2006 ............................................................. Appx7342

Exhibit 249 to Reilly Declaration -
Deposition Testimony of Alan W. Sims,
taken October 12, 2017 ......................................................... Appx7349

Exhibit 250 to Reilly Declaration -
Deposition Testimony of Katalin Abraham,
taken May 18, 2017 .............................................................. Appx7403
***(Cont'd in Vol XVIII)***

**Table of Contents**
**(Continued)**

**Page**

**Volume XVIII**
**(Filed Under Seal)**

Exhibit 251 to Reilly Declaration -
Email from Eric T. Skjeveland to Christopher J. Petroski,
dated June 7, 2012 (MRK-CHA00955961) ........................... Appx7504

Exhibit 252 to Reilly Declaration -
Expert Report of Jonathan Temte, M.D., Ph.D.,
dated June 12, 2018 ............................................... Appx7506

Exhibit 253 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449243-53) ....................... Appx7556

Exhibit 254 to Reilly Declaration -
Transcription of an MVX (voice mail) from Manal A. Morsy
to Henrietta Ukwu and Keith D. Chirgwin
(MRK-CHA00020421-2) ...................................... Appx7568

Exhibit 255 to Reilly Declaration -
CDC Presentation, "Mumps-What Happened in 2006?
National Perspective," by Gustavo Dayan,
dated March 5, 2007
(MRK-CHA01372603-33) ..................................... Appx7571

Exhibit 256 to Reilly Declaration -
"Commentary: Mumps Vaccines: Do We Need A New One?"
by Stanely A. Plotkin, M.D., accepted for publication
December 4, 2012 .................................................. Appx7603

Exhibit 257 to Reilly Declaration -
"Mumps: A Pain in the Neck," by Stanley A. Plotkin, M.D.,
accepted for publication April 19, 2018 ................................ Appx7606

Exhibit 258 to Reilly Declaration -
"Emerging Mumps Infection," by Rubin, *et al.*,
accepted for publication April 12, 2016 ................................ Appx7609

**Table of Contents**
**(Continued)**

Exhibit 259 to Reilly Declaration -
"Measles and mumps outbreaks in the United States: Think
globally, vaccinate locally," by Jennifer A. Whitaker,
*Vaccine* 32 (2014) ................................................................ Appx7613

Exhibit 260 to Reilly Declaration -
"Remembering Mumps," by Latner, *et al.*, *PLOS Pathogens*,
published May 7, 2015 ........................................................ Appx7616

Exhibit 261 to Reilly Declaration -
"The resurgence of mumps and pertussis," by Martine Sabbe
and Corinne Vandermeulen accepted for publication
October 22, 2015 ................................................................ Appx7621

Exhibit 262 to Reilly Declaration -
"Mumps Outbreaks in Vaccinated Populations: Are Available
Mumps Vaccines Effective Enough to Prevent Outbreaks?"
by Dayan, *et al.*, accepted for publication May 20, 2008 ...... Appx7631

Exhibit 263 to Reilly Declaration -
Shapiro Deposition Exhibit 25, Program Announcement for
the Department of Defense's Defense Health Program for
Funding Opportunity No. W81XWH-17-PRMRP-CTA ........ Appx7642

Exhibit 264 to Reilly Declaration -
Excerpts from Notice of Grant Award, issued May 7, 2012
(RELATOR_00004392-478) ................................................ Appx7712

Exhibit 265 to Reilly Declaration -
Expert Report of William P. Nichols, dated June 12, 2018 .... Appx7743

Exhibit 266 to Reilly Declaration -
Solicitation Number 2003-N-00734,
issued December 19, 2002 by the CDC ................................ Appx7779

Exhibit 267 to Reilly Declaration -
Solicitation Number 2005-N-01706,
issued January 4, 2005 by the CDC ...................................... Appx7826

**Table of Contents**
**(Continued)**

**Page**

Exhibit 268 to Reilly Declaration -
Solicitation Number 2007-N-09211,
issued January 23, 2007 by the CDC ................................... Appx7872

Exhibit 269 to Reilly Declaration -
Solicitation Number 2010-N-11873,
issued January 26, 2010 by the CDC ................................... Appx7923

Exhibit 270 to Reilly Declaration -
Solicitation Number 2011-N-13043,
issued December 21, 2010 by the CDC ................................ Appx7956

Exhibit 271 to Reilly Declaration -
Solicitation Number 2012-N-14228,
issued December 13, 2011 by the CDC ................................ Appx7987
***(Cont'd in Vol XIX)***

**Volume XIX**
**(Filed Under Seal)**

Exhibit 272 to Reilly Declaration -
Solicitation Number 2013-N-14972,
issued January 22, 2013 by the CDC ................................... Appx8013

Exhibit 273 to Reilly Declaration -
Solicitation Number 2014-N-15784,
issued January 24, 2014 by the CDC ................................... Appx8040

Exhibit 274 to Reilly Declaration -
Solicitation Number 2015-N-16850,
issued January 16, 2015 by the CDC ................................... Appx8067

Exhibit 275 to Reilly Declaration -
Solicitation Number 2016-N-17693,
issued January, 4, 2015 by the CDC ................................... Appx8098

Exhibit 276 to Reilly Declaration -
Solicitation Number 2017-N-18099,
issued January 21, 2017 by the CDC ................................... Appx8127

**Table of Contents**
**(Continued)**

Exhibit 277 to Reilly Declaration -
Solicitation Number 2018-N-67769,
issued January 10, 2018 by the CDC .................................... Appx8156

Exhibit 278 to Reilly Declaration -
Solicitation Number 75D301-19-R-67848,
issued January 7, 2019 by the CDC ..................................... Appx8183

Exhibit 279 to Reilly Declaration -
Summary of GSK-CDC MMR/V Vaccine Meeting
(GSK-MMR-0030570-2) ...................................................... Appx8212

Exhibit 280 to Reilly Declaration -
Charter of the Advisory Committee on Immunization
Practices, filed April 1, 2018 ................................................ Appx8216

Exhibit 281 to Reilly Declaration -
Relators' Expert Report of Dr. Thomas McGuire,
dated March 13, 2018 .......................................................... Appx8222

Exhibit 282 to Reilly Declaration - [1]
Transactional data, "1998 Lot Assignment.xlsx"
(MRK-CHA02143443) ......................................................... Appx8369

Exhibit 283 to Reilly Declaration -
Transactional data, "1999 Lot Assignment.xlsx"
(MRK-CHA02143444) ......................................................... Appx8371

Exhibit 284 to Reilly Declaration -
Transactional data, "2000 Lot Assignment.xlsx"
(MRK-CHA02143445) ......................................................... Appx8373

Exhibit 285 to Reilly Declaration -
Transactional data, "2001 Lot Assignment.xlsx"
(MRK-CHA02143446) ......................................................... Appx8375

---

[1] Exhibits 282 through 299 to the Reilly Declaration have been omitted by consent of the parties.

**Table of Contents**
**(Continued)**

Exhibit 286 to Reilly Declaration -
Transactional data, "2002 Lot Assignment.xlsx"
(MRK-CHA02143447) ......................................................... Appx8377

Exhibit 287 to Reilly Declaration -
Transactional data, "2003 Lot Assignment.xlsx"
(MRK-CHA02143448) ......................................................... Appx8379

Exhibit 288 to Reilly Declaration -
Transactional data, "2004 Lot Assignment.xlsx"
(MRK-CHA02143449) ......................................................... Appx8381

Exhibit 289 to Reilly Declaration -
Transactional data, "2005 Lot Assignment.xlsx"
(MRK-CHA02143450) ......................................................... Appx8383

Exhibit 290 to Reilly Declaration -
Transactional data, "2006 Lot Assignment.xlsx"
(MRK-CHA02143451) ......................................................... Appx8385

Exhibit 291 to Reilly Declaration -
Transactional data, "2007 Lot Assignment.xlsx"
(MRK-CHA02143452) . ......................................................... Appx8387

Exhibit 292 to Reilly Declaration -
Transactional data, "2008 Lot Assignment.xlsx"
(MRK-CHA02143453) ......................................................... Appx8389

Exhibit 293 to Reilly Declaration -
Transactional data, "2009 Lot Assignment.xlsx"
(MRK-CHA02143454) ......................................................... Appx8391

Exhibit 294 to Reilly Declaration -
Transactional data, "2010 Lot Assignment.xlsx"
(MRK-CHA02143455) ......................................................... Appx8393

Exhibit 295 to Reilly Declaration -
Transactional data, "2011 Lot Assignment.xlsx"
(MRK-CHA02143456) ......................................................... Appx8395

**Table of Contents**
**(Continued)**

**Page**

Exhibit 296 to Reilly Declaration -
Transactional data, "2012 Lot Assignment.xlsx"
(MRK-CHA02143457) ........................................................ Appx8397

Exhibit 297 to Reilly Declaration -
Transactional data, "2013 Lot Assignment.xlsx"
(MRK-CHA02143458) ........................................................ Appx8399

Exhibit 298 to Reilly Declaration -
Transactional data, "2014 Lot Assignment.xlsx"
(MRK-CHA02143459) ........................................................ Appx8401

Exhibit 299 to Reilly Declaration -
Transactional data, "2015 Lot Assignment.xlsx"
(MRK-CHA02143460) ........................................................ Appx8403

Exhibit 300 to Reilly Declaration -
Letter from Lisa C. Dykstra to Counsel,
dated April 17, 2017 ............................................................ Appx8405

Exhibit 301 to Reilly Declaration -
Letter from Stan Bernard, M.D., M.B.A. to Kim Haupt,
dated November 9, 2008 (MRK-CHA02063339-45) ............ Appx8407

Exhibit 302 to Reilly Declaration -
Merck's 2004 Vaccine for Children Contract with the CDC
(MRK-CHA01371280-310) .................................................. Appx8415

Exhibit 303 to Reilly Declaration -
Merck's 2003 Vaccine for Children Contract with the CDC
(MRK-CHA01371311-40) .................................................... Appx8447

Exhibit 304 to Reilly Declaration -
Merck's 2005 Vaccine for Children Contract with the CDC
(MRK-CHA01371341-72) .................................................... Appx8478
***(Cont'd in Vol XX)***

**Table of Contents**
**(Continued)**

**Volume XX**
**(Filed Under Seal)**

Exhibit 305 to Reilly Declaration -
Merck's 2010 Vaccine for Children Contract with the CDC
(MRK-CHA01371373-97) .................................................... Appx8511

Exhibit 306 to Reilly Declaration -
Merck's 2012 Vaccine for Children Contract with the CDC
(MRK-CHA01371398-421) .................................................. Appx8537

Exhibit 307 to Reilly Declaration -
Merck's 2013 Vaccine for Children Contract with the CDC
(MRK-CHA01371422-44) .................................................... Appx8562

Exhibit 308 to Reilly Declaration -
Merck's 2014 Vaccine for Adults Contract with the CDC
(MRK-CHA01371445-72) .................................................... Appx8586

Exhibit 309 to Reilly Declaration -
Merck's 2014 Vaccine for Children Contract with the CDC
(MRK-CHA01371473-96) .................................................... Appx8615

Exhibit 310 to Reilly Declaration -
Merck's 2011 Vaccine for Children Contract with the CDC
(MRK-CHA01371497-518) .................................................. Appx8640

Exhibit 311 to Reilly Declaration -
Merck's 2011 Vaccine for Adults Contract with the CDC
(MRK-CHA01371519-47) .................................................... Appx8663

Exhibit 312 to Reilly Declaration -
Merck's 2013 Vaccine for Adults Contract with the CDC
(MRK-CHA01371548-71) .................................................... Appx8693

Exhibit 313 to Reilly Declaration -
Merck's 2012 Vaccine for Adults Contract with the CDC
(MRK-CHA01371572-603) ................................................. Appx8718

**Table of Contents**
(Continued)

**Page**

Exhibit 314 to Reilly Declaration -
Merck's 2007 Vaccine for Children Contract with the CDC
(MRK-CHA01371604-23) ..................................................... Appx8751

Exhibit 315 to Reilly Declaration -
Merck's 2006 Vaccine for Children Contract with the CDC
(MRK-CHA01371624-55) ..................................................... Appx8772

Exhibit 316 to Reilly Declaration -
Merck's 2001 Vaccine for Children Contract with the CDC
(MRK-CHA01371656-92) ..................................................... Appx8805

Exhibit 317 to Reilly Declaration -
Merck's 2000 Vaccine for Children Contract with the CDC
(MRK-CHA01371693-727) ................................................... Appx8843

Exhibit 318 to Reilly Declaration -
Merck's 1998 Vaccine for Children Contract with the CDC
(MRK-CHA01371728-50) ..................................................... Appx8879

Exhibit 319 to Reilly Declaration -
Merck's 1999 Vaccine for Children Contract with the CDC
(MRK-CHA01371751-84) ..................................................... Appx8903

Exhibit 320 to Reilly Declaration -
Merck's 2002 Vaccine for Children Contract with the CDC
(MRK-CHA01371785-816) ................................................... Appx8938

Exhibit 321 to Reilly Declaration -
Merck's 2008 Vaccine for Children Contract with the CDC
(MRK-CHA01371817-840) ................................................... Appx8971

Exhibit 322 to Reilly Declaration -
Merck's 2009 Vaccine for Adults Contract with the CDC
(MRK-CHA01371841-879) ................................................... Appx8996
*(Cont'd in Vol XXI)*

**Table of Contents**
**(Continued)**

**Page**

**Volume XXI**
**(Filed Under Seal)**

Exhibit 323 to Reilly Declaration -
Merck's 2009 Vaccine for Children Contract with the CDC
(MRK-CHA01371880-1900) ................................................ Appx9036

Exhibit 324 to Reilly Declaration -
Merck's 2010 Vaccine for Adults Contract with the CDC
(MRK-CHA01371901-33) .................................................... Appx9058

Exhibit 325 to Reilly Declaration -
Merck's 2015 Vaccine for Adults Contract with the CDC
(MRK-CHA01371934-61) .................................................... Appx9092

Exhibit 326 to Reilly Declaration -
Merck's 2016 Vaccine for Children Contract with the CDC
(MRK-CHA01371962-89) .................................................... Appx9121

Exhibit 327 to Reilly Declaration -
Merck's 2010 Vaccine for Adults Contract with the CDC
(MRK-CHA01371990-2020) ................................................ Appx9150

Exhibit 328 to Reilly Declaration -
Merck's 2016 Vaccine for Adults Contract with the CDC
(MRK-CHA01372021-44) .................................................... Appx9182

Exhibit 329 to Reilly Declaration -
Merck's 2015 Vaccine for Children Contract with the CDC
(MRK-CHA01372045-72) .................................................... Appx9207

Exhibit 330 to Reilly Declaration -
Invoice, dated March 14, 2012 (MRK-CHA01371253) ........ Appx9236

Exhibit 331 to Reilly Declaration -
Invoice, dated January 3, 2011(MRK-CHA01371256) ......... Appx9238

Exhibit 332 to Reilly Declaration -
Invoice, dated January 6, 2014 (MRK-CHA01371258) ........ Appx9240

**Table of Contents**
**(Continued)**

**Page**

Exhibit 333 to Reilly Declaration -
Invoice, dated May 20, 2010 (MRK-CHA01371259) ........... Appx9242

Exhibit 334 to Reilly Declaration -
Invoice, dated January 14, 2013 (MRK-CHA01371261) ...... Appx9244

Exhibit 335 to Reilly Declaration -
Invoice, dated February 2, 2011 (MRK-CHA01371262) ...... Appx9246

Exhibit 336 to Reilly Declaration -
Invoice, dated November 17, 2010 (MRK-CHA01371263) . Appx9248

Exhibit 337 to Reilly Declaration -
Invoice, dated November 28, 2012 (MRK-CHA01371264) . Appx9250

Exhibit 338 to Reilly Declaration -
Invoice, dated March 20, 2013 (MRK-CHA01371268-69) ... Appx9252

Exhibit 339 to Reilly Declaration -
Invoice, dated January 22, 2016 (MRK-CHA01371274) ...... Appx9255

Exhibit 340 to Reilly Declaration -
Invoice, dated February 26, 2014 (MRK-CHA01371278) .... Appx9257

Exhibit 341 to Reilly Declaration -
Invoice, dated February 4, 2015 (MRK-CHA01371279) ...... Appx9259

Exhibit 342 to Reilly Declaration -
FDA webpage, "National Drug Code Directory," accessible
online at https://www.fda.gov/drugs/drug-approvals-and-
databases/national-drug-code-directory, last accessed
October 1, 2019 ................................................................. Appx9261

Exhibit 343 to Reilly Declaration -
Email from Jonathan Hartzel to Joseph M. Antonello,
dated October 18, 2005 (MRK-CHA00759061-4) ................ Appx9268

**Table of Contents**
(Continued)

Exhibit 344 to Reilly Declaration -
Email from Joseph M. Antonello to Timothy L. Shofield,
dated May 5, 2005 (MRK-CHA00649638-40) ..................... Appx9273

Exhibit 345 to Reilly Declaration -
Letter from Lisa C. Dykstra to Counsel,
dated September 13, 2018 ..................................................... Appx9277

Exhibit 346 to Reilly Declaration -
Letter from Lisa C. Dykstra to the Honorable
Lynne A. Sitarski, dated June 15, 2015 .................................. Appx9289

Exhibit 347 to Reilly Declaration -
Deposition Testimony of Peter Calcott, Ph.D.,
taken September 7, 2018 ....................................................... Appx9307

Exhibit 348 to Reilly Declaration -
Email from Mandie Lyon, dated May 5, 2006
(MRK-CHA00069026-36) ..................................................... Appx9385

Exhibit 349 to Reilly Declaration -
Presentation, M-M-R II End Expiry, produced as "12-14
CDOC presentation.ppt" (MRK-CHA00021319) ................. Appx9397

Exhibit 350 to Reilly Declaration -
Department of Justice Press Release, dated May 13, 2013 .... Appx9410

Exhibit 351 to Reilly Declaration -
Department of Justice Press Release,
dated October 26, 2010 ......................................................... Appx9414

Exhibit 352 to Reilly Declaration -
Department of Justice Press Release,
dated January 12, 2017 ......................................................... Appx9417

Exhibit 353 to Reilly Declaration -
Department of Justice Press Release,
dated September 24, 2014 ..................................................... Appx9420

**Table of Contents**
**(Continued)**

Exhibit 354 to Reilly Declaration -
Department of Justice Press Release, dated April 15, 2009 ... Appx9423

Exhibit 355 to Reilly Declaration -
Rule 30(b)(6) Deposition topics, dated December 13, 2016
(Stannard Ex. 3) ..................................................... Appx9426

Exhibit 356 to Reilly Declaration -
Department of Justice Press Release,
dated August 8, 2014 ............................................. Appx9443

Exhibit 357 to Reilly Declaration -
FDA Form 483, dated August 6, 2001
(MRK-CHA00000547) ........................................... Appx9446

Exhibit 358 to Reilly Declaration -
Deposition Testimony of Robert Malone, M.D.,
taken September 14, 2018 ...................................... Appx9448
*(Cont'd in Vol XXII)*

**Volume XXII**
**(Filed Under Seal)**

Exhibit 359 to Reilly Declaration -
Deposition Testimony of Dr. Manal Morsy,
taken August 5, 2016 ............................................. Appx9511

Exhibit 360 to Reilly Declaration -
Atkinson Deposition Exhibit 6, "Recommendations of
the Immunization Practices Advisory Committee Measles
Prevention: Supplementary Statement,"
dated January 13, 1989 .......................................... Appx9621

Declaration of Lisa C. Dykstra in Support of
    Defendant's Motions for Summary Judgment,
    executed October 25, 2019 (Doc. 295) .................................. Appx9625

Exhibit 1 to Dykstra Declaration -
Stephen A. Krahling's Resume (MRK-KRA00331426-7) .... Appx9656

**Table of Contents**
(Continued)

**Page**

Exhibit 2 to Dykstra Declaration -
Excerpts from Deposition Testimony of Stephen Krahling,
taken May 2, 2017 ................................................................. Appx9659

Exhibit 3 to Dykstra Declaration -
Merck Employee Initialization Form for Stephen Krahling
(MRK-KRA00582401) .......................................................... Appx9680

Exhibit 4 to Dykstra Declaration -
Stephen Krahling's November 30, 2001 Separation Agreement
(MRK-KRA00582394-7) ....................................................... Appx9682

Exhibit 5 to Dykstra Declaration -
Excerpts from Relator Stephen A. Krahling's Responses
and Objections to Merck's First Set of Interrogatories,
dated January 28, 2015 ......................................................... Appx9687

Exhibit 6 to Dykstra Declaration -
Excerpts from Relator Stephen A. Krahling's Responses
and Objections to Merck's Revised First Set of Interrogatories,
dated May 18, 2015 ............................................................... Appx9716

Exhibit 7 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Stephen Krahling, taken May 3, 2017 ................................... Appx9783

Exhibit 8 to Dykstra Declaration -
Stephen Krahling's handwritten notes,
dated October 1, 2001 (RELATOR_00001044-5) ................. Appx9792

Exhibit 9 to Dykstra Declaration -
FDA's Summary of Findings, dated August 6, 2001
(RELATOR_00004086-94) .................................................... Appx9795

Exhibit 10 to Dykstra Declaration -
Merck FDA Inspection Records, dated August 6, 2001
(MRK-KRA01631009-254) ................................................... Appx9805
*(Cont'd in Vol XXIII)*

**Table of Contents**
**(Continued)**

**Volume XXIII**
**(Filed Under Seal)**

Exhibit 11 to Dykstra Declaration -
Excerpts from the Expert Report of
D. Bruce Burlington M.D. ................................................... Appx10052

Exhibit 12 to Dykstra Declaration -
Merck's Virus and Cell Biology Organization Chart
(RELATOR_00000902-3) ................................................... Appx10070

Exhibit 13 to Dykstra Declaration -
Excerpts from Relator Stephen A. Krahling's Responses
and Objections to Defendant Merck's Requests for
Admission, dated April 4, 2016 ........................................... Appx10073

Exhibit 14 to Dykstra Declaration -
FDA Form 483 Frequently Asked Questions ....................... Appx10101

Exhibit 15 to Dykstra Declaration -
FDA Re-Inspection Memorandum, dated August 10, 2001
(MRK-KRA00071241-5) ................................................... Appx10104

Exhibit 16 to Dykstra Declaration -
CBER Merck Communications Mumps Expiry,
dated August 8, 2002 (MRK-KRA00623049-51) ............... Appx10110

Exhibit 17 to Dykstra Declaration -
Email Communication with Attachments regarding FDA
Inspection-IND 1016, dated September 14, 2001
(MRK-KRA00063885-8) ................................................... Appx10114

Exhibit 18 to Dykstra Declaration -
FDA Telephone Conversation Memorandum,
dated September 17, 2001 (MRK-KRA00019107) ............. Appx10119

Exhibit 19 to Dykstra Declaration -
FDA Teleconference-IND 1016 Inspection Follow up,
dated September 25, 2001 (MRK-KRA00071300-1) .......... Appx10121

**Table of Contents**
**(Continued)**

**Page**

Exhibit 20 to Dykstra Declaration -
CBER December 7, 2001 Teleconference: Mumps Inspection
results and discussions, dated December 13, 2001
(MRK-KRA00019640-6) .................................................... Appx10124

Exhibit 21 to Dykstra Declaration -
General Correspondence to FDA in response to CBER
Comments, dated February 4, 2002
(MRK-KRA00025847-916) ................................................ Appx10132

Exhibit 22 to Dykstra Declaration -
General Correspondence to FDA regarding April 18, 2002
Teleconference, dated April 2002
(MRK-KRA00337265-72) ................................................. Appx10203

Exhibit 23 to Dykstra Declaration -
BB-IND 1016 Memorandum regarding Summary of
Discussion with CBER on March 22, 2002 regarding
acceptability of mumps PRN assay data,
dated March 23, 2002 (MRK-KRA00009042) .................... Appx10212

Exhibit 24 to Dykstra Declaration -
Offer Letter to Stephen A. Krahling, dated October 24, 2000
(RELATOR_00001058-60) ................................................ Appx10214

Exhibit 25 to Dykstra Declaration -
Correspondence from Stephen A. Krahling to
Emilio A. Emini, Ph.D., dated April 8, 2001
(RELATOR_00000328-31) ................................................ Appx10218

Exhibit 26 to Dykstra Declaration -
Email communication from Stephen Krahling to
Alan Shaw, dated July 17, 2001 (MRK-KRA00002243) .... Appx10223

Exhibit 27 to Dykstra Declaration -
Email communication from Stephen Krahling to Alan Shaw,
dated September 25, 2001 (RELATOR_00000745) ............ Appx10225

**Table of Contents**
**(Continued)**

Page

Exhibit 28 to Dykstra Declaration -
Email communications between Stephen Krahling and
Alan Shaw, dated September 27-28, 2001
(RELATOR_00000747) ...................................................... Appx10227

Exhibit 29 to Dykstra Declaration -
Letter from Emilio A. Emini, Ph.D. to Stephen Krahling,
dated October 15, 2001, (RELATOR_00001100-3) ............ Appx10229

Exhibit 30 to Dykstra Declaration -
Letter from Tonia Torquato to Alexis Pinto,
dated October 22, 2001 (MRK-KRA00002033-5) .............. Appx10234

Exhibit 31 to Dykstra Declaration -
Letter from Alexis Pinto to Tonia Torquato,
dated October 19, 2001 (MRK-KRA00002036-9) .............. Appx10238

Exhibit 32 to Dykstra Declaration -
Letter from Tonia Torquato to Alexis Pinto,
dated October 26, 2001 (MRK-KRA00002028-9) .............. Appx10243

Exhibit 33 to Dykstra Declaration -
Letter from Alexis Pinto to Tonia Torquato,
dated October 26, 2001 (MRK-KRA00002017-25) ............ Appx10246

Exhibit 34 to Dykstra Declaration -
Letter from Tonia Torquato to Alexis Pinto,
dated October 29, 2001 (MRK-KRA00002013-16) ............ Appx10256

Exhibit 35 to Dykstra Declaration -
Letter from Axel Johnson to Tonia Torquato,
dated November 26, 2001 (RELATOR_00001086) ............ Appx10261

Exhibit 36 to Dykstra Declaration -
Stephen Krahling Pay Stubs (RELATOR_00001061-7) ...... Appx10263

Exhibit 37 to Dykstra Declaration -
Letter from Axel Johnson to Tonia Torquato,
dated December 20, 2001 (RELATOR_00001090) ............. Appx10271

**Table of Contents**
(Continued)

Exhibit 38 to Dykstra Declaration -
CDC Vaccines for Children Program web page
"About VFC," last reviewed on February 18, 2016 ............. Appx10273

Exhibit 39 to Dykstra Declaration -
Advisory Committee on Immunization Practices Charter
approved March 27, 2018 .................................................. Appx10277

Exhibit 40 to Dykstra Declaration -
Excerpts from Expert Report of William P. Nichols ............ Appx10283

Exhibit 41 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Mark Pallansch,
Ph.D., taken October 13, 2017 ........................................... Appx10292

Exhibit 42 to Dykstra Declaration -
1971 MMR Product License (MRK-KRA01972538) ......... Appx10307

Exhibit 43 to Dykstra Declaration -
1995 MMR Product License (MRK-KRA01676252) ......... Appx10309

Exhibit 44 to Dykstra Declaration -
Merck's Establishment License (MRK-KRA01676250) ..... Appx10311

Exhibit 45 to Dykstra Declaration -
Advisory Committee on Immunization Practices Vaccines for
Children Program-Resolution No. 10/17-3, Vaccines to
Prevent Measles, Mumps, Rubella and Varicella,
dated October 25, 2017 ....................................................... Appx10313

Exhibit 46 to Dykstra Declaration -
Vaccines for Children Program-Resolution No. 6/06-1,
Vaccines included in the VFC Program,
dated June 29, 2006 ............................................................ Appx10317

Exhibit 47 to Dykstra Declaration -
Advisory Committee on Immunization Practices, Policies
and Procedures, dated December 2018 ............................... Appx10319

**Table of Contents**
**(Continued)**

**Page**

Exhibit 48 to Dykstra Declaration -
"Recommendation of the Advisory Committee on
Immunization Practices for Use of a Third Dose of Mumps
Virus Containing Vaccine in Persons at Increased Risk for
Mumps During Outbreak," *MMWR*,
dated January 12, 2018 ........................................................ Appx10345

Exhibit 49 to Dykstra Declaration -
Excerpts from the Expert Report of
William L. Atkinson M.D., MPH, dated June 12, 2018 ....... Appx10355

Exhibit 50 to Dykstra Declaration -
National Center for Immunization and Respiratory Diseases
(CVG) Fact Sheet ............................................................... Appx10365

Exhibit 51 to Dykstra Declaration -
"Prevention of Measles, Rubella, Congenital Rubella
Syndrome, and Mumps," *MMWR*, dated June 14, 2013 ...... Appx10380

Exhibit 52 to Dykstra Declaration -
CDC's "Measles, Mumps, and Rubella (MMR) Vaccination:
What Everyone Should Know," last reviewed
March 28, 2019 ................................................................. Appx10421

Exhibit 53 to Dykstra Declaration -
"Measles, Mumps and Rubella-Vaccine Use and Strategies for
Elimination of Measles, Rubella and Congenital Rubella
Syndrome and Control of Mumps: Recommendations of the
Advisory Committee on Immunization Practices,"
*MMWR*, dated May 22, 1998 ............................................... Appx10428

Exhibit 54 to Dykstra Declaration -
Merck's 1998 Vaccine for Children Contract with the CDC
(MRK-KRA01371728-50) .................................................. Appx10473

Exhibit 55 to Dykstra Declaration -
Merck's 1999 Vaccine for Children Contract with the CDC
(MRK-KRA01371751-84) .................................................. Appx10497
*(Cont'd in Vol XXIV)*

**<u>Table of Contents</u>**
**(Continued)**

**Page**

**Volume XXIV**
**(Filed Under Seal)**

Exhibit 56 to Dykstra Declaration -
Merck's 2000 Vaccine for Children Contract with the CDC
(MRK-KRA01371693-1727) ............................................... Appx10532

Exhibit 57 to Dykstra Declaration -
Merck's 2001 Vaccine for Children Contract with the CDC
(MRK-KRA01371656-92) ................................................... Appx10568

Exhibit 58 to Dykstra Declaration -
Merck's 2002 Vaccine for Children Contract with the CDC
(MRK-KRA01371785-816) .................................................. Appx10606

Exhibit 59 to Dykstra Declaration -
Merck's 2003 Vaccine for Children Contract with the CDC
(MRK-KRA01371311-340) .................................................. Appx10639

Exhibit 60 to Dykstra Declaration -
Merck's 2004 Vaccine for Children Contract with the CDC
(MRK-KRA01371280-310) .................................................. Appx10670

Exhibit 61 to Dykstra Declaration -
Merck's 2005 Vaccine for Children Contract with the CDC
(MRK-KRA01371341-72) ................................................... Appx10702

Exhibit 62 to Dykstra Declaration -
Merck's 2006 Vaccine for Children Contract with the CDC
(MRK-KRA01371624-55) ................................................... Appx10735

Exhibit 63 to Dykstra Declaration -
Merck's 2007 Vaccine for Children Contract with the CDC
(MRK-KRA01371604-23) ................................................... Appx10768

Exhibit 64 to Dykstra Declaration -
Merck's 2008 Vaccine for Children Contract with the CDC
(MRK-KRA01371817-40) ................................................... Appx10789

**<u>Table of Contents</u>**
**(Continued)**

Exhibit 65 to Dykstra Declaration -
Merck's 2009 Vaccine for Children Contract with the CDC
(MRK-KRA01371880-1900) ................................................ Appx10814

Exhibit 66 to Dykstra Declaration -
Merck's 2010 Vaccine for Children Contract with the CDC
(MRK-KRA01371373-97) .................................................... Appx10836

Exhibit 67 to Dykstra Declaration -
Merck's 2011 Vaccine for Children Contract with the CDC
(MRK-KRA01371497-518) .................................................. Appx10862

Exhibit 68 to Dykstra Declaration -
Merck's 2012 Vaccine for Children Contract with the CDC
(MRK-KRA01371398-421) .................................................. Appx10885

Exhibit 69 to Dykstra Declaration -
Merck's 2013 Vaccine for Children Contract with the CDC
(MRK-KRA01371422-44) .................................................... Appx10910

Exhibit 70 to Dykstra Declaration -
Merck's 2014 Vaccine for Children Contract with the CDC
(MRK-KRA01371473-96) .................................................... Appx10934

Exhibit 71 to Dykstra Declaration -
Merck's 2015 Vaccine for Children Contract with the CDC
(MRK-KRA01372045-72) .................................................... Appx10959

Exhibit 72 to Dykstra Declaration -
Merck's 2016 Vaccine for Children Contract with the CDC
(MRK-KRA01371962-89) .................................................... Appx10988
*(Cont'd in Vol XXV)*

**Volume XXV**
**(Filed Under Seal)**

Exhibit 73 to Dykstra Declaration -
CDC Vaccine Price List for Vaccines for Children Program
as of April 6, 2001 .............................................................. Appx11017

**Table of Contents**
**(Continued)**

Exhibit 74 to Dykstra Declaration -
Letter from Katherine Norris to Lisa C. Dykstra, dated
November 24, 2015 (MRK-KRA01373392-1373393) ........ Appx11022

Exhibit 75 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Alan Sims,
taken October 12, 2017 ......................................... Appx11025

Exhibit 76 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Michele Taylor,
taken May 9, 2017 ............................................... Appx11045

Exhibit 77 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Colleen Duffy,
taken December 12, 2016 ...................................... Appx11052

Exhibit 78 to Dykstra Declaration -
Letter from Lisa Dykstra to CDC regarding FOIA
request, dated May 18, 2015 ................................. Appx11058

Exhibit 79 to Dykstra Declaration -
ACIP's Vaccine Recommendations and Guidelines-MMR
Vaccine Recommendations, last reviewed
November 21, 2014 ............................................. Appx11067

Exhibit 80 to Dykstra Declaration -
FDA's Vaccines Licensed for Use in the United States ....... Appx11069

Exhibit 81 to Dykstra Declaration -
CDC's Mumps Vaccination, last reviewed
March 8, 2019 ................................................... Appx11077

Exhibit 82 to Dykstra Declaration -
Excerpts from the Expert Report of
Thomas G. McGuire Ph.D., dated March 13, 2018 ............. Appx11081

Exhibit 83 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Thomas G. McGuire, taken July 2, 2018 ............................ Appx11086

**Table of Contents**
(Continued)

**Page**

Exhibit 84 to Dykstra Declaration -
Relator Joan Wlochowski's Responses and Objections
to Merck's Revised First Set of Interrogatories,
dated May 20, 2015 ............................................................. Appx11091

Exhibit 85 to Dykstra Declaration -
Relator Joan Wlochowski's Responses and Objections
to Defendant Merck's Request for Admission,
dated April 6, 2016 ............................................................. Appx11116

Exhibit 86 to Dykstra Declaration -
"Live, Attenuated Mumps-Virus Vaccine," *New England
Journal of Medicine*, by R. Weibel, *et al.*,
dated February 2, 1967 ...................................................... Appx11144

Exhibit 87 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to Alison Fisher, Ph.D.,
dated October 17, 2005 (MRK-KRA00000479-80) ............. Appx11152

Exhibit 88 to Dykstra Declaration -
Response to FDA Request for Information,
dated November 15, 2006 (MRK-KRA00000393-409) ....... Appx11155

Exhibit 89 to Dykstra Declaration -
Email from Zak Johns to Marlene Koury,
dated February 23, 2017 ..................................................... Appx11173

Exhibit 90 to Dykstra Declaration -
Excerpts from the Expert Report of
Ann M. Arvin, M.D., dated June 11, 2018 ........................... Appx11176

Exhibit 91 to Dykstra Declaration -
Excerpts from the Expert Report of
Dipti Gulati, M.S., D. Phil. ................................................. Appx11183

Exhibit 92 to Dykstra Declaration -
Excerpts from the Expert Report of Anna Durbin, M.D.,
dated June 14, 2018 ............................................................ Appx11194

**Table of Contents**
**(Continued)**

Exhibit 93 to Dykstra Declaration -
FDA's Guidance for Industry for the Evaluation of
Combination Vaccines for Preventable Diseases: Production,
Testing and Clinical Studies, dated April 1997 .................... Appx11210

Exhibit 94 to Dykstra Declaration -
CDC's How Flu Vaccine Effectiveness and Efficacy is
Measured, last reviewed January 29, 2016 .......................... Appx11234

Exhibit 95 to Dykstra Declaration -
Excerpts from the CDC's Manual for the Surveillance of
Vaccine-Preventable Diseases ............................................. Appx11243

Exhibit 96 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Joseph Antonello, taken August 3, 2017 ............................. Appx11253

Exhibit 97 to Dykstra Declaration -
"Summary of Notifiable Diseases-United States," 2005,
*MMWR*, dated March 30, 2007 ........................................... Appx11258

Exhibit 98 to Dykstra Declaration -
CDC's Mumps Cases and Outbreaks, last reviewed
September 17, 2019 ............................................................ Appx11361

Exhibit 99 to Dykstra Declaration -
CDC's Mumps: For Healthcare Providers, last reviewed
March 15, 2019 .................................................................. Appx11364

Exhibit 100 to Dykstra Declaration -
CDC's Principles of Epidemiology in Public Health Practice,
Third Edition: An Introduction to Applied Epidemiology
and Biostatistics, last reviewed May 18, 2012 .................... Appx11369

Exhibit 101 to Dykstra Declaration -
CDC's Flu Vaccine Effectiveness: Questions and Answers for
Health Professionals, last updated November 27, 2013 ...... Appx11373

# Table of Contents
## (Continued)

Page

Exhibit 102 to Dykstra Declaration -
"Mumps Virus," by Cherry, *et al*., *Viral Infections*,
(7th Edition, Chapter 180) .................................................... Appx11383

Exhibit 103 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
David Kessler, M.D., taken September 28, 2018 ................. Appx11399

Exhibit 104 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Anna Durbin, M.D., taken October 8, 2018 ......................... Appx11402

Exhibit 105 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Emilio Emini, Ph.D., taken June 6, 2017 ............................. Appx11406

Exhibit 106 to Dykstra Declaration -
January 1998 *Curriculum Vitae* of David L. Krah, M.D.
(MRK-KRA00000695-702) ................................................. Appx11415

Exhibit 107 to Dykstra Declaration -
Excerpts from the Expert Report of
David A. Kessler, M.D. ....................................................... Appx11424

Exhibit 108 to Dykstra Declaration -
FDA Lot Release ................................................................ Appx11429

Exhibit 109 to Dykstra Declaration -
Drugs@FDA Instructions: Health Information ................... Appx11434

Exhibit 110 to Dykstra Declaration -
FDA's Vaccine Safety Questions and Answers ................... Appx11440

Exhibit 111 to Dykstra Declaration -
Excerpts from the Expert Report of
Gary Freed M.D., MPH ...................................................... Appx11447

## Table of Contents
### (Continued)

**Page**

Exhibit 112 to Dykstra Declaration -
"Vaccine Manufacturing," by Philip Gomez
and James Robinson ............................................................ Appx11450

Exhibit 113 to Dykstra Declaration -
Informational Amendment: Clinical, dated September 15, 2011
(GSK-MMR-IND-0022162-3) ............................................. Appx11461

Exhibit 114 to Dykstra Declaration -
Mumps Serology Strategy in Support of Phase III
Development of Priorix®
(GSK-MMR-IND-0022180-6) ............................................. Appx11464

Exhibit 115 to Dykstra Declaration -
Fax from Yolanda Stewart to Donna Boyce,
dated April 25, 2012 (GSK-MMR-IND-0029256-63) ......... Appx11472

Exhibit 116 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Dipti Gulati, M.S., D. Phil., taken December 5, 2018 ......... Appx11481

Exhibit 117 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Amy Keegan,
taken February 9, 2018 ....................................................... Appx11485

Exhibit 118 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
David Krah, M.D., taken July 11, 2017 ............................... Appx11488

Exhibit 119 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
David Krah, M.D., taken July 12, 2017 ............................... Appx11493

Exhibit 120 to Dykstra Declaration -
Excerpts from the Expert Report of
Marcela Pasetti, Ph.D. ........................................................ Appx11497
*(Cont'd in Vol XXVI)*

**Table of Contents**
**(Continued)**

**Volume XXVI**
**(Filed Under Seal)**

Exhibit 121 to Dykstra Declaration -
M-M-R®II Current Label ................................................... Appx11507

Exhibit 122 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Cynthia Morrisey, taken July 27, 2017 ............................... Appx11519

Exhibit 123 to Dykstra Declaration -
Supplemental Biologics License Application,
dated January 29, 2004 (MRK-KRA00000032-139) ........... Appx11522

Exhibit 124 to Dykstra Declaration -
Amendment to Supplemental Biologics License
Application Response to FDA Request for Information,
dated June 5, 2007, with Attachments
(MRK-KRA00000368-82) ................................................... Appx11631

Exhibit 125 to Dykstra Declaration -
Approval Letter, dated December 8, 2007
(MRK-KRA00000383-4) ..................................................... Appx11647

Exhibit 126 to Dykstra Declaration -
Letter from Paul Richman, Ph.D. to Alison Fisher, Ph.D.,
dated May 18, 2007 (MRK-KRA00000385-6) .................... Appx11650

Exhibit 127 to Dykstra Declaration -
Response to Form FDA 483, dated August 20, 2001
(MRK-KRA00000481-539) ................................................. Appx11653

Exhibit 128 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
teleconference regarding clarification of CBER's comments on
the Mumps Expiry trial, dated November 10, 1998
(MRK-KRA00001215-7) ..................................................... Appx11713

**Table of Contents**
**(Continued)**

Exhibit 129 to Dykstra Declaration -
Memo re: Mumps End Expiry trial; November 29th, 2000
CBER teleconference, dated November 29, 2000
(MRK-KRA00001218-21) .................................................... Appx11717

Exhibit 130 to Dykstra Declaration -
Letter from Manal Morsy, M.D., Ph.D., to Luba Vujcic,
dated December 1, 1999 (MRK-KRA00001222-30) ........... Appx11722

Exhibit 131 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to
Manal Morsy, M.D., Ph.D., dated October 27, 2000
(MRK-KRA00001231-6) .................................................... Appx11732

Exhibit 132 to Dykstra Declaration -
General Correspondence to FDA, dated November 16, 2000
(MRK-KRA00001237-48) .................................................... Appx11739

Exhibit 133 to Dykstra Declaration -
Memo re: MMRV (BB-IND 7068): Summary of Pre-Phase III
teleconference discussion on 01/31/00 with CBER,
dated January 31, 2000 (MRK-KRA00001249-52) ............. Appx11752

Exhibit 134 to Dykstra Declaration -
Teleconference Minutes with CBER, dated February 19, 1999
(MRK-KRA00001253-4) .................................................... Appx11757

Exhibit 135 to Dykstra Declaration -
Memo re: BB-IND 1016: Summary of discussion with Dr.
Kathryn Carbone and Ms. Luba Vujcic (CBER) regarding the
Mumps neutralization assay, dated February 8, 2000
(MRK-KRA00001255-57) .................................................... Appx11760

Exhibit 136 to Dykstra Declaration -
Meeting Minutes, dated March 14, 2000
(MRK-KRA00001258-61) .................................................... Appx11764

**Table of Contents**
**(Continued)**

**Page**

Exhibit 137 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II) and BB-IND 7068
(MMRV); Summary of face-to-face meeting discussion
(3/13/00) with CBER regarding wild type mumps
neutralization and ELISA assays, dated March 13, 2000
(MRK-KRA00001262-5) .................................................... Appx11768

Exhibit 138 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to Keith Chirgwin, M.D.,
dated August 30, 1999 (MRK-KRA00001266-9) ................ Appx11773

Exhibit 139 to Dykstra Declaration -
Letter from M. Carolyn Hardegree, M.D. to
Keith Chirgwin, M.D., dated September 8, 1998
(MRK-KRA00001467-9) .................................................... Appx11778

Exhibit 140 to Dykstra Declaration -
Response to FDA Request for Information,
dated December 30, 1999 (MRK-KRA00001470-1924) ..... Appx11782
*(Cont'd in Vol XXVII)*

**Volume XXVII**
**(Filed Under Seal)**

Exhibit 141 to Dykstra Declaration -
Letter from Loris McVittie, Ph.D. to
Roberta L. McKee, Ph.D., dated August 20, 1999
(MRK-KRA00018614-9) .................................................... Appx12238

Exhibit 142 to Dykstra Declaration -
Memo re: Teleconference with CBER: Mumps End
Expiry trial-BB IND 1016, dated November 8, 2000
(MRK-KRA00025161-2) .................................................... Appx12245

Exhibit 143 to Dykstra Declaration -
FDA Warning Letter, dated February 9, 2001
(PUBLIC0000666-670) ...................................................... Appx12248

**Table of Contents**
(Continued)

Exhibit 144 to Dykstra Declaration -
Memo re: M-M-R®II (BB-IND 1016); Summary of telephone
discussions on 11/23/99 and 12-06-99 with Ms. Luba Vujcic
(CBER) regarding the neutralization assay results and impact
on Equivalence Margin and lower bound criterion of the
M-M-R®II End Expiry Study hypothesis,
dated December 23, 1999 (MRK-KRA00025713-24) ......... Appx12254

Exhibit 145 to Dykstra Declaration -
Memo re: BB-IND 1016: Summary of discussion with
Ms. Luba Vujcic (CBER) regarding the Mumps neutralization
assay, dated January 5, 2000 (MRK-KRA00048855) ......... Appx12267

Exhibit 146 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
teleconference on methods used for the plaque reduction
neutralization assay, dated February 22, 2019
(MRK-KRA00062710-3) .................................................. Appx12269

Exhibit 147 to Dykstra Declaration -
Meeting Minutes with CBER, dated March 13, 2000
(MRK-KRA00062845-53) ................................................. Appx12274

Exhibit 148 to Dykstra Declaration -
Email from David M. Wonnacott to Roberta L. McKee, Ph.D.,
dated May 12, 1999 (MRK-KRA00094960) ....................... Appx12284

Exhibit 149 to Dykstra Declaration -
Email from Katalin G. Abraham to Joye L. Bramble,
dated December 3, 1998 (MRK-KRA00095063) ................ Appx12286

Exhibit 150 to Dykstra Declaration -
Memo re: Teleconference with Dr. Norman Baylor, CBER,
Regarding Meeting on Expiry Titers for M-M-R®II,
dated December 3, 1998 (MRK-KRA00095064) ................ Appx12288

**Table of Contents**
**(Continued)**

**Page**

Exhibit 151 to Dykstra Declaration -
Memo re: Teleconference with Norman Baylor, CBER,
on 11/16/98, Regarding VARIVAX® and M-M-R®II,
dated November 16, 1998 (MRK-KRA00095065) ............. Appx12290

Exhibit 152 to Dykstra Declaration -
Email from Katalin G. Abraham to Keith Chirgwin, M.D.,
dated October 5, 1998 (MRK-KRA00095142) ................... Appx12292

Exhibit 153 to Dykstra Declaration -
ProQuad™ Original Application, dated August 3, 2004
(MRK-KRA00158320-526) ................................................ Appx12294
*(Cont'd in Vol XXVIII)*

**Volume XXVIII**
**(Filed Under Seal)**

Exhibit 154 to Dykstra Declaration -
Memo re: CBER teleconference (October 16, 2001): Measles,
Mumps and Rubella ELISAs, dated October 19, 2001
(MRK-KRA00201389-91) ................................................ Appx12502

Exhibit 155 to Dykstra Declaration -
Clinical Study Report for the Protocol 007 Study
(MRK-KRA00224982-6529) .............................................. Appx12506
*(Cont'd in Vols XXIX, XXX, and XXXI)*

**Volume XXXI**
**(Filed Under Seal)**

Exhibit 156 to Dykstra Declaration -
Memo re: Supporting Documents for Stephen Krahling,
dated October 10, 2000 (MRK-KRA00331424-33) ............ Appx14055

Exhibit 157 to Dykstra Declaration -
Neutralization Assay Draft faxed on February 19, 1999
(MRK-KRA00336634-6) .................................................... Appx14066

**Table of Contents**
**(Continued)**

Exhibit 158 to Dykstra Declaration -
Letter from Paul G. Richman, Ph.D. to Alison Fisher, Ph.D.,
dated May 18, 2007 (MRK-KRA00570703-5) .................... Appx14070

Exhibit 159 to Dykstra Declaration -
Response to FDA Request for Information,
dated February 2, 2001 (MRK-KRA00622078-273) ........... Appx14074

Exhibit 160 to Dykstra Declaration -
Response to FDA Request for Information,
dated August 1, 2002 (MRK-KRA00624279-87) ................ Appx14271

Exhibit 161 to Dykstra Declaration -
General Correspondence to FDA, dated June 23, 1998
(MRK-KRA00624345-4446) ............................................... Appx14281

Exhibit 162 to Dykstra Declaration -
Response to FDA Request for Information,
dated February 5, 1999 (MRK-KRA00624448-4589) ......... Appx14384
***(Cont'd in Vol XXXII)***

**Volume XXXII**
**(Filed Under Seal)**

Exhibit 163 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
telephone conversations on 9/24/98 regarding the revised
M-M-R®II draft label and on 9/29/98 regarding the mumps
expiry protocol, dated September 29, 1998
(MRK-KRA00636592-3) ..................................................... Appx14527

Exhibit 164 to Dykstra Declaration -
Biological Product Deviation Report Form,
dated April 20, 2001 (MRK-KRA00754233-8) ................... Appx14530

Exhibit 165 to Dykstra Declaration -
M-M-R®II Label (March 1995)
(MRK-KRA00757060-3) ..................................................... Appx14537

## Table of Contents
### (Continued)

**Page**

Exhibit 166 to Dykstra Declaration -
M-M-R®II Label (April 1999)
(MRK-KRA00757072-6) .................................................... Appx14542

Exhibit 167 to Dykstra Declaration -
M-M-R®II Label (2004) (MRK-KRA00757100-3) ............ Appx14548

Exhibit 168 to Dykstra Declaration -
Response to FDA Request for Information,
dated November 17, 2004 (MRK-KRA00761530-8) .......... Appx14553

Exhibit 169 to Dykstra Declaration -
Response to CBER Comments, dated June 10, 2002
(MRK-KRA00761628-702) ................................................ Appx14563

Exhibit 170 to Dykstra Declaration -
Email from Charlotte Shay to Michael L. Dekleva,
dated June 30, 2004 (MRK-KRA00791508-10) .................. Appx14639

Exhibit 171 to Dykstra Declaration -
Meeting Minutes from a MMRV Pre-Phase III meeting
with CBER, dated February 16, 2000
(MRK-KRA00821856-61) ................................................ Appx14643

Exhibit 172 to Dykstra Declaration -
Approval Letter, dated September 6, 2005
(MRK-KRA00821906-9) .................................................... Appx14650

Exhibit 173 to Dykstra Declaration -
Regulatory Liaison FDA Conversation Record,
dated October 5, 2004 (MRK-KRA00846405-15) .............. Appx14655

Exhibit 174 to Dykstra Declaration -
CBER's Clinical Review of Studies submitted in support of
Licensure of ProQuad™ (MRK-KRA01285010-272) ........ Appx14667

Exhibit 175 to Dykstra Declaration -
FDA report on the release of MMR,
dated February 23, 2016 (MRK-KRA01447562) ................ Appx14931

**Table of Contents**
(Continued)

Page

Exhibit 176 to Dykstra Declaration -
Standard Operating Procedure-Preparation, Review and
Shipment of Biological Product Protocols and Samples to
CBER, dated September 23, 2015
(MRK-KRA01448181-207) ................................................ Appx14933

Exhibit 177 to Dykstra Declaration -
Letter from Roberta L. McKee, Ph.D. to Steven Masiello,
dated March 8, 2001 (MRK-KRA01537603-11) ................. Appx14961

Exhibit 178 to Dykstra Declaration -
Letter from Roberta L. McKee, Ph.D. regarding a proposal for
changes to release specifications, dated December 10, 1998
(MRK-KRA01622125) ....................................................... Appx14971

Exhibit 179 to Dykstra Declaration -
Prior Approval Supplement from Roberta L. McKee, Ph.D.
to William Egan, Ph.D., dated June 18, 1999
(MRK-KRA01622463-5) .................................................... Appx14973

Exhibit 180 to Dykstra Declaration -
Minutes from a December 8, 1998 Meeting,
dated January 8, 1999 (MRK-KRA01622468-72) ............... Appx14977

Exhibit 181 to Dykstra Declaration -
Letter from Katalin Abraham to Dr. Suresh Rastogi
(MRK-KRA01622552) ....................................................... Appx14983

Exhibit 182 to Dykstra Declaration -
Letter from David Wonnacott Ph.D. to Dr. Suresh Rastogi,
dated December 16, 1998 (MRK-KRA01622600-1) ........... Appx14985

Exhibit 183 to Dykstra Declaration -
Prior Approval Supplement from Roberta L. McKee, Ph.D. to
William Egan, Ph.D., dated September 15, 1999
(MRK-KRA01622711-2) .................................................... Appx14988

**Table of Contents**
**(Continued)**

**Page**

Exhibit 184 to Dykstra Declaration -
Attachment 4 to the Prior Approval Supplement from
Roberta L. McKee, Ph.D. to William Egan, Ph.D.,
dated September 15, 1999 (MRK-KRA01622778-9) .......... Appx14991

Exhibit 185 to Dykstra Declaration -
Letter from William Egan, Ph.D. to Roberta L. McKee, Ph.D.,
dated August 20, 1999 (MRK-KRA01624909-10) .............. Appx14994

Exhibit 186 to Dykstra Declaration -
Letter from Barry D. Garfinkle, Ph.D. to Carolyn Hardegree,
M.D., dated January 28, 1998
(MRK-KRA01625508-5639) .............................................. Appx14997
***(Cont'd in Vol XXXIII)***

**Volume XXXIII**
**(Filed Under Seal)**

Exhibit 187 to Dykstra Declaration -
Letter from Peter Patriarca, M.D. to Roberta L. McKee, Ph.D.,
dated February 11, 2000 (MRK-KRA0187091-2) ............... Appx15130

Exhibit 188 to Dykstra Declaration -
MMR Statistical Analysis of Potency on Stability,
dated October 24, 2000 (MRK-KRA01897103-7271) ........ Appx15133

Exhibit 189 to Dykstra Declaration -
Letter from David Wonnacott, Ph.D. to Carolyn Hardegree,
M.D., dated December 5, 1997 (MRK-KRA01972451) ..... Appx15303

Exhibit 190 to Dykstra Declaration -
Various Correspondence between the FDA and Merck,
dated 1969 to 1994 (MRK-KRA01972464-546) ................. Appx15305

Exhibit 191 to Dykstra Declaration -
Various Email Correspondence in 1997
(MRK-KRA01972735-58) ................................................... Appx15389

**<u>Table of Contents</u>**
**(Continued)**

Exhibit 192 to Dykstra Declaration -
Vaccine & Biological Stability Protocol,
dated September 6, 2016 (MRK-KRA02139917-25) .......... Appx15414

Exhibit 193 to Dykstra Declaration -
Chapter "Mumps Vaccine," by Steven Rubin and
Stanley Plotkin .................................................................. Appx15424

Exhibit 194 to Dykstra Declaration -
Stephen Krahling's 2001 Correspondence
(RELATOR_00000736-66) .................................................. Appx15453

Exhibit 195 to Dykstra Declaration -
Letter from Axel Johnson to Tonia Torquato,
dated November 30, 2001 (RELATOR_00001036-43) ....... Appx15485

Exhibit 196 to Dykstra Declaration -
Stephen Krahling's 2001 Correspondence and Papers
(RELATOR_00001071-90) .................................................. Appx15494
***(Cont'd in Vol XXXIV)***

**Volume XXXIV**
**(Filed Under Seal)**

Exhibit 197 to Dykstra Declaration -
Chapter "Mumps Vaccine," by Steven Rubin,
in Plotkin's Vaccines, 7th edition (2018) ............................ Appx15515

Exhibit 198 to Dykstra Declaration -
Letter from Kevin Malone to Kathleen Hardway,
dated July 31, 2018 ........................................................... Appx15548

Exhibit 199 to Dykstra Declaration -
"Live, Attenuated Mumps Virus Vaccine," *New England
Journal of Medicine*, by R. Weibel, *et al.*,
dated February 2, 1967 ...................................................... Appx15556

**Table of Contents**
**(Continued)**

Exhibit 200 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Luwy Musey, M.D., taken October 7, 2016 ......................... Appx15565

Exhibit 201 to Dykstra Declaration -
Rule 30(b)(6) Deposition Topics, dated December 13, 2016
(Stannard Ex. 3) ................................................................ Appx15569

Exhibit 202 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Mark Stannard,
taken December 13, 2016 .................................................... Appx15585

Exhibit 203 to Dykstra Declaration -
*Curriculum Vitae* of Joan L. Wlochowski ........................... Appx15595

Exhibit 204 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Joan L. Wlochowski, taken June 13, 2017 .......................... Appx15597

Exhibit 205 to Dykstra Declaration -
FDA/CDC Submission, dated October 23, 2019 ................. Appx15603

Exhibit 206 to Dykstra Declaration -
Excerpts of Defendant Merck's Responses and Objections to
Relators' Third Set of Requests for Admission,
dated August 16, 2017 ........................................................ Appx15719

Exhibit 207 to Dykstra Declaration -
"Vaccine Impact: Benefits for human health,"
by M. Doherty *et al.*, in *Vaccine* 34 (2016) ......................... Appx15722

Exhibit 208 to Dykstra Declaration -
FDA Prescription Drug Labeling Resources ....................... Appx15731

Exhibit 209 to Dykstra Declaration -
ACIP Committee Members ................................................. Appx15738

**Table of Contents**
**(Continued)**

**Page**

Exhibit 210 to Dykstra Declaration -
"Notice to Readers: Updated Recommendations of the
ACIP for the Control and Elimination of Mumps," *MMWR*,
June 9, 2006/55(22); 629-630 ............................................... Appx15743

Exhibit 211 to Dykstra Declaration -
"Measles Prevention: Recommendations of the ACIP,"
*MMWR*, December 28, 1989 38(S-9); 1-18 ......................... Appx15749

Exhibit 212 to Dykstra Declaration -
"FDA in Brief: FDA reiterates the importance of vaccines
such as MMR vaccine," dated September 6, 2019 .............. Appx15766

Exhibit 213 to Dykstra Declaration -
"Recommendations of the ACIP Mumps Prevention,"
*MMWR*, June 9, 1989/38(22) ............................................... Appx15769

Exhibit 214 to Dykstra Declaration -
"Recommendation of the ACIP Mumps Vaccine,"
*MMWR*, November 26, 1982; 31(46) .................................. Appx15777

Exhibit 215 to Dykstra Declaration -
Statement by Peter Marks M.D., Ph.D., FDA, on FDA's
continued confidence in the safety and effectiveness
of the MMR vaccine, dated April 22, 2019 ......................... Appx15783

Exhibit 216 to Dykstra Declaration -
About CBER ...................................................................... Appx15788

Exhibit 217 to Dykstra Declaration -
Excerpt from FDA's Website on Warning Letters ................ Appx15791

Exhibit 218 to Dykstra Declaration -
Excerpt of FDA's Website with an Index to Warning
Letters for 'M' Companies .................................................. Appx15794

**Table of Contents**
**(Continued)**

**Page**

Exhibit 219 to Dykstra Declaration -
"The Immunological Basis for Immunization Series, Module
16: Mumps," by McLean, *et al.*, *Immunization, Vaccines and
Biologicals-World Health Organization* (2010) ................... Appx15817

Exhibit 220 to Dykstra Declaration -
Email from Sue Manoff to Mark Paponia,
dated February 25, 2000 (MRK-KRA00091399-405) ......... Appx15862

Exhibit 221 to Dykstra Declaration -
Memo re: Teleconference with Norman Baylor, CBER, on
11/16/98, Regarding VARIVAX® and M-M-R®II
(MRK-KRA00095065) ....................................................... Appx15870

Exhibit 222 to Dykstra Declaration -
M-M-R®II Label (MRK-KRA00757064-7) ....................... Appx15872

Exhibit 223 to Dykstra Declaration -
M-M-R®II Label (February 2001)
(MRK-KRA00757068-71) .................................................. Appx15877

Exhibit 224 to Dykstra Declaration -
M-M-R®II Label (August 2001)
(MRK-KRA00757077-80) .................................................. Appx15882

Exhibit 225 to Dykstra Declaration -
M-M-R®II Label (February 2006)
(MRK-KRA00757081-4) .................................................... Appx15887

Exhibit 226 to Dykstra Declaration -
M-M-R®II Label (March 1995)
(MRK-KRA00757085-8) .................................................... Appx15892

Exhibit 227 to Dykstra Declaration -
M-M-R®II Label (March 1995)
(MRK-KRA00757089-91) .................................................. Appx15897

**Table of Contents**
(Continued)

Exhibit 228 to Dykstra Declaration -
M-M-R®II Label (October 2003)
(MRK-KRA00757092-5) ..................................................... Appx15901

Exhibit 229 to Dykstra Declaration -
M-M-R®II Label (September 2002)
(MRK-KRA00757096-9) ..................................................... Appx15906

Exhibit 230 to Dykstra Declaration -
M-M-R®II Label (February 2007)
(MRK-KRA00757104-7) ..................................................... Appx15911

Exhibit 231 to Dykstra Declaration -
M-M-R®II Label (February 2007)
(MRK-KRA00757108-11) ................................................... Appx15916

Exhibit 232 to Dykstra Declaration -
M-M-R®II Label (April 19999)
(MRK-KRA01449029-40) ................................................... Appx15921

Exhibit 233 to Dykstra Declaration -
M-M-R®II Label (February 2014)
(MRK-KRA01449226-36) ................................................... Appx15934

Exhibit 234 to Dykstra Declaration -
M-M-R®II Label (June 2014)
(MRK-KRA01449243-53) ................................................... Appx15946

Exhibit 235 to Dykstra Declaration -
M-M-R®II Label (October 2015)
(MRK-KRA01449260-70) ................................................... Appx15958

Exhibit 236 to Dykstra Declaration -
M-M-R®II Label (February 2000)
(MRK-KRA01449271-5) ..................................................... Appx15970

Exhibit 237 to Dykstra Declaration -
M-M-R®II Label (March 2010)
(MRK-KRA01449276-83) ................................................... Appx15976

**Table of Contents**
**(Continued)**

**Page**

Exhibit 238 to Dykstra Declaration -
M-M-R®II Label (December 2010)
(MRK-KRA01449284-91) .................................................. Appx15985

Exhibit 239 to Dykstra Declaration -
M-M-R®II Label (September 2009)
(MRK-KRA01449292-99) .................................................. Appx15994
*(Cont'd in Vol XXXV)*

**Volume XXXV**
**(Filed Under Seal)**

Exhibit 240 to Dykstra Declaration -
Attachment 1 to Letter from Barry D. Garfinkle, Ph.D.
to Carolyn Hardegree, M.D., dated January 28, 1998
(MRK-KRA01625510-639) ................................................ Appx16003

Exhibit 241 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II) and BB-IND 7068
(MMRV); Summary of Face-to face meeting discussion
(3/13/00) with CBER regarding wild type mumps
neutralization and ELISA assays, dated March 13, 2000
(MRK-KRA00019855-7) ................................................... Appx16134

Exhibit 242 to Dykstra Declaration -
PowerPoint Presentation entitled Immunogenicity
Mumps-Containing Vaccines (MRK-KRA00091408) ........ Appx16138

Exhibit 243 to Dykstra Declaration -
Letter from David M. Wommacott, Ph.D. to
Suresh C. Rastogi, Ph.D., dated December 16, 1998
(MRK-KRA01629294-1629295) ........................................ Appx16152

Exhibit 244 to Dykstra Declaration -
Response to the FDA Form 483, dated October 24, 2000
(MRK-KRA01649535-1649551) ........................................ Appx16155

Exhibit 245 to Dykstra Declaration -
Warning Letters from FDA Website ................................... Appx16173

**Table of Contents**
**(Continued)**

                                                                    **Page**

Exhibit 246 to Dykstra Declaration -
MMD Quality Manual Glossary, dated October 5, 2016
(MRK-KRA01679618-1679772) ......................................... Appx16176

Exhibit 247 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Eric Metzger,
taken June 11, 2015 ............................................. Appx16332

Exhibit 248 to Dykstra Declaration -
Federal Register Vol. 58 No. 137, July 20, 1993 ................. Appx16336

Exhibit 249 to Dykstra Declaration -
FDA Review of Vaccine Labeling Requirements for
Warnings, Use Instructions, and Precautionary
Information, dated October 2004 ......................................... Appx16342

Defendant Merck's Response to Relators' Statement of
    Material Facts, dated November 26, 2019 (Doc. 299) .......... Appx16345

**Volume XXXVI**
**(Filed Under Seal)**

Declaration of Lisa C. Dykstra, for Merck, in Support of
    Response to Relators' Statement of Material Facts,
    executed November 26, 2019 (Doc. 299) ............................. Appx16501

Exhibit 250 to Dykstra Declaration -
"Mumps Complications and Effects of Mumps Vaccination,
England and Wales, 2002-2006," by Yung, Chee-Fu, *et al.*,
*Emerging Infectious Diseases*, (2011) 17(4):661-667 ......... Appx16513

Exhibit 251 to Dykstra Declaration -
Excerpts from the Deposition Testimony of April Cohen,
taken January 4, 2018 ....................................... Appx16521

**Table of Contents**
**(Continued)**

Exhibit 252 to Dykstra Declaration -
"Mumps Virus-Specific Antibody Titers from Pre-Vaccine
Era Sera: Comparison of the Plaque Reduction Neutralization
Assay Enzyme Immunoassays," by Mauldin, Jeremy, *et al.*,
*Journal of Clinical Microbiology*, 2005:43(9):4847-4851 .. Appx16525

Exhibit 253 to Dykstra Declaration -
"Correlates of Protection," by Plotkin and Gilbert,
2018:35-40 .......................................................................... Appx16531

Exhibit 254 to Dykstra Declaration -
FDA, Guidance for Industry: FDA Review of Vaccine
Labeling Requirements for Warnings, Use Instructions, and
Precautionary Information, dated September 2004 ............. Appx16538

Exhibit 255 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Roberta L. McKee, Ph.D., taken March 30, 2017 ............... Appx16547

Exhibit 256 to Dykstra Declaration -
Excerpts from the Expert Report of
Dipti Gulati, MS, D. Phil. .................................................... Appx16551

Exhibit 257 to Dykstra Declaration -
Biological Product Deviation Report Form
submitted by Merck to the FDA, dated March 5, 2001
(MRK-KRA00754239-44) .................................................... Appx16556

Exhibit 258 to Dykstra Declaration -
"Jeryl Lynn Strain Live Attenuated Mumps Virus Vaccine
-Influence of Age, Virus Dose, Lot, and-Globulin
Administration on Response," by Buynak, Eugene, *et al.*,
*Journal of the American Medical Association* (1968)
203(1):63-67 ....................................................................... Appx16563

Exhibit 259 to Dykstra Declaration -
2003 Annual Stability Report for M-M-R®II
(MRK-KRA01632888-945) ................................................. Appx16569

**Table of Contents**
**(Continued)**

Exhibit 260 to Dykstra Declaration -
"Sensitive Neutralization Test for virus antibody,"
by Sato *et al.*, *Archives of Virology*, (1978) 58:301-311 ...... Appx16628

Exhibit 261 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to Alison Fisher, Ph.D.,
dated December 3, 2004 (MRK-KRA00000361-5) ............. Appx16640

Exhibit 262 to Dykstra Declaration -
Fax from Luba Vujcic to Alison Fisher, Ph.D.,
dated July 20, 2007 (MRK-KRA00141957-8) ................... Appx16646

Exhibit 263 to Dykstra Declaration -
Submission, dated August 8, 2007
(MRK-KRA00000140-225) ................................................. Appx16649

Exhibit 264 to Dykstra Declaration -
Submission, dated December 3, 2007
(MKR-KRA00000226-300) ................................................. Appx16736

Exhibit 265 to Dykstra Declaration -
"Long-Term Persistence of Mumps Antibody after Receipt of 2
Measles-Mumps-Rubella (MMR) Vaccinations and Antibody
Response after a Third MMR Vaccination among a University
Population," by Date, Anand, *et al.*, *Journal of Infectious
Diseases*, (2008) 197:1662-1668 ........................................ Appx16812

Exhibit 266 to Dykstra Declaration -
"Mumps Antibody Levels Among Students Before a Mumps
Outbreak: In Search of a Correlate of Immunity,"
by Cortese, *et al.*, *Journal of Infectious Diseases*, (2011)
204:1413-1422 ................................................................. Appx16820

**Table of Contents**
(Continued)

Exhibit 267 to Dykstra Declaration -
"Immunogenicity and Safety of Two Tetravalent (Measles,
Mumps, Rubella, Varicella) Vaccines Coadministered With
Hepatitis A and Pneumococcal Conjugate Vaccines to Children
Twelve to Fourteen Months of Age," by Blatter, *et al.*,
*The Pediatric Infectious Disease Journal,*
(2012) 31:e133-e140 .......................................................... Appx16831

Exhibit 268 to Dykstra Declaration -
Analytical Validation Protocol
(MRK-KRA00337307-18) ................................................... Appx16840

Exhibit 269 to Dykstra Declaration -
Expert Report of Robert Platt, Ph.D.,
dated June 14, 2018 ............................................................ Appx16853

Exhibit 270 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Amy Keegan,
taken April 27, 2017 ........................................................... Appx16992

Exhibit 271 to Dykstra Declaration -
Documentation of Work Activities
(RELATOR_00000272-3) ................................................... Appx16995

Exhibit 272 to Dykstra Declaration -
Work Summary Document (RELATOR_00000274-6) ........ Appx16998
***(Cont'd in Vol XXXVII)***

**Volume XXXVII**
**(Filed Under Seal)**

Exhibit 273 to Dykstra Declaration -
Submission, dated May 5, 2005
(MRK-KRA00176342-176654) ........................................... Appx17002

Exhibit 274 to Dykstra Declaration -
Submission, dated June 30, 2004
(MKR-KRA00137854-55 and 8137-72) ............................. Appx17316

**Table of Contents**
**(Continued)**

**Page**

Exhibit 275 to Dykstra Declaration -
"Safety and Immunogenicity of Human Serum Albumin-Free
MMR Vaccine in US Children Aged 12-15 months,"
by Mufson, *et al.*, *Journal of Pediatric Infectious Diseases
Society*, (2014) 4:339-348 ................................................... Appx17355

Exhibit 276 to Dykstra Declaration -
Letter from Jerry P. Weir, Ph.D. to Alison Fisher, Ph.D.,
dated December 30, 2004 (MRK-KRA00141670-2) ........... Appx17366

Exhibit 277 to Dykstra Declaration -
Submission, dated February 28, 2005
(MRK-KRA00141676-729) ................................................ Appx17370

Exhibit 278 to Dykstra Declaration -
Submission, dated July 13, 2005
(MRK-KRA00141789-906) ................................................ Appx17425
***(Cont'd in Vol XXXVIII)***

**Volume XXXVIII**
**(Filed Under Seal)**

Exhibit 279 to Dykstra Declaration -
"Summary of Notifiable Diseases-United States 2012,"
*MMWR*, 2014:61(53):1-121 ............................................... Appx17544

Exhibit 280 to Dykstra Declaration -
CDC Publication "Mumps Outbreak-Related Questions
and Answers for Patients," last reviewed March 15, 2019 .. Appx17669

Exhibit 281 to Dykstra Declaration -
CDC Publication "Nationally Notifiable Infectious Diseases
and Conditions, United States: Annual Tables" ................... Appx17672

Exhibit 282 to Dykstra Declaration -
"Characteristics of Large Mumps Outbreaks in the United
States during July 2010-December 2015," by Clemmons,
Nakia *et al.*, *Clinical Infectious Diseases*, (2019) ............... Appx17676

**<u>Table of Contents</u>**
**(Continued)**

**<u>Page</u>**

Exhibit 283 to Dykstra Declaration -
CDC Publication "Healthy People 2010 Final Review" ...... Appx17684
***(Cont'd in Vol XXXIX)***

**Volume XXXIX**
**(Filed Under Seal)**

Exhibit 284 to Dykstra Declaration -
CDC Publication "Healthy People 2020 Immunization and
Infectious Diseases Objectives" .......................................... Appx18245

Exhibit 285 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.2
Cases of Hib Data" .............................................................. Appx18278

Exhibit 286 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.4
U.S.-acquired cases of Measles Data" ................................ Appx18280

Exhibit 287 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.5
U.S.-acquired cases of Mumps Data" ................................. Appx18282

Exhibit 288 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.9
 U.S.-acquired cases of Rubella Data" ................................ Appx18284

Exhibit 289 to Dykstra Declaration -
CDC Webpage "National Center for Immunization
and Respiratory Diseases"  .................................................. Appx18286

Exhibit 290 to Dykstra Declaration -
"Mumps vaccination coverage and vaccine effectiveness in a
large outbreak among college students-Iowa, 2006,"
by Marin, Mona *et al.*, *Vaccine*, (2008) 26:3601-3607 ........ Appx18301

**Table of Contents**
**(Continued)**

**Page**

Exhibit 291 to Dykstra Declaration -
"Mumps Outbreak in Orthodox Jewish Communities in the
United States," Barskey, Albert, *et al.*, *New England Journal
of Medicine*, (2012) 367(18):1704-1713 .............................. Appx18309

Exhibit 292 to Dykstra Declaration -
"Impact of a Third Dose of Measles-Mumps-Rubella Vaccine
on a Mumps Outbreak," by Ogbuanu, Ikechukwu, *et al.*,
*Pediatrics*, (2012) 130(6):1-8 ............................................. Appx18320

Exhibit 293 to Dykstra Declaration -
"Epidemiology of a Mumps Outbreak in a Highly Vaccinated
Island Population and Use of a Third Dose of Measles-
Mumps-Rubella Vaccine for Outbreak Control—Guam 2009
to 2010," by Nelson, George, *et al.*, *Pediatric Infectious
Disease Journal*, (2013) 32(4):374-380 .............................. Appx18330

Exhibit 294 to Dykstra Declaration -
"Effectiveness of a Third Dose of MMR Vaccine for Mumps
Outbreak Control," by Cardemil, Cristina, *et al.*, *New England
Journal of Medicine*, (2017) 377(10):947-956 .................... Appx18338

Exhibit 295 to Dykstra Declaration -
"Mumps in a highly vaccinated Marshallese community in
Arkansas, USA: an outbreak report," by Fields, Virgie, *et al.*,
*Lancet Infectious Diseases*,
(Published online January 8, 2019) 1-8 .............................. Appx18349

Exhibit 296 to Dykstra Declaration -
"Antibody Induced by Immunization with the Jeryl Lynn
Mumps Vaccine Strain Effectively Neutralizes a Heterologous
Wild-Type Mumps Virus Associated with a Large Outbreak,"
by Rubin, Steven, *et al.*, *Journal of Infectious Diseases*, (2008)
198:508-515 ....................................................................... Appx18358

Exhibit 297 to Dykstra Declaration -
"Vaccine waning and mumps-re-emergence in the United
States," by Lewnard, Joseph and Grad, Yonatan, *Science
Translational Medicine*, (2018) 10(433):1-10 .................... Appx18367

**Table of Contents**
**(Continued)**

Exhibit 298 to Dykstra Declaration -
"Comment: The changing epidemiology of mumps in a high vaccination era," by Marshall, Helen and Plotkin, Stanley, *Lancet Infectious Diseases*, (2019) 19:118-119 ................... Appx18379

Exhibit 299 to Dykstra Declaration -
"Successes and challenges for preventing measles, mumps and rubella by vaccination," by Bankamp, Bettina, *et al.*, *Current Opinion in Virology*, (2019) 34:110-116 .............................. Appx18382

Exhibit 300 to Dykstra Declaration -
"Mumps Vaccines Do We Need a New One?," by Rubin, Steven and Beeler, Judy, *Pediatric Infectious Disease Journal*, (2013) 32(10):1156-1157 .................................................... Appx18390

Exhibit 301 to Dykstra Declaration -
CDC website listing Measles-related *MMWR* Articles ........ Appx18393

Exhibit 302 to Dykstra Declaration -
CDC website listing Pertussis (Whooping Cough) Publications ......................................................................... Appx18399

Exhibit 303 to Dykstra Declaration -
CDC website listing Chickenpox (Varicella) References and Resources .......................................................................... Appx18407

Exhibit 304 to Dykstra Declaration -
CDC webpage: Glossary ...................................................... Appx18411

Exhibit 305 to Dykstra Declaration -
Email from Jeanne Santoli to Eric Skjeveland, dated June 12, 2012 (MRK-KRA00122172-3) .................... Appx18425

Exhibit 306 to Dykstra Declaration -
CDC webpage, ACIP Workgroups, last reviewed May 30, 2019 ................................................................... Appx18428

**Table of Contents**
**(Continued)**

Exhibit 307 to Dykstra Declaration -
"Recommendations of the Advisory Committee on
Immunization Practices for Use of Hepatitis A Vaccine
for Persons Experiencing Homelessness,"
*MMWR* 2019:68(6):153-56 ................................................ Appx18435

Exhibit 308 to Dykstra Declaration -
"Human Papillomavirus Vaccination for Adults: Updated
Recommendations of the Advisory Committee on
Immunization Practices," *MMWR* 2019:68(3):698-702 ...... Appx18440

Exhibit 309 to Dykstra Declaration -
"Prevention and Control of Seasonal Influenza with
Vaccines: Recommendations of the Advisory Committee
on Immunization Practices-United States, 2019-20
Influenza Season," *MMWR* 2019:69(3):1-21 ....................... Appx18446

Exhibit 310 to Dykstra Declaration -
"Japanese Encephalitis Vaccine: Recommendations of the
Advisory Committee on Immunization Practices,"
*MMWR* 2019:68(2);1-33 .................................................... Appx18475
*(Cont'd in Vol XL)*

**Volume XL**
**(Filed Under Seal)**

Exhibit 311 to Dykstra Declaration -
"Prevention of Pertussis, Tetanus, and Diphtheria with
Vaccines in the United States: Recommendations of the
Advisory Committee on Immunization Practices,"
*MMWR* 2018:67(2):1-44 .................................................... Appx18516

Exhibit 312 to Dykstra Declaration -
"Updated Recommendations for Use of Tetanus Toxoid,
Reduced Diphtheria Toxoid and Acellular Pertussis Vaccine
(Tdap) in Pregnant Women and Persons Who Have or
Anticipate Having Close Contact with an Infant Aged <12
Months-Advisory Committee on Immunization Practices
(ACIP), 2011," *MMWR* 2011:60(41):1424-1426 ................. Appx18565

## Table of Contents
### (Continued)

Exhibit 313 to Dykstra Declaration -
"Updated Recommendations for the Use of Tetanus Toxoid,
Reduced Diphtheria Toxoid, and Acellular Pertussis Vaccine
(Tdap) in Pregnant Women-Advisory Committee on
Immunization Practices (ACIP), 2012," *MMWR*
2013:62(7):131-135 ............................................................. Appx18569

Exhibit 314 to Dykstra Declaration -
"Immunization in the United States (Chapter 73),"
by Cohn, *et al.*, *Vaccines* 1421-1440 .................................... Appx18575

Exhibit 315 to Dykstra Declaration -
Excerpts from the Expert Report of
Daniel Salmon, Ph.D., MPH ................................................ Appx18596

Exhibit 316 to Dykstra Declaration -
Excerpts from Merck's Supplemental Responses and
Objections to Relators' First Set of Interrogatories,
dated December 12, 2016 .................................................... Appx18608

Exhibit 317 to Dykstra Declaration -
"The Pertussis Problem," by Plotkin, Stanley, *Clinical
Infectious Diseases*, (2014) 58(6): 830-833 ......................... Appx18618

Exhibit 318 to Dykstra Declaration -
"Establishing a Global Vaccine-Development Fund,"
by Plotkin, Stanley, *et al.*, *New England Journal of Medicine*,
(2015) 373:297-300 ........................................................... Appx18623

Exhibit 319 to Dykstra Declaration -
Chapter 11 "Anthrax Vaccines," by Friedlander, Arthur, *et al.*,
*Vaccines* (2018) .................................................................. Appx18628

Exhibit 320 to Dykstra Declaration -
Chapter 38 "Meningococcal Capsular Group A, C, W, and Y
Conjugate Vaccines," by Harrison, Lee, *et al.*,
*Vaccines* (2018) .................................................................. Appx18646

## Table of Contents
### (Continued)

Exhibit 321 to Dykstra Declaration -
Chapter 52 "Rotavirus Vaccines," by Parashar, Umesh, *et al.*,
*Vaccines* (2018) ................................................................. Appx18673

Exhibit 322 to Dykstra Declaration -
Chapter 60 "Tuberculosis Vaccines," by Hanekom, Willem,
*et al.*, *Vaccines* (2018) ........................................................ Appx18694

Exhibit 323 to Dykstra Declaration -
Excerpts from Expert Report of
Gary L. Freed, M.D., MPH .................................................. Appx18714

Exhibit 324 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Gary L. Freed, M.D., MPH, taken October 18, 2018 .......... Appx18718

Exhibit 325 to Dykstra Declaration -
Excerpts from "2012 CDC Summary of
Notifiable Diseases" ........................................................... Appx18721

Exhibit 326 to Dykstra Declaration -
Excerpts from "1977 Annual Summary,"
*MMWR*, Vol. 26, No. 53, September 1978 ......................... Appx18729

Exhibit 327 to Dykstra Declaration -
Excerpts from "1980 Annual Summary,"
*MMWR*, Vol. 29, No. 54, September 1981 ......................... Appx18734

Exhibit 328 to Dykstra Declaration -
Excerpts from "2013 CDC Summary of
Notifiable Diseases" ........................................................... Appx18742

Exhibit 329 to Dykstra Declaration -
Excerpts from "2014 CDC Summary of
Notifiable Diseases" ........................................................... Appx18747

**Table of Contents**
**(Continued)**

Relators' Responses to Merck's Statements of Material Facts in
Support of Its First and Fourth Summary Judgment Motions
and Their Corresponding Additional Statement of Material
Facts, dated November 26, 2019 (Doc. 300) ........................ Appx18751

Declaration of Gary Reilly in Support of Relators' Oppositions to
Merck's Four Motions for Summary Judgment,
executed November 26, 2019 (Doc. 300) ............................. Appx18984

Exhibit 361 to Reilly Declaration -
Deposition Testimony of Amy Keegan,
taken April 27, 2017 ........................................................... Appx18996
*(Cont'd in XLI)*

**Volume XLI**
**(Filed Under Seal)**

Exhibit 362 to Reilly Declaration -
Memorandum titled "Delay of Filing for Optimized
GOS/HAS-free Diluent for M-M-R®II" with Attachment,
dated August 28, 2000 (MRK-CHA01593194-9) ................ Appx19070

Exhibit 363 to Reilly Declaration -
The Current Manufacturing Target Titer for the Mumps
Component of Measles, Mumps, and Rubella Virus Vaccine
Live M-M-R®II (MRK-CHA00576983-93) ....................... Appx19077

Exhibit 364 to Reilly Declaration -
Letter from Robert L. McKee, Ph.D. to Carolyn Hardegree,
M.D., dated December 10, 1998, with Attachment
(MRK-CHA00756233-55) .................................................. Appx19089

Exhibit 365 to Reilly Declaration -
Excerpts from Clinical and Regulatory Review Committee
Critical Activities, issued August 15, 2001
(MRK-CHA01724860-25029) ............................................. Appx19113

**Table of Contents**
**(Continued)**

**Page**

Exhibit 366 to Reilly Declaration -
Excerpts from Clinical and Regulatory Review Committee
Critical Activities, issued March 17, 1999
(MRK-CHA01717354-7508) ............................................... Appx19123

Exhibit 367 to Reilly Declaration -
Table (MRK-CHA00280517) ............................................. Appx19142

Exhibit 368 to Reilly Declaration -
Project Management Regulatory Submissions
Schedule for "All Products," from 01-AUG-2002
(MRK-CHA01726084-7) .................................................... Appx19144

Exhibit 369 to Reilly Declaration -
Email from Hentrietta Ukwu to David W. Blois,
dated October 6, 1998, with Attachment
(MRK-CHA00625837-9) .................................................... Appx19149

Exhibit 370 to Reilly Declaration -
Justification of Mumps Component Frequency
(MRK-CHA00032404-7) .................................................... Appx19153

Exhibit 371 to Reilly Declaration -
Email from Alison L. Fisher, Ph.D. to Mark S. Galinski,
dated March 28, 2005 (MRK-CHA00560317-9) ................. Appx19158

Exhibit 372 to Reilly Declaration -
Email from Bonita M. Stankunas to Amy Keegan,
dated October 1, 2010 (MRK-CHA01470854-6) ................ Appx19162

Exhibit 373 to Reilly Declaration -
Presentation titled M-M-R®II
(MRK-CHA00021133-67) ................................................... Appx19166

Exhibit 374 to Reilly Declaration -
Excerpts from Pediatric Measles, Mumps, Rubella &
Varicella-containing Franchise: Integrated Vaccine T-PAC
Review, dated October 28, 2002
(MRK-CHA00233586-3623) ............................................... Appx19202

**Table of Contents**
**(Continued)**

Exhibit 375 to Reilly Declaration -
Deposition Testimony of April D. Cohen,
taken January 4, 2018 ......................................................... Appx19211

Exhibit 376 to Reilly Declaration -
Minutes of October 6, 1999 Project Team Meeting,
dated October 8, 1999 (MRK-CHA01899074-86) .............. Appx19276

Exhibit 377 to Reilly Declaration -
Draft Memo re: Clinical and Regulator Review Committee
Meeting Summary-October 8, 2002, dated October 11, 2002
(MRK-CHA01728735-8) .................................................... Appx19290

Exhibit 378 to Reilly Declaration -
Pediatric Live Virus Vaccine Franchise Review,
dated October 28, 2002 (MRK-CHA00207636-83) ............ Appx19295

Exhibit 379 to Reilly Declaration -
Presentation, produced as "M-M-R II and Priorix Profiles
8_19_11F.ppt" (MRK-CHA00955777) ............................... Appx19344

Exhibit 380 to Reilly Declaration -
Deposition Testimony of Tim Schofield,
taken March 20, 2017 ......................................................... Appx19347

Exhibit 381 to Reilly Declaration -
Memo re: Mumps Stability and Potency Estimations,
dated February 27, 2001 (MRK-CHA01896072-3) ............. Appx19449

Exhibit 382 to Reilly Declaration -
Email from Philip S. Bennett to Cynthia Morrisey,
dated January 18, 2002 (MRK-CHA00094849-50) ............. Appx19452

Exhibit 383 to Reilly Declaration -
*Curriculum Vitae* of Manal Anwar Morsy, M.D., Ph.D., MBA
(MORSY00001-10) ............................................................ Appx19455

**Table of Contents**
(Continued)

Page

Exhibit 384 to Reilly Declaration -
*Curriculum Vitae* of Cynthia F. Morrisey
(MORRISEY_00000001-6) ................................................. Appx19466

Exhibit 385 to Reilly Declaration -
Memo re: Determination of Minimum Release
Specifications for Mumps and Rubella in M-M-R®II,
dated February 9, 2004 (MRK-CHA00722641-2) ............... Appx19473

Exhibit 386 to Reilly Declaration -
Memo re: Determination of Minimum Release Specifications
for Mumps in M-M-R®II, dated November 4, 2004
(MRK-CHA00722667-8) .................................................... Appx19476

Exhibit 387 to Reilly Declaration -
Email from Philip S. Bennett with attachments,
dated December 4, 2012
(MRK-CHA01580006-15) .................................................. Appx19479

Exhibit 388 to Reilly Declaration -
Email from Kimberly A. Duffy to Amy Keegan,
dated December 5, 2012 (MRK-CHA01579943-5) ............. Appx19490

Exhibit 389 to Reilly Declaration -
*Curriculum Vitae* of Amy Keegan
(MRK-CHA02009507-9) .................................................... Appx19494

Exhibit 390 to Reilly Declaration -
Presentation, MMRII Protocol #007 - Mumps End Expiry
study: AIGENT Assay Issues and Impact on Study Criteria,
produced as "6-30 pm Draft 10-04-02 for CRRC-10-08-02
slides.ppt" (MRK-CHA00025831) ...................................... Appx19498
***(Cont'd in Vol LXII)***

**Table of Contents**
**(Continued)**

**Volume LXII**
**(Filed Under Seal)**

Exhibit 391 to Reilly Declaration -
Gulati Deposition Exhibit 14, Select Pages of Supplemental
Biologics License Application, dated June 30, 2004
(MRK-CHA00137854-55 and
MRK-CHA00138585-708) .................................................. Appx19533

Exhibit 392 to Reilly Declaration -
Regulatory Liaison FDA Conversation Record,
dated May 27, 2005 (MRK-CHA00793082-3) .................... Appx19539

Exhibit 393 to Reilly Declaration -
Submission, dated July 13, 2005
(MRK-CHA00141789-906) ................................................. Appx19542

Exhibit 394 to Reilly Declaration -
Deposition Testimony of Dipti Gulati, M.S., D. Phil.,
taken December 5, 2018 ...................................................... Appx19550

Exhibit 395 to Reilly Declaration -
Merck's Biological Stability Program 2001 Annual Stability
Report for M-M-R®II (MRK-CHA01632745-51) .............. Appx19661

Exhibit 396 to Reilly Declaration -
Biological Stability Program 2004 Annual Stability
Report for M-M-R®II (MRK-CHA01632833-8) ................ Appx19669

Exhibit 397 to Reilly Declaration -
Biological Stability Program 2005 Annual Stability
Report for M-M-R®II (MRK-CHA01634117-22) .............. Appx19676

Exhibit 398 to Reilly Declaration -
Biological Stability Program 2008 Annual Stability
Report for M-M-R®II (MRK-CHA01633948-59) .............. Appx19683

**Table of Contents**
**(Continued)**

Exhibit 399 to Reilly Declaration -
Response to FDA Request for Information,
dated February 28, 2005 (MRK-CHA02078926-7) ............. Appx19696

Exhibit 400 to Reilly Declaration -
Excerpts from Biological Stability Program 2010
Annual Stability Report for M-M-R®II
(MRK-CHA01458201-6) ...................................................... Appx19699

Exhibit 401 to Reilly Declaration -
CDC "Mumps Cases and Outbreaks" webpage,
last accessed November 25, 2019 ......................................... Appx19706

Exhibit 402 to Reilly Declaration -
CDC "Mumps Vaccination" webpage, last reviewed
March 28, 2019 .................................................................... Appx19709

Exhibit 403 to Reilly Declaration -
CDC "Mumps Vaccination" webpage, archived as of
May 30, 2012 ....................................................................... Appx19711

Exhibit 404 to Reilly Declaration -
CDC "Mumps Vaccination" webpage, archived as of
December 8, 2009 ................................................................. Appx19714

Exhibit 405 to Reilly Declaration -
Email from Janet Ernst-Gerner to Alan Modlinger,
dated September 23, 2016 (MRK-CHA02008691-4) .......... Appx19717

Exhibit 406 to Reilly Declaration -
Marked M-M-R®II (Measles, Mumps, and Rubella Virus
Vaccine Live) Literature (MRK-CHA02008695-705) ......... Appx19722

Exhibit 407 to Reilly Declaration -
Email from Mark Papania to Barbara Kuter,
dated February 12, 2010 (MRK-CHA00351988-90) ........... Appx19734

**Table of Contents**
**(Continued)**

Exhibit 408 to Reilly Declaration -
Email from Chester J. Kitchen, dated February 25, 2010
(MRK-CHA00790153-4) ..................................................... Appx19738

Exhibit 409 to Reilly Declaration -
Email from Chester J. Kitchen to Scott Porreca,
dated February 26, 2010 (MRK-CHA00791347) ................ Appx19741

Exhibit 410 to Reilly Declaration -
FDA Conversation re; PRIOrix™, measles, mumps &
rubella live, attenuated, viral vaccine BB-IND-7229,
dated December 18, 1997 (GSK-MMR-IND-0047687-9) ... Appx19743

Exhibit 411 to Reilly Declaration -
FDA Conversation re: PRIOrix IND submission,
Clinical Hold, dated October 16, 1997
(GSK-MMR-IND-0047654-6) ............................................. Appx19747

Exhibit 412 to Reilly Declaration -
Extra CDAB Meeting Abstract, dated August 1, 2011
(GSK-MMR-019819-42) .................................................... Appx19751

Exhibit 413 to Reilly Declaration -
Memo re: Minutes of Meeting with CBER on 4/4/01,
dated April 9, 2001 (MRK-CHA00049238-40) ................... Appx19776

Exhibit 414 to Reilly Declaration -
Email from Sally S. Wong to Cathy Hoath,
dated February 26, 2013 (MRK-CHA01556424-8) ............. Appx19780

Exhibit 415 to Reilly Declaration -
Email from Joseph D. Bernardo to Mark J. Stannard,
dated November 30, 2016 (MRK-CHA02101841) ............. Appx19786

Exhibit 416 to Reilly Declaration -
Deposition Testimony of Roberta L. McKee, Ph.D.,
taken March 30, 2017 ......................................................... Appx19788

**Table of Contents**
**(Continued)**

Exhibit 417 to Reilly Declaration -
Vaccine & Biological Stability Protocol for M-M-R®II
(MRK-CHA01714300-8) .................................................... Appx19870

Exhibit 418 to Reilly Declaration -
Excerpts from Biological Stability Program 2000
Annual Stability Report for M-M-R®II
(MRK-CHA01633601-6) .................................................... Appx19880

Exhibit 419 to Reilly Declaration -
Excerpts from Biological Stability Program 2002
Annual Stability Report for M-M-R®II
(MRK-CHA01633529-39) .................................................... Appx19887

Exhibit 420 to Reilly Declaration -
Excerpts from Biological Stability Program 2003
Annual Stability Report for M-M-R®II
(MRK-CHA01632888-95) .................................................... Appx19899

Exhibit 421 to Reilly Declaration -
SOP Active Stability Monitoring of Live Virus Vaccine
Potency Results, effective November 10, 2000
(MRK-CHA00049165-73) .................................................... Appx19908

Exhibit 422 to Reilly Declaration -
SOP Real Time Stability Trend Monitoring, effective
September 21, 2016 (MRK-CHA01714343-54) .................. Appx19918

Exhibit 423 to Reilly Declaration -
Label Claim Compliance of M-M-R®II
(MRK-CHA00322066-73) .................................................... Appx19931

Exhibit 424 to Reilly Declaration -
Proposed New Stabilizer for M-M-R®II,
dated July 12, 2002 (MRK-CHA00239179-99) .................. Appx19940

**Table of Contents**
**(Continued)**

**Page**

Exhibit 425 to Reilly Declaration -
Clinical and Regulatory Review Committee Agenda,
dated October 8, 2002 (MRK-CHA00780210-65) .............. Appx19962
***(Cont'd in Vol XLIII)***

**Volume XLIII**
**(Filed Under Seal)**

Exhibit 426 to Reilly Declaration -
Analytical Approach for MMR in Japan
(MRK-CHA00719989-20008) ............................................ Appx20019

Exhibit 427 to Reilly Declaration -
Excerpts from Memo re: Mumps neutralizing antibody test vs.
efficacy and effectiveness, dated September 10, 1999
(MRK-CHA00061698-703) ................................................. Appx20040

Exhibit 428 to Reilly Declaration -
Atkinson Deposition Exhibit 2, Letter from Kevin Malone
to Kathleen Hardway, dated July 31, 2018,
and Letter from Robert Redfield to Kathleen Hardway,
dated May 24, 2018 ............................................................ Appx20047

Exhibit 429 to Reilly Declaration -
CDC Publication, Ensuring the Safety of Vaccines in the
United States, last updated July 2011 ................................... Appx20055

Exhibit 430 to Reilly Declaration -
Email from Colleen M. Duffy to Diana DeLong,
dated December 14, 2005 (MRK-CHA00942187-8) ........... Appx20058

Exhibit 431 to Reilly Declaration -
Email from Kevin Agnew to Diana DeLong,
dated March 14, 2014 (MRK-CHA01673057-9) ................. Appx20061

Exhibit 432 to Reilly Declaration -
Letter to CDC Request for Final Proposal to RFP 2014-N-
15784 Consolidated Vaccines for Children Contact,
dated March 7, 2014 (MRK-CHA01655048-93) ................. Appx20065

# Table of Contents
## (Continued)

**Page**

Exhibit 433 to Reilly Declaration -
Email from Diana DeLong to Cindy Rivera,
dated March 13, 2014 (MRK-CHA01656202-3) ................. Appx20112

Exhibit 434 to Reilly Declaration -
FDA Comments on PRN Assay, dated May 9, 2007
(GSK-MMR-IND-0015993-4) ............................................ Appx20115

Exhibit 435 to Reilly Declaration -
Excerpts from Merck Presentation, dated November 10, 2011
(MRK-CHA0002441-681) .................................................... Appx20118

Exhibit 436 to Reilly Declaration -
Letter from Lisa C. Dykstra to CDC and Office of General
Counsel for Department of Health and Human Services,
dated May 18, 2015 (MRK-CHA01374713-20) .................. Appx20121

Exhibit 437 to Reilly Declaration -
Summary of GSK Vaccines development pipeline meeting
with CDC March 8, 2016 (GSK-MMR-0062025-30) ......... Appx20130

Exhibit 438 to Reilly Declaration -
Email from Ouzama Nicholson to Donna Boyce,
dated May 27, 2010 (GSK-MMR-0058532) ....................... Appx20137

Exhibit 439 to Reilly Declaration -
Memo re: Supporting Documents for Stephen Krahling,
dated October 10, 2000 (MRK-CHA00447565-74) ............ Appx20139

Exhibit 440 to Reilly Declaration -
Excerpts from journal of David Krah, M.D.
(MRK-CHA00490081-591) ................................................. Appx20150

Exhibit 441 to Reilly Declaration -
Minutes of August 8, 2001 Project Team Meeting
(MRK-CHA00209441-53) ................................................... Appx20176

**Table of Contents**
(Continued)

**Page**

Exhibit 442 to Reilly Declaration -
Deposition Testimony of  Thomas McGuire, Ph.D.,
taken July 2, 2018 ............................................................... Appx20190

Exhibit 443 to Reilly Declaration -
National Vaccine Advisory Committee Report,
The National Vaccine Program 2008 State of the
Program Report, dated February 2009................................... Appx20274

Exhibit 444 to Reilly Declaration -
"National, State, and Local Area Vaccination Coverage
Among Children Aged 19–35 Months — United States, 2012,"
*MMWR* 2013; 62:733-755, dated September 13, 2013 ........ Appx20289

Exhibit 445 to Reilly Declaration -
"Financing Immunizations in the United States," Hinman
*et al.*, *Clinical Infectious Diseases* 2004; 38:1440-6 ........... Appx20314

Exhibit 446 to Reilly Declaration -
"Program Review, National Immunization Survey (NIS) and
State and Local Area Integrated Telephone Survey (SLAITS),"
dated November 27-28, 2007 ............................................... Appx20322

Exhibit 447 to Reilly Declaration -
"About VFC" webpage ........................................................ Appx20344

Exhibit 448 to Reilly Declaration -
"Medicaid Program; Charges for Vaccine Administration
Under the Vaccines for Children Program,"
Federal Register Volume 59, Issue 190
(October 3, 1994) ............................................................... Appx20347

Exhibit 449 to Reilly Declaration -
Deposition Testimony of Michele Taylor,
taken May 9, 2017 .............................................................. Appx20360

**Table of Contents**
**(Continued)**

Defendant Merck's Response to Relators' Additional Statement of
    Material Facts in Connection with Defendant's First and Fourth
    Summary Judgment Motions, dated December 20, 2019
    (Doc. 311) ........................................................................... Appx20427

Defendant Merck's Response to Relators' Additional Statement of
    Material Facts in Connection with Defendant's First and Fourth
    Summary Judgment Motions, dated December 20, 2019
    (Doc. 314) ........................................................................... Appx20486
    *(Cont'd in Vol XLIV)*

**Volume XLIV**
**(Filed Under Seal)**

Declaration of Lisa C. Dykstra in Support of Defendant's
    Replies and Response to Motions for Summary Judgment,
    executed December 20, 2019 (Doc. 315) ............................. Appx20545

    Exhibit 330 to Dykstra Declaration -
    Excerpts from the Deposition Testimony of Amy Keegan,
    taken February 9, 2018 ....................................................... Appx20552

    Exhibit 331 to Dykstra Declaration -
    Email from Paul Lanzetta to Thomas Romanus
    and John Comonitski, dated August 19, 2011
    (MRK-KRA00955764-955765) .......................................... Appx20555

    Exhibit 332 to Dykstra Declaration -
    Excerpts from Deposition Testimony of Cynthia Morrisey,
    taken July 27, 2017 ............................................................. Appx20558

    Exhibit 333 to Dykstra Declaration -
    Table of Contents for Information Submitted with Merck's
    BLA for the replacement of Human Serum Albumin with
    Recombinant Albumin (MRK-KRA00137827-137828) ..... Appx20562

    Exhibit 334 to Dykstra Declaration -
    FDA's Draft Guidance for Industry Stability Testing of
    Drug Substances and Drug Products (June 8, 1998) ............ Appx20565

**Table of Contents**
**(Continued)**

Exhibit 335 to Dykstra Declaration -
WHO's Draft Guidelines on Stability Evaluation of
Vaccines, Expert Committee on Biological Standardization
(October 23-27, 2006) ........................................................ Appx20662

Exhibit 336 to Dykstra Declaration -
Biological Stability Program 1999 Annual Stability
Report for M-M-R®II (MRK-KRA01632656-86) .............. Appx20691

Exhibit 337 to Dykstra Declaration -
Biological Stability Program 2000 Annual Stability
Report for M-M-R®II (MRK-KRA01633601-29) .............. Appx20723

Exhibit 338 to Dykstra Declaration -
Biological Stability Program 2001 Annual Stability
Report for M-M-R®II (MRK-KRA01632745-822) ............ Appx20753

Exhibit 339 to Dykstra Declaration -
Biological Stability Program 2002 Annual Stability
Report for M-M-R®II (MRK-KRA01633529-600) ............ Appx20832

Exhibit 340 to Dykstra Declaration -
Biological Stability Program Annual 2003 Stability
Report for M-M-R®II (MRK-KRA01632888-945) ............ Appx20905

Exhibit 341 to Dykstra Declaration -
Biological Stability Program 2004 Annual Stability
Report for M-M-R®II (MRK-KRA01632833-68) .............. Appx20964

**Volume XLV**
**(Filed Under Seal)**

Exhibit 342 to Dykstra Declaration -
Biological Stability Program 2005 Annual Stability
Report for M-M-R®II (MRK-KRA01633267-99) .............. Appx21001

Exhibit 343 to Dykstra Declaration -
M-M-R®II Stability Data Summary for the 2006
Annual Stability Report (MRK-KRA0163946-83) ............ Appx21035

**Table of Contents**
**(Continued)**

**Page**

Exhibit 344 to Dykstra Declaration -
M-M-R®II Stability Data Summary for the 2007
Annual Stability Report (MRK-KRA01633723-31) ........... Appx21074

Exhibit 345 to Dykstra Declaration -
CDC's Nationally Notifiable Infectious Diseases and
Conditions, United States: Weekly Tables, Table 1y
(October 2019) ..................................................... Appx21084

Exhibit 346 to Dykstra Declaration -
CDC's Nationally Notifiable Infectious Diseases and
Conditions, United States: Weekly Tables, Table 1z
(October 2019) ..................................................... Appx21088

Exhibit 347 to Dykstra Declaration -
CDC's Nationally Notifiable Infectious Diseases and
Conditions, United States: Weekly Tables, Table 1kk
(October 2019) ..................................................... Appx21092

Exhibit 348 to Dykstra Declaration -
"An Assessment of Mumps Vaccine Effectiveness by Dose
during an Outbreak in Canada," by Deeks, Shelley, *et al.*,
*CMAJ*, 183(9) (June 14, 2011) ........................................... Appx21096

Exhibit 349 to Dykstra Declaration -
"Mumps Vaccine Effectiveness and Risk Factors for Disease
in Households during an Outbreak in New York City,"
by Livingston, Kara, *et al.*, Vaccine 32; 369-374 (2014) ..... Appx21104

Exhibit 350 to Dykstra Declaration -
"A Large Outbreak of Mumps in the Postvaccine Era,"
by Wharton, Melinda, *et al.*, *Journal of Infectious Diseases*,
Vol. 158, No. 6 (December 1988) ........................................Appx21111

Exhibit 351 to Dykstra Declaration -
"Persistence of Mumps Antibodies after 2 Doses of
Measles-Mumps-Rubella Vaccine," by LeBaron, Charles,
*et al.*, *Journal of Infectious Diseases*, 2009:199
(February 15, 2009) ........................................... Appx21120

**Table of Contents**
(Continued)

Exhibit 352 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Keith Chirgwin, M.D., taken January 26, 2017 ................... Appx21130

Exhibit 353 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Barbara Kuter, Ph.D., taken December 14, 2016 ................. Appx21137

Exhibit 354 to Dykstra Declaration -
Letter from Manal Morsy, M.D., Ph.D. to Luba Vujcic,
dated March 9, 2000 (MRK-KRA00020409-20410) ........... Appx21141

Exhibit 355 to Dykstra Declaration -
Memorandum from R. Wolchko with the subject "Bridging
Study of the Mumps Legacy ELISA" and "Mumps
'Wild Type' IgG ELISA," dated February 23, 2001
(MRK-KRA00561875-561885) .......................................... Appx21144

Exhibit 356 to Dykstra Declaration -
*Curriculum Vitae* of Emilio Emini, Ph.D. (January 2016)
(EMINI 00001-22) ............................................................. Appx21156

Exhibit 357 to Dykstra Declaration -
General Correspondence to FDA, dated April 23, 2002
(MRK-KRA00000548-553) ................................................ Appx21179

Exhibit 358 to Dykstra Declaration -
"Mumps Epidemiology and Immunity-The Anatomy of a
Modern Epidemic," by Anderson, Larry, *et al.*,
*Pediatric Infectious Disease Journal*, Vol. 27, No. 10
(October 2008) .................................................................. Appx21186

Exhibit 359 to Dykstra Declaration -
IID-1.5 "Reduce cases of mumps (U.S. acquired cases),"
Healthy People 2020 .......................................................... Appx21192

**Table of Contents**
**(Continued)**

**Page**

Defendant's Response to the United States' Statement of
Interest in Response to the Parties' Summary Judgment
Briefing, dated January 18, 2021 (Doc. 323)......................  Appx21194

Defendant Merck's Reply to Relators' Response Regarding
the United States' Statement of Interest (Doc. 328) ..........  Appx21206

Contract No. 200-2016-89086

(xvi) 52.247-64, Preference for Privately-Owned U.S. Flag Commercial Vessels (Feb 2006) (46 U.S.C. Appx 1241(b) and 10 U.S.C. 2631). Flow down required in accordance with paragraph (d) of FAR clause 52.247-64.

(xvii) 52.222-55, Minimum Wages Under Executive Order 13658 (Dec 2014)(Executive Order 13658).

(2) While not required, the contractor may include in its subcontracts for commercial items a minimal number of additional clauses necessary to satisfy its contractual obligations.

(End of clause)

### C.2   The following FAR Clause is incorporated by reference:

| FAR SOURCE | TITLE AND DATE |
|------------|----------------|
| 52.212-4 | Contract Terms and Conditions—Commercial Items (Dec 2014) |
| 52.232-1 | Payments |

### C.3  Special Clauses

### C.3.1. Shelf Life

Vaccine provided under this contract shall have a minimum 12 month shelf life remaining upon delivery to the consignee, or as specified within each Contract Line Item Number (See Section B, Continuation of SF 1449).

(End of clause)

### C.3.2. Packaging and Packing Requirements

1. Packaging:

All items shall be packaged in standard commercial manner.

2. Packing:

    a. Product shall be packed to ensure maintenance of appropriate temperature during transit and safe arrival at destination. Non-frozen vaccines shipped in case-pack size or greater quantities will have temperature monitoring devices included with each shipment.

    b. Vaccine Shipment Temperature Excursions:

    In the event the temperature monitoring device records a temperature excursion that occurred during transit, the Contractor will provide the Project Officer with documentation that includes a description of the event including the vaccines and lot numbers investigated, time of excursion, noting the temperatures and potential impact to product quality. Upon review of the summary provided, CDC will notify Merck if the vaccine is accepted or rejected

(End of clause)

### C.3.3. Contract Period of Performance

The contract period of performance shall begin on the date of award and shall end March 31, 2017.

(End of clause)

### C.3.4. Time of Delivery

Delivery is required to be made at destination within 15 working days after receipt of electronic, written, or telephonic order (telephone orders to be confirmed in writing).

(End of clause)

MRK-KRA01371974
MRK-CHA01371974
Appx11001

Contract No. 200-2016-89086

**C.3.5. Place of Delivery**

The following applies to all Contract Line Item Numbers except Contract Line Item Number 0010 Varicella Vaccine and 0011 MMR-V only:

(a) Contractor shall be required to deliver vaccine F.O.B. Destination, as directed by delivery orders, only to the designated CDC centralized distribution centers in Aurora, CO and Memphis, TN (provided that the private distributor indemnifies or obtains insurance to indemnify, defend and hold harmless the Contractor from any claims and costs arising from or resulting from the distributor's handling of the vaccine purchases under this contract; the Contractor agrees that it will not require any indemnification by the distributor to extend the liability caused by acts or omissions of the Contractor).

2. The following applies to Contract Line Item Number 0010 Varicella Vaccine and 0011 MMR-V only:

a) The Contractor shall be required to deliver vaccines F.O.B. Destination, as directed by delivery orders to National, State, and Regional warehouses, individual physician providers, as well as private distributors under contract with the Federal or state Governments within the 50 states, the District of Columbia, Puerto Rico, Virgin Islands, Guam, American Samoa,Commonwealth Northern Mariana Islands (CNMI) or other designated sites in the event of a public health emergency, as determined by CDC. Deliveries to National, State, or Regional warehouses will be contingent on the warehouse being validated solely by the CDC, or its appointed independent agent and must maintain Varivax® and ProQuad® at -15°C. The CDC shall be responsible for identifying and validating all such warehouses as set forth above; however, in an effort to assist the CDC in the fulfilling its obligation, the Contractor shall provide a list of all such warehouses of which the Contractor becomes aware of additional warehouses. Deliveries to private distributors under contract with the Federal or State Governments will be contingent upon (1) the distributor being validated solely by the CDC or its appointed independent agent as being able to store, ship, and handle Varivax® and ProQuad® at -15°C and (2) that the distributor indemnifies or obtains insurance to indemnify, defend, and hold harmless the Contractor from any claims and costs arising from or resulting from the distributor's handling of the vaccine purchased under this contract. The Contractor agrees that it will not require any indemnification by the distributor to extend to liability caused by acts or omissions of the Contractor.

(b) No more than four (4) shipments each to American Samoa and Guam will be required to be made during the contract period. In the event that CDC requires the Contractor to make such shipments to these sites, CDC and the Contractor agree to discuss how to implement delivery of vaccine to these sites in the most efficient manner.

(End of clause)

**C.3.6. Amendment to OBRA Statute**

In the event of an amendment of 42 U.S.C. Section 1396(s), any terms of the contract affected by such an amendment will be modified in accordance with the revised statute. The Contracting Officer and the Contractor shall meet to discuss such modifications to the contract before finalization of any changes to the contract.

(End of clause)

**C.3.7. Product Licensure**

a. The vaccines produced and delivered under this contract shall be manufactured under a current establishment and product license issued by the Food and Drug Administration as indicated below:

_____2_____

b. The Current Good Manufacturing Practice Regulations (CGMPR's) (21CFR Parts 210, 211) will be the standard to be applied for manufacturing, processing and packing of drugs, chemicals, and biologicals.
c. The Contractor shall advise the Contracting Officer as soon as Contractor becomes aware of any relocation of his prime manufacturing facility or the relocation of any subcontractor's facility, and if at any time during the life of the contract, the item listed under this contract fails to meet CGMPR's and/or a negative Food and Drug Administration Quality Assurance Evaluation is received; the contract may be terminated, in whole or in part, without further liability to the Government.

MRK-KRA01371975
MRK-CHA01371975

Appx11002

Contract No. 200-2016-89086

**C.3.8. Placement of Orders**

    a. All vaccine under this contract will be ordered by delivery orders. Orders shall be placed by Health and Human Services (HHS), the Centers for Disease Control and Prevention (CDC) on behalf of eligible awardees or by the awardees. Orders shall be placed by electronic transfer. In the event of an emergency, orders may be placed by CDC by telephone (confirmed in writing). Contractors shall be able to interface with the CDC Electronic Vaccine Ordering System. If unable to interface at the time of award, the vendor shall complete interface implementation by the end of the period of performance of the contract.

    b. Orders shall be submitted to the Ordering Address specified in Contract Clauses Paragraph C.3.12, Contractor's Ordering/Payment Address, and shall contain the following minimum information:

        1. Date of order;
        2. Contract number and order number;
        3. Item description, quantity and unit price;
        4. Delivery or performance date;
        5. Place of delivery or performance (including consignee);
        6. Packaging, packing and shipping instruction, if any;
        7. Accounting and appropriation data;
        8. Statement to indicate if partial deliveries are not acceptable; (lack of a statement shall be construed to mean partial deliveries are acceptable and payment shall be made as required elsewhere herein)
        9. Any other pertinent data.

(End of clause)

**C.3.9. Delivery Order Limitations**

    a. Minimum Order Size: Individual delivery orders issued under this contract must meet the minimum order size as specified within each Contract Line Item Number (See Section B, Continuation of SF 1449). When the Government requires supplies covered by this contract in amounts less than stated above, the Government is not obligated to purchase, nor is the Contractor obligated to furnish those supplies under this contract.

    b. Maximum Order: The maximum quantity specified within each Contract Line Item Number (See Section B, Continuation of SF1449) is the maximum number of doses that may be ordered during the contract period of performance. Contractors are advised that the maximum quantity represents their commitment to the CDC under their contract.

    c. Delivery Orders shipments:

        1. Shipments shall be sent with all transaction information necessary to be compliant with applicable Drug Supply Chain Security Act requirements regarding Transaction Information (TI), Transaction History (TH), and Transaction Statement (TS). Initially paper documentation or portal access will be acceptable, but EDI messaging between contractors and CDC will transition to allow electronic transmission of information.

        2. The Government reserves the right to reject vaccine doses that exceed delivery order requirements. The Government shall notify the Contractor when excess doses have been delivered to distribution sites. The Contractor is responsible for contacting the distribution site to make arrangement for the return of the excess doses and will be responsible for shipping cost associated with their return.

        3. Bulk order shipments, when possible, shall consist of

            a. One NDC per skid
            b. Full skid quantities with same lot number
            c. Full case quantities (when total order size allows)

(End of clause)

MRK-KRA01371976
MRK-CHA01371976
Appx11003

Contract No. 200-2016-89086

**C.3.10. FAR 52.216-18. Ordering (Oct 1995)**

  a. Any supplies and services to be furnished under this contract shall be ordered by issuance of delivery orders or task orders by the individuals or activities designated in the Schedule. Such orders may be issued from the effective date of the contract through the expiration date of the contract.

  b. All delivery orders or task orders are subject to the terms and conditions of this contract. In the event of conflict between a delivery order or task order and this contract, the contract shall control.

  c. If mailed, a delivery order or task order is considered "issued" when the Government deposits the order in the mail. Orders may be issued orally or by written telecommunications only if authorized in the Schedule.

(End of clause)

**C.3.11. FAR 52.216-22 Indefinite Quantity (Oct 1995)**

  a. This is an indefinite quantity contract for the supplies specified and effective for the period stated in the Schedule. The quantities of supplies and services specified in the Schedule are estimates only and are not purchased by this contract.

  b. Delivery or performance shall be made only as authorized by orders issued in accordance with the Ordering clause. The Contractor shall furnish to the Government, when and if ordered, the supplies specified in the Schedule up to and including the quantity designated in the Schedule as the "maximum." The Government shall order at least the quantity of supplies designated in the Schedule as the "minimum."

  c. Except for any limitations on quantities in the Delivery Order Limitations clause or in the Schedule, there is no limit on the number of orders that may be issued. The Government may issue orders requiring delivery to multiple destinations or performance at multiple locations.

  d. Any order issued during the effective period of this contract and not completed within that period shall be completed by the Contractor within the time specified in the order. The contract shall govern the Contractor's and Government's rights and obligations with respect to that order to the same extent as if the order were completed during the contract's effective period; provided, that the Contractor shall not be required to make any deliveries under this contract after fifteen (15) working days beyond the expiration date of the contract.

(End of clause)

**C.3.12. Contractor's Ordering/Payment Address**

Submission of all orders for Contractor's vaccines and payment of invoices shall be addressed as referenced below:    .

| Ordering Address | Payments Address |
|---|---|
| Merck Vaccine Division | Merck Sharp & Dohme Corp. |
| 351 N Sumneytown Pike  MS UG4C-24 | P.O. Box 5254 |
| North Wales, PA  19454 | Carol Stream, IL 60197-5254 |

(End of clause)

**C.3.13. Invoice Submission**

1. Invoice submission under this contract will be made as follows:

  a. Federal Government: The Contractor shall submit invoices via Electronic Data Interchange (EDI)

  b. Awardees: The Contractor shall submit one hard copy of its invoice(s) to the address specified on the delivery order.

MRK-KRA01371977
MRK-CHA01371977
Appx11004

Contract No. 200-2016-89086

    c. The Contractor agrees to include the following information on each invoice:

        1. Contractor's name and invoice date;

        2. Contract number, or other authorization for delivery of property and/or services;

        3. Description, cost or price, and quantity of property and/or services actually delivered or rendered;

        4. Shipping and payment terms;

        5. Other substantiating documentation or information as required by the contract;

        6. Name where practicable, title, phone number, and complete mailing address of responsible official to whom payment is to be sent;

        7. NDC and Lot number of vaccine shipped;

        8. CDC accounting and appropriation data as described on the delivery order; and

        9. Electronic Funds Transfer (EFT) and Taxpayer Identification Number (TIN).

(End of clause)

**C.3.14. Method of Payment**

    a. Federal Government: The Government will use electronic funds transfer when making payment under this contract IAW/FAR Clause 52.232-33, payment by Electronic Funds Transfer - Central Contractor Registration.

    b. Awardees: Awardees authorized to order vaccine using funds for State and Local Orders will be required to comply with all terms and conditions hereunder, including the Prompt Payment Act and all payment provisions required by this agreement. Merck acknowledges that the CDC is unable to enforce the Prompt Payment Act with the Awardees using state/local/CHIP funds. The Government is not liable for payment related to orders submitted by states, cities, and territories.

(End of clause)

**C.3.15. Contract Officer Representative (COR)**

A COR will be designated in writing by the Contracting Officer to serve during the period of performance of the contract. The COR shall be responsible for guidance in regard to the technical aspect of the contract, provide a point for liaison between the Contractor and other Government agencies and be the general focal point to address technical and logistical problems relating to the performance under the contract. The COR shall not have the authority to make any commitments or authorize any changes which affect the contract price, terms and/or conditions; any such changes shall be referred to the Contracting Officer for action.

(End of clause)

**C.3.16. Return Privileges**

Return privileges for credit, reimbursement or exchange do not apply to this contract except vaccines not conforming to the specifications set forth herein.

(End of clause)

MRK-KRA01371978
MRK-CHA01371978
**Appx11005**

Contract No. 200-2016-89086

**C.3.17. Restrictions on Use of Vaccines**

Vaccines obtained under this contract shall be used only in children 18 years of age and younger as authorized under Section 1928 of the Social Security Act. Sale of such vaccine to any person or entity or reimbursement of vaccine costs is strictly prohibited. Free distribution of such vaccine is also prohibited, except where such vaccine is administered in the context of Federal and Awardee immunization program activities.

(End of clause)

**C.3.18. Federal Excise Tax Credit**

Negotiated prices for the vaccines included in this Contract may include a Federal Excise Tax (See Continuation of SF 1449 for applicable Contract Line Item Numbers). If for any reason the vaccine is returned (other than for resale) or destroyed, the Contractor shall within 6 months following the date the vaccine is returned or destroyed, file a claim for credit or refund relative to any tax previously paid on such vaccine. The Contractor agrees to credit or refund the amount of such excise tax to the purchaser to the extent that the Contractor receives a credit or refund from the Federal Government. Any such credit or refund to the purchaser is expressly conditioned upon the authorized purchaser providing a written summary of events leading to the request for credit or refund. The purchaser shall return all undistributed vaccine to the agent of the Contractor for proper disposal, unless destruction or condition of the vaccine renders return impossible. If destruction or condition of the vaccine renders return impossible and is therefore destroyed by the purchaser, the authorized purchaser must provide a written summary of events to the Contractor within 30 days of said destruction. If a contract is in place with the Contractor at the time when a credit or refund is issued; the purchaser may elect to receive vaccine which will be purchased at the current contract price in lieu of a credit or refund. Otherwise, the Contractor shall refund the amount due to the purchaser's account. If a credit or refund is issued by the Contractor for state or local funds, it shall be submitted to the state or local public health entity identified in the request for FET credit. If a credit or refund is issued by the Contractor to the Federal Funds account, it shall contain the Contractor's DUNS and TIN/EIN and shall be submitted either via EDI (for credit) or to the following address (for check):

Centers for Disease Control and Prevention
Office of Financial Resources (OFR)
Attn: Debt Management Branch
P.O. Box 15580
Atlanta, GA 30329-4027

(End of clause)

**C.3.19. Delinquent Delivery Report**

The Contractor shall provide CDC with a weekly listing of all CDC orders that have not been shipped within the agreed upon delivery schedule specified in the contract. The report shall include the following information: project name, order number, date of order, and status of order in number of pending/undeliverable doses. Depending upon the nature of the delinquencies, the CDC may request this report less often during the Contract performance period and in this situation, frequency and method of providing such reports shall be mutually agreed upon by the Contractor and CDC. This report shall provide an explanation as to the cause for the delinquent deliveries as well as when the vaccine will be delivered, as it is known by the Contractor at the time of the report. This notification shall not relieve the Contractor from meeting its obligations under the contract and shall not limit the Government's rights to seek relief for any breach of contract for failure to perform, including termination for cause. Notwithstanding the foregoing, the CDC agrees to work with the Contractor in good faith to allow the Contractor to remedy the effect of any supply shortage on contract performance, even if the contract performance is not specifically relieved by FAR 52.212-4(f).

   b. CDC acknowledges that the explanation as to the cause for delinquent deliveries and when vaccine will be delivered is confidential and proprietary information to the Contractor, and shall not use such information other than for CDC's internal tracking and reporting purposes and shall not further disclose such information without the Contractor's prior written consent unless required by law or other Federal authority. The Contractor acknowledges that the failure to fill orders as well as data associated with such failure are not confidential or proprietary data but are data incidental to contract performance. In the event that CDC is required by law or other Federal authority to disclose the explanation as to the cause for the delinquent

MRK-KRA01371979
MRK-CHA01371979
Appx11006

Contract No. 200-2016-89086

deliveries and when vaccine will be delivered, CDC shall notify the Contractor prior to making such disclosure in accordance with law or other Federal authority.

(End of clause)

**C.3.20. Biological Surveillance Data Reports**

a. The Contractor shall submit a monthly report of historical sales data for the United States by month and state, specifying the name of the vaccine, NDC #, and the total number of doses sold (segregated by CDC and non-CDC sales), in a standardized format acceptable to the Contractor and the CDC. The report shall be submitted electronically to the COR by the 15th of the month. Information related to vaccine sales through CDC contracts is not considered proprietary. CDC acknowledges that those reports pertaining to private sales unrelated to this contract are confidential and proprietary information of the Contractor, and shall not use reports for any purpose other than CDC's internal tracking and reporting purposes and shall not further disclose such reports without the Contractor's prior written consent unless required by the law or other Federal authority; provided that, no Contractor authorization shall be required for the CDC to include the data from the Contractor's report in a report in which aggregated data from multiple Contractors is summarized, so long as, with respect to multi-sourced products, the CDC's aggregated report does not include any data which could be individually identified as the Contractor's. In the event that CDC is required by law or other Federal authority to disclose such reports required to be held confidential hereunder, CDC shall notify the Contractor prior to making such disclosure in accordance with law or other Federal authority.

b. Data Reports to Manufacturers
   The Government will submit monthly reports of all vaccine data specifying doses by project, zip code, and NDC # in a standardized format. For all vaccines except direct ship vaccines, the Government shall provide distribution data. Because the Government does not distribute direct ship vaccines, purchase data will be provided. The reports shall be submitted electronically to the Contractor by the 15th of the month for the previous month. The Government shall also provide the Contractor with an annual Vaccine Tracking System (VTrckS) spend plan for each Awardee and an annual providers list during the first quarter of the fiscal year.

(End of clause)

**C.3.21. Prohibitions on Inducements**

The Contractor is expressly prohibited from offering, providing or arranging inducements of any kind to providers or authorized purchasers ordering vaccine under this contract for the purpose of obtaining orders for vaccine. Examples of such inducements include, but are not limited to: entertainment, meals, and free or reduced prices for syringes, vaccines, or other medical products or supplies. If the Contractor has entered into similar agreements with the authorized purchasers which offer inducements relative to its commercial business, these agreements must be clear that they do not apply to purchases made under the CDC Federal contracts.

(End of clause)

**C.3.22. Contract Changes**

Notwithstanding FAR Clause 52.212-4(c), Changes, the parties hereby agree that modifications for incremental funding and other administrative changes (e.g., changes to CDC accounting data) that do not affect the terms and conditions of the contract may be made unilaterally by the CDC.

(End of clause)

**C.3.23. Vaccine Images**

Upon contract award, the Contractor agrees to provide via email camera-ready vaccine product images in .pdf format and written authorization for CDC to use the images to the COR. CDC will use the images to illustrate the Contractor's products on the CDC vaccine ordering system. The Contractor agrees to provide CDC with updated product images if there is a change in packaging and vaccine images for new NDCs added to the contract during the period of performance.

MRK-KRA01371980
MRK-CHA01371980
**Appx11007**

Contract No. 200-2016-89086

For each vaccine furnished under this contract, complete the information in the template below, including the NDC numbers for the unit of sale and unit(s) of use in the first and last columns. If there is more than one component/NDC within the unit of use, list each NDC separately along with component name.

| Unit of Sale (Box/Carton) | | | Unit of Use (Vial/Syringe) |
|---|---|---|---|
| NDC | Brandname/ Tradename | Description/Presentation | NDC |
| | | | |
| 0006-4119-03 | Gardasil®9 | 10 Pack – 1 dose vial | 00006-4119-01 10 Pack – 1 dose vial |
| 00006-4681-00 | M-M-R II® | 10 pack – 1 dose vial | 00006-4681-01 10 pack – 1 dose vial |
| 00006-4897-00 | PedvaxHib® | 10 pack – 1 dose vial | 00006-4897-01 10 pack – 1 dose vial |
| 00006-4943-00 | Pneumovax®23 | 10 pack – 1 dose vial | 00006-4943-01 10 pack – 1 dose vial |
| 00006-4171-00 | ProQuad® | 10 pack – 1 dose vial | 00006-4171-01 10 pack – 1 dose vial |
| 00006-4981-00 | Recombivax HB® | 10 pack – 1 dose vial | 00006-4981-01 10 pack – 1 dose vial |
| 00006-4093-02 | Recombivax HB® | 10 pack – 1 dose syringe | 00006-4093-01 10 pack – 1 dose syringe |
| 00006-4047-41 | RotaTeq® | 10 pack – 1 dose tube | 00006-4047-01 10 pack – 1 dose tube |
| 00006-4047-20 | RotaTeq® | 25 pack – 1 dose tube | 00006-4047-01 25 pack – 1 dose tube |
| 00006-4831-41 | Vaqta® | 10 pack – 1 dose vial | 00006-4831-01 10 pack – 1 dose vial |
| 00006-4095-02 | Vaqta® | 10 pack – 1 dose syringe | 00006-4095-01 10 pack – 1 dose syringe |
| 00006-4827-00 | Varivax® | 10 pack – 1 dose vial | 00006-4827-01 10 pack – 1 dose vial |

(End of clause)

**C.3.24. Advance Notice of Supply Issues**

To the extent possible, the Contractor agrees to provide advance notification to COR and the CDC Contracting Officer of any supply issue which may result in the Contractor's failure to deliver vaccine within the agreed upon delivery schedule specified in the contract. This notification shall be given as soon as the Contractor becomes aware of the scope of the problem that will impede the timely delivery of vaccine. This notification shall not relieve the contractor from meeting its obligations under the contract and shall not limit the Government's right to seek relief for any breach of contract for failure to perform, including termination for cause. Furthermore, any deviation from the delivery schedule due to a vaccine supply issue will demonstrate reasonably equal treatment with respect to the fulfillment of orders between CDC and the contracting non-government customers.

(End of clause)

MRK-KRA01371981
MRK-CHA01371981
Appx11008

Contract No. 200-2016-89086

### C.3.25. Authorized Distribution of Record (ADR) Agreements

In accordance with the Prescription Drug Marketing Act (PDMA) of 1998, it is requested that all suppliers provide a written statement included as an attachment in Section D of this solicitation, which designates the CDC as the ADR for all vaccines subject to distribution under this contract.

(End of clause)

### C.3.26. Use of VFC Provider Lists and Distribution of Material

    a. Contractors are prohibited from utilizing VFC providers lists obtained from any source for any mailing or other communication with VFC providers, except as approved in writing by the CDC COR. In addition, contractors are prohibited from otherwise communicating with VFC providers regarding the VFC program, except as approved in writing by the CDC COR. To the extent that Contractors have established relationships with VFC providers or authorized purchasers under this contract that are independent from the VFC program, communications related to such independent relationships are not covered by this provision and do not require CDC consent.

    b. Contractors are prohibited from providing names and/or addresses of VFC providers to any third party, except as needed to comply with the terms of this contract, in which cases the CDC COR shall be notified in writing of such use.

    c. Any Contractor that ships vaccine directly to VFC providers is prohibited from inserting any promotional or other material that is promotional in nature for any product that the Contractor produces, into shipping containers for vaccine purchased under this contract, except for material related to use of the vaccine as approved in writing by the CDC COR. Additionally any shipping container inserts that are required, such as handling instructions or educational materials, should not contain any promotional material as part of its content. Notwithstanding the foregoing, to the extent that Contractors have established relationships with VFC providers or authorized purchasers under this contract that are independent from the VFC program, communications related to such independent relationships are not covered by provision C.3.26 and do not require CDC COR consent.

(End of clause)

### C.3.27. New FDA Product License

Manufacturers who receive a new FDA product license for a vaccine already included within the scope of a VFC resolution may have the new product added to its contract by modification if it is determined that adding the product is in the best interest of the Government. Such new products must be consistent with VFC formulary schedules (regarding periodicity and dosage regimens) as established for the vaccines by the Advisory Committee on Immunization Practices (ACIP). New FDA licensed products added to this contract must comply with Clause C.3.29., *Price Changes*, below.

(End of clause)

### C.3.28. ACIP Approved Product

When a new vaccine product is approved by the ACIP for inclusion in the VFC Formulary, the Manufacturer of such product may have the new product added to its contract by modification if it is determined that adding the product is in the best interest of the Government. This would include new vaccines, new indications or new formulations for existing products or new dosing regimens for an existing product. New FDA licensed products added to this contract must comply with Clause C.3.29., *Price Changes*, below.

(End of clause)

### C.3.29. Price Changes

All price change effective dates shall be approved by the CDC Contracting Officer and shall occur on the first day of the following month.

MRK-KRA01371982
MRK-CHA01371982
Appx11009

Contract No. 200-2016-89086

**C.3.30. Evaluation of Contractor Performance Utilizing CPARS (April 2013)**

In accordance with FAR 42.15, the Centers for Disease Control and Prevention (CDC) will review and evaluate contract performance. FAR 42.1502 and 42.1503 requires agencies to prepare evaluations of contractor performance and submit them to the Past Performance Information Retrieval System (PPIRS). The CDC utilizes the Department of Defense (DOD) web-based Contractor Performance Assessment Reporting System (CPARS) to prepare and report these contractor performance evaluations. All information contained in these assessments may be used by the Government, within the limitations of FAR 42.15, for future source selections in accordance with FAR 15.304 where past performance is an evaluation factor.

The CPARS system requires a contractor representative to be assigned so that the contractor has appropriate input into the performance evaluation process. The CPARS contractor representative will be given access to CPARS and will be given the opportunity to concur or not-concur with performance evaluations before the evaluations are complete. The CPARS contractor representative will also have the opportunity to add comments to performance evaluations.

The assessment is not subject to the Disputes clause of the contract, nor is it subject to appeal beyond the review and comment procedures described in the guides on the CPARS website. Refer to: www.cpars.gov for details and additional information related to CPARS, CPARS user access, how contract performance assessments are conducted, and how Contractors participate. Access and training for all persons responsible for the preparation and review of performance assessments is also available at the CPARS website.

The contractor must provide the CDC contracting office with the name, e-mail address, and phone number of their designated CPARS representative who will be responsible for logging into CPARS and reviewing and commenting on performance evaluations. The contractor must maintain a current representative to serve as the contractor representative in CPARS. It is the contractor's responsibility to notify the CDC contracting office, in writing (letter or email), when their CPARS representative information needs to be changed or updated. Failure to maintain current CPARS contractor representative information will result in the loss of an opportunity to review and comment on performance evaluations.

(End of clause)

**C.3.33. HHSAR 352.203-70 Anti-Lobbying (December 18, 2015)**

Pursuant to the HHS annual appropriations acts, except for normal and recognized executive-legislative relationships, the Contractor shall not use any HHS contract funds for:

(a) Publicity or propaganda purposes;
(b) The preparation, distribution, or use of any kit, pamphlet, booklet, publication, electronic communication, radio, television, or video presentation designed to support or defeat the enactment of legislation before the Congress or any State or local legislature or legislative body, except in presentation to the Congress or any state or local legislature itself; or designed to support or defeat any proposed or pending regulation, administrative action, or order issued by the executive branch of any state or local government, except in presentation to the executive branch of any state or local government itself; or
(c) Payment of salary or expenses of the Contractor, or any agent acting for the Contractor, related to any activity designed to influence the enactment of legislation, appropriations, regulation, administrative action, or Executive order proposed or pending before the Congress or any state government, state legislature or local legislature or legislative body, other than for normal and recognized executive-legislative relationships or participation by an agency or officer of a state, local, or tribal government in policymaking and administrative processes within the executive branch of that government.
(d) The prohibitions in subsections (a), (b), and (c) above shall include any activity to advocate or promote any proposed, pending, or future federal, state, or local tax increase, or any proposed, pending, or future requirement for, or restriction on, any legal consumer product, including its sale or marketing, including, but not limited to, the advocacy or promotion of gun control.

(End of clause)

MRK-KRA01371983
MRK-CHA01371983

Contract No. 200-2016-89086

C.3.34 – Duty to Warn

a.  The Department of Health and Human Services (HHS), Centers for Disease Control and Prevention (CDC), and State agencies as authorized (hereinafter referred to in this contract clause C.3.34 as the Government) represent and agree that all programs which are supplied vaccine under this contract shall take appropriate steps to assure either (1) that such vaccine is administered to each patient on the basis of an individualized medical judgment by a physician; or (2) that such vaccine is administered after meaningful warnings related to the risks and benefits of vaccination are provided to such patient (or the patient's parent or legal guardian), in form and language understandable to such patient, parent, or guardian, including through use of appropriate version of the most recent vaccine information materials.

b.  If any claim or action is asserted against the Contractor arising in whole or in part from an alleged failure by the Government  to carry out its responsibilities under paragraph (a) above, the Contractor shall promptly notify the Contracting Officer and furnish to him copies of all pertinent documents served upon or received by the Contractor.  The Government shall provide reasonable assistance and full cooperation including, but not limited to making witnesses available to testify and providing relevant documents to the Contractor arising from the Government's alleged failure to carry out its responsibilities under paragraph (a) above.  The Government shall have the option to participate in the defense of that portion of such claim or action which arises from the alleged failure of the Government to carry out its responsibilities under paragraph (a) above.

c.  In the event of the Government's breach of or failure to carry out its responsibilities under paragraph (a) above, any measure of resulting damages to the Contractor shall include, but need not be limited to, damages (including money judgments, reasonable attorneys' fees, and other costs) sustained in connection with claims against the Contractor for personal injuries caused by such breach or failure.  The Contractor agrees to take appropriate steps to mitigate any such claims by diligently defending claims brought against it or when appropriate by entering into reasonable settlement agreements.  The entry of a judgment against the Contractor in connection with a claim for personal injury allegedly resulting in whole or in part from the Government's breach of, or failure to carry out, its obligations under paragraph (a).  This provision shall not limit any other right of the Contractor to obtain damages or other relief for any breach of this contract or for the settlement of any dispute arising under this contract.

(End of clause)

C.3.35 Confidentiality-

In the course of the Contractual relationship between the Contractor and the CDC, the CDC acknowledges that certain information provided by the Contractor shall be considered confidential and proprietary information to the Contractor (including, but not limited to information as to cause for delinquent deliveries as provided under Section C.3.19), and shall not use such information other than for CDC's internal tracking and reporting purposes and shall not further disclose such information without the Contractor's prior written consent unless required by law or other Federal authority. The Contractor shall mark all information they deem to be confidential or proprietary accordingly. If the CDC has reason to question the proprietary nature of information deemed such by the Contractor, the CDC will enter into discussions with the Contractor to reach a mutual agreement.  In the event that CDC is required by law or other Federal authority to disclose such confidential and proprietary information, CDC shall notify the Contractor prior to making such disclosure in accordance with law or other Federal authority.

(End of clause)

C.3.36 352.204-70 Prevention And Public Health Fund—Reporting Requirements (December 18, 2015)

(a) Pursuant to public law this contract requires the contractor to provide products or services or both that are funded from the Prevention and Public Health Fund (PPHF), Pub. L. 111-148, sec. 4002. Section 220(b)(5) requires each contractor to report on its use of these funds under this contract. These reports will be made available to the public.

(b) Semi-annual reports from the Contractor for all work funded, in whole or in part, by the PPHF, are due no later than 20 days following the end of each 6-month period. The 6-month reporting periods are January through June and July through December. The first report is due no later than 20 days after the end of the 6-month period following contract award. Subsequent reports are due no later than 20 days after the end of each reporting period. If applicable, the Contractor shall

MRK-KRA01371984
MRK-CHA01371984

Appx11011

Contract No. 200-2016-89086

submit its final report for the remainder of the contract period no later than 20 days after the end of the reporting period in which the contract ended.

(c) The Contractor shall provide the following information in an electronic and Section 508 compliant format to the Contracting Officer.

(1) The Government contract and order number, as applicable.

(2) The amount of PPHF funds invoiced by the contractor for the reporting period and the cumulative amount invoiced for the contract or order.

(3) A list of all significant services performed or supplies delivered, including construction, for which the contractor invoiced in the reporting period.

(4) Program or project title, if any.

(5) The Contractor shall report any subcontract funded in whole or in part with PPHF funding, that is valued at $25,000 or more. The Contractor shall advise the subcontractor that the information will be made available to the public. The Contractor shall report:

(i) Name and address of the subcontractor.

(ii) Amount of the subcontract award.

(iii) Date of the subcontract award.

(iv) A description of the products or services (including construction) being provided under the subcontract.

(End of Clause)

MRK-KRA01371985
MRK-CHA01371985

Appx11012

Contract No. 200-2016-89086

## SECTION D - CONTRACT DOCUMENTS, EXHIBITS OR ATTACHMENTS

**D.1**     **Websites.** Additional information can be found at http://www.fbo.gov/, www.cdc.gov/vaccines; and http://csrc.nist.gov/publications/nistpubs/

**D.2**     **Attachment A -   Authorized Distributor of Record (ADR) Agreement**

MRK-KRA01371986
MRK-CHA01371986

Appx11013

Contract No. 200-2016-89086

**Attachment A: Authorized Distributor of Record (ADR) Agreement**

### *AUTHORIZED DISTRIBUTOR OF RECORD (ADR) AGREEMENT*

This Agreement hereby represents the ongoing relationship between the supplier named below ("MANUFACTURER / SUPPLIER") and the Centers for Disease Control and Prevention, herein after referred to as CDC, to establish and designate CDC as an Authorized Distributor of Record (ADR) as set forth in the Prescription Drug Marketing Act (PDMA) of 1988 as well as in the implementing federal regulations found at 21 CFR Part 203. CDC hereafter agrees to comply with all applicable state and federal laws to ensure continued status of this relationship. To further meet the requirements of the PDMA, please forward with the signed agreement an attachment with a list of the specific products that CDC is authorized to distribute or a statement that the CDC is an ADR for the manufacturer's entire product line. Specific products should be identified by the pharmaceutical / vaccine name, dosage form, and strength of the drug and the NDC number.

Check the box that applies:

___ The Distributor is the ADR for Supplier's entire product line.

_X_ The Distributor is the ADR for the products listed on the attachment A-1.

This agreement shall be valid from the date of dual execution until termination by either party on ninety (90) days written notice. This agreement shall not abridge, supplant, modify, or in any way alter any other pre-existing distribution agreement or any future agreements that may, from time to time, be executed in the furtherance of the business relationship between Manufacturer/ Supplier and the CDC.
This agreement confers no rights upon CDC other than to designate CDC as an Authorized Distributor of Record for Manufacturer / Supplier. This agreement is not intended to be, nor shall it be, interpreted as a sales agreement or any other type of agreement other than to represent an "ongoing relationship" within the meaning set forth in 21 CFR Part 203.3(u).

*By affixing my signature below, I do hereby acknowledge and represent that I have read this Agreement in its entirety, that I understand its terms, that I am duly authorized to bind my organization to the requirements detailed in the above Agreement and that I agree to ensure that my organization will adhere to such requirement for the duration herein stated.*

Authorized Distributor of Record: **Centers for Disease Control and Prevention (CDC)**

Authorized Signature:_____

Print Name: _____ , U.S. Government Contracting Officer

Date: _____

------------------------------------------------------------------------------------------------

Manufacturer / Supplier: ___ Merck_____

Authorized Signature: _____

Print Name: ___Michele Taylor, Director_____

Date: _03/23/2016_____

Page 25

MRK-KRA01371987
MRK-CHA01371987
Appx11014

Contract No. 200-2016-89086

ATTACHMENT A-1

## LIST OF PRODUCTS

| Item No. | Product/Brand Name | NDC |
|---|---|---|
| 1. | Gardasil® <br><br> [Human Papillomavirus Quadrivalent (Types 6, 11, 16, and 18) Vaccine, Recombinant] | 00006-4045-41 |
| 2. | Gardasil®9 <br><br> (Human Papillomavirus 9-valent Vaccine, Recombinant) | 00006-4119-03 |
| 3. | M-M-R II® <br><br> (Measles, Mumps, and Rubella Virus Vaccine Live) | 00006-4681-00 |
| 4. | PedvaxHib® <br><br> [Haemophilus bConjugate Vaccine (Meningococcal Protein Conjugate)] | 00006-4897-00 |
| 5. | Pneumovax®23 <br><br> (Pneumococcal Vaccine Polyvalent) | 00006-4943-00 |
| 6. | ProQuad® <br><br> (Measles, Mumps, Rubella and VaricellaVirus Vaccine Live) | 00006-4171-00 |
| 7. | Recombivax HB® <br><br> ([Hepatitis B Vaccine (Recombinant)] Pediatric Formulation | 00006-4981-00 <br> 00006-4093-02 |
| 8. | RotaTeq® <br><br> (Rotavirus Vaccine, Live, Oral Pentavalent) | 00006-4047-41 |

MRK-KRA01371988 <br> MRK-CHA01371988

Appx11015

Contract No. 200-2016-89086

|  |  |  | 00006-4047-20 |
|---|---|---|---|
| 9. | Vaqta® | | 00006-4831-41 |
| | | | 00006-4095-02 |
| | (Hepatitis A Vaccine, inactivated) | | |
| 10. | Varivax® | | 00006-4827-00 |
| | (Varicella Virus Vaccine Live) | | |

MRK-KRA01371989
MRK-CHA01371989

Appx11016

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

*Plaintiffs,*

v.

MERCK & CO., INC.,

*Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 73

**CDC** Centers for Disease Control and Prevention
CDC 24/7: Saving Lives, Protecting People™

## Vaccines for Children Program (VFC)

# Archived CDC Vaccine Price List as of April 6, 2001

### Archived: This Page Is No Longer Being Updated

This website is archived for historical purposes and is no longer being maintained or updated.

**April 6, 2001**: Content on this page kept for historical reasons.

« Back to Vaccines For Children program
« Back to Immunization Managers Home page

**Prices last reviewed/updated:** April 6, 2001

**Note:** The CDC Vaccine Price Lists posted on this website provide current vaccine contract prices and list the private sector vaccine prices for general information. Contract prices are those for CDC vaccine contracts that are established for the purchase of vaccines by immunization programs that receive CDC immunization grant funds (i.e., state health departments, certain large city immunization projects, and certain current and former U.S. territories). Private providers and private citizens cannot directly purchase vaccines through CDC contracts. Private sector prices are those reported by vaccine manufacturers annually to CDC. All questions regarding the private sector prices should be directed to the manufacturers.

- Vaccine Supply Information (for routine vaccines)
- Vaccine package insert information ⬈
  From this page, you can get to all of the vaccines licensed in the US. Each product page includes links to the prescribing information (package inserts).

As of 5-14-10, the CDC Vaccine Price List also shows the NDC code and contract number for each vaccine.

### Related Pages:

- Archived Price Lists
- Current Price List

| Vaccine | Brandname/ Tradename | Packaging | CDC Cost/Dose | Private Sector Cost/Doses | Contract End Date | Manufacturer |
|---------|---------------------|-----------|---------------|---------------------------|-------------------|--------------|
| DTaP/ | Tripedia® | 10 x 1 dose vial | $10.65 | $17.12 | 3/31/02 | Aventis Pasteur |

**Appx11018**

| Vaccine | Brandname/ Tradename | Packaging | CDC Cost/Dose | Private Sector Cost/Doses | Contract End Date | Manufacturer |
|---|---|---|---|---|---|---|
| DTaP/¤ | Tripedia® | 15 dose vial 10 x 1 dose vial | $10.65 | $17.12 | 3/31/02 | Aventis Pasteur |
| DTaP/¤ | Infanrix® | 10 x 1 dose vial | $10.58 | $18.50 | 3/31/02 | GlaxoSmithKline |
| DTaP-Hib # | TriHIBit® | 5 x 1 dose vials | $22.01 | $37.32 | 3/31/02 | Aventis Pateur |
| e-IPV∘ ¤ | IPOL® | 10 dose vial 10 x 1 dose syringe | $8.25 | $15.42 | 3/31/02 | Aventis Pasteur |
| Hepatitis B-Hibi ¤ | COMVAX® | 10 x 1 dose vials | $21.38 | $38.25 | 3/31/02 | Merck |
| Hepatitis A Pediatric¤ | VAQTA® | 5 x 1 dose vial 5 x 1 dose syringes | $11.15 | $25.17 | 3/31/02 | Merck |
| Hepatitis A Pediatric¤ | Havrix® | 10 x 1 dose vial 1 dose vial 5 x 1 dose TipLok 25 x 1 dose TipLok | $11.15 | $29.73 | 3/31/02 | GlaxoSmithKline |
| Hepatitis A Adult¤ | VAQTA® | 1 dose vial 5 x 1 dose vials 5 x 1 dose syringe | $18.00 | | 6/30/01 | Merck |
| Hepatitis A Adult¤ | Havrix® | 1 dose vial 1 dose TIP-LOK 5 x 1 dose TIP-LOK | $16.82 | $59.45 | 6/30/01 | GlaxoSmithKline |

Appx11019

| Vaccine | Brandname/ Tradename | Packaging | CDC Cost/Dose | Private Sector Cost/Doses | Contract End Date | Manufacturer |
|---|---|---|---|---|---|---|
| Hepatitis B◦¤ Preservative Free Pediatric/Adolescent | ENGERIX B® | 10 x 1 dose vials 5 x 1 dose 23G TipLok 5 x 1 dose 25G TipLok 25 x 1 dose 23G TipLok 25 x 1 dose 25G TipLok | $9.00 | $24.20 | 3/31/02 | GlaxoSmithKline |
| Hepatitis B◦¤ Preservative Free Pediatric/Adolescent | RECOMBIVAX HB® | 10 x 1 dose vial | $9.00 | $20.37 | 3/31/02 | Merck |
| Hepatitis B 2 dose◦ Adolescent (11- 15) | RECOMBIVAX HB® | 10 x 1 dose vials 5 x 1 dose syringes | $23.75 | | 3/31/02 | Merck |
| Hepatitis B-Adult◦ | RECOMBIVAX HB® | 10 x 1 dose vials 10 x 3 dose vial 5 x 1 dose syringe | $23.25 | $51.73 | 9/23/01 | Merck |
| Hepatitis B-Adult• | ENGERIX-B® | 1 x 1 dose vial 5 x 1 dose Tiplok 25 x 1 dose Tiplok | $23.25 | $51.73 | 9/23/01 | GlaxoSmithKline |
| Hib• ¤ | PedvaxHIB® | 10 x 1 dose vials | $8.10 | $18.12 | 3/31/02 | Merck |
| Hib◦ ¤ | HibTITER® | 5 x 1 dose vial | $6.00 | $15.88 | 3/31/02 | Wyeth/Lederle |
| Hib• ¤ | ActHIB® | 5 x 1 dose vial | $5.75 | $15.25 | 3/31/02 | Aventis Pateur |
| Influenza | Fluzone® | 10 dose vial | $2.365 | | 1/31/01 | Aventis Pasteur |
| Influenza | Flushield® | 10 dose vial | $2.365 | | 1/31/01 | Wyeth/Lederle |

Appx11020

| Vaccine | Brandname/ Tradename | Packaging | CDC Cost/Dose | Private Sector Cost/Doses | Contract End Date | Manufacturer |
|---------|---------------------|-----------|---------------|---------------------------|-------------------|--------------|
| MMR• ¤ | MMR II® | 10 x 1 dose vials | $15.53 | $28.19 | 3/31/02 | Merck |
| Measles○ ¤ | Attenuvax® | 10 x 1 dose vials | $6.90 | $10.40 | 3/31/02 | Merck |
| Mumps○ ¤ | Mumpsvax® | 10 x 1 dose vials | $9.24 | $13.36 | 3/31/02 | Merck |
| Pneumococcal 7-valent○ ¤ (Pediatric) | Prevnar® | 5 x 1 dose vial | $45.99 | $58.75 | 3/31/02 | Wyeth/Lederle |
| Pneumococcal (Adult) | Pnu-Imune® | 5 dose vial | $5.606 | | 6/10/01 | Wyeth/Lederle |
| Rubella○ ¤ | Meuvax II® | 10 x 1 dose vials | $6.50 | $11.457 | 3/31/02 | Merck |
| Varicella○ ¤ | Varivax® | 10 x 1 dose vial | $39.14 | $45.56 | 3/31/02 | Merck |

## Footnotes

/Vaccine cost includes $2.25 dose Federal Excise Tax
iVaccine cost includes $1.50 per dose Federal Excise Tax
¤Vaccines which do not contain Thimerosal as a preservative
#Vaccine cost includes $3.00 per dose Federal Excise Tax
•Vaccine cost includes $0.75 per dose Federal Excise Tax

Page last reviewed: April 6, 2001 (archived document)
Content source: National Center for Immunization and Respiratory Diseases

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

        *Plaintiffs,*

    v.

MERCK & CO., INC.,

        *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 74



DEPARTMENT OF HEALTH AND HUMAN SERVICES                    Public Health Service

Centers for Disease Control
and Prevention (CDC)
Atlanta GA 30333
November 24, 2015

Lisa Dykstra
Morgan, Lewis & Bockius, LLP
1701 Markey Street
Philadelphia, Pennsylvania 19103-2921

Dear Ms. Dykstra:

This letter is our final response to your Centers for Disease Control and Prevention and Agency for Toxic Substances and Disease Registry (CDC/ATSDR) Freedom of Information Act (FOIA) request of May 18, 2015, for "information relevant to a legal claim against Merck related to our mumps vaccine and our interactions with the CDC in the context of the CDC's purchase and recommendation of Merck's mumps vaccine for the Vaccines for Children's Program."

Enclosed is a compact disk containing documents you requested (1,319 pages). Please see the enclosed document for further details for each item of your request.

Pursuant to the provisions of 5 U.S.C. §552(b)(4) of the Freedom of Information Act and 45 CFR 5.65 of the Department's implementing regulations, we are unable to produce the contents of four documents which are protected by Title 17 of the United States Code, Section 106 (the Copyright Act). We are enclosing the first page of each document for your information in the event you wish to obtain these articles directly from the copyright holder. Sixty pages of the copyrighted material have been withheld in their entirety pursuant to this same provision.

Under authority of the Freedom of Information Act at 5 U.S.C. §552(b)(6) and the Department's implementing regulation at 45 CFR 5.67, private information such as individual's pictures, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy, were deleted from these documents. No pages have been withheld in their entirety.

You have the right to appeal this decision to deny you full access to agency records. Send your appeal, within 30 days from the date you receive this letter to the Deputy Agency Chief FOIA Officer, Office of the Assistant Secretary for Public Affairs, U.S. Department of Health and Human Services, 5600 Fishers Lane, Room 19-01, Rockville, Maryland 20857. Please mark both your appeal letter and envelope "FOIA Appeal."

Sincerely,

Katherine Norris
CDC/ATSDR FOIA Officer
Office of the Chief Information Officer
(770) 488-6399
Fax: (404) 235-1852

Enclosures

15-00669

A. Sims
**EXHIBIT- 5**
10/12/2017

MRK-KRA01373392
Appx11023

Merck May 18, 2015 questions

1. See attached presentations and articles.
2. Efficacy of vaccine is not a procurement criteria.
3. See attached presentations and articles.
4.b. Nothing found
4.c. See attached February 6, 2007 e-mail from Andrew Kroger to Diane Peterson and attachments.
4.d. Nothing found
4.e. Nothing found
5.-7. See attached presentations and articles.

MRK-KRA01373393

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*, STEPHEN A. KRAHLING and JOAN A. WLOCHOWSKI, | Civil Action No. 10-4374 (CDJ) |
| *Plaintiffs,* | **CONTAINS "CONFIDENTIAL" AND "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" MATERIAL PURSUANT TO PROTECTIVE ORDER** |
| v. | |
| MERCK & CO., INC., | |
| *Defendant.* | |

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 75

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,  )
ex rel, STEPHEN A.  )
KRAHLING and JOAN A.  )
WLOCHOWSKI,  )
  )
    Plaintiffs,  )
  )
vs.  )  CIVIL ACTION NO.
  )
MERCK & CO., INC.,  )  2:10-CV-04374 (CDJ)
  )
    Defendant.  )  Master File No.
IN RE: MERCK MUMPS  )
VACCINE ANTITRUST  )  2:12-CV-03555 (CDJ)
LITIGATION  )


* * * HIGHLY CONFIDENTIAL * * *
VIDEOTAPED DEPOSITION OF ALAN W. SIMS
(Taken by Relators)
October 12, 2017
9:05 a.m.


1600 Clifton Road
Atlanta, Georgia

Reported by:  Debra M. Druzisky, CCR-B-1848


VERITEXT LEGAL SOLUTIONS
MID-ATLANTIC REGION
1801 Market Street - Suite 1800
Philadelphia, PA  19103

Page 6

1    MR. SCHNELL: My name's Gordon
2 Schnell.
3    Good morning --
4    THE WITNESS: Morning.
5    MR. SCHNELL: -- Mr. Sims.
6 I'm with Constantine Cannon, and
7 we're counsel for Relators.
8    MS. MAHENDRANATHAN: I'm Hamsa
9 Mahendranathan. I'm with Constantine
10 Cannon, counsel for Relators.
11    MS. SCANLAN: I'm Kathleen Scanlan
12 from Keller Grover, and I'm also counsel
13 for the Relators.
14    MS. BRYAN: I'm Sally Bryan. I'm
15 counsel for Merck, with Venable.
16    MR. HOWARD: Timothy Howard, in-house
17 counsel for Merck.
18    MR. SANGIAMO: Dino Sangiamo for
19 Merck, with the Venable law firm.
20    MS. DIMATTIO: Melina DiMattio,
21 Morgan, Lewis & Bockius, for Merck.
22    MS. DYKSTRA: I'm Lisa Dykstra. I'm
23 also from Morgan Lewis, for Merck.
24    MR. MALONE: I'm Kevin Malone, Office
25 of the General Counsel, C.D.C.

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 7

1    MS. HARRIS: Elise Harris, Office of
2 the General Counsel, H.H.S.
3    MS. SNOW: And I'm Holly Snow from
4 the Department of Justice, representing
5 the United States and Mr. Sims.
6    THE WITNESS: And I'm Alan Sims. I'm
7 with the Centers for Disease Control and
8 Prevention.
9    (Whereupon, a discussion ensued
10 off the record.)
11    THE VIDEOGRAPHER: Good morning.
12 We're going on the record at 9:08 a.m. on
13 October 12th, 2017.
14    Please note that the microphones are
15 sensitive and may pick up whispering,
16 private conversations and cellular
17 interference.
18    Please turn off all cell phones or
19 place them away from the microphones as
20 they can interfere with the deposition
21 audio.
22    Audio and video recording will
23 continue to take place unless all parties
24 agree to go off the record.
25    This is media unit one of the video

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 8

1 recorded deposition of Alan Sims, taken by
2 counsel for the Relators in the matter of
3 United States of America ex rel. versus
4 Merck & Company, Incorporated, filed in
5 the United States District Court for the
6 Eastern District of Pennsylvania.
7    This deposition is being held at the
8 Centers for Disease Control, located at
9 1600 Clifton Road, Atlanta, Georgia,
10 30301.
11    My name is Ervin Farkas from the firm
12 Veritext, and I'm the videographer. The
13 court reporter is Debra Druzisky from the
14 firm Veritext.
15    I am not related to any party in this
16 action, nor am I financially interested in
17 the outcome.
18    Will the court reporter please swear
19 in the witness?
20    ALAN W. SIMS,
21 having been first duly sworn, was examined and
22 testified as follows:
23    EXAMINATION
24 BY MR. SCHNELL:
25    **Q.** Good morning, Mr. Sims.

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 9

1    A. Morning.
2    **Q.** As I said before, my name is Gordon
3 Schnell, and I'm counsel for Relators. Can you
4 just state your full name for the record, please?
5    A. My name is Alan Way Sims.
6    **Q.** And just to give you a sense of today,
7 we've been allotted seven hours, we're going to
8 split, the Relators and Merck are going to split
9 that time equally. It doesn't mean we're going to
10 go seven hours, but that's the maximum it would go.
11    I'm going to start the questioning, go a
12 chunk of my three and a half hours, then turn it
13 over to Merck's counsel, and then probably come
14 back and have some more questions. And they may go
15 back and forth until we're done.
16    What's your current position at the
17 C.D.C.?
18    A. I work in the Office of Acquisition
19 Services. And I'm a team lead supporting the
20 National Center For Immunization and Respiratory
21 Diseases. And part of that -- among many
22 contracts, part of that is managing the vaccine
23 contracts as the contracting officer.
24    **Q.** And who do you report to?
25    A. Currently my branch chief is acting branch

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 70

1  say that, from your office's perspective, all else
2  being equal, it's going to purchase the vaccine
3  that is the cheapest, and everything else being
4  equal?
5      So the vaccines are equivalent in every
6  way between manufacturer A and manufacturer B, but
7  one of them has a lower price.  Is it fair to say
8  that the C.D.C. is going to purchase from the lower
9  priced supplier?
10     A.  So typically we're -- you know, again,
11 back to that where we're typically awarding to all
12 that have submitted proposals.  And you know, the
13 vaccines, in most cases there's one supplier, maybe
14 two suppliers for a particular purpose and type of
15 that vaccine.
16     I'm not sure if there's vaccines where
17 they're -- outside of flu, but where there may be,
18 like, three.  I'm not sure.  But it's typically one
19 to two.
20     And so, you know, they are factoring in,
21 you know, things like if there was a manufacturing
22 issue with a vaccine, we, you know, want to ensure
23 that there's ample supply.  So typically if there's
24 a vaccine available, we're purchasing it.
25     So I -- you know, for me, since from what

Page 72

1  that and kind of factoring all those different
2  things that are unique to vaccines and so.
3      But you know, I would, in looking at
4  different sources of information, I would try to
5  counteroffer to get the best price.  But to say how
6  that impacts one between the other, you know,
7  it's -- we wouldn't -- from my experience we, you
8  know, we haven't not awarded one.
9      Now, that could impact how many in the end
10 are purchased.  Because we, you know, we are
11 getting requests -- our Program Office, they are
12 working with the states that, you know, are
13 submitting the orders through our system.
14     And so, you know, that could impact in the
15 end how many are actually ordered.  If two
16 particular vaccines, if they can get two of these
17 for the same price as one and they do the same
18 thing, may -- the -- you know, they may get more
19 bang for their buck when these states are
20 submitting their orders.  So that that could come
21 into play.
22     I mean, how that impacts, I can't give you
23 an exact certain answer on that.  But typically
24 we're awarding to all that propose.
25     Q.  Now, in terms of the key contractual

Page 71

1  I recall from when I've been there, there hasn't
2  been a time where we, say, had three vaccines that
3  were of the same type and then we only went with
4  one and the lowest priced one.
5      Q.  So is it fair to say that the decision on
6  the price of the vaccine is really made at the
7  solicitation stage?  So to the extent a supplier
8  submits a response to a solicitation and the
9  pricing that they're offering in the response is
10 too high, is that the point where you would
11 negotiate it down if the --
12     A.  Yeah.
13     Q.  -- C.D.C. thought it was justified?
14     A.  Yeah.  I mean, if we had information, you
15 know, that was a rational basis of why we think
16 it's too high, we'll counteroffer and typically
17 provide that -- our rationale or, you know, the
18 information that we -- the basis of that.  So.
19     Q.  And in the instances where there are
20 multiple suppliers, does the C.D.C. in its
21 negotiations look to what other suppliers of that
22 vaccine are charging as a basis of negotiating
23 price with the other supplier?
24     A.  You know, again, and I kind of count on my
25 Program Office a lot for those -- their input on

Page 73

1  requirements that fall within the C.D.C.'s
2  contracts with the vaccine manufacturers, they each
3  contain a 12-month shelf life requirement; is that
4  correct?
5      A.  Correct.
6      Q.  And do you have an understanding as to why
7  the C.D.C. has that requirement?
8      A.  I'm not sure on the why it's 12 months.
9  I'd defer to Mark tomorrow on why 12 months is
10 chosen.  But I think certainly there's a -- when we
11 receive the vaccines, you know, they go to our
12 distributor.  And certainly you wouldn't want to
13 get a shelf life short enough to where it's
14 immediately expiring before we've had a chance to
15 distribute it and then that to be given.
16     But why 12 months, I'd defer to them.
17     Q.  And another key contractual term that you
18 referenced was that the vaccine have a valid F.D.A.
19 product license; is that true?
20     A.  Correct.
21     Q.  And what is a valid F.D.A. product
22 license?
23     A.  That F.D.A. has essentially licensed that
24 product to be distributed and used.  So you know,
25 that's -- the details behind that, you know, that's

19 (Pages 70 to 73)

Appx11028

1  part of Program's technical review as well.
2  They're certifying and looking at that license to
3  make sure that the vendor, you know, has provided
4  the license for that vaccine.
5       But F.D.A.'s ultimately the regulatory
6  agency for the vaccines.
7       Q.  And is it a correct statement that, if a
8  vaccine doesn't have a valid F.D.A. product
9  license, the C.D.C. won't buy it?
10      A.  That's my understanding, that you have to
11 have a license in order for us to buy it.  And I
12 think they aren't allowed to even ship it or
13 distribute it.  But for us to buy it, it would need
14 that license.
15      Q.  And is it also true that, if a vaccine
16 doesn't have 12 months remaining on its shelf life,
17 the C.D.C. won't buy it?
18      A.  Well, so not necessarily.  If in our
19 solicitation, you know, we had 12 months as the
20 requirement, you know, before a contract award, the
21 manufacturer could say, hey, you know, we only have
22 nine months, and then that's their offer.
23      And the Program Office officials would
24 assess whether -- you know, just assess that
25 factor.  And if that's all they could provide it,

1  requirement, term and condition in the contract,
2  assuming it wasn't negotiated lower.  But so
3  whatever that shelf life requirement is in the
4  contract, if they were not going to meet that, then
5  yes, they would certainly need to let us know.
6       Q.  And if they did not let you know and they
7  sold it to you anyway, what recourse, if any, would
8  the C.D.C. have if it ultimately found out?
9       A.  You know, I've -- I don't recall that
10 occurring.  So I mean, that's something I would,
11 you know, get assessment from Program and then, you
12 know, work with my attorneys to assess that
13 situation and, you know, how that potentially
14 breaches the contract and just looking through it.
15      So certainly we -- if a requirement, we
16 have our contract requirement, if they didn't meet
17 that, then, you know, that's not meeting the terms
18 and conditions of the contract.
19      Q.  Are there potential remedies that are part
20 of the contract if there is a breach?
21      A.  So every -- so contracts have termination
22 clauses that the government could terminate the
23 contract.  But you know, that's a very -- you know,
24 that's ending the contract.  So I mean, certainly
25 that would be a very major issue to result in that.

1  you know, my understanding is that that -- you
2  know, that 12 months is a C.D.C. guideline, and it
3  can -- could move.
4       And then so that's pre-award they could,
5  you know, submit that as a -- you know, as what
6  they could provide.  And then if that came up
7  during the course of the contract that, you know,
8  orders are being placed and the manufacturer lets
9  us know that, you know, we only have nine months'
10 shelf life, and then our Program Office officials
11 would look at that, make an assessment.
12      We would assess the impact of it, the
13 Program Office, and then depending on the situation
14 we may ask for consideration for that.  So if we're
15 getting a short -- shorter shelf life, if there's
16 damages, we may ask for consideration.  And
17 that's -- could be negotiated.
18      Q.  And when you say "consideration," you're
19 saying that the C.D.C. may ask for money back?
20      A.  Correct.
21      Q.  And in the circumstance where the vaccine
22 did not have 12 months left on its shelf life,
23 would the manufacturer be required to disclose that
24 to the C.D.C. in advance?
25      A.  So the 12 months is a contract

1       Q.  Short of termination, is one of the
2  potential remedies to get money back?
3       A.  Consideration if they were not meeting
4  shelf life, for instance.  We would assess the
5  damage and try to get consideration from that
6  typically, depending on each individual situation.
7       Q.  Another key contractual term is complying
8  with current good manufacturing practices, or
9  C.G.M.P.; is that correct?
10      A.  Yes.
11      Q.  Can you tell me what that requirement
12 entails?
13      A.  So that's an F.D.A. requirement.  And
14 that's a -- one of the requirements that Program
15 includes in the contract that's not part of the
16 F.A.R.  It's one of their -- supplements is part of
17 that product licensure area.  But it's F.D.A., and
18 you know, I'm not -- they're the regulatory agency
19 that manages that.
20      But my understanding is it's their way
21 of -- I think they inspect factories as part of
22 that in ensuring that, you know, good manufacturing
23 practices are adhered to so that, you know, quality
24 vaccines are put out.  But that's an F.D.A.
25 managed, regulated statute.

1  there obligations on the part of Merck with respect
2  to that provision?
3      A.  So that, you know, that clause is -- since
4  I've been here it's never come up as an issue or
5  something that I'm of -- that I can recall or am
6  aware of that that issue came up and then working
7  with Program and my attorneys assessing whether or
8  not that clause is -- how it factors in.
9          But you know, again, my understanding of
10  it is it's not something that originated from
11  C.D.C., it's something that Merck put in, and that
12  those two factors, that a -- I think it says
13  physician is administering the vaccine or that
14  information about the benefits and risks has been
15  provided to those receiving it.
16      Q.  You --
17      A.  So to kind of go into context about where
18  that line is, I mean, there hasn't been an instance
19  where it's been fully vetted.
20      Q.  In connection with the C.D.C.'s purchase
21  of vaccines, does the C.D.C. in any way rely on the
22  manufacturer to provide full information on the
23  benefits and risks of the vaccines that it's
24  selling the C.D.C.?
25      A.  So I'd defer to Mark in how F.D.A. plays

1  into that.  I'm not sure on what all of the perhaps
2  F.D.A. licensure things that are between F.D.A. and
3  the manufacturer and what all that is.
4          So I'm not sure if C.D.C. programmatically
5  also has information on that.  But you know, me
6  from contracts, you know, I'm -- you know,
7  that's -- I think probably Mark's better to give an
8  answer on that.
9      Q.  In terms of the vaccines that
10  manufacturers sell to the C.D.C., does the C.D.C.
11  have any kind of expectation that the vaccine is
12  safe?
13      A.  So that's, you know, part of that F.D.A.
14  license.  You know, we -- you know, you have the
15  contract requirements, you know, looking at the
16  contract do they have the F.D.A. license.  You
17  know, there's a warranty clause that says that the
18  vaccine is merchantable and performs its intended
19  purpose.  So.
20          So looking at those type factors, you
21  know, certainly C.D.C. expects safe vaccines.
22      Q.  Does the C.D.C. expect effective vaccines?
23      A.  You know, that's getting more into
24  technical.  And you know, we have our contract
25  requirements of shelf life, licensure, warranty.

1  To get into those definitions is very much
2  technical issues about what that is.
3          But certainly the, you know, the warranty
4  clause that the vaccine is merchantable and
5  performs its intended purpose is important.
6      Q.  And the warranty clause is part of the
7  C.D.C. contracts with the vaccine manufacturers?
8      A.  Correct.  It's part of that commercial
9  clause.
10      Q.  And what is the requirements under that
11  clause on the part of the manufacturer of the
12  vaccine?
13      A.  So it -- I mean, the clause, the warranty
14  section says that, essentially that the product is
15  merchantable and, you know, completes its intended
16  purpose.  So that's really what it says.
17      Q.  And what does it mean for a product to be
18  merchantable?
19      A.  So you know, that it's -- these are
20  commercially available vaccines, that they can be
21  used, you know, in a commercial available setting.
22  So.
23      Q.  And what does it mean to be fit for its
24  intended purpose?
25      A.  So that, you know, that definition, I

1  mean, that's something, you know, you're getting
2  into warranty, obviously, type issue.  And if an
3  issue came up with that, that's something that, for
4  me to -- I would consult with my Program Office
5  official that actually says I should recommend --
6  should consult with my attorneys.
7          And but certainly you, know, the F.D.A.
8  licensure and the vaccine performing, you know,
9  F.D.A. is really the regulatory.  For our contract
10  we have a shelf life requirement but, you know,
11  certainly maintaining that license, you know, is
12  critical.
13      Q.  Is there an expectation on the part of the
14  C.D.C. that the vaccine manufacturer is going to
15  provide full information on any potential problems
16  with the vaccine?
17      A.  You know, so that's probably getting into
18  the licensure and F.D.A. that regulates from my
19  understanding.  But you know, certainly we would
20  want to know if something potentially violates the
21  warranty clause or the licensure.
22          Now, you know, Mark probably can tell more
23  on their interaction with F.D.A. and how that
24  process would take place and how F.D.A. would
25  manage a potential issue like that.  But certainly

1  matter expert, a very -- very knowledgeable of the
2  program and vaccines.
3      Q.  And does Jeanne Santoli -- you said she's
4  a physician?
5      A.  I'm sorry?
6      Q.  You said she's a physician?
7      A.  An M.D.
8      Q.  An M.D.?  Does she coordinate or at least
9  have scientific expertise with respect to Merck's
10 MMR II vaccine, do you know?
11     A.  You know, I don't want to answer on her
12 behalf in how much she knows, but in general she's
13 very knowledgeable of vaccines.
14     Q.  But so you re -- you do rely on her for
15 her independent scientific judgment on whether or
16 not to purchase a vaccine line from Merck?
17     A.  Yes.  They --
18     Q.  Okay.
19     A.  They are the ones that are determining the
20 requirements, deciding how much to purchase and
21 which vaccines.
22     Q.  Okay.  Do you know whether Jeanne Santoli
23 and the folks in her office are privy to and aware
24 of A.C.I.P. recommendations of what should be on
25 the schedule for vaccine purchases?

1  typically it would be Jeanne as well as whoever the
2  C.O.R. is --
3      Q.  Uh-huh.
4      A.  -- for that -- whoever's assigned as the
5  C.O.R. to that one.  And Jeanne typically is the
6  person that's giving the answers and kind of from
7  that discussing an issue that may come -- have come
8  up on that technical side.
9          And then on our end it's, you know, it
10 would be -- typically it would be me and then the
11 contract specialist that's on -- that works with
12 my, the team that I am the team lead for.
13     Q.  And what does the C.O.R. stand for?
14     A.  Contracting officer's representative.
15     Q.  Okay.  And is that somebody in the Program
16 Office or is that in your office?
17     A.  Program Office.
18     Q.  Program Office, okay.
19         Is there documentation that you require
20 Merck provide to you before it enters into the
21 vaccine contract, the Vaccine for Children's
22 contract?
23     A.  What do you mean "documentation"?
24     Q.  So you go back and forth with an R.F.P.,
25 but I understand that you require a product

1      A.  They're definitely tuned in to that and
2  the meetings that take place and the vote.
3      Q.  So does Jeanne Santoli in the Program
4  Office attend the A.C.I.P. meetings as well?
5      A.  I'm not sure how much she attends.  I know
6  that that's something that, when it is occurring,
7  she's very tuned in to that.  Whether she attends,
8  I'm not sure.  I know they take place here.
9      Q.  Right.
10     A.  How much she does, I don't know.
11     Q.  So is -- at least it's fair to say that
12 Jeanne Santoli in the Program Office is educated
13 and aware of A.C.I.P. recommendations?
14     A.  Yes.  Absolutely.
15     Q.  Okay.  So let me ask you when you begin
16 the contract negotiations with Merck.  I know you
17 talked a little bit about the R.F.P. process.  And
18 it's an annual process; correct?
19     A.  Yes.  One-year contracts that -- for each
20 of the four different types.
21     Q.  Okay.  And you said that you and Jeanne
22 Santoli and representatives from Merck would get on
23 the phone and send E-mails back and forth to
24 negotiate the contract; is that accurate?
25     A.  So -- so those negotiations that --

1  license; is that correct?
2      A.  Yeah.  So those -- so it's part of the
3  proposal, you know, which we put the solicitation
4  out, a due date to submit the proposal.  It's part
5  of that, the licensure, you know, that that type of
6  stuff to verify that there is a license, the price
7  proposal and any other required documentation in
8  the contract.
9      Q.  Okay.  And I'm going to show you a product
10 license just to make sure I --
11     A.  Okay.
12     Q.  I understand that this is what Merck
13 submitted to you, but I want to make sure.  And if
14 you haven't seen it or are not familiar with it,
15 that's fine.  I have two of them from two different
16 years.
17         So what I'm going to show you --
18         MS. DYKSTRA:  I'm sorry.  You can't
19     do two things at once.  Thanks.  Just
20     these two.
21         (Whereupon, Deposition
22         Exhibits 1 and 2 were
23         marked.)
24 BY MS. DYKSTRA:
25     Q.  So what I'm showing you are two different

1  product licenses. And my understanding is that
2  this is the product license that Merck provides to
3  you in connection with the R.F.P. to be awarded the
4  V.F.C. contract. And I just want to confirm that
5  that is accurate.
6      A. So as part of that technical proposal --
7      Q. Uh-huh.
8      A. -- that license -- we, you know, verify.
9  The program really is, you know, in their technical
10 review, that's one of the technical things they
11 look at. So I'm relying on them so that when
12 they -- you know, when we go into negotiations, if
13 a -- and I'm not completely sure if this is
14 provided every time, but at least I think there's a
15 fill-in on the contract where you'd have the
16 license to whether this is provided each time.
17     But Program in their tech review is
18 verifying that there's a license for the product.
19 And if there wasn't, they would address that in the
20 negotiations. They would bring that up in one of
21 the talking points that, you know, you didn't
22 provide -- we can't verify your license or
23 something like that.
24     Q. Okay. So what you're saying is that, and
25 we may provide this every year, you may require it

1  every year, but at a minimum it would at least have
2  the license number or some statement that it is, in
3  fact, an F.D.A. licensed product?
4      A. Some way to verify that it's licensed.
5      Q. Okay. As -- for proof that it's licensed,
6  do you require anything other than a valid F.D.A.
7  license? For example, you don't require that the
8  company submit its entire F.D.A. regulatory file to
9  you?
10     A. So that's something that I am relying on
11 Program, that they're reviewing that, making sure
12 that, you know, that they're verifying that there
13 is a license. Now, to what degree they go beyond
14 just looking at a number or -- I'd defer to them on
15 that to what level they go into in their technical
16 review.
17     Q. Okay. Have you had, ever had a discussion
18 about the F.D.A. regulatory filings or any F.D.A.
19 regulatory clinical submissions in your
20 negotiations of the contract?
21     A. I don't recall that coming up. I don't
22 recall that specifically.
23     Q. Okay.
24     A. But you know, Program would be tuned in
25 more to those type issues, but I don't recall

1  something like studies in our negotiations.
2      Q. Okay.
3      A. They're typically these are the contract
4  terms and conditions. And then Merck may have red
5  lined something in our clause. And then -- or
6  added a clause.
7      Q. Uh-huh.
8      A. And then the Program Office is reviewing
9  that and would provide comments, you know, C.D.C.
10 accepts this change in terms or we do not accept.
11 And then that's something that would be talked
12 about in the negotiations.
13     And that's something that Jeanne is -- you
14 know, I would, you know, bring up the topic number
15 that we're talking about and turn it over to her,
16 and she would really go into the discussion about
17 that technical issue.
18     Q. So if there was a clinical or technical
19 issue that the C.D.C. was concerned with or had a
20 question about, the program officer, Jeanne Santoli
21 in this circumstance, would bring it up during the
22 negotiations if they had a question?
23     A. If there was an issue --
24     Q. Or might, might bring it up?
25     A. If there was an issue that she felt the

1  need to discuss, she would list that. Now, whether
2  that type of issue is something that would be
3  involved in those negotiations, you know, again, I
4  don't recall something like that coming up in the
5  negotiations.
6      Q. Okay. Do you -- we sent a, as part of
7  this process we sent a request over to the C.D.C.
8  and asked whether the C.D.C. takes into account
9  efficacy in its contracting decisions in its
10 decision to purchase. And the C.D.C. informed us
11 that efficacy is not a procurement criteria.
12     Is that accurate?
13     A. That's not specifically mentioned as
14 something like shelf life, for example, we'll say
15 12 months. So that specific --
16     Q. Uh-huh.
17     A. -- measurement criteria is not spelled out
18 specifically.
19     Q. So -- so "efficacy" is not a term of the
20 contract in the same way that "shelf life" is a
21 term of the contract?
22     A. "Shelf life" is explicitly stated.
23     Q. Uh-huh. Do you recall -- now, you've been
24 in discussions with Merck for how many years over
25 their V.F.C. contract?

Page 110

```
 1       A.  So I came in June 2012, so it would
 2   have -- I think that time frame it would have been
 3   right after the V.F.C. and adult contracts were
 4   awarded.
 5       And so probably the first one -- you know,
 6   it's possible that at that time Nancy Norton, the
 7   previous person, I could have been sitting in maybe
 8   while she was transitioning.  But it was mid-June,
 9   so it's possible I could have been, you know, in
10   mid-June.
11       But I think it was mid-June and I
12   officially took over this team lead duty.  So I
13   think, I think the adult would have been --
14   actually, it's awarded July 1, so sorry.
15       Q.  Okay.
16       A.  So it -- you know, I may have -- I may
17   have been involved in the adult, but the V.F.C. I
18   think by that time would certainly have been
19   awarded.
20       Q.  So at about -- for the least -- at least
21   for the, about the last five years --
22       A.  Yeah.
23       Q.  -- you've been involved in the contract
24   negotiations for the Merck contract?
25       A.  Correct.
```

Page 112

```
 1       Q.  Okay.
 2       A.  -- coming up.
 3       Q.  So let's go to you did mention that there
 4   are some key terms.  I think you mentioned vaccine
 5   licensure, shelf life and the provisions of
 6   O.B.R.A. '93.  Are the --
 7       A.  Say that last one.
 8       Q.  The provisions of O.B.R.A. '93, which --
 9       A.  Okay.
10       Q.  -- regulate pricing.
11       Are those the three main key provisions?
12       A.  You know, to limit it to three key, I
13   mean, there's other ones in there.  I mean, there's
14   packaging --
15       Q.  Uh-huh.
16       A.  -- temp -- and temperature control with
17   that.  So I mean, I don't -- there's others and --
18   but the ones you mentioned are important terms,
19   certainly.
20       Q.  All right.  Okay.  Fair enough.  So why
21   don't we look at the contract.  That way you'll
22   have it in front of you --
23       A.  Okay.
24       Q.  -- and it'll make it easier for you.
25       MS. DYKSTRA:  This is going to be
```

Page 111

```
 1       Q.  Okay.  Do -- during those negotiations do
 2   you ever recall the issue of efficacy coming up in
 3   the negotiations?
 4       A.  I don't recall that coming up.
 5       Q.  Do you ever recall an issue of potency
 6   coming up in the negotiations of the contract?
 7       A.  I don't recall that coming up.
 8       Q.  Do you ever recall the issue of
 9   seroconversion rates coming up in the negotiations
10   of the contract?
11       A.  I don't recall that specific --
12       Q.  Okay.
13       A.  -- term.
14       Q.  And just two more terms.
15       A.  Yeah.
16       Q.  Do you ever recall issues of
17   immunogenicity coming up in the contract
18   negotiations?
19       A.  I don't recall that specifically --
20       Q.  Okay.
21       A.  -- coming up.
22       Q.  I'm pretty sure I forgot one.  Do you ever
23   recall effectiveness levels coming up in the
24   discussions around the contract?
25       A.  I don't recall that --
```

Page 113

```
 1   three, this one.
 2       (Whereupon, a discussion ensued
 3       off the record.)
 4       (Whereupon, Deposition
 5       Exhibit 3 was marked.)
 6   THE REPORTER:  This is Exhibit 3.
 7   MS. DYKSTRA:  Number 3?  Yeah.
 8   BY MS. DYKSTRA:
 9       Q.  So what's been marked Exhibit 3 is the
10   2016 V.F.C. contract.  You're familiar with this;
11   right?
12       A.  Yes.
13       Q.  Okay.  And I think you may have signed
14   this one.  Yes.  Correct?
15       A.  (Whereupon, there was no audible response
16   by the witness.)
17       Q.  Okay.  All right.  I'm going to -- I just
18   want to walk through some of the provisions of this
19   just kind of very basic.  Let's turn first to Page
20   3, which is in the background of Section B.4.  And
21   in the -- in that paragraph in the sec -- third
22   line, it says:
23       "The Vaccine for Children program
24       established pursuant to Section 1.3631
25       of the Omnibus Budget Reconciliation
```

1    Act of 1993 guarantees federal support
2    for the purchase and supply of
3    sufficient quantities of vaccines to
4    the states to cover a defined group of
5    children."
6        Do you see that?
7    A.   Uh-huh.
8    Q.   Okay.  So I know you're familiar with
9    O.B.R.A. '93.  Can you tell me a little bit more
10   about the purpose of O.B.R.A. '93 and how it
11   regulates price?
12   A.   So -- so is -- specific to how it
13   regulates price?
14   Q.   Uh-huh.
15   A.   So I believe that's where the price cap
16   is -- was part of that legislation for the V.F.C.
17   program where, effective of when this was passed,
18   I'm not sure the exact month, but from that date
19   forward that the vaccines, whichever vaccines were
20   included as part of that legislation, that from
21   that point forward it was I believe the price as of
22   then plus C.P.I.
23   Q.   Right.  So if it -- I want to make sure I
24   understand that.  I think this is correct.  The
25   price for Merck's vaccines containing the mumps

1    make sure it is, you know, that legislative
2    price --
3    Q.   Okay.
4    A.   -- or that it -- that what they propose
5    isn't exceeding it --
6    Q.   Okay.
7    A.   -- because it's a cap.
8    Q.   Right.  So what we -- you check and Merck
9    checks that what we're -- the price agreed to is
10   the 1993 plus the C.P.I. for that year, that is the
11   statutory price?
12   A.   Yeah.  You know, my -- again, Program
13   reviews it.
14   Q.   Okay.
15   A.   You know, to the best of our abilities we
16   try to verify that.  And certainly if there was --
17   if there was found out later an error with it, it
18   would be corrected --
19   Q.   Sure.
20   A.   -- something like that, to the -- that
21   legislative price.
22   Q.   Okay.  And pursuant to O.B.R.A. '93, Merck
23   is not permitted to charge you more than that
24   price, that statutory cap?
25   A.   That's my understanding.

1    vaccine are capped at the 1993 price plus C.P.I.
2    each year?
3    A.   That's my understanding of it.
4    Q.   As well?
5    A.   Yeah.
6    Q.   Okay.  And my understanding, I want to
7    make sure this is accurate, is that when you
8    negotiate the Merck's contract, each year just with
9    respect to the mumps vaccine and MMR II the C.D.C.
10   tells Merck this is the price we're going to pay is
11   the O.B.R.A. -- is the 1993 price plus the C.P.I.
12   for that year, and the C.D.C. provides that price
13   to Merck?
14   A.   No.  Merck would propose it.  But
15   obviously it's -- that price is, you know, mandated
16   by legislation.  And so Merck obviously has an
17   obligation to, you know, make sure that that
18   proposed price is in accordance with it.
19   Q.   Okay.
20   A.   And so then, you know, we would, you know,
21   look at it.  I would, again, get my Program
22   Office --
23   Q.   Uh-huh.
24   A.   -- reviews it and, you know, to as best we
25   can to try to, you know, certify that -- or try to

1    Q.   Okay.  And I'm sorry, you said you did
2    execute this contract on behalf of the C.D.C.;
3    correct?
4    A.   Yes.
5    Q.   Okay.  In the discussion of pricing of the
6    vaccine -- and I just want to go through these.  I
7    know you already kind of answered this in the fact
8    that there's a statutory cap and a statutory set
9    price.
10       But in the discussion of the pricing, the
11   C.D.C. does not raise the issue of the efficacy of
12   the vaccine; correct?
13   A.   No.  That term doesn't come up,
14   specifically that term.
15   Q.   Okay.  And does --
16   A.   Again, it's kind of shelf life --
17   Q.   Uh-huh.
18   A.   -- that requirement, and the others that
19   are explicit -- explicitly mentioned.
20   Q.   Okay.  And the same goes for the C.D.C.
21   does not bring up the issue of seroconversion rates
22   in the negotiating price?
23   A.   No.
24   Q.   Okay.  Let's look at Page 6 of the
25   contract just so we can walk through it a little

Page 130

```
 1        You know, we try to get similar other
 2   pricing information that the vendors submit --
 3       Q.  Uh-huh.
 4       A.  -- catalog prices, price lists, request
 5   information with other states or other places that
 6   may have that information that may have other
 7   pricing information and, you know, our government
 8   cost estimate, so using all those variables to
 9   essentially establish a negotiated position.
10       Q.  Okay.  Do you know -- my understanding is
11   that Merck prices the portion of ProQuad which is
12   MMR II consistent with O.B.R.A. and then adds a
13   portion of the cost for the varicella which is not
14   subject to O.B.R.A. '93.
15        Is that your understanding or you don't
16   know for sure?
17       A.  I'm not aware of that.
18       Q.  Okay.  And I'll just point out on Page 12
19   of the contract, if you can look at paragraph
20   Section C.31, that is the shelf life provision; is
21   that correct?
22       A.  (Whereupon, there was no audible response
23   by the deponent.)
24       Q.  That says:
25        "Vaccines provided under this
```

Page 131

```
 1   contract shall have a minimum 12-month
 2   shelf life remaining upon delivery to
 3   the consignee or as specified within
 4   each contract line item number."
 5        And that means that on the label it will
 6   be delivered to the C.D.C. with at least 12 months
 7   remaining on its shelf life?
 8       A.  Yes.
 9       Q.  Okay.  And if we go to Page 13 of the
10   contract, under -- the bottom of Page 13 is C.3.7,
11   product licensure.
12       A.  Uh-huh.
13       Q.  And that says:
14        "The vaccines produced and
15        delivered under this contract shall be
16        manufactured under a current
17        establishment and product license
18        issued by the F.D.A...."
19        Do you -- can you tell me what a current
20   establishment license is?
21       A.  So that's part of Program's tech review
22   that they're verifying that.  So I'd probably defer
23   to them on that.  But you know, that that is an
24   active license.
25        Now, to what degree they verify that, you
```

Page 132

```
 1   know, other than it being an F.D.A. approved
 2   vaccine, I'm relying on them to do that review.
 3       Q.  Okay.  And I'm going to show you what is
 4   an establishment license for Merck, and you can
 5   tell me if you've ever seen it before.  This is
 6   what we've -- this is what Merck, my understanding
 7   what Merck submits to the C.D.C. to meet this
 8   requirement.
 9           (Whereupon, Deposition
10           Exhibit 4 was marked.)
11   BY MS. DYKSTRA:
12       Q.  So that's my understanding of an
13   establishment license --
14       A.  Okay.
15       Q.  -- what I put before you which is marked
16   Exhibit 4.  Is that your understanding as well?
17       A.  So this information would be part of that
18   technical package that I submit.  So to me it looks
19   like that is what would be.  So you know, again,
20   I'm depending on them to do that review.
21        But it looks like that probably is what is
22   included in the proposal.  Now, whether that's
23   every time or missing, you know, I'm --
24       Q.  Hopefully not missing.
25       A.  Yeah.  No.  I'm definitely, though,
```

Page 133

```
 1   getting that technical and sending it to Program,
 2   and they're really tuned in to those parts of it.
 3       Q.  Okay.
 4       A.  So I believe that is what would be
 5   provided.
 6       Q.  Okay.  And I'm just going to double-check,
 7   is this product license at 1995, is that Exhibit 1?
 8       THE REPORTER:  Yes.
 9   BY MS. DYKSTRA:
10       Q.  Okay.  So my understanding is that Exhibit
11   1, the product license, and Exhibit 4, the
12   establishment license, are submitted to the C.D.C.
13   as part of the contract negotiation.
14        And you said that the product -- Program
15   Office would review that information?
16       A.  Right.
17       Q.  Okay.  And has there ever been a situation
18   that you can recall that the Program Office told
19   you Merck did not submit the documentation or told
20   you not to move forward with the contract because
21   Merck either didn't have an establishment license
22   or wasn't -- didn't have an F.D.A. approved license
23   product?
24       A.  I don't recall anything like that.  I
25   mean, it's possible that something could be
```

1    inadvertently omitted.  I don't know if that's
2    happened, but I don't recall --
3    **Q.**  Okay.
4    **A.**  -- something like that happening.
5    **Q.**  Okay.  I'm going to skip this -- the
6    manufacturing provision and come back to that in a
7    second.  If you go to the top of Page 14 of the
8    contract, there is a provision C.3.8 that discusses
9    the placement of orders.
10    This is a C.D.C. drafted provision;
11    correct?
12    **A.**  Yes.
13    **Q.**  Okay.  And this states that --
14    **A.**  I'm not sure if it --
15    **Q.**  Okay.
16    **A.**  -- this particular one could have been
17    edited slightly in negotiations.  I mean, that does
18    happen where a contractor could take exception to
19    one word or something like that.
20    So to verify 100 percent that this is
21    exactly what we submitted, I -- but in general,
22    this I believe does originate from C.D.C.
23    **Q.**  Okay.  And Merck and the C.D.C. utilize a
24    third-party contracting interface to submit orders
25    and receive payment information; is that correct?

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1    **A.**  I'm not sure about that.  I mean, I know
2    there's E.D.I. transactions.
3    **Q.**  Uh-huh.
4    **A.**  But whether you use a third party, I'm
5    not --
6    **Q.**  And what is "E.D.I. transactions"?
7    **A.**  That's, I believe it stands for electronic
8    data interface, I think.
9    **Q.**  Okay.
10    **A.**  And so that's part of that V-Track system
11    of messaging of orders being placed.
12    **Q.**  Okay.  So you -- is it fair to say C.D.C.
13    puts through that electronic system what it is
14    ordering, and Merck invoices you back through that
15    electronic system for the price to be paid?
16    **A.**  That's my understanding.
17    **Q.**  Okay.  And it's in B of this clause, C.3.8
18    (B), it says orders submitted will include all of
19    this listed information one through nine:
20    Date of order; contract number and order
21    number; item description, quantity and unit price;
22    delivery or performance date; place of delivery or
23    performance; packaging, packing and shipping
24    instruction, if any; accounting and appropriation
25    date; statement, indicate if partial deliveries are

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1    not acceptable; and any other pertinent data.
2    So this is the data that C.D.C. provides
3    to Merck when it orders vaccines; correct?
4    **A.**  I believe so.  I'm not tuned in to if
5    there's anything else that they do --
6    **Q.**  Uh-huh.
7    **A.**  -- to that level.  But yeah, that's --
8    looks to a great of what they do is -- in
9    submitting an order and receiving payment.  So.
10    **Q.**  Okay.  And then going to the flip side, if
11    you go to Page 15, in response to an order Merck
12    submits invoices to the C.D.C. consistent with
13    Paragraph C.3.13 at the bottom of Page 15; is that
14    right?
15    **A.**  Looks accurate.
16    **Q.**  And the invoices, it says invoice -- I'm
17    sorry.  C.3.13 (1) states:
18    "Invoice submission under this
19    contract will be made as follows..."
20    And Paragraph C states:
21    "The contractor agrees to include
22    the following information on each
23    invoice..."
24    And it has a list of nine different
25    things.  Is that the C.D.C.'s requirement as well,

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1    that the C.D.C. has determined what Merck must
2    provide to the C.D.C. in billing the C.D.C. for the
3    vaccine?
4    **A.**  Yes.
5    **Q.**  Okay.  Is Merck required to provide
6    anything else to the C.D.C. when it invoices the
7    C.D.C. for vaccines other than the nine items
8    listed in the contract?
9    **A.**  Not that I'm aware of.  But I would defer
10    to the program as well to see if there is other
11    things that they get.  But this is the contract
12    requirement, and they're tuned in to that.  But
13    yes, I think that's -- meets the minimum.
14    **Q.**  So at least these are the material terms
15    and the minimum terms that Merck must submit --
16    **A.**  Right.
17    **Q.**  -- when it invoices the C.D.C.?
18    **A.**  Yes.
19    **Q.**  Okay.  Have you ever seen -- I don't want
20    to show you something you may not have seen.  Have
21    you ever seen a paper invoice for the vaccine?
22    **A.**  I haven't.
23    **Q.**  You wouldn't be -- it wouldn't be as part
24    of your role to see a paper invoice, I take it?
25    **A.**  No.  It's all managed through that V-Track

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1  system --
2      Q.  Okay.
3      A.  -- which I don't -- you know, Program has
4  access to it.  I'm not in there.  They're doing the
5  receiving and verifying the receipt of the
6  vaccines.
7      Q.  Okay.  All right.  Let's talk about --
8      MS. DYKSTRA:  Do we have -- what time
9  did we start?  I don't want to --
10      MS. DIMATTIO:  (Inaudible.)
11      MS. DYKSTRA:  12:55.
12 BY MS. DYKSTRA:
13      Q.  Let me talk about the warranty of
14  merchantability that you mentioned.  Can you point
15  to where that is incorporated into the contract?
16      A.  So that, that's typically in that clause
17  that would be incorporated by reference, which is
18  52.212-4.  So I'm not sure.
19      Q.  I think that that is on Page 1 in the
20  cover perhaps in the middle, and then also on Page
21  12.
22      A.  Page 12?
23      Q.  I'm not trying to make you read the
24  whole --
25      A.  Yeah.

1      Q.  -- contract.
2      A.  Page 12?
3      Q.  I just want to -- where on Page 12?
4  Sorry.  It's Paragraph C.2 on Page 12.  Is that the
5  warranty of merchantability?
6      A.  Yeah.  So it's within that 52.212-4, the
7  warranty clause.
8      Q.  And that's a warranty of merchantability
9  that is part of the F.A.R.?
10      A.  Correct.
11      Q.  And that's the -- is a typical warranty of
12  merchantability that applies -- is a typical -- it
13  is a -- strike that.
14          It is a typical commercial items clause
15  that you put into C.D.C. contracts?
16      A.  Correct.
17      Q.  Okay.  Does the Program Office, in
18  determining and recommending to you what to
19  purchase, make an assessment of whether the vaccine
20  meets that clause?
21      A.  Can you restate that?
22      Q.  Sure.  You said the Program Office
23  provides to you a, I think you said a requirements
24  package?
25      A.  So when they submit the package before

1  solicitation.
2      Q.  Right.  And so we -- can we just call it
3  the package or --
4      A.  Acquisition package.
5      Q.  Acquisition package.  Thank you.
6          When the Program Office submits an
7  acquisition package to you, it includes what to
8  purchase, how much to purchase, and anything else?
9      A.  You know, they have their government
10  estimate, acquisition plan, contract clearances.
11      Q.  Okay.
12      A.  Those are other things that would be
13  included.
14      Q.  And when the Program Office is determining
15  what to purchase, meaning what vaccines to
16  purchase, is it fair to say that the Program Office
17  is making a determination of which vaccines it
18  believes are fit for its intended purpose and meet
19  this provision?
20      A.  I think you'd have to ask them that.  But
21  you know, their product licensure, I mean,
22  that's -- some of these I think overlap, and
23  product licensure is critical.
24          But certainly whatever reviews they go
25  through in those decisions of what's purchased, I

1  mean, I don't want to speculate on how they -- what
2  they decide and which vaccines and -- those are
3  kind of outside of my scope.
4      Q.  Okay.  So you said the product licensure
5  is critical.  So is it fair that, if a -- if F.D.A.
6  licenses a product for sale in the United States,
7  the F.D.A. has determined that it's fit for its
8  intended purpose and you would defer to the
9  F.D.A.'s decision?
10      A.  Well, that's a critical factor, but I
11  don't think I could say now whether that's the only
12  one.  So.
13      Q.  That's fine.
14      A.  So if an issue came up like that and was
15  presented to me, I -- you know, I would get an
16  assessment from the Program Office on this
17  situation.
18          Warranties, it talks about consulting with
19  our attorneys, especially on an implied warranty.
20  So it'd go through that process of looking at the
21  facts of this particular situation and assessing
22  that in making a decision ultimately.
23      Q.  Well, let's talk about the Merck mumps
24  vaccine specifically, meaning the MMR II and the
25  ProQuad vaccine.

Page 142

1    A.  Uh-huh.
2    Q.  The Program Office has given you -- gives
3  you an acquisition package which includes direction
4  to you to purchase the Merck's MMR II and ProQuad
5  vaccines.
6    A.  Right.
7    Q.  And have they -- has the Program Office
8  ever raised a concern to you that the MMR II
9  vaccine or the ProQuad vaccine does not meet its
10  warranty of merchantability?
11    A.  I don't recall that happening.
12    Q.  Do you think that you would recall it if
13  there was -- if they communicated that to you?
14    A.  I --
15    Q.  And I'm not trying to push you on --
16    A.  Yeah.
17    Q.  -- your personal recollection.  But you're
18  here to speak on --
19    A.  Yeah.
20    Q.  -- behalf of the C.D.C.
21    A.  Absolutely.
22    Q.  So has the C.D.C. ever made the conclusion
23  that the Merck vaccine --
24    A.  I'm not aware of that.
25    Q.  -- I'm sorry, the Merck vaccine has not

Page 143

1  met the -- let me put it into an articulate
2  question.
3    A.  Yeah.
4    Q.  Is the C.D.C. aware or does the C.D.C.
5  take the position that the Merck's mumps vaccine,
6  meaning MMR II or the ProQuad vaccine, has ever not
7  met the warranty of merchantability?
8    A.  I'm not aware of that.
9    Q.  Okay.
10    MS. DYKSTRA:  Why don't we take a
11  break and we'll pick up in a little bit.
12    THE VIDEOGRAPHER:  We're going off
13  the record.  The time is 1:51 p.m.
14    (Whereupon, a discussion ensued
15  off the record.)
16    (Whereupon, there was a brief
17  recess.)
18    THE VIDEOGRAPHER:  We're going back
19  on the record.  The time is 2:09 p.m.
20  Please continue.
21  BY MS. DYKSTRA:
22    Q.  Mr. Sims, can you look again at the C.D.C.
23  contract which is marked Exhibit 3?  You're still
24  looking at it.
25    Can you look at Page 22, which is the duty

Page 144

1  to warn clause?  And you be -- I believe you
2  stated, sir, that this is a provision that Merck
3  requested be inserted into the contract; it's not a
4  provision that the C.D.C. requested be inserted
5  into the contract.
6    A.  I believe that's accurate.
7    Q.  So is it fair to say that this provision
8  is not material to the C.D.C., it's material to
9  Merck perhaps, but the C.D.C. would not require
10  this provision in the contract?
11    A.  It's not included in our solicitation we
12  go out.  So if it -- that wasn't requested be
13  added, it wouldn't be.
14    Q.  You mean if Merck did not request it to be
15  added, the C.D.C. would not require it to be added?
16    A.  Right.  Because it was not in the original
17  solicitation that we put out.
18    Q.  Is it your understanding that Merck adds
19  this provision to obligate the C.D.C. to meet
20  certain requirements with respect to warning
21  healthcare practitioners and patients around the
22  risks and benefits of the vaccine?
23    A.  So -- so those two parts that are -- that
24  are in there, yeah, that it's -- the vaccine is
25  administered to each patient on the basis of an

Page 145

1  individualized medical judgment by a physician or
2  that it's administered after meaningful warnings
3  related to the risks and benefits of the
4  vaccination are provided, so forth.
5    Q.  Okay.  Before we keep going on that, I
6  want to just go back to something you mentioned
7  around the Program Office being the subject matter
8  expert in the vaccine from a clinical perspective.
9  Is that fair?
10    A.  Clinical?  Just, you know, again my role
11  in this is as that contract specialist to conduct
12  acquisitions within the Federal Acquisition
13  Regulations.
14    Q.  Uh-huh.
15    A.  And then I'm reliant on the technical
16  subject matter expertise of the particular
17  service/supply for them to really provide that
18  subject matter expertise in the context of what
19  we're buying.
20    Q.  Okay.  So in the context of what you're
21  buying here, you're buying a vaccine, you're
22  relying on the Program Office, who also relies on
23  A.C.I.P., to determine which vaccines to purchase?
24    A.  I think that's a fair, yeah --
25    Q.  Okay.

1    A.  But I -- go ahead.
2    Q.  Go ahead.  I'm sorry.
3    A.  And I think it's Sanofi has one, maybe
4  G.S.K., I think.
5    Q.  But O.B.R.A. '93 sets the price for these
6  vaccines, including Merck's MMR II, at the price
7  that was set in 1993 and the C.P.I. increased each
8  year and no greater than that, that's the cap?
9    A.  The -- right.  It's a cap, correct.
10    Q.  So generally speaking, it's a lower price
11  than other products on the contract?
12    A.  That -- to say that that's -- I'd have
13  to -- you know, I can't say that for certain.
14    Q.  Okay.
15    A.  And you're saying prices in general?
16    Q.  Uh-huh.
17    A.  You know, there may be flu vaccines that
18  are less than that.  There may be other ones that
19  are less.
20    Q.  Okay.  Let's turn to the contract, I think
21  on Page 13, the current good manufacturing price
22  regulations.  So C.3.7 (B) states that:
23        "C.G.M.P.," the current good
24      manufacturing price regulations, "will
25      be the standard to be applied for

1      manufacturing, processing and packing
2      of drugs and biologic products."
3        Correct?
4    A.  Uh-huh.
5    Q.  And --
6    A.  Yes.
7    Q.  -- is that a standard provision in vaccine
8  contracts?
9    A.  Yeah.  I believe that's included in all
10  the vaccine contracts.
11    Q.  Okay.  And what's the purpose of that
12  provision?
13    A.  So that's the -- F.D.A.'s is the
14  regulatory agency over that.  But my understanding
15  is it's the F.D.A.'s way of ensuring that
16  appropriate -- that factories and processes are
17  appropriate to where it, you know, makes sure that
18  vaccines are of quality.
19    Q.  And who monitors compliance with that
20  provision, with the C.G.M.P. provision?  Is that
21  the F.D.A.?
22    A.  F.D.A. is the regulatory agency on that.
23    Q.  Okay.  So and you had said the F.D.A.
24  conducts inspections and reviews of manufacturing
25  facilities.  So the F.D.A. would conduct those

1  inspections to ensure compliance with the C.G.M.P.?
2    A.  Right.  And I think it mentions that
3  specifically in the next about if there's a
4  negative inspection, that -- but yes, F.D.A. is the
5  one that's in charge of that, the regulatory agency
6  that's -- conducts inspections and -- so.
7    Q.  So is -- does the C.D.C. defer to the
8  F.D.A. to determine whether a product is
9  manufactured consistent with C.G.M.P.?
10    A.  C.G.M.P. is F.D.A.  They're the ones that
11  are in charge of that.
12    Q.  So C.D.C. defers to F.D.A. to make that
13  determination?
14    A.  My understanding is that we're, yeah,
15  we're not involved -- we're not part of that
16  process, that it's in F.D.A.'s lane.
17    Q.  Okay.  Are you aware -- well, has the
18  C.D.C. ever modified its contracting decisions with
19  respect to the mumps vaccine because of any failure
20  of -- to meet C.G.M.P. or any information it --
21  C.D.C. received from F.D.A. about a failure to meet
22  C.G.M.P.?
23    A.  No.  Not that I'm aware of.
24    Q.  Given that the F.D.A. is responsible for
25  ensuring compliance with C.G.M.P., is it fair to

1  say that the C.D.C. doesn't expect to receive
2  copies of F.D.A. inspection reports or warning
3  letters?
4    A.  So that, I'd defer to Program on that.
5  If -- I'm not sure on all the details about what
6  that encompasses to where -- to what our Program
7  Office is -- market and them are interacting.  I'm
8  not sure of all the details on what their
9  interaction is with F.D.A.  But me, I'm almost
10  never in contact with F.D.A. from my side.  So.
11    Q.  So from a contracting side, the F -- the
12  contracting side of C.D.C. is not concerned with
13  the F.D.A. warning letters or F.D.A. -- not
14  concerned with receiving copies of F.D.A. warning
15  letters or inspection reports, although other
16  portions of C.D.C. might be involved?
17    A.  So I'm not receiving anything directly
18  from F.D.A.
19    Q.  Okay.
20    A.  If Program -- I'm not exactly sure on what
21  they receive and what -- how they're interacting.
22    Q.  Uh-huh.
23    A.  But as part of their job if there was
24  something, they would make me aware if it impacted
25  the contract.  But you know, I'm not sure what

1  they -- how -- all the details on their interaction
2  with F.D.A.
3      Q.  Okay.  But the kind -- so -- so what you
4  said, is it fair that the Program Office does have
5  interactions with the F.D.A. if they deem it
6  reasonable and necessary?
7      A.  I'm not sure what level that -- to what
8  degree that occurs.
9      Q.  Okay.
10     A.  Obviously F.D.A. is the regulatory agency
11 on vaccines.  So you know, that's really in that
12 technical lane of them -- how they assess the
13 situation and what the requirements are for them to
14 be in touch with F.D.A.
15     Q.  Okay.  And you said that Program Office
16 would make you aware if something impacted the
17 contract.  That's accurate, right, if there was
18 something that impacted the contract --
19     A.  Right.
20     Q.  -- Program Office would make you aware of
21 that?
22     A.  Yeah.  So if it's a contractual issue that
23 potentially impacts it, they would bring me in the
24 loop to then assess it, work with our attorneys
25 and -- just depending on what the issue is.

1      Q.  Okay.  And the C.D.C. has not ever altered
2  its contracting decisions with respect to the Merck
3  mumps vaccine, at least as long as you've been
4  negotiating the contracts?
5      A.  Not that I'm aware of.
6      Q.  Okay.  Are you aware that there have been
7  various mumps outbreaks over the years in 2006,
8  2010?  Are you aware of them at all?
9      A.  Generally I'm not tuned in to where those
10 types -- I don't recall specific ones like that.
11 You know, there can be issues where it -- where
12 there is an outbreak.
13     Q.  Uh-huh.
14     A.  And for instance, you know, a hepatitis
15 outbreak going on now where --
16     Q.  Uh-huh.
17     A.  -- you know, that's going to increase a
18 surge in demand of vaccine.  So that's, you know, a
19 type of thing where, you know, if there was an
20 outbreak, the impact in the contract couldn't cover
21 what Program assesses could potentially be the
22 amount of vaccine, that they would reach out to me
23 and try to get ahead of a potential inventory
24 issue.
25     But so mumps, you know -- to go back to

1  2006, and I'm not recalling a specific instance
2  back then of when that occurred.
3      Q.  And that -- and the reason that C.D.C.
4  enters into the stockpile contract is partially so
5  that you will have a sufficient supply if there is
6  need for more vaccine?
7      A.  So that's -- so the stockpile is part of
8  the V.F.C. program.  And I believe it's we have to
9  have, I believe, a six-month stockpile --
10     Q.  Uh-huh.
11     A.  -- based on current demand.  So yeah,
12 that's -- the purpose is to ensure that, you know,
13 we could potentially cover an outbreak.  So I think
14 that was created as part of, I think, O.B.R.A. '93
15 that that said C.D.C. needs to keep a six-month
16 supply.
17     Q.  Do you know whether the C.D.C. has ever
18 had to access the stockpile because of outbreaks
19 with respect to mumps?
20     A.  I don't recall.  And you know, I'm not
21 tuned in to those type events to really remember
22 all of them if it was.  But I don't recall that
23 specifically.
24     And you know, really the stockpile they --
25 you know, there could be where a program there's

1  more demand and -- in their shipments and occurring
2  where I'm -- you know, just they say you need to
3  ship some of these there, and I may not go into all
4  the detail why or the specifics other than the --
5  there's a need to increase the stockpile and they
6  send more money and so.
7      Q.  But in the same way that the Program
8  Office would, quote, unquote, make you aware if
9  something impacted the contract, unquote, it's the
10 same thing here, if there was an outbreak that
11 impacted the contract, the Program Office would
12 make you aware of that issue?
13     A.  Yes.
14     Q.  Okay.
15     A.  And potentially the vendor.
16     Q.  Okay.  The Relators whom Mr. Schnell
17 represents in this case have made a statement that
18 the C.D.C. contract requires Merck -- states that
19 Merck has reporting, labeling and testing
20 obligations in connection with the C.D.C.
21 contracts.
22     Can you tell me if that is accurate?  Are
23 there reporting, labeling and testing obligations
24 to the C.D.C. under the C.D.C. contract?
25     A.  So reporting?  So there's --

Page 166

1    A.  I mean, that's the bottom line is what is
2  in the contract, and that is going to be reviewed
3  and looked through in a real situation if that came
4  up.
5    Q.  Is there anything that's not in the
6  contract that you would view as a material term to
7  your purchasing decision, to your purchasing
8  decision?
9    A.  Can you ask that again or --
10   Q.  Everything that's important or material to
11  your purchasing decision is in the contract; is
12  that fair to say?
13   A.  So that -- that's the agreement between
14  Merck and C.D.C., and that's what we're bound to.
15   Q.  Is the acquisition package that the
16  Program Office gives to you in, like, an actual
17  physical package or an electronic submission that
18  you receive of some kind?
19   A.  It's electronic through our contracting
20  system.  I.C.E. is what it's called, our
21  contracting system.
22   Q.  And what exactly is contained in that
23  again?  I'm sorry if you repeated -- you've
24  answered already.
25   A.  So the -- it consists of the acquisition

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 167

1  plan.  That's a formal document from H.H.S. --
2    Q.  Uh-huh.
3    A.  -- required by H.H.S. for acquisitions
4  over 150,000.
5    Q.  Uh-huh.
6    A.  Their government estimate, a statement of
7  work of what we're doing, what we're buying, a list
8  of what we're buying.
9        There's contract clearances at C.D.C.
10  that, you know, for instance, human subjects, if
11  there was a clearance where they submitted to a
12  reviewer to determine if human subjects apply.
13   Q.  Okay.
14   A.  So there's mandatory clearances that they
15  include those documents as part of the package.  So
16  that's the main documents that would be included.
17   Q.  And you rely on that acquisition package
18  to make your purchasing decisions?
19   A.  Use that information about what we submit
20  forward to solicit and receive proposals.
21   Q.  Okay.  I think you said -- and I'm just
22  going to go through some of the things this morning
23  and just clarify.  You said that there has not been
24  any issues that have come up with respect to the
25  duty to warn clause; is that accurate?

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 168

1    A.  I don't recall that.  I don't recall any
2  issues coming up.
3    Q.  You recall saying it; you just don't
4  recall --
5    A.  Right.
6    Q.  -- any issues?
7    A.  I don't recall that clause coming up as an
8  issue that we had to look into whatever a
9  particular issue would be.  So I don't recall that
10  coming up.
11   Q.  You said in -- this morning in response to
12  one of the questions that, as long as a vaccine is
13  licensed and meets the other requirements in the
14  contract, the C.D.C. -- in the proposed contract,
15  the C.D.C. will purchase that vaccine.
16       Do you recall that this morning?
17   A.  Well, so again we -- from my experience,
18  the vaccines that the Program Office is including
19  in their package that what we need to purchase, we
20  typically are -- have awarded all those that have
21  been proposed.
22       Now, not to say that in the past there
23  could have been situations where they didn't
24  warrant all of them.
25   Q.  Uh-huh.

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 169

1    A.  But from my experience I don't -- I don't
2  recall us receiving a proposal -- us having a
3  vaccine that we're requesting in the solicitation,
4  getting a proposal then not -- walking away and
5  not awarding that vaccine.
6    Q.  So is -- so in other words, if the F.D.A.
7  has made a determination that the vaccine is
8  licensed for sale in the United States, you'll rely
9  on that license to make your purchasing decision?
10   A.  Well, Program could walk away.  If they
11  came back to me and said, well, we're just --
12  recommend to me we're not going to buy that --
13   Q.  Uh-huh.
14   A.  -- that could happen.
15   Q.  Has it ever happened?
16   A.  Not since I've -- not since I've been
17  here.
18   Q.  Okay.
19   A.  Not that I'm aware of that I recall.
20   Q.  You mentioned that the solicitation --
21  well, Mr. Schnell asked you if there are three
22  factors relevant to your solicitation, the
23  technical capability, price and past performance.
24       Under technical capability he asked you
25  whether it involves quality, and you said you

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

43  (Pages 166 to 169)

Page 174

1    A.  Not that I'm aware of.  And that's in the
2  context of that warranty clause --
3    Q.  Yes.
4    A.  -- it has.
5    Q.  Agreed.
6    MS. DYKSTRA:  Can we take a quick
7  break?  Great.  Thanks.
8    THE VIDEOGRAPHER:  We're going off
9  the record.  The time is 2:52 p.m.
10    (Whereupon, a discussion ensued
11    off the record.)
12    (Whereupon, there was a brief
13    recess.)
14    THE VIDEOGRAPHER:  We're going back
15  on the record.  The time is 3:09 p.m.
16  Please continue.
17  BY MS. DYKSTRA:
18    Q.  Okay.  I just have a couple more
19  questions, and then I'm going to reserve some time
20  as well to come back afterwards.
21    There was one question that -- and I have
22  the transcript here so it's not fair, but I'm going
23  to read you just so I make sure I understand the
24  answer.  I asked you that, I said:
25    "'Efficacy' is not a term of the

Page 175

1    contract in the same way that 'shelf
2    life' is a term of the contract?"
3    And you said:
4    "'Shelf life' is explicitly
5    stated."
6    So just to clarify, "shelf life" is an
7  express term in the contract; correct?
8    A.  "Express" meaning it's in the contract
9  written specifically.
10    Q.  Correct.
11    A.  Yes.
12    Q.  And the efficacy or the efficacy rate of a
13  vaccine is not an express term written into the
14  contract?
15    A.  Not -- that's not in -- that term in a
16  percentage or something like that is not in the
17  contract.
18    Q.  And the, quote, unquote, effectiveness of
19  the vaccine is also not an express term written
20  into the contract?
21    A.  Right.  There's no, like, percentage or
22  metrics like that regarding that.
23    Q.  All right.  Okay.  Thank you.
24    And then can you tell me just generally,
25  what documents did you look at to prepare for

Page 176

1  today; and besides lawyers who did you speak to to
2  prepare?
3    A.  Besides lawyers?
4    Q.  Yeah.  Not including any conversations
5  with lawyers.
6    A.  I spoke to Jeanne in the Program Office,
7  she's the person I interact with the most, just to,
8  you know, just to make sure I had a complete
9  understanding.  Because again, a lot of these -- a
10  lot of these clauses don't come up often, and so
11  just trying to refresh.  And so I spoke to her some
12  that -- about -- a little bit about it.
13    Does that answer your question?
14    Q.  Yes.
15    A.  Okay.
16    Q.  I --
17    A.  And then just making people aware that
18  I'm -- in my office that I'm going to a deposition.
19    Q.  And they said lucky you?
20    A.  So -- so I believe that's the only people
21  I talked to regarding.
22    Q.  And did you look at any documents to
23  prepare for today?
24    A.  I looked through some of the -- in our
25  I.C.E. contracting system, kind of went back

Page 177

1  scrolling through some of the documents, more of a
2  scanning through just to -- one of the reasons
3  to -- going back many years how consistent these
4  terms and conditions were, so to kind of get a
5  little bit better understanding of that.
6    Q.  What was your conclusion with respect to
7  how consistent the C.D.C. contract terms have been
8  over time?
9    A.  It seemed to be -- for instance, like duty
10  to warn, I think that went back a while before me.
11  So it seemed to be fairly consistent.  Certainly
12  there's changes that -- over time, or small ones.
13  But from what I could gather, fairly consistent.
14    Q.  Okay.
15    MS. DYKSTRA:  Okay.  I think I'm just
16  going to reserve -- I think how much time
17  do we have on?  We have --
18    MS. DIMATTIO:  About an hour.
19    MS. DYKSTRA:  -- about an hour or so
20  left, but I won't take --
21    THE VIDEOGRAPHER:  Three hours 46
22  before --
23    MS. DYKSTRA:  Okay.  So I'm not going
24  to take the whole of my time either, but
25  I'm going to reserve in case we have

45 (Pages 174 to 177)

Appx11042

1  follow-up and turn the questioning over to
2  Mr. Schnell.
3      THE WITNESS:  Okay.
4      MR. SCHNELL:  Pass the baton.
5      FURTHER EXAMINATION
6  BY MR. SCHNELL:
7      Q.  It's me again.  I'd like to mark --
8      MR. SCHNELL:  Where are we, at six?
9      MS. DIMATTIO:  We should be at five.
10     MR. SCHNELL:  Five?
11 BY MR. SCHNELL:
12     Q.  I'd like to mark as Exhibit 5 a letter
13 from the C.D.C., Office of the Chief Information
14 Officer, to Ms. Dykstra.  I'm not seeing a date.
15 Oh, here it is.  It's dated -- no.  I'm not seeing
16 a date on this.
17     MS. DIMATTIO:  It's on the top right
18 under the C.D.C.
19     MR. SCHNELL:  Oh, November 24th,
20 2015.  Thanks.
21     (Whereupon, Deposition
22      Exhibit 5 was marked.)
23 BY MR. SCHNELL:
24     Q.  And the only question I have is on the
25 second page.  And Ms. Dykstra referred to this in

1      Q.  No.  It wasn't anything --
2      A.  Okay.
3      Q.  -- that we had anything --
4      A.  Okay.
5      Q.  -- to do with.  It was what Merck's
6  counsel in some exchange with the C.D.C. had.  And
7  I'm just trying to un -- see if you understand what
8  that means, if anything, in the context of the
9  C.D.C.'s decision to purchase vaccines.
10     A.  Okay.  So the statement "efficacy of
11 vaccine is not a procurement criteria"?
12     Q.  Uh-huh.
13     A.  Yeah, so that really goes back to that
14 license that "efficacy" is not a specific
15 measurement or term that -- in our solicitation
16 that there's some kind of metric related to that
17 term.
18     Q.  So it means that it's not a specific
19 provision, an express provision in the contract?
20     A.  Yeah.  It's "efficacy" is not expressly
21 written in the contract as a requirement.
22     Q.  In the context of the C.D.C.'s purchasing
23 decision, does it mean that efficacy is not
24 relevant to the C.D.C.'s decision to purchase
25 vaccines?

1  her question.  But there's a statement here, number
2  two, that says:
3      "Efficacy of vaccine is not a
4      procurement criteria."
5      Do you see that?
6      A.  Yes.
7      Q.  Do you have an understanding of what that
8  means?
9      A.  In what context?
10     Q.  In the context of the C.D.C.'s decision to
11 purchase vaccines.
12     A.  So in terms of this document, like, number
13 two, it's saying -- what does that relate to?  I'm
14 trying to understand --
15     Q.  I'm asking in the context of the C.D.C.'s
16 decision to purchase vaccines, does the statement
17 "efficacy of vaccine is not" --
18     A.  Oh, so that --
19     Q.  -- "a procurement" --
20     A.  That was --
21     Q.  -- "criteria" have --
22     A.  That was the question --
23     Q.  -- have any significance to you?
24     A.  So that question that you asked, and that
25 was the answer given here?

1      MS. SNOW:  And just to be clear,
2  you're not asking about what in this
3  November 24th, 2015 letter was meant in --
4  by saying "efficacy of vaccine is not a
5  procurement criteria," you're saying in
6  the context of procurement within the
7  scope of his responsibilities at the
8  C.D.C. what does --
9  BY MR. SCHNELL:
10     Q.  Well, do --
11     MS. SNOW:  -- that mean?
12 BY MR. SCHNELL:
13     Q.  -- you know what was meant here?
14     A.  This -- I'm not sure other than looks like
15 a F.O.I.A. request.  And so yeah, I'm not sure
16 exactly the con -- full context of this letter.
17 And looks like there was a question asked --
18     MS. SNOW:  Uh-huh.
19     THE WITNESS:  Uh-huh.  To that, so I --
20 that's kind of what I was asking,
21 what's -- that's an answer to a question
22 that I don't see the question.
23     So that that number two, if you're
24 asking me separately from this document
25 about that statement -- is that what

Page 198

```
 1       Q.  Is it speculation in your view to give an
 2   opinion on whether or not you think a finding by a
 3   court of law that a vaccine manufacturer has
 4   engaged in clinical trial fraud and other
 5   misconduct, that that might have an impact on
 6   C.D.C.'s decision to continue purchasing with that
 7   manufacturer?
 8       MS. SNOW:  Object to the form.
 9       THE WITNESS:  So can you --
10       MR. SCHNELL:  Can --
11       THE WITNESS:  -- re-ask that, or
12   rephrase it?
13       MR. SCHNELL:  Can you ask that again?
14       (Whereupon, the record was read by
15   the court reporter as follows:
16       Q   "Is it speculation in your
17       view to give an opinion on whether or
18       not you think a finding by a court of
19       law that a vaccine manufacturer has
20       engaged in clinical trial fraud and
21       other misconduct, that that might have
22       an impact on C.D.C.'s decision to
23       continue purchasing with that
24       manufacturer?")
25       THE WITNESS:  So again I would, you
```

Page 199

```
 1   know, assess with our Program Office,
 2   gather the facts, assess that situation,
 3   if it impacted the license.
 4       Certainly, you know, this is -- you
 5   know, an F.D.A. license is very much, have
 6   to be licensed.  So if it impacted that,
 7   then that is something that could impact
 8   it, certainly.
 9   BY MR. SCHNELL:
10       Q.  In terms of the meaning of "fit for
11   intended purpose" when it comes to vaccines, is
12   preventing outbreaks subsumed within that purpose?
13       A.  You know, again, getting into those real
14   technical vaccine performance things, I'm relying
15   on, you know, my Program Office to really define
16   whether or not a vaccine is meeting its intended
17   purpose.
18       Q.  Just give me one second.
19       MR. SCHNELL:  Okay.  That's all I
20   have for now.  Thanks.
21       MS. DYKSTRA:  I just have one or two
22   quick follow-up last questions.
23       Thank you, Gordon.
24   ///
25   ///
```

Page 200

```
 1            FURTHER EXAMINATION
 2   BY MS. DYKSTRA:
 3       Q.  Thank you.  I just have one or two
 4   follow-up just from that last bit of questioning.
 5   There was a lot of what I would consider
 6   speculation, like "what would you do if" type
 7   questions.
 8       A.  Right.
 9       Q.  And I just --
10       MR. SCHNELL:  Objection to form.
11   BY MS. DYKSTRA:
12       Q.  And I just want to clarify whether or not
13   some of those things actually occurred in
14   connection with the Merck's mumps vaccine contract
15       So one question was -- I think you already
16   answered the question that there had not been
17   anything related to C.G.M.P. violations that came
18   up with respect to this contract; is that correct?
19       A.  I'm not aware of any.
20       Q.  And you stated that you weren't aware
21   as to -- strike that.
22       Has -- when C.D.C. makes purchasing
23   decisions, meaning when C.D.C. makes the decision
24   to purchase the mumps vaccine, among other things
25   you said it relies on an A.C.I.P. recommendation;
```

Page 201

```
 1   correct?
 2       A.  The Program Office relies on that, among
 3   other things.
 4       Q.  And the Program Office may also rely on
 5   other scientific or clinical evaluations of the
 6   vaccine?
 7       A.  Again, I'd defer to them on exactly what
 8   all they look at.
 9       Q.  Okay.  And they rec -- they direct you
10   about what to purchase, though.
11       A.  Correct.
12       Q.  Correct?
13       And during the discussions with Jeanne
14   Santoli in the Program Office, has -- during those
15   discussions about whether to purchase the mumps
16   vaccine, has the Program Office ever raised
17   concerns relating to the effectiveness or efficacy
18   of the Merck's mumps vaccine?
19       A.  I'm not aware of that occurring.
20       Q.  And has the Program Office in the
21   discussions about whether to purchase the Merck's
22   mumps vaccine ever raised concerns related to
23   seroconversion, immunogenicity, shelf life or
24   potency of the Merck mumps vaccine?
25       A.  Not that I'm aware of.
```

51  (Pages 198 to 201)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA *ex rel*.,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

*Plaintiffs,*

v.

MERCK & CO., INC.,

*Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 76

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3
 4   UNITED STATES OF AMERICA      CIVIL ACTION
     ex rel, STEPHEN A. KRAHLING  NO. 2:12-04374 (CDJ)
 5   and JOAN A. WLOCHOWSKI,
                 Plaintiffs,
 6
 7            V.
 8   MERCK & CO., INC.,
                 Defendant.
     _____
 9   IN RE:  MERCK MUMPS VACCINE  MASTER FILE NO.
     ANTITRUST LITIGATION          2:12-cv-03555(CDJ)
10
     THIS DOCUMENT RELATES TO:
11   ALL ACTIONS
12   _____
13              TUESDAY, MAY 9, 2017
14
15          Videotaped deposition of MICHELE TAYLOR,
16   held in the offices of Spector Roseman Kodroff &
17   Willis, PC, 1818 Market Street, Suite 2500,
18   Philadelphia, Pennsylvania, commencing at 9:45
19   a.m., on the above date, before Deborah L.
20   Williams, a Certified LiveNote Reporter and a
21   Notary Public in the Commonwealth of Pennsylvania.
22
23
24
25
```

Page 194

1  eligible to purchase off of that schedule, so the
2  VA, Department of Defense, Indian Health and Coast
3  Guards, I believe it is.
4      Q.   Okay.  So most of my questions today
5  will deal with the Vaccines for Children contract
6  primarily.  I'll have some questions on the
7  stockpile contract.  We might touch upon the other
8  contracts today.
9          And can you tell me for the Vaccines for
10 Children contract, how often is that contract
11 negotiated?
12     A.   Annually.
13     Q.   Annually.  And what is generally
14 discussed during the negotiations to renew the
15 contract?
16         MS. DYKSTRA:  Objection to form.
17         You can answer.
18         THE WITNESS:  Mostly it is FAR clauses,
19 different terms of the contract related to how
20 we handle certain processes.
21         But, generally speaking, the pricing, we
22 really -- and there is -- by rare exception do
23 we actually have a conversation about the
24 pricing.  Usually that's done via the bid
25 process where, you know, they give us the RFP,

Page 195

1  we fill out the form, we e-mail it back, we wait
2  for a few weeks, they may come back with a
3  counter offer, some suggested different prices,
4  and then we'll submit our best and final, and
5  there may be a conversation depending on a
6  unique situation.
7  BY MS. KOURY:
8      Q.   Okay.  And as far as you know -- and you
9  can answer in your personal capacity -- do the
10 contract terms change substantially throughout the
11 years, or are they generally the same every year
12 that they're negotiated?
13     A.   There's a lot of terms in there.  I
14 would say the vast majority do not change.  But
15 every year there may be one new FAR clause or, you
16 know, one change that they've made to the -- to the
17 contract that we have to work through.
18     Q.   Okay.  And during the contract
19 negotiations between Merck and the CDC, did Merck
20 and the CDC discuss the shelf life of the vaccine?
21     A.   No, we generally have never needed to
22 talk about that.
23         MS. DYKSTRA:  Just for the record, when
24 you talk about vaccines, should we just assume
25 we're talking about MMR II --

Page 196

1          MS. KOURY:  Yes.
2          MS. DYKSTRA:  -- and ProQuad?
3          MS. KOURY:  Yes.
4  BY MS. KOURY:
5      Q.   And are there any internal deliberations
6  at Merck relating to the shelf life of the vaccine
7  in the context of selling the vaccine to the
8  government?
9          MS. DYKSTRA:  Objection to form.
10         THE WITNESS:  It's very straightforward
11 per the contract that we need to have at least
12 12-month shelf life on product that we ship to
13 them.
14 BY MS. KOURY:
15     Q.   Are there any internal deliberations at
16 Merck regarding whether Merck can meet the 12-month
17 shelf life required under the contract?
18         MS. DYKSTRA:  Objection to form.
19         THE WITNESS:  Generally not.  Most
20 products have at least a 24-month shelf life on
21 them, so not deemed to be something that's
22 difficult for us to do.
23 BY MS. KOURY:
24     Q.   Okay.  And can you tell me, if you know,
25 at what point after manufacture of the vaccine is

Page 197

1  shipped to the CDC --
2          MS. DYKSTRA:  Objection to form.
3          THE REPORTER:  Can you please repeat
4      your question?
5          MS. KOURY:  Sure.
6  BY MS. KOURY:
7      Q.   Can you tell me at what time after
8  manufacture of the vaccine it's actually shipped
9  out to I believe it's McKesson?
10         MS. DYKSTRA:  Object to form.
11         THE WITNESS:  I'm not sure I understand
12     the question.
13 BY MS. KOURY:
14     Q.   So my question is, you just said that
15 there's generally a 24-month shelf life on the
16 vaccine and that the contract requires a minimum of
17 12 months upon delivery; is that correct?
18     A.   Yes.
19     Q.   So my question is how Merck ensures that
20 there is 12 months remaining on the vaccine at the
21 time of delivery.
22     A.   It is -- it is in our SAP system that
23 when product is picked off the shelf to fill a CDC
24 order, it automatically looks at the lot number,
25 which has the expiry in it and will determine

50 (Pages 194 - 197)

Page 198

1 whether or not that lot can be sent to McKesson.

2   Q.   Okay.  So if the lot is -- you know, if

3 there's seven months remaining, it won't be shipped

4 out, for example.

5   A.   Exactly.

6   Q.   And during Merck's negotiations with the

7 CDC about the purchase of the mumps vaccine, do

8 Merck and the CDC discuss how well the vaccine

9 works?

10      MS. DYKSTRA:  Objection to form.

11      THE WITNESS:  No, we do not.

12 BY MS. KOURY:

13   Q.   Are there any internal deliberations at

14 Merck relating to how well the vaccine works in the

15 context of selling the vaccine to the government?

16      MS. DYKSTRA:  Objection to form.

17      THE WITNESS:  No.

18      MS. DYKSTRA:  Marlene, just to make sure

19   I'm understanding, we're talking about 24 months

20   shelf life and shipping to McKesson.  I think

21   that just relates to MMR II.  So --

22      MS. KOURY:  Yes.

23      MS. DYKSTRA:  -- we're limiting that

24   to --

25      (Cross-talk.)

Page 199

1      MS. KOURY:  Right.

2      MS. DYKSTRA:  Thank you.

3      MS. KOURY:  Sure.

4 BY MS. KOURY:

5   Q.   What is Merck's understanding, if any,

6 as to the factors the CDC considers when deciding

7 to purchase the mumps vaccine?

8      MS. DYKSTRA:  Objection to form.

9      THE WITNESS:  I'm sorry, can you repeat

10   that?

11 BY MS. KOURY:

12   Q.   What is Merck's understanding, if any,

13 as to the factors the CDC considers when deciding

14 to purchase the mumps vaccine?

15   A.   What are the factors they consider in

16 purchasing it?  And when you say "purchasing," do

17 you mean the decision to put it on the contract and

18 make it available to the FC providers, or do you

19 mean the actual process of placing an order?

20   Q.   I mean the decision to make it available

21 to the FC providers.

22   A.   Okay.  So that is a little bit outside

23 of the scope of my work.  That is all the stuff

24 that's done prior to the product ever being put on

25 contract.  I believe that is all part of the ACIP

Page 200

1 recommendation and whether or not through the HECON

2 data they believe that it should be a recommended

3 vaccine that's on the schedule.

4   Q.   Do you have any understanding of what

5 they consider -- strike that.

6      Do you have any understanding of the

7 factors they consider in putting it on the ACIP

8 schedule?

9      MS. DYKSTRA:  Objection.  Form.  And I

10   think it's outside the scope.

11      But you can answer to the extent you

12   know in your personal capacity.

13      THE WITNESS:  Yeah, I believe it is, you

14   know, disease versus the disease prevented, the

15   cost of that disease versus the cost of the

16   vaccine.  So whether or not they would make it

17   available as a required vaccine or as optional

18   use or something like that.

19 BY MS. KOURY:

20   Q.   Okay.  And during Merck's negotiations

21   with the CDC about the purchase of the mumps

22   vaccine, do Merck and the CDC discuss the

23   outbreaks?

24   A.   No.

25   Q.   Are there any internal deliberations at

Page 201

1 Merck relating to the outbreaks in the context of

2 selling the mumps vaccine to the government?

3      MS. DYKSTRA:  Objection.  Form.

4      THE WITNESS:  No.

5 BY MS. KOURY:

6   Q.   And during Merck's negotiations with the

7 government about purchasing the mumps vaccine, are

8 there any discussions regarding the safety of the

9 vaccine?

10      MS. DYKSTRA:  Objection.  Form.

11      THE WITNESS:  No.

12 BY MS. KOURY:

13   Q.   And are there any internal deliberations

14 at Merck relating to the safety of the vaccine in

15 the context of selling the vaccine to the

16 government?

17      MS. DYKSTRA:  Objection.  Form.

18      THE WITNESS:  No.

19      MS. KOURY:  I'm just going to introduce

20   a contract.  I'm a little low on copies, so I

21   apologize.

22          - - -

23      (Whereupon, the document was marked, for

24   identification purposes, as Plaintiffs' Exhibit

25   Taylor-24.)

51 (Pages 198 - 201)

1    Q.   Okay.  And are there any requirements
2  under that product license relating to the
3  effectiveness of the vaccine?
4    A.   No.
5    Q.   Are there any requirements under the
6  product license related to the potency of the
7  vaccine?
8    A.   No.
9    Q.   Are there any requirements under that
10  product license relating to the safety of the
11  vaccine?
12    A.   No.
13    Q.   Can you give me an example of what
14  requirements would be under the product license?
15    A.   The license -- there should be a copy
16  attached to the contract -- really just states that
17  it is licensed.  So there aren't details in it.
18    Q.   Okay.  And then under section "b," "The
19  Current Good Manufacturing Practice Regulations,"
20  can you explain to me your understanding of what
21  those are?
22    A.   These are the standards by which Merck
23  manufactures all of our vaccines, and this part of
24  the contract is requiring that we have a standard
25  for manufacturing vaccines that we follow, and this

1  states that we do have a standard for that, which
2  is our GMP.
3    Q.   Okay.  And under the Current Good -- can
4  I just call them the CGMP?
5         Under the CGMPs, are there provisions
6  related to potency --
7         MS. DYKSTRA:  Objection.
8  BY MS. KOURY:
9    Q.   -- ensuring the potency of the vaccine?
10         MS. DYKSTRA:  Objection.
11         MS. KOURY:  If she knows.
12         MS. DYKSTRA:  So we had a deposition on
13  CGMP specifications for the vaccine, a 30(B)(6)
14  on that topic.  So if your question is limited,
15  does she know if CGMP generally has requirements
16  around potency, she can answer that in her
17  personal capacity.
18         MS. KOURY:  That's fine.
19         THE WITNESS:  I believe CGMP is the
20  processes we use to follow the manufacturing of
21  the vaccines that of course are done according
22  to the specific requirements in the actual
23  license for the vaccine, the BLA.
24  BY MS. KOURY:
25    Q.   And how does Merck ensure that it

1  complies with this term in the contract?
2    A.   Each of the vaccines and their specific
3  requirements within them are manufactured according
4  to these procedures, for example, documentation of
5  each of the steps along the way, again, according
6  to the BLA for each product.
7    Q.   Okay.  And that's also true, obviously,
8  for the MMR II vaccine under --
9    A.   Yes.
10    Q.   -- this contract, correct?
11         And under subsection "c" it states, if
12  at any time during the life of the contract, the
13  item listed under this contract fails to meet
14  CGMPRs, the contract may be terminated.
15         Do you see that?
16    A.   Yes, I do.
17    Q.   Has there ever been a time when the
18  contract was terminated or threatened to be
19  terminated for failing to follow the CGMPs?
20    A.   No.
21    Q.   If you could turn to page -- Bates page
22  ending 1828.  It's page 9 of the contract.  Under
23  "Invoice submission," part "b," subpart 8 it says,
24  "Expiration date of vaccine vials shipped."
25         Is there an expiration date on all of

1  the vaccine vials shipped for MMR II?
2    A.   Yes.
3    Q.   And that expiration date is 24 months?
4         MS. DYKSTRA:  Objection.  Form.
5         THE WITNESS:  I believe it depends on
6    the actual lot.
7  BY MS. KOURY:
8    Q.   Okay.  Can you explain that a little
9  bit?
10    A.   I -- I'm not --
11         MS. DYKSTRA:  Objection.  Outside the
12  scope.
13         THE WITNESS:  It's beyond my scope, but
14  I believe it -- as it works its way through the
15  manufacturing process, each lot, depending on
16  how long it takes at each stage of that, could
17  have a slightly different shelf life.
18  BY MS. KOURY:
19    Q.   Okay.  And that would be represented on
20  the vaccine vial, correct?
21    A.   Yes.
22    Q.   What is Merck's understanding, if any,
23  as to whether the contract requires Merck to have a
24  certain efficacy rate for its vaccine?
25         MS. DYKSTRA:  Objection.  Form.

53 (Pages 206 - 209)

Appx11049

Page 210

1    THE WITNESS: The contract does not
2  include anything related to efficacy.
3  BY MS. KOURY:
4    Q.   What is Merck's understanding of whether
5  there is a requirement by the CDC contractual or
6  otherwise relating to the efficacy of the vaccine?
7    MS. DYKSTRA: Objection. Form.
8    THE WITNESS: So as per the contract,
9  there are no requirements for efficacy.
10  BY MS. KOURY:
11    Q.   What about outside of the contract?
12    MS. DYKSTRA: Objection. Form.
13    THE WITNESS: Other than what the CDC
14  reads in the label, I don't have any other
15  connection to that.
16  BY MS. KOURY:
17    Q.   What do you mean by "what the CDC reads
18  in the label"?
19    A.   Well, so, they have --
20    MS. DYKSTRA: Objection. Form. Don't
21  speculate as to what the CDC may or may not
22  consider unless you actually know.
23  BY MS. KOURY:
24    Q.   Do you know?
25    A.   No, only what's in the contract.

Page 211

1    Q.   So I just want to be clear. Is it your
2  testimony that the only information relevant to the
3  CDC in purchasing the mumps vaccine is what's
4  contained in the contract?
5    MS. DYKSTRA: Objection. Form.
6  Objection. Misstates her testimony.
7    THE WITNESS: In my interactions with
8  the CDC on the contract and acquisition of it,
9  it is not related to the potency.
10  BY MS. KOURY:
11    Q.   Or the efficacy?
12    A.   Or the efficacy.
13    Q.   Or the effectiveness?
14    A.   No.
15    Q.   What about the safety?
16    A.   No.
17    Q.   Does Merck have an understanding as to
18  whether the CDC expects the mumps vaccine sold
19  under the VFC contract to comply with its label
20  specifications?
21    MS. DYKSTRA: Objection. Form.
22    And to the extent that it's related to
23  the contract, you can answer.
24    I'll object again that the label
25  specifications were already identified and

Page 212

1  discussed by a former 30(B)(6).
2    So in your personal capacity, you may
3  answer the question.
4    THE WITNESS: I don't have discussions
5  with the CDC on that. It's not part of the
6  contract. So I can't speculate what their
7  assumptions are.
8  BY MS. KOURY:
9    Q.   Do you have any discussions with the CDC
10  outside of the contract in your personal capacity?
11    A.   Not about the efficacy or potency or
12  safety of the product.
13    Q.   And during contract negotiations, does
14  Merck make any representations to the CDC regarding
15  the efficacy of the vaccine?
16    A.   No.
17    Q.   And during contract negotiations, does
18  Merck make any representations to the CDC regarding
19  the safety of the vaccine?
20    A.   No.
21    MS. KOURY: I have another document.
22  You can put the contract aside.
23    - - -
24    (Whereupon, the document was marked, for
25  identification purposes, as Plaintiffs' Exhibit

Page 213

1  Taylor-25.)
2    - - -
3  BY MS. KOURY:
4    Q.   The court reporter handed you Taylor
5  Exhibit 25, Bates numbers MRK-CRA00072713 through
6  MRK-KRA00072735.
7    Do you recognize this document?
8    MS. DYKSTRA: You can take a couple
9  minutes to look at it, if you need, since you're
10  not copied on it.
11    MS. KOURY: Yeah, feel free.
12    THE WITNESS: (Witness reviewing
13  document.)
14    Okay.
15  BY MS. KOURY:
16    Q.   Do you understand, generally, what this
17  document is communicating?
18    A.   Yes.
19    Q.   Can you -- you see the subject line is
20  "Vaccine price issue." Can you describe to me what
21  the vaccine price issue was in or around March 3,
22  2015?
23    A.   So this was the year we were negotiating
24  the addition of Gardasil 9 to the contract -- 2015,
25  yes -- and in the process, there was some feedback

54 (Pages 210 - 213)

Page 222

1      THE WITNESS: I do not.
2      MS. DYKSTRA: Objection. Outside the
3  scope.
4      You can answer in your personal
5  capacity.
6      THE WITNESS: I don't know.
7  BY MS. KOURY:
8     Q.   You have no understanding of their
9  eradication goals?
10     MS. DYKSTRA: Objection. Asked and
11  answered.
12     THE WITNESS: Specific to MMR, I do not.
13  BY MS. KOURY:
14    Q.   Specific to mumps.
15    A.   I don't.
16    Q.   So the next bullet point, there's a
17  reference to a quality-based contract.
18     Can you explain what a quality-based
19  contract is?
20    A.   I believe what we're referring to there
21  is a program that we have in place that offers
22  incremental rebates to -- and this is on the
23  private sector side of the business -- for having
24  protocols in place to identify unvaccinated
25  patients and get them vaccinated, and to look at

Page 223

1  their vaccination rates to increase awareness that
2  their rates may not be as high as they think they
3  are.
4     Q.   Okay. And it says here Merck would be
5  interested in considering similar programs for the
6  VFC program; is that correct?
7     A.   Yes.
8     Q.   Did Merck consider similar programs for
9  the VFC program?
10     MS. DYKSTRA: Objection. Outside the
11  scope.
12     You can answer in your personal
13  capacity.
14     THE WITNESS: The -- we have a program
15  in place that's not for MMR, but we do have an
16  HPV program that we work with the CDC on that
17  provides some incremental discounts when they
18  increase utilization, so similar types of
19  programs where it's kind of a cost sharing
20  thing, we both want vaccination rates to go up,
21  which means your spending goes up, so we're
22  willing to help share in some of that cost.
23  BY MS. KOURY:
24    Q.   Okay. And is there movement at Merck to
25  have this program implemented for MMR II?

Page 224

1      MS. DYKSTRA: Same objection.
2      THE WITNESS: No.
3  BY MS. KOURY:
4     Q.   Why not?
5     A.   Vaccination rates are very high for MMR
6  II. This is referring to an HPV program. We had
7  low rates.
8     Q.   Do you know what the vaccination rates
9  are for MMR II?
10     MS. DYKSTRA: Same objection.
11     THE WITNESS: I believe they're in the
12  90s.
13  BY MS. KOURY:
14    Q.   The next page, Bates ending 2723, it
15  says in first bullet, "Presently, the CDC has no
16  clear mechanism to regulate manufacturer's
17  pricing."
18     Do you see that?
19    A.   Yes.
20    Q.   Can you explain to me what that means?
21     MS. DYKSTRA: Same objection.
22     You can answer in your personal
23  capacity.
24     THE WITNESS: I'm not -- I'm not sure if
25  it's referring to private or public sector

Page 225

1  pricing. It's not clear.
2  BY MS. KOURY:
3     Q.   It does say the CDC, so probably public,
4  right?
5     A.   It could, but it's a negotiated
6  contract. So if it's referring to CDC pricing,
7  it's a negotiation.
8     Q.   Is there a cap on how much Merck can
9  charge for the MMR II vaccine to the CDC?
10    A.   Thank you for reminding me. I keep
11  forgetting we're talking about MMR II. It's unique
12  in the contract. So this bullet point, if it is
13  public sector pricing or referring to VFC, then it
14  would not apply to the mumps vaccine because it is
15  under/over 93, and that is not a negotiated price.
16  It is a formulaic price that is driven based on CPI
17  that we have no control over.
18    Q.   Okay. What is a CPI cap?
19    A.   It is -- so we -- they take the current
20  price, and CDC tells us what their consumer price
21  index is that they're using. We apply that to the
22  current price, and that is the new price that we
23  put forward in the new contract.
24    Q.   Okay. You can put this document aside.
25     Let me move on to negotiations between

57 (Pages 222 - 225)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

*Plaintiffs,*

v.

MERCK & CO., INC.,

*Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 77

Page 1

1          IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2

3    UNITED STATES OF AMERICA  : CIVIL ACTION
     ex rel., STEPHEN A.       : NO. 2:10-04374(CDJ)
4    KRAHLING and JOAN A.      :
     WLOCHOWSKI,               :
5         Plaintiffs,          :
                               :
6         vs.                  :
                               :
7    MERCK & CO., INC.,        :
          Defendant.           :
8    _____  : Master File No.
     IN RE:  MERCK MUMPS       : 2:12-cv-03555(CDJ)
9    VACCINE ANTITRUST         :
     LITIGATION                :
10                             :
     THIS DOCUMENT RELATES TO: :
11   ALL ACTIONS               :
12
13               ** CONFIDENTIAL **
14
15             December 12, 2016
16
17          Videotaped deposition of COLLEEN
18   DUFFY, taken at the offices of Spector
19   Roseman Kodroff & Willis, 1818 Market Street,
20   Suite 2500, Philadelphia, Pennsylvania 19103,
21   beginning at 9:39 a.m., before LINDA
22   ROSSI-RIOS, a Federally Approved RPR, CCR and
23   Notary Public.
24
25

Appx11053

Page 38

COLLEEN DUFFY - CONFIDENTIAL

1
2     Q.    Who would that be at that time?
3     A.    I'm not sure at that point in
4  time who was in that department.
5     Q.    Okay.  If you had to go back to
6  your office and figure out who that person
7  would be, what would you do?
8     A.    I'm not sure I understand your
9  question.
10    Q.    If after this deposition you
11 needed to figure out who that responsible
12 person would be who had the expertise in
13 efficacy, what would you do to try to figure
14 that out?  Would you call someone?  Would you
15 check a roster somewhere?  Would you go on the
16 Merck computer and search for something?  What
17 would you do?
18       MS. DYKSTRA:  Objection.
19       THE WITNESS:  I would look at
20       information that I had that related to
21       the outbreak at that point in time.
22 BY MS. LERNER:
23    Q.    And what information would you
24 have?
25    A.    Any files that I had that

Page 39

COLLEEN DUFFY - CONFIDENTIAL

1
2  related to the outbreak.
3     Q.    So you kept a file for the mumps
4  outbreak during this time?
5       MS. DYKSTRA:  Objection.
6       THE WITNESS:  For example, that
7       material, if that was approved,
8       whoever that was approved by.
9  BY MS. LERNER:
10    Q.    I'm sorry, could you say that
11 again?  I don't think I understood what you
12 were -- your answer.
13    A.    So whoever that material was
14 approved by in terms of the medical-legal
15 approvers.
16    Q.    Uh-huh.
17    A.    I could see who that was
18 approved by at that time.
19    Q.    Okay.  So just to backtrack a
20 little bit, you said that you discussed
21 procurement with the CDC during the period of
22 these outbreaks.  Correct?
23    A.    [Nods yes.]
24    Q.    Did the CDC --
25       MS. DYKSTRA:  You need to say it

Page 40

COLLEEN DUFFY - CONFIDENTIAL

1
2  verbally.
3       THE WITNESS:  Yes.
4       MS. LERNER:  Thank you.
5  BY MS. LERNER:
6     Q.    Did the CDC ask to change its
7  procurement criteria in any way during this
8  period?
9       MS. DYKSTRA:  Objection.
10       THE WITNESS:  No.
11 BY MS. LERNER:
12    Q.    Did your contracts with the CDC
13 change in any way as a result of the outbreak?
14    A.    No.
15    Q.    Or in any way related to the
16 outbreak?
17    A.    No.
18    Q.    Did you provide free product to
19 the -- free mumps product to the CDC?
20       MS. DYKSTRA:  Objection.
21 BY MS. LERNER:
22    Q.    Mumps vaccine product the CDC?
23    A.    There was a donation that was
24 referenced, yes.
25    Q.    What was that donation?

Page 41

COLLEEN DUFFY - CONFIDENTIAL

1
2     A.    In terms of the quantity you're
3  asking?
4     Q.    Yes, the quantity.
5     A.    I don't recall the exact quantity.
6     Q.    Do you know why that donation
7  was made of mumps vaccine to the CDC?
8     A.    No, I don't.  I don't recall
9  why.  I know there was -- when I looked back
10 because of the recent inquiry, there was
11 reference to purchasing off of the contract
12 as well as them taking some doses off their
13 stockpile and some donation.
14    Q.    But you don't know why the
15 donation was made?
16    A.    No, I didn't look further into
17 it.
18    Q.    Did the CDC request any further
19 concessions from Merck for that Merck mumps
20 vaccine product in the wake of these
21 outbreaks?
22       MS. DYKSTRA:  Objection.
23 BY MS. LERNER:
24    Q.    Did the CDC ask for any
25 discounts on the mumps vaccine?

11 (Pages 38 - 41)

Appx11054

Page 42

1          COLLEEN DUFFY - CONFIDENTIAL
2          MS. DYKSTRA:  Objection.
3          THE WITNESS:  No.
4          MS. LERNER:  I am going to mark
5     as Exhibit 3 a document bearing Bates
6     stamp MRK-KRA00968791.
7                    - - -
8          (Exhibit Duffy-3, Pediatric
9     Advisory Board Meeting Dallas, Texas
10    September 21-22, 2006 Meeting Summary
11    Report, Bates MRK-KRA00968791 -
12    00968822, was marked for identification.)
13                   - - -
14         MS. DYKSTRA:  Do you know if
15    this is from Ms. Duffy's file?
16         MS. LERNER:  I do according to
17    the metadata, and I have a copy if you
18    need to see it.
19         MS. DYKSTRA:  I just wanted to
20    check the date.
21         THE WITNESS:  It is or is not?
22         MS. DYKSTRA:  She said it is.
23    BY MS. LERNER:
24    Q.    It is from your files.
25         MS. DYKSTRA:  Do you want her to

Page 43

1          COLLEEN DUFFY - CONFIDENTIAL
2     read through the whole document before
3     we -- did you have a --
4     BY MS. LERNER:
5     Q.    I guess if you want to read as
6     much as you need to just familiarize yourself
7     with the document generally, but then I'll
8     direct your attention to some specific
9     sections that I'm going to ask questions
10    about.  The section that I'll be asking the
11    questions about relates to the 2006 mumps
12    outbreak.
13    A.    Okay.
14    Q.    Do you recognize this document?
15    A.    No.
16    Q.    It was produced to us as coming
17    from your files.  Is there any reason to think
18    that this didn't come from your files?
19    A.    It could have, but it doesn't
20    mean that I looked at it.
21    Q.    Do you know what the pediatric
22    advisory board meeting is?
23    A.    I know what an advisory board
24    is in general, yes.
25    Q.    And what is that?

Page 44

1          COLLEEN DUFFY - CONFIDENTIAL
2     A.    It's generally when a franchise
3     conducts an advisory board meeting with a
4     group of consultants to get input on strategies.
5     Q.    And does Merck hire this
6     pediatric advisory board?
7     A.    There's a process by which
8     consultants are -- it's not really a hiring
9     process, but there is a process by which
10    they're engaged.
11    Q.    Are they compensated in
12    connection with that engagement?
13    A.    I believe so.
14    Q.    Did you ever -- did you ever
15    interface with this pediatric advisory board
16    at any time?
17    A.    Not at this time.
18    Q.    When did you?
19    A.    I don't know if I engaged with
20    this particular advisory board or not.
21    Q.    Have you engaged with any
22    pediatric advisory board?
23    A.    I may have.
24    Q.    When would that have been?
25    A.    When I would have been on the

Page 45

1          COLLEEN DUFFY - CONFIDENTIAL
2     franchise as a brand leader.
3     Q.    So just refresh my recollection,
4     what time period was that?
5     A.    It was after this time period.
6     Q.    So 2007?
7     A.    Are you talking about, again,
8     for these vaccines, for MMR-containing
9     vaccines?
10    Q.    Yes.
11    A.    It would have been starting in
12    2010 through mid-2012.
13    Q.    How did you engage with a
14    pediatric advisory board between 2010 and
15    2012?
16    A.    If we had a meeting in that
17    time, we would generally share information
18    with them and then get their feedback on it.
19    Q.    You say "if," between 2010 and
20    2012 did you have a meeting with any pediatric
21    advisory board?
22    A.    I don't recall.
23    Q.    But you think in connection with
24    your job responsibilities at that time you may
25    have met with --

12 (Pages 42 - 45)

Appx11055

Page 266

COLLEEN DUFFY - CONFIDENTIAL
1
2  stockpile contract you would deal with Jeanne?
3      A.   Yes.  Yes.
4      Q.   And I'm sorry, what was your
5  title between 2002 and 2005?
6      A.   Executive director customer
7  marketing and planning.
8      Q.   And your title between 2005 and
9  2007?
10     A.   The same I think.
11     Q.   In your experience contracting
12  with the CDC, what factors did the CDC
13  consider in making its decision to purchase
14  Merck's mumps vaccine?
15         MS. DYKSTRA:  Objection.
16         THE WITNESS:  What factors did
17      they consider in purchasing?
18  BY MS. KOURY:
19     Q.   Uh-huh.
20     A.   They considered the national
21  ACIP recommendations and the providers, the
22  VFC providers in the offices really had the
23  option to purchase the vaccines for their use
24  following the ACIP recommendations and the
25  VFC eligibility guidelines.

Page 267

COLLEEN DUFFY - CONFIDENTIAL
1
2      Q.   Were there any other factors the
3  CDC considered in purchasing the vaccine for
4  children, vaccines for children?
5      A.   I guess that would be really a
6  question for the CDC, I think.
7      Q.   Well, in your experience, did
8  you have an understanding of whether the CDC
9  considered the efficacy of the vaccine is
10  important to its purchasing decision?
11     A.   That would have already been
12  determined, I believe, by the FDA and the
13  ACIP in making recommendations.
14     Q.   Is that the same answer as far
15  as the safety of the vaccine?
16     A.   Yes.
17     Q.   What about the potency of the
18  vaccine?
19     A.   Yes.
20     Q.   And the shelf life of the
21  vaccine?
22     A.   [Nods yes.]
23     Q.   So you testified this morning
24  that customers of Merck's mumps vaccine
25  considered efficacy, safety, convenience and

Page 268

COLLEEN DUFFY - CONFIDENTIAL
1
2  pricing in deciding to purchase the mumps
3  vaccine.  Do you recall that testimony?
4      A.   Yes.
5      Q.   Is there any reason to believe
6  that the CDC would not also consider these
7  factors when deciding to purchase Merck's
8  mumps vaccine?
9      A.   Again, with the -- the VFC
10  providers and the state immunization projects
11  are really making the purchases off of the
12  CDC contract so they're making the decision
13  to purchase.
14     Q.   I don't understand your answer.
15     A.   The CDC is not making the
16  actual purchase.
17     Q.   But they are making a decision
18  to purchase the vaccine.  Correct?
19     A.   No.  The VFC providers and
20  their offices and the state health
21  departments are making the actual purchases
22  off of the CDC contract.
23     Q.   And so those VFC providers -- is
24  it your testimony that those VFC providers are
25  only considering the ACIP recommendations in

Page 269

COLLEEN DUFFY - CONFIDENTIAL
1
2  deciding whether to purchase the vaccine?
3      A.   They make their decision based
4  on the ACIP recommendations and the other
5  factors as well that I mentioned.
6      Q.   What are those factors again?
7      A.   Efficacy, safety, convenience,
8  the choice of the manufacturer.  A number of
9  things.
10     Q.   Did you ever discuss efficacy
11  with the CDC during your contract negotiations?
12     A.   Typically, no.  I wouldn't be
13  discussing clinical information.
14     Q.   Would you ever be discussing how
15  well the vaccine worked with the CDC during
16  your contract negotiations?
17     A.   No.
18     Q.   Has the CDC ever represented to
19  Merck that it considered the efficacy of
20  Merck's mumps vaccine important to its
21  decision in entering into the contract?
22     A.   No, I wouldn't be involved in
23  those discussions with the CDC.  I haven't
24  heard that.
25     Q.   You wouldn't be involved in the

68 (Pages 266 - 269)

Page 278

1         COLLEEN DUFFY - CONFIDENTIAL
2      A.    Okay.
3      Q.    So the last paragraph, the
4  heading is "Final Step is Contract Negotiation
5  with CDC for ProQuad®."  And you write, At
6  this point, we expect the only contentious
7  issue to be that of product dating, due to the
8  short dating ProQuad has post-manufacture
9  coupled with the build-up of doses that was
10  done in order to ensure adequate supply
11  assuming a July approval.  To address
12  potential concerns around this issue, we have
13  worked with the FBG and MMD to develop a new
14  operating procedure in the OFCs that will
15  actually separate CDC orders from private
16  sector orders and ensure priority dating,
17  within contractual requirements, for CDC
18  orders.  Even with this step, we will need to
19  negotiate minimum dating of 8 months (versus a
20  CDC standard of 12 months), and we have
21  prepared our discussion points and fall-back
22  position on this issue.
23         So why were you trying to
24  negotiate eight-month shelf life with the CDC?
25         MS. DYKSTRA:  Objection.

Page 279

1         COLLEEN DUFFY - CONFIDENTIAL
2         THE WITNESS:  Well, again, I
3      don't recall the specific issue and
4      whether it transpired that we had to
5      go this route, but it looks like
6      because of the delay that it took to
7      get the contract negotiated and the
8      product inventory that was built up
9      pending the launch of the product, as
10      you build up your inventory, that
11      product is continuing to age.  So
12      those dates are going by.  And so
13      based on the inventory build, and the
14      aging of that inventory, at least
15      initially we needed to negotiate with
16      the CDC a shorter than the standard
17      shelf life for the contract.
18  BY MS. KOURY:
19      Q.    And what was your fallback
20  position that you mention here?
21      A.    I don't know.
22      Q.    Do you recall what your
23  discussion points were?
24      A.    Well, presumably our discussion
25  points would have been to explain this

Page 280

1         COLLEEN DUFFY - CONFIDENTIAL
2  inventory build situation so that they
3  understood why we were in the situation that
4  we were with respect to planning for the
5  launch and the volumes that were prepared for
6  the launch.
7      Q.    Did the CDC accept Merck's
8  request to sell its mumps vaccine with minimum
9  of eight months shelf life left on the
10  product?
11         MS. DYKSTRA:  Objection.
12         THE WITNESS:  Again, I don't
13      know how this issue was resolved but I
14      don't remember any particular problems
15      with the launch of ProQuad in the
16      public sector.
17  BY MS. KOURY:
18      Q.    You don't recall whether the CDC
19  accepted the eight-month shelf life?
20         MS. DYKSTRA:  Objection.
21         THE WITNESS:  I don't recall.
22  BY MS. KOURY:
23      Q.    In your experience contracting --
24  doing contract negotiations with the CDC, did
25  you ever discuss the safety of the Merck's

Page 281

1         COLLEEN DUFFY - CONFIDENTIAL
2  mumps vaccine?
3      A.    Not that I recall.
4      Q.    Has the CDC ever represented to
5  Merck that it considers the safety of its
6  vaccine to be important to its decision to
7  enter into the VFC contract?
8         MS. DYKSTRA:  Objection.
9         THE WITNESS:  No.
10  BY MS. KOURY:
11      Q.    Are you familiar with log TCID?
12      A.    No.
13      Q.    Are you familiar with the
14  vaccine label?
15         MS. DYKSTRA:  Objection.
16         THE WITNESS:  With --
17  BY MS. KOURY:
18      Q.    Merck's --
19      A.    -- the MMR II vaccine label?
20      Q.    Yes.
21      A.    I don't know it as well as I
22  did at one time, but...
23      Q.    You testified earlier that you
24  were responsible for contracting strategies
25  with various customer segments.  Do you recall

71 (Pages 278 - 281)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel*.,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

         *Plaintiffs,*

   v.

MERCK & CO., INC.,

         *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 78

# Morgan Lewis

Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
Tel. +1.215.963.5000
Fax: +1.215.963.5001
www.morganlewis.com

**Lisa C. Dykstra**
215-963-5207
ldykstra@morganlewis.com

May 18, 2015

Thomas R. Frieden MD, MPH
Director
Centers for Disease Control and Prevention (CDC)
1600 Clifton Road
Atlanta, GA 30329-4027

Katherine Norris
CDC FOIA Officer
Attn: FOIA Office, MS: D54
1600 Clifton Rd, N.E.
Fax:  404-235-1852
Atlanta, GA 30333

Office of the General Counsel
Department of Health and Human Services
200 Independence, S.W.
Washington, DC 20201

Dear Dr. Frieden and Ms. Norris:

We are writing to request the assistance of the Centers for Disease Control and Prevention and your partners in obtaining information relevant to a legal claim (described below) against Merck related to our mumps vaccine and our interactions with the CDC in the context of the CDC's purchase and recommendation of Merck's mumps vaccine (and mumps-containing vaccines) (sold as "M-M-R®II" or as ProQuad) for the Vaccines for Children's (VFC) Program. While Merck firmly disputes all of the allegations made in this action and plans to vigorously defend itself, the breadth of the claims being made requires that we gather a significant amount of information regarding the recommendation and procurement processes managed by the CDC related to the mumps vaccine. Towards this end, we are respectfully requesting the specific information detailed below, and very much appreciate your efforts to help us obtain it.  Please let us know if you have any questions or would like to discuss this matter.

Almaty  Astana  Beijing  Boston  Brussels  Chicago  Dallas  Dubai  Frankfurt  Harrisburg  Hartford  Houston  London  Los Angeles  Miami  Moscow
New York  Orange County  Paris  Philadelphia  Pittsburgh  Princeton  San Francisco  Santa Monica  Silicon Valley  Singapore  Tokyo  Washington  Wilmington

May 18, 2015
Page 2

By way of background, in 2010 two individuals filed a complaint against Merck in the United States District Court for the Eastern District of Pennsylvania. *U.S. ex rel. Krahling v. Merck*, No. 10-4374, E.D. Pa. Later, companion cases were filed based on the same underlying facts. *In Re: Merck Mumps Vaccine Antitrust Litigation*, No. 12-03555, E.D. Pa. In brief, relators and plaintiffs allege: (1) that Merck made and continues to make misrepresentations about the efficacy of the mumps vaccine and engages in efforts to conceal the diminished efficacy of the vaccine; (2) that the M-M-R®II FDA-approved product label is false because it cites "outdated or unidentified studies" not reflective of what Merck knows today about the mumps vaccine; and (3) that Merck's labeling misrepresents the vaccine's efficacy and improperly influenced the CDC's decision to purchase the vaccine. Relators' allegations are almost exclusively based on their involvement in a 2001 study of the mumps vaccine that Merck conducted to evaluate different potencies of the mumps component of M-M-R®II.

We note that the FDA and the DOJ both investigated the relators' allegations. Initially, in 2001, relators raised their allegations to the FDA. After receiving the allegations, FDA inspected Merck's lab and fully evaluated the allegations. The FDA issued a Form 483 identifying certain procedural and documentary concerns, which Merck responsibly resolved to the FDA's satisfaction. Almost ten years later, relators raised the same allegations in a False Claims Act complaint. DOJ investigated the allegations, and, after a thorough investigation, DOJ declined to intervene in relators' case. Relators nonetheless continue to pursue their claims.

Now, in order to defend itself in the pending actions, pursuant to 45 C.F.R. § 2 *et. seq.*, Merck is respectfully requesting documents identified below, and may seek testimony, for the purposes of disputing relators' and plaintiffs' claims and evaluating the information available to CDC when it purchased the mumps vaccine. The requests also seek documents relating to CDC's knowledge regarding mumps, mumps outbreaks, Merck's mumps vaccines, and other non-Merck mumps vaccines, including the basis for statements regarding the efficacy of Merck's mumps vaccines.

For the purposes of the following requests, we are defining Merck's mumps vaccines as including MumpsVax, MMR or MMR®II, MMR-V and/or ProQuad. Other mumps vaccines should be interpreted to include mumps vaccines manufactured by any entity other than Merck, even if those vaccines are not currently licensed by the FDA. Merck should be interpreted to mean Merck & Co., Inc. or Merck Vaccines or Merck Vaccines Division. Unless otherwise specified, the time period for these requests should be construed as January 1, 1998 to the date of this letter.

Merck agrees to provide reimbursement for the costs associated with the collection and production of documents responsive to these requests. Additionally, if it would be helpful to discuss these

May 18, 2015
Page 3

requests and the information CDC may have that relate to these requests, Merck's counsel is available to discuss those issues at your convenience.

Sincerely,

*Lisa C. Dykstra*

Lisa C. Dykstra

cc:    Joel M. Sweet, Assistant United States Attorney
       Margaret L. Hutchinson, Assistant United States Attorney
       Gerald B. Sullivan, Assistant United States Attorney

May 18, 2015
Page 4

### Merck's Requests to CDC

The requests below pertain to the contracts between Merck and CDC from 1998 to the present through which CDC purchased Merck's mumps vaccine for use with pediatric patients. Relevant contracts include, but are not limited to, the following:

| Contract No. | Award/ Effective Date | Solicitation Number | Contracting Officer | Project Officers |
|---|---|---|---|---|
| 200-2005-1533 | 4/1/2005 | 2005-N-01706 | Jeffrey Napier | Rex Ellington, Project Officer ("PO") |
| 200-2006-15819 | 4/1/2006 | 2006-N-08323 | Jeffrey Napier | Rex Ellington, PO |
| 200-2007-20306 | 4/16/2007 | 2007-N-09211 | Nancy Norton | Deberal Denson, PO |
| 200-2008-24718 | 4/1/2008 | | Nancy Norton | Deberal Denson, PO |
| 200-2009-29370 | 4/1/2009 | 2009-N-11074 | Nancy Norton | Deberal Denson, PO |
| 200-2010-34037 | 4/1/2009 | | Nancy Norton | Deberal Denson, Contracting Officer Technical Representative ("COTR") |
| 200-2011-38200 | 4/1/2011 | | Nancy Norton | No COTR specified in the contract. |
| 200-2012-50133 | 4/1/2012 | 2012-N-14228 | Nancy Norton | No Contracting Officer Representative specified in the contract. |

**General**

1.    With respect to mumps vaccine generally, please provide:

    a.    Documents related to the efficacy, immunogenicity, effectiveness, or potency of Merck's mumps vaccine.

    b.    Documents related to whether the label for Merck's mumps vaccine is accurate and/or adequate.

May 18, 2015
Page 5

    c.  Documents related to testing of Merck's mumps vaccine and whether any additional testing of Merck's mumps vaccine should be conducted.

    d.  Documents related to the efficacy, immunogenicity, or effectiveness of GSK's Priorix vaccine.

    e.  Results and analysis of any testing by or sponsored by CDC regarding the efficacy, immunogenicity, effectiveness or potency of Merck's mumps vaccine, including any studies, testing, assessments or evaluation undertaken in connection with any mumps outbreak between 1998 and the present.

    f.  Documents regarding CDC's understanding of mumps activity cycles and preparations for or expectations of additional mumps outbreaks.

    g.  Documents reflecting CDC's understanding of the cause of mumps outbreaks.

    h.  Information related to the preparation of CDC talking points, briefing binders for CDC or other Government officials, public statements, or other action plans related to investigating and responding to mumps outbreaks, to the extent such materials discuss (i) the potency, efficacy, effectiveness, immunogenicity and/or seroconversion rates of Merck's mumps vaccine or (ii) any concerns about Merck's mumps vaccine.

**CDC's Contracts with Merck and CDC's Purchase of the MMRII Vaccine**

2.    With respect to the contracts between Merck and CDC and CDC's purchasing decisions, please provide:

    a.  Documents related to CDC's decision to purchase Merck's mumps vaccine, including, but not limited to:

        i.  CDC's solicitation(s) for mumps vaccines.

        ii.  Documents reflecting CDC's analysis of offers provided in response to the solicitations for mumps vaccines.

    b.  Documents related to any consideration by CDC regarding purchasing a mumps vaccine other than Merck's mumps vaccine.

    c.  Documents related to any representations made by Merck or CDC during the negotiations or performance of any contract between Merck and CDC that related to

May 18, 2015
Page 6

                  Merck's mumps vaccine, the efficacy, effectiveness, immunogenicity or potency of Merck's mumps vaccine, or Merck's ability to comply with the CDC contract.

    d.  Documents related to what price CDC should pay for Merck's mumps vaccine.

    e.  Documents regarding any discussion of the Duty to Warn contract provision in any of the contracts, including any information CDC relied upon when including that provision in the contract(s) and documents available to CDC when making statements about the safety or efficacy of Merck's mumps vaccine.

    f.  Any information received or analyzed by CDC regarding compliance with contract requirements related to the licensing of the mumps vaccine or manufacturing in conformance with current Good Manufacturing Practice (cGMP) regulations.

    g.  Documents that the CDC exchanged with the FDA or any other Government agency regarding Merck's compliance with its obligations under its CDC contract(s).

    h.  Documents exchanged between CDC and the FDA or any other Government agency regarding the efficacy, effectiveness, potency or immunogenicity of Merck's mumps vaccine purchased through the CDC contract(s).

**ACIP Information**

3.      Please produce documents provided to or received from ACIP and/or the ACIP Working Group on Measles, Mumps, and Rubella, regarding the efficacy, immunogenicity, effectiveness, or potency of Merck's mumps vaccine or regarding mumps outbreaks.

**Immunization Action Coalition**

4.      With respect to the Immunization Action Coalition, please produce:

    a.  Documents related to financial support from CDC to IAC for educating HCPs about vaccine recommendations.

    b.  Documents related to CDC's technical review of IAC educational materials related to Merck's mumps vaccine, including, but not limited to, data or comments regarding mumps outbreaks and/or the efficacy, effectiveness, potency, or immunogenicity of Merck's mumps vaccine.

May 18, 2015
Page 7

    c.   Documents related to CDC's technical review of IAC Mumps Q&As (available here: http://www.immunize.org/catg.d/p4211.pdf): "How effective is this vaccine? Postlicensure studies have demonstrated one dose of MMR vaccine is 78% (range, 45%-97%) effective for prevention of mumps. The second dose of MMR is intended to produce immunity in those who did not respond to the first dose, but a very small percentage of people may not be protected even after a second dose."

    d.   Any document or statement by the Immunization Action Coalition to healthcare providers or the public that Merck's mumps vaccine is 95 percent effective.

    e.   Any document or statement by the Immunization Action Coalition to healthcare providers or the public that Merck's mumps vaccine was or is at least 95 percent effective.

**Third Dose/New Vaccine**

5.    Documents related to any analysis by CDC of whether a third dose of the mumps vaccine should be added to the Childhood Immunization Schedule.

6.    Documents related to any analysis by CDC of whether an additional dose of Merck's mumps vaccine should be recommended as a response to, or otherwise in connection with, mumps outbreaks.

7.    Documents regarding CDC support – research, financial, or other public support – for the development of a new mumps vaccine.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* -COMM. JOURNAL- \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* DATE MAY-18-2015 \*\*\*\*\* TIME 17:16 \*\*\*\*\*\*\*\*

```
        MODE = MEMORY TRANSMISSION              START=MAY-18 17:13     END=MAY-18 17:16
        FILE NO.=601

   STN NO.    COMM.    ABBR NO.     STATION NAME/TEL. NO.     PAGES    DURATION

    001        OK       ☎          0069#914042351852#        008/008 00:01:24
```

-MORGAN LEWIS PHILADELPHIA-

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* -13FLR #2 - 595   - \*\*\*\*\*\* -       215 963 5001- \*\*\*\*\*\*\*\*\*\*

Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
TEL. +1.215.963.5000
FAX: +1.215.963.5001
eFax: 877.432.9652
www.morganlewis.com

**Morgan Lewis**

| SEND TO | | | | | | |
|---|---|---|---|---|---|---|
| Name: | Katherine Norris, CDC | | Firm: | FOIA Office | | |
| FAX #: | FOIA Officer | | Telephone #: | | | |
| | 404-235-1852 | | | | | |

| FROM | | | | | | |
|---|---|---|---|---|---|---|
| Name: | Lisa C. Dykstra | | Floor: | 13 | | |
| Operator Sending: | Judy | | Telephone # | 215-963-5207 | | |
| FAX #: | | Date Sent: | May 18, 2015 | | No of Pages: (including cover page) | 8 |

**FAX MESSAGE**

THE INFORMATION CONTAINED IN THIS FAX MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE NAMED RECIPIENT(S). THIS MESSAGE MAY BE AN ATTORNEY-CLIENT COMMUNICATION AND AS SUCH IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR AN AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT YOU HAVE RECEIVED THIS DOCUMENT IN ERROR AND THAT ANY REVIEW, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US BY MAIL. THANK YOU.

COMMENTS

**Appx11066**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*, STEPHEN A. KRAHLING and JOAN A. WLOCHOWSKI, <br>             *Plaintiffs,* <br>     v. <br> MERCK & CO., INC., <br>             *Defendant.* | Civil Action No. 10-4374 (CDJ) <br><br> **CONTAINS "CONFIDENTIAL" AND "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" MATERIAL PURSUANT TO PROTECTIVE ORDER** |

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 79

 Centers for Disease
Control and Prevention

Vaccine Recommendations and Guidelines of the ACIP

# MMR ACIP Vaccine Recommendations (Measles, Mumps and Rubella)

Advisory Committee on Immunization Practices (ACIP)

**Published in Morbidity and Mortality Weekly Report (*MMWR*)**

The Advisory Committee on Immunization Practices (ACIP) provides advice and guidance to the Director of the CDC regarding use of vaccines and related agents for control of vaccine-preventable diseases in the civilian population of the United States. Recommendations made by the ACIP are reviewed by the CDC Director and, if adopted, are published as official CDC/HHS recommendations in the Morbidity and Mortality Weekly Report (MMWR).

## CURRENT MMR Vaccine Recommendations

- *MMWR*, January 12, 2018, Vol 67(1);33–38
  Recommendations of the Advisory Committee on Immunization Practices for Use of a Third Dose of Mumps Virus-Containing Vaccine in Persons at Increased Risk for Mumps During an Outbreak
  Print version 🅿️ [6 pages]
- *MMWR*, June 14, 2013, Vol 62, #RR-04
  Prevention of **Measles, Rubella, Congenital Rubella Syndrome, and Mumps**, 2013 Summary: Recommendations of the ACIP
  Print version 🅿️ [40 pages]
- See also:
  - ACIP-VFC Resolution
  - MMRV ACIP Recommendations (includes varicella)

## ARCHIVED Historical MMR Immunization Publications

For your convenience, these archived publications can be used for historical and research purposes.

- *MMWR*, June 9, 2006, Vol 55, #22
  Notice to Readers: Updated Recommendations of the Advisory Committee on Immunization Practices (ACIP) for the Control and Elimination of Mumps
  Print version 🅿️ [24 pages]
- *MMWR*, December 14, 2001, Vol 50, #49
  Notice to Readers: Revised ACIP Recommendation for Avoiding Pregnancy After Receiving a Rubella-Containing Vaccine
  Print version 🅿️ [28 pages]
- *MMWR*, May 22, 1998, Vol 47, #RR-8
  MMR—Vaccine Use and Strategies for Elimination of Measles, Rubella, and Congenital Rubella Syndrome and Control of Mumps (.pdf version not available)

Page last reviewed: November 21, 2014

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel*.,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

<em>Plaintiffs,</em>

v.

MERCK & CO., INC.,

<em>Defendant.</em>

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 80

# Vaccines Licensed for Use in the United States

| Product Name | Trade Name |
| --- | --- |
| Adenovirus Type 4 and Type 7 Vaccine, Live, Oral (/vaccines-blood-biologics/approved-products/adenovirus-type-4-and-type-7-vaccine-live-oral) | No Trade Name |
| Anthrax Vaccine Adsorbed (/vaccines-blood-biologics/approved-products/anthrax-vaccine-adsorbed) | Biothrax |
| BCG Live (/vaccines-blood-biologics/approved-products/bcg-live) | BCG Vaccine |
| BCG Live (/vaccines-blood-biologics/approved-products/bcg-live) | TICE BCG |
| Cholera Vaccine Live Oral (/vaccines-blood-biologics/approved-products/vaxchora) | Vaxchora |
| Dengue Tetravalent Vaccine, Live (/vaccines-blood-biologics/dengvaxia) | DENGVAXIA |
| Diphtheria & Tetanus Toxoids Adsorbed (/vaccines-blood-biologics/approved-products/diphtheria-and-tetanus-toxoids-adsorbed) | No Trade Name |
| Diphtheria & Tetanus Toxoids & Acellular Pertussis Vaccine Adsorbed (/vaccines-blood-biologics/approved-products/infanrix) | Infanrix |
| Diphtheria & Tetanus Toxoids & Acellular Pertussis Vaccine Adsorbed (/vaccines-blood-biologics/approved-products/daptacel) | DAPTACEL |
| Diphtheria & Tetanus Toxoids & Acellular Pertussis Vaccine Adsorbed, Hepatitis B (recombinant) and Inactivated Poliovirus Vaccine Combined (/vaccines-blood-biologics/approved-products/diphtheria-and-tetanus-toxoids-and-acellular-pertussis-adsorbed-hepatitis-b-recombinant-and) | Pediarix |
| Diphtheria and Tetanus Toxoids and Acellular Pertussis Adsorbed and Inactivated Poliovirus Vaccine (/vaccines-blood-biologics/approved-products/diphtheria-and-tetanus-toxoids-and-acellular-pertussis-adsorbed-and-inactivated-poliovirus-vaccine) | KINRIX |
| Diphtheria and Tetanus Toxoids and Acellular Pertussis Adsorbed and Inactivated Poliovirus Vaccine (/vaccines-blood-biologics/approved-products/diphtheria-and-tetanus-toxoids-and-acellular-pertussis-adsorbed-and-inactivated-poliovirus-vaccine) | Quadracel |

Appx11070

| Product Name | Trade Name |
| --- | --- |
| Diphtheria and Tetanus Toxoids and Acellular Pertussis Adsorbed, Inactivated Poliovirus, Haemophilus b Conjugate [Meningococcal Protein Conjugate] and Hepatitis B [Recombinant] Vaccine (/vaccines-blood-biologics/vaxelis) | VAXELIS |
| Diphtheria and Tetanus Toxoids and Acellular Pertussis Adsorbed, Inactivated Poliovirus and Haemophilus b Conjugate (Tetanus Toxoid Conjugate) Vaccine (/vaccines-blood-biologics/approved-products/diphtheria-and-tetanus-toxoids-and-acellular-pertussis-adsorbed-inactivated-poliovirus-and) | Pentacel |
| Haemophilus b Conjugate Vaccine (Meningococcal Protein Conjugate) (/vaccines-blood-biologics/approved-products/haemophilus-b-conjugate-vaccine-meningococcal-protein-conjugate) | PedvaxHIB |
| Haemophilus b Conjugate Vaccine (Tetanus Toxoid Conjugate) (/vaccines-blood-biologics/approved-products/haemophilus-b-conjugate-vaccine-tetanus-toxoid-conjugate) | ActHIB |
| Haemophilus b Conjugate Vaccine (Tetanus Toxoid Conjugate) (/vaccines-blood-biologics/approved-products/hiberix) | Hiberix |
| Hepatitis A Vaccine, Inactivated (/vaccines-blood-biologics/approved-products/havrix) | Havrix |
| Hepatitis A Vaccine, Inactivated (/vaccines-blood-biologics/approved-products/vaqta) | VAQTA |
| Hepatitis A Inactivated and Hepatitis B (Recombinant) Vaccine (/vaccines-blood-biologics/approved-products/twinrix) | Twinrix |
| Hepatitis B Vaccine (Recombinant) (/vaccines-blood-biologics/approved-products/recombivax-hb) | Recombivax HB |
| Hepatitis B Vaccine (Recombinant) (/vaccines-blood-biologics/approved-products/engerix-b) | Engerix-B |
| Hepatitis B Vaccine (Recombinant), Adjuvanted (/vaccines-blood-biologics/approved-products/heplisav-b) | HEPLISAV-B |
| Human Papillomavirus Quadrivalent (Types 6, 11, 16, 18) Vaccine, Recombinant (/vaccines-blood-biologics/approved-products/human-papillomavirus-vaccine) | Gardasil |

Appx11071

| Product Name | Trade Name |
|---|---|
| Human Papillomavirus 9-valent Vaccine, Recombinant (/vaccines-blood-biologics/approved-products/gardasil-9) | Gardasil 9 |
| Human Papillomavirus Bivalent (Types 16, 18) Vaccine, Recombinant (/vaccines-blood-biologics/approved-products/cervarix) | Cervarix |
| Influenza A (H1N1) 2009 Monovalent Vaccine (/vaccines-blood-biologics/approved-products/influenza-h1n1-2009-monovalent-vaccine-csl-limited) | No Trade Name |
| Influenza A (H1N1) 2009 Monovalent Vaccine (/vaccines-blood-biologics/approved-products/influenza-h1n1-2009-monovalent-vaccine-medimmune-llc) | No Trade Name |
| Influenza A (H1N1) 2009 Monovalent Vaccine (/vaccines-blood-biologics/approved-products/influenza-h1n1-2009-monovalent-vaccine-id-biomedical-corporation-quebec) | No Trade Name |
| Influenza A (H1N1) 2009 Monovalent Vaccine (/vaccines-blood-biologics/approved-products/influenza-h1n1-2009-monovalent-vaccine-novartis-vaccines-and-diagnostics-limited) | No Trade Name |
| Influenza A (H1N1) 2009 Monovalent Vaccine (/vaccines-blood-biologics/approved-products/influenza-h1n1-2009-monovalent-vaccine-sanofi-pasteur-inc) | No Trade Name |
| Influenza Virus Vaccine, H5N1 (/vaccines-blood-biologics/approved-products/influenza-virus-vaccine-h5n1-national-stockpile) (for National Stockpile) | No Trade Name |
| Influenza A (H5N1) Virus Monovalent Vaccine, Adjuvanted (/vaccines-blood-biologics/approved-products/influenza-h5n1-virus-monovalent-vaccine-adjuvanted) | No Trade Name |
| Influenza Vaccine, Adjuvanted (/vaccines-blood-biologics/approved-products/fluad) | FLUAD |
| Influenza Vaccine (/vaccines-blood-biologics/approved-products/afluria-quadrivalent) | AFLURIA QUADRIVALENT |
| Influenza Vaccine (/vaccines-blood-biologics/approved-products/flucelvax-quadrivalent) | Flucelvax Quadrivalent |

Appx11072

| Product Name | Trade Name |
|---|---|
| Influenza Virus Vaccine (Trivalent, Types A and B) (/vaccines-blood-biologics/approved-products/afluria) | Afluria |
| Influenza Virus Vaccine (Trivalent, Types A and B) (/vaccines-blood-biologics/approved-products/flulaval) | FluLaval |
| Influenza Vaccine, Live, Intranasal (Trivalent, Types A and B) (/vaccines-blood-biologics/approved-products/flumist) | FluMist |
| Influenza Virus Vaccine (Trivalent, Types A and B) (/vaccines-blood-biologics/approved-products/fluarix) | Fluarix |
| Influenza Virus Vaccine (Trivalent, Types A and B) (/vaccines-blood-biologics/approved-products/fluvirin) | Fluvirin |
| Influenza Virus Vaccine (Trivalent, Types A and B) (/vaccines-blood-biologics/approved-products/agriflu) | Agriflu |
| Influenza Virus Vaccine (Trivalent, Types A and B) (/vaccines-blood-biologics/approved-products/fluzone-fluzone-high-dose-and-fluzone-intradermal) | Fluzone, Fluzone High-Dose and Fluzone Intradermal |
| Influenza Virus Vaccine (Trivalent, Types A and B) (/vaccines-blood-biologics/approved-products/flucelvax) | Flucelvax |
| Influenza Vaccine (Trivalent) (/vaccines-blood-biologics/approved-products/flublok) | Flublok |
| Influenza Vaccine (Quadrivalent) (/vaccines-blood-biologics/approved-products/flublok-quadrivalent) | Flublok Quadrivalent |
| Influenza Vaccine,Live, Intranasal (Quadrivalent, Types A and Types B) (/vaccines-blood-biologics/approved-products/flumist-quadrivalent) | FluMist Quadrivalent |

Appx11073

| Product Name | Trade Name |
|---|---|
| Influenza Virus Vaccine (Quadrivalent, Types A and Types B) (/vaccines-blood-biologics/approved-products/fluarix-quadrivalent) | Fluarix Quadrivalent |
| Influenza Virus Vaccine (Quadrivalent, Types A and Types B) (/vaccines-blood-biologics/approved-products/fluzone-quadrivalent) | Fluzone Quadrivalent |
| Influenza Virus Vaccine (Quadrivalent, Types A and Types B) (/vaccines-blood-biologics/approved-products/flulaval-quadrivalent) | FluLaval Quadrivalent |
| Japanese Encephalitis Virus Vaccine, Inactivated, Adsorbed (/vaccines-blood-biologics/approved-products/japanese-encephalitis-vaccine-inactivated-adsorbed) | Ixiaro |
| Measles and Mumps Virus Vaccine, Live | M-M-Vax |
| Measles, Mumps, and Rubella Virus Vaccine, Live (/vaccines-blood-biologics/approved-products/measles-mumps-and-rubella-virus-vaccine-live) | M-M-R II |
| Measles, Mumps, Rubella and Varicella Virus Vaccine Live (/vaccines-blood-biologics/approved-products/measles-mumps-rubella-and-varicella-virus-vaccine-live) | ProQuad |
| Meningococcal (Groups A, C, Y, and W-135) Oligosaccharide Diphtheria CRM197 Conjugate Vaccine (/vaccines-blood-biologics/approved-products/menveo) | Menveo |
| Meningococcal (Groups A, C, Y and W-135) Polysaccharide Diphtheria Toxoid Conjugate Vaccine (/vaccines-blood-biologics/approved-products/meningococcal-groups-c-y-and-w-135-polysaccharide-diphtheria-toxoid-conjugate-vaccine) | Menactra |
| Meningococcal Group B Vaccine (/vaccines-blood-biologics/approved-products/bexsero) | BEXSERO |
| Meningococcal Group B Vaccine (/vaccines-blood-biologics/approved-products/trumenba) | TRUMENBA |
| Meningococcal Polysaccharide Vaccine, Groups A, C, Y and W-135 Combined (/vaccines-blood-biologics/approved-products/meningococcal-polysaccharide-vaccine-groups-c-y-and-w-135-combined) | Menomune-A/C/Y/W-135 |

Appx11074

| Product Name | Trade Name |
| --- | --- |
| Plague Vaccine | No trade name |
| Pneumococcal Vaccine, Polyvalent (/vaccines-blood-biologics/approved-products/pneumococcal-vaccine-polyvalent) | Pneumovax 23 |
| Pneumococcal 13-valent Conjugate Vaccine (/vaccines-blood-biologics/approved-products/pneumococcal-13-valent-conjugate-vaccine-diphtheria-crm197-protein) (Diphtheria CRM$_{197}$ Protein) | Prevnar 13 |
| Poliovirus Vaccine Inactivated (Human Diploid Cell) | Poliovax |
| Poliovirus Vaccine Inactivated (Monkey Kidney Cell) (/vaccines-blood-biologics/approved-products/poliovirus-vaccine-inactivated-monkey-kidney-cell) | IPOL |
| Rabies Vaccine (/vaccines-blood-biologics/approved-products/rabies-vaccine) | Imovax |
| Rabies Vaccine (/vaccines-blood-biologics/approved-products/rabavert-rabies-vaccine) | RabAvert |
| Rabies Vaccine Adsorbed | No Trade Name |
| Rotavirus Vaccine, Live, Oral (/vaccines-blood-biologics/approved-products/rotavirus-vaccine-live-oral) | ROTARIX |
| Rotavirus Vaccine, Live, Oral, Pentavalent (/vaccines-blood-biologics/approved-products/rotateq) | RotaTeq |
| Smallpox (Vaccinia) Vaccine, Live (/vaccines-blood-biologics/approved-products/smallpox-vaccinia-vaccine-live) | ACAM2000 |
| Tetanus & Diphtheria Toxoids, Adsorbed (/vaccines-blood-biologics/approved-products/tetanus-diphtheria-toxoids-adsorbed) | TDVAX |
| Tetanus & Diphtheria Toxoids Adsorbed for Adult Use (/vaccines-blood-biologics/approved-products/tenivac) | TENIVAC |
| Tetanus Toxoid Adsorbed (/vaccines-blood-biologics/approved-products/diphtheria-and-tetanus-toxoids-adsorbed) | No Trade Name |
| Tetanus Toxoid, Reduced Diphtheria Toxoid and Acellular Pertussis Vaccine, Adsorbed (/vaccines-blood-biologics/approved-products/tetanus-toxoid-reduced-diphtheria-toxoid-and-acellular-pertussis-vaccine-adsorbed) | Adacel |

Appx11075

| Product Name | Trade Name |
| --- | --- |
| Tetanus Toxoid, Reduced Diphtheria Toxoid and Acellular Pertussis Vaccine, Adsorbed (/vaccines-blood-biologics/approved-products/tetanus-toxoid-reduced-diphtheria-toxoid-and-acellular-pertussis-vaccine-adsorbed) | Boostrix |
| Typhoid Vaccine Live Oral Ty21a (/vaccines-blood-biologics/approved-products/vivotif) | Vivotif |
| Typhoid Vi Polysaccharide Vaccine (/vaccines-blood-biologics/approved-products/typhim-vi) | TYPHIM Vi |
| Varicella Virus Vaccine Live (/vaccines-blood-biologics/approved-products/varivax) | Varivax |
| Yellow Fever Vaccine (/vaccines-blood-biologics/approved-products/yellow-fever-vaccine) | YF-Vax |
| Zoster Vaccine, Live, (Oka/Merck) (/vaccines-blood-biologics/approved-products/zoster-vaccine-live) | Zostavax |
| Zoster Vaccine Recombinant, Adjuvanted (/vaccines-blood-biologics/vaccines/shingrix) | SHINGRIX |

Appx11076

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel*.,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

*Plaintiffs,*

v.

MERCK & CO., INC.,

*Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 81

 Centers for Disease Control and Prevention
CDC 24/7: Saving Lives, Protecting People™

# Mumps

# Mumps Vaccination

## Protect Your Child with Mumps Vaccine

Mumps vaccine is the best way to protect your child against mumps. It is usually given as part of a combination vaccine that protects against three diseases: measles, mumps, and rubella (MMR). This vaccine is only licensed for use in children who are 12 months through 12 years of age. Children should get two doses of MMR vaccine:

- the first dose at 12 through 15 months of age, and
- the second dose at 4 through 6 years of age.

The MMR vaccine is safe and effective. Most children don't have any side effects from the vaccine. The side effects that do occur are usually very mild, such as a fever or rash.

Your child's doctor may also offer the MMRV vaccine, a combination vaccine that protects against four diseases: measles, mumps, rubella, and varicella (chickenpox). Talk to your child's healthcare professional for help deciding which vaccine to use.

## Protect Yourself Against Mumps

Anyone born during or after 1957 who has never had mumps or has never been vaccinated is at risk for mumps. They should get at least one dose of the MMR vaccine.

Teens and adults should also be up to date on MMR vaccinations. Information on locating vaccine records.

College students who do not have evidence of immunity need two doses of MMR vaccine, separated by at least 28 days. Other adults at higher risk, such as international travelers and healthcare professionals, should also get two doses of MMR vaccine.

MMR vaccine is safe and effective. A person with two doses of MMR vaccine has about an 88% reduction in risk for mumps; a person with one dose has a 78% reduction in risk for mumps.

DON'T LET MUMPS SPOIL YOUR FUN

MMR VACCINATION IS THE BEST PROTECTION AGAINST MUMPS!

ASK YOUR STUDENT HEALTH SERVICES ABOUT WHERE YOU CAN GET VACCINATED.

Parents, as children head off to college, ensure they are up to date on their MMR vaccine. Learn more about mumps cases and outbreaks.

## Mumps Outbreaks Still Occur

After the U.S. mumps vaccination program started in 1967, there has been a more than 99% decrease in mumps cases in the United States. However, mumps outbreaks still occur, particularly in settings where people have close, prolonged contact, such as universities and close-knit communities. Examples of this include people who:

Appx11078

- are strongly connected by social, cultural, or family ties
- participate in communal activities
- share a common living space

During these outbreaks, people who previously had one or two doses of MMR vaccine can get mumps too. Experts aren't sure why vaccinated people still get mumps; it could be that their immune system didn't respond as well as it should have to the vaccine. Or their immune system's ability to fight the infection decreased over time. Disease symptoms are milder and complications are less frequent in vaccinated people. Also, high vaccination coverage helps to limit the size, duration, and spread of mumps outbreaks. So it's still very important to be up to date on MMR vaccine.

During a mumps outbreak, public health authorities might recommend an additional dose of MMR vaccine for people who belong to groups at increased risk for getting mumps. These groups are usually those who are likely to have close contact, such as sharing sport equipment or drinks, kissing, or living in close quarters, with a person who has mumps. Your local public health authorities or institution will notify you if you are at increased risk and should receive this dose. If you already have two doses of MMR, it is not necessary to seek out vaccination unless the authorities tell you that you are part of this group.

## Mumps Can Be Serious



Mumps is a contagious disease that is caused by a virus. It typically starts with fever, headache, muscle aches, tiredness, and loss of appetite. Then, most people will have swelling of their salivary glands. This is what causes the puffy cheeks and a tender, swollen jaw.

In most people, mumps is pretty mild. But it can cause serious, long-lasting problems including:

- orchitis (swelling of the testicles) in males who have reached puberty
- oophoritis (swelling of the ovaries) and/or mastitis (swelling of the breasts) in females who have reached puberty
- encephalitis (swelling of the brain)
- meningitis (swelling of the tissue covering the brain and spinal cord)
- loss of hearing (temporary or permanent)

Mumps is best known for the puffy cheeks and swollen jaw that it causes. This is a result of swollen salivary glands. It is sometimes referred to as parotitis when it infects the parotid salivary gland.

In rare cases, mumps is deadly.

## Paying for Mumps Vaccine

Most health insurance plans cover the cost of vaccines. However, you may want to check with your insurance provider before going to the doctor. Learn how to pay for vaccines.

If you don't have health insurance, or if your insurance does not cover vaccines for your child, the Vaccines for Children (VFC) Program may be able to help. This program helps families of eligible children who might not otherwise have access to vaccines. To find out if your child is eligible, visit the VFC website or ask your child's doctor. You can also contact your state VFC coordinator.

| More Information |
|---|
| |

About Mumps

What Everyone Should Know

MMR Vaccination: Information for Healthcare Professionals

Mumps Fact Sheet

Mumps Cases and Outbreaks

MMR (Measles, Mumps, & Rubella) Vaccine: Vaccine Information Statement English or other languages ☐

Measles, Mumps, and Rubella (MMR) Vaccine Safety

Brief Answers to Common Questions: Vaccines for Children Program (VFC)

Parents' Guide to Childhood Immunizations

Page last reviewed: March 8, 2019
Content source: National Center for Immunization and Respiratory Diseases (NCIRD), Division of Viral Diseases

Appx11080

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel*.,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

*Plaintiffs,*

v.

MERCK & CO., INC.,

*Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 82

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel., STEPHEN A. KRAHLING and JOAN WLOCHOWSKI, Plaintiffs, v. MERCK & CO., INC., Defendant. | Civil Action No. 10-4374 (CDJ) |
| IN RE: MERCK MUMPS VACCINE ANTITRUST LITIGATION | Master File No. 2:12-cv-03555 (CDJ) |

**EXPERT REPORT OF THOMAS G. MCGUIRE, PH.D.**



106.    As shown in Table 2 above, Merck and GSK have a similar portfolio of child vaccines; both sell hepatitis A, hepatitis B, hib, and rotavirus vaccines. The portfolios differ in that GSK sells DTaP, polio, and influenza vaccines and Merck sells pneumococcus, MMR, and varicella vaccines. For older adults and children, both companies sell a vaccine for zoster virus[151] (also known as shingles); GSK sells meningococcal vaccines; and Merck sells a human papillomavirus vaccine.[152] MMR was one of the few vaccines Merck had, but GSK did not. If GSK improved its portfolio by receiving approval of its MMR vaccine, it might put additional pressure on Merck to reduce the price of not just MMR, but other vaccines in its portfolio. For example, Merck might increase discounts provided for purchasing its bundle of vaccines. To be conservative, I have not included this type of price competition in my calculations.

## VII.    CALCULATION OF PAYMENTS BY PUBLIC PURCHASES

107.    Based on instructions from Relators' counsel, I have performed two calculations relating to the purchases of MMR-II and ProQuad under Merck's public contracts with the CDC: 1) total payments the CDC made to Merck for MMR-II and ProQuad from 2004-2017 and 2) total payments the CDC made to Merck attributeable to just the mumps portion of MMR-II and ProQuad from 2004-2017. In addition, Relators' counsel has instructed me to calculate penalties for each claim for payment or invoice Merck submitted to the CDC for purchase of MMR-II and ProQuad from 2004 through 2017, assuming a penalty would be applied for each such claim or invoice.

---

[151] GSK recently obtained FDA approval for a shingles vaccine. See "Shingrix approved in the US for prevention of shingles in adults aged 50 and over," October 23, 2017, available at https://www.gsk.com/en-gb/media/press-releases/shingrix-approved-in-the-us-for-prevention-of-shingles-in-adults-aged-50-and-over/.

[152] CDC, "Archived CDC Vaccine Price List as of January 1, 2018," available at https://www.cdc.gov/vaccines/programs/vfc/awardees/vaccine-management/price-list/2018/2018-01-01.html.

GSK had an approved human papillomavirus vaccine, but exited the U.S. market in 2016 because of "very low market demand." See E. Sagonowsky, "GSK exits U.S. market with its HPV vaccine Cervarix," October 21, 2016, available at https://www.fiercepharma.com/pharma/gsk-exits-u-s-market-its-hpv-vaccine-cervarix.

**Appx11083**

108.   First, I summed all payments to Merck under its public contract with the CDC for Mumps Vaccine.[153] Total payments for MMR-II and ProQuad are summed by quarter for the period 2004Q1 to 2015Q4 in Attachment E.1. Table 5 provides the annual totals for the period 2004-2017, where I again calculate extrapolated values for the years 2016 and 2017 (using the technique described above).

TABLE 5
SUMMARY OF ALL PAYMENTS TO MERCK
UNDER THE CDC PUBLIC CONTRACT 2004-2017

| Year | MMR-II | ProQuad | Total |
|------|--------|---------|-------|
| 2004 | $83,016,886 | $0 | $83,016,886 |
| 2005 | $79,769,849 | $0 | $79,769,849 |
| 2006 | $73,030,406 | $132,196,168 | $205,226,575 |
| 2007 | $56,619,814 | $132,723,565 | $189,343,379 |
| 2008 | $94,141,840 | $8,911 | $94,150,750 |
| 2009 | $90,363,782 | $0 | $90,363,782 |
| 2010 | $90,284,984 | $51,570,537 | $141,855,521 |
| 2011 | $87,949,141 | $8,759,009 | $96,708,151 |
| 2012 | $91,118,045 | $21,123,172 | $112,241,218 |
| 2013 | $62,243,788 | $167,905,880 | $230,149,668 |
| 2014 | $68,394,565 | $296,267,050 | $364,661,615 |
| 2015 | $58,762,548 | $243,173,376 | $301,935,924 |
| 2016 | $56,830,628 | $265,133,967 | $321,964,595 |
| 2017 | $56,830,628 | $265,133,967 | $321,964,595 |
| Total | $1,049,356,905 | $1,583,995,602 | $2,633,352,507 |

---

[153] I total payments from Merck's sales data, described above. Payments made under all other public contracts, such as those with the Department of Defense, are omitted from these calculations. The estimates here are conservative for this reason.

EXPERT REPORT OF THOMAS G. MCGUIRE, PH.D.

**Appx11084**

109.    Second, I calculate the mumps portion of payments for MMR-II and ProQuad. In Attachment E.2.a, I calculate the mumps portion of MMR-II as the price of the monovalent Mumps Vaccine divided by the combined prices of the monovalent mumps, measles, and rubella vaccines.[154] I calculate the mumps portion of ProQuad as the the price of MMR-II divided by the combined price of MMR-II and Varivax, multiplied by the mumps portion of MMR-II. Totals by quarter for the period 2004Q1 to 2015Q4 are included in Attachment E.2.b. Table 6 provides the annual totals for the period 2004-2017. I again calculate extrapolated values for the years 2016 and 2017 (using the technique described above).

TABLE 6
SUMMARY OF THE MUMPS PORTION OF PAYMENTS TO MERCK
UNDER THE CDC PUBLIC CONTRACT 2004-2017

| Year | MMR-II | ProQuad | Total |
|------|--------|---------|-------|
| 2004 | $34,566,619 | $0 | $34,566,619 |
| 2005 | $33,214,616 | $0 | $33,214,616 |
| 2006 | $30,408,443 | $11,655,725 | $42,064,167 |
| 2007 | $23,575,391 | $11,573,174 | $35,148,565 |
| 2008 | $39,198,834 | $772 | $39,199,606 |
| 2009 | $37,625,724 | $0 | $37,625,724 |
| 2010 | $37,592,914 | $4,253,942 | $41,846,856 |
| 2011 | $36,620,314 | $722,512 | $37,342,826 |
| 2012 | $37,939,784 | $1,691,324 | $39,631,108 |
| 2013 | $25,917,105 | $13,319,459 | $39,236,563 |
| 2014 | $28,478,168 | $22,937,746 | $51,415,914 |
| 2015 | $24,467,584 | $17,929,055 | $42,396,639 |
| 2016 | $23,663,170 | $19,548,199 | $43,211,369 |
| 2017 | $23,663,170 | $19,548,199 | $43,211,369 |
| Total | $436,931,835 | $123,180,106 | $560,111,941 |

---

[154] The last public contract for the monovalent vaccines ended in March 2002, so I use prices from that contract.

Appx11085

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA *ex rel*.,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

*Plaintiffs,*

v.

MERCK & CO., INC.,

*Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 83

HIGHLY CONFIDENTIAL

Page 1

1      IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF PENNSYLVANIA

2

3    ----------------------------------x

     UNITED STATES OF AMERICA ex rel,

4

     STEPHEN A. KRAHLING and JOAN A.

5

     WLOCHOWSKI,

6

              Plaintiffs,      C.A. No.

7

       v.                    10-4374(CDJ)

8

     MERCK & CO., INC.,

9

              Defendants.

10   ----------------------------------x

11   IN RE: MERCK MUMPS VACCINE

12   ANTITRUST LITIGATION

13   THIS DOCUMENT RELATES TO:

14   ALL ACTIONS

15   ----------------------------------x

16           HIGHLY CONFIDENTIAL

17        VIDEOTAPED DEPOSITION OF

18         THOMAS McGUIRE, Ph.D.

19          Boston, Massachusetts

20            July 2, 2018

21

22   JOB NO. 2949248

23

          VERITEXT LEGAL SOLUTIONS

24           MID-ATLANTIC REGION

       1801 Market Street - Suite 1800

25          Philadelphia, PA  19103

HIGHLY CONFIDENTIAL

Page 142

1    T. McGuire - Highly Confidential
2    Q.  And are you offering an opinion
3 as to whether the allegations in this case
4 are accurate?
5    A.  No.  I'm -- well, I'm offering
6 the opinion that at the time I wrote that
7 paper, there was a perception that Merck
8 had a superior product.  It may have been
9 not fully accurate.
10    Q.  And what is your basis for the
11 belief sitting here today that that
12 perception may not have been fully
13 accurate?
14    A.  Well, we are sitting here today,
15 so there are certainly reason to believe
16 that it may not be fully accurate.
17    Q.  And your reason to believe is
18 because the Plaintiffs and Relaters have
19 filed a complaint in this case?
20    A.  Well, and I was instructed in my
21 report to take that as a basis for my work.
22 But I read this material and I see Kesler's
23 report, and I say:  Well, this makes sense
24 to me, maybe there is an issue here.
25    Q.  But you're not offering an

Page 143

1    T. McGuire - Highly Confidential
2 opinion sitting here today that there is a
3 reason to believe that Merck's product is
4 inferior, are you?
5        MR. KODROFF:  Objection.
6 Inferior to what?  Vague.
7    Q.  You can answer, if you
8 understand.
9    A.  Well, I would ask you, inferior
10 to what?
11    Q.  That you're not offering an
12 opinion sitting here today that Merck's
13 mumps vaccine has zero value.  Let's try
14 that.
15    A.  Certainly not.
16    Q.  And you're not offering an
17 opinion as to the quality of Merck's mumps
18 vaccine, are you?
19    A.  That's outside my bailiwick.
20    Q.  Okay.  If you could turn to the
21 second bullet point in your report.  And it
22 says, Opinion 2, "Direct purchasers paid
23 more for Merck's Mumps Vaccine products
24 than they would have had Merck not made the
25 alleged misrepresentations and omissions

Page 144

1    T. McGuire - Highly Confidential
2 related to its Mumps Vaccine and the market
3 was served by competition instead of a
4 monopoly seller"; is that right?
5    A.  That's right.
6    Q.  And to get to this opinion,
7 you're assuming that certain allegations
8 made by Plaintiffs and Relaters are true,
9 correct?
10    A.  That's correct.
11    Q.  And I think you testified earlier
12 that you didn't do any analysis or
13 investigation to verify whether or not
14 those are true, correct?
15    A.  I didn't do any independent
16 investigation of that.
17    Q.  Okay.  Do you know whether --
18 well, let me back up.  Do you know what
19 ACIP is?
20    A.  Yes.
21    Q.  What is it?
22    A.  It's a committee that advises the
23 CDC about vaccines.  It's something like
24 the Advisor Committee on Immunization
25 Practices.  Something like that.

Page 145

1    T. McGuire - Highly Confidential
2    Q.  Do you know whether ACIP or CDC
3 relies on Merck's representations regarding
4 the efficacy of a vaccine when determining
5 whether to include it on the pediatric
6 dosing schedule?
7    A.  Can I say I would hope so?  I'm
8 not really sure about what their
9 determination practice is.
10    Q.  Okay.  So you have no opinion on
11 whether ACIP or CDC relies on the
12 representations of Merck when making
13 decisions with respect to the dosing
14 schedule?
15    A.  I'm not an expert in the FDA
16 process -- I'm sorry -- CDC process.
17    Q.  So it follows that you don't know
18 whether the CDC relies on Merck's
19 representations when it purchases the
20 vaccine, right?
21    A.  I'm not an expert on the FDC
22 [sic] decision-making process -- I'm sorry,
23 CDC.  I keep saying FDA.
24    Q.  In preparing your report, have
25 you considered any of the statements that

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL

Page 290

T. McGuire - Highly Confidential

1    T. McGuire - Highly Confidential
2    A. Yes, they would.
3    Q. Since this lawsuit has been
4  filed, do you know whether CDC has changed
5  the amount of MMR II it purchases each
6  year?
7    A. There is -- I think my data go up
8  through 2015. Since this lawsuit was
9  filed, which, I'm sorry, I'm not sure what
10 date you would ask me --
11   Q. 2012.
12   A. 2012. I think the public
13 quantities have changed, yeah.
14   Q. With respect to private
15 purchasers, you assume that the earliest
16 GSK could have entered the market was 2009,
17 right?
18   A. Based on Coppman's report, right.
19 Yes.
20   Q. Is it your view, similarly, that
21 the CDC would have paid less for Merck's
22 mumps vaccine after 2009?
23   A. I considered that as part of my
24 assignment here. And, you know, they're at
25 the cap. So they might have remained at

Page 291

T. McGuire - Highly Confidential

1    T. McGuire - Highly Confidential
2  the cap after GSK entry. So I didn't
3  quantify any effect of that. Certainly
4  there would be, if anything, a downward
5  kind of valence to prices, but I didn't see
6  it as -- I didn't see a way to quantify it.
7    Q. Just to back up a second -- well,
8  let's just finish this out.
9    You calculated False Claims Act
10 damages beginning in 2004; is that correct?
11   A. Yes.
12   Q. Okay. Where did you come up with
13 2004?
14   A. That was an instruction from
15 counsel.
16   Q. Okay. Do you have any opinion on
17 the comparisons between MMR II and PRIORIX
18 on efficacy?
19   A. No, I don't.
20   Q. Same question with safety.
21   A. No, I don't.
22   Q. Same question with respect to
23 effectiveness.
24   A. Same answer.
25   Q. Have you reviewed in connection

Page 292

T. McGuire - Highly Confidential

1    T. McGuire - Highly Confidential
2  with your damages calculation for the False
3  Claims Act case any head-to-head study data
4  as to the mumps component of Merck's
5  vaccine and GSK's vaccine?
6    A. No, I don't believe I have.
7    Q. If you had, it would be included
8  in the appendix to your report, correct?
9    A. Yes, it would.
10   Q. In performing your calculations
11 of CDC's actual damages, you assumed that
12 Merck's mumps vaccine has no value, right?
13   A. No, I didn't make that assumption
14 at all.
15   Q. So how do you -- let's actually
16 talk about what you did in Paragraph 109.
17      So is it correct that to isolate
18 the value of the mumps vaccine for MMR, you
19 take the past prices for the monovalent
20 vaccine?
21   A. The most recent ones that I had,
22 yeah.
23   Q. And then you divide that by the
24 MMR -- and divide the price of MMR II in
25 2004 by the monovalent prices?

Page 293

T. McGuire - Highly Confidential

1    T. McGuire - Highly Confidential
2    A. In proportion to the monovalent
3  prices, yes.
4    Q. Right, okay. And for ProQuad,
5  you calculated the cost of mumps vaccine by
6  taking the price of MMR and dividing it by
7  the combined price of MMR and VARIVAX,
8  right?
9    A. It's the similar idea of doing
10 the proportion of the total attributable to
11 mumps.
12   Q. Okay. And you then go ahead and
13 total that up for each year, from 2004 to
14 2007, right?
15   A. Yes.
16   Q. Okay. And you arrive at --
17      MR. KODROFF: '17.
18   Q. I'm sorry. 2017.
19      And you come up with 560 million
20 some odd dollars, right?
21   A. Yes.
22   Q. So your calculations assume that
23 the CDC should receive all of the amounts
24 that it paid for Merck's mumps vaccine
25 back, right?

74 (Pages 290 - 293)

Page 294

T. McGuire - Highly Confidential

A. I'm just doing as I was instructed here by counsel; to total up what the CDC paid Merck for these products. There is no real, any other assumptions behind that. It's just doing the math, as we said earlier.

Q. Okay. So you didn't try to do an analysis of how much less value the government received as a result of a product that's quality was allegedly overstated, right?

A. That's correct. I didn't study value. Only payments.

Q. And we agree, right, that Merck's mumps vaccine does have value?

A. Yeah, we said that earlier. I wouldn't deny that.

Q. And we agree that it reduced -- the Merck's mumps vaccine has reduced occurrences of mumps substantially over the course of its existence since the late '60s, right?

A. I also agree with that, yes.

Q. And you don't do any analysis to

Page 295

T. McGuire - Highly Confidential

determine the difference between what the government was promised and what the government actually received in terms of the MMR vaccine, right?

A. That's true. I didn't study promises. Only what they paid.

Q. And so but you didn't try to do the math that would incorporate, or that would assess the question -- strike that.

You didn't do an analysis to assess the question of the difference between what Merck allegedly said it was providing to the government and what it actually received in terms of damages; is that right?

A. That's correct. I simply totaled up payments by the government.

Q. Did you review any of the invoices from Merck to the CDC?

A. I believe they were included in the data that I had, yes.

Q. And in the transaction data, how did you identify the invoices?

A. The -- how did I identify whether

Page 296

T. McGuire - Highly Confidential

they were CDC or something else?

Q. Well, let me ask you --

A. Or what are you asking?

Q. Let me ask you this. You define an invoice as a single observation in the transaction data; is that right?

A. Point me here. I understand that this was an issue. Where are you looking at when you say where I defined it?

Q. I'm just asking you.

A. I understood my assignment to be a claim or invoice. So I was looking for a claim or invoice in the transactions data.

Q. So based on -- each entry in the transaction data you equated with either a claim or an invoice?

A. That's correct, yes. That's what I -- my count was based on a line that it would be a claim or an invoice - and/or an invoice.

Q. And you didn't use the Merck invoice data field to identify invoices in the transaction data, right?

A. I -- this part of my work was a

Page 297

T. McGuire - Highly Confidential

count, and I counted each line equally, which I think answers your question. If there was more than one invoice number that was common to different lines, I counted them twice.

Q. Is this something that your colleague at Greylock actually did this?

A. "Actually did," meaning what?

Q. Meaning, actually ran the calculations.

A. Yes. Keith would have created programs that did these calculations.

Q. And did you do anything to confirm that you're counting -- that each invoice value represented in the data was unique?

A. Well, as I explained, I wasn't at the time I did this thinking I need to count only invoices. My assignment was to count claims or invoices.

Q. What's the difference in your mind? I'm sorry, were you finished?

A. No. Just briefly, I've worked with claims datasets many, many times and

75 (Pages 294 - 297)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,
        *Plaintiffs,*
   v.
MERCK & CO., INC.,
        *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND**
**"HIGHLY CONFIDENTIAL –**
**ATTORNEYS' EYES ONLY" MATERIAL**
**PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 84

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*, <br><br> STEPHEN A. KRAHLING and JOAN A. WLOCHOWSKI, <br><br>                Plaintiffs, <br><br>         v. <br><br> MERCK & CO., INC., <br><br>                Defendant. | Civil Action No. 10-4374 (CDJ) <br><br> **RELATOR JOAN WLOCHOWSKI'S RESPONSES AND OBJECTIONS TO MERCK'S REVISED FIRST SET OF INTERROGATORIES** |

In accordance with Federal Rules of Civil Procedure 26 and 33, Relator Joan Wlochowski ("Relator") by and through her undersigned counsel, hereby responds and objects to Merck's Revised First Set of Interrogatories to Relator Joan Wlochowski (the "Revised Interrogatories"), as follows:

## PRELIMINARY STATEMENT

1.    Discovery in this action is in its infancy, and Relator's investigation and development of all facts and circumstances relating to this action are ongoing. As per the parties' agreement, Relator's Responses and Objections to the Revised Interrogatories (the "Responses and Objections") are based on the information available as of the filing date of the Amended Complaint. It is anticipated that further discovery and independent investigation will supply additional facts, add meaning to known facts and establish new factual conclusions. Consequently, these responses are given without prejudice to Relator's and her counsel's right to

Appx11092

produce at the time of trial any and all discovered evidence or facts that Relator may later discover or recall relating to presently known material facts, and to produce all evidence, whether subsequently discovered or relating to the proof of subsequently discovered material facts. The answers contained herein are made in a good faith effort to supply as much factual information as was known at the time the Amended Complaint was filed, but should in no way prejudice Relator in relation to further discovery, research or analysis.

      2.    Relator expressly reserves the right to use, or introduce at any hearing and/or trial, documents or information that are responsive to the Revised Interrogatories, but are discovered or recalled subsequent to these responses, including, but not limited to, any documents or information obtained in discovery in this case from other parties or non-parties.

      3.    Except for explicit facts admitted herein, no incidental or implied admissions are intended by making these responses. The fact that Relator has answered any Revised Interrogatories should not be taken as an admission that Relator accepts or admits the existence of any facts set forth or assumed by such Interrogatory, or that such response constitutes admissible evidence. The fact that Relator has answered part or all of any Interrogatory is not intended and shall not be construed to be a waiver by Relator of all or any part of any objection to any Interrogatory made by Relator.

      4.    By making the accompanying responses and objections to the Revised Interrogatories, Relator does not waive, and hereby expressly reserves, her right to assert any and all objections as to the admissibility of such responses into evidence in this action, or in any proceedings, on any and all grounds including, but not limited to, competency, relevancy, materiality, privilege, and scope. Further, Relator makes the responses and objections herein

2

**Appx11093**

without in any way implying that she considers the Revised Interrogatories, and responses to the Revised Interrogatories, to be relevant or material to the subject matter of this action. Relator expressly reserves the right to: (i) object on any ground to the use of any information or documents provided in response to the Revised Interrogatories at any time and in any proceeding in this case or any other cases; and (ii) assert further objections to the discoverability, relevance and/or admissibility of any such information or documents on any and all grounds.

5.      Relator expressly reserves the right to clarify, revise, or correct any and all of the responses and objections herein.

6.      Each and every date stated in response to any Interrogatory is hereby represented as being approximate, and not precise.

7.      Relator will respond to each particular Interrogatory as she understands them. If Defendant subsequently asserts an interpretation that differs from Relator's, Relator reserves the right to change and/or supplement her objections and responses.

8.      This Preliminary Statement is incorporated by reference into each and every response below, as though fully set forth therein.

## **GENERAL OBJECTIONS**

9.      Relator's responses to Defendant's Revised Interrogatories, set forth below, are provided subject to the following General Objections, which apply to each and every Interrogatory for which a response is provided below, and which are incorporated into each and every response as if set forth in full therein. The failure to mention any of the following objections in the specific responses shall not be deemed a waiver of such objection.

3

10.     Relator objects to the Revised Interrogatories to the extent that they purport to impose upon Relator obligations greater than or different than those authorized by Federal Rules of Civil Procedure 26 or 33, the Local Rules of the Eastern District of Pennsylvania, or other applicable law.  Relator expressly disclaims any such obligations and objects to any attempt by Defendant to impose such obligations on Relator.

11.     Relator objects to the Revised Interrogatories to the extent that they seek information or materials protected by Federal Rule of Civil Procedure 26(b), the attorney-client privilege, the attorney work product doctrine, or any other applicable privileges or protections. The fact that Relator does not specifically object to an individual Interrogatory on the ground that it seeks such privileged or protected information or materials shall not be deemed a waiver of the protection afforded by Federal Rule of Civil Procedure 26(b), the attorney-client privilege, attorney work product doctrine, or any other applicable privilege or protection.  Inadvertent production of any documents, information, or communications in response to the Revised Interrogatories shall not constitute a waiver of any privilege or any other ground for objection held by Relator.  Relator reserves the right to demand that Defendant return any documents (along with all copies thereof) inadvertently produced by Relator in response to these Revised Interrogatories.

12.     Relator objects to the Revised Interrogatories to the extent that they seek information that is not relevant to the subject matter of this action and are not reasonably calculated to lead to the discovery of admissible evidence.

13.     Relator objects to the Revised Interrogatories to the extent that they seek discovery of confidential personal information protected by Relator's privacy rights.

4

14.    Relator objects to the Revised Interrogatories to the extent that they seek the production of documents, information, or communications not within Relator's possession, custody, or control.

15.    Relator objects to the Revised Interrogatories to the extent that they purport to impose a burden upon Relator to furnish information and materials that are not available to Relator or are equally or more readily available to Defendant.

16.    Relator objects to the Revised Interrogatories to the extent that they are vague, ambiguous, or incomprehensible.

17.    Relator objects to the Revised Interrogatories as a whole, and in combination with the other written discovery requests served on Relators in this action, to the extent that they are repetitive, overbroad, unduly burdensome, oppressive, and harassing.

18.    Relator objects to the Revised Interrogatories to the extent that they are overly broad, unduly burdensome, do not identify with sufficient particularity the information sought, exceed the scope of inquiry permitted by the applicable Federal Rules of Civil Procedure, and call for an extensive and exhaustive narrative of communications and events regarding many subject matters over a substantial time period.

19.    Relator objects to the Revised Interrogatories to the extent that they cover subject matters which would be better and more efficiently disclosed during a deposition.

20.    Relator objects to the Revised Interrogatories to the extent that they mischaracterize the actions, conduct, and/or obligations of Relator, Relator Krahling, real parties, third parties, and/or Defendant.

Appx11096

21.     Relator objects to the Revised Interrogatories to the extent that they call for the identification of documents or communications to or from Relator's counsel, or to or from any of counsel's employees, agents, experts, or consultants, on the ground of burden and that they seek information protected by the attorney-client privilege and/or attorney work product doctrine. Relator declines to produce or identify any such documents and communications to the extent they exist.

22.     Relator objects to Defendant's definitions of "concerning," "concern," "all," "each," "relate," and "relating," and the terms referenced therein, to the extent that they are vague, ambiguous, unduly burdensome, overly broad, and not reasonably calculated to lead to the discovery of admissible evidence.

## RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 1:

Identify all Persons who have knowledge of, information concerning, or opinions relating to any of the facts, circumstances, damages or allegations described in your Complaint, including but not limited to the identity of the Person(s) who provided you with information relating to the allegations concerning events after your separation from Merck, including Merck's reporting to FDA regarding the results of Protocol 007 testing, Merck's representations to the European Medicines Agency regarding the efficacy of its mumps vaccine, and the mumps outbreaks in 2006, and, for each Person, describe in detail the nature of his or her knowledge or information. If any such Person offered an opinion regarding the damages or allegations described in your Complaint, your answer should include the substance of the opinion and a summary of the grounds for each opinion.

6

**RESPONSE TO INTERROGATORY NO. 1:**

Relator directs Merck to its response to Interrogatory No. 1 in Relator Joan Wlochowski's Responses and Objections to Merck's First Set of Interrogatories (the "Responses and Objections to the First Set of Interrogatories").

**REVISED INTERROGATORY NO. 2:**

Identify all Communications, or Documents reflecting such Communications, of which you have knowledge between Merck and the Government, or between Merck and any other person or entity, concerning, relating to, and/or referencing the allegations in the Complaint, including, but not limited to, the Communication between Merck and the Government that is alleged in Paragraph 68 of the Complaint. In responding to this Interrogatory, identify and describe the substance, date, place, and manner of the alleged Communication, as well as all persons making and receiving the Communication

**RESPONSE TO REVISED INTERROGATORY NO. 2:**

Pursuant to agreements made during the meet and confers regarding these Interrogatories, Relator will respond to this Interrogatory with respect to Relator's knowledge of Communications between Merck and the Government about representations Merck made about the efficacy or potency of its Mumps Vaccine.

Relator incorporates the Preliminary Statement and General Objections stated above. Relator objects to this Interrogatory to the extent that it seeks information that is within Defendant's possession, custody or control, or in the possession, custody or control of the government or a third party that is equally available to Defendant.

7

Subject to and without waiving the foregoing objections, Relator identifies the following communications between Merck and the Government relating to the efficacy or potency of Merck's mumps vaccine:

1. Merck had multiple communications with the FDA in the 1999 to 2001 timeframe on the Protocol 007 testing methodology and results.

Relator Krahling told Relator what he learned from Krah of numerous communications -- both written and verbal -- that Merck had with the FDA in the 1999-2001 timeframe in connection with its Protocol 007 testing. Relator knows these communications occurred and that these communications did not disclose what Merck knew about the significantly diminished efficacy of the vaccine and the steps it was taking to conceal this from the FDA. However, Relator cannot identify the specific dates of these communications and the Merck and FDA individuals involved, all of which is within Defendant's possession, custody or control, or in the possession, custody or control of the FDA.

2. Krah and Shaw met with an FDA representative on August 6, 2001 to answer questions the FDA had about Merck's Protocol 007 testing methodology, and in particular, its process for counting plaques. *See* Relator's Response to Interrogatory No. 4.

3. Merck communicated to the FDA the fraudulent results of the Protocol 007 efficacy testing.

4. Merck engaged in numerous communications with the EMA in connection with Merck's applications for approval to sell MMRVaxpro and ProQuad in Europe.

5. Merck engaged in numerous communications with the FDA in connection with Merck's application for approval of ProQuad.

6. Merck engaged in numerous communications with the FDA in connection with Merck's application for approval of a label change on the potency of MMRII.

8

**INTERROGATORY NO. 3:**

Describe in detail your complete employment history, including the name and address of each employer, the nature of your duties for each employment, the inclusive dates of each employment, the reason for leaving each employment, the name of your immediate supervisor for each employment, and, if you were self-employed, the dates of self-employment, the type of work you performed, and your annual salary.

**RESPONSE TO INTERROGATORY NO. 3:**

Relator directs Merck to its response to Interrogatory No. 3 in the Responses and Objections to the First Set of Interrogatories.

**INTERROGATORY NO. 4:**

Describe in detail how you learned of each of the allegations contained in your Complaint relating to the August 6, 2001 on-site meeting between Merck and the FDA.  Your answer should include, but not be limited to, detailed descriptions of how you learned of the following allegations contained in your Complaint:

(a) "[T]he FDA agent asked whether there was any ad hoc revisiting of plaque counts."

(b) "Krah falsely responded that plaque counts were being rechecked only for verification, controls and to check hypervariability."

(c) "Krah also misrepresented to the FDA that they did not change the data after it was entered in the excel workbook."

(d) The FDA "pressed Krah on the criteria for changing original counts on the counting sheets."

(e) Krah left the meeting without answering the question described in (d) above.

9

(f) "In Krah's absence, Shaw informed the FDA agent that a memo would be added to the standard operating procedure to address changes."

(g) "The FDA agent then asked Shaw why they had not taken care of this before the project started."

(h) "Shaw offered that Krah and another Merck employee had identified 'trends' and 'problems' with the original counts without ever explaining what those 'trends' and 'problems' actually were."

**RESPONSE TO INTERROGATORY NO. 4:**

Relator directs Merck to its response to Interrogatory No. 4 in the Responses and Objections to the First Set of Interrogatories.

**INTERROGATORY NO. 5:**

Describe in detail all Communications you have had with anyone, including, but not limited to, any current or former employee of Merck; Relator Krahling; Plaintiffs or their counsel in *In re: Merck Mumps Vaccine Antitrust Litigation*, Case No. 2:12-cv-03555; or anyone at the CDC, FDA, DOJ, any other government agency (domestic or foreign), or any third-party (individual or entity), about the issues involved in this action; the allegations of your Complaint; mumps and any mumps outbreaks; any mumps vaccine including, but not limited to M-M-R®II and ProQuad®; vaccine safety; vaccine efficacy; and vaccines generally. In responding to this Interrogatory, identify for each Communication the Person with whom you communicated and any other party to the Communication, the time, place and circumstances of the Communication, whether the Communication was oral or in writing, what was communicated, the response received, if any, and any Documents concerning, relating to and/or referencing the

10

Communication.  Your answer should include, but not be limited to, detailed descriptions of your "repeated calls" and complaints to the FDA regarding the fraud alleged in your Complaint.

**RESPONSE TO INTERROGATORY NO. 5:**

Pursuant to agreements made during the meet and confers regarding these Interrogatories, Relator will respond to this Interrogatory only with respect to the existence of any Communications about allegations in the Amended Complaint regarding the mumps vaccine that Relator had with (1) the Government, (2) Merck, (3) persons in the pharmaceutical industry, and (4) vaccine advocacy groups.  Merck has defined a vaccine advocacy group as an organization which uses forms of communication (through any medium, including but not limited to print, electronic communications, the internet, and speaking engagements) to influence public opinion and/or policy with respect to the use, disuse, trust or distrust of vaccines.  For any Communications Relator had on this subject with other individuals, Relator will merely identify that such Communication occurred.

Relator incorporates the Preliminary Statement and General Objections stated above. Relator objects to this Interrogatory on the ground that it calls for information not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the foregoing objections, Relator responds as follows:

Relator had multiple communications with Colleen Milliken Barr about topics relating to allegations in the complaint regarding the mumps vaccine.  These communications took place in person at Merck's facility where they worked in West Point, Pennsylvania between January and

11

September 2001.  Relator does not know Barr's current or last known address or place of employment.

Relator communicated with Alan Brunner, a former colleague from Charles River Tektagen, about topics relating to allegations in the complaint regarding the mumps vaccine. These communications occurred through 2001.  Brunner's last known address was in New Jersey.  Relator understands his current occupation to be a Director of Quality Assurance at Xceleron Inc.

Relator spoke with Emilio Emini about topics relating to allegations in the complaint regarding the mumps vaccine.  These communications took place in person at Merck's facility where they worked in West Point, Pennsylvania between January 2001 and September 2001. Relator recalls in particular an April 2001 meeting in Emini's office where Emini told Krah's lab group to follow Krah's orders and promised all of them double bonuses if the team successfully completed the mumps testing by the fall of 2001.

Relator does not know Emini's current or last known address nor does she know Emini's current employer or occupation.

Relator had multiple communications with Jill DeHaven about topics relating to allegations in the complaint regarding the mumps vaccine.  These communications took place in person at Merck's facility where they worked in West Point, Pennsylvania between January and August 2002.  DeHaven agreed with Relator that there was fraud occurring in Krah's lab on the mumps testing.  She expressed to Relator that she wished she did not have to be put in this position.  Relator does not know DeHaven's current or last known address but understands that she is still employed at Merck.

12

Relator had multiple communications with Jon Gombola about topics relating to allegations in the complaint regarding the mumps vaccine. These communications took place in person at Merck's facility where they worked in West Point, Pennsylvania between January and September 2001. Gombola was an intern working in Krah's lab for the summer who was planning to go on to med school. Gombola expressed that he did not want to be a part of the fraud occurring in the lab. He agreed along with Relators and Maahs to make copies of counting sheets and countersign the sheets which Relator Krahling would collect for safe-keeping. Relator, feeling bad that an intern had to be exposed to fraud, told Gombola that this is an example of what not to do and it is not like this everywhere you go. Relator does not know Gombola's current or last known address or place of employment.

Relator communicated with Chris Hannah and Betsy Halsey, her friends, about topics relating to allegations in the complaint regarding the mumps vaccine. These communications occurred in person in New Britain, PA between 2001 and 2002. Hannah and Halsey are currently employed in Information Systems at a Pharmaceutical Company and a school teacher, respectively. They live on New Galena Road in New Britain, PA.

Relator had multiple communications with Kim Johnston, her friend from Dr. Palker's lab, about topics relating to allegations in the complaint regarding the mumps vaccine. These communications took place in person at Merck's facility where they worked in West Point, Pennsylvania between October and December 2001. Relator recalls a conversation with Johnston where she expressed how pleased she was to work in Dr. Palker's lab amongst a team of scientists who she respected and could learn from. Johnston's last known address was Edgehill Drive Furlong, PA. Relator does not know her current employer or occupation.

13

Relator had multiple communications with Frank Kennedy about topics relating to allegations in the complaint regarding the mumps vaccine. These communications took place in person at Merck's facility where they worked in West Point, Pennsylvania between January and August 2002. Relator recalls discussing with Kennedy the occurrence of fraud in Krah's lab regarding Protocol 007. Kennedy agreed that there was fraud in the lab regarding Protocol 007, but he did not want to be a part of taking a stand against it as he did not want to lose his job. Kennedy transferred into Krah's lab around the same time that Relator had started in January 2001. Kennedy came from the Manufacturing side of Merck with the hopes of finding a better position in Research however he expressed regret after doing so. Kennedy returned to Manufacturing some time after the FDA inspection. Relator does not know Kennedy's current or last known address or place of employment.

Relator had multiple communications with David Krah about topics relating to allegations in the complaint regarding the mumps vaccine. These communications took place in person at Merck's facility where they worked in West Point, Pennsylvania, over email, or via memorandum, between January and September 2001. Relator recalls several conversations between herself and Krah in detail.

On one occasion, Krah instructed Relator to perform recounts of her data. Relator was not provided information regarding the methodology of the study, so initially she thought Krah was teaching her how to find plaques correctly and this was part of the learning curve of plaque identification. Later, however, after Relator Krahling gave her a copy of the Enhanced Assay methodology and after more experience counting plaques, she began to question Krah's motives. Krah requested recounts of plaques after the data was assessed. That is, the raw data (initial

14

count by the analyst) was called into question only after the raw data was analyzed and showed a pre-positive result. If after analysis it was found that a pre-vaccination sample was determined to show a positive result, Krah explained that this sample would then need to be recounted as the expectation was that this sample should be negative. Relator then understood Krah was requesting her to manipulate the data to eliminate the pre-positive outcomes. On another occasion, Krah directed Relator and others in the lab on a procedure to avoid invalidating assays that should have been discarded because the lab was under pressure to complete all testing by an August deadline.

Merck initially planned to outsource the remainder of the mumps testing to a laboratory run by Dr. Richard Ward of Cincinnati Children's Hospital Medical Center. Throughout the spring of 2001, Krah updated his laboratory group on the status of the proposed outsourcing. Relator later learned that the testing would not be outsourced to Ward's laboratory, but Krah never explained the reason for the change of plans.

In June 2001, Krah told Relator she was assigned to perform mumps testing using the Enhanced Assay.

In July 2001, at a laboratory meeting involving all members of the laboratory, Relator accused Krah of "cheating." She stated that when the testers are not blinded as to whether samples are pre- or post-vaccination, it is wrong to recount and adjust a pre-vaccination sample only because it is found to be seropositive. Krah responded to this accusation with an awkward silence.

15

In August and September 2001, Krah communicated with Relator and other lab staff in writing and in person on various procedural changes to the lab testing procedure following the FDA's on-site inspection in early August.

Relator does not know Krah's current or last known address nor does she know Krah's current employer or occupation.

Relator had multiple communications with Relator Krahling about topics relating to allegations in the complaint regarding the mumps vaccine between 2001 and 2010. Most of these communications took place in person at Merck's facility where they worked in West Point, Pennsylvania. In particular, Relator recalls having regular discussions with Relator Krahling while they were both employed at Merck regarding the fraudulent methods mandated by Krah for the Protocol 007 testing and ways of avoiding compliance with these mandates. Relator also met with Relator Krahling at Relator's home in Pennsylvania after Krahling left Merck, and several times at her home in Connecticut after they both left Merck.

Relator also recalls speaking with Relator Krahling about needing to be revaccinated against mumps when she started to work in Krah's lab. When Relator started at Merck Relator was tested for mumps titers and was informed she was seronegative, not immune. This restricted her from working with the mumps virus until the end of February 2001 when it was confirmed she was seropositive after being revaccinated. Relator discussed with Relator Krahling how ironic it was that even though she received all required vaccinations as a child, she was seronegative for the one titer she needed to be able to perform her work. Relator later found out that this was not an uncommon occurrence in the lab. In fact, the majority of the people who had come to work in Krah's lab needed a booster.

16

Sometime after June 2001, Relator Krahling expressed his concern over the manipulation of the data from the Protocol 007 PRN assay and Relator agreed with him.

Around June 2001, Relator suggested to Relator Krahling they review the assay summaries for Protocol 007 on a very large sample size of the data to see if they could measure any statistically significant trends. These summaries were stored in an unlocked filing cabinet right next to Relator's desk. Relator suggested they take tracts of files, review them, and then exchange them for more files. Relators set out to do this during the first week of July 2001. Upon analysis of the data Relator and Relator Krahling discussed the rate of pre-positive data being changed to pre-negative and how it demonstrated an obvious manipulation of the data to the expected outcome.

Around June 2001, Relator Krahling told Relator that he spoke to Alan Shaw about the manipulation of the pre-positive data, but to no avail. Shaw simply reminded him of the large bonuses that Emini had promised to the lab members.

Around July 2001, Relator Krahling told Relator that he was going to speak to Emini regarding the Relators' findings of data falsification.

In July 2001, Relator Krahling told Relator that Emini had committed to performing an internal audit in response to his conversation with Relator Krahling.

On one occasion, Relator, DeHaven, Kennedy, Gombola, and Suzanne Maahs learned of Emini's planned audit from Relator Krahling. Relator, Gombola, and Maahs agreed to stick together and explain to the Merck auditors exactly what was going on in the laboratory. DeHaven and Kennedy opted to take a neutral stance with Emini's auditors. They agreed not to lie but said that they would not volunteer information unless asked.

17

One morning in early August 2001, Relator witnessed Krah taking plates from completed assays and disposing them in biohazard bags. She told Relator Krahling immediately. Relator and Relator Krahling discussed how unusual this was because they had never seen Krah dispose of any plates before and Krah was intentionally destroying the evidence of raw data that was being manipulated in an ongoing clinical trial.

Following the FDA inspection on August 6, 2001 Relator had multiple conversations with Relator Krahling about their disbelief that Krah continued with the Protocol 007 testing after the FDA's on-site inspection.

Once, Relator Krahling asked Relator and Jon Gombola to review his plaque count for the mock control from one of his assays. Krah was claiming that the assay needed to be thrown out because the cell monolayer was torn and there was a low plaque count. Neither Relator nor Gombola observed the torn monolayer that Krah said he observed and both of them counted four plaques, the same number Relator Krahling counted. Later, in a private meeting between Relators, Gombola and Maahs, they discussed reporting any and all instances of cheating that they witnessed to each other. Relator Krahling agreed to collect whatever they could document. The four of them agreed to start making copies of their original data which they countersigned for each other and provided to Relator Krahling for safe-keeping.

On another occasion, Relator was working in the back laboratory next to Relator Krahling. She showed Relator Krahling her counting sheet that contained 11 pre-positives. Relator Krahling calculated this equaled an 84% pre-positive rate. Relators joked sarcastically about the unlikely possibility the data would survive the day. Krah overheard their conversation and came over to look at the plates. He told Relator that the plaques were too faint to count and

18

ordered her to throw away her counting sheet because he intended to retest the entire assay.

Relator protested that the plaques were not too faint to count, citing as evidence the fact that she

had already counted them.  Krah ordered her again to throw out the counting sheet and she

complied.

Relator had multiple communications with Jennifer Kriss about topics relating to

allegations in the complaint regarding the mumps vaccine.  These communications took place in

person at Merck's facility where they worked in West Point, Pennsylvania between January and

September 2001.  Kriss frequently counted assays as she was pregnant and could not perform the

assays.  Relator recalls Kriss, who sat near Relator's desk when counting assays, frequently

getting frustrated while counting plaques as she wasn't able to find enough plaques to get the

expected pre-negative result.  Relator does not know Kriss's current or last known address but

understands that she is still employed at Merck.

Relator had multiple communications with Suzanne Maahs about topics relating to

allegations in the complaint regarding the mumps vaccine.  These communications took place in

person at Merck's facility where they worked in West Point, Pennsylvania between January and

September 2001.  Relator recalls a time when Maahs, a college intern in the lab, told her that

Krah demanded that she needed to find four more plaques on one of her counts.  Maahs

innocently recounted and came up with the same number of plaques.  Krah repeated his demand.

Maahs told Relator that she then tapped her plate four more times just to make Krah go away.

Maahs's last known address was Philadelphia, PA and Relator understands her current

occupation and place of employment to be Multi Therapeutic Area Clinical Sciences Manager at

Novartis.

19

Relator communicated with Tamara and Stu Nicholoson, her friends, about topics relating to allegations in the complaint regarding the mumps vaccine. These communications occurred in person in Doylestown, PA between 2001 and 2002. Stu and Tamara Nicholson were last known to be self-employed and a homemaker respectively. Their last known address was on Pine Mill Circle in Doylestown, PA.

Relator communicated with Rosalie Pugliese, her mother, about topics relating to allegations in the complaint regarding the mumps vaccine. These communications occurred in person in Fairfield, CT or over the phone between 2001 and 2002. Pugliese is retired. She lives on Canterbury Lane in Fairfield, CT.

Relator had multiple communications with Boris Rubin, her friend from Dr. Palker's lab, about topics relating to allegations in the complaint regarding the mumps vaccine. These communications took place in person at Merck's facility where they worked in West Point, Pennsylvania between September and December 2001. Relator does not know Rubin's current or last address but understands that he is currently employed by Merck.

Relator had multiple communications with Alan Shaw about topics relating to allegations in the complaint regarding the mumps vaccine. These communications took place in person at Merck's facility where they worked in West Point, Pennsylvania between January and September 2001. Relator specifically recalls the day Shaw came into the lab to tell the team that the FDA was on site. Shaw was white as a ghost and left quickly after making the announcement. Relator does not know Shaw's current or last known address or place of employment.

Relator had multiple communications with Robert Suter about topics relating to allegations in the complaint regarding the mumps vaccine. These communications took place in

20

person at Merck's facility where they worked in West Point, Pennsylvania between July and September 2001.  Specifically, Relator spoke to Suter about the unethical behavior in the lab with regard to manipulation of data.  Relator does not know Suter's current or last known address or place of employment.

Relator communicated with Mike and Jane Wlochowski, her husband's parents, about topics relating to allegations in the complaint regarding the mumps vaccine.  These communications occurred in person in Manchester, CT between 2001 and 2002.  The Wlochowskis are retired.  They live on Thayer Road in Manchester, CT.

Relator had multiple communications with Mary Yagodich about topics relating to allegations in the complaint regarding the mumps vaccine.  These communications took place in person at Merck's facility where they worked in West Point, Pennsylvania between January and September 2001.  Relator does not know Yagodich's current or last known address but understands her current place of employment to be GlaxoSmithKline.

**INTERROGATORY NO. 6:**

Identify every Document or Tangible Thing that you removed from Merck during your employment or at the time of your separation from Merck.

**RESPONSE TO INTERROGATORY NO. 6:**

Relator incorporates the Preliminary Statement and General Objections stated above. Relator objects to the term "removed" as vague and ambiguous and calling for speculation. Relator further objects to this Interrogatory as overbroad as it refers to "every Document or Tangible Thing" without limitation.

Subject to and without waiving the foregoing objections, Relator responds as follows:

21

Relator will produce documents obtained during the course of Relator's employment at Merck, which she still has in her possession, in response to this request.

**REVISED INTERROGATORY NO. 7:**

Identify any admissions against interest made by Merck or its employees, including in your answer detailed descriptions of interest made by Merck of which you have knowledge. In responding to this Interrogatory, identify each Document or Communication containing each such admission, as well as the time, place, and circumstances of each such admission.

**RESPONSE TO REVISED INTERROGATORY NO. 7:**

Pursuant to agreements made during the meet and confers regarding these Interrogatories, Merck has withdrawn this Interrogatory.

Dated: May 20, 2015

**KELLER GROVER LLP**
Jeffrey F. Keller
Kathleen R. Scanlan
1965 Market Street
San Francisco, CA 94103
(415) 543-1305 (telephone)
(415) 543-7861 (facsimile)

*Counsel for Relators*

**CONSTANTINE CANNON LLP**
Gordon Schnell
Robert L. Begleiter
Marlene Koury
Hamsa Mahendranathan
335 Madison Avenue
New York, NY 10017
(212) 350-2700 (telephone)
(212) 350-2701 (facsimile)

Jason Enzler
1001 Pennsylvania Avenue, NW
Washington DC 20004
(202) 204-3500 (telephone)
(202) 204-2701 (facsimile)

*Counsel for Relators*

22

## VERIFICATION OF JOAN WLOCHOWSKI

I, JOAN WLOCHOWSKI, hereby certify under penalty of perjury that I have reviewed RELATOR JOAN WLOCHOWSKI 'S RESPONSES AND OBJECTIONS TO MERCK'S REVISED FIRST SET OF INTERROGATORIES and it is true and correct to the best of my knowledge. Executed on May 20, 2015, in _IVORYTON_ (insert city), in the state of Connecticut.

JOAN WLOCHOWSKI

**CERTIFICATE OF SERVICE**

I, Hamsa Mahendranathan, am employed in the County of New York, State of New York.  I am over the age of eighteen and not a party to the within action.  My business address is 335 Madison Ave., 9th Floor, New York, NY 10017.  On May 20, 2015, I served the foregoing document(s): **RELATOR JOAN WLOCHOWSKI'S RESPONSES AND OBJECTIONS TO MERCK'S REVISED FIRST SET OF INTERROGATORIES** on the interested party(ies) as set forth below:

Lisa Dykstra                                              *Attorneys for Defendant*
Eric Sitarchuk
Brandon R. Fee
Coleen M. Meehan
Melina R. DiMattio
Margaret E. Rodgers Schmidt
MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
ldykstra@morganlewis.com
esitarchuk@morganlewis.com
bfee@morganlewis.com
cmeehan@morganlewis.com
mdimattio@morganlewis.com
mrodgersschmidt@morganlewis.com

Sally Bryan
Dino Sangiamo
VENABLE LLP
750 E. Pratt Street, Suite 900
Baltimore, MD 21202
srbryan@venable.com
dssangiamo@venable.com
mfroberts@venable.com

☒      (BY ELECTRONIC SERVICE) by electronically mailing a true and correct copy in PDF format through our electronic mail system to the email address(es) set forth above, or as stated on the attached service list per agreement between the parties.

☒      (FEDERAL) I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on **May 20, 2015**, at New York, New York.


_____/s/ Hamsa Mahendranathan_____
Hamsa Mahendranathan

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel*.,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

        *Plaintiffs,*

      v.

MERCK & CO., INC.,

        *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 85

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* STEPHEN A. KRAHLING AND JOAN A. WLOCHOWSKI, | |
| Relators, | Civil Action No. 10-4374 (CDJ) |
| v. | |
| MERCK & CO., INC., | |
| Defendant. | |

**RELATOR JOAN A. WLOCHOWSKI'S RESPONSES AND OBJECTIONS TO DEFENDANT MERCK'S REQUESTS FOR ADMISSION**

In accordance with Federal Rules of Civil Procedure 26 and 36, Relator Joan A.

Wlochowski ("Relator") by and through her undersigned counsel, hereby responds and objects to

Merck's Requests for Admission to Relator Joan A. Wlochowski ("RFAs"), as follows:

**PRELIMINARY STATEMENT**

1.      Discovery in this action and Relator's investigation and development of all facts

and circumstances relating to this action are ongoing.  Relator's Responses and Objections to the

RFAs are based on the information available at this time.  They are made in a good faith effort to

answer each Request as completely as possible with the factual information as is currently

known, but should in no way prejudice Relator in relation to further discovery, recollection,

research, or analysis, including but not limited to Relator's modification or amendment of these

Responses and Objections.

2.      Relator expressly reserves the right to use, or introduce at any hearing and/or trial,

information responsive to the RFAs but discovered or recalled subsequent to these responses,

including, but not limited to, any information obtained in discovery in this case from other parties or non-parties.

3.      Except for explicit facts admitted herein, no incidental or implied admissions are intended hereby. The fact that Relator has answered any RFAs should not be taken as an admission that Relator accepts or admits the existence of any facts set forth or assumed by such RFAs, or that such responses constitute admissible evidence. The fact that Relator has answered part or all of any request is not intended and shall not be construed to be a waiver of any objection made by Relator.

4.      By making the accompanying responses, Relator does not waive, and hereby expressly reserves, her right to assert any and all objections as to the admissibility of such responses into evidence in this action, or in any proceedings, on any and all grounds including, but not limited to, competency, relevancy, materiality, privilege, and scope. Further, Relator makes the responses and objections herein without in any way implying that she considers the RFAs, and responses to the RFAs, to be relevant or material to the subject matter of this action. Relator expressly reserves the right to: (i) object on any ground to the use of any information provided in response to the RFAs at any time and in any proceeding in this case or any other cases; and (ii) assert further objections to the discoverability, relevance, and/or admissibility of any such information on any and all grounds.

5.      Relator will respond to the RFAs as she understands them. If Defendant subsequently asserts an interpretation that differs from Relator's, Relator reserves the right to change and/or supplement her objections and responses.

6.      This Preliminary Statement is incorporated by reference into each and every response below, as though fully set forth therein.

Appx11118

## GENERAL OBJECTIONS

7.    Relator's responses to Defendant's RFAs, set forth below, are provided subject to the following General Objections, which apply to each and every Request for Admission for which a response is provided below, and which are incorporated into each and every response as if set forth in full therein.

8.    Relator objects to the RFAs to the extent they purport to impose obligations greater or different than those authorized by Federal Rules of Civil Procedure 26 or 36, the Local Rules of the Eastern District of Pennsylvania, or other applicable law. Relator expressly disclaims any such obligations and objects to any attempt to impose such obligations on Relator.

9.    Relator objects to the RFAs to the extent they seek information protected by Federal Rule of Civil Procedure 26(b), the attorney-client privilege, the attorney work product doctrine, or any other applicable privileges or protections. The fact that Relator does not specifically object to an individual Request for Admission on the ground that it seeks such privileged or protected information shall not be deemed a waiver of those protections or privileges. Inadvertent disclosure of any information or communications in response to the RFAs shall not constitute a waiver of any privilege or protection.

10.    Relator objects to the RFAs to the extent they seek information not relevant to the subject matter of this action or not reasonably calculated to lead to the discovery of admissible evidence.

11.    Relator objects to the RFAs as a whole, and in combination with the other written discovery requests served on Relators in this action, to the extent they are repetitive, overbroad, unduly burdensome, oppressive, and harassing.

12.    Relator objects to the RFAs to the extent they mischaracterize the actions in the

Appx11119

operative complaint or the conduct of any party or non-party.

13.     Relator objects to the definitions of "Relator," "you," "your," and "yourself" to

the extent that such definitions include counsel Relator retained or consulted with in connection

with this action, and the responses below exclude such meanings for these terms.

## RESPONSES AND OBJECTIONS TO REQUESTS FOR ADMISSION

### REQUEST NO. 1:

Admit that while you worked in Dr. David Krah's laboratory at Merck, you had responsibility for immunostaining assays for the mumps plaque reduction neutralization ("PRN") testing portion of Protocol 007 beginning in April 2001.

### RESPONSE:

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the terms "responsibility" and "testing

portion" are vague and ambiguous to the extent that they suggest that Relator's sole role at

Merck was immunostaining assays for the Protocol 007 tests.

Subject to these objections, Relator admits that her work for Merck included, but was not

limited to, immunostaining assays for Protocol 007 as early as April 2001.

### REQUEST NO. 2:

Admit that while you worked in Dr. David Krah's laboratory at Merck, you had responsibility for inoculating assays for the mumps PRN testing portion of Protocol 007 beginning in June 2001.

### RESPONSE:

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the terms "responsibility" and "testing

portion" are vague and ambiguous to the extent that they suggest that Relator's sole function at

Merck was to inoculate assays for the Protocol 007 PRN tests.

**Appx11120**

Subject to these objections, Relator admits that her work for Merck included, but was not limited to, inoculating assays for Protocol 007 as early as June 2001.

**REQUEST NO. 3:**

Admit that you first complained to Merck about improper data collection or data manipulation in connection with Protocol 007 in July 2001.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the terms "improper data collection" and "data manipulation" are vague and ambiguous and will instead interpret this Request to pertain to the fraud and misconduct Relator alleges in her Amended Complaint.

Subject to these objections, Relator denies this Request.

**REQUEST NO. 4:**

Admit that since your employment with Merck ended you personally have not communicated with the CDC about Merck's Mumps Vaccine or about the topics addressed in your Complaint.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Subject to these objections, Relator admits this Request.

**REQUEST NO. 5:**

Admit that prior to filing this lawsuit, you had no knowledge of the final seroconversion rates Merck reported to the FDA for the mumps component of M-M-R®II found in the Protocol 007 mumps PRN assay.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the term "final seroconversion rates" is vague and ambiguous.

Appx11121

Subject to these objections, Relator denies this Request.

## REQUEST NO. 6:

Admit that, prior to filing this lawsuit, you had no knowledge of the final seroconversion rates Merck reported to the FDA for the mumps component of M-M-R®II found in the Protocol 007 mumps enzyme linked immunosorbent assay ("ELISA assay").

## RESPONSE:

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the term "final seroconversion rates"

is vague and ambiguous.

Subject to these objections, Relator denies this Request.

## REQUEST NO. 7:

Admit that prior to filing this lawsuit, you had no knowledge of the seroconversion rates Merck reported to the FDA for the mumps component of M-M-R®II in connection with Merck's development of the PRN assay to use in Protocol 007.

## RESPONSE:

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the term "development of the PRN

assay" is so vague and ambiguous that Relator cannot understand what information it seeks.

Accordingly, Relator is unable to admit or deny this Request.

## REQUEST NO. 8:

Admit that, prior to filing this lawsuit, you had no knowledge regarding whether the FDA suggested that Merck use "animal antibodies," as that term is used by you in the Complaint, in connection with Protocol 007.

## RESPONSE:

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the term "suggested" is vague and

Appx11122

ambiguous. Relator will interpret this term in its broadest sense to include but not be limited to

the following meanings: originated, approved, acquiesced, proposed, or accepted. Relator also

objects to the use of the term "use" as vague and ambiguous because it does not identify how the

animal antibodies were used or controlled for.

Subject to these objections, Relator denies this Request.

**REQUEST NO. 9:**

Admit that, prior to filing this lawsuit, you had no knowledge regarding whether Merck
discussed with the FDA the effect of the use of "animal antibodies," as that term is used by you
in the Complaint, on rates of pre-positivity.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the use of the term "use" is vague and

ambiguous because it does not identify how the animal antibodies were used or controlled for.

Subject to these objections, Relator denies this Request.

**REQUEST NO. 10:**

Admit that, prior to filing this lawsuit, you had no knowledge regarding whether the FDA
approved the selection of the mumps virus to be used in the PRN assay used in connection with
Protocol 007.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the term "approved" is vague and

ambiguous.

Subject to these objections, Relator denies this Request.

**REQUEST NO. 11:**

Admit that, prior to filing this lawsuit, you had no knowledge regarding the review by the FDA
of data submitted by Merck in connection with Protocol 007.

Appx11123

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Subject to these objections, Relator denies this Request.

**REQUEST NO. 12:**

Admit that, prior to filing this lawsuit, you had no knowledge regarding any FDA deliberations concerning data submitted by Merck in connection with Protocol 007.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the term "deliberations" is vague and

ambiguous. Relator understands this Request to be duplicative of Request Number 10.

Subject to these objections, Relator denies this Request.

**REQUEST NO. 13:**

Admit that, prior to filing this lawsuit, you had no knowledge regarding what Protocol 007 assay data the FDA relied upon in approving the M-M-R®II label change application in connection with which Protocol 007 was conducted.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Subject to these objections, Relator denies this Request.

**REQUEST NO. 14:**

Admit that the FDA relied upon data from the Protocol 007 mumps ELISA assay in approving the M-M-R®II label change application in connection with which Protocol 007 was conducted.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request to the extent that its use of the term "relied upon" suggests

that the FDA exclusively relied upon data from the Protocol 007 mumps ELISA assay in

Appx11124

approving the M-M-R®II label change application.

Subject to these objections, Relator admits that one of the things the FDA relied upon in

approving the M-M-R®II label change application was data from the Protocol 007 mumps

ELISA assay.

**REQUEST NO. 15:**

Admit that the FDA did not rely upon data from the Protocol 007 mumps PRN assay in approving the M-M-R®II label change application in connection with which Protocol 007 was conducted.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Subject to these objections, Relator denies this Request.

**REQUEST NO. 16:**

Admit that you were never involved with the development or running of an ELISA assay.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Subject to these objections, Relator denies this Request.

**REQUEST NO. 17:**

Admit that you were never involved with the development or running of a mumps ELISA assay at Merck.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Subject to these objections, Relator denies this Request.

**REQUEST NO. 18:**

Admit that you were never involved with the development or running of a mumps ELISA assay at Merck in connection with Protocol 007.

Appx11125

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Subject to these objections, Relator denies this Request.

**REQUEST NO. 19:**

Admit that you are unaware of anyone on behalf of the FDA criticizing the description on the M-M-R®II label of the efficacy of the mumps component of M-M-R®II.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the term "on behalf of the FDA" is vague and ambiguous because it is not clear when FDA employees are speaking independently or on behalf of the agency, or whether they are even authorized to do so. Relator also objects to the use of the term "criticizing" as vague and ambiguous. For the purpose of answering this Request, Relator will interpret that term to include any questions or concerns raised about how well Merck's Mumps Vaccine works at protecting recipients from contracting the mumps virus and whether it complies with the specifications and descriptions on its label.

Subjections to these objections, Relator denies this Request.

**REQUEST NO. 20:**

Admit that you are unaware of anyone on behalf of the FDA criticizing the description on the M-M-R®II label regarding the seroconversion rate of the mumps component of M-M-R®II.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator also objects on the grounds that the term "on behalf of the FDA" is vague and ambiguous because it is not clear when FDA employees are speaking independently or on behalf of the agency, or whether they are even authorized to do so. Relator also objects to the use of the term

Appx11126

"criticizing" as vague and ambiguous. For the purpose of answering this Request, Relator will

interpret that term to include any questions or concerns raised about the seroconversion rates of

Merck's Mumps Vaccine and whether it complies with the specifications and descriptions on its

label.

Subjections to these objections, Relator denies this Request.

**REQUEST NO. 21:**

Admit that you are unaware of anyone on behalf of the FDA criticizing the description on the
ProQuad® label of the efficacy of the mumps component of ProQuad®.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the term "on behalf of the FDA" is

vague and ambiguous because it is not clear when FDA employees are speaking independently

or on behalf of the agency, or whether they are even authorized to do so. Relator also objects to

the use of the term "criticizing" as vague and ambiguous. For the purpose of answering this

Request, Relator will interpret that term to include any questions or concerns raised about how

well Merck's Mumps Vaccine works at protecting recipients from contracting the mumps virus

and whether it complies with the specifications and descriptions on its label.

Subject to these objections, Relator denies this Request.

**REQUEST NO. 22:**

Admit that you are unaware of anyone on behalf of the FDA criticizing the description on the
ProQuad® label regarding the seroconversion rate of the mumps component of ProQuad®.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator also objects on the grounds that the term "on behalf of the FDA" is vague and ambiguous

-11-

because it is not clear when FDA employees are speaking independently or on behalf of the

agency, or whether they are even authorized to do so. Relator also objects to the use of the term

"criticizing" as vague and ambiguous. For the purpose of answering this Request, Relator will

interpret that term to include any questions or concerns raised about the seroconversion rates of

Merck's Mumps Vaccine and whether it complies with the specifications and descriptions on its

label.

　　　　Subjections to these objections, Relator denies this Request.

**REQUEST NO. 23:**

Admit that you have never worked in Merck's manufacturing division.

**RESPONSE:**

　　　　Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that "Merck's manufacturing division" is

an undefined term and it is therefore unclear what constitutes that division.

　　　　Subject to these objections, Relator admits she never worked in the unit at Merck

formally referred to as the Merck Manufacturing Division.

**REQUEST NO. 24:**

Admit that while you were employed at Merck you did not have responsibility for the
manufacturing of Merck's Mumps Vaccine.

**RESPONSE:**

　　　　Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the terms "responsibility" and

"manufacturing" are vague and ambiguous.

　　　　Subject to these objections, Relator admits that her job duties did not include

manufacturing Merck's Mumps Vaccine.

Appx11128

**REQUEST NO. 25:**

Admit that while you were employed at Merck you did not have involvement in the manufacturing process for Merck's Mumps Vaccine.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that its use of the terms "involvement" and "manufacturing process" are vague and ambiguous. For the purposes of this Request, Relator will interpret the term "involvement" to include any work that directly or indirectly affected the manufacturing of Merck's Mumps Vaccine.

Subject to these objections, Relator denies this Request.

**REQUEST NO. 26:**

Admit that while you were employed at Merck you did not have personal knowledge of the manufacturing process for Merck's Mumps Vaccine.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Subject to these objections, Relator denies this Request.

**REQUEST NO. 27:**

Admit that, prior to filing this lawsuit, you never read the license describing the manufacturing process for Merck's Mumps Vaccine.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the term "license" is undefined and it is unclear to what document or documents it is referring.

Subject to these objections, Relator is unable to admit or deny this Request

Appx11129

**REQUEST NO. 28:**

Admit that, prior to filing this lawsuit, you did not have personal knowledge of how Merck's Mumps Vaccine is manufactured.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Subject to these objections, Relator denies this Request.

**REQUEST NO. 29:**

Admit that, prior to filing this lawsuit, you did not have personal knowledge of whether Merck's Mumps Vaccine was manufactured differently at the time you were employed at Merck compared to when the vaccine was originally licensed.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Subject to these objections, Relator denies this Request.

**REQUEST NO. 30:**

Admit that your job duties at Merck did not include directly communicating with the FDA on behalf of Merck.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Subject to these objections, Relator admits this Request.

**REQUEST NO. 31:**

Admit that during your employment at Merck you were never asked to communicate with the FDA directly on behalf of Merck.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the definition of Merck includes

Relators and other former employees, which renders this Request vague and ambiguous.

Appx11130

Subject to these objections, Relator denies this Request.

**REQUEST NO. 32:**

Admit that during your employment at Merck you were not involved with drafting, reviewing, or approving the content or any other aspects of any submissions Merck made to the FDA in connection with Merck's Mumps Vaccine.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the meaning of the term "submission" is unclear. For the purposes of this Request, Relator will interpret the term submission to mean any oral, written, or other conveyance of information to the FDA.

Subject to these objections, Relator denies this Request.

**REQUEST NO. 33:**

Admit that during your employment at Merck, you never saw any submission Merck made to the FDA in connection with Merck's Mumps Vaccine.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the meaning of the term "submission" is unclear. For the purposes of this Request, Relator will interpret submission to mean any oral, written, or other conveyance of information to the FDA.

Subject to these objections, Relator denies this Request.

**REQUEST NO. 34:**

Admit that, prior to filing this action, your personal knowledge of communications between Merck and the FDA was based on statements or information that you allege Dr. David Krah made or provided to you.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

**Appx11131**

Relator further objects to this Request on the grounds that it is unclear whether it is asking if

Krah is the sole source of all of Relator's knowledge of communications between Merck and the

FDA or only a source.  Relator also objects to this Request on the grounds that it is overly broad

because it is not limited to communications between Merck and the FDA pertaining to the

allegations in this lawsuit.

Subject to these objections, Relator admits that at the time she filed her Complaint, some

but not all of her knowledge about communications between Merck and the FDA was based on

statements or information Krah made or provided to her.

### REQUEST NO. 35:

Admit that you have never attended any meeting between Merck and the FDA.

### RESPONSE:

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the definition of Merck includes

Relators and other former employees, which renders this Request vague and ambiguous.

Subject to these objections, Relator denies this Request.

### REQUEST NO. 36:

Admit that you have never attended any meeting between Merck and the FDA concerning
Merck's Mumps Vaccine.

### RESPONSE:

Relator incorporates the Preliminary Statement and General Objections stated above.

Subject to these objections, Relator admits this Request.

### REQUEST NO. 37:

Admit that you have never attended any meeting between Merck and the FDA concerning
Protocol 007.

Appx11132

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Subject to these objections, Relator admits this Request.

**REQUEST NO. 38:**

Admit that you have never attended any meeting between Merck and the FDA concerning any neutralization assay.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Subject to these objections, Relator admits this Request.

**REQUEST NO. 39:**

Admit that you have never attended any meeting between Merck and the FDA concerning any ELISA assay.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the definition of Merck includes

Relators and other former employees, which renders this Request vague and ambiguous.

Subject to these objections, Relator denies this Request.

**REQUEST NO. 40:**

Admit that when the FDA inspected Merck's facilities in August and/or September of 2001, you did not attend any meetings between Merck and the FDA.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the time period is compound.

Subject to these objections, Relator admits this Request.

Appx11133

**REQUEST NO. 41:**

Admit that you did not speak to nor were you interviewed by the FDA when they inspected Dr. David Krah's laboratory at Merck in August and/or September 2001.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the time period is compound.

Subject to these objections, Relator admits she was not interviewed or spoken to by

anyone from the FDA during the FDA's onsite inspection of Krah's lab on August 6, 2001.

**REQUEST NO. 42:**

Admit that you were not involved with responding to the FDA on behalf of Merck following the FDA's inspection of Merck's facilities in August and/or September 2001.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the time period is compound.

Subject to these objections, Relator denies this Request.

**REQUEST NO. 43:**

Admit that, prior to filing this lawsuit, you never saw any of Merck's submissions to the FDA in connection with the FDA's inspection of Merck's facilities in August and/or September 2001.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the meaning of the term "submissions"

is unclear.  For the purposes of this Request, Relator will interpret the term submission to mean

any oral, written, or other conveyance of information to the FDA.

Subject to these objections, Relator denies this Request.

Appx11134

**REQUEST NO. 44:**

Admit that during your employment at Merck you were not involved with drafting, reviewing, or approving the content or any other aspects of any submissions Merck made to the FDA in connection with Protocol 007.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the meaning of the term "submissions"

is unclear. For the purposes of this Request, Relator will interpret the term submission to mean

any oral, written, or other conveyance of information to the FDA.

Subject to these objections, Relator denies this Request.

**REQUEST NO. 45:**

Admit that, prior to filing this lawsuit, you never saw any submission Merck made to the FDA in connection with Protocol 007.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the meaning of the term "submission"

is unclear. For the purposes of this Request, Relator will interpret the term submission to mean

any oral, written, or other conveyance of information to the FDA.

Subject to these objections, Relator denies this Request.

**REQUEST NO. 46:**

Admit that during your employment at Merck you were not involved with drafting, reviewing, or approving the content or any other aspects of any submissions Merck made to any foreign regulatory body in connection with Merck's Mumps Vaccine.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the meaning of the term "submissions"

**Appx11135**

is unclear.  For the purposes of this Request, Relator will interpret the term submission to mean

any oral, written, or other conveyance of information to any foreign regulatory body.

Subject to these objections, Relator denies this Request.

**REQUEST NO. 47:**

Admit that, prior to filing this lawsuit, you never saw any submissions Merck made to any
foreign regulatory body in connection with Merck's Mumps Vaccine.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the meaning of the term "submissions"

is unclear.

Subject to these objections, Relator admits this Request.

**REQUEST NO. 48:**

Admit that during your employment at Merck you were not involved with drafting, reviewing, or
approving the content or any other aspects of any submissions Merck made to any foreign
regulatory body in connection with Protocol 007.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the meaning of the term "submissions"

is unclear.  For the purposes of this Request, Relator will interpret the term submission to mean

any oral, written, or other conveyance of information to any foreign regulatory body.

Subject to these objections, Relator denies this Request.

**REQUEST NO. 49:**

Admit that prior to filing this lawsuit, you never saw any submission Merck made to any foreign
regulatory body in connection with Protocol 007.

Appx11136

**RESPONSE:**

  Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the meaning of the term "submission"

is unclear.

  Subject to these objections, Relator admits this Request.

**REQUEST NO. 50:**

Admit that, prior to filing this lawsuit, you had no knowledge regarding what Protocol 007 assay
data any foreign regulatory body relied upon in approving a label change application submitted
for the Merck's Mumps Vaccine.

**RESPONSE:**

  Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that it lacks specificity as to what "label

change" it refers to.

  Accordingly, Relator cannot admit or deny this Request.

**REQUEST NO. 51:**

Admit that your job duties at Merck did not include directly communicating with the CDC on
behalf of Merck.

**RESPONSE:**

  Relator incorporates the Preliminary Statement and General Objections stated above.

  Subject to these objections, Relator admits this Request.

**REQUEST NO. 52:**

Admit that during your employment at Merck you were never asked to communicate with the
CDC directly on behalf of Merck.

**RESPONSE:**

  Relator incorporates the Preliminary Statement and General Objections stated above.

-21-

**Appx11137**

Subject to these objections, Relator admits this Request.

**REQUEST NO. 53:**

Admit that during your employment at Merck you were not involved with drafting, reviewing, or approving the content of or any other aspects of any submissions Merck made to the CDC in connection with Merck's Mumps Vaccine.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the term "submission" is unclear.

Relator also objects on the grounds that the Request is vague, ambiguous, and overly broad

because it is unclear what would constitute being "involved with drafting, reviewing, or

approving the content of or any other aspects of any submissions." Relator also objects on the

grounds that she does not know every "submission" Merck has made to the CDC and therefore

cannot evaluate whether she was "involved" in "any" "aspect" of such a submission.

Accordingly, Relator cannot admit or deny this Request.

**REQUEST NO. 54:**

Admit that, prior to filing this action, you never saw any submission Merck made to the CDC in connection with Merck's Mumps Vaccine.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the meaning of the term "submission"

is unclear. For the purposes of this Request, Relator will interpret the term submission to mean

any oral, written, or other conveyance of information to the CDC.

Subject to these objections, Relator denies this Request.

**REQUEST NO. 55:**

Admit that while you were employed at Merck you were not involved with drafting, negotiating,

**Appx11138**

or executing any contract for the sale of Merck's vaccines to the CDC.

**RESPONSE:**

> Relator incorporates the Preliminary Statement and General Objections stated above.

> Subject to these objections, Relator admits this Request.

**REQUEST NO. 56:**

Admit that, prior to filing this lawsuit, you never saw any contract between Merck and the CDC for the purchase of Merck's Mumps Vaccine.

**RESPONSE:**

> Relator incorporates the Preliminary Statement and General Objections stated above.

> Subject to these objections, Relator admits she cannot recall whether, prior to filing her

lawsuit, she saw any contract between Merck and the CDC for the purchase of Merck's Mumps

Vaccine.

**REQUEST NO. 57:**

Admit that, prior to filing this lawsuit, you had no personal knowledge of any non-public communications between Merck and the CDC concerning Merck's Mumps Vaccine.

**RESPONSE:**

> Relator incorporates the Preliminary Statement and General Objections stated above.

> Subject to these objections, Relator admits this Request.

**REQUEST NO. 58:**

Admit that, prior to filing this lawsuit, you had no personal knowledge of any communications between Merck and the CDC concerning Protocol 007.

**RESPONSE:**

> Relator incorporates the Preliminary Statement and General Objections stated above.

> Subject to these objections, Relator admits this Request.

Appx11139

**REQUEST NO. 59:**

Admit that, prior to filing this lawsuit, you had no knowledge of any communications between Merck and the CDC other than the CDC contracts for purchase of Merck's Mumps Vaccine.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Subject to these objections, Relator denies this Request.

**REQUEST NO. 60:**

Admit that, prior to filing this lawsuit, you did not know the bases upon which the CDC decides to purchase Merck's Mumps vaccine.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request on the grounds that the phrase "the bases" is unclear as to

whether the Request is seeking whether Relator knew all or merely some of the bases upon

which the CDC relied in deciding to purchase Merck's Mumps Vaccine.

Subject to these objections, Relator denies this Request.

**REQUEST NO. 61:**

Admit that you have not spoken to the CDC about its decision to purchase Merck's Mumps Vaccine.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Subject to these objections, Relator admits this Request.

**REQUEST NO. 62:**

Admit that none of the CDC contracts with Merck for M-M-R®II make any reference to seroconversion rates.

Appx11140

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request because it covers every single contract Merck has with the

CDC for M-M-R®II, to which Relator has not been privy. Relator is still waiting for the

production of these documents from Merck.

Accordingly, Relator cannot admit or deny this Request.

**REQUEST NO. 63:**

Admit that none of the CDC contracts with Merck for M-M-R®II make any reference to
efficacy.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request because it covers every single contract Merck has with the

CDC for M-M-R®II, to which Relator has not been privy. Relator is still waiting for the

production of these documents from Merck.

Accordingly, Relator cannot admit or deny this Request.

**REQUEST NO. 64:**

Admit that none of the CDC contracts with Merck for M-M-R®II make any reference to the
clinical trials of the vaccine.

**RESPONSE:**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request because it covers every single contract Merck has with the

CDC for M-M-R®II, to which Relator has not been privy. Relator is still waiting for the

production of these documents from Merck.

Accordingly, Relator cannot admit or deny this Request.

Appx11141

**REQUEST NO. 65:**

Admit that none of the CDC contracts with Merck for M-M-R®II make any reference to the effectiveness of the vaccine.

**RESPONSE**

Relator incorporates the Preliminary Statement and General Objections stated above.

Relator further objects to this Request because it covers every single contract Merck has with the

CDC for M-M-R®II, to which Relator has not been privy. Relator is still waiting for the

production of these documents from Merck.

Accordingly, Relator cannot admit or deny this Request.

April 6, 2016

**KELLER GROVER LLP**
Jeffrey F. Keller
Kathleen R. Scanlan
1965 Market Street
San Francisco, CA 94103
(415) 543-1305 (telephone)

*Counsel for Relators*

**CONSTANTINE CANNON LLP**
Gordon Schnell
Robert L. Begleiter
Marlene Koury
Hamsa Mahendranathan
335 Madison Avenue
New York, NY 10017
(212) 350-2700 (telephone)

Jason Enzler
1001 Pennsylvania Avenue, NW
Washington DC 20004
(202) 204-3500 (telephone)

*Counsel for Relators*

-26-

## CERTIFICATE OF SERVICE

I, Jason Enzler, hereby certify that on April 6, 2016, a true and correct copy of Relator

Joan A. Wlochowski's Responses and Objections to Defendant Merck's Requests for Admission

was served by electronic mail upon all counsel listed below:

Lisa C. Dykstra                                    *Attorneys for Defendant*
Eric Sitarchuk
Brandon R. Fee
Coleen M. Meehan
Melina R. DiMattio
Margaret E. Rodgers Schmidt
MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
ldykstra@morganlewis.com
esitarchuk@morganlewis.com
bfee@morganlewis.com
cmeehan@morganlewis.com
mdimattio@morganlewis.com
mrodgersschmidt@morganlewis.com

Sally Bryan                                        *Attorneys for Defendant*
Dino Sangiamo
VENABLE LLP
750 E. Pratt Street, Suite 900
Baltimore, MD 21202
srbryan@venable.com
dssangiamo@venable.com
mfroberts@venable.com

Gerald B. Sullivan                                 *Attorneys for the United States of America*
Joel M. Sweet
Margaret L. Hutchinson
UNITED STATES ATTORNEY'S OFFICE
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
gerald.sullivan@usdoj.gov
joel.sweet@usdoj.gov
margaret.hutchinson@usdoj.gov

Jason Enzler
Jason Enzler

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*, STEPHEN A. KRAHLING and JOAN A. WLOCHOWSKI, *Plaintiffs,* v. MERCK & CO., INC., *Defendant.* | Civil Action No. 10-4374 (CDJ) **CONTAINS "CONFIDENTIAL" AND "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" MATERIAL PURSUANT TO PROTECTIVE ORDER** |

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 86

252                    THE NEW ENGLAND JOURNAL OF MEDICINE                    Feb. 2, 1967                    Vol. 276

# LIVE, ATTENUATED MUMPS-VIRUS VACCINE[*]

## 4. Protective Efficacy as Measured in a Field Evaluation

MAURICE R. HILLEMAN, PH.D., D.Sc.,[†] ROBERT E. WEIBEL, M.D.,[‡] EUGENE B. BUYNAK, PH.D.,[§]
JOSEPH STOKES, JR., M.D., D.Sc.,[¶] AND JAMES E. WHITTMAN, JR., PH.D.[||]

WEST POINT AND PHILADELPHIA, PENNSYLVANIA

PREVIOUS reports[1,2] described the development of the Jeryl Lynn B level live, attenuated mumps-virus vaccine, the findings in early clinical tests of the vaccine and the serologic and clinical responses to the vaccine in a controlled field study carried out in the Havertown–Springfield suburb of Philadelphia during the fall, winter and spring of 1965-66. The present report summarizes the data on the protective efficacy of the vaccine against natural mumps challenge in the Havertown–Springfield study.

## RESULTS

### Conduct of the Study

Details of the study plan were previously described,[2] and only the essential aspects are given here. Lot 137 of Jeryl Lynn strain, B level, live, attenuated mumps-virus vaccine was used in a dosage of 1.0 ml. given subcutaneously. The children were enrolled as members of nursery or kindergarten classrooms in 17 different private and parochial schools or in a day school or as members of families selected for inclusion in the study. The day-school children were counted with the school classroom groups for purpose of analysis.

The composition of the study groups is shown in Table 1. Most of the children in the study were represented either in classrooms or in families but not in both. There were a number of families, however, in which 1 or more siblings were present as a vaccinated subject or as a control in a study classroom. The 112 children who were included in the family groups and also attended a study classroom were considered as belonging to both the family and the classroom groups and were counted twice in the analyses.

The children in the classrooms who had a negative clinical history of mumps were divided at random to receive mumps-virus vaccine or to serve as controls. Additional children in the classrooms with known positive or uncertain history of mumps were

added to the control group. Families were sought that were large enough to permit vaccination of at least 1 mumps-susceptible child with retention of at least 2 susceptible children for control purpose. The children in the families were chosen to receive vaccine or to serve as controls on as random a basis as was possible.

The mumps-vaccine study was carried out in conjunction with another study in which formalin-killed respiratory syncytial, parainfluenza 1, 2 and 3 viruses and *Mycoplasma pneumoniae* vaccines against respiratory disease were being evaluated.[3] A portion of the children who received mumps vaccine or who served as controls in the present study also received 1 of the respiratory vaccines. These vaccines have been described elsewhere.[6–11] As shown below and in a previous report,[2] the respiratory vaccines did not protect against mumps or induce antibody against mumps. Hence, for purpose of analysis, the concurrent receipt of other vaccines may be disregarded. Blood samples collected before vaccination and again six to eight weeks later or taken only at the equivalent period of six to eight weeks in 191 of the total group of unvaccinated controls served to establish the serologic status for mumps of both the vaccinated children and the controls and permitted measurement of the efficacy of the vaccine for inducing mumps antibody. All serologic testing was by the hemagglutination-inhibition and the serum neutralization procedures as described earlier.[2] Among the total group there were 362 initially seronegative vaccinated children and 505 controls.

The children were followed carefully for the development of clinical mumps during the period after vaccination to the time of writing (July 1, 1966). Those in the classrooms were visited twice weekly by teams of nurses, and all children who were absent from school with what was suspected of being mumps were visited at home. The mothers of the children in the families and of the children in the schools, after school was dismissed for summer vacation, were asked to notify 1 of us (R.E.W.) of the occurrence of possible mumps in any of the children. Reporting was also by co-operating physicians in the area. All children were seen by a qualified physician and with few exceptions were also seen by 1 of us (R.E.W.). Natural mumps-virus infection was occurring in the community at low rate during the time vaccinations were being carried out. The few children in whom mumps developed within sixteen days after vaccination were omitted from the anal-

*From the Division of Virus and Cell Biology Research, Merck Institute for Therapeutic Research, and the Department of Pediatrics, University of Pennsylvania School of Medicine.

†Executive director, Division of Virus and Cell Biology Research, Merck Institute for Therapeutic Research.

‡Department of Pediatrics, University of Pennsylvania School of Medicine; assistant physician, Children's Hospital of Philadelphia; pediatrician, Bryn Mawr and Lankenau hospitals.

§Director of viral immunology, Division of Virus and Cell Biology Research, Merck Institute for Therapeutic Research.

¶Professor emeritus, Department of Pediatrics, University of Pennsylvania School of Medicine.

||Senior research virologist, Division of Virus and Cell Biology Research, Merck Institute for Therapeutic Research.

Supplied by The British Library - "The world's knowledge"

Appx11145

2. 1967

TABLE 1. *Composition of the Study Groups.*

| Group | Dates of Mumps-Vaccine Administration | Total No. of Children | No. by Completed Vaccination | No. of Controls |
|---|---|---|---|---|
| **All children:** | | | | |
| Classroom | 10/4-10/25/65 | 619 | 253 | 306 |
| Family | 10/26/65-1/10/66 | 338 | 113 | 225 |
| Classroom & family | 10/4/65-1/24/66 | 380 (112)† | 116 (53)† | 264 (50)† |
| Totals | | 1337 | 482 | 855 |
| **Initially seronegative children:** | | | | |
| Classroom | | 335 | 195 | 140 |
| Family | | 246 | 86 | 160 |
| Classroom & family | | 286 | 91 (40)* | 195 (43)* |
| Totals | | 867 | 362 | 505 |

*All children bled before & after vaccination except for 191 unvaccinated controls (140 seronegative), from whom only 1 blood specimen was obtained.
†Figures in parentheses indicate children in families who were also members of classrooms.

yses. In each case exposure to a sibling or other close contact with mumps within the proper incubation period was established. A mouth-and-throat specimen for virus isolation was taken at the onset of all cases of suspect mumps, and a convalescent-phase blood sample was also collected for laboratory diagnostic purpose to confirm or to refute the clinical diagnosis of mumps. The throat specimens were taken by swab, with special care to include parotid secretions from Stensen's ducts, extracted into veal infusion broth (pH 7.4), and tested immediately or stored frozen at −60°C. in an electrically operated freezer until examined for virus, usually no more than seven days later. The serums were stored frozen at −20°C. until tested.

Attempts to isolate mumps virus were made from the mouth and throat specimens in cell cultures of grivet-monkey kidney. The thawed samples were diluted 1:2 with a medium containing an antibiotic mixture and were planted in 0.5-ml. amount in quadruplicate in grivet-monkey-kidney tubes. The cultures were rotated in a drum at 36°C. and were observed for cytopathic effect on the third, fifth and seventh days of incubation. One subculture passage was made in the same manner on the seventh day, and the cell sheets at the termination of each passage were examined for mumps cytopathology and for presence of hemadsorbing virus by addition of guinea-pig red-cell suspension. All isolated viruses were identified in appropriate tests with known positive antiserums prepared in animals, and the isolation of mumps virus was considered to be diagnostic of mumps. The serums were tested by the hemagglutination-inhibition and serum neutralization procedures,[1] and the occurrence of a fourfold or greater increase in titer in the convalescent-phase serum specimen compared with that of the sample taken at onset of illness, after vaccination or at an equivalent period in the controls was considered to be diagnostic of mumps. In nearly every case there was a clear-cut rise in antibody titer from zero level to high level. There was excellent correspondence in the serologic and virus-isolation results, and the clinical diagnosis of mumps was upheld in approximately 91 per cent of the cases. The few reported cases of clinical mumps among the groups reported

in Tables 2 and 3 for which laboratory proof could not be established were excluded from the summaries.

Natural mumps was occurring in low incidence in the study populations during the period when the children were being entered into the study. This caused no difficulty except in a few children who had been exposed to mumps before vaccination but not long enough for antibody to have developed and for the child to be considered immune. Such children usually contracted mumps as a result of the natural exposure, and for this reason, the few cases of mumps that occurred within sixteen days of vaccination were discarded from the study. In each child, the exposure to natural mumps in a sibling or other close contact was established, and the occurrence of mumps as a result of vaccination was ruled out.

#### Occurrence of Natural Mumps in the Study Population

Figure 1 shows the time of occurrence, by week, of the laboratory-proved cases of natural mumps observed in the study populations through the week of April 25, 1966. The vaccine was administered to the children in the classrooms from October 4 through October 25, 1965, and in the children in the families, not including siblings who might also have been in classrooms, from October 4, 1965,



FIGURE 1. *Occurrence of Proved Cases of Natural Mumps during the Course of the Study in the School and Family Groups.*

Supplied by The British Library - "The world's knowledge"

Appx11146

254            THE NEW ENGLAND JOURNAL OF MEDICINE        Feb. 2, 1967

TABLE 2. *Occurrence of Laboratory-Proved Cases of Natural Mumps among Children in the Classrooms through the Week of April 25, 1966.*

| SCHOOL, CLASS, ROOM | VACCINATED GROUP | | | CONTROL GROUP | |
|---|---|---|---|---|---|
| | NO. OF CHIL-DREN | NO. OF CASES OF MUMPS | NO. OF CONTROLS* ORIGINALLY IN STUDY | NO. OF CASES OF MUMPS IN CONTROLS ORIGINALLY IN STUDY | NO. OF CASES AMONG CLASSROOM CONTACTS† |
| 01 | A | 2 | 0 | 2 | 1 |
| 01 | B | 3 | 0 | 5 | 5 |
| 04 | I | 7 | 0 | 8 | 1 |
| 05 | D | 9 | 0 | 4 | 2 |
| 05 | F | 4 | 0 | 9 | 1 |
| 06 | M | 8 | 1‡ | 7 | 6 |
| 07 | Q | 3 | 0 | 3 | 3 |
| 07 | R | 6 | 0 | 4 | 4 |
| 11 | AA | 8 | 0 | 7 | 1 |
| 12 | OO | 11 | 0 | 6 | 1 | 1 |
| 13 | CC | 5 | 0 | 5 | 2 |
| 14 | DD | 9 | 0 | 8 | 7 | 5 |
| 17 | KK | 9 | 1‡ | 0 | 3 |
| 18 | QQ | 4 | 0 | 2 | 2 |
| Totals | | 86 | 2 | 70 | 39 | 6 |

*All initially seronegative for mumps.

†Cases occurring in classroom contacts not originally included in study (no blood samples taken during vaccination period from these children).

‡Postvaccination neutralizing-antibody titer of 1:1.

through January 24, 1966. Mumps was endemic in the study groups during October, 1965, through January, 1966, after which it assumed more epidemic proportions, reaching a peak in mid-March of 1966. Altogether, 63 cases of proved mumps were observed during the total study period, and this includes 6 cases among classroom contacts not originally a part of the study population (Table 2).

## Occurrence of Natural Mumps in the Classroom Groups

As shown in Table 2, natural mumps was observed to occur in 14 classrooms by the end of the week of April 25, 1966. The occurrence of 1 or more cases of mumps in a particular classroom was interpreted to have placed the entire classroom at

TABLE 3. *Occurrence of Laboratory-Proved Cases of Natural Mumps among Children in the Families through the Week of April 25, 1966.*

| FAMILY NO. | VACCINATED CHILDREN | | NONVACCINATED CHILDREN | | INTERVAL BETWEEN VACCINATION & 1ST CASE OCCURRING IN FAMILY |
|---|---|---|---|---|---|
| | NO. VACCINATED | NO. OF CASES OF MUMPS | NO. OF CONTROLS* | NO. OF CASES OF MUMPS | |
| 1 | 1 | 0 | 2 | 1 | 26 days |
| 2 | 1 | 0 | 2 | 2 | 6 days; 23 days, |
| 3 | 1 | 0 | 2 | 1 | 3 mo. |
| 4 | 1 | 0 | 2 | 2 | 2 mo.; 2 mo. |
| 5 | 1 | 0 | 2 | 2 | 17 days; 1 mo. |
| 6 | 1 | 0 | 1 | 1 | 3 mo. |
| 7 | 2 | 0 | 2 | 2 | 4 mo.; 5 mo. |
| 8 | 1 | 0 | 2 | 2 | 5 mo.; 5 mo. |
| 9 | 1 | 0 | 2 | 2 | 5 mo.; 5 mo. |
| 10 | 1 | 0 | 1 | 1 | 6 mo. |
| 11 | 1 | 0 | 2 | 2 | 6 mo.; 6 mo. |
| 12 | 1 | 0 | 2 | 2 | 3 mo.; 5 mo. |
| 13 | 1 | 0 | 2 | 2 | 5 mo.; 5 mo. |
| Totals | 14 | 0 | 24 | 22 | |

*All controls initially seronegative for mumps.

risk to mumps, and more than 1 case of mumps did occur in all but 4 classrooms. It is seen that 86 vaccinated children and 76 initially seronegative controls were at risk in the total group. Among the controls, 39 proved cases of mumps occurred, giving an attack rate of 51 per cent. By contrast, only 2 of 86 vaccinated children at risk contracted mumps, with a rate of 2 per cent. These 2 vaccination failures were in children in whom neutralizing-antibody titers of only 1:1 against mumps had developed after vaccination. There were 6 additional proved cases of mumps among unvaccinated children who were not included originally in the study but who were contacts to the children in 2 of the classrooms — that is, 1200 and 14DD.

## Occurrence of Natural Mumps in the Family Groups through the Week of April 25, 1966

Table 3 shows that natural mumps occurred in 13 of the families by the end of the week of April 25, 1966. In all but 2 of these families (6 and 10), the ideal of 1 vaccinated child and 2 controls was achieved. Under such circumstances, an index patient with mumps presumably brought the infection to the home and a vaccinated sibling and a control were put at risk in the same family. Altogether, 22 of the 24 control children in the families contracted mumps with confirmed laboratory diagnosis, giving an attack rate of 92 per cent. By contrast, none of the 14 vaccinated children who were at risk acquired the disease.

Six of the children in the families in whom mumps developed also attended classrooms in the study group and put their classmates at risk. These 6 cases of mumps were counted twice: in the classrooms (Table 2) and in the families (Table 3). The interval between the giving of vaccine in the family and the occurrence of mumps in a sibling control is of special importance. The vaccinated children were put to risk by the occurrence of mumps in contacts whose illness first appeared as early as six days after vaccination or as late as six months. These data indicated that the vaccine induced a durable immunity for at least six months after it was given.

## Occurrence of Natural Mumps in the Family Groups during the Week of May 2 through June 27, 1966

Twenty cases of clinically diagnosed mumps occurred in 13 families (Table 4) in addition to those listed in Table 3. Laboratory diagnostic tests have not been completed to date on these children, and the diagnosis of mumps was based on clinical criteria only. It is seen that 19 cases of clinical mumps occurred among 29 children at risk whereas only 1 case was observed among the 13 sibling contacts who were vaccinated. The tentative attack rates, therefore, were 66 and 8 per cent, respectively, for the control and vaccinated groups. The interval between vaccination and exposure to mumps ranged from five to eight months in the group, and this indicated protection against mumps for at least eight months.

2, 1967

Vol. 276  No. 5     MUMPS-VIRUS VACCINE—HILLEMAN ET AL.     255

TABLE 4. *Occurrence of Additional Cases of Natural Mumps\* in the Families during the Period from the Week of May 2 through the Week of June 27, 1966.*

| FAMILY NO. | VACCINATED CHILDREN | | NONVACCINATED CHILDREN | | INTERVAL BETWEEN VACCINATION & 1ST CASE OCCURRING IN FAMILY |
|---|---|---|---|---|---|
| | NO. VACCINATED | NO. OF CASES OF CLINICAL MUMPS | NO. CONTROLS | NO. OF CASES OF MUMPS | |
| 14 | 1 | 0 | 3 | 3 | 5 mo.; 6 mo.; 7 mo. |
| 15 | 1 | 0 | 3 | 2 | 6 mo.; 7 mo. |
| 16 | 1 | 0 | 3 | 1 | 6 mo. |
| 17 | 1 | 0 | 2 | 2 | 7 mo.; 7 mo. |
| 18 | 1 | 0 | 2 | 1 | 5 mo. |
| 19 | 1 | 0 | 2 | 2 | 8 mo.; 8 mn. |
| 20 | 1 | 0 | 2 | 1 | 6 mo. |
| 21 | 1 | 0 | 1 | 1 | 7 mo. |
| 22 | 1 | 0 | 1 | 1 | 8 mo. |
| 23 | 1 | 0 | 3 | 1 | 8 mo. |
| 24 | 1 | 0 | 2 | 1 | 8 mo. |
| 25 | 1 | 1† | 2 | 0 | 8 mo. |
| 26 | 1‡ | 0 | 3 | 3 | 4 mo.; 5 mo.; 3 mn. |
| Totals | 13 | 1 | 29 | 19 | |

\*Clinical diagnosis only.

†This child showed prevaccination neutralizing-antibody titer of 1:1.

‡This child showed prevaccination neutralizing-antibody titer of <1:1.

## Influence of Respiratory-Virus Vaccines on Occurrence of Natural Mumps

As noted above, a portion of the vaccinated or control children in the classrooms received formalin-killed respiratory syncytial, parainfluenza or *M. pneumoniae* vaccine in connection with a study to evaluate the efficacy of respiratory-virus vaccines. The occurrence of mumps among the children who received such vaccines alone, or who were held as controls, is shown in Table 5. It is seen that the attack rate for mumps in each of the respiratory-virus vaccine groups was roughly the same and that the rates for mumps were higher, though not significantly so, among the recipients of respiratory-virus vaccine than among the unvaccinated controls.

## Overall Appraisal of Efficacy of B Level Jeryl Lynn Strain of Live, Attenuated Mumps-Virus Vaccine

Table 6 summarizes the definitive attack rates for laboratory-proved cases of mumps among children in the classroom and family groups in the study summarized in Tables 2 and 3 and for the unproved cases occurring in the families after the week of April 25 and summarized in Table 4. It is seen that, by chance, there were 100 vaccinated children and 100 controls who were at risk to natural mumps

TABLE 5. *History of Respiratory-Virus Vaccination among the 63 Cases of Laboratory-Proved Mumps Occurring in the Mumps Control Children in the Classroom and Family Study Groups through the Week of April 25, 1966.*

| VACCINE | NO. OF CHILDREN IN GROUP | NO. OF CASES OF MUMPS | MUMPS ATTACK RATE % |
|---|---|---|---|
| Respiratory syncytial | 57 | 9 | 16 |
| Parainfluenza 1, 2 & 3 | 60 | 10 | 17 |
| *M. pneumoniae* | 63 | 13 | 21 |
| None | 50 | 6 | 12 |

TABLE 6. *Protective Efficacy of B Level Jeryl Lynn Strain of Live, Attenuated Mumps-Virus Vaccine against Natural Mumps Challenge.*

| GROUP | VACCINATED PERSONS AT RISK | | | CONTROLS AT RISK | | | PROTECTIVE EFFICACY |
|---|---|---|---|---|---|---|---|
| | NO. AT RISK | NO. OF CASES | RATE % | NO. AT RISK | NO. OF CASES | RATE % | % |
| Laboratory-proved cases of mumps†: | | | | | | | |
| Classrooms (Table 2) | 86 | 2 | 2 | 76 | 39 | 51 | 96 |
| Families (Table 3) | 14 | 0 | 0 | 24 | 22 | 92 | 100 |
| Totals | 100 | 2 | | 100 | 61 | | |
| Averages | | | 2 | | | 61 | 97 |
| Clinically diagnosed cases‡: | | | | | | | |
| Families (Table 4) | 13 | 1 | 8 | 29 | 19 | 66 | 88‡ |

\*Occurred through wk. of April 25, 1966.

†Occurred from wk. of May 2 through June 27, 1966.

‡Tentative estimation.

through the week of April 25 (Tables 2 and 3). All these children were initially seronegative to mumps. The overall attack rate among the controls was 61 per cent as contrasted with only 2 per cent among the children who were vaccinated. Thus, the number of cases among the latter was reduced from 61 expected (as actually occurred in the control group) to 2 per 100, giving a protective efficacy figure for the vaccine of 97 per cent. There were 13 vaccinated children and 29 controls at risk in the families (Table 4) in which the cases occurred after the week of April 25, and the attack rates for unproved mumps were 8 per cent (1 case) and 66 per cent (19 cases), respectively. The expected cases of mumps in the vaccinated children were therefore reduced from 66 to 8 per 100, giving a protective efficacy of 88 per cent. If the clinically diagnosed cases of mumps are accepted without laboratory proof, the overall attack rates for all the groups for all the periods added together would be 3 per cent for vaccinated and 62 per cent for control children, giving a calculated protective efficacy figure for the vaccine of 95 per cent.

## DISCUSSION

Mumps is generally regarded as an acute infection in which the usual presenting sign is parotitis but in which severe and even lethal results may occur, especially when the infection is delayed to adulthood.[12,13] Mumps-virus infection is generalized and may involve the nervous system, testis, epididymis, prostate, ovary, mammary glands, vulvovaginal glands, thymus, pancreas, liver, spleen, kidneys, thyroid gland, eye and ear as well as the parotid glands. The more serious involvement may be in the nervous system,[16] with production of meningoencephalitis, which is lethal on rare occasion, transverse myelitis, ascending paralysis, hemiplegia, optic neuritis and unilateral or bilateral eighth-nerve deafness, which may be permanent. The orchitis,

Supplied by The British Library - "The world's knowledge"

Appx11148

256          THE NEW ENGLAND JOURNAL OF MEDICINE       Feb. 2, 1967    Vol.

which occurs especially in adolescents or adults, frequently leads to testicular atrophy, with impaired fertility or sterility. Severe pancreatitis, with subsequent diabetes, has been noted.[17] Transient arthritis and occasional thrombocytopenic purpura may also occur, and the possibility of a congenital defect[18,19] such as endocardial fibroelastosis has been considered. These aspects of mumps-virus infection, as well as the discomfort to the patient and the time loss from gainful effort, appear to justify application of a safe and effective live mumps-virus vaccine.

The B level Jeryl Lynn strain of live, attenuated mumps-virus vaccine described in the present and other reports[1-4] appears to provide the essential qualifications for an acceptable vaccine for preventing mumps. The vaccine was prepared in cell cultures of chick embryo and was tested for safety in a manner consistent with the guidelines established for live measles-virus vaccine.[19] The infectivity (immunizing potency) of the dried vaccine virus was stable on storage at 4°C. and was sufficiently stable at higher temperature and after rehydration to render it practical for routine application in clinical practice. The vaccine did not cause fever or other clinical manifestations, including parotitis, in any of the vaccinated children that were in excess of those observed in susceptible contact controls who had not been vaccinated. The virus was not excreted from vaccinated children and was not contagious to susceptible contacts. Mumps antibodies induced by the vaccine were retained for at least seven months in all of a sample of children tested to date, and protective efficacy against natural mumps was shown in the present study to last for at least eight months, the longest period of observation to date.

The Jeryl Lynn B level vaccine showed a high degree of protective efficacy against natural mumps in the unusually large-scale epidemic that occurred during 1966. The reduction of cases of natural mumps (that is, protective efficacy) resulting from the vaccine was 97 per cent if only the laboratory-proved cases are considered. If, however, the later cases that occurred in families and have not yet been diagnosed in the laboratory are included, the protective efficacy would be about 95 per cent.

Infection with mumps virus bears many analogies to measles (rubeola). Both illnesses are caused by viruses of the myxovirus group, and there is systemic involvement in both infections. There is only a single serotype for each virus, and natural infection provides lifelong immunity. Both viruses are neurotropic. However, clinically apparent central-nervous-system involvement in mumps appears to be more frequent but less devastating, on the average, than in measles. Both viruses are attenuated in virulence by passage in embryonated hens' eggs, and both propagate well in cell cultures of chick embryo. Neither of the infections established by the Enders live, attenuated measles-virus vaccine[20] or by the B level Jeryl Lynn strain vaccine is conta-

gious to susceptible human contacts. The infection induced by the mumps vaccine is clinically inapparent whereas that arising from the measles vaccine is apparent in a portion of recipients with resultant fever and rash.[20,21] The heights of the neutralizing-antibody responses to mumps-virus and measles-virus vaccines are considerably less than those that follow the respective natural infections.[22] Both the Enders vaccine and the Jeryl Lynn strain of live mumps-virus vaccine induced antibody in approximately 98 per cent of susceptible recipients, and the protective efficacy of the 2 vaccines after natural challenge is approximately 95 per cent or greater. Circulating antibodies resulting from prior natural infection often precluded antibody responses to both vaccines though antibody increase did occur on occasion.[23,21] Both vaccines appear to act by inducing neutralizing antibody that prevents natural virus infection entirely or prevents viremic spread in the body. The pattern of decline in antibody that follows the Enders live, attenuated measles-virus vaccine approximates that for the natural disease, and the evidence to date indicates that the same circumstance attends the mumps-virus vaccine. A neutralizing-antibody titer of 1:1 or less need not be protective against natural challenge with either virus whereas one of 1:2 or greater affords solid immunity. However, protection against natural measles[22] or mumps challenge has been noted in persons with homologous neutralizing-antibody titers of less than 1:1 — that is, less than detectable by ordinary procedure. These close analogies between vaccines of live measles and those of live mumps virus strongly suggest that their characteristics of performance should be much the same.

Children in the present study who received formalin-killed respiratory syncytial, parainfluenza 1, 2 and 3 or M. pneumoniae vaccines that were highly potent[5] were not protected against natural mumps, and antibody against mumps' virus did not develop as a result of such vaccination. This observation is of special interest in relation to the parainfluenza-virus vaccine since there is a remote antigenic relation between mumps virus and certain of the parainfluenza-virus types.[25]

Killed mumps-virus vaccines have not found routine use in children, apparently because there is no durable protective effect.[26] Early studies[27,28] with live virus showed that the mumps agent was rapidly attenuated for man by passage in embryonated hens' eggs and that administration by oral spray was capable of eliciting antibody and affording some degree of protection without causing typical mumps. It was apparent, however, that the virus rapidly became overattenuated for man[29] and that a narrow range in passage level would be required for a safe and effective vaccine. Smorodintsev and his co-workers[30,31] have conducted extensive investigations of live mumps-virus vaccines for several years in Russia, employing virus prepared originally in embryonated hens' eggs and most recently in chick-

Appx11149

nfection
ly inap-
les vac-
with re-
of the
inus and
ess than
ctions.[22]
n strain
body in
cipients,
es after
cent or
m prior-
sponses
id occur
t by in-
natural
pread in
ody that
es-virus
disease,
ime cir-
cine. A
zed not
n either
Is solid
natural
oted in
antibody
tectable
ies be-
of live
aracter-
e.
eceived
nza 1, 2
highly
mumps,
develop
ation is
fluenza-
ric rela-
of the

nd rou-
e is no
as with
rapidly
d hens'
was ca-
me de-
umps. It
tly be-
narrow
r a safe
his co-
igations
ears in
In em-
chick-

embryo cell cultures. The virus was given by the in-
tradermal or subcutaneous route. Though the
antibody responses appeared to be less than maxi-
mal, the vaccines afforded an apparent protective
efficacy of 90 per cent or greater, and the immunity
lasted for at least five years.

The data presented in this and in previous re-
ports[1-4] established conclusively the safety, the high
level of antibody response and the excellent protec-
tive efficacy of the B level Jeryl Lynn strain of
live, attenuated mumps-virus vaccine. The vaccine
should find considerable application for eliminating
morbidity, patient discomfort and time lost from
productive activity resulting from mumps, for pre-
venting the serious complications that sometimes
occur in natural mumps infection and for relieving
parental or personal distress. The close analogy be-
tween live, attenuated measles-virus and mumps-
virus vaccines, the similarities in the pathogenesis
of the natural disease and the evidence for antibody
retention and protective efficacy to date provide a
basis for anticipation that the immunity attending the
live mumps-virus vaccine will be as durable as that
after the Enders live measles-virus vaccine.

### SUMMARY AND CONCLUSIONS

A controlled study to ascertain the protective
efficacy of the B level Jeryl Lynn strain of live,
attenuated mumps-virus vaccine was carried out
among 1337 children in families or in nursery or
kindergarten classrooms in the Havertown–Spring-
field suburb of Philadelphia during 1965-66. In the
total group 362 vaccinated children and 505 controls
were initially devoid of mumps antibody. An epi-
demic of natural mumps occurred in the Philadelphia
area during the late winter and spring of 1966, and
this permitted definitive measurement of the pro-
tective efficacy of the vaccine. Sixty-three cases of
laboratory-confirmed mumps occurred in the study
groups through the week of May 25, and the attack
rates for vaccinated and control children were 2 and
61 per cent, respectively, giving an overall protec-
tive efficacy of 97 per cent. Since that time 20 addi-
tional cases of clinical mumps have occurred that
have not been laboratory confirmed to date. The
attack rates of vaccinated and control children were
8 and 66 per cent, respectively. If the latter are
accepted as mumps and added to the former, the
overall protection rate would be 95 per cent. The
protective efficacy was afforded for at least eight
months after vaccination, the longest period observed
to date. A neutralizing-antibody titer of 1:1 after
vaccination was not protective in 3 cases though a
titer of less than 1:1 appeared to afford protection
in 1 case put to challenge. The basic analogies be-
tween infections with measles and those with mumps
virus and the similarities in the immune responses
to the Enders live measles-virus vaccine and to the
live mumps-virus vaccine are discussed. The find-
ings of durable protection for eight months to date
and of the pattern of antibody retention after vac-

cination and the similarity in pattern of response to
the live measles and mumps vaccines provide a basis
for expectation that the immunity that follows the
mumps-virus vaccine will be permanent.

We are indebted to the parents of the children studied, the
registered nurses, the physicians and the directors and teachers
of the kindergarten and nursery schools in the Havertown–
Springfield area for their support and participation in this
community program.

### REFERENCES

1. Buynak, E. B., and Hilleman, M. R. Live attenuated mumps virus vaccine. 1. Vaccine development. Proc. Soc. Exper. Biol. & Med. (in press).
2. Stokes, J., Jr., Weibel, R. E., Buynak, E. B., and Hilleman, M. R. Live attenuated mumps virus vaccine. 2. Early clinical studies. Pediatrics (in press).
3. Weibel, R. E., Stokes, J., Jr., Buynak, E. B., Whitman, J. E., Jr., and Hilleman, M. R. Live, attenuated mumps-virus vaccine. 3. Clinical and serologic aspects in field evaluation. New Eng. J. Med. 276:245-251, 1967.
4. Hilleman, M. R. Advances in control of viral infections by non-specific measures and by vaccines with special reference to live mumps and rubella virus vaccines. Clin. Pharmacol. & Therap. 7: 752-762, 1965.
5. Weibel, R. J., et al. Respiratory virus vaccines. 7. Field Evalua-tion of RS, Parainfluenza 1, 2, 3 & Mycoplasma pneumoniae vaccines, 1965-66 (in press).
6. Potash, L., et al. Respiratory virus vaccines. 1. Respiratory syn-cytial and parainfluenza virus vaccines. Am. Rev. Resp. Dis. 93:536-549, 1966.
7. Mesgar, D. P., et al. Respiratory virus vaccines. 2. Mycoplasma pneumoniae (Eaton agent) vaccines. Am. Rev. Resp. Dis. 94:1-9, 1966.
8. Sweet, B. H., et al. Respiratory virus vaccines. 3. Perawalent respiratory syncytial-parainfluenza-Mycoplasma pneumoniae vaccine. Am. Rev. Resp. Dis. 94:510-519, 1966.
9. Woodhour, A. F., et al. Respiratory virus vaccines. 4. Heptavalent RS-parainfluenza-mycoplasma-influenza vaccine in institutional-ized persons. Am. Rev. Resp. Dis. 94:530-541, 1966.
10. Weibel, R. E., et al. Respiratory virus vaccines. 5. Field evaluation for efficacy of heptavalent vaccine. Am. Rev. Resp. Dis. 94:362-379, 1966.
11. Hilleman, M. R. Cause and immunologic control of viral respira-tory illnesses. Presented at IVth International Congress for Infect-ious Diseases, Munich, West Germany, April 28-30, 1965 (in press).
12. Holt, L. E., Jr., McIntosh, R., and Barnett, H. L. Pediatrics, Thirteenth edition. 1393 pp. New York: Appleton, 1962.
13. Textbook of Pediatrics. Eighth edition. Edited by W. E. Nelson. 1636 pp. Philadelphia: Saunders, 1964.
14. Grieble, H. G., and Jackson, G. G. Current notions about mumps virus infection. GP 17 (2):73-78, February, 1958.
15. Pray, L. G. Mumps. Journal-Lancet 80:451-454, 1960.
16. Scheid, W. Mumps virus and central nervous system. World Neurol. 2:117-135, 1961.
17. Hinden, E. Mumps followed by diabetes. Lancet 1:1581, 1962.
18. Vosburgh, J. H., Diehl, A. M., Liu, C., Lauer, R. M., and Fabiyi, A. Relationship of mumps to endocardial fibroelastosis: comple-ment-fixation, hemagglutination-inhibition and intradermal skin tests for mumps in children with and without endocardial fi-broelastosis. Am. J. Dis. Child. 109:69-73, 1965.
19. United States Department of Health, Education, and Welfare, Public Health Service. Additional Standards: Regulations, Measles Virus Vaccine, Live Attenuated: Biological products. Washington, D.C.: Government Printing Office, 1965. Title 42, Part 73, P. 34.
20. Enders, J. F., Katz, S. L., Milovanović, M. V., and Holloway, A. Studies on attenuated measles-virus vaccine. 1. Development and preparation of vaccine: technics for assay of effects of vaccina-tion. New Eng. J. Med. 263:153-159, 1960.
21. Stokes, J., Jr., Weibel, R., Halenda, R., Reilly, C. M., and Hille-man, M. R. Enders' live measles-virus vaccine with human im-mune globulin. 1. Clinical reactions. Am. J. Dis. Child. 103:360-372, 1962.
22. Hilleman, M. R., et al. Enders' live measles-virus vaccine with human immune globulin. II. Evaluation of efficacy. Am. J. Dis. Child. 103:373-379, 1962.
23. Krugman, S., Giles, J. P., Friedman, H., and Stone, S. Studies on immunity to measles. J. Pediat. 66:471-488, 1965.
24. Stokes, J., Jr., Reilly, C. M., Buynak, E. B., and Hilleman, M. R. Immunologic studies of measles. Am. J. Hyg. 74:293-303, 1961.

Supplied by The British Library - "The world's knowledge"

Appx11150

258    THE NEW ENGLAND JOURNAL OF MEDICINE    Feb. 2, 1967    Vol. 27

25. Cassell, K. Mumps virus, *Advances in Virus Research* 8:123-161, 1961.
26. Council on Drugs. New and nonofficial drugs. *J.A.M.A.* 184:874, 1967.
27. Henle, G., et al. Studies on prevention of mumps. IV. Effect of oral spraying of attenuated active virus. *J. Immunol.* 68:579-504, 1931.
28. Enders, J. F., Levens, J. H., Stokes, J. Jr., Maris, E. P., and Berenberg, W. Attenuation of virulence with retention of anti-
genicity of mumps virus after passage in embryonated egg. *J. Immunol.* 54:283-291, 1946.
29. Henle, W. Problems in prevention of mumps. *Quart. Rev. Pediat.* 15:99-85, 1960.
30. Smorodintsev, A. A. New data on live vaccines against poliomyelitis, mumps and measles. *Progr. M. Virol.* 3:215-310, 1961.
31. Smorodintsev, A. A., Lutynonua, T. Ya., and Mikutskaya, B. A. Data on efficiency of live mumps vaccine from chick embryo cell cultures. *Acta viral.* 9:240-247, 1965.

## FLUORESCENT TREPONEMAL-ANTIBODY ABSORPTION TESTS*

### Studies of False-Positive Reactions to Tests for Syphilis

DENNY L. TUFFANELLI, M.D.,† KIRK D. WUEPPER, M.D.,‡ LYNDA L. BRADFORD, B.S.,§
AND RONALD M. WOOD, PH.D.¶

SAN FRANCISCO AND BERKELEY, CALIFORNIA

THE association of systemic diseases, particularly diseases of immunologic aberration in patients with chronic false-positive nontreponemal tests for syphilis, has repeatedly been stressed.[1-3] Newer treponemal tests, particularly those employing fluorescent-antibody methods, are modifying previous diagnostic tenets and changing concepts of the false-positive reaction. The *Treponema pallidum* immobilization test (TPI) is less sensitive than the fluorescent treponemal-antibody absorption test (FTA-ABS) in primary, secondary and late syphilis.[4,5]

A number of patients, considered to have false-positive reactions on the basis of a nonreactive TPI test, have been found to have reactive FTA-ABS tests. Because of the disparity in results we have restudied our patients with a previous diagnosis of false-positive reaction. In this report these patients are reclassified by their response to the newer treponemal tests. In addition, the incidence and serologic evidence of immunologic disease in these patients is determined.

### STUDY GROUPS AND METHODS

The records of 347 patients with a previous diag-

*From the Division of Dermatology, Department of Medicine, University of California School of Medicine, San Francisco, and the State of California Health and Welfare Agency, Department of Public Health, Berkeley.

Presented in part at a meeting of Dermatology Research Group of the American Federation of Clinical Research, Atlantic City, New Jersey, and at a meeting of the Venereal Disease Section, American Academy of Dermatology, Chicago, Illinois.

Supported in part by a grant (AI-06609-01) from the National Institute of Allergy and Infectious Diseases, Bacteriology and Mycology Branch, United States Public Health Service, and in part by a grant (CC-00255) from the Communicable Disease Center, United States Public Health Service, Atlanta, Georgia.

†Assistant clinical professor of dermatology, University of California School of Medicine; assistant research dermatologist, Herbert C. Moffitt Hospital.

‡Trainee in dermatology, University of California School of Medicine.

§Associate microbiologist, Microbial Diseases Laboratory, State of California Health and Welfare Agency, Department of Public Health.

¶Chief, Microbial Diseases Laboratory, State of California Health and Welfare Agency, Department of Public Health.

nosis of false-positive reaction to tests for syphilis at the University of California School of Medicine have been reviewed. One hundred and seventy-six responded to an inquiry and were interviewed and re-examined, and serum specimens were obtained for laboratory studies.

Specimens from 30 patients with either scleroderma (11 patients) or systemic lupus erythematosus (19 patients), nonreactive reagin tests and +++ or ++++ antinuclear antibody in undiluted serum were also studied.

Venous blood was obtained aseptically with a disposable syringe and needle from all patients. After removal of the serum the samples were stored at −20°C. until tested. The serologic tests identified below were done.

Quantitative and qualitative Venereal Disease Research Laboratory (VDRL) slide flocculation tests for syphilis were performed according to standard methods.[6]

#### TPI Test

TPI tests were performed as in the usual procedure,[6] with the following exceptions: undiluted guinea-pig complement was used instead of the recommended 200 hemolytic units; and results were reported as reactive, with greater than 60 per cent immobilization, weakly reactive, with 30 to 59 per cent, inconclusive, with 18 to 29 per cent, and nonreactive, with less than 18 per cent immobilization.

The FTA-200 tests were performed as previously described.[7] The *T. pallidum* Nichols strain was prepared as recommended for the TPI test[6] and then lyophilized and stored at 4°C. Fluorescein isothiocyanate-labeled antihuman globulin was obtained commercially. Each vial was titrated against control serums before being used.

#### FTA-ABS Test

FTA-ABS tests were performed as described by Hunter et al.,[7] with the following exceptions: *T. pallidum* antigen smears were fixed in 10 per cent methyl alcohol for five minutes, and test serums

Supplied by The British Library - "The world's knowledge"

Appx11151

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel*.,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

              *Plaintiffs,*

   v.

MERCK & CO., INC.,

              *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 87



DEPARTMENT OF HEALTH & HUMAN SERVICES                    Public Health Service

_____

Food and Drug Administration
Rockville MD 20857

Submission Tracking Number (STN): BL 101069/5061

Alison Fisher, Ph.D.
Merck & Co., Inc.                          **OCT 1 7 2005**
P.O. Box 4
Sumneytown Pike
West Point, PA  19486

Dear Dr. Fisher:

This letter is in regard to the Supplement to your License
Application submitted under Section 351 of the Public Health
Service Act.

The Center for Biologics Evaluation and Research (CBER) has
completed the review of your Supplement received on
April 13, 2005, for Measles, Mumps, and Rubella Virus Vaccine
Live(M-M-R II), to include a change in the labeled potency of
the mumps component of M-M-R II from 20,000 $TCID_{50}$ to 12,500
$TCID_{50}$.  Our review finds that the information and data submitted
are inadequate for final approval at this time based on the
deficiencies described below.

1.   The clinical trial described in your supplement is
     inadequate to support this label change for the mumps
     component due to the following deficiencies:

     a.   A substantial amount of sample data was excluded from
          the analyses.  We note that  only 437 out of 672
          immunized control group subjects contributed to the
          per-protocol analysis.  This large proportion of
          missing data precludes a conclusion of success.

     b.   The accelerated-stability lots (Sublots 1 and 2) were
          assayed at a separate time and in a different assay
          format (1x6 vs. 3x1) from the product control lot
          (Sublot 3), which was the parental lot used to make
          accelerated-stability lots (Sublots 1 and 2).

     c.   The control lot failed the acceptability criteria as
          you acknowledge in your April 13, 2005 response.

If you intend to pursue the proposed changes in labeled potency,
we recommend that you support the proposed label change by

CONFIDENTIAL

Page 2 - STN: BL 101069/5061

correlating these study data and/or other relevant mumps vaccine
immunogenicity data with the immunogenicity data from the
original efficacy studies.  You could also consider shortening
the end-expiry dating period based upon these data.

Within 10 days after the date of this letter, you are requested
to take one of the following actions: (1) amend the Supplement;
(2) notify us of your intent to file amendments; (3) withdraw
the Supplement; or (4) request an opportunity for a hearing on
the question of whether there are grounds for denying approval
of the Supplement.  In the absence of any of the above
responses, CBER may initiate action to deny the Supplement.

Please note our review clock has been suspended with the
issuance of this letter.  Note also that any amendment should
respond to all deficiencies listed and that a partial reply will
not be considered for review nor will the review clock be
reactivated until all deficiencies have been addressed.

Should you need additional information or have any questions
concerning administrative or procedural matters, please contact
CAPT Gale Heavner at 301-827-3070.

                    Sincerely yours,

                    Karen L. Goldenthal, M.D.

                    Karen L. Goldenthal, M.D.
                    Director
                    Division of Vaccines and
                       Related Products Applications
                    Office of Vaccines
                       Research and Review
                    Center for Biologics
                       Evaluation and Research

CONFIDENTIAL

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel*.,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

          *Plaintiffs,*

    v.

MERCK & CO., INC.,

          *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 88

Alison L. Fisher, Ph.D
Associate Director
Worldwide Regulatory Affairs

Merck & Co., Inc.
UG2D-60
P.O. Box 1000
North Wales, PA 19454-1099
Tel 267 305 6727
Fax 267 305 6407
alison_fisher@merck.com

November 15, 2006



Research Laboratories

Norman Baylor, Ph.D.
Office of Vaccines Research and Review (HFM-400)
c/o Food and Drug Administration
Center for Biologics Evaluation and Research
Document Control Center (HFM-99)
Woodmont Office Center, Suite 400N
1401 Rockville Pike
Rockville, MD 20852-1448

Dear Dr. Baylor:

**Measles, Mumps, and Rubella Virus Vaccine Live**
**(M-M-R®ᴵᴵ)**
**STN 101069/5061**

**RESPONSE TO FDA REQUEST FOR INFORMATION**

Reference is made to a letter from CBER on October 17, 2005 regarding the above supplement. In addition to Merck responses, the letter from CBER is attached for your convenience.

This submission is formatted as required in Title 21 paragraph 312.23 of the Code of Federal Regulations and is being submitted in accordance with the current FDA Guidance Documents for the electronic common technical document including, but not limited to the following: *Comprehensive Table of Contents Heading and Hierarchy, Study Tagging Files Specification, Organization of The Common Technical Document – Annex – Granularity Document, and the International Conference on Harmonization, ICH M2 EWG, Electronic Common Technical Document Specification.* As an enclosure to this letter, Merck Research Laboratories (MRL), a Division of Merck & Co., Inc., is providing *one Compact Disk (CD)/DVD* which contains the submission. All documents requiring signatures for certification are included as paper for archival purposes.

All of the information is contained on one CD/DVD and is not more than 100 MB/GB. Merck has taken precautions to ensure that the contents of the media are free of computer viruses (Symantec AntiVirus Corporate Edition, Symantec Corporation), and we authorize the use of anti-virus software, as appropriate. We consider the filing of this supplemental Biologics License Application to be a confidential matter, and request that the Food and Drug Administration not make its content, or any future communications in regard to it, public without first obtaining the written permission of Merck & Co., Inc.

CONFIDENTIAL

Questions concerning the content of this submission should be directed to me at 267-305-6727 or, in my absence to Kenneth Surowitz, Ph.D. at 267-305-6764.

Sincerely,

Alison Fisher, Ph.D.
Associate Director
Worldwide Regulatory Affairs


Q:/Winterbottom/V205C/Response to Request for Information October 2005


Enclosure: *CD/DVD RAM*

CONFIDENTIAL

MRK-KRA00000394
MRK-CHA00000394

Merck-EDPA-00363

DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION

Form Approved: OMB No. 0910-0338
Expiration Date: September 30, 2008
See OMB Statement on page 2.

**APPLICATION TO MARKET A NEW DRUG, BIOLOGIC, OR AN ANTIBIOTIC DRUG FOR HUMAN USE**

(Title 21, Code of Federal Regulations, Parts 314 & 601)

**FOR FDA USE ONLY**

APPLICATION NUMBER

## APPLICANT INFORMATION

| NAME OF APPLICANT | DATE OF SUBMISSION |
|---|---|
| Merck & Co., Inc. | November 15, 2006 |

| TELEPHONE NO. (include Area Code) | FACSIMILE (FAX) Number (include Area Code) |
|---|---|
| (267) 305-6727 | (267) 305-6407 |

APPLICANT ADDRESS (Number, Street, City, State, Country, ZIP Code or Mail Code, and U.S. License number if previously issued):

UG2D-68

P.O. Box 1000

North Wales, PA 19454-1099

AUTHORIZED U.S. AGENT NAME & ADDRESS (Number, Street, City, State, ZIP Code, telephone & FAX number) IF APPLICABLE

## PRODUCT DESCRIPTION

NEW DRUG OR ANTIBIOTIC APPLICATION NUMBER, OR BIOLOGICS LICENSE APPLICATION NUMBER (if previously issued)   STN# 101069

| ESTABLISHED NAME (e.g., Proper name, USP/USAN name) | PROPRIETARY NAME (trade name) IF ANY |
|---|---|
| Measles, Mumps and Rubella Virus Vaccine Live | M-M-R® II |

| CHEMICAL/BIOCHEMICAL/BLOOD PRODUCT NAME (if any) | | CODE NAME (if any)  V205C |
|---|---|---|

| DOSAGE FORM: | STRENGTHS: | ROUTE OF ADMINISTRATION: |
|---|---|---|
| Injection | Measles/1,000 TCID (50) per 0.5 mL Dose | S.C. |
| | Mumps/20,000 TCID (50) per 0.5 mL Dose | |
| | Rubella/1,000 TCID (50) per 0.5 mL Dose | |

(PROPOSED) INDICATION(S) FOR USE:

MMR® II is indicated for simultaneous vaccination against measles, mumps and rubella in persons 15 months of age or older.

## APPLICATION DESCRIPTION

APPLICATION TYPE
(check one)      ☐ NEW DRUG APPLICATION (21 CFR 314.50)          ☐ ABBREVIATED NEW DRUG APPLICATION (ANDA, 21 CFR 314.94)
                 ☒ BIOLOGICS LICENSE APPLICATION (21 CFR Part 601)

IF AN NDA, IDENTIFY THE APPROPRIATE TYPE       ☐ 505 (b)(1)        ☐ 505 (b)(2)

IF AN ANDA, OR 505(b)(2), IDENTIFY THE REFERENCE LISTED DRUG PRODUCT THAT IS THE BASIS FOR THE SUBMISSION
Name of Drug                                  Holder of Approved Application

TYPE OF SUBMISSION (check one)     ☐ ORIGINAL APPLICATION       ☐ AMENDMENT TO A PENDING APPLICATION       ☐ RESUBMISSION
☐ PRESUBMISSION       ☐ ANNUAL REPORT       ☐ ESTABLISHMENT DESCRIPTION SUPPLEMENT       ☐ EFFICACY SUPPLEMENT
☐ LABELING SUPPLEMENT       ☐ CHEMISTRY MANUFACTURING AND CONTROLS SUPPLEMENT       ☒ OTHER

IF A SUBMISSION OF PARTIAL APPLICATION, PROVIDE LETTER DATE OF AGREEMENT TO PARTIAL SUBMISSION:

IF A SUPPLEMENT, IDENTIFY THE APPROPRIATE CATEGORY       ☐ CBE       ☐ CBE-30   ☐ Prior Approval (PA)

REASON FOR SUBMISSION   Response to Request for Information

PROPOSED MARKETING STATUS (check one)   ☒ PRESCRIPTION PRODUCT (Rx)       ☐ OVER THE COUNTER PRODUCT (OTC)

NUMBER OF VOLUMES SUBMITTED          THIS APPLICATION IS       ☐ PAPER    ☒ PAPER AND ELECTRONIC    ☐ ELECTRONIC

ESTABLISHMENT INFORMATION (Full establishment information should be provided in the body of the Application.)
Provide locations of all manufacturing, packaging and control sites for drug substance and drug product (continuation sheets may be used if necessary). Include name, address, contact, telephone number, registration number (CFN), DMF number, and manufacturing steps and/or type of testing (e.g. Final dosage form, Stability testing) conducted at the site. Please indicate whether the site is ready for inspection or, if not, when it will be ready.

Cross References (list related License Applications, INDs, NDAs, PMAs, 510(k)s, IDEs, BMPs, and DMFs referenced in the current application)

FORM FDA 356h (10/05)                                                                 Page 1 of 1

Merck-EDPA-00364

MRK-KRA00000395
MRK-CHA00000395

**Appx11158**

| | This application contains the following items: *(Check all that apply)* |
|---|---|
| ☐ | 1. Index |
| ☐ | 2. Labeling *(check one)*      ☐ Draft Labeling      ☐ Final Printed Labeling |
| ☐ | 3. Summary (21 CFR 314.50 (c)) |
| ☐ | 4. Chemistry section |
| ☐ | A. Chemistry, manufacturing, and controls information (e.g., 21 CFR 314.50(d)(1); 21 CFR 601.2) |
| ☐ | B. Samples (21 CFR 314.50 (e)(1); 21 CFR 601.2 (a)) (Submit only upon FDA's request) |
| ☐ | C. Methods validation package (e.g., 21 CFR 314.50(e)(2)(i); 21 CFR 601.2) |
| ☐ | 5. Nonclinical pharmacology and toxicology section (e.g., 21 CFR 314.50(d)(2); 21 CFR 601.2) |
| ☐ | 6. Human pharmacokinetics and bioavailability section (e.g., 21 CFR 314.50(d)(3); 21 CFR 601.2) |
| ☐ | 7. Clinical Microbiology (e.g., 21 CFR 314.50(d)(4)) |
| ☐ | 8. Clinical data section (e.g., 21 CFR 314.50(d)(5); 21 CFR 601.2) |
| ☐ | 9. Safety update report (e.g., 21 CFR 314.50(d)(5)(vi)(b); 21 CFR 601.2) |
| ☐ | 10. Statistical section (e.g., 21 CFR 314.50(d)(6); 21 CFR 601.2) |
| ☐ | 11. Case report tabulations (e.g., 21 CFR 314.50(f)(1); 21 CFR 601.2) |
| ☐ | 12. Case report forms (e.g., 21 CFR 314.50 (f)(2); 21 CFR 601.2) |
| ☐ | 13. Patent information on any patent which claims the drug (21 U.S.C. 355(b) or (c)) |
| ☐ | 14. A patent certification with respect to any patent which claims the drug (21 U.S.C. 355 (b)(2) or (b)(2)(A)) |
| ☐ | 15. Establishment description (21 CFR Part 600, if applicable) |
| ☐ | 16. Debarment certification (FD&C Act 306 (k)(1)) |
| ☐ | 17. Field copy certification (21 CFR 314.50 (k)(3)) |
| ☐ | 18. User Fee Cover Sheet (Form FDA 3397) |
| ☐ | 19. Financial Information (21 CFR Part 54) |
| ☒ | 20. OTHER (Specify)  *Response to Request for Information* |

**CERTIFICATION**

I agree to update this application with new safety information about the product that may reasonably affect the statement of contra indications, warnings, precautions, or adverse reactions in the draft labeling. I agree to submit safety update reports as provided for by regulation or as requested by FDA. If this application is approved, I agree to comply with all applicable laws and regulations that apply to approved applications, including, but not limited to the following:

1. Good manufacturing practice regulations in 21 CFR Parts 210, 211 or applicable regulations, Parts 606, and/or 820.
2. Biological establishment standards in 21 CFR Part 600.
3. Labeling regulations in 21 CFR Parts 201, 606, 610, 660, and/or 809.
4. In the case of a prescription drug or biological product, prescription drug advertising regulations in 21 CFR Part 202.
5. Regulations on making changes in application in FD&C Act Section 506A, 21 CFR 314.71, 314.72, 314.97, 314.99, and 601.12.
6. Regulations on Reports in 21 CFR 314.80, 314.81, 600.80, and 600.81.
7. Local, state and Federal environmental impact laws.

If this application applies to a drug product that FDA has proposed for scheduling under the Controlled Substances Act, I agree not to market the product until the Drug Enforcement Administration makes a final scheduling decision.

The data and information in this submission have been reviewed and, to the best of my knowledge are certified to be true and accurate.

Warning: A willfully false statement is a criminal offense, U.S. Code, title 18, section 1001.

| SIGNATURE OF RESPONSIBLE OFFICIAL OR AGENT | TYPED NAME AND TITLE | DATE |
|---|---|---|
| *Alison L. Fisher* | Alison L. Fisher, Ph.D.<br>Associate Director<br>Worldwide Reg. Affairs/Vaccines Biologics | *Nov. 15, 2006* |

| ADDRESS *(Street, City, State, and ZIP Code)* | Telephone Number |
|---|---|
| UG2D-68<br>P.O. Box 1000<br>North Wales, PA 19454-1099 | (267) 305-6727 |

Public reporting burden for this collection of information is estimated to average 24 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to:

Department of Health and Human Services
Food and Drug Administration
Center for Drug Evaluation and Research
Central Document Room
5901-B Ammendale Road
Beltsville, MD 20705-1266

Department of Health and Human Services
Food and Drug Administration
Center for Biologics Evaluation and Research (HFM-99)
1401 Rockville Pike
Rockville, MD 20852-1448

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number

FORM FDA 356h (10/05)

Page 2 of 2



DEPARTMENT OF HEALTH & HUMAN SERVICES                    Public Health Service

_____
                                                        Food and Drug Administration
                                                        Rockville MD 20857

Submission Tracking Number (STN): BL 101069/5061

Alison Fisher, Ph.D.
Merck & Co., Inc.                          OCT 17 2005
P.O. Box 4
Sumneytown Pike
West Point, PA 19486

Dear Dr. Fisher:

This letter is in regard to the Supplement to your License
Application submitted under Section 351 of the Public Health
Service Act.

The Center for Biologics Evaluation and Research (CBER) has
completed the review of your Supplement received on
April 13, 2005, for Measles, Mumps, and Rubella Virus Vaccine
Live (M-M-R® II), to include a change in the labeled potency of
the mumps component of M-M-R® II from 20,000 $TCID_{50}$ to 12,500
$TCID_{50}$. Our review finds that the information and data submitted
are inadequate for final approval at this time based on the
deficiencies described below.

1.  The clinical trial described in your supplement is
    inadequate to support this label change for the mumps
    component due to the following deficiencies:

    a.  A substantial amount of sample data was excluded from
        the analyses. We note that only 437 out of 672
        immunized control group subjects contributed to the
        per-protocol analysis. This large proportion of
        missing data precludes a conclusion of success.

    b.  The accelerated-stability lots (Sublots 1 and 2) were
        assayed at a separate time and in a different assay
        format (1x6 vs. 3x1) from the product control lot
        (Sublot 3), which was the parental lot used to make
        accelerated-stability lots (Sublots 1 and 2).

    c.  The control lot failed the acceptability criteria as
        you acknowledge in your April 13, 2005 response.

If you intend to pursue the proposed changes in labeled potency,
we recommend that you support the proposed label change by

CONFIDENTIAL                                           Merck-EDPA-00366

**MRK-KRA00000397**
**MRK-CHA00000397**                              **Appx11160**

Page 2 - STN: BL 101069/5061

correlating these study data and/or other relevant mumps vaccine
immunogenicity data with the immunogenicity data from the
original efficacy studies.  You could also consider shortening
the end-expiry dating period based upon these data.

Within 10 days after the date of this letter, you are requested
to take one of the following actions: (1) amend the Supplement;
(2) notify us of your intent to file amendments; (3) withdraw
the Supplement; or (4) request an opportunity for a hearing on
the question of whether there are grounds for denying approval
of the Supplement.  In the absence of any of the above
responses, CBER may initiate action to deny the Supplement.

Please note our review clock has been suspended with the
issuance of this letter.  Note also that any amendment should
respond to all deficiencies listed and that a partial reply will
not be considered for review nor will the review clock be
reactivated until all deficiencies have been addressed.

Should you need additional information or have any questions
concerning administrative or procedural matters, please contact
CAPT Gale Heavner at 301-827-3070.

Sincerely yours,

Karen L. Goldenthal, M.D.
Director
Division of Vaccines and
   Related Products Applications
Office of Vaccines
   Research and Review
Center for Biologics
   Evaluation and Research

CONFIDENTIAL

1. The clinical trial described in your supplement is inadequate to support this label change for the mumps component due to the following deficiencies:

   a. A substantial amount of sample data was excluded from the analyses. We note that only 437 out of 672 immunized control group subjects contributed to the per-protocol analysis. This large proportion of missing data precludes a conclusion of success.

   Response:

   We acknowledge the deficiency concerning the mumps plaque reduction neutralization (PRN) assay data. However, we believe that the clinical trial described in our supplement, and further described in this response, is adequate to support the proposed M-M-R™II label change to revise the mumps end-expiry potency. The following summary presents data in support of our label claim.

   The total number of serum samples excluded in the per-protocol immunogenicity analysis for mumps PRN assay was 204, 229, and 235 for subjects immunized with M-M-R™II containing mumps virus potency of 3.8, 4.1, and 4.8 $\log_{10}$ TCID$_{50}$/dose, respectively. The proportions of missing PRN data were comparable across the 3 treatment groups. The 4 major reasons for the exclusion of these data were as follows:

   - A seropositivity to mumps by PRN at baseline (75, 93, and 84, for subjects immunized with M-M-R™II containing mumps virus potency of 3.8, 4.1, and 4.8 $\log_{10}$ TCID$_{50}$/dose, respectively)
   - An unknown serostatus at baseline (117, 126, and 138 subjects, respectively) which includes subjects with invalid baseline serum sample but also those with invalid 6-week serum sample since testing of study samples by PRN was only performed when both baseline and 6-week pair samples were available and fit for testing,
   - An extended storage of serum specimen at 4°C for >1 year prior to testing in the PRN assay (64, 77, and 88 subjects, respectively)[1],
   - A lost to follow-up or refusal from the parents to allow a blood draw or any further participation in the study.

   A detailed summary of subjects excluded at 6 weeks postvaccination from the per-protocol immunogenicity analyses for mumps PRN is included in Exhibit A.

   However, the absence of PRN data for approximately 30% of subjects enrolled in this clinical trial does not indicate that no mumps-specific antibodies were detected in these samples and thus imply lack of vaccine-induced mumps response. As per secondary study objectives, serum samples were also tested by an enzyme-linked immunosorbent assay (ELISA) for the presence of mumps-specific antibodies in all 3 treatment groups. The ELISA assay used by Merck utilizes mumps antigen derived from a low passage mumps virus (Jeryl Lynn strain) and is a very sensitive and specific assay for the evaluation of vaccine-induced mumps antibody response. The priority order for the testing of study serum samples were (1)Mumps PRN, (2)Mumps ELISA, (3)Measles ELISA, (4)Rubella ELISA, and (5)Varicella gpELISA.

---

[1] Merck Research Laboratories (MRL) obtained agreement from the Center for Biologics Evaluation and Research (CBER) to invalidate data from the PRN testing carried out in Jun- to Aug-2002 on ~300 pairs of serum samples stored over 1 year at 4°C across all 3 treatment groups (letter to BB-IND, general correspondence, serial #92, November 2002)

CONFIDENTIAL

The testing of study samples for mumps-specific neutralizing antibodies by PRN was interrupted at the Center for Biologics Evaluation and Research's (CBER) request for an investigation (BB-IND 1016, serial #80, February 2002). While waiting for CBER's response, Merck Research Laboratories (MRL) continued to perform the other study-specified tests by ELISA and gpELISA. When testing for PRN resumed, some samples had been stored at $4^0C$ for 1 year or more which was later found to negatively impact the suitability of the samples for PRN testing. PRN assay results for these samples were invalidated but results of the testing by ELISA were deemed valid since ELISA testing was performed well before the storage duration would have impacted the quality of the clinical samples. Because of the difference in the sensitivities of the mumps PRN and ELISA assays, some samples were tested positive at baseline by PRN assay but were found negative by ELISA. Given all these reasons, a great proportion of samples were excluded from the PRN immunogenicity analysis but were found acceptable to be included in the per-protocol immunogenicity analysis by mumps ELISA.

**Exhibit B** documents the number of seropositive subjects (per mumps ELISA) within the non-evaluable mumps PRN sample pool for the 4.8 $\log_{10}$ TCID$_{50}$ mumps virus potency group. Of the 235 subjects excluded from the mumps PRN per-protocol analysis in the control group, more than 80% (191 subjects) had valid mumps ELISA results with 188 demonstrating a seropositive result 6 weeks postvaccination in this assay. One hundred sixty-three (163) of the 191 subjects with valid mumps ELISA results were included in the per-protocol mumps ELISA analysis[2]. The mumps seroconversion rates (SCRs) by ELISA based on these subjects (163) was 98.2% (95% Confidence Interval (CI): [94.7%, 99.6%]) for the 4.8 $\log_{10}$ TCID$_{50}$ mumps virus potency group. The observed mumps ELISA SCR, 98.0% (95% CI: [96.5%, 98.9%]) in the control group based on all per-protocol subjects is in line with historical experience, and the estimated mumps ELISA response rate is comparable to the estimated mumps ELISA response rate in the 4.1 $\log_{10}$ TCID$_{50}$ mumps potency group (98.0% versus 97.4%; non-inferiority p-value= <0.001, δ=5%). Furthermore, additional analysis performed by MRL has shown a strong correlation (93.6%) between ELISA and PRN serology results suggesting that the majority of the non-evaluable samples would have tested positive by PRN (BB-IND 1016, serial #86, June 2002).

Given that we have mumps ELISA antibody titers for a substantial portion of the subjects with missing (or non-evaluable) PRN data, the observed ELISA results and the strong correlation between ELISA and PRN assay provide indirect evidence about the likely outcome for the missing data. As a supportive analysis, we performed an analysis of the primary hypothesis using multiple imputation techniques to account for the incomplete data from the PRN assay. Through the use of statistical modeling and multiple imputation techniques, sets of plausible values of the missing data can be simulated and combined with the observed data to produce multiple "complete" datasets. The multiple versions of the "complete" datasets are then analyzed by standard methods, and the results are combined using simple rules (Rubin, 1987) to yield estimates and standard errors that formally incorporate missing-data uncertainty. As described in **Exhibit C**, we used this approach to assess the impact of the missing data on the study conclusions.

The approach described in **Exhibit C** was replicated 1000 times, creating 1000 simulated "complete" datasets. For each dataset, the observed seroconversion rates (and standard

---

[2] Twenty-eight (28) subjects were excluded from the mumps ELISA per-protocol analysis due to: missing baseline or 6-week serology result; developed or exposed to disease; received wrong vaccine; day range violation; or initially seropositive.

CONFIDENTIAL

errors) and the estimated (stratified) difference in seroconversion rates (and standard error, based on Miettinen and Nurminen, 1985) were calculated for the 4.1 and 4.8 $\log_{10}$ TCID$_{50}$ Mumps Virus Potency groups. The overall estimates and standard errors (accounting for both between and within imputation variability) were then calculated using the method of Rubin (1987). The per-protocol acceptability and non-inferiority hypotheses for the 4.1 $\log_{10}$ TCID$_{50}$ Mumps Virus Potency group were then assessed using the overall estimates and standard errors. These results can be found in **Table 1**.

On average across the 1000 simulations, 515 and 502 subjects in the 4.8 and 4.1 $\log_{10}$ TCID$_{50}$ Mumps Virus Potency groups, respectively, were included in the analyses, compared with 437 and 433, respectively, in the original analysis. This analysis excludes subjects who were initially seropositive at baseline, or subjects who were predicted to be initially seropositive based on Model 2. As seen in **Table 1**, conclusions consistent with the original analysis were obtained for both acceptability and non-inferiority with the inclusion of the imputed data. It is also noted that the lower bound of 95% confidence interval for the observed seroconversion rate for the 4.8 $\log_{10}$ TCID$_{50}$ Mumps Virus Potency group was 89.956% (rounded to 90.0%). Thus, the simulations predict that if the missing PRN data had been available, their inclusion in the analyses would have confirmed the original results of the study. In addition they suggest that the seroconversion rate in the 4.8 $\log_{10}$ TCID$_{50}$ Mumps Virus Potency group would have likely met the non-hypothesized 90% lower bound criterion.

Merck-EDPA-00370

Table 1

Statistical Analysis of Non-Inferiority and Acceptability of Mumps [PRN] Seroconversion Rates
for the $\leq 4.1$ $\log_{10}$ $TCID_{50}$ Mumps Potency Group Using Multiple Imputation
(Per-Protocol Analysis)

| 4.1 $\log_{10}$ $TCID_{50}$ Mumps Potency (N=662) | | 4.8 $\log_{10}$ $TCID_{50}$ Mumps Potency (N=672) | | Estimated Differences[§] (90% CI)[‡] | Acceptability Conclusion[†] | Non-inferiority Conclusion[§] |
|---|---|---|---|---|---|---|
| n | Observed SCR (95% CI)[†] | n | Observed SCR (95% CI) | | | |
| 502 | 93.3% (90.9%, 95.6%) | 515 | 92.4% (90.0%, 94.8%) | 0.9 (-2.0, 3.8) | Acceptable | Similar |

[†] The lower bound of the 95% CI being >90% implies that the value of the parameter is statistically significantly greater than the prespecified acceptability criterion (90%) and allows for a conclusion of acceptability.

[‡] Estimated differences were based on a statistical analysis model adjusting for study centers.

[§] [Treatment Group - Control Group].

[¶] A lower bound of 90% CI on the difference greater than -5.0 implies that the difference is statistically significantly less than the pre-specified clinically relevant decrease of 5 percentage points and allows for a conclusion of similarity (non-inferiority).

N = Number of subjects vaccinated in each treatment group.

n = Average number of subjects (over the 1000 simulations) initially seronegative for mumps [PRN] contributing to the per-protocol analyses.

CI = Confidence interval.

SCR = Seroconversion rate.

CONFIDENTIAL

Merck-EDPA-00371

Appx11165

**b.  The accelerated-stability lots (Sublots 1 and 2) were assayed at a separate time and in a different assay format (1x6 vs. 3x1) from the product control lot (Sublot 3), which was the parental lot used to make accelerated-stability lots (Sublots 1 and 2).**

Response:

Unlike Sublots 1 and 2, Sublot 3 (product control lot) did not undergo any manipulation in order to achieve a specific virus potency but was rather kept frozen immediately after the parental lot has been split into 3 sublots. The product control lot (Sublot 3), underwent standard release testing at the time of manufacture like any other commercial lot of M-M-R$^{TM}$II. This included the 3x1 assay format for potency determination, which was the standard procedure at that time. This method has an estimated standard error of approximately 0.15 $\log_{10}$. Hence the 95% confidence interval around the reported value is estimated to be 4.5 to 5.1 $\log_{10}$ TCID$_{50}$/dose, values well above the current minimum end-expiry potency of 4.3 $\log_{10}$ TCID$_{50}$/dose. Sublots 1 and 2 were tested at a separate time, following incubation at room temperature which was used to decrease their potencies. The expanded assay format (1x6) was performed on Sublots 1 and 2 in order to obtain a more precise estimate of the more critical "expiry" potency. Indeed, multiple 1x6 assays were compiled on Sublots 1 and 2 in order to have an error on the estimated potencies near 0.02 $\log_{10}$. Since the use of the standard release testing provides a mumps virus potency for the product control lot well above the current minimum mumps end-expiry potency (4.3 $\log_{10}$ TCID$_{50}$/dose) and the proposed candidate expiry potencies (3.8 and 4.1 $\log_{10}$ TCID$_{50}$/dose), additional testing or the use of the 1x6 assay format would have added little value for the appropriateness of the selected lot as a suitable control for the clinical trial.

CONFIDENTIAL

c. **The control lot failed the acceptability criteria as you acknowledge in your April 13, 2005 response.**

We acknowledge that the lower bound of the CI for the control group (i.e., 4.8 $\log_{10}$ TCID$_{50}$ mumps potency) was below 90% (89.3%) as measured by the mumps PRN assay, however an acceptability hypothesis was not postulated for the 4.8 $\log_{10}$ TCID$_{50}$ mumps potency group. No acceptability hypothesis was set for the control group because it was designed to serve as a suitable internal reference of the safety and immunogenicity profile of the vaccine. To be acceptable, the candidate mumps end-expiry potency (4.1 or 3.8 $\log_{10}$ TCID$_{50}$/dose) had to display safety and immunogenicity profiles comparable to the internal control group. Based on the study results, only subjects receiving M-M-R™II containing mumps virus potency of 4.1 $\log_{10}$ TCID$_{50}$/dose achieved the study pre-specified criteria for success. Moreover, the 4.8 $\log_{10}$ TCID$_{50}$ mumps potency group had only a slightly lower observed seroconversion rate by PRN assay compared with the 4.1 $\log_{10}$ TCID$_{50}$ mumps potency group (92.2% versus 93.3%), and this difference was not statistically significant (p-value=0.538).

As previously discussed, the proportions of non-evaluable samples by PRN assay were similar across the 3 treatment groups (M-M-R™II containing mumps virus potency of 3.8, 4.1, and 4.8 $\log_{10}$ TCID$_{50}$/dose, respectively), and mumps ELISA antibody titers are available for a substantial portion of the subjects with non-evaluable PRN data in all 3 groups, including the control group (subjects immunized with M-M-R™II containing mumps virus potency of 4.8 $\log_{10}$ TCID$_{50}$/dose). The observed mumps ELISA results (SCR 98.0%) and the strong correlation between ELISA and PRN assay provide indirect evidence about the likely outcome for the missing data in the 4.8 $\log_{10}$ TCID$_{50}$ mumps potency group.

Additionally, there are several factors relating to the use of a neutralization assay that should be considered:

- Although virus neutralization assays may be the most predictive method for assessing protective immunity, these assays are not standardized making them poorly suited to evaluate large numbers of human sera due to assay variability (Mauldin et al. 2005. Mumps Virus Specific Antibody Titers from Pre-Vaccine Era Sera: Comparison of the Plaque Reduction Neutralization Assay and Enzyme Immunoassays. J. Clin. Microbiol. 2005;9:4847-4851).

- Validation testing for the mumps PRN assay used in this study was performed using a sample size of 50. Unfortunately, this does not provide a definitive guarantee of assay performance when addressing significantly larger subject populations as was evaluated in this study.

- The use of 4.8 $\log_{10}$ TCID$_{50}$ mumps virus potency (60,000 TCID$_{50}$) rather than 4.3 $\log_{10}$ TCID$_{50}$ mumps virus potency (20,000 TCID$_{50}$) as a suitable mumps potency for the study control lot provides a high degree of assurance regarding the level of safety and immunogenicity that was to be achieved by any of the 2 candidate mumps end-expiry potencies (3.8 and 4.1 $\log_{10}$ TCID$_{50}$/dose) tested in the clinical trial. Hence the 95% confidence interval around the reported potency value is estimated to be 4.5 to 5.1 $\log_{10}$ TCID$_{50}$/dose, values well above the minimum end-expiry potency of 4.3 $\log_{10}$ TCID$_{50}$/dose currently in place.

Merck-EDPA-00373

- Given the suitability of the internal control group in this clinical trial (see explanation provided in the preceding bullet point), the true performance of the PRN assay used in this clinical trial should be assessed by responses observed in the control group rather than by the arbitrary acceptability criteria (lower bound of the observed response being equal or greater than 90%) set by the applicant.

- The PRN assay used in the study was developed solely for the purpose of this clinical trial. It was not used in any previous nor subsequent clinical trials. It is therefore difficult to ascertain the real performance of this assay other than in the context of this clinical trial

Furthermore, as noted in **Table 1**, the supportive analysis based on multiple imputation techniques suggests that by accounting for the incomplete data in the PRN assay, the seroconversion rate in the 4.8 $\log_{10}$ TCID$_{50}$ Mumps Virus Potency group would have likely met the non-hypothesized 90% lower bound criterion and would have been similar to the rate observed in the 4.1 $\log_{10}$ TCID$_{50}$ Mumps Virus Potency group.

Since the data show that M-M-R™II containing a 4.1 $\log_{10}$ TCID$_{50}$ mumps potency induced an acceptable antibody response to mumps, as determined by the seroconversion rate for mumps neutralizing antibodies, which was also noninferior to M-M-R™II containing a release dose of mumps virus (4.8 $\log_{10}$ TCID$_{50}$), a mumps virus potency of 4.1 $\log_{10}$ TCID$_{50}$ was declared an acceptable end-expiry titer for M-M-R™II.

## Exhibit A

### Summary of Subjects Excluded at 6 Weeks Postvaccination
### From Per-Protocol Immunogenicity Analyses for Mumps (PRN)

| | M-M-R™ II Containing | | |
|---|---|---|---|
| | ≤3.8 log$_{10}$ TCID$_{50}$ Mumps Virus Potency | ≤4.1 log$_{10}$ TCID$_{50}$ Mumps Virus Potency | ~4.8 log$_{10}$ TCID$_{50}$ Mumps Virus Potency |
| Subjects Vaccinated at Day 0: | 663 | 662 | 672 |
| Subjects Included at Week 6: | 459 | 433 | 437 |
| With a retention baseline sample and a retention 6-week sample | 16 | 18 | 22 |
| Subjects Excluded from Week 6 [†]: | 204 | 229 | 235 |
| Mumps (PRN) seropositive[‡] at Baseline[§] | 75 | 93 | 84 |
| Initial serostatus unknown | 117 | 126 | 138 |
| Received M-M-R™ II or varicella prior to the study | 1 | 0 | 0 |
| Had febrile illness prior to vaccination | 0 | 1 | 0 |
| Received incorrect M-M-R™ II study vaccine lot/dose | 1 | 1 | 1 |
| Developed measles, mumps, rubella, varicella or zoster | 4 | 4 | 3 |
| Exposed to mumps during 42-day safety follow-up | 0 | 0 | 1 |
| Missing or not evaluable 6-week serology result | 125 | 135 | 150 |
| Sample outside of day range | 8 | 11 | 16 |
| Blood sample not sufficient | 2 | 6 | 2 |
| Blood sample difficult to obtain | 3 | 4 | 14 |
| Blood sample misplaced/not received/identity unknown | 0 | 2 | 2 |
| Blood sample contaminated | 0 | 2 | 1 |
| Blood sample too old (>1 year storage at 4°C) | 64 | 77 | 88 |
| Incomplete baseline/6-week serology pair | 2 | 3 | 2 |
| Parent refused blood draw | 22 | 5 | 10 |
| Lost to follow-up | 27 | 27 | 22 |
| Parent refused further participation | 20 | 8 | 19 |

[†]  Subjects can be counted more than once in any exclusion category
[‡]  Mumps (PRN) seronegative at baseline corresponds to prevaccination samples with antibody titers <1:32
    Mumps (PRN) seropositive at baseline corresponds to prevaccination samples with antibody titers ≥1:32
[§]  Baseline is considered as the blood sampling before the vaccination.

CONFIDENTIAL

Merck-EDPA-00375

MRK-KRA00000406
MRK-CHA00000406

Appx11169

Exhibit B

~4.8 log₁₀ TCID₅₀ Mumps Virus Potency Treatment Group:
Flow Chart Documenting the Number of Seropositive Subjects (per Mumps ELISA)
Within the Non-Evaluable Mumps PRN Sample Pool



672
Total Sample Size

**437** — Subjects Evaluated for Mumps PRN Analysis

**235** — Subjects Excluded from Mumps PRN Analysis

**84** — Mumps PRN Seropositive at Baseline

**138** — Initial Serostatus Unknown[†]

**13** — Other[‡]

**0** — No Mu ELISA Results[§]

**84** — Mu ELISA Results[§]

**43** — No Mu ELISA Results[§]

**95** — Mu ELISA Results[§]

**1** — No Mu ELISA Results[§]

**12** — Mu ELISA Results[§]

**2** — Seronegative

**82** — Seropositive[¶]

**1** — Seronegative

**94** — Seropositive[¶]

**0** — Seronegative

**12** — Seropositive[¶]

Key

[†] Initial Serostatus Unknown = Blood samples at baseline and/or at 6-week postvaccination were too old (stored at 4°C for >1 year prior to testing); no result due to refusing participation/bleed; quantity not sufficient (QNS); contamination; and/or missing sample.

[‡] Other = Day range violation; missing 6-week result; exposed or developed disease.

[§] No Mu ELISA Results: Refusing participation/bleed; quantity not sufficient (QNS); contamination; and/or missing sample.
   Mu ELISA Results: 191 of 235 non-evaluable PRN samples have valid mumps ELISA results.

[¶] 188/191 (98.4%) of subjects determined to be non-evaluable for the primary immunogenicity analysis (who had valid mumps ELISA data) were seropositive at 6-weeks postvaccination. Seropositive in the assay meant that subjects had an antibody titer ≥10 ELISA Ab units.

Mu = Mumps
Seronegative = Subjects demonstrating an antibody titer <10 ELISA Ab units
Seropositive = Subjects demonstrating an antibody titer ≥10 ELISA Ab units

CONFIDENTIAL

Merck-EDPA-00376

**Appx11170**

## Exhibit C

### Statistical Method - Multiple Imputation

In order to predict if subjects with missing PRN data would have seroconverted, two logistic regression models were fit. In the first model, the probability of seroconverting (based on the PRN assay) was modeled as a function of treatment group and the natural logarithm of the fold-rise in mumps ELISA antibody titer (baseline to 6-weeks postvaccination). Subjects who were initially seropositive to mumps (based on the PRN assay) were excluded from this model. In the second model, the probability of being initially seropositive (based on the PRN assay) was modeled as a function of treatment group and the natural logarithm of the baseline mumps ELISA antibody titer. The estimates and standard errors for Models 1 and 2 are found in **Table 2**.

A "complete" dataset was obtained in the following manner. First, for each model the logistic regression parameters were assumed to follow multivariate normal distributions with means and covariance matrices equal to the parameter estimates and covariance matrix estimates obtained from the respective models. A random sample was then drawn from each multivariate normal distribution to define the estimated logistic regression models for calculating the probability of seroconverting and the probability of being initially seropositive (this introduces variability to account for the uncertainty in the model parameters estimates from Models 1 and 2). For those subjects who had missing PRN data but had baseline and 6-week mumps ELISA data, the probabilities of seroconverting and being initially seropositive were calculated and then used to randomly determine "success" or "failure" based on the binomial distribution. This procedure resulted in a "complete" dataset, with seroconversion status imputed for those subjects with missing PRN data.

Using the methods of Miettenen and Nurminen (Statistics in Medicine, 1985) for testing the non-inferiority of two binomial proportions with stratification by study center, the estimated difference ($\hat{Q}_i$) in seroconversion rates (based on PRN) between the 4.8 and 4.1 $\log_{10}$ TCID$_{50}$ potency groups and the associated variance ($U_i$) were calculated for each "complete" dataset. The multiple imputation (overall) estimate is given by

$$\overline{Q} = \frac{1}{m}\sum_{i=1}^{m}\hat{Q}_i .$$

The total variance for the estimate has two components that take into account variability within each dataset and across each dataset. The within-imputation variance is the average of the estimated variances

$$\overline{U} = \frac{1}{m}\sum_{i=1}^{m}U_i .$$

The between-imputation variance is the sample variance of the estimates

$$B = \frac{1}{m-1}\sum_{i=1}^{m}(\hat{Q}_i - \overline{Q})^2 .$$

The total variance, T, is the sum of the two components with an additional correction factor to account for simulation error in $\overline{Q}$

$$T = \overline{U} + (1+\frac{1}{m})B .$$

Merck-EDPA-00377

A $100 \times (1-\alpha)\%$ confidence interval is obtain using

$$\overline{Q} \pm t_{df} \sqrt{T}$$

where $t_{df}$ denotes a quantile of Student's $t$-distribution with degrees of freedom

$$df = (m-1)\left(1 + \frac{m\overline{U}}{(m+1)B}\right)^2 .$$

A similar approach was used for calculating the estimate and confidence interval for the observed seroconversion rate (by PRN) for the 4.8 and 4.1 $\log_{10}$ TCID$_{50}$ potency groups.

### Table 2

### Parameter Estimates and Standard Errors for Logistic Regression
### Models 1 and 2

| Parameter[†] | Model 1 | | Model 2 | |
|---|---|---|---|---|
| | Estimate | SE | Estimate | SE |
| Intercept | -0.35 | 0.23 | 3.71 | 0.57 |
| 4.8 Group Indicator | 0.20 | 0.26 | -0.17 | 0.17 |
| 4.1 Group Indicator | 0.22 | 0.27 | -0.30 | 0.17 |
| Log (Fold-Rise) | 5.12 | 0.42 | NA | NA |
| Log (Baseline Titer) | NA | NA | -0.79 | 0.24 |

NA = Not applicable.
Model 1 = Logistic regression model which modeled the probability of seroconverting (based on PRN assay)
Model 2 = Logistic regression model which modeled the probability of being initially seronegative (based on PRN assay)
[†] The 3.8 Group was coded as the baseline category.

CONFIDENTIAL

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,
                    *Plaintiffs,*
          v.
MERCK & CO., INC.,
                    *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 89

**From:** Johns, Zachary M.
**Sent:** Thursday, February 23, 2017 6:57 PM
**To:** 'Koury, Marlene'
**Cc:** 'Schnell, Gordon'; 'Enzler, Jason'; 'Vitelli, Dan'; 'Mahendranathan, Hamsa'; 'Keller, Jeffrey'; 'Scanlan, Kathleen'; 'Lerner, Kellie C.'; 'Zolnoski, Michelle C.'; 'John A. Macoretta'; 'Diana J. Zinser'; DiMattio, Melina R.; Mills, Lindsey T.; Dykstra, Lisa C.; Mills, Lindsey T.; Sitarchuk, Eric W.; MFRoberts@venable.com; Rodgers Schmidt, Margaret E.; Fee, R. Brendan; 'Dino S. Sangiamo (DSSangiamo@Venable.com)'; 'Sally R. Bryan (SRBryan@Venable.com)'; Lastowski, Alexandra M.
**Subject:** RE: Krahling v. Merck

Marlene,

Following up on our February 8, 2017 meet and confer, below is a sample of the data fields that Merck currently submits to CDC via the electronic data interchange ("EDI"). The sample below is for a MMRII purchase. The description column provides an explanation of the corresponding field of EDI data. As noted during our meet and confer, we believe all relevant terms for Merck's submission of claims to the CDC and transactions with private purchasers are included in the transactional data Merck previously produced on April 15, 2016. We have since agreed to your request to undertake the expense and burden of supplementing Merck's transactional data with lot and expiry information at the transaction level and to provide you with the below information. Please let us know whether Relators and Plaintiffs agree that the request for lot and expiry information is the final request for transaction-level information so that we may begin the process of supplementing the transactional data.

Regards,
-Zak

| EDI Line | Description |
|---|---|
| CTT*2~ | Transaction totals (number of items in a transaction) |
| SE*23*0808~ | Transaction set trailer |
| ST*810*0809~ | Transaction set header |
| BIG*20170208*7009856655*20170201*4001164691~ | Beginning segment of invoice:<br>20170208 = Invoice issue date<br>7009856655 = Invoice number<br>20170201 = Purchase order date in originating system<br>4001164691 = Purchase order number from CDC |
| N1*SU*Merck Sharp & Dohme Corp.*24*22-1261880~ | Name (Vendor) |
| N3*SUMMNEYTOWN PIKE, P.O. BOX 4~ | Address (Vendor) |
| N4*WEST POINT*PA*19486~ | Address (Vendor) |
| N1*ST*MCKESSON AURORA SPECIALTY*ZZ*M3A999999~ | Name (Recipient/Ship to) |
| N3*3400 FRASER ST~ | Address (Recipient/Ship to) |
| N4*AURORA*CO*80011~ | Address (Recipient/Ship to) |
| ITD*01*4*0.0*20170310**20170310~ | Terms of Sale:<br>01 = Basic/standard sale |

| | 04 = Beginning date of payment period<br>0.0 = Discount percentage<br>20170310 = Date when payment is due |
|---|---|
| DTM*011*20170201~ | Date/Time Reference:<br>011 = Shipped<br>20170201 = Date order shipped |
| IT1*030*2880*EA*178.6**ND*00006-4681-00*PL*00030~ | Baseline Item Data for MMRII vaccine:<br>030 = Invoice line number<br>2880 = Quantity<br>EA = basis for measurement<br>178.6 = Unit Price<br>ND = NDC identifier for MMRII vaccine<br>PL = line number from the original purchase order |
| REF*LT*M040558~ | Lot identifier for MMRII |
| REF*AW*00010359990494659766*PRIJ~ | Air Waybill number |
| DTM*208*20181003~ | Date/Time reference: Lot expiry information for MMRII |
| SAC*C*H660***6480000*******06~ | Service, Promotion, Allowance, or Charge Information:<br>C = Charge<br>H660 = Federal Excise Tax<br>6480000 = Monetary amount<br>06 = Charge to be paid by customer |
| IT1*031*2880*EA*0**ND*00006-4309-00~ | Baseline Item Data for sterile water product (see above) |
| REF*LT*M029234~ | Lot identifier for sterile water product |
| REF*AW*00010359990494659766*PRIJ~ | Air Waybill number |
| DTM*208*20190312~ | Lot expiry information for sterile water product |
| TDS*57916800*51436800*57916800~ | Total monetary value summary |
| SAC*C*H660***6480000*******06~ | Service, Promotion, Allowance, or Charge Information (see above) |

**Zachary M. Johns**
Morgan, Lewis & Bockius LLP
1701 Market Street | Philadelphia, PA 19103-2921
Direct: +1.215.963.5340 | Main: +1.215.963.5000 | Fax: +1.215.963.5001
zachary.johns@morganlewis.com | www.morganlewis.com
Assistant: Karen L. Goldsboro | +1.215.963.5880 | kgoldsboro@morganlewis.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

         *Plaintiffs,*

   v.

MERCK & CO., INC.,

         *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 90

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*, STEPHEN A. KRAHLING and JOAN A. WLOCHOWSKI, | Civil Action No. 10-4374 (CDJ) |
| *Plaintiffs,* | |
| v. | |
| MERCK & CO., INC., | |
| *Defendant.* | |
| IN RE: MERCK MUMPS VACCINE ANTITRUST LITIGATION | Master File No. 12-3555 (CDJ) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**Expert Report of Ann M. Arvin, MD**

1

increase and to consider the addition of another vaccine dose as a possible strategy to address the

increase.

### E.  Evaluation of mumps immunity

The effort to understand mumps immunity is subject to the general caveats about the

limitations in scientific knowledge concerning the role of different components of the immune

response to natural virus infections and live viral vaccines.  As my colleague Professor Sharon

Chen and I have written:  "Whether protective immunity is induced by viral vaccines is often

proved conclusively only after widespread implementation of immunization programs, as

illustrated by the impact of vaccines against childhood diseases, such as measles, mumps and

rubella."[43]  As we noted, "serologic assays are used...even though protection is likely to require

adequate T-cell-mediated immunity."[44]  We elaborated on the role of seroconversion in

understanding protection:

> Effective vaccines are expected to elicit seroconversion in most vaccine recipients,
> which may require the administration of several doses.    Nevertheless,
> seroconversion is not invariably a predictable marker of protective immunity...In
> some cases, detection of any antibodies to viral proteins correlates with protection
> whereas in other cases, a "protective" titer is defined as greater than or equal to a
> particular concentration of antibodies.    The appropriate laboratory marker of
> protection may also differ depending upon the nature of the vaccine being
> evaluated.  For example, inactivated vaccines often elicit higher titers of virus-
> specific antibodies that correlate with protection while live attenuated vaccines are
> more likely to induce cellular immunity and lower antibody titers...Live attenuated
> virus vaccines often induce a more persistent cell-mediated immune response,
> which affords protection even when antibody titers fall below the threshold of
> detection in standard serologic assays.[45]

---

[43] Arvin A, Chen S. Vaccines, Viral. Schaechter ME. The Encyclopedia of Microbiology. Oxford: Elsevier (2009) 796-804 at 802.  Hereinafter referred to as Arvin and Chen.

[44] Arvin and Chen at 802.

CONFIDE

Thus, while assays to measure antibodies and cell-mediated immunity are used to evaluate

vaccines, we do this with a recognition of the uncertain relationship between what component of

the overall immune response is measured by the assay, and whether the person who has been

vaccinated will be protected from disease.

This point is particularly relevant to the effort to understand mumps outbreaks in

vaccinated populations. As noted above, waning immunity to mumps has been considered a

possible factor. It is conceivable that levels of mumps immunity could fall below a threshold for

protection but this cannot be determined definitively by immunologic testing without an assay

that is known to correlate with protection. As has been noted by many experts, if waning of

immunity is occurring, it "may be a consequence of the success of the mumps vaccination

program itself in reducing wild-type virus circulation, resulting in reduced opportunities for

periodic boosting, which in the past may have served to maintain immunity"[46] and "[o]ne

possibility could be, ironically, the success of the vaccine itself; that is, decreased opportunities

for periodic natural boosting."[47]

Because we do not have laboratory assays for immune responses that are accepted as a

definitive correlate with protection of the individual, it is not surprising that CDC experts have

stated that "[t]he immune response to mumps vaccination probably involves both the humoral

---

[45] Arvin and Chen at 802.

[46] Rubin, Sauder, Carbone at 1038.

[47] Rubin at 679.

CONFIDE

Appx11179

and cellular immune response, but no definitive correlates of protection have been identified."[48]

Latner and colleagues from the CDC recently observed that "it is not known what (if any) specific humoral or cellular components of the anti-mumps immune response may provide reliable assurance of protection against symptomatic wild-type mumps infection. It is also assumed that neutralizing antibody is likely essential for protection, while cell-mediated immunity (CMI) is perhaps necessary but is probably not sufficient."[49] Thus, in addition to uncertainty about what the data from laboratory tests means about protection from disease, we also cannot be sure whether the more meaningful lab tests would be those measuring humoral immunity or those measuring cellular immunity.

As Professor Chen and I noted, "[i]n practice, the definition of immunologic correlates of vaccine protection is rarely straightforward. The immunogenicity of vaccines is usually assessed by comparison with immune responses that follow natural infection with the same virus, but in most instances, specific correlates of protection are not known for naturally acquired immunity."[50] For example, it has been suggested that a measles antibody titer of 120 IU is likely to be a marker of protection but this has not been proved with certainty.[51] With regard to mumps, it has been noted that "results of virus neutralization assay[s] are difficult to interpret

---

[48] 2013 MMWR at 10.

[49] Latner D, McGrew M, Williams N, et al. Estimates of mumps seroprevalence may be influenced by antibody specificity and serologic method. Clinical Vaccine Immunology. (2014) 3:286-297 at 286.

[50] Arvin and Chen at 802.

[51] Chen R, Markowitz L, Albrecht P, et al. Measles Antibody: Reevaluation of Protective Titers. Journal of Infectious Diseases. (1990) 162:1036-1042, at 1039.

26

Appx11180

due to the absence of an established neutralizing antibody titer that can be used as a surrogate

marker of protection"[52] and "numerous attempts to define a level of antibody that correlates with

protection have failed."[53]

My lab conducted a study examining the cellular and humoral immune responses of

adults who were vaccinated with MMR as children. In that paper, we stated:

> The immunogenicity of the mumps vaccine depends on the generation of mumps-specific antibodies, particularly neutralizing antibodies, and on the development of cell-mediated immunity. . . . The contribution of cell-mediated immunity to protection against mumps virus infection has not been clearly defined, but evidence supports the importance of T lymphocytes as the main protagonist in the recovery from acute viral infection and in providing long-lasting protection from the disease. Although neutralizing antibodies most likely represent the first defense against reinfection with viruses, individuals lacking humoral immunity appear to be protected against infection or severe disease.[54]

The important point here is that assays that measure humoral immunity, such as plaque

reduction neutralization (PRN) assays, do not measure cell-mediated immunity, and vice versa.

PRN assays can be useful in showing that vaccine recipients have developed a memory immune

response to the vaccine, in other words the vaccine was not "dead" in an immunologic sense.

This information is often part of the data set used by regulators when making initial approval

decisions or to compare different vaccine preparations, depending on the vaccine. However, as

noted above, PRN assays do not reflect the level of cellular immunity, a component of memory

---

[52] Rubin at 673.

[53] Rubin at 674.

[54] Hanna-Wakim R, Yasukawa L, Sung P, Arvin A, Gans H. Immune Responses to Mumps Vaccine in Adults Who Were Vaccinated in Childhood. Journal of Infectious Diseases. (2008) 197:1669-1675 at 1670.

27

CONFIDE

immunity that is thought to be particularly important for long-term protection. In addition, Cortese and colleagues from the CDC and the FDA have noted: "[M]easurements of virus neutralizing antibody in vitro may not be fully predictive of immunological activity in vivo given that Fc-mediated phagocytosis, antibody-dependent cell-mediated cytotoxicity, and other processes that occur in the host are not reflected in the assays used to measure virus viability in vitro."[55]

Therefore, it is always necessary to understand the limits of what laboratory data tell us about protection from disease. It is even more important to do so when attempting to interpret PRN data for a vaccine against a disease such as mumps, for which the immune mechanism of protection is not known and is likely to be the result of both antibody and cellular immunity working together. Caution is especially warranted if we attempt to draw conclusions about long term immunity based on the results of a PRN assay performed on sera drawn six weeks after vaccination.

The necessary consequence of the absence of a laboratory test that reliably predicts protection from disease is that some public health policy decisions, such as whether to add another dose of mumps vaccine at a later age, must be informed by field studies of the incidence of infection in the population. Such decisions have been made with other vaccines, such as rubella and chickenpox vaccines. The need to make these adjustments in the use of a live virus vaccine over time does not mean that the vaccine is ineffective.

---

[55] Cortese M, Barskey A, Tegtmeier G, et al. Mumps Antibody Levels Among Students Before a Mumps Outbreak: In Search of a Correlate of Immunity. Journal of Infectious Diseases. (2011) 204:1413-1422 at 1420.

CONFIDE

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

<em>Plaintiffs,</em>

v.

MERCK & CO., INC.,

<em>Defendant.</em>

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 91

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: MERCK MUMPS VACCINE ANTITRUST LITIGATION<br><br>THIS DOCUMENT PERTAINS TO ALL ACTIONS | Master File No. 2:12-cv-03555 |
| UNITED STATES OF AMERICA *EX REL.* STEPHEN A. KRAHLING AND JOAN A. WLOCHOWSKI,<br><br>PLAINTIFFS<br><br>v.<br><br>MERCK & CO., INC.,<br><br>DEFENDANT. | No. 10-cv-4374 |

## REPORT OF DIPTI GULATI, MS, D. PHIL.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Appx11184**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

could be a material established as such by a national (e.g. USP) or international organization (e.g. WHO) or established internally as house standard that has been tested and validated. Merck uses an internally established house standard in its $TCID_{50}$ assay and relative potency is determined in comparison to this house standard.

21.     There are fundamentally two bioassay types: quantitative and qualitative (Quantal). Quantitative data can be either continuous (e.g. from instruments), counts (e.g. plaque forming units in plaque assay) or discrete (e.g. endpoint dilution titers). Quantal data are typically dichotomous, e.g., survival/death of animal model or positive/negative in a plate-based infectivity assay that results in destruction of a cell monolayer following administration of infectious agent or live attenuated virus (e.g. $TCID_{50}$ assay). Quantal assays are more variable as compared to quantitative assay due to the nature of the assay. The $TCID_{50}$ assay that Merck uses to measure the potency of Mumps-containing vaccines is a quantal assay.

22.     The $TCID_{50}$ assay measures potency by measuring the concentration of infectious virus in a particular sample. $TCID_{50}$ refers to 50% cell culture infectious dose (Tissue culture infectious dose 50%, or $TCID_{50}$). The $TCID_{50}$ assay is performed to determine the infectious titer of any virus which can cause cytopathic effects (CPE) in tissue culture over a reasonable period of 5 to 20 days while cells in culture remain viable. This procedure is performed to quantify how much infectious virus is in a preparation. The $TCID_{50}$ value represent the viral concentration necessary to induce cell death or pathological changes in cell cultures inoculated.

23.     A $TCID_{50}$ assay is known to be more sensitive than a plaque assay. It is also more variable.[16] Increasing the number of independent assay runs increases the reliability of data.[17]

F.     **Stability Programs Ensure Potency Specifications Are Within Established Limits Throughout a Vaccine's Shelf Life.**

24.     Stability is the ability of any product (food, medicine, etc.) to maintain its activity or usable form during the time of storage. For example, foods or medicine can be stored at certain temperature for a limited period of time only or are stable for a limited period of time only. After that, these products degrade visually and functionally and need to be discarded. In the case of vaccines, which contain live cells, it is recognized that the live cells and therefore the vaccines will

---

2018 (hereinafter "USP<1032>"); United States Pharmacopeia, <1034> Analysis of Biological Assays (2012), http://www.drugfuture.com/Pharmacopoeia/usp35/PDF/5186-5201%20[1034]%20Analysis%20of%20Biological%20Assays.pdf, last accessed June 12, 2018 (hereinafter "USP<1034>"); FDA, Guidance for Industry: Potency Tests for Cellular and Gene Therapy Products (Jan. 2011), https://www.fda.gov/downloads/biologicsbloodvaccines/guidancecomplianceregulatoryinformation/guidances/cellularandgenetherapy/ucm243392.pdf, last accessed June 11, 2018.

[16] S. Smither, et al., *Comparison of the plaque assay and 50% tissue culture infectious dose assay as methods for measuring filovirus infectivity*, 193 J. Virol Methods 565-71 (November 2013).

[17] USP<1032>; USP<1034>.

Appx11185

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

degrade over time – and that the rate to which something degrades can be affected by temperature, light and other storage conditions.[18]

25.    Although biotechnological/biological products may be subject to significant losses of activity, physicochemical changes, or degradation during storage, international and national regulations have provided little guidance with respect to distinct release and end of shelf life specifications. Recommendations for maximum acceptable losses of activity, limits for physicochemical changes, or degradation during the proposed shelf life have not been developed for individual types or groups of biotechnological/biological products but are considered on a case-by-case basis.[19]

26.    In general, each product should retain its specifications within established limits for safety, purity, and potency throughout its proposed shelf life. These specifications and limits should be derived from all available information using the appropriate statistical methods. The use of different specifications for release and expiration should be supported by sufficient data to demonstrate that the clinical performance is not affected, as discussed in the tripartite guideline on stability.[20]

27.    Before a product is licensed, manufacturers will undertake a stability study. The purpose of a stability study is to establish, based on testing a minimum of three batches of the drug product, a shelf life and label storage instructions applicable to all future batches of the drug product manufactured and packaged under similar circumstances. The degree of variability of individual batches affects the confidence that a future production batch will remain within specification throughout its shelf life.[21]

28.    Stability studies test attributes of the drug product that are susceptible to change during storage and are likely to influence quality, safety, and/or efficacy. Stability testing should cover, as appropriate, the physical, chemical, biological, and microbiological attributes, preservative content (e.g., antioxidant, antimicrobial preservative), and functionality tests (e.g., for a dose delivery system). Analytical procedures used in stability testing should be fully validated and stability indicating.[22]

29.    Companies use on-going stability programs after a product is licensed to ensure potency specifications are met over the product's shelf-life. A stability program should plan for the stability protocol to be used, the number of final lots to be tested each year and how such lots will be selected.[23]

---

[18] World Health Organization: WHO Guidelines On Stability Evaluation of Vaccines (WHO/BS/06.2049), http://www.who.int/biologicals/publications/trs/areas/vaccines/stability/Microsoft%20Word%20-%20BS%202049.Stability.final.09_Nov_06.pdf, last accessed June 12, 2018 (hereinafter "WHO 2006 Stability Guidelines").

[19] ICH Q5C § 8; ICH Q6B.

[20] ICH Q5C § 8.

[21] ICH Q1A(R2) § 2.2.9.

[22] ICH Q1A(R2) § 2.2.5.

[23] *See, e.g.,* Jan. 1999 CMC Guidance at 24.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

51.     Merck conducts routine stability testing on the Mumps vaccine to monitor the product and compare it to the expectations for the product to verify that it meets specifications for potency and other product characteristics.[45]

52.     Potency is tested in the stability program. Merck uses the same industry-standard and validated $TCID_{50}$ assay (discussed further below) for all potency testing whether conducted for release or stability monitoring purposes.[46]

53.     Merck's current stability program tests four lots per year from each manufacturing site. M-M-R®II is manufactured and filled in both Merck's West Point and Durham manufacturing sites. Thus, each year, Merck initiates 8 new stability studies with M-M-R®II using 4 lots from West Point and four lots from Durham. Those 8 lots are tested at required intervals throughout and beyond product expiry.[47] This exceeds FDA regulations, which require that only one batch of product is placed on stability each year, and exceeds Merck's commitment to CBER that it would place 3 lots each year in the stability program.

54.     The mumps fill General Stability Protocol requires testing at eight intervals for each lot on stability: 0 months, 3 months, 6 months, 9 months, 12 months, 18 months, 24 months, and 30 months.[48]

55.     Annual Stability Reports report on stability results from testing in the prior year. Each year, a product's stability analyst prepares a report analyzing the results of all stability study generated in the prior year.[49] The reports contain statements regarding the product's compliance with stability expectations as well as data from the results of the testing at each required interval.[50]

56.     As described further below, and based on my review of the documents, it appears that Merck enhanced its stability program as a result of its discussions with CBER regarding the end-expiry potency specification for the Mumps Vaccine. In my opinion, Merck's Enhanced Annual Program and Real Time/Early Warning Monitoring Program allow for a better understanding of the product profile in real time and allow for performance of lots on stability to be tracked more closely. The Real Time/Early Warning Monitoring Program consists of ongoing, routine, and process-driven analyses. The Enhanced Annual Program is specific to M-M-R®II; it was initiated in 2006 to fulfill regulatory commitments to enhance the annual stability program already in place. The Enhanced Annual Program uses formulas to detect shifts in the stability profile and identify

---

[45] McKee Tr. at 47:17–48:17.

[46] Stannard Tr. at 157:20–25.

[47] *See* MRK-KRA01714300; and MRK-KRA02139917.

[48] *See* MRK-KRA02139917. While the shelf life is 24 months, Merck's stability program includes one post-expiry interval in its stability testing.

[49] Ex. 3 at the Second 30(b)(6) Deposition of Merck (Mark Stannard, Dec. 13, 2016).

[50] Reports are prepared based on the site that manufactured the product, so separate reports exist for batches manufactured in Durham and batches manufactured in West Point. *See* Annual Stability Reports for M-M-R®II, MumpsVax®, M-M-Vax®, and ProQuad at MRK-KRA01632656 to MRK-KRA01634155.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

potential problems with material on the market by comparing the calculated stability index to a critical value that Merck calculates.[51]

57.    Merck's use of an Early Warning Evaluation System in the West Point Stability LIMS permits monitoring of data in real time[52] in order to: (i) predict if a batch will exceed shelf-life specifications; (ii) determine of the current results of a stability batch differ significantly from the previous time points; and to (iii) determine if a batch differs significantly from a defined historical data set. The system evaluates stability interval results (the results of actual potency assays run on stability samples at required points in time) and makes the specific comparisons set forth in the SOP.[53]

58.    Mumps specific criteria for stability analysis are provided by Merck's Center of Mathematical Sciences (CMS). Memos in 2008 and 2010 provide Early Warning Limits for M-M-R®II.[54] EW flags are reviewed by product-specific stability analysts. Stability analysts apply scientific rationale to determine if a result or study is actually out of trend (OOT); an OOT result exhibits a truly unexpected value or because it exhibits a negative trend compared to the established stability profile for the product. For OOT results, deviations are documented, and the team opens an investigation.[55]

59.    In summary and in my opinion, with the increased number of lots placed on stability and enhanced annual program with real time/early monitoring program, Merck has exceeded and continues to exceed FDA requirements and industry standards for its stability program for Mumps containing vaccines.

B.    **Merck's Mumps-Containing Vaccines Are and Have Been Manufactured Consistent with cGMP.**

60.    Based on my experience and my review of testimony and documents, Merck Mumps-containing vaccines are and have been manufactured as per current good manufacturing practices (cGMP). GMP is met by manufacturing a drug using validated facility, equipment, material, process and methods as per CBER approved process, method and specifications, with complete and accurate documentation.

1.    ***Merck Has an Appropriate Quality System to Require Product is Manufactured Consistent with cGMP.***

---

[51] Ex. 3 at the Second 30(b)(6) Deposition of Merck (Mark Stannard, Dec. 13, 2016).

[52] *See* MRK-KRA00049165 (SOP 233-SU317X:  Active Stability Monitoring of Live Virus Vaccine Potency Results)

[53] *See* MRK-KRA01714343 (SOP 30-STB-132: Real Time Stability Trend Monitoring).

[54] *See* MRK-KRA01714282 (2008-STAT-035a: Revised Early Warning Limits for Filled Container MMR®II); and MRK-KRA01714290 (2010-STAT-015: Recalculated Filled Container MMR®II Early Warning Limits for Measles and Mumps Potency Using Results for All Stability Time Points Including Early Time Points).

[55] Ex. 3 at the Second 30(b)(6) Deposition of Merck (Mark Stannard, Dec. 13, 2016).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

*Increase in the Titer for the Mumps Component of [MMR®II].* Merck provided (1) the SOP for its potency assay (Control Procedure 9110.676, "Infectivity Test for the Determination of Measles, Mumps and Rubella Vaccine Potency Using the Biomek™ 1000 Automated Laboratory Workstation"); (2) a Stability Protocol and two SOPs for the stability program; and (3) a list of the lots manufactured before September 13, 1999 and planned for submission before November 8, 1999 with a mumps target manufacturing potency of 4.9 $\log_{10}$ TCID$_{50}$. The list of lots to be released reflects average potency results between 4.7 $\log_{10}$ TCID$_{50}$ and 5.1 $\log_{10}$ TCID$_{50}$.

79.     In the September 15, 1999 PAS, Merck also reported that, in support of the change to increase the manufacturing target potency to 5.2 $\log_{10}$ TCID$_{50}$, it was placing three lots of M-M-R®II on a stability study. The study protocol Merck submitted states "[t]his stability study will evaluate that this process change supports the current label claim titer for the M-M-R®II vaccine throughout the current shelf life of 24 months."[91] Finally, Merck's letter reflects recent conversations between Merck and Drs. Kathryn Carbone and Dr. Rastogi acknowledging that, for some lots that above 5.0 $\log_{10}$ TCID$_{50}$ at Merck, the same lot could test below 5.0 $\log_{10}$ TCID$_{50}$ in CBER's own testing, because of assay variability between the two labs. Merck asked that CBER contact Merck regarding any such lots.[92]

80.     After further calls and correspondence (on January 17, 2000[93], February 3, 2000[94], and February 10, 2000[95]), on February 11, 2000, CBER approved the increase in minimum release potency to 5.0 $\log_{10}$ TCID$_{50}$ and the change to a 1x6 potency assay testing format.[96]

81.     Merck and CBER continued to discuss the stability of the mumps component of M-M-R®II and, on October 24, 2000, Merck provided a Statistical Analysis of Potency on Stability. The package included stability analyses previously provided on January 28, 1998 and January 4, 1999 and new stability analysis of stability data for the period 1987 to 2000.[97] With this submission, Merck provided an April 19, 1999 M-M-R®II Stability Investigation Summary Report which analyzed higher than expected potency losses observed in connection with Merck's discussions with CBER about an expiry potency for M-M-R®II.

82.     I have reviewed the Annual Stability Reports for Merck's MumpsVax®, M-M-Vax®, and M-M-R®II that were produced in this case. All 176 lots of these Mumps-containing products released with a release potency $\geq$ 5.0 $\log_{10}$ TCID$_{50}$ and which were tested in a stability study met the end-expiry (24 month) potency specification of 4.3 $\log_{10}$ TCID$_{50}$ at each of the time points tested between release and expiry. I have also reviewed the Annual Stability Reports for the lots of ProQuad tested in Merck's stability program. While ProQuad is a mumps-containing vaccine, it has release, target manufacturing, and expiry potency specifications that are different from MumpsVax®, M-M-Vax®, and M-M-R®II. None of the 192 lots of ProQuad tested in a stability

---

[91] The results of this stability study are discussed in paragraph 149.b.iv.

[92] MRK-KRA01622710.

[93] *See* MRK-KRA01622075, at '077.

[94] MRK-KRA01624911.

[95] MRK-KRA01622073.

[96] MRK-KRA01897091.

[97] MRK-KRA01899087.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

study resulted in an out-of-specification result for any time point tested between release and expiry (18 months).[98] The results of Merck's stability program potency testing are clear: there were no out-of-specification results observed in release and stability potency tests for any mumps-containing product manufactured after the release and target manufacturing potency specifications were increased in 1999. All of these results have been included in Merck's Annual Stability Reports which are available to FDA at every inspection.

83.     Mumps stability lots tested are representative of other product lots manufactured and released to market. The stability lot potency test results are representative of real-world (marketed product) potency loss between release and expiry. The purpose of the ongoing stability after-market testing is to monitor the product over its shelf life and to determine that the product remains, and can be expected to remain, within specifications under the storage conditions of the label.[99] They are not (and are not intended to be) representative of potential worst-case scenarios which may be assessed through other modeling and/or calculations.

84.     The Mumps Manufacturing process is not changed without CBER approval. Although other manufacturing changes were implemented between 1999 and the present, none of those changes had a resulting impact on the potency, stability or shelf-life of the mumps component of Merck's mumps-containing vaccines.[100]

85.     Since CBER approved the increase in target manufacturing potency and release potency specifications and continuing through today, Mumps vaccine is made with the same higher titer target manufacturing potency and release potency specifications. Those target manufacturing and specifications did not change even after CBER approved the M-M-R®II label change from $\geq 4.3 \log 10$ $TCID_{50}$ to $\geq 4.1 \log_{10} TCID_{50}$ in 2007.[101]

86.     In my opinion, as there has been no change to the target manufacturing and release potency and because the product continues to meet release and expiry potency specifications, I would reliably and reasonably expect product to be within specification at all times.

C.     **Merck's $TCID_{50}$ Assay is Scientifically Sound and Appropriate for Measuring the Potency of Mumps-Containing Vaccine.**

---

[98] *See* Annual Stability Reports for M-M-R®II, MumpsVax®, M-M-Vax®, and ProQuad at MRK-KRA01632656 to MRK-KRA01634155.

[99] WHO Technical Report Series, No. 953 (2010), Annex 2, http://www.who.int/medicines/areas/quality_safety/quality_assurance/StabilityTable2.pdf, last accessed June 11, 2018); Margaret Sands, FDA, Field Alert Reporting, http://www.afdo.org/Resources/Documents/4-news-and-events/past-presentations/2012/1-Presentation-120605-Drug-1330-Sands%20%5BCompatibility%20Mode%5D.pdf, last accessed June 11, 2018.

[100] Ex. 9 at the Fourth 30(b)(6) Deposition of Merck (Feb. 9, 2018); MRK-KRA00756381; MRK-KRA01625228; MRK-CHA01897091; MRK-KRA01712944; MRK-KRA00141789; MRK-KRA01926962.

[101] Ex. 3 at the Second 30(b)(6) Deposition of Merck (Mark Stannard, Dec. 13, 2016).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

for general characteristic (form, color and appearance), identity, pH, restoration, moisture, sterility, and potency for internal Merck release.[126]

108.    Merck policy imposes a requirement that each batch of filled container is subject to potency testing using the $TCID_{50}$ assay; results are submitted to CBER for approval.[127] For potency testing, six samples or vials from each batch are selected according the procedure laid out in 06520125GEN.[128]

109.    Potency test results for each of the individual samples (referred to as "replicates" or "reps") are reported in LIMS (Laboratory Information Management System), which feeds into another program/database/platform called SAP. LIMS calculates the average potency by averaging the results of the six replicates. SAP, in turn, is used to populate the release protocol document that is submitted to CBER.[129]

110.    CBER requires testing as a matter of course for most biological products due to the inherently less stable nature of these products (compared to pharmaceuticals).[130] Under federal regulations, manufacturers may be required to "submit samples from all lots of a licensed biological product together with the protocols showing results of applicable tests when deemed necessary by the Director, CBER. For most biological products, CBER has required the submission of this information both in support of a license application and for continued lot release following product license application approval."[131]

---

[126] *See* MRK-KRA01448181 (SOP 07-QUR-300x: Preparation, Review and Shipment of Biological Product Protocols and Samples to CBER); MRK-KRA01684356; MRK-KRA01448674; MRK-KRA01926962.

[127] *See* MRK-KRA01448181 (SOP 07-QUR-300x: Preparation, Review and Shipment of Biological Product Protocols and Samples to CBER); MRK-KRA01684356; MRK-KRA01448674; MRK-KRA01926962.

[128] *See e.g.,* MRK-KRA01688220, at '256 (current version of Merck's Quality Standard for M-M-R®II).

[129] *See* MRK-KRA01448181 (SOP 07-QUR-300x: Preparation, Review and Shipment of Biological Product Protocols and Samples to CBER); MRK-KRA01684356; MRK-KRA01448674; and MRK-KRA01926962.

[130] Notice Regarding Guidance on Alternatives to Lot Release for Licensed Biological Products, 58 Fed. Reg. 38661, at 38772 (July 20, 1993).

[131] *See* 21 CFR 610.1 (Tests Prior to Release Required for Each Lot: "No lot of any licensed product shall be released by the manufacturer prior to the completion of tests for conformity with standards applicable to such product. . . . The results of all tests performed shall be considered in determining whether or not the test results meet the test objective, except that a test result may be disregarded when it is established that the test is invalid due to causes unrelated to the product."); *see also* 21 CFR 610.2(a) (Requests for Samples and Protocols; Official Release - Licensed biological products regulated by CBER:  "Samples of any lot of any licensed product together with the protocols showing results of applicable tests, may at any time be required to be sent to the Director, Center for Biologics Evaluation and Research . . . . Upon notification by the Director, Center for Biologics Evaluation and Research, a manufacturer shall not distribute a lot of a product until the lot is released by the Director, Center for Biologics Evaluation and Research: Provided, That the Director,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

(approximately 60 lots). Based on this model, potency was established as 5.2 $\log_{10}$ for manufacturing target, 5.0 $\log_{10}$ for release and 4.3 $\log_{10}$ at expiry.[190]

       b.    *MODEL 2 (End Expiry Prediction Model):* In October 2000, as per CBER request, Merck performed an analysis of log loss from stability data from 1995-2000. This analysis included 24-month data from 20 stability lots filled from 01/95 to 05/98. The analysis using this limited dataset indicated that average log loss was 0.703 with a standard deviation of 0.222. This analysis was submitted to CBER as a supplement on October 24, 2000.[191] In February 2001, Merck built a statistical model to estimate end expiry potency for product manufactured after the potency increase using an updated process, assay and specifications. Merck also predicted the expiry of batches from the model using the stability data from the 20 lots filled from 01/95 to 05/98.[192] The following formula was used in this model: Total log loss= Shelf life log loss + 1.65 x Total standard deviation (standard deviation from assay variability and log loss variability). Using the shelf life loss of 0.703 log and std. dev. of 0.222 log from the 1995-1998 lot data, the lower 95% confidence bound for the loss from release through expiry for mumps was calculated as 1.02 log. This model predicted, with 95% confidence, that given the new release specifications of 5.0 log, each lot released will be at or above 4.0 through expiry.[193] This model is inaccurate due to following reasons:

       i.    *Process Change*: As described above, in September 1999, based on correspondence from CBER, Merck changed its target manufacturing potency specification to 5.2 log $TCID_{50}$ and its release potency specification to 5.0 log $TCID_{50}$. CBER approved the Prior Approval Supplement for this change in February 2000. The February 2001 End Expiry Prediction Model was built based on potency data from 20 lots manufactured from 01/95 to 5/98 under the old manufacturing process, where the target manufacturing potency was 4.9 $\log_{10}$ $TCID_{50}$.[194] In ordinary numbers, changing the target manufacturing potency from 4.9 $\log_{10}$ $TCID_{50}$ (80,000) to 5.2 $\log_{10}$ $TCID_{50}$ (160,000) doubles the amount of mumps virus used for target manufacturing potency. Changing the amount of virus used in manufacturing may impact the amount of potency loss over time and, as of February 2001, real time data did not yet exist to measure how potency loss would be impacted by manufacturing and releasing the mumps vaccine at a higher potency and testing it in a different assay format. Although real time stability potency data for product manufactured at approximately 5.2 $\log_{10}$ $TCID_{50}$ was not yet available to use in the model as of February 2001, it was still inappropriate for the model to assume that the product manufactured at approximately 5.2 $\log_{10}$ $TCID_{50}$ would experience the same rate of log loss (.703) as product manufactured at approximately 4.9 $\log_{10}$ $TCID_{50}$.

       ii.    *Assay Change*: As of 2000, CBER also approved changes to the format of the $TCID_{50}$ assay such that testing would be conducted using a 1x6, not a 3x1, format.[195] The February 2001 End Expiry Prediction Model, however, was built using data generated from testing performed on the 20 lots filled from 1/95 to 5/98 – testing that used the prior assay format (3x1). Changing the testing format from 3x1 to 1x6 was described as reducing random error from ±0.24

---

[190] MRK-KRA01625225; MRK-KRA01897091.

[191] MRK-KRA01625060; MRK-KRA00549487; MRK-KRA01625058.

[192] MRK-KRA00590097.

[193] *Id.*

[194] *See, e.g.*, MRK-KRA00549487.

[195] MRK-KRA01897091.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

$\log_{10}$ TCID$_{50}$ to $\pm 0.14$ $\log_{10}$ TCID$_{50}$.[196] However, the data used in the February 2001 End Expiry Prediction Model was collected using the prior 3x1 assay format. 24-month data that reflected results from the new, lower variability assay format (1x6) was not available in February 2001. Therefore, model could not be validated at the time it was built with stability data from a similar manufacturing process and tested using a similar TCID$_{50}$ assay format.

   iii. *Inadequate study design and data set*: Real time data generated for lots manufactured with the increased manufacturing potency and tested with the 1x6 format was not available until 2003. Because this data was not available, any modeling in 2000/2001 was not supported by real time data reflecting the way the product was being made or tested at the time. Additionally, the modeling appears to be based on an otherwise limited data set from 20 lots. A larger data set over a longer period of time would have given, in my opinion, a more reliable estimate of log loss. The limited data set used (from 20 lots) includes complete 24-months potency stability data set from lots filled only from 01/95 to 05/98. The average of log loss from limited dataset was 0.703. Calculating whether current product would meet expiry specifications based only on this limited data set would not be appropriate because the data set was chosen arbitrarily – it was the set of lots for which CBER asked for stability results in October 2000, but the data set reflects a period of high log loss based on a relatively small number of values where it was not clear that the more recent lots with higher log loss was truly representative of the product's profile (or any potential change to the product profile).[197]

   iv. Under the circumstances, I think it was appropriate that Merck did not report this model to CBER or implement further changes internally until complete stability data was available. On February 8, 2000, February 15, 2000, and February 22, 2000, Merck initiated three "Mumps High Titer" stability studies to evaluate the stability of lots manufactured with a release manufacturing potency of $\geq 5.0$ $\log_{10}$ TCID$_{50}$.[198] Those studies were conducted from 2000 through 2002 and results for the complete studies were reported in Merck's 2003 Annual Stability Report for M-M-R®II, which was approved on May 30, 2003.[199] As that report makes clear, no out of specification measurements were observed at any interval when potency was tested for the mumps lots using product manufactured with potency of $> 5.0$ $\log_{10}$ TCID$_{50}$ and using the 1x6 assay format. The results of the testing reflected:

| Lot | Specification | Interval (Months) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Initial | 3 | 6 | 9 | 12 | 18 | 24 | 30 |
| 0633752 (filled Aug. 30, 1999) | $> 3.6$ $\log_{10}$ (TCID$_{50}$/.1 mL)[200] | 4.5 | 4.3 | 4.2 | 4.1 | 4.1 | 3.9 | 3.9 | 3.7 |

---

[196] MRK-KRA00756381.

[197] MRK-KRA01896309; MRK-KRA00549487.

[198] MRK-KRA01633601; MRK-KRA01632745; MRK-KRA01633529.

[199] MRK-KRA01632888.

[200] Data reported in Annual Stability reports is reported on the basis of TCID$_{50}$ per .1 mL. The expiry potency specification or 4.3 $\log_{10}$ TCID$_{50}$ /.5 mL is equivalent to 3.6 $\log_{10}$ TCID$_{50}$/.1 mL.

Appx11193

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

Civil Action No. 10-4374 (CDJ)

                    *Plaintiffs,*

        v.

MERCK & CO., INC.,

                    *Defendant.*

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 92

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

        *Plaintiffs,*

        v.

MERCK & CO., INC.,

        *Defendant.*

Civil Action No. 10-4374 (CDJ)

IN RE: MERCK MUMPS VACCINE
ANTITRUST LITIGATION

THIS DOCUMENT RELATES TO:
ALL ACTIONS

Master File No. 12-3555 (CDJ)

**Expert Report of Anna Durbin, MD**



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Appx11195**

IV.    **ANALYSIS**

A.    **Immunogenicity assays can provide useful data, but there are limitations on what they tell us.  The best measure of how well a vaccine works is the extent to which it protects people from getting the disease.**

Immunological assays are tests that use serum or other samples from test subjects to look for certain kinds of information about the subject's immune system and the immune response to different stimuli such as infection, vaccination, or drugs/therapeutics.  One common type of information about which immunological assays attempt to obtain information is the presence, absence, or level of antibodies.  In the study of most vaccines, the most common immunological response that is studied is the development of antibodies induced by the vaccine. We look at the level of antibodies present before vaccination and the level of antibodies measured at different points after vaccination. Very often we look for "seroconversion."  This refers to a person going from being "seronegative" prior to vaccination, which generally means lacking pathogen specific antibodies, to being "seropositive" after vaccination, which generally means possessing such antibodies.

There are many different kinds of antibodies and these different kinds of antibodies do different things. For this reason, we do different kinds of tests to measure the specific kind of antibody we are looking for and these tests need to be done in the laboratory. When we are measuring antibodies that are made in response to a vaccine, we are trying to measure the antibodies against specific germs like viruses or a bacteria that cause a specific disease. Antibodies cannot be quantified directly by, for example, looking for them under a microscope. It is therefore necessary to design lab tests that evaluate immune system activity as an indirect means of estimating whether antibodies are present and, if so, in what quantity.  These tests can be very complex, as compared to, for example routine lab tests like the one that measures your cholesterol level or your iron level.

Immunological assays are an important tool in vaccine research and evaluation.  Their role is best understood in the context of overall vaccine development.

Although they take many forms, vaccines typically work by injecting an "antigen" into a human with the intention of causing the person's immune system to respond in a way that protects them from disease, and perhaps lessens the severity of any disease that they may contract.  There are different kinds of antigens that are used in vaccines to prevent disease. The antigen can be a very small part of the germ that causes the disease, or it can be the whole germ that has been changed so it doesn't cause illness, or it can be genetic parts of the virus or bacterium (DNA or RNA vaccines). In the case of vaccines against viruses, the whole virus vaccine can be made safe by killing the virus or by weakening it so it doesn't cause illness.  This

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

is the case of Merck's mumps vaccine, where the antigen is a weakened form of the virus that causes the disease. This is also true of the flavivirus vaccines to which much of my research has been devoted. These are known as "live virus" vaccines.

There are advantages and disadvantages to the different types of vaccines. Killed vaccines and vaccines that use only pieces of the virus generally do not stimulate a strong antibody response so they have to be given several times over a few months and they generally need to be given with another substance called an "adjuvant" or helper, to make the immune response stronger. Live vaccines generally need to be given fewer times to stimulate an immune response that lasts many years and they stimulate parts of the immune system that the other vaccines do not. Whatever the form of the vaccine, an important early step in vaccine development is identifying an appropriate antigen for further study.

After an antigen has been identified, it is usually tested in animals in various ways before it is tested in humans. At this stage, immunologic assays can be used to investigate whether administering the antigen to the animal appears to cause an immune response. This is often done by taking blood samples from the animal both before and after administering the antigen and comparing the amount of antibody in those two samples. If there is an increase in the antibodies after injection, then we presume that there has been an immune response. If we do see an immune response, then the nature of that immune response can be one important factor, among others, in deciding whether the vaccine candidate is promising enough for us to keep studying it.

If the data available to us about the safety and possible immune response to the antigen are favorable, and if the FDA approves, an important next step in the development of a vaccine is to test it in humans. This is done in Phase I clinical trials, which are subject to FDA oversight and regulation. Much of my work has been in Phase I vaccine clinical trials for live virus vaccines. The primary goal of Phase 1 trials is to evaluate the safety of a new vaccine in a small number of people. Immunological assays play an important role here as well, because they help us see if the vaccine will stimulate a good immune response against the cause of the disease we are trying to prevent. In these studies, we use different assays to measure the response in different parts of the immune system of the trial participants that could hypothetically be linked to protection from disease in humans.

If the data from the Phase I and somewhat larger Phase II trials are consistent with the vaccine being safe and prompting an immune response that we hypothesize will protect against the disease, the next step is to perform what are known as Phase III trials, which are conducted on a larger scale. Importantly, for vaccines designed to prevent diseases for which there is not a vaccine currently available, these trials typically are not focused on immunogenicity data. Instead, they are focused on a different kind of data, namely, whether or not the vaccine is

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

actually able to protect people from getting the disease. To do this, we compare how many people in the trial who were vaccinated got the disease with how many people who were not vaccinated got the disease. This is often referred to as the "efficacy" of the vaccine. Ultimately, what matters for a vaccine is whether it helps prevent disease or modifies the course of illness and whether it is safe. Although immunogenicity data in vaccine development can give us clues about whether a vaccine can prevent or control disease (which I describe more below), it is only an indirect measure; the better measure when it is available, and the one of much greater importance to public health, is whether people who get the vaccine are protected against getting the disease and, if a vaccinee does get the disease, whether the disease is as severe as in those who were not vaccinated.

Immunogenicity data can still be important in Phase III trials. For example, the data can provide useful information for our knowledge base about how the body responds to the vaccine, especially because it can be compared to the data about whether people in the trial are contracting disease. This can sometimes help us figure out if there is a correlate of protection from disease. This refers to the notion that even though we prefer data regarding whether people are actually getting the disease, it could be that, with the right immunological assay under the right circumstances, we might be able to conclude that certain immunological assay results might tell us whether someone is likely to be protected from disease. If we can find a correlate of protection, this can be useful for future studies because it could enable us to feel more confident in our ability to use immunogenicity assays to understand whether people are protected from disease.

Immunogenicity data can also be important when it is impossible to do a Phase III trial in which you measure whether people get disease. This can occur when a licensed vaccine has already been in use in the population and the vaccine being evaluated is what is sometimes referred to as a "second generation vaccine." When there is already a recommended vaccine for a disease, you cannot do a study in which you compare the frequency of disease in people who get the vaccine with the frequency of disease in people who do not get the vaccine because it is unethical to withhold a vaccine that has already been determined to be safe and effective in preventing disease. It also may be the case that the disease will have been made rare due to widespread use of the existing vaccine, which means that there will not be enough cases in the study population for a trial that uses disease as an endpoint. In these situations, immunogenicity data may be used for what is known as "bridging," which involves comparing the immunogenicity of a vaccine under consideration to the immunogenicity of a vaccine that is known to provide protection from disease. Under those circumstances, even though the frequency of seroconversion for the vaccine under study may not translate directly to the incidence of disease protection conferred by the vaccine, it can still be useful to determine

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

whether the vaccine under study seems to perform immunologically in a way that is comparable to the vaccine that is known to be protective.

Another instance when immunogenicity data are important in a Phase III trial is when certain changes to a licensed vaccine are being considered. One example of this is Merck's clinical trial to define the end expiry potency for the mumps component of its MMR vaccine, Protocol 007. In that trial, Merck was investigating the hypothesis that lower potencies of the vaccine would be acceptable.[1] It would not have been possible to conduct this trial by determining whether people getting the vaccine at a lower potency got the disease in a different rate because mumps has become so rare due to the success of the vaccine that there simply would not be enough cases of mumps to conduct a study of that type. After extensive discussion with the FDA, Merck instead developed an immunogenicity assay (the AIGENT assay) that it would use, in addition to a type of immunogenicity assay known as an ELISA, to compare the immune responses in the participants in the clinical trial who got different potencies of the vaccine.

In sum, although immunological assays can be very useful, their limitations are well-recognized and the data they generate needs to be evaluated in context. In public health vaccine evaluations of how well a vaccine works, data about disease in people is more valuable than immunogenicity data.

**B.  Although PRN assays are useful for detecting the presence of functional antibodies, they are subject to the limitations mentioned above, are imperfect as replicas of the human immune system, and are subject to practical difficulties.**

There are various types of immunological antibody assays. One important type, and the type I have designed and run repeatedly throughout my career, is a "plaque reduction neutralization" (PRN) assay. See Exhibit C. The AIGENT assay used by Merck in Protocol 007 is a PRN assay.

In very general terms, a PRN assay attempts to measure the extent to which test sera contains antibodies that neutralize virus. As I noted above, antibodies cannot be observed under a microscope and therefore cannot be measured by a simple counting process. We therefore need to use assays to detect antibodies, or antibody activity, indirectly. In a PRN assay, we combine test sera with the virus of interest (sometimes called an "indicator virus") and we expose that mixture to cells which are in a clear well. We then attempt to measure the extent to which the virus is able to infect the cells. Plaques form on the bottom of the well and we presume that the appearance of plaques is attributable to infection of the cells by the virus. The number of plaques is therefore believed to give us information about the extent to which

---

[1] MRK-KRA00224982-MRK-KRA00226259.

the virus is infecting the cells. The theory is that if the test sera have neutralizing antibodies they will prevent the virus from infecting the cells, which would mean there would be fewer plaques. We evaluate the test sera at different dilutions to help enable us to quantify in some way how much antibody is needed to prevent a certain amount of virus from infecting the cells. We apply a calculation method, which typically involves comparing the amount of infection in the various dilutions with the amount of infection in a control. Based on those comparisons at each dilution, we deem one of those dilutions to be the "titer" for that sample, which is in turn used to make conclusions about the immune response of the person whose sera is being tested.

The benefit of PRN assays is that instead of just measuring whether antibodies are present, they are focused on the antibodies that are believed to neutralize virus and help to protect us from infection. They are therefore considered a "functional" assay because they evaluate the functioning of the antibodies, not merely their presence. It is believed that not all antibodies neutralize virus, which means that an assay that detects non-neutralizing antibodies might be detecting at least some antibodies that do not protect a person from disease. For this reason, despite the limitations described above and other important considerations described below, PRN assays are sometimes preferred in certain circumstances.

Although they are considered "functional" and are designed to provide insight into how antibodies act upon virus, PRN assays are not replicas of how a body fights off disease. There are many parts to the immune response and there are different ways that antibodies work. The PRN only measures one part of the immune response (antibodies) and only one way antibodies work (neutralization). The PRN assays are attempts to get an understanding from a lab test (i.e., in vitro) of the complex and often poorly understood process of the actual human immune response to antigens (i.e., in vivo), in this case mumps vaccine, with the hope of it being a surrogate for measuring protection from disease. For example, there are certain known aspects of the in vivo human immune response that we know are not accounted for in PRN assays. Antibodies are proteins that are made by cells of the immune system called B cells. Antibodies protect cells from infection or modify the ability of the germ to spread if infection has occurred. Another type of cell in the immune system is called the T cell. One type of T cell helps the B cell make better antibodies. Another type of T cell helps kill cells that are infected with viruses or bacterial. These T cells are part of the immune system called "cell-mediated" immunity. B and T cells and what they do are not measured by PRN assays. The scientific community does not have a clear understanding of whether humoral immunity or cell-mediated immunity is more important for protection against mumps illness. Thus, a PRN assay may not measure at all an important part of what actually protects people from mumps. Complement is another part of the in vivo immune response to antigens. This also is often not measured in a PRN, as it is often purposefully removed from the serum. Antibodies themselves

Appx11200

can sometimes bind to cells that have been infected and kill these cells. This is not measured by the PRN. Finally, because the immune response to viruses is not well understood, there could be other aspects of the body's in vivo response to mumps virus that are not measured in a PRN. Dr. Rubin of the FDA summed it up this way in his chapter in Plotkin's Vaccines text: "[I]mmune responses other than those measured in routinely performed in vitro assays likely play an important role in protection."[2] Dr. Rubin goes on to identify antibodies involved in antibody-dependent cellular cytotoxicity (ADCC) and Fc-mediated phagocytosis as additional possible immune mediators.

There are other ways in which PRN assays are inherently artificial or imperfect as replicas of the human immune system. For example:

- PRN assays typically involve incubating the virus/serum mixture at a temperature and for a duration that may or may not match true human exposure.
- I mentioned above that PRN assays measure the ability of the virus to infect cells. Those cells are often not human cells. One commonly used cell type is Vero cells, which are from monkeys, not humans.
- In order for a PRN assay to function properly, it is often necessary to include what are known as reagents, many of which are not part of the human immune system, and many of which derive from animals. For instance, the cells and the viruses we use in the assay need to be given nutrition such as sugars and salts. This is put into what we call media and we put media over the cells when we do the assay. We sometimes add other things to the media to help the cells and the viruses grow better. Other things we may add to the media are fetal bovine serum (FBS) and antibiotics to prevent bacteria from contaminating the assay. Obviously, the human immune system does not have fetal bovine serum or antibiotics.
- Determination of whether the cells have been infected in a PRN assay is often equated with the formation of plaques, but it is uncertain whether, or exactly how, plaque formation equates with infection that would cause disease.
- The method for determining whether someone is positive or negative in a PRN assay involves formulas that can vary from assay to assay. For example, many assays, such as the AIGENT assay and the dengue PRN I run in my lab determine a titer by identifying the highest dilution that demonstrates a greater than 50% reduction in plaques from a control that lacks serum; other assays, such as a Respiratory Syncytial Virus PRN assay, use a 60% reduction. If you want the assay to be more specific to the virus you are testing, you use an assay that uses a 90% reduction. We sometimes use the 90%

---

[2] Rubin S. Mumps vaccines. Plotkin S, Orenstein W, Offit P, Edwards K, editors. Vaccines. 7th edition. Philadelphia: Elsevier **2018**; 663-688 at 674. Hereinafter referred to as "Rubin."

reduction to try to distinguish one type of dengue virus from another type of dengue virus. The relationship of these varying percentages is uncertain.

In this way, although the well plate, reagents and overall assay method are supposed to bear a relationship to the human immune response, assays are certainly not an exact replica of what happens in the human body.  For instance, we can measure the amount of neutralizing antibody in our assay but we can't measure the effect of non-neutralizing antibody. Non-neutralizing antibody can be important for some diseases like dengue. We think that non-neutralizing antibody can actually help dengue virus enter cells in the body. This means that even when a dengue vaccine causes people to have a "good" PRN against dengue virus, people can still get dengue. This was seen in a clinical trial of the dengue vaccine Dengvaxia™ where the PRN against dengue type 2 in vaccine recipients was very good but the vaccine did not protect against dengue 2 in the study.

There are other features of PRN assays that must be kept in mind when interpreting results.  As noted by scientists at the CDC and the FDA, mumps PRN assays can generate varying results depending on what strain of virus is used in the assay as the indicator virus.[3]  For example, the same set of samples can be tested in the same assay, with the only difference being the strain of virus being used as the indicator virus, and the titers or seroconversion rates could differ.  We have seen this in our dengue studies when we test the same serum samples from people against different dengue 1, dengue 2, dengue 3, or dengue 4 viruses. Sometimes for example, we see a higher PRN titer against a dengue virus that was different from the dengue virus that actually infected them. This can create challenges in deciding what virus strain would generate the most clinically meaningful results.  If use of one virus strain generates a seroconversion rate of 70% and use of another virus strain generates a seroconversion rate of 90%, we may be able to develop the hypothesis that the vaccine generates more immunity against the second virus strain (at least as measured short term and based on humoral immunity).  If the question was which of these two different seroconversion rates is a better parallel to protection in the real world, the answer could depend in part on which of the two virus strains (if either) were in circulation in the real world.

To further complicate strain selection, virus strains can vary in their behavior.  For example, often when running a PRN assay, the scientist begins with a viral seed and "grows" additional virus by placing it in the presence of human or animal cells so that it can replicate. Some viral strains grow better than others, which means that a viral strain that does not grow well would be a poor candidate for use in an assay.  Also, some virus strains form better or

---

[3] Dayan G, Rubin S.  Mumps outbreaks in vaccinated populations: are available mumps vaccines effective enough to prevent outbreaks? Clinical Infectious Diseases **2008**; 47:1458-1467; Cortese M, Barskey A, Tegtmeier G, et al. Mumps antibody levels among students before a mumps outbreak: in search of a correlate of immunity.  The Journal of Infectious Diseases **2011**; 204:1413-1422.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

worse plaques as compared to other virus strains. This can impact the quality of the data being generated and therefore could influence the selection of a strain to use in the assay.

An additional source of uncertainty regarding interpretation of mumps PRN assay results arises out of the fact that there is no known correlate of protection for mumps. A correlate of protection, for example, would be what has been established for Japanese encephalitis vaccines. Japanese encephalitis virus is another flavivirus. Based on studies of a Japanese encephalitis vaccine, it was established that a PRN of ≥ 10 correlates with protection against infection with Japanese encephalitis. This is not the case for mumps. As Dr. Rubin has described in his Mumps chapter in Plotkin's Vaccines:

> The presence of neutralizing antibody is linked to protection; however, numerous attempts to define a level of antibody that correlates with protection have failed.[4]

In its 2013 summary of the recommendations of the ACIP concerning MMR vaccine, the CDC stated: "Although antibody measurements are often used as a surrogate measure of immunity, no serologic tests are available for mumps that consistently and reliably predict immunity."[5] Dr. Rubin, of the FDA, and scientists at the CDC, published a paper in 2011 in which they attempted to identify a reliable correlate of immunity for mumps, but were unable to do so.[6] We therefore cannot know with confidence if a mumps immunogenicity assay result for a particular person shows that the person is, or that the person is not, protected from disease. That is yet another reason why the results of a mumps PRN assay need to be interpreted with care.

With all of this in mind, the clinical relevance of the results of a PRN assay requires careful analysis. The PRN assay evaluates only one function of antibodies and does not measure the other antibody functions or the role of cell mediated immunity. We know that exact replication of the human immune response is not possible, and therefore that is not what is expected. Instead, the clinical relevance of a PRN assay is based more on whether samples that are run through the assay generate findings that are consistent with clinical experience. For example, if in a clinical trial, the seroconversion rate as determined from the use of an assay parallels the efficacy rate as determined by whether people get disease, that would be an indicator of clinical relevance. Much of assay development (sometimes called "optimization") is

---

[4] Rubin at 674.

[5] McLean H, Fiebelkorn A, Temte J, Wallace G. Prevention of measles, rubella, congenital rubella syndrome, and mumps, 2013: summary recommendations of the Advisory Committee on Immunization Practices (ACIP). MMWR Recommendations and Reports **2013**; 62-04:1-34 at 10.

[6] Cortese M, Barskey A, Tegtmeier G, et al. Mumps antibody levels among students before a mumps outbreak: in search of a correlate of immunity. The Journal of Infectious Diseases **2011**; 204:1413-1422.

Appx11203

directed at making changes to the assay methodology with the goal of generating results that track what is known or what can be presumed about the samples being tested. The optimization is done to improve the reproducibility, specificity, and sensitivity of the assay. The specificity of the assay refers to the ability of the assay to identify a true negative as a negative, to minimize false positives. The sensitivity of the assay refers to the ability of the assay to identify a true positive as a positive. The specificity and sensitivity of an assay are inversely related; as you increase one you necessarily decrease the other.

When attempting to translate results from a PRN assay to real world protection, it is also important to keep in mind that, in a study like Protocol 007 and many other studies designed to measure immune response to vaccination, we are only getting a snapshot taken at six weeks post-vaccination. This is often sufficient for decision-making by regulatory agencies, but it limits the scope of what use can be made of the data. For example, the results of a study like Protocol 007 do not provide information about whether antibody levels and other measures of immunity develop after 6 weeks or wane over time. We have found in trials of the dengue vaccine we are testing that many people do not develop their peak PRN titer until later than 6 weeks after vaccination. Conversely, it is well understood in the scientific community that antibody levels often drop in the time period subsequent to vaccination or exposure and it is thus understood that antibody levels at six weeks post-vaccination certainly cannot be assumed to be the same as antibody levels years later.

It should also be noted that PRN assays can be cumbersome to run. For example, they tend to entail many steps. They also tend to require incubation over a period of days, which slows the process as compared to some other assays. In addition, the counting of plaques can be slow and tedious.

These, and other, features of running a PRN assay not only make them cumbersome, but they also inject subjectivity and risk of error into the process more so than other assays. For example, plaque counting can be subjective and some people are simply better counters than others. Even two skilled counters will not always agree on a plaque count for a given sample. There is also always a risk of pipetting errors, which are mishaps that can occur when the right amount of virus or antibody is not added to the assay. Sometimes pipetting errors are not detected when they occur and only become evident later when the results are seen. Another error that can occur is that the cell layer on which the plaques are counted can sometimes be disturbed or torn. This can lead to fewer virus plaques being visible. Depending on which wells this occurs in, it may make the PRN titer seem higher or lower. The size of the virus plaques can vary; some can be very small, called pinpoint, and some can be large. One counter may choose to count only certain sized plaques while another counter may choose to count plaques of all sizes. This can affect the titer.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

The PRN assay also can have inter-operator and intra-operator variability. For instance, the same person can run the same samples on different days and get somewhat different titers. This is called intra-operator variability. Two different people can run the same samples on the same day and get somewhat different titers. This is called inter-operator variability. For this reason, when interpreting a PRN we look not only at the magnitude of the titer but also at the trend of the titer over time (if multiple samples have been taken), the seroconversion rate, and the titer of the control serum to see if it has varied when run in different assays. Finally, PRN assays are subject to other forms of variability that sometimes confound the scientists running the assays because they do not have a logical explanation. For instance, serum itself can have an effect. The number of plaques seen after mixing with serum that is from someone who has never been exposed to the disease or vaccine in question can be lower than the virus only control. Something in the serum other than antibody or complement, which has been removed, is lowering the plaque count but we do not know what it is. This is probably attributable to the fact that PRNs are biological assays involving "living" cells, sera, virus and reagents, which means they are susceptible to all of the variability associated with such living entities.

These considerations all contribute to the well-recognized uncertainty regarding the extent to which seroconversion in a PRN assay translates into actual protection from disease and the well-recognized difficulty in designing and running a PRN assay.

### C. The design and development of the PRN assay used in Protocol 007, known as the AIGENT assay, were proper, followed commonly accepted procedures, and were discussed extensively with and appropriately approved by the FDA.

#### 1. Protocol 007.

I have reviewed the Protocol 007 clinical study report, as well as the document titled Protocol, which is the document that describes various features of a study including important features of its purpose, design and methodology. I have also reviewed the exchange of correspondence between Merck and CBER about the study and the documentation of meetings between them.

##### a. Overview of trial design

As stated in the Background and Rationale of the Protocol, "the purpose of this clinical trial is to study the immunogenicity of M-M-R™ II at its expiry potency. M-M-R™ II with a reduced potency will be directly compared with M-M-R™ II that has a standard release potency."[7]

---

[7] MRK-KRA00226045.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Appx11205**

3. **The use of anti-human IgG to optimize a neutralization assay is scientifically sound and its use in Protocol 007 was well-supported.**

The AIGENT assay included the addition of anti-human IgG to enhance the sensitivity of the assay. It is not uncommon for assays to include a reagent for this purpose. For example, some PRN assays include complement, others do not. As I have discussed elsewhere in this report, assays, even PRN assays, do not exactly reproduce human immune response. Especially where there is no known correlate of protection, when a new assay under design is detecting less immune response that what would be expected based on other available data, one possibility is that the assay is not sensitive enough. Under these circumstances, scientists will sometimes add a reagent to make the assay more sensitive to help assure the identification of neutralizing antibodies. I have worked with PRN assays that have used complement as an enhancer. I am familiar with use of complement from guinea pigs, trout, rabbit and pigs (none of which, of course, are naturally found in humans), and have found guinea pig complement to be preferable, because I have found it to be less variable in the assays in which I have used complement. Complement was used in assays to measure neutralizing antibody to respiratory syncytial virus because it allowed for a cleaner "cut-off" for the assay. When we developed a PRN to measure neutralizing antibody against dengue virus, we initially included complement in the assay but later removed it because we did not see significant differences in the assay with or without complement.

The use of anti-human IgG in mumps plaque neutralization assays is described in a paper by Sato, and others, including Dr. Frank Ennis, all of whom were at the Bureau of Biologics in the FDA at the time the paper was published.[27] I know Dr. Ennis very well from his work in dengue. We have served on WHO dengue advisory committees together. He is a very well-known and respected virologist and viral immunologist. They found that the addition of anti-human IgG made their assay "approximately 100 times more sensitive" than the neutralization test without anti-human IgG.[28] I notice that Merck had a similar experience during assay development, which appears to be part of a submission to CBER in advance of the March 2000 meeting and which lists "Enhancements to Nt," including "anti-human IgG (~ 100-fold enhancement)."[29] The minutes from that meeting indicate that addition of anti-human IgG is one of the enhancements that Merck was to consider in its continuing mumps PRN assay development. The CBER minutes of that meeting list it as one of the "assay modifications" that are "reasonable to try to enhance sensitivity."[30] The Merck minutes of that meeting also list it

---

[27] Sato H, Albrecht P, Hicks J, Meyer B, Ennis F. Sensitive neutralization test for virus antibody. Archives of Virology **1978**; 58:301-311. Hereinafter referred to as "Sato."
[28] Sato at 301.
[29] MRK-KRA00062851.
[30] MRK-KRA00001260.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Appx11206**

# EXHIBIT D

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1. Asano Y, Albrecht P, Stagno S and Takahashi M. Potentiation of neutralization of Varicella-Zoster virus to antibody to immunoglobulin. J Infect Dis 1982;146:524-9.

2. Sato H, Albrecht P, Krugman S and Ennis FA. Sensitive neutralization test for rubella antibody. J Clin Microbiol 1979;9:259-65.

4. Ashe WK, Notkins AL. Neutralization of an infectious herpes simplex virus-antibody complex by anti-gamma-globulin. Proc Natl Acad Sci U S A 1966;56:447-51.

5. Notkins AL. Infectious virus-antibody complexes: interaction with anti-immunoglobulins, complement, and rheumatoid factor. J Exp Med 1971;134:41-51.

6. Notkins AL, Mage M, Ashe WK and Mahar S. Neutralization of sensitized lactic dehydrogenase virus by anti-gammglobulin. J Immunol 1968;100:314-20.

7. Radwan AI, Burger D. The role of sensitizing antibody in the neutralization of equine arteritis virus by complement or anti-IgG serum. Virology 1973;53:366-71.

8. Lehmann-Grube F, Ambrassat J. A new method to detect lymphocytic choriomeningitis virus-specific antibody in human sera. J Gen Virol 1977;37:85-92.

9. Porter DD, Larsen AE and Porter HG. The pathogenesis of Aleutian disease of mink. I. In vivo viral replication and the host antibody response to viral antigen. J Exp Med 1969;130:575-93.

10. Fedova D, Bruckova M, Plesnik V, et al. Detection of postvaccination mumps virus antibody by neutralization test, enzyme-linked immunosorbent assay and sensitive hemagglutination inhibition test. J Hyg Epidemiol Microbiol Immunol 1987;31:409-22.

11. Shivers JC, Daniels CA. Enhanced antiglobulin-mediated neutralization of herpes simplex virus-IgG complexes by complement and heterologous anti-immunoglobulin. Arch Virol 1979;59:89-97.

12. Hawthorne JD, Albrecht P. Sensitive plaque neutralization assay for parainfluenza virus types 1, 2, and 3 and respiratory syncytial virus. J Clin Microbiol 1981;13:730-7.

13. Schuster V, Otto W, Maurer L, et al. Immunogenicity and safety assessments after one and two doses of a refrigerator-stable tetravalent measles-mumps-rubella-varicella vaccine in healthy children during the second year of life. Pediatr Infect Dis J 2008;27:724-30.

14. Forleo-Neto E, Carvalho ES, Fuentes IC, Precivale MS, Forleo LH and Farhat CK. Seroconversion of a trivalent measles, mumps, and rubella vaccine in children aged 9 and 15 months. Vaccine 1997;15:1898-901.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

15. Blatter MM, Klein NP, Shepard JS, et al. Immunogenicity and safety of two tetravalent (measles, mumps, rubella, varicella) vaccines coadministered with hepatitis a and pneumococcal conjugate vaccines to children twelve to fourteen months of age. Pediatr Infect Dis J 2012;31:e133-40.

16. Albrecht P, Klutch M. Sensitive hemagglutination inhibition test for mumps antibody. J Clin Microbiol 1981;13:870-6.

17. Albrecht P, Herrmann K and Burns GR. Role of virus strain in conventional and enhanced measles plaque neutralization test. J Virol Methods 1981;3:251-60.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

          *Plaintiffs,*

   v.

MERCK & CO., INC.,

          *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 93

# GUIDANCE FOR INDUSTRY

FOR THE EVALUATION OF COMBINATION VACCINES
FOR PREVENTABLE DISEASES:

PRODUCTION, TESTING AND CLINICAL STUDIES

U.S. Department of Health and Human Services
Food and Drug Administration
Center for Biologics Evaluation and Research
April 1997

**Appx11211**

Guidance for Industry for the Evaluation of Combination Vaccines for Preventable Diseases:
Production, Testing and Clinical Studies

Docket No. 97N-0029

For further information regarding this document, contact:

Stephen Ripley
Center for Biologics Evaluation and Research (HFM-630)
Food and Drug Administration
1401 Rockville Pike, Suite 200N
Rockville, MD  20852-1448
301-594-3074


Submit written comments on this document to:

Dockets Management Branch (HFA-305)
Food and Drug Administration
12420 Parklawn Drive, Room 1-23
Rockville, MD 20857

Comments should be identified with the docket number found in the heading of this page.


Submit written requests for additional copies of this document or any other CBER guidance to:

Office of Communication, Training, and Manufacturers Assistance (HFM-40)
Food and Drug Administration
1401 Rockville Pike, Suite 200N
Rockville, MD  20852-1448

Send one self-addressed adhesive label to assist that office in processing your request.

These documents may also be obtained by mail by calling the CBER Voice Information System
at 1-800-835-4709 or 301-827-1800, or by fax by calling the FAX Information System at
1-888-CBER-FAX or 301-827-3844.

Persons with access to the INTERNET may obtain these documents using the World Wide
Web (WWW) or bounce-back e-mail.  For WWW access, connect to CBER at
"http://www.fda.gov/cber/cberftp.html".  To receive this document by bounce-back e-mail,
send a message to "COMBVAC@A1.CBER.FDA.GOV".

TABLE OF CONTENTS

NOTE:  Page numbering may vary for documents distributed electronically.

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

    A.  Scope . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1
    B.  Defining "Combination Vaccine"  . . . . . . . . . . . . . . . . . . . . . . . . .    1
    C.  Applicable Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1
    D.  Incorporation by Reference . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2
    E.  Joint Ventures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2
    F.  Nomenclature . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

II.  MANUFACTURING ISSUES FOR COMBINATION VACCINES . . . . . . . . . . .    3

    A.  Formulation Issues  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3
        1.  Compatibility of Components  . . . . . . . . . . . . . . . . . . . . . . . .    3
        2.  Preservatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4
        3.  Adjuvants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4
        4.  Inactive Components . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5
        5.  Stability/Expiration Dating . . . . . . . . . . . . . . . . . . . . . . . . . .    5

    B.  Demonstrating Consistency of Manufacture . . . . . . . . . . . . . . . . . . . .    6
        1.  Number and Scale of Consistency Lots . . . . . . . . . . . . . . . . . . .    6
        2.  Necessary Combinations of Monovalent Components . . . . . . . . . . . .    6

    C.  Testing Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8
        1.  General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8
        2.  Potency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8
        3.  Identity Testing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9
        4.  Sterility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9
        5.  Purity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9

III.  PRECLINICAL STUDIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9

    A.  Adjuvants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9
    B.  Animal Immunogenicity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    10
    C.  Animal Challenge Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    10

i

**Appx11213**

IV.  CLINICAL STUDIES TO SUPPORT THE LICENSURE OF COMBINATION
VACCINES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    11

A.  Safety Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    11
B.  Immunogenicity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    12
C.  Efficacy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    13
D.  Statistical Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15
    1.  General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15
    2.  Immune Response . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16
    3.  Common Adverse Reactions . . . . . . . . . . . . . . . . . . . . . . . .    17
    4.  Less Common Adverse Reactions . . . . . . . . . . . . . . . . . . . .    17
    5.  Rare Adverse Events . . . . . . . . . . . . . . . . . . . . . . . . . . .    17
    6.  Sample Size . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18
    7.  Submission of Data to CBER . . . . . . . . . . . . . . . . . . . . . . .    18
E.  Indications and Usage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19

V.  VACCINES ADMINISTERED SIMULTANEOUSLY WITH THE
COMBINATION VACCINE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19

# I.  INTRODUCTION

## A.  Scope

The Center for Biologics Evaluation and Research (CBER) is providing this document to provide further guidance and advice on the production, testing and clinical study of combination vaccines. A separate section will deal with issues related to simultaneous administration of vaccines. This document does not cover therapeutic combination vaccines. Not all issues outlined in this document will pertain to all types of combination vaccines. For example, some issues related to live vaccines may not apply to inactivated vaccines and vice versa.  As with other guidance documents, FDA does not intend this document to be all-inclusive and cautions that not all information may be applicable to all situations.  This document is intended to provide information and does not set forth requirements.  FDA anticipates that manufacturers may develop alternative methods and procedures, and discuss them with FDA.  This guidance document represent the agency's current thinking regarding issues related to combination vaccines.  It does not create or confer any rights for or on any person and does not operate to bind FDA or the public.  An alternative approach may be used if such approach satisfies the requirements of the applicable statute, regulations, or both.

## B.  Defining "Combination Vaccine"

For this document, a combination vaccine consists of two or more live organisms, inactivated organisms or purified antigens combined either by the manufacturer or mixed immediately before administration and intended to:

(1)     prevent multiple diseases, or
(2)     prevent one disease caused by different strains or serotypes of the same organism.

Vectored vaccines and conjugated vaccines are combination vaccines if the prevention of the disease caused by the vector organism or the carrier moiety is to be one of the combination's indications.

## C.  Applicable Regulations

The regulations in Title 21 of the Code of Federal Regulations (21 CFR) Parts 600-680 pertain to biological products in general. Particularly important is 21 CFR 610.17, Permissible combinations, which states that licensed products may not be combined with other licensed or unlicensed products either therapeutic, prophylactic, or diagnostic, except as a license is obtained for the combined product. 21 CFR 601.2(a) describes the information that is required in a Product License Application (PLA). When filing the PLA, submit completed forms FDA 3211, 3212, or a combination of both. The "Center for Biologics Evaluation and Research: Refusal to File Guidance for Product License Applications and Establishment License

1

Appx11215

Applications" dated July 12, 1993, (see the Federal Register of July 20, 1993 (58 FR 38770)) explains how CBER determines a PLA to be judged inadequate for filing.

In addition, certain drug regulations such as 21 CFR 201.56, 201.57, 210, 211, and 312 apply to combination vaccines. Also, the regulations in 21 CFR Parts 50 and 56, which provide protection for persons involved in clinical trials, apply to the use of combination vaccines in clinical trials. Combination vaccines must meet the requirements of these regulations where applicable.

### D.  Incorporation by Reference

CBER may grant, on a case-by-case basis, requests to incorporate manufacturing information from a manufacturer's approved license application into the same or related manufacturer's new PLA by referring to its date of submission(s) and all of its page numbers. This request should be made in writing at the pre-PLA meeting with CBER. Also, include a summary of the submission in the new PLA.

Before making a request for incorporation by reference, manufacturers should note the following:
- (1)    the incorporated information will be reviewed again as part of the new application,
- (2)    any changes to the cross-referenced component will require supplements to both the individual component PLA(s) and the combination vaccine PLA, and
- (3)    a supplement must be filed to the cross-referenced component PLA(s) to include the component for further manufacturing into a combined product.

### E.  Joint Ventures

When two or more manufacturers wish to cooperate in the production of a combination vaccine, they should consult FDA's Policy Statement on "Manufacturing Arrangements for Licensed Biologics", (see the Federal Register of November 25, 1992 (57 FR 55544)). In light of the new change in the definition of manufacturer (see the Federal Register of May 14, 1996 (61 FR 24227), "Elimination of Establishment License Application for Specified Biotechnology and Specified Synthetic Biological Products"), FDA intends to revise the policy statement concerning cooperative manufacturing arrangements for licensed biological products to address contract, divided, and shared manufacturing arrangements.

### F.  Nomenclature

Currently, the proposed proper name for a new combination should link the names of all the component vaccines as they are currently licensed; for example, Diphtheria and Tetanus

**Appx11216**

Toxoids and Pertussis Vaccine Adsorbed and Haemophilus b Conjugate Vaccine (Diphtheria CRM197 Protein Conjugate). Understandably, such a name is difficult to place on the label of a small vial and may be inconvenient for other reasons as well. While CBER is considering changes to this naming scheme, it will review reasonable proposals for other names on a case-by-case basis. Alternate proper names should clearly convey the identity of the product, and not be confusing (see 21 CFR 201.6(b)).

## II. MANUFACTURING ISSUES FOR COMBINATION VACCINES

### A. Formulation Issues

#### 1. Compatibility of Components

Experience has shown that combining monovalent vaccines may result in a new combination which is less safe or effective than desirable. Sometimes the components of inactivated vaccines may act adversely on one or more of the active components. One such instance occurred when the combining of whole cell pertussis vaccine and inactivated poliovirus vaccine (IPV) resulted in a vaccine with a decreased pertussis potency.

Additionally, immunological interference between vaccine viruses or virus subtypes has been observed when live vaccines are combined. Consequently, the combined components stimulated weaker immune responses than did viruses administered separately. Component cross-reactivity could also occur with a combination of live vaccines where recombinational events may allow attenuated organisms to be reconstituted to virulent forms.

Therefore, it is of utmost importance to validate the compatibility of the combined components before any clinical trials begin. CBER advises that the product be characterized and the integrity of the components be assessed by performing a battery of physicochemical, biochemical and biological assays.

To further demonstrate the compatibility of the components, it is recommended that preclinical studies, in an appropriate animal model, be conducted to determine the consequences of combinations on potency and immunogenicity. (See Section III., Preclinical Studies section for further discussion.) The manufacturer should consider that the components of the product may revert to toxicity or virulence and should quantify any such tendency both with the monovalent and the combined vaccines. Similarly, the physical characteristics, including resuspension and the suitability of the container and closure for the combination product should be assessed.

If the combination of component vaccines results in a volume too large to be safely administered, the manufacturer may investigate dose-reduction of some or all components. For

3

Appx11217

instance, the manufacturer may restore an optimum final volume by utilizing concentrated intermediate bulks to achieve final concentrations equal to the monovalent component vaccines. The effects of such formulation changes (see Section II.B., Demonstrating Consistency of Manufacture) should be evaluated preclinically.

### 2. Preservatives

21 CFR 610.15 describes the general requirements for agents like preservatives, adjuvants, and other constituent materials which may be added to a vaccine during or at the end the manufacturing process. In a combination vaccine, the preservative or stabilizer in one monovalent vaccine can alter the potency of the other vaccine(s). For example, thimerosal adversely affected the potency of IPV in its combination with Diphtheria and Tetanus Toxoids and Pertussis Vaccine Adsorbed. The use of preservatives can be avoided if vaccines are provided in single dose vials.

Inclusion of a preservative does not obviate the need for the combination vaccine to be evaluated for potency and reversion to toxicity for each of the active components. In addition, the manufacturer should consider doing the following:
> (1)    quantifying the levels of constituents or antimicrobials, that remain in the finished vaccine, and
> (2)    conducting studies on the preservative's ability to protect the final product from contamination (see the Antimicrobial Preservatives Effectiveness Test prescribed in the United States Pharmacopeia (USP).)

### 3. Adjuvants

21 CFR 610.15 describes the general requirements for adjuvants which are agents that augment specific immune responses to antigens. Currently, the only adjuvants included in U.S. licensed vaccines are aluminum compounds. An adjuvant shall not be introduced into a product unless there is satisfactory evidence that it does not affect adversely the safety or potency of the product. As with other ingredients in the final formulation, the adjuvant should be shown to be compatible with all components in the formulation as described above. If appropriate, the manufacturer should demonstrate how much of each component is being adsorbed to the adjuvant. The Investigational New Drug Application (IND) and PLA should describe:
> (1)    changes in manufacture concerning adsorption, such as the stage at which the adsorption takes place for a previously licensed component,
> (2)    the efficiency and kinetics of simultaneous adsorption (if applicable),
> (3)    the efficiency and kinetics of adsorption of components related to changes in the adjuvant, or relative concentrations,
> (4)    the assessment of post-formulation adsorption of components not previously present as adsorbed, and

4

(5)    the effect of the adjuvant on the ability to assay components that were not previously adsorbed; immunologic identity tests or pyrogenicity tests should also be addressed.

Manufacturers should consider whether the following have an impact on the safety, purity and potency of the new combination in comparison to that of the monovalents:

(1)    whether a non-adsorbed component becomes adsorbed,
(2)    whether de-adsorption of the adsorbed component occurs,
(3)    for a previously licensed vaccine, changing the stage of manufacture at which adsorption occurs,
(4)    chemical forms (e.g., aluminum hydroxide and aluminum phosphate) of the adjuvant and buffers which are different from prior manufacturing,
(5)    the effects of mixing different adjuvants, and
(6)    how time affects the adsorption of antigen(s) to the adjuvant (this should be monitored as part of the stability studies of the combined product.)

### 4.  Inactive Components

During formulation development, a manufacturer should determine the effect of using different buffers, salts, and other chemical factors on the safety, purity and potency of the final combined vaccine. Similarly, the manufacturer should ascertain if the stabilizers, i.e., lactose, gelatin, sorbitol, etc., will interact to the detriment of the safety, purity or potency of the vaccine.

### 5.  Stability/Expiration Dating

Storage of a combination product can be divided into at least three stages:

(1)    storage of each in-process component,
(2)    storage of the combined product before initiation of potency testing, and
(3)    storage of the combined product after initiation of potency testing.

Stages 2 and 3 may include storage in bulk or filled containers or a combination of both. The manufacturer should have validated storage times and conditions for each component and the combination product (up until potency testing begins). "Real time" data should be provided to support the appropriateness of these limits. The dating period for a combined vaccine begins on the date of initiation of the last valid potency test on the first component tested and will be no longer than the dating period of the component with the shortest dating period. The data to support storage times and the dating period should confirm the stability of the product over its entire shelf life, i.e., the maximum length of the storage periods (before potency testing) plus the dating period.

At the time of the PLA submission, it is recommended that stability data supporting the dating period be available from at least three lots of final container product covering the requested

5

dating period. To have adequate data at the time of PLA submission, applicants should initiate stability studies during clinical development. CBER encourages the periodic submission of interim stability data to the IND. Studies should be conducted according to a stability protocol which outlines the tests to be conducted and the intervals when testing will be performed. The studies should be done as outlined in the FDA "Guideline for Submitting Documentation for the Stability of Human Drugs and Biologics (1987)" (see the <u>Federal</u> <u>Register</u> of April 3, 1987 (52 FR 10819)); see also the International Conference on Harmonisation final guideline on "Quality of Biotechnological Products: Stability Testing of Biotechnological/Biological Products (see the <u>Federal</u> <u>Register</u> of July 10, 1996 (61 FR 36466)). While accelerated stability data may be used as supporting data, it should not be used to assign the dating period.

### B. Demonstrating Consistency of Manufacture

#### 1. Number and Scale of Consistency Lots

After the final manufacturing procedures are established, consistency of manufacture should be demonstrated. This may be done by producing at least three, preferably consecutive, final bulk lots from which final containers are filled. If consecutive lots are not used, an explanation should be provided.

While CBER recommends that consistency lots be produced in the manufacturing facility for which the corresponding Establishment License Application (ELA) (or supplement) will be submitted, pilot facilities may be used following guidance provided in the "Center for Biologics Evaluation and Research; Use of Pilot Manufacturing Facilities for the Development and Manufacture of Biological Products; Guidance" (see the <u>Federal</u> <u>Register</u> of July 11, 1995 (60 FR 35750)); see also "FDA Guidance Concerning Demonstration of Comparability of Human Biological Products Including Therapeutic Biotechnology-Derived Products" (see the <u>Federal</u> <u>Register</u> of April 26, 1996 (61 FR 18612)). Ideally, the lots will be manufactured using the same equipment intended for full scale production. Generally, the lots need not be full size production runs. However, the comparability testing of at least one full manufacturing scale lot may be requested by CBER if the manufacturing procedures create a situation where the scale of manufacture could affect the final product's safety, purity or potency. An example might be an adsorbed product, or a product that is difficult to resuspend, where the final product may be affected by the efficiency of the adsorption or mixing procedure.

CBER also recommends that at least one lot be submitted for release and be available for distribution at the time of licensure. It may be one of the consistency lots if appropriate. More lots may be requested.

#### 2. Necessary Combinations of Monovalent Components

Appx11220

Each of the manufacturing consistency lots should utilize a different bulk lot of each active component. Thus, there should be at least three different bulk lots for each of the immunogens contained in the combination vaccine. However, if a component is an already licensed immunogen, fewer lots of this component in combination as part of the three consistency lots of final product may be adequate. Manufacturers are encouraged to seek guidance from CBER on such situations.

It is recommended that if the vaccine contains unlicensed product intermediates, then the component lots should also represent at least three, preferably consecutive, production lots. Test results for three lots of each intermediate should also be provided. When the intermediate is also a component of a licensed vaccine, the production of three consecutive component lots may not be needed, if the licensed vaccine has been released by CBER or the manufacturer within the previous twelve months.

It may not be necessary to formulate all possible combinations of consistency lots of vaccine components. However, manufacturing consistency should be shown for each of the antigens present in the final vaccine. Thus, the consistency lots for each of the different components of the combination vaccine should meet the specifications for that particular component. For certain products, such as multivalent polysaccharide vaccines, the testing of combinations using fewer than three monovalent lots of each type may be adequate in some cases, since the testing of all possible combinations for separate lots would be prohibitive and also would not contribute significantly to the evaluation of the product.

It is recommended that a matrix table (such as the one shown below) which explains which combination(s) of monovalent products have been used in laboratory, preclinical and clinical testing be submitted to the IND and PLA. The following is one combination that will, in general, be acceptable to CBER for a combination vaccine.

$$X_1 \quad + \quad Y_1 \quad + \quad Z_1 \ldots N_1 \qquad = \text{Final Lot 1}$$
$$X_2 \quad + \quad Y_2 \quad + \quad Z_2 \ldots N_2 \qquad = \text{Final Lot 2}$$
$$X_3 \quad + \quad Y_3 \quad + \quad Z_3 \ldots N_3 \qquad = \text{Final Lot 3}$$

Manufacturers may propose other combinations. The lots of monovalent product selected for the combination product should represent normal manufacturing lots and should be selected from lots that fall within the normal range of test results for important parameters. For example, if some lots normally fall at the low range of acceptable potency and some fall within the high range, then lots selected only from the middle range would not be considered representative. In all cases, early consultation with CBER staff on the proposed scheme is recommended.

7

Appx11221

A random sampling procedure such as the following may be used as an aid to obtaining representative selections. Suppose, for example, there are 10 lots of component X, 8 lots of component Y, and 10 lots for each component Z…N. Using a random number generator, a random number from 1 to 10 would select the first X lot, a random digit from 1 to 8 would determine the Y lot, and random numbers from 1 to 10 would select lots Z through N, in turn, to define Lot 1. This procedure is repeated until the desired number of final lots of the combination vaccine is determined.

### C.  Testing Issues

#### 1.  General

21 CFR 610.1 requires the manufacturer to test each lot of product to show conformance to the standards applicable to that product. Pursuant to this regulation, each test shall be done after completion of all processes of manufacture that may affect compliance with the standard. Therefore, a manufacturer must perform tests, under 21 CFR 610.1, for the combined product. If the performance of any of these assays are hindered by the new components, the manufacturer should develop new tests to demonstrate that the applicable standards are met. Upon demonstration that a satisfactory assay cannot be developed, the manufacturer should submit either of the following:

   (1)    an explanation of how the safety, purity and/or potency will be assured without such test(s), or

   (2)    a proposal to perform the test(s) at an earlier stage, while retaining the objective of the original test and assuring the product's safety, purity and/or potency.

#### 2.  Potency

Potency, as defined in 21 CFR 600.3(s), is the specific ability or capacity of the product, as indicated by appropriate laboratory tests or by adequately controlled clinical data obtained through administration of the product in the manner intended, to effect a given result. For a combination product, the potency of each component for which a claim of efficacy is made should be determined. The potency of each component should comply with the potency requirement for the monovalent product unless it can be determined that any reduction in potency due to interaction with other components of the combination product does not result in a lowering of the efficacy in humans. With CBER concurrence, testing of the final formulated bulk vaccine may be substituted for testing in the final container when additional processing has been shown to have no effect on the potency of the final product. However, in some cases such as a lyophilized product, demonstration of the potency of the product in the final container is necessary. Tests for potency should detect any component interactions that may have a potentiating or interfering effect on any other component.

8

### 3. Identity Testing

An identity test shall be performed on labeled final containers of vaccines. An identity test should be performed for each active component present in the combination unless it can be shown that this is not necessary. The purpose of the test is to identify the product as the one designated in the product labeling and to distinguish it from any other product being processed in the same laboratory (21 CFR 610.14). Identity tests should focus on those differences that exist between different final container products to assure mislabeling has not occurred.

### 4. Sterility

All ingredients formulated into a combination vaccine and the final combined product shall meet the sterility requirements outlined in 21 CFR 610.12. The presence of residual antibiotics, the inclusion of preservative for components that were previously unpreserved, and the inclusion of particulate adjuvants may require validated changes in the performance of bulk and final container sterility testing.

### 5. Purity

Each bulk component of a combined vaccine should meet purity characteristics appropriate for that component. For example, the Haemophilus b conjugate component should meet the acceptance criteria for pyrogenicity testing even if combined with a vaccine such as DTP which is known to contain endotoxin. In this case, final product will not be pyrogen tested. Similarly, purity of bulk components may be demonstrated by SDS-PAGE; however, this assay may be inappropriate for the final product.

## III. PRECLINICAL STUDIES

### A. Adjuvants

Vaccines adsorbed with aluminum compounds are in widespread use. Although local reactions occur with these vaccines, their safety has been demonstrated by extensive clinical use. Several adjuvants that are not currently components of licensed vaccines (referred to as investigational adjuvants) have been studied preclinically and clinically with the goal of developing more effective immune stimulants. Since adjuvant-antigen combinations formulated together are approved as a single product, an adjuvant alone would not be considered a licensable product.

If a manufacturer contemplates incorporating an adjuvant other than aluminum compounds into combination vaccine formulations for preventable infectious diseases, discussions with CBER

**Appx11223**

should be initiated early in product development regarding appropriate preclinical and clinical studies. Potential safety concerns for investigational adjuvants include injection site reactions (e.g., pain, induration, erythema, granuloma formation, sterile abscess formation), fever, other systemic adverse effects (e.g., nausea, malaise, headache), immune mediated events (e.g. anaphylaxis, uveitis, or arthritis), systemic chemical toxicity to tissues or organs, teratogenicity, and carcinogenicity.

If there are limited or no toxicology data for the adjuvant being considered for inclusion in a combination vaccine for preventable disease, it is advisable to perform toxicity studies of the adjuvant alone. In addition, preclinical animal studies to evaluate the safety profile of the adjuvant/combination vaccine should be performed. It is recommended that these studies use the exact adjuvant/antigen combination, formulation, and route of administration intended for human use. Sponsors are encouraged to discuss protocols for preclinical toxicology studies with CBER before initiation.

In addition to toxicity studies, it is recommended that preclinical studies evaluate adjuvant effects on the immune response. These studies should optimally utilize the exact adjuvant/antigen combination planned for human use, and include a control group that receives the antigen(s) alone or the antigen adjuvanted with an aluminum compound to provide evidence that the investigational adjuvant augments the immune response to the antigen(s).

### B. Animal Immunogenicity

It is recommended that new combinations be studied for the appropriate immunogenicity parameters in an animal model, if available, before the initiation of studies of human clinical trials. The response to each of the antigens in the vaccine should be assessed as well as the quality of the response. This evaluation may include a characterization of antibody class, avidity, affinity, half-life, or function, e.g. examining the ability to neutralize the target agent or toxin. It is preferable to study the new combination in comparison to the individual antigens in animals to determine if any augmentation or diminution of response occurs. Interference between live vaccine strains also may be studied in animal immunogenicity studies.

### C. Animal Challenge Studies

Protection studies are recommended using an animal model, wherever one is available, for new vaccines or combination vaccines with a new antigen that has not been previously studied in humans. Protection should be demonstrated upon challenge with a virulent strain(s) of each organism against which the vaccine is intended to protect. The study should be conducted with statistically and scientifically valid procedures for verifying the results and these should be described. It is advisable to perform such studies early in the product development cycle.

10

Appx11224

## IV. CLINICAL STUDIES TO SUPPORT THE LICENSURE OF COMBINATION VACCINES

This section will discuss the design and statistical considerations for clinical studies to demonstrate the safety, immunogenicity and efficacy of combination vaccines, whether the combination consists of previously licensed or unlicensed vaccines. Generally, such studies should:

(1)   be randomized and controlled, and

(2)   for safety and immunogenicity, include comparisons of the separate but simultaneously administered individual vaccines with the combination.

If the sponsor believes it is not feasible to conduct such studies, it is advisable to discuss this with CBER before beginning alternative types of studies. Each new product should be supported by product specific data. Additional data obtained in uncontrolled studies may provide useful supplemental information.

### A. Safety Studies

Studies of a combination vaccine have generally been performed to demonstrate that safety is not decreased in comparison to the safety of separate, but simultaneously administered, individual components. CBER will consider all data in the risk-benefit assessment of a combination vaccine. The primary data set for evaluation of safety will be the actual clinical experience with the combined vaccine.

Ideally, studies of comparative safety should be randomized and controlled. Typically, individuals in the control group receive the separate, simultaneously administered components contained in the combination vaccine (e.g., a group receiving an investigational DTaP-Hib vaccine compared to a control group receiving separate injections of DTaP and Hib vaccines). Follow-up safety assessments should be active and prospectively planned with baseline and specific post-vaccination times of assessment. The specific time frame of assessments should be appropriate for the vaccine under study. Typically, participants should be actively monitored (temperature and reaction sites measured and other specific information recorded) on designated post-vaccination days for up to one week for most killed and recombinant vaccines or for fourteen or more days for most live vaccines. Follow-up should continue through at least thirty days by telephone interview or questionnaire whether for live or for killed vaccines. For example, for a particular killed vaccine, it may be appropriate to monitor subjects at 6-12 hours, and days 1,2,3,7, and 30 postvaccination.

Case report forms should query for specific events. These forms can also accommodate the recording of other events that may occur during the observation period. Typically, local event assessment includes measuring erythema and induration, and grading pain (e.g., mild,

11

moderate, or severe) and tenderness (e.g., pain on pressure). Information should be recorded concerning the investigational combination vaccine injection site, as well as the injection sites in the control group for the simultaneously administered vaccines containing the same components. The primary analysis for local reactions is usually a comparison of the combination vaccine to the separate individual component antigens using the most reactogenic individual component (see Section IV.D., Statistical Considerations). Systemic events to be recorded include fever and symptoms such as malaise, headache, vomiting, protracted crying, etc. The systemic events assessed should be appropriate for the vaccine and the age of the participants.

Often one or more feasibility studies accumulate data on common local and systemic reactions and then an additional, larger trial(s) with a sample size suitable for the evaluation of less common events is undertaken. CBER will consider simplified trial designs for large trials intended to assess or identify less common serious events as part of a total package to support licensure. For such large trials, it may be appropriate to assess only a subset of subjects for the more common events. For example, to assess local injection site events in large safety trials, the active surveillance could include recording protocol-defined significant local events in all vaccines as well as detailed local injection site evaluation in a randomly selected subset. Also, using fever as an example of a more common event, the following strategy may be appropriate: measure the temperature for each subject in a randomly selected subset as well as for any trial participant for whom fever was clinically suspected. A valuable method of capturing a high proportion of serious adverse events is to develop databases linked to those of HMOs, etc. which can then detect the entry of a test subject into the medical care system after vaccination. Uncontrolled prelicensure studies may also provide additional safety information. Also, postapproval studies may be required to assess the potential for rare but serious reactions.

### B. Immunogenicity

Studies of the immunogenicity of all vaccine components in the combination should be performed. Again, ideally, the immunogenicity induced by the combination vaccine should be compared with that induced by the separate but simultaneously administered individual vaccines. If vaccine components are already included in a licensed combination, then the current licensed formulation could be used in the control group for comparisons of immunogenicity (see example, Section IV.A., Safety Studies). Each serotype or component of a combination vaccine should show immunogenicity in the combination. Information about immunological correlates of protection for individual components should be submitted with the protocol. Also, information about each assay used to evaluate immunogenicity should be submitted to the IND no later than the clinical protocols utilizing these techniques.

The assessment of appropriate immunological parameter(s) for each component is critical. The selection of such criteria should be discussed with CBER. In general, it is recognized that

12

factors other than antibody levels and/or "seroconversion" can be important for protection. The quality and not simply the quantity of antibody should be considered. For example, affinity, functionality, epitope recognition and other defining parameters are important in determining the quality of an antibody response.

The objective of comparative immunogenicity studies should be to rule out important differences between the response to the combined vaccine compared to the separate but simultaneously administered antigens. These studies need not be designed to show superiority of the new vaccine. Such studies should have sufficient power to rule out clinically meaningful differences in geometric mean titers (GMTs) and/or seroconversion rates, and should consider the intrinsic variability in assays and subjects. A clinically meaningful difference for each response should be defined prospectively in the clinical protocol. The difference to be ruled out should be clearly stated in the study hypothesis and this difference used in calculating the sample size. Any differences observed should be evaluated for clinical relevance. Changes in dose or schedule of doses for individual components should be supported by the clinical data.

The physical combination of vaccine components is a process for which consistency of manufacture should be demonstrated physicochemically, biologically, and clinically, as would be done for new single component vaccines. The number of lots that should be evaluated clinically may be less than the entire lot series for consistency of manufacture. However, clinical studies of more lots may be needed in some situations, e.g., if the product contains previously unlicensed components. CBER recommends that:

    (1)    at least one of the manufacturing consistency lots be included in the clinical studies,

    (2)    the same lots used to prepare the combination vaccine be used for the control lots of separately administered vaccines, to rule out differences in lots being the cause of differences in immunogenicity, and

    (3)    analysis for differences between lots be performed.

## C. Efficacy

The efficacy of each component should be demonstrated in clinical studies. Ideally, clinical trials will be prospective, randomized and controlled. Endpoints used to evaluate efficacy in these trials can range from disease incidence to a well-established correlate of protection. A correlate of protection in vaccine efficacy trials is generally a laboratory parameter that has been shown from adequate and well-controlled trials to be associated with protection from clinical disease. An immunological correlate of protection is most useful if clear qualitative and quantitative relationships can be determined, e.g., a certain type and level of antibody correlate with protection. In some cases, an immunological correlate of protection may have been inferred by serological surveys in an immunized population. Such survey data, however, are frequently difficult to interpret.

13

Appx11227

For some well-studied vaccines there is ample evidence that a certain level of a defined antibody response correlates with protection. Attainment of such antibody levels in a significant proportion of the target population following immunization could be the basis for licensure in the absence of additional efficacy studies.

If the combined vaccine consists of components that have been licensed based upon well-controlled studies of protective efficacy, such studies may be incorporated by reference in support of the combination product. Immunogenicity data may be used to "bridge" the existing efficacy data where possible. In some cases, CBER may accept the use of comparative bridging immunogenicity data without a well-established correlate of protection, e.g., to compare the immune response of a component in a new combination vaccine to that observed for the component in the efficacy trial formulation.

If antibody levels induced by the combination vaccine are lower than those induced by the component vaccines, a "protective" antibody level might still be attained. In such cases, the manufacturer should provide data or information to support the premise that the lower response will not affect the protective efficacy of the product.

Although case-control studies are not the preferred method of assessing efficacy, there may be situations where they will be acceptable. Because such studies are subject to bias in many ways, all aspects of the design and conduct of the study including measures taken specifically to minimize bias should be described in detail in the study protocol.

CBER will give special consideration to alternative proposals for demonstrating the efficacy of multiple serotype combination vaccines, where determining efficacy of the vaccine against each serotype may be difficult. Studies designed to demonstrate efficacy for such vaccines could be based upon epidemiologic data regarding the disease incidence of each serotype in the target population. Thus, while the primary endpoint may be the aggregate of disease with all serotypes included in the vaccine, the study should be of sufficient size to allow meaningful subgroup analysis of protection against at least some individual serotypes. For multiple serotype vaccines where clinical efficacy can not be demonstrated due to an insufficient number of homologous cases, efficacy may sometimes be inferred from immunogenicity data. This use of immunogenicity data is strengthened if a serological correlate(s) of protection was identified for the serotypes for which clinical efficacy was demonstrated. Supporting immunogenicity data for such less common serotypes should be comparable to that elicited by heterologous serotypes for which clinical efficacy was demonstrated. Functional assays comparing the immune response elicited by the various serotypes may be especially useful in this regard. In all such cases, CBER encourages an early consultation regarding such issues.

### D.  Statistical Considerations

14

### 1.  General

Most comparative combination vaccine trials will have the separately administered components or previous combinations of the components as active controls. Subjects should be assigned randomly to vaccine groups. Group assignment by computer-generated random numbers is a typical acceptable randomization procedure. Assignment by subjects' characteristics (e.g., age or day of arrival at the clinic) is <u>not</u> a random mechanism and thus may introduce bias into the analysis. Stratified randomization may be recommended if warranted by the inclusion criteria or known disease risk factors.

The planned randomization procedure should be described in enough detail to allow assessment of the validity of the method. Usually a paragraph or two in the protocol will suffice.

When CBER reviews non-randomized trials, data evaluation will consist primarily of estimation (point estimates and confidence intervals). The sponsor may be asked to demonstrate the reliability and validity of such estimates in the evaluation of the product.

The statistical approach employed in the data analysis may be either hypothesis testing or estimation. The statistical methodology to be used for each endpoint should be presented in detail in the protocol. In addition, the protocol should contain explicit statements regarding the endpoints to be analyzed, the null and alternative hypotheses to be tested, as well as the associated significance level.

A critical point is that failure to reject the conventional null hypothesis of no difference does not necessarily imply equivalence. Therefore, undersized difference-detection trials with nonsignificant results will be insufficient to demonstrate similarity of the combination vaccine to the separately administered components.

Blackwelder [<u>Combined Vaccines and Simultaneous Administration: Current Issues and Perspectives</u>, Annals of the New York Academy of Sciences, Vol.754: 321-328, (1995)] has suggested that combination vaccine trials aimed at demonstrating equivalence be designed and analyzed to reject a hypothesis of a difference, rather than the traditional "null" hypothesis of no difference. This approach may be acceptable, depending on the proposed trial design (e.g., aim, error levels, threshold effects, etc.).

Confidence intervals on the difference between the combination vaccine and the separate components should accompany formal hypothesis tests or may themselves comprise the primary analysis. Confidence intervals are particularly useful when testing equivalence hypotheses. To demonstrate equivalence or similarity of rates and proportions, one-sided tests will usually be appropriate, since the comparative trials are aimed at demonstrating that the combined vaccines are "not significantly worse than" the separate components. That is, superiority of the

15

combination vaccine is not an issue for licensure.

Should the sponsor desire to demonstrate and claim superiority of the combination vaccine compared to the separately administered components, the sponsor should design a difference-detection trial rather than an equivalence trial. In such case, CBER recommends that the sponsor test the conventional null hypothesis of no difference against a two-sided alternative.

Even when one-sided tests are appropriate, two-sided confidence intervals for estimation purposes are recommended, since the entire range of likely differences will be informative. Confidence intervals should be narrow in width and consistent with the significance level specified in planning the trial. For example, a two-sided 90% confidence interval corresponds to a one-sided .05 test, while a two-sided 95% confidence interval provides a one-sided test at the .025 significance level.

### 2. Immune Response

Analysis of post-vaccination GMTs (geometric mean titers), or GMRs (geometric mean ratios), is customarily aimed at ruling out pre-specified clinically meaningful differences between the combination vaccine and the separately administered components with respect to these endpoints or demonstration that a surrogate level has been met or exceeded. The sample size required to rule out any pre-specified difference should be calculated.

It is desirable that the immune response to the combination vaccine not be significantly lower than to the separate components. Consequently, analysis of GMTs as a two-sided bioequivalence test has merit. Thus, it may be desired that the combined vaccine evoke titers that are neither too low nor too high by some pre-specified amounts.

Comparison of seroconversion rates may accompany the analysis of titers as a supportive analysis. If seroconversion is considered a primary endpoint, clinically meaningful differences in these rates to be ruled out should be specified in the protocol, and the necessary sample size calculations performed. Without established correlates of protection, it will be difficult to evaluate differences in either seroconversion rates or GMTs without joint consideration of both.

Immune surrogates of protection, if established, should be considered when evaluating any differences between the combination vaccine and the separate components.

### 3. Common Adverse Reactions

16

Comparisons between the combination vaccine and the separate components regarding common adverse events should assess the by-injection and the by-subject event rates. Since reactions to different injections within the same individual are not independent observations, an additional method of analysis which considers all injections but accounts for the within-individual correlations is encouraged.

The required sample size calculated should refer to the number of subjects needed. The difference in rates to be ruled out should be specified in the protocol, and the appropriate sample size calculations performed.

The comparison of local adverse reactions is problematic. First, combination vaccine studies are not usually double-blinded. This has implications for assessing both local and systemic reactions. Secondly, when local reactions at one injection site for the combination vaccine are compared to local reactions at more than one site for separately but simultaneously administered component vaccines, the analyst must compare seemingly incongruous factors, i.e., one injection site versus two or more injection sites.

Various methods for analyzing local adverse reactions in this context have been considered. One plausible method commonly used is to compare the single site reaction to the worst reaction among the multiple injection sites. All reactions among the multiple injections should be recorded. Determining a method of comparison that is both unbiased and reasonable is a topic that needs further consideration.

### 4. Less Common Adverse Reactions

It is important that manufacturers monitor less common adverse events carefully, especially when the vaccine is likely to be widely administered. For example, if an adverse event occurs in 1% of vaccinees receiving separate components, and the combination increases this rate to 2%, there will be 10,000 additional adverse events for every million persons receiving the combination vaccine. These rates are cited here for illustrative purposes only and may not be applicable to all trials. The size of the target population should be considered when determining the appropriate size of safety studies.

### 5. Rare Adverse Events

Sample sizes should be large enough for adequate safety assessment. However, even in a large trial, a rare adverse event associated with vaccination may not be observed. Nonetheless, a large enough sample size is desired so that if no such event is observed, it can be concluded that the event will occur with very low probability, if at all, in the general population.

For example, suppose in a trial with n subjects in the combination vaccine arm, no cases of a

17

certain rare adverse event are observed. Using the "Rule of 3", (Hanley and Lippman-Hand. JAMA 249(13): 1743-45, 1983) a 95% confidence interval for the rate of occurrence of the event is estimated as (0,3/n). The sample size in the combination vaccine arm should be large enough to provide a reasonable upper confidence limit. CBER will also consider appropriate use of post-approval studies in the evaluation of rare adverse events. Again, the size of the target population should be considered in determining an acceptable upper limit on the event rate.

### 6. Sample Size

The protocol should include sample size calculations for each endpoint (immunogenicity, safety, and efficacy if applicable). The largest sample size required for any endpoint should be the one selected for overall trial enrollment. However, immunogenicity studies typically comprise a subsample, randomly selected if possible, from the initially enrolled population.

Sample size calculations should be performed after formulation of the null and alternative hypotheses and should be consistent with those hypotheses. Sample size estimates also may be based upon confidence intervals, if that is the planned analysis approach.

There is no standard for sample size that will be appropriate for all trials of combination vaccines. The criteria for determining an adequate size for a trial will typically be based on statistical, clinical, and basic scientific judgment, and may vary from product to product and from one setting to another.

All assumptions upon which the sample size calculations are based, as well as any special sample size methodology used, should be stated explicitly in the protocol. Enough information should be provided to enable a CBER statistician to verify the sample size estimates.

### 7. Submission of Data to CBER

When the sponsor is ready to submit a PLA, CBER should be consulted for detailed instructions regarding submission of the data. It is desirable for the data to be submitted to the agency on computer diskettes in a form ready for statistical analysis. Diskettes should be accompanied by a copy of the prospective protocol and a detailed statistical report that describes all data files, the names and locations of variables, and computer program statements used to perform main data analyses. Enough information should be provided to enable a CBER statistician to easily verify the sponsor's analysis results, as well as perform additional analyses as appropriate.

### E. Indications and Usage

The development of combination vaccines should be based on rational prevention of the indicated diseases. The data required to support each indication will be the same as for single component vaccines. If the combination vaccine is to be given on a <u>different</u> schedule from that of any previously approved component, data showing adequacy of the proposed schedule should be submitted.

The use of combination vaccines as boosters should also be addressed. If booster use is indicated, it should be supported by safety and immunogenicity data. The labeling should state if booster use is not indicated or was not studied.

## V.  VACCINES ADMINISTERED SIMULTANEOUSLY WITH THE COMBINATION VACCINE

Immunogenicity and safety data should be obtained in prelicensure studies to support the simultaneous administration of a new vaccine with already licensed vaccines that would be given to the same target population using the same (or overlapping) schedule. The concepts presented in Section IV.D: Statistical Considerations, are also applicable here. With regard to immunogenicity, assessments should be performed to show that subjects still attain an acceptable immune response to both the combination vaccine and  the other simultaneously administered vaccines. In some situations, studies of simultaneously administered vaccines compared to vaccines separately administered at different times are useful.

Ideally, the immunogenicity obtained with such simultaneous administration should be evaluated early in clinical development for all components to detect any possible immunological interference. The assessment of immunological interference is particularly valuable before proceeding to a large trial(s) of the investigational vaccine because such trials will typically utilize vaccines for other indications routinely given on the same schedule. Typically, the studies will evaluate safety and interference of the new combination vaccine with one type of simultaneously administered vaccine per indication, e.g., for a new DTaP vaccine, safety and interference will be evaluated in a statistically valid manner with one type of simultaneously administered <u>Haemophilus</u> <u>influenzae</u> type b conjugate vaccine.

The package insert should include descriptions and references for available data concerning simultaneous administration of the new vaccine with licensed vaccines. If no studies have been done, a statement that there are no data regarding safety or immunogenicity of simultaneous administration should also be included.

Appx11233

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

              *Plaintiffs,*

    v.

MERCK & CO., INC.,

              *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 94



Centers for Disease Control and Prevention
CDC 24/7: Saving Lives, Protecting People™

## Influenza (Flu)

# How Flu Vaccine Effectiveness and Efficacy is Measured

Questions & Answers

## How do we measure how well influenza vaccines work?

Two general types of studies are used to determine how well influenza vaccines work: randomized controlled trials and observational studies. These study designs are described below.

### Randomized controlled trials (RCTs)

The first type of study design is called a randomized controlled trial (RCT). In a RCT, volunteers are assigned randomly to receive an influenza vaccine or a placebo (e.g., a shot of saline). Vaccine efficacy is measured by comparing the frequency of influenza illness in the vaccinated and the unvaccinated (placebo) groups. The RCT study design minimizes bias that could lead to invalid study results. Bias is an unintended systematic error in the way researchers select study participants, measure outcomes, or analyze data that can lead to inaccurate results. In a RCT, vaccine allocation is usually double-blinded, which means neither the study volunteers nor the researchers know if a given person has received vaccine or placebo. National regulatory authorities, such as the Food and Drug Administration (FDA) in the United States, require RCTs to be conducted and to demonstrate the protective benefits of a new vaccine before the vaccine is licensed for routine use. However, some vaccines are licensed based on RCTs that use antibody response to the vaccine as measured in the laboratory, rather than decreases in influenza disease among people who were vaccinated.

### Observational Studies

The second type of study design is an observational study. There are several types of observational studies, including cohort and case-control studies. Observational studies assess how influenza vaccines work by comparing the occurrence of influenza among people who have been vaccinated compared to people not vaccinated. Vaccine effectiveness is the percent reduction in the frequency of influenza illness among vaccinated people compared to people not vaccinated, usually with adjustment for factors (like presence of chronic medical conditions) that are related to both influenza illness and vaccination. (See below for details.)

## How do vaccine effectiveness studies differ from vaccine efficacy studies?

Vaccine efficacy refers to vaccine protection measured in RCTs usually under optimal conditions where vaccine storage and delivery are monitored and participants are usually healthy. Vaccine effectiveness refers to vaccine protection measured in observational studies that include people with underlying medical conditions who have been administered vaccines by different health care providers under real-world conditions.

Once an influenza vaccine has been licensed by FDA, recommendations are typically made by CDC's Advisory Committee for Immunization Practices (ACIP) for its routine use. For example, ACIP now recommends annual influenza vaccination for all U.S. residents aged 6 months and older. These universal vaccine recommendations make it unethical to perform

placebo-controlled RCTs because assigning people to a placebo group could place them at risk for serious complications from influenza. Also, observational studies often are the only option to measure vaccine effectiveness against more severe, less common influenza outcomes, such as hospitalization.

# What factors can affect the results of influenza vaccine efficacy and effectiveness studies?

The measurement of influenza vaccine efficacy and effectiveness can be affected by virus and host factors as well as the study methodology used. Therefore, vaccine efficacy/effectiveness point estimates have varied among published studies.

## Virus factors

The protective benefits of influenza vaccination are generally lower during flu seasons where the majority of circulating influenza viruses differ from the influenza viruses used to make the vaccines. Influenza viruses are continuously changing through a natural process known as antigenic drift. (For more information, see How the flu virus can change: Drift and Shift.) However, the degree of antigenic drift and the frequency of drifted viruses in circulation can vary for each of the three or four viruses included in the seasonal flu vaccine. So even when circulating influenza viruses are mildly or moderately drifted in comparison to the vaccine, it is possible that people may still receive some protective benefit from vaccination; and if other circulating influenza viruses are well matched, the vaccine could still provide protective benefits overall.

## Host factors

In addition to virus factors, host factors such as age, underlying medical conditions, history of prior infections and prior vaccinations can affect the benefits received from vaccination.

## Study Design Factors

Experts consider RCTs to be the best study design because they are less susceptible to biases. However, as stated above, these studies cannot be conducted when vaccination is recommended in a population and these studies are very difficult to conduct for more severe outcomes that are less common. There are several observational study designs, but many programs currently use the test-negative, case-control design. In the test-negative design, people who seek care for an acute respiratory illness are enrolled at ambulatory care settings (such as outpatient clinics, urgent care clinics, and emergency department) and information is collected about the patients' influenza vaccination status. All participants are tested for influenza using a highly specific and sensitive test for influenza virus infection, such as reverse transcription polymerase chain reaction (RT-PCR). The ratio of vaccinated to unvaccinated persons (i.e., the odds of influenza vaccination) is then compared for patients with and without laboratory-confirmed influenza. The test-negative design removes selection bias due to health-care seeking behaviors. In addition to the test-negative design, there are additional observational study designs that have been used to estimate vaccine effectiveness.

## Factors Related to Measuring Specific versus Non-Specific Outcomes

For both RCTs and observational studies, the specificity of the outcome measured in the study is important. Non-specific outcomes, such as pneumonia hospitalizations or influenza-like illness (ILI) can be associated with influenza virus infections as well as infections with other viruses and bacteria. Vaccine efficacy/effectiveness estimates against non-specific outcomes are generally lower, depending on what proportion of the outcome measured is attributable to influenza. For example, a study among healthy adults found that the inactivated influenza vaccine (i.e., the flu shot) was 86% effective against laboratory-confirmed influenza, but only 10% effective against all respiratory illnesses in the same population and season[1]. Laboratory-confirmed influenza virus infections, by RT-PCR or viral culture, are generally the most specific outcomes for vaccine efficacy/effectiveness studies.

Serologic assays to detect influenza infection (i.e., which require a four-fold rise in antibody titers against influenza viruses detected from paired sera) were often used in past flu VE studies to detect influenza infections prior to more accurate tests, such as RT-PCR, becoming more widely available. The problem with VE studies that use serology to test for influenza infection, is that vaccination elevates antibody levels, similar to infection. New influenza infections could be missed in a vaccinated person since antibodies are already high and a four-fold increase doesn't develop. Therefore, serologic testing methods can result in biased VE estimates that inflate VE

## Can you describe biases that are important to consider for observational studies measuring vaccine effectiveness?

Observational studies are subject to various forms of bias (see above for definition) more so than RCT studies. Therefore, it is important that bias be minimized with the study design or adjusted for in the analysis. Observational studies of influenza vaccine effectiveness can be subject to three forms of bias: confounding, selection bias, and information bias.

Confounding occurs when the effect of vaccination on the risk of the outcome being measured (e.g., influenza-related hospitalizations confirmed by RT-PCR) is distorted by another factor associated both with vaccination (the exposure) and the outcome. In RCTs, confounding factors are expected to be evenly distributed between vaccinated and unvaccinated groups. This is not true of observational studies. For example, chronic medical conditions can confound the association between influenza vaccination and hospitalization with influenza in observational studies. Chronic medical conditions increase the risk of influenza-related hospitalization and vaccination coverage often is higher among people with chronic medical conditions. Therefore, the presence of a chronic medical condition in a study participant is a potential confounding factor that should be considered in analysis. This is an example of confounding by indication because those at greatest risk for the outcome being measured (i.e., influenza associated hospitalization) are targeted for vaccination, and therefore, they are more likely than those without a chronic medical condition to receive a flu vaccine. Not adjusting for confounders could bias the vaccine effectiveness estimate away from the true estimate. In the example given, the vaccine effectiveness estimate could be biased lower, or towards lower effectiveness.

Selection bias occurs when people with the outcome being measured by the study (i.e., influenza infection) differ from people who do not have the outcome. In observational studies of influenza vaccine effectiveness, people with and without influenza may have different likelihoods of being vaccinated, and this can bias the estimate of vaccine effectiveness. For example, people who visit their health care provider in outpatient settings (e.g., clinics and urgent care) are more likely to be vaccinated than people who do not go to a provider for care. If controls are selected from a different population than the cases (e.g., cases are from a clinic and controls from a community sample) with different health care seeking behaviors, selection bias related to health care seeking (and the likelihood to be vaccinated) may be introduced. The test-negative study design minimizes selection bias related to health care seeking by enrolling patients who seek care for a respiratory illness. This study design is used by many studies globally, including CDC-funded networks that measure vaccine effectiveness.

Information bias occurs if exposures or outcome information are based on different sources of information for people with and without the disease of interest. For example, if researchers obtain information on vaccination for children with influenza from immunization records but ask parents of children without influenza if the child was vaccinated, this difference in data collection procedures could bias the results of the study.

## How well do influenza vaccines work during seasons in which the flu vaccine is not well matched to circulating influenza viruses?

As described above, when the virus components of the flu vaccine are not well matched with circulating influenza viruses, the benefits of influenza vaccination may be reduced. However, the degree of antigenic drift from vaccine viruses and the proportion of circulating drifted viruses can vary. As a result, even when circulating influenza viruses are mildly or moderately drifted in comparison to the vaccine, it is still possible that people may receive some protective benefit from influenza vaccination. In addition, even when some circulating influenza viruses are significantly drifted, it is possible for

Appx11237

other influenza viruses in circulation to be well matched to the vaccine. It is not possible to predict how well the vaccine and circulating strains will be matched in advance of the influenza season, nor is it possible to predict how this match may affect vaccine effectiveness.

# What is the evidence that influenza vaccines work?

## Adults 65 years or older

Among older adults, annual influenza vaccination was recommended based on the high burden of influenza-related disease and demonstrated vaccine efficacy among younger adults. One RCT of adults aged 60 years and older relied on serology for confirmation of influenza and reported a vaccine efficacy of 58% (95% confidence interval (CI): 26-77)[2]. However, it is unknown if infections were missed by serology among the study participants that were vaccinated (and if the vaccine efficacy estimate is biased upwards – see previous description of how bias can occur in VE studies that test for influenza using serology). A meta-analysis of observational studies that used the test-negative design provided VE estimates for adults aged >60 years against RT-PCR confirmed influenza infection. This meta-analysis reported significant vaccine effectiveness of 52% (95% CI: 41-61) during seasons when the vaccine and circulating viruses were well-matched [3]. During seasons when the circulating viruses were antigenically drifted (not well matched), reported VE was 36% (95% CI: 22-48)[3].

An RCT that compared a high-dose, inactivated influenza vaccine (containing four times the standard amount of influenza antigen) to standard dose vaccine in persons aged 65 years or older during the 2011-12 and 2012-13 influenza seasons found that rates of laboratory-confirmed influenza were 24% lower (95% CI: 10-37) among persons who received high-dose vaccine compared to standard dose influenza vaccine, indicating that high-dose vaccine provided 24% better protection against influenza than standard dose vaccine in this trial.[4]

Several observational studies have reported significant vaccine effectiveness against RT-PCR confirmed influenza-related hospitalization among older adults. A three-year study (2006-07 through 2008-09) in Tennessee that used a test-negative design reported vaccine effectiveness of 61% (95% CI: 18-83) among hospitalized adults >50 years of age[5]. In an analysis of two additional seasons, including 2010-11 and 2011-2012 (excluding 2009-10), VE was 58% (95% CI: 8-81) against RT-PCR confirmed influenza associated hospitalizations for persons >50 years of age for the five seasons combined[6].

## Adults

Several RCTs have been done in healthy adults aged <65 years[7,8,9,10,11,12]. These studies have reported vaccine efficacy estimates ranging from 16%-75%; VE of 16% was reported during a season with few influenza infections. An RCT in South Africa among HIV infected adults reported vaccine efficacy of 76% (95 CI 9-96).[13] A meta-analysis that included data from RCTs of licensed inactivated influenza vaccines reported a pooled vaccine effectiveness of 59% (95% CI 51-67) against influenza confirmed by RT-PCR or viral culture[14]. In addition, RCTs of cell-based inactivated influenza vaccines (IIVs) and recombinant trivalent HA protein vaccines have been performed among healthy adults. In general, efficacy estimates for these types of vaccines are similar to other inactivated influenza vaccines that are egg-based[15,16,17].

## Children

In a four-year RCT of inactivated vaccines among children aged 1–15 years, vaccine efficacy was estimated at 77% against influenza A (H3N2) and 91% against influenza A (H1N1) virus infection[18]. An RCT of children aged 6–24 months reported vaccine efficacy of 66% against laboratory-confirmed influenza in 1999-2000 but no vaccine efficacy during the second year when there was little influenza activity[19]. During 2010-11, the vaccine efficacy of a quadrivalent inactivated vaccine among children aged 3-8 years was 59% (95% CI: 45%-70%)[20]. In addition, a cluster-randomized trial conducted in Hutterite communities in Canada found that vaccinating children aged 3 to 15 years with trivalent inactivated influenza

Appx11238

vaccine before the 2008-09 season reduced RT-PCR confirmed influenza in the entire community by 61% (95% CI: 8-83), including a 59% reduction (95% CI: 5-82) in confirmed influenza among non-vaccinated community members, evidence of the "indirect" effect of influenza vaccination on prevention on disease transmission[21].

Several RCTs of live attenuated influenza vaccines among young children have demonstrated vaccine efficacy against laboratory confirmed influenza with estimates ranging from 74%-94%[22,23,24,25]. A study conducted among children aged 12 through 36 months living in Asia during consecutive influenza seasons reported efficacy for live attenuated influenza vaccine of 64%–70%[26].

## Pregnant women

An RCT conducted among pregnant women in South Africa during 2011 and 2012 reported vaccine efficacy against RT-PCR confirmed influenza of 50% among HIV-negative women and 58% among HIV-positive women vaccinated during the third trimester[27]. In addition, the trial showed that vaccination reduced the incidence of laboratory-confirmed influenza among infants born to HIV-negative women by 49%; the study was unable to assess vaccine efficacy among infants of HIV infected women. An observational study in the United States during 2010-11 and 2011-12 using a test-negative design reported vaccine effectiveness of 44% (95% CI: 5 to 67) against influenza among pregnant woman[28].

A randomized trial in Bangladesh found that babies born to mothers vaccinated during pregnancy with trivalent inactivated influenza vaccines were significantly less likely to be born small for gestational age and weighed an average of 200g more than babies born to unvaccinated mothers[29,30]. No effect of maternal immunization on infant birth weight was reported in the South African trial described above. Some observational studies in developed and developing countries have found lower risk of prematurity or low birth weight in babies born to vaccinated mothers, but the effect has not been consistently demonstrated[31,32,33,34,35].

# How well does the live attenuated influenza vaccine (LAIV) work compared to inactivated influenza vaccine (IIV)?

## Children

Three randomized clinical trials comparing live attenuated influenza vaccine to trivalent inactivated influenza vaccine in young children, 2-8 years of age, suggested that live attenuated influenza vaccine had superior efficacy compared to inactivated influenza vaccine[36,37,38]. Recently, several observational studies suggest that LAIV did not consistently provide better protection against influenza than inactivated vaccine, especially against influenza caused by the 2009 H1N1 pandemic virus[39,40,41]. However, a randomized, school-based study in Canada reported lower rates of confirmed influenza among students vaccinated with live-attenuated vaccine compared to students vaccinated with inactivated influenza vaccine, as well as decreased influenza transmission among family members of students vaccinated with live-attenuated influenza vaccines[42].

## Adults

Clinical trials during 2004-05, 2005-06, and 2007-08 that compared inactivated influenza vaccines and live attenuated influenza vaccines to no vaccine among adults suggested that inactivated influenza vaccines provided better protection against influenza than live attenuated influenza vaccines in adults[7,8].

# How does CDC monitor vaccine effectiveness?

CDC monitors vaccine effectiveness annually through the Influenza Vaccine Effectiveness (VE) Network, a collaboration with participating institutions in five geographic locations. These institutions enroll patients with respiratory symptoms at ambulatory clinics and test for influenza by RT-PCR. Vaccine effectiveness is estimated using the test negative design,

Appx11239

comparing proportions (odds) of influenza vaccination among patients with and without influenza. Statistical methods are used to account for differences in age, race and underlying medical conditions that might influence vaccine effectiveness. Estimates are reported annually, and often, an early estimate is reported during the season. Since the match between circulating and vaccine viruses is not known before the season, annual estimates of vaccine effectiveness give a real-world look at how well the vaccine protects against influenza caused by circulating viruses each season.

# References

1. Bridges CB, Thompson WW, Meltzer MI, Reeve GR, Talamonti WJ, Cox NJ, Lilac HA, Hall H, Klimov A, Fukuda K. Effectiveness and cost-benefit of influenza vaccination of healthy working adults: A randomized controlled trial. JAMA. 2000;284(13):1655-63 ⧉ .

2. Govaert TM, Thijs CT, Masurel N, Sprenger MJ, Dinant GJ, Knottnerus JA. The efficacy of influenza vaccination in elderly individuals. A randomized double-blind placebo-controlled trial. JAMA. 1994;272(21):1661-5 ⧉ .

3. Darvishian M, Bijlsma MJ, Hak E, van den Heuvel ER. Effectiveness of seasonal influenza vaccine in community-dwelling elderly people: a meta-analysis of test-negative design case-control studies. Lancet Infect Dis 2014; 14(12): 1228-39.

4. DiazGranados CA, Dunning AJ, Kimmel M, Kirby D, Treanor J, Collins A, Pollak R, Christoff J, Earl J, Landolfi V, Martin E, Gurunathan S, Nathan R, Greenberg DP, Tornieporth NG, Decker MD, Talbot HK. Efficacy of high-dose versus standard-dose influenza vaccine in older adults. N Engl J Med. 2014;371:635-45.

5. Talbot HK, Griffin MR, Chen Q, Zhu Y, Williams JV, Edwards, KM. Effectiveness of seasonal vaccine in preventing confirmed influenza-associated hospitalization in community dwelling older adults. J Infect Dis 2011; 203: 500–8.

6. Chen Q, Griffin MR, Nian H, Zhu Y, Williams JV, Edwards, KM, Talbot HK. Influenza vaccine prevents medically attended influenza-associated acute respiratory illness in adults aged ≥50 years. J Infect Dis 2015; 211: 1045–50.

7. Ohmit SE, Victor JC, Rotthoff JR, et al. Prevention of antigenically drifted influenza by inactivated and live attenuated vaccines. N Engl J Med 2006; 355(24): 2513-22.

8. Ohmit SE, Victor JC, Teich ER, et al. Prevention of symptomatic seasonal influenza in 2005-2006 by inactivated and live attenuated vaccines. J Infect Dis 2008; 198(3): 312-7.

9. Jackson LA, Gaglani MJ, Keyserling HL, et al. Safety, efficacy, and immunogenicity of an inactivated influenza vaccine in healthy adults: a randomized, placebo-controlled trial over two influenza seasons. BMC Infect Dis 2010; 10: 71.

10. Beran J, Wertzova V, Honegr K, et al. Challenge of conducting a placebo-controlled randomized efficacy study for influenza vaccine in a season with low attack rate and a mismatched vaccine B strain: a concrete example. BMC Infect Dis 2009; 9

11. Beran J, Vesikari T, Wertzova V, et al. Efficacy of inactivated split-virus influenza vaccine against culture-confirmed influenza in healthy adults: a prospective, randomized, placebo-controlled trial. J Infect Dis 2009; 200(12): 1861-9.

12. Monto AS, Ohmit SE, Petrie JG, et al. Comparative efficacy of inactivated and live attenuated influenza vaccines. N Engl J Med 2009; 361(13): 1260-7.

13. Madhi SA, Maskew M, Koen A, Kuwanda L, Besselaar TG, Naidoo D, Cohen C, Valette M, Cutland CL, Sanne I. Trivalent inactivated influenza vaccine in African adults infected with human immunodeficient virus: double blind, randomized clinical trial of efficacy, immunogenicity, and safety. Clin Infect Dis 2011; 52(1): 128-37.

14. Osterholm MT, Kelley NS, Sommer A, et al. Efficacy and effectiveness of influenza vaccines: a systematic review and meta-analysis. Lancet ID 2011(12): 36-44 ⧉ .

15. Frey S, Vesikari T, Szymczakiewicz-Multanowska A, et al. Clinical efficacy of cell culture-derived and egg-derived inactivated subunit influenza vaccines in healthy adults. Clin Infect Dis 2010; 51(9): 997-1004.

16. Treanor JJ, El Sahly H, King J, et al. Protective efficacy of a trivalent recombinant hemagglutinin protein vaccine (FluBlok(R)) against influenza in healthy adults: a randomized, placebo-controlled trial. Vaccine 2011; 29(44): 7733-9.

17. Barrett PN, Berezuk G, Fritsch S, et al. Efficacy, safety, and immunogenicity of a Vero-cell-culture-derived trivalent influenza vaccine: a multicentre, double-blind, randomised, placebo-controlled trial. Lancet 2011; 377(9767): 751-9.

Appx11240

18. Neuzil KM, Dupont WD, Wright PF, Edwards KM. Efficacy of inactivated and cold-adapted vaccines against influenza A infection, 1985 to 1990: the pediatric experience. Pediatr Infect Dis J. 2001;20(8):733-40 ☐

19. Hoberman A, Greenberg DP, Paradise JL, Rockette HE, Lave JR, Kearney DH, Colborn DK, Kurs-Lasky M, Haralam MA, Byers CJ, Zoffel LM, Fabian IA, Bernard BS, Kerr JD. Effectiveness of inactivated influenza vaccine in preventing acute otitis media in young children: a randomized controlled trial. JAMA. 2003;290(12):1608-16 ☐ .

20. Jain VK, Rivera L, Zaman K, et al. Vaccine for prevention of mild and moderate-to-severe influenza in children. N Engl J Med 2013; 369(26): 2481-91.

21. Loeb M, Russell ML, Moss L, et al. Effect of influenza vaccination of children on infection rates in Hutterite communities: a randomized trial. JAMA 2010; 303(10): 943-50.

22. Belshe RB, Mendelman PM, Treanor J, et al. The efficacy of live attenuated, cold-adapted, trivalent, intranasal influenzavirus vaccine in children. N Engl J Med 1998;338:1405–12.

23. Belshe RB, Gruber WC, Mendelman PM, et al. Efficacy of vaccination with live attenuated, cold-adapted, trivalent, intranasal influenza virus vaccine against a variant (A/Sydney) not contained in the vaccine. J Pediatr 2000;136:168–75.

24. Vesikari T, Fleming DM, Aristegui JF, et al. Safety, efficacy, and effectiveness of cold-adapted influenza vaccine-trivalent against community-acquired, culture-confirmed influenza in young children attending day care. Pediatrics 2006;118:2298–312.

25. Bracco Neto H, Farhat CK, Tregnaghi MW, et al. Efficacy and safety of 1 and 2 doses of live attenuated influenza vaccine in vaccine-naive children. Pediatr Infect Dis J 2009;28:365–71.

26. Tam JS, Capeding MR, Lum LC, et al. Efficacy and safety of a live attenuated, cold-adapted influenza vaccine, trivalent against culture-confirmed influenza in young children in Asia. Pediatr Infect Dis J 2007;26:619–28.

27. Madhi SA, Cutland CL, Kuwanda L, et al. Influenza vaccination of pregnant women and protection of their infants. N Engl J Med 2014; 371(10): 918-31.

28. Thompson MG, Li DK, Shifflett P, et al. Effectiveness of seasonal trivalent influenza vaccine for preventing influenza virus illness among pregnant women: a population-based case-control study during the 2010-2011 and 2011-2012 influenza seasons. Clin Infect Dis 2014; 58(4): 449-57.

29. Zaman K, Roy E, Arifeen SE, et al. Effectiveness of maternal influenza immunization in mothers and infants. N Engl J Med 2008; 359(15): 1555-64.

30. Steinhoff MC, Omer SB, Roy E, et al. Neonatal outcomes after influenza immunization during pregnancy: a randomized controlled trial. CMAJ : Canadian Medical Association journal = journal de l'Association medicale canadienne 2012.

31. Omer SB, Goodman D, Steinhoff MC, et al. Maternal influenza immunization and reduced likelihood of prematurity and small for gestational age births: a retrospective cohort study. PLoS medicine 2011;8:e1000441.

32. Pasternak B, Svanstrom H, Molgaard-Nielsen D, et al. Vaccination against pandemic A/H1N1 2009 influenza in pregnancy and risk of fetal death: cohort study in Denmark. BMJ 2012;344:e2794.

33. Fell DB, Sprague AE, Liu N, et al. H1N1 influenza vaccination during pregnancy and fetal and neonatal outcomes. Am J Public Health 2012;102:e33-40.

34. Kallen B, Olausson PO. Vaccination against H1N1 influenza with Pandemrix((R)) during pregnancy and delivery outcome: a Swedish register study. BJOG 2012;119:1583-90.

35. Richards JL, Hansen C, Bredfeldt C, et al. Neonatal outcomes after antenatal influenza immunization during the 2009 H1N1 influenza pandemic: impact on preterm birth, birth weight, and small for gestational age birth. Clin Infect Dis 2013;56:1216-22.

36. Ashkenazi S, Vertruyen A, Arístegui J, Esposito S, McKeith DD, Klemola T, Biolek J, Kühr J, Bujnowski T, Desgrandchamps D, Cheng SM, Skinner J, Gruber WC, Forrest BD; CAIV-T Study Group. Superior relative efficacy of live attenuated influenza vaccine compared with inactivated influenza vaccine in young children with recurrent respiratory tract infections. Pediatr Infect Dis J. 2006;25(10):870-9 ☐ .

37. Fleming DM, Crovari P, Wahn U, Klemola T, Schlesinger Y, Langussis A, Øymar K, Garcia ML, Krygier A, Costa H, Heininger U, Pregaldien JL, Cheng SM, Skinner J, Razmpour A, Saville M, Gruber WC, Forrest B; CAIV-T Asthma Study

Appx11241

Group. Comparison of the efficacy and safety of live attenuated cold-adapted influenza vaccine, trivalent, with trivalent inactivated influenza virus vaccine in children and adolescents with asthma. Pediatr Infect Dis J. 2006;25 (10):860-9 [↗] .

38. Belshe RB, Edwards KM, Vesikari T, Black SV, Walker RE, Hultquist M, Kemble G, Connor EM; CAIV-T Comparative Efficacy Study Group. Live attenuated versus inactivated influenza vaccine in infants and young children. N Engl J Med. 2007;356(7):685-96 [270 KB, 12 pages] [↗] .

39. Flannery B. Update on effectiveness of live-attenuated versus inactivated influenza vaccines in children and adolescents aged 2-18 years – US Flu VE Network. Meeting of the Advisory Committee on Immunization Practices, Atlanta, GA, October, 2014. https://www.cdc.gov/vaccines/acip/meetings/downloads/slides-2014-10/flu-03-flannery.pdf

40. Chung JR, Flannery B, Thompson MG, Gaglani M, Jackson ML, MontoAS, NowalkMP, Talbot HK, Treanor JJ, Belongia EA, Murthy K, Jackson LA, G. Petrie J, Zimmerman RK, Griffin MR, McLean HQ, Fry AM. Seasonal effectiveness of live attenuated and inactivated influenza vaccine. *Pediatrics* (in press)

41. Gaglani M , Pruszynski J, Murthy K, Clipper L, Robertson A, Reis M, Chung JR, Piedra PA, Avadhanula V, Nowalk MP Zimmerman RK, Jackson ML, Jackson LA, Petrie JG, Ohmit SE, Monto AS, McLean HQ, Belongia EA, Fry AM, Flannery B. Influenza Vaccine Effectiveness against the 2009 Pandemic A (H1N1) Virus Differed by Vaccine-type During 2013-14 in the United States. *J Inf Dis* (in press)

42. Kwong J, Pereira J, Quach S, Pellizzari R, Dusome E, Russell M, et al. Randomized evalution of live attenuated vs. trivalent inactivated influenza vaccines in schools (RELATIVES) pilot study: preliminary results from the household surveillance sub-study.

Page last reviewed: January 29, 2016

Content source: Centers for Disease Control and Prevention, National Center for Immunization and Respiratory Diseases (NCIRD)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel*.,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

<em>Plaintiffs,</em>

v.

MERCK & CO., INC.,

<em>Defendant.</em>

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 95

# Manual for the Surveillance of Vaccine-Preventable Diseases

Edited by

**Sandra W. Roush, MT, MPH**

**Linda M. Baldy, MPH**

**Mary Ann Kirkconnell Hall, MPH**

**National Center for Immunization and Respiratory Diseases**

**Centers for Disease Control and Prevention**

**Department of Health and Human Services**

Appx11244

# Manual for the Surveillance of Vaccine-Preventable Diseases

**Available on the internet at:** www.cdc.gov/vaccines/pubs/surv-manual/

**Suggested citation**

Centers for Disease Control and Prevention. Manual for the surveillance of vaccine-preventable diseases. Centers for Disease Control and Prevention, Atlanta, GA.

This manual is not intended to be a therapeutic guide; therefore, while dosages of antimicrobials and immunobiologics are discussed in the context of prophylaxis and treatment for case-patients and contacts, physicians and other health-care professionals should review the package inserts prepared by the manufacturers to determine appropriate dosages.

This manual is designed to provide general guidance regarding surveillance activities for vaccine-preventable diseases. Because recommendations for use of vaccines may change, readers should consult their local or state health departments or CDC's Vaccines website at www.cdc.gov/vaccines/.

Use of trade names and commercial sources is for identification only and does not imply endorsement by the U.S. Public Health Service or the U.S. Department of Health and Human Services.

## Acknowledgments

This manual was prepared by the Centers for Disease Control and Prevention (CDC), National Center for Immunization and Respiratory Diseases.

We thank colleagues in the National Center for Immunization and Respiratory Diseases, CDC, and others who offered advice, made specific recommendations on format and content, reviewed drafts, or assisted in other ways in the preparation of this manual.

We particularly wish to acknowledge the valuable assistance of the following:

Cathy Hogan
Curt Wommack

# Table of Contents

Introduction

Acronyms

Definition of Terms

Chapter 1: Diphtheria

Chapter 2: *Haemophilus influenzae* Type b Invasive Disease

Chapter 3: Hepatitis A

Chapter 4: Hepatitis B

Chapter 5: Human Papillomavirus

Chapter 6: Influenza

Chapter 7: Measles

Chapter 8: Meningococcal Disease

Chapter 9: Mumps

Chapter 10: Pertussis

Chapter 11: Pneumococcal Disease

Chapter 12: Polio (not available)

Chapter 13: Rotavirus

Chapter 14: Rubella

Chapter 15: Congenital Rubella Syndrome

Chapter 16: Tetanus

Chapter 17: Varicella

Chapter 18: Surveillance Indicators

Chapter 19: Enhancing Surveillance

Chapter 20: Analysis of Surveillance Data

Chapter 21: Surveillance for Adverse Events Following Immunization

Chapter 22: Laboratory Support for the Surveillance of Vaccine-Preventable Diseases

Chapter 23: National Surveillance of Vaccine-Preventable Diseases

Chapter 24: State-Specific Surveillance of Vaccine-Preventable Diseases

Appendices

# Introduction

This manual was first developed in 1996 to provide general guidance to state and local health department personnel who are involved in surveillance activities for vaccine-preventable diseases. This manual answers commonly asked questions regarding the surveillance and reporting of vaccine-preventable diseases and provides information on enhancing existing surveillance systems.

Several reference documents, tables, and worksheets have been included in this manual for your convenience and information. The worksheets in this manual are in the public domain and may be copied and distributed for use in public health surveillance activities.

Please forward any suggestions and comments regarding this manual to:

> Surveillance Officer
> National Center for Immunization and Respiratory Diseases
> Centers for Disease Control and Prevention
> 1600 Clifton Road NE, MS-A27
> Atlanta, GA 30333
> Phone: 404-639-8741

# Acronyms

| | |
|---|---|
| ACIP | Advisory Committee on Immunization Practices |
| APHL | Association of Public Health Laboratories |
| CDC | Centers for Disease Control and Prevention |
| CF | Complement fixation |
| CMV | Cytomegalovirus |
| CPHA | Commission on Professional and Hospital Activities |
| CRS | Congenital rubella syndrome |
| CSF | Cerebrospinal fluid |
| CSTE | Council of State and Territorial Epidemiologists |
| DAT | Diphtheria antitoxin |
| DFA | Direct fluorescent antibody |
| DHHS | Department of Health and Human Services |
| DRSP | Drug-resistant *Streptococcus pneumoniae* |
| DT | Diphtheria and tetanus toxoids |
| DTP | Diphtheria and tetanus toxoids and whole-cell pertussis vaccine |
| DTaP | Diphtheria and tetanus toxoids and acellular pertussis vaccine |
| EBV | Epstein-Barr virus |
| EIA | Enzyme-immunoassay |
| ELISA | Enzyme-linked immunosorbent assay |
| ELR | Electronic laboratory reporting |
| FAMA | Fluorescent antibody to membrane antigen |
| FDA | Food and Drug Administration |
| HA | Hemagglutinin |
| HAV | Hepatitis A virus |
| HBcAg | Hepatitis B core antigen |
| HBIG | Hepatitis B immune globulin |
| HBeAg | Hepatitis B e antigen |
| HBsAg | Hepatitis B surface antigen |
| HBV | Hepatitis B virus |
| HCV | Hepatitis C virus |
| HDV | Hepatitis D virus |
| HI | Hemagglutination inhibition |
| Hi | *Haemophilus influenzae* |
| Hib | *Haemophilus influenzae* type b |
| HMO | Health maintenance organization |
| IFA | Indirect fluorescent antibody |
| IG | Immune globulin |
| IOM | Institute of Medicine |

| | |
|---|---|
| IPV | Inactivated poliovirus vaccine |
| LA | Latex agglutination |
| MMR | Measles-mumps-rubella vaccine |
| MMWR | Morbidity and Mortality Weekly Report |
| MR | Measles-rubella vaccine |
| MSAEFI | Monitoring System for Adverse Events Following Immunization |
| NA | Neuraminidase |
| NCCLS | National Committee for Clinical Laboratory Standards |
| NCHS | National Center for Health Statistics |
| NCIRD | National Center for Immunization and Respiratory Diseases |
| NCRSR | National Congenital Rubella Syndrome Registry |
| NCVIA | National Childhood Vaccine Injury Act of 1986 |
| NEDSS | National Electronic Disease Surveillance System |
| NETSS | National Electronic Telecommunications System for Surveillance |
| NHANES | National Health and Nutrition Examination Survey |
| NHIS | National Health Interview Survey |
| NNDSS | National Notifiable Diseases Surveillance System |
| NVICP | National Vaccine Injury Compensation Program |
| OPV | Oral poliovirus vaccine |
| P&I | Pneumonia and influenza |
| PCR | Polymerase chain reaction |
| PHA | Passive hemagglutination |
| RASH | Rapid Surveillance Helper |
| RET | Reportable Events Table |
| RIA | Radioimmunoassay |
| SIDS | Sudden Infant Death Syndrome |
| SHC | State health coordinator |
| SPSS | Supplementary Pertussis Surveillance System |
| TIG | Tetanus immune globulin |
| TT | Tetanus toxoid |
| VAE | Vaccine adverse event |
| VAERS | Vaccine Adverse Event Reporting System |
| VAPP | Vaccine-associated paralytic poliomyelitis |
| VHSP | Viral Hepatitis Surveillance Program |
| VPD | Vaccine-preventable disease |
| VZIG | Varicella-zoster immune globulin |
| VZV | Varicella-zoster virus |
| WBC | White blood-cell count |
| WHO | World Health Organization |

# Definitions of Terms

| | |
|---|---|
| **Attenuated virus** | A strain of virus whose virulence has been lowered by physical or chemical processes or by repeated passage through the cells of another species. |
| **Breakthrough** | The appearance of clinical disease in an individual who has previously been vaccinated against the agent causing the disease. |
| **Clinically compatible case** | A case featuring a clinical syndrome generally compatible with the disease, but for which specific clinical criteria may not have been met unless they are noted in the case classification. |
| **Confirmed case** | A case that is classified as confirmed for reporting purposes. |
| **Contraindication** | A characteristic or attribute of an individual that may be temporary or permanent that prohibits the administration of a drug, vaccine, or other therapeutic intervention. |
| **Encephalitis** | An inflammatory condition of brain tissue caused by a variety of infectious and non-infectious diseases. In varicella, influenza, and measles, this is sometimes referred to as post-infectious encephalitis. |
| **Epidemiologically linked case** | A case in which the patient has or has had contact with one or more persons who have or have had the disease, and transmission of the agent by the usual modes of transmission is plausible. In general, a case may be considered epidemiologically linked to a laboratory-confirmed case if at least one case in the chain of transmission is laboratory confirmed. |
| **Erythema** | Redness (or inflammation) of the skin or mucous membranes that is the result of dilation and congestion of superficial capillaries. |
| **Exanthem** | A skin eruption or rash that may have specific diagnostic features of an infectious disease. Chickenpox, measles, roseola infantum, rubella, and smallpox are usually characterized by a particular type of exanthem. |
| **Immunocompromised** | A state in which an individual has either a decreased or absent ability to mount an antibody and/or cell-mediated immune response to infectious agents. |
| **Incubation period** | The period of time from exposure to an infecting agent to the onset of symptoms of disease. |
| **Laboratory confirmed case** | A case that is confirmed by one or more of the laboratory methods listed in the case definition under "Laboratory criteria." Although other laboratory methods may be used in clinical diagnosis, only those listed are accepted for laboratory confirmation for reporting purposes. |
| **Line listing** | A tool used during epidemiologic investigations to allow investigators to record case information and to review and follow up case reports or conduct data analysis. |
| **Meets the clinical case definition** | Meets precisely the clinical case definition. Although in clinical practice the diagnosis may be made with the use of other criteria, for reporting purposes the stated criteria must be met. |
| **Primary vaccine failure** | The absence of seroconversion after vaccination. This is manifest as the occurrence of disease in a vaccinated individual in which the disease occurrence closely resembles that found in natural infection with wild-type virus, i.e., more commonly moderate or severe disease. |
| **Probable case** | A case that is classified as probable for reporting purposes. |
| **Secondary vaccine failure** | Loss of immunity acquired after vaccination. |
| **Sentinel event** | A preventable disease, disability, or untimely death that serves as a warning signal of a possible underlying problem. |

| | |
|---|---|
| **Sentinel surveillance** | Activities focused on monitoring key health indicators in the general population or in special populations. The primary intent is to obtain timely information needed for public health or medical action in a relatively inexpensive manner rather than to derive precise estimates of prevalence or incidence in the general population. |
| **Supportive laboratory results** | Specified laboratory results consistent with the diagnosis but not meeting the criteria for laboratory confirmation. |
| **Susceptible** | Being sensitive to effects of an infectious disease, allergen, or other pathogenic agent; lacking immunity or resistance. |
| **Thermolability** | A characteristic of vaccines that cause them to lose potency when stored or held at temperatures other than that recommended by the manufacturer. |
| **Vaccine coverage** | The proportion or percentage of persons that have received a vaccine among all individuals in a particular group who are eligible to receive the vaccine. |
| **Vaccine effectiveness** | The ability of a vaccine to provide protection against disease when used under field conditions (e.g., use of the vaccine in routine practice). |
| **Vaccine efficacy** | The ability of a vaccine to provide protection against disease under ideal circumstances (e.g., during a clinical trial). |

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

            *Plaintiffs,*

            v.

MERCK & CO., INC.,

            *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 96

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

```
1        IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2
     UNITED STATES OF AMERICA  : CIVIL ACTION
3    ex rel., STEPHEN A.       : NO. 2:10-04374(CDJ)
     KRAHLING and JOAN A.      :
4    WLOCHOWSKI,               :
             Plaintiffs,       :
5                              :
             vs.               :
6                              :
     MERCK & CO., INC.,        :
7         Defendant.           :
     _____    : Master File No.
8    IN RE:  MERCK MUMPS       : 2:12-cv-03555(CDJ)
     VACCINE ANTITRUST         :
9    LITIGATION                :
                               :
10   THIS DOCUMENT RELATES TO: :
     ALL ACTIONS               :
11
12
13   * HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *
14
15                   August 3, 2017
16
17        Videotaped deposition of JOSEPH
18   ANTONELLO, taken at the offices of Spector
19   Roseman & Kodroff, 1818 Market Street, Suite
20   2500, Philadelphia, Pennsylvania 19103,
21   beginning at 9:02 a.m., before LINDA
22   ROSSI-RIOS, a Federally Approved RPR, CCR and
23   Notary Public.
24
25
```

Appx11254

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 62

1  this document?  We've been going a
2  little over an hour.
3      MR. SCHNELL:  Just this page.
4  BY MR. SCHNELL:
5      Q.   Under number 3 it says,
6  "Serostatus Cutoff."  The "lowest antibody
7  concentration (titer) which can be reliably
8  distinguished from a panel of negative
9  samples."
10      Do you see that?
11      A.   Yes.
12      Q.   Is that, in your view, an
13  accurate definition of serostatus cutoff as it
14  was used in the mumps wild type ELISA testing?
15      MR. THOMPSON:  Objection to
16  form.
17      THE WITNESS:  It seems
18  reasonable.
19  BY MR. SCHNELL:
20      Q.   And was that -- is that also a
21  reasonable definition of serostatus cutoff as
22  it was used in the AIGENT testing?
23      A.   We did use a panel of negative
24  samples, I believe, to set the cutoff in the
25  AIGENT assay as well.

Page 63

1      Q.   In terms of selecting the
2  serostatus cutoff, what's the best way to -- I
3  want to keep it specific to the wild type
4  ELISA assay.  Because you were involved in
5  setting the serostatus cutoff, correct?
6      A.   Yes.
7      Q.   What was your goal in terms of
8  selecting what you thought was the most
9  appropriate serostatus cutoff?
10      MR. THOMPSON:  Objection to
11  form.
12  BY MR. SCHNELL:
13      Q.   First of all, was that your
14  goal?  In being tasked with calculating
15  serostatus cutoff, what was your goal?
16      MR. THOMPSON:  Same objection.
17      THE WITNESS:  My goal, I mean,
18  the goal was to identify a level that
19  discriminated between expected
20  negatives and expected positives.
21  BY MR. SCHNELL:
22      Q.   When you say "discriminated,"
23  what do you mean?
24      A.   That classified expected
25  negatives, a high percentage of them as

Page 64

1  negative and classify a high percentage of
2  expected positives as positive.
3      Q.   As high a percentage as
4  possible?
5      A.   They're competing goals.  So I
6  could make on the one end as high a percentage
7  as possible, 100 percent, but then do a poor
8  job for the other goal.  Or I can make one 100
9  percent but do a poor job on the other.  So
10  it's two competing goals of -- so to strike a
11  balance.
12      Q.   And just so I understand the
13  balance that you were trying to strike, is
14  having the highest percentage of accurately
15  classifying negatives and positives.  Is that
16  right?
17      MR. THOMPSON:  Objection to
18  form.
19      THE WITNESS:  The goal was to do
20  a good job overall.
21  BY MR. SCHNELL:
22      Q.   But what were the competing
23  goals that you were talking about?
24      MR. THOMPSON:  Same objection.
25      THE WITNESS:  Sensitivity, I

Page 65

1  guess, and specificity.  You want to
2  have high sensitivity, probability of
3  identifying a positive as a positive
4  and have high specificity probability
5  of identifying a negative as negative,
6  a true negative as negative.
7      MR. SCHNELL:  I do have a few
8  more questions on this document, but
9  it's probably going to take a few more
10  minutes, so if you want to take a break
11  now, it's fine.
12      MR. THOMPSON:  Let's do that.
13      VIDEOGRAPHER:  Off the record at
14  10:11.  This will end disc number one.
15      - - -
16      (A recess was taken.)
17      - - -
18      VIDEOGRAPHER:  Back on the
19  record at 10:26.  The beginning of disc
20  number two.
21  BY MR. SCHNELL:
22      Q.   Dr. Antonello, before the break
23  we were talking about the serostatus cutoff
24  that you calculated for the mumps wild type
25  ELISA.  You had spoken about a balance that

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 98

1      Q.   -- wouldn't that show that
2   that's a more reliable serostatus cutoff, at
3   least for the exercise you were performing
4   here?
5      A.   Yeah.
6         MR. THOMPSON: Objection.
7         THE WITNESS: We made
8      modifications to the wild type ELISA,
9      things to try to improve it over the
10      legacy ELISA. So it's not an
11      unexpected result, not a negative
12      result. Not -- 10-0 wouldn't have been
13      necessarily a better result or a worse
14      result. It's just a comparison. And
15      this is the result of the comparison.
16   BY MR. SCHNELL:
17      Q.   So is 56 out of 56 a better
18   result than 53 out of 56?
19      A.   Yes.
20         MR. THOMPSON: Objection to
21      form.
22   BY MR. SCHNELL:
23      Q.   Is 8 out of 10 a better result
24   than 7 out of 10?
25         MR. THOMPSON: Same objection.

Page 99

1         THE WITNESS: In that case, no,
2      it's not -- I don't view it as a better
3      result for the post-vaccination
4      samples.
5   BY MR. SCHNELL:
6      Q.   So, again, you're putting more
7   weight, then, in your pre-vaccination
8   measurement than in your post-vaccination
9   measurement. Is that correct?
10      A.   For this evaluation, yes.
11      Q.   Why did you even consider
12   post-vaccination samples at all?
13      A.   I guess it gains -- it provides
14   some additional information. It also provides
15   some information relative to the legacy assay.
16   And I know we did a formal comparison between
17   the two assays. And that was done in a lot
18   greater detail.
19      Q.   Now, if you flip to
20   Attachment 5, which is page 21 of the report
21   with the Bates number ending 149, you actually
22   have written out here the estimated titer
23   findings from your calculation?
24      A.   I'm sorry, what page?
25      Q.   Bates number ending 149.

Page 100

1      A.   Okay.
2      Q.   And if you look at the
3   attachment, you've actually highlighted the 2,
4   4, 6, 8, the 10, the post samples versus the
5   pre. Some of the pres are highlighted, too.
6   But if you look at -- if you look at the third
7   sample and the eighth sample, those are the
8   two that were identified in your table under
9   10 Ab units of being positive. Correct?
10      A.   Uh-huh.
11         MR. THOMPSON: You have to say
12      yes or no.
13         THE WITNESS: Yes.
14   BY MR. SCHNELL:
15      Q.   So if you had done this
16   comparison with a serostatus cutoff of 25 Ab
17   instead of 10 Ab, then this post table would
18   have gone from 8-2 to 10-0?
19      A.   Correct.
20         MR. THOMPSON: Object to the
21      form.
22   BY MR. SCHNELL:
23      Q.   But that, to you, doesn't
24   suggest to you that 25 Ab for the purposes of
25   this experiment would have been a more

Page 101

1   appropriate serostatus cutoff?
2      A.   It does not, because the
3   subjects received vaccine, and the fact that
4   you get a positive result on a subject who
5   received vaccine is not atypical or
6   unexpected.
7      Q.   So you had more confidence,
8   then, that the pre-vaccination samples were
9   truly negative than the post-vaccination
10   samples?
11      A.   Yes.
12      Q.   So what kind -- does that weigh
13   into this analysis in any way?
14         MR. THOMPSON: Objection to
15      form.
16         THE WITNESS: It always into the
17      selection of 10 as the cutoff to move
18      forward with.
19   BY MR. SCHNELL:
20      Q.   Do you think 10 is a better
21   cutoff than 25, based on this calculation that
22   you did here?
23      A.   Yes, I do. Because there is
24   competing priorities. There is the
25   specificity, not classifying a negative as

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 102

1  positive, but there is also sensitivity which
2  is classifying a positive, true positive as
3  positive.
4      Q.    So how -- I'm sorry.
5      A.    Yeah.  So you can, I mean,
6  make -- raise the cutoff to 1,000, but you'll
7  do a bad job on the sensitivity.  Might do a
8  better job for specificity.
9      Q.    So how did you balance that all
10 out here?
11     A.    You know, what we do is we
12 provide the results and say here are the
13 results and this seems like a reasonable thing
14 to move forward with.  And these reports get
15 reviewed by the scientists and will be
16 discussed with clinical and there will be a
17 consensus on what to move forward with.  So
18 it's based on the data that's generated and
19 the input of several groups.  We don't set it
20 in isolation.
21     Q.    Did you do any kind of
22 statistical power analysis for this exercise
23 to give you confidence that you had enough
24 samples to make this a reliable calculation?
25     A.    No.  We probably used what was

Page 103

1  available to us at the time, all the samples
2  that were available at the time.
3      Q.    Did you do any kind of
4  confidence interval to measure any kind of
5  variability in the samples that were provided?
6      A.    We assessed the variability
7  precision of the samples.  That typically
8  doesn't have a confidence interval, but we
9  evaluated the precision of the samples.  In the
10 validation study.  We looked at other aspects,
11 maybe put some confidence intervals on other
12 aspects like the ruggedness to operate, I see
13 that has it.  And dilutability has it.
14     Q.    I'm talking, though, about the
15 panel of 72 negative samples that were tested,
16 that was different from the samples that were
17 used for some of these other metrics.  Right?
18     A.    Right.  We can put a confidence
19 interval on the 0 percent and a confidence
20 interval on, you know, the 5.3 percent.  It
21 doesn't change anything.
22     Q.    Why doesn't it change anything?
23     A.    Because these are the results.
24 I mean --
25     Q.    Did you ever consider measuring --

Page 104

1  or in your calculation of the serostatus
2  cutoff here, did you ever consider a split
3  cutoff?  Do you know what a split cutoff is?
4      A.    No.
5      Q.    Where you have a lower cutoff
6  and a higher cutoff, a lower cutoff being the
7  cutoff for negatives and the higher cutoff
8  being the cutoff for positives?
9      A.    I've never heard of a split
10 cutoff.
11     Q.    Did you in this exercise test
12 any samples of expected positives?
13     A.    In this exercise it does --
14 well, I mean, the precision samples would be
15 probably a set of expected positives.
16     Q.    For the serostatus cutoff?
17     A.    For the serostatus cutoff, it
18 does not appear that we included a set of
19 expected positives.
20     Q.    And wouldn't that have made the
21 measure more reliable in the sense that you
22 were trying to balance the competing objectives
23 of finding the proper serostatus cutoff?
24     A.    We could have included those.  I
25 guess we had a history, too, with the assay.

Page 105

1  We also did a very formal comparison between
2  the two.  So we knew how the positives -- we
3  had a good idea that -- how the positives
4  would respond in the assay.
5      Q.    What kind of comparison are you
6  talking about?
7      A.    There was a comparison between
8  the legacy wild type and the -- I mean the
9  legacy mumps ELISA and the wild type ELISA.
10 It was a formal comparison between the two
11 where samples were tested in both and we
12 compared the results.
13     Q.    How would that have assisted you
14 in determining the serostatus cutoff?
15     A.    I think you had asked me, we
16 didn't include those positive samples here in
17 this study.  And my answer was that we already
18 have experience with the assay.  We've been
19 running the EIA, we knew how it compared with
20 the wild type.  So we already had information
21 on how post-vaccination samples performed in
22 the assay.  So it wasn't necessary.  It wasn't
23 value -- it would not be value added.
24     Q.    So doing the same kind of
25 exercise with 66 samples that you expected to

27 (Pages 102 - 105)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

*Plaintiffs,*

v.

MERCK & CO., INC.,

*Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 97



**Weekly**

**March 30, 2007 / 54(53);2-92**

Persons using assistive technology might not be able to fully access information in this file. For assistance, please send e-mail to: mmwrq@cdc.gov. Type 508 Accommodation and the title of the report in the subject line of e-mail.

# Summary of Notifiable Diseases --- United States, 2005

Prepared by
Scott J.N. McNabb, PhD
Ruth Ann Jajosky, DMD
Patsy A. Hall-Baker, Annual Summary Coordinator
Deborah A. Adams
Pearl Sharp
Willie J. Anderson
J. Javier Aponte
Gerald F. Jones
David A. Nitschke
Carol A. Worsham
Roland A. Richard, Jr., MPH
Division of Integrated Surveillance Systems and Services,
National Center for Public Health Informatics,
Coordinating Center for Health Information and Service, CDC

## Preface

The *Summary of Notifiable Diseases --- United States, 2005* contains the official statistics, in tabular and graphic form, for the reported occurrence of nationally notifiable infectious diseases in the United States for 2005. Unless otherwise noted, the data are final totals for 2005 reported as of June 30, 2006. These statistics are collected and compiled from reports sent by state health departments to the National Notifiable Diseases Surveillance System (NNDSS), which is operated by CDC in collaboration with the Council of State and Territorial Epidemiologists (CSTE). The *Summary* is available at http://www.cdc.gov/mmwr/summary.html. This site also includes publications from previous years.

The Highlights section presents noteworthy epidemiologic and prevention information for 2005 for selected diseases and additional information to aid in the interpretation of surveillance and disease-trend data. Part 1 contains tables showing incidence data for the nationally notifiable infectious diseases during 2005.* The tables provide the number of cases reported to CDC for 2005 as well as

Appx11259

the distribution of cases by month, geographic location, and the patient's demographic characteristics (age, sex, race, and ethnicity). Part 2 contains graphs and maps that depict summary data for certain notifiable infectious diseases described in tabular form in Part 1. Part 3 contains tables that list the number of cases of notifiable diseases reported to CDC since 1973. This section also includes a table enumerating deaths associated with specified notifiable diseases reported to CDC's National Center for Health Statistics (NCHS) during 2002--2003. The Selected Reading section presents general and disease-specific references for notifiable infectious diseases. These references provide additional information on surveillance and epidemiologic concerns, diagnostic concerns, and disease-control activities.

Comments and suggestions from readers are welcome. To increase the usefulness of future editions, comments about the current report and descriptions of how information is or could be used are invited. Comments should be sent to Public Health Surveillance Team --- NNDSS, Division of Integrated Surveillance Systems and Services, National Center for Public Health Informatics at soib@cdc.gov.

\* Because no cases of anthrax; diphtheria; domestic arboviral, western equine encephalitis virus, neuroinvasive and nonneuroinvasive, eastern equine nonneuroinvasive, and Powassen nonneuroinvasive; severe acute respiratory syndrome--associated coronavirus (SARS-CoV) disease; smallpox; or yellow fever were reported in the United States during 2005, these diseases do not appear in the tables in Part 1. For certain other nationally notifiable diseases, incidence data were reported to CDC but are not included in the tables or graphs of this *Summary*. Data on chronic hepatitis B and hepatitis C virus infection past or present are undergoing quality review. Data on human immunodeficiency virus (HIV) infections are not included because HIV infection (not acquired immunodeficiency syndrome [AIDS]) reporting has been implemented on different dates and using different methods than for AIDS case reporting; however, these data are summarized in the Highlights section.

## Background

The infectious diseases designated as notifiable at the national level during 2005 are listed on page 3. A notifiable disease is one for which regular, frequent, and timely information regarding individual cases is considered necessary for the prevention and control of the disease. A brief history of the reporting of nationally notifiable infectious diseases in the United States is available at http://www.cdc.gov/epo/dphsi/nndsshis.htm. In 1961, CDC assumed responsibility for the collection and publication of data on nationally notifiable diseases. NNDSS is neither a single surveillance system nor a method of reporting. Certain NNDSS data are reported to CDC through separate surveillance information systems and through different reporting mechanisms; however, these data are aggregated and compiled for publication purposes.

Notifiable disease reporting at the local level protects the public's health by ensuring the proper identification and follow-up of cases. Public health workers ensure that persons who are already ill receive appropriate treatment; trace contacts who need vaccines, treatment, quarantine, or education; investigate and halt outbreaks; eliminate environmental hazards; and close premises where spread has occurred. Surveillance of notifiable conditions helps public health authorities to monitor the impact of notifiable conditions, measure disease trends, assess the effectiveness of control and prevention measures, identify populations or geographic areas at high risk, allocate resources appropriately, formulate prevention strategies, and develop public health policies. Monitoring surveillance data enables public health authorities to detect sudden changes in disease occurrence and distribution, identify changes in agents and host factors, and detect changes in health-care practices.

The list of nationally notifiable infectious diseases is revised periodically. A disease might be added to the list as a new pathogen emerges, or a disease might be deleted as its incidence declines. Public health officials at state health departments and CDC collaborate in determining which diseases should be nationally notifiable. CSTE, with input from CDC, makes recommendations annually for additions and deletions. Although disease reporting is mandated by legislation or regulation at the state and local levels, state reporting to CDC is voluntary. Reporting completeness of notifiable diseases is highly variable and related to the condition or disease being reported (*1*). The list of diseases considered notifiable varies by state and year. Current and historic national public health surveillance case definitions used for classifying and enumerating cases consistently across reporting jurisdictions are available at http://www.cdc.gov/epo/dphsi/nndsshis.htm.

All states report conditions that were designated as internationally quarantinable and notifiable (i.e., cholera, plague, and yellow fever) in compliance with the International Health Regulations (IHR) issued by the World Health Organization (WHO). In May 2005, the World Health Assembly adopted revised IHR. The current IHR will be replaced by the 2005 IHR when it becomes official on June 15, 2007, unless an earlier implementation date is adopted. The 2005 IHR revision stipulates that smallpox, poliomyelitis caused by wild-type poliovirus, human influenza caused by a new subtype, and SARS-CoV are public health events of international concern (PHEIC) and are reportable to WHO. In addition, the 2005 IHR includes an open-ended algorithm to determine other conditions or events that require mandatory reporting to WHO because they might constitute a PHEIC. Conditions for which the algorithm is used to determine notifiability include, but are not limited to, cholera, pneumonic plague, yellow fever, West Nile fever, and meningococcal disease (*2*). On December 13, 2006, the United States formally accepted the 2005 IHR and is taking steps to implement these new international rules.

1.  Doyle TJ, Glynn MK, Groseclose LS. Completeness of notifiable infectious disease reporting in the United States: an analytical literature review. Am J Epidemiol 2002;155:866--74.
2.  World Health Organization. Third report of Committee A. Annex 2. Available at http://www.who.int/gb/ebwha/pdf_files/WHA58/A58_55-en.pdf.

**Infectious Diseases Designated as Notifiable at the National Level During 2005**

| | |
|---|---|
| Acquired immunodeficiency syndrome (AIDS) | Influenza-associated pediatric mortality |
| Anthrax | Legionellosis |
| Botulism | Listeriosis |
|    foodborne | Lyme disease |
|    infant | Malaria |
|    other (wound and unspecified) | Measles |
| Brucellosis | Meningococcal disease, invasive |
| Chancroid | Mumps |
| *Chlamydia trachomatis*, genital infection | Pertussis |
| Cholera | Plague |
| Coccidioidomycosis | Poliomyelitis, paralytic |

Appx11261

Cryptosporidiosis

Cyclosporiasis

Diphtheria

Domestic arboviral diseases, neuroinvasive and non-neuroinvasive[†]

  California serogroup virus disease

  eastern equine encephalitis virus disease

  Powassan virus disease

  St. Louis encephalitis virus disease

  West Nile virus disease

  western equine encephalitis virus disease

Ehrlichiosis

  human granulocytic

  human monocytic

  human, other or unspecified agent

Enterohemorrhagic *Escherichia coli* (EHEC) infection

  EHEC O157:H7

  EHEC Shiga toxin-positive, serogroup non-O157

  EHEC Shiga toxin-positive, not serogrouped

Giardiasis

Gonorrhea

*Haemophilus influenzae*, invasive disease

Hansen disease (leprosy)

Hantavirus pulmonary syndrome

Hemolytic uremic syndrome, postdiarrheal

Hepatitis A, viral, acute

Hepatitis B, viral, acute

Hepatitis B, chronic

Hepatitis B virus infection, perinatal

Hepatitis C, viral, acute

Hepatitis C virus infection (past or present)

Human immunodeficiency virus (HIV) infection

Psittacosis

Q fever

Rabies

  animal

  human

Rocky Mountain spotted fever

Rubella

Rubella, congenital syndrome

Salmonellosis

Severe acute respiratory syndrome--associated coronavirus (SARS-CoV) disease

Shigellosis

Smallpox

Streptococcal disease, invasive, group A

Streptococcal toxic-shock syndrome

*Streptococcus pneumoniae*, invasive disease

  drug resistant, all ages

  age <5 years

Syphilis

Syphilis, congenital

Tetanus

Toxic-shock syndrome (other than streptococcal)

Trichinellosis

Tuberculosis

Tularemia

Typhoid fever

Vancomycin-intermediate *Staphylococcus aureus* infection (VISA)

Vancomycin-resistant *Staphylococcus aureus* infection (VRSA)

Varicella infection (morbidity)

Varicella deaths

Yellow fever

adult (age $\geq$13 yrs)

pediatric (age <13 yrs)

[†] The national surveillance case definition for the arboviral diseases was revised in 2005, and nonneuroinvasive arboviral diseases were added to the list of nationally notifiable infectious diseases.

## Data Sources

Provisional data concerning the reported occurrence of nationally notifiable infectious diseases are published weekly in *MMWR*. After each reporting year, staff in state health departments finalize reports of cases for that year with local or county health departments and reconcile the data with reports previously sent to CDC throughout the year. These data are compiled in final form in the *Summary*.

Notifiable disease reports are the authoritative and archival counts of cases. They are approved by the appropriate chief epidemiologist from each submitting state or territory before being published in the *Summary*. Data published in *MMWR Surveillance Summaries* or other surveillance reports produced by CDC programs might not agree exactly with data reported in the annual *Summary* because of differences in the timing of reports, the source of the data, or surveillance methodology.

Data in the *Summary* were derived primarily from reports transmitted to CDC from health departments in the 50 states, five territories, New York City, and the District of Columbia. Data were reported for *MMWR* weeks 1--52, which correspond to the period for the week ending January 8, 2005, through the week ending December 31, 2005. More information regarding infectious notifiable diseases, including case definitions, is available at http://www.cdc.gov/epo/dphsi/phs.htm. Policies for reporting notifiable disease cases can vary by disease or reporting jurisdiction. The case-status categories used to determine which cases reported to NNDSS are published, by disease or condition, and are listed in the print criteria column of the 2006 NNDSS event code list (available at http://www.cdc.gov/epo/dphsi/phs/files/NNDSSeventcodelistJanuary2006.pdf).

Final data for certain diseases are derived from the surveillance records of the CDC programs listed below. Requests for further information regarding these data should be directed to the appropriate program.

**Coordinating Center for Health Information and Service National Center for Health Statistics (NCHS)**

Office of Vital and Health Statistics Systems (deaths from selected notifiable diseases).

**Coordinating Center for Infectious Diseases (proposed)**

**National Center for HIV/AIDS, Viral Hepatitis, STD, and TB Prevention (proposed)**

Division of HIV/AIDS Prevention (AIDS and HIV infection).

Division of STD Prevention (chancroid; *Chlamydia trachomatis*, genital infection; gonorrhea; and syphilis).

Division of Tuberculosis Elimination (tuberculosis).

**National Center for Immunization and Respiratory Diseases (proposed)**

Influenza Division (proposed) (influenza-associated pediatric mortality).

Division of Viral Diseases (proposed) (poliomyelitis, varicella deaths, and SARS-CoV).

**National Center for Zoonotic, Vector-Borne, and Enteric Diseases (proposed)**

Division of Vector-Borne Infectious Diseases (arboviral diseases).

Division of Viral and Rickettsial Diseases (animal rabies).

Population estimates for the states are from the NCHS bridged-race estimates of the July 1, 2004, U.S. resident population from the vintage 2004 postcensal series by year, county, age, sex, race, and Hispanic origin, prepared under a collaborative arrangement with the U.S. Census Bureau. This data set was released on September 9, 2005, and is available at http://www.cdc.gov/nchs/about/major/dvs/popbridge/popbridge.htm. Populations for territories are 2004 estimates from the U.S. Census Bureau International Data Base Data Access--Display Mode, available at http://www.census.gov/ipc/www/idbprint.html. The choice of population denominators for incidence reported in the *MMWR* is based on 1) the availability of census population data at the time of preparation for publication and 2) the desire for consistent use of the same population data to compute incidence reported by different CDC programs. Incidence in the *Summary* is calculated as the number of reported cases for each disease or condition divided by either the U.S. resident population for the specified demographic population or the total U.S. residential population, multiplied by 100,000. When a nationally notifiable disease is associated with a specific age restriction, the same age restriction is applied to the population in the denominator of the incidence calculation. In addition, population data from states in which the disease or condition was not notifiable or was not available were excluded from incidence calculations. Unless otherwise stated, disease totals for the United States do not include data for American Samoa, Guam, Puerto Rico, the Commonwealth of the Northern Mariana Islands, or the U.S. Virgin Islands.

## Interpreting Data

Incidence data in the *Summary* are presented by the date of report to CDC as determined by the *MMWR* week and year assigned by the state or territorial health department. Data are reported by the state in which the patient resided at the time of diagnosis. For certain nationally notifiable infectious diseases, surveillance data are reported independently to different CDC programs. Thus, surveillance data reported by other CDC programs might vary from data reported in the *Summary* because of differences in 1) the date used to aggregate data (e.g., date of report or date of disease occurrence), 2) the timing of reports, 3) the source of the data, 4) surveillance case definitions, and 5) policies regarding case jurisdiction (i.e., which state should report the case to CDC).

The data reported in the *Summary* are useful for analyzing disease trends and determining relative disease burdens. However, reporting practices affect how these data should be interpreted. Disease reporting is likely incomplete, and completeness might vary depending on the disease. The degree of completeness of data reporting might be influenced by the diagnostic facilities available; control measures in effect; public awareness of a specific disease; and the interests, resources, and priorities of state and local officials responsible for disease control and public health surveillance.

Finally, factors such as changes in methods for public health surveillance, introduction of new diagnostic tests, or discovery of new disease entities can cause changes in disease reporting that are independent of the true incidence of disease.

Public health surveillance data are published for selected racial/ethnic populations because these variables can be risk markers for certain notifiable diseases. Race and ethnicity data also can be used to highlight populations for focused prevention efforts. However, caution must be used when drawing conclusions from reported race and ethnicity data. Different racial/ethnic populations might have different patterns of access to health care, potentially resulting in data that are not representative of actual disease incidence among specific racial/ethnic populations. Surveillance data reported to NNDSS are in either individual case-specific form or summary form (i.e., aggregated data for a group of cases). Summary data often lack demographic information (e.g., race); therefore, the demographic-specific rates presented in the *Summary* might be underestimated.

In addition, not all race and ethnicity data are collected uniformly for all diseases. For example, certain disease programs collect data on race and ethnicity using one or two variables, based on the 1977 standards for collecting such data issued by the Office of Management and the Budget (OMB). However, beginning in 2003, certain CDC programs, such as the tuberculosis program, implemented OMB's 1997 revised standards for collecting such data; these programs collect data on multiple races per person using multiple race variables. In addition, although the recommended standard for classifying a person's race or ethnicity is based on self-reporting, this procedure might not always be followed.

### Transition in NNDSS Data Collection and Reporting

Before 1990, data were reported to CDC as cumulative counts rather than individual case reports. In 1990, states began electronically capturing and reporting individual case reports (without personal identifiers) to CDC using the National Electronic Telecommunication System for Surveillance (NETSS). In 2001, CDC launched the National Electronic Disease Surveillance System (NEDSS), now a component of the Public Health Information Network, to promote the use of data and information system standards that advance the development of efficient, integrated, and interoperable surveillance information systems at the local, state, and federal levels. One of the objectives of NEDSS is to improve the accuracy, completeness, and timeliness of disease reporting at the local, state, and national level. CDC has developed the NEDSS Base System (NBS), a public health surveillance information system that can be used by states that do not wish to develop their own NEDSS-based systems. A major feature of NBS is the ability to capture data already in electronic form (e.g., electronic laboratory results, which are needed for case confirmation) rather than enter these data manually as in NETSS. In 2005, NBS was used by 10 states to transmit nationally notifiable infectious diseases to CDC; as of January 1, 2007, NBS was used by 16 states to transmit these data to CDC. Additional information concerning NEDSS is available at http://www.cdc.gov/NEDSS.

### Highlights for 2005

Below are summary highlights for certain national notifiable diseases. Highlights are intended to assist in the interpretation of major occurrences that affect disease incidence or surveillance trends (e.g., outbreaks, vaccine licensure, or policy changes).

## AIDS

Since 1981, confidential name-based AIDS surveillance has been the cornerstone of national, state, and local efforts to monitor the scope and impact of the HIV epidemic. The data have multiple uses, including developing policy to help prevent and control AIDS. However, because of the introduction of therapies that effectively slow the progression of the infection, AIDS data no longer adequately represent the populations affected by the epidemic. By helping researchers to understand the epidemic at an earlier stage, HIV data, combined with AIDS data, better represent the overall impact. As of the end of 2005, a total of 43 areas (38 states, Puerto Rico, and four U.S. territories) had implemented confidential name-based HIV reporting. These 43 areas have integrated name-based HIV surveillance into their AIDS surveillance systems, whereas other jurisdictions have used other methods for reporting cases of HIV infection. Under no configuration are names or other personal identifying information collected at the national level.

During 1998--1999, declines in AIDS rates began to level. This trend followed a period of sharp declines in reported cases after 1996, when highly effective antiretroviral therapies were introduced. At the end of 2005, an estimated 437,982 persons were living with AIDS. After a substantial decrease in the number of deaths among persons with AIDS during the late 1990s, the rate of decrease declined through 2004. The number of deaths among persons with AIDS decreased 66% during 1995--2000. During 2001--2003, the number of reported deaths decreased an average of 5% annually; however, in 2004, the number of deaths increased 3% compared with the number reported in 2001. In 2005, reported deaths resumed a downward trend and decreased 17% compared with 2004.

## Anthrax

No human cases of anthrax were reported in the United States during 2005. Naturally occurring anthrax epizootics are commonly reported in the United States; in 2005, epizootics were reported in four states, affecting livestock in Montana, North Dakota, and South Dakota, and livestock and game animals in Texas.

## Botulism

Botulism is a severe paralytic illness caused by the toxins of *Clostridium botulinum*. Exposure to toxin can occur by ingestion (foodborne botulism) or by in situ production from *C. botulinum* colonization of a wound (wound botulism) or the gastrointestinal tract (infant botulism and adult intestinal colonization botulism) (*1*). In addition to the National Notifiable Diseases Surveillance System, CDC maintains intensive surveillance for cases of botulism in the United States. In 2005, cases were attributed to foodborne botulism, wound botulism, infant botulism, and intestinal colonization (*2*).

1. Sobel J. Botulism. Clin Infect Dis 2005;41:1167--73.
2. CDC. Letter to state and territorial epidemiologists: surveillance for botulism: summary 2005 data. Atlanta, GA: US Department of Health and Human Services, CDC. In press.

## Brucellosis

Appx11266

In 2005, three cattle herds in two states, and two swine herds in two states were reported by the U.S. Department of Agriculture (USDA) to be affected by brucellosis. Overall, 48 states remain designated free of cattle brucellosis by USDA (*1*). *Brucella abortus* remains enzootic in elk and bison in the greater Yellowstone National Park area, and *Brucella suis* is enzootic in feral swine in the southeast. Hunters exposed to these animals might be at increased risk for infection. Human cases also can occur among returned travelers or immigrants from countries with endemic brucellosis and are associated with consumption of unpasteurized milk or soft cheeses. Pathogenic *Brucella* species are considered category B biologic threat agents because of a high potential for aerosol transmission (*2*). For the same reason, biosafety level 3 practices, containment, and equipment are recommended for laboratory manipulation of isolates (*3*).

1. Donch DA, Gertonson AA, Rhyan JH, Gilsdorf MJ. U.S. Cooperative State--Federal Brucellosis Eradication Program status report---fiscal year 2005. Washington, DC: US Department of Agriculture; 2006. Available at http://www.aphis.usda.gov/vs/nahps/brucellosis/yearly_report/yearly-report.html.
2. CDC. Bioterrorism agents/diseases, by category. Atlanta, GA: US Department of Health and Human Services, CDC; 2006. Available at http://www.bt.cdc.gov/agent/agentlist-category.asp#adef.
3. CDC, National Institutes of Health. Biosafety in microbiological and biomedical laboratories (BMBL). 4th ed. Washington, DC: US Department of Health and Human Services, CDC, National Institutes of Health; 1999. Available at http://www.cdc.gov/OD/OHS/biosfty/bmbl4/bmbl4toc.htm.

## Cholera

In 2005, the largest number of laboratory-confirmed cases of toxigenic *Vibrio cholerae* O1 infection were reported since 1998. The average annual number of cases of cholera reported during 1995--2000 and 2001--2005 was 10.2 and 4.6 per year, respectively (*1*). None of the patients hospitalized for cholera died. Approximately 36% of cases were acquired outside the United States, 36% were attributable to consumption of domestic seafood, and for 27% (residents of Guam),

no source was identified (*3*). Crabs harvested from the U.S. Gulf Coast after Hurricane Katrina were the source of illness for certain cases associated with domestic seafood (*2*). Certain cases associated with domestic seafood were attributed to consumption of raw seafood at a restaurant. Foreign travel and consumption of undercooked seafood continue to be the main sources of illness. Crabs harvested from the U.S. Gulf Coast are a common source of cholera, especially during warmer months, when environmental conditions favor the growth and survival of *V. cholerae* in brackish and coastal waters.

1. Steinberg EB, Greene KD, Bopp CA, Cameron DN, Wells JG, Mintz ED. Cholera in the United States, 1995--2000: trends at the end of the millennium. J Infect Dis 2001;184:799--802.
2. CDC. Two cases of toxigenic *Vibrio cholerae* O1 infection after Hurricanes Katrina and Rita---Louisiana, October 2005. MMWR 2006;55:31--2.
3. Menon M. Investigation of an outbreak of cholera among Chuukese residents of Guam, 2005. Pacific Health Dialogue. In press.

## Enterohemorrhagic *Escherichia coli* Infection

*Escherichia coli* O157:H7 has been nationally notifiable since 1994 (*1*). National surveillance for all Shiga toxin-producing *E. coli* (STEC), under the name enterohemorrhagic *E. coli* (EHEC), began in 2001. Surveillance categories for EHEC infection include 1) EHEC O157:H7; 2) serogroup non-O157; and 3) EHEC, not serogrouped. During 2005, cases of EHEC infection were reported from 50 states, the District of Columbia, and Puerto Rico. Of these, 74% were classified as EHEC O157:H7; 14% as EHEC, serogroup non-O157; and 12% as EHEC, not serogrouped. The majority of cases were reported during July--October.

Healthy cattle, which harbor the organism as part of their bowel flora, are the main animal reservoir for STEC. The majority of reported outbreaks are caused by contaminated food or water. The substantial decline in cases since 2002 coincided with industry and regulatory control activities and with a decrease in the contamination of ground beef (*2*). Direct transmission from animals and their environments to humans in settings such as petting zoos remains a public health concern (*3*), and prevention recommendations have been developed and disseminated (*4*).

1. Mead PS, Griffin PM. *Escherichia coli* O157:H7. Lancet 1998;352:1207--12.
2. Naugle AL, Holt KG, Levine P, Eckel R. 2005 Food Safety and Inspection Service regulatory testing program for *Escherichia coli* O157:H7 in raw ground beef. J Food Prot 2005;68:462--8.
3. Crump JA, Sulka AC, Langer AJ, et al. An outbreak of *Escherichia coli* O157:H7 among visitors to a dairy farm. N Engl J Med 2002;347:555--60.
4. CDC. Compendium of measures to prevent disease associated with animals in public settings, 2005. MMWR 2005;54(No. RR-4).

## Hansen Disease (Leprosy)

The number of reported cases of Hansen disease (HD) in the United States peaked at 361 in 1985 and has declined since 1988. HD outpatient clinics operated under the guidance and direction of the U.S. Department of Health and Human Services, Health Resources and Services Administration exist in Phoenix, Arizona; Los Angeles, Martinez, and San Diego, California; Miami, Florida; Chicago, Illinois; Baton Rouge, Louisiana; Boston, Massachusetts; New York City, New York; San Juan, Puerto Rico; Austin, Dallas, Harlingen, Houston, and San Antonio, Texas; and Seattle, Washington. Services provided to HD patients include diagnosis, treatment, follow-up of patients and contacts, disability prevention and monitoring, education, and a referral system for HD health-care services. More information is available at http://bphc.hrsa.gov/nhdp/default.htm.

## Hemolytic Uremic Syndrome, Postdiarrheal

Hemolytic uremic syndrome (HUS) is characterized by the triad of hemolytic anemia, thrombocytopenia, and renal insufficiency. The most common etiology of HUS in the United States is infection with Shiga toxin-producing *Escherichia coli*, principally *E. coli* O157:H7 (*1*). Approximately 8% of persons infected with *E. coli* O157:H7 progress to HUS (*2*). During 2005, the majority of reported cases occurred among children aged <5 years.

1. Banatvala N, Griffin PM, Greene KD, et al. The United States prospective hemolytic uremic syndrome study: microbiologic, serologic, clinical, and epidemiologic findings. J Infect Dis 2001;183:1063--70.
2. Slutsker L, Ries AA, Maloney K, et al. A nationwide case-control study of *Escherichia coli* O157:H7 infection in the United States. J Infect Dis 1998;177:962--6.

Appx11268

## Hepatitis A, Viral, Acute

In 2005, to further reduce morbidity and mortality from hepatitis A virus infections in the United States, CDC expanded recommendations for hepatitis A vaccination published previously (*1*). Hepatitis A vaccination is now recommended routinely for children aged 1 year (*1*) and for persons who are at increased risk for infection (e.g., international travelers, men who have sex with men [MSM], users of illicit drugs, persons working with nonhuman primates or with hepatitis A virus [HAV] in a laboratory, persons with clotting-factor disorders, and persons who have chronic liver disease), and for any person wishing to become immune (*2*).

Since routine childhood vaccination was recommended in 1999, the overall hepatitis A rate has declined dramatically, especially in the western states. In 2005, the rate of infection (1.5 per 100,000 population) was the lowest yet recorded. Declines have been greater in the age groups and regions for which targeted vaccination was recommended previously (*1*), reflecting the success of the targeted vaccination strategy.

Although rates among children have declined among all races and ethnicities, the decline among Hispanic children has been less than that among non-Hispanics. The highest rates among children are now among children in states in which morbidity was low historically and that were not included in the initial recommendations for routine childhood hepatitis A vaccination.

The decline in rates among children has resulted in a substantial shift in the epidemiologic profile of this disease in the United States. Rates in the western states, which historically have been higher than in other regions, are now similar to the rest of the country, and rates among adults are higher than those among children. These declines also have been accompanied by a shift in the pattern of reported risk factors, with an increasing proportion of cases occurring among adults at high risk for hepatitis A, including MSM and users of injection and noninjection drugs. In addition, as transmission of HAV has declined within the United States, the proportion of cases attributed to travel to countries in which hepatitis A is endemic has increased for all age groups, and travel is now the most frequently reported risk factor among persons with HAV aged <15 years.

1. CDC. Prevention of hepatitis A through active or passive immunization: recommendations of the Advisory Committee on Immunization Practices (ACIP). MMWR 2006;55(No. RR-7):1--23.
2. CDC. Prevention of hepatitis A through active or passive immunization. MMWR 1999;48(No. RR-12).

## Hepatitis B, Viral, Acute

Since 1990, the number of acute hepatitis B cases has declined 80%; the rate reported in 2005 was 1.8 per 100,000 population. This steady decline has coincided with the implementation of a national strategy to achieve the elimination of hepatitis B (*1*). The primary elements of this strategy are the screening of all pregnant women for hepatitis B virus (HBV) infection with the provision of postexposure prophylaxis to infants born to infected women; routine vaccination of all infants and children aged <19 years; and vaccination of others at increased risk for hepatitis B (e.g., health-care workers, men who have sex with men [MSM], injection-drug users [IDUs], and household and sex contacts of persons with chronic HBV infection).

In 2005, the rate of infection among children aged <13 years, the cohort born since routine infant vaccination was implemented, was 0.02 per 100,000 population, representing a 98% decline in that age group since 1990. By race and ethnicity, the highest rates among children continue to be among Asian/Pacific Islanders (APIs), followed by blacks, American Indians/Alaska Natives, and whites; however, since 1990, the disparity between the highest incidence group (APIs) and the lowest (whites) has been reduced 98%. A substantial number of confirmed cases in children born after 1991 occurred among children born outside the United States, including international adoptees (*2*). Rates among adolescents aged 12--19 years also have declined approximately 97% since 1990, but the 2005 rate (0.2 per 100,000 population) remains substantially higher than for younger children.

During 1990--2005, acute hepatitis B rates among adults declined 76%. Among adults, a high proportion of cases occur among persons in identified risk groups (i.e., IDUs, MSM, and persons with multiple sex partners), indicating a need to strengthen efforts to reach these populations with vaccine.

1. CDC. Hepatitis B virus: a comprehensive strategy for eliminating transmission in the United States through universal childhood vaccination. MMWR 1991;40(No. RR-13).
2. CDC. Acute hepatitis B among children and adolescents---United States, 1990--2002. MMWR 2004;53:1015--8.

## HIV Infection, Adult

By December 2003, all 50 states and the District of Columbia had implemented HIV surveillance systems, including both name-based and nonname-based systems. Since 2001, a total of 37 areas (33 states, American Samoa, Guam, the Commonwealth of the Northern Mariana Islands, and the U.S. Virgin Islands) have had laws or regulations requiring name-based confidential reporting for adults and adolescents with confirmed HIV infection, in addition to reporting of persons with AIDS. In 2002, CDC initiated a system to monitor HIV incidence; in 2003, CDC expanded this system and also initiated a national HIV behavioral surveillance system. CDC will assess the implementation and effectiveness of prevention activities through multiple monitoring systems, including use of new performance indicators for state and local health departments and community-based organizations (*1*).

At the end of 2005, a total of 212,579 adults and adolescents in the 37 areas were living with HIV infection (not AIDS). The estimated prevalence of HIV infection (not AIDS) in this group was 136.5 per 100,000 population (*2*). In these areas, 2005 was the first year in which mature HIV surveillance data (i.e., available since at least 2001) could be used to allow for stabilization of data collection and for adjustment of the data to monitor trends. Data from additional areas will be included in analyses when > 4 years of case reports have accrued.

1. CDC. Advancing HIV prevention: new strategies for a changing epidemic---United States, 2003. MMWR 2003;52:329--32.
2. CDC. HIV/AIDS surveillance report, 2005. Atlanta, GA: US Department of Health and Human Services, CDC, Vol. 17; 2006. Available at http://www.cdc.gov/hiv/stats/hasrlink.htm.

## HIV Infection, Pediatric

Appx11270

At the end of 2005, in the 37 areas (33 states, American Samoa, Guam, the Commonwealth of the Northern Mariana Islands, and the U.S. Virgin Islands) that have had laws or regulations since 2001 requiring confidential name-based reporting for children aged <13 years with confirmed HIV infection, an estimated 2,460 children were living with HIV infection. Estimated prevalence of HIV infection (not AIDS) in this group was 7.4 per 100,000 population (1).

1. CDC. HIV/AIDS surveillance report, 2005. Atlanta, GA: US Department of Health and Human Services, CDC, Vol. 17; 2006. Available at http://www.cdc.gov/hiv/stats/hasrlink.htm.

### Influenza-Associated Pediatric Mortality

Early outbreaks of influenza during the 2003--04 season were associated with deaths of children in 31 states, prompting CDC to request that all state, territorial, and local health departments report laboratory-confirmed influenza-associated deaths in children aged <18 years (1,2). During the 2003--04 influenza season, 153 pediatric influenza-associated deaths were reported to CDC by 40 state health departments (3). Histopathologic and immunohistochemical features of fatal influenza virus infection were described in 47 of these children (4). As a result, the Council of State and Territorial Epidemiologists (CSTE) and CDC worked together to draft recommendations for national reporting of pediatric deaths with laboratory confirmation of influenza; these recommendations were approved at the 2004 CSTE annual meeting (5). In October 2004, CDC added influenza-associated pediatric mortality to the list of conditions voluntarily reportable to the National Notifiable Diseases Surveillance System (6). Reporting for this condition began in week 40 (week ending October 9, 2004) of the 2004--05 influenza season. The cumulative year-to-date incidence is published each week in the *MMWR* Table I for low-incidence nationally notifiable diseases.

During 2005, a total of 45 influenza-associated pediatric deaths were reported to CDC by 17 states and New York City, with California reporting 10 deaths. The median age of the deceased children was 5 years (range: 23 days--17 years); 21 (47%) were aged <5 years. Although the majority of deaths occurred in a hospital setting, six children (13%) died outside a hospital setting. Of the 45 children, 31 (69%) had an underlying or chronic condition, and 14 (31%) were previously healthy. Chronic conditions included seizure disorder, prematurity, neurologic disease, neuromuscular disorders, chronic pulmonary disease, immunosuppression, congenital anomalies, and developmental delay. Bacterial coinfections were confirmed in four children. The current recommendations of the Advisory Committee on Immunization Practices (7) highlight the importance of administering 2 doses of influenza vaccine for previously unvaccinated children aged 6 months--<9 years. Continued surveillance of severe influenza-related mortality is important to monitor the impact of influenza and the possible effects of interventions, including influenza vaccination in children.

1. CDC. Update: influenza-associated deaths reported among children aged <18 years---United States, 2003--04 influenza season. MMWR 2004;52:1254--5.
2. CDC. Update: influenza-associated deaths reported among children aged <18 years---United States, 2003--04 influenza season. MMWR 2004;52:1286--8.
3. Bhat N, Wright JG, Broder KR, et al. Influenza-associated deaths among children in the United States, 2003--2004. N Engl J Med 2005;352: 2559--67.

4. Guarner J, Paddock CD, Shieh WJ, et al. Histopathologic and immunohistochemical features of fatal influenza virus infection in children during the 2003--2004 season. Clin Infect Dis 2006;43:132--40.
5. Council of State and Territorial Epidemiologists. Position statement 04-ID-04: influenza-associated pediatric mortality, 2004. Atlanta, GA: Council of State and Territorial Epidemiologists; 2004. Available at http://www.cste.org/ps/2004pdf/04-ID-04-final.pdf.
6. CDC. Mid-year addition of influenza-associated pediatric mortality to the list of nationally notifiable diseases, 2004. MMWR 2004;53:951--2.
7. CDC. Prevention and control of influenza: recommendations of the Advisory Committee on Immunization Practices (ACIP). MMWR 2006;55(No. RR-10).

## Listeriosis

Listeriosis is a rare but severe infection caused by *Listeria monocytogenes* that has been nationally notifiable since 2000. Listeriosis is primarily foodborne and occurs most frequently among persons who are older, pregnant, or immuno-compromised. During 2005, the majority of cases occurred among persons aged $\geq$60 years.

Molecular subtyping of *L. monocytogenes* isolates and sharing of that information through PulseNet (*2*) has enhanced the ability of public health officials to detect and investigate outbreaks of listeriosis. Recent outbreaks have been linked to ready-to-eat deli meat (*1*) and unpasteurized cheese (*3*). During 2005, incidence of listeriosis as reported to FoodNet active surveillance was 0.27 per 100,000 population, representing a decrease of 32% compared with 1996--1998 (*4*).

All clinical isolates should be submitted to state public health laboratories for pulsed-field gel electrophoresis (PFGE) pattern determination, and all persons with listeriosis should be interviewed by a public health official or health-care provider using a standard *Listeria* case form, available at http://www.cdc.gov/foodborneoutbreaks/documents/ListeriaCaseReportFormOMB0920-0004.pdf. Rapid analysis of surveillance data will allow identification of possible food sources of outbreaks. In 2005, an outbreak linked to turkey deli meat was detected by this method (CDC, unpublished data, 2005).

1. Gottlieb SL, Newbern EC, Griffin PM, et al. Multistate outbreak of listeriosis linked to turkey deli meat and subsequent changes in US regulatory policy. Clin Infect Dis 2006;42:29--36.
2. CDC. What is PulseNet? Atlanta, GA: US Department of Health and Human Services, CDC; 2006. Available at http://www.cdc.gov/pulsenet/whatis.htm.
3. MacDonald PDM, Whitwam RE, Boggs JD, et al. Outbreak of listeriosis among Mexican immigrants caused by illicitly produced Mexican-style cheese. Clin Infect Dis 2005;40:677--82.
4. CDC. Foodborne Diseases Active Surveillance Network (FoodNet): FoodNet surveillance report for 2004 (final report). Atlanta, GA: US Department of Health and Human Services, CDC; 2006.

## Measles

Nearly all of confirmed measles cases reported in 2005 were import-associated. Half of all cases occurred among children aged 5--19 years. Overall measles morbidity increased 79% after a record low number of cases in 2004. The increase was the result primarily of an outbreak in Indiana

**Appx11272**

among a group of members of a single church who had not been vaccinated for measles. This outbreak was the largest outbreak in the United States since 1996 and the largest in Indiana since 1990. The source of the outbreak was an unvaccinated U.S. resident who had acquired measles infection while traveling in Romania (*1*). The majority of all cases among U.S. residents can be prevented by following current recommendations for vaccination, including specific guidelines for travelers (*2,3*). Although the elimination of endemic measles in the United States has been achieved, and population immunity remains high (*4*), an outbreak can occur when measles is introduced into a susceptible group. Indiana public health officials estimated that the cost of containing the disease was approximately $168,000 (*5*).

1. CDC. Import-associated measles outbreak---Indiana, May--June 2005. MMWR 2005;54:1073--5.
2. CDC. Preventable measles among U.S. residents, 2001--2004. MMWR 2005;54:817--20.
3. CDC. Measles, mumps, and rubella---vaccine use and strategies for elimination of measles, rubella, and congenital rubella syndrome and control of mumps: recommendations of the advisory committee on immunization practices (ACIP). MMWR 1998;47(No. RR-8).
4. Hutchins SS, Bellini WJ, Coronado V, et al. Population immunity to measles in the United States. J Infect Dis 2004;189(Suppl 1):S91--7.
5. Parker AA, Staggs W, Dayan G, et al. Implications of a 2005 measles outbreak in Indiana for sustained elimination of measles in the United States. N Engl J Med 2006;355:447--55.

## Meningococcal Disease, Invasive

*Neisseria meningitidis* is a leading cause of bacterial meningitis and sepsis in the United States. Despite declining incidence, the case-fatality ratio (10%--14%) remains high, and 11%--19% of survivors have serious health sequelae, including hearing loss, amputations, and cognitive impairment. Rates of meningococcal disease are highest among infants, with a second peak at age 18 years (*1*). The proportion of cases caused by each serogroup of *N. meningitidis* varies by age group. The majority of cases in infants are caused by serogroup B, for which no vaccine is licensed in the United States.

A new tetravalent (A, C, Y, W-135) meningococcal conjugate vaccine ([MCV4] Menactra®; manufactured by Sanofi Pasteur, Swiftwater, Pennsylvania) was licensed in January 2005 for persons aged 11--55 years. CDC's Advisory Committee on Immunization Practices recommends routine vaccination with MCV4 of young adolescents aged 11--12 years, adolescents at high school entry if not vaccinated previously, college freshmen living in dormitories, and other populations at increased risk for meningococcal disease (*1*). The new conjugate vaccine is an important addition to meningococcal disease prevention strategies. Further reductions in meningococcal disease could be achieved with the development of an effective serogroup B vaccine.

1. CDC. Prevention and control of meningococcal disease: recommendations of the Advisory Committee on Immunization Practice (ACIP). MMWR 2005;54(No. RR-7).

## Pertussis

In 2005, incidence of reported pertussis remained stable at 8.7 cases per 100,000 population after doubling during 2003--2004. Infants aged <6 months, who are too young to be fully vaccinated, had the highest reported rate of pertussis (160.81 per 100,000 population), but adolescents aged 10-19 years and adults aged $\geq$20 years contributed the greatest number of reported cases (60%).

Adolescents and adults might be a source of transmission of pertussis to young infants who are at higher risk for severe disease and death (*1*). In addition to routine use of tetanus toxoid, reduced diphtheria toxoid, and acellular pertussis vaccine (Tdap) in adolescents aged 11--18 years as recommended by the Advisory Committee on Immunization Practices (ACIP) in 2005, ACIP recommends use of Tdap for a single dose to replace the next dose of Td for adults aged 19--64 years (*2*,*3*). Use of Tdap also is recommended for certain populations of adults, including health-care workers and persons in close contact with infants aged <12 months (*3*,*4*).

1. Bisgard KM, Pascual FB, Ehresmann KR, et al. Infant pertussis: who was the source? Pediatr Infect Dis J 2004;23:985--9.
2. CDC. Preventing tetanus, diphtheria, and pertussis among adolescents; use of tetanus toxoid, reduced diphtheria toxoid, and acellular pertussis vaccines; recommendations of the Advisory Committee on Immunization Practices (ACIP). MMWR 2006;55(No. RR-3).
3. CDC. ACIP votes to recommend use of combined tetanus, diphtheria and pertussis (Tdap) vaccine for adults. Atlanta, GA: US Department of Health and Human Services, CDC; 2006. Available at http://www.cdc.gov/nip/vaccine/tdap/tdap_adult_recs.pdf.
4. CDC. Prevention of tetanus, diphtheria and pertussis among pregnant women: provisional ACIP recommendations for the use of Tdap vaccine. Atlanta, GA: US Department of Health and Human Services, CDC; 2006. Available at http://www.cdc.gov/nip/recs/provisional_recs/tdap-preg.pdf.

## Poliomyelitis, Paralytic

In 2005, an imported case of vaccine-associated paralytic poliomyelitis (VAPP) was reported to the National Notifiable Diseases Surveillance System. In addition, type 1 vaccine-derived poliovirus (VDPV) infections were reported to CDC. The VAPP case occurred in an unvaccinated U.S. college student aged 22 years who was residing temporarily in Costa Rica, where she likely was exposed through contact with an infant who had recently been vaccinated with oral polio vaccine (OPV) (*1*). Although the risk is extremely low, health-care providers should be aware of contact VAPP; be alert to the diagnosis of polio, especially in unvaccinated persons with onset of acute flaccid paralysis; and obtain stool cultures for poliovirus testing. Electrodiagnostic studies can assist in differentiating polio from demyelinating conditions such as Guillain-Barré syndrome. The VDPV infections occurred among an Amish population in Minnesota. The index case-patient was an Amish infant with severe combined immune deficiency who underwent stool culture examination for diarrhea and failure to thrive. Community investigations demonstrated circulation of VDPV infection in the local Amish community but not in other related communities in the United States and Canada. No cases of paralytic disease or other clinically compatible illnesses caused by poliovirus were identified (*2*). VDPVs emerge from OPV viruses as a result of continuous replication in immune-deficient persons or their circulation in populations with low vaccination coverage. Because OPV has not been used in the United States since 2000 and in Canada since 1997, the original source of the VPDV infection was likely a person who received OPV in another country. Both situations highlight the risks for U.S. citizens of not being vaccinated and the importance of continued polio surveillance.

1. CDC. Imported vaccine-associated paralytic poliomyelitis---United States, 2005. MMWR 2006;55:97--9.
2. CDC. Poliovirus infections in four unvaccinated children---Minnesota, August--October 2005. MMWR 2005;54:1053--5.

## Rabies

During 2005, the majority (92%) of animal rabies cases were reported in wild animal species. Overall, 6.2% fewer cases of animal rabies were reported in 2005 compared with 2004 (*1*). In the United States, five animal species are recognized as reservoir species for various rabies virus variants over defined geographic regions: raccoons (eastern United States), skunks (north and south central United States and California), bats (various species in all U.S. states except Hawaii), foxes (in Alaska, Arizona, and Texas), and mongoose (in Puerto Rico). The reported number of cases decreased among all wildlife species, except bats and mongooses. Reported cases of rabies in domestic animals remain low in part because of high vaccination rates. As in the preceding decade, cats were the most commonly reported domestic animal with rabies during 2005. Vaccination programs to control rabies in wild carnivores were ongoing through the distribution of baits containing an oral rabies vaccine in the eastern United States and Texas. Oral rabies vaccination programs in Texas have demonstrated continued success (*2*). These programs appear to have eliminated a rabies virus variant associated with coyotes and dogs along the U.S.-Mexico border and have reduced the area affected by a variant associated with gray foxes. No cases associated with the coyote/dog variant and few cases of the gray fox variant were reported during 2005. Oral rabies vaccination programs also are being conducted in the eastern United States in an attempt to stop the westward spread of the raccoon rabies virus variant. Active surveillance efforts conducted by the United States Department of Agriculture (USDA) to monitor oral rabies vaccination programs were further enhanced by USDA's use of the Direct Rapid Immunohistochemical Test (DRIT) in the second half of 2005 after training at CDC. This test is used for screening samples collected by USDA, reducing the burden on state laboratories, and permitting faster processing of surveillance samples (*3*). One case of rabies was identified in a human in Mississippi during 2005. This case was identified retrospectively after the Mississippi Department of Health submitted samples to CDC's unexplained deaths project (*4*).

1. Krebs JW, Mandel EJ, Swerdlow DL, et al. Rabies surveillance in the United States during 2004. J Am Vet Med Assoc 2005;227:1912--25.
2. Sidwa TJ, Wilson PJ, Moore GM, et al. Evaluation of oral rabies vaccination programs for control of rabies epizootics in coyotes and gray foxes: 1995--2003. J Am Vet Med Assoc 2005;227:785--92.
3. Lembo T, Niezgoda M, Hamir AN, et al. Evaluation of a direct, rapid immunohistochemical test for rabies diagnosis. Emerg Infect Dis 2006;12:310--3.
4. CDC. Human rabies---Mississippi, 2005. MMWR 2006;55:207--8.

## Salmonellosis

During 2005, as in previous years, the majority of salmonellosis cases occurred among persons aged <5 years. Since 1993, the most frequently reported isolates have been *Salmonella enterica* serotype Typhimurium and *S. enterica* serotype Enteritidis (*1*). The epidemiology of *Salmonella* has been changing. *S. enterica* serotype Typhimurium has decreased in incidence, while the incidence of serotypes Newport, Mississippi, and Javiana have increased. Specific control programs (e.g., farm-based egg--quality assurance programs) have led to reduction of serotype Enteritidis infections, which have been associated with the consumption of internally contaminated eggs. Rates of antibiotic resistance among certain serotypes have been increasing: a substantial proportion of serotypes Typhimurium and Newport isolates are resistant to multiple drugs (*2*).

The epidemiology of *Salmonella* infections is based on serotype characterization, and in 2005, the Council of State and Territorial Epidemiologists adopted a position statement for serotype-specific reporting of laboratory confirmed salmonellosis cases (*3*). However, reporting through the National Notifiable Diseases Surveillance System (NNDSS) does not include serotype, and for users of NNDSS, serotype for *Salmonella* isolates are reported through the Public Health Laboratory Information System (PHLIS). NEDSS or compatible systems eventually will replace PHLIS; users of NEDSS or compatible systems should report serotype in NEDSS.

1. CDC. *Salmonella* surveillance summary, 2004. Atlanta, GA: US Department of Health and Human Services, CDC; 2005. Available at http://www.cdc.gov/ncidod/dbmd/phlisdata/salmonella.htm.
2. CDC. National Antimicrobial Resistance Monitoring System for enteric bacteria (NARMS): 2003 human isolates, final report. Atlanta, GA: US Department of Health and Human Services, CDC; 2006.
3. Council of State and Territorial Epidemiologists. Position statement: serotype specific national reporting for salmonellosis. Atlanta, GA: Council of State and Territorial Epidemiologists; 2005. Available at http://www.cste.org/PS/2005pdf/final2005/05-ID-09final.pdf.

## Shigellosis

The approximately 16,000 cases of shigellosis reported to CDC in 2005 represent an increase over the all-time low of approximately 14,000 cases reported in 2004. Reported annual totals during 1978--2003, with the exception of 2004, have consistently exceeded 17,000 cases. *Shigella sonnei* infections continue to account for >75% of shigellosis in the United States (*1,2*). In 2005, a strain of *S. sonnei* resistant to ampicillin and trimethoprim-sulfamethoxazole emerged as a cause of prolonged, community-wide outbreaks of shigellosis associated with day care centers in three states (*3*). Antimicrobial treatment options for children infected with this strain are limited and include oral azithromycin, "off-label" use of fluoroquinolones, or intramuscular agents such as ceftriaxone (*3,4*). In addition to spread from one person to another, shigellae can be transmitted through contaminated foods, sexual contact, and water used for drinking or recreational purposes (*1*).

1. Gupta A, Polyak CS, Bishop RD, Sobel J, Mintz ED. Laboratory-confirmed shigellosis in the United States, 1989--2002: epidemiologic trends and patterns. Clin Infect Dis 2004;38:1372--7.
2. Shane A, Crump J, Tucker N, Painter J, Mintz E. Sharing *Shigella*: risk factors and costs of a multi-community outbreak of shigellosis. Arch Pediatr Adolesc Med 2003;157:601--3.
3. CDC. Outbreaks of multidrug-resistant *Shigella sonnei* gastroenteritis associated with day care centers---Kansas, Kentucky, and Missouri, 2005. MMWR 2006;55:1068--71.
4. Sivapalasingam S, Nelson JM, Joyce K, Hoekstra M, Angulo FJ, Mintz ED. A high prevalence of antimicrobial resistance among *Shigella* isolates in the United States, 1999--2002. Antimicrob Agents Chemother 2006;50:49--54.

## Syphilis, Primary and Secondary

In 2005, primary and secondary syphilis cases reported to CDC increased for the fifth consecutive year (*1*). The overall increase in 2005 was 9.3%. Although the rate of syphilis infection increased mostly among men, for the first time in > 10 years, the rate also increased among women. Rates increased among black, white, and Hispanic men and women. In collaboration with partners

throughout the United States, CDC updated the Syphilis Elimination Plan for 2005--2010 and is now working to implement it (*2*).

1. CDC. Sexually transmitted disease surveillance, 2005. Atlanta, GA: US Department of Health and Human Services, CDC; 2006. Available at http://www.cdc.gov/std/stats/toc2005.htm.
2. CDC. The National Plan to Eliminate Syphilis from the United States. Atlanta, GA: US Department of Health and Human Services, CDC; 2006.

## Tetanus

Rates of reported tetanus in 2005 (0.095 cases per 1 million population) continue at historically low levels. Two fatalities were attributed to tetanus in 2005: a woman aged 94 years who had never received tetanus toxoid vaccination, and a woman aged 73 years with an unknown vaccination history. The majority (85%) of tetanus cases occurred among persons aged >25 years; 44% occurred among persons aged 25--59 years, and 41% occurred among persons aged > 60 years. No neonatal cases were reported.

## Tularemia

In the United States, tularemia is caused by two subspecies of *Francisella tularensis*: subspecies *tularensis* (type A) and subspecies *holarctica* (type B). A recent analysis combining national surveillance data with laboratory testing demonstrated marked differences in the demographic and geographic distribution of type A and type B infections (*1*). Patients with type A infections were younger and less likely to have a reported immunocompromising condition than patients with type B infections. Type A infections were predominant on the eastern seaboard, in and around Arkansas and Oklahoma, and from the Rocky Mountains in Colorado west to the Sierra Nevada mountains in California. Infections reported from the northern Pacific Coast and along tributaries of the Mississippi River typically were type B. Further subtyping of type A isolates by pulsed-field gel electrophoresis identified two distinct genetic groups, one causing infections east of the 100th meridian (East) and the other to the west (West). Mortality among patients with type A-East infections was 14%, compared with 9% for patients with type B infections, and 0 for patients with type A-West infections. To define the epidemiology of tularemia in the United States further, CDC encourages reporting of cases and submission of *F. tularensis* isolates to the CDC laboratory in Fort Collins, Colorado.

1. Staples JE, Kubota KA, Chalcraft LG, Mead PS, Petersen JM. Epidemiologic and molecular analysis of human tularemia, United States, 1964--2004. Emerg Infect Dis 2006;12:1113--8.

## Typhoid Fever

In 2005, the number of cases of typhoid fever in the United States reported to CDC remained essentially stable. Despite recommendations that travelers to countries in which typhoid fever is endemic should be vaccinated with either of two effective vaccines available in the United States, approximately three fourths of all cases occur among persons who report international travel during the preceding month. Persons visiting friends and relatives in south Asia appear to be at particular risk, even during short visits (*1,2*). *Salmonella* Typhi strains with decreased susceptibility to ciprofloxacin are increasingly frequent in that region and might require treatment with alternative

antimicrobial agents (*3*). In 2005, the first case of truly ciprofloxacin-resistant *S. Typhi* infection in the United States was identified. Cases of paratyphoid fever caused by *Salmonella* Paratyphi A make up an increasing proportion of all cases of enteric fever diagnosed in the United States (CDC, unpublished data, 2006). During 2004--2005, patients with paratyphoid fever were even more likely than those patients with typhoid fever to have acquired their infections in south Asia and to be infected with fluoroquinolone-resistant strains.

1. Steinberg EB, Bishop RB, Dempsey AF, et al. Typhoid fever in travelers: who should be targeted for prevention? Clin Infect Dis 2004;39:186--91.
2. Olsen SJ, Bleasdale SC, Magnano AR, et al. Outbreaks of typhoid fever in the United States, 1960--1999. Epidemiol Infect 2003;130:13--21.
3. Crump J, Barrett TJ, Nelson JT, Angulo FJ. Reevaluating fluoroquinolones breakpoints for *Salmonella enterica* serotype Typhi and for non-Typhi *Salmonellae*. Clin Infect Dis 2003;37:75--81.

## Varicella (Chickenpox)

In 2003, varicella infection was again added to the nationally notifiable disease list with the recommendation that states implement statewide individual case reporting by 2005 (*1*). The objectives of varicella surveillance at state and national levels are to monitor the impact of the varicella vaccination program on the epidemiology of varicella by person (e.g., age, vaccination status, and severity), place, and time, and to evaluate vaccine policy. As of 2005, a total of 30 states and the District of Columbia were conducting either statewide or sentinel case-based surveillance for varicella.

1. Council of State and Territorial Epidemiologists. CSTE position statement 02-ID-06: varicella surveillance. Atlanta, GA: Council of State and Territorial Epidemiologists; 2003. Available at http://www.cste.org/position%20statements/02-ID-06.pdf.

## Part 1
## Summaries of Notifiable Diseases in the United States, 2005

TABLE 1. Reported cases of notifiable diseases,* by month — United States, 2005

| Disease | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AIDS† | 2,905 | 2,695 | 4,274 | 3,130 | 3,255 | 3,877 | 3,631 | 3,219 | 3,353 | 3,963 | 2,943 | 3,875 | 41,120 |
| Botulism | | | | | | | | | | | | | |
| foodborne | 1 | — | — | — | — | 1 | 2 | 9 | 1 | — | 2 | 3 | 19 |
| infant | 4 | 4 | 5 | 4 | 10 | 10 | 9 | 8 | 8 | 10 | 3 | 10 | 85 |
| other (wound & unspecified) | 1 | 1 | 1 | 3 | 3 | 1 | 1 | 4 | 3 | 5 | 2 | 6 | 31 |
| Brucellosis | 3 | 8 | 8 | 11 | 12 | 8 | 13 | 14 | 7 | 12 | 9 | 15 | 120 |
| Chancroid§ | 2 | 2 | 2 | 2 | 1 | 1 | — | — | — | 1 | 2 | 4 | 17 |
| Chlamydia¶¶ | 67,989 | 76,735 | 76,283 | 91,530 | 75,649 | 72,200 | 91,765 | 75,576 | 71,290 | 94,206 | 70,134 | 113,088 | 976,445 |
| Cholera | — | — | — | — | — | 1 | — | — | 2 | — | 2 | 1 | 8 |
| Coccidioidomycosis | 360 | 335 | 251 | 304 | 326 | 295 | 328 | 510 | 319 | 584 | 565 | 2,365 | 6,542 |
| Cryptosporidiosis | 129 | 138 | 147 | 212 | 175 | 179 | 364 | 947 | 1,495 | 874 | 354 | 615 | 5,659 |
| Cyclosporiasis | 2 | 2 | 6 | 44 | 229 | 123 | 79 | 20 | 7 | 2 | 13 | 16 | 543 |
| Domestic arboviral diseases** | | | | | | | | | | | | | |
| California serogroup | | | | | | | | | | | | | |
| neuroinvasive | — | — | — | 1 | 1 | 5 | 15 | 20 | 20 | 11 | — | — | 73 |
| nonneuroinvasive | — | — | — | — | — | — | 1 | 5 | 1 | — | — | — | 7 |
| eastern equine, neuroinvasive | — | — | — | — | — | 2 | 4 | 11 | 3 | 1 | — | — | 21 |
| Powassan, neuroinvasive | — | — | — | — | — | — | — | 1 | — | — | — | — | 1 |
| St. Louis | | | | | | | | | | | | | |
| neuroinvasive | — | — | — | — | — | — | — | 1 | 5 | — | 1 | — | 7 |
| nonneuroinvasive | — | — | — | — | — | 1 | 1 | 1 | 3 | — | — | — | 6 |
| West Nile | | | | | | | | | | | | | |
| neuroinvasive | — | — | 1 | — | 1 | 21 | 191 | 590 | 407 | 91 | 6 | 1 | 1,309 |
| nonneuroinvasive | 1 | 1 | 1 | 1 | 10 | 39 | 326 | 849 | 402 | 54 | 7 | — | 1,691 |
| Ehrlichiosis | | | | | | | | | | | | | |
| human granulocytic | — | 4 | 7 | 29 | 36 | 97 | 175 | 96 | 96 | 68 | 32 | 146 | 786 |
| human monocytic | 4 | 5 | 10 | 8 | 16 | 35 | 87 | 66 | 72 | 59 | 34 | 110 | 506 |
| human (other & unspecified) | 2 | 2 | 2 | 1 | 5 | 23 | 38 | 10 | 9 | 10 | 2 | 8 | 112 |
| Enterohemorrhagic | | | | | | | | | | | | | |
| Escherichia coli infection | | | | | | | | | | | | | |
| O157:H7 | 58 | 73 | 87 | 127 | 116 | 190 | 317 | 338 | 367 | 451 | 181 | 316 | 2,621 |
| Shiga toxin-positive | | | | | | | | | | | | | |
| non-O157 | 13 | 17 | 14 | 18 | 22 | 29 | 58 | 53 | 55 | 68 | 31 | 123 | 501 |
| not serogrouped | 14 | 11 | 8 | 22 | 19 | 12 | 29 | 62 | 56 | 61 | 26 | 87 | 407 |
| Giardiasis | 1,047 | 1,179 | 1,284 | 1,579 | 1,242 | 1,261 | 1,899 | 1,916 | 2,096 | 2,464 | 1,365 | 2,401 | 19,733 |
| Gonorrhea§ | 25,339 | 24,520 | 24,706 | 29,739 | 23,995 | 24,610 | 33,106 | 27,189 | 26,335 | 33,221 | 25,012 | 41,821 | 339,593 |
| Haemophilus influenzae, invasive disease | | | | | | | | | | | | | |
| all ages, serotypes | 182 | 205 | 220 | 255 | 208 | 192 | 188 | 113 | 146 | 158 | 129 | 308 | 2,304 |
| age <5 yrs | | | | | | | | | | | | | |
| serotype b | — | — | — | 1 | 1 | 1 | — | — | — | 2 | — | 3 | 9 |
| nonserotype b | 3 | 15 | 19 | 9 | 10 | 9 | 10 | 13 | 11 | 16 | 3 | 17 | 135 |
| unknown serotype | 14 | 24 | 24 | 22 | 17 | 16 | 13 | 20 | 14 | 13 | 13 | 27 | 217 |
| Hansen disease (leprosy) | 2 | 2 | 4 | 6 | 5 | 19 | 6 | 6 | 3 | 7 | 3 | 24 | 87 |
| Hantavirus pulmonary syndrome | — | 2 | — | 1 | 4 | 5 | 5 | 2 | 3 | 1 | 1 | 2 | 26 |
| Hemolytic uremic syndrome, postdiarrheal | 4 | 11 | 9 | 17 | 10 | 17 | 17 | 33 | 22 | 24 | 10 | 47 | 221 |
| Hepatitis, viral, acute | | | | | | | | | | | | | |
| A | 267 | 331 | 278 | 337 | 262 | 276 | 344 | 362 | 482 | 498 | 272 | 779 | 4,488 |
| B | 331 | 382 | 341 | 469 | 343 | 337 | 468 | 352 | 367 | 454 | 334 | 941 | 5,119 |
| C | 33 | 32 | 39 | 47 | 38 | 50 | 63 | 45 | 58 | 70 | 42 | 135 | 652 |

* No cases of anthrax; diphtheria; domestic arboviral disease, western equine encephalitis virus, neuroinvasive and nonneuroinvasive, eastern equine nonneuroinvasive, and Powassan nonneuroinvasive; severe acute respiratory syndrome–associated coronavirus (SARS-CoV) disease; smallpox; or yellow fever were reported in 2005. Data on chronic hepatitis B and hepatitis C virus infection (past or present) are not included because they are undergoing data quality review. Data on human immunodeficiency virus (HIV) infections are not included because HIV infection reporting has been implemented on different dates and using different methods than for acquired immunodeficiency syndrome (AIDS) case reporting.

† Total number of AIDS cases reported to the Division of HIV/AIDS Prevention, National Center for HIV/AIDS, Viral Hepatitis, STD, and TB Prevention (NCHHSTP) (proposed), through December 31, 2005.

§ Totals reported to the Division of STD Prevention, NCHHSTP (proposed), as of May 5, 2006.

¶ Chlamydia refers to genital infections caused by Chlamydia trachomatis.

** Totals reported to the Division of Vector-Borne Infectious Diseases, National Center for Zoonotic, Vector-Borne, and Enteric Diseases (NCZVED) (proposed) (ArboNET Surveillance), as of June 29, 2006.

Appx11279

**TABLE 1. (Continued) Reported cases of notifiable diseases,* by month — United States, 2005**

| Disease | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Influenza-associated pediatric mortality†† | 4 | 10 | 10 | 4 | 4 | 3 | 3 | 1 | 1 | — | 1 | 4 | 45 |
| Legionellosis | 95 | 76 | 78 | 88 | 96 | 141 | 348 | 250 | 284 | 319 | 222 | 304 | 2,301 |
| Listeriosis | 40 | 34 | 42 | 47 | 38 | 54 | 114 | 109 | 98 | 130 | 79 | 111 | 896 |
| Lyme disease | 448 | 377 | 470 | 592 | 784 | 2,293 | 5,929 | 3,965 | 2,124 | 1,957 | 1,211 | 3,185 | 23,305 |
| Malaria | 105 | 79 | 80 | 99 | 90 | 118 | 173 | 150 | 146 | 127 | 96 | 231 | 1,494 |
| Measles | 3 | 4 | 3 | 5 | 1 | 2 | 33 | 2 | 4 | — | 3 | 6 | 66 |
| Meningococcal disease, invasive |  |  |  |  |  |  |  |  |  |  |  |  |  |
| all serogroups | 102 | 121 | 142 | 129 | 108 | 115 | 82 | 55 | 59 | 81 | 78 | 173 | 1,245 |
| serogroup A, C, Y, & W-135 | 26 | 31 | 39 | 34 | 29 | 30 | 15 | 14 | 14 | 17 | 16 | 32 | 297 |
| serogroup B | 12 | 12 | 16 | 16 | 10 | 16 | 11 | 4 | 8 | 12 | 6 | 33 | 156 |
| other serogroup | 5 | 4 | 3 | 4 | 2 | 2 | 1 | 2 | 1 | — | 1 | 2 | 27 |
| serogroup unknown | 59 | 74 | 84 | 75 | 67 | 67 | 55 | 35 | 36 | 52 | 55 | 106 | 765 |
| Mumps | 18 | 28 | 19 | 25 | 26 | 26 | 27 | 52 | 15 | 19 | 23 | 36 | 314 |
| Pertussis | 1,724 | 1,630 | 1,196 | 1,598 | 1,816 | 1,818 | 2,508 | 2,137 | 1,974 | 2,584 | 1,879 | 4,752 | 25,616 |
| Plague | — | — | — | — | 2 | — | 2 | 1 | 2 | — | — | 1 | 8 |
| Poliomyelitis, paralytic§§ | — | — | — | — | — | — | — | — | — | 1 | — | — | 1 |
| Psittacosis | — | 1 | — | 5 | — | 1 | 4 | 1 | 1 | 1 | — | 2 | 16 |
| Q fever | 6 | 2 | 6 | 10 | 14 | 24 | 19 | 14 | 12 | 14 | 3 | 12 | 136 |
| Rabies |  |  |  |  |  |  |  |  |  |  |  |  |  |
| animal | 485 | 291 | 464 | 732 | 551 | 466 | 565 | 582 | 550 | 525 | 352 | 372 | 5,915 |
| human | 1 | — | — | — | — | — | — | — | 1 | — | — | — | 2 |
| Rocky Mountain spotted fever | 41 | 40 | 35 | 57 | 81 | 185 | 243 | 290 | 234 | 192 | 168 | 370 | 1,936 |
| Rubella | — | 1 | 1 | 2 | 1 | 1 | 2 | 1 | — | — | — | 2 | 11 |
| Rubella, congenital syndrome | — | — | 1 | — | — | — | — | — | — | — | — | — | 1 |
| Salmonellosis | 1,745 | 1,730 | 2,009 | 2,731 | 3,154 | 3,777 | 5,585 | 5,149 | 5,016 | 5,589 | 3,384 | 5,453 | 45,322 |
| Shigellosis | 655 | 790 | 918 | 1,071 | 1,092 | 1,195 | 1,574 | 1,485 | 1,641 | 2,060 | 1,322 | 2,365 | 16,168 |
| Streptococcal disease, invasive, group A | 345 | 421 | 469 | 600 | 436 | 362 | 378 | 260 | 215 | 294 | 265 | 670 | 4,715 |
| Streptococcal toxic-shock syndrome | 13 | 14 | 22 | 31 | 12 | 9 | 6 | 3 | 2 | 2 | 5 | 10 | 129 |
| Streptococcus pneumoniae, invasive disease |  |  |  |  |  |  |  |  |  |  |  |  |  |
| drug resistant, all ages | 223 | 268 | 335 | 371 | 263 | 207 | 161 | 93 | 99 | 161 | 194 | 621 | 2,996 |
| age <5 yrs | 94 | 112 | 167 | 164 | 155 | 118 | 80 | 48 | 45 | 103 | 117 | 292 | 1,495 |
| Syphilis¶¶ |  |  |  |  |  |  |  |  |  |  |  |  |  |
| all stages*** | 2,056 | 2,370 | 2,489 | 3,992 | 2,660 | 2,662 | 3,156 | 2,631 | 2,326 | 3,268 | 2,429 | 3,839 | 33,278 |
| congenital (age <1 yr) | 25 | 32 | 25 | 26 | 27 | 36 | 28 | 24 | 28 | 21 | 20 | 37 | 329 |
| primary & secondary | 532 | 612 | 562 | 880 | 698 | 675 | 830 | 716 | 592 | 916 | 672 | 1,039 | 8,724 |
| Tetanus | — | 2 | 3 | 1 | 3 | 3 | 3 | 1 | 2 | 2 | 1 | 6 | 27 |
| Toxic-shock syndrome | 8 | 6 | 7 | 6 | 8 | 10 | 9 | 6 | 8 | 1 | 3 | 18 | 90 |
| Trichinellosis | 1 | — | — | 1 | 1 | 2 | 5 | 2 | 2 | — | — | 2 | 16 |
| Tuberculosis††† | 589 | 799 | 1,116 | 1,036 | 1,103 | 1,334 | 1,110 | 1,174 | 1,231 | 1,146 | 1,150 | 2,309 | 14,097 |
| Tularemia | 1 | — | 2 | 3 | 7 | 31 | 24 | 26 | 18 | 20 | 4 | 18 | 154 |
| Typhoid fever | 20 | 10 | 19 | 25 | 17 | 24 | 32 | 29 | 39 | 51 | 14 | 44 | 324 |
| Vancomycin-intermediate Staphylococcus aureus | — | — | — | — | — | — | — | — | 1 | — | 1 | — | 2 |
| Vancomycin-resistant Staphylococcus aureus | — | — | — | — | — | — | — | — | — | 1 | — | — | 3 |
| Varicella (chickenpox) | 1,869 | 2,261 | 2,851 | 3,180 | 2,813 | 2,401 | 1,776 | 1,211 | 1,363 | 3,167 | 2,924 | 6,426 | 32,242 |
| Varicella (deaths)§§§ | — | — | — | 1 | 1 | — | — | — | — | — | — | — | 3 |

†† Totals reported to the Influenza Division, National Center for Immunization and Respiratory Diseases (NCIRD) (proposed), as of December 31, 2005.
§§ Cases of vaccine-associated paralytic polio (VAPP) caused by polio vaccine virus.
¶¶ Totals reported to the Division of STD Prevention, NCHHSTP (proposed), as of May 6, 2006.
*** Includes the following categories: primary, secondary, latent (including early latent, late latent, and latent syphilis of unknown duration), neurosyphilis, late (including late syphilis with clinical manifestations other than neurosyphilis), and congenital syphilis.
††† Totals reported to the Division of TB Elimination, NCHHSTP (proposed), as of May 12, 2006.
§§§ Death counts provided by the Division of Viral Diseases, NCIRD (proposed), as of December 31, 2005.

TABLE 2. Reported cases of notifiable diseases,* by geographic division and area — United States, 2005

| Area | Total resident population (in thousands) | AIDS[†] | Botulism | | | Brucellosis | Chancroid[¶] |
|---|---|---|---|---|---|---|---|
| | | | Foodborne | Infant | Other[§] | | |
| United States | 293,655 | 41,120** | 19 | 85 | 31 | 120 | 17 |
| New England | 14,238 | 1,546 | — | 1 | — | 2 | 1 |
| Connecticut | 3,504 | 674 | — | — | — | — | — |
| Maine | 1,317 | 22 | — | — | — | 1 | — |
| Massachusetts | 6,416 | 716 | — | — | — | 1 | 1 |
| New Hampshire | 1,299 | 37 | — | 1 | — | 1 | — |
| Rhode Island | 1,081 | 90 | — | — | — | — | — |
| Vermont | 621 | 7 | — | — | — | — | — |
| Mid. Atlantic | 40,332 | 9,150 | 2 | 15 | 4 | 12 | 1 |
| New Jersey | 8,699 | 1,276 | 2 | 7 | — | 1 | — |
| New York (Upstate) | 11,123 | 1,516 | — | — | — | 4 | — |
| New York City | 8,104 | 4,834 | — | — | 4 | 6 | 1 |
| Pennsylvania | 12,406 | 1,524 | — | 8 | — | 1 | — |
| E.N. Central | 46,033 | 4,102 | 2 | 1 | — | 19 | 1 |
| Illinois | 12,714 | 1,938 | 1 | 1 | — | 13 | — |
| Indiana | 6,238 | 414 | — | — | — | — | — |
| Michigan | 10,113 | 829 | 1 | — | — | 1 | — |
| Ohio | 11,459 | 796 | — | — | — | 2 | 1 |
| Wisconsin | 5,509 | 125 | — | — | — | 3 | — |
| W.N. Central | 19,697 | 890 | — | 1 | 1 | 7 | — |
| Iowa | 2,954 | 95 | — | — | — | 1 | — |
| Kansas | 2,735 | 110 | — | — | — | 1 | — |
| Minnesota | 5,101 | 223 | — | — | — | 1 | — |
| Missouri | 5,755 | 384 | — | 1 | — | 1 | — |
| Nebraska | 1,747 | 49 | — | — | — | 3 | — |
| North Dakota | 634 | 10 | — | — | — | — | — |
| South Dakota | 771 | 19 | — | — | 1 | — | — |
| S. Atlantic | 55,182 | 12,223 | 1 | 9 | — | 15 | 6 |
| Delaware | 830 | 177 | — | 2 | — | 2 | — |
| District of Columbia | 554 | 708 | — | — | — | 1 | — |
| Florida | 17,397 | 5,055 | — | 1 | — | 3 | 1 |
| Georgia | 8,829 | 2,306 | — | — | — | 3 | — |
| Maryland | 5,558 | 1,596 | — | 5 | — | 1 | — |
| North Carolina | 8,541 | 945 | 1 | — | — | 3 | 5 |
| South Carolina | 4,198 | 621 | — | — | — | 1 | — |
| Virginia | 7,460 | 649 | — | 1 | — | 1 | — |
| West Virginia | 1,815 | 76 | — | — | — | — | — |
| E.S. Central | 17,480 | 2,031 | — | 2 | — | 1 | — |
| Alabama | 4,530 | 523 | — | 1 | — | 1 | — |
| Kentucky | 4,146 | 267 | — | 1 | — | — | — |
| Mississippi | 2,903 | 390 | — | — | — | — | — |
| Tennessee | 5,901 | 851 | — | — | — | — | — |
| W.S. Central | 33,283 | 4,654 | 1 | 3 | 1 | 21 | 5 |
| Arkansas | 2,753 | 242 | — | — | — | — | — |
| Louisiana | 4,516 | 976 | — | 1 | — | 3 | 4 |
| Oklahoma | 3,524 | 284 | 1 | 1 | — | 1 | — |
| Texas | 22,490 | 3,152 | — | 1 | 1 | 17 | 1 |
| Mountain | 19,709 | 1,562 | — | 8 | 2 | 12 | 2 |
| Arizona | 5,744 | 645 | — | 1 | 1 | 5 | 1 |
| Colorado | 4,601 | 364 | — | 1 | — | 3 | — |
| Idaho | 1,393 | 26 | — | 1 | — | — | — |
| Montana | 927 | 20 | — | — | 1 | — | — |
| Nevada | 2,335 | 296 | — | 1 | — | 1 | — |
| New Mexico | 1,903 | 139 | — | — | — | 1 | — |
| Utah | 2,389 | 66 | — | 3 | — | — | — |
| Wyoming | 507 | 6 | — | — | — | 2 | 1 |
| Pacific | 47,611 | 4,962 | 13 | 45 | 23 | 31 | 1 |
| Alaska | 655 | 29 | 9 | — | — | 1 | — |
| California | 35,894 | 4,117 | 4 | 41 | 22 | 26 | 1 |
| Hawaii | 1,263 | 110 | — | — | — | 3 | — |
| Oregon | 3,596 | 220 | — | 2 | — | 1 | — |
| Washington | 6,204 | 486 | — | 2 | 1 | — | — |
| American Samoa | 58 | — | — | — | — | — | — |
| C.N.M.I. | 78 | 2 | — | — | — | — | — |
| Guam | 166 | 2 | — | — | — | — | — |
| Puerto Rico | 3,895 | 139 | — | — | N | — | 3 |
| U.S. Virgin Islands | 109 | 17 | — | — | — | — | — |

N: Not notifiable.    U: Unavailable.    —: No reported cases.    C.N.M.I.: Commonwealth of Northern Mariana Islands.
* No cases of anthrax; diphtheria; domestic arboviral disease, western equine encephalitis virus, neuroinvasive and nonneuroinvasive, eastern equine encephalitis virus, neuroinvasive and nonneuroinvasive; Powassan nonneuroinvasive; severe acute respiratory syndrome–associated coronavirus (SARS-CoV) disease; smallpox; or yellow fever were reported in 2005. Data on chronic hepatitis B and hepatitis C virus infection (past or present) are not included because they are undergoing data quality review. Data on human immunodeficiency virus (HIV) infections are not included because HIV infection reporting has been implemented on different dates and using different methods than for AIDS case reporting.
† Total number of acquired immunodeficiency syndrome (AIDS) cases reported to the Division of HIV/AIDS Prevention, National Center for HIV/AIDS, Viral Hepatitis, STD, and TB Prevention (NCHHSTP) (proposed), through December 31, 2005.
§ Includes cases reported as wound and unspecified botulism.
¶ Totals reported to the Division of STD Prevention, NCHHSTP (proposed), as of May 5, 2006.
** Includes 209 cases of AIDS in persons with unknown state or area of residence that were reported in 2005.

Appx11281

TABLE 2. (*Continued*) Reported cases of notifiable diseases,* by geographic division and area — United States, 2005

| Area | Chlamydia†† | Cholera | Coccidioidomycosis | Cryptosporidiosis | Cyclosporiasis |
|---|---|---|---|---|---|
| **United States** | 976,445 | 8 | 6,542 | 5,659 | 543 |
| **New England** | 33,772 | — | — | 362 | 58 |
| Connecticut | 11,039 | — | N | 84 | 35 |
| Maine | 2,254 | — | N | 30 | N |
| Massachusetts | 14,411 | — | — | 152 | 22 |
| New Hampshire | 1,842 | — | — | 38 | — |
| Rhode Island | 3,269 | — | — | 19 | 1 |
| Vermont | 957 | — | N | 39 | N |
| **Mid. Atlantic** | 120,370 | 1 | — | 1,595 | 53 |
| New Jersey | 19,152 | — | N | 58 | 12 |
| New York (Upstate) | 25,313 | 1 | N | 1,131 | 20 |
| New York City | 38,653 | — | N | 148 | 21 |
| Pennsylvania | 37,251 | — | N | 258 | N |
| **E.N. Central** | 173,619 | 2 | 10 | 1,417 | 15 |
| Illinois | 50,559 | — | — | 158 | 9 |
| Indiana | 20,063 | — | N | 94 | 1 |
| Michigan | 38,730 | 2 | 10 | 107 | 2 |
| Ohio | 43,806 | — | N | 561 | 1 |
| Wisconsin | 20,461 | — | N | 497 | 2 |
| **W.N. Central** | 58,835 | 1 | 16 | 589 | 1 |
| Iowa | 7,390 | — | N | 110 | — |
| Kansas | 7,419 | — | N | 40 | — |
| Minnesota | 12,189 | — | 15 | 165 | — |
| Missouri | 22,371 | 1 | 1 | 220 | 1 |
| Nebraska | 5,098 | — | N | 20 | N |
| North Dakota | 1,667 | — | N | 5 | N |
| South Dakota | 2,701 | — | N | 29 | — |
| **S. Atlantic** | 177,386 | — | 2 | 709 | 398 |
| Delaware | 3,392 | — | — | 6 | — |
| District of Columbia | 3,678 | — | — | 18 | 1 |
| Florida | 43,372 | — | N | 286 | 374 |
| Georgia | 33,562 | — | N | 152 | 13 |
| Maryland | 18,291 | — | 2 | 33 | 3 |
| North Carolina | 31,189 | — | N | 92 | 2 |
| South Carolina | 18,296 | — | N | 34 | 2 |
| Virginia | 22,668 | — | N | 77 | 3 |
| West Virginia | 2,944 | — | N | 21 | — |
| **E.S. Central** | 69,812 | — | — | 228 | 3 |
| Alabama | 17,109 | — | N | 29 | N |
| Kentucky | 8,351 | — | N | 149 | N |
| Mississippi | 21,268 | — | — | 2 | — |
| Tennessee | 23,084 | — | N | 48 | 3 |
| **W.S. Central** | 111,001 | 2 | — | 249 | 1 |
| Arkansas | 8,597 | — | — | 8 | — |
| Louisiana | 17,227 | 2 | N | 83 | — |
| Oklahoma | 13,407 | — | — | 43 | — |
| Texas | 71,860 | — | N | 115 | 1 |
| **Mountain** | 63,447 | — | 3,629 | 143 | 5 |
| Arizona | 21,264 | — | 3,516 | 11 | — |
| Colorado | 15,432 | — | N | 50 | 1 |
| Idaho | 2,799 | — | N | 15 | N |
| Montana | 2,400 | — | — | 23 | — |
| Nevada | 7,321 | — | 66 | 13 | N |
| New Mexico | 8,456 | — | 19 | 17 | 4 |
| Utah | 4,602 | — | 23 | 11 | — |
| Wyoming | 1,173 | — | 5 | 3 | — |
| **Pacific** | 168,194 | 2 | 2,885 | 367 | 9 |
| Alaska | 4,355 | — | — | 3 | — |
| California | 130,716 | — | 2,885 | 214 | N |
| Hawaii | 5,489 | 2 | — | 1 | — |
| Oregon | 9,018 | — | N | 50 | 4 |
| Washington | 18,616 | — | — | 99 | 5 |
| American Samoa | — | — | — | — | — |
| C.N.M.I. | — | — | — | — | — |
| Guam | 807 | 3 | — | — | — |
| Puerto Rico | 3,714 | — | N | N | N |
| U.S. Virgin Islands | 235 | — | — | — | — |

N: Not notifiable.    U: Unavailable.    —: No reported cases.    C.N.M.I.: Commonwealth of Northern Mariana Islands.
†† Totals reported to the Division of STD Prevention, NCHHSTP (proposed), as of May 5, 2006. Chlamydia refers to genital infections caused by *Chlamydia trachomatis*.

TABLE 2. (*Continued*) Reported cases of notifiable diseases,* by geographic division and area — United States, 2005

| Area | California serogroup | | Eastern equine | | Powassan | | St. Louis | | West Nile | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Neuro-invasive | Nonneuro-invasive | Neuro-invasive | Nonneuro-invasive | Neuro-invasive | Nonneuro-invasive | Neuro-invasive | Nonneuro-invasive | Neuro-invasive | Nonneuro-invasive |
| United States | 73 | 7 | 21 | — | 1 | — | 7 | 6 | 1,309 | 1,691 |
| New England | — | — | 11 | — | — | — | — | — | 9 | 4 |
| Connecticut | — | — | — | — | — | — | — | — | 4 | 2 |
| Maine | — | — | — | — | — | — | — | — | — | — |
| Massachusetts | — | — | 4 | — | — | — | — | — | 4 | 2 |
| New Hampshire | — | — | 7 | — | — | — | — | — | — | — |
| Rhode Island | — | — | — | — | — | — | — | — | 1 | — |
| Vermont | — | — | — | — | — | — | — | — | — | — |
| Mid. Atlantic | — | — | — | — | 1 | — | — | — | 47 | 22 |
| New Jersey | — | — | — | — | — | — | — | — | 3 | 3 |
| New York (Upstate) | — | — | — | — | 1 | — | — | — | 19 | 5 |
| New York City | — | — | — | — | — | — | — | — | 11 | 3 |
| Pennsylvania | — | — | — | — | — | — | — | — | 14 | 11 |
| E.N. Central | 17 | 4 | — | — | — | — | — | — | 259 | 156 |
| Illinois | — | — | — | — | — | — | — | — | 137 | 115 |
| Indiana | — | 1 | — | — | — | — | — | — | 11 | 12 |
| Michigan | — | — | — | — | — | — | — | — | 54 | 8 |
| Ohio | 14 | 1 | — | — | — | — | — | — | 46 | 15 |
| Wisconsin | 3 | 1 | — | — | — | — | — | — | 11 | 6 |
| W.N. Central | 2 | — | — | — | — | — | — | — | 169 | 471 |
| Iowa | — | — | — | — | — | — | — | — | 14 | 23 |
| Kansas | — | — | — | — | — | — | — | — | 17 | 8 |
| Minnesota | 2 | — | — | — | — | — | — | — | 18 | 27 |
| Missouri | — | — | — | — | — | — | — | — | 17 | 13 |
| Nebraska | — | — | — | — | — | — | — | — | 56 | 133 |
| North Dakota | — | — | — | — | — | — | — | — | 12 | 74 |
| South Dakota | — | — | — | — | — | — | — | — | 36 | 193 |
| S. Atlantic | 49 | 3 | 7 | — | — | — | — | — | 34 | 29 |
| Delaware | — | — | — | — | — | — | — | — | 1 | — |
| District of Columbia | — | — | — | — | — | — | — | — | 3 | 2 |
| Florida | — | — | 5 | — | — | — | — | — | 10 | 11 |
| Georgia | 1 | — | 1 | — | — | — | — | — | 9 | 11 |
| Maryland | — | — | — | — | — | — | — | — | 4 | 1 |
| North Carolina | 31 | 1 | — | — | — | — | — | — | 2 | 2 |
| South Carolina | — | — | 1 | — | — | — | — | — | 5 | — |
| Virginia | 2 | 2 | — | — | — | — | — | — | — | 1 |
| West Virginia | 15 | — | — | — | — | — | — | — | — | — |
| E.S. Central | 4 | — | 2 | — | — | — | 5 | 5 | 65 | 38 |
| Alabama | 1 | — | 2 | — | — | — | — | — | 6 | 4 |
| Kentucky | — | — | — | — | — | — | — | — | 5 | — |
| Mississippi | 1 | — | — | — | — | — | 5 | 4 | 39 | 31 |
| Tennessee | 2 | — | — | — | — | — | — | 1 | 15 | 3 |
| W.S. Central | 1 | — | 1 | — | — | — | 2 | — | 275 | 150 |
| Arkansas | — | — | — | — | — | — | — | — | 13 | 15 |
| Louisiana | 1 | — | 1 | — | — | — | 2 | — | 117 | 54 |
| Oklahoma | — | — | — | — | — | — | — | — | 17 | 14 |
| Texas | — | — | — | — | — | — | — | — | 128 | 67 |
| Mountain | — | — | — | — | — | — | — | 1 | 145 | 240 |
| Arizona | — | — | — | — | — | — | — | 1 | 52 | 61 |
| Colorado | — | — | — | — | — | — | — | — | 21 | 86 |
| Idaho | — | — | — | — | — | — | — | — | 3 | 10 |
| Montana | — | — | — | — | — | — | — | — | 8 | 17 |
| New Mexico | — | — | — | — | — | — | — | — | 20 | 13 |
| Nevada | — | — | — | — | — | — | — | — | 14 | 17 |
| Utah | — | — | — | — | — | — | — | — | 21 | 31 |
| Wyoming | — | — | — | — | — | — | — | — | 6 | 6 |
| Pacific | — | — | — | — | — | — | — | — | 306 | 581 |
| Alaska | — | — | — | — | — | — | — | — | — | — |
| California | — | — | — | — | — | — | — | — | 305 | 575 |
| Hawaii | — | — | — | — | — | — | — | — | — | — |
| Oregon | — | — | — | — | — | — | — | — | 1 | 6 |
| Washington | — | — | — | — | — | — | — | — | — | — |
| American Samoa | — | — | — | — | — | — | — | — | — | — |
| C.N.M.I. | — | — | — | — | — | — | — | — | — | — |
| Guam | — | — | — | — | — | — | — | — | — | — |
| Puerto Rico | — | — | — | — | — | — | — | — | — | — |
| U.S. Virgin Islands | — | — | — | — | — | — | — | — | — | — |

N: Not notifiable.      U: Unavailable.      — No reported cases.      C.N.M.I.: Commonwealth of Northern Mariana Islands.

* Totals reported to the Division of Vector-Borne Infectious Diseases, National Center for Zoonotic, Vector-Borne, and Enteric Diseases (NCZVED) (proposed) (ArboNET Surveillance), as of June 23, 2006.

Appx11283

TABLE 2. (Continued) Reported cases of notifiable diseases,* by geographic division and area — United States, 2005

| Area | Ehrlichiosis | | | Enterohemorrhagic *Escherichia coli* infection | | | Giardiasis | Gonorrhea[¶¶] |
|---|---|---|---|---|---|---|---|---|
| | Human granulocytic | Human monocytic | Human (other & unspecified) | O157:H7 | Shiga toxin-positive Non-O157 | Shiga toxin-positive Not serogrouped | | |
| United States | 786 | 506 | 112 | 2,621 | 501 | 407 | 19,733 | 309,593 |
| New England | 113 | 30 | 3 | 159 | 56 | 13 | 1,712 | 6,104 |
| Connecticut | 30 | 2 | — | 43 | 20 | — | 400 | 2,750 |
| Maine | 4 | 1 | 1 | 16 | 13 | — | 203 | 142 |
| Massachusetts | 62 | 19 | — | 59 | 15 | 13 | 724 | 2,537 |
| New Hampshire | 1 | 2 | — | 16 | 3 | — | 66 | 177 |
| Rhode Island | 16 | 6 | 2 | 9 | — | — | 132 | 436 |
| Vermont | — | — | — | 16 | 5 | — | 187 | 60 |
| Mid. Atlantic | 267 | 151 | 12 | 324 | 109 | 30 | 3,627 | 34,661 |
| New Jersey | 42 | 64 | N | 63 | 8 | 7 | 457 | 5,722 |
| New York (Upstate) | 221 | 85 | 2 | 144 | 83 | 10 | 1,412 | 7,316 |
| New York City | — | — | — | 17 | — | — | 873 | 10,404 |
| Pennsylvania | 4 | 2 | 10 | 100 | 18 | 13 | 895 | 11,222 |
| E.N. Central | 161 | 8 | 48 | 546 | 52 | 45 | 3,319 | 72,651 |
| Illinois | 2 | 4 | 1 | 102 | 10 | 28 | 772 | 20,019 |
| Indiana | — | — | — | 77 | — | — | N | 8,094 |
| Michigan | 2 | — | — | 85 | 2 | 8 | 783 | 17,684 |
| Ohio | 2 | 1 | — | 149 | 13 | 8 | 817 | 20,985 |
| Wisconsin | 155 | 3 | 47 | 133 | 27 | 1 | 938 | 5,869 |
| W.N. Central | 189 | 62 | 14 | 369 | 56 | 104 | 2,514 | 18,785 |
| Iowa | N | N | N | 96 | 2 | — | 280 | 1,606 |
| Kansas | — | — | — | — | — | 54 | 213 | 2,605 |
| Minnesota | 186 | 24 | 1 | 121 | 35 | 25 | 1,239 | 3,482 |
| Missouri | 3 | 38 | 13 | 75 | 11 | 12 | 522 | 9,455 |
| Nebraska | — | — | — | 54 | 3 | 7 | 116 | 1,158 |
| North Dakota | N | N | N | 16 | 1 | 6 | 26 | 128 |
| South Dakota | — | — | — | 29 | 4 | — | 118 | 351 |
| S. Atlantic | 27 | 118 | 17 | 255 | 101 | 114 | 2,828 | 78,928 |
| Delaware | 3 | 4 | — | 9 | 7 | — | 58 | 913 |
| District of Columbia | N | N | N | 2 | — | — | 56 | 2,146 |
| Florida | 1 | 4 | — | 112 | 2 | 18 | 987 | 20,225 |
| Georgia | 2 | 8 | 1 | 31 | 18 | — | 754 | 15,860 |
| Maryland | 9 | 63 | 1 | 36 | 32 | 7 | 210 | 7,035 |
| North Carolina | 4 | 29 | 4 | — | — | 64 | N | 15,072 |
| South Carolina | 8 | 4 | 2 | 9 | 1 | 4 | 106 | 8,561 |
| Virginia | — | 4 | 9 | 53 | 38 | 20 | 602 | 8,346 |
| West Virginia | — | 2 | — | 3 | 3 | 1 | 55 | 770 |
| E.S. Central | 6 | 21 | 5 | 136 | 10 | 32 | 433 | 28,117 |
| Alabama | 2 | 1 | — | 30 | — | — | 200 | 9,406 |
| Kentucky | 1 | 4 | — | 48 | 7 | 21 | N | 2,935 |
| Mississippi | — | — | — | 7 | 1 | — | — | 7,171 |
| Tennessee | 3 | 16 | 5 | 50 | 2 | 11 | 233 | 8,605 |
| W.S. Central | 22 | 115 | 9 | 92 | 19 | 58 | 349 | 45,386 |
| Arkansas | 5 | 35 | 2 | 13 | — | — | 88 | 4,476 |
| Louisiana | N | N | — | 7 | 12 | 3 | 64 | 9,572 |
| Oklahoma | 17 | 79 | — | 35 | 2 | 1 | 197 | 5,228 |
| Texas | — | 1 | 7 | 37 | 5 | 54 | N | 26,110 |
| Mountain | 1 | 1 | — | 236 | 89 | 11 | 1,586 | 13,689 |
| Arizona | 1 | — | — | 35 | 20 | — | 183 | 4,951 |
| Colorado | N | N | N | 75 | 7 | 1 | 534 | 3,224 |
| Idaho | N | N | — | 32 | 14 | 7 | 155 | 119 |
| Montana | — | — | — | 16 | — | — | 81 | 158 |
| Nevada | N | N | N | 20 | 5 | 3 | 113 | 2,880 |
| New Mexico | — | 1 | — | 12 | 13 | — | 91 | 1,552 |
| Utah | — | — | — | 38 | 28 | — | 398 | 7,270 |
| Wyoming | — | — | — | 8 | 2 | — | 31 | 87 |
| Pacific | — | — | 4 | 481 | 9 | — | 3,374 | 41,263 |
| Alaska | N | N | N | N | N | — | 110 | 600 |
| California | — | — | 4 | 182 | N | N | 2,404 | 34,338 |
| Hawaii | — | — | — | 13 | — | — | 63 | 1,024 |
| Oregon | — | — | — | 149 | 9 | — | 416 | 1,562 |
| Washington | — | — | — | 137 | — | — | 381 | 3,739 |
| American Samoa | — | — | — | — | — | — | — | — |
| C.N.M.I. | — | — | — | — | — | — | — | — |
| Guam | — | — | — | — | — | — | 11 | 106 |
| Puerto Rico | N | N | N | 2 | — | — | 274 | 328 |
| U.S. Virgin Islands | — | — | — | — | — | — | — | 30 |

N: Not notifiable.    U: Unavailable.    — No reported cases.    C.N.M.I.: Commonwealth of Northern Mariana Islands.
¶¶ Totals reported to the Division of STD Prevention, NCHHSTP (proposed), as of May 5, 2006.

TABLE 2. (*Continued*) Reported cases of notifiable diseases,* by geographic division and area — United States, 2005

| Area | Haemophilus influenzae, invasive disease | | | | Hansen disease (leprosy) | Hantavirus pulmonary syndrome | Hemolytic uremic syndrome, postdiarrheal |
|---|---|---|---|---|---|---|---|
| | All ages, serotypes | Age <5 yrs | | | | | |
| | | Serotype b | Nonserotype b | Unknown serotype | | | |
| United States | 2,304 | 9 | 135 | 217 | 87 | 26 | 221 |
| New England | 176 | — | 12 | 7 | 7 | — | 10 |
| Connecticut | 55 | — | 6 | — | 1 | N | 5 |
| Maine | 12 | — | — | 3 | N | — | — |
| Massachusetts | 77 | — | 4 | 1 | 6 | — | 3 |
| New Hampshire | 9 | — | — | — | — | — | 1 |
| Rhode Island | 14 | — | 2 | 1 | — | — | 1 |
| Vermont | 9 | — | — | 2 | N | — | — |
| Mid. Atlantic | 452 | 1 | 3 | 46 | 6 | — | 20 |
| New Jersey | 92 | — | — | 12 | — | N | 4 |
| New York (Upstate) | 142 | 1 | 2 | 10 | N | — | 13 |
| New York City | 80 | — | — | 14 | 5 | — | 3 |
| Pennsylvania | 138 | — | 1 | 10 | 1 | — | N |
| E.N. Central | 377 | 1 | 10 | 36 | 2 | 1 | 20 |
| Illinois | 124 | — | — | 17 | — | 1 | 4 |
| Indiana | 71 | — | 9 | — | — | — | — |
| Michigan | 24 | 1 | 1 | 2 | 2 | — | 5 |
| Ohio | 110 | — | — | 14 | — | — | 8 |
| Wisconsin | 48 | — | — | 2 | — | — | 3 |
| W.N. Central | 130 | — | 3 | 16 | 4 | 3 | 36 |
| Iowa | — | — | — | — | 1 | — | 8 |
| Kansas | 18 | — | — | — | — | 1 | 2 |
| Minnesota | 53 | — | 3 | 3 | 1 | — | 17 |
| Missouri | 37 | — | — | 8 | 2 | — | 4 |
| Nebraska | 16 | — | — | 4 | — | — | 2 |
| North Dakota | 6 | — | — | 1 | N | — | — |
| South Dakota | — | — | — | — | — | 2 | 3 |
| S. Atlantic | 540 | 2 | 37 | 37 | 2 | 1 | 36 |
| Delaware | — | — | — | — | — | — | — |
| District of Columbia | 10 | — | — | 1 | — | 1 | — |
| Florida | 140 | 1 | 16 | 5 | 2 | — | 20 |
| Georgia | 113 | — | — | 17 | N | — | 5 |
| Maryland | 78 | — | 7 | 1 | — | — | — |
| North Carolina | 74 | 1 | 8 | — | — | — | 6 |
| South Carolina | 35 | — | — | 3 | — | — | 1 |
| Virginia | 61 | — | — | 9 | N | — | 1 |
| West Virginia | 29 | — | 6 | 1 | N | — | 3 |
| E.S. Central | 120 | — | — | 20 | 1 | — | 19 |
| Alabama | 18 | — | — | 3 | — | N | 4 |
| Kentucky | 14 | — | — | 3 | 1 | — | N |
| Mississippi | — | — | — | — | — | — | — |
| Tennessee | 88 | — | — | 14 | — | — | 15 |
| W.S. Central | 127 | 1 | 11 | 12 | 25 | 4 | 19 |
| Arkansas | 7 | — | 1 | 1 | 1 | — | 2 |
| Louisiana | 38 | 1 | 2 | 11 | 1 | — | — |
| Oklahoma | 74 | — | 8 | — | — | — | 5 |
| Texas | 8 | — | — | — | 23 | 4 | 12 |
| Mountain | 222 | 2 | 23 | 24 | 2 | 16 | 15 |
| Arizona | 105 | 1 | 13 | 4 | 1 | 5 | 3 |
| Colorado | 43 | — | 1 | 10 | — | 8 | 10 |
| Idaho | 5 | — | — | 2 | — | — | 2 |
| Montana | — | — | — | — | — | — | — |
| Nevada | 15 | — | 2 | 3 | 1 | 1 | — |
| New Mexico | 32 | 1 | 5 | 2 | — | 1 | — |
| Utah | 13 | — | — | 2 | — | — | — |
| Wyoming | 9 | — | — | 1 | — | 1 | — |
| Pacific | 160 | 2 | 36 | 20 | 38 | 1 | 46 |
| Alaska | 27 | — | — | 7 | — | N | N |
| California | 65 | 2 | 36 | 3 | 16 | — | 36 |
| Hawaii | 9 | — | — | — | 22 | — | — |
| Oregon | 54 | — | — | 6 | N | — | 6 |
| Washington | 5 | — | — | 4 | N | 1 | 4 |
| American Samoa | — | — | — | — | — | — | — |
| C.N.M.I. | — | — | — | — | — | — | — |
| Guam | 15 | — | — | — | 2 | — | — |
| Puerto Rico | 4 | — | — | 2 | 2 | — | — |
| U.S. Virgin Islands | — | — | — | — | — | — | — |

N: Not notifiable.    U: Unavailable.    —: No reported cases.    C.N.M.I.: Commonwealth of Northern Mariana Islands.

Summary of Notifiable Diseases --- United States, 2005                    Page 28 of 102

TABLE 2. (*Continued*) Reported cases of notifiable diseases,* by geographic division and area — United States, 2005

| Area | Hepatitis, viral, acute | | | Influenza-associated pediatric mortality*** | Legionellosis | Listeriosis | Lyme disease | Malaria |
|---|---|---|---|---|---|---|---|---|
| | A | B | C | | | | | |
| **United States** | 4,488 | 5,119 | 652 | 45 | 2,301 | 896 | 23,305 | 1,494 |
| **New England** | 452 | 158 | 27 | 3 | 158 | 61 | 4,751 | 86 |
| Connecticut | 51 | 50 | 10 | — | 36 | 20 | 1,810 | 24 |
| Maine | 8 | 14 | — | N | 7 | 3 | 247 | 5 |
| Massachusetts | 287 | 54 | — | 1 | 66 | 19 | 2,336 | 39 |
| New Hampshire | 82 | 29 | — | — | 9 | 9 | 265 | 6 |
| Rhode Island | 19 | 5 | — | N | 31 | 8 | 39 | 10 |
| Vermont | 5 | 6 | 17 | 2 | 10 | 2 | 54 | 2 |
| **Mid. Atlantic** | 629 | 677 | 100 | 15 | 763 | 213 | 13,215 | 367 |
| New Jersey | 154 | 239 | 16 | 2 | 121 | 37 | 3,363 | 79 |
| New York (Upstate) | 112 | 101 | 21 | 2 | 240 | 68 | 5,165 | 61 |
| New York City | 278 | 132 | — | 5 | 119 | 44 | 400 | 190 |
| Pennsylvania | 85 | 205 | 63 | 6 | 283 | 64 | 4,287 | 37 |
| **E.N. Central** | 356 | 566 | 141 | 3 | 461 | 118 | 1,739 | 154 |
| Illinois | 130 | 157 | 3 | — | 66 | 32 | 127 | 74 |
| Indiana | 23 | 57 | 25 | N | 33 | 9 | 33 | 10 |
| Michigan | 105 | 169 | 104 | 1 | 120 | 26 | 62 | 24 |
| Ohio | 51 | 136 | 9 | 2 | 206 | 36 | 58 | 30 |
| Wisconsin | 47 | 47 | — | — | 36 | 15 | 1,459 | 16 |
| **W.N. Central** | 117 | 206 | 32 | 2 | 104 | 45 | 1,031 | 79 |
| Iowa | 22 | 31 | — | 1 | 8 | 7 | 89 | 9 |
| Kansas | 17 | 32 | — | N | 4 | 7 | 3 | 7 |
| Minnesota | 33 | 42 | 15 | 1 | 34 | 15 | 917 | 41 |
| Missouri | 26 | 76 | 13 | — | 30 | 6 | 15 | 18 |
| Nebraska | 16 | 17 | 3 | — | 4 | 6 | 2 | 3 |
| North Dakota | 2 | — | 1 | N | 3 | 4 | 3 | 1 |
| South Dakota | 1 | 8 | — | — | 21 | — | 2 | — |
| **S. Atlantic** | 713 | 1,414 | 81 | 7 | 435 | 183 | 2,343 | 329 |
| Delaware | 6 | 37 | — | — | 19 | — | 646 | 3 |
| District of Columbia | 6 | 13 | — | N | 14 | 3 | 10 | 11 |
| Florida | 274 | 487 | 13 | N | 119 | 62 | 47 | 68 |
| Georgia | 124 | 202 | 9 | 4 | 39 | 25 | 6 | 50 |
| Maryland | 82 | 160 | 5 | 1 | 112 | 19 | 1,235 | 99 |
| North Carolina | 84 | 167 | 21 | — | 36 | 34 | 49 | 40 |
| South Carolina | 40 | 133 | 1 | — | 14 | 15 | 15 | 11 |
| Virginia | 93 | 146 | 13 | 2 | 55 | 17 | 274 | 44 |
| West Virginia | 4 | 69 | 19 | N | 27 | 8 | 61 | 3 |
| **E.S. Central** | 232 | 368 | 74 | 1 | 88 | 30 | 16 | 30 |
| Alabama | 44 | 90 | 14 | — | 13 | 9 | 3 | 6 |
| Kentucky | 24 | 67 | 16 | — | 33 | 5 | 5 | 10 |
| Mississippi | 19 | 53 | 17 | 1 | 3 | 5 | — | — |
| Tennessee | 145 | 158 | 27 | N | 39 | 11 | 8 | 14 |
| **W.S. Central** | 552 | 944 | 119 | — | 78 | 60 | 72 | 153 |
| Arkansas | 20 | 72 | 1 | — | 9 | 2 | — | 6 |
| Louisiana | 65 | 69 | 2 | N | 4 | 15 | 3 | 5 |
| Oklahoma | 6 | 61 | 14 | — | 10 | 4 | — | 12 |
| Texas | 461 | 742 | 102 | N | 55 | 39 | 69 | 130 |
| **Mountain** | 344 | 196 | 40 | 4 | 96 | 29 | 23 | 61 |
| Arizona | 195 | U | — | 1 | 26 | 13 | 10 | 21 |
| Colorado | 48 | 61 | 21 | 2 | 20 | 6 | — | 24 |
| Idaho | 20 | 14 | 1 | — | 4 | — | 2 | — |
| Montana | 10 | 10 | 1 | — | 6 | — | — | — |
| Nevada | 21 | 48 | 10 | 1 | 17 | 2 | 3 | 4 |
| New Mexico | 28 | 20 | 1 | — | 4 | 4 | 3 | 3 |
| Utah | 21 | 40 | 6 | — | 15 | 4 | 2 | 7 |
| Wyoming | 1 | 3 | — | — | 4 | — | 3 | 2 |
| **Pacific** | 1,093 | 590 | 38 | 10 | 118 | 157 | 115 | 235 |
| Alaska | 4 | 8 | — | N | 1 | N | 4 | 7 |
| California | 971 | 412 | 24 | 10 | 83 | 132 | 95 | 177 |
| Hawaii | 24 | 10 | 1 | — | 3 | 2 | — | 18 |
| Oregon | 46 | 95 | 13 | N | 14 | 11 | 3 | 12 |
| Washington | 48 | 65 | U | N | 17 | 12 | 13 | 21 |
| American Samoa | 1 | — | — | — | — | — | — | — |
| C.N.M.I. | — | — | — | — | — | — | — | — |
| Guam | 2 | 18 | 8 | — | — | — | — | — |
| Puerto Rico | 68 | 63 | — | N | 1 | 1 | — | 4 |
| U.S. Virgin Islands | — | — | — | — | — | — | — | — |

N: Not notifiable.    U: Unavailable.    — : No reported cases.    C.N.M.I.: Commonwealth of Northern Mariana Islands.
*** Totals reported to the Influenza Division, National Center for Immunization and Respiratory Diseases (NCIRD) (proposed), as of December 31, 2005.

TABLE 2. (*Continued*) Reported cases of notifiable diseases,* by geographic division and area — United States, 2005

| Area | Measles | | Meningococcal disease, invasive | | | | |
|---|---|---|---|---|---|---|---|
| | Indigenous | Imported††† | All serogroups | Serogroup A, C, Y, & W-135 | Serogroup B | Other serogroup | Serogroup unknown |
| United States | 42 | 24 | 1,245 | 297 | 156 | 27 | 765 |
| New England | — | 1 | 70 | 32 | 12 | 2 | 24 |
| Connecticut | — | — | 15 | 11 | 3 | — | 1 |
| Maine | — | — | 2 | — | — | — | 2 |
| Massachusetts | — | — | 32 | 18 | 6 | 1 | 7 |
| New Hampshire | — | 1 | 12 | — | 3 | — | 12 |
| Rhode Island | — | — | 4 | 1 | — | — | 3 |
| Vermont | — | — | 5 | 2 | — | 1 | 2 |
| Mid. Atlantic | 3 | 6 | 166 | 25 | 13 | 1 | 127 |
| New Jersey | 1 | 1 | 32 | — | — | — | 32 |
| New York (Upstate) | — | 1 | 49 | 19 | 11 | — | 19 |
| New York City | 2 | 4 | 28 | — | — | — | 28 |
| Pennsylvania | — | — | 57 | 6 | 2 | 1 | 48 |
| E.N. Central | 36 | 5 | 159 | 21 | 10 | 3 | 125 |
| Illinois | 1 | 1 | 34 | — | — | — | 34 |
| Indiana | 32 | 1 | 19 | 7 | 4 | — | 8 |
| Michigan | — | 1 | 35 | 10 | 4 | 3 | 18 |
| Ohio | 2 | 1 | 45 | 4 | 2 | — | 39 |
| Wisconsin | 1 | 1 | 26 | — | — | — | 26 |
| W.N. Central | — | — | 86 | 32 | 16 | 2 | 36 |
| Iowa | — | — | 18 | 10 | 7 | — | 1 |
| Kansas | — | — | 11 | — | — | — | 11 |
| Minnesota | — | — | 17 | 5 | 5 | 1 | 6 |
| Missouri | — | — | 28 | 10 | 4 | 1 | 13 |
| Nebraska | — | — | 6 | 3 | — | — | 3 |
| North Dakota | — | — | 2 | — | — | — | 2 |
| South Dakota | — | — | 4 | 4 | — | — | — |
| S. Atlantic | — | 1 | 222 | 83 | 34 | 1 | 104 |
| Delaware | — | — | 4 | — | — | — | 4 |
| District of Columbia | — | — | 5 | 1 | — | — | 4 |
| Florida | — | — | 84 | 38 | 9 | — | 37 |
| Georgia | — | — | 18 | — | — | — | 18 |
| Maryland | — | — | 22 | 9 | 7 | 1 | 5 |
| North Carolina | — | — | 32 | 14 | 9 | — | 9 |
| South Carolina | — | — | 14 | 3 | 2 | — | 9 |
| Virginia | — | — | 35 | 12 | 7 | — | 16 |
| West Virginia | — | — | 8 | 6 | — | — | 2 |
| E.S. Central | — | 1 | 61 | 7 | 6 | — | 48 |
| Alabama | — | — | 6 | 2 | 1 | — | 3 |
| Kentucky | — | — | 20 | — | — | — | 20 |
| Mississippi | — | — | 7 | — | — | — | 7 |
| Tennessee | — | 1 | 28 | 5 | 5 | — | 18 |
| W.S. Central | — | 3 | 129 | 50 | 37 | 7 | 35 |
| Arkansas | — | — | 18 | 8 | 5 | — | 5 |
| Louisiana | — | — | 32 | 16 | 7 | — | 9 |
| Oklahoma | — | — | 18 | 6 | 4 | 6 | 2 |
| Texas | — | 3 | 61 | 20 | 21 | 1 | 19 |
| Mountain | — | 1 | 90 | 40 | 16 | 9 | 25 |
| Arizona | — | 1 | 34 | 16 | 5 | 2 | 11 |
| Colorado | — | — | 18 | 8 | 5 | 5 | — |
| Idaho | — | — | 7 | 1 | — | — | 6 |
| Montana | — | — | — | — | — | — | — |
| Nevada | — | — | 14 | 7 | 4 | 1 | 2 |
| New Mexico | — | — | 5 | 1 | — | — | 4 |
| Utah | — | — | 12 | 7 | 2 | 1 | 2 |
| Wyoming | — | — | — | — | — | — | — |
| Pacific | 3 | 6 | 262 | 7 | 12 | 2 | 241 |
| Alaska | — | — | 4 | — | — | — | 4 |
| California | 2 | 2 | 157 | — | — | — | 157 |
| Hawaii | 1 | — | 12 | 2 | 1 | 2 | 7 |
| Oregon | — | 2 | 55 | — | — | — | 55 |
| Washington | — | 2 | 34 | 5 | 11 | — | 18 |
| American Samoa | — | — | 1 | — | — | — | 1 |
| C.N.M.I. | — | — | — | — | — | — | — |
| Guam | — | — | 1 | — | — | — | 1 |
| Puerto Rico | — | — | 7 | — | — | — | 7 |
| U.S. Virgin Islands | — | — | — | — | — | — | — |

N: Not notifiable.    U: Unavailable.    —: No reported cases.    C.N.M.I.: Commonwealth of Northern Mariana Islands.
††† Imported cases include only those directly related to importation from other countries.

TABLE 2. (*Continued*) Reported cases of notifiable diseases,* by geographic division and area — United States, 2005

| Area | Mumps | Pertussis | Plague | Poliomyelitis, paralytic[§§§] | Psittacosis | Q Fever | Rabies Animal | Rabies Human |
|---|---|---|---|---|---|---|---|---|
| United States | 314 | 25,616 | 8 | 1 | 16 | 136 | 5,915 | 2 |
| New England | 11 | 1,636 | — | — | — | 8 | 700 | — |
| Connecticut | 1 | 85 | — | — | N | — | 210 | — |
| Maine | 2 | 55 | — | — | — | 3 | 61 | — |
| Massachusetts | 7 | 1,167 | — | — | — | 5 | 329 | — |
| New Hampshire | 1 | 186 | — | — | — | — | 13 | — |
| Rhode Island | — | 53 | — | — | — | — | 29 | — |
| Vermont | — | 90 | — | — | — | N | 58 | — |
| Mid. Atlantic | 64 | 1,473 | — | — | 3 | 5 | 999 | — |
| New Jersey | 9 | 192 | — | — | — | — | N | — |
| New York (Upstate) | 32 | 656 | — | — | 2 | 1 | 565 | — |
| New York City | 15 | 111 | — | — | — | 1 | 28 | — |
| Pennsylvania | 8 | 514 | — | — | 1 | 3 | 406 | — |
| E.N. Central | 48 | 3,913 | — | — | 1 | 25 | 201 | — |
| Illinois | 10 | 922 | — | — | — | 11 | 51 | — |
| Indiana | 1 | 396 | — | — | — | 4 | 12 | — |
| Michigan | 24 | 321 | — | — | — | 2 | 40 | — |
| Ohio | 8 | 1,185 | — | — | 1 | 3 | 70 | — |
| Wisconsin | 5 | 1,089 | — | — | — | 5 | 28 | — |
| W.N. Central | 19 | 4,521 | — | — | 1 | 17 | 436 | — |
| Iowa | 6 | 1,106 | — | — | 1 | N | 108 | — |
| Kansas | — | 542 | — | — | — | — | 80 | — |
| Minnesota | 6 | 1,571 | — | — | — | — | 71 | — |
| Missouri | 4 | 656 | — | — | — | 13 | 73 | — |
| Nebraska | — | 295 | — | — | — | 2 | — | — |
| North Dakota | 3 | 168 | — | — | — | — | 36 | — |
| South Dakota | — | 183 | — | — | — | 2 | 68 | — |
| S. Atlantic | 36 | 1,450 | — | — | 6 | 11 | 2,067 | — |
| Delaware | — | 16 | — | — | 1 | — | — | — |
| District of Columbia | — | 11 | — | — | — | — | — | — |
| Florida | 8 | 208 | — | — | — | 1 | 201 | — |
| Georgia | 2 | 48 | — | — | — | — | 256 | — |
| Maryland | 10 | 219 | — | — | 4 | 1 | 380 | — |
| North Carolina | 13 | 127 | — | — | 1 | 6 | 459 | — |
| South Carolina | 1 | 405 | — | — | — | 1 | 225 | — |
| Virginia | 2 | 363 | — | — | — | 2 | 495 | — |
| West Virginia | — | 53 | — | — | — | N | 71 | — |
| E.S. Central | 10 | 516 | — | — | 1 | 5 | 149 | 1 |
| Alabama | 6 | 82 | N | — | 1 | — | 79 | — |
| Kentucky | — | 155 | — | — | — | 2 | 17 | — |
| Mississippi | 1 | 62 | — | — | — | 1 | 5 | 1 |
| Tennessee | 3 | 217 | — | — | — | 2 | 48 | — |
| W.S. Central | 37 | 2,729 | — | — | — | 9 | 856 | — |
| Arkansas | 2 | 321 | — | — | — | — | 36 | — |
| Louisiana | 8 | 51 | — | — | — | N | — | — |
| Oklahoma | 2 | 127 | — | — | — | 3 | 79 | — |
| Texas | 25 | 2,224 | — | — | N | 6 | 741 | — |
| Mountain | 20 | 4,214 | 7 | 1 | 1 | 36 | 270 | — |
| Arizona | 1 | 1,106 | 1 | — | — | 2 | 169 | — |
| Colorado | 6 | 1,383 | 3 | — | — | 25 | 18 | — |
| Idaho | — | 220 | — | — | 1 | — | 12 | — |
| Montana | 1 | 586 | — | — | — | — | 15 | — |
| Nevada | 3 | 50 | — | — | — | 2 | 14 | — |
| New Mexico | — | 196 | 4 | — | — | 4 | 10 | — |
| Utah | 7 | 618 | — | — | — | — | 15 | — |
| Wyoming | 2 | 53 | — | — | — | 3 | 17 | — |
| Pacific | 69 | 5,170 | 1 | — | 3 | 20 | 217 | 1 |
| Alaska | 1 | 159 | — | — | — | N | 4 | — |
| California | 47 | 3,182 | 1 | — | 1 | 16 | 205 | 1 |
| Hawaii | 18 | 163 | — | — | — | — | — | — |
| Oregon | N | 619 | — | — | 1 | 2 | 8 | — |
| Washington | 3 | 1,047 | — | — | 1 | 2 | U | — |
| American Samoa | — | — | — | — | — | — | — | — |
| C.N.M.I. | — | — | — | — | — | — | — | — |
| Guam | 3 | 2 | — | — | — | — | — | — |
| Puerto Rico | 3 | 6 | — | — | — | — | 71 | — |
| U.S. Virgin Islands | — | — | — | — | — | — | — | — |

N: Not notifiable.    U: Unavailable.    —: No reported cases.    C.N.M.I.: Commonwealth of Northern Mariana Islands.
§§§ Case of vaccine-associated paralytic poliomyelitis (VAPP) caused by polio vaccine virus.

TABLE 2. (*Continued*) Reported cases of notifiable diseases,* by geographic division and area --- United States, 2005

| Area | Rocky Mountain spotted fever | Rubella | Rubella, congenital syndrome | Salmonellosis | Shigellosis | Streptococcal disease, invasive, group A | Streptococcal toxic-shock syndrome |
|---|---|---|---|---|---|---|---|
| United States | 1,936 | 11 | 1 | 45,322 | 16,168 | 4,715 | 129 |
| New England | 10 | 3 | 1 | 2,158 | 323 | 285 | 21 |
| Connecticut | — | — | — | 468 | 58 | 100 | 19 |
| Maine | N | — | — | 164 | 15 | 14 | N |
| Massachusetts | 6 | 1 | — | 1,144 | 192 | 128 | — |
| New Hampshire | 1 | 2 | 1 | 177 | 19 | 18 | — |
| Rhode Island | 3 | — | — | 112 | 23 | 12 | — |
| Vermont | — | — | — | 93 | 16 | 11 | 2 |
| Mid. Atlantic | 71 | 2 | — | 5,253 | 1,293 | 895 | 7 |
| New Jersey | 30 | — | — | 960 | 318 | 179 | — |
| New York (Upstate) | 2 | 1 | — | 1,427 | 329 | 276 | — |
| New York City | 7 | 1 | — | 1,196 | 416 | 171 | — |
| Pennsylvania | 32 | — | — | 1,670 | 230 | 269 | 7 |
| E.N. Central | 41 | 1 | — | 5,743 | 1,205 | 909 | 61 |
| Illinois | 11 | — | — | 1,837 | 409 | 307 | 35 |
| Indiana | 1 | — | — | 680 | 191 | 110 | 6 |
| Michigan | 6 | 1 | — | 952 | 241 | 208 | 3 |
| Ohio | 21 | — | — | 1,338 | 139 | 192 | 17 |
| Wisconsin | 2 | — | — | 936 | 225 | 92 | — |
| W.N. Central | 154 | — | — | 2,618 | 1,785 | 306 | 7 |
| Iowa | 7 | — | — | 410 | 108 | — | — |
| Kansas | 5 | — | — | 369 | 272 | 40 | 1 |
| Minnesota | 2 | — | — | 573 | 96 | 122 | 2 |
| Missouri | 128 | — | — | 801 | 1,017 | 73 | 3 |
| Nebraska | 6 | — | — | 219 | 160 | 27 | — |
| North Dakota | 1 | — | — | 86 | 6 | 18 | — |
| South Dakota | 5 | — | — | 160 | 131 | 26 | 1 |
| S. Atlantic | 1,910 | 1 | — | 13,016 | 2,514 | 959 | 14 |
| Delaware | 7 | — | — | 126 | 11 | 6 | — |
| District of Columbia | 2 | — | — | 60 | 15 | 13 | — |
| Florida | 14 | — | — | 5,552 | 1,270 | 260 | N |
| Georgia | 86 | — | — | 1,929 | 672 | 203 | — |
| Maryland | 75 | 1 | — | 806 | 108 | 178 | N |
| North Carolina | 625 | — | — | 1,712 | 202 | 124 | 8 |
| South Carolina | 70 | — | — | 1,444 | 105 | 38 | — |
| Virginia | 121 | — | — | 1,172 | 134 | 110 | — |
| West Virginia | 10 | — | — | 215 | 2 | 27 | 6 |
| E.S. Central | 229 | 1 | — | 2,966 | 1,290 | 180 | 4 |
| Alabama | 72 | — | — | 739 | 225 | N | N |
| Kentucky | 3 | 1 | — | 488 | 335 | 35 | 4 |
| Mississippi | 18 | — | — | 904 | 102 | — | — |
| Tennessee | 136 | — | — | 835 | 538 | 145 | — |
| W.S. Central | 379 | — | — | 5,240 | 4,236 | 396 | — |
| Arkansas | 137 | — | — | 739 | 62 | 23 | — |
| Louisiana | 6 | — | — | 908 | 137 | N | N |
| Oklahoma | 206 | — | — | 448 | 937 | 132 | — |
| Texas | 30 | — | — | 3,145 | 3,100 | 241 | N |
| Mountain | 40 | — | — | 2,470 | 999 | 659 | 14 |
| Arizona | 25 | — | — | 746 | 547 | 303 | — |
| Colorado | 4 | — | — | 582 | 170 | 182 | 6 |
| Idaho | 3 | — | — | 150 | 19 | 5 | — |
| Montana | 1 | — | — | 146 | 5 | — | — |
| Nevada | — | — | — | 200 | 64 | N | 3 |
| New Mexico | 4 | — | — | 251 | 137 | 95 | — |
| Utah | — | — | — | 310 | 46 | 69 | 5 |
| Wyoming | 3 | — | — | 85 | 5 | 5 | — |
| Pacific | 2 | 3 | — | 5,858 | 2,619 | 126 | 1 |
| Alaska | N | — | — | 60 | 13 | N | N |
| California | — | 1 | — | 4,546 | 2,278 | N | N |
| Hawaii | — | — | — | 290 | 35 | 126 | 1 |
| Oregon | 2 | 1 | — | 410 | 126 | N | N |
| Washington | — | 1 | — | 552 | 167 | N | N |
| American Samoa | — | — | — | 7 | 7 | — | — |
| C.N.M.I. | — | — | — | — | — | — | — |
| Guam | — | — | — | 48 | 20 | — | — |
| Puerto Rico | N | — | — | 690 | 9 | — | N |
| U.S. Virgin Islands | — | — | — | — | — | — | — |

N: Not notifiable.    U: Unavailable.    —: No reported cases.    C.N.M.I.: Commonwealth of Northern Mariana Islands.

TABLE 2. (*Continued*) Reported cases of notifiable diseases,* by geographic division and area — United States, 2005

| Area | Streptococcus pneumoniae, invasive disease | | Syphilis[111] | | | Tetanus | Toxic-shock syndrome | Trichinellosis |
| | Drug resistant, all ages | Age <5 yrs | All stages**** | Congenital (age <1 yr) | Primary and secondary | | | |
|---|---|---|---|---|---|---|---|---|
| United States | 2,996 | 1,495 | 33,278 | 329 | 8,724 | 27 | 90 | 16 |
| New England | 255 | 123 | 668 | 1 | 225 | — | 5 | 2 |
| Connecticut | 106 | 43 | 166 | 1 | 58 | — | N | — |
| Maine | N | — | 6 | — | 1 | — | N | — |
| Massachusetts | 107 | 55 | 398 | — | 125 | — | 1 | 1 |
| New Hampshire | — | 11 | 33 | — | 16 | — | 2 | — |
| Rhode Island | 29 | 8 | 64 | — | 24 | — | 1 | 1 |
| Vermont | 13 | 6 | 1 | — | 1 | — | 1 | — |
| Mid. Atlantic | 215 | 190 | 5,376 | 25 | 1,037 | 5 | 21 | 2 |
| New Jersey | — | 44 | 813 | 16 | 133 | 1 | 5 | — |
| New York (Upstate) | 88 | 81 | 667 | 7 | 89 | 4 | 5 | — |
| New York City | — | 32 | 3,184 | 1 | 616 | — | 2 | — |
| Pennsylvania | 127 | 33 | 712 | 1 | 199 | — | 9 | 2 |
| E.N. Central | 645 | 356 | 3,024 | 46 | 944 | 3 | 19 | 4 |
| Illinois | 39 | 102 | 1,608 | 23 | 525 | 1 | 5 | 1 |
| Indiana | 199 | 74 | 288 | 2 | 62 | — | 1 | — |
| Michigan | 50 | 61 | 488 | 17 | 105 | 1 | 9 | — |
| Ohio | 357 | 82 | 502 | 2 | 211 | 1 | 4 | 1 |
| Wisconsin | — | 37 | 138 | 2 | 41 | — | — | — |
| W.N. Central | 236 | 122 | 717 | 4 | 252 | 3 | 15 | 1 |
| Iowa | — | — | 28 | — | 9 | 1 | 5 | 1 |
| Kansas | — | 15 | 88 | — | 19 | — | — | — |
| Minnesota | 191 | 80 | 206 | 1 | 70 | — | 9 | — |
| Missouri | 37 | 10 | 372 | 3 | 147 | 2 | — | — |
| Nebraska | 2 | 8 | 18 | — | 4 | — | — | — |
| North Dakota | 3 | 9 | 1 | — | 1 | — | — | — |
| South Dakota | 3 | — | 4 | — | 2 | — | 1 | — |
| S. Atlantic | 1,160 | 342 | 8,151 | 50 | 2,311 | 5 | 7 | 2 |
| Delaware | 3 | 1 | 35 | — | 11 | — | — | — |
| District of Columbia | 16 | 3 | 365 | — | 114 | — | — | — |
| Florida | 614 | 79 | 2,888 | 16 | 724 | 3 | N | 1 |
| Georgia | 389 | 107 | 1,924 | 1 | 645 | — | 2 | N |
| Maryland | 6 | 66 | 1,905 | 16 | 313 | 1 | N | — |
| North Carolina | N | N | 712 | 10 | 274 | — | 4 | — |
| South Carolina | — | 24 | 549 | 4 | 84 | — | — | — |
| Virginia | N | 34 | 655 | 3 | 143 | 1 | 1 | 1 |
| West Virginia | 132 | 28 | 18 | — | 3 | — | — | — |
| E.S. Central | 199 | 20 | 1,967 | 8 | 487 | 1 | 2 | — |
| Alabama | N | — | 551 | 5 | 169 | — | 1 | — |
| Kentucky | 32 | N | 129 | — | 52 | 1 | — | N |
| Mississippi | 1 | 20 | 371 | — | 49 | — | — | — |
| Tennessee | 166 | N | 916 | 3 | 217 | — | 1 | — |
| W.S. Central | 233 | 248 | 5,914 | 84 | 1,247 | — | 1 | — |
| Arkansas | 14 | 23 | 231 | 7 | 52 | — | 1 | — |
| Louisiana | 107 | 36 | 1,237 | 11 | 278 | — | N | — |
| Oklahoma | 112 | 46 | 159 | 1 | 44 | — | — | — |
| Texas | — | 143 | 4,287 | 65 | 873 | — | N | — |
| Mountain | 59 | 85 | 1,574 | 36 | 423 | 2 | 14 | — |
| Arizona | U | U | 792 | 28 | 175 | 1 | 1 | — |
| Colorado | N | 52 | 144 | 1 | 46 | 1 | 6 | — |
| Idaho | N | — | 54 | — | 20 | — | 2 | — |
| Montana | 1 | — | 7 | — | 7 | — | — | — |
| Nevada | N | N | 343 | 1 | 109 | — | 3 | — |
| New Mexico | — | 33 | 183 | 6 | 56 | — | — | — |
| Utah | 26 | — | 50 | — | 10 | — | 2 | — |
| Wyoming | 26 | — | 1 | — | — | — | — | — |
| Pacific | — | 9 | 5,887 | 75 | 1,798 | 8 | 6 | 5 |
| Alaska | N | N | 22 | — | 9 | — | N | 3 |
| California | N | — | 5,340 | 75 | 1,585 | 7 | 6 | 2 |
| Hawaii | — | 3 | 57 | — | 11 | — | — | — |
| Oregon | N | 6 | 109 | — | 41 | — | N | — |
| Washington | N | N | 359 | — | 152 | 1 | N | — |
| American Samoa | — | — | — | — | — | — | — | — |
| C.N.M.I. | — | — | — | — | — | — | — | — |
| Guam | — | 4 | 19 | 1 | 2 | — | — | — |
| Puerto Rico | N | N | 1,223 | 11 | 226 | 3 | N | — |
| U.S. Virgin Islands | — | — | 13 | — | 1 | — | — | — |

N: Not notifiable.    U: Unavailable.    —: No reported cases.    C.N.M.I.: Commonwealth of Northern Mariana Islands.

111 Totals reported to the Division of STD Prevention, NCHHSTP (proposed), as of May 5, 2006.

**** Includes the following categories: primary, secondary, latent (including early latent, late latent, and latent syphilis of unknown duration), neurosyphilis, late (including late syphilis with clinical manifestations other than neurosyphilis), and congenital syphilis.

Summary of Notifiable Diseases --- United States, 2005                    Page 33 of 102

TABLE 2. (*Continued*) Reported cases of notifiable diseases,* by geographic division and area — United States, 2005

| Area | Tuberculosis[††††] | Tularemia | Typhoid fever | Vancomycin-intermediate Staphylococcus aureus | Vancomycin-resistant Staphylococcus aureus | Varicella (chickenpox) | Varicella deaths[§§§] |
|---|---|---|---|---|---|---|---|
| United States | 14,097 | 154 | 324 | 2 | 3 | 32,242 | 3 |
| New England | 436 | 12 | 23 | — | — | 5,284 | — |
| Connecticut | 95 | — | 8 | — | — | 1,709 | — |
| Maine | 17 | — | 1 | N | — | 331 | — |
| Massachusetts | 265 | 12 | 13 | — | — | 2,214 | — |
| New Hampshire | 4 | — | — | — | — | 337 | — |
| Rhode Island | 47 | — | 1 | — | — | N | — |
| Vermont | 8 | — | — | — | — | 693 | — |
| Mid. Atlantic | 2,099 | 4 | 62 | 1 | — | 4,752 | — |
| New Jersey | 485 | — | 12 | — | — | N | — |
| New York (Upstate) | 305 | 2 | 8 | — | — | N | — |
| New York City | 984 | — | 33 | N | — | N | — |
| Pennsylvania | 325 | 2 | 9 | 1 | — | 4,752 | — |
| E.N. Central | 1,326 | 6 | 39 | — | 3 | 6,239 | 1 |
| Illinois | 596 | 1 | 23 | — | — | 106 | 1 |
| Indiana | 146 | 2 | 2 | — | — | N | — |
| Michigan | 246 | 2 | 6 | — | 3 | 3,916 | — |
| Ohio | 260 | 1 | 2 | — | — | 1,725 | — |
| Wisconsin | 78 | — | 6 | N | N | 492 | — |
| W.N. Central | 479 | 48 | 7 | — | — | 695 | — |
| Iowa | 55 | — | — | — | — | N | — |
| Kansas | 60 | 5 | 1 | N | N | — | — |
| Minnesota | 199 | — | 6 | — | — | — | — |
| Missouri | 108 | 27 | — | — | — | 477 | — |
| Nebraska | 35 | 8 | — | — | — | N | — |
| North Dakota | 6 | — | — | — | — | 82 | — |
| South Dakota | 16 | 8 | — | — | — | 136 | — |
| S. Atlantic | 2,937 | 2 | 60 | 1 | — | 3,729 | 2 |
| Delaware | 26 | — | 1 | — | — | 35 | — |
| District of Columbia | 56 | — | — | N | N | 43 | — |
| Florida | 1,094 | 1 | 11 | — | — | N | 1 |
| Georgia | 505 | — | 9 | 1 | — | N | — |
| Maryland | 283 | — | 13 | N | N | N | — |
| North Carolina | 329 | — | 6 | — | — | — | — |
| South Carolina | 261 | 1 | — | — | — | 674 | — |
| Virginia | 355 | — | 20 | — | — | 1,834 | 1 |
| West Virginia | 28 | — | — | — | — | 1,143 | — |
| E.S. Central | 741 | 13 | 7 | — | — | 306 | — |
| Alabama | 216 | 1 | 1 | N | — | 306 | — |
| Kentucky | 124 | 3 | 2 | N | N | N | — |
| Mississippi | 103 | — | 2 | — | — | — | — |
| Tennessee | 298 | 9 | 2 | — | — | N | — |
| W.S. Central | 2,050 | 40 | 32 | — | — | 8,624 | — |
| Arkansas | 114 | 19 | — | — | — | 159 | — |
| Louisiana | 257 | — | 1 | — | — | 129 | — |
| Oklahoma | 144 | 20 | 1 | — | — | — | — |
| Texas | 1,535 | 1 | 30 | — | — | 8,336 | — |
| Mountain | 595 | 14 | 14 | — | — | 2,613 | — |
| Arizona | 281 | 2 | 4 | — | — | U | — |
| Colorado | 101 | 5 | 7 | — | — | 1,797 | — |
| Idaho | 23 | — | — | — | — | N | — |
| Montana | 10 | 2 | — | — | — | — | — |
| Nevada | 112 | — | 1 | N | N | N | — |
| New Mexico | 39 | 2 | 1 | N | N | 212 | — |
| Utah | 29 | 1 | 1 | — | — | 551 | — |
| Wyoming | — | 2 | — | — | — | 53 | — |
| Pacific | 3,434 | 15 | 80 | — | — | N | — |
| Alaska | 59 | 1 | — | N | N | N | — |
| California | 2,904 | 3 | 53 | N | N | N | — |
| Hawaii | 112 | — | 12 | — | — | — | — |
| Oregon | 103 | 2 | 4 | N | N | N | — |
| Washington | 256 | 9 | 11 | N | N | N | — |
| American Samoa | 5 | — | 1 | — | — | — | — |
| C.N.M.I. | 56 | — | — | — | — | — | — |
| Guam | 64 | — | 1 | — | — | 445 | — |
| Puerto Rico | 113 | — | — | N | — | 762 | — |
| U.S. Virgin Islands | — | — | — | — | — | — | — |

N: Not notifiable.    U: Unavailable.    — No reported cases.    C.N.M.I.: Commonwealth of Northern Mariana Islands.
[††††] Totals reported to the Division of TB Elimination, NCHHSTP (proposed), as of May 12, 2006.
[§§§] Death counts provided by the Division of Viral Diseases, National Center for Immunization and Respiratory Diseases (proposed), as of December 31, 2005.

TABLE 3. Reported cases and incidence* of notifiable diseases,† by age group — United States, 2005

| Disease | <1 yr No. | <1 yr Rate | 1–4 yrs No. | 1–4 yrs Rate | 5–14 yrs No. | 5–14 yrs Rate | 15–24 yrs No. | 15–24 yrs Rate | 25–39 yrs No. | 25–39 yrs Rate | 40–64 yrs No. | 40–64 yrs Rate | ≥65 yrs No. | ≥65 yrs Rate | Age not stated | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AIDS§ | 36 | 0.9 | 25 | 0.2 | 100 | 0.2 | 2,299 | 5.5 | 16,736 | 27.4 | 21,117 | 22.5 | 807 | 2.2 | — | 41,120 |
| Botulism | | | | | | | | | | | | | | | | |
| foodborne | — | 0 | 1 | 0 | 1 | 0 | 4 | 0 | 4 | 0 | 3 | 0 | 5 | 0 | 1 | 19 |
| infant | 81 | 2.0 | — | 0 | — | 0 | — | 0 | — | 0 | — | 0 | — | 0 | — | 85 |
| other (wound & unspecified) | 4 | 0.1 | — | 0 | — | 0 | — | 0 | 8 | 0 | 18 | 0 | 1 | 0 | — | 31 |
| Brucellosis | 2 | 0 | 4 | 0 | 15 | 0 | 17 | 0 | 31 | 0.1 | 36 | 0 | 14 | 0 | 1 | 120 |
| Chlamydia§,** | — | 0 | — | 0 | — | 0 | 693,239 | 1,662.4 | 235,447 | 385.4 | 26,553 | 28.3 | 880 | 2.4 | 4,996 | 976,445 |
| Cholera | — | 0 | — | 0 | — | 0 | — | 0 | 2 | 0 | 5 | 0 | 1 | 0 | — | 8 |
| Coccidioidomycosis†† | 19 | 1.2 | 53 | 0.8 | 330 | 2.0 | 636 | 3.5 | 1,393 | 5.7 | 2,672 | 7.3 | 1,330 | 9.7 | 109 | 6,542 |
| Cryptosporidiosis | 127 | 3.1 | 1,248 | 7.5 | 1,347 | 3.3 | 542 | 1.3 | 1,114 | 1.8 | 952 | 1.0 | 271 | 0.7 | 58 | 5,659 |
| Cyclosporiasis | — | 0 | 5 | 0 | 10 | 0 | 24 | 0.1 | 99 | 0.2 | 297 | 0.4 | 106 | 0.4 | 2 | 543 |
| Domestic arboviral diseases | | | | | | | | | | | | | | | | |
| California serogroup | | | | | | | | | | | | | | | | |
| neuroinvasive | — | 0 | 16 | 0.1 | 44 | 0.1 | 4 | 0 | 1 | 0 | 2 | 0 | 6 | 0 | — | 73 |
| nonneuroinvasive | — | 0 | 1 | 0 | 2 | 0 | 2 | 0 | — | 0 | 2 | 0 | — | 0 | — | 7 |
| eastern equine, neuroinvasive | 1 | 0 | 3 | 0 | 2 | 0 | 2 | 0 | 1 | 0 | 7 | 0 | 5 | 0 | — | 21 |
| Powassan, neuroinvasive | — | 0 | — | 0 | — | 0 | — | 0 | — | 0 | — | 0 | 1 | 0 | — | 1 |
| St. Louis | | | | | | | | | | | | | | | | |
| neuroinvasive | — | 0 | — | 0 | — | 0 | — | 0 | 2 | 0 | 2 | 0 | 3 | 0 | — | 7 |
| nonneuroinvasive | — | 0 | — | 0 | — | 0 | 1 | 0 | — | 0 | 5 | 0 | — | 0 | — | 6 |
| West Nile | | | | | | | | | | | | | | | | |
| neuroinvasive | 2 | 0 | 6 | 0 | 23 | 0.1 | 61 | 0.1 | 142 | 0.2 | 565 | 0.6 | 469 | 1.3 | 41 | 1,309 |
| nonneuroinvasive | 1 | 0 | 5 | 0 | 26 | 0.1 | 119 | 0.3 | 269 | 0.4 | 873 | 0.9 | 267 | 0.7 | 131 | 1,691 |
| Ehrlichiosis | | | | | | | | | | | | | | | | |
| human granulocytic | — | 0 | 3 | 0 | 36 | 0.1 | 37 | 0.1 | 100 | 0.2 | 383 | 0.4 | 224 | 0.7 | 3 | 786 |
| human monocytic | — | 0 | 8 | 0.1 | 28 | 0.1 | 37 | 0.1 | 77 | 0.1 | 239 | 0.3 | 114 | 0.3 | 3 | 506 |
| human (other & unspecified) | — | 0 | 4 | 0 | 4 | 0 | 6 | 0 | 18 | 0 | 54 | 0.1 | 26 | 0.1 | — | 112 |
| Enterohemorrhagic | | | | | | | | | | | | | | | | |
| *Escherichia coli* infection | | | | | | | | | | | | | | | | |
| O157:H7 | 37 | 0.9 | 530 | 3.3 | 845 | 1.6 | 411 | 1.0 | 285 | 0.5 | 440 | 0.5 | 232 | 0.6 | 41 | 2,621 |
| Shiga toxin-positive | | | | | | | | | | | | | | | | |
| non-O157 | 14 | 0.4 | 194 | 0.8 | 84 | 0.2 | 78 | 0.2 | 66 | 0.1 | 89 | 0.1 | 43 | 0.1 | 13 | 501 |
| not serogrouped | 19 | 0.5 | 100 | 0.7 | 72 | 0.2 | 59 | 0.2 | 48 | 0.1 | 68 | 0.1 | 36 | 0.1 | 5 | 407 |
| Giardiasis | 298 | 8.7 | 3,919 | 23.0 | 3,568 | 10.3 | 1,606 | 4.5 | 3,808 | 7.3 | 5,013 | 6.2 | 1,114 | 3.5 | 407 | 19,733 |
| Gonorrhea** | — | 0 | — | 0 | — | 0 | 196,177 | 470.4 | 106,654 | 174.6 | 29,606 | 31.6 | 759 | 2.1 | 1,717 | 339,593 |
| *Haemophilus influenzae,* invasive disease | | | | | | | | | | | | | | | | |
| all ages, serotypes | — | 0 | — | 0 | 93 | 0.2 | 81 | 0.2 | 155 | 0.3 | 565 | 0.6 | 1,036 | 2.9 | 375 | 2,304 |
| age <5 yrs | | | | | | | | | | | | | | | | |
| serotype b | 4 | 0.1 | 5 | 0 | — | 0 | — | 0 | — | 0 | — | 0 | — | 0 | — | 9 |
| nonserotype b | 78 | 1.9 | 57 | 0.4 | — | 0 | — | 0 | — | 0 | — | 0 | — | 0 | — | 135 |
| unknown serotype | 122 | 3.0 | 95 | 0.6 | — | 0 | — | 0 | — | 0 | — | 0 | — | 0 | — | 217 |
| Hansen disease (leprosy) | — | 0 | — | 0 | 3 | 0 | 12 | 0 | 15 | 0 | 24 | 0 | 9 | 0 | 24 | 87 |

* Per 100,000 population.
† No cases of anthrax; diphtheria; domestic arboviral disease, western equine encephalitis virus, neuroinvasive and nonneuroinvasive, and Powassan nonneuroinvasive; severe acute respiratory syndrome–associated coronavirus (SARS-CoV) disease; smallpox; or yellow fever were reported in 2005. Data on chronic hepatitis B and hepatitis C virus infection (past or present) are not included because they are undergoing data quality review. Data on human immunodeficiency virus (HIV) infections are not included because HIV infection reporting has been implemented on different dates and using different methods than for acquired immunodeficiency syndrome (AIDS) case reporting.
§ Total number of AIDS cases reported to the Division of HIV/AIDS Prevention, National Center for HIV/AIDS, Viral Hepatitis, STD, and TB Prevention (NCHHSTP) (proposed), through December 31, 2005.
¶ Chlamydia refers to genital infections caused by *Chlamydia trachomatis.*
** Age-related data are collected on aggregate forms different from those used for the number of reported cases. Thus, the total number of cases reported here will differ slightly from other tables. Cases among persons aged <15 years are not shown because some might not be caused by sexual transmission; these cases are included in the totals. Totals reported to the Division of STD Prevention, NCHHSTP (proposed), as of May 5, 2006.
†† Notifiable in <40 states.

TABLE 3. (*Continued*) Reported cases and incidence* of notifiable diseases,[†] by age group — United States, 2005

| Disease | <1 yr No. | <1 yr Rate | 1–4 yrs No. | 1–4 yrs Rate | 5–14 yrs No. | 5–14 yrs Rate | 15–24 yrs No. | 15–24 yrs Rate | 25–39 yrs No. | 25–39 yrs Rate | 40–64 yrs No. | 40–64 yrs Rate | ≥65 yrs No. | ≥65 yrs Rate | Age not stated | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hantavirus pulmonary syndrome | — | 0 | — | 0 | 2 | 0 | 6 | 0 | 7 | 0 | 8 | 0 | 3 | 0 | — | 26 |
| Hemolytic uremic syndrome, postdiarrheal | 7 | 0.2 | 109 | 0.7 | 65 | 0.2 | 10 | 0 | 6 | 0 | 9 | 0 | 12 | 0 | 4 | 221 |
| Hepatitis, viral, acute | | | | | | | | | | | | | | | | |
| A | 14 | 0.3 | 164 | 1.2 | 600 | 1.7 | 742 | 1.8 | 1,008 | 1.6 | 1,304 | 1.4 | 492 | 1.4 | 46 | 4,488 |
| B | 3 | 0.1 | 2 | 0 | 11 | 0 | 514 | 1.3 | 2,099 | 3.5 | 2,073 | 2.3 | 219 | 0.6 | 198 | 5,119 |
| C | 3 | 0.1 | 3 | 0 | — | 0 | 113 | 0.3 | 248 | 0.4 | 295 | 0.3 | 19 | 0.1 | 11 | 652 |
| Influenza-associated pediatric mortality[§§] | 9 | 0.3 | 12 | 0.1 | 18 | 0.1 | 6 | 0 | — | 0 | — | 0 | — | 0 | — | 45 |
| Legionellosis | 3 | 0.1 | 2 | 0 | 13 | 0 | 25 | 0.1 | 199 | 0.3 | 1,177 | 1.3 | 884 | 2.4 | 17 | 2,301 |
| Listeriosis | 73 | 1.8 | 7 | 0 | 9 | 0 | 35 | 0.1 | 71 | 0.1 | 243 | 0.2 | 463 | 1.3 | 5 | 896 |
| Lyme disease | 47 | 1.2 | 1,041 | 6.5 | 4,317 | 10.6 | 2,280 | 5.5 | 2,945 | 4.8 | 9,095 | 9.7 | 3,105 | 8.6 | 484 | 23,305 |
| Malaria | 11 | 0.3 | 67 | 0.4 | 154 | 0.4 | 237 | 0.5 | 442 | 0.7 | 499 | 0.5 | 67 | 0.2 | 37 | 1,484 |
| Measles | 6 | 0.1 | 4 | 0 | 21 | 0.1 | 12 | 0 | 9 | 0 | 10 | 0 | 2 | 0 | 2 | 66 |
| Meningococcal disease, invasive | | | | | | | | | | | | | | | | |
| all serogroups | 151 | 3.7 | 160 | 1.0 | 140 | 0.3 | 261 | 0.6 | 138 | 0.2 | 228 | 0.2 | 171 | 0.5 | 6 | 1,245 |
| serogroup A, C, Y, & W-135 | 18 | 0.4 | 21 | 0.1 | 31 | 0.1 | 62 | 0.1 | 43 | 0.1 | 65 | 0.1 | 55 | 0.2 | — | 297 |
| serogroup B | 31 | 0.8 | 31 | 0.2 | 30 | 0 | 35 | 0.1 | 8 | 0 | 19 | 0 | 10 | 0 | 2 | 156 |
| other serogroup | 8 | 0.2 | 7 | 0 | 1 | 0 | 1 | 0 | 4 | 0 | 5 | 0 | 1 | 0 | — | 27 |
| serogroup unknown | 94 | 2.3 | 101 | 0.6 | 88 | 0.2 | 163 | 0.4 | 78 | 0.1 | 138 | 0.1 | 104 | 0.3 | 4 | 765 |
| Mumps | 1 | 0 | 80 | 0.3 | 75 | 0.2 | 67 | 0.2 | 60 | 0.1 | 49 | 0.1 | 19 | 0 | 2 | 314 |
| Pertussis | 3,957 | 97.1 | 2,437 | 15.6 | 7,028 | 17.2 | 3,944 | 9.5 | 2,481 | 4.1 | 3,755 | 4.0 | 575 | 1.6 | 1,371 | 25,616 |
| Plague | — | 0 | 1 | 0 | — | 0 | 1 | 0 | — | 0 | 5 | 0 | 1 | 0 | — | 8 |
| Poliomyelitis, paralytic | — | 0 | — | 0 | — | 0 | 1 | 0 | — | 0 | — | 0 | — | 0 | — | 1 |
| Psittacosis | — | 0 | — | 0 | — | 0 | 3 | 0 | 3 | 0 | 8 | 0 | 1 | 0 | 1 | 16 |
| Q fever | — | 0 | — | 0 | 5 | 0 | 8 | 0 | 22 | 0 | 74 | 0.1 | 27 | 0.1 | — | 136 |
| Rabies | | | | | | | | | | | | | | | | |
| human | — | 0 | — | 0 | 1 | 0 | 1 | 0 | — | 0 | — | 0 | — | 0 | — | 2 |
| Rocky Mountain spotted fever | 3 | 0.1 | 29 | 0.2 | 283 | 0.6 | 207 | 0.5 | 416 | 0.7 | 785 | 0.8 | 239 | 0.6 | 9 | 1,936 |
| Rubella | 1 | 0 | — | 0 | 1 | 0 | 1 | 0 | 2 | 0 | 5 | 0 | — | 0 | 1 | 11 |
| Rubella, congenital syndrome | 1 | 0 | — | 0 | — | 0 | — | 0 | — | 0 | — | 0 | — | 0 | — | 1 |
| Salmonellosis | 4,805 | 117.9 | 8,160 | 51.0 | 6,566 | 16.1 | 4,296 | 10.3 | 6,207 | 10.2 | 9,385 | 10.0 | 4,845 | 13.3 | 1,036 | 45,322 |
| Shigellosis | 299 | 7.3 | 4,957 | 25.2 | 5,206 | 12.9 | 1,136 | 2.7 | 2,269 | 3.7 | 1,791 | 1.9 | 400 | 1.1 | 549 | 16,168 |
| Streptococcal disease, invasive, group A | 114 | 3.5 | 285 | 1.8 | 297 | 0.9 | 162 | 0.5 | 614 | 1.3 | 1,668 | 2.2 | 1,490 | 5.0 | 145 | 4,715 |
| Streptococcal toxic-shock syndrome | — | 0 | 4 | 0 | 7 | 0 | 12 | 0 | 19 | 0 | 57 | 0.1 | 30 | 0.1 | — | 129 |
| Streptococcus pneumoniae, invasive disease[††] | | | | | | | | | | | | | | | | |
| drug-resistant, all ages | 121 | 4.2 | 213 | 1.9 | 112 | 0.4 | 51 | 0.2 | 384 | 0.6 | 1,038 | 1.5 | 1,097 | 4.1 | 120 | 2,596 |
| age <5 yrs | 449 | 12.4 | 1,046 | 7.4 | — | 0 | — | 0 | — | 0 | — | 0 | — | 0 | — | 1,495 |
| Syphilis, primary & secondary[††] | — | 0 | — | 0 | 5 | 0 | 1,603 | 3.9 | 4,114 | 6.7 | 2,913 | 3.1 | 89 | 0.2 | 5 | 8,724 |
| Tetanus | — | 0 | — | 0 | 1 | 0 | 3 | 0 | 2 | 0 | 12 | 0 | 9 | 0 | — | 27 |
| Toxic-shock syndrome | 1 | 0 | 2 | 0 | 9 | 0 | 32 | 0.1 | 19 | 0 | 25 | 0 | — | 0 | 2 | 90 |
| Trichinellosis | — | 0 | — | 0 | 2 | 0 | 2 | 0 | 3 | 0 | 8 | 0 | 1 | 0 | — | 16 |
| Tuberculosis[†††] | 81 | 2.0 | 369 | 2.5 | 393 | 0.9 | 1,542 | 3.7 | 3,499 | 5.7 | 5,377 | 5.7 | 2,816 | 7.8 | — | 14,097 |
| Tularemia | — | 0 | 16 | 0.1 | 20 | 0 | 18 | 0 | 15 | 0 | 55 | 0.1 | 25 | 0.1 | 2 | 154 |
| Typhoid fever | 6 | 0.1 | 28 | 0.2 | 76 | 0.2 | 60 | 0.1 | 97 | 0.2 | 42 | 0 | 9 | 0 | 8 | 324 |
| Vancomycin-intermediate *Staphylococcus aureus* | — | 0 | — | 0 | — | 0 | — | 0 | — | 0 | — | 0 | 2 | 0 | — | 2 |
| Vancomycin-resistant *Staphylococcus aureus* | — | 0 | — | 0 | — | 0 | — | 0 | — | 0 | 2 | 0 | 1 | 0 | — | 3 |

[§§] Totals reported to the Influenza Division, National Center for Immunization and Respiratory Diseases (NCIRD) (proposed), as of December 31, 2005.
[¶¶] Totals reported to the Division of TB Elimination, NCHHSTP (proposed), as of May 12, 2006.

TABLE 4. Reported cases and incidence* of notifiable diseases,[†] by sex — United States, 2005

| Disease | Male No. | Male Rate | Female No. | Female Rate | Sex not stated No. | Total |
|---|---|---|---|---|---|---|
| AIDS[§] | 30,414 | 21.0 | 10,706 | 7.2 | — | 41,120 |
| Botulism | | | | | | |
| foodborne | 9 | 0 | 10 | 0 | — | 19 |
| infant | 45 | 2.2 | 38 | 1.9 | 2 | 85 |
| other (wound & unspecified) | 23 | 0 | 8 | 0 | — | 31 |
| Brucellosis | 67 | 0 | 52 | 0 | 1 | 120 |
| Chancroid[¶] | 11 | 0 | 5 | 0 | 1 | 17 |
| Chlamydia[¶,**] | 232,781 | 161.1 | 740,371 | 496.5 | 3,293 | 976,445 |
| Cholera | 4 | 0 | 4 | 0 | — | 8 |
| Coccidioidomycosis[††] | 3,762 | 7.3 | 2,577 | 4.9 | 203 | 6,542 |
| Cryptosporidiosis | 2,882 | 2.0 | 2,736 | 1.8 | 41 | 5,659 |
| Cyclosporiasis | 241 | 0.2 | 301 | 0.3 | 1 | 543 |
| Domestic arboviral diseases | | | | | | |
| California serogroup | | | | | | |
| neuroinvasive | 39 | 0 | 33 | 0 | 1 | 73 |
| nonneuroinvasive | 4 | 0 | 3 | 0 | — | 7 |
| eastern equine, neuroinvasive | 13 | 0 | 8 | 0 | — | 21 |
| Powassan, neuroinvasive | 1 | 0 | — | 0 | — | 1 |
| St. Louis | | | | | | |
| neuroinvasive | 3 | 0 | 3 | 0 | 1 | 7 |
| nonneuroinvasive | 3 | 0 | 3 | 0 | — | 6 |
| West Nile | | | | | | |
| neuroinvasive | 749 | 0.5 | 555 | 0.4 | 5 | 1,309 |
| nonneuroinvasive | 945 | 0.7 | 740 | 0.5 | 6 | 1,691 |
| Ehrlichiosis | | | | | | |
| human granulocytic | 456 | 0.3 | 324 | 0.2 | 6 | 786 |
| human monocytic | 271 | 0.2 | 232 | 0.2 | 3 | 506 |
| human (other & unspecified) | 62 | 0 | 50 | 0 | — | 112 |
| Enterohemorrhagic Escherichia coli infection | | | | | | |
| O157:H7 | 1,181 | 0.8 | 1,414 | 1.0 | 26 | 2,621 |
| Shiga toxin-positive non-O157 | 252 | 0.2 | 240 | 0.2 | 9 | 501 |
| not serogrouped | 199 | 0.2 | 206 | 0.2 | 2 | 407 |
| Giardiasis | 10,739 | 8.7 | 8,653 | 6.7 | 341 | 19,733 |
| Gonorrhea[¶] | 161,117 | 111.5 | 177,537 | 119.1 | 939 | 339,593 |
| Haemophilus influenzae, invasive disease | | | | | | |
| all ages, serotypes | 1,071 | 0.7 | 1,225 | 0.8 | 8 | 2,304 |
| age <5 yrs | | | | | | |
| serotype b | 4 | 0 | 4 | 0 | 1 | 9 |
| nonserotype b | 78 | 0.8 | 57 | 0.6 | — | 135 |
| unknown serotype | 128 | 1.2 | 88 | 0.9 | 1 | 217 |

* Per 100,000 population.
[†] No cases of anthrax; diphtheria; domestic arboviral disease, western equine encephalitis virus, neuroinvasive and nonneuroinvasive, eastern equine nonneuroinvasive, and Powassen nonneuroinvasive; severe acute respiratory syndrome–associated coronavirus (SARS-CoV) disease; smallpox; or yellow fever were reported in 2005. Data on chronic hepatitis B and hepatitis C virus infection (past or present) are not included because they are undergoing data quality review. Data on human immunodeficiency virus (HIV) infections are not included because HIV infection reporting has been implemented on different dates and using different methods than for acquired immunodeficiency syndrome (AIDS) case reporting.
[§] Total number of AIDS cases reported to the Division of HIV/AIDS Prevention, National Center for HIV/AIDS, Viral Hepatitis, STD, and TB Prevention (NCHHSTP) (proposed), through December 31, 2005.
[¶] Totals reported to the Division of STD Prevention, NCHHSTP (proposed), as of May 5, 2006.
** Chlamydia refers to genital infections caused by Chlamydia trachomatis.
[††] Notifiable in <40 states.

TABLE 4. (*Continued*) Reported cases and incidence* of notifiable diseases,† by sex — United States, 2005

| Disease | Male No. | Male Rate | Female No. | Female Rate | Sex not stated No. | Total |
|---|---|---|---|---|---|---|
| Hansen disease (leprosy) | 38 | 0 | 26 | 0 | 23 | 87 |
| Hantavirus pulmonary syndrome | 19 | 0 | 7 | 0 | — | 26 |
| Hemolytic uremic syndrome, postdiarrheal | 94 | 0.1 | 126 | 0.1 | 1 | 221 |
| Hepatitis, viral, acute | | | | | | |
| A | 2,470 | 1.7 | 1,971 | 1.3 | 47 | 4,488 |
| B | 3,144 | 2.2 | 1,927 | 1.3 | 48 | 5,119 |
| C | 354 | 0.3 | 296 | 0.2 | 2 | 652 |
| Influenza-associated pediatric mortality§§ | 22 | 0 | 23 | 0 | — | 45 |
| Legionellosis | 1,475 | 1.0 | 806 | 0.5 | 20 | 2,301 |
| Listeriosis | 404 | 0.3 | 487 | 0.3 | 5 | 896 |
| Lyme disease | 12,634 | 8.7 | 10,077 | 6.8 | 594 | 23,305 |
| Malaria | 985 | 0.7 | 490 | 0.3 | 19 | 1,494 |
| Measles | 31 | 0 | 34 | 0 | 1 | 66 |
| Meningococcal disease, invasive | | | | | | |
| all serogroups | 618 | 0.4 | 620 | 0.4 | 7 | 1,245 |
| serogroup A, C, Y, & W-135 | 149 | 0.1 | 147 | 0.1 | 1 | 297 |
| serogroup B | 85 | 0.1 | 71 | 0 | — | 156 |
| other serogroup | 14 | 0 | 13 | 0 | — | 27 |
| serogroup unknown | 370 | 0.3 | 389 | 0.3 | 6 | 765 |
| Mumps | 182 | 0.1 | 130 | 0.1 | 2 | 314 |
| Pertussis | 10,872 | 7.5 | 13,469 | 9.0 | 1,275 | 25,616 |
| Plague | 4 | 0 | 4 | 0 | — | 8 |
| Poliomyelitis, paralytic | — | 0 | 1 | 0 | — | 1 |
| Psittacosis | 6 | 0 | 9 | 0 | 1 | 16 |
| Q fever | 98 | 0.1 | 38 | 0 | — | 136 |
| Rabies | | | | | | |
| human | 2 | 0 | — | 0 | — | 2 |
| Rocky Mountain spotted fever | 1,034 | 0.7 | 889 | 0.6 | 13 | 1,936 |
| Rubella | 8 | 0 | 3 | 0 | — | 11 |
| Rubella, congenital syndrome | 0 | 0 | 1 | 0 | — | 1 |
| Salmonellosis | 21,727 | 15.0 | 22,981 | 15.4 | 614 | 45,322 |
| Shigellosis | 7,518 | 5.2 | 8,407 | 5.6 | 243 | 16,168 |
| Streptococcal disease, invasive, group A | 2,391 | 2.1 | 2,192 | 1.8 | 132 | 4,715 |
| Streptococcal toxic-shock syndrome | 64 | 0.1 | 65 | 0.1 | — | 129 |
| *Streptococcus pneumoniae*, invasive disease†† | | | | | | |
| drug resistant, all ages | 1,407 | 1.4 | 1,462 | 1.4 | 127 | 2,996 |
| age <5 yrs | 867 | 9.3 | 618 | 6.9 | 10 | 1,495 |
| Syphilis, primary & secondary¶ | 7,383 | 5.1 | 1,339 | 0.9 | 2 | 8,724 |
| Tetanus | 14 | 0 | 13 | 0 | — | 27 |
| Toxic-shock syndrome | 19 | 0 | 71 | 0.1 | — | 90 |
| Trichinellosis | 13 | 0 | 3 | 0 | — | 16 |
| Tuberculosis¶¶¶ | 8,715 | 6.0 | 5,382 | 3.6 | — | 14,097 |
| Tularemia | 95 | 0.1 | 58 | 0 | 1 | 154 |
| Typhoid fever | 180 | 0.1 | 142 | 0.1 | 2 | 324 |
| Vancomycin-intermediate *Staphylococcus aureus* | 2 | 0 | — | 0 | — | 2 |
| Vancomycin-resistant *Staphylococcus aureus* | 2 | 0 | 1 | 0 | — | 3 |

§§ Totals reported to the Influenza Division, National Center for Immunization and Respiratory Diseases (NCIRD) (proposed), as of December 31, 2005.
¶¶¶ Totals reported to the Division of TB Elimination, NCHHSTP (proposed), as of May 12, 2006.

Appx11295

TABLE 5. Reported cases and incidence* of notifiable diseases,† by race — United States, 2005

| Disease | American Indian or Alaska Native No. | Rate | Asian or Pacific Islander No. | Rate | Black No. | Rate | White No. | Rate | Other No. | Race not stated No. | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AIDS§ | 205 | 6.5 | 515 | 3.8 | 20,711 | 53.7 | 15,402 | 6.5 | 143 | 4,144 | 41,120 |
| Botulism | | | | | | | | | | | |
| infant | — | — | 7 | 3.6 | 2 | 0.3 | 44 | 1.4 | 1 | 31 | 85 |
| other (wound & unspecified) | 1 | 0 | 1 | 0 | 4 | 0 | 7 | 0 | 0 | 18 | 31 |
| Brucellosis | 0 | 0 | 8 | 0.1 | 0 | 0 | 51 | 0 | 0 | 61 | 120 |
| Chlamydia¶,** | 13,749 | 436.7 | 15,190 | 111.3 | 327,635 | 848.8 | 297,853 | 125.0 | 27,859 | 294,169 | 976,445 |
| Coccidioidomycosis†† | 41 | 2.1 | 125 | 1.6 | 223 | 2.2 | 1,429 | 1.7 | 29 | 4,695 | 6,542 |
| Cryptosporidiosis | 11 | 0.3 | 56 | 0.4 | 360 | 0.9 | 3,288 | 1.4 | 235 | 1,709 | 5,659 |
| Cyclosporiasis | 1 | 0 | 3 | 0 | 8 | 0 | 438 | 0.2 | 3 | 90 | 543 |
| Domestic arboviral diseases§§ | | | | | | | | | | | |
| California serogroup | | | | | | | | | | | |
| neuroinvasive | 0 | 0 | 1 | 0 | 3 | 0 | 62 | 0 | 1 | 6 | 73 |
| West Nile | | | | | | | | | | | |
| neuroinvasive | 19 | 0.6 | 5 | 0 | 116 | 0.3 | 902 | 0.4 | 16 | 251 | 1,309 |
| nonneuroinvasive | 19 | 0.6 | 11 | 0.1 | 42 | 0.1 | 1,247 | 0.5 | 17 | 355 | 1,691 |
| Ehrlichiosis | | | | | | | | | | | |
| human granulocytic | 6 | 0.2 | 5 | 0 | 4 | 0 | 484 | 0.2 | 8 | 279 | 786 |
| human monocytic | 21 | 0.7 | 1 | 0 | 15 | 0 | 359 | 0.2 | 3 | 108 | 506 |
| human (other & unspecified) | 0 | 0 | 0 | 0 | 0 | 0 | 92 | 0 | 3 | 17 | 112 |
| Enterohemorrhagic Escherichia coli infection | | | | | | | | | | | |
| O157:H7 | 8 | 0.3 | 36 | 0.3 | 88 | 0.2 | 1,799 | 0.8 | 77 | 613 | 2,621 |
| Shiga toxin-positive | | | | | | | | | | | |
| non-O157 | 1 | 0 | 2 | 0 | 17 | 0 | 276 | 0.1 | 13 | 192 | 501 |
| not serogrouped | 1 | 0 | 3 | 0 | 22 | 0.1 | 240 | 0.1 | 12 | 129 | 407 |
| Giardiasis | 76 | 2.7 | 1,579 | 12.5 | 1,396 | 4.2 | 8,297 | 4.1 | 641 | 7,755 | 19,733 |
| Gonorrhea** | 2,538 | 80.6 | 2,825 | 20.7 | 179,186 | 464.2 | 67,669 | 28.4 | 6,243 | 91,132 | 339,593 |
| Haemophilus influenzae, invasive disease | | | | | | | | | | | |
| all ages, serotypes | 31 | 1.0 | 37 | 0.3 | 260 | 0.7 | 1,458 | 0.6 | 63 | 455 | 2,304 |
| age <5 yrs | | | | | | | | | | | |
| nonserotype b | 6 | 2.7 | 4 | 0.4 | 19 | 0.6 | 65 | 0.4 | 1 | 40 | 135 |
| unknown serotype | 8 | 3.6 | 2 | 0.2 | 34 | 1.0 | 106 | 0.7 | 0 | 58 | 217 |

* Per 100,000 population. Diseases for which <25 cases were reported are not included in this table.
† No cases of anthrax; diphtheria; domestic arboviral disease, western equine encephalitis virus, neuroinvasive and nonneuroinvasive, eastern equine nonneuroinvasive, and Powassan nonneuroinvasive; severe acute respiratory syndrome–associated coronavirus (SARS-CoV) disease; smallpox; or yellow fever were reported in 2005. Data on chronic hepatitis B and hepatitis C virus infection (past or present) are not included because they are undergoing data quality review. Data on human immunodeficiency virus (HIV) infections are not included because HIV infection reporting has been implemented on different dates and using different methods than for acquired immunodeficiency syndrome (AIDS) case reporting.
§ Total number of AIDS cases reported to the Division of HIV/AIDS Prevention, National Center for HIV/AIDS, Viral Hepatitis, STD, and TB Prevention (NCHHSTP) (proposed), through December 31, 2005.
¶ Chlamydia refers to genital infections caused by Chlamydia trachomatis.
** In addition to data collected through the National Electronic Telecommunications System for Surveillance (NETSS), certain data on ethnicity are collected on aggregate forms different from those used for reported cases. Thus, the total number of cases reported here can differ slightly from totals reported in other surveillance summaries. Totals reported to the Division of STD Prevention, NCHHSTP (proposed), as of May 5, 2006.
†† Notifiable in <40 states.
§§ Totals reported to the Division of Vector-Borne Infectious Diseases, National Center for Zoonotic, Vector-Borne, and Enteric Diseases (NCZVED) (proposed) (ArboNET Surveillance), as of June 23, 2006.

TABLE 5. (*Continued*) Reported cases and incidence* of notifiable diseases,[†] by race — United States, 2005

| Disease | American Indian or Alaska Native | | Asian or Pacific Islander | | Black | | White | | Other | Race not stated | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | No. | Rate | No. | Rate | No. | Rate | No. | Rate | No. | No. | |
| Hansen disease (leprosy) | 0 | 0 | 17 | 0.1 | 8 | 0 | 28 | 0 | 0 | 34 | 87 |
| Hantavirus pulmonary syndrome | 3 | 0.1 | 0 | 0 | 1 | 0 | 21 | 0 | 1 | — | 26 |
| Hemolytic uremic syndrome, postdiarrheal | 2 | 0.1 | 5 | 0 | 8 | 0 | 167 | 0.1 | 3 | 36 | 221 |
| Hepatitis, viral, acute | | | | | | | | | | | |
| A | 14 | 0.4 | 219 | 1.6 | 296 | 0.7 | 2,365 | 1.0 | 133 | 1,472 | 4,499 |
| B | 32 | 1.1 | 157 | 1.2 | 1,078 | 2.8 | 2,333 | 1.0 | 139 | 1,380 | 5,119 |
| C | 8 | 0.3 | 2 | 0 | 39 | 0.1 | 434 | 0.2 | 17 | 152 | 652 |
| Influenza-associated pediatric mortality[§§] | 0 | 0 | 4 | 0 | 8 | 0 | 24 | 0 | 0 | 9 | 45 |
| Legionellosis | 10 | 0.3 | 18 | 0.1 | 362 | 0.9 | 1,476 | 0.6 | 63 | 372 | 2,301 |
| Listeriosis | 4 | 0.1 | 40 | 0.3 | 82 | 0.2 | 559 | 0.2 | 26 | 185 | 896 |
| Lyme disease | 36 | 1.1 | 129 | 0.9 | 167 | 0.4 | 10,736 | 4.5 | 2,007 | 10,230 | 23,305 |
| Malaria | 6 | 0.2 | 94 | 0.7 | 711 | 1.8 | 297 | 0.1 | 44 | 342 | 1,494 |
| Measles | 0 | 0 | 5 | 0 | 1 | 0 | 48 | 0 | 4 | 8 | 66 |
| Meningococcal disease, invasive | | | | | | | | | | | |
| all serogroups | 11 | 0.3 | 25 | 0.2 | 169 | 0.4 | 769 | 0.3 | 29 | 242 | 1,245 |
| serogroup A, C, Y, & W-135 | 4 | 0.1 | 2 | 0 | 58 | 0.2 | 192 | 0.1 | 4 | 37 | 297 |
| serogroup B | 1 | 0 | 2 | 0 | 16 | 0 | 107 | 0 | 4 | 26 | 156 |
| other serogroup | 0 | 0 | 2 | 0 | 4 | 0 | 19 | 0 | 0 | 2 | 27 |
| serogroup unknown | 6 | 0.2 | 18 | 0.1 | 90 | 0.2 | 445 | 0.2 | 21 | 185 | 765 |
| Mumps | 5 | 0.2 | 27 | 0.2 | 20 | 0.1 | 151 | 0.1 | 4 | 107 | 314 |
| Pertussis | 377 | 12.0 | 394 | 2.9 | 1,075 | 2.8 | 16,955 | 7.1 | 319 | 6,496 | 25,616 |
| Q fever | 4 | 0.1 | 1 | 0 | 7 | 0 | 95 | 0 | 1 | 28 | 136 |
| Rocky Mountain spotted fever | 109 | 3.6 | 10 | 0.1 | 140 | 0.4 | 1,358 | 0.6 | 15 | 304 | 1,936 |
| Salmonellosis | 267 | 8.5 | 1,034 | 7.6 | 3,909 | 10.1 | 23,897 | 10.0 | 1,352 | 14,863 | 45,322 |
| Shigellosis | 300 | 9.5 | 231 | 1.7 | 2,152 | 5.6 | 7,247 | 3.0 | 332 | 5,906 | 16,168 |
| Streptococcal disease, invasive, group A | 91 | 4.0 | 115 | 1.4 | 582 | 1.8 | 2,695 | 1.4 | 143 | 1,089 | 4,715 |
| Streptococcal toxic-shock syndrome | 1 | 0 | 4 | 0.1 | 12 | 0 | 93 | 0.1 | 8 | 11 | 129 |
| *Streptococcus pneumoniae,* invasive disease[††] | | | | | | | | | | | |
| drug resistant, all ages | 15 | 0.8 | 13 | 0.2 | 582 | 1.9 | 1,791 | 1.0 | 89 | 506 | 2,996 |
| age <5 yrs | 22 | 11.7 | 39 | 4.4 | 337 | 11.4 | 685 | 4.9 | 50 | 362 | 1,495 |
| Syphilis, primary & secondary** | 62 | 2.0 | 151 | 1.1 | 3,460 | 9.0 | 4,391 | 1.8 | 192 | 468 | 8,724 |
| Tetanus | 0 | 0 | 2 | 0 | 2 | 0 | 19 | 0 | 0 | 4 | 27 |
| Toxic-shock syndrome | 0 | 0 | 0 | 0 | 4 | 0 | 71 | 0 | 1 | 14 | 90 |
| Tuberculosis[††] | 168 | 5.3 | 3,325 | 24.4 | 4,074 | 10.6 | 6,438 | 2.7 | 55 | 37 | 14,097 |
| Tularemia | 10 | 0.3 | 0 | 0 | 1 | 0 | 96 | 0 | 0 | 47 | 154 |
| Typhoid fever | 3 | 0.1 | 119 | 0.9 | 25 | 0.1 | 51 | 0 | 0 | 26 | 324 |

[§§] Totals reported to the Influenza Division, National Center for Immunization and Respiratory Diseases (NCIRD) (proposed), as of December 31, 2005.
[††] Totals reported to the Division of TB Elimination, NCHHSTP (proposed), as of May 12, 2006.

TABLE 6. Reported cases and incidence* of notifiable diseases,[†] by ethnicity — United States, 2005

| Disease | Hispanic | | Non-Hispanic | | Ethnicity not stated | Total |
|---|---|---|---|---|---|---|
| | No. | Rate | No. | Rate | No. | |
| AIDS[§] | 7,522 | 18.2 | 31,317 | 12.4 | 2,281 | 41,120 |
| Botulism | | | | | | |
| infant | 17 | 1.9 | 43 | 1.4 | 25 | 85 |
| other (wound & unspecified) | 10 | 0 | 12 | 0 | 9 | 31 |
| Brucellosis | 58 | 0.1 | 29 | 0 | 33 | 120 |
| Chlamydia[¶,**] | 137,706 | 333.5 | 470,040 | 186.3 | 368,600 | 976,445 |
| Coccidioidomycosis[††] | 908 | 4.9 | 1,463 | 1.7 | 4,171 | 6,542 |
| Cryptosporidiosis | 323 | 0.8 | 2,638 | 1.0 | 2,698 | 5,659 |
| Cyclosporiasis | 28 | 0.1 | 416 | 0.2 | 99 | 543 |
| Domestic arboviral diseases[§§] | | | | | | |
| California serogroup | | | | | | |
| neuroinvasive | 1 | 0 | 55 | 0 | 17 | 73 |
| West Nile | | | | | | |
| neuroinvasive | 148 | 0.4 | 663 | 0.3 | 498 | 1,309 |
| nonneuroinvasive | 116 | 0.3 | 910 | 0.4 | 665 | 1,691 |
| Ehrlichiosis | | | | | | |
| human granulocytic | 18 | 0 | 407 | 0.2 | 361 | 786 |
| human monocytic | 18 | 0 | 345 | 0.1 | 143 | 506 |
| human (other & unspecified) | 5 | 0 | 77 | 0 | 30 | 112 |
| Enterohemorrhagic *Escherichia coli* infection | | | | | | |
| O157:H7 | 104 | 0.3 | 1,505 | 0.6 | 1,012 | 2,621 |
| Shiga-toxin-positive | | | | | | |
| non-O157 | 39 | 0.1 | 218 | 0.1 | 244 | 501 |
| not serogrouped | 38 | 0.1 | 211 | 0.1 | 158 | 407 |
| Giardiasis | 1,519 | 4.6 | 8,960 | 4.1 | 9,254 | 19,733 |
| Gonorrhea** | 23,746 | 57.5 | 192,984 | 76.5 | 122,863 | 339,593 |
| *Haemophilus influenzae,* invasive disease | | | | | | |
| all ages, serotypes | 151 | 0.4 | 1,286 | 0.5 | 867 | 2,304 |
| age <5 yrs | | | | | | |
| nonserotype b | 43 | 1.0 | 66 | 0.4 | 26 | 135 |
| unknown serotype | 29 | 0.7 | 110 | 0.7 | 78 | 217 |

* Per 100,000 population. Diseases for which <25 cases were reported are not included in this table.

[†] No cases of anthrax; diphtheria; domestic arboviral disease, western equine encephalitis virus, neuroinvasive and nonneuroinvasive, eastern equine nonneuroinvasive, and Powassan nonneuroinvasive; severe acute respiratory syndrome–associated coronavirus (SARS-CoV) disease; smallpox; or yellow fever were reported in 2005. Data on chronic hepatitis B and hepatitis C virus infection (past or present) are not included because they are undergoing data quality review. Data on human immunodeficiency virus (HIV) infections are not included because HIV infection reporting has been implemented on different dates and using different methods than for acquired immunodeficiency syndrome (AIDS) case reporting.

[§] Total number of AIDS cases reported to the Division of HIV/AIDS Prevention, National Center for HIV/AIDS, Viral Hepatitis, STD, and TB Prevention (NCHHSTP) (proposed), through December 31, 2005.

[¶] Chlamydia refers to genital infections caused by *Chlamydia trachomatis.*

** In addition to data collected through the National Electronic Telecommunications System for Surveillance (NETSS), certain data on ethnicity are collected on aggregate forms different from those used for reported cases. Thus, the total number of cases reported here can differ slightly from totals reported in other surveillance summaries. Totals reported to the Division of STD Prevention, NCHHSTP (proposed), as of May 5, 2006.

[††] Notifiable in <40 states.

[§§] Totals reported to the Division of Vector-Borne Infectious Diseases, National Center for Zoonotic, Vector-Borne, and Enteric Diseases (NCZVED) (proposed) (ArboNET Surveillance), as of June 23, 2006.

Appx11298

TABLE 6. (*Continued*) Reported cases and incidence* of notifiable diseases,[†] by ethnicity — United States, 2005

| Disease | Hispanic | | Non-Hispanic | | Ethnicity not stated | |
|---|---|---|---|---|---|---|
| | No. | Rate | No. | Rate | No. | Total |
| Hansen disease (leprosy) | 26 | 0.1 | 34 | 0 | 27 | 87 |
| Hantavirus pulmonary syndrome | 6 | 0 | 20 | 0 | — | 26 |
| Hemolytic uremic syndrome, postdiarrheal | 24 | 0.1 | 142 | 0.1 | 55 | 221 |
| Hepatitis, viral, acute | | | | | | |
| A | 1,146 | 2.8 | 2,042 | 0.8 | 1,300 | 4,488 |
| B | 463 | 1.2 | 2,717 | 1.1 | 1,939 | 5,119 |
| C | 62 | 0.2 | 302 | 0.1 | 288 | 652 |
| Influenza-associated pediatric mortality[§§] | 11 | 0 | 23 | 0 | 11 | 45 |
| Legionellosis | 90 | 0.2 | 1,329 | 0.5 | 882 | 2,301 |
| Listeriosis | 115 | 0.3 | 513 | 0.2 | 268 | 896 |
| Lyme disease | 281 | 0.7 | 7,759 | 3.1 | 15,265 | 23,305 |
| Malaria | 99 | 0.2 | 907 | 0.4 | 488 | 1,494 |
| Measles | 2 | 0 | 51 | 0 | 13 | 66 |
| Meningococcal disease, invasive | | | | | | |
| all serogroups | 159 | 0.4 | 698 | 0.3 | 388 | 1,245 |
| serogroup A, C, Y, & W-135 | 30 | 0.1 | 191 | 0.1 | 76 | 297 |
| serogroup B | 22 | 0.1 | 89 | 0 | 45 | 156 |
| other serogroup | 3 | 0 | 16 | 0 | 8 | 27 |
| serogroup unknown | 103 | 0.2 | 397 | 0.2 | 265 | 765 |
| Mumps | 42 | 0.1 | 151 | 0.1 | 121 | 314 |
| Pertussis | 3,400 | 8.2 | 15,195 | 6.0 | 7,021 | 25,616 |
| Q fever | 13 | 0 | 83 | 0 | 40 | 136 |
| Rocky Mountain spotted fever | 66 | 0.2 | 1,359 | 0.5 | 511 | 1,936 |
| Salmonellosis | 4,951 | 12.0 | 20,450 | 8.1 | 19,921 | 45,322 |
| Shigellosis | 4,551 | 11.0 | 5,579 | 2.2 | 6,038 | 16,168 |
| Streptococcal disease, invasive, group A | 414 | 1.5 | 2,267 | 1.1 | 2,034 | 4,715 |
| Streptococcal toxic-shock syndrome | 12 | 0.1 | 51 | 0 | 66 | 129 |
| *Streptococcus pneumoniae*, invasive disease[††] | | | | | | |
| drug resistant, all ages | 144 | 0.6 | 1,507 | 0.8 | 1,345 | 2,996 |
| age <5 yrs | 173 | 4.2 | 634 | 4.5 | 688 | 1,495 |
| Syphilis, primary & secondary** | 1,294 | 3.1 | 6,437 | 2.6 | 993 | 8,724 |
| Tetanus | 0 | 0 | 20 | 0 | 7 | 27 |
| Toxic-shock syndrome | 4 | 0 | 52 | 0 | 34 | 90 |
| Tuberculosis[¶¶] | 4,043 | 9.8 | 10,005 | 4.0 | 49 | 14,097 |
| Tularemia | 3 | 0 | 81 | 0 | 70 | 154 |
| Typhoid fever | 42 | 0.1 | 182 | 0.1 | 100 | 324 |

§§ Totals reported to the Influenza Division, National Center for Immunization and Respiratory Diseases (NCIRD) (proposed), as of December 31, 2005.
¶¶ Totals reported to the Division of TB Elimination, NCHHSTP (proposed), as of May 12, 2006.

## Part 2
## Graphs and Maps for Selected Notifiable Diseases in the United States, 2005



ACQUIRED IMMUNODEFICIENCY SYNDROME (AIDS). Percentage of reported cases, by race/ethnicity* — United States, 2005



* For 0.3% of respondents, race/ethnicity was unknown.

Of persons reported with AIDS during 2005, the greatest percentage were non-Hispanic blacks, followed by non-Hispanic whites, Hispanics, Asians/Pacific Islanders, and American Indians/Alaska Natives.

ACQUIRED IMMUNODEFICIENCY SYNDROME (AIDS). Incidence* — United States[†] and U.S. territories, 2005



* Per 100,000 population.
[†] Includes 209 persons with unknown state of residence.

The highest AIDS rates were observed in the northeastern part of the country. High incidence (i.e., ≥15 cases per 100,000 population) also was reported in the southeastern states, the U.S. Virgin Islands, and Puerto Rico.



ACQUIRED IMMUNODEFICIENCY SYNDROME (AIDS). Number of reported pediatric* cases — United States and U.S. territories, 2005

*Children and adolescents aged <13 years.

During 2005, a total of 93 new cases were reported in the United States and U.S. territories.

BOTULISM, FOODBORNE. Number of reported cases, by year — United States, 1985–2005



Home-canned foods and Alaska Native foods consisting of fermented foods of marine origin remain the principal sources of foodborne botulism in the United States. During 2005, two fatal cases of foodborne botulism were reported.



BOTULISM, INFANT. Number of reported cases, by year — United States, 1985–2005

Infant botulism is the most common type of botulism in the United States. Cases are sporadic, and risk factors remain substantially unknown.



BOTULISM, OTHER (includes wound and unspecified). Number of reported cases, by year — United States, 1995–2005

Wound botulism cases occur almost exclusively in the western United States among injection-drug users and are associated with a particular type of heroin known as black tar heroin. During 2005, all cases of wound botulism occurred among injection-drug users.



BRUCELLOSIS. Number of reported cases, by year — United States, 1975–2005

The incidence of brucellosis has remained stable in recent years, reflecting an ongoing risk for infection with *Brucella suis* acquired through contact with feral swine in the United States, and *B. melitensis* and *B. abortus* acquired through exposure to unpasteurized milk products in countries with endemic brucellosis in sheep, goats, and cattle.



BRUCELLOSIS. Number of reported cases — United States and U.S. territories, 2005

The incidence of brucellosis has remained stable in recent years, reflecting an ongoing risk from feral swine in the United States, and exposure to unpasteurized milk products from countries with endemic brucellosis.

Appx11303

CHLAMYDIA. Incidence* among women — United States and U.S. territories, 2005



* Per 100,000 population.

Chlamydia refers to genital infections caused by *Chlamydia trachomatis*. In 2005, the chlamydia rate among women was 496.5 cases per 100,000 population.

CHOLERA. Number of reported cases — United States and U.S. territories, 2005



In 2005, the majority of cholera infections in the United States were acquired in states or territories with large marine coasts, where noncommercial harvesting of shellfish and fish is a common practice. Consumption of contaminated seafood and foreign travel remain the most common sources of infection.

COCCIDIOIDOMYCOSIS. Number of reported cases — United States* and U.S. territories, 2005



*In the United States, coccidioidomycosis is endemic in the southwestern states. However, cases have been reported in other states, typically among travelers returning from areas in which the disease is endemic.

Reports of coccidioidomycosis cases increased nationwide in 2005. Persons with cases reported from outside the endemic states of California, Arizona, Nevada, New Mexico, and Texas likely were exposed during travel to an endemic area.

CRYPTOSPORIDIOSIS. Incidence* — United States and U.S. territories, 2005



*Per 100,000 population.

Transmission of *Cryptosporidium* continues to occur throughout the United States with increased diagnosis or reporting occurring in northern states. However, state incidence figures should be compared with caution because state surveillance systems have varying capabilities to detect cases. Peak onset of cryptosporidiosis occurs annually during summer through early fall, coinciding with the summer recreational water season.



DIPHTHERIA. Number of reported cases, by year — United States, 1975–2005

For the second consecutive year, no cases of respiratory diphtheria were reported in 2005.

**Appx11306**



DOMESTIC ARBOVIRAL DISEASES. Number* of reported cases, by year — United States, 1996–2005

* Data from the Coordinating Center for Infectious Diseases (proposed) (ArboNET Surveillance). Only reported cases of neuroinvasive disease are shown.

Arboviral diseases are seasonal, occurring during the summer and fall, with incidence peaking in the late summer. The most common arboviruses affecting humans in the United States are West Nile virus (WNV), La Crosse virus (LACV), Eastern equine encephalitis virus (EEEV), and St. Louis encephalitis virus (SLEV). California serogroup viruses (primarily LACV in the eastern United States) cause encephalitis, especially in children. In 2005, cases were reported in 11 states (Alabama, Georgia, Louisiana, Minnesota, Mississippi, North Carolina, Ohio, Tennessee, Virginia, West Virginia, and Wisconsin). During 1964–2005, a median of 69 (range: 29–167) cases per year were reported in the United States. EEEV disease in humans is associated with high mortality rates (>20%) and severe neurologic sequelae. In 2005, cases were reported in seven states (Alabama, Florida, Georgia, Louisiana, Massachusetts, New Hampshire, and South Carolina). During 1964–2005, a median of five (range: 0–21) cases per year were reported in the United States. Before the introduction of WNV to the United States, SLEV was the nation's leading cause of epidemic viral encephalitis. In 2005, cases were reported in two states (Louisiana and Mississippi). During 1964–2005, a median of 26 (range: 2–1,967) cases per year were reported in the United States.

Appx11307



DOMESTIC ARBOVIRAL DISEASES, WEST NILE. Number* of reported cases, by
county — United States, 2005



* Data from the Coordinating Center for Infectious Diseases (proposed) (ArboNET Surveillance).
  Only reported cases of neuroinvasive disease are shown.

In 2005, a total of 42 states and the District of Columbia (DC) reported neuroinvasive West Nile
virus (WNV) disease. Since WNV was first recognized in the United States during an encephalitis
outbreak in New York City in 1999, a median of 1,142 (mean: 1,199; range: 19–2,946)
neuroinvasive cases per year were reported in the United States.

**Appx11308**



EHRLICHIOSIS, HUMAN GRANULOCYTIC. Number of reported cases, by county — United States, 2005



Human monocytic ehrlichiosis and human granulocytic ehrlichiosis (now known as human [granulocytic] anaplasmosis) are emerging tickborne diseases that became nationally notifiable in 1999. Because identification and reporting of these diseases remain incomplete, areas shown might not be definitive predictors for overall distribution or regional prevalence. Increases in numbers of reported cases of human rickettsial infections might result from multiple factors, including increases in vector tick populations; increases in human-tick contact as a result of encroachment into tick habitat through suburban/rural recreational activities and housing construction; changes in case definitions, case report forms, and laboratory tests; and increased use of active surveillance methods to supplement previously passive surveillance methods as a result of increased resource availability and perception of high case density in newly surveyed areas. The pathogen responsible for human granulocytic ehrlichiosis, genus *Ehrlichia*, has been reclassified and now belongs to the genus *Anaplasma*. Diseases resulting from infection with *Ehrlichia chaffeensis*, *Anaplasma phagocytophilum* (formerly *Ehrlichia phagocytophila*), and other pathogens (comprised of *Ehrlichia ewingii* and undifferentiated species) have been known by the acronyms "HME," "HGE," and "Ehrlichiosis (unspecified or other agent)," respectively. Until the case definitions for these diseases have been formally modified by resolutions of the Council of State and Territorial Epidemiologists, these original categories should be used for reporting cases of human ehrlichiosis and human anaplasmosis.



EHRLICHIOSIS, HUMAN MONOCYTIC. Number of reported cases, by county — United States, 2005



Human monocytic ehrlichiosis and human granulocytic ehrlichiosis (now known as human [granulocytic] anaplasmosis) are emerging tickborne diseases that became nationally notifiable in 1999. Because identification and reporting of these diseases remain incomplete, areas shown might not be definitive predictors for overall distribution or regional prevalence. Increases in numbers of reported cases of human rickettsial infections might result from multiple factors, including increases in vector tick populations; increases in human-tick contact as a result of encroachment into tick habitat through suburban/rural recreational activities and housing construction; changes in case definitions, case report forms, and laboratory tests; and increased use of active surveillance methods to supplement previously passive surveillance methods as a result of increased resource availability and perception of high case density in newly surveyed areas. The pathogen responsible for human granulocytic ehrlichiosis, genus *Ehrlichia*, has been reclassified and now belongs to the genus *Anaplasma*. Diseases resulting from infection with *Ehrlichia chaffeensis*, *Anaplasma phagocytophilum* (formerly *Ehrlichia phagocytophila*), and other pathogens (comprised of *Ehrlichia ewingii* and undifferentiated species) have been known by the acronyms "HME," "HGE," and "Ehrlichiosis (unspecified or other agent)," respectively. Until the case definitions for these diseases have been formally modified by resolutions of the Council of State and Territorial Epidemiologists, these original categories should be used for reporting cases of human ehrlichiosis and human anaplasmosis.



EHRLICHIOSIS, HUMAN (OTHER & UNSPECIFIED). Number of reported cases, by county — United States, 2005



Human monocytic ehrlichiosis and human granulocytic ehrlichiosis (now known as human [granulocytic] anaplasmosis) are emerging tickborne diseases that became nationally notifiable in 1999. Because identification and reporting of these diseases remain incomplete, areas shown might not be definitive predictors for overall distribution or regional prevalence. Increases in numbers of reported cases of human rickettsial infections might result from multiple factors, including increases in vector tick populations; increases in human-tick contact as a result of encroachment into tick habitat through suburban/rural recreational activities and housing construction; changes in case definitions, case report forms, and laboratory tests; and increased use of active surveillance methods to supplement previously passive surveillance methods as a result of increased resource availability and perception of high case density in newly surveyed areas. The pathogen responsible for human granulocytic ehrlichiosis, genus *Ehrlichia*, has been reclassified and now belongs to the genus *Anaplasma*. Diseases resulting from infection with *Ehrlichia chaffeensis*, *Anaplasma phagocytophilum* (formerly *Ehrlichia phagocytophila*), and other pathogens (comprised of *Ehrlichia ewingii* and undifferentiated species) have been known by the acronyms "HME," "HGE," and "Ehrlichiosis (unspecified or other agent)," respectively. Until the case definitions for these diseases have been formally modified by resolutions of the Council of State and Territorial Epidemiologists, these original categories should be used for reporting cases of human ehrlichiosis and human anaplasmosis. Cases indicated above were unable to be classified definitively.



ENTEROHEMORRHAGIC *ESCHERICHIA COLI* O157:H7 INFECTION. Number of reported cases — United States and U.S. territories, 2005



*Escherichia coli* O157:H7 is the most common serotype of enterohemorrhagic *E. coli* isolated from ill persons. Other serotypes of *E. coli* also produce Shiga toxin and can cause diarrhea and hemolytic uremic syndrome. *E. coli* O157:H7 has been nationally notifiable since 1994. In 2001, all enterohemorrhagic *E. coli* serotypes were made nationally notifiable, although few clinical laboratories routinely test stool specimens for *E. coli* serotypes other than *E. coli* O157:H7.

GIARDIASIS. Incidence* — United States and U.S. territories, 2005



* Per 100,000 population.

Transmission of *Giardia* continues to occur throughout the United States with increased diagnosis or reporting occurring in northern states. However, state incidence figures should be compared with caution because state surveillance systems have varying capabilities to detect cases. Peak onset of giardiasis occurs during summer through early fall, coinciding with the summer recreational water season.

Appx11312



GONORRHEA. Incidence* — United States and U.S. territories, 2005

* Per 100,000 population.

In 2005, the overall U.S. gonorrhea rate was 115.6 cases per 100,000 population, an increase from the rate in 2004. The *Healthy People 2010* national objective is ≤19 cases per 100,000 population. Six states (Idaho, Maine, Montana, New Hampshire, Vermont, and Wyoming) reported rates below the national objective.



GONORRHEA. Incidence,* by sex — United States, 1990–2005

* Per 100,000 population

The overall incidence of gonorrhea in the United States has declined since 1975 but increased in 2005 for the first time since 1999. In 2005, incidence was slightly higher among women than among men.



GONORRHEA. Incidence,* by race/ethnicity — United States, 1990–2005

* Per 100,000 population.

Gonorrhea incidence among blacks decreased considerably during the 1990s but continues to be the highest among all races/ethnicities. In 2005, gonorrhea incidence among non-Hispanic blacks was approximately 18 times greater than that for non-Hispanic whites.



*HAEMOPHILUS INFLUENZAE*, INVASIVE DISEASE. Incidence,* by age group — United States, 1992–2005

* Per 100,000 population.

Substantial reductions in the incidence of *Haemophilus influenzae* serotype b (Hib) disease have been achieved through universal Hib vaccination. Before introduction of conjugate vaccines in 1987, the incidence of invasive Hib disease among children aged <5 years was estimated to be 100 cases per 100,000 population.





HANSEN DISEASE (LEPROSY). Number of reported cases, by year — United States, 1970–2005

The number of reported cases of Hansen Disease has remained stable for the last 6 years.



HANTAVIRUS PULMONARY SYNDROME. Number of reported cases, by survival status* and year — United States, 1996–2005

* Data from the National Center for Infectious and Respiratory Diseases (proposed).

Hantaviruses are present in wild rodents throughout North America and continue to cause sporadic cases of severe illness associated with occupational or peridomestic rodent exposure.

Appx11315

**HEMOLYTIC UREMIC SYNDROME, POSTDIARRHEAL. Number of reported cases —
United States and U.S. territories, 2005**



The majority of cases of postdiarrheal hemolytic uremic syndrome (HUS) in the United States
are attributed to infection with *Escherichia coli* O157:H7. Infection with other serotypes of Shiga
toxin-producing *E. coli* can cause HUS. Half of HUS cases occur among children aged <5 years.

**HEPATITIS A VIRUS INFECTION. Incidence,\* by county — United States, 2005**



\* Per 100,000 population.

In 1999, routine hepatitis A vaccination was recommended for children living in 11 states with
consistently elevated rates of disease. Since then, rates of infection with hepatitis A virus (HAV)
have declined in all regions, with the greatest decline occurring in 10 western states. HAV
infection rates are now the lowest ever reported and similar in all regions.

**Appx11316**



HEPATITIS, VIRAL. Incidence,* by year — United States, 1975–2005



*Per 100,000 population.
†Hepatitis A vaccine was first licensed in 1995.
§Hepatitis B vaccine was first licensed in June 1982.
¶An anti-hepatitis C virus (HCV) antibody test first became available in May 1990.

Incidence of hepatitis A virus infection continues to decline and in 2005 was the lowest ever recorded. This reduction in incidence is attributed at least in part to routine vaccination of children in states with consistently elevated rates. Incidence of hepatitis B virus infection has declined 79% since 1990. Routine hepatitis B vaccination of infants has reduced rates in children >95%. Rates also have declined among adults, but a large proportion of cases continue to occur among adults with high-risk behaviors. The elevated incidence of hepatitis C virus infection in the mid-to-late 1990s reflects erroneous reporting of chronically infected persons as having acute cases. An increase in the number of persons with chronic infection identified occurred during this time as the widespread availability of screening assays for anti-HCV increased the frequency of testing. However, increasing the specificity of the acute case definition and the establishment of a separate system for reporting chronic HCV infection have resulted in substantial improvement in the reliability of acute hepatitis C reporting in recent years.

**Appx11317**



INFLUENZA-ASSOCIATED PEDIATRIC MORTALITY. Number of reported cases — United States and U.S. territories, 2005



Initial reporting for this condition began in week 40 (the week ending October 9, 2004) of the 2004–05 influenza season; during 2005, a total of 45 influenza-associated pediatric deaths were reported to CDC by 17 states and New York City, with California reporting 10 deaths.

LEGIONELLOSIS. Incidence,* by year — United States, 1990–2005



* Per 100,000 population.

The increase in the incidence of legionellosis that began in 2003 was sustained in 2005. Whether this increase reflects a true increase in transmission, greater use of diagnostic testing, or increased reporting is unclear.



LISTERIOSIS. Incidence* — United States and U.S. territories, 2005

* Per 100,000 population.

Listeriosis has been nationally notifiable since 2000. Although the infection is relatively uncommon, listeriosis is a leading cause of death attributable to foodborne illness in the United States. Recent outbreaks have been linked to deli meats and unpasteurized cheese.



LYME DISEASE. Number of reported cases, by county — United States, 2005

A rash that might be confused with the erythema migrans of early Lyme disease can occur after the bite of the Lone Star tick (*Amblyomma americanum*). These ticks, which do not transmit the Lyme disease bacterium, are common human-biting ticks in the southern and southeastern United States.



MALARIA. Incidence,* by year — United States, 1991–2005

* Per 100,000 population.

The number of reported cases of malaria in the United States has remained relatively stable for the preceding 15 years. Nearly all of these infections occur in persons who traveled recently to a malaria-endemic country.



MEASLES. Incidence,* by year — United States, 1970–2005

* Per 100,000 population.

Measles incidence remains at less than one case per 1 million population. Measles vaccine was licensed in 1963.

Appx11320



**MENINGOCOCCAL DISEASE, INVASIVE.** Incidence,* by year — United States, 1975–2005

* Per 100,000 population.

The highest incidence of meningococcal disease occurs among infants, with a second peak occurring during late adolescence. In 2005, a tetravalent (A, C, Y, and W-135) meningococcal conjugate vaccine was licensed and recommended for adolescents and others at increased risk for disease. Over time, the new vaccine is expected to have a substantial impact on the burden of meningococcal disease in the United States.



**MUMPS.** Incidence,* by year — United States, 1980–2005

MUMPS. Number of reported cases — United States, 1995–2005

* Per 100,000 population. Mumps vaccine was licensed in 1967.



PERTUSSIS. Incidence,* by year — United States, 1975–2005

*Per 100,000 population.

In 2005, incidence of reported pertussis remained stable after doubling during 2003–2004. Increased availability of sensitive diagnostic tests and improved case recognition and reporting account for an unknown fraction of this increase.



PERTUSSIS. Number of reported cases,* by age group — United States, 2005

*Of 25,616 cases of pertussis, age was reported unknown for 1,371 persons.

In 2005, a total of 3,279 (13%) reported cases of pertussis occurred among infants aged <6 months, who were too young to receive 3 doses of Diptheria and Tetanus Toxoids and Acellular Pertussis vaccine Absorbed (DTaP). In 2005, a total of 15,354 cases of pertussis occurred in adolescents aged 10–19 years and in adults aged ≥20 years. The Advisory Committee on Immunization Practices (ACIP) recommends a single dose of Tdap in adolescents aged 11–18 years and in adults aged 19–64 years to replace the next booster dose of tetanus and diphtheria toxoids vaccine (Td).

Appx11322



Q FEVER. Number of reported cases — United States and U.S. territories, 2005

Q fever became nationally notifiable in 1999. To capture as many cases of Q fever as possible, the Q fever case definition is intentionally broad. However, identification and reporting of Q fever remains incomplete, and the numbers of cases reported might not represent the overall distribution or regional incidence of disease.

RABIES, ANIMAL. Number of reported cases among wild and domestic animals,* by year – United States and Puerto Rico, 1975–2005



* Data from the National Center for Zootic, Vector-Borne, and Enteric Diseases (proposed).

Periods of resurgence and decline of rabies incidence are primarily the result of cyclic reemergence. As populations are decimated by epizootics, numbers of reported cases decline until populations again reach levels to support epizootic transmission of disease. Recent declines in the number of reported cases among terrestrial reservoir species (raccoons, skunks, and foxes) have been offset by increases in testing and the subsequent detection of rabid bats. In addition, interventions such as the oral vaccination of wildlife species might contribute to the decreasing trend in recent years.



**ROCKY MOUNTAIN SPOTTED FEVER. Number of reported cases, by county — United States, 2005**



Increases in numbers of reported cases of Rocky Mountain spotted fever cases might result from multiple factors, including increases in vector tick populations; increases in human-tick contact as a result of encroachment into tick habitat through suburban/rural recreational activities and housing construction; changes in case definitions, case report forms, and laboratory tests; and increased use of active surveillance methods to supplement previously passive surveillance methods as a result of increased resource availability and perception of high case density in newly surveyed areas.

**RUBELLA. Incidence,\* by year — United States, 1975–2005**



\* Per 100,000 population.

Rubella vaccine was licensed in 1969. Evidence suggests that rubella is no longer endemic in the United States (CDC. Elimination of rubella and congenital rubella syndrome—United States, 1969–2004. MMWR 2005;54:279–82).



SALMONELLOSIS and SHIGELLOSIS. Number of reported cases, by year — United States, 1975–2005

Foodborne transmission accounts for the majority of cases of salmonellosis. In the United States, the most common serotypes are Typhimurium, Enteritidis, and Newport. During 2005, multistate outbreaks were linked to consumption of tomatoes and unpasteurized orange juice.



STREPTOCOCCAL DISEASE, INVASIVE, GROUP A. Number of reported cases — United States and U.S. territories, 2005

*STREPTOCOCCUS PNEUMONIAE*, INVASIVE, DRUG RESISTANT. Number of reported cases — United States and U.S. territories, 2005



A pneumococcal vaccine for children was licensed in 2000. The vaccine targets seven pneumococcal serotypes, five of which are responsible for the majority of infections by resistant organisms in the United States. Data from Active Bacterial Core surveillance, part of CDC's Emerging Infections Program, indicate that rates of disease caused by resistant pneumococci have declined since 2000.

SYPHILIS, CONGENITAL. Incidence* among infants aged <1 year — United States, 1975–2005



* Per 100,000 live births.

Incidence of congenital syphilis has declined since 1991. In 2005, the rate was 8.0 cases per 100,000 live births.



SYPHILIS, PRIMARY AND SECONDARY. Incidence* — United States, 2005

* Per 100,000 population.

In 2005, the overall U.S. rate of primary and secondary syphilis was 3.0 cases per 100,000 population, which is above the *Healthy People 2010* objective of 0.2 cases per 100,000 population per year. Six states (Maine, Nebraska, North Dakota, Vermont, West Virginia, and Wyoming) reported rates at or below the national objective.



SYPHILIS, PRIMARY AND SECONDARY. Incidence,* by sex — United States, 1990–2005

* Per 100,000 population.

During 2004–2005, incidence of primary and secondary syphilis in the United States increased slightly, from 2.7 to 3.0 cases (women: from 0.8 to 0.9; men: from 4.7 to 5.1) per 100,000 population.

**Appx11327**





SYPHILIS, PRIMARY AND SECONDARY. Incidence,* by race/ethnicity — United States, 1990–2005

\* Per 100,000 population.

During 2004–2005, incidence of primary and secondary syphilis increased among all races/ ethnicities except Asians/Pacific Islanders and American Indians/Alaska Natives. Incidence per 100,000 population increased from 8.8 to 9.8 cases among non-Hispanic blacks; from 3.1 to 3.3 cases among Hispanics; and from 1.6 to 1.8 cases among non-Hispanic whites. Incidence per 100,000 population decreased among American Indians/Alaska Natives from 3.1 to 2.4 cases and remained stable among Asians/Pacific Islanders at 1.2 cases.



TETANUS. Number of reported cases,* by year — United States, 1975–2005

\* Included neonatal cases.

The number of reported cases and the reported incidence of tetanus continue at historically low levels. Neonatal tetanus has become rare; no cases have been reported in the United States since 2001.

Appx11328



TETANUS. Number of reported cases, by age group — United States, 2005

Tetanus disproportionately affects older U.S. residents, a substantial proportion of whom remain susceptible because they never have received a primary series of at least three tetanus toxin-containing vaccinations. No cases of neonatal tetanus have been reported since 2001.



TRICHINELLOSIS. Number of reported cases, by year — United States, 1975–2005

The limited numbers of reported cases of trichinellosis are associated with ingestion of meats of wild animals (bear and wild boar). Domestic pork–associated cases are now extremely rare as a result of improved methods of swine husbandry. A single cluster of three cases in one state was reported in 2005 that was associated with consumption of bear meat.

Appx11329





**TUBERCULOSIS. Incidence\* — United States and U.S. territories, 2005**

\* Per 100,000 population.

In 26 states, the tuberculosis rate was ≤3.5 cases per 100,000 population, the interim goal for the year 2000 established by the Advisory Council for the Elimination of Tuberculosis. In 12 states (Alaska, California, Florida, Georgia, Hawaii, Louisiana, Maryland, New Jersey, New York, South Carolina, Tennessee, and Texas) and the District of Columbia, reported rates exceeded the 2005 national average of 4.8 cases per 100,000 population.



**TUBERCULOSIS. Incidence,\* by race/ethnicity — United States, 1995–2005**

\* Per 100,000 population.

Asians/Pacific Islanders had the highest tuberculosis rates, which declined from 43.5 per 100,000 population in 1995 to 25.5 in 2005. During 2004–2005, rates per 100,000 population declined by ≥50% in other racial/ethnic populations: among non-Hispanic blacks, from 23.2 to 10.9; among Hispanics, from 17.2 to 9.5; among American Indians/Alaska Natives, from 15.7 to 6.9; and among non-Hispanic whites, from 3.1 to 1.3.

Appx11330



TUBERCULOSIS. Number of reported cases among U.S.-born and foreign-born persons,* by year — United States, 1995–2005

* For 330 cases, origin of patients was unknown.

Overall, the number of cases in foreign-born persons remained relatively stable, at approximately 7,000–8,000 cases each year, whereas the number in U.S.-born persons decreased from >14,500 in 1995 to <6,500 in 2005.



TULAREMIA. Number of reported cases — United States and U.S. territories, 2005

In 2005, approximately 60% of cases were reported from Arkansas, Oklahoma, Missouri, and Martha's Vineyard in Massachusetts. To better define the geographic distribution of *Francisella tularensis* subspecies, CDC requests that isolates be forwarded to the CDC laboratory in Fort Collins, Colorado, for subtyping.

**TYPHOID FEVER. Number of reported cases, by year — United States, 1975–2005**



Although the number of cases of typhoid fever reported annually appears to have stabilized, an increasing proportion of all cases of enteric fever appear to be caused by *Salmonella* Paratyphi A. Increasing antimicrobial resistance has complicated the management of cases of typhoid fever and cases of paratyphoid fever.

**VARICELLA (CHICKENPOX). Number of reported cases — Illinois, Michigan, Texas, and West Virginia,\* 1994–2005**



\* These four states maintained consistent and adequate surveillance by reporting cases constituting ≥5% of their birth cohort during 1990–1995 (**Source:** CDC. National Immunization Program, 1994–2005).

During 2004–2005, the number of varicella cases in four states (Michigan, Illinois, Texas, and West Virginia) decreased 30%; compared with the prevaccine years of 1993–1995, the number of cases declined 83%.

**Appx11332**

## Part 3
## Historical Summaries of Notifiable Diseases in the United States, 1974-2005

TABLE 7. Reported incidence* of notifiable diseases — United States, 1995–2005

| Disease | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AIDS[†] | 27.20 | 25.21 | 21.85 | 7.21 | 16.66 | 14.95 | 14.88 | 15.29 | 15.36 | 15.28 | 14.00 |
| Anthrax | — | — | — | — | — | 0 | 0.01 | 0 | — | — | — |
| Botulism, total (includes wound & unspecified) | 0.04 | 0.05 | 0.06 | 0.04 | 0.06 | 0.05 | 0.06 | 0.03 | 0.01 | 0.02 | 0.01 |
| foodborne | 0.01 | 0.01 | 0.02 | 0.01 | 0.01 | 0.01 | 0.01 | 0 | 0.01 | 0.01 | 0.01 |
| Brucellosis | 0.04 | 0.05 | 0.04 | 0.03 | 0.03 | 0.03 | 0.05 | 0.04 | 0.04 | 0.04 | 0.04 |
| Chancroid | 0.20 | 0.15 | 0.09 | 0.07 | 0.06 | 0.03 | 0.01 | 0.02 | 0.02 | 0 | 0.01 |
| Chlamydia[§] | 182.60 | 188.10 | 196.80 | 236.57 | 254.10 | 257.76 | 278.32 | 296.55 | 304.71 | 319.61 | 332.51 |
| Cholera | 0.01 | 0.01 | 0.01 | 0.01 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Coccidioidomycosis | 0.46 | 0.64 | 0.65 | 0.99 | 3.58 | 4.69 | 6.71 | 3.03 | 2.57 | 4.14 | 6.24 |
| Cryptosporidiosis | 1.13 | 1.07 | 1.12 | 1.61 | 0.92 | 1.17 | 1.34 | 1.07 | 1.22 | 1.23 | 1.93 |
| Cyclosporiasis | ¶ | ¶ | ¶ | ¶ | 0.07 | 0.03 | 0.07 | 0.06 | 0.03 | 0.14 | 0.24 |
| Diphtheria | 0 | 0.01 | 0.01 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Domestic arboviral diseases | | | | | | | | | | | |
| California serogroup | | | | | | | | | | | |
| neuroinvasive | — | — | — | — | — | — | — | — | — | — | 0.02 |
| nonneuroinvasive | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | 0 |
| eastern equine | | | | | | | | | | | |
| neuroinvasive | — | — | — | — | — | — | — | — | — | — | 0.01 |
| nonneuroinvasive | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | 0 |
| Powassan | | | | | | | | | | | |
| neuroinvasive | — | — | — | — | — | — | — | — | — | — | 0 |
| nonneuroinvasive | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | 0 |
| St. Louis | | | | | | | | | | | |
| neuroinvasive | — | — | — | — | — | — | — | — | — | — | 0 |
| nonneuroinvasive | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | 0 |
| West Nile | | | | | | | | | | | |
| neuroinvasive | — | — | — | — | — | — | — | — | — | — | 0.45 |
| nonneuroinvasive | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | 0.58 |
| western equine | | | | | | | | | | | |
| neuroinvasive | — | — | — | — | — | — | — | — | — | — | 0 |
| nonneuroinvasive | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | 0 |
| Ehrlichiosis | | | | | | | | | | | |
| human granulocytic | ¶ | ¶ | ¶ | 0.16 | 0.14 | 0.15 | 0.10 | 0.18 | 0.13 | 0.20 | 0.29 |
| human monocytic | ¶ | ¶ | ¶ | 0.03 | 0.06 | 0.09 | 0.05 | 0.08 | 0.11 | 0.12 | 0.18 |
| human (other & unspecified)** | ¶ | ¶ | ¶ | — | — | — | — | — | — | — | 0.04 |
| Encephalitis/meningitis, arboviral[††] | | | | | | | | | | | |
| California serogroup | 0 | 0.04 | 0.04 | 0.04 | 0.03 | 0.04 | 0.05 | 0.06 | 0.06 | 0 | †† |
| eastern equine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | †† |
| Powassan | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | 0 | 0 | 0 | †† |
| St. Louis | 0 | 0 | 0.01 | 0.01 | 0 | 0 | 0.03 | 0.01 | 0.01 | 0 | †† |
| West Nile | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | 1.01 | 1.00 | 0.43 | †† |
| western equine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | — | †† |
| Enterohemorrhagic Escherichia coli infection | | | | | | | | | | | |
| O157:H7 | 1.01 | 1.18 | 1.04 | 1.28 | 1.77 | 1.74 | 1.22 | 1.36 | 0.93 | 0.87 | 0.89 |
| non-O157 | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | 0.19 | 0.08 | 0.09 | 0.13 | 0.19 |
| not serogrouped | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | 0.06 | 0.02 | 0.05 | 0.13 | 0.16 |
| Giardiasis | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | 8.06 | 6.84 | 8.35 | 7.82 |
| Gonorrhea | 149.50 | 122.80 | 121.40 | 132.88 | 133.20 | 131.65 | 128.53 | 125.03 | 116.37 | 113.52 | 115.64 |
| Haemophilus influenzae, invasive disease | | | | | | | | | | | |
| all ages, serotypes | 0.45 | 0.45 | 0.44 | 0.44 | 0.48 | 0.51 | 0.57 | 0.62 | 0.79 | 0.72 | 0.78 |
| age <5 yrs | | | | | | | | | | | |
| serotype b | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | 0.18 | 0.16 | 0.03 | 0.04 |
| nonserotype b | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | 0.75 | 0.59 | 0.04 | 0.67 |
| unknown serotype | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | 0.80 | 1.15 | 0.97 | 1.08 |

* Per 100,000 population.
† Acquired immunodeficiency syndrome.
§ Chlamydia refers to genital infections caused by *Chlamydia trachomatis*.
¶ Not nationally notifiable.
** Data for ehrlichiosis attributable to other or unspecified agents were withheld from publication pending the outcome of discussions about the reclassification of certain *Ehrlichia* species, which probably would affect how data in this category are reported.
†† See also domestic arboviral disease incidence in this table for 2005. In 2005, the domestic arboviral disease surveillance case definitions and categories were revised. The nationally notifiable arboviral encephalitis and meningitis conditions continued to be nationally notifiable in 2005, but under the category of arboviral neuroinvasive disease. In addition, in 2005, nonneuroinvasive domestic arboviral diseases for the six domestic arboviruses listed above were added to the list of nationally notifiable diseases.

**Appx11333**

Summary of Notifiable Diseases --- United States, 2005                                          Page 76 of 102

**TABLE 7. (*Continued*) Reported incidence* of notifiable diseases — United States, 1995–2005**

| Disease | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Hansen disease (leprosy) | 0.06 | 0.05 | 0.05 | 0.05 | 0.04 | 0.04 | 0.03 | 0.04 | 0.03 | 0.04 | 0.03 |
| Hantavirus pulmonary syndrome | NA | NA | NA | NA | NA | 0.02 | 0 | 0.01 | 0.01 | 0.01 | 0.01 |
| Hemolytic uremic syndrome, postdiarrheal | NA | NA | NA | NA | NA | 0.10 | 0.08 | 0.08 | 0.06 | 0.07 | 0.08 |
| Hepatitis, viral, acute | | | | | | | | | | | |
| A | 12.13 | 11.70 | 11.22 | 8.59 | 6.25 | 4.91 | 3.77 | 3.13 | 2.66 | 1.95 | 1.53 |
| B | 4.19 | 4.01 | 3.90 | 3.80 | 2.82 | 2.95 | 2.79 | 2.84 | 2.61 | 2.14 | 1.78 |
| C | 1.78 | 1.41 | 1.43 | 1.30 | 1.14 | 1.17 | 1.41 | 0.65 | 0.38 | 0.31 | 0.23 |
| Influenza-associated pediatric mortality | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | 0.02 |
| Legionellosis | 0.48 | 0.47 | 0.44 | 0.51 | 0.41 | 0.42 | 0.42 | 0.47 | 0.78 | 0.71 | 0.78 |
| Listeriosis | ¶ | ¶ | ¶ | ¶ | 0.31 | 0.29 | 0.22 | 0.24 | 0.24 | 0.32 | 0.31 |
| Lyme disease | 4.49 | 6.21 | 4.79 | 6.39 | 5.99 | 6.53 | 6.05 | 8.44 | 7.39 | 6.84 | 7.94 |
| Malaria | 0.55 | 0.68 | 0.75 | 0.60 | 0.61 | 0.57 | 0.55 | 0.51 | 0.49 | 0.51 | 0.51 |
| Measles | 0.12 | 0.20 | 0.06 | 0.04 | 0.04 | 0.03 | 0.04 | 0.02 | 0.02 | 0.01 | 0.02 |
| Meningococcal disease, invasive | | | | | | | | | | | |
| all serogroups | 1.25 | 1.30 | 1.24 | 1.01 | 0.92 | 0.83 | 0.83 | 0.64 | 0.61 | 0.47 | 0.42 |
| serogroup A, C, Y, & W-135 | §§ | §§ | §§ | §§ | §§ | §§ | §§ | §§ | §§ | §§ | 0.10 |
| serogroup B | §§ | §§ | §§ | §§ | §§ | §§ | §§ | §§ | §§ | §§ | 0.05 |
| other serogroup | §§ | §§ | §§ | §§ | §§ | §§ | §§ | §§ | §§ | §§ | 0.01 |
| serogroup unknown | §§ | §§ | §§ | §§ | §§ | §§ | §§ | §§ | §§ | §§ | 0.26 |
| Mumps | 0.35 | 0.29 | 0.27 | 0.25 | 0.14 | 0.13 | 0.10 | 0.10 | 0.08 | 0.09 | 0.11 |
| Pertussis | 1.97 | 2.94 | 2.46 | 2.74 | 2.67 | 2.88 | 2.69 | 3.47 | 4.04 | 8.88 | 8.72 |
| Plague | 0 | 0.01 | 0.01 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Poliomyelitis, paralytic | 0 | 0.03 | 0.02 | 0.01 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Psittacosis | 0.03 | 0.02 | 0.02 | 0.02 | 0.01 | 0.01 | 0.01 | 0.01 | 0 | 0 | 0.01 |
| Q Fever | ¶ | ¶ | ¶ | ¶ | 0 | 0.01 | 0.01 | 0.02 | 0.02 | 0.03 | 0.05 |
| Rabies, human | 0 | 0.01 | 0.01 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rocky Mountain spotted fever | 0.23 | 0.32 | 0.16 | 0.14 | 0.21 | 0.18 | 0.25 | 0.39 | 0.38 | 0.60 | 0.66 |
| Rubella | 0.05 | 0.10 | 0.07 | 0.13 | 0.21 | 0.06 | 0.01 | 0.01 | 0 | 0 | 0 |
| Rubella, congenital syndrome | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Salmonellosis | 17.66 | 17.15 | 15.66 | 16.17 | 14.89 | 14.51 | 14.39 | 15.73 | 15.16 | 14.47 | 15.43 |
| SARS-CoV[¶¶] | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | 0.0 | — | — |
| Shigellosis | 12.32 | 9.80 | 8.64 | 8.74 | 6.43 | 8.41 | 7.19 | 8.37 | 8.19 | 4.99 | 5.51 |
| Smallpox | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | — | — |
| Streptococcal disease, invasive, group A | 0.23 | 0.55 | 0.75 | 0.83 | 0.87 | 1.45 | 1.60 | 1.69 | 2.04 | 1.82 | 2.00 |
| Streptococcal toxic-shock syndrome | 0 | 0 | 0.01 | 0.02 | 0.02 | 0.04 | 0.04 | 0.05 | 0.06 | 0.06 | 0.07 |
| Streptococcus pneumoniae, invasive disease | | | | | | | | | | | |
| drug resistant, all ages | 0.12 | 0.57 | 0.67 | 1.44 | 2.39 | 2.77 | 2.11 | 1.14 | 0.99 | 1.49 | 1.42 |
| age <5 yrs | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | 1.03 | 3.62 | 8.86 | 8.22 | 8.21 |
| Syphilis | | | | | | | | | | | |
| primary & secondary | 6.30 | 4.29 | 3.19 | 2.61 | 2.50 | 2.19 | 2.17 | 2.44 | 2.49 | 2.71 | 2.97 |
| total, all stages | 26.20 | 19.97 | 17.30 | 14.19 | 13.07 | 11.58 | 11.45 | 11.68 | 11.90 | 11.94 | 11.33 |
| Tetanus | 0.02 | 0.02 | 0.02 | 0.02 | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 |
| Toxic-shock syndrome | 0.07 | 0.06 | 0.06 | 0.06 | 0.05 | 0.06 | 0.05 | 0.05 | 0.05 | 0.04 | 0.04 |
| Trichinellosis | 0.01 | 0.01 | 0.01 | 0.01 | 0 | 0.01 | 0.01 | 0.01 | 0 | 0 | 0.01 |
| Tuberculosis | 8.70 | 8.04 | 7.42 | 6.79 | 6.43 | 6.01 | 5.68 | 5.56 | 5.17 | 5.09 | 4.80 |
| Tularemia | ¶ | ¶ | ¶ | ¶ | ¶ | 0.06 | 0.05 | 0.03 | 0.04 | 0.05 | 0.05 |
| Typhoid fever | 0.14 | 0.15 | 0.14 | 0.14 | 0.13 | 0.14 | 0.13 | 0.11 | 0.12 | 0.11 | 0.11 |
| Vancomycin-intermediate *Staphylococcus aureus* | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | — | 0 |
| Vancomycin-resistant *Staphylococcus aureus* | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | — | 0 |
| Varicella (chickenpox)*** | 118.11 | 44.13 | 93.55 | 70.28 | 44.56 | 26.18 | 19.51 | 10.27 | 7.27 | 18.41 | 19.64 |
| Yellow fever | — | 0 | — | — | 0 | — | — | 0 | 0 | — | — |

§§ To help public health specialists monitor the impact of the new tetravalent meningococcal conjugate vaccine (Menactra®, Sanofi-Pasteur, Swiftwater, Pennsylvania; licensed in the United States in January 2005), the data display for meningococcal disease was modified to differentiate the fraction of the disease that is potentially vaccine preventable (serogroups A, C, Y, W-135) from the nonvaccine-preventable fraction of disease (serogroup B and others).

¶¶ Severe acute respiratory syndrome–associated coronavirus disease.

*** Varicella was not a notifiable disease before 2003.

Summary of Notifiable Diseases --- United States, 2005                    Page 77 of 102

TABLE 8. Reported cases of notifiable diseases — United States, 1998–2005

| Disease | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|
| AIDS* | 46,521 | 45,104 | 40,758 | 41,868 | 42,745 | 44,232 | 44,108 | 41,120[†] |
| Anthrax | — | — | 1 | 23 | 2 | — | — | — |
| Botulism, total (including wound & unspecified) | 116 | 154 | 138 | 155 | 118 | 129 | 133 | 135 |
| foodborne | 22 | 23 | 23 | 39 | 28 | 20 | 16 | 19 |
| infant | 65 | 92 | 93 | 97 | 69 | 76 | 87 | 85 |
| Brucellosis | 79 | 82 | 87 | 136 | 125 | 104 | 114 | 120 |
| Chancroid¶ | 189 | 143 | 78 | 38 | 67 | 54 | 30 | 17[§] |
| Chlamydia¶ | 604,420 | 656,721 | 702,093 | 783,242 | 834,555 | 877,478 | 929,462 | 976,445[§] |
| Cholera | 17 | 6 | 5 | 3 | 2 | 2 | 5 | 8 |
| Coccidioidomycosis | 2,274 | 2,826 | 2,867 | 3,922 | 4,968 | 4,870 | 6,449 | 6,542 |
| Cryptosporidiosis | 3,793 | 2,361 | 3,128 | 3,785 | 3,016 | 3,506 | 3,577 | 5,659 |
| Cyclosporiasis | ** | 56 | 60 | 147 | 156 | 75 | 171 | 543 |
| Diphtheria | 1 | 1 | 1 | 2 | 1 | 1 | — | — |
| Domestic arboviral diseases[††] | | | | | | | | |
| California serogroup | | | | | | | | |
| neuroinvasive | — | — | — | — | — | — | — | 73 |
| nonneuroinvasive | ** | ** | ** | ** | ** | ** | ** | 7 |
| eastern equine | | | | | | | | |
| neuroinvasive | — | — | — | — | — | — | — | 21 |
| nonneuroinvasive | ** | ** | ** | ** | ** | ** | ** | — |
| Powassan | | | | | | | | |
| neuroinvasive | — | — | — | — | — | — | — | 1 |
| nonneuroinvasive | ** | ** | ** | ** | ** | ** | ** | — |
| St. Louis | | | | | | | | |
| neuroinvasive | — | — | — | — | — | — | — | 7 |
| nonneuroinvasive | ** | ** | ** | ** | ** | ** | ** | 6 |
| western equine | | | | | | | | |
| neuroinvasive | — | — | — | — | — | — | — | — |
| nonneuroinvasive | ** | ** | ** | ** | ** | ** | ** | — |
| West Nile | | | | | | | | |
| neuroinvasive | — | — | — | — | — | — | — | 1,309 |
| nonneuroinvasive | ** | ** | ** | ** | ** | ** | ** | 1,691 |
| Ehrlichiosis | | | | | | | | |
| human granulocytic | ** | 203 | 351 | 261 | 511 | 362 | 537 | 786 |
| human monocytic | ** | 99 | 200 | 142 | 216 | 321 | 338 | 506 |
| human (other & unspecified) | ** | 99 | 99 | 99 | 99 | 99 | 99 | 112 |
| Encephalitis/Meningitis, arboviral | | | | | | | | |
| California serogroup | 97 | 70 | 114 | 128 | 164 | 108 | 112 | ¶¶ |
| eastern equine | 4 | 5 | 3 | 9 | 10 | 14 | 6 | ¶¶ |
| Powassan | ** | ** | ** | ** | 1 | 8 | 1 | ¶¶ |
| St. Louis | 24 | 4 | 2 | 79 | 28 | 41 | 12 | ¶¶ |
| West Nile | ** | ** | ** | ** | 2,840 | 2,866 | 1,142 | ¶¶ |
| western equine | — | 1 | — | — | — | — | — | ¶¶ |
| Enterohemorrhagic Escherichia coli infection | | | | | | | | |
| Shiga toxin-positive | | | | | | | | |
| O157:H7 | 3,161 | 4,513 | 4,528 | 3,287 | 3,840 | 2,671 | 2,544 | 2,621 |
| non-O157 | ** | ** | ** | 171 | 194 | 252 | 316 | 501 |
| not serogrouped | ** | ** | ** | 20 | 60 | 156 | 308 | 407 |
| Giardiasis | ** | ** | ** | ** | 21,206 | 19,709 | 20,836 | 19,733 |
| Gonorrhea | 355,642 | 360,076 | 358,995 | 361,705 | 351,852 | 335,104 | 330,132 | 339,593[§§] |
| Haemophilus influenzae, invasive disease | | | | | | | | |
| all ages, serotypes | 1,194 | 1,309 | 1,398 | 1,597 | 1,743 | 2,013 | 2,095 | 2,304 |
| age <5 yrs | | | | | | | | |
| serotype b | ** | ** | ** | ** | 34 | 32 | 19 | 9 |
| nonserotype b | ** | ** | ** | ** | 144 | 117 | 135 | 135 |
| unknown serotype | ** | ** | ** | ** | 153 | 227 | 177 | 217 |
| Hansen disease (leprosy) | 108 | 108 | 91 | 70 | 96 | 95 | 105 | 87 |
| Hantavirus pulmonary syndrome | NA | 33 | 41 | 8 | 19 | 26 | 24 | 26 |

* Acquired immunodeficiency syndrome.

[†] The total number of AIDS cases includes all cases reported to the Division of HIV/AIDS Prevention, National Center for HIV/AIDS, Viral Hepatitis, STD, and TB Prevention (NCHHSTP) (proposed), through December 31, 2005.

[§] Cases were updated through the Division of STD Prevention, NCHHSTP (proposed), as of May 5, 2005.

¶ Chlamydia refers to genital infections caused by Chlamydia trachomatis.

** Not nationally notifiable.

[††] Data provided by the Division of Vector-Borne Infectious Diseases, National Center for Zoonotic, Vector-Borne, and Enteric Diseases (NCZVED) (proposed) (ArboNET Surveillance), as of June 23, 2006.

[§§] Data on ehrlichiosis attributable to other or unspecified agents were withheld from publication pending the outcome of discussions about the reclassification of certain Ehrlichia species, which probably could affect how data in this category are reported.

¶¶ See also domestic arboviral disease incidence in this table for year 2005. In 2005, the domestic arboviral disease surveillance case definitions and categories were revised. The nationally notifiable arboviral encephalitis and meningitis conditions continued to be nationally notifiable in 2005, but under the category of arboviral neuroinvasive disease. In addition, in 2005, nonneuroinvasive domestic arboviral diseases for the six domestic arboviruses listed above were added to the list of nationally notifiable diseases.

TABLE 8. (*Continued*) Reported cases of notifiable diseases — United States, 1998–2005

| Disease | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|
| Hemolytic uremic syndrome, postdiarrheal | 119 | 181 | 249 | 202 | 216 | 178 | 200 | 221 |
| Hepatitis, viral, acute*** | | | | | | | | |
| A | 23,229 | 17,047 | 13,397 | 10,609 | 8,795 | 7,653 | 5,683 | 4,488 |
| B | 10,258 | 7,694 | 8,036 | 7,843 | 7,996 | 7,526 | 6,212 | 5,119 |
| C | 3,518 | 3,111 | 3,197 | 3,976 | 1,835 | 1,102 | 720 | 652 |
| Influenza-associated pediatric mortality | ** | ** | ** | ** | ** | ** | ** | 45 |
| Legionellosis | 1,355 | 1,108 | 1,127 | 1,168 | 1,321 | 2,232 | 2,093 | 2,301 |
| Listeriosis | ** | 823 | 755 | 613 | 665 | 696 | 753 | 896 |
| Lyme disease | 16,801 | 16,273 | 17,730 | 17,029 | 23,763 | 21,273 | 19,804 | 23,305 |
| Malaria | 1,611 | 1,666 | 1,560 | 1,544 | 1,430 | 1,402 | 1,458 | 1,494 |
| Measles | 100 | 100 | 86 | 116 | 44 | 56 | 37 | 66 |
| Meningococcal disease, invasive††† | | | | | | | | |
| all serogroups | 2,725 | 2,501 | 2,256 | 2,333 | 1,814 | 1,756 | 1,361 | 1,245 |
| serogroup A, C, Y, & W-135 | — | — | — | — | — | — | — | 297 |
| serogroup B | — | — | — | — | — | — | — | 156 |
| other serogroup | — | — | — | — | — | — | — | 27 |
| serogroup unknown | — | — | — | — | — | — | — | 765 |
| Mumps | 666 | 387 | 338 | 266 | 270 | 231 | 258 | 314 |
| Pertussis | 7,405 | 7,288 | 7,867 | 7,580 | 9,771 | 11,647 | 25,827 | 25,616 |
| Plague | 9 | 9 | 6 | 2 | 2 | 1 | 3 | 8 |
| Poliomyelitis, paralytic§§§ | 3 | 2 | — | — | — | — | — | 1 |
| Psittacosis | 47 | 16 | 17 | 25 | 18 | 12 | 12 | 16 |
| Q Fever | ** | ** | 21 | 26 | 61 | 71 | 70 | 136 |
| Rabies | | | | | | | | |
| animal | 7,259 | 6,730 | 6,934 | 7,150 | 7,609 | 6,846 | 6,345 | 5,915 |
| human | 1 | ** | 4 | 1 | 3 | 2 | 7 | 2 |
| Rocky Mountain spotted fever | 365 | 579 | 495 | 695 | 1,104 | 1,091 | 1,713 | 1,936 |
| Rubella | 364 | 267 | 176 | 23 | 18 | 7 | 10 | 11 |
| Rubella, congenital syndrome | 7 | 9 | 9 | 3 | 1 | 1 | ** | 1 |
| Salmonellosis | 43,694 | 40,596 | 39,574 | 40,495 | 44,264 | 43,657 | 42,197 | 45,322 |
| SARS-CoV¶¶¶ | ** | ** | ** | ** | ** | 8 | — | — |
| Shigellosis | 23,626 | 17,521 | 22,922 | 20,221 | 23,541 | 23,581 | 14,627 | 16,168 |
| Streptococcal disease, | | | | | | | | |
| Streptococcal disease, invasive, group A | 2,260 | 2,667 | 3,144 | 3,750 | 4,720 | 5,872 | 4,395 | 4,715 |
| Streptococcal toxic-shock syndrome | 58 | 65 | 83 | 77 | 118 | 161 | 132 | 129 |
| Streptococcus pneumoniae, | | | | | | | | |
| drug resistant, all ages | 2,823 | 4,625 | 4,533 | 2,896 | 2,546 | 2,356 | 2,590 | 2,996 |
| age <5 yrs | ** | ** | ** | 498 | 513 | 845 | 1,162 | 1,495 |
| Syphilis | | | | | | | | |
| all stages | 37,977 | 35,628 | 31,575 | 32,221 | 32,871 | 34,270 | 33,401 | 33,278**** |
| congenital (age <1 yr) | 801 | 556 | 529 | 441 | 412 | 413 | 353 | 329 |
| primary & secondary | 6,993 | 6,657 | 5,979 | 6,103 | 6,862 | 7,177 | 7,980 | 8,724§ |
| Tetanus | 41 | 40 | 35 | 37 | 25 | 20 | 34 | 27 |
| Toxic-shock syndrome | 138 | 113 | 135 | 127 | 109 | 133 | 95 | 90 |
| Trichinellosis | 19 | 12 | 16 | 22 | 14 | 6 | 5 | 16 |
| Tuberculosis | 18,361 | 17,531 | 16,377 | 15,989 | 15,075 | 14,874 | 14,517 | 14,097†††† |
| Tularemia | ** | ** | 142 | 129 | 90 | 129 | 134 | 154 |
| Typhoid fever | 375 | 346 | 377 | 368 | 321 | 356 | 322 | 324 |
| Vancomycin-intermediate | | | | | | | | |
| *Staphylococcus aureus* | ** | ** | ** | ** | ** | ** | — | 3 |
| Vancomycin-resistant | | | | | | | | |
| *Staphylococcus aureus* | ** | ** | ** | ** | ** | ** | 1 | 2 |
| Varicella (chickenpox)§§§§ | 82,455 | 46,016 | 27,382 | 22,536 | 22,841 | 20,948 | 32,931 | 32,242 |
| Varicella (deaths)¶¶¶¶ | ** | ** | ** | ** | 9 | 2 | 9 | 3 |
| Yellow fever***** | | | | | | 1 | — | — |

*** The anti–hepatitis C virus antibody test became available in May 1990. Data on hepatitis B, chronic; hepatitis B, perinatal infection; and hepatitis C, virus infection (past or present) are not included because they are undergoing data quality review.

††† To help public health specialists monitor the impact of the new meningococcal conjugate vaccine (Menactra®, licensed in the United States in January 2005), the data display for meningococcal disease was modified to differentiate the fraction of the disease that is potentially vaccine preventable (serogroups A, C, Y, W-135) from the nonvaccine-preventable fraction of disease (serogroup B and others).

§§§ Cases of vaccine-associated paralytic poliomyelitis (VAPP) caused by polio vaccine virus. Numbers might not reflect changes based on retrospective case evaluations or late reports (CDC. Poliomyelitis—United States, 1975–1984. MMWR 1986;35:180–2).

¶¶¶ Severe acute respiratory syndrome (SARS)–associated coronavirus disease. The total number of SARS-CoV cases includes all cases reported to the Division of Viral Diseases, Coordinating Center for Infectious Diseases (CCID) (proposed).

**** Totals reported to the Division of STD Prevention, NCHHSTP (proposed), as of May 5, 2006.

†††† Cases were updated through the Division of TB Elimination, NCHHSTP (proposed), as of May 12, 2005.

§§§§ Varicella was taken off the national notifiable disease list in 1991. Varicella again became nationally notifiable in 2003.

¶¶¶¶ Death counts provided by the Division of Viral Diseases, National Center for Immunization and Respiratory Diseases (proposed), as of December 31, 2005.

***** The last indigenous case of yellow fever was reported in 1911; all other cases since 1911 have been imported.

Summary of Notifiable Diseases --- United States, 2005                                Page 79 of 102

**TABLE 9. Reported cases of notifiable diseases — United States, 1990–1997**

| Disease | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|---|---|---|---|
| AIDS* | 41,595 | 43,672 | 45,472 | 103,691 | 78,279 | 71,547 | 66,885 | 58,492 |
| Amebiasis | 3,328 | 2,989 | 2,942 | 2,970 | 2,983 | † | † | † |
| Anthrax | — | — | 1 | — | — | — | — | — |
| Aseptic meningitis | 11,852 | 14,526 | 12,223 | 12,848 | 8,932 | † | † | † |
| Botulism, total (including wound & unspecified) | 92 | 114 | 91 | 97 | 143 | 97 | 119 | 132 |
| foodborne | 23 | 27 | 21 | 27 | 50 | 24 | 25 | 31 |
| infant | 65 | 81 | 66 | 65 | 85 | 54 | 80 | 79 |
| Brucellosis | 82 | 104 | 105 | 120 | 119 | 98 | 112 | 98 |
| Chancroid | 4,212 | 3,476 | 1,895 | 1,399 | 773 | 606 | 386 | 243§ |
| Chlamydia¶ | † | † | † | † | † | 477,638 | 498,884 | 526,671§ |
| Cholera | 6 | 26 | 103 | 18 | 39 | 23 | 4 | 6 |
| Coccidioidomycosis | † | † | † | † | † | 1,212 | 1,697 | 1,749 |
| Cryptosporidiosis | † | † | † | † | † | 2,970 | 2,827 | 2,566 |
| Diphtheria | 4 | 5 | 4 | — | 2 | — | 2 | 4 |
| Encephalitis, primary | 1,341 | 1,021 | 774 | 919 | 717 | † | † | † |
| postinfectious | 105 | 82 | 129 | 170 | 143 | † | † | † |
| Encephalitis/Meningitis | | | | | | | | |
| California serogroup viral | † | † | † | † | † | 11 | 123 | 129 |
| eastern equine | † | † | † | † | † | 1 | 5 | 14 |
| St. Louis | † | † | † | † | † | 1 | 2 | 13 |
| western equine | † | † | † | † | † | — | 2 | — |
| *Escherichia coli* O157:H7 | † | † | † | † | 1,420 | 2,139 | 2,741 | 2,555 |
| Gonorrhea | 690,169 | 620,478 | 501,409 | 439,673 | 418,068 | 392,848 | 325,883 | 324,907§ |
| Granuloma inguinale | 97 | 29 | 6 | 19 | 3 | † | † | † |
| *Haemophilus influenzae*, invasive disease | † | † | 1,412 | 1,419 | 1,174 | 1,180 | 1,170 | 1,162 |
| Hansen disease (leprosy) | 198 | 154 | 172 | 187 | 136 | 144 | 112 | 122 |
| Hantavirus pulmonary syndrome | † | † | † | † | † | — | NA | NA |
| Hemolytic uremic syndrome, postdiarrheal | † | † | † | † | † | 72 | 97 | 91 |
| Hepatitis, viral, acute | | | | | | | | |
| A | 31,441 | 24,378 | 23,112 | 24,238 | 26,796 | 31,582 | 31,032 | 30,021 |
| B | 21,102 | 18,003 | 16,126 | 13,361 | 12,517 | 10,805 | 10,637 | 10,416 |
| C/non-A, non-B** | 2,553 | 3,582 | 6,010 | 4,786 | 4,470 | 4,576 | 3,716 | 3,816 |
| unspecified | 1,671 | 1,260 | 884 | 627 | 444 | † | † | † |
| Legionellosis | 1,370 | 1,317 | 1,339 | 1,280 | 1,615 | 1,241 | 1,198 | 1,163 |

\* Acquired immunodeficiency syndrome.
† Not nationally notifiable.
§ Cases were updated through the Division of STD Prevention, National Center for HIV/AIDS, Viral Hepatitis, STD, and TB Prevention (NCHHSTP) (proposed).
¶ Chlamydia refers to genital infections caused by *Chlamydia trachomatis*.
\*\* The anti-hepatitis C virus antibody test became available in May 1990.

Appx11337

**TABLE 9. (Continued) Reported cases of notifiable diseases — United States, 1990–1997**

| Disease | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|---|---|---|---|
| Leptospirosis | 77 | 58 | 54 | 51 | 38 | † | † | † |
| Lyme disease | † | † | 9,895 | 8,257 | 13,043 | 11,700 | 16,455 | 12,801 |
| Lymphogranuloma venereum | 277 | 471 | 302 | 285 | 235 | † | † | † |
| Malaria | 1,292 | 1,278 | 1,087 | 1,411 | 1,229 | 1,419 | 1,800 | 2,001 |
| Measles | 27,786 | 9,643 | 2,237 | 312 | 963 | 309 | 508 | 138 |
| Meningococcal disease, invasive | 2,451 | 2,130 | 2,134 | 2,637 | 2,886 | 3,243 | 3,437 | 3,308 |
| Mumps | 5,292 | 4,264 | 2,572 | 1,692 | 1,537 | 906 | 751 | 683 |
| Murine typhus fever | 50 | 43 | 28 | 25 | † | † | † | † |
| Pertussis | 4,570 | 2,719 | 4,083 | 6,586 | 4,617 | 5,137 | 7,796 | 6,564 |
| Plague | 2 | 11 | 13 | 10 | 17 | 9 | 5 | 4 |
| Poliomyelitis, paralytic | 6 | 10 | 6 | 4 | 8 | 7 | 7 | 6 |
| Psittacosis | 113 | 94 | 92 | 60 | 38 | 64 | 42 | 33 |
| Rabies | | | | | | | | |
| animal | 4,826 | 6,910 | 8,589 | 9,377 | 8,147 | 7,811 | 6,982 | 8,105 |
| human | 1 | 3 | 1 | 3 | 6 | 5 | 3 | 2 |
| Rheumatic fever, acute | 108 | 127 | 75 | 112 | 112 | † | † | † |
| Rocky Mountain spotted fever | 651 | 628 | 502 | 456 | 465 | 590 | 831 | 409 |
| Rubella | 1,125 | 1,401 | 160 | 192 | 227 | 128 | 238 | 181 |
| Rubella, congenital syndrome | 11 | 47 | 11 | 5 | 7 | 6 | 4 | 5 |
| Salmonellosis, excluding typhoid fever | 48,603 | 48,154 | 40,912 | 41,641 | 43,323 | 45,970 | 45,471 | 41,901 |
| Shigellosis | 27,077 | 23,548 | 23,931 | 32,198 | 29,769 | 32,080 | 25,978 | 23,117 |
| Streptococcal disease, invasive, group A | † | † | † | † | † | 613 | 1,445 | 1,973 |
| Streptococcal toxic-shock syndrome | † | † | † | † | † | 10 | 19 | 33 |
| Streptococcus pneumoniae, invasive disease drug-resistant, all ages | † | † | † | † | † | 309 | 1,514 | 1,799 |
| Syphilis, primary & secondary | 50,223 | 42,935 | 33,973 | 26,498 | 20,627 | 16,500 | 11,387 | 8,550 |
| total, all stages | 134,255 | 128,569 | 112,581 | 101,259 | 81,696 | 68,953 | 52,976 | 46,540 |
| Tetanus | 64 | 57 | 45 | 48 | 51 | 41 | 36 | 50 |
| Toxic-shock syndrome | 322 | 280 | 244 | 212 | 192 | 191 | 145 | 157 |
| Trichinosis | 129 | 62 | 41 | 16 | 32 | 29 | 11 | 13 |
| Tuberculosis | 25,701 | 26,283 | 26,673 | 25,313 | 24,361 | 22,860 | 21,337 | 19,851†† |
| Tularemia | 152 | 193 | 159 | 132 | 96 | † | † | † |
| Typhoid fever | 552 | 501 | 414 | 440 | 441 | 369 | 396 | 365 |
| Varicella§§ | 173,099 | 147,076 | 158,364 | 134,722 | 151,219 | 120,624 | 83,511 | 98,727 |
| Yellow fever¶¶ | — | — | — | — | — | — | 1 | — |

†† Cases were updated through the Division of TB Elimination, NCHHSTP (proposed).
§§ Varicella was taken off the nationally notifiable disease list in 1991. Certain states continued to report these cases to CDC.
¶¶ The last indigenous case of yellow fever was reported in 1911; all other cases since 1911 have been imported.

TABLE 10. Reported cases of notifiable diseases* — United States, 1982–1989

| Disease | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 |
|---|---|---|---|---|---|---|---|---|
| AIDS† | § | § | 4,445 | 8,249 | 12,932 | 21,070 | 31,001 | 33,722 |
| Amebiasis | 7,304 | 6,658 | 5,252 | 4,433 | 3,532 | 3,123 | 2,860 | 3,217 |
| Anthrax | — | — | 1 | — | — | 1 | 2 | — |
| Aseptic meningitis | 9,680 | 12,696 | 8,326 | 10,619 | 11,374 | 11,487 | 7,234 | 10,274 |
| Botulism, total (including wound & unspecified) | 97 | 133 | 123 | 122 | 109 | 82 | 84 | 89 |
| foodborne | § | § | § | 49 | 23 | 17 | 28 | 23 |
| infant | § | § | § | 70 | 79 | 59 | 50 | 60 |
| Brucellosis | 173 | 200 | 131 | 153 | 106 | 129 | 96 | 95 |
| Chancroid | 1,392 | 847 | 666 | 2,067 | 3,756 | 4,998 | 5,001 | 4,692 |
| Cholera | — | 1 | 1 | 4 | 23 | 6 | 8 | — |
| Diphtheria¶ | 2 | 5 | 1 | 3 | — | 3 | 2 | 3 |
| Encephalitis, primary | 1,464 | 1,761 | 1,257 | 1,376 | 1,302 | 1,418 | 882 | 981 |
| postinfectious** | 36 | 34 | 108 | 161 | 124 | 121 | 121 | 88 |
| Gonorrhea | 960,633 | 900,435 | 878,556 | 911,419 | 900,868 | 780,905 | 719,536 | 733,151 |
| Granuloma inguinale | 17 | 24 | 30 | 44 | 61 | 22 | 11 | 7 |
| Hansen disease (leprosy) | 250 | 259 | 290 | 361 | 270 | 238 | 184 | 163 |
| Hepatitis, viral, acute | | | | | | | | |
| A | 23,403 | 21,532 | 22,040 | 23,210 | 23,430 | 25,280 | 28,507 | 35,821 |
| B | 22,177 | 24,318 | 26,115 | 26,611 | 26,107 | 25,916 | 23,177 | 23,419 |
| C/non-A, non-B†† | § | § | 3,871 | 4,184 | 3,634 | 2,999 | 2,619 | 2,529 |
| unspecified | 8,564 | 7,149 | 5,531 | 5,517 | 3,940 | 3,102 | 2,470 | 2,306 |
| Legionellosis | 654 | 852 | 750 | 830 | 980 | 1,038 | 1,085 | 1,190 |
| Leptospirosis | 100 | 61 | 40 | 57 | 41 | 43 | 54 | 93 |
| Lymphogranuloma venereum | 235 | 335 | 170 | 226 | 396 | 303 | 185 | 189 |
| Malaria | 1,056 | 813 | 1,007 | 1,049 | 1,123 | 944 | 1,099 | 1,277 |
| Measles | 1,714 | 1,497 | 2,587 | 2,822 | 6,282 | 3,655 | 3,396 | 18,193 |
| Meningococcal disease, invasive | 3,056 | 2,736 | 2,746 | 2,479 | 2,594 | 2,930 | 2,964 | 2,727 |
| Mumps | 5,270 | 3,355 | 3,021 | 2,982 | 7,790 | 12,848 | 4,866 | 5,712 |
| Murine typhus fever | 58 | 62 | 53 | 37 | 67 | 49 | 54 | 41 |
| Pertussis | 1,895 | 2,463 | 2,276 | 3,589 | 4,195 | 2,823 | 3,450 | 4,157 |
| Plague | 19 | 40 | 31 | 17 | 10 | 12 | 15 | 4 |
| Poliomyelitis, total | 12 | 13 | 9 | 8 | 10 | §§ | §§ | §§ |
| paralytic§§ | 12 | 13 | 9 | 8 | 10 | 9 | 9 | 11 |
| Psittacosis | 152 | 142 | 172 | 119 | 224 | 98 | 114 | 116 |
| Rabies | | | | | | | | |
| animal | 6,212 | 5,878 | 5,567 | 5,565 | 5,504 | 4,658 | 4,651 | 4,724 |
| human | — | 2 | 3 | 1 | — | 1 | — | 1 |
| Rheumatic fever, acute | 137 | 88 | 117 | 90 | 147 | 141 | 158 | 144 |
| Rocky Mountain spotted fever | 976 | 1,126 | 838 | 714 | 760 | 604 | 609 | 623 |
| Rubella | 2,325 | 970 | 752 | 630 | 551 | 306 | 225 | 396 |
| Rubella, congenital syndrome | 7 | 22 | 5 | — | 14 | 5 | 6 | 3 |
| Salmonellosis | 40,936 | 44,250 | 40,861 | 65,347 | 49,984 | 50,916 | 48,948 | 47,812 |
| Shigellosis | 18,129 | 19,710 | 17,371 | 17,057 | 17,138 | 23,860 | 30,617 | 25,010 |
| Syphilis, primary & secondary | 33,613 | 32,698 | 28,607 | 27,131 | 27,883 | 35,147 | 40,117 | 44,540 |
| total, all stages | 75,579 | 74,637 | 69,888 | 67,563 | 68,215 | 86,545 | 103,437 | 110,797 |
| Tetanus | 88 | 91 | 74 | 83 | 64 | 48 | 53 | 53 |
| Toxic-shock syndrome | § | § | 482 | 384 | 412 | 372 | 390 | 400 |
| Trichinosis | 115 | 45 | 68 | 61 | 39 | 40 | 45 | 30 |
| Tuberculosis | 25,520 | 23,846 | 22,255 | 22,201 | 22,768 | 22,517 | 22,436 | 23,495 |
| Tularemia | 275 | 310 | 291 | 177 | 170 | 214 | 201 | 152 |
| Typhoid fever | 425 | 507 | 390 | 402 | 362 | 400 | 436 | 460 |
| Varicella | 167,423 | 177,462 | 221,983 | 178,162 | 193,243 | 213,196 | 192,857 | 185,441 |

\* No cases of yellow fever were reported during 1982–1989.
† Acquired immunodeficiency syndrome.
§ Not nationally notifiable.
¶ Cutaneous diphtheria ceased being nationally notifiable after 1979.
** Beginning in 1984, data were recorded by date of record to state health departments. Before 1984, data were recorded by onset date.
†† The anti-hepatitis C virus antibody test became available in May 1990.
§§ No cases of paralytic poliomyelitis caused by wild virus have been reported in the United States since 1993.

**TABLE 11. Reported cases of notifiable diseases\* — United States, 1974–1981**

| Disease | 1974 | 1975 | 1976 | 1977 | 1978 | 1979 | 1980 | 1981 |
|---|---|---|---|---|---|---|---|---|
| Amebiasis | 2,743 | 2,775 | 2,906 | 3,044 | 3,937 | 4,107 | 5,271 | 6,632 |
| Anthrax | 2 | 2 | 2 | — | 6 | — | 1 | — |
| Aseptic meningitis | 3,197 | 4,475 | 3,510 | 4,789 | 6,573 | 8,754 | 8,028 | 9,547 |
| Botulism, total (including wound & unspecified) | 28 | 20 | 55 | 129 | 105 | 45 | 89 | 103 |
| Brucellosis | 240 | 310 | 296 | 232 | 179 | 215 | 183 | 185 |
| Chancroid | 945 | 700 | 628 | 455 | 521 | 840 | 788 | 850 |
| Cholera | — | — | — | 3 | 12 | 1 | 9 | 19 |
| Diphtheria | 272 | 307 | 128 | 84 | 76 | 59 | 3 | 5 |
| Encephalitis | | | | | | | | |
|   primary | 1,164 | 4,064 | 1,651 | 1,414 | 1,351 | 1,504 | 1,362 | 1,492 |
|   postinfectious | 219 | 237 | 175 | 119 | 78 | 84 | 40 | 43 |
| Gonorrhea | 906,121 | 999,937 | 1,001,994 | 1,002,219 | 1,013,436 | 1,004,058 | 1,004,029 | 990,864 |
| *Granuloma inguinale* | 47 | 60 | 71 | 75 | 72 | 76 | 51 | 66 |
| Hansen disease (leprosy) | 118 | 162 | 145 | 151 | 168 | 185 | 223 | 256 |
| Hepatitis | | | | | | | | |
|   A (infectious) | 40,358 | 35,855 | 33,288 | 31,153 | 29,500 | 30,407 | 29,087 | 25,802 |
|   B (serum) | 10,631 | 13,121 | 14,973 | 16,831 | 15,016 | 15,452 | 19,015 | 21,152 |
|   unspecified | † | † | 7,488 | 8,639 | 8,776 | 10,534 | 11,894 | 10,975 |
| Legionellosis | † | † | † | 235 | 359 | 761 | 593 | 408 |
| Leptospirosis | 8,351 | 93 | 73 | 71 | 110 | 94 | 85 | 82 |
| *Lymphogranuloma venereum* | 394 | 353 | 365 | 348 | 284 | 250 | 199 | 263 |
| Malaria | 293 | 373 | 471 | 547 | 731 | 894 | 2,062 | 1,388 |
| Measles | 22,094 | 24,374 | 41,126 | 57,345 | 26,871 | 13,597 | 13,506 | 3,124 |
| Meningococcal disease, invasive | 1,346 | 1,478 | 1,605 | 1,828 | 2,505 | 2,724 | 2,840 | 3,525 |
| Mumps | 59,128 | 59,647 | 38,492 | 21,436 | 16,817 | 14,225 | 8,576 | 4,941 |
| Murine typhus fever | 26 | 41 | 69 | 75 | 46 | 69 | 81 | 61 |
| Pertussis | 2,402 | 1,738 | 1,010 | 2,177 | 2,063 | 1,623 | 1,730 | 1,248 |
| Plague | 8 | 20 | 16 | 18 | 12 | 13 | 18 | 13 |
| Poliomyelitis, total | 7 | 13 | 10 | 19 | 8 | 22 | 9 | 10 |
|   paralytic | 7 | 13 | 10 | 19 | 8 | 22 | 9 | 10 |
| Psittacosis | 164 | 49 | 78 | 94 | 140 | 137 | 124 | 136 |
| Rabies | | | | | | | | |
|   animal | 3,151 | 2,627 | 3,073 | 3,130 | 3,254 | 5,119 | 6,421 | 7,118 |
|   human | — | 2 | 2 | 1 | 4 | 4 | — | 2 |
| Rheumatic fever, acute | 2,431 | 2,854 | 1,865 | 1,738 | 851 | 629 | 432 | 264 |
| Rocky Mountain spotted fever | 754 | 844 | 937 | 1,153 | 1,063 | 1,070 | 1,163 | 1,192 |
| Rubella | 11,917 | 16,652 | 12,491 | 20,395 | 18,269 | 11,795 | 3,904 | 2,077 |
| Rubella, congenital syndrome | 45 | 30 | 30 | 23 | 30 | 62 | 50 | 19 |
| Salmonellosis | 21,980 | 22,612 | 22,937 | 27,850 | 29,410 | 33,138 | 33,715 | 39,990 |
| Shigellosis | 22,600 | 16,584 | 13,140 | 16,052 | 19,511 | 20,135 | 19,041 | 9,859 |
| Syphilis | | | | | | | | |
|   primary & secondary | 25,385 | 25,561 | 23,731 | 20,399 | 21,656 | 24,874 | 27,204 | 31,266 |
|   total, all stages | 83,771 | 80,356 | 71,761 | 64,621 | 64,875 | 67,049 | 68,832 | 72,799 |
| Tetanus | 101 | 102 | 75 | 87 | 86 | 81 | 95 | 72 |
| Trichinosis | 120 | 252 | 115 | 143 | 67 | 157 | 131 | 206 |
| Tuberculosis§ | 30,122 | 33,989 | 32,105 | 30,145 | 28,521 | 27,669 | 27,749 | 27,373 |
| Tularemia | 144 | 129 | 157 | 165 | 141 | 196 | 234 | 288 |
| Typhoid fever | 437 | 375 | 419 | 398 | 505 | 528 | 510 | 584 |
| Varicella | 141,495 | 154,248 | 183,990 | 188,396 | 154,089 | 199,081 | 190,894 | 200,766 |

\* No cases of yellow fever were reported during 1974–1981.
† Not nationally notifiable.
§ Case data after 1974 are not comparable with earlier years because of changes in reporting criteria that became effective in 1975.

Appx11340

TABLE 12. Deaths from selected nationally notifiable diseases* — United States, 2002–2003

| Cause of death | ICD-10 cause of death code[†] | 2002 no. of deaths | 2002 CMR[§] | Rank of mortality count[¶] | 2003 no. of deaths | 2003 CMR[§] | Rank of mortality count[¶] |
|---|---|---|---|---|---|---|---|
| AIDS | B20–24 | 14,095 | 4.89 | 1 | 13,658 | 4.70 | 1 |
| Coccidioidomycosis | B38 | 84 | 0.03 | 7 | 73 | 0.03 | 9 |
| Hemolytic uremic syndrome, postdiarrheal | D59.3 | 35 | 0.01 | 12 | 29 | 0.01 | 15 |
| Hepatitis, viral, acute | | | | | | | |
| A | B15 | 76 | 0.03 | 9 | 54 | 0.02 | 11 |
| B | B16 | 659 | 0.23 | 4 | 583 | 0.20 | 4 |
| C | B17.1 | 4,321 | 1.50 | 2 | 4,109 | 1.41 | 2 |
| Influenza-associated pediatric mortality** | J10, J11 | 25 | 0.03 | 15 | 147 | 0.19 | 6 |
| Legionellosis | A48.1 | 62 | 0.02 | 10 | 98 | 0.03 | 8 |
| Listeriosis | A32 | 32 | 0.01 | 13 | 33 | 0.01 | 14 |
| Malaria | B50–54 | 12 | 0[††] | 18 | 11[††] | 0[††] | 18 |
| Meningococcal disease | A39 | 161 | 0.06 | 5 | 161 | 0.06 | 5 |
| Pertussis | A37 | 18 | 0.01[††] | 17 | 11 | 0[††] | 17 |
| Salmonellosis | A02 | 21 | 0.01 | 16 | 43 | 0.01 | 12 |
| Streptococcal disease, invasive, group A | A40.0, A49.1, B95.0 | 109 | 0.04 | 6 | 115 | 0.04 | 7 |
| Syphilis, total, all stages | A50–53 | 41 | 0.01 | 11 | 34 | 0.01 | 13 |
| Toxic-shock syndrome | A48.3 | 78 | 0.03 | 8 | 71 | 0.02 | 10 |
| Tuberculosis | A15–19 | 784 | 0.27 | 3 | 711 | 0.24 | 3 |
| Varicella | B01 | 32 | 0.01 | 13 | 16 | 0.01[§§] | 16 |

Source: CDC. CDC WONDER Compressed Mortality files (http://wonder.cdc.gov/mortSQL.html) provided by the National Center for Health Statistics (NCHS). National Vital Statistics System (NVSS), 1999–2003. Underlying causes of death are classified according to ICD 10. Data for 2004–2005 are not available. Data are limited by the accuracy of the information regarding the underlying cause of death indicated on death certificates and reported to NVSS.
* Includes only causes of death corresponding to nationally notifiable infectious diseases with >10 deaths.
† World Health Organization. International Statistical Classification of Diseases and Related Health Problems. Tenth Revision, 1992.
§ Crude mortality rate per 100,000 population.
¶ A rank of "1" indicates the highest number of deaths. The 2002 and 2003 total populations used to calculate incidence were 288,368,705 and 290,810,789, respectively.
** CDC WONDER staff provided the mortality counts and population data for 2002 and 2003 mortality rates. The population estimates for children aged <18 years for 2002 and 2003 were based on the NCHS bridged-race vintage 2003 national population estimates. For 2002 deaths, the population in the age group <18 years was 76,892,760. For 2003 deaths, the population in the age group <18 years was 77,138,460.
†† Includes unreliable CMR as a result of mortality counts of <10 deaths.
§§ Suppressed mortality count because the count was <10 deaths.

## Selected Reading

### General

Adekoya N. Nationally notifable disease surveilance (NNDSS) and the *Healthy People 2010* objectives. The eJournal of the South Carolina Medical Association 2005;101:e68--72. Available at http://www.scmanet.org/Downloads/e-Journal/SCMA_eJournal_March05.pdf.

Baker MG, Fidler DP. Global public health surveillance under new international health regulations. Emerg Infect Dis 2006;12:1058--65.

Bayer R, Fairchild AL. Public health: surveillance and privacy. Science 2000;290:1898--9.

CDC. Racial disparities in nationally notifiable diseases---United States, 2002. MMWR 2005;54:9--11.

CDC. Progress in improving state and local disease surveillance---United States, 2000--2005. MMWR 2005;54:822--5.

CDC. Case definitions for infectious conditions under public health surveillance. MMWR 1997;46 (No. RR-10). Additional information available at http://www.cdc.gov/epo/dphsi/casedef/index.htm.

CDC. Demographic differences in notifiable infectious disease morbidity---United States, 1992--1994. MMWR 1997;46:637--41.

Appx11341

CDC. Framework for evaluating public health surveillance systems for early detection of outbreaks; recommendations from the CDC working group. MMWR 2004;53(No. RR-5).

CDC. Framework for program evaluation in public health. MMWR 1999;48(No. RR-11).

CDC. Historical perspectives: notifiable disease surveillance and notifiable disease statistics---United States, June 1946 and June 1996. MMWR 1996;45:530--6.

CDC. Manual of procedures for the reporting of nationally notifiable diseases to CDC. Atlanta, GA: US Department of Health and Human Services, Public Health Service, CDC; 1995.

CDC. Manual for the surveillance of vaccine-preventable diseases. 3rd ed. Atlanta, GA: US Department of Health and Human Services, Public Health Service, CDC; 2002. Available at http://www.cdc.gov/nip/publications/surv-manual.

CDC. National Electronic Disease Surveillance System (NEDSS): a standards-based approach to connect public health and clinical medicine. J Public Health Management and Practice 2001;7:43--50.

CDC. Public Health Information Network (PHIN): overview. Atlanta, GA: US Department of Health and Human Services, CDC; 2006. Available at http://www.cdc.gov/phin/overview.html.

CDC. Reporting race and ethnicity data---National Electronic Telecommunications System for Surveillance, 1994--1997. MMWR 1999;48:305--12.

CDC. Sexually transmitted disease surveillance, 2005. Atlanta, GA: US Department of Health and Human Services, CDC; 2006.

CDC. Sexually transmitted diseases treatment guidelines, 2006. MMWR 2006;55(No. RR-11).

CDC. Ten leading nationally notifiable infectious diseases---United States, 1995. MMWR 1996;45:883--4.

CDC. Updated guidelines for evaluating public health surveillance systems: recommendations from the Guidelines Working Group. MMWR 2001;50(No. RR-13).

CDC. Use of race and ethnicity in public health surveillance: summary of the CDC/ATSDR workshop. MMWR 1993;42(No. RR-10).

Chang M-H, Glynn MK, Groseclose SL. Endemic, notifiable bioterrorism-related diseases, United States, 1992--1999. Emerg Infect Dis 2003;9:556--64.

Chin JE, ed. Control of communicable diseases manual. 17th ed. Washington, DC: American Public Health Association; 2000.

Doyle TJ, Glynn MK, Groseclose SL. Completeness of notifiable infectious disease reporting in the United States: an analytical literature review. Am J Epidemiol 2002;155: 866--74.

Effler P, Ching-Lee M, Bogard A, Ieong M-C, Nekomoto T, Jernigan D. Statewide system of electronic notifiable disease reporting from clinical laboratories: comparing automated reporting with conventional methods. JAMA 1999;282:1845--50.

Appx11342

Freimuth V, Linnan HW, Potter P. Communicating the threat of emerging infections to the public. Emerg Infect Dis 2000;6:337--47.

German R. Sensitivity and predictive value positive measurements for public health surveillance systems. Epidemiology 2000;11:720--7.

Government Accountability Office. Emerging infectious diseases: review of state and federal disease surveillance efforts. Washington, DC: Government Accountability Office; 2004. GAO-04-877. Available at http://www.gao.gov/new.items/d04877.pdf.

Hopkins RS. Design and operation of state and local infectious disease surveillance systems. J Public Health Management Practice 2005;11:184--90.

Jajosky RA, Groseclose SL. Evaluation of reporting timeliness of public health surveillance systems for infectious diseases. BMC Public Health 2004;4:29.

Koo D, Caldwell B. The role of providers and health plans in infectious disease surveillance. Eff Clin Pract 1999;2:247--52. Available at http://www.acponline.org/journals/ecp/sepoct99/koo.htm.

Koo D, Wetterhall S. History and current status of the National Notifiable Diseases Surveillance System. J Public Health Management Practice 1996;2:4--10.

Krause G, Brodhun B, Altmann D, Claus H, Benzler J. Reliability of case definitions for public health surveillance assessed by Round-Robin test methodology. BMC Public Health 2006;6:129.

Lin SS, Kelsey JL. Use of race and ethnicity in epidemiologic research: concepts, methodological issues, and suggestions for research. Epidemiol Rev 2000;22:187--202.

Martin SM, Bean NH. Data management issues for emerging diseases and new tools for managing surveillance and laboratory data. Emerg Infect Dis 1995;1:124--8.

McNabb S, Chungong S, Ryan M, et al. Conceptual framework of public health surveillance and action and its application in health sector reform. BMC Public Health 2002;2:2.

McNabb S, Surdo A, Redmond A, et al. Applying a new conceptual framework to evaluate tuberculosis surveillance and action performance and measure the costs, Hillsborough County, Florida, 2002. Ann Epidemiol 2004;14:640--5.

Niskar AS, Koo D. Differences in notifiable infectious disease morbidity among adult women---United States, 1992--1994. J Womens Health 1998;7:451--8.

Panackal AA, M'ikanatha NM, Tsui FC, et al. Automatic electronic laboratory-based reporting of notifiable infectious diseases at a large health system. Emerg Infect Dis 2002;8:685--91.

Pinner RW, Koo D, Berkelman RL. Surveillance of infectious diseases. In: Lederberg J, Alexander M, Bloom RB, eds. Encyclopedia of microbiology. 2nd ed. San Diego, CA: Academic Press; 2000.

Pinner RW, Jernigan DB, Sutliff SM. Electronic laboratory-based reporting for public health. Mil Med 2000;165 (Suppl 2):20--4.

Roush S, Birkhead G, Koo D, Cobb A, Fleming D. Mandatory reporting of diseases and conditions by health care professionals and laboratories. JAMA 1999;282:164--70.

Silk, BJ, Berkelman RL. A review of strategies for enhancing the completeness of notifiable disease reporting. J Public Health Management Practice 2005;11:191--200.

Teutsch SM, Churchill RE, eds. Principles and practice of public health surveillance. 2nd ed. New York, NY: Oxford University Press; 2000.

Thacker SB, Choi K, Brachman PS. The surveillance of infectious diseases. JAMA 1983;249:1181--5.

**AIDS**

CDC. HIV/AIDS surveillance report, 2005. Atlanta, GA: US Department of Health and Human Services, CDC, Vol. 17; 2006. Available at http://www.cdc.gov/hiv/stats/hasrlink.htm.

CDC. Guidelines for national human immunodeficiency virus case surveillance, including monitoring for human immunodeficiency virus infection and acquired immunodeficiency syndrome. MMWR 1999;48(No. RR-13).

Nakashima AK, Fleming PL. HIV/AIDS surveillance in the United States, 1981--2001. J Acquir Immune Defic Syndr 2003;32:68--85.

**Anthrax**

CDC. Use of anthrax vaccine in response to terrorism: supplemental recommendations of the Advisory Committee on Immunization Practices. MMWR 2002;51:1024--6.

Holty JE, Bravata DM, Liu H, Olshen RA, McDonald KM, Owens DK. Systematic review: a century of inhalational anthrax cases from 1900 to 2005. Ann Intern Med 2006;144:270--80.

Howell JM, Mayer TA, Hanfling D, et al. Screening for inhalational anthrax due to bioterrorism: evaluating proposed screening protocols. Clin Infect Dis 2004;39:1842.

Hugh-Jones M. 1996--97 global anthrax report. J Appl Microbiol 1999;87:189--91.

Inglesby TV, O'Toole T, Henderson DA, et al. Anthrax as a biological weapon, 2002: updated recommendations for management. JAMA 2002;287:2236--52.

Kyriacou DN, Stein AC, Yarnold PR, et al. Clinical predictors of bioterrorism-related inhalational anthrax. Lancet 2004;364(9432):449--52.

**Botulism**

Angulo FJ, St. Louis ME. Botulism. In: Evans AS, Brachman PS, eds. Bacterial infections of humans. New York, NY: Plenum; 1998:131--53.

CDC. Infant botulism---New York City, 2001--2002. MMWR 2003;52:21--4.

Shapiro RL, Hatheway C, Becher J, Swerdlow DL. Botulism surveillance and emergency response: a public health strategy for a global challenge. JAMA 1997;278:433--5.

Shapiro RL, Hatheway C, Swerdlow DL. Botulism in the United States: a clinical and epidemiologic review. Ann Intern Med 1998;129:221--8.

Sobel J, Tucker N, McLaughlin J, Maslanka S. Foodborne botulism in the United States, 1999--2000. Emerg Infect Dis 2004;10:1606--12.

Sobel J. Botulism. Clin Infect Dis 2005;41:1167--73.

**Brucellosis**

CDC. Brucellosis (*Brucella melitensis, abortus, suis*, and *canis*). Atlanta, GA: US Department of Health and Human Services, CDC; 2005. Available at http://www.cdc.gov/ncidod/dbmd/diseaseinfo/brucellosis_g.htm.

CDC. Brucellosis case definition. Atlanta, GA: US Department of Health and Human Services, CDC; 2001. Available at http://www.bt.cdc.gov/Agent/Brucellosis/CaseDef.asp.

CDC. Human exposure to *Brucella abortus* strain RB51---Kansas, 1997. MMWR 1998;47:172--5.

Stevens, MG, Olsen SC, Palmer MV, Cheville NF. US Department of Agriculture, Agricultural Research Service National Animal Disease Center, Iowa State University. *Brucella abortus* strain RB51: a new brucellosis vaccine for cattle. Compendium 1997;19:766--74.

Yagupsky P, Baron EJ. Laboratory exposures to *Brucellae* and implications for bioterrorism. Emerg Infect Dis 2005;11:1180--5.

Chomel BB, DeBess EE, Mangiamele DM, et al. Changing trends in the epidemiology of human brucellosis in California from 1973 to 1992: a shift toward foodborne transmission. J Infect Dis 1994;170:1216--23.

**Chancroid**

DiCarlo RP, Armentor BS, Martin DH. Chancroid epidemiology in New Orleans men. J Infect Dis 1995;172:446--52.

Mertz KJ, Weiss JB, Webb RM, et al. An investigation of genital ulcers in Jackson, Mississippi, with use of a multiplex polymerase chain reaction assay: high prevalence of chancroid and human immunodeficiency virus infection. J Infect Dis 1998;178:1060--6.

Mertz KJ, Trees D, Levine WC, et al. Etiology of genital ulcers and prevalence of human immunodeficiency virus coinfection in 10 US cities. The Genital Ulcer Disease Surveillance Group. J Infect Dis 1998;178:1795--8.

***Chlamydia trachomatis*, Genital Infection**

CDC. Sexually transmitted disease surveillance 2005 supplement: Chlamydia Prevalence Monitoring Project, annual report 2005. Atlanta, GA: US Department of Health and Human Services, CDC. In press.

Gaydos CA, Howell MR, Pare B, et al. *Chlamydia trachomatis* infections in female military recruits. N Engl J Med 1998;339:739--44.

Mertz KJ, McQuillian GM, Levine WC, et al. A pilot study of chlamydial infection in a national household survey. Sex Transm Dis 1998;25:225--8.

Miller WC, Ford CA, Handcock MS, et al. Prevalance of chlamydial and gonococcal infections among young adults in the United States. JAMA 2004;291:2229--36.

**Cholera**

Steinberg EB, Greene KD, Bopp CA, Cameron DN, Wells JG, Mintz ED. Cholera in the United States, 1995--2000: trends at the end of the millennium. J Infect Dis 2001;184:799--802.

World Health Organization. Cholera, 2005. Wkly Epidemiol Rec 2006;81:297--308.

Mintz ED, Tauxe RV, Levine MM. The global resurgence of cholera. In: Noah ND, O'Mahony M, eds. Communicable disease epidemiology and control. Chichester, UK: John Wiley & Sons; 1998:63--104.

CDC. Cholera epidemic associated with raw vegetables---Lusaka, Zambia, 2003--2004. MMWR 2004;53:783--6.

CDC. Two cases of toxigenic *Vibrio cholerae* O1 infection after Hurricanes Katrina and Rita---Louisiana, October 2005. MMWR 2006;55:31--2.

**Coccidioidomycosis**

Park BJ, Sigel K, Vaz V et al. An epidemic of coccidioidomycosis in Arizona associated with climatic changes, 1998--2001. J Infect Dis 2005;191:1981--7.

**Cryptosporidiosis**

Hlavsa MC, Watson JC, Beach MJ. Cryptosporidiosis surveillance---United States 1999--2002. In: CDC Surveillance Summaries, January 28, 2005. MMWR 2005;54(No. SS-1): 1--8.

Yoder JS, Blackburn BG, Craun GF, et al. Surveillance for waterborne-disease outbreaks associated with recreational water---United States, 2001--2002. In: CDC Surveillance Summaries, October 22, 2004. MMWR 2004;53(No. SS-8): 1--21.

Roy SL, DeLong SM, Stenzel SA, et al. Risk factors for sporadic cryptosporidiosis among immunocompetent persons in the United States from 1999 to 2001. J Clin Microbiol 2004;42:2944--51.

CDC. Diagnostic procedures for stool specimens; detection of parasite antigens. Atlanta, GA: US Department of Health and Human Services, CDC; 2004. Available at http://www.dpd.cdc.gov/dpdx/html/diagnosticprocedures.htm.

## Cyclosporiasis

Herwaldt BL. The ongoing saga of U.S. outbreaks of cyclosporiasis associated with imported fresh produce: what *Cyclospora cayetanensis* has taught us and what we have yet to learn. In: Institute of Medicine. Addressing foodborne threats to health: policies, practices, and global coordination. Washington, DC: The National Academies Press; 2006:85--115, 133--40. Available at http://newton.nap.edu/catalog/11745.html#toc.

Herwaldt BL. *Cyclospora cayetanensis*: a review, focusing on the outbreaks of cyclosporiasis in the 1990s. Clin Infect Dis 2000;31:1040--57.

## Diphtheria

Dewinter LM, Bernard KA, Romney MG. Human clinical isolates of *Corynebacterium diphtheriae* and *Corynebacterium ulcerans* collected in Canada from 1999 to 2003 but not fitting reporting criteria for cases of diphtheria. Clin Microbiol 2005;43:3447--9.

## Domestic Arboviral Diseases, Neuroinvasive and Nonneuroinvasive

CDC. Revision of guidelines for surveillance, prevention, and control of West Nile virus infection. MMWR 2003;52:797.

CDC. West Nile virus activity---United States, January 1--December 1, 2005. MMWR 2005;54:1253--6.

Hayes EB, Komar N, Nasci RS, et al. Epidemiology and transmission dynamics of West Nile virus disease. Emerg Infect Dis 2005;11:1167--73.

CDC. Eastern equine encephalitis---New Hampshire and Massachusetts, August--September 2005. MMWR 2006;55:697--700.

## Enterohemorrhagic *Escherichia coli*

Bender JB, Hedberg CW, Besser JM, et al. Surveillance for *Escherichia coli* O157:H7 infections in Minnesota by molecular subtyping. N Engl J Med 1997;337:388--94.

Brooks JT, Sowers EG, Wells JB, et al. Non-O157 Shiga toxin-producing *Escherichia coli* infections in the United States, 1983--2002. J Infect Dis 2005;192:1422--9.

Crump JA, Sulka AC, Langer AJ, et al. An outbreak of *Escherichia coli* O157:H7 among visitors to a dairy farm. N Engl J Med 2002;347:555--60.

Griffin PM, Mead PS, Sivapalasingam S. *Escherichia coli* O157:H7 and other enterohemorrhagic *E. coli*. In: Blaser MJ, Smith PD, Ravdin JI, Greenberg HB, Guerrant RL, eds. Infections of the gastrointestinal tract. Philadelphia, PA: Lippincott Williams & Wilkins; 2002:627--42.

Mead PS, Griffin PM. *Escherichia coli* O157:H7. Lancet 1998;352:1207--12.

**Ehrlichiosis (Human Granulocytic and Human Monocytic)**

CDC. Diagnosis and management of tickborne rickettsial diseases: Rocky Mountain spotted fever, rhrlichioses, and anaplasmosis---United States. MMWR 2006;55(No. RR-4).

Demma LJ, Holman RC, McQuiston JH, Krebs JW, Swerdlow DL. Epidemiology of human ehrlichiosis and anaplasmosis in the United States, 2001--2002. Am J Trop Med Hyg 2005;73:400--9.

Paddock CD, Childs JE. *Ehrlichia chaffeensis*: a prototypical emerging pathogen [Review]. J Clin Microbiol 2003;16: 37--64.

IJdo JW, Meek JI, Cartter ML, et al. The emergence of another tick-borne infection in the 12-town area around Lyme, Connecticut: human granulocytic ehrlichiosis. J Infect Dis 2000;181:1388--93.

**Giardiasis**

Hlavsa MC, Watson JC, Beach MJ. Giardiasis surveillance---United States, 1998--2002. In: CDC Surveillance Summaries, January 28, 2005. MMWR 2005;54(No. SS-1):9--16.

Blackburn BG, Craun GF, Yoder JS et al. Surveillance for waterborne-disease outbreaks associated with drinking water---United States, 2001--2002. In: CDC Surveillance Summaries, October 22, 2004. MMWR 2004;53(No. SS-8): 23--45.

Stuart JM, Orr HJ, Warburton FG, et al. Risk factors for sporadic giardiasis: a case-control study in Southwestern England. Emerg Infect Dis 2003;9:229--33.

CDC. Diagnostic procedures for stool specimens; detection of parasite antigens. Atlanta, GA: US Department of Health and Human Services, CDC; 2004. Available at http://www.dpd.cdc.gov/dpdx/html/diagnosticprocedures.htm.

**Gonorrhea**

CDC. Increases in fluoroquinolone-resistant *Neisseria gonorrhoeae* among men who have sex with men---United States, 2003, and revised recommendations for gonorrhea treatment, 2004. MMWR 2004;53:335--8.

CDC. Sexually transmitted diseases treatment guidelines, 2006. MMWR 2006;55(No. RR-11).

CDC. Sexually transmitted diseases surveillance 2005 supplement: Gonococcal Isolate Surveillance Project (GISP) annual report 2005. Atlanta, GA: US Department of Health and Human Services, CDC. In press.

***Haemophilus influenzae*, Invasive Disease**

CDC. Progress toward elimination of *Haemophilus influenzae* type b disease among infants and children---United States, 1998--2000. MMWR 2002;51:234--7.

Fry AM, Lurie P, Gidley M, Schmink S, Lingappa J, Rosenstein NE. *Haemophilus influenzae* type b (Hib) disease among Amish children in Pennsylvania: reasons for persistent disease. Pediatrics 2001;108:1--6.

**Hansen Disease (Leprosy)**

Britton WJ, Lockwood NJ. Leprosy. Lancet 2004;363:1209--19.

Hartzell JD, Zapor M, Peng S, Straight T. Leprosy: a case series and review. South Med J 2004;97:1252--6.

Hastings R, Ed. Leprosy. 2nd ed. New York, NY: Churchill Livingstone; 1994.

Joyce MP, Scollard DM. Leprosy (Hansen's disease). In: Rakel RE, Bope ET, eds. Conn's current therapy 2004: latest approved methods of treatment for the practicing physician. 56th ed. Philadelphia, PA: Saunders; 2004:100--5.

Ooi WW, Moschella SL. Update on leprosy in immigrants in the United States: status in the year 2000. Clin Infect Dis 2001;32:930--7.

Bruce S, Schroeder TL, Ellner K, Rubin H, Williams T, Wolf JE Jr. Armadillo exposure and Hansen's disease: an epidemiologic survey in southern Texas. J Am Acad Dermatol 2000;43(2 Pt1):223--8.

**Hantavirus Pulmonary Syndrome**

CDC. Hantavirus pulmonary syndrome---five states, 2006. MMWR 2006;55:627--9.

**Hemolytic Uremic Syndrome, Postdiarrheal**

Banatvala N, Griffin PM, Greene KED, et al. The United States Prospective Hemolytic Uremic Syndrome Study; microbiologic, serologic, clinical, and epidemiologic findings. J Infect Dis 2001;183:1063--70.

Mahon BE, Griffin PM, Mead PS, Tauxe RV. Hemolytic uremic syndrome surveillance to monitor trends in infection with *Escherichia coli* O157:H7 and other Shiga toxin-producing *E. coli* [Letter]. Emerg Infect Dis 1997;3: 409--12.

**Hepatitis A**

Armstrong GL, Bell BP. Hepatitis A virus infections in the United States: model-based estimates and implications for childhood immunization. Pediatrics 2002;109:839--45.

Bell BP, Kruszon-Moran D, Shapiro CN, Lambert SB, McQuillan GM, Margolis HS. Hepatitis A virus infection in the United States: serologic results from the Third National Health and Nutrition Examination Survey. Vaccine 2005;23:5798--806.

CDC. Prevention of hepatitis A through active or passive immunization: recommendations of the Advisory Committee on Immunization Practices. MMWR 2006;55(No. RR-7).

Wasley A, Samandari T, Bell BP. Incidence of hepatitis A in the United States in the era of vaccination. JAMA 2005;294:194--201.

Wasley A, Fiore A, Bell BP. Hepatitis A in the era of vaccination. Epidemiol Rev 2006;28:101--11.

## Hepatitis B

Armstrong GL, Mast EE, Wojczynski M, Margolis HS. Childhood hepatitis B virus infections in the United States before hepatitis B immunization. Pediatrics 2001;108:1123--8.

CDC. Hepatitis B virus: a comprehensive strategy for eliminating transmission in the United States through universal childhood vaccination: recommendations of the Immunization Practices Advisory Committee (ACIP). MMWR 1991;40(No. RR-13).

CDC. A comprehensive immunization strategy to eliminate transmission of hepatitis B virus infection in the United States: recommendations of the Advisory Committee on Immunization Practices (ACIP). Part 1: immunization of infants, children, and adolescents. MMWR 2005;54 (No. RR-16).

CDC. A comprehensive strategy to eliminate transmission of hepatitis B virus infection in the United States: recommendations of the Advisory Committee on Immunization Practices (ACIP). Part II: immunization of adults. MMWR 2006;55(No. RR-16).

Shepard CW, Simard EP, Finelli L, Fiore A, Bell BP. Hepatitis B virus infection: epidemiology and vaccination. Epidemiol Rev 2006;28:112--25.

Goldstein ST, Alter MJ, Williams IT, et al. Incidence and risk factors for acute hepatitis B in the United States, 1982--1998: implications for vaccination programs. J Infect Dis 2002;185:713--9.

McQuillan GM, Coleman PJ, Kruszon-Moran D, Moyer LA, Lambert SB, Margolis HS. Prevalence of hepatitis B virus infection in the United States: The National Health and Nutrition Examination Surveys, 1976 through 1994. Am J Public Health 1999;89:14--8.

## Hepatitis C

Armstrong GL, Wasley A, Simard EP, McQuillan GM, Kuhnert WL, Alter MJ. The prevalence of hepatitis C virus infection in the United States, 1999 through 2002. Ann Intern Med 2006;144):705--14.

Armstrong GA, Alter MJ, McQuillan GM, Margolis HS. The past incidence of hepatitis C virus infection: implications for the future burden of chronic liver disease in the United States. Hepatology 2000;31:777--82.

CDC. Recommendations for prevention and control of hepatitis C virus (HCV) infection and HCV-related chronic disease. MMWR 1998;47(No. RR-19).

Shepard CW, Finelli L, Alter MJ. The global epidemiology of hepatitis C. Lancet Infect Dis 2005;5:558--67.

**Influenza-Associated Pediatric Mortality**

Bhat N, Wright JG, Broder KR, et al. Influenza-associated deaths among children in the United States, 2003--2004. N Engl J Med 2005;352:2559--67.

CDC. Update: Influenza-associated deaths reported among children aged <18 years---United States, 2003--04 influenza season. MMWR 2004;52:1254--5.

CDC. Update: influenza-associated deaths reported among children aged <18 years---United States, 2003--04 influenza Season. MMWR 2004;52:1286--8.

CDC. Mid-year addition of influenza-associated pediatric mortality to the list of nationally notifiable diseases, 2004. MMWR 2004;53:951--2.

CDC. Prevention and control of influenza: recommendations of the Advisory Committee on Immunization Practices (ACIP). MMWR 2006;55(No. RR-10).

Council of State and Territorial Epidemiologists. Influenza-associated pediatric mortality, 2004. Atlanta, GA: Council of State and Territorial Epidemiologists; 2004. Available at http://www.cste.org/PositionStatementsResolutions2.htm.

Council of State and Territorial Epidemiologists. Position statement 04-ID-04: influenza-associated pediatric mortality 2004. Atlanta, GA: Council of State and Territorial Epidemiologists; 2004. Available at http://www.cste.org/ps/2004pdf/04-ID-04-final.pdf.

Guarner J, Paddock CD, Shieh WJ, et al. Histopathologic and immunohistochemical features of fatal influenza virus infection in children during the 2003--2004 season. Clin Infect Dis 2006;43;132--40.

**Legionellosis**

Cowgill KD, Lucas CE, Benson RF, et al. Recurrence of legionnaires disease at a hotel in the United States Virgin Islands over a 20-year period. Clin Infect Dis 2005;40:1205--7.

Fields BS, Benson RF, Besser RE. *Legionella* and Legionnaires' disease: 25 years of investigation. Clin Microbiol Rev 2002;15:506--26.

European Working Group on *Legionella* Infections. European guidelines for control and prevention of travel associated Legionnaires' disease. London, UK: United Kingdom Health Protection Agency; 2005.

Joseph CA. Legionnaires' disease in Europe 2000--2002. Epidemiol Infect 2004;132:417--24.

Marston BJ, Lipman HB, Breiman RF. Surveillance for Legionnaires' disease: risk factors for morbidity and mortality. Arch Intern Med 1994;154:2417--22.

**Listeriosis**

Gottlieb SL, Newbern EC, Griffin PM, et al. Multistate outbreak of listeriosis linked to turkey deli meat and subsequent changes in US regulatory policy. Clin Infect Dis 2006;42:29--36.

Mead PS, Dunne EF, Graves L, et al. Nationwide outbreak of listeriosis due to contaminated meat. Epidemiol Infect 2006;134:744--51.

Mead PS, Slutsker L, Dietz V, et al. Food-related illness and death in the United States. Emerg Infect Dis 1998;5: 607--25.

Slutsker L, Schuchat A. Listeriosis in humans. In: Ryser ET Marth EH, eds. *Listeria*, listeriosis, and food safety. 2nd ed. New York, NY: Marcel Dekker, Inc.; Little, Brown and Company; 1999:75--95.

Tappero J, Schuchat A, Deaver K, Mascola L, Wenger J, for the Listeriosis Study Group. Reduction in the incidence of human listeriosis in the United States: effectiveness of prevention efforts. JAMA 1995;273:1118--22.

**Lyme Disease**

Stafford KC III. Tick management handbook: an integrated guide for homeowners, pest control operators, and public health officials for the prevention of tick-associated disease. New Haven, CT: Connecticut Agricultural Experiment Station; 2004. Available at http://www.cdc.gov/ncidod/dvbid/lyme/resources/handbook.pdf.

Hayes EB, Piesman J. How can we prevent Lyme disease? N Engl J Med 2003;348:2424--30.

Aguero-Rosenfeld ME, Wang G, Schwartz I, Wormser GP. Diagnosis of Lyme borreliosis. Clin Microbiol Rev 2005;18:484--509.

Medical Letter. Treatment of Lyme disease. Med Lett Drugs Ther 2005;47:41--3.

CDC. Caution regarding testing for Lyme disease. MMWR 2005;54:125.

**Malaria**

Baird JK. Effectiveness of antimalarial drugs. N Engl J Med 2005;352:1565--77.

Chen LH, Keystone JS. New strategies for the prevention of malaria in travelers. Infect Dis Clin N Amer 2005;19: 185--210.

Guinovart C, Navia MM, Tanner M, et al. Malaria: burden of disease. Curr Mol Med 2006;6:137--40.

Leder K, Black J, O'Brien D, et al. Malaria in travelers: a review of the GeoSentinel Surveillance Network. Clin Infect Dis 2004;39:1104--12.

Skarbinski J, Eliades MJ, Causer LM, et al. Malaria surveillance---United States, 2004. In: CDC Surveillance Summaries, May 26, 2006. MMWR 2006;55(No. SS-4):23--37.

**Measles**

Papania M, Hinman A, Katz S, Orenstein W, McCauley M, eds. Progress toward measles elimination---absence of measles as an endemic disease in the United States. J Infect Dis 2004;189 (Suppl 1):S1--257.

CDC. National, state, and urban area vaccination levels among children aged 19--35 months---United States, 2002. MMWR 2003;52:728--32.

Rota PA, Liffick SL, Rota JS, et al. Molecular epidemiology of measles viruses in the United States, 1997--2001. Emerg Infect Dis 2002;8:902--8.

De Serres G, Gay NJ, Farrington CP. Epidemiology of transmissible diseases after elimination. Am J Epidemiol 2000;151:1039--48.

**Meningococcal Disease**

CDC. Prevention and control of meningococcal disease: recommendations of the Advisory Committee on Immunization Practices (ACIP). MMWR 2005;54(No. RR-7).

Rosenstein NE, Perkins BA, Stephens DS, et al. Meningococcal disease. N Engl J Med 2001;344:1378--88.

Rosenstein NE, Perkins BA, Stephens DS, et al. The changing epidemiology of meningococcal disease in the United States, 1992--1996. J Infect Dis 1999;180:1894--901.

**Mumps**

Harling R, White JM, Ramsay ME, et al. The effectiveness of the mumps component of the MMR vaccine: a case control study. Vaccine 2005;23:4070--4.

CDC. Mumps outbreak at a summer camp---New York, 2005. MMWR 2006;55:175--7.

**Pertussis**

Bisgard KM, Rhodes P, Connelly BL, et al. Pertussis vaccine effectiveness among children 6 to 59 months of age in the United States, 1998--2001. Pediatrics 2005;116:e285--94.

Bisgard KM, Pascual FB, Ehresmann KR, et al. Infant pertussis: who was the source? Pediatr Infect Dis J 2004;23:985--9.

CDC. Preventing tetanus, diphtheria, and pertussis among adolescents; use of tetanus toxoid, reduced diphtheria toxoid and acellular pertussis vaccines: recommendations of the Advisory Committee on Immunization Practices (ACIP). MMWR 2006;55(No. RR-3).

CDC. Recommended antimicrobial agents for the treatment and postexposure prophylaxis of pertussis: 2005 CDC guidelines. MMWR 2005;54(No. RR-14).

CDC. Pertussis---United States, 2001--2003. MMWR 2005;54:1283--6.

Lee GM, Lebaron C, Murphy TV, Lett S, Schauer S, Lieu TA. Pertussis in adolescents and adults: should we vaccinate? Pediatrics 2005;115:1675--84.

CDC. Preventing tetanus, diphtheria, and pertussis among adults: use of tetanus toxoid, reduced diphtheria toxoid and acellular pertussis vaccine (Tdap): recommendations of the Advisory Committee on Immunization Practices (ACIP) and recommendation of ACIP, supported by the Healthcare Infection Control Practices Advisory Committee (HICPAC), for use of Tdap among health-care personnel. MMWR 2006;55(No. RR-17).

**Plague**

CDC. Imported plague---New York City, 2002. MMWR 2003;53:725--8.

Enscore RE, Biggerstaff BJ, Brown TL, et al. Modeling relationships between climate and the frequency of human plague cases in the southwestern United States, 1960--1997. Am J Trop Med Hyg 2002;66:186--96.

Inglesby TV, Dennis DT, Henderson DA, et al. Plague as a biological weapon: medical and public health management. Working Group on Civilian Biodefense [Review]. JAMA 2000;283:2281--90.

Dennis DT, Gage KL, Gratz N, Poland JD, Tikhomirov E. Plague manual: epidemiology, distribution, surveillance and control. Geneva, Switzerland: World Health Organization; 1999.

**Poliomyelitis**

CDC. Imported vaccine-associated paralytic poliomyelitis---United States, 2005. MMWR 2006;55:97--9.

CDC. Poliovirus infections in four unvaccinated children---Minnesota, August--October 2005. MMWR 2005; 54:1053--5.

CDC. Poliomyelitis prevention in the United States: updated recommendations of the Advisory Committee on Immunization Practices (ACIP). MMWR 2000;49(No. RR-5).

Alexander LN, Seward JF, Santibanez TA, et al. Vaccine policy changes and epidemiology of polio in the United States. JAMA 2004;292:1696--702.

CDC. Progress toward interruption of wild poliovirus transmission---worldwide, January 2005--March 2006. MMWR 2006;55:458--62.

Kew OM, Sutter RW, de Gourville EM, Dowdle WR, Pallansch MA. Vaccine-derived polioviruses and the endgame strategy for global polio eradication. Annu Rev Microbiol 2005; 59:587--635.

**Q Fever**

McQuiston JH, Holman RC, McCall CL, Childs JE, Swerdlow DL, Thompson HA. National surveillance and the epidemiology of Q fever in the United States, 1978--2004. Am J Trop Med Hyg 2006;75:36--40.

Mcquiston JH, Nargund VN, Miller JD, Priestly R, Shaw EI, Thompson HA. Prevalence of antibodies to *Coxiella burnetii* among veterinary school dairy herds in the United States, 2003. Vector Borne Zoonotic Dis 2005;5:90--1.

Raoult D, Tissot-Dupont H, Foucault C, et al. Q fever 1985--1998. Clinical and epidemiologic features of 1,383 infections [Review]. Medicine 2000;79:109--25.

Bernard KW, Parham GL, Winkler WG, Helmick CG. Q fever control measures: recommendations for research facilities using sheep. Infect Control 1982;3:461--5.

**Rabies, Animal and Human**

CDC. Compendium of animal rabies prevention and control, 2005: National Association of State and Territorial Public Health Veterinarians, Inc. MMWR 2005;54(No. RR-3).

CDC. Human rabies prevention---United States, 1999: recommendations of the Advisory Committee on Immunization Practices (ACIP). MMWR 1999;48(No. RR-1).

Krebs JW, Mandel EJ, Swerdlow DL, Rupprecht CE. Rabies surveillance in the United States during 2004. J Am Vet Med Assoc 2005;227:1912--25.

**Rocky Mountain Spotted Fever**

CDC. Diagnosis and management of tickborne rickettsial diseases: Rocky Mountain spotted fever, ehrlichioses, and anaplasmosis---United States. MMWR 2006;55(No. RR-4).

Chapman AS, Murphy SM, Demma LJ, et al. Rocky Mountain spotted fever in the United States, 1997--2002. Vector Borne Zoonotic Dis 2006;6:170--8.

Demma LJ, Traeger MS, Nicholson WL, et al. Rocky Mountain spotted fever from an unexpected tick reservoir in Arizona. N Engl J Med 2005;353:587--94.

CDC. Fatal cases of Rocky Mountain spotted fever in family clusters---three states, 2003. MMWR 2004;53:407--10.

Thorner AR, Walker DH, Petri WA. Rocky Mountain spotted fever [Review]. Clin Infect Dis 1998;27:1353--60.

**Rubella**

CDC. Control and prevention of rubella: evaluation and management of suspected outbreaks, rubella in pregnant women, and surveillance for congenital rubella syndrome. MMWR 2001;50 (No. RR-12).

Danovaro-Holliday MC, Gordon E, Woernle C, et al. Identifying risk factors for rubella susceptibility in a population at risk in the United States. Am J Public Health 2003;93:289--91.

Reef SE, Frey TK, Theall K, et al. The changing epidemiology of rubella in the 1990s: on the verge of elimination and new challenges for control and prevention. JAMA 2002;287;464--72.

Reef S, Plotkin S, Cordero J, et al. Preparing for congenital rubella syndrome elimination: summary of the Workshop on Congenital Rubella Elimination in the United States. Clin Infect Dis 2000;31:85--95.

**Salmonellosis**

Braden CR. *Salmonella enterica* serotype Enteritidis and eggs: a national epidemic in the United States. Clin Infect Dis 2006;43:512--7.

Olsen SJ, Bishop R, Brenner FW, et al. The changing epidemiology of *Salmonella*: trends in serotypes isolated from humans in the United States, 1987--1997. J Infect Dis 2001;183:756--61.

Voetsch AC, Van Gilder TJ, Angulo FJ, et al. FoodNet estimate of burden of illness caused by nontyphoidal *Salmonella* infections in the United States. Clin Infect Dis 2004;38(Suppl 3):S127--34.

**Shigellosis**

Shane A, Crump J, Tucker N, Painter J, Mintz E. Sharing *Shigella*: risk factors and costs of a multi-community outbreak of shigellosis. Arch Pediatr Adolesc Med 2003;157:601--3.

CDC. Outbreaks of multidrug-resistant *Shigella sonnei* gastroenteritis associated with day care centers---Kansas, Kentucky, and Missouri, 2005. MMWR 2006;55:1068--71.

Gupta A, Polyak CS, Bishop RD, Sobel J, Mintz ED. Laboratory-confirmed shigellosis in the United States, 1989--2002: epidemiologic trends and patterns. Clin Infect Dis 2004;38:1372--7.

Sivapalasingam S, Nelson JM, Joyce K, Hoekstra M, Angulo FJ, Mintz ED. A high prevalence of antimicrobial resistance among *Shigella* isolates in the United States, 1999--2002. Antimicrob Agents Chemother 2006;50:49--54.

**Streptococcal Disease, Invasive, Group A**

CDC. Active Bacterial Core Surveillance report. Emerging Infections Program Network. Group A streptococcus, 2005-provisional. Atlanta, GA: US Department of Health and Human Services, CDC; 2006. Available at http://www.cdc.gov/ncidod/dbmd/abcs/survreports/gas05prelim.pdf.

CDC. Investigating clusters of group A streptococcal disease. Atlanta, GA: US Department of Health and Human Services, CDC; 2005. Available at http://www2.cdc.gov/ncidod/dbmd/abcs/calc/calc_new/new_page.htm.

Bisno AL, Rubin FA, Cleary PP, Dale JB. National Institute of Allergy and Infectious Diseases. Prospects for a group A streptococcal vaccine: rationale, feasibility, and obstacles: report of a National Institute of Allergy and Infectious Diseases workshop. Clin Infect Dis 2005;41:1150--6.

O'Brien KL, Beall B, Barrett NL, et al. Epidemiology of invasive group A streptococcus disease in the United States, 1995--1999. Clin Infect Dis 2002;35:268--76.

The Prevention of Invasive Group A Streptococcal Infections Workshop Participants. Prevention of invasive group A streptococcal disease among household contacts of case patients and among postpartum and postsurgical patients: recommendations from the Centers for Disease Control and Prevention. Clin Infect Dis 2002;35:950--9.

**Streptococcal Toxic-Shock Syndrome**

Bisno AL. Brito MO. Collins CM. Molecular basis of group A streptococcal virulence. Lancet Infect Dis 2003;3:191--200.

O'Brien KL, Beall B, Barrett NL, et al. Epidemiology of invasive group A streptococcus disease in the United States, 1995--1999. Clin Infect Dis 2002;35:268--76.

Stevens DL. Streptococcal toxic shock syndrome associated with necrotizing fasciitis. Annu Rev Med 2000;51:271--88.

The Prevention of Invasive Group A Streptococcal Infections Workshop Participants. Prevention of invasive group A streptococcal disease among household contacts of case patients and among postpartum and postsurgical patients: recommendations from the Centers for Disease Control and Prevention. Clin Infect Dis 2002;35:950--9.

***Streptococcus pneumoniae*, Invasive, Drug-Resistant**

CDC. Preventing pneumococcal disease among infants and young children: recommendations of the Advisory Committee on Immunization Practices (ACIP). MMWR 2000;49(No. RR-9).

Clinical and Laboratory Standards Institute. Performance standards for antimicrobial susceptibility testing: 15th informational supplement [No. M100-S15]. Wayne, PA: National Committee for Clinical Laboratory Standards; 2005.

Flannery B, Schrag S, Bennett NM, et al. Impact of childhood vaccination on racial disparities in invasive *Streptococcus pneumoniae* infections. JAMA 2004;291:2197--203.

Kyaw MH, Lynfield R, Schaffner W, et al. Effect of introduction of the pneumococcal conjugate vaccine on drug-resistant *Streptococcus pneumoniae*. N Engl J Med 2006;354:1455--63.

Poehling KA, Talbot TR, Griffin MR, et al. Invasive pneumococcal disease among infants before and after introduction of pneumococcal conjugate vaccine. JAMA 2006;295:1668--74.

Ray GT, Whitney CG, Fireman BH, Ciuryla V, Black SB. Cost-effectiveness of pneumococcal conjugate vaccine: evidence from the first 5 years of use in the United States incorporating herd effects. Pediatr Infect Dis J 2006;25: 494--501.

**Syphilis, Congenital**

CDC. Congenital syphilis---United States, 2002. MMWR 2004;53:716--9.

**Syphilis, Primary and Secondary**

CDC. The National Plan to Eliminate Syphilis from the United States. Atlanta, GA: US Department of Health and Human Services, CDC; 1999.

CDC. The National Plan to Eliminate Syphilis from the United States. Atlanta, GA: US Department of Health and Human Services, CDC; 2006.

CDC. Primary and secondary syphilis---United States, 2003--2004. MMWR 2006;55:269--73.

CDC Sexually transmitted disease surveillance supplement 2005; syphilis surveillance report. Atlanta, GA: US Department of Health and Human Services, CDC. In press.

**Tetanus**

Pascual FB, McGinley EL, Zanardi LR, Cortese MM, Murphy TV. Tetanus surveillance---United States, 1998--2000. In: CDC Surveillance Summaries, June 20, 2003. MMWR 2003;52(No. SS-3).

CDC. Tetanus---Puerto Rico, 2002. MMWR 2002;51:613--5.

McQuillan GM, Kruszon-Moran D, Deforest A, Chu SY, Wharton M. Serologic immunity to diphtheria and tetanus in the United States. Ann Intern Med 2002;136:660--6.

**Trichinellosis**

CDC. Trichinellosis associated with bear meat---New York and Tennessee, 2003. MMWR 2004;53:606--10.

Roy SL, Lopez AS, Schantz PM. Trichinellosis surveillance---United States, 1997--2001. In: CDC Surveillance Summaries, July 25, 2003. MMWR 2003;52(No. SS-6).

Moorhead A, Grunenwald PE, Dietz VJ, Schantz PM. Trichinellosis in the United States, 1991--1996: declining but not gone. Am J Trop Med Hyg 1999;60:66--9.

CDC. Outbreak of trichinellosis associated with eating cougar jerky---Idaho, 1995. MMWR 1996;45:205--6.

**Tuberculosis**

CDC. Reported tuberculosis in the United States, 2003. Atlanta, GA: US Department of Health and Human Services, CDC; 2004. Available at http://www.cdc.gov/nchstp/tb.

CDC. Trends in tuberculosis---United States, 2004. MMWR 2005;54:245--9.

Saraiya M, Cookson ST, Tribble P, et al. Tuberculosis screening among foreign-born persons applying for permanent US residence. Am J Public Health 2002;92:826--9.

Talbot EA, Moore M, McCray E, Binkin NJ. Tuberculosis among foreign-born persons in the United States, 1993--1998. JAMA 2000;284:2894--900.

**Tularemia**

CDC. Outbreak of tularemia among commercially distributed prairie dogs, 2002. MMWR 2002;51:688, 699.

CDC. Tularemia---United States, 1990--2000. MMWR 2002;51:182--4.

Dennis DT, Inglesby TV, Henderson DA, et al. Tularemia as a biological weapon: medical and public health management. JAMA 2001;285:2763--73.

Feldman KA, Enscore RE, Lathrop SL, et al. Outbreak of primary pneumonic tularemia on Martha's Vineyard. N Engl J Med 2001;345:1219--26.

Petersen JM, Schriefer ME. Tularemia: emergence/ re-emergence. Vet Res 2005;36:455--67.

**Typhoid Fever**

Crump J, Barrett TJ, Nelson JT, Angulo FJ. Reevaluating fluoroquinolone breakpoints for *Salmonella enterica* serotype Typhi and for non-Typhi *Salmonellae*. Clin Infect Dis 2003;37:75--81.

Kubota K, Barrett TJ, Hunter S et al. Analysis of *Salmonella* serotype Typhi pulsed-field gel electrophoresis patterns associated with international travel. J Clin Micro 2005;43:1205--9.

Olsen SJ, Bleasdale SC, Magnano AR, et al. Outbreaks of typhoid fever in the United States, 1960--1999. Epidemiol Infect 2003;130:13--21.

Reller M, Olsen S, Kressel A. Sexual transmission of typhoid fever: a multi-state outbreak among men who have sex with men. Clin Infect Dis 2003;37:141--4.

Steinberg EB, Bishop RB, Dempsey AF, et al. Typhoid fever in travelers: who should be targeted for prevention? Clin Infect Dis 2004;39:186--91.

**Varicella**

CDC. Public health response to varicella outbreaks---United States, 2003--2004. MMWR 2006;55:993--5.

CDC. Prevention of varicella: provisional ACIP recommendations for prevention of varicella. Atlanta, GA: US Department of Health and Human Services, CDC; 2006. Available at http://www.cdc.gov/nip/vaccine/varicella/varicella_acip_recs_prov_june_2006.pdf.

CDC. Prevention of varicella: recommendations of the Advisory Committee on Immunization Practices (ACIP). MMWR. In press.

CDC. Varicella surveillance practices, United States, 2004. MMWR. In press.

Seward JF, Zhang JX, Maupin TJ, Mascola L, Jumaan AO. Contagiousness of varicella in vaccinated cases: a household contact study. JAMA 2004;292:704--8.

**Vancomycin-Intermediate *Staphylococcus aureus* Infection (VISA)/Vancomycin-Resistant *Staphylococcus aureus* Infection (VRSA)**

Fridkin SK, Hageman J, McDougal LK, et al. Vancomycin-Intermediate *Staphylococcus aureus* Epidemiology Study Group. Epidemiological and microbiological characterization of infections

caused by *Staphylococcus aureus* with reduced susceptibility to vancomycin, United States, 1997--2001. Clin Infect Dis 2003;36:429--39.

Chang S, Sievert DM, Hageman JC, et al. Vancomycin-Resistant *Staphylococcus aureus* Investigative Team. Infection with vancomycin-resistant *Staphylococcus aureus* containing the vanA resistance gene. N Engl J Med 2003;348:1342--7.

Whitener CJ, Park SY, Browne FA, et al. Vancomycin-resistant *Staphylococcus aureus* in the absence of vancomycin exposure. Clin Infect Dis 2004;38:1049--55.

Weigel LM, Clewell DB, Gill SR, et al. Genetic analysis of a high-level vancomycin-resistant isolate of *Staphylococcus aureus*. Science 2003;302:1569--71.

McDonald LC, Hageman JC. Vancomycin intermediate and resistant *Staphylococcus aureus*: what the nephrologist needs to know. Nephrol News Issues 2004;8:63--4, 66--7, 71--2.

Use of trade names and commercial sources is for identification only and does not imply endorsement by the U.S. Department of Health and Human Services.

---

References to non-CDC sites on the Internet are provided as a service to *MMWR* readers and do not constitute or imply endorsement of these organizations or their programs by CDC or the U.S. Department of Health and Human Services. CDC is not responsible for the content of pages found at these sites. URL addresses listed in *MMWR* were current as of the date of publication.

**Disclaimer** All *MMWR* HTML versions of articles are electronic conversions from ASCII text into HTML. This conversion may have resulted in character translation or format errors in the HTML version. Users should not rely on this HTML document, but are referred to the electronic PDF version and/or the original *MMWR* paper copy for the official text, figures, and tables. An original paper copy of this issue can be obtained from the Superintendent of Documents, U.S. Government Printing Office (GPO), Washington, DC 20402-9371; telephone: (202) 512-1800. Contact GPO for current prices.

\*\*Questions or messages regarding errors in formatting should be addressed to mmwrq@cdc.gov.

Date last reviewed: 2/23/2007



**SAFER·HEALTHIER·PEOPLE™**
**Morbidity and Mortality Weekly Report**
Centers for Disease Control and Prevention
1600 Clifton Rd, MailStop E-90, Atlanta, GA
30333, U.S.A

Department of Health
and Human Services

**Appx11360**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*, STEPHEN A. KRAHLING and JOAN A. WLOCHOWSKI, *Plaintiffs,* v. MERCK & CO., INC., *Defendant.* | Civil Action No. 10-4374 (CDJ) **CONTAINS "CONFIDENTIAL" AND "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" MATERIAL PURSUANT TO PROTECTIVE ORDER** |

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 98



Centers for Disease Control and Prevention
CDC 24/7: Saving Lives, Protecting People™

# Mumps

# Mumps Cases and Outbreaks



*DE, FL, GA, HI, IA, ID, IL, IN, KS, KY, LA, MA, MD, ME, MI, MN, MO, MS, MT, NC, ND, NE, NJ, NM, NV, NY, OH, OK, OR, PA, RI, SC, TN, TX, UT, VA, VT, WA, WI, WV*

*CDC. Mumps outbreaks are not reportable.*

## Mumps Cases

From January 1 to September 13, 2019, 47 states* and the District of Columbia in the U.S. reported mumps infections in 2,363** people to CDC.

Before the U.S. mumps vaccination program started in 1967, about 186,000 cases were reported each year, but the actual number of cases was likely much higher due to underreporting. Since the two-MMR dose vaccination program was introduced in 1989, U.S. mumps cases decreased more than 99%, with only a few hundred cases reported most years. However, since 2006, there have been several increases in cases and outbreaks about every 5 years (see below).



* Case count is preliminary and subject to change.

**Cases as of September 13, 2019. Case count is preliminary and subject to change.

Source: Morbidity and Mortality Weekly Report (MMWR), Notifiable Diseases and Mortality Tables

## Outbreaks

Mumps outbreaks can still occur in U.S. communities of people who previously had one or two doses of MMR vaccine. This is particularly common in close-contact settings. High vaccination coverage helps limit the size, duration, and spread of mumps outbreaks.

- From 2015 to 2017, the U.S. saw a range of different mumps outbreak settings and sizes. Cases started to increase in late 2015. From January 2016 to June 2017, health departments reported 150 outbreaks (9,200 cases), including households, schools, universities, athletics teams and facilities, church groups, workplaces, and large parties and events.
    - The largest outbreak occurred in a close-knit community in northwest Arkansas that resulted in nearly 3,000 cases.
    - Two large outbreaks from Iowa and Illinois each involved several hundred university students.
    - About half of outbreaks involved greater than 10 cases.
- From 2009 to 2010, two large outbreaks occurred.
    - One outbreak involved over 3,000 people and mostly affected students who were part of a close-knit religious community in New York City and attended schools in which they participated in activities that involved very close contact. The outbreak started when an infected student returned from the United Kingdom where a large mumps outbreak was occurring.
    - The second outbreak involved about 500 people, mostly school-aged children, in the U.S. Territory of Guam.
- In 2006, the United States experienced a multi-state mumps outbreak involving more than 6,500 reported cases. This resurgence predominantly affected college-aged students living in the Midwest, with outbreaks occurring on many different Midwestern college campuses.

For more information about mumps outbreaks see Mumps Outbreak Articles.

## For General Public

- Outbreak-Related Questions and Answers for Patients
    - What is CDC's role in responding to mumps cases and outbreaks?

## For Health Professionals

- Manual for the Surveillance of Vaccine-Preventable Diseases, Chapter 9: Mumps
- Laboratory Testing for Mumps Infection
- Mumps Information for Health Providers

| Related Page |
| --- |
| Mumps Outbreak Articles |

Page last reviewed: September 17, 2019
Content source: National Center for Immunization and Respiratory Diseases (NCIRD), Division of Viral Diseases

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

           *Plaintiffs,*

v.

MERCK & CO., INC.,

           *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 99

Appx11364



Centers for Disease Control and Prevention
CDC 24/7: Saving Lives, Protecting People™

# Mumps

# For Healthcare Providers

### On this Page
- The Virus
- Clinical Features
- Background
- Transmission
- Complications
- Mumps during Pregnancy
- Vaccination
- Case Classification
- Reporting Mumps Cases
- Prevention and Control in Healthcare Settings
- Controlling Mumps in a School Setting



Parotid gland

Sublingual gland

Submandibular gland

5 by Merck Sharp & Dohme Corp., a subsidiary of Merck & Co, Inc, Kenilworth, NJ. Available at merckmanuals.com ⃗ . Accessed June 2015.

## The Virus

Mumps is a viral illness caused by a paramyxovirus, a member of the Rubulavirus family. The average incubation period for mumps is 16 to 18 days, with a range of 12 to 25 days.

## Clinical Features

Mumps usually involves pain, tenderness, and swelling in one or both parotid salivary glands (cheek and jaw area). Swelling usually peaks in 1 to 3 days and then subsides during the next week. The swollen tissue pushes the angle of the ear up and out. As swelling worsens, the angle of the jawbone below the ear is no longer visible. Often, the jawbone cannot be felt because of swelling of the parotid. One parotid may swell before the other, and in 25% of patients, only one side swells. Other salivary glands (submandibular and sublingual) under the floor of the mouth also may swell but do so less frequently (10%).

Nonspecific prodromal symptoms may precede parotitis by several days, including low-grade fever which may last 3 to 4 days, myalgia, anorexia, malaise, and headache. Parotitis usually lasts at least 2 days, but may persist longer than 10 days. Mumps infection may also present only with nonspecific or primarily respiratory symptoms, or may be asymptomatic. Recurrent parotitis, when parotitis on one side resolves but is followed days to weeks later by parotitis on the other side, can also occur in mumps patients. Vaccinated cases are less likely to present severe symptoms or complications than under- or unvaccinated cases.

Appx11365

Mumps infection is most often confused with swelling of the lymph nodes of the neck. Lymph node swelling can be differentiated by the well-defined borders of the lymph nodes, their location behind the angle of the jawbone, and lack of the ear protrusion or obscuring of the angle of the jaw, which are characteristics of mumps.

---

### Parotitis and Flu

While not a common symptom of flu, swelling of their salivary glands (parotitis) has been reported in persons with laboratory-confirmed influenza infections. To learn more, see 2016-2017 Influenza Update for Health Care Providers: Parotitis and Influenza.

---

## Background

Before the U.S. mumps vaccination program started in 1967, about 186,000 cases were reported each year, and many more unreported cases occurred. The disease caused complications, such as permanent deafness in children, and occasionally, encephalitis, which could rarely result in death. Since the pre-vaccine era, there has been a more than 99% decrease in mumps cases in the United States. From year to year, the number of mumps cases can range from roughly a couple hundred to a couple thousand. However, outbreaks still occur, even among highly vaccinated populations.

## Transmission

The mumps virus replicates in the upper respiratory tract and is transmitted person to person through direct contact with saliva or respiratory droplets of a person infected with mumps. The risk of spreading the virus increases the longer and the closer the contact a person has with someone who has mumps. The infectious period is considered from 2 days before to 5 days after parotitis onset, although virus has been isolated from saliva as early as 7 days prior to and up to 9 days after parotitis onset. Mumps virus has also been isolated up to 14 days in urine and semen.

When a person is ill with mumps, they should avoid contact with others from the time of diagnosis until 5 days after the onset of parotitis by staying home from work or school and staying in a separate room if possible.

## Complications

Mumps complications include orchitis, oophoritis, mastitis, meningitis, encephalitis, pancreatitis, and hearing loss. Complications can occur in the absence of parotitis and occur less frequently in vaccinated patients. Some complications of mumps are known to occur more frequently among adults than children.

Orchitis occurs in approximately 20–30% of unvaccinated and 6–7% of vaccinated postpubertal male mumps patients. In 60% to 83% of males with mumps orchitis, only one testis is affected. Mumps orchitis has not been linked to infertility, but may result in testicular atrophy and hypofertility. Among adolescent and adult female mumps patients in the United States, rates of oophoritis and mastitis have been ≤1%. However, these complications may be more difficult to recognize and are likely underreported. Pancreatitis, deafness, meningitis, and encephalitis have been reported in less than 1% of cases in recent U.S. outbreaks. Cases of nephritis and myocarditis and other sequelae, including paralysis, seizures, cranial nerve palsies, and hydrocephalus, in mumps patients have been reported but are very rare. Death from mumps is exceedingly rare. There have been no mumps-related deaths reported in the United States during recent mumps outbreaks.

## Mumps during Pregnancy

Appx11366

Mumps that occurs in pregnant women is generally benign and not more severe than in women who are not pregnant. Like other infections, there is a theoretical risk that mumps during the early months of pregnancy may cause complications. Most studies on the effects of gestational mumps on the fetus were conducted in the 1950s–60s when the disease was more common before mumps vaccine was available. One study from 1966 reported an association between mumps infection during the first trimester of pregnancy and an increase in the rate of spontaneous abortion or intrauterine fetal death[1], but this result has not been observed in other studies[2]. One study of low birth weight in relation to mumps during pregnancy found no significant association[1]. While there are case reports of congenital malformations in infants born to mothers who had mumps during pregnancy, the only prospective, controlled study found rates of malformations were similar between mothers who had mumps and those who did not have mumps during pregnancy[3].

Learn more about preventing infections during pregnancy.

## Mumps in Vaccinated People

People who previously had one or two doses of MMR vaccine can still get mumps and transmit the disease. During mumps outbreaks in highly vaccinated communities, the proportion of cases that occur among people who have been vaccinated may be high. This does not mean that the vaccine is ineffective. The effectiveness of the vaccine is assessed by comparing the attack rate in people who are vaccinated with the attack rate in those who have not been vaccinated. In outbreaks of highly vaccinated populations, people who have not been vaccinated against mumps usually have a much greater mumps attack rate than those who have been fully vaccinated. Disease symptoms are generally milder and complications are less frequent in vaccinated people.

## Vaccination

Vaccination is the best way to prevent mumps and mumps complications. This vaccine is included in the combination measles-mumps-rubella (MMR) and measles-mumps-rubella-varicella (MMRV) vaccines. Two doses of mumps vaccine are 88% (range 31% to 95%) effective at preventing the disease; one dose is 78% (range 49% to 91%) effective.

In October 2017, the Advisory Committee on Immunization Practices (ACIP) recommended that people identified by public health authorities as being part of a group at increased risk for acquiring mumps because of a mumps outbreak should receive a third dose of MMR vaccine. The purpose of the recommendation is to improve protection of people in outbreak settings against mumps disease and mumps-related complications.

- Your health department will provide information on groups at increased risk who should receive a dose. If you suspect an outbreak, or are unsure if your patient belongs to a group at increased risk, contact your local health department for more information.
- You should not give a third dose unless your patient is part of a group at increased risk as determined by your local public health authorities.
- MMR vaccine has not been shown to prevent illness in persons already infected with mumps and should not be used as post-exposure prophylaxis in immediate close contacts.

See Mumps Vaccination for vaccination recommendations.

## Case Classification

For information about how to classify mumps cases, visit the National Notifiable Diseases Surveillance System (NNDSS) page for mumps or the Laboratory Testing Section of the Manual for the Surveillance of Vaccine-Preventable Diseases (2018), Chapter 9: Mumps.

Appx11367

# Laboratory Tests to Diagnose Mumps

RT-PCR and viral culture are used to confirm mumps infection. Buccal swabs are most commonly used for RT-PCR testing, but urine and CSF may also be used in specific situations. IgM serology can also be used to aid in diagnosing mumps infection. A patient's vaccination status and timing of specimen collection are important for interpreting laboratory results. A negative test result does not rule out mumps infection.

# Reporting Mumps Cases

Mumps is a nationally notifiable disease, and all cases should be reported to the state or local health department. Contact your state health department for more information on how to report mumps in your state.

# Mumps Prevention and Control in Healthcare Settings

Mumps transmission in healthcare settings, while not common, has occurred in past outbreaks, involving hospitals and long-term care facilities housing adolescents and adults. Information about what measures to take to prevent and control mumps in healthcare settings can be found under the Healthcare Setting section of the Manual for the Surveillance of Vaccine-Preventable Diseases (2018), Chapter 9: Mumps

## Footnotes

1. Siegel M, Fuerst HT, Peress NS. Comparative fetal mortality in maternal virus diseases. A prospective study on rubella, measles, mumps, chicken pox and hepatitis. *N Engl J Med* 1966;274(14):768-71.

2. Wilson CB, Nizet V, Maldonado YA, Remington JS, Klein JO. *Remington and Klein's infectious diseases of the fetus and newborn infant.* 8th Edition, Elsevier Health Sciences, 2016.

3. Siegel M. Congenital malformations following chickenpox, measles, mumps, and hepatitis. Results of a cohort study. *JAMA* 1973;226(13):1521-4.

Page last reviewed: March 15, 2019
Content source: National Center for Immunization and Respiratory Diseases (NCIRD), Division of Viral Diseases

Appx11368

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel*.,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,
    *Plaintiffs,*
    v.
MERCK & CO., INC.,
    *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 100


Centers for Disease Control and Prevention
CDC 24/7: Saving Lives, Protecting People™

# Principles of Epidemiology in Public Health Practice, Third Edition
An Introduction to Applied Epidemiology and Biostatistics

# Lesson 3: Measures of Risk

## Section 6: Measures of Public Health Impact

A measure of public health impact is used to place the association between an exposure and an outcome into a meaningful public health context. Whereas a measure of association quantifies the relationship between exposure and disease, and thus begins to provide insight into causal relationships, measures of public health impact reflect the burden that an exposure contributes to the frequency of disease in the population. Two measures of public health impact often used are the attributable proportion and efficacy or effectiveness.

## Attributable proportion

### Definition of attributable proportion

The attributable proportion, also known as the attributable risk percent, is a measure of the public health impact of a causative factor. The calculation of this measure assumes that the occurrence of disease in the unexposed group represents the baseline or expected risk for that disease. It further assumes that if the risk of disease in the exposed group is higher than the risk in the unexposed group, the difference can be attributed to the exposure. Thus, the attributable proportion is the amount of disease in the exposed group attributable to the exposure. It represents the expected reduction in disease if the exposure could be removed (or never existed).

Appropriate use of attributable proportion depends on a single risk factor being responsible for a condition. When multiple risk factors may interact (e.g., physical activity and age or health status), this measure may not be appropriate.

### Method for calculating attributable proportion

Attributable proportion is calculated as follows:

$$\frac{\text{Risk for exposed group} - \text{risk for unexposed group}}{\text{Risk for exposed group}} \times 100\%$$ Attributable proportion can be calculated for rates in the same way.

### EXAMPLE: Calculating Attributable Proportion

In another study of smoking and lung cancer, the lung cancer mortality rate among nonsmokers was 0.07 per 1,000 persons per year.(14) The lung cancer mortality rate among persons who smoked 1–14 cigarettes per day was 0.57 lung cancer deaths per 1,000 persons per year. Calculate the attributable proportion.

Attributable proportion = (0.57 − 0.07)/0.57 × 100% = 87.7%

Appx11370

Given the proven causal relationship between cigarette smoking and lung cancer, and assuming that the groups are comparable in all other ways, one could say that about 88% of the lung cancer among smokers of 1 14 cigarettes per day might be attributable to their smoking. The remaining 12% of the lung cancer cases in this group would have occurred anyway.

## Vaccine efficacy or vaccine effectiveness

Vaccine efficacy and vaccine effectiveness measure the proportionate reduction in cases among vaccinated persons. Vaccine efficacy is used when a study is carried out under ideal conditions, for example, during a clinical trial. Vaccine effectiveness is used when a study is carried out under typical field (that is, less than perfectly controlled) conditions.

Vaccine efficacy/effectiveness (VE) is measured by calculating the risk of disease among vaccinated and unvaccinated persons and determining the percentage reduction in risk of disease among vaccinated persons relative to unvaccinated persons. The greater the percentage reduction of illness in the vaccinated group, the greater the vaccine efficacy/effectiveness. The basic formula is written as:

$$\frac{\textit{Risk among unvaccinated group} - \textit{risk among vaccinated group}}{\textit{Risk among unvaccinated group}}$$

OR: *1 − risk ratio*

In the first formula, the numerator (risk among unvaccinated − risk among vaccinated) is sometimes called the risk difference or excess risk.

Vaccine efficacy/effectiveness is interpreted as the proportionate reduction in disease among the vaccinated group. So a VE of 90% indicates a 90% reduction in disease occurrence among the vaccinated group, or a 90% reduction from the number of cases you would expect if they have not been vaccinated.

### *EXAMPLE: Calculating Vaccine Effectiveness*

Calculate the vaccine effectiveness from the varicella data in Table 3.13.

$$VE = (42.9 - 11.8)/42.9 = 31.1/42.9 = 72\%$$

Alternatively, $VE = 1 - RR = 1 - 0.28 = 72\%$

So, the vaccinated group experienced 72% fewer varicella cases than they would have if they had not been vaccinated.

## References (This Section)

14. Doll R, Hill AB. Smoking and carcinoma of the lung. Br Med J 1950;1:739–48.

Previous Page                                                          Next Page: Summary
Lesson 3 Overview

Appx11371

Page last reviewed: May 18, 2012

Content source: Centers for Disease Control and Prevention, Office of Public Health Scientific Services, Center for Surveillance, Epidemiology, and Laboratory Services, Division of Scientific Education and Professional Development

Appx11372

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel*.,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

*Plaintiffs,*

v.

MERCK & CO., INC.,

*Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 101



**Centers for Disease Control and Prevention**
CDC 24/7: Saving Lives, Protecting People™

# Flu Vaccine Effectiveness: Questions and Answers for Health Professionals

### How do we measure how well influenza vaccines work?

Two types of studies are used to determine how well influenza vaccines work. The first type of study is called a randomized control trial (RCT). In a RCT, volunteers are assigned randomly to either a group that receives vaccine or a group that receives a placebo (e.g., a shot of saline), and **vaccine efficacy** is measured by comparing the frequency of influenza illness in the vaccinated and the unvaccinated groups. RCTs are required before a new vaccine is licensed for routine use by a national regulatory authority, such as the Food and Drug Administration (FDA) in the United States. The second type of study is called an observational study. In observational studies the study participants make their own decisions about whether or not to be vaccinated. In this type of study, **vaccine effectiveness** is measured by comparing the frequency of influenza illness in the vaccinated and unvaccinated groups, usually with adjustment for factors (like presence of chronic medical conditions) that may vary between the groups. (See below for further details.)

### What is 'vaccine effectiveness'?

Vaccine effectiveness is a measure of how well influenza vaccines work to protect against influenza infection and illness when they are used in routine circumstances in the community, and not specifically in a RCT. Effectiveness represents the percentage reduction in the frequency of influenza infections among people vaccinated compared with the frequency among those who were not vaccinated, assuming that the vaccine is the cause of this reduction. These studies are conducted in community settings, and researchers have no control over those who choose to be vaccinated or not.

### How do vaccine effectiveness studies differ from vaccine efficacy studies?

Vaccine efficacy refers to studies of vaccine effects that occur under randomized, controlled conditions, where individuals are randomly assigned to either a group that is given influenza vaccine or to a second group that is not given influenza vaccine, but instead, given a placebo. A RCT is a study designed by researchers to minimize factors that could lead to invalid study results. For example, vaccine allocation is usually double-blinded, which means neither the study volunteers nor the researchers know if a given person has received vaccine or placebo. This methodology reduces bias that can occur if the researchers or the individuals receiving the intervention know which study volunteers have received placebo versus vaccine. Bias is an unintended systematic error in the way researchers select study participants, measure outcomes, or analyze data that can lead to inaccurate results.)

### When can vaccine effectiveness studies be conducted?

**On this Page**

- How do we measure how well influenza vaccines work?
- What is vaccine effectiveness?
- How do vaccine effectiveness studies differ from vaccine efficacy studies?
- When can vaccine effectiveness studies be conducted?
- What factors can affect the results of influenza vaccine effectiveness studies?
- What outcomes are measured in influenza vaccine effectiveness studies?
- Which outcomes provide the best estimates of vaccine effectiveness?
- How can vaccine effectiveness against non-

The most common approach now used to evaluate how well licensed influenza vaccines work is an observational or vaccine effectiveness study. Once an influenza vaccine has been licensed by FDA, recommendations are typically made by CDC's Advisory Committee for Immunization Practices (ACIP) for its routine use. For example, ACIP now recommends annual influenza vaccination for all U.S. residents aged 6 months and older. These universal vaccine recommendations make it unethical to perform efficacy (i.e., experimental randomized) studies with persons who are explicitly recommended to receive vaccine, especially because assigning people to a placebo group could place them at risk for serious complications from influenza.

## What factors can affect the results of influenza vaccine effectiveness studies?

Effectiveness studies are subject to various forms of bias (see above for definition), more so than are efficacy studies. Therefore, it is important when evaluating the results of an influenza vaccine effectiveness study that researchers identify the potential biases and introduce methods to minimize them. There are at least three forms of bias that are especially important in interpreting the results of influenza vaccine effectiveness studies: confounding bias, selection bias, and information bias.

- Confounding bias occurs when the effect of vaccination on the risk of the outcome of interest (e.g., RT-PCR-confirmed influenza infection) is distorted by other factors associated both with vaccination and influenza infection. For example, confounding bias would occur if the majority of influenza cases in a case-control study have a chronic medical condition that places them at a greater risk of influenza hospitalization and makes them more likely to receive an influenza vaccine than non-cases. Not taking these associations into account for this study population would lead to an estimate of effectiveness that is too low due to confounding bias caused by cases having more chronic medical conditions than controls.

- Selection bias refers to errors introduced into a study because of differences between people who are enrolled in a study compared with people who are not enrolled. For example, people who are willing to participate in vaccine effectiveness studies might seek health care sooner, exercise more, or live healthier lifestyles than people who don't participate in such studies. As a result of this bias, study participants may not be representative of the general population, and the study results may be biased towards finding higher vaccine effectiveness, if vaccination worked better in such persons. Taking into account "health seeking behaviors" is especially important in vaccine effectiveness studies conducted among the elderly.

- Finally, information bias occurs when there are differences in the quality or accuracy of measuring vaccination status or influenza illness in the groups of people being compared in a study. For example, if researchers obtain information on vaccination for influenza cases from medical records but use verbal interviews to get this information from non-cases, this difference in data collection procedures could bias the results of the study.

The methods used to conduct observational studies of vaccine effectiveness must be reviewed carefully to see if these and other possible forms of bias have been described and addressed by adjustment for the factors that differ between groups.

- laboratory-confirmed outcomes be interpreted?
- Why do estimates of influenza vaccine effectiveness vary widely?
- How well do inactivated influenza vaccines work in randomized control trials?
- How well do influenza vaccines work during seasons in which the vaccine strains are not wellmatched to circulating influenza viruses?
- How well do influenza vaccines work in people with chronic high-risk medical conditions?
- How effective is the live attenuated influenza vaccine (LAIV)?
- How do live attenuated vaccine and inactivated vaccines compare in vaccine efficacy and effectiveness studies?
- What information is necessary to make assessments

Appx11375

of vaccine
effectiveness?
- References

^ Top of Page

## What outcomes are measured in influenza vaccine effectiveness studies?

The interpretation of vaccine effectiveness studies depends on the outcomes measured in a particular study. These outcomes may include prevention of laboratory-confirmed influenza illness or hospitalization, prevention of medically attended, acute respiratory illness (MAARI), prevention of influenza-like illness (or ILI, defined as an illness with fever and cough or sore throat), and prevention of pneumonia requiring hospitalization. In general, the more specific the outcome used (e.g., laboratory-confirmed influenza compared with ILI) the more accurate the measurement of the effect of vaccination. A recent study suggests that using serology (a laboratory test which measures the amount of antibody against a particular virus in a person's body) to determine whether or not study participants have been infected with influenza may potentially overestimate vaccine efficacy (Petrie et al, 2011). The reason for this is that following an influenza vaccination, a person's immune system may produce a significant amount of antibody against influenza. If that same person were to become infected with influenza despite being vaccinated (i.e., a "vaccine failure"), it is possible that enough additional antibody may not be produced to provide a positive result in a serology test. Diagnosis of influenza infection with serology tests requires two blood samples: one taken prior to infection, and the second taken after infection. Confirmation of influenza infection by serology tests requires a four-fold increase in antibody in the post-infection serum as compared to the level in the pre-infection serum. Because an influenza infection does not always produce a four-fold increase in antibody in people who have received the flu vaccine, vaccine failures can be missed, thus increasing estimates of vaccine efficacy. Despite this potential for bias, studies using serology-confirmed outcomes can still provide valid estimates of vaccine efficacy when considered with other disease endpoints.

## Which outcomes provide the best estimates of vaccine effectiveness?

Studies that use more specific outcomes, such as laboratory-confirmed influenza outcomes (e.g., culture positive or reverse-transcriptase polymerase chain reaction (RT-PCR) positive results), provide the best and most specific estimates of the impact of influenza vaccines in preventing influenza. In general, when non-laboratory-confirmed outcomes are used (e.g., all pneumonia hospitalizations or influenza-like illness, which include many non-influenza illnesses), vaccine effectiveness estimates are lower. For example, a study by Bridges et al (2000) among healthy adults found that the inactivated influenza vaccine was 86% effective against laboratory-confirmed influenza, but only 10% effective against all respiratory illnesses in the same population and season.

## How can vaccine effectiveness against non-laboratory-confirmed outcomes be interpreted?

The interpretation of vaccine effectiveness against less specific, non-laboratory-confirmed outcomes is influenced by the proportion of the outcome used that is actually caused by influenza virus infections compared with other pathogens. One non-laboratory-confirmed outcome that is often used is influenza like illness (ILI). The proportion of ILI caused by influenza viruses varies by year, and even varies within a specific year over the course of the winter. For example, in the results of a theoretical study graphed below, vaccine was 75% effective against laboratory-confirmed influenza, but it was only 30% effective against ILI when influenza caused 40% of ILI in unvaccinated people (Figure). Influenza vaccine would be estimated to be only 15% effective, however, if influenza viruses were responsible for only 20% of ILI at a particular point during the winter. This relationship is important because the percentage of ILI caused by influenza varies widely over time and geography.

Figure: The effect of non-influenza illnesses on an estimate of influenza vaccine effectiveness.



^ Top of Page

## Why do estimates of influenza vaccine effectiveness vary widely?

Estimates of influenza vaccine effectiveness are affected by several factors, including the specific study biases discussed above, the match between the vaccine influenza strains and the circulating strains, host factors and the sample size of a specific study. As noted above, the specificity of the outcome measured in a study has an important influence on the observed effectiveness. As more data are collected globally from annual studies that estimate effectiveness for RT-PCR confirmed influenza, it is expected that our estimates will become more refined. However, vaccine effectiveness will always vary from season to season, based upon the degree of similarity between the viruses in the vaccine and those in circulation, as well as other factors. In years when the vaccine strains are not well-matched to circulating strains, vaccine effectiveness is generally lower. In addition, host factors also affect vaccine effectiveness. In general, influenza vaccines are less effective among people with chronic medical conditions and among people age 65 and older, as compared to healthy young adults and older children.

## How well do inactivated influenza vaccines work in randomized control trials?

As noted above, effectiveness varies with vaccine match and the age and immune function of the recipient. In general, the greatest benefits of influenza vaccines have been reported in randomized controlled trials (RCTs) conducted among healthy adults. For example, recent RCTs of inactivated influenza vaccine among adults under 65 years of age have estimated 50-70% vaccine efficacy during seasons in which the vaccines' influenza A components were well matched to circulating influenza A viruses (Beran et al., 2009, 2006-2007 season; Jackson et al., 2010, 2005-2006 season; Monto et al., 2009, 2007-2008 season). As vaccine efficacy from a randomized clinical trial is the gold standard for how well a vaccine actually works, vaccine effectiveness estimates obtained from observational studies can equal, but not exceed, estimates of efficacy. Many factors that can result in substantial bias in effectiveness studies tend to bias the vaccine effect downwards.

## How well do influenza vaccines work during seasons in which the vaccine strains are not well matched to circulating influenza viruses?

When vaccine strains are not well matched with circulating influenza viruses, the benefits of vaccination may be reduced. For example, inactivated influenza vaccine effectiveness against laboratory-confirmed influenza was 60% among healthy persons and 48% among those with high-risk medical conditions in a case-control study among people 50–64 years old during the 2003-2004 influenza season, when the vaccine strains were not optimally matched to viruses in circulation (Herrera et al., 2007). However, in a year when the influenza vaccine and predominant circulating influenza viruses were

Appx11377

poorly matched, researchers were not able to measure an effect of influenza vaccination against the respective vaccine component (Bridges et al., 2000). It is not possible to predict how well the vaccine and circulating strains will be matched in advance of the influenza season, and how this match may affect vaccine effectiveness.

^ Top of Page

How well do influenza vaccines work in people with chronic high-risk medical conditions?

The presence of chronic medical conditions may also affect the effectiveness of influenza vaccines. For example, in an observational study of people 50–64 years of age, the vaccine was 60% effective in preventing laboratory-confirmed influenza among otherwise healthy adults 50–64 years of age, but only 48% effective among those who had high-risk medical conditions (Herrera et al., 2006). In general, vaccine efficacy and effectiveness estimates among people with high-risk conditions may be somewhat lower than among people of similar age without high-risk conditions. However, because the risk of influenza-related complications among this group is much higher, vaccination still provides important benefits.

Adults 65 years or older

Only one large randomized, controlled trial of influenza vaccine has been conducted among an elderly population. During the 1991-1992 influenza season, a group of Dutch people 60 years of age and older not living in long-term care facilities (e.g., nursing homes) was studied (Govaert et al., 1994). In this study, vaccine efficacy was 58% in preventing clinically-defined influenza with serologic confirmation of infection. There are no published studies of the efficacy or effectiveness of influenza vaccines in preventing laboratory-confirmed, serious outcomes of influenza such as hospitalization, primarily because the size of the study would be large, and therefore, such a study is very expensive to conduct. Published observational studies conducted among people 65 and older not living in long-term care facilities have used non-specific outcomes, such as pneumonia hospitalizations or all-cause mortality. These studies may be subject to substantial confounding and selection bias, and they use outcomes in which the proportion of illness associated with influenza virus infections vary by season (as other respiratory viruses can cocirculate). As a result, it is difficult to interpret the results of these studies.

Adults 65 years or older in long-term care facilities

All residents of long-term care facilities s (e.g., nursing homes) should receive annual influenza vaccination, as outbreaks of influenza can be explosive and result in substantial morbidity and mortality among residents of such facilities. There is evidence that vaccination prevents respiratory illnesses during periods of influenza circulation for elderly nursing home residents. For example, one study conducted during the 1991-1992 influenza season found that vaccination was associated with a 34% reduction in total respiratory illnesses and a 55% reduction in pneumonia during the two-week peak of influenza activity (Monto, 2001). In addition, one study conducted in UK nursing homes found that vaccinating health care workers decreased deaths during periods of influenza activity during one season with substantial influenza circulation, but not during the next year, when influenza activity was low throughout the winter (Hayward, 2006).

Children

In a four-year randomized, placebo-controlled study of inactivated and live influenza vaccines among children aged 1–15 years, vaccine efficacy was estimated at 77% against influenza A (H3N2) and 91% against influenza A (H1N1) virus infection (Neuzil et al., 2001). A two-year study of children aged 6–24 months found that the vaccine was 66% effective in preventing laboratory-confirmed influenza in one year of the study (Hoberman et al., 2003). Only children who were fully vaccinated (i.e., had either two doses if not previously vaccinated, or one dose if previously vaccinated) versus unvaccinated children were included in the analysis. In the other year of this study, few cases of influenza occurred, making it difficult to assess the vaccine's efficacy (Hoberman et al., 2003). Children younger than 9 years of age who have not been vaccinated previously are recommended to receive two doses of vaccine the first year they get vaccinated. In subsequent

Appx11378

years, they need only one dose. This recommendation was made because many children younger than 9 years of age have not been infected with influenza viruses previously, and a booster dose is needed for them to produce a protective immune response.

∧ Top of Page

## How effective is the live attenuated influenza vaccine (LAIV)?

This vaccine currently is licensed only for healthy, non-pregnant people between 2 and 49 years of age.

Healthy Children

Because LAIV (nasal spray) vaccine was licensed more recently than inactivated vaccines, there are more data available on its effects from large randomized trials. For example, a RCT conducted among 1,602 healthy children initially aged 15–71 months assessed the efficacy of trivalent LAIV against culture-confirmed influenza during two seasons (Belshe et al., 1998; 2000). In season one, when vaccine and circulating virus strains were well-matched, efficacy in preventing laboratory-confirmed illness from influenza was 93% for participants who received two doses of LAIV. In season two, when the A (H3N2) component was not well-matched between vaccine and circulating virus strains, efficacy was 86% overall.

Healthy Adults

A randomized, double-blind, placebo-controlled trial among 4,561 healthy working adults aged 18–64 years assessed multiple endpoints (i.e., targeted outcome measures), including reductions in self-reported respiratory tract illness without laboratory confirmation, absenteeism, health care visits, use of antibiotics, and use of over-the-counter medications for illness symptoms during peak and total influenza outbreak periods (Nichol et al., 1999). The study was conducted during the 1997-1998 influenza season, when the influenza vaccine and circulating A (H3N2) viruses were poorly matched. Vaccination was associated with reductions in severe febrile illnesses of 19%, and febrile upper respiratory tract illnesses of 24%.

Vaccination was also associated with fewer days of illness, fewer days of work lost, fewer days with health care provider visits, and reduced use of prescription antibiotics and over-the-counter medications. Among a subset of 3,637 healthy adults aged 18–49 years, LAIV recipients (n = 2,411) had 26% fewer febrile upper-respiratory illness episodes; 27% fewer lost work days as a result of febrile upper respiratory illness; and 18%–37% fewer days of health care provider visits caused by febrile illness, compared with placebo recipients (n = 1,226). Days of antibiotic use were reduced by 41%–45% in this age subset.

A randomized, double-blind, placebo-controlled influenza virus challenge study among 92 healthy adults (LAIV, n = 29; placebo, n = 31; inactivated influenza vaccine, n = 32) aged 18–41 years assessed the efficacy of both LAIV and inactivated vaccine (Treanor et al., 1999). The overall efficacy of LAIV and inactivated influenza vaccine in preventing laboratory-documented influenza from all three influenza strains combined was 85% and 71%, respectively. These results were obtained after study participants, all of whom were susceptible to recently circulating influenza viruses before vaccination, were experimentally exposed to viruses. The difference in efficacy between the two vaccines was not statistically significant.

## How do live attenuated vaccine and inactivated vaccines compare in vaccine efficacy and effectiveness studies?

Few studies that directly compare live attenuated influenza vaccine (LAIV) and trivalent inactivated influenza vaccine (TIV) have been conducted, and results appear to differ for adults and children. More data are available for children than for adults. Among children, each of three RCTs comparing inactivated and live vaccines demonstrated that live vaccine offered better protection than inactivated vaccine. However, none of the studies included a placebo group, so the absolute efficacies of the two vaccines could not be assessed. One study included 2,187 children aged 6–71 months who had

Appx11379

recurrent respiratory tract infections (Ashkenazi et al., 2006) and found overall influenza rates of 2.3% among live vaccine recipients and 4.8% for TIV, for a 52.7% decrease in children receiving live vaccine compared to those receiving inactivated vaccine. In a randomized study of 2,229 children aged 6–17 years with asthma, 4.1% of live vaccine recipients and 6.2% of TIV recipients developed influenza, for a relative reduction of 34.7% (Fleming et al., 2006). Finally, in 2004-2005 a multinational RCT was conducted among 8,352 children aged 6–59 months (Belshe et al., 2007). For the primary endpoint in this trial, culture-confirmed influenza-like illness, there were 45% fewer cases of influenza for well-matched influenza strains and 58% fewer for mismatched strains among live versus inactivated vaccine recipients.

In contrast to the studies in young children described above, a RCT conducted among primarily college age healthy adults was conducted during three influenza seasons using three assignment groups, including a placebo group. Overall, the results suggested that inactivated vaccine may be more efficacious than live vaccine for this age group. For example, in the final season of the study, absolute efficacy against the influenza A virus was 72% for the inactivated vaccine and 29% (not significant) for the live attenuated vaccine. Therefore, the relative improvement in efficacy offered by the inactivated vaccine was 60% (Monto et al., 2009).

The above studies taken together indicate that live and inactivated influenza viruses perform differently relative to each other in children and young adults.

⌃ Top of Page

## What information is necessary to make assessments of vaccine effectiveness?

Ideally, influenza vaccine effectiveness should be assessed on an annual basis, using a consistent methodology and similar populations. Use of a laboratory-confirmed outcome to assess vaccine effectiveness is important to provide the most specific results of the benefits of vaccination and to limit the impact of the co-circulation of non-influenza respiratory pathogens on estimates of vaccine effectiveness. Because the current recommendation for the United States is that all persons aged 6 months and older receive a vaccine each season, it is ideal if estimates of effectiveness can be made for children, adults and older adults. Because a proportion of older adults have chronic medical conditions and most in this age group seek vaccination, it is difficult to conduct and interpret influenza vaccine effectiveness in this population. CDC currently conducts annual vaccine effectiveness studies among people of all age groups recommended for annual vaccination (i.e., all aged 6 months and older). In addition, CDC conducts special studies targeted at answering more specific questions, such as estimating the effectiveness of inactivated vaccine in preventing laboratory-confirmed influenza hospitalizations among older U.S. residents.

⌃ Top of Page

## References

Ashkenazi S, Vertruyen A, Arístegui J, Esposito S, McKeith DD, Klemola T, Biolek J, Kühr J, Bujnowski T, Desgrandchamps D, Cheng SM, Skinner J, Gruber WC, Forrest BD; CAIV-T Study Group. Superior relative efficacy of live attenuated influenza vaccine compared with inactivated influenza vaccine in young children with recurrent respiratory tract infections. Pediatr Infect Dis J. 2006;25(10):870-9 (http://journals.lww.com/pidj/Abstract/2006/10000/Superior_Relative_Efficacy_of_Live_Attenuated.4.aspx). PDF Link (http://www.slipe.org/documentos/Aristegui6.pdf)

Belshe RB, Mendelman PM, Treanor J, King J, Gruber WC, Piedra P, Bernstein DI, Hayden FG, Kotloff K, Zangwill K, Iacuzio D, Wolff M. The efficacy of live attenuated, cold-adapted, trivalent, intranasal influenza virus vaccine in children. N Engl J Med. 1998;338(20):1405-12 (http://ukpmc.ac.uk/abstract/MED/9580647/reload=0;jsessionid=FA3A92D5483E2B9B077728BAD5243E3A). PDF Link (http://www.nejm.org/doi/pdf/10.1056/NEJM199805143382002)

Appx11380

Belshe RB, Gruber WC. Prevention of otitis media in children with live attenuated influenza vaccine given intranasally. Pediatr Infect Dis J. 2000;19(5 Suppl):S66-71 (http://journals.lww.com/pidj/Fulltext/2000/05001/Prevention_of_otitis_media_in_children_with_live.10.aspx).

Belshe RB, Edwards KM, Vesikari T, Black SV, Walker RE, Hultquist M, Kemble G, Connor EM; CAIV-T Comparative Efficacy Study Group. Live attenuated versus inactivated influenza vaccine in infants and young children. N Engl J Med. 2007;356(7):685-96      (http://www.columbia.edu/itc/hs/medical/pathophys/immunology/2008/teamA_fluvaccine.pdf).

Beran J, Vesikari T, Wertzova V, Karvonen A, Honegr K, Lindblad N, Van Belle P, Peeters M, Innis BL, Devaster JM. Efficacy of inactivated split-virus influenza vaccine against culture-confirmed influenza in healthy adults: a prospective, randomized, placebo-controlled trial. J Infect Dis 2009;200(12):1861-9 (http://jid.oxfordjournals.org/content/200/12/1861.short). PDF Link (http://jid.oxfordjournals.org/content/200/12/1861.full.pdf+html)

Bridges CB, Thompson WW, Meltzer MI, Reeve GR, Talamonti WJ, Cox NJ, Lilac HA, Hall H, Klimov A, Fukuda K. Effectiveness and cost-benefit of influenza vaccination of healthy working adults: A randomized controlled trial. JAMA. 2000;284(13):1655-63 (http://jama.jamanetwork.com/article.aspx?articleid=193139). PDF Link (http://jama.jamanetwork.com/article.aspx?articleid=193139)

Fleming DM, Crovari P, Wahn U, Klemola T, Schlesinger Y, Langussis A, Øymar K, Garcia ML, Krygier A, Costa H, Heininger U, Pregaldien JL, Cheng SM, Skinner J, Razmpour A, Saville M, Gruber WC, Forrest B; CAIV-T Asthma Study Group. Comparison of the efficacy and safety of live attenuated cold-adapted influenza vaccine, trivalent, with trivalent inactivated influenza virus vaccine in children and adolescents with asthma. Pediatr Infect Dis J. 2006;25(10):860-9 (http://journals.lww.com/pidj/Abstract/2006/10000/Comparison_of_the_Efficacy_and_Safety_of_Live.3.aspx).

Govaert TM, Thijs CT, Masurel N, Sprenger MJ, Dinant GJ, Knottnerus JA. The efficacy of influenza vaccination in elderly individuals. A randomized double-blind placebo-controlled trial. JAMA. 1994;272(21):1661-5 (http://jama.jamanetwork.com/article.aspx?articleid=383571). PDF Link (http://jama.jamanetwork.com/article.aspx?articleid=383571)

Hayward AC, Harling R, Wetten S, Johnson A, Munro S, Smedley J, Murad S, Watson JM; Effectiveness of an influenza vaccine programme for care home staff to prevent death, morbidity, and health service use among residents: cluster randomized controlled trial. BMJ 2006;333:1241 (http://www.bmj.com/content/333/7581/1241). PDF Link (http://www.bmj.com/content/333/7581/1241)

Herrera GA, Iwane MK, Cortese M, Brown C, Gershman K, Shupe A, Averhoff F, Chaves SS, Gargiullo P, Bridges CB. Influenza vaccine effectiveness among 50-64-year-old persons during a season of poor antigenic match between vaccine and circulating influenza virus strains: Colorado, United States, 2003-2004. Vaccine. 2007;25(1):154-60 (http://www.ncbi.nlm.nih.gov/pubmed/?term=Influenza+vaccine+effectiveness+among+50%E2%80%9364-year-old+persons+during+a+season+of+poor+antigenic+match+between+vaccine+and+circulating+influenza+virus+strains%3A+Colorado%2C+United+States%2C+2003%E2%80%932004).

Hoberman A, Greenberg DP, Paradise JL, Rockette HE, Lave JR, Kearney DH, Colborn DK, Kurs-Lasky M, Haralam MA, Byers CJ, Zoffel LM, Fabian IA, Bernard BS, Kerr JD. Effectiveness of inactivated influenza vaccine in preventing acute otitis media in young children: a randomized controlled trial. JAMA. 2003;290(12):1608-16 (http://jama.jamanetwork.com/article.aspx?articleid=197348). PDF Link (http://jama.jamanetwork.com/article.aspx?articleid=197348)

Appx11381

Jackson LA, Gaglani MJ, Keyserling HL, Balser J, Bouveret N, Fries L, Treanor JJ. Safety, efficacy, and immunogenicity of an inactivated influenza vaccine in healthy adults: a randomized, placebo-controlled trial over two influenza seasons. BMC Infect Dis. 2010;10:71 (http://www.biomedcentral.com/1471-2334/10/71/). PDF Link (http://www.biomedcentral.com/content/pdf/1471-2334-10-71.pdf)

Monto AS, Hornbuckle K, Ohmit SE. Influenza vaccine effectiveness among elderly nursing home residents: a cohort study. Am J Epidemiol. 2001;154(2):155-60 (http://aje.oxfordjournals.org/content/154/2/155.short). PDF Link (http://aje.oxfordjournals.org/content/154/2/155.full.pdf+html)

Monto AS, Ohmit SE, Petrie JG, Johnson E, Truscon R, Teich E, Rotthoff J, Boulton M, Victor JC. Comparative efficacy of inactivated and live attenuated influenza vaccines. N Engl J Med. 2009;361(13):1260-7 (http://www.ncbi.nlm.nih.gov/pubmed/19776407) .

Neuzil KM, Dupont WD, Wright PF, Edwards KM. Efficacy of inactivated and cold-adapted vaccines against influenza A infection, 1985 to 1990: the pediatric experience. Pediatr Infect Dis J. 2001;20(8):733-40 (http://journals.lww.com/pidj/Abstract/2001/08000/Efficacy_of_inactivated_and_cold_adapted_vaccines.4.aspx) .

Nichol KL, Mendelman PM, Mallon KP, Jackson LA, Gorse GJ, Belshe RB, Glezen WP, Wittes J. Effectiveness of live, attenuated intranasal influenza virus vaccine in healthy, working adults: a randomized controlled trial. JAMA. 1999;282 (2):137-44 (http://jama.jamanetwork.com/article.aspx?articleid=302147). PDF Link (http://jama.jamanetwork.com/article.aspx?articleid=302147)

Petrie JG, Ohmit SE, Johnson E, Cross RT, Monto AS. Efficacy Studies of Influenza Vaccines: Effect of End Points Used and Characteristics of Vaccine Failures. JID. 2011;203(9):1309-1315 (http://jid.oxfordjournals.org/content/203/9/1309.full). PDF Link (http://jid.oxfordjournals.org/content/203/9/1309.full.pdf+html)

Treanor JJ, Kotloff K, Betts RF, Belshe R, Newman F, Iacuzio D, Wittes J, Bryant M. Evaluation of trivalent, live, cold-adapted (CAIV-T) and inactivated (TIV) influenza vaccines in prevention of virus infection and illness following challenge of adults with wild-type influenza A (H1N1), A (H3N2), and B viruses. Vaccine. 1999;18(9-10):899-906 (http://www.ncbi.nlm.nih.gov/pubmed/?term=Evaluation+of+of+trivalent%2C+live%2C+cold-adapted+(CAIV-T) +and+inactivated+(TIV) +influenza+vaccines+in+prevention+of+virus+infection+and+illness+following+challenge+of+adults+with+wild-type+influenza+A+(H1N1)%2C+A+(H3N2)%2C+and+B+viruses).

⌃ Top of Page

---

**File Formats Help:**

How do I view different file formats (PDF, DOC, PPT, MPEG) on this site? (http://www.cdc.gov/Other/plugins/)

(http://www.cdc.gov/Other/plugins/#pdf)

---

Page last reviewed: October 12, 2011

Page last updated: November 27, 2013

Content source: Centers for Disease Control and Prevention (http://www.cdc.gov/)

Appx11382

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel*.,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,
                    *Plaintiffs,*
          v.
MERCK & CO., INC.,
                    *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 102

because of the contraindications to vaccination mentioned previously. In these children, immunoglobulin (0.5 mL/kg; maximal dose, 15 mL) should be administered when measles is epidemic in the community in which they reside. The dosage should be repeated every 4 weeks until the epidemic subsides. Intravenous immunoglobulin in a dose of 400 mg/kg may be used (also see Chapter 245).

## NEW REFERENCES SINCE THE SIXTH EDITION

11. Becker D, Patel A, Abou-Khalil BW, et al. Successful treatment of encephalopathy and myoclonus with levetiracetam in a case of subacute sclerosing panencephalitis. *J Child Neurol* 2009;24: 763–7.

77. Centers for Disease Control and Prevention. Progress in global measles control and mortality reduction, 2000–2007. *MMWR Morb Mortal Wkly Rep* 2008;57:1303–6.

78. Centers for Disease Control and Prevention. Increased transmission and outbreaks of measles—European region, 2011. *M M W R Morb Mortal Wkly Rep* 2011;60:1605–10.

79. Centers for Disease Control and Prevention. False-positive measles test—Maine, February 2012. *M M W R Morb Mortal Wkly Rep* 2012;61:396.

80. Centers for Disease Control and Prevention. Measles. In: Atkinson W, Wolfe S, Hamborsky J, editors. *Epidemiology and prevention of vaccine-preventable diseases.* 12th ed. Washington, D.C.: Public Health Foundation; 2012.

81. Centers for Disease Control and Prevention. Measles—United States, 2012. *M M W R Morb Mortal Wkly Rep* 2012;61:253–8.

82. Centers for Disease Control and Prevention. Progress in global measles control, 2009–2010. *M M W R Morb Mortal Wkly Rep* 2012;61:73–8.

162. Gershon AA. Chickenpox, measles, and mumps. In: Remington JS, Klein JO, Wilson CB, et al. editors. *Infectious diseases of the*

*fetus and newborn infant.* 7th ed. Philadelphia: Saunders; 2011. p. 685–95.

170. Gorays J, Marks H, Khurana D, et al. Subacute sclerosing panencephalitis (SSPE) presenting as acute disseminated encephalomyelitis in a child. *J Child Neurol* 2009;24:899–903.

194. Haralambieva IH, Ovsyannikova IG, Kennedy RB, et al. Associations between single nucleotide polymorphisms and haplotypes in cytokine and cytokine receptor genes and immunity to measles vaccination. *Vaccine* 2011;29:7883–95.

216. Jacobson RM, Ovsyannikova IG, Vierkant RA, et al. Human leukocyte antigen associations with humoral and cellular immunity following a second dose of measles-containing vaccine: persistence, dampening, and extinction of associations found after a first dose. *Vaccine* 2011;29:7982–91.

240. Klein NP, Lewis E, Baxter R, et al. Measles-containing vaccines and febrile seizures in children age 4 to 6 years. *Pediatrics* 2012; 129:809–14.

274. Mahadevan A, Vaidya SR, Wairagkar NS, et al. Case of fulminant-SSPE associated with measles genotype D7 from India: an autopsy study. *Neuropathology* 2008;28:621–6.

280. Marin M, Broder KR, Temte JL, et al; Centers for Disease Control and Prevention (CDC). Use of combination measles, mumps, rubella, and varicella vaccine: recommendations of the Advisory Committee on Immunization Practices (ACIP). *MMWR Recomm Rep* 2010;59(RR-3):1–12.

317. Muscat M. Who gets measles in Europe? *J Infect Dis* 2011; 204(Suppl 1):S353–65.

420. Strebel PM, Papania MJ, Dayan GH, et al. Measles vaccine. In: Plotkin SA, Orenstein WA, Offit PA, editors. *Vaccines.* 5th ed. Philadelphia: Saunders; 2008.

467. Yanagi Y, Takeda M, Ohno S, et al. Measles virus receptors. *Curr Top Microbiol Immunol* 2009;329:13–30.

*The full reference list for this chapter is available at* 🔗 *expertconsult.com.*

# CHAPTER 180

# MUMPS VIRUS

James D. Cherry · Kevin K. Quinn

Mumps (epidemic parotitis) is an acute communicable disease caused by the mumps virus, a member of the genus *Rubulavirus*. As a result of universal immunization, mumps was an uncommon disease in children in the United States at the end of the 20th century; however, a 2006 epidemic and subsequent outbreaks indicate the need for renewed study of mumps. In addition, mumps continues to be an epidemic problem worldwide.

## HISTORY

In the fifth century BCE, Hippocrates described an outbreak on the island of Thasos.[99,188] He noted that most

patients had bilateral swelling near the ears and that the others had unilateral swelling. He also noted that some patients had bilateral or unilateral pain and swelling of the testes.

The origin of the name mumps is not known. It may be from the English noun *mump*, which means "a lump," or the English verb *mump*, one of whose definitions is "mumble." This latter possible origin is based on the mumbling speech that patients with significant parotitis may have.

In 1790, Robert Hamilton[74,75] presented an extensive study of mumps in which he noted orchitis, associated the illness with neurologic involvement, and described the neuropathology of a fatal case. In 1886, Hirsch[85]

noted that mumps occurred throughout the world and that it was a major cause of morbidity in Confederate troops during the American Civil War. In the first half of the 20th century, investigators recognized that mumps virus infection involved multiple organs, and the causative agent was shown by Johnson and Goodpasture in 1934[72,93] to be a filterable virus.

The growth of mumps virus in embryonated eggs was reported in 1945, and 10 years later its propagation in tissue culture was noted.[72,78] This latter development led to the development and licensure of a live attenuated mumps vaccine in 1967.

## CLASSIFICATION

Mumps virus is a member of the genus *Rubulavirus*, subfamily *Paramyxovirinae*, and family *Paramyxoviridae*.[115] It contains a single-stranded, nonsegmented, negative-sense RNA genome that is surrounded by a helical nucleocapsid and a surface envelope.

## PROPERTIES

### Physical Properties[19,101,115]

The virus generally is spherical, but marked pleomorphism occurs. Its size varies from 100 to 600 nm. The mumps viral genome is 15,384 nucleotides in length and encodes for nine known viral proteins: a nucleocapsid-associated protein (NP), a phosphoprotein (P), a membrane or matrix protein (M), a fusion protein (F), a hydrophobic membrane-associated protein (SH), a hemagglutinin–neuraminidase (HN), a polymerase protein (L), and nonstructural proteins within the P protein (I and V), which counteracts the interferon [IFN]-induced host antiviral response).[189] The genes for these proteins have been sequenced, and the gene order is 3-NP-P-M-F-SH-HN-L-5. The viral envelope is studded with 12- to 15-nm projections that contain either of the two structural glycoproteins (HN or F).

The P structural protein is associated with the nucleocapsid, and an RNA-dependent RNA polymerase is located within the nucleocapsid structure. The envelope has a high lipid content, and it contains the M protein.

The SH protein gene is the most variable region of the genome and, therefore, can be used to differentiate viral strains.[2,19,107,135,165] Analysis of the variations in SH gene nucleotide sequences has been used to study outbreaks, identify vaccine viruses, study vaccine adverse events, and identify new viral strains. Antigenic differences between vaccine strains result in variable cross-neutralization of unknown significance.[127]

Mumps virus infectivity is destroyed by heat (56° C for 20 minutes), and its infectivity is reduced by ultraviolet light, Tween 80, ether, and formalin. The virus is stable at 4° C for several days; and when placed in a buffered salt solution (such as Hanks) with 1 to 2 percent inactivated fetal calf serum, it can be stored indefinitely at −70° C.

## Antigenic Composition

The three major antigenic components of mumps virus are the two glycoproteins (HN or V antigen and F protein) and the nucleocapsid protein (NP or S antigen).[101] The glycoproteins that project from the viral surface are the antigenic target for specific antibodies. Host antibodies to HN and F proteins confer protective immunity against the virus. Mumps viral particles agglutinate erythrocytes of several mammalian and avian species (human, avian, rodent, and simian); at 37° C, the virus causes partial hemolysis of susceptible erythrocytes when it is attached to cellular surface receptors. Specific antibody blocks hemagglutination, hemadsorption, and hemolysis.

Mumps virus is considered to have a single immunotype. However, polyclonal antibodies to parainfluenza and Newcastle disease viral antigens cross react with antibodies to mumps virus in complement-fixation and hemagglutination-inhibition assays. With monoclonal antibodies, an antigenic relationship between the NH and NP proteins of Sendai virus (a murine parainfluenza type 1 virus) and mumps virus has been demonstrated.[116]

Although mumps is a monotypic virus, genetic variation between strains exists. A standardized nomenclature and an analysis protocol have been proposed for the genetic characterization of mumps strains to facilitate the expansion of molecular epidemiologic studies.[92] This nomenclature includes 13 genotypes (A to M) based on the nucleotide sequence of the hydrophobic (SH) gene. The 2004-2005 UK outbreak and the 2006 USA outbreak were of serotype G,[29,148] whereas the F serotype is most prevalent in recent Chinese outbreaks.[118] Historically, C, D, E, G, and H predominate in the Western hemisphere and B, F, and I occur in Asia.[89] The Western hemisphere tends to use vaccines to the A serotype.[189]

## Tissue Culture Growth and Animal Susceptibility

Mumps virus can be propagated in many different primary and cell-line tissue cultures.[101] To isolate the virus, primary monkey kidney cells generally are used. Its cytopathic effect is similar to that of other paramyxoviruses. When stained, multinucleated giant cells and cytoplasmic eosinophilic inclusions may be observed. In culture, the addition of erythrocytes results in hemadsorption to surface virus.

Mumps virus infects monkeys, rabbits, dogs, cats, and rodents. The virus is isolated readily after inoculation of the amniotic sac of 7- to 8-day-old chicken embryos.

## EPIDEMIOLOGY

### Incidence

In the United States, mumps was a reportable disease from 1922 to 1950 and has been again since 1967. Between 1950 and 1967, incidence data were gathered from voluntary reporting by cooperating states. Incidence

data from 1922 to 1982 are presented in Figure 180-1, and vaccine-era data are presented in Figure 180-2.[22,35] In the pre-vaccine era, mumps was a yearly disease, with epidemic peaks occurring approximately every 4 years. The peak epidemic year was 1944, when the rate was 250 per 100,000 population.

In the pre-vaccine era, mumps was a disease predominantly of young children.[22] However, outbreaks of mumps were a significant problem in young adults in the military.[97,123] The age distribution of mumps in the United States during selected years is presented in Table 180-1. After the mumps vaccine was licensed in 1967, mumps remained a disease of predominantly young children from 1967 to 1971. However, by 1981, most reported

patients were 10 years or older. In 1987, 76 percent of the cases occurred in persons 10 years or older (see Table 180-1). In 1994, 1537 cases were reported, and of those with age noted, 21.8 percent were in patients 20 years or older. The increase in reported cases that occurred in 1987 (see Fig. 180-2 and Table 180-1) was the result of a marked increase in cases in nonimmunized persons aged 10 to 19 years. This group had been protected for a time by herd immunity because of the rapidly declining incidence of mumps as a result of routine vaccine use beginning in 1977.[41] In 1998, only 666 cases of mumps were reported in the United States.[26] Nineteen percent of the patients were younger than 5 years old, and 36 percent were 15 years or older. In 2010, 54.6 percent of



**FIGURE 180-1** ▫ Incidence of reported mumps in the United States from 1922 to 1982 and the number of reported cases from 1968 to 1982. (From Centers for Disease Control and Prevention: Mumps—United States, 1983-1984. *MMWR Morb Mortal Wkly Rep* 1984;33:533-5.)

**TABLE 180-1    Age Distribution of Mumps Cases in the United States During Selected Years**

| Age Group (yr) | 1967-1971* | | 1987 | | 1994 | | Age Group (yr) | 2010 | |
|---|---|---|---|---|---|---|---|---|---|
| | CASES | % | CASES | % | CASES | % | | CASES | % |
| <5 | 2,932 | 17.1 | 804 | 6.5 | 250 | 17.4 | <5 | 297 | 11.4 |
| 5-9 | 10,413 | 60.8 | 2,196 | 17.9 | 473 | 33.0 | 5-14 | 884 | 33.8 |
| 10-14 | 2,372 | 13.8 | 4,567 | 37.3 | 271 | 18.9 | 15-24 | 767 | 29.4 |
| 15-19 | 1,418† | 8.3 | 3,455 | 28.2 | 128 | 8.9 | ≥25 | 657 | 25.2 |
| ≥20 | | | 1,235 | 10.1 | 312 | 20.8 | | | |

*Average annual reported cases for California, Massachusetts, and New York City.
†Includes all reported cases in patients 15 years or older.
Data from references 22, 35, and 174.



FIGURE 180-2 ▨ Incidence of reported mumps in the United States from 1985 to 2010. (Modified from Centers for Disease Control and Prevention: Summary of notifiable diseases—United States, 2010. *MMWR Morb Mortal Wkly Rep* 2012;**59**:74.)

the reported cases were in persons 15 years of age or older (see Table 180-1).

In the pre-vaccine era, the peak incidence of mumps occurred in the winter and spring months, and this peak continued well into the vaccine era.[21,67,105] After licensure of the mumps vaccine, reported cases in the United States dropped from 152,209 cases (87.9 cases per 100,000 persons) in 1968 to less than 300 cases (<0.1 case per 100,000 persons) from 2001 through 2005.[20,28] However, a 2006 outbreak in primarily Midwestern college student populations revealed a dramatic resurgence of disease.[28,30,31] By March 28, 2006, a total of 219 mumps cases were reported in Iowa alone; this was a 44-fold increase in cases from the preceding decade. Of the 219 cases, the median patient age was 21 years (range, 3 to 85 years), with 48 percent of the patients aged 17 to 25 years old; 30 percent of the patients were known to be college students. This outbreak in Iowa in December 2005 was found to involve 10 additional states by May 2, 2006.[31] A total of 6584 cases were reported nationwide.[27,49] There were 85 hospitalizations, 85 percent of patients lived in eight contiguous Midwestern states, and 83 percent were college students. Sixty-three percent of the case patients with known vaccination status had received two doses of either mumps or mumps-measles-rubella (MMR) vaccine, and affected colleges reported 84 percent two-dose MMR vaccine coverage. The year 2006 represented a historical national two-dose coverage peak of 87 percent among adolescents.[10,46,49,120]

In 2004 to 2005, a mumps epidemic occurred in the United Kingdom.[29] There were 56,390 reported cases. In

2004, 79.1 percent of the confirmed cases were in persons aged 15 to 24 years, and two thirds of all cases occurred in persons who had not been vaccinated. In many respects, this epidemic is similar to the one in the United States in 1987; herd immunity had protected this adolescent and young adult cohort for a number of years.

A 2009-2010 outbreak in the New York/New Jersey area revealed 1,494 cases linked to a boy who returned from the United Kingdom in the midst of an epidemic (Fig. 180-3). Among those whose vaccinations were reported, 88 percent had received at least one dose of mumps-containing vaccine and 75 percent had received two doses of mumps vaccine.[34]

Worldwide, recent outbreaks have occurred in the Netherlands (2007-2009[187] and 2009-2010[56,186]), Canada (2007-2009[187] and 2009-2010[179]), Spain (2007-2008[64]), Poland (2009[138]), Bosnia/Herzegovina (2010-2011[85]), Israel (2009-2010),[128,163] Scotland (2010-2011[178]), Moldova (2007-2008[153]), Macedonia (2008-2009[111]), Australia (2007-2008[9]), the United Kingdom (2003-2006[91]), Luxembourg (2008[126]), and Palestinian refugee camps of the West Bank (2003-2005[84]).

## Morbidity and Mortality

The most common clinical manifestations of mumps virus infection are fever and parotitis. However, approximately 30 percent of infected persons do not have parotitis and therefore are not recognized.[104] Epididymo-orchitis occurs in 20 to 30 percent of clinical cases in postpubertal male patients. Approximately 60 percent of



**FIGURE 180-3** ■ The number (n = 1494) of reported confirmed or probable mumps cases by week of illness onset and age group in New York and New Jersey during an outbreak that occurred from June 2009 to January 2010. The outbreak-related mumps cases were reported from several counties in New York and New Jersey. (From Centers for Disease Control and Prevention: Update: mumps outbreak—New York and New Jersey, June 2009–January 2010. *MMWR Morb Mortal Wkly Rep* 2010;59:125-9.)

clinical mumps cases involve cerebrospinal fluid (CSF) pleocytosis, but only one sixth of these patients have meningeal symptoms.[8] In 1966, 628 cases of encephalitis (0.5%) were reported, and of these, 10 (1.6%) had a fatal outcome.[21] Encephalitis occurs more frequently in male patients (61%), and the rate of occurrence is greatest in adults. Deafness after a case of mumps has been estimated to occur in 0.5 to 5.0 per 100,000 cases.[55,177]

From 1966 to 1975, 200 mumps-associated deaths were reported in the United States.[23] Of these, 44 (22%) were in patients with encephalitis; in the others, the causes of death were not identified. Forty-one percent of the deaths occurred in adults 40 years or older. During the 10-year period from 1988 through 1997, only 8 deaths caused by mumps were reported.[26]

In the 2006 mumps outbreak in the United States there were 85 hospitalizations (2%) but no deaths were reported. Parotitis or other salivary gland inflammation was reported in 99 percent, nonspecific symptoms (headache, myalgia, or fatigue) in 57 percent, and fever in 29 percent. Overall complications were 5 percent, with orchitis most prevalent. Encephalitis and meningitis occurred in less than 1 percent.[20]

## Spread of Infection

Mumps virus is contagious in nonimmune persons. It is spread from an infected person to a new host by the respiratory route. The virus can be isolated from the saliva of infected patients from 7 days before the onset of parotitis to 9 days after onset.[101] Transmission is greatest during a 7-day period beginning 2 days before the onset of parotitis. Asymptomatically infected persons also can transmit the virus. The finding that outbreaks of mumps occurred in young adult populations in the pre-vaccine era suggests that mumps virus is less contagious than is measles; a significant number of persons passed through childhood without being infected with mumps virus. A serologic study reported by Black[13] in 1964 noted that 24 percent of army recruits lacked hemagglutination-inhibition antibody to mumps whereas only 1 percent lacked measles antibody. The incubation period usually is 16 to 18 days, although it can vary from 12 to 25 days.[101]

## PATHOGENESIS

After respiratory or perhaps oral acquisition of the virus occurs, primary viral replication occurs in the upper respiratory mucosal epithelium.[57,101,188] Virus multiplies and is spread by drainage to local lymph nodes.[57] Subsequently, viremia develops.[96,137,173] As a result of viremia, infection occurs in multiple secondary infection sites. Most prominent is infection of the salivary glands, which results in inflammation and swelling. This infection

causes virus shedding for 1 to 2 weeks. Other secondary sites of infection include the inner ear (cochlea), pancreas, heart, nervous system (meninges and brain), joints, kidneys, liver, gonads, and thyroid.

## PATHOLOGY

In the salivary glands, virus infects the ductal epithelium and causes periductal interstitial edema and a local inflammatory reaction involving lymphocytes and macrophages.[185,188] Tissue damage ensues, and the involved cells desquamate. Virus enters the central nervous system (CNS) by the choroid plexus through infected mononuclear cells. Virus multiplies in choroid and ependymal cells on the ventricular surfaces, and these cells desquamate into the CSF and result in meningitis. In encephalitis, perivascular infiltration with mononuclear cells, scattered foci of neuronophagia, and microglial rod-cell proliferation occur.[16] Periventricular demyelination also takes place. In the male gonad, the primary site of viral replication is the seminiferous tubules, where infection results in lymphocytic infiltration and edema of interstitial tissue.

### Immunologic Events

Infection gives rise to serum antibodies to the HN glycoprotein (V antigen), the F antigen, and the NP protein (S antigen).[101] Antibody to NP protein develops first, 3 to 7 days after the onset of symptoms. Antibodies to NP protein are short lived and usually are absent after 6 months; they cross react with parainfluenza viruses. Antibodies to HN glycoprotein develop 2 to 4 weeks after the onset of illness and persist for long periods after infection.

Immunoglobulin (Ig) G and IgM antibody responses (determined by enzyme-linked immunosorbent assay [ELISA]) regularly occur after infection.[172] IgG antibody levels measured by ELISA correlate best with those derived by complement-fixation and hemolysis-in-gel assays. ELISA results are less specific than are those achieved with the plaque-reduction neutralization assay because of the high rate of cross-reacting antibodies against parainfluenza viruses detected by ELISA.[19,121,143] IgM antibodies develop early in the course of infection (second day of illness), peak within the first week of illness, and usually are undetectable 3 months after the onset of illness; occasionally, mumps-specific IgM antibody persists for 5 to 6 months.[101,172] Mumps-specific IgG antibody appears at the end of the first week of illness, peaks 3 weeks later, and persists throughout life. The IgG response is mainly the IgG1 subclass; a minor IgG3 subclass response also occurs.[19,152] Salivary IgA antibodies to mumps virus regularly appear after infection.[61]

During infection with vaccine virus, the cell-mediated response to tuberculin is diminished for up to 4 weeks.[108] During the same period, a mumps-specific, cell-mediated immune response develops.[101,188] This response has been demonstrated by skin test hypersensitivity, in vitro lymphocyte proliferative responses, and cytotoxic T-lymphocyte studies.[15,17,103] Asano and colleagues

demonstrated a significant increase in interleukin (IL)-8, IL-10, IL-12, IL-13, and IFN-γ levels isolated from Japanese patients with mumps meningitis when compared with other cases of viral meningitis, suggesting a distinct immunologic response.[5]

In general, immunity against recurrent disease has been thought to be lifelong. However, Gut and associates[71] noted 26 patients with mumps who had a previous history of mumps and antibody response patterns suggestive of reinfection and not primary infection. Specifically, these patients had a rise in IgG but not IgM titers.

## CLINICAL MANIFESTATIONS

In epidemics of mumps, cases can be separated into five groups of patients: (1) those with a short course whose signs and symptoms are nonspecific, (2) those in whom the disease is full blown with salivary swelling but no complications, (3) those with severe mumps and complications (epididymo-orchitis or meningoencephalitis, or both, or other complications), (4) those with no apparent symptoms but with typical antibody responses, and (5) those with meningoencephalitis or orchitis but without involvement of the salivary glands.[164] Approximately 75 percent of all cases of apparent mumps in children are of the full-blown type without complications. Involvement of the gonads rarely occurs before puberty.

## Typical Mumps Without Complications

The average case in children has a prodromal period of 1 to 2 days that consists of fever, anorexia, headache, vomiting, and generalized aches and pains. The headache often is particularly marked and probably is caused by mild meningoencephalitis.[59] The temperature usually rises slowly to 38.9°C or 39.4°C (102°F or 103°F) as the disease becomes full blown, but at times fever is only slight or absent.[164]

After the prodromal period, one or both parotid glands begin to enlarge (Fig. 180-4). Mumps is bilateral in 70 to 80 percent of cases. A few days to a week or more may intervene between the swelling of the two sides. A distinctive "puckering" sensation is experienced at the angle of the jaw in the early stage, and it may be increased by the application of sour liquids, such as lemon juice or vinegar, to the tongue. This sign, when present, may be useful for early establishment of the diagnosis. The swelling of the gland also is distinctive in that a brawny type of edema occurs about the parotid gland, the borders of which are not discrete, in contrast to the discrete swelling typical of lymphadenitis, in which the node generally is outlined easily. The lobe of the ear is in the center of the swelling, which usually cannot be separated by palpation from the angle of the mandible. Pressure is painful, and opening the jaw often is difficult.

The swelling of an individual gland reaches its maximum in approximately 3 days, remains at its peak for approximately 2 days, and then slowly recedes. The extent of the swelling varies considerably but at times is sufficient to distort the outline of the face and head completely. The submaxillary and sublingual glands may

L)-8
Japa
bared
stinc

has
soci
vious
gges
cally

five
hose
hom
it no
npli-
s, or
arent
and
hout
y 75
re of
nent



**FIGURE 180-4** ☐ Note the swelling on the left side of the face related to parotitis secondary to mumps virus infection. The left ear protrudes from the side of the head.

be involved separately or with the parotids in any combination.

During the prodromal phase, slight redness of the orifices of the Stensen or Wharton ducts, when present, has diagnostic significance. The amount of saliva usually is unchanged, although the mouth may be dry or salivation may be extreme. Gellis and Peters[65] described a few cases with edema over the upper part of the sternum, apparently caused by pressure on the lymphatics in the neck.

In uncomplicated mumps, the white blood cell count usually is low, with a slight relative lymphocytosis. The serum amylase value typically is elevated.

## Meningitis, Meningoencephalitis, and Encephalitis

Meningitis and mild meningoencephalitis are the most frequent complications of mumps in children. Azimi and Cramblett[6] reviewed 51 children with mumps meningoencephalitis who were admitted to Columbus Children's Hospital between July 1964 and December 1967. Of this group of patients, fever occurred in 94 percent, vomiting in 84 percent, nuchal rigidity in 71 percent, lethargy in 69 percent, parotid swelling in 47 percent, headache in 47 percent, convulsions in 18 percent, abdominal pain in 14 percent, sore throat in 8 percent, diarrhea in 8 percent, and delirium in 6 percent.

Clinical findings in neurologic illness caused by mumps virus infection differ according to the age of the patient. Meningeal signs are recognized more readily in older children, adolescents, and adults, whereas nonspecific findings such as drowsiness and lethargy occur more frequently in young children.[188] Although seizures develop

d of
ache
ache
d by
ually
s the
only

ands
'0 to
may
dis-
ngle
d by
e or
y be
vell-
type
rs of
lling
ly is
: the
tion
and

its
c for
The
es is
iead
may

in 20 to 30 percent of hospitalized patients, electroencephalographic results usually are normal. Even in patients with severe obtundation, the electroencephalogram reveals only diffuse slowing with increased voltage. Focal findings are rare. The outlook in mumps meningoencephalitis generally is good and usually is better than in encephalitis of other viral causes (see Chapter 36). Even patients with profound obtundation generally recover without having residual damage. Rarely, deaths do occur, however.[26]

In the typical case, CSF has normal glucose and elevated protein levels and pleocytosis. Glucose levels are slightly low in approximately 20 percent of cases. At the onset of symptoms, modest mononuclear pleocytosis is present. The CSF cell count peaks on the third day of illness; counts average 250/mm³, but counts greater than 1000/mm³ are not uncommon. Mumps meningitis usually develops in patients with parotitis approximately 5 days after the onset of illness, but CNS findings can precede the parotid findings and can develop without any salivary gland involvement.

Herndon and colleagues[80] noted that ependymitis regularly occurs in cases of mumps meningitis. A rare complication of mumps appears to be acquired aqueductal stenosis, and researchers have suggested that it may be caused by the preceding ependymitis.[80,132,162,170] In one reported fatal case, hydrocephalus developed within 5 days of onset of disease.[134] More recently, acute hydrocephalus associated with mumps meningoencephalitis was noted in an 8½-year-old boy.[3] This child received a ventriculoperitoneal shunt and at follow-up had no neurologic deficit.

A 3-year-old boy with mumps cerebellitis, nystagmus, and focal localization of brain lesions noted by electroencephalography was described.[119] Also reported were facial palsy in a 3-year-old Japanese boy and transverse myelitis in an adult.[53,176] A case in a girl aged 4 years and 3 months who had brain stem encephalitis and acute disseminated encephalomyelitis after mumps has been reported.[160] This child responded rather dramatically to treatment with glucocorticoids and intravenous immunoglobulin. Haginoya and associates[73] reported the case of a 14-year-old Japanese girl who had chronic progressive mumps virus encephalitis. This child had an illness similar to subacute sclerosing panencephalitis, and her antibody titers suggested that the infecting virus may have had a defect in the HN protein.

## Gonadal Infection (Epididymo-Orchitis and Oophoritis)

Epididymo-orchitis and oophoritis almost never occur before puberty.[164] However, in adolescent boys and adult men, epididymo-orchitis is second only to parotitis as a manifestation of mumps virus infection.[104] Cases of orchitis have been reported in children as young as 3 years old.[147] In postpubertal male patients, orchitis develops in 30 to 38 percent with mumps.[11,142] The rate of orchitis is highest in those 15 to 29 years of age. The greatest number of cases occur during the second, third, and fourth decades of life. Approximately 80 percent of cases of epididymo-orchitis appear during the first 8 days of

involvement of the salivary gland, but a few cases occur a considerable time after the parotitis has subsided.[164]

The onset of testicular involvement usually is manifested as chills, recurrence of fever, and swelling of the testes. Pain over the renal area or in the lower part of the abdomen, bilateral or unilateral, may precede or accompany the orchitis. Occasionally, this pain, if on the right side, may suggest appendicitis.

The orchitis usually is unilateral, but bilateral involvement has been reported in 17 to 38 percent of cases.[11,142] Although atrophy may develop after orchitis, in those with unilateral involvement, sterility is not a concern. Sterility has resulted after some cases of bilateral orchitis, however. A 16-year-old adolescent with mumps epididymo-orchitis was found to have persistent mumps virus RNA in his semen for 40 days.[90] In follow-up studies, he was found to have antisperm antibodies. The development of malignant disease in affected testes also has been reported.[11,93]

Oophoritis occurs in approximately 7 percent of postpubertal female patients. Pelvic pain and tenderness are noted.[154]

## Pancreatitis

In a retrospective survey of 2482 hospitalized patients with mumps, pancreatitis was noted in 75 (3%).[1] Cases occurred in children and adults, and pancreatitis was 1.6 times more common in male than in female patients. Severe involvement of the pancreas is a rare occurrence, but mild or subclinical infection may occur more frequently than recognized.[154] It may be unassociated with salivary gland manifestations and be misdiagnosed as gastroenteritis. Epigastric pain and tenderness are suggestive; they may be accompanied by fever, chills, vomiting, and prostration. A child with acute hemorrhagic pancreatitis and a pseudocyst caused by mumps virus infection has been reported.[56]

## Diabetes Mellitus

Diabetes mellitus long has been suspected to be associated with antecedent mumps.[23,76] In experimental animals, mumps virus infection has been linked to hyperglycemia and histologic lesions of the pancreatic islets. Mumps virus can invade the human pancreas and can infect and destroy human and rhesus beta cells in vitro,[146] but pancreatic damage has not been documented in reported cases of diabetes that developed after mumps or mumps vaccination.[159]

In humans, many cases of temporal association have been described both in individuals and in siblings,[45,46,100,125,131] and outbreaks of diabetes mellitus a few months or years after outbreaks of mumps have been reported.[70,124,168] Although evidence has not established a causal association in these cases, a study in Surrey, England, suggested that a small proportion, if any, of diabetes cases that start in childhood (only 15 of the 1663 patients in the study [<1%]) may have resulted from a recent mumps virus infection.[63] Antibody studies have shown fewer positive titers for mumps in diabetic patients than in normal subjects, even in children.[151] Infection

may contribute to the development of diabetes either by specifically damaging islet cells or by precipitating diabetes in patients whose disease is latent. Teng and colleagues[169] reported the case of an 11-year-old girl with mumps infection complicated by transient hyperinsulinemic hypoglycemia.

## Nephritis

Viruria is a common occurrence in uncomplicated mumps, and mild abnormalities in renal function occur.[17] Severe and fatal nephritis was reported as a rare complication of mumps occurring 10 to 14 days after parotitis.[176] Fujieda and associates[62] reported the demonstration of mumps virus genomic RNA by polymerase chain reaction (PCR) in a renal biopsy specimen from a 5-year-old girl with IgA nephropathy. Baas and colleagues reported a case of a 56-year old renal transplant patient who developed acute irreversible transplant failure due to interstitial nephritis with mumps RNA detected in urine and renal biopsy.[7]

## Deafness

Deafness is an important but rare complication of mumps virus infection.[71,67,105] Its incidence has been estimated at 0.5 to 5.0 per 100,000 cases of mumps.[41,152] However, the incidence rate of minor degrees of hearing impairment, such as high-tone hearing loss, is probably much higher.[38]

Mumps-associated deafness occurs with or without meningoencephalitis and may develop after asymptomatic infection.[28,55,130] The deafness usually is unilateral and often permanent. Twenty-two of 103 cases (21%) reviewed by Everberg[55] were bilateral. Mumps virus has been isolated from perilymph fluid in a case of sudden-onset, unilateral, complete deafness that began 2 days after the onset of mumps.[14,144] Vertigo also is noted occasionally in patients with mumps; it occurs most commonly in those in whom deafness develops.[89]

## Mumps and Pregnancy

The incidence of mumps during pregnancy was estimated at 0.8 to 10 cases per 10,000 pregnancies[157] before vaccine was licensed in the United States. No vaccine-era data are available for comparison. Maternal complications such as mastitis,[142] aseptic meningitis,[44] and fatal glomerulonephritis[51] have been reported. Mumps virus has been isolated from human breast milk.[97]

Increased rates of fetal mortality were reported in women who contracted mumps during the first trimester. In a large prospective case-control study, a 27.3 percent rate of fetal wastage was noted in women with mumps during the first trimester versus a 13.0 percent rate in matched, healthy controls during the first trimester.[157] No significant differences in birth weight were noted among the live births.[157] Because fetal loss usually occurs in such cases within 2 weeks of development of maternal infection, investigators postulated that factors related to maternal gonadal infection with resulting hormonal changes may be responsible. A histopathologic study of

the products of conception in mothers with gestational mumps revealed severe proliferative necrotic villitis and vasculitis in the placenta and viral inclusions, as seen in mumps infection, in fetal tissues.[64] Mumps virus was isolated from a spontaneously aborted 10-week-old human fetus.[110]

No evidence has shown that gestational mumps in humans increases the risk of development of fetal malformations,[156] although a few cases of various congenital malformations with no consistent pattern have been reported.[86]

## Other Manifestations

Other rare clinical manifestations include exanthem and enanthem,[37] arthritis,[68] myocarditis,[12] thrombocytopenia,[109,114,144] keratouveitus,[133] lower respiratory tract infection,[40] and other glandular involvement (thyroiditis, mastitis, dacryoadenitis, and bartholinitis).[104,140]

## DIAGNOSIS

### Differential Diagnosis

Not all patients with mumps have parotid swelling, and mumps virus is not the only cause of parotitis. Mumps virus infection must be considered in all children with aseptic meningitis, meningoencephalitis, and encephalitis (see Chapters 35 and 36). In addition to mumps virus infection, many other infectious agents and noninfectious conditions are associated with parotitis or parotid swelling (see Chapter 13). Other viruses that can cause parotitis include Epstein-Barr virus, coxsackieviruses and echoviruses, influenza A virus, parainfluenza viruses, cytomegalovirus, human herpesvirus–6, and lymphocytic choriomeningitis virus.[18,68] Purulent parotitis can be differentiated from mumps by the exquisite tenderness of the region, an elevated white blood cell count, and the observation of pus coming from the Stensen duct. Other viral causes of parotitis can be differentiated by the respective epidemiologic and clinical characteristics of specific agents and appropriate culture, serologic study, or both.

Enlargement of lymph nodes in proximity to the parotid gland must be differentiated from parotid enlargement (see Chapter 12). The cervical lymph nodes are below the ramus of the mandible. The preparotid nodes generally are anterior to the parotid, and their enlargement usually is associated with conjunctivitis. Occasionally, an enlarged lymph node within the parotid gland may cause some confusion. Lesions of the ramus of the mandible, such as osteomyelitis, occasionally have been mistaken for parotid enlargement. In this case, the enlargement usually is persistent.

## DIAGNOSIS

In an epidemic situation, the diagnosis of mumps is clinically straightforward, and performing laboratory tests is unnecessary. The critical points are a history of

exposure, an incubation period of 2 to 3 weeks, and a typical clinical picture consisting of fever and parotitis. In a sporadic case or in a previously vaccinated child, confirming the cause by laboratory study is important. Mumps virus, as well as most other viruses that cause parotitis, can be demonstrated readily by culture or nucleic acid detection from saliva, throat swabs, or mouth washings during acute illness. Oral fluid specimens can also be assayed for virus-specific IgM. In patients with meningoencephalitis, virus also can be recovered from CSF. Virus is isolated in primary monkey kidney tissue culture. In unusual cases in which the source of facial swelling is obscure, determination of a serum amylase level may be helpful; a high value indicates parotid involvement.

Mumps virus infection also can be confirmed by demonstrating a significant rise in antibody titer in paired serum specimens by complement fixation, hemagglutination inhibition, or ELISA. However, because mumps cross reacts with parainfluenza viruses, these methods are not ideal.[143] Mumps-specific IgM antibody determined by ELISA is the usual test performed; the presence of this antibody indicates a recent infection. Mumps-specific IgM antibodies determined by enzyme immunoassay in oral fluid also are useful for establishing the diagnosis.[180] Mumps virus RNA also can be detected directly from clinical samples by real-time PCR.[171] In outbreaks today, many cases occur in previously vaccinated individuals. Many of these vaccine failures are secondary and, therefore, there is less likely to be a mumps-specific serum IgM antibody response.[16,149] Therefore, greater diagnostic sensitivity will occur using culture or PCR assay.

## TREATMENT

Conservative therapy is indicated in the treatment of mumps. Adequate attention given to hydration and alimentation of patients is important. Patients may have difficulty with acidic foods such as orange juice. In addition, orange juice may cause vomiting in an already nauseated patient. The diet should be light, with a generous offering of fluids.

Occasionally, analgesics are necessary to treat severe headache or discomfort caused by parotitis. Stronger analgesics such as codeine or meperidine (Demerol) rarely are required for headache but may be useful for orchitis. Vomiting seldom is sufficiently severe to require intravenous fluids. In these instances, however, electrolytes lost by vomiting should be repleted.

Although lumbar puncture seldom is necessary for establishing a diagnosis in patients with meningoencephalitis accompanying mumps, patients often indicate that they have experienced relief of headache after undergoing this procedure. No antiviral agent is appropriate or indicated for the treatment of mumps, which is a self-limited illness.

A potential treatment for mumps orchitis specifically is IFN-α2b. In a small study of 12 patients, both symptom resolution and normospermia were improved versus results in untreated control subjects.[54,106]

## PROGNOSIS

The overall prognosis in uncomplicated mumps is excellent. The outlook in meningoencephalitis also generally is favorable, but death and neurologic damage can occur. Deafness and sterility are rare complications.

## PREVENTION

### Immunization

A summary of the recommendations of the Advisory Committee on Immunization Practices (ACIP) and the Committee on Infectious Diseases of the American Academy of Pediatrics for the use of mumps vaccine follows.[4,32] For more complete information, the reader should consult the most recent ACIP statement or the Report of the Committee on Infectious Diseases of the American Academy of Pediatrics.

The mumps virus vaccine available in the United States (official name: mumps virus vaccine, live) is the Jeryl Lynn strain and is prepared in chick embryo cell culture. The vaccine produces a subclinical, noncommunicable infection with few side effects. Mumps vaccine is available in both a monovalent (mumps only) form and combinations: mumps-rubella, MMR, and measles-mumps-rubella-varicella (MMRV) vaccines.

In initial trials, mumps vaccine was approximately 95 percent efficacious in preventing mumps disease[83,98,166]; and after vaccination, measurable antibody developed in more than 97 percent of persons known to be susceptible to mumps.[184] Vaccine-induced antibody was protective and long lasting,[182,183] although it was of considerably lower titer than antibody resulting from natural infection.[184] The duration of vaccine-induced immunity is unknown, but serologic and epidemiologic data collected during 35 years of use of live vaccine suggested both persistence of antibody and continuing protection against infection. The epidemic occurrence of mumps in 2006 in the United States as well as in other countries resulted in further evaluations of vaccine efficacy and waning immunity.* In a study in England, the effectiveness of vaccine after one dose declined from 96 percent in 2-year-old children to 66 percent in children aged 11 to 12 years old.[42] In those children who had received two doses, the effectiveness declined from 99 percent in children aged 5 to 6 years old to 86 percent in children aged 11 to 12 years old. These data suggest that waning immunity contributes to outbreaks of mumps in older, previously vaccinated populations. Studies in Belgium and Korea also demonstrated waning immunity as contributing to outbreaks of mumps.[36] However, a small study in Wisconsin compared the mumps antibody titers of children who received their second MMR shot at age 4 to 6 (as is typical) with delaying until age 9 to 11. At age 17, both groups had similar titers.[117]

In Finland, a two-dose MMR vaccination program with the Jeryl Lynn mumps vaccine strain was launched

in 1982.[141] This program was highly successful, and Finland was the first country documented to be free of indigenous mumps, as well as rubella and measles. In a study in Finland that was published in 2007, researchers found that previous vaccinees who were found to be seronegative nonetheless had mumps antigen-specific lymphoproliferative responses.[94]

In a review of 47 publications documenting the vaccination status of patients during 50 outbreaks from 1977 through 2008, Dayan and Rubin[50] calculated that the effectiveness of prior vaccination with one dose of vaccine ranged from 72.8 to 91 percent for the Jeryl Lynn strain, from 54.4 to 93 percent for the Urabe strain, and from 0 to 33 percent for the Rubini strain. Vaccine effectiveness after two doses of mumps vaccine was reported in three outbreaks and ranged from 91 to 94.6 percent.[150]

Clinical isolates sequenced from recent outbreaks have revealed genotypes distinct from those of vaccine viruses, raising concern that certain mumps virus strains may escape vaccine-induced immunity. Rubin and colleagues performed a study in which sera obtained from children 6 weeks after MMR vaccination were tested for the ability to neutralize genetically diverse mumps virus strains. Although antibody titers varied, all viruses were readily neutralized, arguing against immune escape.

The vaccination rates in the United States in 1999 through 2004 were 90 percent, which is at the low end of the estimated population immunity (90% to 92%) needed for herd immunity.[111] It appears that outbreaks have occurred when vaccination rates drop below that required for herd immunity, and both vaccinated and unvaccinated individuals are at risk of infection. At present, the contribution of waning immunity to outbreaks is not well understood and additional booster vaccinations are not routinely recommended in non-outbreak settings. Notably, the 2006 Midwestern U.S. outbreak occurred during a time of very high two-dose vaccine coverage, leading to the suggestion that a more effective vaccine or an updated vaccination policy was needed.[49]

#### General Recommendations

Susceptible children, adolescents, and adults should be vaccinated against mumps unless vaccination is contraindicated. Mumps vaccine is of particular value for children approaching puberty and for adolescents and adults who have not had mumps. MMR is the vaccine of choice for routine administration and should be used in all situations in which recipients also are likely to be susceptible to measles, rubella, or both. The favorable benefit-to-cost ratio for routine mumps immunization is more marked when vaccine is administered as MMR.[162,181] Persons should be considered susceptible to mumps unless they have documentation of (1) physician-diagnosed mumps, (2) adequate immunization with live mumps virus vaccine on or after their first birthday, or (3) laboratory evidence of immunity.

Persons who are unsure of their history of mumps disease or mumps vaccination should be vaccinated. No evidence has shown that persons who previously either received mumps vaccine or had mumps are at any

---

*References 15, 35, 42, 77, 94, 139, 175.

increased risk for developing local or systemic reactions from receiving live mumps vaccine. Testing for susceptibility before administering vaccination, especially in adolescents and young adults, is not necessary. In addition to the expense, some tests (e.g., mumps skin test, complement-fixation antibody test) may be unreliable and tests with established reliability (e.g., neutralization, enzyme immunoassay, radial hemolysis antibody test) are not readily available.

### Dosage

Two doses of MMR vaccine separated by at least 1 month in the volume specified by the manufacturer should be administered subcutaneously.

### Age

Live mumps virus vaccine is recommended at any age on or after the first birthday for all susceptible persons, unless a contraindication exists. In routine circumstances, mumps vaccine should be given in combination with measles and rubella vaccines as MMR, and the currently recommended schedule for administration of measles vaccine should be followed. It should not be administered to infants younger than 12 months old because persisting maternal antibody may interfere with seroconversion. To ensure that the patient has developed immunity, all persons vaccinated before their first birthday should be revaccinated on or after their first birthday.

## Persons Exposed to Mumps

### Use of Vaccine

When given after exposure to mumps, live mumps virus vaccine may not provide protection. However, if the exposure did not result in infection, vaccine should induce protection against infection from subsequent exposure. No evidence has indicated that the risk of vaccine-associated adverse events increases if vaccine is administered to persons incubating disease.

### Use of Immunoglobulin

Immunoglobulin has not been demonstrated to be of established value in postexposure prophylaxis and is not recommended.

### Adverse Effects of Vaccine Use

In field trials in the United States before vaccine was licensed, illnesses did not occur more often in vaccinees than in unvaccinated controls.[82] Reports of illnesses occurring after receipt of mumps vaccination have been episodes mainly of parotitis and low-grade fever. Allergic reactions, including rash, pruritus, and purpura, have been associated temporally with mumps vaccination but are uncommon and usually mild and of brief duration. The reported development of encephalitis within 30 days of receiving a mumps-containing vaccine in the United States (0.4 per million doses) is not greater than the

observed background incidence rate of CNS dysfunction in the normal population. Other manifestations of CNS involvement in the United States, such as febrile seizures and deafness, also have been reported infrequently. Complete recovery usually occurs. Reports of nervous system illness occurring after receipt of mumps vaccination do not necessarily denote an etiologic relationship between the illness and the vaccine. In parts of Europe, Canada, and Japan, where different mumps vaccines (Leningrad 3 strain and Urabe Am 9 strain) have been used, rates of vaccine-induced aseptic meningitis have been high.[39,43,122,129,167] Orchitis is a very rare complication of mumps vaccination.[40] Most cases have occurred in adolescents and adults, and five different vaccine strains have been associated with orchitis.

## Contraindications to Vaccine Use

### Pregnancy

Although mumps vaccine virus has been shown to infect the placenta and fetus,[190] no evidence has indicated that it causes congenital malformations in humans. However, because of the theoretic risk of fetal damage, a prudent approach is to avoid giving live virus vaccine to pregnant women. Women should avoid becoming pregnant for 3 months after receiving vaccination. Routine precautions for vaccinating postpubertal women include asking whether they are or may be pregnant, excluding those who say that they are, and explaining the theoretic risk to those who plan to receive the vaccine. Being vaccinated during pregnancy should not be considered an indication for termination of pregnancy. However, the final decision about interruption of pregnancy must rest with the individual patient and her physician.

### Severe Febrile Illness

Administration of vaccine should not be postponed because of minor or intercurrent febrile illnesses such as mild upper respiratory tract infections. However, vaccination of persons with severe febrile illnesses generally should be deferred until they have recovered.

### Allergies

Because live mumps vaccine is produced in chick embryo cell culture, persons with a history of anaphylactic reactions (e.g., hives, swelling of the mouth and throat, difficulty breathing, hypotension, shock) after ingesting eggs should be vaccinated only with caution and according to published protocols.[69,79] Children known to be allergic should not leave the vaccination site for 20 minutes after being vaccinated. Evidence indicates that persons are not at increased risk if they have egg allergies that are not anaphylactic. Such persons may be vaccinated in the usual manner. No evidence has demonstrated that persons with allergies to chickens or feathers are at increased risk of having a reaction to the vaccine.

Because mumps vaccine contains trace amounts of neomycin (25 μg), persons who have experienced anaphylactic reactions to topically or systemically

administered neomycin should not receive mumps vaccine. Most often, allergy to neomycin is manifested as contact dermatitis, which is a delayed-type (cell-mediated) immune response rather than anaphylaxis. In such persons, the adverse reaction, if any, to 25 μg of neomycin in the vaccine would be an erythematous, pruritic nodule or papule at 48 to 96 hours. A history of contact dermatitis to neomycin is not a contraindication to receiving mumps vaccine. Live mumps virus vaccine does not contain penicillin.

### Recent Immunoglobulin Injection

Passively acquired antibody can interfere with the response to live attenuated virus vaccines. Therefore, mumps vaccine should be given at least 2 weeks before the administration of immunoglobulin or be deferred for 3 to 11 months after the administration of immunoglobulin. The duration of deferral depends on the dose of immunoglobulin administered.[181]

### Altered Immunity

In theory, replication of the mumps vaccine virus may be potentiated in patients with immune deficiency disease and by the suppressed immune responses that occur with leukemia, lymphoma, or generalized malignancy or with therapy with corticosteroids, alkylating drugs, antimetabolites, or radiation. In general, patients with such conditions should not be given live mumps virus vaccine. Because vaccinated persons do not transmit mumps vaccine virus, the risk of exposure to mumps in these patients may be reduced by vaccinating their close susceptible contacts.

An exception to these general recommendations is in children infected with human immunodeficiency virus (HIV): all asymptomatic HIV-infected children should receive MMR vaccine at 12 months of age.[24,181] If measles vaccine is administered to symptomatic HIV-infected children, the combination MMR vaccine generally is preferred.[25]

Patients with leukemia in remission whose chemotherapy has been terminated for at least 3 months also may receive live mumps virus vaccine. Short-term (<2 weeks' duration) corticosteroid therapy, topical corticosteroid therapy (e.g., nasal, skin), and intra-articular, bursal, or tendon injection with corticosteroids are not contraindications to the administration of mumps vaccine. However, mumps vaccine should be avoided if systemic immunosuppressive levels are reached by prolonged, extensive, topical application.

Live vaccines have historically been avoided in patients who have received bone marrow, stem cell, and solid-organ transplantation. An international consensus conference recommends two doses of the MMR vaccine for allogeneic hematopoietic stem cell transplant recipients starting 24 months after transplant and once no longer on immunosuppression.[81] A review by Danerseau and colleagues in 2008 concluded that there were insufficient published data to determine the safety and/or efficacy of live viral vaccines in transplant recipients still on immunosuppression.[47]

## Containment of Disease

Containment is important in prevention of mumps in the United States. Mumps is a reportable disease, and compliance is the obligation of all physicians. After early reports of sporadic mumps cases, health department workers can organize local immunization clinics and exclude susceptible students from school so that disease can be contained in a small geographic area. Kutty and colleagues have published a discussion of containment strategies in wake of the 2006 U.S. outbreak.[112] Isolation of case patients was the primary outbreak control measure.

A 2008 CDC update has recommended isolation of infected persons for 5 days after onset of parotitis and for contact and droplet precautions during this time.[33] These recommendations were based on data from the 2006 Iowa outbreaks, which yielded information on the duration of virus shedding after symptom onset[145] as well as poor compliance with 9-day as compared with 5-day isolation regimens.[161]

## NEW REFERENCES SINCE THE SIXTH EDITION

4. American Academy of Pediatrics. Mumps. In: Pickering LK, Baker CJ, Kimberlin DW, et al, editors. *Red book: 2012 report of the Committee on Infectious Diseases.* Elk Grove Village, Ill.: American Academy of Pediatrics; 2012. p. 464–8.
5. Asano T, Ichiki K, Koizumi S, et al. Enhanced expression of cytokines/chemokines in cerebrospinal fluids in mumps meningitis in children. *Pediatr Int* 2011;53:143–6.
7. Baas MC, van Donselaar KA, Florquin S, et al. Mumps: not an innocent bystander in solid organ transplantation. *Am J Transplant* 2009;9:2186–9.
9. Bangor-Jones RD, Dowse GK, Giele CM, et al. A prolonged mumps outbreak among highly vaccinated Aboriginal people in the Kimberley region of Western Australia. *Med J Aust* 2009; 191:398–401.
10. Barskey AE, Glasser JW, LeBaron CW. Mumps resurgences in the United States: a historical perspective on unexpected elements. *Vaccine* 2009;27:6186–95.
34. Centers for Disease Control and Prevention. Update: mumps outbreak—New York and New Jersey, June 2009–January 2010. *MMWR Morb Mortal Wkly Rep* 2010;59:125–9.
35. Centers for Disease Control and Prevention. Summary of notifiable diseases—United States, 2010. *MMWR Morb Mortal Wkly Rep* 2012;59:1–111.
40. Clifford V, Wadsley J, Jenner B, et al. Mumps vaccine associated orchitis: evidence supporting a potential immune-mediated mechanism. *Vaccine* 2010;28:2671–3.
44. Cortese MM, Jordan HT, Curns AT, et al. Mumps vaccine performance among university students during a mumps outbreak. *Clin Infect Dis* 2008;46:1172–80.
47. Danerseau AM, Robinson JL. Efficacy and safety of measles, mumps, rubella and varicella live viral vaccines in transplant recipients receiving immunosuppressive drugs. *World J Pediatr* 2008;4: 254–8.
49. Dayan GH, Quinlisk MP, Parker AA, et al. Recent resurgence of mumps in the United States. *N Engl J Med* 2008;358:1580–9.
50. Dayan GH, Rubin S. Mumps outbreaks in vaccinated populations: are available mumps vaccines effective enough to prevent outbreaks? *Clin Infect Dis* 2008;47:1458–67.
56. Fanoy EB, Cremer J, Ferreira JA, et al. Transmission of mumps virus from mumps-vaccinated individuals to close contacts. *Vaccine* 2011;29:9551–6.
66. Gonzalez PP, Barrios JA, Morales Serna JC. [Study of a population-wide epidemic outbreak of mumps virus G1 in Jerez de la Frontera (Spain)]. *Aten Primaria* 2012;44:320–7. In Spanish.
81. Hilgendorf I, Freund M, Jilg W, et al. Vaccination of allogeneic haematopoietic stem cell transplant recipients: report from the international consensus conference on clinical practice in chronic GVHD. *Vaccine* 2011;29:2825–33.

84. Hindiyeh MY, Aboudy Y, Wohoush M, et al. Characterization of large mumps outbreak among vaccinated Palestinian refugees. *J Clin Microbiol* 2009;47:560–5.

87. Hukic M, Ravlija J, Dedeic Ljubovic A, et al. Ongoing large mumps outbreak in the Federation of Bosnia and Herzegovina, Bosnia and Herzegovina, December 2010 to July 2011. *Euro Surveill* 2011;16(35).

88. Hviid A, Rubin S, Mühlemann K. Mumps. *Lancet* 2008;371: 932–44.

91. Jick H, Chamberlin DP, Hagberg KW. The origin and spread of a mumps epidemic: United Kingdom, 2003–2006. *Epidemiology* 2009;20:656–61.

111. Kutty PK, Kruszon-Moran DM, Dayan GH, et al. Seroprevalence of antibody to mumps virus in the US population, 1999–2004. *J Infect Dis* 2010;202:667–74.

112. Kutty PK, Kyaw MH, Dayan GH, et al. Guidance for isolation precautions for mumps in the United States: a review of the scientific basis for policy change. *Clin Infect Dis* 2010;50:1619–28.

113. Kuzmanovska G, Polozhani A, Mikik V, et al. Mumps outbreak in the former Yugoslav Republic of Macedonia, January 2008–June 2009: epidemiology and control measures. *Euro Surveill* 2010; 15(23).

116. Latner DR, McGrew M, Williams N, et al. Enzyme-linked immunospot assay detection of mumps-specific antibody-secreting B cells as an alternative method of laboratory diagnosis. *Clin Vaccine Immunol* 2011;18:35–42.

117. LeBaron CW, Forghani B, Beck C, et al. Persistence of mumps antibodies after 2 doses of measles-mumps-rubella vaccine. *J Infect Dis* 2009;199:552–60.

118. Liang Y, Ma S, Liu L, et al. Identification and development of a promising novel mumps vaccine candidate strain. *Microbes Infect* 2010;12:1178–87.

120. Marin M, Quinlisk P, Shimabukuro T, et al. Mumps vaccination coverage and vaccine effectiveness in a large outbreak among college students—Iowa, 2006. *Vaccine* 2008;26:3601–7.

126. Mossong J, Bonert C, Weicherding P, et al. Mumps outbreak among the military in Luxembourg in 2008: epidemiology and evaluation of control measures. *Vaccine* 2009;14(7).

128. Muhsen K, Shohat T, Aboudy Y, et al. Sero-prevalence of mumps antibodies in subpopulations subsequently affected by a large scale mumps epidemic in Israel. *Vaccine* 2011;29:3878–82.

138. Paradowska-Stankiewicz I, Orlikova H. [Mumps in Poland in 2009]. *Przegl Epidemiol* 20.1;65:185–7. In Polish.

145. Polgreen PM, Bohnett LC, Cavanaugh JE, et al. The duration of mumps virus shedding after the onset of symptoms. *Clin Infect Dis* 2008;46:1447–9.

148. Rota JS, Turner JC, Yost-Daljev MK, et al. Investigation of a mumps outbreak among university students with two measles-mumps-rubella (MMR) vaccinations, Virginia, September-December 2006. *J Med Virol* 2009;81:1819–25.

149. Royuela E, Castellanos A, Sanchez-Herrero C, et al. Mumps virus diagnosis and genotyping using a novel single RT-PCR. *J Clin Virol* 2011;52:359–62.

150. Rubin SA, Link MA, Sauder CJ, et al. Recent mumps outbreaks in vaccinated populations: no evidence of immune escape. *J Virol* 2012;86:615–20.

153. Schwarz NG, Melnic A, et al. Mumps outbreak in the Republic of Moldova, 2007-2008. *Pediatr Infect Dis J* 2010;29: 703–6.

161. Soud FA, Cortese MM, Curns AT, et al. Isolation compliance among university students during a mumps outbreak, Kansas 2006. *Epidemiol Infect* 2009;137:30–7.

163. Stein-Zamir C, Shoob H, Abramson N, et al. Mumps outbreak in Jerusalem affecting mainly male adolescents. *Euro Surveill* 2009; 14(50).

178. Walker J, Huc S, Sinka K, et al. Ongoing outbreak of mumps infection in Oban, Scotland, November 2010 to January 2011. *Euro Surveill* 2011;16(8).

179. Walkty A, Van Caeseele P, Hilderman T, et al. Mumps in prison: description of an outbreak in Manitoba, Canada. *Can J Public Health* 2011;102:341–4.

186. Whelan J, van Binnendijk R, Greenland K, et al. Ongoing mumps outbreak in a student population with high vaccination coverage, Netherlands, 2010. *Euro Surveill* 2010;15(17).

187. Wielders CC, van Binnendijk RS, Snijders BE, et al. Mumps epidemic in orthodox religious low-vaccination communities in the Netherlands and Canada, 2007 to 2009. *Euro Surveill* 2011;16(41).

189. Xu P, Luthra P, Li Z, et al. The V protein of mumps virus plays a critical role in pathogenesis. *J Virol* 2012;86:1768–76.

*The full reference list for this chapter is available at 🔗 expertconsult.com.*

CHAPTER 181

# RESPIRATORY SYNCYTIAL VIRUS

H. Cody Meissner • Caroline Breese Hall

*As by one bow on varied strings*
*the tune is played,*
*By both the microbe and the host,*
*disease is made.*

—CBH

*This chapter is dedicated to the memory of Carolyn B. Hall, MD. Few individuals have made such extensive*

*contributions to a specialty as Caren did for pediatric infectious disease. The greatest contributions from Caren were not only her remarkable scientific accomplishments, but also her acts of kindness and compassion. Caren will be missed intensely by those who had the great good fortune to share her friendship. Her memory will not be forgotten by several generations of medical students, residents, fellows, and colleagues. Although petite and*

# FEIGIN AND CHERRY'S TEXTBOOK OF PEDIATRIC INFECTIOUS DISEASES

SEVENTH EDITION

## James D. Cherry, MD, MSc

Distinguished Professor of Pediatrics
David Geffen School of Medicine at UCLA
Attending Physician
Pediatric Infectious Diseases
Mattel Children's Hospital UCLA
Los Angeles, California

## Gail J. Harrison, MD

Professor
Department of Pediatrics
Section of Infectious Diseases
Baylor College of Medicine
Attending Physician
Infectious Diseases Service
Texas Children's Hospital
Houston, Texas

## Sheldon L. Kaplan, MD

Professor and Vice-Chairman for Clinical Affairs
Head, Section of Infectious Diseases
Department of Pediatrics
Baylor College of Medicine
Chief, Infectious Disease Service
Texas Children's Hospital
Houston, Texas

## William J. Steinbach, MD

Associate Professor of Pediatrics, Molecular
   Genetics and Microbiology
Department of Pediatrics
Department of Molecular Genetics and
   Microbiology
Attending Physician
Division of Pediatric Infectious Diseases
Duke University Medical Center
Durham, North Carolina

## Peter J. Hotez, MD, PhD

Dean, National School of Tropical Medicine
Professor, Pediatrics and Molecular & Virology
   and Microbiology
Head, Section of Pediatric Tropical Medicine
Baylor College of Medicine
Texas Children's Hospital Endowed Chair of
   Tropical Pediatrics
Director, Sabin Vaccine Institute & Texas
   Children's Hospital Center for Vaccine
   Development
President, Sabin Vaccine Institute
Houston, Texas

ELSEVIER
SAUNDERS

Appx11397

## ELSEVIER
SAUNDERS

1600 John F. Kennedy Blvd.
Ste 1800
Philadelphia, PA 19103-2899

Feigin & Cherry's Textbook of Pediatric Infectious Diseases

Volume 1: Part no. 9996092720
Volume 2: Part no. 9996092844
Two-volume set ISBN: 978-1-4557-1177-2

**Copyright © 2014, 2009, 2004, 1998, 1992, 1987, 1981 by Saunders, an imprint of Elsevier Inc.
Chapter 146—Infant Botulism—Stephen S. Arnon—Government employee. This chapter will be
in the public domain.**

No part of this publication may be reproduced or transmitted in any form or by any means, electronic
or mechanical, including photocopying, recording, or any information storage and retrieval system,
without permission in writing from the publisher. Details on how to seek permission, further
information about the Publisher's permissions policies and our arrangements with organizations such as
the Copyright Clearance Center and the Copyright Licensing Agency, can be found at our website:
www.elsevier.com/permissions.

This book and the individual contributions contained in it are protected under copyright by the
Publisher (other than as may be noted herein).

---

### Notices

Knowledge and best practice in this field are constantly changing. As new research and experience
broaden our understanding, changes in research methods, professional practices, or medical
treatment may become necessary.

Practitioners and researchers must always rely on their own experience and knowledge in
evaluating and using any information, methods, compounds, or experiments described herein. In
using such information or methods they should be mindful of their own safety and the safety of
others, including parties for whom they have a professional responsibility.

With respect to any drug or pharmaceutical products identified, readers are advised to check the
most current information provided (i) on procedures featured or (ii) by the manufacturer of each
product to be administered, to verify the recommended dose or formula, the method and duration of
administration, and contraindications. It is the responsibility of practitioners, relying on their own
experience and knowledge of their patients, to make diagnoses, to determine dosages and the best
treatment for each individual patient, and to take all appropriate safety precautions.

To the fullest extent of the law, neither the Publisher nor the authors, contributors, or editors,
assume any liability for any injury and/or damage to persons or property as a matter of products
liability, negligence or otherwise, or from any use or operation of any methods, products,
instructions, or ideas contained in the material herein.

---

**Library of Congress Cataloging-in-Publication Data**
Feigin & Cherry's textbook of pediatric infectious diseases.
Feigin and Cherry's textbook of pediatric infectious diseases / [edited by] James D. Cherry, Gail J.
Demmler-Harrison, Sheldon L. Kaplan, Peter Hotez, William J. Steinbach.—Seventh edition.
     p. ; cm.
   Textbook of pediatric infectious diseases
   Preceded by: Feigin & Cherry's textbook of pediatric infectious diseases / [edited by] Ralph D.
Feigin—[et al.]. 6th ed. c2009.
   Includes bibliographical references and index.
   ISBN 978-1-4557-1177-2 (two-volume set : alk. paper)
   I.  Cherry, James D. (James Donald), 1930- editor of compilation.   II.  Demmler-Harrison, Gail J.,
editor of compilation.   III.  Kaplan, Sheldon L., editor of compilation.   IV.  Hotez, Peter J., editor of
compilation.   V.  Steinbach, William J., editor of compilation.   VI.  Title.   VII.  Title: Textbook of
pediatric infectious diseases.
   [DNLM:  1.  Communicable Diseases.  2.  Child.  3.  Pediatrics—methods.  WC 100]
   RJ401
   618.92′98—dc23

                                                                          2013033020

*Senior Content Specialist:* Stefanie Jewell-Thomas
*Content Development Specialist:* Lisa Barnes
*Publishing Services Manager:* Patricia Tannian
*Senior Project Manager:* Claire Kramer
*Design Direction:* Steven Stave

Printed in the United States of America

Last digit is the print number:  9  8  7  6  5  4  3  2  1



Working together
to grow libraries in
developing countries

www.elsevier.com • www.bookaid.org

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel*.,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,
                              *Plaintiffs,*
                    v.
MERCK & CO., INC.,
                              *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 103

Page 277

1            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2
     - - - - - - - - - - - - - x
3    UNITED STATES OF          :
     AMERICA, ex rel.,         :
4    STEPHEN A. KRAHLING and   :
     JOAN A. WLOCHOWSKI,       :  Civil Action No.
5                              :  10-4374 (CDJ)
          Plaintiffs,          :
6                              :  Volume II of II
       v.                      :  7:28 p.m. - 11:33 p.m.
7                              :
     MERCK & CO., INC.,        :
8                              :
          Defendants.          :
9    - - - - - - - - - - - - - x
     IN RE: MERCK MUMPS        :  Master File No.
10   VACCINE ANTITRUST         :  12-03555 (CDJ)
     LITIGATION                :
11                             :
     THIS DOCUMENT RELATES     :  Friday, September 28, 2018
12   TO:  ALL ACTIONS.         :  Washington, D.C.
     - - - - - - - - - - - - - x
13
     Volume II of the Videotaped Deposition of:
14
                    DAVID KESSLER, M.D.,
15
     called for oral examination by counsel for the
16
     Defendants, pursuant to notice, at the law offices of
17
     Venable, LLP, 600 Massachusetts Avenue, Northwest,
18
     Washington, D.C. 20001, before Christina S. Hotsko,
19
     RPR, CRR, of Veritext Legal Solutions, a Notary
20
     Public in and for the District of Columbia, beginning
21
     at 7:28 p.m., when were present on behalf of the
22
     respective parties:
23
                  VERITEXT LEGAL SOLUTIONS
24                    MID-ATLANTIC REGION
                1801 Market Street - Suite 1800
25                  Philadelphia, PA  19103

Page 390

1    MS. WYSOCKI: It's Exhibit 3.
2    THE WITNESS: Is it marked?
3    MS. SCANLAN: It does have an exhibit
4  number on it.
5    THE WITNESS: Oh, I'm sorry.
6    MS. HARDWAY: Exhibit 3.
7    UNIDENTIFIED MALE: Yeah, Exhibit 3.
8    THE WITNESS: I didn't realize.
9  BY MS. HARDWAY:
10   Q. Do you agree, Dr. Kessler, that the
11 projected potency at end expiry column that is
12 throughout this report -- there's a "Projected
13 Potency At End Expiry" column, right?
14   A. Yes.
15   Q. And you'd agree that that projected
16 potency at end expiry is based on a Merck
17 stability model?
18   A. It's based on the Dr. Margoslskee -- the
19 analysis that Dr. Margoslskee used, and I used
20 the exact methodology that Dr. Margoslskee used.
21   Q. But for the projected potency, the
22 specific projected potency, that's based on a
23 Merck stability model, correct?
24   A. That Dr. Margoslskee -- again, I used
25 exactly Dr. Margoslskee's model and

Page 391

1 Dr. Margoslskee's number.
2    Q. And then there is an "Actual Potency
3 Below 4.3 At End Expiry" column, right?
4    A. Yes.
5    Q. And there are -- most of that column
6 contains question marks, right?
7    A. Correct.
8    Q. With a few exceptions which we'll --
9    A. Yeah, no. I've sought that data. I
10 mean, when I can find those in BPBRs or in other
11 documents, I attempted to fill that in.
12    If you have that data, again, within the
13 next, you know, short period of time, 30 days or
14 so, if you can provide me that, I think that
15 would be helpful. And certainly I'm open to
16 that.
17    I don't know where -- where I can -- I
18 mean, I've sought that. I don't know whether
19 it's in your LIMS database. I don't know which
20 databases it's in to find that data.
21    Q. Okay. Just so that the record is clear,
22 the question mark in the actual potency column
23 reflects that you don't know what the actual
24 potency is at the end of expiry for those lots,
25 right?

Page 392

1    A. I've sought that answer, and I hope it
2  exists. And if you could share that data with
3  me, I would appreciate it. It's possible I
4  missed it and it's in some documents, but I've
5  tried hard to find it.
6    Q. And so for the lots where you have a
7  question mark, which is a vast majority of the
8  lots in this chart, you don't know whether those
9  lots lost a log -- a 1.0 log over the 24-month
10 expiry period, right?
11   A. That's correct. I'm using exactly what
12 Dr. Margoslskee used. And I'm happy to be
13 informed that -- of that data. And if you could
14 share that data with me, I would appreciate it.
15   Q. All right. I'm going to show you what
16 we're going to mark as the next exhibit. I only
17 have one copy. Sorry.
18    (Kessler Deposition Exhibit 48 marked
19    for identification and attached to the
20    transcript.)
21 BY MS. HARDWAY:
22   Q. And if you would turn with me to the
23 Bates ending 2621.
24   A. 2621, 2621. Yes, ma'am.
25   Q. And this is a letter to Karen Goldenthal

Page 393

1 from Manal Morsy?
2    A. Yes.
3    Q. And it's in reference, as you'll see on
4 the first page, to a November 29, 2000 telephone
5 conference call.
6    A. Correct.
7    Q. And it was a meeting at Merck's request
8 to discuss with Dr. Carbone and her laboratory
9 staff Merck's newly developed mumps antibody
10 neutralization assay and to clarify some of the
11 comments, questions CBER provided Merck in a
12 letter dated October 27, 2000.
13    A. Correct.
14    Q. Do you see that?
15    A. I do.
16    Q. And in the -- you'll see actually again
17 on the first page, right before the bolded text,
18 it says, "The three issues for discussion with
19 CBER scientists in the requested teleconference
20 are: Background attached."
21    Do you see that?
22    A. Yes, I do.
23    Q. And if we go to the attachment, which is
24 Bates ending in 2623 --
25    A. Correct.

30 (Pages 390 - 393)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel*.,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

<em>Plaintiffs,</em>

v.

MERCK & CO., INC.,

<em>Defendant.</em>

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 104

Page 1

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2
    - - - - - - - - - - - - - x
3     UNITED STATES OF          :
      AMERICA, ex rel.,         :
4     STEPHEN A. KRAHLING and   :
      JOAN A. WLOCHOWSKI,       :
5                               :
          Plaintiffs,           :  Civil Action No.
6                               :
        v.                      :  10-4374 (CDJ)
7                               :
      MERCK & CO., INC.,        :
8                               :
          Defendants.           :
9     - - - - - - - - - - - - - x
      IN RE: MERCK MUMPS        :
10    VACCINE ANTITRUST         :
      LITIGATION                :  Master File No.
11                              :  12-03555 (CDJ)
      THIS DOCUMENT RELATES     :
12    TO:  ALL ACTIONS.         :
    - - - - - - - - - - - - - x
13                               Monday, October 8, 2018
                                    Washington, D.C.
14

15

16  Videotaped Deposition of:
17                  ANNA P. DURBIN, M.D.,
18  called for oral examination by counsel for the
19  Plaintiffs, pursuant to notice, at the law offices of
20  Constantine Cannon, LLP, 1001 Pennsylvania Avenue,
21  Northwest, Suite 1300N, Washington, D.C. 20004,
22  before Christina S. Hotsko, RPR, CRR, of Veritext
23  Legal Solutions, a Notary Public in and for the
24  District of Columbia, beginning at 9:07 a.m., when
25  were present on behalf of the respective parties:

Appx11403

Page 62

1  the broad survey that Salmon did
2  of seroconversion studies. It's those
3  two things --
4      A. No. It's all of -- there was more than
5  just the Hilleman study. So other studies,
6  which are probably references in Dr. Salmon's
7  paper. But other efficacy studies of mumps
8  vaccines.
9      Q. Well, the part of Dr. Salmon's paper
10  that you relied on were not efficacy studies.
11  They were just immunologic studies of the
12  seroconversion rates, right?
13      A. Well, no. Some of those studies may
14  have come from efficacy studies where they
15  measured immune responses in either a subset --
16  in a subset of the population.
17      Q. Okay. So how does -- we'll talk about
18  Dr. Salmon's studies later, but the Hilleman
19  studies I want to focus on now.
20      How do the studies that Dr. Hilleman did
21  in the 1960s give you any kind of comfort that
22  the AIGENT study provided an indirect measure of
23  protection against mumps?
24      MR. SANGIAMO: Object to the form.
25      THE WITNESS: So Dr. Hilleman's study

Page 63

1  was a true efficacy study. So it was measuring
2  how many people who got the vaccine got mumps,
3  compared to people who didn't get the vaccine
4  and got mumps and showed high efficacy.
5      As part of that study, they also
6  measured antibodies from people who got the
7  vaccine. And he -- those antibodies were
8  measured in different ways, one of which was
9  neutralizing antibody.
10  BY MR. SCHNELL:
11      Q. So the Hilleman study gives you comfort
12  because, in your opinion, the Hilleman study
13  demonstrated that neutralizing -- mumps-specific
14  neutralizing antibodies correlated with
15  protection from disease?
16      A. So let me back up. There is no proven
17  correlate of protection for mumps. What the
18  Hilleman study showed was that on neutralization
19  assays, there was a high seroconversion rate of
20  greater -- I believe greater than 90 percent,
21  around 95 percent.
22      So again, an indirect measure of
23  protection, based on a true efficacy study.
24      So we know that -- we know that more
25  than 95 percent of people were actually

Page 64

1  protected against mumps. We know that a high
2  proportion of those people who got the vaccine
3  seroconverted to mumps. So that seroconversion
4  was related -- you know, what you can say is
5  people seroconverted, and we had protection.
6      Q. Well, isn't the relevance of the
7  Hilleman study to the AIGENT assay only as good
8  as the comparability, the apples-to-apples
9  comparability of the two studies?
10      A. They're --
11      MR. SANGIAMO: Object to the form.
12      THE WITNESS: They're measuring
13  neutralizing antibody. So there's different
14  ways to measure neutralizing antibody, but
15  you're still measuring neutralizing antibody.
16  BY MR. SCHNELL:
17      Q. Right. But if the way that you're
18  measuring them are completely different and the
19  potency of the samples are very different and
20  the indicator strains are very different, aren't
21  those all reasons to make relying on the
22  Hilleman study to support the relevance to
23  protection of the AIGENT study not something
24  that you can rely on?
25      A. I would disagree with that.

Page 65

1      Q. So is it your opinion that did not --
2  the size of the Hilleman study has no bearing on
3  the relevance of it to the AIGENT assay?
4      A. I don't know what you mean by the size
5  of the --
6      Q. The sample size.
7      A. No.
8      Q. And is it your opinion that the
9  indicator strain used in the Hilleman studies is
10  irrelevant to the indicator strain used in the
11  AIGENT assay in terms of using the Hilleman
12  study to support your opinions on the AIGENT
13  assay?
14      A. Can you repeat the question, please?
15      (The reporter read the record as
16      requested.)
17      THE WITNESS: So the indicator strain
18  may or may not be important. And I think that
19  was evident in discussions with CBER in
20  determining which indicator strain they were
21  going to use.
22      So again, if we go back and we look at
23  seroconversion rates not only based in the
24  original Hilleman study, but you look at
25  seroconversion rates through different studies

17 (Pages 62 - 65)

Appx11404

Page 146

1   A.  That actually aided in the ability to
2 see the effect of the antibodies, in my opinion.
3 It increased the sensitivity of the assay.
4   Q.  Have you ever done a mumps PRN?
5   A.  I have not.
6   Q.  Have you ever done a mumps clinical
7 trial?
8   A.  I have not.  I'm not that old.
9   Q.  Have you ever used anti-IgG in a PRN?
10   A.  I have not.
11   Q.  Why not?
12   A.  Because I haven't found the need to do
13 that in the assays that I'm running.
14   Q.  And you've run thousands of PRNs?
15   A.  My lab has run thousands of PRNs, and I
16 have supervised them.  I have not personally
17 pipetted for a thousand PRNs, but I've been
18 heavily involved in the running of thousands of
19 PRNs.
20   Q.  And not in a single one of those
21 thousands was anti-IgG used?
22   A.  No.  And I believe if you look at the
23 literature review, there's only certain viruses
24 that actually use anti-IgG.  So measles doesn't
25 require it, rubella doesn't require it, but

Page 147

1 mumps did require it.
2   Q.  You're saying mumps requires the use of
3 anti-IgG in the PRN assay?
4   A.  It did in the AIGENT assay to include --
5 increase the sensitivity.
6   Q.  What's your opinion as to why it was
7 needed in the AIGENT assay?
8   A.  So I think, and I can't quote this, but,
9 you know, in reviewing Sato's assay, so mumps is
10 behaving differently from measles and rubella.
11 It doesn't behave in the same way in a PRN.  The
12 antibodies are not able to be detected as easily
13 as in a measles or rubella PRN or in the PRNs
14 that I've run.
15      And so for that reason, they were
16 looking -- they were looking to optimize the
17 assay to increase the ability to detect those
18 antibodies, and that's why the anti-IgG was
19 added.
20   Q.  Hilleman didn't use anti-IgG in his PRN
21 studies, right?
22   A.  I have not seen his protocol.  I cannot
23 comment on that.
24   Q.  You've seen no indication that he used
25 anti-IgG?

Page 148

1   A.  No.  I have not reviewed his protocol,
2 so I cannot comment on that.
3   Q.  Well, you did have a research into the
4 use of anti-IgG in PRNs for this report, right?
5   A.  I did.
6   Q.  Did you not look and see whether
7 Hilleman used it?
8   A.  Hilleman -- a paper by Hilleman was not
9 referenced, but I have not seen the exact
10 protocol that Hilleman used.
11   Q.  Now, you mentioned that GSK used it in
12 one of their PRNs.
13   A.  Yes.
14   Q.  Any other PRNs that you're aware of in
15 which anti-IgG was used?
16   A.  So not for mumps, per se.  But certainly
17 for other viruses like herpes, CMV.  There were
18 several different papers that referenced the use
19 of IgG.
20   Q.  Anti-IgG?
21   A.  Anti-IgG.
22   Q.  Were any of those Phase III pivotal
23 clinical trials?
24   A.  Not to my knowledge, no.
25   Q.  So the only Phase III pivotal clinical

Page 149

1 trial that you're aware of where anti-IgG was
2 used in a PRN was the AIGENT?
3      MR. SANGIAMO:  Object to the form.
4      THE WITNESS:  First of all, I want to
5 say I don't know that that protocol 7 was a
6 Phase III clinical trial.  I don't know the
7 phase of that trial, per se.  I think I saw
8 reference that it was a Phase V, but I could be
9 wrong.
10      But I do know that it was used in at
11 least two different mumps clinical trials.
12 BY MR. SCHNELL:
13   Q.  The GSK one?
14   A.  GS -- yes.
15   Q.  And what else?
16   A.  And the AIGENT assay that was used in
17 protocol 7.
18   Q.  Oh, okay.
19      And your opinion is that the use of
20 anti-IgG in the AIGENT assay -- and I don't want
21 to paraphrase; you tell me if I'm wrong; I'm
22 sure Dino will -- was that made it a more
23 reliable measure of the level of mumps
24 neutralizing antibodies; is that correct?
25      MR. SANGIAMO:  Object to the form.

38 (Pages 146 - 149)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

             *Plaintiffs,*

    v.

MERCK & CO., INC.,

             *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 105

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

1

1          IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2

3   UNITED STATES OF AMERICA  : CIVIL ACTION
    ex rel., STEPHEN A.       : NO. 2:10-04374(CDJ)
    KRAHLING and JOAN A.      :
4   WLOCHOWSKI,               :
          Plaintiffs,         :
5                             :
          vs.                 :
6                             :
    MERCK & CO., INC.,        :
7         Defendant.          :
    _____ : Master File No.
8   IN RE:  MERCK MUMPS       : 2:12-cv-03555(CDJ)
    VACCINE ANTITRUST         :
9   LITIGATION                :
                              :
10  THIS DOCUMENT RELATES TO: :
    ALL ACTIONS               :
11

12

13  ** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY **

14

15                  June 6, 2017

16

17          Videotaped deposition of DR. EMILIO

18  EMINI, taken at the offices of Spector Roseman

19  & Kodroff, 1818 Market Street, Suite 2500,

20  Philadelphia, Pennsylvania 19103, beginning at

21  9:36 a.m., before LINDA ROSSI-RIOS, a

22  Federally Approved RPR, CCR and Notary Public.

23

24

25

Appx11407

**HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**

**78**

1  observed in the clinical study that is
2  being referenced.  It is not a
3  requirement.
4  BY MR. BEGLEITER:
5      Q.     But this document, is this an
6  insert for the vaccine?
7      A.     Yes, it is.
8      Q.     And this, as far as you know, is
9  given to every medical center, physician who --
10     A.     Whoever purchases the vaccine
11 gets an insert because it's in the box.
12     Q.     And when you answered 90 percent
13 before, what were you reserving to there?
14     A.     I was referring specifically to
15 the context of the 007 clinical trial and what
16 the agency, the FDA was looking for in terms
17 of the quality of the assay that was being
18 used to assess the immunological response to
19 the vaccine.  That's a different situation
20 than what's in the label here.  This label is
21 reporting data from its original efficacy
22 study.  We need to recall that what you
23 measure is a function of how you measure it.
24 That the assay that was used back when this
25 clinical study was originally conducted, and,

**79**

1  again, I need -- I don't know if it's
2  appropriately referenced here so we can go
3  back to see when the study was originally
4  conducted, we'll have to read and take a look
5  at it, but I'm certain it was many decades
6  before the late 1990s because that was when
7  the vaccine was first licensed.  That assay
8  was no longer in existence by the time of the
9  007 study.  So a new assay had to be developed
10 and the agency wanted the assay to be
11 sensitive.  What I mean by sensitivity, it
12 needed to be able to discern a difference in
13 the seroconversion rate that could be elicited
14 by 4.3, 4.1 and 3.7.  Those were the three
15 comparators, right, that were being done.  It
16 had nothing to do with what was originally
17 done many decades ago.
18     Q.     So the 90 percent you're talking
19 about which is post the confidence interval --
20     A.     No, the 90 percent, I
21 presume, but the 90 percent, because in the
22 documents I saw the number that I recollect
23 was 90 percent, 90 percent is a measure of the
24 assay sensitivity.  So, for instance, if one
25 wants to look at -- do a comparison, which is

**80**

1  what 007 was, of the ability of the vaccine at
2  three different dosage levels, its ability to
3  elicit a seroconversion response in young
4  children, one wants as sensitive a vaccine as
5  possible -- excuse me, as sensitive an assay
6  as possible.  If the vaccine were not capable
7  of eliciting a seroconversion of at least 90
8  percent given the assay that you developed,
9  you wouldn't be able to tell the difference
10 between 90 percent or a few percentage points
11 later, because typically the lower the
12 midpoint of what you measure, the wider the
13 confidence intervals and it becomes difficult
14 to discern what's happening.
15     Q.     Just to be straightened out, the
16 90 percent you're talking about is pre the
17 confidence interval or post the confidence
18 interval?
19     A.     No, I view it as -- I interpret
20 it as the midpoint of the confidence interval.
21     Q.     So in other words, it could be
22 from 95 to 85?
23     A.     If the confidence interval --
24     Q.     If it were 5 percent.
25     A.     -- were 5 percent, it would be

**81**

1  referred to as 90 percent plus or minus 5
2  percent.
3          MR. BEGLEITER:  We can have our
4  break.
5          VIDEOGRAPHER:  The time is
6  10:54.  Going off the video record.
7                -  -  -
8          (A recess was taken.)
9                -  -  -
10         VIDEOGRAPHER:  The time is
11 11:09.  We're back on the video record.
12         MS. DYKSTRA:  Dr. Emini, you
13 asked him about the different arms in
14 the 007 study and what the potencies
15 were in the different arms.  I think
16 you may want to clarify what they were.
17 He didn't have anything in front of him
18 at the time, but he can clarify.
19         THE WITNESS:  I mentioned they
20 were 4.3, 4.1, 3.7.  My apologies.  The
21 levels that were being tested were 4.9,
22 4.0 and 3.7.
23 BY MR. BEGLEITER:
24     Q.     Now, in going back to the
25 seroconversion rate for a moment, was -- did

21 (Pages 78 to 81)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

126

1　reflected by that level. That would tend to
2　suggest that there is something not,
3　quote/unquote, correct about the assay in
4　terms of what it was reflecting that the
5　vaccine was actually doing. By having data
6　from two -- from sera from children who
7　received independently two known efficacious
8　vaccines, the fact that both vaccines elicited
9　immune responses that gave rise to a result
10　that was roughly around 70 percent using the
11　Lo1 virus, allows you to firmly conclude that
12　and assay developed using the Lo1 virus is not
13　fit for purpose and that it is incapable of
14　giving you the kind of sensitivity that is
15　required to answer the 007 question that was being
16　posed by the 007 trial.
17　　　Q.　If -- I believe you're saying
18　that the efficacy in the field answers the
19　question as to the efficacy of the --
20　　　A.　It is the only way to address
21　efficacy.
22　　　　MS. DYKSTRA: Object to the
23　　　form.
24　BY MR. BEGLEITER:
25　　　Q.　And why have --

127

1　　　　MS. DYKSTRA: I objected to the
2　　　form of the question.
3　BY MR. BEGLEITER:
4　　　Q.　Then if your conclusion is
5　because of what's happening in the field that
6　the mumps virus is fit for purpose --
7　　　A.　The vaccine.
8　　　Q.　Excuse me, and the mumps vaccine is
9　fit for purpose as it stood, then why have
10　Protocol 007 at all?
11　　　A.　The purpose for Protocol 007 was
12　to provide the data that would allow both the
13　company and the agency to define an end expiry
14　number that it could then place in the label.
15　　　Q.　And if that clinical study were
16　to show a --
17　　　A.　End expiry potency number.
18　　　Q.　If that clinical study was to
19　show that the potency had fallen below 90
20　percent, wouldn't that be something of
21　interest to the CBER?
22　　　　MS. DYKSTRA: Objection. Form.
23　　　　THE WITNESS: Repeat your
24　　　question because you're mixing words.
25　BY MR. BEGLEITER:

128

1　　　Q.　Let me ask it a different way.
2　　　A.　Let's be precise.
3　　　Q.　Let's ask it a different way.
4　　　　The test was being conducted to
5　see what the potency was at expiry. Isn't
6　that right?
7　　　　MS. DYKSTRA: Objection. Form.
8　　　　THE WITNESS: The test was being
9　　　conducted, which test, the study or the
10　　　clinical study?
11　BY MR. BEGLEITER:
12　　　Q.　007.
13　　　A.　The clinical study was being
14　conducted to generate data that would support
15　a vaccine potency level for mumps at the end
16　of shelf life; so, therefore, the expiry
17　potency level.
18　　　Q.　But the conclusion you already
19　had was that since it was efficacious in the
20　field, that no matter what that number was, it
21　was -- the vaccine was fit for purpose. Isn't
22　that what you're saying?
23　　　　MS. DYKSTRA: Objection.
24　　　　THE WITNESS: The conclusion was
25　　　that the vaccine that was being used

129

1　　　from the time the vaccine was licensed
2　　　up until the time that this entire
3　　　discussion occurred, which was late
4　　　'90s, early 2000s, that the vaccine
5　　　that was being used in the field was
6　　　indeed efficacious.
7　BY MR. BEGLEITER:
8　　　Q.　And this study was designed to
9　show that the vaccine was fit for purpose?
10　　　A.　No. The study was designed to
11　develop a number, to provide data that would
12　support a number, a value for potency that
13　could be placed in the label for determination
14　of end expiry potency at the end of shelf
15　life.
16　　　Q.　And why was end expiry potency
17　important to CBER?
18　　　A.　It was important for control
19　purposes. And what I mean by control purposes
20　is so that there is a consistency and you can
21　determine a consistency at which point -- in
22　terms of shelf life. So if over time, if a
23　particular batch of vaccine were to lose
24　potency for whatever reason and were to drop
25　below a given level, a given number which was

VERITEXT LEGAL SOLUTIONS
(212) 279-9424                www.veritext.com                (212) 490-3430

**HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**

### 130

1   your end expiry potency, you could declare
2   that, you know, there was loss of control
3   potentially in the production of the vaccine
4   or in the storage of the vaccine.  Doesn't
5   mean that the vaccine is no longer effective.
6   That there was simply loss of control.
7       Q.    So the premise for this Protocol
8   007 was that MMR/V, the mumps part of it at
9   least, was effective?
10      A.    Yes.
11          MS. DYKSTRA:  Objection to the
12  form.
13  BY MR. BEGLEITER:
14      Q.    Premise going in?
15          MS. DYKSTRA:  MMR/V wasn't in
16  the study.
17  BY MR. BEGLEITER:
18      Q.    Excuse me, MMR II.
19      A.    MMR II.
20      Q.    MMR II.  Yes.
21      A.    That the mumps component --
22  we'll stick with the mumps component.  That
23  the mumps component in MMR II --
24      Q.    Yes.
25      A.    -- was absolutely effective.

### 131

1       Q.    And that's the premise going in?
2       A.    That is the observed fact.  It's
3   effective.
4       Q.    And let's just -- while we're on
5   the subject, let's go to the first paragraph,
6   MMR II end expiry.  It says that -- first
7   sentence tells you how many people, how many
8   subjects are enrolled.  Skip that.  Then it
9   says, "The primary study hypothesis of a..."
10      A.    Seroconversion rate.
11      Q.    "...seroconversion rate equal to
12  or greater than 90 percent against wild type
13  mumps...is unlikely to be met..."  [as read]
14      A.    Right.
15      Q.    "...and therefore...should be
16  revised either in terms of addressing the
17  hypothesis or addressing the technical
18  limitations of the assays used to date."
19      A.    Right.
20      Q.    And this is in October 31, 1999.
21  Right?
22      A.    Right.
23      Q.    Do you know if by then there had
24  even -- that the PRN had actually been set up
25  to do any kind of assay work, any kind of

### 132

1   testing?
2       A.    Well, according to this, the
3   assays had been developed, that there was a
4   PRN assay and the CPE assay, apparently both
5   assays were being -- I'm reading what's in the
6   rest of the document, that were being done.
7   And they were being developed, you know,
8   probably with the concurrence, not probably
9   but for a fact, with the concurrence of the
10  agency using a wild type virus.  And with a
11  wild type virus, and, again, reading through
12  the rest of the document, one of the ones that
13  was used, probably the initial one that was
14  used was this Lo1 wild type virus.  It was
15  giving seroconversion rates that were much
16  lower than 90 percent, approximately 70 percent.
17  And that was not going to meet the agency's
18  requirement for a sensitive enough test that
19  would allow you to answer the questions posed
20  by 007.
21      Q.    Do you know if the agency was
22  told, if CBER was told about the low SCR for
23  Lo1?
24      A.    Based on documents that I
25  reviewed, these were discussions that were

### 133

1   going on in collaboration with the agency
2   because the agency very much wanted an assay
3   that would answer the question that would
4   allow them to establish a value for end expiry
5   in the label.  An SCR of 70 percent, all
6   right.  So what we know is the following:  We
7   know that the vaccine is effective --
8       Q.    My question --
9           MS. DYKSTRA:  Let him answer.
10          MR. BEGLEITER:  He's not
11  answering my question.
12          THE WITNESS:  I will get into
13  the answer.  Allow me to answer the
14  question, please.
15          What we know is that the vaccine
16  is effective, it's been given to
17  children, to all the children in the
18  study, and that the assay that had been
19  developed using Lo1 was only yielding
20  an SCR of 70 percent.  That would not
21  have been fit for purpose.  That
22  indicates that the assay, the assay is
23  not fit for purpose.  It's not allowing
24  you to determine whether or not -- it
25  was not allowing you to -- would not

34  (Pages 130 to 133)

Appx11410

**HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**

---

**134**

1  allow you, it would not prospectively
2  allow you to determine whether or not
3  there would be a difference in the
4  seroconversion rate that would be
5  statistically acceptable among the
6  different, the three different potency
7  levels that were being tested in 007.
8  So, therefore, the discussion with the
9  agency was how can we modify the assay
10  that would give us an assay or assays
11  of sufficient sensitivity.
12      MR. BEGLEITER:  Can you read the
13  question back, please.
14               - - -
15      (The court reporter read the
16  pertinent part of the record.)
17               - - -
18  BY MR. BEGLEITER:
19      Q.   Do you know if they were told
20  specifically about what the low SCR was?
21      A.   I do not recall what the
22  specific conversation was.  What I do recall
23  was that there were ongoing conversations with
24  the agency to generate an assay with
25  sufficient sensitivity.

**135**

1      Q.   But you don't recall whether or
2  not somebody said, you know, we've done an
3  assay on Lo1 and the SCR is 70 to 75 percent?
4      A.   What I do recall -- no, I don't
5  recall that specific question.
6      Q.   That's my question.  Okay.
7      A.   That specific discussion.
8      Q.   Now, in terms of whether CBER
9  was going to be -- whether CBER was going to
10  be told about the unanticipated low SCR, back
11  to the last paragraph on that page, when the
12  results from the head-to-head trial with
13  MMR II and Priorix was available.  Was that
14  discussed with Dr. Scolnick?
15      A.   I don't recall.
16      Q.   Was that discussed with
17  Dr. Margolskee?
18      A.   I don't recall.
19      Q.   Isn't it a fact, sir, that the
20  three of you discussed that and came to a
21  conclusion this is what should be done?
22      MS. DYKSTRA:  Objection to the
23  form.
24      THE WITNESS:  I have no
25  recollection.

**136**

1  BY MR. BEGLEITER:
2      Q.   By the way, I don't know if I
3  asked it.  Did you receive this document in
4  the usual course of your employment?
5      A.   The document was -- let's see,
6  am I here?  Yes, the document was sent to me
7  on October 31, 1999, and, therefore, I assume
8  I did receive it.
9      MS. DYKSTRA:  When is a good
10  time to take a break?  I don't know if
11  you want to go another time, we can
12  break for lunch.
13      MR. BEGLEITER:  Let me just see
14  what the latest one is.  We can do it
15  now.
16      MS. DYKSTRA:  Okay.
17      MR. BEGLEITER:  Have it now.
18      MS. DYKSTRA:  We'll come back.
19      MR. BEGLEITER:  Come back and
20  then we'll go to lunch.
21      MS. DYKSTRA:  That's sounds
22  fine.
23      MR. BEGLEITER:  Okay.  Fine.
24      VIDEOGRAPHER:  The time is now
25  12:16.  Going off the video record.

**137**

1               - - -
2      (A recess was taken.)
3               - - -
4      VIDEOGRAPHER:  The time is now
5  12:31.  We're back on the video record.
6  BY MR. BEGLEITER:
7      Q.   What would have -- what, if
8  anything, in the years '99, 2000, 2001 when
9  you were with biologics, would have indicated
10  to you that there was a problem with the
11  efficacy of the vaccine?
12      A.   Nothing at all.
13      Q.   What if statistics in the field
14  had been different?
15      MS. DYKSTRA:  Objection.  Form.
16  BY MR. BEGLEITER:
17      Q.   Well, do it this way.
18      A.   I don't know what that means.
19      Q.   On what basis -- you've said, I
20  believe, you testified -- if I put words in
21  your mouth, please correct me, I'm sure you
22  will.
23      What is the basis -- on what
24  basis, what scientific basis do you conclude
25  that in those years that you were biologic

35 (Pages 134 to 137)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

138

1    that the vaccine was effective?
2        A.    Well, the original basis for the
3    determination of the vaccine's efficacy or
4    efficaciousness is a controlled clinical
5    study.  So that was the controlled clinical
6    study that was performed that supported the
7    original licensure of the vaccine back in
8    whenever it was, the '60s, the '70s.  So that
9    was the placebo-controlled study.
10       Subsequent to that, your
11   establishment of the -- one's determination of
12   the continued effectiveness of the vaccine is
13   that, you know, when the vaccine became widely
14   used as a pediatric vaccine in this country,
15   the mumps epidemics which tended to occur with
16   certain regularity completely disappeared and
17   those epidemics have not recurred since.  The
18   only way in which that would have happened is
19   if the vaccine had, in fact, retained its
20   effectiveness.
21       Q.    Would a sustained outbreak short
22   of an epidemic lead you to a different
23   conclusion?
24       A.    No, sustained outbreaks, the
25   problem is there are a lot of variables

139

1    associated with those.  You don't know how
2    many individuals were immunized, how, many
3    individuals have not been immunized.  Immunity
4    wains, goes away with time.  It depends on how
5    long -- I'm slowing down, my apologies.  It
6    depends on how long those individuals have
7    been immunized.  It depends on a number of
8    factors which it's the only -- the only thing
9    that I personally would have taken as a clear
10   indication of the loss of effectiveness of the
11   vaccine, particularly given the fact that the
12   vaccine is used in practically every child,
13   there are unfortunately children who are not
14   immunized as we know, would be an actual
15   sustained epidemic.
16       Q.    Did you -- let's go back to this
17   document for a moment.
18       A.    Which document?
19       Q.    This document, the one you had
20   before, I think it was 9.
21       A.    Number 9?
22       Q.    It's 8.
23       A.    Number 8?
24       MS. MAHENDRANATHAN:  It's 9.
25       MR. BEGLEITER:  9 is right.

140

1    BY MR. BEGLEITER:
2        Q.    In that first paragraph again,
3    "The primary study hypothesis of a SCR greater
4    than or equal to 90 percent against wild type
5    mumps virus is unlikely to be met and
6    therefore this should be revised either in
7    terms of addressing the hypothesis or
8    addressing the technical limitations of the
9    assays used to date."  [As read]
10       Your name is in this document,
11   isn't it?
12       A.    Yes.
13       Q.    What do you understand
14   "addressing the hypothesis" to mean?
15       A.    The hypothesis of the study, so
16   that would be the 007 study, and addressing
17   the hypothesis of what the 007 study was
18   designed to do which was to provide data to
19   establish a number, potency number that could
20   be used for end expiry.  And if the assay is
21   insufficiently sensitive to show statistical
22   differences in terms of seroconversion rates,
23   not effectiveness, seroconversion rates among
24   the three levels that were being tested within
25   the study, one could not appropriately address

141

1    the hypothesis.
2        Q.    And one way of addressing the
3    hypothesis was in the choice of the viral
4    strain to be -- of the isolate to be assayed?
5        A.    Not to address the hypothesis
6    but the choice of the viral strain was
7    necessary to look at how one could devise an
8    assay that would give sufficient sensitivity
9    as a measure of seroconversion.
10       Q.    And did that mean, going to the
11   bottom paragraph, that Jeryl Lynn was a better
12   choice for the assay than Lo1?
13       MS. DYKSTRA:  Objection to the
14   form.
15       THE WITNESS:  The low passage
16   Jeryl Lynn which was, as we discussed
17   earlier, a representation of wild type
18   virus, was selected because this
19   particular strain, defined by both
20   passage and isolate, the Jeryl Lynn
21   isolate, was apparently capable of
22   giving a much more sensitive
23   representation of seroconversion, yes.
24   BY MR. BEGLEITER:
25       Q.    Have you ever heard that the

36 (Pages 138 to 141)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

**310**

1  paragraph, the first sentence, "We have been
2  assisting MMD in responding to CBER questions
3  re mumps end-expiry by performing an interim
4  analysis on 600 children participating in the
5  mumps end-expiry study (200 per group, studied
6  at mumps potencies of 4.9, 4.0 and 3.7)."
7      Do you see that?
8  A.    Yes.
9  Q.    That study, was that study part
10 of the Protocol 007?
11 A.    Yes.
12 Q.    Now, did that study in the
13 preliminary subset indicate that lots below
14 3.7 were not -- did not meet the requirements
15 of immunogenicity?
16     MS. DYKSTRA:  Objection.
17     THE WITNESS:  No, that is not
18     the result.  The result is indicated
19     right here in the memo.  It says in the
20     last paragraph on that first page, all
21     the way down at this bottom, it
22     describes the neut assays.  It says,
23     "By the neutralization assays, ...and
24     end-expiry of 4.0...," remember this
25     was one of the three levels that were

**312**

1  BY MR. BEGLEITER:
2  Q.    It then says --
3  A.    It then says, Jerry, that would
4  be Gerald Sadoff, and I feel 3.7 is medically
5  okay and would be defensible to the office of
6  compliance.  And based on the data, I would
7  agree.
8  Q.    The last sentence of that
9  paragraph under "Ed" it says, the last two
10 sentences, "The less than 3.7 lots are of
11 particular concern; the 3.7 to 4.0 lots are
12 likely defensible with some additional work."
13 And then it says, "All 106 lots are a
14 compliance issue."
15     Do you see that?
16 A.    Right.  So I don't know what
17 the -- I believe the 106 lots are referring to
18 the lots that they believe at end expiry may
19 be below.  It's unclear from what's written
20 here.  Maybe below that declared level which
21 the agency had declared at 4.3.  The data, I'm
22 reading the penultimate sentence in the first
23 paragraph, the 3.7 to 4.0 lots are likely
24 defensible.  And given the data at the end of
25 this page, I would agree, they are defensible

**311**

1  tested in 007, "...meets CBER's
2  demand...," as was noted here, CBER's
3  perspective criteria for 90 percent
4  seroconversion rate.  So 4.0 is fine.
5  While the 3.7 log titer misses, right,
6  with 88.2 percent seroconversion rate
7  but a 95 percent confidence interval of
8  82.3 to 92.6.
9      Now, going back to our earlier
10 conversation from today, this is not an
11 assessment of efficacy.  Rather what
12 this is, is a measure of the ability of
13 the vaccine at these three different
14 tested potency levels to elicit a
15 measurable immune response as measured
16 by the assay.  CBER obviously placed a
17 criterion around what they would accept
18 as given the assay of an acceptable
19 seroconversion rate, criterion that was
20 established on the basis of, I'm not
21 exactly certain what, but they
22 established it at 90 percent, that
23 that's what they wanted to do, and they
24 did it.  You will note that the
25 confidence interval crosses 90 percent.

**313**

1  because the data are not ostensibly different
2  between 4.0 and 3.7.
3      The reason why the 3.7 lots are
4  of particular concern, less than 3.7 lots are
5  of particular concern is that there are no
6  data on the level of seroconversion that would
7  be -- that would occur because the study only
8  went down to 3.7 lots, so what would happen at
9  3.5, 3.4, any lower number, there are no data.
10 So it's classic unknown lines.
11 Q.    But there was data at 3.7 and
12 4.0.  Is that correct?
13 A.    Right there, yes.
14 Q.    So I'm asking about the -- I'm
15 talking about the lots which were between 4.0
16 and 3.7.  Those are the -- aren't those the
17 lots, 106 lots which are a compliance issue?
18     MS. DYKSTRA:  Objection.
19     THE WITNESS:  The wording is
20     unclear, but it may refer that -- those
21     106 lots may refer to those lots
22     between 3.7 and 4.0.
23 BY MR. BEGLEITER:
24 Q.    You got this e-mail on
25 February 23, 2001?

79 (Pages 310 to 313)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

338

1    we discussed previously.
2           Assay description and the
3    standard operating protocol procedure was
4    submitted to CBER as background for the
5    November 29, 2000, conference.  And as
6    suggested by CBER during the meeting held on
7    March 13th, the assay sensitivity for
8    measurement of virus neutralizing antibody has
9    been optimized by addition of the antihuman
10   IgG.  It notes that the assay relies upon
11   immunostaining to reveal plaques since the
12   virus used in the assay is not ostensibly
13   cytopathic.  And, therefore, also it's agreed
14   with CBER during the March 13, 2000, meeting
15   we have chosen the lowest available passage,
16   that would be passage 8.
17          MR. BEGLEITER:  You're reading
18   very quickly.
19          THE WITNESS:  It's verbatim --
20   my apologies.  I can read it again more
21   slowly.
22          So as I said, "As agreed with
23   CBER...," again, "...during the
24   March 13, 2000, meeting, we have chosen
25   the lowest available passage

339

1    (passage 8) of the Jeryl Lynn strain of
2    mumps as being appropriately
3    representative of a wild-type mumps
4    virus strain."
5    BY MS. DYKSTRA:
6        Q.    This paragraph in the submission
7    to CBER is consistent with your recollection
8    that CBER first suggested the use of antihuman
9    IgG and that they agreed that passage 8 of the
10   Jeryl Lynn strain was appropriate for this
11   assay?
12       A.    It agrees with my recollection
13   of CBER's recommendation to use the antihuman
14   IgG to increase the sensitivity of the assay,
15   again, for the reasons we discussed
16   previously.  And with regarding -- I did not
17   have a specific recollection of why the Jeryl
18   Lynn strain was chosen, but that was,
19   recollection occurred, if you will, as a
20   result of looking at documents over the past
21   several days.
22       Q.    Thank you.  I'm going to also go
23   back and ask you to look at what was marked
24   Emini Exhibit 11 today.  This is a two-page
25   document from -- the first one is from Phil

340

1    Bennett and the second e-mail on the page is
2    from Keith Chirgwin.  Do you have that in
3    front of you?
4        A.    This one?
5        Q.    Emini-11.
6        A.    11.
7        Q.    Might be --
8        A.    No, no.  It's just getting a
9    little confused here.  My apologies.  Yes, 11.
10       Q.    So you -- do you recall --
11   separate and apart from looking at the words
12   on this document, do you recall discussions
13   with Phil Bennett around his stability or any
14   stability modeling he may have done?
15       A.    I do not have a specific
16   recollection of discussions with Phil Bennett.
17       Q.    In the context of determining
18   whether shelf life of the vaccine should be,
19   how does the company determine that and what
20   would they rely on at this point in time --
21   let me strike that.
22          You recall you had discussions
23   with Mr. Begleiter around CBER's
24   recommendation and approval to raise the
25   minimum release potency of the vaccine to 5.0

341

1    log10 TCID50.  Correct?
2        A.    Yes, I do.
3        Q.    In connection with that increase
4    in potency, what would the company do to
5    determine the appropriate shelf life of the
6    product?
7        A.    Well, what would normally be
8    done in the context of an appropriate shelf
9    life is that one would conduct formal
10   stability studies which is, I believe, what I
11   answered before, formal stability studies that
12   would entail actual measurement of virus
13   potency at different time points in realtime
14   with in this case vaccine that had been stored
15   at the accepted storage temperature of the
16   vaccine, which is 28 degrees Celsius.
17       Q.    So is that similar to saying
18   that the company would -- it would be
19   preferable or more reliable for the company to
20   rely on actual stability potency assay results
21   over time versus a stability model in
22   determining appropriate shelf life?
23          MR. BEGLEITER:  Object to the
24   form.
25          THE WITNESS:  Both the company

86 (Pages 338 to 341)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel*.,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

          *Plaintiffs,*

    v.

MERCK & CO., INC.,

          *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 106

Appx11415

January 1998          **CURRICULUM VITAE**

I.    **PERSONAL**

    A. Name:              David L. Krah

    B. Home Address:     213 Brunswick Court
                         Lansdale PA 19446

    C. Home Telephone No.:     215-361-1886

II.   **EDUCATION**

| School | Date | Major Courses | Degree |
|---|---|---|---|
| Pennsylvania State University University Park, PA | 1977 | Biology | B.S. |
| Hahnemann Medical College Philadelphia, PA | 1980 | Microbiology Immunology | M.S. |
| Hahnemann University Philadelphia, PA | 1982 | Microbiology Immunology | Ph.D. |

III.  **MERCK/MRL EMPLOYMENT HISTORY**

    1995-present     Senior Research Fellow
                     Department of Virus and Cell Biology

    1991-1995        Research Fellow
                     Department of Virus and Cell Biology

    1988-1991        Senior Research Virologist
                     Department of Virus and Cell Biology/Cellular and
                     Molecular Biology

IV.   **NON-MERCK EMPLOYMENT HISTORY**

    1986-1988        Senior Research Scientist
                     Department of Antiviral Chemotherapy
                     Schering Corporation, Bloomfield, NJ

    1985-1986        Research Associate
                     Department of Virology
                     The Rockefeller University, New York, NY

    1982-1985        Postdoctoral Fellow (Purnell W. Choppin, sponsor)
                     Department of Virology
                     The Rockefeller University, New York, NY

V.    **ACADEMIC EXPERIENCE**

    Laboratory Assistant, Medical Microbiology for Medical and Graduate
    Students (Spring 1982), Hahnemann University.

**EXHIBIT**
Krah -1
PENGAD 800-631-6989

page 1

CONFIDENTIAL

Merck-EDPA-00664

**MRK-KRA00000695**
**MRK-CHA00000695**

V.    **ACADEMIC EXPERIENCE** (continued)

Predoctoral Research Fellow (1980-2, Richard L. Crowell, advisor),   Hahnemann University.

Laboratory Instructor, Medical Microbiology and Immunology for Podiatric Students (Fall and Winter 1980, Fall 1981), Pennsylvania College of  Podiatric Medicine, Philadelphia, PA.

Laboratory Instructor and Co-Lecturer, Medical Microbiology for Medical Laboratory Technicians (Spring 1979, Winter 1979 and Winter 1980), Hahnemann Medical College.

Alternate Laboratory Instructor, Microbiology for Allied Health Students    (Spring 1978), Hahnemann Medical College.

VI.    **TRAINING**

| | |
|---|---|
| Good Manufacturing Practices for Biologics and Vaccines | 1989 |
| Introduction to RS/1 | 1989 |
| Situational Leadership | 1989 |
| Models and Mechanisms of Protein Antigen Processing and Presentation | 1989 |
| Hints for Macintosh | 1990 |
| Monoclonal Antibodies | 1991 |
| Fundamentals of Recombinant DNA Technology | 1991 |
| Synthesis and Recycling of Receptors | 1991 |
| Gene Mapping | 1991 |
| GMP Training | 1992 |
| Immunology | 1992 |
| Lyophilization of Parenteral Formulations | 1992 |
| Bloodborne Pathogens | 1992 |
| GMP Training | 1993 |
| Assay Validation | 1993 |
| GMP Training | 1994 |
| Intracellular Vaccines | 1994 |

page 2

CONFIDENTIAL

**MRK-KRA00000696**
**MRK-CHA00000696**

Merck-EDPA-00665

Appx11417

VI.     **TRAINING** (continued)

| | |
|---|---|
| Patents | 1994 |
| FDA Laboratory Inspection Guidelines | 1994 |
| New Manager Orientation Program<br>•Counseling Poor Performance and Key HR Issues/<br>Procedures in MRL<br>•Practical Application of Key Policies, Performance<br>Evaluations and Salary Planning<br>•Coaching and Developing Employees | 1994 |
| GMP Requirements for Laboratory Operations | 1994 |
| Documentation Requirements for Pre-Approval Inspections | 1994 |
| GMP Requirements for Sterile Products | 1994 |
| Basic Virology and Viral Vaccines | 1995 |
| GMP training (computer validation) | 1995 |
| GMP training (GMP concerns in R&D) | 1995 |

VII.    **SOCIETY MEMBERSHIPS**

Albert B. Sabin Vaccine Foundation
American Association for the Advancement of Science
American Society for Microbiology
American Society for Microbiology (Eastern PA Branch)
American Society for Virology
International Society for Vaccines
New York Academy of Sciences
Society for General Microbiology
Society for In Vitro Biology (formerly the Tissue Culture Association)

VIII.   **ACADEMIC AND PROFESSIONAL HONORS**

Phi Sigma Society (Beta Alpha Chapter), Penna. State University, 1977
Who's Who in American Colleges and Universities, 1982
National Research Service Awardee, 1982-5
American Men and Women of Science, 1992
Who's Who Worldwide, 1994

page 3

CONFIDENTIAL

Merck—EDPA—00666

**MRK-KRA00000697**
**MRK-CHA00000697**

**Appx11418**

IX.    **PUBLICATIONS AND PATENTS**

Publications

1.    Krah, D.L. and R.L. Crowell. (1982) A solid-phase assay of solubilized HeLa cell receptors for binding group B coxsackieviruses and polioviruses. Virology 118: 148-56.

2.    Crowell, R.L., D.L. Krah, J. Mapoles, and B. Landau. (1983) Methods for assay of cellular receptors for picornaviruses. Methods in Enzymology 96:443-52.

3.    Krah, D.L. and R.L. Crowell. (1985) Properties of the deoxycholate-solubilized HeLa cell plasma membrane receptor for binding group B coxsackieviruses. J. Virol. 53:867-70.

4.    Shaw, M.W., M.Y. Stoeckle, D.L. Krah, and P.W. Choppin. (1985) The NB glycoprotein of influenza B virus. Vaccines 85. Molecular and chemical basis of resistance to parasitic, bacterial, and viral diseases. R.A. Lerner, R.M. Chanock, and F. Brown, eds. pp. 309-14. Cold Spring Harbor Laboratory, New York.

5.    Mapoles, J.E., D.L. Krah, and R.L. Crowell. (1985) Purification of a HeLa cell receptor protein for group B coxsackieviruses. J. Virol. 55: 560-6.

6.    Shaw, M.W., D.L. Krah, M.Y. Stoeckle, and P.W. Choppin. (1987) Immunologic studies on the NB glycoprotein of influenza B virus. In: The Biology of Negative Strand Viruses. B. Mahy and D. Kolakofsky, eds. pp. 309-15. Elsevier Science Publishing Company, Inc., New York.

7.    Hull, J.D., D.L. Krah, and P.W. Choppin. (1987) Resistance of a measles virus mutant to fusion inhibitory oligopeptides is not associated with mutations in the fusion peptide. Virology 159:368-72.

8.    Krah, D.L., and P.W. Choppin. (1988) Selective inhibition of WSN influenza virus hemolysis by pea lectin. J. Gen. Virol. 69: 717-22.

9.    Krah, D.L., and P.W. Choppin. (1988) Mice immunized with measles virus develop antibodies to a cell surface receptor for binding virus. J. Virol. 62: 1565-72.

10.    Krah, D.L. (1989) Characterization of octyl glucoside-solubilized cell membrane receptors for binding measles virus. Virology 172: 386-90.

11.    Krah, D.L., T.L. Schofield, and P.J. Provost. (1990) Enhancement of varicella-zoster virus plaquing efficiency with an agarose overlay medium. J. Virol. Methods 27: 319-26.

CONFIDENTIAL

Merck-EDPA-00667

MRK-KRA00000698
MRK-CHA00000698

**Appx11419**

IX.    **PUBLICATIONS AND PATENTS** (continued)

Publications

12.    Provost, P.J., D.L. Krah, B.J. Kuter, D.H. Morton, T.L. Schofield, E.A. Wasmuth, C.J. White, W.J. Miller, and R.W. Ellis. (1991) Antibody assays suitable for assessing immune responses to live varicella vaccine. Vaccine 9:111-6.

13.    Krah, D.L., R. D. Amin, D. R. Nalin, and P.J. Provost. (1991) A simple antigen-reduction assay for the measurement of neutralizing antibodies to hepatitis A virus. J. Infect. Dis. 163: 634-7.

14.    Midthun, K., E. Ellerbeck, K. Gershman, G. Calandra, D. Krah, M. McCaughtry, D. Nalin, and P. Provost. (1991) Safety and immunogenicity of a live attenuated hepatitis A virus vaccine in seronegative volunteers. J. Infect. Dis. 163: 735-9.

15.    Krah, D.L., R.D. Amin, D.R. Nalin, and P.J. Provost. (1991) Simplified assay for the measurement of hepatitis A virus neutralizing antibodies. Viral Hepatitis and Liver Disease. Proceedings of the 1990 International Symposium on Viral Hepatitis and Liver Disease: Contemporary Issues and Future Prospects. F. Blaine Hollinger, S. M. Lemon, and H. Margolis, eds., pp. 81-2. Williams and Wilkins, Baltimore, MD.

16.    Krah, D.L. (1991) A simplified multiwell plate assay for the measurement of hepatitis A virus infectivity. Biologicals 19: 223-7.

17.    Provost, P.J., F.S. Banker, C.W. Wadsworth, and D.L. Krah. (1991) Further evaluation of a live hepatitis A vaccine in marmosets. J. Med. Virol. 34: 227-31.

18.    Krah, D.L. (1991) Receptors for binding measles virus on host cells and erythrocytes. Microbial Pathogenesis 11: 221-8.

19.    White, C.J., B.J. Kuter, A. Ngai, C.S. Hildebrand, K.L. Isganitis, C.M. Patterson, A. Capra, W.J. Miller, D. L. Krah, P.J. Provost, R.W. Ellis, and G.B. Calandra. (1992) Modified cases of chickenpox following varicella vaccination: Correlation of protection with antibody response. Pediatr. Infect. Dis. J. 11: 19-23.

20.    Krah, D.L., P.J. Provost, and R. W. Ellis. (1995). Combined use of complement and anti-immunoglobulin in an enhanced neutralization assay for antibodies to varicella-zoster virus J. Virol. Methods 53:176-187.

21.    Clark, H.F., Offit, P.A., Ellis, R.W., Eiden, J.J., Krah, D., Shaw, A.R., Pichichero, M., Treanor, J.J., Borian, F.A., Bell, L.B., and Plotkin, S.A. (1996). The development of multivalent bovine rotavirus (strain WC3) reassortant vaccine for infants. J. Infect. Dis. 174: S73-S80.

22.    Krah, D.L. (1996). Assays for antibodies to varicella-zoster virus. Infectious Disease Clinics of North America: Varicella Vaccine 10:   507-527.

page 5

CONFIDENTIAL

Merck-EDPA-00668

MRK-KRA00000699
MRK-CHA00000699

IX.     **PUBLICATIONS AND PATENTS** (continued)

Publications

23.     Clark, H.F., P.A. Offit, R. W. Ellis, D. Krah, A.R. Shaw, J.J. Eiden, M. Pichichero, and J.H. Treanor (1996).  WC3 reassortant vaccines in children. Arch. Virol. N12, Supplement 12: 187-198.

24.     Krah, D.L., I. Cho, T. Schofield, and R.W. Ellis. (1997).  Comparison of gp ELISA and neutralizing antibody responses to Oka/Merck live varicella vaccine (Varivax®) in children and adults.  Vaccine 15: 61-64.

Abstracts

1.     Krah, D.L., and R.L. Crowell.  (1980)  A solid-phase assay of solubilized HeLa cell membrane receptors for binding group B coxsackieviruses. Abst. Ann. Mtg., American Society for Microbiology, p. 258.

2.     Krah, D.L., and R.L. Crowell.  (1981)  A solid-phase binding assay for solubilized HeLa cell membrane receptors for group B coxsackieviruses and polioviruses. Fifth International Congress of Virology (Strasbourg, France), p. 355.

3.     Krah, D.L., and R. L. Crowell.  (1982)  Partial purification of solubilized HeLa cell plasma membrane receptors for binding group B coxsackieviruses. Abst. Ann. Mtg., American Society for Microbiology, p. 264.

4.     Krah, D.L.  (1982)  Coxsackievirus receptor purification: Roundtable discussion on viral receptors. Session B, Viral Pathogenesis (R. L. Crowell and K. Lonberg-Holm, Chairmen). American Society for Virology Mtg. (Ithaca, NY).

5.     Mapoles, J.E., D.L. Krah, and R.L. Crowell.  (1985)  Purification of a HeLa cell receptor protein for the group B coxsackieviruses. American Society for Virology Mtg (Albuquerque, NM).

6.     Shaw, M.W., M.Y. Stoeckle, D.L. Krah, and P.W. Choppin.  (1985)  Immunologic studies on the influenza B virus glycoprotein. Virus Res. Supplement 1, p. 57. Sixth International Mtg on Negative Strand Viruses.

7.     Hull, J.D., D.L. Krah, and P.W. Choppin.  (1986)  Changes in the F gene sequence of a measles virus mutant resistant to fusion-inhibitory oligopeptides. American Society for Virology Mtg (Santa Barbara, CA).

8.     Provost, P., D. Krah, W. Miller, E. Wasmuth, T. Schofield, R. Ellis, and R. Gerety.  (1989)  Comparative sensitivities of assays for antibodies induced by live varicella vaccine. Program and Abstracts of the 29th ICAAC, p. 134 (abstract 199).

page 6

CONFIDENTIAL

MRK-KRA00000700
MRK-CHA00000700

**Appx11421**

IX.    **PUBLICATIONS AND PATENTS** (continued)

<u>Abstracts</u>

18.    Clark, H.F., Offit, P.A., Ellis, R.W., Eiden, J.J., Krah, D., Shaw, A.R., Pichichero, M., Treanor, J.J., Borian, F.A., Bell, L.B., and Plotkin, S.A.  (1995). The development of multivalent bovine rotavirus (strain WC3) reassortant vaccine for infants. Fifth Rotavirus Vaccine Workshop, Atlanta, Georgia.

<u>Patents</u>

1.    Provost, P.J, D.L. Krah, and P.A. Friedman. Process for attenuated varicella zoster virus vaccine production. Patent number 5,360,736, November 1, 1994; and 5,607,852, March 4, 1997.

page 8

CONFIDENTIAL

Merck-EDPA-00670

MRK-KRA00000701
MRK-CHA00000701

Appx11422

urrent Job Description

EXEMPT
POSITION DESCRIPTION

3/./81
~~10/10/80~~

SITION TITLE __SENIOR RESEARCH FELLOW__    DATE ____

VISION____MSDRL_____    INCUMBENT(S)____    POINTS ~~702~~ 782

EA ____

PARTMENT NO.____    DEPARTMENT NAME ____

m 03219 - 08 entry
POSITION CODE m 03919 - 09 entry

**Major Accountability:** The Senior Research Fellow with minimal technical guidance from a Director, is primarily responsible for planning and executing advanced studies toward objectives assigned or approved by Research Management, the execution of which may require providing technical direction to a small staff of professionals. The level at which the incumbent carries out research endeavors is characterized by concentration in a technical or scientific specialty leading to recognition within the Company or the profession on the basis of professional competence. Expected to exercise a high degree of sophistication in research and in the approach to problems encountered. Is expected to be cognizant of developments in his/her field of specialization and to propose methods of capitalizing on research advances to achieve practical gain.

Nature and Scope of Position:

The incumbent ordinarily receives assignments, general direction and some technical guidance from a Director. Such assignments are made in fairly broad terms with specific but difficult objectives outlined.

The incumbent collaborates with a Director in the design of research programs in his/her own or related fields. Subsequently consults with the Director relative to progress and results; otherwise, proceeds independently, carrying full responsibility for the knowledge and application of all pertinent literature.

The Senior Research Fellow accumulates and prepares data within his/her areas of responsibility. Develops or modifies techniques and devises and reduces to practice testing procedures deemed useful in pertinent evaluations. Issues periodic reports relative to research programs and contributes to overall departmental progress reports segments falling within his/her area of specialization. Expected to submit basic patent applications in support of patent coverage of research efforts.

The incumbent may supply technical direction to a group of professional and non-professional staff/members, the number depending on the nature of the program, such direction to include the planning, scheduling, and assignment of work within the program area. However, administrative responsibility is minimal. Is expected to broaden and develop the technical competence of assigned staff members.

The incumbent is competent in his/her field of specialization and is expected to mature and develop within this field of specialty by participation in and attendance at scientific meetings and by keeping abreast of the latest developments in his/her field. Will have achieved a reputation for creative research in his/her own field and be recognized as a leader in research, not only within the Company but among scientific associates in his/her field.

The Senior Research Fellow is expected to recommend programs of potential value to the company, which could lead to new products or new processes, based on knowledge and understanding of his/her field of research. Generally, this activity will consist of participation in the research reccomendations program.

.... continued

| | | | | | POSITION STATUS |
|---|---|---|---|---|---|
| | | C-H-H | 12/1/81 | | NEW |
| /i/ Brinkman | | (illegible) 12/6 | | | MODIFIED |
| G11-E557-DIP | 400-230-932=762 | 33-30-17 | (signature) | | EXEMPT CONT |

FORWARD APPROVED MASTER TO THE PERSONNEL DEPT. 8/11/81

CONFIDENTIAL

Merck-EDPA-00671

MRK-KRA00000702
MRK-CHA00000702

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

*Plaintiffs,*

v.

MERCK & CO., INC.,

*Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" MATERIAL PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 107

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel., STEPHEN A. KRAHLING and JOAN A. WLOCHOWSKI, <br>                  Plaintiffs, <br> v. <br> MERCK & CO., INC., <br>                  Defendant. | Civil Action No. 10-cv-4374 (CDJ) |
| IN RE: MERCK MUMPS VACCINE ANTITRUST LITIGATION <br><br> THIS DOCUMENT RELATES TO ALL ACTIONS | Master File No. 2:12-cv-03555 (CDJ) |

**EXPERT REPORT**

**DAVID A. KESSLER, M.D.**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

– The results of assay testing outside the protocol in assay 46-01, showing the following results for the ten children retested:

None of the ten responded in a standard neutralization assay using JL-135.

Seven of the ten responded in the WT ELISA (also using JL-135).[601]

**N.** **Merck Did Not Have Adequate Assurance of the Mumps Potency of MMRII Until the End Expiry Claim on the MMRII Label Was Lowered in 2007**

237.    As described below, from 2002 until 2007, Merck still could not assure that MMRII lots would meet the end expiry claim of "not less than 4.3" for mumps, even after the overfill.

**1.** **Merck Estimated 7% of MMRII lots "were expected to be below 4.3 at end expiry" and "with some creative math" shelf life could be improved from 12 to 15-16 months**

238.    In January 2002, MRL's Statistician, BARDS, Philip Bennett again[602] documented Merck's inability to ensure compliance with the "not less than 4.3" mumps end expiry claim on the MMRII label for 24 months. His prior estimate of less than 12 months' shelf life[603] could be improved "with some creative math."[604] Mr. Bennett further estimated as many as 7% of MMRII lots "were expected to be below 4.3 at end expiry."[605] Merck's Clinical Regulatory Review Committee was kept informed of Mr. Bennett's potency calculations and the inability to assure "not less than 4.3" through end expiry for mumps in MMRII. A power point presentation

---

[601] *See* paragraph 195 above (summary of the results of the ten children in assay 46-01); Deposition of David L. Krah, July 12, 2017, 708:3 to 714:9.
[602] *See* MRK-KRA01896072 at '72-73 (February 27, 2001 Memo: "Given our current minimum release specification limit of 5.0, we have 95% confidence that each lot released will be at or above 4.0 through expiry") and MRK-KRA00562218 (March 14, 2001 email: "Our expiry dating needs to be 12 months in order to provide 95% confidence that a lot released at 5.0 will be above 4.3 at expiry.").
[603] MRK-KRA00562218.
[604] MRK-KRA00024008.
[605] MRK-KRA00561350.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

to the Clinical Regulatory Review Committee stated: "Product still not compliant with labeled potency.[606]

238.1. An email from MRL's Statistician, BARDS, Philip Bennett, to MRL's Manager, Vaccine Regulatory and Analytical Sciences, Cynthia Morrissey, cc'd to MMD's Senior Director, Regulatory & Analytical Sciences, Mark Rosolowsky, MRL's Associate Director, Timothy Schofield, Chris Petroski, Sally Wong and MRL's Executive Director, Worldwide Regulatory Affairs, Dr. Keith Chirgwin, with the subject "Re: Mumps End Expiry," dated January 18, 2002, stated:

> The picture does not look good if we must short date Mumps to assure … (4.3 per dose) at expiry with 95% confidence for release at 5.0.
>
> <u>With some creative math and the updated stability data for fills made 1995-1999, the shelf life is about 15-16 months.</u>

MRK-KRA00024008 (emphasis added).

238.2. An email from MMD's Christopher Petroski to MRL's Executive Director, Worldwide Regulatory Affairs, Dr. Keith Chirgwin, MRL's Vice President, Infectious Disease and Vaccine Clinical Research, Dr. Jeffrey Chodakewitz, cc'd to MMD's Senior Director, Regulatory & Analytical Sciences, Mark Rosolowsky, MRL's Vice President, Worldwide Regulatory Affairs, Dr. Henrietta Ukwu, MRL's Senior Director, Project Planning and Management/Vaccine Integration, Dr. Joye Bramble, MRL's Executive Director, Vaccine Integration, Dr. Florian Schodel, MRL's Vice President, Vaccine & Biologics Research, Dr. Emilio Emini, and MMD's Vice President, Vaccine & Sterile Quality Operations, Dr. Roberta McKee, with the subject "RE: CRRC Agenda – 22January02," dated January 21, 2002, stated:

---

[606] MRK-KRA00019085 at '010.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

I reviewed the BPDRs that have been filed since the Team Bio inspection. We filed 14 so far, but only 2 of them are related to failure to meet mumps potencies of 4.3. (I recalled, incorrectly, that there were more). In 1 case we make mention of the Warning Letter response and recent clinical data as low as 4.0/dose. In both cases, we stated that we implemented a new mumps release specification (5.0/dose) to ensure lots at expiry would meet 4.3/dose at expiry. Therefore, from CBER's point of view, they may be expecting all recent lots (after increasing the mumps content and increasing the release specification) to meet 4.3/dose through expiry. That may explain the fact that there has been no negative feedback in response to the BPDRs.

I spoke with Cindy Morrisey (Stability) and Phil Bennet (Biometrics). Even at the current release specification, approx. 7% of the lots are expected to be < 4.3 at expiry. If we were to short date the product to achieve a 95% confidence of meeting 4.3/dose through expiry, we would have to date the product to approx. 16 months. This would impact our ability to supply the market.

If we can not get approval for an end-expiry titer of 4.0, there is still a risk that we will obtaining out-of-specification potency values for mumps at expiry. CBER has not made us take any market action in the past relative to potency values below 4.3/dose. However, the difference now would be the fact that our corrective actions (adding more mumps and increasing the release specification) did not ensure we meet 4.3/dose at expiry as previously indicated.

If CBER rejects the clinical study data and forces us to repeat a portion of it, we should get their concurrence in advance on our planned course of action if an OOS result is obtained, prior to revising the label.

MRK-KRA00561350 (emphasis added).

238.3. An email from MRL's Executive Director, Worldwide Regulatory Affairs, Dr. Keith Chirgwin, to MRL's Associate Director, Worldwide Regulatory Affairs, Dr. Manal Morsy,

282

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Appx11428**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel*., STEPHEN A. KRAHLING and JOAN A. WLOCHOWSKI, <br>        *Plaintiffs,* <br>   v. <br> MERCK & CO., INC., <br>        *Defendant.* | Civil Action No. 10-4374 (CDJ) <br><br> **CONTAINS "CONFIDENTIAL" AND "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" MATERIAL PURSUANT TO PROTECTIVE ORDER** |

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 108

# Lot Release



What is lot release?

What happens before the biological product is licensed?

What happens after the biological product is licensed?

- What lot release materials must the applicant submit to the Agency?

- How should the applicant submit the lot release materials to the Agency?

- What happens after the applicant has submitted the lot release materials to the Agency?

- How long will it take for a product lot to be released by the Agency?

Is there other information that applicants should know about the lot release process?

---

**Lot Release**

Appx11430

**What is lot release?**

Lot release is a mechanism that provides FDA with a real-time system to continuously monitor product quality, through review and testing, of many of the biological products that it regulates.

Biological products licensed under the Public Health Service Act are subject to the lot release requirements of Subpart A of 21 C.F.R. Part 610 (General Biological Products Standards):

- 21 C.F.R. §610.1 provides that "[n]o lot of any licensed product shall be released by the manufacturer prior to the completion of tests for conformity with standards applicable to such product . . . "

- 21 C.F.R. §610.2(a) and (b) provide that "[s]amples of any lot of any licensed product together with the protocols showing results of applicable tests, may at any time be required to be sent to the Director [of the Center for Biologics Evaluation and Research or the Center for Drug Evaluation and Research, as appropriate] . . . Upon notification by the Director . . . a manufacturer shall not distribute a lot of a . . . product until the lot is released by the Director . . .

**What happens before the biological product is licensed?**

As part of the approval of many biologics license applications (BLAs), the responsible Center (the Center for Biologics Evaluation and Research (CBER) or the Center for Drug Evaluation and Research (CDER)) works with the applicant to develop a lot release protocol that will be used for each lot of product post-licensure. The Center also develops a test plan for independent confirmatory testing by the Agency.

**What happens after the biological product is licensed?**

Once the Agency has licensed such a biological product, for each product lot, the applicant must submit materials relating to that lot to the Agency before the lot can be released.

- **What lot release materials must the applicant submit to the Agency?**

  ◦ **Protocols**: The applicant must submit the protocols that contain the agreed-upon tests.

  ◦ **Results**: The applicant must submit the results of the testing performed by the applicant.

◦ **Samples**: The applicant generally must submit samples of the product from the lot in question in order to permit the Agency to perform confirmatory testing.

• **How should the applicant submit the lot release materials to the Agency?**

◦ **Electronically**: The Agency encourages applicants to submit lot release protocols and results to the Agency electronically through the Gateway, which facilitates the lot release process.(Currently, over 55% of lot release protocols are submitted electronically.)Interested applicants should first contact the Sample Custodian at the address below.

◦ **Samples**: should be submitted by courier to the Agency's Sample Custodian. An applicant seeking to submit protocols and results by mail or courier should direct these to the Agency's Sample Custodian, as well. Note that applicants should send protocols, results, and samples for CDER-regulated products, as well as for CBER-regulated ones, to the Sample Custodian at the following address:

Sample Custodian
Center for Biologics Evaluation and Research
Food and Drug Administration
10903 New Hampshire Avenue
WO75-G707
Silver Spring, MD 20993-0002

• **What happens after the applicant has submitted the lot release materials to the Agency?**
Once the Agency has reviewed the lot release protocol, completed any testing of samples, and has found the results acceptable, the Agency will notify the applicant that that lot has been released.

• **How long will it take for a product lot to be released by the Agency?**
Please note that **there is no required timeframe for lot release**. However, the Agency strives to release lots within 30 business days once a complete and accurate submission has been received. This is the length of time that the Agency generally expects to need in order to review the data and multiple test results contained in a protocol and conduct confirmatory testing. If it becomes necessary for the Agency to resolve an issue with a protocol, or request the submission of a corrected protocol, the lot release process may take longer.

◦ In situations of true product shortages, an expedited release may be requested. A request should be made to CBER's Product Shortage Coordinator at cbershortage@fda.hhs.gov (mailto:cbershortage@fda.hhs.gov).

**Is there other information that applicants should know about the lot release process?**

Yes. Please note that lots that are submitted in support of an application or a prior approval supplement (PAS) cannot be released until the application or supplement is approved.

| Resources for You |
| --- |
| • Consumers (Biologics) (/vaccines-blood-biologics/resources-you-biologics/consumers-biologics) <br><br> • Healthcare Providers (Biologics) (/vaccines-blood-biologics/resources-you-biologics/healthcare-providers-biologics) <br><br> • Industry (Biologics) (/vaccines-blood-biologics/resources-you-biologics/industry-biologics) <br><br> • About the Center for Biologics Evaluation and Research (CBER) (/about-fda/office-medical-products-and-tobacco/center-biologics-evaluation-and-research-cber) |

**FOLLOW CBER**

Appx11433

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,
                        *Plaintiffs,*
        v.
MERCK & CO., INC.,
                        *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 109

# Drugs@FDA Instructions: Health Information

Appx11435

**How to find:**
• Therapeutic equivalents
• Generics for a brand name drug
• Labels
• Medication Guides
• Patient Package Inserts
• More Information from FDA

More Instructions:  Quick Search (/drugs/drug-approvals-and-databases/drugsfda-instructions-quick-search-instructions)   Regulatory Information (/drugs/drug-approvals-and-databases/drugsfda-instructions-regulatory-information)   Advanced Search (/drugs/drug-approvals-and-databases/drugsfda-instructions-advanced-search)

## Health Information

**First, search for a drug and choose an FDA application:**

• On the main **Search** page, enter the drug name or active ingredient in the search box.  If you don't know the whole name, type in as much as you know (at least three characters). You can also search by application number; however, do not enter both the number and the name. You may also click on the first letter of the drug name in the **Browse Box**.

• On the **Search Results** page, click on your drug name.

• On the **Overview** page, find your drug product by its dosage form/route and strength, and click on the drug name in the **Drug Name and FDA Application Number** column. This will take you to the **Drug Details** page for an individual application. (If there is only one application that matches your search, you will not see the Search Results or Overview page.)

**On the Drug Details page, links appear and are live ONLY if the information is available.**



**Click on the links on the Drug Detail page for the following health-related information:**

> **NOTE**: While many people commonly use the phrase "**generic for the brand name drug**,"
> Drugs@FDA uses a more precise official term for the drug(s) a pharmacist may
> substitute for another drug: **therapeutic equivalent**.

### 1. Therapeutic Equivalents

This link appears for **prescription** drugs only. (**Over-the-counter** drugs will have a link called "Other OTC Drugs
with the same Active Ingredient"). This link will be active only if generics or other therapeutic equivalents are
available for your prescription drug product. **Note**: Please read definitions for Generic Drug
(http://www.fda.gov/CDER/DRUGSATFDA/Glossary.htm#generic_drug) and Therapeutic Equivalence
(http://www.fda.gov/CDER/DRUGSATFDA/glossary.htm#TE).

- Click on the **Therapeutic Equivalents** link to go to the **Therapeutic Equivalents** page. This page will show
  you generic drug products or other brand name products that are available as  therapeutic equivalents
  for another prescription drug product.

  **Note**: If your drug is an over-the-counter drug product, the link will go to a page called "**Over-the-Counter
  Drugs with the Same Active Ingredient**." The products listed on that page are over-the-counter (OTC)
  drugs and do not receive therapeutic equivalence ratings. They may not be interchangeable.

- Products appear on the **Therapeutic Equivalents** page in tables by product, distinguished by dosage strength. Scroll through the tables until you find the table listing the products with the same dosage strength and form/route of administration as the drug you want to substitute. Drug products in each table are therapeutically equivalent to your drug product.

**2.  Label Information**

This link will take you to the most current label that FDA has in electronic format.

- If Drugs@FDA does not have the latest approved label, you will see a link to the latest approved label that we do have.

- There will be no link if FDA does not have a label for the drug.

- Links to older labels appear in the **Approval History** section.

| |
|---|
| **What's in a Drug Product Label?** |
| **The FDA approved label is the official description of a drug product which includes indication (what the drug is used for); who should take it; adverse events (side effects); instructions for uses in pregnancy, children, and other populations; and safety information for the patient.  Labels are often found inside drug product packaging.** |

| | |
|---|---|
| • description of the drug | • drug abuse and dependence |
| • clinical pharmacology | • dosage and administration |
| • Indications (uses for the drug) | • use in pregnancy, use in nursing mothers |
| • Contraindications (who should not take the drug) | • use in children and older patients |
| • warnings | • how the drug is supplied |
| • precautions | • safety Information for the patient |
| • adverse events (side effects) | |

**3.  Approval History and Related Documents**

This link will take you to the drug's **action dates, supplement numbers, supplement types**, plus links to the **approval letters, reviews, labels, and patient package inserts (if available),** and additional notes.

- **FDA Action dates**. The action date tells when any FDA regulatory action, such as an original or supplemental approval, took place.

- **Supplement numbers**.  A supplement number is associated with an existing FDA Application number (NDA, ANDA, BLA). Companies are allowed to make changes to drugs or their labels after they have been approved.  To change a label, market a new dosage or strength of a drug, or change the way it manufactures a drug, a company must submit a supplemental new drug application (sNDA).  Each sNDA is assigned a number which is usually, but not always, sequential, starting with 001.

- **Supplement Approval types**. Companies are allowed to make changes to drugs or their labels after they have been approved.  To change a label, market a new dosage or strength of a drug, or change the way it manufactures a drug, a company must submit a supplemental new drug application (sNDA).   The supplement type refers to the kind of change that was approved by FDA.  This includes changes in manufacturing, patient population, and formulation.

- **Labels**. (current and older) The FDA approved label is the official description of a drug product, which includes indication (what the drug is used for); who should take it; adverse events (side effects); instructions for uses in pregnant women, children, and other populations; and safety information for the patient.

- **Approval letter**. An official communication from FDA to a drug application's sponsor that allows the commercial marketing of the product.

- **Drug approval reviews**. A review is the basis of FDA's decision to approve an application.  It is a comprehensive analysis of clinical trial data and other information prepared by FDA drug application reviewers.  A review is divided into sections on medical analysis, chemistry, clinical pharmacology, biopharmaceutics, pharmacology, statistics, and microbiology.

- **Patient Package Insert.**  A Patient Package Insert (PPI) contains information for patients on how to safely use a drug product. It is part of the FDA-approved labeling.

### 4. Medication Guide

  ◦ Medication Guides contain information for patients on how to safely use a drug product. They are available for some drugs with special risk management information.  Not all drugs have Medication Guides.  A Medication Guide is part of the FDA-approved labeling.

### 5. Consumer Information Sheet (available for drugs approved since 1998)

  ◦ Pharmacists from the Center for Drug Evaluation's Drug Information Branch prepare these information sheets based on the drug's approved package insert.

### 6. Patient Package Insert

  ◦ A Patient Package Insert (PPI) contains information for patients on how to safely use a drug product. It is part of the FDA-approved labeling.

### 7. More Information from FDA

  ◦ This link will open an FDA Web page that includes drug approval information, safety information, questions and answers about the drug, and other information.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,
               *Plaintiffs,*
   v.
MERCK & CO., INC.,
               *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 110

# Vaccine Safety Questions and Answers

**Under the National Childhood Vaccine Injury Act (NCVIA), are health care providers and vaccine manufacturers required to report adverse events following the administration of vaccines?**

## Health Care Providers

Health care providers are subject to the adverse event reporting provisions of the NCVIA. This act mandates the reporting of the following events:

- Any event set forth in the *Reportable Events Table* that occurs within the time period specified.
- Any event listed in the manufacturer's package insert as a contraindication to subsequent doses of the vaccine.

There are no penalties specified in the law for health care providers who do not report adverse events. However, FDA takes active steps to educate physicians, nurses and other health care workers about the importance of reporting adverse vaccine events.

[TOP]

## Vaccine Manufacturers

Under FDA regulations [21 CFR, Subpart D - Reporting of Adverse Experiences, Section 600.80] and the Vaccine Adverse Event Reporting System (VAERS), licensed vaccine manufacturers must report to FDA adverse experience information. FDA has a number of enforcement options at its disposal that can be used if a vaccine manufacturer fails to establish and maintain records, and report adverse events under VAERS.

If a manufacturer were to fail to report an adverse event, FDA would warn the firm that it is out of compliance with the law. FDA also would examine the firm's total compliance situation and take further action according to the severity of the reporting violation. If necessary, FDA has the authority to revoke a manufacturer's biological product license for a vaccine.

[TOP]

## Why is the definition of "event" defined as any "adverse event?"

The agency does not have a formal definition of "event". An "event" is simply an outcome. Any outcome that an individual, whether a health care provider or consumer, believes may have resulted from an administration of a vaccine, may be reported to VAERS. Any such report will be entered into the system, whether or not there appears to be a causal relation to the vaccine. Thus, there can be no precise definition of "event," since the reporters are the ones who determine what is reported.

[TOP]

## I have heard a number of conflicting reports regarding increased safety concerns about vaccine inoculation. In light of the recent safety reports, why should my child be vaccinated?

Due to the success of immunization programs, the incidence of vaccine-preventable infectious diseases has declined. Therefore, individuals are less aware of the serious consequences of vaccine preventable illnesses. While vaccines are extremely safe and effective, no medical product is 100 percent safe or effective. Vaccines have been proven, over decades, to be one of the safest and most powerful disease prevention tools available.

Today there are far fewer visible reminders of the suffering, injuries, and premature deaths caused by diseases that can now be prevented with vaccines. For most of the vaccine-preventable diseases, there has been a 95 percent or more reduction in incidence. Routine immunization has eradicated smallpox from the globe and eliminated wild polio virus in this country. Vaccines have reduced preventable infectious diseases to an all-time low and few children suffer the devastating effects of these illnesses.

Prior to approval by FDA, vaccines are extensively tested by scientists to ensure that they are effective and safe. FDA has a stringent regulatory process for licensing vaccines that serves as a model for other countries.

For reasons related to the individual, not all vaccinated persons develop immunity. Most routine childhood vaccines are effective for 85% to 95% of recipients. Differences in the way individual immune systems react to a vaccine account for rare occasions when people are not protected following immunization or when they experience side effects. Vaccines are licensed, after stringent testing and study, because the benefits offered to the individual far outweigh the risk of serious health effects. In fact, some risks for serious health effects following vaccination are so rare that they currently cannot be measured.

Immunization programs optimally prevent the threat of dangerous infectious diseases that threaten the lives of our citizens, especially the Nation's children and elderly. Vaccines are among the 20th century's most successful and cost-effective public health tools for preventing disease, disability, and death.

[TOP]

## What does CDC do when someone wants to exempt out of vaccinations?

Enacting and enforcing immunization laws and regulations are the responsibility of State governments. CDC supports States' decisions to require certain immunizations as recommended on the Childhood Immunization Schedule for children entering school and childcare facilities. Almost all State immunization mandates pertain to entrance into school and childcare facilities. Many States also have college immunization requirements. States' approaches to exemptions for immunization requirements vary. All States allow medical exemptions for immunization. Forty-eight States permit exemptions for religious reasons and 15 States permit parents to claim exemptions on philosophical grounds. Implementation of religious and philosophical exemptions also varies among States. In some States, immunization program staff review written applications for exemption before granting or denying religious or philosophical exemptions. In other States, parents can obtain exemptions by simply signing a form which is accepted without review.

State public health laws and regulations are enacted pursuant to the provisions of individual State constitutions. CDC guidelines are voluntary rather than regulatory. CDC works with States that are ultimately responsible for the development and enforcement of school laws. The issue of philosophical exemptions in State laws was reviewed by the National Vaccine Advisory Committee (NVAC), which is made up of

experts in immunization policy. The Committee supports the current policy, which gives States flexibility in developing and enforcing immunization laws. This issue, as well as other immunization issues, are periodically assessed by the NVAC.

[TOP]

## Why don't we give parents a choice in deciding if they want to vaccinate their children?

Protecting a child through immunization is a parent's decision, taken in discussion with their doctor. The Federal Government may recommend that States develop laws or requirements for vaccines, but whether the State includes a given vaccine in its regulations and how informed consent is to be obtained are State decisions. Currently, 48 States allow religious exemptions to vaccination and 15 allow philosophical exemptions, in addition to the medical contraindications that are the same in all 50 States. The rationale for limiting choice is that vaccinations have been a very effective approach to protecting the public's health in the United States. The first article in a series on ten great achievements in public health in the 20th century highlighted the impact of vaccines universally recommended for children (*Morbidity and Mortality Weekly Report;* CDC 1999;48:243-48).

Because of high vaccine coverage rates today, one may focus on rare, potentially vaccine-associated adverse effects, but before vaccines were introduced there were over 175,000 cases of diphtheria annually (1920-22), over 147,000 cases of Pertussis (1922-25), and over 503,000 cases of measles (1951-54). More recently, an estimated 20,000 cases of invasive infections such as meningitis caused by *Haemophilus influenzae* type b occurred in 1985. Now, because of vaccination, the number of cases of these infections has been decreased by about 96% to 100%. But lessons from other countries have relevance for the United States - 1) if vaccination rates decrease, the number of cases of infection will increase as occurred in the United Kingdom and Japan after concerns about adverse events associated with the whole cell Pertussis vaccine resulted in decreased immunization (In the U.S. today, less reactogenic acellular Pertussis vaccines are now recommended); and 2) the decrease in disease of 96% to 100% exceeds the level of vaccine coverage. This is because at high vaccination rates, the circulation of a bacteria or virus may be decreased which lessens the chance that even someone who has not been immunized will get disease. This "herd

immunity" is important because some persons can not be vaccinated because of illnesses such as cancer and high vaccination rates in the community will protect them from disease.

[TOP]

## In addition to the data available on the approved product labeling, how do I obtain adverse event information regarding the vaccine my child received?

This information can be obtained by filing a Freedom of Information Act (FOIA) request with FDA. If you would like adverse event information on a specific lot of vaccine, please call 1-800-835-4709 or send an e-mail to ocod@fda.hhs.gov (mailto:ocod@fda.hhs.gov).

[TOP]

## Can the expiration date of a vaccine be extended?

Data demonstrating the stability of a vaccine, including potency data are required to determine the expiry. If a manufacturer wants to extend the dating period, it must submit data to FDA that includes, but is not limited to verification of the potency of the vaccine through the requested new expiry date. If the data demonstrate that the quality of the vaccine is not impacted, then following FDA approval, newly manufactured vaccines will be assigned the new expiry.

[TOP]

## What is meant by lot release and what are the steps involved?

Because of the complex manufacturing process for most biological products, each lot undergoes thorough testing by the manufacturer. The manufacturer performs specific tests as specified in their license application. The manufacturer submits samples of each licensed vaccine lot and the results of their own tests for potency, safety, and sterility to the Agency. The manufacturer may not distribute a lot of the product into interstate commerce until CBER releases it. All vaccines are subject to lot release. The lot release program is part of FDA's multi-part strategy that helps assure biological product safety by providing a quality control check on product specifications.

[TOP]

## Related Information

- Common Ingredients in U.S. Licensed Vaccines (/vaccines-blood-biologics/vaccine-safety-availability/common-ingredients-us-licensed-vaccines)
- Handbook for Requesting Information and Records from FDA (/regulatory-information/freedom-information/how-make-foia-request)

## Related Links

- Vaccine Safety (CDC) (http://www.cdc.gov/vaccinesafety/)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel*.,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

  *Plaintiffs,*

v.

MERCK & CO., INC.,

  *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 111

Highly Confidential – Attorneys' Eyes Only

# EXPERT REPORT OF

# GARY L. FREED MD, MPH

## A.    Academic and Professional Background

1.    My name is Gary L. Freed MD, MPH, and I am currently the Percy and Mary Murphy Professor of Pediatrics in the School of Medicine and Professor of Health Management and Policy in the School of Public Health at the University of Michigan.  I am the Associate Chair of the Department of Pediatrics and the Director of Faculty Programs for the Office of Health Equity and Inclusion in the Michigan Medical School.  From 1998-2013, I served as director of the Division of General Pediatrics and founding director of the Children's Health Evaluation and Research Center at the University of Michigan, the largest pediatric health services research center in the USA. From 2013-2016, I divided my time between the University of Michigan and the University of Melbourne (Australia) where I served as director of the Australian Health Workforce Institute, Professor of Population Health, and as visiting scholar in Health Care Policy at the Royal Children's Hospital.  While there I also founded the first pediatric health services research center in Australia and still serve as a consultant to its current director. In 2016, I returned full time to the University of Michigan to continue my research in health policy, quality of care measurement and economic issues focused on children, and to provide pediatric primary care.  I am still active as a primary care pediatrician.

2.    I have more than 25 years of experience in children's health services research and have been the principal investigator of numerous federal, state and foundation-funded grants, and of the first pediatric health services research fellowship program funded by the National Institutes of Health. I have published more than 280 peer-reviewed articles on child health policy and health economics, immunizations, health care quality measurement, physician behavior, the medical workforce and interspecialty variation in the provision of preventive services to children.

3.    I received my bachelor's degree from The University of Texas at Austin, my medical degree from Baylor College of Medicine in Houston and my Master of Public Health degree from the University of North Carolina at Chapel Hill. At UNC, I was a Robert Wood Johnson clinical scholar as well as a preventive medicine fellow.

4.    I am a past president of the Society for Pediatric Research (SPR), the largest research society in the field of child health.  In 2009, I was awarded the SPR Douglas K. Richardson Lifetime Achievement Award for Perinatal and Pediatric Health Care Research.  In 2018, I received the Distinguished Alumnus Award from Baylor College of Medicine.

5.    I serve on several national and international committees regarding child health, including serving as the Chair of the Scientific Advisory Committee of the

1

Highly Confidential – Attorneys' Eyes Only

prevention in its two-dose form (range: 31-95%) and approximately 78% effective if only one dose is administered (range: 49%-92%).[26]

45.     Many health departments will contact CDC to voluntarily report mumps outbreaks to CDC, such as the outbreaks primarily reported in college settings among young adults during 2016 and 2017.  These recent outbreaks were likely due to a variety of factors, including waning immunity, known vaccine effectiveness, the crowded environments more prevalent in college campuses combined with behaviors that increase transmission risk.[27]

46.     During these mumps outbreaks, where the affected population is usually highly vaccinated, there may be a fairly high proportion of vaccinated people among the affected; however, this does not indicate that the vaccine is not effective. Unvaccinated people are still usually affected by mumps at a much higher rate during these mumps outbreaks than those who have received the recommended two doses of MMR, and vaccine effectiveness is assessed by comparing the rates vaccinated people affected by mumps to those for unvaccinated people also affected.[28] [29]

47.     In the past twelve years, reports of US mumps outbreaks include:

a.     Almost 3,000 cases in northwest Arkansas during 2016-2017;
b.     Outbreaks involving up to several hundred university students from several university campuses during 2014-2016 as well as an outbreak in the National Hockey League at the beginning of that time period;
c.     Between 2011 and 2013, there were several smaller, more limited, mumps outbreaks reported on several university campuses;
d.     In 2009 to 2010, two large outbreaks occurred:
  i.     There was an outbreak involving over 3,000 mainly high school students in a religious community in New York City after one student was infected during a trip to the United Kingdom during a large outbreak there;
  ii.     There was an outbreak involving 500 mainly school-aged children in Guam;
e.     There was a multi-state outbreak in 20016, with more than 6,500 reported cases among mainly college students on university campuses.[30]

---

[26] Centers for Disease Control and Prevention, Mumps Home: Mumps Vaccination, *available at* https://www.cdc.gov/mumps/vaccination.html (last accessed June 9, 2018).
[27] Centers for Disease Control and Prevention, *supra* note 15.
[28] Centers for Disease Control and Prevention, *supra* at note 11.
[29] Id.
[30] Centers for Disease Control and Prevention, *supra* note 15.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

*Plaintiffs,*

v.

MERCK & CO., INC.,

*Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 112

**Appx11450**



# Vaccine Manufacturing

*Phillip L. Gomez and James M. Robinson*

The vast majority of the more than 1 billion doses of vaccines manufactured worldwide each year are given to perfectly healthy people.[1-4] It is this fact that drives the requirements for vaccines to be among the most rigorously designed, monitored, and compliant products manufactured today. The ability to manufacture these vaccines safely and consistently is built on four competencies:

1. The manufacturing process that defines how the product is made;
2. The compliance of the organization to successfully complete that process;
3. The testing of the product and supporting operations; and
4. The regulatory authorization to release and distribute the product.

This chapter examines how each of these components is established during the development of a new vaccine and how the field of vaccine manufacturing is responding to emerging challenges for increased capacity (e.g., pandemic influenza vaccine), increased safety assurance (e.g., barrier isolator filling), and increasing complexities of manufacture (e.g., conjugate vaccines). All of this must be accomplished while consistently delivering more than 1 billion doses annually at the relatively low cost of similar therapeutic products.

In the United States, vaccines are regulated as biological products. The U.S. Food and Drug Administration's (FDA) Center for Biologics Evaluation and Research (CBER) is responsible for regulating vaccines. Current authority for the regulation of vaccines resides primarily in Section 351 of the Public Health Service Act and specific sections of the Federal Food, Drug and Cosmetic Act.[5,6] Section 351 of the Public Health Service Act gives the federal government the authority to license biological products and the establishments where they are produced.[7] Vaccines undergo a rigorous review of laboratory, nonclinical, and clinical data to ensure safety, efficacy, purity, and potency. Vaccines approved for marketing may also be required to undergo additional studies to further evaluate the vaccine and often to address specific questions about the vaccine's safety, effectiveness, or possible side effects.[8]

In the European Union, animal and human vaccines are regulated by the European Medicines Agency (EMA), whose main responsibility is the promotion of public and animal health. The EMA's Committee on Medicinal Products for Human Use through its Vaccine Working Party has oversight for human vaccines. Vaccines are licensed through a centralized procedure that allows for simultaneous licensure within all countries within the European Union. Human vaccines manufacturing is regulated under a Good Manufacturing Practices (GMP) Directive 200/94/EEC, Annex 16, and Annex 2.

Harmonization of licensing and regulating procedures for vaccines worldwide has obvious benefits in rapidly delivering safe and effective vaccines to the market. Impediments to harmonization include lack of standardized regulatory procedures and mutual recognition of licenses and inspections between countries and worldwide regulatory agencies. Harmonization of regulation continues to progress as joint FDA-EMA establishment inspections programs have become a

reality and adherence to International Conference on Harmonisation (ICH) guidance is expected.

New vaccines are subjected to a well-defined regulatory process for approval. The approval process consists of four principal elements:

- Preparation of preclinical materials for proof-of-concept testing in animal models; manufacture of clinical materials according to current GMP; and toxicology analysis in an appropriate animal system.
- Submission of an investigational new drug (IND) application for submission to FDA for review.
- Testing for safety and effectiveness through clinical and further nonclinical studies (Phase I to Phase III clinical studies).
- Submission of all clinical, nonclinical, and manufacturing data to the FDA and EMA in the form of a Biologics License Application (BLA) for final review and licensure.

This chapter outlines the basics of manufacturing a vaccine and a description of some examples of currently licensed products. It then moves to the regulatory requirements for vaccine manufacturing including current GMP compliance, and then discusses the development of new vaccines. The final section examines the great challenges in the field to deliver a product held to an ever-increasing standard of safety while providing sufficient doses at reasonable costs for an ever-increasing number of diseases.

## MANUFACTURING BASICS

The manufacture of vaccines is composed of several basic steps that result in the finished product. Table 5.1 summarizes these steps with examples for pathogens that have a licensed vaccine. The first step is the generation of the antigen used to induce an immune response. This step includes the generation of the pathogen itself (for subsequent inactivation or isolation of a subunit) or generation of a recombinant protein derived from the pathogen. Vaccines under development use additional methods that will be discussed later. Viruses are grown in cells, which can be either primary cells, such as chicken fibroblasts (e.g., yellow fever vaccine), or continuous cell lines, such as MRC-5 (e.g., hepatitis A vaccine). Bacterial pathogens are grown in bioreactors using medium developed to optimize the yield of the antigen while maintaining its integrity. Recombinant proteins can be manufactured in bacteria, yeast, or cell culture. The viral and bacterial seed cultures and the cell lines used for viral production are carefully controlled, stored, characterized, and, often, protected. The first step in manufacture is the establishment of a "master cell bank." This is a collection of vialed cells that form the starting material for all future production. It is extensively characterized for performance and the absence of any adventitious agents. From this bank, working cell banks are prepared that are used as the routine starting culture for production lots. The final vaccine is a direct function of its starting materials, and a change in this seed can be as complicated as initiating a new product development altogether.

51

Appx11451

TABLE 5.1 Examples of Licensed Vaccine Manufacturing Processes

| Disease | Trade Name | Generic Name | Cell Culture/Formulation | Isolation | Purification | Formulation | Preservative |
|---|---|---|---|---|---|---|---|
| Anthrax | BioThrax | Anthrax Vaccine Adsorbed | Chemically defined protein-free media grown in microaerophilic cultures of aerated, nonencapsulated Bacillus anthracis | ND | Sterile filtration of culture medium | Aluminum hydroxide | Benzethonium and formaldehyde |
| Hemophilus influenzae | ActHIB | Hemophilus b Conjugate Vaccine (Tetanus Toxoid Conjugate) | Growth of Haemophilus influenzae type b strain 1482 grown in a semisynthetic medium | Centrifugation | Phenol extraction and alcohol precipitation with polysaccharide conjugated to tetanus toxoid | Lyophilized | None |
| Hepatitis A | Havrix | Hepatitis A Vaccine inactivated | Hepatitis A strain HM175 propagated in MRC-5 human diploid cells | Cells lysed to form a suspension | Purification by ultrafiltration and gel permeation chromatography followed by formalin inactivation | Adsorbed onto aluminum hydroxide | 2-Phenoxyethanol |
| Hepatitis B | Recombivax HB | Hepatitis B Vaccine (recombinant) | Recombinant hepatitis B surface antigen (HBsAg) produced in yeast cells grown in a complex medium of elements of yeast, soy peptone, dextrose, amino acids, and mineral salts | Released from yeast by cell disruption | Series of chemical and physical methods (HB) followed by treatment with formaldehyde | Aluminum hydroxide with amorphous aluminum hydroxyphosphate sulfate | None |
| Influenza | Fluzone | Inactivated Influenza Virus Vaccine | Propagation in embryonated chicken eggs | Low-speed centrifugation and filtration | Purification/concentration on sheet sucrose density gradient using continuous flow centrifugation followed by additional purification by chemical means | Phosphate-buffered saline with gelatin or sucrose | Thimerosal in some package configurations |
| Japanese encephalitis | JE-VAX | Japanese Encephalitis Virus Vaccine Inactivated | Intracerebral inoculation of mice | Harvest of brain tissue homogenization | Centrifugation, supernatant collection followed by formaldehyde inactivation further purification by ultracentrifugation through 40% sucrose | Lyophilized | Thimerosal |
| Measles, mumps, rubella, and varicella | ProQuad | Measles, Mumps, Rubella (Oka) Merck Virus Vaccine Live | Measles virus propagated in chick embryo cell culture, mumps virus in chick embryo cell culture, rubella virus propagated in WI-38 human diploid lung fibroblasts, varicella virus propagated on MRC-5 cells | ND | ND | Lyophilized | None |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Meningococcal | Menactra | Meningococcal (groups A, C, Y, and W-135) Polysaccharide Diphtheria Toxoid Conjugate Vaccine | Meningococcal strains are cultured individually on Mueller-Hinton agar and grown in Watson-Scherp media; Corynebacterium diphtheriae grown on modified Mueller and Miller medium | Extraction of polysaccharide from cell | Polysaccharide purified by centrifugation, detergent precipitation, alcohol precipitation, solvent extraction, and diafiltration; diphtheria purified by ammonium sulfate fractionation and diafiltration; conjugate purified by serial diafiltration | Sodium phosphate–buffered isotonic sodium chloride | None |
| Pneumococcal | Prevnar | Pneumococcal 13-valent Conjugate Vaccine (Diphtheria CRM197 Protein) | Streptococcus pneumoniae serotypes 1, 3, 4, 5, 6A, 6B, 7 F, 9 V, 14, 18 C, 19A, 19 F, and 23 F individually grown on soy peptone broth; C. diphtheriae strain containing CRM197 grown in casamino acids and yeast extract-based medium | Polysaccharides isolated by centrifugation; CRM197 ND | Polysaccharides purified by precipitation, ultrafiltration, and column chromatography; CRM197 purified by ultrafiltration, ammonium sulfate precipitation, and ion-exchange chromatography; conjugation done by reductive amination and the conjugate purified by ultrafiltration and column chromatography | Aluminum hydroxide suspension | None |
| Polio | IPOL | Poliovirus Vaccine Inactivated | Types 1, 2, and 3 poliovirus individually grown in Vero cells on microcarriers using Eagle MEM modified medium supplemented with newborn calf serum | Clarification (method ND) and concentration | Purification by three chromatography steps: anion exchange, gel filtration, and anion exchange; inactivation by formalin | Medium M-199 | 2-Phenoxy-ethanol |
| Rabies | RabAvert | Rabies Vaccine | Rabies virus grown in primary culture of chicken fibroblasts in synthetic cell culture medium with the addition of human albumin, polygeline, and antibiotics | Inactivated with β-propiolactone | Purification by zonal centrifugation in a sucrose density gradient | Stabilized with buffered polygeline and potassium glutamate; lyophilized | None |
| Streptococcus pneumoniae | Pneumovax | Pneumococcal vaccine polyvalent | ND | ND | ND | Isotonic saline | Phenol |
| Typhoid fever | Vivotif | Typhoid Vaccine Live Oral Ty21a | Fermentation using medium containing a digest of yeast extract, an acid digest of casein, dextrose, and galactose | Centrifugation | ND | Enteric-coated capsule containing lyophilized product | None |
| Yellow fever | YF-Vax | Yellow Fever Vaccine | Strain 17D-204 of yellow fever is cultured on living avian leukosis virus-free chicken embryos | Homogenization | Centrifugation | Lyophilized product containing gelatin and sorbitol as stabilizer | None |

Data from vaccine package inserts.
ND, not disclosed.

Case: 23-2553   Document: 19-8   Page: 552   Date Filed: 12/06/2023

Appx11453

The next step is to release the antigen from the substrate and isolate it from the bulk of the environment used in its growth. This can be isolation of free virus or of secreted proteins from cells or of cells containing the antigen from the spent medium. The next step is purification of the antigen. For vaccines that are composed of recombinant proteins, this step may involve many unit operations of column chromatography and ultrafiltration. For an inactivated viral vaccine, there may simply be inactivation of isolated virus with no further purification. The formulation of the vaccine is designed to maximize the stability of the vaccine while delivering it in a format that allows efficient distribution and preferred clinical delivery of the product. The formulated vaccine may include an adjuvant to enhance the immune response, stabilizers to prolong shelf life, and/or preservatives to allow multidose vials to be delivered.

Formulation consists of combining all components that constitute the final vaccine and uniformly mixing them in a single vessel (Fig. 5.1). Operations are conducted in a highly controlled environment with employees wearing special protective clothing to avoid contamination with adventitious agents. Control monitoring of the environment and critical surfaces is conducted during operations. Quality control (QC) testing at this stage usually consists of safety, potency, purity, sterility, and other assays specific to the product.

During this phase, individual, scrupulously cleaned, depyrogenated, single-dose or multidose containers are filled with vaccine and sealed with sterile stoppers or plungers. If the vaccine is to be lyophilized, the vial stoppers are inserted only partially to allow moisture to escape during the lyophilization process, and the vials are moved to a lyophilization chamber. All vials receive outer caps over the stopper for container closure integrity. To preclude the introduction of extraneous viable and nonviable contamination, all filling operations must take place in a highly controlled environment where people, equipment, and components are introduced into the critical area in a controlled manner. After filling, all containers are inspected using semiautomated or automated equipment designed to detect any minute cosmetic and physical defects. As with the formulation phase of the vaccine manufacturing operation, extensive control and monitoring of the environment and critical surfaces are conducted during operations. QC testing at this stage also consists of safety, potency, purity, sterility, and other assays that may be specific to the product.

Vaccine efficacy can be adversely affected by improper distribution and storage conditions. The sensitivity of vaccines to



**Figure 5.1.** Automated vaccine formulation vessels.

adverse environmental conditions, particularly temperature extremes, varies depending on their composition. Live attenuated vaccines tend to be more susceptible than inactivated vaccines and toxoids.[1] Vaccines are formulated such that the potency at the end of shelf-life remains above the effective dose demonstrated in human clinical trials. As the product may degrade over the 2 to 3 years of shelf life, the release target potency may be significantly above the specified end-of-shelf-life specification. This "overformulation" can represent a significant production yield loss and cost-of-goods increase for the final product in order to support the necessary lead times to deliver and store the vaccines, especially if they are used as a rotating stockpile to protect against supply interruption or an emergency use that does not materialize. The addition of stabilizers or lyophilization, when feasible, tends to improve the thermal resistance of vaccines. Storage at very low temperatures within the manufacturing supply chain may be used to reduce potency loss during storage.

Although recommended storage conditions for many vaccines have been detailed,[9] the vaccine manufacturers are responsible for developing data before and after licensing that demonstrate the stability of their vaccines under recommended storage conditions for the claimed shelf life. Generally, these programs provide data in excess of the claimed shelf life (up to 3 years) to support the development of new products intended for clinical use, as well as routine support of currently marketed products, expiration date extension, and supporting distribution conditions.[10,11] Accelerated studies conducted at elevated temperatures are commonly applied to better understand the impact of transient temperature excursions on the vaccine. Manufacturers are required to assure that products under their control are maintained under appropriate conditions so that the identity, strength, quality, and purity of the products are not affected.[12]

Currently, only a limited number of vaccines are required by federal regulation to have specified shipping temperatures.[10] Although most vaccine manufacturers use insulated containers and other precautions for the brief (usually 24 to 72 hours) shipping time, occasional, unanticipated temperature excursions may occur that could have a detrimental impact on the shipped product. Before accepting any vaccine shipment, users should look for any evidence of improper transportation conditions, including excessive transport time and possible adverse ambient temperature conditions.[1]

## EXAMPLES OF VACCINE PRODUCTION

### Inactivated Virus (Influenza)

Influenza virus vaccine for intramuscular use is a sterile suspension prepared from influenza viruses propagated in chicken embryos. This vaccine is the primary method for preventing influenza and its more severe complications.[13]

Typically, influenza vaccine contains two strains of influenza A viruses (H1N1 and H3N2) and a single influenza B virus. An additional strain of the influenza B virus was added, with the first four-antigen-containing-vaccine licensed in 2012.[14] The two type A viruses are identified by their subtypes of hemagglutinin and neuraminidase. The hemagglutinin and neuraminidase glycoproteins of influenza A virus comprise the major surface proteins and the principal immunizing antigens of the virus. These proteins are inserted into the viral envelopes as spike-line projections in a ratio of approximately 4 : 1.[15]

The trivalent subunit vaccine is the predominant influenza vaccine used today. This vaccine is produced from viral strains that are identified early each year by the World Health Organization, the Centers for Disease Control and Prevention

**Appx11454**

(CDC), and CBER. For U.S.-licensed manufacturers, the viral strains are normally acquired from CBER or CDC. European strains are typically provided by the National Institute for Biological Standards and Control, and Southern Hemisphere strains by the Therapeutic Goods Administration of Australia. These viral strains are used to prepare cells banks at each manufacturer, which cell banks are ultimately used as the inoculums for vaccine production.

The substrate most commonly used by producers of influenza vaccine is the 11-day-old embryonated chicken egg. A monovalent virus (suspension) is received from CBER or the CDC. The monovalent virus suspension is passed in eggs. The inoculated eggs are incubated for a specific time and temperature regimen under controlled relative humidity and then harvested. In the European Union, the number of passages from the original sample is limited. The harvested allantoic fluids, which contain the live virus, are tested for infectivity, titer, specificity, and sterility. These fluids are then stored wet frozen at extremely low temperatures to maintain the stability of the monovalent seed virus (MSV).[15] This MSV is also certified by CBER.

Once the MSV is introduced into the egg by automated inoculators, the virus is grown at incubated temperatures, and then the allantoic fluid is harvested and purified by high-speed centrifugation on a sucrose gradient or by chromatography. The purified virus is often split using a detergent before final filtration. The virus is inactivated using formaldehyde before or after the primary purification step, depending on the manufacturer. This is repeated for three or four strains of virus, and the individually tested and released inactivated viral concentrates are combined and diluted to final vaccine strength. Fig. 5.2 outlines the overall process.

The inactivated virus vaccine described above is used for the majority of flu vaccine produced and sold today. In recent years, the inactivated influenza vaccine produced on mammalian cell culture has been approved in a number of countries. The process replaces the egg-based virus expansion with a certified cell line; the downstream processes are similar, but focused on removing the host cell protein and DNA to below designated thresholds. A recombinant influenza vaccine, produced in insect cells infected with a recombinant baculovirus to express the hemagglutinin protein has also been approved in the United States.

## Recombinant Protein (Hepatitis B)

In July 1986, a recombinant hepatitis B vaccine was licensed in the United States. This vaccine built on the knowledge that heat-inactivated serum containing hepatitis B virus (HBV) and hepatitis B surface antigen (HBsAg) was not infectious, but was immunogenic and partially protective against subsequent exposure to HBV.[17] HBsAg was the component that conferred protection to HBV on immunization.[18] To produce this vaccine, the gene coding for HBsAg, or "S" gene, was inserted into an expression vector that was capable of directing the synthesis of large quantities of HBsAg in *Saccharomyces cerevisiae*. The HBsAg particles expressed by and purified from the yeast cells have been demonstrated to be equivalent to the HBsAg derived from the plasma of the blood of hepatitis B chronic carriers.[17,19,20]

The recombinant *S. cerevisiae* cells expressing HBsAg are grown in stirred tank fermenters. The medium used in this process is a complex fermentation medium that consists of an extract of yeast, soy peptone, dextrose, amino acids, and mineral salts. In-process testing is conducted on the fermentation product to determine the percentage of host cells with the expression construct.[7] At the end of the fermentation process, the HBsAg is harvested by lysing the yeast cells. It is

separated by hydrophobic interaction and size-exclusion chromatography. The resulting HBsAg is assembled into 22-nm–diameter lipoprotein particles. The HBsAg is purified to greater than 99% for protein by a series of physical and chemical methods. The purified protein is treated in phosphate buffer with formaldehyde, sterile filtered, and then coprecipitated with alum (potassium aluminum sulfate) to form bulk vaccine adjuvanted with amorphous aluminum hydroxyphosphate sulfate. The vaccine contains no detectable yeast DNA but may contain not more than 1% yeast protein.[7,19,21] In a second recombinant hepatitis B vaccine, the surface antigen expressed in *S. cerevisiae* cells is purified by several physiochemical steps and formulated as a suspension of the antigen absorbed on aluminum hydroxide. The procedures used in its manufacturing result in a product that contains no more than 5% yeast protein. No substances of human origin are used in its manufacture.[20] Vaccines against hepatitis B prepared from recombinant yeast cultures are noninfectious[20] and are free of association with human blood and blood products.[19]

Each lot of hepatitis B vaccine is tested for safety, in mice and guinea pigs, and for sterility.[19] QC product testing for purity and identity includes numerous chemical, biochemical, and physical assays on the final product to assure thorough characterization and lot-to-lot consistency. Quantitative immunoassays using monoclonal antibodies can be used to measure the presence of high levels of key epitopes on the yeast-derived HBsAg. A mouse potency assay is also used to measure the immunogenicity of hepatitis B vaccines. The effective dose capable of seroconverting 50% of the mice ($ED_{50}$) is calculated.[21]

Hepatitis B vaccines are sterile suspensions for intramuscular injection. The vaccine is supplied in four formulations: pediatric, adolescent/high-risk infant, adult, and dialysis.

All formulations contain approximately 0.5 mg of aluminum (provided as amorphous aluminum hydroxyphosphate sulfate) per milliliter of vaccine.[19] Table 5.2 summarizes the QC testing requirements for the release of recombinant hepatitis B vaccine.

Most vaccines are still released by CBER on a lot-by-lot basis; but for several extensively characterized vaccines, such as hepatitis B and human papillomavirus (HPV) vaccines, which are manufactured using recombinant DNA processes, this requirement has been eliminated.. Their manufacturing process includes significant purification, and they are extensively characterized by their analytical methods. In addition, hepatitis B vaccine had to demonstrate a "track record" of continued safety, purity, and potency to qualify for this exemption.[7,22]

**TABLE 5.2** Testing Requirements for the Release of Recombinant Hepatitis B Vaccine

| Type of Test | Stage of Production |
|---|---|
| Plasmid retention | Fermentation production |
| Purity and identity | Bulk-adsorbed product or nonadsorbed bulk product |
| Sterility | Final bulk product |
| Sterility | Final container |
| General safety | Final container |
| Pyrogen | Final container |
| Purity | Final container |
| Potency | Final container |



Embryonated eggs inspected and components (raw material) sampled/tested

↓

Certified influenza monovalent seed virus suspension inoculated into eggs

↓

Inoculated eggs incubated

↓

Eggs inspected and viable eggs refrigerated

↓

Allantoic fluid from eggs harvested (contains the live virus)

↓

Virus concentrated, purified, and inactivated

↓

Whole virus reduced to subunit particles by adding disrupting agents

↓

Purification of split virus

↓

Preservative and stabilizers added (if required)

↓

Sterile filtration of split virus concentrate

↓

Monovalent split virus concentrate

↓

| Type A monovalent $H_1N_1$ split virus concentrate/concentrate pool | Type A monovalent $H_3N_2$ split virus concentrate/concentrate pool | Type B monovalent split virus concentrate/concentrate pool |
|---|---|---|
| CBER and QC potency testing (CBER-assigned potency) | CBER and QC potency testing (CBER-assigned potency) | CBER and QC potency testing (CBER-assigned potency) |

↓

Final bulk-trivalent types A and B influenza split virus vaccine

↓

QC and CBER release

↓

Bulk aseptically filled into final containers

↓

100% inspection for particulated and other defects

↓

Final containers labeled

↓

Containers packaged

↓

QA/QC release

↓

Ship to customer

**Figure 5.2. Egg-based influenza vaccine manufacturing process flow.** CBER, Center for Biologics Evaluation and Research (of the U.S. Food and Drug Administration); QA, quality assurance; QC, quality control.

## Conjugate Vaccine (*Haemophilus influenzae* Type B)

The production of *Haemophilus influenzae* type b (Hib) conjugate includes the separate production of capsular polysaccharide from Hib and a carrier protein such as tetanus protein from *Clostridium tetani* (i.e., purified tetanus toxoid), CRM

protein from *Corynebacterium diphtheriae*, or outer membrane protein complex of *Neisseria meningitidis*.

The capsular polysaccharide is produced in industrial bioreactors using approved seeds of Hib. A crude intermediate is recovered from fermentation supernatant, using a cationic detergent. The resulting material is harvested by continuous-flow centrifugation. The paste is then resuspended in buffer,

and the polysaccharide is selectively dissociated from disrupted paste by increasing the ionic strength. The polysaccharide is then further purified by phenol extraction, ultrafiltration, and ethanol precipitation. The final material is precipitated with alcohol, dried under vacuum, and stored at −35°C for further processing.

Tetanus protein is prepared in bioreactors using approved seeds of *C. tetani*. The crude toxin is recovered from the culture supernatant by continuous-flow centrifugation and diafiltration. Crude toxin is then purified by a combination of fractional ammonium sulfate precipitation and ultrafiltration. The resulting purified toxin is detoxified using formaldehyde, concentrated by ultrafiltration, and stored at between 2°C and 8°C for further processing.

The industrial conjugation process was initially developed using tetanus toxoid by a team headed by J.B. Robbins at the National Institute of Allergy and Infectious Diseases (NIAID), Bethesda, Maryland.[23]

Conjugate preparation is a two-step process that involves: (a) activation of the Hib capsular polysaccharide and (b) conjugation of activated polysaccharide to tetanus protein through a spacer. Activation includes chemical fragmentation of the native polysaccharide to a specified molecular weight target and covalent linkage of adipic acid dihydrazide. The activated polysaccharide is then covalently linked to the purified tetanus protein by carbodiimide-mediated condensation using 1-ethyl-3(3-dimethylaminopropyl)carbodiimide. Purification of the conjugated material is performed to obtain high-molecular-weight conjugate molecules devoid of chemical residues and free protein and polysaccharide. Conjugate bulk is then diluted in an appropriate buffer, filled into unit-dose and/or multidose vials, and lyophilized.

## Live Attenuated Vaccine (Measles)

The measles virus, isolated in 1954, is part of the genus *Morbillivirus* in the family Paramyxoviridae. Current vaccines are derived from Edmonston, Moraten, or Schwarz strains. Such vaccines have been on the market since the 1960s and in combination (measles, mumps, rubella [MMR]) since the 1970s. The final vaccine is a live attenuated viral vaccine inducing immunity in more than 90% of recipients.

For one measles vaccine, the manufacture of the vaccine starts with specific pathogen-free embryonated chicken eggs that are incubated several days. The embryos are collected and treated with trypsin to prepare the chick embryo fibroblasts for cell culture. All of the operations are done under strict aseptic conditions, performed by well-trained operators.

Cell culture are grown in roller bottles using fetal calf sera and M199 Hanks media for optimal cell growth. Chick embryo fibroblast cells are further infected by the viral working seed and incubated several days for viral culture. At the end of the viral culture, the cells are disrupted by mechanical lysis to release the virus. The virus is purified by centrifugation and filtration and stored frozen. After release of all QC tests, the vaccine is formulated alone or with mumps and rubella vaccines and lyophilized to obtain the stable product. The vaccine is reconstituted just before use.

Other manufacturers use different cell substrates; for example, the Serum Institute of India uses human diploid cells to manufacture their measles vaccine (see http://www.seruminstitute.com/content/products/product_mvac.htm).

## Virus-Like Particle–Based Vaccines

Traditional viral vaccines rely on attenuated virus strains or inactivation of infectious virus. Subunit vaccines based on

viral proteins expressed in heterologous systems have been effective for some pathogens, but have often had poor immunogenicity because of incorrect folding or modification.[24] Virus-like particles (VLPs) are designed to mimic the overall structure of virus particles and, thus, preserve the native antigenic conformation of the immunogenic proteins. VLPs have been produced for a wide range of taxonomically and structurally distinct viruses and have unique *potential* advantages in terms of safety and immunogenicity over previous approaches.[1] Attenuation or inactivation of the VLP is not required; this is particularly important as epitopes are commonly modified by inactivation treatments.[25] However, if a viral vector (e.g., baculovirus) is used as the expression system, inactivation may be required if the purification process cannot eliminate residual viral activity.

For a VLP to be a realistic vaccine candidate, it needs to be produced in a safe expression system that is easy to scale up to large-scale production[1] and by an accompanying purification and inactivation process that will maintain native structure and immunogenicity and will meet the requirements of today's global regulatory authorities. A number of expression systems manufacture multimeric VLPs, including the baculovirus expression system (BVES) in Sf9 and High Five cells, *Escherichia coli, Aspergillus niger,* Chinese hamster ovary cells, human function liver cells, baby hamster kidney cells, transgenic plants (potato, tobacco, soybean), *S. cerevisiae, Pichia pastoris,* human embryonic kidney 293 (HEK293) cells, and lupin callus (a plant-cell production system) with yields ranging from 0.3 to 10 μg/mL or as high as 300 to 500 μg/mL with *E. coli* and HEK293 (purified).[2]

The BVES has proven quite versatile, demonstrating the capability of preparing vaccine candidates for papillomavirus, feline calicivirus, hepatitis E virus, porcine parvovirus, chicken anemia virus, porcine circovirus, SV40 (simian virus 40), poliovirus, bluetongue virus, rotavirus, hepatitis C virus, HIV, simian immunodeficiency virus, feline immunodeficiency virus, Newcastle disease virus, severe acute respiratory syndrome (SARS) coronavirus, Hantaan virus, influenza A virus, and infectious bursal disease virus.[1]

Many pathogenic viruses, such as influenza, HIV, and hepatitis C, are surrounded by an envelope, a membrane that consists of a lipid bilayer derived from the host cell, inserted with virus glycoprotein spikes. These proteins are targets of neutralizing antibodies and are essential components of a vaccine. Owing to inherent properties of the lipid envelope, assembly of VLPs in insect cells for these viral vaccines is a different type of technical challenge to those produced viruses with multiple capsids.[1] For these targets, production of VLPs is a challenging task because the synthesis and assembly of one or more recombinant proteins may be required. This is the case for VLPs of rotavirus, which is an RNA virus with capsids formed by 1860 monomers of four different proteins. In addition, the production of most VLPs requires the simultaneous expression and assembly of several recombinant proteins, which, in the case of RLP, needs to occur in a single host cell.[26] Purification of VLPs also constitutes a particularly challenging task. VLPs are structures of several nanometers in diameter and of molecular weights in the range of $10^6$ Da. Also, for guaranteeing the quality of the product, it is not sufficient to demonstrate the absence of contaminant proteins; it is also necessary to show that proteins are correctly assembled into VLPs.

Production of HPV VLPs represents another challenge. The HPV type 16 major 55-kDa capsids protein, L1, when produced in certain recombinant expression systems such as *S. cerevisiae,* can form irregularly shaped VLPs with a broad size distribution. These HPV VLPs are inherently unstable and tend to aggregate in solution. The primary challenge of HPV vaccine

formulation development was the preparation of aqueous HPV VLP solutions that are stable under a variety of purification, processing, and storage conditions. By treating the HPV VLPs through a process of disassembly and reassembly, the stability and in vitro potency of the vaccine are enhanced significantly. In addition, the in vivo immunogenicity of the vaccine was also improved by as much as approximately 10-fold, as shown in mouse potency studies.[27] The disassembly and reassembly of particles may also be important to remove residual proteins from the expression system or host cells used in the production and is a serious processing challenge, particularly for enveloped VLPs.

## PRODUCT DEVELOPMENT

Vaccine development involves the process of taking a new antigen or immunogen identified in the research process and developing this substance into a final vaccine that can be evaluated through preclinical and clinical studies to determine the safety and efficacy of the resultant vaccine. During this process, the product's components, in-process materials, final product specifications, and manufacturing process are defined. The manufacturing scale used during development is usually significantly smaller than that used in the final manufacturing process. Phase I and, sometimes, Phase II clinical trial vaccines are typically produced in product development, but it is usually anticipated that at least one of the three or more consistency lots used for Phase III clinical trials will be manufactured at full-scale production volume. The product manufactured during the development phase is manufactured according to current GMP.[28]

## INDUSTRY'S RESPONSE TO NEW CHALLENGES
## Manufacturing Flexibility in Scale-Up: New Trends in Single Use

Early vaccines were produced in vivo (e.g., infecting calves with cowpox or rabbits with rabies virus; indeed, most influenza virus vaccines are still made in chicken embryos) and used neat or purified with largely glass lab equipment. Later, the animal cells used for viral vaccines were grown in vitro (e.g., roller bottles) and then infected to amplify virus for viral vaccines; later these cells were grown on microcarriers in deep culture to enable high manufacturing volumes and efficiencies. Microbial vaccines have been produced in large (500 to 5000 L) bioreactors at larger scale. These products were processed in stainless steel equipment for purification. Large-scale production was used to increase capacity to meet the increased demand for these lifesaving products. The cost of these facilities was increasingly expensive through the past few decades, and systems were increasingly complex to automate, clean, sterilize, and validate the facilities for manufacturing. Large central manufacturing facilities enabled lower cost of manufacturing; higher volumes were needed to lower the high fixed cost of construction, validation, and operation. The large central facilities were increasingly efficient, but also limited the manufacturing to a limited number of sites in developed countries.

Higher production yields and new manufacturing techniques, and an increasing focus on personalized medicine and niche products (e.g., low-volume products for rare diseases),[29] has allowed a new paradigm of smaller manufacturing facilities and bioreactors. The advent of disposable single-use equipment has eliminated the high cost of cleaning and sterilizing manufacturing equipment, reducing the complexity and cost of manufacturing facilities, and allowing economical

manufacturing at smaller scale. Manufacturing systems that were enabled by 100% single-use technology enabled competitive pricing and a significant time advantage in smaller facilities.[30] The promise of the technology is clear and has triggered a significant investment by equipment developers into the single-use space.

The single-use promise is significant; however, there are a number of hurdles as in any new technology format. Glass and stainless steel equipment of historical manufacturing processes is generally inert and do not contribute impurities to the manufacturing process. The polymers used in single-use equipment may have different reactivity with the product (extractables and leachables), have been shown to shed particulate, and have shown a tendency to leak. Many of these concerns are being overcome in time through polymer engineering, and altering production techniques. Next, the ability to eliminate the high cost of cleaning and sterilizing equipment requires that the entire system be single-use. Many processes have not been able to make this conversion because of yield (low yield means high volume; volumes >2000 L are challenging because of weight and hydrostatic pressure), pressure (high $O_2$ demand, aeration volume, or flow rate), solvent use, and temperature control (heat transfer limitations). Chromatography also has been a challenging process in single-use systems, although there are promising advances and increasing options for prepacked columns.[29]

With the promise and dynamic pace of advancement in single-use systems, manufacturers are faced with a plethora of options and a jigsaw puzzle of parts to connect effectively. As the industry is rather new, the standards necessary to allow interconnectivity of parts are still marginal but gaining attention.[31] Standards are in development for extractables and leachables, particulate classification and management, integrity, supplier evaluation, and interchangeability. Governing and sponsoring agencies include Parental Drug Associate, Bio-Process Systems Alliance, Extractables and Leachables Safety Information Exchange, Product Quality Research Institute, International Society of Pharmaceutical Engineers, American Society for Testing Materials, and United States Pharmacopeia, to name a few. Managing standards will be key to an effective use and integration of technologies supporting the vision of 100% single-use, reliable contingency supplies, robust supply chains, and limited surprises in change management.

## Promise and Challenges of Distributed Manufacturing

One major advantage of the right-sized, single-use process is the ability to support distributed manufacturing. Today, a vast majority of supply of vaccines comes from a handful of developed countries because of the cost and complexity of the large-scale facilities and the profitability of those markets that support the significant manufacturing and clinical investment of public companies necessary to license and manufacture a vaccine. Once a large facility is built, duplicating it is a significant challenge as the complexity of the support systems essentially makes every facility unique. The advent of low-capital, single-use manufacturing platforms supports "scale-out" of processes built with "off-the-shelf" single-use systems, truly duplicating the original licensed process and minimizing the challenge of providing equivalence of the product from new facilities to the original facility. One can also imagine making clinical materials at modest scale and avoiding the challenge of scale-up for all markets, which could leverage addition of multiple single-use bioreactors instead of a large stainless system as demand grows. The approach supports a "pay-as-you-go" capital approach, avoiding large investments prior to demonstrating proof of concept and has the promise to make

Case: 23-2553    Document: 76-8    Page: 558    Date Filed: 12/06/2023

product available more broadly and more quickly after license through global partnerships and distribution of facilities nearer to the market they will serve. It is well aligned with the current developing policies of multiple emerging economies to be self-reliant for essential services like vaccine supply. For example, a 2009 agreement between GlaxoSmithKline and Brazil describes the sale of GlaxoSmithKline pneumococcal conjugate vaccine to Brazil for 8 years, with an agreement to transfer the manufacturing process to Brazil for potential use in future years.[32]

The distributed manufacturing approach has many benefits including limiting global supply shortages from a catastrophic event at a single plant, the ability to customize a product for a region (e.g., strain of organism changing by region), and offsetting some of the cost of manufacturing (potentially paid by government) with tax-generating local jobs. There are some challenges to be considered. Maintaining alignment of the process among multiple facilities can be challenging in biological manufacturing processes. A process can "drift" in any single plant; having multiple manufacturing plants increases the chances that at least one plant will drift from the licensed, proven process. Likewise, control of raw material quality and source, single-use component supply, changes in supplier's materials in components, and similar unintended, unexpected consequences can leave a region without supply until the issue is identified and resolved. Single-use systems are ever improving; keeping the very specific needs of a process may be challenging with multiple small purchasers of the equipment versus a large central organization. Managing the regulatory files of a diverse production approach within a single company or across companies for a single product may also be difficult for regulators.

In spite of the challenges noted, the benefits of the distributed model, the advancement of standards within single-use manufacturers and the solutions that come with the experience of expanded use are sure to make this a reality in time.

## Future Challenges in Polio Vaccine Manufacturing

The manufacture of polio vaccines began in 1955, and ultimately resulted in two products that have been widely distributed: the Salk inactivated polio vaccine (IPV) and the Sabin live attenuated polio vaccine (OPV). The OPV is manufactured typically on a cell line with minimal purification postharvest. This combined with the relatively high productivity of doses/liter of capacity results in a lower cost of manufacture. Because the risk of vaccine-associated paralytic poliomyelitis (VAPP) is estimated at 0.42 per million[33] over a three-dose schedule, there is a planned transition to the Salk IPV as the polio comes closer to eradication. To ultimately make this switch, however, will require substantial increases in the capacity to manufacture IPV, and without productivity improvement, it would require substantial increases in the cost of delivering polio vaccines to the target populations.

The production of IPV as described in Table 5.1 shows that the virus must be grown in cell culture, and then purified using three chromatography steps, followed by inactivation. As with any bioprocess, each steps results in loss of material that reduces the overall productivity. Alternatively, OPV is manufactured on cell lines with minimal purification. In addition, the dose of a live viral vaccine is typically much lower than an inactivated one, also helping the productivity of the process. This is reflected in the pricing of these vaccines. UNICEF publishes the prices of vaccine procured, and in 2014 OPV in a 20-dose vial from the Serum Institute of India was \$0.14/dose, whereas IPV from Bilthoven Biologicals/Serum Institute of India in a five-dose vial was \$1.90/dose.[34]

An additional challenge is the World Health Organization (WHO) guidelines on the use of wild-type polio virus necessary for the manufacture of IPV. Given the potential for an accident in manufacturing that could release wild-type poliovirus into the environment, the WHO has recommended limiting wild-type manufacturing of IPV to geographies with high IPV coverage in the surrounding community (>90% and at least three doses), and in environments with low transmission potential.[35] Currently, most of the vaccines for global vaccination come from India and China, where the suppliers of vaccines have focused on low-cost production and delivery of vaccines, and these geographies are currently not an option for IPV manufacture based on the WHO GAPIII recommendations.

A variety of strategies are currently being developed in the field to address these challenges, including a focus on the manufacturing technologies utilized to manufacture IPV, and opportunities to increase productivity and reduce unit costs. Existing polio vaccine manufacturing processes were developed years ago and use stainless steel fixed infrastructure manufacturing processes. Newer single-use technologies allow lower costs for initial facility design and could be used for polio vaccine manufacturing. An analysis by Lopes and colleagues shows that using newer facility design approaches that include single-use technologies can reduce bulk IPV costs by 40%, predominantly by reducing the capital costs of the facility.[36] Another approach to decreasing the cost is to increase the productivity of the manufacturing process.

Optimization of cell culture conditions and use of alternative cell lines are being evaluated, which suggest much higher titers of wild-type virus that could drive down the costs of the vaccine. Thomassen and colleagues showed that Vero cell culture can be further optimized to increase the production of D-antigen threefold.[37] Crucell has presented data that show its PER.C6 human-derived cell line has productivity 30 times higher than the Vero cells that are currently used to manufacture IPV.[38]

To allow broader manufacture of polio vaccines, an alternative vaccine using the Sabin attenuated strains but then inactivating them is also being pursued (Sabin-IPV [sIPV]). These viruses have shown lower yields in cell culture, but further work is being done to optimize their expression and purification yields.[39,40] This work again is focusing on cell-line selection, optimization, and facility design. Most importantly, the use of sIPV will allow a broader geographic set of potential locations for manufacturing, including India and China where there is substantial manufacturing infrastructure for vaccines focused on low-cost manufacturing.

Just as the initial discovery of polio vaccines required innovation in manufacturing methods to enable their launch, the ultimate eradication of polio will require innovation in manufacturing to enable the full public health impact of the vaccines.

## Prime-Boost Vaccines

Given the complexities of developing vaccines for difficult targets like HIV, tuberculosis (TB), and malaria, a new tool has emerged that uses a "prime-boost" strategy for vaccination. The concept uses one vaccine as a prime, followed by the use of an entirely different vaccine for the boost. Most notably, an HIV vaccine efficacy trial in Thailand had a positive result using this approach. The Thai trial primed with a recombinant canarypox vector and followed with a recombinant gp120 protein boost.[41] Neither the canarypox nor the recombinant protein had shown efficacy on its own, but when combined gave a positive result in the trial. This approach has been used

**Appx11459**

in additional HIV vaccine efficacy testing,[47] TB vaccines,[43] and malaria,[44] among others.

Several challenges arise in the use of prime-boost vaccines that will need to be overcome if they are to be used in future licensed vaccines for distribution. The first is the complexity of multivalent vaccines. To have a successful batch release, prime-boost vaccines, like multivalent vaccines require successful manufacture and release of multiple components. For example, the HIV vaccines developed by the Vaccine Research Center at the National Institutes of Health (NIH) for HIV and tested for efficacy contained six plasmid DNA components in the prime, and five recombinant adenovirus vectors in the boost.[43] This requires the production of 10 separate active pharmaceutical ingredients, which must then be combined into two separate formulations and tested. Failure of any one component will delay both the ability to combine materials and the manufacturing of the final products. Yields of individual components and consequent costs can vary widely, requiring unique manufacturing supply chain designs that provide consistent supply of the projected demands.

A critical component of assay development for any vaccine is the development of a potency assay for release. With two vaccines required for efficacy testing, defining exactly what the potency requirements are from each component will be important during clinical studies to ensure that future batches for distribution meet these criteria. It may require a prime-boost immunogenicity evaluation in animals for batch release, which has decreased with improved in vitro methods for potency evaluation of vaccines.

Finally, most of the prime-boost approaches often involve multiple organizations or companies. Most vaccine companies focus on a core set of vaccine platform technologies, which allow them to build expertise in process development, assay development, and manufacturing facilities. Nearly all of

the vaccines cited for HIV, TB, and malaria use products from separate organizations. Ultimately, if the vaccines prove successful, there needs to be a single regulatory license holder responsible for the distribution of the vaccine, which requires careful collaboration between the different organizations for licensure and life-cycle management of the vaccines.

Most of the prime-boost vaccines being tested are for early clinical trials that are designed to see an early efficacy signal from the vaccine. Given this, there is limited focus on the future manufacturing supply chain and production costs. Even at these early stages of clinical studies, however, it is important to ensure partnerships are clearly defined among vaccine developers, and the clinical studies are designed to demonstrate the true requirement for the prime-boost regime and the characteristics that each component must elicit after immunization. Early cost modeling can help target investments in process development to ensure that a successful signal in efficacy testing can ultimately result in a vaccine that can be successfully manufactured and distributed to the target populations.

A final challenge will be the coordination of the supply chains. As two separate vaccines are required for complete immunizations and potentially different immunization times, deployment and supply of the vaccines have to be synchronized to demand. For routine immunizations this is relatively straightforward; but for any catch-up or mass vaccination campaigns, it requires care management of expiration dates and planning. Vaccine supply shortages are unfortunately not uncommon, and a requirement for multiple vaccines increases the possibility that one might not be continuously available, creating partially immunized and potentially off-schedule immunized individuals. The implications of these scenarios may have to be explored during Phase II dosing studies or postmarketing surveillance.

References for this chapter are available at ExpertConsult.com.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,
            *Plaintiffs,*
      v.
MERCK & CO., INC.,
            *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 113



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022162



GSK-MMR-IND-0022163

**Appx11463**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel*.,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,
                              *Plaintiffs,*
               v.
MERCK & CO., INC.,
                              *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 114

CONFIDENTIAL



1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022180

CONFIDENTIAL



2

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022181

CONFIDENTIAL



3

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022182

**CONFIDENTIAL**



4

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022183

CONFIDENTIAL



5

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022184

CONFIDENTIAL



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022185

**CONFIDENTIAL**



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0022186

**Appx11471**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

        *Plaintiffs,*

    v.

MERCK & CO., INC.,

        *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 115

Appx11472



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0029256



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0029257



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0029258



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0029259



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0029260



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0029261



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0029262



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

GSK-MMR-IND-0029263

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel*.,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

     *Plaintiffs,*

 v.

MERCK & CO., INC.,

     *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 116

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 1

1          IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

UNITED STATES OF AMERICA  : CIVIL ACTION
3   ex rel., STEPHEN A.      : NO. 10-04374(CDJ)
    KRAHLING and JOAN A.     :
4   WLOCHOWSKI,              :
         Plaintiffs,         :
5                            :
         vs.                 :
6                            :
    MERCK & CO., INC.,       :
7        Defendant.          :
    _____ : Master File No.
8   IN RE:  MERCK MUMPS      : 12-03555(CDJ)
    VACCINE ANTITRUST        :
9   LITIGATION               :
                             :
10  THIS DOCUMENT RELATES TO: :
    ALL ACTIONS              :
11                   -  -  -
12              December 5, 2018
13    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
14                   -  -  -
15        Videotaped deposition of DIPTI
16  GULATI, PhD, taken at the offices of Spector
17  Roseman & Kodroff, PC, 1818 Market Street,
18  Suite 2500, Philadelphia, Pennsylvania 19103,
19  beginning at 8:46 a.m., before LINDA
20  ROSSI-RIOS, a Federally Approved RPR, CCR and
21  Notary Public.
22
23
24

Appx11482

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 142

1  is part of the program, stability program.
2  Which study?
3      Q.    The ASM model, the advanced
4  stability model.
5          MS. SCHMIDT:  Sorry, what is
6      the question?
7  BY MR. MACORETTA:
8      Q.    Do you understand that CBER --
9  that Merck undertok that study at CBER's
10 recommendation?
11     A.    I don't understand which study
12 you're referencing.
13     Q.    Okay.  All right.  That's fine.
14 Let me go to the next sentence.  "Recent
15 calculations show...."
16         Do you see that sentence?
17     A.    I see that.
18     Q.    Okay.  It says it "...can
19 support an end expiry claim of 4.0...the
20 intermediate dose used in the...expiry
21 trial."
22         Do you see that?
23     A.    I see that.
24     Q.    But at the time the end expiry

Page 143

1  on the label was 4.3.  Right?
2          MS. SCHMIDT:  Objection.
3          THE WITNESS:  Yes, approved in
4      2000, it was 4.3.
5  BY MR. MACORETTA:
6      Q.    Yes.  So recent calculations
7  show that the new higher target of 5.0 and a
8  release of 5.0 can support 4.0.  Right?  But
9  they can't support 4.3.  Right?
10         MS. SCHMIDT:  Objection.
11         THE WITNESS:  I read that
12     sentence.  And I mean, do I agree with
13     that?  No, I don't.
14 BY MR. MACORETTA:
15     Q.    Why?
16     A.    Because this is written in
17 2002.  I mean, it's not clear which study
18 recent calculation, what calculation they're
19 talking about, that's one that's based on
20 which.  And if they're talking about the
21 Model 2, which is in my report, it could be
22 that, or it could be something else.  I mean,
23 just reading this sentence, I don't know.
24 Because there are hundreds of studies which

Page 144

1  are going on as you can see from the
2  supplements.
3      Q.    Well, if we assume this is a
4  high level report, you don't think it's just
5  some random study.  Right?
6          MS. SCHMIDT:  Objection.
7          THE WITNESS:  I agree that it
8      is high level report and it's not a
9      random study, but I need to know which
10     specific study they are talking about
11     here.
12 BY MR. MACORETTA:
13     Q.    Let's say it's Model 2 in your
14 report.
15     A.    Okay.
16     Q.    So Model 2 shows that they can
17 meet 4.0 but not 4.3.  Right?
18         MS. SCHMIDT:  Objection.
19         THE WITNESS:  Right.  As I said
20     in my report, that Model 2, like in
21     this particular case, I just want to
22     clarify that we are talking about the
23     overfill lots.
24 BY MR. MACORETTA:

Page 145

1      Q.    Well, that's what the sentence
2  talks about in Exhibit 4.  Right?
3      A.    Right.  So it's talking about
4  the overfill lots, and it's talking about the
5  Model 2 as it applies to overfill lots.  And
6  as I said in my report, that my -- this
7  Model 2 was developed as per request from
8  CBER in the warning letter to determine the
9  worst case scenario.  Like, if you, like,
10 assume that all the lots were released at
11 4.3, what would be the worst end expiry for
12 the lots if they're released at 4.3.
13         So Merck took the data from the
14 1995 to 1998 which was the worst log loss
15 period.  And based on only small data set for
16 the period of three years, it developed the
17 model.  And this showed the log loss of 1.0
18 and it was submitted in the prior approval
19 supplement and also the warning letter
20 response.  But if you look at the overall --
21 so, okay.  So that's what that model showed,
22 whatever data set is the small data set,
23 small number of years.  And it shows log loss
24 of, maximum log loss of 1.0, it was submitted

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 146

1  in the warning letter.  And as a result, what
2  is the end expiry was submitted in the
3  warning letter.
4       So what you mention here in
5  this Exhibit 4, this is like over titer --
6  overfill lots.  So that model doesn't -- like
7  I said in my report, that model is not
8  applicable to overfill lots because you don't
9  have the -- it's not based on the real, like,
10  data from the overfill lot because overfill
11  lots are manufactured differently, they're
12  tested differently and so the data set which
13  is this Model 2 is not applicable to overfill
14  lot.
15       Q.   Of course by October 2002, we
16  would have 24 months of stability data on
17  overfill lots, wouldn't we?
18       MS. SCHMIDT:  Objection.
19       THE WITNESS:  I mean, my
20  understanding in reading the
21  supplement and annual report, it was
22  by 2003, because I think the way they
23  put the stability, it takes the time
24  to collect the data and generate the

Page 147

1       report.  So I think by 2002 to 2003,
2       two years of data was available,
3       stability data was available and which
4       was not supporting in this model also.
5  BY MR. MACORETTA:
6       Q.   On the over -- two years of
7  data on the overfill lot was available?
8       A.   Yes.
9       Q.   Okay.  Where's the model that
10  analyzes that?
11       A.   You have --
12       Q.   Only the overfill lots.
13       A.   You have realtime data from
14  overfill lots.  I mean, you have those high
15  titer lots from 1998, 1999.  You have 2000.
16  I mean, all those -- you have, like, from
17  some years you have partial data and you have
18  full data set from 1990 -- high titer -- 1999
19  high titer lots.  And that's not supporting
20  this model.  It makes sense to me.
21       Q.   Well, why wouldn't you take the
22  realtime data on the overfill lots and redo
23  the model with what you believe to be the
24  better data?  Why didn't -- where is that

Page 148

1  model?
2       A.   I don't know.
3       MS. SCHMIDT:  Objection.  Form.
4  BY MR. MACORETTA:
5       Q.   It doesn't exist as far as you
6  know.  Right?
7       A.   That's correct.  What I have
8  seen, I don't see it.
9       Q.   There needed to be some model
10  for the overfill to figure out what overfill
11  was necessary to meet the end expiry.  Right?
12       MS. SCHMIDT:  Object to form.
13       THE WITNESS:  It's not a
14  general rule to have a model.  I mean,
15  what I'm looking when I read all the
16  documents and supplements, model 1 we
17  have this issue, we need to change the
18  target manufacturing, we are going to
19  start doing a historical analysis,
20  develop model, we did develop Model 1.
21  Now we have discussion from CBER to do
22  the worst case analysis assuming 4.3
23  is the release potency.  We develop
24  another model because we took the

Page 149

1       worst case lot, worst case period and
2       smaller data set and we saw what would
3       be the worst case scenario and worst
4       case expiry potency.
5            So we develop that lot -- that
6       data to analyze the lots in the
7       market, 1998 and 1999 lots which are
8       manufactured using old process.  So
9       that was that model.  So then -- now
10       we are -- we have overfill lots.  I
11       mean, do we have -- we have realtime
12       data and CBER analyzes the stability
13       based on the realtime data.  Do we
14       have to develop the model?  I mean,
15       what's the objective, why would we do
16       it?  Do we want to develop the model?
17       It all depends on what was required
18       and needed at that time.
19  BY MR. MACORETTA:
20       Q.   But as of October 1, 2002,
21  there doesn't seem to be a better model,
22  right, as of Gulati-4?
23       MS. SCHMIDT:  Objection.
24       THE WITNESS:  There is a model

38 (Pages 146 - 149)

Appx11484

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

          *Plaintiffs,*

    v.

MERCK & CO., INC.,

          *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 117

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1         IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2
    UNITED STATES OF AMERICA  : CIVIL ACTION
3   ex rel., STEPHEN A.       : NO. 2:10-04374(CDJ)
    KRAHLING and JOAN A.      :
4   WLOCHOWSKI,               :
            Plaintiffs,       :
5                             :
            vs.               :
6                             :
    MERCK & CO., INC.,        :
7         Defendant.          :
    _____  : Master File No.
8   IN RE:  MERCK MUMPS       : 2:12-cv-03555(CDJ)
    VACCINE ANTITRUST         :
9   LITIGATION                :
                              :
10  THIS DOCUMENT RELATES TO: :
    ALL ACTIONS               :
11
12    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
13              February 9, 2018
14
15         Videotaped 30(b)(6) deposition of
16  Merck & Co., Inc., through AMY KEEGAN, taken
17  at the offices of Spector Roseman & Kodroff,
18  1818 Market Street, Suite 2500, Philadelphia,
19  Pennsylvania 19103, beginning at 3:42 p.m.,
20  before LINDA ROSSI-RIOS, a Federally
21  Approved RPR, CCR and Notary Public.
22
23
24
25

Appx11486

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 22

1    Q.    So your understanding is based
2  on this August 20, 1999, letter?
3    A.    That is correct.
4    Q.    Anything else?
5    A.    From my historical understanding
6  of the vaccine and the manufacturing
7  documents that I've seen.
8    Q.    When you say your historical
9  understanding, were you involved in these
10 discussions in 1999?
11   A.    I was not directly involved in
12 those discussions, no.
13   Q.    So your historical understanding
14 is based on what exactly?
15   A.    So my understanding is based
16 on reviewing these filings and these
17 discussions which are referenced in this
18 filing, 99-1163, as well as the formulation
19 SOP in the Merck manufacturing area.
20   Q.    Anything else?
21   A.    No.
22   Q.    In the beginning of what you
23 quoted it says, "'[B]ased on CBER's
24 calculations....'" Do you understand that
25 at some point people at Merck reached the

Page 23

1  conclusion that CBER's calculations were
2  wrong?
3         MS. DYKSTRA:  Objection.  Form.
4         I'm not sure that that is in
5         the scope of this deposition.  It's
6         not a manufacturing change.  You're
7         asking her about studies that other
8         people at Merck may or may not have
9         done, and that does not relate to a
10        manufacturing change.
11        MR. MACORETTA:  But it's in
12        her answer.  If it wasn't in her
13        answer, I wouldn't ask about it.  But
14        it says, "'[B]ased on CBER's
15        calculations....'" She kind of
16        opened the door.  I'm entitled to say
17        what do you -- you know, what do you
18        understand about CBER's -- what did
19        Merck understand about CBER's
20        calculations.
21        MS. DYKSTRA:  That wasn't your
22        question.
23 BY MR. MACORETTA:
24   Q.    What did Merck understand
25 about CBER's calculations?

Page 24

1    A.    I don't have that information
2  in front of me.  I would have to see
3  documents that would describe those
4  discussions.
5    Q.    Are you aware -- do you have
6  any understanding that at some point Merck,
7  at least some people at Merck thought CBER's
8  calculations were wrong?
9         MS. DYKSTRA:  Objection.  That
10        is outside the scope of this
11        deposition.
12 BY MR. MACORETTA:
13   Q.    So Merck begins filling to 5.2
14 at manufacturing to aim for at least potency
15 of 5.0, in September of 1999.  Correct?
16   A.    Correct.
17   Q.    Since that time, has Merck
18 changed either the target manufacturing
19 potency or the minimum release specification?
20   A.    No.
21   Q.    At this time, was there a
22 maximum release specification?
23   A.    At which time?  Could you
24 clarify?
25   Q.    September 1999.

Page 25

1    A.    I would need to have those
2  documents in front of me.  I couldn't speak
3  to when the maximum was implemented.
4    Q.    Let me show you what we're
5  going to mark as Number 12, which has been
6  previously marked as Stannard-3.
7            - - -
8         (Exhibit 30(b)(6)(4)-12,
9         Potency topics, was marked for
10        identification.)
11           - - -
12        MS. DYKSTRA:  John, to the
13        extent that you're going to ask one
14        30(b)(6) witness to testify about
15        what another 30(b)(6) witness already
16        testified, it's going to be outside
17        the scope.
18        MR. MACORETTA:  Let me ask the
19        question first.
20        MS. DYKSTRA:  You can ask and
21        then we can decide.  So let's just
22        hear the question before we answer.
23        This is, I'm sorry, Number 11?
24        MR. MACORETTA:  Number 12.
25        MS. DYKSTRA:  Thank you.

7 (Pages 22 - 25)

Appx11487

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

*Plaintiffs,*

v.

MERCK & CO., INC.,

*Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 118

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

1

1    IN THE UNITED STATES DISTRICT COURT
    FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

UNITED STATES OF AMERICA  : CIVIL ACTION
3    ex rel., STEPHEN A.       : NO. 2:10-04374(CDJ)
    KRAHLING and JOAN A.      :
4    WLOCHOWSKI,               :
        Plaintiffs,           :
5                              :
        vs.                   :
6                              :
    MERCK & CO., INC.,        :
7        Defendant.           :
    _____ : Master File No.
8    IN RE:  MERCK MUMPS       : 2:12-cv-03555(CDJ)
    VACCINE ANTITRUST         :
9    LITIGATION               :
                              :
10    THIS DOCUMENT RELATES TO: :
    ALL ACTIONS               :

11
12
13    ** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY **
14
15                 July 11, 2017
16
17        Videotaped deposition of DAVID KRAH,
18    taken at the offices of Spector Roseman &
19    Kodroff, 1818 Market Street, Suite 2500,
20    Philadelphia, Pennsylvania 19103, beginning at
21    8:58 a.m., before LINDA ROSSI-RIOS, a
22    Federally Approved RPR, CCR and Notary Public.
23
24
25

Appx11489

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

54

1     MR. KELLER:  In fairness I will
2  identify for the record that page 7 of
3  this CV is missing from the production
4  that was given to us.
5     THE WITNESS:  I don't have any
6  reason to expect that anything is not
7  correct.
8  BY MR. KELLER:
9     Q.   So the education and employment
10  history, that's accurate.  Correct?
11     A.   To the best of my understanding,
12  yes.
13     Q.   So after 1998 -- I'm sorry,
14  after 1995, it says you are the "Senior
15  Research Fellow Department of Virus and Cell
16  Biology."  Do you see that?  Can you tell me
17  what your positions were from 1998 through
18  current?  I don't have a current CV, so we
19  have to fill in the gap.  So if you can
20  identify what your employment history is at
21  Merck after 1995 to fill in the gaps in the
22  CV.
23     A.   The title names have changed
24  over the years.  As best I can recall, 1998 I
25  was promoted to senior investigator.

55

1     Q.   That is the department of virus
2  and cell biology?
3     A.   Our department name changed many
4  times so I think that -- like we were virus
5  and cell biology and cellular/microbiology and
6  then -- I can't -- I don't recall how many --
7  it's in the same theme of virus and cell
8  biology.  The department number changed and
9  the name changed, but the same entity,
10  basically.  The same group.  It was still in
11  the same group.
12     Q.   The same management group?
13     A.   Yes.
14     Q.   Your job duties were the same
15  even though the department may have changed
16  names?
17     A.   Within a given -- within a given
18  job title, yes.
19     Q.   So in 1998 you were promoted to
20  a senior investigator.  Correct?
21     A.   The best I can recall is 1998.
22     Q.   Can you tell me your next
23  promotion or next position?
24     A.   That's been -- still the same
25  level.  Now, the name has changed to senior

56

1  principal scientist or something of that sort.
2     Q.   It's the same level?
3     A.   Yes.
4     Q.   So from 1998 to 2017 you've had
5  the same job?
6     A.   Yes.
7     Q.   What is -- so if I say senior
8  investigator, is that a fair way to describe
9  your title?  How would you like me to describe
10  your title between 1998 and 2017?
11     A.   Senior investigator is as good
12  as any.  It's just a set of words.
13     Q.   Fair enough.  And did your job
14  duties change from 1998 to 2017?
15     A.   So projects changed.  I don't
16  know if one could infer from that
17  responsibilities changed.  There's a broad --
18  so there's not a -- it's my understanding a
19  formal change of -- range of job
20  responsibilities between 1998 and present.
21     Q.   Sorry, I didn't mean to
22  interrupt you.
23     MR. SANGIAMO:  Are you done with
24  your answer?
25     THE WITNESS:  I guess getting to

57

1  the point that the -- there are core
2  job responsibilities for a given
3  position, but the project
4  responsibilities can vary between
5  projects even with the same title.
6  BY MR. KELLER:
7     Q.   You're researching different --
8  you may be researching different viruses.
9  Correct?
10     A.   Yes, as an example.
11     Q.   Can you just give me a
12  description of what you do as a senior
13  investigator during this time frame?  I
14  understand you worked on different projects,
15  but is there a way to describe what your job
16  responsibilities were in a very general way?
17     MR. SANGIAMO:  You said this
18  time frame, that being?
19  BY MR. KELLER:
20     Q.   1998 to 2017 you've had the same
21  job title, and my question is, were you
22  generally doing the same work?
23     A.   There were some -- I would break
24  it up into two time periods.
25     Q.   Sure.

15 (Pages 54 to 57)

Appx11490

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

**78**

1      form.
2          THE WITNESS:  I did it to help
3      me be more efficient in my job at
4      Merck.
5      BY MR. KELLER:
6          Q.    Did anybody know -- did your
7      superiors know that you were using a journal
8      at Merck?
9          MR. SANGIAMO:  Object to the
10     form.
11         THE WITNESS:  I can't say that
12     they did or didn't, no.
13     BY MR. KELLER:
14         Q.    Was it your practice during your
15     time that you worked at Merck, at least from
16     1998, you maintained a daily journal of
17     your -- what you were -- strike that.
18         What was the purpose of you
19     maintaining a journal on a daily basis?
20         A.    The original intent, as best I
21     can recall, is to keep track of experiments,
22     both progress and experiments, in some cases
23     experiment numbers, in some cases results of
24     those experiments.  And then additionally over
25     time began to include summaries of meetings or

**79**

1      points that I thought were relevant to being a
2      more easily retrievable form for my personal
3      efficiency.
4          Q.    You didn't use this journal for
5      your personal life.  Correct?
6          A.    I can't exclude that there were
7      no -- in fact, I expect there are entries,
8      have a car service done today or something
9      like that.  So it was a journal to keep track
10     primarily of work-related things, but there
11     are some work -- life-related events that I
12     would have -- like reminders, for example.
13         Q.    Did it act as your calendar as
14     well?
15         A.    It was a reminder for certain
16     items that would be part of a calendar.
17         Q.    I noticed in your journals that
18     some things had checks on it and some things
19     just had bullet points.
20         A.    Yes.
21         Q.    What do the checks mean?
22         A.    The check typically means that
23     that comment was completed or addressed.
24         Q.    And did you also capture
25     communications with other Merck employees?

**80**

1          A.    There are occasions where that
2      was included.
3          Q.    Why would you capture a
4      communication between another -- for example,
5      a superior?
6          MR. SANGIAMO:  Object to the
7      form.
8          MR. KELLER:  Let me strike that.
9      BY MR. KELLER:
10         Q.    Did you ever capture communications
11     with your superiors?
12         A.    Yes.
13         Q.    Who were your superiors, who did
14     you report to from this 1998 to 2002 time
15     frame?
16         A.    Alan Shaw.
17         Q.    Who did Alan Shaw report to?
18         A.    Emilio Emini.
19         Q.    Who did Mr. Emini report to?
20         A.    That, I don't recall.
21         Q.    During this time frame, did you
22     ever have any communications with Emilio Emini?
23         A.    Yes.
24         Q.    Did you ever capture those in
25     your journals?

**81**

1          A.    As best I can recall, yes.
2          Q.    Did you have any communications
3      with Alan Shaw?
4          A.    Yes.
5          Q.    Did you capture those in your
6      journals?
7          MR. SANGIAMO:  Object to the
8      form.
9          THE WITNESS:  Yes.
10     BY MR. KELLER:
11         Q.    Did you have communications with
12     individuals in the lab that you captured in
13     the journals during this 1998 to 2002 time
14     frame?
15         A.    I don't recall specific examples,
16     but I would anticipate so.
17         Q.    Do you have any reason to believe
18     that the entries that you entered into your
19     journals were inaccurate?
20         MR. SANGIAMO:  Object to the
21     form.
22         THE WITNESS:  The entries that I
23     made are, to the best of my understanding,
24     my impression or -- so as far as whether
25     they're accurate, I would say they

21 (Pages 78 to 81)

Appx11491

**HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**

90

1  recall, my understanding.
2      Q.   Do you recall what those three
3  doses were?
4      A.   No.
5      Q.   Do you recall what the purpose
6  was behind those three doses were?
7          MR. SANGIAMO:  Object to the
8      form.
9          THE WITNESS:  All I recall is
10      that they were comparing the
11      immunogenicity of those three doses.  I
12      don't recall further details.
13  BY MR. KELLER:
14      Q.   So you don't know how that data
15  was going to be used?
16      A.   I recall that there was going to
17  be a comparison of immunogenicity between
18  doses, but I don't recall details of how that
19  was going to be used.
20      Q.   Did that comparison have any
21  clinical relevance to whether or not the
22  vaccine would protect a kid from getting sick
23  from mumps?
24      A.   I don't -- I'm not -- it's
25  outside of my area of expertise.  I don't know

91

1  what the clinical -- connection for clinical
2  relevance was intended.
3      Q.   Did you develop the assay for
4  Protocol 007?
5          MR. SANGIAMO:  Objection.  Form.
6          THE WITNESS:  Other members of
7      the lab and I did development work to
8      develop the assay.  It wasn't a --
9      multiple people in the lab were
10      involved in the development of the
11      assay.
12  BY MR. KELLER:
13      Q.   When you say "people in the
14  lab," people that worked for you, under you?
15      A.   Everyone in the lab reported to
16  me, so yes.
17      Q.   So when -- you say they helped
18  you run the experiments.  Correct?
19          MR. SANGIAMO:  Object to the
20      form.
21          THE WITNESS:  In some cases,
22      helped design experiments and run
23      experiments.
24  BY MR. KELLER:
25      Q.   At any time, did you understand

92

1  that -- did you have any understanding that
2  the purpose of this assay was to identify an
3  end expiry potency for Merck's marketed MMR
4  product for the mumps component?
5      A.   I recall that the title of the
6  study was an end expiry study.  So that would
7  imply that an expiry was part of the study.
8  But I don't know, I don't recall how the data
9  factored into that calculation.
10      Q.   When you say that you did
11  development work, can you describe for me what
12  you mean by development work?
13          MR. SANGIAMO:  Object to the
14      form.
15          THE WITNESS:  Just to clarify,
16      you're looking for, like, variables
17      that we are -- looked at in developing
18      the assay?
19  BY MR. KELLER:
20      Q.   Sure.
21      A.   So initial work was largely
22  based on any discussion with the FDA where we
23  ran options for the assay format, meaning
24  different virus strains, different supplements
25  to the media, different means of calculating

93

1  an endpoint, different means of visualizing
2  plaques.  So in discussion with the FDA, we
3  presented data that we had from preliminary
4  experiments that we had conducted.  Received
5  feedback from the FDA over their suggestions
6  of how to proceed in the assay development.
7  And then communicated results as we were
8  giving them to the FDA -- maybe not exactly
9  the day, but in a timely way from our
10  perspective to the FDA.  And then identified
11  an assay format to move ahead for Protocol
12  007.
13      Q.   When you say you got feedback
14  from the FDA, what do you mean by "feedback"?
15      A.   Feedback meaning we presented
16  data, the FDA made suggestions, recommendations
17  of how to proceed.
18      Q.   Did you understand those
19  suggestions and recommendations were binding
20  on the FDA?  Did you understand that the FDA
21  was -- let me back up a second.  We'll come
22  back to that in a moment.
23          So as you sit here today, you --
24  strike that.
25          Is it fair to say that your

24 (Pages 90 to 93)

Appx11492

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel*.,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,
                    *Plaintiffs,*
        v.
MERCK & CO., INC.,
                    *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 119

Page 401

```
1        IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2
    UNITED STATES OF AMERICA  : CIVIL ACTION
3   ex rel., STEPHEN A.       : NO. 2:10-04374(CDJ)
    KRAHLING and JOAN A.      :
4   WLOCHOWSKI,               :
            Plaintiffs,       :
5                             :
            vs.               :
6                             :
    MERCK & CO., INC.,        :
7        Defendant.           :
    _____   : Master File No.
8   IN RE:  MERCK MUMPS       : 2:12-cv-03555(CDJ)
    VACCINE ANTITRUST         :
9   LITIGATION                :
                              :
10  THIS DOCUMENT RELATES TO: :
    ALL ACTIONS               :
11
12
13  ** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY **
14
15                  July 12, 2017
16
17        Continued videotaped deposition of
18  DAVID KRAH, taken at the offices of Spector
19  Roseman & Kodroff, 1818 Market Street, Suite
20  2500, Philadelphia, Pennsylvania 19103,
21  beginning at 9:05 a.m., before LINDA
22  ROSSI-RIOS, a Federally Approved RPR, CCR and
23  Notary Public.
24
25
```

Appx11494

Page 430

1 person in my view, who developed the assay and
2 was the most experienced person in running the
3 assay.
4     Q.    Mary developed -- Mary Yagodich
5 developed the assay?
6     A.    In collaboration with me and
7 others in the lab.
8     Q.    Who else was involved in the
9 development of the assay?
10     A.    I was -- there were others --
11 there were other people in the lab who may
12 have contributed experiments.  I don't recall
13 who -- I don't know who first was involved in
14 running any of the development experiments.
15     Q.    But in terms of who came up with
16 the assay, that was you and Mary?
17     A.    The assay was developed in
18 discussion with CBER as far as the assay
19 design and specifics including the virus
20 strain, use of anti-IgG, the endpoint, the
21 staining method.  We had -- Mary and I and
22 others in the lab had done experiments to
23 evaluate effects of variables in the assay and
24 then relay that information to CBER to get a
25 consensus on the format for the assay.

Page 431

1     Q.    But in terms of who at Merck led
2 the design and development of the AIGENT test,
3 that was you and Mary.  Correct?
4     A.    To the best of my recollection,
5 yes.
6     Q.    In terms of who led the testing,
7 the AIGENT testing, that was you.  Correct?
8     A.    I was in charge of the lab that
9 was running the AIGENT testing, the mumps
10 AIGENT testing.
11     Q.    Was Mary Yagodich the only
12 reference counter in the AIGENT testing?
13     A.    I was -- I considered myself a
14 reference counter as well.
15     Q.    Anyone else?
16     A.    I don't recall.  I don't recall.
17     Q.    So getting back to the flow of
18 the counting process, we'll start with the
19 interim analysis because you said it was
20 different for the first third of the AIGENT
21 test than it was for the second two-thirds.
22 Correct?
23     A.    The analysis, the calculation of
24 percent of mock was no different.  What was
25 different was the second third and the third

Page 432

1 third, and the assignment of a titer was no
2 different between the first third and the
3 second third and third third.  The difference
4 was that in the second third and third third
5 there was a workbook that indicated flags for
6 various results being extra variability,
7 invalid dilution as examples.
8     Q.    Let's look at that because you
9 also mentioned for the first third there
10 wasn't a flag system set up, but there was, I
11 think you described it as the counters looking
12 for certain things.  Were the things -- you
13 gave a couple of examples.  Before we go
14 through those examples, I want us -- were the
15 things that counters were looking for in the
16 first third of the AIGENT testing for accuracy
17 purposes ultimately incorporated into the
18 flagging system or was there a difference in
19 terms of measuring the accuracy between the
20 two portions of the AIGENT testing?
21         MR. SANGIAMO:  Object to the
22     form.
23 BY MR. SCHNELL:
24     Q.    Let me make this easier.  So for
25 the first third when you I asked earlier about

Page 433

1 how you confirmed the accuracy of the
2 counting, you identified the counters would
3 look for data at a positive neutralization at
4 a single dilution?  Correct?
5     A.    Yes.
6     Q.    And you also mentioned they
7 would look for erratic neutralizations.
8 Correct?
9         MR. SANGIAMO:  Object to the
10     form.
11         THE WITNESS:  That was an
12     example of a case where plates were
13     checked for accuracy.
14 BY MR. SCHNELL:
15     Q.    But that was something that you
16 directed the counters to be looking for when
17 they were doing these counting for the first
18 third of the test?
19     A.    I don't recall -- in some
20 cases -- so I don't recall necessarily
21 directing the counters to look for that in
22 each assay, but in some cases, I would review
23 the data and notice these conditions and then
24 relay that information to the counter.
25     Q.    And is that the same for the

9 (Pages 430 - 433)

Appx11495

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 722

1  have anti-IgG or not?
2       A.   No.
3       Q.   So when you have a mumps
4  anti-IgG, there's a qualitative difference of
5  how well it neutralizes?
6            MR. SANGIAMO:  Object to the
7       form.
8            THE WITNESS:  A quantitative
9       difference, meaning that the assay --
10      think of this as a window, that if your
11      assay is capable of measuring
12      neutralization from one dilution and
13      up, and the antibody level is within
14      that range, you'll have a value.  If
15      the level is low but below that range
16      that you're testing, it doesn't
17      preclude there being antibody there, it
18      just means that it's at a lower
19      concentration that can be detected with
20      that assay format.
21  BY MR. SCHNELL:
22      Q.   Isn't the goal of developing
23  these tests to develop a test that has the
24  highest sensitivity?
25           MR. SANGIAMO:  Object to the

Page 723

1       form.  The goal of the test are --
2       charged with this test was to develop
3       an assay that was capable of detecting
4       a 95 percent seroconversion.  There was
5       a target, as it indicates here, a
6       targeted range of approximately 10
7       percent for the pre-positive rates.  So
8       I cannot exclude that some assays may
9       be developed with the sensitivity as
10      the requirement.  This assay was
11      developed with the requirement to meet
12      the seroconversion target and a target
13      of -- as stated here, of pre-positivity
14      rate.
15  BY MR. SCHNELL:
16      Q.   Your goal in developing the
17  AIGENT assay wasn't to develop the most
18  sensitive test.  Correct?
19      A.   My -- one could argue, so my
20  interpretation of the requirement stated by
21  CBER was -- discussion with CBER was to have
22  an assay that was capable of protecting a
23  95 percent seroconversion rate.  My
24  interpretation of that was to identify
25  conditions that would allow us to be able to

Page 724

1  measure that seroconversion rate and not try
2  to have it be the most sensitive assay, but
3  allow us to have the capability of measuring
4  95 percent seroconversion.
5       Q.   But in not trying to develop the
6  most sensitive assay, weren't you sacrificing
7  accuracy?
8       A.   That I can't -- I don't have a
9  sense of how accuracy factors in.
10      Q.   So, again, on the front page
11  when you talked about having -- providing the
12  ideal sensitivity, the goal was not to find
13  the assay with the greatest sensitivity, but
14  it was to find the assay with the sensitivity
15  that would allow you to find results with
16  post-positives greater than or equal to 95
17  percent and pre-positives below 10 percent.
18  Is that correct?
19      A.   Or approximately -- at least
20  it's indicated here, approximately 10 percent
21  pre-positives.
22      Q.   And even though at a 1 to 4
23  dilution of an anti-IgG, it detected a lot of
24  neutralization that wasn't detected in the 1
25  to 6 or 1 to 8 dilution, you weren't

Page 725

1  interested in that because that fell outside
2  your parameters.  Correct?
3            MR. SANGIAMO:  Object to the
4       form.
5            THE WITNESS:  That was -- if we
6       wanted to have the same result at 1 to
7       4, 1 to 6, and 1 to 8, then we would
8       have had to reassess the parameters.
9       In looking at the data, the 1 to 4 --
10      the use of the 1 to 4 dilution does not
11      offer us any improvement in seroconversion
12      rate versus 1 to 6 or pre-positivity
13      rate.
14  BY MR. SCHNELL:
15      Q.   Are we talking about improvement
16  in rate or are we talking about finding the
17  most accurate result of what's really going
18  on?
19           MR. SANGIAMO:  Object to the
20      form.
21           THE WITNESS:  The goal is, of
22      this assay was to be able to measure
23      seroconversion in 95 percent of the
24      people with a high pre-positivity rate.
25      If you had an extremely sensitive assay

82 (Pages 722 - 725)

Appx11496

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,
                              *Plaintiffs,*
         v.
MERCK & CO., INC.,
                              *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND**
**"HIGHLY CONFIDENTIAL –**
**ATTORNEYS' EYES ONLY" MATERIAL**
**PURSUANT TO PROTECTIVE ORDER**

# MERCK'S MASTER SET OF EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 120

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* STEPHEN A. KRAHLING AND JOAN A. WLOCHOWSKI, *Plaintiffs,* | Civil Action No. 10-4374 (CDJ) |
| v. | |
| MERCK & CO., INC., *Defendant.* | |
| IN RE: MERCK MUMPS VACCINE ANTITRUST LITIGATION<br><br>THIS DOCUMENT PERTAINS TO ALL ACTIONS | Master File No. 12 -3555 (CDJ) |

**Expert Report of Marcela Pasetti, Ph.D.**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



**Appx11498**

The term serocoversion in the context of vaccine studies refers to a specific increase in immunity induced after vaccination. The definition of seroconversion varies depending on the study and the particular immune response in question; it can involve a 2 or 4 fold increase in antibody ("Ab") titer at any time point post vaccination as compared to baseline or the presence of Ab levels above a pre-determined seronegative threshold post vaccination (*i.e.,* a subject becomes "seropositive").

**Protocol 007 Immunogenicity Endpoints:** The primary endpoint for mumps immunogenicity was the proportion of mumps seronegative subjects (baseline titer 1:16, corresponding to a starting dilution of 1:32) who had a 4-fold rise in response (titer $\geq$1:64), as measured by the AIGENT assay, 6 weeks post vaccination.[5] The secondary endpoint for mumps immunogenicity was the proportion of subjects who were seronegative at baseline by mumps ELISA (<10Ab) and seropositive ($\geq$10 Ab) at 6 weeks post vaccination.[6] Functional and binding assays are used in a complementary manner under Protocol 007 to obtain confirmatory information.

### B. ELISA and PRN as serological assays to evaluate vaccine responses.

Antibodies are proteins produced by the host immune system in response to antigenic stimuli such as vaccination; they mediate effector mechanisms (*e.g.*, microbial killing, phagocytic uptake, toxin or virus neutralization, etc.) that help prevent infections. Vaccine-induced antibodies can be measured in serum and provide reliable proof of vaccine take (or host immune response). The term serology is used to refer to the analysis of serum antibodies in the context of natural infection or vaccination. Levels of systemic antibodies reflect the host immune status (*i.e.,* host's immunity against a pathogen acquired through either vaccination or natural infection). For some diseases, the presence of antibodies in a person's blood has been associated with reduced risk of infection, and a certain level of antibodies is considered

---

[5] CSR at 225032.
[6] Id.

6

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

sufficient to prevent illness (also known as threshold of protection).[7]  Unfortunately, there are no known immunological parameters that can reliably assure protection from symptomatic wild-type mumps infection.[8] Neutralizing antibodies are assumed to play an essential role, yet there is no defined predictor of protective immunity.[9]

ELISA is one of multiple methods available to determine levels of antigen-specific (or vaccine-induced) antibodies. The assay involves the immobilization of an antigen to a plastic surface (microtiter wells), the addition of serum containing antibodies to antigen-coated wells, and the detection of "bound" antibodies by means of a secondary anti-human antibody labeled with an enzyme that transforms a substrate into a colored product (which can be measured in an ELISA spectrophotometer).  In the absence of antigen-specific antibodies, the secondary antibody does not bind to the immobilized antigen, and there is no (or minimal) color reaction. Controls in ELISAs typically include: 1) antigen-coated wells incubated with serum diluent instead of serum samples (no antibodies), with all other reagents and procedures being the same; these are also known as "blanks"; 2) antigen-coated wells incubated with negative serum or negative matrix known as the negative control; and 3) antigen-coated wells incubated with a positive serum (containing antibodies against the antigen in question) known as the positive control.  Test samples are usually tested in serial dilutions and Ab titers are calculated as the inverse of the serum dilution that produces a certain Optical Density ("OD") value.

Another method for calculation of titers involves interpolation of diluted specimen OD values into the curve of a calibrated control or standard (tested in the same conditions as the experimental

---

[7] Plotkin SA. Correlates of protection induced by vaccination. *Clin Vaccine Immunol.* 2010;17(7):1055-1065.

[8] Latner DR, McGrew M, Williams NJ, Sowers SB, Bellini WJ, Hickman CJ. Estimates of mumps seroprevalence may be influenced by antibody specificity and serologic method. *Clin Vaccine Immunol.* 2014;21(3):286-297.

[9] Latner DR, Parker Fiebelkorn A, McGrew M, et al. Mumps Virus Nucleoprotein and Hemagglutinin-Specific Antibody Response Following a Third Dose of Measles Mumps Rubella Vaccine. *Open Forum Infect Dis.* 2017;4(4):ofx263.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER