## 23-2553

IN THE

# United States Court of Appeals

### FOR THE THIRD CIRCUIT

➤➤◄◄

UNITED STATES OF AMERICA EX REL.,
STEPHEN A. KRAHLING; JOAN A. WLOCHOWSKI,

*against*

MERCK & CO, INC.,

STEPHEN A. KRAHLING; JOAN A. WLOCHOWSKI,

*Appellants.*

---

*On Appeal from the United States District Court
for the Eastern of District of Pennsylvania
The Honorable Chad F. Kenney, Case No. 2:10-04374-CFK*

---

### JOINT APPENDIX
### VOLUME XL OF XLV
### Pages Appx18501 to Appx19000
### (Filed Under Seal)

---

VENABLE LLP
750 East Pratt Street, Suite 900
Baltimore, Maryland 21202
410-244-7400

MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, Pennsylvania 19103
215-963-5000

HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
202-637-5600

*Attorneys for Defendant-Appellee*

CONSTANTINE CANNON LLP
355 Madison Avenue, 9th Floor
New York, New York 10017
212-350-2700

KELLER GROVER, LLP
1965 Market Street
San Francisco, California 94103
415-543-1305

*Attorneys for Relators-Appellants*



# Table of Contents

**Page**

**Volume III**
**(Filed Under Seal)**

Order of the Honorable Lynne A. Sitarski, dated May 16, 2019
(Doc. 250) ................................................................. Appx181

Statement of Material Facts by Defendant in Support of
Its First Dispositive Motion, dated October 25, 2019
(Doc. 281-3) ............................................................. Appx185

Statement of Material Facts by Defendant in Support of
Its Fourth Dispositive Motion, dated October 25, 2019
(Doc. 287-3) ............................................................. Appx247

Statement of Material Facts by Relators,
dated October 25, 2019 (Doc. 294) ........................................ Appx295

Declaration of Gary Reilly, for Relators,
in Support of Motion, dated October 25, 2019 (Doc. 24) ......... Appx396

Exhibit 1 to Reilly Declaration -
Expert Report of Eugene Shapiro, M.D.,
dated March 13, 2018. ........................................... Appx438

Exhibit 2 to Reilly Declaration -
Expert Report of Dr. Robert Malone, M.D.,
dated March 13, 2018 ........................................... Appx460
*(Cont'd in Vol IV)*

**Volume IV**
**(Filed Under Seal)**

Exhibit 3 to Reilly Declaration -
Expert Report of David A. Kessler, M.D.,
dated March 14, 2018, with Schedules
and Appendices ................................................... Appx551
*(Cont'd in Vol V)*

**Table of Contents**
**(Continued)**

**Page**

**Volume V**
**(Filed Under Seal)**

Exhibit 4 to Reilly Declaration -
Deposition Testimony of David Kessler, M.D.,
taken September 28, 2018 ...................................................... Appx1483
*(Cont'd in Vol VI)*

**Volume VI**
**(Filed Under Seal)**

Exhibit 5 to Reilly Declaration -
Expert Report of D. Bruce Burlington, M.D.,
dated June 19, 2018 ............................................................... Appx1588

Exhibit 6 to Reilly Declaration -
Deposition Testimony of D. Bruce Burlington, M.D.,
taken December 13, 2018 ...................................................... Appx1637

Exhibit 7 to Reilly Declaration -
Deposition Testimony of Mark Pallansch, M.D.,
taken October 13, 2017 ......................................................... Appx1715

Exhibit 8 to Reilly Declaration -
Deposition Testimony of Eugene Shapiro, M.D.
taken November 7, 2018 ....................................................... Appx1765

Exhibit 9 to Reilly Declaration -
Deposition Testimony of Alison L. Fisher, Ph.D.,
taken November 1, 2016 ....................................................... Appx1822

Exhibit 10 to Reilly Declaration -
Expert Report of Ann M. Arvin, M.D.,
dated June 11, 2018 ............................................................... Appx1910

Exhibit 11 to Reilly Declaration -
Letter from Dr. Robert Redfield, Director, CDC,
dated May 24, 2018 ............................................................... Appx1945

## Table of Contents
### (Continued)

**Page**

Exhibit 12 to Reilly Declaration -
Letter from Dr. Anne Schuchat, Principal Deputy
Director, CDC, dated September 26, 2017 ........................... Appx1950

Exhibit 13 to Reilly Declaration -
Statement of Dr. Jesse Goodman, FDA,
dated April 18, 2007 .............................................................. Appx1956

Exhibit 14 to Reilly Declaration -
Letter from Merck to Jacqueline Little, Ph.D.,
dated March 23, 2006 (MRK-CHA00214088-148) ............... Appx1960
***(Cont'd in Vol VII)***

### Volume VII
### (Filed Under Seal)

Exhibit 15 to Reilly Declaration -
Deposition Testimony of Jonathan L. Temte, M.D., Ph.D.,
taken August 17, 2018 ........................................................... Appx2010

Exhibit 16 to Reilly Declaration -
Expert Report of Peter H. Calcott, B.Sc. (Hons.), D.Phil.,
dated March 12, 2018 ........................................................... Appx2061

Exhibit 17 to Reilly Declaration -
Deposition Testimony of Joye L. Bramble, Ph.D.,
taken January 6, 2017 ........................................................... Appx2141

Exhibit 18 to Reilly Declaration -
FDA Warning Letter, dated February 9, 2001
(MRK-CHA00209399-409) ................................................... Appx2220

Exhibit 19 to Reilly Declaration -
Excerpts from Defendant Merck's Answer to
Amended Complaint (ECF No. 62) ....................................... Appx2232

**Table of Contents**
**(Continued)**

Exhibit 20 to Reilly Declaration -
Excerpts from Defendant Merck's Responses and
Objections to Relator's Third Set of Requests for Admission,
dated August 16, 2017 ........................................................... Appx2239

Exhibit 21 to Reilly Declaration -
ProQuadTM (Measles, Mumps, Rubella and Varicella
[Oka/Merck] Virus Vaccine Live)-Original Application
(MRK-CHA00158126-79) ...................................................... Appx2293

Exhibit 22 to Reilly Declaration -
Expert Report of William L. Atkinson, M.D., MPH,
dated June 12, 2018 ............................................................... Appx2348

Exhibit 23 to Reilly Declaration -
Deposition Testimony of Jonathan Hartzel, Ph.D.,
taken June 23, 2017 ............................................................... Appx2380

Exhibit 24 to Reilly Declaration -
Expert Report of Anna Durbin, M.D, dated June 14, 2018  ... Appx2476
***(Cont'd in Vol VIII)***

**Volume VIII**
**(Filed Under Seal)**

Exhibit 25 to Reilly Declaration -
Expert Report of Marcela Pasetti, Ph.D.,
dated June 14, 2018 ............................................................... Appx2511

Exhibit 26 to Reilly Declaration -
Excerpts of Presentation, Principles of Vaccinology,
produced as "Principles of Vaccination.ppt"
(MRK-CHA01339555) .......................................................... Appx2534

Exhibit 27 to Reilly Declaration -
Deposition Testimony of Mary K. Yagodich,
taken August 18, 2016 ........................................................... Appx2538

**Table of Contents**
**(Continued)**

**Page**

Exhibit 28 to Reilly Declaration -
GlaxoSmithKline Application for Priorix
(GSK-MMR-IND-0019450-76) ............................................ Appx2631

Exhibit 29 to Reilly Declaration -
Deposition Testimony of Marcela Pasetti, Ph.D.,
taken December 4, 2018 ....................................................... Appx2659

Exhibit 30 to Reilly Declaration -
Deposition Testimony of Anna P. Durbin, M.D.,
taken October 8, 2018 .......................................................... Appx2699

Exhibit 31 to Reilly Declaration -
Excerpts from Rationale for the M-M-R®II End Expiry
Clinical Studies Presentation (MRK-CHA01893680-730) ... Appx2788

Exhibit 32 to Reilly Declaration -
Letter to the Editor "Comparability of M-M-R™II and
Priorix" from Scott Thaler, M.D., *et al.*, *The Pediatric
Infectious Disease Journal*, September 1999:18(9)
(MRK-CHA00088592-3) ...................................................... Appx2836

Exhibit 33 to Reilly Declaration -
Phase V Clinical Development Plan for M-M-R®II
(MRK-CHA00667054-122) ................................................... Appx2839

Exhibit 34 to Reilly Declaration -
Fax from Yolanda Stewart to Donna Boyce,
dated April 25, 2012 (GSK-MMR-IND-0029256-63) ........... Appx2909

Exhibit 35 to Reilly Declaration -
Letter from Karen L. Goldenthal, M.D. to Angus Grant, Ph.D.,
dated September 2, 1997 (GSK-MMR-IND-0000004-7) ...... Appx2918

Exhibit 36 to Reilly Declaration -
Email from Katalin G. Abraham to Keith D. Chirgwin, M.D.,
dated October 5, 1998 (MRK-CHA00095142) ..................... Appx2923

**Table of Contents**
**(Continued)**

Exhibit 37 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449029-40) ....................... Appx2925

Exhibit 38 to Reilly Declaration -
Deposition Testimony of Mark Stannard,
taken December 13, 2016 ..................................................... Appx2938
*(Cont'd in Vol IX)*

**Volume IX**
**(Filed Under Seal)**

Exhibit 39 to Reilly Declaration -
Deposition Testimony of Luwy Musey, M.D.,
taken October 7, 2016 .......................................................... Appx3023

Exhibit 40 to Reilly Declaration -
Deposition Testimony of Ann M. Arvin, M.D.,
taken November 12, 2018 ..................................................... Appx3129

Exhibit 41 to Reilly Declaration -
Deposition Testimony of William Nichols,
taken October 25, 2018 ........................................................ Appx3213

Exhibit 42 to Reilly Declaration -
Proposed New Stabilizer for M-M-R®II,
dated July 26, 2022 (MRK-CHA00207690-7735) ................ Appx3249

Exhibit 43 to Reilly Declaration -
M-M-R®II Mumps End Expiry Study: AIGENT Assay Issues
Impact on Study Criteria Regulatory Implications,
dated October 11, 2002 (MRK-CHA00094161-82) .............. Appx3296

Exhibit 44 to Reilly Declaration -
Memo re: Historical Review and Confirmation of Mumps
Virus Potency Formulation Targets in M-M-R®II,
dated April 8, 2011 (MRK-CHA01456760) .......................... Appx3319

**Table of Contents**
**(Continued)**

**Page**

Exhibit 45 to Reilly Declaration -
Presentation, M-M-R II Mumps End Expiry Trial, produced as
"CDOC presentation November 15-00-draft.ppt"
(MRK-CHA00020396) ......................................................... Appx3321

Exhibit 46 to Reilly Declaration -
Memo re: Stability of Mumps Component in Merck's Live
Virus Vaccines, dated October 5, 2000
(MRK-CHA00587859-62) ..................................................... Appx3419

Exhibit 47 to Reilly Declaration -
Memo re: Stability of Measles, Mumps, and
Rubella Components in Merck's Live Virus Vaccines,
dated October 17, 2000 (MRK-CHA00549487-94) .............. Appx3424

Exhibit 48 to Reilly Declaration -
Email from Katalin G. Abraham to Bonita M. Stankunas,
dated October 5, 2000 (MRK-CHA00284623-9) .................. Appx3433

Exhibit 49 to Reilly Declaration -
Deposition Testimony of Philip S. Bennett,
taken May 24, 2017 ............................................................... Appx3441

**Volume X**
**(Filed Under Seal)**

Exhibit 50 to Reilly Declaration -
Email from Keiko Simon, dated October 2, 2002
(MRK-CHA00615147-74) ..................................................... Appx3501

Exhibit 51 to Reilly Declaration -
Internal Strategy Document regarding M-M-R®II
Regulatory Compliance (MRK-CHA00019225-45) .............. Appx3530

Exhibit 52 to Reilly Declaration -
"Genetic Heterogeneity of Mumps Strains: Potential
Implications in Comparative Neutralization Studies" CBER
Background Information, dated November 1999
(MRK-CHA00020635-42) ..................................................... Appx3552

**Table of Contents**
(Continued)

Exhibit 53 to Reilly Declaration -
Draft memo, produced as "Outstanding-
issuesMMRV&MMRII.doc"
(MRK-CHA00198876-91) ..................................................... Appx3561

Exhibit 54 to Reilly Declaration -
Memo re: Mumps neutralization meeting minutes,
dated September 16, 1999 (MRK-CHA00020425-7) ............ Appx3578

Exhibit 55 to Reilly Declaration -
Email from Katalin G. Abraham to Keith D. Chirgwin,
dated February 25, 2000 (MRK-CHA00095143) .................. Appx3582

Exhibit 56 to Reilly Declaration -
Memo re: Team Biologics Close Out – Form FDA 483,
dated October 11, 2000 (MRK-CHA00071265-71) .............. Appx3584

Exhibit 57 to Reilly Declaration -
Email from Dorothy Margolskee, M.D., to
Florian Schodel, M.D., with attachments,
dated February 26, 2001
(MRK-CHA00549510-35) ..................................................... Appx3592

Exhibit 58 to Reilly Declaration -
Email from Joseph F. Heyse with attachments,
dated March 5, 2001
(MRK-CHA00616007-12) ..................................................... Appx3627

Exhibit 59 to Reilly Declaration -
Response to FDA 483 Observation 3
(MRK-CHA00086295-7) ....................................................... Appx3634

Exhibit 60 to Reilly Declaration -
Draft Response to FDA 483 Observation 3
(MRK-CHA00086298-317) ................................................... Appx3638

Exhibit 61 to Reilly Declaration -
Draft Response to FDA 483 Observation 3
(MRK-CHA00562230-41) ..................................................... Appx3659

**Table of Contents**
**(Continued)**

**Page**

Exhibit 62 to Reilly Declaration -
Draft Response to FDA 483 Observation 3
(MRK-CHA01440844-64) ...................................................... Appx3672

Exhibit 63 to Reilly Declaration -
Letter from Robert L. McKee, Ph.D. to Steven A. Masiello,
dated March 8, 2001 (MRK-CHA01537603-11) ................... Appx3694

Exhibit 64 to Reilly Declaration -
Deposition Testimony of Dorothy Margolskee, M.D.,
taken April 21, 2017 .............................................................. Appx3704

Exhibit 65 to Reilly Declaration -
Excerpts from Label Claim Compliance M-M-R®II
Peer Review Meeting, dated July 15, 2002
(MRK-CHA00322038-65) ...................................................... Appx3796

Exhibit 66 to Reilly Declaration -
Memo re: Executive Summary-CBER/Merck Meeting
April 4, 2001, dated April 8, 2001
(MRK-CHA01649955-6) ........................................................ Appx3819

Exhibit 67 to Reilly Declaration -
Memo re: Minutes, Meeting with CBER on 4/4/01
Regarding Mumps Stability, dated April 9, 2001
(MRK-CHA00754687-91) ...................................................... Appx3822

Exhibit 68 to Reilly Declaration -
Email from Christopher J. Petroski to Keith D. Chirgwin,
dated January 21, 2002 (MRK-CHA00561350-5) ................. Appx3828

Exhibit 69 to Reilly Declaration -
Presentation, M-M-R®II Mumps Expiry Mumps Potency
Claim in Label (MRK-CHA00334863-8) .............................. Appx3835

Exhibit 70 to Reilly Declaration -
Presentation, Mumps Expiry- Label Claim, produced as
"RMC mumps expiry update.ppt" (MRK-CHA00086318) ... Appx3842

**Table of Contents**
**(Continued)**

**Page**

Exhibit 71 to Reilly Declaration -
Memo re: M-M-R®II: Mumps End Expiry label change –
filing strategy, dated August 2, 2001
(MRK-CHA00247149-52) ..................................................... Appx3846

Exhibit 72 to Reilly Declaration -
Email from Keith D. Chirgwin to Manal A. Morsy with
attachment, dated January 22, 2002
(MRK-CHA00019084-5) ..................................................... Appx3851

Exhibit 73 to Reilly Declaration -
Email from Cynthia F. Morrisey, dated September 5, 2002
(MRK-CHA01562819-20) ..................................................... Appx3873

Exhibit 74 to Reilly Declaration -
Email from Roberta L. McKee, Ph.D.,
dated October 31, 2002 (MRK-CHA00094134-5) ................ Appx3876

Exhibit 75 to Reilly Declaration -
Memo, Mumps and Rubella Formulation and Potency Assay
Format Changes to Support Potency through Twenty-four
Month Expiry (MRK-CHA01894982-98) ............................ Appx3879

Exhibit 76 to Reilly Declaration -
Email from Mark S. Galinski to Keiko Simon,
dated August 23, 2004 (MRK-CHA01564065-8) .................. Appx3897

Exhibit 77 to Reilly Declaration -
Email from Alison L. Fisher with attachments,
dated September 20, 2004
(MRK-CHA01574732-8) ..................................................... Appx3902

Exhibit 78 to Reilly Declaration -
Presentation, Accomplishments to Date,
produced as "accomplishments to 5-17-01.ppt"
(MRK-CHA00724288) ........................................................ Appx3910

**Table of Contents**
**(Continued)**

**Page**

Exhibit 79 to Reilly Declaration -
Draft letter from Roberta L. McKee, Ph.D., to
Michael Angelo, with metadata date of October 17, 2002
(MRK-CHA01649892-3) ....................................................... Appx3917

Exhibit 80 to Reilly Declaration -
Email from Manal Morsy to Keith D. Chirgwin,
dated November 4, 2002 (MRK-CHA00501762-5) .............. Appx3920

Exhibit 81 to Reilly Declaration -
Memo re: Preparations for the Mumps Stability-CBER
discussion, dated March 19, 2001
(MRK-CHA00019430-2) ....................................................... Appx3925

Exhibit 82 to Reilly Declaration -
Email from Philip S. Bennett to Joseph M. Antonello,
dated September 5, 2002 (MRK-CHA00780325-6) .............. Appx3929

Exhibit 83 to Reilly Declaration -
Memo re: Mumps End Expiry study issues,
with Attachment (MRK-CHA00019246-67) ........................ Appx3932

Exhibit 84 to Reilly Declaration -
Draft Presentation, M-M-R II to October 8, 2002 CRRC,
produced as "Draft#1-CRRC 10-08-02 slides.ppt"
(SCHOFIELD_00000201) ..................................................... Appx3955

Exhibit 85 to Reilly Declaration -
Presentation, M-M-R II to October 8, 2002 CRRC,
produced as"CRRC-10-08-02 slides.ppt"
(MRK-CHA00027726) ......................................................... Appx3991
*(Cont'd in Vol XI)*

**Volume XI**
**(Filed Under Seal)**

Exhibit 86 to Reilly Declaration -
Email from Philip S. Bennett with attachment,
dated March 14, 2001 (MRK-CHA00562218-9) ................... Appx4021

## Table of Contents
## (Continued)

**Page**

Exhibit 87 to Reilly Declaration -
Meeting Agenda, dated March 7, 2002
(MRK-CHA00205854-60) ...................................................... Appx4024

Exhibit 88 to Reilly Declaration -
Email from Manal Morsy, M.D., Ph.D. to Deitra E. Arena,
dated March 27, 2002 (MRK-CHA00064005-12) ................. Appx4032

Exhibit 89 to Reilly Declaration -
Email from Manal Morsy, M.D., Ph.D. to David Krah, M.D.,
dated April 10, 2002 (MRK-CHA00561310-2) ..................... Appx4041

Exhibit 90 to Reilly Declaration -
Spreadsheet for June 10, 2003 Vaccine Assay Committee
meeting (MRK-CHA00440797-811) ...................................... Appx4045

Exhibit 91 to Reilly Declaration -
Minutes of CBER Teleconference, dated December 7, 2001
(MRK-CHA00019434-7) ........................................................ Appx4061

Exhibit 92 to Reilly Declaration -
Draft Summary of Teleconference Notes
(MRK-CHA00024596-9) ........................................................ Appx4066

Exhibit 93 to Reilly Declaration -
Memo re: CBER teleconference (December 7, 2001): Mumps
Inspection results and discussion, dated December 13, 2001
(MRK-CHA00071082-9) ........................................................ Appx4071

Exhibit 94 to Reilly Declaration -
Memo re: Consultation with Dr. William Fairweather
on Vaccine Stability, dated December 14, 2000
(MRK-CHA00590949-58) ...................................................... Appx4080

Exhibit 95 to Reilly Declaration -
Excerpts from Proposed New Stabilizer for M-M-R®II,
dated August 2002 (MRK-CHA01591461-87) ..................... Appx4091

**Table of Contents**
(Continued)

**Page**

Exhibit 96 to Reilly Declaration -
Email from Manal Morsy, M.D., Ph.D. to Joye L. Bramble,
dated June 11, 2002 (MRK-CHA00494158-61) .................... Appx4117

Exhibit 97 to Reilly Declaration -
M-M-R®11 Defense Action Plan, dated June 1999
(MRK-CHA00285276-96) ..................................................... Appx4122

Exhibit 98 to Reilly Declaration -
Memo re: Statement of Interest for ProQuad™ Measles,
mumps, rubella, and varicella virus vaccine live, dated
November 10, 2000 (MRK-CHA00325472-91) .................... Appx4144

Exhibit 99 to Reilly Declaration -
Memo re: Statement of Interest for ProQuad™ Measles,
mumps, rubella, and varicella virus vaccine live,
dated November 10, 2000 (MRK-CHA00671410-28) .......... Appx4165

Exhibit 100 to Reilly Declaration -
Memo re: Minimum Expiry Specification Limit for Mumps
Potency in M-M-R®II, dated July 5, 2001
(MRK-CHA01896349) ......................................................... Appx4185

Exhibit 101 to Reilly Declaration -
Excerpts from Clinical and Regulatory Review Committee
Development Projects, dated October 29, 2002
(MRK-CHA01725276-364) .................................................. Appx4187

Exhibit 102 to Reilly Declaration -
Presentation, MMRII Mumps End Expiry study status &
Regulatory implications, produced as "slides for
GRSRC_MumpsEndExpiry -10-11-02.ppt"
(MRK-CHA00040705) ......................................................... Appx4197

Exhibit 103 to Reilly Declaration -
Presentation, MMRII Mumps End Expiry study status &
Regulatory implications, produced as
"slides for GRSRC -10-11-02.ppt"
(MRK-CHA00094159) ......................................................... Appx4227

**Table of Contents**
**(Continued)**

Exhibit 104 to Reilly Declaration -
Email from Joseph F. Heyse to Keith D. Chirgwin,
dated September 30, 2002 (MRK-CHA01582137-9) ............ Appx4256

Exhibit 105 to Reilly Declaration -
MRL Clinical Study Report, Multicenter Study: A Study of
M-M-R II at Mumps Expiry Potency in Healthy Children 12
to 18 Months of Age (Protocol 007)
(MRK-CHA00224982-26529) ............................................... Appx4260

Exhibit 106 to Reilly Declaration -
Email from Dorothy Margolskee to Keith D. Chirgwin,
dated March 8, 1998 (MRK-CHA00095320-1) ..................... Appx4419

Exhibit 107 to Reilly Declaration -
Slide Deck from M-M-R™ Expiry Investigators Meeting,
dated March 15-16, 1999 (MRK-CHA00017605-12) ........... Appx4422

Exhibit 108 to Reilly Declaration -
Excerpts from Merck Submission to the Department of Justice,
dated April 9, 2012 (MRK-CHA0002549-75) ....................... Appx4431

Exhibit 109 to Reilly Declaration -
Letter from Karen L. Goldethal, M.D. to
Keith Chirgwin, M.D., dated September 8, 1998
(MRK-CHA00001467-9) ....................................................... Appx4459

Exhibit 110 to Reilly Declaration -
Memo re: BB-IND 1016: Summary of discussion with
Dr. Kathryn Carbone and Ms. Luba Vujcic (CBER) regarding
the Mumps neutralization assay, dated February 8, 2000
(MRK-CHA00001255-7) ....................................................... Appx4463

Exhibit 111 to Reilly Declaration -
Memo re: Communication with Dr. Kathryn Carbone (CBER)
on April 12, 200 regarding CBER's meeting (face to face-
March 13, 2000) minutes and the mumps neutralization
and ELISA assays, dated April 12, 2000
(MRK-CHA01927351-5) ....................................................... Appx4467

**Table of Contents**
**(Continued)**

Exhibit 112 to Reilly Declaration -
Response to FDA Request for Information,
dated November 17, 2004 (MRK-CHA00126963-71) .......... Appx4473

Exhibit 113 to Reilly Declaration -
Summary of Findings of Inspection, dated August 6, 2001
(MRK-CHA02021754-61) ..................................................... Appx4483

Exhibit 114 to Reilly Declaration -
Meeting Minutes, dated March 14, 2000
(MRK-CHA00001258-61) ..................................................... Appx4492

Exhibit 115 to Reilly Declaration -
Deposition Testimony of Emilio Emini, Ph.D.,
taken June 6, 2017 .................................................................. Appx4497
*(Cont'd in Vol XII)*

**Volume XII**
**(Filed Under Seal)**

Exhibit 116 to Reilly Declaration -
Deposition Testimony of Florian Schodel, M.D.,
taken December 22, 2016 .................................................... Appx4592

Exhibit 117 to Reilly Declaration -
Email from Manal Morsy, dated September 13, 2002
(MRK-CHA01386177-82) ..................................................... Appx4700

Exhibit 118 to Reilly Declaration -
Email from Keiko Simon with attachments,
dated October 27, 2003
(MRK-CHA00279197-247) ................................................... Appx4707

Exhibit 119 to Reilly Declaration -
Slide Deck from M-M-R™ Expiry Investigators Meeting,
dated March 15-16, 1999 (MRK-CHA01888826-913) ......... Appx4759

**Table of Contents**
**(Continued)**

**Page**

Exhibit 120 to Reilly Declaration -
Email from Deitra E. Arena with attachments,
dated June 16, 2000
(MRK-CHA00026466-89) ...................................................... Appx4848

Exhibit 121 to Reilly Declaration -
Email from Manal Morsy to Henrietta Ukwu,
dated October 10, 1999 (MRK-CHA01898773-6) ................ Appx4874

Exhibit 122 to Reilly Declaration -
Deposition Testimony of David Krah, M.D.,
taken July 11-12, 2017 .......................................................... Appx4879
*(Cont'd in Vol XIII)*

**Volume XIII**
**(Filed Under Seal)**

Exhibit 123 to Reilly Declaration -
Mumps Neutralization Assay Development
(MRK-CHA00336905-18) ...................................................... Appx5076

Exhibit 124 to Reilly Declaration -
Minutes of CAS Meeting, dated June 20, 2000
(MRK-CHA00209674-8) ........................................................ Appx5091

Exhibit 125 to Reilly Declaration -
Email from Ted L. Staub to George Williams,
dated February 20, 1998 (MRK-CHA00625629-30) ............. Appx5097

Exhibit 126 to Reilly Declaration -
Minutes of Mumps Neutralization Assay Meeting,
dated September 29, 1999 (MRK-CHA00020428-9) ............ Appx5100

Exhibit 127 to Reilly Declaration -
Presentation, MMR II End Expiry Trial,
produced as "MMRII-Neut-fnQPAslides9-27-99.ppt"
(MRK-CHA00025315) .......................................................... Appx5103

**Table of Contents**
**(Continued)**

Exhibit 128 to Reilly Declaration -
Draft Summary of 8/17/99 meeting by M. Morsy
(MRK-CHA00198869-70) .......................................................Appx5111

Exhibit 129 to Reilly Declaration -
Memo re: Options and proposed path forward for the
Mumps Expiry Trial (MRK-CHA00086292-3) ..................... Appx5114

Exhibit 130 to Reilly Declaration -
Email from Florian P. Schodel to Colleen A. Forsythe,
dated July 7, 1997 (MRK-CHA01648951-6) ........................ Appx5117

Exhibit 131 to Reilly Declaration -
Memo re: Monthly report for August, 2000,
dated August 23, 2000 (MRK-CHA00016632-5) .................. Appx5124

Exhibit 132 to Reilly Declaration -
Virus & Cell Biology Research Procedure
(MRK-CHA00002189-98) ..................................................... Appx5129

Exhibit 133 to Reilly Declaration -
Letter from Karen L. Goldenthal, M.D. to Keith D. Chirgwin,
M.D., dated October 26, 1999 (MRK-CHA00761482-4) ...... Appx5140

Exhibit 134 to Reilly Declaration -
Memo re: Filing Strategy for ProQuad,
dated January 31, 2002 (MRK-CHA00818776-81) ............... Appx5144

Exhibit 135 to Reilly Declaration -
Memo re: CBER teleconference (October 16, 2001):
Measles, Mumps and Rubella ELISAs, dated October 19, 2001
(MRK-CHA00331831-6) ....................................................... Appx5151

Exhibit 136 to Reilly Declaration -
Email from Michael L. Dekleva to Alison L. Fisher,
dated October 26, 2004 (MRK-CHA00846454-8) ............... Appx5158

**Table of Contents**
(Continued)

Exhibit 137 to Reilly Declaration -
Response to FDA Request for Information,
dated April 13, 2005 (MRK-CHA00000315-60) ................... Appx5164

Exhibit 138 to Reilly Declaration -
Response to FDA Request for Information,
dated November 15, 2006 (MRK-CHA00000393-409) ........ Appx5211

Exhibit 139 to Reilly Declaration -
Response to CBER Comments, dated June 10, 2002
(MRK-KRA00761628-702) .................................................... Appx5229

Exhibit 140 to Reilly Declaration -
Regulatory Liaison FDA Conversation Record,
dated October 5, 2004 (MRK-CHA00846405-15) ................ Appx5305

Exhibit 141 to Reilly Declaration -
Email from Florian Schodel to Michael L. Dekleva,
dated July 3, 2004 (MRK-CHA00791315-9) ........................ Appx5317

Exhibit 142 to Reilly Declaration -
Proposal for Immunogenicity Analyses
(MRK-CHA00561111-2) ....................................................... Appx5323

Exhibit 143 to Reilly Declaration -
Email from David Krah, M.D. to Emilio Emini, Ph.D.,
dated October 9, 2000 (MRK-CHA00065695-703) .............. Appx5326

Exhibit 144 to Reilly Declaration -
Anti-IgG Enhanced Mumps Neutralization Assay-Update,
dated October 24, 2000 (MRK-CHA00026912-8) ................ Appx5336

Exhibit 145 to Reilly Declaration -
Email from Jospeh Antonello to David Krah, M.D.,
dated October 30, 2000 (MRK-CHA00759836-9) ................ Appx5344

Exhibit 146 to Reilly Declaration -
Deposition Testimony of Barbara Kuter,
taken February 9, 2018 ......................................................... Appx5349

**Table of Contents**
**(Continued)**

Exhibit 147 to Reilly Declaration -
Email from Steven Rubin to David Krah, M.D.,
dated August 24, 2011 (MRK-CHA00030994-8) .................. Appx5398

Exhibit 148 to Reilly Declaration -
Excerpts from Attachments to 11/18/98 CDOC Meeting
(MRK-CHA01731773-1804) ................................................ Appx5404

Exhibit 149 to Reilly Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
teleconference on methods used for the plaque reduction
neutralization assay, dated February 22, 1999
(MRK-CHA00095050-2) ...................................................... Appx5437

Exhibit 150 to Reilly Declaration -
Extra CDAB Meeting Abstract, dated August 1, 2011
(GSK-MMR-0195819-42) ...................................................... Appx5441

Exhibit 151 to Reilly Declaration -
Performance Characteristics and Validation for Mumps Plaque
Reduction Microneutralization assay
(GSK-MMR-IND-0022195-269) .......................................... Appx5466
*(Cont'd in Vol XIV)*

**Volume XIV**
**(Filed Under Seal)**

Exhibit 152 to Reilly Declaration -
Agenda for CBER Meeting, dated March 13, 2000
(MRK-CHA00016335-43) ...................................................... Appx5542

Exhibit 153 to Reilly Declaration -
Email from David Krah, M.D. to Alan Shaw,
dated August 15, 2000 (MRK-CHA00068546) ..................... Appx5552

Exhibit 154 to Reilly Declaration -
To-Do List, dated August 26, 2000
(MRK-CHA00273243-4) ...................................................... Appx5554

**Table of Contents**
**(Continued)**

Exhibit 155 to Reilly Declaration -
Deposition Testimony of Stephen Krahling,
taken May 2-3, 2017 ............................................................. Appx5557

Exhibit 156 to Reilly Declaration -
Memo re: Monthly report for May, 2000, dated May 23, 2000
(MRK-CHA01634869-71) ...................................................... Appx5690

Exhibit 157 to Reilly Declaration -
Handwritten Notes in Book 31271, Pages 161-2
(MRK-CHA00064608-9) ........................................................ Appx5694

Exhibit 158 to Reilly Declaration -
Email from David Krah, M.D. to Emilio Emini, Ph.D.,
dated March 30, 2000 (MRK-CHA00336323-5) ................... Appx5697

Exhibit 159 to Reilly Declaration -
Email from Keith D. Chirgwin with attachment,
dated February 26, 2001
(MRK-CHA00549462-72) ...................................................... Appx5701

Exhibit 160 to Reilly Declaration -
Relator Stephen A. Krahling's Responses and Objections
to Merck's Revised First Set of Interrogatories,
dated May 18, 2015 ............................................................... Appx5713

Exhibit 161 to Reilly Declaration -
Deposition Testimony of Joseph Antonello, Ph.D.,
taken August 3, 2017 ............................................................ Appx5780

Exhibit 162 to Reilly Declaration -
Email from Beverly A. Zaber to Cathy W. Wadsworth,
dated August 9, 2001 (MRK-CHA00008835-9) .................... Appx5862

Exhibit 163 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Steve Krahling, dated March 29, 2001
(MRK-CHA00015702-3) ........................................................ Appx5868

**Table of Contents**
**(Continued)**

Exhibit 164 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Colleen Barr, dated March 29, 2001
(MRK-CHA00014739-40) ..................................................... Appx5871

Exhibit 165 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Mary Yagodich, dated March 29, 2001
(MRK-CHA00014746-7) ..................................................... Appx5874

Exhibit 166 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Jennifer Kriss, dated March 29, 2001
(MRK-CHA00014829-30) ..................................................... Appx5877

Exhibit 167 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Steve Krahling, dated March 29, 2001
(MRK-CHA00014731-2) ..................................................... Appx5880

Exhibit 168 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Mary Yagodich, dated March 29, 2001
(MRK-CHA00014744-5) ..................................................... Appx5883

Exhibit 169 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Jill DeHaven, dated March 29, 2001
(MRK-CHA00014749-50) ..................................................... Appx5886

Exhibit 170 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Jennifer Kriss, dated March 29, 2001
(MRK-CHA00015719-20) ..................................................... Appx5889

Exhibit 171 to Reilly Declaration -
Memo re: Study KM-248 Phase III-Questionable ELISA
Results in the Comparator Group, dated November 1, 2001
(MRK-CHA00760670-2) ..................................................... Appx5892

**Table of Contents**
**(Continued)**

Exhibit 172 to Reilly Declaration -
Deposition Testimony of Joan L. Wlochowski,
taken June 13-14, 2017 ......................................................... Appx5896
*(Cont'd in Vol XV)*

**Volume XV**
**(Filed Under Seal)**

Exhibit 173 to Reilly Declaration -
Outline for HR Discussion (RELATOR_00000273) ............. Appx6040

Exhibit 174 to Reilly Declaration -
Expert Report of Philip Stark, Ph.D.,
dated March 12, 2018 ........................................................... Appx6042

Exhibit 175 to Reilly Declaration -
Supplemental Expert Report of Philip Stark, Ph.D.,
dated October 16, 2018 ......................................................... Appx6072

Exhibit 176 to Reilly Declaration -
Email from Jospeh Antonello with attachments,
dated March 20, 2002
(MRK-CHA00544820-47) .................................................... Appx6079

Exhibit 177 to Reilly Declaration -
Excerpts from journal of David Krah, M.D.
(MRK-CHA00489903-490080) ............................................ Appx6133

Exhibit 178 to Reilly Declaration -
Handwritten Log (RELATOR_00001025-6) ......................... Appx6136

Exhibit 179 to Reilly Declaration -
Excerpts from journal of David Krah, M.D.
(MRK-CHA00490592-91038) ............................................... Appx6139

Exhibit 180 to Reilly Declaration -
Memo re: Review of mumps-AIGENT neutralization data,
dated August 1, 2001 (MRK-CHA00026864) ....................... Appx6144

**Table of Contents**
**(Continued)**

**Page**

Exhibit 181 to Reilly Declaration -
Email from Karen R. McKenney, dated August 7, 2001
(MRK-CHA00052249-53) ..................................................... Appx6146

Exhibit 182 to Reilly Declaration -
General Correspondence and Submission to FDA,
dated February 4, 2002 (MRK-CHA00000410-78) ............... Appx6152

Exhibit 183 to Reilly Declaration -
Assay Log (MRK-CHA00050333-42) .................................. Appx6222

Exhibit 184 to Reilly Declaration -
Handwritten Notes regarding Discarded Plates
(MRK-CHA00055013) ......................................................... Appx6233

Exhibit 185 to Reilly Declaration -
Memo re: Validation of the Anti-IgG Enhanced Mumps Wild
Type Plaque Reduction Neutralization Assay (Virus and Cell
Biology Research Procedure #874.3489), dated
February 27, 2001 (MRK-CHA00016988-17023) ................ Appx6235

Exhibit 186 to Reilly Declaration -
Response to FDA Request for Information,
dated March 12, 2001 (MRK-CHA00017036-115) ............... Appx6272

Exhibit 187 to Reilly Declaration -
Biological Product Deviation Report Form,
dated April 20, 2001 (MRK-CHA00754233-8) ..................... Appx6353

Exhibit 188 to Reilly Declaration -
Background Document: M-M-R®II Protocol 007-Mumps End
Expiry Study: AIGENT Assay Issues and Impact on Study
Criteria (MRK-CHA00615152-74) ....................................... Appx6360

Exhibit 189 to Reilly Declaration -
Supplemental Biologics License Application,
dated January 29, 2004 (MRK-CHA00000032-139) ............. Appx6384

**Table of Contents**
**(Continued)**

Exhibit 190 to Reilly Declaration -
Information Amendment-Clinical, dated November 30, 2001
(MRK-CHA00126233-66) .................................................... Appx6493
*(Cont'd in Vol XVI)*

**Volume XVI**
**(Filed Under Seal)**

Exhibit 191 to Reilly Declaration -
Email from Mandie Lyon to David Krah, M.D.,
dated August 19, 2004 (MRK-CHA00337141-57) ................ Appx6528

Exhibit 192 to Reilly Declaration -
Email from Barbara J. Kuter to Barbara J. Kuter
with attachment, dated August 5, 2009
(MRK-CHA00121080-82) .................................................... Appx6546

Exhibit 193 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of October 24, 2011 ..................... Appx6550

Exhibit 194 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of September 26, 2012 ................. Appx6555

Exhibit 195 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of October 17, 2012 ..................... Appx6559

Exhibit 196 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of December 22, 2012 ................. Appx6563

Exhibit 197 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of July 3, 2013 ............................ Appx6567

**Table of Contents**
**(Continued)**

**Page**

Exhibit 198 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of October 7, 2015 ....................... Appx6571

Exhibit 199 to Reilly Declaration -
CinicalTrials.gov "Background" webpage,
last accessed October 14, 2019 ............................................. Appx6575

Exhibit 200 to Reilly Declaration -
EMEA Scientific Discussion Paper re: M-M-RVAXPRO
and M-M-RII, downloaded October 10, 2019 ........................ Appx6580

Exhibit 201 to Reilly Declaration -
Letter from Dr. Gudrun V. Wangenheim to
D. Wonnacott, Ph.D. (MRK-CHA00626021-2) .................... Appx6616

Exhibit 202 to Reilly Declaration -
Letter from Karen L. Goldenthal, M.D. to Alison Fisher,
Ph.D., dated October 17, 2005 (MRK-CHA00560257-8) ..... Appx6619

Exhibit 203 to Reilly Declaration -
Amendment to Supplemental Biologics License Application
Response to FDA Request for Information,
dated June 5, 2007, with Attachments
(MRK-CHA00000368-82) ..................................................... Appx6622

Exhibit 204 to Reilly Declaration -
Email from Margaret Kanters to Donna Zacholski,
dated January 30, 2009 (MRK-CHA01300697-9) ................. Appx6638

Exhibit 205 to Reilly Declaration -
Approval Letter from FDA, dated December 6, 2007
(MRK-CHA01519087-8) ....................................................... Appx6642

Exhibit 206 to Reilly Declaration -
Memo re: Review of Merck's 7068-214, dated July 27, 2004
(MRK-CHA00846451-3) ....................................................... Appx6645

**Table of Contents**
**(Continued)**

**Page**

Exhibit 207 to Reilly Declaration -
ProQuad™ Original Application, dated August 3, 2004
(MRK-CHA00158320-71) ..................................................... Appx6649

Exhibit 208 to Reilly Declaration -
Deposition Testimony of Michael Dekleva,
taken February 9, 2017 ........................................................ Appx6687

Exhibit 209 to Reilly Declaration -
Original Biologics License Application, dated August 27, 2004
(MRK-CHA00157572-3) ....................................................... Appx6760

Exhibit 210 to Reilly Declaration -
Email from Louis H. Washington to Michael L. Dekleva,
dated June 10, 2004 (MRK-CHA00821967-9) ...................... Appx6763

Exhibit 211 to Reilly Declaration -
Information Amendment-Clinical, dated November 27, 2001
(MRK-CHA00152449-67) ..................................................... Appx6767

Exhibit 212 to Reilly Declaration -
Excerpts from Merck's Responses and Objections to
Plaintiffs' First Set of Interrogatories,
dated August 16, 2017 ......................................................... Appx6787

Exhibit 213 to Reilly Declaration -
Excerpts from Merck's Response to Request for Information,
dated May 4, 2005 (MRK-CHA00846087-6404) .................. Appx6798

Exhibit 214 to Reilly Declaration -
Approval Letter, dated September 6, 2005
(MRK-CHA00761865-89) ..................................................... Appx6804

Exhibit 215 to Reilly Declaration -
Supplemental Biologics License Application,
dated June 30, 2004 (MRK-CHA00137854-5) ...................... Appx6830

**Table of Contents**
**(Continued)**

**Page**

Exhibit 216 to Reilly Declaration -
Excerpts from A Comparison of the Safety, Tolerability, and
Immunogenicity of M-M-R™II Manufactured With
Recombinant Human Albumin (rHA) Versus M-M-R™II
Manufactured with Pooled-Donor Human Serum Albumin
(HSA) in Healthy Children 12 to 18 Months of Age
Protocol 009 (MRK-CHA00140056-41340) ......................... Appx6833

Exhibit 217 to Reilly Declaration -
Excerpts from Measles, Mumps, and Rubella Virus Vaccine,
Live-Replacement of Human Serum Albumin With
Recombinant Albumin (MRK-CHA00138137-72) ............... Appx6908

Exhibit 218 to Reilly Declaration -
Excerpts from Response to FDA Request for Information,
dated June 28, 2004 (MRK-CHA00124554-4690) ................ Appx6931

Exhibit 219 to Reilly Declaration -
Approval Letter, dated August 31, 2005
(MRK-CHA00141909-22) ..................................................... Appx6979

Exhibit 220 to Reilly Declaration -
M-M-R®II Label (April 1999)
(MRK-CHA00757072-6) ....................................................... Appx6994

Exhibit 221 to Reilly Declaration -
M-M-R®II Label (MRK-CHA00757108-11) ........................ Appx7000
*(Cont'd in Vol XVII)*

**Volume XVII**
**(Filed Under Seal)**

Exhibit 222 to Reilly Declaration -
M-M-R®II Label (2004) (MRK-CHA00757100-3) .............. Appx7005

Exhibit 223 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449260-70) ........................ Appx7010

**Table of Contents**
**(Continued)**

**Page**

Exhibit 224 to Reilly Declaration -
Current M-M-R®II Label (last revised: 09/2019),
downloaded on October 22, 2019 .......................................... Appx7022

Exhibit 225 to Reilly Declaration -
M-M-R®II Label (1990) (MRK-CHA00757060-3) .............. Appx7034

Exhibit 226 to Reilly Declaration -
Summary of Revisions of M-M-R®II Label
(MRK-CHA00137876-7) ....................................................... Appx7039

Exhibit 227 to Reilly Declaration -
Protocol 006 Clinical Study Report Synopsis,
dated August 16, 2004 (MRK-CHA01580213-19) ................ Appx7042

Exhibit 228 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449029-40) ........................ Appx7050

Exhibit 229 to Reilly Declaration -
Description of ProQuad® (MRK-CHA00177125-36) .......... Appx7063

Exhibit 230 to Reilly Declaration -
ProQuad® Label (MRK-CHA01449181-2) .......................... Appx7076

Exhibit 231 to Reilly Declaration -
Current ProQuad Label (last revised: 09/2019),
downloaded on October 22, 2019 .......................................... Appx7079

Exhibit 232 to Reilly Declaration -
Excerpts from Merck's Responses and Objections to Relators'
First Set of Interrogatories, dated April 9, 2015 .................... Appx7105

Exhibit 233 to Reilly Declaration -
Expert Report of Yonatan Grad, M.D., Ph.D.,
dated June 12, 2018 ............................................................... Appx7114

Exhibit 234 to Reilly Declaration -
Excerpts from "Summary of Notifiable Diseases-United
States, 2006," *MMWR*, 2008:55(53) ..................................... Appx7169

**Table of Contents**
**(Continued)**

Exhibit 235 to Reilly Declaration -
Excerpts from "Summary of Notifiable Diseases-United
States, 2009," *MMWR*, 2009:58(53) ..................................... Appx7173

Exhibit 236 to Reilly Declaration -
Excerpts from a "Summary of Notifiable Diseases-United
States, 2010," *MMWR*, 2012:59(53) ..................................... Appx7177

Exhibit 237 to Reilly Declaration -
Excerpts from "Summary of Notifiable Diseases-United
States, 2012," *MMWR*, 2014:61(53) ..................................... Appx7181

Exhibit 238 to Reilly Declaration -
Excerpts from "Summary of Notifiable Infectious
Diseases and Conditions-United States, 2013,"
*MMWR*, 2015:62(53) ........................................................... Appx7185

Exhibit 239 to Reilly Declaration -
Excerpts from "Summary of Notifiable Infectious
Diseases and Conditions-United States, 2014,"
*MMWR*, 2016:63(54) ........................................................... Appx7189

Exhibit 240 to Reilly Declaration -
Excerpts from "Summary of Notifiable Infectious
Diseases and Conditions-United States, 2015,"
*MMWR*, 2017:64(53) ........................................................... Appx7194

Exhibit 241 to Reilly Declaration -
National Notifiable Infectious Diseases and Conditions:
United States TABLE 2j. Reported cases of notifiable
diseases, by region and reporting area-United States and
U.S. territories, 2016 ........................................................... Appx7199

Exhibit 242 to Reilly Declaration -
National Notifiable Infectious Diseases and Conditions:
United States TABLE 2j. Reported cases of notifiable
diseases, by region and reporting area-United States and
U.S. territories, 2017 ........................................................... Appx7202

**Table of Contents**
**(Continued)**

**Page**

Exhibit 243 to Reilly Declaration -
Nationally Notifiable Infectious Diseases and Conditions,
United States: Weekly Tables; TABLE 1y. Weekly cases of
notifiable diseases, United States, U.S. Territories, and
Non-U.S. Residents weeks ending September 14, 2019
(week 37) ............................................................................ Appx7205

Exhibit 244 to Reilly Declaration -
"Decreased humoral immunity to mumps in young adults
immunized with MMR vaccine in childhood," Rasheed, *et al.*,
PNAS, dated September 17, 2019 116 (38) ........................... Appx7209

Exhibit 245 to Reilly Declaration -
Deposition Testimony of William L. Atkinson, M.D., MPH,
taken January 30, 2019 ......................................................... Appx7216

Exhibit 246 to Reilly Declaration -
Email from Don Latner to William Bellini,
dated July 29, 2010 (BIAOHE000446-53) ............................ Appx7270

Exhibit 247 to Reilly Declaration -
Deposition Testimony of Yonatan Grad, M.D., Ph.D.,
taken October 30, 2018 ......................................................... Appx7279

Exhibit 248 to Reilly Declaration -
Press Briefing Transcripts from CDC,
dated April 19, 2006 .............................................................. Appx7342

Exhibit 249 to Reilly Declaration -
Deposition Testimony of Alan W. Sims,
taken October 12, 2017 ......................................................... Appx7349

Exhibit 250 to Reilly Declaration -
Deposition Testimony of Katalin Abraham,
taken May 18, 2017 ............................................................... Appx7403
***(Cont'd in Vol XVIII)***

**Table of Contents**
**(Continued)**

**Volume XVIII**
**(Filed Under Seal)**

Exhibit 251 to Reilly Declaration -
Email from Eric T. Skjeveland to Christopher J. Petroski,
dated June 7, 2012 (MRK-CHA00955961) ........................... Appx7504

Exhibit 252 to Reilly Declaration -
Expert Report of Jonathan Temte, M.D., Ph.D.,
dated June 12, 2018 ................................................................. Appx7506

Exhibit 253 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449243-53) ........................ Appx7556

Exhibit 254 to Reilly Declaration -
Transcription of an MVX (voice mail) from Manal A. Morsy
to Henrietta Ukwu and Keith D. Chirgwin
(MRK-CHA00020421-2) ......................................................... Appx7568

Exhibit 255 to Reilly Declaration -
CDC Presentation, "Mumps-What Happened in 2006?
National Perspective," by Gustavo Dayan,
dated March 5, 2007
(MRK-CHA01372603-33) ....................................................... Appx7571

Exhibit 256 to Reilly Declaration -
"Commentary: Mumps Vaccines: Do We Need A New One?"
by Stanely A. Plotkin, M.D., accepted for publication
December 4, 2012 ................................................................... Appx7603

Exhibit 257 to Reilly Declaration -
"Mumps: A Pain in the Neck," by Stanley A. Plotkin, M.D.,
accepted for publication April 19, 2018 ................................. Appx7606

Exhibit 258 to Reilly Declaration -
"Emerging Mumps Infection," by Rubin, *et al.*,
accepted for publication April 12, 2016 ................................. Appx7609

**Table of Contents**
(Continued)

Exhibit 259 to Reilly Declaration -
"Measles and mumps outbreaks in the United States: Think
globally, vaccinate locally," by Jennifer A. Whitaker,
*Vaccine* 32 (2014) ................................................................. Appx7613

Exhibit 260 to Reilly Declaration -
"Remembering Mumps," by Latner, *et al.*, *PLOS Pathogens*,
published May 7, 2015 ............................................................ Appx7616

Exhibit 261 to Reilly Declaration -
"The resurgence of mumps and pertussis," by Martine Sabbe
and Corinne Vandermeulen accepted for publication
October 22, 2015 ................................................................... Appx7621

Exhibit 262 to Reilly Declaration -
"Mumps Outbreaks in Vaccinated Populations: Are Available
Mumps Vaccines Effective Enough to Prevent Outbreaks?"
by Dayan, *et al.*, accepted for publication May 20, 2008 ...... Appx7631

Exhibit 263 to Reilly Declaration -
Shapiro Deposition Exhibit 25, Program Announcement for
the Department of Defense's Defense Health Program for
Funding Opportunity No. W81XWH-17-PRMRP-CTA ........ Appx7642

Exhibit 264 to Reilly Declaration -
Excerpts from Notice of Grant Award, issued May 7, 2012
(RELATOR_00004392-478) .................................................. Appx7712

Exhibit 265 to Reilly Declaration -
Expert Report of William P. Nichols, dated June 12, 2018 .... Appx7743

Exhibit 266 to Reilly Declaration -
Solicitation Number 2003-N-00734,
issued December 19, 2002 by the CDC ................................. Appx7779

Exhibit 267 to Reilly Declaration -
Solicitation Number 2005-N-01706,
issued January 4, 2005 by the CDC ...................................... Appx7826

**Table of Contents**
**(Continued)**

**Page**

Exhibit 268 to Reilly Declaration -
Solicitation Number 2007-N-09211,
issued January 23, 2007 by the CDC .................................... Appx7872

Exhibit 269 to Reilly Declaration -
Solicitation Number 2010-N-11873,
issued January 26, 2010 by the CDC .................................... Appx7923

Exhibit 270 to Reilly Declaration -
Solicitation Number 2011-N-13043,
issued December 21, 2010 by the CDC ................................ Appx7956

Exhibit 271 to Reilly Declaration -
Solicitation Number 2012-N-14228,
issued December 13, 2011 by the CDC ................................ Appx7987
*(Cont'd in Vol XIX)*

**Volume XIX**
**(Filed Under Seal)**

Exhibit 272 to Reilly Declaration -
Solicitation Number 2013-N-14972,
issued January 22, 2013 by the CDC .................................... Appx8013

Exhibit 273 to Reilly Declaration -
Solicitation Number 2014-N-15784,
issued January 24, 2014 by the CDC .................................... Appx8040

Exhibit 274 to Reilly Declaration -
Solicitation Number 2015-N-16850,
issued January 16, 2015 by the CDC .................................... Appx8067

Exhibit 275 to Reilly Declaration -
Solicitation Number 2016-N-17693,
issued January, 4, 2015 by the CDC .................................... Appx8098

Exhibit 276 to Reilly Declaration -
Solicitation Number 2017-N-18099,
issued January 21, 2017 by the CDC .................................... Appx8127

**Table of Contents**
**(Continued)**

Exhibit 277 to Reilly Declaration -
Solicitation Number 2018-N-67769,
issued January 10, 2018 by the CDC ..................................... Appx8156

Exhibit 278 to Reilly Declaration -
Solicitation Number 75D301-19-R-67848,
issued January 7, 2019 by the CDC ...................................... Appx8183

Exhibit 279 to Reilly Declaration -
Summary of GSK-CDC MMR/V Vaccine Meeting
(GSK-MMR-0030570-2) ........................................................ Appx8212

Exhibit 280 to Reilly Declaration -
Charter of the Advisory Committee on Immunization
Practices, filed April 1, 2018 ................................................ Appx8216

Exhibit 281 to Reilly Declaration -
Relators' Expert Report of Dr. Thomas McGuire,
dated March 13, 2018 ........................................................... Appx8222

Exhibit 282 to Reilly Declaration - [1]
Transactional data, "1998 Lot Assignment.xlsx"
(MRK-CHA02143443) ........................................................... Appx8369

Exhibit 283 to Reilly Declaration -
Transactional data, "1999 Lot Assignment.xlsx"
(MRK-CHA02143444) ........................................................... Appx8371

Exhibit 284 to Reilly Declaration -
Transactional data, "2000 Lot Assignment.xlsx"
(MRK-CHA02143445) ........................................................... Appx8373

Exhibit 285 to Reilly Declaration -
Transactional data, "2001 Lot Assignment.xlsx"
(MRK-CHA02143446) ........................................................... Appx8375

---

[1] Exhibits 282 through 299 to the Reilly Declaration have been omitted by consent of the parties.

**Table of Contents**
**(Continued)**

Exhibit 286 to Reilly Declaration -
Transactional data, "2002 Lot Assignment.xlsx"
(MRK-CHA02143447) ........................................................ Appx8377

Exhibit 287 to Reilly Declaration -
Transactional data, "2003 Lot Assignment.xlsx"
(MRK-CHA02143448) ........................................................ Appx8379

Exhibit 288 to Reilly Declaration -
Transactional data, "2004 Lot Assignment.xlsx"
(MRK-CHA02143449) ........................................................ Appx8381

Exhibit 289 to Reilly Declaration -
Transactional data, "2005 Lot Assignment.xlsx"
(MRK-CHA02143450) ........................................................ Appx8383

Exhibit 290 to Reilly Declaration -
Transactional data, "2006 Lot Assignment.xlsx"
(MRK-CHA02143451) ........................................................ Appx8385

Exhibit 291 to Reilly Declaration -
Transactional data, "2007 Lot Assignment.xlsx"
(MRK-CHA02143452) . ........................................................ Appx8387

Exhibit 292 to Reilly Declaration -
Transactional data, "2008 Lot Assignment.xlsx"
(MRK-CHA02143453) ........................................................ Appx8389

Exhibit 293 to Reilly Declaration -
Transactional data, "2009 Lot Assignment.xlsx"
(MRK-CHA02143454) ........................................................ Appx8391

Exhibit 294 to Reilly Declaration -
Transactional data, "2010 Lot Assignment.xlsx"
(MRK-CHA02143455) ........................................................ Appx8393

Exhibit 295 to Reilly Declaration -
Transactional data, "2011 Lot Assignment.xlsx"
(MRK-CHA02143456) ........................................................ Appx8395

**Table of Contents**
**(Continued)**

**Page**

Exhibit 296 to Reilly Declaration -
Transactional data, "2012 Lot Assignment.xlsx"
(MRK-CHA02143457) .......................................................... Appx8397

Exhibit 297 to Reilly Declaration -
Transactional data, "2013 Lot Assignment.xlsx"
(MRK-CHA02143458) .......................................................... Appx8399

Exhibit 298 to Reilly Declaration -
Transactional data, "2014 Lot Assignment.xlsx"
(MRK-CHA02143459) .......................................................... Appx8401

Exhibit 299 to Reilly Declaration -
Transactional data, "2015 Lot Assignment.xlsx"
(MRK-CHA02143460) .......................................................... Appx8403

Exhibit 300 to Reilly Declaration -
Letter from Lisa C. Dykstra to Counsel,
dated April 17, 2017 ............................................................. Appx8405

Exhibit 301 to Reilly Declaration -
Letter from Stan Bernard, M.D., M.B.A. to Kim Haupt,
dated November 9, 2008 (MRK-CHA02063339-45) ............ Appx8407

Exhibit 302 to Reilly Declaration -
Merck's 2004 Vaccine for Children Contract with the CDC
(MRK-CHA01371280-310) ................................................... Appx8415

Exhibit 303 to Reilly Declaration -
Merck's 2003 Vaccine for Children Contract with the CDC
(MRK-CHA01371311-40) ..................................................... Appx8447

Exhibit 304 to Reilly Declaration -
Merck's 2005 Vaccine for Children Contract with the CDC
(MRK-CHA01371341-72) ..................................................... Appx8478
*(Cont'd in Vol XX)*

**Table of Contents**
**(Continued)**

**Page**

**Volume XX**
**(Filed Under Seal)**

Exhibit 305 to Reilly Declaration -
Merck's 2010 Vaccine for Children Contract with the CDC
(MRK-CHA01371373-97) .................................................... Appx8511

Exhibit 306 to Reilly Declaration -
Merck's 2012 Vaccine for Children Contract with the CDC
(MRK-CHA01371398-421) .................................................. Appx8537

Exhibit 307 to Reilly Declaration -
Merck's 2013 Vaccine for Children Contract with the CDC
(MRK-CHA01371422-44) .................................................... Appx8562

Exhibit 308 to Reilly Declaration -
Merck's 2014 Vaccine for Adults Contract with the CDC
(MRK-CHA01371445-72) .................................................... Appx8586

Exhibit 309 to Reilly Declaration -
Merck's 2014 Vaccine for Children Contract with the CDC
(MRK-CHA01371473-96) .................................................... Appx8615

Exhibit 310 to Reilly Declaration -
Merck's 2011 Vaccine for Children Contract with the CDC
(MRK-CHA01371497-518) .................................................. Appx8640

Exhibit 311 to Reilly Declaration -
Merck's 2011 Vaccine for Adults Contract with the CDC
(MRK-CHA01371519-47) .................................................... Appx8663

Exhibit 312 to Reilly Declaration -
Merck's 2013 Vaccine for Adults Contract with the CDC
(MRK-CHA01371548-71) .................................................... Appx8693

Exhibit 313 to Reilly Declaration -
Merck's 2012 Vaccine for Adults Contract with the CDC
(MRK-CHA01371572-603) .................................................. Appx8718

**Table of Contents**
**(Continued)**

**Page**

Exhibit 314 to Reilly Declaration -
Merck's 2007 Vaccine for Children Contract with the CDC
(MRK-CHA01371604-23) ...................................................... Appx8751

Exhibit 315 to Reilly Declaration -
Merck's 2006 Vaccine for Children Contract with the CDC
(MRK-CHA01371624-55) ...................................................... Appx8772

Exhibit 316 to Reilly Declaration -
Merck's 2001 Vaccine for Children Contract with the CDC
(MRK-CHA01371656-92) ...................................................... Appx8805

Exhibit 317 to Reilly Declaration -
Merck's 2000 Vaccine for Children Contract with the CDC
(MRK-CHA01371693-727) ...................................................... Appx8843

Exhibit 318 to Reilly Declaration -
Merck's 1998 Vaccine for Children Contract with the CDC
(MRK-CHA01371728-50) ...................................................... Appx8879

Exhibit 319 to Reilly Declaration -
Merck's 1999 Vaccine for Children Contract with the CDC
(MRK-CHA01371751-84) ...................................................... Appx8903

Exhibit 320 to Reilly Declaration -
Merck's 2002 Vaccine for Children Contract with the CDC
(MRK-CHA01371785-816) ...................................................... Appx8938

Exhibit 321 to Reilly Declaration -
Merck's 2008 Vaccine for Children Contract with the CDC
(MRK-CHA01371817-840) ...................................................... Appx8971

Exhibit 322 to Reilly Declaration -
Merck's 2009 Vaccine for Adults Contract with the CDC
(MRK-CHA01371841-879) ...................................................... Appx8996
*(Cont'd in Vol XXI)*

**Table of Contents**
**(Continued)**

**Page**

**Volume XXI**
**(Filed Under Seal)**

Exhibit 323 to Reilly Declaration -
Merck's 2009 Vaccine for Children Contract with the CDC
(MRK-CHA01371880-1900) .................................................. Appx9036

Exhibit 324 to Reilly Declaration -
Merck's 2010 Vaccine for Adults Contract with the CDC
(MRK-CHA01371901-33) ...................................................... Appx9058

Exhibit 325 to Reilly Declaration -
Merck's 2015 Vaccine for Adults Contract with the CDC
(MRK-CHA01371934-61) ...................................................... Appx9092

Exhibit 326 to Reilly Declaration -
Merck's 2016 Vaccine for Children Contract with the CDC
(MRK-CHA01371962-89) ...................................................... Appx9121

Exhibit 327 to Reilly Declaration -
Merck's 2010 Vaccine for Adults Contract with the CDC
(MRK-CHA01371990-2020) .................................................. Appx9150

Exhibit 328 to Reilly Declaration -
Merck's 2016 Vaccine for Adults Contract with the CDC
(MRK-CHA01372021-44) ...................................................... Appx9182

Exhibit 329 to Reilly Declaration -
Merck's 2015 Vaccine for Children Contract with the CDC
(MRK-CHA01372045-72) ...................................................... Appx9207

Exhibit 330 to Reilly Declaration -
Invoice, dated March 14, 2012 (MRK-CHA01371253) ........ Appx9236

Exhibit 331 to Reilly Declaration -
Invoice, dated January 3, 2011(MRK-CHA01371256) ......... Appx9238

Exhibit 332 to Reilly Declaration -
Invoice, dated January 6, 2014 (MRK-CHA01371258) ........ Appx9240

**Table of Contents**
**(Continued)**

**Page**

Exhibit 333 to Reilly Declaration -
Invoice, dated May 20, 2010 (MRK-CHA01371259) ........... Appx9242

Exhibit 334 to Reilly Declaration -
Invoice, dated January 14, 2013 (MRK-CHA01371261) ...... Appx9244

Exhibit 335 to Reilly Declaration -
Invoice, dated February 2, 2011 (MRK-CHA01371262) ...... Appx9246

Exhibit 336 to Reilly Declaration -
Invoice, dated November 17, 2010 (MRK-CHA01371263) . Appx9248

Exhibit 337 to Reilly Declaration -
Invoice, dated November 28, 2012 (MRK-CHA01371264) . Appx9250

Exhibit 338 to Reilly Declaration -
Invoice, dated March 20, 2013 (MRK-CHA01371268-69) ... Appx9252

Exhibit 339 to Reilly Declaration -
Invoice, dated January 22, 2016 (MRK-CHA01371274) ...... Appx9255

Exhibit 340 to Reilly Declaration -
Invoice, dated February 26, 2014 (MRK-CHA01371278) .... Appx9257

Exhibit 341 to Reilly Declaration -
Invoice, dated February 4, 2015 (MRK-CHA01371279) ...... Appx9259

Exhibit 342 to Reilly Declaration -
FDA webpage, "National Drug Code Directory," accessible
online at https://www.fda.gov/drugs/drug-approvals-and-
databases/national-drug-code-directory, last accessed
October 1, 2019 .................................................................... Appx9261

Exhibit 343 to Reilly Declaration -
Email from Jonathan Hartzel to Joseph M. Antonello,
dated October 18, 2005 (MRK-CHA00759061-4) ................ Appx9268

**Table of Contents**
**(Continued)**

Exhibit 344 to Reilly Declaration -
Email from Joseph M. Antonello to Timothy L. Shofield,
dated May 5, 2005 (MRK-CHA00649638-40) ...................... Appx9273

Exhibit 345 to Reilly Declaration -
Letter from Lisa C. Dykstra to Counsel,
dated September 13, 2018 ...................................................... Appx9277

Exhibit 346 to Reilly Declaration -
Letter from Lisa C. Dykstra to the Honorable
Lynne A. Sitarski, dated June 15, 2015 .................................. Appx9289

Exhibit 347 to Reilly Declaration -
Deposition Testimony of Peter Calcott, Ph.D.,
taken September 7, 2018 ....................................................... Appx9307

Exhibit 348 to Reilly Declaration -
Email from Mandie Lyon, dated May 5, 2006
(MRK-CHA00069026-36) ..................................................... Appx9385

Exhibit 349 to Reilly Declaration -
Presentation, M-M-R II End Expiry, produced as "12-14
CDOC presentation.ppt" (MRK-CHA00021319) ................. Appx9397

Exhibit 350 to Reilly Declaration -
Department of Justice Press Release, dated May 13, 2013 .... Appx9410

Exhibit 351 to Reilly Declaration -
Department of Justice Press Release,
dated October 26, 2010 ......................................................... Appx9414

Exhibit 352 to Reilly Declaration -
Department of Justice Press Release,
dated January 12, 2017 ......................................................... Appx9417

Exhibit 353 to Reilly Declaration -
Department of Justice Press Release,
dated September 24, 2014 ...................................................... Appx9420

**Table of Contents**
**(Continued)**

**Page**

Exhibit 354 to Reilly Declaration -
Department of Justice Press Release, dated April 15, 2009 ... Appx9423

Exhibit 355 to Reilly Declaration -
Rule 30(b)(6) Deposition topics, dated December 13, 2016
(Stannard Ex. 3) .................................................................. Appx9426

Exhibit 356 to Reilly Declaration -
Department of Justice Press Release,
dated August 8, 2014 ........................................................... Appx9443

Exhibit 357 to Reilly Declaration -
FDA Form 483, dated August 6, 2001
(MRK-CHA00000547) .......................................................... Appx9446

Exhibit 358 to Reilly Declaration -
Deposition Testimony of Robert Malone, M.D.,
taken September 14, 2018 ..................................................... Appx9448
*(Cont'd in Vol XXII)*

**Volume XXII**
**(Filed Under Seal)**

Exhibit 359 to Reilly Declaration -
Deposition Testimony of Dr. Manal Morsy,
taken August 5, 2016 ........................................................... Appx9511

Exhibit 360 to Reilly Declaration -
Atkinson Deposition Exhibit 6, "Recommendations of
the Immunization Practices Advisory Committee Measles
Prevention: Supplementary Statement,"
dated January 13, 1989 ......................................................... Appx9621

Declaration of Lisa C. Dykstra in Support of
Defendant's Motions for Summary Judgment,
executed October 25, 2019 (Doc. 295) .................................. Appx9625

Exhibit 1 to Dykstra Declaration -
Stephen A. Krahling's Resume (MRK-KRA00331426-7) .... Appx9656

**Table of Contents**
**(Continued)**

Exhibit 2 to Dykstra Declaration -
Excerpts from Deposition Testimony of Stephen Krahling,
taken May 2, 2017 ................................................................ Appx9659

Exhibit 3 to Dykstra Declaration -
Merck Employee Initialization Form for Stephen Krahling
(MRK-KRA00582401) .......................................................... Appx9680

Exhibit 4 to Dykstra Declaration -
Stephen Krahling's November 30, 2001 Separation Agreement
(MRK-KRA00582394-7) ........................................................ Appx9682

Exhibit 5 to Dykstra Declaration -
Excerpts from Relator Stephen A. Krahling's Responses
and Objections to Merck's First Set of Interrogatories,
dated January 28, 2015 .......................................................... Appx9687

Exhibit 6 to Dykstra Declaration -
Excerpts from Relator Stephen A. Krahling's Responses
and Objections to Merck's Revised First Set of Interrogatories,
dated May 18, 2015 ............................................................... Appx9716

Exhibit 7 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Stephen Krahling, taken May 3, 2017 .................................... Appx9783

Exhibit 8 to Dykstra Declaration -
Stephen Krahling's handwritten notes,
dated October 1, 2001 (RELATOR_00001044-5) ................. Appx9792

Exhibit 9 to Dykstra Declaration -
FDA's Summary of Findings, dated August 6, 2001
(RELATOR_00004086-94) ................................................... Appx9795

Exhibit 10 to Dykstra Declaration -
Merck FDA Inspection Records, dated August 6, 2001
(MRK-KRA01631009-254) .................................................. Appx9805
*(Cont'd in Vol XXIII)*

**Table of Contents**
**(Continued)**

**Page**

**Volume XXIII**
**(Filed Under Seal)**

Exhibit 11 to Dykstra Declaration -
Excerpts from the Expert Report of
D. Bruce Burlington M.D. ................................................... Appx10052

Exhibit 12 to Dykstra Declaration -
Merck's Virus and Cell Biology Organization Chart
(RELATOR_00000902-3) ................................................... Appx10070

Exhibit 13 to Dykstra Declaration -
Excerpts from Relator Stephen A. Krahling's Responses
and Objections to Defendant Merck's Requests for
Admission, dated April 4, 2016 .......................................... Appx10073

Exhibit 14 to Dykstra Declaration -
FDA Form 483 Frequently Asked Questions ....................... Appx10101

Exhibit 15 to Dykstra Declaration -
FDA Re-Inspection Memorandum, dated August 10, 2001
(MRK-KRA00071241-5) ................................................... Appx10104

Exhibit 16 to Dykstra Declaration -
CBER Merck Communications Mumps Expiry,
dated August 8, 2002 (MRK-KRA00623049-51) ............... Appx10110

Exhibit 17 to Dykstra Declaration -
Email Communication with Attachments regarding FDA
Inspection-IND 1016, dated September 14, 2001
(MRK-KRA00063885-8) ................................................... Appx10114

Exhibit 18 to Dykstra Declaration -
FDA Telephone Conversation Memorandum,
dated September 17, 2001 (MRK-KRA00019107) ............. Appx10119

Exhibit 19 to Dykstra Declaration -
FDA Teleconference-IND 1016 Inspection Follow up,
dated September 25, 2001 (MRK-KRA00071300-1) .......... Appx10121

**Table of Contents**
**(Continued)**

Exhibit 20 to Dykstra Declaration -
CBER December 7, 2001 Teleconference: Mumps Inspection
results and discussions, dated December 13, 2001
(MRK-KRA00019640-6) .................................................... Appx10124

Exhibit 21 to Dykstra Declaration -
General Correspondence to FDA in response to CBER
Comments, dated February 4, 2002
(MRK-KRA00025847-916) ................................................ Appx10132

Exhibit 22 to Dykstra Declaration -
General Correspondence to FDA regarding April 18, 2002
Teleconference, dated April 2002
(MRK-KRA00337265-72) ................................................. Appx10203

Exhibit 23 to Dykstra Declaration -
BB-IND 1016 Memorandum regarding Summary of
Discussion with CBER on March 22, 2002 regarding
acceptability of mumps PRN assay data,
dated March 23, 2002 (MRK-KRA00009042) .................... Appx10212

Exhibit 24 to Dykstra Declaration -
Offer Letter to Stephen A. Krahling, dated October 24, 2000
(RELATOR_00001058-60) ................................................. Appx10214

Exhibit 25 to Dykstra Declaration -
Correspondence from Stephen A. Krahling to
Emilio A. Emini, Ph.D., dated April 8, 2001
(RELATOR_00000328-31) ................................................. Appx10218

Exhibit 26 to Dykstra Declaration -
Email communication from Stephen Krahling to
Alan Shaw, dated July 17, 2001 (MRK-KRA00002243) .... Appx10223

Exhibit 27 to Dykstra Declaration -
Email communication from Stephen Krahling to Alan Shaw,
dated September 25, 2001 (RELATOR_00000745) ............ Appx10225

**Table of Contents**
**(Continued)**

**Page**

Exhibit 28 to Dykstra Declaration -
Email communications between Stephen Krahling and
Alan Shaw, dated September 27-28, 2001
(RELATOR_00000747) ...................................................... Appx10227

Exhibit 29 to Dykstra Declaration -
Letter from Emilio A. Emini, Ph.D. to Stephen Krahling,
dated October 15, 2001, (RELATOR_00001100-3) ............ Appx10229

Exhibit 30 to Dykstra Declaration -
Letter from Tonia Torquato to Alexis Pinto,
dated October 22, 2001 (MRK-KRA00002033-5) .............. Appx10234

Exhibit 31 to Dykstra Declaration -
Letter from Alexis Pinto to Tonia Torquato,
dated October 19, 2001 (MRK-KRA00002036-9) .............. Appx10238

Exhibit 32 to Dykstra Declaration -
Letter from Tonia Torquato to Alexis Pinto,
dated October 26, 2001 (MRK-KRA00002028-9) .............. Appx10243

Exhibit 33 to Dykstra Declaration -
Letter from Alexis Pinto to Tonia Torquato,
dated October 26, 2001 (MRK-KRA00002017-25) ............ Appx10246

Exhibit 34 to Dykstra Declaration -
Letter from Tonia Torquato to Alexis Pinto,
dated October 29, 2001 (MRK-KRA00002013-16) ............ Appx10256

Exhibit 35 to Dykstra Declaration -
Letter from Axel Johnson to Tonia Torquato,
dated November 26, 2001 (RELATOR_00001086) ............ Appx10261

Exhibit 36 to Dykstra Declaration -
Stephen Krahling Pay Stubs (RELATOR_00001061-7) ...... Appx10263

Exhibit 37 to Dykstra Declaration -
Letter from Axel Johnson to Tonia Torquato,
dated December 20, 2001 (RELATOR_00001090) ............. Appx10271

**Table of Contents**
(Continued)

Exhibit 38 to Dykstra Declaration -
CDC Vaccines for Children Program web page
"About VFC," last reviewed on February 18, 2016 ............. Appx10273

Exhibit 39 to Dykstra Declaration -
Advisory Committee on Immunization Practices Charter
approved March 27, 2018 .................................................... Appx10277

Exhibit 40 to Dykstra Declaration -
Excerpts from Expert Report of William P. Nichols ............ Appx10283

Exhibit 41 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Mark Pallansch,
Ph.D., taken October 13, 2017 ............................................ Appx10292

Exhibit 42 to Dykstra Declaration -
1971 MMR Product License (MRK-KRA01972538) ......... Appx10307

Exhibit 43 to Dykstra Declaration -
1995 MMR Product License (MRK-KRA01676252) ......... Appx10309

Exhibit 44 to Dykstra Declaration -
Merck's Establishment License (MRK-KRA01676250) ..... Appx10311

Exhibit 45 to Dykstra Declaration -
Advisory Committee on Immunization Practices Vaccines for
Children Program-Resolution No. 10/17-3, Vaccines to
Prevent Measles, Mumps, Rubella and Varicella,
dated October 25, 2017 ....................................................... Appx10313

Exhibit 46 to Dykstra Declaration -
Vaccines for Children Program-Resolution No. 6/06-1,
Vaccines included in the VFC Program,
dated June 29, 2006 ............................................................ Appx10317

Exhibit 47 to Dykstra Declaration -
Advisory Committee on Immunization Practices, Policies
and Procedures, dated December 2018 ............................... Appx10319

**Table of Contents**
**(Continued)**

**Page**

Exhibit 48 to Dykstra Declaration -
"Recommendation of the Advisory Committee on
Immunization Practices for Use of a Third Dose of Mumps
Virus Containing Vaccine in Persons at Increased Risk for
Mumps During Outbreak," *MMWR*,
dated January 12, 2018 ....................................................... Appx10345

Exhibit 49 to Dykstra Declaration -
Excerpts from the Expert Report of
William L. Atkinson M.D., MPH, dated June 12, 2018 ....... Appx10355

Exhibit 50 to Dykstra Declaration -
National Center for Immunization and Respiratory Diseases
(CVG) Fact Sheet ................................................................ Appx10365

Exhibit 51 to Dykstra Declaration -
"Prevention of Measles, Rubella, Congenital Rubella
Syndrome, and Mumps," *MMWR*, dated June 14, 2013 ...... Appx10380

Exhibit 52 to Dykstra Declaration -
CDC's "Measles, Mumps, and Rubella (MMR) Vaccination:
What Everyone Should Know," last reviewed
March 28, 2019 ................................................................... Appx10421

Exhibit 53 to Dykstra Declaration -
"Measles, Mumps and Rubella-Vaccine Use and Strategies for
Elimination of Measles, Rubella and Congenital Rubella
Syndrome and Control of Mumps: Recommendations of the
Advisory Committee on Immunization Practices,"
*MMWR*, dated May 22, 1998 ............................................... Appx10428

Exhibit 54 to Dykstra Declaration -
Merck's 1998 Vaccine for Children Contract with the CDC
(MRK-KRA01371728-50) ................................................... Appx10473

Exhibit 55 to Dykstra Declaration -
Merck's 1999 Vaccine for Children Contract with the CDC
(MRK-KRA01371751-84) ................................................... Appx10497
*(Cont'd in Vol XXIV)*

**Table of Contents**
**(Continued)**

**Volume XXIV**
**(Filed Under Seal)**

Exhibit 56 to Dykstra Declaration -
Merck's 2000 Vaccine for Children Contract with the CDC
(MRK-KRA01371693-1727) ................................................ Appx10532

Exhibit 57 to Dykstra Declaration -
Merck's 2001 Vaccine for Children Contract with the CDC
(MRK-KRA01371656-92) ................................................ Appx10568

Exhibit 58 to Dykstra Declaration -
Merck's 2002 Vaccine for Children Contract with the CDC
(MRK-KRA01371785-816) ................................................ Appx10606

Exhibit 59 to Dykstra Declaration -
Merck's 2003 Vaccine for Children Contract with the CDC
(MRK-KRA01371311-340) ................................................ Appx10639

Exhibit 60 to Dykstra Declaration -
Merck's 2004 Vaccine for Children Contract with the CDC
(MRK-KRA01371280-310) ................................................ Appx10670

Exhibit 61 to Dykstra Declaration -
Merck's 2005 Vaccine for Children Contract with the CDC
(MRK-KRA01371341-72) ................................................ Appx10702

Exhibit 62 to Dykstra Declaration -
Merck's 2006 Vaccine for Children Contract with the CDC
(MRK-KRA01371624-55) ................................................ Appx10735

Exhibit 63 to Dykstra Declaration -
Merck's 2007 Vaccine for Children Contract with the CDC
(MRK-KRA01371604-23) ................................................ Appx10768

Exhibit 64 to Dykstra Declaration -
Merck's 2008 Vaccine for Children Contract with the CDC
(MRK-KRA01371817-40) ................................................ Appx10789

**Table of Contents**
**(Continued)**

Exhibit 65 to Dykstra Declaration -
Merck's 2009 Vaccine for Children Contract with the CDC
(MRK-KRA01371880-1900) ................................................ Appx10814

Exhibit 66 to Dykstra Declaration -
Merck's 2010 Vaccine for Children Contract with the CDC
(MRK-KRA01371373-97) ................................................... Appx10836

Exhibit 67 to Dykstra Declaration -
Merck's 2011 Vaccine for Children Contract with the CDC
(MRK-KRA01371497-518) .................................................. Appx10862

Exhibit 68 to Dykstra Declaration -
Merck's 2012 Vaccine for Children Contract with the CDC
(MRK-KRA01371398-421) .................................................. Appx10885

Exhibit 69 to Dykstra Declaration -
Merck's 2013 Vaccine for Children Contract with the CDC
(MRK-KRA01371422-44) ................................................... Appx10910

Exhibit 70 to Dykstra Declaration -
Merck's 2014 Vaccine for Children Contract with the CDC
(MRK-KRA01371473-96) ................................................... Appx10934

Exhibit 71 to Dykstra Declaration -
Merck's 2015 Vaccine for Children Contract with the CDC
(MRK-KRA01372045-72) ................................................... Appx10959

Exhibit 72 to Dykstra Declaration -
Merck's 2016 Vaccine for Children Contract with the CDC
(MRK-KRA01371962-89) ................................................... Appx10988
***(Cont'd in Vol XXV)***

**Volume XXV**
**(Filed Under Seal)**

Exhibit 73 to Dykstra Declaration -
CDC Vaccine Price List for Vaccines for Children Program
as of April 6, 2001 .............................................................. Appx11017

**Table of Contents**
**(Continued)**

Exhibit 74 to Dykstra Declaration -
Letter from Katherine Norris to Lisa C. Dykstra, dated
November 24, 2015 (MRK-KRA01373392-1373393) ........ Appx11022

Exhibit 75 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Alan Sims,
taken October 12, 2017 ........................................ Appx11025

Exhibit 76 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Michele Taylor,
taken May 9, 2017 ................................................ Appx11045

Exhibit 77 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Colleen Duffy,
taken December 12, 2016 ...................................... Appx11052

Exhibit 78 to Dykstra Declaration -
Letter from Lisa Dykstra to CDC regarding FOIA
request, dated May 18, 2015 ................................. Appx11058

Exhibit 79 to Dykstra Declaration -
ACIP's Vaccine Recommendations and Guidelines-MMR
Vaccine Recommendations, last reviewed
November 21, 2014 ............................................. Appx11067

Exhibit 80 to Dykstra Declaration -
FDA's Vaccines Licensed for Use in the United States ....... Appx11069

Exhibit 81 to Dykstra Declaration -
CDC's Mumps Vaccination, last reviewed
March 8, 2019 .................................................... Appx11077

Exhibit 82 to Dykstra Declaration -
Excerpts from the Expert Report of
Thomas G. McGuire Ph.D., dated March 13, 2018 ............. Appx11081

Exhibit 83 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Thomas G. McGuire, taken July 2, 2018 ........................ Appx11086

**Table of Contents**
**(Continued)**

**Page**

Exhibit 84 to Dykstra Declaration -
Relator Joan Wlochowski's Responses and Objections
to Merck's Revised First Set of Interrogatories,
dated May 20, 2015 ............................................................ Appx11091

Exhibit 85 to Dykstra Declaration -
Relator Joan Wlochowski's Responses and Objections
to Defendant Merck's Request for Admission,
dated April 6, 2016 ............................................................ Appx11116

Exhibit 86 to Dykstra Declaration -
"Live, Attenuated Mumps-Virus Vaccine," *New England
Journal of Medicine*, by R. Weibel, *et al.*,
dated February 2, 1967 ....................................................... Appx11144

Exhibit 87 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to Alison Fisher, Ph.D.,
dated October 17, 2005 (MRK-KRA00000479-80) ............. Appx11152

Exhibit 88 to Dykstra Declaration -
Response to FDA Request for Information,
dated November 15, 2006 (MRK-KRA00000393-409) ....... Appx11155

Exhibit 89 to Dykstra Declaration -
Email from Zak Johns to Marlene Koury,
dated February 23, 2017 ...................................................... Appx11173

Exhibit 90 to Dykstra Declaration -
Excerpts from the Expert Report of
Ann M. Arvin, M.D., dated June 11, 2018 ........................... Appx11176

Exhibit 91 to Dykstra Declaration -
Excerpts from the Expert Report of
Dipti Gulati, M.S., D. Phil. .................................................. Appx11183

Exhibit 92 to Dykstra Declaration -
Excerpts from the Expert Report of Anna Durbin, M.D.,
dated June 14, 2018 ............................................................ Appx11194

**Table of Contents**
**(Continued)**

Exhibit 93 to Dykstra Declaration -
FDA's Guidance for Industry for the Evaluation of
Combination Vaccines for Preventable Diseases: Production,
Testing and Clinical Studies, dated April 1997 .................... Appx11210

Exhibit 94 to Dykstra Declaration -
CDC's How Flu Vaccine Effectiveness and Efficacy is
Measured, last reviewed January 29, 2016 ......................... Appx11234

Exhibit 95 to Dykstra Declaration -
Excerpts from the CDC's Manual for the Surveillance of
Vaccine-Preventable Diseases ............................................. Appx11243

Exhibit 96 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Joseph Antonello, taken August 3, 2017 ............................. Appx11253

Exhibit 97 to Dykstra Declaration -
"Summary of Notifiable Diseases-United States," 2005,
*MMWR*, dated March 30, 2007 ........................................... Appx11258

Exhibit 98 to Dykstra Declaration -
CDC's Mumps Cases and Outbreaks, last reviewed
September 17, 2019 ............................................................ Appx11361

Exhibit 99 to Dykstra Declaration -
CDC's Mumps: For Healthcare Providers, last reviewed
March 15, 2019 .................................................................. Appx11364

Exhibit 100 to Dykstra Declaration -
CDC's Principles of Epidemiology in Public Health Practice,
Third Edition: An Introduction to Applied Epidemiology
and Biostatistics, last reviewed May 18, 2012 .................... Appx11369

Exhibit 101 to Dykstra Declaration -
CDC's Flu Vaccine Effectiveness: Questions and Answers for
Health Professionals, last updated November 27, 2013 ...... Appx11373

**Table of Contents**
**(Continued)**

Exhibit 102 to Dykstra Declaration -
"Mumps Virus," by Cherry, *et al.*, *Viral Infections*,
(7th Edition, Chapter 180) ..................................................... Appx11383

Exhibit 103 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
David Kessler, M.D., taken September 28, 2018 ................. Appx11399

Exhibit 104 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Anna Durbin, M.D., taken October 8, 2018 ......................... Appx11402

Exhibit 105 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Emilio Emini, Ph.D., taken June 6, 2017 ............................. Appx11406

Exhibit 106 to Dykstra Declaration -
January 1998 *Curriculum Vitae* of David L. Krah, M.D.
(MRK-KRA00000695-702) ................................................. Appx11415

Exhibit 107 to Dykstra Declaration -
Excerpts from the Expert Report of
David A. Kessler, M.D. ....................................................... Appx11424

Exhibit 108 to Dykstra Declaration -
FDA Lot Release ................................................................. Appx11429

Exhibit 109 to Dykstra Declaration -
Drugs@FDA Instructions: Health Information ................... Appx11434

Exhibit 110 to Dykstra Declaration -
FDA's Vaccine Safety Questions and Answers ................... Appx11440

Exhibit 111 to Dykstra Declaration -
Excerpts from the Expert Report of
Gary Freed M.D., MPH ...................................................... Appx11447

**Table of Contents**
**(Continued)**

**Page**

Exhibit 112 to Dykstra Declaration -
"Vaccine Manufacturing," by Philip Gomez
and James Robinson ............................................................ Appx11450

Exhibit 113 to Dykstra Declaration -
Informational Amendment: Clinical, dated September 15, 2011
(GSK-MMR-IND-0022162-3) ............................................. Appx11461

Exhibit 114 to Dykstra Declaration -
Mumps Serology Strategy in Support of Phase III
Development of Priorix®
(GSK-MMR-IND-0022180-6) ............................................. Appx11464

Exhibit 115 to Dykstra Declaration -
Fax from Yolanda Stewart to Donna Boyce,
dated April 25, 2012 (GSK-MMR-IND-0029256-63) ......... Appx11472

Exhibit 116 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Dipti Gulati, M.S., D. Phil., taken December 5, 2018 ......... Appx11481

Exhibit 117 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Amy Keegan,
taken February 9, 2018 ........................................................ Appx11485

Exhibit 118 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
David Krah, M.D., taken July 11, 2017 ............................... Appx11488

Exhibit 119 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
David Krah, M.D., taken July 12, 2017 ............................... Appx11493

Exhibit 120 to Dykstra Declaration -
Excerpts from the Expert Report of
Marcela Pasetti, Ph.D. ........................................................ Appx11497
*(Cont'd in Vol XXVI)*

**Table of Contents**
**(Continued)**

**Volume XXVI**
**(Filed Under Seal)**

Exhibit 121 to Dykstra Declaration -
M-M-R®II Current Label ................................................... Appx11507

Exhibit 122 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Cynthia Morrisey, taken July 27, 2017 ............................... Appx11519

Exhibit 123 to Dykstra Declaration -
Supplemental Biologics License Application,
dated January 29, 2004 (MRK-KRA00000032-139) ........... Appx11522

Exhibit 124 to Dykstra Declaration -
Amendment to Supplemental Biologics License
Application Response to FDA Request for Information,
dated June 5, 2007, with Attachments
(MRK-KRA00000368-82) ................................................. Appx11631

Exhibit 125 to Dykstra Declaration -
Approval Letter, dated December 8, 2007
(MRK-KRA00000383-4) ................................................... Appx11647

Exhibit 126 to Dykstra Declaration -
Letter from Paul Richman, Ph.D. to Alison Fisher, Ph.D.,
dated May 18, 2007 (MRK-KRA00000385-6) .................... Appx11650

Exhibit 127 to Dykstra Declaration -
Response to Form FDA 483, dated August 20, 2001
(MRK-KRA00000481-539) ................................................ Appx11653

Exhibit 128 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
teleconference regarding clarification of CBER's comments on
the Mumps Expiry trial, dated November 10, 1998
(MRK-KRA00001215-7) .................................................... Appx11713

**Table of Contents**
**(Continued)**

Exhibit 129 to Dykstra Declaration -
Memo re: Mumps End Expiry trial; November 29th, 2000
CBER teleconference, dated November 29, 2000
(MRK-KRA00001218-21) .................................................... Appx11717

Exhibit 130 to Dykstra Declaration -
Letter from Manal Morsy, M.D., Ph.D., to Luba Vujcic,
dated December 1, 1999 (MRK-KRA00001222-30) ........... Appx11722

Exhibit 131 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to
Manal Morsy, M.D., Ph.D., dated October 27, 2000
(MRK-KRA00001231-6) .................................................... Appx11732

Exhibit 132 to Dykstra Declaration -
General Correspondence to FDA, dated November 16, 2000
(MRK-KRA00001237-48) .................................................... Appx11739

Exhibit 133 to Dykstra Declaration -
Memo re: MMRV (BB-IND 7068): Summary of Pre-Phase III
teleconference discussion on 01/31/00 with CBER,
dated January 31, 2000 (MRK-KRA00001249-52) ............. Appx11752

Exhibit 134 to Dykstra Declaration -
Teleconference Minutes with CBER, dated February 19, 1999
(MRK-KRA00001253-4) .................................................... Appx11757

Exhibit 135 to Dykstra Declaration -
Memo re: BB-IND 1016: Summary of discussion with Dr.
Kathryn Carbone and Ms. Luba Vujcic (CBER) regarding the
Mumps neutralization assay, dated February 8, 2000
(MRK-KRA00001255-57) .................................................... Appx11760

Exhibit 136 to Dykstra Declaration -
Meeting Minutes, dated March 14, 2000
(MRK-KRA00001258-61) .................................................... Appx11764

**Table of Contents**
**(Continued)**

**Page**

Exhibit 137 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II) and BB-IND 7068
(MMRV); Summary of face-to-face meeting discussion
(3/13/00) with CBER regarding wild type mumps
neutralization and ELISA assays, dated March 13, 2000
(MRK-KRA00001262-5) ..................................................... Appx11768

Exhibit 138 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to Keith Chirgwin, M.D.,
dated August 30, 1999 (MRK-KRA00001266-9) ................ Appx11773

Exhibit 139 to Dykstra Declaration -
Letter from M. Carolyn Hardegree, M.D. to
Keith Chirgwin, M.D., dated September 8, 1998
(MRK-KRA00001467-9) ..................................................... Appx11778

Exhibit 140 to Dykstra Declaration -
Response to FDA Request for Information,
dated December 30, 1999 (MRK-KRA00001470-1924) ..... Appx11782
*(Cont'd in Vol XXVII)*

**Volume XXVII**
**(Filed Under Seal)**

Exhibit 141 to Dykstra Declaration -
Letter from Loris McVittie, Ph.D. to
Roberta L. McKee, Ph.D., dated August 20, 1999
(MRK-KRA00018614-9) ..................................................... Appx12238

Exhibit 142 to Dykstra Declaration -
Memo re: Teleconference with CBER: Mumps End
Expiry trial-BB IND 1016, dated November 8, 2000
(MRK-KRA00025161-2) ..................................................... Appx12245

Exhibit 143 to Dykstra Declaration -
FDA Warning Letter, dated February 9, 2001
(PUBLIC0000666-670) ....................................................... Appx12248

**Table of Contents**
**(Continued)**

Exhibit 144 to Dykstra Declaration -
Memo re: M-M-R®II (BB-IND 1016); Summary of telephone
discussions on 11/23/99 and 12-06-99 with Ms. Luba Vujcic
(CBER) regarding the neutralization assay results and impact
on Equivalence Margin and lower bound criterion of the
M-M-R®II End Expiry Study hypothesis,
dated December 23, 1999 (MRK-KRA00025713-24) ......... Appx12254

Exhibit 145 to Dykstra Declaration -
Memo re: BB-IND 1016: Summary of discussion with
Ms. Luba Vujcic (CBER) regarding the Mumps neutralization
assay, dated January 5, 2000 (MRK-KRA00048855) ......... Appx12267

Exhibit 146 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
teleconference on methods used for the plaque reduction
neutralization assay, dated February 22, 2019
(MRK-KRA00062710-3) .................................................... Appx12269

Exhibit 147 to Dykstra Declaration -
Meeting Minutes with CBER, dated March 13, 2000
(MRK-KRA00062845-53) ................................................. Appx12274

Exhibit 148 to Dykstra Declaration -
Email from David M. Wonnacott to Roberta L. McKee, Ph.D.,
dated May 12, 1999 (MRK-KRA00094960) ....................... Appx12284

Exhibit 149 to Dykstra Declaration -
Email from Katalin G. Abraham to Joye L. Bramble,
dated December 3, 1998 (MRK-KRA00095063) ................ Appx12286

Exhibit 150 to Dykstra Declaration -
Memo re: Teleconference with Dr. Norman Baylor, CBER,
Regarding Meeting on Expiry Titers for M-M-R®II,
dated December 3, 1998 (MRK-KRA00095064) ................ Appx12288

**Table of Contents**
**(Continued)**

Exhibit 151 to Dykstra Declaration -
Memo re: Teleconference with Norman Baylor, CBER,
on 11/16/98, Regarding VARIVAX® and M-M-R®II,
dated November 16, 1998 (MRK-KRA00095065) ............. Appx12290

Exhibit 152 to Dykstra Declaration -
Email from Katalin G. Abraham to Keith Chirgwin, M.D.,
dated October 5, 1998 (MRK-KRA00095142) ................... Appx12292

Exhibit 153 to Dykstra Declaration -
ProQuad™ Original Application, dated August 3, 2004
(MRK-KRA00158320-526) ................................................ Appx12294
***(Cont'd in Vol XXVIII)***

**Volume XXVIII**
**(Filed Under Seal)**

Exhibit 154 to Dykstra Declaration -
Memo re: CBER teleconference (October 16, 2001): Measles,
Mumps and Rubella ELISAs, dated October 19, 2001
(MRK-KRA00201389-91) ................................................ Appx12502

Exhibit 155 to Dykstra Declaration -
Clinical Study Report for the Protocol 007 Study
(MRK-KRA00224982-6529) ............................................ Appx12506
***(Cont'd in Vols XXIX, XXX, and XXXI)***

**Volume XXXI**
**(Filed Under Seal)**

Exhibit 156 to Dykstra Declaration -
Memo re: Supporting Documents for Stephen Krahling,
dated October 10, 2000 (MRK-KRA00331424-33) ............ Appx14055

Exhibit 157 to Dykstra Declaration -
Neutralization Assay Draft faxed on February 19, 1999
(MRK-KRA00336634-6) .................................................... Appx14066

**Table of Contents**
**(Continued)**

**Page**

Exhibit 158 to Dykstra Declaration -
Letter from Paul G. Richman, Ph.D. to Alison Fisher, Ph.D.,
dated May 18, 2007 (MRK-KRA00570703-5) .................... Appx14070

Exhibit 159 to Dykstra Declaration -
Response to FDA Request for Information,
dated February 2, 2001 (MRK-KRA00622078-273) ........... Appx14074

Exhibit 160 to Dykstra Declaration -
Response to FDA Request for Information,
dated August 1, 2002 (MRK-KRA00624279-87) ................ Appx14271

Exhibit 161 to Dykstra Declaration -
General Correspondence to FDA, dated June 23, 1998
(MRK-KRA00624345-4446) ............................................... Appx14281

Exhibit 162 to Dykstra Declaration -
Response to FDA Request for Information,
dated February 5, 1999 (MRK-KRA00624448-4589) ......... Appx14384
***(Cont'd in Vol XXXII)***

**Volume XXXII**
**(Filed Under Seal)**

Exhibit 163 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
telephone conversations on 9/24/98 regarding the revised
M-M-R®II draft label and on 9/29/98 regarding the mumps
expiry protocol, dated September 29, 1998
(MRK-KRA00636592-3) ..................................................... Appx14527

Exhibit 164 to Dykstra Declaration -
Biological Product Deviation Report Form,
dated April 20, 2001 (MRK-KRA00754233-8) ................... Appx14530

Exhibit 165 to Dykstra Declaration -
M-M-R®II Label (March 1995)
(MRK-KRA00757060-3) ..................................................... Appx14537

**Table of Contents**
**(Continued)**

**Page**

Exhibit 166 to Dykstra Declaration -
M-M-R®II Label (April 1999)
(MRK-KRA00757072-6) ...................................................... Appx14542

Exhibit 167 to Dykstra Declaration -
M-M-R®II Label (2004) (MRK-KRA00757100-3) ............ Appx14548

Exhibit 168 to Dykstra Declaration -
Response to FDA Request for Information,
dated November 17, 2004 (MRK-KRA00761530-8) .......... Appx14553

Exhibit 169 to Dykstra Declaration -
Response to CBER Comments, dated June 10, 2002
(MRK-KRA00761628-702) ................................................. Appx14563

Exhibit 170 to Dykstra Declaration -
Email from Charlotte Shay to Michael L. Dekleva,
dated June 30, 2004 (MRK-KRA00791508-10) .................. Appx14639

Exhibit 171 to Dykstra Declaration -
Meeting Minutes from a MMRV Pre-Phase III meeting
with CBER, dated February 16, 2000
(MRK-KRA00821856-61) ................................................. Appx14643

Exhibit 172 to Dykstra Declaration -
Approval Letter, dated September 6, 2005
(MRK-KRA00821906-9) ................................................... Appx14650

Exhibit 173 to Dykstra Declaration -
Regulatory Liaison FDA Conversation Record,
dated October 5, 2004 (MRK-KRA00846405-15) .............. Appx14655

Exhibit 174 to Dykstra Declaration -
CBER's Clinical Review of Studies submitted in support of
Licensure of ProQuad™ (MRK-KRA01285010-272) ........ Appx14667

Exhibit 175 to Dykstra Declaration -
FDA report on the release of MMR,
dated February 23, 2016 (MRK-KRA01447562) ................ Appx14931

**Table of Contents**
(Continued)

Exhibit 176 to Dykstra Declaration -
Standard Operating Procedure-Preparation, Review and
Shipment of Biological Product Protocols and Samples to
CBER, dated September 23, 2015
(MRK-KRA01448181-207) ................................................ Appx14933

Exhibit 177 to Dykstra Declaration -
Letter from Roberta L. McKee, Ph.D. to Steven Masiello,
dated March 8, 2001 (MRK-KRA01537603-11) ................. Appx14961

Exhibit 178 to Dykstra Declaration -
Letter from Roberta L. McKee, Ph.D. regarding a proposal for
changes to release specifications, dated December 10, 1998
(MRK-KRA01622125) ....................................................... Appx14971

Exhibit 179 to Dykstra Declaration -
Prior Approval Supplement from Roberta L. McKee, Ph.D.
to William Egan, Ph.D., dated June 18, 1999
(MRK-KRA01622463-5) ..................................................... Appx14973

Exhibit 180 to Dykstra Declaration -
Minutes from a December 8, 1998 Meeting,
dated January 8, 1999 (MRK-KRA01622468-72) ............... Appx14977

Exhibit 181 to Dykstra Declaration -
Letter from Katalin Abraham to Dr. Suresh Rastogi
(MRK-KRA01622552) ....................................................... Appx14983

Exhibit 182 to Dykstra Declaration -
Letter from David Wonnacott Ph.D. to Dr. Suresh Rastogi,
dated December 16, 1998 (MRK-KRA01622600-1) ........... Appx14985

Exhibit 183 to Dykstra Declaration -
Prior Approval Supplement from Roberta L. McKee, Ph.D. to
William Egan, Ph.D., dated September 15, 1999
(MRK-KRA01622711-2) ..................................................... Appx14988

**Table of Contents**
**(Continued)**

Exhibit 184 to Dykstra Declaration -
Attachment 4 to the Prior Approval Supplement from
Roberta L. McKee, Ph.D. to William Egan, Ph.D.,
dated September 15, 1999 (MRK-KRA01622778-9) .......... Appx14991

Exhibit 185 to Dykstra Declaration -
Letter from William Egan, Ph.D. to Roberta L. McKee, Ph.D.,
dated August 20, 1999 (MRK-KRA01624909-10) .............. Appx14994

Exhibit 186 to Dykstra Declaration -
Letter from Barry D. Garfinkle, Ph.D. to Carolyn Hardegree,
M.D., dated January 28, 1998
(MRK-KRA01625508-5639) .............................................. Appx14997
***(Cont'd in Vol XXXIII)***

**Volume XXXIII**
**(Filed Under Seal)**

Exhibit 187 to Dykstra Declaration -
Letter from Peter Patriarca, M.D. to Roberta L. McKee, Ph.D.,
dated February 11, 2000 (MRK-KRA0187091-2) ............... Appx15130

Exhibit 188 to Dykstra Declaration -
MMR Statistical Analysis of Potency on Stability,
dated October 24, 2000 (MRK-KRA01897103-7271) ........ Appx15133

Exhibit 189 to Dykstra Declaration -
Letter from David Wonnacott, Ph.D. to Carolyn Hardegree,
M.D., dated December 5, 1997 (MRK-KRA01972451) ..... Appx15303

Exhibit 190 to Dykstra Declaration -
Various Correspondence between the FDA and Merck,
dated 1969 to 1994 (MRK-KRA01972464-546) ................. Appx15305

Exhibit 191 to Dykstra Declaration -
Various Email Correspondence in 1997
(MRK-KRA01972735-58) ................................................... Appx15389

**Table of Contents**
**(Continued)**

**Page**

Exhibit 192 to Dykstra Declaration -
Vaccine & Biological Stability Protocol,
dated September 6, 2016 (MRK-KRA02139917-25) .......... Appx15414

Exhibit 193 to Dykstra Declaration -
Chapter "Mumps Vaccine," by Steven Rubin and
Stanley Plotkin .................................................................... Appx15424

Exhibit 194 to Dykstra Declaration -
Stephen Krahling's 2001 Correspondence
(RELATOR_00000736-66) .................................................. Appx15453

Exhibit 195 to Dykstra Declaration -
Letter from Axel Johnson to Tonia Torquato,
dated November 30, 2001 (RELATOR_00001036-43) ....... Appx15485

Exhibit 196 to Dykstra Declaration -
Stephen Krahling's 2001 Correspondence and Papers
(RELATOR_00001071-90) .................................................. Appx15494
*(Cont'd in Vol XXXIV)*

**Volume XXXIV**
**(Filed Under Seal)**

Exhibit 197 to Dykstra Declaration -
Chapter "Mumps Vaccine," by Steven Rubin,
in Plotkin's Vaccines, 7th edition (2018) ............................ Appx15515

Exhibit 198 to Dykstra Declaration -
Letter from Kevin Malone to Kathleen Hardway,
dated July 31, 2018 ............................................................. Appx15548

Exhibit 199 to Dykstra Declaration -
"Live, Attenuated Mumps Virus Vaccine," *New England Journal of Medicine*, by R. Weibel, *et al.*,
dated February 2, 1967 ....................................................... Appx15556

## Table of Contents
### (Continued)

**Page**

Exhibit 200 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Luwy Musey, M.D., taken October 7, 2016 ......................... Appx15565

Exhibit 201 to Dykstra Declaration -
Rule 30(b)(6) Deposition Topics, dated December 13, 2016
(Stannard Ex. 3) ................................................................ Appx15569

Exhibit 202 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Mark Stannard,
taken December 13, 2016 ................................................... Appx15585

Exhibit 203 to Dykstra Declaration -
*Curriculum Vitae* of Joan L. Wlochowski ........................... Appx15595

Exhibit 204 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Joan L. Wlochowski, taken June 13, 2017 .......................... Appx15597

Exhibit 205 to Dykstra Declaration -
FDA/CDC Submission, dated October 23, 2019 ................. Appx15603

Exhibit 206 to Dykstra Declaration -
Excerpts of Defendant Merck's Responses and Objections to
Relators' Third Set of Requests for Admission,
dated August 16, 2017 ....................................................... Appx15719

Exhibit 207 to Dykstra Declaration -
"Vaccine Impact: Benefits for human health,"
by M. Doherty *et al.*, in *Vaccine* 34 (2016) .......................... Appx15722

Exhibit 208 to Dykstra Declaration -
FDA Prescription Drug Labeling Resources ....................... Appx15731

Exhibit 209 to Dykstra Declaration -
ACIP Committee Members ................................................. Appx15738

**Table of Contents**
(Continued)

**Page**

Exhibit 210 to Dykstra Declaration -
"Notice to Readers: Updated Recommendations of the
ACIP for the Control and Elimination of Mumps," *MMWR*,
June 9, 2006/55(22); 629-630 .............................................. Appx15743

Exhibit 211 to Dykstra Declaration -
"Measles Prevention: Recommendations of the ACIP,"
*MMWR*, December 28, 1989 38(S-9); 1-18 ......................... Appx15749

Exhibit 212 to Dykstra Declaration -
"FDA in Brief: FDA reiterates the importance of vaccines
such as MMR vaccine," dated September 6, 2019 .............. Appx15766

Exhibit 213 to Dykstra Declaration -
"Recommendations of the ACIP Mumps Prevention,"
*MMWR*, June 9, 1989/38(22) .............................................. Appx15769

Exhibit 214 to Dykstra Declaration -
"Recommendation of the ACIP Mumps Vaccine,"
*MMWR*, November 26, 1982; 31(46) .................................. Appx15777

Exhibit 215 to Dykstra Declaration -
Statement by Peter Marks M.D., Ph.D., FDA, on FDA's
continued confidence in the safety and effectiveness
of the MMR vaccine, dated April 22, 2019 ......................... Appx15783

Exhibit 216 to Dykstra Declaration -
About CBER ....................................................................... Appx15788

Exhibit 217 to Dykstra Declaration -
Excerpt from FDA's Website on Warning Letters ................ Appx15791

Exhibit 218 to Dykstra Declaration -
Excerpt of FDA's Website with an Index to Warning
Letters for 'M' Companies ................................................... Appx15794

**Table of Contents**
**(Continued)**

**Page**

Exhibit 219 to Dykstra Declaration -
"The Immunological Basis for Immunization Series, Module
16: Mumps," by McLean, *et al.*, *Immunization, Vaccines and
Biologicals-World Health Organization* (2010) ................... Appx15817

Exhibit 220 to Dykstra Declaration -
Email from Sue Manoff to Mark Paponia,
dated February 25, 2000 (MRK-KRA00091399-405) ......... Appx15862

Exhibit 221 to Dykstra Declaration -
Memo re: Teleconference with Norman Baylor, CBER, on
11/16/98, Regarding VARIVAX® and M-M-R®II
(MRK-KRA00095065) ....................................................... Appx15870

Exhibit 222 to Dykstra Declaration -
M-M-R®II Label (MRK-KRA00757064-7) ....................... Appx15872

Exhibit 223 to Dykstra Declaration -
M-M-R®II Label (February 2001)
(MRK-KRA00757068-71) .................................................. Appx15877

Exhibit 224 to Dykstra Declaration -
M-M-R®II Label (August 2001)
(MRK-KRA00757077-80) .................................................. Appx15882

Exhibit 225 to Dykstra Declaration -
M-M-R®II Label (February 2006)
(MRK-KRA00757081-4) .................................................... Appx15887

Exhibit 226 to Dykstra Declaration -
M-M-R®II Label (March 1995)
(MRK-KRA00757085-8) .................................................... Appx15892

Exhibit 227 to Dykstra Declaration -
M-M-R®II Label (March 1995)
(MRK-KRA00757089-91) .................................................. Appx15897

**Table of Contents**
**(Continued)**

Exhibit 228 to Dykstra Declaration -
M-M-R®II Label (October 2003)
(MRK-KRA00757092-5) ..................................................... Appx15901

Exhibit 229 to Dykstra Declaration -
M-M-R®II Label (September 2002)
(MRK-KRA00757096-9) ..................................................... Appx15906

Exhibit 230 to Dykstra Declaration -
M-M-R®II Label (February 2007)
(MRK-KRA00757104-7) ..................................................... Appx15911

Exhibit 231 to Dykstra Declaration -
M-M-R®II Label (February 2007)
(MRK-KRA00757108-11) ................................................... Appx15916

Exhibit 232 to Dykstra Declaration -
M-M-R®II Label (April 19999)
(MRK-KRA01449029-40) ................................................... Appx15921

Exhibit 233 to Dykstra Declaration -
M-M-R®II Label (February 2014)
(MRK-KRA01449226-36) ................................................... Appx15934

Exhibit 234 to Dykstra Declaration -
M-M-R®II Label (June 2014)
(MRK-KRA01449243-53) ................................................... Appx15946

Exhibit 235 to Dykstra Declaration -
M-M-R®II Label (October 2015)
(MRK-KRA01449260-70) ................................................... Appx15958

Exhibit 236 to Dykstra Declaration -
M-M-R®II Label (February 2000)
(MRK-KRA01449271-5) ..................................................... Appx15970

Exhibit 237 to Dykstra Declaration -
M-M-R®II Label (March 2010)
(MRK-KRA01449276-83) ................................................... Appx15976

**Table of Contents**
**(Continued)**

**Page**

Exhibit 238 to Dykstra Declaration -
M-M-R®II Label (December 2010)
(MRK-KRA01449284-91) ................................................... Appx15985

Exhibit 239 to Dykstra Declaration -
M-M-R®II Label (September 2009)
(MRK-KRA01449292-99) ................................................... Appx15994
*(Cont'd in Vol XXXV)*

**Volume XXXV**
**(Filed Under Seal)**

Exhibit 240 to Dykstra Declaration -
Attachment 1 to Letter from Barry D. Garfinkle, Ph.D.
to Carolyn Hardegree, M.D., dated January 28, 1998
(MRK-KRA01625510-639) ................................................. Appx16003

Exhibit 241 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II) and BB-IND 7068
(MMRV); Summary of Face-to face meeting discussion
(3/13/00) with CBER regarding wild type mumps
neutralization and ELISA assays, dated March 13, 2000
(MRK-KRA00019855-7) ................................................... Appx16134

Exhibit 242 to Dykstra Declaration -
PowerPoint Presentation entitled Immunogenicity
Mumps-Containing Vaccines (MRK-KRA00091408) ........ Appx16138

Exhibit 243 to Dykstra Declaration -
Letter from David M. Wommacott, Ph.D. to
Suresh C. Rastogi, Ph.D., dated December 16, 1998
(MRK-KRA01629294-1629295) ......................................... Appx16152

Exhibit 244 to Dykstra Declaration -
Response to the FDA Form 483, dated October 24, 2000
(MRK-KRA01649535-1649551) ......................................... Appx16155

Exhibit 245 to Dykstra Declaration -
Warning Letters from FDA Website ................................... Appx16173

**Table of Contents**
**(Continued)**

Exhibit 246 to Dykstra Declaration -
MMD Quality Manual Glossary, dated October 5, 2016
(MRK-KRA01679618-1679772) ......................................... Appx16176

Exhibit 247 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Eric Metzger,
taken June 11, 2015 ............................................................ Appx16332

Exhibit 248 to Dykstra Declaration -
Federal Register Vol. 58 No. 137, July 20, 1993 ................. Appx16336

Exhibit 249 to Dykstra Declaration -
FDA Review of Vaccine Labeling Requirements for
Warnings, Use Instructions, and Precautionary
Information, dated October 2004 ......................................... Appx16342

Defendant Merck's Response to Relators' Statement of
    Material Facts, dated November 26, 2019 (Doc. 299) .......... Appx16345

**Volume XXXVI**
**(Filed Under Seal)**

Declaration of Lisa C. Dykstra, for Merck, in Support of
    Response to Relators' Statement of Material Facts,
    executed November 26, 2019 (Doc. 299) ............................. Appx16501

Exhibit 250 to Dykstra Declaration -
"Mumps Complications and Effects of Mumps Vaccination,
England and Wales, 2002-2006," by Yung, Chee-Fu, *et al.*,
*Emerging Infectious Diseases*, (2011) 17(4):661-667 ......... Appx16513

Exhibit 251 to Dykstra Declaration -
Excerpts from the Deposition Testimony of April Cohen,
taken January 4, 2018 ........................................................ Appx16521

**Table of Contents**
**(Continued)**

**Page**

Exhibit 252 to Dykstra Declaration -
"Mumps Virus-Specific Antibody Titers from Pre-Vaccine
Era Sera: Comparison of the Plaque Reduction Neutralization
Assay Enzyme Immunoassays," by Mauldin, Jeremy, *et al.*,
*Journal of Clinical Microbiology*, 2005:43(9):4847-4851  .. Appx16525

Exhibit 253 to Dykstra Declaration -
"Correlates of Protection," by Plotkin and Gilbert,
2018:35-40 ........................................................................... Appx16531

Exhibit 254 to Dykstra Declaration -
FDA, Guidance for Industry: FDA Review of Vaccine
Labeling Requirements for Warnings, Use Instructions, and
Precautionary Information, dated September 2004  ............. Appx16538

Exhibit 255 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Roberta L. McKee, Ph.D., taken March 30, 2017  ............... Appx16547

Exhibit 256 to Dykstra Declaration -
Excerpts from the Expert Report of
Dipti Gulati, MS, D. Phil.  .................................................... Appx16551

Exhibit 257 to Dykstra Declaration -
Biological Product Deviation Report Form
submitted by Merck to the FDA, dated March 5, 2001
(MRK-KRA00754239-44) .................................................... Appx16556

Exhibit 258 to Dykstra Declaration -
"Jeryl Lynn Strain Live Attenuated Mumps Virus Vaccine
-Influence of Age, Virus Dose, Lot, and-Globulin
Administration on Response," by Buynak, Eugene, *et al.*,
*Journal of the American Medical Association* (1968)
203(1):63-67 ....................................................................... Appx16563

Exhibit 259 to Dykstra Declaration -
2003 Annual Stability Report for M-M-R®II
(MRK-KRA01632888-945) ................................................. Appx16569

**Table of Contents**
**(Continued)**

**Page**

Exhibit 260 to Dykstra Declaration -
"Sensitive Neutralization Test for virus antibody,"
by Sato *et al.*, *Archives of Virology*, (1978) 58:301-311 ...... Appx16628

Exhibit 261 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to Alison Fisher, Ph.D.,
dated December 3, 2004 (MRK-KRA00000361-5) ............. Appx16640

Exhibit 262 to Dykstra Declaration -
Fax from Luba Vujcic to Alison Fisher, Ph.D.,
dated July 20, 2007 (MRK-KRA00141957-8) .................... Appx16646

Exhibit 263 to Dykstra Declaration -
Submission, dated August 8, 2007
(MRK-KRA00000140-225) ................................................. Appx16649

Exhibit 264 to Dykstra Declaration -
Submission, dated December 3, 2007
(MKR-KRA00000226-300) ................................................. Appx16736

Exhibit 265 to Dykstra Declaration -
"Long-Term Persistence of Mumps Antibody after Receipt of 2
Measles-Mumps-Rubella (MMR) Vaccinations and Antibody
Response after a Third MMR Vaccination among a University
Population," by Date, Anand, *et al.*, *Journal of Infectious
Diseases*, (2008) 197:1662-1668 ......................................... Appx16812

Exhibit 266 to Dykstra Declaration -
"Mumps Antibody Levels Among Students Before a Mumps
Outbreak: In Search of a Correlate of Immunity,"
by Cortese, *et al.*, *Journal of Infectious Diseases*, (2011)
204:1413-1422 .................................................................... Appx16820

**Table of Contents**
**(Continued)**

Exhibit 267 to Dykstra Declaration -
"Immunogenicity and Safety of Two Tetravalent (Measles,
Mumps, Rubella, Varicella) Vaccines Coadministered With
Hepatitis A and Pneumococcal Conjugate Vaccines to Children
Twelve to Fourteen Months of Age," by Blatter, *et al.*,
*The Pediatric Infectious Disease Journal,*
(2012) 31:e133-e140 ........................................................... Appx16831

Exhibit 268 to Dykstra Declaration -
Analytical Validation Protocol
(MRK-KRA00337307-18) .................................................. Appx16840

Exhibit 269 to Dykstra Declaration -
Expert Report of Robert Platt, Ph.D.,
dated June 14, 2018 ........................................................... Appx16853

Exhibit 270 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Amy Keegan,
taken April 27, 2017 ......................................................... Appx16992

Exhibit 271 to Dykstra Declaration -
Documentation of Work Activities
(RELATOR_00000272-3) ................................................... Appx16995

Exhibit 272 to Dykstra Declaration -
Work Summary Document (RELATOR_00000274-6) ........ Appx16998
*(Cont'd in Vol XXXVII)*

**Volume XXXVII**
**(Filed Under Seal)**

Exhibit 273 to Dykstra Declaration -
Submission, dated May 5, 2005
(MRK-KRA00176342-176654) .......................................... Appx17002

Exhibit 274 to Dykstra Declaration -
Submission, dated June 30, 2004
(MKR-KRA00137854-55 and 8137-72) ............................. Appx17316

**Table of Contents**
**(Continued)**

Exhibit 275 to Dykstra Declaration -
"Safety and Immunogenicity of Human Serum Albumin-Free
MMR Vaccine in US Children Aged 12-15 months,"
by Mufson, *et al.*, *Journal of Pediatric Infectious Diseases
Society*, (2014) 4:339-348 .................................................. Appx17355

Exhibit 276 to Dykstra Declaration -
Letter from Jerry P. Weir, Ph.D. to Alison Fisher, Ph.D.,
dated December 30, 2004 (MRK-KRA00141670-2) ........... Appx17366

Exhibit 277 to Dykstra Declaration -
Submission, dated February 28, 2005
(MRK-KRA00141676-729) ................................................. Appx17370

Exhibit 278 to Dykstra Declaration -
Submission, dated July 13, 2005
(MRK-KRA00141789-906) ................................................. Appx17425
*(Cont'd in Vol XXXVIII)*

**Volume XXXVIII**
**(Filed Under Seal)**

Exhibit 279 to Dykstra Declaration -
"Summary of Notifiable Diseases-United States 2012,"
*MMWR*, 2014:61(53):1-121 ................................................. Appx17544

Exhibit 280 to Dykstra Declaration -
CDC Publication "Mumps Outbreak-Related Questions
and Answers for Patients," last reviewed March 15, 2019 .. Appx17669

Exhibit 281 to Dykstra Declaration -
CDC Publication "Nationally Notifiable Infectious Diseases
and Conditions, United States: Annual Tables" ................... Appx17672

Exhibit 282 to Dykstra Declaration -
"Characteristics of Large Mumps Outbreaks in the United
States during July 2010-December 2015," by Clemmons,
Nakia *et al.*, *Clinical Infectious Diseases*, (2019) ............... Appx17676

**Table of Contents**
**(Continued)**

**Page**

Exhibit 283 to Dykstra Declaration -
CDC Publication "Healthy People 2010 Final Review" ...... Appx17684
*(Cont'd in Vol XXXIX)*

**Volume XXXIX**
**(Filed Under Seal)**

Exhibit 284 to Dykstra Declaration -
CDC Publication "Healthy People 2020 Immunization and
Infectious Diseases Objectives" .......................................... Appx18245

Exhibit 285 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.2
Cases of Hib Data" .............................................................. Appx18278

Exhibit 286 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.4
U.S.-acquired cases of Measles Data" ................................. Appx18280

Exhibit 287 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.5
U.S.-acquired cases of Mumps Data" .................................. Appx18282

Exhibit 288 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.9
 U.S.-acquired cases of Rubella Data" ................................. Appx18284

Exhibit 289 to Dykstra Declaration -
CDC Webpage "National Center for Immunization
and Respiratory Diseases" ................................................... Appx18286

Exhibit 290 to Dykstra Declaration -
"Mumps vaccination coverage and vaccine effectiveness in a
large outbreak among college students-Iowa, 2006,"
by Marin, Mona *et al.*, *Vaccine*, (2008) 26:3601-3607 ........ Appx18301

**Table of Contents**
**(Continued)**

**Page**

Exhibit 291 to Dykstra Declaration -
"Mumps Outbreak in Orthodox Jewish Communities in the
United States," Barskey, Albert, *et al.*, *New England Journal
of Medicine*, (2012) 367(18):1704-1713 .............................. Appx18309

Exhibit 292 to Dykstra Declaration -
"Impact of a Third Dose of Measles-Mumps-Rubella Vaccine
on a Mumps Outbreak," by Ogbuanu, Ikechukwu, *et al.*,
*Pediatrics*, (2012) 130(6):1-8 ............................................. Appx18320

Exhibit 293 to Dykstra Declaration -
"Epidemiology of a Mumps Outbreak in a Highly Vaccinated
Island Population and Use of a Third Dose of Measles-
Mumps-Rubella Vaccine for Outbreak Control—Guam 2009
to 2010," by Nelson, George, *et al.*, *Pediatric Infectious
Disease Journal*, (2013) 32(4):374-380 .............................. Appx18330

Exhibit 294 to Dykstra Declaration -
"Effectiveness of a Third Dose of MMR Vaccine for Mumps
Outbreak Control," by Cardemil, Cristina, *et al.*, *New England
Journal of Medicine*, (2017) 377(10):947-956 .................... Appx18338

Exhibit 295 to Dykstra Declaration -
"Mumps in a highly vaccinated Marshallese community in
Arkansas, USA: an outbreak report," by Fields, Virgie, *et al.*,
*Lancet Infectious Diseases*,
(Published online January 8, 2019) 1-8 .............................. Appx18349

Exhibit 296 to Dykstra Declaration -
"Antibody Induced by Immunization with the Jeryl Lynn
Mumps Vaccine Strain Effectively Neutralizes a Heterologous
Wild-Type Mumps Virus Associated with a Large Outbreak,"
by Rubin, Steven, *et al.*, *Journal of Infectious Diseases*, (2008)
198:508-515 ....................................................................... Appx18358

Exhibit 297 to Dykstra Declaration -
"Vaccine waning and mumps-re-emergence in the United
States," by Lewnard, Joseph and Grad, Yonatan, *Science
Translational Medicine*, (2018) 10(433):1-10 .................... Appx18367

**Table of Contents**
**(Continued)**

**Page**

Exhibit 298 to Dykstra Declaration -
"Comment: The changing epidemiology of mumps in a high
vaccination era," by Marshall, Helen and Plotkin, Stanley,
*Lancet Infectious Diseases*, (2019) 19:118-119 .................. Appx18379

Exhibit 299 to Dykstra Declaration -
"Successes and challenges for preventing measles, mumps and
rubella by vaccination," by Bankamp, Bettina, *et al.*, *Current
Opinion in Virology*, (2019) 34:110-116 ............................. Appx18382

Exhibit 300 to Dykstra Declaration -
"Mumps Vaccines Do We Need a New One?," by Rubin,
Steven and Beeler, Judy, *Pediatric Infectious Disease Journal*,
(2013) 32(10):1156-1157 .................................................... Appx18390

Exhibit 301 to Dykstra Declaration -
CDC website listing Measles-related *MMWR* Articles ........ Appx18393

Exhibit 302 to Dykstra Declaration -
CDC website listing Pertussis (Whooping Cough)
Publications ......................................................................... Appx18399

Exhibit 303 to Dykstra Declaration -
CDC website listing Chickenpox (Varicella) References and
Resources .......................................................................... Appx18407

Exhibit 304 to Dykstra Declaration -
CDC webpage: Glossary ...................................................... Appx18411

Exhibit 305 to Dykstra Declaration -
Email from Jeanne Santoli to Eric Skjeveland,
dated June 12, 2012 (MRK-KRA00122172-3) .................... Appx18425

Exhibit 306 to Dykstra Declaration -
CDC webpage, ACIP Workgroups, last reviewed
May 30, 2019 ..................................................................... Appx18428

**Table of Contents**
**(Continued)**

**Page**

Exhibit 307 to Dykstra Declaration -
"Recommendations of the Advisory Committee on
Immunization Practices for Use of Hepatitis A Vaccine
for Persons Experiencing Homelessness,"
*MMWR* 2019:68(6):153-56 ................................................. Appx18435

Exhibit 308 to Dykstra Declaration -
"Human Papillomavirus Vaccination for Adults: Updated
Recommendations of the Advisory Committee on
Immunization Practices," *MMWR* 2019:68(3):698-702 ...... Appx18440

Exhibit 309 to Dykstra Declaration -
"Prevention and Control of Seasonal Influenza with
Vaccines: Recommendations of the Advisory Committee
on Immunization Practices-United States, 2019-20
Influenza Season," *MMWR* 2019:69(3):1-21 ....................... Appx18446

Exhibit 310 to Dykstra Declaration -
"Japanese Encephalitis Vaccine: Recommendations of the
Advisory Committee on Immunization Practices,"
*MMWR* 2019:68(2);1-33 .................................................... Appx18475
***(Cont'd in Vol XL)***

**Volume XL**
**(Filed Under Seal)**

Exhibit 311 to Dykstra Declaration -
"Prevention of Pertussis, Tetanus, and Diphtheria with
Vaccines in the United States: Recommendations of the
Advisory Committee on Immunization Practices,"
*MMWR* 2018:67(2):1-44 .................................................... Appx18516

Exhibit 312 to Dykstra Declaration -
"Updated Recommendations for Use of Tetanus Toxoid,
Reduced Diphtheria Toxoid and Acellular Pertussis Vaccine
(Tdap) in Pregnant Women and Persons Who Have or
Anticipate Having Close Contact with an Infant Aged <12
Months-Advisory Committee on Immunization Practices
(ACIP), 2011," *MMWR* 2011:60(41):1424-1426 ................. Appx18565

**Table of Contents**
**(Continued)**

Exhibit 313 to Dykstra Declaration -
"Updated Recommendations for the Use of Tetanus Toxoid,
Reduced Diphtheria Toxoid, and Acellular Pertussis Vaccine
(Tdap) in Pregnant Women-Advisory Committee on
Immunization Practices (ACIP), 2012," *MMWR*
2013:62(7):131-135 ........................................................... Appx18569

Exhibit 314 to Dykstra Declaration -
"Immunization in the United States (Chapter 73),"
by Cohn, *et al.*, *Vaccines* 1421-1440 ................................... Appx18575

Exhibit 315 to Dykstra Declaration -
Excerpts from the Expert Report of
Daniel Salmon, Ph.D., MPH ............................................... Appx18596

Exhibit 316 to Dykstra Declaration -
Excerpts from Merck's Supplemental Responses and
Objections to Relators' First Set of Interrogatories,
dated December 12, 2016 .................................................... Appx18608

Exhibit 317 to Dykstra Declaration -
"The Pertussis Problem," by Plotkin, Stanley, *Clinical
Infectious Diseases*, (2014) 58(6): 830-833 ......................... Appx18618

Exhibit 318 to Dykstra Declaration -
"Establishing a Global Vaccine-Development Fund,"
by Plotkin, Stanley, *et al.*, *New England Journal of Medicine*,
(2015) 373:297-300 ........................................................... Appx18623

Exhibit 319 to Dykstra Declaration -
Chapter 11 "Anthrax Vaccines," by Friedlander, Arthur, *et al.*,
*Vaccines* (2018) .............................................................. Appx18628

Exhibit 320 to Dykstra Declaration -
Chapter 38 "Meningococcal Capsular Group A, C, W, and Y
Conjugate Vaccines," by Harrison, Lee, *et al.*,
*Vaccines* (2018) .............................................................. Appx18646

**Table of Contents**
(Continued)

Page

Exhibit 321 to Dykstra Declaration -
Chapter 52 "Rotavirus Vaccines," by Parashar, Umesh, *et al.*,
*Vaccines* (2018) ................................................................. Appx18673

Exhibit 322 to Dykstra Declaration -
Chapter 60 "Tuberculosis Vaccines," by Hanekom, Willem,
*et al.*, *Vaccines* (2018) .......................................................... Appx18694

Exhibit 323 to Dykstra Declaration -
Excerpts from Expert Report of
Gary L. Freed, M.D., MPH ................................................. Appx18714

Exhibit 324 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Gary L. Freed, M.D., MPH, taken October 18, 2018 .......... Appx18718

Exhibit 325 to Dykstra Declaration -
Excerpts from "2012 CDC Summary of
Notifiable Diseases" ........................................................... Appx18721

Exhibit 326 to Dykstra Declaration -
Excerpts from "1977 Annual Summary,"
*MMWR*, Vol. 26, No. 53, September 1978 .......................... Appx18729

Exhibit 327 to Dykstra Declaration -
Excerpts from "1980 Annual Summary,"
*MMWR*, Vol. 29, No. 54, September 1981 .......................... Appx18734

Exhibit 328 to Dykstra Declaration -
Excerpts from "2013 CDC Summary of
Notifiable Diseases" ........................................................... Appx18742

Exhibit 329 to Dykstra Declaration -
Excerpts from "2014 CDC Summary of
Notifiable Diseases" ........................................................... Appx18747

**Table of Contents**
**(Continued)**

Relators' Responses to Merck's Statements of Material Facts in
 Support of Its First and Fourth Summary Judgment Motions
 and Their Corresponding Additional Statement of Material
 Facts, dated November 26, 2019 (Doc. 300) ........................ Appx18751

Declaration of Gary Reilly in Support of Relators' Oppositions to
 Merck's Four Motions for Summary Judgment,
 executed November 26, 2019 (Doc. 300) ............................. Appx18984

   Exhibit 361 to Reilly Declaration -
   Deposition Testimony of Amy Keegan,
   taken April 27, 2017 ............................................................ Appx18996
   *(Cont'd in XLI)*

**Volume XLI**
**(Filed Under Seal)**

   Exhibit 362 to Reilly Declaration -
   Memorandum titled "Delay of Filing for Optimized
   GOS/HAS-free Diluent for M-M-R®II" with Attachment,
   dated August 28, 2000 (MRK-CHA01593194-9) ................ Appx19070

   Exhibit 363 to Reilly Declaration -
   The Current Manufacturing Target Titer for the Mumps
   Component of Measles, Mumps, and Rubella Virus Vaccine
   Live M-M-R®II (MRK-CHA00576983-93) ....................... Appx19077

   Exhibit 364 to Reilly Declaration -
   Letter from Robert L. McKee, Ph.D. to Carolyn Hardegree,
   M.D., dated December 10, 1998, with Attachment
   (MRK-CHA00756233-55) ................................................... Appx19089

   Exhibit 365 to Reilly Declaration -
   Excerpts from Clinical and Regulatory Review Committee
   Critical Activities, issued August 15, 2001
   (MRK-CHA01724860-25029) ............................................. Appx19113

**Table of Contents**
**(Continued)**

**Page**

Exhibit 366 to Reilly Declaration -
Excerpts from Clinical and Regulatory Review Committee
Critical Activities, issued March 17, 1999
(MRK-CHA01717354-7508) ............................................... Appx19123

Exhibit 367 to Reilly Declaration -
Table (MRK-CHA00280517) ............................................... Appx19142

Exhibit 368 to Reilly Declaration -
Project Management Regulatory Submissions
Schedule for "All Products," from 01-AUG-2002
(MRK-CHA01726084-7) .................................................... Appx19144

Exhibit 369 to Reilly Declaration -
Email from Hentrietta Ukwu to David W. Blois,
dated October 6, 1998, with Attachment
(MRK-CHA00625837-9) .................................................... Appx19149

Exhibit 370 to Reilly Declaration -
Justification of Mumps Component Frequency
(MRK-CHA00032404-7) .................................................... Appx19153

Exhibit 371 to Reilly Declaration -
Email from Alison L. Fisher, Ph.D. to Mark S. Galinski,
dated March 28, 2005 (MRK-CHA00560317-9) ................. Appx19158

Exhibit 372 to Reilly Declaration -
Email from Bonita M. Stankunas to Amy Keegan,
dated October 1, 2010 (MRK-CHA01470854-6) ................ Appx19162

Exhibit 373 to Reilly Declaration -
Presentation titled M-M-R®II
(MRK-CHA00021133-67) ................................................... Appx19166

Exhibit 374 to Reilly Declaration -
Excerpts from Pediatric Measles, Mumps, Rubella &
Varicella-containing Franchise: Integrated Vaccine T-PAC
Review, dated October 28, 2002
(MRK-CHA00233586-3623) ............................................... Appx19202

**Table of Contents**
**(Continued)**

**Page**

Exhibit 375 to Reilly Declaration -
Deposition Testimony of April D. Cohen,
taken January 4, 2018 ......................................................... Appx19211

Exhibit 376 to Reilly Declaration -
Minutes of October 6, 1999 Project Team Meeting,
dated October 8, 1999 (MRK-CHA01899074-86) .............. Appx19276

Exhibit 377 to Reilly Declaration -
Draft Memo re: Clinical and Regulator Review Committee
Meeting Summary-October 8, 2002, dated October 11, 2002
(MRK-CHA01728735-8) ..................................................... Appx19290

Exhibit 378 to Reilly Declaration -
Pediatric Live Virus Vaccine Franchise Review,
dated October 28, 2002 (MRK-CHA00207636-83) ............ Appx19295

Exhibit 379 to Reilly Declaration -
Presentation, produced as "M-M-R II and Priorix Profiles
8_19_11F.ppt" (MRK-CHA00955777) ............................... Appx19344

Exhibit 380 to Reilly Declaration -
Deposition Testimony of Tim Schofield,
taken March 20, 2017 ......................................................... Appx19347

Exhibit 381 to Reilly Declaration -
Memo re: Mumps Stability and Potency Estimations,
dated February 27, 2001 (MRK-CHA01896072-3) ............. Appx19449

Exhibit 382 to Reilly Declaration -
Email from Philip S. Bennett to Cynthia Morrisey,
dated January 18, 2002 (MRK-CHA00094849-50) ............. Appx19452

Exhibit 383 to Reilly Declaration -
*Curriculum Vitae* of Manal Anwar Morsy, M.D., Ph.D., MBA
(MORSY00001-10) ............................................................. Appx19455

**Table of Contents**
(Continued)

                                                                        **Page**

Exhibit 384 to Reilly Declaration -
*Curriculum Vitae* of Cynthia F. Morrisey
(MORRISEY_00000001-6) ................................................. Appx19466

Exhibit 385 to Reilly Declaration -
Memo re: Determination of Minimum Release
Specifications for Mumps and Rubella in M-M-R®II,
dated February 9, 2004 (MRK-CHA00722641-2) ............... Appx19473

Exhibit 386 to Reilly Declaration -
Memo re: Determination of Minimum Release Specifications
for Mumps in M-M-R®II, dated November 4, 2004
(MRK-CHA00722667-8) .................................................... Appx19476

Exhibit 387 to Reilly Declaration -
Email from Philip S. Bennett with attachments,
dated December 4, 2012
(MRK-CHA01580006-15) ................................................... Appx19479

Exhibit 388 to Reilly Declaration -
Email from Kimberly A. Duffy to Amy Keegan,
dated December 5, 2012 (MRK-CHA01579943-5) ............. Appx19490

Exhibit 389 to Reilly Declaration -
*Curriculum Vitae* of Amy Keegan
(MRK-CHA02009507-9) .................................................... Appx19494

Exhibit 390 to Reilly Declaration -
Presentation, MMRII Protocol #007 - Mumps End Expiry
study: AIGENT Assay Issues and Impact on Study Criteria,
produced as "6-30 pm Draft 10-04-02 for CRRC-10-08-02
slides.ppt" (MRK-CHA00025831) ...................................... Appx19498
***(Cont'd in Vol LXII)***

**Table of Contents**
**(Continued)**

**Volume LXII**
**(Filed Under Seal)**

Exhibit 391 to Reilly Declaration -
Gulati Deposition Exhibit 14, Select Pages of Supplemental
Biologics License Application, dated June 30, 2004
(MRK-CHA00137854-55 and
MRK-CHA00138585-708) .................................................. Appx19533

Exhibit 392 to Reilly Declaration -
Regulatory Liaison FDA Conversation Record,
dated May 27, 2005 (MRK-CHA00793082-3) .................... Appx19539

Exhibit 393 to Reilly Declaration -
Submission, dated July 13, 2005
(MRK-CHA00141789-906) ................................................. Appx19542

Exhibit 394 to Reilly Declaration -
Deposition Testimony of Dipti Gulati, M.S., D. Phil.,
taken December 5, 2018 ...................................................... Appx19550

Exhibit 395 to Reilly Declaration -
Merck's Biological Stability Program 2001 Annual Stability
Report for M-M-R®II (MRK-CHA01632745-51) .............. Appx19661

Exhibit 396 to Reilly Declaration -
Biological Stability Program 2004 Annual Stability
Report for M-M-R®II (MRK-CHA01632833-8) ................ Appx19669

Exhibit 397 to Reilly Declaration -
Biological Stability Program 2005 Annual Stability
Report for M-M-R®II (MRK-CHA01634117-22) .............. Appx19676

Exhibit 398 to Reilly Declaration -
Biological Stability Program 2008 Annual Stability
Report for M-M-R®II (MRK-CHA01633948-59) .............. Appx19683

**Table of Contents**
(Continued)

Exhibit 399 to Reilly Declaration -
Response to FDA Request for Information,
dated February 28, 2005 (MRK-CHA02078926-7) ............. Appx19696

Exhibit 400 to Reilly Declaration -
Excerpts from Biological Stability Program 2010
Annual Stability Report for M-M-R®II
(MRK-CHA01458201-6) .................................................... Appx19699

Exhibit 401 to Reilly Declaration -
CDC "Mumps Cases and Outbreaks" webpage,
last accessed November 25, 2019 ........................................ Appx19706

Exhibit 402 to Reilly Declaration -
CDC "Mumps Vaccination" webpage, last reviewed
March 28, 2019 ................................................................... Appx19709

Exhibit 403 to Reilly Declaration -
CDC "Mumps Vaccination" webpage, archived as of
May 30, 2012 ..................................................................... Appx19711

Exhibit 404 to Reilly Declaration -
CDC "Mumps Vaccination" webpage, archived as of
December 8, 2009 ............................................................... Appx19714

Exhibit 405 to Reilly Declaration -
Email from Janet Ernst-Gerner to Alan Modlinger,
dated September 23, 2016 (MRK-CHA02008691-4) .......... Appx19717

Exhibit 406 to Reilly Declaration -
Marked M-M-R®II (Measles, Mumps, and Rubella Virus
Vaccine Live) Literature (MRK-CHA02008695-705) ......... Appx19722

Exhibit 407 to Reilly Declaration -
Email from Mark Papania to Barbara Kuter,
dated February 12, 2010 (MRK-CHA00351988-90) ........... Appx19734

**Table of Contents**
(Continued)

Exhibit 408 to Reilly Declaration -
Email from Chester J. Kitchen, dated February 25, 2010
(MRK-CHA00790153-4) ..................................................... Appx19738

Exhibit 409 to Reilly Declaration -
Email from Chester J. Kitchen to Scott Porreca,
dated February 26, 2010 (MRK-CHA00791347) ................ Appx19741

Exhibit 410 to Reilly Declaration -
FDA Conversation re; PRIOrix™, measles, mumps &
rubella live, attenuated, viral vaccine BB-IND-7229,
dated December 18, 1997 (GSK-MMR-IND-0047687-9) ... Appx19743

Exhibit 411 to Reilly Declaration -
FDA Conversation re: PRIOrix IND submission,
Clinical Hold, dated October 16, 1997
(GSK-MMR-IND-0047654-6) ............................................. Appx19747

Exhibit 412 to Reilly Declaration -
Extra CDAB Meeting Abstract, dated August 1, 2011
(GSK-MMR-019819-42) ..................................................... Appx19751

Exhibit 413 to Reilly Declaration -
Memo re: Minutes of Meeting with CBER on 4/4/01,
dated April 9, 2001 (MRK-CHA00049238-40) ................... Appx19776

Exhibit 414 to Reilly Declaration -
Email from Sally S. Wong to Cathy Hoath,
dated February 26, 2013 (MRK-CHA01556424-8) ............. Appx19780

Exhibit 415 to Reilly Declaration -
Email from Joseph D. Bernardo to Mark J. Stannard,
dated November 30, 2016 (MRK-CHA02101841) ............. Appx19786

Exhibit 416 to Reilly Declaration -
Deposition Testimony of Roberta L. McKee, Ph.D.,
taken March 30, 2017 ......................................................... Appx19788

**Table of Contents**
**(Continued)**

**Page**

Exhibit 417 to Reilly Declaration -
Vaccine & Biological Stability Protocol for M-M-R®II
(MRK-CHA01714300-8) .................................................... Appx19870

Exhibit 418 to Reilly Declaration -
Excerpts from Biological Stability Program 2000
Annual Stability Report for M-M-R®II
(MRK-CHA01633601-6) .................................................... Appx19880

Exhibit 419 to Reilly Declaration -
Excerpts from Biological Stability Program 2002
Annual Stability Report for M-M-R®II
(MRK-CHA01633529-39) .................................................... Appx19887

Exhibit 420 to Reilly Declaration -
Excerpts from Biological Stability Program 2003
Annual Stability Report for M-M-R®II
(MRK-CHA01632888-95) .................................................... Appx19899

Exhibit 421 to Reilly Declaration -
SOP Active Stability Monitoring of Live Virus Vaccine
Potency Results, effective November 10, 2000
(MRK-CHA00049165-73) .................................................... Appx19908

Exhibit 422 to Reilly Declaration -
SOP Real Time Stability Trend Monitoring, effective
September 21, 2016 (MRK-CHA01714343-54) .................. Appx19918

Exhibit 423 to Reilly Declaration -
Label Claim Compliance of M-M-R®II
(MRK-CHA00322066-73) .................................................... Appx19931

Exhibit 424 to Reilly Declaration -
Proposed New Stabilizer for M-M-R®II,
dated July 12, 2002 (MRK-CHA00239179-99) .................. Appx19940

**Table of Contents**
**(Continued)**

**Page**

Exhibit 425 to Reilly Declaration -
Clinical and Regulatory Review Committee Agenda,
dated October 8, 2002 (MRK-CHA00780210-65) .............. Appx19962
*(Cont'd in Vol XLIII)*

**Volume XLIII**
**(Filed Under Seal)**

Exhibit 426 to Reilly Declaration -
Analytical Approach for MMR in Japan
(MRK-CHA00719989-20008) ............................................. Appx20019

Exhibit 427 to Reilly Declaration -
Excerpts from Memo re: Mumps neutralizing antibody test vs.
efficacy and effectiveness, dated September 10, 1999
(MRK-CHA00061698-703) ................................................. Appx20040

Exhibit 428 to Reilly Declaration -
Atkinson Deposition Exhibit 2, Letter from Kevin Malone
to Kathleen Hardway, dated July 31, 2018,
and Letter from Robert Redfield to Kathleen Hardway,
dated May 24, 2018 ............................................................ Appx20047

Exhibit 429 to Reilly Declaration -
CDC Publication, Ensuring the Safety of Vaccines in the
United States, last updated July 2011 ................................... Appx20055

Exhibit 430 to Reilly Declaration -
Email from Colleen M. Duffy to Diana DeLong,
dated December 14, 2005 (MRK-CHA00942187-8) ........... Appx20058

Exhibit 431 to Reilly Declaration -
Email from Kevin Agnew to Diana DeLong,
dated March 14, 2014 (MRK-CHA01673057-9) ................. Appx20061

Exhibit 432 to Reilly Declaration -
Letter to CDC Request for Final Proposal to RFP 2014-N-
15784 Consolidated Vaccines for Children Contact,
dated March 7, 2014 (MRK-CHA01655048-93) ................. Appx20065

**Table of Contents**
(Continued)

Exhibit 433 to Reilly Declaration -
Email from Diana DeLong to Cindy Rivera,
dated March 13, 2014 (MRK-CHA01656202-3) ................. Appx20112

Exhibit 434 to Reilly Declaration -
FDA Comments on PRN Assay, dated May 9, 2007
(GSK-MMR-IND-0015993-4) ............................................ Appx20115

Exhibit 435 to Reilly Declaration -
Excerpts from Merck Presentation, dated November 10, 2011
(MRK-CHA0002441-681) ................................................... Appx20118

Exhibit 436 to Reilly Declaration -
Letter from Lisa C. Dykstra to CDC and Office of General
Counsel for Department of Health and Human Services,
dated May 18, 2015 (MRK-CHA01374713-20) .................. Appx20121

Exhibit 437 to Reilly Declaration -
Summary of GSK Vaccines development pipeline meeting
with CDC March 8, 2016 (GSK-MMR-0062025-30) ......... Appx20130

Exhibit 438 to Reilly Declaration -
Email from Ouzama Nicholson to Donna Boyce,
dated May 27, 2010 (GSK-MMR-0058532) ....................... Appx20137

Exhibit 439 to Reilly Declaration -
Memo re: Supporting Documents for Stephen Krahling,
dated October 10, 2000 (MRK-CHA00447565-74) ............ Appx20139

Exhibit 440 to Reilly Declaration -
Excerpts from journal of David Krah, M.D.
(MRK-CHA00490081-591) ................................................ Appx20150

Exhibit 441 to Reilly Declaration -
Minutes of August 8, 2001 Project Team Meeting
(MRK-CHA00209441-53) .................................................. Appx20176

**Table of Contents**
(Continued)

Page

Exhibit 442 to Reilly Declaration -
Deposition Testimony of  Thomas McGuire, Ph.D.,
taken July 2, 2018 ............................................................... Appx20190

Exhibit 443 to Reilly Declaration -
National Vaccine Advisory Committee Report,
The National Vaccine Program 2008 State of the
Program Report, dated February 2009.................................. Appx20274

Exhibit 444 to Reilly Declaration -
"National, State, and Local Area Vaccination Coverage
Among Children Aged 19–35 Months — United States, 2012,"
*MMWR* 2013; 62:733-755, dated September 13, 2013 ........ Appx20289

Exhibit 445 to Reilly Declaration -
"Financing Immunizations in the United States," Hinman
*et al.*, *Clinical Infectious Diseases* 2004; 38:1440-6 ........... Appx20314

Exhibit 446 to Reilly Declaration -
"Program Review, National Immunization Survey (NIS) and
State and Local Area Integrated Telephone Survey (SLAITS),"
dated November 27-28, 2007 .............................................. Appx20322

Exhibit 447 to Reilly Declaration -
"About VFC" webpage ....................................................... Appx20344

Exhibit 448 to Reilly Declaration -
"Medicaid Program; Charges for Vaccine Administration
Under the Vaccines for Children Program,"
Federal Register Volume 59, Issue 190
(October 3, 1994) .............................................................. Appx20347

Exhibit 449 to Reilly Declaration -
Deposition Testimony of Michele Taylor,
taken May 9, 2017 .............................................................. Appx20360

**Table of Contents**
**(Continued)**

**Page**

Defendant Merck's Response to Relators' Additional Statement of
    Material Facts in Connection with Defendant's First and Fourth
    Summary Judgment Motions, dated December 20, 2019
    (Doc. 311) ........................................................................... Appx20427

Defendant Merck's Response to Relators' Additional Statement of
    Material Facts in Connection with Defendant's First and Fourth
    Summary Judgment Motions, dated December 20, 2019
    (Doc. 314) ........................................................................... Appx20486
    *(Cont'd in Vol XLIV)*

**Volume XLIV**
**(Filed Under Seal)**

Declaration of Lisa C. Dykstra in Support of Defendant's
    Replies and Response to Motions for Summary Judgment,
    executed December 20, 2019 (Doc. 315) ............................. Appx20545

    Exhibit 330 to Dykstra Declaration -
    Excerpts from the Deposition Testimony of Amy Keegan,
    taken February 9, 2018 ....................................................... Appx20552

    Exhibit 331 to Dykstra Declaration -
    Email from Paul Lanzetta to Thomas Romanus
    and John Comonitski, dated August 19, 2011
    (MRK-KRA00955764-955765) .......................................... Appx20555

    Exhibit 332 to Dykstra Declaration -
    Excerpts from Deposition Testimony of Cynthia Morrisey,
    taken July 27, 2017 ............................................................. Appx20558

    Exhibit 333 to Dykstra Declaration -
    Table of Contents for Information Submitted with Merck's
    BLA for the replacement of Human Serum Albumin with
    Recombinant Albumin (MRK-KRA00137827-137828) ..... Appx20562

    Exhibit 334 to Dykstra Declaration -
    FDA's Draft Guidance for Industry Stability Testing of
    Drug Substances and Drug Products (June 8, 1998) ............ Appx20565

**Table of Contents**
**(Continued)**

Exhibit 335 to Dykstra Declaration -
WHO's Draft Guidelines on Stability Evaluation of
Vaccines, Expert Committee on Biological Standardization
(October 23-27, 2006) .......................................................... Appx20662

Exhibit 336 to Dykstra Declaration -
Biological Stability Program 1999 Annual Stability
Report for M-M-R®II (MRK-KRA01632656-86) .............. Appx20691

Exhibit 337 to Dykstra Declaration -
Biological Stability Program 2000 Annual Stability
Report for M-M-R®II (MRK-KRA01633601-29) .............. Appx20723

Exhibit 338 to Dykstra Declaration -
Biological Stability Program 2001 Annual Stability
Report for M-M-R®II (MRK-KRA01632745-822) ............ Appx20753

Exhibit 339 to Dykstra Declaration -
Biological Stability Program 2002 Annual Stability
Report for M-M-R®II (MRK-KRA01633529-600) ............ Appx20832

Exhibit 340 to Dykstra Declaration -
Biological Stability Program Annual 2003 Stability
Report for M-M-R®II (MRK-KRA01632888-945) ............ Appx20905

Exhibit 341 to Dykstra Declaration -
Biological Stability Program 2004 Annual Stability
Report for M-M-R®II (MRK-KRA01632833-68) .............. Appx20964

**Volume XLV**
**(Filed Under Seal)**

Exhibit 342 to Dykstra Declaration -
Biological Stability Program 2005 Annual Stability
Report for M-M-R®II (MRK-KRA01633267-99) .............. Appx21001

Exhibit 343 to Dykstra Declaration -
M-M-R®II Stability Data Summary for the 2006
Annual Stability Report (MRK-KRA0163946-83) ............ Appx21035

**Table of Contents**
**(Continued)**

Exhibit 344 to Dykstra Declaration -
M-M-R®II Stability Data Summary for the 2007
Annual Stability Report (MRK-KRA01633723-31) ........... Appx21074

Exhibit 345 to Dykstra Declaration -
CDC's Nationally Notifiable Infectious Diseases and
Conditions, United States: Weekly Tables, Table 1y
(October 2019) .................................................................. Appx21084

Exhibit 346 to Dykstra Declaration -
CDC's Nationally Notifiable Infectious Diseases and
Conditions, United States: Weekly Tables, Table 1z
(October 2019) .................................................................. Appx21088

Exhibit 347 to Dykstra Declaration -
CDC's Nationally Notifiable Infectious Diseases and
Conditions, United States: Weekly Tables, Table 1kk
(October 2019) .................................................................. Appx21092

Exhibit 348 to Dykstra Declaration -
"An Assessment of Mumps Vaccine Effectiveness by Dose
during an Outbreak in Canada," by Deeks, Shelley, *et al.*,
*CMAJ*, 183(9) (June 14, 2011) ........................................... Appx21096

Exhibit 349 to Dykstra Declaration -
"Mumps Vaccine Effectiveness and Risk Factors for Disease
in Households during an Outbreak in New York City,"
by Livingston, Kara, *et al.*, Vaccine 32; 369-374 (2014) ..... Appx21104

Exhibit 350 to Dykstra Declaration -
"A Large Outbreak of Mumps in the Postvaccine Era,"
by Wharton, Melinda, *et al.*, *Journal of Infectious Diseases*,
Vol. 158, No. 6 (December 1988) ........................................Appx21111

Exhibit 351 to Dykstra Declaration -
"Persistence of Mumps Antibodies after 2 Doses of
Measles-Mumps-Rubella Vaccine," by LeBaron, Charles,
*et al.*, *Journal of Infectious Diseases*, 2009:199
(February 15, 2009) ........................................................... Appx21120

**Table of Contents**
(Continued)

**Page**

Exhibit 352 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Keith Chirgwin, M.D., taken January 26, 2017 ................... Appx21130

Exhibit 353 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Barbara Kuter, Ph.D., taken December 14, 2016 ................. Appx21137

Exhibit 354 to Dykstra Declaration -
Letter from Manal Morsy, M.D., Ph.D. to Luba Vujcic,
dated March 9, 2000 (MRK-KRA00020409-20410) ........... Appx21141

Exhibit 355 to Dykstra Declaration -
Memorandum from R. Wolchko with the subject "Bridging
Study of the Mumps Legacy ELISA" and "Mumps
'Wild Type' IgG ELISA," dated February 23, 2001
(MRK-KRA00561875-561885) ........................................... Appx21144

Exhibit 356 to Dykstra Declaration -
*Curriculum Vitae* of Emilio Emini, Ph.D. (January 2016)
(EMINI 00001-22) ............................................................. Appx21156

Exhibit 357 to Dykstra Declaration -
General Correspondence to FDA, dated April 23, 2002
(MRK-KRA00000548-553) ................................................ Appx21179

Exhibit 358 to Dykstra Declaration -
"Mumps Epidemiology and Immunity-The Anatomy of a
Modern Epidemic," by Anderson, Larry, *et al.*,
*Pediatric Infectious Disease Journal*, Vol. 27, No. 10
(October 2008) .................................................................. Appx21186

Exhibit 359 to Dykstra Declaration -
IID-1.5 "Reduce cases of mumps (U.S. acquired cases),"
Healthy People 2020 ......................................................... Appx21192

**<u>Table of Contents</u>**
**(Continued)**

Defendant's Response to the United States' Statement of
    Interest in Response to the Parties' Summary Judgment
    Briefing, dated January 18, 2021 (Doc. 323) ...................... Appx21194

Defendant Merck's Reply to Relators' Response Regarding
    the United States' Statement of Interest (Doc. 328) .......... Appx21206

137. Ding D, Hong Z, Zhao SJ, et al. Long-term disability from acute childhood Japanese encephalitis in Shanghai, China. Am J Trop Med Hyg 2007;77:528–33. https://doi.org/10.4269/ajtmh.2007.77.528

138. Hills SL, Van Cuong N, Touch S, et al. Disability from Japanese encephalitis in Cambodia and Viet Nam. J Trop Pediatr 2011;57:241–4. https://doi.org/10.1093/tropej/fmp133

139. Hatz C, Werlein J, Mutsch M, Hufnagel M, Behrens RH. Japanese encephalitis: defining risk incidence for travelers to endemic countries and vaccine prescribing from the UK and Switzerland. J Travel Med 2009;16:200–3. https://doi.org/10.1111/j.1708-8305.2009.00334.x

140. Macdonald WB, Tink AR, Ouvrier RA, et al. Japanese encephalitis after a two-week holiday in Bali. Med J Aust 1989;150:334–6,9.

141. Wittesjö B, Eitrem R, Niklasson B, Vene S, Mangiafico JA. Japanese encephalitis after a 10-day holiday in Bali. Lancet 1995;345:856–7. https://doi.org/10.1016/S0140-6736(95)92990-8

142. Caramello P, Canta F, Balbiano R, et al. A case of imported JE acquired during short travel in Vietnam. Are current recommendations about vaccination broader? J Travel Med 2007;14:346–8. https://doi.org/10.1111/j.1708-8305.2007.00140.x

143. CDC. Japanese encephalitis among three U.S. travelers returning from Asia, 2003–2008. MMWR Morb Mortal Wkly Rep 2009;58:737–40.

144. CDC. Japanese encephalitis in a U.S. traveler returning from Thailand, 2004. MMWR Morb Mortal Wkly Rep 2005;54:123–5.

145. Rose MR, Hughes SM, Gatus BJ. A case of Japanese B encephalitis imported into the United Kingdom. J Infect 1983;6:261–5. https://doi.org/10.1016/S0163-4453(83)93693-9

146. Trillen C. American chronicles. Zei-da-man. New Yorker 1985;61–93.

147. Burdon JT, Stanley PJ, Lloyd G, Jones NC. A case of Japanese encephalitis. J Infect 1994;28:175–9. https://doi.org/10.1016/S0163-4453(94)95640-5

148. Buhl MR, Lindquist L. Japanese encephalitis in travelers: review of cases and seasonal risk. J Travel Med 2009;16:217–9. https://doi.org/10.1111/j.1708-8305.2009.00333.x

149. Buhl MR, Black FT, Andersen PL, Laursen A. Fatal Japanese encephalitis in a Danish tourist visiting Bali for 12 days. Scand J Infect Dis 1996;28:189. https://doi.org/10.3109/00365549609049074

150. Pogodina VV, Bochkova NG, Leshchinskaia EV, Levina LS. [Japanese encephalitis in citizens of Russia who travel abroad]. Vopr Virusol 1996;41:8–11.

151. Bernard P, Jambaud E, Berbineau A, Brunot J, Flechaire A. [Japanese encephalitis: an exceptional imported arbovirus]. Presse Med 1998;27:1327.

152. Saito M, Sunagawa T, Makino Y, et al. Three Japanese encephalitis cases in Okinawa, Japan, 1991. Southeast Asian J Trop Med Public Health 1999;30:277–9.

153. Monnet FP. Behavioural disturbances following Japanese B encephalitis. Eur Psychiatry 2003;18:269–73. https://doi.org/10.1016/j.eurpsy.2003.09.001

154. Geraghty CM, McCarthy JS. Japanese encephalitis vaccine: is it being sufficiently used in travellers? Med J Aust 2004;181:269–70.

155. Hanson JP, Taylor CT, Richards AR, Smith IL, Boutlis CS. Japanese encephalitis acquired near Port Moresby: implications for residents and travellers to Papua New Guinea. Med J Aust 2004;181:282–3.

156. Ostlund MR, Kan B, Karlsson M, Vene S. Japanese encephalitis in a Swedish tourist after travelling to Java and Bali. Scand J Infect Dis 2004;36:512–3. https://doi.org/10.1080/00365540410020640

157. Cutfield NJ, Anderson NE, Brickell K, Hueston L, Pikholz C, Roxburgh RH. Japanese encephalitis acquired during travel in China. Intern Med J 2005;35:497–8. https://doi.org/10.1111/j.1445-5994.2005.00852.x

158. Delsing CE, Ardesch J, Nihom J, Mulder L, Kootstra GJ, Hylkema BS. [An unusual cause of meningo-encephalitis: Japanese encephalitis]. Ned Tijdschr Geneeskd 2005;149:2423–7.

159. Lehtinen VA, Huhtamo E, Siikamäki H, Vapalahti O. Japanese encephalitis in a Finnish traveler on a two-week holiday in Thailand. J Clin Virol 2008;43:93–5. https://doi.org/10.1016/j.jcv.2008.05.001

160. Poland JD, Cropp CB, Craven RB, Monath TP. Evaluation of the potency and safety of inactivated Japanese encephalitis vaccine in US inhabitants. J Infect Dis 1990;161:878–82. https://doi.org/10.1093/infdis/161.5.878

161. Artsob H, Spence L. Imported arbovirus infections in Canada 1974–89. Can J Infect Dis 1991;2:95–100. https://doi.org/10.1155/1991/678906

162. Jeurissen A, Strauven T. A case of aseptic meningitis due to Japanese encephalitis virus in a traveller returning from the Philippines. Acta Neurol Belg 2011;111:143–5.

163. Tappe D, Nemecek A, Zipp F, et al. Two laboratory-confirmed cases of Japanese encephalitis imported to Germany by travelers returning from Southeast Asia. J Clin Virol 2012;54:282–5. https://doi.org/10.1016/j.jcv.2012.03.004

164. Werlinrud AM, Christiansen CB, Koch A. Japanese encephalitis in a Danish short-term traveler to Cambodia. J Travel Med 2011;18:411–3. https://doi.org/10.1111/j.1708-8305.2011.00565.x

165. CDC. Japanese encephalitis in two children—United States, 2010. MMWR Morb Mortal Wkly Rep 2011;60:276–8.

166. Langevin S, Libman M, Drebot MA, Laverdière M. A case of Japanese encephalitis virus infection acquired during a trip in Thailand. J Travel Med 2012;19:127–9. https://doi.org/10.1111/j.1708-8305.2011.00582.x

167. Lee DW, Choe YJ, Kim JH, et al. Epidemiology of Japanese encephalitis in South Korea, 2007–2010. Int J Infect Dis 2012;16:e448–52. https://doi.org/10.1016/j.ijid.2012.02.006

168. Australian Government Department of Health. National Notifiable Diseases Surveillance System. Canberra, Australia: Australian Government Department of Health. http://www9.health.gov.au/cda/source/cda-index.cfm

169. Doti P, Castro P, Martínez MJ, et al. A case of Japanese encephalitis in a 20 year-old Spanish sportsman, February 2013. Euro Surveill 2013;18:20573. https://doi.org/10.2807/1560-7917.ES2013.18.35.20573

170. Lagarde S, Lagier JC, Charrel R, et al. Japanese encephalitis in a French traveler to Nepal. J Neurovirol 2014;20:99–102. https://doi.org/10.1007/s13365-013-0226-2

171. Knope KE, Doggett SL, Kurucz N, et al; National Arbovirus and Malaria Advisory Committee. Arboviral diseases and malaria in Australia, 2011–12: annual report of the National Arbovirus and Malaria Advisory Committee. Commun Dis Intell Q Rep 2014;38:E122–42.

172. Schwermer B, Eschle D, Bloch-Infanger C. Fever and headache after a vacation in Thailand. Dtsch Med Wochenschr 2017;142:1063–6.

173. Shin ES, Park O, Kong IS. Review of the incidence of Japanese encephalitis in foreign-born and Korean nationals living in the Republic of Korea, 2007–2016. Osong Public Health Res Perspect 2018;9:126–9. https://doi.org/10.24171/j.phrp.2018.9.3.08

174. Huang MZ, Novara SC, Hough-Telford C, Oliver SE, Wu CL, Pinninti S. Japanese encephalitis in an American adolescent after travel to Asia. J Investig Med 2015;63:395.

175. Ketel WB, Ognibene AJ. Japanese B encephalitis in Vietnam. Am J Med Sci 1971;261:271–9. https://doi.org/10.1097/00000441-197105000-00006

Appx18501

176. Aidem HP, Garagusi VF. Japanese B encephalitis: a case report from New York and a brief review of the literature. Ann Intern Med 1961;55:324–7. https://doi.org/10.7326/0003-4819-55-2-324

177. Long AP. Current status of immunization procedures; tetanus, and exotic diseases of military importance. Am J Public Health Nations Health 1948;38:485–9. https://doi.org/10.2105/AJPH.38.4.485

178. Perez-Pina F, Merikangas UR. Japanese B encephalitis in an American soldier returning from Korea. N Engl J Med 1953;249:531–2. https://doi.org/10.1056/NEJM195309242491305

179. Tigertt WD, Hammon WM, Berge TO, et al. Japanese B encephalitis; a complete review of experience on Okinawa 1945-1949. Am J Trop Med Hyg 1950;30:689–722. https://doi.org/10.4269/ajtmh.1950.s1-30.689

180. National Travel and Tourism Office. U.S. citizen travel to international regions. Washington, DC: US Department of Commerce, National Travel and Tourism Office. https://travel.trade.gov

181. Duffy MR, Reed C, Edelson PJ, et al. A survey of U.S. travelers to Asia to assess compliance with recommendations for the use of Japanese encephalitis vaccine. J Travel Med 2013;20:165–70. https://doi.org/10.1111/jtm.12020

182. Deshpande BR, Rao SR, Jentes ES, et al; The Global TravEpiNet Consortium. Use of Japanese encephalitis vaccine in U.S. travel medicine practices in Global TravEpiNet. Am J Trop Med Hyg 2014;91:694–8. https://doi.org/10.4269/ajtmh.14-00062

183. Eick-Cost AA, Hu Z, Klein TA, Putnak RJ, Jarman RG. Seroconversion to Japanese encephalitis virus among U.S. infantry forces in Korea. Am J Trop Med Hyg 2015;93:1052–4. https://doi.org/10.4269/ajtmh.15-0307

184. Ratnam I, Leder K, Black J, et al. Low risk of Japanese encephalitis in short-term Australian travelers to Asia. J Travel Med 2013;20:206–8. https://doi.org/10.1111/jtm.12019

185. Hills S, Martin R, Marfin A, Fischer M. Control of Japanese encephalitis in Asia: the time is now. Expert Rev Anti Infect Ther 2014;12:901–4. https://doi.org/10.1586/14787210.2014.929498

186. Batchelor P, Petersen K. Japanese encephalitis: a review of clinical guidelines and vaccine availability in Asia. Trop Dis Travel Med Vaccines 2015;1:11. https://doi.org/10.1186/s40794-015-0013-6

187. Markoff L. Points to consider in the development of a surrogate for efficacy of novel Japanese encephalitis virus vaccines. Vaccine 2000;18(Suppl 2):26–32. https://doi.org/10.1016/S0264-410X(00)00038-4

188. Hombach J, Solomon T, Kurane I, Jacobson J, Wood D. Report on a WHO consultation on immunological endpoints for evaluation of new Japanese encephalitis vaccines, WHO, Geneva, 2–3 September, 2004. Vaccine 2005;23:5205–11. https://doi.org/10.1016/j.vaccine.2005.07.002

189. Oya A. Japanese encephalitis vaccine. Acta Paediatr Jpn 1988;30:175–84. https://doi.org/10.1111/j.1442-200X.1988.tb02516.x

190. Hammon WM, Sather GE. Passive immunity for arbovirus infection. I. Artificially induced prophylaxis in man and mouse for Japanese (B) encephalitis. Am J Trop Med Hyg 1973;22:524–34. https://doi.org/10.4269/ajtmh.1973.22.524

191. Lubiniecki AS, Cypess RH, Hammon WM. Passive immunity for arbovirus infection. II. Quantitative aspects of naturally and artificially acquired protection in mice for Japanese (B) encephalitis virus. Am J Trop Med Hyg 1973;22:535–42. https://doi.org/10.4269/ajtmh.1973.22.535

192. Konishi E, Yamaoka M, Khin-Sane-Win, Kurane I, Takada K, Mason PW. The anamnestic neutralizing antibody response is critical for protection of mice from challenge following vaccination with a plasmid encoding the Japanese encephalitis virus premembrane and envelope genes. J Virol 1999;73:5527–34.

193. Beasley DW, Li L, Suderman MT, et al. Protection against Japanese encephalitis virus strains representing four genotypes by passive transfer of sera raised against ChimeriVax-JE experimental vaccine. Vaccine 2004;22:3722–6. https://doi.org/10.1016/j.vaccine.2004.03.027

194. Van Gessel Y, Klade CS, Putnak R, et al. Correlation of protection against Japanese encephalitis virus and JE vaccine (IXIARO) induced neutralizing antibody titers. Vaccine 2011;29:5925–31. https://doi.org/10.1016/j.vaccine.2011.06.062

195. Raengsakulrach B, Nisalak A, Gettayacamin M, et al. An intranasal challenge model for testing Japanese encephalitis vaccines in rhesus monkeys. Am J Trop Med Hyg 1999;60:329–37. https://doi.org/10.4269/ajtmh.1999.60.329

196. Raengsakulrach B, Nisalak A, Gettayacamin M, et al. Safety, immunogenicity, and protective efficacy of NYVAC-JEV and ALVAC-JEV recombinant Japanese encephalitis vaccines in rhesus monkeys. Am J Trop Med Hyg 1999;60:343–9. https://doi.org/10.4269/ajtmh.1999.60.343

197. Feroldi E, Capeding MR, Boaz M, Gailhardou S, Meric C, Bouckenooghe A. Memory immune response and safety of a booster dose of Japanese encephalitis chimeric virus vaccine (JE-CV) in JE-CV-primed children. Hum Vaccin Immunother 2013;9:889–97. https://doi.org/10.4161/hv.23087

198. Sohn YM, Tandan JB, Yoksan S, Ji M, Ohrr H. A 5-year follow-up of antibody response in children vaccinated with single dose of live attenuated SA14-14-2 Japanese encephalitis vaccine: immunogenicity and anamnestic responses. Vaccine 2008;26:1638–43. https://doi.org/10.1016/j.vaccine.2008.01.021

199. Monath TP, Guirakhoo F, Nichols R, et al. Chimeric live, attenuated vaccine against Japanese encephalitis (ChimeriVax-JE): phase 2 clinical trials for safety and immunogenicity, effect of vaccine dose and schedule, and memory response to challenge with inactivated Japanese encephalitis antigen. J Infect Dis 2003;188:1213–30. https://doi.org/10.1086/378356

200. Ferguson M, Johnes S, Li L, Heath A, Barrett A. Effect of genomic variation in the challenge virus on the neutralization titres of recipients of inactivated JE vaccines—report of a collaborative study on PRNT50 assays for Japanese encephalitis virus (JE) antibodies. Biologicals 2008;36:111–6. https://doi.org/10.1016/j.biologicals.2007.07.002

201. Lyons A, Kanesa-thasan N, Kuschner RA, et al. A Phase 2 study of a purified, inactivated virus vaccine to prevent Japanese encephalitis. Vaccine 2007;25:3445–53. https://doi.org/10.1016/j.vaccine.2006.12.046

202. Srivastava AK, Putnak JR, Lee SH, et al. A purified inactivated Japanese encephalitis virus vaccine made in Vero cells. Vaccine 2001;19:4557–65. https://doi.org/10.1016/S0264-410X(01)00208-0

203. Tauber E, Kollaritsch H, Korinek M, et al. Safety and immunogenicity of a Vero-cell-derived, inactivated Japanese encephalitis vaccine: a non-inferiority, phase III, randomised controlled trial. Lancet 2007;370:1847–53. https://doi.org/10.1016/S0140-6736(07)61780-2

204. Schuller E, Klade CS, Wölfl G, Kaltenböck A, Dewasthaly S, Tauber E. Comparison of a single, high-dose vaccination regimen to the standard regimen for the investigational Japanese encephalitis vaccine, IC51: a randomized, observer-blind, controlled Phase 3 study. Vaccine 2009;27:2188–93. https://doi.org/10.1016/j.vaccine.2008.12.062

Appx18502

205. Jelinek T, Burchard GD, Dieckmann S, et al. Short-term immunogenicity and safety of an accelerated pre-exposure prophylaxis regimen with Japanese encephalitis vaccine in combination with a rabies vaccine: A phase III, multicenter, observer-blind study. J Travel Med 2015;22:225–31. https://doi.org/10.1111/jtm.12210

206. Cramer JP, Dubischar K, Eder S, et al. Immunogenicity and safety of the inactivated Japanese encephalitis vaccine IXIARO® in elderly subjects: Open-label, uncontrolled, multi-center, phase 4 study. Vaccine 2016;34:4579–85. https://doi.org/10.1016/j.vaccine.2016.07.029

207. Woolpert T, Staples JE, Faix DJ, et al. Immunogenicity of one dose of Vero cell culture-derived Japanese encephalitis (JE) vaccine in adults previously vaccinated with mouse brain-derived JE vaccine. Vaccine 2012;30:3090–6. https://doi.org/10.1016/j.vaccine.2012.02.063

208. Erra EO, Askling HH, Rombo L, et al. A single dose of Vero cell-derived Japanese encephalitis (JE) vaccine (Ixiaro) effectively boosts immunity in travelers primed with mouse brain-derived JE vaccines. Clin Infect Dis 2012;55:825–34. https://doi.org/10.1093/cid/cis542

209. Kaltenböck A, Dubischar-Kastner K, Eder G, et al. Safety and immunogenicity of concomitant vaccination with the cell-culture based Japanese Encephalitis vaccine IC51 and the hepatitis A vaccine HAVRIX1440 in healthy subjects: A single-blind, randomized, controlled Phase 3 study. Vaccine 2009;27:4483–9. https://doi.org/10.1016/j.vaccine.2009.05.034

210. Dubischar-Kastner K, Eder S, Buerger V, et al. Long-term immunity and immune response to a booster dose following vaccination with the inactivated Japanese encephalitis vaccine IXIARO, IC51. Vaccine 2010;28:5197–202. https://doi.org/10.1016/j.vaccine.2010.05.069

211. Cramer JP, Jelinek T, Paulke-Korinek M, et al. One-year immunogenicity kinetics and safety of a purified chick embryo cell rabies vaccine and an inactivated Vero cell-derived Japanese encephalitis vaccine administered concomitantly according to a new, 1-week, accelerated primary series. J Travel Med 2016;23:1–8.

212. Schuller E, Klade CS, Heinz FX, et al. Effect of pre-existing anti-tick-borne encephalitis virus immunity on neutralising antibody response to the Vero cell-derived, inactivated Japanese encephalitis virus vaccine candidate IC51. Vaccine 2008;26:6151–6. https://doi.org/10.1016/j.vaccine.2008.08.056

213. Schuller E, Jilma B, Voicu V, et al. Long-term immunogenicity of the new Vero cell-derived, inactivated Japanese encephalitis virus vaccine IC51 Six and 12 month results of a multicenter follow-up phase 3 study. Vaccine 2008;26:4382–6. https://doi.org/10.1016/j.vaccine.2008.05.081

214. Dubischar-Kastner K. New clinical data for IXIARO Japanese encephalitis vaccine, inactivated, adsorbed. Presentation to Advisory Committee on Immunization Practices (ACIP), February 24, 2016. Atlanta, GA: US Department of Health and Human Services, CDC; 2016. https://stacks.cdc.gov/view/cdc/60592

215. Eder S, Dubischar-Kastner K, Firbas C, et al. Long term immunity following a booster dose of the inactivated Japanese Encephalitis vaccine IXIARO®, IC51. Vaccine 2011;29:2607–12. https://doi.org/10.1016/j.vaccine.2011.01.058

216. Taucher C, Kollaritsch H, Dubischar KL. Persistence of the immune response after vaccination with the Japanese encephalitis vaccine, IXIARO® in healthy adults: A five year follow-up study. Vaccine 2019;37:2529–31. https://doi.org/10.1016/j.vaccine.2019.03.030

217. Paulke-Korinek M, Kollaritsch H, Kundi M, Zwazl I, Seidl-Friedrich C, Jelinek T. Persistence of antibodies six years after booster vaccination with inactivated vaccine against Japanese encephalitis. Vaccine 2015;33:3600–4. https://doi.org/10.1016/j.vaccine.2015.05.037

218. Krow-Lucal E, Fischer M, Laven J, et al. Seroprotection at 12–23 months following a single dose of Vero cell culture-derived Japanese encephalitis (JE) vaccine in adults previously vaccinated with mouse brain-derived JE vaccine. The 15th Conference of the International Society of Travel Medicine; May 14–18, 2017; Barcelona, Spain.

219. Erra EO, Askling HH, Yoksan S, et al. Cross-protection elicited by primary and booster vaccinations against Japanese encephalitis: a two-year follow-up study. Vaccine 2013;32:119–23. https://doi.org/10.1016/j.vaccine.2013.10.055

220. Jelinek T, Cramer JP, Dieckmann S, et al. Evaluation of rabies immunogenicity and tolerability following a purified chick embryo cell rabies vaccine administered concomitantly with a Japanese encephalitis vaccine. Travel Med Infect Dis 2015;13:241–50. https://doi.org/10.1016/j.tmaid.2015.05.008

221. Alberer M, Burchard G, Jelinek T, et al. Co-administration of a meningococcal glycoconjugate vaccine ACWY with travel vaccines: a randomized, open-label, multi-center study. Travel Med Infect Dis 2014;12:485–93. https://doi.org/10.1016/j.tmaid.2014.04.011

222. Erra EO, Askling HH, Yoksan S, et al. Cross-protective capacity of Japanese encephalitis (JE) vaccines against circulating heterologous JE virus genotypes. Clin Infect Dis 2013;56:267–70. https://doi.org/10.1093/cid/cis883

223. Dubischar KL, Kadlecek V, Sablan JB, et al. Immunogenicity of the inactivated Japanese encephalitis virus vaccine IXIARO in children from a Japanese encephalitis virus-endemic region. Pediatr Infect Dis J 2017;36:898–904. https://doi.org/10.1097/INF.0000000000001615

224. Kaltenböck A, Dubischar-Kastner K, Schuller E, Datla M, Klade CS, Kishore TS. Immunogenicity and safety of IXIARO (IC51) in a Phase II study in healthy Indian children between 1 and 3 years of age. Vaccine 2010;28:834–9. https://doi.org/10.1016/j.vaccine.2009.10.024

225. Jelinek T, Cromer MA, Cramer JP, et al. Safety and immunogenicity of an inactivated Vero cell-derived Japanese encephalitis vaccine (IXIARO®, JESPECT®) in a pediatric population in JE non-endemic countries: An uncontrolled, open-label phase 3 study. Travel Med Infect Dis 2018;22:18–24. https://doi.org/10.1016/j.tmaid.2018.03.003

226. Kadlecek V, Borja-Tabora CF, Eder-Lingelbach S, et al. Antibody persistence up to 3 years after primary immunization with inactivated Japanese encephalitis vaccine IXIARO in Philippine children and effect of a booster dose. Pediatr Infect Dis J 2018;37:e233–40. https://doi.org/10.1097/INF.0000000000002124

227. Taucher C, Kundi M. Estimating the duration of protection following a booster dose of the inactivated Japanese encephalitis vaccine IXIARO®, IC51 in children. American Society of Tropical Medicine and Hygiene. 67th Annual Meeting; New Orleans, Louisiana; October 28–November 1, 2018.

228. Tauber E, Kollaritsch H, von Sonnenburg F, et al. Randomized, double-blind, placebo-controlled phase 3 trial of the safety and tolerability of IC51, an inactivated Japanese encephalitis vaccine. J Infect Dis 2008;198:493–9. https://doi.org/10.1086/590116

229. Dubischar-Kastner K, Kaltenboeck A, Klingler A, Jilma B, Schuller E. Safety analysis of a Vero-cell culture derived Japanese encephalitis vaccine, IXIARO (IC51), in 6 months of follow-up. Vaccine 2010;28:6463–9. https://doi.org/10.1016/j.vaccine.2010.07.040

230. Dubischar KL, Kadlecek V, Sablan B Jr, et al. Safety of the inactivated Japanese encephalitis virus vaccine IXIARO in children. Pediatr Infect Dis J 2017;36:889–97. https://doi.org/10.1097/INF.0000000000001623

Appx18503

231. Rabe IB, Miller ER, Fischer M, Hills SL. Adverse events following vaccination with an inactivated, Vero cell culture-derived Japanese encephalitis vaccine in the United States, 2009–2012. Vaccine 2015;33:708–12. https://doi.org/10.1016/j.vaccine.2014.11.046

232. Walker WL, Hills SL, Miller ER, Fischer M, Rabe IB. Adverse events following vaccination with an inactivated, Vero cell culture-derived Japanese encephalitis vaccine in the United States, 2012–2016. Vaccine 2018;36:4369–74. https://doi.org/10.1016/j.vaccine.2018.04.038

233. Dubischar-Kastner K. Data supporting the use of a booster dose of Ixiaro. Presentation to Advisory Committee on Immunization Practices (ACIP); February 23, 2011; Atlanta, GA. https://www.cdc.gov/vaccines/acip/meetings/index.html

234. Lindsey NP, Staples JE, Jones JF, et al. Adverse event reports following Japanese encephalitis vaccination in the United States, 1999–2009. Vaccine 2010;29:58–64. https://doi.org/10.1016/j.vaccine.2010.10.016

235. Takahashi H, Pool V, Tsai TF, Chen RT; The VAERS Working Group. Adverse events after Japanese encephalitis vaccination: review of post-marketing surveillance data from Japan and the United States. Vaccine 2000;18:2963–9. https://doi.org/10.1016/S0264-410X(00)00111-0

236. Food and Drug Administration. Postmarketing reporting of adverse experiences. 21 C.F.R. Sect. 600.80 (2018). https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/cfrsearch.cfm?fr=600.80

237. Taucher C. VLA-401: JE-VC post-marketing adverse event surveillance among U.S. military personnel. October 26, 2017. Presentation to Advisory Committee on Immunization Practices (ACIP), October 26, 2017; Atlanta, GA.

238. CDC. Special situations. General best practice guidelines for immunization: Best Practices Guidance of the Advisory Committee on Immunization Practices (ACIP). https://www.cdc.gov/vaccines/hcp/acip-recs/general-recs/special-situations.html

239. Siraprapasiri T, Sawaddiwudhipong W, Rojanasuphot S. Cost benefit analysis of Japanese encephalitis vaccination program in Thailand. Southeast Asian J Trop Med Public Health 1997;28:143–8.

240. Yin Z, Beeler Asay GR, Zhang L, et al; Guizhou JE Study Group. An economic evaluation of the use of Japanese encephalitis vaccine in the expanded program of immunization of Guizhou province, China. Vaccine 2012;30:5569–77. https://doi.org/10.1016/j.vaccine.2012.05.068

241. Touch S, Suraratdecha C, Samnang C, et al. A cost-effectiveness analysis of Japanese encephalitis vaccine in Cambodia. Vaccine 2010;28:4593–9. https://doi.org/10.1016/j.vaccine.2010.04.086

242. Meltzer M. Comparative analysis of strategies for JE vaccination for U.S. travelers to Asia. Presentation to the Advisory Committee on Immunization Practices (ACIP), June 21, 2018; Atlanta, GA. https://www.cdc.gov/vaccines/acip/meetings/downloads/slides-2018-06/JE-03-Hills-Fischer-508.pdf

243. US Department of Health and Human Services. Biosafety in microbiological and biomedical laboratories. 5th ed. HHS Publication No. (CDC) 21-1112. Washington, DC: US Department of Health and Human Services; 2018. https://www.cdc.gov/biosafety/publications/bmbl5

Appx18504

Recommendations and Reports

## Advisory Committee on Immunization Practices
### Membership as of February 27, 2019

**Chair:** José R. Romero, MD, University of Arkansas for Medical Sciences and Arkansas Children's Hospital, Little Rock, Arkansas.

**Executive Secretary:** Amanda Cohn, MD, National Center for Immunization and Respiratory Diseases, CDC, Atlanta, Georgia.

**Members:** Robert L. Atmar, MD, Baylor College of Medicine, Houston, Texas; Kevin A. Ault, MD, University of Kansas Medical Center, Kansas City, Kansas; Henry Bernstein, DO, Zucker School of Medicine at Hofstra/Northwell Cohen Childrens' Medical Center, New Hyde Park, New York; Echezona Ezeanolue, MD, University of Nevada, Las Vegas, Nevada; Sharon E. Frey, MD, Saint Louis University Medical School, Saint Louis, Missouri; Stefan Gravenstein, MD, Providence Veterans Administration Hospital, Providence, Rhode Island; Paul Hunter, MD, City of Milwaukee Health Department, Milwaukee, Wisconsin; Grace M. Lee, MD, Lucile Packard Children's Hospital, Stanford University School of Medicine, Stanford, California; Veronica V. McNally, JD, Fanny Strong Foundation, West Bloomfield, Michigan; Kelly Moore, MD, Vanderbilt University School of Medicine, Nashville, Tennessee; José R. Romero, MD, University of Arkansas for Medical Sciences and Arkansas Children's Hospital, Little Rock, Arkansas; David Stephens, MD, Emory University School of Medicine, Atlanta, Georgia; Peter Szilagyi, MD, University of California, Los Angeles (UCLA), Los Angeles, California; Helen Keipp Talbot, MD, Vanderbilt University, Nashville, Tennessee; Emmanuel Walter, Jr., MD, Duke University School of Medicine, Durham, North Carolina.

**Ex Officio Members:** Mary Beth Hance, Centers for Medicare and Medicaid Services; Eric Deussing, MD, Department of Defense; Jane A. Kim, MD, Department of Veterans Affairs; Doran Fink, MD, Food and Drug Administration; Narayan Nair, MD, Health Resources and Services Administration; Thomas Weiser, MD, Indian Health Service; Tammy Beckham, National Vaccine Program Office; John Beigel, MD, National Institutes of Health.

**Liaison Representatives:** American Academy of Family Physicians, Pamela G. Rockwell, DO, Ann Arbor, Michigan; American Academy of Pediatrics, Yvonne Maldonado, MD, Stanford, California; American Academy of Pediatrics, David Kimberlin, MD, Birmingham, Alabama; American Academy of Physician Assistants, Marie-Michèle Léger, MPH, Alexandria, Virginia; American College Health Association, Susan Even, MD, Columbia, Missouri; American College of Nurse Midwives, Carol E. Hayes, MN, Atlanta, Georgia; American College of Nurse Midwives, Pamela M. Meharry, PhD; American College of Obstetricians and Gynecologists, Linda O'Neal Eckert, MD, Seattle, Washington; American College of Physicians, Jason M. Goldman, MD, Boca Raton, Florida; American Geriatrics Society, Kenneth Schmader, MD, Durham, North Carolina; America's Health Insurance Plans, Mark J. Netoskie, MD, Houston, Texas; American Immunization Registry Association, Rebecca Coyle, MSEd, Washington DC; American Medical Association, Sandra Adamson Fryhofer, MD, Atlanta, Georgia; American Nurses Association, Charles Rittle, MPH, Pittsburgh, Pennsylvania; American Osteopathic Association, Stanley Grogg, DO, Tulsa, Oklahoma; American Pharmacists Association, Stephan L. Foster, PharmD, Memphis, Tennessee; Association of Immunization Managers, Christine Finley, MPH, Burlington, Vermont; Association for Prevention Teaching and Research, Paul W. McKinney, MD, Louisville, Kentucky; Association of State and Territorial Health Officials, Nathaniel Smith, MD, Little Rock, Arkansas; Biotechnology Industry Organization, Phyllis A. Arthur, MBA, Washington, DC; Council of State and Territorial Epidemiologists, Christine Hahn, MD, Boise, Idaho; Canadian National Advisory Committee on Immunization, Caroline Quach, MD, Montreal, Québec, Canada; Infectious Diseases Society of America, Carol J. Baker, MD, Houston, Texas; National Association of County and City Health Officials, Matthew Zahn, MD, Santa Ana, California; National Association of County and City Health Officials, Jeffrey Duchin, MD, Seattle, Washington; National Association of Pediatric Nurse Practitioners, Patricia A. Stinchfield, MS, St. Paul, Minnesota; National Foundation for Infectious Diseases, William Schaffner, MD, Nashville, Tennessee; Mexico National Immunization Council and Child Health Program, Luis Duran, MD, Mexico; National Medical Association, Patricia Whitley-Williams, MD, New Brunswick, New Jersey; Pediatric Infectious Diseases Society, Sean O'Leary, MD, Colorado; Pediatric Infectious Diseases Society, Mark H. Sawyer, MD, San Diego, California; Pharmaceutical Research and Manufacturers of America, David R. Johnson, MD, Swiftwater, Pennsylvania; Society for Adolescent Health and Medicine, Amy B. Middleman, MD, Oklahoma City, Oklahoma; Society for Healthcare Epidemiology of America, David Weber, MD, Chapel Hill, North Carolina.

## ACIP Japanese Encephalitis Vaccine Work Group
### Membership as of February 27, 2019

**Chair:** Emmanuel Walter, Jr., MD, Duke University School of Medicine, Durham, North Carolina.

**Members:** Robert L. Atmar, MD, Baylor College of Medicine, Houston, Texas; Elizabeth Barnett, MD, Boston Medical Center, Boston, Massachusetts; Alan Barrett, PhD, University of Texas, Medical Branch, Galveston, Texas; Joseph A. Bocchini, MD, Louisiana State University, Baton Rouge, Louisiana; Lin Chen, MD, Mount Auburn Hospital, Cambridge, Massachusetts; Eric Deussing, MD, Department of Defense, Atlanta, Georgia; Doran Fink, MD, PhD, Food and Drug Administration, Bethesda, Maryland; Michael Holbrook, MD, Battelle Memorial Institute, Frederick, Maryland; Myron Levin, MD, University of Colorado, Denver, Colorado; Anthony Marfin, MD, PATH, Seattle, Washington; Cody Meissner, MD, Tufts University, Boston, Massachusetts; Robert Schechter, MD, California Department of Public Health, California; David Shlim, MD, Jackson Hole Travel and Tropical Medicine, Jackson, Wyoming; Mary Wilson, MD, University of California, San Francisco, California.

**CDC Contributors:** Marc Fischer, MD, J. Erin Staples, MD, PhD, Fort Collins, Colorado; Steven Waterman, MD, San Juan, Puerto Rico; Mark Gershman, MD, Terri Hyde, MD, Michael M. McNeil, MD, Atlanta, Georgia.

**Work Group Secretariat:** Susan L. Hills, MBBS, CDC, Fort Collins, Colorado.

Appx18505

**CDC Adoption of ACIP Recommendations for *MMWR* Recommendations and Reports,
*MMWR* Policy Notes, and Immunization Schedules (Child/Adolescent, Adult)**

Recommendations for routine use of vaccines in children, adolescents, and adults are developed by the Advisory Committee on Immunization Practices (ACIP). ACIP is chartered as a federal advisory committee to provide expert external advice and guidance to the Director of CDC on use of vaccines and related agents for the control of vaccine-preventable diseases in the civilian population of the United States. Recommendations for routine use of vaccines in children and adolescents are harmonized to the greatest extent possible with recommendations made by the American Academy of Pediatrics (AAP), the American Academy of Family Physicians (AAFP), and the American College of Obstetricians and Gynecologists (ACOG). Recommendations for routine use of vaccines in adults are harmonized with recommendations of AAFP, ACOG, and the American College of Physicians (ACP). ACIP recommendations approved by the CDC Director become agency guidelines on the date published in the *Morbidity and Mortality Weekly Report* (*MMWR*). Additional information is available at https://www.cdc.gov/vaccines/acip.

Recommendations and Reports

TABLE 1. Seroprotection rates at 1 month after a 2-dose primary series of inactivated Vero cell culture–derived Japanese encephalitis vaccine administered according to the dose and schedule approved by the Food and Drug Administration, by age group

| Age group (yrs) | Study location | Seroprotection rate* | | | Reference |
|---|---|---|---|---|---|
| | | Total | No. seroprotected | (%) | |
| ≥18 | United States, Europe | 361 | 352 | 98 | 203 |
| ≥18 | Europe | 127 | 126 | 99 | 209 |
| ≥18 | Europe | 113 | 110 | 97 | 204 |
| ≥18 | Europe | 31 | 30 | 97[†] | 208 |
| ≥18 | United States | 92 | 88 | 96 | 207 |
| 18–49 | United States | 22 | 21 | 95 | 201 |
| 18–65 | Europe | 206 | 206 | 100 | 205 |
| ≥64 | Europe | 197 | 128 | 65 | 206 |

* Proportion with 50% plaque reduction neutralization test titer ≥10.
[†] Seroprotection measured 4–8 weeks after dose 2.

TABLE 2. Seroprotection rates and geometric mean titers for inactivated Vero cell culture–derived Japanese encephalitis vaccine administered to adults aged 18–65 years in an accelerated schedule with rabies vaccine or standard schedule with and without rabies vaccine*

| Measure and time after second JE-VC dose | Primary series schedule | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | JE-VC, 0 and 7 days with rabies vaccine[†] | | | JE-VC, 0 and 28 days with rabies vaccine[§] | | | JE-VC, 0 and 28 days alone | | |
| Seroprotection rate[¶] | Total | No. seroprotected | (%) | Total | No. seroprotected | (%) | Total | No. seroprotected | (%) |
| 28 days | 206 | 203 | 99 | 157 | 157 | 100 | 49 | 49 | 100 |
| >300 days** | 199 | 188 | 94 | 154 | 132 | 86 | 48 | 42 | 88 |
| GMT[††] | GMT (95% CI) | | | GMT (95% CI) | | | GMT (95% CI) | | |
| 28 days | 690 (595–801) | | | 299 (254–352) | | | 337 (252–451) | | |
| >300 days** | 117 (100–137) | | | 39 (33–47) | | | 39 (28–54) | | |

Sources: Food and Drug Administration. Ixiaro: Japanese encephalitis vaccine, inactivated, adsorbed [package insert]. Vienna, Austria: Valneva Austria GmbH; 2018. https://www.fda.gov/media/75777/download; Jelinek T, Burchard GD, Dieckmann S, et al. Short-term immunogenicity and safety of an accelerated pre-exposure prophylaxis regimen with Japanese encephalitis vaccine in combination with a rabies vaccine: A phase III, multicenter, observer-blind study. J Travel Med 2015;22:225–31; Cramer JP, Jelinek T, Paulke-Korinek M, et al. One-year immunogenicity kinetics and safety of a purified chick embryo cell rabies vaccine and an inactivated Vero cell–derived Japanese encephalitis vaccine administered concomitantly according to a new, 1-week, accelerated primary series. J Travel Med 2016;23:1–8.
Abbreviations: CI = confidence interval; GMT = geometric mean titer; JE-VC = Vero cell culture–derived Japanese encephalitis vaccine; PCEC = purified chick embryo cell.
* Per-protocol analysis.
[†] PCEC rabies vaccine administered in a 0-, 3-, 7-day schedule.
[§] PCEC rabies vaccine administered in a 0-, 7-, 28-day schedule.
[¶] Proportion with 50% plaque reduction neutralization test titer ≥10.
** Study ended on day 365.
[††] PRNT titers <10 were imputed to 5.

Appx18507

Recommendations and Reports

TABLE 3. Seroprotection rates and geometric mean titers among adults at intervals after the first dose of a 2-dose primary series of inactivated Vero cell culture–derived Japanese encephalitis vaccine

| Measure and study site | 6 mos | | | 12–15 mos | | | 24 mos | | | 60 mos | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Seroprotection rate* | Total | No. seroprotected | (%) | Total | No. seroprotected | (%) | Total | No. seroprotected | (%) | Total | No. seroprotected | (%) |
| Austria, Germany, Romania | 181 | 172 | (95) | 181 | 151 | (83) | 181 | 148 | (82) | 151 | 124 | (82) |
| Germany, Northern Ireland | 116 | 96 | (83) | 116 | 67 | (58) | 116 | 56 | (48) | — | — | — |
| Austria, Germany | — | — | — | 198 | 137 | (69) | — | — | — | — | — | — |
| GMT | GMT (95% CI) | | | GMT (95% CI) | | | GMT (95% CI) | | | GMT (95% CI) | | |
| Austria, Germany, Romania | 84 (71–98) | | | 41 (34–49) | | | 44 (37–53) | | | 43 (36–53) | | |
| Germany, Northern Ireland | 47 (37–59) | | | 18 (14–23) | | | 16 (13–21) | | | — | | |
| Austria, Germany | — | | | 23 (19–27) | | | — | | | — | | |

Sources: Food and Drug Administration. Ixiaro: Japanese encephalitis vaccine, inactivated, adsorbed [package insert]. Vienna, Austria: Valneva Austria GmbH; 2018. https://www.fda.gov/media/75777/download; Dubischar-Kastner K, Eder S, Buerger V, et al. Long-term immunity and immune response to a booster dose following vaccination with the inactivated Japanese encephalitis vaccine IXIARO, IC51. Vaccine 2010;28:5197–202. Schuller E, Jilma B, Voicu V, et al. Long-term immunogenicity of the new Vero cell-derived, inactivated Japanese encephalitis virus vaccine IC51 Six and 12 month results of a multicenter follow-up phase 3 study. Vaccine 2008;26:4382–6. Dubischar-Kastner K. New clinical data for IXIARO Japanese encephalitis vaccine, inactivated, adsorbed. Presentation to Advisory Committee on Immunization Practices (ACIP), February 24, 2016. Atlanta, GA: US Department of Health and Human Services, CDC; 2016. https://stacks.cdc.gov/view/cdc/60592; Eder S, Dubischar-Kastner K, Firbas C, et al. Long term immunity following a booster dose of the inactivated Japanese Encephalitis vaccine IXIARO®, IC51. Vaccine 2011;29:2607–12.
Abbreviations: CI = confidence interval; GMT = geometric mean titer.
* Proportion with 50% plaque reduction neutralization test titer ≥10.

TABLE 4. Seroprotection rates and geometric mean titers among adults at intervals after first dose of a 2-dose primary series of inactivated Vero cell culture–derived Japanese encephalitis vaccine, by tickborne encephalitis vaccination status

| Measure | 6 mos | | | 12 mos | | | 24 mos | | | 60 mos | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Seroprotection rate* | Total | No. seroprotected | (%) | Total | No. seroprotected | (%) | Total | No. seroprotected | (%) | Total | No. seroprotected | (%) |
| TBE vaccine[†] | 89 | 86 | (97) | 89 | 82 | (92)[§] | 86 | 78 | (91)[§] | 78 | 67 | (86)[§] |
| No TBE vaccine | 92 | 86 | (93) | 92 | 69 | (75) | 78 | 53 | (68) | 47 | 30 | (64) |
| GMT | GMT | | | GMT | | | GMT | | | GMT | | |
| TBE vaccine[†] | 96 | | | 48 | | | 56 | | | 45 | | |
| No TBE vaccine | 73 | | | 35 | | | 33 | | | 29 | | |

Sources: Dubischar-Kastner K. New clinical data for IXIARO Japanese encephalitis vaccine, inactivated, adsorbed. Presentation to Advisory Committee on Immunization Practices (ACIP), February 24, 2016. Atlanta, GA: US Department of Health and Human Services, CDC; 2016. https://stacks.cdc.gov/view/cdc/60592; Taucher C, Kollaritsch H, Dubischar KL. Persistence of the immune response after vaccination with the Japanese encephalitis vaccine, IXIARO® in healthy adults: A five year follow-up study. Vaccine 2019;37:2529–31.
Abbreviations: GMT = geometric mean titer; TBE = tickborne encephalitis.
* Proportion with 50% plaque reduction neutralization test titer ≥10.
[†] TBE vaccine received before or after Vero cell culture–derived Japanese encephalitis vaccine.
[§] Nonoverlapping 95% confidence intervals (calculated according to the method recommended by Altman, developed by Wilson) for seroprotection rates for TBE and no TBE vaccine groups.

TABLE 5. Seroprotection rates and geometric mean titers before and after a booster dose of inactivated Vero cell culture–derived Japanese encephalitis vaccine administered 15 months after the first dose of a 2-dose primary series

| Measure | 0 days | | | 1 mo | | | 6 mos | | | 12 mos | | | 76 mos | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Seroprotection rate* | Total | No. seroprotected | (%) | Total | No. seroprotected | (%) | Total | No. seroprotected | (%) | Total | No. seroprotected | (%) | Total | No. seroprotected | (%) |
| | 198 | 137 | (69) | 198 | 198 | (100) | 197 | 194 | (98) | 194 | 191 | (98) | 67 | 64 | (96) |
| GMT | GMT (95% CI) | | | GMT (95% CI) | | | GMT (95% CI) | | | GMT (95% CI) | | | GMT (95% CI) | | |
| | 23 (19–27) | | | 900 (742–1,091) | | | 487 (391–608) | | | 361 (295–444) | | | 148 (107–207) | | |

Sources: Eder S, Dubischar-Kastner K, Firbas C, et al. Long term immunity following a booster dose of the inactivated Japanese Encephalitis vaccine IXIARO®, IC51. Vaccine 2011;29:2607–12; Paulke-Korinek M, Kollaritsch H, Kundi M, Zwazl I, Seidl-Friedrich C, Jelinek T. Persistence of antibodies six years after booster vaccination with inactivated vaccine against Japanese encephalitis. Vaccine 2015;33:3600–4.
Abbreviations: CI = confidence interval; GMT = geometric mean titer.
* Proportion with 50% plaque reduction neutralization test titer ≥10.

US Department of Health and Human Services/Centers for Disease Control and Prevention

TABLE 6. Seroprotection rates in children at 1 month after a 2-dose primary series of inactivated Vero cell culture–derived Japanese encephalitis vaccine administered according to the dose and schedule approved by the Food and Drug Administration*

| Study site | Age group | Seroprotection rate[†] | | | | | |
| | | 0.25-mL JE-VC dose | | | 0.5-mL JE-VC dose | | |
| | | Total | No. seroprotected | (%) | Total | No. seroprotected | (%) |
|---|---|---|---|---|---|---|---|
| Philippines | 2 mos–17 yrs | 148 | 147 | (99)[§] | 237 | 237 | (100) |
| India | 1–2 yrs | 23 | 22 | (96) | — | — | —[¶] |
| United States, Europe, Australia | 2 mos–17 yrs | 5 | 5 | (100) | 57 | 57 | (100) |

**Sources:** Food and Drug Administration. Ixiaro: Japanese encephalitis vaccine, inactivated, adsorbed [package insert]. Vienna, Austria: Valneva Austria GmbH; 2018. https://www.fda.gov/media/75777/download; Dubischar KL, Kadlecek V, Sablan JB, et al. Immunogenicity of the inactivated Japanese encephalitis virus vaccine IXIARO in children from a Japanese encephalitis virus-endemic region. Pediatr Infect Dis J 2017;36:898–904; Kaltenböck A, Dubischar-Kastner K, Schuller E, Datla M, Klade CS, Kishore TS. Immunogenicity and safety of IXIARO (IC51) in a Phase II study in healthy Indian children between 1 and 3 years of age. Vaccine 2010;28:834–9; Jelinek T, Cromer MA, Cramer JP, et al. Safety and immunogenicity of an inactivated Vero cell–derived Japanese encephalitis vaccine (IXIARO®, JESPECT®) in a pediatric population in JE non-endemic countries: An uncontrolled, open-label phase 3 study. Travel Med Infect Dis 2018;22:18–24.
**Abbreviations:** FDA = Food and Drug Administration; JE-VC = Vero cell culture–derived Japanese encephalitis vaccine.
* For children aged 2 months–2 years, 2 doses (0.25 mL each) administered 28 days apart; for children aged 3–17 years, 2 doses (0.5 mL each) administered 28 days apart.
[§] Of an additional 98 children aged 3–11 years who received 2 doses of 0.25 mL, 94 (96%) were seroprotected at 1 month after the second dose.
[¶] Of 21 children aged 1–2 years who received 2 doses of 0.5 mL, 20 (95%) were seroprotected at 1 month after the second dose; the FDA-approved dose for children aged 1–2 years is 0.25 mL.


TABLE 7. Seroprotection rates and geometric mean titers among children aged 14 months–17 years in the Philippines before and after a booster dose of inactivated Vero cell culture–derived Japanese encephalitis vaccine administered 11 months after the second dose of a 2-dose primary series

| Measure | 0 days | | 1 mo | | 12 mos | | 24 mos | |
| Seroprotection rate* | No. seroprotected (n = 148) | (%) | No. seroprotected (n = 148) | (%) | No. seroprotected (n = 147) | (%) | No. seroprotected (n = 143) | (%) |
|---|---|---|---|---|---|---|---|---|
| | 139 | (94) | 148 | (100) | 147 | (100) | 143 | (100) |
| GMT | GMT | (95% CI) | GMT | (95% CI) | GMT | (95% CI) | GMT | (95% CI) |
| | 53 | (45–64) | 2,067 | (1,671–2,556) | 428 | (335–546) | 350 | (279–440) |

**Source:** Kadlecek V, Borja-Tabora CF, Eder-Lingelbach S, et al. Antibody persistence up to 3 years after primary immunization with inactivated Japanese encephalitis vaccine IXIARO in Philippine children and effect of a booster dose. Pediatr Infect Dis J 2018;37:e233–40.
**Abbreviations:** CI = confidence interval; GMT = geometric mean titer.
* Proportion with 50% plaque reduction neutralization test titer ≥10.

**TABLE 8. Local and systemic adverse events in adults occurring within 7 days after vaccination with inactivated Vero cell culture–derived Japanese encephalitis vaccine or inactivated mouse brain–derived Japanese encephalitis vaccine\***

| Adverse events | JE-VC[†] | JE-MB[§] |
|---|---|---|
| Severe local adverse events | No. (%) (n = 421) | No. (%) (n = 427) |
| Redness | 4 (1) | 46 (11) |
| Swelling | 3 (1) | 23 (5) |
| Hardness | 4 (1) | 25 (5) |
| Any[¶] | 9 (2) | 59 (14) |
| Systemic adverse events | No. (%) (n = 428) | No. (%) (n = 435) |
| Headache | 113 (26) | 125 (29) |
| Myalgia | 88 (21) | 69 (16) |
| Influenza-like illness | 54 (13) | 55 (13) |
| Fatigue | 54 (13) | 48 (11) |

**Source:** Tauber E, Kollaritsch H, Korinek M, et al. Safety and immunogenicity of a Vero-cell-derived, inactivated Japanese encephalitis vaccine: a non-inferiority, phase III, randomised controlled trial. Lancet 2007;370:1847–53.

**Abbreviations:** JE-MB = mouse brain–derived Japanese encephalitis vaccine; JE-VC = Vero cell culture–derived Japanese encephalitis vaccine.

\* Analysis includes all participants who entered into the study and received ≥1 dose of vaccine.

[†] Two doses administered at days 0 and 28, with one dose of placebo at 7 days.

[§] Three doses administered at days 0, 7, and 28.

[¶] $p < 0.01$ calculated using Fisher's exact test for difference between two vaccines.

Appx18510

The *Morbidity and Mortality Weekly Report (MMWR)* Series is prepared by the Centers for Disease Control and Prevention (CDC) and is available free of charge in electronic format. To receive an electronic copy each week, visit *MMWR* at *https://www.cdc.gov/mmwr/index.html.*

Readers who have difficulty accessing this PDF file may access the HTML file at https://www.cdc.gov/mmwr/volumes/68/rr/rr6802a1.htm?s_cid=rr6802a1_w. Address all inquiries about the *MMWR* Series, including material to be considered for publication, to Executive Editor, *MMWR* Series, Mailstop E-90, CDC, 1600 Clifton Rd., N.E., Atlanta, GA 30329-4027 or to *mmwrq@cdc.gov.*

All material in the *MMWR* Series is in the public domain and may be used and reprinted without permission; citation as to source, however, is appreciated.

*MMWR* and *Morbidity and Mortality Weekly Report* are service marks of the U.S. Department of Health and Human Services.

Use of trade names and commercial sources is for identification only and does not imply endorsement by the U.S. Department of Health and Human Services.

References to non-CDC sites on the Internet are provided as a service to *MMWR* readers and do not constitute or imply endorsement of these organizations or their programs by CDC or the U.S. Department of Health and Human Services. CDC is not responsible for the content of these sites. URL addresses listed in *MMWR* were current as of the date of publication.

ISSN: 0149-2195 (Print)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

          *Plaintiffs,*

    v.

MERCK & CO., INC.,

          *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S EXHIBITS IN SUPPORT OF MERCK'S RESPONSE TO RELATORS' STATEMENT OF UNDISPUTED FACTS

# EXHIBIT 311



*Centers for Disease Control and Prevention*

**MMWR**

Morbidity and Mortality Weekly Report

Recommendations and Reports / Vol. 67 / No. 2                    April 27, 2018

# Prevention of Pertussis, Tetanus, and Diphtheria with Vaccines in the United States: Recommendations of the Advisory Committee on Immunization Practices (ACIP)



**U.S. Department of Health and Human Services**
Centers for Disease Control and Prevention

Appx18517

Recommendations and Reports

# CONTENTS

Introduction ........................................................................ 1

Methods.............................................................................. 2

Background and Epidemiology of Pertussis................................3

Background and Epidemiology of Tetanus..................................6

Background and Epidemiology of Diphtheria................................8

Vaccines for Prevention of Pertussis, Tetanus, and Diphtheria ........... 9

Strategy for Pertussis, Tetanus, and Diphtheria Control................22

Rationale for Recommendations for Use of Pertussis, Tetanus, and
    Diphtheria Vaccines ..................................................... 25

Recommendations for Vaccination for Pertussis, Tetanus, and
    Diphtheria ................................................................. 25

National Vaccine Injury Compensation Program.......................30

Safety Monitoring in Pregnant Women....................................31

Future Directions............................................................... 31

Acknowledgments.............................................................. 31

References......................................................................... 31

**CDC Adoption of ACIP Recommendations for *MMWR*
Recommendations and Reports, *MMWR* Policy Notes, and
Immunization Schedules (Child/Adolescent, Adult)**

Recommendations for routine use of vaccines in children, adolescents, and adults are developed by the Advisory Committee on Immunization Practices (ACIP). ACIP is chartered as a federal advisory committee to provide expert external advice and guidance to the Director of CDC on use of vaccines and related agents for the control of vaccine-preventable diseases in the civilian population of the United States. Recommendations for routine use of vaccines in children and adolescents are harmonized to the greatest extent possible with recommendations made by the American Academy of Pediatrics (AAP), the American Academy of Family Physicians (AAFP), and the American College of Obstetricians and Gynecologists (ACOG). Recommendations for routine use of vaccines in adults are harmonized with recommendations of AAFP, ACOG, and the American College of Physicians (ACP). ACIP recommendations approved by the CDC Director become agency guidelines on the date published in the *Morbidity and Mortality Weekly Report* (*MMWR*). Additional information is available at https://www.cdc.gov/vaccines/acip.

The *MMWR* series of publications is published by the Center for Surveillance, Epidemiology, and Laboratory Services, Centers for Disease Control and Prevention (CDC), U.S. Department of Health and Human Services, Atlanta, GA 30329-4027.

**Suggested citation:** [Author names; first three, then et al., if more than six.] [Title]. MMWR Recomm Rep 2018;67(No. RR-#):[inclusive page numbers].

**Centers for Disease Control and Prevention**
Robert R. Redfield, MD, *Director*
Anne Schuchat, MD, *Principal Deputy Director*
Leslie Dauphin, PhD, *Acting Associate Director for Science*
Joanne Cono, MD, ScM, *Director, Office of Science Quality*
Chesley L. Richards, MD, MPH, *Deputy Director for Public Health Scientific Services*
Michael F. Iademarco, MD, MPH, *Director, Center for Surveillance, Epidemiology, and Laboratory Services*

***MMWR* Editorial and Production Staff (Serials)**

Charlotte K. Kent, PhD, MPH, *Acting Editor in Chief, Executive Editor*
Christine G. Casey, MD, *Editor*
Mary Dott, MD, MPH, *Online Editor*
Teresa F. Rutledge, *Managing Editor*
David C. Johnson, *Lead Technical Writer-Editor*
Jeffrey D. Sokolow, MA, *Project Editor*

Martha F. Boyd, *Lead Visual Information Specialist*
Maureen A. Leahy, Julia C. Martinroe,
Stephen R. Spriggs, Tong Yang,
*Visual Information Specialists*
Quang M. Doan, MBA, Phyllis H. King,
Paul D. Maitland, Terraye M. Starr, Moua Yang,
*Information Technology Specialists*

***MMWR* Editorial Board**

Timothy F. Jones, MD, *Chairman*
Matthew L. Boulton, MD, MPH
Virginia A. Caine, MD
Katherine Lyon Daniel, PhD
Jonathan E. Fielding, MD, MPH, MBA
David W. Fleming, MD

William E. Halperin, MD, DrPH, MPH
King K. Holmes, MD, PhD
Robin Ikeda, MD, MPH
Rima F. Khabbaz, MD
Phyllis Meadows, PhD, MSN, RN
Jewel Mullen, MD, MPH, MPA

Jeff Niederdeppe, PhD
Patricia Quinlisk, MD, MPH
Patrick L. Remington, MD, MPH
Carlos Roig, MS, MA
William L. Roper, MD, MPH
William Schaffner, MD

Recommendations and Reports

# Prevention of Pertussis, Tetanus, and Diphtheria with Vaccines in the United States: Recommendations of the Advisory Committee on Immunization Practices (ACIP)

Jennifer L. Liang, DVM[1]
Tejpratap Tiwari, MD[1]
Pedro Moro, MD[2]
Nancy E. Messonnier, MD[3]
Arthur Reingold, MD[4]
Mark Sawyer, MD[5]
Thomas A. Clark, MD[6]

[1]Division of Bacterial Diseases, National Center for Immunization and Respiratory Diseases, CDC
[2]Division of Healthcare Quality Promotion, National Center for Emerging and Zoonotic Infectious Diseases, CDC
[3]Office of the Director, National Center for Immunization and Respiratory Diseases, CDC
[4]University of California, Berkeley; Berkeley, CA
[5]University of California, San Diego; La Jolla, California
[6]Division of Reproductive Health, National Center for Chronic Disease Prevention and Health Promotion, CDC

## Summary

*This report compiles and summarizes all recommendations from CDC's Advisory Committee on Immunization Practices (ACIP) regarding prevention and control of tetanus, diphtheria, and pertussis in the United States. As a comprehensive summary of previously published recommendations, this report does not contain any new recommendations and replaces all previously published reports and policy notes; it is intended for use by clinicians and public health providers as a resource. ACIP recommends routine vaccination for tetanus, diphtheria, and pertussis. Infants and young children are recommended to receive a 5-dose series of diphtheria and tetanus toxoids and acellular pertussis (DTaP) vaccines, with one adolescent booster dose of tetanus toxoid, reduced diphtheria toxoid, and acellular pertussis (Tdap) vaccine. Adults who have never received Tdap also are recommended to receive a booster dose of Tdap. Women are recommended to receive a dose of Tdap during each pregnancy, which should be administered from 27 through 36 weeks' gestation, regardless of previous receipt of Tdap. After receipt of Tdap, adolescents and adults are recommended to receive a booster tetanus and diphtheria toxoids (Td) vaccine every 10 years to assure ongoing protection against tetanus and diphtheria.*

## Introduction

This report compiles and summarizes all previously published recommendations from CDC's Advisory Committee on Immunization Practices (ACIP) regarding prevention and control of pertussis, tetanus, and diphtheria in the United States, specifically after the introduction of acellular pertussis vaccines, and does not contain any new recommendations. A timeline of ACIP recommendations for DTaP and Tdap during 1991–2015 is available at https://stacks.cdc.gov/view/cdc/52821. This report describes the process undertaken and the rationale used in support of these recommendations and is intended for use by clinicians and public health providers as a resource.

From the late 1940s through the 1990s, vaccination against pertussis, diphtheria, and tetanus with a combined diphtheria and tetanus toxoids and whole-cell pertussis (DTP) vaccine

was recommended for infants and young children. Receipt of DTP was commonly associated with local adverse events (e.g., redness, swelling, and pain at the injection site) and less commonly with serious adverse events (*1*,*2*). Because of safety concerns about the whole-cell pertussis component of DTP, diphtheria and tetanus toxoids and acellular pertussis (DTaP) vaccines were developed and subsequently replaced doses of DTP in the 1990s. Since 1997, infants and young children have been recommended to receive a 5-dose series of DTaP (*3*). In 2005, ACIP recommended that adolescents and adults receive a single dose of a tetanus toxoid, reduced diphtheria toxoid, and acellular pertussis (Tdap) vaccine (*4*,*5*). After receipt of Tdap, adolescents and adults are recommended to receive a booster dose of tetanus and diphtheria toxoids (Td) vaccine every 10 years or when indicated for wound management (*4*,*5*). In 2012, in an effort to reduce the burden of pertussis in infants, ACIP recommended a dose of Tdap for women during each pregnancy (*6*).

For the purposes of this report, DTaP and Tdap are used as general terms for diphtheria toxoid, tetanus toxoid, and

**Corresponding preparer:** Jennifer L. Liang, National Center for Immunization and Respiratory Diseases, CDC. E-mail: JLiang@cdc.gov.

Appx18519

acellular pertussis vaccines, and DT and Td are used for diphtheria and tetanus toxoid–containing vaccines. Any of the vaccine formulations licensed in the United States can be used in an age-appropriate manner to implement these vaccination recommendations. Both DTP and monovalent tetanus toxoid (TT) vaccines are discussed for historical purposes and no longer are manufactured or available in the United States.

ACIP recommendations for vaccination for pertussis, tetanus, and diphtheria and guidance for use are described elsewhere in this report (see Recommendations for Use of Pertussis, Tetanus, and Diphtheria Vaccines) (Table 1). Details regarding contraindications, precautions, and special circumstances are described elsewhere in this report (see Recommendations for Use of Pertussis, Tetanus, and Diphtheria Vaccines (Tables 2 and 3). In 2013, after review of available data, ACIP did not support a universal recommendation for a second dose of Tdap for the general population (see No Additional Doses of Tdap For the General Population). In 2014 and 2015, ACIP did not support a second dose of Tdap for health care personnel or close contacts of infants.

## Methods

Periodically, ACIP reviews available information to inform the development or revision of its vaccine recommendations. In February 2009, the ACIP Pertussis Vaccines Work Group was formed to review and revise previously published vaccine recommendations for DTaP, DT, Td, TT, and Tdap because of 1) the availability of new licensed DTaP vaccine products since 1997; 2) multiple ACIP updates to the adolescent and adult Tdap recommendations; 3) new U.S. Food and Drug Administration (FDA) age indications for both Tdap vaccine products; 4) the need to incorporate pertussis, tetanus, and diphtheria vaccine recommendations into a single document; 5) new data on Tdap coverage, impact, and vaccine effectiveness; and 6) the discontinuation of TT vaccine manufacturing and availability in the United States. The work group held teleconference meetings monthly from April 2009 through April 2015. In addition to ACIP members, the work group included participants from the American Academy of Family Physicians (AAFP), American Academy of Pediatrics (AAP), American College of Obstetricians and Gynecologists (ACOG), the Association of Immunization Managers, CDC, the Council of State and Territorial Epidemiologists, FDA, the Infectious Diseases Society of America, the National Institute of Health, and other infectious disease experts (7).*

---

* A list of the members of the Work Group appears on page 43.

TABLE 1. Recommended pertussis, diphtheria, and tetanus vaccination schedule — Advisory Committee on Immunization Practices, 2017

| Vaccine | Age group/Indication | Recommended schedule |
|---|---|---|
| DTaP* | 2 mos–6 yrs | Primary (3 doses) |
| | | • 1 dose at ages 2, 4, and 6 mos |
| | | 1st booster |
| | | • 1 dose at age 15–18 mos |
| | | 2nd booster |
| | | • 1 dose at age 4–6 yrs |
| Tdap† | 7–10 yrs§ | Not routinely recommended; refer to "Persons with incomplete or unknown vaccine history" |
| | 11–18 yrs | 11–12 yrs, 1 dose |
| | | 13–18 yrs, 1 dose if not vaccinated previously with Tdap |
| | ≥19 yrs | 1 dose if not vaccinated previously with Tdap |
| | Pregnant women¶ | 1 dose each pregnancy; preferred at 27–36 wks' gestation |
| Td† | | Booster |
| | | • 1 dose every 10 yrs |

**Abbreviations:** DTaP = diphtheria and tetanus toxoids and acellular pertussis vaccine; Td = tetanus and diphtheria toxoids vaccine; Tdap = tetanus toxoid, reduced diphtheria toxoid, and acellular pertussis vaccine.
* See Table 4 for vaccine type and ages for licensed use.
† See Table 5 for vaccine type and ages for licensed use.
§ Off-label use of Tdap in persons aged 7–9 years.
¶ Off-label use of Tdap.

Issues reviewed and considered by the work group included epidemiology of pertussis, tetanus, and diphtheria in the United States; use of Tdap vaccine among persons aged ≥65 years, children aged 7–10 years, health care personnel, and women during pregnancy; minimum interval between the last tetanus toxoid–containing vaccine and receipt of Tdap; effectiveness of Tdap vaccine; and vaccine safety. Recommendation options were developed and discussed by the work group. The work group evaluated the available published and unpublished data and evidence regarding pertussis disease epidemiology in the United States, decision analyses, cost-effectiveness, programmatic considerations, vaccine immunogenicity, vaccine safety, and postlicensure Tdap vaccine effectiveness. When evidence was lacking, the recommendations incorporated expert opinion of the work group members (6,8–10).

From June 2010 through June 2015 at 11 ACIP meetings, a summary of the data reviewed, work group discussions, and proposed changes to recommendations were presented. During these 11 meetings, changes to recommendations, if made, were approved either as submitted or as amended by ACIP and then published as policy notes in *MMWR*. A summary of these recommendations is available at https://stacks.cdc.gov/view/cdc/52821. During the preparation of this summary report, nonsystematic literature searches

Appx18520

TABLE 2. Contraindications and precautions* for DTaP, Tdap, DT, and Td vaccines

| Vaccine | Contraindications | Precautions* |
|---|---|---|
| DTaP | Severe allergic reaction (e.g., anaphylaxis) after a previous dose or to a vaccine component[†,§] <br> Encephalopathy (e.g., coma, decreased level of consciousness, or prolonged seizures) not attributable to another identifiable cause within 7 days of administration of previous dose of DTP or DTaP[¶] | Progressive or unstable neurologic disorder, including infantile spasms, uncontrolled seizures or progressive encephalopathy; defer DTaP until neurologic status clarified and stabilized <br> Guillain-Barré syndrome <6 weeks after previous dose of tetanus toxoid–containing vaccine <br> History of Arthus-type hypersensitivity reactions after a previous dose of tetanus or diphtheria toxoid–containing vaccines; defer vaccination until at least 10 years since the last tetanus toxoid–containing vaccine <br> Moderate or severe acute illness with or without fever |
| Tdap | Severe allergic reaction (e.g., anaphylaxis) after a previous dose or to a vaccine component[§] <br> Encephalopathy (e.g., coma, decreased level of consciousness, or prolonged seizures) not attributable to another identifiable cause, within 7 days of administration of previous dose of DTP, DTaP, or Tdap** | Progressive or unstable neurological disorder, uncontrolled seizures, or progressive encephalopathy until a treatment regimen has been established and the condition has stabilized; these precautions are for pertussis components <br> Guillain-Barré syndrome <6 weeks after a previous dose of tetanus toxoid–containing vaccine <br> History of Arthus-type hypersensitivity reactions after a previous dose of tetanus or diphtheria toxoid–containing vaccines; defer vaccination until at least 10 years have elapsed since the last tetanus toxoid–containing vaccine <br> Moderate or severe acute illness with or without fever |
| DT, Td | Severe allergic reaction (e.g., anaphylaxis) after a previous dose or to a vaccine component[§] | Guillain-Barré syndrome <6 weeks after previous dose of tetanus toxoid–containing vaccine <br> History of Arthus-type hypersensitivity reactions after a previous dose of tetanus or diphtheria toxoid–containing vaccines; defer vaccination until at least 10 years have elapsed since the last tetanus toxoid–containing vaccine <br> Moderate or severe acute illness with or without fever |

**Abbreviations**: DT = diphtheria and tetanus toxoids vaccine; DTaP = diphtheria and tetanus toxoids and acellular pertussis vaccine; DTP = diphtheria toxoid, tetanus toxoid and whole-cell pertussis vaccine; MenACWY = quadrivalent meningococcal conjugate, serogroups A, C, W, Y vaccine; Td = tetanus and diphtheria toxoids vaccine; Tdap = tetanus toxoid, reduced diphtheria toxoid, and acellular pertussis vaccine.

* Events or conditions listed as precautions should be reviewed carefully. Benefits of and risks for administering a specific vaccine to a person under these circumstances should be considered. If the risk from the vaccine is believed to outweigh the benefit, the vaccine should not be administered. If the benefit of vaccination is believed to outweigh the risk, the vaccine should be administered. Whether and when to administer DTaP to children with proven or suspected underlying neurologic disorders should be decided on a case-by-case basis.

† Further vaccination with any of the three components of DTaP should be deferred because of uncertainty as to which component of the vaccine might be responsible.

§ Because of the importance of tetanus vaccination, persons who experience anaphylactic reactions should be referred to an allergist to determine whether they have a specific allergy to tetanus toxoid and can be desensitized to tetanus toxoid.

¶ In such cases, DT vaccine should be administered for the remaining doses in the vaccination schedule to ensure protection against diphtheria and tetanus.

** This contraindication is for the pertussis component, and these persons should receive Td instead of Tdap.

for specific topics were conducted in PubMed and Google Scholar for published literature in English available in print or online to provide more updated data and information since publication of any ACIP vaccine recommendations for DTaP, DT, Td, TT, and Tdap published in *MMWR*; a document containing the literature search topics, search terms, search period, and references selected is available at https://stacks.cdc.gov/view/cdc/52823. The contents of this summary report were presented to ACIP and approved at the October 2016 ACIP meeting. During the review process, CDC modified the summary to update and clarify wording. ACIP meeting minutes, including declaration of ACIP member conflicts of interest, are available at https://www.cdc.gov/ vaccines/acip/ meetings/meetings-info.html. One ACIP member abstained from voting because of a conflict of interest.

# Background and Epidemiology of Pertussis

Pertussis is an acute respiratory disease caused by the bacterium *Bordetella pertussis* (*11*). Classic pertussis disease is characterized by three phases of illness: catarrhal, paroxysmal, and convalescent (*11–13*). During the catarrhal phase, infected persons experience coryza (inflammation of the mucous membranes of the nasal cavities), mild occasional cough, and low-grade fever. The paroxysmal phase is characterized by spasmodic cough, posttussive vomiting, and inspiratory whoop. Symptoms slowly improve during the convalescent phase, which generally lasts 7–10 days, but can last for months. Factors that affect the clinical presentation of pertussis include age, the level of immunity, history of vaccination, and use of antimicrobials early during the course of the illness (*11*).

Appx18521

**TABLE 3. Conditions that are not contraindications to vaccination with DTaP, DT, Td, and Tdap**

| Vaccine | Conditions commonly misperceived as contraindications (i.e., vaccine may be administered under these conditions) |
|---|---|
| General for DTaP, DT, Td, Tdap | Mild acute illness with or without fever |
| | Mild-to-moderate local reaction (i.e., swelling, redness, soreness); low-grade or moderate fever after previous dose |
| | Lack of previous physical examination in well-appearing person |
| | Current antimicrobial therapy |
| | Convalescent phase of illness |
| | Preterm birth |
| | Recent exposure to an infectious disease |
| | History of penicillin allergy, other nonvaccine allergies, relatives with allergies, or receiving allergen extract immunotherapy |
| DTaP | Fever of <105°F (<40.5°C), fussiness or mild drowsiness after a previous dose of DTP/DTaP |
| | Family history of seizures |
| | Family history of sudden infant death syndrome |
| | Family history of an adverse event after DTP or DTaP administration |
| | Stable neurologic conditions (e.g., cerebral palsy, well-controlled seizures, or developmental delay) |
| | History of collapse or shock-like state (i.e., hypotonic hyporesponsive episode) within 48 hours after receiving a previous dose of DTP/DTaP |
| | History of seizure with or without fever within 3 days after receiving a previous dose of DTP/DTaP |
| | History of persistent, inconsolable crying lasting >3 hours within 48 hours after receiving a previous dose of DTP/DTaP |
| Tdap | Fever of ≥105°F (≥40.5°C) for <48 hours after vaccination with a previous dose of DTP or DTaP |
| | History of collapse or shock-like state (i.e., hypotonic hyporesponsive episode) within 48 hours after receiving a previous dose of DTP/DTaP |
| | History of seizure with or without fever within 3 days after receiving a previous dose of DTP/DTaP |
| | History of persistent, inconsolable crying lasting >3 hours within 48 hours after receiving a previous dose of DTP/DTaP |
| | History of extensive limb swelling after DTP/DTaP/Td that is not an Arthus-type reaction |
| | Stable neurologic disorder |
| | History of brachial neuritis |
| | Breastfeeding |
| | Immunosuppression |

**Abbreviations:** DT = diphtheria and tetanus toxoids vaccine; DTaP = diphtheria and tetanus toxoids and acellular pertussis vaccine; DTP = diphtheria toxoid, tetanus toxoid and whole-cell pertussis vaccine; Td = tetanus and diphtheria toxoids vaccine; Tdap = tetanus toxoid, reduced diphtheria toxoid, and acellular pertussis vaccine.
**Source:** Adapted from CDC. General recommendations on immunization: recommendations of the Advisory Committee on Immunization Practices (ACIP). MMWR Recomm Rep-2011;60(No. RR-2).

*B. pertussis* is transmitted primarily from person to person through aerosolized respiratory droplets generated by coughing or sneezing. Persons with pertussis are most infectious during the catarrhal and early paroxysmal phases of illness (*12*). Pertussis generally is treated with antibiotics, which are used to control the signs and symptoms and to prevent infected persons from spreading the infection to others. Recommended antibiotics for pertussis include azithromycin, clarithroymycin, erythromycin, or trimethoprim-sulfamethoxazole (TMP-SMX). Guidance for the treatment of pertussis has been published previously (*14*). Guidance on postexposure prophylaxis of pertussis is available at https://www.cdc.gov/pertussis/outbreaks/pep.html.

## Epidemiology of Pertussis in the United States

In the United States, pertussis is a nationally notifiable disease (*15*). During 1934–1943, before the introduction of childhood pertussis vaccination in the United States, an annual average of 200,752 pertussis cases and 4,034 pertussis-related deaths were reported (*16*). After introduction of whole-cell pertussis vaccine during the 1940s, the number of reported pertussis cases declined dramatically, reaching an historic low

of 1,010 in 1976 (Figure 1) (*3*). Since the 1980s, there has been an overall trend of an increase in reported pertussis cases, especially among adolescents and adults (*17–19*). Although pertussis is cyclic in nature, with peaks in disease every 3 to 5 years, the peaks have gotten higher, notably in 2004 (25,827 cases), 2005 (25,616 cases), 2010 (27,500 cases), and 2012 (48,277 cases) (*20–24*). The increase in reported pertussis cases is likely attributable to an actual increase in the burden of disease; however, other factors have contributed to the estimates of disease burden. These include improvements in diagnostic testing, increased health care personnel and public awareness of pertussis, and better reporting of cases (*17,18,25–27*). A growing body of evidence strongly suggests that the change in vaccines in the late 1990s from whole-cell pertussis vaccines to acellular pertussis vaccines in the childhood vaccine series has caused the age-specific increases in pertussis incidence among children aged 7–10 years observed in the mid-2000s because of waning immunity (Figure 2) (*28–30*).

In the United States, coverage with pertussis-containing vaccines varies across age groups. Vaccination coverage with DTaP in children aged 19–35 months remains consistently high, at 95.0% for ≥3 DTaP doses and 84.6% for ≥4 DTaP doses reported in 2015 (*31*). Coverage for ≥4 DTaP doses

US Department of Health and Human Services/Centers for Disease Control and Prevention

Appx18522

Recommendations and Reports

FIGURE 1. Number of reported pertussis cases — United States, 1922–2016



**Abbreviations:** DTaP = diphtheria and tetanus toxoids and acellular pertussis vaccine; DTP = diphtheria toxoid, tetanus toxoid and whole-cell pertussis vaccine; Tdap = tetanus toxoid, reduced diphtheria toxoid and acellular pertussis vaccine.
**Sources:** National Notifiable Diseases Surveillance System and Supplemental Pertussis Surveillance System and 1922–1949, passive reports to the U.S. Public Health Service.

is below the *Healthy People 2020* target of 90% (*32*). Since the introduction of Tdap in 2005, coverage with Tdap in adolescents aged 13–17 years has increased substantially, from 10.8% in 2006 to 86.4% in 2015 (*33,34*). Tdap coverage among adolescents has met the *Healthy People 2020* target of 80% (*35*). In 2015, for adults aged ≥19 years, the proportion receiving any tetanus toxoid–containing vaccine (e.g, TT, Td, or Tdap) during the preceding 10 years was 62.1% (19–49 years), 64.1% (50–64 years), and 56.9% (≥65 years); Tdap coverage was 23.1% (*36*). Among pregnant women, Tdap coverage during the 2015–2016 influenza season was 48.8% (*37*).

Although pertussis vaccination has resulted in a markedly reduced incidence of pertussis cases and deaths, pertussis still causes morbidity in persons of all ages. Compared with all other age groups, infants aged <12 months have substantially higher rates of pertussis disease, complications, hospitalizations, and pertussis-related deaths (*38–40*). The highest percentage of pertussis-related hospitalizations and deaths occurs among infants aged <2 months (CDC, unpublished data, 2016) (*38,41*). During 2004–2016, among all infants hospitalized for pertussis, 54.4% were aged <2 months; of the infant pertussis cases who died,

85.5% were aged <2 months and too young to have received any doses of pertussis vaccines (CDC, unpublished data, 2016). Over the past decade, with the changing pertussis epidemiology, a shift in the source of pertussis transmission to infants has been observed, with siblings rather than mothers being the most common source of pertussis infection for infants (*40,42,43*).

Although infants have substantially higher rates of reported pertussis compared with other age groups, an increase in the number of reported pertussis cases among children and adolescents since the mid-2000s has been attributed to the waning of acellular pertussis vaccine-induced immunity (Figure 2). This increase was first observed in children aged 7–10 years who were among the first birth cohorts to exclusively receive 5 doses of acellular pertussis (DTaP) vaccine following the switch from DTP in 1997 (*28*). As this birth cohort aged, an increase in reported pertussis cases also was observed among those aged 13–14 years in 2012 (*29,44*). Continued monitoring of national surveillance data will permit further characterization of the impact of acellular pertussis vaccines on the evolving epidemiology of pertussis that has been observed over the past decade.

Appx18523

FIGURE 2. Annual incidence* of pertussis, by age group — United States, 1990–2016



**Sources:** National Notifiable Diseases Surveillance System and Supplemental Pertussis Surveillance System.
* Per 100,000 population.

## Background and Epidemiology of Tetanus

Tetanus is a life-threatening but vaccine-preventable disease caused by a potent neurotoxin produced by *Clostridium tetani*. The organism is a ubiquitous, spore-forming, motile Gram-positive bacillus found in high concentrations in soil and animal excrement. *C. tetani* spores enter the body through breaches in the skin or mucous membranes. Germination of *C. tetani* spores occurs under anaerobic conditions, such as in necrotic tissue that can result from deep puncture wounds or blunt trauma. *C. tetani* bacilli vegetate and produce tetanospasmin, a powerful exotoxin that binds irreversibly with neural tissue and causes spasms and rigidity of skeletal muscles. Direct person-to-person transmission of *C. tetani* does not occur (*45*).

The incubation period from injury to symptom onset varies from 3 to 21 days (median: 7 days), with extremes of 1 day to several months. The incubation period depends on the severity and site of the wound. Shorter incubation periods are associated with more severe disease and a poorer prognosis; longer incubation periods are associated with injuries furthest from the central nervous system. The course of disease is variable but is usually intense for ≥4 weeks before subsiding. The convalescent period is usually protracted and long-term neurologic sequelae and intellectual and behavioral abnormalities might follow recovery. The case-fatality ratio for tetanus is highest in infants and the elderly, and can be as high as 100% without high-quality medical care, but is approximately 10%–20% even in modern health care facilities (*46*).

Appx18524

FIGURE 3. Annual incidence* of and deaths attributable to tetanus — United States, 1947–2016



**Sources:** National Notifiable Diseases Surveillance System and passive reports to the U.S. Public Health Service.
* Per 100,000 population.

## Epidemiology of Tetanus in the United States

Tetanus is a nationally notifiable disease in the United States (*15*). After the introduction of universal vaccination with tetanus toxoid–containing (TT) vaccines in the mid-1940s, the incidence of reported tetanus in the United States declined by >98%, from 0.39 per 100,000 population in 1947, when national reporting began, to 0.01 per 100,000 population by 2016 (CDC, unpublished data, 2016) (Figure 3). The decline in incidence occurred across all age groups. Deaths from tetanus also declined similarly during this period. The decline in morbidity and mortality is attributable to widespread use of tetanus toxoid–containing vaccines; improved wound management, including use of tetanus prophylaxis in emergency departments; improved hygiene during childbirth; increased levels of maternal immunity; and expanded urbanization (*45*).

Tetanus occurs primarily among older adults (*47*). During 2001–2016, three neonatal tetanus cases and 459 non-neonatal tetanus cases were reported to the National Notifiable Diseases Surveillance System (NNDSS). The median age for non-neonatal cases was 44.0 years (range: 2–95 years); 60% of cases occurred in males (CDC, unpublished data, 2016). The risk for both tetanus disease and mortality was higher among persons aged ≥65 years than among persons aged <65 years (*48*). Tetanus occurs almost exclusively among persons who are unvaccinated or inadequately vaccinated or in those whose vaccination histories are unknown or uncertain. The case-fatality ratio for reported tetanus in the United States declined from 18% (1998–2000) to 8.0% (2001–2016) (CDC, unpublished data, 2016) (*48,49*).

## Population Immunity

The minimum level of circulating antitetanus antibodies associated with protection against tetanus is assay-specific. The acceptable level of circulating antitetanus antibodies required for protection is 0.01 IU/mL as measured in an in vivo toxin neutralization assay. When in vitro methods, such as standard enzyme-linked immunosorbent assays (ELISA), are used, antibody level readings of at least 0.1–0.2 IU/mL are considered protective (*50*).

The National Health and Nutritional Examination Survey (NHANES III), a population-based national serosurvey

Appx18525

conducted in the United States during 1988–1994, found that approximately 80% of adolescents aged 12–19 years and >80% of adults aged 20–39 years had seroprotective concentrations of antitetanus toxoid antibodies (*51*). In this survey, a standard ELISA test was used to assess antibody levels with levels >0.15 IU/mL considered as protective. The proportions of persons lacking protective levels of circulating antibodies against tetanus toxin increased with age, with a greater rate of decline among women. By age 70 years, only 45% of men and 21% of women had a protective level of antibodies to tetanus. Previous military service was associated with a higher prevalence of protective antibodies to tetanus in men, presumably because of routine vaccination during military service. The low prevalence of detectable antibodies and the high proportion of tetanus cases among older adults reflects the high proportion of older adults who possibly never received primary DTP vaccination or have waning immunity if they never received subsequent tetanus toxoid–containing booster doses (*48,51*).

### Prevention

Immunity to tetanus toxin is rarely if ever acquired naturally, but tetanus is preventable through the use of highly effective tetanus toxoid–containing vaccines (i.e., DTaP, DT, Td, or Tdap) (*50*). Completing a 5-dose childhood vaccination series with DTaP before age 7 years is necessary for developing protective levels of antitetanus antibodies that persist into the adolescent years, when a booster dose of vaccine is needed; thereafter, decennial boosters with Td administered throughout adulthood are recommended to maintain protection against tetanus (*52*).

## Background and Epidemiology of Diphtheria

Respiratory diphtheria is an acute, communicable infectious illness caused by toxigenic strains of *Corynebacterium diphtheriae*, which are nonmotile, nonencapsulated, club-shaped, Gram-positive bacilli. Although rare, toxin-producing *Corynebacterium ulcerans* can also cause a diphtheria-like illness (*53*). Vaccination with diphtheria toxoid-containing vaccines (i.e., DTaP, DT, Tdap, or Td) prevents diphtheria (*54*). Toxin-producing strains of *C. diphtheriae* can cause disease in susceptible persons by multiplying and producing diphtheria toxin in either nasopharyngeal or skin lesions. The classic feature of respiratory diphtheria is a gray-colored pseudomembrane that is firmly adherent to the mucosa lining the nasopharynx, tonsils, or larynx. The extension of the pseudomembrane into the trachea-bronchial tree might cause life-threatening airway obstruction. In addition, systemic absorption and dissemination of diphtheria toxin can cause toxin-mediated cardiac and neurologic complications (*55*).

## Epidemiology of Diphtheria in the United States

In the United States, diphtheria is a nationally notifiable disease (*15*). Reported diphtheria cases from all anatomical sites declined from approximately 200,000 in 1921 to 15,536 in 1940 (Figure 4). This decline continued after the introduction of universal childhood vaccination in the late 1940s and, in 1980, only two cases of diphtheria were reported (*56*). Since 1980, cutaneous diphtheria has not been reportable and only respiratory cases are reportable to NNDSS. During 1996–2016, a total of 13 cases were reported (CDC, unpublished data, 2016) (*21–23,57–63*). Although no cases were reported during 2004–2011, a probable case with a positive polymerase chain reaction (PCR) test for the diphtheria toxin gene ("tox") occurred in 2012, and a case positive by culture with nontoxigenic *C. diphtheriae* was reported in 2014 (*24,47*).

Although childhood DTaP vaccination coverage is >80% in the United States, immunity acquired from childhood vaccination wanes in the absence of decennial boosters, and older adults might not be adequately protected (*51*). An analysis of NHANES III indicated that only 60% of the overall population sample had immunity to diphtheria (defined as an antidiphtheria toxoid concentration of >0.1 IU/mL). This immunity declined progressively with increasing age from 91% at age 6–11 years and 80% among adolescents aged 12–19 years, to approximately 30% among those aged 60–69 years (*54*). Data from the 2015 National Immunization Survey (NIS) indicated that 61.6% of adults aged 19–49 years received any tetanus toxoid–containing vaccination during the preceding 10 years, 64.1% (aged 50–64 years), and 56.9% (aged ≥65 years) (*36*).

Although rare in the United States, exposure to diphtheria remains possible during travel to countries with endemic disease[†] or from imported cases (*64*). Information about the clinical management of diphtheria, including use of diphtheria antitoxin, and the public health response is available at https://www.cdc.gov/diphtheria/clinicians.html.

---

[†] Information available at http://wwwnc.cdc.gov/travel/page/yellowbook-home.

Appx18526

FIGURE 4. Number of reported diphtheria cases — United States, 1920–2016



**Sources:** National Notifiable Diseases Surveillance System and passive reports to the U.S. Public Health Service.

## Vaccines for Prevention of Pertussis, Tetanus, and Diphtheria

Vaccines of different compositions, formulations, and combinations are licensed and available in the United States for different age groups to prevent pertussis, tetanus, and diphtheria (Tables 4 and 5). The indication and age for vaccination might differ by vaccine product and licensure. In certain situations, the off-label use of Tdap vaccine has been recommended, including the absence of a minimum interval between the last tetanus toxoid–containing vaccine and receipt of Tdap, catch-up vaccination for those aged 7–10 years, and vaccination of women during each pregnancy (6,8).

### Tetanus Component

TT vaccine became commercially available in the United States in 1938. After the 1940s, tetanus toxoid was available in combination with diphtheria toxoid with or without whole-cell pertussis antigens in vaccines. Although single antigen TT was used predominantly before 1960, use of Td has replaced TT; production of TT was discontinued in 2013.

In the United States, manufactured tetanus toxoid is adsorbed to aluminum salt adjuvants (aluminum hydroxide, aluminum phosphate, or aluminum sulfate), thimerosal-free, and highly purified, with <0.02% formaldehyde and <1.25 mg aluminum. Pediatric formulations of tetanus toxoid–containing vaccines (DT and DTaP) contain 5–10 limit of flocculation (Lf) units of the antigen (Table 4). Adolescent and adult formulations (Td and Tdap) contain ≤5 Lf units of tetanus toxoid per 0.5 ml dose (Table 5). More than a single dose of vaccine is required to induce immunologic protection, and booster doses are required to maintain protection.

### Immunogenicity and Effectiveness

Although no randomized controlled clinical trial of the efficacy of tetanus toxoid in preventing disease ever has been conducted, evidence from observational studies consistently supports the effectiveness of vaccination. The incidence of tetanus among U.S. army personnel declined from 13.4 per 100,000 during World War I (when personnel were unvaccinated) to 0.44 per 100,000 during World War II (when personnel routinely were vaccinated with TT and also vaccinated following an injury) (65). Similar observations were made among British army personnel during the same periods during the two world wars

US Department of Health and Human Services/Centers for Disease Control and Prevention

Appx18527

TABLE 4. Composition of vaccines containing tetanus toxoid, diphtheria toxoid, and acellular pertussis antigens and age for approved use by vaccine type for persons aged less than 7 years — United States, 2017

| Vaccine type | Trade name | Manufacturer | Pertussis antigens (µg) | | | | Diphtheria toxoid (Lf) | Tetanus toxoid (Lf) | Age for approved use in routine and catch-up immunization schedules | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | PT | FHA | PRN | FIM | | | 2 mos | 4 mos | 6 mos | 15–18 mos | 4–6 yrs |
| **DTaP vaccines\*** | | | | | | | | | | | | | |
| DTaP | Infanrix | GlaxoSmithKline | 25 | 25 | 8 | | 25 | 10 | X[†] | X | X | X | X |
| DTaP | Daptacel | Sanofi Pasteur, Inc. | 10 | 5 | 3 | 5 | 15 | 5 | X[†] | X | X | X | X |
| **Combination vaccines with DTaP\*** | | | | | | | | | | | | | |
| DTaP-IPV-HepB | Pediarix | GlaxoSmithKline | 25 | 25 | 8 | | 25 | 10 | X[†] | X | X | X | X[§] |
| DTaP-IPV-Hib | Pentacel | Sanofi Pasteur, Inc. | 20 | 20 | 3 | 5 | 15 | 5 | X[†] | X | X | X | X[¶] |
| DTaP-IPV | Kinrix | GlaxoSmithKline | 25 | 25 | 8 | | 25 | 10 | | | | | X |
| DTaP-IPV | Quadracel | Sanofi Pasteur, Inc. | 20 | 20 | 3 | 5 | 15 | 5 | | | | | X |
| **DT vaccine\*** | | | | | | | | | | | | | |
| DT | No trade name | Sanofi Pasteur, Inc. | | | | | 6.7 | 5 | X[†] | X | X | X | X |

**Abbreviations**: DT= diphtheria and tetanus toxoids vaccine; DTaP = diphtheria and tetanus toxoids and acellular pertussis vaccine; FDA= U.S. Food and Drug Administration; FHA = filamentous hemagglutinin; FIM = fimbriae types 2 and 3; HepB = hepatitis B; Hib = *Haemophilus influenza* type b; IPV = inactivated poliovirus; Lf = limit of flocculation unit; PRN = pertactin; PT = pertussis toxin.
\* Vaccine dosage and administration: 0.5mL intramuscular injection.
[†] FDA-approved for use in infants as young as 6 weeks.
[§] FDA-approved for use through age 6 years (prior to 7th birthday).
[¶] FDA-approved for use through age 4 years (prior to 5th birthday).

TABLE 5. Composition of vaccines containing tetanus toxoid, diphtheria toxoid, and acellular pertussis antigens and age for approved use by vaccine type for persons aged ≥7 years — United States, 2017

| Vaccine type | Trade name | Manufacturer | Age (yrs) for approved use in routine and catch-up immunization schedules | Pertussis antigens (µg) | | | | Diphtheria toxoid (Lf) | Tetanus toxoid (Lf) |
|---|---|---|---|---|---|---|---|---|---|
| | | | | PT | FHA | PRN | FIM | | |
| **Tdap vaccines\*** | | | | | | | | | |
| Tdap | Adacel | Sanofi Pasteur, Inc. | 10–64 | 2.5 | 5 | 3 | 5 | 2 | 5 |
| Tdap | Boostrix | GlaxoSmithKline | ≥10 | 8 | 8 | 2.5 | | 2.5 | 5 |
| **Td vaccines\*** | | | | | | | | | |
| Td | No trade name | MassBiologics | ≥7 | | | | | 2 | 2 |
| Td | Tenivac | Sanofi Pasteur, Inc. | ≥7 | | | | | 2 | 5 |

**Abbreviations**: FHA = filamentous hemagglutinin; FIM = fimbriae types 2 and 3; Lf = limit of flocculation unit; PRN = pertactin; PT = pertussis toxin; Td = tetanus and diphtheria toxoids vaccine; Tdap = tetanus toxoid, reduced diphtheria toxoid, and acellular pertussis vaccine.
\* Vaccine dosage and administration: 0.5mL intramuscular injection.

(66). The effectiveness of tetanus toxoid is very high, although not 100%. Although data on a minimum antitetanus antibody cut-off level for protection are sparse, it is generally accepted that levels at 0.01 IU/mL and above by in vivo toxin neutralization assay are protective (46,54). One dose of tetanus toxoid vaccine provides little, if any, immunity. After receiving 3 doses of tetanus toxoid–containing vaccine, virtually all infants and adults develop protective tetanus antitoxin titers >0.1 IU/mL. A primary immunization series with 3 doses of tetanus toxoid induced a mean antitetanus level of 0.2 IU/mL, and antibody levels from primary vaccination provide protection from tetanus for approximately 3–5 years (67–69). Additional booster tetanus doses heighten the immune response and prolong the duration of protective immunity. Booster doses at age 4–8 years and during adolescence provide long-lasting protective immunity and a duration of 20–30 years from the last dose has been suggested (50).

## Diphtheria Component

Diphtheria toxoid was shown to be immunogenic in 1923 and has since been used as the immunizing agent against diphtheria (70). The immunogenicity of diphtheria toxoid is improved when it is adsorbed onto an adjuvant (most commonly aluminum hydroxide or aluminum phosphate). By the mid-1940s, diphtheria toxoid was combined with tetanus toxoid and pertussis vaccine as DTP and later adsorbed onto an aluminum salt and used in the routine childhood vaccination program. Only vaccines containing formaldehyde-inactivated diphtheria toxin adsorbed to an aluminum salt adjuvant combined with tetanus toxoid with or without acellular pertussis vaccines are available in the United States (Tables 4 and 5). More than a single dose of vaccine is required to induce immunologic protection, and booster doses are required to maintain protection (71).

## Immunogenicity and Effectiveness

Although no randomized controlled clinical trial of the efficacy of diphtheria toxoid in preventing disease has ever been conducted, strong evidence from observational studies supports the effectiveness of vaccination (*72*). The effectiveness of diphtheria toxoid is high, although not 100%. After receiving 3 doses of diphtheria toxoid–containing vaccines, virtually all infants develop diphtheria antitoxin titers >0.01 IU/mL (*71,73,74*). Although some DTaP products produce lower geometric mean titers than those observed after vaccination with DTP, these differences are not thought likely to be clinically significant. For primary vaccination of adults aged ≥19 years, data suggest that virtually all adults develop diphtheria antitoxin titers >0.01 IU/mL after receiving 3 doses of diphtheria toxoid–containing vaccines (*75,76*). A diphtheria antitoxin level of 0.01 to 0.09 IU/mL provides some degree of protection, whereas levels ≥0.1 IU/mL are considered protective and levels >1.0 IU/mL are associated with long-lasting protection (*77*). Although no level of circulating diphtheria antitoxin confers absolute protection, most reports indicate that *C. diphtheriae* infection in previously vaccinated persons is milder and less likely to be fatal (*56,78,79*). The failure of the vaccine to protect all persons exposed to *C. diphtheriae* highlights the importance of maintaining high vaccination coverage and herd immunity to prevent or limit transmission and outbreaks, as evidenced by the disappearance of diphtheria cases in industrialized countries with established vaccination programs.

Although various schedules used worldwide for primary vaccination (3 doses during infancy or 4 doses by age 15 months) appear to provide adequate protection from diphtheria in the early years of life, a booster dose is needed at age 4–6 years to maintain protection throughout the school-age years (*71*). The massive epidemic in the former Union of Soviet Socialist Republics in the 1990s strongly suggests that sustaining high vaccination coverage with a primary series of diphtheria toxoid–containing vaccine among infants and administering booster doses at school entry and throughout life are important for maintaining population immunity (*80*). In developed countries where diphtheria is well controlled, there is little to no opportunity for exposure and natural boosting of immunity from infection after childhood. The World Health Organization (WHO) recommends that persons living in areas of low endemicity or areas where disease is not endemic should receive booster doses of combined diphtheria and tetanus toxoids approximately 10 years after completing the primary series and subsequently every 10 years throughout life (*70*).

## Tetanus and Diphtheria Toxoid–containing Vaccines

As of 2016, one DT vaccine product and two Td vaccine products are licensed by FDA and available in the United States (Tables 4 and 5); production of TT vaccine was discontinued in 2013, and it is no longer available in the United States.

### DT

DT product (no trade name; Sanofi Pasteur, Swiftwater, Pennsylvania) is licensed by FDA for active vaccination against diphtheria and tetanus in children up to age 7 years for whom the pertussis vaccine component is contraindicated or in situations when the health care provider decides that pertussis vaccine should not be administered. The concentration of diphtheria toxoid is higher in DT vaccine compared to Td vaccine. Additional information is available in the package insert (https://www.fda.gov/downloads/BiologicsBloodVaccines/Vaccines/ApprovedProducts/UCM142732.pdf).

### Td

Tenivac (Sanofi Pasteur, Swiftwater, Pennsylvania) is licensed by FDA as a booster vaccination against tetanus and diphtheria in persons aged ≥7 years. Additional information is available in the package insert (https://www.fda.gov/downloads/BiologicsBloodVaccines/Vaccines/ApprovedProducts/UCM152826.pdf).

Td product (no trade name; manufactured by MassBiologics, Boston, Massachusetts; distributed by Grifols, Los Angeles, California) is licensed by FDA for active vaccination for the prevention of tetanus and diphtheria in persons aged ≥7 years. Additional information is available in the package insert (https://www.fda.gov/downloads/BiologicsBloodVaccines/Vaccines/ApprovedProducts/UCM164127.pdf).

## Acellular Pertussis Components

In the United States, all vaccines available for preventing pertussis are acellular pertussis formulations combined with tetanus and diphtheria toxoids. Depending on the manufacturer, the pertussis antigens included in acellular pertussis vaccines are: pertussis toxin (PT), filamentous haemagglutinin (FHA), pertactin (PRN) and/or fimbriae types 2 and 3 (FIM). The amount of pertussis antigens present differs depending on the vaccine type and manufacturer (Tables 4 and 5). No "pertussis-only" vaccines are licensed in the United States.

Appx18529

## Interpretation of Immunogenicity Data

Vaccine efficacy studies have demonstrated a correlation between the presence of antipertussis antibodies and protection against pertussis disease, but there are no well-accepted definitive serologic or laboratory correlates of protection against pertussis (81–85). Antibody studies are useful for comparing the immune responses elicited by a single vaccine under different conditions or in different studies, whereas efficacy studies are important to measure clinical protection conferred by each pertussis vaccine (54).

Licensure of new pertussis vaccines is based on the overall safety profile and the demonstration of immunogenicity not inferior to U.S.-licensed pediatric DTaP products in clinical trials (86). In a noninferiority trial, immunogenicity, efficacy, or safety endpoints are demonstrated when a new product is at least as good as a comparator on the basis of a predefined and narrow margin for a clinically acceptable difference between the study groups (87).

## DTaP Vaccines

DTaP vaccines consist of pertussis antigens and diphtheria and tetanus toxoids (Table 4). Depending on vaccine type and manufacturer, the composition and amount of pertussis antigen and amount of diphtheria and tetanus toxoids differs. The FDA-approved age indication for use of DTaP vaccines differs, depending upon the specific DTaP product (Table 4). Data on immunogenicity and safety of DTaP vaccines have been published (3,88–94).

### Licensed and Available DTaP Vaccines

As of 2016, two DTaP vaccines are licensed by FDA and available in the United States: Infanrix (GlaxoSmithKline [GSK], Rixensart, Belgium) and Daptacel (Sanofi Pasteur, Swiftwater, Pennsylvania). Immunogenicity and safety data for each of these vaccines have been published (3,88,89,91).

Infanrix (GSK) is licensed by FDA for active vaccination against diphtheria, tetanus, and pertussis as a 5-dose series in infants and children aged 6 weeks through 6 years. Additional information is available in the package insert (https://www.fda.gov/downloads/BiologicsBloodVaccines/Vaccines/ApprovedProducts/UCM124514.pdf).

Daptacel (Sanofi Pasteur) is licensed by FDA for active vaccination against diphtheria, tetanus, and pertussis as a 5-dose series in infants and children aged 6 weeks through 6 years. Additional information is available in the package insert (https://www.fda.gov/downloads/BiologicsBloodVaccines/Vaccines/ApprovedProducts/UCM103037.pdf).

## Licensed and Available Combination Vaccines That Include DTaP

As of 2016, four combination vaccines that contain the components of DTaP vaccines are licensed by FDA and available in the United States: DTaP-IPV-HepB (Pediarix, GSK, Rixensart, Belgium), DTaP-IPV (Kinrix, GSK, Rixensart, Belgium), DTaP-IPV/Hib (Pentacel, Sanofi Pasteur, Swiftwater, Pennsylvania), and DTaP-IPV (Quadracel, Sanofi Pasteur, Swiftwater, Pennsylvania). Combination vaccines with DTaP have been shown to be both safe and immunogenic, and have similar safety profiles and antibody responses compared with DTaP administered by itself (95–97).

DTaP-IPV-HepB (Pediarix) contains DTaP, inactivated poliovirus (IPV), and Hepatitis B (recombinant) (HepB). Pediarix is approved by FDA for use as a 3-dose series in infants born to hepatitis B surface antigen (HBsAg)-negative mothers. Pediarix can be administered as early as age 6 weeks through 6 years. Additional information is available in the package insert (https://www.fda.gov/downloads/BiologicsBloodVaccines/Vaccines/ApprovedProducts/UCM241874.pdf).

DTaP-IPV (Kinrix) contains DTaP and IPV. Kinrix is licensed by FDA for use as the fifth dose of the DTaP vaccine series and the fourth dose of the IPV series in children aged 4–6 years whose previous DTaP vaccine doses were DTaP (Infanrix, GSK) and/or DTaP-HepB-IPV (Pediarix, GSK) for the first 3 doses and DTaP (Infanrix) for the fourth dose. Additional information is available in the package insert (https://www.fda.gov/downloads/BiologicsBloodVaccines/Vaccines/ApprovedProducts/UCM241453.pdf).

DTaP-IPV/Hib (Pentacel) contains DTaP, IPV, and *Haemophilus influenzae* type b (Hib) conjugate. Pentacel is licensed by FDA for use as a 4-dose series in children aged 6 weeks through 4 years. Additional information is available in the package insert (https://www.fda.gov/downloads/BiologicsBloodVaccines/Vaccines/ApprovedProducts/UCM109810.pdf).

DTaP-IPV (Quadracel) contains DTaP and IPV. Quadracel is licensed by FDA for use as the fifth dose of the DTaP vaccine series and the fourth or fifth dose of the IPV series in children aged 4 through 6 years who have previously received 4 doses of Pentacel and/or Daptacel vaccine. Further information is available in the package insert (https://www.fda.gov/downloads/BiologicsBloodVaccines/Vaccines/ApprovedProducts/UCM439903.pdf).

Appx18530

## DTaP Vaccine Immunogenicity, Efficacy, and Effectiveness

### Immunogenicity of DTaP Vaccines

**Infanrix (GSK):** One month after receiving 3 doses of Infanrix at ages 2, 4, and 6 months, ≥83% of children had a fourfold or greater antibody response to PT, FHA, and PRN (*98*). All children developed diphtheria antitoxin titers of ≥0.1 IU/mL and tetanus antitoxin titers of ≥0.01 IU/mL (i.e., indications of immunity against these diseases) (*3*). Whether the first 3 doses were Infanrix or DTP, >80% of children aged 15–20 months had a fourfold or greater rise in serum antibody to each of the pertussis vaccine antigens after a fourth dose of Infanrix (*99*). Immunogenicity data on the fifth dose were not required for FDA approval (*100*).

**Daptacel (Sanofi Pasteur):** After 4 doses of Daptacel, the antibody response to pertussis antigens among U.S. infants was similar to that achieved among Swedish infants in whom efficacy was demonstrated after receiving 3 doses of Daptacel (*88,101*). Diphtheria antitoxin levels of ≥1.0 IU/mL were achieved by 98.5% of children, and 100% of children achieved tetanus antitoxin levels of ≥1.0 IU/mL (*101*). Licensure for use of Daptacel as a fifth dose at age 4–6 years was based on the assumption that children previously primed with this vaccine will have a robust immune response to a booster dose of the same vaccine. For diphtheria and tetanus, it was expected that most children will have protective levels of antibody following booster vaccination (*102*).

### Immunogenicity of Combination Vaccines with DTaP

**Pediarix (GSK) (DTaP-HepB-IPV):** The immunologic response of all antigens in Pediarix (diphtheria and tetanus toxoids; pertussis antigens; Hepatitis B virus; and inactivated poliovirus Types 1, 2, and 3) following 3 doses at age 2, 4, and 6 months was generally similar to those following 3 doses of separately administered Infanrix [DTaP (GSK)], ENGERIX-B (HepB), and oral poliovirus vaccine (*89*).

**Kinrix (GSK) (DTaP-IPV):** The immunogenicity of all antigens in Kinrix (diphtheria and tetanus toxoids; pertussis antigens; and inactivated poliovirus Types 1, 2, and 3) was similar between groups (DTaP-IPV and separately administered DTaP and IPV vaccines) with or without a co-administered second dose of measles, mumps, and rubella (MMR) vaccine (*92*).

**Pentacel (Sanofi Pasteur) (DTaP-IPV/Hib):** The immunologic response of all antigens in Pentacel (diphtheria and tetanus toxoids; pertussis antigens; inactivated poliovirus types 1, 2, and 3; and *Haemophilus influenzae* Type b conjugate)

following 3 or 4 doses generally was similar to those following separately administered component vaccines (*86,103*). Immune responses following the first and second doses were not measured (*93*).

**Quadracel (Sanofi Pasteur) (DTaP-IPV):** The immunogenicity of all antigens in Quadracel (diphtheria and tetanus toxoids; pertussis antigens; and inactivated poliovirus types 1, 2, and 3) was noninferior between groups (DTaP-IPV and separately administered DTaP [Daptacel] and IPV [IPOL, Sanofi Pasteur] vaccines) with or without a co-administered second dose of MMR and varicella vaccines (*94*).

### Pertussis Vaccine Efficacy

The efficacy of both DTaP vaccine products (Infanrix [GSK] and Daptacel [Sanofi Pasteur]) was evaluated in prelicensure trials in which participants received a 3-dose series at ages 2, 4, and 6 months (*104–106*). The vaccine efficacy estimates for 3 doses of DTaP against pertussis disease§ ranged from 79% to 89%, with a follow-up time up to 2 years after receipt of the third dose (*104–106*).

### Postlicensure Pertussis Vaccine Effectiveness

Assessment of the 5-dose DTaP series indicated that the estimated overall effectiveness of the pertussis vaccine was 88.7% (95% confidence interval [CI] = 79.4%–93.8%); within the first year after the fifth DTaP dose, vaccine effectiveness was 98.1% (95% CI = 96.1%–99.1%) (*28*). However, vaccine effectiveness declined with increasing time since receipt of the fifth DTaP dose; by ≥5 years since the fifth DTaP dose, vaccine effectiveness was estimated at 71.2% (95% CI = 45.8%–84.8%) (*28*). Other studies support the findings of a progressive decrease in DTaP vaccine effectiveness and increased risk for pertussis over time after receipt of the fifth dose (*107,108*). In contrast, an early assessment of DTaP indicated 100% vaccine effectiveness against pertussis for a limited period of time after receipt of 5 doses in children up to age 5 years, but this assessment was done shortly after ACIP issued the 5-dose DTaP recommendation and the majority of participants had received DTP as the first 3 doses (*109*).

## Postlicensure Safety Surveillance of DTaP

Studies conducted since the introduction of acellular pertussis vaccines in the United States have supported the safety of DTaP (*110–123*). A summary of these studies is available at https://stacks.cdc.gov/view/cdc/52822. Many of these studies were performed through surveillance for adverse events

---

§ The case definition was a confirmed case of pertussis with ≥21 days of paroxysmal cough illness with culture or serologic confirmation of infection with *B. pertussis*.

following vaccine receipt through two systems in the United States, Vaccine Adverse Event Reporting System (VAERS) and Vaccine Safety Datalink (VSD). VAERS is a national passive surveillance system operated jointly by CDC and FDA that receives reports of adverse events following vaccination from health care personnel, manufacturers, vaccine recipients, and others (*124*). VSD is a collaborative effort of CDC and eight managed care organizations in the United States and allows for planned vaccination safety studies and timely investigation of hypotheses that arise from the review of the medical literature, reports to VAERS, changes in the vaccination schedule, or the introduction of new vaccines (*125*).

## Safety of Licensed and Available DTaP Vaccines in VAERS

During January 1, 1990–July 31, 2015, VAERS received 46,448 reports involving receipt of one of the five DTaP vaccines that are available in the United States during that period (Daptacel, Infanrix, Kinrix, Pediarix, and Pentacel); 44,061 (95%) of the reports involved children aged <6 years. DTaP vaccine was administered concurrently with one or more other vaccines in 40,868 (88%) case reports (CDC, unpublished data, 2016). The median time from vaccination to onset of an adverse event was 1 day. The most frequently reported adverse events were injection-site erythema (11,879 [26%]), pyrexia (9,225 [20%]), injection-site swelling (6,964 [15%]), erythema site other than injection site or site not specified (5,339 [12%]), and injection-site warmth (4,468 [10%]). When VAERS DTaP reports for each vaccine brand were compared individually with those for all other inactivated vaccines in the VAERS database, no concerning patterns of adverse events were observed.

Among all DTaP vaccine-related reports, 5,205 (11%) were coded as serious (i.e., one of the following outcomes was reported: death, life-threatening illness, hospitalization, prolongation of hospitalization, or permanent disability). Among those reports coded as serious, the most frequent adverse events were pyrexia (1,795 [35%]), vomiting (1,420 [27%]), irritability (1,101 [21%]), seizure (938 [18%]), and intussusception (746 [14%]). In 97% of the 728 intussusception reports, rotavirus vaccine was administered concomitantly. Intussusception has been associated with administration of both U.S.-licensed rotavirus vaccine products (*126,127*).

A total of 793 deaths following receipt of DTaP vaccines were reported in VAERS during the study period (CDC, unpublished data, 2016). An autopsy report or other type of medical record was available for 682 (86%) reports and reviewed for cause of death. The most frequent reported cause of death was sudden infant death syndrome (SIDS) in 338 (49.6%) reports. Other categories of death included asphyxiation (47 [6.8%]); diseases of the respiratory system (44 [6.5%]); diseases of the circulatory system (27 [3.9%]); certain infections or parasitic diseases (27 [3.9%]); diseases of the nervous system (24 [3.5%]); and congenital malformations, deformations and chromosomal abnormalities (23 [3.4%]). In 90 (13.2%) death reports, the cause was undetermined and in 62 (9.1%) death reports various other causes were reported (e.g., blunt force trauma). These reported frequencies are similar to those observed with overall U.S. infant mortality data and among recipients of other recommended childhood vaccines (*128*). Two recent VSD studies do not suggest a causal relation or increased risk for death following vaccination of any type (*129,130*).

## Adverse Events Associated with Vaccines with Pertussis Components or Tetanus Toxoid–Containing Components

### Vaccines with Pertussis Components

Because of concerns about the possible role of vaccines with acellular pertussis components in causing neurologic reactions or exacerbating underlying neurologic conditions, ACIP recommendations to defer pertussis vaccines in infants with suspected or evolving neurologic disease, including seizures, have been based primarily on concerns that neurologic events after vaccination (with whole-cell preparations in particular) might interfere with the subsequent evaluation of the infant's neurologic status (*3,12,131*).

During the whole-cell pertussis vaccine era, the Institute of Medicine (IOM) concluded that evidence favored acceptance of a causal relation between pediatric DTP use and acute encephalopathy (*132*). After the change to DTaP vaccines, IOM reviewed the evidence for a causal association between acellular pertussis–containing vaccines and several neurologic outcomes (*133*). The evidence was inadequate to accept or reject a causal relation between receipt of acellular pertussis-containing vaccine and encephalitis, encephalopathy, infantile spasms, seizures, ataxia, autism, acute disseminated encephalomyelitis, transverse myelitis, optic neuritis, onset of multiple sclerosis in adults, relapse of multiple sclerosis in adults, relapse of multiple sclerosis in children, Guillain-Barré syndrome, chronic inflammatory disseminated polyneuropathy, opsoclonus myoclonus syndrome, or Bell's palsy (*133*).

Pediatric DTaP is contraindicated in children with a history of encephalopathy not attributable to another identifiable cause occurring within 7 days after pediatric DTP/DTaP vaccination (Table 2). Although active surveillance in Canada among a population of children administered 6.5 million doses of pertussis vaccines during 1993–2002 failed to ascertain any acute encephalopathy cases causally related to whole-cell or

acellular pertussis vaccines, postlicensure surveillance in Japan during a 23 year period demonstrated rates of encephalopathy/encephalitis (death) of 7.6 cases within 7 days of vaccination per 10 million doses during 1970–1974 when DTP was administered, and 0.5 cases per 10 million doses during 1989–2000 when DTaP replaced DTP (113,134).

ACIP recommends that infants with evolving neurologic conditions not be vaccinated with pediatric DTaP until a treatment regimen has been established and the condition has stabilized (Table 2) (3). A history of seizures (febrile or afebrile) <3 days after a previous dose of DTP/DTaP, a history of well-controlled seizures in the vaccinee or a family history of seizures or other neurologic disorder is not a contraindication or precaution to vaccination with pertussis components (Table 3) (3).

Hypotonic-hyporesponsive episodes (HHE) and prolonged crying are adverse events that are less commonly reported with DTaP than were historically reported with DTP (111,135,136). Neither HHE nor prolonged crying after receipt of DTP/DTaP are known to be associated with serious sequelae, and both adverse events have been reported after receipt of vaccines other than DTP/DTaP (135,136). Among children who received subsequent DTP/DTaP doses, recurrent HHE occurrences are very rarely reported (135,136). A single, uncomplicated occurrence of either HHE or prolonged crying does not preclude vaccination, and the benefits of vaccination outweigh the risks for additional episodes.

ACIP recommends that vaccine providers and parents evaluate the risks for and benefits of administering subsequent doses of vaccines with pertussis components to young children who after receiving pediatric DTP/DTaP experienced any of the events listed in the table for contraindications and precautions for DTaP, DT, Td, or Tdap vaccines (Table 2). All of these events were documented more frequently following whole-cell pertussis vaccines than following acellular vaccines (3,110,111,136,137).

### Tetanus Toxoid–Containing Vaccines

As with the recent conclusions regarding acellular pertussis–containing vaccines, IOM also concluded that the evidence was inadequate to accept or reject a causal relation between receipt of diphtheria toxoid and tetanus toxoid–containing vaccine and encephalitis, encephalopathy, infantile spasms, seizures, ataxia, autism, acute disseminated encephalomyelitis, transverse myelitis, optic neuritis, onset of multiple sclerosis in adults, relapse of multiple sclerosis in adults, relapse of multiple sclerosis in children, Guillain-Barré syndrome, chronic inflammatory disseminated polyneuropathy, opsoclonus myoclonus syndrome, or Bell's palsy (133). ACIP recommends that Guillain-Barré syndrome occurring <6 weeks after receipt of a tetanus toxoid–containing vaccine is a precaution for subsequent administration of tetanus toxoid–containing vaccines (52).

IOM has concluded that evidence from case reports and uncontrolled studies involving tetanus toxoid–containing vaccines favored a causal relation between tetanus toxoid–containing vaccines and brachial neuritis (133). Although brachial neuritis is considered to be a compensable event through the Vaccine Injury Compensation Program (VICP), ACIP considers that occurrence of brachial neuritis following vaccination with a tetanus toxoid–containing vaccine does not preclude their future use in the same person; brachial neuritis is usually self-limited (52,132,138).

### Milk Allergy

DTaP and Tdap vaccines might include residual milk allergens from ingredients used during manufacturing (139). Because of reports of children and adolescents with a documented history of severe milk allergy having an anaphylactic reaction to booster doses of DTaP or Tdap within one hour of administration (139,140), a prospective review of VAERS data was conducted. No safety signal in VAERS for anaphylaxis in patients with milk protein allergy was identified, leading to the conclusion that these vaccines are tolerated by those with a milk allergy, and that milk allergy is not a contraindication or precaution to receipt of DTaP or Tdap (140); vaccine providers should continue to vaccinate persons with milk allergy as recommended and strongly consider monitoring the patient for anaphylaxis.

## Simultaneous Administration of DTaP with Other Vaccines

Simultaneous administration of vaccines is defined as administering more than one vaccine on the same clinic day, at different anatomical sites, and not combined in the same syringe (52). Before the availability of DTaP-containing combination vaccines, administration of DTaP vaccine was recommended with other vaccines on the same clinic day. Limited historic data regarding simultaneous administration of the first 3 doses of DTaP with other childhood vaccines indicate no interference with response to any of these antigens (3).

A recent safety study on simultaneous administration of DTaP with other vaccines indicated a small increased risk for febrile seizures during the 24 hours after a child receives the inactivated influenza vaccine (IIV) at the same time as the pneumococcal 13-valent conjugate (PCV13) vaccine or DTaP (123). Other studies have not shown an increased risk for febrile seizures after DTaP, except when simultaneously administered with IIV (114,115,121,122). The risk for febrile seizure with any combination of these vaccines is small; ACIP recommends simultaneous administration of these vaccines.

Appx18533

## Tdap Vaccines

Two Tdap products are licensed for use in adolescents and adults as a single-dose booster vaccination against tetanus, diphtheria, and pertussis: Boostrix (GlaxoSmithKline, Rixensart, Belgium), and Adacel (Sanofi Pasteur, Swiftwater, Pennsylvania). The age indication for approved use differs depending upon the specific Tdap product and licensure (Table 5). Both Tdap products consist of pertussis antigen and diphtheria and tetanus toxoids (Table 5). The pertussis antigen composition and amount differ, as does the amount of diphtheria toxoids between the two Tdap products. Summaries of the data on the immunogenicity and safety of each of these vaccines have been published (*4*,*5*).

Adacel (Sanofi Pasteur) is licensed by FDA as a single dose in persons aged 10–64 years (*141*). Adacel contains the same tetanus toxoid, diphtheria toxoid, and five pertussis antigens (PT, PRN, FHA, and FIM) as those in Daptacel (pediatric DTaP), but is formulated with reduced quantities of the toxoids and antigens (Table 5). Adacel contains no thimerosal or other preservative. Additional information is available in the package insert (https://www.fda.gov/downloads/BiologicsBloodVaccines/Vaccines/ApprovedProducts/UCM142764.pdf).

Boostrix (GSK) is licensed by FDA as a single dose in persons aged ≥10 years (*142*). Boostrix contains the same tetanus toxoid, diphtheria toxoid, and three pertussis antigens (PT, PRN, and FHA) as those in Infanrix (pediatric DTaP), but is formulated with reduced quantities of the toxoids and antigens (Table 5). Boostrix contains no thimerosal or other preservative. Additional information is available in the package insert (https://www.fda.gov/downloads/BiologicsBloodVaccines/UCM152842.pdf).

### Immunogenicity and Efficacy

Both Tdap products were licensed on the basis of clinical trials demonstrating immunogenicity not inferior to U.S.-licensed Td or pediatric DTaP products and an overall safety profile clinically comparable to U.S.-licensed Td products (*143*,*144*). Determining the efficacy of the tetanus and diphtheria toxoid components for each Tdap product was based on the comparison of the rates of protective immune response to these antigens as compared to U.S.-licensed Td and using established serologic correlates of protection (*45*,*72*). The percentage of persons achieving protective antitetanus and antidiphtheria antibody concentrations (>0.1 IU/mL) and the booster response to each of these antigens 1 month postvaccination were evaluated.

Because no well-accepted serologic or laboratory correlate of protection against pertussis has been established, clinical endpoint efficacy studies of acellular pertussis vaccines among adolescents or adults were not required for Tdap licensure. Instead, the efficacy of the pertussis components of Tdap vaccines was inferred using a serologic bridge to infants vaccinated with DTaP in efficacy trials with clinical endpoints (*145*). The immune response of adolescents and adults to each pertussis vaccine antigen after a single dose of Tdap was compared with the immune responses of infants who received 3 doses of pediatric DTaP that included the same pertussis components as the Tdap being assessed (*141*,*142*). The percentage of persons with an acceptable booster response to pertussis vaccine antigens according to predefined criteria also was evaluated. The predefined lower limit was defined as the lower limit of 95% CI for the GMC ratio of the Tdap/pediatric DTaP. Prelicensure Tdap vaccine efficacy was inferred using a serologic bridge to infants vaccinated with 3 doses of DTaP and ranged from 79% to 89% (*105*,*106*).

### Postlicensure Tdap Effectiveness

Following the 2005 Tdap recommendation for adolescents and adults, postlicensure pertussis vaccine effectiveness estimates for Tdap in settings with similar vaccines and recommendation schedules have ranged from 66% to 78% among adolescents who received both DTP and DTaP as children (*146*–*148*). Among adolescents who received only DTaP as children, in a matched case-control study, the overall estimated vaccine effectiveness of Tdap against pertussis was 63.9% (95% CI = 50%–74%) (*29*). Initial vaccine effectiveness against pertussis within one year of Tdap vaccination was 73% (95% CI = 60%–82%), but after 2–4 years, postvaccination vaccine effectiveness decreased to 34% (95% CI = -0.03%–58%) (*29*). Another study that calculated Tdap vaccine effectiveness among adolescents found that, within the first year after vaccination, effectiveness was 68.8% (95% CI = 59.7%–75.9%); by ≥4 years after vaccination, vaccine effectiveness was 8.9% (95% CI = -30.6%–36.4%) (*149*). As observed with DTaP, Tdap vaccine effectiveness declines substantially with increasing time since vaccination (*29*,*149*,*150*). Although there are no studies estimating Tdap vaccine effectiveness in persons who received only DTP as infants, reported rates of pertussis have been observed to be significantly lower among children who had started their vaccination series with DTP than among those who had started with DTaP (*151*,*152*).

### Prevention of Transmission: Indirect Protection ("Cocooning")

At the time Tdap was first recommended, it was anticipated that this vaccine would prevent pertussis in adolescents and adults and thereby result in preventing transmission

Appx18534

of *B. pertussis* to contacts (e.g., infants). Providing indirect protection through Tdap vaccination to adults was the premise for the "cocooning" strategy to prevent pertussis in young infants at highest risk for severe pertussis morbidity and mortality. A limited number of studies have evaluated the effectiveness of Tdap vaccination in preventing transmission of pertussis in young infants, but the evidence was inconclusive. Although one study found a modest decrease in the risk for pertussis in infants whose mothers received postpartum Tdap, another study found that mother's postpartum vaccination and cocooning did not reduce pertussis in infants (*153,154*).

Studies in animal models have shown that acellular pertussis vaccines protect against disease but not against infection or transmission of *B. pertussis* or the closely related species, *B. bronchiseptica* (*155–157*). Although it is unclear if these animal models fully represent human disease, expert opinion is that persons vaccinated with acellular pertussis vaccines can become infected with and transmit *B. pertussis* (*158,159*). Persons up to date with pertussis vaccines are less likely to have severe disease compared with those not up to date (*160*). Although it is presumed that vaccinated persons with less severe disease would be less likely to transmit *B. pertussis* because of less frequent or severe coughing, more recent evidence suggests that vaccination with acellular pertussis vaccines does not prevent transmission and therefore does not afford indirect protection against pertussis (*155–157*).

## Postlicensure Safety of Tdap

Since 2005, when both Tdap products were first licensed and recommended, both vaccine product label indications have expanded and ACIP Tdap recommendations have been updated (*6,8–10,161–163*). A summary of these recommendations is available at https://stacks.cdc.gov/view/cdc/52821. Routine VAERS surveillance for and VSD studies on adverse events following receipt of Tdap vaccines in persons aged 10–64 years have provided reassuring data that support the prelicensure clinical trial safety data and have not demonstrated any associations between Tdap and the following rare adverse events: encephalopathy-encephalitis-meningitis; paralytic syndromes; seizures; cranial nerve disorders; and Guillain-Barré syndrome (*164–166*). Medically attended local reactions were uncommon and did not differ with concomitant or sequential administration of diphtheria toxoid–containing vaccines (Td/Tdap and MenACWY-D [meningococcal serogroups A, C, W, and Y] Menactra, Sanofi Pasteur) (*167*). No increased risk for medically attended neurologic or allergic reactions was observed following Tdap vaccination and, when compared with matched historical Td recipients, no increase in the onset of new chronic illnesses was seen after Tdap (*168*). Although a 2016 study found an increased risk for acute disseminated

encephalomyelitis following Tdap vaccination, this finding was based on cases in two Tdap-vaccinated persons and might have been unrelated to vaccination (*169*). Safety data from VAERS, VSD, and other studies in populations not originally routinely recommended to receive Tdap (e.g., adults aged ≥65 years and pregnant women) have become available since 2009 and were reviewed by ACIP (*6,8–10*).

### Persons Aged ≥65 Years

For adults aged ≥65 years, Tdap vaccine safety was comparable to that of Td vaccine (*170,171*). The most frequent adverse events following receipt of Tdap in persons aged ≥65 years were local injection-site reactions, and no unusual or unexpected clusters of adverse events after Tdap were identified (*170*). In addition, the risks for the following prespecified events were comparable following receipt of Tdap and Td in older persons: meningitis, encephalitis and encephalopathy; cranial nerve disorders, including Bell's palsy; Guillain-Barré syndrome; brachial neuritis; paralytic syndromes; medically attended inflammatory or allergic events; and anaphylaxis and generalized reactions (*171*).

### Interval of Tdap After Td

When Tdap was licensed in 2005, the safety of administering a dose of Tdap at intervals <5 years after Td or pediatric DTP/DTaP had not been studied. Evaluations of the safety of administering Tdap at intervals <5 years after Td, including as short as 18 months, suggest that the safety of much shorter intervals is acceptable (*172–174*). Two studies were conducted in adults who received a Tdap or combined Tdap-inactivated polio (Tdap-IPV) vaccine <2 years following a previous Td-containing vaccine (*173,174*). Observed adverse events were limited to local reactions, including pain (68%–83%), erythema (20%–25%), and swelling (19%–38%) (*173,174*). Although serious adverse events did not occur, the numbers of subjects in these studies were small and the potential for rare, but serious, adverse events cannot be excluded. ACIP concluded that although longer intervals between Td and Tdap vaccination could decrease the occurrence of local reactions, the benefits of protection against pertussis outweigh the potential risk for adverse events (*8*).

### Persons Aged 7–10 Years

ACIP concluded that the overall safety of Tdap and the frequency of local reactions in persons aged 7–10 years who have not completed the childhood DTaP series likely would be similar to those observed in children who received 4 doses of DTaP (*8*). Although both Tdap products are approved for use in persons as young as age 10 years, no data have been published regarding the safety of Tdap in children aged 7–9 years who

Appx18535

have never received pertussis-containing vaccines. Several studies assessing the safety and immunogenicity of Tdap or Tdap-IPV as the fifth dose of acellular pertussis vaccine in children aged 4–8 years were reviewed (*175–179*). No increase in the risk for severe local reactions or systemic adverse events was observed (*175–179*). The most commonly reported adverse events that occurred within 15 days after receipt of Tdap were pain (40%–56%), erythema (34%–53%), and swelling (24%–45%). Fewer local reactions were observed or reported among Tdap or Tdap-IPV recipients compared with those who received DTaP or DTaP-IPV, but the differences were not statistically significant. No differences were noted when children aged 4–6 and 7–8 years were compared with respect to the frequency of solicited or unsolicited adverse reactions following vaccination with Tdap-IPV (*179*).

### Pregnant Women

In 2011, when ACIP first considered administration of Tdap during pregnancy, safety data on women and their infants were limited (*9*); prelicensure evaluations did not study the safety of administering a booster dose of Tdap to pregnant women. ACIP reviewed available data from VAERS, pregnancy registries established by both Sanofi Pasteur (Adacel) and GSK (Boostrix), and small studies (*174,180–183*). ACIP concluded that these studies did not suggest any elevated risk for or unusual patterns of adverse events in pregnant women who received Tdap or in their newborn infants, and the few serious adverse events reported were judged unlikely to have been caused by the vaccine (*9*). A summary of these studies is available at https://stacks.cdc.gov/view/cdc/52820.

When ACIP considered recommending Tdap vaccination during each pregnancy, the safety information concerning booster doses of Tdap in pregnant women previously vaccinated with Tdap was not available (*6*). Data on the safety of two closely spaced doses of tetanus toxoid–containing vaccines were limited to receipt of Td and Tdap or Tdap-IPV vaccine within 21 days or ≤2 years and receipt of 2 doses of Tdap at a five-year interval in nonpregnant persons; of the few serious adverse events reported, none were attributed to the vaccine (*172–174,184,185*). Receipt of a second dose of Tdap in nonpregnant persons was well tolerated; injection-site pain was the most commonly reported adverse event (*184–188*). The frequency of reported adverse events following the second dose of Tdap was similar to that after the first dose in the same subjects and in controls receiving Tdap for the first time.

A theoretical risk for severe local reactions exists among pregnant women who are vaccinated during multiple closely spaced pregnancies. These severe local reactions are hypersensitivity reactions that have been associated with vaccines containing tetanus toxoid, tetanus, and diphtheria toxoids and/or pertussis antigens in persons who have received multiple doses of vaccine. Most of the data on multiple doses of tetanus toxoid–containing vaccines and hypersensitivity reactions are historical, and the risk for severe adverse events likely has been reduced with current formulations that contain lower concentrations of tetanus toxoid (*45,189,190*). Recent studies were small and did not include pregnant subjects; therefore, the findings do not exclude the possibility of rare but serious adverse events in pregnant women after receipt of Tdap (*6*).

ACIP recognized the need for safety studies of severe adverse events when Tdap is administered during subsequent pregnancies but concluded that the potential benefit of preventing pertussis morbidity and mortality in infants too young to be fully vaccinated outweighs the theoretical concern of possible localized severe adverse events in pregnant women receiving Tdap. ACIP also concluded that experience with tetanus toxoid–containing vaccines suggests no excess risk for severe adverse events among women receiving Tdap with each pregnancy (*6*).

Additional data from the United States and elsewhere on the safety of Tdap vaccination during pregnancy for both pregnant women and their infants continue to be reassuring, with no reported increase in adverse events, including adverse birth outcomes, and no observation of new or unexpected vaccine safety concerns (*191–209*); a summary of these studies is available at https://stacks.cdc.gov/view/cdc/52820. Receipt of Tdap during pregnancy has not been found to be associated with an increased risk for frequency of major malformations, stillbirth, preterm birth, small for gestational age, or hypertensive disorders (*193–195,197,208*). One study observed a slight increase in the risk for chorioamnionitis and, although chorioamnionitis is a risk factor for preterm birth, there were no associated increases in preterm or small for gestational age births in this cohort (*193*). The authors concluded that the small increase in the risk for chorioamnionitis was likely due to residual confounding or heterogeneity in outcome ascertainment (*193*). A review of the VAERS database from 1990 through 2014 found 31 reports of chorioamnionitis following receipt of any vaccine out of 3,389 pregnancy reports (*198*).

An evaluation of the safety of Tdap and influenza vaccines administered concomitantly and sequentially to pregnant women aged 14–49 years found no statistically significant increase in risk for fever or any medically attended acute adverse event in pregnant women vaccinated concomitantly compared with sequentially. No differences in preterm delivery, low birth weight, or small for gestational age neonates were observed between the two groups (*196*).

Data on the safety of receipt of Tdap during pregnancy in close intervals from prior tetanus toxoid–containing

Appx18536

vaccinations are limited. One study found no increased risk for acute adverse events (i.e., fever, allergy, and local reactions) or adverse birth outcomes (i.e., small for gestational age, preterm delivery, and low birth weight) for those women who had a previous vaccination ≤5 years before compared with those vaccinated >5 years before receipt of Tdap during pregnancy, suggesting that recent receipt of a prior tetanus toxoid–containing vaccination does not increase risk for adverse events after Tdap vaccination in pregnancy (195).

## Additional Safety Data

### Neurologic and Systemic Events Associated with Vaccines with Pertussis Components

Concerns about the possible role of vaccines with pertussis components in causing neurologic reactions or exacerbating underlying neurologic conditions are long-standing (12,131). Although the occurrence of neurologic sequelae after receipt of vaccines with pertussis components is rare, the evidence for a causal association between acellular pertussis–containing vaccines and neurologic outcomes is inconclusive (133). Concerns about vaccinating adolescents with progressive or uncontrolled underlying neurologic disease must be weighed against the potential morbidity of pertussis; adolescents with severe neurologic conditions might be at risk for severe pertussis (CDC, unpublished data, 2005) (39). ACIP does not consider a history of well-controlled seizures in the vaccinee or a family history of seizures (febrile or afebrile) or other neurologic disorder to be a contraindication or precaution to vaccination with pertussis components (Table 3) (3).

ACIP recommends that the risks for and benefits of administering subsequent doses of vaccines with pertussis components be evaluated for young children who, after receiving pediatric DTP/DTaP, experienced any of the events listed in the table as contraindications and precautions for DTaP, DT, Td, and Tdap vaccines (Table 2); all of these events were documented more frequently following whole-cell pertussis vaccines than following acellular vaccines (3,110,111,136,137). For adolescents and adults, these events (e.g., febrile seizures and HHE) either do not occur or are of less clinical concern than such events in infants and children. Taken together, this information supports administering Tdap to adolescents with a history of the events listed under pediatric DTaP/DTP (Table 2).

ACIP recommends that adolescents with unstabilized progressive neurologic conditions not be vaccinated with Tdap until the condition stabilizes. However, progressive neurologic disorders that are chronic and stable (e.g., dementia) are more common among adults, and the possibility that Tdap would complicate subsequent neurologic evaluation is of less clinical concern. As a result, chronic progressive neurologic conditions that are stable in adults do not constitute a reason to delay Tdap; this is in contrast to unstable or evolving neurologic conditions (e.g., cerebrovascular events and acute encephalopathic conditions) (5).

### Arthus Reactions

Arthus reactions (type III hypersensitivity reactions) are rarely reported after vaccination, but can occur after tetanus toxoid- or diphtheria toxoid–containing vaccines (CDC, unpublished data, 2005) (54,132,210–214). An Arthus reaction is a local vasculitis associated with deposition of immune complexes and activation of complement. Immune complexes form in the setting of a high local concentration of vaccine antigens and high concentration of circulating antibody (210,211,213,215). Arthus reactions are characterized by severe pain, swelling, induration, edema, hemorrhage, and occasionally necrosis. These symptoms and signs usually occur 4–12 hours after vaccination; by contrast, anaphylaxis (an immediate type I hypersensitivity reaction) usually occurs within minutes of vaccination. As with extensive limb swelling, Arthus reactions usually resolve without sequelae. ACIP recommends that persons who have experienced an Arthus reaction following a dose of tetanus toxoid or diphtheria toxoid–containing vaccine should not receive a tetanus toxoid–containing vaccine more frequently than every 10 years, even for tetanus prophylaxis as part of wound management (54).

### Tetanus Toxoid Safety

Tetanus toxoid is one of the most extensively used vaccines globally, either as a monocomponent vaccine (TT) or combined with diphtheria toxoid (DT and Td) and pertussis antigens (DTP, DTaP, and Tdap). Historically, mild local reactions (i.e., redness, pain and tenderness, and mild swelling) after receipt of TT vaccine are common (0–95%). Systemic reactions (i.e., fever, malaise, headache, and lymphadenopathy) are less common but might occur, particularly after receipt of a booster dose of vaccine. Severe reactions, including neurologic (e.g., peripheral neuropathy, particularly brachial plexus neuropathy, Guillain-Barré syndrome, seizures, and acute encephalopathy) and hypersensitivity reactions (anaphylaxis) are exceedingly rare (45,216).

An evaluation by IOM concluded that evidence from case reports and uncontrolled studies involving tetanus toxoid–containing vaccines favored a causal relation between tetanus toxoid–containing vaccines and brachial neuritis (133). Although brachial neuritis is considered to be a compensable event through the National Vaccine Injury Compensation Program (VICP), ACIP considers that occurrence of brachial neuritis following vaccination with a tetanus toxoid–containing

Appx18537

vaccine does not preclude their future use in the same person; brachial neuritis is usually self-limited (52,132,138).

As with the recent conclusions regarding acellular pertussis–containing vaccines, IOM also concluded that the evidence was inadequate to accept or reject a causal relation between receipt of diphtheria toxoid- and tetanus toxoid–containing vaccine and encephalitis, encephalopathy, infantile spasms, seizures, ataxia, autism, acute disseminated encephalomyelitis, transverse myelitis, optic neuritis, onset of multiple sclerosis in adults, relapse of multiple sclerosis in adults, relapse of multiple sclerosis in children, Guillain-Barré syndrome, chronic inflammatory disseminated polyneuropathy, opsoclonus myoclonus syndrome, or Bell's palsy (133). ACIP considers Guillain-Barré syndrome occurring <6 weeks after receipt of a tetanus toxoid–containing vaccine a precaution for subsequent administration of tetanus toxoid–containing vaccines (52). Active surveillance data covering two million doses of Tdap administered to both adolescent and adult populations failed to demonstrate an association between receipt of a tetanus toxoid–containing vaccine and onset of Guillain-Barré syndrome within six weeks following vaccination (164,165,217).

### Pregnant Women

Tetanus toxoid–containing vaccines are safe in pregnant women. No evidence exists to indicate that tetanus and diphtheria toxoids administered during pregnancy are teratogenic (54). Field trials of tetanus toxoid in pregnant women have shown high efficacy (80%–100%) in preventing maternal and neonatal tetanus (50,218–222).

### Arthritis

Although the causal relation between vaccination with tetanus toxoid and arthritis is biologically plausible, the evidence of a possible association between receipt of tetanus vaccine and arthritis is limited (132). In 1994, on the basis of case reports, case series and uncontrolled observational studies, IOM concluded that the evidence was insufficient to demonstrate a causal link between receipt of tetanus toxoid and arthritis (132). In a second review of the evidence, IOM reached a similar conclusion on the basis of several case reports and two case-control studies (133). The first case-control study found an increased risk for psoriatic arthritis after tetanus toxoid vaccination (odds ratio [OR]: 1.91; 95% CI = 1.0%–3.7%) (223). In the second study, the investigators concluded that tetanus toxoid or diphtheria vaccination did not increase the risk for rheumatoid arthritis (224). Both studies had serious limitations and low precision (133).

A more recent study in a large health maintenance organization assessed the risk for rheumatoid arthritis after tetanus, influenza, and hepatitis B vaccination, using a cohort and case-control design to determine risk at different intervals postvaccination (225). This study did not identify a significantly increased risk for rheumatoid arthritis associated with tetanus vaccine for any interval assessed (225).

### Diphtheria Toxoid Safety

Reactogenicity with vaccines containing diphtheria toxoid is common. All available pertussis-containing vaccines include diphtheria toxoid, and different forms of diphtheria toxoid are used as carrier proteins in certain conjugate vaccines (MenACWY-D [Menactra, Sanofi Pasteur], MenACWY-CRM [Menveo, GlaxoSmithKline, Rixensart, Belgium], 13-valent pneumococcal polysaccharide-protein conjugate vaccine [PCV13, Prevnar13, Wyeth Pharmaceuticals Inc., Collegeville, Pennsylvania, a subsidiary of Pfizer Inc., New York, New York]). The frequency of reported adverse events from diphtheria toxoid–containing vaccines varies by vaccine formulation, dose of diphtheria toxoid, prior vaccination history, and prevaccination antidiphtheria toxoid antibody levels. Although local injection-site reactions are common, only a small proportion of these are clinically significant (226). Administration of diphtheria toxoid has not been associated with anaphylaxis.

Because diphtheria toxoid is not administered as a monovalent diphtheria toxoid vaccine, it is difficult to characterize reactogenicity to diphtheria toxoid alone. However, in a study of 180 persons comparing the reactogenicity of DTaP (diphtheria toxoid ≥10 IU) with that of Td (diphtheria toxoid ≥2 IU) and of monovalent diphtheria toxoid (diphtheria toxoid ≥2 IU), the proportion of vaccinees with local reactions (e.g., erythema, induration, warmth, and tenderness) was generally lower among recipients of the monovalent diphtheria toxoid than was observed in the other two groups (227). There was no consistent pattern of increased reactogenicity among recipients of DTaP compared with Td (227). In addition, data from several controlled studies suggest that fever and local reactions are more common after administration of Td than after TT vaccine (190,228,229). In general, the frequencies of reported common systemic signs and symptoms in infants (i.e., temperature of ≥38° C [≥100.4° F], crying for ≥1 hour, irritability, drowsiness, loss of appetite, and vomiting) and local reactions (i.e., redness, swelling, and tenderness) after vaccination with DT or DTaP were comparable (230).

### Pregnant Women

Diphtheria toxoid–containing vaccines are safe in pregnant women. No evidence exists to indicate that tetanus and diphtheria toxoids administered during pregnancy are teratogenic (54). Randomized trials of diphtheria toxoid conducted among pregnant women in the 1940s demonstrated efficient

Appx18538

transplacental transfer of maternal antidiphtheria antibodies and protection of infants against diphtheria (*231–234*).

## Simultaneous Administration of Tdap with Other Vaccines

Pre- and postlicensure studies in adolescents and adults have evaluated and support the safety and immunogenicity of Tdap when administered simultaneously or sequentially with one or two other vaccines (e.g., MenACWY, HepB, and human papillomavirus [HPV] and trivalent inactivated influenza vaccines) (*141,167,235–242*). In most of these studies, no differences were observed in the safety profiles when Tdap was administered simultaneously or sequentially with another vaccine. However, the rates of erythema and swelling at the Tdap injection site were higher when it was co-administered with HepB vaccine (*141*). Swollen or sore joints were reported in both the simultaneous (22.5%) and sequential (17.9%) vaccination groups, with most joint complaints being mild in intensity and lasting a mean duration of 1.8 days (*141*).

Tdap was immunogenic when administered simultaneously with other vaccines. The proportions of subjects achieving protective levels of antibodies against diphtheria and tetanus were similar in the simultaneously vaccinated group compared with those vaccinated sequentially (*235–242*). Immune responses to pertussis antigens were similar when Tdap was administered simultaneously or sequentially with MenACWY-D, HPV (bivalent or quadrivalent) or HepB vaccines, although the immune responses to pertussis antigens with MenACWY-CRM (Menveo, Novartis) and trivalent inactivated influenza vaccines were lower after simultaneous administration (*141,235–241*). When Tdap was administered simultaneously with MenACWY-CRM (Menveo, Novartis), the immune responses to two of the three pertussis antigens were lower, but the clinical relevance of this finding, if any, is not clear (*237*). When Tdap and trivalent inactivated influenza vaccines were administered to adults aged 19–64 years, the immune responses to the pertussis antigens were lower but noninferior in the simultaneously vaccinated group compared with the immue responses to the pertussis antigens in those vaccinated sequentially, with the exception of Adacel's PRN and Boostrix's FHA and PRN (*235,236*). The clinical significance, if any, of not meeting noninferiority criteria for these antigens is unclear (*235*). For adults aged ≥65 years, compared with separate administration of Boostrix and a trivalent inactivated influenza vaccine, simultaneous administration of these two vaccines also was safe and immunogenic (*242*).

## Cost-Effectiveness Analyses

As part of the consideration of recommendations for use of Tdap in specific populations, cost-effectiveness analyses were conducted for specific vaccination strategies and target populations. These were considered for adults aged ≥65 years and women during pregnancy.

### Vaccinating Adults Aged ≥65 Years

Two cost-effectiveness analyses of the epidemiologic and economic impact of substituting a single dose of Tdap for one decennial Td booster in healthy persons aged ≥65 years were reviewed by ACIP (CDC, unpublished data, 2012) (*243*). Both models were developed to assess the epidemiologic and economic impact of Tdap vaccination in adults aged ≥65 years, and both demonstrated that a dose of Tdap administered to older adults resulted in a modest decrease in the number of cases of pertussis and other outcomes (e.g., outpatient visits, hospitalizations, and deaths) (CDC, unpublished data, 2012) (*243*). From the two models with similar incidence (100–104 cases per 100,000 population), the cost per quality adjusted life-year saved ranged from $30,946 to $62,716 and the cost per case averted ranged from $1,966 to $3,263 (CDC, unpublished data, 2012) (*243*). Model results were most sensitive to the incidence of pertussis; however, sensitivity analyses showed that, even assuming a range of estimates of pertussis underreporting, Tdap vaccination compared with no Tdap vaccination might be cost-effective in this population. Reassured by the concordance between the two cost-effectiveness models, ACIP's conclusion was that the cost per case averted and the cost per quality-adjusted life-year saved were modest (*10*).

### Maternal Tdap Vaccination and Cocooning

A decision and cost-effectiveness model was developed to assess the likely impact and cost-effectiveness of Tdap vaccination administered during pregnancy versus postpartum with or without cocooning. The model showed that Tdap vaccination during pregnancy could reduce annual infant pertussis incidence more than postpartum vaccination, reducing cases by 33% versus 20%, hospitalizations by 38% versus 19%, and deaths by 49% versus 16%. The cost per quality adjusted life-year saved for pregnancy vaccination was $414,523 compared with postpartum vaccination, which was $1,172,825. The two primary drivers of the reduction in infant pertussis were earlier indirect protection from the mother by vaccinating before the infant's birth and the provision of passive immunity to the infant through transplacental transfer of maternal antibodies. Sensitivity analyses under robust conditions, including reduced Tdap vaccine effectiveness, did not alter the relative benefits of vaccination during pregnancy (*244*).

Appx18539

# Strategy for Pertussis, Tetanus, and Diphtheria Control

## Routine DTaP, Tdap, and Td Vaccination

In the United States, reported tetanus and diphtheria cases are rare. Although vaccine coverage is high among infants, children, and adolescents, serologic and survey data indicate that adults are undervaccinated against tetanus and diphtheria and that coverage declines with increasing age (*36,51*). Maintaining seroprotection against tetanus and diphtheria through adherence to the ACIP-recommended schedule of booster doses of vaccine is important for adults of all ages.

In contrast to tetanus and diphtheria, the incidence of reported pertussis in the United States has been increasing despite high infant and childhood coverage with DTaP vaccines and increasing Tdap coverage among adolescents (*245*). Although vaccine-induced protection provided by acellular pertussis vaccines wanes over time, vaccination remains the best protection available against pertussis. ACIP recognizes that not all cases of pertussis can be prevented. However, sustaining vaccine coverage in young children (DTaP) and adolescents (Tdap) with the available licensed vaccines and achieving high Tdap coverage among adults, especially pregnant women, presents the best available means of preventing pertussis.

### Preventing Pertussis in Young Infants Through Maternal Tdap Vaccination

Because young infants continue to be at greatest risk for hospitalization and death due to pertussis, ACIP has made efforts to optimize the vaccination program strategies for preventing pertussis in those too young to be vaccinated. Very young infants are dependent in part on passively acquired maternal antibodies, which are thought to protect infants from infection and to modify the severity of diverse infectious diseases in infants for varying periods of time (*246,247*). Before the ACIP recommendation to vaccinate pregnant women, several studies provided evidence supporting the existence of efficient transplacental transfer of pertussis antibodies (*181,248,249*). These studies indicated that newborn infants whose mothers received Tdap before or during pregnancy had higher concentrations of pertussis antibodies at birth compared with those of unvaccinated mothers (*181,248,249*).

The strategy of preventing pertussis in newborns through the vaccination of women with Tdap during pregnancy from 27 through 36 weeks' gestation is 80%–91% effective (CDC, unpublished data, 2016) (*250–253*). One study found that, among infants infected with pertussis, those born to mothers vaccinated with Tdap during pregnancy had less severe pertussis than those born to unvaccinated mothers; maternal vaccination

was 58% effective in preventing hospitalization among infants infected with pertussis (*254*).

### Vaccinating From 27 Through 36 Weeks' Gestation

Tdap may be administered any time during pregnancy, but vaccination during the third trimester likely provides the highest concentration of maternal antibodies to be transferred closer to birth (*247*). Substantial active transport of maternal immunoglobulin G does not take place before 30 weeks of gestation (*255*). After receipt of Tdap, a minimum of 2 weeks is required to mount a maximal immune response to the vaccine antigens (*256,257*). One study noted that, after receipt of Tdap, maternal antibodies waned quickly; pregnant women who received Tdap during the first or second trimester had low levels of antibodies at term, suggesting that Tdap might need to be administered later in pregnancy to have high levels of antibodies for transfer to infants (*247*). Therefore, to optimize the concentration of vaccine-induced antipertussis antibodies transported from mother to infant, ACIP concluded in 2012 that pregnant women should be vaccinated with Tdap during the third trimester, preferably from 27 through 36 weeks' gestation (*6*).

New data available since 2012 suggest that vaccinating earlier in the 27 through 36-week time period will maximize passive antibody transfer to the infant (C. Mary Healy, Baylor College of Medicine, unpublished data, 2016) (*258–260*); however, it is unclear how this translates to effectiveness in preventing infant pertussis. Three studies have shown that, among infants whose mothers received Tdap during the 27 through 36 weeks' gestational time period, antipertussis antibody concentrations were significantly higher in cord blood of infants whose mothers received Tdap "earlier" (e.g., 27 through 32 weeks' gestation) compared with those who received Tdap "later" (e.g., after 32 weeks' gestation) (C. Mary Healy, Baylor College of Medicine, unpublished data, 2016) (*259,260*). A fourth study indicated that those who received Tdap as early as 22 through 26 weeks' gestation developed similar levels of antibody to those vaccinated 27 through 36 weeks' gestation (*258*). These studies support the observation that vaccinating earlier within the 27 through 36 week period, or even slightly before 27 weeks, might optimize the production and transfer of maternal antibodies to infants.

Assuring a sufficient amount of time between a pregnant woman's receipt of Tdap and her infant's birth to allow for the maximum production and transfer of maternal antibodies is important and might be achieved by vaccinating at a gestational age earlier than the current guidance of 27 through 36 weeks. However, ACIP is cautious not to equate higher newborn maternal antibody concentrations, which might be achieved through earlier maternal Tdap vaccination, with similar or better effectiveness at preventing pertussis during infancy.

Appx18540

Furthermore, it is unclear whether maternal vaccination earlier in pregnancy would result in the development and transfer of maternal antibodies at concentrations that would persist at protective levels until the infant's first DTaP dose. Lacking effectiveness data on vaccination before 27 weeks' gestation, ACIP concluded that vaccinating earlier in the 27 through 36 week period will maximize passive antibody transfer to the infant (261).

### Vaccinating During Each Pregnancy

Studies of the persistence of antipertussis antibodies following a dose of Tdap show substantial decay in antibody levels after one year in healthy, nonpregnant adults (186,262,263); antibody kinetics in pregnant women are likely to be similar. With regard to maternal antipertussis antibody concentrations in infants born to women who received Tdap within the preceding 2 years, results from one study indicated that antipertussis antibody concentrations waned quickly in pregnant women vaccinated before pregnancy and were unlikely to be high enough to provide passive protection to infants (247). Because antibody levels wane substantially during the first year following vaccination, ACIP concluded that a single dose of Tdap during a pregnancy would be insufficient to provide protection for subsequent pregnancies (6).

### Interference with Infant Immune Response to Primary Vaccination

The presence of maternally derived transplacental antipertussis antibodies might interfere with an infant's response to subsequent active vaccination with recommended DTaP vaccines potentially putting an infant at risk for disease later in infancy. In the United Kingdom, infants born to mothers who received Tdap-IPV during pregnancy had lower PT, FHA, and FIM antibodies when measured 3–6 weeks after the third dose of a 2-3-4 month schedule, compared with infants born to unvaccinated mothers (264). Antibodies to diphtheria also were lower, as were antibodies to some CRM-conjugated pneumococcal antigens when vaccinated with PCV13 on a 2–4-month schedule. In contrast, antitetanus antibody and anti-Hib antibody responses were enhanced. In the United States and Canada, pertussis antibody levels were modestly diminished (7.2%–48.3%) following the third dose of a 2-4-6 month DTaP schedule in infants whose mothers received Tdap during pregnancy, compared with infants whose mothers were not vaccinated during pregnancy; however, after the fourth dose of DTaP, pertussis antibody levels were comparable in the two groups of infants (S. A. Halperin, Dalhousie University, unpublished data, 2011) (192,249). Because correlates of protection are not well defined for pertussis, the clinical importance of lower infant immune responses following

receipt of DTaP is unclear. However, any interference with infant immune responses is likely to be short-lived because circulating maternal antibodies decline rapidly (265). Although it is not known what level of maternal antibody is protective against infant pertussis, ACIP concluded that the potential benefit of protection from maternal antibodies in newborn infants outweighs the potential risk for shifting pertussis disease burden to later in infancy and emphasized the importance of timely receipt of the fourth DTaP dose (9).

### "Cocooning"

ACIP recommends Tdap vaccination for women during pregnancy to prevent infant pertussis. Before this recommendation was developed to vaccinate pregnant women with Tdap, the primary strategy to prevent infant pertussis was Tdap vaccination of close contacts of infants, on the assumption that vaccination with Tdap would reduce the risk for pertussis exposure and transmission to infants, a strategy referred to as "cocooning" (5).

Cocooning programs had limited success and have been confronted with substantial logistical and financial challenges to implementation and program sustainability (43,266–268). Programs achieved moderate Tdap coverage among postpartum mothers, but had less success vaccinating other family members (268,269). The evidence on the effectiveness and impact of cocooning in preventing transmission of pertussis to infants is inconclusive (153,154,270). Recent epidemiologic and animal model evidence suggests that Tdap vaccination does not prevent transmission and therefore does not afford indirect protection of close contacts against pertussis (155,156,159). However, persons who are up to date with pertussis vaccines and who become infected generally have a milder infection compared with those who have not been vaccinated, which might make them less efficient in transmitting pertussis to others (160).

When recommendations for Tdap vaccination were made in 2005, mothers were identified as the primary source of pertussis in infants (271,272). This appears to have shifted, with siblings now identified as the primary source of pertussis infection for infants (40,42,43). This shift in the source of infant pertussis, along with recent evidence suggesting that Tdap vaccination does not prevent transmission of *B. pertussis*, underscores the importance of providing newborns with maternal antipertussis antibodies through Tdap vaccination of women during pregnancy (155,156,159). A single dose of Tdap is recommended for all persons aged ≥11 years who have not previously received a dose; having a pregnancy in a household presents an opportunity to review the Tdap vaccination status of close contacts to ensure that they are up to date.

Appx18541

## Preventing Pertussis in Health Care Personnel

Health care personnel in the United States are not known to have higher risk for diphtheria or tetanus compared with the general population. However, for pertussis, occupational exposures occur in health care settings, and nosocomial spread of pertussis in various health care settings has been documented (*273–288*). In these settings, the index case might occur in a health care provider, patient, or hospital visitor (*273–288*). Although the frequency and intensity of patient exposure might lead to infection of health care personnel with subsequent transmission to other patients, the risk for and burden of pertussis in health care personnel are difficult to quantify. The few population-based estimates of the risk for pertussis among health care personnel in the United States suggest the risk for pertussis among health care personnel is comparable to the risk among the general population of adolescents and adults (*289–291*).

Since 2005, ACIP has recommended that health care personnel receive a single dose of Tdap to protect them against pertussis and possibly reduce transmission to patients, co-workers, household members, and persons in the community. Hospital-based Tdap coverage rates among health care personnel might depend on the type of Tdap vaccination program an institution employs; reported coverage ranges from 30% (campaign) to 100% (hospital mandate) (*292,293*). Nationally, Tdap coverage among health care personnel is 42.1% (*36*).

Previous models assessing the likely benefits and costs of vaccinating health care personnel with Tdap to prevent nosocomial pertussis outbreaks indicated that vaccination of health care personnel substantially reduced the risk for hospital-based outbreaks and was cost-saving (*294,295*). However, model inputs included estimates of Tdap vaccine efficacy against pertussis higher than current estimates, and assumed vaccination would decrease pertussis transmission and thereby prevent secondary cases. Current data do not support the assumption that Tdap vaccination would prevent transmission.

## Management of Health Care Personnel Exposed to Pertussis

Depending on the approach used, management of pertussis exposures in health care settings can be complicated, time-consuming, and costly. Exposed health care personnel with cough illness must be evaluated and might require diagnostic testing, administration of prophylactic antimicrobial agents, and possible exclusion from work. Several studies have shown that the costs of investigating pertussis outbreaks in the health care setting and implementing control measures are substantial. The cost of managing pertussis exposures in the health care setting over a 12-month period ranged from $84,000 to

$98,000 (*284,294*). The associated costs of dealing with hospital-based pertussis outbreaks ranged from $74,000 to $263,000 (*285,288*). Since the promulgation of the 2005 Tdap recommendations for health care personnel, only one study has tried to determine whether it is necessary to give Tdap-vaccinated health care personnel postexposure antimicrobial prophylaxis, but the results were inconclusive due to the low risk for disease during the study period (*296*).

## Guidance on Postexposure Prophylaxis for Health Care Personnel

Tdap vaccination status does not change the approach to evaluating postexposure prophylaxis when health care personnel are exposed to pertussis. Postexposure prophylaxis is recommended for health care personnel in contact with persons at risk for severe disease (e.g., hospitalized neonates, newborn infants, and patients with chronic respiratory conditions). Other health care personnel can either receive postexposure prophylaxis or be carefully monitored for 21 days after pertussis exposure. Health care personnel should be treated with antibiotics at the onset of signs and symptoms of pertussis, and excluded from work for the first 5 days while receiving appropriate antibiotics. Recommended antimicrobial agents for postexposure prophylaxis among health care personnel exposed to pertussis include azithromycin, clarithromycin, erythromycin, and trimethoprim-sulfamethoxazole (TMP-SMX). Guidance on postexposure prophylaxis of pertussis is available at https://www.cdc.gov/mmwr/PDF/rr/rr5414.pdf.

## No Additional Doses of Tdap for the General Population

With the exception of pregnant women, only a single booster dose of Tdap is recommended for persons aged ≥11 years. Both available Tdap products are approved for use as a single booster dose (*141,142*). Tdap provides protection against tetanus, diphtheria, and pertussis, but protection from pertussis infection begins to decline within 2 to 4 years after receipt of Tdap (*29,149,150*).

Clinical trials support that a second dose of Tdap is safe and immunogenic at a 5- or 10-year interval (*184–188*). Immunogenicity studies show that diphtheria and tetanus antibody levels persisted for five to 10 years after receipt of Tdap (*186,188,262,263,297–301*). However, antipertussis antibodies decline rapidly after the first year, suggesting that protection wanes, which would likely limit the impact of a second dose of Tdap on the overall burden of pertussis in the United States (*186,188,262,263,297–301*). Antibody decay and, therefore, clinical protection following additional doses

of Tdap are likely similar to what is observed following the first dose of Tdap.

ACIP recognizes the increasing burden of pertussis in the United States and the need for an effective strategy to reduce this burden. A decision analysis model evaluating the epidemiologic and economic impact of a routine program of additional doses of Tdap administered at either a 5- or 10-year interval to persons who received their first Tdap at age 11 years suggested that the reduction in pertussis disease burden attributable to the routine use of a second dose of Tdap would be limited (*302*). In the model, the proportion of cases preventable compared with the recommendation, ranged from 3% to 5% (*302*). ACIP concluded that the data do not support a general recommendation for a routine second dose of Tdap, and that the public health impact of routinely recommending a second dose of Tdap would be limited (*303*).

## Rationale for Recommendations for Use of Pertussis, Tetanus, and Diphtheria Vaccines

Before the availability of vaccines, pertussis, tetanus, and diphtheria were common diseases and caused severe morbidity and mortality. As a result of the routine DTP/DTaP childhood vaccination program and decennial booster doses of tetanus-toxoid containing vaccines for adolescents and adults, the number of cases of all three diseases has declined markedly; cases of tetanus and diphtheria are rare in the United States. For pertussis, the number of reported cases declined dramatically following introduction of universal childhood pertussis vaccination (*3*). However, even with sustained high vaccine coverage, the incidence of reported pertussis began increasing in the 1980s.

In 1997, ACIP recommended that DTaP replace all DTP doses; since then, no changes have been made to these childhood vaccine recommendations (*3*). In 2005, to address the increase in the incidence of pertussis among adolescents and adults, ACIP recommended a single dose of Tdap for persons aged 11–64 years as a booster immunization against tetanus, diphtheria, and pertussis, with the intention to provide routine vaccination at ages 11–12 years (*4,5*). Additionally, special populations, including health care personnel and close contacts of infants, were recommended to receive a dose of Tdap.

Since the promulgation of the ACIP Tdap recommendations in 2005, several studies have identified barriers to and programmatic gaps in the implementation of the recommendations for adolescents and adults. Barriers to implementation included confusion around guidance language concerning the timing of administration of Tdap after the last tetanus toxoid–containing vaccine dose and obstacles to vaccinating health care personnel. Programmatic gaps at the time of the 2005 recommendations included lack of a Tdap vaccine licensed for children aged 7–10 years and for adults aged ≥65 years. In 2011 and 2012, ACIP recommended a dose of Tdap for these age groups and clarified the language concerning the timing of Tdap vaccination and the vaccination of health care personnel (*8,10,304*).

Compared with older children and adults, infants aged <12 months have substantially higher rates of pertussis (Figure 2) and the largest burden of pertussis-related deaths. The majority of pertussis-related hospitalizations and deaths occur in infants aged ≤2 months who are too young to be vaccinated. The desire to protect the youngest infants from pertussis morbidity and mortality prompted ACIP in 2011 to recommend a dose of Tdap be administered to women during pregnancy, but only for pregnant women who had never received Tdap (*9*). Because antibody levels wane substantially after vaccination, ACIP concluded that a single dose of Tdap during one pregnancy would not provide protection for infants who were the product of subsequent pregnancies. In 2012, the recommendation was revised; ACIP recommends the use of Tdap during each pregnancy (*6*).

## Recommendations for Vaccination for Pertussis, Tetanus, and Diphtheria

All persons are recommended to receive routine pertussis, tetanus, and diphtheria vaccination. Vaccine type, product, number of doses and booster dose recommendations are based on age and pregnancy status (Tables 4 and 5). Recommendations for off-label use of Tdap vaccines were made after thorough review of available data on the risks for and benefits of Tdap vaccination, and include the following persons: pregnant women, children aged 7–10 years, and persons aged ≥65 years (for one Tdap product) (*6,8–10*). At the time these recommendations were made, ACIP determined that although data were limited, the benefits of off-label Tdap vaccination in preventing pertussis and decreasing pertussis-related morbidity and mortality outweigh the risks of an adverse event.

### General Recommendations

**Persons Aged 2 Months–6 Years**

The routine pertussis, tetanus, and diphtheria vaccination schedule for persons aged 2 months–6 years is comprised of five doses of vaccine containing diphtheria and tetanus toxoids, and pertussis antigens (DTaP), administered at ages 2, 4, 6, 15–18 months and 4–6 years.

Recommendations and Reports

- Three (primary) doses should be administered at ages 2, 4, and 6 months.
- The fourth (first booster) dose should be administered to children aged 15–18 months to maintain adequate immunity during preschool years.
- The fifth (second booster) dose should be administered to children aged 4–6 years to confer continued protection against disease during the early years of schooling.

**Guidance for Use**

The first DTaP dose can be administered as early as age 6 weeks.

The fourth DTaP dose should be administered at least 6 months after the third DTaP dose and should not be administered to a child aged <12 months.

A fifth DTaP dose is not necessary if the fourth DTaP dose in the series is administered at age ≥4 years.

## Persons Aged 11–18 Years

Persons aged 11–18 years should receive a single dose of Tdap, preferably at a preventive care visit at ages 11–12 years. To ensure continued protection against tetanus and diphtheria, booster doses of Td should be administered every 10 years throughout life.

## Persons Aged ≥19 Years

Persons aged ≥19 years who previously have not received a dose of Tdap should receive a single dose of Tdap in place of a decennial Td booster dose. The dose of Tdap, when indicated, should not be delayed and should be administered regardless of interval since the last tetanus or diphtheria toxoid–containing vaccine. To ensure continued protection against tetanus and diphtheria, booster doses of Td should be administered every 10 years throughout life.

## Pregnant Women

ACIP recommends that providers of prenatal care implement a Tdap immunization program for all pregnant women. Health care personnel should administer a dose of Tdap during each pregnancy, irrespective of the patient's prior history of receiving the vaccine.

**Guidance for Use**

Tdap should be administered between 27 and 36 weeks' gestation, although it may be administered at any time during pregnancy. Available data suggest that vaccinating earlier in the 27–36 week time period will maximize passive antibody transfer to the infant.

Tdap may be simultaneously administered with an inactivated influenza vaccine to pregnant women.

If a woman did not receive Tdap during her current pregnancy and did not receive a prior dose of Tdap ever (i.e.,

during adolescence, adulthood, or a previous pregnancy), then Tdap should be administered immediately postpartum. If a woman did not receive Tdap during her current pregnancy but did receive a prior dose of Tdap, then she should not receive a dose of Tdap postpartum.

## Vaccination of Special Populations

### Persons Aged 2 Months–6 Years

**Contraindications to pertussis vaccination**. For children aged <7 years with a contraindication to pertussis vaccination (Table 2), DT should be used instead of DTaP to complete an age appropriate series. Previously unvaccinated children who receive their first DT dose at age <12 months should receive a total of 4 doses of DT, the first 3 doses at 4- to 8-week intervals and the fourth dose 6 to 12 months later (similar to the recommended DTaP schedule).

Unvaccinated children aged ≥12 months for whom pertussis vaccine is contraindicated should receive 2 doses of DT 4 to 8 weeks apart, followed by a third dose 6 to 12 months later to complete the primary series. Children who have already received 1 or 2 doses of DT or DTaP after their first birthday and for whom further pertussis vaccine is contraindicated should receive a total of 3 doses of a preparation containing diphtheria and tetanus toxoids appropriate for age, with the third dose administered 6 to 12 months after the second dose.

Children aged 4–6 years who complete a primary series of DT before their fourth birthday should receive a fifth dose of DT by the time of school entry to confer continued protection against disease.

**Personal history of seizures.** Among infants and children with a history of previous seizures, it is prudent to delay pertussis vaccination until the child's neurologic status has been assessed. Infants and children with a stable neurologic condition, including well-controlled seizures, may be vaccinated with DTaP. Infants with evolving neurologic conditions should not be vaccinated until a treatment regimen has been established and the condition has stabilized. A family history of seizures is not a contraindication to pertussis vaccination.

### Persons Aged ≥11 Years

**Close contacts of infants.** Persons aged ≥11 years who have or anticipate having close contact with an infant aged ≤12 months (e.g., parents, siblings, grandparents, child care providers, and health care providers) and who have never received Tdap should receive a dose of Tdap. Ideally, these persons should receive Tdap at least 2 weeks prior to contact with the infant to allow for an immune response to pertussis vaccine antigens.

US Department of Health and Human Services/Centers for Disease Control and Prevention

Appx18544

**Health care personnel.** All health care personnel should receive a single dose of Tdap as soon as feasible if they have not previously received Tdap. After receipt of 1 dose of Tdap, health care personnel should receive routine Td booster immunizations according to the recommended schedule.

In-patient and out-patient care facilities should consider approaches that maximize vaccination rates of health care personnel (e.g., education about the benefits of vaccination, convenient access, provision of Tdap at no charge).

## Persons with Incomplete or Unknown Vaccine History

### Persons Aged 2 Months–6 Years

For persons aged <7 years not fully immunized with DTaP vaccine, the catch-up schedule and minimum intervals between doses are available at https://www.cdc.gov/vaccines/schedules/hcp/child-adolescent.html. The vaccine series does not need to be restarted regardless of the time that has elapsed between doses for those with incomplete DTaP vaccine history.

Because of concern about adverse reactions, the total number of doses of vaccines containing diphtheria and tetanus toxoids (e.g., DTaP, DT, and DTP) received should not exceed 6 doses before the seventh birthday. Only documented doses count toward the maximum of 6 doses.

### Persons Aged 7–18 Years

Persons aged 7–18 years not fully immunized with DTaP vaccine should receive a single dose of Tdap as one (preferably the first) dose of the catch-up series; if additional doses are needed, use Td vaccine. The vaccine series does not need to be restarted, regardless of the time that has elapsed between doses for those with incomplete DTaP vaccine history. The catch-up schedule and minimum intervals between doses are available at https://www.cdc.gov/vaccines/schedules/hcp/child-adolescent.html.

For persons aged 7–10 years who receive a dose of Tdap as part of the catch-up series, an adolescent Tdap vaccine dose should be administered at age 11–12 years.

### Persons Aged >18 Years

Persons aged >18 years who have never been vaccinated against pertussis, tetanus, or diphtheria should receive a series of three vaccinations containing tetanus and diphtheria toxoids, which includes 1 dose of Tdap. The preferred schedule is a single dose of Tdap, followed by a dose of Td at least 4 weeks after Tdap and another dose of Td 6 to 12 months later. However, the single dose of Tdap can substitute for any of the Td doses in the 3-dose primary series.

Persons aged >18 years who are not fully immunized against tetanus and diphtheria should receive 1 dose of Tdap (preferably the first) in the catch-up series; if additional tetanus toxoid–containing doses are needed, use Td vaccine. Alternatively, in situations in which a person aged >18 years probably received vaccination against tetanus and diphtheria but cannot produce documentation, vaccine providers may consider serologic testing for antibodies to tetanus and diphtheria toxin to avoid unnecessary vaccination. If tetanus and diphtheria antitoxin levels are each >0.01 IU/mL, previous vaccination with tetanus and diphtheria toxoid vaccine is presumed, and a single dose of Tdap is indicated.

## Prevention of Obstetric and Neonatal Tetanus

Pregnant women who have completed the childhood immunization schedule and were last vaccinated more than ten years previously should receive a booster dose of tetanus toxoid–containing vaccine to prevent neonatal tetanus. The risk of neonatal tetanus is minimal if a previously unimmunized woman has received at least 2 properly spaced doses of tetanus toxoid–containing vaccine during pregnancy; one of the doses administered during pregnancy should be Tdap, administered according to the current guidance. She should complete the 3-dose primary series at the recommended intervals.

## Tetanus Prophylaxis for Wound Management

ACIP has recommended administering tetanus toxoid–containing vaccine and tetanus immune globulin (TIG) when indicated as part of standard wound management to prevent tetanus (Table 6). A tetanus toxoid–containing vaccine is indicated as part of wound management if more than five years has passed since the last tetanus toxoid–containing vaccine dose. If a tetanus toxoid–containing vaccine is indicated for persons aged ≥11 years, Tdap is preferred for persons who have not previously received Tdap or whose Tdap history is unknown. If a tetanus toxoid–containing vaccine is indicated for a pregnant woman, Tdap should be used. For nonpregnant persons with documentation of previous vaccination with Tdap, Td should be used if a tetanus toxoid–containing vaccine is indicated. If a tetanus toxoid–containing vaccine is indicated and Td is unavailable, Tdap may be administered.

Persons who have completed the 3-dose primary tetanus vaccination series and have received a tetanus toxoid–containing vaccine <5 years earlier are protected against tetanus and do not require a tetanus toxoid–containing vaccine or TIG as part of wound management. An attempt should be made to determine

Appx18545

TABLE 6. Guide to tetanus prophylaxis in routine wound management

| No. doses of adsorbed tetanus toxoid–containing vaccines | Clean and minor wound | | All other wounds* | |
|---|---|---|---|---|
| | DTaP, Tdap, or Td[†] | TIG | DTaP, Tdap, or Td[†] | TIG[§] |
| Unknown or <3 | Yes | No | Yes | Yes |
| ≥3 | No[¶] | No | No** | No |

**Abbreviations:** DTaP = diphtheria and tetanus toxoids and acellular pertussis vaccine; Tdap = tetanus toxoid, reduced diphtheria toxoid, and acellular pertussis; Td = tetanus and diphtheria toxoids; TIG = tetanus immune globulin.
* Such as, but not limited to, wounds contaminated with dirt, feces, soil, and saliva; puncture wounds; avulsions; and wounds resulting from missiles, crushing, burns, and frostbite.
[†] DTaP is recommended for children aged <7 years. Tdap is preferred to Td for persons aged ≥11 years who have not previously received Tdap. Persons aged ≥7 years who are not fully immunized against pertussis, tetanus or diphtheria should receive one dose of Tdap for wound management and as part of the catch-up series.
[§] Persons with HIV infection or severe immunodeficiency who have contaminated wounds should also receive TIG, regardless of their history of tetanus immunization.
[¶] Yes, if ≥10 years since the last tetanus toxoid–containing vaccine dose.
** Yes, if ≥5 years since the last tetanus toxoid–containing vaccine dose.

whether a patient has completed the 3-dose primary tetanus vaccination series. Persons with unknown or uncertain previous tetanus vaccination histories should be considered to have had no previous tetanus toxoid–containing vaccine. Persons who have not completed the primary series might require tetanus toxoid–containing vaccine and passive vaccination with TIG at the time of wound management (Table 6). When both TIG and a tetanus toxoid–containing vaccine are indicated, the products should be administered using separate syringes at different anatomical sites. Persons with human immunodeficiency virus (HIV) infection or severe immunodeficiency who have contaminated wounds should also receive TIG, regardless of their history of tetanus immunizations.

Persons with a history of an Arthus reaction following a previous dose of a tetanus toxoid–containing vaccine should not receive a tetanus toxoid–containing vaccine until >10 years after the most recent dose; this interval is recommended regardless of the wound condition (e.g., even if contaminated or severe). In all circumstances, the decision to administer TIG should be based on the primary vaccination history for tetanus (Table 6).

## Special Situations

### Accelerated Schedule for Infants and Children Aged <7 Years

For an infant or child aged <7 years, circumstances such as travel, potential loss to follow-up or increased risk of exposure to pertussis might warrant an accelerated schedule to provide protection as early as possible. An accelerated schedule can be started as soon as the infant is aged 6 weeks, with the second

and third DTaP doses administered no earlier than 4 weeks after each preceding dose. The fourth DTaP dose should not be administered before the infant is aged 12 months and should be separated from the third dose by at least 6 months. The fifth DTaP dose should not be administered before the child is aged 4 years. When considering an accelerated schedule, providers also should consider the timing of other recommended vaccines and well-child visits.

### History of Pertussis

Persons who have a history of pertussis should receive a pertussis-containing vaccine (i.e., DTaP or Tdap) according to the routine recommendation. Although pertussis disease is likely to confer natural immunity against pertussis, the immune response might be suboptimal against subsequent pertussis disease and the duration of protection induced by an infection does not provide long-term immunity (305,306).

### Persons Who Have Recovered from Tetanus or Diphtheria

Tetanus or diphtheria infection do not necessarily confer immunity against re-infection (54,307,308); therefore, active vaccination should be initiated at the time of recovery from the illness according to the schedule. Persons who have completed the primary tetanus vaccination series should receive a booster dose as soon as feasible during convalescence. Persons with unknown or uncertain previous tetanus vaccination histories should be considered to have had no previous tetanus toxoid–containing vaccine and should begin the 3-dose tetanus and diphtheria toxoids vaccination series.

## Vaccine Administration

A summary of dose schedules is provided (Tables 4 and 5).

All health care personnel administering vaccinations should be aware of the potential for syncope after vaccination, especially among adolescents and young adults, and should take appropriate measures to prevent potential injuries. Providers should strongly consider observing patients for 15 minutes after they are vaccinated. If syncope occurs, the vaccine recipient should be observed until symptoms resolve (52).

### DTaP

Six vaccines are licensed for the pertussis, tetanus and diphtheria vaccination series (Table 4). The dose of DTaP is 0.5 mL, administered intramuscularly. The preferred intramuscular injection site for infants and children through age 2 years is the anterolateral aspect of the thigh (52). For children aged ≥3 years, the preferred site is the deltoid muscle

Appx18546

(*52*). DTaP may be administered simultaneously with other vaccines at a different anatomical site.

**Interchangeable use of acellular pertussis vaccines.** Whenever feasible, the same DTaP product should be used for all doses of the vaccination series. Data are limited regarding the safety, immunogenicity, and efficacy of using DTaP vaccines from different manufacturers for successive doses of the primary or booster vaccination series. However, the vaccine provider might not know or have available the type of DTaP vaccine previously administered to a child; neither circumstance should present a barrier to administration of the vaccine. Any of the licensed DTaP vaccines may be used to complete the vaccination series.

**Minimum interval between third and fourth DTaP dose.** The recommended minimal interval between the third and fourth doses of DTaP is 6 months, and the minimum age for receipt of the fourth dose of DTaP is 12 months. However, a fourth DTaP dose is considered valid if administered at least 4 months after the third dose of DTaP and the child is aged ≥12 months.

### DT

One vaccine is licensed for active immunization of children up to age seven years against diphtheria and tetanus in instances where the pertussis vaccine component is contraindicated or where the physician decides that pertussis vaccine is not to be administered (Table 4). The dose of DT is 0.5 mL, administered intramuscularly. The preferred intramuscular injection site for infants and children through age 2 years is the anterolateral aspect of the thigh (*52*). For children aged ≥3 years, the preferred site is the deltoid muscle (*52*).

### Tdap

Two vaccines are licensed for the pertussis, tetanus and diphtheria vaccination booster dose for adolescents and adults (Table 5). The dose of Tdap is 0.5 mL, administered intramuscularly, preferably into the deltoid muscle (*52*). Tdap may be administered simultaneously with other vaccines at a different anatomical site.

**Interval between Td and Tdap.** ACIP recommends that for pertussis vaccination, when indicated, Tdap should be administered regardless of interval since the last tetanus or diphtheria toxoid–containing vaccine. ACIP concluded that, while longer intervals between Td and Tdap vaccination could decrease the occurrence of local reactions, the benefits of protection against pertussis outweigh the potential risk for adverse events. For persons aged ≥7 years with incomplete or unknown vaccine history, the interval between doses of tetanus toxoid–containing vaccines should follow the catch-up series schedule.

**Tdap products in adults aged ≥65 years.** Providers should not miss an opportunity to vaccinate persons aged ≥65 years with Tdap. When feasible, Boostrix (approved for use in persons aged ≥10 years) should be used for adults aged ≥65 years instead of Adacel (approved for use in persons aged 10–64 years); however, ACIP concluded that either vaccine administered to a person aged ≥65 years is immunogenic and would provide protection. A dose of either Tdap product is considered valid; therefore, providers may administer the Tdap vaccine they have available.

### Td

For tetanus and diphtheria toxoids adsorbed vaccines, there are two licensed vaccines (Table 5). The dose of Td is 0.5 mL, administered intramuscularly, preferably into the deltoid muscle (*52*).

## Inadvertent Administration

### DTaP

DTaP is not indicated for persons aged ≥7 years. If DTaP is administered inadvertently to a fully vaccinated child aged 7–10 years, this dose should be counted as the adolescent Tdap dose. If DTaP is administered inadvertently to an undervaccinated child aged 7–10 years, this dose should count as the Td dose of the catch-up series and the child should receive an adolescent booster dose of Tdap. If DTaP is administered inadvertently to a person aged ≥11 years, this dose should count as the Tdap dose, and the person should not receive an additional dose of Tdap.

### Tdap

**Persons aged 2 months–6 years.** If Tdap is administered inadvertently instead of DTaP as any one of the first 3 doses of the tetanus-diphtheria-pertussis vaccination series, the Tdap dose should not be counted as valid, and a replacement dose of DTaP should be administered. The replacement dose of DTaP can be administered as soon as feasible at any interval after the inadvertent Tdap dose. The remaining doses of the DTaP series should be administered on the routine schedule, with at least a four-week interval between the replacement dose of DTaP and the next dose of DTaP. The adolescent Tdap dose should be administered as recommended when this child is aged 11–12 years.

If Tdap is administered inadvertently as the fourth or the fifth dose in the tetanus-diphtheria-pertussis vaccination series, the Tdap dose should be counted as valid and does not need to be repeated; the child who received Tdap as a fourth dose should complete the pediatric DTaP schedule. The adolescent

Tdap dose should be administered as recommended when this child is aged 11–12 years.

**Children aged 7–10 years who are fully vaccinated.**¶ If Tdap is administered inadvertently, the Tdap dose should not be counted as valid. The adolescent Tdap dose should be administered as recommended when this child is aged 11–12 years.

## Additional Doses of Tdap for the General Population

Both Tdap products are licensed for use as a single dose for active booster immunization; Boostrix is approved for use in persons aged ≥10 years and Adacel is approved for use in persons aged 10–64 years. Tdap is not licensed for multiple administrations nor is it recommended for multiple administrations, with the exception of the recommendation that pregnant women receive a dose of Tdap during each pregnancy. If a dose of Tdap is administered to a person who has previously received Tdap, this dose should count as the next booster dose of tetanus toxoid–containing vaccine.

## Contraindications and Precautions

Providers should screen patients for contraindications and precautions to the vaccine before each dose of vaccine is administered (Table 2). A contraindication is a condition in a recipient that increases the risk for a serious adverse reaction. A vaccine should not be administered when a contraindication is present. In contrast, certain conditions are commonly misperceived as contraindications (i.e., are not valid reasons to defer vaccination) (Table 3). In general, vaccinations should be deferred when a precaution is present. However, a vaccination might be indicated in the presence of a precaution if the perceived benefit of protection from the vaccine outweighs the risk for an adverse reaction.

For DTaP vaccines, providers and parents should evaluate the risks and benefits of administering subsequent doses of a pertussis-containing vaccine. In circumstances in which the benefits of further pertussis vaccination outweigh the possible risks (e.g., during an outbreak of pertussis), DTaP vaccine should be administered for the subsequent doses.

## Reporting of Vaccine Adverse Events

Clinically significant and serious adverse events that arise after vaccination should be reported to VAERS at https://vaers.hhs.gov/reportevent.html. VAERS is a postmarketing safety surveillance program that collects information about adverse events (possible side effects) that occur after the administration of vaccines licensed for use in the United States.

Reports can be filed securely online, by mail, or by fax. A VAERS form can be downloaded from the VAERS website or requested by e-mail (info@vaers.org), telephone (800-822-7967), or fax (877-721-0366). Additional information on VAERS and vaccine safety is available at https://vaers.hhs.gov/about/index or by calling telephone 800-822-7967.

## National Vaccine Injury Compensation Program

The National Vaccine Injury Compensation Program (VICP), established by the National Childhood Vaccine Injury Act of 1986, as amended, provides a mechanism through which compensation can be paid on behalf of a person determined to have been injured or to have died as a result of receiving a vaccine covered by VICP. National Childhood Vaccine Injury Act requires health care providers to report any adverse events listed by the manufacturer as a contraindication to further vaccination or any adverse event listed in the VAERS Table of Reportable Events Following Vaccination that occurs within the specified time period after vaccination. The Vaccine Injury Table lists the vaccines covered by VICP and the injuries and conditions (including death) for which compensation might be paid. If the injury or condition is not included in the table or does not occur within the time period specified on the table, persons must prove that the vaccine caused the injury or condition. For a person to be eligible for compensation, the general filing deadlines for injuries require claims to be filed within 3 years after the first sign or symptom of the vaccine injury; for a death, claims must be filed within 2 years of the vaccine-related death and not more than 4 years after the start of the first sign or symptom of the vaccine-related injury from which the death occurred. When a new vaccine is covered by VICP or when a new injury/condition is added to the table, claims that do not meet the general filing deadlines must be filed within 2 years from the date the vaccine or injury/condition is added to the table for injuries or deaths that occurred up to 8 years before the table change. Persons who receive a VICP-covered vaccine might be eligible to file a claim. Additional information about VICP is available https://www.hrsa.gov/vaccinecompensation/index.html or by calling 800–338–2382.

---

¶ Fully vaccinated is defined as having received 5 valid doses of DTaP or 4 valid doses of DTaP if the fourth dose was administered on or after the fourth birthday.

US Department of Health and Human Services/Centers for Disease Control and Prevention

Appx18548

## Safety Monitoring in Pregnant Women

Safety monitoring in pregnant women following Tdap administration includes enhanced monitoring in VAERS and utilization of the VSD to assess acute adverse events during pregnancy, adverse pregnancy outcomes affecting the mother, and birth outcomes.

Although not required by the FDA, pregnancy registries were established by Sanofi Pasteur and GSK during licensure of both Tdap vaccines to collect data on adverse events following inadvertent administration of Tdap vaccine during pregnancy. ACIP recommends administration of Tdap vaccine during each pregnancy. Neither Tdap product is contraindicated for use in pregnant women; lack of a specific "indication and usage" statement about use of the product in pregnant women in the product labeling does not preclude use of these vaccines during pregnancy. Both pharmaceutical companies continue to maintain a pregnancy registry. Health care providers may report Tdap vaccination during pregnancy, regardless of trimester, to the appropriate company's pregnancy registry: Sanofi Pasteur (Adacel) telephone: 800-822-2463 and GSK (Boostrix) telephone: 888-452-9622.

## Future Directions

The United States has experienced substantial increases in the number of reported pertussis cases and changes in the epidemiologic features of pertussis since the early 1990s. The impact of switching from whole-cell pertussis vaccines (DTP) to acellular pertussis vaccines (DTaP) on the epidemiologic features of pertussis is still being investigated. Both DTaP and Tdap vaccines remain the most effective tools for preventing pertussis disease and are associated with fewer serious adverse events than DTP, but data thus far indicate that they do not provide long-term protection and might not prevent transmission.

Since the introduction of a single Tdap booster vaccine for adolescents and adults in 2005, changes to the recommendation were made in order to reduce barriers to Tdap uptake and coverage among adolescents and adults and to reduce the burden of pertussis in infants. High vaccine coverage in adolescents is being achieved and has met the *Healthy People 2020* target (80%), but attaining high coverage among adults remains a challenge (*35*). Despite challenges to vaccinating women during pregnancy, focused efforts to educate providers and pregnant women have resulted in gradual improvement in Tdap coverage. Ongoing efforts are needed to increase Tdap coverage in each pregnancy to optimize prevention of severe pertussis in young infants. The effects of the changes made to the Tdap recommendations need to be monitored and evaluated over time for their effectiveness and impact on pertussis, particularly in infants.

As the epidemiologic features of pertussis in the United States continue to evolve and more is understood about acellular pertussis vaccines, reassessment of immunization strategies might be required in the future. Looking ahead, the ability to improve the current prevention and control strategies is limited by gaps in the understanding of the immune response to acellular pertussis vaccines and pertussis infection, as well as the lack of accepted defined serologic or laboratory correlates of protection against pertussis. Given existing understanding of the durability of protection provided by the current pertussis vaccines, optimizing the current pertussis vaccination program and protecting infants, who are at highest risk for pertussis-related death, are immediate priorities.

### Acknowledgments

This report is based, in part, on contributions by Amanda Cohn, MD; Amanda Faulkner, MPH; and Bo-Hyun Cho, PhD; National Center for Immunization and Respiratory Diseases; Mark Messonnier, PhD; Office of Public Health Scientific Services; and Hajime Kamiya, MD, PhD, National Institute of Infectious Diseases, Tokyo, Japan.

### References

1. Cody CL, Baraff LJ, Cherry JD, Marcy SM, Manclark CR. Nature and rates of adverse reactions associated with DTP and DT immunizations in infants and children. Pediatrics 1981;68:650–60.
2. Long SS, Deforest A, Smith DG, Lazaro C, Wassilak GF. Longitudinal study of adverse reactions following diphtheria-tetanus-pertussis vaccine in infancy. Pediatrics 1990;85:294–302.
3. CDC. Pertussis vaccination: use of acellular pertussis vaccines among infants and young children. Recommendations of the Advisory Committee on Immunization Practices (ACIP). MMWR Recomm Rep 1997;46(No. RR-7):1–25.
4. Broder KR, Cortese MM, Iskander JK, et al. Preventing tetanus, diphtheria, and pertussis among adolescents: use of tetanus toxoid, reduced diphtheria toxoid and acellular pertussis vaccines recommendations of the Advisory Committee on Immunization Practices (ACIP). MMWR Recomm Rep 2006;55(No. RR-3):1–34.
5. Kretsinger K, Broder KR, Cortese MM, et al. Preventing tetanus, diphtheria, and pertussis among adults: use of tetanus toxoid, reduced diphtheria toxoid and acellular pertussis vaccine recommendations of the Advisory Committee on Immunization Practices (ACIP) and recommendation of ACIP, supported by the Healthcare Infection Control Practices Advisory Committee (HICPAC), for use of Tdap among health-care personnel. MMWR Recomm Rep 2006;55(No. RR-17):1–37.
6. CDC. Updated recommendations for use of tetanus toxoid, reduced diphtheria toxoid, and acellular pertussis vaccine (Tdap) in pregnant women—Advisory Committee on Immunization Practices (ACIP), 2012. MMWR Morb Mortal Wkly Rep 2013;62:131–5.

Appx18549

7. Smith JC, Snider DE, Pickering LK. Immunization policy development in the United States: the role of the Advisory Committee on Immunization Practices. Ann Intern Med 2009;150:45–9. https://doi.org/10.7326/0003-4819-150-1-200901060-00009

8. CDC. Updated recommendations for use of tetanus toxoid, reduced diphtheria toxoid and acellular pertussis (Tdap) vaccine from the Advisory Committee on Immunization Practices, 2010. MMWR Morb Mortal Wkly Rep 2011;60:13–5.

9. CDC. Updated recommendations for use of tetanus toxoid, reduced diphtheria toxoid and acellular pertussis vaccine (Tdap) in pregnant women and persons who have or anticipate having close contact with an infant aged <12 months—Advisory Committee on Immunization Practices (ACIP), 2011. MMWR Morb Mortal Wkly Rep 2011;60:1424–6.

10. CDC. Updated recommendations for use of tetanus toxoid, reduced diphtheria toxoid, and acellular pertussis (Tdap) vaccine in adults aged 65 years and older—Advisory Committee on Immunization Practices (ACIP), 2012. MMWR Morb Mortal Wkly Rep 2012;61:468–70.

11. Edwards KM, Decker MD. Pertussis vaccines. In: Plotkin SA, Orenstein WA, Offit PA, eds. Vaccines. 5th ed. Philadelphia, PA: Saunders/Elsevier; 2012:447–92.

12. Gordon JE, Hood RI. Whooping cough and its epidemiological anomalies. Am J Med Sci 1951;222:333–61. https://doi.org/10.1097/00000441-195109000-00011

13. Cherry JD. Epidemiological, clinical, and laboratory aspects of pertussis in adults. Clin Infect Dis 1999;28(Suppl 2):S112–7. https://doi.org/10.1086/515058

14. Tiwari T, Murphy TV, Moran J. Recommended antimicrobial agents for the treatment and postexposure prophylaxis of pertussis: 2005 CDC Guidelines. MMWR Recomm Rep 2005;54(No. RR-14):1–16.

15. NNDSS. Surveillance case definitions for current and historical conditions. Atlanta, GA: U.S. Department of Health and Human Services; 2017. https://wwwn.cdc.gov/nndss/conditions/

16. CDC. Annual summary 1979: reported morbidity and mortality in the United States. MMWR Morb Mortal Wkly Rep 1980;28:12–7.

17. Farizo KM, Cochi SL, Zell ER, Brink EW, Wassilak SG, Patriarca PA. Epidemiological features of pertussis in the United States, 1980–1989. Clin Infect Dis 1992;14:708–19. https://doi.org/10.1093/clinids/14.3.708

18. CDC. Pertussis—United States, 2001–2003. MMWR Morb Mortal Wkly Rep 2005;54:1283–6.

19. Güris D, Strebel PM, Bardenheier B, et al. Changing epidemiology of pertussis in the United States: increasing reported incidence among adolescents and adults, 1990–1996. Clin Infect Dis 1999;28:1230–7. https://doi.org/10.1086/514776

20. Cherry JD. The epidemiology of pertussis and pertussis immunization in the United Kingdom and the United States: a comparative study. Curr Probl Pediatr 1984;14:1–78. https://doi.org/10.1016/0045-9380(84)90016-1

21. Jajosky RA, Hall PA, Adams DA, et al. Summary of notifiable diseases—United States, 2004. MMWR Morb Mortal Wkly Rep 2006;53(53).

22. McNabb SJ, Jajosky RA, Hall-Baker PA, et al. Summary of notifiable diseases—United States, 2005. MMWR Morb Mortal Wkly Rep 2007;54(53).

23. Adams DA, Gallagher KA, Jajosky RA, et al. Summary of notifiable diseases—United States, 2010. MMWR Morb Mortal Wkly Rep 2012;59(53).

24. Adams DA, Jajosky RA, Ajani U, et al. Summary of notifiable diseases—United States, 2012. MMWR Morb Mortal Wkly Rep 2014;61(53).

25. Güris D, Strebel PM, Bardenheier B, et al. Changing epidemiology of pertussis in the United States: increasing reported incidence among adolescents and adults, 1990–1996. Clin Infect Dis 1999;28:1230–7. https://doi.org/10.1086/514776

26. Tanaka M, Vitek CR, Pascual FB, Bisgard KM, Tate JE, Murphy TV. Trends in pertussis among infants in the United States, 1980–1999. JAMA 2003;290:2968–75. https://doi.org/10.1001/jama.290.22.2968

27. Yih WK, Lett SM, des Vignes FN, Garrison KM, Sipe PL, Marchant CD. The increasing incidence of pertussis in Massachusetts adolescents and adults, 1989–1998. J Infect Dis 2000;182:1409–16. https://doi.org/10.1086/315863

28. Misegades LK, Winter K, Harriman K, et al. Association of childhood pertussis with receipt of 5 doses of pertussis vaccine by time since last vaccine dose, California, 2010. JAMA 2012;308:2126–32. https://doi.org/10.1001/jama.2012.14939

29. Acosta AM, DeBolt C, Tasslimi A, et al. Tdap vaccine effectiveness in adolescents during the 2012 Washington State pertussis epidemic. Pediatrics 2015;135:981–9. https://doi.org/10.1542/peds.2014-3358

30. Gambhir M, Clark TA, Cauchemez S, Tartof SY, Swerdlow DL, Ferguson NM. A change in vaccine efficacy and duration of protection explains recent rises in pertussis incidence in the United States. PLOS Comput Biol 2015;11:e1004138. https://doi.org/10.1371/journal.pcbi.1004138

31. Hill HA, Elam-Evans LD, Yankey D, Singleton JA, Dietz V. Vaccination coverage among children aged 19–35 months—United States, 2015. MMWR Morb Mortal Wkly Rep 2016;65:1065–71. https://doi.org/10.15585/mmwr.mm6539a4

32. US Department of Health and Human Services. IID-7.1. Maintain an effective vaccination coverage level of 4 doses of the diphtheria-tetanus-acellular pertussis (DTaP) vaccine among children by age 19 to 35 months. Washington, DC: US Department of Health and Human Services; 2018. https://www.healthypeople.gov/node/4712/data_details

33. CDC. National vaccination coverage among adolescents aged 13–17 years—United States, 2006. MMWR Morb Mortal Wkly Rep 2007;56:885–8.

34. Reagan-Steiner S, Yankey D, Jeyarajah J, et al. National, regional, state, and selected local area vaccination coverage among adolescents aged 13–17 years—United States, 2015. MMWR Morb Mortal Wkly Rep 2016;65:850–8. https://doi.org/10.15585/mmwr.mm6533a4

35. US Department of Health and Human Services. IID-11.1 Increase the vaccination coverage level of 1 dose of tetanus-diphtheria-acellular pertussis (Tdap) booster vaccine for adolescents by age 13 to 15 years. Washington, DC: US Department of Health and Human Services; 2018. https://www.healthypeople.gov/node/4654/data_details

36. Williams WW, Lu PJ, O'Halloran A, et al. Surveillance of vaccination coverage among adult populations—United States, 2015. MMWR Surveill Summ 2017;66:1–28. https://doi.org/10.15585/mmwr.ss6611a1

37. Kahn KE, Ding H, Fiebelkorn A, et al. AdultVaxView. Pregnant women and Tdap vaccination, internet panel survey, United States, April 2016. Atlanta, GA: US Department of Health and Human Services, CDC; 2016. https://www.cdc.gov/vaccines/imz-managers/coverage/adultvaxview/tdap-report-2016.html

38. Sutter RW, Cochi SL. Pertussis hospitalizations and mortality in the United States, 1985–1988. Evaluation of the completeness of national reporting. JAMA 1992;267:386–91. https://doi.org/10.1001/jama.1992.03480030064038

Appx18550

39. Vitek CR, Pascual FB, Baughman AL, Murphy TV. Increase in deaths from pertussis among young infants in the United States in the 1990s. Pediatr Infect Dis J 2003;22:628–34. https://doi.org/10.1097/01.inf.0000073266.30728.0e

40. Skoff TH, Kenyon C, Cocoros N, et al. Sources of infant pertussis infection in the United States. Pediatrics 2015;136:635–41. https://doi.org/10.1542/peds.2015-1120

41. Tiwari TS, Baughman AL, Clark TA. First pertussis vaccine dose and prevention of infant mortality. Pediatrics 2015;135:990–9. https://doi.org/10.1542/peds.2014-2291

42. de Greeff SC, Mooi FR, Westerhof A, et al. Pertussis disease burden in the household: how to protect young infants. Clin Infect Dis 2010;50:1339–45.https://doi.org/10.1086/652281

43. Wiley KE, Zuo Y, Macartney KK, McIntyre PB. Sources of pertussis infection in young infants: a review of key evidence informing targeting of the cocoon strategy. Vaccine 2013;31:618–25. https://doi.org/10.1016/j.vaccine.2012.11.052

44. CDC. Pertussis epidemic—Washington, 2012. MMWR Morb Mortal Wkly Rep 2012;61:517–22.

45. Roper MH, Wassilak SG, Tiwari TS, Orenstein WA. Tetanus toxoid. In: Plotkin SA, Orenstein WA, Offit PA, eds. Vaccines. 5th ed. Philadelphia, PA: Saunders/Elsevier; 2012:746–77.

46. World Health Organization. Tetanus vaccines: WHO position paper—February 2017. Wkly Epidemiol Rec 2017;92:53–76.

47. Adams DA, Thomas KR, Jajosky RA, et al.; Nationally Notifiable Infectious Conditions Group. Summary of notifiable infectious diseases and conditions—United States, 2014. MMWR Morb Mortal Wkly Rep 2016;63:1–152. https://doi.org/10.15585/mmwr.mm6354a1

48. CDC. Tetanus surveillance—United States, 2001–2008. MMWR Morb Mortal Wkly Rep 2011;60:365–9.

49. Pascual FB, McGinley EL, Zanardi LR, Cortese MM, Murphy TV. Tetanus surveillance—United States, 1998–2000. MMWR Surveill Summ 2003;52:1–8.

50. Borrow R, Balmer P, Roper MH. The immunologic basis of immunization series—Module 3: tetanus update 2006. Geneva, Switzerland: World Health Organization; 2007.

51. McQuillan GM, Kruszon-Moran D, Deforest A, Chu SY, Wharton M. Serologic immunity to diphtheria and tetanus in the United States. Ann Intern Med 2002;136:660–6. https://doi.org/10.7326/0003-4819-136-9-200205070-00008

52. CDC. General recommendations on immunization—recommendations of the Advisory Committee on Immunization Practices (ACIP). MMWR Recomm Rep 2011;60(No. RR-2):1–64.

53. Tiwari TS, Golaz A, Yu DT, et al. Investigations of 2 cases of diphtheria-like illness due to toxigenic Corynebacterium ulcerans. Clin Infect Dis 2008;46:395–401. https://doi.org/10.1086/525262

54. CDC. Diphtheria, tetanus, and pertussis: recommendations for vaccine use and other preventive measures: recommendations of the Immunization Practices Advisory committee (ACIP). MMWR Recomm Rep 1991;40(No. RR-10):1–28.

55. Collier RJ. Diphtheria toxin: mode of action and structure. Bacteriol Rev 1975;39:54–85.

56. Chen RT, Broome CV, Weinstein RA, Weaver R, Tsai TF. Diphtheria in the United States, 1971–81. Am J Public Health 1985;75:1393–7. https://doi.org/10.2105/AJPH.75.12.1393

57. CDC. Summary of notifiable diseases, United States, 1997. MMWR Morb Mortal Wkly Rep 1998;46(54).

58. CDC. Summary of notifiable diseases in the United States, 2001. MMWR Morb Mortal Wkly Rep 2003;50(53).

59. Groseclose SL, Brathwaite WS, Hall PA, et al. CDC. Summary of notifiable diseases—United States, 2002. MMWR Morb Mortal Wkly Rep 2004;51(53).

60. Hopkins RS, Jajosky RA, Hall PA, et al. CDC. Summary of notifiable diseases—United States, 2003. MMWR Morb Mortal Wkly Rep 2005;52(54).

61. McNabb SJ, Jajosky RA, Hall-Baker PA, et al. CDC. Summary of notifiable diseases—United States, 2006. MMWR Morb Mortal Wkly Rep 2008;55(53).

62. Adams DA, Gallagher KM, Jajosky RA, et al. Summary of notifiable diseases—United States, 2011. MMWR Morb Mortal Wkly Rep 2013;60(53).

63. CDC. Notifiable diseases and mortality tables. MMWR Morb Mortal Wkly Rep 2016;65:38.

64. CDC. Fatal respiratory diphtheria in a U.S. traveler to Haiti—Pennsylvania, 2003. MMWR Morb Mortal Wkly Rep 2004;52:1285–6.

65. Long AP. Tetanus toxoid, its use in the United States Army. Am J Public Health Nations Health 1943;33:53–7. PubMed https://doi.org/10.2105/AJPH.33.1.53

66. Boyd JS. Tetanus in the African and European theatres of war, 1939–1945. Lancet 1946;1:113–9. https://doi.org/10.1016/S0140-6736(46)91262-7

67. Volk VK, Gottshall RY, Anderson HD, Top FH, Bunney WE, Serfling RE. Antigenic response to booster dose of diphtheria and tetanus toxoids. Seven to thirteen years after primary inoculation of noninstitutionalized children. Public Health Rep 1962;77:185–94. https://doi.org/10.2307/4591451

68. Anderson EL, Belshe RB, Bartram J. Differences in reactogenicity and antigenicity of acellular and standard pertussis vaccines combined with diphtheria and tetanus in infants. J Infect Dis 1988;157:731–7. https://doi.org/10.1093/infdis/157.4.731

69. Edwards KM, Bradley RB, Decker MD, et al. Evaluation of a new highly purified pertussis vaccine in infants and children. J Infect Dis 1989;160:832–7. https://doi.org/10.1093/infdis/160.5.832

70. World Health Organization. Diphtheria vaccine: WHO position paper. Wkly Epidemiol Rec 2006;3:24–32.

71. Orenstein WA, Weisfeld JS, Halsey NA. Diphtheria and tetanus toxoids and pertussis vaccine, combined. In: Halsey NA, de Quadros, CA, eds. Recent advances in immunization: a bibliographic review. Washington, DC: Pan American Health Organization; 1983:30–51.

72. Tiwari TS, Wharton M. Diphtheria toxoid. In: Plotkin SA, Orenstein WA, Offit PA, eds. Vaccines. 5th ed. Philadelphia, PA: Saunders/Elsevier; 2012:153–66.

73. Barkin RM, Samuelson JS, Gotlin LP, Barkin SZ. Primary immunization with diphtheria-tetanus toxoids vaccine and diphtheria-tetanus toxoids-pertussis vaccine adsorbed: comparison of schedules. Pediatr Infect Dis 1985;4:168–71. https://doi.org/10.1097/00006454-198503000-00011

74. Barkin RM, Pichichero ME, Samuelson JS, Barkin SZ. Pediatric diphtheria and tetanus toxoids vaccine: clinical and immunologic response when administered as the primary series. J Pediatr 1985;106:779–81. https://doi.org/10.1016/S0022-3476(85)80353-X

75. Feery BJ, Benenson AS, Forsyth JR, Menser MA, Minty DW. Diphtheria immunization in adolescents and adults with reduced doses of adsorbed diphtheria toxoid. Med J Aust 1981;1:128–30.

Appx18551

76. Myers MG, Beckman CW, Vosdingh RA, Hankins WA. Primary immunization with tetanus and diphtheria toxoids. Reaction rates and immunogenicity in older children and adults. JAMA 1982;248:2478–80. https://doi.org/10.1001/jama.1982.03330190042028

77. Efstratiou A, Maple PAC. Manual for the laboratory diagnosis of diphtheria in the European Region. Copenhagen: Expanded Programme on Immunization in the European Region of World Health Organization; 1994. ICP/EPI 038(C0)

78. Naiditch MJ, Bower AG. Diphtheria; a study of 1,433 cases observed during a ten-year period at the Los Angeles County Hospital. Am J Med 1954;17:229–45. https://doi.org/10.1016/0002-9343(54)90261-2

79. Brooks GF, Bennett JV, Feldman RA. Diphtheria in the United States, 1959–1970. J Infect Dis 1974;129:172–8. https://doi.org/10.1093/infdis/129.2.172

80. Dittmann S, Wharton M, Vitek C, et al. Successful control of epidemic diphtheria in the states of the Former Union of Soviet Socialist Republics: lessons learned. J Infect Dis 2000;181(Suppl 1):S10–22. https://doi.org/10.1086/315534

81. Cherry JD, Gornbein J, Heininger U, Stehr K. A search for serologic correlates of immunity to Bordetella pertussis cough illnesses. Vaccine 1998;16:1901–6. https://doi.org/10.1016/S0264-410X(98)00226-6

82. Storsaeter J, Hallander HO, Gustafsson L, Olin P. Levels of anti-pertussis antibodies related to protection after household exposure to *Bordetella pertussis*. Vaccine 1998;16:1907–16. https://doi.org/10.1016/S0264-410X(98)00227-8

83. Taranger J, Trollfors B, Lagergård T, et al. Correlation between pertussis toxin IgG antibodies in postvaccination sera and subsequent protection against pertussis. J Infect Dis 2000;181:1010–3. https://doi.org/10.1086/315318

84. Storsaeter J, Hallander HO, Gustafsson L, Olin P. Low levels of antipertussis antibodies plus lack of history of pertussis correlate with susceptibility after household exposure to *Bordetella pertussis*. Vaccine 2003;21:3542–9. https://doi.org/10.1016/S0264-410X(03)00407-9

85. Hellwig SM, Rodriguez ME, Berbers GA, van de Winkel JG, Mooi FR. Crucial role of antibodies to pertactin in *Bordetella pertussis* immunity. J Infect Dis 2003;188:738–42. https://doi.org/10.1086/377283

86. Black S, Greenberg DP. A combined diphtheria, tetanus, five-component acellular pertussis, poliovirus and *Haemophilus influenzae* type b vaccine. Expert Rev Vaccines 2005;4:793–805. https://doi.org/10.1586/14760584.4.6.793

87. Food and Drug Administration. International conference on harmonisation; guidance on statistical principles for clinical trials; availability—FDA. Notice. Fed Regist 1998;63:49583–98.

88. CDC. Food and Drug Administration approval of a fifth acellular pertussis vaccine for use among infants and young children—United States, 2002. MMWR Morb Mortal Wkly Rep 2002;51:574.

89. CDC. FDA licensure of diphtheria and tetanus toxoids and acellular pertussis adsorbed, hepatitis B (recombinant), and poliovirus vaccine combined, (PEDIARIX) for use in infants. MMWR Morb Mortal Wkly Rep 2003;52:203–4.

90. CDC. FDA approval of diphtheria and tetanus toxoids and acellular pertussis vaccine adsorbed, (INFANRIX) for fifth consecutive DTaP vaccine dose. MMWR Morb Mortal Wkly Rep 2003;52:921.

91. Food and Drug Administration. Product approval information—licensing action, approval letter: DAPTACEL. Rockville, MD: US Department of Health and Human Services, Food and Drug Administration, Center for Biologics Evaluation and Research; 2008. http://wayback.archive-it.org/7993/20170723024602/https://www.fda.gov/BiologicsBloodVaccines/Vaccines/ApprovedProducts/ucm103039.htm

92. CDC. Licensure of a diphtheria and tetanus toxoids and acellular pertussis adsorbed and inactivated poliovirus vaccine and guidance for use as a booster dose. MMWR Morb Mortal Wkly Rep 2008;57:1078–9.

93. CDC. Licensure of a diphtheria and tetanus toxoids and acellular pertussis adsorbed, inactivated poliovirus, and *Haemophilus* B conjugate vaccine and guidance for use in infants and children. MMWR Morb Mortal Wkly Rep 2008;57:1079–80.

94. Liang J, Wallace G, Mootrey G. Licensure of a diphtheria and tetanus toxoids and acellular pertussis adsorbed and inactivated poliovirus vaccine and guidance for use as a booster dose. MMWR Morb Mortal Wkly Rep 2015;64:948–9. https://doi.org/10.15585/mmwr.mm6434a5

95. Yeh SH, Ward JI, Partridge S, et al. Safety and immunogenicity of a pentavalent diphtheria, tetanus, pertussis, hepatitis B and polio combination vaccine in infants. Pediatr Infect Dis J 2001;20:973–80. https://doi.org/10.1097/00006454-200110000-00011

96. Guerra FA, Blatter MM, Greenberg DP, Pichichero M, Noriega FR; Pentacel Study Group. Safety and immunogenicity of a pentavalent vaccine compared with separate administration of licensed equivalent vaccines in US infants and toddlers and persistence of antibodies before a preschool booster dose: a randomized, clinical trial. Pediatrics 2009;123:301–12. https://doi.org/10.1542/peds.2007-3317

97. Weston WM, Klein NP. Kinrix: a new combination DTaP-IPV vaccine for children aged 4–6 years. Expert Rev Vaccines 2008;7:1309–20. https://doi.org/10.1586/14760584.7.9.1309

98. Edwards KM, Meade BD, Decker MD, et al. Comparison of 13 acellular pertussis vaccines: overview and serologic response. Pediatrics 1995;96:548–57.

99. Pichichero ME, Deloria MA, Rennels MB, et al. A safety and immunogenicity comparison of 12 acellular pertussis vaccines and one whole-cell pertussis vaccine given as a fourth dose in 15- to 20-month-old children. Pediatrics 1997;100:772–88. https://doi.org/10.1542/peds.100.5.772

100. Food and Drug Administration. Clinical review of supplement to license application for Infanrix (diphtheria and tetanus toxoids and acellular pertussis vaccine, adsorbed) to include fifth dose indication. Rockville, MD: US Department of Health and Human Services, Food and Drug Administration, Center for Biologics Evaluation and Research; 2003. http://wayback.archive-it.org/7993/20170723024620/https://www.fda.gov/BiologicsBloodVaccines/Vaccines/ApprovedProducts/ucm103005.htm

101. Sanofi Pasteur. Daptacel (Diphtheria and tetanus toxoids and acellular pertussis vaccine adsorbed) [package insert]. Swiftwater, PA: Sanofi Pasteur; 2017. https://www.fda.gov/BiologicsBloodVaccines/Vaccines/ApprovedProducts/ucm101572.htm

102. Food and Drug Administration. Summary basis for regulatory action–DAPTACEL. Rockville, MD: US Department of Health and Human Services, Food and Drug Administration, Center for Biologics Evaluation and Research; 2011. http://wayback.archive-it.org/7993/20170723024601/https://www.fda.gov/downloads/BiologicsBloodVaccines/Vaccines/ApprovedProducts/UCM263449.pdf

103. Sanofi Pasteur. Pentacel (Diphtheria and tetanus toxoids and acellular pertussis adsorbed, inactivated poliovirus and *Haemophilus b* conjugate (Tetanus toxoid conjugate) vaccine) [package insert]. Swiftwater, PA: Sanofi Pasteur; 2017. https://www.fda.gov/downloads/BiologicsBloodVaccines/Vaccines/ApprovedProducts/UCM109810.pdf

Appx18552

104. Greco D, Salmaso S, Mastrantonio P, et al.; Progetto Pertosse Working Group. A controlled trial of two acellular vaccines and one whole-cell vaccine against pertussis. N Engl J Med 1996;334:341–8. https://doi.org/10.1056/NEJM199602083340601

105. Schmitt HJ, von König CH, Neiss A, et al. Efficacy of acellular pertussis vaccine in early childhood after household exposure. JAMA 1996;275:37–41. https://doi.org/10.1001/jama.1996.03530250041024

106. Gustafsson L, Hallander HO, Olin P, Reizenstein E, Storsaeter J. A controlled trial of a two-component acellular, a five-component acellular, and a whole-cell pertussis vaccine. N Engl J Med 1996;334:349–55. https://doi.org/10.1056/NEJM199602083340602

107. Klein NP, Bartlett J, Rowhani-Rahbar A, Fireman B, Baxter R. Waning protection after fifth dose of acellular pertussis vaccine in children. N Engl J Med 2012;367:1012–9. https://doi.org/10.1056/NEJMoa1200850

108. Tartof SY, Lewis M, Kenyon C, et al. Waning immunity to pertussis following 5 doses of DTaP. Pediatrics 2013;131:e1047–52. https://doi.org/10.1542/peds.2012-1928

109. Bisgard KM, Rhodes P, Connelly BL, et al. Pertussis vaccine effectiveness among children 6 to 59 months of age in the United States, 1998–2001. Pediatrics 2005;116:e285–94. https://doi.org/10.1542/peds.2004-2759

110. Rosenthal S, Chen R, Hadler S. The safety of acellular pertussis vaccine vs whole-cell pertussis vaccine. A postmarketing assessment. Arch Pediatr Adolesc Med 1996;150:457–60. https://doi.org/10.1001/archpedi.1996.02170300011001

111. Braun MM, Mootrey GT, Salive ME, Chen RT, Ellenberg SS; VAERS Working Group. Infant immunization with acellular pertussis vaccines in the United States: assessment of the first two years' data from the Vaccine Adverse Event Reporting System (VAERS). Pediatrics 2000;106:E51. https://doi.org/10.1542/peds.106.4.e51

112. Jackson LA, Carste BA, Malais D, Froeschle J. Retrospective population-based assessment of medically attended injection site reactions, seizures, allergic responses and febrile episodes after acellular pertussis vaccine combined with diphtheria and tetanus toxoids. Pediatr Infect Dis J 2002;21:781–6. https://doi.org/10.1097/00006454-200208000-00016

113. Moore DL, Le Saux N, Scheifele D, Halperin SA; Members of the Canadian Paediatric Society/Health Canada Immunization Monitoring Program Active (IMPACT). Lack of evidence of encephalopathy related to pertussis vaccine: active surveillance by IMPACT, Canada, 1993–2002. Pediatr Infect Dis J 2004;23:568–71. https://doi.org/10.1097/01.inf.0000130875.56368.02

114. Zangwill KM, Eriksen E, Lee M, et al. A population-based, postlicensure evaluation of the safety of a combination diphtheria, tetanus, acellular pertussis, hepatitis B, and inactivated poliovirus vaccine in a large managed care organization. Pediatrics 2008;122:e1179–85. https://doi.org/10.1542/peds.2008-1977

115. Huang WT, Gargiullo PM, Broder KR, et al.; Vaccine Safety Datalink Team. Lack of association between acellular pertussis vaccine and seizures in early childhood. Pediatrics 2010;126:263–9. https://doi.org/10.1542/peds.2009-1496

116. Andrews N, Stowe J, Wise L, Miller E. Post-licensure comparison of the safety profile of diphtheria/tetanus/whole cell pertussis/*Haemophilus influenza* type b vaccine and a 5-in-1 diphtheria/tetanus/acellular pertussis/*Haemophilus influenza* type b/polio vaccine in the United Kingdom. Vaccine 2010;28:7215–20. https://doi.org/10.1016/j.vaccine.2010.08.062

117. Jackson LA, Yu O, Nelson JC, et al.; Vaccine Safety Datalink Team. Injection site and risk of medically attended local reactions to acellular pertussis vaccine. Pediatrics 2011;127:e581–7. https://doi.org/10.1542/peds.2010-1886

118. Sun Y, Christensen J, Hviid A, et al. Risk of febrile seizures and epilepsy after vaccination with diphtheria, tetanus, acellular pertussis, inactivated poliovirus, and *Haemophilus influenzae* type B. JAMA 2012;307:823–31. https://doi.org/10.1001/jama.2012.165

119. Jackson LA, Peterson D, Nelson JC, et al. Vaccination site and risk of local reactions in children 1 through 6 years of age. Pediatrics 2013;131:283–9. https://doi.org/10.1542/peds.2012-2617

120. Nelson JC, Yu O, Dominguez-Islas CP, et al. Adapting group sequential methods to observational postlicensure vaccine safety surveillance: results of a pentavalent combination DTaP-IPV-Hib vaccine safety study. Am J Epidemiol 2013;177:131–41. https://doi.org/10.1093/aje/kws317

121. Daley MF, Yih WK, Glanz JM, et al. Safety of diphtheria, tetanus, acellular pertussis and inactivated poliovirus (DTaP-IPV) vaccine. Vaccine 2014;32:3019–24. https://doi.org/10.1016/j.vaccine.2014.03.063

122. Kawai AT, Martin D, Kulldorff M, et al. Febrile seizures after 2010–2011 trivalent inactivated influenza vaccine. Pediatrics 2015;136:e848–55. https://doi.org/10.1542/peds.2015-0635

123. Duffy J, Weintraub E, Hambidge SJ, et al. Vaccine Safety Datalink. Febrile seizure risk after vaccination in children 6 to 23 months. Pediatrics 2016;138:e20160320. https://doi.org/10.1542/peds.2016-0320

124. Shimabukuro TT, Nguyen M, Martin D, DeStefano F. Safety monitoring in the Vaccine Adverse Event Reporting System (VAERS). Vaccine 2015;33:4398–405. https://doi.org/10.1016/j.vaccine.2015.07.035

125. Baggs J, Gee J, Lewis E, et al. The Vaccine Safety Datalink: a model for monitoring immunization safety. Pediatrics 2011;127(Suppl 1):S45–53. https://doi.org/10.1542/peds.2010-1722H

126. Weintraub ES, Baggs J, Duffy J, et al. Risk of intussusception after monovalent rotavirus vaccination. N Engl J Med 2014;370:513–9. https://doi.org/10.1056/NEJMoa1311738

127. Yih WK, Lieu TA, Kulldorff M, et al. Intussusception risk after rotavirus vaccination in U.S. infants. N Engl J Med 2014;370:503–12. https://doi.org/10.1056/NEJMoa1303164

128. Xu J, Murphy SL, Kochanek KD, Bastian BA. Deaths: final data for 2013. Natl Vital Stat Rep 2016;64:1–119.

129. McCarthy NL, Weintraub E, Vellozzi C, et al. Mortality rates and cause-of-death patterns in a vaccinated population. Am J Prev Med 2013;45:91–7. https://doi.org/10.1016/j.amepre.2013.02.020

130. McCarthy NL, Gee J, Sukumaran L, et al. Vaccination and 30-day mortality risk in children, adolescents, and young adults. Pediatrics 2016;137:e20152970. https://doi.org/10.1542/peds.2015-2970

131. CDC. Update: vaccine side effects, adverse reactions, contraindications, and precautions. Recommendations of the Advisory Committee on Immunization Practices (ACIP). MMWR Recomm Rep 1996;45(No. RR-12):1–35.

132. Stratton KR, Howe CJ, Johnston RB Jr. Adverse events associated with childhood vaccines other than pertussis and rubella. Summary of a report from the Institute of Medicine. JAMA 1994;271:1602–5. https://doi.org/10.1001/jama.1994.03510440062034

133. Institute of Medicine. Adverse effects of vaccines: evidence and causality. Washington DC: The National Academies Press; 2011.

Appx18553

134. Kuno-Sakai H, Kimura M. Safety and efficacy of acellular pertussis vaccine in Japan, evaluated by 23 years of its use for routine immunization. Pediatr Int 2004;46:650–5. https://doi.org/10.1111/j.1442-200x.2004.01970.x

135. Goodwin H, Nash M, Gold M, Heath TC, Burgess MA. Vaccination of children following a previous hypotonic-hyporesponsive episode. J Paediatr Child Health 1999;35:549–52. https://doi.org/10.1046/j.1440-1754.1999.00419.x

136. DuVernoy TS, Braun MM; VAERS Working Group. Hypotonic-hyporesponsive episodes reported to the Vaccine Adverse Event Reporting System (VAERS), 1996–1998. Pediatrics 2000;106:E52. https://doi.org/10.1542/peds.106.4.e52

137. Le Saux N, Barrowman NJ, Moore DL, Whiting S, Scheifele D, Halperin S. Canadian Paediatric Society/ Health Canada Immunization Monitoring Program-Active (IMPACT). Decrease in hospital admissions for febrile seizures and reports of hypotonic-hyporesponsive episodes presenting to hospital emergency departments since switching to acellular pertussis vaccine in Canada: a report from IMPACT. Pediatrics 2003;112:e348. https://doi.org/10.1542/peds.112.5.e348

138. Fenichel GM. Assessment: Neurologic risk of immunization: report of the Therapeutics and Technology Assessment Subcommittee of the American Academy of Neurology. Neurology 1999;52:1546–52. https://doi.org/10.1212/WNL.52.8.1546

139. Kattan JD, Konstantinou GN, Cox AL, et al. Anaphylaxis to diphtheria, tetanus, and pertussis vaccines among children with cow's milk allergy. J Allergy Clin Immunol 2011;128:215–8. https://doi.org/10.1016/j.jaci.2011.04.046

140. Slater JE, Rabin RL, Martin D. Comments on cow's milk allergy and diphtheria, tetanus, and pertussis vaccines. J Allergy Clin Immunol 2011;128:434, author reply 435.https://doi.org/10.1016/j.jaci.2011.06.028

141. Sanofi Pasteur. Adacel (tetanus toxoid, reduced diphtheria toxoid and acellular pertussis vaccine adsorbed) [package insert]. Swiftwater, PA: Sanofi Pasteur; 2017. https://www.fda.gov/downloads/BiologicsBloodVaccines/Vaccines/ApprovedProducts/UCM142764.pdf

142. GlaxoSmithKline. Boostrix (Tetanus toxoid, reduced diphtheria toxoid and acellular pertussis vaccine, adsorbed) [package insert]. Research Triangle Park, NC: GlaxoSmithKline; 2017. https://www.fda.gov/downloads/BiologicsBloodVaccines/Vaccines/UCM152842.pdf

143. Food and Drug Administration. Sanofi Pasteur. Adacel briefing document. Bethesda, MD: US Department of Health and Human Services, Food and Drug Administration, Center for Biologic Evaluation and Research; 2005. https://www.fda.gov/ohrms/dockets/ac/05/briefing/2005-4097B1_6.pdf

144. Food and Drug Administration. GlaxoSmithKline Biologicals. Boostrix briefing document. Bethesda, MD: US Department of Health and Human Services, Food and Drug Administration, Center for Biologic Evaluation and Research; 2005. https://www.fda.gov/ohrms/ac/05/briefing/2005-4097B1_3.pdf

145. Food and Drug Administration. Vaccines and Related Biological Products Advisory Committee meeting. Bethesda, MD: Food and Drug Administration; 1997.

146. Rank C, Quinn HE, McIntyre PB. Pertussis vaccine effectiveness after mass immunization of high school students in Australia. Pediatr Infect Dis J 2009;28:152–3. https://doi.org/10.1097/INF.0b013e318185608e

147. Wei SC, Tatti K, Cushing K, et al. Effectiveness of adolescent and adult tetanus, reduced-dose diphtheria, and acellular pertussis vaccine against pertussis. Clin Infect Dis 2010;51:315–21. https://doi.org/10.1086/653938

148. Rodgers L, Martin SW, Cohn A, et al. Epidemiologic and laboratory features of a large outbreak of pertussis-like illnesses associated with cocirculating Bordetella holmesii and Bordetella pertussis—Ohio, 2010–2011. Clin Infect Dis 2013;56:322–31. https://doi.org/10.1093/cid/cis888

149. Klein NP, Bartlett J, Fireman B, Baxter R. Waning Tdap effectiveness in adolescents. Pediatrics 2016;137:e20153326. https://doi.org/10.1542/peds.2015-3326

150. Koepke R, Eickhoff JC, Ayele RA, et al. Estimating the effectiveness of tetanus-diphtheria-acellular pertussis vaccine (Tdap) for preventing pertussis: evidence of rapidly waning immunity and difference in effectiveness by Tdap brand. J Infect Dis 2014;210:942–53. https://doi.org/10.1093/infdis/jiu322

151. Sheridan SL, Ware RS, Grimwood K, Lambert SB. Unexpectedly limited durability of immunity following acellular pertussis vaccination in preadolescents in a North American outbreak. Clin Infect Dis 2012;55:1434–5, author reply 1435–6. https://doi.org/10.1093/cid/cis672

152. Liko J, Robison SG, Cieslak PR. Priming with whole-cell versus acellular pertussis vaccine. N Engl J Med 2013;368:581–2. https://doi.org/10.1056/NEJMc1212006

153. Castagnini LA, Healy CM, Rench MA, Wootton SH, Munoz FM, Baker CJ. Impact of maternal postpartum tetanus and diphtheria toxoids and acellular pertussis immunization on infant pertussis infection. Clin Infect Dis 2012;54:78–84. https://doi.org/10.1093/cid/cir765

154. Quinn HE, Snelling TL, Habig A, Chiu C, Spokes PJ, McIntyre PB. Parental Tdap boosters and infant pertussis: a case-control study. Pediatrics 2014;134:713–20. https://doi.org/10.1542/peds.2014-1105

155. Goebel EM, Zhang X, Harvill ET. Bordetella pertussis infection or vaccination substantially protects mice against B. bronchiseptica infection. PLoS One 2009;4:e6778. https://doi.org/10.1371/journal.pone.0006778

156. Warfel JM, Zimmerman LI, Merkel TJ. Acellular pertussis vaccines protect against disease but fail to prevent infection and transmission in a nonhuman primate model. Proc Natl Acad Sci U S A 2014;111:787–92. https://doi.org/10.1073/pnas.1314688110

157. Smallridge WE, Rolin OY, Jacobs NT, Harvill ET. Different effects of whole-cell and acellular vaccines on Bordetella transmission. J Infect Dis 2014;209:1981–8. https://doi.org/10.1093/infdis/jiu030

158. World Health Organization. Pertussis vaccines: WHO position paper—September 2015. Wkly Epidemiol Rec 2015;90:433–58.

159. Trainor EA, Nicholson TL, Merkel TJ. Bordetella pertussis transmission. Pathog Dis 2015;73:ftv068. https://doi.org/10.1093/femspd/ftv068

160. McNamara LA, Skoff T, Faulkner A, et al. Reduced severity of pertussis in persons with age-approporate pertussis vaccination—United States, 2010–2012. Clin Infect Dis 2017;65:811–8. https://doi.org/10.1093/cid/cix421

161. CDC. FDA approval of expanded age indication for a tetanus toxoid, reduced diphtheria toxoid and acellular pertussis vaccine. MMWR Morb Mortal Wkly Rep 2009;58:374–5.

162. CDC. FDA approval of expanded age indication for a tetanus toxoid, reduced diphtheria toxoid and acellular pertussis vaccine. MMWR Morb Mortal Wkly Rep 2011;60:1279–80.

163. Food and Drug Administration. Summary basis for regulatory action—Adacel. Rockville, MD: US Department of Health and Human Services, Food and Drug Administration, Center for Biologics Evaluation and Research; 2014. http://wayback.archive-it.org/7993/20170723151952/https://www.fda.gov/downloads/BiologicsBloodVaccines/Vaccines/ApprovedProducts/UCM392043.pdf

Appx18554

164. Yih WK, Nordin JD, Kulldorff M, et al. An assessment of the safety of adolescent and adult tetanus-diphtheria-acellular pertussis (Tdap) vaccine, using active surveillance for adverse events in the Vaccine Safety Datalink. Vaccine 2009;27:4257–62. https://doi.org/10.1016/j.vaccine.2009.05.036

165. Nordin JD, Yih WK, Kulldorff M, Weintraub E. Tdap and GBS letter. Vaccine 2011;29:1122. https://doi.org/10.1016/j.vaccine.2010.11.056

166. Chang S, O'Connor PM, Slade BA, Woo EJ.US. U.S. Postlicensure safety surveillance for adolescent and adult tetanus, diphtheria and acellular pertussis vaccines: 2005–2007. Vaccine 2013;31:1447–52. https://doi.org/10.1016/j.vaccine.2012.10.097

167. Jackson LA, Yu O, Nelson J, et al. Risk of medically attended local reactions following diphtheria toxoid containing vaccines in adolescents and young adults: a Vaccine Safety Datalink study. Vaccine 2009;27:4912–6. https://doi.org/10.1016/j.vaccine.2009.06.038

168. Klein NP, Hansen J, Lewis E, et al. Post-marketing safety evaluation of a tetanus toxoid, reduced diphtheria toxoid and 3-component acellular pertussis vaccine administered to a cohort of adolescents in a United States health maintenance organization. Pediatr Infect Dis J 2010;29:613–7. https://doi.org/10.1097/INF.0b013e3181d581f9

169. Baxter R, Lewis E, Goddard K, et al. Acute demyelinating events following vaccines: a case-centered analysis. Clin Infect Dis 2016;63:1456–62. https://doi.org/10.1093/cid/ciw607

170. Moro PL, Yue X, Lewis P, Haber P, Broder K. Adverse events after tetanus toxoid, reduced diphtheria toxoid and acellular pertussis (Tdap) vaccine administered to adults 65 years of age and older reported to the Vaccine Adverse Event Reporting System (VAERS), 2005-2010. Vaccine 2011;29:9404–8. https://doi.org/10.1016/j.vaccine.2011.05.100

171. Tseng HF, Sy LS, Qian L, et al.; Vaccine Safety Datalink (VSD) Team. Safety of a tetanus-diphtheria-acellular pertussis vaccine when used off-label in an elderly population. Clin Infect Dis 2013;56:315–21. https://doi.org/10.1093/cid/cis871

172. Halperin SA, Sweet L, Baxendale D, et al. How soon after a prior tetanus-diphtheria vaccination can one give adult formulation tetanus-diphtheria-acellular pertussis vaccine? Pediatr Infect Dis J 2006;25:195–200. https://doi.org/10.1097/01.inf.0000202082.56403.c4

173. Beytout J, Launay O, Guiso N, et al. Safety of Tdap-IPV given one month after Td-IPV booster in healthy young adults: a placebo-controlled trial. Hum Vaccin 2009;5:315–21. https://doi.org/10.4161/hv.5.5.6911

174. Talbot EA, Brown KH, Kirkland KB, Baughman AL, Halperin SA, Broder KR. The safety of immunizing with tetanus-diphtheria-acellular pertussis vaccine (Tdap) less than 2 years following previous tetanus vaccination: Experience during a mass vaccination campaign of healthcare personnel during a respiratory illness outbreak. Vaccine 2010;28:8001–7. https://doi.org/10.1016/j.vaccine.2010.09.034

175. Scheifele DW, Halperin SA, Ochnio JJ, Ferguson AC, Skowronski DM. A modified vaccine reduces the rate of large injection site reactions to the preschool booster dose of diphtheria-tetanus-acellular pertussis vaccine: results of a randomized, controlled trial. Pediatr Infect Dis J 2005;24:1059–66. https://doi.org/10.1097/01.inf.0000190028.96152.46

176. Langley JM, Predy G, Guasparini R, et al. An adolescent-adult formulation tetanus and diptheria toxoids adsorbed combined with acellular pertussis vaccine has comparable immunogenicity but less reactogenicity in children 4-6 years of age than a pediatric formulation acellular pertussis vaccine and diphtheria and tetanus toxoids adsorbed combined with inactivated poliomyelitis vaccine. Vaccine 2007;25:1121–5. https://doi.org/10.1016/j.vaccine.2006.09.053

177. Sänger R, Behre U, Krause KH, et al. Booster vaccination and 1-year follow-up of 4–8-year-old children with a reduced-antigen-content dTpa-IPV vaccine. Eur J Pediatr 2007;166:1229–36. https://doi.org/10.1007/s00431-006-0403-x

178. Meyer CU, Habermehl P, Knuf M, Hoet B, Wolter J, Zepp F. Immunogenicity and reactogenicity of acellular pertussis booster vaccines in children: standard pediatric versus a reduced-antigen content formulation. Hum Vaccin 2008;4:203–9. https://doi.org/10.4161/hv.4.3.5290

179. Advisory Committee on Immunization Practices (ACIP). Summary report: October 27–28, 2010 (meeting minutes). Atlanta, GA: US Department of Health and Human Services, CDC; 2010. https://www.cdc.gov/vaccines/acip/meetings/downloads/min-archive/min-oct10.pdf

180. Pichichero ME, Rennels MB, Edwards KM, et al. Combined tetanus, diphtheria, and 5-component pertussis vaccine for use in adolescents and adults. JAMA 2005;293:3003–11. https://doi.org/10.1001/jama.293.24.3003

181. Gall SA, Myers J, Pichichero M. Maternal immunization with tetanus-diphtheria-pertussis vaccine: effect on maternal and neonatal serum antibody levels. Am J Obstet Gynecol 2011;204:334.e1–5. https://doi.org/10.1016/j.ajog.2010.11.024

182. Zheteyeva YA, Moro PL, Tepper NK, et al. Adverse event reports after tetanus toxoid, reduced diphtheria toxoid, and acellular pertussis vaccines in pregnant women. Am J Obstet Gynecol 2012;207:59.e1–7. https://doi.org/10.1016/j.ajog.2012.05.006

183. Shakib JH, Korgenski K, Sheng X, Varner MW, Pavia AT, Byington CL. Tetanus, diphtheria, acellular pertussis vaccine during pregnancy: pregnancy and infant health outcomes. J Pediatr 2013;163:1422–6. https://doi.org/10.1016/j.jpeds.2013.06.021

184. Halperin SA, McNeil S, Langley J, et al. Tolerability and antibody response in adolescents and adults revaccinated with tetanus toxoid, reduced diphtheria toxoid, and acellular pertussis vaccine adsorbed (Tdap) 4–5 years after a previous dose. Vaccine 2011;29:8459–65. https://doi.org/10.1016/j.vaccine.2011.07.068

185. Knuf M, Vetter V, Celzo F, Ramakrishnan G, Van Der Meeren O, Jacquet JM. Repeated administration of a reduced-antigen-content diphtheria-tetanus-acellular pertussis and poliomyelitis vaccine (dTpa-IPV; Boostrix IPV). Hum Vaccin 2010;6:554–61. https://doi.org/10.4161/hv.6.7.11760

186. Booy R, Van der Meeren O, Ng SP, Celzo F, Ramakrishnan G, Jacquet JM. A decennial booster dose of reduced antigen content diphtheria, tetanus, acellular pertussis vaccine (Boostrix) is immunogenic and well tolerated in adults. Vaccine 2010;29:45–50. https://doi.org/10.1016/j.vaccine.2010.10.025

187. Halperin SA, Scheifele D, De Serres G, et al. Immune responses in adults to revaccination with a tetanus toxoid, reduced diphtheria toxoid, and acellular pertussis vaccine 10 years after a previous dose. Vaccine 2012;30:974–82. https://doi.org/10.1016/j.vaccine.2011.11.035

Appx18555

188. Mertsola J, Van Der Meeren O, He Q, et al. Decennial administration of a reduced antigen content diphtheria and tetanus toxoids and acellular pertussis vaccine in young adults. Clin Infect Dis 2010;51:656–62. https://doi.org/10.1086/655825

189. Edsall G, Elliott MW, Peebles TC, Eldred MC. Excessive use of tetanus toxoid boosters. JAMA 1967;202:111–3. https://doi.org/10.1001/jama.202.1.111

190. Levine L, Ipsen J Jr, McComb JA. Adult immunization. Preparation and evaluation of combined fluid tetanus and diphtheria toxoids for adult use. Am J Hyg 1961;73:20–35.

191. Wang M, Khromava A, Mahmood A, Dickson N. Pregnant women receiving tetanus-diphtheria-acellular pertussis (Tdap) vaccine: 6 years of Adacel vaccine pregnancy registry data. Proceedings of the 27th International Conference on Pharmacoepidemiology and Therapeutic Risk Management (ICPE); August 14–17, 2011; Chicago, Illinois; 2011:S60–1.

192. Munoz FM, Bond NH, Maccato M, et al. Safety and immunogenicity of tetanus diphtheria and acellular pertussis (Tdap) immunization during pregnancy in mothers and infants: a randomized clinical trial. JAMA 2014;311:1760–9. https://doi.org/10.1001/jama.2014.3633

193. Kharbanda EO, Vazquez-Benitez G, Lipkind HS, et al. Evaluation of the association of maternal pertussis vaccination with obstetric events and birth outcomes. JAMA 2014;312:1897–904. https://doi.org/10.1001/jama.2014.14825

194. Donegan K, King B, Bryan P. Safety of pertussis vaccination in pregnant women in UK: observational study. BMJ 2014;349:g4219. https://doi.org/10.1136/bmj.g4219

195. Sukumaran L, McCarthy NL, Kharbanda EO, et al. Association of Tdap vaccination with acute events and adverse birth outcomes among pregnant women with prior tetanus-containing immunizations. JAMA 2015;314:1581–7. https://doi.org/10.1001/jama.2015.12790

196. Sukumaran L, McCarthy NL, Kharbanda EO, et al. Safety of tetanus toxoid, reduced diphtheria toxoid, and acellular pertussis and influenza vaccinations in pregnancy. Obstet Gynecol 2015;126:1069–74. https://doi.org/10.1097/AOG.0000000000001066

197. Morgan JL, Baggari SR, McIntire DD, Sheffield JS. Pregnancy outcomes after antepartum tetanus, diphtheria, and acellular pertussis vaccination. Obstet Gynecol 2015;125:1433–8. https://doi.org/10.1097/AOG.0000000000000862

198. Datwani H, Moro PL, Harrington T, Broder KR. Chorioamnionitis following vaccination in the Vaccine Adverse Event Reporting System. Vaccine 2015;33:3110–3. https://doi.org/10.1016/j.vaccine.2015.04.097

199. Moro PL, Cragan J, Tepper N, et al. Enhanced surveillance of tetanus toxoid, reduced diphtheria toxoid, and acellular pertussis (Tdap) vaccines in pregnancy in the Vaccine Adverse Event Reporting System (VAERS), 2011–2015. Vaccine 2016;34:2349–53. https://doi.org/10.1016/j.vaccine.2016.03.049

200. Hoang HT, Leuridan E, Maertens K, et al. Pertussis vaccination during pregnancy in Vietnam: Results of a randomized controlled trial Pertussis vaccination during pregnancy. Vaccine 2016;34:151–9. https://doi.org/10.1016/j.vaccine.2015.10.098

201. Vizzotti C, Juarez MV, Bergel E, et al. Impact of a maternal immunization program against pertussis in a developing country. Vaccine 2016;34:6223–8. https://doi.org/10.1016/j.vaccine.2016.10.081

202. Regan AK, Tracey LE, Blyth CC, Richmond PC, Effler PV. A prospective cohort study assessing the reactogenicity of pertussis and influenza vaccines administered during pregnancy. Vaccine 2016;34:2299–304. https://doi.org/10.1016/j.vaccine.2016.03.084

203. Berenson AB, Hirth JM, Rahman M, Laz TH, Rupp RE, Sarpong KO. Maternal and infant outcomes among women vaccinated against pertussis during pregnancy. Hum Vaccin Immunother 2016;12:1965–71. https://doi.org/10.1080/21645515.2016.1157241

204. Petousis-Harris H, Walls T, Watson D, Paynter J, Graham P, Turner N. Safety of Tdap vaccine in pregnant women: an observational study. BMJ Open 2016;6:e010911. https://doi.org/10.1136/bmjopen-2015-010911

205. DeSilva M, Vazquez-Benitez G, Nordin JD, et al. Tdap vaccination during pregnancy and microcephaly and other structural birth defects in offspring. JAMA 2016;316:1823–5. https://doi.org/10.1001/jama.2016.14432

206. Kharbanda EO, Vazquez-Benitez G, Lipkind HS, et al. Maternal Tdap vaccination: Coverage and acute safety outcomes in the vaccine safety datalink, 2007–2013. Vaccine 2016;34:968–73. https://doi.org/10.1016/j.vaccine.2015.12.046

207. Maertens K, Caboré RN, Huygen K, Hens N, Van Damme P, Leuridan E. Pertussis vaccination during pregnancy in Belgium: Results of a prospective controlled cohort study. Vaccine 2016;34:142–50. https://doi.org/10.1016/j.vaccine.2015.10.100

208. Walls T, Graham P, Petousis-Harris H, Hill L, Austin N. Infant outcomes after exposure to Tdap vaccine in pregnancy: an observational study. BMJ Open 2016;6:e009536. https://doi.org/10.1136/bmjopen-2015-009536

209. Villarreal Pérez JZ, Ramírez Aranda JM. de la O Cavazos M, et al. Randomized clinical trial of the safety and immunogenicity of the Tdap vaccine in pregnant Mexican women. Hum Vaccin Immunother 2017;13:128–35. https://doi.org/10.1080/21645515.2016.1232786

210. Relyveld EH, Bizzini B, Gupta RK. Rational approaches to reduce adverse reactions in man to vaccines containing tetanus and diphtheria toxoids. Vaccine 1998;16:1016–23. https://doi.org/10.1016/S0264-410X(97)00288-0

211. Froehlich H, Verma R. Arthus reaction to recombinant hepatitis B virus vaccine. Clin Infect Dis 2001;33:906–8. https://doi.org/10.1086/322585

212. Terr AI. Immune-complex allergic diseases. In: Parslow TG, Stites DP, Terr AI, Imboden JB, eds. Medical immunology. New York, NY: Lange Medical Books/McGraw-Hill; 2001:380–5.

213. Moylett EH, Hanson IC. Mechanistic actions of the risks and adverse events associated with vaccine administration. J Allergy Clin Immunol 2004;114:1010–20, quiz 1021. https://doi.org/10.1016/j.jaci.2004.09.007

214. Nikkels AF, Nikkels-Tassoudji N, Piérard GE. Cutaneous adverse reactions following anti-infective vaccinations. Am J Clin Dermatol 2005;6:79–87. https://doi.org/10.2165/00128071-200506020-00002

215. Ponvert C, Scheinmann P. Vaccine allergy and pseudo-allergy. Eur J Dermatol 2003;13:10–5.

216. Quast U, Hennessen W, Widmark RM. Mono- and polyneuritis after tetanus vaccination (1970–1977). Dev Biol Stand 1979;43:25–32.

217. Tuttle J, Chen RT, Rantala H, Cherry JD, Rhodes PH, Hadler S. The risk of Guillain-Barré syndrome after tetanus-toxoid-containing vaccines in adults and children in the United States. Am J Public Health 1997;87:2045–8. https://doi.org/10.2105/AJPH.87.12.2045

Appx18556

218. Schofield FD, Tucker VM, Westbrook GR. Neonatal tetanus in New Guinea. Effect of active immunization in pregnancy. BMJ 1961;2:785–9. https://doi.org/10.1136/bmj.2.5255.785

219. MacLennan R, Schofield FD, Pittman M, Hardegree MC, Barile MF. Immunization against neonatal tetanus in New Guinea. Antitoxin response of pregnant women to adjuvant and plain toxoids. Bull World Health Organ 1965;32:683–97.

220. Newell KW, Dueñas Lehmann A, LeBlanc DR, Garces Osorio N. The use of toxoid for the prevention of tetanus neonatorum. Final report of a double-blind controlled field trial. Bull World Health Organ 1966;35:863–71.

221. Hardegree MC, Barile MF, Pittman M, Schofield FD, Maclennan R, Kelly A. Immunization against neonatal tetanus in New Guinea. Bull World Health Organ 1970;43:439–51.

222. Rahman M, Chen LC, Chakraborty J, et al. Use of tetanus toxoid for the prevention of neonatal tetanus. 1. Reduction of neonatal mortality by immunization of non-pregnant and pregnant women in rural Bangladesh. Bull World Health Organ 1982;60:261–7.

223. Pattison E, Harrison BJ, Griffiths CE, Silman AJ, Bruce IN. Environmental risk factors for the development of psoriatic arthritis: results from a case-control study. Ann Rheum Dis 2008;67:672–6. https://doi.org/10.1136/ard.2007.073932

224. Bengtsson C, Kapetanovic MC, Källberg H, et al.; EIRA Study Group. Common vaccinations among adults do not increase the risk of developing rheumatoid arthritis: results from the Swedish EIRA study. Ann Rheum Dis 2010;69:1831–3. https://doi.org/10.1136/ard.2010.129908

225. Ray P, Black S, Shinefield H, et al.; Vaccine Safety Datalink Team. Risk of rheumatoid arthritis following vaccination with tetanus, influenza and hepatitis B vaccines among persons 15–59 years of age. Vaccine 2011;29:6592–7. https://doi.org/10.1016/j.vaccine.2011.06.112

226. Jackson LA, Yu O, Belongia EA, et al. Frequency of medically attended adverse events following tetanus and diphtheria toxoid vaccine in adolescents and young adults: a Vaccine Safety Datalink study. BMC Infect Dis 2009;9:165. https://doi.org/10.1186/1471-2334-9-165

227. Bartels I, Jüngert J, Lugauer S, Stehr K, Heininger U. Immunogenicity and reactogenicity of a single dose of a diphtheria-tetanus-acellular pertussis component vaccine (DTaP) compared to a diphtheria-tetanus toxoid (Td) and a diphtheria toxoid vaccine (d) in adults. Vaccine 2001;19:3137–45. https://doi.org/10.1016/S0264-410X(01)00029-9

228. Macko MB, Powell CE. Comparison of the morbidity of tetanus toxoid boosters with tetanus-diphtheria toxoid boosters. Ann Emerg Med 1985;14:33–5. https://doi.org/10.1016/S0196-0644(85)80732-0

229. Deacon SP, Langford DT, Shepherd WM, Knight PA. A comparative clinical study of Adsorbed Tetanus Vaccine and Adult-type Tetanus-Diphtheria Vaccine. J Hyg (Lond) 1982;89:513–9. https://doi.org/10.1017/S0022172400071084

230. Schmitt-Grohé S, Stehr K, Cherry JD, et al.; The Pertussis Vaccine Study Group. Minor adverse events in a comparative efficacy trial in Germany in infants receiving either the Lederle/Takeda acellular pertussis component DTP (DTaP) vaccine, the Lederle whole-cell component DTP (DTP) or DT vaccine. Dev Biol Stand 1997;89:113–8.

231. Liebling J, Schmitz HE. Protection of the infant against diphtheria during the first year of life following the active immunization of the pregnant mother. J Pediatr 1943;23:430–6. https://doi.org/10.1016/S0022-3476(43)80061-5.

232. Vahlquist B. The decrease of natural antitoxic immunity against diphtheria. Acta Paediatr 1948;35:117–29. https://doi.org/10.1111/j.1651-2227.1948.tb03722.x

233. Vahlquist B, Murray U, Persson NG. Immunization against diphtheria in newborn babies and in infants. Acta Paediatr 1948;35:130–48. https://doi.org/10.1111/j.1651-2227.1948.tb03723.x

234. Cohen P, Schneck H, Dubow E. Prenatal multiple immunization. J Pediatr 1951;38:696–704. https://doi.org/10.1016/S0022-3476(51)80131-8

235. McNeil SA, Noya F, Dionne M, et al. Comparison of the safety and immunogenicity of concomitant and sequential administration of an adult formulation tetanus and diphtheria toxoids adsorbed combined with acellular pertussis (Tdap) vaccine and trivalent inactivated influenza vaccine in adults. Vaccine 2007;25:3464–74. https://doi.org/10.1016/j.vaccine.2006.12.047

236. Weston WM, Chandrashekar V, Friedland LR, Howe B. Safety and immunogenicity of a tetanus toxoid, reduced diphtheria toxoid, and acellular pertussis vaccine when co-administered with influenza vaccine in adults. Hum Vaccin 2009;5:858–66. https://doi.org/10.4161/hv.9961

237. Gasparini R, Conversano M, Bona G, et al. Randomized trial on the safety, tolerability, and immunogenicity of MenACWY-CRM, an investigational quadrivalent meningococcal glycoconjugate vaccine, administered concomitantly with a combined tetanus, reduced diphtheria, and acellular pertussis vaccine in adolescents and young adults. Clin Vaccine Immunol 2010;17:537–44. https://doi.org/10.1128/CVI.00436-09

238. Reisinger KS, Block SL, Collins-Ogle M, et al.; Protocol 025 Investigators. Safety, tolerability, and immunogenicity of gardasil given concomitantly with Menactra and Adacel. Pediatrics 2010;125:1142–51. https://doi.org/10.1542/peds.2009-2336

239. Arguedas A, Soley C, Loaiza C, et al. Safety and immunogenicity of one dose of MenACWY-CRM, an investigational quadrivalent meningococcal glycoconjugate vaccine, when administered to adolescents concomitantly or sequentially with Tdap and HPV vaccines. Vaccine 2010;28:3171–9. https://doi.org/10.1016/j.vaccine.2010.02.045

240. Weston WM, Friedland LR, Wu X, Howe B. Immunogenicity and reactogenicity of co-administered tetanus-diphtheria-acellular pertussis (Tdap) and tetravalent meningococcal conjugate (MCV4) vaccines compared to their separate administration. Vaccine 2011;29:1017–22. https://doi.org/10.1016/j.vaccine.2010.11.057

241. Wheeler CM, Harvey BM, Pichichero ME, et al. Immunogenicity and safety of human papillomavirus-16/18 AS04-adjuvanted vaccine coadministered with tetanus toxoid, reduced diphtheria toxoid, and acellular pertussis vaccine and/or meningococcal conjugate vaccine to healthy girls 11 to 18 years of age: results from a randomized open trial. Pediatr Infect Dis J 2011;30:e225–34. https://doi.org/10.1097/INF.0b013e31822d28df

242. Weston WM, Friedland LR, Wu X, Howe B. Vaccination of adults 65 years of age and older with tetanus toxoid, reduced diphtheria toxoid and acellular pertussis vaccine (Boostrix): results of two randomized trials. Vaccine 2012;30:1721–8. https://doi.org/10.1016/j.vaccine.2011.12.055

243. McGarry LJ, Krishnarajah G, Hill G, et al. Cost-effectiveness analysis of Tdap in the prevention of pertussis in the elderly. PLoS One 2013;8:e67260. https://doi.org/10.1371/journal.pone.0067260

Appx18557

244. Terranella A, Asay GR, Messonnier ML, Clark TA, Liang JL. Pregnancy dose Tdap and postpartum cocooning to prevent infant pertussis: a decision analysis. Pediatrics 2013;131:e1748–56. https://doi.org/10.1542/peds.2012-3144

245. Clark TA. Changing pertussis epidemiology: everything old is new again. J Infect Dis 2014;209:978–81. https://doi.org/10.1093/infdis/jiu001

246. Van Rie A, Wendelboe AM, Englund JA. Role of maternal pertussis antibodies in infants. Pediatr Infect Dis J 2005;24(Suppl):S62–5. https://doi.org/10.1097/01.inf.0000160915.93979.8f

247. Healy CM, Rench MA, Baker CJ. Importance of timing of maternal combined tetanus, diphtheria, and acellular pertussis (Tdap) immunization and protection of young infants. Clin Infect Dis 2013;56:539–44. https://doi.org/10.1093/cid/cis923

248. Leuridan E, Hens N, Peeters N, de Witte L, Van der Meeren O, Van Damme P. Effect of a prepregnancy pertussis booster dose on maternal antibody titers in young infants. Pediatr Infect Dis J 2011;30:608–10. https://doi.org/10.1097/INF.0b013e3182093814

249. Hardy-Fairbanks AJ, Pan SJ, Decker MD, et al. Immune responses in infants whose mothers received Tdap vaccine during pregnancy. Pediatr Infect Dis J 2013;32:1257–60. https://doi.org/10.1097/INF.0b013e3182a09b6a

250. Amirthalingam G, Andrews N, Campbell H, et al. Effectiveness of maternal pertussis vaccination in England: an observational study. Lancet 2014;384:1521–8. https://doi.org/10.1016/S0140-6736(14)60686-3

251. Dabrera G, Amirthalingam G, Andrews N, et al. A case-control study to estimate the effectiveness of maternal pertussis vaccination in protecting newborn infants in England and Wales, 2012–2013. Clin Infect Dis 2015;60:333–7. https://doi.org/10.1093/cid/ciu821

252. Amirthalingam G, Campbell H, Ribeiro S, et al. Sustained effectiveness of the maternal pertussis immunization program in England 3 years following introduction. Clin Infect Dis 2016;63(suppl 4):S236–43. https://doi.org/10.1093/cid/ciw559

253. Winter K, Nickell S, Powell M, Harriman K. Effectiveness of prenatal versus postpartum tetanus, diphtheria, and acellular pertussis vaccination in preventing infant pertussis. Clin Infect Dis 2017;64:3–8. https://doi.org/10.1093/cid/ciw634

254. Winter K, Cherry JD, Harriman K. Effectiveness of prenatal tetanus, diphtheria, and acellular pertussis vaccination on pertussis severity in infants. Clin Infect Dis 2017;64:9–14. https://doi.org/10.1093/cid/ciw633

255. Englund JA. The influence of maternal immunization on infant immune responses. J Comp Pathol 2007;137(Suppl 1):S16–9. https://doi.org/10.1016/j.jcpa.2007.04.006

256. Halperin BA, Morris A, Mackinnon-Cameron D, et al. Kinetics of the antibody response to tetanus-diphtheria-acellular pertussis vaccine in women of childbearing age and postpartum women. Clin Infect Dis 2011;53:885–92. https://doi.org/10.1093/cid/cir538

257. Kirkland KB, Talbot EA, Decker MD, Edwards KM. Kinetics of pertussis immune responses to tetanus-diphtheria-acellular pertussis vaccine in health care personnel: implications for outbreak control. Clin Infect Dis 2009;49:584–7. https://doi.org/10.1086/603555

258. Eberhardt CS, Blanchard-Rohner G, Lemaître B, et al. Maternal immunization earlier in pregnancy maximizes antibody transfer and expected infant seropositivity against pertussis. Clin Infect Dis 2016;62:829–36 10.1093/cid/ciw027. https://doi.org/10.1093/cid/ciw027

259. Abu Raya B, Srugo I, Kessel A, et al. The effect of timing of maternal tetanus, diphtheria, and acellular pertussis (Tdap) immunization during pregnancy on newborn pertussis antibody levels—a prospective study. Vaccine 2014;32:5787–93. https://doi.org/10.1016/j.vaccine.2014.08.038

260. Naidu MA, Muljadi R, Davies-Tuck ML, Wallace EM, Giles ML. The optimal gestation for pertussis vaccination during pregnancy: a prospective cohort study. Am J Obstet Gynecol. 2016;215:237 e1–6. doi: 10.1016/j.ajog.2016.03.002

261. Advisory Committee on Immunization Practices. Summary report: October 19–20, 2016 (meeting minutes). Atlanta, GA: US Department of Health and Human Services, CDC; 2016. https://www.cdc.gov/vaccines/acip/meetings/downloads/min-archive/min-2016-10.pdf

262. Weston W, Messier M, Friedland LR, Wu X, Howe B. Persistence of antibodies 3 years after booster vaccination of adults with combined acellular pertussis, diphtheria and tetanus toxoids vaccine. Vaccine 2011;29:8483–6. https://doi.org/10.1016/j.vaccine.2011.09.063

263. Tomovici A, Barreto L, Zickler P, et al. Humoral immunity 10 years after booster immunization with an adolescent and adult formulation combined tetanus, diphtheria, and 5-component acellular pertussis vaccine. Vaccine 2012;30:2647–53. https://doi.org/10.1016/j.vaccine.2012.02.013

264. Ladhani SN, Andrews NJ, Southern J, et al. Antibody responses after primary immunization in infants born to women receiving a pertussis-containing vaccine during pregnancy: single arm observational study with a historical comparator. Clin Infect Dis 2015;61:1637–44. https://doi.org/10.1093/cid/civ695

265. Van Savage J, Decker MD, Edwards KM, Sell SH, Karzon DT. Natural history of pertussis antibody in the infant and effect on vaccine response. J Infect Dis 1990;161:487–92. https://doi.org/10.1093/infdis/161.3.487

266. Yeh S, Mink C, Kim M, Naylor S, Zangwill KM, Allred NJ. Effectiveness of hospital-based postpartum procedures on pertussis vaccination among postpartum women. Am J Obstet Gynecol. 2014;210:237 e1-6.

267. Rosenblum E, McBane S, Wang W, Sawyer M. Protecting newborns by immunizing family members in a hospital-based vaccine clinic: a successful Tdap cocooning program during the 2010 California pertussis epidemic. Public Health Rep 2014;129:245–51. https://doi.org/10.1177/003335491412900306

268. Healy CM, Rench MA, Castagnini LA, Baker CJ. Pertussis immunization in a high-risk postpartum population. Vaccine 2009;27:5599–602. https://doi.org/10.1016/j.vaccine.2009.07.030

269. Healy CM, Rench MA, Baker CJ. Implementation of cocooning against pertussis in a high-risk population. Clin Infect Dis 2011;52:157–62. https://doi.org/10.1093/cid/ciq001

270. Blain AE, Lewis M, Banerjee E, et al. An assessment of the cocooning strategy for preventing infant pertussis—United States, 2011. Clin Infect Dis 2016;63(Suppl 4):S221–6. https://doi.org/10.1093/cid/ciw528

271. Wendelboe AM, Njamkepo E, Bourillon A, et al.; Infant Pertussis Study Group. Transmission of Bordetella pertussis to young infants. Pediatr Infect Dis J 2007;26:293–9. https://doi.org/10.1097/01.inf.0000258699.64164.6d

272. Bisgard KM, Pascual FB, Ehresmann KR, et al. Infant pertussis: who was the source? Pediatr Infect Dis J 2004;23:985–9.https://doi.org/10.1097/01.inf.0000145263.37198.2b

273. Valenti WM, Pincus PH, Messner MK. Nosocomial pertussis: possible spread by a hospital visitor. Am J Dis Child 1980;134:520–1.

274. Steketee RW, Wassilak SG, Adkins WN Jr, et al. Evidence for a high attack rate and efficacy of erythromycin prophylaxis in a pertussis outbreak in a facility for the developmentally disabled. J Infect Dis 1988;157:434–40. https://doi.org/10.1093/infdis/157.3.434

Appx18558

275. Fisher MC, Long SS, McGowan KL, Kasells E, Smith DG. Outbreak of pertussis in a residential facility for handicapped people. J Pediatr 1989;114:934–9. https://doi.org/10.1016/S0022-3476(89)80433-0

276. Addiss DG, Davis JP, Meade BD, et al. A pertussis outbreak in a Wisconsin nursing home. J Infect Dis 1991;164:704–10. https://doi.org/10.1093/infdis/164.4.704

277. Christie CD, Glover AM, Willke MJ, Marx ML, Reising SF, Hutchinson NM. Containment of pertussis in the regional pediatric hospital during the Greater Cincinnati epidemic of 1993. Infect Control Hosp Epidemiol 1995;16:556–63. https://doi.org/10.2307/30141094

278. Shefer A, Dales L, Nelson M, Werner B, Baron R, Jackson R. Use and safety of acellular pertussis vaccine among adult hospital staff during an outbreak of pertussis. J Infect Dis 1995;171:1053–6. https://doi.org/10.1093/infdis/171.4.1053

279. CDC. Outbreaks of pertussis associated with hospitals—Kentucky, Pennsylvania, and Oregon, 2003. MMWR Morb Mortal Wkly Rep 2005;54:67–71.

280. Boulay BR, Murray CJ, Ptak J, Kirkland KB, Montero J, Talbot EA. An outbreak of pertussis in a hematology-oncology care unit: implications for adult vaccination policy. Infect Control Hosp Epidemiol 2006;27:92–5. https://doi.org/10.1086/500420

281. Pascual FB, McCall CL, McMurtray A, Payton T, Smith F, Bisgard KM. Outbreak of pertussis among healthcare workers in a hospital surgical unit. Infect Control Hosp Epidemiol 2006;27:546–52. https://doi.org/10.1086/506232

282. Vranken P, Pogue M, Romalewski C, Ratard R. Outbreak of pertussis in a neonatal intensive care unit—Louisiana, 2004. Am J Infect Control 2006;34:550–4. https://doi.org/10.1016/j.ajic.2006.01.008

283. Bryant KA, Humbaugh K, Brothers K, et al. Measures to control an outbreak of pertussis in a neonatal intermediate care nursery after exposure to a healthcare worker. Infect Control Hosp Epidemiol 2006;27:541–5. https://doi.org/10.1086/505666

284. Zivna I, Bergin D, Casavant J, et al. Impact of Bordetella pertussis exposures on a Massachusetts tertiary care medical system. Infect Control Hosp Epidemiol 2007;28:708–12. https://doi.org/10.1086/518352

285. Baggett HC, Duchin JS, Shelton W, et al. Two nosocomial pertussis outbreaks and their associated costs - King County, Washington, 2004. Infect Control Hosp Epidemiol 2007;28:537–43. https://doi.org/10.1086/513497

286. CDC. Hospital-acquired pertussis among newborns—Texas, 2004. MMWR Morb Mortal Wkly Rep 2008;57:600–3.

287. Leekha S, Thompson RL, Sampathkumar P. Epidemiology and control of pertussis outbreaks in a tertiary care center and the resource consumption associated with these outbreaks. Infect Control Hosp Epidemiol 2009;30:467–73. https://doi.org/10.1086/596774

288. Yasmin S, Sunenshine R, Bisgard KM, et al. Healthcare-associated pertussis outbreak in Arizona: challenges and economic impact, 2011. J Pediatric Infect Dis Soc 2014;3:81–4. https://doi.org/10.1093/jpids/pis136

289. De Serres G, Shadmani R, Duval B, et al. Morbidity of pertussis in adolescents and adults. J Infect Dis 2000;182:174–9. https://doi.org/10.1086/315648

290. Wright SW, Decker MD, Edwards KM. Incidence of pertussis infection in healthcare workers. Infect Control Hosp Epidemiol 1999;20:120–3. https://doi.org/10.1086/501593

291. Cherry JD. The present and future control of pertussis. Clin Infect Dis 2010;51:663–7 10.1086/655826. https://doi.org/10.1086/655826

292. Calderon M, Feja KN, Ford P, et al. Implementation of a pertussis immunization program in a teaching hospital: an argument for federally mandated pertussis vaccination of health care workers. Am J Infect Control 2008;36:392–8. https://doi.org/10.1016/j.ajic.2007.10.027

293. Weber DJ, Consoli SA, Sickbert-Bennett E, Rutala WA. Assessment of a mandatory tetanus, diphtheria, and pertussis vaccination requirement on vaccine uptake over time. Infect Control Hosp Epidemiol 2012;33:81–3. https://doi.org/10.1086/663337

294. Calugar A, Ortega-Sánchez IR, Tiwari T, Oakes L, Jahre JA, Murphy TV. Nosocomial pertussis: costs of an outbreak and benefits of vaccinating health care workers. Clin Infect Dis 2006;42:981–8. https://doi.org/10.1086/500321

295. Greer AL, Fisman DN. Use of models to identify cost-effective interventions: pertussis vaccination for pediatric health care workers. Pediatrics 2011;128:e591–9.

296. Goins WP, Edwards KM, Vnencak-Jones CL, et al. A comparison of 2 strategies to prevent infection following pertussis exposure in vaccinated healthcare personnel. Clin Infect Dis 2012;54:938–45. https://doi.org/10.1093/cid/cir973

297. Barreto L, Guasparini R, Meekison W, Noya F, Young L, Mills E. Humoral immunity 5 years after booster immunization with an adolescent and adult formulation combined tetanus, diphtheria, and 5-component acellular pertussis vaccine. Vaccine 2007;25:8172–9. https://doi.org/10.1016/j.vaccine.2007.09.031

298. Edelman KJ, He Q, Mäkinen JP, et al. Pertussis-specific cell-mediated and humoral immunity in adolescents 3 years after booster immunization with acellular pertussis vaccine. Clin Infect Dis 2004;39:179–85. https://doi.org/10.1086/421943

299. McIntyre PB, Turnbull FM, Egan AM, Burgess MA, Wolter JM, Schuerman LM. High levels of antibody in adults three years after vaccination with a reduced antigen content diphtheria-tetanus-acellular pertussis vaccine. Vaccine 2004;23:380–5. https://doi.org/10.1016/j.vaccine.2004.05.030

300. Edelman K, He Q, Mäkinen J, et al. Immunity to pertussis 5 years after booster immunization during adolescence. Clin Infect Dis 2007;44:1271–7. https://doi.org/10.1086/514338

301. McIntyre PB, Burgess MA, Egan A, Schuerman L, Hoet B. Booster vaccination of adults with reduced-antigen-content diphtheria, Tetanus and pertussis vaccine: immunogenicity 5 years post-vaccination. Vaccine 2009;27:1062–6. PubMed https://doi.org/10.1016/j.vaccine.2008.11.102

302. Kamiya H, Cho BH, Messonnier ML, Clark TA, Liang JL. Impact and cost-effectiveness of a second tetanus toxoid, reduced diphtheria toxoid, and acellular pertussis (Tdap) vaccine dose to prevent pertussis in the United States. Vaccine 2016;34:1832–8. https://doi.org/10.1016/j.vaccine.2016.02.027

303. Advisory Committee on Immunization Practices. Summary report: June 19–20, 2013 (meeting minutes). Atlanta, GA: US Department of Health and Human Services, CDC; 2013. https://www.cdc.gov/vaccines/acip/meetings/downloads/min-archive/min-jun13.pdf

304. Shefer A, Atkinson W, Friedman C, et al. CDC. Immunization of health-care personnel: recommendations of the Advisory Committee on Immunization Practices (ACIP). MMWR Recomm Rep 2011;60(RR-7):1–45.

Appx18559

305. van der Zee A, Agterberg C, Peeters M, Mooi F, Schellekens J. A clinical validation of *Bordetella pertussis* and *Bordetella parapertussis* polymerase chain reaction: comparison with culture and serology using samples from patients with suspected whooping cough from a highly immunized population. J Infect Dis 1996;174:89–96. https://doi.org/10.1093/infdis/174.1.89

306. Wendelboe AM, Van Rie A, Salmaso S, Englund JA. Duration of immunity against pertussis after natural infection or vaccination. Pediatr Infect Dis J 2005;24(Suppl):S58–61. https://doi.org/10.1097/01.inf.0000160914.59160.41

307. American Academy of Pediatrics. Diphtheria. In: Kimberlin D, Brady MT, Jackson MA, Long SS, eds. Red Book: 2015 Report of the Committee on Infectious Diseases, 30th ed. Elk Grove Village, IL: American Academy of Pediatrics; 2015325–9.

308. American Academy of Pediatrics. Tetanus. In: Kimberlin D, Brady MT, Jackson MA, Long SS, eds. Red Book: 2015 Report of the Committee on Infectious Diseases, 30th ed. Elk Grove Village, IL: American Academy of Pediatrics; 2015:773–8.

Appx18560

## Disclosure of Relationship

CDC planners and content experts wish to disclose they have no financial interests or other relationships with the manufacturers of commercial products, suppliers of commercial services, or commercial supporters. This report includes discussion of the unlabeled use of diphtheria and tetanus toxoids and acellular pertussis (DTaP) vaccines or tetanus toxoid, reduced diphtheria toxoid, and acellular pertussis (Tdap) vaccine in the following situations:

1. The following conditions are considered precautions and not contraindications as indicated in DTaP package inserts: progressive neurologic disorders including infantile spasms, uncontrolled epilepsy, or progressive encephalopathy.

2. The administration of the fourth dose of DTaP may be at an age younger than the approved age indicated in the package insert.

3. The minimum interval between the last tetanus toxoid–containing vaccine and receipt of Tdap may be shorter than the 5 years indicated in the package insert.

4. The administration of Tdap may be at an age younger than the approved age indicated in the package insert.

5. The administration of Tdap as part of the catch-up series for tetanus and diphtheria for persons aged >18 years.

6. The administration of Tdap is recommended for women during pregnancy.

7. The administration of Adacel (Tdap, Sanofi Pasteur, Swiftwater, Pennsylvania) may be at an age older than the approved age indicated in the package insert.

8. The inadvertent administration of DTaP at an age older than the approved age indicated in the package insert.

9. The inadvertent administration of Tdap at an age younger than the approved age indicated in the package insert.

Appx18561

## Advisory Committee on Immunization Practices
### Membership as of October 20, 2016

**Chair:** Nancy Bennett, MD, University of Rochester School of Medicine and Dentistry, Rochester, New York.

**Executive Secretary:** Amanda Cohn, MD, National Center for Immunization and Respiratory Diseases, CDC, Atlanta, Georgia.

**Members:** Robert L Atmar, MD, Baylor College of Medicine, Houston, Texas; Edward Belongia, MD, Marshfield Clinic Research Foundation, Marshfield, Wisconsin; Echezona Ezeanolue, MD, University of Nevada, Las Vegas, Nevada; Paul Hunter, MD, City of Milwaukee Health Department, Milwaukee, Wisconsin; Allison Kempe, MD, University of Colorado School of Medicine, Denver, Colorado; Grace Lee, MD, Harvard Pilgrim Health Care Institute & Harvard Medical School, Boston, Massachusetts; Kelly Moore, MD, Tennessee Department of Health, Nashville, Tennessee; Cynthia Pellegrini, March of Dimes, Washington D.C.; Arthur L. Reingold, MD, University of California, Berkeley, California; Laura E. Riley, MD, Harvard Medical School, Boston, Massachusetts; José R. Romero, MD, University of Arkansas for Medical Sciences and Arkansas Children's Hospital, Little Rock, Arkansas; David Stephens, MD, Emory University School of Medicine, Atlanta, Georgia; Peter Szilagyi, MD, University of California, Los Angeles (UCLA), Los Angeles, California; Emmanuel Walter, Jr., MD, Duke University School of Medicine, Durham, North Carolina.

**Ex Officio Members:** Eric Deussing, MD, Department of Defense, Atlanta, Georgia; Bruce Gellin, MD, National Vaccine Program Office, District of Columbia; Richard Gorman, MD, National Institutes of Health, Bethesda, Maryland; Amy Groom, MPH, Indian Health Service, Albuquerque, New Mexico; Mary Beth Hance, Centers for Medicare and Medicaid Services, Baltimore, Maryland; Jane A. Kim, MD, Department of Veterans Affairs, Durham, North Carolina; Narayan Nair, MD, Health Resources and Services Administration, Rockville, Maryland; Wellington Sun, MD, Food and Drug Administration, Bethesda, Maryland.

**Liaison Representatives:** American Academy of Family Physicians, Margot Savoy, MD, Wilmington, Delaware; American Academy of Pediatrics, Carrie L. Byington, MD, Salt Lake City, Utah; David Kimberlin, MD, Birmingham, Alabama; American Academy of Physician Assistants, Marie-Michèle Léger, MPH, Alexandria, Virginia; American College Health Association, Susan Even, MD, Columbia, Missouri; American College of Nurse Midwives, Carol E. Hayes,CNM, MN, MPH, Atlanta, Georgia; American College of Obstetricians and Gynecologists, Kevin A. Ault, MD Kansas City, Kansas; American College of Physicians, Sandra Adamson Fryhofer, MD, Atlanta Georgia; American Geriatrics Society, Kenneth Schmader, M, Durham, North Carolina; America's Health Insurance Plans, Mark J. Netoskie, MD, Houston, Texas; American Medical Association, Sandra Adamson Fryhofer, MD, Atlanta Georgia; American Nurses Association, Charles Rittle, DNP, Pittsburgh, Pennsylvania; American Osteopathic Association, Stanley E. Grogg, DO, Tulsa, Oklahoma; American Pharmacists Association, Stephan L. Foster, PharmD, Memphis, Tennessee; Association of Immunization Managers, Christine Finley, MPH, Burlington, Vermont; Association for Prevention Teaching and Research, W. Paul McKinney, MD, Louisville, Kentucky; Association of State and Territorial Health Officials, Terry L. Dwelle, MD, Bismark, North Dakota; Biotechnology Industry Organization, Phyllis A. Arthur, MBA, Washington D.C.; Canadian National Advisory Committee on Immunization, Ian MacDonald Gemmill, MD, Kingston, Ontario, Canada; Council of State and Territorial Epidemiologists, Christine Hahn, MD, Boise, Idaho; Infectious Diseases Society of America, Kathleen Neuzil, MD, Seattle, Washington; National Association of County and City Health Officials, Matthew Zahn, MD, Santa Ana, California; National Association of Pediatric Nurse Practitioners, Patricia Stinchfield, MS, St. Paul, Minnesota; National Foundation for Infectious Diseases, William Schaffner, MD, Nashville, Tennessee; National Immunization Council and Child Health Program, Mexico, Ignacio Villaseñor Ruiz, MD, Mexico; National Medical Association, Patricia Whitley-Williams, MD, New Brunswick, New Jersey; National Vaccine Advisory Committee, Kimberly Thompson, ScD, Orlando, Florida; Pediatric Infectious Diseases Society, Sean O'Leary, MD, Denver, Colorado; Pharmaceutical Research and Manufacturers of America, David R. Johnson, MD, Swiftwater, Pennsylvania; Society for Adolescent Health and Medicine, Amy Middleman, MD, Houston, Texas; Society for Healthcare Epidemiology of America, David Weber, MD, Chapel Hill, North Carolina.

## ACIP Pertussis Vaccines Work Group
### Membership as of October 20, 2016

**Chair:** Arthur Reingold, MD, University of California – Berkeley, Berkeley, CA (ACIP)

**Members:** William Atkinson, MD, Immunization Action Coalition, Saint Paul, Minnesota; Carol Baker, MD, Baylor College of Medicine, Houston, Texas; Richard H. Beigi, MD, University of Pittsburgh, Pittsburgh, Pennsylvania; Albert Bourbon, MPAS, University of New Mexico Hospital, Albuquerque, New Mexico; Lance Chilton, MD, University of New Mexico, Albuquerque, New Mexico; Alexis Elward, MD, Washington University School of Medicine, St. Louis, Missouri; Xin-Xing Gu, MD, National Institutes of Health, Bethesda, Maryland; Christine Hahn, MD, Idaho Department of Health and Welfare, Boise, Idaho; Scott Halperin, MD, Canadian Center for Vaccinology, Halifax, Nova Scotia, Canada; Kathleen Harriman, PhD, California Department of Public Health, Richmond, California; Carol Hayes, CNM, MN, MPH, America College of Nurse Midwives, Atlanta, Georgia; Mary Healy, MD, Baylor College of Medicine, Houston, Texas; Jessica Kahn, MD, Cincinnati Children's Hospital Medical Center, Cincinnati, Ohio; Ruth Karron, MD, Johns Hopkins Bloomberg School of Public Health, Baltimore, Maryland; Sarah Long, MD, St. Christopher's Hospital for Children, Philadelphia, Pennsylvania; Peter McIntyre, PhD, National Centre for Immunization Research and Surveillance, Sydney, Australia; Paul Offit, MD, Children's Hospital of Philadelphia, Philadelphia, Pennsylvania; Laura Riley, MD, Harvard Medical School, Boston, Massachusetts (ACIP); Elizabeth Rosenblum, MD, University of California, San Diego School of Medicine, San Diego, California; Mark Sawyer, MD, University of California, San Diego School of Medicine, San Diego, California; Stephanie Schauer, PhD, Wisconsin Department of Health Services, Madison, Wisconsin; Kenneth Schmader, MD, Duke University and Durham VA Medical Centers, Durham, North Carolina; Ann Schwartz, MD, Food and Drug Administration, Rockville, Maryland; Tina Tan, MD, Northwestern University Feinberg School of Medicine, Chicago, Illinois; Marietta Vázquez, MD, Yale University School of Medicine, New Haven, Connecticut; David Weber, MD, University of North Carolina Schools of Medicine and Public Health, Chapel Hill, North Carolina; Matthew Zahn, MD, Orange County Health Care Agency, Santa Ana, California.

**Contributors:** Anna Acosta, MD; Thomas A. Clark, MD; Denise Jamieson, MD; Stacey Martin, MSc; Nancy E. Messonnier, MD; Pedro Moro, MD; Sonia Rasmussen, MD; Tami Skoff, MS; Tejpratap Tiwari, MD, Lucia Tondella, PhD; JoEllen Wolicki, CDC, Atlanta, Georgia.

**Work Group Secretariat (CDC):** Jennifer L. Liang, DVM.

Appx18562

Appx18563

The *Morbidity and Mortality Weekly Report (MMWR)* Series is prepared by the Centers for Disease Control and Prevention (CDC) and is available free of charge in electronic format. To receive an electronic copy each week, visit *MMWR*'s free subscription page at *https://www.cdc.gov/mmwr/mmwrsubscribe.html*. Paper copy subscriptions are available through the Superintendent of Documents, U.S. Government Printing Office, Washington, DC 20402; telephone 202-512-1800.

Readers who have difficulty accessing this PDF file may access the HTML file at https://www.cdc.gov/mmwr/volumes/67/rr/rr6702a1.htm?s_cid=rr6702a1_w. Address all inquiries about the *MMWR* Series, including material to be considered for publication, to Executive Editor, *MMWR* Series, Mailstop E-90, CDC, 1600 Clifton Rd., N.E., Atlanta, GA 30329-4027 or to *mmwrq@cdc.gov.*

All material in the *MMWR* Series is in the public domain and may be used and reprinted without permission; citation as to source, however, is appreciated.

Use of trade names and commercial sources is for identification only and does not imply endorsement by the U.S. Department of Health and Human Services.

References to non-CDC sites on the Internet are provided as a service to *MMWR* readers and do not constitute or imply endorsement of these organizations or their programs by CDC or the U.S. Department of Health and Human Services. CDC is not responsible for the content of these sites. URL addresses listed in *MMWR* were current as of the date of publication.

ISSN: 1057-5987 (Print)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,
                         *Plaintiffs,*
       v.
MERCK & CO., INC.,
                         *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S EXHIBITS IN SUPPORT OF MERCK'S RESPONSE TO RELATORS' STATEMENT OF UNDISPUTED FACTS

# EXHIBIT 312

Appx18565

Morbidity and Mortality Weekly Report

# Updated Recommendations for Use of Tetanus Toxoid, Reduced Diphtheria Toxoid and Acellular Pertussis Vaccine (Tdap) in Pregnant Women and Persons Who Have or Anticipate Having Close Contact with an Infant Aged <12 Months — Advisory Committee on Immunization Practices (ACIP), 2011

Compared with older children and adults, infants aged <12 months have substantially higher rates of pertussis and the largest burden of pertussis-related deaths. Since 2004, a mean of 3,055 infant pertussis cases with more than 19 deaths has been reported each year through the National Notifiable Diseases Surveillance System (CDC, unpublished data, 2011). The majority of pertussis cases, hospitalizations, and deaths occur in infants aged ≤2 months, who are too young to be vaccinated; therefore, other strategies are required for prevention of pertussis in this age group. Since 2005, the Advisory Committee on Immunization Practices (ACIP) has recommended tetanus toxoid, reduced diphtheria toxoid and acellular pertussis (Tdap) booster vaccines to unvaccinated postpartum mothers and other family members of newborn infants to protect infants from pertussis, a strategy referred to as cocooning (*1*). Over the past 5 years, cocooning programs have proven difficult to implement widely (*2,3*). Cocooning programs might achieve moderate vaccination coverage among postpartum mothers but have had limited success in vaccinating fathers or other family members. On June 22, 2011, ACIP made recommendations for use of Tdap in unvaccinated pregnant women and updated recommendations on cocooning and special situations. This report summarizes data considered and conclusions made by ACIP and provides guidance for implementing its recommendations.

ACIP recommends a single Tdap dose for persons aged 11 through 18 years who have completed the recommended childhood diphtheria and tetanus toxoids and pertussis/diphtheria and tetanus toxoids and acellular pertussis (DTP/DTaP) vaccination series and for adults aged 19 through 64 years who have not previously received Tdap (*1,4*). ACIP also recommends that adults aged 65 years and older receive a single dose of Tdap if they have or anticipate having close contact with an infant aged <12 months and previously have not received Tdap (*5*). Two Tdap vaccines are available in the United States. Adacel (Sanofi Pasteur) is licensed for use in persons aged 11 through 64 years. Boostrix (GlaxoSmithKline Biologicals) is licensed for use in persons aged ≥10 years (*6*).

The ACIP Pertussis Vaccines Work Group reviewed unpublished Tdap safety data from pregnancy registries and the Vaccine Adverse Event Reporting System (VAERS) and published studies on use of Tdap in pregnant women. The Work Group also considered the epidemiology of pertussis in infants and provider and program feedback, and then presented policy options for consideration to ACIP. These updated recommendations on use of Tdap in pregnant women are consistent with the goal of reducing the burden of pertussis in infants.

## Safety of Tdap in Pregnant Women

In prelicensure evaluations, the safety of administering a booster dose of Tdap to pregnant women was not studied. Because information on use of Tdap in pregnant women was lacking, both manufacturers of Tdap established pregnancy registries to collect information and pregnancy outcomes from pregnant women vaccinated with Tdap. Data on the safety of administering Tdap to pregnant women are now available. ACIP reviewed published and unpublished data from VAERS, Sanofi Pasteur (Adacel) and GlaxoSmithKline (Boostrix) pregnancy registries, and small studies (*7,8*). ACIP concluded that available data from these studies did not suggest any elevated frequency or unusual patterns of adverse events in pregnant women who received Tdap and that the few serious adverse events reported were unlikely to have been caused by the vaccine. Both tetanus and diphtheria toxoids (Td) and tetanus toxoid vaccines have been used extensively in pregnant women worldwide to prevent neonatal tetanus. Tetanus- and diphtheria-toxoid containing vaccines administered during pregnancy have not been shown to be teratogenic (*9,10*). From a safety perspective, ACIP concluded that administration of Tdap after 20 weeks' gestation is preferred to minimize the risk for any low-frequency adverse event and the possibility that any spurious association might appear causative.

## Transplacental Maternal Antibodies

For infants, transplacentally transferred maternal antibodies might provide protection against pertussis in early life and before beginning the primary DTaP series. Several studies provide evidence supporting the existence of efficient transplacental transfer of pertussis antibodies (*7,11,12*). Cord blood from newborn infants whose mothers received Tdap during pregnancy or before pregnancy had higher concentrations of pertussis antibodies when compared with cord blood from newborn infants of unvaccinated mothers (*7,11*). The half-life of transferred maternal pertussis antibodies is approximately 6 weeks (*12*). The effectiveness of maternal antipertussis antibodies in preventing infant pertussis is not yet known, but pertussis-specific antibodies likely confer protection and modify the severity of pertussis illness (*13,14*). In addition,

Appx18566

a woman vaccinated with Tdap during pregnancy likely will be protected at time of delivery, and therefore less likely to transmit pertussis to her infant. After receipt of Tdap, boosted pertussis-specific antibody levels peak after several weeks, followed by a decline over several months (15,16). To optimize the concentration of maternal antibodies transferred to the fetus, ACIP concluded that unvaccinated pregnant women should receive Tdap, preferably in the third or late second (after 20 weeks gestation) trimester.

## Interference with Infant Immune Response to Primary DTaP Vaccination

Several studies have suggested that maternal pertussis antibodies can inhibit active pertussis-specific antibody production after administration of DTaP vaccine to infants of mothers vaccinated with Tdap during pregnancy, referred to as blunting (12,17). Because correlates of protection are not fully understood, the clinical importance of blunting of an infant's immune response is not clear. Evidence suggests that any blunting would be short-lived because circulating maternal antibodies decline rapidly (12,18). Circulating maternal pertussis antibodies might reduce an infant's risk for pertussis in the first few months of life but slightly increase risk for disease because of a blunted immune response after receipt of primary DTaP doses. The benefit would be to reduce the risk for disease and death in infants aged <3 months, but the trade-off might be to increase the occurrence of pertussis in older infants; however, this group experiences a substantially lower burden of hospitalizations and mortality (National Notifiable Diseases Surveillance System, CDC, unpublished data, 2011).

Currently, two clinical trials are being conducted to measure the immune response of infants receiving DTaP immunization at ages 2, 4, and 6 months whose mothers received Tdap during the third trimester of pregnancy (19,20). These trials also are designed to evaluate safety and immunogenicity of Tdap during pregnancy, but are not sufficiently powered to assess disease endpoints. Analysis of interim data from one trial (19, unpublished data) measured infant antibody to pertussis antigens in a blinded fashion for two groups: infants whose mothers received Tdap and infants whose mothers received Td. The first group had elevated antipertussis antibody levels compared with the second at birth and before dose 1, which might be the result of passive antibody transfer, but had lower antipertussis antibody levels after dose 3. In both groups, antipertussis antibody levels were comparable before doses 2 and 3. Although the first group had lower antipertussis antibody levels after dose 3, the evidence of sufficient immune response to DTaP doses compared with the second group was reassuring. ACIP concluded that the interim data are consistent with

previously published literature suggesting a short duration of blunting of the infant response, and that the potential benefit of protection from maternal antibodies in newborn infants outweighs the potential risk for shifting disease burden to later in infancy.

## Cocooning

Cocooning is defined as the strategy of vaccinating pregnant women immediately postpartum and all other close contacts of infants aged <12 months with Tdap to reduce the risk for transmission of pertussis to infants. Cocooning has been recommended by ACIP since 2005. Cocooning programs have achieved moderate postpartum coverage among mothers but have had limited success in vaccinating fathers or other family members (3) (CDC, unpublished data, 2011). Programmatic challenges impede implementation of cocooning programs complex and also impede program expansion and sustainability (2). The effectiveness of vaccinating postpartum mothers and close contacts to protect infants from pertussis is not yet known, but the delay in antibody response among those vaccinated with Tdap after an infant's birth might result in insufficient protection to infants during the first weeks of life (21). ACIP concluded that cocooning alone is an insufficient strategy to prevent pertussis morbidity and mortality in newborn infants. Regardless, ACIP concluded that cocooning likely provides indirect protection to infants and firmly supports vaccination with Tdap for unvaccinated persons who anticipate close contact with an infant.

## Decision and Cost Effectiveness Analysis

A decision analysis and cost effectiveness model was developed to assess the impact and cost effectiveness of maternal Tdap vaccination during pregnancy compared with immediately postpartum. The model showed that Tdap vaccination during pregnancy would prevent more infant cases, hospitalizations, and deaths compared with the postpartum dose for two reasons: 1) vaccination during pregnancy benefits the mother and infant by providing earlier protection to the mother, thereby protecting the infant at birth; and 2) vaccination during late pregnancy maximizes transfer of maternal antibodies to the infant, likely providing direct protection to the infant for a period after birth. Model results were most sensitive to efficacy of maternal antibodies and risk for disease as a result of blunting; however, a sensitivity analysis in which infants were assumed to have as little as 20% efficacy of maternal antibodies and a 60% increase in risk for disease as a result of blunting found that maternal vaccination during pregnancy was more cost effective and prevented a greater proportion of infant cases and deaths than postpartum maternal vaccination (22).

Appx18567

Morbidity and Mortality Weekly Report

## Guidance for Use

**Maternal vaccination.** ACIP recommends that women's health-care personnel implement a Tdap vaccination program for pregnant women who previously have not received Tdap. Health-care personnel should administer Tdap during pregnancy, preferably during the third or late second trimester (after 20 weeks' gestation). If not administered during pregnancy, Tdap should be administered immediately postpartum.

**Cocooning.** ACIP recommends that adolescents and adults (e.g., parents, siblings, grandparents, child-care providers, and health-care personnel) who have or anticipate having close contact with an infant aged <12 months should receive a single dose of Tdap to protect against pertussis if they have not previously received Tdap. Ideally, these adolescents and adults should receive Tdap at least 2 weeks before beginning close contact with the infant.

## Special Situations

**Pregnant women due for tetanus booster.** If a tetanus and diphtheria booster vaccination is indicated during pregnancy for a woman who has previously not received Tdap (i.e., more than 10 years since previous Td), then Tdap should be administered during pregnancy, preferably during the third or late second trimester (after 20 weeks' gestation).

**Wound management for pregnant women.** As part of standard wound management care to prevent tetanus, a tetanus toxoid–containing vaccine might be recommended for wound management in a pregnant woman if 5 years or more have elapsed since last receiving Td. If a tetanus booster is indicated for a pregnant woman who previously has not received Tdap, Tdap should be administered.

**Pregnant women with unknown or incomplete tetanus vaccination.** To ensure protection against maternal and neonatal tetanus, pregnant women who have never been vaccinated against tetanus should receive three vaccinations containing tetanus and reduced diphtheria toxoids. The recommended schedule is 0, 4 weeks, and 6 to 12 months. Tdap should replace 1 dose of Td, preferably during the third or late second trimester (after 20 weeks' gestation) of pregnancy.

### References

1. CDC. Preventing tetanus, diphtheria, and pertussis among adults: use of tetanus toxoid, reduced diphtheria toxoid and acellular pertussis vaccine. Recommendations of the Advisory Committee on Immunization Practices (ACIP) and recommendation of ACIP, supported by the Healthcare Infection Control Practices Advisory Committee (HICPAC), for use of Tdap among health-care personnel. MMWR 2006;55(No. RR-17).
2. Healy CM, Rench MA, Castagnini LA, Baker CJ. Pertussis immunization in a high-risk postpartum population. Vaccine 2009;27:5599–602.
3. Healy CM, Rench MA, Baker CJ. Implementation of cocooning against pertussis in a high-risk population. Clin Infect Dis 2011;52:157–62.
4. CDC. Preventing tetanus, diphtheria, and pertussis among adolescents: use of tetanus toxoid, reduced diphtheria toxoid and acellular pertussis vaccines. Recommendations of the Advisory Committee on Immunization Practices (ACIP). MMWR 2006;55(No. RR-3).
5. CDC. Updated recommendations for use of tetanus toxoid, reduced diphtheria toxoid and acellular pertussis (Tdap) vaccine from the Advisory Committee on Immunization Practices, 2010. MMWR 2011;60;13–5.
6. CDC. FDA approval of expanded age indication for a tetanus toxoid, reduced diphtheria toxoid and acellular pertussis vaccine. MMWR 2011;60;1279–80.
7. Gall SA, Myers J, Pichichero M. Maternal immunization with tetanus-diphtheria-pertussis vaccine: effect on maternal and neonatal serum antibody levels. Am J Obstet Gynecol 2011;204:334.e1–5.
8. Talbot EA, Brown KH, Kirkland, KB, Baughman AL, Halperin SA, Broder KP. The safety of immunizing with tetanus-diphtheria-acellular pertussis vaccine (Tdap) less than 2 years following previous tetanus vaccination: experience during a mass vaccination campaign of healthcare personnel during a respiratory illness outbreak. Vaccine 2010;28:8001–7.
9. Czeizel AE, Rockenbauer M. Tetanus toxoid and congenital abnormalities. Int J Gynecol Obstet 1999;64:253–8.
10. Silveria CM, Caceres VM, Dutra MG, Lopes-Camelo J, Castilla EE. Safety of tetanus toxoid in pregnant women: a hospital-based case-control study of congenital anomalies. Bull World Health Organ 1995;73:605–8.
11. Leuridan E, Hens N, Peeters N, de Witte L, Van der Meeren O, Van Damme P. Effect of a prepregnancy pertussis booster dose on maternal antibody titers in young infants. Pediatr Infect Dis J 2011;30:608–10.
12. Van Savage J, Decker MD, Edwards KM, Sell SH, Karzon DT. Natural history of pertussis antibody in the infant and effect on vaccine response. J Infect Dis 1990;161:487–92.
13. Ward JI, Cherry JD, Chang SJ, et al. *Bordetella pertussis* infections in vaccinated and unvaccinated adolescents and adults, as assessed in a national prospective randomized Acellular Pertussis Vaccine Trial (APERT). Clin Infect Dis 2006;43:151–7.
14. Van Rie A, Wendelboe AM, Englund JA. Role of maternal pertussis antibodies in infants. Pediatr Infect Dis J 2005;24(5 Suppl):S62–5.
15. Le T, Cherry JD, Chang SJ, et al. Immune responses and antibody decay after immunization of adolescents and adults with an acellular pertussis vaccine: the APERT study. J Infect Dis 2004;190:535–44.
16. Kirkland KB, Talbot EA, Decker MD, Edwards KM. Kinetics of pertussis immune responses to tetanus-diphtheria-acellular pertussis vaccine in health care personnel: implications for outbreak control. Clin Infect Dis 2009;49:584–7.
17. Englund JA, Anderson EL, Reed GF, et al. The effect of maternal antibody on the serologic response and the incidence of adverse reactions after primary immunization with acellular and whole-cell pertussis vaccines combined with diphtheria and tetanus toxoids. Pediatrics 1995;96(3 Pt 2):580–4.
18. Hardy-Fairbanks AJ, Pan SJ, Johnson DR, Bernstein HH. Immune responses in infants following receipt of pertussis immunization by their mothers during pregnancy. Presented at the 48th Infectious Diseases Society of America Annual Meeting, Vancouver, Canada; October 21–24, 2010.
19. Dalhousie University. Pertussis maternal immunization study. Identifier: NCT00553228. Available at http://clinicaltrials.gov/show/nct00553228. Accessed October 13, 2011.
20. National Institute of Allergy and Infectious Diseases. Pertussis vaccine in healthy pregnant women. Identifier: NCT00707148. Available at http://clinicaltrials.gov/show/nct0707148. Accessed October 13, 2011.
21. Halperin BA, Morris A, Mackinnon-Cameron D, et al. Kinetics of the antibody response to tetanus-diphtheria-acellular pertussis vaccine in women of childbearing age and postpartum women. Clin Infect Dis 2011;53;885–92.
22. Terranella A, Asay G, Messonnier M, Clark T, Liang J. Preventing infant pertussis: a decision analysis comparing prenatal vaccination to cocooning. Presented at the 49th Infectious Diseases Society of America Annual Meeting, Boston, MA; October 20–23, 2011.

Appx18568

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,
                              *Plaintiffs,*
          v.
MERCK & CO., INC.,
                              *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S EXHIBITS IN SUPPORT OF MERCK'S RESPONSE TO RELATORS' STATEMENT OF UNDISPUTED FACTS

# EXHIBIT 313

Appx18569

Morbidity and Mortality Weekly Report

# Updated Recommendations for Use of Tetanus Toxoid, Reduced Diphtheria Toxoid, and Acellular Pertussis Vaccine (Tdap) in Pregnant Women — Advisory Committee on Immunization Practices (ACIP), 2012

In October 2011, in an effort to reduce the burden of pertussis in infants, the Advisory Committee on Immunization Practices (ACIP) recommended that unvaccinated pregnant women receive a dose of tetanus toxoid, reduced diphtheria toxoid, and acellular pertussis vaccine (Tdap) (1). Vaccination of women with Tdap during pregnancy is expected to provide some protection to infants from pertussis until they are old enough to be vaccinated themselves. Tdap given to pregnant women will stimulate the development of maternal antipertussis antibodies, which will pass through the placenta, likely providing the newborn with protection against pertussis in early life, and will protect the mother from pertussis around the time of delivery, making her less likely to become infected and transmit pertussis to her infant (1). The 2011 Tdap recommendation did not call for vaccinating pregnant women previously vaccinated with Tdap. On October 24, 2012, ACIP voted to recommend use of Tdap during every pregnancy. This report summarizes data considered and conclusions made by ACIP and provides guidance for implementing its recommendations. These updated recommendations on use of Tdap in pregnant women aim to optimize strategies for preventing pertussis morbidity and mortality in infants.

ACIP is chartered as a federal advisory committee to provide expert external advice and guidance to the Director of the Centers for Disease Control and Prevention (CDC) on use of vaccines and related agents for the control of vaccine-preventable diseases in the civilian population of the United States. Recommendations for routine use of vaccines in children and adolescents are harmonized to the greatest extent possible with recommendations made by the American Academy of Pediatrics, the American Academy of Family Physicians (AAFP), and the American College of Obstetricians and Gynecologists. Recommendations for routine use of vaccines in adults are reviewed and approved by the American College of Physicians, AAFP, the American College of Obstetricians and Gynecologists, and the American College of Nurse-Midwives. ACIP recommendations adopted by the CDC Director become agency guidelines on the date published in the *Morbidity and Mortality Weekly Report* (*MMWR*).

The United States has experienced substantial increases in reported pertussis cases over the past several years. Provisional case counts for 2012 have surpassed the last peak year, 2010, with 41,880 pertussis cases and 14 deaths in infants aged <12 months (2) (CDC, unpublished data, 2012). To reduce this burden, optimizing the current vaccination program and protecting infants who are at highest risk for death are immediate priorities. Since the 2011 ACIP vaccination recommendation, uptake of Tdap among pregnant women has been low; one survey of 1,231 women (August 2011 to April 2012) estimated that only 2.6% of women received Tdap during their recent pregnancy (3). New data indicate that maternal antipertussis antibodies are short-lived; therefore, Tdap vaccination in one pregnancy will not provide high levels of antibodies to protect newborns during subsequent pregnancies (4).

## Methods

In monthly teleconferences during 2012, the ACIP Pertussis Vaccines Work Group considered published, peer-reviewed literature and unpublished data relevant to vaccinating pregnant women with Tdap. When data were not available, expert opinion was considered. Summaries of the data reviewed and work group discussions were presented to ACIP before recommendations were proposed. The proposed Tdap recommendation for pregnant women was presented at the October 2012 ACIP meeting and approved by ACIP.

## Summary of ACIP Deliberations and Rationale

### A dose of Tdap during each pregnancy

Very young infants are dependent solely on maternal antibodies and lack the ability to mount a cell-mediated response (4). The effectiveness and optimal concentration of maternal antipertussis antibodies in newborns are not yet known, but high levels of antibodies in the first weeks after birth likely confer protection and might prevent pertussis or modify disease severity (5–7). Studies on the persistence of antipertussis antibodies following a dose of Tdap show antibody levels in healthy, nonpregnant adults peak during the first month after vaccination, with substantial antibody decay after 1 year (8–10). Antibody kinetics in pregnant women likely would be similar. One study evaluated persistence of maternal

Appx18570

antipertussis antibody concentrations from maternal delivery and cord blood pairs from women who received Tdap within the prior 2 years (4). The estimated antipertussis antibody concentrations at birth in most of these infants were considered unlikely to provide adequate protection. These findings indicate that maternal antibodies from women immunized before pregnancy waned quickly and the concentration of maternal antibodies was unlikely to be high enough to provide passive protection to infants (4). Because antibody levels wane substantially during the first year after vaccination, ACIP concluded a single dose of Tdap at one pregnancy would be insufficient to provide protection for subsequent pregnancies.

### Potential Impact of Tdap During Pregnancy

For the 2011 ACIP recommendation, ACIP reviewed a decision analysis model developed to assess the impact and cost effectiveness of Tdap vaccination during pregnancy compared with immediately postpartum vaccination (1). The model showed that Tdap vaccination during pregnancy would prevent more infant cases, hospitalizations, and deaths compared with the postpartum dose (11).

For this updated recommendation, the model was rereviewed and the analysis updated. To estimate the potential impact of Tdap given either during pregnancy or postpartum, percent mean reductions were applied to the annual mean number of reported pertussis cases in infants aged <12 months during 2000–2011 (CDC, unpublished data, 2011). During 2000–2011, the annual mean of pertussis cases in infants aged <12 months was 2,746 (range: 1,803–4,298), hospitalizations was 1,217 (range: 687–1,938), and deaths was 18 (range: 8–35) (CDC, unpublished data, 2011). Based on the model, Tdap vaccination during pregnancy might prevent 906 (range: 595–1,418) infant cases, 462 (range: 261–736) hospitalizations, and nine (range: 4–17) deaths; a postpartum dose might prevent 549 (range: 361–860) infant cases, 219 (range: 124–349) hospitalizations, and three (range: 1–6) deaths (CDC, unpublished data, 2012).

### Birth Statistics in the United States

To address the likelihood that women might receive Tdap during consecutive pregnancies in a short period, and therefore theoretically be at greater risk for adverse reactions, ACIP reviewed available data on birth statistics. In the United States, approximately 4 million births are reported each year, and an average of 2.06 children are born per woman in a lifetime (12,13). Among women with more than one pregnancy, only 2.5% have an interval ≤12 months between births (14). The majority of women, who have two pregnancies, have an interval of ≥13 months between births (14). For women of

lower socioeconomic status, the interval between pregnancies generally is ≥18 months (15). Approximately 5% of women have four or more babies (16). ACIP concluded that the interval between subsequent pregnancies is likely longer than the persistence of maternal antipertussis antibodies, and were reassured that most women would receive only 2 Tdap doses and a small proportion of women would receive ≥4 doses of Tdap.

### Safety of Repeat Tdap Administration to Pregnant Women

In 2011, ACIP concluded that available data did not suggest any elevated frequency or unusual patterns of adverse events in pregnant women who received Tdap and that the few serious adverse events reported were unlikely to have been caused by the vaccine; at that time, a dose of Tdap for every pregnancy was not considered (9). Published data on receipt of 2 doses of Tdap and multiple doses of tetanus toxoid–containing vaccines were reviewed. Receipt of a second dose of Tdap at a 5- or 10-year interval in healthy nonpregnant adolescents and adults was well tolerated; injection site pain was the most commonly reported adverse event (9,17–20). The frequency of reported adverse events for the second dose was similar to the first dose in these same subjects and in naïve controls receiving Tdap for the first time. Of the few serious adverse events reported, none were attributed to the vaccine. Fever was reported in 2.4%–6.5% of recipients of a Tdap booster; the frequency of fever was similar to that in the same subjects after their first Tdap dose and in naïve controls (9,17–19). Studies on short intervals (i.e., within 21 days or ≤2 years) between receipt of tetanus and diphtheria toxoids (Td) and Tdap or Tdap-inactivated polio vaccine in healthy, nonpregnant adolescents and adults found no serious adverse events (21–23). Fever was reported in 1.7%–6.8% of subjects who received Tdap ≤2 years after Td; rates were comparable to the control group and to cohorts that received Tdap longer after receipt of Td (21,22). The number of subjects in these studies was small, and therefore, the findings do not rule out the possibility of rare but serious adverse events.

A theoretical risk exists for severe local reactions (e.g., Arthus reactions, whole limb swelling) for pregnant women who have multiple closely spaced pregnancies. Arthus reactions and whole limb swelling are hypersensitivity reactions that have been associated with vaccines containing tetanus toxoid, tetanus and diphtheria toxoids, and/or pertussis antigens. Historical data on multiple doses of Td and tetanus toxoid vaccines (TT) indicate that hypersensitivity was associated with higher levels of preexisting antibody (24–26). The frequency of side effects depended on antigen content, product formulation, preexisting antibody levels related to the interval since last dose, and the number of doses (24–26). Challenges

Appx18571

Morbidity and Mortality Weekly Report

to reviewing historical data on multiple doses of TT and Td include differences in adjuvant and toxoid amounts in vaccines over time and severity of adverse events by number of vaccines received (24–26). Most of the data are historical, and the risk for severe adverse events likely has been reduced with current formulations that contain lower doses of TT.

TT and Td have been used extensively in pregnant women worldwide to prevent neonatal tetanus; large studies on use of TT during pregnancy have not reported clinically significant severe adverse events (27–30). Safety data on use of Td during multiple pregnancies have not been published. ACIP believes the potential benefit of preventing pertussis morbidity and mortality in infants outweighs the theoretical concerns of possible severe adverse events.

ACIP concluded that experience with tetanus-toxoid containing vaccines suggests no excess risk for severe adverse events for women receiving Tdap with every pregnancy. ACIP stated the need for safety studies of severe adverse events when Tdap is given during subsequent pregnancies. Plans for safety monitoring in pregnant women following Tdap administration include enhanced monitoring in Vaccine Adverse Event Reporting System (VAERS) and utilizing the Vaccine Safety Datalink (VSD) to assess acute adverse events, adverse pregnancy outcomes affecting the mother, and birth outcomes; assessing risks for rare adverse events in pregnant women after Tdap will require data collection for several years (31).

### Vaccination During the Third Trimester

Tdap may be administered any time during pregnancy, but vaccination during the third trimester would provide the highest concentration of maternal antibodies to be transferred closer to birth (4). After receipt of Tdap, a minimum of 2 weeks is required to mount a maximal immune response to the vaccine antigens (32,33). Active transport of maternal immunoglobulin G does not substantially take place before 30 weeks of gestation (34). One study of pregnant women who received Tdap within the prior 2 years noted that maternal antibodies waned quickly; even women immunized during the first or second trimester had low levels of antibodies at term (4). Therefore, to optimize the concentration of vaccine-specific antipertussis antibodies transported from mother to infant, ACIP concluded that pregnant women should be vaccinated with Tdap during the third trimester.

## ACIP Recommendations for Pregnant Women

ACIP recommends that providers of prenatal care implement a Tdap immunization program for all pregnant women. Health-care personnel should administer a dose of Tdap during each pregnancy, irrespective of the patient's prior history of receiving Tdap.

### Guidance for Use

To maximize the maternal antibody response and passive antibody transfer to the infant, optimal timing for Tdap administration is between 27 and 36 weeks gestation although Tdap may be given at any time during pregnancy. For women not previously vaccinated with Tdap, if Tdap is not administered during pregnancy, Tdap should be administered immediately postpartum.

### Special Situations

**Pregnant women due for tetanus booster**. If a tetanus and diphtheria booster vaccination is indicated during pregnancy (i.e., >10 years since previous Td), then Tdap should be administered. Optimal timing is between 27 and 36 weeks gestation to maximize the maternal antibody response and passive antibody transfer to the infant.

**Wound management for pregnant women**. As part of standard wound management to prevent tetanus, a tetanus toxoid–containing vaccine might be recommended for wound management in a pregnant woman if ≥5 years have elapsed since the previous Td booster. If a Td booster is recommended for a pregnant woman, health-care providers should administer Tdap.

**Pregnant women with unknown or incomplete tetanus vaccination**. To ensure protection against maternal and neonatal tetanus, pregnant women who never have been vaccinated against tetanus should receive three vaccinations containing tetanus and reduced diphtheria toxoids. The recommended schedule is 0, 4 weeks, and 6 through 12 months. Tdap should replace 1 dose of Td, preferably between 27 and 36 weeks gestation to maximize the maternal antibody response and passive antibody transfer to the infant.

### Cocooning

ACIP recommends that adolescents and adults (e.g., parents, siblings, grandparents, child-care providers, and health-care personnel) who have or anticipate having close contact with an infant aged <12 months should receive a single dose of Tdap to protect against pertussis if they have not received Tdap previously. Guidance will be forthcoming on revaccination of persons who anticipate close contact with an infant, including postpartum women who previously have received Tdap.

### Research Needs

Future research needs will address the effectiveness of Tdap vaccination of pregnant women to prevent infant pertussis morbidity and mortality, the impact of timing of Tdap during

Appx18572

pregnancy on infant pertussis, and safety of multiple doses of Tdap in pregnant women. CDC will monitor and assess the safety of Tdap use during pregnancy. Results from these studies and monitoring systems will inform future considerations made by ACIP on use of Tdap in preventing infant pertussis morbidity and mortality.

### Reported by

*Mark Sawyer, MD, Univ of California, San Diego, La Jolla, California. Jennifer L. Liang, DVM, Nancy Messonnier, MD, Thomas A. Clark, MD, Div of Bacterial Diseases, National Center for Immunization and Respiratory Diseases, CDC.* **Corresponding contributor**: *Jennifer L. Liang, jliang@cdc.gov, 404-639-2301.*

### Acknowledgments

Members of the Advisory Committee on Immunization Practices.

### References

1. CDC. Updated recommendations for use of tetanus toxoid, reduced diphtheria toxoid and acellular pertussis vaccine (Tdap) in pregnant women and persons who have or anticipate having close contact with an infant aged <12 months—Advisory Committee on Immunization Practices (ACIP), 2011. MMWR 2011;60:1424–6.
2. CDC. Notifiable diseases and mortality tables. MMWR 2012;61:ND 719–32.
3. Liang J. Considerations for recommendation on Tdap for every pregnancy. Presented to the Advisory Committee on Immunization Practices (ACIP), Atlanta, GA; October 24, 2012.
4. Healy CM, Rench MA, Baker CJ. Importance of timing of maternal Tdap immunization and protection of young infants. Clin Infect Dis 2013;56:539–44.
5. Englund JA, Anderson EL, Reed GF, et al. The effect of maternal antibody on the serologic response and the incidence of adverse reactions after primary immunization with acellular and whole-cell pertussis vaccines combined with diphtheria and tetanus toxoids. Pediatrics 1995;96(3 Pt 2):580–4.
6. Van Rie A, Wendelboe AM, Englund JA. Role of maternal pertussis antibodies in infants. Pediatr Infect Dis J 2005;24(5 Suppl):S62–5.
7. Libster R, Edwards KM. How can we best prevent pertussis in infants? Clin Infect Dis 2012;54:85–7.
8. Weston W, Messier M, Friedland LR, Wu X, Howe B. Persistence of antibodies 3 years after booster vaccination of adults with combined acellular pertussis, diphtheria and tetanus toxoids vaccine. Vaccine 2011;29:8483–6.
9. Booy R, Van der Meeren O, Ng SP, Celzo F, Ramakrishnan G, Jacquet JM. A decennial booster dose of reduced antigen content diphtheria, tetanus, acellular pertussis vaccine (Boostrix™) is immunogenic and well tolerated in adults. Vaccine 2010;29:45–50.
10. Tomovici A, Barreto L, Zickler P, et al. Humoral immunity 10 years after booster immunization with an adolescent and adult formulation combined tetanus, diphtheria, and 5-component acellular pertussis vaccine. Vaccine 2012;30:2647–53.
11. Terranella A, Asay G, Messonnier M, Clark T, Liang J. Preventing infant pertussis: a decision analysis comparing prenatal vaccination to cocooning. Presented at the 49th Infectious Diseases Society of America Annual Meeting, Boston, MA; October 20–23, 2011.
12. CDC. FastStats: births and natality. Atlanta, GA: US Department of Health and Human Services, CDC; 2013. Available at http://www.cdc.gov/nchs/fastats/births.htm.
13. Central Intelligence Agency. The world factbook; United States; people and society; total fertility rate. Washington, DC: Central Intelligence Agency; 2012. Available at https://www.cia.gov/library/publications/the-world-factbook/geos/us.html.
14. Martinez G, Daniels K, Chandra A. Fertility of men and women aged 15–44 years in the United States: National Survey of Family Growth, 2006–2010. Natl Health Stat Rep 2012;51.
15. CDC. Summary of health indicators. 2010 Pregnancy Nutrition Surveillance, Pregnancy Nutrition Surveillance System. Atlanta, GA: US Department of Health and Human Services, CDC; 2011. Available at http://www.cdc.gov/pednss/pnss_tables/pdf/national_table2.pdf.
16. US Census Bureau. Fertility of American women: 2010 – detailed tables. Washington, DC: US Census Bureau; 2010. Available at http://www.census.gov/hhes/fertility/data/cps/2010.html.
17. Halperin SA, McNeil S, Langley J, et al. Tolerability and antibody response in adolescents and adults revaccinated with tetanus toxoid, reduced diphtheria toxoid, and acellular pertussis vaccine adsorbed (Tdap) 4–5 years after a previous dose. Vaccine 2011;29:8459–65.
18. Halperin SA, Scheifele D, De Serres G, et al. Immune responses in adults to revaccination with a tetanus toxoid, reduced diphtheria toxoid, and acellular pertussis vaccine 10 years after a previous dose. Vaccine 2012; 30:974–82.
19. Knuf M, Vetter V, Celzo F, Ramakrishnan G, Van Der Meeren O, Jacquet JM. Repeated administration of a reduced-antigen-content diphtheria-tetanus-acellular pertussis and poliomyelitis vaccine (dTpa-IPV; Boostrix™ IPV). Hum Vaccin 2010;6:554–61.
20. Mertsola J, Van der Meeren O, He Q, et al. Decennial administration of a reduced antigen content diphtheria and tetanus toxoids and acellular pertussis vaccine in young adults. Clin Infect Dis 2010;51:656–62.
21. Halperin SA, Sweet L, Baxendale D, et al. How soon after a prior tetanus-diphtheria vaccination can one give adult formulation tetanus-diphtheria-acellular pertussis vaccine? Pediatr Infect Dis J 2006;25:195–200.
22. Beytout J, Launay O, Guiso N, et al. Safety of Tdap-IPV given one month after Td-IPV booster in healthy young adults: a placebo-controlled trial. Hum Vaccin 2009;5:315–21.
23. Talbot EA, Brown KH, Kirkland KB, Baughman AL, Halperin SA, Broder KP. The safety of immunizing with tetanus-diphtheria-acellular pertussis vaccine (Tdap) less than 2 years following previous tetanus vaccination: experience during a mass vaccination campaign of healthcare personnel during a respiratory illness outbreak. Vaccine 2010;28:8001–7.
24. Edsall G, Elliott MW, Peebles TC, Eldred MC. Excessive use of tetanus toxoid boosters. JAMA. 1967;202:111–3.
25. Levine L, Ipsen J Jr, McComb JA. Adult immunization. Preparation and evaluation of combined fluid tetanus and diphtheria toxoids for adult use. Am J Hyg 1961;73:20–35.
26. Wassilak SGF, Roper MH, Murphy TV, Orenstein WA. Tetanus toxoid. In: Plotkin S, Orenstein W, Offit P, eds. Vaccines. 5th ed. Philadelphia, PA: Elsevier; 2008:745–81.
27. Schofield FD, Tucker VM, Westbrook GR. Neonatal tetanus in New Guinea. Effect of active immunization in pregnancy. Br Med J 1961; 2:785–9.
28. Newell, KW, Dueñas Lehmann, Leblanc DR, Garces Osoria N. The use of toxoid for the prevention of tetanus neonatorum. Final report of a double-blind controlled field trial. Bull World Health Organ 1966; 35:863–71.
29. Hardegree MC, Barile MF, Pittman M, Schofield FD, Maclennan R, Kelly A. Immunization against neonatal tetanus in New Guinea: 2. Duration of primary antitoxin responses to adjuvant tetanus toxoids and comparison of booster responses to adjuvant and plain toxoids. Bull World Health Organ 1970;43:439–51.
30. MacLennan R, Schofield FD, Pittman M, Hardegree MC, Barile MF. Immunization against neonatal tetanus in New Guinea. Antitoxin response of pregnant women to adjuvant and plain toxoids. Bull World Health Organ 1965;32:683–97.

Appx18573

31. Zheteyeva YA, Moro PL, Tepper NK, et al. Adverse event reports after tetanus toxoid, reduced diphtheria toxoid, and acellular pertussis vaccines in pregnant women. Am J Obstet Gynecol 2012;207:59.e1-7.

32. Kirkland KB, Talbot EA, Decker MD, Edwards KM. Kinetics of pertussis immune responses to tetanus-diphtheria-acellular pertussis vaccine in health care personnel: implications for outbreak control. Clin Infect Dis 2009;49:584–7.

33. Halperin BA, Morris A, Mackinnon-Cameron D, et al. Kinetics of the antibody response to tetanus-diphtheria-acellular pertussis vaccine in women of childbearing age and postpartum women. Clin Infect Dis 2011;53:885–92.

34. Englund JA. The influence of maternal immunization on infant immune responses. J Comp Pathol 2007;137(Suppl 1):S16–9.

Appx18574

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

          *Plaintiffs,*

   v.

MERCK & CO., INC.,

          *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S EXHIBITS IN SUPPORT OF MERCK'S RESPONSE TO RELATORS' STATEMENT OF UNDISPUTED FACTS

# EXHIBIT 314

# 73 Immunization in the United States

*Amanda Cohn, Lance E. Rodewald, Walter A. Orenstein, and Anne Schuchat*

A strong immunization program is critical to ensure vaccines are given at the recommended ages to all children, adolescents, and adults in the United States. The immunization system in the United States is a public- and private-sector partnership, including federal agencies, state and local health departments, healthcare providers, and vaccine manufacturers, that works toward common immunization goals and objectives. The U.S. immunization system has a formal process of establishing national immunization recommendations and uses a set of systems to monitor the health impact, coverage levels, and safety of recommended vaccines. As of 2017, routine immunizations protected the U.S. public against 17 vaccine-preventable diseases. Vaccine access is provided through private and public health insurance for all ages, and financially vulnerable children have a federal government entitlement to vaccines through the Vaccines for Children (VFC) program.

Immunization of young children in the United States has been highly effective. Most vaccine-preventable diseases of children are at record or near record lows in the United States with small or no disparities by race and ethnicity.[1] Measles, rubella, and polio have been, and remain, eliminated in the United States, and the number of young children not immunized at all remains less than 1%. Immunization of adolescents has improved substantially but lags for selected recommended vaccines (e.g., human papillomavirus [HPV]).[2] Immunization of adults continues to be a growing challenge in the United States as vaccination coverage for both older and new vaccines, such as zoster, tetanus toxoid, diphtheria toxoid, and acellular pertussis vaccine (Tdap), and HPV vaccines, is still low, while new vaccines, such as pneumococcal conjugate vaccine, are being introduced.

## IMMUNIZATION RECOMMENDATIONS

Vaccines for routine immunization in the United States must be licensed prior to recommendations. The sole authority for licensing vaccines in the United States is the Food and Drug Administration (FDA), which has responsibility for ensuring the safety and efficacy of vaccines before licensure (see Chapter 81). The FDA approves vaccines for specific indications, age groups, dose amounts and schedules, and contraindications and precautions. Information about the safety and efficacy of administering a specific vaccine simultaneously with other vaccines may be obtained before or after licensure of that vaccine, but information about the safety and efficacy of combining several vaccines into one formulation must be obtained before combination vaccines are licensed.

Technical recommendations for the use of vaccines are made by the U.S. Centers for Disease Control and Prevention (CDC) with advice from its Advisory Committee on Immunization Practices (ACIP). The ACIP was chartered in 1964, and

members are 15 experts in immunization and related fields selected by the Secretary of the U.S. Department of Health and Human Services to provide advice and guidance on control of vaccine-preventable diseases.[3] In its role as a federal advisory committee, the ACIP develops written recommendations, subject to approval of the CDC director, for administration of FDA-licensed vaccines to children, adolescents, and adults in the U.S. civilian population. The ACIP works closely with several liaison organizations, including the American Academy of Pediatrics, the American Academy of Family Physicians, the American College of Physicians, and the American College of Obstetricians and Gynecologists, to harmonize immunization recommendations among key professional medical organizations in the United States.[4,5] ACIP meetings are conducted three times a year and are open to the public and the media, invite public comment, and are webcast live. Presentations at ACIP are considered in the public domain and are available at the CDC's ACIP website[6] soon after the meeting. Comprehensive descriptions of the structure, role, and procedures of the ACIP are also available in the peer-reviewed literature.[5]

The ACIP is charged to conduct its work in an objective manner, and decisions are to be made without regard for budgetary implications (VFC Statement of Managers[7]). The ACIP recommends vaccines, ages of vaccination, number of doses and dosing interval, and precautions and contraindications for vaccination (Table 73.1). The ACIP considers a careful review of available scientific data, including the epidemiology of the disease in the general U.S. population and in specific risk groups; the licensed indications, safety, efficacy, and cost-effectiveness of the vaccine; and programmatic concerns and related factors. Selection of the age at which a vaccine should be administered depends on the ability of the vaccinee to respond to the vaccine, the risk of exposure to disease, and the age-specific incidence of disease and its complications.[8,9] In general, the approach has been to administer vaccine at the earliest possible age at which the vaccine is reliably effective and has sufficient duration of immunity to protect vaccinees through ages of peak disease risk or until a booster dose is recommended.

In 2010, the ACIP adopted the Grading of Recommendations, Assessment, Development and Evaluation (GRADE) framework for developing evidence-based recommendations.[10,11] In the GRADE framework, key factors include the balance of benefits and harms, type of evidence, values and preferences of the people affected, and economic analyses. Category A recommendations apply for all persons in an age group or for all persons in a risk-factor-based group. Category B recommendations direct individualized clinical decision making; category B recommendations may not apply to all members of an age- or risk-factor-based subgroup of the population, but in the context of a clinician-patient interaction, vaccination may be found to be appropriate for a person.

1421

**Appx18576**

**TABLE 73.1** Selected Major Immunization Policy Decisions, U.S. Advisory Committee on Immunization Practices: 2005–15

| New Vaccine/Recommendation | ACIP Vote |
|---|---|
| Meningococcal A/C/Y/W-135 conjugate (adolescents) | February 2005 |
| Tetanus, diphtheria, and pertussis (Tdap) (adolescents) | June 2005 |
| Measles-mumps-rubella-varicella (MMRV), universal hepatitis A | October 2005 |
| Rotavirus (infants) | February 2006 |
| Quadrivalent human papillomavirus (4vHPV) (adolescent girls); varicella second dose | June 2006 |
| Zoster (shingles) | October 2006 |
| Influenza (universal >6 months), PCV13 children | February 2010 |
| Meningococcal A/C/Y/W-135 conjugate second dose | October 2010 |
| Tdap in every pregnancy | October 2012 |
| Pneumococcal conjugate vaccine (PCV13) in persons age ≥65 years | August 2014 |
| 2-dose human papillomavirus for younger adolescents | October 2016 |
| Meningococcal serogroup B (MenB) (adolescents, category B) | June 2015 |

Evidence tables are used to summarize the benefits and harms and the strengths and limitations of the body of evidence. The ACIP does not have predetermined economic valuation criteria for recommending a vaccine. The CDC provides guidance on the allowable methods for health economic studies presented to the ACIP.[12,13]

Recommendations for the use of a vaccine depend on the balance of benefits of vaccination, duration of protection, risks of disease, and risks of vaccination. This balance must be assessed periodically and when new information is available. As experience is gained with a particular vaccine, recommendations may need to be modified. Examples of modification of recommendations include transitioning from oral poliovirus vaccine to inactivated poliovirus vaccine to eliminate the risk of vaccine-acquired paralytic polio,[14] adding a second dose of varicella vaccine in the face of evidence of limited immunity after one dose of varicella vaccine,[15] withdrawing a recommendation for the rhesus rotavirus vaccine owing to evidence that this particular rotavirus vaccine caused intussusception,[16] adding a second dose of meningococcal conjugate vaccine after evidence of waning immunity,[17] and adjusting Tdap recommendations for women from the postpartum period to the third trimester of each pregnancy.[18]

ACIP recommendations are summarized in two separate immunization schedules: one for children 0 through 18 years of age, and the second for adults (19 years of age and older). There is also a catch-up schedule for children who are not appropriately immunized for their age. There are two adult immunization schedules, one based on age and the other based on underlying conditions. The most current immunization schedules are available from the CDC in a variety of formats.[19] The schedules are updated annually and published at the beginning of each year in the CDC's *Morbidity and Mortality Weekly Report* and in major medical journals, including *Pediatrics*, *Annals of Internal Medicine*, and *American Family Physician*. The schedules provide information for clinicians on routinely recommended vaccines and risk-group recom-

mended vaccines with category A and category B recommendations. The CDC also publishes general recommendations that supplement the schedules with information about vaccination technique and storage and handling of vaccines.[20] Updates to these general recommendations can be found at the CDC website.[21] Vaccines recommended solely for international travel are not included in these schedules, but information on vaccines for travelers is available at the CDC.[22]

Fig. 73.1 shows recommended immunizations for children and adolescents, and Fig. 73.2 shows recommended immunizations for adults as of 2017. The United States currently protects children against 16 infectious diseases, and adults older than age 60 years are additionally protected against zoster. Full protection during the first 18 years of age requires more than 50 doses of vaccines, although combination vaccines can reduce the number of injections needed and may lead to higher coverage rates.[23,24] Lessons learned from making and implementing vaccine recommendations in the United States have been reviewed.[3,25]

Policy immunization recommendations are made by the Department of Health and Human Services' National Vaccine Advisory Committee (NVAC), which was established in 1986 by the National Childhood Vaccine Injury Act to focus on programmatic policies and strategies. Some important NVAC reports have focused on vaccination financing, vaccine supply, standards for immunization practices, the status of vaccine research, and a blueprint for immunization programs.[26–30]

## U.S. IMMUNIZATION PROGRAM
### History

In the United States, immunizations are provided through the private and public sectors. The public sector consists primarily of health departments, but also includes other clinics, such as community and migrant health centers and public hospital-based clinics supported by public funds. There was no federal support specifically for immunization activities until 1955, when inactivated polio vaccine was licensed. Through the Polio Vaccination Assistance Act, Congress appropriated funds in 1955 and 1956 to the Communicable Disease Center (now the CDC) to help states and local communities purchase and administer vaccine.

In 1962, President John F. Kennedy signed into law the Vaccination Assistance Act. The central thrust of this legislation was to allow the CDC to support mass immunization campaigns and to initiate maintenance programs. The first grants, authorized under Section 317 of the Public Health Service Act, were made in June 1963. During the more than 50 years since the Vaccination Assistance Act was signed into law, this grant program has thrived. There are now 64 grantees under what has become known as the "317" Immunization Grant Program, including all 50 states, six large cities (including the District of Columbia), and eight territories and former territories.[30] The level of grant funding has varied greatly over the years. When the grant program began in 1963, the only vaccines available were diphtheria and tetanus toxoids and whole-cell pertussis (DTP), polio, and smallpox. In 1966, a national effort to eradicate measles began.[31] The focus on measles vaccine administration ultimately led to adoption of many critical components of the program that have had impact on multiple vaccine-preventable diseases[32] and funding has since expanded to support the infrastructure underpinning the addition of new vaccines to the immunization schedule, as outlined in the NVAC report "Protecting the Public's Health: Critical Functions of the Section 317 Immunization Program."[19]

In the early 1970s, immunization programs around the country were in varying states of effectiveness. In 1977, a



Figure 73.1. 2017 immunization schedule for birth through 18 years of age. Footnotes for each vaccine are not shown in the figure, but can be found at https://www.cdc.gov/vaccines/schedules/hcp/child-adolescent.html.

national childhood immunization initiative was announced with two goals: attainment of immunization levels of 90% in the nation's children by October 1979 and establishment of a permanent system to provide comprehensive immunization services to the 3 million children born annually in the United States at that time.[33] (For comparison, the current U.S. birth cohort is 4.3 million.) At the time, it was estimated that nearly 20 million U.S. children were in need of at least one dose of a vaccine to be fully immunized. The poor and minority populations were disproportionately represented among the persons needing additional vaccine doses. Efforts were expended to enact school immunization requirements in states that did not have them and to enforce those already in existence. As a result of these efforts, all 50 states soon had, and were enforcing, school-entry immunization laws. Since 1981, 95% or more of children entering school had documented immunizations. Given these levels, even with lower levels in preschoolers, the overall immunization level in children of all ages in this country was 90% or greater. Thus, the first goal of the initiative was met.

Unfortunately, the second goal of the 1977 initiative was not met. Although the overall level of support for immunization grants rose rapidly in the late 1970s and throughout

the 1980s (reaching US$126.8 million in 1989), almost all the increase was to meet the increasing cost of vaccines or the addition of new vaccines or additional doses of existing vaccines. In the 1980s, the level of federal support to grantees to carry out maintenance elements did not increase significantly. Over the years, the federal government provided more existing and new vaccines within a delivery system that had remained static in the face of increasing demands. Investigations of the measles epidemics of 1989 to 1991, which especially affected unvaccinated preschool children, made it clear that the public sector delivery system was inadequate for the challenge and that it required substantial assistance.

Part of the problem was that immunization grant funds were only permitted to be used to purchase vaccines and to carry out surveillance, investigation, education, and coordination, but not to support vaccine delivery (e.g., salaries of nurses, clinic supplies, expenses associated with increasing clinic hours). In 1991, President George H.W. Bush announced the federal government's support to accomplish a major health goal—to raise immunization levels by the year 2000 so that 90% or more of the nation's children routinely completed their basic series of vaccinations by their second birthday. The President announced that model

immunization plans would be developed in several areas of the country as a beginning for the national effort to ensure adequate and timely immunization of infants and young children.[34] This began a process that ultimately resulted in the preparation of immunization action plans by all 50 states and 28 metropolitan areas. Although there was great variation in the reported needs around the country, one theme was common to most plans and that was to increase the availability of immunization services. Consequently, for the first time, federal immunization grant funds were allowed to be used for the actual provision of immunization services.

President Bill Clinton's announcement of the Childhood Immunization Initiative in 1993 and the leadership and infusion of funds associated with that initiative, coupled with the VFC program that followed, have brought the United States to the point that it is now, finally achieving 90% coverage in most vaccines recommended for preschool children.[35-37] A critical part of the Childhood Immunization Initiative was to eliminate financial barriers to vaccination and ensure children could be vaccinated at their site of usual care ("medical home"), typically a private provider's office.[38] The Childhood Immunization Initiative also established the National Immu-

nization Survey (NIS) to assess vaccination coverage levels among young children. During the measles resurgence of 1989–91, there was no national mechanism to assess vaccination coverage. NIS was designed to estimate national, state, and selected local area coverage levels of children, 19 to 35 months of age. NIS has been in continuous operation since its establishment in 1994.

Following successful achievement of the 1996 Childhood Immunization Initiative goals, funding for the Section 317 program declined. Concerned about the adequacy of immunization infrastructure in the United States, Congress requested that the Institute of Medicine (IOM) conduct a study on the level of need for federal infrastructure support. The IOM recognized the damaging impact that the ebb and flow of infrastructure funding was having on the nation's immunization system and recommended a combined, 5-year investment of US\$1.5 billion, shared between both federal and state resources. Between the publication of the IOM's 2000 report, "Calling the Shots," and 2010, federal infrastructure funding was increased by US\$115 million to US\$239 million.[39] Colgrove reviewed the history of two critical components of U.S. immunization efforts—public financing and immunization mandates.[40]

**Figures 1 and 2 should be read with the footnotes that contain important general information and considerations for special populations.**

Figure 1. Recommended immunization schedule for adults aged 19 years or older by age group, United States, 2017

| Vaccine | 19–21 years | 22–26 years | 27–59 years | 60–64 years | ≥ 65 years |
|---|---|---|---|---|---|
| Influenza[1] | 1 dose annually | | | | |
| Td/Tdap[2] | Substitute Tdap for Td once, then Td booster every 10 yrs | | | | |
| MMR[3] | 1 or 2 doses depending on indication | | | | |
| VAR[4] | 2 doses | | | | |
| HZV[5] | | | | 1 dose | |
| HPV–Female[6] | 3 doses | | | | |
| HPV–Male[6] | 3 doses | | | | |
| PCV13[7] | 1 dose | | | | |
| PPSV23[7] | 1 or 2 doses depending on indication | | | | 1 dose |
| HepA[8] | 2 or 3 doses depending on vaccine | | | | |
| HepB[9] | 3 doses | | | | |
| MenACWY or MPSV4[10] | 1 or more doses depending on indication | | | | |
| MenB[11] | 2 or 3 doses depending on vaccine | | | | |
| Hib[11] | 1 or 3 doses depending on indication | | | | |

Recommended for adults who meet the age requirement, lack documentation of vaccination, or lack evidence of past infection | Recommended for adults with additional medical conditions or other indications | No recommendation

**Figure 73.2.** 2017 immunization schedules for adults, including age-based recommendations and medical and other condition recommendations. Footnotes on each vaccine are not shown in the figure, but can be found at https://www.cdc.gov/vaccines/schedules/hcp/adult.html.

**Figure 2. Recommended immunization schedule for adults aged 19 years or older by medical condition and other indications, United States, 2017**

| Vaccine | Pregnancy[1][2][3] | Immuno-compromised (excluding HIV infection)[3][7][8] | HIV infection CD4+ count (cells/μL)[3][8][11] < 200 | ≥ 200 | Asplenia, persistent complement deficiencies[7][8][11] | Kidney failure, end-stage renal disease, on hemodialysis[1][9] | Heart or lung disease, chronic alcoholism[7] | Chronic liver disease[1][9] | Diabetes[1][9] | Healthcare personnel[9][4][9] | Men who have sex with men[4][9] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Influenza[1] | 1 dose annually |||||||||||
| Td/Tdap[2] | 1 dose Tdap each pregnancy | Substitute Tdap for Td once, then Td booster every 10 yrs |||||||||
| MMR[3] | contraindicated | 1 or 2 doses depending on indication |||||||||
| VAR[4] | contraindicated | 2 doses |||||||||
| HZV[5] | contraindicated | 1 dose |||||||||
| HPV-Female[6] | 3 doses through age 26 yrs |||||||||||
| HPV-Male[6] | 3 doses through age 26 yrs | 3 doses through age 21 yrs ||||||||| 3 doses through age 26 yrs |
| PCV13[7] | 1 dose |||||||||||
| PPSV23[7] | 1, 2, or 3 doses depending on indication |||||||||||
| HepA[8] | 2 or 3 doses depending on vaccine |||||||||||
| HepB[9] | 3 doses |||||||||||
| MenACWY or MPSV4[10] | 1 or more doses depending on indication |||||||||||
| MenB[10] | 2 or 3 doses depending on vaccine |||||||||||
| Hib[11] | 3 doses post-HSCT recipients only | 1 dose |||||||||

Recommended for adults who meet the age requirement, lack documentation of vaccination, or lack evidence of past infection  ·  Recommended for adults with additional medical conditions or other indications  ·  Contraindicated  ·  No recommendation

**Figure 73.2, cont'd**

Three major pieces of legislation have helped solidify the success of the U.S. immunization program: the National Childhood Vaccine Injury Act, the VFC program, and the Patient Protection and Affordable Care Act (ACA). Their role in vaccine successes are summarized below. In 1986, the National Childhood Vaccine Injury Act was enacted, which put in place a no-fault compensation program for persons who had been injured after receipt of a vaccine that was universally recommended for children (no matter the age of the recipient). This reduced the threat of liability for vaccine manufacturers and facilitated the availability of vaccines. The VFC program was created by the Omnibus Budget Reconciliation Act of 1993 and first implemented in 1994. The VFC program entitles eligible children 0 to 18 years of age to receive all ACIP recommended vaccines free of charge. The ACA was passed in 2010 and requires private insurers to cover all vaccines as indicated on the pediatric and adult immunization schedules. A comprehensive review of the *Morbidity and Mortality Weekly Report (MMWR)*'s documentation of the U.S. immunization program has been published.[41]

## ROLES OF THE U.S. IMMUNIZATION PROGRAM

The IOM "Calling the Shots" report provided a useful conceptual framework for understanding the complex array of roles

of the federal, state, and local immunization programs in collaboration with the nation's healthcare delivery system. The IOM identified five key functions in vaccine implementation: (a) assure purchase of vaccine, (b) assure service delivery, (c) control and prevent infectious diseases and measure disease burden, (d) conduct surveillance of vaccine coverage and safety, and (e) sustain and improve immunization coverage levels.[39] These functions are all needed to ensure the ultimate immunization program goal of controlling and preventing infectious diseases. The impact of immunization policies and practices is assessed through careful disease surveillance, vaccine effectiveness studies, and safety monitoring—an evidence base that is used to adjust immunization recommendations as new evidence emerges. All these activities are supported by a base of immunization finance policies and practices and through the work of health departments and other public sector agencies.

## Assuring Vaccine Purchase, Supply, and Distribution

Except for a small amount of diphtheria and tetanus toxoids vaccine, all U.S. vaccines for routine use are manufactured by private sector pharmaceutical companies, with some produced by several companies and others by a single manufacturer.

**1426**    **SECTION 5**  Public Health and Regulatory Issues

Manufacturers are the sole decision makers for which vaccines they will develop and bring to the U.S. market, including new vaccines and combinations of existing vaccines.[42] However, the National Vaccine Plan of the U.S. Department of Health and Human Services proposes a government role to encourage the development of vaccines specific to U.S. public health needs.[43] One goal of the National Vaccine Plan is "to create an evidence-based list of new vaccine targets to prevent infectious diseases that are high priorities for development." The IOM, with support from National Vaccine Program Office, developed a new vaccine decision-support tool called the Strategic Multi-Attribute Ranking Tool for Vaccines, or SMART Vaccines tool. National Vaccine Program Office is developing strategies to ensure this multistakeholder decision support tool is useful and available for the public.[44]

Approximately half of the childhood vaccine supply is purchased with federal and state government funding using the CDC's vaccine contracts. These contracts allow state and local immunization programs to obtain vaccines at reduced prices and without having to negotiate separate contracts with the vaccine manufacturers. Current CDC contract prices and comparative private sector catalog prices are available from the CDC.[45] Fig. 73.3 shows the CDC vaccine contract cost to fully vaccinate a child at three points in time. The current policy allows multiple manufacturers to contract for any of the program vaccines. States and local immunization programs are allowed to select which of the vaccines they will use if there is more than one manufacturer for a given vaccine. In turn, states generally permit their providers to select which vaccines they will use to vaccinate program-eligible persons. Vaccine purchased using the CDC contracts is not allowed to be resold, and parents cannot be charged for the cost of CDC-contracted vaccine, although a state-determined administration fee can be charged to parents who can afford this fee. Approximately 90% of vaccine funding is provided by the federal VFC

entitlement program, with state/local funding and the federal Section 317 funding making up the remainder. State and local immunization programs are provided a credit line of federal vaccine purchase funding that is awarded through population-based formulas for VFC and Section 317 vaccine.

The management of public-sector vaccine is accomplished with a comprehensive information technology system called VTrckS, for "Vaccine Tracking System." Public sector vaccine is delivered by a CDC-contracted distributor directly to more than 40,000 end-user immunization providers. The providers can order vaccine through VTrckS or through their state's immunization information system that, in turn, places the orders into VTrckS. State and local immunization programs have oversight and control of the vaccine orders placed by providers, and they can also enter the vaccine orders on behalf of their providers. VTrckS and its interfaces to manufacturers, the CDC-funded distributors, and state and local immunization programs now provide a unified, seamless system with complete visibility of all segments of the system. Information about VTrckS and centralized vaccine distribution is available from the CDC.[46]

The CDC maintains stockpiles of childhood vaccine that are intended to serve as a buffer against short- and medium-term vaccine supply disruptions and to control outbreaks of vaccine-preventable diseases.[47] The stockpiles are maintained as storage and rotation inventories of vaccine so that the vaccine that enters the stockpile is used before its expiration. All the vaccines that are routinely recommended for children and are included in the VFC program are included in the stockpiles. The stockpiles include a 6-month supply of each of the CDC-contracted pediatric vaccines purchased through the public sector. Because shortages of vaccine and outbreaks of vaccine-preventable diseases span private and public sectors, the stockpile also supports the private sector vaccine supply system by allowing vaccine manufacturers to borrow vaccine



2015 represents minimum cost to vaccinate a child (birth through 18); exceptions are 1) no preservative pediatric influenza vaccine, and 2) HPV for males and females.

Federal contract prices as of February 1,1990, September 27, 2000, and April 1, 2015.

**Figure 73.3.** Sums of the prices of the Centers for Disease Control and Prevention (CDC) contract prices for vaccines needed to fully vaccinate a child from birth through 18 years of age. The vaccine contract prices are from February 1, 1990, September 27, 2000, and April 1, 2015. DTaP, diphtheria, pertussis, and acellular pertussis; Hep A, hepatitis A; Hep B, hepatitis B; Hib, *Haemophilus influenzae* type b; HPV, human papillomavirus; MCV, meningococcal conjugate vaccine; MMR, measles, mumps, rubella; PCV, pneumococcal conjugate vaccine; Tdap, adolescent-adult formulation tetanus, diphtheria, and acellular pertussis vaccine.

from the stockpile to sell to their private customers. Because the public sector purchases half of the childhood vaccines, CDC's stockpiles can manage a complete vaccine supply disruption of at least 3 month's duration or longer if disruptions are incomplete (e.g., a vaccine with more than one manufacturer).

Assuring an uninterrupted supply of vaccine is especially challenging during manufacturing production problems. A staged response is used to manage such supply disruptions. If there is more than one manufacturer the disruption can often be managed by increasing the use of another manufacturer's vaccine. If there is only one manufacturer, then the shortage is, by definition, a national shortage. The first step in managing such a shortage is to limit vaccine purchase in the public and private sectors so that excessive inventory is halted. If these measures are unable to address the shortage, the next step is to use CDC's vaccine stockpile to maintain the vaccine supply. If the stockpile is exhausted or is insufficient to manage the projected scope and duration of the shortage, temporary recommendations are often made to reduce vaccine use. For example, during the *Haemophilus influenzae* type b (Hib) vaccine shortage from 2007 to 2009, interim recommendations eliminated the booster dose for children unless they were at high risk such as Native American or Native Alaskans. Once the shortage resolved, routine recommendations were reinstated.[48] Following the resolution of a severe vaccine shortage, additional catch-up vaccination is often needed to ensure adequate protection. The much greater visibility of public sector vaccine with centralized vaccine distribution and VTrckS has greatly enhanced the CDC's ability to manage shortages. Current information on U.S. vaccine shortages and delays is available from the CDC.[49]

## Assuring Access to Vaccines

A critically important step in the ensuring vaccine delivery is to make vaccines available with as few barriers to immunization as possible and with a minimum of missed opportunities to vaccinate. Cost of vaccines to the patient is a widely studied and recognized barrier, and one that is amenable to government programs that support the purchase of vaccine for financially vulnerable persons and government laws and regulations that require private insurance coverage for immunization—two solutions to the cost barrier that are cornerstones of the U.S. immunization system.

The 2010 ACA requires private health insurers to cover CDC/ACIP-recommended vaccines (category A and category B) on the pediatric and adult immunization schedules without cost sharing (i.e., first dollar coverage) as a benefit for persons of all ages when administered by a provider in the person's health plan network. Vaccines are required to be covered within 1 year of the publication of a new ACIP vaccine recommendation in the *MMWR*. Although health plans not covering immunization before the ACA are exempt from the immunization requirement, their exemption (grandfathered status) disappears if the plan makes any changes in coverage. Before ACA, the general practice of the health insurance industry had been to cover vaccines; 11% of young children and 20% of teens had commercial insurance that did not cover vaccines (underinsured).[50,51] The net effect of the ACA has been a decline in the number of persons with private health insurance that does not cover immunizations and a reduction in the number of persons without health insurance.

The VFC program has been critical in assuring access to vaccine for children by providing financially vulnerable children with government-purchased vaccine up to a child's 19th birthday. The VFC program is an entitlement to eligible children that has mandatory federal funding of ACIP-recommended vaccines. Four groups of children are entitled to VFC vaccine: children who are 18 years of age or younger who are either (a) eligible for Medicaid health insurance (a federal–state means-tested health insurance program), (b) have no health insurance, (c) Native American or Alaska Native children, or (d) not insured for recommended vaccines and are vaccinated at a Federally Qualified Health Center or Rural Health Clinic. The combination of VFC and the ACA's requirement that private health insurance cover ACIP-recommended vaccines ensures that all U.S. children have access to vaccine without out-of-pocket costs for the vaccine.

The VFC program has important characteristics that make it effective at assuring access to vaccine with a minimum of missed vaccination opportunities. First and foremost, VFC is an entitlement with mandatory federal funding that is not subject to the annual appropriations process. State and local VFC immunization programs determine the size of the VFC-eligible population in their jurisdiction, and the CDC uses this information to determine the vaccine purchase funding needed to meet the vaccination needs of all VFC-entitled children.

Second, the ACIP is the sole authority for the list of vaccines that are included in the VFC program. The ACIP indicates to the CDC which vaccines are included by passing a VFC resolution that specifies the number of doses and VFC age groups entitled to VFC vaccine. Unlike ACIP's vaccine recommendations, VFC resolutions are not subject to approval by the CDC director and become effective immediately after a passing vote. For a new vaccine to become available to VFC children, the CDC negotiates a contract with the manufacturers of the vaccine.

Enrolled VFC providers establish eligibility to the program at the point of service by asking parents whether their child meets any of the four eligibility categories. By VFC statute, independent verification is not required. Providers are required to indicate eligibility status in the child's medical record. Having point-of-service eligibility determination reduces missed immunization opportunities because parents are not required to sign their children up for VFC before visiting their child's healthcare provider. This provision is intended to prevent missed opportunities seen in the measles resurgence of 1989 to 1991 where mandatory referrals to public health department clinics were required.[26] VFC providers order and receive their vaccine without charge. The VFC program pays for the vaccine and its distribution to VFC providers, in contrast to the reimbursement model for private insurance where the provider has to pay for vaccine upfront at financial risk.[52]

The CDC also administers the Section 317 program to state and local immunization programs. Although smaller than VFC in total funding, immunization program grantees can use Section 317 vaccine to vaccinate populations that are not captured by private insurance or the VFC program (i.e., uninsured adults) and to vaccinate rapidly in response to a vaccine-preventable disease outbreak. The ACA authorized Section 317 permanently and also added the authority to allow states to purchase vaccine for adults using the CDC's vaccine contracts.

State and local immunization programs are responsible for enrolling providers into VFC. States also enroll non-VFC providers who can receive state or locally purchased vaccine or Section 317-purchased vaccine for the state/local priority populations. These networks of providers are vital to the success of government vaccine programs. The majority of VFC providers are private clinicians who use a combination of VFC vaccine and privately purchased vaccine to immunize children in their practices. VFC has more than 40,000 providers enrolled, and three quarters of these providers are private

providers. In total, VFC providers vaccinate approximately 90% of U.S. children.[53,54]

Maintaining the capacity and quality of their networks of providers is also a responsibility of state and local immunization programs. Federal funding is made available through VFC and Section 317 so that state and local programs are able to enroll new providers and conduct quality improvement activities among existing providers to help the providers practice in accordance with the standards of immunization practice. Section 317 grant funds are also available to provide direct service delivery in public health department clinics.

The community of immunization providers is large and growing in diversity. Many state and local immunization programs are expanding access to vaccines through pharmacists and community vaccinators who can vaccinate in schools and other settings.[55,56]

The governmental program role in assuring access to vaccines for adults has been more limited than the governmental role for assuring access to vaccines for children. Medicare Part B covers pneumococcal and influenza vaccination services for all persons 65 years of age or older enrolled in Medicare Part B (>95% of the older-than-65 population) and hepatitis B vaccine for people undergoing dialysis of any age. State Medicaid programs, supported by federal contributions, may cover recommended vaccines for younger adults enrolled in Medicaid, but there is not a requirement that Medicaid cover vaccines for adults. In 2005, Medicare part D was enacted to cover prescription drugs, including vaccines other than those included in Part B. Thus, all vaccines recommended for the Medicare population are covered by Medicare Part B or Medicare Part D, for persons who pay to participate. Provider billing for vaccines under Medicare Part D is more complicated than under Medicare Part B. The Centers for Medicare & Medicaid Services provides a comparison between Part B and Part D coverage for vaccines.[57]

The clinical work of vaccinating is supported with a fee-for-service payment mechanism in the private and public sectors. Private insurance and Medicaid pay vaccine administration fees with Medicaid paying the administration fee for Medicaid-enrolled VFC children and adults; reimbursement varies from state to state. VFC providers are allowed to charge parents of non-Medicaid VFC children a fee for the administration of VFC vaccine, although the VFC statute prohibits VFC providers from denying VFC vaccine to an eligible child solely because the parent cannot pay the administration fee. The importance of the vaccine administration fee is apparent from its prominence in the NVAC's vaccine financing recommendations. The NVAC made five recommendations to improve the vaccine administration fee, including that "the American Medical Association Relative Value Scale Update Committee should review its relative value unit coding to ensure that it reflects accurately the nonvaccine costs of vaccination, including the potential costs and savings with the use of combination vaccines."[29]

## Control and Prevent Infectious Diseases

The desired outcome of immunization is reduction, elimination, or eradication of disease or disability and prevention or control of outbreaks and their associated disruption. The goals of an immunization program determine how intensively a vaccine-preventable disease is monitored (Table 73.2). When programs aim to achieve or sustain disease elimination, intensive efforts are needed surrounding each suspected case. Control programs may also require rapid identification and reporting of cases so that interventions can be offered promptly to reduce complications or limit transmission. Recognition of disease outbreaks is important to limit their scope. Outbreaks

may also serve as sentinel events because they may provide the first indication of important program deficiencies or unanticipated limitations in vaccine performance. While some vaccine-preventable diseases manifest as relatively distinct clinical syndromes (e.g., paralytic poliomyelitis, measles, mumps, and congenital rubella syndrome), others may require laboratory testing to differentiate the illness from non–vaccine-preventable causes of the same syndrome (e.g., gastroenteritis or pneumonia). Vaccine-preventable causes of pneumonia (e.g., *Streptococcus pneumoniae* and *Haemophilus influenzae*) are difficult to diagnose even when optimal laboratory testing is available. Monitoring trends in the epidemiology of these diseases relies on targeted tracking of more specific manifestations of the disease, such as bacteremia and meningitis.

Reports of the occurrence of vaccine-preventable diseases have been the means of evaluating the impact of most of the immunization disease programs.[58] Information is obtained through state health departments, which have authority to mandate reporting of selected diseases to the state level by physicians and other healthcare providers.[59] The Council of State and Territorial Epidemiologists, in consultation with the CDC, establishes the list of nationally notifiable diseases. In the United States, most vaccine-preventable diseases of childhood are reported to the National Notifiable Diseases Surveillance System.

For all nationally notifiable diseases, data collected weekly include date of report and locating information (e.g., state and, when appropriate, county). For many of the vaccine-preventable diseases, supplemental information (e.g., date of onset, age, sex, race/ethnicity, vaccination status, whether the case was confirmed by a laboratory, and disease complications) is forwarded to the CDC. Reports by state of cases notified that week and the cumulative total for the year of many of the vaccine-preventable diseases are published in the *MMWR*. Case definitions have been established with the Council of State and Territorial Epidemiologists that detail criteria for confirmation of a given illness as a case of a vaccine-preventable disease.[60,61]

The National Notifiable Diseases Surveillance System is supplemented by other surveillance systems operated by the CDC. Diphtheria surveillance is enhanced through monitoring requests to the CDC for antitoxin, which the CDC has responsibility for distributing.[62] Efforts to collect data beyond the National Notifiable Diseases Surveillance System are made for several vaccine-preventable diseases. Some of these systems involve laboratory-based methods and others rely on death certificate data or other administrative data systems. Where data are not available nationally, special sentinel surveillance systems in selected states and communities may be established. Laboratory-confirmed, population-based surveillance systems in selected geographic areas are used to monitor causes of invasive bacterial disease, including *H. influenzae* type b, meningococcal disease, and pneumococcal disease.[63] The largest of these is the Active Bacterial Core surveillance within the Emerging Infections Program network, which tracks disease and assesses vaccine impact in parts or all of 10 states.[64]

The Emerging Infections Program has also been used to evaluate the incidence of hospitalization for laboratory-confirmed influenza, as well as vaccine effectiveness; the burden of invasive pneumococcal disease, and more recently the Emerging Infections Program network's HPV Impact has conducted active population-based surveillance of cervical intraepithelial neoplasia grades 2 and 3 and adenocarcinoma in situ, as well as associated HPV types in women 18 years of age and older.[65] The New Vaccine Surveillance Network, including population-based surveillance in three sites—Nashville, Tennessee; Rochester, New York; and Cincinnati

**TABLE 73.2** Objectives, Characteristics, and Limitations of Systems for Monitoring Vaccine-Preventable Diseases in the United States

| Public Health Goal | Vaccine-Preventable Diseases | Surveillance Objectives | Key System Characteristics | Challenges |
|---|---|---|---|---|
| Elimination or eradication | Polio, measles, hepatitis B, rubella | Characterize circulating strains<br>Maintain elimination or eradication (i.e., determine source of cases) | Active case-finding; high sensitivity and specificity; timely collection of specimens; verification of vaccination status of cases | Resource intensive; sustainability |
| Case management and/or intervention(s) | Diphtheria, meningococcal disease, hepatitis A, hepatitis B, invasive *Haemophilus influenzae* type b | Rapidly identify individual cases<br>Trace contacts for prophylaxis | Population-based passive reporting with timely active follow-up; requirements for rapid local reporting | Speed of reporting to health department not always optimal; contact tracing may be incomplete; follow-up is resource intensive |
| Outbreak detection and control | Pertussis, influenza, hepatitis A, meningococcal disease, mumps, measles, varicella | Determine extent of outbreak<br>Evaluate pathogen characteristics<br>Verify effectiveness of control measures | Passive reporting (population- or facility-based) with rapid, active follow-up; laboratory confirmation of initial cases to confirm diagnosis; specimen collection | Speed of reporting to health department not always optimal; follow-up is resource intensive; specimens collected from limited number of cases; laboratory tests problematic for some vaccine-preventable diseases, especially in highly vaccinated population |
| Disease control | All | Monitor trends<br>Identify gaps (pockets of need)<br>Characterize populations at ongoing risk | Specific and consistent case definitions (e.g., laboratory confirmation); population-based (sentinel and/or national) adequate case information (demographics, vaccination status); longitudinal data; specimen collection to characterize strains[a] (sentinel laboratory-based reporting) | Routinely collected data may be of poor quality and incomplete; high-quality epidemiologic data and specimens primarily from sentinel active surveillance sites; high-quality systems do not exist in all jurisdictions—limited information to guide local programs |

[a]Access to specimens to characterize infecting strain particularly is important when not all disease-causing serotypes/strains are included in the vaccine (e.g., pneumococcus, rotavirus, human papillomavirus, polio, influenza, meningococcus, *Haemophilus influenzae* type b).
*From* Schuchat A, Bell B. Monitoring the impact of vaccines postlicensure: new challenges, new opportunities. Expert Rev Vaccines. 2008;7:437–456.

Ohio—provides data on the burden of influenza and rotavirus disease in children and the impact of various vaccines, and has now been expanded to include a total of seven sites.[66,67] As new vaccines are developed, licensed, and made available for use, surveillance and monitoring are critical to address their impact on communities and populations. New Vaccine Surveillance Network supports broad-based surveillance and research projects for acute gastroenteritis in areas with a population base of at least 500,000. A sentinel counties surveillance system was used for tracking hepatitis B infections, and varicella active surveillance has been conducted in three sites (Antelope Valley, California; Travis County, Texas; and Philadelphia, Pennsylvania).[68,69] Administrative data sources have provided information on varicella, rotavirus, and pneumococcal hospitalizations.[70–72] The National Health and Nutrition Examination Survey provides periodic reports on population immunity to various vaccine-preventable diseases, including antibody levels against pertussis, HPV, and other infectious agents.[73,74] Reporting completeness for each of the surveillance systems varies, and the active systems are substantially more sensitive than the National Notifiable Diseases Surveillance System. Completeness of reporting varies by source of report and type of disease, with more complete reporting from hos-

pitals and laboratories than from physicians for diseases such as *H. influenzae* type b.[75]

Surveillance data are analyzed to determine whether reductions of disease occur with increasing vaccine coverage; greater-than-expected reductions and changes in incidence beyond the target age groups may signal important herd effects.[76,77] Surveillance data are also analyzed to evaluate potential changing epidemiology of disease, such as a shift to a predominance of adult cases where there had been a childhood focus or the emergence of disease caused by strains of the pathogen that are not targeted by the vaccine.[78] Surveillance can also determine whether cases are a result of failure of vaccine or of failure to vaccinate.[79,80]

## Vaccine Effectiveness

When a substantial proportion of cases of vaccine-preventable disease occurs in persons with a history of vaccination, an investigation is often undertaken to determine whether the rates of vaccine failure are within expected ranges. *Vaccine effectiveness* is the term used for these observational studies, to contrast with *vaccine efficacy*, which is usually measured prospectively in randomized, double-blind, placebo-controlled

Appx18584

**1430    SECTION 5** Public Health and Regulatory Issues

trials. Several methods are used to evaluate vaccine effectiveness in the postlicensure setting, including cohort, case-control, secondary attack rates in families, and other techniques.[76,81] Vaccine effectiveness is calculated as where ARV is the attack rate in vaccinated persons and ARU is the attack rate in unvaccinated persons. When case-control studies are used, the odds ratio is used to approximate the relative risk of disease in the vaccinated compared with the unvaccinated population (ARV/ARU).

Of particular note has been a relatively simple screening technique to help determine whether a more rigorous investigation of vaccine effectiveness is warranted. The screening analysis requires data on the vaccination status of cases and the vaccination status of the populations from which the cases are drawn. These data are often available from existing population-based estimates from surveys and other methods. Data must always be broken down into dichotomous variables, with unvaccinated persons compared with vaccinated individuals. For example, for a vaccine recommended in three doses, the population of cases vaccinated must be calculated excluding persons who received only one or two doses. Similar adjustments must be made for coverage assessment. Fig. 73.4 allows approximation of vaccine effectiveness using a nomogram.

Public health investigation of vaccine effectiveness can be facilitated in areas where comprehensive immunization information systems exist. One study of pentavalent rotavirus vaccine reported a vaccine effectiveness of 82% using data from an immunization information system (IIS) compared with 82% to 88% using data from providers.[82] Vaccine effectiveness studies may use population-based control subjects obtained through telephone surveys or household visits, as well as control subjects obtained through inpatient or outpa-

tient healthcare facilities who have conditions differen from the vaccine-preventable disease under investigation. F example, influenza vaccine effectiveness studies often u: control subjects who have sought medical care for respirato illness but have laboratory tests negative for influenza virus When vaccine effectiveness is within expected limits b disease transmission persists, new immunization strategi may be considered. For example, investigations showed th measles transmission could persist despite a vaccine effectiv ness of greater than 90% and high levels of coverage with o dose of vaccine.[84] This information was critical in the decisi to universally recommend a second dose of measles vacci When vaccine effectiveness is lower than expected, investi tions also are triggered into potential causes such as failure maintain vaccine at the proper temperature (i.e., deficienc in the cold chain).

When most cases occur in unvaccinated persons, invest tions can identify geographic and demographic characteris to help guide future vaccination efforts. For example, a re gence of measles in the United States during 1989 to 1991 found to be caused by a failure to vaccinate young presch children and led to a major national initiative to impl coverage.[26,32] In contrast, relatively small outbreaks of mea in 2008 and 2011 were focused in communities where sonal beliefs led parents to exempt their children from v nation required for school entry.[85,86] In 2013 and 2014, se measles outbreaks were linked to local religious and cul communities where immunization rates were very low.[87]

## Conduct Surveillance for Immunization Covera

The U.S. immunization program uses a set of cov surveys to monitor implementation of CDC/ACIP vaccin



$$VE = \frac{PPV - PCV}{PPV(1 - PCV)}$$

Vaccine efficacy = 40%    60%    80%    95%

Percent cases vaccinated

Percent population vaccinated

**Figure 73.4.** Percentage of cases vaccinated (PCV) per percentage of population vaccinated (PPV) for 12 values of vaccine (VE), varying from 40% through 95% at 5-percentage-point increments. Embedded formula uses proportions rather than percentag Orenstein WA, Bernier RH, Dondero TJ, et al. Field evaluation of vaccine efficacy. Bull World Health Organ. 1985;63:1055–1068.)

recommendations. These surveys provide an indirect measure of the population protection from vaccine-preventable diseases while assessing performance of the federal, state, and urban area immunization programs.

Coverage among young children has been comprehensively measured for the longest period. Measurement of childhood coverage has been measured since 1960, except for 1985 to 1991.[90,91] Beginning in 1994, immunization of preschool children has been assessed through the NIS, which consists of random-sample telephone surveys measuring immunization coverage of 19- to 35-month-old children (median age: 27 months). In 2006, the NIS was expanded to the NIS-teen to include children 13- through 17-years-old to assess coverage of vaccines recommended for 11- and 12-years-olds. Descriptions of this family of national immunization surveys is available at the CDC website.[92] The website provides information for the public and for healthcare professionals on the purpose, methods, instruments, and results of the surveys.[92]

The NIS and NIS-teen provide national estimates of coverage, usually with 95% confidence intervals of less than 3 percentage points, and comparable, statistically valid estimates for each of the 50 states, the six urban area Section 317 awardees, and the U.S. Virgin Islands, Guam, and Puerto Rico.[93,94] Although response rates vary by survey area, the methods are identical, allowing for comparison among the survey areas. In addition to the jurisdictions sampled annually, states are allowed to purchase from the CDC additional coverage surveys for geographic areas of interest within their jurisdictions.

Since parental recall of vaccination is known to have poor concordance with provider-verified vaccination status,[95] the NIS and NIS-teen surveys only report verified vaccinations by the immunization provider who administered the vaccine to the sampled child. Parents are interviewed about their demographics and access to vaccines, and they are asked permission to contact their child's providers to report the child's immunization history. Survey results are adjusted for telephone nonresponse. Because of the increasing use of cell phones and a concomitant decline in landline-only households, a cell phone sample frame was added in 2011 for adjustment of telephone access.[96] The NIS and NIS-teen results are reported annually in the CDC's *MMWR* and on the CDC's website. The CDC makes NIS and NIS-teen public-use data files available to researchers and others who request access to deidentified raw data. The CDC evaluates its immunization surveys for evidence of bias or nonrepresentativeness, and conducts research on methods to improve representativeness and value of the surveys.

The CDC estimates annual influenza vaccination coverage for the United States by using data from several nationally representative surveys: the Behavioral Risk Factor Surveillance System, the National Health Interview Survey, the NIS-flu survey, and Internet panel surveys of adults, healthcare personnel, and pregnant women. The CDC also provides ongoing vaccine effectiveness assessment during and after each influenza season through the Influenza vaccine effectiveness unit. The CDC's website provides reports, interactive figures, and data tables for these influenza coverage surveys at http://www.cdc.gov/flu/fluvaxview/index.htm. Coverage among adults for vaccines other than influenza is assessed using Behavioral Risk Factor Surveillance System and National Health Interview Survey. Vaccines include pneumococcal, HPV, zoster, and Tdap.[97]

Surveillance for vaccination coverage among new kindergarten students is conducted by the states and reported annually to the CDC. These data are published on the CDC's SchoolVaxView website and in the MMWR.[98,99] Managed care health plan performance on immunization is measured annually by the National Committee on Quality Assurance using the Health Plan Employer Data and Information Set (HEDIS). The HEDIS currently estimates immunization coverage for 2-year-old children, 13-year-old adolescents, and 50-year-old and older adults. Separate measures are made for commercial plans and Medicaid or Medicare plans. Results of HEDIS measures are published annually in a report called "The State of Healthcare Quality."[100]

Techniques for measuring immunization coverage at the provider level were developed during the 1990s and have been integrated into the VFC program since 2000. Additionally, immunization programs can use their IISs for determining provider-level coverage.[101] IISs are also an important way for immunization programs to assess coverage at the local level and target areas of undervaccination for outreach.

## Sustain and Improve Immunization Coverage Levels

Sustaining and improving vaccination coverage levels requires a system that actively promotes vaccination of individuals targeted by recommendations. Simply making vaccines available will not result in coverage levels high enough to achieve immunization program goals and objectives. This section describes barriers to vaccination, key program activities to promote vaccination, and evidence-based strategies to improve coverage.

### Barriers to Vaccination

In the United States, barriers to vaccination vary by vaccine and target population. For example, providers of vaccines recommended only for adults with behavioral or health risk factors must identify those for whom the vaccine is recommended; implementation of new vaccines must overcome the barrier of unfamiliarity; and seasonal vaccination against influenza must overcome time constraints associated with an annual seasonal vaccination schedule. However, common barriers to vaccination exist. These include lack of a provider recommendation to be vaccinated; missed opportunities to immunize during visits to immunization providers; lack of affordable access to vaccines; lack of knowledge that a vaccine is due or overdue to be given; lack of confidence in the safety or effectiveness of vaccines leading to hesitancy to vaccinate; and lack of belief in the necessity of vaccination.

For advice about vaccines and immunization, parents trust the advice of their children's healthcare providers more than any other source of information.[102] Thus, lack of a provider's recommendation to vaccinate can be a significant barrier to vaccine receipt as seen with HPV vaccination of adolescents.[103] Provider endorsement increases vaccine acceptance rates and lack of endorsement decreases acceptance.[104] Recommendations from providers serve not only as professional advice, but they also serve as reminders that a vaccination is due or overdue, thus helping parents and patients navigate a complicated vaccination schedule.

During a visit to a healthcare provider, failure to give all recommended vaccines constitutes a missed opportunity to immunize. Epidemiological investigation shows that missed opportunity to immunize was a prominent root cause of the 1989–91 measles resurgence in the United States.[105] Missed opportunities to immunize can be caused by use of false contraindications to vaccination, for example not administering influenza vaccine out of concern for mild illness at the time of vaccination; by deferring some vaccines to decrease the number of injections at a single visit; or by referring to another provider such as the public health clinics out of concern for

the costs to vaccinate. Supporting evidence that missed opportunities to immunize constitute barriers to achieving coverage goals is found in studies showing that if all opportunities were taken to vaccinate, coverage would improve. Fu and colleagues showed that 45% of undervaccinated children would have been up-to-date on their infant vaccinations had all age-appropriate immunization opportunities been taken,[105] and Stokley and colleagues showed that more than 90% of adolescent females could have been up-to-date with HPV vaccine had all vaccination opportunities been taken.[106]

Out-of-pocket costs for vaccination are a well-known barrier to vaccination. Indeed, many of the missed opportunities to immunize during the 1989–91 measles resurgence were caused by referral from a private provider to a free vaccine provider because of cost considerations, a finding that, in part, led to the creation of the VFC program. Currently, in the United States, government support and private health insurance largely cover the costs of vaccination of most children up to 18 years of age, and a combination of private and government insurance covers vaccination costs of adults older than 65 years of age and younger adults with health insurance coverage. Uninsured adults between 19 and 64 years of age comprise the largest group of individuals lacking coverage for vaccination services. Supportive evidence that out-of-pocket costs constitute a barrier to vaccination comes from studies demonstrating that provision of affordable access to vaccines increases coverage. In 2007, the Community Preventive Services Task Force (TFCPS) reviewed studies on the impact of reducing out-of-pocket costs on vaccination coverage levels. The TFCPS found that in 11 studies published between 1997 and 2009, the median increase in vaccination coverage by reducing cost barriers was 22 percentage points.[107]

Vaccination recommendations are updated at least annually as new vaccines are recommended or previous vaccine recommendations are changed with new evidence. The complexity and changing nature of the routine immunization schedule makes it unrealistic to assume that parents or patients track their child's or their own vaccination status. Supportive evidence that parents need reminders when vaccinations are due or past due comes from intervention studies showing the positive impact of reminder/recall systems on vaccine uptake. The TFCPS reviewed 62 qualified studies of reminder/recall systems that showed median increases in vaccination coverage of 12 percentage points among studies conducted in the 1980s and 1990s and 6 percentage points in studies conducted after 1997.[108] The TFCPS also reviewed evidence for impact of reminder systems for targeted adult vaccines. In nine studies, reminder systems increased coverage by a median of 18 percentage points.[109]

Parent or patient concern about the safety, effectiveness, or need for a vaccine can lead to hesitancy or outright refusal of vaccination. Vaccine hesitancy is a global phenomenon that has been studied by a working group of the World Health Organization's Strategic Advisory Group of Experts (SAGE) on immunization. In the definition of the World Health Organization's Strategic Advisory Group of Experts, vaccine hesitancy refers to "delay in acceptance or refusal of vaccination despite availability of vaccination services."[110,111]

In the United States, vaccine refusal among parents of young children is monitored indirectly through the NIS by assessing the number of young children with zero doses of vaccine, a figure that has remained below 1% nationwide since 2006. Evidence that vaccine hesitancy is a problem in the United States can be seen in surveys of parents and studies on exemptions from school vaccination requirements.[112] In a nationally representative survey of parents of children younger than 18 years of age conducted in 2009, Freed and colleagues found that more than half of parents had fears of serious

adverse events from vaccines and that 12% of parents had refused to have their children vaccinated with at least one vaccine.[113] Objective measures of vaccine hesitancy show a relation between vaccine hesitancy and undervaccination of young children and adolescents.[114,115]

A 2015 NVAC report discusses the importance of vaccine confidence to maintain high immunization coverage levels in the United States. In this report, vaccine confidence refers to the trust that parents or healthcare providers have (a) in the recommended immunizations, (b) the provider(s) who administers vaccines, and (c) the process that leads to vaccine licensure and the recommended vaccination schedule. This report outlines current measures of vaccine confidence and recommends healthcare providers, immunization programs, and those involved in promoting recommended vaccinations actively reinforce that vaccination according to the ACIP recommended schedule is the social norm and not the exception.[116]

## Key Program Activities

**Reporting and Monitoring Adverse Events Following Vaccination.** It is important to ensure that the vaccine recipient (or parent or guardian) is adequately aware of the risks and the benefits of vaccination and that the recipient has a record of all immunizations received. The National Childhood Vaccine Injury Act of 1986 and subsequent changes (section XXI of the Public Health Service Act) require that all vaccine providers formally notify parents and parents or guardians of the risks and benefits of vaccines covered by the National Childhood Vaccine Injury Act. Formal notification is accomplished through the use of standardized vaccine information statements.[117] Printable versions of these forms are available for downloading at the CDC website.[118]

The National Childhood Vaccine Injury Act also established a no-fault compensation mechanism for persons with injuries from the vaccines covered by the act. Persons wanting further information about this program should contact the National Childhood Vaccine Injury Compensation Program at 800–338–2382 or at the Program's website (see Chapter 83).[119] The National Childhood Vaccine Injury Act also requires providers to note in the patient's permanent medical record the date the vaccine was administered, the vaccine manufacturer, the vaccine lot number, and the name, address, and title of the person administering the vaccines, in addition to noting the provision of vaccine information materials. Finally, the Act requires that providers report selected adverse events occurring after vaccination and events that would contraindicate further doses of vaccines to the Vaccine Adverse Event Reporting System.[120] Providers are encouraged to report all serious adverse events following all vaccines, regardless of whether they believe that a vaccine caused the event. The Vaccine Adverse Event Reporting System forms can be obtained by calling 800–822–7967 or through the Internet.[121] (See Chapter 82 for further discussion of vaccine safety.)

**Operating Immunization Information Systems.** IISs have the potential to strengthen the system and raise and maintain immunization levels.[101] The IISs are confidential, computerized information systems that contain information about immunizations provided to individuals. The IISs are capable of monitoring the immunization status of individuals and population groups, generating reminder/recall notices, and generating official immunization records.[122] The Healthy People 2020 objectives call for 95% of children younger than 6 years of age to be enrolled in a fully operational population-based IIS.

Registries have demonstrated usefulness in sending reminder/recall notices, increasing coverage, monitoring

Case: 23-2553    Document: 50-10    Page: 187    Date Filed: 12/26/2023

implementation of policy changes, generating official immunization records, assessing immunization levels for healthcare quality indices, reducing missed opportunities, preventing unnecessary immunization, vaccine inventory management, and public sector vaccine ordering. They have also been used to identify and recall children who did not receive vaccines during temporary, national shortages and to identify children in need of vaccination when new vaccines are introduced. The TFCPS recommends the use of IISs based on strong evidence of their effectiveness.

In 2015, all 50 states have active, functioning IISs. As of December 31, 2012, results from an IIS annual survey indicate that 86% (19.5 million) of U.S. children younger than 6 years of age had two or more vaccinations recorded in an IIS, and 25% (57.8 million) of U.S. adults had one or more vaccinations recorded in an IIS.[123] An important functional component of an IIS is that it receives information from an electronic health record. The percentage of IISs meeting Functional Standards 7 (i.e., meeting basic international standards for exchange of clinical data between systems) increased from 58% in 2011 to 77% in 2012, and 37% of IISs met more advanced functionality.[123] Thus, full interoperability between electronic health record systems and IISs is closer to reality. Another critical function of an IIS to improve accuracy of records and to reduce missed opportunities is for data to be exchanged between jurisdictions. A 2015 NVAC report pro-

motes ongoing efforts to address the technical and legal barriers to cross-jurisdictional IIS data exchange.[117]

In 2012 the CDC launched a strategic plan to achieve the vision for the future of immunization information management that real time, consolidated immunization data and services for all ages would be available for authorized clinical, administrative, and public health users, and consumers, anytime and anywhere.[124] Table 73.3 summarizes the goals and challenges facing IISs. Strategic investments are being made at the federal level to support state and local IISs in meeting these challenges as a community.

**Enforcing Laws and Regulations for Immunization.** Laws requiring immunization in the United States date from the early 19th century.[125–127] Massachusetts enacted a law in 1809 that required smallpox vaccination of the general population, and other jurisdictions followed during the course of the century. In 1905, the Supreme Court affirmed the right of states to pass and enforce compulsory immunization statutes and in 1922 the Supreme Court also affirmed laws requiring vaccination before school entry. School entry laws were variably enforced, and the vaccines covered varied considerably. After measles vaccine was introduced in the mid-1960s, school entry requirements for measles vaccination became common because measles was a disease primarily of school-age children. It became apparent that states without laws were

**TABLE 73.3** Immunization Information Systems Strategic Plan Focus Areas and Challenges, Centers for Disease Control and Prevention, 2012[a]

| Focus Area | Long-Term Goal | Challenge |
|---|---|---|
| National Leadership | There is a national immunization and immunization information management program vision, strategy, policy and metrics. | Policies and standards to support immunization management are not coordinated nationwide across all immunization stakeholders. There is no overriding nationwide consent policy for interstate data exchange. There is no nationwide policy for interstate data exchange. |
| Sustainability | The national immunization information management program has sufficient funding and permanent informatics, epidemiology, economics, computer science, and information technology resources providing immunization-centric analytical services. | There is no IIS line item in VFC or section 317 funding programs; state-level support of IIS is variable and although CDC-provided Prevention and Public Health Fund awards have helped, these funds are short in duration and cannot be used to support ongoing operations to maintain the IIS technology and appropriately skilled staff to support it. |
| Provider Services | Providers transmit immunization event data automatically and receive consolidated patient history and clinical decision support within the same application. | Some IIS integration standards for providers and EHR-S vendors are applied in a variable way across jurisdictions due to local statutes and business rules. Immunization-centric data, functionality, usability, and interoperability standards are applied in a variable way for immunization data collection at the point of care. |
| Public Health Services | IIS collect and display real-time, accurate immunization coverage analytics for all ages and vaccine inventory status for the jurisdiction. | There is a lack of informatics, epidemiology, economics, computer science, and information technology knowledge, skills, and roles within some sectors of the immunization information management community. Some IIS functions are redundant while others are variable across jurisdictions due to local statutes and business rules. Some IIS interoperability standards for immunization programs and IIS vendors are implemented in a variable way across jurisdictions because of local statutes and business rules. Methods and standards for analyzing IIS data (e.g., developing coverage rates) vary from IIS to IIS, resulting in potential misinterpretation by public health officials and scientists. |
| Interoperability | Data exchange among immunization information management systems is automatic and transparent regardless of location. | Challenges remain to ensure immunization data in IIS are complete, accurate, and acquired in a timely manner. |

[a]Available at https://www.cdc.gov/vaccines/programs/iis/strategic.html
CDC, Centers for Disease Control and Prevention; EHR-S, electronic health record systems; IIS, Immunization Information System; VFC, Vaccines for Children.

experiencing a higher incidence of measles than those with laws and, with the Immunization Initiative of 1977, considerable emphasis was placed on enactment and enforcement of school entry laws.

Laws requiring immunization before entry in school or daycare are the safety net for the U.S. immunization program. All 50 states and the District of Columbia have laws in effect, although the precise vaccines, doses, and schedules vary. The impact of these laws on the decreased incidence of measles and mumps in states with laws versus states without laws was apparent. A major resurgence of mumps during 1986 was shown to occur almost exclusively in states without comprehensive laws requiring mumps vaccination.[128] A comprehensive review of the impact of school laws was done by Orenstein and Hinman.[126]

Although the vast majority of parents comply with school immunization requirements, a substantial—and possibly growing—number of parents exempt their children from school laws.[112] All states allow medical exemptions from school immunization requirements, and by July 2016, all but three states will allow religious or philosophical exemptions from school immunization requirements. The process of obtaining an exemption from school immunization requirements varies widely by state. Rota and colleagues showed that the difficulty of the exemption process was inversely related to the percentage of children obtaining exemptions, indicating that many exemptions are likely to be exemptions of convenience rather than deeply held convictions.[129]

Exemptions from school immunization requirements have consequences. Exemption was associated with a 35-fold higher risk of measles in a 1999 study.[130] Feikin and colleagues showed that exemption was associated with a sixfold higher risk of pertussis.[131] Omer and colleagues showed that the ease of obtaining exemptions was associated with a nearly three-fold increase in pertussis outbreaks in Michigan, primarily owing to clustering of exemptors.[132] Parents who exempt their children from school immunization requirements hold measurably different beliefs about vaccines than parents complying with school immunization requirements. For example, Salmon and colleagues have shown that exempting parents are much more likely to believe that vaccines weaken the immune system and that immunization does more harm than good.[133]

A recent review on exemption from school immunization law summarizes much of the current literature.[134]

**Using the Standards of Immunization Practices.** In 1993 the NVAC recommended a set of 18 standards to improve th immunization performance of pediatric providers, and i 2002, these standards were updated to incorporate advance in knowledge of best immunization practices (Table 73.4).[?] Many of the standards specifically address improving immu nization coverage in children, including removing barriers t immunization, taking advantage of all opportunities t vaccinate, simultaneously vaccinating and using only vali contraindications, establishing tracking systems to identif children who are underimmunized and to facilitate takin corrective actions, and semiannually auditing patients serve by a given clinic or practice to evaluate performance and t determine whether improvements are needed. The Infectiou Diseases Society of America has established 46 implementa tion standards that apply to adults, adolescents, and chil dren.[132] These 46 standards are graded according to the qualit of their supportive evidence.

In 2013, NVAC released revised Standards for Adult Immu nization Practice, recognizing the importance of the healt care provider recommendation for patients to receive neede adult vaccines, the current low vaccination rates among U.! adults, and the changing environment within which adu vaccines are now given.[135] These standards are a call for a healthcare professionals to take the following steps to ensu that adult patients are fully immunized and have maximum protection from serious diseases:

- ASSESS immunization status of all patients in every clinica encounter.
- SHARE a strong recommendation for vaccines that patien need.
- ADMINISTER needed vaccines or REFER to a provider wh can immunize.
- DOCUMENT vaccines administered or received by you patients.

The National Adult and Influenza Immunization Summ (NAIIS) is a partnership of more than 130 private and publ

**TABLE 73.4** Standards for Pediatric Immunization Practices

1. Immunization services are readily available.
2. There are no barriers or unnecessary prerequisites to the receipt of vaccines.
3. Immunization services are available free or for a minimal fee.
4. Providers utilize all clinical encounters to screen and, when indicated, vaccinate children.
5. Providers educate parents and guardians about immunization in general terms.
6. Providers question parents or guardians about contraindications and, before vaccinating a child, inform them in specific terms about the risks and benefits of the vaccinations their child is to receive.
7. Providers follow only true contraindications.
8. Providers administer simultaneously all vaccine doses for which a child is eligible at the time of each visit.
9. Providers use accurate and complete recording procedures.
10. Providers co-schedule immunization appointments in conjunction with appointments for other child health services.
11. Providers report adverse events following vaccination promptly, accurately, and completely.
12. Providers operate a tracking system.
13. Providers adhere to appropriate procedures for vaccine management.
14. Providers conduct semi-annual audits to assess immunization coverage levels and to review immunization records in the patient populations they serve.
15. Providers maintain up-to-date, easily retrievable medical protocols at all locations where vaccines are administered.
16. Providers practice patient-oriented and community-based approaches.
17. Vaccines are administered by properly trained persons.
18. Providers receive ongoing education and training regarding current immunization recommendations.

*From Centers for Disease Control and Prevention. Standards for pediatric immunization practices. MMWR. 1993;42(RR-5):1-13.*

organizations that focuses on increasing adult and influenza immunization rates and on increasing implementation of the adult standards.[136] NAIIS has active workgroups on topics such as provider outreach, access and collaboration, patient education, policy and decision makers, and quality and performance measures. NAIIS has an annual meeting to bring together partners to discuss opportunities to improve adult immunization.

**Educating and Updating the Immunization Workforce.** The U.S. immunization schedule is complicated and changes at least once each year. Temporary changes in the schedule owing to vaccine supply disruptions can happen at any time. Specific vaccines can have safety concerns or issues that require temporary or permanent changes in vaccination practices. One example is the temporary halt in 2010 of the use of one of the licensed rotavirus vaccines because of the presence of porcine circovirus and the recommendation against using one of the licensed influenza vaccines owing to concerns about febrile seizures. This dynamic environment, coupled with the massive number of vaccinations given each year in the United States, require a means to educate and update the immunization workforce.

Continuously updated authoritative material is available at government sites listed later under "Sources of Additional Information." Professional organizations and other immunization education organizations also have continuously updated material, and several of these are listed in that section. Professional organizations, like the American Academy of Pediatrics, offer continuing medical education courses focused on immunization practices. The VFC program provides funding for state and local immunization programs to educate their VFC providers on all aspects of immunization practices, especially those required by law (use of the vaccine information statement and documenting immunizations properly), storage and handling of vaccines, and updates to the VFC program and immunization schedule.

State and local immunization programs communicate directly with their networks of immunization providers. To reduce the need to create multiple versions of immunization materials, the CDC now offers a new Web Content Syndication service that allows partners, including federal public health agencies, state and local public health departments, nonprofit organizations, academic institutions, and commercial organizations to syndicate CDC content directly to their sites. Public health partners can gain direct access to CDC Web content without having to monitor and copy updates, control which content from CDC.gov to use on their site, or integrate CDC content with localized content while keeping visitors on their sites. Information about content syndication is available at the CDC's Public Health Media Library.[137]

**Communicating With the Public.** Communicating with the public requires an understanding of the questions and concerns of the public and mechanisms to address them. With NVAC, the CDC developed a parental concerns module for the NIS that was administered in 2010. This module asked parents whether they have refused or delayed a vaccination, and, if so, which vaccine and why.[138] Using the NIS as the sample frame has the advantage of being able to link parent responses to immunization status of their child. The CDC also uses other survey and polling mechanisms to learn of parental concerns, and is currently conducting a prospective study looking at changes in vaccine attitudes among the same group of mothers over 5 years.[139]

Official communication with individual parents or guardians about vaccines and vaccine-preventable diseases is required on an individual basis for every vaccination with the vaccine information statement. These two-page information sheets are used by immunization providers to address questions and concerns and to bring important information to the attention of parents, guardians, and vaccinees. Broader communication with the public includes informational Internet sites as listed in this chapter and strategic communication with media channels. CDC launched an Internet site in 2011 dedicated to providing vaccine information to parents.[140]

## Evidence-Based Strategies to Improve Coverage

The evidence of what works to raise and sustain immunization coverage levels has been systematically reviewed by the TFCPS[141] and other independent reviewers. The TFCPS is an independent body that reviews the evidence base of community preventive services and makes recommendations for interventions based on the quantity and quality of evidence regarding their effectiveness. The TFCPS has reviewed a number of interventions addressing approaches aimed at enhancing access to vaccination services, increasing community demand for vaccinations, and provider- or system-based interventions and updates these reviews regularly. Table 73.5 summarizes the Task Forces' recommendations.

**Supporting Provider-Based Interventions.** Physicians and nurses need to ensure that their patients are immunized. However, when queried, they tend to overestimate the coverage of the children they serve. Studies report that physicians overestimated coverage by 10% to more than 40%.[142] The purpose of assessment and feedback is to alert providers to the actual coverage in their patient populations and to help motivate them to improve that coverage. The VFC program funds state and local immunization programs to conduct assessment and feedback on providers enrolled in VFC using the AFIX method. The AFIX method includes four components:

- Assessment of the immunization coverage of the preschool children served by a given clinic.
- Feedback of the results to persons in the clinic with the authority to make changes. Such feedback often includes potential problems identified during the review, such as failure to administer vaccines simultaneously.
- Incentives for improved performance. In the public sector, this often involves community recognition, plaques, and/or dinners rather than financial incentives.
- eXchange of information or comparing the performance of one clinic with that of others to stimulate competition to improve performance.

Assessment and feedback has been shown to increase immunization coverage for children in a provider's office and is a recommendation of the TFCPS. Many immunization programs are also implementing AFIX to provide assessment and feedback to providers on adolescent immunization coverage in their practice. While evidence supporting the impact of AFIX on adolescent coverage is limited, adolescent AFIX is an opportunity to engage providers and encourage a strong recommendation for HPV immunization in their practice.[143]

Many studies show that reminders for immunizations that are due or recall systems for immunization appointments that are missed can significantly improve immunization coverage in a variety of settings. In a health maintenance organization setting, computer-generated letters to families with children who had not received an measles-mumps-rubella (MMR) vaccine by 20 months of age improved coverage by 19 percentage points compared with similar children whose parents did not receive reminders (54% vs 35%), at a cost of US$4.04 per

**TABLE 73.5** Effective Strategies to Improve Immunization Coverage

| ENHANCING ACCESS TO VACCINATION SERVICES | |
| --- | --- |
| Home visits to increase vaccination rates | Recommended—March 2009 |
| Reducing client out-of-pocket costs | Recommended—October 2008 |
| Vaccination programs in schools and organized childcare centers | Recommended—June 2009 |
| Vaccination programs in WIC settings | Recommended—March 2009 |
| **INCREASING COMMUNITY DEMAND FOR VACCINATIONS** | |
| Client or family incentive rewards | Recommended—May 2015 |
| Client reminder and recall systems | Recommended—May 2015 |
| Client-held paper immunization records | Insufficient evidence—March 2010 |
| Clinic-based education when used alone | Insufficient evidence—May 2015 |
| Communitywide education when used alone | Insufficient evidence—March 2010 |
| Community-based interventions implemented in combination | Recommended—October 2014 |
| Monetary sanction policies | Insufficient evidence—April 2011 |
| Vaccination requirements for child care, school, and college attendance | Recommended—June 2009 |
| **PROVIDER- OR SYSTEM-BASED INTERVENTIONS** | |
| Healthcare system-based interventions implemented in combination[a] | Recommended—October 2014 |
| Immunization information systems | Recommended—July 2010 |
| Provider assessment and feedback | Recommended—February 2008 |
| Provider education when used alone | Insufficient Evidence—May 2015 |
| Provider reminders[b] | Recommended—June 2008 |
| Standing orders | Recommended |

[a]Combination refers to the situation in which an intervention is applied in concert with another intervention rather than as a standalone intervention. For example, combining client-based education with reducing out-of-pocket costs for vaccination.
[b]Provider reminders serve as prompts to vaccinate a patient being seen who is in need of vaccination.
*From The Guide to Community Preventive Services. Increasing Appropriate Vaccination. Available at: https://www.thecommunity guide.org/topic/vaccination.*

**TABLE 73.6** Comparison of Prevaccine Era and 2016 Counts of Cases for U.S. Vaccine-Preventable Diseases, Excluding Invasive Meningococcal Disease and Human Papillomavirus–Related Diseases

| Disease | 20th Century Estimated Annual Cases[a] | 2016 Reported Cases[b] | Percent Decrease |
| --- | --- | --- | --- |
| Smallpox | 29,005 | 0 | 100% |
| Diphtheria | 21,053 | 0 | 100% |
| Measles | 530,217 | 69 | >99% |
| Mumps | 162,344 | 5311 | 97% |
| Pertussis | 200,752 | 15,737 | 92% |
| Polio (paralytic) | 16,316 | 0 | 100% |
| Rubella | 47,745 | 5 | >99% |
| Congenital rubella syndrome | 152 | 1 | 99% |
| Tetanus | 580 | 33 | 94% |
| *Haemophilus influenzae* | 20,000 | 22[c] | >99% |

[a]Data from Roush SW, Murphy TV. Vaccine-preventable disease table working group. Historical comparisons of morbidity and mortality for vaccine-preventable diseases in the United States. *JAMA.* 2007;298(18):2155-2163.
[b]Data from Centers for Disease Control and Prevention. MMWR January 9,2015/63(53);ND-733-ND-746. (MMWR 2014 provisional week 53 data).
[c]*Haemophilus influenzae* type b (Hib) <5 years of age. An additional 12 cases of Hib are estimated to have occurred among the 226 reports of Hi (<5 years of age) with unknown serotype.

## IMPACT OF IMMUNIZATION PROGRAMS
### Occurrence of Disease

The occurrence of most vaccine-preventable diseases is at or near record low levels. Table 73.6 shows the representative annual levels of disease reported or estimated for selected vaccine-preventable diseases during the 20th century. Most often, these are the years immediately preceding vaccine licensure. Most diseases with mature vaccination programs have been reduced by 95% or more from representative 20th-century morbidity. In March 2000, a group of experts concluded that endemic transmission of measles in the United States had ceased,[146] and in 2003, rubella was declared to be eliminated from the United States.[147] Although measles outbreaks continue to occur around imported cases,[85] the elimination of indigenous transmission has been sustained. Maintaining elimination status is especially important in an era in which measles remains uncontrolled in many countries. Substantial reductions are also evident for several of the diseases for which vaccines have been introduced more recently, such as rotavirus and pneumococcal disease.[148–150] Vaccination in the United States has led to substantial reductions in hospitalizations attributed to pneumococcus, rotavirus, and varicella.[76,151,152]

### Immunization Coverage
#### Preschool Immunization

The United States is currently experiencing record-high or near-record-high vaccination coverage levels among 2-year-old

additional immunized child.[144] Provider-based recall systems have been shown to be effective at the community level in reducing racial and ethnic disparities in immunization coverage levels.[145] Provider reminders to inform those who administer vaccinations that individual clients are due for specific vaccinations are also effective. Immunization providers can use reminders and recalls in concert with other effective interventions to ensure the best protection possible for their patient population.



**Figure 73.5. Vaccine-specific coverage among children 19 to 35 months of age, National Immunization Survey, 1994 to 2014.** The *Healthy People 2020* (HP 2020) target for coverage is 90% for all these vaccines except rotavirus (80%) and HepA (85%). DTP/DTaP, diphtheria, tetanus toxoids, and pertussis vaccine/diphtheria, tetanus toxoids, and acellular pertussis vaccine; HepA, hepatitis A vaccine; HepB, hepatitis B vaccine; Hib, *Haemophilus influenzae* type b vaccine; MMR, measles, mumps, and rubella vaccine; PCV, pneumococcal conjugate vaccine. *(From CDC. For Immunization Managers. Figure Depicting Coverage with Individual Vaccines from the Inception of NIS, 1994 Through 2014. http://www.cdc.gov/vaccines/imz-managers/coverage/nis/child/figures/2014-map.html.)*

children, although there is moderate variation in coverage levels across states (Fig. 73.5). In 2014, the *Healthy People 2020* target of 90% was met for three or more doses of poliovirus vaccine (93.3%), one or more doses of MMR (91.5%), three or more doses of hepatitis B vaccine (91.6%), and one or more doses of varicella vaccine (91.0%). However, the targets were not met for four or more doses of diphtheria, tetanus, and pertussis vaccine (DTaP); the full series of Hib; four or more doses of pneumococcal conjugate vaccine; two or more doses of hepatitis A vaccine; the hepatitis B vaccine birth dose, and the full series of rotavirus vaccine.[1] The NIS monitors the number of young children who are completely unvaccinated—the "zero-dose" children. Since 2006, the number of zero-dose children has remained consistently below 1%. Coverage with vaccines scheduled to be given in the second year of life is lower than for vaccines given during the first year. Most recent immunization coverage tables for children by state, race, ethnicity, and poverty status can be found at the CDC's For Immunization Managers web page.[153]

The United States has made substantial progress in reducing vaccination coverage level disparities by race in the past three decades. Measles disease and measles immunization serve as an example. In the 1970s, the white–nonwhite disparity in MMR vaccine coverage was 18 percentage points, and attack rates for measles among children younger than 5 years of age were four to seven times higher in nonwhites than in whites. During the 1990s, the white–black coverage disparity was reduced to 2 percentage points, and the disease disparity was eliminated. Zhao and Luman analyzed series-complete data and found that during the time from 2000 to 2008, the series-complete coverage levels (four DTaP, three inactivated poliovirus vaccine, one MMR, three hepatitis B, three Hib, and one varicella vaccines) showed relatively little black–white coverage disparities. In 2000, the disparity was approximately 4 percentage points, and by 2008, it was reduced to approxi-

mately 2 percentage points.[154] Current disparities by race and ethnicity have remained relatively small, but disparities remain for doses given in the second year of life.

## Teens

All U.S. adolescents are recommended to receive HPV, Tdap, and meningococcal conjugate vaccine-4 vaccines at 11 to 12 years of age. Coverage among 13- to 17-year-old teens has steadily climbed for Tdap and meningococcal conjugate vaccine-4 to over the Healthy People 2020 coverage goal of 80%, with 2014 coverage of 87.6% and 79.6% respectively.[2] However, coverage for HPV series initiation and completion continues to be low, with initiation rates of 60% among girls and 41.7% among boys in 2014 (Fig. 73.6). There is wide variation in coverage rates by state for all three vaccines, but disparities by race, ethnicity, and poverty status are small. The most recent coverage estimates for teens are available online at the CDC.[155]

## Adult Immunization

Vaccination coverage levels among U.S. adults are substantially lower than coverage for young children.[97] Table 73.7 shows adult coverage for influenza, pneumococcal polysaccharide, and zoster vaccines, all three of which are recommended routinely for age-appropriate adults. Adult vaccination coverage levels reveal a much larger disparity by race and ethnicity than the disparity seen among young children and teens, with coverage for pneumococcal vaccine in adults 65 years of age and older, diphtheria and tetanus toxoids vaccine, and zoster vaccine lower among blacks and Hispanics compared to white non-Hispanics.[156,157] Influenza vaccination coverage varies by year and data from each influenza season can be found at the CDC's FluVaxView interactive website.[158]



**Figure 73.6.** Vaccination coverage with selected vaccines and doses among adolescents age 13 to 17 years, by survey year—National Immunization Survey-Teen, United States, 2006 to 2014. HPV, human papillomavirus; MenACWY, quadrivalent meningococcal conjugate vaccine; Tdap, tetanus, diphtheria, and pertussis.

**TABLE 73.7** Vaccination Coverage Levels of Adults, 2013

| Vaccine and Age Group | National Average | White, Non-Hispanic | Black, Non-Hispanic | Hispanic |
|---|---|---|---|---|
| Pneumococcal polysaccharide, 19–64 y | 21.2% | 22.3% | 21.2% | 17.9% |
| Pneumococcal polysaccharide, >64 y | 59.7% | 63.6% | 48.7% | 39.2% |
| Td, 19–49 y | 62.9% | 69.0% | 54.1% | 52.5% |
| Td, 50–64 y | 64.0% | 67.3% | 54.4% | 55.0% |
| Td >64 y | 56.4% | 59.6% | 40.3% | 45.3% |
| Tdap, 19–64 y | 18.4% | 21.6% | 13.6% | 10.5% |
| Hepatitis A, 19–49 y | 12.3% | 12.6% | 11.0% | 10.6% |
| Hepatitis B, 19–49 y | 32.6% | 35.2% | 30.5% | 23.7% |
| Herpes zoster, >59 y | 24.2% | 27.4% | 10.7% | 9.5% |
| HPV, females 19–26 y | 36.9% | 41.7% | 30.6% | 30.3% |

HPV, human papillomavirus; Td, tetanus and diphtheria vaccine.
*From Williams WW, Lu PJ, O'Halloran A, et al; Centers for Disease Control and Prevention (CDC). Vaccination coverage among adults, excluding influenza vaccination—United States, 2013. MMWR Morb Mortal Wkly Rep. 2015:64;95–102.*

## Impact of the U.S. Program

The immunization schedule, taken as a whole, saves lives, prevents suffering, and saves money for the healthcare system and for society. In 2014, a model was conducted to assess the impact of 20 years of the VFC Program (Table 73.8). This analysis was based on a modeling approach that assessed the economic impact of each of the recommended vaccines

individually and combined into the routine program. Among 78.6 million children born during 1994 to 2013, routine childhood immunization estimated that 322 million illnesses (averaging 4.1 illnesses per child) and 21 million hospitalizations (0.27 per child) were prevented over the course of their lifetimes and 732,000 premature deaths from vaccine-preventable illnesses were averted. Vaccination will potentially save $402 billion in direct costs and $1.5 trillion in societal

Appx18593

**TABLE 73.8** Estimated Number of Illnesses, Hospitalizations, and Deaths Prevented by Routine Childhood Immunization for Selected Vaccine-Preventable Diseases Among Children Born During the Vaccine for Children Era—United States, 1994–2013

| Vaccine-Preventable Disease[a] | Cases Prevented (in Thousands) | | |
|---|---|---|---|
| | Illnesses | Hospitalizations | Deaths |
| Diphtheria | 5073 | 5073 | 507.3 |
| Tetanus | 3 | 3 | 0.5 |
| Pertussis | 54,406 | 2697 | 20.3 |
| Haemophilus influenzae type b | 361 | 334 | 13.7 |
| Polio | 1244 | 530 | 14.8 |
| Measles | 70,748 | 8877 | 57.3 |
| Mumps | 42,704 | 1361 | 0.2 |
| Rubella | 36,540 | 134 | 0.3 |
| Congenital rubella syndrome | 12 | 17 | 1.3 |
| Hepatitis B | 4007 | 623 | 59.7 |
| Varicella | 68,445 | 176 | 1.2 |
| Pneumococcus-related diseases[b] | 26,578 | 903 | 55.0 |
| Rotavirus | 11,968 | 327 | 0.1 |
| Total | 322,089 | 21,055 | 731.7 |

[a]Vaccines were considered as preventing disease for birth cohorts born in all years during 1994–2013 except for the following, which were only in use for part of the 20-year period: varicella, 1996–2013; 7-valent and 13-valent pneumococcal conjugate vaccines, 2001–13; and rotavirus, 2007–13.

[b]Includes invasive pneumococcal disease, otitis media, and pneumonia.

costs because of illnesses prevented in these birth cohorts. After accounting for $107 billion and $121 billion in direct and societal costs of routine childhood immunization, respectively, the net present values (net savings) of routine childhood immunization from the payers' and societal perspectives were US$295 billion and US$1.38 trillion, respectively.[159]

Immunization has consistently ranked as one of the most effective and cost-effective clinical preventive services available.[160]

## CONCLUSION

Development and use of vaccines in the United States has had a profound effect on the occurrence of vaccine-preventable diseases. The success represents a blend of public-private and federal, state, and local partnerships. Measles, rubella, and polio remain eliminated as indigenous diseases in the United States, and large declines in other diseases for which routine vaccination is recommended have been seen. Childhood vaccination coverage levels have remained high for many years with small or no disparities by race and ethnicity. The number of children receiving no vaccines has remained less than 1% since 2006.

There are numerous challenges. During the past 20 years, the number of vaccine-preventable diseases of childhood has doubled, from eight to 16. Since 2004, vaccines against influenza, hepatitis A, meningococcal disease, rotavirus, and HPV have been routinely recommended for children and/or adolescents. In addition, an adolescent booster has become available for pertussis, a second dose of varicella vaccine has been recommended, and a new vaccine for zoster is recommended for all adults older than 60 years. Assuring financial barriers to access are removed, sustaining high coverage among children, and attaining high levels of coverage among adolescents and adults will be major challenges for the next several years as the U.S. immunization system works to achieve the Healthy People 2020 immunization objectives.

## Sources of Additional Information

There are numerous sources of information about U.S. vaccines, immunization recommendations, and immunization systems, including the following:

- The CDC has a comprehensive website that includes information about ACIP, vaccines, vaccine-preventable diseases, immunization programs, communication and health education materials, and data and statistics about disease and coverage rates: https://www.cdc.gov/vaccines.
- Official package inserts. Manufacturers provide product-specific information with each vaccine; some of these circulars are reproduced in their entirety in the *Physicians' Desk Reference* (a new edition published annually can be obtained at http://www.PDRBookstore.com).
- *Morbidity and Mortality Weekly Report*. This report is published weekly by the CDC. ACIP statements are usually published in separate *Recommendations and Reports* supplements to the weekly publication. Current and back issues are available at https://www.cdc.gov/mmwr.
- *Red Book*: The Report of the Committee on Infectious Diseases of the American Academy of Pediatrics. The full report containing recommendations on all licensed vaccines is usually updated every 2 to 4 years, and updates are provided on the Red Book's Internet site: http://aapredbook.aappublications.org.
- *Health Information for International Travel* (the Yellow Book). This book is published every other year by the CDC as a guide to requirements and recommendations for specific immunizations and health practices for travel to various countries. It can be obtained by telephone at 800–545–2522 or from the publisher at http://www.us.elsevierhealth.com. A comprehensive and frequently updated resource for travel information is available at https://www.cdc.gov/travel. This site includes an online version of the Yellow Book. Advisory notices for international travel are also available at https://www.cdc.gov/travel.
- *Control of Communicable Diseases Manual*. This manual is published by the American Public Health Association at approximately 5-year intervals; the 19th edition (2008) is currently available. The manual contains valuable information concerning infectious diseases, their occurrence worldwide, immunization, diagnostic and therapeutic issues, and up-to-date recommendations on isolation and other control measures for each disease presented. It is available through Internet booksellers.
- State and local health departments, medical schools, and large hospitals. Many of these agencies or institutions provide routine immunizations, immunization cards, and schedules to patients. They may also send out routine reports of disease incidence. Internet sites for state and local immunization programs are available at https://www.cdc.gov/vaccines/partners.htm.
- The TFCPS (http://www.thecommunityguide.org) has published structured reviews of evidence for interventions to improve public health. These reviews cover universally recommended immunizations for children and adults and

targeted vaccination of children and adults at high risk of vaccine-preventable diseases or their complications.

- The CDC National Center for Immunization and Respiratory Diseases (NCIRD) has established toll-free numbers for answering questions from the general public and providers: 800–232–4636. Inquiries can also be addressed to the CDC by e-mail (nipinfo@cdc.gov).
- The Internet serves as a rich source of immunization information for providers, health officials, and the general public. The CDC maintains a list of immunization partner websites at https://www.cdc.gov/vaccines/partners.htm.
- The Department of Health and Human Services provides Internet resources for the public concerning vaccines and influenza at http://www.vaccines.gov and http://www.flu.gov, respectively.

References for this chapter are available at ExpertConsult.com.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel*.,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,
                    *Plaintiffs,*
        v.
MERCK & CO., INC.,
                    *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S EXHIBITS IN SUPPORT OF MERCK'S RESPONSE TO RELATORS' STATEMENT OF UNDISPUTED FACTS

# EXHIBIT 315

## Expert Report of Daniel Salmon, Ph.D., MPH

**Professional Experience**

Dr. Salmon is a Professor of Global Disease Epidemiology and Control, Department of International Health, Johns Hopkins University Bloomberg School of Public Health. He also has a joint appointment in the Department of Health, Behavior and Society and serves as the Deputy Director of the Institute for Vaccine Safety at Johns Hopkins. Dr. Salmon is broadly trained in vaccinology, with an emphasis in epidemiology, behavioral epidemiology, and health policy. Dr. Salmon received a Bachelor of Arts (BA) in Political Science with a minor in Psychology from Rutgers University in 1991. He received a Master of Public Health (MPH) from Emory University Rollins School of Public Health in 1996. Dr. Salmon received a Doctor of Philosophy (PhD) from Johns Hopkins University Bloomberg School of Public Health in 2003.

Dr. Salmon has held positions in government and academia. Dr. Salmon has worked for the Centers for Disease Control and Prevention as a contractor and later as a Policy Analyst. In these positions, he used surveillance systems to conduct studies of measles and pertussis and coordinated Federal efforts around vaccine safety, immunization information systems, and development of new vaccines such as tuberculosis. Dr. Salmon also served as the Director of Vaccine Safety, National Vaccine Program Office, Department of Health and Human Services. In this capacity, Dr. Salmon was responsible for coordinating and overseeing the nation's vaccine safety system including vaccine safety activities in the Department of Health and Human Services (National Institute of Health, Food and Drug Administration, Centers for Disease Control and Prevention, and Health Resources and Services Administration) other Federal Departments (Defense, Veterans Affairs, State), and non-federal partners including academia, industry, professional medical and public health associations, states and localities, and the public. Dr. Salmon led a Secretary's initiative in vaccine safety, oversaw the 2009 H1N1 vaccine safety program (the largest and most comprehensive vaccine safety program ever conducted anywhere in the world), and served as the Designated Federal Official for the National Vaccine Advisory Committee (NVAC) Vaccine Safety Working Group. Among other accomplishments, Dr. Salmon created the Post-Licensure Rapid Immunization Safety Monitoring (PRISM) Network to conduct active vaccine safety surveillance for the 2009 H1N1 immunization program. PRISM is now an ongoing surveillance system for the Food and Drug Administration.

Dr. Salmon has conducted a broad range of research in academia including research grants funded by the National Institutes of Health, Centers for Disease Control and Prevention, state health departments, the Robert Wood Johnson Foundation, and private industry including Walgreens, Pfizer, and Crucell. Dr. Salmon has also served as a grant reviewer for the National Institutes for Health, Centers for Disease Control and Prevention, Food and Drug Administration, National Science Foundation, the Gates Foundation, as well as numerous other country federal health authorities. Dr. Salmon has taught and continues to teach a class in vaccine policy for more than a decade and also currently teaches a class in public health practice at Johns Hopkins University Bloomberg School of Public Health. Dr. Salmon has mentored numerous students and scientists, many of which now hold leadership positions in academia, government, and international organizations.

Dr. Salmon has published more than 60 papers in top medical and public health journals including the *New England Journal of Medicine*, the *Lancet*, the *Journal of the American Medical Association*, *Health Affairs*, and *Pediatrics*. Dr. Salmon regularly serves as a peer reviewer for these and other high impact journal. He has been invited to give presentations at the National Foundation for Infectious Diseases, Federal advisory committees, and international meetings. Dr. Salmon has served as an expert witness for a variety of legal cases, including testifying in two cases over the past 4 years (Malaga v. Wciorkadc, Case No D-17-552632-D, Eighth Judicial District Court, Clark County, Nevada (2018); Department of Disability Services v. Andrews, Case No 2012-IID-149, Superior Court of the District of Columbia, Washington DC (2017)). Dr. Salmon's current curriculum vitae is attached (Appendix 1).

Dr. Salmon has been retained by the Defendant, Merck & Co., Inc. The matters discussed in this report have been at the request of Merck & Co., Inc. The client has not impacted the methods used to address these issues, findings, nor interpretation of science. Dr. William Bleser, PhD, MSPH, a former student and fellow of Dr. Salmon and currently a Research Associate at Duke University, provided assistance to Dr. Salmon. All opinions herein are that of Dr. Salmon. Dr. Salmon was compensated at a rate of $450 per hour for researching and writing this report and testimony in the case. Compensation does not depend on the outcome of this litigation or any conclusions of the report or testimony

Dr. Salmon was requested by the Defendant to provide expert review of the following:

1) Characterize the body of scientific evidence on laboratory tests for mumps vaccine response;
2) Evaluate available epidemiological evidence for mumps vaccine effectiveness over time;
3) Evaluate the relative priority of development of a new mumps vaccine for the United States and developed world given other vaccine research and development priorities.

Each of these issues are further defined below along with a detailed description of the methods used to address them. The first two issues (laboratory tests for mumps vaccine response and epidemiological evidence for vaccine effectiveness) were addressed through systematic reviews of the literature, as described. The evaluation of relative priority for research and development of new mumps vaccines is based upon professional judgement informed by national prioritization strategies.

2

**Appx18598**

**Task 1. Characterize the body of scientific evidence on laboratory tests for mumps vaccine response.**

The following methods were used to characterize the body of scientific evidence on laboratory tests for mumps vaccine seropositivity and seroconversion.

**Seropositivity** is an absolute measure of antibodies at one time point, not comparing before and after vaccination in one value. It is formally defined as,

> "A subject without antibodies in his serum is called *seronegative*, while a subject with antibodies is called *seropositive*. A subject's *serostatus* is his status with respect to being seropositive or seronegative for a particular antibody."[1(p28)]

**Seroconversion** is formally defined as,

> "… development of detectable particular antibodies in the serum as a result of infection or immunization. … A subject whose serostatus was seronegative but has become seropositive is said to have seroconverted."[1(p28)]

Seropositivity is only equal to seroconversion in the post-vaccination timeframe if it is known that all individuals being measured were initially seronegative. The terms seroprotection and seroresponse are also sometimes used. The meanings of those terms differed depending on the study, so when they were encountered in the review, the operationalization of the term was carefully reviewed to determine if the authors were referring to seropositivity or seroconversion.

PubMed was searched for peer reviewed, published articles relating to clinical studies involving mumps vaccines. The following list of key terms were developed based upon review articles[2–4] and used for the search:

- antibody response
- central memory cells
- ELISA (assay) antibodies
- hemagglutination inhibition (HAI) (titers)
- immunogenicity
- indirect (fluorescent) antibodies
- neutralizing (fluorescent) antibodies
  - plaque reduction neutralization (test used to get neutralizing antibodies)
- T-cell responses / central memory cells
- Th1 response
- (surface) antigens

PubMed's Medical Subject Heading (MeSH) indexed search terms related to these key words were used. If none were available, broad search terms were used to capture them. All of the terms were connected with OR statements, and then that entire string was connected with an AND statement to the PubMed MeSH term for mumps vaccines. This resulted in the following:

3

("Antibodies"[Mesh] OR "Antibody Formation"[Mesh] OR "Immunogenicity, Vaccine"[Mesh] OR "T-Lymphocytes"[Mesh] OR "Enzyme-Linked Immunosorbent Assay"[Mesh] OR "Hemagglutination Inhibition Tests"[Mesh] OR "Fluorescent Antibody Technique, Indirect"[Mesh] OR "Antibodies, Neutralizing"[Mesh] OR "plaque reduction neutralization" OR "Th1 Cells"[Mesh] OR "Antigens, Surface"[Mesh]) AND "Mumps Vaccine"[Mesh]

This search yielded a total of 792 results. The following criteria were used to systematically screen studies to be included in the final review. Studies were included if they contained primary data on vaccine response in healthy children.

Studies were excluded if they:

1) were not in the English language;
2) were not related to a mumps vaccine;
3) were animal model studies;
4) were not peer-reviewed journal articles (i.e., books, reports, other non-journal sources), with the exception of PubMed published surveillance reports from government disease surveillance authorities (e.g., the Centers for Disease Control and Prevention's *Morbidity and Mortality Weekly Report [MMWR]* and the European Centre for Disease Prevention and Control's *European Communicable Disease Bulletin [Eurosurveillance]*);
5) discussed mumps vaccine response but did not present novel primary data (literature reviews, commentaries, etc.);
6) examined general population serology but did not examine vaccine response (e.g., some studies examined just seroprevalence, seronegativity, or seropositive rate, without any relation to vaccine response; these data only provide information on risk of infection/disease);
7) examined long-term seronegativity/vaccine failure/waning immunity (follow-up of previously reported populations years later is not a measure of primary vaccine response);
8) Any population other than healthy children. Examples of this exclusion criteria:
   a. all adults (aged ≥18 years old)
   b. not "healthy" children (e.g., special populations, such as children in studies re-testing vaccines in children with HIV, transplants, etc.; children on dialysis; children with cancer, etc.)
   c. infants who were too young to be vaccinated (e.g., studies where infants were examined based upon maternal vaccination)
   d. children with mumps virus exposure or disease, including outbreak studies
   e. children previously vaccinated against mumps and deemed non-responders

A final list of 146 studies were included after passing all inclusion and exclusion criteria. A summary of this process is below:

- Excluded 101 studies that were not in English (691 studies remaining)
- Excluded 305 studies by title and abstract review as obviously violating exclusion criteria above (386 studies remaining)
- Excluded 240 studies via full-text review for violating exclusion criteria (146 remaining)

4

Appx18600

This rigorous process resulted in 146 peer-reviewed studies representing the peer-reviewed knowledge on mumps vaccine response.

The following information was extracted from each study to ensure that mumps vaccine response could be appropriately and systematically examined:

- **Study name** (author(s) and year)
- **Data years** (most recent year of data, not date of publication; e.g., a study published in 2013 using data from 2010-2012 would be extracted as 2012)
- **Location** (country or countries of the population where the estimate came from)
- **Laboratory method** (the method used to examine human biological specimens for some sort of antibody response; e.g., ELISA IgG, plaque neutralization test, immunofluorescence, among many other methods)
- **Laboratory method threshold** (from the laboratory method, the threshold of response equating to seropositivity or seroconversion; e.g., 2-fold increase, $\geq 231$ U/ml, optical density of $\geq 0.028$, among many other thresholds)
- **Estimate** of % seroconversion or % seropositivity per threshold
- **Mumps vaccine strain** (e.g., Jeryl-Lynn, Rubini, UrabeAM9, etc.)
- **Dose** (1 or 2, corresponding to each estimate of seroconversion or seropositivity)
- **Manufacturer** (Merck, Sanofi Pasteur, GSK, etc., among many others)

Many studies reported multiple vaccine response estimates (e.g., different unique estimates for mumps vaccine seroconversion or seropositivity). Across the 146 studies there were 383 unique estimates following mumps vaccination (seroconversion [n=292 estimates] or seropositivity [n=91 estimates]). The full extracted results are shown in Appendix 2.

The majority of estimates in the search examined the outcome of seroconversion (292 of 383 estimates: 76%). The remaining 24% (91 of 383) of estimates were seropositivity.

Seroconversion estimates represented data from 11 unique vaccine strains. Jeryl Lynn vaccines comprised half (51%) of the estimates, and Jeryl Lynn plus the next 4 strains comprised almost 90% of estimates: Urabe AM9 (14%), RIT4385 [note: this strain is derived from Jeryl Lynn] (14%), Rubini (6%); and Hoshino (4%). The remaining 11% of estimates comprised a mix of studies examining the mumps vaccine strains Leningrad-Zagreb, Leningrad-3, S79, Torii, BBM-18, and Jones, and a few estimates where information on the strain was missing or from unstratified mixed strains estimates. These vaccines were manufactured by 19 different entities, although two comprised the majority of the vaccines used in the estimates: Merck (45%) and GSK (23%). The remaining 32% of estimates were from vaccines manufactured by 17 different entities, each ranging from 0.3-3.4% of all. Seropositivity estimates, being less common, represented data from only 6 strains (the top 3 most frequently represented strains, containing a vast majority of estimates, were the same as for seroconversion); the distribution of manufacturers of these strains was also very similar.

Seroconversion estimates represented populations from 34 countries (with some estimates containing persons from multiple countries). A quarter of all estimates (25%) were from the United States, followed by Germany (12%), Finland (8%), Japan (5%), Switzerland (5%), Brazil (4%), and India (3%). The remaining 40% of estimates were from 27 other countries or a

**Appx18601**

combination of countries. Seropositivity estimates were similarly represented by US studies (31%) and Germany, but the remaining estimates were relatively evenly distributed among 18 other countries.

The most common laboratory method used to analyze blood samples for an immune response as part of a seroconversion calculation was some type of enzyme immunoassay of IgG antibodies (55%). Almost a quarter of estimates used some type of serum neutralization test (23%), followed by some type of hemagglutination inhibition test (9%), and some type of immunofluorescence test (7%). The remaining 7% encompassed a variety of uncommon methods or a combination of methods. There were at least 14 different ways that laboratory methods were used by themselves or in combination with others; the most prevalent single method, by far, was the ELISA IgG subtype of enzyme immunoassay, which was used in almost half of all estimates (48%). After that, the prevalence of specific laboratory methods sharply drops off (unspecified serum neutralization test was used in 19% of estimates, unspecified enzyme immunoassays of IgG antibodies in 7%, and the remaining single methods were used <5% of the time individually). Seropositivity estimates were similarly represented in terms of laboratory method (ELISA IgG compromised about 60% of estimates with some type of neutralization test around 20% and quickly tapering off among the remaining methods).

Thirty-two different laboratory method *thresholds* for what constitutes seroconversion were used across the 14 different laboratory methods for assessing immune response. By far, the most common single threshold was ≥231 units/mL (15% of all estimates), which was a common threshold (but not the only threshold) used in ELISA mumps IgG antibody kits. Using a "4-fold increase" antibody threshold was also used 15% of the time; this (and other fold increase thresholds) are not specific to a particular antibody and thus were used across a variety of laboratory methods (i.e.., not just in ELISA IgG tests, but also in other enzyme immunoassays, in serum neutralization tests, in hemagglutination inhibition tests, etc.). Outside of these two thresholds were many other laboratory thresholds: various quantifications of antibody titers, units/mL, optical density units, percent increases, 50% neutralization titers, etc. Moreover, exactly 25% of all seroconversion estimates did not report the threshold that they used, so missingness was high. Seropositivity estimates were similarly represented in terms of laboratory method thresholds (the ELISA IgG threshold of ≥231 units/mL compromised about a quarter of estimates, quickly tapering off among the remaining thresholds, and with 15% missingness).

**Comparing seroconversion rates by strain and by Merck manufacturer.**

Across all estimates, the median seroconversion rate was 95.0% (94.5% for dose 1, and 99.8% for dose 2), and the interquartile range (IQR - (middle 50% of the data)) was 88.6-99.0% (87.8-98.3% for dose 1, and 97.7-100% for dose 2). The 95% confidence interval was 94.1-95.9% (93.5-95.3% for dose 1, and 99.2-100 for dose 2). Tables 1 and 2 below summarize all the medians with IQRs and 95% confidence intervals via bootstrapping, respectively.

**Appx18602**

**Table 1. Median and Interquartile Range (IQR) for seroconversion and seropositive rates of mumps vaccine strains in healthy children, stratified by Jeryl-Lynn vs. other strains, and by Jeryl-Lynn manufacturer**

| Mumps Vaccine Strains | Seroconversion (%) | | Seropositivity* (%) | |
|---|---|---|---|---|
| | Dose 1 Median (IQR) | Dose 2 Median (IQR) | Dose 1 Median (IQR) | Dose 2 Median (IQR) |
| All strains | 94.5 (87.8-98.3) n=262 | 99.8 (97.7-100) n=30 | 93.9 (88.0-98.6) n=62 | 99.5 (83.7-100) n=28 |
| Non-J-L strains | 92.4 (85.0-96.1) n=116 | 99.5 (97.1-100) n=22 | 94.3 (87.0-98.6) n=30 | 98.1 (53.5-100) n=12 |
| J-L strains only | 96.1 (93.0-99.0) n=141 | 99.9 (98.7-100) n=8 | 92.9 (88.0-98.3) n=31 | 100 (90.0-100) n=13 |
| Merck J-L strains | 96.7 (93.0-99.2) n=124 | 99.9 (98.7-100) n=8 | 92.9 (88.0-97.7) n=22 | 100 (100-100) n=10 |
| Other J-L strains | 94.0 (85.0-96.0) n=17 | n/a n=0 | 98.3 (88.9-100) n=9 | 89.9 (79.9-90) n=3 |

* Seropositivity rates are difficult to interpret because the denominator is not restricted to seronegative persons before vaccination, thus seropositivity can also be caused by exposure to natural disease or other factors.

**Table 2. Median and 95% confidence intervals (CI) for seroconversion and seropositive rates of mumps vaccine strains in healthy children, stratified by Jeryl-Lynn vs. other strains, and by Jeryl-Lynn manufacturer**

| Mumps Vaccine Strains | Seroconversion (%) | | Seropositivity* (%) | |
|---|---|---|---|---|
| | Dose 1 Median (95%CI) | Dose 2 Median (95%CI) | Dose 1 Median (95%CI) | Dose 2 Median (95%CI) |
| All strains | 94.5 (93.5-95.3) n=262 | 99.8 (99.2-100) n=30 | 93.9 (91.9-95.9) n=62 | 99.5 (95.1-100) n=28 |
| Non-J-L strains | †92.4 (90.9-93.9) n=116 | 99.5 (98.5-100) n=22 | 94.3 (91.7-96.8) n=30 | 98.1 (69.3-100) n=12 |
| J-L strains only | †96.1 (95.0-97.2) n=141 | 99.9 (97.0-100) n=8 | 92.9 (89.1-96.7) n=31 | 100 (95.4-100) n=13 |
| Merck J-L strains | 96.7 (95.5-97.9) n=124 | 99.9 (97.0-100) n=8 | 92.9 (89.5-96.2) n=22 | †100 (98.8-100) n=10 |
| Other J-L strains | 94.0 (88.0-100) n=17 | n/a n=0 | 98.3 (85.5-100) n=9 | †89.9 (81.4-98.4) n=3 |

Standard errors used to calculate 95% confidence intervals (CIs) of medians obtained by bootstrapping the median calculation 1,000 times.
† Comparing vertical cells within each comparison group, estimates are statistically significantly different (95% CIs do not overlap).
* Seropositivity rates are difficult to interpret because the denominator is not restricted to seronegative persons before vaccination, thus seropositivity can also be caused by exposure to natural disease.

Seroconversion and seropositivity estimates for Jeryl Lynn vaccines vs. other mumps vaccine strains are compared (Tables 1 and 2), excluding estimates with missing strains or those that were not stratified by strain and could contain more than one strain in the denominator of the

7

seroconversion calculation. Vaccines with the Jeryl-Lynn mumps strain had seroconversion estimates for dose 1 ranging from 13.0-100%.  The IQR was 93.0-99.0%, and excluding boxplot outliers (see Figure 1), all estimates were 85.0% and higher. Vaccines with the Jeryl-Lynn mumps strain had seroconversion estimates for dose 2 ranging from 80.0-100%.  The IQR was 98.7-100%, and excluding boxplot outliers, all estimates were 97.7% and higher. Vaccines with the Jeryl-Lynn mumps strain had the highest median seroconversion rate of all other mumps vaccine strains for dose 1 (96.1% vs. 92.4%) and dose 2 (99.9% vs. 99.5%). The difference in dose 1 was statistically significant (see Table 2). Figure 1 illustrates this point for dose 1. Vaccines with the Jeryl-Lynn mumps strain had a slightly lower median seropositivity rate for dose 1 than RIT4385 (derived from Jeryl-Lynn) and UrabeAM9, but had the highest median seropositivity rate in dose 2 (100%). Seropositivity rates are difficult to interpret because the denominator is not restricted to seronegative persons before vaccination, thus seropositivity can also be caused by exposure to natural disease. Other comparisons were not statistically significant, likely due to the small sample sizes in most cells.

While all Merck manufactured mumps vaccine components are the Jeryl Lynn strain, other manufacturers have used Jeryl Lynn strains in their vaccines uncommonly (Merck vaccines represent 89% of all Jeryl Lynn seroconversion estimates). The Merck Jeryl-Lynn vaccines elicited the highest median seroconversion rate compared to other manufacturers' Jeryl-Lynn mumps vaccines (for dose 1: 96.7% vs. 94.0%; for dose 2, Merck vaccines had a 99.9% median seroconversion rate but there were no studies reporting 2nd dose seroconversion from other manufacturers). Figure 2 illustrates this point for dose 1. For seropositivity, other manufacturers' had a slightly higher median seropositivity rate for dose 1, but Merck vaccines had the highest in dose 2 (100%; statistically significant; see Table 2). Other comparisons were not statistically significant, likely due to the small sample sizes in most cells.

Appx18604

**Figure 1. Boxplot of mumps seroconversion rates of all mumps vaccine strains (dose 1) in healthy children**



Key for strains:
- BBM-18 = BBM-18
- H = Hoshino
- J = Jeryl-Lynn
- Jones = Jones
- L-3 = Leningrad-3
- L-Z = Leningrad-Zagreb
- R = Rubini
- RIT = RIT4385 [note: this strain is derived from Jeryl Lynn]
- S = S79
- T = Torii
- U = UrabeAM9

9

Appx18605

**Figure 2. Boxplot of mumps seroconversion rates of all Jeryl-Lynn mumps vaccine (dose 1) in healthy children, by Merck vs. other manufacturer**



## Summary of key findings

The extant peer-reviewed literature on seroconversion and seropositivity in healthy children coalesced on very high values for dose 1 (~94%) and 2 (≥99.5%) despite the large variety of strains, manufacturers, countries, laboratory methods, and threshold of what constitutes an appropriate mumps vaccine immune response. Although studies on the Jeryl-Lynn vaccine strain showed seroconversion rates as low as 13% in outlier studies, Jeryl-Lynn vaccine strain had the highest median seroconversion of any strain for both dose 1 (96.1%; statistically significant) and dose 2 (99.9%). Merck-manufactured Jeryl-Lynn vaccine strains had the highest median seroconversion vs. Jeryl Lynn strains produced by others both for dose 1 (96.7%) and dose 2 (99.9%). These studies consistently demonstrate a robust immune response to mumps vaccines among healthy children, despite occasional outliers.

10

(basic research and development, preclinical studies, phase 1-3 trials) for dozens of diseases is summarized (Appendix A of the Jordan Report). Again, mumps is not even mentioned. While this is not to say that NIAID would not have any interest in a superior mumps vaccine, given competing priorities it is extremely unlikely NIAID would make a superior mumps vaccine a high priority. A search of the National Institute of Health research portfolio over the past 10 years resulted in two studies funded on developing new mumps vaccines (1R01AI097368 proposes "to develop a novel mumps virus vaccine by attenuating virus through introducing mutations at desirable locations within the genome and to test immunogenicity of vaccine candidates in mice and ferrets" and 1R01AI127365 is "focused on identifying critical genetic determinants of long-term mumps *vaccine-induced immunity* by examining associations between gene polymorphisms and variations in immune response to mumps vaccine"). These projects were funded through investigator-initiated mechanisms that made it through the review process for funding. Neither study was in response to a National Institutes of Health Request for Proposals (RFP), which reflect agency priorities.

From the perspective of the private sector (vaccine company), development of new mumps vaccine that would be <u>superior</u> to the Jeryl Lynn would not be a prudent investment. As discussed, evaluation to show superiority in longevity of protection (less of an issue with waning immunity) would be extremely difficult and consequently very costly. Without showing superiority in this area, a competitor product would not receive a preferential recommendation from the Advisory Committee on Immunization Practices (ACIP). It would be important for the competitors' product to include measles and rubella antigens to compete with the Merck MMR product. In contrast to issues with trying to develop a superior product, GlaxoSmithKline is working towards licensure of an <u>equivalent product</u> (see deposition of April D. Cohen, January 4, 2018). The GlaxoSmithKline product is "effectively a derivative of the Merck vaccine, so we think they would perform the same" (page 83). As discussed at length in this deposition, the GlaxoSmithKline product need only show equivalency, a much lower bar that superiority, with intention of gaining some portion of the United States market. GlaxoSmithKline is not trying to develop nor license and market a superior product. At best, the GlaxoSmithKline mumps vaccine will be equivalent to the Merck mumps vaccine, offering no advantages to the United States government, public health community, or the public. Given competing priorities for limited industry sponsored research and development for new vaccines and other pharmaceuticals, it is extremely unlikely the vaccine industry would strive to make a superior mumps vaccine a high priority.

Prioritizing development of a superior mumps vaccine would not be a good use of limited resources for the public sector nor a wise investment for the private sector when considering the many other diseases for which a new vaccine would be extremely valuable and a high priority for vaccine development, the extremely well-established safety and effectiveness profile of the Merck mumps vaccine, and the current success of the mumps vaccine in controlling mumps in the United States.

Appx18607

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel*.,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,
　　　　　　　　*Plaintiffs,*
　　v.
MERCK & CO., INC.,
　　　　　　　　*Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S EXHIBITS IN SUPPORT OF MERCK'S RESPONSE TO RELATORS' STATEMENT OF UNDISPUTED FACTS

# EXHIBIT 316

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* STEPHEN A. KRAHLING AND JOAN A. WLOCHOWSKI,<br><br><br><br><br><br>Plaintiffs,<br><br>v.<br><br><br>MERCK & CO., INC.<br><br><br><br>Defendant. | Civil Action No. 10-4374 (CDJ) |

**MERCK'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO RELATORS' FIRST SET OF INTERROGATORIES**

**INTRODUCTORY STATEMENT**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Merck Sharp & Dohme Corp., formerly known as Merck & Co., Inc., ("Merck") hereby provides the following Supplemental Responses and Objections to Relators' First Set of Interrogatories (hereinafter "Interrogatories") and states:

The within responses are based on documents and information available to Merck at this time. The information set forth herein is true and correct to Merck's best knowledge as of this

1

Appx18609

the discovery of admissible evidence. In responding to Relators' Interrogatories, unless otherwise indicated, Merck will construe this term to mean any test, assay, measurement, study, experiment, research or clinical trial related to the Efficacy or Potency (as those terms are defined herein) of Merck's Mumps Vaccine or the mumps vaccine of another manufacturer.

6.    Merck objects to the definition of "Employee" or "Employees" contained in Paragraph 4 of the "Definitions" to these Interrogatories, as well as every Interrogatory in which these terms appear, as vague, ambiguous, overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. In responding to Relators' Interrogatories, unless otherwise indicated, Merck will construe these terms to mean current and former officers, directors, executives, managers, sales personnel, engineers, secretaries, clerical staff, financial personnel, or any other person employed at Merck in the past or present.

## OBJECTIONS AND RESPONSES TO INTERROGATORIES

Merck incorporates its General Objections and Objections to Definitions and Instructions into each of the responses that follow.  Any specific objections set forth in each response are in addition to those objections and, unless otherwise specified, Merck's responses are limited in accordance with each of its objections.

## INTERROGATORIES

INTERROGATORY NO. 2:

Identify all Testing Merck has performed from 1973 to the present to determine or which measured Efficacy and/or a Seroconversion rate of Merck's Mumps Vaccine, and for each such Test, identify the Efficacy and/or Seroconversion rate found.

SUPPLEMENTAL RESPONSE:

Merck objects to Interrogatory No. 2 on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence to the extent it seeks "all" testing and requires Merck to produce information prior to January 1, 1998.

5

Merck further objects to this Interrogatory to the extent it seeks information that is publicly available and/or obtainable from some other source that is equally available to Relators as it is to Merck.

Subject to and without waiving the foregoing objections, Merck supplements its answer to this Interrogatory as follows. Table 1 below sets forth per protocol mumps antibody response rates following either one dose or two doses of a mumps-containing vaccine in studies conducted by Merck. The data shown in Table 1 were generated by use of an ELISA. Table 1 also shows for these studies the approximate dates of serology testing. In addition, the following ranges of per protocol mumps antibody response rates were observed in studies conducted by Merck when a plaque reduction neutralization ("PRN") assay was used: 53.0% to 96.3% (MMR II Protocol 006)[1] and 89.3% to 92.2% (MMR II Protocol 007).[2] The approximate dates of serology testing conducted using the PRN in MMR II Protocol 006 and in MMR II Protocol 007 were September 1999 to June 2000 and December 2000 to March 2003, respectively.

---

[1] In MMR II Protocol 006, five different mumps isolates were evaluated by a PRN assay and the following seroconversion rates were observed: 75.6% Lol (wild-type); 53.0% JL-2 (vaccine substrain); 96.3% Merck Jeryl Lynn; 65.8% Tennessee (wild type); and 61.8% Barnes (wild-type).

[2] The range of antibody response rates identified in connection with MMR II Protocol 007 includes rates observed following the administration of a mumps-containing vaccine where the mumps potency was lower than the expiry mumps potency specification.

6

Table 1

| Study[3] | Range of Mumps Antibody Response Rates[4] | | Approximate Dates of Serology Testing |
|---|---|---|---|
| | Dose 1 | Dose 2 | |
| Comvax Protocol 009 | 98.4% to 99.2% | | August 1996 to February 1998 |
| MMR II Protocol 006 | 100% | | August 2003 |
| MMR II Protocol 007 | 94.1% to 98.0% | | March 2001 to October 2003 |
| MMR II Protocol 009 | 97.9% to 99.5% | | December 2002 to September 2004 |
| Varivax Protocol 010 | 96.1% to 100% | | [5] |
| Varivax Protocol 032 | 99.1% to 99.6% | | November 1993 to April 1994 |
| Varivax Protocol 033 | 98.4% to 100% | | February 1995 to May 1995 |
| Varivax Protocol 044 | 99% | | May 1998 to February 1999 |
| Varivax Protocol 045 | 97.3% to 99.5% | | August 1998 to August 2000 |
| Varivax Protocol 048 | 99.4% to 100% | | September 1999 to November 2000 |
| Varivax Protocol 050 | 86.7% to 100% | | January 2002 to February 2002 |
| Varivax Protocol 051 | 98.9% to 100% | | January 2000 to March 2001 |
| MMRV Protocol 004 | 98.5% to 99.5% | | August 1992 to December 1995 |
| MMRV Protocol 005 | 97.3% to 99.3% | | October 1992 to June 1995 |
| MMRV Protocol 007 | 97.7% to 99.2% | | May 1993 to December 1995 |
| ProQuad Protocol 009 | 98.7% to 99.0% | 100% | May 1998 to July 1999 |
| ProQuad Protocol 011 | 98.2% to 99.7% | 99.7% to 100% | June 1999 to May 2001 |
| ProQuad Protocol 012 | 94.9% to 97.9% | | March 2001 to September 2003 |
| ProQuad Protocol 013 | 95.2% to 98.6% | | April 2001 to November 2002 |
| ProQuad Protocol 014 | | 99.5% to 100% | April 2001 to February 2003 |
| ProQuad Protocol 016 | 97.7% to 98.0% | | May 2003 to December 2004 |
| ProQuad Protocol 019 | 96.8% to 98.6% | | July 2006 to June 2007 |
| ProQuad Protocol 022 | 100% | | September 2007 |
| ProQuad Protocol 023[6] | 100% | | December 2008 |
| ProQuad Protocol 027 | 97.2% to 98.2% | | December 2012 to July 2013 |
| VAQTA Protocol 056 | 98.7% | | March 2002 |
| VAQTA Protocol 057 | 99% to 100% | | March 2002 to April 2002 |

---

[3] Some studies contain a vaccine other than a Merck Mumps Vaccine in the study name as shown in this list. In such studies, a Merck Mumps Vaccine was administered to study participants as part of the study protocol and ELISA seroconversion rate data were gathered.

[4] The ranges shown in this column reflect results from different study arms for which in some studies there were differences in the following: vaccine, vaccine formulation, and potency.

[5] Data unavailable after investigation.

[6] This study was terminated prior to completion.

7

Merck further states that Table 2 below sets forth per protocol mumps antibody response rates following either one dose or two doses of a mumps-containing vaccine observed in studies not conducted by Merck but where Merck conducted the serology testing. The data shown in Table 2 were generated by use of an ELISA. Table 2 also shows for these studies the approximate dates of serology testing.

Table 2

| Study Sponsor | Study[7] | Range of Mumps Antibody Response Rates[8] | | Approximate Dates of Serology Testing |
|---|---|---|---|---|
| | | Dose 1 | Dose 2 | |
| Sanofi Pasteur MSD | MMR II Protocol 011 X04-MMR-301 | 97.7% to 98.1% | | November 2005 to March 2006 |
| Aventis Pasteur | Hexavac A3R21 | 98.14% to 99.38% | | July 2003 to April 2004 |
| Sanofi Pasteur MSD | ProQuad Protocol MRV02c | 96.6% to 98.7% | 99.2% to 99.5% | December 2008 to May 2009[9] |
| Sanofi Pasteur MSD | ProQuad Protocol X06-MMRV-302 | 96.7% to 98.6% | | August 2008 to September 2008[10] |
| Sanofi Pasteur MSD | ProQuad Protocol F05-MMRV-304 | 91.3% to 97.4% | 99.3% | May 2007 to June 2007 |
| MedImmune | VAVI Protocol 001 | 96.7% to 98.8% | | June 2003 to March 2004 |

Merck further states that during the time period when the ELISA testing was conducted in connection with the studies identified in the charts above, Merck used the following ELISAs: (1) ELISA Assay for the Measurement of Antibodies to Mumps Virus (SOP No. 874.3193); (2) ELISA for Detection of Mumps Antibody in Human Serum (SOP No. 910.0007); (3) Mumps

---

[7] Some studies contain a vaccine other than a Merck Mumps Vaccine in the study name as shown in this list. In such studies, a Merck Mumps Vaccine was administered to study participants as part of the study protocol and ELISA seroconversion rate data were gathered.

[8] The ranges shown in this column reflect results from different study arms for which in some studies there were differences in the following: vaccine, vaccine formulation, and potency.

[9] The mumps serology assays for this study were performed by both Merck and PPD Vaccines and Biologics LLC.

[10] Merck's investigation to determine whether it conducted the mumps serology assays for this study is ongoing. Merck will supplement its response as appropriate.

8

Appx18613

Wild Type IgG ELISA for the Quantification of Human Antibody (SOP No. 910.0096); and (4) Mumps Wild Type IgG ELISA for the Quantification of Human Antibody to Mumps Virus (SOP No. 874.3633). Merck has already produced or will produce all reasonably available versions of these ELISA SOPs.

During the time periods when the ELISA testing was conducted in connection with the studies identified in the charts above, the persons responsible for management of the ELISA testing were Pamela Burke and Dr. Rocio Marchese. Ms. Burke had this responsibility between the mid-1990s and June 2003 at which time Dr. Marchese assumed responsibility for management of this testing.

The PRN assay used in MMR II Protocol 006 was SOP No. 874.3422, Mumps Plaque Reduction Neutralization Assay. The PRN assay used in MMR II Protocol 007 was SOP No. 874.3489, The Anti-IgG Enhanced Mumps Plaque-Reduction Neutralization Assay (AIGENT). Dr. David Krah was responsible for the conduct and/or management of the conduct of the PRN testing done in connection with MMR II Protocol 006 and MMR II Protocol 007.


INTERROGATORY NO. 4:

For each Test identified in response to Interrogatory 2 or 3, identify all Merck employees involved in the Testing.

SUPPLEMENTAL RESPONSE:

Merck objects to Interrogatory No. 4 on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence to the extent it seeks the identification of "all" employees and requires Merck to produce information prior to January 1, 1998.

9

Appx18614

Subject to and without waiving the foregoing objections, Merck incorporates its original response to this Interrogatory and the portion of its supplemental response to Interrogatory No. 2 above that identifies the individuals who had management responsibility for the conduct of the ELISA and PRN testing as described therein.

INTERROGATORY NO. 5:

For each Test identified in response to Interrogatory 2 or 3, identify what, if any, findings were communicated to the Government, and the form of the communication.

SUPPLEMENTAL RESPONSE:

Merck objects to Interrogatory No. 5 on the grounds that the term "findings" is vague and ambiguous. Merck further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence to the extent it (a) requires Merck to produce information prior to January 1, 1998; (b) seeks information about findings communicated to entities outside the United States; and (c) requires Merck to identify every occasion on which seroconversion rate data for Merck's Mumps Vaccine was reported to the Government in connection with studies conducted as part of the clinical trial program for any products other than MMR II and ProQuad.

Subject to and without waiving the foregoing objections, Merck incorporates its original response to this Interrogatory and states that in addition to the communications described therein Merck also reported seroconversion rate information concerning Merck's Mumps Vaccine as follows. On April 5, 2006, Merck provided seroconversion rate data for Merck's Mumps Vaccine from ProQuad Protocol 016 in connection with the submission of a supplemental biologics license application regarding a formulation change to permit refrigerator storage of ProQuad (MRK-KRA00865980 to MRK-KRA00865981). In addition, Merck reported

10

seroconversion rate data for Merck's Mumps Vaccine from ProQuad Protocol 019 on September 25, 2008 in connection with its submission of a supplemental biologics license application regarding the partial fulfillment of a postmarketing commitment (MRK-KRA00172584 to MRK-KRA00172586; MRK-KRA00173547 to MRK-KRA00173962).  On October 3, 2011, in connection with a request for a Type C meeting, Merck submitted seroconversion rate data for Merck's Mumps Vaccine from MMR II Protocol 009 and ProQuad Protocols 011/X04-MMRr-301 and MRV-02C (MRK-KRA00182040 to MRK-KRA00182041; MRK-KRA00182046-MRK-KRA00182109).  Merck also reported seroconversion rate data for Merck's Mumps Vaccine from ProQuad Protocol 027 on May 28, 2014 in connection with a supplemental biologics license application for ProQuad made with an alternative manufacturing process (MRK-KRA01289878 to MRK-KRA01289879).

In addition, Merck provides the bates ranges for certain communications identified in Merck's original response to this Interrogatory.  The bates ranges for the June 30, 2004 supplemental license application regarding the substitution of rHA for HSA in the MMR II manufacturing process that includes the seroconversion rate data for Merck's Mumps Vaccine from Protocol 009 are MRK-KRA00137854 to MRK-KRA00137855 and MRK-KRA00140056 to MRK-KRA00141340.  The bates ranges for the August 27, 2004 application for licensure of ProQuad submission that includes seroconversion rate data for Merck's Mumps Vaccine observed during the conduct of ProQuad Protocols 009, 011, 012, 013, and 014 are MRK-KRA00157572 to MRK-KRA00157573, MRK-KRA00161017 to MRK-KRA00161952 (Protocol 009), MRK-KRA00162015 to MRK-KRA00162837 (Protocol 011), MRK-KRA00162963 to MRK-KRA00164825 (Protocol 012), MRK-KRA00164918 to MRK-KRA00166728 (Protocol 013), and MRK-KRA00166846 to MRK-KRA00168205 (Protocol

11

014). The bates range of the February 25, 2010 Mumps Research Priorities Meeting Presentation made at a meeting convened by the Centers for Disease Control and Prevention where Merck reported seroconversion rate data for Merck's Mumps Vaccine is MRK-KRA00120631.[11]

INTERROGATORY NO. 6:

Identify all instances from 1998 to the present where Merck communicated to the Government the Efficacy, Seroconversion rate, or any measure or statement of effectiveness of Merck's Mumps Vaccine, and for each instance, identify the Efficacy, Seroconversion rate, or measure or statement of effectiveness Merck communicated and the form of the communication.

SUPPLEMENTAL RESPONSE:

Merck objects to Interrogatory No. 6 on the grounds that the undefined phrase "any measure or statement of effectiveness" is vague and ambiguous. Merck further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence to the extent it seeks information about "all" communications and to the extent it seeks information communicated to entities outside the United States.

Subject to and without waiving the foregoing objections, Merck incorporates its original response to this Interrogatory and directs Relators to its supplemental response to Interrogatory No. 2 and Interrogatory No. 5 above.

---

[11] In its original response to this Interrogatory Merck stated that this presentation was made at a meeting of the Advisory Committee on Immunization Practices.

12

Appx18617

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

*Plaintiffs,*

v.

MERCK & CO., INC.,

*Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S EXHIBITS IN SUPPORT OF MERCK'S RESPONSE TO RELATORS' STATEMENT OF UNDISPUTED FACTS

# EXHIBIT 317

Downloaded from https://academic.oup.com/cid/article-abstract/58/6/830/343203 by guest on 26 November 2019

**VIEWPOINTS**

# The Pertussis Problem

**Stanley A. Plotkin**

Department of Pediatrics, University of Pennsylvania, Philadelphia

**Pertussis is resurgent, and many cases are occurring in vaccinated children and adolescents. In countries using acellular vaccines, waning immunity is at least part of the problem. This article discusses possible improvements in those vaccines.**

*Keywords.* pertussis; pertussis toxin; adjuvants; waning immunity; Th1 responses.

Pertussis is resurgent. After being largely controlled in children after the advent of routine pertussis immunization with whole cell vaccine in the 1940s, and continuing control when a switch was made to acellular vaccines in the 1990s, recent reports from around the world suggest that more cases of pertussis are occurring than can be explained by better observation and better diagnostic methods [1]. Although the epidemiologic situation is unclear in some geographical areas, there is little doubt that pertussis incidence has risen in North America, Europe, and Australia, both in school children and adolescents [2, 3]. Pertussis has increased in practically every state in the United States and in some to epidemic proportions [4, 5]. The situation in adults is uncertain, as pertussis has always been common in that age group owing to the impermanence of immunity to *Bordetella pertussis* [6].

Five factors appear to be playing a role, although experts differ as to what weight to give each one: strain change in the presence of vaccine immunity; local collections of unvaccinated and therefore susceptible children; lower efficacy of acellular vaccines relative to whole cell vaccines; waning immunity after acellular vaccines; and the predilection of those vaccines to induce Th2 rather than Th1 responses. A sixth possible factor is suggested by the recent finding that acellular vaccine does not

protect against pertussis infection in a baboon model, although symptoms are prevented [7]. If this is true in humans, circulation of the organism would be intensified in countries using acellular vaccine.

Acellular pertussis vaccines contain 1–5 antigens: pertussis toxin (PT), filamentous hemagglutinin, pertactin (PRN), and 2 fimbrial agglutinogens. Strain change has been expressed in several ways: change in circulating organisms over the years in the alleles for each of the antigens [8]; replacement of older promoters of the PT allele with the so called P3 promotor, which generates more toxin [9, 10]; and the appearance of pertactin deficient strains [11, 12]. The latter makes vaccines containing PRN less useful.

Although most reported cases have occurred in vaccinated children, the presence of substantial numbers of unvaccinated children in a particular area increases the pertussis risk by a factor of 2.5 [13, 14].

Multiple studies, both epidemiological and serological, have confirmed that immunity wanes rapidly after the acellular vaccine booster at age 4–6 years and the preadolescent dose at age 10–12 years [15–18]. Vaccine effectiveness is high for only about 2 years postdose. Moreover, in the many clinical trials conducted in the 1990s, one of the whole cell pertussis vaccines that was compared with acellular vaccines was poorly immunogenic. In every trial where other whole cell pertussis vaccines were used, their efficacy was greater than that of the acellular vaccine in the same trial [19]. Although opinions differ as to the correlation of protection with antibody levels, many authorities consider that high levels of PT and PRN antibodies are associated with protection [20, 21]. In addition, studies in mice and in baboons have demonstrated that whereas whole cell

Received 18 October 2013; accepted 8 December 2013; electronically published 20 December 2013.

Correspondence: Stanley A. Plotkin, MD, 4650 Wismer Road, Doylestown, PA 18902 (stanley.plotkin@vaxconsult.com).

**Clinical Infectious Diseases   2014;58(6):830–3**
© The Author 2013. Published by Oxford University Press on behalf of the Infectious Diseases Society of America. All rights reserved. For Permissions, please e mail: journals.permissions@oup.com.
DOI: 10.1093/cid/cit934

**Appx18619**

Downloaded from https://academic.oup.com/cid/article-abstract/58/6/830/343203 by guest on 26 November 2019

**Table 1.    Possible Vaccination Strategies to Control the Resurgence of Pertussis**

| Strategy | Remarks |
|---|---|
| Return to the use of wcP | Probably unacceptable |
| Develop less reactogenic wcP | Not yet done |
| Maternal vaccination to provide transplacental antibody to protect newborn | Now generally recommended |
| Vaccination of newborn contacts (cocoon strategy) | Difficult to obtain complete coverage |
| More frequent boosters with acP | Costly and difficult to put in place |
| Change antigens in acP to those from currently circulating strains | Uncertain effect |
| Increase quantities of current antigens | Would require large trials |
| Inactivate PT by genetic mutation or milder chemical | Probably advisable to increase immunogenicity |
| Add new virulence factors | Would require large trials |
| Use stronger adjuvants | May require large trials |
| Administer live attenuated *Bordetella pertussis* intranasally | Early development Probably best as a boost strategy |

Abbreviations: acP, acellular pertussis vaccine; PT, pertussis toxin; wcP, whole cell pertussis vaccine.

vaccines induce both Th1 and Th2 responses (and possibly Th17 responses as well), acellular vaccines induce only Th2 cells [22 26]. Retrospective data, though uncontrolled, suggest that the receipt of even 1 dose of whole cell vaccine in infancy before exposure confers better protection against later exposure than receipt of all acellular pertussis vaccine doses [4, 27 30].

**Possible Solutions to Increased Pertussis**

What can be done to respond to this situation? Table 1 lists the possibilities. Although it may be possible to make a less reacto genic whole cell vaccine, it is unlikely that the public in developed countries would accept a return to the whole cell vaccine formerly used. Maternal vaccination to protect newborns is now recom mended and should become widespread, but that will not stop pertussis in older age groups [31]. Although it is tempting to change the alleles in acellular pertussis vaccine to those from cir culating strains, that step in itself is unlikely to be the complete answer to the problem. Increasing the dose of PT to generate more and longer lasting antibodies to the PT could be helpful. In terestingly, Denmark claims to have a low incidence of pertussis and uses a vaccine containing PT only, but in a quantity at least 2 fold higher than formulations used in other countries [32].

More relevant may be the impact of formalin inactivation of PT. Some reports show that PT so inactivated induces antibody that binds PT but is not bactericidal [33]. A PT that had been inactivated genetically but not chemically was tested in the 1990s and produced antibody levels that were much higher

than the formalin inactivated products [34, 35]. This is an im portant point, inasmuch as the high antibody levels are likely to give a longer duration of protection even if they wane.

Another possible improvement of acellular pertussis vaccine would be the inclusion of additional virulence factors of *B. per tussis*. The most prominent candidate is adenylate cyclase toxin, an important toxic factor [36]. However, there are nu merous other candidate antigens [37 39].

Perhaps the most obvious way of improving the immunoge nicity of acellular vaccine is the incorporation of a stronger adjuvant than aluminum salts into the vaccine to drive a Th1 response, assuming that such a response is necessary. Many new types of adjuvants are available, including multiple Toll like receptor agonists. In fact, an extensive literature exists re porting experiments in animals with adjuvants to improve anti body responses to pertussis antigens [40 44]. A recent report shows that oligosaccharides derived from *B. pertussis* lipopoly saccharide and conjugated with a protein could induce bacteri cidal antibody [45].

Last, an attenuated strain of *B. pertussis* that is administered intranasally has been developed [45]. Whereas that type of ad ministration raises safety concerns in infants, a live vaccine conceivably would be a useful booster after primary acellular pertussis vaccination.

In the interim, the main strategy to prevent the worst disease is acellular vaccination of pregnant women in the last trimester to provide the newborn with passive protection [46]. Cocooning (vaccination of family contacts) may provide some additional ad vantage but is difficult in practice [47]. Boosters with acellular vaccine could be given more often, but that is a costly public health strategy, and at the moment all acellular pertussis vaccine is given in combination with diphtheria and tetanus toxoids. In addition, until the situation is clarified, the gradual switch from whole cell to acellular vaccines that has been occurring in less af fluent countries will probably stop.

**Difficulties of Vaccine Reformulation**

To change the vaccine given to infants in the first 2 years of life is a daunting proposition, both because the requirements for safety data would be large and because the pertussis is often part of combinations with many other valences, thus requiring recertification of many products currently on the market. At a time when pertussis vaccination is recommended throughout the world, it is ethically impermissible to do an efficacy study in infants with an unvaccinated control group. Moreover, the data from outbreaks show reasonable levels of protection through age 6, with the problem coming later in life [15, 16, 18, 28]. Therefore, the focus should be on the booster vaccines given to pre school age children and in adolescents.

However, even for a new booster vaccine, the regulatory pathway is unclear. A classical efficacy study would have to

Appx18620

compare a new vaccine with a currently accepted one to show noninferiority or superiority. Such studies will be expensive and long, considering that the current vaccines are effective for the first couple of years after administration. Therefore, ideally the licensing authorities should consider other ways of demonstrating vaccine efficacy. Those ways might include protection data in animals such as baboons, human challenge with circulating strains of *B. pertussis*, or simply serologic data showing higher and more persistent antibody titers. Safety will have to be demonstrated in large numbers, although fewer subjects would be needed if current components are simply updated with analogous alleles or newer inactivation methods, rather than addition of new components. It should be kept in mind that because immunity is not permanent even after natural infection [48], boosters will be necessary even with new vaccines.

Last, perhaps the most difficult obstacle is to convince manufacturers to launch development programs for new pertussis vaccines. Large effort and investment was devoted in the 1990s to bring current acellular vaccines to market. Priorities for other new vaccines are pressing and even major manufacturers cannot afford to support multiple simultaneous clinical development programs, so demand from physicians and governments will be crucial to their decisions. In addition, academia and the National Institutes of Health should assist vaccine development by conducting research on the pathogenesis and immunology of pertussis. All of this implies an enormous effort, but I believe that we cannot allow a vaccine preventable disease to be incompletely controlled, and that a new pertussis vaccine is needed.

## Note

*Potential conflicts of interest.* The author is a consultant to vaccine manufacturers, including those who manufacture pertussis vaccines, but declares no financial conflict of interest related to this article.

The author has submitted the ICMJE Form for Disclosure of Potential Conflicts of Interest. Conflicts that the editors consider relevant to the content of the manuscript have been disclosed.

## References

1. de Greeff SC, De Melker HE, van Gageldonk PG, et al. Seroprevalence of pertussis in the Netherlands: evidence for increased circulation of *Bordetella pertussis*. PLoS One **2010**; 5:e14183.
2. Kaczmarek MC, Valenti L, Kelly HA, Ware RS, Britt HC, Lambert SB. Sevenfold rise in likelihood of pertussis test requests in a stable set of Australian general practice encounters, 2000 2011. Med J Aust **2013**; 198:624 8.
3. Chiappini E, Stival A, Galli L, de Martino M. Pertussis re-emergence in the post-vaccination era. BMC Infect Dis **2013**; 13:151.
4. Centers for Disease Control and Prevention. Pertussis epidemic Washington, 2012. MMWR Morb Mortal Wkly Rep **2012**; 61:517 22.
5. Clark TA, Messonnier NE, Hadler SC. Pertussis control: time for something new? Trends Microbiol **2012**; 20:211 3.
6. Fine PE, Clarkson JA. Reflections on the efficacy of pertussis vaccines. Rev Infect Dis **1987**; 9:866 83.
7. Warfel JM, Zimmerman LI, Merkel TJ. Acellular pertussis vaccines protect against disease but fail to prevent infection and transmission in a nonhuman primate model. Proc Natl Acad Sci U S A **2013**. Epub ahead of print.
8. Mooi FR, Van Der Maas NA, De Melker HE. Pertussis resurgence: waning immunity and pathogen adaptation two sides of the same coin. Epidemiol Infect **2013**; 1 10. Epub ahead of print.
9. Mooi FR, van Loo IH, van Gent M, et al. *Bordetella pertussis* strains with increased toxin production associated with pertussis resurgence. Emerg Infect Dis **2009**; 15:1206 13.
10. King AJ, van der Lee S, Mohangoo A, van Gent M, van der Ark A, van de Waterbeemd B. Genome-wide gene expression analysis of *Bordetella pertussis* isolates associated with a resurgence in pertussis: elucidation of factors involved in the increased fitness of epidemic strains. PLoS One **2013**; 8:e66150.
11. Bouchez V, Brun D, Cantinelli T, Dore G, Njamkepo E, Guiso N. First report and detailed characterization of *B. pertussis* isolates not expressing pertussis toxin or pertactin. Vaccine **2009**; 27:6034 41.
12. Otsuka N, Han HJ, Toyoizumi-Ajisaka H, et al. Prevalence and genetic characterization of pertactin-deficient *Bordetella pertussis* in Japan. PLoS One **2012**; 7:e31985.
13. Glanz JM, Narwaney KJ, Newcomer SR, et al. Association between undervaccination with diphtheria, tetanus toxoids, and acellular pertussis (DTaP) vaccine and risk of pertussis infection in children 3 to 36 months of age. JAMA Pediatr **2013**; 167:1060 4.
14. Atwell JE, Van OJ, Zipprich J, et al. Nonmedical vaccine exemptions and pertussis in California, 2010. Pediatrics **2013**; 132:624 30.
15. Misegades LK, Winter K, Harriman K, et al. Association of childhood pertussis with receipt of 5 doses of pertussis vaccine by time since last vaccine dose, California, 2010. JAMA **2012**; 308:2126 32.
16. Baxter R, Bartlett J, Rowhani-Rahbar A, Fireman B, Klein NP. Effectiveness of pertussis vaccines for adolescents and adults: case-control study. BMJ **2013**; 347:f4249.
17. Klein NP, Bartlett J, Fireman B, Rowhani-Rahbar A, Baxter R. Comparative effectiveness of acellular versus whole-cell pertussis vaccines in teenagers. Pediatrics **2013**; 131:e1716 22.
18. Tartof SY, Lewis M, Kenyon C, et al. Waning immunity to pertussis following 5 doses of DTaP. Pediatrics **2013**; 131:e1047 52.
19. Edwards KM, Lawrence E, Wright PF. Diphtheria, tetanus, and pertussis vaccine. A comparison of the immune response and adverse reactions to conventional and acellular pertussis components. Am J Dis Child **1986**; 140:867 71.
20. Storsaeter J, Hallander HO, Gustafsson L, Olin P. Levels of anti-pertussis antibodies related to protection after household exposure to *Bordetella pertussis*. Vaccine **1998**; 16:1907 16.
21. Cherry JD, Gornbein J, Heininger U, Stehr K. A search for serologic correlates of immunity to *Bordetella pertussis* cough illnesses. Vaccine **1998**; 16:1901 6.
22. Higgs R, Higgins SC, Ross PJ, Mills KH. Immunity to the respiratory pathogen *Bordetella pertussis*. Mucosal Immunol **2012**; 5: 485 500.
23. Warfel JM, Beren J, Kelly VK, Lee G, Merkel TJ. Nonhuman primate model of pertussis. Infect Immun **2012**; 80:1530 6.
24. Warfel JM, Merkel TJ. *Bordetella pertussis* infection induces a mucosal IL-17 response and long-lived Th17 and Th1 immune memory cells in nonhuman primates. Mucosal Immunol **2013**; 6:787 96.
25. Mascart F, Hainaut M, Peltier A, Verscheure V, Levy J, Locht C. Modulation of the infant immune responses by the first pertussis vaccine administrations. Vaccine **2007**; 25:391 8.
26. Ross PJ, Sutton CE, Higgins S, et al. Relative contribution of Th1 and Th17 cells in adaptive immunity to *Bordetella pertussis*: towards the rational design of an improved acellular pertussis vaccine. PLoS Pathog **2013**; 9:e1003264.
27. Sheridan SL, Ware RS, Grimwood K, Lambert SB. Number and order of whole cell pertussis vaccines in infancy and disease protection. JAMA **2012**; 308:454 6.

Downloaded from https://academic.oup.com/cid/article-abstract/58/6/830/343203 by guest on 26 November 2019

Appx18621

Downloaded from https://academic.oup.com/cid/article-abstract/58/6/830/343203 by guest on 26 November 2019

28. Klein NP, Bartlett J, Rowhani-Rahbar A, Fireman B, Baxter R. Waning protection after fifth dose of acellular pertussis vaccine in children. N Engl J Med **2012**; 367:1012 9.

29. Liko J, Robison SG, Cieslak PR. Priming with whole-cell versus acellular pertussis vaccine. N Engl J Med **2013**; 368:581 2.

30. Witt MA, Arias L, Katz PH, Truong ET, Witt DJ. Reduced risk of pertussis among persons ever vaccinated with whole cell pertussis vaccine compared to recipients of acellular pertussis vaccines in a large US cohort. Clin Infect Dis **2013**; 56:1248 54.

31. Centers for Disease Control and Prevention. Updated recommendations for use of tetanus toxoid, reduced diphtheria toxoid, and acellular pertussis vaccine (Tdap) in pregnant women   Advisory Committee on Immunization Practices (ACIP), 2012. MMWR Morb Mortal Wkly Rep **2013**; 62:131 5.

32. Thierry-Carstensen B, Dalby T, Stevner MA, Robbins JB, Schneerson R, Trollfors B. Experience with monocomponent acellular pertussis combination vaccines for infants, children, adolescents and adults   a review of safety, immunogenicity, efficacy and effectiveness studies and 15 years of field experience. Vaccine **2013**; 31:5178 91.

33. Ibsen PH. The effect of formaldehyde, hydrogen peroxide and genetic detoxification of pertussis toxin on epitope recognition by murine monoclonal antibodies. Vaccine **1998**; 14:359 68.

34. Rappuoli R. The vaccine containing recombinant pertussis toxin induces early and long-lasting protection. Biologicals **1999**; 27:99 102.

35. Buasri W, Impoolsup A, Boonchird C, et al. Construction of *Bordetella pertussis* strains with enhanced production of genetically-inactivated pertussis toxin and pertactin by unmarked allelic exchange. BMC Microbiol **2012**; 12:61.

36. Dunne A, Ross PJ, Pospisilova E, et al. Inflammasome activation by adenylate cyclase toxin directs Th17 responses and protection against *Bordetella pertussis*. J Immunol **2010**; 185:1711 9.

37. Marzouqi I, Richmond P, Fry S, Wetherall J, Mukkur T. Development of improved vaccines against whooping cough: current status. Hum Vaccin **2010**; 6:543 53.

38. Asensio CJ, Gaillard ME, Moreno G, et al. Outer membrane vesicles obtained from *Bordetella pertussis* Tohama expressing the lipid A deacylase PagL as a novel acellular vaccine candidate. Vaccine **2011**; 29:1649 56.

39. Alvarez HJ, Erben E, Lamberti Y, et al. *Bordetella pertussis* iron regulated proteins as potential vaccine components. Vaccine **2013**; 31:3543 8.

40. Gracia A, Polewicz M, Halperin SA, et al. Antibody responses in adult and neonatal BALB/c mice to immunization with novel *Bordetella pertussis* vaccine formulations. Vaccine **2011**; 29:1595 604.

41. Moyer MW. New adjuvants aim to give whooping cough vaccine a boost. Nat Med **2012**; 18:991.

42. Polewicz M, Gracia A, Garlapati S, et al. Novel vaccine formulations against pertussis offer earlier onset of immunity and provide protection in the presence of maternal antibodies. Vaccine **2013**; 31:3148 55.

43. Garlapati S, Eng NF, Kiros TG, et al. Immunization with PCEP microparticles containing pertussis toxoid, CpG ODN and a synthetic innate defense regulator peptide induces protective immunity against pertussis. Vaccine **2011**; 29:6540 8.

44. Asokanathan C, Corbel M, Xing D. A CpG-containing oligodeoxynucleotide adjuvant for acellular pertussis vaccine improves the protective response against *Bordetella pertussis*. Hum Vaccin Immunother **2013**; 9. Epub ahead of print.

45. Kubler-Kielb J, Vinogradov E, Lagergard T, et al. Oligosaccharide conjugates of *Bordetella pertussis* and bronchiseptica induce bactericidal antibodies, an addition to pertussis vaccine. Proc Natl Acad Sci U S A **2011**; 108:4087 92.

46. Heininger U, Riffelmann M, Bar G, Rudin C, von Konig CH. The protective role of maternally derived antibodies against *Bordetella pertussis* in young infants. Pediatr Infect Dis J **2013**; 32:695 8.

47. Terranella A, Asay GR, Messonnier ML, Clark TA, Liang JL. Pregnancy dose Tdap and postpartum cocooning to prevent infant pertussis: a decision analysis. Pediatrics **2013**; 131:e1748 56.

48. Wendelboe AM, Van RA, Salmaso S, Englund JA. Duration of immunity against pertussis after natural infection or vaccination. Pediatr Infect Dis J **2005**; 24(5 suppl):S58 61.

Appx18622

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

            *Plaintiffs,*

    v.

MERCK & CO., INC.,

            *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S EXHIBITS IN SUPPORT OF MERCK'S RESPONSE TO RELATORS' STATEMENT OF UNDISPUTED FACTS

# EXHIBIT 318



*The* NEW ENGLAND JOURNAL *of* MEDICINE



Perspective

JULY 23, 2015

## Establishing a Global Vaccine-Development Fund

Stanley A. Plotkin, M.D., Adel A.F. Mahmoud, M.D., Ph.D., and Jeremy Farrar, M.D., Ph.D.

As the Ebola epidemic in West Africa continues, albeit at a much lower level than it reached in the spring, we still lack a vaccine that has been shown to be safe and effective. There has been no shortage of basic research: by 2009, at least seven Ebola vaccines had been tested in monkeys, with encouraging results.[1] But before the West African epidemic, only one of these vaccine candidates was tested in healthy humans, in phase 1 trials to evaluate its safety, and it was subsequently abandoned.[2] No vaccine had reached the later processes that would lead to licensure, and none was available in sufficient supply to be deployed in an emergency. Unfortunately, the same applies to many other infections: vaccines against them are not available because collectively we have not been willing or able to invest in the costly and complex development process that would be required to establish

safety and immunogenicity, at a minimum.

Vaccine development is facing a crisis for three reasons: the complexity of the most challenging targets, which necessitates substantial investment of capital and human expertise; the diminishing numbers of vaccine manufacturers able to devote the necessary resources to research, development, and production; and the prevailing business model, which prioritizes the development of vaccines with a large market potential. We consider an international vaccine-development fund to be urgently needed to provide the resources and the momentum to carry vaccines from their conception in academic and government

laboratories and small biotechnology firms to development and licensure by industry. Such a fund would enable basic scientists to move candidate vaccines from the laboratory through the so-called valley of death — the critical steps after good preclinical data have been obtained, comprising manufacture to Food and Drug Administration standards, a phase 1 clinical trial, and proof of concept in terms of protective immune responses. This support would permit efficacy assessment to begin — and thereby avert a repetition of the Ebola crisis.

Much attention has appropriately been directed at major disease targets such as human immunodeficiency virus (HIV), tuberculosis, and malaria, for which organizations such as the National Institutes of Health, the Bill and Melinda Gates Foundation, and the Wellcome Trust are providing considerable financial sup-

The New England Journal of Medicine
Downloaded from nejm.org at NIH Libary on January 25, 2016  For personal use only  No other uses without permission
Copyright © 2015 Massachusetts Medical Society  All rights reserved

Appx18624

## Vaccine-Preventable Diseases and Infections and Targets Currently Uncontrolled by Vaccination.*

**Diseases and infections with commonly used vaccines**

| | |
|---|---|
| Diphtheria | Polio |
| *Haemophilus influenzae* type b | Pneumococcus |
| Hepatitis type A | Rabies |
| Hepatitis type B | Rotavirus |
| Human papillomavirus (HPV) | Rubella |
| Influenza types A and B (seasonal) | Smallpox |
| Japanese encephalitis | Tetanus |
| Measles | Tickborne encephalitis |
| Meningococcus | Typhoid |
| Mumps | Varicella (chickenpox) |
| Pertussis (whooping cough) | Yellow fever |

**Diseases and infections with limited-use vaccines**

| | |
|---|---|
| Adenovirus types 4 and 7 | Anthrax |

**Diseases and infections with no vaccines or only partially effective vaccines**

| | |
|---|---|
| Campylobacter | Lyme disease |
| Cancer | Malaria |
| Candida | MERS |
| Chikungunya | Metapneumovirus |
| Chlamydia | Moraxella (for otitis) |
| *Clostridium difficile* | *Neisseria gonorrhoeae* |
| Cryptosporidium | Norovirus |
| Cytomegalovirus | Nosocomial bacteria |
| Dengue | Parainfluenza |
| Ebola and viral hemorrhagic fevers | Plague |
| Enterovirus including EV71, EV68, CA16 | Rhinovirus |
| Epstein–Barr virus | RSV |
| *Escherichia coli* | *Salmonella paratyphi* |
| *Helicobacter pylori* | SARS |
| *Haemophilus influenzae*, nontypable | Schistosomiasis |
| Helminths (numerous) | Shigella |
| Hepatitis type C | Staphylococcus |
| Hepatitis type E | Tuberculosis |
| Herpesvirus type 6 | Strep group A |
| Herpes simplex | Strep group B |
| HIV–AIDS | Toxoplasmosis |
| Influenza, universal | Trypanosomiasis |
| Influenza, avian types H5 and H7 | West Nile virus |
| Leishmaniasis | |

\* Information is from the Foundation for Vaccine Research. MERS denotes Middle East respiratory syndrome, RSV respiratory syncytial virus, and SARS severe acute respiratory syndrome. Vaccines for some of the targets indicated above are in advanced development, but most are not.

port. Similar attention has been devoted to the provision of currently licensed pediatric vaccines, which is supported by GAVI (formerly the Global Alliance for Vaccines and Immunization). However, there are many infectious disease targets for which vaccines are both badly needed and feasible but which are not being developed owing to either a lack of governmental prioritization or a lack of incentives because the market has been considered too small to justify the capital investment, to allow development costs and to reward the required investment risk. These targets, listed in the box, include Ebola, chikungunya, Middle East respiratory syndrome coronavirus (MERS-CoV), the severe acute respiratory syndrome (SARS) virus (which is not extinct in its animal reservoir), West Nile virus, and Lyme disease, to name a few. They are not attractive to major manufacturers because the anticipated revenues would be small. In the table, we compare the three major global health funds with the vaccine-development fund that we are proposing.

There are now only four major manufacturers that focus on vaccine development: GlaxoSmithKline, Merck, Pfizer, and Sanofi Pasteur. These days, the development of just one new vaccine requires a capital investment ranging from $500 million for the least complex to $1 billion or more for the most complex, including construction of facilities for manufacture.[3] Moreover, only about 7% of vaccine development projects that reach the preclinical development phase result in a licensed vaccine.[4] With few exceptions, the scores of biotechnology companies and government and university laboratories engaged in vaccine discovery and

The New England Journal of Medicine
Downloaded from nejm.org at NIH Library on January 25, 2016. For personal use only. No other uses without permission.
Copyright © 2015 Massachusetts Medical Society. All rights reserved.

Appx18625

| Comparison of Existing Global Health Funds and Proposed Vaccine-Development Fund.* | | | | |
|---|---|---|---|---|
| Variable | Global Fund to Fight AIDS, Tuberculosis and Malaria | GAVI | UNITAID Airline Tax | Proposed Vaccine Development Fund |
| Focus | HIV, tuberculosis, and malaria prevention, treatment, care, and support | Purchase and delivery of childhood vaccines | Purchase of HIV, tuberculosis, and malaria drugs | Accelerating discovery and development of new vaccines |
| Source of funds | Donor governments (95%); private foundations, corporate donors, and individuals (5%) | Donor governments (80%); private foundations (17%); International Finance Facility for Immunization (2%) | Airline solidarity levy | Donor governments (50%); private foundations and industry (50%) Options: financial transactions tax, tax breaks for industry donors |
| Eligibility | Middle- and low-income countries | Low-income countries | 85% of funds must go to low-income countries | Scientists, institutions, and biotechnology companies engaged in vaccine discovery and development |
| Application process | Competitive country proposal | Facilitative country proposal | Funds distributed to implementing agencies and NGOs on a discretionary basis | Competitive proposal |
| Proposal review | Country proposals reviewed by independent technical review panel; board usually follows panel's recommendations | Country proposals facilitated by GAVI, reviewed by independent reviewers appointed by GAVI; decisions made by board | No proposals required | Proposals subject to rigorous scientific review by independent panel; board makes funding decision on the basis of scientific merit and available funds |
| Features | Performance-based model emphasizing results, transparency, accountability; hands-on monitoring by local fund agents and independent auditors; does not implement or fund research | Performance-based model emphasizing results, transparency, accountability; hands-off monitoring; does not implement or fund research | Does not implement or fund research | Performance-based model emphasizing results, transparency, accountability; independent auditors will monitor and assess performance; will not finance phase 3 clinical trials or conduct research |
| Governance | 27-member international board representing donor and recipient countries, foundations, NGOs, industry, other stakeholders; 5 members are nonvoting representatives of WHO, U.N. agencies, and World Bank | 28-member international board representing donor and recipient countries, private individuals, U.N. agencies, vaccine industry, foundations, other stakeholders | 12-member executive board; 1 member is nonvoting WHO representative | Streamlined structure; medium-sized board whose majority of voting members represent donors; rest of composition to be determined |
| Funds disbursed through December 31, 2014 | $25.8 billion | $7.8 billion | Approximately $2 billion | Goal: raise $2 billion initially |

* Information is from the Foundation for Vaccine Research. GAVI denotes Global Alliance for Vaccines and Immunization, NGO nongovernmental organization, WHO World Health Organization, U.N. United Nations, and UNITAID Unity and AID.

development lack the necessary resources to carry candidate vaccines through early-stage clinical trials — let alone the costly phase 3 trials required for licensure. They and other groups must convince an increasingly skeptical investor or a major vaccine manufacturer to take up development after the initial stages.

Thus, the pharmaceutical industry's enthusiasm for vaccine development has dropped well below the levels seen in the 1980s and 1990s. The ClinicalTrials.gov website shows that only a minority of trials of vaccines against new infectious disease targets are sponsored by major vaccine companies and that the total

number of trials is not increasing. Although we may hope that manufacturers in developing countries will soon be able to develop needed new vaccines from research to licensure, that is only beginning to be the case.

In addition to producing new vaccines, there is a growing need to improve old vaccines. Pertussis

The New England Journal of Medicine
Downloaded from nejm.org at NIH Library on January 25, 2016  For personal use only  No other uses without permission
Copyright © 2015 Massachusetts Medical Society  All rights reserved

and influenza vaccines, for example, are currently recommended for everyone, but their effectiveness leaves much to be desired. Efforts to improve them are stymied by the need for costly, new — and in many cases impractically large — studies of vaccine safety and efficacy to validate reformulated products. Also weighing against efforts to develop improved vaccines are the low prices of existing vaccines and the lack of economic incentives to improve them. External funding could permit the exploration of ideas for improving partially effective vaccines.

Seed money for the proposed fund could come from governments, foundations, the pharmaceutical industry, and nontraditional sources, perhaps including the insurance and travel industries. At least $2 billion would be needed at the outset. This level of funding should be achievable, even at a time when resources are scarce. Witness the cost of addressing the Ebola emergency, estimated at $8 billion to date, with the final figure likely to be far higher.

The proposed fund would invite competitive proposals from scientists, their institutions, and eligible biotech companies. Requests for support to help carry promising vaccine projects through tests in large animals, manufacturing for human use, phase 1 and 2 clinical trials, including the initial demonstration of efficacy and the production of a small stockpile, would be reviewed by an in-


*An audio interview with Dr. Plotkin is available at NEJM.org*

dependent panel of scientists and funders. Grants would be awarded and renewed on the basis of milestones achieved and overall grant performance, which would be closely monitored by independent auditors. Institutional overhead costs would be capped. Costly phase 3 trials would have to be funded and conducted by an interested pharmaceutical partner, most likely with substantial government support or special incentives, as circumstances dictated. With initial support, however, at least a vaccine would be available for emergency use. In some cases, if phase 3 trials were impractical, results from animal or human challenge models might suffice for licensure.

The extraordinary challenges facing vaccine developers are not dissimilar to those of developing new classes of antibiotics. Indeed, the rationale for the proposed $2 billion antibiotic-resistance fund is remarkably similar to our arguments for a vaccine-development fund; the two funds would be complementary. The economic reality today is that strategic support from government and other investors is needed to address the most difficult infectious disease problems.

The fundamental challenges facing the discovery and development of new vaccines are growing in significance and can no longer be ignored. The lack of resources at critical stages of the early development process is the key rate-limiting factor that discourages vaccine discovery and development by impeding scien-

tific advances that could lead to new and improved vaccines. If a global vaccine-development fund had enabled just one candidate Ebola vaccine to be tested for safety and immunogenicity in humans before the 2014 outbreak in West Africa, public health workers could have begun vaccinating people at the start of the epidemic, potentially saving thousands of lives. The lesson we take from the Ebola crisis is that disease prevention should not be held back by lack of money at a critical juncture when a relatively modest, strategic investment could save thousands of lives and billions of dollars further down the line.

Disclosure forms provided by the authors are available with the full text of this article at NEJM.org.

From the Department of Pediatrics, University of Pennsylvania, Philadelphia (S.A.P.); the Foundation for Vaccine Research, Washington, DC (S.A.P., A.A.F.M.); the Department of Molecular Biology and the Woodrow Wilson School of Public and International Affairs, Princeton University, Princeton, NJ (A.A.F.M.); and the Wellcome Trust, London (J.F.).

1. Marzi A, Feldmann H. Ebola virus vaccines: an overview of current approaches. Expert Rev Vaccines 2014;13:521-31.
2. Ledgerwood JE, Costner P, Desai N, et al. A replication defective recombinant Ad5 vaccine expressing Ebola virus GP is safe and immunogenic in healthy adults. Vaccine 2010;29:304-13.
3. Pronker ES, Weenen TC, Commandeur HR, Osterhaus AD, Claassen HJ. The gold industry standard for risk and cost of drug and vaccine development revisited. Vaccine 2011;29:5846-9.
4. Pronker ES, Weenen TC, Commandeur HR, Claassen EH, Osterhaus AD. Risk in vaccine research and development quantified. PLoS One 2013;8(3):e57755.

DOI: 10.1056/NEJMp1506820
Copyright © 2015 Massachusetts Medical Society.

The New England Journal of Medicine
Downloaded from nejm.org at NIH Libary on January 25, 2016  For personal use only  No other uses without permission
Copyright © 2015 Massachusetts Medical Society  All rights reserved

Appx18627

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*, STEPHEN A. KRAHLING and JOAN A. WLOCHOWSKI, *Plaintiffs,* v. MERCK & CO., INC., *Defendant.* | Civil Action No. 10-4374 (CDJ) **CONTAINS "CONFIDENTIAL" AND "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" MATERIAL PURSUANT TO PROTECTIVE ORDER** |

# MERCK'S EXHIBITS IN SUPPORT OF MERCK'S RESPONSE TO RELATORS' STATEMENT OF UNDISPUTED FACTS

# EXHIBIT 319



# 11 Anthrax Vaccines*

*Arthur M. Friedlander, John D. Grabenstein, and Philip S. Brachman†*

Anthrax, a zoonotic disease caused by *Bacillus anthracis*, has three forms: cutaneous, inhalational, and gastrointestinal. Mortality in untreated cutaneous cases is approximately 20%, but less than 1% if antibiotics are promptly given. Inhalational anthrax is almost 100% fatal if untreated, and gastrointestinal cases have an untreated mortality rate of 25% to 75%. Meningitis may be a complication of any of the three forms of disease. Natural cases are primarily associated with industrial, agricultural, or laboratory exposure. The natural disease is not a major global public health problem, although occasional epidemics occur. However, the intentional use of *B. anthracis* as a bioweapon in the fall of 2001 in the United States irrevocably altered our views of public health, not just for anthrax, but also for many other infections with bioterrorism potential.

Historically, anthrax is considered to have been the fifth and sixth plagues described in *Exodus* (circa 1491 BC). Hippocrates described the disease in approximately 300 BC. Europeans recorded epizootics and epidemics in the 16th century. Between 1750 and 1850, the disease in both humans and animals was described in detail, and the organism was characterized. An epidemic of presumed gastrointestinal anthrax occurred in 1770 in Haiti and involved approximately 15,000 people; it was attributed to the ingestion of contaminated beef during a famine.[1]

In the 1870s, Koch cultured *B. anthracis* on artificial media and demonstrated definitively for the first time the microbial etiology of an infectious disease. In 1881, Pasteur attenuated the organism and conducted a successful field test of his attenuated vaccine strain administered for livestock. Greenfield performed similar work at the same time.[2] In the late 1800s and early 1900s, cases of cutaneous and inhalational industrial anthrax involved rag pickers in Germany and woolsorters in England.[3] The term *woolsorters' disease* referred to inhalational anthrax. Because of the large number of reported cases in England, a wool disinfection station was established in Liverpool.[4] All incoming wool and other animal fibers were disinfected using formaldehyde baths before being further processed. Subsequently, the number of cases of anthrax among these workers decreased significantly.

Cases of human anthrax have been reported from almost every country. However, the actual number of cases in the world is at best an estimate. In 1958, Glassman[5] estimated the annual worldwide incidence at 20,000 to 100,000 cases. In the 1980s and 1990s, the total global reported disease decreased to an estimated 2000 cases annually.

Industrial cases occur primarily in European and North American countries, and are associated with the processing of animal materials, such as hair, wool, hides, and bones. Agricultural cases occur primarily in Asian and African countries and result from contact with diseased domesticated animals or their products, such as hair, wool, hides, bones, and carcasses, including meat.

In the United States, the earliest reports of animal anthrax came in the early 1700s from what is now Louisiana. Sporadic animal cases were reported later from almost every state. Areas with more regularly reported animal cases are now called anthrax districts and primarily include the Great Plains states. Human anthrax was first reported from Kentucky in 1824. Human cases subsequently occurred throughout the United States, with the majority reported from industrialized states in the Northeast. However, as the textile industry moved to other parts of the country, human cases arose in the new locations.

Several unusual epidemics have been reported since the late 1970s. The largest epidemic in modern times occurred in Zimbabwe, with approximately 10,000 human cases reported between 1979 and 1985, including approximately 7000 cases occurring in 1979 and 1980.[6–8] Most people had cutaneous lesions, but some gastrointestinal cases also were reported. The source of the infections was infected cattle.

Another unusual epidemic occurred in Sverdlovsk, Russia, part of the Soviet Union, in 1979, after an accidental release of spores from a military microbiology facility. In this epidemic, at least 77 human cases of inhalational anthrax with at least 66 deaths occurred among people exposed to aerosolized *B. anthracis* organisms.[9,10] Some cases also occurred in sheep and cattle grazing as far as 50 km downwind from the facility, possibly as a result of the same release, although natural anthrax outbreaks previously had been reported from the region. In 1995, Iraq admitted to the United Nations that it produced weapons containing anthrax spores and was prepared to launch them during the 1991 Persian Gulf War.[11]

In late September 2001, a Florida man developed inhalational anthrax, the first case in the United States since 1976 and subsequently died.[12] Initially, it was regarded as an isolated case, but it became the first among 11 confirmed inhalational cases and seven confirmed and four suspected cutaneous cases of anthrax reported from Florida, New York, New Jersey, the District of Columbia, and Connecticut.[13–15] Exposure to contaminated mail was the confirmed or apparent source of infection in all these patients.[13–16] Among cutaneous cases, lesions developed on the forearm, neck, chest, or fingers.[17] Of the 11 inhalational cases, the median age was 56 years (range: 43–94 years). The presumed incubation period from exposure to onset of symptoms ranged from 4 to 6 days.[15] Additional details of these cases will be subsequently described. An unusual epidemic of anthrax cases arising secondary to heroin injection began in Europe in 2009 and continues. Since the first report of injectional anthrax in a heroin addict in 2000,[18] there have been more than 70 laboratory confirmed cases with a 37% case fatality rate reported from four European countries, some with unusual clinical syndromes.[19–21] These included cases with compartment syndrome or necrotizing fasciitis and others who presented with acute abdominal pain and signs of peritonitis associated with groin heroin injection. In most cases, the typical lesion consisting of an initial papule progressing to eschar, as described below, was absent.

The incidence of human anthrax in the developed world is extremely low. However, the impetus for the development of an improved human vaccine is the threat of *B. anthracis* used

*Opinions, interpretations, conclusions, and recommendations are those of the authors and are not necessarily endorsed by the U.S. Army.
†Deceased.

134

as a biological weapon. This worrisome possibility was given credence by the 1979 Sverdlovsk incident and the 1991 Iraqi experience, and prompted the U.S. Department of Defense to begin anthrax vaccinations for some members of the U.S. Armed Forces on March 10, 1998. The 2001 bioweapon attacks in the United States confirmed fears and heightened interest in the effort to develop new vaccines. The specter of anthrax spores used as a bioweapon against civilian populations on a larger scale than that yet experienced poses potential catastrophic consequences.[22] Given that spores can persist in experimentally infected animals after treatment with antibiotics for well over 30 days,[23–26] the major efforts directed to the management of such an event include early diagnosis and postexposure prophylaxis with antibiotics and vaccination.

## BACKGROUND

### Clinical Description

There are three primary forms of anthrax: cutaneous, inhalational, and gastrointestinal.[27] Secondary meningitis can occur with all three forms but is most often observed with inhalational anthrax. Rarely, meningitis has been reported without a primary site identified. In the United States, approximately 95% of reported cases of clinical anthrax have been cutaneous and 5% inhalational.

### Cutaneous Anthrax

The incubation period for cutaneous anthrax is 1 to 7 days (usually 2–5 days). The lesion is first noted as a small, pruritic papule. Within several days, the papule develops into a vesicle 1 to 2 cm in diameter. Occasionally, the initial papule is surrounded by a ring of vesicles, which coalesce to form a large vesicle. The vesicular fluid is clear or serous colored and contains numerous *B. anthracis* organisms and a paucity of leukocytes. Nonpitting edema and erythema may develop around the lesion. Pain is not present unless there is secondary infection. The vesicle may enlarge to 2 to 3 cm in diameter, sometimes becoming hemorrhagic. Systemic symptoms are usually mild and include malaise and low-grade fever. There may be regional lymphangitis and lymphadenopathy. Approximately 5 to 7 days after the skin lesion, the vesicle ruptures, revealing a straight-edged, depressed ulcer crater that develops a black eschar. During a period of 2 to 3 weeks, the eschar loosens and falls off, usually without leaving a scar. The evolution of the eschar is not affected by antibiotic treatment.

The lesions most often occur on an exposed part of the body, such as the face, neck, or arm. Large, irregularly shaped cutaneous lesions have been reported in some industrial cases after many organisms were rubbed into the skin. Occasionally, extensive ocular involvement occurs, with orbital involvement leading to damage to the lids and ductal system.

More severe cutaneous involvement is referred to as malignant edema, in which multiple bullae surround the site of the initial lesion and extensive local edema, induration, and toxemia are present. At times, the edema may be massive, extending from a primary lesion on the neck to the groin.

Rarely, multiple cutaneous lesions have been reported after multiple inoculations of spores through the skin. Reinfections have been rarely reported, but not confirmed.

Cutaneous anthrax in heroin users, arising mainly from IM injection of heroin, has been associated with varying clinical findings from more typical self-limiting skin lesions to atypical abscesses, cellulitis, compartment syndrome, and necrotizing fasciitis with accompanying systemic toxicity and sepsis. The cases of sepsis may result from coinfection with other organisms in the setting of traumatized tissue.[19–21]

### Inhalational Anthrax

In 1 to 5 days after inhaling an infectious dose of *B. anthracis* organisms, nonspecific symptoms develop that include malaise, fatigue, myalgia, slight temperature elevation, and minimal nonproductive cough, usually without symptoms of an upper respiratory infection.[28] There may also be a feeling of precordial tightness. Auscultation of the chest may reveal rhonchi. A slight improvement may occur within 2 to 4 days, but then severe respiratory distress develops suddenly, including dyspnea, cyanosis, stridor, and profuse diaphoresis. In some cases, subcutaneous (SC) edema of the neck and chest may be present. Physical examination reveals a patient with toxic symptoms who has an elevated pulse, respiratory rate, and temperature. Physical examination may reveal signs of a pleural effusion. Widening of the mediastinum on radiographic examination of the chest is frequently seen, as are pleural effusions, that may be hemorrhagic. The leukocyte count may be moderately elevated. Shock may develop terminally, and death usually occurs within 24 hours of respiratory distress. Death likely is caused by lymphatic/vascular obstruction in the mediastinum, with pulmonary hemorrhage and edema associated with large hemorrhagic pleural effusions and toxicity.

The patients treated in the 2001 U.S. outbreak frequently reported chills, prolonged and profound fatigue, nausea or vomiting, and chest discomfort.[15] All had abnormal chest radiographs (Table 11.1),[14] with paratracheal and hilar fullness, and pleural effusions, infiltrates or both. In some patients, the initial findings were subtle. Among all eight patients who had not received antibiotics before diagnosis, *B. anthracis* grew in blood cultures drawn at initial examination. Of the 11 patients, six (55%) survived with aggressive supportive care and multidrug antibiotic regimens.[14,15] All five patients with fulminant signs of illness, with severe respiratory distress or hypotension, or meningitis at initial examination, died despite receiving appropriate intravenous antibiotics and supportive care.[13,14] In all fatal cases, autopsy revealed classical edematous mediastinitis with hemorrhage.

A literature review of articles published from 1900 to 2005, some of which include the patients from the 2001 U.S. outbreak, reports the clinical features of 82 cases of inhalational anthrax from 106 reports.[29] The symptoms and clinical features in the 2001 patients were similar to the other cases but the 2001 patients were more likely to have had therapy initiated during the prodromal phase, to have received multiple antibiotics, and to have had pleural fluid drainage. Additional cases occurred in drumhead makers in 2006[30,31] and 2008.[32]

TABLE 11.1 Initial Clinical Findings in 10 Patients With Bioterrorism-Related Inhalational Anthrax, October to November 2001

| CHEST RADIOGRAPHY FINDINGS | |
|---|---|
| Any abnormality | 10/10 |
| Mediastinal widening | 7/10 |
| Infiltrates/consolidation | 7/10 |
| Pleural effusion | 8/10 |
| **CHEST COMPUTED TOMOGRAPHY FINDINGS** | |
| Any abnormality | 8/8 |

From Jernigan JA, Stephens DS, Ashford DA, et al., for the Anthrax Bioterrorism Investigation Team. Bioterrorism-related inhalational anthrax: the first 10 cases reported in the United States. Emerg Infect Dis. 2001;7:933–944.

**Appx18630**



# 11 Anthrax Vaccines*

*Arthur M. Friedlander, John D. Grabenstein, and Philip S. Brachman[†]*

Anthrax, a zoonotic disease caused by *Bacillus anthracis*, has three forms: cutaneous, inhalational, and gastrointestinal. Mortality in untreated cutaneous cases is approximately 20%, but less than 1% if antibiotics are promptly given. Inhalational anthrax is almost 100% fatal if untreated, and gastrointestinal cases have an untreated mortality rate of 25% to 75%. Meningitis may be a complication of any of the three forms of disease. Natural cases are primarily associated with industrial, agricultural, or laboratory exposure. The natural disease is not a major global public health problem, although occasional epidemics occur. However, the intentional use of *B. anthracis* as a bioweapon in the fall of 2001 in the United States irrevocably altered our views of public health, not just for anthrax, but also for many other infections with bioterrorism potential.

Historically, anthrax is considered to have been the fifth and sixth plagues described in *Exodus* (circa 1491 BC). Hippocrates described the disease in approximately 300 BC. Europeans recorded epizootics and epidemics in the 16th century. Between 1750 and 1850, the disease in both humans and animals was described in detail, and the organism was characterized. An epidemic of presumed gastrointestinal anthrax occurred in 1770 in Haiti and involved approximately 15,000 people; it was attributed to the ingestion of contaminated beef during a famine.[1]

In the 1870s, Koch cultured *B. anthracis* on artificial media and demonstrated definitively for the first time the microbial etiology of an infectious disease. In 1881, Pasteur attenuated the organism and conducted a successful field test of his attenuated vaccine strain administered for livestock. Greenfield performed similar work at the same time.[2] In the late 1800s and early 1900s, cases of cutaneous and inhalational industrial anthrax involved rag pickers in Germany and woolsorters in England.[3] The term *woolsorters' disease* referred to inhalational anthrax. Because of the large number of reported cases in England, a wool disinfection station was established in Liverpool.[4] All incoming wool and other animal fibers were disinfected using formaldehyde baths before being further processed. Subsequently, the number of cases of anthrax among these workers decreased significantly.

Cases of human anthrax have been reported from almost every country. However, the actual number of cases in the world is at best an estimate. In 1958, Glassman[5] estimated the annual worldwide incidence at 20,000 to 100,000 cases. In the 1980s and 1990s, the total global reported disease decreased to an estimated 2000 cases annually.

Industrial cases occur primarily in European and North American countries, and are associated with the processing of animal materials, such as hair, wool, hides, and bones. Agricultural cases occur primarily in Asian and African countries and result from contact with diseased domesticated animals or their products, such as hair, wool, hides, bones, and carcasses, including meat.

In the United States, the earliest reports of animal anthrax came in the early 1700s from what is now Louisiana. Sporadic animal cases were reported later from almost every state. Areas with more regularly reported animal cases are now called anthrax districts and primarily include the Great Plains states. Human anthrax was first reported from Kentucky in 1824. Human cases subsequently occurred throughout the United States, with the majority reported from industrialized states in the Northeast. However, as the textile industry moved to other parts of the country, human cases arose in the new locations.

Several unusual epidemics have been reported since the late 1970s. The largest epidemic in modern times occurred in Zimbabwe, with approximately 10,000 human cases reported between 1979 and 1985, including approximately 7000 cases occurring in 1979 and 1980.[6-8] Most people had cutaneous lesions, but some gastrointestinal cases also were reported. The source of the infections was infected cattle.

Another unusual epidemic occurred in Sverdlovsk, Russia, part of the Soviet Union, in 1979, after an accidental release of spores from a military microbiology facility. In this epidemic, at least 77 human cases of inhalational anthrax with at least 66 deaths occurred among people exposed to aerosolized *B. anthracis* organisms.[9,10] Some cases also occurred in sheep and cattle grazing as far as 50 km downwind from the facility, possibly as a result of the same release, although natural anthrax outbreaks previously had been reported from the region. In 1995, Iraq admitted to the United Nations that it produced weapons containing anthrax spores and was prepared to launch them during the 1991 Persian Gulf War.[11]

In late September 2001, a Florida man developed inhalational anthrax, the first case in the United States since 1976 and subsequently died.[12] Initially, it was regarded as an isolated case, but it became the first among 11 confirmed inhalational cases and seven confirmed and four suspected cutaneous cases of anthrax reported from Florida, New York, New Jersey, the District of Columbia, and Connecticut.[13-15] Exposure to contaminated mail was the confirmed or apparent source of infection in all these patients.[13-16] Among cutaneous cases, lesions developed on the forearm, neck, chest, or fingers.[17] Of the 11 inhalational cases, the median age was 56 years (range: 43–94 years). The presumed incubation period from exposure to onset of symptoms ranged from 4 to 6 days.[15] Additional details of these cases will be subsequently described. An unusual epidemic of anthrax cases arising secondary to heroin injection began in Europe in 2009 and continues. Since the first report of injectional anthrax in a heroin addict in 2000,[18] there have been more than 70 laboratory confirmed cases with a 37% case fatality rate reported from four European countries, some with unusual clinical syndromes.[19-21] These included cases with compartment syndrome or necrotizing fasciitis and others who presented with acute abdominal pain and signs of peritonitis associated with groin heroin injection. In most cases, the typical lesion consisting of an initial papule progressing to eschar, as described below, was absent.

The incidence of human anthrax in the developed world is extremely low. However, the impetus for the development of an improved human vaccine is the threat of *B. anthracis* used

---

*Opinions, interpretations, conclusions, and recommendations are those of the authors and are not necessarily endorsed by the U.S. Army.

[†]Deceased.

as a biological weapon. This worrisome possibility was given credence by the 1979 Sverdlovsk incident and the 1991 Iraqi experience, and prompted the U.S. Department of Defense to begin anthrax vaccinations for some members of the U.S. Armed Forces on March 10, 1998. The 2001 bioweapon attacks in the United States confirmed fears and heightened interest in the effort to develop new vaccines. The specter of anthrax spores used as a bioweapon against civilian populations on a larger scale than that yet experienced poses potential catastrophic consequences.[22] Given that spores can persist in experimentally infected animals after treatment with antibiotics for well over 30 days,[23–26] the major efforts directed to the management of such an event include early diagnosis and postexposure prophylaxis with antibiotics and vaccination.

## BACKGROUND
### Clinical Description

There are three primary forms of anthrax: cutaneous, inhalational, and gastrointestinal.[27] Secondary meningitis can occur with all three forms but is most often observed with inhalational anthrax. Rarely, meningitis has been reported without a primary site identified. In the United States, approximately 95% of reported cases of clinical anthrax have been cutaneous and 5% inhalational.

### Cutaneous Anthrax

The incubation period for cutaneous anthrax is 1 to 7 days (usually 2–5 days). The lesion is first noted as a small, pruritic papule. Within several days, the papule develops into a vesicle 1 to 2 cm in diameter. Occasionally, the initial papule is surrounded by a ring of vesicles, which coalesce to form a large vesicle. The vesicular fluid is clear or serous colored and contains numerous *B. anthracis* organisms and a paucity of leukocytes. Nonpitting edema and erythema may develop around the lesion. Pain is not present unless there is secondary infection. The vesicle may enlarge to 2 to 3 cm in diameter, sometimes becoming hemorrhagic. Systemic symptoms are usually mild and include malaise and low-grade fever. There may be regional lymphangitis and lymphadenopathy. Approximately 5 to 7 days after the skin lesion, the vesicle ruptures, revealing a straight-edged, depressed ulcer crater that develops a black eschar. During a period of 2 to 3 weeks, the eschar loosens and falls off, usually without leaving a scar. The evolution of the eschar is not affected by antibiotic treatment.

The lesions most often occur on an exposed part of the body, such as the face, neck, or arm. Large, irregularly shaped cutaneous lesions have been reported in some industrial cases after many organisms were rubbed into the skin. Occasionally, extensive ocular involvement occurs, with orbital involvement leading to damage to the lids and ductal system.

More severe cutaneous involvement is referred to as malignant edema, in which multiple bullae surround the site of the initial lesion and extensive local edema, induration, and toxemia are present. At times, the edema may be massive, extending from a primary lesion on the neck to the groin.

Rarely, multiple cutaneous lesions have been reported after multiple inoculations of spores through the skin. Reinfections have been rarely reported, but not confirmed.

Cutaneous anthrax in heroin users, arising mainly from IM injection of heroin, has been associated with varying clinical findings from more typical self-limiting skin lesions to atypical abscesses, cellulitis, compartment syndrome, and necrotizing fasciitis with accompanying systemic toxicity and sepsis. The cases of sepsis may result from coinfection with other organisms in the setting of traumatized tissue.[19–21]

### Inhalational Anthrax

In 1 to 5 days after inhaling an infectious dose of *B. anthracis* organisms, nonspecific symptoms develop that include malaise, fatigue, myalgia, slight temperature elevation, and minimal nonproductive cough, usually without symptoms of an upper respiratory infection.[28] There may also be a feeling of precordial tightness. Auscultation of the chest may reveal rhonchi. A slight improvement may occur within 2 to 4 days, but then severe respiratory distress develops suddenly, including dyspnea, cyanosis, stridor, and profuse diaphoresis. In some cases, subcutaneous (SC) edema of the neck and chest may be present. Physical examination reveals a patient with toxic symptoms who has an elevated pulse, respiratory rate, and temperature. Physical examination may reveal signs of a pleural effusion. Widening of the mediastinum on radiographic examination of the chest is frequently seen, as are pleural effusions, that may be hemorrhagic. The leukocyte count may be moderately elevated. Shock may develop terminally, and death usually occurs within 24 hours of respiratory distress. Death likely is caused by lymphatic/vascular obstruction in the mediastinum, with pulmonary hemorrhage and edema associated with large hemorrhagic pleural effusions and toxicity.

The patients treated in the 2001 U.S. outbreak frequently reported chills, prolonged and profound fatigue, nausea or vomiting, and chest discomfort.[15] All had abnormal chest radiographs (Table 11.1),[14] with paratracheal and hilar fullness, and pleural effusions, infiltrates or both. In some patients, the initial findings were subtle. Among all eight patients who had not received antibiotics before diagnosis, *B. anthracis* grew in blood cultures drawn at initial examination. Of the 11 patients, six (55%) survived with aggressive supportive care and multidrug antibiotic regimens.[14,15] All five patients with fulminant signs of illness, with severe respiratory distress or hypotension, or meningitis at initial examination, died despite receiving appropriate intravenous antibiotics and supportive care.[13,14] In all fatal cases, autopsy revealed classical edematous mediastinitis with hemorrhage.

A literature review of articles published from 1900 to 2005, some of which include the patients from the 2001 U.S. outbreak, reports the clinical features of 82 cases of inhalational anthrax from 106 reports.[29] The symptoms and clinical features in the 2001 patients were similar to the other cases but the 2001 patients were more likely to have had therapy initiated during the prodromal phase, to have received multiple antibiotics, and to have had pleural fluid drainage. Additional cases occurred in drummakers in 2006[30,31] and 2008.[32]

TABLE 11.1 Initial Clinical Findings in 10 Patients With Bioterrorism-Related Inhalational Anthrax, October to November 2001

| CHEST RADIOGRAPHY FINDINGS | |
|---|---|
| Any abnormality | 10/10 |
| Mediastinal widening | 7/10 |
| Infiltrates/consolidation | 7/10 |
| Pleural effusion | 8/10 |
| CHEST COMPUTED TOMOGRAPHY FINDINGS | |
| Any abnormality | 8/8 |

From Jernigan JA, Stephens DS, Ashford DA, et al., for the Anthrax Bioterrorism Investigation Team. Bioterrorism-related inhalational anthrax: the first 10 cases reported in the United States. Emerg Infect Dis. 2001;7:933–944.

## Gastrointestinal Anthrax

Symptoms of gastrointestinal anthrax develop 2 to 5 days after the ingestion of contaminated meat. The initial symptoms of disease consist of nausea, vomiting, anorexia, and fever followed by abdominal pain and diarrhea, which may be bloody. Hematemesis, sometimes severe, may develop. In some cases, the presentation is that of an acute abdomen and has prompted surgical exploration of the abdomen. Physical examination reveals an elevated temperature, pulse, and respiratory rate. Sepsis with toxemia, shock, and death may develop.

Oral–oropharyngeal anthrax occurs when ingested organisms gain entrance to the SC tissues through the oral or oropharyngeal tissue. In these cases, local ulcers, fever, anorexia, cervical or submandibular lymphadenopathy, or edema may develop.

## Bacteriology

B. anthracis, the causative agent of anthrax, is a large, Gram-positive, spore-forming, nonmotile bacillus (1.0 to $1.5 \times 3$ to 10 mm). The organism grows readily on sheep blood agar aerobically and is nonhemolytic under these conditions. The colonies are large, rough, and gray-white in color, with irregular, tapered, curving outgrowths that cause the typical "medusa head" appearance. A loop drawn up through a colony makes the disturbed part of the colony stand upright like whipped egg white. In the presence of high concentrations of carbon dioxide, the organisms form antiphagocytic capsules and two exotoxins, and colonies are noted to be smooth and mucoid. In tissue, the bacteria are encapsulated and appear singly or in chains of two or three bacilli. Bacterial identification is confirmed by the production of toxin, lysis by a specific γ bacteriophage, the presence of a capsule and cell wall polysaccharide confirmed by fluorescent antibody testing, and confirmed virulence when injected in mice and guinea pigs. Polymerase chain reaction (PCR) tests for toxin and capsule genes are also confirmatory. Genetic analyses of different isolates reveal that B. anthracis is one of the most monomorphic, homogeneous bacterial species known.[33,34]

The spores are quite resistant to environmental extremes and may survive for decades in soil (see "Epidemiology" below). Recent evidence also suggests that B. anthracis infected with lysogenic bacteriophage can survive in soil and colonize earthworm intestines for prolonged periods in the vegetative state and may serve as a source of infectious spores.[35] Viable spores were reported to persist for weeks to months within the lungs of rhesus monkeys after inhalation, while receiving antibiotic treatment. After the cessation of antibiotic treatment, residual spores remain viable and can cause fatal disease.[23–25]

## Pathogenesis

The major pathogenic virulence determinants of B. anthracis are the capsule and two protein exotoxins, lethal toxin and edema toxin. More recently, additional factors have been shown to contribute to virulence, although to a lesser degree than the capsule and toxins. These other factors include a capsule depolymerase responsible for attachment of the capsule to the cell wall peptidoglycan,[36] a manganese adenosine triphosphate (ATP)-binding cassette transporter,[37] siderophore biosynthesis genes,[38] nitric oxide synthase,[39] a caseinolytic protease component (ClpX),[40] a surface protein that may be involved in cell adhesion (BslA),[41] and a high temperature requirement A gene involved in the bacterial response to stress.[42]

The importance of the capsule was appreciated early in the 20th century when Bail[43] demonstrated that organisms without

a capsule were avirulent. However, extensive studies by Sterne[44] and others in the 1930s showed that nonencapsulated strains could induce immunity to anthrax. The strains developed by Sterne[45] have proved remarkably effective as live vaccines for domesticated animals and are used worldwide.

As is true for many bacterial virulence factors, the genes encoding the anthrax capsule are carried on an extrachromosomal 96-kb plasmid (pX02).[46,47] Anthrax strains lacking the capsule plasmid fail to produce capsule and are attenuated.[48] The capsule is a homopolymer of poly-D-glutamic acid and enhances virulence by making the organism resistant to phagocytosis and to lysis by cationic proteins.[49,50] Capsule released from the surface may also interfere with resistance[51] and with maturation of antigen presenting cells induced by peptidoglycan resulting in reduced chemotaxis of these cells to chemokines.[52]

A role for toxins in anthrax pathogenesis was suspected from the earliest studies by Koch,[53] but it was not firmly established until 1954, when Smith and Kepple[54] demonstrated that sterile plasma from experimentally infected guinea pigs was lethal when injected into other animals. Evans and Shoesmith[55] showed that B. anthracis culture filtrates produced edema after injection into the skin of rabbits. Additional work in the 1950s and 1960s evaluated the impact of toxins in disease and immunity.[56,57] Since the mid-1980s, many advances have been made in the understanding of the molecular biology of the toxins and their effects on multiple cell types in vivo and in vitro.[58] Nevertheless, their precise role in pathogenesis remains undefined. Anthrax has been characterized as being due to a large bacterium that produces a feeble toxin.[59] Although it is clear that anthrax is an invasive disease and that anthrax lethal toxin, when given intravenously, is relatively impotent compared with other bacterial toxins, the lethal and edema toxins are essential for virulence and thought to be important in the establishment of disease by impairing host defenses.

The anthrax lethal and edema toxins, like many bacterial toxins (e.g., diphtheria, tetanus, botulinum), have a binding domain by which they bind to target cell receptors and an active domain that is responsible for the biochemical and usually enzymatic activity of the toxin. However, the anthrax toxins are unusual in that the binding and active domains exist in two distinct proteins, and the two active domain proteins share the same binding protein. This binding protein is called protective antigen (PA). PA combined with a second protein called lethal factor (LF) constitutes the anthrax lethal toxin, which is lethal when injected into experimental animals.[60,61] The same PA combined with a third protein, edema factor (EF), constitutes the edema toxin, which causes edema when injected into experimental animals[60,61] and can also be lethal for some animals.[62] The edema toxin is responsible for the massive edema that may be present in cases of anthrax, whether in the skin or mediastinum. The 89-kDa EF is a calmodulin-dependent adenylate cyclase that raises intracellular cyclic adenosine monophosphate (AMP) levels.[63] The 85-kDa LF is a zinc metalloprotease that inactivates mitogen-activated protein kinase interfering with multiple host cell signaling pathways.[64,65] Toxicity in macrophages appears to be mediated through activation of caspase-1, requires a specific inflammasome protein, and results in lysosomal permeabilization.[66–68] Consistent with this model, each of the individual proteins alone lacks biologic activity.

The crystal structures of PA,[69] LF,[70] and EF[71] have all been determined. The current model, based on cell culture studies, proposes that PA first binds to a host cell toxin receptor (Fig. 11.1). Two of these receptors have now been identified,[72,73] and additional cell-surface proteins may modulate their activity.[74] PA then is cleaved by a cell-surface protease, releasing a

Case: 23-2553    Document: 78-10    Page: 233    Date Filed: 12/26/2023



**Figure 11.1.** Model of anthrax toxin action. Protective antigen (PA) secreted by *Bacillus anthracis* binds to a membrane protein receptor (ATR) *(1)*, two of which have been described. The PA is then cleaved by the protease furin *(2)* with release of a 20-kDa fragment and oligomerization of the remaining 63-kDa monomer *(3)*. The $PA_{63}$ oligomer then binds edema factor (EF) or lethal factor (LF) *(4)*. The complete toxin is then endocytosed *(5)* and trafficked to endosomes. At the low pH of the endosomes, the oligomer inserts into the membrane resulting in translocation of EF/LF to the cytosol *(6)*. EF causes an increase in cyclic adenosine monophosphate (cAMP) *(7)*, while LF cleaves mitogen-activated protein kinases (MAPKKs) *(8)* resulting in host cell damage and death of some cell types. PA can also be cleaved by proteases in the circulation to the 63-kDa monomer and form oligomers with EF/LF which then bind to host cell receptors. *(Modified from Mourez M, Lacy DB, Cunningham K, et al: 2001: a year of major advances in anthrax toxin research. Trends Microbiol. 2002;10:287–293.)*

20-kDa aminoterminal fragment. The cell-bound 63-kDa carboxyterminal fragment oligomerizes and creates a second binding domain to which either or both of the active proteins (LF or EF) binds. The complex then enters the cell through endocytosis with LF and EF passing through a PA channel induced by the low pH of the endosome, recently visualized by cryoelectron microscopy,[75] to exert their intracellular toxic effects. PA may also be cleaved by proteases in the circulation to form oligomers with LF and EF which then bind to cell receptors.[58] An alternative pathway has recently been described whereby LF within extracellular vesicles or exosomes can enter and intoxicate cells independently of the PA receptor.[76]

The genes for the toxin production are carried on a second 182-kb plasmid (pXO1).[77] Strains deleted of the plasmid coding for the toxin genes remain encapsulated, but are attenuated.[58,77] Of historical significance, it appears that the veterinary vaccine strains produced by Pasteur through passage at high temperature lack the plasmid for the toxin genes, explaining their lack of virulence.[77] It is thought that vaccine preparations consisted of a mixture of organisms, most of which lacked the toxin plasmid together with small numbers of fully virulent organisms that retained the toxin plasmid and were responsible for the vaccine's efficacy. Further work has shown that deleting the PA gene alone eliminates the organism's virulence,[78] thus confirming the central role of PA in the activity of the two toxins and their role in virulence.

Early studies showed that crude toxin preparations or combinations of edema and lethal toxins inhibited neutrophil killing,[79] chemotaxis,[80] or phagocytosis,[45] and that edema toxin inhibits neutrophil phagocytosis[81] and priming of the respiratory burst of neutrophils.[82] At low concentrations, lethal and edema toxins also appear to block the production of proinflammatory cytokines from macrophages,[83,84] directly inhibit macrophage chemotaxis,[85] and interfere with the early protective inflammatory response. At high concentrations, lethal toxin is cytolytic to macrophages from some mouse strains.[46] These mouse studies have shown that the strains with macrophages and neutrophils resistant to lethal toxin, as seen in human cells, are more resistant to infection, with neutrophils more important for resistance than macrophages.[87–89] However, the relevance of these studies in mice with attenuated unencapsulated strains to the mechanism of toxin pathogenesis of human disease remains to be determined. Lethal and edema toxins also have deleterious effects on a multitude of other cells, including lymphocytes and dendritic cells,[90–94] endothelial cells,[95] glucocorticoid receptor–positive cells,[96] and cardiac myocytes,[97] but the physiologically important cell target(s) in the infected host remains to be established. In terms of pathogenesis, the greater importance of lethal toxin versus edema toxin was demonstrated with a mouse model in which an anthrax strain producing the lethal toxin alone retained some virulence, whereas a strain producing only edema toxin was avirulent; the parent strain producing both

toxins was the most virulent.[98] More recent studies show that lethal toxin, but not edema toxin, is essential for virulence in nonhuman primates.[99]

In cutaneous anthrax, infection begins when a spore is introduced through the skin. At the local site, the spore germinates into the vegetative bacillus, which produces the antiphagocytic capsule. The edema and lethal toxins produced by the organism impair leukocyte function and contribute to the distinctive findings of tissue necrosis, edema, and relative lack of leukocytes in the local lesion. If not contained, the bacilli spread to the draining regional lymph nodes, allowing further production of toxins and induction of the typical hemorrhagic, edematous, and necrotic lymphadenitis. From the lymph nodes, the bacteria continue to multiply and enter the bloodstream, producing a systemic infection.

In inhalational anthrax, spores ingested by alveolar phagocytes and lung dendritic cells are transported to the tracheobronchial and mediastinal lymph nodes, where they germinate.[100,101] Local production of toxins by extracellular bacilli leads to the massive hemorrhagic, edematous, and necrotic lymphadenitis and mediastinitis characteristic of this form of the disease. The bacilli then spread to the blood, causing septicemia. In approximately half the cases there may be hemorrhagic meningitis. PA and LF are detectable in the blood early and at high concentrations later,[96,102] with the lethal toxin occurring as a complex of PA and LF at late stages of disease.[103] Capsule is also present at high levels.[102] The site of action and the role of lethal and edema toxins in the mechanism of death from infection remain obscure. Death is a result of respiratory failure with overwhelming bacteremia that is often associated with meningitis and subarachnoid hemorrhage.

## Diagnosis

A diagnosis of cutaneous anthrax should be considered after the appearance of a painless, pruritic papule that develops into a 1- to 2-cm vesicle, revealing a black eschar at the base of a shallow ulcer. Examination by Gram stain or culture of the vesicular fluid should confirm the diagnosis, but prior antibiotic therapy quickly renders the infected site culture-negative. Biopsy at the lesion edge, examined by Gram stain, immunohistology, and PCR, may be useful in people who have been treated with antibiotics. The latter two tests are available through the Laboratory Response Network (see below). In addition, there should be a history of exposure to materials contaminated with *B. anthracis*.

The diagnosis of inhalational anthrax is difficult, but should be suspected in cases with a history of exposure to an aerosol containing *B. anthracis*, followed by an initial phase during which symptoms are nonspecific. Once the acute stage develops, a widened mediastinum seen on chest radiograph, often with pleural effusions, should suggest the diagnosis. In untreated cases, culture of blood and pleural effusions will readily establish the diagnosis, and more rapid detection methods, including PCR for the PA gene, immunoassay for PA and capsule antigens, and mass spectrometry for LF or lethal toxin, may all be useful.[102,104] These tests are available through the Laboratory Response Network and state health departments (http://www.cdc.gov/anthrax/labs/labtestingfaq.html). In cases previously treated with antibiotics, these assays for toxin and capsule in blood and pleural fluid, as well as immunohistologic examination of pleural fluid or transbronchial biopsy specimens, are of particular value[14,15,17,105] and may be positive as long as 6 to 8 days after initiation of therapy.[104,106] Because primary pneumonia is not a feature of inhalational anthrax, sputum examinations do not aid diagnosis. The radiographic differential diagnosis should include histoplasmosis,

sarcoidosis, tuberculosis, and lymphoma. A computed tomography scan of the chest may be helpful to detect hemorrhagic mediastinal lymphadenopathy and edema, peribronchial thickening, and pleural effusions.

Gastrointestinal anthrax is difficult to diagnose because of its rarity and similarity to other more common severe gastrointestinal diseases. An epidemiologic history of ingesting contaminated meat, particularly in association with other similar outbreak cases, suggests the diagnosis. Microbiologic cultures are not helpful in confirming the diagnosis unless bacteremia is present. The diagnosis of oral-oropharyngeal anthrax can be made from the clinical and physical findings, but the role of bacteriologic cultures in confirming this diagnosis remains unclear.

## Treatment and Prevention With Antibiotics

Mild cases of cutaneous anthrax may be treated effectively with oral penicillin, fluoroquinolone, doxycycline, or another antibiotic, depending on antimicrobial susceptibility. If rapid spread or prominent systemic symptoms are present, high-dose parenteral therapy as for inhalational anthrax (see below) should be given until there is a clinical response. Effective therapy reduces the edema and systemic symptoms but does not change the evolution of the skin lesion. In injectional anthrax parenteral antibiotic therapy as for inhalational anthrax (see below) should be initiated and surgical debridement and fasciotomy may be required.

Treatment of inhalational anthrax requires high-dose intravenous therapy (ciprofloxacin or another fluoroquinolone) with at least one or more antibiotics with good central nervous system penetration, for example, meropenem and linezolid, because of the high incidence of meningitis.[14,15,107,108] This approach also applies to gastrointestinal anthrax. Regimens should be altered based on susceptibility testing available at the Laboratory Response Network and state health departments along with the clinical status. The successful treatment of six of the 11 inhalational cases in the 2001 bioweapon attacks suggests that, with rapid antibiotic treatment and modern supportive care, including aggressive management of respiratory distress and pleural effusions, mortality is similar to that of other causes of sepsis.

After exposure to an aerosol of anthrax, postexposure prophylaxis or presymptomatic treatment should include oral antibiotics for 60 days or more, depending on individual circumstances (eg, extent of exposure, vaccination status; see later text).[107,108] Ciprofloxacin or doxycycline are recommended. Other oral antibiotics, including other fluoroquinolones, clindamycin, or amoxicillin or penicillin VK if the strain is susceptible, are alternatives. Levofloxacin is indicated as a second-line drug because of limited safety data beyond 30 days.[108] Amoxicillin is recommended for children and pregnant or lactating women, depending on microbial resistance.[15,107] Preexposure or postexposure vaccination may enable shorter courses of antibiotics (see later text).[107,109] Postexposure vaccination alone would not be expected to protect quickly enough to be effective.[22]

## EPIDEMIOLOGY

Several theories explain the ecology of soil contaminated with *B. anthracis* spores. One theory suggests that *B. anthracis* spores can persist for many years in soil rich in nitrogen and organic material with adequate calcium, a pH greater than 6.0, and an ambient temperature greater than 15.5°C. It remains unclear whether there are cycles of germination and replication within the soil or if amplification within mammalian hosts serves to maintain the spore population in the soil.

**Appx18635**

Animal anthrax results from animals ingesting *B. anthracis* spores by eating contaminated feed or while grazing on pastures. Soil becomes contaminated from contaminated commercial fertilizer, contaminated feed, or diseased animals that contaminate the soil with their secretions before or after death.[110]

The number of reported human anthrax cases in the United States has declined steadily. Between 1916 and 1925, the annual average number of cases was 127; between 1948 and 1957, 44 cases; between 1978 and 1987, 0.9 cases per year; and between 1988 and 2000, 0.25 cases per year. Of the 235 human cases reported in the United States from 1955 to 2000, 20 were fatal (Fig. 11.2). Among these cases, 224 had cutaneous lesions (118 on an arm, 65 on the head or neck, 11 on the trunk, 8 on a leg, and 22 at an unknown site) and 11 were inhalational cases. These cases only include naturally occurring cases and do not include cases related to the 2001 outbreak. As discussed, in 2001, there were a total of 22 cases, 11 inhalational cases that included five deaths, and 11 cutaneous cases associated with contaminated mail. In the years from 2002 to 2014, there have been six cases of anthrax reported in the United States, the last being in 2011.[111] Three of those cases were related to exposure to drumheads made from animal skin; two of these were inhalational anthrax, and one was the first confirmed case of gastrointestinal anthrax reported in the United States. The other cases included two cutaneous cases and one inhalational case associated with travel in four states where anthrax is enzootic.[112]

A new manifestation of anthrax was reported in the United Kingdom in 2009—injectional anthrax. Since then, more than 140 laboratory-confirmed cases of anthrax associated with injecting heroin contaminated with *B. anthracis* have been reported in Europe.[19,71] These cases have demonstrated varying clinical signs and symptoms as well as high mortality rates. It has not been determined whether the heroin itself was contaminated, or *B. anthracis* was present in materials mixed with the heroin.

For naturally occurring anthrax, the basic epidemiologic principles are the same in developing and developed countries. Agricultural anthrax is a more significant problem in developing countries, and industrial anthrax occurs more commonly in developed countries. Industrial anthrax results from exposure of susceptible persons to contaminated animal products including wool, goat hair, hides, or bones. These materials come from animals that were infected with *B. anthracis* before death or contaminated after death (eg, from contaminated soil with which the carcass or animal products

came in contact). The wool and hair from infected animals may be clipped from live animals or pulled from carcasses. A hide may be obtained from an animal that has died of anthrax. Bones can be collected from grazing areas on which animals die or from rendering plants that may handle carcasses of animals that have died of anthrax.

Wool and goat hair are processed into yarn used in the textile and carpet industries and in the preparation of other cloth-like materials. Hides are processed into leather goods. Bones are used in preparing bone meal, gelatin, and fertilizer. In industrial cases, cutaneous anthrax results from spores that gain entrance through the skin by entering preexisting wounds or by being rubbed through the skin or on a hair fiber that may penetrate the skin. At times, the processing of goat hair and wool creates infectious aerosols that may result in inhalational anthrax when inhaled. A rendering plant is another source of potential infection.

A case of inhalational anthrax was reported in early 2006 in a 44-year-old male drumhead maker who brought goat skins into the United States from Africa. After cleaning the skins, he developed inhalational anthrax, but with vigorous therapy survived.[27,105] *B. anthracis* was recovered from his work environment. Several additional cases of anthrax associated with drums from Africa have been reported, including one case of disseminated anthrax, another of inhalational anthrax from Europe,[32] and two cutaneous[113] and one presumed gastrointestinal case[114] from the United States.

Cases associated with agricultural settings result from contact with diseased animals or with the products of animals that have died of anthrax. Affected persons are primarily agricultural workers, veterinarians, or people who kill and butcher infected animals or butcher the carcasses of animals that have died of anthrax. This contact results in cutaneous anthrax or, if the infected meat is ingested, gastrointestinal or oral–oropharyngeal anthrax.

Laboratory-associated cases of anthrax are rare. These are essentially all cutaneous, although a few inhalational cases have occurred. Rarely, cases have been reported after contact with contaminated clothing, such as woolen coats or pilots' leather helmets. Table 11.2 presents the sources of infection of the 264 cases reported in the United States from 1955 to 2011. The two vaccine-associated cases of cutaneous agricultural anthrax resulted from the inadvertent injection of live attenuated animal vaccine into the hand of the vaccinator. Two additional vaccine-associated cases of anthrax occurred in persons producing vaccine and were thought to result from contamination of skin lesions with the vaccine strain.[115]

Exposures related to bioterrorist events represent a new category. The anthrax spore attacks in the fall of 2001 resulted in 11 confirmed inhalational cases and seven confirmed and four suspected cutaneous cases reported from Florida, New York, New Jersey, the District of Columbia, and Connecticut.[13–15] Exposure to contaminated mail was the confirmed or apparent source of infection in all patients.[15,16] More than 32,000 people received short courses of prophylactic antibiotics while potential exposures were evaluated,[116] and among the treated people, more than 10,000 continued to receive antibiotics for 60 or more days with or without postexposure vaccination as prophylaxis.[117,118] Exposures likely resulted from opening contaminated letters, from working in buildings with high-speed automated mail-sorting machines, or through direct contact with cross-contaminated pieces of mail or environments contaminated with spores.



**Figure 11.2.** Number of both naturally occurring and biological terrorism-related reported cases of anthrax, by year in the United States for the years 1957 to 2012.[111]

## PASSIVE IMMUNIZATION

In the era before antibiotics, antisera from convalescent animals were common therapeutic products.[119] One of the first

Appx18636

**TABLE 11.2** Sources of Infection in 264 Cases of Human Anthrax in the United States, 1955 to 2011

| Source | No. of Cases |
|---|---|
| **INDUSTRIAL** | |
| Goat hair | 113 |
| Wool | 34 |
| Goat skin | 17 |
| Meat | 3 |
| Bone | 4 |
| Laboratory | 1 |
| Animal hide drums | 4 |
| Unknown | 13 |
| Total | 189 |
| **AGRICULTURAL** | |
| Animal | 42 |
| Vaccine | 2 |
| Unknown | 8 |
| Total | 52 |
| Unknown | 1 |
| **TERRORISM** | |
| Inhalational | |
| Working in mail-processing facility | 7 |
| Receiving mail (confirmed or presumptive) | 4 |
| Cutaneous | |
| Working in mail processing facility | 7 |
| Receiving mail (confirmed or presumptive) | 4 |
| Total | 22 (18 confirmed and 4 suspected) |

was anthrax antiserum, developed in France by Marchoux and in Italy by Sclavo in 1895.[120,121] Although it was used initially for prophylaxis and treatment of anthrax among livestock, Sclavo later used his product to treat cutaneous or septicemic human disease. He reported 10 deaths among 164 treated patients (6% mortality, compared with the Italian case-fatality rate of 24% in untreated cases), although these were not controlled clinical trials. Sclavo injected 30 to 40 mL of antiserum subcutaneously, and repeated it 24 hours later. In severe cases, he also injected 10 mL or more intravenously.

Between the 1910s and 1940s, clinicians in Europe and the Americas treated patients with anthrax antiserum using 25 to 300 mL daily for 5 days, sometimes in combination with arsenicals.[119–130] One patient with severe cutaneous anthrax recovered after receiving 2265 mL of antiserum.[131] No controlled studies were performed to demonstrate efficacy. Anthrax antiserum for therapy of cutaneous anthrax was replaced by therapy with sulfanilamide in 1939, followed by penicillin in 1947 and subsequently by other antibiotics.[125,132]

Equine anthrax antiserum produced by live-spore vaccination has been licensed in China,[133] the Soviet Union, and later Russia for decades, and its use continues, although the frequency of its use is unclear. The Lanzhou Institute of Biological Products in China developed a lyophilized antianthrax F(ab)₂ formulation of equine immunoglobulin (Ig) G fragments for

human use by intracutaneous, IM, or IV administration, but it is rarely used (Dong Shulin, personal communication, 2002). Several other Fab formulations are in early-stage animal testing.

Experimental evidence indicates that passive immunization with equine antibody produced against attenuated Sterne veterinary vaccine strains or against crude toxins prevents disease in animals when given before or shortly after spore challenge.[73,134] Rhesus monkeys were protected with one or two doses of equine antianthrax spore hyperimmune serum when begun 1 day after low-dose aerosol challenge. Of immune serum–treated animals 45% survived, compared with only 10% of control animals.

Studies by Little and colleagues[135] showed efficacy of anti-PA antiserum prophylaxis against an IM challenge in animals. The anti-PA polyclonal antibody protected against death, and anti-PA monoclonal antibody significantly delayed mortality. Reuveny and colleagues[136] similarly found that passive immunization of guinea pigs with polyclonal anti-PA antisera conferred protection against an intradermal challenge dose of 40 median lethal doses ($LD_{50}$).

Kobiler and colleagues[137] challenged guinea pigs intranasally with a 25 $LD_{50}$ dose of spores and intraperitoneal administration of rabbit anti-PA serum 24 hours after infection protected 90% of animals, with lesser efficacy seen with anti-Sterne and anti-LF antibodies. Beedham and colleagues[120] demonstrated that mice could be protected against live anthrax challenge with antibody from PA-vaccinated animals, but not with their splenic lymphocytes, supporting the longstanding evidence that antibody is the major mechanism of vaccine-induced immunity.

Although the importance of anthrax toxins in pathogenesis suggests that antiserum to toxins could have a role in treatment, no such products were produced, until interest was rekindled by the anthrax bioweapon attacks in fall 2001.[139] Modern experimental evidence shows that passive immunization with antiserum prevents anthrax in animals when given before or shortly after spore challenge.[140] This includes protecting guinea pigs from intradermal challenge, rhesus monkeys from low-dose aerosol challenge, and rats from parenteral challenge. The need for therapeutics other than antibiotics may be especially great in the case of antibiotic-resistant strains of *B. anthracis*, although there remains no definitive evidence to date of efficacy of antiserum to toxin in humans. In 2007, the U.S. government purchased several thousand therapeutic courses of human polyclonal anthrax immunoglobulin from Cangene Corporation (Winnipeg, Canada). This product was manufactured by fractionating the plasma of volunteers given at least four doses of anthrax vaccine adsorbed (AVA [BioThrax]). The formulation, now known by the trade name Anthrasil, was licensed by the Food and Drug Administration (FDA) in March 2015 for use in combination with appropriate antibacterial drugs. The anthrax immunoglobulin formed part of the successful treatment of a 2006 case of inhalational anthrax in a 44-year-old man exposed via African hides[105] and has been used in treatment of anthrax in drug users in Scotland,[141] but definitive evidence of efficacy in humans is unavailable. Efficacy evidence for licensure relied heavily on animal-challenge data, augmented with cross-species pharmacokinetic data,[142] fulfilling the FDA Animal Rule.

Several human monoclonal anti-PA antibodies have been developed. The U.S. government contracted for several thousand intravenous treatment courses of raxibacumab (ABthrax, Human Genome Sciences, Rockville, MD), a monoclonal anti-PA antibody. This antibody protects rabbits and nonhuman primates from death when given prophylactically against an aerosol spore challenge and when given therapeutically.[143]

The FDA licensed raxibacumab in December 2012 for use in combination with appropriate antibacterial drugs. Even though studies with both polyclonal anthrax immunoglobulin (Anthrasil) and raxibacumab showed increased survival over animals treated with antibiotic alone, the difference was not statistically significant.[108,144] Other monoclonal antibodies are also under development, such as MDX-1303 (or Valortim) developed by Pharmathene.[145] It remains unclear whether polyclonal antibodies that neutralize several epitopes might be preferable to monoclonal antibodies that target only one epitope.[146] If bacteria could be reengineered to modify the single binding epitope of a monoclonal antibody, it might be rendered ineffective. Indeed, it has been reported that modifications to PA can result in lack of effectiveness of a neutralizing monoclonal antibody, whereas a polyclonal antibody was still active.[147]

Mouse and humanized chimpanzee monoclonal antibodies to the other major virulence factor, capsule, have also been shown to be protective in mouse models.[148,149]

## ACTIVE IMMUNIZATION

### History of Vaccine Development

Although there is great historical interest in Pasteur's first effective live bacterial vaccine, and live attenuated veterinary vaccines are still used, human anthrax vaccines licensed in the United States and Europe consist of purified anthrax proteins, and not live attenuated vaccines. Early human anthrax vaccines (presumably live) were used in the 1910s but found little favor.[23] Then, Sterne developed live attenuated strains in the 1930s, which led to worldwide use for domesticated animals.[43] Russian investigators developed similar vaccines for animal and human use. In 1946, Gladstone[150] identified the PA component of cultures of *B. anthracis* as being an effective vaccine, and only later did subsequent studies identify PA as the cell-binding component of the anthrax toxins. Belton and Strange[134] increased the yields of PA to allow large-scale production, leading to the current British vaccine, anthrax vaccine precipitated. Wright and colleagues[151–153] used similar techniques to develop precursors to the American vaccine.

*Protective antigen* is the term applied to one of the toxin proteins, which is the plasmid-encoded binding component of the anthrax toxins described previously. The major effective immunogen in culture supernatants is PA, although smaller amounts of LF and EF may be present; their contribution to protective immunity has remained controversial.[55] In older studies, EF enhanced the protective efficacy of PA in some experimental animals.[154,155] These studies are difficult to interpret because the preparations used may not have been pure and free of cross-contamination. Studies using the PA gene cloned into *Bacillus subtilis* demonstrated conclusively that PA alone, in the absence of EF, LF, or other *B. anthracis* proteins, protects animals against experimental infection.[156] Although other experiments showed that purer preparations of PA, free of immunologically detectable LF or EF,[157] or recombinant PA,[158] can protect experimental animals, it remains unknown whether adding EF or LF enhances the efficacy of PA. One study reported that a DNA vaccine with the N-terminal domain of LF alone delayed time to death but did not increase overall survival in rabbits challenged with a virulent strain.[159] Similar results were observed with anti-LF serum in guinea pigs,[137] although antibody to LF[160] and vaccination with inactivated LF or the N-terminal domain[161] protected mice from infection with an attenuated strain. In addition, some protection was observed in a mouse model with EF expressed in an adenovirus vector.[162]

## Description of Vaccines

The only human anthrax vaccine licensed in the United States, AVA marketed as BioThrax, is produced by Emergent BioSolutions (Rockville, MD) from sterile filtrates of microaerophilic cultures of an attenuated, unencapsulated, nonproteolytic strain (V770-NP1-R) of *B. anthracis*. The cell-free culture filtrate, containing predominantly PA, is adsorbed to aluminum hydroxide, and the final product contains no more than 2.4 mg of aluminum hydroxide per 0.5-mL dose. Formaldehyde, in a final concentration of no more than 0.02%, and 0.0025% benzethonium chloride are included as preservatives. Current product-content standards require 5 to 20 µg/mL of total protein, of which at least 35% is the 83-kDa PA protein, measured by densitometric analysis on sodium dodecyl sulfate–polyacrylamide gel electrophoresis after pooling 12 sublots.[163] The vaccine is stable for 3 years after a successful potency testing.

Some lots produced in the 1980s appeared to contain small amounts of LF and lesser amounts of EF, as determined by induction of antibody responses in animal recipients,[48,157,164,165] although this has not been reported in the limited observations in human vaccinees.[165] Western blot analysis found no detectable EF. Enzyme-linked immunosorbent assay (ELISA) studies found LF to be present in the range of 10 to 30 ng/mL of fermentation filtrate before adsorption.[163] However, analysis by mouse macrophage cytotoxicity assay suggested that LF was present in a biologically inactive form.[155] Although it is clear that PA by itself is an effective immunogen, it remains unresolved whether the small amounts of LF or EF that may be present in some lots contribute to the vaccine's protective efficacy. A 2008 study of serum samples of AVA vaccinees showed that low levels of antibody to LF and EF were present by Western blot, but these did not contribute to toxin neutralization.[166]

Potency testing of AVA is performed by assessing biologic activity after intradermal challenge of vaccinated guinea pigs with a lethal dose of spores. The vaccine is stored at 2°C to 8°C. In December 2008, the FDA approved a revised recommended schedule for vaccination consisting of 0.5 mL given IM at 0 and 4 weeks and at 6, 12, and 18 months instead of the previous schedule with doses given SC at 0, 2, and 4 weeks followed by doses at 6, 12, and 18 months.[169] With continued exposure, booster doses have traditionally been recommended annually. A study of a simplified dosing schedule revealed that at month 43, anti-PA IgG geometric mean concentrations (GMCs) for three reduced-dosage groups were noninferior to the original eight-dose SC group. At month 43, volunteers receiving doses at 0, 1, 6, and 42 months IM or at 0, 1, 6, 18, and 42 months IM had GMC responses greater than those receiving the original eight-dose SC schedule. Solicited injection-site adverse events occurred at lower proportions in the IM group compared to SC. Route of administration did not influence the occurrence of systemic adverse events. A three-dose IM priming schedule with doses administered at months 0, 1, and 6 elicited long-term immunological responses and robust immunological memory that was efficiently stimulated by a booster vaccination at 42 months.[167]

Anthrax Vaccine Precipitated, a similar vaccine produced by the Health Protection Agency (Porton Down, Salisbury, Wiltshire), was developed in the United Kingdom, first administered to humans in the early 1950s, and licensed there in 1979.[168–171] This vaccine is made by precipitating the sterile cell-free culture filtrate of a derivative of the attenuated, unencapsulated Sterne strain 34 $F_2$ with aluminum potassium sulfate.[172] LF and EF are present in this vaccine at levels higher than believed to be found in the U.S. vaccine from the 1980s.[138,173] The vaccine contains thimerosal as a preservative.

The British vaccine is administered IM in a regimen of three 0.5-mL doses at 0, 3, and 6 weeks, with a booster dose 6 months after the third dose. Subsequent booster doses are given annually.[165] Other schedules of administration of this vaccine are also being studied.

A vaccine consisting of a suspension of live spores, named STI-1 for the Sanitary-Technical Institute, has been used for humans in the Soviet Union and its subsequent independent republics since 1953.[130,174] This strain, similar to the Sterne strain used in veterinary vaccines, is unencapsulated.[174] Although this vaccine has a reputation for causing substantial side effects, its developers assert that it is reasonably well tolerated and shows some degree of protective efficacy.[174,175] This vaccine, manufactured by the Tbilisi Scientific Research Institute of Vaccines & Serums (Tbilisi, Georgia), the Institute of Microbiology (Kirov [Vyatka], Russian Federation), and perhaps at other locations, is given either by scarification through a 10- to 20-mL drop of vaccine containing 1.3 to $4 \times 10^8$ spores or SC.[2,130,172,174,176–178] The initial dose is followed by a second dose 21 days later, with yearly boosters.

Another human live spore vaccine given by scarification has been manufactured by the Lanzhou Institute of Biological Products (Lanzhou, Gansu, People's Republic of China) since the 1960s, based on the avirulent strain A16R.[130,133] A single dose contains 1.6 to $2.4 \times 10^8$ colony-forming units. A single booster dose is given 6 to 12 months after the first vaccination (Dong Shulin, personal communication, 2002).

## Immunogenicity of Anthrax Vaccine Adsorbed Vaccine Produced in the United States

The results of two studies indicated that immunization with the AVA induced an immune response (as measured by indirect.hemagglutination) to PA. In the first study, 83% of vaccinees seroconverted 2 weeks after the first three doses.[179] In the other, 91% seroconverted after receiving two or more doses.[180] The titers fell over time, but 100% of vaccinees responded with an anamnestic response to the annual booster dose. Analysis using a more sensitive ELISA against PA demonstrated that seroconversion rates were between 96% to 100% of vaccinees after the second dose.[181,182]

By using a more sensitive validated ELISA assay, Pittman and colleagues[183] found that one dose of AVA evoked detectable anti-PA IgG antibodies in 60% to 84% of vaccinees. After two doses, 95% to 100% of vaccinees developed anti-PA antibodies. Studies also show that providing a missed 6-month dose after a delay as long as 5 to 7 years did not impair the booster response and it is not necessary to restart the series.[184]

A pilot study comparing SC and IM administration of AVA revealed higher titers to PA when a 4-week interval between the first two doses was compared with a 2-week interval, with fewer injection-site or systemic events with the IM route.[182] As described earlier, based on a larger randomized clinical trial,[185] the FDA changed the licensed schedule of 0.5 mL of vaccine given at 0 and 4 weeks and at 6, 12, and 18 months by the IM route from the old schedule of 0, 2, and 4 weeks and 6, 12, and 18 months given SC. The 2014 Wright study[167] may lead FDA to simplify the schedule further, as has been done by German regulatory counterparts who adopted a booster-vaccination interval of 3 years after a three-dose priming series (0, 1, and 6 months).

Although the change in route from SC to IM resulted in fewer solicited injection-site adverse events, it had no effect on the occurrence of systemic adverse events. Most importantly, the change to the IM route and elimination of the 2-week dose resulted in statistically significantly lower concentrations of anti-PA antibody from week 8 through and including month 6. The antibody titers using the new schedule were noninferior

to the old schedule at month 7, after the 6-month dose. However, the percentage of responders with a fourfold rise in titer was similar at 8 weeks and 7 months after the 6-month booster with the two schedules. The significance of the lower immune response up to month 7 remains unclear as the serologic correlation with immunity remains to be determined and will require extrapolation from studies in animal models. However, in those instances where rapid onset of an immune response is desired, as when postexposure vaccination is given together with antibiotics (see later), then the original schedule of doses given SC at 0, 2, and 4 weeks should be considered.[186]

There also seems to be some variability in the response of humans to vaccination with AVA as persons with DRB1-DQA1-DQB1 human leukocyte antigen (HLA) class II haplotypes produce significantly lower levels of anti-PA antibody.[187]

### Cellular Responses

Soviet scientists developed a skin-test antigen known as anthraxin in 1957, derived from the edematous fluid of infected animals given an unencapsulated B. anthracis strain.[178] Licensed in 1962 in Russia, the skin test product is composed of an undefined heat-stable polysaccharide–protein–nucleic acid complex, without anthrax capsular or toxigenic material.[176,188] A positive skin test after a 0.1-mL intradermal injection is defined as erythema of 8 mm or more with local induration persisting for 48 hours.[198] Anthraxin was useful in identifying cases of anthrax[174,189] and identifying STI-1 vaccine-induced immunity in guinea pigs, sheep, and humans.[174] Experimental data show that guinea pigs vaccinated against anthrax that developed a positive anthraxin skin test were immune to a subsequent parenteral challenge.[178] The positive and negative predictive values of the individual test results have not been published and there is limited experience with the skin-test antigen in humans in Western countries. Thus, its usefulness in predicting immunity in humans remains unknown. Contemporary immunologic studies show that humans develop PA-reactive CD4+ T cells with a T-helper cell type 2 (Th2) cytokine profile[190] as well as long-lived PA-specific memory B-cell responses after vaccination with AVA.[191] Another study examined associations between HLA genotypes, haplotypes, and homozygosity and PA-specific cellular immune responses in healthy subjects following vaccination with AVA. Limited associations were observed between individual HLA alleles or haplotypes and variable lymphocyte proliferative (LP) responses to AVA. Individuals homozygous for any HLA locus demonstrated significantly lower PA-specific LP than subjects heterozygous at all eight loci.[192]

### Correlates of Protection

After a naturally acquired infection, antibody to PA develops in 68% to 93% of cases as reported in different series, depending on when samples are drawn.[173,180,181,193] Antibody to LF occurs in 42% to 55% of cases, whereas antibody to EF is less frequently observed.[173,181] Antibody to the anthrax capsule occurs in 67% to 94% of cases.[181,193] This reaction contrasts with that after vaccination, in which no response to capsule is expected because the strain used to produce the vaccine is nonencapsulated. In the 2001 epidemic of inhalational anthrax, antibody to PA was detected in all survivors of confirmed cases.

In experimental animals, there is generally a correlation between immunity and antibody titer to PA after immunization with AVA.[194] In a mouse model using an attenuated strain, systemic rather than mucosal antibody correlated better with

protection against inhalational challenge.[195] However, the live veterinary vaccine provides significantly greater protection against similar challenge doses of anthrax in experimentally infected animals than does the human vaccine, even though it often induces lower levels of antibody to PA,[156,164,165] suggesting other antigens may be involved in protection.

More recent studies using live and protein-based vaccines have demonstrated a strong correlation between antibodies to PA and protective immunity. Barnard and Friedlander[196] showed, for the first time using live vaccines producing varying amounts of PA, that protection was strongly correlated with antibody titers to PA, a finding subsequently confirmed by Cohen and colleagues.[197] A similar correlation of immunity to AVA with antibody to PA, measured by ELISA and toxin neutralization, was observed in a rabbit model of inhalational anthrax.[194] Reuveny and colleagues,[156] using a PA vaccine to protect guinea pigs against an intradermal challenge, found that toxin-neutralizing antibodies correlated better with survival than antibodies measured by ELISA, and similar results were observed in rabbits challenged by the intranasal route.[198] However, studies in nonhuman primates showed that anti-PA IgG was more accurate than toxin-neutralizing antibodies as a correlate of protection against inhalational challenge.[199] Further analysis of the antibody response to different epitopes on PA[200] will increase knowledge of the nature of the protective antibodies as monoclonal antibodies to PA with synergistic, additive or antagonistic effects on neutralization have been described.[201] The overall evidence based on passive immunity with the aforementioned antibodies and protection with PA vaccines confirms that humoral immunity is the predominant mechanism of protection. Vaccine-induced protection seems in some animal models to be a function of the rapidity of the infectious process, the level of antibody present at challenge, and the speed of development of an anamnestic response.[202]

More recent studies sponsored by the National Institute of Allergy and Infectious Diseases (NIAID) and the Centers for Disease Control and Prevention (CDC) to further establish the relationship between antibody response and protection in rabbits (NIAID) and in nonhuman primates (NIAID and CDC) have been conducted. Although the NIAID used second-generation anthrax PA vaccines (see later) and the CDC used the licensed AVA vaccine, studies using both types of vaccines have shown that antibody levels in both species correlate with protection against aerosol challenge. Analysis of multiple studies in rabbits and two nonhuman primate species showed that levels of toxin neutralizing antibodies in one species are predictive of vaccine efficacy in the other species.[203,204] The finding that toxin neutralizing antibody levels can predict cross-species survival supports the extrapolation of data from animals to predict anthrax vaccine efficacy in humans. It is hoped this approach will be suitable for licensure of new anthrax vaccines and/or indications using the FDA pathways for licensure of vaccines that cannot be tested for efficacy in humans.[205]

## Efficacy of Vaccine

The protective efficacy of different experimental PA-based vaccines derived from culture filtrates of *B. anthracis* has been clearly demonstrated with the use of various animal models and routes of challenge.[56,171] A comprehensive, peer-reviewed evaluation by the National Academy of Sciences reported that "The committee finds that the available evidence from studies with humans and animals, coupled with reasonable assumptions of analogy, shows that AVA as licensed is an effective vaccine for the protection of humans against anthrax, including inhalational anthrax, caused by all known or plausible engineered strains of *B. anthracis*."[163] The FDA independently

affirmed that AVA prevents anthrax regardless of route of exposure.[206]

A controlled field trial was conducted in the late 1950s with a less potent vaccine similar to the currently licensed AVA.[207] This vaccine was composed of an alum-precipitated, cell-free culture supernatant from an attenuated, unencapsulated, nonproteolytic strain of *B. anthracis*. This strain differed slightly from that used to produce the licensed vaccine and was grown under aerobic rather than microaerophilic conditions.[152] The study was conducted in a susceptible population working in four mills in the northeastern United States, where raw imported goat hair contaminated with *B. anthracis* was encountered. The results indicated that vaccination, compared with a placebo, provided 92.5% protection against anthrax, combining the cutaneous and inhalational cases (95% confidence interval [CI], 65%–100%). No isolated assessment of the effectiveness of the vaccine against inhalational anthrax could be made because there were too few cases, although the only inhalational cases observed occurred in nonvaccinated persons.

There have been no controlled clinical trials in humans of the efficacy of the currently licensed U.S. vaccine, although the differences between the AVA vaccine and the PA-based vaccine used in the 1950s study by Brachman and colleagues described above[207] are minor from a regulatory perspective.[163] The AVA vaccine has been tested extensively in animals and protects guinea pigs against IM[164,165] and aerosol[157] challenge. More recent experiments show that this vaccine also protected rhesus monkeys against a lethal aerosol challenge with anthrax spores.[158,208–211] Table 11.3 summarizes inhalational challenge studies in nonhuman primates vaccinated with the licensed human vaccine or a recombinant PA vaccine. Additional studies with various formulations of recombinant PA by different manufacturers have confirmed its efficacy in nonhuman primates (E. Nuzum, personal communication, March 18, 2011).

## Duration of Immunity

The duration of immunity induced by vaccination has not been clearly established. In the field trials that evaluated a vaccine similar to the currently licensed AVA, one case of cutaneous anthrax occurred 5 months after receipt of three doses within 4 weeks just before the scheduled 6-month boosting dose.[207] This single observation could indicate that immunity induced by the initial dosing series of AVA may not be long lasting but this was a less-potent vaccine than AVA and complete protection against cutaneous inoculation might not be possible. Ongoing studies of clinical correlates of protection may help clarify this point.[163,185,187]

## Postexposure Prophylaxis With Vaccination

Postexposure vaccination by itself is unlikely to be of any acute benefit because of the short incubation period and the rapid course of the disease. Animal studies support this conclusion.[22] However, vaccination combined with antibiotic prophylaxis before onset of clinical illness may offer the best possible protection against inhalational anthrax. This is because of the propensity of anthrax spores to persist in the host for long periods and possibly germinate after antibiotics have been discontinued.[15–22] Vaccination allows an immune response to develop during the period of antibiotic prophylaxis. Thus, postexposure vaccination may shorten the period of antibiotic prophylaxis required for prolonged protection. This is supported by recent studies in nonhuman primates demonstrating that addition of postexposure vaccination to antibiotics resulted in a significant increase in survival

TABLE 11.3  Preexposure Efficacy of Anthrax Vaccines Against Inhalational Challenge in Nonhuman Primates

| Reference | Vaccine Product | Vaccination | Challenge Strain | Challenge Dose | Vaccination to Challenge | Vaccinated Animals[a] | Unvaccinated Animals[a] |
|---|---|---|---|---|---|---|---|
| Wright et al,[152] 1954 | Alum-precipitated preparation 138 | Two 1-mL SC doses 16 days apart | Vollum<br>Vollum | 39,000–82,000 spores<br>890,000 to 3 million spores | 16 days<br>34 days | 3/4<br>4/4 | 0/4<br>0/2 |
| Darlow et al,[148] 1956 | Alum-precipitated vaccine | Two 1.25-mL SC doses 10 days apart | M.36 Vollum<br>M.36 Vollum<br>M.36 Vollum | 10–15 $LD_{50}$<br>10–15 $LD_{50}$<br>10–15 $LD_{50}$ | 7 days<br>1 y<br>2 y | 10/10<br>10/10<br>6/7 | 0/10<br>0/10<br>1/9 |
| Ivins et al,[208] 1996 | Anthrax vaccine adsorbed | Two 0.5-mL IM doses 2 wk apart | Ames<br>Ames<br>Ames | 255–760 $LD_{50}$<br>161–247 $LD_{50}$<br>239–635 $LD_{50}$ | 8 wk<br>38 wk<br>100 wk | 10/10<br>3/3<br>7/8 | 0/5<br>0/2 |
| Pitt et al,[209] 1996 | Anthrax vaccine adsorbed<br>rFA 50 µg + Al(OH)b | Two 0.5-mL IM doses 4 wk apart<br>Two 0.5-mL IM doses 4 wk apart | Ames<br>Ames | 899 ± 62 $LD_{50}$<br>899 ± 62 $LD_{50}$ | 3 mo<br>3 mo | 9/9<br>9/10 | 0/2<br>0/2 |
| Friedlander et al,[119] 1999, and Pitt[b] | Anthrax vaccine adsorbed | Two 0.5-mL IM doses 4 wk apart | Ames | 133 ± 43 $LD_{50}$ | 3 mo | 5/6 | 0/6 |
| Ivins et al,[118] 1998 | Anthrax vaccine adsorbed<br>rFA 50 µg + various adjuvants | One 0.5-mL IM dose<br>One 0.5-mL IM dose | Ames | 74.4 $LD_{50}$<br>78–117 $LD_{50}$ | 6 wk<br>6 wk | 10/10<br>28/29 | 0/3 |
| Fellows et al,[211] 2001 | Anthrax vaccine adsorbed | Two 0.5-mL IM doses 4 wk apart | ASIL K9778-Namibia<br>ASIL K9729-Turkey | 396 $LD_{50}$ (Ames equivalent)<br>1004 $LD_{50}$ (Ames equivalent) | 10 wk<br>10 wk | 10/10<br>8/10 | 0/2<br>0/2 |
| Chawla et al,[210] 2009 | rFA 25 µg no adjuvant<br>rFA 50 µg no adjuvant<br>rFA 100 µg no adjuvant | Two doses IM 4 wk apart | IVRI<br>IVRI<br>IVRI | 1000 $LD_{50}$<br>1,000 $LD_{50}$<br>1,000 $LD_{50}$ | 7 wk<br>7 wk<br>7 wk | 6/6<br>6/6<br>6/6 | 0/6 |
| Food and Drug Administration,[206] 2010 | Anthrax vaccine adsorbed | 0.5 mL IM 0, 4 wk, 6 mo | Ames | 200 $LD_{50}$ | 52 mo | 8/10 | 3/13 |
| | Anthrax vaccine adsorbed | 0.5 mL 1:5 dilution IM 0, 4 wk, 6 mo | Ames | 200 $LD_{50}$ | 52 mo | 9/9 | |

IM, Intramuscular; $LD_{50}$, median lethal dose; rPA, recombinant protective antigen; SC, subcutaneous.
[a]Number surviving/number challenged.
[b]Personal communication, M.L.M. Pitt, 2002.

Case: 23-2553   Document: 36-10   Page: 240   Date Filed: 12/26/2023

Appx18641

compared with treatment with antibiotics alone.[212] Because the rapid development of an antibody response is particularly critical for postexposure prophylaxis and the new vaccine schedule of 0 and 4 weeks and 6, 12, and 18 months given IM (see earlier) results in a lower anti-PA antibody response at weeks 4 and 8, the FDA recommends using the previously licensed dose schedule and route (0, 2, and 4 weeks given SC) along with antibiotics for a minimum of 60 days until more definitive data are available.[109] Based on initial studies in non-human primates,[212] it may be possible to further reduce the recommended duration of antibiotics, but at present, 60 days are recommended. Use of AVA for postexposure prophylaxis along with antibiotics is not licensed at present and will require an investigational new drug protocol or emergency use authorization by the FDA during a public health emergency. Further studies are required to determine the optimal human vaccine dose schedule and duration of antibiotics for licensure for postexposure prophylaxis.

## Vaccine Safety
### Common Adverse Effects

The licensed AVA vaccine, when first used, gave an incidence of local reactions similar to that of the antecedent alum-precipitated vaccine, although no detailed observations were reported.[153] In an open-label study from 1966 to 1971 with the licensed vaccine given SC, approximately 7000 textile employees, laboratory workers, and other at-risk persons received 15,907 doses.[213] There were 24 reports (0.15% of doses) of severe local reactions (defined as edema or induration >120 mm in diameter or marked limitation of arm motion or axillary node tenderness). There were 150 reports (0.9%) of moderate local reactions (edema or induration 30–120 mm in diameter) and 1373 reports (8.6%) of mild local reactions (erythema only or induration <30 mm in diameter). Four cases of systemic reactions (<0.06%), reported as transient, included fever, chills, nausea, and general body aches. None of these studies used contemporary methods of data collection for signs and symptoms.[214]

The U.S. Army Medical Research Institute of Infectious Diseases (USAMRIID) assessed the safety of the licensed AVA vaccine as part of a randomized clinical study between 1996 and 1999.[162] A total of 28 volunteers received SC doses according to the licensed schedule. Each volunteer was observed for 30 minutes after administration of AVA and scheduled for follow-up evaluations at 1 to 3 days, 1 week, and 1 month after vaccination. Four volunteers reported seven acute adverse events within 30 minutes after SC administration. These included erythema (3), headache (2), fever (1), and elevated temperature (1). Of these events, one patient reported simultaneous occurrence of headache, fever, and elevated temperature (38.2°C). The most common local reactions were tenderness, erythema, SC nodule, induration, warmth, local pruritus, limited arm motion, and edema. Local reactions occurred more often in women. No abscess or necrosis was observed at the injection site. Systemic reactions included malaise, headache, myalgia, fever, anorexia, respiratory difficulty, and nausea or vomiting (4%). All local and systemic adverse events reported in this study were transient. There was one report of a delayed-type hypersensitivity reaction beginning 3 days after the first dose.

The USAMRIID also analyzed the occupational health records of 1583 workers (1249 men and 334 women) who reported adverse events after receiving 10,722 SC doses of the licensed AVA vaccine from 32 separate vaccine lots.[215] In this group, 273 people received 10 or more doses and 46 people received 20 or more doses. With regard to injection-site

reactions, 3.6% of doses were reported to produce redness, induration, itching, or edema. Most people who reported a reaction received subsequent doses without problems, but people who reported an injection-site reaction were more likely to report a local reaction to a later dose. Systemic events of headache, fever, chills, malaise, and muscle or joint aches were reported after 1% of doses. The most common of these were headache (0.4%), malaise (0.4%), and fever (0.1%). Women noted local (i.e., erythema, induration, edema, swollen lymph nodes, lumps) and systemic (i.e., headache, fever, dizziness, hives) events more commonly than did men. Vaccine recipients younger than age 40 years reported adverse events more often than did recipients age 40 years or older.

Two uncontrolled case series used serial self-administered surveys to assess the local and systemic reaction after SC anthrax vaccine administration. Among 601 healthcare workers at an Army hospital in Honolulu,[163,216,217] after the first, second, and third doses more women reported localized itching (56%–68%) than did men (24%–31%); more SC nodules (81%–93%) than did men (56%–65%); more moderate to large injection-site reactions (erythema >10 cm) (40%–51%) than did men (17%–32%); and more swelling of the lower arm (8%–15%) than did men (7%–10%). Overall, nearly 20% of both men and women reported symptoms that they personally judged could be ignored; 15% reported symptoms that affected their activity for a short time, but did not limit their ability to perform duties; 8% reported symptoms that were relieved by self-treatment with nonprescription medication that affected their activity for a short time; and fewer than 2% reported symptoms unrelieved by medication, with their ability to perform duties limited for a short time. From 1.5% to 2.7% of women and from 1.2% to 2.1% of men reported systemic events that limited work performance, leading to limitation of performing duties. Events in both sexes resolved without intervention and without sequelae.

Differential rates of adverse events between the sexes have been reported for other vaccines.[214,218-220] Other studies suggested that female sex, body mass index, and prevaccination serum progesterone levels were associated with an increased risk of adverse events. Elevated prevaccination anti-PA IgG levels in women were also associated with an increased risk of local reactions after anthrax vaccination.[221,222]

The other uncontrolled case series was conducted at a U.S. Army base in South Korea[163,216,223] where 2214 men and 610 women were given AVA vaccine SC. Women reported SC nodules more frequently (50%–62%) than did men (21%–29%); erythema greater than 12 cm in diameter was self-reported by 2% to 4% of women and 0.4% to 1% of men. Women experienced more itching at the local site (20%–37%) than did men (6%–8%), more fever (2%–4%) than did men (1%), more chills (3%–6%) than did men (1%–2%), and more malaise (8%–15%) than did men (4%–7%). Overall, 0% to 1.9% of vaccine recipients reported restricted work activities or limited duty assignments. From 0% to 1.1% of vaccine recipients reported losing 1 or more days of duty and between 0.4% to 1.7% sought medical care for the reaction. Regardless of sex, almost all vaccine recipients reported that events were localized or minor and self-limited and did not lead to impairment of work performance.

As noted, the change in the route of routine administration for AVA from SC to IM in December 2008 resulted in fewer solicited injection-site adverse events but had no effect on the occurrence of systemic adverse events.[185]

### Rare Adverse Effects

The best quality evidence evaluating the overall safety of the licensed AVA vaccine comes from database studies conducted

by the Army Medical Surveillance Activity and the Naval Health Research Center (NHRC).[163,224,225] These studies established that anthrax-vaccinated and unvaccinated personnel of either sex are hospitalized and visit outpatient clinics at the same rates overall for each of 14 major categories within the International Classification of Diseases and for each of several specific diagnoses with speculative association with anthrax vaccination. For example, 1 per 35 anthrax-vaccinated people was hospitalized per year, compared with 1 per 28 unvaccinated people hospitalized per year.

A similar cohort study evaluated disability discharge rates, comparing 154,456 anthrax-vaccinated and 53,377 unvaccinated soldiers during 4.25 years of follow-up.[226] Rates of disability evaluations did not differ significantly between the two groups, with an adjusted hazard ratio of 0.96 (95% CI, 0.92–0.99). Subset analyses similarly found no differences between men and women for permanent disability, temporary disability, musculoskeletal disability, or neurologic disability.

Three reports described the long-term health of 99 male laboratory workers who received a variety of licensed and investigational vaccines (volume range: 52–134 mL), including the early and the current formulation of anthrax vaccine.[227–229] The third study included a small control group. Although there were elevations in liver and kidney function test results and white blood cell counts in some of the male vaccine recipients, none developed unusual diseases or unexplained symptoms attributable to repeated doses of multiple vaccines. A 17-year follow-up study comparing 155 multiply vaccinated laboratory workers (142 of whom received anthrax vaccine) and 265 unvaccinated workers in the surrounding community found no differences in clinical side effects attributable to anthrax vaccine.[230]

All reports to the Vaccine Adverse Event Reporting System (VAERS) involving the licensed AVA vaccine for a multiyear interval were evaluated by the Anthrax Vaccine Expert Committee (AVEC), composed of civilian physicians.[231,232] The AVEC evaluated 1857 VAERS reports and additional medical records corresponding to 1793 recipients of the AVA between March 1998 and February 2002. The 1857 adverse event reports could be grouped into three main categories, based on effect on the vaccine recipient's functional status: hospitalization, inability to work for 24 hours or more, and "other." Of the 1857 reports, 64 involved hospitalization. The civilian panel found that 11 of the 64 "very likely/certainly" or "probably" were caused by anthrax vaccine. All 11 involved allergic or inflammatory reactions at the injection site. Another 172 reports involved inability to work for 24 hours or more (but did not involve hospitalization); 94 of the 172 reactions were certainly or probably caused by anthrax vaccine according to the AVEC. These 94 reports primarily described injection-site reactions, various rashes, acute allergic reactions, and viral-like symptoms. In the balance of the 1857 reports, 1621, involved neither hospitalization nor time off work for 24 hours or more. All were reviewed by the AVEC, which found no patterns of unexpected adverse events. Subsequent analyses of VAERS reporting rates did not identify any serious unexpected risk from the vaccine.[233]

Two cases of optic neuritis were reported in soldiers after anthrax vaccination. Optic nerve antibodies were found in one case, but no epitopes were found in common between optic nerve and the anthrax organism.[234] A later database study found no statistically significant elevation in the risk of optic neuritis in AVA vaccines compared with similar unvaccinated people.[235]

A cohort study involving 4092 active-duty women in the U.S. Army assessed the effect of the licensed AVA vaccine on pregnancy and childbirth.[236] This cohort contrasted 3135 vaccinated women and 957 unvaccinated women, with 39,549 person-months of follow-up. The anthrax-vaccinated and unvaccinated women had an equivalent likelihood of becoming pregnant and of giving birth. A subsequent NHRC assessment found a slight elevation in the rate of birth defects in first trimester–exposed infants (odds ratio = 1.18; 95% CI, 0.997–1.41) compared with infants of women vaccinated outside of the first trimester, but no specific defect occurred at an elevated rate after adjustment for multiple comparisons.[237]

An analysis of men in the military evaluated at an assisted reproductive technology clinic compared 254 anthrax-vaccinated and 791 unvaccinated men and found no differences in semen concentration, sperm motility, sperm morphology, need for intracytoplasmic sperm injection, rate of fertilization of mature oocytes, embryo transfer, or clinical pregnancy.[238]

AVA was the subject of much controversy in the late 1990s and early 2000s, with assertions that the vaccine was associated with a variety of adverse health effects. To provide an objective basis for assessing the vaccine's safety profile, a large number of postmarketing safety studies were conducted. These studies involved cohort studies of acute symptoms,[167,182,185,185,214,215,217,221,223,224,235] hospitalizations,[163,224,239,240] quality of life,[241,242] disability evaluations,[226] periodic physical-examination and clinical-laboratory parameters,[243] and reproductive outcomes,[236,238,244] as well as primary and secondary review of the spontaneous reports to VAERS.[231–233] Several cohort studies span multiple years after immunization.[163,167,185,224,227,230,231,239–242,245–248] Multiple studies used active surveillance, defined as data collected at fixed time points without relying on the passive reporting of symptoms or conditions.[167,182,184,185,217,221,230,241,242] Other studies featured systematic surveillance where data were collected automatically and electronically, without any reporting action required by the clinician or associated with specific vaccines.[163,224,226,235,237,238–240,243,245–248]

After the National Academies of Sciences heard from anthrax vaccinees and comprehensively reviewed the accumulated scientific data, they concluded that anthrax vaccine has an adverse-reaction profile similar to that of other adult vaccines.[163] However, the anthrax immunization program needed improvements in the methods of communication between the Department of Defense and military personnel with regard to overall clinical immunization services. Concern about the value of anthrax immunization among military personnel largely resolved after the anthrax bio-attacks of the fall of 2001 that demonstrated the lethality of anthrax spores.

## Indications for Vaccination

Routine preexposure vaccination with doses given IM at 0 and 4 weeks and at 6, 12, and 18 months plus yearly boosters is recommended for industrial workers who handle potentially contaminated animal products, including wool, goat hair, hides, and bones imported from countries in which animal anthrax is reported. These countries are primarily in Asia and Africa but are occasionally in South America and the Caribbean. A veterinarian or agricultural worker who has contact with potentially infected animals should be vaccinated, as should laboratory workers who work with *B. anthracis*.[109] For postexposure prophylaxis the most rapid immune response is generated in unvaccinated persons with three doses of vaccine that should be given SC at 0, 2, and 4 weeks in conjunction with a 60-day course of appropriate antimicrobial agents.[109]

Special circumstances that warrant vaccination with anthrax vaccine include a threat of biologic warfare or terrorism. The U.S. Armed Forces began vaccinating designated service members in 1998 to protect against anthrax arising from the

use of *B. anthracis* as a biologic weapon. Between 1998 and 2016, more than 3 million military personnel received more than 13 million doses of AVA.[249]

## Contraindications and Precautions

A contraindication to vaccination is a hypersensitivity reaction to the vaccine. This is uncommon, but several persons who have received the initial dose or doses developed moderately severe local reactions with some systemic response. If it is necessary to immunize persons with such responses, pretreatment with antihistamines and nonsteroidal antiinflammatory drugs may be of value, although this has not been evaluated scientifically.[250] Anaphylaxis is extremely rare after vaccination and is a contraindication to further vaccination.[109]

## PUBLIC HEALTH CONSIDERATIONS

The use of the anthrax vaccine in industrialized populations had a significant impact on the reduction of natural anthrax cases among industrial workers and is one of the main methods by which industrial anthrax was controlled. Improvements in the industrial environment, with better manufacturing equipment and environmental control, also have helped reduce the industrial risks of naturally occurring anthrax. In addition, replacement of animal products (primarily goat hair) with synthetic fibers has reduced the occurrence of anthrax infection. It is ironic that mail-processing machines replaced wool-processing machines as a source of industrial risk in the 2001 anthrax bioweapon attacks.

Agricultural cases have been reduced by control of the disease in animals through the use of animal vaccines and better disposal of infected carcasses. The routine immunization of animals in areas with continuing cases of animal anthrax and the immunization of appropriate humans exposed agriculturally and industrially to *B. anthracis* will serve to reduce the number of naturally occurring human cases.

## FUTURE VACCINES

Current acellular vaccines against anthrax are less than ideal for several reasons. These vaccines are composed of an incompletely defined culture supernatant adsorbed to aluminum hydroxide. There is only partial quantification of the PA content of the vaccine or other constituents, thus the degree of purity is not fully characterized. Standardization is determined by biologic activity in an animal potency test. The schedule currently licensed for the U.S. vaccine is less than optimal, in that five doses are required during 18 months, followed by annual boosters. Clearly, the ideal anthrax vaccine would be more completely defined and able to produce long-lasting immunity within 30 days.[163] Current research to accelerate and enhance the antibody response to AVA is of particular importance in view of the lower immune response seen with the new schedule eliminating the week 2 dose and changing the route from SC to IM. The most advanced effort involves use of the adjuvant cytosine phosphate guanine (CpG). This has been shown in mice, guinea pigs, and nonhuman primates[251,252] and in an initial Phase 1 trial in humans[253] to enhance the antibody response to AVA, although increased adverse events were seen in humans after the adjuvant. In a follow up Phase I study using lower doses of CpG there was some increase in local reactogenicity, transient lymphopenia, and increased serum C-reactive protein (CRP) levels with CpG. The peak antibody response was higher and occurred 1 week earlier with CpG and further studies are planned to determine the optimal regimen.[254] Additional studies suggest a regimen of 0 and 2 weeks with AVA plus CpG gives a higher

peak antibody response than a 0-, 2-, and 4-week regimen with AVA alone.[255] Further understanding of the molecular pathogenesis of anthrax and of the structure of PA and its interaction with LF and EF would likely lead to significant progress in the development of improved vaccines. For example, genetically defined mutations in the receptor-binding domain,[256,257] the protease-sensitive domain,[258] or other parts of the molecule[259,260] may generate a less toxic more stable PA preparation to be used alone or as a complex with EF and/or LF. Similarly, mutations in the edema or lethal toxin may allow evaluation of nontoxic complexes with PA. Evidence in experimental animals suggests that adjuvants other than aluminum may increase the protective efficacy of PA substantially even after a single dose,[261,262] including CpG as described, and new formulations using microcapsules,[263] liposomes,[264] nanoparticles[265,266] or delivery by the transcutaneous,[264,267] intradermal,[268] or intranasal[165,269] route also may be of value.

Several vaccine candidates based on recombinant PA protected nonhuman primates from inhalational challenge.[158,285,270] These vaccines are in advanced stages of development, undergoing Phase I/II human trials.[271–273] The initial small studies revealed the PA vaccine to be well tolerated with reactogenicity similar to or less than that seen with AVA. In one study, the immunogenicity of PA after two doses of 5 to 75 μg was noninferior to AVA while in another study without an AVA group, antibody titers were higher at 50 μg compared to doses of 5 and 25 μg. Although there is evidence that the efficacy of AVA against parenteral challenge in rodents differs with challenge strains,[164,165,173] AVA protected rhesus monkeys against a more rigorous aerosol challenge with all strains tested.[208,211] Nevertheless, there is concern that naturally occurring or genetically engineered strains might circumvent protection seen with a single component PA-based vaccine.

Another approach has been to develop live vaccines for human as live vaccine protects experimental animals better than does the licensed human PA vaccine.[157,164,165,274] The precedent exists for using such a vaccine in humans in Russia and the former Soviet republics. Live attenuated vaccines known to protect experimental animals against anthrax include aromatic compound-dependent, toxigenic, nonencapsulated strains of *B. anthracis*,[274] as well as strains of *B. anthracis*,[196,137,275] *B. subtilis*,[274] *Salmonella*,[276,277] *Lactobacillus*,[278] and vaccinia,[279–281] that have been constructed to contain the cloned PA gene alone or with mutated and inactivated LF and/or EF. A system using killed but metabolically active *B. anthracis* expressing PA and mutated LF and EF protected rabbits against intratracheal challenge with a virulent strain.[282] Finally, other approaches giving protection in animals using PA alone or with LF or EF have included nonreplicating DNA vaccines,[159,283,284] viral replicons,[285] adenovirus vectors,[162,286] bacteriophage,[261] and hepatitis B core particles.[287] However, in the first human trial, a DNA vaccine expressing a mutated PA and mutated LF was poorly immunogenic and showed dose-limiting adverse events.[288]

Attempts to identify antigens other than the PA component of the toxin that contribute to protection are also underway. Spore components[289] and the capsule[290–292] have been shown to offer additional protection in small-animal models, and a capsule vaccine offers some protection in nonhuman primates.[59,293] In more recent studies, a capsule vaccine completely protected nonhuman primates against inhalational anthrax.[294] While some enhancement of protection was observed when PA was combined with spore components, there was no protection when the spore components were used alone,[295–297] and the search for protective spore antigens continues. A recent study showed some protection in mice against challenge with an attenuated strain after vaccination with glyceraldehyde-3-phosphate dehydrogenase or GroEL

isolated from *B. anthracis*.[298,299] In addition, the recent sequencing of the *B. anthracis* genome[300] is anticipated to advance the search for new vaccine candidates using reverse vaccinology to identify surface exposed or secreted antigens.[301]

Although these efforts are in the experimental stage, they may lead to the production of a vaccine that requires fewer doses and provides a more rapid and enhanced immune response and long-lasting immunity In addition, inclusion of other PAs, such as the capsule, with PA, may protect against a broader range of anthrax strains, provide protection of individuals who do not respond optimally to PA, and perhaps increase the efficacy of PA vaccines.

References for this chapter are available at ExpertConsult.com.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,
                    *Plaintiffs,*
          v.
MERCK & CO., INC.,
                    *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S EXHIBITS IN SUPPORT OF MERCK'S RESPONSE TO RELATORS' STATEMENT OF UNDISPUTED FACTS

# EXHIBIT 320

# 38

# Meningococcal Capsular Group A, C, W, and Y Conjugate Vaccines

*Lee H. Harrison, Dan M. Granoff, and Andrew J. Pollard*

Epidemics of meningococcal meningitis were first described in Geneva, Switzerland in 1805[1] and Medfield, Massachusetts in 1806.[2] Such epidemics occurred in the United States until 1944. In sub-Saharan Africa, meningococcal epidemics have been recognized for more than 100 years.[3] In the early 1900s, Flexner[4] demonstrated that intrathecal administration of antimeningococcal serum decreased mortality of meningococcal meningitis. In the past 15 years, huge advances have been made in new meningococcal vaccines, which are changing the face of meningococcal disease epidemiology globally.

Meningococcal disease can progress rapidly. The case fatality rate, which was 70% to 85% before the advent of antibiotics, is now 10% to 15%.[5] Epidemics historically occured every 5 to 10 years in sub-Saharan Africa with incidence rates as high as 1000 per 100,000 population,[3] but the epidemiology has changed dramatically in the past few years. Epidemics have not occurred in the United States and Europe since the 1940s and during the past decade endemic disease incidence rates have fallen to rates not seen in the last 60 years. A group B epidemic in New Zealand with more than 5000 cases during a 15-year period beginning in the early 1990s demonstrated the potential of *Neisseria meningitidis* to cause epidemic disease in an industrialized country. Control measures were unsuccessful in New Zealand until development of an epidemic-specific outer membrane vesicle vaccine and mass immunization.

## BACKGROUND

### Clinical Description and Manifestations

The clinical features of meningococcal disease are highly variable. Classic clinical features of meningococcal disease are fever, rash, and meningitis, but initial presentation is often nonspecific and therefore may be indistinguishable from those of other bacterial, rickettsial, or viral infections.[6,7] In fact, many serious cases of meningococcal disease are initially misdiagnosed as a benign viral illness, which can have devastating consequences because rapid progression to life-threatening disease may follow within hours.[7]

The most common clinical manifestation is acute bacterial meningitis.[8] Older children and adults typically have an abrupt onset of fever, headache, photophobia, myalgias, and malaise. Seizures occur in approximately 20% of patients. Signs of altered consciousness, such as hyperactivity or lethargy, can be prominent. Nuchal rigidity is a common sign except in infants in whom a more gradual onset of fever, poor feeding, and lethargy are the typical initial complaints, and a bulging fontanel may be the major sign of central nervous system involvement. A rash is present in the majority of cases of meningococcal disease, which consists of typical petechiae or purpuric lesions that usually are most apparent on the chest, upper arms, and axillae.[9] Maculopapular rashes also are common and may occur early in the absence of petechiae.

Among patients with meningococcal disease, 10% to 20% have severe sepsis or meningococcemia. Meningitis may be absent, but the organism is widely disseminated in the bloodstream and in multiple organs. Spreading purpura heralds signs and symptoms of septicemia with rapid onset of hypotension and signs of multiple organ failure, although not all patients with shock or hypotension have purpura. White blood cell counts may be very high, normal, or low, and a prominence of immature band forms is often present. At the time of autopsy, acute adrenal hemorrhage may be present (Waterhouse-Friderichsen syndrome).

Up to 15% of patients with meningococcal disease have pneumonia, which is most commonly associated with capsular group Y strains.[10] In the absence of a characteristic rash and bacteremia, the cause of the pneumonia may go unrecognized because the clinical microbiology laboratory may not report isolation of *N. meningitidis* from oropharyngeal secretions as it is considered normal flora. Less-common manifestations of meningococcal disease include myocarditis, endocarditis, or pericarditis; arthritis; conjunctivitis; urethritis; pharyngitis; and cervicitis. Late in the course of treated disease, arthritis or pericarditis may occur as a result of immune complex formation. The case fatality rate from severe meningococcemia can be as high as 40%. More commonly, the course of meningococcal disease is less fulminant.

## Complications of Meningococcal Disease

Approximately 10% to 20% of patients who survive meningococcal disease have permanent sequelae. In a multicenter study of 146 children surviving meningococcal infection, one required amputation of toes or all four extremities; 14 developed skin necrosis (four required skin grafting); 14 developed bilateral ($n = 8$) or unilateral ($n = 6$) deafness; four developed ataxia; and three developed hemiplegia.[6] Patients with certain genetic polymorphisms have an increased risk of dying or developing permanent sequelae (see subsequent text).[11] Patients with meningococcal meningitis who do not develop septic shock are less likely to die or have these sequelae (<10%), but they are at risk of developing neurosensory hearing loss, mild to moderate cognitive deficits, or seizure disorders.[12–17] In a study of UK children who survived group B meningococcal disease, approximately 9% had major disabling sequelae as compared with 2% of matched control children.[17] The risk of neurologic complications with meningococcal meningitis is generally lower than that of patients with meningitis caused by *Haemophilus influenzae* type b (Hib) or *Streptococcus pneumoniae.*[18–20]

## Bacteriology and Molecular Epidemiology

Weichselbaum was the first to culture meningococcus from patients with meningitis in 1887.[21] The organism is a Gram-negative, encapsulated, oxidase-positive, aerobic diplococcus that naturally infects only humans.[22] Meningococci are usually grown on heated blood agar or Mueller-Hinton media in an

619

atmosphere containing 5% to 10% carbon dioxide. Catlin-6 medium[23] and Frantz medium[24] also have been used as defined and partially defined liquid culture media, respectively. Thirteen serologically distinct meningococcal capsular groups were reported on the basis of the immunochemistry of the polysaccharide.[23,25] However, what had been designated as group D was recently found to be an unencapsulated variant of group C; therefore, there are 12 known meningococcal capsular groups: A, B, C, E (formerly known as 29E), H, I, K, L, W (formerly known as W-135), X, Y, and Z.[27] Organisms with capsular groups A, B, C, W, X, or Y are responsible for almost all cases of disease.[28]

For epidemiologic purposes, meningococci have been further classified into serotypes and serosubtypes on the basis of the immunological reactivity of the PorB and PorA outer membrane proteins, respectively.[29-33] The accepted nomenclature lists the capsular group, PorB serotype, and PorA serosubtype, each separated by a colon (e.g., B4:P1.7,4). The VR1 (loop 2) and VR2 (loop 4) encoded epitopes of PorA are given in order after the prefix P1.x, separated from one another by a comma.[34,35] Although phenotyping reagents for capsular group, type, and subtype are available,[36] these are not comprehensive. PorA subtypes are further classified into variants that cannot be classified serologically and can be defined by VR1 and VR2 gene sequence typing.[37] Another outer membrane protein, FetA, an enterobactin receptor, is also used for typing.[38-40] Sequencing of the meningococcal factor H (fH) binding protein gene has also been shown to provide additional evolutionary[41,42] and genomic epidemiologic information about meningococcal strains.[43] Meningococci also can be divided into immunotypes on the basis of variation in the lipooligosaccharide structure.[44]

The meningococcus is naturally competent for transformation with DNA, which provides a mechanism for horizontal exchange of DNA.[45,46] As a consequence, the organism has a highly panmictic population structure[47] and exchanges genes encoding key antigens that are used in the serologic characterization of isolates and as vaccine components.[40,48-50] The facility to exchange genes that encode for capsule and outer membrane proteins has implications for vaccine escape by virulent clones.[40,51,52]

For analysis of genetic lineage of isolates, multilocus sequence typing (MLST) is a commonly used method. MLST capitalizes on nucleotide sequence analysis to index variation based on sequence polymorphisms in housekeeping genes.[53,54] Despite the capacity of *N. meningitidis* to acquire DNA through horizontal gene transfer, a relatively small number of MLST-defined genetic lineages cause most invasive meningococcal disease (IMD).[28] This paradox may be explained by the presence of restriction modification systems that present a differential barrier to horizontal gene transfer and lead to the observed population structuring.[55]

Whole genome sequencing is replacing traditional molecular methods for meningococcal strain characterization. One of the most notable features of the meningococcal genome is the large number of repetitive elements, presumed to contribute to genome fluidity, and more than 100 putative phase-variable genes.[56] These features make an important contribution to the antigenic variability and phenotypic adaptability of the organism.

## Risk Factors for Disease and Carriage

The meningococcus colonizes the pharynx of humans and has no other known environmental niche. The organism is usually a harmless commensal, and there are major differences in carriage rates by age, geography, and time.[57-61]

Carriage rates are usually highest among adolescents and young adults.[62-65] Aerosol droplets or direct contact leads to transmission of the meningococcus from person-to-person through respiratory secretions and requires close contact, such as kissing. Viral respiratory infections,[66-69] exposure to tobacco smoke[70-72] or indoor firewood stoves,[73] bar or discotheque patronage, and binge drinking[71,74-77] are all associated with increased rates of meningococcal carriage or disease. There are a variety of plausible mechanisms for the association between these environmental and behavioral factors and meningococcal infection. Respiratory viruses and tobacco smoking cause alterations in the mucosal surface that enhance bacterial binding or decrease the ability of the host to clear the organism from the nasopharynx. Bar patronage and binge drinking could increase transmission through crowding, coughing caused by exposure to tobacco smoke, and other close contact. In the United Kingdom, being a university student,[78] a freshman living in a university residence hall,[79] and intimate kissing with multiple partners were associated with an increased risk of acquiring meningococcal carriage or disease. These data suggest that behavior, not age or gender per se, is the main determinant of meningococcal carriage in this population. However, children with a history of preterm birth[74] and patients with HIV infection are at increased risk of developing meningococcal disease, which demonstrates that comorbidities can affect risk of disease as well.[80,81,81a]

## Pathogenesis

As mentioned above, most IMD is caused by bacteria from a limited number of hypervirulent lineages.[58,5] Carriage isolates, in contrast, belong to a broader group of lineages, many of which have been rarely associated with disease.[60,81] These observations indicate that certain meningococci are genetically predisposed to cause disease. In addition, IMD is, with rare exception, caused by encapsulated strains, whereas colonizing strains often do not require capsule, which underscores the importance of the meningococcal capsule as a virulence factor.[63,84]

Following attachment to pharyngeal mucosal cells, the organism replicates and establishes a carrier state. Pili seem to be the most important adhesin, and two opacity-associated proteins (Opa and Opc), lipooligosaccharide, and interbacterial interactions (via PilX) facilitate subsequent tight attachment.[85-87] Attachment to epithelial cells is mediated by specific receptors such as CD46[87] and carcinoembryonic antigen receptors.[88] Attachment initiates loss of piliation by the bacteria as well as cytoskeletal rearrangements in the host cell that result in internalization of the bacteria within membrane-bound vesicles by endocytosis.[85,89] Once the organism has established the carrier state, the likelihood of acquiring IMD depends on the virulence of the particular isolate, host factors affecting innate susceptibility,[11] and the presence or absence of serum bactericidal antibodies.[90] Once the organism enters the bloodstream, the spleen is involved in bacterial clearance. Because of impaired clearance, patients with asplenia or hyposplenic function may be at increased risk of severe meningococcal disease.[91]

The complement cascade is activated by serum antibodies via the classical pathway, which results in opsonization and bacteriolysis of meningococci. In the absence of specific antimeningococcal antibodies, these complement-mediated functions also can be activated by the alternative pathway.[92] Given the central role of complement proteins in host defenses against invasive *N. meningitidis* disease, persons with underlying deficiencies of properdin, C3, or the late complement components (C5 through C9) are at greatly increased risk of acquiring meningococcal disease.[93-100]

fH is an important downregulatory molecule in the alternative complement pathway cascade. fH binds specifically to *N. meningitidis* and enhances resistance of the organism to serum bactericidal activity (SBA).[101,102] Binding of fH, therefore, is a mechanism by which the organism can evade complement-mediated killing. Polymorphisms within the complement fH and complement fH-related protein 3 have been found in genome-wide studies to be associated with a lower risk of meningococcal disease.[103] Two vaccines that were recently licensed for prevention of meningococcal group B disease target a ligand on meningococci that binds fH to the bacterial surface (referred to as fH binding protein).

Meningococcal disease causes rapidly progressive cutaneous hemorrhage and skin necrosis, disseminated intravascular coagulation, and shock. Many factors contribute to overwhelming meningococcal disease, but the most important are the rapid doubling time of the bacteria and their propensity to release endotoxin-rich outer membrane vesicles (blebbing), which results in very high levels of endotoxin in the circulation and porin proteins and DNA.[104] These trigger various pattern recognition receptors expressed on monocytes and macrophages (see subsequent discussion), which results in proinflammatory cytokine release and activation of fibrinolytic and complement pathways. Endotoxin (lipooligosaccharide) is the most potent toxic molecule,[105] and levels of lipooligosaccharide in the circulation correlate directly with severity of clinical manifestations and case fatality rate.[106]

## Host Genetic Factors

Activation of the complement cascade and binding of complement components to the surface of *N. meningitidis* are critical host defenses against developing IMD. Deficiency of proteins in the complement cascade, particularly components of the membrane attack complex, such as C5, C6, or C7, has long been recognized as an important risk factor for IMD. Complement deficiency was recognized in 0.3% of 297 patients with meningococcal disease in the United Kingdom.[107] Other smaller studies have found no complement-deficient patients and in one population-based study, three (19%) of just 16 patients with meningococcal disease had a low complement 50 level ($CH_{50}$).[108–110] In another study, complement-deficient persons had a more than 1000-fold higher lifetime risk of developing IMD than the general population.[111] Complement deficiency is more common (30% or more) among individuals with disease caused by less-common capsular groups (X, Y, Z, W, 29E).[95,112] In addition, the complement-deficient patients frequently had recurrent episodes of IMD as teenagers or adults, and their disease was often caused by strains with capsular groups that rarely cause disease in the general population. Accordingly, complement deficiency should be considered in patients with recurrent meningococcal disease and patients with disease caused by strains with less-common capsular groups. Deficiencies in serum levels of C3 or C4, properdin, or alternative complement pathway activation from factor D deficiency are also associated with increased risk of IMD.[95,113] Mannose-binding lectin (MBL)[114–117] is a constituent of serum that binds to meningococci and activates the complement cascade.[111] Although there are conflicting data,[78] persons with low serum concentrations of MBL[113] or MBL polymorphisms associated with diminished function[115] are reported to be at increased risk of IMD.[118,119] Because the prevalence of polymorphisms of MBL is much greater in the general population than complement deficiencies, these structural variants of MBL may have an important role in overall susceptibility to meningococcal disease in the population, particularly in children and

adolescents who have not yet acquired serum bactericidal antibodies.

Toll-like receptors (TLRs) are members of the innate immune system with specificity for different microbial molecules. TLR4 binds bacterial lipopolysaccharide and is responsible for innate host response to Gram-negative infections. Heterozygous missense mutations of TLR4 have been reported to be more frequent in patients with meningococcal disease than in the general population.[120]

A variety of other genetic polymorphisms are reported to increase the severity of meningococcal disease without affecting the risk of acquiring meningococcal disease.[11] These include a receptor on neutrophils for immunoglobulin (Ig) $G_2$ or $IgG_1$, termed $Fc\gamma$ receptor IIA ($Fc\gamma RIIA$), which affects the ability of the phagocytic cell to clear opsonized bacteria from the bloodstream.[121–123] Several studies found an association between the $Fc\gamma RIIA$-R131 polymorphism, which binds IgG2 poorly, and an increased risk of severe forms of meningococcal disease.[121–125] Polymorphisms of the interleukin-1 gene family,[126] genotypes associated with high expression of interleukin-10[127] or with altered production of tumor necrosis factor-$\alpha$,[127,128] and the presence of a specific allele of the angiotensin-converting enzyme are reported to increase the risk of severe meningococcal disease.[129] While most of these associations were identified in small sample sets and require independent confirmation, the accumulating data support a genetic component of altered host responses in otherwise healthy persons that underlies the disparities in clinical outcomes of persons exposed to meningococci. As mentioned above, mutations related to complement fH are associated with a lower risk of meningococcal disease.[103]

## DIAGNOSIS

Confirmation of meningococcal disease is usually achieved through conventional cultures of blood, cerebrospinal fluid (CSF), or other infected sites. Gram staining to demonstrate the characteristic Gram-negative diplococcus also can be used for diagnosis. Latex agglutination testing for detection of meningococcal capsular polysaccharides in serum or CSF commonly leads to false-negative results.

A polymerase chain reaction (PCR) assay that detects meningococcal DNA in normally sterile body fluids can be used to establish the diagnosis and is particularly useful in the setting of negative cultures because of previous antibiotic use.[130] Capsular group-specific PCR assays are available to discriminate among capsular groups A, B, C, W, X, Y, Z, and 29E.[131–133]

In Europe, a substantial proportion of meningococcal cases are detected using PCR, as opposed to the United States where PCR is less commonly used. In the United Kingdom, for example, 55% of all cases were diagnosed based on positive PCR.[134,135] Using PCR for diagnosis of meningococcal disease has dual benefits: it provides a more accurate picture of disease burden and establishes the diagnosis in a greater proportion of cases.

## TREATMENT AND PREVENTION

### Antibiotics

Although many antimicrobial agents are effective for management of meningococcal disease, intravenous aqueous penicillin was traditionally considered the therapy of choice once meningococcal disease is confirmed. Although the clinical importance is unknown, some meningococcal isolates from the United States have intermediate susceptibility to penicillin (minimum inhibitory concentration: 0.1–1.0 $\mu g/mL$).[9,136]

**Appx18649**

In Belgium during 2011–2012, the frequency of clinical isolates with decreased susceptibility to penicillin increased; however, there was no resistance to expanded-spectrum cephalosporins, such as ceftriaxone.[137] Among 466 meningococcal isolates from the 10 Active Bacterial Core surveillance sites in the United States from 2004, 2008, 2010, and 2011, 10.3% had intermediate susceptibility to penicillin, 0.6% (three isolates) were resistant to penicillin, and all were susceptible to ceftriaxone.[138] The uncertainty about the clinical significance of intermediate susceptibility to penicillin, the more convenient dosing schedule, and the availability of generic ceftriaxone make it a reasonable option for therapy of meningococcal disease, even after the diagnosis has been established. In fact, penicillin is uncommonly used in the United States and ceftriaxone is the recommended antimicrobial agent for treatment of meningococcal disease in the United Kingdom.[138a] Early initiation of antibiotic therapy and attention to circulatory status in patients suspected of having meningococcal infection may help decrease morbidity and mortality.[135,140] Because the clinical features of meningococcal disease can overlap those of bacterial meningitis or sepsis caused by other bacterial pathogens, depending on the age of the patient, clinical manifestations, exposure history, the results of Gram stains of CSF or petechial hemorrhages, and the presence or absence of other epidemiologic risk factors, broader initial empirical therapy is standard before the diagnosis is confirmed.[9] Antibiotic treatment for 5 to 7 days is adequate therapy for most systemic meningococcal illnesses. In resource-poor settings, single-dose intramuscular chloramphenicol in oil or ceftriaxone has been effectively used.[141]

## Other Therapies

Patients with purpura fulminans have the highest case fatality rates (as high as 50%). This syndrome is a result of a massive release of proinflammatory mediators[142] and development of shock and disseminated intravascular coagulation from a procoagulant state with local accumulation of thrombi in small and large arterial vessels.

One therapy for severe systemic meningococcal infection focused on activated protein C, an endogenous anticoagulant that suppresses excessive thrombosis and fibrin formation.[143,144] Although recombinant human activated protein C (drotrecogin alfa [activated]) was licensed based on a clinical trial, additional studies failed to show a survival benefit and the drug was withdrawn from the market.[144–147]

Dexamethasone therapy for 4 days, with the first dose given before the initiation of antibiotic therapy, is reported to decrease the rate of neurosensory deafness in patients with meningitis caused by Hib. In a randomized controlled trial in adults with bacterial meningitis, dexamethasone use also was associated with decreased mortality. A statistically significant benefit was seen only in patients with pneumococcal meningitis, but the study was not sufficiently powered to demonstrate efficacy for other pathogens.[148] High doses of corticosteroids have been demonstrated not to be beneficial in septic shock. Although low-dose corticosteroids are often administered,[149,150] a randomized, controlled study in patients with septic shock (Corticosteroid Therapy of Septic Shock [CORTICUS] trial) failed to demonstrate a benefit in overall 28-day mortality rate (33% for hydrocortisone recipients vs 31% for placebo recipients). Although the duration of shock was shorter in patients who received corticosteroids, adverse events, including new episodes of sepsis and septic shock, were more frequent in the hydrocortisone group. Sprung and colleagues concluded that for the majority of patients with septic shock, the potential advantages of corticosteroids do not outweigh the adverse risks.[151]

## Chemoprophylaxis

Close contacts of a patient with meningococcal disease are at greatly increased risk of developing disease. The risk is greatest in household contacts and other close contacts exposed to oral secretions and in coattendees at child daycare. The risk of transmission to healthcare workers is low, but persons performing mouth-to-mouth resuscitation and unprotected healthcare workers exposed during management of endotracheal tubes are at increased risk.[152] Numerous cases of meningococcal disease among microbiology laboratory workers, primarily those who processed liquid cultures on an open bench, also have been reported.[153–155] In one report of 16 probable laboratory-acquired cases, 50% were fatal.[154] Rifampin, ceftriaxone, and ciprofloxacin eradicate nasopharyngeal *N. meningitidis* colonization, and these agents are recommended for chemoprophylaxis of close contacts.[5] Fluoroquinolone-resistant isolates were reported in 2008 in North Dakota and Minnesota, which prompted the Centers for Disease Control and Prevention (CDC) to recommend ceftriaxone, rifampin, or azithromycin for eradication of meningococcal carriage in areas where resistance has been identified.[156,157]

Chemoprophylaxis should be offered to household members and to other persons with a history of prolonged close contact. Prophylaxis of child daycare contacts and staff is recommended in the United States[5] but not in the United Kingdom.[158] Because the risk of disease in contacts is highest in the first week after onset of disease in the index patient, prophylaxis should be administered to contacts as soon as feasible, preferably within 24 hours of identification of the index patient.[267] Because penicillin therapy does not reliably eradicate nasopharyngeal colonization, additional antimicrobial treatment is recommended at the time of hospital discharge for eradication of colonization in patients treated exclusively with penicillin. Contacts who were previously immunized with meningococcal vaccines should still be considered for chemoprophylaxis because primary vaccine failure or lack of serum antibody persistence, or both, may render vaccinated persons susceptible to disease.

Chemoprophylaxis given to large populations in response to outbreaks of meningococcal disease may be of limited effectiveness in lowering the risk of disease, particularly as a standalone measure, and increases the likelihood of emergence of antimicrobial resistance. In small school-based outbreaks, chemoprophylaxis to all people within the population may be considered. Settings in which mass chemoprophylaxis may be of some benefit include relatively small populations that have limited mixing with outside populations and in which high antibiotic coverage can rapidly be achieved. If undertaken, the antibiotic should be administered to all persons at the same time.

## EPIDEMIOLOGY

### Incidence and Public Health Burden

Although meningococcal disease is a global problem that occurs in all countries,[28] the true burden of disease is unknown for many parts of the world because of inadequate surveillance.[159–161] The epidemiology is highly variable, dynamic, and fluid and is influenced by natural variation and immunization policy. In addition, the epidemiology varies substantially by capsular group. Group A meningococcus was historically remarkable for its ability to cause large epidemics. Since World War II, epidemic meningococcal disease caused by group A organisms largely has been confined to developing countries, most often reported from the meningitis belt of sub-Saharan Africa. In this region, with recent widespread use

of a low-cost meningococcal A conjugate vaccine (see below), group A epidemics have largely been prevented.[162] Capsular group X and W strains now also cause substantial rates of disease in Africa. Group C disease, which in the past has rarely caused outbreaks in sub-Saharan Africa, has emerged in Nigeria and Niger.[163-166]

In the 1960s and 1970s, high rates of capsular group A disease were reported in China, Mongolia, and Nepal. As recently as 2005, group A epidemics were reported in India, and a meningococcal capsular group A outbreak occurred in the Philippines in 2004 and 2005, with 98 cases (33% mortality) reported to the World Health Organization (WHO).[167]

In Europe, most cases of meningococcal disease are sporadic and currently caused by capsular group B and C strains. However, some countries in Europe have experienced an increase in disease caused by group Y and W strains. During 2007–09, the proportion of invasive meningococcal cases caused by group Y strains in England and Wales increased from 3% to 6%, which was higher than in the previous three decades.[168] Nearly 40% of patients had underlying medical conditions. A high proportion of patients 65 years of age and older had pneumonia. Strains belonging to the ST-23 clonal complex were responsible for most of the increase. Other European countries have also reported increases in group Y disease.[169] The burden of endemic meningococcal disease varies substantially among countries and has declined dramatically in countries that introduced group C meningococcal conjugate vaccines. Using culture-confirmed cases, countries with the highest reported incidence rates per 100,000 population in 2012 were Lithuania (1.8), the United Kingdom (1.4 cases), and Ireland (1.3).[179] The capsular group distribution was group B (68% of cases), group C (17%), group Y (8%), and group W (4%).

Although a relatively small proportion of meningococcal disease in Europe is caused by group W, since 2009 the United Kingdom has experienced a rapid increase in group W disease, from 1.8% of cases in 2008–09 to 15% of cases 2013–14.[171,172] The increase was a result of clonal expansion of an ST-11 clonal complex strain. Analysis of whole-genome sequencing data indicated that the strain was not a descendent of the Hajj clone but more related to ST-11 group W strains that had been circulating pre-Hajj.[52,173] This observation is in contrast to a brief increase in group W disease that occurred in the early 2000s from the Hajj clone.[52] As a result of the increase and as discussed further below, a quadrivalent MenACWY immunization campaign for 14- to 18-year-olds was initiated in the United Kingdom in August 2015.[174]

Fig. 38.1 shows the annual incidence of meningococcal disease in the United States between 1984 and 2014.[175] The annual incidence of meningococcal disease since 2000 has been remarkably low, with an incidence in 2013 of 0.14 per 100,000.[176,177] The reasons for the decrease are not known but are likely multifactorial and include decreases in active and passive tobacco smoking, changing patterns of antibiotic use, increased use of influenza vaccines, declines in meningococcal carriage, and lack of novel antigenic variants among virulent strains to which the population does not have immunity.[178] A study from Maryland found that increases in capsular group C and Y disease incidence during the 1990s were associated with antigenic shifts involving key meningococcal outer membrane proteins.[40] Capsular switching from one meningococcal capsular group is also associated with emergence of meningococcal disease globally.[52] Meningococcal disease epidemiology is naturally cyclical; how the incidence will change in the future is unknown.

The age-specific incidence of meningococcal disease results from an interplay between the degree of immunity in the population and virulence of circulating strains. Disease



**Figure 38.1.** Incidence of meningococcal disease, 1982–2012. *(From Adams DA, Thomas KR, Jajosky RA, et al. Summary of notifiable diseases—United States, 2014. MMWR Morb Mortal Wkly Rep. 2016;63:1–152.)*



**Figure 38.2.** Rate per 100,000 of meningococcal disease, by age group, in the United States, 2002–2011. *(Cohn AC, MacNeil JR, Clark TA, et al. Centers for Disease Control and Prevention. Prevention and control of meningococcal disease: recommendations of the Advisory Committee on Immunization Practices [ACIP]. MMWR Recomm Rep. 2013;62:1–28.)*

incidence is highest among infants who have not yet acquired natural immunity. In the European Union, the reported rate of meningococcal disease (primarily group B) during 2012 among children younger than 1 year of age and between 1 and 4 years of age were 11.4 and 3.7 cases per 100,000 population, respectively.[170] During the same period, the incidence in the United States was much lower, 1.86, 0.41, and 0.20 among children younger than 1 year of age, children 1 year of age, and children 2 to 4 years of age per 100,000 population, respectively.[179] In the United States and Europe, there were peaks in incidence among adolescents and young adults, which have diminished over time (representative data for the United States is shown in Fig. 38.2).[5]

In temperate climates, rates of meningococcal infections are highest during the winter months. This association may be a result of closer personal contact during the winter months, lack of ventilation, or an increase in upper respiratory infections, all factors that facilitate transmission of or invasion by the organism, or both.

Appx18651

**624    SECTION 2    Licensed Vaccines and Vaccines in Development**

## Meningococcal Capsular Group A Disease

Until recently, Group A strains of *N. meningitidis* were the major cause of epidemic and endemic meningococcal disease in the meningitis belt of sub-Saharan Africa, which extends from Senegal on the west coast to Eritrea on the east coast (Fig. 38.3).[28,180] These strains rarely cause disease in the United States[177,181] or in Europe.[170] A notable recent exception is Russia, where group A isolates were reported to account for the majority of isolates in Moscow as recently as 2010.[182-184]

The annual incidence of disease during group A epidemics in sub-Saharan Africa can exceed 1000 per 100,000 population, or 3000-fold higher than the current incidence of meningococcal disease in the United States. The case fatality rate during group A epidemics in Africa historically varied between 10% and 15%.[5] With the recent introduction of a monovalent group A conjugate vaccine, the incidence of group A disease in the meningitis belt has dramatically declined and substantial proportion of disease is now caused by groups W, X, and, more recently C.[163,164] Why disease caused by strains with these capsular groups has increased in the sub-Saharan region and why epidemics begin there with the dry season (generally November or December) and terminate abruptly with the onset of increased humidity and rain (generally June and July) is unknown. Most likely, environmental, host, and microbial factors in combination play a role.[185]

## Meningococcal Capsular Group B Disease

See Chapter 39.



**Figure 38.3. Sub-Saharan African meningitis belt.** Countries shown in yellow experience explosive epidemics of meningococcal disease every 5 to 10 years that are usually caused by capsular group A strains. *(Courtesy the World Health Organization.)*

## Meningococcal Capsular Group C Disease

Group C strains are a major cause of disease in many parts of the world, including North America, South America, Europe, and Australia, with the proportion of group C isolates varying by country. However, group C disease has declined substantially in countries that have introduced meningococcal conjugate vaccines into routine immunization schedules. For example, Canada, Australia, the United Kingdom, The Netherlands, and many other countries in Europe have experienced decreases in group C disease since the introduction of monovalent group C conjugate vaccines.[186-191] In 2012, 17% of disease in Europe was caused by group C strains, with 69% being caused by group B strains. More recently, group C conjugate vaccine was introduced into the routine pediatric immunization schedule in Brazil, with subsequent decreases in the incidence of group C disease.[192,193] In the United States, in part because of use of quadrivalent conjugate vaccines in adolescents, the incidence of disease in 2012–2013 caused by group C, in addition to groups W and Y, was only 0.05 per 100,000 population in persons 11 to 19 years old.[194] However, in 2013 group C strains still accounted for approximately 30% of all meningococcal disease in the United States.[195]

Group C meningococcus has periodically caused disease in the African meningitis belt but has not typically been a major cause of disease in this region. However, recent epidemics of group C disease have occurred in Niger and Nigeria.[163,164] Outbreaks of group C meningococcal disease have also been reported among men who have sex with men in the United States and Europe.[196-202a]

## Meningococcal Capsular Group Y Disease

Group Y strains cause all the major meningococcal clinical syndromes, but patients with group Y disease are more likely to have pneumonia than patients with disease caused by strains with other capsular groups.[168,203,204] In the United States, the incidence of group Y disease increased substantially in the 1990s and by 1996 accounted for 33% of isolates.[205,206] In 2013, approximately 15% of IMD in the United States was caused by group Y strains.[195] Group Y strains have also been reported as a cause of a substantial proportion of disease in Colombia, parts of Canada,[207,208] South Africa,[209] Sweden,[210] and other European countries.[211] For reasons that remain unexplained, disease caused by group Y strains remains relatively rare in most other parts of the world despite observations that group Y strains are common causes of pharyngeal colonization.[95,64,212-214]

## Meningococcal Capsular Group W Disease

In 2012, the nomenclature for what was previously referred to as group W135 was simplified to group W.[27] Until 2000, group W strains were a relatively uncommon cause of invasive disease worldwide and had not been known to cause outbreaks. That changed in 2000 and 2001, when outbreaks of group W disease occurred among Hajj pilgrims in Mecca, Saudia Arabia, where several million pilgrims from all the world gather each year in crowded conditions.[215-218] A group W clone belonging to the ST-11 complex caused the outbreak. ST-11 complex isolates typically expresss group C polysaccharide, which suggested that a group C to group W capsular switch had occurred at some point.[52,219] Group W strains belonging to the ST-11 complex were also isolated from patients with meningococcal disease in other African countries and globally.[220-223] In 2002, Burkina Faso reported more than 10,000 cases caused by group W isolates.[224,225] A study of a global collection of group W isolates dating from 1970 to 2013

Appx18652

using whole-genome sequencing suggested that the vast majority of ST-11 complex group W isolates arose from an ancestral strain that had undergone horizontal gene transfer events in the capsular operon.[219] By 2000, another series of horizontal gene transfer events involving, for example, fH binding protein, led to a strain that caused the Hajj outbreak and subsequent disease globally. W ST-11 strains unrelated to the Hajj outbreak contribute a significant proportion of W ST-11 cases globally.[52]

Group W strains now cause a substantial proportion of meningococcal disease in the African meningitis belt. For example, 61% of meningococcal cases in 2014 were caused by group W strains.[225] The recent emergence of non–group A strains in the meningitis belt comes in the face of the success of the monovalent group A meningococcal conjugate vaccine, which underscores the need for multivalent meningococcal vaccines for the meningitis belt.

An increase in disease caused by group W strains has also been reported from Argentina[227] and southern Brazil.[228] For example, the proportion of meningococcal cases caused by group W strains among children in Argentina increased from 7% in 2006 to 28% in 2008.[229] The proportion of cases caused by group W strains in the United Kingdom has increased, with 15% of cases being caused by group W during 2013–2014.[171]

Although an outbreak of 14 cases of group W meningococcal disease occurred in Florida between 2008 and 2009,[230] group W disease remains an infrequent cause of disease in the United States; for the period 2006–10, 3% of meningococcal infections in the United States were caused by group W strains.[181]

## MENINGOCOCCAL IMMUNITY
### Natural Acquisition of Humoral Immunity

Serum antibodies confer protection against meningococcal disease by activating complement-mediated bacteriolysis and, possibly, by enhancing phagocytosis (opsonic activity).[231] Naturally acquired serum antibodies are elicited by asymptomatic pharyngeal carriage of pathogenic and nonpathogenic meningococci,[232–234] or *Neisseria lactamica*.[62,235–237] Anticapsular antibodies stimulated by gastrointestinal colonization with *Escherichia coli* or *Bacillus pumilus* strains with cross-reacting polysaccharides also may contribute.[238–240]

Considerable data indicate that persons with SBA are protected from developing meningococcal disease (see below).[241]

### Passive Immunization

Antibodies administered to infant rats passively conferred protection against meningococcal bacteremia.[242–252] However, studies of the ability of passive immunization to confer protection against bacteremia in infant rats likely overestimate protective activity because binding of certain complement downregulating proteins, such as fH, to *N. meningitidis* is specific for human fH (see below).

### Immunity Following Active Immunization
#### Methods Used to Measure Vaccine Immunogenicity and Memory

**Serum Antibody.** Antigen-binding assays have been used to assess meningococcal vaccine immunogenicity.[253,254] Some investigations have suggested that an anticapsular antibody concentration of 2 µg/mL or greater is sufficient to confer protection against meningococcal disease.[255,256] The results,

however, of antigen binding assays such as enzyme-linked immunosorbent assay do not consistently distinguish between bactericidal and nonbactericidal anticapsular antibodies.[243,244,254,257–259] Therefore, serologic assessments of meningococcal vaccine immunogenicity rely on measurements of complement-mediated SBA. In this assay, the test serum is heated to inactivate endogenous complement. Dilutions of the test serum are incubated for 60 minutes with the bacteria and a source of exogenous complement. The results are expressed as the dilution of serum giving 50% bacterial killing. The seminal study by Goldschneider and colleagues,[98] which demonstrated a correlation between naturally acquired SBA and protection against developing meningococcal disease, used endogenous complement (a fixed dilution of the human test serum that had been obtained to preserve endogenous complement and that had not been heated). For many years, infant rabbit serum was used as an exogenous source of complement for testing vaccine-induced bactericidal activity because of the difficulty of finding normal human serum without antibody that is suitable as a complement source for the assay.[216,260] Titers measured with rabbit complement are much higher than with human complement.[261] One reason is the presence of downregulatory complement proteins in human serum, such as fH, which demonstrate species specificity in binding to the bacteria.[101,102] In the absence of fH binding, the meningococcus is more susceptible to complement-mediated bactericidal activity.

**Immunologic B-Cell Memory.** Unconjugated polysaccharides elicit serum antibody responses largely without T-cell help (so-called T-cell–independent antigens).[262,263] Conjugation of a polysaccharide to a carrier protein confers T-cell–dependent properties to the polysaccharide. The immunologic hallmark of polysaccharide-protein conjugate vaccines is their ability to induce memory B cells capable of responding with a booster antibody response to a subsequent exposure to the polysaccharide. In practice, measuring serum antibody responses to an unconjugated polysaccharide vaccine "probe," following prior immunization with a conjugate, assesses induction of immunologic memory by the conjugate vaccine. Typically a reduced dose of the polysaccharide vaccine is used (as low as 1 µg),[264] based on the theory that a suboptimal immunogenic dose may be more useful for distinguishing memory antibody responses from antibody responses in subjects not primed by the conjugate vaccine.

The ability of a conjugate vaccine to prime for memory antibody responses on subsequently encountering meningococci was thought to be an important second mechanism of protection from developing disease in persons whose serum antibody concentrations had declined to subprotective levels.[265] However, persistence of functional antibody is now considered to be the most important determinant of MenC conjugate vaccine effectiveness, which casts doubt on the ability of memory antibody responses alone to protect against meningococcal group C disease.[266] The inability of memory antibody responses alone to confer protection is because it takes a minimum of 5 to 7 days to elicit a serum group C memory antibody response[264] and most IMD occurs within a few days after exposure to the organism.[90,267,268]

Induction of B-cell memory, therefore, has limited value as a potential mechanism of protection. In addition, the administration of test doses of unconjugated polysaccharide vaccine to assess memory antibody responses may be harmful by depleting antigen-specific memory B cells and impairing subsequent antibody responses.[269]

Induction of memory B cells is accompanied by avidity maturation, which reflects the effects of T cells on B-cell somatic mutation of antibody variable region genes. Memory

TABLE 38.1 Antibody Avidity in Relation to Age and Vaccine[a]

| Vaccine | Age Group | Mean Avidity Constant (nM⁻¹) ± 2 SE | | |
|---|---|---|---|---|
| | | Pre | 1 Mo Post | 6 Mo Post |
| **GROUP C ANTIBODY** | | | | |
| MPSV4 | Adults | $15 \pm 3$ | $26 \pm 4$ | ND |
| MPSV4 | 3 y | ND | $16 \pm 2$ | $17 \pm 2$ |
| MCV4-DT | 2 y | ND | $22 \pm 3$ | $28 \pm 3$ |
| **GROUP W135 ANTIBODY** | | | | |
| MPSV4 | 3 y | ND | $23 \pm 2$ | $21 \pm 2$ |
| MCV4-DT | 2 y | ND | $27 \pm 3$ | $31 \pm 4$ |

[a]Vaccines: MPSV4, a quadrivalent meningococcal polysaccharide vaccine; MCV4-DT, a quadrivalent meningococcal conjugate vaccine with each of the four polysaccharides independently conjugated with diphtheria toxoid (see Table 38.3). At 1 and 6 months postvaccination, the mean antibody avidity is higher in the MCV4-DT group than in the MPSV4 group ($P = .002$ for capsular group C; $P < .02$ for capsular group W135). The increase in mean avidity between 1 and 6 months is statistically significant for the MCV4-DT group ($P < .001$ for group C, and $P < .05$ for W135) but not for the MPSV4 group.
ND, not done.
Data from Granoff DM, Morgan A, Welsch JA. Immunogenicity of an investigational quadrivalent Neisseria meningitidis–diphtheria toxoid conjugate vaccine in 2-year-old children. Vaccine. 2005;23:4307–4314.

B-cell clones with mutated antibody combining sites have increased antibody avidity compared with antibodies elicited by primary immunization. Table 38.1 provides an example of avidity maturation of group C and W anticapsular antibodies in vaccinated children. During the 6 months of follow-up, a significant increase in avidity of the anticapsular antibodies was elicited by a dose of the meningococcal conjugate vaccine but not by a dose of the unconjugated polysaccharide vaccine. Thus, instead of administering a polysaccharide probe to assess induction of antigen-specific B-cell memory, it may be possible to use avidity as a correlate.[270–272] Other correlates include demonstration of booster antibody responses to a second injection of the conjugate vaccine (as demonstrated for groups C, Y, and W after quadrivalent meningococcal conjugate vaccination of adolescents; see later discussion)[273] and detection of antigen-specific peripheral blood memory B-cell responses after vaccination.[274,275] None of these approaches risks induction of antibody hyporesponsiveness or loss of immunologic memory that can accompany group C and, possibly, Y and W polysaccharide challenges.

**Correlates of Protection.** Since the first observations at the turn of the 20th century that some meningococci are serum sensitive while others are serum resistant, and that serum from some individuals has more bactericidal activity than serum from others,[275] it has become accepted that immunity to meningococci can be described by the titer of serum required to kill N. meningitidis in vitro. Epidemiological cohort studies[90] and vaccine evaluation studies[250] provide support for the routine use of a serum bactericidal assay as a correlate of protection. In the widely used assays, survival of meningococci following incubation in the presence of heat-inactivated test serum and an exogenous complement source (usually human or rabbit) is determined.

Fig. 38.4A and B show the percent survival of a group C strain incubated with rabbit complement and different



Figure 38.4. Effect of the addition of human factor H (fH) on survival of Neisseria meningitidis. **A** and **B**, Survival of group C strain 4242 when incubated with rabbit complement and dilutions of serum samples from children immunized with meningococcal polysaccharide vaccine. Open circles, no added human fH; triangles, addition of a negative control complement protein, C1 esterase inhibitor, 25 µg/mL; filled circles, addition of human fH (25 µg/mL).[277] **C**, Bacteremia 18 hours after intraperitoneal challenge of infant rats with group B strain H44/76 (≈1000 colony-forming units [CFU]/rat). Circles, human fH transgenic (Hu fH Tg) rats with serum human fH concentrations of 100–500 µg/mL; triangles, wild-type (WT) control littermates (human fH <12 µg/mL). (Modified from Vu DM, Shaughnessy J, Lewis LA et al. Enhanced bacteremia in human factor H transgenic rats infected by Neisseria meningitidis. Infect Immun. 2012;80:643–650.)

dilutions of test serum obtained 1 month after immunization of two children with meningococcal polysaccharide vaccine. In the absence of added human fH, the bacteria were killed by rabbit complement and antibody at a serum dilution of approximately 1:800 (<50% survival after incubation for 1 hour compared with colony-forming units at time 0). The addition of 25 µg/mL of human fH eliminated the killing by binding to the bacteria and downregulating complement activation.[277] The addition of a negative control complement protein (C1 esterase inhibitor) had no effect on bacterial survival. Wild-type infant rats whose natural fH does not bind to

*N. meningitidis* are naturally relatively resistant to disease caused by many pathogenic group B *N. meningitidis* strains. After treatment with human fH, the rats became susceptible.[277] Human fH transgenic infant rats also are highly susceptible to meningococcal bacteremia, whereas control wild-type litter- mates whose rat fH does not bind to meningococci cleared the bacteremia (Fig. 38.4C). Collectively, these data illustrate one mechanism by which the meningococcus has uniquely adapted to cause disease in humans.

For meningococcal group B strains, there is consensus that only human complement bactericidal assays are reliable for predicting protection against disease.[241] As of 2012, rabbit complement assays were still used in Europe for licensure of new polysaccharide-protein conjugate vaccines against capsu- lar group A, C, Y, or W strains[276,279] and were the basis of infer- ring efficacy for licensure in India of a new group A conjugate vaccine intended for Africa (see subsequent discussion). For group C strains, bactericidal titers as high as 1 : 128 using rabbit complement are needed to ensure that a titer of 1 : 4 is present if measured with human complement.[261] Using estimates of age-specific vaccine effectiveness from the United Kingdom, a titer of 1 : 8 or greater measured with rabbit complement has been suggested as the putative protective threshold following capsular group C conjugate vaccination.[265,286] A titer of 1 : 128 measured with rabbit complement was the basis of inferring efficacy for U.S. licensure of a quadrivalent meningococcal polysaccharide conjugate vaccine for adolescents (MCV4- DT; see subsequent discussion). Because meningococci cause disease only in humans and because of the exquisite human species specificity of binding complement–downregulating molecules by *N. meningitidis* and the corresponding uncer- tainty in inferring vaccine efficacy from bactericidal titers measured with rabbit complement, the U.S. Food and Drug Administration (FDA) requires bactericidal data from assays using human complement to support licensure of new meningococcal conjugate vaccines intended for infants and children.

## History of Meningococcal Vaccine Development

Vaccines offering protection against meningococcal disease were first introduced into routine use in the military more than 40 years ago. Early attempts to develop meningococcal vaccines used killed whole bacterial cells.[281–283] Between 1900 and 1940, several trials were conducted, but the studies were poorly controlled, and, in most cases, it was impossible to tell whether the vaccines conferred protective immunity.[284] Pursuit of a whole-cell vaccine was curtailed by the excessive reacto- genicity of such preparations. Following the successful devel- opment of tetanus and diphtheria toxoid vaccines in the 1930s, the protective potential of crude meningococcal culture filtrates containing inactivated exotoxin was explored.[285,286] These preparations were immunogenic, but they were cer- tainly contaminated with capsular polysaccharide antigens, outer membranes, and endotoxin. Enthusiasm for develop- ment of meningococcal vaccines waned with the early suc- cesses with antibiotic treatment and prevention of secondary cases. By the early 1960s, sulfonamide-resistant isolates of *N. meningitidis* were widespread and represented an important problem among military recruits during the Vietnam War era, which promoted renewed interest in meningococcal vaccine development.[287,288]

During the early 1940s, Scherp and Rake demonstrated that serum from horses immunized with group-specific capsular polysaccharides protected mice against lethal challenge with *N. meningitidis*,[289] but purified preparations of capsular poly- saccharide had failed to elicit antibody responses in humans.[236,291] The poor immunogenicity was subsequently

attributed to the relatively low molecular size of the polysac- charide formulation tested, as studies showed that polysac- charide antigens of high molecular weight induced sufficient antibody responses in humans.[292,293] By the end of the 1960s, Gotschlich and colleagues had developed an alternative approach for the purification of high-molecular-weight meningococcal polysaccharides that was safe and immuno- genic.[294,295] The principal limitation of polysaccharide vaccines is that they do not induce T-cell–dependent immunity. The lack of T-cell immunity has profound implications for the lack of immunogenicity of these vaccines in young children and the inability of polysaccharide vaccines to elicit long-term immunologic memory.[264,296,297] The chemical conjugation of polysaccharides to protein carrier molecules confers a T-cell- dependent immune response.[298] The success of this approach was first demonstrated in humans with Hib vaccines in the 1980s.[299–301] Subsequently, similar conjugate vaccines were investigated for the meningococcus for group A (*N*-acetyl mannosamine-1-phosphate) and group C (alpha 2–9 *N*-acetyl neuraminic acid [NANA]) polysaccharides,[302] group C polysac- charide,[303–306] and groups A, C, W (copolymer of NANA with galactose), and Y (copolymer of NANA with glucose).[244,259,307–310] These vaccines elicited high serum bactericidal antibody titers and boostable immune responses. As described, monovalent group C conjugate vaccines were introduced with great success in the United Kingdom in late 1999 and have been introduced into routine immunization shedules in Europe, Brazil, Canada, and Australia.

As of August 2015, two quadrivalent A, C, W, and Y menin- gococcal polysaccharide-protein conjugate vaccines were licensed in the United States and recommended for routine use in adolescents and young adults.[311] In addition, a menin- gococcal conjugate vaccine that contains capsular groups C and Y, as well as Hib, is licensed for use in infants and toddlers. Recently, two vaccines for prevention of capsular group B disease were licensed (see Chapter 39).

## Polysaccharide Meningococcal Vaccines

Meningococcal polysaccharide vaccines are rapidly being replaced by conjugate vaccines because of the immunologic inferiority of the former. Although they have an acceptable safety profile and are immunogenic and effective in older children and adults, polysaccharide vaccines have substan- tial limitations relative to meningococcal polysaccharide- protein conjugate vaccines. They are poorly immunogenic in infants, do not provide a booster response, do not substan- tially decrease meningococcal pharyngeal colonization and therefore do not provide herd protection, and can induce the phenomenon of immunologic hyporesponsiveness. They are still used at times for outbreak control[312] and are still avail- able in the United States and other countries. However, it is likely that their use will eventually be phased out. Table 38.2 shows currently licensed polysaccharide vaccines. For a comprensive review of this topic, refer to this chapter in the 6th edition.[313]

## MENINGOCOCCAL POLYSACCHARIDE-PROTEIN CONJUGATE VACCINES
### Meningococcal Capsular Group a Conjugate Vaccine for Africa

Until recently, the only meningococcal vaccines available in sub-Saharan Africa were a bivalent group A and C and a triva- lent group A, C, and W polysaccharide vaccine (MPSV2 and MPSV3). These vaccines are poorly immunogenic in infants,

**TABLE 38.2** Meningococcal Polysaccharide Vaccines[a]

| Manufacturer | Vaccine | Active Constituents | Other Excipients | Diluent |
|---|---|---|---|---|
| Sanofi Pasteur | Mengivac | Group A polysaccharide<br>Group C polysaccharide | Lactose (2 mg) | Phosphate-buffered saline solution |
| | Menomune | Group A polysaccharide<br>Group C polysaccharide<br>Group W135 polysaccharide<br>Group Y polysaccharide | Lactose (2.5–5.0 mg)<br>Sodium chloride (4.25–4.75 mg) | Pyrogen-free water |
| GlaxoSmithKline Biologicals | AC Vax | Group A polysaccharide<br>Group C polysaccharide | Lactose (12.6 mg) | Saline solution |
| | ACWY Vax | Group A polysaccharide<br>Group C polysaccharide<br>Group W135 polysaccharide<br>Group Y polysaccharide | Lactose (12.6 mg) | Saline solution |

[a]Bivalent, trivalent, and quadrivalent meningococcal polysaccharide vaccines are referred to in the text as MPSV2, MPSV3, and MPSV4, respectively. All vaccines shown are licensed in European countries. Menomune is available in the United States and Canada and is sold in other countries under the trade name Menomune-A/C/Y/W135. All vaccines contain 50 µg of each of the capsular polysaccharides shown and are lyophilized, requiring reconstitution with preservative-free diluent. For multidose vials, the diluent used to reconstitute Menomune contains thimerosal (mercury derivative) 1:10,000 as a preservative. Note: although still licensed in Europe, the bivalent vaccines are generally no longer available.

the age group at greatest risk of acquiring disease, and have only a transient effect, if any, on colonization and spread of infection. For these reasons, meningococcal vaccination in Africa was largely done in response to epidemics, which was a logistically challenging and relatively ineffective strategy. Although an emergency response plan had been developed in collaboration with the WHO and the CDC,[314] implementation was often delayed because of limitations of surveillance or logistics. One study estimated that even under optimal circumstances, fewer than 60% of outbreak-related cases were prevented by implementing vaccination after an epidemic was recognized.[314] An improved meningococcal vaccine, therefore, was needed.

In sub-Saharan Africa, most meningococcal epidemics are caused by capsular group A strains. By the late 1990s, three vaccine manufacturers had developed capsular group C meningococcal conjugate vaccines for the United States, where there had been approximately 10,000 cases of disease caused by group C organisms and 1000 deaths during the previous decade.[315] There was little commercial interest in developing a group A meningococcal conjugate vaccine for sub-Saharan Africa, where there had been more than 700,000 cases and 100,000 deaths in the same decade.[3] The countries in this region remain some of the poorest in the world and could not afford to purchase the vaccine.

In 1999, the WHO funded a feasibility study to explore options to develop and manufacture a group A conjugate vaccine that could be sold in Africa for less than $0.50 a dose.[316,317] The results from this study formed the basis of a successful grant application to the Bill and Melinda Gates Foundation, which in 2001 awarded $70 million to the WHO and the Program for Appropriate Technology in Health to develop a meningococcal group A conjugate vaccine with the goal of eliminating group A epidemics in Africa.[316] Although there were concerns at the time about the potential for epidemics caused by capsular group W strains,[225,318–320] in the previous 100 years, more than 90% of epidemic meningococcal disease in sub-Saharan Africa had been caused by capsular group A strains. The dominance of group A disease and the greater technical challenges, higher cost, and extended timelines for developing a bivalent capsular group A and W conjugate vaccine made development of a monovalent group A vaccine more feasible as a first step.

A novel conjugation chemistry using reductive amination of group A polysaccharide aldehydes and tetanus toxoid hydrazides was developed by scientists at the FDA's Center for Biologics Evaluation and Research.[321] The process was transferred to the Serum Institute, a vaccine manufacturer in India.[322] Extensive testing of the vaccine in sub-Saharan Africa provided assurance of safety, immunogenicity, and manufacturing consistency.[323] In 2010, marketing authorization for MenAfriVac (MenA-TT conjugate vaccine) was granted by the Food and Drug Administration of India for the export of the vaccine to African countries. Mass vaccination of 1- to 29-year-olds was introduced in December 2010, as part of countrywide demonstration projects in Burkina Faso, Mali, and Niger.[324] More than 217 million people ages 1 through 29 years have received MenA-TT vaccine (containing 10 µg MenA polysaccharide) in 17 countries in the African meningitis belt by 2015.[325] It is hoped that high coverage in this age group will lead to herd protection of unvaccinated children younger than 1 year and elimination of epidemics of meningococcal A disease. In fact, MenA-TT led to a dramatic decline in group A carriage in African villages, suggesting that herd protection with this vaccine is substantial.[326,327] Once the mass vaccination campaigns are completed, the concern will be to protect subsequent birth cohorts throughout infancy. Two strategies are recommended: one for countries where MenA coverage is high and another where MenA coverage is low (<60%).[328] In high-coverage countries, vaccination should be administered as a single dose at 9 to 18 months of age. A lower-dose vaccine (5 µg of MenA polysaccharide) is available for children younger than 2 years of age. In low-coverage countries, periodic single-dose campaigns are recommended.

A major problem that has occurred since the widespread use of a capsular group A conjugate vaccine is the emergence of disease caused by strains with other capsular groups such as C, W, or X.[190,225,318,329–331] Currently there is no vaccine available for prevention of group X disease, which is extremely rare in North America and Europe.[332] For prevention of group W disease, quadrivalent (A, C, Y, and W) conjugate vaccines are available in industrialized countries (see earlier discussion), but these vaccines are expensive and not available in sub-Saharan Africa. A trivalent MPSV3 vaccine is available for Africa and kept in reserve by the WHO for response to capsular group C and W epidemics, but this vaccination strategy has

many limitations, as described. Work is currently underway to produce a low-cost pentavalent MenACWXY conjugate vaccine that could (potentially) replace the monovalent vaccine.

## Monovalent Capsular Group C Conjugate Vaccines

### Composition

Three group C conjugate vaccines (Table 38.3) are currently licensed in European countries, Australia, Brazil, and Canada; two are based on oligosaccharides derived from group C capsular polysaccharide that are conjugated to the nontoxic $CRM_{197}$ derivative of diphtheria toxin; the third vaccine

consists of de-O-acetylated group C polysaccharide conjugated to tetanus toxoid. Although these vaccines use different O-acetylated saccharides, all three vaccines are immunogenic in infants and elicit boostable serum meningococcal bactericidal antibody responses, whether or not the test organisms in the assay naturally express O-acetylated or de-O-acetylated group C capsules.

Meningitec (Pfizer, herein described as P-MenC-CRM) is prepared by the controlled treatment of group C polysaccharide with sodium periodate followed by the separation of the resulting oligosaccharides from high-molecular-weight saccharide and conjugation to $CRM_{197}$ by reductive amination. Menjugate (GlaxoSmithKline Vaccines, recently acquired from Novartis Vaccines and Diagnostics, herein described as

**TABLE 38.3** Meningococcal Conjugate Vaccines

| Manufacturer | Vaccine | Other Designation | Active Constituents Per Dose | Adjuvant | Other Excipients | Presentation |
|---|---|---|---|---|---|---|
| Pfizer | Meningitec | P-MenC-CRM | 10 µg O-acetylated group C oligosaccharide conjugated to 11–25 µg $CRM_{197}$ | $AlPO_4$ | Sodium chloride | Single-dose, liquid suspension vial |
| Pfizer (previously Baxter Bioscience) | NeisVac | MenC-TT | 10 µg de-O-acetylated group C oligosaccharide conjugated to 10–20 µg tetanus toxoid | $Al(OH)_3$ | Sodium chloride | Single-dose, prefilled syringe |
| GlaxoSmithKline vaccines (previously Novartis vaccines) | Menjugate | G-MenC-CRM | 10 µg de-O-acetylated group C oligosaccharide conjugated to 11–25 µg $CRM_{197}$ | $Al(OH)_3$ | Mannitol, sodium phosphate buffer | Single-dose, freeze-dried, vial reconstituted with diluent |
| GlaxoSmithKline vaccines (previously Novartis vaccines) | Menveo | MCV4-CRM | 5 µg each of groups C, Y, and W135 oligosaccharide and 10 µg of group A oligosaccharide conjugated to 33–64 µg $CRM_{197}$ | None | Sucrose, potassium dihydrogen phosphate, sodium dihydrogen phosphate monohydrate, disodium phosphate dehydrate, sodium chloride | Single-dose vial with lyophilized group A component; single-dose vial with the three other components in liquid form |
| Sanofi Pasteur | Menactra | MCV4-DT | 4 µg each of groups A, C, Y, and W135 polysaccharide conjugated to ~48 µg of diphtheria toxoid | None | Sodium chloride | Single dose, prefilled syringe |
| Pfizer (previously GlaxoSmithKline) | Nimenrix | MCV4-TT | 5 µg each of groups A, C, Y, and W polysaccharide conjugated to ~44 µg of tetanus toxoid | None | Sucrose and trometamol | Liquid single dose |
| GlaxoSmithKline vaccines | Menitorix | Hib-MenC | 5 µg Hib polysaccharide and 5 µg group C polysaccharide each conjugated to ~17.5 µg of tetanus toxoid | None | Tris, sucrose, sodium chloride | Single-dose, freeze-dried vial reconstituted with prefilled syringe |
| GlaxoSmithKline vaccines | MenHibrix[a] | Hib-MenCY-TT | 5 µg group C polysaccharide conjugated to 5 µg of tetanus toxoid, 5 µg group Y polysaccharide conjugated to 6.5 µg of tetanus toxoid, and 2.5 µg Hib polysaccharide conjugated to 6.25 µg of tetanus toxoid | None | Sucrose and trometamol | Single dose lyophilized with saline diluent |

[a]GlaxoSmithKline announced that this vaccine would be discontinued as of February 28, 2017.

Appx18657

many limitations, as described. Work is currently underway to produce a low-cost pentavalent MenACWXY conjugate vaccine that could (potentially) replace the monovalent vaccine.

## Monovalent Capsular Group C Conjugate Vaccines

### Composition

Three group C conjugate vaccines (Table 38.3) are currently licensed in European countries, Australia, Brazil, and Canada; two are based on oligosaccharides derived from group C capsular polysaccharide that are conjugated to the nontoxic $CRM_{197}$ derivative of diphtheria toxin; the third vaccine

consists of de-O-acetylated group C polysaccharide conjugated to tetanus toxoid. Although these vaccines use different O-acetylated saccharides, all three vaccines are immunogenic in infants and elicit boostable serum meningococcal bactericidal antibody responses, whether or not the test organisms in the assay naturally express O-acetylated or de-O-acetylated group C capsules.

Meningitec (Pfizer, herein described as P-MenC-CRM) is prepared by the controlled treatment of group C polysaccharide with sodium periodate followed by the separation of the resulting oligosaccharides from high-molecular-weight saccharide and conjugation to $CRM_{197}$ by reductive amination. Menjugate (GlaxoSmithKline Vaccines, recently acquired from Novartis Vaccines and Diagnostics, herein described as

**TABLE 38.3** Meningococcal Conjugate Vaccines

| Manufacturer | Vaccine | Other Designation | Active Constituents Per Dose | Adjuvant | Other Excipients | Presentation |
|---|---|---|---|---|---|---|
| Pfizer | Meningitec | P-MenC-CRM | 10 μg O-acetylated group C oligosaccharide conjugated to 11–25 μg $CRM_{197}$ | $AIPO_4$ | Sodium chloride | Single-dose, liquid suspension vial |
| Pfizer (previously Baxter Bioscience) | NeisVac | MenC-TT | 10 μg de-O-acetylated group C oligosaccharide conjugated to 10–20 μg tetanus toxoid | $Al(OH)_3$ | Sodium chloride | Single-dose, prefilled syringe |
| GlaxoSmithKline vaccines (previously Novartis vaccines) | Menjugate | G-MenC-CRM | 10 μg O-acetylated group C oligosaccharide conjugated to 11–25 μg $CRM_{197}$ | $Al(OH)_3$ | Mannitol, sodium phosphate buffer | Single-dose, freeze-dried, vial reconstituted with diluent |
| GlaxoSmithKline vaccines (previously Novartis vaccines) | Menveo | MCV4-CRM | 5 μg each of groups C, Y, and W135 oligosaccharide and 10 μg of group A oligosaccharide conjugated to 33–64 μg $CRM_{197}$ | None | Sucrose, potassium dihydrogen phosphate, sodium dihydrogen phosphate monohydrate, disodium phosphate dehydrate, sodium chloride | Single-dose vial with lyophilized group A component; single-dose vial with the three other components in liquid form |
| Sanofi Pasteur | Menactra | MCV4-DT | 4 μg each of groups A, C, Y, and W135 polysaccharide conjugated to ≈48 μg of diphtheria toxoid | None | Sodium chloride | Single dose, prefilled syringe |
| Pfizer (previously GlaxoSmithKline) | Nimenrix | MCV4-TT | 5 μg each of groups A, C, Y, and W polysaccharide conjugated to ≈44 μg of tetanus toxoid | None | Sucrose and trometamol | Liquid single dose |
| GlaxoSmithKline vaccines | Menitorix | Hib-MenC | 5 μg Hib polysaccharide and 5 μg group C polysaccharide each conjugated to ≈17.5 μg of tetanus toxoid | None | Tris, sucrose, sodium chloride | Single-dose, freeze-dried vial reconstituted with prefilled syringe |
| GlaxoSmithKline vaccines | MenHibrix[a] | Hib-MenCY-TT | 5 μg group C polysaccharide conjugated to 5 μg of tetanus toxoid, 5 μg group Y polysaccharide conjugated to 6.5 μg of tetanus toxoid, and 2.5 μg Hib polysaccharide conjugated to 6.25 μg of tetanus toxoid | None | Sucrose and trometamol | Single dose lyophilized with saline diluent |

[a]GlaxoSmithKline announced that this vaccine would be discontinued as of February 28, 2017.

Appx18658

G-MenC-CRM) is manufactured from group C polysaccharide that has been partially hydrolyzed at low pH and size-fractionated before being conjugated to $CRM_{197}$ through a bis N-hydroxysuccinimide ester of adipic acid.[302] In the manufacture of NeisVac-C (Pfizer, recently acquired from Baxter Bioscience, herein described as MenC-TT), the group C polysaccharide is first deacetylated with sodium hydroxide, but, because N-acetyl groups are part of the epitopes that elicit protective antibody, the amino groups are reacetylated with acetic anhydride.[333] Following limited depolymerization with sodium periodate and size fractionation, the de-O-acetylated oligosaccharide is conjugated directly to the tetanus toxoid by reductive amination. The single-dose formulations of all three vaccines do not contain preservatives.

Group C conjugate vaccines are stable at the recommended storage temperature ($2°–8°C$). Studies in which the conjugate vaccines have been stored at higher temperatures or subjected to repeated freeze–thaw cycles indicated that the structural stability of the oligosaccharide chains and of the protein carrier is related to the conjugation chemistry and formulation of the vaccine.[334] However, the immunogenicity of the vaccines in mice was affected only by incubation of the vaccines under more extreme conditions that resulted in the release of a substantial proportion of free saccharide.[335]

### Immunogenicity

Prelicensure studies of monovalent meningococcal polysaccharide-protein group C conjugate vaccines demonstrated their safety and immunogenicity in all age groups. In infants and toddlers, the conjugate vaccines elicited higher antibody responses than did the polysaccharide vaccine, and the antibody elicited by the conjugate vaccine had greater bactericidal activity.[304,306,336,337]

### Age-Related Immunogenicity

The hallmark of protection against meningococcal disease is SBA. Substantial evidence indicates that all three group C conjugate vaccines are highly immunogenic after two or three doses given in the first 6 months of life and elicit serum bactericidal antibody.[304,306,336,338] In most of these studies, the

highest responses in infants or toddlers were with MenC-TT.[336,356,339] These early studies were performed with concomitant administration of combination vaccines containing diphtheria and tetanus toxoids and whole-cell pertussis (DTwP) vaccines. Since then, combination vaccines using acellular pertussis have largely replaced DTwP vaccines in most industrialized countries, and pneumococcal polysaccharide-protein conjugate vaccines have been introduced into the infant vaccination schedule. These changes have the potential to enhance or impair antibody responses to meningococcal conjugate vaccines.

A study in the United Kingdom compared serum antibody responses to the three MenC conjugate vaccines when administered at 2 and 3 months of age along with separate injections of a combination acellular pertussis vaccine (DTaP₅/IPV/Hib-TT, Pediacel, Sanofi Pasteur) and pneumococcal conjugate vaccine 7 (PCV7) (Prevnar, Pfizer).[340] At 2 months a single dose of MenC-TT vaccine elicited higher serum bactericidal antibody responses than either of the MenC-CRM diphtheria toxoid vaccines (compare respective hatched bars in Fig. 38.5A). One month after the second dose (Fig. 38.5A, bars *without hatching*), the highest serum bactericidal geometric mean titer (GMT) was in the group given the G-MenC-CRM vaccine (1:682) followed by the MenC-TT (1:437) and P-MenC-CRM (1:229; $P < .02$) vaccines. In an earlier study with coadministration with DTaP₅/IPV/Hib-TT, the MenC-TT conjugate vaccine also elicited higher serum bactericidal antibody responses after one dose given at 2 months of age, but after two additional doses at 3 and 4 months of age, the responses were significantly higher to the G-MenC-CRM vaccine.[341]

The reasons for the higher group C antibody responses to one dose of the MenC-TT conjugate vaccine at 2 months and the higher responses to the G-MenC-CRM vaccine after a second or third dose are unknown. Epitopic or nonepitopic suppression to the tetanus toxoid carrier protein may have been induced by the first dose of the MenC-TT vaccine when coadministered with the DTaP vaccine, which dampened the anticapsular antibody responses to the second injection of the tetanus toxoid conjugate vaccine. This mechanism may explain the lower serum bactericidal antibody responses to the MenC-TT vaccine in preschoolers or adolescents, or both




**Figure 38.5.** Serum bactericidal antibody responses of infants immunized with MenC conjugate vaccines (rabbit complement). **A,** Titers 1 month after a dose of vaccine given at 2 months *(hatched bars)* or after a second dose given at 3 months *(solid bars)*.[339] **B,** Serum bactericidal titers before *(horizontal hatched bars)* and after a booster dose of Hib-MenC-TT vaccine given at 12 to 15 months of age in relation to previous MenC vaccination at 2 to 4 months of age. Titers 1 month after the booster *(solid bars)*, at 24 months of age *(diagonal hatched bars)*, and at 36 months of age *(open bars)*.[382] CI, confidence interval; GMT, geometric mean titer; GSK, GlaxoSmithKline; Hib, *Haemophilus influenzae* type b.

given DT or Td at the same visit or at 1 month before the conjugate vaccine.[342-344] The clinical relevance of these lower responses is unclear because most subjects achieved putative protective titers (albeit measured with rabbit complement; see earlier discussion). Two studies also suggested interference might occur between coadministration of a combination of meningococcal and pneumococcal conjugate vaccines when CRM$_{197}$ is the carrier protein of both vaccines.[345,346] In infants given P-MenC-CRM at 2, 3, and 4 months of age along with an investigational nine-valent pneumococcal conjugate vaccine that also used CRM$_{197}$, the meningococcal bactericidal GMT was 1:291 (95% confidence interval [CI], 208–407).[345] This response is substantially lower than the GMTs previously reported in children who received P-MenC-CRM alone. In another study, decreased meningococcal bactericidal antibody responses were observed in infants given an investigational combination pneumococcal-meningococcal CRM$_{197}$-based conjugate vaccine prepared by Pfizer, when compared with the responses of control infants given P-MenC-CRM (GMT, 1:179 vs 1:808, respectively).[346]

### Anticapsular Antibody Kinetics and Persistence

Most adults immunized with group C conjugate vaccines develop protective serum bactericidal antibody levels within 7 to 10 days.[347] Serum bactericidal titers peak at approximately 2 to 4 weeks after immunization and persist for longer than a year.[348] Most teenagers immunized with the G-MenC-CRM conjugate vaccine had protective serum bactericidal titers at 3.7 years[268] or 5 years of follow-up.[349] Serum antibody persistence seems to be inversely correlated with age[263] as waning immunity was detected in the majority of 6- to 12-year-old children immunized an average of 6.8 years earlier as part of the United Kingdom national MenC catch-up campaign.[350] Similarly, only 44% of Australian children immunized at 2 to 8 years of age with a MenC vaccine had adequate serologic protection an average of 8.2 years following immunization.[351] As described subsequently, protective serum antibody levels decline even more rapidly after immunization of infants or toddlers.

At the end of the United Kingdom catch-up campaign, routine MenC conjugate vaccination was introduced for infants (three primary doses beginning at 2 or 3 months of age). With this schedule, serum bactericidal titers declined to subprotective levels by 1 year (see Fig. 38.5B, *horizontal hatched bars*) and there was evidence of lower effectiveness in the second year of life.[266] To extend the duration of protective titers, a booster dose of a combined group C meningococcal-Hib tetanus toxoid conjugate vaccine (Menitorix, GlaxoSmith-Kline; see Table 38.2) was introduced in the United Kingdom for the 12- to 14-month age group. At 1 month after a booster dose, high serum bactericidal antibody titers were present in toddlers previously vaccinated with any of the three MenC conjugate vaccines (see Fig. 38.5B, *solid bars*).[352] By age 24 months *(diagonal hatched bars)* or 36 months *(open bars)*, however, the serum titers in the majority of the children had declined to less than the titers thought to be required for protection. In another study, infants were immunized at 2, 3, and 4 months of age with the G-MenC-CRM conjugate vaccine and boosted with MCV4-CRM at 12 months. At 40 to 60 months of age, 59% had protective titers of serum bactericidal antibody against capsular group C meningococci.[353]

Recent data assessing the impact of different conjugates (G-MenC-CRM or MenC-TT) or the numbers of doses (0, 1, or 2 doses) for primary immunization in the United Kingdom, on the persistence of protective titers after a Hib-MenC booster, again found that MenC-TT priming resulted in improved antibody persistence when compared with MenC-CRM priming.

Of particular note, one priming dose of MenC-CRM resulted in superior booster responses to Hib-MenC when compared with two priming doses of MenC-CRM (Fig. 38.6).[354] Interestingly, antibody persistence to 2 years of age after the toddler Hib-MenC dose was the same with one or two priming doses as it was without any priming doses of MenC-CRM.[354]

### Immunologic Memory

MenC conjugate vaccines prime for the ability to mount memory anticapsular antibody responses on subsequent exposure to a polysaccharide challenge (infants,[304,306,338] toddlers,[303] and adults[355]). In other studies, infants given lower doses of conjugated meningococcal A and C polysaccharide antigens[356,357] or fewer numbers of doses,[265,338] or both, mounted higher memory antibody responses to subsequent challenges with unconjugated polysaccharide vaccine than did infants who previously received higher doses or more injections of the conjugated antigen. Similarly, immunization with one dose of MenC-CRM resulted in higher memory responses than did two doses of MenC-CRM following a toddler dose of Hib-MenC-TT.[354] The immunization with the higher quantities of polysaccharide antigen per dose of conjugate vaccine or multiple injections, or both, resulted in higher serum bactericidal titers at 1 month after vaccination and greater serum antibody persistence, but lower memory responses.[354] Thus, the choice of the optimal dose of antigen and number of injections of a conjugate vaccine needs to consider the greater importance of having higher serum antibody concentrations for protection against meningococcal disease than the robustness of the memory antibody response. Underscoring this point are the UK data on decreasing vaccine effectiveness between 1 and 4 years after immunization of infants and toddlers,[266] at a time when the vaccinated children could mount robust memory antibody responses[271] but lacked protective levels of SBA.



**Figure 38.6.** Geometric mean titers (and 95% confidence interval) for capsular group C meningococcal (MenC) rabbit serum bactericidal antibody (rSBA) at visits performed at ages 5, 12, 13, and 24 months according to type of MenC priming (G-MenC-CRM or MenC-TT) schedule and Hib-MenC boosting at 12 months of age (intention-to-treat population). Hib, *Haemophilus influenzae* type b. *(From Pace D, Khatami A, McKenna J, et al. Immunogenicity of reduced dose priming schedules of serogroup C meningococcal conjugate vaccine followed by booster at 12 months in infants: open label randomised controlled trial.* BMJ. *2015;350:h1554.)*

**632**    **SECTION 2**  Licensed Vaccines and Vaccines in Development

### Effect of Prior Polysaccharide Vaccination Responses to MenC Conjugate Vaccine

Adults and toddlers previously vaccinated with one or more doses of meningococcal polysaccharide vaccine have lower serum antibody responses to a group C conjugate vaccine than do individuals immunized for the first time.[303,347,355,358] These lower responses to the conjugate vaccine probably are a result of depletion of memory B cells by exposure to the unconjugated polysaccharide. However, this phenomenon is not considered further here because conjugate vaccines have largely replaced unconjugated polysaccharides.

## MenC Conjugate Vaccine Effectiveness

In England and Wales, the incidence of group C meningococcal disease rose substantially from 1994 to 1998.[359] Enhanced meningococcal surveillance was initiated, and the total number of group C cases for the 1998–1999 epidemiologic year (July 1 to June 30) was estimated at 1500 (Fig. 38.7, *left panel*), with at least 150 deaths. From November 1999, group C conjugate vaccination was introduced in the United Kingdom for all individuals younger than 19 years of age (later extended to younger than 24 years of age) in a catch-up program that took 12 months to complete. Individuals 1 to 18 years of age were given one dose, infants were given three doses at 2, 3, and 4 months of age along with their routine primary immunizations, with two doses for those 5 to 11 months of age.

Within 12 to 18 months after introduction of group C vaccination, a marked decline in the number of cases and deaths caused by group C disease occurred in the age groups targeted for immunization.[266,313,360,361] Ten years after vaccine introduction, group C meningococcal disease had been virtually eliminated in the UK population, including in the groups older than 24 years of age who were not vaccinated (see Fig. 38.7, *right panel*).

Formal estimates of age-specific vaccine effectiveness during the first year after vaccination were approximately 90% or more for all vaccinated age groups. Between 1 and 4 years after vaccination, however, effectiveness declined in all age groups.[266] The decline was most marked in infants vaccinated at 2, 3, and 4 months of age for whom there was no demonstrable effectiveness, −81% (95% CI, −7430% to 71%) and least in adolescents given one dose of vaccine, 90% (95% CI, 77% to 96%). In toddlers given one dose of vaccine, effectiveness between 1 and 4 years declined to 61% (95% CI, −327% to 94%).[266] In response to the decline in effectiveness in vaccinated infants, in September 2006, the ages of the routine infant UK MenC vaccination schedule were changed to 3, 4, and 12 months, with the final dose administered as a combination Hib-MenC vaccine.[266] Based on data inclusive from 2000 through the middle of 2009, vaccine effectiveness within 1 year of infant immunization was estimated to be 97% (95% CI, 91% to 99%) and was 68% (95% CI, −63% to 90%) at 12 or more months of follow-up.[183]

Between 2000 and 2003, 53 reported cases of group C conjugate vaccine failure occurred in persons from England or Wales.[361] There was no evidence of immunodeficiency in these immunized persons and the case fatality rate was 7.5%, which was similar to that of cases in unvaccinated persons in the same birth cohorts: 10.4%. Serum bactericidal titers in convalescent serum and avidity indices in acute serum were significantly higher in vaccine failures than in unvaccinated cases (5.7-fold higher for SBA titers, $P = .03$; 2.9-fold higher for avidity indices, $P = .01$), which are consistent with an anamnestic antibody response in the vaccine failures. These observations suggest that group C disease had occurred in vaccinated persons despite induction of immunologic priming (memory) by the group C conjugate.[361]

Additional effectiveness data are available from other countries that have introduced meningococcal group C conjugate vaccines using a catch-up campaign at the time of introduction, including Spain, The Netherlands, and Canada. These countries reported high vaccine effectiveness using various different schedules, but with some waning of effectiveness over time.[362–364] The decline in vaccine effectiveness in immunized infants and young children was consistent with the rapid decline in serum bactericidal antibody titers after vaccination (see Fig. 38.5). Booster doses for toddlers were widely introduced with the expectation that antibody, and thus protection, would persist better during early childhood after the 12-month dose. However, accumulating evidence indicates that persistence of serum antibody after this booster is poor,[365] more so with the MenC-CRM vaccines than the MenC-TT, and the observed protection against disease in the population was




**Figure 38.7.**  Group C meningococcal disease in the United Kingdom by age group, as determined by enhanced surveillance. *Left,* Cases for July 1998 to June 1999 before introduction of group C meningococcal conjugate vaccine. *Right,* Cases for July 2007 to June 2008 after vaccine had been used in the United Kingdom for 10 years. Epi. year, epidemiologic year. *(Data from Helen Campell, UK Health Protection Agency, Centre for Infections. From Campbell H, Andrews N, Borrow R, et al. Updated postlicensure surveillance of the meningococcal C conjugate vaccine in England and Wales: effectiveness, validation of serological correlates of protection, and modeling predictions of the duration of herd immunity.* Clin Vaccine Immunol. *2010;17:840–847.)*

**Appx18661**

likely maintained chiefly through herd protection from decreased group C meningococcal carriage. Thus, the focus of the UK program has now switched to maintaining herd protection rather than optimizing antibody levels in the first few years of life. Accordingly, in 2013 the UK infant schedule was changed to 3 and 12 months, with a second MenC booster offered in early adolescence.[365] In 2015 the teenage MenC dose was replaced with MCV4 in response to an increase in MenW cases. In 2016 the 3-month dose of MenC was dropped once the majority of teenagers had been immunized and herd protection had been secured.[366] Similarly, many other countries and regions with established infant/toddler immunization programs have either introduced an adolescent booster dose of MenC or MenACWY vaccine or plan to do so.

### Effect of MenC Conjugate Vaccine on Carriage and Herd Protection

To measure the effectiveness of group C conjugate vaccines on decreasing carriage of meningococci,[367] oropharyngeal swabs were obtained in 1999 from 15,106 UK students 15 to 19 years of age before introduction of group C conjugate vaccines. After vaccine introduction (single dose for this age group), swabs were obtained from 18,095 students in 2000, and 19,710 students in 2001. After 1 year of vaccine use, there was a 66% decrease in carriage of encapsulated group C meningococci, which reached 75% by 2 years.[39] In contrast, there was no evidence of decreases or increases in carriage by isolates with other capsular groups.[39] Consistent with these data, there also was a 66% decrease in the attack rate of group C meningococcal disease in unvaccinated persons.[368] Thus, the near eradication of group C meningococcal disease from the United Kingdom during the past 15 years (see Fig. 38.7) occurred despite relatively limited vaccine efficacy beyond 1 year after vaccination in the youngest age groups.[188] It is likely that direct protection of the vaccinated individuals was important in the rapid control of disease but, as antibody levels waned rapidly in the younger age groups, sustained control has been driven by decreased colonization and thus decreased circulation of hypervirulent group C strains as a result of vaccine-induced herd protection. Recent data show that the current carriage rates of capsular group C meningococci remain very low, even 15 years after introduction of the vaccine.[369,370] Herd protection with group C conjugate vaccines has been documented in other countries as well.[371,372]

Although the incidence of group C disease in the United Kingdom and the rates of group B carriage remain very low, serum group C anticapsular antibody levels in the childhood population have waned.[262,373] Thus, there is a large susceptible population potentially at risk of disease should a virulent group C clone be introduced. However, as discussed above, the addition of MenC adolescent boosters from 2013 and a MenACWY catch-up campaign among 14- to 18-year-olds from 2015, should boost immunity among teenagers and maintain herd protection, as sustained persistence of antibody has been observed in this age group.

Before introduction of group C conjugate vaccination in the United Kingdom, concerns were raised that immune pressure induced by vaccination might select for capsular switching from group C to group B strains.[374] Capsular switching between group B and group C strains had been observed in the United States.[51,181,375] Switching from group C ST-11 complex isolates to group B ST-11 complex isolates also has been reported in France, together with conservation of virulence.[376] To date, there is no evidence of increased rates of group B disease in the United Kingdom by strains that have undergone capsular switching; indeed rates of capsular group B disease have actually declined over the past decade.[377] There

also is no evidence of capsular group switching or replacement observed among UK carriage isolates.[59] In contrast, since introduction of group C conjugate vaccine immunization in Spain, an increase in ST-11 capsular group B disease has occurred in Navarra, which suggests that group C–to–group B capsular switching and subsequent clonal expansion of the group B clone had occurred, but there is no clear evidence that this was driven by vaccination.[378] Similarly, an ST-11 W clone emerged in the United Kingdom in 2009, which appears to have originated in Latin America and is apparently unrelated to the MenC vaccine program.[174]

### Safety of MenC Conjugate Vaccines

From prelicensure safety studies in the United Kingdom, transient headache of mild to moderate severity was the most commonly reported adverse event, with the highest rate (12%) in the first 3 days after vaccination. Headache was reported more frequently in secondary school than in primary school children, and more frequently in girls than in boys. Local reactions at the injection site consisted mostly of pain, tenderness, and occasional redness. These reactions tended to be of mild to moderate severity, were maximal on the third postvaccination day, and typically resolved within 1 day. Local reactions were more common after diphtheria toxoid or diphtheria toxoid–tetanus toxoid booster vaccination than after group C conjugate vaccination. Preexisting allergies did not seem to affect reactogenicity.[379] Postlicensure passive surveillance through reports of adverse vaccine events from health professionals to the UK Medicines Control Agency/Committee on Safety of Medicines indicated a rate of one adverse event per 2875 doses of meningococcal group C vaccine distributed in the first 10 months of the UK campaign.[380] Nearly all these adverse events consisted of transient headache, pyrexia, or dizziness, or local reactions. Anaphylaxis was reported at a rate of one per 500,000 doses distributed. Although some new reactions to group C conjugate vaccine were identified (e.g., headache, nausea, vomiting, abdominal pain, and malaise in all age groups), these were generally not serious, and the balance of risks and benefits for group C conjugate vaccines was considered overwhelmingly in favor of immunization.

Five cases of Guillain-Barré syndrome (GBS) were reported in persons immunized with monovalent group C conjugate vaccines during the UK catch-up campaign when millions of doses were administered. This number of cases was considered by the UK Health Protection Agency to be lower than the expected background rate.

## MULTIVALENT MENINGOCOCCAL CONJUGATE VACCINES

### Composition

As of September 2015, three meningococcal conjugate vaccines are licensed in the United States (see Table 38.3). One is a combination Hib-meningococcal C and Y conjugate (MenHibrix, GlaxoSmithKline, referred to herein as Hib-MenCY),[381-383] and the other two are quadrivalent conjugate vaccines: Menactra (Sanofi Pasteur, referred to as MCV4-DT), and Menveo (GlaxoSmithKline Vaccines, referred to as MCV4-CRM).[384-386] However, GlaxoSmithKline recently announced that Hib-MenCY will no longer be available. One or both of the quadrivalent vaccines also are licensed in Canada, Europe, and some countries in Latin America, the Middle East, and Asia. A third quadrivalent conjugate vaccine called Nimenrix (recently acquired by Pfizer Vaccines from GlaxoSmithKline, referred to herein as MCV4-TT) is licensed in Europe, Canada, and Australia and is under review or licensed in various other countries.

Appx18662

A combination Hib conjugate vaccine and group C meningococcal conjugate vaccine (without Y) (Menitorix, GlaxoSmithKline, referred to herein as Hib-MenC) is available in Europe and Australia. None of these vaccines contains an adjuvant or preservative.

MCV4-DT is prepared by performing controlled, limited depolymerization of capsular groups A, C, Y, and W polysaccharides, which are then derivatized with a dihydrazide-containing linker molecule. The derivatized polysaccharides are independently conjugated to the carboxylic acid groups on diphtheria toxoid. One dose of the quadrivalent vaccine contains 4 µg of each of the four polysaccharides and a total dose of approximately 48 µg of diphtheria toxoid in 0.5 mL of phosphate-buffered physiologic saline (see Table 38.2).[300] The vaccine is currently available in 0.5-mL single-dose vials and single-dose, prefilled syringes; the single-dose vials contain dry natural latex rubber stoppers.

For manufacturing MCV4-CRM, the oligosaccharide from each polysaccharide is prepared by the processes of hydrolysis, sizing, and reductive amination, and linked covalently to $CRM_{197}$. One dose contains 5 µg of oligosaccharide for each capsular group C, Y, and W, 10 µg of capsular group A oligosaccharide, and a total dose of 33 to 64 µg of $CRM_{197}$. The vaccine is presented as a single-dose vial containing the group A conjugate component in lyophilized form and another single-dose vial containing the three other components in liquid form. The group A component is reconstituted with the groups C, Y, and W liquid conjugate vaccine component immediately before administration.

For manufacturing MCV4-TT, the conjugate is made by sizing, cyanate ester formation, and derivatisation of the oligosaccharide with a spacer prior to conjugation to TT by carboxylic group activation (MenA and MenC) or sizing, and conjugation via a cyanate ester group (MenY and MenW). One dose contains 5 µg of each oligosaccharide conjugated to a total dose of 44 µg of tetanus toxoid.[387] MCV4-TT is presented as a freeze-dried powder in a single-dose vial for constitution with saline.

For manufacturing Hib-MenC or Hib-MenCY, the Hib polysaccharide is derivatized with a dihydrazide-containing linker molecule and conjugated to the tetanus toxoid carrier protein via carbodiimide condensation. The meningococcal polysaccharide(s) is activated by cyanylation and directly linked to tetanus toxoid through its amino group. One dose of the Hib-MenC vaccine contains 5 µg of Hib polysaccharide, 5 µg of meningococcal C polysaccharide, and a total dose of approximately 17.5 µg of tetanus toxoid.[388] The presentation is a single-dose vial containing the vaccine as a powder, which is reconstituted with 0.5 mL of saline solution that is provided in a prefilled syringe. One dose of the Hib-MenCY contains 2.5 µg of Hib polysaccharide, 5 µg each of C and Y polysaccharides, and a total dose of approximately 18 µg of tetanus toxoid, and is presented as a lyopholised product for reconstitution with saline.[389]

## Immunogenicity
### MCV4-DT

In adolescents, MCV4-DT elicited noninferior serum bactericidal antibody responses as compared with a U.S.-licensed meningococcal quadrivalent polysaccharide vaccine (MPSV4).[310] In children 2- to 11-years-old, the conjugate vaccine elicited superior serum bactericidal antibody responses.[309] In infants given three doses of MCV4-DT at 2, 4, and 6 months of age, serum bactericidal antibody responses 1 month after the third dose were approximately 50-fold lower than those obtained after three doses of monovalent group C conjugate

vaccines.[330] MCV4-DT, therefore, was considered insufficiently immunogenic in infants using this schedule. On the other hand, toddlers 12 to 23 months old given two doses of MCV4-DT, separated by 2 months, developed geometric mean serum bactericidal antibody responses of 1:300 to 1:400 against two strains with capsular groups C, Y, or W and about 1:300 to a group A strain.[391] In other studies, a two-dose schedule of MCV4-DT given at 9 and 12 months of age was investigated in 1128 children.[392] The first dose was given alone and the second dose was given alone; with measles, mumps, rubella, and varicella vaccine; or with pneumococcal 7-valent conjugate vaccine (PCV7). The proportions of children with SBA titers (using human complement) of 1:8 or more were 90.5% to 95.6% for group A, 97.8% to 100% for group C, 95.1% to 96.4% for group Y, and 81.2% to 86.4% for group W. Although there was overlap in the 95% CIs, meningococcal antibody titers were lower in children who received MCV4-DT concomitantly with PCV7 than in children who received MCV4-DT alone. In addition, in the children who received concomitant PCV7, noninferiority criteria were not met for the pneumococcal IgG GMTs for serotypes 4, 6B, and 18C. No data have been reported for concomitant use of MCV4-DT and pneumococcal conjugate vaccine (PCV13), which replaced PCV7 in the infant immunization schedule in the United States in 2010.

There is also evidence for immunologic interference between MV4-DT and Daptacel (diphtheria and tetanus toxoids and cellular pertussis vaccine, DTaP, Sanofi Pasteur). Among children 4 to 6 years old, antibody responses to each of the four meningococcal capsular groups did not meet noninferiority criteria among children to whom MCV-DT was given 30 days after DTaP. This phenomenon was not observed when MCV4-DT and DTaP were given concomitantly.[392a]

These immunogenicity and safety results formed the basis of licensure of MCV4-DT in Canada and the United States.

### MCV4-CRM

For licensure of the new MCV4-CRM conjugate vaccine, immunogenicity was compared with that of the licensed MCV4-DT conjugate vaccine. In a randomized trial of 296 children 2 to 10 years old, the respective serum geometric mean reciprocal titers (human complement) 1 month after a dose of MCV4-DT or MCV4-CRM vaccine were similar for capsular groups A and C, and approximately twofold higher in the MCV-CRM group for capsular groups W and Y.[393] Fig. 38.8A (2- to 5-year-olds) and B (6- to 10-year-olds) show the proportion of children with protective titers 1 month after vaccination. In both age groups, the MCV4-CRM conjugate vaccine met preestablished noninferiority criteria against capsular groups C, Y, and W, whereas the responses to group A did not satisfy noninferiority criteria.[364] In a second study, the immunogenicity of MCV4-CRM and MCV4-DT was evaluated in 11- to 18-year-old children; noninferior criteria were met for all four capsular groups (Fig. 38.8C).[370] At 28 days after vaccination, clear differences in favor of MCV4-CRM were observed in the reverse cumulative distribution curves of the serum bactericidal titers against capsular groups A, W, and Y, while noninferiority criteria were met for capsular group C (Fig. 38.9).

MCV4-CRM also is highly immunogenic in infants given a variety of schedules starting at 2 months of age.[396] Fig. 38.10 summarizes the serum bactericidal antibody responses (using human complement) after immunization at 2, 4, and 6 months. Titers peaked 1 month after the third dose and declined nearly 10-fold by 6 months after vaccination (age 12 months). A booster dose at 12 months elicited high serum bactericidal titers against strains from each of the four capsular groups (Fig. 38.10B).





**Figure 38.6.** Serum bactericidal antibody responses 28 days after a dose of quadrivalent meningococcal conjugate vaccine. **A** and **B,** Data from a randomized study in children 2 to 10 years old.[393] **C,** Data from a randomized study in adolescents aged 11 to 18 years.[395] Bars represent the percentage of subjects with protective titers (defined as 1:8 measured with human complement). Error bars represent 95% confidence intervals. Asterisks indicate that the response to the new MCV4-CRM vaccine met preestablished noninferiority criteria compared with the licensed MCV4-DT vaccine. These criteria were not satisfied for group A in the age groups 2 to 5 and 6 to 10 years. For capsular groups W135 and Y, the new vaccine elicited superior bactericidal responses in all three age groups ($P < .05$).



**Figure 38.9.** Reverse cumulative distribution of bactericidal titers (human complement) in serum samples obtained 28 days after vaccination with MCV4-DT or MCV4-CRM. The responses were higher for the MCV4-CRM vaccine group against strains with capsular group A, W135, or Y. *(Data from Jackson LA, Baxter R, Reisinger K, et al, V59P13 Study Group. Phase III comparison of an investigational quadrivalent meningococcal conjugate vaccine with the licensed meningococcal ACWY conjugate vaccine in adolescents. Clin Infect Dis. 2009;49:e1–e10.)*

MCV4-CRM also is highly immunogenic in toddlers.[397] After two doses given at 12 and 18 months, the percentages of subjects with protective bactericidal titers of 1:8 or more were 100% for capsular group C, W, and Y, and 84% for capsular group A.[397] The titers to group C after the second dose were more than 10-fold higher than after one dose at 12 months.

### MCV4-TT

As of December 2016, this vaccine was not yet approved in the United States. A recent systematic review assessed the immunogenicity of MCV4-TT and found the vaccine to be not inferior to licensed quadrivalent meningococcal polysaccharide vaccines. When compared with MCV4-CRM, there were no

differences in the proportions of individuals achieving responses over the putative protective threshold but GMTs were generally higher for MCV4-TT for A, W and Y, especially in younger children.[398]

The immunogenicity of MCV4-TT was compared with MCV4-DT in only one study, where it was found to be noninferior with 51.0% to 82.5% of adolescents and young adults mounting vaccine responses (defined as human SBA [hSBA] titer of at least 1:8 for those seronegative at baseline and a fourfold rise in titer for those seropositive at baseline) to strains with each of the four capsular polysaccharides.[399] A study in Korea also documented responses to MCV4-TT among adolescents with 79% to 99% of adolescents with hSBA responses 1:4 or greater.[400]

In a study conducted in the United Kingdom, an adolescent booster dose of MCV4-TT was compared with MCV4-CRM among teenagers who had been primed during childhood with one of the three monovalent C conjugates. Both booster vaccines induced strong MenC rabbit serum bactericidal antibody (rSBA) responses with 100% above the putative protective threshold at 1 month and 96% 9 months later. Overall the highest responses occurred after a MCV4-CRM booster dose with any MenC vaccine prime, but the strongest postbooster resposes were among those primed with MenC-TT and boosted with MCV4-TT.[401]

In younger children (9–12 months of age), 50% to 94% after one dose and 88% to 100% after two doses of MCV4-TT of infants made an hSBA response 1:8 or greater. Antibody responses waned and were substantially lower in both one- and two-dose groups for capsular group A (20.6% and 25.9%, respectively).[402]

### Hib-MenC and Hib-MenCY

Hib-MenC is used as a toddler booster following infant priming with monovalent MenC in several countries, including the United Kingdom, and is highly immunogenic. Hib-MenCY is approved in the United States for primary and booster immunization beginning at 6 to 8 weeks of age, although the manufacturer recently announced that this vaccine will be discontinued. In one study of Hib-MenC, 95.6% of MenC-CRM–primed toddlers achieved postbooster Hib-MenC rSBA 1:8 or greater.[403] Interestingly, responses were greater among a group who were primed with Hib-MenCY (99% rSBA ≥1:8).

**Appx18664**



**Figure 38.10.** Serum bactericidal antibody responses (human complement) of infants immunized with MCV4-CRM vaccine at 2, 4, and 6 months and boosted at 12 months of age. *Left,* Reciprocal geometric mean titers (GMTs) of serum were obtained before immunization (*pre*) and 1 and 6 months after (*post*) the third dose. *Right,* Reciprocal titers before and 1 month postbooster dose given at 12 months of age. Note that the respective preboost bars in the right panel are the same as those for the bars shown at 6 months after in the left panel, except that the *y*-axis is expanded on the right panel. CI, confidence interval. *(Data from Snape MD, Perrett KP, Ford KJ, et al. Immunogenicity of a tetravalent meningococcal glycoconjugate vaccine in infants: a randomized controlled trial. JAMA. 2008;299:173–184.)*



**Figure 38.11.** Meningococcal serum bactericidal antibody titers before (**A**) and after (**B**) a toddler booster (fourth dose) of Hib-MenCY at 12–16 months of age. Ab, antibody; GMT, geometric mean titer *(Modified from Marshall GS, Marchant CD, Blatter M, et al. Immune response and one-year antibody persistence after a fourth dose of a novel Haemophilus influenzae type b and Neisseria meningitidis serogroups C and Y-tetanus toxoid conjugate vaccine (HibMenCY) at 12 to 15 months of age. Pediatr Infect Dis J. 2010;29:469–471.)*

Hib-MenCY is highly immunogenic in infants and toddlers. For example, in a schedule at 2, 4, and 6 months of age with a booster between 12 and 18 months, Hib responses were higher with Hib-MenCY than with Hib-TT and more than 95% of toddlers had antibody titers above the seroprotective threshold. The vaccine was also studied in a 2-, 3-, 4-, and 12-month schedule and was found to induce strong antibody responses against the three vaccine components.[404] Antibody persistence has been studied up to 1 year after the toddler booster with anti–polyribosylribitol phosphate concentrations ≥0.15 µg/mL and MenC and Y hSBA greater than 1:8 at 100%, 96.6%, and 83.8%, respectively (Fig. 38.11).[382]

### Serum Antibody Persistence After Quadrivalent Meningococcal Conjugate Vaccines

Serum samples were obtained from a group of teenagers immunized 3 years earlier with MCV4-DT.[330] Although bactericidal titers had declined compared with peak titers at 1 month, the proportions of subjects at 3 years with titers of 1:128 (rabbit complement) or greater were 95% (group A), 71% (group C), 83% (group W), and 96% (group Y). A subset

of the 3-year postvaccination serum samples was reassayed with human complement using a bactericidal titer of 1:4 or greater as a measure of protection (Fig. 38.12, *right panel*).[330] As expected from previous studies, the absolute percentages of serum samples with "protective" titers with human complement were lower than with rabbit complement; with human complement, the majority of subjects lacked protective titers to capsular groups C and W and 42% lacked protective titers to group Y (titers to group A were not measured). In another study of 108 children who received MCV4-DT 5 years earlier at the age of 2 to 10 years, 55% and 94% had SBA titers (using rabbit complement) more than 1:128 for capsular groups C and Y, respectively.[405]

A third study compared serum antibody persistence 22 months after immunization of adolescents with MCV4-CRM or MCV4-DT (Fig. 38.12, *left panel*).[406] The proportions of subjects with protective serum bactericidal titers (defined as ≥1:8 with human complement) were 36% vs 25% in favor of MCV4-CRM for group A, 62% vs 58% for group C, 84% vs 74% for group W, and 67% vs 54% for group Y. These differences for capsular groups A, Y or W were statistically significant (*P* < .05 for each capsular group). Although the clinical and





**Figure 38.12.** Persistence of serum bactericidal antibody (human complement) after vaccination of teenagers with quadrivalent meningococcal conjugate vaccines. Results from 22 months of follow-up of subjects immunized with MCV4-CRM or MCV4-DT (left)[406] or from 3 years of follow-up with MCV4-DT (right).[246] At 22 months, the MCV4-CRM-vaccinated group had greater antibody persistence than the MCV4-DT group ($P < .05$ for all four capsular groups). In each study, groups of vaccine-naive subjects were bled at the time of the respective follow-up of the vaccinated subjects.

TABLE 38.4  Recommendations for Use of Meningococcal Conjugate Vaccines Available in the United States[a]

| Risk Group | Primary Series | Booster Dose |
|---|---|---|
| Routine immunization of healthy persons aged 11–18 y who are not at increased risk for meningococcal disease | 1 dose of MCV4-CRM or MCV4-DT, preferably at age 11–12 y | At age 16 y if primary series at age 11 or 12 y<br>At age 16–18 y if primary dose at age 13–15 y<br>No booster needed if primary dose on or after age 16 y |
| Persons aged 2–23 mo with complement component deficiency,[b] human immunodeficiency virus infection, functional or anatomic asplenia, or increased risk of exposure[c] | MCV4-CRM at 2, 4, 6, 12–15 months or (only if age >9 mo) MCV4-DT at 9 and 12 mo of age (in this age group, MCV4-DT contraindicated in asplenia and human immunodeficiency virus infection[d,e]) | In persons immunized at age <7 y, after 3 y<br>In persons immunized at ≥7 y, after 5 y<br>If continued risk, additional boosters every 5 y |
| Persons aged ≥24 mo with complement component deficiency,[b] human immunodeficiency virus infection, or functional or anatomic asplenia | 2 doses of MCV4-CRM or MCV4-DT 8–12 weeks apart[a,f] | In persons immunized at <7 y, after 3 y<br>In all persons immunized at ≥7 y, after 5 y<br>If continued risk, additional boosters every 5 y |
| Persons aged 24 mo to 55 y with increased risk of exposure[c] | 2 doses of MCV4-CRM or MCV4-DT 8–12 weeks apart<br><br>1 dose of MCV4-CRM or MCV4-DT[a,f] | In persons immunized at age 9 mo to 6 y and who remain at increased risk of exposure, after 3 y<br>In all persons immunized at 7 y or older, after 5 y<br>In persons immunized at age <7 y and who remain at increased risk of exposure, after 3 y<br>In all persons immunized at ≥7 y, after 5 y<br>If continued risk, additional boosters every 5 y |

[a] See http://www.cdc.gov/mmwr/preview/mmwrhtml/rr6202a1.htm, http://www.cdc.gov/mmwr/preview/mmwrhtml/mm6324a2.htm, and http://www.cdc.gov/mmwr/volumes/65/wr/mm6543a3.htm for current ACIP recommendations.
[b] Such as C3, C5–C9, properdin, factor D, factor H, or eculizumab administration.
[c] For example, microbiologists routinely working with *Neisseria meningitidis* at risk because of a community outbreak caused by a vaccine capsular group, and travelers to or residents of countries where meningococcal disease is hyperendemic or epidemic.
[d] MCV4-DT contraindicated in this scenario because of interference with pneumococcal conjugate vaccine.
[e] If MCV4-DT is used, it should be given either before or at the same time as DTaP. This recommendation is based on new evidence indicating that hSBA responses to all four meningococcal capsular groups did not meet noninferiority criteria when MCV4-DT was given 30 days after DTaP.
[f] If MCV4-DT is used, it should be administered at least 4 weeks after administration of all pneumococcal conjugate vaccine doses.
Modified from recommendations of the Advisory Committee on Immunization Practices.

public health importance of these differences is unknown, the greater persistence of group Y SBA in the MCV4-CRM group would be expected to translate into greater protection against capsular group Y strains, which account overall for nearly one-third of cases of meningococcal disease in the United States. Collectively, the antibody persistence data also indicate that for both vaccines, protective serum titers wane in immunized adolescents. Taken together with evidence of declining MCV4-DT vaccine efficacy over time in adolescents immunized in the United States with MCV4-DT, in 2010, the Advisory

Committee on Immunization Practices (ACIP) recommended the addition of a booster dose of MCV4-DT or MCV4-CRM (Table 38.4; also see "Recommendations for the Use of Meningococcal Vaccines in the United States" below).[311] Similar findings have been reported among military personnel.[407]

Most MCV4-CRM use in the United States is currently targeted at adolescents and more recent data address persistence after a booster dose in adolescents immunized initially with either MCV4-DT or MCV-CRM. Two years after an MCV4-CRM booster, 77% to 100% of individuals had an hSBA of 1:8 or

greater.[408] Similarly, in a study conducted 3.5 years after a dose of MenACYW-TT (not yet FDA approved) all volunteers among a small group of adolescents maintained an rSBA of 1:8 or greater.[409]

Limited data are available on serum antibody persistence in younger children immunized with MCV4-DT. In one study, children 2 to 11 years old were given one dose of MCV4-DT or MPSV4 and were followed up for 6 months. Between 1 and 6 months, serum bactericidal titers declined in both vaccine groups, but titers waned more rapidly in the MPSV4 group.[309] When the 6-month follow-up serum samples were retested with human complement,[243] the results confirmed more rapid waning of immunity in the MPSV group. In a second study, serum samples were obtained at a mean interval of 2.4 years after MCV4-DT vaccination of 2-year-old children.[307] The proportions of MCV4-DT-vaccinated children with titers of 1:4 or greater (using human complement) were 15% (group A), 33% (group Y), and 45% (group W). The respective percentages for unvaccinated children were lower (2.5%, 15%, and 17.5%). In a separate analysis, serum group C antibody concentrations, which were measured by a binding assay, remained elevated for 2 to 3 years after MCV4-DT vaccination compared with unvaccinated children, but serum group C bactericidal titers of 1:4 or greater were infrequent in both groups (14.6% and 6.4%, respectively; $P = 0.3$).[235] In vaccinated children, some serum samples with bactericidal titers less than 1:4 conferred passive protective activity against group C bacteremia in the infant rat model. These results are difficult to interpret in the light of more recent studies showing that complement activation on *N. meningitidis* is not downregulated by rat fH because the molecule does not bind to meningococci.[377] Therefore, the bacteria are more easily cleared by antibodies interacting with rat complement than they would be with human complement and, therefore, the passive protection results in the rat bacteremia model in the absence of human fH are likely to overestimate protection compared with protection in humans.

At 5 years of age antibody had waned after three- or four-dose infant schedules with MCV4-CRM such that 9% to 69% had an hSBA of 1:8 or greater after three doses against the different stains, and 11% to 85% had an hSBA of 1:8 or greater after four doses, with the best responses being against W.[353] Antibody persistence was evaluated 5 years after immunization of 2- to 10-year-old children with MCV4-CRM, and about half were found to have maintained "protective" antibody levels for C, Y, and W, but persistence was poor for A.[410]

Among toddlers 12 to 23 months of age, MCV4-TT was highly immunogenic and noninferior to MenC-CRM with at least 90% of toddlers maintaining rSBA titers of 1:8 or greater 3 years after vaccination. However, in this study hSBA was also measured and shown to have waned markedly for capsular group A (only 21% maintained an hSBA of 1:4 or greater at 3 years of age).[411]

Persistence of antibody after Hib-MenC vaccine is discussed above under "Hib-MenC and Hib-MenCY."

## Immunologic Memory Elicited by MCV4 Vaccines and Effect of Previous Administration of MPSV4 Vaccine

A booster dose of MCV4-DT given to adolescents 3 years after a primary MCV4-DT vaccination elicited higher groups C, Y, and W anticapsular antibody responses than in control subjects immunized with MCV4-DT for the first time (Fig. 38.13). In contrast, a dose of MCV4-DT vaccine given to adolescents who had previously been given a dose of MPSV4 vaccine elicited lower serum bactericidal antibody responses than in



**Figure 38.13.** Serum bactericidal antibody titers of adolescents 8 days after a dose of quadrivalent meningococcal conjugate (MCV4-DT) vaccine in relation to previous vaccination. Three years earlier, the subjects had received a dose of MCV4-DT vaccine or quadrivalent meningococcal polysaccharide (MPSV4) vaccine as part of a randomized vaccine trial. A newly recruited control group of vaccine-naïve adolescents was given a dose of MCV4 vaccine. For capsular groups C, Y, and W135, the reciprocal serum geometric mean titers (GMTs) to the second dose of MCV4-DT were higher than those to a first dose given to the naïve subjects ($P < .05$); evidence of immunologic priming by the first injection. For all four capsular groups (A, C, Y, and W), the reciprocal serum GMTs to the dose of MCV4 vaccine in subjects previously vaccinated with MPSV4 were lower than those to a first dose of MCV4-DT given to the naïve subjects ($P <$ ...); evidence of antibody hyporesponsiveness induced by the polysaccharide vaccine). *CI*, confidence interval. *(Data from Keyserling Papa T, Koranyi K, et al. Safety, immunogenicity, and immune memory of a novel meningococcal [groups A, C, Y, and W-135] polysaccharide diphtheria toxoid conjugate vaccine [MCV-4] in healthy adolescents. Arch Pediatr Adolesc Med. 2005;159:907–913.)*

control adolescents immunized with MCV4-DT for the first time (Fig. 38.13). Although the impaired serum antibody response to group C was the most affected, polysaccharide-induced antibody hyporesponsiveness also was present for capsular groups A, Y, and W. Nevertheless, 100% of the subjects previously immunized with the polysaccharide vaccine who were immunized with MCV4-DT developed bactericidal titers of 1:128 or greater (using rabbit complement) to all four capsular groups, which should be sufficient for protection.

Adolescents previously immunized with MCV4-CRM mounted stronger responses to a booster of MCV4-CRM than was observed in both naïve individuals and those previously immunized with a quadrivalent polysaccharide vaccine, which indicated an anamnestic response.[412]

Immunologic memory was assessed in infants immunized with MCV4-CRM vaccine by administration of a decreased dose of MPSV4 at 12 months of age. The infants had been immunized at 2 and 4 months or at 2, 4, and 6 months. The percentages of the children responding with fourfold increases in human complement serum bactericidal titer to the polysaccharide probe at 12 months ranged from 55% (group C) to 95% (groups W and Y). These response rates were substantially higher than those of immunologically naïve historical control subjects who showed minimal or no detectable bactericidal responses when immunized with a dose of polysaccharide vaccine at 1 to 2 years of age.

Appx18667

## Rationale for Two-Dose Primary Series in Certain High-Risk Groups

In the United States, a single dose of MCV4-DT or MCV4-CRM was considered sufficient for eliciting protective antibody responses in persons 2 years or older. Recently, for certain patient populations with increased risk of meningococcal disease, a two-dose primary schedule was recommended (see "Recommendations for the Use of Meningococcal Conjugate Vaccines in the United States" below). The rationale for this recommendation is that (1) persons with certain underlying medical conditions respond suboptimally to meningococcal vaccines and (2) there is evidence that a two-dose primary vaccination series given 2 months apart increases the antibody response. Also, although persons with deficiency of late complement components are reported to respond as well to MPSV4 as persons without such deficiencies, serum antibody titers wane more rapidly in complement-deficient patients.[413,414]

In one study of asplenic patients, approximately 20% did not achieve putative protective bactericidal antibody responses following a single dose of one of three group C meningococcal conjugate vaccines, and their GMTs were nearly 10-fold lower than in control subjects without asplenia (158 vs 1448).[415] Patients with a congenital or functional reason for asplenia had lower antibody responses than did patients with asplenia as a result of trauma. Among 23 persons who did not achieve a bactericidal antibody titer of 1:16 (using rabbit complement) or greater after the first dose, 61% achieved a titer of 1:16 or more after a second dose. These data suggest that a two-dose series would provide protection superior to a one-dose series.

In a study of meningococcal conjugate vaccination in adolescents with HIV infection, 86%, 55%, 73%, and 72% of patients had serum bactericidal titers of 1:128 or greater (using rabbit complement), respectively, for capsular groups A, C, Y, and W after one dose of MCV4-DT.[416] Lower CD4+ lymphocyte percentages and higher HIV viral loads were independently associated with a poorer response to immunization.[417]

## Postlicensure MCV4-DT Effectiveness

In 2014, MCV4-DT vaccine coverage among U.S. 13- to 17-year-olds was estimated to be 79%, although with a great deal of regional variation.[418] The small numbers of cases from the historically low rates of meningococcal disease in the United States have made it challenging to establish the effectiveness of MCV4-DT. However, several recent studies using different approaches have provided a picture of the effectiveness of this vaccine. In one study, surveillance for MCV4-DT vaccine failures was conducted and vaccine effectiveness was modeled based on the expected number of vaccine failures and estimates of MCV4-DT coverage.[419] This analysis suggested a vaccine effectiveness of 80% to 85% within 3 to 4 years after vaccination, which is similar to that expected for meningococcal polysaccharide vaccine. In a case-control vaccine effectiveness study, overall vaccine effectiveness (all capsular groups) for 0 to 8 years postvaccination was estimated to be 69% (95% CI, 51–80%). Over time, there was evidence for waning of effectiveness with estimates of 79% (49–91%) during the first year after vaccination, 69% (44–83%) at 1 to less than 3 years, and 61% (25–79%) at 3 to less than 8 years.[419a] These results are consistent with waning serum bactericidal titers and supported the addition of a booster dose (see earlier discussion and Fig. 38.12).

Based on active surveillance of meningococcal disease in regions of the United States with 13% of the overall population (ABCs[426]), the incidence of IMD among 11- to 17-year-



**Figure 38.14.** Incidence of capsular groups C, Y, and W meningococcal disease in the United States, from 2004–2013 by age group.

olds caused by capsular group C, Y, or W strains fell from 0.37 per 100,000 population during 2006 to rates of less than 0.1 cases per 100,000 population in 2013. Rates have changed little in other age groups (Fig. 38.14).

Although attribution of causality is not possible in this ecological analysis, these data, in combination with the vaccine effectiveness data, suggest a selective effect of MCV4-DT on the immunized population and a lack of substantial herd protection in the unvaccinated population, although this may be because the coverage was low initially. In addition, there are no data on the impact of MCV4-DT on pharyngeal carriage of vaccine capsular groups. No postlicensure effectiveness data are available for MCV4-CRM because it was licensed in the United States in 2010 and follow-up has been too brief. However, use of quadrivalent conjugate vaccines in Latin America and the United Kingdom to control recent outbreaks of ST-11 capsular group W disease will likely provide evidence in due course.

MCV4-DT and MCV4-CRM provide capsular group–specific coverage, which does not include capsular group B disease. One concern about widespread use of vaccines that do not cover all disease-causing strains is the possibility of capsular switching and subsequent clonal expansion from a virulent vaccine-capsular group strain (i.e., group C, Y, or W) to a nonvaccine capsular group strain (i.e., group B). To assess the meningococcal population structure in the United States before licensure of MCV4-DT in 2005, a study was performed on isolates from 2000 to 2005 from Active Bacterial Core surveillance (ABCs) sites throughout the United States.[51] Of 1160 isolates included in the study, 1.5% of group B, 12.9% of group C, and 0.9% of group Y isolates showed evidence of capsular switching. For example, there were one and four isolates, respectively, that expressed capsular group B polysaccharide and belonged to sequence type 11 or 103, which are both hypervirulent meningococcal lineages that typically express group C capsules.[51] An update to this study in 2015 found no new evidence of vaccine driven changes in the population.[181] It is noteworthy that although a group B vaccine was not introduced in the United States until 2015, the incidence of capsular group B disease in the United States has fallen dramatically since the 1990s.

## Safety of MCV4 Vaccines

In prelicensure studies, MCV4-DT was administered to approximately 7000 persons. Vaccination was safe and well tolerated.[310,384] In randomized studies, fever (temperature, ≥38°C) was more common after MCV4-DT than MPSV4 (5.1% vs 3.0%, respectively, in immunized adolescents; and 1.5% vs 0.5% in adults). Fewer than 5% of subjects vaccinated with MCV4-DT or MPSV4 experienced serious systemic reactions (defined as high fever; headache, fatigue, malaise, chills, or arthralgia requiring bed rest; or anorexia [missing three meals]; three or more episodes of vomiting; five or more episodes of diarrhea; or the presence of rash or seizures). The respective rates of serious reactions in the MCV4-DT group met predetermined noninferiority criteria as compared with the respective rates observed in the MPSV4 vaccine group.

The prelicensure MCV4-DT studies also showed that local reactions were more common than with MPSV4, which likely reflected the presence of diphtheria toxoid as the carrier protein in the conjugate vaccine. Thus, 16.7% of adolescents given MCV4-DT and 3.9% of the MPSV4 group reported moderate pain at the injection site,[310] and 2.5% and 0.7%, respectively, reported moderate swelling. Severe pain (unable to move arm) occurred in 0.7% of the MCV4-DT group and 0% of the MPSV4 group, while severe swelling at the injection site (>2 inches) was reported by 0.7% and 0%, respectively. These local reactions generally resolved within 48 to 72 hours. The frequencies of local reactions in MCV4-DT–vaccinated adolescents were similar to those observed in this age group after Td (diphtheria and tetanus toxoids–adult) vaccination. The respective rates of local reactions in MCV4-DT–immunized adults were lower than in adolescents and similar to those observed after typhoid vaccination of adults.

In prelicensure studies, the safety and tolerability of MCV4-CRM were compared with those of MCV4-DT. In 2- to 5-year-olds, the respective rates of local reactions were similar for the two vaccines (e.g., 27% vs 25% for erythema and 33% vs 35% for pain, respectively).[393] Rates of systemic reactions were also similar (e.g., 21% vs 22%, respectively, for irritability). In the same study, there were also no substantial differences for the two vaccines in adverse reactions for 6- to 10-year-olds. In a separate study, tolerability in 11- to 18-year-olds was similar for MCV4-DT and MCV4-CRM, with, for example, 70% and 64% of subjects, respectively, reporting mild to moderate solicited reactions.[395] Tolerability of a single dose of MCV4-CRM or MPSV4 also was similar, with reported local reactions, respectively, in 63% to 71% vs 60% to 62%, and systemic in 44% to 56% vs 46% to 59%.[421]

Soon after MCV4-DT licensure in 2005, cases of GBS with onset 2 to 4 weeks after MCV4-DT vaccination were reported to the Vaccine Adverse Event Reporting System (VAERS).[422] An increased rate of GBS was not observed after vaccination with MPSV4 or diphtheria toxoids, the two principal components of MCV4-DT nor with other conjugate vaccines. Several studies conducted to clarify the association between MCV4-DT vaccination and GBS were done. A review of Vaccine Safety Datalink data revealed no GBS cases following 889,684 MCV4-DT doses. The statistical power, however, of this study alone to measure increased risk, if any, was limited. Another study was conducted to estimate the risk of GBS during the 6 weeks following MCV4-DT vaccination as compared with vaccinees at other times and in persons who had not received MCV4-DT.[423] Five health plans with a total membership of approximately 50 million persons participated. GBS cases were identified through claims data and confirmed through a review of medical records. There were 99 GBS cases confirmed and more than 1.4 million MCV4-DT immunizations observed, but no GBS cases occurred within 6 weeks following MCV4-DT

immunization. The 95% upper confidence limit was per million MCV4-DT doses. Taken together, these do not support an increased risk of GBS from M immunization. Based on these data, on June 23, 2 ACIP removed the precautionary language about th GBS and this vaccine and no new safety concerns ha since.

Safety data have been developed during the lice MCV4-CRM and do not identify any unexpected events signals from the trials. One study involving m 7700 infants found that safety of MCV4-CRM is no to routine vaccines after adjusting for study center.[420]

## RECOMMENDATIONS FOR THE USE OF MENINGOCOCCAL CONJUGATE VACCINES IN THE UNITED STATES

The ACIP has published its recommendations on of meningococcal conjugate vaccines.[425-427a] Conjug cines are preferred over unconjugated polysaccharide because conjugate vaccines are at least equivalent immunogenic than polysaccharide vaccines, can be us early infancy, and prime for booster antibody respo addition, although not documented for meningococ jugate vaccines licensed in the United States, conju cines in general and capsular groups C and A menin conjugate vaccines specifically induce herd protection decreased pharyngeal carriage. In contrast, the mening polysaccharide vaccines have minimal effect on carr induce antibody hyporesponsiveness to a subseque tion. The reason conjugate vaccines, but not polysa vaccines, have a substantial effect in decreasing men cal carriage is that the T-cell help associated with c vaccines leads to higher levels of antibody that hav avidity than those associated with polysaccharide v Therefore, except for certain circumstances, such as f age 55 years or older for whom there are insufficie on the use of meningococcal conjugate vaccines, gate vaccine is preferred over an unconjugated polysa vaccine. That said, off-label use of meningococcal c vaccines could be considered for persons 55 year and older.

## Routine Immunization

ACIP recommends routine immunization for all per to 18-years-old with MCV4-DT or MCV4-CRM, with ence for beginning immunization at 11 to 12 years of Table 38.4). For children immunized at 11 to 12 year a booster dose is recommended at age 16 years (at leas later). Only a single dose is recommended for those ol 16 years of age and routine vaccination is not recom for those older than 19 years of age. This recommend based on an increased risk of meningococcal disease lescence and, as described, evidence for waning seru body levels and vaccine effectiveness over time.[427] vaccination is not recommended for other ages in the States.

MCV4-CRM and Hib-MenCY are approved by the use in infants as young as 6 to 8 weeks of age. How of September 2015, these vaccines were not recomm by the ACIP for routine immunization before age although the incidence of disease in children young age 1 year is more than sevenfold higher than in ado (Fig. 38.15).

The reasons the ACIP does not recommend routir nation with MCV4 beginning at 2 months of age ind



Figure 38.15. Incidence of meningococcal disease in the United States, from 2005 to 2012 by age group. (From Centers for Disease Control and Prevention. Advisory Committee on Immunization Practices Meeting, October 2014.)

disease burden, the majority of infant disease is caused by capsular group B strains, the high price of the vaccine, and concerns that additional injections would be unacceptable in an already overcrowded and complex infant and toddler vaccination schedule.[428]

## Groups at Increased Risk of Disease, Ages 2 Months to 55 Years

### Ages 2 Months to 23 Months

A four-dose course of MCV4-CRM is recommended at 2, 4, 6, and 12 months of age for infants known to be at increased risk of meningococcal disease.[428] MCV4-CRM is the only quadrivalent vaccine licensed for infants younger than 9 months of age and so infants who fall into a risk group at ages 7 to 23 months should have a two-dose course of MCV4-CRM (second dose given when infant is older than 12 months of age and at least 3 months after the first dose). MCV4-DT also can be used as an alternative for infants older than 9 months of age.

If MCV4-DT or MCV4-CRM or Hib-MenCY have been used to initiate immunization at 2 to 13 months of age, the first booster should be given 3 years later with a quadrivalent vaccine and subsequent boosters every 5 years.

Infants and toddlers with functional or anatomic asplenia should receive MCV4-CRM or wait until 2 years of age and receive MCV4-DT as MCV4-DT may interfere with PCV13-CRM responses.

### Ages 24 Months to 55 Years

A two-dose primary course of MC4-DT or MCV4-CRM (8 weeks apart) is recommended for individuals with complement deficiency, or functional or anatomic asplenia, and for individuals with HIV infection who have one of the other indications for immunization (i.e., not routinely recommended in HIV infection). A single dose of MCV4 is recommended for travelers to regions with epidemic or hyperendemic meningococcal disease, college freshmen living in dormitories (younger than 22 years of age), microbiologists with routine exposure to N. meningitidis, and during an outbreak. For those at ongoing risk of disease, initial booster doses are recommended after 3 years of age among those younger than 7 years of age and at 5 years for children aged 7 and older and adults. Further boosters are recommended every 5 years.

### Persons Age 55 Years or Older

There are no data available on the use of quadrivalent meningococcal conjugate vaccines in the 55-years-or-older age group. When meningococcal vaccination is indicated for persons 55 years of age or older, the ACIP recommends MPSV4, although the immunological advantages of MCV4 make this advice appear rather conservative. If the polysaccharide vaccine is not available or repeated vaccine doses are likely to be required as a result of ongoing risk, ACIP agrees that off-label use of one of the conjugate vaccines could be considered.

## Mass Vaccination Programs to Control Outbreaks

Outbreaks of meningococcal disease can occur in institutions and communities. An outbreak has been defined by the CDC as the occurrence of three or more cases in less than 3 months resulting in a primary disease attack rate of at least 10 cases per 100,000 population in persons who have a common affiliation or who live in the same area but have no close contact.[5] Either of the quadrivalent meningococcal vaccines (MCV4-DT, from age 9 months, or MCV4-CRM, ages 2 months to 55 years) can be used for control of outbreaks caused by a strain with a vaccine-preventable capsular group.[384] For the aforementioned reasons, one of the conjugate vaccines is preferred.

## Precautions and Contraindications

No clinically important adverse effects have been documented among women vaccinated with MCV4 during pregnancy or their newborns. Therefore, MCV4 can be administered during pregnancy, if indicated.[427,433-435] Meningococcal vaccines can be administered during a minor acute illness, including in the presence of low-grade fever but deferred in those with a moderate to severe illness. Meningococcal conjugate vaccines can be safely admininistered to the immunocompromised. All vaccines are contraindicated in persons with known hypersensitivity to any vaccine component.

The use of meningococcal conjugate vaccines in adolescents has occurred in the context of the addition of other vaccines in this population, including acellular pertussis, human papillomavirus, and influenza vaccines.[416,436,437] Coadministration of MCV4-DT vaccine with diphtheria combined with tetanus toxoid (dT) in adolescents and with typhoid vaccine (Vi polysaccharide) in adults is safe and immunogenic. Coadministration of MCV4-CRM with human papillomavirus vaccine and tetanus, diphtheria, and pertussis (Tdap) in adolescents also is safe and immunogenic, as is coadministration with measles-mumps-rubella-varicella (MMRV) in toddlers.[394,438,439] Studies in infants have also shown that MCV4-CRM is safe and immunogenic when given with routinely administered vaccines in Europe. In general, polysaccharide-protein vaccines can be safely and effectively coadministered with live attenuated viral vaccines or purified subcomponent vaccines. Given the risk of syncope after immunization, particularly in adolescents,[440] the ACIP recommends observation of patients for 15 minutes after vaccine administration.[441]

Hib-MenCY has been studied concomitantly with routine infant immunizations including DTaP-HepB-IPV and pneumococcal conjugate vaccine in infants and with measles, mumps, rubella (MMR), and pneumococcal conjugate vaccine among toddlers and has an acceptable profile.[442,443]

## MENINGOCOCCAL VACCINES IN CANADA

There are currently two meningococcal polysaccharide vaccines (MPSV4 and MPSV2 [capsular groups A and C], both

called Menomune) licensed in Canada, and five meningococcal conjugate vaccines[444]: the conjugate products are MCV4-DT and MCV4-CRM, and three monovalent group C conjugate vaccines (P-MenC-CRM, G-MenC-CRM, and MenC-TT; see earlier section). In 2001, the Canadian National Advisory Committee on Immunization (NACI) recommended routine group C meningococcal conjugate vaccine for infants, children through 4 years of age, and adolescents and young adults.[59,445] In 2010, the NACI recommended the use of quadrivalent conjugate vaccine in place of monovalent group C conjugate vaccines in early adolescence. In addition, the NACI recommends the use of quadrivalent conjugate vaccine for persons 2 to 55 years of age who are at high risk. The NACI is an advisory organization, and immunization policy in Canada is made at the provincial level. For example, as of June 2011, Alberta recommended routine vaccination with three doses of a monovalent MenC conjugate vaccine at 2, 4, and 12 months; British Columbia recommended two doses at 2 and 12 months, and Ontario, Saskatchewan, and Quebec recommended one dose at 12 months. The diverse group of schedules used in Canada is available online.[444]

All provinces recommend a booster dose of C conjugate vaccine in adolescence but in some provinces this is administered as MCV4 and in others as a monovalent vaccine; the age of administration varies also.

## MENINGOCOCCAL CONJUGATE VACCINE POLICY IN EUROPE

Between 1999 and 2006, in response to relatively high endemic rates of meningococcal C disease, multiple European countries (Belgium, Iceland, Ireland, The Netherlands, Spain, and the United Kingdom) introduced meningococcal C conjugate vaccines as part of national immunization programs. The initial regimen in the United Kingdom included immunization of infants beginning at 2, 3, and 4 months of age. Because vaccine effectiveness fell substantially after 1 year among infants immunized with this regimen, the UK vaccination schedule was changed in 2006 to include a booster dose at 12

months of age (3, 4, and 12 months of age). The 4-month dose was dropped in 2013 and replaced by a booster of MenC for adolescents to sustain herd immunity. The latter was changed to MCV4 in 2015 and the 3-month dose of MenC was dropped in 2016 so that the final schedule starts at 12 months of age (as Hib-MenC-TT) followed by MCV4 in adolescence (see below).

In several European countries where the incidence of meningococcal disease remained low and stable during the 1999 to 2006 period (=0.2 per 100,000 population),[444] routine vaccination with meningococcal C conjugate was not initially implemented but has now become routine (Germany, Portugal, and Switzerland in 2006, and France in 2009; Table 38.5). Although waning serum bactericidal antibody titers have been observed after immunization,[249,352,373] vaccine effectiveness remains high,[188,314] although, as in the United Kingdom, an adolescent booster to maintain vaccine effectiveness is being considered or has been introduced in a number of countries either as the monovalent C conjugate or the quadrivalent product.

MCV4-CRM and MCV4-TT are both licensed in Europe but because of the low incidence of meningococcal disease in the region attributable to strains with capsular group A, W, or Y, recommendations for use of the quadrivalent conjugate vaccine in Europe are limited. In response to a marked increase in the number of cases of group W disease in the United Kingdom, a routine one-dose adolescent program of MCV4 was introduced in 2015 with catch-up for adolescents 14 to 18 years of age.

## A MENINGOCOCCAL CAPSULAR GROUP A CONJUGATE VACCINE FOR AFRICA

Up to 2010, the only meningococcal vaccines available in sub-Saharan Africa were a bivalent groups A and C and a trivalent groups A, C, and W polysaccharide vaccine (MPSV2 and MPSV3). These vaccines are poorly immunogenic in infants, the age group at greatest risk of acquiring disease, and have only a transient effect, if any, on colonization and spread of

**TABLE 38.5** Meningococcal Vaccine Policy in Selected European Countries[a]

| Country | Current Vaccination Schedule | Initial MenC Catch-Up |
|---|---|---|
| Austria | MenC at 12–14 mo and MCV4 at 12 y | |
| Belgium | MenC at 15 mo | 1–5 y/1–18 y; regional variation |
| Czech Republic | MenB vaccine in 3 doses at 2–5 mo with a booster at 12 mo. Two doses of MenB at 13–15 y. One dose of MCV4 at 1–2 y and at 13–15 y | |
| France | MenC at 12–24 mo | Catch-up to 24 y |
| Germany | MenC at between 12 and 24 mo | Recommended for unvaccinated through age 17 y |
| Greece | MenC at 2, 4, and 15–18 mo and MCV4 at 11 y | |
| Iceland | MenC at 6 and 8 mo | Through 20 y |
| Italy | MenC at 12–15 mo | |
| Ireland | MenC at 4 and 12 mo and 12–13 y | Through 23 y |
| Netherlands | MenC at 14 mo | 1 through 19 y |
| Portugal | MenC at 12 mo | Through 18 y |
| Spain | MenC at 2 and 12 mo and 12 y | <6 y; regional variation |
| United Kingdom | MenC at 12 mo and MCV4 at 13/14 y. MenB at 2, 4, and 12 mo | In 1999 MenC <18 y; expanded to 24 y. MCV4 catch up 14–18 y initiated in 2015 |

[a]MenC conjugate vaccines are recommended for routine use in various countries in Europe and Hib-MenC is used at 12 months of age in the United Kingdom. MenB and MCV4 is now recommended in the United Kingdom and is under consideration elsewhere. See http://vaccine-schedule.ecdc.europa.eu/Pages/Scheduler.aspx and http://www.szu.cz/uploads/IMO/Recommendation_for_vaccination_IMD.pdf

infection. For these reasons, meningococcal vaccination in Africa was largely done in response to epidemics, which was a logistically challenging and relatively ineffective strategy. Although an emergency response plan had been developed in collaboration with the WHO and the CDC,[314] implementation was often delayed because of limitations of surveillance or logistics. One study estimated that even under optimal circumstances, fewer than 60% of outbreak-related cases were prevented by implementing vaccination after an epidemic was recognized.[314] An improved meningococcal vaccine, therefore, was needed.

In sub-Saharan Africa, most meningococcal epidemics are caused by capsular group A strains. By the late 1990s, three vaccine manufacturers had developed capsular group C meningococcal conjugate vaccines for the United Kingdom, where there had been approximately 10,000 cases of disease caused by group C organisms and 1000 deaths during the previous decade.[315] There was little commercial interest in developing a group A meningococcal conjugate vaccine for sub-Saharan Africa, where there had been more than 700,000 cases and 100,000 deaths in the same decade.[3] The countries in this region remain some of the poorest in the world and could not afford to purchase the vaccine.

In 1999, the WHO funded a feasibility study to explore options to develop and manufacture a group A conjugate vaccine that could be sold in Africa for less than US$0.50 a dose.[316,317] The results from this study formed the basis of a successful grant application to the Bill and Melinda Gates Foundation, which in 2001 awarded $70 million to the WHO and the Program for Appropriate Technology in Health to develop a meningococcal group A conjugate vaccine with the goal of eliminating group A epidemics in Africa.[316] While there were concerns at the time about the potential for epidemics caused by capsular group W strains,[225,318-320] in the previous 100 years, more than 90% of epidemic meningococcal disease in sub-Saharan Africa had been caused by capsular group A strains. The dominance of group A disease and the greater technical challenges, higher cost, and extended timelines for developing a bivalent capsular groups A and W conjugate vaccine made development of a monovalent group A vaccine more feasible as a first step.

A novel conjugation chemistry using reductive amination of group A polysaccharide aldehydes and tetanus toxoid hydrazides was developed by scientists at the FDA's Center for Biologics Evaluation and Research.[321] The process was transferred to the Serum Institute, a vaccine manufacturer in India.[322] Extensive testing of the vaccine in sub-Saharan Africa provided assurance of safety, immunogenicity, and manufacturing consistency.[323] In 2010, marketing authorization for MenAfriVac (MenA-TT conjugate vaccine) was granted by the Food and Drug Administration of India for the export of the vaccine to African countries. Mass vaccination of 1- to 29-year-olds was introduced in December 2010, as part of countrywide demonstration projects in Burkina Faso, Mali, and Niger.[324] More than 217 million people ages 1 through 29 years had received MenA-TT vaccine (containing 10 μg MenA polysaccharide) in 17 countries in the African meningitis belt by 2015.[325] It is hoped that high coverage in this age group will lead to herd protection of unvaccinated children younger than 1 year of age and elimination of epidemics of meningococcal A disease. MenA-TT led to a dramatic decline in group A carriage in African villages, suggesting that herd protection with this vaccine will be substantial.[326] Once the mass vaccination campaigns are completed, the concern will be to protect subsequent birth cohorts throughout infancy. Two strategies are recommended, one for countries where MenA coverage is high and another where MenA coverage is low (<60%).[328] In high-coverage countries, vaccination should be administered as a single dose at 9 to 18 months of age. A lower dose vaccine (5 μg of MenA polysaccharide) is available for children younger than 2 years of age. In low-coverage countries, periodic single-dose campaigns are recommended.

A major problem that has occurred since the widespread use of a capsular group A conjugate vaccine is the emergence of disease caused by strains with other capsular groups such as C, W, or X.[225,316,329-331] Currently there is no vaccine available for prevention of group X disease, which is extremely rare in North America and Europe.[332] For prevention of group C and W disease, tetravalent (A, C, Y, and W) conjugate vaccines are available in industrialized countries (see earlier discussion), but these vaccines are expensive and not available in sub-Saharan Africa. A trivalent MPSV3 vaccine is available for Africa and kept in reserve by the WHO for response to capsular groups C and W epidemics, but this vaccination strategy has many limitations, as described. Work is currently underway to produce a low-cost pentavalent MenACWXY conjugate vaccine that could (potentially) replace the monovalent vaccine.

### Acknowledgments

This chapter incorporates some material written by Martha Lepow, Bradly Perkins, Patricia Hughes, and Jan Poolman, authors of the chapter on meningococcal vaccines that appeared in the third edition of *Vaccines*; Ian Feavers, an author of the chapter that appeared in the fourth edition; Ray Borrow, an author of the chapter that appeared in the fifth edition; and Steve Pelton, an author of the chapter that appeared in the sixth edition.

The work was supported in part by grants R01 AI046464 and R01 AI114701 (D.M.G.) from the National Institute of Allergy and Infectious Diseases, National Institutes of Health (NIH).

References for this chapter are available at ExpertConsult.com.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,
            *Plaintiffs,*
      v.
MERCK & CO., INC.,
            *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S EXHIBITS IN SUPPORT OF MERCK'S RESPONSE TO RELATORS' STATEMENT OF UNDISPUTED FACTS

# EXHIBIT 321



# 52 Rotavirus Vaccines

*Umesh D. Parashar, Margaret M. Cortese, and Paul A. Offit*

Rotaviruses were the leading cause of severe dehydrating diarrhea in infants and young children throughout the world before rotavirus vaccines became available. Most children were infected by the time they reached 2 to 3 years of age.[1,2] Even in developed nations, where standards of hygiene are high, rotavirus was the most common cause of severe infant diarrhea.[3]

In the United States, before the introduction of a vaccine, rotavirus accounted for approximately 2.7 million illness episodes, 500,000 physician visits, 55,000 to 70,000 hospitalizations, and 20 to 60 deaths each year, and the economic burden of disease was estimated at approximately US$1 billion each year in medical and indirect costs.[4-7] In less-developed countries, rotaviruses ranked highest among the multiple microbial causes of severe gastroenteritis in children and contributed disproportionately to the mortality associated with the disease.[8-10a] Worldwide, rotavirus was estimated to cause approximately 200,000 deaths in children in 2013, with the highest mortality rates occurring in countries of sub-Saharan Africa.[11-16] Extensive global efforts to disseminate oral rehydration therapy in the developing world have contributed to a decline in diarrhea deaths.[17] However, the continuing mortality associated with rotavirus, 500 to 600 deaths per day, suggests that prevention through universal application of a safe, economical, and efficacious vaccine is the best means of drastically decreasing the morbidity and mortality from rotavirus.

The first rotavirus vaccine to be licensed (RotaShield, Wyeth Lederle) was introduced into the U.S. immunization program in 1998, but was withdrawn a year later when it was associated with intussusception. Two other rotavirus vaccines, RotaTeq (Merck) and Rotarix (GlaxoSmithKline) were introduced into the United States 7 and 9 years later, respectively. Following studies of more than 70,000 infants, the Advisory Committee on Immunization Practices (ACIP) recommended RotaTeq for routine use in the United States in February 2006. Following studies of more than 60,000 infants, Rotarix was licensed for use in the European Union and Latin America in 2006, and for use in the United States in April 2008. Globally, as of May 2016, a total of 81 countries, including 38 low-income countries that are eligible for support for vaccine purchase from the Vaccine Alliance, Gavi, have implemented rotavirus vaccines in their national immunization programs (Fig. 52.1).

This chapter describes the globally licensed RotaTeq and Rotarix vaccines and other rotavirus vaccines.

## CLINICAL DISEASE

Evaluation of children admitted to the hospital with rotavirus infection reveals a consistent pattern. The disease is characterized by the sudden onset of watery diarrhea, fever, and vomiting.[18-21] Most disease is mild, but a small proportion (approximately <1%) of children infected with rotavirus[4,5] will develop dehydration associated with severe loss of sodium and chloride in the stools and a compensated metabolic acidosis. In children admitted to the hospital with dehydration, fever and vomiting usually persist for 2 to 3 days and diarrhea for 4 to 5 days.[18-21] Detection of rotavirus antigen in the

plasma of infected children is common[22] and may be associated with disease severity.[23] Disease severity is also predicted by elevated hepatic transaminases and prolonged viral excretion in the feces.[24,25]

## VIRUS

Rotavirus infection has been detected in most common species of domestic animals and in many species of wild mammals and birds. Eight groups (species) of rotavirus have been described (A to H) based on genetic and antigenic differences in the VP6 protein—only viruses in groups A, B, and C are known to cause disease in humans. Whereas the great majority of human and animal rotaviruses share one set of common group antigens (group A rotaviruses),[26] animal rotaviruses within group A can be distinguished from human strains on the basis of type-specific surface antigens. Animals appear to be neither a reservoir for human strains nor a common source for direct transmission of rotaviruses to humans.

Certain rotaviruses of bovine and simian origin were propagated in cell culture to high titer before development of methods to propagate strains from humans.[27,28] Therefore, the molecular structure of rotavirus was largely determined by studies of the bovine strain, Nebraska Calf Diarrhea Virus,[29] and the simian strain, SA11.[30]

Rotaviruses are 70-nm icosahedral viruses that constitute a distinct genus of the family Reoviridae.[26] The virus is composed of three layers (an outer and inner capsid and a core) that encase the genome of 11 segments of double-stranded RNA.[26] All but segment 11, which contains information for two proteins (NSP5 and NSP6), encode a single protein. Gene segments can be separated on the basis of their molecular weight by polyacrylamide gel electrophoresis.[26] When mixed infections with distinct rotavirus strains occur under experimental conditions or in nature, the gene segments may reassort independently, producing progeny viruses of mixed parentage. Analysis of reassortant rotaviruses has led to identification of the gene segments encoding each of the structural polypeptides. This identification, in turn, has made possible techniques to intentionally reassort rotavirus strains and prepare candidate vaccine strains that incorporate desirable phenotypic characteristics of different parental viruses.[31-33]

Three major structural and one nonstructural protein of rotavirus are of interest in vaccine development (Table 52.1). The outer layer of rotavirus contains two distinct proteins: VP4 and VP7 (Fig. 52.2).[26] Each of these proteins bears type-specific antigenic determinants, elicits serotype-specific neutralizing antibodies, and induces serotype-specific protective immune responses in vivo.[34-37] Protein VP7 is encoded by gene segments 7, 8, or 9 in different rotavirus strains; protein VP4 is encoded by gene segment 4.[26] The most highly represented viral structural protein is VP6, which is found in the internal capsid and bears group-specific antigenic determinants.[38] Three structural proteins (VP1, VP2, and VP3) form the viral core and six other nonstructural proteins (NSP1, NSP2, NSP3, NSP4, NSP5, and NSP6) are also made during infection.[26] NSP4 is an enterotoxin.[39]

Both of the surface proteins, VP4 and VP7, elicit distinct serotype-specific neutralizing antibodies as well as, in certain

950



Figure 52.1. Countries that have included rotavirus vaccines in their national immunization programs, as of May 2016.

TABLE 52.1 Biologically Significant Structural and Nonstructural Rotavirus Proteins

| Designation | Product of Gene Segment | Approximate Molecular Weight (kDa) | Virion Localization | Biological Significance |
|---|---|---|---|---|
| VP4[a] | 4 | 88,000 | Outer capsid | Type-specific antigen, hemagglutinin |
| VP6 | 6 | 44,000 | Inner capsid | Major subgroup antigen |
| VP7 | 7, 8, or 9 | 38,000 | Outer capsid | Type-specific antigen |
| NSP4 | 10 | 28,000 | Nonstructural | Enterotoxin[a] |

[a]Trypsin cleaves VP4 yielding VP5 (MW 60,000) and VP8 (MW 27,000).
Data from Estes MK, Cohen J. Rotavirus gene structure and function. Microbiol Rev. 1989;53:410–449; Bellamy AR, Both GW. Molecular biology of rotaviruses. Adv Virus Res. 1990;38:1–43; and Ball JM, Tian P, Zeng CQY, et al. Age-dependent diarrhea induced by a rotaviral nonstructural glycoprotein. Science. 1996;272:101–104.



Figure 52.2. Three layers of a rotavirus particle: inner core, inner capsid, and outer capsid. Two surface proteins (VP4 and VP7) and one inner capsid protein (VP6) are shown.

circumstances, cross-reactive neutralizing antibodies.[40–46] The VP7 protein is glycosylated and serotypes determined by this protein are termed G types[26]; 27 rotavirus G serotypes have been identified. The VP4 protein is cleaved by the protease trypsin into VP5 and VP8; serotypes determined by the latter protein are termed P types.[26] The P protein presents in the form of 60 protein dimer spikes (the hemagglutinin) that extend beyond the VP7 surface of the virion while also penetrating through the outer capsid to interact with VP6 on the inner capsid.[47] Because of extensive cross-reactivity among different P types, it has not been possible to classify all P types by use of polyclonal hyperimmune antisera or monoclonal antibodies alone, although the major P serotypes have been established. This led to development of an additional system of P typing into genotypes identified by nucleic acid hybridization and nucleic acid sequencing studies.[48] Thirty-seven P genotypes have been identified.

Because of the above phenomena, a complex nomenclature has been developed. A complete rotavirus serotype is described using a number (or a number and letter) for the P serotype, followed by a number in brackets that represents the P genotype. This is followed or preceded by the G type designation (e.g., P1A[8]G1). Table 52.2 lists the most common human serotypes.

**TABLE 52.2** Common Human Group A Rotavirus Serotypes Worldwide

| VP4 Serotype (Genotypes) | Associated VP7 Types |
|---|---|
| P1A[8] | G1, G3, G4, G9, G12 |
| P1B[4] | G2 |
| P2[6] | G9, G12 |

## PATHOGENESIS

Studies of rotavirus pathology and pathophysiology in animals and humans focus on four important questions:

1. In which intestinal and nonintestinal tissues do rotaviruses replicate and induce disease?
2. By what mechanism does rotavirus induce gastroenteritis?
3. Why is rotavirus-induced gastroenteritis primarily a disease of the young?
4. What factors determine why rotavirus disease is more severe in developing than in developed countries?

Studies of natural rotavirus infection indicate that rotavirus replication is restricted to mature villous epithelial cells in the mucosal surface of the small intestine.[49-54] Replication progresses from the proximal to the distal small intestine.[52,54] Rotaviruses do not appear to replicate in immature epithelial cells of the villous crypt or in M cells overlying Peyer patches.[55] Despite epidemiologic support for respiratory spread, there is no clear evidence that rotaviruses productively replicate in organs or tissues other than the intestine. Rotavirus antigen, RNA, and live virus have been identified in blood during rotavirus infection, and RNA has been identified in cerebrospinal fluid, but the significance of these observations is unknown[14,22,23,55a,55b,55c]; rotaviruses have never been shown to replicate productively in humans in sites distant to the intestine. Although simian rotaviruses have been shown to replicate in hepatocytes of inbred mice, often leading to biliary atresia,[56,57] the relevance of these findings to human infection remains unclear.

Rotavirus replication in intestinal epithelial cells causes several physiologic and morphologic changes. Infected animals have a decreased capacity to absorb sodium, glucose, and water and have decreased levels of intestinal lactase, alkaline phosphatase, and sucrase.[58,59] These findings are consistent with an absorptive abnormality associated with an accelerated migration of immature epithelial cells toward the villous tip. Because no inflammatory changes occur in the lamina propria, in Peyer patches, or at the intestinal mucosal surface,[49-54] it is unlikely that intestinal epithelial cell damage is mediated by the host immune response.

One of the rotavirus nonstructural proteins, NSP4, acts as a viral enterotoxin.[39] Exposure of intestinal epithelial cells to NSP4 induces diarrhea in suckling mice in an age-dependent, dose-dependent, and specific manner. Disease is caused by excess chloride secretion by a calcium-dependent signaling pathway that can be blocked by oral administration of human immunoglobulin.[60,61] This finding is consistent with animal studies using reassortant rotaviruses generated from pathogenic and nonpathogenic strains,[62] indicating that the genes that encode pathogenic VP3, VP4, VP7, and NSP4 of the pathogenic strain were all required to reconstitute virulence. Because virus replication is required for generation of nonstructural proteins, it is not surprising that attenuation of rotavirus virulence can occur without attenuation of NSP4.[63]

Rotavirus infections are more likely to be severe in children 3 to 24 months of age than in younger infants or older children and adults.[64-67] Several studies have offered possible explanations for these differences in age susceptibility. First, children of increasing age may be protected by a virus-specific immune response generated by repeated natural infections. Protection of young infants may be mediated by passively transferred, transplacental, maternal antibodies. Breastfeeding clearly protects against rotavirus disease.[69] Second, infant mice have a larger percentage of intestinal epithelial cells with putative rotavirus-binding proteins on the surface than do older mice[70]—an observation that correlates directly with the age susceptibility to disease. Last, rotavirus entry into target cells is facilitated by cleavage of VP4,[71,72] which occurs in the presence of trypsin, elastase, or pancreatin.[73] Quantities of these exopeptidases are decreased in intestinal fluid secretions of newborn infants compared with older infants and young children.[74]

Children in developing countries are more susceptible to severe rotavirus disease than those in developed countries.[75] This is probably a consequence of poor access to hydration therapy and medical care, poor nutrition, concomitant infections with other viruses and enteropathogenic and toxin-producing bacteria, and possible differences in the gut microbiome.[76,77] Several studies in animals support the hypotheses that poor nutrition,[78,79] or associated bacterial infections, may enhance the severity of rotavirus-induced enteritis.[55,79,80]

## IMMUNOLOGIC FACTORS ASSOCIATED WITH PROTECTION AGAINST DISEASE

Protection against reinfection, which has been reviewed,[81,82] focuses on two important questions:

1. Which effector function or functions of the immune response mediate protection?
2. What is the importance of including different rotavirus serotypes in an optimal vaccine?

In 1983, the role of immunity to rotavirus was demonstrated by studies of natural infection in neonates.[83] Neonates infected in the first month of life were not protected against rotavirus reinfection but were protected against moderate to severe disease on reinfection. Conversely, neonates not infected with rotavirus during the first month of life were fully susceptible to diarrheal disease associated with the first rotavirus infection. Since then, studies of natural infection in infants and young children indicate that prior infections protect against severe disease upon reinfection.[84,85] In birth cohort studies from Mexico,[68] Guinea Bissau,[86] and India,[86a] a primary rotavirus infection conferred 77%, 70%, and 43% protection, respectively, against subsequent rotavirus disease (any severity). In Mexico, two previous infections provided 100% protection against subsequent moderate or severe rotavirus disease, but in India, three previous infections provided only 79% protection against this outcome. Such cohort studies from various geographic areas have examined preexisting antirotavirus IgG and IgA levels and subsequent rotavirus infections and disease episodes, with differing estimates of association.[64,85,86b,86c] Protection is associated with the presence of virus-specific immunoglobulin (Ig) A at the intestinal mucosal surface[87,88] and therefore serum IgA responses are often measured to evaluate immune responses to vaccines. However serum IgA antibodies do not accurately predict rotavirus-specific IgA antibody levels at the intestinal surface of infants.

While IgG- or IgA-binding antibody responses to vaccine have not consistently correlated with protective efficacy,[88a,88b] a recent analysis found serum antirotavirus IgA titers, to

aggregate, correlated with vaccine efficacy based on clinical trials of the two vaccines currently in wide use.[68c] Serotype-specific serum neutralizing antibody responses are often also measured. This is based on the knowledge that maternal protection following rotavirus infection is at least partially serotype-specific and virus-neutralizing antibodies have most often correlated with protection in many other infectious diseases.

Although natural rotavirus infection protects against moderate to severe disease caused by reinfection, some children experience repeated episodes of diarrhea with the same serotype during the following rotavirus season,[83,89-99] and a small number of children develop symptomatic rotavirus infection twice within the same season.[87] These observations are consistent with the fact that effector functions at mucosal surfaces, such as production of virus-specific secretory IgA (sIgA), are usually short-lived and that rotavirus-specific sIgA often is not detected at the intestinal mucosal surface within 1 year of symptomatic infection.[83,87-100] Modification of the severity of rotavirus disease caused by reinfection is most likely mediated by production of virus-specific sIgA by memory rotavirus-specific B cells located in the intestinal lamina propria.[101]

The presence of rotavirus-specific sIgA at the intestinal mucosal surface (as reflected in the feces) and in serum is predictive of protection against disease in studies of natural infection but not in vaccine trials. Virus-specific IgA in feces or serum did not predict protection against disease after immunization of infants with simian-human reassortant rotaviruses.[102-104] Several explanations for this phenomenon have been posited. First, the absence of rotavirus-specific sIgA in feces does not necessarily predict the absence of rotavirus-specific memory B cells in the intestinal lamina propria.[101] The presence of rotavirus-specific memory B cells in the lamina propria can only be determined by intestinal biopsy. Second, protection against rotavirus disease after immunization with animal rotaviruses might be mediated in part by virus-specific cytotoxic T lymphocytes. Whereas the role of rotavirus-specific cytotoxic T lymphocytes in protection against human disease is unknown, some evidence supports their importance in protection against disease in animals.[105-108] Alternatively, after immunization, cytokines with antiviral activity that are produced by activated CD4-bearing T cells may be generated either earlier or in greater quantities than after primary infection. Studies have found that rotavirus-specific CD4-bearing T cells alone mediated protection against challenge in experimental animals.[109,110] Several cytokines have been found to block rotavirus replication in vitro.[111]

It has been reported in some instances that natural infection or immunization of children with one rotavirus serotype induced protection against challenge with a different serotype (heterotypic protection).[95,112] Heterotypic protection may be mediated by antibodies directed against cross-reactive epitopes on outer capsid proteins VP4 and VP7,[42] antigenically conserved inner capsid proteins that are actively transported through rotavirus-infected villous epithelial cells,[113] rotavirus-specific cytotoxic T lymphocytes that broadly cross-react with cells infected with different rotavirus serotypes,[114] or antiviral cytokines generated by activated CD4-bearing T cells.[109,110,115]

The relative importance of including all common human P and G types in a rotavirus vaccine remains undetermined. However, it is clear that after a primary, natural rotavirus infection infants develop virus-specific neutralizing antibodies in serum directed against the infecting G type at levels greater than those directed against other G types.[116-120] In a similar manner, it has been reported that children are more likely to be protected against disease after reinfection with a G type to which they have already been exposed.[85,93] Finally, protection against rotavirus disease in adults challenged with a virulent human rotavirus strain (G1P1A[8]) correlated with antibodies directed against homotypic VP4 and VP7.[121] This may explain, in part, why heterotypic protection following administration of vaccines is inconsistent (see below).

## DIAGNOSIS

Electron microscopy, which once served as the reference standard for diagnosis of rotavirus infections, has now been replaced by enzyme-linked immunosorbent assay (ELISA). ELISA, which uses either polyclonal or monoclonal antibody preparations directed against the antigenically conserved inner capsid protein VP6, is as sensitive as electron microscopy but easier and less expensive to use.[122,123] However, false-positive ELISA results have been reported.[124]

The detection of rotavirus by polyacrylamide gel electrophoresis, although not commercially available, offers several advantages over ELISA. Assays that detect rotaviral genome, such as polyacrylamide gel electrophoresis and polymerase chain reaction, are absolutely specific for rotavirus. In addition, detection of migration patterns of segmented double-stranded RNA (electropherotypes) is of value in determining specific strains associated with community outbreaks or nosocomial infections, as is reverse transcriptase–polymerase chain reaction with partial sequencing of the gene coding VP7.[125] Indeed, because of difficulty in developing highly specific antisera against certain rotavirus P-serotypes, many have been classified only by characterization of their nucleic acid. Such strains are designated as *genotypes* with arbitrary numbered serotypes assigned based upon each P type newly identified by its genotype.

Reverse transcriptase–polymerase chain reaction is more sensitive than ELISA or electrophoresis in detecting small concentrations of rotavirus, particularly from clinical stool specimens.[126,127] A technique for VP7 typing of rotavirus in stool samples using partial genome product sequencing has proved consistently useful for characterizing specific serotype subtypes and allowing worldwide assessment of rotavirus strain relationships.[125]

## EPIDEMIOLOGY

Rotavirus is a ubiquitous infection in young children.[2] In settings without rotavirus vaccines, nearly all children are exposed to rotavirus and acquire antibodies by 2 to 3 years of age and most rotavirus diarrhea occurs during the first 3 years. In the first 3 months, infections might be asymptomatic or less severe than those in older infants; this is most likely a result of the protective effect of passively transferred maternal antibodies or breastfeeding or both. Infections in neonatal nurseries are often asymptomatic.[83] First infections after 3 months of age are generally associated with diarrhea that can range from mild to severe, whereas subsequent exposures lead to milder illness or asymptomatic infections.[68,84,85,87,128] The observation that nearly all children throughout the world, regardless of socioeconomic status, were infected early in life suggests that rotavirus is not primarily transmitted through fecally contaminated water or food, as distinct from bacterial or parasitic pathogens. Therefore, improvements in water, sanitation, and hygiene are not likely to substantially alter the incidence of disease. The priority placed on prevention of rotavirus by vaccination is predicated on the great global disease burden of rotavirus, the recognition that natural immunity is protective, and the expectation that alternative public health measures, including the provision of clean food and water, are unlikely to fully prevent disease.[1,123] Also, although infants in developing countries experience many more episodes of gastroenteritis every year than those in developed countries, the percentage

of rotavirus disease in hospitalized infants with dehydration secondary to diarrhea (approximately 40%) was similar in developing and developed countries before vaccine introduction.[130] Clearly, rotavirus causes most of the life-threatening gastroenteritis, regardless of the economic status of a nation, if vaccine is not in use.

Little is known about the exact mode of transmission of rotavirus. Person-to-person contact or exposure to aerosolized respiratory droplets are the most likely modes of transmission. In a mouse model, airborne spread of epidemic diarrhea by a murine strain has been reported.[131] Furthermore, rotavirus disease has a distinct winter seasonality in temperate climates that is similar to that seen for viruses spread by the respiratory route, such as influenza, respiratory syncytial virus, and measles. Before implementation of rotavirus vaccination in the United States, annual rotavirus epidemics began in the Southwest and spread to the North and East. The reasons for this phenomenon are not clear, although a recent mathematical study correlated the earlier onset of rotavirus activity in the West with higher birth rates in Western U.S. states, possibly resulting in more rapid accumulation of susceptible infants through births in each rotavirus season.[132] Following implementation of rotavirus vaccination in 2006, postvaccine seasons have demonstrated a delayed onset and distortion of the geographic patterns seen in prevaccine seasons. A south-to-north migration of rotavirus activity has been documented in Europe, and has been correlated with variations in birth rates, temperature, and rainfall.[133]

Humans are believed to be the only reservoir of human rotaviruses and consistent transmission of animal rotavirus strains to humans seems unlikely. Nevertheless, although classical epidemiology has failed to identify transmission of virus from animals to humans, reassortant strains composed of genomic segments from both human and animal rotaviruses have been identified. The presence of wild-type animal–human reassortants indicates that some mixing of strains must occur in nature and that these reassortments might be important for virus evolution.[134–136]

Global surveillance has led to the characterization of at least 27 G types and 37 P types in humans, and because rotavirus has a segmented genome, gene reassortment could theoretically lead to almost 1000 different G and P combinations. Although more than 60 G-P combinations have been found in human beings, just five strains (P[8], G1; P[4], G2; P[8], G3; P[8], G4; and P[8], G9) cause 80% to 90% of childhood rotavirus disease globally (see Table 52.2). Certain histo-blood-group antigens expressed on enterocytes have recently been proposed as receptors or ligands for the P protein of rotaviruses and associations between a population's frequency of particular histo–blood-group antigens and disease (or lack of disease) from particular rotavirus P genotypes have been made.[137–141] The distribution of various rotavirus strains varies by region and over time within the same region[142]; these natural variations are important to keep in mind when monitoring ecologic changes in rotavirus strains following the implementation of rotavirus vaccination.

Certain clues about immunity and transmission of rotavirus can be gained from epidemic investigations and special studies. Whereas immunity is believed to protect adults from disease,[143–146] parents and caretakers of children with rotavirus diarrhea often get disease, perhaps because practices such as diaper changing expose them to a large infectious dose.[146–152] Outbreaks in childcare centers and hospitals can spread rapidly among nonimmune infants and young children, presumably because of person-to-person contact, airborne or droplet spread, or contact with contaminated toys.[150–153] In the elderly, outbreaks have been described that may be linked to waning immunity or institutional crowding or both. Of note,

many of these outbreaks have been associated with G2 strains rather than other more common rotavirus serotypes.[151–155] In adults traveling from developed to developing countries (i.e., persons who would be expected to be immune to rotavirus), the virus has been identified as a cause of diarrhea, perhaps because the mode of transmission is different or the inoculum size is greater.[156] In addition, people immunocompromised by HIV infection,[157] hereditary immunodeficiency,[158,159] immunosuppression for organ transplantation,[160] or chemotherapy can develop rotavirus diarrhea with virus shedding that can persist for months.

Given the relatively high prevalence of HIV in some developing country settings, it is important to evaluate the safety of rotavirus vaccines in HIV-infected infants. It is anticipated that rotavirus vaccines will be well tolerated in HIV-infected infants given that the vaccines are composed of highly attenuated viruses. In addition, wild-type rotavirus does not lead to more severe disease in HIV-infected as compared with uninfected children. Studies conducted in the United States, Latin America, and several countries in Africa have shown that the presentation of rotavirus is similar in HIV-infected and uninfected infants.[161–166] The severity of symptoms, duration of hospitalization, and age at presentation does not appear to differ by HIV status. One study showed shedding of rotavirus up to 3 weeks after onset of symptoms in a higher proportion of HIV-infected than uninfected infants; however, the shedding was not associated with symptoms.[161] Furthermore, Rotarix (see below) was found to be safe in HIV-infected infants in South Africa.[167] Another factor that supports the safety of rotavirus vaccines in HIV-infected infants is the tolerability of oral polio vaccine (OPV) in this population. OPV is a live vaccine that replicates vigorously in the intestinal tract. There is no evidence of an increased risk of vaccine-associated paralytic poliomyelitis in HIV-infected infants.[168]

Several differences in the epidemiology of rotavirus diarrhea between developed and developing countries may affect future considerations concerning the use of vaccines. The distinct winter seasonality of rotavirus hospitalizations in temperate climates stands in contrast to the year-round disease seen in several tropical settings.[10] This means that a child born in a temperate climate immediately after the rotavirus season will have to wait many months before encountering the first possible natural infection during the following year's winter season. A child born in a tropical setting could be exposed any day of the year. Consequently, the average age at first infection is often younger in developing countries in tropical areas. In such tropical countries the first episode of rotavirus disease occurs most often during the first year of life, whereas frequently in developed countries the greatest prevalence of first rotavirus infections occurs in the second year of life. Therefore, an effective vaccine program in a developing country may require earlier and higher levels of coverage than a vaccine program in a developed country.[80a,168a] The Expanded Program on Immunization schedule, which is widely used throughout the developing world, calls for completion of the third vaccination visit by 14 weeks of age, which would provide such early coverage regardless of the rotavirus vaccine used. For unexplained reasons, fecal specimens from children from developed countries are typically infected with a single strain of virus of one of the common serotypes found globally, while in developing countries, the rate of mixed infections with two or more strains can be as high as 30%. These mixed infections as well as single-virus infections in developing countries may include uncommon serotypes not found in other parts of the world.[171] Nevertheless G1 to G4 and G9 serotypes are still predominant (~80% of all strains); thus, a vaccine that provides protection against these strains would be expected to have broad coverage in the developing world.

**TABLE 52.3** Burden of Rotavirus Disease in the United States and Worldwide Prevaccine

| | United States | | Worldwide | |
|---|---|---|---|---|
| Parameter | Total | Risk Per Child | Total | Risk Per Child |
| Births | 3.9 million | — | 130 million | — |
| Rotavirus gastroenteritis | 2.7 million | 1 in 1.4[a] | 111 million | 1 in 1.2 |
| Physician, ED visits | 600,000 | 1 in 6.5 | 2.5 million | 1 in 52 |
| Hospitalizations | 55,000–70,000 | 1 in 70 | 2 million | 1 in 65 |
| Moderate to severe disease | — | — | 16 million | 1 in 8 |
| Deaths | 20–60 | 1 in 100,000 | 450,000–600,000 | 1 in 250 |
| Medical costs | $400 million | — | — | — |
| Indirect and direct costs | $1 billion | — | — | — |

[a]Meaning that 1 of every 1.4 children born in the United States will have at least one episode of symptomatic rotavirus infection.
ED, emergency department.

The burden of rotavirus diarrhea for children in developing countries became evident when the first diagnostic tests were used to study the etiology of diarrhea in hospitalized children (Table 52.3). In more than 100 studies conducted around the world among children younger than 5 years of age who were hospitalized for diarrhea, rotavirus was the most common cause of diarrhea (detected in 20–60% of cases). Prospective studies of children observed from birth to 2 years of age suggest that the incidence of rotavirus diarrhea varies directly with the intensity of surveillance. These studies indicate that 77% to 83% of children will have an episode of rotavirus diarrhea in their first 2 to 3 years of life and, depending somewhat on the locale,[172–174] seek medical attention or treatment.

In developed countries, rotavirus was originally considered to be a mild, inconsequential infection of children. This point of view was proved incorrect when early studies documented a clear winter peak of rotavirus-associated hospitalizations that accounted for as much as 80% of cases of winter diarrhea.[4,175,176] On the basis of these surveys, the Centers for Disease Control and Prevention (CDC) developed national estimates for rotavirus diarrhea. These estimates, prior to the use of rotavirus vaccines, indicated that by the end of the second or third year of life 60% to 80% of all children developed a rotaviral diarrheal illness (~2.7 million episodes per year), one in 6.5 sought medical attention, one in 70 (55,000–70,000 patients) were hospitalized, and one in 66,000 to one in 200,000 (20–60 children) died from rotavirus.[4,177] The estimated rate of hospitalizations for rotavirus gastroenteritis among U.S. children (~275 per 100,000 for children younger than 5 years of age) was lower than the estimated rates for the United Kingdom,[178] Australia,[179] Ireland,[180] Venezuela,[181] and Finland, which ranged from approximately 800 to 3000 per 100,000. The cost of medical care in the United States was estimated to be more than US$400 million; indirect costs were estimated to be more than US$1 billion.[7] However, because rotavirus can cause vomiting and fever in the absence of diarrhea,[182] estimates of disease burden from U.S. medical records that include a code for diarrhea alone may underestimate the actual incidence of disease.

## PASSIVE IMMUNIZATION

Passive immunization with rotavirus-specific antibodies administered by the oral route ameliorates acute rotavirus infection in infants.[183–186] Sources of rotavirus-specific antibodies studied have included pooled commercial preparations of human serum immunoglobulin or colostrum from cows

parenterally immunized with rotavirus. In both immunocompetent and immunocompromised children, oral inoculation with rotavirus-specific antibodies caused a decrease in the number of days with diarrhea as well as a decrease in the length of hospital stays. No commercial source of rotavirus antiserum for therapy is currently available.

## ACTIVE IMMUNIZATION
### Nonhuman Rotaviruses

Initially, researchers examined two bovine- and one simian-origin rotavirus as oral vaccines for humans. In each case, promising early clinical trials characterized by low pathogenicity and impressive protective efficacy were followed by more extensive trials yielding inconsistent results. They are described briefly below because many of their phenotypic characteristics are retained in reassortant vaccines. A single animal rotavirus strain of lamb origin is currently available in China.

### Bovine Strain RIT4237

The first rotavirus vaccine to be evaluated in humans was the bovine strain Nebraska Calf Diarrhea Virus (P6[1]G6),[25] which was named RIT4237 for use in human trials.[187] This virus was highly attenuated by approximately 200 passages in bovine cell culture and most often was administered to infants at a dose of $10^8$ median tissue culture-infective doses. Induction of immunity to the vaccine virus was associated with minimal replication and minimal shedding of vaccine virus in feces.[188] Between 50% and 70% of vaccine recipients had a humoral immune response measured by rotavirus-specific ELISA for serum IgG or IgA or by neutralization of the vaccine virus strain.[188–190] Adverse clinical events were not noted in infants as young as 2 weeks of age.

In two initial efficacy trials of RIT4237 in 6- to 12-month-old Finnish infants, 50% and 58% were protected against all rotavirus diarrhea and 88% and 82% were protected against clinically significant disease.[190,191] The natural challenge was serotype P1A[8]G1. In subsequent efficacy trials performed at other sites, little or no protection was observed.[192–194] As a result, RIT4237 was withdrawn from further development.

Several principles generally applicable to oral rotavirus vaccines in infants were established with RIT4237:

1. A live, attenuated oral vaccine could protect children against natural rotavirus challenge.

2. The highest rates of immune response were achieved in infants 5 to 12 months of age, a time when prevaccination serum antibody levels, which reflected passively transferred maternal antibodies, were minimal.[188,190,195]

3. The specificity of virus-neutralizing antibodies in serum was primarily restricted to the homologous (G6) serotype, but heterotypic immunity could protect children against human strains.[196,197]

4. Administration of infant formulas to buffer stomach acids given before the vaccine enhanced virus-specific immune responses.[198,199]

5. Coadministration of OPV with a bovine-origin rotavirus vaccine had the potential to inhibit rotavirus-specific immune responses.[200]

6. Protection against severe rotavirus disease was always more efficient than protection against all rotavirus disease.

## Bovine Strain WC3

The parent rotavirus strain Wistar Calf 3 (WC3; P7[5]G6) was isolated from a calf with diarrhea in Pennsylvania in 1981 and passaged 12 times in African green monkey kidney cells.[201] Like RIT4237, WC3 vaccine was given at high titers ($10^7$ plaque-forming units [PFU] per child), was shed infrequently in feces, and was well tolerated.[201,202] Virus-specific neutralizing antibody responses in serum occurred in 71% to 100% of infants in trials in the United States and were primarily homotypic.[201]

In an initial double-blinded, placebo-controlled, efficacy trial in Philadelphia, WC3 vaccine caused a 76% reduction in rotavirus morbidity and 100% protection against moderate to severe rotavirus diarrhea when the natural challenge strain was P1A[8]G1.[112] Levels of virus-neutralizing antibodies did not correlate with protection from rotavirus illness. In a subsequent efficacy trial of WC3 conducted in Cincinnati, 100% of infant vaccine recipients developed WC3-specific neutralizing antibodies but none were protected against G1 rotavirus disease.[203] However, following immunization with WC3 vaccine, seropositive infants with evidence of prior infection exhibited booster responses of broad specificity (G1–G4).[204] In subsequent efficacy trials, WC3 gave little protection in the Central African Republic[205] and only 50% protection in Shanghai. Because protection against rotavirus disease was inconsistent, WC3 was eliminated as a potential vaccine candidate.

## Simian Strain RRV

The third animal-origin rotavirus tested in infants was the rhesus rotavirus vaccine (RRV) (P5[3]G3), which was isolated from a young monkey with diarrhea[206] and tested as a vaccine candidate in the 16th cell-culture passage.[206] Although RRV is nominally type G3,[207] the G protein shares only moderate homology with human G3 strains.[208]

RRV was safe and immunogenic in children 2 to 12 years of age,[206] but in infants 5 to 20 months of age, a clustering of febrile responses was noted 3 to 4 days after inoculation.[209] In Finnish infants 6 to 8 months of age, postvaccine fevers (64%) and watery stools (20%) were associated with administration of RRV in quantities of $10^5$ PFU.[210] In the same study, infants administered RIT4237 vaccine exhibited a lower rate of serum antibody responses but had no adverse reactions.[210]

The increased incidence of fevers was frequently absent in RRV vaccine recipients in developing countries[211] and in younger infants (4 months of age or younger) inoculated with a lower dose of vaccine. Immunogenicity was less at lower doses (i.e., $10^4$ PFU) and in children who were breastfed or

did not receive a buffer before vaccination.[211-213] RRV at a dose of $10^4$ PFU was not reactogenic in newborn Venezuelan infants.[214] Coadministration of RRV and OPV did not appear to lead to significant inhibition of serum antibody responses to either vaccine.[214,215]

Results of clinical efficacy trials of RRV varied. Infants were given a single dose of $10^4$ PFU between 2 and 12 months of age. Trials in Finland and Sweden identified modest protection (38% and 48%, respectively) against all cases of rotavirus diarrhea, but greater efficacy against severe rotavirus diarrhea (67% and 80%, respectively).[216,217] However, in three trials in the United States, much lower levels of protection were observed. In all these trials, the natural challenge viruses were predominantly G1.[194,218,219]

The greatest efficacy of RRV was observed in Venezuela. The vaccine protected 65% of children from all rotavirus disease and 100% of children from severe disease[220]; consistent with that observation, the natural rotavirus strains were predominately serotype G3. Vaccine-associated reduction in cases identified as G1, G2, or G4 (67%) was similar to the efficacy against G3 (70%).[221] Because protection against rotavirus disease was inconsistent, RRV was not pursued as a vaccine candidate.

## Lamb Strain Lanzhou Lamb Rotavirus Vaccine

The Lanzhou Lamb Rotavirus Vaccine (LLR), developed at the Lanzhou Institute of Biological Products, is licensed in China.[222] This live oral vaccine, which was derived from an ovine rotavirus isolated in 1985 and characterized as P[10] G12, was passaged 42 times in calf kidney cells. The vaccine is a liquid formulation with buffer containing $10^{5.5}$ infectious particles per dose in a volume of 3 mL and is given as a single dose between 2 and 24 months of age. In an efficacy trial, two cases of rotavirus diarrhea occurred among 1506 vaccine recipients and eight cases occurred among 1583 placebo recipients (73% efficacy). The rates of mild reactions were similar in the vaccine and placebo groups. The vaccine was licensed in China in 2000 and currently is being sold in several provinces. Postlicensure evaluations have found one dose, or one or more doses, of LLR to be 35.0% to 73.3% effective against rotavirus diarrhea requiring hospitalization.[223,124,224a]

## Animal X Human Reassortant Rotaviruses

Because protection induced against rotavirus disease by animal rotavirus strains was inconsistent, vaccine researchers focused efforts on recombinant (reassortant) rotaviruses. Such reassortant strains were prepared by using simian (RRV) or bovine (WC3 or UK) rotaviruses. In vitro–derived reassortants were selected bearing a human VP7 protein (to evoke human G type-specific neutralizing antibodies) and the remaining genes from an animal rotavirus (to attenuate rotavirus virulence for infants).[62,125] One multivalent bovine (WC3) human reassortant vaccine (RotaTeq) also contains a reassortant strain containing human VP4 (to evoke human P serotype-specific neutralizing antibodies). In addition, naturally occurring bovine–human reassortants ("Indian strains") currently are being tested as vaccines.

The first generation of reassortants, including those in the first licensed vaccine (RotaShield), were designed to contain the gene coding for VP7 of a human virus and 10 genes of the animal virus. To prepare a reassortant, susceptible cell cultures, usually derived from African green monkeys, were coinfected with a human virus and an animal virus (Fig. 52.3). Reassortment of viral gene segments occurred by chance and a virus containing the desired human virus VP7 was selected, often by suppressing the VP7 of animal origin with a monotypic

| Animal strain | Human strain | Animal-human strain |
|---|---|---|
| A1 | H1 | A1 |
| A2 | H2 | A2 |
| A3 | H3 | A3 |
| A4 | H4 | A4 |
| A5 | H5 | A5 |
| A6 | H6 | A6 |
| A7 | H7 | A7 |
| A8 | H8 | A8 |
| A9 | H9 | H9 |
| A10 | H10 | A10 |
| A11 | H11 | A11 |

**Figure 52.3.** The rotavirus genome consists of 11 individual segments of double-stranded RNA (dsRNA). Segments can be distinguished by their pattern of migration following electrophoresis in polyacrylamide gels. Progeny virions resulting from coinfection of monkey kidney cells with an animal and a human rotavirus strain often contain gene segments from each parent. The animal-human reassortant rotavirus strain shown has 10 dsRNA segments from the animal strain and 1 segment (gene segment 9) from the human strain.

antiserum against that protein. Viruses with the human VP7 gene accompanied by 10 genes from the animal virus were selected by use of gels identifying all the genomic segments of the reassortants. In some cases, additional confirmation of the origin of each reassortant gene was obtained by sequencing the viral genome.

### Simian (Strain RRV)–Human Reassortant Rotaviruses (RotaShield)

The first reassortant rotavirus vaccine candidates consisted of simian–human rotavirus reassortants that contained a single human gene (i.e., that coding for VP7) and the remaining 10 genes from RRV. These reassortant viruses were prepared at the laboratory of Infectious Diseases at the National Institutes of Health.[226]

RotaShield was licensed for universal use for infants in the United States in August 1998. However, because the vaccine was later found to be a rare cause of intussusception, the recommendation to use RotaShield was withdrawn in October 1999.

**Composition.** The vaccine (RotaShield), produced by Wyeth-Lederle, contained RRV (P5[3]G3) and three simian–human reassortants of G types 1, 2, and 4, each in a virus containing all the other genes of RRV. The human virus genes were from strain D1 (RRV-G1), DS1 (RRV-G2), and ST-3 (RRV-G4). This quadrivalent combination of RRV with three simian–human reassortant rotavirus strains was called RotaShield.

**Dosage and Route.** Field trials of the quadrivalent RRV-human reassortant vaccine were initiated at an inoculum of $10^4$ PFU of each of the four viruses (i.e., a total dose of $4 \times 10^4$ PFU) and completed at a dose of $1 \times 10^5$ PFU per strain ($4 \times 10^5$ PFU total), the dose of the licensed vaccine.[225] In each of

these trials, vaccine was administered orally in three doses, immunizations were separated by at least 3 weeks, and dosing was completed by the time a child was 6 to 7 months old. Protective outcomes were determined either by recording episodes of rotavirus diarrhea reported through active surveillance by field workers during the rotavirus season or passive catchment surveillance of children attending a clinic or hospital for diarrhea confirmed to be caused by rotavirus. In the United States, two separate but comparable multicenter trials using either the low ($10^4$ PFU per strain) or the high ($10^5$ PFU per strain) doses did not demonstrate a significant difference in efficacy.[103,227] However, in Latin America, two trials conducted in Peru[228] and Brazil[229] with the lower dose of vaccine each demonstrated a lower efficacy against severe disease than a trial with the same low dose in the United States and a trial with the higher dose conducted in Venezuela.[230]

**Immunogenicity.** RotaShield was developed with the hope that children would develop serotype-specific immunity to the four most common G types of rotavirus in global circulation at that time (G1, G2, G3, and G4). Whereas more than 90% of children developed an immune response, as measured by the appearance of virus-specific serum IgA or virus-neutralizing antibodies directed against RRV, few children (<50%) developed serotype-specific neutralizing antibodies to any of the four human G serotypes.[227] Nonetheless, studies of efficacy of RotaShield outperformed those using a single RRV-human reassortant (containing human G1) in seasons when strains other than G1 were circulating. This finding indicated that the strategy of using RotaShield to afford broad protection against several serotypes was correct even if there was not an adequate immunologic marker to predict protection against challenge or a complete understanding of the mechanism of this protection.[103,227,231] In a rare clinical trial in which the predominant natural challenge was not serotype G1 (but was G3), the quadrivalent RRV reassortant vaccine, which contained a strain (RRV) that was of G3 specificity, was clearly more protective than was a monotype G1 RRV reassortant, lending further evidence to the utility of multivalent vaccines.[232]

**Efficacy.** Seven efficacy trials of RRV-human vaccine were conducted, three using the vaccine in the lower dose and four using the vaccine in the higher dose. In all these trials, infants were enrolled for immunization between 6 weeks and 2 months of age and three doses were given by mouth. Efficacy was greater against severe disease than against mild disease and, in trials lasting 2 years, protection endured for both years.[233]

In general, the efficacy of the RRV-human reassortant vaccine was lower in developing countries. The protective efficacy of the low-dose vaccine was poorest in Peru,[228] intermediate in Brazil,[229] and best in the United States.[103] In a similar manner, the higher-dose preparations performed least well among Native Americans,[194] better among Venezuelans[230] and Americans,[232] and best among Finns.[233]

In trials using high-dose vaccine, efficacy ranged from 48% to 68% against any rotavirus disease and from 64% to 91% against severe disease. Of particular note, the efficacy reported in Venezuela (48% for mild disease and 88% for severe disease) was not significantly different from that reported in the multicenter trial in the United States using this higher dose (57% and 82%), suggesting that RotaShield might be well suited for use in developing countries. Furthermore, the observation that the higher dose worked well in Venezuela, when a lower dose did not work in Peru or Brazil, suggested that in developing countries vaccine dose might be critical.

Only two trials were large enough to examine protection against hospitalization. In the trial in Finland, all 22 children

**958   SECTION 2** Licensed Vaccines and Vaccines in Development

hospitalized for rotavirus diarrhea were in the placebo group,[233] and, in Venezuela, efficacy against hospitalization was 70%.[230] A postlicensure effectiveness evaluation at three U.S. hospitals showed 100% protection against hospitalization for rotavirus disease.[234]

**Adverse Reactions.** A significant increase in mild fevers was observed 3 to 5 days after immunization with the RRV-human reassortant vaccine. Low-grade fevers (temperature >38°C and <39°C) were most common (up to 15%) after the first dose and a small group of children (1–2%) had higher temperatures (>39°C).[105,227,229,232,235] In the Finnish trial, fever was associated with diarrhea and abdominal cramping in approximately 3% of children.[235] No increase in the incidence of vomiting was associated with vaccination in the first 6 months of life. However, in earlier studies with RRV only, older children in Sweden did have an increased incidence of loose stools and fever, suggesting that replication of the virus in older children could lead to mild symptoms of diarrhea.[217] In Bangladesh, the RRV-human reassortant vaccine caused fever in 15% of vaccinees, compared with 2% in placebo recipients. In addition, vaccine strain virus was isolated from some of the latter, indicating contact spread from vaccinees.[236]

Prior to licensure, intussusception was reported in five of approximately 11,000 children who had received RRV-human reassortant rotavirus compared with one of approximately 4500 children who had received placebo.[231] Intussusception was not found after the first dose in any child, but was observed within 7 days after receiving the second or third dose of vaccine in three of the five affected children. Differences in rates of intussusception between vaccine and placebo recipients were not found to be statistically significant and the incidence of intussusception in vaccine recipients was not greater than estimated background rates. However, both the CDC and the American Academy of Pediatrics warned in their recommendations for use of RRV-human reassortant vaccine that intussusception might be an adverse event associated with vaccination.[231,237] In addition, the possible relationship between the vaccine and intussusception was noted in the product insert.

In July 1999, after the RRV-human reassortant vaccine had been given to approximately 1 million children, 15 cases of intussusception following administration were reported to the Vaccine Adverse Event Reporting System (VAERS).[238,239] Although approximately 2000 cases of intussusception occur each year in the United States, these 15 cases were greater than what would have been predicted given the general underreporting to VAERS. Following these reports, RotaShield was temporarily suspended from use[238] pending results of a case-controlled analysis by the CDC.

In October 1999, the CDC completed its analysis and found that the relative risk 3 to 7 days after receipt of the first or second dose of RRV-human reassortant vaccine was 37 ($P < .001$) and 3.8 ($P < .05$), respectively.[233] Using case series and case-control analysis, the population-attributable risk was initially estimated to be approximately one case of intussusception per 10,000 children immunized.[240,241] The actual attributable risks were one in 4670 to one in 9474 for the case series and case-control studies, respectively. Following results of the CDC analysis, use of the vaccine was discontinued and the manufacturer ceased its production. Subsequent ecologic studies using hospital discharge diagnoses estimated that the attributable risk of intussusception following administration of RRV-human reassortant vaccine might have been much smaller than initial estimates.[212,243]

The cause of intussusception following RotaShield remains unknown. However, because the benefits of the vaccine likely outweigh its risks in the developing world, the vaccine was tested in Ghana, given as two doses administered in the first 2 months of life.[244] The two-dose efficacy against rotavirus gastroenteritis (any severity) to age 1 year was 64%.

## Bovine (Strain WC3)–Human Reassortant Rotaviruses (RotaTeq)

RotaTeq (Merck and Co.) was licensed by the U.S. Food and Drug Administration (FDA) and recommended by the CDC and the American Academy of Pediatrics for universal use in U.S. infants in February 2006.[245] RotaTeq is also licensed in the European Union and many other countries.

**Composition.** RotaTeq is a live, oral vaccine that contains five reassortant rotaviruses developed from human and bovine parent rotavirus strains.[245,246] Four of the bovine (WC3)–human reassortant rotaviruses express human virus VP7 from serotypes G1, G2, G3, or G4 and VP4 (P7[5]) from bovine strain WC3. The fifth reassortant virus contains VP4 (P1A[8]) from a human rotavirus strain and VP7 (G6) from WC3. The human strains that provided surface proteins G1, G2, G3, G4, and P1A for the bovine–human reassortant vaccine were WI79, SC2, WI78, Bricout B, and WI79, respectively. The reassortants were propagated in Vero cells.

Each 2-mL vial of vaccine contains the following minimum concentration of each of the five reassortants: WC3-G1: $2.2 \times 10^6$ infectious units; WC3-G2: $2.8 \times 10^6$ infectious units; WC3-G3: $2.2 \times 10^6$ infectious units; WC3-G4: $2.0 \times 10^6$ infectious units; and WC3-P1A: $2.3 \times 10^6$ infectious units. Trace amounts of fetal bovine serum might be present. The vaccine does not contain thimerosal or other preservatives.

**Buffer and Stability.** WC3-human reassortant vaccine is suspended in a solution of buffer (sodium citrate and phosphate) and stabilizer (sucrose) that can be stored refrigerated at 2°C to 8°C for 24 months. The vaccine formulation contains sucrose, sodium citrate, sodium phosphate monobasic monohydrate, sodium hydroxide, polysorbate 80, and tissue culture media. This diluent was adapted following a bivalent (G1 and G2) WC3-reassortant experiment in which no loss of protective potency was observed in the reassortants suspended in the buffer-stabilizer formulation after 125 weeks.[247] The shelf life is 24 months at refrigeration temperature—6 months is reserved for packaging and shipping and 18 months for shelf life in the clinic. The vaccine does not require reconstitution into a liquid form; it requires only that the cap be removed from the squeezable plastic container and the contents then squirted into the infant's mouth.

**Immunogenicity**

*Relative Capacity of VP4 and VP7 to Evoke Neutralizing Antibodies.* Infants given one or two oral doses of the univalent G1 or G2 reassortant vaccine tended to have a more efficient neutralizing antibody response in serum to the bovine WC3 (the VP4 antigen in the reassortant) than to G1 or G2 (the human VP7 antigen in the reassortant).[248–252] This led to an early opinion that, unlike the response to parenterally inoculated rotavirus, the neutralizing antibody response to VP4 predominated following oral administration. This phenomenon also had been observed repeatedly in clinical trials with RRV-human reassortant rotaviruses.

However, when a WC3 reassortant was constructed with a human P1A (VP4) and administered orally to infants, the serum neutralizing antibody responses after two doses were predominantly to the WC3 VP7 surface G6 component: 76% serum neutralizing antibody response to WC3 (VP7) and only 28% response to the P1A (VP4) surface component.[252,253] When two doses of a mixture of equal concentrations of the

G1 (VP7) and P1A (VP4) single-gene reassortants of WC3 were administered to infants, an excellent neutralizing antibody response in serum was obtained to both the P1AG1 parent (78%) and to the WC3 P7G6 parent (100%).[253] Conversely, less than 35% of infants developed neutralizing antibodies to either WC3 or the human P1AG1 parent after oral inoculation with two doses of one double reassortant (a single virus containing both P1A and G1 on a WC3 background).[250,253] These findings suggest that an animal rotavirus/human rotavirus reassortant (with regard to VP4 and VP7) may have the potential to induce certain antihuman rotavirus immune responses more efficiently than an entirely human rotavirus-origin vaccine; that is, one surface antigen of bovine virus origin in some manner enhances the immunogenicity of the reassortants in response to both surface antigens VP4 and VP7.

*Importance of Dose.* It was later determined in two separate clinical trials that, compared with two doses of the univalent G1 reassortant, three doses resulted in higher rates of neutralizing antibody responses in serum to both the WC3 (93% after two doses and 95% after three doses) and the P1AG1 (70% after two doses and 78% after three doses) parent viruses.[251] Most infants developed neutralizing antibodies to WC3 after the first dose, a few developed them after the second dose, and almost none developed them after the third dose. In contrast, a minority of infants responded to P1AG1 rotavirus after the first dose, but many more responded to the second and third doses. Infants with neutralizing antibodies to P1AG1 virus prior to the first dose were less likely to develop an antibody response of that specificity after the first dose, but, after three doses, they exhibited response rates similar to those of originally seronegative infants.[254] Therefore, it appears that one or two serial doses given to an infant who lost maternally acquired antibody gives a serum antibody response after the completion of the series that is equal to that of those who were seronegative prior to the first dose.

**Efficacy.** In a pilot efficacy trial of the WC3-G1 reassortant involving 77 infants given two doses, complete protection against rotavirus disease was observed. Cases of disease in the placebo cohort were caused by either serotype G1 or G3.[252] A subsequent efficacy trial employed three doses of the G1 reassortant administered to 312 infants in either New York or Philadelphia. The vaccine provided 64% protection against all episodes of rotavirus disease and 84% protection against moderate to severe rotavirus disease.[249] The predominant wild-type challenge rotavirus was serotype G1. No adverse effects followed administration of any dose of this vaccine.

Because of the success of the WC3-G1 reassortant vaccine in situations of primarily G1 challenge, additional WC3 reassortants of the other traditionally most common serotypes (i.e., G2, G3, and G4) were constructed, based on epidemiological evidence that protective immunity is at least partly G-serotype-specific. Each was individually evaluated in infants and found to be safe and immunogenic.

Prior to the availability of the G4 reassortant, the principle of using a multivalent WC3 reassortant vaccine was evaluated in an efficacy trial of a WC3-human reassortant vaccine containing human G1, G2, G3, and P1A.[255-258] Quadrivalent WC3-human reassortant vaccine containing G1, G2, G3, and P1A, given in three doses and containing 10[7] PFU of each reassortant, was safe, immunogenic, and protective in a trial involving 439 infants in 10 different U.S. sites. Rates of vaccine virus shedding in feces were less than 10%. There was no significant excess of fever, diarrhea, or vomiting in vaccine recipients. The vaccine provided 74.6% protection against all rotavirus disease and 100% protection against severe rotavirus disease.

In the clinical trial of quadrivalent WC3-human reassortant vaccine containing G1, G2, G3, and P1A, a rotavirus-specific serum IgA antibody response occurred in 88% of vaccine recipients and a fecal rotavirus-specific IgA antibody response occurred in 65% of vaccine recipients.[257,258] The proportion of children who developed virus neutralizing antibodies to serotype G1 was 57%. Similar rates of neutralizing antibody responses specific to types G3, G6, and P1A were observed; the neutralizing antibody response to G2 was slightly lower. The predominant wild-type rotavirus challenge strains as found in placebo cases of rotavirus disease were G1 (26 of 39 episodes) and G3 (10 of 39 episodes), while G2 and G4 were associated with two cases and one case, respectively. The breakthrough cases of rotavirus disease seen in quadrivalent rotavirus vaccine-immunized infants were predominately G1 (10 of 11 cases); the other breakthrough case was G2.

Because rotaviruses are highly acid labile, all the abovementioned clinical trials involved prefeeding of vaccine recipients with breast milk, infant formula, or Maalox. These trials also involved a frozen product thawed immediately before use. Because prebuffering and use of a frozen product are impractical, a vaccine-diluent formulation was developed that contained both buffer and stabilizing components that permitted direct administration without reconstitution and storage of viable vaccine refrigerated in liquid form.[259,260] In a clinical trial of bivalent (types G1 and G2) reassortant vaccine, vaccine suspended in the buffer-stabilizer in varying volumes and concentrations, given without a previous oral buffer, was compared with traditionally prepared vaccine given after a separate administration of buffer.[247] Three doses were given and no adverse events were observed. Although the trial was not designed to demonstrate efficacy, immune responses in infants given vaccine in the new formulation without prebuffering were excellent and equal to those of the prebuffered vaccine cohort. For example, following administration of the vaccine in the buffer-stabilizer formulation, serum neutralizing antibody responses to G1 were 67% to 73% and rotavirus-specific IgA antibody responses were 84% to 91% in serum and 77% to 88% in feces.

Following the clinical success of a quadrivalent WC3-human reassortant vaccine containing G1, G2, G3, and P1A, a pentavalent reassortant rotavirus vaccine (RotaTeq) was developed by adding WC3-G4, to protect against the G4 serotype which, like G1, G2, and G3, was established to be of worldwide prevalence. In a multisite trial involving 1946 infants, the safety, immunogenicity, and efficacy of five different vaccine compositions (approximately 300 infants per group) were evaluated in comparison with placebo (Table 52.4). The test vaccines included three pentavalent vaccine combinations (G1, G2, G3, G4, and P1A) in concentrations of either $5 \times 10^6$, $1.6 \times 10^5$, or $5.5 \times 10^5$ PFU per reassortant. Also included were groups given the G1, G2, G3, and G4 reassortants alone and the P1A reassortant alone at concentrations of $5 \times 10^5$ PFU per reassortant.[260] In this trial, infants were prefed with infant formula for buffering before vaccine. The incidence of adverse events was comparable among vaccine and placebo recipients for all vaccines evaluated. All compositions were immunogenic and protective; however, the magnitude of the antibody responses varied with virus concentration. The immunogenicity and efficacy of the high and middle concentrations of the pentavalent vaccine and the quadrivalent vaccine (G1, G2, G3, and G4) were about equal and consistent with the efficacy of the previously evaluated quadrivalent vaccine (G1, G2, G3, and P1A). The low-concentration pentavalent rotavirus vaccine and the monovalent P1A vaccine were less effective. However, the approximate 50% efficacy of the P1A reassortant against rotavirus infection of any degree of severity suggested that P1A might provide protection against

**TABLE 52.4** Effect of Dose and Composition of RotaTeq, Quadrivalent (G1, G2, G3, and G4) and Univalent (P1A) Bovine (WC3)–Human Reassortant Rotavirus Vaccine on Efficacy and Immunogenicity in Infants

| Dose (PFU) | Strains | N | G1 SNA[a] | Serum IgA[b] | Efficacy (95% CI) |
|---|---|---|---|---|---|
| $2.5 \times 10^{7c}$ | G1–G4, P1A | 375 | 86.2 | 98.7 | 68.0 (31.1–86.4) |
| $8.0 \times 10^{6}$ | G1–G4, P1A | 328 | 73.3 | 97.3 | 74.3 (37.9–91.0) |
| $2.5 \times 10^{6}$ | G1–G4, P1A | 324 | 61.7 | 93.4 | 57.6 (11.8–80.9) |
| $2.0 \times 10^{7}$ | G1–G4 | 270 | 84.4 | 98.2 | 74.0 (40.3–60.3) |
| $6.0 \times 10^{9}$ | P1A | 327 | 3.6 | 88.7 | 43.4 (–1.7–69.2) |
| Placebo | — | 322 | 1.1 | 13.5 | — |

[a]Percent of infants with G1-specific neutralizing antibody response determined by plaque-reduction neutralization assay.
[b]Percent of infants with serum rotavirus-specific IgA response (i.e., 3-fold rise in titer from baseline) determined by ELISA.
[c]Approximate combined dose of vaccine for all components.
CI, confidence interval; IgA, immunoglobulin A; PFU, plaque-forming units; SNA, serum neutralizing antibodies.

prevalent rotaviruses (e.g., P1AG9) expressing the P1A antigen but none of the G specificities in the vaccine (see Table 52.4). This trial conclusively demonstrated that the G antigens of these vaccine strains are the dominant molecular components in inducing serum antibody and protection. As a result of these studies, $1.6 \times 10^{6}$ PFU per reassortant or $8.0 \times 10^{6}$ PFU for all five reassortants (G1, G2, G3, G4, and P1A) was selected for further development.[261] These quantities of vaccine viruses also served as the basis for selection of the lowest dose acceptable at expiration.

The efficacy of RotaTeq was confirmed in a placebo-controlled trial involving 1312 infants randomized to receive three doses of either approximately $1.1 \times 10^{7}$ infectious units of RotaTeq in a buffer stabilizer solution or placebo.[247] The incidence of adverse events was comparable among vaccine and placebo recipients with the exception of a statistically significant 4.6% excess of fevers greater than 38.1°C among vaccinees during the week after the first dose. A high proportion (96%) of infants had a significant increase in serum antirotavirus IgA and 57% had a significant increase in serum neutralizing antibody response to serotype G1. Efficacy against all rotavirus disease was 72.5% (95% confidence interval [CI], 50.6 to 85.6); efficacy against severe rotavirus disease was 100% (95% CI, 13.0 to 100).[247]

Although all rotavirus reassortants based upon a bovine WC3 rotavirus had been generally well tolerated in all clinical trials, new concerns for RotaTeq safety arose when the RRV reassortant-based vaccine RotaShield was found to be a rare cause of intussusception. It became necessary to perform a large (70,000 infant) Rotavirus Efficacy and Safety Trial (REST) to determine whether RotaTeq was also a rare cause of intussusception.[262]

The large sample size provided an opportunity to evaluate the efficacy of the vaccine in preventing healthcare encounters for rotavirus gastroenteritis of all serotypes including hospitalizations, emergency visits, and physicians' office visits. In addition, efficacy against all cases of rotavirus gastroenteritis regardless of whether they resulted in a healthcare encounter were evaluated in a subset of 5673 vaccinated subjects in this nested placebo-controlled study.

The efficacy of RotaTeq against rotavirus gastroenteritis caused by major rotavirus serotypes was also evaluated in a nested placebo-controlled study within the large-scale clinical trial. RotaTeq protected against the serotypes included in the vaccine (i.e., G1, G2, G3, and G4) (Table 52.5).[262] RotaTeq also protected against natural challenge with P1AG9 rotaviruses, demonstrating the contribution of the WC3–human reassortant containing human P1A. Compared with placebo, efficacy against any severity of rotavirus disease caused by

**TABLE 52.5** Reduction in Hospitalizations and Emergency Department Visits (by G Type) in the Phase III Efficacy Study of RotaTeq

| | Number of Cases of Rotavirus Disease | | |
|---|---|---|---|
| Serotype | Vaccine (N = 34,035) | Placebo (N = 34,003) | Rate Reduction (95% CI) |
| G1 | 18 | 328 | 95.1 (91.6–97.1) |
| G2 | 1 | 8 | 87.6 (–0.0 to 98.5) |
| G3 | 1 | 15 | 93.4 (49.4–99.1) |
| G4 | 2 | 18 | 89.1 (52.0–97.5) |
| G9 | 0 | 13 | 100.0 (67.4–100.0) |

CI, confidence interval.

serotypes G1, G2, G3, and G4 was 74.0% (95% CI, 66.8–79.9%); efficacy against severe rotavirus disease was 98% (95% CI, 88.3–100%).[45] RotaTeq reduced the rate of rotavirus-associated hospitalizations by 95.8% (95% CI, 90.5–98.2%), emergency visits by 93.7% (95% CI, 88.8–96.5%), and office visits by 86.0% (95% CI, 73.9–92.5%). Efficacy against all-cause gastroenteritis hospitalizations was 58.9% (95% CI, 51.7–65.0%), demonstrating the importance of rotavirus as a cause of severe gastroenteritis in children. The efficacy of RotaTeq in the second rotavirus season postvaccination was 63% (95% CI, 44–75%) against rotavirus gastroenteritis of any severity, and 88% (95% CI, 49–99%) against severe rotavirus gastroenteritis. RotaTeq has also shown sustained protective efficacy against rotavirus hospitalizations and emergency department visits, regardless of rotavirus serotype, for up to 3.1 years after vaccination, with rate reductions (95% CI) in hospitalizations and emergency department visits during the first, second, and third years of life of 94.0% (90.0–96.5%), 94.7% (90.7–97.2%), and 85.9% (51.6–97.2%), respectively.[263]

Data on the efficacy of a partial series of RotaTeq are primarily based on protection conferred between vaccine doses (i.e., between dose 1 and 2 and between dose 2 and 3) as most vaccine recipients in the REST study received the full vaccine series. In the trial, RotaTeq reduced the rates of combined hospitalizations and emergency department visits for G1 to G4 rotavirus gastroenteritis or rotavirus gastroenteritis regardless of serotype between doses 1 and 2 by 100% (95% CI, 72–100%) or 82% (95% CI, 39–97%), respectively. Between doses 2 and 3, RotaTeq reduced the rates of combined hospitalizations and emergency department visits for G1 to G4

**TABLE 52.6** Efficacy of RotaTeq and Rotarix Against Severe Rotavirus Gastroenteritis in the First Year of Life in Africa and Asia

| Country | Incidence Per 100 Person-Years | | Vaccine Efficacy (95% CI) |
|---|---|---|---|
| | Vaccine | Placebo | |
| **ROTARIX** | | | |
| South Africa | 0.8 | 3.3 | 76.9 (56.0–68.4) |
| Malawi | 4.0 | 7.9 | 49.4 (19.2–68.3) |
| **ROTATEQ** | | | |
| Ghana | 2.7 | 7.7 | 65.0 (35.5–81.9) |
| Kenya | 0.7 | 4.0 | 83.4 (25.5–98.2) |
| Mali | 0.7 | 0.7 | 1.0 (−431.7–81.6) |
| Bangladesh | 4.9 | 9.1 | 45.7 (−1.2–71.8) |
| Vietnam | 0.8 | 2.8 | 72.3 (−45.2–97.2) |

CI, confidence interval.

rotavirus gastroenteritis or rotavirus gastroenteritis regardless of serotype by 91% (95% CI, 63–99%) or 84% (95% CI, 54–96%).[264]

In the Phase III prelicensure study of RotaTeq, protection against severe rotavirus-induced gastroenteritis was 100%, 95.4%, and 100% in children who were never breastfed, sometimes breastfed, or exclusively breastfed, respectively.[265]

Phase III trials of RotaTeq were completed in developing countries of Asia and Africa (Table 52.6).[266,267] In three African clinical trial sites in Kenya, Ghana, and Mali, a three-dose regimen of RotaTeq administered at 6, 10, and 14 weeks of age was overall 64% (95% CI, 40–79%) effective against severe rotavirus gastroenteritis during the first year of follow-up. During the first year of follow-up in the two Asian trial sites in Vietnam and Bangladesh, three doses of RotaTeq were overall 51% (95% CI, 13–73%) effective against severe rotavirus gastroenteritis.

**Effectiveness and Impact.** Recently summarized,[268–270] effectiveness studies in the United States using the case-control approach were conducted primarily by performing active surveillance for children presenting to the emergency department or admitted to the hospital for acute gastroenteritis; the largest network for these evaluations comprised seven pediatric hospitals. Children whose stools tested positive for rotavirus by enzyme immunoassay comprise the cases; control groups consisted of children with gastroenteritis who tested negative for rotavirus (test-negative controls), children with acute respiratory illness, or children selected from city or state immunization registries. Statistically significant vaccine effectiveness estimates for three doses of RotaTeq against emergency department visits or hospitalization (considered moderate to severe illness) for rotavirus ranged from 83% to 92%, with similar estimates in infants aged 8 to 12 months of age and those older; there was no evidence of waning protection up to 4 years of age.[271–275] Similarly high vaccine effectiveness estimates were found against moderate to severe rotavirus disease from all specific genotypes thus reported: G1P[8], G2P[4], G3P[8], G9, and G12P[8]. The statistically significant point estimates for effectiveness after one dose ranged from 69% to 74% and after two doses from 78% to 88%, demonstrating good protection for the time between doses.

Based on examination of medical claims databases, other RotaTeq effectiveness estimates in the United States have ranged from 89% to 100%.[280–282] In reports from other high

income locations in Australia, Finland, France, Spain, Portugal (≥1 dose) and Taiwan, the statistically significant point estimates for vaccine effectiveness of three doses of RotaTeq against hospitalization for rotavirus disease has ranged from 92% to 97%.[283–288]

In Nicaragua, one of the poorest countries in Latin America and an early adopter of RotaTeq in 2006 (through a manufacturer-sponsored donation program), lower vaccine effectiveness was observed than in industrialized settings. In one evaluation, a full series of RotaTeq was 52% to 63% effective in preventing severe (Vesikari score ≥11) rotavirus gastroenteritis. However, RotaTeq was more effective (73–86%) in preventing very severe (Vesikari score ≥15) rotavirus gastroenteritis.[289] Another evaluation in Nicaragua found three-dose vaccine effectiveness against severe disease of 64% and 87%, depending on the control group.[290]

Consistent with the high effectiveness results, the use of RotaTeq in the United States (used exclusively before Rotarix was licensed) resulted in marked reductions in rotavirus hospitalizations in young children younger than 5 years of age; reductions ranged from approximately 62% to 83%.[281,291–299] This reduction in rotavirus disease translated to reductions in all-cause hospitalizations for gastroenteritis among children younger than 5 years of age, ranging from approximately 25% to 50%. Studies in Australia in areas that used RotaTeq also reported reductions of 50% to 83% in rotavirus hospitalizations and of 20% to 48% in total gastroenteritis hospitalizations among young children.[286,300,301]

An additional and somewhat unexpected benefit following the use of RotaTeq was identified by investigators with the U.S. Vaccine Safety Datalink (VSD). Given earlier clinical reports of the association of rotavirus disease and seizures, they performed a retrospective cohort analysis and found that children who received the rotavirus vaccine series had an 18% to 20% reduction in risk of seizures requiring hospitalization or emergency department care, compared with children who did not receive a rotavirus vaccine.[302] A protective effect against hospital or emergency department care for febrile seizures was found in Australia.[302a]

**Transmission of Vaccine Virus.** Reassortants of G1, G2, G3, and G4 specificity have been administered individually to infants and demonstrated to be as safe as WC3 and, like WC3, to be shed in feces in low incidence (<10%) and at low concentration.[248–251] Therefore, WC3-containing vaccine is much-less-well adapted to growth at the infant intestinal mucosal surface than were RRV-containing vaccines. As a result, horizontal transmission of WC3-based vaccine from immunized infants would seem unlikely. (The initial Phase I study of WC3 rotavirus in infants revealed virus shedding in seven of 22 infants inoculated with 10^{7.5} PFU; no shedding rate of similar magnitude has been noted in any subsequent clinical trial of WC3 or WC3 reassortants.) A report in 2009 described detection of a RotaTeq vaccine-derived strain in a child with gastroenteritis whose sibling had been recently vaccinated with RotaTeq, and further investigation indicated that this strain was generated by further reassortment between two of the reassortant rotavirus strains present in RotaTeq.[303] Additional patients with acute-gastroenteritis and vaccine-derived double-reassortant rotavirus strains have been identified through active surveillance, although it has often been difficult to determine the extent that the rotavirus detected contributed to the patients' symptoms.[304–305]

**Adverse Reactions**

*Intussusception.* Because RotaShield was found to be associated with intussusception postlicensure, a large trial was necessary to determine whether intussusception was causally

or coincidentally associated with administration of RotaTeq.[262] In the large Phase III REST study, one case of intussusception occurred in the vaccine group and one in the placebo group within 14 days of inoculation; six cases in the vaccine group and five in the placebo group occurred within 42 days of inoculation; and 13 cases in the vaccine group and 15 in the placebo group occurred within 1 year of inoculation. No clustering of cases in the RotaTeq group occurred at any time after vaccination.[303] There were no other cases of intussusception reported in the other Phase III studies. Therefore, RotaTeq did not appear to be associated with intussusception.

Postmarketing evaluations designed to evaluate whether RotaTeq was associated with intussusception have been conducted in the United States and Australia (Table 52.7).[307–313] In the United States, through VSD, analyses of data from March 2006 through March 2013 found no increased risk of intussusception following any of the three doses compared to those expected based on historical rates, and no significant clustering

of cases following RotaTeq was detected.[306,314] In the U.S. Post-Licensure Rapid Immunization Safety Monitoring (PRISM) program, an increased risk of intussusception following dose 1 was detected in both the self-controlled risk interval and cohort designs.[310] Although with inherent limitations of a passive reporting system, the clustering of intussusception cases in U.S. VAERS following dose 1 has suggested an increased risk.[311] In Australia, an increased risk was detected following dose 1 and dose 2 in the self-controlled case series (SCCS) design, and dose 1 only using case-control methodology.[312]

*Other Adverse Events.* Among RotaTeq and placebo recipients in the Phase III trials of RotaTeq, the incidence of serious adverse events (2.4% vs 2.6%, respectively), including deaths (~0.1% [n = 25] vs <0.1% [n = 21], respectively), was similar.[261] No deaths were attributed to vaccination by blinded investigators. Sudden infant death syndrome accounted for 17 of the 52 deaths; cases were equally distributed among RotaTeq and placebo recipients [n = 8 and n = 9, respectively].

**TABLE 52.7** Attributable Risk Estimates of Intussusception Associated With RotaTeq or Rotarix Among Infants, by Study

| | Country | Study Period | Attributable Risk Based on This Study Design[a] | Attributable Risk Based on These Doses and Intervals[a] | Attributable Risk (Per 100,000 Vaccinated Infants)[b] Point Estimate | Attributable Risk (Per 100,000 Vaccinated Infants)[b] 95% CI | Reference |
|---|---|---|---|---|---|---|---|
| **RotaTeq** | | | | | | | |
| | U.S.: six health care organizations in 5 states (VSD) | May 2006–March 2013 | Vaccinated cohort vs expected rates | | No statistically significant risk identified | | 306 |
| | U.S.: national network of 3 health plans (PRISM) | January 2004–September 2011 | Self-controlled risk interval[c] | Dose 1: days 1–7 | 1.1 | 0.3 to 2.7 | 310 |
| | | | | Dose 1: days 1–21 | 1.5 | 0.2 to 3.2 | |
| | | | Vaccinated cohort vs unexposed person-time[d] | Dose 1: days 1–21 | 1.2 | 0.2 to 3.2 | |
| | U.S.: national passive surveillance of adverse events (VAERS) | February 2006–April 2012 | Self-controlled risk interval | Dose 1: days 3–6 | 0.7 | 0.2 to 1.7 | 311 |
| | Australia: hospitals in 6 jurisdictions | July 2007–June 2010 | Self-controlled case series | Dose 1: days 1–21 | 7.0 | 1.5 to 33.1 | 312 |
| | | | | Dose 2: days 1–7 | 7.0 | 1.5 to 33.1 | |
| **Rotarix** | | | | | | | |
| | Mexico: 16 hospitals in 10 states | August 2008–August 2010 | Self-controlled case series | Dose 1: days 1–7 | 2.0 | NR | 308 |
| | Mexico: 221 hospitals | January 2008–October 2010 | Self-controlled case series | Dose 1: days 0–6 | 3.7 | 1.2 to 7.3 | 313 |
| | Brazil: 53 hospitals in 7 states | August 2008–August 2010 | Self-controlled case series | Dose 2: days 1–7 | 1.5 | NR | 308 |
| | U.S.: six healthcare organizations in 5 states (VSD) | April 2008–March 2013 | Vaccinated cohort vs expected rates | Dose 1: days 1–7 | 5.3 | NR | 309 |
| | | | | Dose 2: days 1–7 | 5.3 | NR | |
| | U.S.: national network of 3 health plans (PRISM) | January 2004–September 2011 | Vaccinated cohort vs unexposed person-time[d] | Dose 2: days 1–21 | 7.3[e] | 0.8 to 22.5 | 310 |
| | Australia: hospitals in 6 jurisdictions | July 2007–June 2010 | Self-controlled case series | Dose 1: days 1–21 | 4.3 | 0.8 to 23.1 | 312 |
| | | | | Dose 2: days 1–7 | 4.3 | 0.8 to 23.1 | |
| | Singapore: 1 hospital | October 2005–September 2012 | Self-controlled case series | Dose 1: days 1–7 | 1.5 | NR | 314 |
| | UK: National Health Service Hospitals | July 2013–October 2014 | Self-controlled case series | Dose 1: days 1–21 | 3.4 | NR | 382 |
| | | | | Dose 2: days 1–21 | 3.4 | NR | 382[e] |

[a]For the attributable risk presented in this table.
[b]Overall attributable risk based on doses and intervals in previous column.
[c]Primary study design.
[d]Secondary study design.
[e]Results from the secondary study design. Results from the primary study design (self-controlled risk interval) for Rotarix were not statistically significant.
CI, confidence interval; NR, not reported; PRISM, Post-Licensure Rapid Immunization Safety Monitoring; VAERS, Vaccine Adverse Events Reporting System; VSD, Vaccine Safety Datalink.
*Modified from Rha B, Tate JE, Weintraub E, et al. Intussusception following rotavirus vaccination: an updated review of the available evidence. Expert Rev Vaccines. 2014;13(11):1339–1348.*

Approximately 11,700 children within the Phase III trials were studied in detail to assess other potential adverse experiences, such as fever, diarrhea, and vomiting.[246] Within 42 days of vaccination, vaccinees had a small but statistically significant greater rate of several symptoms than placebo recipients, including vomiting (15% vs 14%, respectively), diarrhea (24% vs 21%, respectively), nasopharyngitis (7% vs 6%, respectively), otitis media (15% vs 13%, respectively), and bronchospasm (1.1% vs 0.7%, respectively). Among RotaTeq and placebo recipients, the incidence of reported episodes of fever (43% vs 43%, respectively) and hematochezia (0.5% vs 0.3%, respectively) was similar. Although Kawasaki disease was reported in several children following RotaTeq in the Phase III trial, this association was not found posticensure.[315]

In the 7-day period after vaccination, vaccinees had a statistically significantly greater rate of diarrhea after dose 1 (10% vs 9%, respectively), after dose 2 (9% vs 6%, respectively), and after any dose (18% vs 15%, respectively). Similarly, vaccinees had a statistically significantly greater rate of vomiting after dose 1 (7% vs 5%, respectively) and after any dose (12% vs 10%, respectively). The incidence of fever and irritability during the 7-day period after any vaccine dose was similar among RotaTeq and placebo recipients.

## Bovine (Strain UK)—Human Reassortant Rotaviruses

Bovine–human reassortant rotaviruses also have been generated incorporating the genes for VP7 of either G1, G2, G3, or G4 human serotypes and 10 genes from the bovine UK strain rotavirus, which (like strain WC3) is serotype P7[5]G6.[316-318] These reassortants are serotypically similar to the G1, G2, G3, and G4 reassortants of bovine rotavirus WC3. Phase I studies were performed on each of the four UK reassortants individually in small numbers of infants (11 to 20 per G serotype) at doses up to 10[5.8] PFU per strain. The vaccine was well tolerated and was shed in feces at rates ranging from 10 to 64% per group. Serum neutralizing antibody responses to the human parent rotaviruses (representing G types 1, 2, 3, and 4) ranged from 0% to 30% per serotype, but the neutralizing antibody responses to the corresponding UK parent virus were higher (30–82%). Only 50% of a group of 14 infants given a G1 reassortant developed evidence of any immune response (serum neutralizing antibodies or serum IgA or IgG detected by ELISA) after the first dose of vaccine. However, following a second dose, all exhibited evidence of an immune response.[317]

Subsequently a quadrivalent vaccine containing G1, G2, G3, and G4 reassortants of UK was administered in three doses to 20 infants.[317] No adverse events occurred following vaccination. Nineteen (95%) of the infants developed neutralizing antibodies to UK bovine rotavirus; neutralizing antibody response rates to human rotaviruses of serotypes G1 through G4 ranged from 28% to 37%.[318,319]

The quadrivalent vaccine was tested for efficacy in a placebo-controlled trial involving 256 infants given two doses of 10[5] PFU (total) in Finland.[319] The first and second doses were given at mean ages of 95 days and 150 days, respectively. Efficacy in the first year postvaccination was 59% against all rotavirus gastroenteritis and 90% against severe gastroenteritis. The vaccine showed no protective efficacy in the second rotavirus season postimmunization. It has not been submitted for licensure in the United States. Despite limited information about the multivalent UK reassortant vaccine, the National Institutes of Health has now licensed it to seven non-U.S. research groups, including investigators located primarily in less-developed countries (including China, Brazil, and India). Both a quadrivalent (G1–G4) and pentavalent (G1–G4, G9) bovine–human reassortant vaccine have been shown to be safe and immunogenic in healthy Indian infants; efficacy testing is ongoing in India.[320,321] A recent randomized Phase

III clinical trial of a pentavalent bovine-human reassortant vaccine (ROTASIIL) conducted in Niger found that the vaccine was not associated with any adverse events and had an efficacy of 66.7% (95% CI, 49.9–77.9%) against severe rotavirus gastroenteritis.[321a] Of note, the vaccine is reportedly thermostable for 24 months at 37°C and six months at 40°C, which may provide advantages for vaccine delivery in remote areas where cold chain capacity is limited.

## Natural Human–Bovine Reassortant Rotaviruses (Rotavac)

Naturally occurring bovine–human reassortant rotaviruses were isolated in two sites in India—New Delhi (the 116E strain)[322] and Bangalore (the I321 strain).[323] Newborns infected with the 116E or I321 strains were found to be protected against severe disease on reinfection.[126,324] The 116E strain is a human G9 isolate with a single VP4 gene segment from a bovine strain (P[10]G9) while the I321 strain (P[11]G10) has a bovine backbone with two segments coding nonstructural proteins NSP1 and NSP3 from human strains. Both of these strains were developed for clinical trials. In Phase II trials, infants inoculated with strain 116E developed a more robust rotavirus-specific IgA response than those inoculated with I321.[325-327] Consequently, only the 116E candidate underwent further efficacy testing. In a multicenter Phase III trial that enrolled infants from three cities in India–New Delhi, Pune, and Vellore—the 116E vaccine (Rotavac) was administered in a three-dose schedule with doses given at 6, 10, and 14 weeks of age. The vaccine showed 56% efficacy (95% CI, 37–70%) against severe rotavirus gastroenteritis during the first year of life, with sustained efficacy in the second year of life (49%; 95% CI, 17–68%).[328,329] Rotavac provided protection against a wide variety of vaccine mismatch strains, including G1P[8], G2P[4], and G12P[6], which were the most common circulating strains during the trial. Rotavac was not associated with any serious adverse events, including intussusception, in the Phase III trial. Six (<1%) cases of intussusception were reported in the vaccine group and two (<1%) were reported in the placebo group (with a 2:1 allocation of vaccine and placebo recipients). All events took place after administration of dose 3. The minimum interval between dosing and intussusception was 112 days in the vaccine group and 36 days in the placebo group. However, since a relatively small number of infants (~4500) were vaccinated in the trial, a low risk of intussusception cannot be excluded. Rotavac was licensed for use in India in 2014 and was recommended for inclusion in the Universal Immunization Program of India.

## Attenuated Human Rotaviruses

### Newborn Rotavirus Strain M37

Rotavirus strains isolated from children in the first month of life have been studied as potential vaccines because infants in neonatal nurseries in several locales worldwide have been found to be infected with rotavirus with high prevalence but with little gastroenteritis; followed by resistance to subsequent episodes of severe disease.[83,330] Many of these newborn strains share a similar P gene.[41,330] These strains have been largely ineffective as vaccine candidates.[2,31,331-333] Only the Australian strain RV3 is currently in clinical testing.[88,334,335]

### Attenuated Human Strain P1[8]AG1 (Rotarix)

The attenuated human rotavirus strain P1A[8]G1 (Rotarix) is now licensed in nearly 100 countries, including the European Union. The vaccine was licensed in the United States in April 2008, and recommended for use by ACIP in June 2008.

**Origin.** Symptomatic or asymptomatic infection of young children with a single circulating wild-type strain (serotype P1A[8]G1) in Cincinnati provided 100% protection against subsequent rotavirus disease caused primarily by the P1A[8] G1 serotype over a 2-year period.[84] A vaccine of this strain obtained from the stool of one of the study subjects (i.e., strain 89-12) was developed after 26 passages of the virus in primary African green monkey kidney cells and seven passages in serially passaged African green monkey kidney cells.[347] Initial safety and immunogenicity studies with this vaccine candidate indicated it was relatively safe and immunogenic in children less than 4 months of age.[336] Nearly every child developed an immune response to the vaccine virus after two doses.

Limited comparisons of the effects of dose on the immunogenicity of the 89-12 candidate vaccine have been conducted.[336] However, 19 of 20 infants inoculated with two doses of $10^5$ fluorescent-focus units (FFU) of 89-12 developed rotavirus-specific antibodies and 16 did so after the first dose.

The strain 89-12 vaccine candidate was evaluated in an efficacy trial in healthy 10- to 16-week-old infants at four centers in the United States. Two doses of $10^5$ FFU or placebo with a 4-week interval between doses were administered to 108 or 107 subjects, respectively.[337] Low-grade fever after the first dose was the only side effect more common in vaccine than placebo recipients (21 [19%] vs 5 [4.6%] subjects, respectively; $P < .001$). An immune response to rotavirus was detected in 94% of vaccinees and in only 4% of the placebo recipients. Rotavirus-specific serum IgA responses were detected in 91.6% and anti–89-12 serum neutralizing antibodies in 69.2% of vaccines.

During the first rotavirus season, rotavirus disease was detected in 18 placebo recipients and two vaccine recipients (efficacy of 89%). Vaccine episodes were scored for clinical severity using a 20-point system: in this system, cases scoring 8 or higher were considered "severe" and those scoring higher than 14 as "very severe." Ten placebo recipients but no vaccine recipients presented for medical care necessitated by rotavirus disease. In the second year, efficacy decreased to 59%, but only one case of severe rotavirus gastroenteritis occurred in vaccine recipients, while 10 severe cases occurred in placebo recipients. Vaccine efficacy for 2 years was 76% against any rotavirus gastroenteritis, 84% against severe disease, and 100% against very severe disease. As G1 rotaviruses predominated during both years, the efficacy against rotaviruses of other G or P types was not determinable.

To produce a homogeneous vaccine, strain 89-12 was purified by a series of three end point dilutions in Vero cells and passaged seven more times in these cells after it was sublicensed by GlaxoSmithKline in 1997. The final product, now at passage 43, was called RIX4414 and is being sold under the trademark name Rotarix.

**Immunogenicity.** Investigators orally inoculated 6- to 12-week-old infants in Finland with RIX4414 and found no increase in any elicited symptoms including fever.[338] Thus, it appeared that clonal selection and increased passage in tissue culture produced a more attenuated vaccine relative to its parental 89-12 strain. A dose range effect was seen for the immune response in Finnish infants with seroconversion detected in 73% to 96% after the second dose administered 4 weeks after the first dose (Table 52.8).[338]

Evaluation of RIX4414 began in Asia shortly thereafter, marking the initiation of what would become a global effort to evaluate this vaccine.[335,340] Unlike most vaccines, evaluation of RIX4414 was performed in developed and developing nations simultaneously (see Table 52.8). In a dose-ranging trial conducted in Singapore in 2464 infants, no increase in fever, diarrhea, vomiting, or irritability was detected—not even

**TABLE 52.8**  Clinical Studies of Rotarix in Infants

| Site | N | Seroconversion[a] | Efficacy Against Severe Disease |
|------|---|------------------|--------------------------------|
| Finland | 92 | 73–96% | ND |
| Finland | 405 | 80% | 90% |
| Singapore | 2464 | 76–91% | 82% |
| United States | 529 | 82–88% | ND |
| Latin America (Brazil, Mexico Venezuela) | 2155 | 61–65% | 66–86% |
| Latin America (11 countries) and Finland | 63,225 | ND | 85% |

[a]Percent of infants that developed an immune response after two doses as determined by rotavirus-specific IgA by ELISA.

IgA, immunoglobulin A; ELISA, enzyme-linked immunosorbent assay; ND, not determined.

at the highest dose of $10^{6.1}$ FFU; seroconversion rates determined by rotavirus-specific serum IgA responses were 76% to 91% depending on the dose.[340] Interference with the other routine childhood vaccines administered concomitantly was not observed. In a multicenter study conducted in the United States, the vaccine appeared to be safe in infants 5 to 15 weeks of age, and did not interfere with the immune responses to concomitantly administered vaccines.[341] Concomitant use of Rotarix with OPV was reported to suppress the uptake of the rotavirus vaccine. This effect was eliminated following the second dose.[342] Vaccine-specific immune responses assessed by serum IgA response after two doses occurred in 81.5% to 88.0% of vaccinees, depending on the size of the dose.

**Efficacy.** The first efficacy study of RIX4414 was conducted in Finland during two rotavirus epidemic seasons following oral administration of two relatively low doses of the vaccine ($10^{4.7}$ FFU). In this trial of 405 infants, the vaccine was well tolerated with a seroconversion rate of 80% after the second dose (see Table 52.8).[343] Efficacy against any episode of rotavirus gastroenteritis was 73%, whereas efficacy against severe rotavirus disease was 90% in the first season and 85% after two seasons. Because 35 of the 38 cases of rotavirus gastroenteritis were associated with the same G1 serotype as the vaccine, this trial did not yield evidence about the potential of this vaccine to protect against heterotypic rotaviruses. In an initial placebo-controlled efficacy trial with RIX4414 in Latin America, seroconversion after two doses of either $10^{4.7}$, $10^{5.2}$, or $10^{5.8}$ FFU of vaccine virus based on serum rotavirus IgA responses, was a disappointing 61% to 65% and the dose administered had no significant effect on these responses.[344] Despite these low detectable serum antibody response rates, protection against severe rotavirus disease was 86% in vaccinees given the highest dose. Equally important was the observation that vaccine efficacy against non-G1 rotaviruses, most commonly P1A[9], was similar to that against G1 serotypes, confirming the hypothesis that a vaccine containing P1A could protect against P1A-containing viruses of a different G serotype from that of the vaccine.

A randomized, placebo-controlled safety, immunogenicity, and efficacy trial was next performed with the RIX4414 vaccine (now called by its commercial name Rotarix) in approximately 63,000 infants, primarily in 11 countries in Latin America (see Table 52.8).[345] The primary purposes of the study were to

determine if the rates of intussusception were equivalent in vaccinees and placebo recipients and, in a subset of 10,159 vaccinees and 10,010 placebo recipients, the efficacy of the vaccine against severe rotavirus disease and hospitalizations. The efficacy of Rotarix against hospitalizations resulting from rotavirus was 85% and reached 100% against the most-severe cases of rotavirus gastroenteritis. Overall efficacy against severe rotavirus disease was 91.8%. Efficacy against any severity of disease caused by non-G1 strains (G3, G4, and G9) that belonged to the same P1A[8] serotype and genotype as the vaccine was 87.3%. Although protection was only 41.0% against G2P[4] strains in this trial, a metaanalysis of the results of this trial combined with two previous trials of Rotarix[343,346] allowed the calculation of a protection rate against G2[P4] strain of 67%. Thus, although this vaccine appeared to be less protective against a rotavirus strain that differed serotypically in both its VP4 and VP7 neutralization proteins from that of the vaccine, it still provided protection. It is also important to note that protection against all cases of severe gastroenteritis or diarrhea-associated hospitalizations of any etiology in vaccinees in this trial was 40% and 42%, respectively, thus indicating that an effective rotavirus vaccine could dramatically reduce the numbers of cases of severe gastroenteritis in young children. In the other pivotal Phase III efficacy study, conducted among approximately 3800 infants from six European countries, the efficacy of two doses of Rotarix against rotavirus disease of any severity to age 1 year was 85%, with 100% efficacy against hospitalization for rotavirus diseases through the first rotavirus season.[347] The vaccine gave protection rates against severe gastroenteritis caused by G1, G2, G3, G4, and G9 strains of 96%, 86%, 94%, 95%, and 85%, respectively, through the second season. An efficacy trial was also conducted among approximately 10,700 infants in the high-income Asian locations of Hong Kong, Singapore, and Taiwan.[348] Two doses of Rotarix was 96% protective against severe rotavirus gastroenteritis (Vesikari score ≥11) to age 2 years. In the European, Latin American, and Asian trials, the efficacy of Rotarix was sustained in the second year of life.[349]

In the first Phase III trials of Rotarix in developing countries, Rotarix pooled efficacy for the 2- and 3-dose regimens ranged from 49% (95% CI, 19 to 68) in Malawi to 77% (95% CI, 56 to 88) in South Africa (see Table 51.6).[350] The number of severe rotavirus cases prevented per 100 infants vaccinated was substantial—seven cases per 100 vaccinated in Malawi and four cases per 100 vaccinated in South Africa—illustrating the large potential public health impact of even a moderately efficacious vaccine.

**Effectiveness and Impact.** The effectiveness of Rotarix has been evaluated in many countries.[268–270] Middle-income Latin American countries were among the first to introduce and evaluate the vaccine. Measured through case-control studies (described earlier), the overall effectiveness of two doses of Rotarix against hospitalization for rotavirus in Bolivia, Brazil, and El Salvador ranged from 40% to 77%, whereas an assessment from Columbia did not demonstrate effectiveness in all age groups combined, but did in infants 6 to 11 months of age (85%).[351–355] In a recent metaanalysis, the pooled estimate for effectiveness from these studies was 63% and 72%, with generally higher effectiveness in children 6 to 11 months of age (75% and 82%) than in those 12 months of age and older (56% and 66%).[356] The pooled estimate for one Rotarix dose was 50% and 55%, indicating moderately good protection in these countries at least during the period between doses.

The overall vaccine effectiveness of two doses of Rotarix against rotavirus hospitalization in the high-income countries of Belgium, Spain, Portugal, Taiwan, and the United States has ranged from 92% to 98% in case-control studies, with high effectiveness sustained in the second year of life in the two countries that reported results by separate age groups (i.e., Belgium and the United States).[274,276,284,285,357] In Central Australia with a large indigenous population, effectiveness estimate was 84% against hospitalization during a G9P[8] season, but was not statistically significant during a G2P[4] season—a genotype that is classified in a genogroup different from the vaccine strain.[358,359] However, in other middle- or in high-income settings where Rotarix effectiveness against hospitalization from genotype G2P[4] has been assessed, such as Belgium, Brazil, and the United States, the overall effectiveness against hospitalization has been 85% or greater, similar to that against P[8] strains; the Brazil study found the high effectiveness against G2P[4] challenge in infancy was not sustained in children 12 months of age or older.[276,355,357] In a metaanalysis, no differences were noted in Rotarix effectiveness against partly heterotypic or fully heterotypic strains, compared with homotypic strains, within country income levels.[360]

In the first evaluation of the effectiveness of Rotarix in the African region, two doses were found to be 57% effective against rotavirus hospitalization among South African children younger than 2 years of age, with similar results in the first and second year of life, and in HIV-exposed-uninfected and HIV-unexposed-uninfected children.[361] Importantly, in the low-income country of Malawi, two Rotarix doses were 64% effective against rotavirus hospitalization in young children.[362]

Several evaluations demonstrated marked reductions in hospitalizations for rotavirus among young children following the introduction of Rotarix into the immunization program, with reduction estimates ranging from 59% to 81% in Brazil and El Salvador, 68% to 88% in Australia, and 40% to 45% in S. Africa, including during early postintroduction periods when not all children younger than 5 years of age were age-eligible for vaccine.[363–367] In Blantyre, Malawi, the incidence of rotavirus hospitalizations among infants was reduced by 43% during the second season.[362] In the United States, in a retrospective cohort analysis based on a national insurance claims databases, a 96% rate reduction in the rotavirus-coded hospitalizations was observed in children who received Rotarix compared with children who were age-eligible but did not receive any rotavirus vaccine.[282]

Notably, Mexico was the first country to demonstrate a reduction in mortality from diarrheal disease following rotavirus vaccine introduction. Following the introduction of Rotarix, a sustained 46% decrease in overall diarrheal deaths has been detected among children younger than 5 years of age, with approximately 90% coverage in children younger than 2 years of age.[368,369] and similar diarrhea mortality rate reductions in high as well as low-income sectors.[370] Two studies in Brazil estimate diarrheal death rate reductions of 22%, and 33% to 39%, respectively, after Rotarix introduction.[371,372] In Panama, a reduction of 47% in diarrheal deaths was estimated, based on relatively small numbers.[373] Other studies from Latin America, some from single locations and others using regional or national data, estimated early annual reductions in overall diarrhea hospitalizations, generally among children younger than 5 years of age, with point estimates ranging from 17% to 55%.[367,371,372,374,375] In South Africa, diarrhea hospitalizations among children younger than 5 years of age were reduced by an estimated 33% in the first 2 years after Rotarix introduction.[364]

**Transmission of Vaccine Virus.** In Phase II or Phase III studies of Rotarix administered at $10^{6.5}$ to $10^{6.8}$ CCID$_{50}$ (median end point of the cell culture's infectious dose) per dose in various countries, after dose 1, rotavirus antigen shedding was detected by ELISA in 50% to 80% of infants at approximately day 7, 19.2% to 64.1% at approximately day 15, 0% to 24.3%

at approximately day 30, and 0% to 2.6% at approximately day 60.[376] Shedding was lower after dose 2, and was detected in 4.2% to 18.4% of infants at approximately day 7, 0% to 16.2% at approximately day 15, 0% to 1.2% at approximately day 30, and 0 at approximately day 45. Shedding of live rotavirus was assessed in two studies in which Rotarix was administered at $10^{4.5}$ $CCID_{50}$ per dose. In both studies, stool samples that were antigen-positive by ELISA at approximately day 7 after dose 1 were tested subsequently for live virus by focus forming unit assay. Live virus was detected in six (46.2%) of 13 and 15 (45.5%) of 33 rotavirus antigen-positive stools, for an estimated 26% of vaccinated infants shedding live virus at approximately day 7 after dose 1. The potential for transmission of vaccine virus to contacts was evaluated in a study of twin pairs conducted in the Dominican Republic. In this study, one twin from each pair received Rotarix and the other received placebo and fecal specimens were obtained thrice weekly for 6 consecutive weeks after vaccination. In 80 infants who received placebo, rotavirus vaccine strain was detected in at least one fecal specimen in 15 (19%) infants.[377] None of the transmission cases was associated with gastrointestinal symptoms.

**Adverse Events.** No excess of adverse effects in vaccinees compared with control infants was reported in any of the above-mentioned clinical trials.[378,379] However, the virus was shed in concentrations detectable by ELISA in 60% to 80% of infants[380,381] after dose 1 and often after dose 2, suggesting the possibility of horizontal transmission to nonvaccinees.

**Intussusception.** Because of the association of RotaShield with intussusception, a large Phase III safety trial was conducted with approximately 63,000 subjects randomized to receive either two doses of the Rotarix vaccine or placebo, as mentioned above. The primary end point of this large trial was the occurrence of intussusception within 31 days after each dose of vaccine.[345] A secondary objective was to assess the occurrence of serious adverse events, including intussusception, during the entire study period (i.e., a median of 100 days after the second dose). No increased risk for intussusception was observed after administration of Rotarix when compared with placebo. A total of 13 cases of intussusception were identified during the 31-day windows; six in Rotarix recipients and seven in placebo recipients. No clustering in the initial 1 to 2 weeks was identified after either dose. During the entire duration of the study, 16 cases of intussusception occurred in the placebo group compared with nine in the vaccine group.

Postmarketing studies to assess if Rotarix is associated with intussusception have been conducted in Mexico, Brazil, Australia, the United States, Singapore and the United Kingdom (see Table 52.7).[307-313,382,382a] An increased risk of intussusception was detected in a first study in Mexico, following dose 1 and dose 2 (SCCS and case-control methodology)[306]; a second study in Mexico, following dose 1 only (SCCS)[312]; in Brazil, following dose 2 but not dose 1 (SCCS and case-control)[308]; and in Australia, following dose 1 and dose 2 (SCCS) and dose 1 only (case-control).[312] In the United States, the VSD evaluation found an increased risk of intussusception following dose 2 compared with that expected based on historical rates; the statistical significance of the dose 1 relative risk could not be calculated.[309] The relative risk of intussusception within 7 days after Rotarix was greater than that following RotaTeq vaccination.[329] In the PRISM evaluation, the study of Rotarix was underpowered for the primary analysis (self-controlled risk interval design) but the secondary analysis (cohort design) suggested an increased risk following dose 2.[310] In Singapore, an increased risk of intussusception was detected following dose 1 (SCCS), and in the United Kingdom, following dose 1 and dose 2 (SCCS).[382,382a]

## Inactivated Human Rotaviruses

Because administration of oral rotavirus vaccines in the developing world may induce a lesser response than in higher income countries—and because reduced immunogenicity and effectiveness in the developing world might be caused by antibodies in breast milk or interference by parasites or toxin-producing bacteria in the gut—parenteral rotavirus vaccines are being developed. A variety of approaches have been pursued, including inactivated whole rotavirus vaccine,[n] triple- and double-layered virus-like particle vaccines,[383,385] recombinant subunit VP6 protein vaccines,[386-388] and a truncated recombinant subunit VP8 protein vaccine candidate with P[8], P[4], or P[6] specificity expressed in *Escherichia coli*.[389] Preliminary studies in experimental animals show promise for some of these approaches[390]; further clinical development is ongoing.

## Community Protection

Shortly after vaccine introduction in the U.S., declines in hospitalizations for rotavirus gastroenteritis were also observed among children under age 5 years that were not age-eligible for vaccination[268-270,281,251-294,297,259,391,392] suggesting indirect benefits from reduced transmission of rotavirus in the community. Similar observations were reported from Australia, countries in Europe and Latin America and in Israel, following national introduction of rotavirus vaccine.[266,301,303,367,393-396] Interestingly, indirect protection from infant vaccination appears to extend to (unvaccinated) older children (United States, Australia, United Kingdom) and adults (United States, United Kingdom), revealing a previously unrecognized burden of moderate to severe rotavirus disease in these age groups.[398b,393-402] These indirect benefits were not anticipated prior to vaccine implementation and provide further encouragement for vaccine use, as do the early data on unanticipated benefits of rotavirus vaccination in protection against childhood seizures.[302,302a,402a]

### Recommendations for Use of RotaTeq and Rotarix in the United States

*Routine Administration.* Recommendations for the use of rotavirus vaccines have been issued by several committees.[403-406] The ACIP recommends routine oral immunization of U.S. infants with either three doses of RotaTeq administered at 2, 4, and 6 months of age or two doses of Rotarix administered at 2 and 4 months of age.[404,405] The minimum age for the first dose is 6 weeks and the maximum age is 14 weeks and 6 days of age. Subsequent doses should be given with an interval of at least 4 weeks, and all doses of vaccine should be administered by age 8 months and 0 days. The first dose of vaccine was not recommended for infants more than 14 weeks and 6 days because of lack of safety data from the clinical trials in starting the series in infants older than this age and to avoid the peak age range at which idiopathic intussusception occurs. It was also recommended that no dose of vaccine be administered to infants more than 8 months and 0 days of age because of insufficient data on safety. It is unlikely that these age restrictions will be loosened any time soon.

Rotavirus vaccines can be administered together with diphtheria, tetanus, and acellular pertussis, *Haemophilus influenzae* type b, inactivated polio, hepatitis B, and pneumococcal conjugate vaccines. Rotavirus vaccine can be administered to infants with mild illness. Infants with moderate to severe illness should be vaccinated as soon as they recover from the acute phase of the illness.

The effect of simultaneous administration of both RotaTeq and Rotarix with OPV on the immune response to each of the

vaccines has been evaluated.[406-408] Neither RotaTeq nor Rotarix interferes with the immune response to any of the three antigens in OPV. OPV appears to interfere with the immune response of the first dose of rotavirus vaccine, but this interference is largely overcome after administration of the complete vaccine series. Bivalent and monovalent OPV also appear to interfere with the immune response to rotavirus vaccine.[408a,408b]

*Breastfeeding.* The efficacy of the vaccine is similar among breastfed and nonbreastfed infants. No restrictions are placed on the infant's feeding before or after receipt of rotavirus vaccine.

*Premature Infants.* Premature infants may be vaccinated if they are at least 6 weeks of age, have been discharged or are about to be discharged from the hospital nursery, and are clinically stable. The ACIP considers the benefits of rotavirus vaccination of premature infants to outweigh the theoretical risks.

*Contraindications.* Rotavirus vaccine should not be administered to persons who have severe hypersensitivity to any component of the vaccine or who have experienced a serious allergic reaction to a previous dose. Latex rubber is contained in the Rotarix oral applicator; consequently, infants with a severe (anaphylactic) allergy to latex should not receive Rotarix. The RotaTeq dosing tube is latex-free. Neither RotaTeq nor Rotarix should be administered to infants who have severe combined immunodeficiency disease; vaccine-acquired rotavirus infection and disease has been reported in infants with severe combined immunodeficiency disease following rotavirus vaccine administration.[409,410] RotaTeq and Rotarix are also contraindicated in infants that have had intussusception.[411]

*Precautions.* Practitioners should consider the potential risks and benefits when deciding whether to administer RotaTeq or Rotarix to the special populations listed below.

*Altered Immunocompetence Other Than Severe Combined Immunodeficiency Disease.* Children and adults who are immunocompromised because of congenital immunodeficiency, hematopoietic transplantation, or solid-organ transplantation sometimes experience severe, prolonged, and even fatal rotavirus gastroenteritis.[183-185] However, no safety or efficacy data are available for the administration of rotavirus vaccine to infants who are potentially immunocompromised.

*Preexisting Chronic Gastrointestinal Disease.* The safety and efficacy of RotaTeq or Rotarix have not been established for infants with chronic gastrointestinal diseases such as congenital malabsorption syndromes, Hirschsprung disease, short-gut syndrome, or persistent vomiting of unknown cause. However, the benefits of vaccination outweigh the theoretical risks in infants with preexisting chronic gastrointestinal conditions who are not undergoing immunosuppressive therapy.

*Special Situations*

*Exposure of Immunocompromised Persons to Vaccinated Infants.* Infants living in households with persons who have or are suspected of having an immunodeficiency disorder or impaired immune status may be vaccinated. Protection of the immunocompromised household member afforded by immunization of young children in the household likely outweighs the small risk of transmitting vaccine virus to the immunocompromised household member and any subsequent risk of vaccine virus-associated disease. To minimize potential virus transmission, all members of the household should employ measures such as good hand washing after contact with the feces of the vaccinated infant.

*Exposure of Pregnant Women to Vaccinated Infants.* Infants living in households with pregnant women should be vaccinated according to the same schedule as infants in households without pregnant women. Most women of childbearing age have preexisting immunity to rotavirus; therefore, the risk of infection and disease from potential exposure to the attenuated vaccine virus strains is low. In addition, immunization of young children would avoid potential exposure of pregnant women to wild-type virus if the unvaccinated infant suffers from rotavirus gastroenteritis.

*Regurgitation of Vaccine.* The practitioner should not readminister a dose of rotavirus vaccine to an infant who regurgitates, spits out, or vomits during or after administration of vaccine. The infant can receive the remaining recommended doses of rotavirus vaccine at appropriate intervals.

*Hospitalization After Vaccination.* If a recently vaccinated child is hospitalized for any reason, no precautions other than routine universal precautions need be taken to prevent the spread of vaccine virus in the hospital setting.

## DETECTION OF PORCINE CIRCOVIRUSES IN ROTAVIRUS VACCINES

In 2010, Eric Delwart and colleagues at the University of California, San Francisco, using deep sequencing and microarray technologies, found nucleic acids from porcine circovirus (PCV) type 1 in Rotarix.[412] Subsequent studies performed by the U.S. Food and Drug Administration, Merck, and Glaxo-SmithKline found evidence for live PCV type 1 in Rotarix and genetic fragments but not live PCV type 2 in RotaTeq.[412a,413,414] Neither PCV-1 nor PCV-2 has been found to cause an immune response or disease in humans.[415] Consistent with that observation, children inoculated with Rotarix or RotaTeq in Phase III trials were not found to have PCV-1 or PCV-2 antibodies in serum. The source of PCV in both vaccine preparations was probably the porcine trypsin used to grow rotaviruses in vitro. Although the presence of PCV does not pose a safety risk, both companies have committed to removing PCV from their vaccines.

## PUBLIC HEALTH CONSIDERATIONS

After the withdrawal of RotaShield vaccine from the market, there was deep disappointment that, despite the licensing of an effective rotavirus vaccine, public health advocates were back at square one. A vaccine had been developed that had a rare flaw in its safety profile: intussusception in infants. The situation was made worse by the fact that the mechanism for the causation of intussusception was unknown and the incidence of intussusception attributed to the vaccine was extremely low (approximately one in 10,000). This meant that establishing apparent relative safety with a new and alternative vaccine could only be claimed by blindly vaccinating large numbers of infants and observing their health for an extended period, without the benefit of any biological markers known in the infant hosts to determine whether the vaccine trial in progress was safe (the numbers of infants tested by two companies that took up the challenge [GlaxoSmithKline and Merck] was more than 60,000 for each company). That two companies pursued this product at extraordinary cost and with absolutely no guarantee of success is just as remarkable as the fact that each created, produced, and licensed a new rotavirus vaccine, based on different biological approaches.

Many countries that have introduced rotavirus vaccines in their national childhood immunization programs have shown remarkable declines in severe rotavirus gastroenteritis post vaccine introduction.[268-270,415a] In the United States, for example, an estimated 177,000 hospitalizations, 242,000 emergency department visits, and more than 1,000,000 outpatient clinic visits for rotavirus gastroenteritis were averted during the 4-year period July 2007 through June 2011.[282] Data from a national network of sentinel clinical laboratories show the marked and sustained declines in U.S. rotavirus activity

after vaccine implementation and depict the biennial pattern of rotavirus activity that has emerged following vaccine introduction, with small peaks of rotavirus activity now alternating with years with very low levels (Fig. 52.4).[416]

Against these remarkable health benefits from vaccination, postlicensure evaluations have identified a safety issue, with a risk of intussusception following RotaTeq and Rotarix estimated between approximately one and six excess cases of intussusception per 100,000 vaccinated infants. Acknowledging the documented benefits as well as the small increased risk of intussusception from these vaccines (Table 52.9),[307,308,312,417] advisory bodies and health organizations continue to support the routine use of these vaccines. Evaluations based on ecological data do not demonstrate a consistent increase in the overall rate of intussusception in infants (younger than age 1

year) in early postintroduction data from the United States and Australia; however, ecological data have important inherent limitations for assessing possible changes in rate of such an uncommon condition.[417a,418,418a,418b] Given that three biologically different rotavirus vaccines are associated with intussusception, one could postulate that wild-type natural rotavirus infections might also be a rare cause of intussusception. If this is true, then one could argue that rotavirus vaccines, which prevent natural rotavirus infections, might also prevent intussusception caused by natural infection. U.S. investigators used VSD data to evaluate whether infants who received rotavirus vaccine have a lower intussusception risk in later infancy compared with infants who did not receive rotavirus vaccine; a statistically significant difference in rates in later infancy was not found.[419]



**Figure 52.4.** Number of total rotavirus enzyme immunoassay (EIA) tests performed and number of positive rotavirus EIA tests from 23 continuously reporting laboratories in the U.S. National Respiratory and Enteric Viruses Surveillance System (NREVSS), by week of year, July 2000–August 2014, 3-week moving average. *(Modified from Aliabadi N, Tate JE, Haynes AK, et al. Sustained decrease in laboratory detection of rotavirus after implementation of routine vaccination—United States, 2000–2014. MMWR Morb Mortal Wkly Rep. 2015;64(13): 337–342.)*

**TABLE 52.9** Risk-to-Benefit Estimates of Rotavirus Disease vs. Intussusception Outcomes by Country[a]

| Country | | Rotavirus Outcome Averted | Intussusception Outcome Caused | Rotavirus Outcome Averted: Intussusception Outcome Caused | Reference |
|---|---|---|---|---|---|
| Mexico | Hospitalizations | 11,551 | 41 | 282:1 | 308 |
| | Deaths | 663 | 2 | 331:1 | |
| Brazil | Hospitalizations | 69,572 | 55 | 1265:1 | 308 |
| | Deaths | 640 | 3 | 213:1 | |
| Australia | Hospitalizations | 6528 | 14 | 466:1 | 312 |
| | Deaths | NR | NR | NR | |
| United States | Hospitalizations | 53,444 | 35–166 | 322–1530:1[b] 251–1191:1[c] | 417 |
| | Deaths | 14 | 0.1–0.5 | 28–134:1 | |

[a]Estimates based on one vaccinated birth cohort followed to age 5 years.
[b]Rotavirus hospitalizations averted per 1 excess hospitalized intussusception case.
[c]Rotavirus hospitalizations averted per 1 excess intussusception case.
NR, not reported.
*Modified from Rha B, Tate JE, Weintraub E, et al. Intussusception following rotavirus vaccination: an updated review of the available evidence.*
Expert Rev Vaccines. 2014;13(11):1339–1348.

In 2010, results of Phase III trials of both RotaTeq and Rotarix conducted in developing countries of Africa and Asia were reported (see Table 52.6). The efficacy of both vaccines in these trials was moderate compared with that reported in earlier trials in affluent settings.[262,267,350,416a,419a,419b] However, because of the greater baseline burden of severe rotavirus in developing countries, the public health benefits of vaccination in terms of absolute number of cases of severe rotavirus disease prevented were substantial. While the exact reasons for the somewhat diminished performance of rotavirus vaccines in developing countries are unclear, other live oral vaccines such as those against polio, cholera, and typhoid have also not worked equally well in populations in developed and developing country settings. Many factors in infants in the developing world—levels of maternal antibody, micronutrient malnutrition, the presence of interfering microorganisms, and comparison diseases such as HIV and malaria—can alter the ability of the infant to process a live oral vaccine, lower the effective dose, and interfere with virus replication and impede a good immune response.[420,420a] Alternate vaccine schedules have also been explored.[423a,423b,423c,423d] Antibodies and other factors present in breast milk have also been postulated as factors that could impair rotavirus vaccine performance.[421-423,423e] However, several newer studies have not shown any beneficial effect of temporarily withholding breastfeeding for 30 to 60 minutes before and after vaccine administration on the immune response to rotavirus vaccine.[424-425]

## RECOMMENDATIONS FOR ROTAVIRUS VACCINE USE IN THE EXPANDED PROGRAMME ON IMMUNIZATION

WHO recommends that rotavirus vaccines be included in all national immunization programs and be considered a priority in countries with high rotavirus fatality rates.[427,428] Two vaccines are currently widely available. Rotarix is recommended to be given in a 2-dose schedule at the time of DTP1 and DTP2; RotaTeq is recommended to be given in a 3-dose schedule at the time of DTP1, DPT2, and DPT3. For both vaccines, a minimum interval of 4 weeks is recommended between doses.

WHO recommendations state that although early immunization is still favored, with the first dose of rotavirus vaccine administered as soon as possible after 6 weeks of age, immunization programs can allow children to receive rotavirus vaccine together with DTP regardless of the time of vaccination (to age 24 months). These updated recommendations were made following review of data on the potential impact of the manufacturers' conventional age restrictions on the first and last doses of the series[427]; in countries where rotavirus mortality is the highest, delays in immunization are common and hence strict limits on maximum ages for administration of rotavirus vaccine can substantially reduce the number of children who can receive rotavirus vaccine. A modeling study had assessed the potential benefits of mortality reduction from rotavirus versus the risk of fatal intussusception in low- and low/middle-income countries when the first dose of the vaccine is strictly administered by 15 weeks of age and the last dose is administered by 32 weeks of age, compared with a unrestricted age strategy with rotavirus vaccine administered at the time of DTP administration (up to age 3 years).[429] This analysis demonstrated that removing the age restrictions in these countries (which would allow an additional 21% to 25% of children to receive rotavirus vaccine) would avert an additional 47,200 rotavirus deaths and cause an additional 294 intussusception deaths, for an incremental benefit-to-risk ratio of 154 deaths averted for every death caused by vaccine. Postintroduction intussusception assessments are underway in Africa.

Future development and introduction of rotavirus vaccines will require substantial input from the international donor community, including the Vaccine Alliance, Gavi, and the Bill & Melinda Gates Foundation. Many local vaccine makers in China, India, Indonesia, and other settings have begun their own programs for rotavirus vaccine development and introduction, and these efforts could provide an additional supply of vaccine at an affordable cost to ensure that they reach the poorest children in the world who need them the most. In addition to other candidate oral rotavirus vaccines, approaches such as inactivated rotavirus vaccines are being pursued, especially since this could help overcome some of the challenges to diminished performance of oral rotavirus vaccines in developing countries and also potentially avoid a risk of intussusception.[387] Such new vaccines are unlikely to be proposed for international use for many years.

### Acknowledgment

We acknowledge H. Fred Clark, Roger Glass, and Richard Ward for contributions to this chapter.

References for this chapter are available at ExpertConsult.com.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

*Plaintiffs,*

v.

MERCK & CO., INC.,

*Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S EXHIBITS IN SUPPORT OF MERCK'S RESPONSE TO RELATORS' STATEMENT OF UNDISPUTED FACTS

# EXHIBIT 322



# 60 Tuberculosis Vaccines

*Willem A. Hanekom, Thomas R. Hawn, and Ann M. Ginsberg*

Bacille Calmette-Guérin (BCG) is currently the only licensed vaccine available against tuberculosis (TB). The vaccine has been given to over 4 billion people; yet, TB still poses a major public health threat globally.[1] One-third of the world's population is thought to be infected with *Mycobacterium tuberculosis*, while 10.4 million new cases of TB disease, causing 1.4 million deaths, occurred in 2015.[1] Drug-resistant forms of disease, difficult and expensive to treat, are emerging and are associated with high morbidity and mortality.[1] Intervention in the TB pandemic requires optimal delivery of BCG, antimicrobials and diagnostics. In settings where these current tools could be delivered optimally, the decline in TB incidence has been approximately 5% per year, compared to the global average decline of 1.5% per year.[2,3] Even at decline of 5% per year, the World Health Organization (WHO) Stop TB Partnership goal of achieving a disease incidence of 20 cases per 100,000 per year by 2030 is not achievable.[4] New tools are needed: among these, a vaccine that is effective in preventing adult forms of pulmonary TB is likely to have the greatest impact.[5,6] The ability of the current TB vaccine, BCG, to prevent pulmonary disease is variable, as the vaccine mainly protects infants and young children against disseminated forms of TB (see below).

## TUBERCULOSIS—A BRIEF OVERVIEW

### History and Epidemiology

TB has probably been the leading cause of death in Europe and the United States in recorded history.[7] The earliest known cases of TB were discovered in Egyptian mummies dating from 4000 to 2000 years BC where evidence of spinal disease was uncovered.[8] Recent studies analyzing global distribution and variability among *M. tuberculosis* strains suggest that the pathogen migrated out of Africa with humans during the Neolithic period and may have coexisted with humans for up to 70,000 years.[9,10]

In 1882, Koch identified the tubercle bacillus as the cause of TB.[11] The discovery that TB is an infectious disease led to four successive disease control approaches.[7] First, a sanatorium movement was established in Europe in 1854 and in the United States in 1882, and remained in place until after the advent of antimicrobial therapy against TB. This intervention included exposure to fresh air and sunlight in a community setting. Other intervention during this period included ordinances to improve sanitation and housing. The second development was pasteurization of cow's milk, which virtually eliminated human disease caused by *Mycobacterium bovis*, the most common cause of TB in animals. Third, the BCG vaccine was developed in the early 20th century in France (see below). Finally, antimicrobials against TB were developed, including streptomycin, first used in the 1940s, followed by isoniazid and rifampin, which were introduced in the 1950s and 1970s, respectively. These anti-TB drugs would be used both to treat established disease and to prevent progression of latent *M. tuberculosis* infection to active disease. The cornerstone of TB control for the past 5 decades in the United States has been a combination of targeted screening, chemotherapy, and contact investigation of persons potentially exposed to patients with TB disease.

It is worth noting that TB disease incidence declined in Europe and the United States long before the availability of chemotherapy and without use of BCG.[12] The decrease in incidence was associated with industrialization, urbanization, and an accompanying rise in socioeconomic status.

Today, the global burden of TB disease remains high, with an estimated 10.4 million incident cases and 1.4 million deaths in 2015 (Fig. 60.1).[1] Despite these numbers, substantial progress in TB control has been made in all regions of the world over the past 20 years. The United Nations Millennium Development Goal target of halting and reversing the rise in TB incidence globally by 2015 was met: between 2000 and 2013, global incidence was reduced by 1.5% per year.[1,13] The STOP TB Partnership's target of halving mortality attributable to TB from 1990 to 2015 was reached in three of six WHO regions; globally, mortality fell by 45% in the period up to 2013.[1]

Adolescents and adults between the ages of 15 and 54 years account for the vast majority of cases of TB disease,[1] and those with pulmonary disease are responsible for the transmission of TB. Modeling studies show that interruption of transmission would be the most effective intervention in the TB epidemic.[5] In contrast to adolescents and adults, children with TB do not commonly spread the pathogen, a consequence of the paucibacillary nature of their disease. Therefore, many TB vaccine developers are now focusing efforts on developing vaccines for delivery to adolescents and adults as a priority.[6] In contrast, the current TB vaccine, BCG, targets infants and works best in infant and childhood populations (see below). Ultimately, novel TB vaccine strategies should address all populations at risk, including, for example, the elderly, whose contribution to the Western Pacific Rim region burden of TB disease is increasing.[1]

The HIV epidemic has compounded challenges of meeting TB control targets: globally, approximately 13% of TB cases occur in HIV-infected persons.[1] HIV infection leads to increased susceptibility to TB disease, and complicates treatment, because of drug interactions between TB and HIV medications, and immune reconstitution inflammatory syndrome.[14] Novel vaccines would also need ultimately to be effective in HIV-infected persons if the burden of disease is to be prevented.

The rise of multidrug resistant (MDR) TB poses a global health threat. The WHO estimated that there were 480,000 new cases of MDR TB globally in 2013.[15] Extensively drug-resistant and totally drug-resistant strains of *M. tuberculosis* have now been isolated from patients, compounding efforts to control TB even more.[16] Drug-resistant disease needs to be treated for prolonged periods, and the total cost of care is manyfold higher than for drug-sensitive TB. Even in countries where drug-resistance rates are low, managing these forms of the disease may absorb a major portion of TB control budgets.[17] The situation clearly calls for new tools, of which novel, better vaccines would be particularly attractive. *M. tuberculosis* drug-resistance patterns are not likely to be a factor in vaccine efficacy.

## BACTERIOLOGY

All members of the genus *Mycobacterium* share the property of acid-fastness, which is related to mycolic acid components of

Appx18695



**Figure 60.1.** Changes in **(A)** global incidence of and **(B)** mortality from tuberculosis (TB). **C,** Incidence rates of TB disease in 2013 in countries from around the globe. (*From World Health Organization. Global Tuberculosis Report 2016. Geneva, Switzerland: WHO; 2016.*)

a complex cell wall. Each species has a unique pattern of mycolic acid composition.[18] Nine species—*M. tuberculosis, Mycobacterium africanum, Mycobacterium canetti, M. bovis, Mycobacterium caprae, Mycobacterium pinnipedii, Mycobacterium microti, Mycobacterium mungi,* and *Mycobacterium orygis*—share 99.9% similarity at the nucleotide level and have identical 16S ribosomal RNA sequences, and are classified together as the *M. tuberculosis* complex. These strains share growth characteristics and biochemical reactions, and can each cause clinical TB disease in humans and other mammals.[19,20] *M. bovis* causes TB in cattle and other animals, primarily, but can cause disease in humans who have extensive contact with infected animals

or who drink animal milk that contain the pathogen. Veterinary control programs have all but eliminated *M. bovis* disease in the United States, but human infection still occurs in some countries.[21]

Approximately half of the approximate 3,800 open reading frames of the *M. tuberculosis* genome are involved in fatty acid metabolism. A major effort is ongoing to determine whether lipid components could be used in future vaccines against TB[11] (see below). Most new vaccines in clinical testing contain immunodominant protein antigens, including early secretory antigen target-6 (ESAT-6) and culture filtrate protein-10 (CFP-10) (see below). These antigens belong to the so-called RD1

Appx18696

region, which also contains the secretory apparatus for transport of ESAT-6 and CFP-10 to the cell surface to mediate host cell membrane disruption and bacterial release, thereby promoting cell-to-cell infection.[23,24] Importantly, the RD1 region is missing in BCG. Other important protein families, some of which have been incorporated into novel vaccines, include mycolyl transferases (Ag85 family), which play a role in building and stabilizing the cell wall by anchoring units of mycolic acid, and major chaperonins such as DnaK, GroEL, GoeES, and α crystalline. Recent studies have expanded our understanding of the breadth of antigens that stimulate T-cell responses in humans[25]; many novel CD4 and CD8 immunodominant epitopes[26] have been discovered with screening strategies. Interestingly, many of these belong to the PE/PPE group of antigens, which appear to have immunomodulatory and virulence properties.[27] Functional attributes of many *M. tuberculosis* proteins remain unknown. In addition, it is not known which particular antigens are critical for protection against TB. Rather, the lack of variation of immunodominant antigens in *M. tuberculosis* strains across the globe in the face of possibly tens of thousands of years of immune pressure suggest that responses to these components may even hold evolutionary advantage to the pathogen.[28]

Nontuberculous mycobacteria (NTM) were discovered shortly after Koch's identification of the tubercle bacillus, but were recognized as human pathogens only in the 1940s, approximately 20 years after the first use of BCG.[29] NTMs are a group of more than 140 species and are found worldwide, often in soil and water reservoirs.[30,31] The most ubiquitous species are those of the *Mycobacterium avium–intracellulare* complex. Although environmental mycobacteria rarely cause disease, immunologic effects on humans may modulate the course of *M. tuberculosis* infection. In addition, NTM interactions may partially explain variability in efficacy induced by BCG (see below).

## PATHOGENESIS

TB is spread by adolescents and adults with cavitary lung disease who release the pathogens into the air, largely through coughing. Approximately 35% of contacts of a patient will become infected following inhalation of *M. tuberculosis*; proximity and duration of exposure are important determinants of infection. Only a small fraction of exposed persons resist infection, as demonstrated by their having persistently negative tuberculin skin tests (TSTs) or interferon-γ release assays (IGRAs).[32] These individuals may have an innate alveolar macrophage response to *M. tuberculosis* that resists initial infection or rapidly clears the bacillus before a T-cell response develops.

Upon inhalation, once in the lung, the bacilli bind to receptors on macrophages and other myeloid cells, such as monocytes, dendritic cells, and neutrophils, resulting in detection by the innate immune system.[33,34] Several phagocyte receptors mediate this detection, including toll-like receptors (TLRs: TLR1/2/6/8/9), Nod-like receptors (NLRs: NOD2), C type lectin receptors (CLRs: CLEC4E or Mincle), mannose receptor (MR), dendritic cell-specific intracellular adhesion molecule-3 (ICAM-3)-grabbing non-integrin (DC-SIGN or CD209), and DNA sensors (STING).[35–38] In animal models, inoculation with tubercle bacilli first causes inflammation of the lung interstitium, with local tissue damage and histamine and prostaglandin release. Infected macrophages secrete tumor necrosis factor, which causes local tissue cells to release chemokines. Leukocytes are attracted, including neutrophils and T cells. T cells migrate to the lung following sensitization in regional lymph nodes by dendritic cells that have migrated to this compartment. A so-called TB primary complex visible on roentgenography consists of a local infiltrate in the lung as well as enlarged regional lymph nodes, both caused by cellular accumulation.

The onset of specific T-cell immunity greatly alters the pathogenic picture. The incubation period between when tubercle bacilli enter the body and the development of cutaneous delayed type hypersensitivity, a hallmark of the T-cell response, is most often between 3 and 8 weeks. During this time, a granuloma is formed at the site of infection. This granuloma, the pathognomonic histopathologic feature of the infection, contains a center of macrophage-derived cells with an outer ring of lymphocytes. The granuloma may contain the infection through encapsulation, or may break down leading to caseous necrosis with the subsequent local spread of mycobacteria. It is also thought that systemic spread of the tubercle bacilli to multiple organs occurs early in the pathogenesis of the infection.

Only 10% of untreated infected persons will develop TB disease, with approximately 50% of these individuals developing disease within 2 years of infection—so-called primary progressive disease. TB disease may also occur much later in life, by reactivation and growth of live bacilli contained within contained granulomas. This so-called secondary, postprimary, or adult-type disease is often associated with a temporary decline in T-cell immune status, associated with aging, cancers, poor nutrition, or other forms of immune compromise. In settings where TB is endemic, primary disease drives the epidemic. In this setting, exogenous reinfection may occur in persons previously infected and play a role in manifestation of clinical disease. As epidemic disease control advances, the relative contribution of postprimary, endogenous reactivation TB becomes greater.

There is evidence that a primary *M. tuberculosis* infection imparts a degree of protection from disease resulting from secondary exogenous infection. Studies from the preantibiotic era in areas with high TB rates compared active TB disease rates in those with or without original primary *M. tuberculosis* infection (as indicated by positive skin test reactivity). A metaanalysis of 18 studies with an aggregate sample size of 19,886 individuals estimated that individuals with latent *M. tuberculosis* infection (positive skin test reaction) had a 79% (95% confidence interval [CI], 70–86%) lower risk of developing active TB disease after reinfection when compared with uninfected individuals.[39] Other studies have had similar findings.[40–42] Together, these studies suggest that humans can acquire partial immunity to TB disease from natural exposure, and that understanding this protection may hold clues to successful vaccination against TB.

The immunologic mechanisms that control *M. tuberculosis* disease remain incompletely understood.[43] CD4 T cells are indispensable and act by producing T-helper type 1 (Th1) cytokines, including interleukin (IL)-2 and interferon (IFN)-γ, to activate infected macrophages for control of the pathogen. Animal studies show that CD8 T cells may also contribute, either through cytokine production or cytotoxic activity. In addition to effector responses, a host response characterized by immune mechanisms to control excessive inflammation may be important.[44] An optimal vaccination response would therefore not necessarily be a quantitatively greater T-cell response. To date, the immunological correlates of protection against *M. tuberculosis* infection and/or TB disease have not been identified.[45] Although identification of correlates of protection against TB is not possible until completion of a placebo-controlled trial of a protective vaccine, some clues have emerged from prospective studies of BCG-vaccinated infants or of other persons at risk of TB disease. A prospective study of infants vaccinated with BCG at birth, where a control arm of unvaccinated infants was not possible, showed that classical CD4 and CD8 T-cell responses induced by BCG and

measured 10 weeks after vaccination did not differ between infants who ultimately developed TB disease and whose who did not develop TB disease in the first 2 years of life.[46] These results suggest that host responses that are essential may not be sufficient for protection against TB. In another study, *M. tuberculosis*-infected South African adolescents were enrolled and followed for 2 years to identify those who developed TB disease and those who did not.[47] Examination of blood collected prior to development of disease revealed a 16-gene expression signature of risk. The signature predicted tuberculosis progression with a sensitivity of 66.1% (95% CI, 63.2–68.9%) and a specificity of 80.6% (79.2–82.0%) in the 12 months preceding tuberculosis diagnosis. The risk signature was validated in various independent African cohorts. Although further analysis of the character of the host response associated with disease risk is needed, these results represent a step toward better understanding of correlates of protection against TB.

During thousands of years of coevolution with humans, *M. tuberculosis* has evolved multiple strategies to evade or modulate a host response. The bacillus employs phagolysosome modification and inhibition of apoptosis (and promotion of bacillus survival) of innate cells,[48] for example. The pathogen also induces cellular trafficking to the granuloma to allow expansion of the number of cells available for infection to increase its survival.[34,49–51] After infection, T-cell responses to the pathogen are delayed; a positive skin reaction does not develop for approximately 6 weeks.[52,53] A similar delay in T-cell immune responses is observed in mice, which has been associated with delayed transport of bacilli from the lung to the draining lymph node.[54,55] Antigen-specific T cells often fail to recognize and eradicate *M. tuberculosis*-infected macrophages.[34,55] There are several possible mechanisms underlying impaired killing of bacilli, including a protected cellular niche for the pathogen during the first week that prevents recognition,[57] inhibition of IFN-γ activated pathways in macrophages,[58–60] and the development of excessive regulatory T-cell response,[61] which may dampen effective immune responses.

Successful vaccination against TB will require induction of immunity that is critical for protection, while, at the time of exposure to *M. tuberculosis*, circumvent the pathogen's ability to inhibit innate and adaptive host responses, and allow inflammation of an optimal character and magnitude. One possible approach would be to pursue a vaccine goal of prevention of *M. tuberculosis* infection, rather than disease.[62] Advantages would include circumvention of delayed T-cell induction by the pathogen, if CD4 T-cell or other effector cell responses were present at the time of exposure. Second, the kinetics of killing of *M. tuberculosis*-infected macrophages may be altered in acutely infected cells, compared with those with chronic infection. If T cells produced IFN-γ to activate macrophages immediately after infection, clearance of the bacillus may be more likely because of less time for development of *M. tuberculosis* modification of the macrophage. If vaccine-induced T cells were qualitatively different than those from chronic infection and present in higher quantities in the lung at the time of exposure, protection may be possible. Understanding why Th1 effector cells are ineffective during the early phases of infection and identification of markers of efficacy or of an optimal balance between effector and regulatory or exhaustion host responses may be critical for successful development of a TB vaccine.

## CLINICAL FEATURES

The result of exposure to *M. tuberculosis* is no infection, transient infection,[63] or established infection. Established infection is so-called latent TB infection (LTBI). Individuals with LTBI have a positive TST or IGRA, but no clinical or radiographic evidence of active disease. TB disease occurs when manifestations of pulmonary or extrapulmonary TB become apparent, either clinically or on imaging studies.

The clinical presentation of pulmonary TB disease in childhood differs from that in adolescents and adults. The signs and symptoms of primary intrathoracic TB in children are often surprisingly mild, a result of the paucibacillary nature of the disease.[64] Nonproductive cough, mild dyspnea, and low-grade fever are the most common symptoms in infants. Chest roentgenograms may show hilar or mediastinal lymph node enlargement, a hallmark of childhood disease, and mild infiltrates. "Progressive primary disease" is characterized by lobular or lobar spread of TB and pulmonary dissemination is characterized by the appearance of miliary lesions. Complications of lymph node compression on the airway, such as segmental collapse, are relatively common, while parenchymal breakdown is uncommon.[65]

In contrast, adolescents and adults manifest more significant symptoms and signs because of the multibacillary nature of their disease.[66] The wide spectrum of clinical manifestations include chronic cough, low-grade fever, night sweats, fatigue, and weight loss. The disease occurs most commonly in the apical or posterior segment of the upper lobes, or the superior segment of the lower lobes. The typical pattern is airspace consolidation of a patchy or confluent nature, with cavitation occurring frequently. The development of fibrosis leads to volume loss in the involved lung. Older adults are more prone to having unusual radiographic manifestations of TB, including lower lung field disease.[67] At all ages, early pulmonary disease, identifiable by radiology, may be asymptomatic.

Extrapulmonary manifestations of disease occur in approximately 15% of immunocompetent adults and 25% of children.[68] Virtually any organ of the body can be involved. Superficial lymph node disease in the cervical or supraclavicular regions is the most common manifestation. Pleural TB accounts for almost 25% of the cases of extrapulmonary TB, but it is uncommon in children and rare in infants. Other sites of TB disease include the genitourinary system, the bones and joints, the peritoneum, and the pericardium.

Two forms of TB are life threatening: disseminated or miliary disease, and meningitis. The early clinical manifestations of miliary TB are protean, depending on the organs involved, including lungs, spleen, liver, bone marrow, meninges, or abdomen.[69] Central nervous system TB is fatal without effective treatment.[70] A meningeal exudate usually concentrates near the brainstem, while inflamed cortical or meningeal blood vessels lead to infarction of the cerebral cortex. Cranial nerve involvement is common, as is noncommunicating hydrocephalus. Death or profound handicap is a common outcome.

Adults with uncontrolled HIV infection who develop pulmonary TB often have a clinical and radiographic presentation that differs from that found in HIV-negative persons.[71] In advanced HIV infection, the radiographic presentation often includes hilar or mediastinal adenopathy, and diffuse or miliary pulmonary infiltrates, while cavitation is uncommon. Lower lung field involvement and endobronchial TB are much more common in patients with HIV infection. Disseminated or extrapulmonary TB occurs commonly. Patients with advanced HIV infection and TB who are started on both anti-TB drugs and antiretrovirals are prone to developing immune reconstitution inflammatory syndrome, which manifests as worsening of the original focus of infection or onset of new findings related to *M. tuberculosis* infection at other body sites.[72] The pathophysiology is dominated by a proinflammatory innate and adaptive immune response directed toward *M. tuberculosis* antigens.[73,74] The main treatment is corticosteroids to modulate the inflammation.

## Diagnosis

### Tuberculin Skin Test

A positive TST is the hallmark of latent infection with *M. tuberculosis* and remains positive for an individual's lifetime, even after chemotherapy.[75,76] The gold standard TST is the Mantoux test—the intradermal injection of purified protein derivative by use of a needle and syringe. The test should be read 48 to 72 hours after administration. Induration, not erythema, should be measured.

The appropriate cutoff size for a positive TST varies according to the clinical and epidemiological setting.[77,78] For adults and children at the highest risk for TB, a Mantoux induration of 5 mm is regarded as positive. For other groups at high risk for TB, induration of 10 mm is considered positive. In settings where TB is rare, the cutoff may be increased to 15 mm for individuals with no other risk factors for infection or disease.

Ten percent of adults and children with TB disease have a negative TST.[79,80] A variety of host-related factors such as young or old age, poor nutrition, immunosuppression by disease or drugs, viral infections, and overwhelming TB can lower TST reactivity. False-positive reactions may be the result of environmental mycobacterial exposure or BCG vaccination. The size of the skin test reaction after BCG vaccination varies with the strain and dose of the vaccine,[81,82] the route of administration,[83,84] the age of the person,[85–87] the nutritional status of the patient, the number of years since vaccination,[85,87,88] and the frequency of skin testing. There are conflicting findings about whether the TST reaction increases with repeated BCG vaccination or not.[89,90]

In a large number of studies of children who received BCG vaccine, the mean reaction to a TST ranged from 0 to 19 mm, although many experts believe that reactions larger than 10 to 15 mm that result from vaccination are unusual. Tuberculin reactivity wanes rapidly during the first few years after vaccination. Lifschitz found that approximately 50% of infants given BCG vaccine shortly after birth were tuberculin-negative at 6 months of age, and almost all children were tuberculin-negative at 1 year after vaccination.[85] Only 18% of Sri Lankan children vaccinated with BCG at birth had significant reactions at 1 year of age, and none was significant at 5 years of age.[91] A study from Canada investigated older children and adults who had received BCG vaccine by the scarification method on the lower back either in infancy or as older children.[92] Among children with a mean age of 11 years at skin testing, 4.9% vaccinated in infancy had a positive TST, compared with 12.5% of those vaccinated as older children. Among young adults with a mean age of 23 years at skin testing, 10.3% vaccinated in infancy had a positive TST compared with 25.5% of those vaccinated as older children. A similar study found that only 16% of U.S. naval recruits who had received BCG vaccine 8 to 15 years previously had a positive TST reaction at 10 mm or more.[93]

In summary, in BCG-vaccinated persons, the probability that a skin test reaction has resulted from infection by *M. tuberculosis* increases (1) with the size of the reaction, (2) when a patient had been in contact with a patient with infectious TB, (3) if the person is in a high-risk group for TB, (4) when the person's country of origin has a high prevalence of TB, and (5) when the interval between vaccination and skin testing is longer.[90]

### Interferon-Gamma Release Assays

The newer IGRAs are also used to diagnose latent tuberculosis and contain antigens that are specific to *M. tuberculosis*, absent in BCG, and variably present in NTMs.[94] The QuantiFERON-TB Gold In-tube test (Qiagen, Germany) is based on a whole-blood enzyme-linked immunosorbent assay using three antigens: ESAT-6, CFP-10, and TB7.7. QuantiFERON-TB Gold Plus is the latest version of this test and includes additional ESAT-6 and CFP-10 epitopes that are targets of CD8+ T cells. The test was designed to improve sensitivity and perform better in HIV-infected individuals with low CD4 T-cell counts. T-SPOT. TB (Oxford Immunotec, Oxford, UK) is also based on measurement of IFN-γ released by T cells stimulated with ESAT-6 and CFP-10, using an overnight enzyme-linked immunospot assay. These tests and other new tests may become important in clinical trials for new TB vaccines, addressing some of the methodologic problems encountered with previous BCG vaccine trials.

### Microbiologic Diagnosis

The most rapid and widely available procedure to detect mycobacteria is microscopic examination of sputum or other body fluid with an acid-fast stain. Fluorochrome methods are more sensitive than carbolfuchsin techniques, but at least $10^4$ acid-fast bacilli per milliliter of specimen are required for detection with either method. An acid-fast stain of sputum can identify 40% to 75% of adults with pulmonary TB.[95,96] Although environmental mycobacteria can be present in sputum and create a false-positive smear, the specificity of the acid-fast smear of sputum is high, especially when TB is endemic.[97] Most children with pulmonary TB do not spontaneously produce sputum and early morning gastric aspirates are used for diagnosis. As a consequence of the paucibacillary nature of childhood disease, sensitivity of acid-fast smears from these samples is low: usually less than 10% even in highly endemic areas.

Mycobacterial culture is commonly regarded as the gold standard for diagnosis. The best culture specimen is freshly expectorated sputum, from which *M. tuberculosis* can be isolated in approximately 80% of cases of pulmonary TB in adults.[98] Childhood gastric aspirate and induced sputum-derived cultures are positive in less than 50% of cases.[99]

Newer nucleic acid amplification techniques for direct detection of *M. tuberculosis* in sputum include Xpert MTB/RIF. In addition to rapid detection of presence of the pathogen, rifampin resistance may be evaluated simultaneously. A recent Cochrane review of 15 studies showed that Xpert had a pooled sensitivity and specificity of 88% and 98%, respectively, for replacement of smear microscopy.[100]

### Newer Diagnostic Tests

In 2014, a consensus group convened by the WHO recommended the highest priority indications for TB diagnostic test development for impact.[101] First, a non–sputum-based, point-of-care test to detect all forms of TB. Progress toward such a test, performed using blood or urine, is in early stages of development, and focuses on detection of specific host signatures or bacterial components like lipoarabinomannan. The recently marketed urine lipoarabinomannan detection test displays limited sensitivity, but may be useful for diagnosing TB in certain populations, such as HIV-infected persons.[102] Second, a simple, low-cost point-of-care triage test to be used by first-contact healthcare providers to rule out TB. Third, a point-of-care sputum-based test to be used as a replacement for smear microscopy. In some settings, such as South Africa, Xpert MTB/RIF is already used at a primary care level. Next-generation nucleic amplification tests hold the promise of being more compact and less expensive, and possibly more applicable to a primary care setting globally.[103] Finally, a rapid drug susceptibility test, which is likely to be incorporated into next-generation nuclear amplification tests[103] remains a priority.

## Clinical Diagnosis

In both highly resourced and lesser-resourced environments, many cases of childhood TB are diagnosed on clinical grounds with the use of one of several scoring systems incorporating symptoms, signs, and, when available, radiographic findings.[104,105] Although helpful, these systems have low sensitivity and specificity.

## TREATMENT AND INFECTION CONTROL

TB is treatable and preventable with antimicrobials. Guidelines for treatment are published by many expert groups, including the American Thoracic Society,[106,107] the American Academy of Pediatrics,[108] the Centers for Disease Control and Prevention,[109] and the WHO.[110] In general, TB disease should be treated with three or four drugs—isoniazid, rifampin, pyrazinamide, and ethambutol—for 2 months, followed by 4 months of isoniazid and rifampin.

Drug-resistant strains of *M. tuberculosis* are more difficult to treat. Strains are classified as extensively drug resistant when additional fluoroquinolone and injectable aminoglycoside resistance are present. Totally drug resistant strains of *M. tuberculosis* have also been described.[111] Treatment of MDR-TB is challenging because of lower efficacy, longer durations, and more adverse effects. With rising levels of drug resistance worldwide, the impact of an efficacious vaccine will be heightened.

The goals of infection control programs are to detect TB disease promptly, to isolate those who have or are suspected of having TB disease by using airborne precautions, and to treat people who have or who are suspected of having TB disease. Factors associated with infectiousness in adults include presence of a cough; lung cavities; acid-fast bacilli on sputum smear; disease of the lungs, airway, or larynx; and less than 2 weeks of adherent treatment.[112]

## Bacille Calmette-Guérin Vaccine

BCG is a live attenuated strain of *M. bovis*. Two French scientists, Calmette, a physician, and Guérin, a veterinarian, selected a *M. bovis* strain isolated from a cow with tuberculous mastitis in 1908.[113] The isolate was cultured in a medium that contained glycerol, potato slices, and beef bile, and subcultured every 3 weeks for a total of 13 years or 239 cycles. Loss of virulence was shown first in animal models and phenotypic changes from rough, dry, and granular colonies to viscous, moist, and smooth ones were noted.

The vaccine strain was first used in 1921 in Paris, when it was given orally to infants.[114] In 1928, the League of Nations declared that oral BCG vaccine was safe. Unfortunately, from 1929 to 1930, 72 of 250 children vaccinated in Lübeck, Germany, died of TB, as the oral preparation was contaminated by virulent *M. tuberculosis*.[115] Despite this tragedy, BCG vaccination continued, with introduction of new methods of administration: intradermal in 1927, multiple puncture in 1939, and scarification in 1947.[116]

In 1948, the First International BCG Congress in Paris concluded that BCG was effective and safe, even though no controlled clinical trials or retrospective case-control studies of the intervention had been performed. After World War II, the WHO and the United Nations International Children's Emergency Fund (UNICEF) organized campaigns to promote vaccination with BCG in several countries. The seed-lot system for BCG was established in 1956,[113] and the WHO developed requirements for freeze-dried BCG vaccine in 1966.[117] Since 1974, BCG vaccination has been included in the WHO Expanded Programme on Immunization, which aims to strengthen the fight against infectious diseases among children in developing countries. Rates of BCG vaccination have increased dramatically; more than 4 billion persons have received the vaccine, and more than 100 million infants receive BCG annually at present.

## Bacteriology of Bacille Calmette-Guérin Strains and Vaccine Constituents

In the decades since the first BCG created by Calmette and Guérin, multiple substrains have been generated using diverse culture methods that are best classified by genomic sequencing (Fig. 60.2).[118-122] A genealogy of BCG vaccine strains and a timeline for specific polymorphisms have been suggested.[118-123] BCG substrains differ in colony morphology, growth characteristics, biochemistry, immunogenicity, and virulence in animals.[123-134]

The variability among BCG strains is of concern for two reasons. First, extensive serial passage may have unintentionally resulted in overattenuation, compared to the original BCG strain.[135] Second, variability in substrains may be responsible in part, for variability in BCG efficacy demonstrated in clinical trials (see below). The consequences of strain variation on human vaccine efficacy and adverse effects remain to be fully elucidated; multiple studies have now shown that different strains induce differential host responses in humans.[134-135] To prevent further accumulation of genotypic and phenotypic differences during vaccine production, the WHO and many national regulatory authorities have instituted standardized procedures for manufacture (see below).

## Manufacturing, Quality Assurance, and Supply

BCG vaccine is produced from seed lots of lyophilized bacilli. A master seed lot is defined as a bacterial suspension of a single substrain originating from the bacillus of Calmette and Guérin that has been processed as a single lot and is of uniform composition.[139] The seed-lot system was adopted in the mid-1950s in an attempt to standardize production and vaccine characteristics. In the 1950s, the WHO recommended stabilization of the biologic characteristics of daughter strains by lyophilization and cryostorage of BCG.[140] Seed lots of the various BCG strains were originally maintained by the WHO and the Statens Serum Institut in Copenhagen.[117] Currently, BCG manufacture is the responsibility of individual suppliers, overseen by national regulatory authorities.

The classical method of manufacturing BCG involves inoculation into liquid medium for growth as a pellicle on the surface. Alternatively, organisms are dispersed through the liquid medium, which results in a slightly different colony morphology. Regardless, the WHO recommends, to avoid variation, that the total number of passages from master seed lot to final product should not exceed 12.[139,141] Early harvest of bacilli after 6 to 9 days of growth is essential for ultimate viability of the product. After filtering and pressing, the semidry mycobacterial mass is homogenized at controlled temperatures, diluted, and then freeze-dried. A stabilizer is added to the preparation.

Culture conditions can have profound effects on the final product.[123,142,143] For example, the Tice strain is grown in a medium containing glycerin, asparagine, citric acid, potassium phosphate, magnesium sulfate, and iron ammonium citrate. Lactose is added to the final preparation prior to freeze-drying.[144] In contrast, the Danish strain contains sodium glutamate, magnesium sulfate heptahydrate, dipotassium phosphate, citric acid monohydrate, L-asparagine monohydrate, ferric ammonium citrate, glycerol and water for

Appx18700



**Figure 60.2. Classification of the bacille Calmette-Guérin (BCG) strains currently in clinical use.** Of the 3954 protein-coding genes of BCG, 58 are present in two copies as a result of two independent tandem duplications, DU1 and DU2. Strains can be classified according to variation in DU1 and DU2. Genealogy is demonstrated by year in which deletions of groups of genes (RD [region of differentiation]) or individual genes, both shown in boxes, occurred. *(From Brosch R, Gordon SV, Garnier T, et al. Genome plasticity of BCG and impact on vaccine efficacy. Proc Natl Acad Sci U S A. 2007;104[13]:5596–5601.)*

injection.[145] The Connaught strain contains monosodium glutamate, sodium chloride, disodium hydrogen phosphate, sodium dihydrogen phosphate, polysorbate 80, and water for injection.[146] It is conceivable that these differences may ultimately affect vaccine efficacy.

The most recent WHO recommendations to assure quality, safety, and efficacy of BCG were published in 2013.[147] WHO recommendations focus on the manufacture of lots that do not differ significantly from prior lots shown to be safe and effective in humans and do not state a preference of one vaccine over another.[147] WHO Reference Reagent substrains are available as comparators for validity and consistency monitoring in viability assays[147]; the Danish 1331, Tokyo 172-1, Russian BCG-I, and Moreau RDJ strains of BCG are available[148] (see "Products Available" below).

Viability is assessed either by determining the number of culturable particles using a national regulatory authority–

approved method or by a bioluminescence or other biochemical method that has been validated, such as the adenosine triphosphate method.[147] As the lyophilization and reconstitution process results in cell death, the final product contains both live and dead bacilli. The final total bacterial mass of the vaccine appears to correlate with local reactogenicity, whereas the number of culturable organisms appears to correlate with tuberculin sensitivity.[117] The number of culturable bacilli from some vaccines may also correlate with the rate of complications in newborns (see "Safety" below).

Other routine quality-control procedures include a test of identity, a test for contamination, and tests for dermal reactivity and safety in guinea pigs. Thermal stability testing requirements are considered to be at the discretion of the national regulatory authority, and are generally based on determining the number of culturable particles before and after samples are maintained at appropriate temperatures for designated

periods, with the ratios of before-to-after values and the absolute value approved by the national regulatory authority.[147]

All freeze-dried BCG vaccines are sensitive to ultraviolet and fluorescent light and heat and should not be exposed to direct sunlight; BCG vaccines are supplied in dark brown glass vials or ampoules and are typically supplied in multidose containers.[150] After reconstitution of the multidose vial, the vaccine should be used as soon as possible, while the remaining vaccine should be stored at 2°C to 8°C for a total expiration time determined by individual stability studies: typically a few hours.[147] As a result, a substantial amount of BCG vaccine is wasted during routine use, contributing to periodic supply shortages.

United Nations agencies supply more than 120 million doses of BCG per year. UNICEF purchases vaccines through a WHO prequalification process, which determines eligibility of different vaccines for clinical use. Currently, there are four WHO prequalified producers and distributors of BCG vaccine: BB-NCIPD/Intervax, BCG Japan, Serum Institute of India (SII), and Statens Serum Institut (SSI) in Denmark.[151] However, a number of other manufacturers produce vaccine for local use.

**Products Available.** The various strains of BCG are generally known by the name of the country or laboratory in which they are kept. The following account for more than 90% of the vaccines in use worldwide: French (Pasteur) strain 1173 P2, Danish (SSI) strain 1331, Glaxo strain 1077, Tokyo strain 172-1, Russian strain BCG-I, and Moreau RDJ.[152] Other commonly used strains include the Montreal strain (Canada) and the Tice strain (United States). The Tice strain, originally derived from the Pasteur strain 1173 P2 and produced by Organon Teknika (now owned by Merck) is the only product approved for use in the United States.

## Dosage and Route of Administration

Worldwide, BCG is most commonly administered by intradermal injection with a syringe and needle. The only alternate route used currently is percutaneous administration with a multipuncture device.[153-155] A Phase IV trial conducted in South Africa compared multipuncture (percutaneous) and intradermal administration of the Japanese BCG strain and demonstrated equivalence between the two routes, in terms of both efficacy to prevent pulmonary TB and adverse events.[156]

Intradermal injection can be technically difficult in newborns, but other methods of administration have not been as successful. Subcutaneous injection induces tuberculin sensitivity, but may result in abscesses and unsightly, retracted scars.[157] Other techniques, such as scarification, jet injection, and use of bifurcated needles, have yielded variable results.[157-159]

The recommended dose of BCG vaccine differs by vaccine strain and age of the recipient. Similarly, the number of colony-forming units per dose varies by vaccine strain.[17] Although most body sites can be used for vaccination, the most common site is the deltoid region of the arm, usually on the right.

A wide range in BCG dosing schedules exists globally.[160] The WHO recommends a single dose given in infancy.[161] The effect of delaying BCG vaccination beyond the immediate newborn period has been studied, with variable results in different settings (see "Immunogenicity" below). BCG can be given to low-birth-weight newborns, as these infants develop a specific immune response.[162] When vaccination of preterm infants at 34 to 35 weeks' gestation was compared with delaying the vaccination to 38 to 40 weeks' gestation, no difference in tuberculin reactivity, scar formation, or immune

response could be shown.[163] Safety and immunogenicity has been shown following administration to infants as preterm as 31 weeks.[164] Mangtani and colleagues investigated the question of age of vaccine administration in their metaregression analysis of published BCG studies[165] and reported that BCG is most effective when given at younger ages. In addition, school-age children who received BCG were better protected if their prevaccination TST reaction was small, which suggests that vaccination prior to sensitization by NTM or even *M. tuberculosis* may be a more important determinant of success (see below).Despite the WHO recommendation to give a single dose to newborns, some countries continue to give the first dose of BCG in infancy followed by one or multiple vaccinations throughout childhood.[166] Although this is an area of active investigation, evidence to support revaccination of older children and adults does not exist currently (see below). In some settings, repeating BCG vaccination is based on lack of tuberculin sensitivity, the absence of a typical BCG scar, or an individual's risk of exposure.[167] Regardless, neither absence of a scar after BCG vaccination nor tuberculin sensitivity correlates with risk of TB disease after BCG vaccination.[168,169]

## Immunogenicity

The qualitative or quantitative determinants of BCG-induced immunity required for protection against TB are not known. Furthermore, knowledge of natural host protection against *M. tuberculosis* infection and TB disease is incomplete (see above). It is known that a CD4 T-cell response is essential for protection, as illustrated by markedly increased risk of mycobacterial disease in the presence of genetic mutations of the IL-12/IFN-γ pathway,[170,171] and by increased TB disease risk in untreated, advanced HIV disease.[172] For this reason, TB vaccinology efforts have relied heavily on the paradigm that a CD4 T-cell response should be induced, with production of so-called type 1 cytokines, IFN-γ, IL-2, and tumor necrosis factor-α.

Multiple studies of human newborns vaccinated with BCG have shown potent induction of CD4 T cells that produce type 1 cytokines (Th1 response).[136,137,173-176] However, there is great variability in the magnitude and character of the Th1 immune response in infants. In a study of nearly 6000 infants, the magnitude and character of the T-cell response to BCG did not correlate with risk of TB disease in the first 2 years of life,[61] suggesting that a Th1 response may not be sufficient for protection against TB.

BCG-specific T cells are able to proliferate in vitro and may have cytotoxic potential.[176-179] CD8 T cells, which may contribute to protection against TB, are also induced by newborn BCG vaccination, although at much lower frequency and with lesser diverse cytokine production profiles, compared with CD4 T cells.[46,175,180] Induced CD8 T cells may be cytotoxic. The phenotype of CD4 T cells induced by vaccination of human newborns is a mixture of effector memory and central memory cells; that is, a mixture of shorter-lived, ready-for-action (effector) cells and longer-lived (memory) cells that require additional immune stimuli to become effector cells again.[176,177]

After newborn BCG vaccination, the immune response appears to peak between 6 and 10 weeks of age, after which there is a gradual decline in frequency of specific cells in peripheral blood.[176] The reduction in detectable peripheral blood cells may be a consequence of homing to specific organs.

The effect of HIV exposure and infection of the newborn on the BCG induced immune response has also been studied.[181-185] Overall, HIV exposure in infants who do not become infected appears to have little effect on the

BCG-induced immune response, measured over the first year of life. A dramatically different scenario occurs in infants who are HIV infected. In the HIV-infected group, when not on antiretroviral therapy, the magnitude of the peak specific response is much reduced, and virtually no specific immune response is detectable at 1 year of age.[181]

The host response to BCG vaccination of infants beyond the immediate newborn period has also been defined.[173,177,186] Various projects have assessed whether delaying vaccination to 6 weeks of age, or even later, would influence the BCG-induced immune response. The results have been conflicting—in some instances, a delay in vaccine administration was associated with enhanced immunogenicity, whereas in others there has been no enhancement.

The importance of the epidemiological setting in BCG-induced immunity has been evaluated systematically.[178,187-189] Malawian infants vaccinated with BCG demonstrate quantitative and qualitative characteristics of a Th1 response that are distinct from those of UK infants vaccinated with BCG. These results may also be the consequence of genetic or other differences between populations.

When considering prior mycobacterial exposure, infants born to mothers who are latently infected with *M. tuberculosis* appear to have a lower host response to BCG vaccination compared to infants born to mothers who are uninfected.[190] Similarly, environmental mycobacterial exposure prior to BCG vaccination in children and adults vaccinated beyond the immediate newborn period may result in lower host responses.[191] This may translate to lesser protection, as a negative TST at the time of vaccination correlates with BCG-induced protection against TB (see below). These studies suggest that preexisting mycobacterial infection may result in masking or blocking of host responses to BCG. The effect of non-mycobacterial infections, particularly helminth infections, on the BCG-induced response has been studied extensively.[192-194] These results are inconsistent—in some cases, lower host responses have been reported and in others there has been no effect. Again, these results may reflect study design and epidemiological and genetic diversity.

BCG vaccination of adults does induce an immune response that is similar in character to that of newborn vaccination, although the induced immune response may peak earlier in adults.[84,186] One study shows that BCG may safely be given to persons latently infected with *M. tuberculosis* with the baseline immune responses not impacting the ultimate vaccine response (Thomas J. Scriba, personal communication, 2016).

Data on animal host responses induced by BCG—and protection afforded by vaccination—should be interpreted with caution, as none of these completely replicate human disease. For example, TB in the mouse is a chronic disease, with the histological appearance in the lung differing from humans. In mice, the breakdown of granulomas is unusual, whereas this is common in adults with TB disease.[125] In the mouse, BCG induces a predominance of effector memory T cells, whereas in humans, both effector and central memory responses are induced. Nonhuman primate species, such as rhesus and cynomolgus macaques, may best model human TB where immune responses to BCG vaccination have been very similar to that described in humans.[196,197]

Conversion of the TST has been used widely to assess whether a person has responded to BCG vaccination; in the past, revaccination was often advised if no response was detectable. Unfortunately, neither the presence nor size of the postvaccination TST reaction reliably predicts protection afforded by BCG.[198,199] Results from the Medical Research Council's BCG trial in Great Britain demonstrate a high level of protection against TB and show that the degree of tuberculin sensitivity is independent of the degree of protection conferred by vaccination.[200] Other studies, such as the Chingleput trial in southern India, demonstrated poor protective efficacy while high levels of vaccine-induced tuberculin sensitivity were shown.[201,202]

## Bacille Calmette-Guérin Efficacy and Effectiveness

Overall, BCG appears most protective against disseminated forms of childhood TB, such as miliary TB and TB meningitis, with an overall efficacy of approximately 80% (see below). Protective efficacy against active pulmonary disease has been variable, ranging from 0% to 80%; protection is greater early in childhood, in persons who are TST-negative prior to vaccination, and in persons who live further from the equator—the latter two variables may be related to environmental mycobacterial exposure (see below). BCG appears to have a modest effect in preventing *M. tuberculosis* infection: overall, approximately 20% efficacy (see below). Finally, BCG may protect against other mycobacterial disease: the vaccine is highly effective at preventing leprosy,[203] but has limited protective efficacy against Buruli ulcer.[204]

### Selected Controlled Trials of Bacille Calmette-Guérin Efficacy

Fig. 60.3 and Table 60.1 summarize the efficacy of BCG as demonstrated in major case-control, cohort, and household-contact studies. Comparison of the trials is difficult because of differences in eligibility criteria, methods of disease surveillance, diagnostic/outcome criteria, vaccine strain and administration, trial setting and environmental factors. Comstock published a comprehensive comparison of the major BCG vaccine studies.[205] Extensive discussion comparing the controlled trials can also be found in other reviews and in previous editions of this textbook.[206-209]

The largest controlled clinical trials, each involving more than 10,000 participant years of follow up, are discussed here. Three trials demonstrated excellent protection against pulmonary and other forms of TB.[200,210,211] The first was conducted among Native Americans in the 1930s and involved school-age children. The estimated efficacy in preventing pulmonary TB in this trial was 74% (95% CI, 67–80%).[210] The second study was also conducted in the 1930s, in Chicago, among infants living in high-risk areas. The protective efficacy against pulmonary TB was 66% (95% CI, 40–81%).[211] A third trial was initiated in 1950 among British schoolchildren and showed 78% (95% CI, 69–84%) efficacy against pulmonary TB.[200] These three clinical trials had three characteristics in common. First, they were conducted in northern geographic areas with a low prevalence of environmental mycobacteria (see below). Second, infants or children were enrolled. Third, in subsequent critical evaluation of all controlled trials, the methodology and statistical precision of these three trials have been judged to be superior to those of the other major BCG trials—for example, the protective efficacy of each had narrow 95% CIs, which was not the case in the majority of other trials.[165,205,212]

Other controlled trials have demonstrated moderate to poor protective efficacy. The first was sponsored by the U.S. Public Health Service and conducted in Puerto Rico starting in 1949.[213] The efficacy in preventing TB disease in school-age children was 28%, with a wide 95% CI of 10% to 43%. A study conducted in southern India (Madanapalle) enrolled school-age children between 1950 and 1955.[214,215] After 15 years of follow-up, the protective effect had decreased to 19% (95% CI, −26% to 48%). A study conducted in Muscogee County,

**1104**    **SECTION 2**  Licensed Vaccines and Vaccines in Development



| Trial | RR (95% CI) | BCG cases/PYs | Unvaccinated cases/PYs |
|---|---|---|---|
| **Neonatal vaccination** | | | |
| Saskatchewan infants (Ferguson) 1933 Canada | 0.20 (0.06, 0.69) | 3/2182 | 14/2000 |
| Chicago infants CCH (Rosenthal) 1937 USA | 0.34 (0.19, 0.60) | 16/15616 | 48/15822 |
| Turtle and Rosebud infants (Aronson) 1938 USA | 0.40 (0.13, 1.25) | 4/968 | 11/1060 |
| Chicago infants TB HH (Rosenthal) 1941 USA | 0.28 (0.08, 1.02) | 3/1374 | 11/1424.5 |
| Bombay infants (Mehta) 1976* India | 0.62 (0.35, 1.07) | 22/962.5 | 27/716.25 |
| Fixed effect within stratum (Heterogeneity: P = .387) | 0.40 (0.28, 0.56) | | |
| Random effects within stratum (τ² = .0065) | 0.41 (0.29, 0.58) | | |
| | | | |
| **School-age vaccination - stringent tuberculin testing** | | | |
| Native American (Aronson) 1935 USA | 0.26 (0.20, 0.33) | 79/68716 | 267/58219 |
| Ida B. Wells housing project (Rosenthal) 1942 USA | 0.15 (0.01, 2.87) | 0/7770 | 3/6050 |
| Georgia school (Shaw) 1947 USA | 1.25 (0.28, 5.58) | 4/29830 | 3/27966 |
| MRC (MRC) 1950 UK | 0.22 (0.16, 0.31) | 40/210800 | 163/188900 |
| Fixed effect within stratum (Heterogeneity: P = .160) | 0.25 (0.21, 0.31) | | |
| Random effects within stratum (τ² = .048) | 0.26 (0.18, 0.37) | | |
| | | | |
| **School-age vaccination - nonstringent tuberculin testing** | | | |
| Puerto Rico children (Palmer) 1949 USA | 0.72 (0.57, 0.90) | 186/944520 | 127/510872 |
| Agra (Mehrotra) 1988* India | 0.40 (0.19, 0.83) | 10/6270 | 25/6232.5 |
| Fixed effect within stratum (Heterogeneity: P = .135) | 0.67 (0.54, 0.84) | | |
| Random effects within stratum (τ² = .095) | 0.59 (0.35, 1.01) | | |
| | | | |
| **Other age vaccination - stringent tuberculin testing** | | | |
| US mental health patients (Rosenthal) 1944 USA | 0.26 (0.01, 6.36) | 0/80 | 1/62 |
| Illinois mentally handicapped (Bettag) 1947 USA | 1.40 (0.57, 3.42) | 12/6300 | 8/5980 |
| Madanapalle (Frimodt-Moller) 1950 India | 0.61 (0.52, 1.26) | 33/61167 | 47/70200 |
| Fixed effect within stratum (Heterogeneity: P = .420) | 0.88 (0.60, 1.30) | | |
| Random effects within stratum (τ² = 0) | 0.88 (0.59, 1.31) | | |
| | | | |
| **Other age vaccination - nonstringent tuberculin testing** | | | |
| Georgia/Alabama (Palmer) 1950 USA | 0.92 (0.56, 1.53) | 28/256585 | 32/270870 |
| African gold miners (Coetzee) 1965 South Africa | 0.63 (0.39, 1.00) | 29/7226 | 45/7036 |
| Haiti (Vandiviere) 1965 Haiti | 0.11 (0.01, 0.91) | 1/1903.5 | 5/1006.5 |
| Chingleput Madras (TBPT) 1968 India | 1.05 (0.88, 1.25) | 380/754718 | 180/373976 |
| Fixed effect within stratum (Heterogeneity: P = .043) | 0.96 (0.82, 1.12) | | |
| Random effects within stratum (τ² = .091) | 0.81 (0.55, 1.22) | | |
| | | | |
| Fixed effect overall (Heterogeneity: P < .0005) | 0.56 (0.51, 0.62) | | |
| Random effects overall (τ² = .38) | 0.50 (0.35, 0.72) | | |

```
        .01      .1  .2  .5  1   2   5  10        100
        BCG reduces risk of TB      BCG increases risk of TB
                        Rate ratio
```

**Figure 60.3.  A,** Rate ratios and 95% confidence intervals (CIs) for bacille Calmette-Guérin (BCG)'s efficacy in preventing pulmonary tuberculosis, stratified by age vaccinated and stringency of prevaccination tuberculin testing. Trials are ordered by year of study start (see Table 60.1 for details). The "other" age group includes studies in which older persons were vaccinated, as well as those in which BCG was given at any age. Both fixed effects and random effects metaanalyses were applied to determine summary results (for methods, see reference 165). *Date of study publication was used if study start date was not available.



| Trial | | RR (95% CI) | BCG cases/PYs | Unvaccinated cases/PYs |
|---|---|---|---|---|
| **Neonatal vaccination** | | | | |
| Saskatchewan infants (Ferguson) 1933 Canada* | | 0.08 (0.00, 151) | 0/2014 | 5/1840 |
| Chicago infants TB HH (Rosenthal) 1941 USA | | 0.12 (0.01, 2.14) | 0/1374 | 4/1425 |
| **School-age vaccination - stringent tuberculin testing** | | | | |
| Native American (Aronson) 1935 USA | | 0.10 (0.03, 0.31) | 3/12239 | 27/10442 |
| MRC (MRC) 1950 UK | | 0.04 (0.00, 0.73) | 0/210800 | 10/188800 |
| **School-age vaccination - nonstringent tuberculin testing** | | | | |
| Puerto Rican children (Palmer) 1949 USA | | 0.54 (0.08, 3.84) | 2/944519 | 2/510872 |
| **Other age vaccination - nonstringent tuberculin testing** | | | | |
| Georgia/Alabama (Palmer) 1950 USA | | → 5.28 (0.25, 109.94) | 2/256585 | 0/270870 |
| Overall (Heterogeneity: P = .135) | | 0.15 (0.08, 0.31) | | |

.01    .1  .2  .5  1  2   5 10     100
←BCG reduces risk of TB    BCG increases risk of TB→
Rate ratio

(B)

**Figure 60.3, cont'd B,** Rate ratios and 95% CIs for BCG's efficacy in preventing meningeal and/or miliary tuberculosis, stratified by age at vaccination and tuberculin testing stringency. Pooled results from only fixed effects metaanalysis is shown as the numbers of studies are small; these are ordered by year of study onset. *Outcome is miliary tuberculosis only. MRC, Medical Research Council; PY, person-years; TB, tuberculosis. *(Modified from Mangtani P, Abubakar I, Ariti C, et al. Protection by BCG vaccine against tuberculosis: a systematic review of randomized controlled trials.* Clin Infect Dis. *2014;58:470–480.)*

Georgia, beginning in 1947 had three cases of TB in the control group and five in the vaccinated group, resulting in a negative protective efficacy with wide CIs.[216,217] Similarly, no protective efficacy (efficacy, 8%; 95% CI, −53% to 44%) was shown in Georgia and Alabama in the 1950s.[218] All these studies have in common a high prevalence of environmental mycobacteria (see below), and multiple problems with methodology.[163,209,212]

The largest BCG field trial ever conducted commenced in 1968 in the Chingleput district of southern India, and involved 260,000 participants.[201,202] Persons of all ages except infants younger than 1 month of age, and regardless of skin test reaction, were randomized to receive one of two vaccines at one of two dosages, or to receive placebo. Follow-up continued for 10 years, with active study visits every 2.5 years. The study was confounded by bias; for example, follow-up varied among groups depending on size of the enrollment skin test reaction, age, and perception of risk. Furthermore, microbiological tests were completed on a fraction of the TB cases only; regardless, culture confirmation was the finally agreed outcome, because other outcome measures were not applied uniformly. Because of these and other shortcomings, cases among young children were probably missed. It is noteworthy that the study was conducted in a geographic area in which environmental mycobacteria are endemic. The first results were published in 1979, after 7.5 years of follow-up. Neither of the two vaccines studied, in full or reduced dosage, showed any evidence of protection against pulmonary TB, compared with that of placebo (efficacy, −5%; 95% CI, −25% to 12%).

## Metaanalyses and Other Evidence of Bacille Calmette-Guérin Efficacy and Effectiveness

Colditz published the first metaanalysis of the efficacy of BCG in 1994.[219] Fourteen prospective trials and 12 case-control studies were included in the analysis. A random-effects model estimated a weighted average relative risk or odds ratio, from which protective efficacy was deducted. In prospective trials, the protective efficacy of BCG to prevent any form of TB was 51% (95% CI, 30–66%), and in case-control studies, 50% (95% CI, 36–61%). Seven trials reported on death as an end point: BCG had a protective efficacy of 71% (95% CI, 47–84%), while five studies reported meningitis and showed a protective effect of 64% (95% CI, 30–82%). BCG appeared more protective in children, especially when including only case-control studies where a positive culture or histology was used for diagnosis (83% protective; 95% CI, 38–93%).

Mangtani and associates published a very comprehensive assessment of 18 randomized trials reporting on BCG induced protection against TB, including six that reported meningitis as an outcome.[163] Both fixed-effect and random-effect models were applied in their systematic review and metaanalysis and metaregression. The overall protective efficacy of BCG against pulmonary TB was 50% (95% CI, 28–65%). Protection was highest in infants, at 69% (95% CI, 42–71%), compared with older ages. Protection against meningeal and miliary tuberculosis was 90% in infants (95% CI, 23–99%).

Roy focused on 14 studies, most with a retrospective case-control design, that addressed whether BCG could protect against *M. tuberculosis* infection in childhood, in a

**TABLE 60.1** Characteristics of Trials of Bacille Calmette-Guérin Vaccination Against Pulmonary and Miliary or Meningeal Tuberculosis

| Trial | Years, Start of Entry to End of Follow-Up | No. BCG Vaccinated/ No. Unvaccinated | Age at Vaccination and Tuberculin Testing Stringency, Where Applicable | Vaccine Strain |
|---|---|---|---|---|
| Saskatchewan Infants (Ferguson[228])[a] | 1933–48 | 306/303 | Neonatal | Frappier/Pasteur 450-S1, 468-S1 |
| Native American (Aronson[265])[a] | 1935–98 | 1551/1457 | School age, stringent | Phipps/Pasteur 317 used at U.S. sites; Pasteur 575 used at Alaskan sites |
| Chicago Infants CCH (Rosenthal[211,389])[a] | 1937–60 | 5426/4128 | Neonatal | Pasteur, Tice |
| Turtle and Rosebud Infants (Aronson[390]) | 1938–46 | 123/139 | Neonatal | Phipps |
| Chicago Infants (TB HH) (Rosenthal[211,389]) | 1941–53 | 311/250 | Neonatal | Pasteur, Tice |
| Ida B. Wells Housing Project (Rosenthal[391]) | 1942–56 | 699/625 | School age, stringent | Pasteur, Tice |
| U.S. Mental Health Patients (Rosenthal[391]) | 1944–48 | 20/15 | Other age, stringent | Pasteur, Tice |
| Illinois Mentally Handicapped (Bettag[392]) | 1947–59 | 531/494 | Other age, stringent | Not specified |
| Georgia (School) (Shaw[393]) | 1947–67 | 2498/2341 | School age, stringent | Tice 811K, 811L, 812E, 812L, 813E |
| Puerto Rican Children (Palmer[212])[a] | 1949–68 | 50,634/27,338 | School age, nonstringent | Phipps |
| Madanapalle (Frimodt-Moller[214,215,394]) | 1950–71 | 5069/5803 | Other age, stringent | Danish/Copenhagen |
| Georgia/Alabama (Palmer[213])[a] | 1950–70 | 16,913/17854 | Other age, nonstringent | Tice |
| MRC (MRC[200])[a] | 1950–70 | 20,800/13,300 | School age, stringent | Danish/Copenhagen |
| African Gold Miners (Coetzee[395]) | 1965–68 | 8317/7997 | Other age, nonstringent | Glaxo |
| Haiti (Vandivere[396]) | 1965–68 | 641/340 | Other age, nonstringent | Frappier/Montreal, 1202 |
| Chingleput (Bally[397]) | 1968–83 | 73,459/36,404 | Other age, nonstringent | Danish/Copenhagen/1931, Paris/Pasteur-1173 P2 |
| Bombay Infants (Mehta[398]) | 1976[b] | 396/300 | Neonatal | Danish/Copenhagen |
| Agra (Mehrotra[399]) | 1986[b] | 1259/1259 | School age, nonstringent | Not specified |

[a]Miliary and/or meningeal outcomes reported as well as pulmonary disease outcomes.
[b]Date of study publication was used if study start date was not available.

BCG, bacille Calmette-Guérin; CCH, Cook County Hospital; CI, confidence interval; MRC, Medical Research Council; PY, person-years; RR, rate ratio; TB HH, tuberculosis households; TBPT, Tuberculosis Prevention Trial.
*Modified from Mangtani P, Abubakar I, Ariti C, et al. Protection by BCG vaccine against tuberculosis: a systematic review of randomized controlled trials. Clin Infect Dis. 2014;58:470–480.*

systematic review and metaanalysis.[220] Infection was defined by a positive result using one of two types of IGRAs (enzyme-linked immunosorbent spot or QuantiFERON). The overall protective efficacy was 19% (95% CI, 8–69%). When the analysis was restricted to six studies with information on progression to active TB, BCG had a 27% effect in protection against infection (95% CI, 13–59%) and 71% against active disease (95% CI, 42–85%). Among those infected, protection against progression to disease was 58% (95% CI, 23–77%).

In the 1980s, the WHO initiated a global study using a standardized case-contact protocol to evaluate children who were household contacts of TB cases with infectious disease. The evaluation allowed an estimation of BCG efficacy; results were similar to those of the major controlled trials, with efficacy ranging from 0% to greater than 80%.[221–238] Studies that evaluated meningitis or miliary disease in children as outcomes demonstrated that BCG offers good protection.[153,198,238–243] Case-control and contact studies have the advantages of ease

of conduct and lesser expense, but the potential for bias is increased.

## Reasons for Variable Efficacy

The protection demonstrated in the major controlled BCG field trials ranged from 0% to 80%. In this section, variables that could have influenced the outcomes of these vaccine trials and of current vaccination practice are discussed.

**Trial Methodology.** It is a given that substantial variation will result from different trial designs, conducted in different time periods (between 1935 and 1975), in nine different geographic areas in three countries, by different investigators and various organizations. The role of methodologic and statistical variation among the eight major BCG trials has been evaluated critically.[205,212,244] Some authors argue that methodologic differences may have biased some of the trials and account for the variability in outcomes, whereas others believe that none

of the shortcomings could have appreciably influenced conclusions. Mangtani and associates evaluated bias in execution of studies systematically in a metaregression analysis.[165] The authors demonstrated that a lack of efficacy of BCG shown in many studies may have been the result of some sources of bias, such as diagnostic detection bias, although this finding was not consistent for all sources of bias.[165]

**Vaccine Strain.** At least six different vaccines were used in the trials. Thawed vaccine preparations were used in all studies except for the Chingleput trial, which used vaccine from reconstituted lyophilized vials. The differences in vaccine strains (see "Bacteriology of Bacille Calmette-Guérin Strains and Vaccine Constituents" above) are likely to have had an effect on outcome.

**Environmental Mycobacteria, *Mycobacterium tuberculosis*, and Helminthic Exposure.** Exposure to environmental mycobacteria may lead to tuberculin sensitization and immunity against *M. tuberculosis* and *M. bovis* BCG; environmental mycobacteria have many antigens in common with these organisms.[245] Environmental mycobacteria are endemic in tropical and subtropical regions of the world, including the southern areas of the United States, whereas human exposure to these organisms is less in Europe and northern parts of North America. Overall, BCG appears to be more protective in latitudes farther from the equator.[165] Three of the controlled trials were conducted in geographic areas where the prevalence of environmental mycobacteria was low, and these studies demonstrated the highest vaccine efficacy. In contrast, the five trials conducted in the southern United States and southern India, where the prevalence of environmental mycobacteria was high, demonstrated low vaccine efficacy.

Environmental mycobacteria may either block induction of immunity by BCG as immunity induced by the environmental mycobacteria may kill the live organism in the vaccine, or mask protection induced by BCG because protection may have been induced by the environmental organisms themselves.[246] For example, BCG-induced host responses, measured by a whole-blood IFN-γ assay or a purified protein derivative skin test, differ following BCG vaccination in the United Kingdom and Malawi; Malawi children have quantitatively greater baseline responses, whereas children from the United Kingdom demonstrate a greater increase in responses after vaccination.[189,247] This result suggests that sensitization by nontuberculous mycobacteria could inhibit immune responses to BCG vaccination.

An observer-blinded, cluster-randomized trial conducted in Brazil showed that efficacy of BCG vaccination at school-age was higher in Salvador, a coastal city where environmental mycobacterial exposure is thought to be low (efficacy, 34%; 95% CI, 7–53%), compared with Manaus, a city in the Amazon with presumed high environmental endemicity (efficacy, 8%; 95% CI, −39% to 40%).[248] In contrast, vaccine efficacy for neonatal vaccination was similar in Salvador (efficacy, 40%; 95% CI, 22–54%) and Manaus (efficacy, 36%; 95% CI, 11–53%). These findings concur with a blocking mechanism, as suggested by the Malawi/UK studies.

Although several studies suggest a possible effect of heterologous immunity from NTMs, there are major knowledge gaps in these studies. There is no qualified or reliable immunologic assay available to measure prior exposure or current infection with NTMs. Although intriguing, these previous studies were small and underpowered, focused on a limited number of immune responses—blood IGRAs or delayed-type hypersensitivity in skin—and employed whole-cell reagents rather than single proteins or peptide pools, while evaluating a limited number of NTMs in only a few regions of the world.

With ongoing efforts to develop new vaccines for TB, understanding the role of NTM exposure and heterologous immune responses may be critical to success. Development of validated NTM-specific immunologic assays will be required to assess this important issue.

Evidence from animal and human studies indicates that sensitization to environmental mycobacteria provides protection against TB that is similar to that provided by BCG. In a study of 625,000 Navy recruits with serial skin testing using purified protein derivatives from *M. tuberculosis* and *Mycobacterium intracellulare*,[249] the incidence of active TB disease was lower in individuals with an *M. intracellulare* skin test result that was greater in magnitude than the *M. tuberculosis* skin test. As stated above, even *M. tuberculosis* infection appears to have a protective effect—a metaanalysis of the protective effect of latent infection against reinfection-mediated TB disease, incorporating studies from the preantibiotic era, showed a protective efficacy of approximately 80%.[39] The caveat from this observation is that many persons would have died from TB disease during the preantibiotic era, therefore skewing the results to show a positive effect on a population basis.

Other infections may also influence the BCG-induced response. For example, Ethiopian adults with latent *M. tuberculosis* and helminthic coinfection who are treated with albendazole prior to BCG vaccination demonstrated increased specific immune responses to the vaccine.[153] However, a large study in Uganda showed that treating maternal helminthic infection during pregnancy had little effect on the infant BCG-induced immune response[194] or on mycobacteria-specific immune responses in BCG-vaccinated 5-year-olds.[250] As mentioned before, the immune correlates of BCG-induced protection against TB disease are not known; consequently, results should be interpreted with caution. Interestingly, BCG vaccination may be associated with a lower helminthic infection rate.[251]

**Host Genetic, Microbiotic, and Environmental Factors.** The BCG trials were completed in populations that were genetically diverse. Human and animal evidence suggest that genetic factors may determine the host's response to BCG vaccines,[252–255] and therefore likely also protective efficacy. The role of genetic variation on susceptibility to mycobacterial disease and to infant immune responses to vaccination has been reviewed.[171,256,257]

The human microbiome has a significant influence of multiple health indicators; limited evidence suggests that infant microbiome constituents may also affect the BCG-induced immune response.[258]

Experimental research has demonstrated that nutritional deficiencies affect the magnitude and character of the immune response to BCG vaccination.[259–262] However, studies in humans remain controversial.[218,263]

**Regional Differences in *Mycobacterium tuberculosis* Strains.** There is marked heterogeneity among seven major families of *M. tuberculosis* that occur in different regions of the world.[10,264] This heterogeneity manifests in differential host responses to the pathogen, and epidemiological evidence suggests that BCG might have skewed the epidemic toward greater prominence of certain *M. tuberculosis* strains. It is therefore a reasonable hypothesis that variation among strains that occurred in different setting could have confounded results of clinical trials of BCG.

## Duration of Protection and Revaccination

When Native American participants of the 1935 BCG trial were followed up for 60 years, an efficacy of 52% (95% CI,

27–69%) in protection against disease was found.[265] The results suggest that a long duration of protection from a single dose of BCG is possible. In contrast, a case-control study investigating efficacy of neonatal BCG vaccination over the first 20 years of life found 82% protection in children younger than 15 years of age, 67% protection in the 15- to 24-year-old age group, and 20% protection in persons 25 to 34 years of age, indicating better protection in younger age groups and waning immunity over time.[266] Furthermore, the kinetics of the host immune response to newborn BCG vaccination suggest that immunity is likely to be relatively short-lived.[176,181]

The practice of BCG revaccination continues in many places of the world (see above). The only large-scale efficacy trial of BCG revaccination was completed in Brazil, where school-age children received a second dose of BCG, following newborn BCG vaccination.[248] Interestingly, revaccination was poorly effective in preventing TB disease in the coastal region of Brazil, and not at all effective in the Amazon. In the coastal region, children without evidence of previous BCG vaccination showed greater protective efficacy than those who had received BCG before; the respective efficacies were 19% (95% CI, 7–53%) and 1% (95% CI, −27% to 33%). The results concur with those from a metaanalysis of BCG efficacy that suggests that prior exposure to environmental mycobacteria—presumably high in the Amazon and low in the coastal region—and in the case of the Brazil study, prior exposure to BCG itself, results in lesser efficacy of BCG.[185]

## Safety

BCG has been administered safely to billions of people throughout the world. Complications are rare, but rates of these vary depending on the skill and method of administration, the strain, dose, gender, age, and immune status of the recipient.[117,267,268] The Pasteur 1173 P2 and Danish 1331 strains induce more adverse reactions than the Glaxo 10777, Tokyo 172-1, or Moreau RDJ strains.[117] The concentration of live particles in BCG vaccines ranges from approximately 50,000 to 3 million per dose, depending on the strain; vaccines with relatively low numbers of live bacilli per dose are generally less reactogenic.[269] Women and older vaccinees are generally more likely to develop local reactions and abscesses, and vaccination at less than 6 months of age is better tolerated than after that age.[270]

## Common Adverse Events in Nonimmunocompromised Persons

Local adverse reactions are common after BCG vaccination, but serious long-term complications from these are rare (Table 60.2). In summary, up to 95% of persons vaccinated with BCG develop a local reaction (Fig. 60.4). Erythema, induration, and tenderness are common. A papule that is often red, tender,

**TABLE 60.2** Estimated Age-Specific Risks for Complications After Administration of Bacille Calmette-Guérin Vaccine

| Complication | Incidence per 1 Million Vaccinations | |
|---|---|---|
| | Age <1 y | Age 1–20 y |
| Local subcutaneous abscess, regional lymphadenopathy | 387 | 25 |
| Musculoskeletal lesions | 0.39–0.89 | 0.06 |
| Multiple lymphadenitis, nonfatal disseminated lesions | 0.31–0.39 | 0.36 |
| Fatal disseminated lesions | 0.19–1.56 | 0.06–0.72 |

*From Lotte A, Wasz-Hockert O, Poisson N, et al. Second IUATLD study on complications induced by intradermal BCG vaccination. Bull Int Union Tuberc. 1988;63:47–59.*



**Figure 60.4.** Characteristic evolution of the injection sites after administration of intradermal bacille Calmette-Guérin. *(Courtesy Gregory D. Hussey.)*

and indurated may emerge 2 or more weeks after vaccination. Ulceration may follow, and if this occurs, healing takes 2 to 5 months, followed by scar formation. Ipsilateral lymphadenopathy may also occur and is usually less than 1.5 cm in greatest dimension and seen in the axilla.

A small U.S. study of healthy TST-negative adults vaccinated with BCG intradermally found that all patients developed a local reaction with erythema, induration, and tenderness at the vaccination site; 75% developed muscle soreness; and 70% had local ulceration with drainage.[271] Only 2% developed tender regional adenopathy. Overall, local ulceration and regional lymphadenitis occur in less than 1% of immunocompetent recipients who receive intradermal administration.[272] Certain BCG strains, such as the Tokyo and Moreau strains, are rarely associated with lymphadenitis, whereas this complication appears more often when the Pasteur strain is used.[272-274] Outbreaks of lymphadenitis have been reported following introduction of new BCG strains into vaccination programs[275,276]; altered administration technique may have contributed. The risk of suppurative lymphadenitis is greater among newborns than among older infants and children, especially when a full dose of vaccine is given.

A lasting cutaneous scar develops in most patients, although the likelihood is lower when vaccination is given in early infancy.[277]

The treatment of local adenitis as a complication of BCG vaccination is controversial and ranges from observation, to surgical drainage, to the administration of antimycobacterial drugs, to a combination of surgical management and medications.[278] Nonsuppurative lymph nodes usually improve spontaneously, although resolution may take several months. Several studies have shown that some children with lymphadenitis respond to a course of isoniazid of several weeks' or months' duration.[279-281] However, a metaanalysis of four randomized controlled trials revealed no significant difference in the frequency of suppuration between the treatment and control groups for the erythromycin and isoniazid treatments; the conclusion was that medical treatment does not reduce the frequency of suppuration.[282] Furthermore, a Cochrane evaluation concluded there was no evidence that antimicrobial therapy or aspiration was associated with an improved outcome.[283]

Persons with latent *M. tuberculosis* infection appear to have an accelerated adverse effect response to BCG vaccination, without any obvious difference in severity.[284] In a study of 82 South African adults, injection-site erythema (68%) and induration (86%) peaked 1 week after revaccination, whereas ulceration (76%) peaked at 2 weeks, and resolved by 3 months in all but three subjects. A residual scar was common (85%).

## Rare Adverse Events

The risk of osteitis after BCG vaccination has varied from 0.01 to 300 per million doses.[267,285-288] In a controlled study of 132 former BCG osteitis patients, variant genotypes of the TLR2 and TLR6 genes were associated with a higher risk of BCG osteitis whereas TLR1 variant genotypes were associated with a decreased risk.[289]

Generalized BCG infection is extremely rare in immunocompetent patients.[290-294] Autopsy studies of children who died of unrelated causes show granulomas in various organs of vaccinated infants with apparently intact immune systems, suggesting that generalized nonfatal dissemination may occur in normal hosts.[292,295,296]

A report from Thailand described four immunocompetent neonates with fever and *M. tuberculosis* complex isolated from blood within 72 hours of BCG vaccination.[297] All infants

recovered and remained healthy without treatment. One isolate was genotyped as *M. bovis* BCG, and all four infants were presumed to have had BCG bacteremia.

Treatment of extremely rare complications, including lupus vulgaris, erythema nodosum, iritis, osteomyelitis, and disseminated BCG disease, should include systemic anti-TB drugs; pyrazinamide should not be included because all BCG strains are resistant to this drug.[298]

## Adverse Events in Immunocompromised Individuals

Fatal disseminated BCG disease has been reported at a rate of 0.19 to 1.56 cases per 1 million persons vaccinated.[272] Invariably, cases have occurred in patients with severe defects in cell-mediated immunity, such as those with HIV, severe combined immunodeficiency, and complete DiGeorge syndrome, but cases have also been associated with chronic granulomatous disease, malnutrition, cancer, and abnormalities of the IL-12–IFN-γ axis (genetic defects identified in IL-12p40, IL-12R, IFN-γR1,IFN-γR2, and STAT1).

Since the advent of the HIV era, it has become clear that BCG vaccination of untreated HIV-infected children places them at a dramatically increased risk of potentially severe and fatal adverse events; rates of disseminated BCG disease in this population have approached 1%.[299-300] These complications may also occur in BCG-vaccinated HIV-infected infants who are on antiretroviral therapy,[302] although early therapy reduces the risk dramatically.[303] BCG disease has also been described in a person who became infected with HIV as an adult and who had received BCG 30 years prior to becoming ill.[304]

All cases of BCG disease in HIV-infected children have followed vaccination in the neonatal period and there appears to be no clear association with particular BCG strains.[299-301] The median age of onset was 8 months (range, 3 to 35 months). Manifestations included local or regional lymphadenopathy in the majority of infants. Many cases of disseminated disease, often involving bone, nonregional lymph nodes, and multiple other organs, have been described. Disease was mostly associated with very low CD4 T-cell counts, and often occurred with other opportunistic infections. Outcome has been poor in the absence of antiretroviral therapy, even if antimycobacterial therapy is given: more than 80% of infants with disseminated disease and more than 50% of infants with local or regional disease will succumb to the disseminated infection. Antiretroviral therapy is associated with a vastly improved outcome.

HIV-exposed but uninfected infants may be at greater risk of other infectious diseases in the first year of life,[305] but no evidence of an increase of BCG-related adverse events have been reported in these infants. Variable results of immunogenicity of newborn BCG vaccination in this population has been reported[181,184]; regardless, delaying BCG vaccination to 8 weeks of age does not compromise ability of this vaccine to induce a robust immune response.[183]

## Recommendations for Use

### In the United States

The United States has never had a universal BCG vaccination program.[160] In the United States, TB control involves treatment of patients with disease, contact investigation, and prophylaxis for latent infection.[306,307] In this setting, BCG vaccination is considered only in special circumstances involving unavoidable continued exposure and failure to employ other methods of control. The Centers for Disease Control and Prevention's Advisory Council for the Elimination of Tuberculosis and

**1110    SECTION 2**  Licensed Vaccines and Vaccines in Development

Advisory Committee on Immunization Practices have published guidelines for the use of BCG vaccination in young children and healthcare workers.[308] In the United States, BCG immunization should be considered for all persons with continuous exposure to MDR TB who cannot be removed from the exposure, but only if the person has a negative TST and is not infected with HIV; infants younger than 2 months of age with such exposure do not need a TST prior to vaccination. BCG should also be considered for children with continuous exposure to contagious drug-sensitive TB who cannot be removed from the exposure or treated with anti-TB therapy.

Vaccination with BCG should be considered for healthcare workers only in areas that have a high risk of transmission of MDR TB in which aggressive infection-control measures have been implemented and have failed.[308] Even in high-risk settings, BCG should not be the major method of control or protection, because the vaccine's efficacy is variable and does not protect unvaccinated patients or visitors, yet confounds TST interpretation, thereby also confounding surveillance and preventive treatment measures.

In the United States, it is recommended that local TB control authorities be contacted when BCG vaccination is considered.[309]

### In Other Countries

Zwerling and associates published an atlas of global BCG vaccination policy and practices from 180 countries.[166,310] Like the United States, Canada, Italy, Belgium, and The Netherlands have never had universal BCG vaccination programs, and recommend use of the vaccine only in select cases. Ecuador, Australia, New Zealand, and Western European countries other than Belgium and The Netherlands had universal programs before, but now recommend vaccination for only select populations. The only European countries that practice universal BCG vaccination are Portugal and Ireland, and the vaccine is usually given to newborn babies.

The International Union against Tuberculosis and Lung Disease (IUATLD) has suggested criteria for countries to consider when shifting from routine universal BCG vaccination to selective vaccination of high-risk groups.[311] The IUATLD recommends that BCG be discontinued only if an efficient notification system is in place, and if either the average annual notification rate of smear-positive pulmonary TB is less than five per 100,000 population per year, or the average annual notification rate of TB meningitis in children younger than 5 years of age is less than one per 10 million population over the previous 5 years, or the average annual risk of TB infection is less than 0.1%.

It is known that BCG vaccine has some efficacy against leprosy[204] and that some countries, such as Brazil, Cuba, and Venezuela, recommend BCG vaccination for contacts of leprosy patients.[160] Widespread BCG vaccination may have contributed to the decline of leprosy in certain populations.[312,313] BCG vaccine also has a transient protective effect against *Mycobacterium ulcerans* disease, or Buruli ulcer, which manifests with skin lesions and osteomyelitis.[204] Finally, one of the most frequent indications for use of BCG in high-income countries today is for the treatment of bladder cancer by intravesicular administration, and here the vaccine has a nonspecific immunostimulant effect; it is worth noting that the supply and dose for this indication differs from that for prevention of TB.[314]

### In the Setting of HIV Infection

HIV-infected persons are at increased risk of complications of BCG vaccination; this risk is mitigated by antiretroviral therapy, although not completely averted. The issues become prominent in the setting of infants born to HIV-infected mothers, where the majority of infants will be HIV-uninfected. However, the status will not be known immediately after birth, the time that BCG is given routinely in most countries. Additionally, in lesser-resourced environments, follow-up HIV testing and BCG vaccination of uninfected babies often cannot be guaranteed. Not vaccinating a significant portion of babies in countries where maternal HIV infection and TB disease is common, such as South Africa, could precipitate an epidemic of disseminated and pulmonary TB in infants.

The latest WHO recommendation and a follow-up position statement have addressed this dilemma.[315,316] BCG vaccination is now contraindicated in HIV-infected persons, including infants. The approach to HIV exposed infants depends on the existing public health structures. BCG administration should be delayed, if certain conditions are met, until HIV infection has been excluded in the baby. These conditions include a high uptake of maternal HIV testing coupled with effective prevention of mother-to-child HIV transmission strategies; early virological diagnosis of HIV infection coupled with early initiation of antiretroviral therapy; and coordination of prevention of mother-to-child HIV transmission, BCG vaccination, and TB control programs to minimize loss to follow up, implementation of alternative TB preventive strategies, and delivery of BCG vaccination following selective nonvaccination at birth. Although there have been significant advances in introduction of these programs globally, in many regions of the world, HIV-infected infants continue to receive BCG at birth.

### Contraindications to Bacille Calmette-Guérin Vaccination

Contraindications vary among countries and often reflect different healthcare delivery resources available in the locale. In the United States, BCG vaccine is contraindicated for persons with impaired immunity, including patients with HIV infection, congenital immunodeficiency, leukemia, lymphoma, generalized malignant disease, and who are on suppressive corticosteroids, alkylating agents, antimetabolites, or radiation, as well as those who are pregnant.[308] Caution should also be used when administrating BCG to persons at high risk for HIV infection.

### Nonspecific Effects of Bacille Calmette-Guérin

The major controlled trials that evaluated BCG-induced protection against TB in the United Kingdom and the United States in the first half of the 20th century showed an unanticipated effect: a reduction in nonaccidental deaths by 25% (95% CI, 6–41%).[317] Subsequently, observational studies, mainly conducted in West Africa, showed that BCG vaccination is associated with a 40% to 60% reduction in all-cause mortality, when compared with unvaccinated children.[318-326] The effects appear particularly prominent in the neonatal period, with a major effect on neonatal sepsis and respiratory infections.[327,328] In a randomized trial of immediate versus delayed BCG in 2343 infants in Guinea Bissau, there was no difference in the primary outcome of mortality at 6 months. Secondary analyses suggested possible mortality benefits of immediate BCG,[328] particularly in low-birth-weight infants. These results are controversial because the mortality trends were observed as early as 3 days after vaccination, there was no placebo injection, and there was a risk of allocation bias.[329] Some plausibility to the nonspecific effects of BCG has been provided by a finding that BCG induces epigenetic modifications of monocytes—the vaccine appears to "train" innate cells, which may result in protection against other pathogens.[330]

BCG may also enhance antibody responses and, in some cases, T-cell responses to other childhood vaccines, such as hepatitis B, tetanus toxoid, pertussis, and pneumococcal vaccines.[241,331-334] The mechanism of this beneficial effect is unclear.

Incomplete data suggest that BCG may also have nonspecific effects that extend to cancer and other chronic inflammatory disorders. BCG vaccination of newborns might reduce incidence of certain childhood cancers.[335] A cohort study of 542 malignant melanoma patients showed previous vaccination with BCG or vaccinia in childhood was associated with significantly longer life.[336] A large Danish case-cohort study found a beneficial effect of BCG vaccination on the risk of lymphomas.[337] Multiple observational studies have shown either a protective or no effect of newborn BCG vaccination on development of asthma. Subsequent metaanalyses show that an effect is unlikely, and if present, likely to be transient.[338,339] Furthermore, a systematic review and metaanalysis showed no association between childhood vaccination and emergence of inflammatory bowel disease,[340] although a Danish study suggested that BCG vaccination in infants younger than 4 months of age is associated with lower occurrence of the disease[341]; one of the hypothesized causes of inflammatory bowel disease is chronic mycobacterial infection.[342]

## NEW TUBERCULOSIS VACCINES

Multiple modeling studies show that the global TB epidemic would be impacted significantly by interrupting transmission of M. tuberculosis. This may be achieved either by preventing infection or by preventing disease; preventing disease will have earlier and marginally greater impact in high-prevalence settings.[5,61,343] Although the ideal vaccine should have both effects, we do not currently know whether this is

possible; regardless, TB vaccine development is shifting to add the goal of prevention of infection to that of prevention of disease.

The primary target populations should be adolescents and younger adults, and not infants; the first modern Phase IIb trial of a new TB vaccine was conducted in infants.[344] The bulk of global TB disease occurs in adolescents and younger adults.[1] These populations transmit M. tuberculosis and thus should be targeted for impact. In contrast, infants and children generally do not transmit the pathogen. Modeling shows that, compared with an infant vaccine, an adult vaccine would have considerably greater early impact on the epidemic and would be cost-effective, even with a relatively low efficacy and short protection duration.[6] Infants, HIV-infected persons, persons with comorbidities (e.g., diabetes mellitus), and the elderly should be included in the secondary testing of new candidates.

## New Vaccines in Clinical Development

The last 15 years has seen a concerted effort toward developing novel TB vaccines that would be safe and more effective than BCG, while still being affordable and accessible to high-risk populations globally. Some of this research has been aimed at replacing BCG in infants with an improved vaccine, although it is now thought that this approach would have a limited impact on the global epidemic.[6] Rather, the focus has shifted to developing vaccines that would be delivered to adolescents and adults.

At the time of this writing, there are 16 TB vaccine candidates in clinical development globally (Fig. 60.5). The candidates include whole, live mycobacteria such as recombinant BCGs and recombinant M. tuberculosis, lysates of whole mycobacteria, subunit vaccines (adjuvanted recombinant proteins),

| Phase I | Phase IIa | Phase IIb | Phase III |
|---|---|---|---|
| ID93 (antigens Rv2608, Rv3619, Rv3620, and Rv1813) + adjuvant GLA-SE<br>IDRI, Aeras | H1 (Ag85B/ESAT-6) + IC31<br>SSI, TBVI, EDCTP, Intercell | M72 (MTB32A, 39A) + AS01E<br>GSK, Aeras | M. vaccae<br>Anhui Zhifei Longcom |
| Ad5Ag85A<br>McMaster CanSino | H4 (Ag85B/TB10.4) + IC31<br>SSI, Sanofi, Aeras, Intercell | MVA85A/AERAS-485<br>Oxford, Aeras | M. obuense<br>DarDar study, NIAID |
| MVA85A/MVA85A (Aerosol)<br>Oxford | H56 (Ag85B/ESAT-6/Rv2660) + IC31<br>SSI, Aeras, Intercell | | |
| MVA85A – IMX313<br>Oxford, Imaxio | Ad35 (Ag85Ab, TB10.4)/ /AERAS-402<br>Crucell, Aeras | | |
| ChAdOx185A<br>Oxford, Birmingham | VPM 1002 (rBCG)<br>Max Planck, VPM, TBVI, SII | | |
| TB/FLU-04L (ESAT-6, Ag85A)<br>RIBSP | | | |
| MTBVAC (rMTB)<br>TBVI, Zaragoza, Biofabri | | ☐ Protein-adjuvant | |
| DAR-901 (M. obuense)<br>Aeras, Dartmouth | | ☐ Viral-vectored<br>☐ Whole cell | |

Figure 60.5. Tuberculosis vaccine candidates currently in clinical development. EDCTP, European and Developing Countries Clinical Trials Partnership; GSK, GlaxoSmithKline; IDRI, Infectious Disease Research Institute; NIAID, National Institute of Allergy and Infectious Diseases; RIBSP, Research Institute for Biological Safety Problems; SSI, Statens SerumInstitut; TBVI, Tuberculosis Vaccine Initiative.

and viral-vectored candidates.[345-348] Some efforts are also ongoing to evaluate combinations of these vaccine approaches. Two candidates have completed or are currently in Phase III testing, two candidates have completed or are currently in Phase II proof-of-concept trials, and multiple candidates are in earlier testing. Many more candidates are in preclinical product development.

## Whole-Cell Vaccines

Mycobacteria other than *M. bovis* have been considered TB vaccine candidates for many years. A killed *M. tuberculosis* vaccine was studied in the 1930s and was found to have a protective efficacy of approximately 50% against disease in humans.[349] Until the modern era, only BCG and the vole bacillus (*M. microti*) have been considered seriously as candidates for vaccination. Whole mycobacterial vaccines, or vaccines derived from whole mycobacteria, are attractive since knowledge of specific antigens involved in a protective host response against TB remains limited.[350]

One whole-cell vaccine candidate, SRL172, has been tested in a Phase III trial. SRL172, thought at the time to be the environmental mycobacterium *Mycobacterium vaccae*, but more recently determined by 16S ribosomal RNA sequence to be *Mycobacterium obuense*, a close relative of *M. vaccae*, demonstrated limited efficacy against microbiologically confirmed TB in HIV-infected adults in Tanzania, when delivered as a series of five intradermal doses[351]: protection against microbiologically confirmed TB was 49% (95% CI, 4–61%). No protection was shown against disseminated TB or non-microbiologically confirmed TB. The vaccine was manufactured by a nonscalable process, but a liquid fermentation based manufacturing process was developed for this candidate. The new product, DAR901, is heat-inactivated and currently in first-in-human testing.

A heat-inactivated version of *M. vaccae*, already licensed as an immunotherapy in China (Vaccae), is currently in Phase III evaluation in China for prevention of TB in persons who are strongly TST positive, that is, with LTBI. Results are expected in 2017.

A live, attenuated *M. tuberculosis* candidate, known as MTBVAC, is currently in a Phase I trial in South Africa, after successful first-in-human testing in Europe. The candidate has two mutations—of phoP and fadD26—rendering it less virulent than BCG in immunocompromised animals.[352] Although initially developed as a replacement for BCG in infants, a shift in strategy now has this vaccine also targeted for use in adolescents and adults.

Multiple recombinant BCG candidates have emerged. The candidate in the most advanced stages of development is VPM1002, which is engineered to allow phagosomal acidification and lysosomal escape in the macrophages or dendritic cells that take up the organism, and as such potentially enhance induction of both CD4 and CD8 T-cell immunity.[353] The vaccine is currently in Phase II testing in India, on a track for BCG replacement. AERAS-422 was another recombinant BCG with a lysosomal escape mechanism, but its development was halted during its first-in-human trial because of a safety signal—two participants developed herpes zoster (Tom Evans, personal communication, 2016). rBCG30, a recombinant BCG that overexpresses antigen 85B (a 30-kDa antigen), completed a first-in-human safety that demonstrated immunogenicity and an acceptable safety profile.[354] To date, the vaccine has not progressed further in development.

RUTI is a preparation of detoxified fragments of *M. tuberculosis* cells, delivered in liposomes, and being developed to prevent TB disease in persons with LTBI.[355-357] The vaccine is currently in Phase II testing.

## Subunit Vaccines

The subunit vaccines currently in development contain a limited number of immunodominant *M. tuberculosis* antigens, typically as fusion proteins for ease of production, and formulated in Th1 cell-inducing adjuvants like AS01E,[358] GLA-SE,[359,360] CAF01,[361] or IC31.[362] Each of these candidates has demonstrated an acceptable safety profile, immunogenicity, and some degree of protection against *M. tuberculosis* challenge in animal models. The most advanced candidate in this category is M72/AS01E,[363-367] which is currently in a proof-of-concept Phase IIb trial, testing whether TB disease can be prevented in latently infected, HIV-negative adults in Africa. Another subunit vaccine, H4:IC31,[368] is currently in a proof-of-concept Phase II trial, testing whether *M. tuberculosis* infection can be prevented in adolescents without LTBI.

## Virally Vectored Candidates

Viral vectors being developed as platforms for antigen delivery in TB vaccines include modified vaccinia Ankara (in the vaccine MVA85A),[344,369-375] influenza (TB/FLU-04L), and several human and chimpanzee adenoviruses (Ad5/Ag85[376] and Ad35/AERAS-402).[377-380] Most platforms contain attenuated, live, and replication-deficient viruses, and each of the clinical candidates express an antigen from the immunodominant *M. tuberculosis* antigen-85 complex, either as the sole antigen or in combination with one or more additional *M. tuberculosis* antigens.

MVA85A was evaluated recently in a Phase IIb trial in infants in South Africa, testing whether TB disease could be prevented if the vaccine is given as a boost at 4 months of age, following BCG vaccination at birth.[344] MVA85A induced a modest immune response in the infants and failed to show efficacy beyond that of BCG alone, leaving open the question of whether it was the nature or the magnitude of the induced immune response that was inadequate for protection. MVA has also been evaluated in a Phase II trial of HIV-infected persons, primarily assessing safety and immunogenicity, with disease prevention as an underpowered secondary end point. Although the safety profile was acceptable, and immunogenicity was shown, no protection was demonstrated. More recently, a combination approach of one or two doses of an adenovirus-vectored antigen-85A–expressing candidate followed by a single dose of MVA85A demonstrated robust CD4+ and CD8+ immune responses (Tom Evans, personal communication, 2016).

## New Concepts in Vaccine Development

### Targeting Different Immunological Compartments

The current portfolio of new TB vaccines in clinical trials relies on induction of a relatively narrow immune repertoire—classical major histocompatibility complex (MHC) class II–restricted Th1 CD4 cells, and in some cases, classical MHC class I–restricted CD8 T cells—so-called conventional T cells. (Whole mycobacterial candidates may be the exception.) This paradigm could be challenged, as one possible explanation of the MVA85A trial results is that CD4 T-cell immunity to 85A was insufficient to confer protection in newborns, compared with BCG alone (see above). However, it is not clear whether it was the quantity or the nature of the induced immune response that was inadequate. Furthermore, the immunodominant antigens/epitopes in current vaccines appear conserved across global TB strains, suggesting there may be benefit of the vaccine-induced T-cell responses for the TB pathogen.

In a paradigm shift, the field is moving toward developing vaccines that address immunological hypotheses other than that a conventional T-cell response is essential for protection.[381,382] The new approaches focus on eliciting a response in immunological compartments other than conventional T cells, or inducing responses to diverse classes of antigens. The immunity induced by new approaches could differ from that which occurs in the natural setting; many examples of vaccines that induce "unnatural immunity" already exist (e.g., natural infection with *Clostridium tetani* does not induce long-lived protection, whereas vaccination with tetanus toxoid does, and protein conjugation of various polysaccharide vaccines affords immune memory that does not occur when children younger than 2 years of age are immunized with the polysaccharide alone).

Induction of nonconventional immunity includes induction of antibodies, traditionally not thought to play a major role in protection against intracellular bacteria such as *M. tuberculosis*, but which may play a role in prevention of infection, rather than disease.[62] Other examples of induction of nonconventional immunity include exploitation of antigen presentation that is less polymorphic, involving molecules such as CD1, HLA-E, and MR1, or use of novel antigen classes, such as glycolipids or phosphoantigens. The cells targeted include CD1-restricted T cells, γδ T cells, and mucosal-associated invariant T cells.[381,382] Finally, preliminary results using an attenuated live replicating cytomegalovirus vector suggest that novel classes of T cells (e.g., HLA-E restricted CD8 T cells and MHCII restricted CD8 T cells) are elicited and that these may contribute to protection against TB, as has been suggested for HIV (Louis Picker, personal communication, 2016).

## Antigen Selection

It is not known which antigens in the *M. tuberculosis* genome are responsible for host responses associated with protection. *M. tuberculosis* may hyperconserve immunodominant antigens, presumably to its own pathogenic advantage,[383,384] which has motivated the selection of nondominant antigens for a number of next-generation TB vaccine candidates. This is an area of active research.

## Targeting the Lung in Vaccination

Preclinical data suggest that mucosal vaccination against TB elicits lung and systemic immunity that differs from that induced by parenteral vaccination, and in some cases, elicits enhanced protection. Furthermore, knowledge is emerging about so-called tissue-resident memory T ($T_{RM}$) cells,[385,386] which express receptors that allow homing to the lung, where they live for extended periods. (Classical central memory or long-lived T cells have receptors that allow preferential homing to lymph nodes.[387]) $T_{RM}$ cells are thought to be particularly important for protection against pulmonary pathogens, and may be induced preferentially through mucosal vaccination approaches. New approaches in the field aim at defining the role of these cells in protection against TB. Overall, a strong rationale is proposed for developing aerosol vaccination approaches, which are currently being tested.[370,388]

### Acknowledgment

We thank Kim Connelly Smith, Ian M. Orme, and Jeffrey R. Starke for their work on previous versions of this chapter.

References for this chapter are available at ExpertConsult.com.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel*.,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,
                    *Plaintiffs,*
        v.
MERCK & CO., INC.,
                    *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S EXHIBITS IN SUPPORT OF MERCK'S RESPONSE TO RELATORS' STATEMENT OF UNDISPUTED FACTS

# EXHIBIT 323

Highly Confidential – Attorneys' Eyes Only

## EXPERT REPORT OF

## GARY L. FREED MD, MPH

### A.     Academic and Professional Background

1.      My name is Gary L. Freed MD, MPH, and I am currently the Percy and Mary Murphy Professor of Pediatrics in the School of Medicine and Professor of Health Management and Policy in the School of Public Health at the University of Michigan.  I am the Associate Chair of the Department of Pediatrics and the Director of Faculty Programs for the Office of Health Equity and Inclusion in the Michigan Medical School.  From 1998-2013, I served as director of the Division of General Pediatrics and founding director of the Children's Health Evaluation and Research Center at the University of Michigan, the largest pediatric health services research center in the USA. From 2013-2016, I divided my time between the University of Michigan and the University of Melbourne (Australia) where I served as director of the Australian Health Workforce Institute, Professor of Population Health, and as visiting scholar in Health Care Policy at the Royal Children's Hospital.  While there I also founded the first pediatric health services research center in Australia and still serve as a consultant to its current director. In 2016, I returned full time to the University of Michigan to continue my research in health policy, quality of care measurement and economic issues focused on children, and to provide pediatric primary care.  I am still active as a primary care pediatrician.

2.      I have more than 25 years of experience in children's health services research and have been the principal investigator of numerous federal, state and foundation-funded grants, and of the first pediatric health services research fellowship program funded by the National Institutes of Health. I have published more than 280 peer-reviewed articles on child health policy and health economics, immunizations, health care quality measurement, physician behavior, the medical workforce and interspecialty variation in the provision of preventive services to children.

3.      I received my bachelor's degree from The University of Texas at Austin, my medical degree from Baylor College of Medicine in Houston and my Master of Public Health degree from the University of North Carolina at Chapel Hill. At UNC, I was a Robert Wood Johnson clinical scholar as well as a preventive medicine fellow.

4.      I am a past president of the Society for Pediatric Research (SPR), the largest research society in the field of child health.  In 2009, I was awarded the SPR Douglas K. Richardson Lifetime Achievement Award for Perinatal and Pediatric Health Care Research.  In 2018, I received the Distinguished Alumnus Award from Baylor College of Medicine.

5.      I serve on several national and international committees regarding child health, including serving as the Chair of the Scientific Advisory Committee of the

Highly Confidential – Attorneys' Eyes Only

pricing constructs.  Also of importance is the fact that the magnitude of the range between the ASP and AWP does not vary by whether a vaccine had a competitor manufacturer or not.[67]

92.     Unfortunately, the lack of transparency in actual prices paid result in a vacuum of information for which my published study is the only available information.  A further examination of the data from the study show that there is no consistent pattern in the minimum and maximum pricing variation among those vaccines with and without competitors.  Sometimes competing vaccines have similar pricing and sometimes they differ widely.  As such, there can be no way to predict actual pricing, either initially or over time, when a new competitor enters the market.

**J.     Funding of Research on a New Mumps Vaccine in the US**

93.     In the Relator's/Plaintiff's Consolidated Amended Complaint, they allege on page 34 that the NIH has "begun to recognize that the Mumps Vaccine is not as effective as Merck claims". They go on to allege that the "NIH concluded earlier this year that it is time to develop a new vaccine".  This allegation is based on the funding of a grant on May 12, 2012 to Dr. Biao He of the University of Georgia. This claim is both false and grossly misleading.

94.     To better understand why the claim is false and misleading, it is important to understand the nature and process of NIH funding of research proposals.  One of the six criteria on which the NIH evaluates research proposals for funding is the importance of the grant.  In that section of the application, the investigator seeks to provide a justification for the proposal. To support their assertion, the plaintiffs go on to quote a portion of Dr. He's application and imply that the statements he makes have been, in fact, adopted by the NIH.  The NIH, nor its leadership, have ever made such a statement.  Again, the plaintiffs' assertion is false and grossly misleading.

95.     The NIH does have several mechanisms to explicitly signal and announce priority topics and areas of research for which they hope to receive applications and to increase funding in those areas.  The most commonly used mechanisms are "Requests for Proposals (RFP)," "Requests for Applications (RFA)," and "Program Announcements (PA)".  For those areas of exceptional interest, the NIH will publically announce specific funds have been set aside for support of that area of research.  In the case of mumps vaccine, there have been no such announcements in at least the past decade, including the time from which Dr. He's application was funded.  Thus, to claim funding of research to develop a new vaccine is a priority of the NIH is both false and misleading.

---

[67] Id.

Appx18716

Highly Confidential – Attorneys' Eyes Only

96.     The plaintiffs then go on to suggest that but for the availability of data from Merck that the NIH would have funded the development of a new vaccine prior to the mumps outbreaks of 2006 and 2009 (page 34).   Again, this statement is also false and grossly misleading as no RFP, RFA or PA have been made since the allegations by the plaintiffs and the funding of the proposal by He has taken place. Further, there have been no further grants on the development of a new mumps vaccine since that of Dr. He.[68]

97.     Another way of looking at potential NIH priorities is to look at the funding for a specific topic relative the overall NIH budget and to the Institute (of the NIH) which funded grants in a certain area.  In this case, funding to Dr. He for this proposal in 2012 was $371,000 (a quite modest NIH grant).  In contrast, the overall 2012 extramural research budget of the National Institute of Allergy and Infectious Diseases (NIAID) (the NIH Institute from which the grant was funded) was $178,834,170.  The overall extramural funding of the NIH in 2012 was $1,613,344,565.[69]  Thus, the proportion of funding on the development of a new mumps vaccine (this was the only grant on the topic in that year or since) was .002% for the NIAID and .00002% for the NIH as a whole.  No one should confuse this with a priority of either the NIAID or the NIH.

**General References:**

1.     European Centre for Disease Prevention and Control. Mumps. In: ECDC. Annual epidemiological report for 2015. Stockholm: ECDC; 2017. Stockholm, November 2017.

2.      G. Ong, *et al.*, *Comparative efficacy of Rubini, Jeryl-Lynn and Urabe mumps vaccine in an Asian population*, The Journal of Infection, 2004 Nov 5; 51(4): 294-298.

3.     Stanley A. Plotkin, *et al.*, Plotkin's Vaccines, 7th edition 2018.

4.     Centers for Disease Control and Prevention, Epidemiology and Prevention of Vaccine-Preventable Diseases, 13th ed. 2015.

5.     Centers for Disease Control and Prevention, Mumps, *available at* https://www.cdc.gov/mumps/ (last accessed June 9, 2018).

---

[68] See https://projectreporter.nih.gov/reporter.cfm?frs=1&icde=39806015 .

[69] Id.

Appx18717

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

  *Plaintiffs,*

v.

MERCK & CO., INC.,

  *Defendant.*

Civil Action No. 10-4374 (CDJ)

CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER

# MERCK'S EXHIBITS IN SUPPORT OF MERCK'S RESPONSE TO RELATORS' STATEMENT OF UNDISPUTED FACTS

# EXHIBIT 324

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2

    UNITED STATES OF AMERICA   : CIVIL ACTION
 3  ex rel., STEPHEN A.        : NO. 10-04374(CDJ)
    KRAHLING and JOAN A.       :
 4  WLOCHOWSKI,                :
            Plaintiffs,        :
 5                             :
            vs.                :
 6                             :
    MERCK & CO., INC.,         :
 7        Defendant.           :
    _____    : Master File No.
 8  IN RE:  MERCK MUMPS        : 12-03555(CDJ)
    VACCINE ANTITRUST          :
 9  LITIGATION                 :
                               :
10  THIS DOCUMENT RELATES TO:  :
    ALL ACTIONS                :
11                 -   -   -
12               October 18, 2018
13    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
14                 -   -   -
15          Videotaped deposition of GARY L.
16  FREED, MD, taken at the offices of Spector
17  Roseman & Kodroff, PC, 1818 Market Street,
18  Suite 2500, Philadelphia, Pennsylvania 19103,
19  beginning at 9:06 a.m., before LINDA
20  ROSSI-RIOS, a Federally Approved RPR, CCR and
21  Notary Public.
22
23
24
```

Appx18719

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 346

1     Q.   You didn't think that was
2 interesting to you?
3     A.   I didn't think it was relevant
4 to my area of expertise.
5     Q.   So this document does explain
6 that Steve Rubin is a CBER inspector and he
7 says that CBER is very interested in
8 licensing a second supplier.  Do you see
9 that?
10     A.   I do.
11     Q.   So my question is, how do you
12 reconcile that with your prior opinion that a
13 second vaccine is not necessary?
14     MS. GAARDER:  Objection.  Calls
15    for speculation.  Misstates his
16    testimony and lack of foundation.
17     MR. SHEANIN:  Your objections
18    have been made.
19     MS. GAARDER:  Well, you don't
20    get a continuing objection in federal
21    court.
22     THE WITNESS:  So I have two
23    points to make.  Number one is, I
24    don't know if an inspector has the

Page 347

1    knowledge to know what CBER's intent
2    or interest is.  This could be Steve
3    Rubin's interest.  I have no idea.
4    And secondly, I based my opinion on
5    the fact that the rates of disease are
6    still very low.
7 BY MR. SHEANIN:
8     Q.   You've never worked with CBER.
9 Correct?
10     A.   No.
11     Q.   Do you know who -- your report
12 you talk about Dr. Biao He.  Do you recall
13 that?
14     A.   Biao He.
15     Q.   Biao He.
16     A.   Yes.
17     Q.   And do you understand that --
18     A.   Paragraph 93.
19     Q.   Do you understand that Dr. He
20 was given a grant to conduct research into an
21 additional mumps vaccine?
22     A.   Yes.
23     Q.   And I take it your opinion was
24 the fact that there was a grant by NIH

Page 348

1 doesn't make it an NIH priority.  Is that
2 correct?
3     A.   That is correct.
4     Q.   Do you know who Dr. David Krah
5 is?
6     A.   Who?
7     Q.   David Krah, K-R-A-H.
8     A.   No.
9     MR. SHEANIN:  Can I get 26,
10    please?
11     THE WITNESS:  Are we done with
12    this one?
13     MR. SHEANIN:  Yes.
14     - - -
15    (Exhibit Freed-17, Emails,
16    000083 - 000111, was marked for
17    identification.)
18     - - -
19 BY MR. SHEANIN:
20     Q.   We are marking as Exhibit 17 a
21 document produced by Dr. He as BIAOHE000083.
22 And I'm going to have you focus on the
23 beginning, the first page, because this
24 document, the way it's produced, seems to

Page 349

1 have a lot of repeated email, the same email
2 repeated multiple spots.  Just take a minute
3 to read through the first page.  I don't
4 honestly think you need to read through the
5 rest of it.
6     A.   Okay.
7     Q.   Do you see the bottom email on
8 the first page from David Krah, he's a Senior
9 Investigator of Vaccines Research, Merck
10 Research Laboratories?
11     A.   Yes.
12     Q.   Do you know that Dr. Krah was
13 responsible for running the clinical
14 laboratory that conducted Protocol 007 which
15 is at issue in this case?
16     A.   No.
17     Q.   You've never heard of Dr. Krah
18 before?
19     A.   No.
20     Q.   He writes to Dr. He, "My name
21 is David Krah and I am in the department of
22 Vaccines Research at Merck Research
23 Laboratories in West Point, PA.  One of my
24 colleagues, Ian Tarpey, indicated that he

88 (Pages 346 - 349)

Appx18720

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,
　　　　　　　　*Plaintiffs,*
　　v.
MERCK & CO., INC.,
　　　　　　　　*Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S EXHIBITS IN SUPPORT OF MERCK'S RESPONSE TO RELATORS' STATEMENT OF UNDISPUTED FACTS

# EXHIBIT 325



*Centers for Disease Control and Prevention*

Morbidity and Mortality Weekly Report

Weekly / Vol. 61 / No. 53                    September 19, 2014

# Summary of Notifiable Diseases — United States, 2012



**U.S. Department of Health and Human Services**
Centers for Disease Control and Prevention

Morbidity and Mortality Weekly Report

## CONTENTS

Preface ..................................................................................................... 2

Background ........................................................................................... 2

Infectious Diseases Designated as Notifiable
at the National Level During 2012 ........................................... 3

Data Sources ....................................................................................... 4

Interpreting Data .............................................................................. 5

Transition in NNDSS Data Collection and Reporting ............... 5

Method for Identifying Which Nationally Notifiable Infectious
Diseases Are Reportable ........................................................... 6

Revised International Health Regulations ................................. 6

Highlights for 2012 ......................................................................... 11

PART 1: Summaries of Notifiable Diseases in the United States, 2012 .. 24

Abbreviations and Symbols Used in Tables ............................. 24

TABLE 1. Reported cases of notifiable diseases, by month — United
States, 2012 ................................................................................. 25

TABLE 2. Reported cases of notifiable diseases, by geographic
division and area — United States, 2012 ............................... 27

TABLE 3. Reported cases and incidence of notifiable diseases, by age
group — United States, 2012 ............................................... 40

TABLE 4. Reported cases and incidence of notifiable diseases, by sex
— United States, 2012 ........................................................... 42

TABLE 5. Reported cases and incidence of notifiable diseases, by race
— United States, 2012 ........................................................... 44

## CONTENTS (*Continued*)

TABLE 6. Reported cases and incidence of notifiable diseases, by
ethnicity — United States, 2012 ............................................ 46

PART 2: Graphs and Maps for Selected Notifiable Diseases
in the United States, 2012 ...................................................... 49

Abbreviations and Symbols Used in Graphs and Maps ..................... 49

PART 3: Historical Summaries of Notifiable Diseases
in the United States, 1980–2012 ......................................... 100

Abbreviations and Symbols Used in Tables ................................... 100

TABLE 7. Reported incidence of notifiable diseases —United States,
2002–2012 ................................................................................ 101

TABLE 8. Reported cases of notifiable diseases — United States,
2005–2012 ................................................................................ 104

TABLE 9. Reported cases of notifiable diseases—United States,
1997–2004 ................................................................................ 107

TABLE 10. Reported cases of notifiable diseases—United States,
1989–1996 ................................................................................ 109

TABLE 11. Reported cases of notifiable—United States,
1981–1988 ................................................................................ 111

TABLE 12. Number of deaths from selected nationally notifiable
infectious diseases United States, 2004–2010 .................. 112

Selected Reading for 2012 .......................................................... 114

The *MMWR* series of publications is published by the Center for Public Health Scientific Services, Centers for Disease Control and Prevention (CDC), U.S. Department of Health and Human Services, Atlanta, GA 30329-4027.

**Suggested citation:** Centers for Disease Control and Prevention. [Summary of Notifiable Diseases, 2012]. Published September 19, 2014 for MMWR 2014;61(No. 53):[inclusive page numbers].

### Centers for Disease Control and Prevention

Thomas R. Frieden, MD, MPH, *Director*
Harold W. Jaffe, MD, MA, *Associate Director for Science*
Joanne Cono, MD, ScM, *Director, Office of Science Quality*
Chesley L. Richards, MD, MPH, *Deputy Director for Public Health Scientific Services*
Michael F. Iademarco, MD, MPH, *Director, Center for Surveillance, Epidemiology, and Laboratory Services*

### MMWR Editorial and Production Staff

Charlotte Kent, *Acting Editor-in-Chief*
Christine G. Casey, MD, *Deputy Editor*, MMWR *Series*
Teresa F. Rutledge, *Managing Editor*, MMWR *Series*
David C. Johnson, *Lead Technical Writer-Editor*
Denise Williams, MBA, *Project Editor*

Martha F. Boyd, *Lead Visual Information Specialist*
Maureen A. Leahy, Julia C. Martinroe,
Stephen R. Spriggs, Terraye M. Starr
*Visual Information Specialists*
Quang M. Doan, MBA, Phyllis H. King
*Information Technology Specialists*

### MMWR Editorial Board

William L. Roper, MD, MPH, Chapel Hill, NC, Chairman

Matthew L. Boulton, MD, MPH, Ann Arbor, MI
Virginia A. Caine, MD, Indianapolis, IN
Barbara A. Ellis, PhD, MS, Atlanta, GA
Jonathan E. Fielding, MD, MPH, MBA, Los Angeles, CA
David W. Fleming, MD, Seattle, WA
William E. Halperin, MD, DrPH, MPH, Newark, NJ
King K. Holmes, MD, PhD, Seattle, WA

Timothy F. Jones, MD, Nashville, TN
Rima F. Khabbaz, MD, Atlanta, GA
Dennis G. Maki, MD, Madison, WI
Patricia Quinlisk, MD, MPH, Des Moines, IA
Patrick L. Remington, MD, MPH, Madison, WI
William Schaffner, MD, Nashville, TN

Morbidity and Mortality Weekly Report

# Summary of Notifiable Diseases —
# United States, 2012

Deborah A. Adams, Coordinator, *Summary of Notifiable Diseases*
Ruth Ann Jajosky, DMD
Umed Ajani, MBBS
Jeffrey Kriseman, PhD
Pearl Sharp
Diana H. Onweh
Alan W. Schley
Willie J. Anderson
Anna Grigoryan, MD
Aaron E. Aranas, MPH
Michael S. Wodajo
John P. Abellera, MPH
*Division of Health Informatics and Surveillance ,*
*Office of Public Health Scientific Services, CDC*

Appx18724

*Morbidity and Mortality Weekly Report*

**TABLE 8.** (*Continued*) Reported cases of notifiable diseases — United States, 2005–2012

| Disease | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|
| Hansen disease (leprosy) | 87 | 66 | 101 | 80 | 103 | 98 | 82 | 82 |
| Hantavirus pulmonary syndrome | 26 | 40 | 32 | 18 | 20 | 20 | 23 | 30 |
| Hemolytic uremic syndrome, postdiarrheal | 221 | 288 | 292 | 330 | 242 | 266 | 290 | 274 |
| Hepatitis, viral, acute¶¶ | | | | | | | | |
| A | 4,488 | 3,579 | 2,979 | 2,585 | 1,987 | 1,670 | 1,398 | 1,562 |
| B | 5,119 | 4,713 | 4,519 | 4,033 | 3,405 | 3,374 | 2,903 | 2,895 |
| C | 652 | 766 | 845 | 877 | 782 | 849 | 1,229 | 1,782 |
| Hepatitis B perinatal infection | — | — | — | — | — | — | — | 40 |
| Human immunodeficiency virus (HIV) diagnoses[†] | — | — | — | — | 36,870 | 35,741 | 35,266 | 35,361 |
| Influenza-associated pediatric mortality*** | 45 | 43 | 77 | 90 | 358 | 61 | 118 | 52 |
| Invasive pneumococcal disease | | | | | | | | |
| all ages | — | — | — | — | — | — | — | 15,815 |
| age<5 years | — | — | — | — | — | — | — | 1,266 |
| Legionellosis | 2,301 | 2,834 | 2,716 | 3,181 | 3,522 | 3,346 | 4,202 | 3,688 |
| Listeriosis | 896 | 884 | 808 | 759 | 851 | 821 | 870 | 727 |
| Lyme disease, total†† | 23,305 | 19,931 | 27,444 | 35,198 | 38,468 | 30,158 | 33,097 | 30,831 |
| confirmed | ††† | ††† | ††† | 28,921 | 29,959 | 22,561 | 24,364 | 22,014 |
| probable | ††† | ††† | ††† | 6,277 | 8,509 | 7,597 | 8,733 | 8,817 |
| Malaria | 1,494 | 1,474 | 1,408 | 1,255 | 1,451 | 1,773 | 1,724 | 1,503 |
| Measles | 66 | 55 | 43 | 140 | 71 | 63 | 220 | 55 |
| indigenous | — | — | — | — | — | — | — | 34 |
| imported | — | — | — | — | — | — | — | 21 |
| Meningococcal disease, invasive§§§ | | | | | | | | |
| all serogroups | 1,245 | 1,194 | 1,077 | 1,172 | 980 | 833 | 759 | 551 |
| serogroup A,C,Y, & W-135 | 297 | 318 | 325 | 330 | 301 | 280 | 257 | 161 |
| serogroup B | 156 | 193 | 167 | 188 | 174 | 135 | 159 | 110 |
| other serogroup | 27 | 32 | 35 | 38 | 23 | 12 | 20 | 20 |
| serogroup unknown | 765 | 651 | 550 | 616 | 482 | 406 | 323 | 260 |
| Mumps | 314 | 6,584 | 800 | 454 | 1,991 | 2,612 | 404 | 229 |
| Novel influenza A virus infections | ¶ | ¶ | 4 | 2 | 43,696 | 4 | 14 | 313 |
| Pertussis | 25,616 | 15,632 | 10,454 | 13,278 | 16,858 | 27,550 | 18,719 | 48,277 |
| Plague | 8 | 17 | 7 | 3 | 8 | 2 | 3 | 4 |
| Poliomyelitis, paralytic¶¶¶ | 1 | — | — | — | 1 | — | — | — |
| Poliovirus infection, nonparalytic | — | — | — | — | — | — | — | — |
| Psittacosis | 16 | 21 | 12 | 8 | 9 | 4 | 2 | 2 |
| Q Fever**** | 136 | 169 | 171 | 120 | 113 | 131 | 134 | 135 |
| acute | §§§§ | §§§§ | §§§§ | 106 | 93 | 106 | 110 | 113 |
| chronic | §§§§ | §§§§ | §§§§ | 14 | 20 | 25 | 24 | 22 |
| Rabies | | | | | | | | |
| animal | 5,915 | 5,534 | 5,862 | 4,196 | 5,343 | 4,331 | 4,357 | 4,541 |
| human | 2 | 3 | 1 | 2 | 4 | 2 | 6 | 1 |
| Rubella | 11 | 11 | 12 | 16 | 3 | 5 | 4 | 9 |
| Rubella, congenital syndrome | 1 | 1 | — | — | 2 | — | — | 3 |
| Salmonellosis | 45,322 | 45,808 | 47,995 | 51,040 | 49,192 | 54,424 | 51,887 | 53,800 |
| SARS-CoV†††† | | | | | | | | |
| Shiga toxin-producing *E. coli* (STEC) | ¶ | 4,432 | 4,847 | 5,309 | 4,643 | 5,476 | 6,047 | 6,463 |
| Shigellosis | 16,168 | 15,503 | 19,758 | 22,625 | 15,931 | 14,786 | 13,352 | 15,283 |
| Spotted Fever Rickettsiosis, total§§§§ | 1,936 | 2,288 | 2,221 | 2,563 | 1,815 | 1,985 | 2,802 | 4,470 |
| confirmed | §§§§ | §§§§ | §§§§ | 190 | 151 | 156 | 234 | 188 |
| probable | §§§§ | §§§§ | §§§§ | 2,367 | 1,662 | 1,835 | 2,562 | 4,278 |
| Streptococcal disease, invasive, group A | 4,715 | 5,407 | 5,294 | 5,674 | 5,279 | ¶ | ¶ | ¶ |
| Streptococcal, toxic shock syndrome | 129 | 125 | 132 | 157 | 161 | 142 | 168 | 194 |
| *Streptococcus pneumoniae* invasive disease(IPD) | | | | | | | | |
| all ages | ¶¶¶¶ | ¶¶¶¶ | ¶¶¶¶ | ¶¶¶¶ | ¶¶¶¶ | 16,569 | 17,138 | ††††† |
| age <5 yrs | ¶¶¶¶ | ¶¶¶¶ | ¶¶¶¶ | ¶¶¶¶ | ¶¶¶¶ | 2,186 | 1,459 | ††††† |
| *Streptococcus pneumoniae*, invasive disease | | | | | | | | |
| drug resistant, all ages | 2,996 | 3,308 | 3,329 | 3,448 | 3,370 | ††††† | ††††† | ††††† |
| age <5 yrs | — | — | 563 | 532 | 583 | ††††† | ††††† | ††††† |
| non-drug resistant, age <5 yrs | 1,495 | 1,861 | 2,032 | 1,998 | 1988 | ††††† | ††††† | ††††† |
| Syphilis, total, all stages** | 33,278 | 36,935 | 40,920 | 46,277 | 44,828 | 45,834 | 46,042 | 49,903 |
| congenital (age <1 yr.) | 339 | 382 | 430 | 431 | 427 | 377 | 360 | 322 |
| primary and secondary | 8,724 | 9,756 | 11,466 | 13,500 | 13,997 | 13,774 | 13,970 | 15,667 |
| Tetanus | 27 | 41 | 28 | 19 | 18 | 26 | 36 | 37 |
| Toxic-shock syndrome | 90 | 101 | 92 | 71 | 74 | 82 | 78 | 65 |

See table footnotes on page 106.

Appx18725

Morbidity and Mortality Weekly Report

**TABLE 9. Reported cases of notifiable diseases—United States, 1997–2004**

| Disease | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|
| AIDS* | 58,492 | 46,521 | 45,104 | 40,758 | 41,868 | 42,745 | 44,232 | 44,108 |
| Anthrax | — | — | — | 1 | 23 | 2 | — | — |
| Botulism, total (including wound and unspecified) | 132 | 116 | 154 | 138 | 155 | 118 | 129 | 133 |
|   foodborne | 31 | 22 | 23 | 23 | 39 | 28 | 20 | 16 |
|   infant | 79 | 65 | 92 | 93 | 97 | 69 | 76 | 87 |
| Brucellosis | 98 | 79 | 82 | 87 | 136 | 125 | 104 | 114 |
| Chancroid† | 243 | 189 | 143 | 78 | 38 | 67 | 54 | 30 |
| *Chlamydia trachomatis* infections† | 526,671 | 604,420 | 656,721 | 702,093 | 783,242 | 834,555 | 877,478 | 929,462 |
| Cholera | 6 | 17 | 6 | 5 | 3 | 2 | 2 | 5 |
| Coccidioidomycosis | 1,749 | 2,274 | 2,826 | 2,867 | 3,922 | 4,968 | 4,870 | 6,449 |
| Cryptosporidiosis | 2,566 | 3,793 | 2,361 | 3,128 | 3,785 | 3,016 | 3,506 | 3,577 |
| Cyclosporiasis | § | § | § | 60 | 147 | 156 | 75 | 171 |
| Diphtheria | 4 | 1 | 1 | 1 | 2 | 1 | 1 | — |
| Ehrlichiosis | | | | | | | | |
|   human granulocytic | § | § | 203 | 351 | 261 | 511 | 362 | 537 |
|   human monocytic | § | § | 99 | 200 | 142 | 216 | 321 | 338 |
|   human (other and unspecified) | § | § | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ |
| Encephalitis/Meningitis, arboviral | | | | | | | | |
|   California serogroup virus | 129 | 97 | 70 | 114 | 128 | 164 | 108 | 112 |
|   Eastern equine virus | 14 | 4 | 5 | 3 | 9 | 10 | 14 | 6 |
|   Powassan virus | § | § | § | § | § | 1 | — | 1 |
|   St. Louis virus | 13 | 24 | 4 | 2 | 79 | 28 | 41 | 12 |
|   West Nile virus | § | § | § | § | § | 2,840 | 2,866 | 1,142 |
|   Western equine virus | — | — | 1 | — | — | — | — | — |
| Enterohemorrhagic *Escherichia coli* infection | | | | | | | | |
| Shiga toxin-positive | | | | | | | | |
|   O157:H7 | 2,555 | 3,161 | 4,513 | 4,528 | 3,284 | 3,840 | 2,671 | 2,544 |
|   Non-O157 | § | § | § | § | 171 | 194 | 252 | 316 |
|   not serogrouped | § | § | § | § | 20 | 60 | 156 | 308 |
| Giardiasis | § | § | § | § | § | 21,206 | 19,709 | 20,636 |
| Gonorrhea† | 324,907 | 355,642 | 360,076 | 358,995 | 361,705 | 351,852 | 335,104 | 330,132 |
| *Haemophilus influenzae*, invasive disease | | | | | | | | |
|   all ages, serotypes | 1,162 | 1,194 | 1,309 | 1,398 | 1,597 | 1,743 | 2,013 | 2,085 |
|   age <5 yrs | | | | | | | | |
|     serotype b | § | § | § | § | § | 34 | 32 | 19 |
|     nonserotype b | § | § | § | § | § | 144 | 117 | 135 |
|     unknown serotype | § | § | § | § | § | 153 | 227 | 177 |
| Hansen disease (Leprosy) | 122 | 108 | 108 | 91 | 79 | 96 | 95 | 105 |
| Hantavirus Pulmonary Syndrome | NA | NA | 33 | 41 | 8 | 19 | 26 | 24 |
| Hemolytic uremic syndrome, postdiarrheal | 91 | 119 | 181 | 249 | 202 | 216 | 178 | 200 |
| Hepatitis, viral, acute | | | | | | | | |
|   A | 30,021 | 23,229 | 17,047 | 13,397 | 10,609 | 8,795 | 7,653 | 5,683 |
|   B | 10,416 | 10,258 | 7,694 | 8,036 | 7,843 | 7,996 | 7,526 | 6,212 |
|   C/non-A, non-B** | 3,816 | 3,518 | 3,111 | 3,197 | 3,976 | 1,835 | 1,102 | 720 |
| Legionellosis | 1,163 | 1,355 | 1,108 | 1,127 | 1,168 | 1,321 | 2,232 | 2,093 |
| Listeriosis | § | § | § | 755 | 613 | 665 | 696 | 753 |
| Lyme disease | 12,801 | 16,801 | 16,273 | 17,730 | 17,029 | 23,763 | 21,273 | 19,804 |
| Malaria | 2,001 | 1,611 | 1,666 | 1,560 | 1,544 | 1,430 | 1,402 | 1,458 |
| Measles | 138 | 100 | 100 | 86 | 116 | 44 | 56 | 37 |
| Meningococcal disease, invasive | 3,308 | 2,725 | 2,501 | 2,256 | 2,333 | 1,814 | 1,756 | 1,361 |
| Mumps | 683 | 666 | 387 | 338 | 266 | 270 | 231 | 258 |
| Pertussis | 6,564 | 7,405 | 7,288 | 7,867 | 7,580 | 9,771 | 11,647 | 25,827 |
| Plague | 4 | 9 | 9 | 6 | 2 | 2 | 1 | 3 |
| Poliomyelitis, paralytic | 6 | 3 | 2 | — | — | — | — | — |
| Psittacosis | 33 | 47 | 16 | 17 | 25 | 18 | 12 | 12 |
| Q Fever | § | § | § | 21 | 26 | 61 | 71 | 70 |
| Rabies | | | | | | | | |
|   animal | 8,105 | 7,259 | 6,730 | 6,934 | 7,150 | 7,609 | 6,846 | 6,345 |
|   human | 2 | 1 | — | 4 | 1 | 3 | 2 | 7 |
| Rubella | 181 | 364 | 267 | 176 | 23 | 18 | 7 | 10 |
| Rubella, congenital syndrome | 5 | 7 | 9 | 9 | 3 | 1 | 1 | — |
| Salmonellosis, excluding typhoid fever | 41,901 | 43,694 | 40,596 | 39,574 | 40,495 | 44,264 | 43,657 | 42,197 |
| SARS-CoV | — | — | — | — | — | — | 8 | — |
| Shigellosis | 23,117 | 23,626 | 17,521 | 22,922 | 20,221 | 23,541 | 23,581 | 14,627 |

See table footnotes on page 108.

Appx18726

Morbidity and Mortality Weekly Report

TABLE 10. Reported cases of notifiable diseases — United States, 1989–1996

| Disease | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|---|---|---|
| AIDS* | 33,722 | 41,595 | 43,672 | 45,472 | 103,691 | 78,279 | 71,547 | 66,885 |
| Amebiasis | 3,217 | 3,328 | 2,989 | 2,942 | 2,970 | 2,983 | — | — |
| Anthrax | — | — | — | 1 | — | — | — | — |
| Aseptic meningitis | 10,274 | 11,852 | 14,526 | 12,223 | 12,848 | 8,932 | — | — |
| Botulism, total (including wound and unspecified) | 89 | 92 | 114 | 91 | 97 | 143 | 97 | 119 |
| foodborne | 23 | 23 | 27 | 21 | 27 | 50 | 24 | 25 |
| infant | 60 | 65 | 81 | 66 | 65 | 85 | 54 | 80 |
| Brucellosis | 95 | 82 | 104 | 105 | 120 | 119 | 98 | 112 |
| Chancroid | 4,692 | 4,212 | 3,476 | 1,886 | 1,399 | 773 | 606 | 386 |
| *Chlamydia trachomatis* infections | — | — | — | — | — | — | 447,638 | 498,884 |
| Cholera | — | 6 | 26 | 103 | 18 | 39 | 23 | 4 |
| Coccidioidomycosis | — | — | — | — | — | — | 1,212 | 1,697 |
| Crytosporidiosis | — | — | — | — | — | — | 2,970 | 2,827 |
| Cyclosporiasis | † | † | † | † | † | † | † | † |
| Diphtheria† | 3 | 4 | 5 | 4 | — | 2 | — | 2 |
| human granulocytic | § | § | § | § | § | § | § | § |
| human monocytic | § | § | § | § | § | § | § | § |
| human (other and unspecified) | § | § | § | § | § | § | § | § |
| Encephalitis, primary | 981 | 1,341 | 1,021 | 774 | 919 | 717 | ** | ** |
| Postinfectious¶ | 88 | 105 | 82 | 129 | 170 | 143 | ** | ** |
| Enterohemorrhagic *Escherichia coli* infection Shiga toxin-positive | | | | | | | | |
| O157:H7 | ¶ | ¶ | ¶ | ¶ | ¶ | 1,420 | 2,139 | 2,741 |
| Non-O157 | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | — | ¶ |
| not serogrouped | ¶ | ¶ | ¶ | ¶ | ¶ | ¶ | — | ¶ |
| Giardiasis | § | § | § | § | § | § | § | § |
| Gonorrhea | 733,151 | 690,169 | 620,478 | 501,409 | 439,673 | 418,068 | 392,848 | 325,883 |
| Granuloma inguinale | 7 | 97 | 29 | 6 | 19 | 3 | — | — |
| *Haemophilus influenzae*, invasive disease | | | | | | | | |
| all ages, serotypes | ¶ | ¶ | ¶ | 1,412 | 1,419 | 1,174 | 1,180 | 1,170 |
| age<5 yrs | | | | | | | | |
| serotype b | § | § | § | § | § | § | § | § |
| nonserotype b | § | § | § | § | § | § | § | § |
| unknown serotype | § | § | § | § | § | § | § | § |
| Hansen disease (leprosy) | 163 | 198 | 154 | 172 | 187 | 136 | 144 | 112 |
| Hantavirus pulmonary syndrome | NA | NA | NA | NA | NA | NA | NA | NA |
| Hemolytic uremic syndrome, postdiarrheal | | | | | | | 72 | 97 |
| Hepatitis, viral, acute | | | | | | | | |
| A | 35,821 | 31,441 | 24,378 | 23,112 | 24,238 | 26,796 | 31,582 | 31,302 |
| B | 23,419 | 21,102 | 18,003 | 16,126 | 13,361 | 12,517 | 10,805 | 10,637 |
| C/ non-A, non-B** | 2,529 | 2,553 | 3,582 | 6,010 | 4,786 | 4,470 | 4,576 | 3,716 |
| unspecified | 2,306 | 1,671 | 1,260 | 884 | 627 | 444 | — | — |
| Legionellosis | 1,190 | 1,370 | 1,317 | 1,339 | 1,280 | 1,615 | 1,241 | 1,198 |
| Leptospirosis | 93 | 77 | 58 | 54 | 51 | 38 | — | — |
| Listeriosis | § | § | § | § | § | § | § | § |
| Lyme disease | ** | ** | ** | 9,895 | 8,257 | 13,043 | 11,700 | 16,455 |
| Lymphogranuloma venereum | 189 | 277 | 471 | 302 | 285 | 235 | — | — |
| Malaria | 1,277 | 1,292 | 1,278 | 1,087 | 1,411 | 1,229 | 1,419 | 1,800 |
| Measles | 18,193 | 27,786 | 9,643 | 2,237 | 312 | 963 | 309 | 508 |
| Meningococcal disease, invasive | 2,727 | 2,451 | 2,130 | 2,134 | 2,637 | 2,886 | 3,243 | 3,437 |
| Mumps | 5,712 | 5,292 | 4,264 | 2,572 | 1,692 | 1,537 | 906 | 751 |
| Murine typhus fever | 41 | 50 | 43 | 28 | 25 | ** | — | — |
| Pertussis | 4,157 | 4,570 | 2,719 | 4,083 | 6,586 | 4,617 | 5,137 | 7,796 |
| Plague | 4 | 2 | 11 | 13 | 10 | 17 | 9 | 5 |
| Poliomyelitis, paralytic | 11 | 6 | 10 | 6 | 4 | 8 | 7 | 7 |
| Psittacosis | 116 | 113 | 94 | 92 | 60 | 38 | 64 | 42 |
| Rabies | | | | | | | | |
| animal | 4,724 | 4,826 | 6,910 | 8,589 | 9,337 | 8,147 | 7,811 | 6,982 |
| human | 1 | 1 | 3 | 1 | 3 | 6 | 5 | 3 |
| Rheumatic fever, acute | 144 | 108 | 127 | 75 | 112 | 112 | — | — |
| Rocky Mountain spotted fever | 623 | 651 | 628 | 502 | 456 | 465 | 590 | 831 |
| Rubella | 396 | 1,125 | 1,401 | 160 | 192 | 227 | 128 | 238 |
| Rubella, congenital syndrome | 3 | 11 | 47 | 11 | 5 | 7 | 6 | 4 |

See table footnotes on page 110.

Appx18727

Morbidity and Mortality Weekly Report

TABLE 11. Reported cases of notifiable diseases* — United States, 1981–1988

| Disease | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 |
|---|---|---|---|---|---|---|---|---|
| AIDS[†] | § | § | § | 4,445 | 8,249 | 12,932 | 21,070 | 31,001 |
| Amebiasis | 6,632 | 7,304 | 6,658 | 5,252 | 4,433 | 3,532 | 3,123 | 2,860 |
| Anthrax | – | – | – | 1 | – | – | 1 | 2 |
| Aseptic meningitis | 9,547 | 9,680 | 12,696 | 8,326 | 10,619 | 11,374 | 11,487 | 7,234 |
| Botulism, total (including wounds and unspecified) | 103 | 97 | 133 | 123 | 122 | 109 | 82 | 84 |
|   foodborne | § | § | § | § | 49 | 23 | 17 | 28 |
|   infant | § | § | § | § | 70 | 79 | 59 | 50 |
| Brucellosis | 185 | 173 | 200 | 131 | 153 | 106 | 129 | 96 |
| Chancroid | 850 | 1,392 | 847 | 666 | 2,067 | 3,756 | 4,998 | 5,001 |
| Chlamydia trachomatis infections | – | – | – | – | – | – | – | – |
| Cholera | 19 | – | 1 | 1 | 4 | 23 | 6 | 8 |
| Diphtheria | 5 | 2 | 5 | 1 | 3 | – | 3 | 2 |
| Encephalitis | | | | | | | | – |
|   primary | 1,492 | 1,464 | 1,761 | 1,257 | 1,376 | 1,302 | 1,418 | 882 |
|   postinfectious | 43 | 36 | 34 | 108 | 161 | 124 | 121 | 121 |
| Enterohemorrhagic *Escherichia coli* | | | | | | | | |
| Gonorrhea | 990,864 | 960,633 | 900,435 | 878,556 | 911,419 | 900,868 | 780,905 | 719,536 |
| Granuloma inguinale | 66 | 117 | 24 | 30 | 44 | 61 | 22 | 11 |
| Hansen disease (leprosy) | 256 | 250 | 259 | 290 | 361 | 270 | 238 | 184 |
| Hepatitis | | | | | | | | |
|   A (infectious) | 25,802 | 23,403 | 21,532 | 22,040 | 23,210 | 23,430 | 25,280 | 28,507 |
|   B (serum) | 21,152 | 22,177 | 24,318 | 26,115 | 26,611 | 26,107 | 25,916 | 23,177 |
|   C/ non-A, non-B[¶] | § | § | § | 3,871 | 4,184 | 3,634 | 2,999 | 2,619 |
|   unspecified | 10,975 | 8,564 | 7,149 | 5,531 | 5,517 | 3,940 | 3,102 | 2,470 |
| Legionellosis | 408 | 654 | 852 | 750 | 830 | 980 | 1,038 | 1,085 |
| Leptospirosis | 82 | 100 | 61 | 40 | 57 | 41 | 43 | 54 |
| Lymphogranuloma venereum | 263 | 235 | 335 | 170 | 226 | 396 | 303 | 185 |
| Malaria | 1,388 | 1,056 | 813 | 1,007 | 1,049 | 1,123 | 944 | 1,099 |
| Measles | 3,124 | 1,714 | 1,497 | 2,587 | 2,822 | 6,282 | 3,655 | 3,396 |
| Meningococcal disease, invasive | 3,525 | 3,056 | 2,736 | 2,746 | 2,479 | 2,594 | 2,930 | 2,964 |
| Mumps | 4,941 | 5,270 | 3,355 | 3,021 | 2,982 | 7,790 | 12,848 | 4,866 |
| Murine typhus fever | 61 | 58 | 62 | 53 | 37 | 67 | 49 | 54 |
| Pertussis | 1,248 | 1,895 | 2,463 | 2,276 | 3,589 | 4,195 | 2,823 | 3,450 |
| Plague | 13 | 19 | 40 | 31 | 17 | 10 | 12 | 15 |
| Poliomyelitis, total | 10 | 12 | 13 | 9 | 8 | 10 | 9 | 9 |
|   paralytic | 10 | 12 | 13 | 9 | 8 | 10 | 9 | 9 |
| Psittacosis | 136 | 152 | 142 | 172 | 119 | 224 | 98 | 114 |
| Rabies | | | | | | | | |
|   animal | 7,118 | 6,212 | 5,878 | 5,567 | 5,565 | 5,504 | 4,658 | 4,651 |
|   human | 2 | – | 2 | 3 | 1 | – | 1 | – |
| Rheumatic fever, acute | 264 | 137 | 88 | 117 | 90 | 147 | 141 | 158 |
| Rocky Mountain spotted fever | 1,192 | 976 | 1,126 | 838 | 714 | 760 | 604 | 609 |
| Rubella | 2,077 | 2,325 | 970 | 752 | 630 | 551 | 306 | 225 |
| Rubella, congenital syndrome | 19 | 7 | 22 | 5 | – | 14 | 5 | 6 |
| Salmonellosis | 39,990 | 40,936 | 44,250 | 40,861 | 65,347 | 49,984 | 50,916 | 48,948 |
| Shigellosis | 9,859 | 18,129 | 19,719 | 17,371 | 17,057 | 17,138 | 23,860 | 30,617 |
| Syphilis | | | | | | | | |
|   congenital (age <1 yr) | 287 | 259 | 239 | 305 | 329 | 410 | 480 | 741 |
|   primary and secondary | 31,266 | 33,613 | 32,698 | 28,607 | 27,131 | 27,883 | 35,147 | 40,117 |
|   total, all stages | 72,799 | 75,579 | 74,637 | 69,888 | 67,563 | 68,215 | 86,545 | 103,437 |
| Tetanus | 72 | 88 | 91 | 74 | 83 | 64 | 48 | 53 |
| Toxic-shock syndrome | § | § | § | 482 | 384 | 412 | 372 | 390 |
| Trichinosis | 206 | 115 | 45 | 68 | 61 | 39 | 40 | 45 |
| Tuberculosis | 27,373 | 25,520 | 23,846 | 22,255 | 22,201 | 22,768 | 22,517 | 22,436 |
| Tularemia | 288 | 275 | 310 | 291 | 177 | 170 | 214 | 201 |
| Typhoid fever | 584 | 425 | 507 | 390 | 402 | 362 | 400 | 436 |
| Varicella | 200,766 | 167,423 | 177,462 | 221,983 | 178,162 | 183,243 | 213,196 | 192,857 |

* No cases of yellow fever were reported during 1981–1988.
[†] Acquired immunodeficiency syndrome.
§ Not nationally notifiable.
[¶] The anti-hepatitis C virus antibody test became available in 1990.

Appx18728

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

        *Plaintiffs,*

    v.

MERCK & CO., INC.,

        *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S EXHIBITS IN SUPPORT OF MERCK'S RESPONSE TO RELATORS' STATEMENT OF UNDISPUTED FACTS

# EXHIBIT 326



CENTER FOR DISEASE CONTROL

# MMWR

ANNUAL SUMMARY 1977

September 1978 / Volume 26 / Number 53

# REPORTED MORBIDITY & MORTALITY IN THE UNITED STATES

RECEIVED

NOV 28 1979

CDC LIBRARY
ATLANTA, GA. 30333

U.S. DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE//PUBLIC HEALTH SERVICE

Appx18730

The annual statistical summary is published as the last issue in each volume of the
Morbidity and Mortality Weekly Report by the Center for Disease Control,
Public Health Service, U.S. Department of Health, Education, and Welfare, Atlanta, Georgia 30333

William H. Foege, M.D.
Director, Center for Disease Control

Philip S. Brachman, M.D.
Director, Bureau of Epidemiology

Michael B. Gregg, M.D.
Editor, Morbidity and Mortality Weekly Report

Stephen B. Thacker, M.D.
Chief, Consolidated Surveillance and Communications Activity
Bureau of Epidemiology

Phyllis Cohen, Norma Gibbs,
Betsey Spierto, and Dennis Bregman, Chief,
National Morbidity and Mortality Statistical Activity
Bureau of Epidemiology

Pat Hurst, Geneva Moore, Charlotte Turner,
Frances H. Wilson, and Frances H. Porcher, Chief,
Editorial and Graphic Services
Bureau of Epidemiology

## SOURCES OF DATA

This document carries final figures on the reported incidence of notifiable diseases in 1977. Data are submitted to the Center for Disease Control by the individual States through the National Morbidity Reporting System and are supplemented by surveillance activities of the Bureau of Epidemiology and Bureau of State Services at CDC, as well as the National Center for Health Statistics, Health Services Administration. Totals for the United States do not include data listed for Guam, Puerto Rico, and the Virgin Islands.

The population figures for 1977 used in computing rates are from the Bureau of the Census and are provisional estimates of the resident population as of July 1, 1977 (Table 1 and Table 5). Estimates of the resident population by age are from Current Population Reports, Series P-25, No. 721. Population figures from those States where diseases were not notifiable or where age specific data were not available were excluded from rate calculations.

The morbidity data in this report represent cases reported to CDC through State health departments. The accuracy of reporting, that is, the number of cases that are reported to CDC as compared with the actual number that occur, varies with the disease. Some diseases, such as plague and rabies, that cause severe clinical illness and are associated with serious consequences are probably reported fairly completely. Diseases that are clinically mild and infrequently associated with serious consequences, such as salmonellosis and mumps, are less likely to be reported. Additionally, subclinical cases are seldom detected except in the course of special studies. Also, the degree of completeness of reporting is influenced by the diagnostic facilities available, the control measures in effect, and the interests and priorities of State and local officials responsible for disease control and surveillance.

The data in this report stem from a variety of reporting mechanisms and motivations that seem to remain consistent; thus the analysis of trends is valid. For example, the age and seasonal distributions of these samples have been shown to be consistent over the years.

In order not to delay the publication of this document, we have included provisional data from California. For confirmation of any of those data, contact the California State Department of Health.

| EXPLANATION OF SYMBOLS USED IN TABLES | |
| --- | --- |
| Data not available . . . . . . . . . . . . . | NA |
| No reported cases . . . . . . . . . . . . . | — |
| Report of disease not required by State health department (not notifiable) | NN |

# TABLE OF CONTENTS

| | | | Page |
|---|---|---|---|
| Table 1. | (A) | Reported Cases of Specified Notifiable Diseases, United States, 1968-1977 | 2 |
| | (B) | Reported Cases of Specified Notifiable Diseases per 100,000 Population, United States, 1968-1977 | 3 |
| Table 2. | (A) | Deaths from Specified Notifiable Diseases, United States, 1967-1976 | 4 |
| | (B) | Deaths from Selected Non-Notifiable Acute Diseases, United States, 1967-1976 | 5 |
| Table 3. | (A) | Reported Cases of Specified Notifiable Diseases by Month, United States, 1977 | 6 |
| | (B) | Reported Cases of Selected Notifiable Diseases by Age, United States, 1977 | 7 |
| Table 4. | | Reported Cases of Diseases Covered by International Quarantine Agreement, United States, 1968-1977 | 8 |
| Table 5. | | Reported Cases of Notifiable Diseases by Geographic Division and by State, United States, 1977 | 9 |
| Table 6. | | Reported Cases of Notifiable Diseases of Low Frequency by Geographic Division and by State, United States, 1977 | 12 |
| Table 7. | | Reported Cases of Infectious Encephalitis by Geographic Division and by State, United States, 1976(A) and 1977(B) | 13 |
| Table 8. | | Tuberculosis Cases and Cases per 100,000 Population by Geographic Division and by State, United States 1976 and 1977; by Age, Race, and Sex, United States, 1976 | 15 |
| Table 9. | (A) | Newly Reported Cases of Venereal Diseases in Civilians and Cases per 100,000 Population by Geographic Division and by State, United States, 1976 and 1977 | 16 |
| | (B) | Newly Reported Cases of Venereal Diseases in Civilians and Cases per 100,000 Population by Age and Sex, United States, 1976 and 1977 | 17 |
| | (C) | Newly Reported Cases of Venereal Diseases in Civilians and Cases per 100,000 Population by Geographic Division and by City, United States, 1976 and 1977 | 18 |
| Table 10. | | Rabies in Animals by State and by Species of Animal, United States, 1977 | 19 |
| Table 11. | | Reported Cases of Selected Notifiable Diseases by State and by Age, United States, 1977 | 20 |
| Table 12. | | Reported Cases of Selected Notifiable Diseases by State and by Month, United States, 1977 | 31 |
| Table 13. | | Animal Bites and Cases of Acute Diseases *Optionally* Reported by Certain States, 1977 | 39 |
| Table 14. | | Deaths in 121 Selected Cities, United States, 1977 | 41 |
| Table of Contents: Special Summaries and Disease Patterns | | | 43 |
| | | Reported Legal Abortions by Age and State of Occurrence, Selected States, 1976 | 44 |
| | | Reported Number of Legal Abortions by State of Occurrence, Abortion Ratios and Abortion Rates, United States, 1976 | 45 |
| | | Death-to-Case Rate for Legal Abortions by Type of Procedure and Weeks of Gestation, United States, 1972-1976 | 46 |
| | | Abortion-Related Deaths by Category and Quarter, United States, 1972-1976 | 46 |
| | | Reported Incidence of Selected Congenital Malformations by United States Census Region (Including Puerto Rico), 1971-1977 | 47 |
| | | Number of Monitored Total Births by United States Census Region (Including Puerto Rico), 1971-1977 | 47 |
| | | Reported Cases of Legionnaires' Disease by State, United States, 1977 | 48 |
| | | Reported Cases of Reye Syndrome by State, United States, 1977 | 48 |
| Disease Patterns | | | 49 |
| Index | | | 79 |
| State Epidemiologists | | | Inside Back Cover |

EW Publication No. (CDC) 78-8241

Appx18732

**TABLE 1(A). Reported Cases of Specified Notifiable Diseases, United States, 1968-1977**

| DISEASE | 1977 | 1976 | 1975 | 1974 | 1973 | 1972 | 1971 | 1970 | 1969 | 1968 |
|---|---|---|---|---|---|---|---|---|---|---|
| U.S. total resident population, July 1 estimate (in thousands) | 216,332 | 214,659 | 213,121 | 211,390 | 209,851 | 208,232 | 206,256 | 203,805 | 201,921 | 199,846 |
| Amebiasis | 3,044 | 2,906 | 2,775 | 2,743 | 2,235 | 2,199 | 2,752 | 2,888 | 2,915 | 3,005 |
| Anthrax | — | 2 | 2 | 2 | 2 | 2 | 5 | 2 | 4 | 3 |
| Aseptic meningitis | 4,789 | 3,510 | 4,475 | 3,197 | 4,846 | 4,634 | 5,176 | 6,480 | 3,672 | 4,494 |
| Botulism | 114[1] | 37[1] | 17[1] | 28 | 34 | 22 | 25 | 12 | 16 | 7 |
| Brucellosis (undulant fever) | 232 | 296 | 310 | 240 | 202 | 196 | 183 | 213 | 235 | 218 |
| Chickenpox | 188,396 | 183,990 | 154,248 | 141,495 | 182,927 | 164,114 | ..... Not previously notifiable nationally ...... | | | |
| Diphtheria | 84 | 128 | 307 | 272 | 228 | 152 | 215 | 435 | 241 | 260 |
| Encephalitis, primary[2] | 784[3] | 1548[4] | 3,815 | 1,066 | 1,618 | 1,059 | 1,524 | 1,580 | 1,613 | 1,781 |
| Encephalitis, post-infectious[2] | 154[3] | 278[4] | 486 | 316 | 349 | 243 | 439 | 370 | 304 | 502 |
| Hepatitis A | 31,153 | 33,288 | 35,855 | 40,358 | 50,749 | 54,074 | 59,606 | 56,797 | 48,416 | 45,893 |
| Hepatitis B | 16,831 | 14,973 | 13,121 | 10,631 | 8,451 | 9,402 | 9,556 | 8,310 | 5,909 | 4,829 |
| Hepatitis, unspecified | 8,639 | 7,488 | 7,158 | 8,351 | ............. Not previously notifiable nationally ................. | | | | | |
| Leprosy | 151 | 145 | 162 | 118 | 146 | 130 | 131 | 129 | 98 | 123 |
| Leptospirosis | 71 | 73 | 93 | 68 | 57 | 41 | 62 | 47 | 89 | 69 |
| Malaria | 547 | 471 | 373 | 293 | 237 | 742 | 2,375 | 3,051 | 3,102 | 2,317 |
| Measles (rubeola) | 57,345 | 41,126 | 24,374 | 22,094 | 26,690 | 32,275 | 75,290 | 47,351 | 25,826 | 22,231 |
| Meningococcal infections, total | 1,828 | 1,605 | 1,478 | 1,346 | 1,378 | 1,323 | 2,262 | 2,505 | 2,951 | 2,623 |
| Mumps | 21,436 | 38,492 | 59,647 | 59,128 | 69,612 | 74,215 | 124,939 | 104,953 | 90,918 | 152,209 |
| Pertussis (whooping cough) | 2,177 | 1,010 | 1,738 | 2,402 | 1,759 | 3,287 | 3,036 | 4,249 | 3,285 | 4,810 |
| Poliomyelitis, total | 18 | 14 | 8 | 7 | 8 | 31 | 21 | 33 | 20 | 53 |
| Paralytic | 17 | 12 | 8 | 7 | 7 | 29 | 17 | 31 | 18 | 53 |
| Psittacosis | 94 | 78 | 49 | 164 | 33 | 52 | 32 | 35 | 57 | 43 |
| Rabies in man | 1 | 2 | 2 | — | 1 | 2 | 2 | 3 | 1 | 1 |
| Rheumatic fever, acute | 1,738[5] | 1,865 | 2,854 | 2,431 | 2,560 | 2,614 | 2,793 | 3,227 | 3,229 | 3,470 |
| Rubella (German measles) | 20,395 | 12,491 | 16,652 | 11,917 | 27,804 | 25,507 | 45,086 | 56,552 | 57,686 | 49,371 |
| Rubella congenital syndrome | 23 | 30 | 30 | 45 | 35 | 42 | 68 | 77 | 31 | 14 |
| Salmonellosis, excluding typhoid fever | 27,850 | 22,937 | 22,612 | 21,980 | 23,818 | 22,151 | 21,928 | 22,096 | 18,419 | 16,514 |
| Shigellosis | 16,052 | 13,140 | 16,584 | 22,600 | 22,642 | 20,207 | 16,143 | 13,845 | 11,946 | 12,180 |
| Tetanus | 87 | 75 | 102 | 101 | 101 | 128 | 116 | 148 | 185 | 178 |
| Trichinosis | 143 | 115 | 252 | 120 | 102 | 89 | 103 | 109 | 222 | 77 |
| Tuberculosis[6] | 30,145 | 32,105 | 33,989 | 30,122 | 30,998 | 32,882 | 35,217 | 37,137 | 39,120 | 42,623 |
| Tularemia | 165 | 157 | 129 | 144 | 171 | 152 | 187 | 172 | 149 | 186 |
| Typhoid fever | 398 | 419 | 375 | 437 | 680 | 398 | 407 | 346 | 364 | 395 |
| Typhus fever, flea-borne (endemic, murine) | 75 | 69 | 44 | 26 | 32 | 18 | 23 | 27 | 36 | 36 |
| Typhus fever, tick-borne (Rocky Mountain spotted) | 1,153 | 937 | 844 | 754 | 668 | 523 | 432 | 380 | 498 | 298 |
| Venereal diseases (newly reported civilian cases)[7] | | | | | | | | | | |
| Syphilis, primary and secondary | 20,362 | 23,731 | 25,561 | 25,385 | 24,825 | 24,429 | 23,783 | 21,982 | 19,130 | 19,019 |
| Syphilis, total all stages | 64,473 | 71,761 | 80,356 | 83,771 | 87,469 | 91,149 | 95,997 | 91,382 | 92,162 | 96,271 |
| Gonorrhea | 1,000,177 | 1,001,994 | 999,937 | 906,121 | 842,621 | 767,215 | 670,268 | 600,072 | 534,872 | 464,543 |
| Other specified venereal diseases: chancroid, granuloma inguinale, and lymphogranuloma venereum | 878 | 1,064 | 1,113 | 1,386 | 1,635 | 2,251 | 2,101 | 2,152 | 1,778 | 1,486 |
| Rabies in animals[2] | 3,130 | 3,073 | 2,627 | 3,151 | 3,640 | 4,369 | 4,310 | 3,224 | 3,490 | 3,591 |

[1] Includes foodborne and infant botulism.
[2] Cases reported through the Viral Diseases Division, Bureau of Epidemiology.
[3] Provisional figure for 1977.
[4] Final figure for 1976.
[5] Reports received from 39 states.
[6] Cases reported through the Tuberculosis Control Division, Bureau of State Services. New diagnostic standards introduced in 1975.
[7] Cases reported through the Venereal Disease Control Division, Bureau of State Services.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,
                              *Plaintiffs,*
        v.
MERCK & CO., INC.,
                              *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S EXHIBITS IN SUPPORT OF MERCK'S RESPONSE TO RELATORS' STATEMENT OF UNDISPUTED FACTS

# EXHIBIT 327

CENTERS FOR DISEASE CONTROL



**MORBIDITY AND MORTALITY WEEKLY REPORT**
September 1981 / Vol. 29 / No. 54



# ANNUAL
# SUMMARY
# 1980

## Reported Morbidity & Mortality
## in the United States

U-S. DEPARTMENT OF HEALTH AND HUMAN ,SERVIC&7.4ty^lg £E^j|h4 SERVICE

Appx18735

The annual statistical summary is published as the last issue in each volume of the Morbidity and Mortality Weekly Report by the Centers for Disease Control, Public Health Service, U.S. Department of Health and Human Services, Atlanta, Georgia 30333.

## SUGGESTED CITATION

Centers for Disease Control. Annual summary 1980: reported morbidity and mortality in the United States. Morbidity Mortality Weekly Rep 1981;29(54).

Centers for Disease Control.........................................................William H. Foege, M.D"
*Director*

This report was prepared by:

Epidemiology Program Office.......................................... Philip S. Brachman, MD->
*Director*

Editor, Morbidity and Mortality
Weekly Report..................................................................... Michael B. Gregg, M.D–

Consolidated Surveillance and
Communications Activity.................................................Stephen B. Thacker, MD->
*Chief*

Keewhan Choi, Ph.D"
*Mathematical Statistician*

Phyllis Cohen
Norma Gibbs
Pat Robinson
Barbara Sulli'/an

Editorial and Graphic Services......................................... R. Elliott Churchill,
*Chief*

Loraine S. Good'
*Consulting Edit°r*
Pat Hurst

HHS Publication IMo. (CDC) 81-8241

# Table of Contents

Foreword. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    iii

Significant Public Health Events of 1980 . . . . . . . . . . . . . . . . . . . . . . .    v

History of National Morbidity Reporting and
Surveillance in the United States . . . . . . . . . . . . . . . . . . . . . . . . . . .    vii

Data Sources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    ix

### Part 1

Summaries of Notifiable Diseases in the United States . . . . . . . . . . . . . . . . . .    1

Reported Cases by Month, 1980. . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3
Reported Cases by Geographic Division and by State, 1980. . . . . . . . . . . . .    4

Reported Deaths by Year, 1970-1979. . . . . . . . . . . . . . . . . . . . . . . . . . .    11
Reported Cases by Year, 1971-1980 . . . . . . . . . . . . . . . . . . . . . . . . . . .    12
Reported Case Rates by Year, 1971-1980 . . . . . . . . . . . . . . . . . . . . . . .    13
Reported Cases by Year, 1961-1970. . . . . . . . . . . . . . . . . . . . . . . . . . .    14
Reported Cases by Year, 1951-1960. . . . . . . . . . . . . . . . . . . . . . . . . . .    15
Reported Cases by Year, 1941-1950. . . . . . . . . . . . . . . . . . . . . . . . . . .    16
Reported Cases by Year, 1931-1940. . . . . . . . . . . . . . . . . . . . . . . . . . .    17

### Part 2

Statistical Tables, Graphs, Maps, and Narratives for
Notifiable Diseases in the United States. . . . . . . . . . . . . . . . . . . . . . . . . .    19

### Part 3

Surveillance Summaries for Non-notifiable Conditions and
Subjects of Special Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    97

Cases Optionally Reported by Certain States, 1980 . . . . . . . . . . . . . . . . . .    99
Deaths from Selected Acute Conditions by Year, 1970-1979. . . . . . . . . . . . . .    101
Leading Causes of Death, 1969, 1978, and 1979 . . . . . . . . . . . . . . . . . . . .    102
Abortion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    103
Congenital Malformations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    105
Guillain-Barre Syndrome. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    108
Heat-related Illness. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    109
Lead Poisoning. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    110
Pneumonia and Influenza. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    112
Refugees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    116
Reye Syndrome. . . . . . . . . ; . . . . . . . . . . . . . . . . . . . . . . . . . . . .    120
Surgical Sterilization. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    121
Toxic-shock Syndrome. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    124

Index . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    127

State Epidemiologists. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Inside Back Cover

## Data Sources

Data on the reported occurrence of notifiable diseases are routinely published in the *Morbidity and Mortality Weekly Report* (MMWR) and compiled in final form in this summary from annual reports submitted by the state and territorial departments of health. Data from the Trust Territory of the Pacific Islands have been divided into two reporting areas for 1980—Commonwealth of the Northern Mariana Islands (CNMI) and Pacific Trust Territory (excluding CNMI), which includes six districts—Marshall, Palau, Ponape, Kosrae, Truk, and Yap. However, totals for the United States do not include data listed for Guam, Puerto Rico, the Virgin Islands, CNMI, and the Trust Territory of the Pacific Islands.

CDC also maintains national surveillance programs for selected diseases, with the cooperation of state and local health departments, and publishes detailed epidemiologic analyses on a periodic basis. Data appearing in a surveillance report may not

timing of reports or because of refinements in case definition.

It should be noted that the MMWR and the national surveillance program are separate systems; data from each appear in this *Annual Summary.* These data should be interpreted with caution. Some diseases such as plague and rabies that cause severe clinical illness and are associated with serious consequences are probably reported quite accurately. However, diseases such as salmonellosis and mumps that are clinically mild and infrequently associated with serious consequences are less likely to be reported. Additionally, subclinical cases are seldom detected except in the course of special studies. The degree of completeness of reporting is also influenced by the diagnostic facilities available, the control measures in effect, and the interests and priorities of state and local officials responsible for disease control and surveillance. Finally, factors such as the introduction of new diagnostic tests (e.g., hepatitis B) and the discovery of new disease entities (e.g., infant botulism and legionellosis) may cause changes in disease reporting independent of the true incidence of disease. Despite these limitations the data in this report have proven to be useful in analyzing trends.

Mortality data, with the exception of statistics obtained from the 121 participating cities, are from the National Center for Health Statistics. Each year these data are also published in *Vital Statistics of the United States,* Vol. II.

Data on the notifiable diseases prior to 1960 were obtained from publications of the National Office of Vital Statistics.

The population data for 1980 used in computing rates are from the Bureau of the Census: Supplementary Reports, 1980 Census of Population, PC80-S1-1; Advance Reports, 1980 Census of Population and Housing, PHC80-V-34 (New York); Preliminary Reports, 1980 Census of Population and Housing, PHC80-P-54 (Guam); PHC80-P-53 (Puerto Rico); PHC80-P-55 (Virgin Islands); and press release CB81-97 (Trust Territory of the Pacific Islands). Population estimates for the years 1931-1969 were obtained from Series P-25, No. 802.

Population data from those states in which diseases were not notifiable or from which age-specific data were not available were excluded from rate calculation. Rates

were calculated using resident population data except for chancroid, gonorrhea, granuloma inguinale, lymphogranuloma venereum, and syphilis, for which only civilian resident population data were utilized.

Data on reported venereal disease cases were prepared by the Venereal Disease Control Division, CDC.

In order not to delay the publication of this document, provisional data from California were included. For further modification of any of those data, contact the California Department of Health Services.

No reported cases.......................................................... –
Report of disease not required
by state health department
(not notifiable)............................................................ NN

# PART 1:



# Summaries of
# Notifiable Diseases
# in the
# United States

# NOTIFIABLE DISEASES

## NOTIFIABLE DISEASES — Summary of reported cases, United States, 1961-1970

| Disease | 1970 | 1969 | 1968 | 1967 | 1966 | 1965 | 1964 | 1963 | 1962 | 1961 |
|---|---|---|---|---|---|---|---|---|---|---|
| U.S. total resident population, July 1 estimate (in thousands) | 203,805 | 201,385 | 199,399 | 197,457 | 195,576 | 193,526 | 191,141 | 188,483 | 185,771 | 182,992 |
| Amebiasis | 2,888 | 2,915 | 3,005 | 3,157 | 2,921 | 2,768 | 3,304 | 2,886 | 3,048 | 2,850 |
| Anthrax | 2 | 4 | 3 | 5 | 5 | 7 | 5 | 4 | 9 | 14 |
| Aseptic meningitis | 6,480 | 3,672 | 4,494 | 3,082 | 3,058 | 2,329 | 2,177 | 1,844 | 2,654 | 5,162 |
| Botulism | 12 | 16 | 7 | 5 | 9 | 19 | 23 | 16 | 10 | 14 |
| Brucellosis (undulant fever) | 213 | 238 | 218 | 265 | 262 | 262 | 411 | 407 | 408 | 636 |
| Chancroid | 1,416 | 1,104 | 845 | 784 | 838 | 982 | 1,247 | 1,220 | 1,344 | 1,438 |
| Cholera | | | | | | | | | 2 | |
| Diphtheria | 435 | 241 | 260 | 219 | 209 | 164 | 293 | 314 | 444 | 617 |
| Encephalitis, primary | 1,580 | 1,613 | 1,781 | 1,478 | 2,121 | 1,722 | 2,002 | 1,993 | 2,094 | 2,248 |
| Encephalitis, post-infectious | 370 | 304 | 502 | 1,060 | 964 | 981 | 1,585 | | | |
| Gonorrhea | 600,072 | 534,872 | 464,543 | 404,836 | 351,738 | 324,925 | 300,666 | 278,289 | 263,714 | 264,158 |
| Granuloma inguinale | 124 | 154 | 156 | 148 | 148 | 155 | 135 | 173 | 207 | 241 |
| Hepatitis, serum | 8,310 | 5,909 | 4,829 | 2,458 | 1,497* | | | | | |
| Hepatitis, infectious | 56,797 | 48,416 | 45,893 | 38,909 | 32,859* | 33,856 | 37,740 | 42,974 | 53,016 | 72,651 |
| Leprosy | 129 | 98 | 123 | 81 | 109 | 96 | 97 | 103 | 80 | 63 |
| Leptospirosis | 47 | 89 | 69 | 67 | 72 | 84 | 142 | 89 | 79 | 71 |
| Lymphogranuloma venereum | 612 | 520 | 485 | 371 | 308 | 878 | 732 | 586 | 590 | 787 |
| Malaria | 3,051 | 3,102 | 2,317 | 2,022 | 565 | 147 | 93 | 99 | 118 | |
| Measles (rubeola) | 47,351 | 25,826 | 22,231 | 62,705 | 204,136 | 261,904 | 458,083 | 385,156 | 481,530 | 423,919 |
| Meningococcal infections | 2,505 | 2,951 | 2,623 | 2,161 | 3,381 | 3,040 | 2,826 | 2,470 | 2,150 | 2,232 |
| Mumps | 104,953 | 90,918 | 152,209 | | | | | | | |
| Pertussis (whooping cough) | 4,249 | 3,285 | 4,810 | 9,718 | 7,717 | 6,799 | 13,005 | 17,135 | 17,749 | 11,468 |
| Plague | 13 | | | 5 | | 8 | | | | 3 |
| Poliomyelitis, total | 33 | 20 | 53 | 41 | 113 | 72 | 122 | 449 | 910 | 1,312 |
| Paralytic | 31 | 18 | 53 | 40 | 106 | 61 | 106 | 396 | 762 | 988 |
| Psittacosis | 35 | 57 | 43 | 41 | 50 | 60 | 53 | 76 | 79 | 102 |
| Rabies, animal | 3,224 | 3,490 | 3,591 | 4,481 | 4,178 | 4,574 | 4,780 | 3,929 | 3,732 | 3,599 |
| Rabies, human | 3 | 1 | | 2 | 2 | | | | 9 | 3 |
| Rheumatic fever, acute | 3,227 | 3,229 | 3,470 | 3,985 | 4,472 | 4,998 | 7,491 | 7,561 | 7,977 | 10,470 |
| Rubella (German measles) | 56,552 | 57,686 | 49,371 | 46,888 | 46,975 | | | | | |
| Rubella congenital syndrome | 77 | 31 | 14 | 10 | 11 | | | | | |
| Salmonellosis, excluding typhoid fever | 22,096 | 18,419 | 16,514 | 18,120 | 16,841 | 17,161 | 17,144 | 15,390 | 9,680 | 8,542 |
| Shigellosis (bacillary dysentery) | 13,845 | 11,946 | 12,180 | 13,474 | 11,888 | 11,027 | 12,984 | 13,009 | 12,443 | 12,571 |
| Smallpox | | | | | occurred Ccse occurred in 1949 | | | | | |
| Streptococcal sore throat and scarlet fever | NN | 450,008 | 435,013 | 453,351 | 427,752 | 395,168 | 402,334 | 342,161 | 315,809 | 338,410 |
| Syphilis, primary and secondary | 21,982 | 19,130 | 19,019 | 21,053 | 21,414 | 23,338 | 22,969 | 22,251 | 21,067 | 19,851 |
| Total, all stages | 91,382 | 92,162 | 96,271 | 102,581 | 105,159 | 112,842 | 114,325 | 124,137 | 126,245 | 124,658 |
| Tetanus | 148 | 192 | 178 | 263 | 235 | 300 | 289 | 325 | 322 | 379 |
| Trichinosis | 109 | 215 | 115 | 66 | 115 | 199 | 198 | 208 | 194 | 306 |
| Tuberculosis (newly reported active cases) | 37,137 | 39,120 | 42,623 | 45,647 | 47,767 | 49,016 | 50,874 | 54,042 | 53,315 | 53,726 |
| Tularemia | 172 | 149 | 186 | 184 | 208 | 264 | 342 | 327 | 328 | 365 |
| Typhoid fever | 346 | 364 | 395 | 396 | 378 | 454 | 501 | 566 | 608 | 814 |
| Typhus fever, flea-borne (endemic, murine) | 27 | 36 | 36 | 52 | 33 | 30 | 30 | 35 | 32 | 46 |
| Typhus fever, tick-borne (Rocky Mountain spotted) | 380 | 498 | 298 | 305 | 268 | 281 | 277 | 216 | 240 | 219 |
| Yellow fever | | | Last indigenous case reported 1911, last imported 192 | | | | | | | |

\* Requeated  1961.

*Not previousW not()atale nationally.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,
                    *Plaintiffs,*
        v.
MERCK & CO., INC.,
                    *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S EXHIBITS IN SUPPORT OF MERCK'S RESPONSE TO RELATORS' STATEMENT OF UNDISPUTED FACTS

# EXHIBIT 328



Morbidity and Mortality Weekly Report

Weekly / Vol. 62 / No. 53     October 23, 2015

# Summary of Notifiable Infectious Diseases and Conditions — United States, 2013



**U.S. Department of Health and Human Services**
Centers for Disease Control and Prevention

Morbidity and Mortality Weekly Report

## CONTENTS

Summary of Notifiable Infectious Diseases and Conditions —
   United States, 2013 ........................................................................... 1

Preface ............................................................................................................. 2

Background .................................................................................................... 2

Infectious Diseases and Conditions Designated by CSTE
   and CDC as Nationally Notifiable During 2013 ........................... 4

Data Sources ................................................................................................. 5

Interpreting Data ......................................................................................... 6

Transitions in NNDSS Data Collection ................................................ 7

Method for Identifying which Nationally Notifiable Infectious
   Diseases and Conditions are Reportable ..................................... 7

Revised International Health Regulations ........................................... 8

Highlights for 2013 .................................................................................... 14

## CONTENTS (*Continued*)

PART 1 Summaries of Notifiable Diseases in the
   United States, 2013 ..................................................................... 29

Abbreviations and Symbols Used in Tables ................................... 29

PART 2 ........................................................................................................ 53

Graphs and Maps for Selected Notifiable Diseases
   in the United States, 2013 ......................................................... 53

Abbreviations and Symbols Used in Graphs and Maps ............. 53

PART 3 ...................................................................................................... 105

Historical Summaries of Notifiable Diseases
   in the United States, 2003–2013 .......................................... 105

Abbreviations and Symbols Used in Tables ................................ 105

Selected Reading for 2013 ................................................................. 110

The *MMWR* series of publications is published by the Center for Surveillance, Epidemiology, and Laboratory Services (proposed), Centers for Disease Control and Prevention (CDC), U.S. Department of Health and Human Services, Atlanta, GA 30329-4027.

**Suggested citation:** Centers for Disease Control and Prevention. [Summary of Notifiable Diseases, 20xx]. Published month day, 20xx for MMWR Morb Mortal Wkly Rep 20xx;63(No. 53):[inclusive page numbers].

### Centers for Disease Control and Prevention

Thomas R. Frieden, MD, MPH, *Director*
Harold W. Jaffe, MD, MA, *Associate Director for Science*
Joanne Cono, MD, ScM, *Director, Office of Science Quality*
Chesley L. Richards, MD, MPH, *Deputy Director for Public Health Scientific Services*
Michael F. Iademarco, MD, MPH, *Director, Center for Surveillance, Epidemiology, and Laboratory Services*

### MMWR Editorial and Production Staff (Serials)

Sonja A. Rasmussen, MD, MS, *Editor-in-Chief*
Charlotte K. Kent, PhD, MPH, *Executive Editor*
Christine G. Casey, MD, *Editor*
Teresa F. Rutledge, *Managing Editor*
David C. Johnson, *Lead Technical Writer-Editor*
David C. Johnson, *Project Editor*

Martha F. Boyd, *Lead Visual Information Specialist*
Maureen A. Leahy, Julia C. Martinroe,
Stephen R. Spriggs, Brian E. Wood, Moua Yang
*Visual Information Specialists*
Quang M. Doan, MBA, Phyllis H. King,
Teresa C. Moreland, Terraye M. Starr
*Information Technology Specialists*

### MMWR Editorial Board

Timothy F. Jones, MD, *Chairman*
Matthew L. Boulton, MD, MPH
Virginia A. Caine, MD
Katherine Lyon Daniel, PhD
Jonathan E. Fielding, MD, MPH, MBA
David W. Fleming, MD

William E. Halperin, MD, DrPH, MPH
King K. Holmes, MD, PhD
Robin Ikeda, MD, MPH
Rima F. Khabbaz, MD
Phyllis Meadows, PhD, MSN, RN
Jewel Mullen, MD, MPH, MPA

Jeff Niederdeppe, PhD
Patricia Quinlisk, MD, MPH
Patrick L. Remington, MD, MPH
Carlos Roig, MS, MA
William L. Roper, MD, MPH
William Schaffner, MD

Morbidity and Mortality Weekly Report

# Summary of Notifiable Infectious Diseases and Conditions — United States, 2013

Deborah Adams[1]
Kathleen Fullerton, MPH[2]
Ruth Jajosky, DMD, MPH[1]
Pearl Sharp[1]
Diana Onweh[1]
Alan Schley[1]
Willie Anderson[1]
Amanda Faulkner, MPH[3]
Kiersten Kugeler, PhD, MPH[4]
and the Nationally Notifiable Infectious Conditions Group

[1]*Division of Health Informatics and Surveillance, Office of Public Health Scientific Services, CDC*
[2]*Division of Foodborne, Waterborne, and Environmental Diseases, Office of Infectious Diseases, CDC*
[3]*Division of Bacterial Diseases, Office of Infectious Diseases, CDC*
[4]*Division of Vector-Borne Diseases, Office of Infectious Diseases, CDC*

Appx18745

TABLE 1. (*Continued*) Reported cases of notifiable diseases,* by month — United States, 2013

| Disease | Jan. | Feb. | Mar. | Apr. | May | June | July | Aug. | Sept. | Oct. | Nov. | Dec. | Month not stated | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Measles, total | 7 | 6 | 13 | 23 | 33 | 36 | 15 | 28 | 6 | — | 16 | 4 | — | 187 |
| indigenous | 4 | 3 | 8 | 20 | 29 | 30 | 2 | 22 | 4 | — | 13 | — | — | 135 |
| imported | 3 | 3 | 5 | 3 | 4 | 6 | 13 | 6 | 2 | — | 3 | 4 | — | 52 |
| Meningococcal disease | | | | | | | | | | | | | | |
| All serogroups | 60 | 69 | 63 | 59 | 45 | 30 | 36 | 38 | 29 | 32 | 51 | 44 | — | 556 |
| serogroup ACWY | 11 | 14 | 14 | 16 | 17 | 7 | 13 | 13 | 5 | 9 | 11 | 12 | — | 142 |
| serogroup B | 10 | 17 | 11 | 14 | 14 | 4 | 4 | 4 | 3 | 3 | 5 | 10 | — | 99 |
| serogroup other | 1 | 3 | 3 | 2 | — | — | 1 | 1 | — | — | 3 | 3 | — | 17 |
| serogroup unknown | 38 | 35 | 35 | 27 | 14 | 19 | 18 | 20 | 21 | 20 | 32 | 19 | — | 298 |
| Mumps | 19 | 22 | 61 | 106 | 137 | 38 | 20 | 49 | 61 | 38 | 22 | 11 | — | 584 |
| Novel influenza A virus infection | — | — | — | — | — | 5 | 9 | 4 | 3 | — | — | — | — | 21 |
| Pertussis | 1,650 | 1,697 | 2,047 | 1,771 | 2,053 | 2,706 | 2,591 | 3,237 | 2,309 | 2,225 | 3,217 | 3,136 | — | 28,639 |
| Plague | — | — | — | — | — | — | — | 2 | 1 | 1 | — | — | — | 4 |
| Poliomyelitis, paralytic | — | — | — | — | — | — | 1 | — | — | — | — | — | — | 1 |
| Psittacosis | — | — | — | 1 | 1 | — | — | 1 | 2 | — | — | 1 | — | 6 |
| Q fever, total | 5 | 7 | 11 | 7 | 10 | 22 | 20 | 25 | 22 | 7 | 8 | 26 | — | 170 |
| acute | 4 | 6 | 7 | 6 | 7 | 18 | 14 | 21 | 18 | 6 | 6 | 24 | — | 137 |
| chronic | 1 | 1 | 4 | 1 | 3 | 4 | 6 | 4 | 4 | 1 | 2 | 2 | — | 33 |
| Rabies | | | | | | | | | | | | | | |
| animal | 156 | 281 | 320 | 365 | 403 | 411 | 351 | 610 | 466 | 322 | 291 | 272 | — | 4,248 |
| human | — | — | 1 | — | 1 | — | — | — | — | — | — | — | — | 2 |
| Rubella | 1 | — | 1 | 1 | — | — | 3 | — | — | — | 1 | 2 | — | 9 |
| Rubella, congenital syndrome | — | — | — | — | — | — | — | — | — | — | — | 1 | — | 1 |
| Salmonellosis | 1,807 | 1,802 | 2,881 | 2,855 | 3,554 | 5,440 | 5,728 | 7,292 | 5,562 | 5,297 | 4,697 | 3,719 | — | 50,634 |
| Shiga toxin-producing *Escherichia coli* (STEC) | 244 | 213 | 361 | 353 | 568 | 800 | 820 | 1,140 | 720 | 552 | 492 | 400 | — | 6,663 |
| Shigellosis | 511 | 622 | 706 | 620 | 673 | 994 | 1,008 | 1,520 | 1,210 | 1,329 | 1,747 | 1,789 | — | 12,729 |
| Spotted fever rickettsiosis, total | 30 | 47 | 50 | 69 | 219 | 573 | 569 | 739 | 419 | 295 | 159 | 190 | — | 3,359 |
| confirmed | 2 | 3 | 5 | 8 | 17 | 31 | 31 | 34 | 18 | 17 | 3 | 5 | — | 174 |
| probable | 28 | 44 | 44 | 60 | 202 | 542 | 538 | 704 | 401 | 277 | 156 | 185 | — | 3,181 |
| Streptococcal toxic-shock syndrome | 26 | 21 | 24 | 26 | 22 | 17 | 11 | 12 | 19 | 7 | 18 | 21 | — | 224 |
| Syphilis, total all stages§†† | 3,729 | 4,188 | 5,423 | 4,427 | 4,381 | 5,168 | 4,133 | 5,504 | 4,607 | 5,297 | 4,925 | — | — | 56,471 |
| congenital§ | 25 | 20 | 31 | 27 | 33 | 32 | 31 | 36 | 22 | 26 | 31 | 34 | — | 348 |
| primary and secondary§ | 1,072 | 1,261 | 1,652 | 1,318 | 1,322 | 1,593 | 1,279 | 1,744 | 1,548 | 1,378 | 1,656 | 1,552 | — | 17,375 |
| Tetanus | 4 | 2 | — | 2 | 1 | 1 | — | 2 | 5 | 2 | 4 | 3 | — | 26 |
| Toxic-shock syndrome (other than streptococcal) | 6 | 8 | 3 | 8 | 9 | 4 | 7 | 11 | 8 | 1 | 4 | 2 | — | 71 |
| Trichinellosis | — | 4 | 5 | 2 | — | 1 | — | — | 2 | 1 | 5 | 2 | — | 22 |
| Tuberculosis§§ | 493 | 611 | 668 | 795 | 789 | 892 | 882 | 783 | 768 | 895 | 769 | 1,237 | — | 9,582 |
| Tularemia | 2 | 2 | 3 | 5 | 16 | 63 | 33 | 38 | 14 | 14 | 7 | 6 | — | 203 |
| Typhoid fever | 24 | 17 | 30 | 30 | 24 | 39 | 39 | 28 | 28 | 21 | 32 | 26 | — | 338 |
| Vancomycin-intermediate *Staphylococcus aureus* (VISA) | 9 | 14 | 17 | 36 | 21 | 25 | 18 | 15 | 27 | 29 | 15 | 22 | — | 248 |
| Varicella (Chickenpox) | | | | | | | | | | | | | | |
| morbidity | 710 | 941 | 1,206 | 1,038 | 1,127 | 1,018 | 496 | 752 | 1,027 | 1,015 | 1,139 | 890 | — | 11,359 |
| mortality¶¶ | — | — | — | — | 2 | 1 | — | — | — | — | — | — | — | 3 |
| Vibriosis | 15 | 31 | 24 | 33 | 55 | 116 | 271 | 361 | 170 | 119 | 61 | 43 | — | 1,299 |

* No cases of anthrax; diphtheria; eastern equine encephalitis, nonneuroinvasive disease; poliovirus infection, nonparalytic; severe acute respiratory syndrome-associated coronavirus disease (SARS-CoV); smallpox; St. Louis encephalitis, nonneuroinvasive disease; western equine encephalitis, neuroinvasive and nonneuroinvasive disease; vancomycin-resistant staphylococcus aureus (VRSA); viral hemorrhagic fevers and Yellow fever were reported in the United States during 2013. Data on chronic hepatitis B and hepatitis C virus infection (past or present) are not included because they are undergoing data quality review.
† Totals reported to the Division of Vector-Borne Diseases, National Center for Emerging and Zoonotic Infectious Diseases (ArboNET Surveillance), as of **June 1, 2014.**
§ Totals reported to the Division of STD Prevention, National Center for HIV/AIDS, Viral Hepatitis, STD, and TB Prevention (NCHHSTP), as of **June 4, 2014.**
¶ Total number of HIV diagnoses reported to the Division of HIV/AIDS Prevention, NCHHSTP through **December 28, 2013.**
** Totals reported to the Influenza Division, National Center for Immunization and Respiratory Diseases (NCIRD), as of **December 28, 2013.**
†† Includes the following categories: primary, secondary, latent (including early latent, late latent, and latent syphilis of unknown duration), neurosyphilis, late (including late syphilis with clinical manifestations other than neurosyphilis), and congenital syphilis. Totals reported to the Division of STD Prevention, NCHHSTP, as of **June 4, 2014.**
§§ Totals reported to the Division of Tuberculosis Elimination, NCHHSTP, as of **July 1, 2014.**
¶¶ Totals reported to the Division of Viral Diseases, NCIRD, as of **May 30, 2014.**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,
                           *Plaintiffs,*
          v.
MERCK & CO., INC.,
                           *Defendant.*

Civil Action No. 10-4374 (CDJ)

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY" MATERIAL
PURSUANT TO PROTECTIVE ORDER**

# MERCK'S EXHIBITS IN SUPPORT OF MERCK'S RESPONSE TO RELATORS' STATEMENT OF UNDISPUTED FACTS

# EXHIBIT 329

Appx18747



*Centers for Disease Control and Prevention*

Morbidity and Mortality Weekly Report

Weekly / Vol. 63 / No. 54

Published October 14, 2016, for 2014

# Summary of Notifiable Infectious Diseases and Conditions — United States, 2014



**U.S. Department of Health and Human Services**
Centers for Disease Control and Prevention

Morbidity and Mortality Weekly Report

## CONTENTS

Preface ........................................................................... 1

Background ...................................................................... 1

Data Sources ................................................................... 2

Interpreting Data ............................................................. 6

Transitions in NNDSS Data Collection ................................... 7

Method for Identifying which Nationally Notifiable Infectious
    Diseases and Conditions are Reportable ........................... 7

International Health Regulations ......................................... 7

Highlights for 2014 ......................................................... 10

PART 1

    Summary of Notifiable Diseases in the United States, 2014 ........... 29

PART 2

    Graphs and Maps for Selected Notifiable Diseases in the
    United States, 2014 .................................................... 75

Selected Reading for 2014 ................................................ 141

The *MMWR* series of publications is published by the Center for Surveillance, Epidemiology, and Laboratory Services (proposed), Centers for Disease Control and Prevention (CDC), U.S. Department of Health and Human Services, Atlanta, GA 30329-4027.

**Suggested citation:** Centers for Disease Control and Prevention. [Summary of Notifiable Diseases, 20xx]. Published month day, 20xx for MMWR Morb Mortal Wkly Rep 20xx;63(No. 54):[inclusive page numbers].

**Centers for Disease Control and Prevention**

Thomas R. Frieden, MD, MPH, *Director*
Harold W. Jaffe, MD, MA, *Associate Director for Science*
Joanne Cono, MD, ScM, *Director, Office of Science Quality*
Chesley L. Richards, MD, MPH, *Deputy Director for Public Health Scientific Services*
Michael F. Iademarco, MD, MPH, *Director, Center for Surveillance, Epidemiology, and Laboratory Services*

**MMWR Editorial and Production Staff (Serials)**

Sonja A. Rasmussen, MD, MS, *Editor-in-Chief*
Charlotte K. Kent, PhD, MPH, *Executive Editor*
Christine G. Casey, MD, *Editor*
Teresa F. Rutledge, *Managing Editor*
David C. Johnson, *Lead Technical Writer-Editor and Project Editor*

Martha F. Boyd, *Lead Visual Information Specialist*
Maureen A. Leahy, Julia C. Martinroe,
Stephen R. Spriggs, Moua Yang, Tong Yang,
*Visual Information Specialists*
Quang M. Doan, MBA, Phyllis H. King, Terraye M. Starr,
*Information Technology Specialists*

**MMWR Editorial Board**

Timothy F. Jones, MD, *Chairman*
Matthew L. Boulton, MD, MPH
Virginia A. Caine, MD
Katherine Lyon Daniel, PhD
Jonathan E. Fielding, MD, MPH, MBA
David W. Fleming, MD

William E. Halperin, MD, DrPH, MPH
King K. Holmes, MD, PhD
Robin Ikeda, MD, MPH
Rima F. Khabbaz, MD
Phyllis Meadows, PhD, MSN, RN
Jewel Mullen, MD, MPH, MPA

Jeff Niederdeppe, PhD
Patricia Quinlisk, MD, MPH
Patrick L. Remington, MD, MPH
Carlos Roig, MS, MA
William L. Roper, MD, MPH
William Schaffner, MD

TABLE 2I. Number of reported cases of notifiable diseases,* by region and reporting area — United States and U.S. territories, 2014

| Area | Meningococcal disease | | | | | Mumps | Novel Influenza A virus Infections† | Pertussis |
|---|---|---|---|---|---|---|---|---|
| | All Serogroups | Serogroups ACWY | Serogroup B | Other Serogroups | Unknown Serogroup | | | |
| **United States** | 433 | 123 | 89 | 25 | 196 | 1,223 | 3 | 32,971 |
| **New England** | 18 | 11 | 4 | 2 | 1 | 10 | — | 1,199 |
| Connecticut | 3 | 3 | — | — | — | 3 | — | 100 |
| Maine | 2 | 1 | — | 1 | — | — | — | 557 |
| Massachusetts | 12 | 6 | 4 | 1 | 1 | 5 | — | 308 |
| New Hampshire | — | — | — | — | — | 2 | — | 84 |
| Rhode Island | 1 | 1 | — | — | — | — | — | 108 |
| Vermont | — | — | — | — | — | — | — | 42 |
| **Mid. Atlantic** | 51 | 7 | 11 | 3 | 30 | 193 | — | 2,223 |
| New Jersey | 9 | — | — | — | 9 | 39 | — | 387 |
| New York (upstate) | 8 | 2 | 5 | 1 | — | 12 | — | 901 |
| New York City | 18 | — | — | — | 18 | 123 | — | 122 |
| Pennsylvania | 16 | 5 | 6 | 2 | 3 | 19 | — | 813 |
| **E.N. Central** | 50 | 19 | 21 | 3 | 7 | 805 | 3 | 5,658 |
| Illinois | 12 | 7 | 4 | 1 | — | 142 | — | 764 |
| Indiana | 4 | — | 4 | — | — | 25 | — | 492 |
| Michigan | 12 | 4 | 5 | — | 3 | 20 | — | 1,424 |
| Ohio | 12 | 7 | 2 | — | 3 | 552 | 2 | 1,463 |
| Wisconsin | 10 | 1 | 6 | 2 | 1 | 66 | 1 | 1,515 |
| **W.N. Central** | 22 | 3 | 3 | — | 16 | 41 | — | 2,689 |
| Iowa | 2 | 1 | 1 | — | — | 10 | — | 222 |
| Kansas | 1 | 1 | — | — | — | 2 | — | 431 |
| Minnesota | 7 | — | — | — | 7 | 22 | — | 950 |
| Missouri | 8 | — | — | — | 8 | 6 | — | 558 |
| Nebraska | — | — | — | — | — | — | — | 366 |
| North Dakota | 2 | 1 | 1 | — | — | 1 | — | 52 |
| South Dakota | 2 | — | 1 | — | 1 | — | — | 110 |
| **S. Atlantic** | 102 | 17 | 22 | 5 | 58 | 47 | — | 3,002 |
| Delaware | 1 | — | 1 | — | — | — | — | 205 |
| District of Columbia | 1 | — | 1 | — | — | 16 | — | 22 |
| Florida | 50 | — | — | — | 50 | 1 | — | 719 |
| Georgia | 14 | 7 | 2 | 1 | 4 | 2 | — | 408 |
| Maryland | 7 | 2 | 4 | 1 | — | 3 | — | 203 |
| North Carolina | 13 | 6 | 5 | — | 2 | 2 | — | 752 |
| South Carolina | 5 | — | 3 | 1 | 1 | 2 | — | 170 |
| Virginia | 10 | 2 | 6 | 1 | 1 | 20 | — | 505 |
| West Virginia | 1 | — | — | 1 | — | 1 | — | 18 |
| **E.S. Central** | 19 | 9 | 3 | — | 7 | 8 | — | 983 |
| Alabama | 7 | 4 | 1 | — | 2 | 2 | — | 285 |
| Kentucky | 3 | — | — | — | 3 | 2 | — | 300 |
| Mississippi | 1 | — | — | — | 1 | — | — | 68 |
| Tennessee | 8 | 5 | 2 | — | 1 | 4 | — | 330 |
| W.S. Central | 40 | 15 | 8 | 6 | 11 | 21 | — | 3,094 |
| Arkansas | 1 | 1 | — | — | — | 1 | — | 286 |
| Louisiana | 7 | — | — | — | 7 | 1 | — | 90 |
| Oklahoma | 10 | 3 | 4 | 3 | — | 4 | — | 142 |
| Texas | 22 | 11 | 4 | 3 | 4 | 15 | — | 2,576 |
| **Mountain** | 33 | 17 | 6 | 4 | 6 | 49 | — | 4,176 |
| Arizona | 9 | 4 | 4 | 1 | — | 12 | — | 517 |
| Colorado | 9 | 5 | 1 | 2 | 1 | 4 | — | 1,282 |
| Idaho | 5 | 2 | 1 | 1 | 1 | 26 | — | 367 |
| Montana | 4 | 4 | — | — | — | 1 | — | 494 |
| Nevada | 3 | — | — | — | 3 | 2 | — | 144 |
| New Mexico | 2 | 2 | — | — | — | 2 | — | 370 |
| Utah | 1 | — | — | — | 1 | 2 | — | 940 |
| Wyoming | — | — | — | — | — | — | — | 62 |
| **Pacific** | 98 | 25 | 11 | 2 | 60 | 49 | — | 9,947 |
| Alaska | 3 | 3 | — | — | — | 1 | — | 169 |
| California | 57 | — | — | — | 57 | 37 | — | 8,723 |
| Hawaii | 2 | 1 | — | 1 | — | 1 | — | 38 |
| Oregon | 19 | 11 | 5 | — | 3 | 1 | — | 416 |
| Washington | 17 | 10 | 6 | 1 | — | 9 | — | 601 |

See table footnotes on next page.

Appx18750

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA *ex rel.*,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

               *Plaintiffs,*

   v.

MERCK & CO., INC.,

               *Defendant*.

Civil Action No. 10-4374 (CDJ)

**FILED UNDER SEAL**

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY"
INFORMATION PURSUANT TO
PROTECTIVE ORDER**

**RELATORS' (I) RESPONSES TO MERCK'S STATEMENTS OF UNDISPUTED
MATERIAL FACTS IN SUPPORT OF ITS FIRST AND FOURTH SUMMARY
JUDGMENT MOTIONS AND (II) THEIR CORRESPONDING ADDITIONAL
STATEMENT OF MATERIAL FACTS**

**RELATORS' RESPONSE TO MERCK'S STATEMENTS OF UNDISPUTED
MATERIAL FACTS IN SUPPORT OF ITS FIRST AND FOURTH DISPOSITIVE
MOTIONS FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Paragraph D of Judge

Jones's Policies and Procedures for Civil Cases, Relators Stephan A. Krahling and Joan A.

Wlochowski respectfully submit (i) the following responses to Merck & Co., Inc.'s ("Merck")

statement of undisputed material facts in support of Merck's First Dispositive Motion for

Summary Judgment on Relators' Claims Based on an Efficacy-Based Theory of Falsity, dated

October 25, 2019 ("Merck SUMF1"); (ii) Merck's statement of undisputed material facts in

support of Merck's Fourth Dispositive Motion to Strike, or, in the Alternative, for Summary

Judgment on, the Unpled Kessler-Based Theory, dated October 25, 2019 ("Merck SUMF4"); and

(iii) Relators' corresponding additional statement of facts.  Relators' responses to Merck SUMF1

are contained on pages 1 through 119.  Relators' responses to Merck SUMF2 are contained on

pages 120 through 213.   Relators' corresponding additional statement of undisputed facts is

contained on pages 214 through 232.[1]

**RELATORS' RESPONSE TO MERCK'S STATEMENT OF UNDISPUTED MATERIAL
FACTS IN SUPPORT OF ITS FIRST DISPOSITIVE MOTION FOR SUMMARY
JUDGMENT**

1.      Stephen A. Krahling is a former Merck employee who received a B.S. in
Microbiology from Penn State University in 1995. Ex. 1 (Krahling Resume) at MRK-
KRA00331426.

**Response**:  Undisputed.

2.      Krahling worked for Merck from March 1999 to August 2000 and December 27,
2000 to November 9, 2001. Ex. 2 (Krahling Dep. Tr. Vol. 1) at 39:15-40:12, 111:2-4 and 171:10-
12; Ex. 3 (Merck Employee Initialization Form) at MRK-KRA00582401; Ex. 4 (Krahling

---

[1]  Exs. 1 360 refer to the exhibits attached to and identified in the Declaration of Gary Reilly dated October 25,
2019, filed with Relators' Motion for Summary Judgment (Dkt. 294).  Exs. 361 449 refer to the exhibits attached to
and identified in the accompanying Declaration of Gary Reilly dated November 26, 2019 ("G. Reilly Decl.").

Separation Agreement) at MRK-KRA00582394; Ex. 5 (Krahling's Resp. to Def.'s First Set of Interrogatories, Interrogatory No. 6) at 15.

    **Response**: Undisputed.

    3.    From March 1999 to August 2000, Krahling worked as a contract employee in a Merck research laboratory. Ex. 2 (Krahling Dep. Tr. Vol. 1) at 39:12- 40:12, 41:4-13; Ex. 5 (Krahling's Resp. to Def.'s First Set of Interrogatories, Interrogatory No. 6) at 15.

    **Response**: Undisputed.

    4.    In December 2000, four months after leaving Merck at the conclusion of his contract work, Krahling returned to Merck as a permanent employee in the same lab. Krahling held this position until November 2001. Ex. 3 (Merck Employee Initialization Form) at MRK-KRA00582401; Ex. 4 (Krahling's Separation Agreement) at MRK-KRA00582394, MRK-KRA00582397; Ex. 2 (Krahling Dep. Tr. Vol. 1) at 180:3-6; Ex. 5 (Krahling's Resp. to Def.'s First Set of Interrogatories, Interrogatory No. 6) at 15.

     **Response**:  Undisputed.

    5.    At Merck, Krahling was a lab technician in a division called Merck Research Laboratories (MRL) under the supervision of Dr. David Krah. Ex. 24 (Krahling Employment Offer) at RELATOR 00001059; Ex. 5 (Krahling's Resp. to Def.'s First Set of Interrogatories, Interrogatory No. 6) at 15.

    **Response**: Disputed that Relator Krahling was employed as a "lab technician" at Merck.

    Merck hired Relator Krahling as a virologist.[2]  Otherwise undisputed.

    6.    In that role, Krahling ran cell-based assays to characterize Merck's live virus vaccines, including work in support of the plaque reduction neutralization assay referred to as Protocol 007. Ex. 2 (Krahling Dep. Tr. Vol. 1) at 39:15-43, 55:7-12.

    **Response**: Disputed to the extent the phrase "[i]n that role" invokes unspecified facts outside

    the statement which makes it impossible to answer as a stand-alone fact.  Also disputed to the

    extent "that role" is referring to "lab technician" in Merck SUMF1 ¶ 5.  Merck hired Relator

---

[2]  Merck Ex. 24 at RELATOR  00001059 (Krahling Employment Offer); Merck Ex. 3 at MRK KRA00582401 (Merck Employee Initialization Form); Merck Ex. 5 at 15 (Krahling's Resp. to Def.'s First Set of Interrogatories, Interrogatory No. 6); Merck Ex. 1 (Krahling Resume).

Appx18753

Krahling as a virologist.[3]  Also disputed to the extent this statement implies that running

"cell-based assays to characterize Merck's live virus vaccines" was the only job responsibility

Relator Krahling had as a virologist at Merck.  Otherwise undisputed.

7.    Krahling never worked in the laboratory that ran the enzyme-linked immunosorbent assay (ELISA) for Protocol 007. Ex. 2 (Krahling Dep. Tr. Vol. 1) at 56:20-57:2.

**Response**: Undisputed.

8.    Krahling does not allege scientific impropriety in the original 1960s efficacy studies that supported Merck's mumps vaccine's initial licensure. In fact, neither Krahling nor Wlochowski challenge or context [sic] the validity of Dr. Hilleman's original clinical trials. Ex. 2 (Krahling Dep. Tr. Vol. 1) at 83:13-84:6.

**Response**: Undisputed as to the first sentence.  Disputed as to the second sentence.  Relator

Krahling challenges the validity of Dr. Hilleman's original clinical trials and methods.[4]

There is no evidence cited to support Merck's proffered fact as to Relator Wlochowski.[5]

9.    Krahling never worked in Merck's Manufacturing Division, never had any responsibility for manufacturing the mumps vaccine, and did not run the $TCID_{50}$ assay used to measure the potency of the mumps vaccine. Ex. 13 (Krahling Responses to Def.'s Req. for Admission) at ¶¶ 22-23; Ex. 2 (Krahling Dep. Tr. Vol. 1) at 61:19-25; Ex. 7 (Krahling Dep. Tr. Vol. 2) at 392-393:12-22, 488:21-489:6.

**Response**:  Disputed to the extent Merck implies Relator Krahling never had any

responsibility for work that supported manufacturing of the mumps vaccine.[6]  Otherwise

undisputed.

---

[3] *See* Rel. Resp. SUMF1 ¶ 5, *citing* Merck Ex. 24 at '1059 (Krahling Employment Offer); Merck Ex. 3 at '401 (Merck Employee Initialization Form); Merck Ex. 5 at 15 (Krahling's Resp. to Def.'s First Set of Interrogatories); Merck Ex. 1 (Krahling Resume).

[4] Merck Ex. 2 at 83:13 84:6 (Krahling Dep. Tr. Vol. 1) (Dr. Hilleman's studies were "less rigorous than what are available today. The sample size run[s] are smaller than the things Merck did in Protocol 007. So less rigorous, not as good a test or accurate a test isn't scientific misconduct.").

[5] *See*, Judge Jones Policies and Procedures, Civil Cases, D. Summary Judgment Motions, ¶ 5 ("The Court will not consider any description of a fact that is not supported by citation to the record. Statement of Material Facts in support of or in opposition to a motion for summary judgment must include <u>specific</u> and not general references to the parts of the record that support each of the statements…<u>Pinpoint citations are required</u>. Summary judgment motion practice that fails to follow these procedures to the letter will be stricken.") (emphasis in original).

3

10.    While working for Merck, Krahling was not responsible for communicating with the U.S. Food and Drug Administration (FDA) on Merck's behalf. Ex. 13 (Krahling Responses to Def.'s Req. for Admission) at ¶ 29.

**Response**: Undisputed.

11.    Prior to his participation in this litigation, Krahling never reviewed any of Merck's submissions to foreign regulatory bodies related to Merck's mumps vaccine or Protocol 007. *Id.* at ¶¶ 46-48.

**Response**: Undisputed.

12.    Prior to his participation in this litigation, Krahling never personally communicated with the Centers for Disease Control and Prevention (CDC) about Merck's mumps vaccine or the issues in the Amended Complaint and he was not responsible for communications with CDC. *Id.* at ¶¶ 3, 50-51.

**Response**: Undisputed.

13.    While working for Merck, Krahling was not responsible for drafting, negotiating, or executing any contracting for the sale of Merck's vaccines to CDC. *Id.* at ¶ 54.

**Response**: Undisputed.

14.    Before this lawsuit, Krahling had no personal knowledge of non-public communications between Merck and CDC concerning Merck's mumps vaccine, including no knowledge of communications with CDC concerning Protocol 007. *Id.* at ¶¶ 56-57.

**Response**: Undisputed.

15.    Krahling has not spoken with CDC about its decision to purchase Merck's Mumps Vaccine. *Id.* at ¶ 60.

**Response**: Undisputed.

16.    Relator Joan L. Wlochowski is a former Merck employee who worked for Merck from 2000 to 2002. Ex. 203 (Wlochowski Resume) at AMGEN 0007.

**Response**: Undisputed.

---

[6] Ex. 155 at 61:7 18, 392:12 23 (Deposition of Relator Stephen Krahling (hereinafter "Krahling Dep.")) ("…According to [David] Krah and according to what I understand, the work we were doing impacted manufacturing. How much goes into the vaccine…So what they would report to regulatory. But there's a building somewhere where they make it. My job was not to report to that building and make it."); ("I did work that supported manufacturing … [David Krah] explained how.").

17.    While working at Merck, Wlochowski was a lab technician in MRL's virus and cell biology laboratory under the supervision of Dr. Krah. *Id.*; Ex. 204 (Wlochowski Dep. Vol. 1) at 60:23-61:1.

**Response**:  Disputed that Relator Wlochowski was a lab technician.  She was a "Staff Virologist."[7]  Also disputed to the extent Merck implies that Relator Wlochowski's only position throughout her employment at Merck was working in Dr. Krah's laboratory.[8] Otherwise undisputed.

18.    In this role, she inoculated assays for the plaque reduction neutralization assay for Protocol 007. Ex. 85 (Wlochowski's Responses to Def.'s Req. for Admission) at ¶¶ 1-2.

**Response**: Disputed to the extent the phrase "[i]n this role" invokes unspecified facts outside the statement which makes it impossible to answer as a stand-alone fact.  Disputed to the extent Merck implies inoculating assays was Relator Wlochowski's only responsibility with respect to Protocol 007.  Relator Wlochowski's work in Dr. Krah's laboratory included, but was not limited to, inoculating assays for the plaque reduction neutralization assay for Protocol 007.[9]  Also disputed to the extent Merck implies that Relator Wlochowski's only position throughout her employment at Merck was working in Dr. Krah's laboratory.[10] Otherwise undisputed.

---

[7] Merck Ex. 203, 1 (Wlochowski Resume).

[8] Ex. 172 at 61:16 62:10 (Deposition of Relator Joan Wlochowski (hereinafter "Wlochowski Dep.")) (testifying that after she worked in Dr. Krah's laboratory, she moved to Dr. Palker's laboratory to work on HPV vaccine related research).

[9] Merck Ex. 85 at ¶¶ 1 2 (Wlochowski's Responses to Def.'s Req. for Admission).  *See also* Merck Ex. 203 (Wlochowski Resume) (Relator Wlochowski "[p]rovided support for the potency and stability of attenuated live viral vaccine formulations by performing various cell based assays to measure infectious viral titers…Determined seroconversion rates from human sera in a high priority clinical trial through plaque reduction neutralization assay on pre  and post  vaccination samples…"); Rel. 56.1 Stat. ¶ 97, *citing among other evidence* Ex. 172 at 210:1 10 ("Wlochowski Dep.") (With regard to the PRN testing, Relator Wlochowski testified: "[I] performed the [Protocol 007] assay in its entirety so I set up the serum dilutions, I inoculated the plates. I fixed and stained the plates and I performed counting on the plates.").

[10] *See supra* note 8.

19.     As of June 13, 2017, Wlochowski had never had a conversation directly about the mumps vaccine with FDA or with CDC. Ex. 204 (Wlochowski Dep. Tr. Vol. 1) at 123:7-15.

**Response**: Undisputed.

20.     Wlochowski cannot say what CDC does in order to determine whether to purchase the mumps vaccine and she has not personally communicated with CDC about Merck's mumps vaccine or the topics addressed in her complaint. Ex. 204 (Wlochowski Dep. Tr. Vol. 1) at 152:16-153:5; Ex. 85 (Wlochowski's Responses to Def.'s Req. for Admission) at ¶ 4.

**Response**: Disputed to the extent Merck implies Relator Wlochowski knows nothing about

the "CDC's decision-making process regarding the purchase of vaccines."[11]  Otherwise

undisputed.

21.     Wlochowski never worked in Merck's Manufacturing Division and did not have responsibility for manufacturing the mumps vaccine when she worked at Merck. Ex. 85 (Wlochowski's Responses to Def.'s Req. for Admission) at ¶¶ 23-24.

**Response**: Disputed to the extent Merck implies Relator Wlochowski never had any

responsibility for work that supported manufacturing the mumps vaccine.[12]  Otherwise

undisputed.

22.     While working for Merck, Wlochowski was not responsible for communicating with FDA on Merck's behalf and she has never attended any meeting between Merck and FDA relating to Merck's mumps vaccine, Protocol 007, or any neutralization assay. Ex. 85 (Wlochowski's Responses to Def.'s Req. for Admission) at ¶¶ 30, 36-38.

**Response**: Undisputed.

23.     Prior to her participation in this litigation, Wlochowski never reviewed any of Merck's submissions to foreign regulatory bodies related to Merck's mumps vaccine or Protocol 007. Ex. 85 (Wlochowski's Responses to Def.'s Req. for Admission) at ¶¶ 47, 49.

---

[11] Merck Ex. 204 at 151:3 6 (Wlochowski Dep.) ("Do you know anything about the CDC's decision making process regarding the purchase of vaccines?  A. Yes."). *Id.* at 152:10 13 ("I know that the label is public so that information is available to the CDC in determining a decision on whether or not to purchase a product").

[12] Ex. 155 at 61:7 16 (Krahling Dep.) ("…According to [David] Krah and according to what I understand, the work we were doing [in Dr. Krah's lab] impacted manufacturing. How much goes into the vaccine…So what they would report to regulatory.").

**Response**: Undisputed.

24.    While working for Merck, Wlochowski was not responsible for communications with CDC and was never asked to communicate with CDC on Merck's behalf. Ex. 85 (Wlochowski's Responses to Def.'s Req. for Admission) at ¶¶ 51-52.

**Response**: Undisputed.

25.    While working for Merck, Wlochowski was not responsible for drafting, negotiating, or executing any contracting for the sale of Merck's vaccines to CDC. Ex. 85 (Wlochowski's Responses to Def.'s Req. for Admission) at ¶ 55.

**Response**: Undisputed.

26.    Before this lawsuit, Wlochowski had no personal knowledge of non-public communications between Merck and CDC concerning Merck's mumps vaccine, including no knowledge of communications with CDC concerning Protocol 007. Ex. 85 (Wlochowski's Responses to Def.'s Req. for Admission) ¶¶ 57-58.

**Response**: Undisputed.

27.    Wlochowski has not spoken with CDC about its decision to purchase Merck's Mumps Vaccine. Ex. 85 (Wlochowski's Responses to Def.'s Req. for Admission) at ¶ 61.

**Response**: Undisputed.

28.    Mumps, the once ubiquitous childhood disease, generally presents as fever and parotitis (inflammation of one or both parotid (salivary glands)). Ex. 197 (Excerpts of Rubin, *Vaccines* (2018)) at 663.

**Response**: Undisputed.

29.    In the pre-vaccine era, "mumps was the leading cause of viral encephalitis and sudden onset deafness in the United States." Ex. 197 (Excerpts of Rubin, *Vaccines* (2018)) at 663.

**Response**: Undisputed.

30.    Meningitis and mild meningoencephalitis, the most frequent complications of mumps in children, can result in death, albeit rarely. Ex. 102 (Excerpts of Feigin and Cherry, *Textbook of Pediatric Infectious Diseases*, 8th Ed. (2019)) at 1775.

**Response**: Undisputed.

31.    In 1967, Merck's monovalent mumps vaccine, MUMPSVAX®, was first licensed in the United States, containing a version of the "Jeryl Lynn" strain of the mumps virus. Ex. 197 (Excerpts of Rubin, *Vaccines* (2018)) at 669.

Appx18758

**Response**: Undisputed.

32.    In 1971, Merck introduced the MMR vaccine, which combined the Mumpsvax vaccine with a measles vaccine and a rubella vaccine in a single "trivalent" vaccine. Ex. 197 (Excerpts of Rubin, *Vaccines* (2018)) at 670.

**Response**: Undisputed.

33.    In 1978, Merck obtained approval of second trivalent MMR vaccine, called MMR-II, which included the same measles and mumps vaccines as were in MMR but a different rubella vaccine. Ex. 197 (Excerpts of Rubin, *Vaccines* (2018)) at 672, 979-980.

**Response**: Undisputed.

34.    The Jeryl Lynn mumps vaccine is also included in ProQuad, a quadrivalent vaccine licensed by Merck in 2005 that comprises four distinct vaccines    the same measles, mumps and rubella vaccines that are in MMR-II, as well as a varicella (chicken pox) vaccine. Ex. 197 (Excerpts of Rubin, *Vaccines* (2018)) at 672.

**Response**: Undisputed.

35.    As a result, the Jeryl Lynn mumps vaccine has been the mumps vaccine administered to children and adults in the United States for more than 50 years.

**Response**: Disputed to the extent this fact is not supported by citation to the record as required by the Court's rules.[13]  Undisputed that since 1967 Merck has been the only vaccine manufacturer licensed to sell a mumps vaccine in the United States.[14]

36.    CDC reports that, "[a]fter the U.S. mumps vaccination program started in 1967, there has been a more than 99% decrease in mumps cases in the United States. Ex. 81 (CDC, *Mumps Vaccination*, https://www.cdc.gov/mumps/vaccination.html).

**Response**:  Disputed to the extent Merck implies this statistic provides a complete and accurate representation of the trend in mumps incidence since 2006.[15]  Also disputed to the

---

[13] *See* Judge Jones Policies and Procedures, Civil Cases, D. Summary Judgment Motions, ¶ 5.

[14] Ex. 19 ¶ 11 (Merck Ans.); Ex. 20 at 175 (Merck Responses to Requests for Admission 222 23).

[15] *See, e.g.,* Rel. 56 Stat. ¶¶ 195 99, 208 214, *citing among other evidence* Ex. 4 at 147:17 149:12 (Deposition of Relators' Expert Dr. David A. Kessler (hereinafter "Kessler Dep.")) (The statement that "there's been a 99 percent decrease in mumps cases since the vaccine was introduced in 1967 … would probably be an incomplete statement … the CDC [website says] … 'Although the United States experienced a 99 percent reduction in mumps cases following implementation of the two dose vaccination program in 1989, mumps has resurged in the past ten years.' … So I think [Merck's] data is correct, but it's somewhat out of date."); Ex. 40 at 220:20 221:2 (Deposition of

extent Merck implies this statistic indicates the resurgence in mump cases in since 2006 in highly vaccinated populations is not a significant public health concern.[16]  Undisputed that the evidence cited contains the selectively quoted language.  The cited document in full speaks for itself.

37.    "Before the U.S. mumps vaccination program started in 1967, about 186,000 cases were reported each year, but the actual number of cases was likely much higher due to

Merck's Expert Dr. Ann M. Arvin (hereinafter "Merck Expert Arvin Dep.") (agreeing there was a 2000% increase in mumps between 2000 and 2017 based on 300 cases reported in 2000 and 6,000 cases in 2017); Ex. 22 at 27 (Report of Merck's Expert Dr. William L. Atkinson (hereinafter "Merck Expert Atkinson Rep.")) ("Since 2012, the number of mumps cases, incidence, number of outbreaks, proportion of outbreak associated cases, and number of jurisdictions reporting mumps outbreaks have all increased.  The number of cases reported in 2016 (6,369) and 2017 (5,629[]) are the highest reported in a decade."); Ex. 1 at 9 12 (Report of Relators' Expert Dr. Eugene Shapiro (hereinafter "Shapiro Rep.")) (citing publications) ("[S]ince early 2006 there have been numerous, large outbreaks of mumps in the United States, with nearly 15,000 reported mumps cases since 2014."); Ex. 7 at 139:7 9 (Deposition of CDC's 30(b)(6) Witness Dr. Mark Pallansch (hereinafter "CDC 30(b)(6) Pallansch Dep.")) ("There clearly has been a resurgence [of mumps cases] particularly from 2006 till present …."); Ex. 22 at 21 (Merck Expert Atkinson Rep.) ("Several mumps outbreaks have occurred in US since 2006, which has contributed to an increase in the number of reported mumps cases."); Ex. 41 at 82:2 14 (Deposition of Merck's Expert William P. Nichols (hereinafter "Merck Expert Nichols Dep.")) (agreeing "there's been a resurgence in mumps cases since 2006" and "since 2006 there's been an across the board increase in mumps cases in individuals … who have received two doses of Merck's mumps containing vaccines").  *See also* Ex. 4 at 149:13 23 (Kessler Dep.) ("If [Merck] want[s] to represent that this [vaccine] results in 99 percent reduction in mumps … [Merck's] out of date … [a]nd that needs to be corrected.").

[16] *See, e.g.,* Rel. 56 Stat. ¶¶ 195 99, 208 214, *citing among other evidence* Ex. 246 at '446 (CDC: the "surge" of mumps cases among vaccinated populations "is not understood and it is of serious public health concern for many reasons."); Ex. 7 at 144:24 145:12 (CDC 30(b)(6) Pallansch Dep.) ("Q. Why is the prevention of these outbreaks of such issue to the CDC?  A. It's disease burden.  I mean, if you look at these outbreaks, they do have not only a disruption for the institutions and populations affected, but you have children who are being hospitalized with complications, some of which include more serious conditions, like deafness, or even some issues around loss of fertility associated with orchitis, as another example.  So these complications are nontrivial.  So there's still significant disease severity associated with mumps, even though it is less than what it was in the pre vaccine era."); Ex. 7 at 163:25 164:4 (CDC 30(b)(6) Pallansch Dep.) (testifying a "big focus" of the CDC is "the contributing factors to the resurgence and the size of the outbreaks"); Ex. 40 at 213:6, 216:19 217:3 (Merck Expert Arvin Dep.) ("Every outbreak is a concern. … We are concerned about what the burden of disease is.  Q. When you say 'we' who do you mean by 'we'?  A. I mean pediatric infectious disease specialists.  I mean pediatricians.  I mean parents.  I mean the CDC.  I mean, I hope, all of us."); Ex. 1 at 13, 20 (Shapiro Rep.) (mumps outbreaks "have become a major public health problem") ("[mumps] outbreaks are not trivial"); Ex. 7 at 143:21 22 (CDC 30(b)(6) Pallansch Dep.) ("We have seen a trend over these outbreaks of the number of cases having two doses has gone up."); Ex. 22 at 27 (Merck Expert Atkinson Rep.) ("An increase in mumps outbreaks and cases, particularly among people who received 2 doses of MMR was first noted in 2006."); Ex. 40 at 219:7 9, 227:18 23 (Merck Expert Arvin Dep.) ("[W]e have been seeing these outbreaks in vaccinated populations…."); Ex. 15 at 32:10 18 (Deposition of Merck's Expert Dr. Jonathan L. Temte (hereinafter "Merck Expert Temte Dep.")) (testifying recent mumps cases have been "largely[] in fully vaccinated populations"); Ex. 39 at 166:17 20 (Deposition of Merck Employee Dr. Luwy Musey (hereinafter "Musey Dep.")) (affirming mumps outbreaks in vaccinated populations); Ex. 1 at 10 14 (Shapiro Rep.) (reporting on mumps outbreaks in fully vaccinated populations); Ex. 244 at 1 (*Decreased humoral immunity to mumps in young adults immunized with MMR vaccine in childhood*, Proc. Nat'l Acad. Sci. USA 116:19071 19076, Sept. 17, 2019) ("Unexpectedly, in the past decade, multiple mumps outbreaks have been reported in the United States … with a high attack rate among vaccinated young adults").

9

underreporting." By comparison, in 2018, the provisional number of mumps cases reported in the United States was 2,251    99% fewer cases than were reported annually in the pre-vaccine era. Ex. 98 (CDC, *Mumps Cases and Outbreaks*, https://www.cdc.gov/mumps/outbreaks.html).

**Response**:  Disputed to the extent Merck implies this statistic provides a complete and

accurate representation of the trend in mumps incidence since 2006.[17]  Also disputed to the

extent Merck implies this statistic indicates the resurgence in mump cases in since 2006 in

highly vaccinated populations is not a significant public health concern.[18]  Undisputed that

the evidence cited contains the selectively quoted language and that there were 2,251

reported mumps cases in 2018.  The cited document in full speaks for itself.

38.    In the context of vaccine trials, *efficacy* refers to "[t]he ability of a vaccine to provide protection against disease under ideal circumstances." Ex. 95 (Centers for Disease Control and Prevention, *Manual for the Surveillance of Vaccine-Preventable Disease*, Definition of Terms (5th ed. 2012), http://www.cdc.gov/vaccines/pubs/surv-manual/front-portion.pdf) at ix.

**Response**:  Disputed that this is the only definition of efficacy "in the context of vaccine

trials."  The term efficacy is often used interchangeably with effectiveness and other terms

reflecting protection from disease in the context of vaccine clinical trials, including by

Merck.[19]  Undisputed that the evidence cited contains the selectively quoted language.

---

[17] *See supra* note 15.

[18] *See supra* note 16.

[19] Rel. 56 Stat. ¶¶ 137 143, 150, *citing* Ex. 42 at '708 ("In addition, and more seriously, [FDA] challenged the efficacy of marketed product at the lowest predicted potencies (below label claim). … With regard to product efficacy, we provided an interim analysis of an ongoing mumps end expiry trial to justify efficacy of lower potency product.  [FDA] accepted the Merck response."); Ex. 23 at 33:24 34:10 (Deposition of Merck Employee Dr. Jonathan Hartzel (hereinafter "Hartzel Dep.")) (testifying and affirming "investigators" and "site personnel" are "the individuals at the clinical sites that are enrolling the patients and observing them for safety and efficacy" and "drawing the blood from the patients"); Exs. 193 198 at 1 (clinicaltrials.gov archives indicating Protocol 007 was an "Efficacy Study"); Ex. 108 at '567 69 (Protocol 007 "measured the effectiveness of the vaccine at the potencies being studied."); Ex. 189 at '038 (Merck identified its sBLA, supported by Protocol 007, as an "Efficacy Supplement" on the face of its application); *Id.* at '116 ("In agreement with … FDA, the mumps specific PRN assay [AIGENT] was developed and used as a surrogate for vaccine effectiveness."); Ex. 137 at '321 ("The purpose … is to provide clinical data supporting a reduction in expiry potency ….  This clinical data provides evidence … based on … [AIGENT] assay used as a surrogate marker for vaccine efficacy."); *see also* Ex. 359 at 58:4 7 (Deposition of Merck Employee Dr. Manal Morsy (hereinafter "Morsy Dep.")) (Efficacy and effectiveness are "interchangeable."); Merck Ex. 41 at 27:11 28:6 (CDC 30(b)(6) Pallansch Dep.) ("[E]fficacy is often measured in a specific clinical trial setting, where you know who is vaccinated and not … it's often also applied to a situation of measuring

10

39.    In the context of vaccines, efficacy is typically evaluated by comparing how many people in a clinical trial who were vaccinated got the disease with how many people who were not vaccinated got the disease. Ex. 100 (CDC, *Principles of Epidemiology in Public Health Practice* (3d ed. 2012), https://www.cdc.gov/csels/dsepd/ss1978/lesson3/section6.html) at § 6.

**Response**: Disputed.  The evidence cited does not support the proffered fact.  The only

relevant portion of section 6 in CDC's *Principles of Epidemiology in Public Health Practice*

is the "Vaccine efficacy or effectiveness" subsection.  With respect to epidemiology, the

section states:

> Vaccine efficacy and vaccine effectiveness measure the proportionate reduction in cases among vaccinated persons. Vaccine efficacy is used when a study is carried out under ideal conditions, for example, during a clinical trial. Vaccine effectiveness is used when a study is carried out under typical field (that is, less than perfectly controlled) conditions.

In the context of vaccine clinical trials, the term efficacy is often used interchangeably with

effectiveness and other terms reflecting protection from disease, including by Merck.[20]

40.    The primary pre-licensure field trial for the Jeryl Lynn vaccine was published in the New England Journal of Medicine. The study was carried out by Dr. Maurice Hilleman and his colleagues in 1965-1966. The investigators found: "The reduction of cases of natural mumps (that is, protective efficacy) resulting from the vaccine was 97 per cent if only the laboratory-proved cases are considered. If, however, the later cases that occurred in families and have not yet been diagnosed in the laboratory are included, the protective efficacy would be about 95 per cent." Ex. 86 (Maurice Hilleman et al., *Live, Attenuated Mumps Virus Vaccine 4. Protective Efficacy as Measured in a Field Evaluation*. 276 New England J. of Medicine (1967)) at 256; *see also* Ex. 199 (Robert Weibel et al., *Live, Attenuated Mumps Virus Vaccine 3. Clinical and Serologic Aspects in a Field Evaluation*, 276 New England J. of Medicine 245 (1967)) at 245-251.

**Response**: Disputed to the extent the statement refers to Merck's MMR-II or ProQuad

vaccines, which did not exist at the time of Dr. Hilleman's 1965-1966 study.  *See supra*

SUMF1 ¶¶ 31-34.  Undisputed this statement accurately describes the 1965-66 field trial

conducted on MUMPSVAX®.

---

immunogenicity as well as disease in the context of those clinical trials…"); Merck SUMF4 ¶ 174 (describing Protocol 007 data as "data on the efficacy of the vaccine at potencies lower than 4.3 log10 TCID50/dose").

[20] *See supra* note 19.

41.     Neutralizing antibody was induced in 98% of vaccinated participants who were initially seronegative to mumps. Ex. 86 [Maurice Hilleman et al., *Live, Attenuated Mumps Virus Vaccine 4. Protective Efficacy as Measured in a Field Evaluation*. New England Journal of Medicine. 276(5) (1967)] at 256; *see also* Ex. 199 [Robert Weibel et al., *Live, Attenuated Mumps Virus Vaccine 3*. Clinical and Serologic Aspects in a Field Evaluation. New England Journal of Medicine. (1967) 276(5):245-251] at 251.

**Response**: Disputed to the extent the statement relies on unspecified facts outside the

statement (as to the study where this result was measured) which makes it impossible to

answer as a stand-alone fact.  Also disputed to the extent the statement implies this result was

found in response to vaccination by MMR-II or ProQuad, because neither vaccine existed at

the time of Dr. Hilleman's 1965-1966 study. *See supra* SUMF1 ¶¶ 31-34.  Undisputed this

statement accurately describes the neutralizing antibody response rate found in Dr.

Hilleman's 1965-66 field trial conducted on MUMPSVAX®.

42.     In the context of vaccines, *effectiveness* "represents the percentage reduction in the frequency of . . . infections among people vaccinated compared to the frequency among those who were not vaccinated." Ex. 101 (CDC, Flu Vacine Effectiveness:  Q&A for Health Professionals) at 1; Ex. 111 (Freed Report) at 13 ¶ 46; *see also* Ex. 95 (CDC, *Manual for the Surveillance of Vaccine-Preventable Disease* (5th ed. 2012), http://www.cdc.gov/vaccines/pubs/surv-manual/front-portion.pdf) at ix (Vaccine effectiveness is the "ability of a vaccine to provide protection against disease when used under field conditions (e.g., use of the vaccine in routine practice).").

**Response**: Disputed that this definition is the only definition of effectiveness used "in the

context of vaccines."  The term effectiveness is used interchangeably with efficacy in the

context of vaccine clinical trials and other terms reflecting protection from disease, including

by Merck.[21]  Undisputed that the evidence cited contains the selectively quoted language.

The cited document in full speaks for itself.

43.     The term vaccine *impact* can be used to describe the comparison of the incidence of a disease in a given population before and after the introduction of a vaccine. Ex. 207 (M. Doherty, *Vaccine Impact: Benefits for Human Health*, 2016 *Vaccine* 6707) at 6708.

---

[21] *See supra* note 19.

Appx18763

**Response**: Undisputed that vaccine impact "can" be defined as stated but disputed that there is consensus among public health agencies, including the CDC, on what defines impact.[22]

44.    In part, because impact considers both vaccinated and unvaccinated individuals, it also accounts for effects such as "herd immunity," whereby "circulation of a bacteria or virus may be decreased" because of the vaccine, "which lessens the chance that even someone who has not been immunized will get disease." Ex. 110 (FDA, *Vaccine Safety Questions and Answers* https://www.fda.gov/vaccines-blood-biologics/safety-availability-biologics/vaccine-safety-questions-and-answers).

**Response**: Disputed. The evidence cited does not support the proffered fact.  The only potentially relevant portion of the FDA's Questions and Answers in Merck Exhibit 110 is at page 5 under the heading "Why don't we give parents a choice in deciding if they want to vaccinate children."  The quoted phrases are contained in that section, but they are used in the context of encouraging high vaccination rates.  In addition, "International agencies like … the Centers for Disease Control and Prevention have no consensus on what defines impact."[23]

45.    In part because it would be unethical to randomize people into a placebo or no vaccine group after a vaccine has been licensed, it is generally not possible to conduct efficacy studies after a vaccine has been recommended for use. Ex. 94 (CDC, *Flu Vaccine Effectiveness and Efficacy is Measured: Questions and Answers for Health Professionals* (Jan. 29, 2016), http://www.cdc.gov/flu/professionals/vaccination/effectivenessqa.htm) (explaining that universal vaccine recommendations make it unethical to perform randomized clinical control trials because assigning individuals to the placebo-controlled group puts them at risk of infection).

**Response**: Disputed.  Once a vaccine has been licensed, "universal vaccine recommendations make it unethical to perform *placebo controlled [randomized controlled trials]* because assigning people to a placebo group could place them at risk for serious complications."[24]  It is possible to conduct efficacy studies after a vaccine has been recommended for use as

---

[22] Merck Ex. 207 at '6708 ("International agencies like … the Centers for Disease Control and Prevention have no consensus on what defines impact.").

[23] *See supra* note 22.

[24] Merck Ex. 94 at '1 *2 (emphasis added)*.

13

Merck used the term "efficacy study" in describing the immunogenicity testing it conducted in Protocol 007.[25]

46.    CDC currently reports that "[t]wo doses of mumps vaccine are 88% (range 31% to 95%) effective at preventing the disease; one dose is 78% (range 49% to 91%) effective." Ex. 99 (CDC, *Mumps For Healthcare Providers*, https://www.cdc.gov/mumps/hcp.html) at 3.

**Response**: Disputed to the extent the point effectiveness data in the statement means the median effectiveness rate measured across multiple studies and that the lower-end of the range of these effectiveness results, as reported by the CDC, has consistently decreased since 2006.[26]  Also disputed to the extent Merck implies these statistics provide a complete and accurate picture of how well Merck's mumps vaccine works. *See* Ex. 427 at '698 ("Please note that postmarketing field estimates of effectiveness are fraught with error, most often yielding results suggesting much lower protection than that seen using the same vaccine in a true efficacy trial.").  Undisputed that the evidence cited contains the selectively quoted language.  The cited document in full speaks for itself.

47.    The "preponderance of data demonstrate [mumps vaccines] to be highly effective and solely responsible for the near elimination of this once ubiquitous disease in all countries where mumps-containing vaccine is rigorously used." Ex. 197 (Rubin, *Vaccines* (2018)) at 688.

---

[25] Rel. 56 Stat. ¶¶ 137 143 and 150 *citing among other evidence* Ex. 42 at '708 ("In addition, and more seriously, [FDA] challenged the efficacy of marketed product at the lowest predicted potencies (below label claim). … With regard to product efficacy, we provided an interim analysis of an ongoing mumps end expiry trial to justify efficacy of lower potency product.  [FDA] accepted the Merck response."); Ex. 23 at 33:24 34:10 (Hartzel Dep.) (testifying and affirming "investigators" and "site personnel" are "the individuals at the clinical sites that are enrolling the patients and observing them for safety and efficacy" and "drawing the blood from the patients"); Exs. 193 198 at 1 (clinicaltrials.gov archives indicating Protocol 007 was an "Efficacy Study"); Ex. 189 at '038 (Merck identified its sBLA, supported by Protocol 007, as an "Efficacy Supplement" on the face of its application); Ex. 137 at '321 ("The purpose … is to provide clinical data supporting a reduction in expiry potency ….  This clinical data provides evidence … based on … [AIGENT] assay used as a surrogate marker for vaccine efficacy."); *see also* Merck SUMF4¶ 174 (describing Protocol 007 data as "data on the efficacy of the vaccine at potencies lower than 4.3 log10 TCID50/dose").

[26] *See* Rel. 56 Add'l. Stat. SJ1 and SJ4 ¶ 45; Ex. 48 at 2 (*Recommendation of the Advisory Committee on Immunization Practices for Use of a Third Dose of Mumps Virus  Containing Vaccine in Persons at Increased Risk for Mumps During an Outbreak*, MMWR, Jan. 12, 2018: 67(1); 33 38) ("The median effectiveness of 2 doses of MMR vaccine in preventing mumps is 88%, with estimates ranging from 31% to 95%").

14

Appx18765

**Response**: Disputed to the extent neither "mumps vaccines" nor "highly effective" are defined making it impossible to answer.  The evidence appears to refer to all mumps vaccines and not just Merck's mumps vaccines.  Also disputed because the statement does not account for (i) the resurgence in mump cases since 2006[27]; (ii) the fact that Merck's mumps vaccine is inadequate to control mumps outbreaks[28]; and (iii) there have been numerous calls for a new mumps vaccine, including by the author of the quoted language.[29]  Undisputed that the

---

[27] *See supra* Rel. Resp. SUMF1 ¶ 36.

[28] *See* Rel. 56 Stat. ¶ 222, *citing* Ex. 7 at 151:1 8 (CDC 30(b)(6) Pallansch Dep.) ("Mumps is potentially something that could be eliminated … …  and the [mumps] outbreaks called that assumption into question."); Ex. 1 at 4, 14, 18, 20 (Shapiro Rep.) ("A new mumps vaccine is necessary if we wish to control mumps in the United States.") ("The resurgence of outbreaks has caused many to question the current understanding of how well Merck's mumps vaccine actually protects against disease.") ("use of the current vaccine is not likely to lead to a sustained decrease in the number of cases of mumps ….") ("Merck's mumps vaccine is not adequate to prevent outbreaks.") ("The factors that are associated with these [mumps] outbreaks, waning immunity, antigenic changes in the virus, and inadequate B cell memory induced by the vaccine, are not likely to change for the better.") ("[T]hese [mumps] outbreaks may continue to increase in both frequency and severity."); Ex. 160 at 8 (Relator Krahling's Response to Revised Interrogatory 1) ("[Dr.] Krah told Relator [Krahling] on multiple occasions that the efficacy rate of the mumps vaccine had significantly diminished since its original licensure. … Krah further told Relator that based on this observation, Krah believed the MMRII vaccine no longer provided adequate immunization, and that the vaccine's diminished efficacy would result in mumps outbreaks in the future."); *see also infra* ¶¶ 223, 225 26 (citing evidence of calls for a new mumps vaccine).

[29] *See* Ex. 264 at '446 (Statement by FDA's Dr. Steve Rubin in support of application to study a new mumps vaccine) ("The proposed studies are of public health significance and are timely considering the recent resurgence of mumps in highly vaccinated populations in the United States and elsewhere, making it quite clear that newer, more immunogenic vaccines are needed."); Ex. 258 at 799 801 (2016 S. Rubin article) ("[I]t is clear that other approaches to improve vaccine effectiveness need to be pursued. Among these, development of new vaccines must be considered."); Ex. 4 at 404:24 405:5 (Kessler Dep.) ("[FDA's Dr.] Steve Rubin as [well as] other great virologists strongly support the develop[ment] of newer more immunogenic mumps vaccine to deal with the issues that we currently face as a country."); Rel. 56 Stat. ¶¶ 222 226 (collecting evidence of calls for a new mumps vaccine) *citing among other evidence* Ex. 1 at 4 and 17 (Shapiro Rep.) ("A new mumps vaccine is necessary if we wish to control mumps in the United States.") ("The seriousness of the resurgence of mumps in the United States is reflected in the recognition by many prominent vaccine experts, such as Stanley Plotkin, that there is a need for a new vaccine for mumps …."); Ex. 256 at 381 2 (2013 S. Plotkin article) ("We need a new mumps vaccine."); Ex. 262 at 1458 467 (2008 G. Dayan article) ("Our findings indicate the need for more effective mumps vaccines.") Ex. 255 at '631 (CDC: "Encourage development of more immunogenic and effective mumps vaccines."); Ex. 264 at '403 04 ("The fact that [mumps] outbreaks had occurred in populations with over 95% coverage of two dose [mumps] vaccine strongly suggests that the current vaccine is not effective. … All these possible causes indicate a need for a new vaccine that is effective against current outbreak strain of mumps virus.") ("Recently, large outbreaks in vaccinated populations have occurred at increasing frequency. The outbreaks of mumps virus … infection in vaccinated populations underscore the urgency and importance of developing a new and effective vaccine against mumps virus … that caused current outbreaks."); *see also* Ex. 409 at '47 (Summary of 2010 ACIP meeting regarding mumps outbreak) (Dr. Stanley A. Plotkin: "It's a complex situation that we have, but as I've said to my colleagues from Merck, we do need a better mumps strain than we currently have").

15

evidence cited contains the selectively quoted language.  The cited document in full speaks

for itself.

48.    During the first five years of this century, the number of mumps cases reported
annually in the United States were at all-time lows, with only 200-300 cases being reported each
year. Ex. 97 (CDC, MMWR, *Summary of Notifiable Diseases    United States, 2005* (Mar. 30,
2007), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm5453a1.htm) at 77.

**Response**: Undisputed that from 2000 through 2005 there were approximately 200-300

mumps cases reported each year in the United States.  *See* Merck Ex. 97 at 78 (CDC,

MMWR, *Summary of Notifiable Diseases    United States, 2005* (Mar. 30, 2007),

https://www.cdc.gov/mmwr/preview/mmwrhtml/mm5453a1.htm) (reporting 338 mumps

cases in 2000, 266 mumps cases in 2001, 270 mumps cases in 2002, 231 mumps cases in

2003, 258 mumps cases in 2004, and 314 mumps cases in 2005).

49.    Since 2006, the number of mumps cases reported each year has generally
numbered in the hundreds or low thousands    a significant decrease from the 186,000 cases
reported each year in the pre-vaccine era. Ex. 99 (CDC, *Mumps For Healthcare Providers*,
https://www.cdc.gov/mumps/hcp.html) at 2.

**Response**: Disputed. The evidence cited does not support Merck's proffered fact that "the

number of mumps cases reported each year has generally numbered in the hundreds or low

thousands." *See* Merck Ex. 99 at 2 ("the number of mumps cases can range from roughly a

couple hundred to a *couple* thousand") (emphasis added); *see also* Rel. 56 Stat. ¶ 196 (6,584

mumps cases reported in 2006; 2,612 mumps cases reported in 2010; 6,369 mumps cases

reported in 2016; 6,109 mumps cases reported in 2017; 2,424 mumps cases reported in 2019

as of September 14, 2019);[30] Merck Ex. 98 at 1 (CDC, *Mumps Cases and Outbreaks*,

---

[30] *Citing* Ex. 234 at Table 2 (2006 CDC Summary of Notifiable Diseases); Ex. 235 at 29 (2009 CDC Summary of
Notifiable Diseases); Ex. 236 at 24 (2010 CDC Summary of Notifiable Diseases); Ex. 237 at 105 (2012 CDC
Summary of Notifiable Diseases); Ex. 238 at 31 (2013 CDC Summary of Notifiable Diseases); Ex. 239 at 48 (2014
CDC Summary of Notifiable Diseases); Ex. 240 at 53 54 (2015 CDC Summary of Notifiable Infectious Diseases
and Conditions); Ex. 241 at Table 2j (2016 CDC Nat'l Notifiable Diseases Surveillance Sys., Annual Tables of
Infectious Disease Data); Ex. 242 at Table 2j (2017 CDC Nat'l Notifiable Diseases Surveillance Sys., Annual Tables

16

https://www.cdc.gov/mumps/outbreaks.html) (2,251 mumps cases reported in 2018).

Undisputed that the annual reported mumps cases since 2006 have been lower than 186,000.

*See* Merck Ex. 99 at 2.

    50.    Consistent with statute and regulations, for the entire time period relevant to this case, the MMR-II vaccine has carried an FDA-approved label. Ex. 226 (March 1995), Ex. 227 (March 1995), Ex. 165 (1995), Ex. 166 (Apr. 1999), Ex. 232 (Apr. 1999), Ex. 222 (Oct. 2000), Ex. 236 (Feb. 2000), Ex. 223 (Feb. 2001), Ex. 224 (Aug. 2001), Ex. 229 (Sept. 2002), Ex. 228 (Oct. 2003), Ex. 225 (Feb. 2006), Ex. 230 (Feb. 2007), Ex. 231 (Feb. 2007), Ex. 167 (Dec. 2007), Ex. 233 (Feb. 2014), Ex. 234 (June 2014), Ex. 235 (Oct. 2015), Ex. 237 (Mar. 2010), Ex. 238 (Dec. 2010), and Ex. 239 (Sep. 2009).

**Response**: Disputed that there is factual support in the statement, or the record generally, for

the MMR-II label being "[c]onsistent with statute and regulations" for the time period

relevant to this case.[31]  Otherwise undisputed.

    51.    Part of what FDA considers to be labeling is the insert that contains "Prescribing Information," which is "written for the healthcare practitioner."  The statements about the mumps vaccine in this Statement and accompanying Motion refer to the label and the Prescribing Information component of the insert interchangeably. Ex. 208 (FDA, *Prescription Drug Labeling Resources*, https://www.fda.gov/drugs/laws-acts-and-rules/prescription-drug-labeling-resources); *see* 21 C.F.R. § 201.56(e) (treating the Prescribing Information as contained within "drug labeling").

**Response**: Undisputed as to the first sentence.  Disputed as to the second sentence.  The

evidence cited does not support that "statements about the mumps vaccine in this Statement

---

of Infectious Disease Data); Ex. 243 at Table 1y (2019 CDC Nat'l Notifiable Diseases Surveillance System, Weekly Tables of Infectious Disease Data (Week 37)); Ex. 1 at 9‑11 (Shapiro Rep.) (describing mumps outbreaks).

[31] Rel. 56 Stat. ¶¶ 43‑44 *citing among other evidence* Ex. 3 ¶¶ 419, 419.14 (Kessler Rep.) ("From at least 1998 December 2007, Merck did not have adequate procedures to assure that MMR II vaccine had 'not less than 4.3 [log]' … through end expiry.") ("From May 1998‑December 2007, MMR II was adulterated because Merck was unable to assure the potency specification for mumps of not less than 4.3 [log] … for the shelf life of the vaccine."); Ex. 4 at 281:6‑16 (Kessler Dep.) ("[P]roduct … manufactured after the [Overfill] was adulterated" because "there was not assurances that it would be within the 4.3 [log] based on Merck's internal representations."); Ex. 87 at '854 ("Mis[]branded   stability continues to be an issue, even with the increase in mumps and reduction of end expiry of 4.0 [log]."); Ex. 88 at '005 ("[W]e are on a very constrained time line to file [the sBLA to lower the minimum mumps potency specification using Protocol 007] this year as we are out of compliance."); *see also* Ex. 2 at 7 (Malone Rep.) ("The M M R II … package insert [is] inaccurate, false and misleading in claiming and/or suggesting Merck has conducted clinical studies demonstrating these vaccines afford protection against mumps."); Ex. 3 at ¶ 429‑30 (Kessler Rep.) ("The MMRII label from 2005 to the present was misleading).

and accompanying Motion refer to the label and the Prescribing Information component of

the insert interchangeably" and it is not appropriately a statement of undisputed facts.

52.    In discussing efficacy, since 1999, the label has explained:  "Efficacy of measles,
mumps and rubella vaccines was established in a series of double-blind controlled field trials
which demonstrated a high degree of protective efficacy afforded by the individual vaccine
components."  In a footnote, the label cites to the Hilleman and Weibel studies as support for this
statement. Ex. 166 (April 1999 Label) at MRK-KRA00757072; Ex. 167 (December 2004 Label)
at MRK-KRA00757100; Ex. 121 (current label, *available at*
https://www.merck.com/product/usa/pi circulars/m/mmr ii/mmr ii pi.pdf) at 2.

**Response**: Disputed that the quoted language from the label either "discusses" or "explains"

efficacy.  The label statement speaks for itself.  Also disputed to the extent the statement

implies that the Hilleman and Weibel studies, which were conducted roughly fifty years ago,

relate to the MMR-II product Merck has been selling since 2000.[32]  Undisputed that since

1999 the MMR-II label has stated: "Efficacy of measles, mumps and rubella vaccines was

established in a series of double-blind controlled field trials which demonstrated a high

degree of protective efficacy afforded by the individual vaccine components" with a footnote

to the Hilleman and Weibel studies as support for that statement.

53.    In discussing evidence of impact, since 1999, the label has explained that:  "The
impact of measles, mumps, and rubella vaccination on the natural history of each disease in the
United States can be quantified by comparing the maximum number of measles, mumps, and
rubella cases reported in a given year prior to vaccine use to the number of cases of each disease
reported in 1995. . . .[F]or mumps, 152,209 cases reported in 1968 compared to 840 cases
reported in 1995 resulted in a 99.45% decrease in reported cases."  Ex. 166 (April 1999 Label) at
MRK-KRA00757072; Ex. 167 (December 2004 Label) at MRK-KRA00757100; Ex. 121
(current label) at 1.

---

[32] Rel. 56 Stat. ¶ 187 *citing among other evidence* Ex. 20 at 235 (Merck Response to Request for Admission 300)
(Merck "admits that the double blind controlled efficacy trials referenced in the package insert for M M R®II were
conducted prior to 1970."); Ex. 223 at '261, '268 (references 13 15 citing studies from 1961, 1966, and 1970); Ex.
146 at 106:16 107:2 (Deposition of Merck's 30(b)(6) Witness Dr. Barbara Kuter (hereinafter "Merck 30(b)(6) Kuter
Dep.")) ("Q. So this information about seroconversion parallel protection from diseases all comes from studies from
1967 or 1968? A. Yes.  Q. Does Merck have more current information as to whether seroconversion parallels the
mumps vaccine parallels protection from mumps?  A. Again, we have no ability to conduct efficacy studies of this
nature, so no."); *id.* at 111:20 24 ("Q. Does Merck have any current information that indicates that seroconversion
parallels protection from mumps?  A. Again, we don't have the ability to do that.").

Appx18769

**Response**: Disputed that the quoted language from the label provides evidence of impact.[33]

Also disputed that the quoted language, which only compares the number of cases in 1967 to

1995 provides evidence of impact after the resurgence of mumps since 2006.[34]  Also disputed

that the quoted language "discusses" or "explains" evidence of impact since there is "no

consensus on what defines impact."[35] Undisputed that the statement accurately quotes what

has been in the MMR-II label since 1999.

54.     The MMR-II label has also included statements about seroconversion and
immunogenicity, which are distinct from effectiveness, efficacy, or impact. The relevant
statements have been substantively the same for the entire relevant period from 1999 to the
present. Ex. 166 (April 1999 Label) at MRK-KRA00757072; Ex. 167 (December 2004 Label) at
MRK-KRA00757100; Ex. 121 (current label) at 1-2.

**Response**: Disputed to the extent the word "also" invokes unspecified facts outside the

statement which makes it impossible to answer as a stand-alone fact.  Also disputed that

statements about seroconversion and immunogenicity are distinct from effectiveness,

efficacy or impact.  Rel. 56 Stat. ¶ 185-187.  Undisputed that from 1999 to the present the

MMR-II label has included statements about seroconversion and immunogenicity and that

the statements have been substantively the same during that time.

55.     *Immunogenicity* provides information about how a subject's immune system
responds to different stimuli, including vaccination. Ex. 193 (Plotkin, *Mumps vaccine*) at 430.

---

[33] Ex. 405 at '691 92 (Internal Merck 2016 email) ("Our MMR II label contains multiple instances where the data is
not supported by substantial evidence.  Please see the attached MMR II US [Package Insert].  … the text in yellow
… will need to be amended or removed.") (referencing MRK KRA02008695); Ex. 406 at '695 (package insert with
information highlighted to be amended or removed because of lack of substantial evidence includes the claim on
impact of mumps vaccination on the natural history of mumps cited in Merck Exhibits 166, 167 and 121).

[34] Rel. 56 Stat. ¶ 195 *citing among other evidence* Ex. 1 at 9 12 (Shapiro Rep.) (citing publications) ("[S]ince early
2006 there have been numerous, large outbreaks of mumps in the United States, with nearly 15,000 reported mumps
cases since 2014."); Ex. 4 at 147:17 149:12 (Kessler Dep.) (The statement that "there's been a 99 percent decrease in
mumps cases since the vaccine was introduced in 1967 … would probably be an incomplete statement … the CDC
[website says] … 'Although the United States experienced a 99 percent reduction in mumps cases following
implementation of the two dose vaccination program in 1989, mumps has resurged in the past ten years.' … So I
think [Merck's] data is correct, but it's somewhat out of date.").

[35] *See supra* note 22.

19

**Response**: Undisputed.

56.     In the study of most vaccines, the most common immunological response that is studied is the development of antibodies induced by the vaccine.  Immunological assays are tests that use serum or other samples from test subjects to look for certain kinds of information about the subject's immune system and the immune response to different stimuli, including vaccination. Ex. 92 (Durbin Report) at 6.

**Response**: Undisputed.

57.     One measure of immunogenicity is *seroconversion*, which refers to the "a person going from being 'seronegative' prior to vaccination, which generally means lacking pathogen specific antibodies, to being 'seropositive' after vaccination, which means possessing such antibodies." Ex. 92 (Durbin Report) at 6.

**Response**: Undisputed.

58.     Immunogenicity and seroconversion can be indirect measures for protection. However, a person observed to be seropositive may not be protected against disease, and someone observed to be seronegative may be protected. In part, this is because production of antibodies is not the only way that the immune system can combat a pathogen, and in part because for most vaccines there is no known level of antibody that reliably indicates actual protection. Ex. 92(Durbin Report) at 8-9; Ex. 90 (Arvin Report) at 24-28.

**Response**: Undisputed.

59.     In discussing seroconversion, the MMR-II label has explained:  "Clinical studies of 284 triple seronegative children, 11 months to 7 years of age, demonstrated that M-M-R II is highly immunogenic and generally well tolerated. In these studies, a single injection of the vaccine induced . . . mumps neutralizing antibodies in 96% . . . of susceptible persons. However, a small percentage (1-5%) of vaccinees may fail to seroconvert after the primary dose." Ex. 121 (current label) at 1.[36]

**Response**: Disputed that the language quoted from the label "discusses" or "explains"

seroconversion.  Also disputed to the extent the statement implies seroconversion as reported

in these studies, which were conducted roughly fifty years ago, relate to the MMR-II product

Merck has been selling since 2000.  Rel. 56 Stat. ¶ 181-183.  Undisputed that the statement

accurately quotes what has been stated in the MMR-II label since at least 1999.

---

[36]     Prior to 2006, the label stated that there were 279 triple seronegative children in the studies. In 2006, 279 was changed to 284 to show the correct number of triple seronegative children in the studies.

60.    The label then cites to the Indications and Usage section's Recommended Vaccination Schedule, which states:  "Individuals first vaccinated at 12 months of age or older should be revaccinated prior to elementary school entry. Revaccination is intended to seroconvert those who do not respond to the first dose. The Advisory Committee on Immunization Practices (ACIP) recommends administration of the first dose of M-M-R II at 12 to 15 months of age and administration of the second dose of M-M-R II at 4 to 6 years of age."  Ex. 121 (current label) at 2.

**Response**: Disputed to the extent the word "then" invokes unspecified facts outside the

statement which makes it impossible to answer as a stand-alone fact.  Undisputed that the

statement accurately quotes the language currently set forth in the "Indications and Usage"

Section of the MMR-II label.

61.    The label has also explained that the efficacy established through field trials citing a 1966 study for the mumps vaccine    "also established that seroconversion in response to vaccination against measles, mumps, and rubella paralleled protection from these diseases."  Ex. 121 (current label) at 2.

**Response**: Disputed to the extent the word "also" invokes unspecified facts outside the

statement which makes it impossible to answer as a stand-alone fact.  Disputed to the extent

the statement implies these studies or this label claim relate to the MMR-II product Merck

has been selling since 2000.[37]  Undisputed that the MMR-II label states: "These studies also

established that seroconversion in response to vaccination against measles, mumps, and

rubella paralleled protection from these diseases" referencing studies conducted more than

fifty years ago cited in footnotes 7-12.

62.    In 1989, the ACIP effectively recommended a second dose of mumps vaccine when it, for improved measles control, recommended "a second dose of measles-mumps-rubella vaccine for school-aged (i.e., grades K    12) and college students."  Ex. 211 (ACIP, *Measles*

---

[37] Rel. 56 Stat. ¶ 186 187 *citing among other evidence* Ex. 20 at 235 (Merck Response to Request for Admission 300) (Merck "admits that the double blind controlled efficacy trials referenced in the package insert for M M R®II were conducted prior to 1970."); Ex. 146 at 106:16 107:2 (Merck 30(b)(6) Kuter Dep.) ("Q. So this information about seroconversion parallel protection from diseases all comes from studies from 1967 or 1968?  A. Yes.  Q. Does Merck have more current information as to whether seroconversion from the mumps vaccine parallels protection from mumps?  A. Again, we have no ability to conduct efficacy studies of this nature, so no."); *id.* at 111:20 24 ("Q. Does Merck have any current information that indicates that seroconversion parallels protection from mumps?  A. Again, we don't have the ability to do that.").

Appx18772

*Prevention: Recommendations of the Immunization Practices Advisory Committee*, MMWR, 1989:38 (S-9):1-18) at 1.

**Response**: Disputed that ACIP effectively recommended a second dose of mumps vaccine when it changed "the routine childhood vaccine schedule from a one-dose to a two-dose schedule using combined measles-mump-rubella (MMR) vaccine." Merck Ex. 211 at 1 (ACIP, *Measles Prevention: Recommendations of the Immunization Practices Advisory Committee*, MMWR, 1989:38 (S-9):1-18). ACIP explicitly recommended "[a] routine two-dose measles vaccination schedule" to "help achieve a goal of measles elimination." *Id.* at 3. ACIP did not recommend a second dose of mump vaccine for children until 2006. *See* Merck Ex. 51 at 7 (Huong McLean et al., *Prevention of Measles, Rubella, Congenital Rubella Syndrome, and Mumps, 2013: Summary Recommendations of the [ACIP],* MMWR, June 14, 2013, 62(4):1-34) ("ACIP specified in 2006 that all children … should receive 2 doses of mumps-containing vaccine").

63.    In May 2006, the "ACIP issued updated recommendations for mumps vaccination" with a key change being the express recommendation that in outbreak settings a second dose of mumps vaccine be considered for children aged one to four years and adults at low risk if they are affected by the outbreak. Ex. 210 (ACIP, MMWR, *Notice to Readers: Updated Recommendations of the Advisory Committee on Immunization Practices (ACIP) for the Control and Elimination of Mumps* (2006), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm5522a4.htm). The label also has explained: "Following vaccination, antibodies associated with protection can be measured" by various tests and that "antibodies to . . . mumps . . . viruses are still detectable in most individuals 11-13 years after primary vaccination." Ex. 121 (current label) at 2.

**Response**: As to the first sentence, disputed that ACIP's 2006 recommendation for a second dose of mump vaccine for children was limited to outbreak settings. *See* Merck Ex. 51 at 7 (Huong McLean et al., *Prevention of Measles, Rubella, Congenital Rubella Syndrome, and Mumps, 2013: Summary Recommendations of the [ACIP],* MMWR, June 14, 2013, 62(4):1-34) ("ACIP specified in 2006 that all children … should receive 2 doses of mumps-

22

containing vaccine").  Undisputed that in 2006 ACIP recommended a second dose of mumps

vaccine for children.  As to the second sentence, disputed to the extent that Merck

characterizes statements on the MMR-II label as "explanations."  Undisputed that the current

MMR-II label contains the selectively quoted language.  The MMR-II label in full speaks for

itself.  The full quoted passage states: "Following vaccination, *antibodies associated with*

*protection can be measured by* neutralization assays, HI, or *ELISA* (enzyme linked

immunosorbent assay) tests. Neutralizing and ELISA antibodies to measles, mumps, and

rubella viruses are still detectable in most individuals 11 to 13 years after primary

vaccination."  Merck Ex. 121 at 2 (current MMR-II label) (emphasis added).

64.    The label has made no further statements about immunogenicity or
seroconversion in response to the mumps vaccine. Ex. 121 (current label).

**Response**: Disputed.  The phrase "no further statements" invokes unspecified facts which

makes it impossible to answer this statement as a stand-alone fact.  Without enumerating the

specific statements about immunogenicity or seroconversion in response to the mumps

vaccine Merck considers in the label for this fact, it is not possible to answer if there are any

"further statements" in the label.

65.    When CDC mumps experts have published on their understanding of the
seroconversion rate of Merck's mumps vaccine, they have looked to published literature, not to
the MMR label.  Ex. 41 (Pallansch Dep. Tr.) at 80:12-19.

**Response**:  Disputed. The CDC reviews and relies on vaccine labels for an understanding

about seroconversion rates measured in the vaccine's clinical trials and supporting FDA

licensure.[38]

---

[38]  Ex. 245 at 160:5 168:8 (Merck Expert Atkinson Dep.) (testifying he reviewed all vaccine labels as part of his
work at the CDC because "there's important information … to describe the studies that led to licensure. …  There's
important information in all package inserts because of what FDA requires to be included that is helpful in my role
as being someone who tries to educate doctors and nurses about the characteristics of any given vaccine.")  ("Q.
What's the basis of your understanding as to what Merck did to support its application, license application, for

23

66.     Included in the FDA-approved label for MMR-II is a statement concerning the *potency* of the MMR II vaccine.  Ex. 121 (current label).

**Response**: Undisputed.

67.     *Potency* in the label describes the concentration of virus in each dose of vaccine. Ex. 122 (Morrisey Dep. Tr.) at 27:23-28:13.

**Response**: Undisputed.

68.     Potency in the label is reported in units of "tissue culture infective dose" ($TCID_{50}$). Potency values expressed using this measurement represent the viral concentration necessary to induce cell death or pathological changes in 50% of inoculated cell cultures. Ex. 91 (Gulati Report) at ¶ 22.

**Response**: Undisputed.

69.     Potency values can be expressed as simple numbers or as log base 10 values (*e.g.*, 20,000 $TCID_{50}$ or 4.3 $\log_{10} TCID_{50}$). Ex. 200 (Musey Dep. Tr.) at 102:2-19.

**Response**: Undisputed.

70.     As of the late 1990s, the MMR-II label stated that "[e]ach 0.5 mL dose contains not less than . . . 20,000 $TCID_{50}$ of mumps virus"    equivalent to 4.3 $\log_{10} TCID_{50}$. Ex. 166 (April 1999 Label), at 1.

**Response**: Undisputed that from 1999-2007 the MMR-II label stated that "[e]ach 0.5 mL

dose contains not less than . . . 20,000 $TCID_{50}$ of mumps virus"    equivalent to 4.3 $\log_{10}$

$TCID_{50}$.[39]

71.     The mumps vaccine is a live virus vaccine containing live viral cells, and as such, the volume of live cells in the vaccine (i.e. potency) is known to decrease over time. This degradation can be impacted by environmental conditions, including, for example, the

---

ProQuad?  A. I reviewed the label.") (testifying label contains "important information I need to know" and that it "oftentimes [is] the best description of how the vaccine was approved.  In the case of ProQuad, that was the case.") (testifying CDC's understanding of clinical trial results supporting licensure, shelf life, and potency comes from the label); ECF No. 49 2 (Merck's Reply in Supp. of Mot. to Dismiss) at 2 (the vaccine label is "the definitive source of product information under the FDA's regulatory scheme"); *Mazur v. Merck & Co.*, 964 F.2d 1348, 1367 (3d Cir. 1992) ("The [vaccine label's] intended audience is not the ultimate user, but rather … the CDC, who [is] contractually obligated to develop a meaningful warning for vaccinees or their parents.") ("[T]he [vaccine label's] intended audience here is the CDC, who Merck contractually obligated to develop a warning in lay terms").

[39] *See* Merck SUMF1 ¶ 50 *citing* Merck Ex. 222 (Oct. 2000), Merck Ex. 236 (Feb. 2000), Merck Ex. 223 (Feb. 2001), Merck Ex. 224 (Aug. 2001), Merck Ex. 229 (Sept. 2002), Merck Ex. 228 (Oct. 2003), Merck Ex. 225 (Feb. 2006), Merck Ex. 230 (Feb. 2007), Merck Ex. 231 (Feb. 2007).

24

temperature at which the vaccine is stored. Ex. 112 (Excerpts of Phillip L. Gomez & James M. Robinson, *Vaccine Manufacturing* in Stanley Plotkin et al. eds., *Vaccines* (2018 7th ed.) at 54; Ex. 91 (Gulati Report) at ¶ 24.

**Response**: Undisputed.

72.    CDC administers the federal Vaccines for Children (VFC) program. Ex. 38 (About VFC, https://www.cdc.gov/vaccines/programs/vfc/about/index.html (last reviewed Sept. 26, 2019).

**Response**: Undisputed.

73.    The VFC program helps "provide vaccines to children whose parents or guardians may not be able to afford them." *Id*. Vaccines available through the VFC program "are those recommended by [ACIP]." *Id*.

**Response**: Undisputed.

74.    VFC is an entitlement program. Under this program, CDC is directed to purchase vaccines that ACIP has included within the VFC program. 42 U.S.C. § 1396s (d)(1) ("[t]he Secretary shall negotiate and enter into contracts with manufacturers of pediatric vaccines . . . to purchase vaccines."); *see also id*. § 1396s(e) ("The Secretary shall use, for the purpose of the purchase, delivery, and administration of pediatric vaccines under this section, the list established (and periodically reviewed and as appropriate revised) by the Advisory Committee on Immunization Practices (an advisory committee established by the Secretary, acting through the Director of the Centers for Disease Control and Prevention)."); *see also* Ex. 39 (ACIP Charter, *available at* https://www.cdc.gov/vaccines/acip/committee/acip-charter.pdf (approved March 27, 2018)) at 2 ("In accordance with Section 1928 of the Social Security Act, the ACIP also shall establish and periodically review and, as appropriate, revise the list of vaccines for administration to children and adolescents eligible to receive vaccines through the Vaccines for Children Program . . . The Secretary, and as delegated CDC Director, shall use the list established by the ACIP for the purpose of the purchase, delivery, and administration of pediatric vaccines in the Vaccines for Children Program."); Ex.40 (Nichols Report) at 8-10.

**Response**: Disputed to the extent Merck implies that CDC must contract "to purchase vaccines that ACIP has included within the VFC program." *See* Ex. 41 at 105:8-22 (Merck Expert Nichols Dep.) ("CDC is not in full control of [contracting to purchase] … the mandatory nature of it is that CDC, in my opinion, has to at least try to establish a contract for the product that the ACIP has recommended.").  Otherwise undisputed.

75.    The purchase of Merck's mumps-containing vaccines by CDC is mandatory because Merck's MMR-II and ProQuad vaccines are licensed by FDA and mumps is included

25

within the VFC program per ACIP resolution. Ex. 41 (Pallansch Dep. Tr.) at 101:6-8 (CDC's Director of the Division of Viral Diseases in the National Center for Immunization and Respiratory Diseases testifying that once a vaccine is recommended by ACIP "then the purchase [by CDC] through VFC . . . is automatic"); Ex. 40 (Nichols Report) at 11; Ex. 42 (1971 MMR Product License) at MRK-KRA01972538 ; Ex. 43 (1995 MMR Product License at MRK-KRA01676252; Ex. 44 (Establishment License) at MRK-KRA01676250); *see also* Ex. 45 (ACIP Resolution 10/17-3 for MMR and Varicella (Oct. 25, 2017) (including vaccine for measles, mumps, rubella (MMR) and measles, mumps, rubella, varicella (MMRV) within current recommended ACIP schedule); *see also* Ex. 46 (ACIP Resolution 6/06-1, June 29, 2016) (listing mumps for inclusion in the list of diseases for which vaccines should be in the VFC program).

**Response**: Disputed that the CDC's purchase of Merck's mumps vaccines is mandatory or automatic. *See* Ex. 41 at 105:8-22 (Merck Expert Nichols Dep.) ("CDC is not in full control of [contracting to purchase] … the mandatory nature of it is that CDC, in my opinion, has to at least try to establish a contract for the product that the ACIP has recommended."). *See also id*. at 105:15-16, 106:7-9 ("[E]stablishing a contract is far from automatic."); ("I took issue with the word "automatic" having worked in the procurement and grants office …").

76.     "The ACIP includes 15 voting members responsible for making vaccine recommendations.  The Secretary of the U.S. Department of Health and Human Services (DHHS) selects these members following an application and nomination process.  Fourteen of the members have expertise in vaccinology, immunology, pediatrics, internal medicine, nursing, family medicine, virology, public health, infectious diseases, and/or preventive medicine; one member is a consumer representative who provides perspectives on the social and community aspects of vaccination.  In addition to the 15 voting members, ACIP includes 8 ex officio members who represent other federal agencies with responsibility for immunization programs in the United States, and 30 non-voting representatives of liaison organizations that bring related immunization expertise."  (CDC, *ACIP Committee Members*, https://www.cdc.gov/vaccines/acip/members/index.html)

**Response**: Undisputed the CDC website https://www.cdc.gov/vaccines/acip/members/index.html currently contains the quoted language.  The cited document (Merck Ex. 209) in full speaks for itself.

77.     The ACIP membership includes some of the leading figures in vaccine expertise. Ex. 41 (Pallansch Dep. Tr.) at 44:11-44:14, 47:20-48:3.

**Response**: Undisputed.

26

78.    ACIP's charter provides a description of its duties. It states in part: "Committee deliberations on use of vaccines to control disease in the U.S. shall include considerations of disease epidemiology and burden of disease, vaccine efficacy and effectiveness, vaccine safety, the quality of evidence reviewed, economic analyses and implementation issues." Ex. 39 (ACIP Charter, *available at* https://www.cdc.gov/vaccines/acip/committee/charter.html) at 2; *see also* Ex. 47 (ACIP Policies and Procedures (Dec. 2018) at 1.

**Response**: Undisputed.

79.    Once a vaccine is licensed, the data most important to ACIP when evaluating the use of a vaccine to control disease is that regarding the vaccine's safety and effectiveness. Ex. 49 (Atkinson Report) at 16-17.

**Response**: Undisputed.

80.    Evaluations of vaccine effectiveness and the conduct of outbreak investigations are the responsibility of CDC. The mission statement for the National Center for Immunization and Respiratory Diseases (NCIRD), one of four Centers within CDC Office of Infectious Diseases, identifies "respond[ing] to disease outbreaks domestically and abroad" as a responsibility. The Division of Viral Diseases (DVD), a division of the NCIRD, identifies as its mission the "prevent[ion of] disease, disability, and death through immunization and by control of . . . viral diseases."  In furtherance of this mission, the DVD, for example, conducts surveillance and related activities to monitor the impact of vaccination, estimates vaccine effectiveness, and consults, supports, and/or participates in investigations of national and international outbreaks of viral vaccine preventable diseases. Ex. 50 (NCIRD Mission/Function Statement, https://www.cdc.gov/maso/pdf/NCIRDfs.pdf) at 1, 8.

**Response**:  Disputed because the statement implies Merck does not have an independent duty to ensure its vaccines are safe and effective.[40]  Also disputed because Merck has a continuous obligation to report to the CDC and FDA all information material to how well the vaccine protects against disease.[41]

---

[40] Rel. 56 Stat. ¶ 11, *citing* Ex. 14 at '088 ("We recognize that [Merck is] the sole supplier to the United States of measles, mumps, rubella and varicella containing vaccines, and as such, we are responsible for ensuring the uninterrupted supply of safe and efficacious vaccines."); Ex. 3 ¶ 378 (Kessler Rep.) (It is "the manufacturers' responsibility to ensure their vaccines are safe and effective and have labeling that is not false or misleading."); Ex. 4 at 356:14 17 (Kessler Dep.) ("[I]t's [Merck's] responsibility to assure the safety and efficacy of the vaccine."); 21 C.F.R. § 201.57(c)(2) ("All indications [for a drug] shall be supported by substantial evidence of effectiveness based on adequate and well controlled studies; *Wyeth v. Levine*, 555 U.S. 555, 566 (2009) ("[FDCA] amendments required the manufacturer to prove the drug's effectiveness by introducing 'substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling.'").

[41] Rel. 56 Stat. ¶¶ 15 16, *citing Mazur v. Merck & Co.*, 767 F. Supp. 697, 701 03 (E.D. Pa. 1991) (describing Merck's delegation of its duty to warn to the CDC through a provision in the Merck/CDC vaccine purchase

27

Appx18778

81.     Consistent with this mission, a "major" responsibility and a "key function" of CDC is to "measure vaccine effectiveness for both old and new products."  Ex. 41 (Pallansch Dep. Tr.) at 33:19-21, 101:10-16.

**Response**: Undisputed.

82.     Because "[e]ffectiveness is the [CDC's] single-most important measure in terms of the impact that a vaccine has on disease in the population," CDC conducts vaccine effectiveness studies either independently or often times in collaboration with state health departments and/or academics. CDC's role is to "look and evaluate post-marketing how the vaccine is performing in the real world as opposed to clinical trial data, which is . . . the basis that is often used by the FDA for the purpose of licensure."  *Id.* at 22:16-23:2, 33:3-5, 42:17-19.

**Response**: As to the first sentence, disputed to the extent the evidence cited does not support

Merck's proffered fact that the "CDC conducts vaccine effectiveness studies either

independently or often times in collaboration with state health departments and/or

academics" *because* "[e]ffectiveness is the [CDC's] single-most important measure."

Undisputed that Dr. Pallansch testified "[e]ffectiveness is the [CDC's] single-most important

measure in terms of the impact that a vaccine has on disease in the population" and also that

effectiveness studies "can be conducted by CDC, other state health departments, and with or

without collaborations of academic collaborators."  As to the second sentence, disputed to the

extent the statement ignores that ACIP is "mandated" by "the [ACIP] charter" to "review

---

contract); Ex. 249 at 143:25 145:4 (CDC 30(b)(6) Sims Dep.) (Merck requests its contracts with CDC include this delegation of its duty to warn to CDC); 42 U.S.C. § 300aa 22 (incorporating into National Childhood Vaccine Injury Act delegation of duty to warn to CDC); *Mazur v. Merck & Co.*, 964 F.2d 1348, 1365 66 (3d Cir. 1992) ("[Merck's] responsibility [to provide accurate and up to date safety and efficacy information to the CDC] is continuous, and it must therefore apprise the CDC of any risks it later discovers, or in the exercise of reasonable care, should have discovered."); Ex. 3 ¶¶ 138 39 (Kessler Rep.) (vaccine manufacturers have duty to apprise the government of problems concerning "vaccine efficacy, including duration of protection, immunogenicity … and stability"); *id.* at ¶ 138 (Kessler Rep.) ("To fulfill its obligations under the [National Childhood Vaccine Injury Act] with respect to its duty to warn of potential vaccine risks or hazards, a manufacturer must provide adequate warnings and directions to the intermediary who … provides the information to the vaccine recipient."); *see also infra* ¶¶ 249, 269 (citing evidence of duty to warn); Ex. 6 at 55:5 10, 142:19 22, 145:14 21(Merck Expert Burlington Dep.) (testifying lack of efficacy or effectiveness "would be one of the reportable concerns that a manufacturer would have to tell the agency") (testifying if Merck knew it did not comply with potency specification, then "if the product is … within the expiry dating period, they have an obligation to report that to the [FDA], … investigate[,] and … take any appropriate actions."); Ex. 3 ¶ 379 (Kessler Rep.) (The "manufacturer must provide updates with any information it later discovers, or in the exercise of reasonable care, should have discovered about its vaccine … such as vaccine efficacy, including duration of protection, immunogenicity … and stability ...").

28

Appx18779

those clinical trials and the efficacy and safety data resulting from those trials and uses that

information in assessing what recommendations, if any, it's going to make." Ex. 15 at 91:19-

92:19 (Merck Expert Temte Dep.).[42]  As to both sentences, disputed to the extent Merck

implies the CDC does not review and rely on the vaccine labels for an understanding about

the vaccine's shelf life, potency, clinical trial results, and basis for licensure.  Rel. 56. Stat. ¶

178.[43]  Otherwise undisputed.

83.   "Vaccine effectiveness studies in general are not often conducted by the
manufacturers."  CDC also understands that manufacturers are "not obligated to share
unpublished data with CDC specifically."  *Id*. at 42:15-16; 112:3-14.

**Response**: As to the first sentence, disputed.  *See* Ex. 428 at 2 (Merck Expert Atkinson Dep.,

Ex. 2) (CDC identifying as inaccurate or incomplete excerpt of Merck Expert Atkinson's

expert report stating "[n]either the FDA nor the manufacturer participate in the evaluation of

post-licensure vaccine effectiveness," citing to manufacturer-conducted post-marketing

studies of long-term efficacy and immunogenicity of the shingles vaccine).  Also disputed to

---

[42] *See also* Rel.56 Stat. ¶ 239, *citing among other evidence* Ex. 252 at 29 30 (Merck Expert Temte Rep.) ("New vaccine recommendations … are largely dependent on the results of studies conducted by the manufacturer.  These studies are required for licensure by the FDA and include detailed information on safety, efficacy, and other vaccine features."); Ex. 252 at 49 (Merck Expert Temte Rep.) ("ACIP uses clinical trial data for new vaccines."); Ex. 15 at 97:17 19 (Merck Expert Temte Dep.) ("ACIP will look at the clinical trial data for all new vaccines to evaluate … effectiveness."); Ex. 22 at 22 (Merck Expert Atkinson Rep.) ("Clinical trial data (efficacy and safety) generated by the manufacturer help inform subsequent recommendations made by the ACIP."); Ex. 22 at 23 (Merck Expert Atkinson Rep.) ("Initial vaccine recommendations made by ACIP are based upon … efficacy and safety data generated by the manufacturer in clinical trials."); Ex. 22 at 23 (Merck Expert Atkinson Rep.) ("ACIP recommendations … will be based upon pre licensure clinical trials performed by the manufacturer.").

[43] *Citing* Ex. 245 at 160:5 168:8 (Merck Expert Atkinson Dep.) (testifying he reviewed all vaccine labels as part of his work at the CDC because "there's important information … to describe the studies that led to licensure. … There's important information in all package inserts because of what FDA requires to be included that is helpful in my role as being someone who tries to educate doctors and nurses about the characteristics of any given vaccine.") ("Q. What's the basis of your understanding as to what Merck did to support its application, license application, for ProQuad?  A. I reviewed the label.") (testifying label contains "important information I need to know" and that it "oftentimes [is] the best description of how the vaccine was approved.  In the case of ProQuad, that was the case.") (testifying CDC's understanding of clinical trial results supporting licensure, shelf life, and potency comes from the label); ECF No. 49 2 (Merck's Reply in Supp. of Mot. to Dismiss) at 2 (the vaccine label is "the definitive source of product information under the FDA's regulatory scheme"); *Mazur v. Merck & Co.*, 964 F.2d 1348, 1367 (3d Cir. 1992) ("The [vaccine label's] intended audience is not the ultimate user, but rather … the CDC, who [is] contractually obligated to develop a meaningful warning for vaccines or their parents.") ("[T]he [vaccine label's] intended audience here is the CDC, who Merck contractually obligated to develop a warning in lay terms").

the extent Merck implies clinical trials conducted by manufacturers do not speak to vaccine

effectiveness.  Ex. 429 at 1 (FDA, Ensuring the Safety of Vaccines in the United States,

available at https://www.fda.gov/files/vaccines,%20blood%20&%20biologics/published/Ens

uring-the-Safety-of-Vaccines-in-the-United-States.pdf) ("The results of the clinical trials are

a part of FDA's evaluation to assess the safety and effectiveness of each vaccine.").  As to the

second sentence, disputed because the statement ignores that vaccine manufacturers are

obligated to report to the CDC all information material to how well the vaccine protects

against disease, published or not.  *See* Rel. 56 Stat. ¶ 15.[44] *See also* Ex. 7 at 111:22-112:2

(CDC 30(b)(6) Pallansch Dep.)  (CDC 30(b)(6) Pallansch Dep.) ("What [CDC does] is use

information that manufacturers are willing to provide, often unpublished, that can inform the

work group of data relevant to the question of vaccine efficacy or effectiveness. Often it's

efficacy that's the data that they have.").

84.     CDC has conducted multiple mumps effectiveness studies and after them has concluded that "[t]here has been no significant change in the estimates of vaccine effectiveness for more than 10 years in general"    referring to the 10 year period ending in October 2017. *Id.* at 129:7-11; *see also* Ex. 49 (Atkinson Report) at 8.

**Response**:  Disputed because Merck does not account for the fact that this reference to

effectiveness means the median effectiveness rate measured across multiple studies and that

the lower-end of the range of these effectiveness results, as reported by the CDC, has

---

[44] *Citing Mazur v. Merck & Co.*, 767 F. Supp. 697, 701 03 (E.D. Pa. 1991) (describing Merck's delegation of its duty to warn to the CDC through a provision in the Merck/CDC vaccine purchase contract); Ex. 249 at 143:25 145:4 (CDC 30(b)(6) Sims Dep.) (Merck requests its contracts with CDC include this delegation of its duty to warn to CDC); 42 U.S.C. § 300aa 22 (incorporating into National Childhood Vaccine Injury Act delegation of duty to warn to CDC); *Mazur v. Merck & Co.*, 964 F.2d 1348, 1365 66 (3d Cir. 1992) ("[Merck's] responsibility [to provide accurate and up to date safety and efficacy information to the CDC] is continuous, and it must therefore apprise the CDC of any risks it later discovers, or in the exercise of reasonable care, should have discovered."); Ex. 3 ¶¶ 138 39 (Kessler Rep.) (vaccine manufacturers have duty to apprise the government of problems concerning "vaccine efficacy, including duration of protection, immunogenicity … and stability"); *id.* at ¶ 138 (Kessler Rep.) ("To fulfill its obligations under the [National Childhood Vaccine Injury Act] with respect to its duty to warn of potential vaccine risks or hazards, a manufacturer must provide adequate warnings and directions to the intermediary who … provides the information to the vaccine recipient."); *see also infra* ¶¶ 249, 269 (citing evidence of duty to warn).

consistently decreased since 2006.[45]  Undisputed that CDC has conducted multiple mumps

effectiveness studies.

85.    CDC has noted that "[c]linical studies conducted before vaccine licensure in approximately 7,000 children found a single dose of mumps vaccine to be approximately 95% effective in preventing mumps disease. However, vaccine effectiveness estimates have been lower in post-licensure studies." Ex. 51 (Huong McLean et al., *Prevention of Measles, Rubella, Congenital Rubella Syndrome, and Mumps, 2013:  Summary Recommendations of the [ACIP],* MMWR, June 14, 2013, 62(4):1-34) at 10.

Response: Undisputed that the evidence cited contains the selectively quoted language

(along with citations that Merck omitted from its statement).  The cited document in full

speaks for itself.

86.    In 1998, CDC observed that in "controlled clinical trials, one dose of vaccine was approximately 95% efficacious in preventing mumps disease" but the effectiveness of the vaccine observed in field studies was lower ranging from 75% to 95%. Ex. 53 [May 22, 1998 MMWR] (MMWR's *Measles, Mumps and Rubella    Vaccine use and Strategies for Elimination of Measles, Rubella and Congenital Rubella Syndrome and Control of Mumps: Recommendations of the Advisory Committee on Immunization Practices* ) at 6.

Response:  Undisputed.

87.    CDC has known since at least the early 1980s that the vaccine effectiveness estimates for mumps have ranged from 75% to 95%. *See, e.g.*, Ex. 214 [November 26, 1982 MMWR] (Recommendation of the Immunization Practices Advisory Committee Mumps Vaccine) at 2; Ex. 213 [June 9, 1989 MMWR] (Recommendations of the Immunization Practices Advisory Committee Mumps Prevention) at 2.

Response:  Disputed.  The evidence cited does not support Merck's proffered statement that

"CDC has known since at least the early 1980s that the vaccine effectiveness estimates for

mumps have ranged from 75% to 95%."  Merck Ex. 214 ("Reported clinical vaccine

efficacies have ranged from 75%-90%).  Also disputed because Merck does not account for

---

[45] *See* Rel. 56 Add'l. Stat. SJ1 and SJ4 ¶ 45.

Appx18782

the fact that the lower-end of the range of these effectiveness results, as reported by the CDC, has consistently decreased since 2006 and is currently 31%.[46]

88.     Accordingly, CDC understands "that the effectiveness of the vaccine in the real world application is lower than the efficacy that was found in the initial clinical trials." Ex. 41 (Pallansch Dep. Tr.) at 39:11-20.

**Response**:  Disputed to the extent the word "[a]ccordingly" invokes unspecified facts outside

the statement which makes it impossible to answer as a stand-alone fact.  Undisputed that the

evidence cited contains the selectively quoted language.

89.     CDC's current view is that the recommended two doses of the MMR vaccine are "88% effective against mumps." Ex. 52 (CDC, *Measles, Mumps, and Rubella (MMR) Vaccination: What Everyone Should Know*, https://www.cdc.gov/vaccines/vpd/mmr/public/index.html)at 4.

**Response**: Disputed. CDC has stated that two doses of MMR have a *median* mumps

effectiveness rate of 88%, with the current range of mump effectiveness rates spanning from

31% to 95%.[47]

90.     The CDC Merck's contracts with CDC for its mumps vaccines are negotiated annually, for one-year terms. Ex. 75 (Sims Dep. Tr.) at 80:16-19. CDC's VFC contracts with Merck concerning the purchase of its mumps-containing vaccines do not include any terms that require a vaccine meet or have previously met any specific effectiveness rate, efficacy rate, seroconversion rate, specified potency value, or safety requirements (each of the below collective referred to herein as the "CDC Contracts"):

| Contract Year | Award / Effective Date | Exhibit No. | Bates No. | Mumps Products Included |
|---|---|---|---|---|
| 1998 | 5/5/1998 | 54 | MRK-KRA01371728 | M-M-R II |
| 1999 | 4/1/1999 | 55 | MRK-KRA01371751 | M-M-R II |
| 2000 | 4/1/2000 | 56 | MRK-KRA01371693 | M-M-R II |
| 2001 | 4/1/2001 | 57 | MRK-KRA01371656 | M-M-R II |

---

[46]  *See* Rel. 56 Add'l. Stat. SJ1 and SJ4 ¶ 45.

[47]  *See* Rel. 56 Add'l. Stat. SJ1 and SJ4 ¶ 45.

| Contract Year | Award / Effective Date | Exhibit No. | Bates No. | Mumps Products Included |
|---|---|---|---|---|
| 2002 | 4/1/2002 | 58 | MRK-KRA01371785 | M-M-R II |
| 2003 | 4/1/2003 | 59 | MRK-KRA01371311 | M-M-R II |
| 2004 | 4/1/2004 | 60 | MRK-KRA01371280 | M-M-R II |
| 2005 | 4/1/2005 | 61 | MRK-KRA01371341 | M-M-R II |
| 2006 | 4/1/2006 | 62 | MRK-KRA01371624 | M-M-R II & ProQuad |
| 2007 | 4/16/2007 | 63 | MRK-KRA01371604 | M-M-R II & ProQuad |
| 2008 | 4/1/2008 | 64 | MRK-KRA01371817 | M-M-R II & ProQuad |
| 2009 | 4/1/2009 | 65 | MRK-KRA01371880 | M-M-R II & ProQuad |
| 2010 | 4/1/2010 | 66 | MRK-KRA01371373 | M-M-R II & ProQuad |
| 2011 | 4/1/2011 | 67 | MRK-KRA01371497 | M-M-R II |
| 2012 | 4/1/2012 | 68 | MRK-KRA01371398 | M-M-R II & ProQuad (as optional) |
| 2013 | 4/1/2013 | 69 | MRK-KRA01371422 | M-M-R II & ProQuad |
| 2014 | 4/1/2014 | 70 | MRK-KRA01371473 | M-M-R II & ProQuad |
| 2015 | 4/1/2015 | 71 | MRK-KRA01372045 | M-M-R II & ProQuad |
| 2016 | 4/1/2016 | 72 | MRK-KRA01371962 | M-M-R II & ProQuad |

**Response**: As to the first sentence, undisputed. As to the second sentence, disputed because VFC contracts contain numerous requirements including meeting the minimum 12-month shelf life; complying with cGMP (including with adequate assurances of meeting minimum potency value through shelf life and safety); complying with the warranty of merchantability;

33

and apprising the CDC of any issues with the vaccine.  Rel. 56 Stat. ¶¶ 246-49.[48]  Undisputed

that the contracts do not contain a reference to a specific "effectiveness rate, efficacy rate, or

---

[48] *Citing* Ex. 249 at 72:25 73:5, 122:22 123:15 (CDC 30(b)(6) Sims Dep.) (testifying CDC requires 12 month shelf life remaining on vaccines it purchases); Ex. 249 at 112:3 19 (CDC 30(b)(6) Sims Dep.) (testifying "shelf life" provisions are among the "important terms, certainly"); Ex. 249 at 75:12 20, 77:1 4, 128:21 23 (CDC 30(b)(6) Sims Dep.) (testifying if vaccine shelf life is less than 12 months after delivery, CDC may ask for money back); Ex. 249 at 76:2 5, 124:17 25 (CDC 30(b)(6) Sims Dep.) (testifying if vaccine unable to meet 12 month shelf life after delivery, manufacturer "would certainly need to let us know"); Ex. 249 at 163:5 12 (CDC 30(b)(6) Sims Dep.) (testifying if manufacturer becomes aware of something that violates contract terms or conditions, like 12 month shelf life requirement, manufacturer "would notify" CDC); Ex. 265 at 16 (Merck Expert Nichols Rep.) ("CDC contracts require that … Merck's mumps containing vaccines have a 'minimum 12 month shelf life remaining upon delivery' to CDC."); Ex. 41 at 45:1 20 (Merck Expert Nichols Dep.) (testifying CDC contract "could be void" if CDC learned expiration date on vaccine label was not true expiration date); Ex. 41 at 97:13 23 (Merck Expert Nichols Dep.) (testifying CDC would never knowingly purchase expired vaccine and health care providers would not use it); Ex. 41 at 19:6 20:9 (Merck Expert Nichols Dep.) ("CDC would not initiate procurement for a product without [certain characteristics," including "a 12 month shelf life"); Ex. 41 at 19:6 20:15 (Merck Expert Nichols Dep.) ("CDC would not release an RFP to get proposals from potential vendors and would not accept a proposal without the product having [certain] qualifications," including "a 12 month shelf life"); Ex. 41 at 29:24, 30:4 5 (Merck Expert Nichols Dep.) (identifying minimum "12 month shelf life" as one of the "prerequisites to a CDC purchase of a [VFC] vaccine"); Ex. 249 at 77:7 10 (CDC 30(b)(6) Sims Dep.) (testifying cGMP compliance is key CDC contractual term); Ex. 249 at 193:19 194:2 (CDC 30(b)(6) Sims Dep.) (testifying cGMP violations "[c]ertainly … would be a violation of the terms and conditions of the [CDC] contract, and certainly [CDC would] want to know"); Ex. 249 at 192:20 193:10 (CDC 30(b)(6) Sims Dep.) (testifying if cGMP compliance issue potentially impacts the contract, the CDC certainly would discuss that issue); Ex. 41 at 19:6 20:9 (Merck Expert Nichols Dep.) ("CDC would not initiate procurement for a product without [certain] characteristics," including compliance with cGMP); Ex. 41 at 19:6 20:15 (Merck Expert Nichols Dep.) ("CDC would not release an RFP to get proposals from potential vendors and would not accept a proposal without the product having [certain] qualifications," including compliance with cGMP); Ex. 41 at 30:1 5 (Merck Expert Nichols Dep.) (identifying compliance with "CGMP" as one of the "prerequisites to a CDC purchase of a [VFC] vaccine"); Ex. 5 ¶ 26 (Merck Expert Burlington Rep.) ("The cGMP regulations and guidances … require stability testing to establish the potency of biological products through their labeled expiry date."); Ex. 3 ¶ 419.3 (Kessler Rep.) ("Merck was required to have adequate procedures to assure that MMR II vaccine had [the required] amount of mumps virus per dose through end expiry."); *see also* Ex. 16 ¶ 8(4) (Calcott Rep.) ("Merck failed to maintain its manufacturing operations in a GMP compliant manner over the period 2000 2005, producing Mumps vaccine materials that did not consistently meet the label claim for potency through the shelf life, yet marketing these adulterated products."); Ex. 249 at 83:16 84:16, 138:13 139:16 (CDC 30(b)(6) Sims Dep.) (testifying CDC contract incorporates a warranty of merchantability, which requires vaccines to perform their intended purpose); Ex. 249 at 85:19 21 (CDC 30(b)(6) Sims Dep.) (testifying CDC would certainly want to know if something potentially violates warranty clause of CDC contract); Ex. 41 at 19:6 20:9 (Merck Expert Nichols Dep.) ("CDC would not initiate procurement for a product without [certain] characteristics," including "that the product is merchantable"); Ex. 41 at 19:6 20:15 (Merck Expert Nichols Dep.) ("CDC would not release an RFP to get proposals from potential vendors and would not accept a proposal without the product having [certain] qualifications," including "that the product is merchantable"); Ex. 41 at 30:1 5 (Merck Expert Nichols Dep.) (identifying "merchantability" as one of the "prerequisites to a CDC purchase of a [VFC] vaccine"); Ex. 249 at 24:24 26:14, 143:25 145:4 (CDC 30(b)(6) Sims Dep.) (testifying the CDC's duty to warn requirement (of benefits and risks of vaccine) came from Merck); Ex. 249 at 163:9 12 (CDC 30(b)(6) Sims Dep.) (testifying if manufacturer "become[s] aware of something that violates the terms and conditions of the contract," like "shelf life" requirement, manufacturer "would notify [CDC]"); *Mazur v. Merck & Co.*, 767 F. Supp. 697, 701 703 (E.D. Pa. 1991) (describing Merck's delegation of its duty to warn to the CDC through a provision in the Merck/CDC vaccine purchase contract); *Mazur v. Merck & Co.*, 964 F.2d 1348, 1365 66 (3d Cir. 1992) ("[Merck's] responsibility [to provide accurate and up to date safety and efficacy information to the CDC] is continuous, and it must therefore apprise the CDC of any risks it later discovers, or in the exercise of reasonable care, should have discovered.").

seroconversion rate."  As to the table, disputed to the extent the 1998   2001 VFC contracts

also included MumpsVax.  *See* Merck Exs. 54 at '732; Ex. 55 at '759; Ex. 56 at '702; Ex. 57

at '667.  Otherwise undisputed as to the table.

91.    CDC makes public the vaccines that it purchases, and the prices that it pays for them. For example, it posts them on a website, and the price list for April 6, 2001 is still available online. *Ex.* 73 (CDC, *CDC Vaccine Price List*, https://www.cdc.gov/vaccines/programs/vfc/awardees/vaccine-management/price-list/index.html) (listing current vaccine contract prices); Ex. 73 (CDC Vaccine Price List as of April 6, 2001, *available at* https://www.cdc.gov/vaccines/programs/vfc/awardees/vaccine-management/price-list/2001/2001-04-06.html); *see also* 48 C.F.R. §§ 5.301, 5.401(b) (requiring publication of certain information about federal contracts in excess of $25,000)

**Response**: Undisputed.

92.    According to CDC, the "[e]fficacy of the vaccine is not a procurement criteria" in CDC's Contracts with Merck for the purchase of mumps-containing vaccine. Ex. 74 (Ltr. from K. Norris to L. Dykstra (Nov. 24, 2015)) at MRK-KRA01373393 (responding to question 2 of Merck's May 18, 2015 set of questions); *see also* Ex. 75 (Sims Dep. Tr.) at 180:20-21 (testifying that " 'efficacy' is not expressly written in the contract as a requirement"); *id*. at 175:12-17 (same); *id.* at 182:21-183:9 (testifying that FDA "is the regulatory agency" and "there are things, I would think those type things [efficacy] maybe go into the licensing . . . FDA is issuing the license, and they're the regulatory agency on that.").

**Response**:  Disputed.  Vaccine effectiveness is significant to the CDC's purchase decision.

Rel. 56 Stat. ¶ 253.[49]  Ensuring vaccines are effective is a "key function" of the CDC.  Rel.

56 Stat. ¶ 9.  CDC will not purchase a vaccine unless it has been recommended by ACIP, Rel.

56 Stat. ¶ 245,[50] and ACIP's decisions to recommend new vaccines, or revise or withdraw

---

[49]  Ex. 249 at 85:25 86:9 (CDC 30(b)(6) Sims Dep.) (testifying CDC "certainly … want[s] safe and effective vaccines" so they accomplish the "intended purpose" of protecting the public health); Ex. 11 at 2 ("CDC has a major programmatic role in accomplishing reduction in vaccine preventable infectious disease through the agency's [Vaccines For Children] Program by using scarce public health federal funding to purchase effective vaccines for administration to children by public and private [Vaccines For Children] providers throughout the country."); Ex. 12 at 2 (same); *see also supra* ¶ 9 (citing evidence that "key function" of the CDC is ensuring vaccines are effective).

[50]  *Citing* Ex. 7 at 166:8 13 (CDC 30(b)(6) Pallansch Dep.) (testifying if ACIP stops recommending a vaccine, CDC will not purchase it); Ex. 22 at 9 (Merck Expert Atkinson Rep.) ("CDC does not purchase any vaccine until there is an ACIP recommendation for use of that vaccine …."); Ex. 41 at 19:6 20:9 (Merck Expert Nichols Dep.) ("CDC would not initiate procurement for a product without [certain] characteristics," including "a recommendation from the [ACIP]"); Ex. 41 at 19:6 20:15 (Merck Expert Nichols Dep.) ("CDC would not release an RFP to get proposals from potential vendors and would not accept a proposal without the product having [certain] qualifications," including "a recommendation from the [ACIP]"); Ex. 41 at 30:11 13 (Merck Expert Nichols Dep.) (testifying CDC

existing recommendations for vaccines, are based on, among other things, considerations of

vaccine efficacy and effectiveness. Rel. 56 Stat. ¶¶ 238, 241, 243.[51]  In addition, the CDC

includes in its VFC contracts with vaccine manufacturers numerous requirements relating to

efficacy, effectiveness, and protection afforded by the vaccines.  Rel. 56 Stat. ¶¶ 246-49.[52]

---

will not buy a vaccine not recommended by ACIP); Ex. 41 at 29:23, 30:2 5 (Merck Expert Nichols Dep.)
(identifying "recommendation by ACIP" as one of the "prerequisites to a CDC purchase of a [VFC] vaccine"); Ex.
41 at 121:13 17 (Merck Expert Nichols Dep.) ("If the product has changed in such a way that it would impact the
ACIP recommendations, then the scientific side of the house would want to know that to talk to the ACIP about it.").

[51]  *Citing* Ex. 280 at 2 ("[ACIP] deliberations on use of vaccines to control disease in the U.S. shall include
consideration of … vaccine efficacy and effectiveness, vaccine safety, [and] the quality of evidence reviewed, …
[ACIP] may revise or withdraw their recommendation(s) regarding a particular vaccine as new information on …
vaccine effectiveness or safety … or other data become available."); Ex. 252 at 24 (Merck Expert Temte Rep.)
(citing same); Ex. 22 at 19 (Merck Expert Atkinson Rep.) (citing same); Ex. 15 at 44:16 45:9 (Merck Expert Temte
Dep.) (testifying CDC tasks ACIP "to carefully evaluate safety, effectiveness, efficacy …"); Ex. 252 at 27 (Merck
Expert Temte Rep.) ("Important information necessary for … new or revised vaccine recommendations includes
assessments of … efficacy/effectiveness."); Ex. 15 at 135:13 15 (Merck Expert Temte Dep.) (testifying ACIP
recommendations based on efficacy, effectiveness, and safety); Ex. 252 at 30 31 (Merck Expert Temte Rep.)
("Several factors are considered in each ACIP vaccine recommendation" including "vaccine efficacy and
effectiveness …."); Ex. 22 at 16 (Merck Expert Atkinson Rep.) ("Once vaccines are licensed, the data most
important to the ACIP and the CDC is that regarding a vaccine's safety and effectiveness."); Ex. 245 at 34:10 15
(Merck Expert Atkinson Dep.) (testifying besides vaccine safety, "vaccine efficacy … is the … single most
important issue[] with vaccine manufacturers is the protection that those vaccines provide"); Ex. 7 at 98:21 99:2
(CDC 30(b)(6) Pallansch Dep.) (testifying part of process of generating ACIP recommendations is understanding the
benefits and risks of the vaccines CDC purchases); Ex. 280 at 2 ("[ACIP] may revise or withdraw their
recommendation(s) regarding a particular vaccine as new information on … vaccine effectiveness or safety … or
other data become available."); Ex. 7 at 102:9 11 (CDC 30(b)(6) Pallansch Dep.) (CDC "monitoring vaccine
effectiveness is almost always in the context of potential revisions to [ACIP] recommendations based on actual
experience."); Ex. 7 at 102:22 103:12 (CDC 30(b)(6) Pallansch Dep.) (testifying new information on vaccine
effectiveness can lead to informing ACIP there is a need to reevaluate its recommendation); Ex. 252 at 30, 31, 49
(Merck Expert Temte Rep.) ("Ongoing assessments … on clinical effectiveness … are of critical importance.")
("[V]accine recommendations are not fixed, but can adapt to changes in epidemiology, emerging evidence of
vaccine performance and safety, and programmatic issues.") ("ACIP relies on effectiveness data derived from real
world experience for reviewing, renewing and revising recommendations for existing vaccines."); Ex. 15 at 80:23
81:2 (Merck Expert Temte Dep.) ("A vaccine recommendation [by ACIP] could change depending on the
effectiveness …."); Ex. 22 at 17 (Merck Expert Atkinson Rep.) ("Vaccine effectiveness is monitored after licensure
to assure that the efficacy determined during pre licensure clinical trials continues after the vaccine is widely used.
…  Post licensure vaccine effectiveness monitoring has resulted in important changes being made to vaccine
recommendations.") (citing 1989 recommendation for second measles dose and 2018 recommendation for third
mumps dose during outbreaks resulting from mumps cases among highly vaccinated populations); Ex. 245 at 28:3
17 (Merck Expert Atkinson Dep.) ("[V]accine effectiveness is obviously kind of the most important thing that we
deal with …."); Ex. 11 at 2 ("Critical to [CDC/ACIP recommendations] is the agency receiving accurate information
from the vaccine manufacturers to better inform CDC/ACIP guidance"); Ex. 12 at 2 (same); Ex. 15 at 99:4 11
(Merck Expert Temte Dep.) ("Q. … [H]ow important is it to ACIP that the clinical trial data that it is reviewing for
newly licensed vaccines be accurate?  [A.] There is an assumption that the data emanating from a trial that was
implemented for FDA is accurate data.").

[52]  *See supra* note 48.

Also disputed to the extent that the author, source and admissibility of MRK-KRA01373393 has not been established.

93.    As CDC's contracting officer testified, CDC Contracts do not have express requirements that vaccines meet certain efficacy or effectiveness requirements. Ex. 75 (Sims Dep. Tr.) at 175:18-22 (testifying that effectiveness is not an express term in CDC contracts); *id*. at 109:6-15 (testifying that there is nothing specific in the contract for efficacy), *id.* at 83:10-19 (same for safety); *see also* Ex. 76 (Taylor Dep. Tr.) at 211:1-17; *id*. at 209:22-210:9 (testifying that Merck does not understand there to be any requirement in CDC Contracts for a certain efficacy rate for its mumps-containing vaccines).

**Response**:  Undisputed that at his deposition CDC contracting officer Mr. Sims agreed that the effectiveness of the vaccine is not an express term in the contract nor is it "specifically mentioned."  Disputed to the extent Merck implies the CDC's VFC contracts do not contain requirements relating to effectiveness afforded by the vaccines.  These VFC contracts require, among other things, that the vaccine meet the minimum 12-month shelf life and that the manufacturer comply with cGMP (including by having adequate assurances of minimum potency through shelf life); and comply with the warranty of merchantability, that Merck provide the CDC accurate and complete information regarding any issues with the vaccine including those related to effectiveness.[53]

94.    Nor are the topics of effectiveness, efficacy, immunogenicity, or potency discussed with CDC in the context of negotiating CDC's purchase of vaccines. Ex. 75 (Sims Dep. Tr.) at 110:20-112:2.

**Response**:  Disputed to the extent the phrase "nor are the topics " invokes unspecified facts outside the statement which makes it impossible to answer as a stand-alone fact.  Also disputed that the evidence cited supports Merck's proffered fact.  Undisputed that Mr. Sims testified that over the last five years that he has been involved in contract negotiations with Merck, he did not recall the issues of efficacy, potency, seroconversion rates,

---

[53] *See supra* note 44; Rel. 56 Stat. ¶¶ 246 49.

37

immunogenicity, and effectiveness levels coming up during those negotiations, despite

Merck's obligation to report to the CDC all information material to how well the vaccine

protects against disease. *See* Merck Ex. 75 (CDC 30(b)(6) Sims Dep.) at 110:20-112:2; Rel.

56 Stat. ¶ 15.[54]  Disputed to the extent Merck implies this information is not material to the

CDC's purchase decision.[55]

 95. During the course of negotiations with CDC for the purchase of mumps-
containing vaccines, Merck and CDC have not and do not discuss how well the vaccine works.
Ex. 76 (Taylor Dep. Tr.) at 198:6-11 ("Q: And during the Merck's negotiations with CDC about
the purchase of the mumps vaccine, do Merck and CDC discuss how well the vaccine works? . . .
A: No, we do not."); *see also* Ex. 77 (Duffy Dep. Tr.) at 269:10-17, 280:23-281:9 (testifying that
in the course of negotiations with CDC, clinical information    including efficacy and how well
the vaccine works    and safety are not discussed).

**<u>Response</u>**:  Disputed that the evidence cited supports Merck's proffered fact.  Undisputed

that Ms. Taylor and Ms. Duffy testified that CDC contracting officer Mr. Sims testified that

over the last five years that he has been involved in contract negotiations with Merck, he did

not recall the issues of efficacy, potency, seroconversion rates, immunogenicity, and

effectiveness levels coming up during those negotiations and that Ms. Duffy testified that in

her experience efficacy typically did not come up in contract negotiations with the CDC, she

would not be discussing how well the vaccine works with the CDC, and she did not recall if

safety came up, despite Merck's obligation to report to the CDC all information material to

how well the vaccine protects against disease.  *See* Merck Ex. 75 (CDC 30(b)(6) Sims Dep.

Tr.) at 110:20-112:2; Rel. 56 Stat. ¶ 15.[56]  Disputed to the extent Merck implies this

information is not material to the CDC's purchase decision.[57]

---

[54] *See supra* note 42.

[55] *See* Rel. Resp. SUMF1 ¶ 102.

[56] *See supra* note 44.

[57] *See* Rel. Resp. SUMF1 ¶ 102.

96.     Nor do CDC and Merck discuss in the course of their negotiations for CDC's purchase of mumps vaccines "the shelf life," Ex. 76 (Taylor Dep. Tr.) at 195:18-22, the safety, *id*. at 201:6-11, or any outbreaks with respect to mumps, *id*. at 200:20-24.

**Response**: Disputed.  In connection with Solicitation # 2006-N-082574, Merck and the CDC

discussed a proposed minimum shelf life of 8 months for ProQuad.  *See, e.g.,* Ex. 430 at

'187-88 ("Merck has proposed [to CDC] a minimum shelf life of 8 months for the new

MMR-V vaccine (brand name ProQuad).").  Disputed to the extent Merck implies this

information is not material to the CDC's purchase decision.[58]

97.     While CDC requires that any vaccine it purchases have a valid product license issued by FDA, FDA is "the regulatory agency for the vaccine" and CDC only checks "to make sure the vendor . . . has provided the license for [a] vaccine."  Ex. 75 (Sims Dep. Tr.) at 73:23-74:6.

**Response**: Undisputed that Mr. Sims testified that FDA is "the regulatory agency for the

vaccine" and that as part of the CDC's technical review, the Program Office "certif[ies] and

look[s] at the license to make sure that the vendor . . . has provided the license for that

vaccine."  Merck Ex. 75 at 73:23-74:6 (CDC 30(b)(6) Sims Dep.).  Disputed to the extent

Merck implies that CDC *only* checks "to make sure the vendor . . . has provided the license

for [a] vaccine."  The evidence cited does not support that proffered fact.  Mr. Sims testified

that his understanding is that CDC will not buy a vaccine without a valid FDA product

license and that if "something was mislabeled" CDC "would want to know about it."[59]

98.     To show licensure, a vaccine manufacturer need only submit to CDC the one-page FDA product license. *Id*. at 104:24-107:22, 131:9-132:24, 133:10-16; Ex. 43 (1995 MMR FDA product licenses) at MRK-KRA01676252; Ex. 42 (One-page FDA establishment license) at MRK-KRA01972538; Ex. 44 (FDA establishment license) at MRK-KRA01676250.

---

[58] *See* Rel. Resp. SUMF1 ¶ 102.

[59] Ex. 249 at 188:22 189:15 (CDC 30(b)(6) Sims Dep.) ("Certainly if something was mislabeled [CDC] would … want to know about it …."); Merck Ex. 75 at 74:7 14 (CDC 30(b)(6) Sims Dep.). *See also* Ex. 249 at 188:22 189:15 (CDC 30(b)(6) Sims Dep.) ("the vaccine should be properly labeled. And that's part of … what they're required to do is properly label.") ("if it's not properly labeled, then that's very problematic").

**Response**:  Disputed.  The evidence cited does not support Merck's proffered fact.  CDC

contracting officer Mr. Sims testified that the Program Office verifies vaccine licensure in

their technical review, he relies on their review, and with respect to proof of licensure, he

defers to Program Office on "what level they go into in their technical review."  Merck Ex.

75 at 104:24-107:22, 131:9-132:24, 133:10-16 (CDC 30(b)(6) Sims Dep.).  Also, the FDA

product license is not simply a one-page document, it also incorporates the sBLA and BLA.

Ex. 6 at 123:4-16 (Merck Expert Burlington Dep.) ("**Q.** … when you say licensing

documents where the specifications of the product are normally contained, what documents

are you referring to, specifically? … **A.** The Biologic License Application, as amended and

approved.").

99.    Manufacturers are not required "to submit any other regulatory documents during
the procurement process, because CDC defers to FDA on the regulation of vaccines."  Ex. 40
(Nichols Report) at 14.

**Response**:  Disputed.  Vaccine manufacturers are required to provide clinical trial data to

CDC/ACIP as part of the recommendation process for new vaccines, which is required for

the CDC's vaccine procurement process.  Ex. 15 at 91:19-92:19 (Merck Expert Temte Dep.)

("With new vaccines for FDA licensure, companies are required to provide clinical trial data

to show both safety and efficacy.").  ACIP is "mandated" by "the [ACIP] charter" to "review

those clinical trials and the efficacy and safety data resulting from those trials and uses that

information in assessing what recommendations, if any, it's going to make."  *Id.*[60]  Also

disputed to the extent the phrase "other regulatory documents" invokes unspecified facts

outside the statement which makes it impossible to answer as a stand-alone fact.

---

[60] *See also supra* note 42.

100.    CDC does not monitor or enforce FDA's regulations, including whether a vaccine manufacturer such as Merck has complied with FDA's current Good Manufacturing Practices (cGMP) regulations. Ex. 75 (Sims Dep. Tr.) at 77:7-19, 150:20-152:16.

**Response**: Disputed.  The CDC VFC contracts require compliance with cGMP regulations.

*See* Rel. 56 Stat. ¶ 247.[61]    The CDC would want to know about a cGMP compliance issue.

*Id.*[62]  Merck is obligated to disclose cGMP compliance issues that impact the safety or

effectiveness of the vaccine to the CDC.  *See id.* at ¶ 249.[63]

101.    CDC has never modified its contracting decisions because of vaccine manufacturer's failure to meet cGMP. *Id*. at 152:17-23.

**Response**:  Disputed. The evidence cited does not support Merck's proffered fact.  CDC

contracting officer Mr. Sims testified that he was not aware of any instance when CDC

modified its contracting decision because of a failure to meet cGMP or any information CDC

received from FDA about a failure to meet cGMP.  Merck Ex. 75 at 152:17-23 (CDC

30(b)(6) Sims Dep.).  The CDC VFC contracts require compliance with cGMP regulations.

*See* Rel. 56 Stat. ¶ 247.[64]   The CDC would want to know about a cGMP compliance issue.

---

[61]  *Citing among other evidence* Ex. 41 at 19:6 20:9 (Merck Expert Nichols Dep.) ("CDC would not initiate procurement for a product without [certain] characteristics," including compliance with cGMP); Ex. 41 at 19:6 20:15 (Merck Expert Nichols Dep.) ("CDC would not release an RFP to get proposals from potential vendors and would not accept a proposal without the product having [certain] qualifications," including compliance with cGMP); Ex. 41 at 30:1 5 (Merck Expert Nichols Dep.) (identifying compliance with "CGMP" as one of the "prerequisites to a CDC purchase of a [VFC] vaccine"); Ex. 249 at 77:7 10 (CDC 30(b)(6) Sims Dep.) (testifying cGMP compliance is key CDC contractual term);.

[62]  *Citing among other evidence* Ex. 249 at 193:19 194:2 (CDC 30(b)(6) Sims Dep.) (testifying cGMP violations "[c]ertainly … would be a violation of the terms and conditions of the [CDC] contract, and certainly [CDC would] want to know"); Ex. 249 at 192:20 193:10 (CDC 30(b)(6) Sims Dep.) (testifying if cGMP compliance issue potentially impacts the contract, the CDC certainly would discuss that issue).

[63]  *See supra* note 44.

[64]  *Citing among other evidence* Ex. 41 at 19:6 20:9 (Merck Expert Nichols Dep.) ("CDC would not initiate procurement for a product without [certain] characteristics," including compliance with cGMP); Ex. 41 at 19:6 20:15 (Merck Expert Nichols Dep.) ("CDC would not release an RFP to get proposals from potential vendors and would not accept a proposal without the product having [certain] qualifications," including compliance with cGMP); Ex. 41 at 30:1 5 (Merck Expert Nichols Dep.) (identifying compliance with "CGMP" as one of the "prerequisites to a CDC purchase of a [VFC] vaccine"); Ex. 249 at 77:7 10 (CDC 30(b)(6) Sims Dep.) (testifying cGMP compliance is key CDC contractual term);.

Appx18792

*Id.*[65]  Merck is obligated to disclose cGMP compliance issues that impact the safety or

effectiveness of the vaccine to the CDC.  *See id.* at ¶ 249.[66]

102.    Everything that is material to CDC's decision to purchase Merck's mumps-containing vaccines was set forth in CDC Contracts with Merck. *Ex.* 75 (Sims Dep. Tr.) at 166:10-14 ("Q. Everything that's important or material to your purchasing decision is in the contract; is that fair to say?  A. So that   that's the agreement between Merck and C.D.C., and that's what we're bound to.").

**Response**: Disputed, the evidence cited does not support Merck's proffered fact.  Also

disputed because are several other factors that are material to the CDC's decision to purchase

Merck's mumps vaccines, including, but not limited to:

- Vaccine potency[67];

- Vaccine effectiveness[68];

- Whether the vaccine has been recommended by ACIP[69];

---

[65]  *Citing among other evidence* Ex. 249 at 193:19 194:2 (CDC 30(b)(6) Sims Dep.) (testifying cGMP violations "[c]ertainly … would be a violation of the terms and conditions of the [CDC] contract, and certainly [CDC would] want to know"); Ex. 249 at 192:20 193:10 (CDC 30(b)(6) Sims Dep.) (testifying if cGMP compliance issue potentially impacts the contract, the CDC certainly would discuss that issue).

[66]  *See supra* note 44.

[67]  Ex. 7 at 148:17 149:10 (CDC 30(b)(6) Pallansch Dep.) (testifying that potency "affects how [the CDC] interpret[s] data being provided, because we look at data for a specific product as the product hasn't changed unless we're aware of it.  So, again, if we knew the potency change occurred …. we would deliberately analyze data"); Ex. 7 at 156:7 18 (CDC 30(b)(6) Pallansch Dep.) (testifying change of potency could "[a]bsolutely" impact effectiveness: "If you … cut the … amount of virus in the vaccine, that could easily make a lower response."); Ex. 360 at 2 (Merck Expert Atkinson Dep. Ex. 6) (ACIP moving from one dose to two dose recommendation for measles vaccine because of "primary vaccine failure," which "may be due to ... less than optimal vaccine storage and handling or to the greater lability of the measles vaccine manufactured before a new stabilizer was used in 1979"); *see also* Ex. 3 ¶ 33 (Kessler Rep.) ("Potency is defined as the 'ability of the product ... to effect a given result.'  The potency of a vaccine is connected to how well the vaccine works.  If a vaccine does not have sufficient potency, it may not provide protection from disease.") (quoting 21 C.F.R. § 600.3); Ex. 8 at 162:1 3 (Shapiro Dep.) ("[I]t is pretty obvious that … vaccine[] potency is part of what makes a vaccine work.").

[68]  Ex. 249 at 85:25 86:9 (CDC 30(b)(6) Sims Dep.) (testifying CDC "certainly … want[s] safe and effective vaccines" so they accomplish the "intended purpose" of protecting the public health); Ex. 11 at 2 ("CDC has a major programmatic role in accomplishing reduction in vaccine preventable infectious disease through the agency's [Vaccines For Children] Program by using scarce public health federal funding to purchase effective vaccines for administration to children by public and private [Vaccines For Children] providers throughout the country."); Ex. 12 at 2 (same); *see also supra* ¶ 9 (citing evidence that "key function" of the CDC is ensuring vaccines are effective).

[69]  *See* Rel. 56 Stat. ¶ 245, c*iting* Ex. 7 at 166:8 13 (CDC 30(b)(6) Pallansch Dep.) (testifying if ACIP stops recommending a vaccine, CDC will not purchase it); Ex. 22 at 9 (Merck Expert Atkinson Rep.) ("CDC does not

42

- Whether vaccines are properly labeled, whether the labels are accurate and not misleading, and whether the vaccines comply with their labels[70]; and

- Whether a vaccine manufacturer engaged in fraud.[71]

103.    In CDC's negotiations with Merck over the contracts, the issue of efficacy never came up.  *Id.* at 111:1-4 ("[D]uring those negotiations do you ever recall the issue of efficacy coming up in the negotiations?  A. I don't recall that coming up.").

**Response**:  Disputed, the evidence cited does not support Merck's proffered fact. Also disputed because "over the contracts" is broad, vague and ambiguous making it impossible to respond to this statement. Assuming Merck means the CDC's contracts to purchase Merck's mumps vaccines, undisputed that Mr. Sims testified that with respect to the negotiations he was involved in over the last five years, he did not recall the issue of efficacy coming up.[72] Also disputed to the extent Merck implies effectiveness is not relevant to the CDC's purchasing decision.[73]

---

purchase any vaccine until there is an ACIP recommendation for use of that vaccine …."); Ex. 41 at 19:6 20:9 (Merck Expert Nichols Dep.) ("CDC would not initiate procurement for a product without [certain] characteristics," including "a recommendation from the [ACIP]"); Ex. 41 at 19:6 20:15 (Merck Expert Nichols Dep.) ("CDC would not release an RFP to get proposals from potential vendors and would not accept a proposal without the product having [certain] qualifications," including "a recommendation from the [ACIP]"); Ex. 41 at 30:11 13 (Merck Expert Nichols Dep.) (testifying CDC will not buy a vaccine not recommended by ACIP); Ex. 41 at 29:23, 30:2 5 (Merck Expert Nichols Dep.) (identifying "recommendation by ACIP" as one of the "prerequisites to a CDC purchase of a [VFC] vaccine"); Ex. 41 at 121:13 17 (Merck Expert Nichols Dep.) ("If the product has changed in such a way that it would impact the ACIP recommendations, then the scientific side of the house would want to know that to talk to the ACIP about it.").

[70] Ex. 249 at 188:22 189:15 (CDC 30(b)(6) Sims Dep.) ("Certainly if something was mislabeled [CDC] would … want to know about it ….") ("the vaccine should be properly labeled. And that's part of … what they're required to do is properly label.") ("if it's not properly labeled, then that's very problematic").

[71] Ex. 249 at 45:20 46:7, 48:6 51:13 (CDC 30(b)(6) Sims Dep.) (testifying a major criterion CDC considers in awarding vaccine contracts includes past performance; past performance includes consideration of whether vaccine manufacturer has engaged in fraud); Ex. 41 at 107:21 108:9 (Merck Expert Nichols Dep.) (testifying fraud would be relevant factor material to CDC's purchasing decision: "I don't think the CDC would want to contract with a vendor … who had been found guilty of committing fraud previously.").

[72] Merck Ex. 75 at 110:20 25 (CDC 30(b)(6) Sims Dep.) (testifying he has been involved in the contract negotiations for Merck for about the last five years).

[73] *See supra* note 68.

43

104.    In CDC's negotiations with Merck over the contracts, the issue of potency never came up. *Id.* at 111:5-7 ("Q. Do you ever recall an issue of potency coming up in the negotiations of the contract?  A. I don't recall that coming up.").

**Response**: Disputed, the evidence cited does not support Merck's proffered fact. Also

disputed because "over the contracts" is broad, vague and ambiguous making it impossible to

respond to this statement. Assuming Merck means the CDC's contracts to purchase Merck's

mumps vaccines, undisputed that Mr. Sims testified that with respect to the negotiations he

was involved in over the last five years, he did not recall the issue of potency coming up.[74]

Also disputed to the extent Merck implies potency is not relevant to the CDC's purchasing

decision.[75]

105.    Dr. Mark Pallansch, CDC's Director of the Division of Viral Diseases in the National Center for Immunization and Respiratory Diseases, explained that potency is "not a factor that comes into consideration." Ex. 41 (Pallansch Dep. Tr.) at 157:11-15.

**Response**:  Disputed, the evidence cited does not support Merck's proffered fact.  In response

to a question asking whether it was the goal of the CDC to purchase vaccines that have the

lowest potency sufficient to provide an effective response, Dr. Pallansch responded: "We do

not take that into consideration because the vaccine that we're having a discussion around is

already a licensed product at a certain potency, so it's not a factor that comes into

consideration."  Merck Ex. 41 at 157:11-15 (CDC's 30(b)(6) Pallansch Dep).  Also disputed

to the extent Merck implies potency is not relevant to the CDC's purchasing decision.[76]

106.    CDC's negotiations with Merck over the contracts, the issue of seroconversion rates never came up. Ex. 75 (Sims Dep. Tr.) at 111:8-13 ("Q. Do you ever recall the issue of seroconversion rates coming up in the negotiations of the contract?  A. I don't recall that specification . . . term.").

---

[74] *See supra* note 72.

[75] *See supra* note 67.

[76] *See supra* note 67.

Appx18795

**Response**: Disputed, the evidence cited does not support Merck's proffered fact. Disputed, the evidence cited does not support Merck's proffered fact. Also disputed because "over the contracts" is broad, vague and ambiguous making it impossible to respond to this statement. Assuming Merck means the CDC's contracts to purchase Merck's mumps vaccines, undisputed that Mr. Sims testified that with respect to the negotiations he was involved in over the last five years, he did not recall that "specific . . . term," *i.e.* seroconversion rates.[77] Also disputed to the extent Merck implies effectiveness is not relevant to the CDC's purchasing decision.[78]

107.    In CDC's negotiations with Merck over the contracts, the issue of immunogenicity never came up. *Id.* at 111:16-21 ("Q. Do you ever recall issues of immunogenicity coming up in contract negotiations?  A. I don't recall that specifically . . . coming up.").

**Response**: Disputed, the evidence cited does not support Merck's proffered fact. Also disputed because "over the contracts" is broad, vague and ambiguous making it impossible to respond to this statement. Assuming Merck means the CDC's contracts to purchase Merck's mumps vaccines, undisputed that Mr. Sims testified that with respect to the negotiations he was involved in over the last five years, he did not recall the issue of immunogenicity coming up.[79] Also disputed to the extent Merck implies effectiveness is not relevant to the CDC's purchasing decision.[80]

108.    In CDC's negotiations with Merck over the contracts, CDC never requested effectiveness information from Merck. *Id.* at 111:22-112:2 ("Q. Do you ever recall effectiveness levels coming up in the discussions around the contract?  A. I don't recall that . . . coming up.").

---

[77] See supra note 72.

[78] *See supra* note 68.

[79] See supra note 72.

[80] *See supra* note 68.

Appx18796

**Response**: Disputed, the evidence cited does not support Merck's proffered fact. Also disputed because "over the contracts" is broad, vague and ambiguous making it impossible to respond to this statement. Assuming Merck means the CDC's contracts to purchase Merck's mumps vaccines, undisputed that Mr. Sims testified that with respect to the negotiations he was involved in over the last five years, he did not recall the issue of effectiveness coming up.[81] Also disputed to the extent Merck implies effectiveness is not relevant to the CDC's purchasing decision.[82]

109.    CDC contracts with Merck to purchase Merck's mumps-containing vaccines were indefinite quantity contracts for vaccines manufactured under a current establishment and product license issued by FDA and as set forth in the contracts. *Ex.* 54 (1998 VFC Contract)  at MRK-KRA01371731 (noting under heading "Type of Contract" that it is an "[i]ndefinite quantity contract"); Ex. 55 (1999 VFC Contract) at MRK-KRA01371754 (same); Ex. 56 (2000 VFC Contract) at MRK-KRA01371696 (same); Ex. 57 (2001 VFC Contract) at MRK-KRA01371660 (same); Ex. 58 (2002 VFC Contract) at MRK-KRA01371788 (same);  Ex. 59 (2003 VFC Contract) at MRK-KRA01371314 (same); Ex. 60 (2004 VFC Contract) at MRK-KRA01371284 (same); Ex. 61 (2005 VFC Contract) at MRK-KRA01371344 (same); Ex. 62 (2006 VFC Contract) at MRK-KRA01371627 (same); Ex.63 (2007 VFC Contract) at MRK-KRA01371608 (same); Ex. 64 (2008 VFC Contract) at MRK-KRA01371822  (same); Ex. 65 (2009 VFC Contract) at MRK-KRA01371885 (same); Ex. 66 (2010 VFC Contract) at MRK-KRA01371380  (same); Ex. 67 (2011 VFC Contract) at MRK-KRA01371503  (same); Ex. 68 (2012 VFC Contract) at MRK-KRA01371405 (same); Ex. 69 (2013 VFC Contract) at MRK-KRA01371425 (same); Ex. 70 (2014 VFC Contract) at MRK-KRA01371476  (same); Ex. 71 (2015 VFC Contract) at MRK-KRA01372047 (same); Ex. 72 (2016 VFC Contract) at MRK-KRA01371964 (same).

**Response**: Undisputed.

110.    CDC's 1998 contract with Merck to purchase Merck's mumps-containing vaccines stated:  "Vaccine shall have a minimum shelf life of twelve (12) months remaining upon receipt of the vaccine by the consignee."  Ex. 54 (1998 VFC Contract) at MRK-KRA01371734.

**Response**: Undisputed.

111.    CDC's contracts with Merck from 1999 through 2016 to purchase Merck's mumps-containing vaccines similarly required a minimum shelf life of 12 months remaining

---

[81] See supra note 72.

[82] *See supra* note 68.

Appx18797

upon receipt of or delivery to the consignee.  Ex. 55 (1999 VFC Contract) at MRK-KRA01371759, MRK-KRA01371761; Ex. 56 (2000 VFC Contract) at MRK-KRA-1371702, MRK-KRA01371704; Ex. 57 (2001 VFC Contract) at MRK-KRA-1371667, MRK-KRA01371669; Ex. 58 (2002 VFC Contract) at MRK-KRA01371796, MRK-KRA01371798; Ex. 59 (2003 VFC Contract) at MRK-KRA01371321, MRK-KRA01371323; Ex. 60 (2004 VFC Contract) at MRK-KRA01371291, MRK-KRA01371293; Ex. 61 (2005 VFC Contract) at MRK-KRA01371350, MRK-KRA01371352; Ex. 62 (2006 VFC Contract) at MRK-KRA01371634, MRK-KRA01371638; Ex. 67 (2007 VFC Contract) at MRK-KRA01371607, MRK-KRA01371609; Ex. 68 (2008 VFC Contract)at MRK-KRA01371821, MRK-KRA01371823; Ex. 69 (2009 VFC Contract) at MRK-KRA01371884, MRK-KRA01371886; Ex. 70 (2010 VFC Contract) at MRK-KRA01371378, MRK-KRA01371382; Ex. 67 (2011 VFC Contract) at MRK-KRA01371502, MRK-KRA01371504; Ex. 68 (2012 VFC Contract) at MRK-KRA01371403, MRK-KRA01371406; Ex. 69 (2013 VFC Contract) at MRK-KRA01371428, MRK-KRA01371435; Ex. 70 (2014 VFC Contract) at MRK-KRA01371479, MRK-KRA01371486; Ex. 71 (2015 VFC Contract) at MRK-KRA01372050, MRK-KRA01372059; Ex. 72 (2016 VFC Contract) at MRK-KRA01371968, MRK-KRA01371974.

**Response**: Undisputed.

112.    CDC's 2006 contract with Merck to purchase ProQuad required a minimum shelf life of 8 months remaining upon delivery to the consignee. Ex. 62 (2006 VFC Contract) at MRK-KRA01371636, MRK-KRA01371638.

**Response**: Undisputed.

113.    CDC's contracts with Merck state, under the heading "Product License," that: "The vaccines produced and delivered under this contract shall be manufactured under a current establishment and product license issued by the [FDA] as indicated below. . . . The Current Good Manufacturing Practice Regulations (cGMPR's) (21C.F.R. Parts 210-211) will be the standard to be applied for manufacturing, processing and packing of drugs, chemicals, biologicals, and reagents."  The same section of the contract states that the contract "may be terminated" by CDC "in whole or part" if "the item listed under this contract fails to meet CGMPR's." Ex. 54 (1998 VFC Contract) at MRK-KRA01371740; Ex. 55 (1999 VFC Contract) at MRK-KRA01371769, MRK-KRA01371770; Ex. 56 (2000 VFC Contract)  at MRK-KRA01371712; Ex. 57 (2001 VFC Contract)  at MRK-KRA01371673; Ex. 58 (2002 VFC Contract) at MRK-KRA01371800;  Ex. 59 (2003 VFC Contract) at MRK-KRA01371325; Ex. 60 (2004 VFC Contract) at MRK-KRA01371295; Ex. 61 (2005 VFC Contract) at MRK-KRA01371354; Ex. 62 (2006 VFC Contract) at MRK-KRA01371640; Ex. 63 (2007 VFC Contract) at MRK-KRA01371611; Ex. 64 (2008 VFC Contract) at MRK-KRA01371825; Ex. 65 (2009 VFC Contract)at MRK-KRA01371887; Ex. 67 (2011 VFC Contract) at MRK-KRA01371505.

**Response**: Undisputed.

114.    CDC contracts from 2010 and 2012 through 2016 contained materially identical provisions with slight wording changes. *Ex.* 66 (2010 VFC Contract) at MRK-KRA01371383; Ex. 68 (2012 VFC Contract) at MRK-KRA01371407; Ex. 69 (2013 VFC Contract) at MRK-

KRA01371436; Ex. 70 (2014 VFC Contract) at MRK-KRA01371487; Ex. 71 (2015 VFC Contract) at MRK-KRA01372060; Ex. 72 (2016 VFC Contract) at MRK-KRA01371975.

**Response**: Undisputed.

115.     In CDC contracts, CDC required Merck to include certain information on each invoice. None of CDC's contracts with Merck required specific representations about vaccine efficacy, effectiveness, or the amount of potency in each dose to be included in the invoices for payment submitted to CDC. *Ex.* 55 (1999 VFC Contract) at MRK-KRA01371765-66; Ex. 56 (2000 VFC Contract) at MRK-KRA01371710-11; Ex. 57 (2001 VFC Contract) at MRK-KRA01371677]; Ex. 58 (2002 VFC Contract) at MRK-KRA01371804;  Ex. 59 (2003 VFC Contract) at MRK-KRA01371329; Ex. 60 (2004 VFC Contract) at MRK-KRA01371280; Ex. 61 (2005 VFC Contract) at MRK-KRA01371357; Ex. 62 (2006 VFC Contract) at MRK-KRA01371624; Ex. 63 (2007 VFC Contract) at MRK-KRA01371604; Ex. 64 (2008 VFC Contract) at MRK-KRA01371828; Ex. 65 (2009 VFC Contract) at MRK-KRA01371880; Ex. 66 (2010 VFC Contract) at MRK-KRA01371373; Ex. 67 (2011 VFC Contract) at MRK-KRA01371508; Ex. 68 (2012 VFC Contract) at MRK-KRA01371410; Ex. 69 (2013 VFC Contract) at MRK-KRA01371422; Ex. 70 (2014 VFC Contract) at MRK-KRA01371490; Ex. 71 (2015 VFC Contract) at MRK-KRA01372062; Ex. 72 (2016 VFC Contract) at MRK-KRA01371978.

**Response**:  Undisputed as to the first sentence.  As to the second sentence, disputed because

Merck ignores that VFC contracts require the manufacturers to include on the invoice or

claim for payment to CDC the product description and expiration date, which represents that

the vaccine will meet all potency and protection specifications and representations contained

in the label and license throughout the shelf life of the product (as reflected by the expiration

date of the vaccine), including the minimum potency specification.[83]

116.     CDC contracts require Merck to submit requests for payment electronically. CDC contracts identify the specific data Merck is to include in its requests for payment to CDC via Electronic Data Interchange, which include the following:

(1)     Contractor's name and invoice date;
(2)     Contract number, or other authorization for delivery of property and/or services;
(3)     Description, cost or price, and quantity of property and/or services actually delivered or rendered;
(4)     Shipping and payment terms;
(5)     Other substantiating documentation or information as required by the contract; and

---

[83] *See* Rel. 56 Stat. ¶ 272.

(6)     Name where practicable, title, phone number, and complete mailing address of responsible official to whom payment is to be sent.

(7)     Lot number of vaccine vials shipped;

(8)     Expiration date of vaccine vials shipped; and

(9)     CDC accounting and appropriate date as described on the delivery order.

*Ex.* 54 (1998 VFC Contract) at MRK-KRA01371737 (Addendum B, Paragraph 9 "Invoice Submission")).

**Response**: Undisputed.

117.     CDC contracts from 1998 to 2005 required the same data to be submitted in requests for payment *Ex.* 55 (1999 VFC Contract) at MRK-KRA01371765, MRK-KRA01371766; Ex. 56 (2000 VFC Contract) at MRK-KRA01371709, MRK-KRA01371710; Ex. 57 (2001 VFC Contract) at MRK-KRA01371677; Ex. 58 (2002 VFC Contract) at MRK-KRA01371804;  Ex. 59 (2003 VFC Contract) at MRK-KRA01371329; Ex. 60 (2004 VFC Contract) at MRK-KRA01371299; Ex. 61 (2005 VFC Contract) at MRK-KRA01371357.

**Response**: Disputed to the extent the phrase "the same data" invokes unspecified facts

outside the statement which makes it impossible to answer as a stand-alone fact.  Otherwise

undisputed.

118.     Beginning in 2006, CDC has occasionally changed the list of required information in invoices. For instance:

- Beginning in 2006, CDC required Merck to add information related to "(10) Taxpayer I.D. Number" and "(11) DUNS Number." *Ex.* 62 (2006 VFC Contract) at MRK-KRA01371643 (Addendum C, Paragraph 14 ("Invoice Submission")); Ex. 63 (2007 VFC Contract) at MRK-KRA01371613 (same); Ex. 64 (2008 VFC Contract) at MRK-KRA0137 1828 (same).

- Beginning in 2009, CDC removed the requirement that invoices include "Expiration date of vaccine vials shipped." *Ex.* 65 (2009 VFC Contract) at MRK-KRA01371890 (Addendum C, Paragraph 13).

- Beginning in 2010, CDC added  requirements for an National Drug Code number as well "accounting and appropriation data." *Ex.* 66 (2010 VFC Contract) at MRK-KRA01371385, MRK-KRA01371386 (Addendum C, Paragraph 12); Ex. 67 (2011 VFC Contract) at MRK-KRA01371508  (same); Ex. 68 (2012 VFC Contract) at MRK-KRA01371410 (same).

- Beginning in 2013, CDC added a requirement that invoices include "Electronic Funds Transfer (EFT)" and "Taxpayer Identification Number (TIN)." *Ex.* 69 (2013 VFC Contract) at MRK-KRA01371439 (Addendum C, Paragraph 13); Ex. 70 (2014 VFC

49

Contract) at MRK-KRA01371490 (same); Ex. 71 (2015 VFC Contract) at MRK-
KRA01372062 (same); Ex. 72 (2016 VFC Contract) at MRK-KRA01371978 (same).

**Response**:  Disputed to the extent the statement implies that from 2000 to the present, Merck

has not submitted product description, NDC codes, and expiration dates on its invoices or

claims for payment to the CDC.  *See* Exs. 282-299 at Columns AH-AI, AK-AL, AP.

Otherwise undisputed.

119.    Merck is not required to provide any other information in its requests for payment
to CDC other than what is required by CDC contracts. Ex. 75 (Sims Dep. Tr.) at 137:5-13 ("Q …
Is Merck required to provide anything else to the C.D.C. when it invoices the C.D.C. for
vaccines other than the nine items listed in the contract?  A. Not that I'm aware of….").

**Response**:  Disputed to the extent the phrase "any other information" invokes unspecified

facts outside the statement which makes it impossible to answer as a stand-alone fact.

Disputed that the evidence cited supports Merck proffered fact.  Undisputed that in response

to the question quoted in the statement above ("Is Merck required to provide anything else to

the C.D.C. when it invoices the C.D.C. for vaccines other than the nine items listed in the

contract?"), Mr. Sims responded that he's not aware of other required information, this

information "meets the minimum," and that he would defer to the Program Office.  *See*

Merck Ex. 75 at 137:9-13 (CDC 30(b)(6) Sims Dep.).  Also disputed to the extent Merck

implies it does not include any other information on its invoices or claims for payment other

than what it is required to provide under the CDC contracts.  *See* Exs. 282-299 at Columns

AH-AI, AK-AL, AP.

120.    A representative set of electronic invoice data includes coding that reflects the
National Drug Code  number for the MMR-II vaccine of "ND*00006-4681-00," a quantity of
"2880," a unit price of "178.60," a lot identifier of "REF*LT*M040558~," and a lot expiration of
"DTM*208*20181003~," as well as logistical data like the invoice issue data, the recipient
address, and payment due date. Ex. 89 (Email from Z. Johns to M. Koury (Feb. 23, 2017)).

**Appx18801**

**Response**: Undisputed that among other information, the representative electronic invoice data Merck produced in this case includes the information described in the statement above.

121.    As reflected in the sample invoice data Merck provided to counsel for Relators, Merck did not and does not include representations regarding efficacy, effectiveness, immunogenicity, safety, or potency of the vaccines sold to CDC. *Id*.

**Response**: Disputed.  The evidence cited does not support Merck's proffered fact.  The invoice data Merck produced in this case includes, among other information, the NDC code, product description, lot expiration date, contract ID number, and contract description.  *See* Exs. 282-299 at Columns AH-AI, AK-AL, AP.  The Contract Number, Contract Description and Product Description collectively identify the licensed vaccine being sold and the contract that governs the sale, which, together with the license and label, contain the requirements the vaccine must meet.  The Product Expiration Date represents the date through which the vaccine is supposed to meet the potency and protection specifications and representations contained in the label and license.  And the NDC Code is a vaccine-specific code which, among other things, represents the specific strength, dosage form, and formulation the vaccine is supposed to have according to its label and license specifications.  Rel. 56 Stat. ¶ 272.[84]

122.    By reference to regulations, CDC contracts with Merck include a requirement that Merck warrant its vaccines are merchantable and fit for their intended purpose. *See* 48 C.F.R. § 52.212-4(o) (Federal Acquisition Regulation (FAR) setting forth contract terms that are referenced in CDC contracts, which include a requirement that:  "The Contractor warrants and implies that the items delivered hereunder are merchantable and fit for use for the particular purpose described in this contract."); *see also*, *e.g.*, Ex. 54 (1998 VFC Contract) at MRK-

---

[84]  *Citing* Ex. 342 at 4 ("Each listed drug product is assigned a unique 10 digit, 3 segment number. This number, known as the NDC, identifies the labeler, product, and trade package size.  …  The second segment, the product code, identifies a specific strength, dosage form, and formulation of a drug for a particular firm.  Different formulations or different strengths of the same formulation should be assigned different product codes.  This means even if the same formulations of a drug product ultimately deliver different strengths of the active ingredient to the recipient, they should be assigned different product codes.  Also, drug products that share the same formulation but have different product characteristics that clearly distinguish one drug product version from another cannot share the same product code ….").

KRA01371729 (incorporating by reference FAR 52.212-4 and adding an addendum); Ex. 55 (1999 VFC Contract) at MRK-KRA01371762 (same); Ex. 56 (2000 VFC Contract) at MRK-KRA01371707 (same); Ex. 66 (2010 VFC contract) at MRK-KRA01371392 (same); Ex. 69 (2013 VFC Contract) at MRK-KRA01371434 (same); Ex. 70 (2014 VFC Contract) at MRK-KRA01371485 (same); Ex. 71 (2015 VFC Contract) at MRK-KRA01372058 (same); Ex. 72 (2016 VFC Contract)at MRK-KRA01371974 (same).

**Response**: Undisputed.

123.    CDC's contracting officer interprets the requirements for a warranty to "say that, essentially the product is merchantable and, you know, completes its intended purpose." Ex. 75 (Sims Dep. Tr.) at 84:10-16.

**Response**: Undisputed that Merck accurately quotes CDC contracting officer Mr. Sims's

deposition testimony.

124.    "Merchantable" means that the product "can be used . . . in a commercially available setting." *Id*. at 84:17-21. CDC is not aware of any instance where Merck's mumps-containing vaccines did not meet the warranty of merchantability required under CDC contracts. *Id*. at 143:4-8.

**Response**: As to the first sentence, undisputed that Mr. Sims testified that merchantable

means the product can be used in a commercially available setting.  Merck Ex. 75 at 84:17-

21 (CDC 30(b)(6) Sims Dep.).  As to the second sentence, undisputed that Mr. Sims is not

aware of an instance when MMR-II or ProQuad did not meet the warranty of merchantability.

*Id*.  at 143:4-8 (CDC 30(b)(6) Sims Dep.).

125.    "Fit for its intended purpose" means that the vaccine has an FDA license, with CDC deferring to FDA on whether to issue and/or maintain a given license. *Id*. at 84:23-85:12. Licensure by FDA is the "critical factor" for CDC to determine whether a vaccine is fit for its intended use. *Id*. at 141:4-12.

**Response**:  As to the first sentence, disputed. CDC contracting officer Mr. Sims testified that

"fit for its intended purpose" would certainly involve FDA licensure and vaccine

performance, and he also referenced the shelf life requirement in the contract.  He continued

that if an issue came up with whether a vaccine was "fit for purpose" he would need to

consult with the Program Office and CDC attorneys. He also testified "FDA is really the

52

regulatory," without explaining this testimony further.  As to the second sentence, disputed.

Mr. Sims testified that with respect to whether a vaccine is "fit for purpose," "maintaining

that [FDA] license … is critical," but he could not say whether it's the only factor.  Merck Ex.

75 at 84:23-85:12, 141:4-12.

126.    On April 27, 2010, Relators filed their complaint. Docket, *U.S. ex rel. Krahling v. Merck & Co., Inc.*, Civ. A. No. 10-4374 (E.D. Pa.) at ECF. No. 20.

**Response**: Disputed. The Court's electronic stamp at the top of the Complaint states April 27,

2010.[85]

127.    On April 27, 2012, two years after Relators' initial complaint was filed, the United States Department of Justice (DOJ) informed the Court that it would decline to intervene in Relators' case. United States' Notice of Election to Decline to Intervene, *U.S. ex rel. Krahling v. Merck & Co., Inc.*, Civ. A. No. 10-4374 (E.D. Pa.), ECF. No. 14.

**Response**: Undisputed that DOJ informed the Court that it would decline to intervene in

Relators' case on April 27, 2012 but disputed that DOJ informed the Court two years after

relators filed their complaint.[86]

128.    Counsel for DOJ are included as counsel of record and are copied on submissions by the parties in this matter. Docket, *U.S. ex rel. Krahling v. Merck & Co., Inc.*, Civ. A. No. 10-4374 (E.D. Pa.) (listing Gerald B. Sullivan and Joel M. Sweet from the United States Attorney's Office Eastern District of Pennsylvania as counsel of record); *see also id.* at ECF. Nos. 2 & 3 (docketing entries of appearance for Messrs. Sullivan and Sweet on August 27, 2010).

**Response**: Undisputed Counsel for DOJ are included as counsel of record and are copied on

submissions by the parties in this matter but disputed that evidence supporting this fact

accurately reflects the docket in this case to the extent that Messrs. Sweet and Sullivan did

not enter appearances on August 27, 2010.  ECF No. 2, Mr. Sweet's appearance, is dated

September 20, 2010.  ECF No. 3, Mr. Sullivan's appearance, is dated September 22, 2010.

---

[85] The Court's manual file stamp and the signature block on the complaint both are dated August 27, 2010, the date the complaint was actually filed. G. Reilly Decl. ¶ 2.

[86] *See supra* note 85.

129.    The protective order in this matter permits disclosure of discovery materials produced by Merck and designated as "Confidential" or "Highly Confidential    Attorneys' Eyes Only" to attorneys at DOJ as well as government employees of FDA, CDC, and the U.S. Department of Health and Human Services (HHS). Protective Order, ECF No. 69, at 7.2(b), (c); *id*. at 7.3(b), (c).

**Response**: Disputed to the extent the statement implies that there are no restrictions on the

disclosure to employees of FDA, CDC and HHS.  *See* Protective Order, ECF No. 69, at 7.2

(d) and 7.3 (c) ("Government employees of FDA, CDC, HHS, or EMA to whom disclosure is

reasonably necessary for purposes of the Actions provided that they have signed the

"Acknowledgment and Agreement to Be Bound" (Exhibit A)); *see also* ECF No. 275 (Order

to Amend the Protective Order) (amending 7.2 (d) and 7.3 (c) to eliminate requirement that

government employees sign Exhibit A).  Otherwise undisputed.

130.    On May 18, 2015, counsel for Merck requested from CDC and HHS certain information that may be relevant in this litigation. Ex. 78 (Ltr. from L. Dykstra to T. Frieden, et al. (May 18, 2015)) at 1.

**Response**: The May 18, 2015 letter from Merck's counsel speaks for itself.  Otherwise

undisputed.

131.    In its letter, Merck summarized Relators' allegations, including Relators' contentions that "Merck made and continues to make misrepresentations about the efficacy of the mumps vaccine and engages in efforts to conceal the diminished efficacy of the vaccine" and that "Merck's labeling misrepresents the vaccine's efficacy and improperly influenced CDC's decision to purchase the vaccine." *Id*. at 2.

**Response**:  Disputed to the extent the statement implies that the quoted language was the

only relevant information set forth in counsel's letter, which also stated: "While Merck firmly

disputes all of the allegations made in this action and plans to vigorously defend itself, the …

claims … require[] that we gather a significant amount of information…"[87]  Undisputed that

the statement accurately quotes from the May 18, 2015 letter from Merck's counsel.

---

[87] Merck Ex. 78 at 1.

54

132.    On November 24, 2015, CDC responded to Merck's request for documents. Ex. 74 (Ltr. from K. Norris to L. Dykstra (Nov. 24, 2015)) at MRK-KRA01373393.

**Response**: Disputed to the extent that MRK-KRA01373393 is represented as Merck's May 18, 2015 request for documents from Merck's counsel.[88]  Also disputed to the extent that the author, source and admissibility of MRK-KRA01373393 has not been established.[89]  Undisputed that CDC responded to Merck's May 18, 2015 request for documents on November 24, 2015.

133.    On October 12, 2017, Alan Sims, CDC's team lead who supports the National Centers for Immunization and Respiratory Diseases, was deposed in this litigation. Ex. 75 (Sims Dep. Tr.) at 9:16-23. Mr. Sims is the contracting officer for CDC's vaccine contracts. *Id*.

**Response**: Undisputed.

134.    On October 13, 2017, Dr. Mark Pallansch, who is the Director of the Division of Viral Disease in the National Center for Immunization and Respiratory Diseases at CDC, was deposed in this litigation. Ex. 41 (Pallansch Dep. Tr.) at 8:17-20.

**Response**: Undisputed.

135.    CDC authorized three former employees to serve as expert witnesses for Merck. Ex. 198, Letter from CDC to K. Hardway (May 24, 2018)) at 3.

**Response**: Disputed. CDC authorized testimony and consultation by four former employees in the interest of the CDC subject to restriction, including that "these former … employees … can only represent their own views and … and cannot represent CDC's or the ACIP's views, including in terms of potential future agency/committee actions."[90]  Three of the four authorized former employees provided consultation and testimony for Merck, and Merck has supported the current motion with the reports of two of them.[91]  Also disputed that Merck

---

[88] *See* Merck Ex. 78 (Ltr. from L. Dykstra to T. Frieden, et al. (May 18, 2015)).

[89]  *See supra* Rel. Resp. Merck SUMF1 ¶ 92.

[90]  Ex. 11 (Letter from CDC to K. Hardway (May 24, 2018)).

[91] Merck Ex. 40 (Merck Expert Nichols Rep.) and Merck Ex. 49 (Merck Expert Atkinson Rep.).

55

Appx18806

Exhibit 198, purportedly supporting the statement, is a letter from CDC to K. Hardway dated

May 24, 2018.  Merck Exhibit 198 is a July 31, 2018 letter from CDC to K. Hardway noting

"a number of statements in [the former employees'] reports may be interpreted to be outside

the scope of the opinions that the CDC authorized them to provide" and "statements in the

reports that appear to be inaccurate or incomplete."

136.    On May 16, 2019, the Court entered an order that provided a protocol by which Relators' hired expert, Dr. David Kessler, could interface directly with CDC, FDA, and HHS regarding his assessment of the discovery record and opinions based on those materials. Order (Under Seal), *U.S. ex rel. Krahling v. Merck & Co., Inc.*, Civ. A. No. 10-4374 (E.D. Pa.), at ECF No. 250.

**Response**: Undisputed that the Court entered an order on May 16, 2019.  The order speaks

for itself.

137.    Since this case was filed on April 27, 2010, ACIP has continued to include the mumps vaccine in its recommended schedule for immunization. *E.g.*, Ex. 79 (ACIP, *MMR ACIP Vaccine Recommendations (Measles, Mumps and Rubella)*, https://www.cdc.gov/vaccines/hcp/acip-recs/vacc-specific/mmr.html).

**Response**: Disputed to the extent that Merck implies ACIP recommends Merck's mumps

vaccine specifically.[92] Also disputed that this case was filed on April 27, 2010.[93] Undisputed

that ACIP has continued to include a mumps vaccine in its recommended schedule since

April 27, 2010.

138.    Since this case was filed on April 27, 2010, FDA has continued to license Merck's MMR-II and ProQuad products. *Ex.* 42 (1971 MMR Product License) at MRK-KRA01972538; Ex. 6 (1995 MMR Product License) at MRK-KRA01676252; *see also* Ex. 80 (FDA, Vaccines Licensed for Use in the United States, https://www.fda.gov/vaccines-blood-biologics/vaccines/vaccines-licensed-use-united-states (current as of May 9, 2019)) at 5 (listing Merck's M-M-R II and ProQuad products as currently licensed by FDA).

---

[92] Ex. 41 at 110:2 11 (Merck Expert Nichols Dep.) (testifying the ACIP resolution is disease specific, not brand specific).

[93] *See supra* note 85.

56

**Response**: Disputed that this case was filed on April 27, 2010.[94]  Undisputed that FDA has

continued to license Merck's MMR-II and ProQuad since April 27, 2010.

139.    Since this case was filed on April 27, 2010, CDC has continued to purchase
Merck's mumps-containing vaccines. Ex. 75 (Sims Dep Tr.) at 155:1-5.

**Response**: Undisputed that CDC has continued to purchase Merck's mumps-containing

vaccines since April 27, 2010.  Disputed that this case was filed on April 27, 2010.[95]

140.    Since this case was filed on April 27, 2010, CDC has not raised concerns related
to the efficacy, effectiveness, seroconversion, immunogenicity, shelf life, or potency of Merck's
mumps-containing vaccines. *Id.* at 201:13-25.

**Response**: Disputed.  The testimony Merck cites does not support the proposition.  Mr.  Sims

was answering a question about whether the CDC's Program Office ever raised concerns to

him related to efficacy, effectiveness, seroconversion, immunogenicity, shelf life, or potency.

Merck Ex. 75 at 201:13-25 (Sims Dep.).  CDC has raised concerns related to the efficacy,

effectiveness, seroconversion, immunogenicity, shelf life, or potency of Merck's mumps-

containing vaccines.  Starting in 2006 there has been a resurgence of mumps in the United

States among highly vaccinated populations. Rel. 56 Stat. ¶¶ 195-199.  The CDC does not

know the causes of the mumps resurgence, but possible causes include waning immunity,

primary vaccine failure, low vaccine potency, and a change in the circulating mumps virus

strain.  Rel. 56 Stat. ¶¶ 200-204.  The CDC has reached out to Merck to provide input on the

possible causes.  For example, during the 2010 outbreak CDC invited Merck to discuss

mumps strategy with the CDC and specifically noted that "[t]he high proportion of [mumps]

cases among persons who have received two doses of MMR *raises issues concerning the*

---

[94] *See supra* note 85.

[95] *See supra* note 85.

*vaccine effectiveness and duration of protection*."[96] Merck has never provided CDC with

any information relating to problems with mumps vaccine effectiveness, potency, or shelf

life; compliance with the FDA license or label specifications for mumps vaccines; or clinical

trial fraud relating to mumps vaccines. Rel. 56 Stat. ¶¶ 205-206. Since the filing of this

lawsuit Merck has repeatedly communicated to the CDC that there are no issues with

Merck's mumps vaccines.[97] Also disputed that this case was filed on April 27, 2010.[98]

141. FDA has similarly issued statements underscoring its continued view that the MMR vaccine is safe and effective. *See, e.g.*, Ex. 212 (FDA In Brief: FDA reiterates the importance of vaccines such as the Measles, Mumps, and Rubella (MMR) vaccine, Sept. 6, 2019, https://www.fda.gov/news-events/fda-brief/fda-brief-fda-reiterates-importance-vaccines-such-measles-mumps-and-rubella-mmr-vaccine) ("As a public health agency, we want to reiterate our confidence in the safety and efficacy of the MMR vaccine. FDA always strives to use the best available scientific evidence to promote and protect the well-being of individuals and the public health, and the evidence fully supports the safety and effectiveness of this vaccine."); Ex. 215 (Statement from Peter Marks, M.D., Ph.D., director of FDA's Center for Biologics Evaluation and Research, on FDA's continued confidence in the safety and effectiveness of the measles, mumps, and rubella (MMR) vaccine, Apr. 22, 2019, https://www.fda.gov/news-events/press-announcements/statement-peter-marks-md-phd-director-fdas-center-biologics-evaluation-and-research-fdas-continued) ("We do not take lightly our responsibility to ensure the safety and effectiveness of vaccines, and work diligently to assess safety and effectiveness of all licensed vaccines for their intended uses. The MMR vaccine is very effective at protecting people against measles, mumps, and rubella.").

**Response**: Disputed to the extent the phrase "similarly issued" is not defined and invokes

unspecified facts outside the statement which makes it impossible to answer as a stand-alone

fact. Disputed to the extent Merck ignores other relevant language in the evidence cited to

---

[96] Ex. 407 at '989 (Feb. 2010 Email from CDC to Merck) (emphasis added); Ex. 408 at '153 (Rough transcript of 2010 ACIP Meeting on mumps outbreak) (ACIP's Dr. Temte and current Merck expert asked: "any issues with storage and handling of vaccines?").

[97] Rel. Stat. ¶ 207; *see also* Merck Ex. 78 at 1 (Merck counsel letter to CDC) ("… Merck firmly disputes all of the allegations made in this action and plans to vigorously defend itself …"); Merck Ex. 205 at '45/116 ("There is no public health concern presented by … any aspect of the history of the potency of Merck's mumps vaccine."); *Id.* at 53/116 ("There is nothing about the history of the potency of Merck's mumps vaccine or its labeling that should cause any clinical concern. There is therefore no need to take any action … In sum, action based on the concerns expressed by Dr. Kessler is neither necessary nor appropriate."); *Id.* at 109/116 ("Nothing in Dr. Kessler's submissions warrants a change of course in the agencies' ongoing effective regulation of the vaccine and its use as a tool in disease control.").

[98] *See supra* note 80.

Appx18809

support this statement.[99]  Undisputed that the evidence cited contains the selectively quoted language.

142.    Since this case was filed on April 27, 2010, CDC has continued to recommend administration of the mumps vaccine as part of the schedule for routine vaccination of children. Ex. 41 (Pallansch Dep. Tr.) at 95:6-20.

**Response**: Disputed to the extent that the statement implies ACIP's recommendation is for a specific product.[100]  Also disputed that this case was filed on April 27, 2010.[101]  Otherwise undisputed.

143.    CDC has stated publicly and believes that Merck's mumps vaccine is "very safe and effective." *Id.* at 26:19-24.

**Response**: Disputed that Dr. Pallansch's testimony provides evidence that the CDC statement was specific to Merck's mumps vaccine.[102]  Undisputed Dr. Pallansch testified that the CDC's position regarding MMR vaccine is: "MMR vaccine is safe and effective."

144.    CDC states currently that the mumps vaccine is "safe and effective." Ex. 81 (CDC, *Mumps Vaccination*, https://www.cdc.gov/mumps/vaccination.html (last revised Mar. 8, 2019)) at 1.

**Response**: Disputed that the evidence supports the statement: "CDC states currently the mumps vaccine is safe and effective."  The CDC website states that "MMR vaccine is safe and effective."

---

[99] *See e.g.* Merck Exhibit 215 (FDA April 2019 Statement) ("It deeply concerns us when we see preventable diseases such as … mumps reemerging in the United States and threatening our communities.") and Merck Exhibit 212 (September 2019 FDA Statement quoting FDA CBER Director Dr. Marks) ("It is deeply concerning to see vaccine preventable infectious diseases such as … mumps reemerging in the U.S and impacting the health of individuals and entire communities."); *see also* Rel. 56 Stat. ¶¶ 208 214 (collecting evidence of significant concern over mumps resurgence); Rel. Resp. SUMF1 ¶ 140 (collecting CDC statements about concern related to efficacy and effectiveness since resurgence of mumps in highly vaccinated populations starting in 2006).

[100] Ex. 41 at 110:2 11 (Merck Expert Nichols Dep.) (testifying the ACIP resolution is disease specific, not brand specific).

[101] *See supra* note 80.

[102] Ex. 41 at 110:2 11 (Merck Expert Nichols Dep.) (testifying the ACIP resolution is disease specific, not brand specific).

145.    CDC is aware that certain studies have found an effectiveness rate as low as 31 percent for the mumps component of Merck's mumps vaccine. Ex 81 (CDC, *Mumps Vaccination*, https://www.cdc.gov/vaccines/vpd/mumps/index.html) ("MMR vaccine is very safe and effective. The mumps component of the MMR vaccine is about 88% (range: 31-95%) effective when a person gets two doses; one dose is about 78% (range: 49%  92%) effective."); *see also* Ex. 41 (Pallansch Dep. Tr.) at 31:20-33:1.

**Response**: Undisputed.

146.    CDC understands that the mumps vaccine in the real world has a lower effectiveness rate than the efficacy rate found in the initial clinical trials conducted in the 1960s. CDC will continue to purchase vaccines, like the influenza and pertussis vaccines even where effectiveness rates are as low as 25% and where protection wanes over time.  Ex. 41 (Pallansch Dep. Tr.) at 39:16-21; Ex. 40 (Nichols Report) at 6, 18.

**Response**: Disputed that the evidence cited supports the statement that "CDC will continue

to purchase vaccines, like the influenza and pertussis vaccines even where effectiveness rates

are as low as 25% and where protection wanes over time." Dr. Pallansch's testimony does

not support this statement.  Merck Ex. 41 at 39:16-21.  To the extent Merck offers the report

of Mr. Nichols to support what the CDC "will purchase," Mr. Nichols "cannot represent

CDC's or the ACIP's views, including in terms of potential future agency/committee

actions."[103]  Undisputed that Dr. Pallansch testified that vaccine effectiveness estimates have

been lower than the 95% found in the clinical studies before Mumpsvax was licensed in the

1960s.

147.    CDC mumps experts have published on findings of Jeryl Lynn mumps vaccine seroconversion rates as low as 74% and as high as 100%.  *Id.* at 74:4 to 76:11; Ex. 219 Huong McLean et al.  The Immunological Basis for Immunization Series:  Module 16:  Mumps (2010):1-33 at 9).

---

[103] Ex. 11 at 4 (Letter from CDC to K. Hardway (May 24, 2018)); s*ee also* Ex. 41 at 8:15 21 (Merck Expert Nichols Dep.) ("The statements in my report and the testimony that I provide represent my own opinions and views based on my experiences and knowledge and not those of the US Centers for Disease Control and Prevention."); Merck Ex. 198 at 1 2 (July 31, 2018 letter from CDC to K. Hardway) ("a number of statements in [Mr. Nichols'] report[] may be interpreted to be outside the scope of the opinions that the CDC authorized them to provide," including part of page six).

Appx18811

**Response**:  Disputed to the extent Merck implies that the wide range of seroconversion rates referenced in Merck Ex. 219 is relevant to the design and conduct of the clinical studies Merck performed to support the licenses for its mumps-containing vaccines at issue in this case.  In order for Merck to support its sBLA to lower the MMR-II minimum mumps potency specification on the MMR-II label, the FDA required Merck use an assay that could be a surrogate of efficacy in Protocol 007 and achieve a 95% seroconversion rate (statistical lower bound of 90% using a 95% confidence interval), roughly matching the seroconversion rate on the MMR-II label.[104]  Undisputed that Dr. Pallansch considered Huong McLean and her co-authors to be mumps experts.  Also undisputed that Module 16 on Mumps published in 2010 states that "seroconversion rates vary widely from 74% to 100% for vaccines containing the Jeryl Lynn strain."

148.    Merck has presented data to CDC from a Merck study showing seroconversion rates for Merck's mumps vaccine as low as 53%.  Ex. 220 (email); Ex. 242 (Feb. 25, 2010 presentation) at Slide 11.

**Response**: Undisputed that Merck provided CDC a slide deck presentation, Exhibit 242, titled "Immunogenicity of Mumps-Containing Vaccines Merck Research Priorities Meeting February 25, 2010." Also undisputed that Slide 11 is titled "Mumps Immunogenicity (Plaque Reduction Neutralization assay*) ~ 6 Weeks After 1 dose of M-M-R™II or Priorix™" and that the "SCR" for M-M-R™II using the vaccine substrain JL-2 as the virus strain, is stated as 53%.

149.    CDC has continued to purchase Merck's mumps-containing vaccines despite mumps outbreaks.  Ex. 41 (Pallansch Dep. Tr.) at 60:12-22.

**Response**: Undisputed.

---

[104] Rel. 56 Stat. ¶ 56 (collecting evidence).

150.    CDC has not requested a change its procurement criteria or price during any of the mumps outbreaks. Ex. 77 (Duffy Dep. Tr.) at 39:19-40:17; *see also id*. at 41:24-42:3 (testifying that CDC has not requested discounts on the mumps vaccine due to any outbreaks).

**Response**:  Disputed to the extent Merck implies CDC has not or would not attempt to

negotiate or "suggest" lower prices for Merck's vaccines. CDC has "counter proposed prices

in writing" and "request[ed] additional discounts" on Merck vaccines including M-M-R II

and ProQuad.[105] Otherwise undisputed.

151.    CDC has continued to purchase M-M-R II at the statutory maximum price the entire time since this lawsuit was filed. *Ex.* 76 (Taylor Dep. Tr.) at 225:8-23; Ex. 75 (Sims Dep. Tr.) at 114:8-116:25, 155:1-5; *see also* 42 U.S.C. § 1396s(d)(3)(B)).

**Response**: Undisputed.

152.    ACIP continues to recommend the MMR vaccine    whether in the MMR-II form or the ProQuad form    be administered in both is Vaccines for Children (VFC) and Vaccines for Adults (VFA) programs. The current recommendations were published in June 2013, which was three years after this suit was filed. The recommendation is that the vaccine be administered twice to children, once at age 12-15 months and once at age 4 through 6 years. It also recommends two doses for adults at high risk for exposure and transmission and one dose for other adults over 18 years old. Ex. 51 (*2013: ACIP Summary Recommendations*) at 20; *see also* Ex. 79 (CDC, *MMR ACIP Vaccine Recommendations (Meales, Mumps and Rubella)*, https://www.cdc.gov/vaccines/hcp/acip-recs/vacc-specific/mmr.html) (indicating that the June 14, 2013 recommendation is current).

**Response**: Undisputed.

153.    The only supplementation to ACIP's recommendation has been to recommended [sic] a third dose of a mumps virus  containing vaccine for persons "previously vaccinated with 2 doses who are identified by public health authorities as being part of a group or population at increased risk for acquiring mumps because of an outbreak." That recommendation was agreed at ACIP's October 2017 meeting and published in January 2018. Ex. 48 (*Recommendation of the Advisory Committee on Immunization Practices for Use of a Third Dose of Mumps Virus Containing Vaccine in Persons at Increased Risk for Mumps During an Outbreak*, MMWR, Jan. 12, 2018: 67(1); 33-38 at 1; *see also* Ex. 79 (CDC, *MMR ACIP Vaccine Recommendations*

---

[105] Ex. 431 at '059 ("CDC ... counter proposed prices in writing after we submitted our ... offer ... CDC's proposed prices were the **lower** of either FCP (Federal Ceiling Price) or current VFC price + 0.3% ...") (emphasis added); Ex. 432 at '057 ("PRICING: CDC Response: After reviewing Merck's ... proposal, the Government requests additional discounts as follows:") (requesting discounts on Merck vaccines including M M R II and ProQuad); Ex. 433 at '203 ("CDC has requested that Merck revise pricing offered on the VFC contract", including M M R II); Ex. 430 at '187 ("Merck is requested to consider submitting a lower price" for ProQuad).

Appx18813

*(Measles, Mumps and Rubella)*, https://www.cdc.gov/vaccines/hcp/acip-recs/vacc-specific/mmr.html) (indicating that the Jan. 12, 2018 recommendation is current).

**Response**: Undisputed.

154.    Citing studies published from 2007 to 2017, ACIP stated in its Summary of Key Findings in the October 2017 recommendation, that was published in January 2018, that "[t]he median effectiveness of 2 doses of MMR vaccine in preventing mumps is 88%, with estimates ranging from 31% to 95%." Ex. 48 (Jan. 12, 2018 MMWR) at 2.

**Response**: Undisputed.

155.    In 1996 and early 1997, Merck and FDA's Center for Biologics Evaluation and Research (CBER) engaged in discussions over how to interpret what the mumps label meant with regard to potency. Ex. 152 (Oct. 5, 1998 email) at MRK-KRA00095142; Ex. 191 (Jan. 23, 1997 Email) at MRK-KRA01972735; Ex. 189 (Dec. 5, 1997 Letter) at MRK-KRA01972451; Ex. 186 (Jan. 28, 1998 Letter at MRK-KRA01625508.

**Response**: Disputed to the extent the evidence cited does not support that the discussions

were "over how to interpret what the mumps label meant."[106]  Undisputed that in 1996 and

1997 Merck and CBER engaged in discussions concerning the MMR-II label regarding

mumps potency.

156.    CBER is a center within FDA whose "mission is to protect and enhance the public health through the regulation of biological and related products including blood, vaccines, allergenics, tissues, and cellular and gene therapies." CBER reviews "new biological products" and "new indications for already approved products," which requires "evaluating scientific and clinical data submitted by manufacturers to determine whether the product meets CBER's standards for approval. After a thorough assessment of the data, CBER makes a decision based on the risk-benefit for the intended population and the product's intended use." Ex. 216 (*About CBER*, U.S. Food and Drug Administration, https://www.fda.gov/about-fda/center-biologics-evaluation-and-research-cber/about-cber).

**Response**: Undisputed.

157.    CBER's inquiry was part of a broad program to review a large number of vaccines' labels in the 1990s to carry out the mandate of the National Childhood Vaccine Injury Act. Ex. 93 (FDA, *Guidance for Industry: FDA Review of Vaccine Labeling Requirements for*

---

[106] Ex. 44 at '760 ("In 1990, the mumps virus end expiry potency for M M R™ II was established as 4.3 [log]."); Merck Ex. 191  at '735 (Jan. 23, 1997 Email) ("The CBER comment required that expiry titers be provided."); Merck Ex. 189 at '451 (Dec. 5, 1997 Letter) ("[T]he label statement has been interpreted as the 'shelf life' specification."); Merck Ex. 186 at '508 (Jan. 28, 1998 Letter) ("During teleconferences in 1996 and in early 1997 … the need to clarify the label claims for potency and to define them in terms of … expiry became evident.").

Appx18814

*Warnings, Use Instructions, and Precautionary Information* (Sep. 2004),
https://www.fda.gov/regulatory-information/search-fda-guidance-documents/fda-review-
vaccine-labeling-requirements-warnings-use-instructions-and-precautionary-information) at 3-6.

**Response**: Disputed to the extent that "CBER's inquiry" is not defined and invokes

unspecified facts outside the statement which makes it impossible to answer as a stand-alone

fact.  Undisputed that as part of the National Childhood Vaccine Injury Act Congress

directed the review of vaccine labels to ensure vaccines on the market complied with their

specifications, including those relating to efficacy and effectiveness, duration of protection,

immunogenicity, stability, and safety.  Products that had inaccurate labeling would have to

have the labeling revised.  As part of this process, beginning in the mid-1990's, the FDA

reviewed Merck's MMR-II vaccine to ensure, among other things, that the vaccine complied

with its minimum mumps potency specifications for the full 24-month shelf life of the

vaccine.[107]

158.    Merck understood the MMR-II label to state the minimum "release potency"  i.e.,
the amount of live virus in the vaccine when the vaccine is approved for release to the market by
CBER. CBER requested during these discussions that the label state the minimum "end-expiry
potency"  i.e., the amount of live virus in the vaccine at the end of its shelf life. Ex.152, (Oct. 5,
1998 email) at MRK-KRA00095142; Ex. 191 (Jan. 23, 1997 Email) at MRK-KRA01972735; Ex.
189 (Dec. 5, 1997 letter) at MRK-KRA01972451; Ex. 186 (Jan. 28, 1998 Letter) at MRK-
KRA01625508.

**Response**: Disputed.  The evidence cited does not support the proffered facts, particularly as

to what Merck "understood" and when.  In 1996 Merck "explained" to FDA that "historically

[Merck] provided the release specification" and FDA "said that the way [the label] is written

it implied that [4.3 log] is met through expiry."[108]  In January 1997 "[t]he CBER comment

---

[107] *See* Rel 56 Stat. ¶27.

[108] Merck Ex.152 at '42 (February 26, 1996 email); *see also* Ex. 44 at '760 ("In 1990, the mumps virus end expiry potency for M M R™ II was established as 4.3 [log].").

[on a draft MMR-II label change] required that expiry titers be provided."[109]  In December

1997 "the label statement ha[d] been interpreted as the 'shelf-life' specification."[110]

159.    Between 1997 and 1999, Merck and CBER discussed mumps potency labeling and analysis of historical mumps potency data to address the label interpretation issue. Ex. 186 (Jan. 28, 1998 Letter) at MRK-KRA01625508; Ex. 163(Sept. 29, 1998 Letter) at MRK-KRA00636592; Ex. 149 (Dec. 3, 1998 Email) at MRK-KRA00095063; Ex. 151 (Nov. 6, 1998 Email) at MRK-KRA00095065; Ex. 150; Ex. 178 (Dec. 10, 1998 Letter) at MRK-KRA01622125; Ex. 181 (Merck Letter to CBER) at MRK-KRA01622552; Ex. 182 (Dec. 16, 1998 Letter) at MRK-KRA01622600; Ex. 180 (Jan. 8, 1999 letter) at MRK-KRA01622468; Ex. 148 (May 12, 1999 Email) at MRK-KRA00094960; Ex. 179 (Jan. 18, 1999 Letter) at MRK-KRA01622463.

**Response**: Disputed to the extent Merck implies the discussions between Merck and FDA

from 1997 to 1999 regarding the mumps potency specification on the MMR-II label were to

address a "label interpretation."[111]  Undisputed that between 1997 and 1999 Merck and FDA

discussed the mumps potency specification in the MMR-II labeling and analysis of historical

mumps potency data.

160.    After discussions with Merck and undertaking its own analysis of data, on August 20, 1999, CBER directed Merck to increase the release potency for its mumps-containing vaccines from a minimum release potency of 4.3 $\log_{10}$ $TCID_{50}$ to a minimum release potency of 5.0 $\log_{10}$ $TCID_{50}$, in order for the product to meet, throughout its entire 24 month shelf life, the potency of 4.3 $\log_{10}$ $TCID_{50}$. Ex. 185 (Aug. 20, 1999 Letter) at MRK-KRA01624909.

---

[109] Merck Ex. 191 at '35 (Jan. 23, 1997 Email).

[110] Merck Ex. 189 at '51 (Dec. 5, 1997 Letter).  *See also* Merck Ex. 186 at '08 (Jan. 28, 1998 Letter) ("During teleconferences in 1996 and in early 1997 … the need to clarify the label claims for potency and to define them in terms of … expiry became evident.").

[111] Merck Ex. 150 (Dec. 12, 1998 Internal Merck Memo) (FDA's "Dr. Baylor … stated that from [FDA's] perspective the titers on the label have always been perceived as expiry titers."); Merck Ex. 148 at '60 (May 12, 1999 Email) ("Dr. Baylor … does not believe the new label has changed substantially from the wording used for potency over the past 20 years."); *see also* Merck Ex. 186 at '08 (Jan. 28, 1998 Letter) ("During teleconferences in 1996 and in early 1997 … the need to clarify the label claims for potency and to define them in terms of … expiry became evident."); *see also* Ex. 44 at '760 ("In 1990, the mumps virus end expiry potency for M M R™ II was established as 4.3 [log].").

Appx18816

**Response**:  Disputed that the evidence cited supports Merck's proffered fact that 4.3 log was a minimum release potency.  Merck Ex. 185 at '909.  Also disputed that 4.3 log was a minimum release potency.[112]  Otherwise undisputed.

161.    Since implementation of this change, Merck has manufactured the MMR-II vaccine to a minimum mumps release potency of 5.0 $\log_{10}$ TCID$_{50}$, irrespective of subsequent label changes. Ex. 202 (Stannard Dep. Tr.) at 297:21-298:7; Ex. 117 (Keegan Dep. Tr.) at 24:13-20.

**Response**: Disputed to the extent the phrase "[s]ince implementation of this change" invokes unspecified facts outside the statement which makes it impossible to answer as a stand-alone fact.  Otherwise undisputed.

162.    In December 1997, Merck discussed with FDA a clinical trial to support a label change of mumps potency lower than 4.3 $\log_{10}$ TCID$_{50}$. The lower potency would be an end-expiry potency. Ex. 186 (January 28, 1998 Letter and Attachment) at MRK-KRA01625508.

**Response**: Undisputed that in 1997 Merck discussed with FDA a clinical trial to support lowering the mumps specification on the MMR-II label to less than 4.3.  Also undisputed that Merck was seeking to lower the mumps end-expiry specification on the MMR-II label.

163.    Over the course of next several years, Merck and FDA discussed numerous aspects of the clinical trial. Topics of discussion included the specifics of the design of the tests (assays) that were going to be used to measure immune response, the requirements for how the trial would show that a lower potency was an appropriate end-expiry potency, the inclusion of an additional test potency, the number of subjects to participate in the trial, and the manner in which the lots for the test potencies would be created. The discussions took the form of exchanges of correspondence, Merck responses to specific questions posed by FDA, telephone conferences, sharing of data, and an in-person meeting.  Ex. 161 (June 23, 1998 Letter) at MRK-KRA00624345-446; Ex. 139 (Sept. 8, 1998 Letter) at MRK-KRA00001467-469; Ex. 128 (Nov. 10, 1998 Memo) at MRK-KRA00001215-217; Ex. 162 (Feb. 5, 1999 Response) at MRK-KRA0062448-589; Ex. 157 (Feb. 19, 1999 Fax) at MRK-KRA00336634-636; Ex. 134 (Feb. 19,

---

[112] Rel. 56. Stat. ¶29 30, *citing* Ex. 42 at '706 07 ("During communications with [FDA] in 1996 98, it became evident that the [FDA] … defined [the label's potency] specifications as end expiry potencies."); Ex. 43 at '165 66 (same); Ex. 44 at '760 ("In 1990, the mumps virus end expiry potency for M M R$^{TM}$ II was established as 4.3 [log]."); Ex. 17 at 26:15 27:10, 28:2 7 (Bramble Dep.) (testifying FDA's position was potency on label was minimum potency required at end of shelf life); Merck Ex. 150 (Dec. 12, 1998 Internal Merck Memo) (FDA's "Dr. Baylor … stated that from [FDA's] perspective the titers on the label have always been perceived as expiry titers."); Merck Ex. 148 at '60 (May 12, 1999 Email) ("Dr. Baylor … does not believe the new label has changed substantially from the wording used for potency over the past 20 years.").

1999 Notes) at MRK-KRA00001253-254; Ex. 146 (Feb. 22, 1999 Memo) at MRK-
KRA00062710-713; Ex. 138 (Aug. 30, 1999 Letter); Ex. 130 (Dec. 1, 1999 Letter) at
KRA00001222-230; Ex. 144 (Dec. 23, 1999 Notes) at MRK-KRA00025713-724; Ex. 140  (Dec.
30, 1999 Letter) at MRK-KRA00001470-924; Ex. 145 (Jan. 5, 2000 Memo) at MRK-
KRA00048855; Ex. 133 (Jan. 31, 2000 Memo) at MRK-KRA00001249-252; Ex. 135 (Feb. 8,
2000 Memo) at MRK-KRA00001255-257; Ex. 147 (March 13, 2000 Minutes) at MRK-
KRA00062845-85; Ex. 137 (March 13, 2000 Memo) at MRK-KRA00001262-265; Ex. 136
(March 14, 2000 Minutes) at MRK-KRA00001258-261; Ex. 131 (Oct. 27, 2000 Letter) at MRK-
KRA00001231-236; Ex. 142 (Notes from Nov. 8, 2000) at MRK-KRA00025161-162; Ex. 132
(Nov. 16, 2000 Letter) at MRK-KRA00001237-248; Ex. 129 (Nov. 29, 2000 Memo) at MRK-
KRA00001218-221; Ex. 159 (Feb. 2, 2001 Response) at MRK-KRA00622078-273.

**Response**: Undisputed that from 1997-2000 Merck and FDA had numerous discussions

about the design and development of Protocol 007.  Also undisputed that topics included

those listed in the statement, but disputed to the extent Merck implies these were the only

topics Merck and FDA discussed in the design and development of Protocol 007.  Among

other things, Merck and FDA also discussed FDA's requirements that: the clinical study be a

measure of protection;[113] Merck use a functional tests such as plaque reduction neutralization

for the primary objectives of the clinical study;[114] Merck correlate any ELISA to the results

---

[113] Rel. 56 Stat. ¶ 51 (requirement to measure protection) *citing among other evidence* Ex. 108 at '567 69 ("Protocol
007 was designed to determine whether Merck's MMR vaccine would remain effective against mumps if the
potency (i.e. concentration) of the mumps component of the vaccine was reduced.  The study involved determining
'seroconversion rates'   which are used as a measure of mumps vaccine effectiveness at different potencies.")
(representing purpose of Protocol 007 was to determine if below label potency vaccine was "comparably
protective") (The AIGENT and ELISA tests in Protocol 007 "measured the effectiveness of the vaccine at the
potencies being studied.") ("[I]n approving Merck's label change request, the FDA found …. That the vaccine would
be adequately protective against mumps even if Merck were to reduce the potency of the mumps component …."); 
Ex. 109 at '469 (FDA requiring Merck's Protocol 007 to provide "indicators of protection.  …  There are concerns
about long term protection against mumps ….").

[114] Ex. 110 at '256 (FDA explaining to Merck "it is important that the immunogenicity at that low end be measured
with a neutralization assay that can be reflective of protection."); Ex. 111 at '351 ("[I]n [Protocol 007] we are trying
to establish clinical protective efficacy"); Rel. 56 Stat. ¶ 52 (requirement to use a neutralization test) *citing among
other evidence* Ex. 54 at '425 ("requirement was set forth by [FDA] to use a functional neutralization assay"); Ex.
110 at '255 (FDA "can not accept ELISA for the mumps end expiry and only will accept neutralization data … since
neutralization reflects protection.").

of the functional test before it could use ELISA to measure the secondary objectives in the study;[115] and Merck use a wild-type virus as the indicator strain in all Protocol 007 testing.[116]

164.    The result of the negotiations was a study titled "A Study of M-M-R II at Mumps Expiry Potency in Healthy Children 12 to 18 Months of Age" (Protocol 007). The goal of the study was to evaluate *non-inferiority*  i.e., to test whether the vaccine at a lower potency would have similar immunogenic effects as at higher potencies. Ex. 155 (Clinical Study Report (CSR)) at MRK-KRA00224982 at '5021.

**Response**: Disputed to the extent that "results of the negotiations" invokes unspecified facts

outside the statement which make it impossible to answer as a stand-alone fact.  Assuming

Merck is referring to the "discussions" referenced in SUMF1 ¶ 163, also disputed that those

discussions were "negotiations."[117]  Also disputed the goal of the study was to evaluate non-

inferiority.  Given the FDA's concerns surrounding MMR-II at lower, below-label mumps

potencies, Merck was required to demonstrate through Protocol 007 that MMR-II with lower,

below-label mumps potencies would provide protection against mumps.[118]  Also disputed

---

[115] Rel. 56 Stat. ¶¶ 65 66 (requirement to correlate ELISA and PRN) *citing among other evidence* Ex. 6 at 251:6 14 (Merck Expert Burlington Dep.) ("[FDA] wanted some sort of functional antibody information to be associated with ELISA seroconversion. … that is clear from the record."); Ex. 133 at '483 ("It is essential that ELISA testing methods be validated against a working neutralization assay …."); Ex. 112 at '970 (FDA requesting Merck assurances that "the cutoff employed in the ELISA for seropositive should be supported by data demonstrating some relevance with protective levels of antibody (e.g., neutralizing antibody)."); Ex. 134 at '778 ("Justification is required for the new mumps cutoff of 10 ELISA antibody units …. [FDA] requested that the ELISA results be compared to the mumps [PRN] assay. [FDA] would like the rationale for the new cutoff to be linked to a biologically relevant reference standard."); Ex. 121 at '775 ("[E]vidence of a correlation between the current assays and a [wild type] Neut[ralization] assay, or evidence of correlation with protective efficacy, would allow the current [ELISA] based assays to be used.").

[116] Rel. 56 Stat. ¶ 55 (requirement to use a wild type mumps virus) *citing among other evidence* Ex. 52 at '636 ("[A]t [FDA's] request, the [Protocol 007] study incorporated a wild type mumps isolate as [an indicator] test strain on the *premise that neutralization of a wild type isolate would act as a surrogate for protection from disease.*") (emphasis in original).

[117] *See* Rel. Resp. SUMF1 ¶ 163, *supra*; *see also* Ex. 358 at 103:17 104:3 (Malone Dep.) ("The onus for justification of any decision that the sponsor makes in prosecuting and demonstrating the safety and immunogenicity and effectiveness or efficacy of the product is the responsibility of the sponsor. What [FDA] in consultation with a medical officer may or may not have said or discussed is not binding. The onus is on the sponsor to ensure that they have designed their studies in a way that ensures that the requirements for licensure have been met. The onus is not on the [FDA].").

[118] Rel. 56 Stat. ¶ 51, *citing* Ex. 108 at '567 69 ("Protocol 007 was designed to determine whether Merck's MMR vaccine would remain effective against mumps if the potency (i.e. concentration) of the mumps component of the vaccine was reduced. The study involved determining 'seroconversion rates'  which are used as a measure of

68

that Protocol 007 had a single goal. Protocol 007 had two primary objectives (endpoints)[119] and two secondary objectives (endpoints).[120] Undisputed that the title of Protocol 007 was "A Study of M-M-R II at Mumps Expiry Potency in Healthy Children 12 to 18 Months of Age."

165.    The study would be a clinical trial studying the effect of vaccination on children who had not yet received the vaccine and who would be randomized to receive vaccine lots at different potencies. *Id.* at '018, '022.

---

mumps vaccine effectiveness at different potencies.") (representing purpose of Protocol 007 was to determine if below label potency vaccine was "comparably protective") (The AIGENT and ELISA tests in Protocol 007 "measured the effectiveness of the vaccine at the potencies being studied.") ("[I]n approving Merck's label change request, the FDA found …. That the vaccine would be adequately protective against mumps even if Merck were to reduce the potency of the mumps component ….."); Ex. 109 at '469 (FDA requiring Merck's Protocol 007 to provide "indicators of protection. … There are concerns about long term protection against mumps …."); Ex. 110 at '256 (FDA explaining to Merck "it is important that the immunogenicity at that low end be measured with a neutralization assay that can be reflective of protection."); Ex. 111 at '351 ("[I]n [Protocol 007] we are trying to establish clinical protective efficacy"); Ex. 53 at '878 ("[FDA] requires that [seroconversion rates] reflect protective efficacy."); Ex. 112 at '970 ("[T]he appropriateness of the cutoff employed in the ELISA for seropositivity should be supported by data demonstrating some relevance with protective levels of antibody (e.g., neutralizing antibody)."); Ex. 113 at '756 (FDA referring to Protocol 007 testing as an "immunological correlate for efficacy of mumps vaccination"); Ex. 114 at '259 ("As the PRN assay is an immunological endpoint for protection against wild type disease, [FDA] stated that the virus used in the assay must be wild type (early passage) virus, not attenuated virus vaccine."); Ex. 100 at '349 ("This change in mumps expiry specification is feasible only on the basis of clinical efficacy data which is currently being generated [in Protocol 007]."); Ex. 17 at 60:10 61:2, 118:25 119:8 (Bramble Dep.) (testifying purpose of Protocol 007 was "to determine the effectiveness of the dose levels … [o]r the efficacy"); Ex. 115 at 68:14 69:8 (Deposition of Merck Employee Dr. Emilio Emini (hereinafter "Emini Dep.")) ("The question [in Protocol 007] was … what potency level … should still be present in the vaccine at the end of shelf life that reflects the effectiveness of the vaccine."); Ex. 116 at 32:19 22 (Deposition of Merck Employee Dr. Florian Schodel (hereinafter "Schodel Dep.")) ("Merck had to make sure that whatever was in the vaccine throughout shelf life maintained its efficacy."); Ex. 30 at 114:2 3, 115:22 23 (Merck Expert Durbin Dep.) ("FDA wanted an assay that was reflective of clinical protection") ("FDA wanted an assay that could relate to the clinical outcome of protection"); Ex. 3 ¶¶ 72, 385 (Kessler Rep.) ("FDA required the mumps immunogenicity testing [to support a sBLA to lower the mumps end expiry potency claim for MMR II] to reflect protection against disease as a result of getting the vaccine") ("The objective of Protocol 007 was to measure MMRII's ability to protect against currently circulating wild type mumps, especially at a potency lower than … 4.3 [log].").

[119] Rel. 56 Stat. ¶ 58 *citing among other evidence* Ex. 105 at '5017 (Protocol 007 CSR) ((1) "To demonstrate an adequate immune response [by mumps virus neutralization] among subjects receiving M M R™II containing an expiry dose of mumps [4.0 log or 3.7 log] …."; and (2) "To demonstrate a similar immune response to mumps virus by neutralization among subjects receiving M M R™II containing an expiry dose of mumps virus [4.0 log or 3.7 log] … compared to subjects receiving M M R™II containing a release dose [4.9 log] of mumps ….").

[120] Rel. 56 Stat. ¶ 58 (The secondary objective of Protocol 007 were "[t]o demonstrate similar immune responses to … mumps … (seroconversion rates by ELISA) among children who receive M M R™II containing an expiry dose of mumps [4.0 log or 3.7 log] … compared to children who receive M M R™II containing a release dose of mumps [4.9 log] and "[t]o summarize the persistence of antibody to … mumps … 1 year post vaccination in each treatment group."); *see also* Ex. 109 at '469 ("There are concerns about long term protection against mumps … by the vaccine …. As an indicator of duration of protection, the follow up period should be extended to one year post vaccination to assure that the vaccine at end expiry is sufficiently immunogenic.").

69

**Response**: Undisputed.

166.    Protocol 007 was *not* a study of vaccine efficacy. Rather, efficacy of the vaccine was established through the Hilleman studies. Ex. 200 (Musey Dep. Tr.) at 81:2-22; Ex. 104 (Durbin Dep. Tr.) at 62:25-63:9; Ex. 105 (Emini Dep. Tr.) at 128:24-129:6, 130:21-131:3, 311:9-11; Ex. 123 (January 29, 2004 Submission) at MRK-KRA00000032 at '116.

**Response**: Disputed.  Merck repeatedly identified Protocol 007 as a study of vaccine

efficacy.[121]  In the context of Merck's mumps testing, including Protocol 007, Merck also

used the terms "efficacy" and "effectiveness" interchangeably.[122]  Also disputed that the

evidence cited supports the statement that "efficacy of the vaccine was established through

the Hilleman studies."  Merck Ex. 105, 123 and 200 do not support this statement.  In Merck

Ex. 104, Dr. Durbin's testified that Dr. Hilleman's placebo-controlled study was an "efficacy"

study.  She did not testify that "efficacy of the vaccine was established" as stated.[123]

Undisputed that efficacy of the monovalent mumps vaccine was established by Dr. Hilleman

---

[121] Merck Ex. 123 at '38 (Merck identified its sBLA, supported by Protocol 007, as an "Efficacy Supplement" on the face of its application); Merck SUMF4¶ 174 (describing Protocol 007 data as "data on the efficacy of the vaccine at potencies lower than 4.3 log10 TCID50/dose"); *see also* Exs. 193 198 at 1 (clinicaltrials.gov archives indicating Protocol 007 was an "Efficacy Study"); Rel. 56 Stat. ¶¶ 137 143 and 150 *citing* Ex. 42 at '708 ("In addition, and more seriously, [FDA] challenged the efficacy of marketed product at the lowest predicted potencies (below label claim). … With regard to product efficacy, we provided an interim analysis of an ongoing mumps end expiry trial to justify efficacy of lower potency product.  [FDA] accepted the Merck response."); Ex. 23 at 33:24 34:10 (Hartzel Dep.) (testifying and affirming "investigators" and "site personnel" are "the individuals at the clinical sites that are enrolling the patients and observing them for safety and efficacy" and "drawing the blood from the patients"); Ex. 137 at '321 ("The purpose … is to provide clinical data supporting a reduction in expiry potency …. This clinical data provides evidence … based on … [AIGENT] assay used as a surrogate marker for vaccine efficacy.").

[122] Ex. 359 at 58:4 7 (Morsy Dep.) (Efficacy and effectiveness are "interchangeable."); Ex. 108 at '567 69 (Protocol 007 "measured the effectiveness of the vaccine at the potencies being studied."); Ex. 189 at '116 ("In agreement with … FDA, the mumps specific PRN assay [AIGENT] was developed and used as a surrogate for vaccine effectiveness."); *see also* Merck Ex. 41 at 27:11 28:6 (Pallansch Dep.) ("[E]fficacy is often measured in a specific clinical trial setting, where you know who is vaccinated and not … it's often also applied to a situation of measuring immunogenicity as well as disease in the context of those clinical trials…").

[123] Merck Ex. 104 at 62:25  63:4 ("So Dr. Hilleman's study was a true efficacy study. So it was measuring how many people who got the vaccine got mumps, compared to people who didn't get the vaccine and got mumps showed a high degree of efficacy."); *see also* Merck Ex. 41 at 27:11 28:6 (Pallansch Dep.) ("[E]fficacy is often measured in a specific clinical trial setting, where you know who is vaccinated and not … it's often also applied to a situation of measuring immunogenicity as well as disease in the context of those clinical trials…")

in the 1960s, but disputed that those studies were accepted by FDA to support vaccines sold

after 2000.[124]

167.    Instead, the study evaluated seroconversion in subjects receiving different potencies to compare whether a lower-potency vaccine would have similar immunogenic effects to the higher-potency vaccine. Ex. 155 (CSR) at MRK-KRA00224982 at '021; Ex. 105 (Emini Dep. Tr.) at 137:23-138:20.

**Response**: Disputed to the extent the phrase "[i]nstead, the study" invokes unspecified facts

outside the statement which make it impossible to answer as a stand-alone fact.  Assuming

Merck is referencing SUMF1 ¶ 166 and Protocol 007, also disputed since Merck is conflating

what Protocol 007 was designed to do and how the study measured the stated objectives.

Given the FDA's concerns surrounding MMR-II at lower, below-label mumps potencies,

Merck was required to demonstrate through Protocol 007 that MMR-II with lower, below-

label mumps potencies would provide protection against mumps.[125]  Protocol 007 had two

primary objectives (endpoints)[126] and two secondary objectives (endpoints).[127]  Undisputed

---

[124] Rel. 56 Stat. ¶ 33 (FDA rejecting Merck's original clinical studies as the basis for Merck to lower the mumps end expiry claim on the MMR II label) *citing among other evidence* Ex. 42 at '706 (Merck's "[a]rguments for the demonstrated immunogenicity at lower potencies of the monovalents and the apparent effectiveness … due to the virtual eradication of disease in the US … were further rejected [by FDA], because of the small number of children used in the studies, and the circumstantial nature of the justification."); Ex. 50 at '155 (same); Ex. 51 at '226 (same); Ex. 43 at '163 (same); Ex. 50 at '157 ("[T]he minimum immunizing dose studies were performed in a relatively small number of individuals … and have not been repeated in recent years or with the trivalent M M R®II vaccine []. Therefore, in order to determine the minimum expiry potency … it was essential to demonstrate the immunogenicity … at the reduced titers expected at expiry."); Ex. 51 at '228 (same); Ex. 53 at '877 (prior clinical studies "were old   based on small number of studies … and furthermore were questioned as to w[he]ther they are still valid in predicting the current protective efficacy …."); Ex. 54 at '425 ("A requirement was set forth by [FDA] to use a functional neutralization assay for [Protocol 007] … due to: 1  The efficacy statements in MMR®II label are based on old, limited data and an assay that is no longer used by Merck."); Ex. 2 at 82 83 (Malone Rep.) ("I agree with [the FDA's] assessment that Merck's original mumps efficacy studies, conducted on the monovalent vaccine (not the current trivalent or quadrivalent formulations), with a very small subject sampling, and with what I would consider antiquated testing methods, are not clinically relevant to ProQuad or M M R II ….").

[125]  *See supra* note 115.

[126] Rel. 56 Stat. ¶ 58 *citing among other evidence* Ex. 105 at '5017 (Protocol 007 CSR) ((1) "To demonstrate an adequate immune response [by mumps virus neutralization] among subjects receiving M M R™II containing an expiry dose of mumps [4.0 log or 3.7 log] …."; and (2) "To demonstrate a similar immune response to mumps virus by neutralization among subjects receiving M M R™II containing an expiry dose of mumps virus [4.0 log or 3.7 log] … compared to subjects receiving M M R™II containing a release dose [4.9 log] of mumps ….").

that one of the two primary objectives was to evaluate whether the immune responses between the two lower potency doses was similar to the marketed dose. Also undisputed that the responses of the subjects in Protocol 007 were to be measured in terms of seroconversion.

168.    Protocol 007 would not, and could not, be used to corroborate the original Hilleman efficacy results, in part because no subjects had the vaccine entirely withheld, so there would be no way to compare immunized subjects to non-immunized subjects.

**Response**: Disputed. There is no evidence cited to support the proffered statement.[128]

169.    Moreover, as CBER has recognized, there is no antibody level known to be protective for the mumps virus, so there is no way definitively to infer protection from antibody levels in individual study subjects. Ex. 137 (March 13, 2000 Memo from Morsy) at MRK-KRA00001263; Ex. 197 (Rubin, *Vaccines* (2018)) at 673.

**Response**: Disputed. Merck Ex. 137 does not support the proffered statement.[129] Likewise, Merck Ex. 197 does not support the proffered statement.[130] Undisputed that Merck Exs. 137 and 197 accurately reflect the positions of FDA's Drs. Carbone and Rubin regarding the appropriate definition of seroconversion when there is no antibody level known to be protective for mumps.

170.    Two types of assays — i.e., tests — would be used in Protocol 007: a plaque reduction neutralization assay (PRN) and an enzyme linked immunosorbent assay (ELISA). Ex. 155 (CSR) at MRK-KRA002250372. The ELISA assay was run in a different laboratory. Ex. 105 (Emilio Dep. Tr.) at 342:3-342:25; Ex. 204 (Wlochowski Dep Tr. (Day 1)) at 206:21-207:18; Ex. 119 (Krah Dep. Tr. (Day 2)) at 467:14-468:3.

---

[127] Rel. 56 Stat. ¶ 58 (The secondary objective of Protocol 007 were "[t]o demonstrate similar immune responses to … mumps … (seroconversion rates by ELISA) among children who receive M M R™II containing an expiry dose of mumps [4.0 log or 3.7 log] … compared to children who receive M M R™II containing a release dose of mumps [4.9 log] and "[t]o summarize the persistence of antibody to … mumps … 1 year post vaccination in each treatment group."); *see also* Ex. 109 at '469 ("There are concerns about long term protection against mumps … by the vaccine …. As an indicator of duration of protection, the follow up period should be extended to one year post vaccination to assure that the vaccine at end expiry is sufficiently immunogenic.").

[128] *See*, Judge Jones Policies and Procedures, Civil Cases, D. Summary Judgment Motions, ¶ 5.

[129] Merck Ex. 137 at '263 64 ("Dr. Carbone noted that we do not know what level of antibody is protective, and therefore the *appropriate definition of seroconversion*, or a minimally acceptable post vaccination response, *was uncertain*.") (emphasis added).

[130] Merck Ex. 197 at '673 ("results of the virus neutralization assay *are difficult to interpret* due to the absence of an established neutralizing antibody titer that can be used as a surrogate market of protection.") (emphasis added).

**Response**: As to the first sentence, undisputed.  As to the second sentence, undisputed that the ELISA assay used in Protocol 007 was run in a different laboratory than the PRN assay used in Protocol 007.

171.    Dr. David Krah was in charge of the lab that developed and performed the PRN assay that was part of Protocol 007. Exs. 118 & 119 (Krah Dep. Tr.) at 91:3-11, 431:6-10.

**Response**: Undisputed.

172.    Dr. Krah began his employment with Merck in 1988 in the Department of Virus and Cell Biology and was promoted to Senior Investigator in 1998. Ex. 106 (Curriculum Vitae of David L. Krah) at MRK-KRA00000696; Ex. 118 (Krah Dep. Tr.) at 54:13-25.

**Response**: Undisputed.

173.    During the 1998-2002 time period, Dr. Krah's immediate supervisor was Dr. Alan Shaw, and Dr. Shaw reported to Dr. Emilio Emini. *Id.* at 80:13-20.

**Response**: Undisputed.

174.    A PRN indirectly measures antibodies based on their capacity to neutralize the virus of interest or the indicator virus. Ex. 92 (Durbin Report) at 9.

**Response**: Undisputed.

175.    In a PRN, a serum or blood sample is incubated with the indicator virus. That mixture is added to a cell monolayer in a clear well. *Id.*

**Response**: Undisputed.

176.    The presence of functional antibodies is evaluated by determining how effectively the serum neutralized the indicator virus. If not neutralized, the virus causes "plaques"   or holes   in the cell monolayer. The plaques are manually counted by a technician. The theory is the more plaques there are, the fewer functional antibodies are present. *Id.* at 9-10.

**Response**: Undisputed.

177.    A PRN is considered a functional assay which has the benefit of measuring antibodies based on their presumed biological relevance   i.e., the ability to neutralize the virus. *Id.* at 10.

**Response**: Undisputed.

73

178.    But because they require manual counting of plaques, they are time-consuming and subjective. Further, PRNs are complex biological assays involving multiple steps each of which is subject to error. *Id.* at 14-15.

**Response**: As to the first sentence, disputed to the extent that "they" invokes unspecified facts outside the statement which make it impossible to answer as a stand-alone statement. Assuming the statement is referring to PRN tests, otherwise undisputed.

179.    In Protocol 007 PRN, pre-vaccinated serum samples were compared to post-vaccinated serum samples to determine if as a result of vaccination the child developed functional antibodies and can be said to have "seroconverted." Ex. 155 (CSR) at MRK-KRA00224982 at '5021.

**Response**: Undisputed that in the Protocol 007 AIGENT test pre-vaccinated serum samples were compared to post-vaccination samples to determine if as a result of vaccination the child could be said to have seroconverted, but disputed that Protocol 007's AIGENT measured functional antibodies.[131]

180.    As part of Protocol 007, the control group received MMR-II containing 4.8 $\log_{10}$ TCID$_{50}$ per dose of mumps, which represented the release potency, while the other groups received vaccines containing 3.8 $\log_{10}$ TCID$_{50}$ per dose or 4.1 $\log_{10}$ TCID$_{50}$ per dose of mumps, representing the candidate end-expiry potencies. The PRN was used to evaluate the similarity (non-inferiority) of the seroconversion rates across the three different potencies. *Id.* at '5021, '5029.

**Response**: As to the first sentence, undisputed that the control group received "the current release potencies for mumps. As to the first sentence, also undisputed that the other groups received vaccines containing 3.7 log and 4.0 log per dose of mumps representing the candidate end-expiry potencies at the time the vaccines were administered to the children, which were later adjusted to 3.8 and 4.1 log, respectively.[132] As to the second sentence, disputed to the extent Merck ignore that given the FDA's concerns surrounding MMR-II at

---

[131] Rel. 56 Stat. ¶¶ 84 90 and notes 109 114 (collecting evidence).

[132]  Merck Ex. 155 at '5000 (the 4.0 log and 3.7 log expiry doses in Protocol 007 were adjusted to 4.1 log and 3.8 log in 2004 after the "reassignment of the mumps [house standard] potency"). All references to the 4.0 and 3.7 study potencies before the re assignment are equivalent to the 4.1 and 3.8 potencies after re assignment.

lower, below-label mumps potencies, Merck was required to demonstrate through Protocol

007 that MMR-II with lower, below-label mumps potencies would provide protection against

mumps.[133]  Undisputed that PRN was used to evaluate similar immune responses by

comparing seroconversion rates of the control group to each of the candidate end-expiry

potencies, but disputed that this was the only objective of Protocol 007.  In addition, FDA

required Merck to use PRN to evaluate two primary objectives (endpoints) in Protocol

007.[134]

181.    The ability of an assay to identify true positives as positive (correctly classifying
seropositive samples as seropositive) is known as its *sensitivity*. Ex. 96 (Antonello Dep Tr.) at
64:22-65:6, 101:20-102:3.

**Response**: Disputed that the cited evidence stands for the proffered statement.  Dr. Antonello

testified sensitivity was the "probability of identifying a positive as a positive."  Merck Ex.

96 at 64:22-65:6.  Also disputed that sensitivity necessarily measures "true" positives.[135]

Also disputed to the extent Merck implies sensitivity has a single definition.  As Merck made

clear in developing the AIGENT test, sensitivity can be manipulated in the design of the tests

itself.[136]  Undisputed that sensitivity generally means classifying a positive as positive.

---

[133] *See supra* note 115.

[134] Rel. 56 Stat. ¶ 58 *citing among other evidence* Ex. 105 at '5017 (Protocol 007 CSR) ((1) "To demonstrate an adequate immune response [by mumps virus neutralization] among subjects receiving M M R™II containing an expiry dose of mumps [4.0 log or 3.7 log] …."; and (2) "To demonstrate a similar immune response to mumps virus by neutralization among subjects receiving M M R™II containing an expiry dose of mumps virus [4.0 log or 3.7 log] … compared to subjects receiving M M R™II containing a release dose [4.9 log] of mumps …."); *see also* Rel. 56 Stat. ¶ 52 *citing among other evidence* Ex. 54 at '425 ("requirement was set forth by [FDA] to use a functional neutralization assay"); Ex. 110 at '255 (FDA "can not accept ELISA for the mumps end expiry and only will accept neutralization data … since neutralization reflects protection."); Ex. 117 at '177 78 ("[FDA] considers a neutralization assay essential for establishing efficacy w[h]ere you need to define effectiveness for a product   the mumps end expiry trial [Protocol 007]").

[135] Ex. 434 at '994 (FDA to GSK) ███████████████████████████████████████████
███████████   [GSK MMR IND 0015993 15994]

[136] Ex. 153 at '546 ("We are also readdressing the anti IgG concentration to see if we can reduce the assay sensitivity to reduce the pre positive rate while maintaining sensitivity to detect seroconversion.").  [00068546 00068546]; Ex.

182.    CBER set two statistical criteria to determine whether a candidate end-expiry potency would be considered acceptable as compared to the existing release potency. First, for a candidate end-expiry potency to be considered non-inferior to the release potency (the control), the seroconversion rate in the group receiving the candidate end-expiry potency could not be more than 5% less than the seroconversion rate in the group receiving the control. Second, the lower limit of the confidence interval of the seroconversion rate in the group receiving the candidate end-expiry potency would have to be above 90%. Ex. 139 (Sept. 8, 1998 Letter) at MRK-KRA00001467 at '468.

**Response**: Undisputed.

183.    Based on the criteria set by CBER, Merck undertook to develop a sensitive PRN that was capable of detecting a seroconversion rate over 95%. Ex. 119 (Krah Dep. Tr.) at 723:16-724:21.

**Response**: Disputed to the extent the evidence cited does not support the proffered statement that the statistical criteria FDA required were "for a candidate end-expiry potency to be considered non-inferior." Given the FDA's concerns surrounding MMR-II at lower, below-label mumps potencies, Merck was required to demonstrate through Protocol 007 that MMR-II with lower, below-label mumps potencies would provide protection against mumps.[137] In Protocol 007 Merck's primary objectives were to demonstrate an adequate immune response and a similar immune response.[138] Merck's secondary objectives in Protocol 007 were to measure similar immune response to demonstrate MMR-II was "sufficiently immunogenic," including one year after vaccination, because FDA was concerned about the duration of protection.[139]

---

149 at '050 ("[FDA] does not use either complement or [anti ]IgG to enhance sensitivity [in a PRN assay] and feels that these maneuvers should not be necessary" for Protocol 007.)

[137] *See supra* note 115.

[138] Rel. 56 Stat. ¶ 58 *citing among other evidence* Ex. 105 at '5017 (Protocol 007 CSR) ((1) "To demonstrate an adequate immune response [by mumps virus neutralization] among subjects receiving M M R™II containing an expiry dose of mumps [4.0 log or 3.7 log] …."; and (2) "To demonstrate a similar immune response to mumps virus by neutralization among subjects receiving M M R™II containing an expiry dose of mumps virus [4.0 log or 3.7 log] … compared to subjects receiving M M R™II containing a release dose [4.9 log] of mumps …."); *see also* Rel. Resp. SUMF1 ¶ 163, *supra* (discussing FDA requirement that Merck use neutralization assay).

[139] Rel. 56 Stat. ¶ 58 (The secondary objective of Protocol 007 were "[t]o demonstrate similar immune responses to … mumps … (seroconversion rates by ELISA) among children who receive M M R™II containing an expiry dose

76

Appx18827

184. Further, because the assay was to be used to compare seroconversion rates of subjects receiving three different potencies, the assay had to be sufficiently sensitive to discern a difference in the seroconversion rates elicited by the control and candidate end-expiry potencies. Ex. 105 (Emini Dep. Tr.) at 78:12-79:17.

**Response**: Disputed to the extent that "the assay" invokes unspecified facts outside the

statement which make it impossible to answer as a stand-alone fact. Assuming Merck means

the neutralization assay FDA required Merck to use in Protocol 007 testing, disputed that the

evidence cited supports the proffered statement. Dr. Emini testified that "[w]hat I mean by

sensitivity" is "it needed to be able to discern a difference in the seroconversion rate." Merck

has not pointed to any citation in Merck communication with FDA, including the Clinical

Study Report, to support Dr. Emini's view of why Merck increased the sensitivity of the PRN

it used in Protocol 007. Elsewhere FDA had noted problems with increasing sensitivity in

PRN testing.[140]

185. CBER required that Merck use a wild type indicator virus (WT) i.e., a naturally occurring version of the mumps virus. Ex. 139 (Sept. 8, 1998 Letter) at MRK-KRA 0001468; Ex. 128 (Nov. 10, 1998 Memo) at MRK-KRA00001215.

**Response**: Undisputed that FDA required Merck to use a wild-type indicator virus, but

disputed to the extent that Merck implies it used a wild-type indicator virus in the Protocol

---

of mumps [4.0 log or 3.7 log] … compared to children who receive M M R™II containing a release dose of mumps [4.9 log] and "[t]o summarize the persistence of antibody to … mumps … 1 year post vaccination in each treatment group."); *see also* Ex. 109 at '469 ("There are concerns about long term protection against mumps … by the vaccine …. As an indicator of duration of protection, the follow up period should be extended to one year post vaccination to assure that the vaccine at end expiry is sufficiently immunogenic.").

[140] Ex. 434 at '994 (FDA to GSK) ████████████████████████████████████████

████████████ ") [GSK MMR IND 0015993 15994]; Ex. 149 at '050 ("[FDA] does not use either complement or [anti ]IgG to enhance sensitivity [in a PRN assay] and feels that these maneuvers should not be necessary" for Protocol 007.); *see also* Merck Ex. 155 (Clinical Study Report).

007 testing.  Merck used a low-passage mumps vaccine strain (rather than a wild-type strain) as the indicator virus in both the AIGENT and ELISA tests.[141]

186.    As part of the development of a highly sensitive PRN, Merck evaluated different mumps indicator strains including:  the Jeryl Lynn vaccine strain, Swiss isolates, New York, Tennessee, South Africa, Jones, Lo1, JL2, and JL5. Ex. 130 (Dec. 1, 1999 Letter) at MRK-KRA00001223.

**Response**: Disputed that Merck evaluated different indicator strains as "part of the development of a highly sensitive PRN."  To meet the FDA's requirement that Merck perform a neutralization test in Protocol 007, Merck initially engaged in preliminary testing with a standard PRN test using its mumps vaccine virus strain (called Jeryl Lynn) as well as several wild-type mumps virus strains as the indicator virus.[142]  When Merck could not measure 95 percent seroconversion with a standard mumps neutralization assay using the wild-type indicator viruses Merck modified the test to include anti-IgG and a low-passage mumps vaccine strain to determine whether the sensitized assay was capable of detecting more than 95% seroconversion.[143]  Otherwise undisputed.

187.    Focusing its development efforts on Lo1, as suggested by CBER, Merck found in preliminary studies that the seroconversion rate was in the range of 69%-76%. Merck informed FDA of this. Ex. 130 (Dec. 1, 1999 Letter) at MRK-KRA00001224.

**Response**: Disputed to the extent that "[f]ocusing its development efforts on Lo1" invokes unspecified facts outside the statement which make it impossible to answer as a stand-alone

---

[141] Ex. 105 at '6160 (Clinical Protocol 007 01) ("**The indicator virus** [used in the AIGENT] **is a low passage (passage 8) Jeryl Lynn™ strain (JL135)** ….") (emphasis in original).  A "low passage" vaccine strain is "an attenuated (or weakened) version" of the virus used to manufacture the vaccine.  In contrast, a true wild type virus strain is a virus strain that is circulating in the real world.  Ex. 2 at 47, nn. 145 146 (Malone Rep.); Ex. 3 ¶¶ 28 29 (Kessler Rep.); see also Rel. 56 Stat. ¶ 62 63, 126 and notes 81 84 (collecting evidence Merck used the same indicator virus in both tests).

[142] Rel 56 Stat. ¶ 60 and note 79 (collecting evidence).

[143] Rel. 56 Stat. ¶ 62 *citing among other evidence* Ex. 105 at '5037 38, '6152, and '6160 (Protocol 007 CSR); Ex. 131 at '632 ("Modification of the standard mumps [neutralization] assay to include … anti []IgG … has been evaluated to determine whether the sensitized assay is capable of detecting ≥95% seroconversion in vaccinees.").

78

fact.  Assuming Merck is referencing its efforts to develop a PRN test to use in Protocol 007

and that "Lo1" refers to the London 1 wild-type mumps virus, undisputed that in its

preliminary testing using a standard PRN and the London1 indicator virus Merck measured

seroconversion rates in the range of 69%-76%.  Also undisputed that Merck informed FDA

of the results of these preliminary tests.

188.    During these discussions in 1999 and 2000, Merck also reported to CBER that it
was finding seroconversion rates for its mumps vaccine with other indicator strains as low as
56% or even lower.  Ex. 136 (March 14, 2000 Minutes) at MRK-KRA00001259; Ex. 140
(December 30, 1999 Letter) at MRK-KRA00001617.

**Response**: Disputed to the extent that "[d]uring these discussions in 1999 and 2000" invokes

unspecified facts outside the statement which make it impossible to answer as a stand-alone

fact.  Assuming Merck is referencing ongoing communications between Merck and FDA

relating to the design of the Protocol 007 PRN test, undisputed.

189.    However, Merck found that when the Jeryl Lynn vaccine strain was utilized as the
indicator virus, the seroconversion rate was in the range of 91% to 96% which was in agreement
with the original clinical trials. Merck informed FDA of this. Ex. 130 (Dec. 1, 1999 Letter) at
MRK-KRA00001203.

**Response**: Disputed to the extent that "[h]owever" implies a comparison to unspecified facts

outside the statement which make it impossible to answer as a stand-alone fact.  Assuming

Merck is comparing the results it measured using wild-type indicator viruses, referenced in

SUMF1 ¶¶ 187-188, to the seroconversion rates it measured using the Jeryl Lynn vaccine

strain when it did preliminary testing in Protocol 007, disputed that the 91% to 96% range

Merck measured in the preliminary Protocol 007 testing "was in agreement" with the original

clinical studies.  The two tests used different methods and there is no evidence cited to

support that the 91% to 96% agreed with the original studies except that the percentages were the same.[144]  Otherwise undisputed.

190.    Therefore, Merck requested using the Jeryl Lynn vaccine strain as the indicator virus. Ex. 130 (Dec. 1, 1999 Letter) at MRK-KRA00001226.

**Response**: Disputed to the extent that "therefore" invokes unspecified facts outside the

statement which make it impossible to answer as a stand-alone statement.  Also disputed to

the extent that the proffered statement that Merck "requested" implies FDA had decision-

making authority with regard to the design of the study.[145]  Merck "proposed" to use the

vaccine strain and provided FDA its "rationale."[146]  Otherwise undisputed.

191.    CBER agreed and later confirmed that certain passages of the Jeryl Lynn strain would be considered wild type and could be used in the PRN. Ex. 137 (March 13, 2000 Memo) at MRK-KRA00001262.

**Response**: Disputed to the extent the statement invokes unspecified facts outside the

statement that make it impossible to answer as a stand-alone fact.  Assuming Merck is

referencing the prior statement, disputed that FDA agreed Merck could use the vaccine strain

---

[144] Merck Ex. 105 at 78:14 79:17 (Emini Dep.) ("We need to recall that what you measure is a function of how you measure it. [The assay used in the original clinical studies] was no longer in existence by the time of the [Protocol] 007 study."); Ex. 2 at 82 83 (Malone Rep.) ("I agree with [the FDA's] assessment that Merck's original mumps efficacy studies, conducted on the monovalent vaccine (not the current trivalent or quadrivalent formulations), with a very small subject sampling, and with what I would consider antiquated testing methods, are not clinically relevant to ProQuad or M M R II ….").

[145] Ex. 4 at 301:9 13 (Kessler Dep.) ("FDA doesn't approve [the design of Protocol 007 with the use of a low passage Jeryl Lynn strain].  FDA responded to questions."); Ex. 358 at 103:17 104:3 (Malone Dep.) ("The onus for justification of any decision that the sponsor makes in prosecuting and demonstrating the safety and immunogenicity and effectiveness or efficacy of the product is the responsibility of the sponsor.  What [FDA] in consultation with a medical officer may or may not have said or discussed is not binding.  The onus is on the sponsor to ensure that they have designed their studies in a way that ensures that the requirements for licensure have been met.  The onus is not on the [FDA].").

[146] Merck Ex. 130 at '1226; *see also* Ex. 4 at 302:13 19 (Kessler Dep.) ("[Merck] argued for use of the low passage [virus] strain, and [FDA's Dr. Rubin] consider[ed] it stacking the deck."); (quoting Ex. 147); Ex. 147 at '994 95 (FDA's Dr. Steve Rubin: Using the Jeryl Lynn vaccine virus in an assay "would not be an acceptable practice for measuring vaccine immunogenicity as a surrogate for efficacy in a clinical trial ….  Instead, a wild type virus will have to be used.  Many years ago Merck argued for use of a low passage version of [Jeryl Lynn] in such an assay, and we accepted (not my decision, I would not have been in favor of stacking the deck).").

of the virus in its testing.[147]  Following Merck's "proposal," FDA "concurred" with Merck's

representations that a low-passage strain of the vaccine was wild type.[148]  Also disputed to

the extent that Merck implies its rationale supported the use of the low-passage vaccine strain

as an appropriate indicator virus in the Protocol 007 testing.[149]  Otherwise undisputed.

192.    In a face-to-face meeting regarding assay development, CBER suggested the use of anti-human IgG to enhance the sensitivity of the PRN. Ex. 137 (March 13, 2000 Memo) at MRK-KRA00001262; Ex. 105 (Emini Dep. Tr.) at 339:06-21.

**Response**: Disputed.  FDA's notes from the March 13, 2000 meeting are inconsistent with

the proffered evidence.[150]  When Merck gets the FDA's version of notes from a meeting,

---

[147] Ex. 4 at 301:9 13 (Kessler Dep.) ("FDA doesn't approve [the design of Protocol 007 with the use of a low passage Jeryl Lynn strain].  FDA responded to questions."); *Id.* at 304:18 23 (Kessler Dep.) ("Merck argued for certain things and FDA … it's not a choice but maybe allowed it to go forward. But either way, it's Merck's decision."); Ex. 358 at 103:17 104:3 (Malone Dep.) ("The onus for justification of any decision that the sponsor makes in prosecuting and demonstrating the safety and immunogenicity and effectiveness or efficacy of the product is the responsibility of the sponsor.  What [FDA] in consultation with a medical officer may or may not have said or discussed is not binding.  The onus is on the sponsor to ensure that they have designed their studies in a way that ensures that the requirements for licensure have been met.  The onus is not on the [FDA].").

[148] Merck Ex. 137 at '1262; *see also* Ex. 4 at 356:7 9 (Kessler Dep.) ("In both the ELISA and the [AIGENT], Merck made the case that [low passage strains of virus] were appropriate strains.  FDA accepted Merck's representation."); Ex. 147 at '994 95 (FDA's Dr. Steve Rubin: Using the Jeryl Lynn vaccine virus in an assay "would not be an acceptable practice for measuring vaccine immunogenicity as a surrogate for efficacy in a clinical trial …. Instead, a wild type virus will have to be used.  Many years ago Merck argued for use of a low passage version of [Jeryl Lynn] in such an assay, and we accepted (not my decision, I would not have been in favor of stacking the deck).").

[149] Ex. 3 at ¶ 31 (Kessler Rep.) ("The [virus] strain that was used as an indicator virus in Merck's AIGENT and [] ELISA assays … was neither the Wild Type Jeryl Lynn nor the Jeryl Lynn [used in the vaccine].  It was a 'low passage' strain (passage 8) 'derived from the original wild type Jeryl Lynn isolate in 1963'"); Ex. 4 at 300:2 8 (Kessler Dep.) ("[I]f you went out and said … that you tested this [vaccine] in a [plaque reduction neutralization assay] with a low passage Jeryl Lynn strain … and you presented that to a group of scientists … everybody would say Well, show me the data against true wild type, because that's what's clinical effectiveness."); *Id.* at 300:11 12 (Kessler Dep.) ("[I]t doesn't make sense … why one would use a [plaque reduction neutralization assay] not against the wild type [mumps virus]."); Ex. 2 at 47 (Malone Rep.) ("Merck's use of a low passage version of the Jeryl Lynn vaccine strain undermined the relevance of the AIGENT as a measure of clinical protection against currently circulating mumps viruses," because (i) "the low passage vaccine strain Merck used was still an attenuated (or weakened) version of the original Jeryl Lynn wild type strain from which it originated"; and (ii) "the Jeryl Lynn strain which was circulating in the 1960's when Merck isolated it for development of its mumps vaccine is of a different genotype … than the mumps strains that have been circulating in the U.S. in more recent times….") (cites omitted).

[150] Ex. 114.

"that's the official version that stands."[151]  According to the FDA notes, in March 2000

Merck had already tried IgG enhancement in a few pilot studies.[152]  According to the FDA

notes, FDA could not comment on the development of the assay until Merck provided FDA

validation data. With regard to enhancement, FDA's notes do not support Merck's statement

that FDA "suggested the use of anti-human IgG to enhance sensitivity of the PRN.[153]

193.    That is a common way to enhance PRN assays. Ex. 92 (Durbin Report) at 22-23,
Exhibit D; Ex. 104 (Durbin Dep. Tr.) at 148:14-19.

**Response**: Disputed. The statement invokes unspecified facts outside the statement that make

it impossible to answer as a stand-alone statement.  Assuming "[t]hat" refers to the

enhancement of a PRN using anti-human IgG to enhance sensitivity, the evidence does not

support the proffered statement.  Dr. Durbin's report states that "it is not uncommon for

assays to include a reagent" for the purpose of enhancing the sensitivity of the assay, not

anti-IgG.  Merck Ex. 92 at '22.  Likewise, Dr. Durbin testified that she had not seen anti-IgG

used to enhance a mumps PRN or in any pivotal clinical studies.  Merck Ex. 104 at 148:14-

19.  Also disputed that the use of anti-IgG to enhance PRN testing is common.  Anti-IgG is

rarely used in clinical neutralization testing for mumps and Merck never used the AIGENT

before or after Protocol 007.[154]

---

[151] Ex. 359 at 36: 2 4 (Morsy Dep.) ("But eventually we get the FDA's version of the notes.  And that's the official version that stands.").

[152] Ex. 114 at '1259 ("Merck stated … [t]hey briefly tried IgG enhancement in a few pilot studies, but dropped this approach before investigating it fully.").

[153] Ex. 114 at '1260 61 ("Action Items: … The following PRN assay modifications are reasonable to try to enhance sensitivity of the assay, *pending appropriate validation* … IgG enhancement") (emphasis added); *Id*. at '1260 ("Validation and Optimization: For PRN Assay: Since this assay development is still 'in progress' [FDA] cannot comment on the appropriateness of the Merck assay until the PRN assay [standard operating procedure] is finalized and the validation data are provided by Merck"); *see also* Ex. 149 at '050 ("[FDA] does not use either complement or [anti ]IgG to enhance sensitivity [in a PRN assay] and feels that these maneuvers should not be necessary" for Protocol 007.).

[154]  Ex. 30 at 146:9 19 (Merck Expert Durbin Dep.) (testifying never used anti IgG in thousands of PRN tests Dr. Durbin has run or overseen); Ex. 30 at 148:22 24 (Merck Expert Durbin Dep.) (Dr. Durbin testifying she is unaware

194.    Merck provided data to CBER showing the impact of different dilutions of anti-human IgG in the PRN assay. Ex. 132 (Nov. 16, 2000 Letter) at MRK-KRA00001242.

**Response**: Disputed to the extent the statement mischaracterizes what Merck provided to

FDA in Merck Ex. 132 at '1242.  Merck provided FDA a Table summarizing data to support

the dilution Merck selected in the Protocol 007 AIGENT test.[155]  Otherwise undisputed.

195.    Prior to beginning testing of clinical samples in Protocol 007, CBER approved the use of the anti-IgG enhanced PRN (AIGENT) assay with Jeryl Lynn passage 8 as the indicator strain. Ex. 129 (Nov. 29, 2000 Memo) at MRK-KRA0001219.

**Response**: Disputed.  The cited evidence does not support the proffered statement.  FDA did

not approve the use of the anti-IgG enhanced PRN (AIGENT) assay with Jeryl Lynn passage

8 as the indicator strain.  FDA "acknowledged" Merck was using the low passage virus and

the IgG enhancement.[156]

196.    Another element of designing a PRN was selecting a cutoff to distinguish negative samples from positive samples    i.e., a concentration of serum above which the sample will be deemed "positive" (here, signaling a seropositive sample) and below which it will be "negative" (here, signaling a seronegative sample). Ex. 11 (Burlington Report) at 13, 23.

**Response**: Undisputed.

---

of anti IgG used in any Phase III clinical trials); Ex. 30 at 326:25 327:6 (Merck Expert Durbin Dep.) (testifying AIGENT never used again after Protocol 007); *see also* Ex. 27 at 84:2 86:11 (Yagodich Dep.) (testifying AIGENT was only neutralization test in which anti IgG was used at Merck and could not explain why); Ex. 122 at 588:6 589:14 (Krah Dep.) ("I am not aware or do not recall any other clinical trial in which [anti IgG] was used."); Ex. 29 at 78:16 19 (Merck Expert Pasetti Dep.) (Dr. Pasetti testifying she has never used anti IgG in a PRN assay); Ex. 138 at '405 ("The [AIGENT] was developed solely for the purpose of this clinical trial.  It was not used in any previous nor subsequent clinical trials."); Ex. 149 at '050 ("[FDA] does not use either complement or [anti ]IgG to enhance sensitivity [in a PRN assay] and feels that these maneuvers should not be necessary" for Protocol 007.); Ex. 2 at 49 (Malone Rep.) (Merck's use of anti IgG "is a method of PRN modification rarely, if ever, used in the industry").

[155] Merck Ex. 132 at '1241 ("[W]e have chosen a 1:6 dilution of the current stock of anti human IgG as this appears to be the optimal dilution for reducing the number of pre positive vaccination samples and preserving assay sensitivity. (Table 1).").

[156] Merck Ex. 129 at '1219; *see also* Ex. 4 at 301:9 13 (Kessler Dep.) ("FDA doesn't approve [the design of Protocol 007 with the use of a low passage Jeryl Lynn strain].  FDA responded to questions."); *Id.* at 304:18 23 (Kessler Dep.) ("Merck argued for certain things and FDA … it's not a choice but maybe allowed it to go forward. But either way, it's Merck's decision."); Ex. 358 at 103:17 104:3 (Malone Dep.) ("The onus for justification of any decision that the sponsor makes in prosecuting and demonstrating the safety and immunogenicity and effectiveness or efficacy of the product is the responsibility of the sponsor.  What [FDA] in consultation with a medical officer may or may not have said or discussed is not binding.  The onus is on the sponsor to ensure that they have designed their studies in a way that ensures that the requirements for licensure have been met.  The onus is not on the [FDA].").

197.    The choice of a cutoff necessarily involves a trade-off between false negatives (incorrectly classifying as seronegative a sample that should be classified as seropositive) and false positives (incorrectly classifying as seropositive a sample that should be classified as seronegative). The selection of a cutoff to achieve the appropriate balance between sensitivity and specificity depends on the goals of the particular assay. Ex. 11 (Burlington Report) at 13.

**Response**: Disputed.  The choice of a cutoff does not necessarily involve a trade-off between false negatives and false positives.[157]

198.    As used in Protocol 007, the goal of the AIGENT assay was not to evaluate efficacy of the mumps component of MMRII directly, but to assess similarity (non-inferiority) of two candidate end-expiry potencies to the release potency based on seroconversion rate. This thus required selecting a sufficiently sensitive cutoff so that the assay could detect the assumed seroconversion rate of 96% for children vaccinated with the existing release potency, to serve as a basis for comparison for the lower-potency vaccinations. Ex. 11 (Burlington Report) at 23.

**Response**: As to the first sentence, disputed.  Given FDA's concerns surrounding MMR-II at lower, below-label mumps potencies, Merck was required to demonstrate through Protocol 007 that MMR-II with lower, below-label mumps potencies would provide protection against mumps.[158]  FDA required Merck to use a functional test such as plaque reduction neutralization for the primary objectives of the clinical study.[159]  As to the second sentence, disputed.  The assay did not "require a sufficiently sensitive cutoff so that the assay could detect the assumed seroconversion rate of 96%."  FDA's requirement with regard to the AIGENT cutoff was that it be linked to protection against disease.[160]

---

[157] Ex. 358 at 130:9 131:19 (Malone. Dep.) ("There are many variables that have to be considered in addressing specificity and sensitivity … this tension … always must guide decisions in the context of an awareness of the intended use… [t]here's always a tension … although some technologies can … improve both parameters simultaneously.").

[158] *See supra* note 115.

[159] Ex. 110 at '256 (FDA explaining to Merck "it is important that the immunogenicity at that low end be measured with a neutralization assay that can be reflective of protection."); Ex. 111 at '351 ("[I]n [Protocol 007] we are trying to establish clinical protective efficacy"); Rel. 56 Stat. ¶ 52 (requirement to use a neutralization test) *citing among other evidence* Ex. 54 at '425 ("requirement was set forth by [FDA] to use a functional neutralization assay"); Ex. 110 at '255 (FDA "can not accept ELISA for the mumps end expiry and only will accept neutralization data … since neutralization reflects protection.").

[160] Ex. 3 at ¶ 153 (Kessler Rep.) ("FDA wanted Merck to demonstrate the cutoffs [in the Clinical Trial to Support an Expiry Potency for the Mumps Component of MMR II] were linked to protection against the children getting

84

199.    Consistent with CBER's criteria, Merck selected a high-sensitivity cutoff. Ex. 11 (Burlington Report) at 23.

**Response**: Disputed to the extent that the statement invokes unspecified facts outside the statement that make it impossible to answer as a stand-alone fact.  Assuming Merck is referring back to the prior statements regarding the selection of the cutoff in the AIGENT test used in Protocol 007, disputed that FDA's criteria was for a high-sensitivity cutoff.  Given FDA's concerns surrounding MMR-II at lower, below-label mumps potencies, Merck was required to demonstrate through Protocol 007 that MMR-II with lower, below-label mumps potencies would provide protection against mumps.[161]  FDA required Merck to use a functional test such as plaque reduction neutralization for the primary objectives of the clinical study.[162]  FDA's requirement with regard to the AIGENT cutoff was that it be linked to protection against disease.[163]  Undisputed that Merck selected a high-sensitivity cutoff.

---

mumps."); *see also* Ex. 4 at 376:12 20 (Kessler Dep.) ("[I]t's [Merck's] responsibility to provide FDA with adequate data, and it's [Merck's] responsibility to provide a clinically meaningful and adequate and well controlled set of data … if the cutoff is part of that, that had to be clinically relevant."); Ex. 2 at 13 (Malone Rep.) ("For a PRN test to be fit for the purpose of measuring clinically relevant neutralizing antibodies, the serostatus cutoff (or fold rise increase in titer) must reflect a level of neutralizing antibodies that provides protection from infection or disease."); *Id.* at 13 (Malone Rep.) ("Selecting an appropriate serostatus cutoff is critical to the accuracy, predictive value and clinical relevance of a PRN or any other immunogenicity test"); Ex. 434 at '994 (FDA to GSK) ███████████████████ ████████████████████████████████████████ [GSK MMR IND 0015993 15994].

[161]    *See supra* note 115.

[162]    Rel. 56 Stat. ¶ 52 (requirement to use a neutralization test) *citing among other evidence* Ex. 110 at '256 (FDA explaining to Merck "it is important that the immunogenicity at that low end be measured with a neutralization assay that can be reflective of protection."); Ex. 111 at '351 ("[I]n [Protocol 007] we are trying to establish clinical protective efficacy"); Ex. 54 at '425 ("requirement was set forth by [FDA] to use a functional neutralization assay"); Ex. 110 at '255 (FDA "can not accept ELISA for the mumps end expiry and only will accept neutralization data … since neutralization reflects protection.").

[163]    Ex. 3 at ¶ 153 (Kessler Rep.) ("FDA wanted Merck to demonstrate the cutoffs [in the Clinical Trial to Support an Expiry Potency for the Mumps Component of MMR II] were linked to protection against the children getting mumps."); *see also* Ex. 4 at 376:12 20 (Kessler Dep.) ("[I]t's [Merck's] responsibility to provide FDA with adequate data, and it's [Merck's] responsibility to provide a clinically meaningful and adequate and well controlled set of data … if the cutoff is part of that, that had to be clinically relevant."); Ex. 2 at 13 (Malone Rep.) ("For a PRN test to be fit for the purpose of measuring clinically relevant neutralizing antibodies, the serostatus cutoff (or fold rise increase in titer) must reflect a level of neutralizing antibodies that provides protection from infection or disease."); *Id.* at 13 (Malone Rep.) ("Selecting an appropriate serostatus cutoff is critical to the accuracy, predictive value and clinical relevance of a PRN or any other immunogenicity test"); Ex. 434 at '994 (FDA to GSK) ████████████ t

200.    The primary endpoint — or ultimate statistic of interest — for the study was the proportion of subjects who were seronegative to mumps before they got the vaccine who had a greater-than-or-equal-to four-fold rise in the serum concentration separating seronegative from seropositive, as measured by the AIGENT assay, six weeks post-vaccination. Ex. 155 (CSR) at MRK-KRA00225032.

**Response**: Disputed to the extent Merck is conflating the test method used, AIGENT, with the primary objectives (endpoints) of Protocol 007.[164] Also disputed that Protocol 007 had one primary endpoint. Protocol 007 had two primary objectives (endpoints).[165] Also disputed to the extent the statement does not accurately describe how the "proportion of subjects" were evaluated in Protocol 007.[166] Also disputed that the evidence cited supports the statement that there was an "ultimate statistic of interest" in Protocol 007. Undisputed that that a four-fold rise in titer (1:16 to ≥ 1:64) was considered a seroconversion in the AIGENT.

201.    The second type of assay used in Protocol 007 was an ELISA. ELISAs are performed by adding serum samples to plastic microtiter wells coated with antigens — which are structures that bond to particular antibodies. If the serum contains antigen-specific antibodies, those antibodies will bind to the antigens, which will trigger a secondary reaction that will change the color of the solution. The color can be measured by a device called a spectrophotometer to determine whether or not there has been sufficient color change to identify a positive result. Ex. 120 (Pasetti Report) at 7.

---

████████████████████████████████████████████ [GSK MMR IND 0015993 15994].

[164] Merck Ex. 155 at '174 ("Following agreement with [FDA] and in an attempt to demonstrate that mumps virus at end expiry potency was not only immunogenic but effective in inhibiting viral replication, a functional assay … aimed at measuring mumps specific neutralizing antibodies[] was … used to evaluate the primary immunogenicity hypotheses of the study."); *see also* Rel. 56 Stat. ¶ 139, *citing among other evidence* Ex. 189 at '111 12 (**"Study Endpoints** … The [AIGENT] assay was used as the primary endpoint because it is a functional assay that measures the ability of the vaccine induced immune response to inhibit viral replication in vitro, and can, therefore, be considered a surrogate for vaccine effectiveness.").

[165] Rel. 56 Stat. ¶ 58 *citing among other evidence* Ex. 105 at '5017 (Protocol 007 CSR) ((1) "To demonstrate an adequate immune response [by mumps virus neutralization] among subjects receiving M M R™II containing an expiry dose of mumps [4.0 log or 3.7 log] …."; and (2) "To demonstrate a similar immune response to mumps virus by neutralization among subjects receiving M M R™II containing an expiry dose of mumps virus [4.0 log or 3.7 log] … compared to subjects receiving M M R™II containing a release dose [4.9 log] of mumps ….").

[166] Merck Ex. 155 at '5021 ("The primary endpoint for comparing the mumps antibody response between the 2 groups was the proportion of initially seronegative subjects who developed neutralizing antibodies to mumps 6 weeks post vaccination in all treatment groups.").

Appx18837

**Response**: Undisputed.

202.    Similar to the PRN assay, ELISAs require selecting a serostatus cutoff to reliably distinguish seronegative and seropositive sera. For an ELISA, that cutoff is the lowest concentration of antibody (Ab) units that must be detected for a serum sample to be classified as seropositive. Ex. 11 (Burlington Report) at 25; Ex. 120 (Pasetti Report) at 13-14.

**Response**: Disputed that an ELISA cutoff is always set as stated, especially when the cutoff

needs to be connected to protection as was required in the Protocol 007 ELISA.[167]

Undisputed that selecting a serostatus cutoff to reliably distinguish seronegative and

seropositive sera is required for both PRN and ELISA tests.  Also undisputed that for an

ELISA the serostatus cutoff can be the lowest concentration of antibody (Ab) units that must

be detected for a serum sample to be classified as seropositive.

203.    ELISAs have several advantages compared to PRNs: they are easier and faster to perform and are more easily standardized, more objective, and more reproducible because they do not require manual counting. Ex. 120 (Pasetti Report) at 9.

**Response**: Undisputed.

204.    When Protocol 007 was designed, PRNs were the preferred assay for studying mumps in certain circumstances because of the presumed biological relevance of the neutralizing antibodies they are designed to measure. Unlike PRNs, which only measure neutralizing antibodies, ELISAs detect all antibodies capable of binding to a given antigen. Ex. 120 (Pasetti Report) at 8; Ex. 92 (Durbin Report) at 10.

**Response**: Undisputed that PRNs are the preferred assay for studying mumps in certain

circumstances because of the presumed biological relevance of the neutralizing antibodies

they are designed to measure, but disputed to the extent Merck implies that PRNs were only

the preferred assay in the late 1990s when Protocol 007 was designed.  Neither report

supports such a time restriction.  Merck Ex. 120 and Merck Ex. 92; *see also* Rel. 56 Stat. ¶

---

[167] Rel. 56 Stat. ¶ 65 *citing among other evidence* Ex. 134 at '778 ("Justification is required for the new mumps cutoff of 10 ELISA antibody units …. [FDA] requested that the ELISA results be compared to the mumps [PRN] assay.  [FDA] would like the rationale for the new cutoff to be linked to a biologically relevant reference standard."); *see also* Ex. 135 at '381 ("The observation that the assay cutoff is sufficiently high to accurately classify pre vaccination sera as negative is useful, but insufficient by itself as it does not relate to seroprotection.").

22.  Undisputed that unlike PRNs, which only measure neutralizing antibodies, ELISAs

detect all antibodies capable of binding to a given antigen.

205.    Traditionally, in order to demonstrate the same biological relevance, ELISAs and
PRNs were compared and correlated to the satisfaction of the regulatory body. Ex. 154 (Oct. 19,
2001 Memo from Manal Morsy re CBER teleconference) at MRK-KRA00201389-91.

**Response**: Disputed.  The cited evidence sets forth the requirements FDA imposed on Merck

before it could use the ELISA test in its mumps testing at issue in this case, not what is done

"traditionally."[168]  Merck submitted and referred to its ELISA-AIGENT correlation results in

numerous exchanges with the FDA concerning Protocol 007 and in the years that followed to

support FDA decision making with respect to Merck's mumps vaccines.[169]

206.    Subsequent scientific developments in the immunogenicity testing of mumps,
however, led to the acceptance of ELISA data being used to evaluate the immunogenicity of the
MMR II vaccine. Ex. 158 (May 18, 2007 Facsimile from CBER to Merck) at MRK-
KRA00570704.

**Response**: Disputed.  The word "subsequent" has no antecedent and necessarily invokes

unspecified facts outside the statement which make it impossible to answer as a stand-alone

statement.  Also disputed because the evidence cited does not support the proffered fact.

There is no support for the statement that there were "scientific developments" or that any

developments were "in the immunogenicity testing of mumps" generally.  Merck Ex. 158, a

letter from the FDA to Merck, states: "'the science related to immunogenicity testing of M-

M-R®II has substantially evolved."  FDA reached the conclusion that "the science related to

immunogenicity testing of M-M-R®II has substantially evolved" after Merck's repeated

---

[168] Rel. 56 Stat. ¶ 65 *citing among other evidence* Ex. 134 at '778 ("Justification is required for the new mumps cutoff of 10 ELISA antibody units .... [FDA] requested that the ELISA results be compared to the mumps [PRN] assay.  [FDA] would like the rationale for the new cutoff to be linked to a biologically relevant reference standard."); *see also* Ex. 135 at '831 ("The observation that the assay cutoff is sufficiently high to accurately classify pre vaccination sera as negative is useful, but insufficient by itself as it does not relate to seroprotection.").

[169] Rel. 56 Stat. ¶ 66.

Appx18839

misrepresentations to FDA of the clinical relevance of the ELISA correlation, data, and

serostatus cutoff.[170]  Also disputed that the science related to immunogenicity testing of

MMR-II had evolved leading to the acceptance of ELISA data.[171]

207.    Merck and CBER discussed the use of a vaccine-strain-based ELISA to support certain secondary hypotheses of Protocol 007. Ex. 162 (Feb. 5, 1999 BB-IND 1016: MMR™II Serial No. 027) at MRK-KRA00624470-72; Ex. 155 (CSR) at MRK-KRA00225032.

**Response**: Disputed to the extent that "discussed" implies FDA considered the use of a

vaccine-strain-based ELISA in Protocol 007.  In February 1999 Merck proposed to use a

vaccine-strain-based ELISA to support certain secondary hypotheses in Protocol 007.  In

response, FDA raised concerns with Merck's use of the ELISA described in Merck Exhibit

162 for Protocol 007 testing and "requested that Merck utilize a wild-type virus strain in this

assay and to also provide a correlation between a plaque reduction neutralization assay."[172]

The ELISA used in Protocol 007 used the same low passage mumps vaccine strain that

Merck used in its AIGENT.[173]  Merck also used the same ELISA in the clinical studies to

support the ProQuad BLA and the sBLA for MMR-II with rHA.[174]

---

[170] Ex. 2 at '78 (Malone Rep.) ("Following Merck's repeated misrepresentations … CBER allowed Merck to use the … ELISA data to support its mumps end expiry potency sBLA."); *see also* Ex. 9 at 198:6 200:5 (Fisher Dep.) (The "hard work in bringing the FDA to the conclusion that the use of ELISA to evaluate immunogenicity for the mumps end expiry study" was "the entirety of [Merck's] submissions" including "what we sent them on concordance testing" between the PRN and ELISA.) (referencing "the science related to immunogenicity testing of M M R®II has substantially evolved").

[171] Ex. 4 at 343:6 8 (Kessler Dep.) ("I certainly wouldn't subscribe to your view that … the science has changed.") (referencing "the science related to immunogenicity testing of M M R®II has substantially evolved "); Ex. 4 at 344:15 345:2 (Kessler Dep.) ("[I]t's not that the science evolved and then [ELISA] could be used. [ELISA] needed to be correlated … the justification of ELISA was that it was linked to the [plaque reduction neutralization] test, and the [plaque reduction neutralization] test was linked to clinical relevance. But we know that … those links were broken … you can't justify using the ELISA test … as was done here … The science doesn't support that.") (referencing "the science related to immunogenicity testing of M M R®II has substantially evolved").

[172] SUMF1 ¶ 208, *citing* Merck Exhibit 11 and Merck Exhibit 171.

[173] Rel. 56 Stat. ¶¶ 63 64 (ELISA used in Protocol 007); *see also* Merck Ex. 155 at '043 44 (CSR) ("Mumps ELISA … [t]he assay uses an early passage of the Jeryl Lynn mumps virus (<12 passages) that is … considered to be a Wild Ttpe (WT) like strain.").

[174] Rel. 56 Stat. at ¶ 156 (ELISA used in ProQuad BLA); *Id*. at ¶ 168 (ELISA used in sBLA for MMR II with rHA).

208.    In early 2000, CBER requested that Merck design an ELISA using a "wild type" mumps virus antigen (WT ELISA). Ex. 11 (Burlington Report) at 25; Ex. 171 (CBER's meeting minutes from Jan. 31, 2000 Merck-CBER teleconference) at MRK-KRA00821860.

**Response**: Undisputed.

209.    Merck and CBER engaged in multiple conversations regarding the development of the WT ELISA. Ex. 133 (Jan. 31, 2000 Merck memorandum re Merck-CBER teleconference] at MRK-KRA00001249-52; Ex. 135 (Feb. 8, 2000 Merck memorandum re telephone call with Dr. Kathy Carbone and Luba Vujcic of CBER at MRK-KRA00001255-57; Ex. 171 (CBER meeting minutes from Jan. 31, 2000 Merck-CBER teleconference) at MRK-KRA00821856-61; Ex. 137 (Mar. 13, 2000 Merck memorandum re Merck-CBER in-person meeting) at MRK-KRA00001262-65; Ex. 241 (Merck memorandum re Jan. 13, 2000 Merck-CBER in-person meeting at MRK-KRA00019855-57; Ex. 136 (Mar. 14, 2000 Merck memorandum re Merck-CBER in-person meeting at MRK KRA00001258-924.

**Response**: Disputed to the extent that Merck implies the conversations documented in the

cited evidence were the only conversations regarding the development of the WT ELISA.[175]

Otherwise, undisputed.

210.    In response to a request from CBER, Merck performed a validation of the WT ELISA. Ex. 11 (Burlington Report) at 24-25; Ex. 171 (CBER's meeting minutes from Jan. 31, 2000 Merck-CBER teleconference) at MRK-KRA00821860.

**Response**: Undisputed.

211.    Assay validations, which examine several characteristics of the assay, are performed to provide evidence that the assay, as designed, is reliable and meets the requirements for its intended use. Ex. 120 (Pasetti Report) at 9.

**Response**: Undisputed.

212.    As part of its WT ELISA validation, Merck evaluated its selected cutoff of 10 Ab units by comparing it to an alternative cutoff. Ex. 159 (Feb. 2, 2001 Response to FDA Request for Information) at MRK-KRA00622256.

**Response**: Undisputed.

213.    The comparison supported the proposed cutoff of 10 Ab units, demonstrating greater assay specificity than the alternative cutoff of 5 Ab units. Ex. 11 (Burlington Report) at 26-30; Ex. 159 (Feb. 2, 2001 Response to FDA Request for Information) at MRK-KRA00622256.

---

[175] *See e.g.* Merck Ex. 154 (Merck memorandum re CBER teleconference on Oct. 16, 2001).

Appx18841

**Response**: Disputed that the validation of the ELISA test in Merck Exhibit 159 at '251-273, provided support for the proposed cutoff of 10 Ab units in the ELISA test Merck used in its mumps testing or that FDA accepted the validation of the ELISA as support for the 10 Ab cutoff.[176]  After Merck provided FDA the ELISA validation but before allowing Merck to use its ELISA in the Protocol 007 testing to support Merck's sBLA to lower the minimum mumps potency specification on the MMR-II label, FDA required Merck to demonstrate a correlation between the results of its ELISA and AIGENT tests.[177]  FDA insisted on this ELISA-AIGENT correlation to ensure Merck's ELISA seroconversion results and the 10 Ab serostatus cutoff Merck used to generate those results were clinically relevant and reflected protection against mumps.[178]  Numerous witnesses and experts in this case confirm the ELISA test did not provide a reliable or clinically relevant measure of protection.[179]

214.    The data and analysis from this comparison were included in the WT ELISA validation results that Merck submitted to CBER on multiple occasions. Ex. 159 (Feb. 2, 2001 Response to FDA Request for Information) MRK-KRA00622078-273 at '220-'273; Ex. 169 (June 10, 2002 Response to Request for Information) at MRK-KRA00761671-702; Ex. 160 (Aug. 1, 2002 Letter from Merck to CBER re responses to CBER's comments and clarifications) at MRK-KRA00624279-87.

---

[176] Ex. 135 at '381 ("The observation that the assay cutoff is sufficiently high to accurately classify pre vaccination sera as negative is useful, but insufficient by itself as it does not relate to seroprotection.").

[177] SUMF1 ¶ 212, *citing* Merck Exhibit 159; SUMF1 ¶ 217 ("To support the proposed 10 Ab units cutoff, CBER requested additional information, including a correlation analysis to assess the performance of the ELISA using the 10 Ab cutoff and the PRN assay using the 32 cutoff.").

[178] Rel. 56 Stat. ¶¶ 65 66 *citing among other evidence* Ex. 6 at 251:6 14 (Merck Expert Burlington Dep.) ("[FDA] wanted some sort of functional antibody information to be associated with ELISA seroconversion. … that is clear from the record."); Ex. 133 at '483 ("It is essential that ELISA testing methods be validated against a working neutralization assay …."); Ex. 112 at '970 (FDA requesting Merck assurances that "the cutoff employed in the ELISA for seropositive should be supported by data demonstrating some relevance with protective levels of antibody (e.g., neutralizing antibody)."); Ex. 134 at '778 ("Justification is required for the new mumps cutoff of 10 ELISA antibody units …. [FDA] requested that the ELISA results be compared to the mumps [PRN] assay. [FDA] would like the rationale for the new cutoff to be linked to a biologically relevant reference standard."); Ex. 121 at '775 ("[E]vidence of a correlation between the current assays and a [wild type] Neut[ralization] assay, or evidence of correlation with protective efficacy, would allow the current [ELISA] based assays to be used.").

[179] Rel. 56. Stat. ¶¶ 128 131 (collecting evidence).

**Response**: Disputed to the extent that "data and analysis from this comparison" references unspecified facts outside the statement which make it impossible to answer as a stand-alone fact. Also disputed to the extent that the statement implies the data and analysis for the ELISA validation and the correlation were the same thing. Merck submitted the ELISA validation results to FDA on February 2, 2001 as evidenced by Merck Exhibit 159, but Merck Exhibits 169 and 160 include the correlation analysis that FDA required Merck conduct to justify the 10 Ab cutoff separate from the validation.[180] Also disputed that the evidence supports the proffered statement that Merck submitted the ELISA validation results to FDA on multiple occasions. Merck Ex. 159 is the only evidence supporting the submission of the validation results to the FDA.

215.    The secondary endpoint for Protocol 007 was therefore selected to be the proportion of subjects who were seronegative at baseline in the ELISA (<10 Ab units) and seropositive (≥10 Ab units) six weeks post vaccination. Ex. 120 (Pasetti Report) at 6; Ex. 155 (CSR) at MRK-KRA00225032.

**Response**: Disputed to the extent that Merck is conflating the test method used, ELISA, with the secondary objectives (endpoints) of Protocol 007. Protocol 007 had two secondary objectives (endpoints).[181] The second endpoint, one year persistence, was added as an indicator of duration of protection because FDA had concerns about the long-term protection against mumps.[182] Both secondary endpoints in Protocol 007 used ELISA to measure

---

[180] *See* Rel. 56 Stat. ¶¶ 65 66; Rel. Resp. SUMF1 ¶ 213 (collecting evidence).

[181] Rel. 56 Stat. ¶ 58 (The secondary objective of Protocol 007 were "[t]o demonstrate similar immune responses to … mumps … (seroconversion rates by ELISA) among children who receive M M R$^{TM}$II containing an expiry dose of mumps [4.0 log or 3.7 log] … compared to children who receive M M R$^{TM}$II containing a release dose of mumps [4.9 log] and "[t]o summarize the persistence of antibody to … mumps … 1 year post vaccination in each treatment group.").

[182] Ex. 109 at '469 ("There are concerns about long term protection against mumps … by the vaccine …. As an indicator of duration of protection, the follow up period should be extended to one year post vaccination to assure that the vaccine at end expiry is sufficiently immunogenic.").

seroconversion.[183]  Undisputed that the other secondary study endpoint for the evaluation of

immunogenicity in Protocol 007 was seroconversion by ELISA 6 weeks post vaccination in

all treatment groups.  Also undisputed that for the secondary objective of measuring

seroconversion by ELISA 6-weeks post vaccination the seroconversion rate was the

proportion of subjects who were seronegative (antibody titer < 10 ELISA Ab units) at

baseline and were seropositive (antibody titers ≥ 10 ELISA Ab units).

216.    CBER has acknowledged that there is no "reference standard for a sero-protective
level for mumps," meaning there is no universal standard for what cutoff is appropriate to use for
an ELISA. Ex. 11 (Burlington Report) at 35; Ex. 154 (Merck memorandum re CBER
teleconference on Oct. 16, 2001) at MRK-KRA00201390.

**Response**: Disputed.  FDA's statement about "the absence of a reference standard … for

mumps" does not mean "there is no universal standard for what cutoff is appropriate to use

for an ELISA," and Dr. Burlington did not reach that conclusion in his report.[184]

Dr. Burlington testified that "[FDA] wanted some sort of functional antibody information to

be associated with ELISA seroconversion.  … that is clear from the record."[185]  In Merck's

October 2001 teleconference with FDA, two standards for what FDA would find appropriate

"in the absence of a reference standard" were conveyed to Merck.  FDA "pointed out" that "a

neutralization assay cutoff [was] an acceptable biologically relevant cutoff" and FDA

"request[ed] a comparison between the PRN and the ELISA cutoff."[186]  "If … there

continue[d] to be uncertainty about the biological/clinical relevance of the cutoff [for Merck's

---

[183] Merck Ex. 155 at '032 ("In agreement with [FDA], the measurement of mumps neutralizing [antibody] by
[plaque reduction neutralization] at 1 year post vaccination was … eliminated in view of the excellent correlation
between mumps [plaque reduction neutralization] and ELISA.").

[184] Merck Ex. 11 at 35 (Burlington Report).

[185] Ex. 6 at 251:6 14 (Merck Expert Burlington Dep.).

[186] Merck Ex. 154 at '390; *see also* Rel. 56 Stat. ¶¶ 65 66; Rel. Resp. SUMF1 ¶ 213 (collecting evidence).

ELISA], it [was] expected that [FDA] would require a 4-fold rise criterion, as that would be necessary to demonstrate significant response to the vaccine."[187]

217.    To support the proposed 10 Ab units cutoff, CBER requested additional information, including a correlation analysis to assess the performance of the ELISA using the 10 Ab cutoff and the PRN assay using the 32 cutoff. Ex. 11 (Burlington Report) at 35-36; Ex. 154 (Merck memorandum re CBER teleconference on Oct. 16, 2001) at MRK-KRA00201390.

**Response**: Disputed to the extent that the word "additional" invokes unspecified facts outside the statement which make it impossible to answer as a stand-alone statement of fact.  Also disputed that the correlation analysis was to "assess the performance of the ELISA."  The FDA insisted on the ELISA-AIGENT correlation to ensure Merck's ELISA seroconversion results and the 10 Ab serostatus cutoff Merck used to generate those results were clinically relevant and reflected protection against mumps.[188]  Undisputed that FDA requested a correlation analysis to support the proposed 10 Ab cutoff.

218.    Merck provided the requested analysis, including the raw data for all 565 subjects, to CBER as part of a June 10, 2002 submission. Ex. 169 [(June 10, 2002 Response to Request for Information) at MRK-KRA00761671-702.

**Response**: Undisputed that Merck provided FDA a correlation analysis on June 10, 2002 comparing the AIGENT and ELISA including data for 565 of the approximately 1800 subjects in Protocol 007, but disputed that Merck provided FDA the correlation analysis it requested, which was to justify the ELISA 10 Ab cutoff with data demonstrating some

---

[187] Merck Ex. 154 at '391*; see also* Ex. 3 at ¶ 227 n. 548 (A four fold rise criteria would require a "four fold increase … [I]f the … titer before vaccination was 10 Ab, the post vaccination titer would have to be four times that number (10x4), or 40. In that instance, the 'cutoff' … would be 40 Ab.").

[188] Rel. 56 Stat. ¶¶ 65 66 *citing among other evidence* Ex. 134 at '778 ("Justification is required for the new mumps cutoff of 10 ELISA antibody units …. [FDA] requested that the ELISA results be compared to the mumps [PRN] assay.  [FDA] would like the rationale for the new cutoff to be linked to a biologically relevant reference standard."); Ex. 121 at '775 ("[E]vidence of a correlation between the current assays and a [wild type] Neut[ralization] assay, or evidence of correlation with protective efficacy, would allow the current [ELISA] based assays to be used.").

**Appx18845**

relevance with protective levels of neutralizing antibody.[189]  The AIGENT was not a reliable

or relevant measure of protection against mumps. Rel. Stat. ¶¶ 69-125 (collecting evidence).

The ELISA-AIGENT correlation analysis Merck submitted to FDA on June 10, 2002

provided no support that the ELISA or its 10 Ab serostatus cutoff provided a reliable

measure of protection against mumps. *Id*. at ¶ 127-131 (collecting evidence).

219.    Overall, there was agreement between the PRN assay and the ELISA. There was agreement of 90.4% with respect to samples classified as positive in both assays and negative in both assays, 93.4% agreement on seroconversion rates, and at least 85% agreement for sensitivity, specificity, and positive and negative predictive value. Ex. 11 (Burlington Report) at 37; Ex. 169 (June 10, 2002 Response to Request for Information) at MRK-KRA00761672.

**Response**: Disputed that the correlation analysis Merck submitted to FDA on June 10, 2002

means there was "overall" agreement between the AIGENT and ELISA.[190]  Undisputed that

the correlation analysis Merck submitted to FDA on June 10, 2002 reported 90.4%

agreement with respect to samples classified as positive in both assays and negative in both

assays, 93.4% agreement on seroconversion rates, and at least 85% agreement for sensitivity,

specificity, and positive and negative predictive value.

220.    Over the next two months, Merck and CBER further discussed the choice of a 10 Ab ELISA cutoff. As a result of these discussions, Merck provided additional information regarding the proposed cutoff to CBER in a written submission dated August 1, 2002. Ex. 11 (Burlington Report) at 36-37; Ex. 160 (Aug. 1, 2002 Letter from Merck to CBER re responses to CBER's comments and clarifications) at MRK-KRA00624279-87.

---

[189] Merck Ex. 154 at '390; *see also* Ex. 112 at '970 (FDA requested assurances that "the cutoff employed in the ELISA for seropositivity should be supported by data demonstrating some relevance with protective levels of antibody (e.g., neutralizing antibody)."); Ex. 121 at '775 ("[E]vidence of a correlation between the current assays and a [wild type] Neut[ralization] assay, or evidence of correlation with protective efficacy, would allow the current [ELISA] based assays to be used.").

[190] Ex. 174 ¶¶ 27 47; *Id*. at ¶27 ("Merck's analysis of the agreement between the … ELISA … and the AIGENT … is misleading."); *Id*. at ¶ 47 (exclusion of pre positives in the analysis made it appear the assays agreed better than they did and created a misleading impression of what would happen if ELISA using 10 Ab was used to replace AIGENT); (using ELISA with 10 Ab on its own would substantially increase the apparent rate of seroconversion); (an ELISA cutoff of 15 Ab provided better agreement between the AIGENT and ELISA and 23 Ab provided the best agreement between the two assays but if Merck had used either 15 Ab or 23 Ab the seroconversion rate by ELISA would have been substantially lower than with a cutoff of 10 Ab).

Appx18846

**Response**: Undisputed that Merck and FDA discussed the proposed mumps cutoff after

Merck's June 10, 2002 submission of the correlation analysis and that on August 1, 2002

Merck submitted responses to FDA comments and requests for clarification regarding the

mumps cutoff.

221.    The next day, Merck and CBER participated in a teleconference to further discuss the ELISA cutoff. Following this teleconference, Merck wrote to CBER to provide a summary of the August 2 teleconference and reiterate its understanding "that CBER confirmed the acceptance of the WT Mumps ELISA assay cutoff of 10 Ab units." Ex. 11 (Burlington Report) at 36-37; Ex. 16 (Aug. 8, 2002 General Correspondence CBER-Merck Communication Mumps Expiry) at MRK-KRA00623050.

**Response**: Undisputed that Merck and FDA held a teleconference on August 2, 2002 in

which the proposed mumps ELISA cutoff of 10 Ab was discussed.  Also undisputed that

Merck wrote to FDA on August 8, 2002 to state Merck's understanding "that CBER

confirmed the acceptance of the WT Mumps ELISA assay cutoff of 10 Ab units."

222.    On June 19, 2001, Krahling called the Philadelphia, Pennsylvania branch of FDA to report concerns he had about "misconduct in Krah's laboratory at Merck," specifically, that he "worked in a lab at Merck and that the lab was committing fraud." Ex. 6 (Krahling's Response to Merck's Revised Interrogatory No. 14) at 44-45; Ex. 2 (Krahling Dep. Tr. Vol. 1) at 242:23-243:15, 293:3-4; Ex. 7 (Krahling Dep. Tr. Vol. 2) at 499:23-500:5; 501:14-16.

**Response**: Undisputed.

223.    Over the next two months, Krahling had "four or five teleconference calls or telephone meetings from the middle of June to the end of July, 2001" with FDA about his "complaints around 007."  He told FDA that he "worked at a lab at Merck and that the lab was committing fraud" related to the "Protocol 007 testing." During the last call, he told FDA that "they need[] to come in, that data was being destroyed."  He urged the agency "to conduct an on-site inspection and interview him and his co-workers in Krah's lab." Ex. 2 (Krahling Dep. Tr. Vol. 1) at 121:12-24, 125: 7, 166:17-19, 243:11-15, 245:16-246:6, 246:18-23, 248:8-18, 295:12-13); Ex. 6 (Krahling's Response to Merck's Revised Interrogatory No. 14) at 44-45.

**Response**:  Disputed to the extent that "the next two months" is undefined.  Otherwise

undisputed.

Appx18847

224.    As Krahling testified at his deposition, he provided FDA "details" about the fraud that was allegedly taking place and asked FDA to visit Merck to investigate his claims. Ex. 2 (Krahling Dep. Tr. Vol 1) at 166:17-19, 245:16-246:6, 246:18-23, 247:7-17, 248:14-18.

**Response**:  Disputed to the extent this statement implies Relator Krahling was able to

provide the FDA all details about the fraud he witnessed in Dr. Krah's lab.[191]  Otherwise

undisputed.

225.    Krahling also reported his belief that Krah was destroying PRN assay data by discarding certain cell plates used in the assay. *Id.* at 246:4-6, 246:20-23, 296:14-24; Ex. 6 (Krahling's Response to Merck's Revised Interrogatory No. 14) at 44-45.

**Response**:  Disputed to the extent the statement is ambiguous with regard to whom Relator

Krahling reported his belief.  Assuming this statement is referencing the FDA, undisputed.

226.    In his handwritten notes from September 2001, Krahling wrote that he contacted FDA "several times" during June and July 2001 and that he shared with FDA his concerns about data manipulation    in particular, that Merck was "instituting a policy to fraudulently lower the pre-positive rate" in the PRN assay. Krahling also wrote that he "was responsible" for FDA's subsequent inspection of Krah's lab on August 6, 2001. Ex. 8 (Sept. 21, 2001 Krahling's handwritten notes in Merck lab notebook) at RELATOR  00001044; *see also* Ex. 2 (Krahling Dep. Tr. Vol. 1) at 291:11-292:4 (testifying that these handwritten notes are "accurate").

**Response**:  Disputed to the extent the statement "he shared with FDA his concerns" implies

that Relator Krahling was able to provide the FDA a complete accounting of the fraud in Dr.

Krah's lab that he was reporting. Relator Krahling conveyed general information to the FDA

in his calls.[192]  Relator Krahling's handwritten notes in Merck Ex. 8 speak for themselves.

Otherwise undisputed.

---

[191] Ex. 155 at 248:2  18 (Krahling Dep.) ("I didn't have time to tell them everything. I couldn't put together some big presentation. … I couldn't lay out point for point everything of misconduct I saw").

[192] Ex. 155 at 242:23  244:4 (Krahling Dep.) ("I said that I worked at a lab at Merck and that the lab was committing fraud… it wasn't a very long call."); *Id.* at 292:23  293:4 ("That [David] Krah's lab was committing fraud, Merck was committing fraud."); *Id.* at 499:23  500:13 ("What I told the FDA was that Krah and Merck were committing fraud. That I worked in a lab where fraud was being committed."); *Id.* at 245:16  246:23 ("And so the series of four phone calls I didn't get to tell them too much. I told them that fraud was occurring, they should come in…I wasn't able to tell them too much."); *Id.* at 247:23  249:5 (" I didn't have time to tell them everything…I couldn't lay out point for point everything of misconduct I saw. I tried to get the point across that fraud was happening in this lab, the FDA

227.    Krahling viewed FDA as taking his complaints "very seriously." Ex. 7 (Krahling Dep. Tr. Vol. 2) at 500:23-25.

**Response**: Undisputed.

228.    In response to Krahling's phone calls, FDA Investigator Debra J. Bennett and Supervising Medical Officer Dr. Kathryn M. Carbone conducted an on-site inspection at the Merck laboratory performing the PRN assay under Krah's supervision on August 6, 2001. Bennet was an FDA field force investigator, and Carbone was a CBER medical scientist expert on mumps and the mumps vaccine. As Krahling characterized it in his deposition, after he called, "then they showed up August 6th." Ex. 9 (Aug. 6, 2001 FDA Establishment Inspection Report (EIR)) at RELATOR 00004088; Ex. 10 (Merck file regarding Aug. 6, 2001 FDA Inspection) at MRK-KRA01631029; Ex. 2 (Krahling Dep. Tr. Vol. 1) at 296:13-24; *see also* Ex. 8 (Sept. 21, 2001 Krahling's handwritten notes stating that he was "responsible" for FDA's inspection) at RELATOR 00001044; Ex. 11 (Burlington Report) at 38.

**Response**: Undisputed.

229.    According to FDA records, the purpose of the inspection "was to assure that raw data" from the clinical trial "was accurate and reliable." Ex. 9 (FDA EIR) at RELATOR 00004086.

**Response**: Undisputed.

230.    The on-site inspection lasted nearly eight hours (from 10:05 a.m. to 5:45 p.m.). Ex. 10 (Merck file regarding FDA's Aug. 6, 2001 inspection) at MRK-KRA01631029.

**Response**: Undisputed that the document cited states the inspection lasted from 10:05-5:45.

231.    Bennett and Carbone toured Krah's lab, reviewed raw data and other documentation related to the PRN assay, and conducted "an evaluation of laboratory and quality systems." *Id.*; Ex. 9 (FDA EIR) at RELATOR 00004091-92.

**Response**: Undisputed.

232.    During the tour of Krah's lab, Bennett and Carbone inquired about lab practices for collecting data. Ex. 10 (Merck file regarding FDA's Aug. 6, 2001 inspection) at MRK-KRA01631030.

**Response**: Undisputed.

---

did not know about it, it was    and they should come and investigate it."); *Id*. at 294:19 295:4 ("But I was reporting to them what I knew to try and get them to come in and do an investigation. I wasn't detailing for them every step of scientific misconduct or fraud I saw. The point was to say fraud is occurring, this is where it's at, come in and investigate it.").

233.    Carbone was "interested in the trigger that would result in re-evaluation of raw assay data," and she and Bennett noted instances where raw data was changed without a documented justification. *Id.*

**Response**:  Disputed to the extent that Merck's statement implies that Merck provided the

information Dr. Carbone was "interested" in seeing.  Portions of Merck Ex. 10 not set forth

in the statement provided Dr. Krah's response, which did not provide Dr. Carbone with all

the information she was "interested" in seeing.[193]  Undisputed that the statement accurately

quotes from Merck Ex. 10.  The document cited in full speaks for itself.

234.    Carbone also inquired about the procedures for handling pre- and post-vaccination blood samples for the PRN assay. *Id.* at MRK-KRA01631029.

**Response**:  Disputed to the extent Merck's statement implies that Merck provided Dr.

Carbone the information she requested about the procedures.  Portions of Merck Ex. 10 not

set forth in the statement provided Dr. Krah's response, which did not provide Dr. Carbone

with all the information she inquired about.[194]  Merck Ex. 10 speaks for itself. Otherwise

undisputed.

235.    Carbone and Bennett reviewed assay documentation, including "the majority of the data" from the PRN assay in Protocol 007, "for frequency and nature of re-checks and corrections." *Id.* at MRK-KRA01631030-31.

**Response**:  Disputed to the extent Carbone and Bennett did not review "the majority of the

data" from the PRN assay because the majority of the data was changed or destroyed.[195]

---

[193] Rel. 56 Stat. ¶111, *citing*, Ex. 122 at 547:6 549:2 (Krah Dep.) (Dr. Krah testifying he did not disclose extent of plaque count changes or "targeting pre positives in [] recount"); Ex. 155 at 163:9 12 (Krahling Dep.) ("Krah told us that they were hiding it from the FDA.  That [FDA] w[as]n't to know that the data was being changed.").

[194] Rel. 56 Stat. ¶111, citing, Ex. 122 at 547:6 549:2 (Krah Dep.) (Dr. Krah testifying he did not disclose extent of plaque count changes or "targeting pre positives in [] recount"); Ex. 155 at 163:9 12 (Krahling Dep.) ("Krah told us that they were hiding it from the FDA.  That [FDA] w[as]n't to know that the data was being changed.").

[195] Rel. 56 Stat. ¶115, *citing*, *among other evidence,* Ex. 183 (listing "discarded" Protocol 007 AIGENT assay plates); Ex. 184 at '013 (listing Protocol 007 AIGENT assay "Plates thrown out"); Ex. 122 at 487:23 489:4, 514:15 515:4, 518:15 519:2 (Krah Dep.) (admitting AIGENT testing plates were "discarded," without quality assurance auditing whether counting sheets accurately reflected plaque counts recorded on testing plates); *id.* at 678:16 679:5 (Dr. Krah testifying he would not be surprised if more than 120 of 172 assays had been destroyed).

Also disputed to the extent Merck Ex. 10 does not support the proffered fact that the data Dr.

Carbone and Ms. Bennett reviewed was "from the PRN assay in the MMR-II Study." Merck

Ex. 10 only states that raw data was reviewed. Also disputed to the extent the statement

limits what Dr. Carbone and Ms. Bennett were looking for to "frequency and nature of re-

checks and corrections." Since the Form 483 included the observation that data was being

changed without justification, the investigation involved more than review of "frequency and

nature." Merck SUMF2 ¶ 27. Also disputed to the extent the statement implies that the

review means that the changes did not impact the pre-positive rate in the AIGENT study.

They did.[196] Also disputed because Merck concealed from Dr. Carbone and Ms. Bennett the

extent of the plaque count changes and that they selectively recounted pre-positive

samples.[197]

236.    During the inspection, Carbone and Bennett collected and made copies of 16
Merck documents totaling over 200 pages, including standard operating procedures and
notebooks containing raw assay data. *Id.* at MRK-KRA01631031-254 (listing and attaching
copies of all 16 documents collected and reviewed by FDA; *see also* Ex. 9 (FDA EIR) at
RELATOR 00004091-92 (listing certain Merck documents collected and attached to EIR as
exhibits).

---

[196] Rel. 56. Stat. ¶107, *citing among other evidence*, Ex. 178; *see also* Ex. 172 at 459:9 463:7 (Wlochowski Dep.) (discussing Relators' audit findings); Ex. 155 at 256:25 266:15 (Krahling Dep.) (same); Rel. 56. Stat. ¶102 *citing,* Ex. 174 ¶¶ 15, 65 67, 70 (Report of Relators' Expert Dr. Philip Stark (hereinafter "Stark Rep.")) (finding "overwhelming statistical evidence" of bias) (the chance of so many changes to pre vaccination samples 245 times smaller than "chance of winning the jackpot in the Powerball lottery twice by buying a total of 2 tickets") (the chance so many changes to pre vaccinations samples were increases is "far less than the chance of picking a particular atom from a trillion planets like planet Earth. It is comparable to the chance of picking a particular atom at random from our entire galaxy"); *see also* Ex. 175 ¶¶ 10 14 (Supplemental Report of Relators' Expert Dr. Philip Stark (hereinafter "Stark Suppl. Rep.")) (pointing to data of Merck expert statistician Dr. Robert Platt as further support for Dr. Stark's findings of bias); Ex. 176 at '828 (Table 2) and '841 (Table 2) (AIGENT preliminary subset showing originally 61 pre positives that reduced to 38 pre positives after changes to the plaque counts through selective recounting); Ex. 2 at 60 (Malone Rep.) ("The end result of Merck's uncontrolled and biased plaque counting process was a reduction in the pre positive rate through targeted and unjustified recounting of undesirable plaque counts.").

[197] Rel. 56 Stat. ¶111, *citing,* Ex. 122 at 547:6 549:2 (Krah Dep.) (Dr. Krah testifying he did not disclose extent of plaque count changes or "targeting pre positives in [] recount"); Ex. 155 at 163:9 12 (Krahling Dep.) ("Krah told us that they were hiding it from the FDA. That [FDA] w[as]n't to know that the data was being changed.").

**Response**: Undisputed.

237.    At least six individuals from various departments at Merck were involved in responding to FDA's questions during the August 6, 2001 inspection: Dr. Alan Shaw (Executive Director, MRL Virus & Cell Biology, who reported directly to Dr. Emini); Dr. David Krah (Senior Investigator for MRL Virus & Cell Biology, who reported directly to Dr. Shaw); Dr. Kelli J. Pardue (Senior GMP Compliance Administrator); Karen R. McKenney (Associate Director, Process R&D GMP Compliance); Cathy W. Wadsworth (Worldwide Quality Assurance Manager); and Denise Ann Williams (Associate Non-Clinical Quality Assurance Auditor). Ex. 9 (FDA EIR) at RELATOR 00004086; Ex.12 (Merck organizational chart) at RELATOR 00000902-3.

**Response**: Undisputed.

238.    Krahling was not interviewed by anyone from FDA during the August 6, 2001 inspection, nor did he speak to anyone from FDA during the inspection. Ex. 13 (Krahling's Answers to Merck's Request for Admissions, Request No. 40) at 18.

**Response**: Undisputed.

239.    Krahling alleges that, when FDA inspectors were speaking with Shaw and Krah in Krah's lab, Krahling overhead approximately 20 minutes but not the entirety of their conversation, eavesdropping from a desk located approximately three feet away. Ex. 5 (Krahling's Answers to Merck's Interrogatories, Interrogatory No. 8) at 17; Exhibit 2 (Krahling Dep. Tr. Vol. 1) at 299:4-302:5.

**Response**: Disputed to the extent the statement implies Krahling was improperly

"eavesdropping" on a conversation he was able to overhear from a desk three feet away. *See*

Ex. 155 at 304:20-23.  Otherwise undisputed.

240.    Krahling was not involved in, and did not witness or overhear, any other portion of FDA's August 6, 2001 inspection. Ex. 2 (Krahling Dep. Tr. Vol. 1) at 302:25-303:6.

**Response**: Disputed to the extent "was not involved in" does not account for Relator

Krahling's role in the testing that was the subject of the inspection, including the FDA's

review of the underlying data being reviewed.  SUMF2 ¶¶ 16-19 (describing the data that Dr.

Carbone was "interested" in seeing).  Also disputed because "any other portion" is undefined

and unclear.  Otherwise undisputed.

101

241.     At the conclusion of the inspection, Bennett and Carbone issued Merck an FDA Form 483. Ex. 10 (FDA Form 483) at MRK- KRA01631018.

**Response**:  Undisputed.

242.     A Form 483 "notifies the company's management of objectionable conditions… and encourages the company to respond and, if necessary, correct the cited conditions." Ex. 14 (FDA Form 483 Frequently Asked Questions, *available at* https://www.fda.gov/iceci/inspections/ucm256377.htm).

**Response**:  Undisputed that the evidence cited contains the selectively quoted language.  The

cited document in full speaks for itself.  Otherwise undisputed.

243.     The Form 483 listed four observations. First, FDA observed that raw data was being changed without justification. Second, it observed that there was no procedure to assess whether a research lab is suitable for clinical trial testing prior to the start of testing. Third, it observed that spreadsheets used to determine questionable results and retesting had not been validated. And fourth, it observed that notebooks did not identify each technician performing each task. Ex. 10 (FDA Form 483) at MRK- KRA01631018.

**Response**:  Disputed to the extent it is unclear to what Form 483 the statement is referring.

Assuming the statement is referring to the Form 483 issued to Merck on August 6, 2001, the

Form 483 speaks for itself.  Otherwise undisputed.

244.     On August 10, 2001, Investigator Bennett returned to Merck for a second time to collect copies of raw data for the initial 600 samples of PRN assay data that Merck had previously submitted to FDA. Ex. 15 (Merck Memorandum dated August 10, 2001) at MRK- KRA00071241.

**Response**:  Disputed to the extent Merck implies Dr. Krah fully disclosed the purpose behind

the recounting and retesting of assays.[198]  The document speaks for itself. Otherwise

undisputed.

245.     The following individuals at Merck were involved in responding to FDA's questions during the August 10, 2001 inspection:  Krah; Shaw; Karen McKenney; and Beverly

---

[198] *See* Rel. 56. Stat. ¶111, *citing,* Ex. 122 at 602:11 17, 742:1 4 (Krah Dep.) (Dr. Krah testifying he told the FDA that the lab maintained original plaque counts and that all changes were for legitimate purposes); Ex. 122 at 547:6 549:2 (Krah Dep.) (Dr. Krah testifying he did not disclose extent of plaque count changes or "targeting pre positives in [] recount"); Ex. 155 at 163:9 12 (Krahling Dep.) ("Krah told us that they were hiding it from the FDA.  That [FDA] w[as]n't to know that the data was being changed.").

102

**Appx18853**

Zaber (from the Quality Assurance department). Ex. 15 (Merck Memorandum dated August 10, 2001) at MRK-KRA00071241.

**Response**: Disputed to the extent this statement implies Krah, Shaw, McKenney, and Zaber

were the only individuals from Merck involved in responding to FDA's questions during the

August 10, 2001 inspection.[199]  Otherwise undisputed.

246.    Krahling did not witness or participate in any aspect of the August 10, 2001 inspection. Ex. 2 (Krahling Dep. Tr. Vol. 1) at 120:9-122:22, 303:7-11; *see also* Ex. 15 (Merck Memorandum dated August 10, 2001) at MRK-KRA00071241-45.

**Response**: Undisputed.

247.    Investigator Bennett returned a third time, on September 14, 2001, to collect Merck's "data and correspondence" related to FDA's investigation of a concern that Merck had contracted with Dr. Richard Ward of Cincinnati Children's Hospital to test samples for the PRN assay, but then rejected his data because it did not align with Merck's. Ex. 9 (FDA EIR) at RELATOR  00004093; Ex. 17 (Merck Memorandum dated Sept. 14, 2001) at MRK-KRA00063886; Ex. 18 (Merck memorandum dated Sept. 17, 2001) at MRK-KRA00019107.

**Response**: Disputed to the extent this statement implies Merck provided all relevant data

regarding Dr. Richard Ward or his lab's ability to reproduce the results from Dr. Krah's lab.

For example, Ex. 167 is not among the documents provided to FDA even though the

document specifically addresses the outside lab's ability to "match" the level of precision.[200]

Otherwise undisputed.

248.    Merck provided the requested documentation and discussed this issue with FDA during its September 14 inspection, and then again during subsequent telephone conferences on

---

[199] Merck Ex. 15 at MRK KRA00071241 (listing Worldwide Quality Assurance Manager Cathy Wadsworth as an individual at Merck involved in responding to FDA's questions during the August 10, 2001 inspection).

[200] Rel. 56 Stat. ¶ 93 96, *citing among other evidence,* Ex. 167 at '731 ("Due to an urgent need for high precision data to support label changes for M M R®II, David Krah's laboratory will be carrying out neutralization tests …This activity was originally scheduled for transfer to a contract laboratory.  Two things have conspired to make this transfer unacceptable from a strategic perspective. … issues arising following [an October 2000 FDA] inspection in [Merck's Manufacturing Division] have placed a heightened importance on this data set. … a preliminary run of about one third of the serum set has revealed an unanticipated tightness of data … We doubt that the contract lab would be able to match this level of precision."); *see also*, Rel. 56. Stat. ¶96, *citing*, Ex. 122 at 728:6 25 (Krah Dep.) (Dr. Krah testifying he had no idea what Dr. Shaw was referring to in telling Dr. Emini that with the "unanticipated tightness of the data," Dr. Ward's lab would be unable to match the "level of precision" Dr. Krah achieved); Ex. 27 at 266:9 267:3 (Yagodich Dep.) (same).

**Appx18854**

September 17 and 25, 2001. Ex. 17 (Merck Memorandum dated Sept. 14, 2001) at MRK-KRA00063886; Ex. 18 (Merck Memorandum dated Sept. 17, 2001) at MRK-KRA00019107; Ex. 19 (Merck Memorandum dated Sept. 25, 2001) at MRK-KRA00071300; Ex. 10 (Oct. 10, 2001 Merck Letter to FDA) at MRK-KRA01631027.

**Response**:  Disputed to the extent the phrase "this issue" invokes unspecified facts outside the statement which make it impossible to answer as a stand-alone fact.  Assuming Merck is referring to the FDA request for information about why the Protocol 007 testing was not outsourced to Dr. Ward's lab as originally planned, disputed to the extent this statement implies Merck provided all relevant data regarding Dr. Richard Ward or his lab's ability to reproduce the results from Dr. Krah's lab.  *See* Response to SUMF2 ¶ 31, supra.  Otherwise undisputed.

249.    The following individuals at Merck were involved in responding to FDA's questions during the September 14, 2001 inspection and subsequent September 17 and 25, 2001 telephone conferences:  Beverly Zaber; Krah; Shaw; and Dr. Manal Morsy (Merck Associate Director, Worldwide Regulatory Affairs for Vaccines/Biologics). Ex. 17 (Merck Memorandum dated Sept. 14, 2001) at MRK-KRA00063886-88; Ex. 18 (Merck Memorandum dated Sept. 17, 2001) at MRK-KRA00019107; Ex. 19 (Merck Memorandum dated Sept. 25, 2001) at MRK-KRA00071300.

**Response**:  Disputed to the extent this statement implies those listed were the only individuals from Merck involved in responding to FDA's questions during the September 14, 2001 inspection and subsequent September 17 and 25, 2001 telephone conferences.  Merck Ex. 18 (also listing Drs. Henrietta Uwku, Emini; and McKee, among others).  Otherwise undisputed.

250.    Krahling did not witness or participate in any aspect of the September 14, 2001 inspection and subsequent September 17 and 25, 2001 telephone conferences. Ex. 2 (Krahling Dep. Tr, Vol. 1) at 120:9-122:22, 303:7-11; *see also* Ex. 17 (Merck Memorandum dated Sept. 14, 2001) at MRK-KRA00063886-87; Ex. 18 (Merck Memorandum dated Sept. 17, 2001) at MRK-KRA00019107; Ex. 19 (Merck Memorandum dated Sept. 25, 2001) at MRK-KRA00071300.

**Response**:  Undisputed.

Appx18855

251.    Merck responded to the Form 483 observations in an August 20, 2001 letter. It explained that Merck had "retrained" the Protocol 007 lab staff "in proper documentation practices," was retraining all staff "who perform testing of samples from vaccine clinical trials," had reviewed "all historical changes to the" Protocol 007 data, and had conducted a "reanalysis of the data."  Ex. 10 (CBER Aug. 20, 2001 Correspondence) at MRK01631019-22.

**Response**:  Disputed to the extent that Merck Ex. 10 selectively quotes from the document

changing the meaning.  Merck Ex. 10 states: "a reanalysis of the data set using only *original*

*values prior to any changes*." Merck could not conduct a "reanalysis of the data set using

only original values" because Merck destroyed original data, including testing plates,

counting sheets, and data that was wiped from cell plates.[201]  Also disputed to the extent

Merck implies the "reanalysis of the data," which only analyzed impact of the recounting and

retesting of the data on seroconversion, was complete.  Merck did not analyze or report the

effect on the change in the pre-positive rate.[202]  Also disputed to the extent that Merck

implies that the "reanalysis of data" did not affect the outcome of the study.  The recounting

and retesting of the AIGENT data significantly reduced the number of pre-positive results.[203]

---

[201] Rel 56 Stat. ¶ 115, *citing, among other evidence,* Ex. 183 (listing "discarded" Protocol 007 AIGENT assay plates); Ex. 155 at 214:21 25 (Krahling Dep.) (Relator Krahling testifying he saw Dr. Krah and other lab staff wipe plaque counts off the plates "[a]ll the time"); Ex. 172 at 381:6 10 (Wlochowski Dep.) ("[T]here were instances of wiping out the original plaque counts on the plate and repeating the plaque counts. … I consider that the original data was not maintained.").

[202] Rel. 56 Stat. ¶ 100, *citing, among other evidence,* Ex. 122 at 435:12 439:2, 441:17 442:7, 468:15 469:10 (Krah Dep.) (testifying that Drs. Krah and Emini reviewed counting sheets or Excel spreadsheets that contained plaque counts; Dr. Emini directed Dr. Krah to bring him counting sheets so he could check them; Drs. Krah and Emini looked for pre positives, pre positives at a single dilution, and post negatives; the review by Drs. Krah and Emini led to recounts; it was Dr. Emini's idea to recount all pre positives at a single dilution); Ex. 122 at 627:16 630:20 (Krah Dep.) (testifying once plaque counts were done Dr. Krah and staff calculated seroconversion rates and pre positives; Dr. Emini requested pre positive calculations); Rel. 56 Stat. ¶ 111, *citing, among other evidence,* Ex. 122 at 547:6 549:2 (Krah Dep.) (Dr. Krah testifying he did not disclose extent of plaque count changes or "targeting pre positives in [] recount").

[203] Rel. 56. Stat. ¶102 *citing,* Ex. 174 ¶¶ 15, 65 67, 70 (Stark Rep.) (finding "overwhelming statistical evidence" of bias) (the chance of so many changes to pre vaccination samples 245 times smaller than "chance of winning the jackpot in the Powerball lottery twice by buying a total of 2 tickets") (the chance so many changes to pre vaccinations samples were increases is "far less than the chance of picking a particular atom from a trillion planets like planet Earth.  It is comparable to the chance of picking a particular atom at random from our entire galaxy"); *see also* Ex. 175 ¶¶ 10 14 (Stark Suppl. Rep.) (pointing to data of Merck expert statistician Dr. Robert Platt as further

105

Disputed to the extent the statement implies that the retraining was adequate. Finally disputed

to the extent Merck implies its response to the FDA was complete and truthful.  Merck

represented that the recounting and retesting of the AIGENT data "were made for appropriate

reasons," "improve[d] the quality of the data obtained," and resulted in "accurate,

scientifically sound data for use in decision making."[204]

252.    That reanalysis compared the results for the initial 565 subjects using the data as
originally recorded with the changed data which the inspectors faulted for lack of documentation.
The new analysis showed that "there is no difference between the corrected and uncorrected data
sets with respect to seroconversion."  Ex. 11 (Burlington Report) at 40; Ex. 10 (CBER Aug. 20,
2001 Correspondence) at MRK01631019-22).

**Response**:  Disputed to the extent that "originally recorded" or "uncorrected data" being

"compared" assumes there was originally recorded/uncorrected data.  Merck destroyed

original data, including testing plates, counting sheets, and data that was wiped from cell

plates.[205]  Also disputed to the extent that Merck implies that the "reanalysis of data" did not

affect the outcome of the study.  The recounting and retesting of the AIGENT data

---

support for Dr. Stark's findings of bias); Ex. 176 at '828 (Table 2) and '841 (Table 2) (AIGENT preliminary subset
showing originally 61 pre positives that reduced to 38 pre positives after changes to the plaque counts through
selective recounting); Ex. 2 at 60 (Malone Rep.) ("The end result of Merck's uncontrolled and biased plaque
counting process was a reduction in the pre positive rate through targeted and unjustified recounting of undesirable
plaque counts.").  Disputed to the extent Carbone and Bennett did not review "the majority of the data" from the
PRN assay because the majority of the data was changed or destroyed.  Rel. 56 Stat. ¶115, *citing*, *among other
evidence,* Ex. 183 (listing "discarded" Protocol 007 AIGENT assay plates); Ex. 184 at '013 (listing Protocol 007
AIGENT assay "Plates thrown out"); Ex. 122 at 487:23 489:4, 514:15 515:4, 518:15 519:2 (Krah Dep.) (admitting
AIGENT testing plates were "discarded," without quality assurance auditing whether counting sheets accurately
reflected plaque counts recorded on testing plates); *id.* at 678:16 679:5 (Dr. Krah testifying he would not be
surprised if more than 120 of 172 assays had been destroyed).

[204] Rel. 56. Stat. ¶112 113, *citing,* Ex. 357 at '547; Ex. 182 at '418, '421 23; Ex. 92 at '598 (FDA relied on Merck's
representations); Rel. 56. Stat. ¶¶ 97 115 and *citations therein* representing the basis for Relators disputing any
inference that the recounting and retesting of the AIGENT data "were made for appropriate reasons," "improve[d]
the quality of the data obtained," and resulted in "accurate, scientifically sound data for use in decision making."

[205] Rel 56 Stat. ¶ 115, *citing, among other evidence,* Ex. 183 (listing "discarded" Protocol 007 AIGENT assay
plates); Ex. 155 at 214:21 25 (Krahling Dep.) (Relator Krahling testifying he saw Dr. Krah and other lab staff wipe
plaque counts off the plates "[a]ll the time"); Ex. 172 at 381:6 10 (Wlochowski Dep.) ("[T]here were instances of
wiping out the original plaque counts on the plate and repeating the plaque counts…I consider that the original data
was not maintained.").

significantly reduced the number of pre-positive results.[206]  Also disputed to the extent that

Dr. Burlington only looked at the recounting and retesting effect on seroconversion, not pre-

positives.  Merck Ex. 11 at 40.  Also disputed to the extent Merck implies the recounting and

retesting was made for "appropriate reasons" and resulted in "accurate, scientifically sound

data for use in decision making."[207]  Relators dispute any such inference.[208]  Otherwise,

undisputed.

253.    In fact, the corrected plaque counts as compared to the originally counted plaques
led to a slight *decrease* in the seroconversion rates    *i.e.*, the corrected data showed lower
seroconversion rates that the original data. Ex. 21 (CBER Correspondence Feb. 4, 2002) at
MRK-KRA00025856.

**Response**: Undisputed.

---

[206] Rel. 56. Stat. ¶102 *citing,* Ex. 174 ¶¶ 15, 65 67, 70 (Stark Rep.) (finding "overwhelming statistical evidence" of bias) (the chance of so many changes to pre vaccination samples 245 times smaller than "chance of winning the jackpot in the Powerball lottery twice by buying a total of 2 tickets") (the chance so many changes to pre vaccinations samples were increases is "far less than the chance of picking a particular atom from a trillion planets like planet Earth.  It is comparable to the chance of picking a particular atom at random from our entire galaxy"); *see also* Ex. 175 ¶¶ 10 14 (Stark Suppl. Rep.) (pointing to data of Merck expert statistician Dr. Robert Platt as further support for Dr. Stark's findings of bias); Ex. 176 at '828 (Table 2) and '841 (Table 2) (AIGENT preliminary subset showing originally 61 pre positives that reduced to 38 pre positives after changes to the plaque counts through selective recounting); Ex. 2 at 60 (Malone Rep.) ("The end result of Merck's uncontrolled and biased plaque counting process was a reduction in the pre positive rate through targeted and unjustified recounting of undesirable plaque counts.").  Disputed to the extent Carbone and Bennett did not review "the majority of the data" from the PRN assay because the majority of the data was changed or destroyed.  Rel. 56 Stat. ¶115, *citing, among other evidence,* Ex. 183 (listing "discarded" Protocol 007 AIGENT assay plates); Ex. 184 at '013 (listing Protocol 007 AIGENT assay "Plates thrown out"); Ex. 122 at 487:23 489:4, 514:15 515:4, 518:15 519:2 (Krah Dep.) (admitting AIGENT testing plates were "discarded," without quality assurance auditing whether counting sheets accurately reflected plaque counts recorded on testing plates); *id.* at 678:16 679:5 (Dr. Krah testifying he would not be surprised if more than 120 of 172 assays had been destroyed).

[207] Ex. 182 at '418, '421 23 (Merck representing to FDA that: "We believe that the application of the extravariability criteria improves the quality of the data obtained and does provide accurate, scientifically sound data for use in decision making…Although we believe changes were made for appropriate reasons, we understand CBER's concerns regarding the lack of documented justifications. Therefore we propose, and seek CBER's concurrence with, the use of the original PRN assay results in the evaluation of the 007 trial. The analytic evaluation of these data will strictly follow that specified in the original SOP (except for the inclusion of the assay validity criteria on the mock and positive control samples as requested by CBER on November 29, 2000 and defined in the assay validation.).

[208] Rel. 56. Stat. ¶112 113, *citing,* Ex. 357 at '547; Ex. 182 at '418, '421 23; Ex. 92 at '598 (FDA relied on Merck's representations); Rel. 56. Stat. ¶¶ 97 115 and *citations therein* representing the basis for Relators disputing any inference that the recounting and retesting of the AIGENT data "were made for appropriate reasons," "improve[d] the quality of the data obtained," and resulted in "accurate, scientifically sound data for use in decision making."

254.     During a teleconference on December 7, 2001, Merck and representatives from FDA (including Carbone) discussed, among other things, the integrity of the data from the PRN assay in Protocol 007 and whether "changes" to some of the data or the discarding of certain cell plates had impacted the study results. Ex. 20 (Merck Memorandum dated Dec. 13, 2001) at MRK-KRA00019640.

**Response**:  Merck Ex. 20 speaks for itself.  Otherwise undisputed.

255.     FDA expressed concern that because certain cell plates had been discarded or wiped clean and recounted there was no "way to confirm the accuracy of the unchanged data" that Merck previously reported to FDA. *Id.* at MRK-KRA00019644.

**Response**:  Undisputed.

256.     Merck responded to and further discussed FDA's concerns in written and telephone communications with the agency in December 2001 through March 2002. *Id.* at MRK-KRA00019640-46; Ex. 21 (Feb. 4, 2002 Merck Letter to FDA) at MRK-KRA00025847-916; Ex. 23 (March 23, 2002 memorandum describing a March 22, 2002 Merck and FDA telephone conference) at MRK-KRA00009042.

**Response**:  Disputed to the extent Merck implies that its responses to the Form 483 were

accurate, complete and not misleading.[209]  Undisputed Merck responded to the FDA's Form

483 in writing and verbally by teleconference and in person meetings from August 6, 2001 to

March 2002.

257.     Altogether, thirteen individuals at Merck engaged with FDA during its follow-up. Ex. 20 (Merck Memorandum dated December 13, 2001) at MRK-KRA00019640; Ex. 21 (Feb. 4, 2002 Merck Letter to FDA) at MRK-KRA00025847-916; Ex. 23 (March 23, 2002 memorandum describing a March 22, 2002 Merck and FDA telephone conference) at MRK-KRA00009042.

**Response**:  Disputed to the extent that the term "FDA during its follow-up" invokes

unspecified facts outside the statement which make it impossible to answer as a stand-alone

fact.  Assuming the statement is referring to the FDA's investigation and follow up of the

August 6, 2001 Form 483, undisputed that the documents cited reference thirteen individuals

---

[209] Rel. 56. Stat. ¶112 113, *citing,* Ex. 357 at '547; Ex. 182 at '418, '421 23; Ex. 92 at '598 (FDA relied on Merck's representations); Rel. 56. Stat. ¶¶ 97 115 and *citations therein* representing the basis for Relators disputing any inference that the recounting and retesting of the AIGENT data "were made for appropriate reasons," "improve[d] the quality of the data obtained," and resulted in "accurate, scientifically sound data for use in decision making."

at Merck communicated with the FDA in a Feb. 4, 2002 letter, a March 22, 2002 telephone conference, and a March 23, 2002 memorandum.

258.    Krahling did not participate in any of the follow-up between Merck and FDA from December 2001 to March 2002 as he had already left Merck by this time. Ex. 2 (Krahling Dep. Tr. Vol. 1) at 42:4-7, 118:25-119:14, 120:9-122:22.

**Response**: Disputed to the extent that the term "any of the follow-up" invokes unspecified

facts outside the statement which make it impossible to answer as a stand-alone fact.

Assuming the statement is referring to the FDA's investigation and follow up of the August 6,

2001 Form 483, undisputed.

259.    Following the initial inspection and in connection with CBER's follow-up visits and questions, Merck provided CBER with extensive data regarding the assay including the PRN plaque counting sheets and data. Ex. 10 (Merck file regarding FDA August 6, 2001 inspection) at MRK-KRA0001631019-1254; Ex. 127, Aug. 20, 2001 Letter) at MRK-KRA00000481-539.

**Response**: Disputed to the extent Merck implies that its responses to the FDA were accurate,

complete and not misleading.[210]  The citation to evidence of counting sheets and PRN data

only identifies 6 of the 565 assay counting sheets.[211]  Undisputed Merck provided FDA with

certain data regarding the AIGENT assay, including counting sheets and data.

260.    However, because there was no pre-specified protocol for making corrections or recounting, CBER declined to accept the corrected plaque counts. Ex. 20 (Dec. 13, 2001 Memo) at MRK-KR00019640-41.

**Response**: Merck Ex. 20 speaks for itself.  Otherwise undisputed.

261.    Instead, CBER accepted Merck's proposal to use the un-corrected, originally recorded AIGENT assay data to support the change in the mumps expiry claim. Ex. 23 (March 23, 2002 Merck Memo) at MRK-KRA00009042; Ex. 22 (April 19, 2002 Letter) at MRK-KRA 00337266.

---

[210] Rel. 56. Stat. ¶112 113, *citing,* Ex. 357 at '547; Ex. 182 at '418, '421 23; Ex. 92 at '598 (FDA relied on Merck's representations); Rel. 56. Stat. ¶¶ 97 115 and *citations therein* representing the basis for Relators disputing any inference that the recounting and retesting of the AIGENT data "were made for appropriate reasons," "improve[d] the quality of the data obtained," and resulted in "accurate, scientifically sound data for use in decision making."

[211] Merck Ex. 10 at '029 254 (including assays MMRV 188 01; 265:01; 267:01; 275:01; 223 01; 225:01).

109

**Response**: Disputed to the extent the word "[i]nstead" invokes unspecified facts outside the statement which make it impossible to answer as a stand-alone fact. Also disputed because Merck did not have "originally recorded" data to support the change in mumps expiry claim because Merck destroyed original data, including testing plates, counting sheets, and data that was wiped from cell plates.[212] Undisputed that FDA accepted Merck's proposal to "use the originally recorded results from the mumps PRN [AIGENT] assay for analysis" based on Merck representations that its responses to the FDA were accurate, complete and not misleading.[213]

262.    CBER later allowed the company GlaxoSmithKline (GSK) to use ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 113 (September 15, 2011 cover letter for GSK's submission of proposed serology strategy for Phase III clinical trials for ▮▮▮▮▮▮▮▮▮▮ at GSK-MMR-IND-0022162; Ex. 114 (Mumps Strategy) GSK-MMR-IND-0022180 at '2186 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ "); Ex. 115 (CBER April 23, 2012 Response to GSK) at GSK-MMR-IND-00229260 (CBER's April 25, 2012 response to GSK's meeting background materials notes ▮▮▮▮▮▮▮▮▮ .

**Response**: Disputed to the extent that the word "later" has no antecedent and is invoking unspecified facts outside the statement which make it impossible to answer this as a stand-alone statement of fact. Also disputed because by referencing "later," Merck does not account for the fact that FDA previously required ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[212] Rel 56. Stat. ¶ 115, *citing, among other evidence,* Ex. 183 (listing "discarded" Protocol 007 AIGENT assay plates); Ex. 155 at 214:21 25 (Krahling Dep.) (Relator Krahling testifying he saw Dr. Krah and other lab staff wipe plaque counts off the plates "[a]ll the time"); Ex. 172 at 381:6 10 (Wlochowski Dep.) ("[T]here were instances of wiping out the original plaque counts on the plate and repeating the plaque counts. … I consider that the original data was not maintained.").

[213] Rel. 56. Stat. ¶112 113, *citing,* Ex. 357 at '547; Ex. 182 at '418, '421 23; Ex. 92 at '598 (FDA relied on Merck's representations); Rel. 56. Stat. ¶¶ 97 115 and *citations therein* representing the basis for Relators disputing any inference that the recounting and retesting of the AIGENT data "were made for appropriate reasons," "improve[d] the quality of the data obtained," and resulted in "accurate, scientifically sound data for use in decision making."

████████████████████████████████████████████████████████[214] This was the

same requirement FDA imposed on Merck.[215] ██████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████.[216] FDA allowed Merck to

---

[214] Merck Ex. 115 at '260 ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████ Rel. 56 Stat. ¶ 26, *citing* Ex. 35 at '005 ██████████████████████
████████████████████████████████████████████████████████████████); Ex.
410 at '688 (GSK stated: ██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████; Ex. 411 at
'655-656 (GSK stating: ██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████; Ex. 412 at '820 (GSK stating: ██████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
█████████.

[215] Ex. 6 at 251:6-14 (Merck Expert Burlington Dep.) ("[FDA] wanted some sort of functional antibody information to be associated with ELISA seroconversion. … that is clear from the record."); Ex. 133 at '483 ("It is essential that ELISA testing methods be validated against a working neutralization assay …."); Ex. 3 ¶ 383 (Kessler Rep.) ("For Merck to use ELISA … it had to correlate the ELISA to a highly specific neutralization assay designed as a measure of protection against circulating wild type mumps infection."); Ex. 112 at '970 (FDA requesting Merck assurances that "the cutoff employed in the ELISA for seropositivity should be supported by data demonstrating some relevance with protective levels of antibody (e.g., neutralizing antibody)."); Ex. 134 at '778 ("Justification is required for the new mumps cutoff of 10 ELISA antibody units …. [FDA] requested that the ELISA results be compared to the mumps [PRN] assay. [FDA] would like the rationale for the new cutoff to be linked to a biologically relevant reference standard."); Ex. 135 at '833 (FDA directing Merck to "relate the cutoff … to seroprotection" by "relat[ing] the ELISA cutoff to … the PRN assay"); Ex. 136 at '454 ("We need to convince [FDA] that the ELISA will provide equivalent results to PRN and thus equate (bridge) to protection."); Ex. 121 at '775 ("[E]vidence of a correlation between the current assays and a [wild type] Neut[ralization] assay, or evidence of correlation with protective efficacy, would allow the current [ELISA] based assays to be used."); Ex. 105 at '5175 (Merck representing to FDA its "ELISA used in [Protocol 007] was shown to correlate with the [AIGENT] … and previous studies have established a strong correlation between the development of mumps specific neutralizing antibodies and vaccine efficacy."); Ex. 137 at '331 (Merck responding to FDA's request for justification and clinical relevance of ELISA 10 Ab cutoff by pointing to the ELISA AIGENT correlation).

[216] Merck Ex. 115 at GSK MMR IND 00229260 (CBER April 23, 2012 Response to GSK) (CBER's April 25, 2012 response to GSK's meeting background materials notes that CBER agrees '████████████ that the ELISA assay for mumps can be used as the primary endpoint in certain GSK studies, '████████████████████████████████

use this ELISA based on Merck's representations of a correlation between the ELISA and the

AIGENT. [217]  Otherwise undisputed.

263.    In January 2004, Merck submitted a supplemental Biologics License Application (sBLA) to FDA requesting to change the label statement of mumps potency from 4.3 $\log_{10}$ (20,000) $TCID_{50}$ per dose to 4.1 $\log_{10}$ (12,500) $TCID_{50}$ per dose. Protocol 007 provided supporting immunogenicity data to indicate that a mumps vaccine with potency of 4.1 $\log_{10}$ $TCID_{50}$ per dose was comparably immunogenic to a vaccine with potency of 4.8 $\log_{10}$ $TCID_{50}$ per dose. Ex. 123 Jan. 29, 2004 Submission) at MRK-KRA00000032-33.

Response: Disputed.  Undisputed that Merck submitted the application and Protocol 007 was

the only supporting clinical study but disputed to the extent Merck implies that the Protocol

007 immunogenicity data actually supported the change to the mumps specification.[218]

264.    After several rounds of comments from CBER and responses from Merck, CBER notified Merck in May 2007 that it would not approve the sBLA based on Protocol 007's PRN assay, principally due to an insufficient quantity of data. Ex. 87 (Oct. 17, 2005 Letter) MRK-KRA000000479 at '479; Ex. 88 (Nov. 15, 2006 Letter) MRK-KRA00000393 at '397, '399. Specifically, FDA stated: "Our review finds that the information and data submitted are inadequate for final approval at this time. We cannot accept use of multiple imputation analysis of the PRN data to support the lowering of mumps vaccine end-expiry potency."  Ex. 126 (May 18, 2007 Letter) at MRK-KRA00000385. CBER also noted, however, that immunogenicity testing had "substantially evolved since our initial testing requirements" and that "[u]se of ELISA data to evaluate the effect of differences in product potency on immunogenicity is now acceptable."  Id. CBER requested that Merck submit a new analysis pooling the control lot from Protocol 007 with two lots from previous studies to create a new control group against which to evaluate the lower-potency immunogenicity. Id.

---

[blacked out] ; Ex. 215 at 854 55 (Merck using Protocol 007 ELISA test in its sBLA to switch MMR II from HSA to rHA); Ex. 216 at '079, '109 (Protocol 009 CSR) (same); Ex. 217 at '147 (same); Ex. 206 at '451; Ex. 207 at '371 (Merck relying on same Protocol 007 ELISA to support ProQuad BLA); Ex. 21 at '138 (same); Ex. 6 at 14:15 20, 249:7 12 (Merck Expert Burlington Dep.) (testifying Merck used same ELISA in Protocol 007 and to support ProQuad BLA); Ex. 29 at 43:9 14 (Merck Expert Pasetti Dep.) (same).

[217] Ex. 2 at '78 (Malone Rep.) ("Following Merck's repeated misrepresentations … CBER allowed Merck to use the … ELISA data to support its mumps end expiry potency sBLA."); Ex. 9 at 198:6 200:5 (Fisher Dep.) (The "hard work in bringing the FDA to the conclusion that the use of ELISA to evaluate immunogenicity for the mumps end expiry study" was "the entirety of [Merck's] submissions" including "what we sent them on concordance testing" between the PRN and ELISA.) (referencing "the science related to immunogenicity testing of M M R®II has substantially evolved").

[218] Rel. 56 Stat. ¶¶ 116 24 (collecting evidence).

112

**Response**: Disputed that FDA letter stated immunogenicity testing "had substantially

evolved." Undisputed that Merck Ex. 158 at '85, the May 2007 letter from FDA to Merck,

states: "the science related to immunogenicity testing of M-M-R®II has substantially evolved

since our initial testing requirements" but disputed to the extent Merck implies FDA reached

this conclusion independently. From January 2004 to May 2007 Merck responded to

comments from FDA in the review of the sBLA to lower the MMR-II minimum potency

specification.[219] FDA allowed Merck to use ELISA only after Merck's repeated

misrepresentations to FDA of the clinical relevance of the ELISA correlation, data, and

serostatus cutoff.[220] Also disputed that the science related to immunogenicity testing of

MMR-II had evolved leading to the acceptance of ELISA data.[221] Undisputed that in May

2007 FDA notified Merck it would not approve the sBLA to lower the MMR-II minimum

potency specification. Also undisputed that the statement quotes Merck Ex. 158 stating:

"Our review finds that the information and data submitted are inadequate for final approval at

this time. We cannot accept use of multiple imputation analyses of the PRN data to support

the lowering of mumps vaccine end-expiry potency." Also undisputed that FDA requested

---

[219] Rel. 56 Stat. 146 151 (collecting evidence); *see also* Ex. 4 at 338:16 18 (Kessler Dep.) ("I'm surprised at the number of complete responses [to the sBLA from FDA], which was basically denials. That's unusual.").

[220] Rel. 56 Stat. ¶¶ 147, 149, 151; *see also* Ex. 2 at '78 (Malone Rep.) ("Following Merck's repeated misrepresentations … CBER allowed Merck to use the … ELISA data to support its mumps end expiry potency sBLA."); Ex. 9 at 184:8 12 (Fisher Dep.) (Q: "Is the argument [Merck is] making [in Ex. 88, the November 2006 submission to FDA] that the FDA can look at the ELISA data in part because it correlates strongly to the PRN data. A: Yes.") and Ex. 9 at 198:6 200:5 (Fisher Dep.) (The "hard work in bringing the FDA to the conclusion that the use of ELISA to evaluate immunogenicity for the mumps end expiry study" was "the entirety of [Merck's] submissions" including "what we sent them on concordance testing" between the PRN and ELISA.) (referencing "the science related to immunogenicity testing of M M R®II has substantially evolved").

[221] Ex. 4 at 343:6 8 (Kessler Dep.) ("I certainly wouldn't subscribe to your view that … the science has changed.") (referencing "the science related to immunogenicity testing of M M R®II has substantially evolved"); Ex. 4 at 344:15 345:2 (Kessler Dep.) ("[I]t's not that the science evolved and then [ELISA] could be used. [ELISA] needed to be correlated … the justification of ELISA was that it was linked to the [plaque reduction neutralization] test, and the [plaque reduction neutralization] test was linked to clinical relevance. But we know … those links were broken … you can't justify using the ELISA test … as was done here … The science doesn't support that.") (referencing "the science related to immunogenicity testing of M M R®II has substantially evolved").

Merck submit a new analysis pooling the control lot from Protocol 007 with two lots from

previous studies to create a new control group against which to evaluate the lower-potency

immunogenicity.

265.    Merck has presented the ELISA results from Protocol 007 to CDC. Ex. 220
(email); Ex. 242 (Feb. 25, 2010 presentation) at Slide 9.

**Response**: Undisputed that Merck provided CDC a slide deck presentation, Exhibit 242,

titled "Immunogenicity of Mumps-Containing Vaccines Mumps Research Priorities Meeting

February 25, 2010." Also undisputed that Slide 9 is titled "Persistence of Mumps

Immunogenicity ~ 1 Year after 1 dose of either ProQuad™ or M-M-R™II as Measured by

ELISA."  Undisputed that the first three rows on slide 9 indicate results from Protocol 007,

Mumps End Expiry Study.

266.    Merck provided the requested information in June 2007 and follow-up
information in August 2007, reporting that the lots were consistent and allowed for a pooled
control data set as CBER suggested. Further, the 4.1 $\log_{10}$ $TCID_{50}$ lot from Protocol 007 also met
the non-inferiority criteria compared to the pooled control data. Ex. 124 (June 5, 2007 Letter) at
MRK-KRA00000374; Ex. 126 (May 18, 2007 Letter) at MRK-KRA00000385-86.

**Response**: Disputed to the extent that "the requested information" has no antecedent and is

invoking unspecified facts outside the statement which make it impossible to answer this as a

stand-alone statement of fact.  Disputed to the extent that the cited evidence does not support

the statement that Merck provided follow-up information in August 2007.  Undisputed that in

June 2007 Merck resubmitted Protocol 007 ELISA data in response to the FDA's May 2007

letter, but disputed that the ELISA data Merck submitted to FDA in June 2007 was reliable

and clinically relevant to use to determine whether the stated criteria were met.[222]

Undisputed that Merck further supported the sBLA to lower the MMR-II minimum potency

---

[222] Ex. 2 at 78 (Malone Rep.).

114

Appx18865

specification by also including in its June 2007 submission ELISA data from the clinical

studies it used to support the ProQuad BLA and sBLA for MMR-II with rHA.  Rel. 56 Stat. ¶

153.

267.    Based on that data, CBER approved Merck's sBLA to change the labeled potency to 4.1 $\log_{10}$ $TCID_{50}$ in December 2007. Ex. 125 (Dec. 8, 2007 letter from FDA) at MRK-KRA00000383.

**Response**: Disputed to the extent that "Based on that data" is invoking unspecified facts

outside the statement which make it impossible to answer this as a stand-alone statement of

fact.  Disputed that FDA approved the sBLA to lower the MMR-II minimum potency

specification based on the data Merck submitted in June 2007.  CBER approved the sBLA

based on the entirety of Merck's submissions, including Merck's repeated misrepresentations

while the sBLA was pending about the correlation that allowed Merck to use ELISA data to

support the sBLA.[223]

268.    Despite the approved label change in 2007, Merck has never reduced the release potency specification for the MMR-II vaccines it manufactures, and it continues to use 5.0 $\log_{10}$ $TCID_{50}$ as the minimum potency for release. Ex. 202 (Stannard Dep. Tr.) at 298:4-7 (Q:  ". . . [h]as the target manufacturing potency or the release potency changed since . . . September 1999?"  A:  "It has not."); Ex. 201 (Summary of Potency Topics) at 2 ("Minimum Release Potency for mumps in MumpsVax, MM-Vax and MMR" from October 4, 1999 to the present reported as 5.0 $\log_{10}$ $TCID_{50}$/dose).

**Response**: Undisputed.

---

[223] Ex. 2 at '78 (Malone Rep.) ("Following Merck's repeated misrepresentations … CBER allowed Merck to use the … ELISA data to support its mumps end expiry potency sBLA."); *see also* Ex. 9 at 198:6 200:5 (Fisher Dep.) (The "hard work in bringing the FDA to the conclusion that the use of ELISA to evaluate immunogenicity for the mumps end expiry study" was "the entirety of [Merck's] submissions" including "what we sent them on concordance testing" between the PRN and ELISA.); *see also* Ex. 4 at 349:15 21(Kessler Dep.)  (On the basis of "the representations that Merck made in the [] ELISA … that it was correlated with the [plaque reduction neutralization test] and that it had clinical relevance … the [FDA] approved the [sBLA to lower the end expiry specification]."); *Id*. at 350:10 13 ("So the approval [of the sBLA to lower the end expiry claim] was based on what Merck represented to FDA."); *Id*. at 353:23 25 ("[A]t the end of the day, FDA relied on what Merck said to it and approved this [sBLA].") *Id*. at 355:16 17 (Kessler Dep.) ("[J]ust underscore FDA approved this [sBLA] based on what Merck stated.").

269.    In 2004, CBER was also considering Merck's application to license the ProQuad vaccine, which would combine measles, mumps, and rubella vaccines with a varicella (chicken pox) vaccine. Ex. 153 (Aug. 3, 2004 Application) at MRK-KRA00158320-526.

**Response**: Undisputed.

270.    In evaluating combination vaccines, CBER's primary question is whether the co-formulation of the individually-approved vaccines would lead to any interference among them that would reduce their effectiveness. Ex. 93 (FDA, *Guidance for Industry, Evaluation of Combination Vaccines for Preventable Diseases: Production, Testing & Clinical Studies, April 1997,* https://www.fda.gov/downloads/biologicsbloodvaccines/guidancecomplianceregulatoryinformation/guidances/vaccines/ucm175909.pdf) at 3, 14.

**Response**: Undisputed.

271.    Merck provided assorted information to answer this question.  CBER, in analyzing whether data from ELISA assays would be accepted to support ProQuad's licensure, then requested information about the degree of agreement between the PRN and ELISA assays from Protocol 007.  Merck responded to the request by noting that this information and analysis had previously been provided in a June 10, 2002 submission. A summary of that submission was also provided. Ex. 170 (June 30, 2004 Email) at MRK-KRA00791508-510; Ex. 173 (FDA Record) at MRK-KRA00846406-07; Ex. 168 (Nov. 17, 2004 Response) at MRK-KRA00761530-538; Ex. 173 (FDA Record) at MRK-KRA00846406-07.

**Response**: Disputed as to the first sentence.  "[T]his question" has no antecedent and

necessarily invokes unspecified facts outside the statement which make it impossible to

answer as a stand-alone statement.  Also disputed because the statement does not define

"assorted information."  Assuming "this question" refers to SUMF1 ¶ 270 ("CBER's primary

question is whether the co-formulation … would lead to any interference … that would

reduce their effectiveness") and "assorted information" refers to the information contained in

the cited exhibits, Merck does not account for the fact that before FDA allowed Merck to use

an ELISA in its clinical studies to support the BLA for ProQuad, FDA first required Merck

to demonstrate the ELISA results were linked to protection against disease.[224]  Disputed as to

---

[224]  Ex. 206 at '451; Ex. 208 at 169:23 170:5 (Dekleva Dep.) (affirming FDA required Merck to "correlate or bridge … ELISA data to PRN data" for ProQuad BLA); Ex. 3 ¶ 169 (Kessler Rep.) ("Before Merck could use ELISA

116

the second sentence.  FDA was not asking for information about the degree of agreement

between the PRN and ELISA.[225]  In reviewing Merck's BLA for ProQuad, FDA requested

that Merck support the appropriateness of the cutoff with data demonstrating some relevance

with protective levels of neutralizing antibody.[226]  Disputed as to the third sentence.  Since it

is disputed that FDA was asking for information "about the degree of agreement between the

PRN and the ELISA," it is also disputed that the information Merck provided in November

2004 (Merck Ex. 168) was responsive to FDA's request for data supporting the

appropriateness of the cutoff demonstrating some relevance with protective levels of

neutralizing antibody.  Also disputed to the extent Merck implies it provided reliable

information regarding the degree of agreement between the PRN and ELISA.[227]  As to the

fourth sentence, undisputed that in response to FDA's June 2004 request for information to

support the appropriateness of the cutoff (Merck Ex. 170), Merck responded by referring

back to its June 10, 2002 submission.

272.    CBER completed its clinical review of the studies submitted to support ProQuad
in August 2005. Ex. 174 (Clinical Review) at MRK-KRA01285010.

---

assays [to support the ProQuad BLA], FDA required Merck to demonstrate that the ELISA results would have a link
to protection against disease.").

[225] Merck Ex. 173 at '406 07 (FDA Record) ("The sponsor's information that the overall agreement between the
ELISA and the plaque reduction neutralization is 93% is encouraging, but it is only a point estimate and does not
support the chosen cutoff per se.").

[226] Merck Ex. 173 at '406 07 (FDA Record) (FDA requested Merck "provide additional data to support the
appropriateness of the cutoff employed in the mumps ELISA for seropositivity, relative to the plaque reduction
neutralization assay…[FDA] requested that the mumps ELISA seropositive cutoff be justified via use of known
mumps neutralizing and non neutralizing sera…[T]he appropriateness of the cutoff employed in the ELISA for
seropositivity should be supported by data demonstrating some relevance with protective levels of antibody (e.g.,
neutralizing antibody).").

[227] Ex. 174 ¶¶ 27 47; *Id*. at ¶27 ("Merck's analysis of the agreement between the … ELISA … and the AIGENT …
is misleading."); *Id*. at ¶ 47 (exclusion of pre positives in the analysis made it appear the assays agreed better than
they did and created a misleading impression of what would happen if ELISA using 10 Ab was used to replace
AIGENT); (using ELISA with 10 Ab on its own would substantially increase the apparent rate of seroconversion);
(an ELISA cutoff of 15 Ab provided better agreement between the AIGENT and ELISA and 23 Ab provided the
best agreement between the two assays but if Merck had used either 15 Ab or 23 Ab the seroconversion rate by
ELISA would have been substantially lower than with a cutoff of 10 Ab).

117

**Response**: Undisputed.

273.     CBER concluded that Merck had demonstrated "good correlation" between the mumps PRN assay and the ELISA and that Merck's "studies indicated that the ELISAs used to assess antibody response to each of the vaccine antigens in ProQuad would parallel responses that correlated with protection in other studies."  *Id.* at '222.

**Response**: Disputed to the extent Merck does not account for how FDA came to the stated

conclusion.  FDA came to this conclusion after Merck's repeated misrepresentations to FDA

of the clinical relevance of the ELISA correlation, data, and serostatus cutoff.[228]  Otherwise

undisputed.

274.     CBER did not require Merck to conduct a new PRN assay to demonstrate non-interference on antibody responses when the four vaccines were combined in ProQuad, and it accepted the endpoint measured by the Protocol 007 ELISA in Merck's studies to support approval of ProQuad; it accepted ELISA data instead. *Id.* at MRK-KRA01285010-272.

**Response**: Disputed. It is impossible to identify the "specific reference" to the part of the

record supporting this statement because Merck has cited a 262-page document without

providing any pinpoint citation.[229]  Also disputed because the statement misstates the

connection between Protocol 007 and the clinical studies supporting the ProQuad BLA.  For

the ProQuad BLA, FDA accepted Merck's proposal to conduct clinical studies using the

---

[228] Ex. 2 at 78 (Malone Rep) ("Merck … misrepresented the clinical relevance of the test results it submitted in its ProQuad BLA and follow up submissions."); Ex. 3 at ¶ 422 (Kessler Rep.) (Merck represented the "measure of immunogenicity in … the [ProQuad BLA] was … linked to protection against disease."); Ex. 3 at ¶ 427 (Kessler Rep.) (Merck's representation to the FDA in the ProQuad BLA were "misleading because the seroconversion rates reported using the [] ELISA assay … … were not related to protection and could not support the assertion that ProQuad was as efficacious as its parent products.") (quoting MRK KRA00158320 at '39). *See also* Rel. 56 Stat. ¶¶ 156 67 (collecting evidence); Ex. 2 at 86 (Malone Rep.) (reaching "the firm conclusion that the [] ELISA tests Merck used … provide no support for M M R II or ProQuad claims concerning clinical protection"); Ex. 2 at 79 80 (Malone Rep.) ("[T]he [] ELISA tests (including the serostatus cutoff and AIGENT correlation on which they relied) were unreliable and had no relevance to protection.  Therefore, these central representations and submissions Merck made to the FDA in support of its ProQuad BLA were false and unsupported."); Ex. 140 at '409, '414 (When FDA sought assurances that ELISA cutoff has "relevance [to] protective levels," Merck represented its AIGENT/ELISA correlation "provid[ed] information on the clinical relevance of the chosen ELISA cutoff.").

[229] See, Judge Jones Policies and Procedures, Civil Cases, D. Summary Judgment Motions, ¶ 5: "Statement of material fact in support of or opposition to summary judgment must "include underline specific and not general references to the part of the record that supports each of the statements. Pinpoint citations are required. Summary judgment motion practice that fails to follow these procedures to the letter will be stricken.") (emphasis in original)

same ELISA test with the same 10 Ab serostatus cutoff that Merck used in Protocol 007.[230]

As FDA did with Protocol 007 and Merck's sBLA to lower the MMR-II minimum mumps

potency specification, FDA requested that the ELISA serostatus cutoff used in Merck's

clinical studies supporting the ProQuad BLA "be supported by data demonstrating some

relevance with protective levels of antibody (e.g., neutralizing antibody)."[231]  Undisputed that

that FDA accepted ELISA results in support of the ProQuad BLA.[232]

275.    ProQuad's license was approved on September 6, 2005. Ex. 172 (Sept. 6, 2005
Letter) at MRK-KRA00821906.

**Response**: Undisputed.

---

[230]  Rel. 56 Stat. ¶ 156, *citing* Ex. 206 at '451; Ex. 207 at '371 (Merck relying on same Protocol 007 ELISA to
support ProQuad BLA); Ex. 21 at '138 (same); Ex. 6 at 14:15 20, 249:7 12 (Merck Expert Burlington Dep.)
(testifying Merck used same ELISA in Protocol 007 and to support ProQuad BLA); Ex. 29 at 43:9 14 (Merck Expert
Pasetti Dep.) (same).

[231]  Rel. 56 Stat. ¶ 157, *citing* Ex. 206 at '451; Ex. 208 at 169:23 170:5 (Deposition of Merck Employee Michael
Dekleva (hereinafter "Dekleva Dep.")) (affirming FDA required Merck to "correlate or bridge … ELISA data to
PRN data" for ProQuad BLA); Ex. 3 ¶ 169 (Kessler Rep.) ("Before Merck could use ELISA assays [to support the
ProQuad BLA], FDA required Merck to demonstrate that the ELISA results would have a link to protection against
disease."). *See also* Rel. 56 Stat. ¶¶158 167 (collecting relevant evidence regarding FDA's approval of ProQuad).

[232]  Rel. 56 Stat. ¶¶158 167 (collecting relevant evidence regarding FDA's approval of ProQuad); *see supra* at 228.

Appx18870

**RELATORS' RESPONSE TO MERCK'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS FOURTH DISPOSITIVE MOTION FOR SUMMARY JUDGMENT**

1.     Stephen A. Krahling is a former Merck employee who worked for Merck from March 1999 to August 2000 and December 27, 2000 to November 9, 2001. Ex. 2 (Krahling Dep. Tr. Vol. 1) at 39:15-40:12, 111:2-4 and 171:10-12; Ex. 3 (Merck Employee Initialization Form) at MRK-KRA00582401; Ex. 4 (Krahling Separation Agreement) at MRK-KRA00582394; Ex. 5 (Krahling's Resp. to Def's First Set of Interrogatories, Interrogatory No. 6) at 15.

**Response**:  Undisputed.

2.     At Merck, Krahling was a lab technician in a division called Merck Research Laboratories (MRL) under the supervision of Dr. David Krah. Ex. 24 (Krahling Employment Offer) at RELATOR  00001059; Ex. 5 (Krahling's Resp. to Def's First Set of Interrogatories, Interrogatory No. 6) at 15.

**Response**:  Undisputed.

3.     In that role, Krahling ran cell-based assays to characterize Merck's live virus vaccines, including work in support of the plaque reduction neutralization assay referred to as Protocol 007.   Krahling was not involved in the design and development of the actual PRN assay. Ex. 2 (Krahling Dep. Tr. Vol. 1) at 39:15-43, 55:7-12; 111:10-18.

**Response**:  Disputed to the extent the phrase "[i]n that role" invokes unspecified facts outside

the statement which makes it impossible to answer as a stand-alone fact.  Also disputed to the

extent "that role" is referring to "lab technician" in Merck SUMF1 ¶ 5.  Merck hired Relator

Krahling as a virologist.[233]  Also disputed to the extent this statement implies that running

"cell-based assays to characterize Merck's live virus vaccines" was the only job responsibility

Relator Krahling had as a virologist at Merck.  Otherwise undisputed.

4.     Krahling does not allege scientific impropriety in the original 1960's efficacy studies that supported Merck's mumps vaccine's initial licensure. In fact, neither Relator Krahling nor Wlochowski challenge or context the validity of Dr. Hilleman's original clinical trials. Ex. 2 (Krahling Dep. Tr. Vol. 1) at 83:13-84:6.

---

[233] *See* Rel. Resp. SUMF1 ¶ 5, *citing* Merck Ex. 24 at '1059 (Krahling Employment Offer); Merck Ex. 3 at '401 (Merck Employee Initialization Form); Merck Ex. 5 at 15 (Krahling's Resp. to Def.'s First Set of Interrogatories); Merck Ex. 1 (Krahling Resume).

**Response**:  Undisputed as to the first sentence.  Disputed as to the second sentence.  Relator

Krahling challenges the validity of Dr. Hilleman's original clinical trials and methods.[234]

There is no evidence cited to support Merck's proffered fact as to Relator Wlochowski.[235]

5.    Krahling never worked in Merck's Manufacturing Division, never had any responsibility for manufacturing the mumps vaccine, and did not run the $TCID_{50}$ assay used to measure the potency of the mumps vaccine.  Krahling also does not know "what amount of virus" Merck uses to manufacture vaccine today.  Ex. 13 (Krahling Responses to Def's Req. for Admission) at ¶¶ 22-23; Ex. 2 (Krahling Dep. Tr. Vol. 1) at 61:19-25; Ex. 7 (Krahling Dep. Tr. Vol. 2) at 392-393:12-22, 488:21-489:6; 484:16-17.

**Response**:  Disputed to the extent Merck implies Relator Krahling never had any

responsibility for work that supported manufacturing of the mumps vaccine.[236]  Otherwise

undisputed.

6.    While working for Merck, Krahling was not responsible for communicating with the U.S. Food and Drug Administration (FDA) on Merck's behalf. Ex. 13 (Krahling Responses to Def's Req. for Admission) at ¶ 29.

**Response**:  Undisputed.

7.    Prior to his participation in this litigation, Krahling never reviewed any of Merck's submissions to foreign regulatory bodies related to Merck's mumps vaccine or Protocol 007. *Id.* at ¶¶ 46-48.

**Response**:  Undisputed.

8.    Prior to his participation in this litigation, Krahling never personally communicated with the Centers for Disease Control and Prevention (CDC) about Merck's

---

[234] Merck Ex. 2 at 83:13 84:6 (Krahling Dep. Tr. Vol. 1) (Dr. Hilleman's studies were "less rigorous than what are available today. The sample size run[s] are smaller than the things Merck did in Protocol 007. So less rigorous, not as good a test or accurate a test isn't scientific misconduct.").

[235] *See*, Judge Jones Policies and Procedures, Civil Cases, D. Summary Judgment Motions, ¶ 5 ("The Court will not consider any description of a fact that is not supported by citation to the record. Statement of Material Facts in support of or in opposition to a motion for summary judgment must include specific and not general references to the parts of the record that support each of the statements…Pinpoint citations are required. Summary judgment motion practice that fails to follow these procedures to the letter will be stricken.") (emphasis in original).

[236] Ex. 155 at 61:7 18, 392:12 23 (Deposition of Relator Stephen Krahling (hereinafter "Krahling Dep.")) ("…According to [David] Krah and according to what I understand, the work we were doing impacted manufacturing. How much goes into the vaccine…So what they would report to regulatory. But there's a building somewhere where they make it. My job was not to report to that building and make it."); ("I did work that supported manufacturing … [David Krah] explained how.").

mumps vaccine or the issues in the Amended Complaint and he was not responsible for communications with CDC. *Id.* at ¶¶ 3, 50-51.

**Response**:  Undisputed.

9.    While working for Merck, Krahling was not responsible for drafting, negotiating, or executing any contracting for the sale of Merck's vaccines to CDC. *Id.* at ¶ 54.

**Response**:  Undisputed.

10.    Before this lawsuit, Krahling had no personal knowledge of non-public communications between Merck and CDC concerning Merck's mumps vaccine, including no knowledge of communications with CDC concerning Protocol 007. *Id.* at ¶¶ 56-57.

**Response**:  Undisputed.

11.    Krahling has not spoken with CDC about its decision to purchase Merck's Mumps Vaccine. *Id.* at ¶ 60.

**Response**:  Undisputed.

12.    Relator Joan L. Wlochowski is a former Merck employee who worked for Merck from 2000 to 2002. Ex. 203 (Wlochowski Resume) at AMGEN 0007.

**Response**:  Undisputed.

13.    While working at Merck, Wlochowski was a lab technician in MRL's virus and cell biology laboratory under the supervision of Dr. Krah. *Id.*; Ex. 204 (Wlochowski Dep. Vol. 1) at 60:23-61:1.

**Response**:  Disputed that Relator Wlochowski was a lab technician.  She was a "Staff

Virologist."[237]  Also disputed to the extent Merck implies that Relator Wlochowski's only

position throughout her employment at Merck was working in Dr. Krah's laboratory.[238]

Otherwise undisputed.

14.    In this role, she inoculated assays for the plaque reduction neutralization assay for Protocol 007. Ex. 85 (Wlochowski's Responses to Def's Req. for Admission) at ¶¶ 1-2.

---

[237] Merck Ex. 203, 1 (Wlochowski Resume).

[238] Ex. 172 at 61:16 62:10 (Deposition of Relator Joan Wlochowski (hereinafter "Wlochowski Dep.")) (testifying that after she worked in Dr. Krah's laboratory, she moved to Dr. Palker's laboratory to work on HPV vaccine related research).

**Response**: Disputed to the extent the phrase "[i]n this role" invokes unspecified facts outside the statement which makes it impossible to answer as a stand-alone fact. Disputed to the extent Merck implies inoculating assays was Relator Wlochowski's only responsibility with respect to Protocol 007. Relator Wlochowski's work in Dr. Krah's laboratory included, but was not limited to, inoculating assays for the plaque reduction neutralization assay for Protocol 007.[239] Also disputed to the extent Merck implies that Relator Wlochowski's only position throughout her employment at Merck was working in Dr. Krah's laboratory.[240] Otherwise undisputed.

15.    As of June 13, 2017, Wlochowski had never had a conversation directly about the mumps vaccine with FDA or with CDC. Ex. 204 (Wlochowski Dep. Tr. Vol. 1) at 123:7-15.

**Response**: Undisputed.

16.    Wlochowski cannot say what CDC does in order to determine whether to purchase the mumps vaccine and she has not personally communicated with CDC about Merck's mumps vaccine or the topics addressed in her complaint. Ex. 204 (Wlochowski Dep. Tr. Vol. 1) at 152:16-153:5; Ex. 85 (Wlochowski's Responses to Def's Req. for Admission) at ¶ 4.

**Response**: Disputed to the extent Merck implies Relator Wlochowski knows nothing about the "CDC's decision-making process regarding the purchase of vaccines."[241] Otherwise undisputed.

---

[239] Merck Ex. 85 at ¶¶ 1 2 (Wlochowski's Responses to Def.'s Req. for Admission). *See also* Merck Ex. 203 (Wlochowski Resume) (Relator Wlochowski "[p]rovided support for the potency and stability of attenuated live viral vaccine formulations by performing various cell based assays to measure infectious viral titers…Determined seroconversion rates from human sera in a high priority clinical trial through plaque reduction neutralization assay on pre and post vaccination samples…"); Rel. 56.1 Stat. ¶ 97, *citing among other evidence* Ex. 172 at 210:1 10 ("Wlochowski Dep.") (With regard to the PRN testing, Relator Wlochowski testified: "[I] performed the [Protocol 007] assay in its entirety so I set up the serum dilutions, I inoculated the plates. I fixed and stained the plates and I performed counting on the plates.").

[240] *See supra* note 8.

[241] Merck Ex. 204 at 151:3 6 (Wlochowski Dep.) ("Do you know anything about the CDC's decision making process regarding the purchase of vaccines? A. Yes."). *Id.* at 152:10 13 ("I know that the label is public so that information is available to the CDC in determining a decision on whether or not to purchase a product").

17.    Wlochowski never worked in Merck's Manufacturing Division and did not have responsibility for manufacturing the mumps vaccine when she worked at Merck. Ex. 85 (Wlochowski's Responses to Def's Req. for Admission) at ¶¶ 23-24.

**Response**:  Disputed to the extent Merck implies Relator Wlochowski never had any responsibility for work that supported manufacturing the mumps vaccine.[242]  Otherwise undisputed.

18.    While working for Merck, Wlochowski was not responsible for communicating with FDA on Merck's behalf and she has never attended any meeting between Merck and FDA relating to Merck's mumps vaccine, Protocol 007, or any neutralization assay. Ex. 85 (Wlochowski's Responses to Def's Req. for Admission) at ¶¶ 30, 36-38.

**Response**:  Undisputed.

19.    Prior to her participation in this litigation, Wlochowski never reviewed any of Merck's submissions to foreign regulatory bodies related to Merck's mumps vaccine or Protocol 007. Ex. 85 (Wlochowski's Responses to Def's Req. for Admission) at ¶¶ 47, 49.

**Response**:  Undisputed.

20.    While working for Merck, Wlochowski was not responsible for communications with CDC and was never asked to communicate with CDC on Merck's behalf. Ex.  85 (Wlochowski's Responses to Def's Req. for Admission) at ¶¶ 51-52.

**Response**:  Undisputed.

21.    While working for Merck, Wlochowski was not responsible for drafting, negotiating, or executing any contracting for the sale of Merck's vaccines to CDC. Ex. 85 (Wlochowski's Responses to Def's Req. for Admission) at ¶ 55.

**Response**:  Undisputed.

22.    Before this lawsuit, Wlochowski had no personal knowledge of non-public communications between Merck and CDC concerning Merck's mumps vaccine, including no knowledge of communications with CDC concerning Protocol 007. Ex. 85 (Wlochowski's Responses to Def's Req. for Admission) ¶¶ 57-58.

**Response**:  Undisputed.

---

[242] Ex. 155 at 61:7 16 (Krahling Dep.) ("…According to [David] Krah and according to what I understand, the work we were doing [in Dr. Krah's lab] impacted manufacturing. How much goes into the vaccine…So what they would report to regulatory.").

**Appx18875**

23.    Wlochowski has not spoken with CDC about its decision to purchase Merck's Mumps Vaccine. Ex. 85 (Wlochowski's Responses to Def's Req. for Admission) at ¶ 61.

**Response**:  Undisputed.

24.    Mumps, the once ubiquitous childhood disease, generally presents as fever and parotitis (inflammation of one or both parotid (salivary glands)). Ex. 197 (Excerpts of Rubin, *Vaccines* (2018)) at 663.

**Response**:  Undisputed.

25.    In 1967, Merck's monovalent mumps vaccine, MUMPSVAX®, was first licensed in the United States, containing a version of the "Jeryl Lynn" strain of the mumps virus. Ex. 197 (Excerpts of Rubin, *Vaccines* (2018)) at 669.

**Response**:  Undisputed.

26.    In 1971, Merck introduced the MMR vaccine, which combined the Mumpsvax vaccine with a measles vaccine and a rubella vaccine in a single "trivalent" vaccine. Ex. 197 (Excerpts of Rubin, *Vaccines* (2018)) at 670.

**Response**:  Undisputed.

27.    In 1978, Merck obtained approval of second trivalent MMR vaccine, called MMR-II, which included the same measles and mumps vaccines as were in MMR but a different rubella vaccine. Ex. 197 (Excerpts of Rubin, *Vaccines* (2018)) at 672, 979-980.

**Response**:  Undisputed.

28.    The Jeryl Lynn mumps vaccine is also included in ProQuad, a quadrivalent vaccine licensed by Merck in 2005 that comprises four distinct vaccines    the same measles, mumps and rubella vaccines that are in MMR-II, as well as a varicella (chicken pox) vaccine. Ex. 197 (Excerpts of Rubin, *Vaccines* (2018)) at 672.

**Response**:  Undisputed.

29.    As a result, the Jeryl Lynn mumps vaccine has been the mumps vaccine administered to children and adults in the United States for more than 50 years.

**Response**:  Disputed to the extent this fact is not supported by citation to the record as required by the Court's rules.[243]  Undisputed that since 1967 Merck has been the only vaccine manufacturer licensed to sell a mumps vaccine in the United States.[244]

---

[243] *See* Judge Jones Policies and Procedures, Civil Cases, D. Summary Judgment Motions, ¶ 5.

30.     CDC reports that that, "[a]fter the U.S. mumps vaccination program started in 1967, there has been a more than 99% decrease in mumps cases in the United States."   Ex. 81 (CDC, *Mumps Vaccination*, https://www.cdc.gov/mumps/vaccination.html).

**Response**:  Disputed to the extent Merck implies this statistic provides a complete and accurate representation of the trend in mumps incidence since 2006.[245]  Also disputed to the extent Merck implies this statistic indicates the resurgence in mump cases in since 2006 in highly vaccinated populations is not a significant public health concern.[246]  Undisputed that

---

[244] Ex. 19 ¶ 11 (Merck Ans.); Ex. 20 at 175 (Merck Responses to Requests for Admission 222 23).

[245] *See, e.g.,* Rel. 56 Stat. ¶¶ 195 99, 208 214, *citing among other evidence* Ex. 4 at 147:17 149:12 (Kessler Dep.) (The statement that "there's been a 99 percent decrease in mumps cases since the vaccine was introduced in 1967 … would probably be an incomplete statement … the CDC [website says] … 'Although the United States experienced a 99 percent reduction in mumps cases following implementation of the two dose vaccination program in 1989, mumps has resurged in the past ten years.' … So I think [Merck's] data is correct, but it's somewhat out of date."); Ex. 40 at 220:20 221:2 (Merck Expert Arvin Dep.) (agreeing there was a 2000% increase in mumps between 2000 and 2017 based on 300 cases reported in 2000 and 6,000 cases in 2017); Ex. 22 at 27 (Merck Expert Atkinson Rep.) ("Since 2012, the number of mumps cases, incidence, number of outbreaks, proportion of outbreak associated cases, and number of jurisdictions reporting mumps outbreaks have all increased.  The number of cases reported in 2016 (6,369) and 2017 (5,629[]) are the highest reported in a decade."); Ex. 1 at 9 12 (Shapiro Rep.) (citing publications) ("[S]ince early 2006 there have been numerous, large outbreaks of mumps in the United States, with nearly 15,000 reported mumps cases since 2014."); Ex. 7 at 139:7 9 CDC 30(b)(6) Pallansch Dep.) ("There clearly has been a resurgence [of mumps cases] particularly from 2006 till present …."); Ex. 22 at 21 (Merck Expert Atkinson Rep.) ("Several mumps outbreaks have occurred in US since 2006, which has contributed to an increase in the number of reported mumps cases."); Ex. 41 at 82:2 14 (Deposition of Merck's Expert William P. Nichols (hereinafter "Merck Expert Nichols Dep.")) (agreeing "there's been a resurgence in mumps cases since 2006" and "since 2006 there's been an across the board increase in mumps cases in individuals … who have received two doses of Merck's mumps containing vaccines").  *See also* Ex. 4 at 149:13 23 (Kessler Dep.) ("If [Merck] want[s] to represent that this [vaccine] results in 99 percent reduction in mumps … [Merck's] out of date … [a]nd that needs to be corrected.").

[246] *See, e.g.,* Rel. 56 Stat. ¶¶ 195 99, 208 214, *citing among other evidence* Ex. 246 at '446 (CDC: the "surge" of mumps cases among vaccinated populations "is not understood and it is of serious public health concern for many reasons."); Ex. 7 at 144:24 145:12 (CDC 30(b)(6) Pallansch Dep.) ("Q. Why is the prevention of these outbreaks of such issue to the CDC?  A. It's disease burden.  I mean, if you look at these outbreaks, they do have not only a disruption for the institutions and populations affected, but you have children who are being hospitalized with complications, some of which include more serious conditions, like deafness, or even some issues around loss of fertility associated with orchitis, as another example.  So these complications are nontrivial.  So there's still significant disease severity associated with mumps, even though it is less than what it was in the pre vaccine era."); Ex. 7 at 163:25 164:4 (CDC 30(b)(6) Pallansch Dep.) (testifying a "big focus" of the CDC is "the contributing factors to the resurgence and the size of the outbreaks"); Ex. 40 at 213:6, 216:19 217:3 (Merck Expert Arvin Dep.) ("Every outbreak is a concern.  …  We are concerned about what the burden of disease is.  Q. When you say 'we' who do you mean by 'we'?  A. I mean pediatric infectious disease specialists.  I mean pediatricians.  I mean parents. I mean the CDC.  I mean, I hope, all of us."); Ex. 1 at 13, 20 (Shapiro Rep.) (mumps outbreaks "have become a major public health problem") ("[mumps] outbreaks are not trivial"); Ex. 7 at 143:21 22 (CDC 30(b)(6) Pallansch Dep.) ("We have seen a trend over these outbreaks of the number of cases having two doses has gone up."); Ex. 22 at 27 (Merck Expert Atkinson Rep.) ("An increase in mumps outbreaks and cases, particularly among people who received 2 doses of MMR was first noted in 2006."); Ex. 40 at 219:7 9, 227:18 23 (Merck Expert Arvin Dep.) ("[W]e have been seeing these outbreaks in vaccinated populations…."); Ex. 15 at 32:10 18 (Merck Expert Temte Dep.)) (testifying recent mumps cases have been "largely[] in fully vaccinated populations"); Ex. 39 at 166:17 20

126

the evidence cited contains the selectively quoted language.  The cited document in full

speaks for itself.

31.    "Before the U.S. mumps vaccination program started in 1967, about 186,000
cases were reported each year, but the actual number of cases was likely much higher due to
underreporting."  By comparison, in 2018, the provisional number of mumps cases reported in
the United States was 2,251   99% fewer cases than were reported annually in the pre-vaccine
era. Ex. 98 (CDC, *Mumps Cases and Outbreaks*, https://www.cdc.gov/mumps/outbreaks.html).

**Response**:  Disputed to the extent Merck implies this statistic provides a complete and

accurate representation of the trend in mumps incidence since 2006.[247]  Also disputed to the

extent Merck implies this statistic indicates the resurgence in mump cases in since 2006 in

highly vaccinated populations is not a significant public health concern.[248]  Undisputed that

the evidence cited contains the selectively quoted language and that there were 2,251

reported mumps cases in 2018.  The cited document in full speaks for itself.

32.    In the context of vaccine trials, *efficacy* refers to "[t]he ability of a vaccine to
provide protection against disease under ideal circumstances." Ex. 95 (Centers for Disease
Control and Prevention, *Manual for the Surveillance of Vaccine-Preventable Disease*, Definition
of Terms (5th ed. 2012), http://www.cdc.gov/vaccines/pubs/surv-manual/front-portion.pdf) at ix.

**Response**:  Disputed that this is the only definition of efficacy "in the context of vaccine

trials."  The term efficacy is often used interchangeably with effectiveness and other terms

reflecting protection from disease in the context of vaccine clinical trials, including by

Merck.[249]  Undisputed that the evidence cited contains the selectively quoted language.

---

(Musey Dep.) (affirming mumps outbreaks in vaccinated populations); Ex. 1 at 10 14 (Shapiro Rep.) (reporting on
mumps outbreaks in fully vaccinated populations); Ex. 244 at 1 (*Decreased humoral immunity to mumps in young
adults immunized with MMR vaccine in childhood*, Proc. Nat'l Acad. Sci. USA 116:19071 19076, Sept. 17, 2019)
("Unexpectedly, in the past decade, multiple mumps outbreaks have been reported in the United States … with a
high attack rate among vaccinated young adults").

[247] *See supra* note 15.

[248] *See supra* note 16.

[249] Rel. 56 Stat. ¶¶ 137 143, 150, *citing* Ex. 42 at '708 ("In addition, and more seriously, [FDA] challenged the
efficacy of marketed product at the lowest predicted potencies (below label claim). … With regard to product
efficacy, we provided an interim analysis of an ongoing mumps end expiry trial to justify efficacy of lower potency
product.  [FDA] accepted the Merck response."); Ex. 23 at 33:24 34:10 (Deposition of Merck Employee Dr.

33.     In the context of vaccines, efficacy is typically evaluated by comparing how many people in a clinical trial who were vaccinated got the disease with how many people who were not vaccinated got the disease. Ex. 100 (CDC, *Principles of Epidemiology in Public Health Practice* (3d ed. 2012), https://www.cdc.gov/csels/dsepd/ss1978/lesson3/section6.html) at § 6.

**Response**:  Disputed.  The evidence cited does not support the proffered fact.  The only

relevant portion of section 6 in CDC's *Principles of Epidemiology in Public Health Practice*

is the "Vaccine efficacy or effectiveness" subsection.  With respect to epidemiology, the

section states:

> Vaccine efficacy and vaccine effectiveness measure the proportionate reduction in cases among vaccinated persons. Vaccine efficacy is used when a study is carried out under ideal conditions, for example, during a clinical trial. Vaccine effectiveness is used when a study is carried out under typical field (that is, less than perfectly controlled) conditions.

In the context of vaccine clinical trials, the term efficacy is often used interchangeably with

effectiveness and other terms reflecting protection from disease, including by Merck.[250]

34.     The primary pre-licensure field trial for the Jeryl Lynn vaccine was published in the New England Journal of Medicine. The study was carried out by Dr. Maurice Hilleman and his colleagues in 1965-1966. The investigators found:  "The reduction of cases of natural mumps (that is, protective efficacy) resulting from the vaccine was 97 per cent if only the laboratory-proved cases are considered. If, however, the later cases that occurred in families and have not yet been diagnosed in the laboratory are included, the protective efficacy would be about 95 per cent." Ex. 86 (Maurice Hilleman et al., *Live, Attenuated Mumps Virus Vaccine 4. Protective Efficacy as Measured in a Field Evaluation*. 276 New England J. of Medicine (1967)) at 256; *see also* Ex. 199 (Robert Weibel et al., *Live, Attenuated Mumps Virus Vaccine 3. Clinical and*

---

Jonathan Hartzel (hereinafter "Hartzel Dep.")) (testifying and affirming "investigators" and "site personnel" are "the individuals at the clinical sites that are enrolling the patients and observing them for safety and efficacy" and "drawing the blood from the patients"); Exs. 193 198 at 1 (clinicaltrials.gov archives indicating Protocol 007 was an "Efficacy Study"); Ex. 108 at '567 69 (Protocol 007 "measured the effectiveness of the vaccine at the potencies being studied."); Ex. 189 at '038 (Merck identified its sBLA, supported by Protocol 007, as an "Efficacy Supplement" on the face of its application); *Id.* at '116 ("In agreement with … FDA, the mumps specific PRN assay [AIGENT] was developed and used as a surrogate for vaccine effectiveness."); Ex. 137 at '321 ("The purpose … is to provide clinical data supporting a reduction in expiry potency …. This clinical data provides evidence … based on … [AIGENT] assay used as a surrogate marker for vaccine efficacy."); *see also* Ex. 359 at 58:4 7 (Deposition of Merck Employee Dr. Manal Morsy (hereinafter "Morsy Dep.")) (Efficacy and effectiveness are "interchangeable."); Merck Ex. 41 at 27:11 28:6 (CDC 30(b)(6) Pallansch Dep.) ("[E]fficacy is often measured in a specific clinical trial setting, where you know who is vaccinated and not … it's often also applied to a situation of measuring immunogenicity as well as disease in the context of those clinical trials…"); Merck SUMF4 ¶ 174 (describing Protocol 007 data as "data on the efficacy of the vaccine at potencies lower than 4.3 log10 TCID50/dose").

[250] *See supra* note 20.

128

Appx18879

*Serologic Aspects in a Field Evaluation*, 276 New England J. of Medicine 245 (1967)) at 245-251.

**Response**: Disputed to the extent the statement refers to Merck's MMR-II or ProQuad

vaccines, which did not exist at the time of Dr. Hilleman's 1965-1966 study. *See supra*

SUMF1 ¶¶ 31-34. Undisputed this statement accurately describes the 1965-66 field trial

conducted on MUMPSVAX®.

35.    In the context of vaccines, *effectiveness* "represents the percentage reduction in the frequency of . . . infections among people vaccinated compared to the frequency among those who were not vaccinated." Ex. 94 (CDC, Flu Vaccine Effectiveness: Q&A for Health Professionals) at 1; Ex. 111 (Freed Report) at 13 ¶ 46; *see also* Ex. 95 (CDC, *Manual for the Surveillance of Vaccine-Preventable Disease* (5th ed. 2012), http://www.cdc.gov/vaccines/pubs/surv-manual/front-portion.pdf) at ix (Vaccine effectiveness is the "ability of a vaccine to provide protection against disease when used under field conditions (e.g., use of the vaccine in routine practice).").

**Response**: Disputed that this definition is the only definition of effectiveness used "in the

context of vaccines." The term effectiveness is used interchangeably with efficacy in the

context of vaccine clinical trials, including by Merck, and includes immunogenicity testing

conducted as a surrogate of vaccine efficacy or effectiveness.[251] Undisputed that the

evidence cited contains the selectively quoted language. The cited document in full speaks

for itself.

36.    The term vaccine *impact* can be used to describe the comparison of the incidence of a disease in a given population before and after the introduction of a vaccine. Ex. 207 (M. Doherty, *Vaccine Impact: Benefits for Human Health*, 2016 *Vaccine* 6707) at 6708.

**Response**: Undisputed that vaccine impact "can" be defined as stated but disputed that there

is consensus among public health agencies, including the CDC, on what defines impact. [252]

37.    In part, because impact considers both vaccinated and unvaccinated individuals, it also accounts for effects such as "herd immunity," whereby "circulation of a bacteria or virus

---

[251] *See supra* note 19.

[252] Merck Ex. 207 at '6708 ("International agencies like … the Centers for Disease Control and Prevention have no consensus on what defines impact.").

may be decreased" because of the vaccine, "which lessens the chance that even someone who has not been immunized will get disease." Ex. 110 (FDA, *Vaccine Safety Questions and Answers* https://www.fda.gov/vaccines-blood-biologics/safety-availability-biologics/vaccine-safety-questions-and-answers).

**Response**: Disputed. The evidence cited does not support the proffered fact. The only potentially relevant portion of the FDA's Questions and Answers in Merck Exhibit 110 is at page 5 under the heading "Why don't we give parents a choice in deciding if they want to vaccinate children." The quoted phrases are contained in that section, but they are used in the context of encouraging high vaccination rates. In addition, "International agencies like … the Centers for Disease Control and Prevention have no consensus on what defines impact."[253]

    38.    In part because it would be unethical to randomize people into a placebo or no vaccine group after a vaccine has been licensed, it is generally not possible to conduct efficacy studies after a vaccine has been recommended for use. Ex. 94 (CDC, *Flu Vaccine Effectiveness and Efficacy is Measured: Questions and Answers for Health Professionals* (Jan. 29, 2016), http://www.cdc.gov/flu/professionals/vaccination/effectivenessqa.htm) (explaining that universal vaccine recommendations make it unethical to perform randomized clinical control trials because assigning individuals to the placebo-controlled group puts them at risk of infection).

**Response**: Disputed. Once a vaccine has been licensed, "universal vaccine recommendations make it unethical to perform *placebo controlled [randomized controlled trials]* because assigning people to a placebo group could place them at risk for serious complications."[254] It is possible to conduct efficacy studies after a vaccine has been recommended for use as Merck used the term "efficacy study" in describing the immunogenicity testing it conducted in Protocol 007.[255]

---

[253] *See supra* note 22.

[254] Merck Ex. 94 at '1 *2 (emphasis added)*.

[255] Rel. 56 Stat. ¶¶ 137 143 and 150 *citing among other evidence* Ex. 42 at '708 ("In addition, and more seriously, [FDA] challenged the efficacy of marketed product at the lowest predicted potencies (below label claim). … With regard to product efficacy, we provided an interim analysis of an ongoing mumps end expiry trial to justify efficacy of lower potency product. [FDA] accepted the Merck response."); Ex. 23 at 33:24 34:10 (Hartzel Dep.) (testifying

39.    CDC currently reports that "[t]wo doses of mumps vaccine are 88% (range 31% to 95%) effective at preventing the disease; one dose is 78% (range 49% to 91%) effective." Ex. 99 (CDC, *Mumps For Healthcare Providers*, https://www.cdc.gov/mumps/hcp.html) at 3.

**Response**: Disputed to the extent the point effectiveness data in the statement means the median effectiveness rate measured across multiple studies and that the lower-end of the range of these effectiveness results, as reported by the CDC, has consistently decreased since 2006.[256]  Also disputed to the extent Merck implies these statistics provide a complete and accurate picture of how well Merck's mumps vaccine works.  *See* Ex. 427 at '698 ("Please note that postmarketing field estimates of effectiveness are fraught with error, most often yielding results suggesting much lower protection than that seen using the same vaccine in a true efficacy trial.").  Undisputed that the evidence cited contains the selectively quoted language.  The cited document in full speaks for itself.

40.    The "preponderance of data demonstrate [mumps vaccines] to be highly effective and solely responsible for the near elimination of this once ubiquitous disease in all countries where mumps-containing vaccine is rigorously used." Ex. 197 (Rubin, *Vaccines* (2018)) at 688.

**Response**: Disputed to the extent neither "mumps vaccines" nor "highly effective" are defined making it impossible to answer.  The evidence appears to refer to all mumps vaccines and not just Merck's mumps vaccines.  Also disputed because the statement does not account

---

and affirming "investigators" and "site personnel" are "the individuals at the clinical sites that are enrolling the patients and observing them for safety and efficacy" and "drawing the blood from the patients"); Exs. 193 198 at 1 (clinicaltrials.gov archives indicating Protocol 007 was an "Efficacy Study"); Ex. 189 at '038 (Merck identified its sBLA, supported by Protocol 007, as an "Efficacy Supplement" on the face of its application); Ex. 137 at '321 ("The purpose … is to provide clinical data supporting a reduction in expiry potency ….  This clinical data provides evidence … based on … [AIGENT] assay used as a surrogate marker for vaccine efficacy."); *see also* Merck SUMF4¶ 174 (describing Protocol 007 data as "data on the efficacy of the vaccine at potencies lower than 4.3 log10 TCID50/dose").

[256] *See* Rel. 56 Add'l. Stat. SJ1 and SJ4 ¶ 45; Ex. 48 at 2 (*Recommendation of the Advisory Committee on Immunization Practices for Use of a Third Dose of Mumps Virus Containing Vaccine in Persons at Increased Risk for Mumps During an Outbreak*, MMWR, Jan. 12, 2018: 67(1); 33 38) ("The median effectiveness of 2 doses of MMR vaccine in preventing mumps is 88%, with estimates ranging from 31% to 95%").

for (i) the resurgence in mump cases since 2006[257]; (ii) the fact that Merck's mumps vaccine

is inadequate to control mumps outbreaks[258]; and (iii) there have been numerous calls for a

new mumps vaccine, including by the author of the quoted language.[259]  Undisputed that the

evidence cited contains the selectively quoted language.  The cited document in full speaks

for itself.

---

[257] *See supra* Rel. Resp. SUMF1 ¶ 36.

[258] *See* Rel. 56 Stat. ¶ 222, *citing* Ex. 7 at 151:1 8 (CDC 30(b)(6) Pallansch Dep.) ("Mumps is potentially something that could be eliminated … …  and the [mumps] outbreaks called that assumption into question."); Ex. 1 at 4, 14, 18, 20 (Shapiro Rep.) ("A new mumps vaccine is necessary if we wish to control mumps in the United States.") ("The resurgence of outbreaks has caused many to question the current understanding of how well Merck's mumps vaccine actually protects against disease.") ("use of the current vaccine is not likely to lead to a sustained decrease in the number of cases of mumps ….") ("Merck's mumps vaccine is not adequate to prevent outbreaks.") ("The factors that are associated with these [mumps] outbreaks, waning immunity, antigenic changes in the virus, and inadequate B cell memory induced by the vaccine, are not likely to change for the better.") ("[T]hese [mumps] outbreaks may continue to increase in both frequency and severity."); Ex. 160 at 8 (Relator Krahling's Response to Revised Interrogatory 1) ("[Dr.] Krah told Relator [Krahling] on multiple occasions that the efficacy rate of the mumps vaccine had significantly diminished since its original licensure. …  Krah further told Relator that based on this observation, Krah believed the MMRII vaccine no longer provided adequate immunization, and that the vaccine's diminished efficacy would result in mumps outbreaks in the future."); *see also infra* ¶¶ 223, 225 26 (citing evidence of calls for a new mumps vaccine).

[259] *See* Ex. 264 at '446 (Statement by FDA's Dr. Steve Rubin in support of application to study a new mumps vaccine) ("The proposed studies are of public health significance and are timely considering the recent resurgence of mumps in highly vaccinated populations in the United States and elsewhere, making it quite clear that newer, more immunogenic vaccines are needed."); Ex. 258 at 799 801 (2016 S. Rubin article) ("[I]t is clear that other approaches to improve vaccine effectiveness need to be pursued. Among these, development of new vaccines must be considered."); Ex. 4 at 404:24 405:5 (Kessler Dep.) ("[FDA's Dr.] Steve Rubin as [well as] other great virologists strongly support the develop[ment] of newer more immunogenic mumps vaccine to deal with the issues that we currently face as a country."); Rel. 56 Stat. ¶¶ 222 226 (collecting evidence of calls for a new mumps vaccine) *citing among other evidence* Ex. 1 at 4 and 17 (Shapiro Rep.) ("A new mumps vaccine is necessary if we wish to control mumps in the United States.") ("The seriousness of the resurgence of mumps in the United States is reflected in the recognition by many prominent vaccine experts, such as Stanley Plotkin, that there is a need for a new vaccine for mumps …."); Ex. 256 at 381 2 (2013 S. Plotkin article) ("We need a new mumps vaccine."); Ex. 262 at 1458 467 (2008 G. Dayan article) ("Our findings indicate the need for more effective mumps vaccines.") Ex. 255 at '631 (CDC: "Encourage development of more immunogenic and effective mumps vaccines."); Ex. 264 at '403 04 ("The fact that [mumps] outbreaks had occurred in populations with over 95% coverage of two dose [mumps] vaccine strongly suggests that the current vaccine is not effective. … All these possible causes indicate a need for a new vaccine that is effective against current outbreak strain of mumps virus.") ("Recently, large outbreaks in vaccinated populations have occurred at increasing frequency. The outbreaks of mumps virus … infection in vaccinated populations underscore the urgency and importance of developing a new and effective vaccine against mumps virus … that caused current outbreaks."); *see also* Ex. 409 at '47 (Summary of 2010 ACIP meeting regarding mumps outbreak) (Dr. Stanley A. Plotkin: "It's a complex situation that we have, but as I've said to my colleagues from Merck, we do need a better mumps strain than we currently have").

132

41.     During the first five years of this century, the number of mumps cases reported annually in the United States were at all-time lows, with only 200-300 cases being reported each year. Ex. 97 (CDC, MMWR, *Summary of Notifiable Diseases  United States, 2005* (Mar. 30, 2007), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm5453a1.htm) at 77.

**Response**:  Undisputed that from 2000 through 2005 there were approximately 200-300

mumps cases reported each year in the United States.  *See* Merck Ex. 97 at 78 (CDC,

MMWR, *Summary of Notifiable Diseases  United States, 2005* (Mar. 30, 2007),

https://www.cdc.gov/mmwr/preview/mmwrhtml/mm5453a1.htm) (reporting 338 mumps

cases in 2000, 266 mumps cases in 2001, 270 mumps cases in 2002, 231 mumps cases in

2003, 258 mumps cases in 2004, and 314 mumps cases in 2005).

42.     Since 2006, the number of mumps cases reported each year has generally numbered in the hundreds or low thousands    a significant decrease from the 186,000 cases reported each year in the pre-vaccine era. Ex. 99 (CDC, *Mumps For Healthcare Providers*, https://www.cdc.gov/mumps/hcp.html) at 2.

**Response**:  Disputed. The evidence cited does not support Merck's proffered fact that "the

number of mumps cases reported each year has generally numbered in the hundreds or low

thousands."  *See* Merck Ex. 99 at 2 ("the number of mumps cases can range from roughly a

couple hundred to a *couple* thousand") (emphasis added); *see also* Rel. 56 Stat. ¶ 196 (6,584

mumps cases reported in 2006; 2,612 mumps cases reported in 2010; 6,369 mumps cases

reported in 2016; 6,109 mumps cases reported in 2017; 2,424 mumps cases reported in 2019

as of September 14, 2019);[260] Merck Ex. 98 at 1 (CDC, *Mumps Cases and Outbreaks*,

https://www.cdc.gov/mumps/outbreaks.html) (2,251 mumps cases reported in 2018).

---

[260] *Citing* Ex. 234 at Table 2 (2006 CDC Summary of Notifiable Diseases); Ex. 235 at 29 (2009 CDC Summary of Notifiable Diseases); Ex. 236 at 24 (2010 CDC Summary of Notifiable Diseases); Ex. 237 at 105 (2012 CDC Summary of Notifiable Diseases); Ex. 238 at 31 (2013 CDC Summary of Notifiable Diseases); Ex. 239 at 48 (2014 CDC Summary of Notifiable Diseases); Ex. 240 at 53 54 (2015 CDC Summary of Notifiable Infectious Diseases and Conditions); Ex. 241 at Table 2j (2016 CDC Nat'l Notifiable Diseases Surveillance Sys., Annual Tables of Infectious Disease Data); Ex. 242 at Table 2j (2017 CDC Nat'l Notifiable Diseases Surveillance Sys., Annual Tables of Infectious Disease Data); Ex. 243 at Table 1y (2019 CDC Nat'l Notifiable Diseases Surveillance System, Weekly Tables of Infectious Disease Data (Week 37)); Ex. 1 at 9 11 (Shapiro Rep.) (describing mumps outbreaks).

133

Undisputed that the annual reported mumps cases since 2006 have been lower than 186,000.

*See* Merck Ex. 99 at 2.

43.     Consistent with statute and regulations, for the entire time period relevant to this case, the MMR-II vaccine has carried an FDA-approved label. *See* Ex. 226 (March 1995), Ex. 227 (March 1995), Ex. 165 (1995), Ex. 166 (Apr. 1999), Ex. 232 (Apr. 1999), Ex. 222 (Oct. 2000), Ex. 236 (Feb. 2000), Ex. 223 (Feb. 2001), Ex. 224 (Aug. 2001), Ex. 229 (Sept. 2002), Ex. 228 (Oct. 2003), Ex. 225 (Feb. 2006), Ex. 230 (Feb. 2007), Ex. 231 (Feb. 2007), Ex. 167 (Dec. 2007), Ex. 233 (Feb. 2014), Ex. 234 (June 2014), Ex. 235 (Oct. 2015), Ex. 237 (Mar. 2010), Ex. 238 (Dec. 2010), and Ex. 239 (Sep. 2009).

**Response**:  Disputed that there is factual support in the statement, or the record generally, for

the MMR-II label being "[c]onsistent with statute and regulations" for the time period

relevant to this case.[261]  Otherwise undisputed.

44.     Part of what FDA considers to be labeling is the insert that contains "Prescribing Information," which is "written for the healthcare practitioner."  The statements about the mumps vaccine in this Statement and accompanying Motion refer to the label and the Prescribing Information component of the insert interchangeably. Ex. 208 (FDA, *Prescription Drug Labeling Resources*, https://www.fda.gov/drugs/laws-acts-and-rules/prescription-drug-labeling-resources); *see* 21 C.F.R. § 201.56(e) (treating the Prescribing Information as contained within "drug labeling").

**Response**:  Undisputed as to the first sentence.  Disputed as to the second sentence.  The

evidence cited does not support that "statements about the mumps vaccine in this Statement

and accompanying Motion refer to the label and the Prescribing Information component of

the insert interchangeably" and it is not appropriately a statement of undisputed facts.

---

[261] Rel. 56 Stat. ¶¶ 43 44 *citing among other evidence* Ex. 3 ¶¶ 419, 419.14 (Kessler Rep.) ("From at least 1998 December 2007, Merck did not have adequate procedures to assure that MMR II vaccine had 'not less than 4.3 [log]' … through end expiry.") ("From May 1998 December 2007, MMR II was adulterated because Merck was unable to assure the potency specification for mumps of not less than 4.3 [log] … for the shelf life of the vaccine."); Ex. 4 at 281:6 16 (Kessler Dep.) ("[P]roduct … manufactured after the [Overfill] was adulterated" because "there was not assurances that it would be within the 4.3 [log] based on Merck's internal representations."); Ex. 87 at '854 ("Mis[]branded   stability continues to be an issue, even with the increase in mumps and reduction of end expiry of 4.0 [log]."); Ex. 88 at '005 ("[W]e are on a very constrained time line to file [the sBLA to lower the minimum mumps potency specification using Protocol 007] this year as we are out of compliance."); *see also* Ex. 2 at 7 (Malone Rep.) ("The M M R II … package insert [is] inaccurate, false and misleading in claiming and/or suggesting Merck has conducted clinical studies demonstrating these vaccines afford protection against mumps."); Ex. 3 at ¶ 429 30 (Kessler Rep.) ("The MMRII label from 2005 to the present was misleading).

45.    In discussing efficacy, since 1999, the label has explained:  "Efficacy of measles, mumps and rubella vaccines was established in a series of double-blind controlled field trials which demonstrated a high degree of protective efficacy afforded by the individual vaccine components."  In a footnote, the label cites to the Hilleman and Weibel studies as support for this statement. Ex. 166 (April 1999 Label) at MRK-KRA00757072; Ex. 167 (December 2007 Label) at MRK-KRA00757100; Ex. 121 (current label, *available at* https://www.merck.com/product/usa/pi circulars/m/mmr ii/mmr ii pi.pdf) at 2.

**Response**:  Disputed that the quoted language from the label either "discusses" or "explains"

efficacy.  The label statement speaks for itself.  Also disputed to the extent the statement

implies that the Hilleman and Weibel studies, which were conducted roughly fifty years ago,

relate to the MMR-II product Merck has been selling since 2000.[262]  Undisputed that since

1999 the MMR-II label has stated: "Efficacy of measles, mumps and rubella vaccines was

established in a series of double-blind controlled field trials which demonstrated a high

degree of protective efficacy afforded by the individual vaccine components" with a footnote

to the Hilleman and Weibel studies as support for that statement.

46.    In discussing evidence of impact, since 1999, the label has explained that:  "The impact of measles, mumps, and rubella vaccination on the natural history of each disease in the United States can be quantified by comparing the maximum number of measles, mumps, and rubella cases reported in a given year prior to vaccine use to the number of cases of each disease reported in 1995. . . .[F]or mumps, 152,209 cases reported in 1968 compared to 840 cases reported in 1995 resulted in a 99.45% decrease in reported cases."  Ex. 166 (April 1999 Label) at MRK-KRA00757072; Ex. 167 (December 2007 Label) at MRK-KRA00757100; Ex. 121 (current label) at 1.

---

[262] Rel. 56 Stat. ¶ 187 *citing among other evidence* Ex. 20 at 235 (Merck Response to Request for Admission 300) (Merck "admits that the double blind controlled efficacy trials referenced in the package insert for M M R®II were conducted prior to 1970."); Ex. 223 at '261, '268 (references 13 15 citing studies from 1961, 1966, and 1970); Ex. 146 at 106:16 107:2 (Deposition of Merck's 30(b)(6) Witness Dr. Barbara Kuter (hereinafter "Merck 30(b)(6) Kuter Dep.")) ("Q. So this information about seroconversion parallel protection from diseases all comes from studies from 1967 or 1968?  A. Yes.  Q. Does Merck have more current information as to whether seroconversion from the mumps vaccine parallels protection from mumps?  A. Again, we have no ability to conduct efficacy studies of this nature, so no."); *id.* at 111:20 24 ("Q. Does Merck have any current information that indicates that seroconversion parallels protection from mumps?  A. Again, we don't have the ability to do that.").

**Response**: Disputed that the quoted language from the label provides evidence of impact.[263]

Also disputed that the quoted language, which only compares the number of cases in 1967 to

1995 provides evidence of impact after the resurgence of mumps since 2006.[264]  Also

disputed that the quoted language "discusses" or "explains" evidence of impact since there is

"no consensus on what defines impact."[265] Undisputed that the statement accurately quotes

what has been in the MMR-II label since 1999.

47.    Included in the FDA-approved label for MMR-II is a statement concerning the *potency* of the MMR II vaccine. *See* Ex. 121 (current label).

**Response**: Undisputed.

48.    *Potency* in the label describes the concentration of virus in each dose of vaccine. Ex. 122 (Morrisey Dep. Tr.) at 27:23-28:13.

**Response**: Undisputed.

49.    Potency in the label is reported in units of "tissue culture infective dose" ($TCID_{50}$). Potency values expressed using this measurement represent the viral concentration necessary to induce cell death or pathological changes in 50% of inoculated cell cultures. Ex. 91 (Gulati Report) at ¶ 22.

**Response**: Undisputed.

50.    Potency values can be expressed as simple numbers or as log base 10 values (*e.g.*, 20,000 $TCID_{50}$ or 4.3 $\log_{10} TCID_{50}$). Ex. 200 (Musey Dep. Tr.) at 102:2-19.

**Response**: Undisputed.

---

[263] Ex. 405 at '691 92 (Internal Merck 2016 email) ("Our MMR II label contains multiple instances where the data is not supported by substantial evidence.  Please see the attached MMR II US [Package Insert]. … the text in yellow … will need to be amended or removed.") (referencing MRK KRA02008695); Ex. 406 at '695 (package insert with information highlighted to be amended or removed because of lack of substantial evidence includes the claim on impact of mumps vaccination on the natural history of mumps cited in Merck Exhibits 166, 167 and 121).

[264] Rel. 56 Stat. ¶ 195 *citing among other evidence* Ex. 1 at 9 12 (Shapiro Rep.) (citing publications) ("[S]ince early 2006 there have been numerous, large outbreaks of mumps in the United States, with nearly 15,000 reported mumps cases since 2014."); Ex. 4 at 147:17 149:12 (Kessler Dep.) (The statement that "there's been a 99 percent decrease in mumps cases since the vaccine was introduced in 1967 … would probably be an incomplete statement … the CDC [website says] … 'Although the United States experienced a 99 percent reduction in mumps cases following implementation of the two dose vaccination program in 1989, mumps has resurged in the past ten years.' … So I think [Merck's] data is correct, but it's somewhat out of date.").

[265] *See supra* note 8.

**Appx18887**

51.     As of the late 1990s, the M-M-R II label stated that "[e]ach 0.5 mL dose contains not less than . . . 20,000 $TCID_{50}$ of mumps virus" equivalent to 4.3 $log_{10}$ $TCID_{50}$. Ex. 166 (April 1999 Label), at 1.  After the FDA approved the change to the label in 2007, the M-M-R II label stated that "[e]ach 0.5 mL dose contains not less than … 12,500 TCID50 of mumps virus" equivalent to 4.1 $log_{10}$ $TCID_{50}$. Ex. 167 (Current Label) at 1.

**Response**: Undisputed that from 1999-2007 the MMR-II label stated that "[e]ach 0.5 mL

dose contains not less than . . . 20,000 $TCID_{50}$ of mumps virus" equivalent to 4.3 $log_{10}$

$TCID_{50}$.[266]

52.     The mumps vaccine is a live virus vaccine containing live viral cells, and as such, the volume of live cells in the vaccine (i.e. potency) is known to decrease over time. This degradation can be impacted by environmental conditions, including, for example, the temperature at which the vaccine is stored. Ex. 112 (Excerpts of Phillip L. Gomez & James M. Robinson, *Vaccine Manufacturing* in Stanley Plotkin et al. eds., *Vaccines* (2018 7th ed.) at 54; Ex. 91 (Gulati Report) at ¶ 24.

**Response**: Undisputed.

53.     The CDC administers the federal Vaccines for Children (VFC) program. Ex. 38 (About VFC, https://www.cdc.gov/vaccines/programs/vfc/about/index.html (last reviewed Sept. 26, 2019).

**Response**: Undisputed.

54.     The VFC program helps "provide vaccines to children whose parents or guardians may not be able to afford them." *Id*. Vaccines available through the VFC program "are those recommended by [ACIP]." *Id*.

**Response**: Undisputed.

55.     VFC is an entitlement program. Under this program, the CDC is directed to purchase vaccines that ACIP has included within the VFC program. 42 U.S.C. § 1396s(d)(1) ("[t]he Secretary shall negotiate and enter into contracts with manufacturers of pediatric vaccines . . . to purchase vaccines."); *see also id*. § 1396s(e) ("The Secretary shall use, for the purpose of the purchase, delivery, and administration of pediatric vaccines under this section, the list established (and periodically reviewed and as appropriate revised) by the Advisory Committee on Immunization Practices (an advisory committee established by the Secretary, acting through the Director of the Centers for Disease Control and Prevention)."); *see also* Ex. 39 (ACIP Charter, *available at* https://www.cdc.gov/vaccines/acip/committee/acip-charter.pdf

---

[266] *See* Merck SUMF1 ¶ 50 *citing* Merck Ex. 222 (Oct. 2000), Merck Ex. 236 (Feb. 2000), Merck Ex. 223 (Feb. 2001), Merck Ex. 224 (Aug. 2001), Merck Ex. 229 (Sept. 2002), Merck Ex. 228 (Oct. 2003), Merck Ex. 225 (Feb. 2006), Merck Ex. 230 (Feb. 2007), Merck Ex. 231 (Feb. 2007).

(approved March 27, 2018)) at 2 ("In accordance with Section 1928 of the Social Security Act, the ACIP also shall establish and periodically review and, as appropriate, revise the list of vaccines for administration to children and adolescents eligible to receive vaccines through the Vaccines for Children Program . . . The Secretary, and as delegated CDC Director, shall use the list established by the ACIP for the purpose of the purchase, delivery, and administration of pediatric vaccines in the Vaccines for Children Program."); Ex.40 (Nichols Report) at 8-10.

**Response**: Disputed to the extent Merck implies that CDC must contract "to purchase

vaccines that ACIP has included within the VFC program." *See* Ex. 41 at 105:8-22 (Merck

Expert Nichols Dep.) ("CDC is not in full control of [contracting to purchase] … the

mandatory nature of it is that CDC, in my opinion, has to at least try to establish a contract

for the product that the ACIP has recommended.").  Otherwise undisputed.

56.    The purchase of Merck's mumps-containing vaccines by CDC is mandatory because Merck's MMR-II and ProQuad vaccines are licensed by FDA and mumps is included within the VFC program per ACIP resolution. Ex. 41 (Pallansch Dep. Tr.) at 101:6-8 (CDC's Director of the Division of Viral Diseases in the National Center for Immunization and Respiratory Diseases testifying that once a vaccine is recommended by ACIP "then the purchase [by CDC] through VFC . . . is automatic"); Ex. 40 (Nichols Report) at 11; Ex. 42 (1971 MMR Product License) at MRK-KRA01972538 ; Ex. 43 (1995 MMR Product License at MRK-KRA01676252; Ex. 44 (Establishment License) at MRK-KRA01676250); *see also* Ex. 45 (ACIP Resolution 10/17-3 for MMR and Varicella (Oct. 25, 2017) (including vaccine for measles, mumps, rubella (MMR) and measles, mumps, rubella, varicella (MMRV) within current recommended ACIP schedule); *see also* Ex. 46 (ACIP Resolution 6/06-1, June 29, 2016) (listing mumps for inclusion in the list of diseases for which vaccines should be in the VFC program).

**Response**: Disputed that the CDC's purchase of Merck's mumps vaccines is mandatory or

automatic. *See* Ex. 41 at 105:8-22 (Merck Expert Nichols Dep.) ("CDC is not in full control

of [contracting to purchase] … the mandatory nature of it is that CDC, in my opinion, has to

at least try to establish a contract for the product that the ACIP has recommended."). *See*

*also id*. at 105:15-16, 106:7-9 ("[E]stablishing a contract is far from automatic."); ("I took

issue with the word "automatic" having worked in the procurement and grants office …").

57.    "The ACIP includes 15 voting members responsible for making vaccine recommendations.  The Secretary of the U.S. Department of Health and Human Services (DHHS) selects these members following an application and nomination process.  Fourteen of the members have expertise in vaccinology, immunology, pediatrics, internal medicine, nursing,

family medicine, virology, public health, infectious diseases, and/or preventive medicine; one member is a consumer representative who provides perspectives on the social and community aspects of vaccination.  In addition to the 15 voting members, ACIP includes 8 ex officio members who represent other federal agencies with responsibility for immunization programs in the United States, and 30 non-voting representatives of liaison organizations that bring related immunization expertise."  Ex. 209 (CDC, *ACIP Committee Members*, https://www.cdc.gov/vaccines/acip/members/index.html)

**Response**:  Undisputed the CDC website

https://www.cdc.gov/vaccines/acip/members/index.html currently contains the quoted

language.  The cited document (Merck Ex. 209) in full speaks for itself.

58.     The ACIP membership includes some of the leading figures in vaccine expertise. Ex. 41 (Pallansch Dep. Tr.) at 44:11-44:14, 47:20-48:3.

**Response**:  Undisputed.

59.     ACIP's charter provides a description of its duties. It states in part:  "Committee deliberations on use of vaccines to control disease in the U.S. shall include considerations of disease epidemiology and burden of disease, vaccine efficacy and effectiveness, vaccine safety, the quality of evidence reviewed, economic analyses and implementation issues."  Ex. 39 (ACIP Charter, *available at* https://www.cdc.gov/vaccines/acip/committee/charter.html) at 2; *see also* Ex. 47 (ACIP Policies and Procedures (Dec. 2018) at 1.

**Response**:  Undisputed.

60.     Once a vaccine is licensed, the data most important to ACIP when evaluating the use of a vaccine to control disease is that regarding the vaccine's safety and effectiveness. Ex. 49 (Atkinson Report) at 16-17.

**Response**:  Undisputed.

61.     Evaluations of vaccine effectiveness and the conduct of outbreak investigations are the responsibility of CDC. The mission statement for the National Center for Immunization and Respiratory Diseases (NCIRD), one of four Centers within CDC Office of Infectious Diseases, identifies "respond[ing] to disease outbreaks domestically and abroad" as a responsibility. The Division of Viral Diseases (DVD), a division of the NCIRD, identifies as its mission the "prevent[ion of] disease, disability, and death through immunization and by control of . . . viral diseases."  In furtherance of this mission, the DVD, for example, conducts surveillance and related activities to monitor the impact of vaccination, estimates vaccine effectiveness, and consults, supports, and/or participates in investigations of national and international outbreaks of viral vaccine preventable diseases. Ex. 50 (NCIRD Mission/Function Statement, https://www.cdc.gov/maso/pdf/NCIRDfs.pdf) at 1, 8.

Appx18890

**Response**:  Disputed because the statement implies Merck does not have an independent duty to ensure its vaccines are safe and effective.[267]  Also disputed because Merck has a continuous obligation to report to the CDC and FDA all information material to how well the vaccine protects against disease.[268]

62.     Consistent with this mission, a "major" responsibility and a "key function" of CDC is to "measure vaccine effectiveness for both old and new products."  Ex. 41 (Pallansch Dep. Tr.) at 33:19-21, 101:10-16.

**Response**:  Undisputed.

63.     Because "[e]ffectiveness is the [CDC's] single-most important measure in terms of the impact that a vaccine has on disease in the population," CDC conducts vaccine effectiveness studies either independently or often times in collaboration with state health departments and/or academics. *Id.* at 33:3-5, 42:17-19.

---

[267]  Rel. 56 Stat. ¶ 11, *citing* Ex. 14 at '088 ("We recognize that [Merck is] the sole supplier to the United States of measles, mumps, rubella and varicella containing vaccines, and as such, we are responsible for ensuring the uninterrupted supply of safe and efficacious vaccines."); Ex. 3 ¶ 378 (Kessler Rep.) (It is "the manufacturers' responsibility to ensure their vaccines are safe and effective and have labeling that is not false or misleading."); Ex. 4 at 356:14 17 (Kessler Dep.) ("[I]t's [Merck's] responsibility to assure the safety and efficacy of the vaccine."); 21 C.F.R. § 201.57(c)(2) ("All indications [for a drug] shall be supported by substantial evidence of effectiveness based on adequate and well controlled studies); *Wyeth v. Levine*, 555 U.S. 555, 566 (2009) ("[FDCA] amendments required the manufacturer to prove the drug's effectiveness by introducing 'substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling.'").

[268] Rel. 56 Stat. ¶¶ 15 16, *citing Mazur v. Merck & Co.*, 767 F. Supp. 697, 701 03 (E.D. Pa. 1991) (describing Merck's delegation of its duty to warn to the CDC through a provision in the Merck/CDC vaccine purchase contract); Ex. 249 at 143:25 145:4 (CDC 30(b)(6) Sims Dep.) (Merck requests its contracts with CDC include this delegation of its duty to warn to CDC); 42 U.S.C. § 300aa 22 (incorporating into National Childhood Vaccine Injury Act delegation of duty to warn to CDC); *Mazur v. Merck & Co.*, 964 F.2d 1348, 1365 66 (3d Cir. 1992) ("[Merck's] responsibility [to provide accurate and up to date safety and efficacy information to the CDC] is continuous, and it must therefore apprise the CDC of any risks it later discovers, or in the exercise of reasonable care, should have discovered."); Ex. 3 ¶ 138 39 (Kessler Rep.) (vaccine manufacturers have duty to apprise the government of problems concerning "vaccine efficacy, including duration of protection, immunogenicity … and stability"); *id.* at ¶ 138 (Kessler Rep.) ("To fulfill its obligations under the [National Childhood Vaccine Injury Act] with respect to its duty to warn of potential vaccine risks or hazards, a manufacturer must provide adequate warnings and directions to the intermediary who … provides the information to the vaccine recipient."); *see also infra* ¶¶ 249, 269 (citing evidence of duty to warn); Ex. 6 at 55:5 10, 142:19 22, 145:14 21(Merck Expert Burlington Dep.) (testifying lack of efficacy or effectiveness "would be one of the reportable concerns that a manufacturer would have to tell the agency") (testifying if Merck knew it did not comply with potency specification, then "if the product is … within the expiry dating period, they have an obligation to report that to the [FDA], … investigate[,] and … take any appropriate actions."); Ex. 3 ¶ 379 (Kessler Rep.) (The "manufacturer must provide updates with any information it later discovers, or in the exercise of reasonable care, should have discovered about its vaccine … such as vaccine efficacy, including duration of protection, immunogenicity … and stability ...").

**Response**:  As to the first sentence, disputed to the extent the evidence cited does not support Merck's proffered fact that the "CDC conducts vaccine effectiveness studies either independently or often times in collaboration with state health departments and/or academics" *because* "[e]ffectiveness is the [CDC's] single-most important measure." Undisputed that Dr. Pallansch testified "[e]ffectiveness is the [CDC's] single-most important measure in terms of the impact that a vaccine has on disease in the population" and also that effectiveness studies "can be conducted by CDC, other state health departments, and with or without collaborations of academic collaborators."  As to the second sentence, disputed to the extent the statement ignores that ACIP is "mandated" by "the [ACIP] charter" to "review those clinical trials and the efficacy and safety data resulting from those trials and uses that information in assessing what recommendations, if any, it's going to make." Ex. 15 at 91:19-92:19 (Merck Expert Temte Dep.).[269]  As to both sentences, disputed to the extent Merck implies the CDC does not review and rely on the vaccine labels for an understanding about the vaccine's shelf life, potency, clinical trial results, and basis for licensure.  Rel. 56. Stat. ¶ 178.[270]  Otherwise undisputed.

---

[269] *See also* Rel.56 Stat. ¶ 239, *citing among other evidence* Ex. 252 at 29 30 (Merck Expert Temte Rep.) ("New vaccine recommendations … are largely dependent on the results of studies conducted by the manufacturer.  These studies are required for licensure by the FDA and include detailed information on safety, efficacy, and other vaccine features."); Ex. 252 at 49 (Merck Expert Temte Rep.) ("ACIP uses clinical trial data for new vaccines."); Ex. 15 at 97:17 19 (Merck Expert Temte Dep.) ("ACIP will look at the clinical trial data for all new vaccines to evaluate … effectiveness."); Ex. 22 at 22 (Merck Expert Atkinson Rep.) ("Clinical trial data (efficacy and safety) generated by the manufacturer help inform subsequent recommendations made by the ACIP."); Ex. 22 at 23 (Merck Expert Atkinson Rep.) ("Initial vaccine recommendations made by ACIP are based upon … efficacy and safety data generated by the manufacturer in clinical trials."); Ex. 22 at 23 (Merck Expert Atkinson Rep.) ("ACIP recommendations … will be based upon pre licensure clinical trials performed by the manufacturer.").

[270] *Citing* Ex. 245 at 160:5 168:8 (Merck Expert Atkinson Dep.) (testifying he reviewed all vaccine labels as part of his work at the CDC because "there's important information … to describe the studies that led to licensure. … There's important information in all package inserts because of what FDA requires to be included that is helpful in my role as being someone who tries to educate doctors and nurses about the characteristics of any given vaccine.") ("Q. What's the basis of your understanding as to what Merck did to support its application, license application, for ProQuad?  A. I reviewed the label.") (testifying label contains "important information I need to know" and that it "oftentimes [is] the best description of how the vaccine was approved.  In the case of ProQuad, that was the case.")

64.    "Vaccine effectiveness studies in general are not often conducted by the manufacturers." *Id.* at 42:15-16.

**Response**:  As to the first sentence, disputed.  *See* Ex. 428 at 2 (Merck Expert Atkinson Dep., Ex. 2) (CDC identifying as inaccurate or incomplete excerpt of Merck Expert Atkinson's expert report stating "[n]either the FDA nor the manufacturer participate in the evaluation of post-licensure vaccine effectiveness," citing to manufacturer-conducted post-marketing studies of long-term efficacy and immunogenicity of the shingles vaccine).  Also disputed to the extent Merck implies clinical trials conducted by manufacturers do not speak to vaccine effectiveness.  Ex. 429 at 1 (FDA, Ensuring the Safety of Vaccines in the United States, available at https://www.fda.gov/files/vaccines,%20blood%20&%20biologics/published/Ensuring-the-Safety-of-Vaccines-in-the-United-States.pdf) ("The results of the clinical trials are a part of FDA's evaluation to assess the safety and effectiveness of each vaccine.").  As to the second sentence, disputed because the statement ignores that vaccine manufacturers are obligated to report to the CDC all information material to how well the vaccine protects against disease, published or not.  *See* Rel. 56 Stat. ¶ 15.[271]  *See also* Ex. 7 at 111:22-112:2

---

(testifying CDC's understanding of clinical trial results supporting licensure, shelf life, and potency comes from the label); ECF No. 49 2 (Merck's Reply in Supp. of Mot. to Dismiss) at 2 (the vaccine label is "the definitive source of product information under the FDA's regulatory scheme"); *Mazur v. Merck & Co.*, 964 F.2d 1348, 1367 (3d Cir. 1992) ("The [vaccine label's] intended audience is not the ultimate user, but rather … the CDC, who [is] contractually obligated to develop a meaningful warning for vaccinees or their parents.") ("[T]he [vaccine label's] intended audience here is the CDC, who Merck contractually obligated to develop a warning in lay terms").

[271]  *Citing Mazur v. Merck & Co.*, 767 F. Supp. 697, 701 03 (E.D. Pa. 1991) (describing Merck's delegation of its duty to warn to the CDC through a provision in the Merck/CDC vaccine purchase contract); Ex. 249 at 143:25 145:4 (CDC 30(b)(6) Sims Dep.) (Merck requests its contracts with CDC include this delegation of its duty to warn to CDC); 42 U.S.C. § 300aa 22 (incorporating into National Childhood Vaccine Injury Act delegation of duty to warn to CDC); *Mazur v. Merck & Co.*, 964 F.2d 1348, 1365 66 (3d Cir. 1992) ("[Merck's] responsibility [to provide accurate and up to date safety and efficacy information to the CDC] is continuous, and it must therefore apprise the CDC of any risks it later discovers, or in the exercise of reasonable care, should have discovered."); Ex. 3 ¶¶ 138 39 (Kessler Rep.) (vaccine manufacturers have duty to apprise the government of problems concerning "vaccine efficacy, including duration of protection, immunogenicity … and stability"); *id.* at ¶ 138 (Kessler Rep.) ("To fulfill its obligations under the [National Childhood Vaccine Injury Act] with respect to its duty to warn of potential vaccine risks or hazards, a manufacturer must provide adequate warnings and directions to the intermediary who … provides the information to the vaccine recipient."); *see also infra* ¶¶ 249, 269 (citing evidence of duty to warn).

(CDC 30(b)(6) Pallansch Dep.)  (CDC 30(b)(6) Pallansch Dep.) ("What [CDC does] is use information that manufacturers are willing to provide, often unpublished, that can inform the work group of data relevant to the question of vaccine efficacy or effectiveness. Often it's efficacy that's the data that they have.").

65.    The CDC has conducted multiple mumps effectiveness studies and after them has concluded that "[t]here has been no significant change in the estimates of vaccine effectiveness for more than 10 years in general"    referring to the 10 year period ending in October 2017. *Id.* at 129:7-11; *see also* Ex. 49 (Atkinson Report) at 8.

**Response**:  Disputed because Merck does not account for the fact that this reference to effectiveness means the median effectiveness rate measured across multiple studies and that the lower-end of the range of these effectiveness results, as reported by the CDC, has consistently decreased since 2006.[272]  Undisputed that CDC has conducted multiple mumps effectiveness studies.

66.    The CDC has noted that "[c]linical studies conducted before vaccine licensure in approximately 7,000 children found a single dose of mumps vaccine to be approximately 95% effective in preventing mumps disease. However, vaccine effectiveness estimates have been lower in post-licensure studies." Ex. 51 (Huong McLean et al., *Prevention of Measles, Rubella, Congenital Rubella Syndrome, and Mumps, 2013:  Summary Recommendations of the [ACIP],* MMWR, June 14, 2013, 62(4):1-34) at 10.

**Response**:  Undisputed that the evidence cited contains the selectively quoted language (along with citations that Merck omitted from its statement).  The cited document in full speaks for itself.

67.    In 1998, the CDC observed that in "controlled clinical trials, one dose of vaccine was approximately 95% efficacious in preventing mumps disease" but the effectiveness of the vaccine observed in field studies was lower ranging from 75% to 95%.  Ex. 53 (CDC, *MMR Vaccine Use and Strategies for Elimination of Measles, Rubella, and Congenital Rubella Syndrome and Control of Mumps,* MMWR, May 22, 1998: 47 (RR-8), 1-57) at 6.

**Response**:  Undisputed.

---

[272] *See supra* note 26.

Appx18894

68.     The CDC has known since at least the early 1980s that the vaccine effectiveness estimates for mumps have ranged from 75% to 95%. *See, e.g.*, Ex. 214 [November 26, 1982 MMWR] (Recommendation of the Immunization Practices Advisory Committee Mumps Vaccine) at 2; Ex. 213 [June 9, 1989 MMWR] (Recommendations of the Immunization Practices Advisory Committee Mumps Prevention) at 2.

**Response**:  Disputed.  The evidence cited does not support Merck's proffered statement that "CDC has known since at least the early 1980s that the vaccine effectiveness estimates for mumps have ranged from 75% to 95%."  Merck Ex. 214 ("Reported clinical vaccine efficacies have ranged from 75%-90%).  Also disputed because Merck does not account for the fact that the lower-end of the range of these effectiveness results, as reported by the CDC, has consistently decreased since 2006 and is currently 31%.[273]

69.     Accordingly, the CDC understands "that the effectiveness of the vaccine in the real world application is lower than the efficacy that was found in the initial clinical trials." Ex. 41 (Pallansch Dep. Tr.) at 39:11-20.

**Response**:  Disputed to the extent the word "[a]ccordingly" invokes unspecified facts outside the statement which makes it impossible to answer as a stand-alone fact.  Undisputed that the evidence cited contains the selectively quoted language.

70.     The CDC's current view is that the recommended two doses of the MMR vaccine are "88% effective against mumps." Ex. 52 (CDC, *Measles, Mumps, and Rubella (MMR) Vaccination: What Everyone Should Know*, https://www.cdc.gov/vaccines/vpd/mmr/public/index.html)at 4.

**Response**:  Disputed. CDC has stated that two doses of MMR have a *median* mumps effectiveness rate of 88%, with the current range of mump effectiveness rates spanning from 31% to 95%.[274]

71.     The CDC's VFC contracts with Merck concerning the purchase of its mumps-containing vaccines do not include any terms that require a vaccine meet or have previously met any specific effectiveness rate, efficacy rate, seroconversion rate, specified potency value, or safety requirements (each of the below collective referred to herein as the "CDC Contracts"):

---

[273] *See supra* note 26.

[274] *See supra* note 26.

**Appx18895**

| Contract Year | Award / Effective Date | Exhibit No. | Bates No. | Mumps Products Included |
|---|---|---|---|---|
| 1998 | 5/5/1998 | 54 | MRK-KRA01371728 | M-M-R II |
| 1999 | 4/1/1999 | 55 | MRK-KRA01371751 | M-M-R II |
| 2000 | 4/1/2000 | 56 | MRK-KRA01371693 | M-M-R II |
| 2001 | 4/1/2001 | 57 | MRK-KRA01371656 | M-M-R II |
| 2002 | 4/1/2002 | 58 | MRK-KRA01371785 | M-M-R II |
| 2003 | 4/1/2003 | 59 | MRK-KRA01371311 | M-M-R II |
| 2004 | 4/1/2004 | 60 | MRK-KRA01371280 | M-M-R II |
| 2005 | 4/1/2005 | 61 | MRK-KRA01371341 | M-M-R II |
| 2006 | 4/1/2006 | 62 | MRK-KRA01371624 | M-M-R II & ProQuad |
| 2007 | 4/16/2007 | 63 | MRK-KRA01371604 | M-M-R II & ProQuad |
| 2008 | 4/1/2008 | 64 | MRK-KRA01371817 | M-M-R II & ProQuad |
| 2009 | 4/1/2009 | 65 | MRK-KRA01371880 | M-M-R II & ProQuad |
| 2010 | 4/1/2010 | 66 | MRK-KRA01371373 | M-M-R II & ProQuad |
| 2011 | 4/1/2011 | 67 | MRK-KRA01371497 | M-M-R II |
| 2012 | 4/1/2012 | 68 | MRK-KRA01371398 | M-M-R II & ProQuad (as optional) |
| 2013 | 4/1/2013 | 69 | MRK-KRA01371422 | M-M-R II & ProQuad |
| 2014 | 4/1/2014 | 70 | MRK-KRA01371473 | M-M-R II & ProQuad |
| 2015 | 4/1/2015 | 71 | MRK-KRA01372045 | M-M-R II & ProQuad |
| 2016 | 4/1/2016 | 72 | MRK-KRA01371962 | M-M-R II & ProQuad |

**Response**: As to the first sentence, undisputed. As to the second sentence, disputed because

VFC contracts contain numerous requirements including meeting the minimum 12-month

145

shelf life; complying with cGMP (including with adequate assurances of meeting minimum

potency value through shelf life and safety); complying with the warranty of merchantability;

and apprising the CDC of any issues with the vaccine.  Rel. 56 Stat. ¶¶ 246-49.[275]

---

[275] *Citing* Ex. 249 at 72:25 73:5, 122:22 123:15 (CDC 30(b)(6) Sims Dep.) (testifying CDC requires 12 month shelf life remaining on vaccines it purchases); Ex. 249 at 112:3 19 (CDC 30(b)(6) Sims Dep.) (testifying "shelf life" provisions are among the "important terms, certainly"); Ex. 249 at 75:12 20, 77:1 4, 128:21 23 (CDC 30(b)(6) Sims Dep.) (testifying if vaccine shelf life is less than 12 months after delivery, CDC may ask for money back); Ex. 249 at 76:2 5, 124:17 25 (CDC 30(b)(6) Sims Dep.) (testifying if vaccine unable to meet 12 month shelf life after delivery, manufacturer "would certainly need to let us know"); Ex. 249 at 163:5 12 (CDC 30(b)(6) Sims Dep.) (testifying if manufacturer becomes aware of something that violates contract terms or conditions, like 12 month shelf life requirement, manufacturer "would notify" CDC); Ex. 265 at 16 (Merck Expert Nichols Rep.) ("CDC contracts require that … Merck's mumps containing vaccines have a 'minimum 12 month shelf life remaining upon delivery' to CDC."); Ex. 41 at 45:1 20 (Merck Expert Nichols Dep.) (testifying CDC contract "could be void" if CDC learned expiration date on vaccine label was not true expiration date); Ex. 41 at 97:13 23 (Merck Expert Nichols Dep.) (testifying CDC would never knowingly purchase expired vaccine and health care providers would not use it); Ex. 41 at 19:6 20:9 (Merck Expert Nichols Dep.) ("CDC would not initiate procurement for a product without [certain] characteristics," including "a 12 month shelf life"); Ex. 41 at 19:6 20:15 (Merck Expert Nichols Dep.) ("CDC would not release an RFP to get proposals from potential vendors and would not accept a proposal without the product having [certain] qualifications," including "a 12 month shelf life"); Ex. 41 at 29:24, 30:4 5 (Merck Expert Nichols Dep.) (identifying minimum "12 month shelf life" as one of the "prerequisites to a CDC purchase of a [VFC] vaccine"); Ex. 249 at 77:7 10 (CDC 30(b)(6) Sims Dep.) (testifying cGMP compliance is key CDC contractual term); Ex. 249 at 193:19 194:2 (CDC 30(b)(6) Sims Dep.) (testifying cGMP violations "[c]ertainly … would be a violation of the terms and conditions of the [CDC] contract, and certainly [CDC would] want to know"); Ex. 249 at 192:20 193:10 (CDC 30(b)(6) Sims Dep.) (testifying if cGMP compliance issue potentially impacts the contract, the CDC certainly would discuss that issue); Ex. 41 at 19:6 20:9 (Merck Expert Nichols Dep.) ("CDC would not initiate procurement for a product without [certain] characteristics," including compliance with cGMP); Ex. 41 at 19:6 20:15 (Merck Expert Nichols Dep.) ("CDC would not release an RFP to get proposals from potential vendors and would not accept a proposal without the product having [certain] qualifications," including compliance with cGMP); Ex. 41 at 30:1 5 (Merck Expert Nichols Dep.) (identifying compliance with "CGMP" as one of the "prerequisites to a CDC purchase of a [VFC] vaccine"); Ex. 5 ¶ 26 (Merck Expert Burlington Rep.) ("The cGMP regulations and guidances … require stability testing to establish the potency of biological products through their labeled expiry date."); Ex. 3 ¶ 419.3 (Kessler Rep.) ("Merck was required to have adequate procedures to assure that MMR II vaccine had [the required] amount of mumps virus per dose through end expiry."); *see also* Ex. 16 ¶ 8(4) (Calcott Rep.) ("Merck failed to maintain its manufacturing operations in a GMP compliant manner over the period 2000 2005, producing Mumps vaccine materials that did not consistently meet the label claim for potency through the shelf life, yet marketing these adulterated products."); Ex. 249 at 83:16 84:16, 138:13 139:16 (CDC 30(b)(6) Sims Dep.) (testifying CDC contract incorporates a warranty of merchantability, which requires vaccines to perform their intended purpose); Ex. 249 at 85:19 21 (CDC 30(b)(6) Sims Dep.) (testifying CDC would certainly want to know if something potentially violates warranty clause of CDC contract); Ex. 41 at 19:6 20:9 (Merck Expert Nichols Dep.) ("CDC would not initiate procurement for a product without [certain] characteristics," including "that the product is merchantable"); Ex. 41 at 19:6 20:15 (Merck Expert Nichols Dep.) ("CDC would not release an RFP to get proposals from potential vendors and would not accept a proposal without the product having [certain] qualifications," including "that the product is merchantable"); Ex. 41 at 30:1 5 (Merck Expert Nichols Dep.) (identifying "merchantability" as one of the "prerequisites to a CDC purchase of a [VFC] vaccine"); Ex. 249 at 24:24 26:14, 143:25 145:4 (CDC 30(b)(6) Sims Dep.) (testifying the CDC's duty to warn requirement (of benefits and risks of vaccine) came from Merck); Ex. 249 at 163:9 12 (CDC 30(b)(6) Sims Dep.) (testifying if manufacturer "become[s] aware of something that violates the terms and conditions of the contract," like "shelf life" requirement, manufacturer "would notify [CDC]"); *Mazur v. Merck & Co.*, 767 F. Supp. 697, 701 703 (E.D. Pa. 1991) (describing Merck's delegation of its duty to warn to the CDC through a provision in the Merck/CDC vaccine purchase contract); *Mazur v. Merck & Co.*, 964 F.2d 1348, 1365 66 (3d Cir. 1992) ("[Merck's] responsibility [to

146

Undisputed that the contracts do not contain a reference to a specific "effectiveness rate,

efficacy rate, or seroconversion rate."  As to the table, disputed to the extent the 1998    2001

VFC contracts also included MumpsVax.  *See* Merck Exs. 54 at '732; Ex. 55 at '759; Ex. 56

at '702; Ex. 57 at '667.  Otherwise undisputed as to the table.

72.     The CDC makes public the vaccines that it purchases, and the prices that it pays
for them. For example, it posts them on a website, and the price list for April 6, 2001 is still
available online. *See* Ex. 73 (CDC, *CDC Vaccine Price List*,
https://www.cdc.gov/vaccines/programs/vfc/awardees/vaccine-management/price-
list/index.html) (listing current vaccine contract prices); Ex. 73 (CDC Vaccine Price List as of
April 6, 2001, *available at* https://www.cdc.gov/vaccines/programs/vfc/awardees/vaccine-
management/price-list/2001/2001-04-06.html); *see also* 48 C.F.R. §§ 5.301, 5.401(b) (requiring
publication of certain information about federal contracts in excess of $25,000)

**Response**:  Undisputed.

73.     The topics of effectiveness, efficacy, immunogenicity, or potency are not
discussed with CDC in the context of negotiating CDC's purchase of vaccines. Ex. 75 (Sims Dep.
Tr.) at 110:20-112:2.

**Response**:  Disputed that the evidence cited supports Merck's proffered fact.  Undisputed

that Mr. Sims testified that over the last five years that he has been involved in contract

negotiations with Merck, he did not recall the issues of efficacy, potency, seroconversion

rates, immunogenicity, and effectiveness levels coming up during those negotiations, despite

Merck's obligation to report to the CDC all information material to how well the vaccine

protects against disease.  *See* Merck Ex. 75 (CDC 30(b)(6) Sims Dep.) at 110:20-112:2; Rel.

56 Stat. ¶ 15.[276]  Disputed to the extent Merck implies this information is not material to the

CDC's purchase decision.[277]

---

provide accurate and up to date safety and efficacy information to the CDC] is continuous, and it must therefore
apprise the CDC of any risks it later discovers, or in the exercise of reasonable care, should have discovered.").

[276] *See supra* note 44.

[277] *See* Rel. Resp. SUMF1 ¶ 102.

**Appx18898**

74.    During the course of negotiations with CDC for the purchase of mumps-containing vaccines, Merck and CDC have not and do not discuss how well the vaccine works. Ex. 76 (Taylor Dep. Tr.) at 198:6-11 ("Q: And during the Merck's negotiations with CDC about the purchase of the mumps vaccine, do Merck and CDC discuss how well the vaccine works? . . . A: No, we do not."); *see also* Ex. 77 (Duffy Dep. Tr.) at 269:10-17, 280:23-281:9 (testifying that in the course of negotiations with CDC, clinical information    including efficacy and how well the vaccine works    and safety are not discussed).

**Response**: Disputed that the evidence cited supports Merck's proffered fact.  Undisputed that Ms. Taylor and Ms. Duffy testified that CDC contracting officer Mr. Sims testified that over the last five years that he has been involved in contract negotiations with Merck, he did not recall the issues of efficacy, potency, seroconversion rates, immunogenicity, and effectiveness levels coming up during those negotiations and that Ms. Duffy testified that in her experience efficacy typically did not come up in contract negotiations with the CDC, she would not be discussing how well the vaccine works with the CDC, and she did not recall if safety came up, despite Merck's obligation to report to the CDC all information material to how well the vaccine protects against disease.  *See* Merck Ex. 75 (CDC 30(b)(6) Sims Dep. Tr.) at 110:20-112:2; Rel. 56 Stat. ¶ 15.[278]  Disputed to the extent Merck implies this information is not material to the CDC's purchase decision.[279]

75.    Nor do CDC and Merck discuss in the course of their negotiations for CDC's purchase of mumps vaccines "the shelf life," Ex. 76 (Taylor Dep. Tr.) at 195:18-22, the safety, *id*. at 201:6-11, or any outbreaks with respect to mumps, *id*. at 200:20-24.

**Response**: Disputed.  In connection with Solicitation # 2006-N-082574, Merck and the CDC discussed a proposed minimum shelf life of 8 months for ProQuad.  *See, e.g.,* Ex. 430 at '187-88 ("Merck has proposed [to CDC] a minimum shelf life of 8 months for the new

---

[278]  *See supra* note 44.

[279] *See* Rel. Resp. SUMF1 ¶ 102.

Appx18899

MMR-V vaccine (brand name ProQuad)."). Disputed to the extent Merck implies this

information is not material to the CDC's purchase decision.[280]

76.    While CDC requires that any vaccine it purchases have a valid product license issued by FDA, the FDA is "the regulatory agency for the vaccine" and CDC only checks "to make sure the vendor . . . has provided the license for [a] vaccine." Ex. 75 (Sims Dep. Tr.) at 73:23-74:6.

**Response**: Undisputed that Mr. Sims testified that FDA is "the regulatory agency for the

vaccine" and that as part of the CDC's technical review, the Program Office "certif[ies] and

look[s] at the license to make sure that the vendor . . . has provided the license for that

vaccine." Merck Ex. 75 at 73:23-74:6 (CDC 30(b)(6) Sims Dep.). Disputed to the extent

Merck implies that CDC *only* checks "to make sure the vendor . . . has provided the license

for [a] vaccine." The evidence cited does not support that proffered fact. Mr. Sims testified

that his understanding is that CDC will not buy a vaccine without a valid FDA product

license and that if "something was mislabeled" CDC "would want to know about it."[281]

77.    To show licensure, a vaccine manufacturer need only submit to CDC the one-page FDA product license, *id*. at 104:24-107:22, 131:9-132:24, 133:10-16; Ex. 43 (1995 MMR FDA product licenses) at MRK-KRA01676252; Ex. 42 (One-page FDA establishment license) at MRK-KRA01972538; Ex. 44 (FDA establishment license) at MRK-KRA01676250.

**Response**: Disputed. The evidence cited does not support Merck's proffered fact. CDC

contracting officer Mr. Sims testified that the Program Office verifies vaccine licensure in

their technical review, he relies on their review, and with respect to proof of licensure, he

defers to Program Office on "what level they go into in their technical review." Merck Ex. 75

at 104:24-107:22, 131:9-132:24, 133:10-16 (CDC 30(b)(6) Sims Dep.). Also, the FDA

---

[280] *See* Rel. Resp. SUMF1 ¶ 102.

[281] Ex. 249 at 188:22 189:15 (CDC 30(b)(6) Sims Dep.) ("Certainly if something was mislabeled [CDC] would … want to know about it …."); Merck Ex. 75 at 74:7 14 (CDC 30(b)(6) Sims Dep.). *See also* Ex. 249 at 188:22 189:15 (CDC 30(b)(6) Sims Dep.) ("the vaccine should be properly labeled. And that's part of … what they're required to do is properly label.") ("if it's not properly labeled, then that's very problematic").

product license is not simply a one-page document, it also incorporates the sBLA and BLA. Ex. 6 at 123:4-16 (Merck Expert Burlington Dep.) ("**Q.** … when you say licensing documents where the specifications of the product are normally contained, what documents are you referring to, specifically? … **A.** The Biologic License Application, as amended and approved.").

78.    Manufacturers are not required "to submit any other regulatory documents during the procurement process, because CDC defers to FDA on the regulation of vaccines." Ex. 40 (Nichols Report) at 14.

**Response**:  Disputed.  Vaccine manufacturers are required to provide clinical trial data to CDC/ACIP as part of the recommendation process for new vaccines, which is required for the CDC's vaccine procurement process.  Ex. 15 at 91:19-92:19 (Merck Expert Temte Dep.) ("With new vaccines for FDA licensure, companies are required to provide clinical trial data to show both safety and efficacy.").  ACIP is "mandated" by "the [ACIP] charter" to "review those clinical trials and the efficacy and safety data resulting from those trials and uses that information in assessing what recommendations, if any, it's going to make." *Id.*[282]  Also disputed to the extent the phrase "other regulatory documents" invokes unspecified facts outside the statement which makes it impossible to answer as a stand-alone fact.

79.    CDC does not monitor or enforce FDA's regulations, including whether a vaccine manufacturer such as Merck has complied with FDA's current Good Manufacturing Practices (cGMP) regulations. Ex. 75 (Sims Dep. Tr.) at 77:7-19, 150:20-152:16.

**Response**:  Disputed.  The CDC VFC contracts require compliance with cGMP regulations.

*See* Rel. 56 Stat. ¶ 247.[283]   The CDC would want to know about a cGMP compliance issue.

---

[282] *See also supra* note 42**Error! Bookmark not defined.**.

[283]  *Citing among other evidence* Ex. 41 at 19:6 20:9 (Merck Expert Nichols Dep.) ("CDC would not initiate procurement for a product without [certain] characteristics," including compliance with cGMP); Ex. 41 at 19:6 20:15 (Merck Expert Nichols Dep.) ("CDC would not release an RFP to get proposals from potential vendors and would not accept a proposal without the product having [certain] qualifications," including compliance with cGMP); Ex. 41 at 30:1 5 (Merck Expert Nichols Dep.) (identifying compliance with "CGMP" as one of the "prerequisites to

150

*Id.*[284] Merck is obligated to disclose cGMP compliance issues that impact the safety or effectiveness of the vaccine to the CDC. *See id.* at ¶ 249.[285]

80.    CDC has never modified its contracting decisions because of vaccine manufacturer's failure to meet cGMP. *Id.* at 152:17-23.

**Response**:  Disputed. The evidence cited does not support Merck's proffered fact.  CDC contracting officer Mr. Sims testified that he was not aware of any instance when CDC modified its contracting decision because of a failure to meet cGMP or any information CDC received from FDA about a failure to meet cGMP.  Merck Ex. 75 at 152:17-23 (CDC 30(b)(6) Sims Dep.).  The CDC VFC contracts require compliance with cGMP regulations. *See* Rel. 56 Stat. ¶ 247.[286]  The CDC would want to know about a cGMP compliance issue. *Id.*[287]  Merck is obligated to disclose cGMP compliance issues that impact the safety or effectiveness of the vaccine to the CDC. *See id.* at ¶ 249.[288]

81.    Everything that is material to CDC's decision to purchase Merck's mumps-containing vaccines was set forth in CDC Contracts with Merck. *See* Ex. 75 (Sims Dep. Tr.) at 166:10-14 ("Q. Everything that's important or material to your purchasing decision is in the

---

a CDC purchase of a [VFC] vaccine"); Ex. 249 at 77:7 10 (CDC 30(b)(6) Sims Dep.) (testifying cGMP compliance is key CDC contractual term);.

[284] *Citing among other evidence* Ex. 249 at 193:19 194:2 (CDC 30(b)(6) Sims Dep.) (testifying cGMP violations "[c]ertainly … would be a violation of the terms and conditions of the [CDC] contract, and certainly [CDC would] want to know"); Ex. 249 at 192:20 193:10 (CDC 30(b)(6) Sims Dep.) (testifying if cGMP compliance issue potentially impacts the contract, the CDC certainly would discuss that issue).

[285] *See supra* note 44.

[286] *Citing among other evidence* Ex. 41 at 19:6 20:9 (Merck Expert Nichols Dep.) ("CDC would not initiate procurement for a product without [certain] characteristics," including compliance with cGMP); Ex. 41 at 19:6 20:15 (Merck Expert Nichols Dep.) ("CDC would not release an RFP to get proposals from potential vendors and would not accept a proposal without the product having [certain] qualifications," including compliance with cGMP); Ex. 41 at 30:1 5 (Merck Expert Nichols Dep.) (identifying compliance with "CGMP" as one of the "prerequisites to a CDC purchase of a [VFC] vaccine"); Ex. 249 at 77:7 10 (CDC 30(b)(6) Sims Dep.) (testifying cGMP compliance is key CDC contractual term);.

[287] *Citing among other evidence* Ex. 249 at 193:19 194:2 (CDC 30(b)(6) Sims Dep.) (testifying cGMP violations "[c]ertainly … would be a violation of the terms and conditions of the [CDC] contract, and certainly [CDC would] want to know"); Ex. 249 at 192:20 193:10 (CDC 30(b)(6) Sims Dep.) (testifying if cGMP compliance issue potentially impacts the contract, the CDC certainly would discuss that issue).

[288] *See supra* note 44.

Appx18902

contract; is that fair to say?  A. So that    that's the agreement between Merck and C.D.C., and that's what we're bound to.").

**Response**:  Disputed, the evidence cited does not support Merck's proffered fact.  Also

disputed because are several other factors that are material to the CDC's decision to purchase

Merck's mumps vaccines, including, but not limited to:

- Vaccine potency[289];

- Vaccine effectiveness[290];

- Whether the vaccine has been recommended by ACIP[291];

- Whether vaccines are properly labeled, whether the labels are accurate and not

  misleading, and whether the vaccines comply with their labels[292]; and

---

[289]  Ex. 7 at 148:17 149:10 (CDC 30(b)(6) Pallansch Dep.) (testifying that potency "affects how [the CDC] interpret[s] data being provided, because we look at data for a specific product as the product hasn't changed unless we're aware of it.  So, again, if we knew the potency change occurred …. we would deliberately analyze data"); Ex. 7 at 156:7 18 (CDC 30(b)(6) Pallansch Dep.) (testifying change of potency could "[a]bsolutely" impact effectiveness: "If you … cut the … amount of virus in the vaccine, that could easily make a lower response."); Ex. 360 at 2 (Merck Expert Atkinson Dep. Ex. 6) (ACIP moving from one dose to two dose recommendation for measles vaccine because of "primary vaccine failure," which "may be due to ... less than optimal vaccine storage and handling or to the greater lability of the measles vaccine manufactured before a new stabilizer was used in 1979"); *see also* Ex. 3 ¶ 33 (Kessler Rep.) ("Potency is defined as the 'ability of the product ... to effect a given result.' The potency of a vaccine is connected to how well the vaccine works.  If a vaccine does not have sufficient potency, it may not provide protection from disease.") (quoting 21 C.F.R. § 600.3); Ex. 8 at 162:1 3 (Shapiro Dep.) ("[I]t is pretty obvious that … vaccine[] potency is part of what makes a vaccine work.").

[290]  Ex. 249 at 85:25 86:9 (CDC 30(b)(6) Sims Dep.) (testifying CDC "certainly … want[s] safe and effective vaccines" so they accomplish the "intended purpose" of protecting the public health); Ex. 11 at 2 ("CDC has a major programmatic role in accomplishing reduction in vaccine preventable infectious disease through the agency's [Vaccines For Children] Program by using scarce public health federal funding to purchase effective vaccines for administration to children by public and private [Vaccines For Children] providers throughout the country."); Ex. 12 at 2 (same); *see also supra* ¶ 9 (citing evidence that "key function" of the CDC is ensuring vaccines are effective).

[291]  *See* Rel. 56 Stat. ¶ 245, *citing* Ex. 7 at 166:8 13 (CDC 30(b)(6) Pallansch Dep.) (testifying if ACIP stops recommending a vaccine, CDC will not purchase it); Ex. 22 at 9 (Merck Expert Atkinson Rep.) ("CDC does not purchase any vaccine until there is an ACIP recommendation for use of that vaccine …."); Ex. 41 at 19:6 20:9 (Merck Expert Nichols Dep.) ("CDC would not initiate procurement of a product without [certain] characteristics," including "a recommendation from the [ACIP]"); Ex. 41 at 19:6 20:15 (Merck Expert Nichols Dep.) ("CDC would not release an RFP to get proposals from potential vendors and would not accept a proposal without the product having [certain] qualifications," including "a recommendation from the [ACIP]"); Ex. 41 at 30:11 13 (Merck Expert Nichols Dep.) (testifying CDC will not buy a vaccine not recommended by ACIP); Ex. 41 at 29:23, 30:2 5 (Merck Expert Nichols Dep.) (identifying "recommendation by ACIP" as one of the "prerequisites to a CDC purchase of a [VFC] vaccine"); Ex. 41 at 121:13 17 (Merck Expert Nichols Dep.) ("If the product has changed in such a way that it would impact the ACIP recommendations, then the scientific side of the house would want to know that to talk to the ACIP about it.").

152

- Whether a vaccine manufacturer engaged in fraud.[293]

82.    In CDC's negotiations with Merck over the contracts, the issue of potency never came up. *See id.* at 111:5-7 ("Q. Do you ever recall an issue of potency coming up in the negotiations of the contract?  A. I don't recall that coming up.").

**Response**:  D Disputed, the evidence cited does not support Merck's proffered fact. Also

disputed because "over the contracts" is broad, vague and ambiguous making it impossible to

respond to this statement. Assuming Merck means the CDC's contracts to purchase Merck's

mumps vaccines, undisputed that Mr. Sims testified that with respect to the negotiations he

was involved in over the last five years, he did not recall the issue of potency coming up.[294]

Also disputed to the extent Merck implies potency is not relevant to the CDC's purchasing

decision.[295]

83.    Dr. Mark Pallansch, CDC's Director of the Division of Viral Diseases in the National Center for Immunization and Respiratory Diseases, explained that potency is "not a factor that comes into consideration." Ex. 41 (Pallansch Dep. Tr.) at 157:11-15.

**Response**:  Disputed, the evidence cited does not support Merck's proffered fact.  In response

to a question asking whether it was the goal of the CDC to purchase vaccines that have the

lowest potency sufficient to provide an effective response, Dr. Pallansch responded: "We do

not take that into consideration because the vaccine that we're having a discussion around is

already a licensed product at a certain potency, so it's not a factor that comes into

---

[292]  Ex. 249 at 188:22 189:15 (CDC 30(b)(6) Sims Dep.) ("Certainly if something was mislabeled [CDC] would … want to know about it ….") ("the vaccine should be properly labeled. And that's part of … what they're required to do is properly label.") ("if it's not properly labeled, then that's very problematic").

[293]  Ex. 249 at 45:20 46:7, 48:6 51:13 (CDC 30(b)(6) Sims Dep.) (testifying a major criterion CDC considers in awarding vaccine contracts includes past performance; past performance includes consideration of whether vaccine manufacturer has engaged in fraud); Ex. 41 at 107:21 108:9 (Merck Expert Nichols Dep.) (testifying fraud would be relevant factor material to CDC's purchasing decision: "I don't think the CDC would want to contract with a vendor … who had been found guilty of committing fraud previously.").

[294] *See supra* note 72.

[295] *See supra* note 67.

consideration."  Merck Ex. 41 at 157:11-15 (CDC's 30(b)(6) Pallansch Dep).  Also disputed

to the extent Merck implies potency is not relevant to the CDC's purchasing decision.[296]

84.    CDC contracts with Merck to purchase Merck's mumps-containing vaccines were indefinite quantity contracts for vaccines manufactured under a current establishment and product license issued by FDA and as set forth in the contracts. *See* Ex. 54 (1998 VFC Contract) at MRK-KRA01371731 (noting under heading "Type of Contract" that it is an "[i]ndefinite quantity contract"); Ex. 55 (1999 VFC Contract) at MRK-KRA01371754 (same); Ex. 56 (2000 VFC Contract) at MRK-KRA01371696 (same); Ex. 57 (2001 VFC Contract) at MRK-KRA01371660 (same); Ex. 58 (2002 VFC Contract) at MRK-KRA01371788 (same);  Ex. 59 (2003 VFC Contract) at MRK-KRA01371314 (same); Ex. 60 (2004 VFC Contract) at MRK-KRA01371284 (same); Ex. 61 (2005 VFC Contract) at MRK-KRA01371344 (same); Ex. 62 (2006 VFC Contract) at MRK-KRA01371627 (same); Ex.63 (2007 VFC Contract) at MRK-KRA01371608 (same); Ex. 64 (2008 VFC Contract) at MRK-KRA01371822  (same); Ex. 65 (2009 VFC Contract) at MRK-KRA01371885 (same); Ex. 66 (2010 VFC Contract) at MRK-KRA01371380  (same); Ex. 67 (2011 VFC Contract) at MRK-KRA01371503  (same); Ex. 68 (2012 VFC Contract) at MRK-KRA01371405 (same); Ex. 69 (2013 VFC Contract) at MRK-KRA01371425 (same); Ex. 70 (2014 VFC Contract) at MRK-KRA01371476  (same); Ex. 71 (2015 VFC Contract) at MRK-KRA01372047 (same); Ex. 72 (2016 VFC Contract) at MRK-KRA01371964 (same).

**Response**:  Undisputed.

85.    The CDC's 1998 contract with Merck to purchase Merck's mumps-containing vaccines stated:  "Vaccine shall have a minimum shelf life of twelve (12) months remaining upon receipt of the vaccine by the consignee."  Ex. 54 (1998 VFC Contract) at MRK-KRA01371734.

**Response**:  Undisputed.

86.    The CDC's contracts with Merck from 1999 through 2016 to purchase Merck's mumps-containing vaccines similarly required a minimum shelf life of 12 months remaining upon receipt of or delivery to the consignee. Ex. 55 (1999 VFC Contract) at MRK-KRA01371759, MRK-KRA01371761; Ex. 56 (2000 VFC Contract) at MRK-KRA-1371702, MRK-KRA01371704; Ex. 57 (2001 VFC Contract) at MRK-KRA-1371667, MRK-KRA01371669; Ex. 58 (2002 VFC Contract) at MRK-KRA01371796, MRK-KRA01371798; Ex. 59 (2003 VFC Contract) at MRK-KRA01371321, MRK-KRA01371323; Ex. 60 (2004 VFC Contract) at MRK-KRA01371291, MRK-KRA01371293; Ex. 61 (2005 VFC Contract) at MRK-KRA01371350, MRK-KRA01371352; Ex. 62 (2006 VFC Contract) at MRK-KRA01371634, MRK-KRA01371638; Ex. 67 (2007 VFC Contract) at MRK-KRA01371607, MRK-KRA01371609; Ex. 68 (2008 VFC Contract)at MRK-KRA01371821, MRK-KRA01371823; Ex. 69 (2009 VFC Contract) at MRK-KRA01371884, MRK-KRA01371886; Ex. 70 (2010 VFC Contract) at MRK-KRA01371378, MRK-KRA01371382; Ex. 67 (2011 VFC Contract) at MRK-

---

[296] *See supra* note 67.

KRA01371502, MRK-KRA01371504; Ex. 68 (2012 VFC Contract) at MRK-KRA01371403, MRK-KRA01371406; Ex. 69 (2013 VFC Contract) at MRK-KRA01371428, MRK-KRA01371435; Ex. 70 (2014 VFC Contract) at MRK-KRA01371479, MRK-KRA01371486; Ex. 71 (2015 VFC Contract) at MRK-KRA01372050, MRK-KRA01372059; Ex. 72 (2016 VFC Contract) at MRK-KRA01371968, MRK-KRA01371974.

**Response**: Undisputed.

87. The CDC's 2006 contract with Merck to purchase ProQuad required a minimum shelf life of 8 months remaining upon delivery to the consignee. Ex. 62 (2006 VFC Contract) at MRK-KRA01371636, MRK-KRA01371638.

**Response**: Undisputed.

88. The CDC's contracts with Merck state, under the heading "Product License," that: "The vaccines produced and delivered under this contract shall be manufactured under a current establishment and product license issued by the [FDA] as indicated below. . . . The Current Good Manufacturing Practice Regulations (cGMPR's) (21C.F.R. Parts 210-211) will be the standard to be applied for manufacturing, processing and packing of drugs, chemicals, biologicals, and reagents." Ex. 54 (1998 VFC Contract) at MRK-KRA01371740; Ex. 55 (1999 VFC Contract) at MRK-KRA01371769, MRK-KRA01371770; Ex. 56 (2000 VFC Contract) at MRK-KRA01371712; Ex. 57 (2001 VFC Contract) at MRK-KRA01371673; Ex. 58 (2002 VFC Contract) at MRK-KRA01371800; Ex. 59 (2003 VFC Contract) at MRK-KRA01371325; Ex. 60 (2004 VFC Contract) at MRK-KRA01371295; Ex. 61 (2005 VFC Contract) at MRK-KRA01371354; Ex. 62 (2006 VFC Contract) at MRK-KRA01371640; Ex. 63 (2007 VFC Contract) at MRK-KRA01371611; Ex. 64 (2008 VFC Contract) at MRK-KRA01371825; Ex. 65 (2009 VFC Contract)at MRK-KRA01371887; Ex. 67 (2011 VFC Contract) at MRK-KRA01371505.

**Response**: Undisputed.

89. CDC contracts from 2010 and 2012 through 2016 contained materially identical provisions with slight wording changes. *See* Ex. 66 (2010 VFC Contract) at MRK-KRA01371383; Ex. 68 (2012 VFC Contract) at MRK-KRA01371407; Ex. 69 (2013 VFC Contract) at MRK-KRA01371436; Ex. 70 (2014 VFC Contract)at MRK-KRA01371487; Ex. 71 (2015 VFC Contract)at MRK-KRA01372060; Ex. 72 (2016 VFC Contract) at MRK-KRA01371975.

**Response**: Undisputed.

90. In the CDC contracts, CDC required Merck to include certain information on each invoice. None of CDC's contracts with Merck required specific representations about vaccine efficacy, effectiveness, or the amount of potency in each dose to be included in the invoices for payment submitted to CDC. *See* Ex. 55 (1999 VFC Contract) at MRK-KRA01371765-66; Ex. 56 (2000 VFC Contract) at MRK-KRA01371710-11; Ex. 57 (2001 VFC Contract) at MRK-KRA01371677]; Ex. 58 (2002 VFC Contract) at MRK-KRA01371804;  Ex. 59 (2003 VFC

Contract) at MRK-KRA01371329; Ex. 60 (2004 VFC Contract) at MRK-KRA01371280; Ex. 61 (2005 VFC Contract) at MRK-KRA01371357; Ex. 62 (2006 VFC Contract) at MRK-KRA01371624; Ex. 63 (2007 VFC Contract) at MRK-KRA01371604; Ex. 64 (2008 VFC Contract) at MRK-KRA01371828; Ex. 65 (2009 VFC Contract) at MRK-KRA01371880; Ex. 66 (2010 VFC Contract) at MRK-KRA01371373; Ex. 67 (2011 VFC Contract) at MRK-KRA01371508; Ex. 68 (2012 VFC Contract) at MRK-KRA01371410; Ex. 69 (2013 VFC Contract) at MRK-KRA01371422; Ex. 70 (2014 VFC Contract) at MRK-KRA01371490; Ex. 71 (2015 VFC Contract) at MRK-KRA01372062; Ex. 72 (2016 VFC Contract) at MRK-KRA01371978..

**Response**:  Undisputed as to the first sentence.  As to the second sentence, disputed because Merck ignores that VFC contracts require the manufacturers to include on the invoice or claim for payment to CDC the product description and expiration date, which represents that the vaccine will meet all potency and protection specifications and representations contained in the label and license throughout the shelf life of the product (as reflected by the expiration date of the vaccine), including the minimum potency specification.[297]

91.     The CDC contracts require Merck to submit requests for payment electronically. The CDC contracts identify the specific data Merck is to include in its requests for payment to CDC via Electronic Data Interchange, which include the following:

(1)     Contractor's name and invoice date;
(2)     Contract number, or other authorization for delivery of property and/or services;
(3)     Description, cost or price, and quantity of property and/or services actually delivered or rendered;
(4)     Shipping and payment terms;
(5)     Other substantiating documentation or information as required by the contract; and
(6)     Name where practicable, title, phone number, and complete mailing address of responsible official to whom payment is to be sent.
(7)     Lot number of vaccine vials shipped;
(8)     Expiration date of vaccine vials shipped; and
(9)     CDC accounting and appropriate date as described on the delivery order.
*See* Ex. 54 (1998 VFC Contract) at MRK-KRA01371737 (Addendum B, Paragraph 9 "Invoice Submission")).

**Response**:  Undisputed.

---

[297] *See* Rel. 56 Stat. ¶ 272.

Appx18907

92.     CDC contracts from 1998 to 2005 required the same data to be submitted in requests for payment *See* Ex. 55 (1999 VFC Contract) at MRK-KRA01371765, MRK-KRA01371766; Ex. 56 (2000 VFC Contract) at MRK-KRA01371709, MRK-KRA01371710; Ex. 57 (2001 VFC Contract) at MRK-KRA01371677; Ex. 58 (2002 VFC Contract) at MRK-KRA01371804; Ex. 59 (2003 VFC Contract) at MRK-KRA01371329; Ex. 60 (2004 VFC Contract) at MRK-KRA01371299; Ex. 61 (2005 VFC Contract) at MRK-KRA01371357.

**Response**: Disputed to the extent the phrase "the same data" invokes unspecified facts

outside the statement which makes it impossible to answer as a stand-alone fact.  Otherwise

undisputed.

93.     Beginning in 2006, the CDC has occasionally changed the list of required information in invoices. For instance:

- Beginning in 2006, CDC required Merck to add information related to "(10) Taxpayer I.D. Number" and "(11) DUNS Number." *See* Ex. 62 (2006 VFC Contract) at MRK-KRA01371643 (Addendum C, Paragraph 14 ("Invoice Submission")); Ex. 63 (2007 VFC Contract) at MRK-KRA01371613 (same); Ex. 64 (2008 VFC Contract) at MRK-KRA0137 1828 (same).

- Beginning in 2009, CDC removed the requirement that invoices include "Expiration date of vaccine vials shipped." *See* Ex. 65 (2009 VFC Contract) at MRK-KRA01371890 (Addendum C, Paragraph 13).

- Beginning in 2010, CDC added  requirements for an National Drug Code number as well "accounting and appropriation data." *See* Ex. 66 (2010 VFC Contract) at MRK-KRA01371385, MRK-KRA01371386 (Addendum C, Paragraph 12); Ex. 67 (2011 VFC Contract) at MRK-KRA01371508  (same); Ex. 68 (2012 VFC Contract) at MRK-KRA01371410 (same).

- Beginning in 2013, CDC added a requirement that invoices include "Electronic Funds Transfer (EFT)" and "Taxpayer Identification Number (TIN)." *See* Ex. 69 (2013 VFC Contract) at MRK-KRA01371439 (Addendum C, Paragraph 13); Ex. 70 (2014 VFC Contract) at MRK-KRA01371490 (same); Ex. 71 (2015 VFC Contract) at MRK-KRA01372062 (same); Ex. 72 (2016 VFC Contract) at MRK-KRA01371978 (same).

**Response**: Disputed to the extent the statement implies that from 2000 to the present, Merck

has not submitted product description, NDC codes, and expiration dates on its invoices or

claims for payment to the CDC.  *See* Exs. 282-299 at Columns AH-AI, AK-AL, AP.

Otherwise undisputed.

157

Appx18908

94.    Merck is not required to provide any other information in its requests for payment to CDC other than what is required by the CDC contracts. Ex. 75 (Sims Dep. Tr.) at 137:5-13 ("Q … Is Merck required to provide anything else to the C.D.C. when it invoices the C.D.C. for vaccines other than the nine items listed in the contract?  A. Not that I'm aware of.…").

**Response**:  Disputed to the extent the phrase "any other information" invokes unspecified

facts outside the statement which makes it impossible to answer as a stand-alone fact.

Disputed that the evidence cited supports Merck proffered fact.  Undisputed that in response

to the question quoted in the statement above ("Is Merck required to provide anything else to

the C.D.C. when it invoices the C.D.C. for vaccines other than the nine items listed in the

contract?"), Mr. Sims responded that he's not aware of other required information, this

information "meets the minimum," and that he would defer to the Program Office.  *See*

Merck Ex. 75 at 137:9-13 (CDC 30(b)(6) Sims Dep.).  Also disputed to the extent Merck

implies it does not include any other information on its invoices or claims for payment other

than what it is required to provide under the CDC contracts.  *See* Exs. 282-299 at Columns

AH-AI, AK-AL, AP.

95.    A representative set of electronic invoice data includes coding that reflects the National Drug Code  number for the MMR-II vaccine of "ND*00006-4681-00," a quantity of "2880," a unit price of "178.60," a lot identifier of "REF*LT*M040558~," and a lot expiration of "DTM*208*20181003~," as well as logistical data like the invoice issue data, the recipient address, and payment due date. Ex. 89 (Email from Z. Johns to M. Koury (Feb. 23, 2017)).

**Response**:  Undisputed that among other information, the representative electronic invoice

data Merck produced in this case includes the information described in the statement above.

96.    As reflected in the sample invoice data Merck provided to counsel for Relators, Merck did not and does not include representations regarding efficacy, effectiveness, immunogenicity, safety, or potency of the vaccines sold to CDC. *Id*.

**Response**:  Disputed.  The evidence cited does not support Merck's proffered fact.  The

invoice data Merck produced in this case includes, among other information, the NDC code,

product description, lot expiration date, contract ID number, and contract description.  *See*

158

Exs. 282-299 at Columns AH-AI, AK-AL, AP.  The Contract Number, Contract Description

and Product Description collectively identify the licensed vaccine being sold and the contract

that governs the sale, which, together with the license and label, contain the requirements the

vaccine must meet.  The Product Expiration Date represents the date through which the

vaccine is supposed to meet the potency and protection specifications and representations

contained in the label and license.  And the NDC Code is a vaccine-specific code which,

among other things, represents the specific strength, dosage form, and formulation the

vaccine is supposed to have according to its label and license specifications.  Rel. 56 Stat. ¶

272.[298]

97.     By reference to regulations, the CDC contracts with Merck include a requirement
that Merck warrant its vaccines are merchantable and fit for their intended purpose. *See* 48 C.F.R.
§ 52.212-4(o) (Federal Acquisition Regulation (FAR) setting forth contract terms that are
referenced in the CDC contracts, which include a requirement that:  "The Contractor warrants
and implies that the items delivered hereunder are merchantable and fit for use for the particular
purpose described in this contract."); *see also*, *e.g.*, Ex. 54 (1998 VFC Contract) at MRK-
KRA01371729 (incorporating by reference FAR 52.212-4 and adding an addendum); Ex. 55
(1999 VFC Contract) at MRK-KRA01371762 (same); Ex. 56 (2000 VFC Contract) at MRK-
KRA01371707 (same); Ex. 66 (2010 VFC contract) at MRK-KRA01371392 (same); Ex. 69
(2013 VFC Contract) at MRK-KRA01371434 (same); Ex. 70 (2014 VFC Contract) at MRK-
KRA01371485 (same); Ex. 71 (2015 VFC Contract) at MRK-KRA01372058 (same); Ex. 72
(2016 VFC Contract)at MRK-KRA01371974 (same).

**Response**:  Undisputed.

98.     The CDC's contracting officer interprets the requirements for a warranty to "say
that, essentially the product is merchantable and, you know, completes its intended purpose."  Ex.
75 (Sims Dep. Tr.) at 84:10-16.

---

[298]  *Citing* Ex. 342 at 4 ("Each listed drug product is assigned a unique 10 digit, 3 segment number. This number,
known as the NDC, identifies the labeler, product, and trade package size.  …  The second segment, the product
code, identifies a specific strength, dosage form, and formulation of a drug for a particular firm.  Different
formulations or different strengths of the same formulation should be assigned different product codes.  This means
even if the same formulations of a drug product ultimately deliver different strengths of the active ingredient to the
recipient, they should be assigned different product codes.  Also, drug products that share the same formulation but
have different product characteristics that clearly distinguish one drug product version from another cannot share the
same product code ….").

159

**Response**:  Undisputed that Merck accurately quotes CDC contracting officer Mr. Sims's

deposition testimony.

99.    "Merchantable" means that the product "can be used . . . in a commercially available setting."  *Id*. at 84:17-21. CDC is not aware of any instance where Merck's mumps-containing vaccines did not meet the warranty of merchantability required under the CDC contracts. *Id*. at 143:4-8.

**Response**:  As to the first sentence, undisputed that Mr. Sims testified that merchantable

means the product can be used in a commercially available setting.  Merck Ex. 75 at 84:17-

21 (CDC 30(b)(6) Sims Dep.).  As to the second sentence, undisputed that Mr. Sims is not

aware of an instance when MMR-II or ProQuad did not meet the warranty of merchantability.

*Id*.  at 143:4-8 (CDC 30(b)(6) Sims Dep.).

100.    "Fit for its intended purpose" means that the vaccine has an FDA license, with CDC deferring to FDA on whether to issue and/or maintain a given license. *Id*. at 84:23-85:12. Licensure by FDA is the "critical factor" for CDC to determine whether a vaccine is fit for its intended use. *Id*. at 141:4-12.

**Response**:  As to the first sentence, disputed. CDC contracting officer Mr. Sims testified that

"fit for its intended purpose" would certainly involve FDA licensure and vaccine

performance, and he also referenced the shelf life requirement in the contract.  He continued

that if an issue came up with whether a vaccine was "fit for purpose" he would need to

consult with the Program Office and CDC attorneys. He also testified "FDA is really the

regulatory," without explaining this testimony further.  As to the second sentence, disputed.

Mr. Sims testified that with respect to whether a vaccine is "fit for purpose," "maintaining

that [FDA] license … is critical," but he could not say whether it's the only factor.  Merck Ex.

75 at 84:23-85:12, 141:4-12.

101.    On April 27, 2010, Relators filed their complaint. Docket, *U.S. ex rel. Krahling v. Merck & Co., Inc.*, Civ. A. No. 10-4374 (E.D. Pa.) at ECF. No. 20.

**Response**: Disputed. The Court's electronic stamp at the top of the Complaint states April 27, 2010.[299]

102.    On April 27, 2012, two years after Relators' initial complaint was filed, the United States Department of Justice (DOJ) informed the Court that it would decline to intervene in Relators' case. United States' Notice of Election to Decline to Intervene, *U.S. ex rel. Krahling v. Merck & Co., Inc.*, Civ. A. No. 10-4374 (E.D. Pa.),ECF. No. 14.

**Response**: Undisputed that DOJ informed the Court that it would decline to intervene in

Relators' case on April 27, 2012 but disputed that DOJ informed the Court two years after

relators filed their complaint.[300]

103.    Counsel for DOJ are included as counsel of record and are copied on submissions by the parties in this matter. Docket, *U.S. ex rel. Krahling v. Merck & Co., Inc.*, Civ. A. No. 10-4374 (E.D. Pa.) (listing Gerald B. Sullivan and Joel M. Sweet from the United States Attorney's Office Eastern District of Pennsylvania as counsel of record); *see also id.* at ECF. Nos. 2 & 3 (docketing entries of appearance for Messrs. Sullivan and Sweet on August 27, 2010).

**Response**: Undisputed Counsel for DOJ are included as counsel of record and are copied on

submissions by the parties in this matter but disputed that evidence supporting this fact

accurately reflects the docket in this case to the extent that Messrs. Sweet and Sullivan did

not enter appearances on August 27, 2010.  ECF No. 2, Mr. Sweet's appearance, is dated

September 20, 2010.  ECF No. 3, Mr. Sullivan's appearance, is dated September 22, 2010.

104.    The protective order in this matter permits disclosure of discovery materials produced by Merck and designated as "Confidential" or "Highly Confidential    Attorneys' Eyes Only" to attorneys at DOJ as well as government employees of FDA, CDC, and the U.S. Department of Health and Human Services (HHS). Protective Order, ECF No. 69, at 7.2(b), (c); *id.* at 7.3(b), (c).

**Response**: Disputed to the extent the statement implies that there are no restrictions on the

disclosure to employees of FDA, CDC and HHS.  *See* Protective Order, ECF No. 69, at 7.2

(d) and 7.3 (c) ("Government employees of FDA, CDC, HHS, or EMA to whom disclosure is

---

[299] The Court's manual file stamp and the signature block on the complaint both are dated August 27, 2010, the date the complaint was actually filed. G. Reilly Decl. ¶ 2.

[300] *See supra* note 85.

Appx18912

reasonably necessary for purposes of the Actions provided that they have signed the

"Acknowledgment and Agreement to Be Bound" (Exhibit A)); *see also* ECF No. 275 (Order

to Amend the Protective Order) (amending 7.2 (d) and 7.3 (c) to eliminate requirement that

government employees sign Exhibit A).  Otherwise undisputed.

105.    On May 18, 2015, counsel for Merck requested from CDC and HHS certain information that may be relevant in this litigation. Ex. 78 (Ltr. from L. Dykstra to T. Frieden, et al. (May 18, 2015)) at 1.

**Response**:  The May 18, 2015 letter from Merck's counsel speaks for itself.  Otherwise

undisputed.

106.    In its letter, Merck summarized Relators' allegations, including Relators' contentions that "Merck made and continues to make misrepresentations about the efficacy of the mumps vaccine and engages in efforts to conceal the diminished efficacy of the vaccine" and that "Merck's labeling misrepresents the vaccine's efficacy and improperly influenced CDC's decision to purchase the vaccine." *Id.* at 2.

**Response**:  Disputed to the extent the statement implies that the quoted language was the

only relevant information set forth in counsel's letter, which also stated: "While Merck firmly

disputes all of the allegations made in this action and plans to vigorously defend itself, the …

claims … require[] that we gather a significant amount of information…"[301]  Undisputed that

the statement accurately quotes from the May 18, 2015 letter from Merck's counsel.

107.    On November 24, 2015, CDC responded to Merck's request for documents. Ex. 74 (Ltr. from K. Norris to L. Dykstra (Nov. 24, 2015)) at MRK-KRA01373393.

**Response**:  Disputed to the extent that MRK-KRA01373393 is represented as Merck's May

18, 2015 request for documents from Merck's counsel.[302]  Also disputed to the extent that the

author, source and admissibility of MRK-KRA01373393 has not been established.[303]

---

[301] Merck Ex. 78 at 1.

[302] *See* Merck Ex. 78 (Ltr. from L. Dykstra to T. Frieden, et al. (May 18, 2015)).

[303] *See supra* Rel. Resp. Merck SUMF1 ¶ 92.

Undisputed that CDC responded to Merck's May 18, 2015 request for documents on November 24, 2015.

108.    On October 12, 2017, Alan Sims, CDC's team lead who supports the National Centers for Immunization and Respiratory Diseases, was deposed in this litigation. Ex. 75 (Sims Dep. Tr.) at 9:16-23. Mr. Sims is the contracting officer for CDC's vaccine contracts. *Id*.

**Response**:  Undisputed.

109.    On October 13, 2017, Dr. Mark Pallansch, who is the Director of the Division of Viral Disease in the National Center for Immunization and Respiratory Diseases at CDC, was deposed in this litigation. Ex. 41 (Pallansch Dep. Tr.) at 8:17-20.

**Response**:  Undisputed.

110.    CDC authorized three former employees to serve as expert witnesses for Merck. Ex. 198, Letter from CDC to K. Hardway (May 24, 2018)) at 3.

**Response**:  Disputed. CDC authorized testimony and consultation by four former employees in the interest of the CDC subject to restriction, including that "these former … employees … can only represent their own views and … and cannot represent CDC's or the ACIP's views, including in terms of potential future agency/committee actions."[304]  Three of the four authorized former employees provided consultation and testimony for Merck, and Merck has supported the current motion with the reports of two of them.[305]  Also disputed that Merck Exhibit 198, purportedly supporting the statement, is a letter from CDC to K. Hardway dated May 24, 2018.  Merck Exhibit 198 is a July 31, 2018 letter from CDC to K. Hardway noting "a number of statements in [the former employees'] reports may be interpreted to be outside the scope of the opinions that the CDC authorized them to provide" and "statements in the reports that appear to be inaccurate or incomplete."

111.    On May 16, 2019, the Court entered an order that provided a protocol by which Relators' hired expert, Dr. David Kessler, could interface directly with CDC, FDA, and HHS

---

[304]  Ex. 11 (Letter from CDC to K. Hardway (May 24, 2018)).

[305]  Merck Ex. 40 (Merck Expert Nichols Rep.) and Merck Ex. 49 (Merck Expert Atkinson Rep.).

Appx18914

regarding his assessment of the discovery record and opinions based on those materials. Order (Under Seal), *U.S. ex rel. Krahling v. Merck & Co., Inc.*, Civ. A. No. 10-4374 (E.D. Pa.), at ECF No. 250.

**Response**:  Undisputed that the Court entered an order on May 16, 2019.  The order speaks

for itself.

112.     Since this case was filed on April 27, 2010, ACIP has continued to include the mumps vaccine in its recommended schedule for immunization. *E.g.*, Ex. 79 (ACIP, *MMR ACIP Vaccine Recommendations (Measles, Mumps and Rubella)*, https://www.cdc.gov/vaccines/hcp/acip-recs/vacc-specific/mmr.html).

**Response**:  Disputed to the extent that Merck implies ACIP recommends Merck's mumps

vaccine specifically.[306] Also disputed that this case was filed on April 27, 2010.[307]

Undisputed that ACIP has continued to include a mumps vaccine in its recommended

schedule since April 27, 2010.

113.     Since this case was filed on April 27, 2010, FDA has continued to license Merck's MMR-II and ProQuad products. *See* Ex. 42 (1971 MMR Product License) at MRK-KRA01972538; Ex. 6 (1995 MMR Product License) at MRK-KRA01676252; *see also* Ex. 80 (FDA, Vaccines Licensed for Use in the United States, https://www.fda.gov/vaccines-blood-biologics/vaccines/vaccines-licensed-use-united-states (current as of May 9, 2019)) at 5 (listing Merck's M-M-R II and ProQuad products as currently licensed by FDA).

**Response**:  Disputed that this case was filed on April 27, 2010.[308]  Undisputed that FDA has

continued to license Merck's MMR-II and ProQuad since April 27, 2010.

114.     Since this case was filed on April 27, 2010, the CDC has continued to purchase Merck's mumps-containing vaccines. Ex. 75 (Sims Dep Tr.) at 155:1-5.

**Response**:  Undisputed that CDC has continued to purchase Merck's mumps-containing

vaccines since April 27, 2010.  Disputed that this case was filed on April 27, 2010.[309]

---

[306] Ex. 41 at 110:2 11 (Merck Expert Nichols Dep.) (testifying the ACIP resolution is disease specific, not brand specific).

[307] *See supra* note 85.

[308] *See supra* note 85.

[309] *See supra* note 85.

Appx18915

115.    Since this case was filed on April 27, 2010, the CDC has not raised concerns related to the efficacy, effectiveness, seroconversion, immunogenicity, shelf life, or potency of Merck's mumps-containing vaccines. *Id.* at 201:13-25.

**Response**:  Disputed.  The testimony Merck cites does not support the proposition.  Mr. Sims was answering a question about whether the CDC's Program Office ever raised concerns to him related to efficacy, effectiveness, seroconversion, immunogenicity, shelf life, or potency.  Merck Ex. 75 at 201:13-25 (Sims Dep.).  CDC has raised concerns related to the efficacy, effectiveness, seroconversion, immunogenicity, shelf life, or potency of Merck's mumps-containing vaccines.  Starting in 2006 there has been a resurgence of mumps in the United States among highly vaccinated populations.  Rel. 56 Stat. ¶¶ 195-199.  The CDC does not know the causes of the mumps resurgence, but possible causes include waning immunity, primary vaccine failure, low vaccine potency, and a change in the circulating mumps virus strain.  Rel. 56 Stat. ¶¶ 200-204.  The CDC has reached out to Merck to provide input on the possible causes.  For example, during the 2010 outbreak CDC invited Merck to discuss mumps strategy with the CDC and specifically noted that "[t]he high proportion of [mumps] cases among persons who have received two doses of MMR *raises issues concerning the vaccine effectiveness and duration of protection*."[310]  Merck has never provided CDC with any information relating to problems with mumps vaccine effectiveness, potency, or shelf life; compliance with the FDA license or label specifications for mumps vaccines; or clinical trial fraud relating to mumps vaccines.  Rel. 56 Stat. ¶¶ 205-206.  Since the filing of this lawsuit Merck has repeatedly communicated to the CDC that there are no

---

[310] Ex. 407 at '989 (Feb. 2010 Email from CDC to Merck) (emphasis added); Ex. 408 at '153 (Rough transcript of 2010 ACIP Meeting on mumps outbreak) (ACIP's Dr. Temte and current Merck expert asked: "any issues with storage and handling of vaccines?").

Appx18916

issues with Merck's mumps vaccines.[311]  Also disputed that this case was filed on April 27, 2010.[312]

116.  FDA has similarly issued statements underscoring its continued view that the MMR vaccine is safe and effective. *See, e.g.*, Ex. 212 (FDA In Brief: FDA reiterates the importance of vaccines such as the Measles, Mumps, and Rubella (MMR) vaccine, Sept. 6, 2019, https://www.fda.gov/news-events/fda-brief/fda-brief-fda-reiterates-importance-vaccines-such-measles-mumps-and-rubella-mmr-vaccine) ("As a public health agency, we want to reiterate our confidence in the safety and efficacy of the MMR vaccine. FDA always strives to use the best available scientific evidence to promote and protect the well-being of individuals and the public health, and the evidence fully supports the safety and effectiveness of this vaccine."); Ex. 215 (Statement from Peter Marks, M.D., Ph.D., director of FDA's Center for Biologics Evaluation and Research, on FDA's continued confidence in the safety and effectiveness of the measles, mumps, and rubella (MMR) vaccine, Apr. 22, 2019, https://www.fda.gov/news-events/press-announcements/statement-peter-marks-md-phd-director-fdas-center-biologics-evaluation-and-research-fdas-continued) ("We do not take lightly our responsibility to ensure the safety and effectiveness of vaccines, and work diligently to assess safety and effectiveness of all licensed vaccines for their intended uses. The MMR vaccine is very effective at protecting people against measles, mumps, and rubella.").

**Response**:  Disputed to the extent the phrase "similarly issued" is not defined and invokes

unspecified facts outside the statement which makes it impossible to answer as a stand-alone

fact.  Disputed to the extent Merck ignores other relevant language in the evidence cited to

support this statement.[313]  Undisputed that the evidence cited contains the selectively quoted

language.

---

[311] Rel. Stat. ¶ 207; *see also* Merck Ex. 78 at 1 (Merck counsel letter to CDC) ("… Merck firmly disputes all of the allegations made in this action and plans to vigorously defend itself …"); Merck Ex. 205 at '45/116 ("There is no public health concern presented by … any aspect of the history of the potency of Merck's mumps vaccine."); *Id.* at 53/116 ("There is nothing about the history of the potency of Merck's mumps vaccine or its labeling that should cause any clinical concern. There is therefore no need to take any action … In sum, action based on the concerns expressed by Dr. Kessler is neither necessary nor appropriate."); *Id.* at 109/116 ("Nothing in Dr. Kessler's submissions warrants a change of course in the agencies' ongoing effective regulation of the vaccine and its use as a tool in disease control.").

[312] *See supra* note 80.

[313] *See e.g.* Merck Exhibit 215 (FDA April 2019 Statement) ("It deeply concerns us when we see preventable diseases such as … mumps reemerging in the United States and threatening our communities.") and Merck Exhibit 212 (September 2019 FDA Statement quoting FDA CBER Director Dr. Marks) ("It is deeply concerning to see vaccine preventable infectious diseases such as … mumps reemerging in the U.S and impacting the health of individuals and entire communities."); *see also* Rel. 56 Stat. ¶¶ 208 214 (collecting evidence of significant concern over mumps resurgence); Rel. Resp. SUMF1 ¶ 140 (collecting CDC statements about concern related to efficacy and effectiveness since resurgence of mumps in highly vaccinated populations starting in 2006).

117.    Since this case was filed on April 27, 2010, CDC has continued to recommend administration of the mumps vaccine as part of the schedule for routine vaccination of children. Ex. 41 (Pallansch Dep. Tr.) at 95:6-20.

**Response**:  Disputed to the extent that the statement implies ACIP's recommendation is for a specific product.[314]  Also disputed that this case was filed on April 27, 2010.[315]  Otherwise undisputed.

118.    The CDC has stated publicly and believes that Merck's mumps vaccine is "very safe and effective." *Id.* at 26:19-24.

**Response**:  Disputed that Dr. Pallansch's testimony provides evidence that the CDC statement was specific to Merck's mumps vaccine.[316]  Undisputed Dr. Pallansch testified that the CDC's position regarding MMR vaccine is: "MMR vaccine is safe and effective."

119.    The CDC states currently that the mumps vaccine is "safe and effective." Ex. 81 (CDC, *Mumps Vaccination*, https://www.cdc.gov/mumps/vaccination.html (last revised Mar. 8, 2019)) at 1.

**Response**:  Disputed that the evidence supports the statement: "CDC states currently the mumps vaccine is safe and effective."  The CDC website states that "MMR vaccine is safe and effective."

120.    The CDC is aware that certain studies have found an effectiveness rate as low as 31 percent for the mumps component of Merck's mumps vaccine. Ex 81 (CDC, *Mumps Vaccination*, https://www.cdc.gov/vaccines/vpd/mumps/index.html) ("MMR vaccine is very safe and effective. The mumps component of the MMR vaccine is about 88% (range: 31-95%) effective when a person gets two doses; one dose is about 78% (range: 49% 92%) effective."); *see also* Ex. 41 (Pallansch Dep. Tr.) at 31:20-33:1.

**Response**:  Undisputed.

---

[314] Ex. 41 at 110:2 11 (Merck Expert Nichols Dep.) (testifying the ACIP resolution is disease specific, not brand specific).

[315] *See supra* note 80.

[316] Ex. 41 at 110:2 11 (Merck Expert Nichols Dep.) (testifying the ACIP resolution is disease specific, not brand specific).

Appx18918

121.    The CDC understands that the mumps vaccine in the real world has a lower effectiveness rate than the efficacy rate found in the initial clinical trials conducted in the 1960s. Ex. 41 (Pallansch Dep. Tr.) at 39:16-21.

**Response**:  Disputed that the evidence cited supports the statement that "CDC will continue to purchase vaccines, like the influenza and pertussis vaccines even where effectiveness rates are as low as 25% and where protection wanes over time."  Dr. Pallansch's testimony does not support this statement.  Merck Ex. 41 at 39:16-21.  To the extent Merck offers the report of Mr. Nichols to support what the CDC "will purchase," Mr. Nichols "cannot represent CDC's or the ACIP's views, including in terms of potential future agency/committee actions."[317]  Undisputed that Dr. Pallansch testified that vaccine effectiveness estimates have been lower than the 95% found in the clinical studies before Mumpsvax was licensed in the 1960s.

122.    CDC mumps experts have published on findings of Jeryl Lynn mumps vaccine seroconversion rates as low as 74% and as high as 100%.   Ex. 41 (Pallansch Dep. Tr.) at 74:4-76:11; Ex. 219 Huong McLean et al. The Immunological Basis for Immunization Series: Module 16: Mumps (2010):1-33 at 9).

**Response**:  Disputed to the extent Merck implies that the wide range of seroconversion rates referenced in Merck Ex. 219 is relevant to the design and conduct of the clinical studies Merck performed to support the licenses for its mumps-containing vaccines at issue in this case.  In order for Merck to support its sBLA to lower the MMR-II minimum mumps potency specification on the MMR-II label, the FDA required Merck use an assay that could be a surrogate of efficacy in Protocol 007 and achieve a 95% seroconversion rate (statistical lower bound of 90% using a 95% confidence interval), roughly matching the seroconversion

---

[317] Ex. 11 at 4 (Letter from CDC to K. Hardway (May 24, 2018)); s*ee also* Ex. 41 at 8:15 21 (Merck Expert Nichols Dep.) ("The statements in my report and the testimony that I provide represent my own opinions and views based on my experiences and knowledge and not those of the US Centers for Disease Control and Prevention."); Merck Ex. 198 at 1 2 (July 31, 2018 letter from CDC to K. Hardway) ("a number of statements in [Mr. Nichols'] report[] may be interpreted to be outside the scope of the opinions that the CDC authorized them to provide," including part of page six).

168

Appx18919

rate on the MMR-II label.[318]  Undisputed that Dr. Pallansch considered Huong McLean and her co-authors to be mumps experts.  Also undisputed that Module 16 on Mumps published in 2010 states that "seroconversion rates vary widely from 74% to 100% for vaccines containing the Jeryl Lynn strain."

123.    Merck has presented to the CDC data from a Merck study showing seroconversion rates for Merck's mumps vaccine as low as 53%.  Ex. 220 (email); Ex. 242 (Feb. 25, 2010 presentation) at Slide 11.

**Response**:  Undisputed that Merck provided CDC a slide deck presentation, Exhibit 242, titled "Immunogenicity of Mumps-Containing Vaccines Merck Research Priorities Meeting February 25, 2010." Also undisputed that Slide 11 is titled "Mumps Immunogenicity (Plaque Reduction Neutralization assay*) ~ 6 Weeks After 1 dose of M-M-R™II or Priorix™" and that the "SCR" for M-M-R™II using the vaccine substrain JL-2 as the virus strain, is stated as 53%.

124.    The CDC has continued to purchase Merck's mumps-containing vaccines despite mumps outbreaks. *Id.* at 60:12-22.

**Response**:  Undisputed.

125.    The CDC has not requested a change its procurement criteria or price during any of the mumps outbreaks. Ex. 77 (Duffy Dep. Tr.) at 39:19-40:17; *see also id.* at 41:24-42:3 (testifying that CDC has not requested discounts on the mumps vaccine due to any outbreaks).

**Response**:  Disputed to the extent Merck implies CDC has not or would not attempt to negotiate or "suggest" lower prices for Merck's vaccines. CDC has "counter proposed prices in writing" and "request[ed] additional discounts" on Merck vaccines including M-M-R II and ProQuad.[319] Otherwise undisputed.

---

[318] Rel. 56 Stat. ¶ 56 (collecting evidence).

[319] Ex. 431 at '059 ("CDC ... counter proposed prices in writing after we submitted our ... offer ... CDC's proposed prices were the **lower** of either FCP (Federal Ceiling Price) or current VFC price + 0.3% ...") (emphasis added); Ex. 432 at '057 ("PRICING: CDC Response: After reviewing Merck's ... proposal, the Government requests additional discounts as follows:") (requesting discounts on Merck vaccines including M M R II and ProQuad); Ex. 433 at '203

126.    CDC has continued to purchase M-M-R II at the statutory maximum price the entire time since this lawsuit was filed. *See* Ex. 76 (Taylor Dep. Tr.) at 225:8-23; Ex. 75 (Sims Dep. Tr.) at 114:8-116:25, 155:1-5; *see also* 42 U.S.C. § 1396s(d)(3)(B)).

**Response**:  Undisputed.

127.    ACIP continues to recommend the MMR vaccine — whether in the MMR-II form or the ProQuad form — be administered in both is Vaccines for Children (VFC) and Vaccines for Adults (VFA) programs. The current recommendations were published in June 2013, which was three years after this suit was filed. The recommendation is that the vaccine be administered twice to children, once at age 12-15 months and once at age 4 through 6 years. It also recommends two doses for adults at high risk for exposure and transmission and one dose for other adults over 18 years old. Ex. 51 (*2013: ACIP Summary Recommendations*) at 20; *see also* Ex. 79 (CDC, *MMR ACIP Vaccine Recommendations (Meales, Mumps and Rubella)*, https://www.cdc.gov/vaccines/hcp/acip-recs/vacc-specific/mmr.html) (indicating that the June 14, 2013 recommendation is current).

**Response**:  Undisputed.

128.    The only supplementation to ACIP's recommendation has been to recommended a third dose of a mumps virus–containing vaccine for persons "previously vaccinated with 2 doses who are identified by public health authorities as being part of a group or population at increased risk for acquiring mumps because of an outbreak." That recommendation was agreed at ACIP's October 2017 meeting and published in January 2018. Ex. 48 (*Recommendation of the Advisory Committee on Immunization Practices for Use of a Third Dose of Mumps Virus–Containing Vaccine in Persons at Increased Risk for Mumps During an Outbreak*, MMWR, Jan. 12, 2018: 67(1); 33-38 at 1; *see also* Ex. 79 (CDC, *MMR ACIP Vaccine Recommendations (Measles, Mumps and Rubella)*, https://www.cdc.gov/vaccines/hcp/acip-recs/vacc-specific/mmr.html) (indicating that the Jan. 12, 2018 recommendation is current).

**Response**:  Undisputed.

129.    Citing studies published from 2007 to 2017, ACIP stated in its Summary of Key Findings that "[t]he median effectiveness of 2 doses of MMR vaccine in preventing mumps is 88%, with estimates ranging from 31% to 95%." Ex. 48 (Jan. 12, 2018 MMWR) at 2.

**Response**:  Undisputed.

130.    In 1996 and early 1997, Merck and FDA's Center for Biologics Evaluation and Research (CBER) engaged in discussions over how to interpret what the mumps label meant with regard to potency. *See* Ex. 152 (Oct. 5, 1998 Email) at MRK-KRA00095142; Ex. 191 (Jan. 23, 1997 Email) at MRK-KRA01972735; Ex. 189 (Dec. 5, 1997 Letter) at MRK-KRA01972451; Ex. 186 (Jan. 28, 1998 Letter) at MRK-KRA01625508.

---

("CDC has requested that Merck revise pricing offered on the VFC contract", including M M R II); Ex. 430 at '187 ("Merck is requested to consider submitting a lower price" for ProQuad).

**Response**: Disputed to the extent the evidence cited does not support that the discussions

were "over how to interpret what the mumps label meant."[320]  Undisputed that in 1996 and

1997 Merck and CBER engaged in discussions concerning the MMR-II label regarding

mumps potency.

131.    CBER is a center within FDA whose "mission is to protect and enhance the public health through the regulation of biological and related products including blood, vaccines, allergenics, tissues, and cellular and gene therapies."  CBER reviews "new biological products" and "new indications for already approved products," which requires "evaluating scientific and clinical data submitted by manufacturers to determine whether the product meets CBER's standards for approval. After a thorough assessment of the data, CBER makes a decision based on the risk-benefit for the intended population and the product's intended use." Ex. 126 (*About CBER*, U.S. Food and Drug Administration, https://www.fda.gov/about-fda/center-biologics-evaluation-and-research-cber/about-cber).

**Response**:  Undisputed.

132.    CBER's inquiry was part of a broad program to review a large number of vaccines' labels in the 1990s to carry out the mandate of the National Childhood Vaccine Injury Act. Ex. 250 (FDA, *Guidance for Industry: FDA Review of Vaccine Labeling Requirements for Warnings, Use Instructions, and Precautionary Information* (Sep. 2004), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/fda-review-vaccine-labeling-requirements-warnings-use-instructions-and-precautionary-information) at 3-6.

**Response**:  Disputed to the extent that "CBER's inquiry" is not defined and invokes

unspecified facts outside the statement which makes it impossible to answer as a stand-alone

fact.  Undisputed that as part of the National Childhood Vaccine Injury Act Congress

directed the review of vaccine labels to ensure vaccines on the market complied with their

specifications, including those relating to efficacy and effectiveness, duration of protection,

immunogenicity, stability, and safety.  Products that had inaccurate labeling would have to

have the labeling revised.  As part of this process, beginning in the mid-1990's, the FDA

---

[320] Ex. 44 at '760 ("In 1990, the mumps virus end expiry potency for M M R™ II was established as 4.3 [log]."); Merck Ex. 191  at '735 (Jan. 23, 1997 Email) ("The CBER comment required that expiry titers be provided."); Merck Ex. 189  at '451 (Dec. 5, 1997 Letter) ("[T]he label statement has been interpreted as the 'shelf life' specification."); Merck Ex. 186 at '508 (Jan. 28, 1998 Letter) ("During teleconferences in 1996 and in early 1997 … the need to clarify the label claims for potency and to define them in terms of … expiry became evident.").

reviewed Merck's MMR-II vaccine to ensure, among other things, that the vaccine complied

with its minimum mumps potency specifications for the full 24-month shelf life of the

vaccine.[321]

133.    Merck understood the MMR-II label to state the minimum "release potency"   i.e., the amount of live virus in the vaccine when the vaccine is approved for release to the market by CBER. CBER requested during these discussions that the label state the minimum "end-expiry potency"   i.e., the amount of live virus in the vaccine at the end of its shelf life. Ex. (Oct. 5, 1998 email) at MRK-KRA00095142; Ex. 191 (Jan. 23, 1997 Email) at MRK-KRA01972735; Ex. 189 (Dec. 5, 1997 letter) at MRK-KRA01972451; Ex. 186 (Jan. 28, 1998 Letter) at MRK-KRA01625508.

**Response**:  Disputed.  The evidence cited does not support the proffered facts, particularly as

to what Merck "understood" and when.  In 1996 Merck "explained" to FDA that "historically

[Merck] provided the release specification" and FDA "said that the way [the label] is written

it implied that [4.3 log] is met through expiry."[322]  In January 1997 "[t]he CBER comment

[on a draft MMR-II label change] required that expiry titers be provided."[323]  In December

1997 "the label statement ha[d] been interpreted as the 'shelf-life' specification."[324]

134.    Between 1997 and 1999, Merck and CBER discussed mumps potency labeling and analysis of historical mumps potency data to address the label interpretation issue. Ex. 186 (Jan. 28, 1998 Letter) at MRK-KRA01625508; Ex. 163 (Sept. 29, 1998 Letter) at MRK-KRA00636592; Ex. 149 (Dec. 3, 1998 Email) at MRK-KRA00095063; Ex. 221 (Nov. 6, 1998 Email) at MRK-KRA00095065; Ex. 150; Ex. 178 (Dec. 10, 1998 Letter) at MRK-KRA01622125; Ex. 181 (Merck Letter to CBER) at MRK-KRA01622552; Ex. 182 (Dec. 16, 1998 Letter) at MRK-KRA01622600; Ex. 180 (Jan. 8, 1999 letter) at MRK-KRA01622468; Ex. 148 (May 12, 1999 Email) at MRK-KRA00094960; Ex. 179 (Jan. 18, 1999 Letter) at MRK-KRA01622463.

---

[321] *See* Rel 56 Stat. ¶27.

[322] Merck Ex.152 at '42 (February 26, 1996 email); *see also* Ex. 44 at '760 ("In 1990, the mumps virus end expiry potency for M M R™ II was established as 4.3 [log].").

[323] Merck Ex. 191 at '35 (Jan. 23, 1997 Email).

[324] Merck Ex. 189 at '51 (Dec. 5, 1997 Letter).  *See also* Merck Ex. 186 at '08 (Jan. 28, 1998 Letter) ("During teleconferences in 1996 and in early 1997 … the need to clarify the label claims for potency and to define them in terms of … expiry became evident.").

Appx18923

**Response**:  Disputed to the extent Merck implies the discussions between Merck and FDA from 1997 to 1999 regarding the mumps potency specification on the MMR-II label were to address a "label interpretation."[325]  Undisputed that between 1997 and 1999 Merck and FDA discussed the mumps potency specification in the MMR-II labeling and analysis of historical mumps potency data.

135.    After discussions with Merck and undertaking its own analysis of data, on August 20, 1999, CBER directed Merck to increase the release potency for its mumps-containing vaccines from a minimum release potency of 4.3 $\log_{10}$ $TCID_{50}$ to a minimum release potency of 5.0 $\log_{10}$ $TCID_{50}$, in order for the product to meet, throughout its entire 24 month shelf life, the potency of 4.3 $\log_{10}$ $TCID_{50}$. Ex. 185 (Aug. 20, 1999 Letter) at MRK-KRA01624909.

**Response**:  Disputed that the evidence cited supports Merck's proffered fact that 4.3 log was a minimum release potency.  Merck Ex. 185 at '909.  Also disputed that 4.3 log was a minimum release potency.[326]  Otherwise undisputed.

136.    Since implementation of this change, Merck has manufactured the MMR-II vaccine to a minimum mumps release potency of 5.0 $\log_{10}$ $TCID_{50}$, irrespective of subsequent label changes. Ex. 202 (Stannard Dep. Tr.) at 297:21-298:7; Ex. 117 (Keegan Dep. Tr.) at 24:13-20.

**Response**:  Disputed to the extent the phrase "[s]ince implementation of this change" invokes unspecified facts outside the statement which makes it impossible to answer as a stand-alone fact.  Otherwise undisputed.

---

[325] Merck Ex. 150 (Dec. 12, 1998 Internal Merck Memo) (FDA's "Dr. Baylor … stated that from [FDA's] perspective the titers on the label have always been perceived as expiry titers."); Merck Ex. 148 at '60 (May 12, 1999 Email) ("Dr. Baylor … does not believe the new label has changed substantially from the wording used for potency over the past 20 years."); *see also* Merck Ex. 186 at '08 (Jan. 28, 1998 Letter) ("During teleconferences in 1996 and in early 1997 … the need to clarify the label claims for potency and to define them in terms of … expiry became evident."); *see also* Ex. 44 at '760 ("In 1990, the mumps virus end expiry potency for M M R™ II was established as 4.3 [log].").

[326] Rel. 56. Stat. ¶29 30, *citing* Ex. 42 at '706 07 ("During communications with [FDA] in 1996 98, it became evident that the [FDA] … defined [the label's potency] specifications as end expiry potencies."); Ex. 43 at '165 66 (same); Ex. 44 at '760 ("In 1990, the mumps virus end expiry potency for M M R™ II was established as 4.3 [log]."); Ex. 17 at 26:15 27:10, 28:2 7 (Bramble Dep.) (testifying FDA's position was potency on label was minimum potency required at end of shelf life); Merck Ex. 150 (Dec. 12, 1998 Internal Merck Memo) (FDA's "Dr. Baylor … stated that from [FDA's] perspective the titers on the label have always been perceived as expiry titers."); Merck Ex. 148 at '60 (May 12, 1999 Email) ("Dr. Baylor … does not believe the new label has changed substantially from the wording used for potency over the past 20 years.").

Appx18924

137.    Relators' expert Kessler has suggested that the release potency should have been made higher or the shelf-life shortened to ensure that the potency at end-expiry was above 4.3 $\log_{10}$ TCID$_{50}$. Specifically, Kessler has opined based on a Merck stability model that at the post-1999 release specification, up to 7% of lots may fall below 4.3 $\log_{10}$ TCID$_{50}$ by the end of a 24-month shelf-life. Ex. 107 (Kessler Report) at 280-282. Dr. Kessler has no data to evidence that any lot manufactured after Merck raised the release potency to 5.0 $\log_{10}$ TCID$_{50}$ actually did fall below 4.3 $\log_{10}$ TCID$_{50}$. *See* Ex. 103 (Kessler Dep. Tr. Vol. 2) at 391:21-392:11.

**Response**: Disputed. There is no evidence in the cited documents to support the proffered statement that Dr. Kessler "has suggested that the release potency should have been made higher or the shelf-life shortened to ensure that the potency at end-expiry was above 4.3 log10 TCID50." Although Dr. Kessler did not suggest changing the release specification or shortening the shelf life, those "fixes" were among several options Merck considered for how it could continue to sell MMR-II despite its ongoing mumps potency failures.[327] Also disputed that Dr. Kessler's report at page 280-282 supports the proffered statement that "Kessler has opined based on a Merck stability model that at the post 1999 release specification, up to 7% of lots may fall below 4.3 log10 TCID50 by the end of a 24-month shelf-life." Dr. Kessler's report at page 280-282 collects Merck documents under the heading "Merck estimated 7% of MMR-II lots 'were expected to be below 4.3 at end expiry' and "'with some creative math' shelf life could be improved from 12 to 15-16 months." Merck Exhibit 107 at p. 280-282. The 7% number stated in Dr. Kessler's report at page 282 comes from a Merck document, MRK-KRA00561350.[328] This was not the only Merck document evidencing Merck projections that 7% of lots would fail minimum mumps potency

---

[327] Rel. 56 Stat. ¶¶ 47 48 (collecting evidence).

[328] *See* Ex. 68 at '350 ("Even at the current release specification, approx. 7% of the lots are expected to be < 4.3 [log] at expiry.").

174

specifications.[329]  After reviewing MRK-KRA00561350, among other documents, Dr.

Kessler did not opine about what either the specification or the shelf-life should have been.[330]

At deposition Dr. Kessler again stated that *Merck* "projected 7 percent would be out of

compliance… Therefore you lacked assurances."[331]  Also disputed that Dr. Kessler has no

data to evidence 7% of MMR-II lots failing to meet the 4.3 log mumps potency specification

on the label after Merck raised the minimum release specification to 5.0 log10 TCID50 to the

extent that Merck failed to provide it for Dr. Kessler's review.  Dr. Kessler answered this

exact question in his deposition.[332]  Dr. Kessler also disputed lack of a reported failure after

Merck raised the minimum release specification to 5.0 as evidence of Merck's compliance for

all lots of MMR-II manufactured from 1999-2007 because of Merck's limited sampling to

pick up a failure.[333]  Although Merck committed in 1999 to putting three lots a year on

stability, it only put one lot on stability each year until late 2006, and then only increased the

---

[329] *See* Ex. 72 at 10, 15 ("Product still not compliant with labeled mumps potency. … [Merck] must file a Biologic Product Deviation report to [FDA] detailing results of investigation and medical impact (estimate ~7% of lots).") ("[E]xpect ~7% of lots to test below 4.3 [log] at some point.").

[330] Merck Exhibit 107 at ¶ 239 ("In my opinion … Merck remained obligated to ensure that all product met the 'not less than 4.3 log [20,000]' mumps end expiry claim.  … [Merck's] analysis documents Merck's ongoing inability to ensure all MMRII products complied with that label specification even after the overfill.").

[331] Ex. 4 at 282:23 25.

[332] Ex. 4 at 281:23 282:7 (Kessler Dep.) (Q: There is no actual stability data of product manufactured after the … release titers were raised, is there?  A: [Y]ou have to give me LIMS data in order to answer that or give me your full data set in order to answer that."); *see also* ECF No. 133 (denying Relators' motion to compel Merck's production of the LIMS data).

[333] Ex. 4 at 284:24 285:16 (Kessler Dep.) ("Merck is saying that 7 percent will fall out … the thing that matches this is Merck … in 2002 is concerned about increasing the number of lots that it samples. … Merck projected 7 percent would fall below.  If your sampling didn't pick it up, then your sampling may not have been accurate. … at the very least, if your modeling is predicting and you are projecting 7 percent, you can't assure compliance.") *referencing* Ex. 73 at '819 (2002 Internal Merck email) ("We've been lucky with mumps so far, but it's only a matter of time, since we can statistically predict that a certain number of lots will fail on stability.  And if we increase the number of annual lots that we test, like we committed to do, then the probability increases.") *Id.* at 287:3 13 ("Give me your data … put that data on the table. If it's not 7 percent … let's know what it is. But Merck's certainly saying … it's a matter of time … before our sampling picks it up. …  and if we increase the number of annual lots that we test, like we committed to do, then the probability increases … again, you can't assure that these lots are in … compliance.").

sample to four.[334]  Dr. Kessler also disputed Merck's compliance from 2005-2007, even after Merck increased the number of lots on stability.[335]

138.    In December 1997, Merck discussed with FDA a clinical trial to support a label change of mumps potency lower than 4.3 $\log_{10}$ TCID$_{50}$. The lower potency would be an end-expiry potency. Ex. 186 (January 28, 1998 Letter and Attachment) at MRK-KRA01625508.

**Response**:  Undisputed that in 1997 Merck discussed with FDA a clinical trial to support

lowering the mumps specification on the MMR-II label to less than 4.3.  Also undisputed that

Merck was seeking to lower the mumps end-expiry specification on the MMR-II label.

139.    The result of additional discussions between FDA and Merck was a study titled "A Study of M-M-R II at Mumps Expiry Potency in Healthy Children 12 to 18 Months of Age" (Protocol 007). The goal of the study was to evaluate *non-inferiority*  i.e., to test whether the vaccine at a lower potency would have similar immunogenic effects as at higher potencies. Ex. 155 (Clinical Study Report (CSR)) at MRK-KRA00225021.

**Response**:  Disputed to the extent that "results of the negotiations" invokes unspecified facts

outside the statement which make it impossible to answer as a stand-alone fact.  Assuming

Merck is referring to the "discussions" referenced in SUMF1 ¶ 163, also disputed that those

---

[334] Merck Ex. 183 at '712 (1999 correspondence with FDA committing to put three lots a year on stability); Ex. 413 at '239 (During an April 4, 2001 conference between Merck and FDA regarding Merck's stability program, FDA's Dr. Carbone requested more than one lot be placed on stability: "[FDA] felt that one annual lot was insufficient and look to Merck for a proposal that will address their concern. They expect the number of lots on stability to increase and indicated that the number of lots manufactured per year should fit into the equation."); Ex. 399 at '928 (Merck February 28, 2005 letter:  "Merck…commits to place a minimum of three lots of MMRII on stability each year…"); Ex. 414 at '26 ("[FDA] thought that our stability program  with 1 annual lot  was insufficient to detect trends.")("[W]e committed to 3, we actually put 4 on stability each year."  The program was implemented in late 2006.); *see also* Ex. 347 at 267:21 268:5 (Calcott Dep.) ("[W]hen you go through a period … with uncertainty of product[] [stability], you go above the minimum requirements which is one lot per year. … where we had a concern about stability [for a product where Dr. Calcott was head of quality] … we ended up putting over 90 percent of batches on [stability] because of uncertainty."). Rel. 56 Add'l. Stat. SJ1 and SJ4 ¶ 40 (From 2000 2007 Merck manufactured from more than one hundred lots to several hundred lots of MMR II each year).

[335] Ex. 3 at ¶¶ 257 262; *see also* Ex. 4 at 211:6 13 (Kessler Dep.) ("I would be very happy to be reassured … that this problem [of 7% of lots manufactured after the overfill statistically predicted not to meet the 4.3 log TCID50/dose specification] was corrected. I see nothing in the record that says … FDA was informed of this … and that these children received potent vaccine … Because [from] everything I see, that's not the case, and that's why I am very concerned here.").

176

discussions were "negotiations."[336]  Also disputed the goal of the study was to evaluate non-inferiority.  Given the FDA's concerns surrounding MMR-II at lower, below-label mumps potencies, Merck required to demonstrate through Protocol 007 that MMR-II with lower, below-label mumps potencies would provide protection against mumps.[337]  Also disputed that Protocol 007 had a single goal.  Protocol 007 had two primary objectives (endpoints)[338]

---

[336] *See* Rel. Resp. SUMF1 ¶ 163, *supra*; *see also* Ex. 358 at 103:17 104:3 (Malone Dep.) ("The onus for justification of any decision that the sponsor makes in prosecuting and demonstrating the safety and immunogenicity and effectiveness or efficacy of the product is the responsibility of the sponsor.  What [FDA] in consultation with a medical officer may or may not have said or discussed is not binding.  The onus is on the sponsor to ensure that they have designed their studies in a way that ensures that the requirements for licensure have been met.  The onus is not on the [FDA].").

[337] Rel. 56 Stat. ¶ 51, *citing* Ex. 108 at '567 69 ("Protocol 007 was designed to determine whether Merck's MMR vaccine would remain effective against mumps if the potency (i.e. concentration) of the mumps component of the vaccine was reduced.  The study involved determining 'seroconversion rates'  which are used as a measure of mumps vaccine effectiveness at different potencies.") (representing purpose of Protocol 007 was to determine if below label potency vaccine was "comparably protective") (The AIGENT and ELISA tests in Protocol 007 "measured the effectiveness of the vaccine at the potencies being studied.") ("[I]n approving Merck's label change request, the FDA found …. That the vaccine would be adequately protective against mumps even if Merck were to reduce the potency of the mumps component …."); Ex. 109 at '469 (FDA requiring Merck's Protocol 007 to provide "indicators of protection.  …  There are concerns about long term protection against mumps …."); Ex. 110 at '256 (FDA explaining to Merck "it is important that the immunogenicity at that low end be measured with a neutralization assay that can be reflective of protection."); Ex. 111 at '351 ("[I]n [Protocol 007] we are trying to establish clinical protective efficacy"); Ex. 53 at '878 ("[FDA] requires that [seroconversion rates] reflect protective efficacy."); Ex. 112 at '970 ("[T]he appropriateness of the cutoff employed in the ELISA for seropositivity should be supported by data demonstrating some relevance with protective levels of antibody (e.g., neutralizing antibody)."); Ex. 113 at '756 (FDA referring to Protocol 007 testing as an "immunological correlate for efficacy of mumps vaccination"); Ex. 114 at '259 ("As the PRN assay is an immunological endpoint for protection against wild type disease, [FDA] stated that the virus used in the assay must be wild type (early passage) virus, not attenuated virus vaccine."); Ex. 100 at '349 ("This change in mumps expiry specification is feasible only on the basis of clinical efficacy data which is currently being generated [in Protocol 007]."); Ex. 17 at 60:10 61:2, 118:25 119:8 (Bramble Dep.) (testifying purpose of Protocol 007 was "to determine the effectiveness of the dose levels … [o]r the efficacy"); Ex. 115 at 68:14 69:8 (Deposition of Merck Employee Dr. Emilio Emini (hereinafter "Emini Dep.")) ("The question [in Protocol 007] was … what potency level … should still be present in the vaccine at the end of shelf life that reflects the effectiveness of the vaccine."); Ex. 116 at 32:19 22 (Deposition of Merck Employee Dr. Florian Schodel (hereinafter "Schodel Dep.")) ("Merck had to make sure that whatever was in the vaccine throughout shelf life maintained its efficacy."); Ex. 30 at 114:2 3, 115:22 23 (Merck Expert Durbin Dep.) ("FDA wanted an assay that was reflective of clinical protection") ("FDA wanted an assay that could relate to the clinical outcome of protection."); Ex. 3 ¶¶ 72, 385 (Kessler Rep.) ("FDA required the mumps immunogenicity testing [to support a sBLA to lower the mumps end expiry potency claim for MMR II] to reflect protection against disease as a result of getting the vaccine") ("The objective of Protocol 007 was to measure MMRII's ability to protect against currently circulating wild type mumps, especially at a potency lower than … 4.3 [log].").

[338] Rel. 56 Stat. ¶ 58 *citing among other evidence* Ex. 105 at '5017 (Protocol 007 CSR) ((1) "To demonstrate an adequate immune response [by mumps virus neutralization] among subjects receiving M M R[TM]II containing an expiry dose of mumps [4.0 log or 3.7 log] …."; and (2) "To demonstrate a similar immune response to mumps virus by neutralization among subjects receiving M M R[TM]II containing an expiry dose of mumps virus [4.0 log or 3.7 log] … compared to subjects receiving M M R[TM]II containing a release dose [4.9 log] of mumps ….").

and two secondary objectives (endpoints).[339]  Undisputed that the title of Protocol 007 was

"A Study of M-M-R II at Mumps Expiry Potency in Healthy Children 12 to 18 Months of

Age."

140.    The study would be a clinical trial studying the effect of vaccination on children who had not yet received the vaccine and who would be randomized to receive vaccine lots at different potencies. *Id.* at '018, '022.

**Response**:  Undisputed.

141.    Protocol 007 was *not* a study of vaccine efficacy. Rather, efficacy of the vaccine was established through the Hilleman studies. Ex. 200 (Musey Dep. Tr.) at 81:2-22; Ex. 104 (Durbin Dep. Tr.) at 62:25-63:9; Ex. 105 (Emini Dep. Tr.) at 128:24-129:6, 130:21-131:3, 311:9-11; Ex. 123 (January 29, 2004 Submission) MRK-KRA00000116.

**Response**:  Disputed.  Merck repeatedly identified Protocol 007 as a study of vaccine

efficacy.[340]  In the context of Merck's mumps testing, including Protocol 007, Merck also

used the terms "efficacy" and "effectiveness" interchangeably.[341]  Also disputed that the

evidence cited supports the statement that "efficacy of the vaccine was established through

[339] Rel. 56 Stat. ¶ 58 (The secondary objective of Protocol 007 were "[t]o demonstrate similar immune responses to … mumps … (seroconversion rates by ELISA) among children who receive M M R™II containing an expiry dose of mumps [4.0 log or 3.7 log] … compared to children who receive M M R™II containing a release dose of mumps [4.9 log] and "[t]o summarize the persistence of antibody to … mumps … 1 year post vaccination in each treatment group."); *see also* Ex. 109 at '469 ("There are concerns about long term protection against mumps … by the vaccine …. As an indicator of duration of protection, the follow up period should be extended to one year post vaccination to assure that the vaccine at end expiry is sufficiently immunogenic.").

[340] Merck Ex. 123 at '38 (Merck identified its sBLA, supported by Protocol 007, as an "Efficacy Supplement" on the face of its application); Merck SUMF4¶ 174 (describing Protocol 007 data as "data on the efficacy of the vaccine at potencies lower than 4.3 log10 TCID50/dose"); *see also* Exs. 193 198 at 1 (clinicaltrials.gov archives indicating Protocol 007 was an "Efficacy Study"); Rel. 56 Stat. ¶¶ 137 143 and 150 *citing* Ex. 42 at '708 ("In addition, and more seriously, [FDA] challenged the efficacy of marketed product at the lowest predicted potencies (below label claim). … With regard to product efficacy, we provided an interim analysis of an ongoing mumps end expiry trial to justify efficacy of lower potency product.  [FDA] accepted the Merck response."); Ex. 23 at 33:24 34:10 (Hartzel Dep.) (testifying and affirming "investigators" and "site personnel" are "the individuals at the clinical sites that are enrolling the patients and observing them for safety and efficacy" and "drawing the blood from the patients"); Ex. 137 at '321 ("The purpose … is to provide clinical data supporting a reduction in expiry potency …. This clinical data provides evidence … based on … [AIGENT] assay used as a surrogate marker for vaccine efficacy.").

[341] Ex. 359 at 58:4 7 (Morsy Dep.) (Efficacy and effectiveness are "interchangeable."); Ex. 108 at '567 69 (Protocol 007 "measured the effectiveness of the vaccine at the potencies being studied."); Ex. 189 at '116 ("In agreement with … FDA, the mumps specific PRN assay [AIGENT] was developed and used as a surrogate for vaccine effectiveness."); *see also* Merck Ex. 41 at 27:11 28:6 (Pallansch Dep.) ("[E]fficacy is often measured in a specific clinical trial setting, where you know who is vaccinated and not … it's often also applied to a situation of measuring immunogenicity as well as disease in the context of those clinical trials…").

the Hilleman studies." Merck Ex. 105, 123 and 200 do not support this statement. In Merck

Ex. 104, Dr. Durbin's testified that Dr. Hilleman's placebo-controlled study was an "efficacy"

study. She did not testify that "efficacy of the vaccine was established" as stated.[342]

Undisputed that efficacy of the monovalent mumps vaccine was established by Dr. Hilleman

in the 1960s, but disputed that those studies were accepted by FDA to support vaccines sold

after 2000.[343]

142.    Instead, the study evaluated seroconversion in subjects receiving different
potencies to compare whether a lower-potency vaccine would have similar immunogenic effects
to the higher-potency vaccine. Ex. 155 (CSR) at MRK-KRA00225021; Ex. 105 (Emini Dep. Tr.)
at 137:23-138:20.

**Response**: Disputed to the extent the phrase "[i]nstead, the study" invokes unspecified facts

outside the statement which make it impossible to answer as a stand-alone fact. Assuming

Merck is referencing SUMF1 ¶ 166 and Protocol 007, also disputed since Merck is conflating

what Protocol 007 was designed to do and how the study measured the stated objectives.

---

[342] Merck Ex. 104 at 62:25  63:4 ("So Dr. Hilleman's study was a true efficacy study. So it was measuring how many people who got the vaccine got mumps, compared to people who didn't get the vaccine and got mumps showed a high degree of efficacy."); *see also* Merck Ex. 41 at 27:11 28:6 (Pallansch Dep.) ("[E]fficacy is often measured in a specific clinical trial setting, where you know who is vaccinated and not … it's often also applied to a situation of measuring immunogenicity as well as disease in the context of those clinical trials…")

[343] Rel. 56 Stat. ¶ 33 (FDA rejecting Merck's original clinical studies as the basis for Merck to lower the mumps end expiry claim on the MMR II label) *citing among other evidence* Ex. 42 at '706 (Merck's "[a]rguments for the demonstrated immunogenicity at lower potencies of the monovalents and the apparent effectiveness … due to the virtual eradication of disease in the US … were further rejected [by FDA], because of the small number of children used in the studies, and the circumstantial nature of the justification."); Ex. 50 at '155 (same); Ex. 51 at '226 (same); Ex. 43 at '163 (same); Ex. 50 at '157 ("[T]he minimum immunizing dose studies were performed in a relatively small number of individuals … and have not been repeated in recent years or with the trivalent M M R®II vaccine []. Therefore, in order to determine the minimum expiry potency … it was essential to demonstrate the immunogenicity … at the reduced titers expected at expiry."); Ex. 51 at '228 (same); Ex. 53 at '877 (prior clinical studies "were old   based on small number of studies … and furthermore were questioned as to w[he]ther they are still valid in predicting the current protective efficacy …."); Ex. 54 at '425 ("A requirement was set forth by [FDA] to use a functional neutralization assay for [Protocol 007] … due to: 1 The efficacy statements in MMR®II label are based on old, limited data and an assay that is no longer used by Merck."); Ex. 2 at 82 83 (Malone Rep.) ("I agree with [the FDA's] assessment that Merck's original mumps efficacy studies, conducted on the monovalent vaccine (not the current trivalent or quadrivalent formulations), with a very small subject sampling, and with what I would consider antiquated testing methods, are not clinically relevant to ProQuad or M M R II ….").

179

Given the FDA's concerns surrounding MMR-II at lower, below-label mumps potencies,

Merck was required to demonstrate through Protocol 007 that MMR-II with lower, below-

label mumps potencies would provide protection against mumps.[344]  Protocol 007 had two

primary objectives (endpoints)[345] and two secondary objectives (endpoints).[346]  Undisputed

that one of the two primary objectives was to evaluate whether the immune responses

between the two lower potency doses was similar to the marketed dose.  Also undisputed that

the responses of the subjects in Protocol 007 were to be measured in terms of seroconversion.

143.    Protocol 007 would not, and could not, be used to corroborate the original
Hilleman efficacy results, in part because no subjects had the vaccine entirely withheld, so there
would be no way to compare immunized subjects to non-immunized subjects.

**Response**:  Disputed. There is no evidence cited to support the proffered statement.[347]

144.    Moreover, as CBER has recognized, there is no antibody level known to be
protective for the mumps virus, so there is no way definitively to infer protection from antibody
levels in individual study subjects. Ex. 137 (March 13, 2000 Memo from Morsy) at MRK-
KRA00001263; Ex. 197 (Rubin, *Vaccines* (2018)) at 673.

**Response**:  Disputed.  Merck Ex. 137 does not support the proffered statement.[348]  Likewise,

Merck Ex. 197 does not support the proffered statement.[349]  Undisputed that Merck Exs. 137

---

[344] *See supra* note 115.

[345] Rel. 56 Stat. ¶ 58 *citing among other evidence* Ex. 105 at '5017 (Protocol 007 CSR) ((1) "To demonstrate an adequate immune response [by mumps virus neutralization] among subjects receiving M M R™II containing an expiry dose of mumps [4.0 log or 3.7 log] …."; and (2) "To demonstrate a similar immune response to mumps virus by neutralization among subjects receiving M M R™II containing an expiry dose of mumps virus [4.0 log or 3.7 log] … compared to subjects receiving M M R™II containing a release dose [4.9 log] of mumps ….").

[346] Rel. 56 Stat. ¶ 58 (The secondary objective of Protocol 007 were "[t]o demonstrate similar immune responses to … mumps … (seroconversion rates by ELISA) among children who receive M M R™II containing an expiry dose of mumps [4.0 log or 3.7 log] … compared to children who receive M M R™II containing a release dose of mumps [4.9 log] and "[t]o summarize the persistence of antibody to … mumps … 1 year post vaccination in each treatment group."); *see also* Ex. 109 at '469 ("There are concerns about long term protection against mumps … by the vaccine …. As an indicator of duration of protection, the follow up period should be extended to one year post vaccination to assure that the vaccine at end expiry is sufficiently immunogenic.").

[347] *See*, Judge Jones Policies and Procedures, Civil Cases, D. Summary Judgment Motions, ¶ 5.

[348] Merck Ex. 137 at '263 64 ("Dr. Carbone noted that we do not know what level of antibody is protective, and therefore the *appropriate definition of seroconversion*, or a minimally acceptable post vaccination response, *was uncertain*.") (emphasis added).

180

and 197 accurately reflect the positions of FDA's Drs. Carbone and Rubin regarding the

appropriate definition of seroconversion when there is no antibody level known to be

protective for mumps.

145.    In January 2004, Merck submitted a supplemental Biologics License Application (sBLA) to FDA requesting to change the label statement of mumps potency from 4.3 $\log_{10}$ (20,000) $TCID_{50}$ per dose to 4.1 $\log_{10}$ (12,500) $TCID_{50}$ per dose. Protocol 007 provided supporting immunogenicity data to indicate that a mumps vaccine with potency of 4.1 $\log_{10}$ $TCID_{50}$ per dose was comparably immunogenic to a vaccine with potency of 4.8 $\log_{10}$ $TCID_{50}$ per dose. Ex. 123 Jan. 29, 2004 Submission) at MRK-KRA00000032-33.

**Response**:  Disputed.  Undisputed that Merck submitted the application and Protocol 007

was the only supporting clinical study but disputed to the extent Merck implies that the

Protocol 007 immunogenicity data actually supported the change to the mumps

specification.[350]

146.    After several rounds of comments from CBER and responses from Merck, CBER notified Merck in May 2007 that it would not approve the sBLA based on Protocol 007's PRN assay, principally due to an insufficient quantity of data. Ex. 87 (Oct. 17, 2005 Letter) MRK-KRA00000479 at '479; Ex. 88 (Nov. 15, 2006 Letter) MRK-KRA00000393 at '397, '399. Specifically, FDA stated: "Our review finds that the information and data submitted are inadequate for final approval at this time. We cannot accept use of multiple imputation analysis of the PRN data to support the lowering of mumps vaccine end-expiry potency."  Ex. 126 (May 18, 2007 Letter) at MRK-KRA00000385. CBER also noted, however, that immunogenicity testing had "substantially evolved since our initial testing requirements" and that "[u]se of ELISA data to evaluate the effect of differences in product potency on immunogenicity is now acceptable."  *Id.* CBER requested that Merck submit a new analysis pooling the control lot from Protocol 007 with two lots from previous studies to create a new control group against which to evaluate the lower-potency immunogenicity. *Id.*

**Response**:  Disputed that FDA letter stated immunogenicity testing "had substantially

evolved."  Undisputed that Merck Ex. 158 at '85, the May 2007 letter from FDA to Merck,

states: "the science related to immunogenicity testing of M-M-R®II has substantially evolved

since our initial testing requirements" but disputed to the extent Merck implies FDA reached

---

[349] Merck Ex. 197 at '673 ("results of the virus neutralization assay *are difficult to interpret* due to the absence of an established neutralizing antibody titer that can be used as a surrogate market of protection.") (emphasis added).

[350] Rel. 56 Stat. ¶¶ 116 24 (collecting evidence).

this conclusion independently.  From January 2004 to May 2007 Merck responded to comments from FDA in the review of the sBLA to lower the MMR-II minimum potency specification.[351]  FDA allowed Merck to use ELISA only after Merck's repeated misrepresentations to FDA of the clinical relevance of the ELISA correlation, data, and serostatus cutoff.[352]  Also disputed that the science related to immunogenicity testing of MMR-II had evolved leading to the acceptance of ELISA data.[353]  Undisputed that in May 2007 FDA notified Merck it would not approve the sBLA to lower the MMR-II minimum potency specification.  Also undisputed that the statement quotes Merck Ex. 158 stating: "Our review finds that the information and data submitted are inadequate for final approval at this time. We cannot accept use of multiple imputation analyses of the PRN data to support the lowering of mumps vaccine end-expiry potency."  Also undisputed that FDA requested Merck submit a new analysis pooling the control lot from Protocol 007 with two lots from previous studies to create a new control group against which to evaluate the lower-potency immunogenicity.

---

[351] Rel. 56 Stat. 146 151 (collecting evidence); *see also* Ex. 4 at 338:16 18 (Kessler Dep.) ("I'm surprised at the number of complete responses [to the sBLA from FDA], which was basically denials.  That's unusual.").

[352] Rel. 56 Stat. ¶¶ 147, 149, 151; *see also* Ex. 2 at '78 (Malone Rep.) ("Following Merck's repeated misrepresentations … CBER allowed Merck to use the … ELISA data to support its mumps end expiry potency sBLA."); Ex. 9 at 184:8 12 (Fisher Dep.) (Q: "Is the argument [Merck is] making [in Ex. 88, the November 2006 submission to FDA] that the FDA can look at the ELISA data in part because it correlates strongly to the PRN data. A: Yes.") and Ex. 9 at 198:6 200:5 (Fisher Dep.) (The "hard work in bringing the FDA to the conclusion that the use of ELISA to evaluate immunogenicity for the mumps end expiry study" was "the entirety of [Merck's] submissions" including "what we sent them on concordance testing" between the PRN and ELISA.) (referencing "the science related to immunogenicity testing of M M R®II has substantially evolved").

[353] Ex. 4 at 343:6 8 (Kessler Dep.) ("I certainly wouldn't subscribe to your view that … the science has changed.") (referencing "the science related to immunogenicity testing of M M R®II has substantially evolved"); Ex. 4 at 344:15 345:2 (Kessler Dep.) ("[I]t's not that the science evolved and then [ELISA] could be used. [ELISA] needed to be correlated … the justification of ELISA was that it was linked to the [plaque reduction neutralization] test, and the [plaque reduction neutralization] test was linked to clinical relevance. But we know … those links were broken … you can't justify using the ELISA test … as was done here … The science doesn't support that.") (referencing "the science related to immunogenicity testing of M M R®II has substantially evolved").

Appx18933

147.    Merck has presented the ELISA results from Protocol 007 to the CDC. Ex. 220 (email); Ex. 242 (Feb. 25, 2010 presentation) at Slide 9.

**Response**:  Undisputed that Merck provided CDC a slide deck presentation, Exhibit 242,

titled "Immunogenicity of Mumps-Containing Vaccines Mumps Research Priorities Meeting

February 25, 2010." Also undisputed that Slide 9 is titled "Persistence of Mumps

Immunogenicity ~ 1 Year after 1 dose of either ProQuad™ or M-M-R™II as Measured by

ELISA."  Undisputed that the first three rows on slide 9 indicate results from Protocol 007,

Mumps End Expiry Study.

148.    Merck provided the requested information in June 2007 and follow-up information in August 2007, reporting that the lots were consistent and allowed for a pooled control data set as CBER suggested. Further, the 4.1 $\log_{10}$ $TCID_{50}$ lot from Protocol 007 also met the non-inferiority criteria compared to the pooled control data. Ex. 124 (June 5, 2007 Letter) at MRK-KRA00000374; Ex. 126 (May 18, 2007 Letter) at MRK-KRA00000385-86.

**Response**:  Disputed to the extent that "the requested information" has no antecedent and is

invoking unspecified facts outside the statement which make it impossible to answer this as a

stand-alone statement of fact.  Disputed to the extent that the cited evidence does not support

the statement that Merck provided follow-up information in August 2007.  Undisputed that in

June 2007 Merck resubmitted Protocol 007 ELISA data in response to the FDA's May 2007

letter, but disputed that the ELISA data Merck submitted to FDA in June 2007 was reliable

and clinically relevant to use to determine whether the stated criteria were met.[354]

Undisputed that Merck further supported the sBLA to lower the MMR-II minimum potency

specification by also including in its June 2007 submission ELISA data from the clinical

studies it used to support the ProQuad BLA and sBLA for MMR-II with rHA.  Rel. 56 Stat. ¶

153.

_____

[354] Ex. 2 at 78 (Malone Rep.).

Appx18934

149. Based on that data, CBER approved Merck's sBLA to change the labeled potency to 4.1 $\log_{10}$ $TCID_{50}$ in December 2007. Ex. 125 (Dec. 8, 2007 letter from FDA) at MRK-KRA00000383.

**Response**: Disputed to the extent that "Based on that data" is invoking unspecified facts

outside the statement which make it impossible to answer this as a stand-alone statement of

fact. Disputed that FDA approved the sBLA to lower the MMR-II minimum potency

specification based on the data Merck submitted in June 2007. CBER approved the sBLA

based on the entirety of Merck's submissions, including Merck's repeated misrepresentations

while the sBLA was pending about the correlation that allowed Merck to use ELISA data to

support the sBLA.[355]

150. Despite the approved label change in 2007, Merck has never reduced the release potency specification for the MMR-II vaccines it manufactures, and it continues to use 5.0 $\log_{10}$ $TCID_{50}$ as the minimum potency for release. Ex. 202 (Stannard Dep. Tr.) at 298:4-7 (Q: ". . . [h]as the target manufacturing potency or the release potency changed since . . . September 1999?" A: "It has not."); Ex. 201 [Stannard Dep. Ex. 3] (Summary of Potency Topics) at 2 ("Minimum Release Potency for mumps in MumpsVax, MM-Vax and MMR" from October 4, 1999 to the present reported as 5.0 $\log_{10}$ $TCID_{50}$/dose).

**Response**: Undisputed.

151. Beginning in 1996 and continuing through 2001, Merck and FDA engaged in comprehensive and collaborative discussions about the potency of the mumps vaccine and how to interpret the potency language in the label. *See* Ex. 186 (Jan. 28, 1998 Letter to Hardegree) at MRK-KRA01625508; Ex. 178 (Dec. 10, 1998 Letter to Hardegree) at MRK-KRA01622125; Ex. 180 (Jan. 8, 1999 Letter to Egan) at MRK-KRA01622468.

---

[355] Ex. 2 at '78 (Malone Rep.) ("Following Merck's repeated misrepresentations … CBER allowed Merck to use the … ELISA data to support its mumps end expiry potency sBLA."); *see also* Ex. 9 at 198:6 200:5 (Fisher Dep.) (The "hard work in bringing the FDA to the conclusion that the use of ELISA to evaluate immunogenicity for the mumps end expiry study" was "the entirety of [Merck's] submissions" including "what we sent them on concordance testing" between the PRN and ELISA.); *see also* Ex. 4 at 349:15 21(Kessler Dep.) (On the basis of "the representations that Merck made in the [] ELISA … that it was correlated with the [plaque reduction neutralization test] and that it had clinical relevance … the [FDA] approved the [sBLA to lower the end expiry specification]."); *Id*. at 350:10 13 ("So the approval [of the sBLA to lower the end expiry claim] was based on what Merck represented to FDA."); *Id*. at 353:23 25 ("[A]t the end of the day, FDA relied on what Merck said to it and approved this [sBLA].") *Id*. at 355:16 17 (Kessler Dep.) ("[J]ust underscore FDA approved this [sBLA] based on what Merck stated.").

**Response**: Disputed. The evidence cited does not support the proffered statement. The three exhibits dated in January 1998, December 1998 and January 1999 cannot support a statement of fact about events that happened from January 8, 1999 through 2001. Also disputed that three documents support a statement that discussions were "comprehensive" to the extent these three exhibits are cited to cover a five-year period. Also disputed to the extent the evidence cited does not support that discussions between Merck and FDA from 1996-1997 were "how to interpret the potency language in the label."[356] Undisputed that in 1996 and 1997 Merck and FDA engaged in discussions concerning the MMR-II label regarding mumps potency.[357]

152.    At this time, the MMR-II label read: "When reconstituted as directed, the dose for injection is 0.5 mL and contains not less than equivalent of . . . 20,000 $TCID_{50}$ [or 4.3 $log_{10}$ $TCID_{50}$] of the U.S. Reference Mumps Virus." *See* Ex. 165 (March 1995) at MRK-KRA00757060.

**Response**: Disputed. The phrase "At this time" necessarily invokes an unspecified time that requires facts outside the statement to clarify which makes it impossible to answer as a stand-alone statement. Undisputed that from 1995-1999, the MMR-II label specified that "the dose … contains not less than … 20,000 TCID50 of the … Mumps Virus."[358]

153.    During these initial discussions, FDA and Merck discussed the fact that Merck had interpreted the label to refer to the minimum release potency, and FDA interpreted the potency listed on the label to refer to the minimum potency at the end of the 24-month shelf life. *See* Ex. 186 (Jan. 28, 1998 Letter to Hardegree) at MRK-KRA01625508; Ex. 178 (Dec. 10, 1998 Letter to Hardegree) at MRK-KRA01622125; Ex. 180 (January 8, 1999 Letter to Egan) at MRK-KRA01622468.

---

[356] Rel. Resp. SUMF1 ¶155, *supra*.

[357] Rel. Resp. SUMF1 ¶155; *see also* Rel. Resp. SUMF1 ¶ 159 (regarding 1997 1999 discussions between Merck and FDA about historical mumps potency data).

[358] Ex. 225 (MMR II label Mar. 1995) and Ex. 37 at '029 (MMR II label Apr. 1999); *see also* Rel. Resp. SUMF1 ¶ 70 (Undisputed that from 1999 2007 the MMR II label stated that "[e]ach 0.5 mL dose contains not less than . . . 20,000 TCID50 of mumps virus"  equivalent to 4.3 log10 TCID50.).

Appx18936

**Response**: Disputed. The phrase "During these initial discussions" necessarily invokes unspecified facts outside the statement which makes it impossible to answer as a stand-alone statement particularly with regard to when "these initial discussions" took place. Also disputed that Merck Ex. 180 supports the proffered fact. Exhibit 180 is the minutes of a December 1998 meeting between FDA and Merck regarding mumps stability and the need to increase the mumps release specification, not the mumps potency specification on the MMR-II label. Also disputed that from 1996 to 1999 Merck and FDA "discussed" how each of them "interpreted" the mumps potency claim on the MMR-II label. At all relevant times, FDA was clear that the specification on the MMR-II label was an end expiry specification.[359]

154. During the 1996-1999 discussion, Merck and FDA discussed the fact that Merck had historically manufactured the mumps vaccine using a target manufacturing potency of 4.9 $\log_{10}$ TCID$_{50}$ to assure it would have a minimum release specification of 4.3 $\log_{10}$ TCID$_{50}$. *See* Ex. 186 (Jan. 28, 1998 Letter to Hardegree) at MRK-KRA01625508; Ex. 178 (Dec. 10, 1998 Letter to Hardegree) at MRK-KRA01622125; Ex. 180 (Jan. 8, 1999 Letter to Egan) at MRK-KRA01622468.

**Response**: Disputed. The phrase "[d]uring the 1996-1999 discussion" necessarily invokes unspecified facts outside the statement which makes it impossible to answer as a stand-alone statement particularly with regard to when "the 1996-1999 discussion" took place. Disputed that the cited evidence supports the proffered statement. None of Merck's cited exhibits reference discussion regarding Merck's manufacture using a target manufacturing potency of 4.9 log. Exhibits 178 and 180 do not support the statement about manufacturing to "assure it would have a minimum release specification of 4.3." Merck Ex. 186, Merck correspondence

---

[359] Merck Ex. 150 (Dec. 12, 1998 Internal Merck Memo) (FDA's "Dr. Baylor … stated that from [FDA's] perspective the titers on the label have always been perceived as expiry titers."); Merck Ex. 148 at '60 (May 12, 1999 Email) ("Dr. Baylor … does not believe the new label has changed substantially from the wording used for potency over the past 20 years."); Merck Ex. 186 at '08 ("During teleconferences in 1996 and in early 1997 … the need to clarify the label claims for potency and to define them in terms of … expiry became evident."); *see also* Rel. Resp. SUMF1 ¶ 158.

to FDA in which Merck claims the "minimum release titer is 20,000 [4.3]", is inconsistent with FDA's expressed position during this time that the mumps potency claim on the label was an expiry specification.[360]  Undisputed that before September 1999 Merck manufactured MMR-II with a mumps target manufacturing potency of 4.9 log (80,000 infectious dose units).[361]

155.    The "release specification" for potency is the established specification to which a material must conform at the time of its release, meaning that many vaccines would be released with a higher potency. *See, e.g.*, Ex. 246 (MMD Quality Manual Glossary and Commonly Used Acronyms) at MRK-KRA01679729.

**Response**:  Disputed that Merck Ex. 246 at '729 provides the definition for "release specification" set forth in this statement.  Disputed to the extent Merck does not provide any evidence to support its assertion that this definition means "many vaccines would be released with a higher potency" than the "release specification."  Undisputed that the cited evidence defines "release limits" as "established specifications to which a material must conform at the time of its release.  These limits are normally based on stability and assay variability data and assure that the product will conform to regulatory specifications through its life to expiry.  They are generally more restrictive and may never be looser than shelf life limits."

---

[360] Rel. 56. Stat. ¶29 30, *citing* Ex. 42 at '706 07 ("During communications with [FDA] in 1996 98, it became evident that the [FDA] … defined [the label's potency] specifications as end expiry potencies."); Ex. 43 at '165 66 (same); Ex. 44 at '760 ("In 1990, the mumps virus end expiry potency for M M R$^{TM}$ II was established as 4.3 [log]."); Ex. 17 at 26:15 27:10, 28:2 7 (Bramble Dep.) (testifying FDA's position was potency on label was minimum potency required at end of shelf life); Ex. 3 ¶ 419.3 (Kessler Rep.) ("[A]s long as the MMR II label stated 'not less than 4.3 [log]' Merck was required to have adequate procedures to assure that MMR II vaccine had that amount of mumps virus per dose through end expiry."); *see also* Merck Ex. 150 (Dec. 12, 1998 Internal Merck Memo) (FDA's "Dr. Baylor … stated that from [FDA's] perspective the titers on the label have always been perceived as expiry titers."); Merck Ex. 148 at '60 (May 12, 1999 Email) ("Dr. Baylor … does not believe the new label has changed substantially from the wording used for potency over the past 20 years.").

[361] Rel. 56 Stat. ¶ 34 (In September 1999, Merck implemented the Overfill, which doubled its mumps target manufacturing potency, increasing it to 5.2 log (160,000 infectious dose units), with a mumps minimum release potency of 5.0 log (100,000 infectious dose units)).

Appx18938

156.    Also during these discussions, Merck submitted to FDA all of the mumps stability data in its possession dating back to 1986. For example, on January 28, 1998, Merck presented to FDA data on the average release potencies with the then minimum release potency of 4.3 $\log_{10}$ $TCID_{50}$ and stability data from lots manufactured between 1987 and 1996. *See* Ex. 186 (Jan. 28, 1998 Letter to Hardegree) at MRK-KRA01625508; Ex. 178 (Dec. 10, 1998 Letter to Hardegree) at MRK-KRA01622125; Ex. 180 (Jan. 8, 1999 Letter to Egan) at MRK-KRA01622468.

**Response**:  As to the first sentence, disputed to the extent "[a]lso during these discussions"

necessarily invokes unspecified facts outside the statement which makes it impossible to

answer as a stand-alone statement, particularly because there is no reference to any

discussions in the immediately preceding statement.  Also disputed to the extent the cited

evidence does not support Merck's proffered fact that Merck submitted to FDA "all of the

mumps stability data in its possession."  Also disputed that Merck Exs. 178 and 180 support

this statement.  *See* Merck Ex. 178 at '125 (referencing but not including stability data

analysis); Merck Ex. 180 at '468 (same).  Also disputed that 4.3 log was a minimum release

potency.[362]  Disputed that the pinpoint citation to Merck Ex. 186 at '508 supports this

statement, but undisputed that Merck sent FDA mumps "[s]tability data … from 1987 to

1996."  Merck Ex. 186 at '576-87.

157.    In stability studies, Merck's manufacturing division measures the potency of the vaccine at different, routine, intervals    usually every three months    through the end of the shelf life, following FDA guidelines. In this way, Merck assesses how much potency is lost at each interval over the course of the vaccine's shelf life. Ex. 192 (Sept, 6, 2016 Vaccine & Biological Stability Protocol) at MRK-KRA02139917; *see also* Ex. 91 (Gulati Report) at 14.

**Response**:  Disputed to the extent Merck implies this general stability protocol (Merck Ex.

192) was in effect before 2005.  Also disputed that the pinpoint citation to Merck Ex. 192 at

---

[362] Rel. 56. Stat. ¶29 30, *citing* Ex. 42 at '706 07 ("During communications with [FDA] in 1996 98, it became evident that the [FDA] … defined [the label's potency] specifications as end expiry potencies."); Ex. 43 at '165 66 (same); Ex. 44 at '760 ("In 1990, the mumps virus end expiry potency for M M RTM II was established as 4.3 [log]."); Ex. 17 at 26:15 27:10, 28:2 7 (Bramble Dep.) (testifying FDA's position was potency on label was minimum potency required at end of shelf life); Merck Ex. 150 (Dec. 12, 1998 Internal Merck Memo) (FDA's "Dr. Baylor … stated that from [FDA's] perspective the titers on the label have always been perceived as expiry titers."); Merck Ex. 148 at '60 (May 12, 1999 Email) ("Dr. Baylor … does not believe the new label has changed substantially from the wording used for potency over the past 20 years.").

'917 supports this statement.  Since this is a general stability protocol referencing site specific

stability programs which have not been included as part of the exhibit, the statement is not

supported by the evidence cited.  Also disputed that Merck Ex. 91 at 14 (Gulati Report)

supports this statement.[363]

158.    Because Merck manufactures each lot of vaccine to detailed specifications, any lot used for stability testing is representative of other lots on the market manufactured at the same time. Ex. 188 MRK-KRA01897103 at '235-236; *see also* Ex. 91 (Gulati Report) at 23.

**Response**:  Disputed.  *See* Ex. 394 at 427:19-24 (Gulati Dep.) ("I mean, vaccines are

biological products and potency is a biological assay. Variability is very high even day to day.

So year to year because you will see the impact of the season. I mean, you will see all kind of

variability."). Also, neither of the exhibits cited support the statement that "Merck

manufactures each lot of vaccine to detailed specifications."

159.    Based on the data submitted, FDA was informed that the vaccine's potency could fall below the 4.3 $\log_{10}$ $TCID_{50}$ labeled specification during the vaccine's shelf-life. *See*  Ex. 186 (Jan. 28, 1998 Letter and Attachment) at MRK-KRA01625513-14 (slides from presentation stating the "minimum release specification" of 4.3 and the "average release potency" of 4.9), MRK-KRA01625521-23 (slides stating that in a study of 23 lots, the mean expiry titer was 3.9 $\log_{10}$ $TCID_{50}$, with a range of observed potencies between 3.7 $\log_{10}$ $TCID_{50}$ and 4.1 $\log_{10}$ $TCID_{50}$), MRK-KRA01625566 (slide discussing an analysis of recently manufactured lots and a prediction of a potency of 3.9 $\log_{10}$ $TCID_{50}$ at end-expiry); *see also* Ex. 243 (Dec. 16, 1998 Letter to Rastogi) at MRK-KRA01629294.

**Response**:  Disputed.  The phrase "[b]ased on the data submitted" necessarily invokes

unspecified facts outside the statement which makes it impossible to answer as a stand-alone

statement, particularly with regard to what data Merck claims informed the FDA.  Also

disputed because citation to documents dated in 1998 without limiting the fact to MMR-II

vaccine Merck manufactured before the September 1999 ignores material facts.  The cited

---

[363] Merck Ex. 91 at 14, ¶¶ 51 54 (Gulati Report) (discussing *current* stability program).

189

evidence was disclosed to the FDA and formed part of the basis for Merck to change the

manufacture of MMR-II and begin to overfill to ensure compliance with the label

specification.[364]  After Merck implemented the manufacturing change in 1999 to remedy its

inability to meet the 4.3 specification, it still could not assure the 4.3 specification, but failed

to inform FDA.[365]  Undisputed that the statement accurately cites Merck Exhibit 186.

160.     Thus, FDA had information from Merck that mumps vaccine released between
$4.9 \log_{10} TCID_{50}$ and $4.3 \log_{10} TCID_{50}$ could, and did, fall below the potency of $4.3 \log_{10} TCID_{50}$
stated on the label. *See* Ex. 186 (Jan. 28, 1998 Letter to Hardegree) at MRK-KRA01625508; Ex.
178 (Dec. 10, 1998 Letter to Hardegree) at MRK-KRA01622125; Ex. 180 (Jan. 8, 1999 Letter to
Egan, N. Baylor, and P. Patriarca) at MRK-KRA01622468; *see also* Ex. 148 (Memo on
Discussions with N. Baylor) at MRK-KRA00094960.

**Response**:  Undisputed that in 1998 and early 1999 FDA had information from Merck that

some mumps vaccines manufactured to the pre-overfill specification and released between

4.9 and 4.3 could not meet the label specification.  FDA directed Merck to increase the

minimum release specification of MMR-II because of Merck's inability to meet the 4.3 label

specification.[366]  Disputed that the statement, which is not restricted as to time, implies that

Merck's disclosures to FDA in 1998 informed FDA in any way about Merck's ability to meet

the MMR-II label specification of 4.3 for mumps after the September 1999 overfill or how

much mumps vaccine would fail to meet the specification.  Also disputed that Merck

---

[364] *See* Rel. 56 Stat. ¶ 34; Ex. 42 at '707, '714 ("It was determined that the mumps component could not meet its
specifications if current manufacturing practices were followed.  As such, the manufacturing process had to change
to increase the amount of mumps component in [MMR II].") ("Ongoing [FDA] concerns about misbranding result
in agreement to increase the minimum release spec[ification] for mumps from 4.3 [log] to 5.0 log[].").

[365] Rel. 56 Stat. ¶ 43 45 (collecting evidence).

[366] Merck Motion 4 at 14 15; *see also* Rel. 56 Stat. ¶ 34; Ex. 42 at '707, '714 ("It was determined that the mumps
component could not meet its specifications if current manufacturing practices were followed.  As such, the
manufacturing process had to change to increase the amount of mumps component in [MMR II].") ("Ongoing
[FDA] concerns about misbranding result in agreement to increase the minimum release spec[ification] for mumps
from 4.3 [log] to 5.0 log[].").

**Appx18941**

Exhibits 178 and 180 support the proffered statement.  Neither document discusses whether

Merck's mumps vaccines could or did fall below the label specification.

161.    To address the known issue that lots released at or near 4.3 $\log_{10}$ $TCID_{50}$ would not sustain potency at or above 4.3 $\log_{10}$ $TCID_{50}$ over the 24-month shelf life, on August 20, 1999, FDA directed Merck to increase the minimum release potency to 5.0 $\log_{10}$ $TCID_{50}$ with a target manufacturing potency of 5.2 $\log_{10}$ $TCID_{50}$. Ex. 141 (Aug. 20, 1999 Letter to McKee) at MRK-KRA00018614-19.

**Response**:  Disputed that the evidence cited supports Merck's proffered fact that 4.3 log was

a minimum release potency.  Merck Ex. 185 at '909.  Also disputed because Merck cites the

entire document and does not identify the specific part of the record that supports this

statement.[367]  Also disputed to the extent the statement does not describe, and the evidence

does not support, what was known, by whom, and when about "lots released at or near 4.3

$\log_{10}$ $TCID_{50}$ would not sustain potency at or above 4.3 $\log_{10}$ $TCID_{50}$ over the 24-month shelf

life."  Also disputed to the extent Merck implies that the steps taken in 1999 to address the

"known issue" assured that lots would have potency at or above 4.3 log over the course of the

24-month shelf life. [368] Also disputed that 4.3 log was a minimum release potency.[369]  Also

---

[367] *See* Judge Jones Policies and Procedures, Civil Cases, D. Summary Judgment Motions, ¶ 5.

[368] Rel. 56 Stat. ¶¶ 43‐46, *citing* including but not limited to, Ex. 69 at '865 ("**Compliance**:  Even with higher mumps target, current stability data suggest 4.3 [log] at expiry cannot be supported.") (emphasis in original); Ex. 70 at 1 ("Stability data do not support current end of shelf life label claim (4.3 log[])"); Ex. 71 at '149 ("[C]urrent stability data do not support an adequate end expiry mumps potency claim of greater than 4.0 log[]."); Ex. 72 at 10, 15 ("Product still not compliant with labeled mumps potency…[Merck] must file a Biologic Product Deviation report to [FDA] detailing results of investigation and medical impact (estimate ~7% of lots).") ("[E]xpect ~7% of lots to test below 4.3 [log] at some point."); Ex. 73 at '819 ("We've been lucky with mumps so far, but it's only a matter of time, since we can statistically predict that a certain number of lots will fail on stability."); Ex. 74 at '134 ("[O]ur most recent stability analysis for mumps does not support the current label claim"); Ex. 75 at '985 ("The [enhanced release model] indicated that the current release titers of 5.0 log[] for mumps … are also insufficient to meet the current minimum potencies at expiry of 4.3 [log]..."); Ex. 76 at '066‐67 ("[T]he stability model … does not support an expiry of 20,000 [4.3 log] after storage for 24 months"; recognizing "need to remediate the compliance gap for the expiry potency for M‐M‐R®II product …."); Ex. 79 at '892‐93 ("Based on recent stability analyses…we now believe that we do not have adequate (95%) confidence that the current manufacturing process supports the 4.3 log[] label claim.  As such, an immediate corrective action must be taken."); Ex. 80 at '762 (Merck has "no controls to ensure" MMR II complies with 4.3 log potency for full 24 month shelf life.); Ex. 49 at 211:4‐9 (Bennett Dep.) ("[The] analyses that I had performed showed that [the minimum release specification of] 5.0 [log] would not support an expiry of 4.3 [log] based upon the release assays, the stability loss estimates and the variability in the loss estimates."); Ex. 3 ¶¶ 419, 419.14 (Kessler Rep.) ("From at least 1998‐December 2007, Merck did not have

191

disputed that Merck ever released MMR-II lots with mumps potency at or below 4.3 log.[370]

Otherwise undisputed.

162.    FDA's August 20, 1999 letter stated:

- "Based on CBER's calculations the average titer of six independent and valid potency assays must be at least 5.0 $\log_{10}$ TCID$_{50}$ at the time of release in order to be 95% confident that the lot will maintain a potency of 4.3 $\log_{10}$ TCID$_{50}$ for the two years."

- "We understand that you will formulate all mumps-containing vaccine lots manufactured (filled) on and after September 13, 1999, to contain at least 5.2 $\log_{10}$ TCID$_{50}$. These lots will be released by CBER with a dating period of 24 months based upon the CBER potency testing criteria described above."

- "Furthermore, all mumps-containing lots submitted for CBER release, regardless of manufacturing date, will be subject to the described CBER release requirements as of November 8, 1999."

- "Additionally, as we requested in the August 16, 1999 telephone conversation, please submit a list of the approximately 60 currently pending mumps-containing vaccine lots (including the status, i.e., whether the lot has been packaged and dated, or filled by not packaged, or is in the queue for manufacturing with a committed stabilizer). Please identify each lot by lot number, and include the manufacturing date, the mumps titer and lot size (number of doses), if available."

Ex. 141 (Aug. 20, 1999 Letter) at MRK-KRA00018614-15.

**Response**: Undisputed.

---

adequate procedures to assure that MMR II vaccine had 'not less than 4.3 [log]' … through end expiry.") ("From May 1998 December 2007, MMR II was adulterated because Merck was unable to assure the potency specification for mumps of not less than 4.3 [log] … for the shelf life of the vaccine."); Ex. 4 at 281:6 16 (Kessler Dep.) ("[P]roduct … manufactured after the [Overfill] was adulterated" because "there was not assurances that it would be within the 4.3 [log] based on Merck's internal representations.").

[369] Rel. 56. Stat. ¶29 30, *citing* Ex. 42 at '706 07 ("During communications with [FDA] in 1996 98, it became evident that the [FDA] … defined [the label's potency] specifications as end expiry potencies."); Ex. 43 at '165 66 (same); Ex. 44 at '760 ("In 1990, the mumps virus end expiry potency for M M RTM II was established as 4.3 [log]."); Ex. 17 at 26:15 27:10, 28:2 7 (Bramble Dep.) (testifying FDA's position was potency on label was minimum potency required at end of shelf life); Merck Ex. 150 (Dec. 12, 1998 Internal Merck Memo) (FDA's "Dr. Baylor … stated that from [FDA's] perspective the titers on the label have always been perceived as expiry titers."); Merck Ex. 148 at '60 (May 12, 1999 Email) ("Dr. Baylor … does not believe the new label has changed substantially from the wording used for potency over the past 20 years.").

[370] Merck Ex. 186 at '574 589 (Single Dose Mumps Stability Data from 1987 to 1996 reflects no lots released below 4.3 log and only one lot released at 4.4 log).

192

163.    Following FDA's direction, Merck increased the target and minimum release potencies to 5.2 and 5.0 $\log_{10}$ $TCID_{50}$, respectively, and on September 15, 1999, Merck submitted to FDA the data requested on the mumps-containing vaccine lots awaiting release. Ex. 183 (Sep. 15, 1999 Letter to Egan) at MRK-01622711-12; *see also* Ex. 91 (Gulati Report) at 42.

**Response**: Disputed to the extent that Merck was "[f]ollowing FDA's direction."[371]    Merck

sought FDA approval to "change [] the minimum release titer for mumps to 5.0 $\log_{10}$" and fill

lots manufactured after September 13, 1999 "at a target titer of 5.2 $\log_{10}$."  Merck Ex. 183 at

'711.

164.    In the September 15, 1999 submission, in response to CBER's request for "information regarding the mumps potency testing procedure," Merck provided a "list of lots manufactured prior to September 13, 1999, at the previous target titer of 4.9 $\log_{10}$ $TCID_{50}$/dose and planned for submission for CBER release before the new release specification became effective on November 8, 1999."  The lots described in the submission were filled between October 1998 and September 1999, with a release potency ranging from 4.8 to 5.1 $\log_{10}$ $TCID_{50}$/dose, with one lot slightly higher. Merck further stated that the lots "contain approximately 120,000 vials except for [14 specified lots] that contain approximately 60,000 vials." While several of those lots were tested to have potency near or below 4.3 $\log_{10}$ $TCID_{50}$, FDA did not request that these lots be withdrawn or withheld from the market. *See* Ex. 183 MRK-KRA01622711-12] (Sep. 15, 1999 Letter to Egan) at MRK-KRA01622711-12; Ex. 184 (Attachment #4 to Letter) at MRK-KRA01622778-79.

**Response**: Undisputed as to the first sentence.  As to the second sentence, undisputed that

Merck Ex. 184 contains 26 lots listing average potencies measured at a time prior to the

vaccine's release which, when converted to a per dose measure, range from 4.8 log (~64,000

infectious dose units) to 5.1 log (~125,000 infectious dose units).[372]  Merck Ex. 184 contains

one lot with an average potency of 5.4 log (~250,000 infectious dose units) per dose.  Merck

Ex. 184 contains 16 lots of MMR-II with no potency data available.  Undisputed as to the

---

[371]  *See also* Ex. 3 at ¶ 36 (Kessler Rep.) ("A manufacturer sets the release potency by determining the minimum potency a vaccine component must be at release in order to ensure the vaccine will not fall below the end expiry potency specification before the end of the shelf life.").

[372]  Ex. 134 at '841 (to convert the 0.1 mL potency measure to a 0.5 mL (per dose) potency measurement add 0.7 log). [MRK KRA02101841]; *see also* Ex. 3 at Schedule 19 (conversion chart providing potency measurements for 0.5mL/dose from the manufacturing measurement of 0.1mL).

**Appx18944**

third sentence.  As to the fourth sentence, disputed to the extent the evidence cited does not

support Merck's proffered fact that while "several of those lots were tested to have potency

near or below 4.3 log10 TCID50" per dose, "FDA did not request that these lots be

withdrawn or withheld from the market."[373]  The evidence cited indicates these lots "were

tested to have potency near or below 4.3 $\log_{10}$ TCID50" per 0.1 mL, but the potency per dose

(0.5 mL) is 0.7 log higher than the 0.1 mL measurement.[374]

165.    On September 15, 1999, Merck submitted to FDA a Prior Approval Supplement
(PAS) to increase release potency of 5.0 $\log_{10}$ TCID50 along with a Release Protocol. Ex. 183
(Sep. 15, 1999 PAS to Egan) at MRK-KRA01622711-12.

**Response**:  Undisputed that in the September 1999 PAS, Merck sought FDA approval to

manufacture the mumps component of MMR-II at a target titer of 5.2 log, with a minimum

release titer of 5.0 log.  Undisputed that Merck Ex. 183 references, but does not include,

Attachment 2 (the lot release protocol).

166.    FDA approved the PAS on February 11, 2000. Ex. 187 (Feb. 11, 2000 Letter to
McKee) at MRK-KRA01897091.

**Response**:  Undisputed.

167.    Approximately six months after FDA's approval of the PAS, FDA's Team Bio
conducted an inspection of Merck's manufacturing division. FDA issued Merck a Form 483,
citing failures to provide Error and Accident Reports related to certain lots of mumps vaccine
that had failed stability tests at various intervals. These failures related solely to lots of vaccine
manufactured prior to the increase in release potency. This information was later incorporated
into a February 9, 2001 Warning Letter. A Form 483 "notifies the company's management of

---

[373] In FDA's subsequent 2001 Warning Letter, FDA stated: "Our investigators reported that the data in your firm's
files showed that a number of Mumps Vaccine stability samples representing lots manufactured before the
formulation was changed during February 2000 failed to meet the minimum potency specification. … Please submit
an analysis of Mumps stability data describing the range of potencies you would expect the various Mumps Vaccine
products to reach at the two year expiration date."  Thirty three of the lots listed in Merck Ex. 184 are from the 225
sub potent lots Merck identified in February 2001, *See* Ex. 57. Merck failed to disclose these lots to CBER in its
response to the Warning Letter on March 8, 2001. *See* Ex. 63. Merck also failed to disclose these lots in the BPDR
for mumps stability failures dated April 20, 2001. *See* Ex. 187.

[374] *See supra* note 372.

objectionable conditions" and encourages the company to respond and, if necessary, correct the cited conditions. A Warning Letter is a notification FDA gives to manufacturers when it finds a violation of FDA regulations and "makes clear that the company must correct the problem and provides directions and a timeframe for the company to inform FDA of its plans for correction." FDA explains that "[m]atters described in FDA warning letters may have been subject to subsequent interaction between FDA and the recipient of the letter that may have changed the regulatory status of the issues discussed in the letter." *See* Ex. 244 (Merck's Response to FDA Form 483 Observations) at MRK-KRA01649536; Ex. 143 [PUBLIC0000666] (Warning Letter) at PUBLIC0000669; Ex. 14 (FDA Form 483 Frequently Asked Questions, *available at* https://www.fda.gov/iceci/inspections/ucm256377.htm); Ex. 245 (FDA, Warning Letters, *available at* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/compliance-actions-and-activities/warning-letters).

**Response**:  As to the first sentence, assuming Merck is referencing the September 1999 PAS (SUMF4 ¶ 165) approved in February 2000 (SUMF4 ¶ 166), undisputed that FDA Team Biologics conducted an inspection of Merck's manufacturing division beginning six months later, in August 2000.  As to the second sentence, undisputed that FDA issued Merck a Form 483 in October 2000, citing, among other things, failures to provide Error and Accident Reports related to certain lots of mumps vaccine that had failed stability tests at various intervals.  As to the third sentence, undisputed.  As to the fourth sentence, disputed to the extent Merck does not account for the fact that FDA issued the Warning Letter after receiving Merck's response to the Form 483 that "did not provide the FDA sufficient assurance that corrective actions had been taken to fix the cited deficiencies including with regard to mumps potency."[375]  Otherwise undisputed as to the fourth sentence.  As to the fifth sentence, undisputed that Merck Ex. 14 states a Form 483 "notifies the company's management of objectionable conditions" and encourages the company to respond "to the FDA Form 483 in writing with their corrective action plan and then implement that corrective action plan expeditiously."  As to the sixth sentence, undisputed it accurately

---

[375] Ex. 3 at ¶ 188 (Kessler Rep.) ("The Warning Letter was the next regulatory mechanism after the Form 483, before FDA could initiate an enforcement action to assure Merck's compliance with the law").

Appx18946

quotes Merck Ex. 245 but disputed to the extent this is not a complete description of an FDA

warning letter.[376]  As to the seventh sentence, disputed to the extent Merck takes FDA's

statement out of context.  Merck Ex. 245 is a page on FDA's website that allows users to

search for warning letters FDA has issued.  The webpage provides the caveat for any warning

letter posted on its site that "[m]atters described in FDA warning letters may have been

subject to subsequent interaction between FDA and the recipient of the letter that may have

changed the regulatory status of the issues discussed in the letter."  Merck Ex. 245 at 1.

168.     In this period, FDA made warning letters available on its website. As early as
January 13, 2004, FDA made the February 9, 2001 warning letter to Merck available in its online
"Reference Room," under the link for "Warning Letters."  Ex. 217
(https://web.archive.org/web/20040113051602/http://www.fda.gov/).

**Response**: Undisputed.

169.     Archived webpages from FDA website remain available, and the February 9,
2001 warning letter to Merck remains available through those links today. Ex. 218
(https://web.archive.org/web/20051106012957/http://www.accessdata.fda.gov/scripts/wlcfm/company_archive.cfm?FL=M)

**Response**: Undisputed.

170.     In the Warning Letter, FDA stated that the "investigators reported that the data in
your firm's files showed that a number of Mumps Vaccine stability samples representing lots
manufactured before the formulation was changed during February 2000 failed to meet the
minimum potency specification."  Ex. 143 (Warning Letter) at PUBLIC0000666.

**Response**: Disputed to the extent the specific part of the record Merck cites does not support

Merck's proffered fact.[377]  Undisputed that Merck Ex. 143 at '669 contains the quoted

language.

---

[376] *See supra* note 375; Ex. 416 at 151:20 152:15, 153:10 15 (Merck Employee Roberta McKee Deposition
("McKee Dep.")) (a Warning Letter documenting significant deviations is a "significant event"); Ex. 4 at 198:18 20
(Kessler Dep.) (affirming that "FDA takes issues identified in a warning letter very seriously.").

[377] See, Judge Jones Policies and Procedures, Civil Cases, D. Summary Judgment Motions, ¶ 5.

196

**Appx18947**

171.   FDA continued:  "Product manufactured before February 2000 may still be on the market because the expiry period is two years. Please submit an analysis of Mumps stability data describing the range of potencies you would expect the various Mumps Vaccine products to reach at the two year expiration date."  For this analysis, FDA requested that Merck "assume the initial potency is the minimum release potency specification that was in effect before February 2000" or 4.3 $\log_{10}$ TCID$_{50}$/dose. *Id.* at PUBLIC0000669.

**Response**:  Undisputed as to the first and second sentences.  As to the third sentence,

disputed that 4.3 log was a minimum release potency.[378]  The document speaks for itself.

172.   On March 8, 2001, Merck submitted the information requested:  "As stated in our October 24, 2000 communication, we historically considered the MMRII labeled titers to reflect minimum release specifications. As such, measured potency results below the label specification observed during stability monitoring of MMRII were not considered atypical. . . . The average estimated loss rate for mumps stored at 2-8C for 2 years is 0.703 logs as reported in Attachment 8, table 2, page 104 of the October 24, 2000 submission. Thus, if it is assumed that the initial potency is 4.3 $\log_{10}$ TCID$_{50}$/dose, the minimum release specification in effect prior to February 2000, the expected average potency at expiry is 3.6  $\log_{10}$ TCID$_{50}$/dose. In order to estimate the range of potencies around the average loss rate, the standard deviation of the loss rate was calculated and found to be 0.3 logs. Therefore, the 95% upper and lower confidence bounds for mumps potency at the end of a two year expiry is estimated to be 3.9 and 3.3 $\log_{10}$ TCID$_{50}$/dose, respectively."  Ex. 177 (Merck's Response to the Warning Letter) at MRK-KRA01537603-11.

**Response**:  Disputed that Merck's March 8, 2001 submission provided FDA with the

information regarding mumps potency that FDA requested, and that Merck was obligated to

provide, in response to its Warning Letter.[379]  Disputed to the extent that Merck does not

---

[378] Rel. 56. Stat. ¶29 30, *citing* Ex. 42 at '706 07 ("During communications with [FDA] in 1996 98, it became evident that the [FDA] … defined [the label's potency] specifications as end expiry potencies."); Ex. 43 at '165 66 (same); Ex. 44 at '760 ("In 1990, the mumps virus end expiry potency for M M RTM II was established as 4.3 [log]."); Ex. 17 at 26:15 27:10, 28:2 7 (Bramble Dep.) (testifying FDA's position was potency on label was minimum potency required at end of shelf life); Merck Ex. 150 (Dec. 12, 1998 Internal Merck Memo) (FDA's "Dr. Baylor … stated that from [FDA's] perspective the titers on the label have always been perceived as expiry titers."); Merck Ex. 148 at '60 (May 12, 1999 Email) ("Dr. Baylor … does not believe the new label has changed substantially from the wording used for potency over the past 20 years.").

[379] Merck Ex.143 at '669 ("Neither this letter nor the list of inspectional observations (Form FDA 483) is meant to be an all inclusive list of deviations.  It is your responsibility to ensure that your facility is in compliance with the provisions of the Federal Food, Drug, and Cosmetic Act and all applicable regulations"); Ex. 3 ¶ 399 (Kessler Dep.) ("Merck's response to the February 2001 Warning Letter was inadequate."); Ex. 3 at ¶ 190 (Kessler Rep) ("After receiving the February 2001 Warning Letter, Merck needed to provide FDA … information regarding the stability/potency of product … still on the market; and … a summary of efficacy data… at lower… potency … to provide reassurance that … lower potency product on the market … did not present a risk to [those] who receive[d] the vaccine."); Ex. 3 at ¶ 394 (Kessler Rep.) ("In responding to the February 2001 Warning Letter, Merck needed to

provide the specific pinpoint citation reference to the part of the record that supports Merck's proffered fact.[380]  Undisputed that the statement accurately quotes from Merck's March 8, 2001 response to the warning letter.  Merck Ex. 177 at '608-09.

173.    Merck informed FDA that, while the average estimated loss was 0.703 $\log_{10}$ $TCID_{50}$ as had been reported in Merck's October 2000 submission, the potential projected loss could be up to 1.0 $\log_{10}$ $TCID_{50}$. Merck characterized this projection as a worst-case scenario because it projects the highest possible potential loss that might occur if the vaccine was administered at the end of 24 months and was freeze-dried and maintained out of refrigeration for the longest permissible time per the labeling instructions prior to administration. *See id.*

**Response**:  As to the first sentence, undisputed that Merck informed FDA that the average estimated mumps potency loss for MMR-II was 0.703 log.  Merck Ex. 177 at '608.

Otherwise disputed.  Merck's response to the Warning Letter stated the average estimated potency loss over shelf life was 0.703 log "[t]hus, if its assumed that the initial potency is 4.3 log . . . the lower confidence limit at the end of two years is estimated to be 3.3 log."  Merck Ex. 177 at '609.  As to the second sentence, disputed.  The cited evidence does not support Merck's proffered fact.  Also disputed to the extent that Merck does not provide the specific pinpoint citation reference to the part of the record that supports Merck's proffered fact.[381]

174.    At this time, Merck also submitted data on the efficacy of the vaccine at potencies lower than 4.3 $\log_{10}$ $TCID_{50}$/dose, including data from Hilleman's initial licensure studies, Protocol 007, and CDC field effectiveness data showing a 99% decrease in disease. *See id.*

**Response**:  Disputed to the extent that "at this time" does not have an antecedent to inform when this efficacy data was submitted.  Disputed that Merck's March 8, 2001 response to the

---

demonstrate appropriate corrective actions to ensure compliance regarding the mumps potency issue … or it would face potential regulatory action."); Ex. 3 at ¶ 395 (Kessler Rep.) (Dr. Kessler's exhaustive list of information that he as former Commissioner of the FDA would have expected Merck to provide in response to the February 9, 2001 Warning Letter); Ex. 4 at 198:18 20 (Kessler Dep.) (affirming that "FDA takes issues identified in a warning letter very seriously."); *see also* Rel. 56 Stat. ¶ 36 45 (collecting evidence of the inadequacies relating to Merck's response to the Warning Letter).

[380] *See* Judge Jones Policies and Procedures, Civil Cases, D. Summary Judgment Motions, ¶ 5.

[381] *See* Judge Jones Policies and Procedures, Civil Cases, D. Summary Judgment Motions, ¶ 5.

Appx18949

Warning Letter "submitted data on the efficacy of the vaccine at potencies lower than 4.3 … including data from Hilleman initial licensure studies, Protocol 007 and CDC field effectiveness data showing a 99% decrease in disease."  Merck Ex. 177 at '609 summarizes information from the initial licensure studies, Protocol 007, and the CDC field effectiveness data.  Also disputed to the extent that Merck does not provide the specific pinpoint citation reference to the part of the record that supports Merck's proffered fact.[382]  Undisputed that Merck subsequently submitted "corrected" data from the interim analysis of Protocol 007 to "justify the efficacy" of MMR-II.[383]  Undisputed that Merck has represented Protocol 007 data as data on the efficacy of the mumps vaccine.

175.    Merck also reported other information related to vaccines with a potency below 4.3 $\log_{10}$ TCID$_{50}$. Specifically, Merck reported that "lots were chosen to be tested . . . based on recent stability analyses . . . [that] predicted [them] to be below 3.7 [$\log_{10}$ TCID$_{50}$]." *See* Ex. 164 (April 5, 2001 BPDR) at MRK-KRA00754233.

**Response**:  Disputed as to the first sentence because it incorporates by reference facts outside the statement, which makes it impossible to answer as a stand-alone fact.  Also disputed that the evidence cited supports the first sentence. As to the second sentence, undisputed that Merck Ex. 164 contains the quoted language.  Merck Ex. 164 at '234.  Also disputed to the extent that Merck does not provide the specific pinpoint citation reference to the part of the record that supports Merck's proffered fact.[384]  Also disputed that "lots were chosen to be

---

[382] *See* Judge Jones Policies and Procedures, Civil Cases, D. Summary Judgment Motions, ¶ 5.

[383] Rel. 56 Stat. ¶ 135; see also Ex. 42 at '708 ("In addition, and more seriously, [FDA] challenged the efficacy of marketed product at the lowest predicted potencies (below label claim).  …  With regard to product efficacy, we provided an interim analysis of an ongoing mumps end expiry trial to justify efficacy of lower potency product.  [FDA] accepted the Merck response."); Ex. 188 at '159 (same); Ex. 51 at '230 (same); Ex. 43 at '167 (same); Ex. 65 at '041 ("Provided interim analysis of mumps end expiry trial data to justify efficacy of lower potency product.").

[384] *See* Judge Jones Policies and Procedures, Civil Cases, D. Summary Judgment Motions, ¶ 5.

Appx18950

tested" based on "recent stability analyses." Rather, Merck identified them and hundreds of others as part of its response to the February 2001 Warning Letter. Ex. 57 at '510. Merck considered these lots a "compliance issue." *Id*. A spreadsheet of the "lots in question" highlighted the six lots with the lowest potency. Ex. 57 at '518. Five of the six lots cited in Merck Ex. 164 match the lots highlighted in Ex. 57. Ex. 57 at '518 (Lots 0538J, 0539J, 0926J, 1070J and 1071J). A "Fact Finding," what Merck called a "prelude to potential product recall," was "ongoing especially for the 6 lowest lots" in February 2001. Ex. 18 at '513. As part of its Fact Finding, "[r]etention samples of [the] 6 lowest lots [we]re being assayed" in March 2001. Ex. 58 at '08. Merck reported the results of that testing in Merck Ex. 164, but did not disclose that the five lots were part of its fact finding involving hundreds of lots --which was a "prelude to potential product recall" -- when it represented to FDA that these five lots were chosen based on recent stability analyses. Ex. 18 at '513.

176. Merck further reported to FDA in April 2001 the following out of specification information regarding vaccine manufactured prior to the potency increase in 1999:

| Lot Number | Number of Doses | Time Point Tested | Release Potency ($\log_{10}$ $TCID_{50}$/dose) | Potency Result ($\log_{10}$ $TCID_{50}$/dose) | Expiration Date |
|---|---|---|---|---|---|
| 0538J | 117,970 | 24-month | 4.5 | 4.0 | 3/26/01 |
| 0539J | 115,320 | 24-month | 4.5 | 3.9 | 3/26/01 |
| 0926J | 57,720 | 22-month | | 4.3 | 5/28/01 |
| 1070J | 118,040 | 22-month | 4.4 | 4.2 | 5/15/01 |
| 1071J | 117,550 | 22-month | 4.5 | 3.9 | 5/18/01 |

*Id.* at MRK-KRA00754234.

**Response**: Undisputed.

200

177.    Consistent with applicable requirements, Merck investigated these out-of-specification results and reported to FDA on its investigation. *Id.*

**Response**:  Disputed to the extent "these" out-of-specification results" refers to facts outside

the statement which make it impossible to answer as a stand-alone fact.  Assuming "these-

out-of-specification results" refers to the five lots Merck reported in Merck Ex. 164,

Biological Product Deviation Report 01-005, also disputed that Merck investigated the out of

specification results and reported to FDA "[c]onsistent with applicable requirements."[385]

---

[385] Ex. 3 at ¶ 404 (Kessler Rep.) ("[Biological Product Deviation Report] 01 005 was inadequate … I would have expected to see an investigation" … of the lots "on the list of 225 'Low Mumps Titer Lots Within Expiry' in Attachment #4 to Dr. Margolskee's February 23, 2001 email to [the President and Executive Vice President of MRL].") (referencing MRK KRA00549510 and MRK KRA00549518); *Id.* at ¶ 405 (The "submission of [Protocol 007 AIGENT] clinical data [in Biological Product Deviation Report 01 005] … was inadequate to support the medical assessment of the risk of receiving lower potency vaccine because raw data was changed without justification during the testing."); *Id.* at ¶ 406 ("[Biological Product Deviation Report] 01 005 was … inadequate because [a] reasonable and prudent manufacturer would have disclosed that, at the time it was reporting these out of specification lots, it did not have adequate assurances that future lots of product would meet the mumps potency specification of 4.3 [log TCID$_{50}$/dose]."); *Id.* at ¶ 405 (After four lots "fail[ed] to meet the end expiry potency specification for mumps at 24 months" Merck "used the results of the preliminary subset analysis of Protocol 007's AIGENT testing as part of the medical assessment [in Biological Product Deviation Report 01 005] … for why no further [regulatory] action was required."); *Id.* at ¶ 408 ("Merck … relied on data… 'changed with no justification,' … in Biological Product Deviation Report 01 005.") (quoting MRK KRA01649971); Ex. 4 at 207:10 14 (Kessler Dep.) ("[T]he requirement in [Biologic Product Deviation Reports] is that if you identify a lot below [specification], you have an obligation … to inspect the other lots [made the same year] … that may be out and inform the [FDA] … you can't stop at just the one lot [below specification]."); Ex. 4 at 224:14 18 (Kessler Dep.) (In Biological Product Deviation Report 01 005 "5 lots [were reported], and it doesn't talk about the other 220 or so lots that [Merck] analyzed, and that's the omission.") (referencing MRK KRA00754233 and MRK KRA00549518); Ex. 16 ¶ 8(3) (Calcott Rep.) ("Merck failed to communicate to the FDA in an open and honest manner when Mumps vaccine materials on the market were out of specification during shelf life.  These failures occurred both in Merck's regular communications with the FDA and its filing of Biological Product Deviation Reports (… formerly Errors and Accident Reports)."); Ex. 2 at 33 (Malone Rep.) ("Merck also relied on its interim analysis of the 'corrected' AIGENT data in its April 20, 2001 Biologics Product Deviation Report … to [FDA] on certain M M R II lots that failed to comply with the mumps end expiry potency specifications."); *see also* Ex. 4 at 235:12 20 ("When the FDA received … [Biological Product Deviation Report 01 005] in April of 2001 in which there were five lots that Merck indicated fell below the 4.3 [log TCID50/dose] potency at 24 months, they did nothing … Based on Merck's representations in this [Biological Product Deviation Report 01 005] that in the future potency for lots at [expiry] would meet the current specification.") (referencing MRK KRA00754233); *Id.* at 243:19 24 ("[Merck] made certain representations in [Biological Product Deviation Report 01 005] and … those representations were false … taken as a whole [Merck was] asserting there's not a problem with these lots [reported in Biological Product Deviation Report 01 005]. So of course FDA would not take an action.") (referencing MRK KRA00754233); *Id.* at 245:10 17 ("[I]f a company makes a representation on a [Biological Product Deviation Report] of four lots and says in the future there's not going to be a problem and the clinical data supports no problem and those are … false statements … the FDA is not going to take action unless it's aware that those statements are false.").

201

Undisputed that Merck Ex. 164, cited in SUMF4 ¶ 175, cited here as "*Id*." is a Biological

Product Deviation Report Merck submitted to FDA.

178.    On April 11, 2001, without taking any action with respect to product still on the market that might fall below the 4.3 $\log_{10}$ $TCID_{50}$ labeled specification, FDA closed the Warning Letter.  *See* Ex. 206 (Merck's Responses and Objections to Relator's Third Set of Requests For Production No. 143) at 102.

**Response**:  Disputed to the extent Merck does not account for the fact that FDA closed the

Warning Letter only after Merck made numerous misrepresentations and omissions in (i) its

March 8, 2001 response to the Warning Letter stating, among other things that "we believe

that the actions taken to date comprehensively address all concerns raised" (Merck Ex. 177 at

'603); (ii) its March 12, 2001 submission of its analysis of the "corrected" preliminary subset

AIGENT data (Ex. 186 at '038) to "justify efficacy of lower potency product" (Ex. 42 at

'708);[386] and (iii) its Biological Product Deviation Report 01-005 which represented, among

other things, that in the future, potency for lots at expiry would meet the specification of 4.3

log (Merck Ex. 164 at '236).[387]  Otherwise undisputed.

179.    While the calculation of a potential 1.0  $\log_{10}$ $TCID_{50}$ loss was developed based on an analysis of vaccine manufactured prior to the potency increase, it did not include an analysis of potency test result data from vaccine manufactured after September 13, 1999, at which time Merck had increased the release potency of the vaccine consistent with FDA's direction. *See* Ex. 116 (Gulati Dep. Tr.) at 145-146.

**Response**:  Disputed.  Merck reported to the President of Merck Research Laboratories that

it calculated a "total of ~ 1.0 log loss over 24 months" based on an analysis of vaccine

---

[386]  Rel. 56 Stat. ¶ 133 (this "corrected" preliminary subset AIGENT data incorporated selective plaque recounting changes made by Dr. Krah and his staff).

[387] *See also* Ex. 4 at 237:25 239:2 (Kessler Dep.) ("[Y]ou would not expect FDA to take any actions [in April 2001] for two reasons … Merck represented that it had the clinical data to support efficacy … based on [Protocol] 007 [a]nd … Merck represent[ed] that it had fixed the problem … by the overfill … [that] will ensure that in the future potency for lots would meet the 4.3 [log TCID50/dose].  I wouldn't take any action based on those representations … that the clinical data of [Protocol] 007 is correct, and … you fixed the problem.  I believe Merck. The problem is [the overfill] didn't fix the problem.").

Appx18953

manufactured prior to the potency increase.  Ex. 57 at '511.  Disputed to the extent Merck

implies it could assure MMR-II met the 4.3 log mumps end-expiry potency specification

after the potency increase in 1999.[388]  Also disputed to the extent that Merck increased the

release potency of its mumps vaccine "at FDA's direction."  The exhibits Merck cites do not

support that Merck was following FDA's direction.[389]

180.    CDC testified that, in connection with its decision to purchase the mumps vaccine, it has not raised concerns relating to the potency of the vaccine, or any of the following: efficacy, effectiveness, seroconversion or immunogenicity, or shelf life. Ex. 75 (Sims Dep. Tr.) at 201:13-25.

**Response**:  Disputed.  The testimony Merck cites does not support the proffered fact.  In the

testimony cited Mr. Sims was answering a question about whether the CDC's Program Office

ever raised concerns to him related to efficacy, effectiveness, seroconversion,

immunogenicity, shelf life, or potency.  Merck Ex. 75 at 201:13-25 (Sims Dep.).  This

testimony does not mean the CDC had not raised concerns relating to the potency, efficacy,

effectiveness, seroconversion, immunogenicity, or shelf life of Merck's mumps vaccines.

CDC authorized Mr. Sims' deposition because of CDC's "clear interest" in this case "given its

public health mission to decrease vaccine preventable … diseases … efficiently, at an

appropriate cost to the public. … In addition, CDC has a major programmatic role in

---

[388] Rel. 56. Stat. ¶43 44 *citing among other evidence* Ex. 69 at '865 ("**Compliance**:  Even with higher mumps target, current stability data suggest 4.3 [log] at expiry cannot be supported.") (emphasis in original); Ex. 49 at 211:4 9 (Bennett Dep.) ("[The] analyses that I had performed showed that [the minimum release specification of] 5.0 [log] would not support an expiry of 4.3 [log] based upon the release assays, the stability loss estimates and the variability in the loss estimates."); Ex. 4 at 281:6 16 (Kessler Dep.) ("[P]roduct … manufactured after the [Overfill] was adulterated" because "there was not assurances that it would be within the 4.3 [log] based on Merck's internal representations."); Ex. 75 at '985 ("The [enhanced release model] indicated that the current release titers of 5.0 log[] for mumps … are also insufficient to meet the current minimum potencies at expiry of 4.3 [log] …."); Ex. 87 at '854 ("Mis[]branded   stability continues to be an issue, even with the increase in mumps and reduction of end expiry of 4.0 [log].").

[389] *See also* Ex. 3 at ¶ 36 (Kessler Rep.) ("A manufacturer sets the release potency by determining the minimum potency a vaccine component must be at release in order to ensure the vaccine will not fall below the end expiry potency specification before the end of the shelf life.").

accomplishing reduction in vaccine-preventable … disease … using scarce public health

federal funding to purchase effective vaccines for administration to children … throughout

the country."[390]

181.    CBER requires testing as a matter of course for most biological products due to the variable nature of biological products. Under federal regulations, for continued release of each lot to the market, manufacturers are required to submit "samples from all lots of a licensed biological product together with the protocols showing results of applicable tests." Ex. 91 (Gulati Report at 30 ¶ 110); Ex. 248 (Notice Regarding Guidance on Alternatives to Lot Release for Licensed Biological Products, 58 Fed. Reg. 38,771, at 38,772 (July 20, 1993); 21 C.F.R. §§ 610.1, 610.2(a).

**Response**:  Undisputed as to the first sentence.  As to the second sentence, undisputed that it

accurately quotes from the FDA guidance but disputed that submission of "samples from all

lots of a licensed biological product together with the protocols showing the results of

applicable tests" is "required."  None of the evidence cited supports Merck's proffered fact

that this submission is "required."[391]

182.    Pursuant to these regulations, in connection with the release of every vaccine lot to the U.S. market, Merck tests the potency of the lot and reports the potency and other product characteristics on a detailed release protocol. Ex. 202 (Stannard Dep. Tr.) at 40:23-41:4 (before vaccine goes to customers, some is sent to CBER and they have to release it), 41:23-42:11 (testing the filled lots and preparing sample vials for CBER), 235:24-236:8 (a granular release protocol is prepared for each lot with potency test results), 247:17-24 (a protocol has to be submitted for every lot that's produced for the U.S. market).

**Response**:  Disputed to the extent Merck implies its submission of release potency data to

the FDA relieves Merck of its duty to assure its vaccines meet their label specifications

---

[390] Ex. 11 at 2; *see also* Ex. 407 at '989 (Feb. 2010 Email from CDC to Merck) (emphasis added) (CDC invited Merck to discuss mumps strategy with the CDC during the 2010 outbreak and specifically noted that "[t]he high proportion of [mumps] cases among persons who have received two doses of MMR *raises issues concerning the vaccine effectiveness and duration of protection*.").

[391] Merck Ex. 91 at ¶ 110 (Gulati Rep.) (stating "manufacturers *may* by required" to submit samples) (emphasis added); Merck Ex. 248 at 38,772 (Notice Regarding Guidance on Alternatives to Lot Release for Licensed Biological Products, 58 Fed. Reg. 38,771 (July 20, 1993)) (same); 21 C.F.R § 610.2 ("Samples of any lot of any licensed product together with the protocols showing results of applicable tests, *may* at any time be required…") (emphasis added).

204

throughout the shelf life.[392]  Further disputed that Merck implies FDA would not take action

regarding millions of doses of vaccine released to the market when the manufacturer could

not assure the potency specification throughout the shelf-life.[393]  Otherwise undisputed.

183.    After the release protocol has been completed, it is reviewed and approved/signed by a qualified member of Merck's Quality team and uploaded to a website for electronic submission to CBER. CBER is also sent vials of 30 samples from each batch in order to perform its own testing. Ex. 176 (Sept. 23, 2015 West Point SOP 07-QUR-300X, Preparation, Review and Shipment of Biological Product Protocols and Samples to CBER) at MRK-KRA01448181.

**Response**: Disputed to the extent the specific part of the record Merck cites does not support

Merck's proffered fact.[394]  Disputed that this release protocol was in effect prior to September

23, 2015.  The evidence cited does not support that proffered fact. Also disputed to the extent

Merck implies that FDA tests the samples it receives, the evidence cited does not support this

inference. Otherwise undisputed.

184.    As FDA explains, "[o]nce the Agency has reviewed the lot release protocol, completed any testing of samples, and has found the results acceptable, the Agency will notify the applicant that that lot has been released."  Ex. 108 ([FDA, Lot Release, https://www.fda.gov/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/Post-MarketActivities/LotReleases/default.htm, last accessed Aug. 29, 2019]); *see, e.g.*, Ex. 175 (Feb. 23, 2016 CBER Release letter to Merck for lot 0000485964) at MRK-KRA01447562.

**Response**:  Disputed that this release protocol was effective prior to March 22, 2018. The

evidence cited does not support Merck's proffered fact.[395]  Also disputed to the extent Merck

---

[392] Ex. 3 at ¶ 419.3 (Kessler Rep.) ("[A]s long as the MMR II label stated 'not less than 4.3 [log TCID$_{50}$/dose]' Merck was required to have adequate procedures to assure that MMR II vaccine had that amount of mumps virus per dose through end expiry."); Rel. 56 Stat. ¶¶ 28 29, 35, *citing* Ex. 18 at '402 ("Products must meet their specifications…throughout the labeled expiry period."); Ex. 56 at '65 66 (listing October 2000 Team Biologics Form 483 citations to Merck).

[393] Ex. 4 at 224:20  225:17 (Kessler Dep.) ("I could assure you … had Merck [been] forthcoming, that … million[s] [of] doses were below specification … bells would have been set off at the [FDA].").

[394] *See* Judge Jones Policies and Procedures, Civil Cases, D. Summary Judgment Motions, ¶ 5.

[395] *See* Judge Jones Policies and Procedures, Civil Cases, D. Summary Judgment Motions, ¶ 5.

Appx18956

implies that FDA tests the samples it receives, the evidence cited does not support this

inference. Otherwise undisputed.

185.    FDA can test the sample (or not) and then notifies Merck if the lot is approved for
distribution. No lot is released to the U.S. market without CBER's approval. Ex. 202 (Stannard
Dep. Tr.) at 40:23-41:4 (before vaccine goes to customers, some is sent to CBER and they have
to release it), 239:18-240:7 (CBER may or may not test concurrently with its review of the
release protocol), and 298:13-18 (Q: "[I]s it correct to say that there is no product released into
the market that has not, number one, met our release specifications; and number two, been
released by CBER?"  A:  "Correct.").

**Response**:  Disputed to the extent Merck implies that FDA tests the samples it receives, the

evidence cited does not support this inference. Otherwise undisputed.

186.    Stability refers to the ability of any product, including vaccines, to maintain its
activity or usable form during the time of storage. The mumps vaccine contains live cells and
will degrade over time; the rate at which something degrades can be affected by temperature,
light and other storage conditions. Ex. 91 (Gulati Report) at 7 ¶ 24.

**Response**:  As to the first sentence, disputed that the evidence cited supports the phrase

"during the time of storage."  Otherwise undisputed.

187.    Stability studies are used to ensure potency specifications are met over the
product's shelf-life. Merck tested the potency of the mumps vaccine on multiple lots per year,
depending on the year, and at multiple intervals (at 0 months and then again at 3, 6, 9, 12, 24 and
30 months). Ex. 91 (Gulati Report) at 8 ¶¶ 28-29, at 14 ¶¶ 52-54.

**Response**: As to the first sentence, undisputed except Merck omits from the cited

paragraphs: "Stability studies test attributes of the drug products that are susceptible to

change during storage and are likely to influence quality, safety, and/or efficacy."[396] As to the

second sentence, disputed to the extent the statement implies Merck placed more than one lot

of MMR-II on stability prior to late 2006.[397]  Disputed to the extent the evidence cited does

---

[396] Merck Ex. 91 at ¶ 28 (Gulati Report).

[397] *See* Rel. Resp. SUMF4 ¶ 137, *citing among other evidence* Ex. 413 at '239 (During an April 4, 2001 conference
between Merck and FDA regarding Merck's stability program, FDA's Dr. Carbone requested more than one lot be
placed on stability: "[FDA] felt that one annual lot was insufficient and look to Merck for a proposal that will
address their concern. They expect the number of lots on stability to increase and indicated that the number of lots

not support that the "current stability program" was in effect any time prior to September 6, 2016.[398]

188.    FDA's Office of Compliance and Biologics Quality stated in its 2001 Warning Letter that "Products must meet their specifications," not historical trends. Ex. 143 [PUBLIC0000666] (Feb. 9, 2001 Warning Letter), at PUBLIC0000669.

**Response**:  Undisputed.

189.    For all testing on lots manufactured and released with a release potency at or above 5.0 $\log_{10}$ $TCID_{50}$, the potency testing conducted in Merck's stability program did not reveal any out-of-specification results for any lots at any interval through 24 months. Ex. 202 (Stannard Dep. Tr.) at 308:4-17; Ex. 91 (Gulati Report) at 22 ¶ 82.

**Response**:  Disputed to the extent that Merck implies that a stability study of one or two lots per year of marketed MMR-II released after the minimum release specification was set at 5.0 $\log$,[399] ensures that all MMR-II lots manufactured and released to the US market will meet end-expiry specifications.[400]  Otherwise undisputed.

190.    In addition to evaluating potency results against the end-expiry potency specification, Merck also uses an Early Warning Evaluation System to monitor data, in real time,

---

manufactured per year should fit into the equation.") [bates?]; Ex. 414 at '26 ("[FDA] thought that our stability program   with 1 annual lot   was insufficient to detect trends."); *id.* ("[W]e committed to 3, we actually put 4 on stability each year."  The program was implemented in late 2006.).

[398] *See* Merck Ex. 91 at ¶ 53 (Gulati Report), *citing* Merck Ex. 192 at '917  25 and Ex. 417 at '300 (Vaccine & Biological Stability Protocols dated September 6, 2016).

[399] For example, Ex. 418 at '602 (2000 Annual Stability Report showing 2 annual stability studies for 1996 (single dose and 10 dose packages), two for 1997 (single dose and 10 dose packages), one for 1999 (10 dosage); Ex. 395 at '746 (2001 Annual Stability Report showing one annual stability study for 1999, two for 2000 and one for 2001; Ex. 419 at '531 (2002 Annual Stability Report showing one annual stability report for 1999, two for 2000 and two for 2001); Ex. 420 at '889 (2003 Annual Stability Report showing two annual stability studies for 2000, 2001 and one for 2002).

[400] Ex. 4 at 284:24  285:16 (Kessler Dep.) ("Merck is saying that 7 percent will fall out … the thing that matches this is Merck … in 2002 is concerned about increasing the number of lots that it samples. … Merck projected 7 percent would fall below.  If your sampling didn't pick it up, then your sampling may not have been accurate. … at the very least, if your modeling is predicting and you are projecting 7 percent, you can't assure compliance.") *referencing* Ex. 73 at '819 (2002 Internal Merck email) ("We've been lucky with mumps so far, but it's only a matter of time, since we can statistically predict that a certain number of lots will fail on stability.  And if we increase the number of annual lots that we test, like we committed to do, then the probability increases.") *Id.* at 287:3  13 ("Give me your data … put that data on the table. If it's not 7 percent … let's know what it is. But Merck's certainly saying … it's a matter of time … before our sampling picks it up. …  and if we increase the number of annual lots that we test, like we committed to do, then the probability increases … again, you can't assure that these lots are in … compliance.").

Appx18958

to evaluate whether individual lots appear to be losing potency differently than other lots or trending toward a future out-of-specification result. Ex. 91 (Gulati Report) at 15 ¶¶ 57-58.

**Response**: Disputed to the extent Merck ignores the other stability analyses it relied on, including stability release models, based on which it concluded it could not assure all lots released at potencies greater than or equal to 5.0 log would meet the minimum potency specification through shelf life.[401] Also disputed to the extent it is not clear what "evaluating potency results against the end-expiry potency specification" entails making it impossible to respond to this statement. Further disputed to the extent that the cited evidence does not support Merck's proffered fact that Merck uses an Early Warning Evaluation System *in addition to* evaluating potency results against the end-expiry specification. Also disputed to the extent the evidence cited does not indicate that the Early Warning Evaluation System was in effect prior to 2008. *See* Merck Ex. 91 at 15 ¶¶ 57-58 (Merck Expert Gulati Rep.) (*citing*,

---

[401] Rel. 56 Stat. ¶¶ 43 46, *citing* including but not limited to, Ex. 69 at '865 ("**Compliance**: Even with higher mumps target, current stability data suggest 4.3 [log] at expiry cannot be supported.") (emphasis in original); Ex. 70 at 1 ("Stability data do not support current end of shelf life label claim (4.3 log[])"); Ex. 71 at '149 ("[C]urrent stability data do not support an end expiry mumps potency claim of greater than 4.0 log[]."); Ex. 72 at 10, 15 ("Product still not compliant with labeled mumps potency…[Merck] must file a Biologic Product Deviation report to [FDA] detailing results of investigation and medical impact (estimate ~7% of lots).") ("[E]xpect ~7% of lots to test below 4.3 [log] at some point."); Ex. 73 at '819 ("We've been lucky with mumps so far, but it's only a matter of time, since we can statistically predict that a certain number of lots will fail on stability."); Ex. 74 at '134 ("[O]ur most recent stability analysis for mumps does not support the current label claim"); Ex. 75 at '985 ("The [enhanced release model] indicated that the current release titers of 5.0 log[] for mumps … are also insufficient to meet the current minimum potencies at expiry of 4.3 log]..."); Ex. 76 at '066 67 ("[T]he stability model … does not support an expiry of 20,000 [4.3 log] after storage for 24 months"; recognizing "need to remediate the compliance gap for the expiry potency for M M R®II product …."); Ex. 79 at '892 93 ("Based on recent stability analyses…we now believe that we do not have adequate (95%) confidence that the current manufacturing process supports the 4.3 log[] label claim. As such, an immediate corrective action must be taken."); Ex. 80 at '762 (Merck has "no controls to ensure" MMR II complies with 4.3 log potency for full 24 month shelf life.); Ex. 49 at 211:4 9 (Bennett Dep.) ("[The] analyses that I had performed showed that [the minimum release specification of] 5.0 [log] would not support an expiry of 4.3 [log] based upon the release assays, the stability loss estimates and the variability in the loss estimates."); Ex. 3 ¶¶ 419, 419.14 (Kessler Rep.) ("From at least 1998 December 2007, Merck did not have adequate procedures to assure that MMR II vaccine had 'not less than 4.3 [log]' … through end expiry.") ("From May 1998 December 2007, MMR II was adulterated because Merck was unable to assure the potency specification for mumps of not less than 4.3 [log] … for the shelf life of the vaccine."); Ex. 4 at 281:6 16 (Kessler Dep.) ("[P]roduct … manufactured after the [Overfill] was adulterated" because "there was not assurances that it would be within the 4.3 [log] based on Merck's internal representations.").

208

at the earliest, a 2008 source document relating to the Early Warning Evaluation System).

Otherwise undisputed.

191.    Under Merck's stability program:  (1) Merck annually places a certain number of lots aside to be tested between release and the end of the shelf-life; (2) Merck develops a protocol for testing each lot and then conducts potency testing at specific intervals; (3) Merck analyzes the results against the end-expiry specification to ensure the lot is within the specification; (4) Merck analyzes the results against all other lots tested on stability to evaluate trends in potency loss and identify whether a lot appears to be losing more potency than expected; (5) Merck prepares an annual stability report to document its findings; and (6) the annual stability reports are available to and consulted during FDA inspections.  Ex. 91 (Gulati Report) at 13-15; Ex. 202 (Stannard Dep. Tr.) at 309:5-8.

**Response**:  In response to (1) "Merck annually places a certain number of lots aside to be

tested between release and the end of the shelf-life," undisputed to the extent the citation to

evidence omits that despite the FDA's requests, starting in April 2001, for Merck to put more

than one annual MMR-II marketed lot on stability to test the potency of the lot through end

expiry, Merck only placed one lot of MMR-II on stability until late 2006, when it began

placing 4 lots on stability.[402]

In response to (2) "Merck develops a protocol for testing each lot and then conducts potency

testing at specific intervals," Undisputed to the extent the evidence cited only supports the

statement starting in September 2016.  The statement is supported by a citation to Gulati

Report at ¶54 which only discusses Merck's "General Stability Protocol." See Merck Ex. 91

(Gulati Report) at ¶ 54, citing MRK-KRA02139917 which is a Vaccine & Biological

Stability Protocols dated September 6, 2016.  See Merck Ex. 192 at MRK-KRA02139917

---

[402] Ex. 413 at '239 (During an April 4, 2001 conference between Merck and FDA regarding Merck's stability program, FDA's Dr. Carbone requested more than one lot be placed on stability: "[FDA] felt that one annual lot was insufficient and look to Merck for a proposal that will address their concern. They expect the number of lots on stability to increase and indicated that the number of lots manufactured per year should fit into the equation."); Ex. 399 at '928 (Merck February 28, 2005 letter:  "Merck…commits to place a minimum of three lots of MMRII on stability each year…"); Ex. 414 at '26 ("[FDA] thought that our stability program   with 1 annual lot   was insufficient to detect trends.")( "[W]e committed to 3, we actually put 4 on stability each year."  The program was implemented in late 2006.) [01556424 01556428]

MRK-KRA02139925].  Merck provides no evidentiary support for this statement for any procedure prior to September 6, 2016.  Ex. 202 (Stannard Dep.) at 309:5-8 does not support this statement or fact.

In response to (3) and (4) "Merck analyzes the results against the end-expiry specification to ensure the lot is within the specification" and "analyzes the results against all other lots tested on stability to evaluate trends in potency loss and identify whether a lot appears to be losing more potency than expected," Undisputed to the to the extent Merck relied on other stability analyses, including stability release models, whereby Merck concluded it could not ensure the end-expiry potency of all lots released at potencies of $\geq 5.0$ log through the stated shelf life of twenty-four months.[403]  Disputed to the extent the evidence cited does not support more than Merck had protocols for an Active Stability Monitoring (ASM) program.  Gulati only cites to Standard Operating Procedures ("SOP") and nothing more. Merck Ex. 91 at 15 ¶¶ 57-58.  Undisputed that SOP 233-SU317X, cited by Gulati and effective November 10, 2000, provides: "ASM is used to compare stability results for a single lot to historical stability results from multiple lots.  Historical analysis is used to monitor product quality and consistency over time…"[404]  SOP 233-SU317X provides that "Specific ASM Programs will be defined, documented, and approved for each live virus vaccine product or family of products."[405] The SOP does not define what historical data to be reviewed or what criteria establishes a single lot at risk of falling out of specification.[406]  Disputed to the extent no SOP

---

[403] *See supra* note 401.

[404] Ex. 421 at '166 (SOP 233 SU317X).

[405] *Id.*

[406] *Id.*

Appx18961

or defined SOP Program for mumps is cited for any period prior to September 16, 2106.[407]

Further, the "specific criteria for stability analysis" is supported by evidence dated in 2008 and 2010.[408]   Therefore, Disputed that the statement or fact is supported by evidence to support statements (3) and (4), otherwise Undisputed.

Response to (5) is undisputed to the extent Merck prepares Annual Stability Reports, Disputed to the extent Merck discloses "the product's compliance with stability expectations as well as data from the results of the testing at each required interval."[409]   Merck did not disclose in any of its Annual Stability Reports that even with the increased potency in September 1999, Merck could not ensure MMR-II would comply with its 4.3 log minimum mumps potency specifications for the full 24-months shelf life.[410]   For example, in December 2002, Merck internally reported the results of a stability study ("Mumps High Titer Study") on post overfill "high titer" lots that Merck committed to conduct to confirm the minimum release specification of 5.0 log would ensure compliance with the end expiry specification of 4.3 log.[411]   Merck confirmed based on the Mumps High Titer stability study that its current

---

[407] Ex. 422 at '343 (Real Time Stability Trend Monitoring: effective September 21, 2016).

[408] Merck Ex. 91 (Gulati Report) at 15 ¶¶ 57 58, *citing* MRK KRA01714282 (2008 STAT 015a: Revised Early Warning Limits for Filled Container MMRII) and MRK KRA0171429 (2010 STAT 015: Recalculated Filled Container MMRII Early Warning Limits for Measles and Mumps Potency Using Results for All Stability Time Points Including Early Time Points)."

[409] Merck Ex. 91 at 15.

[410] Rel. 56. Stat. ¶¶ 41, 43 45, 47 50 and citations contained therein; see also, Ex. 74 at '34 35 ("Given that our most recent stability analysis for mumps does not support the current label claim, Merck is required to report this finding to FDA.  The Biological Product Deviation Reporting regulations requires that this report be made within 45 days of knowledge of the event.  I consider Tim [Schofield]'s presentation last Friday as 'Day 1' which means that the final report must be submitted by Friday, December 6th [2002].  A cross functional team must convene to develop our path forward and communication pans with the FDA and other agencies…Senior management leadership is critical to provide appropriate guidance and direction on the path forward.") [00094134 00094135]

[411] Ex. 423 at '066 ("Finally, [FDA] requested and Merck subsequently implemented a stability study of lots made with increased mumps, to confirm tentative release potencies for the [sic] its products."); Ex. 424 at '85 ("At [FDA]'s recommendation, Merck designed a stability study with lots manufactured to the new mumps target, and promised to set permanent release specifications with the data obtained from that study.  Recent calculations show that the manufacturing target of 5.2 TCID50/dose and associated release potency of 5.0 TCID50/dose can support an end

Appx18962

specifications did "not guarantee that future lots will maintain adequate potency through expiry."[412]  However, Merck did not report this in its Annual Stability Report.  Instead, Merck represented in its 2002 Annual Stability Report:

> Overall, the stability data in this Annual Stability Report demonstrate stability that is consistent with the historical performance for this product. In September 1999 a process change was made to increase the level of mumps virus in M-M-R®II family vaccines containing mumps component. The process change was implemented to increase the likelihood that lots will meet the mumps potency expiry specification of [4.3 log] and the release specification of [5.0 log]."[413]

Response to (6) is Undisputed to the extent the cited evidence, Ex. 202 (Stannard Dep. Tr.) at 309:5-8 only supports the statement "annual stability reports are available for [FDA] inspection at other agencies during inspection," otherwise, Disputed.  The statement or fact is not supported by the cited evidence.[414]

192.    On October 23, 2019, Merck and Relators' proffered expert, Dr. Kessler, provided a joint submission to the FDA.  Ex. 205 (Oct. 23, 2019 Joint Submission).

**Response**:  Disputed to the extent Merck implies the Joint Submission was only provided to the FDA.  *See* SUMF1 ¶ 136/SUMF4 ¶111.  On May 16, 2019 the Court ordered a process to

---

expiry claim of 4.0 TCID50/dose, the dose demonstrated to be effective in an interim analysis of the mumps expiry trial.") [00239179 00239199]; Ex. 425 at '41 ("Multiple regulatory interactions ensued, which led to Merck commitment to…design a stability study with lots manufactured to the new mumps target and …set permanent release specifications with the data obtained from that study.").

[412] Ex. 426 at '991.

[413] Ex. 419 at '535 (2002 Annual Stability Report)(identified the "Mumps High Titer Study" lots in the stability study, but not the conclusions from that stability study); *see also*, Ex. 420 at '889 90 (2003 Annual Stability Report, which also listed the lots from the Mumps High Titer Study, but did not disclose the conclusions of the stability study)("Overall, the stability data in this Annual Report demonstrate stability is consistent with the historical performance of this product.").

[414] See, Judge Jones Policies and Procedures, Civil Cases, D. Summary Judgment Motions, ¶ 5.

allow Dr. Kessler to convey to HHS, CDC and FDA his concerns that potency issues relating

to Merck's mumps vaccines may negatively impact the vaccine's effectiveness.  *Id. citing*

ECF No 250.  Thereafter, the government invited a Joint Submission coordinated through Mr.

Dickos for Dr. Kessler to convey the data he identified and for Merck to provide its response.

Merck Ex. 205 at 4 of 116.  The Joint Submission was addressed to recipients at HHS, CDC

and FDA, including the CDC Director and CDC's Director of the National Center for

Immunization and Respiratory Diseases, and delivered to Mr. Dickos for dissemination.  *Id.*

at 3 of 116.  Disputed to the extent that Merck implies Merck Exhibit 205 is a complete copy

of the October 23, 2019 Joint Submission.  The Joint Submission was supported by

documentation, including the data the Court's order allowed Dr. Kessler to convey to the

government, which is referenced in Merck Exhibit 205 but not included.  Undisputed that on

October 23, 2019 Merck and Dr. Kessler provided FDA Associate Chief Counsel Peter

Dickos a Joint Submission.

193.    Merck Research Laboratories is involved in vaccine discovery and development
through clinical trials.  A separate division, Global Human Health, is involved in sales and
marking.  *See* Ex. 247 (Metzger Dep. Tr.) at 25:15-26:8.

**<u>Response</u>**:  Disputed to the extent Merck implies that work conducted by Merck Research

Laboratories and individuals working within Merck Research Laboratories play no role, and

have never played a role, in Merck's sale of vaccines.  The evidence cited does not support

that implication.  *See* Ex. 247 at 25:15-26:8 (Metzger Dep.) ("**Q.** So what does Merck

Research Labs do in connection with the vaccines? **A.** Discovery and development up

through clinical trials.").  Otherwise undisputed.

Appx18964

**RELATORS' ADDITIONAL STATEMENT OF MATERIAL FACTS**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Paragraph D(2) of Judge Jones's Policies and Procedures for Civil Cases, Relators Stephen A. Krahling and Joan A. Wlochowski respectfully submit this Statement of Additional Material Facts that Preclude Merck's First and Fourth Motions for Summary Judgment.

**I.     MINIMUM MUMPS POTENCY SPECIFICATION ON MMR-II LABEL**

1.     Internal Merck documents and testimony of Merck witnesses   including Merck's 30(b)(6) designee on topics concerning manufacturing, potency, stability, and compliance with label specifications   show that as early as 1990 the mumps potency specification of 4.3 log on the MMR-II label was the minimum mumps potency required at the end of expiry (24-month shelf life), not at release.[415]

**II.     MUMPS OVERFILL**

2.     In 1999, Merck agreed to increase the amount of mumps in each MMR-II dose at the time the vaccine was released to the market (the "Overfill").  Prior to the Overfill, Merck had manufactured MMR-II with a mumps target manufacturing potency of 4.9 log (80,000 infectious dose units).  In or around September 1999, Merck implemented the Overfill, which doubled its

---

[415] Ex. 38 at 130:13 16, 173:7 10, 179:16 19, 183:3 5 (Merck 30(b)(6) Stannard Dep.) ("[I]n 1990, the mumps end expiry was established as 4.3 [log].  So as of 1990, we did have that.") ("Q. … Ms. Keegan's memo says, starting in 1990, we're going to treat 4.3 [log] as an end expiry spec[ification]?  A. That is correct.") ("[Ms. Keegan's] summary states in 1990 the mumps virus end expiry was established as 4.3 [log].") ("Q. During this whole time [preceding the mumps overfill in 1999] the end expiry potency was 4.3 [log]?  A. That is correct."); Ex. 44 at '760 ("In 1990, the mumps virus end expiry potency for M M R$^{TM}$ II was established as 4.3 [log]."); Ex. 201 at '021 (Aug. 26, 1997 Ltr. from Paul Ehrlich Institut to Merck) ("It is clear that the [potency] stated on the label should be maintained up to the end of shelf life."); Ex. 361 at 80:21 24, 82:11 20 (Keegan Dep.) ("I was requested to prepare the memo by Merck internal counsel … My interpretation of a[n FDA] approval letter … stated minimum potency as 4.3 [log].  I interpreted that to mean mumps end expiry.").

**Appx18965**

mumps target manufacturing potency, increasing it to 5.2 log (160,000 infectious dose units),
with a mumps minimum release potency of 5.0 log (100,000 infectious dose units).[416]

3. The FDA viewed the Overfill as a temporary or interim measure until Merck
completed Protocol 007, submitted its sBLA to lower the minimum mumps potency specification
on the MMR-II label, and obtained approval to lower the minimum mumps potency
specification.[417]

4. Since the Overfill was implemented in or around September 1999, Merck has
continued to manufacture MMR-II with a target manufacturing potency of 5.2 log (160,000
infectious dose units), with a mumps minimum release potency of 5.0 log (100,000 infectious
dose units).[418]

## III.    PROTOCOL 007

---

[416] Ex. 20 at 18, 32 33 (Merck Responses to Requests for Admission 24, 39 41); Ex. 42 at '707, '714 ("It was determined that the mumps component could not meet its specifications if current manufacturing practices were followed. As such, the manufacturing process had to change to increase the amount of mumps component in [MMR II].") ("Ongoing [FDA] concerns about misbranding result in agreement to increase the minimum release spec[ification] for mumps from 4.3 [log] to 5.0 log[].");  Ex. 51 at '226 ("To maintain the product on the market while [Protocol 007] was in progress, [FDA] specified that the mumps minimum release potency be increased to 5.0 log [] to support an end expiry claim of 4.3 log [].");  Ex. 355 at 2 3 (Merck 30(b)(6) Stannard Dep. Ex. 3);  *see also* Ex. 155 at 62:14 63:19, 64:3 7, 66:14 (Krahling Dep.) ("[Merck] w[as] putting … [m]ore virus … [in t]he mumps vaccine because it didn't work … [Dr. Krah] said we were protecting the marquis vaccine and keeping it on the market.") (testifying Dr. Krah told Relator Krahling that Merck "had to put more [mumps virus] in the vaccine because it degraded and there was potency loss. And potency loss, lower potency means it doesn't work as well, or at least they didn't have proof that it worked. … The loss of efficacy he linked to degradation, meaning a lot of dead virus in the vaccine.").

[417] Ex. 48 at '624 ("[FDA] has indicated they view the higher mumps [potency] a temporary measure until [Protocol 007] results are in ….");  Ex. 79 at '892 ("It is [FDA's] understanding (as was ours) that Merck took temporary measures in 1999 to [ensure compliance with the mumps potency label claim] (add more mumps and change release spec[ification]).") (FDA employee "commented … on numerous occasions that the additional mumps in the product was expected to be temporary") (emphasis in original); Ex. 362 at '195 96 ("Manufacturing has committed to manufacture [MMR II] at the higher mumps [potency] … although [FDA] has verbally expressed that they feel the higher mumps [potency] is a temporary solution, pending the results of [Protocol 007].") [01593194 01593199]; Ex. 363 at '983, '987 ("Implementation of this manufacturing target [potency] is an interim measure that will be re evaluated once the results of the current expiry trial [Protocol 007] become available.") ("This is a temporary modification within the manufacturing process.") [00576983 00576993]; Ex. 364 at '236 37 ("This proposal is an interim plan for product release and expiry dating.") ("Implement these changes as an interim measure until the conclusions derived from the results of [Protocol 007] have been approved by [FDA].") [00756233 00756254].

[418] Ex. 20 at 18, 32 33 (Merck Responses to Requests for Admission 24, 39 41); Ex. 355 at 2 3 (Merck 30(b)(6) Stannard Dep. Ex. 3).

Appx18966

5.     Evidence in the record demonstrates that Merck, Merck's experts, Merck's

counsel, Relators, Relators' experts, the FDA, and others have described Protocol 007 as a

clinical trial involving testing that was supposed to assess the efficacy of, effectiveness of, or

protection afforded by, the mumps component of MMR-II.[419]

---

[419]  Merck SUMF4 ¶ 174 ("Merck … submitted data on the efficacy of the vaccine at potencies lower than 4.3 log[], including data from … Protocol 007 …."); Ex. 3 ¶¶ 72, 385 (Kessler Rep.) ("FDA required the mumps immunogenicity testing [to support an sBLA to lower the minimum mumps potency specification] to reflect protection against disease as a result of getting the vaccine") ("The objective of Protocol 007 was to measure MMRII's ability to protect against currently circulating wild type mumps, especially at a potency lower than … 4.3 [log]."); Ex. 17 at 60:10 61:2, 118:25 119:8 (Bramble Dep.) (testifying purpose of Protocol 007 was "to determine the effectiveness of the dose levels … [o]r the efficacy"); Ex. 21 at '135 (ProQuad BLA) ("Evaluation of immunogenicity using validated assays [including same ELISA assay used in Protocol 007] could be used as a surrogate measure for efficacy."); Ex. 23 at 33:24 34:10 (Hartzel Dep.) (testifying and affirming "investigators" and "site personnel" are "the individuals at the clinical sites that are enrolling the patients and observing them for safety and efficacy"); Ex. 30 at 114:2 3, 115:22 23 (Merck Expert Durbin Dep.) ("FDA wanted an assay that was reflective of clinical protection") ("FDA wanted an assay that could relate to the clinical outcome of protection."); Ex. 31 at '695 ("**[FDA] Response to Merck Mumps Expiry Proposal [Protocol 007]** … • Virus antigens in serologic **assays should reflect efficacy against natural infection; therefore, <u>wild-type antigens are appropriate for</u>** <u>serologic assays</u>.") (emphasis in original); Ex. 42 at '708 ("In addition, and more seriously, [FDA] challenged the efficacy of marketed product at the lowest predicted potencies (below label claim). …  With regard to product efficacy, [Merck] provided [FDA] an interim analysis of [Protocol 007] to justify efficacy of lower potency product. [FDA accepted the Merck response."); Ex. 43 at '167 (same); Ex. 50 at '159 (same); Ex. 51 at '230 (same); Ex. 52 at '636 ("[A]t [FDA's] request, the [Protocol 007] study incorporated a wild type mumps isolate … on the *premise that neutralization of a wild type isolate would act as a surrogate for protection from disease*.") (emphasis in original); Ex. 53 at '877 78 (prior clinical studies "were old   based on small number of studies … and furthermore were questioned as to w[he]ther they are still valid in predicting the current protective efficacy …." ) ("[FDA] requires that [seroconversion rate] reflect protective efficacy"); Ex. 54 at '425 ("A requirement was set forth by [FDA] to use a functional neutralization assay for [Protocol 007] … due to: 1 The efficacy statements in MMR®II label are based on old, limited data and an assay that is no longer used by Merck."); Ex. 65 at '041 ("Provided interim analysis of mumps [Protocol 007] data to justify efficacy of lower potency product."); Ex. 100 at '349 ("This change in mumps expiry specification is feasible only on the basis of clinical efficacy data which is currently being generated [in Protocol 007]."); Ex. 105 at '5036, '5174 75 (Protocol 007 CSR) ("For the purpose of this study, a functional [AIGENT] assay was developed and used to measure the ability of the vaccine induced immune response to inhibit viral replication …." ) ("Following agreement with [FDA] and in an attempt to demonstrate that mumps virus at end expiry potency was not only immunogenic but effective in inhibiting viral replication, a functional assay [AIGENT], aimed at measuring mumps specific neutralizing antibodies, was developed and validated …." ) ("[AIGENT and ELISA results] support the effectiveness of M M R$^{TM}$II containing a mumps virus potency of no more than 4.1 log[] and the lowering of the mumps virus end expiry potency …." ); Ex. 105 at '6197 (Protocol 007 Patient Consent Form) ("The purpose of [Protocol 007] is to compare the ability of the three different formulations of M M R$^{TM}$II to make protective antibodies against disease.  The results of this comparison will be used to determine how much of each of the virus components is necessary at the date of expiration to make a protective antibody response. …  In order to make sure that the amount of each of the M M R$^{TM}$II components is enough to protect children even at the end of the vaccine storage period (24 months), or shelf life, [Merck], could add additional amounts to the vaccine when it is produced.  However, this would expose some children to high doses of the vaccine.  [Merck] believes a better approach is to make sure that lower doses of the vaccine will still be effective at stimulating antibodies."); Ex. 108 at '567 69 ("Protocol 007 was designed to determine whether Merck's MMR vaccine would remain effective against mumps if the potency (i.e. concentration) of the mumps component of the vaccine was reduced.  The study involved determining 'seroconversion rates'   which are used as a measure of mumps vaccine effectiveness at

216

**Appx18967**

different potencies.") (purpose of Protocol 007 was to determine if vaccine at below label potency was "comparably protective") (Protocol 007 "measured the effectiveness of the vaccine at the potencies being studied.") ("[I]n approving Merck's label change request, the FDA found … [t]hat the vaccine would be adequately protective against mumps even if Merck were to reduce the potency of the mumps component …."); Ex. 109 at '469 (FDA requiring Protocol 007 to provide "indicators of protection. … There are concerns about long term protection against mumps …."); Ex. 110 at '256 (FDA explaining to Merck "it is important that the immunogenicity at that low end be measured with a neutralization assay that can be reflective of protection."); Ex. 111 at '351 ("[I]n [Protocol 007] we are trying to establish clinical protective efficacy"); Ex. 112 at '970 ("[T]he appropriateness of the cutoff employed in the ELISA for seropositivity should be supported by data demonstrating some relevance with protective levels of antibody (e.g., neutralizing antibody)."); Ex. 113 at '756 (FDA referring to Protocol 007 testing as an "immunological correlate for efficacy of mumps vaccination"); Ex. 114 at '259 ("[T]he PRN assay [in Protocol 007] is an immunological endpoint for protection against wild type disease …"); Ex. 115 at 68:14 69:8 (Emini Dep.) ("The question [in Protocol 007] was … what potency level … should still be present in the vaccine at the end of shelf life that reflects the effectiveness of the vaccine."); Ex. 116 at 32:19 22 (Schodel Dep.) ("Merck had to make sure that whatever was in the vaccine throughout shelf life maintained its efficacy."); Ex. 117 at '177 78 ("[FDA] considers a neutralization assay essential for establishing efficacy w[h]ere you need to define effectiveness for a product   the mumps end expiry trial [Protocol 007]"); Ex. 118 at '214, '239 (Merck's sBLA to lower mumps end expiry potency "will reduce amount of unneeded virus given to children while preserving safety and efficacy profiles of the vaccine") ("Important benefit is that you can give vaccine with lower mumps potency and do not need to give more than needed."); Ex. 119 at '846, '849 (Merck Presentation to Protocol 007 Clinical Investigators) ("[A] wild type mumps strain will be used in the PRN assay to best assess protection from wild mumps infection.") ("Advantages to Participation in this Trial for Subjects • A positive mumps neutralization titer almost certainly ensures protection from wild type infection."); Ex. 121 at '775 ("[E]vidence of a correlation between the current assays and a [wild type] Neut[ralization] assay, or evidence of correlation with protective efficacy, would allow the current [ELISA] based assays to be used."); Ex. 129 at '292 ("[FDA] insistence on a [wild type] neutralization assay [in Protocol 007] will likely result in [seroconversion rate] of 70 80% … Risks: a) Label may be adversely affected with perceived change in efficacy."); Ex. 135 at '833 (FDA directing Merck to "relate the cutoff … to seroprotection" by "relat[ing] the ELISA cutoff to … the PRN assay"); Ex. 136 at '454 ("We need to convince [FDA] that the ELISA will provide equivalent results to PRN and thus equate (bridge) to protection."); Ex. 137 at '321 ("The purpose … is to provide clinical data supporting a reduction in expiry potency …. This clinical data provides evidence … based on … [AIGENT] assay used as a surrogate marker for vaccine efficacy."); Ex. 155 at 190:10 24 (Krahling Dep.) (testifying Dr. Krah explained to Relator Krahling that in Protocol 007 Merck selected "a methodology that they knew could give them 95 percent efficacy which is what they needed") ("[Dr. Krah told me] that in order to meet the 95 percent efficacy FDA mandate, that we needed to cross out pre positives when we found them and change them to pre negatives."); Ex. 160 at 13 (Relator Krahling's Response to Revised Interrogatory 1) ("[Dr.] Emini admitted to Relator [Krahling] that … the standard PRN test is a more specific and accurate test of vaccine efficacy …."); Ex. 189 at '038, '110, '111 12 '116, '127 (Merck's sBLA supported by Protocol 007 to lower minimum mumps potency specification) (Merck identifying sBLA as "Efficacy Supplement" on face of application) ("The clinical data described herein demonstrate that … [l]owering the mumps virus potency to 4.1 log[] maintains > 90% seroconversion rate using a mumps neutralization assay, thus preserving the excellent safety and efficacy profile of the vaccine.") (**Study Endpoints** … The [AIGENT] assay was used as the primary endpoint because it is a functional assay that measures the ability of the vaccine induced immune response to inhibit viral replication in vitro, and can, therefore, be considered a surrogate for vaccine effectiveness.") ("In agreement with … FDA, the mumps specific [AIGENT] was developed and used as a surrogate marker for vaccine effectiveness.") ("The data presented here indicate with a high level of assurance that decreasing the mumps end expiry [potency] from 4.3 to 4.1 log[] in children … will ensure that M M R™II remains a highly effective vaccine."); Ex. 190 at '241, '247, '249 50 (Protocol 007 Patient Consent Forms) (representing Protocol 007 results would determine "whether your child is protected from … mumps" or whether "your child needs to be revaccinated.") (purpose of Protocol 007 was "to make sure that M M R™II vaccine still has enough live viruses at the end of its 24 month storage period or 'shelf life' to protect children from … mumps … infections.") ("If your child responds to the vaccine with protective antibodies to … mumps…, your child will not need the routine 2nd shot of MMR given before entering school.  You will be given written proof of protection against …mumps … with the date the blood was drawn."); Ex. 191 at '144 ("Antibody response measured by mumps virus specific [PRN] assay was used as a surrogate of vaccine efficacy …."); Ex. 192 at '082 (same); Exs. 193 198 at 1 (clinicaltrials.gov archives indicating Protocol 007 was "Efficacy

217

6.    Evidence in the record demonstrates that Merck has viewed the 96%
seroconversion rate referenced in the MMR-II label as one that reflects the vaccine's ability to
protect against mumps.  Merck also understood the label would be changed to reflect reduced
mumps protection if Merck did not meet the 95% target set for Protocol 007, a result Merck
wanted to avoid because it would lower the bar to competition from competing mumps vaccine
suppliers, especially GSK.[420]

---

Study"); Ex. 210 at '969 (Merck was "banking on immunogenicity data to serve as surrogate markers for efficacy");
Ex. 345 at 2 n.2 ("Protocol 007 compared the potency of the then current vaccine at end expiry with two lower
potencies to determine whether the lower potencies were equally immunogenic, which can be indicative of
protection from disease."); Ex. 359 at 114:7 12 (Morsy Dep.) ("Q. Was there any discussion during your time there
that Merck would update the label with its results from Protocol 007?  A. If they proved any different in terms of the
efficacy, the FDA would have demanded [it]."); Ex. 366 at '867 ("One of the observations in the [FDA's Warning
L]etter requested that Merck … provide a summary of available efficacy data at the lower end of the potency range
for these lots. …  Included in [Merck's] response [to the FDA] is data from a subset analysis of [Protocol 007]
which shows good efficacy … at expiry titers as low as 4.0 log[].") [01724860 01725029]; Ex. 366 at '364 ("A
clinical protocol was submitted for [FDA] review to address expiry efficacy.") [01717354 01717508]; Ex. 367 at
'517 ("Dose Confirmation Efficacy Study (Protocol 007)") [00280517 00280517]; Ex. 368 at '084 (describing sBLA
supported by Protocol 007 as "Efficacy Supplement" [01726079  01726092]; Ex. 369 at '839 ("[T]he serologic
response of the population as a whole should correlate with protection.  If the cutoff for seroconversion is at or
above the level reached by the majority of vaccinees, this cutoff, by inference, should correlate with protective
efficacy.") [00625837 00625839]; Ex. 370 at '404 (Merck responding to request to "justify how a mumps
component potency of [4.1 log] can be guaranteed to be clinically efficacious …" by describing Protocol 007 and
stating "[t]he clinical efficacy of the vaccine containing the candidate mumps end expiry potencies were to be based
on a laboratory assay [PRN assay] widely accepted as a surrogate marker for vaccine efficacy.") [00032404
00032407]; Ex. 371 at '317 18 (describing sBLA supported by Protocol 007 as "efficacy supplement") ("The
purpose and underlying rationale for proposing a reduction in potency of the mumps component … was historically
to … 2) provide evidence that a mumps end expiry potency of 12 500 TCID in M M R® II at the end of its shelf life
is not statistically different to that of the product at release [based on … (PRN) assay used as a surrogate market for
vaccine efficacy].") (brackets in original) [00560317 00560319]; Ex. 372 at '855 ("I recall we ran a clinical trial
[Protocol 007] to support the mumps expiry claims.  Expiry specifications are, in my experience, solely based on
minimum efficacious dose proven in the clinic.") [01470854 01470856].  *See also* Ex. 7 at 27:11 28:6 (CDC
30(b)(6) Pallansch Dep.) ("[E]fficacy is often measured in a specific clinical trial setting, where you know who is
vaccinated and not … it's often also applied to a situation of measuring immunogenicity as well as disease in the
context of those clinical trials…"); Ex. 359 at 58:4 7 (Morsy Dep.) ("Q. … Is there a difference between your
understanding of efficacy and effectiveness?  A. No, I think they're interchangeable.").

[420]  Ex. 4 at 363:4 17 (Kessler Dep.) ("The label says that [Merck's] clinical studies have supported 96 percent, and
that's what [FDA] holds GSK to and others to[o] … by doing that … Merck has stood in the way of GSK and others
…"); Ex. 50 at '156 ("Change label to reflect lower than 96% protection … however, this would lower the bar for the
competition."); Ex. 51 at '227 (same); Ex. 79 at '892 93 ("May have to change label claim highlighting the lower
response rate.  This is expected to put us at a competitive disadvantage."); Ex. 84 at 29 ("Change label to reflect
lower than 96% protection • Competitive disadvantage … • … relax[ing] the criteria of success would potentially
lower the bar for the competition."); Ex. 97 at '278 (Merck's "Competitive Defense Task Force … has succeeded in
'raising the bar' for the competition at every available opportunity," citing a "tactical plan to delay the launch" of
GSK's MMR vaccine); Ex. 101 at '342 ("Change package circular to reflect < 96% protection against mumps by
neutralizing antibodies."); Ex. 102 at 26 27 ("Change label to reflect lower than 96% protection … · Change label to

218

## IV.    MERCK'S POTENCY LOSS, STABILITY, AND SHELF-LIFE ANALYSES

7.    Until at least 2004, Mr. Philip Bennett was the Merck statistician who "primarily"

dealt with MMR-II potency and stability issues.[421]  From around the 1980s to around 1997, Mr.

Bennett was "responsible" for Merck's stability monitoring process.[422]  Mr. Bennett also helped

create Merck's "enhanced stability monitoring program" in or around 2003.[423]

8.    Mr. Bennett performed potency loss, stability, and shelf-life analyses for MMR-II.

Mr. Bennett's potency loss, stability, and shelf-life analyses were "part of an approach to

determine … the probability … of lots being within potency throughout their shelf life."[424]

---

reflect antibodies* against mumps in 96% of subjects vaccinated (as measured by ELISA) *not neutralizing antibodies as is currently reflected on the label"); Ex. 103 at 26 (same); Ex. 104 at '138 ("Major argument would be that lowering the seroconversion rate in the label would help GSK."); Ex. 373 at '159 ("Change label to reflect lower than 96% protection") [00021133 00021167]; Ex. 374 at '593 ("[C]hange package circular to reflect lower than 96% neutralizing antibody protection against mumps.") [00233586 00233623]; Ex. 101 at '342 ("Change package circular to reflect <96% protection against mumps by neutralizing antibodies.") [00281174 00281262]; Ex. 375 at 149:22 150:18 (Deposition of GSK 30(b)(6) April Cohen (hereinafter "GSK 30(b)(6) Cohen Dep.")) ("Q. … MMR II's label suggests that there's a 96 percent effectiveness of its mump[s] vaccine. Right?  …  A. It's in the 90s, yes.  …  Q. So GSK understood that it had to have a vaccine that was also in the 90s. Right? A. Yes.  …  Q. If MMR II's label had said the vaccine is 70 percent effective, GSK would have had to meet the 70 percent effective.  Right?  [A.] Correct."); Ex. 376 at '076 ("If the expiry [potency] claim remains [4.3 log] no label change is needed.  Depending on the outcome … [FDA] may require that the seroconversion rate of 96% for mumps be changed to reflect this assay's results ….") [01899074 01899086]; Ex. 377 at '736 ("If endpoint [of Protocol 007] is missed, it becomes a business issue on how to resolve, i.e., … development of a response to MMRII being at a competitive disadvantage in the marketplace (i.e. if ≤ 96% [seroconversion rate] is put in label).") [01728735 01728738]; Ex. 378 at '663("Regulatory options • Change label to reflect reduced % neutralizing antibody protection against mumps (current label = 96%)" [00207636 00207683]; Ex. 379 at 1 (MMR II "Efficacy Profile • Single dose seroconversion rates: … Mumps 96%") [00955777 00955777]; Ex. 380 at 244:1 5 (Deposition of Merck Employee Timothy Schofield (hereinafter "Schofield Dep.")) ("Q.  … [O]ptions under evaluation, 'Change label to reflect lower than 96 percent protection.'  That's talking about the efficacy or effectiveness of the vaccine, right?  A. Yes."); Ex. 254 at '421 (modifying label to lower than 96% viewed as "undesirable label change") [00020421 00020422].

[421]  Ex. 49 at 16:13 16, 18:1 6 (Bennett Dep.) (Bennett affirming (i) "[w]hen it came to potency and stability calculations [at least prior to 2004], … that always f[e]ll within [Bennett's] responsibility"; and (ii) he was "primarily" "the statistician who dealt with any potency and stability issues dealing with M M R").

[422]  Ex. 49 at 86:14 87:9 (Bennett Dep.).

[423]  Ex. 49 at 91:10 14 (Bennett Dep.).

[424]  Ex. 49 at 220:22 25 (Bennett Dep.).  *See also id.* at 225:6 11 (Bennett Dep.) (affirming his potency loss, stability, and shelf life analyses were supposed to provide 95 percent confidence that end expiry potency would be reached).

9.      On or about February 27, 2001, Mr. Bennett performed a potency loss, stability, and shelf-life analysis for MMR-II, which incorporated potency measurements from samples of 20 lots of mumps vaccine.[425]

10.     According to Mr. Bennett's February 27, 2001 potency loss, stability, and shelf-life analysis, "[g]iven [Merck's] current minimum release specification limit of 5.0 [log], [Merck] ha[s] 95% confidence that each lot released will be at or above 4.0 [log] through expiry [at 24 months]."[426]  As of February 2001 and until December 2007, the minimum mumps potency specification on the MMR-II Label was 4.3 log.[427]

11.     Mr. Bennett addressed his February 27, 2001 potency loss, stability, and shelf-life analysis to Keith Chirgwin (Merck Sr. Dir. of Regulatory Affairs) and Roberta McKee (Merck VP of Vaccine & Sterile Quality Operations), copying several other Merck employees.[428]

12.     On or around March 14, 2001, Mr. Bennett performed a potency loss, stability, and shelf-life analysis concerning MMR-II in connection with "[p]reparations for [FDA] discussion on mumps stability/expiry."[429]

13.     According to Mr. Bennett's March 14, 2001 potency loss, stability, and shelf-life analysis, Merck's MMR-II "expiry dating needs to be 12 months in order to provide 95%

---

[425]  Ex. 381 at '072 [01896072 01896073]; Ex. 49 at 30:18 31:6 (Bennett Dep.).

[426]  Ex. 381 at '073 (emphasis added) [01896072 01896073].

[427]  Ex. 42 at '706 07 ("[T]he [FDA] … defined [the label's potency] specifications as end expiry potencies."); Ex. 43 at '165 66 (same); Ex. 44 at '760 ("In 1990, the mumps virus end expiry potency for M M R$^{TM}$ II was established as 4.3 [log]."); Ex. 220 at '072 ("Each 0.5 mL dose contains not less than … [4.3 log] of mumps virus …."); Ex. 221 at '108 (same); Ex. 205 at '088 (On Dec. 6, 2007 FDA approved Merck's sBLA to "change … the labeled potency of the mumps component from no less than [4.3 log] to no less than [4.1 log] per dose at end of expiry").

[428]  Ex. 381 at '072 [01896072 01896073].

[429]  Ex. 86 at '218.

confidence that a lot released at 5.0 will be above 4.3 at expiry."[430]  The shelf life of MMR-II has always been <u>24 months</u>.[431]

14.    Mr. Bennett sent his March 14, 2001 potency loss, stability, and shelf-life analysis to roughly 20 Merck employees, including Merck's "upper management."[432]

15.    On or around January 18, 2002, Mr. Bennett performed a potency loss, stability, and shelf-life analysis concerning MMR-II, which incorporated potency measurements from samples of at least 12 lots of mumps-vaccine.[433]

16.    In connection with his January 18, 2002 potency loss, stability, and shelf-life analysis, Mr. Bennett concluded "[t]he early [potency] loss of the newer lots (high [potency]) [after the mumps Overfill] appears steeper.  …  For lots released at 5.0 [log], we can lo[]se no more than 0.7 log.  This happened in 1 lot at 1 year and in 2 other lots at 18 months."[434]  Mr. Bennett affirmed "13.6 months" as the calculated "expiry period [shelf life] that is supported, with 95% confidence, by [Merck's] current product which is released at 5.0 [log.]"[435]  Mr. Bennett stated "[t]he picture does not look good if we must short date Mumps to assure … 4.3 [log] … at expiry with 95% confidence for release at 5.0 [log]."[436]

---

[430] Ex. 86 at '218 (emphasis added).

[431] Ex. 20 at 172 (Merck Response to Request for Admission 217) (admitting MMR II dating period is 24 months); Ex. 38 at 36:21 23 (Merck 30(b)(6) Stannard Dep.) (identifying 24 month shelf life for MMR II); Ex. 39 at 105:9 21 (Musey Dep.) (testifying shelf life is on MMR II label and has always been 24 months).

[432] Ex. 86 at '218; Ex. 49 at 158:22 159:11 (Bennett Dep.).

[433] Ex. 382 at '849 (referencing "9 lots with an average [potency] of 5.3 [log], range 5.1 [log] to 5.7 [log]," and 3 lots "released at 5.0").

[434] Ex. 382 at '849; Ex. 49 at 181:1 5 (Bennett Dep.) (affirming "newer lots" referenced were lots "manufactured after the minimum release expiry was increased to 5.0 [log]")

[435] Ex. 382 at '849 850.

[436] Ex. 382 at '849.

Appx18972

17.    Mr. Bennett sent his January 18, 2002 potency loss, stability, and shelf-life analysis to several Merck employees.[437]

18.    On or around September 5, 2002, Mr. Bennett performed a potency loss, stability, and shelf-life analysis concerning MMR-II, which incorporated potency measurements from samples of lots of mumps vaccine.[438]  An employee in Merck's Manufacturing Division asked Mr. Bennett to "perform [] analyses of the mumps stability data in order to estimate the maximum shelf life" of MMR-II.[439]

19.    Mr. Bennett's September 5, 2002 potency loss, stability, and shelf-life analysis concluded "the **maximum … shelf life of 12 months**."[440]

20.    Mr. Bennett sent his September 5, 2002 potency loss, stability, and shelf-life analysis to several Merck employees.[441]

21.    In response to Mr. Bennett's September 5, 2002 potency loss, stability, and shelf-life analysis, Merck's Director of Worldwide Regulatory Affairs stated "[t]his is what I was fearful of    12 month[s] will be unacceptable ….  We have much larger problem … if we can only support 12 month[s]."[442]

22.    In regards to Mr. Bennett's September 5, 2002 potency loss, stability, and shelf-life analysis, a Merck Manager of Vaccine Regulatory and Analytical Sciences and a former Merck Stability Coordinator, stated (i) "[w]e've been lucky with mumps so far, but it's only a

---

[437]  Ex. 382 at '849 [00094849 00094851].

[438]  Ex. 73 at '820.

[439]  Ex. 73 at '820; Ex. 49 at 184:24 185:4 (Bennett Dep.) (affirming request came from Merck Manufacturing Division employee).

[440]  Ex. 73 at '820 (emphasis in original).

[441]  Ex. 73 at '820.

[442]  Ex. 73 at '820; Ex. 383 at '001 (Morsy Curriculum Vitae) [MORSY 00001 00010].

matter of time" until "mumps potency stability failures" occur, "since we can statistically predict that a certain number of lots will fail on stability"; and (ii) if Merck were to include the potency loss associated with "recon[stitution]" and "store loss" -- "which it should be for US" -- the 95% confidence interval for expiry would be only "10 months."[443]

23.     On or around February 9, 2004, Mr. Bennett performed a potency loss, stability, and shelf-life analysis concerning MMR-II, which incorporated potency measurements from samples of lots of mumps vaccine.[444]

24.     According to Mr. Bennett's February 9, 2004 potency loss, stability, and shelf-life analysis, a minimum release potency specification of "4.92 log[]" ("rounded up to … 5.0 log[]") "provide[s] 95% probability of meeting [an] expiry limit" of "4.1 log[]."[445]  As of February 2004 and until December 2007, the minimum mumps potency specification on the MMR-II Label was 4.3 log.[446]

25.     Mr. Bennett addressed his February 9, 2004 potency loss, stability, and shelf-life analysis to a Merck employee in Merck's Manufacturing Division, copying several other Merck employees.[447]

26.     On or around November 4, 2004, Mr. Bennett performed a potency loss, stability, and shelf-life analysis concerning MMR-II, which incorporated potency measurements from samples of lots of mumps vaccine, and which "calculate[d] the required minimum release

---

[443]  Ex. 73 at '819; Ex. 384 at '003 (Morrisey Resume) [MORRISEY  00000001 00000006].

[444]  Ex. 385 at '641 42 [00722641 00722642].

[445]  Ex. 385 at '641 42 (emphasis added) [00722641 00722642].

[446]  Ex. 42 at '706 07 ("[T]he [FDA] … defined [the label's potency] specifications as end expiry potencies."); Ex. 43 at '165 66 (same); Ex. 44 at '760 ("In 1990, the mumps virus end expiry potency for M M R$^{TM}$ II was established as 4.3 [log]."); Ex. 220 at '072 ("Each 0.5 mL dose contains not less than … [4.3 log] of mumps virus …."); Ex. 221 at '108 (same); Ex. 205 at '088 (On Dec. 6, 2007 FDA approved Merck's sBLA to "change … the labeled potency of the mumps component from no less than [4.3 log] to no less than [4.1 log] per dose at end of expiry").

[447]  Ex. 385 at '641 [00722641 00722642]; Ex. 49 at 190:9 13 (Bennett Dep.).

Appx18974

specification" given "different scenarios for shelf life storage (18 and 24 months) and [time out of refrigerator] (35 and 40 hours) with a minimum expiry specification of 4.3 log[] …."[448]

27.    According to Mr. Bennett's November 4, 2004 potency loss, stability, and shelf-life analysis, Merck would need to set its minimum release potency specification at "5.2 [log]" in order to reach the 4.3 log minimum potency specification at end expiry, given a 24-months shelf life, 40 hours for time out of the refrigerator, and 8 hours for time upon reconstitution.[449]

28.    Mr. Bennett's November 4, 2004 calculation of the required minimum release potency specification of 5.2 log (160,000 infectious dose units) was 60% (60,000 infectious dose units) higher than the 5.0 log (100,000 infectious dose units) minimum release potency specification Merck has been using since October 1999.[450]

29.    Mr. Bennett addressed his November 4, 2004 potency loss, stability, and shelf-life analysis to an employee in Merck's Manufacturing Division, copying several other Merck employees.[451]

30.    At his deposition, Mr. Bennett affirmed the accuracy, reliability, and precision of his potency loss, stability, and shelf-life analyses concerning MMR-II.[452]

---

[448] Ex. 386 at '667 68 [00722667 00722668].

[449] Ex. 386 at '667 [00722667 00722668]; Ex. 49 at 207:19 25 (Bennett Dep.).

[450] Ex. 386 at '667 [00722667 00722668]; Ex. 355 at 2 (Merck 30(b)(6) Stannard Dep. Ex. 3); Ex. 3 at Schedule 19 (Kessler Rep.).

[451] Ex. 386 at '667 [00722667 00722668]; Ex. 49 at 184:24 185:4 (Bennett Dep.).

[452] Ex. 49 at 48:12 16, 49:24 50:6, 50:23 51:4, 51:14 17, 160:10 14, 161:5 11, 185:18 20 (Bennett Dep.) (testifying given available data and the request there was nothing more he could have done to make his analysis of potency loss and variability more precise) (affirming given available data his analysis "was a reliable calculation of what the 95 percent confidence level would have been with respect to the [potency] log loss") (testifying "[t]here would be no changes" to make his analysis more reliable) (testifying he did not make any mistakes) (affirming his calculations were accurate) (affirming his calculations were the most reliable calculations he could do) ("Q. … [D]o you have any reason to question that calculation?  A. No.").

31.    Mr. Bennett testified he could not recall anyone ever criticizing his potency loss, stability, and shelf-life analyses concerning MMR-II, and no one ever said he made any mistakes in them.[453]

32.    In December 2012, approximately a decade after Mr. Bennett performed his potency loss, stability, and shelf-life analyses concerning MMR-II, Merck employees seeking "to develop specification[s] for [the] min    max range for MMR potency" sought and were provided with Mr. Bennett's potency loss, stability, and shelf-life analyses concerning MMR-II.[454]  Upon receiving Mr. Bennett's potency loss, stability, and shelf-life analyses concerning MMR-II, Merck's Associate Director of Vaccines Chemistry, Manufacturing and Controls stated "Even though old, these are the ones I believe this group needs."[455]  Merck's Director of Global Regulatory Affairs, Vaccines Chemistry, Manufacturing and Controls responded by requesting that the Merck employees "take the remainder of this conversation off-line."[456]

33.    In addition to Mr. Bennett's potency loss, stability, and shelf-life analyses, other evidence in the record, including contemporaneous internal Merck documents and testimony, shows that even after Merck implemented the mumps Overfill, it could not assure with 95% confidence that MMR-II could meet the minimum mumps potency specification of 4.3 log at the end of the 24-month shelf life.[457]

---

[453]  Ex. 49 at 51:6 13, 161:13 16, 185:21 23 (Bennett Dep.) ("Q. Did anyone ever ... criticize the analysis that you did …?  A. To my recollection, no.  Q. And did anyone ... ever say you made any mistakes in this analysis?  A. No.") ("Q. Did anyone ever tell you that the calculations … were incorrect?  A. I don't recall that, no.") ("Q. And did anyone ever tell you [that] you made a mistake with that calculation?  A. Not that I recall.").

[454]  Ex. 387 at '006 07 [0158006 01580015].

[455]  Ex. 388 at '943 [01579943 01579945]; Ex. 389 at '507 (Keegan Curriculum Vitae) [02009507 02009509].

[456]  Ex. 388 at '943 [01579943 01579945].

[457]  Ex. 49 at 178:17 22 (Bennett Dep.) ("Q. [W]as there a concern at Merck during this time that with the 24 month shelf life, they were not able to meet the 4.3 end expiry specification?  A. There were people at Merck that were concerned about that, yes."); Ex. 50 at '155, '159 ("M M R® II may have to remain at the current expiry dose of 4.3 log[] which would only support < 12 months expiry using current data in the stability model.") (emphasis in

34.    In connection with Merck's sBLA to begin manufacturing MMR-II with

"Recombinant Human Albumin" ("rHA") instead of "pooled human derived serum albumin"

("HSA"), on June 30, 2004 Merck submitted to the FDA a potency loss, stability, and shelf-life

original) ("[C]urrent estimations suggest a shelf life < 12 month, a potentially non marketable shelf life[]."); Ex. 51 at '226, '230 (same); Ex. 68 at '350 ("Even at the current release specification, approx. 7% of the lots are expected to be   < 4.3 [log] at expiry."); Ex. 69 at '865 ("**Compliance**: Even with higher mumps target, current stability data suggest 4.3 [log] at expiry cannot be supported.") (emphasis in original); Ex. 70 at 1 ("Stability data do not support current end of shelf life label claim (4.3 log[])"); Ex. 71 at '149 ("[C]urrent stability data do not support an end expiry mumps potency claim of greater than 4.0 log[]."); Ex. 72 at 10, 15 ("Product still not compliant with labeled mumps potency. … [Merck] must file a Biologic Product Deviation Report to [FDA] detailing results of investigation and medical impact (estimate ~7% of lots).") ("[E]xpect ~7% of lots to test below 4.3 [log] at some point."); Ex. 73 at '819 820 ("We've been lucky with mumps so far, but it's only a matter of time, since we can statistically predict that a certain number of lots will fail on stability.") (in response to calculation "yield[ing] the maximum … shelf life of 12 months," Merck's Director of Worldwide Regulatory Affairs stating "[t]his is what I was fearful of   12 month[s] will be unacceptable"); Ex. 74 at '134 ("[O]ur most recent stability analysis for mumps does not support the current label claim"); Ex. 75 at '985 ("The [enhanced release model] indicated that the current release titers of 5.0 log[] for mumps … are also insufficient to meet the current minimum potencies at expiry of 4.3 [log] …."); Ex. 76 at '066 67 ("[T]he stability model … does not support an expiry of [4.3 log] after storage for 24 months") (recognizing "need to remediate the compliance gap for the expiry potency for M M R®II product …."); Ex. 77 at '732 ("4.3 log" mumps end expiry potency specification in label "is wrong as [Merck] cannot guarantee this potency in [its] product."); Ex. 78 at 2 ("8% of current product is expected to fail 4.3."); Ex. 79 at '892 93 ("Based on recent stability analyses … we now believe that we do not have adequate (95%) confidence that the current manufacturing process supports the 4.3 log[] label claim.  As such, an immediate corrective action must be taken."); Ex. 80 at '762 64 (Merck has "no controls to ensure" MMR II complies with 4.3 log potency for full 24 month shelf life.) ("[W]e assure ourselves a non viable mumps containing product if 4.0 [log] is not achieved as the end expiry potency.") ("[W]e absolutely have to have an end expiry of 4.0 to be viable" because failure to comply with 4.3 log[] mumps end expiry potency specification "would mean 'no product' since shelf life estimates reduce to less than 12 month"); Ex. 81 at '430 ("The assessment of shelf life needed to maintain 4.3 [log] was reported … to be limited 12 month only."); Ex. 82 at '325 (calculating "maximum … shelf life of 12 months"); Ex. 83 at '248, '252 ("Outstanding Risks: … M M R®II may have to remain at current expiry dose of 4.3 log[] which would only support ≤ 11 months expiry ….") ("[C]urrent estimations suggest a shelf life < 11 month, a potentially non marketable shelf life[]."); Ex. 84 at 22, 28 ("Recent calculations … support an end expiry claim of 4.3 log[] with a shelf life of **< 12 month, a potentially nonmarketable shelf life**.") (emphasis in original) ("[C]urrent estimate for shelf life is < 12 month."); Ex. 85 at 19 ("Estimated* shelf life with 4.3 log[] is **< 12 months, a potentially non- marketable shelf life**.") (emphasis in original); Ex. 86 at '218 ("Our expiry dating needs to be 12 months in order to provide 95% confidence that a lot released at 5.0 [log] will be above 4.3 [log] at expiry."); Ex. 87 at '854 ("Mis[]branded   stability continues to be an issue, even with the increase in mumps and reduction of end expiry of 4.0 [log]."); Ex. 88 at '005 ("[W]e are on a very constrained time line to file [the sBLA to lower the minimum mumps potency specification] this year as we are out of compliance."); Ex. 89 at '310 ("[F]iling the mumps end expiry and label change is the highest priority from a regulatory and compliance standpoint   every day delay … is a problem for the rest of the team and our ability to resolve this compliance issue which is a concern not only for the US but also for the EU and the rest of the world …."); Ex. 90 at '803 ("**Critical Milestones** … label is out of compliance.  **Timing of Critical Milestones** … **OVERDUE!**") (emphasis in original); Ex. 94 at '950 ("[T]here continues to be an unacceptable risk of current product failure. This has serious implications for these vaccines, potentially culminating in a recall …."); Ex. 96 at '158 ("[C]oncern with mumps that the issue of short shelf life was of significant concern to marketing … we may not have any other immediate solution to keep product on the market …."); Ex. 390 at 5 (Merck committed to "design a stability study with lots manufactured to the new mumps [Overfill] target ….  Recent calculations show that the current manufacturing target of 5.2 log[] and associated release potency of 5.0 log[] can support an end of expiry claim of 4.0 log[] (at 24 months dating), … **but not an end expiry of 4.3 log**[].") (emphasis in original) [00025831 00025831].

226

analysis concerning MMR-II, which incorporated potency measurements from samples of lots of mumps vaccine.  According to Merck's analysis, "the minimum release potency for mumps of 5.0 log [rounded from 4.92 log] ensures, with 95% confidence, that [MMR-II] will meet or exceed the end-expiry dose [of 4.1 log] at the end of the 24 month shelf-life."[458]  As of June 2004 and until December 2007, the minimum mumps potency specification on the MMR-II Label was 4.3 log.[459]

35.    On or about May 27, 2005 the FDA contacted Merck and stated that Merck "need[ed] to revise the label for MMR[TM]II/rHA.  The revised label should state that the Mumps End Expiry potency is … 4.3 log[] … because the Mumps End Expiry sBLA [to lower the minimum mumps potency specification on the MMR-II label] has not been approved …."[460]

36.    On July 13, 2005 Merck submitted to the FDA an amended sBLA for rHA, including a revised potency loss, stability, and shelf-life analysis concerning MMR-II, which incorporated potency measurements from samples of mumps-vaccine lots.[461]  Merck's revised analysis showed that "[t]he minimum release potency for mumps of 5.0 log[] ensures, with 95% confidence, that [MMR-II] will meet or exceed the end-expiry dose [of 4.3 log] at the end of the 24 month shelf-life."[462]

---

[458] Ex. 391 at '7854, '8707 (Gulati Dep., Ex. 14) (emphasis added); Ex. 215 at '854.

[459] Ex. 42 at '706 07 ("[T]he [FDA] … defined [the label's potency] specifications as end expiry potencies."); Ex. 43 at '165 66 (same); Ex. 44 at '760 ("In 1990, the mumps virus end expiry potency for M M R[TM] II was established as 4.3 [log]."); Ex. 220 at '072 ("Each 0.5 mL dose contains not less than … [4.3 log] of mumps virus …."); Ex. 221 at '108 (same); Ex. 205 at '088 (On Dec. 6, 2007 FDA approved Merck's sBLA to "change … the labeled potency of the mumps component from no less than [4.3 log] to no less than [4.1 log] per dose at end of expiry").

[460] Ex. 392 at '082; see also Ex. 189 at '032 (Jan. 29, 2004 sBLA to lower the minimum mumps potency specification); Ex. 205 at '088 (Dec. 6, 2007 approval of sBLA to lower the minimum mumps potency specification).

[461] Ex. 393 at '885.

[462] Ex. 393 at '885 (emphasis added).

Appx18978

37.     In connection with its July 13, 2005 revised potency loss, stability, and shelf-life analysis, Merck used potency measurements of samples of mumps-vaccine lots from 0 to 30 months to calculate potency loss over time, despite the fact that the MMR-II shelf life has always been only 24 months.[463]

38.     Merck's use in its July 13, 2005 revised potency loss, stability, and shelf-life analysis of potency measurements of samples of mumps-vaccine lots from 0 to 30 months (instead of from 0 to only 24 months) "biased Merck's estimates of the rate at which mumps vaccines lose potency from 0 to 24 months."  "Had the estimates been based on the potency of mumps vaccines only 24 months or younger, the estimated rate at which mumps vaccines lose potency from 0 to 24 months would have been approximately 15.5 percent greater."[464]

39.     From at least as early as 1998 to 2004, Merck included in its annual stability program samples from only one or two MMR-II lots manufactured and released each year.[465] From 2005 to 2006, Merck included in its annual stability program samples from only three

---

[463]  Ex. 394 at 351:6 352:16 (Merck Expert Gulati Dep.) (agreeing Merck used potency data to 30 months) ("Q. So your statement in [your report] '…when the slope was calculated in 2005, it was also calculated based on 24 months of data.'  You don't … agree with that anymore?  A. Once I read Dr. Stark's report, I went in depth into … what he was saying and … I agree that Merck was using zero to 30 months of data …."); Ex. 174 (Stark Rep.) ¶¶ 16, 78 82 (concluding Merck used potency data from 0 to 30 months); Ex. 175 (Stark Suppl. Rep.) ¶ 17 (same).

[464]  Ex. 174 (Stark Rep.) ¶¶ 16, 80, 82 ("[E]stimating the rate from data that includes vaccines older than 24 months resulted in predicting higher potency at 24 months than if the estimates had been based only on vaccines 0 to 24 months old.") ("Merck's inclusion of data beyond 24 months in its regression estimates of the rate of vaccine potency loss decreased the estimated rate at which vaccines lost potency from 0 to 24 months by approximately 15.5 percent …."); Ex. 175 (Stark Suppl. Rep.) ¶ 17 ("[U]sing data out to 30 months to estimate the slope of the loss of potency … over 24 months introduces a bias into the estimate of the slope.  Using Merck's methodology, but on data only out to 24 months, would have resulted in a higher estimated rate of decrease in potency than using data out to 30 months."); Ex. 394 at 348:23 349:3 (Merck Expert Gulati Dep.) (agreeing with potency loss calculations of Relators' expert statistician Dr. Stark).

[465]  Ex. 395 at '746 (2001 MMR II Annual Stability Report showing only 1 single dose and 1 ten dose annual study each year from 1998 2000, and only 1 ten dose annual study in 2001) [01632745 01632822]; Ex. 396 at '834 (2004 MMR II Annual Stability Report showing only 1 single dose annual study each year from 2001 2003) [01632833 01632868]; Ex. 397 at '118 (2005 MMR II Annual Stability Report showing only 1 single dose annual study each year from 2002 2004) [01634117 01634149]; Ex. 49 at 88:22 89:2 (Bennett Dep.) ("Q. And at the time that you were overseeing the [stability] program [in or around 1998], how many lots were samples drawn from on any given year?  ...  [A.] The requirement at that time was one lot per year.").

228

MMR-II lots manufactured and released each year.[466]  In 2007, Merck included in its annual

stability program samples from only four MMR-II lots manufactured and released each year.[467]

40.    Each year from 1998 to at least 2015, Merck has sold MMR-II doses from more

than one hundred lots to several hundred lots.[468]

41.    Mr. Bennett testified that "you'd never know what the stability is of a lot you don't

test.  So there's no way to evaluate the lots that you have on study versus the lots you don't, aside

from just saying there is nothing in the production process of these lots which would make them

different from the lots we have on study."[469]

42.    Mr. Bennett testified that all mumps potency measurements, including potency

measurements done in connection with Merck's annual stability monitoring program, are just

estimates.[470]

---

[466]  Ex. 398 at '949 950 (2008 MMR II Annual Stability Report showing only 3 annual studies each year from 2005 2006) [01633948 01633959]; Ex. 399 at '926 27 (Feb. 2005 Merck committing to increase number of MMR II lots per year from which it would place samples on annual stability program from one to three) [02078926 02078927].

[467]  Ex. 398 at '949 950 (2008 MMR II Annual Stability Report showing only 4 annual studies in 2007) [01633948 01633959].

[468]  Exs. 282 299 (Merck Transactional Data from 1998 2015) (identifying 228 unique MMR II Lot Numbers for 1998, 274 for 1999, 257 for 2000, 410 for 2001, 331 for 2002, 313 for 2003, 279 for 2004, 294 to 2005, 336 for 2006, 245 for 2007, 203 for 2008, 174 for 2009, 150 for 2010, 166 for 2011, 165 for 2012, 130 for 2013, 142 for 2014, and 149 for 2015).

[469]  Ex. 49 at 109:3 9 (Bennett Dep.).

[470]  Ex. 49 at 30:10 12, 34:9 11, 36:19 37:2, 38:3 18, 39:25 40:2, 111:13 112:3, 148:20 25 (Bennett Dep.) ("[E]very potency measurement is just an estimate of the average for that lot.") ("5.0 is a potency measurement which has variability or uncertainty in it.") (referencing "variability of the estimated shelf life loss from ... lots," including "variability in their release potencies, the variability in the potency at expiry, potentially the variability from one lot to another, the variability as to when they were tested") ("A. ... [T]he [potency] values are estimates; they aren't known, they aren't true ….  So when I take a sample from that, I get an estimate of that … average potency of the lot.  So each of the measurements for release from these 20 lots is an estimate of the … average potency of those 20 lots, just as the potency at expiry would be an estimate of the … average potency of that lot.  Q. Can the average potency of any lot ever be known?  A. No.  Q. It's always an estimate?  A. Yes.") ("When you measure release potency ... you don't know what the true value is, so you get an estimate.") ("[A.] [Potency measurements are] not the actual potencies, they are potency tests.  ... [T]he potency test is three vials to get an estimate of the potency of the lot ... at release ... and presumably three vials at expiry.  So those are ... just estimates of the actual release potency and estimates of the actual potency at expiry, and they have a considerable variability.  ...  Q. ... [I]s that the case with the measurements that are done in the stability monitoring programs; they're just estimates?  A. Yes.")

43.    Prior to March 2010 Merck's annual stability program "did not include [potency]
data at Time Zero and 3 months" in "the slope evaluations for … mumps potency," despite the
fact that the rate of potency loss for the mumps component of MMR-II is greater from 0 to 6
months than the rate of potency loss from 6 to 24 months.[471]

## V.    OUTBREAKS

44.    In 2018, there were at least 2,251 reported cases of mumps in the United States.
In 2019 (as of November 24, 2019) there have been 2,618 reported cases of mumps across 48
states and the District of Columbia so far.[472]

## VI.    EFFECTIVENESS ESTIMATES

45.    From various outbreak studies it has conducted, the CDC has calculated a median
effectiveness rate of the mumps component of MMR-II when a person gets two doses of 88%.
The lower range of the CDC's effectiveness findings has continually dropped since the mumps
resurgence began in 2006.[473]

## VII.    NO GOVERNMENT KNOWLEDGE

46.    Current CDC employees testified in this case that the CDC has no knowledge of
whether Relators' allegations are true or whether the conduct Relators claim was improper
occurred.[474]

---

("[T]he assay … that you measure it at any particular interval, you won't get the true value at that interval.  You
don't know the true value.  Each assay is an estimate of the true value ...").

[471]  Ex. 400 at '201 [01458201 1458225]; Ex. 49 at 74:13 19 (Bennett Dep.) (affirming rate of potency loss is faster
from 0 to 6 months than from 6 to 24 months); Ex. 394 at 346:9 14 (Merck Expert Gulati Dep.) (affirming MMR II
loses mumps potency more from 0 to 6 months than from 6 to 24 months).

[472]  Ex. 401 at 1 [https://www.cdc.gov/mumps/outbreaks.html].

[473]  Ex. 402 at 1 (2019 CDC statement of 88% median effectiveness rate, range of 31% to 95%) Ex. 403 at 1 (2012
CDC statement of 88% median effectiveness rate, range of 66% to 95%) ; Ex. 404 at 1 (2009 CDC statement of
effectiveness range of 76% to 95%).

[474]  Ex. 249 at 87:21 89:7, 89:25 91:3, 197:7 11 (CDC 30(b)(6) Sims Dep.) (no knowledge of any conclusion at
CDC whether allegations of misconduct are true) (no knowledge of whether alleged misconduct has occurred); Ex. 7

47.     Current and former CDC employees testified in this case that the CDC has no knowledge of any problems with Merck's mumps vaccines.[475]

48.     A current CDC employee testified in this case that the CDC has no knowledge of the details surrounding Protocol 007.[476]

49.     A current CDC employee testified in this case that the CDC has no knowledge of the surrounding context of Merck's use of ELISA test in Protocol 007.[477]

---

at 14:18 19, 168:16 19 (CDC 30(b)(6) Pallansch Dep.) (he has only a "superficial understanding of the details of the allegations" in this lawsuit) (CDC has not made any determination as to veracity of allegations of lawsuit).

[475] Ex. 249 at 87:8 20, 200:15 19, 201:16 25 (CDC 30(b)(6) Sims Dep.) (no knowledge of any problems with Merck's mumps vaccines) (not aware of any cGMP violations associated with Merck's mumps vaccines) (not aware of any concerns with Merck's mumps vaccine relating to efficacy, effectiveness, potency, shelf life, seroconversion, or immunogenicity); Ex. 245 at 188:9 189:4, 189:14 21, 190:11 16, 190:21 191:9, 192:4 6 (Merck Expert Atkinson Dep.) (no knowledge of any issues with Merck's mumps vaccines relating to shelf life, stability, not complying with label specifications, fraud in securing licenses, or clinical trial fraud); Ex. 7 at 117:13 118:19 (CDC 30(b)(6) Pallansch Dep.) (not aware of Merck ever disclosing to CDC any issues with its mumps vaccines relating to effectiveness, potency, shelf life, compliance with label specifications, or compliance with FDA licenses).

[476] Ex. 7 at 15:5 10, 122:12 17, 125:16 18, 125:20 126:1, 126:5 9 (CDC 30(b)(6) Pallansch Dep.) (does not know the "context" or "motivation" behind Protocol 007 and does not think CDC does either) (CDC had no knowledge of the "details" of Protocol 007 and was "not informed of any interaction related between Merck and FDA") ("no awareness of any issue" relating to Merck falsifying data in Protocol 007) (not aware of any fraud with Protocol 007).

[477] Ex. 7 at 120:24 121:2, 121:4 24 (CDC 30(b)(6) Pallansch Dep.) (CDC has no understanding of the surrounding context for Merck's use of the ELISA in Protocol 007 and "I don't think we fully understand even to this day") (doesn't know details of how Merck selected ELISA serostatus cutoff).

231

50.    As the CDC's Dr. Pallansch explained: "[The CDC] ha[s] not looked at potency because of the lack of any awareness of a change in potency.  Therefore, as far as our assumptions is the vaccine that was originally licensed for MMR is still the vaccine that we're evaluating for vaccine effectiveness."[478]

Dated: November 26, 2019

By: _____

Gordon Schnell
Robert L. Begleiter
Marlene Koury
Daniel J. Vitelli
Hamsa Mahendranathan
CONSTANTINE CANNON LLP
335 Madison Avenue
New York, NY 10017
Tel: (212) 350- 2700
Fax: (212) 350-2701
gschnell@constantinecannon.com
rbegleiter@constantinecannon.com
mkoury@constantinecannon.com
dvitelli@constantinecannon.com
hmahendranathan@constantinecannon.com

Jeffrey F. Keller
Kathleen R. Scanlan
KELLER GROVER LLP
1965 Market Street
San Francisco, CA 94103
Tel: (415) 543-1305
jfkeller@KellerGrover.com
kscanlan@KellerGrover.com

---

[478] Ex. 7 at 156:2-18 (CDC 30(b)(6) Pallansch Dep.).  Dr. Pallansch further testified CDC would want to know about any potency changes because "it affects how we interpret data being provided, because we look at data for a specific product as the product hasn't changed unless we're aware of it.  So again, if we knew the potency change occurred at such and such a date, we would deliberately analyze data."  But CDC has not engaged in any kind of analysis of any potency changes -- "We can't because we're not aware of potency changes."  *Id.* at 148:17-149:10; *see also id.* at 141:24-142:13, 147:25-148:10 (in connection with mumps outbreak investigations, CDC is not looking into any MMR-II manufacturing changes because Merck has not disclosed any changes) (existence of any manufacturing changes would be relevant but CDC "unaware of any changes in the product itself").

Appx18983

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA ex rel.,
STEPHEN A. KRAHLING and JOAN A.
WLOCHOWSKI,

*Plaintiffs*,

v.

MERCK & CO., INC.,

*Defendant*.

Civil Action No. 10-4374 (CDJ)

**FILED UNDER SEAL**

**CONTAINS "CONFIDENTIAL" AND
"HIGHLY CONFIDENTIAL -
ATTORNEY'S EYES ONLY"
INFORMATION PURSUANT TO
PROTECTIVE ORDER**

## DECLARATION OF GARY REILLY IN SUPPORT OF
## RELATORS' OPPOSITIONS TO MERCK'S FOUR MOTIONS FOR SUMMARY
## JUDGMENT

I, GARY REILLY, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct:

1.   I am an attorney at Constantine Cannon LLP, which represents Relators Stephen A. Krahling and Joan A. Wlochowski ("Relators") in the above-captioned action. I respectfully submit this declaration in support of Relators' Motion for Summary Judgment. I have personal knowledge of the facts stated herein.

2.   Relators filed their complaint on August 27, 2010. The Court's electronic stamp at the top of the Complaint (ECF No. 20) states April 27, 2010.  The Court's manual file stamp and the signature block on the complaint both are dated August 27, 2010, the date the complaint was actually filed.

3.   Attached as Exhibit 361 is a true and correct copy of the transcript of the deposition of Amy Keegan, taken in this matter on April 27, 2017.

4.   Attached as Exhibit 362 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01593194-99.

5.   Attached as Exhibit 363 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00576983-993.

6.   Attached as Exhibit 364 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00756233-255.

7.   Attached as Exhibit 365 is a true and correct copy of excerpts of a document produced by Defendant in this action, bates stamped MRK-CHA01724860-25029.

8.   Attached as Exhibit 366 is a true and correct copy of excerpts of a document produced by Defendant in this action, bates stamped MRK-CHA01717354-7508.

2

9.   Attached as Exhibit 367 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00280517.

10. Attached as Exhibit 368 is a true and correct copy of excerpts of a document produced by Defendant in this action, bates stamped MRK-CHA01726079-092.

11. Attached as Exhibit 369 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00625837-39.

12. Attached as Exhibit 370 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00032404-07.

13. Attached as Exhibit 371 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00560317-19.

14. Attached as Exhibit 372 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01470854-56.

15. Attached as Exhibit 373 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00021133-167.

16. Attached as Exhibit 374 is a true and correct copy of excerpts a document produced by Defendant in this action, bates stamped MRK-CHA00233586-3623.

17. Attached as Exhibit 375 is a true and correct copy of the transcript of the deposition of GlaxoSmithKline plc ("GSK")'s 30(b)(6) witnesses, April D. Cohen, taken in this matter on January 4, 2018.

18. Attached as Exhibit 376 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01899074-86.

19. Attached as Exhibit 377 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01728735-38.

20. Attached as Exhibit 378 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00207636-683.

21. Attached as Exhibit 379 is a true and correct copy of a document produced by Defendant in this action as "M-M-R II and Priorix Profiles 8_19_11F.ppt," bates stamped MRK-CHA00955777.

22. Attached as Exhibit 380 is a true and correct copy of the transcript of the deposition of Tim Schofield, taken in this matter on March 20, 2017.

23. Attached as Exhibit 381 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01896072-73.

24. Attached as Exhibit 382 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00094849-850.

25. Attached as Exhibit 383 is a true and correct copy of a document produced in this action, bates stamped MORSY 00001-010.

26. Attached as Exhibit 384 is a true and correct copy of a document produced in this action, bates stamped MORRISEY_00000001-06.

27. Attached as Exhibit 385 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00722641-42.

28. Attached as Exhibit 386 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00722667-68.

29. Attached as Exhibit 387 is a true and correct copy of a partial family of documents produced by Defendant in this action, bates stamped MRK-CHA01580006-015.

30. Attached as Exhibit 388 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01579943-45.

4

31. Attached as Exhibit 389 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA02009507-09.

32. Attached as Exhibit 390 is a true and correct copy of a document produced by Defendant in this action as "6-30 pm Draft 10-04-02 for CRRC -10-08-02 slides.ppt," bates stamped MRK-CHA00025831.

33. Attached as Exhibit 391 is a true and correct copy of Gulati Deposition Exhibit 14, which is comprised of select pages of two documents produced by Defendant in this action, bates stamped MRK-CHA00137854-55 and MRK-CHA00138585-8708.

34. Attached as Exhibit 392 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00793082-83.

35. Attached as Exhibit 393 is a true and correct copy of excerpts of a document produced by Defendant in this action, bates stamped MRK-CHA00141789-1906.

36. Attached as Exhibit 394 is a true and correct copy of the transcript of the deposition of Merck's expert Dr. Dipti Gulati, taken in this matter on December 5, 2018.

37. Attached as Exhibit 395 is a true and correct copy of excerpts of a document produced by Defendant in this action, bates stamped MRK-CHA01632745-2822.

38. Attached as Exhibit 396 is a true and correct copy of excerpts of a document produced by Defendant in this action, bates stamped MRK-CHA01632833-868.

39. Attached as Exhibit 397 is a true and correct copy of excerpts of a document produced by Defendant in this action, bates stamped MRK-CHA01634117-4149.

40. Attached as Exhibit 398 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01633948-959.

Appx18988

41. Attached as Exhibit 399 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA02078926-27.

42. Attached as Exhibit 400 is a true and correct copy of excerpts of a document produced by Defendant in this action, bates stamped MRK-CHA01458201-225.

43. Attached as Exhibit 401 is a true and correct copy of the Centers for Disease Control and Prevention ("CDC") "Mumps Cases and Outbreaks" webpage, accessible at https://www.cdc.gov/mumps/outbreaks.html, last accessed November 25, 2019.

44. Attached as Exhibit 402 is a true and correct copy of the CDC "Mumps Vaccination" webpage, accessible at https://www.cdc.gov/vaccines/vpd/mumps/index.html, last accessed November 25, 2019.

45. Attached as Exhibit 403 is a true and correct copy of the CDC "Mumps Vaccination" webpage, archived as of May 30, 2012 on web.archive.org accessible at https://web.archive.org/web/20120530161646/http://www.cdc.gov/mumps/vaccination.html, last accessed November 12, 2019.

46. Attached as Exhibit 404 is a true and correct copy of the CDC "Mumps Vaccination" webpage, archived as of December 8, 2009 on web.archive.org accessible at https://web.archive.org/web/20091208104712/https://www.cdc.gov/mumps/vaccination.html, last accessed November 12, 2019.

47. Attached as Exhibit 405 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA02008691-94.

48. Attached as Exhibit 406 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA02008695-8705.

Appx18989

49. Attached as Exhibit 407 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00351988-990.

50. Attached as Exhibit 408 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00790153-54.

51. Attached as Exhibit 409 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00791347.

52. Attached as Exhibit 410 is a true and correct copy of a document produced by GSK in this action, bates stamped GSK-MMR-IND-0047687-89.

53. Attached as Exhibit 411 is a true and correct copy of a document produced by GSK in this action, bates stamped GSK-MMR-IND-0047654-56.

54. Attached as Exhibit 412 is a true and correct copy of a document produced by GSK in this action, bates stamped GSK-MMR-019819-842.

55. Attached as Exhibit 413 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00049238-240.

56. Attached as Exhibit 414 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01556424-28.

57. Attached as Exhibit 415 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA02101841.

58. Attached as Exhibit 416 is a true and correct copy of the transcript of the deposition of Dr. Roberta L. McKee, taken in this matter on March 30, 2017.

59. Attached as Exhibit 417 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01714300-08.

Appx18990

60. Attached as Exhibit 418 is a true and correct copy of excerpts of a document produced by Defendant in this action, bates stamped MRK-CHA01633601-629.

61. Attached as Exhibit 419 is a true and correct copy of excerpts of a document produced by Defendant in this action, bates stamped MRK-CHA01633529-3600.

62. Attached as Exhibit 420 is a true and correct copy of excerpts of a document produced by Defendant in this action, bates stamped MRK-CHA01632888-2945.

63. Attached as Exhibit 421 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00049165-173.

64. Attached as Exhibit 422 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01714343-354.

65. Attached as Exhibit 423 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00322066-073.

66. Attached as Exhibit 424 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00239179-199.

67. Attached as Exhibit 425 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00780210-265.

68. Attached as Exhibit 426 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00719989-20008.

69. Attached as Exhibit 427 is a true and correct copy of excerpts of a document produced by Defendant in this action, bates stamped MRK-CHA00061698-1743.

70. Attached as Exhibit 428 is a true and correct copy of Atkinson Deposition Exhibit 2, which is comprised of a letter from Kevin Malone to Kathleen Hardway dated July 31, 2018, and a letter from Robert Redfield to Kathleen Hardway dated May 24, 2018.

8

71. Attached as Exhibit 429 is a true and correct copy of the CDC publication "Ensuring the Safety of Vaccines in the United States", accessible at https://www.cdc.gov/vaccines/hcp/conversations/downloads/vacsafe-ensuring-color-office.pdf, last updated July 2011.

72. Attached as Exhibit 430 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00942187-88.

73. Attached as Exhibit 431 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01673057-59.

74. Attached as Exhibit 432 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01655048-093.

75. Attached as Exhibit 433 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01656202-03.

76. Attached as Exhibit 434 is a true and correct copy of a document produced by GSK in this action, bates stamped GSK-MMR-IND-0015993-94.

77. Attached as Exhibit 435 is a true and correct copy of excerpts of a document produced by Defendant in this action, bates stamped MRK-CHA0002441-2681.

78. Attached as Exhibit 436 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA01374713-720.

79. Attached as Exhibit 437 is a true and correct copy of a document produced by GSK in this action, bates stamped GSK-MMR-0062025-030.

80. Attached as Exhibit 438 is a true and correct copy of a document produced by GSK in this action, bates stamped GSK-MMR-0058532.

Appx18992

81. Attached as Exhibit 439 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00447565-574.

82. Attached as Exhibit 440 is a true and correct copy of excerpts of a document produced by Defendant in this action, bates stamped MRK-CHA00490081-0591.

83. Attached as Exhibit 441 is a true and correct copy of a document produced by Defendant in this action, bates stamped MRK-CHA00209441-453.

84. Attached as Exhibit 442 is a true and correct copy of the transcript of the deposition of the Relators' expert Dr. Thomas McGuire, taken in this matter on July 2, 2018.

85. Attached as Exhibit 443 is a true and correct copy of a United States Health & Human Services Department ("HHS") National Vaccine Program Office report by the National Vaccine Advisory Committee, "The National Vaccine Program 2008 State of the Program Report", dated February 2009.

86. Attached as Exhibit 444 is a true and correct copy of the CDC publication "National, State, and Local Area Vaccination Coverage Among Children Aged 19–35 Months — United States, 2012", MMWR 2013;62:733-755, dated September 13, 2013 and accessible at https://www.cdc.gov/mmwr/pdf/wk/mm6236.pdf.

87. Attached as Exhibit 445 is a true and correct copy of an article titled "Financing Immunizations in the United States", Hinman et al, Clinical Infectious Diseases 2004; 38:1440–6.

88. Attached as Exhibit 446 is a National Center for Health Statistics report, "Program Review, National Immunization Survey (NIS) and State and Local Area Integrated Telephone Survey (SLAITS)" dated November 2007, accessible at https://www.cdc.gov/nchs/data/bsc/program_review_reports/bsc_nis_progmatl.pdf.

10

89. Attached as Exhibit 447 is a true and correct copy of the CDC "About VFC" webpage, accessible at https://www.cdc.gov/vaccines/programs/vfc/about/index.html, last accessed November 20, 2019.

90. Attached as Exhibit 448 is a true and correct copy of an HHS Health Care Financing Administration Notice regarding "Medicaid Program; Charges for Vaccine Administration Under the Vaccines for Children Program", Federal Register Volume 59, Issue 190 (October 3, 1994).

91. Attached as Exhibit 449 is a true and correct copy of the transcipt of the deposition of one of Merck's 30(b)(6) witnesses, Michele Taylor, taken in this matter on May 9, 2017.

11

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 26, 2019
       New York, New York

                                            GARY REILLY

12

Appx18995

11/26/2019
Declaration of G. Reilly
EXHIBIT 361

Page 1

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2
     UNITED STATES OF AMERICA  : CIVIL ACTION
3    ex rel., STEPHEN A.       : NO. 2:10-04374(CDJ)
     KRAHLING and JOAN A.      :
4    WLOCHOWSKI,               :
              Plaintiffs,      :
5                              :
              vs.              :
6                              :
     MERCK & CO., INC.,        :
7         Defendant.           :
     _____  : Master File No.
8    IN RE:  MERCK MUMPS       : 2:12-cv-03555(CDJ)
     VACCINE ANTITRUST         :
9    LITIGATION                :
                               :
10   THIS DOCUMENT RELATES TO: :
     ALL ACTIONS               :
11
12
13    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
14
15                 April 27, 2017
16
17        Videotaped deposition of AMY KEEGAN,
18   taken at the offices of Spector Roseman
19   Kodroff & Willis, 1818 Market Street, Suite
20   2500, Philadelphia, Pennsylvania 19103,
21   beginning at 9:04 a.m., before LINDA
22   ROSSI-RIOS, a Federally Approved RPR, CCR and
23   Notary Public.
24
25

Page 2

1 A P P E A R A N C E S :
2
3  On behalf of the Private Plaintiffs
4     SPECTOR ROSEMAN KODROFF & WILLIS, P C
      BY:  DIANA J  ZINSER, ESQUIRE
5        JEFFREY KODROFF, ESQUIRE
         and
6        JOHN A  MACORETTA, ESQUIRE
      1818 Market Street
7     Suite 2500
      Philadelphia, PA  19103
8     215 496 0300
      dzinser@srkw-law com
9     jkodroff@srkw-law com
      jmacoretta@srkw-law com
10
11
12  On behalf of the Defendant, Merck & Co ,
    Inc  and the Witness
13    MORGAN LEWIS & BOCKIUS LLP
      BY:  MARGARET ERIN RODGERS SCHMIDT, ESQUIRE
14       And
         JONATHAN D  WALL, ESQUIRE
15    1701 Market Street
      Philadelphia, PA  19103
16    215-963-5000
      margaret rodgers-schmidt@morganlewis com
17    jonathan wall@morganlewis com
18
19
    On behalf of the Defendant, Merck & Co ,
20  Inc  and the witness
21    VENABLE LLP
      BY:  MICHAELA F  ROBERTS, ESQUIRE
22    750 East Pratt Street
      Suite 900
23    Baltimore, MD  21202
      410 244 7400
24    mfroberts@venable com
25

Page 3

1 A L S O   P R E S E N T :
2
3     JAMES HOLSTEN, ESQUIRE
      Merck in-house counsel
4
      RUSS STRAIN, Videographer
5
6           - - -
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1           I N D E X
2
    WITNESS               PAGE
3
    AMY KEEGAN
4
      By Ms  Zinser        9
5
6        E X H I B I T S
7
    MARKED      DESCRIPTION       PAGE
8
    Keegan-1   Curriculum vitae,      11
9              MRK-KRA02009507 -
              02009509
10
    Keegan-2   List of committees     31
11
    Keegan-3   2/16/15 E-mail with    36
12             attachment,
              MRK-KRA00618327 - 00618334
13
    Keegan-4   12/9/13 E-mail with    39
14             attachment,
              MRK-KRA01355908 - 01355910
15
    Keegan-5   Series of e-mails with  42
16             attachments,
              MRK-KRA01556156 - 01556183
17
    Keegan-6   7/13/05 Letter,        52
18             MRK-KRA00141789 & 00141790
19  Keegan-7   Two e-mails,           54
              MRK-KRA00256875
20
    Keegan-8   9/30/20 E-mail with    63
21             attachment,
              MRK-KRA01593726 - 01593737
22
    Keegan-9   4/8/11 Memo,           77
23             MRK-KRA01456760
24  Keegan-10  E-mail chain,          91
              MRK-KRA01470854 - 01470858
25

Page 5

1        E X H I B I T S (cont'd )
2  Keegan-11   Series of e-mails,     99
              MRK-KRA01364795 - 01364798
3
    Keegan-12  Series of e-mails,     107
4              MRK-KRA01580006 - 01580015
5  Keegan-13   Series of e-mails,     125
              MRK-KRA01579964 - 01579966
6
    Keegan-14  Series of e-mails,     130
7              MRK-KRA01579943 - 01579945
8  Keegan-15   Series of e-mails,     131
              MRK-KRA01559118 & 01559119
9
    Keegan-16  Series of e-mails,     145
10             MRK-KRA01556705 - 01556708
11  Keegan-17  1/19/05 Letter,        146
              MRK-KRA01972632
12
    Keegan-18  2/2/05 Letter,         146
13             MRK-KRA01971200 & 01971201
14  Keegan-19  3/10/05 Regulatory     146
              Conversation,
15             MRK-KRA01971023
16  Keegan-20  3/23/05 Regulatory     147
              Conversation,
17             MRK-KRA01971197 & 01971198
18  Keegan-21  5/24/05 Letter,        147
              MRK-KRA01971196
19
    Keegan-22  Series of documents,   167
20             MRK-KRA01895955 - 01895961
21  Keegan-23  Series of e-mails      177
              MRK-KRA01895942 - 01895951
22
    Keegan-24  Series of slides,      188
23             MRK-KRA01537297 - 01537307
24  Keegan-25  Meeting Agenda,        195
              MRK-KRA00285466 & 00285467
25

2 (Pages 2 - 5)

Appx18998

Page 6

```
1        E X H I B I T S (cont'd )
2  Keegan-26  Response to Form FDA for   198
             Merck Biological
3            Manufacturing Facility,
             West Point,
4            MRK-KRA0784030 - 00784046
5  Keegan-27  Handwritten notes,        210
             MRK-KRA01537292 - 01537296
6
   Keegan-28  Biological Stability      215
7            Program Annual Stability
             Report,
8            MRK-KRA01632656 - 01632686
9  Keegan-29  Potency Standard          222
             Historical Review,
10           MRK-KRA01543545 - 01543585
11 Keegan-30  1/27/03 Memo,             236
             MRK-KRA01543655 - 01543677
12
   Keegan-31  David Krah journal        248
13           excerpt,
             MRK-KRA00490011 - 00490023
14
   Keegan-32  Series of e-mails,        254
15           MRK-KRA01561959 - 01561963
16 Keegan-33  Series of e-mails,        271
             MRK-KRA01567693 - 01567696
17
18
19
20
21
22
23
24
25
```

Page 7

```
1        DEPOSITION SUPPORT INDEX
2
3   DIRECTION TO WITNESS NOT TO ANSWER
4   Page  Line
5    80    5
     86    8
6
7
8
9   REQUEST FOR PRODUCTION OF DOCUMENTS
10  Page  Line
11  (None)
12
13
14
15  STIPULATIONS
16  Page  Line
17  (None)
18
19
20
    QUESTIONS MARKED
21
    Page  Line
22
    (None)
23
24        - - -
25
```

Page 8

```
1
2          - - -
3       VIDEOGRAPHER:  We're now on the
4   record.  My name is Russ Strain,
5   representing Veritext Legal Solutions.
6       The date today is April 27,
7   2017.  The time is approximately
8   9:04 a.m.  This deposition is being
9   held at the office of Spector Roseman,
10  1818 Market Street, Philadelphia, PA.
11  The caption of this case is United
12  States of America ex rel., et al.
13  versus Merck & Company, Incorporated,
14  et al., filed in the US District Court
15  for the Eastern District of
16  Pennsylvania, Case Numbers 10-4374 and
17  Case 12-03555.  The name of the witness
18  is Amy Keegan.
19      If the counsel at this time
20  will, please, introduce themselves for
21  the record?
22      MS. ZINSER:  Diana Zinser,
23  Spector Roseman Kodroff & Willis for
24  private plaintiffs.
25      MR. KODROFF:  Jeffrey Kodroff
```

Page 9

```
1
2   Spector Roseman Kodroff & Willis for
3   private plaintiffs.
4       MS. SCHMIDT:  Margaret Rodgers
5   Schmidt for Merck and Ms. Keegan.
6       MS. ROBERTS:  Michaela Roberts
7   from Venable for Merck and the witness.
8       MR. WALL:  Jonathan Wall from
9   Morgan Lewis for Merck and the witness.
10      MR. HOLSTEN:  Jim Holsten.
11      VIDEOGRAPHER:  The court
12  reporter is Linda Rossi of Veritext.
13  Will the court reporter, please, swear
14  in the witness?
15         - - -
16      AMY KEEGAN, after having been
17  duly sworn, was examined and testified
18  as follows:
19         - - -
20      VIDEOGRAPHER:  Testimony can
21  now proceed.
22         - - -
23      EXAMINATION
24         - - -
25  BY MS. ZINSER:
```

3 (Pages 6 - 9)

1       AMY KEEGAN - HIGHLY CONFIDENTIAL
2       Q.    Good morning.  As I just said,
3   my name is Diana Zinser.
4             Can you, please, state your
5   full name for the record?
6       A.    Amy Keegan.
7       Q.    And have you been known by any
8   other names?
9       A.    Yes, I have.  My maiden name is
10  Amy Romanowski.
11      Q.    You're aware that you're being
12  deposed in the Merck Mumps Antitrust Litigation
13  and that you are under oath.  Correct?
14      A.    Yes, I am.
15      Q.    Have you ever been deposed
16  before?
17      A.    I have not.
18      Q.    You have not, okay.  So just a
19  few, you know, basic instructions.  The court
20  reporter is going to be transcribing
21  everything we say, so we'll try not to talk
22  over each other.  I know it's hard because
23  when you're speaking to -- when you anticipate
24  what the other person is going to say, but
25  I'll try not to interrupt you and hopefully

1       AMY KEEGAN - HIGHLY CONFIDENTIAL
2   you can try not to interrupt me.
3             The court reporter can't
4   transcribe, you know, gestures, head nodding,
5   saying uh-huh, so, you know, please try to
6   answer yes or no to questions.  If you need me
7   to repeat or clarify a question, just ask.
8   And if you need to take a break, just let us
9   know, we may need to finish a certain line of
10  questioning, but we'll be able to take a break
11  if you need one.  Do you understand those
12  instructions?
13      A.    Yes, I do.
14      Q.    All right.
15            MS. ZINSER:  We'll start with
16  this one.
17                 - - -
18            (Exhibit Keegan-1, Curriculum
19            vitae, MRK-KRA02009507 - 02009509, was
20            marked for identification.)
21                 - - -
22  BY MS. ZINSER:
23      Q.    I have marked for identification
24  as Keegan-1, Bates number -- the Bates number,
25  if I refer to that, is in the lower right-hand

1       AMY KEEGAN - HIGHLY CONFIDENTIAL
2   corner.  It's just to identify the pages.
3       A.    Thank you.
4       Q.    This is 2009507, and it's a
5   copy of Amy Keegan's CV.  Do you recognize
6   this document?
7       A.    Yes, I do.
8       Q.    And this was produced to us, I
9   believe, on Monday.  Is this the most recent
10  version from looking at it?
11      A.    Yes, it is.
12      Q.    Okay.  So if we could turn to
13  page 3, or page ending in 509.  Looking at
14  "NON-MERCK EMPLOYMENT HISTORY."  So you have
15  worked at Merck since graduating college.
16  Correct?
17      A.    That is correct.  Well,
18  clarification.  I -- the September after my
19  graduation.
20      Q.    Sure.  Now, we're looking at
21  page 2 going onto page 3, March '97 to
22  April '98 you were a scientist bioanalytical
23  development at MMD.  MMD, that's Merck
24  Manufacturing.  Correct?
25      A.    That is correct.

1       AMY KEEGAN - HIGHLY CONFIDENTIAL
2       Q.    Now, in the second bullet point
3   it says, "Supported technical transfer and
4   demonstration activities for 2nd Generation
5   and Process Upgrade VARIVAXTM bulk processes."
6   What is technical transfer?
7       A.    Technical transfer is when a
8   process is transitioned from the research
9   environment into the manufacturing environment.
10      Q.    So is it a transfer in location
11  as well or just from the different stage of
12  that particular process?
13      A.    It is a physical transition.
14  So from one laboratory into the manufacturing
15  facility.
16      Q.    Going down to the next bullet
17  point, "Administered stability programs in
18  support of ProQuadTM dose-ranging clinical
19  trials."  Can you identify which clinical
20  trials those were or describe them?
21      A.    No, I don't recall.
22      Q.    And the next bullet down, in
23  the second line of that bullet, "...supported
24  M-M-RTM II expiry dating efforts..."  Was that
25  a part of the end expiry trial?

4 (Pages 10 - 13)

Appx19000