## 23-2553

IN THE

# United States Court of Appeals

### FOR THE THIRD CIRCUIT



UNITED STATES OF AMERICA EX REL.,
STEPHEN A. KRAHLING; JOAN A. WLOCHOWSKI,

*against*

MERCK & CO, INC.,

STEPHEN A. KRAHLING; JOAN A. WLOCHOWSKI,

*Appellants.*

*On Appeal from the United States District Court
for the Eastern of District of Pennsylvania
The Honorable Chad F. Kenney, Case No. 2:10-04374-CFK*

### JOINT APPENDIX
### VOLUME XLI OF XLV
### Pages Appx19001 to Appx19500
### (Filed Under Seal)

VENABLE LLP
750 East Pratt Street, Suite 900
Baltimore, Maryland 21202
410-244-7400

MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, Pennsylvania 19103
215-963-5000

HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
202-637-5600

*Attorneys for Defendant-Appellee*

CONSTANTINE CANNON LLP
355 Madison Avenue, 9th Floor
New York, New York 10017
212-350-2700

KELLER GROVER, LLP
1965 Market Street
San Francisco, California 94103
415-543-1305

*Attorneys for Relators-Appellants*

# **Table of Contents**

**Page**

## **Volume III**
### **(Filed Under Seal)**

Order of the Honorable Lynne A. Sitarski, dated May 16, 2019
(Doc. 250) ................................................................... Appx181

Statement of Material Facts by Defendant in Support of
Its First Dispositive Motion, dated October 25, 2019
(Doc. 281-3) ............................................................ Appx185

Statement of Material Facts by Defendant in Support of
Its Fourth Dispositive Motion, dated October 25, 2019
(Doc. 287-3) ............................................................ Appx247

Statement of Material Facts by Relators,
dated October 25, 2019 (Doc. 294) .......................... Appx295

Declaration of Gary Reilly, for Relators,
in Support of Motion, dated October 25, 2019 (Doc. 24) ......... Appx396

Exhibit 1 to Reilly Declaration -
Expert Report of Eugene Shapiro, M.D.,
dated March 13, 2018. ......................................... Appx438

Exhibit 2 to Reilly Declaration -
Expert Report of Dr. Robert Malone, M.D.,
dated March 13, 2018 ........................................... Appx460
***(Cont'd in Vol IV)***

## **Volume IV**
### **(Filed Under Seal)**

Exhibit 3 to Reilly Declaration -
Expert Report of David A. Kessler, M.D.,
dated March 14, 2018, with Schedules
and Appendices ................................................... Appx551
***(Cont'd in Vol V)***

# Table of Contents
**(Continued)**

**Page**

**Volume V**
**(Filed Under Seal)**

Exhibit 4 to Reilly Declaration -
Deposition Testimony of David Kessler, M.D.,
taken September 28, 2018 ...................................................... Appx1483
*(Cont'd in Vol VI)*

**Volume VI**
**(Filed Under Seal)**

Exhibit 5 to Reilly Declaration -
Expert Report of D. Bruce Burlington, M.D.,
dated June 19, 2018 ................................................................ Appx1588

Exhibit 6 to Reilly Declaration -
Deposition Testimony of D. Bruce Burlington, M.D.,
taken December 13, 2018 ........................................................ Appx1637

Exhibit 7 to Reilly Declaration -
Deposition Testimony of Mark Pallansch, M.D.,
taken October 13, 2017 ........................................................... Appx1715

Exhibit 8 to Reilly Declaration -
Deposition Testimony of Eugene Shapiro, M.D.
taken November 7, 2018 ......................................................... Appx1765

Exhibit 9 to Reilly Declaration -
Deposition Testimony of Alison L. Fisher, Ph.D.,
taken November 1, 2016 ......................................................... Appx1822

Exhibit 10 to Reilly Declaration -
Expert Report of Ann M. Arvin, M.D.,
dated June 11, 2018 ................................................................ Appx1910

Exhibit 11 to Reilly Declaration -
Letter from Dr. Robert Redfield, Director, CDC,
dated May 24, 2018 ................................................................ Appx1945

**Table of Contents**
**(Continued)**

**Page**

Exhibit 12 to Reilly Declaration -
Letter from Dr. Anne Schuchat, Principal Deputy
Director, CDC, dated September 26, 2017 ........................... Appx1950

Exhibit 13 to Reilly Declaration -
Statement of Dr. Jesse Goodman, FDA,
dated April 18, 2007 ............................................................. Appx1956

Exhibit 14 to Reilly Declaration -
Letter from Merck to Jacqueline Little, Ph.D.,
dated March 23, 2006 (MRK-CHA00214088-148) ............... Appx1960
***(Cont'd in Vol VII)***

**Volume VII**
**(Filed Under Seal)**

Exhibit 15 to Reilly Declaration -
Deposition Testimony of Jonathan L. Temte, M.D., Ph.D.,
taken August 17, 2018 ......................................................... Appx2010

Exhibit 16 to Reilly Declaration -
Expert Report of Peter H. Calcott, B.Sc. (Hons.), D.Phil.,
dated March 12, 2018 ......................................................... Appx2061

Exhibit 17 to Reilly Declaration -
Deposition Testimony of Joye L. Bramble, Ph.D.,
taken January 6, 2017 ......................................................... Appx2141

Exhibit 18 to Reilly Declaration -
FDA Warning Letter, dated February 9, 2001
(MRK-CHA00209399-409) ................................................... Appx2220

Exhibit 19 to Reilly Declaration -
Excerpts from Defendant Merck's Answer to
Amended Complaint (ECF No. 62) ...................................... Appx2232

iii

**Table of Contents**
**(Continued)**

Exhibit 20 to Reilly Declaration -
Excerpts from Defendant Merck's Responses and
Objections to Relator's Third Set of Requests for Admission,
dated August 16, 2017 ............................................................ Appx2239

Exhibit 21 to Reilly Declaration -
ProQuadTM (Measles, Mumps, Rubella and Varicella
[Oka/Merck] Virus Vaccine Live)-Original Application
(MRK-CHA00158126-79) ....................................................... Appx2293

Exhibit 22 to Reilly Declaration -
Expert Report of William L. Atkinson, M.D., MPH,
dated June 12, 2018 ................................................................. Appx2348

Exhibit 23 to Reilly Declaration -
Deposition Testimony of Jonathan Hartzel, Ph.D.,
taken June 23, 2017 ................................................................. Appx2380

Exhibit 24 to Reilly Declaration -
Expert Report of Anna Durbin, M.D, dated June 14, 2018  ... Appx2476
*(Cont'd in Vol VIII)*

**Volume VIII**
**(Filed Under Seal)**

Exhibit 25 to Reilly Declaration -
Expert Report of Marcela Pasetti, Ph.D.,
dated June 14, 2018 ................................................................. Appx2511

Exhibit 26 to Reilly Declaration -
Excerpts of Presentation, Principles of Vaccinology,
produced as "Principles of Vaccination.ppt"
(MRK-CHA01339555) ............................................................ Appx2534

Exhibit 27 to Reilly Declaration -
Deposition Testimony of Mary K. Yagodich,
taken August 18, 2016 ............................................................ Appx2538

**Table of Contents**
**(Continued)**

**Page**

Exhibit 28 to Reilly Declaration -
GlaxoSmithKline Application for Priorix
(GSK-MMR-IND-0019450-76) ............................................ Appx2631

Exhibit 29 to Reilly Declaration -
Deposition Testimony of Marcela Pasetti, Ph.D.,
taken December 4, 2018 ....................................................... Appx2659

Exhibit 30 to Reilly Declaration -
Deposition Testimony of Anna P. Durbin, M.D.,
taken October 8, 2018 ........................................................... Appx2699

Exhibit 31 to Reilly Declaration -
Excerpts from Rationale for the M-M-R®II End Expiry
Clinical Studies Presentation (MRK-CHA01893680-730) ... Appx2788

Exhibit 32 to Reilly Declaration -
Letter to the Editor "Comparability of M-M-R™II and
Priorix" from Scott Thaler, M.D., *et al.*, *The Pediatric
Infectious Disease Journal*, September 1999:18(9)
(MRK-CHA00088592-3) ....................................................... Appx2836

Exhibit 33 to Reilly Declaration -
Phase V Clinical Development Plan for M-M-R®II
(MRK-CHA00667054-122) ................................................... Appx2839

Exhibit 34 to Reilly Declaration -
Fax from Yolanda Stewart to Donna Boyce,
dated April 25, 2012 (GSK-MMR-IND-0029256-63) ........... Appx2909

Exhibit 35 to Reilly Declaration -
Letter from Karen L. Goldenthal, M.D. to Angus Grant, Ph.D.,
dated September 2, 1997 (GSK-MMR-IND-0000004-7) ...... Appx2918

Exhibit 36 to Reilly Declaration -
Email from Katalin G. Abraham to Keith D. Chirgwin, M.D.,
dated October 5, 1998 (MRK-CHA00095142) ..................... Appx2923

**Table of Contents**
**(Continued)**

Exhibit 37 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449029-40) ........................ Appx2925

Exhibit 38 to Reilly Declaration -
Deposition Testimony of Mark Stannard,
taken December 13, 2016 ..................................................... Appx2938
*(Cont'd in Vol IX)*

**Volume IX**
**(Filed Under Seal)**

Exhibit 39 to Reilly Declaration -
Deposition Testimony of Luwy Musey, M.D.,
taken October 7, 2016 .......................................................... Appx3023

Exhibit 40 to Reilly Declaration -
Deposition Testimony of Ann M. Arvin, M.D.,
taken November 12, 2018 ..................................................... Appx3129

Exhibit 41 to Reilly Declaration -
Deposition Testimony of William Nichols,
taken October 25, 2018 ........................................................ Appx3213

Exhibit 42 to Reilly Declaration -
Proposed New Stabilizer for M-M-R®II,
dated July 26, 2022 (MRK-CHA00207690-7735) ................ Appx3249

Exhibit 43 to Reilly Declaration -
M-M-R®II Mumps End Expiry Study: AIGENT Assay Issues
Impact on Study Criteria Regulatory Implications,
dated October 11, 2002 (MRK-CHA00094161-82) .............. Appx3296

Exhibit 44 to Reilly Declaration -
Memo re: Historical Review and Confirmation of Mumps
Virus Potency Formulation Targets in M-M-R®II,
dated April 8, 2011 (MRK-CHA01456760) .......................... Appx3319

**Table of Contents**
**(Continued)**

**Page**

Exhibit 45 to Reilly Declaration -
Presentation, M-M-R II Mumps End Expiry Trial, produced as
"CDOC presentation November 15-00-draft.ppt"
(MRK-CHA00020396) ........................................................ Appx3321

Exhibit 46 to Reilly Declaration -
Memo re: Stability of Mumps Component in Merck's Live
Virus Vaccines, dated October 5, 2000
(MRK-CHA00587859-62) .................................................... Appx3419

Exhibit 47 to Reilly Declaration -
Memo re: Stability of Measles, Mumps, and
Rubella Components in Merck's Live Virus Vaccines,
dated October 17, 2000 (MRK-CHA00549487-94) .............. Appx3424

Exhibit 48 to Reilly Declaration -
Email from Katalin G. Abraham to Bonita M. Stankunas,
dated October 5, 2000 (MRK-CHA00284623-9) .................. Appx3433

Exhibit 49 to Reilly Declaration -
Deposition Testimony of Philip S. Bennett,
taken May 24, 2017 .............................................................. Appx3441

**Volume X**
**(Filed Under Seal)**

Exhibit 50 to Reilly Declaration -
Email from Keiko Simon, dated October 2, 2002
(MRK-CHA00615147-74) .................................................... Appx3501

Exhibit 51 to Reilly Declaration -
Internal Strategy Document regarding M-M-R®II
Regulatory Compliance (MRK-CHA00019225-45) .............. Appx3530

Exhibit 52 to Reilly Declaration -
"Genetic Heterogeneity of Mumps Strains: Potential
Implications in Comparative Neutralization Studies" CBER
Background Information, dated November 1999
(MRK-CHA00020635-42) .................................................... Appx3552

vii

**Table of Contents**
**(Continued)**

Exhibit 53 to Reilly Declaration -
Draft memo, produced as "Outstanding-
issuesMMRV&MMRII.doc"
(MRK-CHA00198876-91) ..................................................... Appx3561

Exhibit 54 to Reilly Declaration -
Memo re: Mumps neutralization meeting minutes,
dated September 16, 1999 (MRK-CHA00020425-7) ............ Appx3578

Exhibit 55 to Reilly Declaration -
Email from Katalin G. Abraham to Keith D. Chirgwin,
dated February 25, 2000 (MRK-CHA00095143) .................. Appx3582

Exhibit 56 to Reilly Declaration -
Memo re: Team Biologics Close Out – Form FDA 483,
dated October 11, 2000 (MRK-CHA00071265-71) .............. Appx3584

Exhibit 57 to Reilly Declaration -
Email from Dorothy Margolskee, M.D., to
Florian Schodel, M.D., with attachments,
dated February 26, 2001
(MRK-CHA00549510-35) ..................................................... Appx3592

Exhibit 58 to Reilly Declaration -
Email from Joseph F. Heyse with attachments,
dated March 5, 2001
(MRK-CHA00616007-12) ..................................................... Appx3627

Exhibit 59 to Reilly Declaration -
Response to FDA 483 Observation 3
(MRK-CHA00086295-7) ....................................................... Appx3634

Exhibit 60 to Reilly Declaration -
Draft Response to FDA 483 Observation 3
(MRK-CHA00086298-317) ................................................... Appx3638

Exhibit 61 to Reilly Declaration -
Draft Response to FDA 483 Observation 3
(MRK-CHA00562230-41) ..................................................... Appx3659

# Table of Contents
## (Continued)

**Page**

Exhibit 62 to Reilly Declaration -
Draft Response to FDA 483 Observation 3
(MRK-CHA01440844-64) ..................................................... Appx3672

Exhibit 63 to Reilly Declaration -
Letter from Robert L. McKee, Ph.D. to Steven A. Masiello,
dated March 8, 2001 (MRK-CHA01537603-11) ................... Appx3694

Exhibit 64 to Reilly Declaration -
Deposition Testimony of Dorothy Margolskee, M.D.,
taken April 21, 2017 .............................................................. Appx3704

Exhibit 65 to Reilly Declaration -
Excerpts from Label Claim Compliance M-M-R®II
Peer Review Meeting, dated July 15, 2002
(MRK-CHA00322038-65) ..................................................... Appx3796

Exhibit 66 to Reilly Declaration -
Memo re: Executive Summary-CBER/Merck Meeting
April 4, 2001, dated April 8, 2001
(MRK-CHA01649955-6) ....................................................... Appx3819

Exhibit 67 to Reilly Declaration -
Memo re: Minutes, Meeting with CBER on 4/4/01
Regarding Mumps Stability, dated April 9, 2001
(MRK-CHA00754687-91) ..................................................... Appx3822

Exhibit 68 to Reilly Declaration -
Email from Christopher J. Petroski to Keith D. Chirgwin,
dated January 21, 2002 (MRK-CHA00561350-5) ................. Appx3828

Exhibit 69 to Reilly Declaration -
Presentation, M-M-R®II Mumps Expiry Mumps Potency
Claim in Label (MRK-CHA00334863-8) .............................. Appx3835

Exhibit 70 to Reilly Declaration -
Presentation, Mumps Expiry- Label Claim, produced as
"RMC mumps expiry update.ppt" (MRK-CHA00086318) ... Appx3842

# Table of Contents
## (Continued)

**Page**

Exhibit 71 to Reilly Declaration -
Memo re: M-M-R®II: Mumps End Expiry label change –
filing strategy, dated August 2, 2001
(MRK-CHA00247149-52) ...................................................... Appx3846

Exhibit 72 to Reilly Declaration -
Email from Keith D. Chirgwin to Manal A. Morsy with
attachment, dated January 22, 2002
(MRK-CHA00019084-5) ...................................................... Appx3851

Exhibit 73 to Reilly Declaration -
Email from Cynthia F. Morrisey, dated September 5, 2002
(MRK-CHA01562819-20) ...................................................... Appx3873

Exhibit 74 to Reilly Declaration -
Email from Roberta L. McKee, Ph.D.,
dated October 31, 2002 (MRK-CHA00094134-5) ................ Appx3876

Exhibit 75 to Reilly Declaration -
Memo, Mumps and Rubella Formulation and Potency Assay
Format Changes to Support Potency through Twenty-four
Month Expiry (MRK-CHA01894982-98) ............................ Appx3879

Exhibit 76 to Reilly Declaration -
Email from Mark S. Galinski to Keiko Simon,
dated August 23, 2004 (MRK-CHA01564065-8) .................. Appx3897

Exhibit 77 to Reilly Declaration -
Email from Alison L. Fisher with attachments,
dated September 20, 2004
(MRK-CHA01574732-8) ...................................................... Appx3902

Exhibit 78 to Reilly Declaration -
Presentation, Accomplishments to Date,
produced as "accomplishments to 5-17-01.ppt"
(MRK-CHA00724288) ......................................................... Appx3910

**Table of Contents**
**(Continued)**

**Page**

Exhibit 79 to Reilly Declaration -
Draft letter from Roberta L. McKee, Ph.D., to
Michael Angelo, with metadata date of October 17, 2002
(MRK-CHA01649892-3) ...................................................... Appx3917

Exhibit 80 to Reilly Declaration -
Email from Manal Morsy to Keith D. Chirgwin,
dated November 4, 2002 (MRK-CHA00501762-5) .............. Appx3920

Exhibit 81 to Reilly Declaration -
Memo re: Preparations for the Mumps Stability-CBER
discussion, dated March 19, 2001
(MRK-CHA00019430-2) ...................................................... Appx3925

Exhibit 82 to Reilly Declaration -
Email from Philip S. Bennett to Joseph M. Antonello,
dated September 5, 2002 (MRK-CHA00780325-6) .............. Appx3929

Exhibit 83 to Reilly Declaration -
Memo re: Mumps End Expiry study issues,
with Attachment (MRK-CHA00019246-67) ........................ Appx3932

Exhibit 84 to Reilly Declaration -
Draft Presentation, M-M-R II to October 8, 2002 CRRC,
produced as "Draft#1-CRRC 10-08-02 slides.ppt"
(SCHOFIELD_00000201) ................................................... Appx3955

Exhibit 85 to Reilly Declaration -
Presentation, M-M-R II to October 8, 2002 CRRC,
produced as"CRRC-10-08-02 slides.ppt"
(MRK-CHA00027726) ........................................................ Appx3991
*(Cont'd in Vol XI)*

**Volume XI**
**(Filed Under Seal)**

Exhibit 86 to Reilly Declaration -
Email from Philip S. Bennett with attachment,
dated March 14, 2001 (MRK-CHA00562218-9) ................... Appx4021

**Table of Contents**
**(Continued)**

Exhibit 87 to Reilly Declaration -
Meeting Agenda, dated March 7, 2002
(MRK-CHA00205854-60) ...................................................... Appx4024

Exhibit 88 to Reilly Declaration -
Email from Manal Morsy, M.D., Ph.D. to Deitra E. Arena,
dated March 27, 2002 (MRK-CHA00064005-12) ................. Appx4032

Exhibit 89 to Reilly Declaration -
Email from Manal Morsy, M.D., Ph.D. to David Krah, M.D.,
dated April 10, 2002 (MRK-CHA00561310-2) ..................... Appx4041

Exhibit 90 to Reilly Declaration -
Spreadsheet for June 10, 2003 Vaccine Assay Committee
meeting (MRK-CHA00440797-811) ..................................... Appx4045

Exhibit 91 to Reilly Declaration -
Minutes of CBER Teleconference, dated December 7, 2001
(MRK-CHA00019434-7) ...................................................... Appx4061

Exhibit 92 to Reilly Declaration -
Draft Summary of Teleconference Notes
(MRK-CHA00024596-9) ...................................................... Appx4066

Exhibit 93 to Reilly Declaration -
Memo re: CBER teleconference (December 7, 2001): Mumps
Inspection results and discussion, dated December 13, 2001
(MRK-CHA00071082-9) ...................................................... Appx4071

Exhibit 94 to Reilly Declaration -
Memo re: Consultation with Dr. William Fairweather
on Vaccine Stability, dated December 14, 2000
(MRK-CHA00590949-58) ..................................................... Appx4080

Exhibit 95 to Reilly Declaration -
Excerpts from Proposed New Stabilizer for M-M-R®II,
dated August 2002 (MRK-CHA01591461-87) ...................... Appx4091

**Table of Contents**
**(Continued)**

**Page**

Exhibit 96 to Reilly Declaration -
Email from Manal Morsy, M.D., Ph.D. to Joye L. Bramble,
dated June 11, 2002 (MRK-CHA00494158-61) .................... Appx4117

Exhibit 97 to Reilly Declaration -
M-M-R®11 Defense Action Plan, dated June 1999
(MRK-CHA00285276-96) .................................................... Appx4122

Exhibit 98 to Reilly Declaration -
Memo re: Statement of Interest for ProQuad™ Measles,
mumps, rubella, and varicella virus vaccine live, dated
November 10, 2000 (MRK-CHA00325472-91) .................... Appx4144

Exhibit 99 to Reilly Declaration -
Memo re: Statement of Interest for ProQuad™ Measles,
mumps, rubella, and varicella virus vaccine live,
dated November 10, 2000 (MRK-CHA00671410-28) .......... Appx4165

Exhibit 100 to Reilly Declaration -
Memo re: Minimum Expiry Specification Limit for Mumps
Potency in M-M-R®II, dated July 5, 2001
(MRK-CHA01896349) ......................................................... Appx4185

Exhibit 101 to Reilly Declaration -
Excerpts from Clinical and Regulatory Review Committee
Development Projects, dated October 29, 2002
(MRK-CHA01725276-364) .................................................. Appx4187

Exhibit 102 to Reilly Declaration -
Presentation, MMRII Mumps End Expiry study status &
Regulatory implications, produced as "slides for
GRSRC_MumpsEndExpiry -10-11-02.ppt"
(MRK-CHA00040705) ......................................................... Appx4197

Exhibit 103 to Reilly Declaration -
Presentation, MMRII Mumps End Expiry study status &
Regulatory implications, produced as
"slides for GRSRC -10-11-02.ppt"
(MRK-CHA00094159) ......................................................... Appx4227

**Table of Contents**
(Continued)

**Page**

Exhibit 104 to Reilly Declaration -
Email from Joseph F. Heyse to Keith D. Chirgwin,
dated September 30, 2002 (MRK-CHA01582137-9) ............ Appx4256

Exhibit 105 to Reilly Declaration -
MRL Clinical Study Report, Multicenter Study: A Study of
M-M-R II at Mumps Expiry Potency in Healthy Children 12
to 18 Months of Age (Protocol 007)
(MRK-CHA00224982-26529) ............................................... Appx4260

Exhibit 106 to Reilly Declaration -
Email from Dorothy Margolskee to Keith D. Chirgwin,
dated March 8, 1998 (MRK-CHA00095320-1) ..................... Appx4419

Exhibit 107 to Reilly Declaration -
Slide Deck from M-M-R™ Expiry Investigators Meeting,
dated March 15-16, 1999 (MRK-CHA00017605-12) ........... Appx4422

Exhibit 108 to Reilly Declaration -
Excerpts from Merck Submission to the Department of Justice,
dated April 9, 2012 (MRK-CHA0002549-75) ....................... Appx4431

Exhibit 109 to Reilly Declaration -
Letter from Karen L. Goldethal, M.D. to
Keith Chirgwin, M.D., dated September 8, 1998
(MRK-CHA00001467-9) ...................................................... Appx4459

Exhibit 110 to Reilly Declaration -
Memo re: BB-IND 1016: Summary of discussion with
Dr. Kathryn Carbone and Ms. Luba Vujcic (CBER) regarding
the Mumps neutralization assay, dated February 8, 2000
(MRK-CHA00001255-7) ...................................................... Appx4463

Exhibit 111 to Reilly Declaration -
Memo re: Communication with Dr. Kathryn Carbone (CBER)
on April 12, 200 regarding CBER's meeting (face to face-
March 13, 2000) minutes and the mumps neutralization
and ELISA assays, dated April 12, 2000
(MRK-CHA01927351-5) ...................................................... Appx4467

**Table of Contents**
**(Continued)**

Exhibit 112 to Reilly Declaration -
Response to FDA Request for Information,
dated November 17, 2004 (MRK-CHA00126963-71) .......... Appx4473

Exhibit 113 to Reilly Declaration -
Summary of Findings of Inspection, dated August 6, 2001
(MRK-CHA02021754-61) ..................................................... Appx4483

Exhibit 114 to Reilly Declaration -
Meeting Minutes, dated March 14, 2000
(MRK-CHA00001258-61) ..................................................... Appx4492

Exhibit 115 to Reilly Declaration -
Deposition Testimony of Emilio Emini, Ph.D.,
taken June 6, 2017 .................................................................. Appx4497
*(Cont'd in Vol XII)*

**Volume XII**
**(Filed Under Seal)**

Exhibit 116 to Reilly Declaration -
Deposition Testimony of Florian Schodel, M.D.,
taken December 22, 2016  ..................................................... Appx4592

Exhibit 117 to Reilly Declaration -
Email from Manal Morsy, dated September 13, 2002
(MRK-CHA01386177-82) ..................................................... Appx4700

Exhibit 118 to Reilly Declaration -
Email from Keiko Simon with attachments,
dated October 27, 2003
(MRK-CHA00279197-247) ................................................... Appx4707

Exhibit 119 to Reilly Declaration -
Slide Deck from M-M-R™ Expiry Investigators Meeting,
dated March 15-16, 1999 (MRK-CHA01888826-913) ......... Appx4759

**Table of Contents**
**(Continued)**

Exhibit 120 to Reilly Declaration -
Email from Deitra E. Arena with attachments,
dated June 16, 2000
(MRK-CHA00026466-89) ...................................................... Appx4848

Exhibit 121 to Reilly Declaration -
Email from Manal Morsy to Henrietta Ukwu,
dated October 10, 1999 (MRK-CHA01898773-6) ................ Appx4874

Exhibit 122 to Reilly Declaration -
Deposition Testimony of David Krah, M.D.,
taken July 11-12, 2017 ........................................................... Appx4879
*(Cont'd in Vol XIII)*

**Volume XIII**
**(Filed Under Seal)**

Exhibit 123 to Reilly Declaration -
Mumps Neutralization Assay Development
(MRK-CHA00336905-18) ...................................................... Appx5076

Exhibit 124 to Reilly Declaration -
Minutes of CAS Meeting, dated June 20, 2000
(MRK-CHA00209674-8) ........................................................ Appx5091

Exhibit 125 to Reilly Declaration -
Email from Ted L. Staub to George Williams,
dated February 20, 1998 (MRK-CHA00625629-30) ............. Appx5097

Exhibit 126 to Reilly Declaration -
Minutes of Mumps Neutralization Assay Meeting,
dated September 29, 1999 (MRK-CHA00020428-9) ............ Appx5100

Exhibit 127 to Reilly Declaration -
Presentation, MMR II End Expiry Trial,
produced as "MMRII-Neut-fnQPAslides9-27-99.ppt"
(MRK-CHA00025315) ........................................................... Appx5103

**Table of Contents**
**(Continued)**

**Page**

Exhibit 128 to Reilly Declaration -
Draft Summary of 8/17/99 meeting by M. Morsy
(MRK-CHA00198869-70) .......................................................Appx5111

Exhibit 129 to Reilly Declaration -
Memo re: Options and proposed path forward for the
Mumps Expiry Trial (MRK-CHA00086292-3) ..................... Appx5114

Exhibit 130 to Reilly Declaration -
Email from Florian P. Schodel to Colleen A. Forsythe,
dated July 7, 1997 (MRK-CHA01648951-6) ........................ Appx5117

Exhibit 131 to Reilly Declaration -
Memo re: Monthly report for August, 2000,
dated August 23, 2000 (MRK-CHA00016632-5) .................. Appx5124

Exhibit 132 to Reilly Declaration -
Virus & Cell Biology Research Procedure
(MRK-CHA00002189-98) ..................................................... Appx5129

Exhibit 133 to Reilly Declaration -
Letter from Karen L. Goldenthal, M.D. to Keith D. Chirgwin,
M.D., dated October 26, 1999 (MRK-CHA00761482-4) ...... Appx5140

Exhibit 134 to Reilly Declaration -
Memo re: Filing Strategy for ProQuad,
dated January 31, 2002 (MRK-CHA00818776-81) ............... Appx5144

Exhibit 135 to Reilly Declaration -
Memo re: CBER teleconference (October 16, 2001):
Measles, Mumps and Rubella ELISAs, dated October 19, 2001
(MRK-CHA00331831-6) ...................................................... Appx5151

Exhibit 136 to Reilly Declaration -
Email from Michael L. Dekleva to Alison L. Fisher,
dated October 26, 2004 (MRK-CHA00846454-8) ............... Appx5158

**Table of Contents**
(Continued)

Exhibit 137 to Reilly Declaration -
Response to FDA Request for Information,
dated April 13, 2005 (MRK-CHA00000315-60) ................... Appx5164

Exhibit 138 to Reilly Declaration -
Response to FDA Request for Information,
dated November 15, 2006 (MRK-CHA00000393-409) ........ Appx5211

Exhibit 139 to Reilly Declaration -
Response to CBER Comments, dated June 10, 2002
(MRK-KRA00761628-702) ................................................... Appx5229

Exhibit 140 to Reilly Declaration -
Regulatory Liaison FDA Conversation Record,
dated October 5, 2004 (MRK-CHA00846405-15) ................ Appx5305

Exhibit 141 to Reilly Declaration -
Email from Florian Schodel to Michael L. Dekleva,
dated July 3, 2004 (MRK-CHA00791315-9) ........................ Appx5317

Exhibit 142 to Reilly Declaration -
Proposal for Immunogenicity Analyses
(MRK-CHA00561111-2) ...................................................... Appx5323

Exhibit 143 to Reilly Declaration -
Email from David Krah, M.D. to Emilio Emini, Ph.D.,
dated October 9, 2000 (MRK-CHA00065695-703) .............. Appx5326

Exhibit 144 to Reilly Declaration -
Anti-IgG Enhanced Mumps Neutralization Assay-Update,
dated October 24, 2000 (MRK-CHA00026912-8) ................ Appx5336

Exhibit 145 to Reilly Declaration -
Email from Jospeh Antonello to David Krah, M.D.,
dated October 30, 2000 (MRK-CHA00759836-9) ................ Appx5344

Exhibit 146 to Reilly Declaration -
Deposition Testimony of Barbara Kuter,
taken February 9, 2018 ......................................................... Appx5349

**Table of Contents**
**(Continued)**

**Page**

Exhibit 147 to Reilly Declaration -
Email from Steven Rubin to David Krah, M.D.,
dated August 24, 2011 (MRK-CHA00030994-8) .................. Appx5398

Exhibit 148 to Reilly Declaration -
Excerpts from Attachments to 11/18/98 CDOC Meeting
(MRK-CHA01731773-1804) ................................................ Appx5404

Exhibit 149 to Reilly Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
teleconference on methods used for the plaque reduction
neutralization assay, dated February 22, 1999
(MRK-CHA00095050-2) ...................................................... Appx5437

Exhibit 150 to Reilly Declaration -
Extra CDAB Meeting Abstract, dated August 1, 2011
(GSK-MMR-0195819-42) .................................................... Appx5441

Exhibit 151 to Reilly Declaration -
Performance Characteristics and Validation for Mumps Plaque
Reduction Microneutralization assay
(GSK-MMR-IND-0022195-269) .......................................... Appx5466
***(Cont'd in Vol XIV)***

**Volume XIV**
**(Filed Under Seal)**

Exhibit 152 to Reilly Declaration -
Agenda for CBER Meeting, dated March 13, 2000
(MRK-CHA00016335-43) .................................................... Appx5542

Exhibit 153 to Reilly Declaration -
Email from David Krah, M.D. to Alan Shaw,
dated August 15, 2000 (MRK-CHA00068546) ..................... Appx5552

Exhibit 154 to Reilly Declaration -
To-Do List, dated August 26, 2000
(MRK-CHA00273243-4) ...................................................... Appx5554

**Table of Contents**
(Continued)

Exhibit 155 to Reilly Declaration -
Deposition Testimony of Stephen Krahling,
taken May 2-3, 2017 ............................................................ Appx5557

Exhibit 156 to Reilly Declaration -
Memo re: Monthly report for May, 2000, dated May 23, 2000
(MRK-CHA01634869-71) ...................................................... Appx5690

Exhibit 157 to Reilly Declaration -
Handwritten Notes in Book 31271, Pages 161-2
(MRK-CHA00064608-9) ........................................................ Appx5694

Exhibit 158 to Reilly Declaration -
Email from David Krah, M.D. to Emilio Emini, Ph.D.,
dated March 30, 2000 (MRK-CHA00336323-5) ................... Appx5697

Exhibit 159 to Reilly Declaration -
Email from Keith D. Chirgwin with attachment,
dated February 26, 2001
(MRK-CHA00549462-72) ...................................................... Appx5701

Exhibit 160 to Reilly Declaration -
Relator Stephen A. Krahling's Responses and Objections
to Merck's Revised First Set of Interrogatories,
dated May 18, 2015 .............................................................. Appx5713

Exhibit 161 to Reilly Declaration -
Deposition Testimony of Joseph Antonello, Ph.D.,
taken August 3, 2017 ........................................................... Appx5780

Exhibit 162 to Reilly Declaration -
Email from Beverly A. Zaber to Cathy W. Wadsworth,
dated August 9, 2001 (MRK-CHA00008835-9) .................... Appx5862

Exhibit 163 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Steve Krahling, dated March 29, 2001
(MRK-CHA00015702-3) ........................................................ Appx5868

**Table of Contents**
**(Continued)**

**Page**

Exhibit 164 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Colleen Barr, dated March 29, 2001
(MRK-CHA00014739-40) ..................................................... Appx5871

Exhibit 165 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Mary Yagodich, dated March 29, 2001
(MRK-CHA00014746-7) ..................................................... Appx5874

Exhibit 166 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Jennifer Kriss, dated March 29, 2001
(MRK-CHA00014829-30) ..................................................... Appx5877

Exhibit 167 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Steve Krahling, dated March 29, 2001
(MRK-CHA00014731-2) ..................................................... Appx5880

Exhibit 168 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Mary Yagodich, dated March 29, 2001
(MRK-CHA00014744-5) ..................................................... Appx5883

Exhibit 169 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Jill DeHaven, dated March 29, 2001
(MRK-CHA00014749-50) ..................................................... Appx5886

Exhibit 170 to Reilly Declaration -
Memo re: Supplemental Activities for Mumps Neuts,
Protocol 005, Jennifer Kriss, dated March 29, 2001
(MRK-CHA00015719-20) ..................................................... Appx5889

Exhibit 171 to Reilly Declaration -
Memo re: Study KM-248 Phase III-Questionable ELISA
Results in the Comparator Group, dated November 1, 2001
(MRK-CHA00760670-2) ..................................................... Appx5892

**Table of Contents**
**(Continued)**

Exhibit 172 to Reilly Declaration -
Deposition Testimony of Joan L. Wlochowski,
taken June 13-14, 2017 .......................................................... Appx5896
*(Cont'd in Vol XV)*

**Volume XV**
**(Filed Under Seal)**

Exhibit 173 to Reilly Declaration -
Outline for HR Discussion (RELATOR_00000273) ............. Appx6040

Exhibit 174 to Reilly Declaration -
Expert Report of Philip Stark, Ph.D.,
dated March 12, 2018 ........................................................... Appx6042

Exhibit 175 to Reilly Declaration -
Supplemental Expert Report of Philip Stark, Ph.D.,
dated October 16, 2018 ......................................................... Appx6072

Exhibit 176 to Reilly Declaration -
Email from Jospeh Antonello with attachments,
dated March 20, 2002
(MRK-CHA00544820-47) ..................................................... Appx6079

Exhibit 177 to Reilly Declaration -
Excerpts from journal of David Krah, M.D.
(MRK-CHA00489903-490080) ............................................. Appx6133

Exhibit 178 to Reilly Declaration -
Handwritten Log (RELATOR_00001025-6) ......................... Appx6136

Exhibit 179 to Reilly Declaration -
Excerpts from journal of David Krah, M.D.
(MRK-CHA00490592-91038) ............................................... Appx6139

Exhibit 180 to Reilly Declaration -
Memo re: Review of mumps-AIGENT neutralization data,
dated August 1, 2001 (MRK-CHA00026864) ....................... Appx6144

**Table of Contents**
**(Continued)**

Exhibit 181 to Reilly Declaration -
Email from Karen R. McKenney, dated August 7, 2001
(MRK-CHA00052249-53) ..................................................... Appx6146

Exhibit 182 to Reilly Declaration -
General Correspondence and Submission to FDA,
dated February 4, 2002 (MRK-CHA00000410-78) ............... Appx6152

Exhibit 183 to Reilly Declaration -
Assay Log (MRK-CHA00050333-42) ................................. Appx6222

Exhibit 184 to Reilly Declaration -
Handwritten Notes regarding Discarded Plates
(MRK-CHA00055013) ......................................................... Appx6233

Exhibit 185 to Reilly Declaration -
Memo re: Validation of the Anti-IgG Enhanced Mumps Wild
Type Plaque Reduction Neutralization Assay (Virus and Cell
Biology Research Procedure #874.3489), dated
February 27, 2001 (MRK-CHA00016988-17023) ................ Appx6235

Exhibit 186 to Reilly Declaration -
Response to FDA Request for Information,
dated March 12, 2001 (MRK-CHA00017036-115) ............... Appx6272

Exhibit 187 to Reilly Declaration -
Biological Product Deviation Report Form,
dated April 20, 2001 (MRK-CHA00754233-8) ..................... Appx6353

Exhibit 188 to Reilly Declaration -
Background Document: M-M-R®II Protocol 007-Mumps End
Expiry Study: AIGENT Assay Issues and Impact on Study
Criteria (MRK-CHA00615152-74) ....................................... Appx6360

Exhibit 189 to Reilly Declaration -
Supplemental Biologics License Application,
dated January 29, 2004 (MRK-CHA00000032-139) ............. Appx6384

**Table of Contents**
**(Continued)**

Exhibit 190 to Reilly Declaration -
Information Amendment-Clinical, dated November 30, 2001
(MRK-CHA00126233-66) ..................................................... Appx6493
*(Cont'd in Vol XVI)*

**Volume XVI**
**(Filed Under Seal)**

Exhibit 191 to Reilly Declaration -
Email from Mandie Lyon to David Krah, M.D.,
dated August 19, 2004 (MRK-CHA00337141-57) ................ Appx6528

Exhibit 192 to Reilly Declaration -
Email from Barbara J. Kuter to Barbara J. Kuter
with attachment, dated August 5, 2009
(MRK-CHA00121080-82) ..................................................... Appx6546

Exhibit 193 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of October 24, 2011 ..................... Appx6550

Exhibit 194 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of September 26, 2012 ................. Appx6555

Exhibit 195 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of October 17, 2012 ..................... Appx6559

Exhibit 196 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of December 22, 2012 ................. Appx6563

Exhibit 197 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of July 3, 2013 ............................ Appx6567

**Table of Contents**
(Continued)

Exhibit 198 to Reilly Declaration -
ClinicalTrials.gov webpage for the Protocol 007
clinical study, archived as of October 7, 2015 ...................... Appx6571

Exhibit 199 to Reilly Declaration -
CinicalTrials.gov "Background" webpage,
last accessed October 14, 2019 ............................................. Appx6575

Exhibit 200 to Reilly Declaration -
EMEA Scientific Discussion Paper re: M-M-RVAXPRO
and M-M-RII, downloaded October 10, 2019 ........................ Appx6580

Exhibit 201 to Reilly Declaration -
Letter from Dr. Gudrun V. Wangenheim to
D. Wonnacott, Ph.D. (MRK-CHA00626021-2) .................... Appx6616

Exhibit 202 to Reilly Declaration -
Letter from Karen L. Goldenthal, M.D. to Alison Fisher,
Ph.D., dated October 17, 2005 (MRK-CHA00560257-8) ..... Appx6619

Exhibit 203 to Reilly Declaration -
Amendment to Supplemental Biologics License Application
Response to FDA Request for Information,
dated June 5, 2007, with Attachments
(MRK-CHA00000368-82) ...................................................... Appx6622

Exhibit 204 to Reilly Declaration -
Email from Margaret Kanters to Donna Zacholski,
dated January 30, 2009 (MRK-CHA01300697-9) ................. Appx6638

Exhibit 205 to Reilly Declaration -
Approval Letter from FDA, dated December 6, 2007
(MRK-CHA01519087-8) ........................................................ Appx6642

Exhibit 206 to Reilly Declaration -
Memo re: Review of Merck's 7068-214, dated July 27, 2004
(MRK-CHA00846451-3) ........................................................ Appx6645

**Table of Contents**
**(Continued)**

**Page**

Exhibit 207 to Reilly Declaration -
ProQuad™ Original Application, dated August 3, 2004
(MRK-CHA00158320-71) ..................................................... Appx6649

Exhibit 208 to Reilly Declaration -
Deposition Testimony of Michael Dekleva,
taken February 9, 2017 ......................................................... Appx6687

Exhibit 209 to Reilly Declaration -
Original Biologics License Application, dated August 27, 2004
(MRK-CHA00157572-3) ....................................................... Appx6760

Exhibit 210 to Reilly Declaration -
Email from Louis H. Washington to Michael L. Dekleva,
dated June 10, 2004 (MRK-CHA00821967-9) ...................... Appx6763

Exhibit 211 to Reilly Declaration -
Information Amendment-Clinical, dated November 27, 2001
(MRK-CHA00152449-67) ...................................................... Appx6767

Exhibit 212 to Reilly Declaration -
Excerpts from Merck's Responses and Objections to
Plaintiffs' First Set of Interrogatories,
dated August 16, 2017 .......................................................... Appx6787

Exhibit 213 to Reilly Declaration -
Excerpts from Merck's Response to Request for Information,
dated May 4, 2005 (MRK-CHA00846087-6404) .................. Appx6798

Exhibit 214 to Reilly Declaration -
Approval Letter, dated September 6, 2005
(MRK-CHA00761865-89) ..................................................... Appx6804

Exhibit 215 to Reilly Declaration -
Supplemental Biologics License Application,
dated June 30, 2004 (MRK-CHA00137854-5) ...................... Appx6830

**Table of Contents**
**(Continued)**

Exhibit 216 to Reilly Declaration -
Excerpts from A Comparison of the Safety, Tolerability, and
Immunogenicity of M-M-R™II Manufactured With
Recombinant Human Albumin (rHA) Versus M-M-R™II
Manufactured with Pooled-Donor Human Serum Albumin
(HSA) in Healthy Children 12 to 18 Months of Age
Protocol 009 (MRK-CHA00140056-41340) ......................... Appx6833

Exhibit 217 to Reilly Declaration -
Excerpts from Measles, Mumps, and Rubella Virus Vaccine,
Live-Replacement of Human Serum Albumin With
Recombinant Albumin (MRK-CHA00138137-72) ............... Appx6908

Exhibit 218 to Reilly Declaration -
Excerpts from Response to FDA Request for Information,
dated June 28, 2004 (MRK-CHA00124554-4690) ................ Appx6931

Exhibit 219 to Reilly Declaration -
Approval Letter, dated August 31, 2005
(MRK-CHA00141909-22) ..................................................... Appx6979

Exhibit 220 to Reilly Declaration -
M-M-R®II Label (April 1999)
(MRK-CHA00757072-6) ....................................................... Appx6994

Exhibit 221 to Reilly Declaration -
M-M-R®II Label (MRK-CHA00757108-11) ......................... Appx7000
*(Cont'd in Vol XVII)*

**Volume XVII**
**(Filed Under Seal)**

Exhibit 222 to Reilly Declaration -
M-M-R®II Label (2004) (MRK-CHA00757100-3) .............. Appx7005

Exhibit 223 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449260-70) ....................... Appx7010

**Table of Contents**
**(Continued)**

**Page**

Exhibit 224 to Reilly Declaration -
Current M-M-R®II Label (last revised: 09/2019),
downloaded on October 22, 2019 .......................................... Appx7022

Exhibit 225 to Reilly Declaration -
M-M-R®II Label (1990) (MRK-CHA00757060-3) .............. Appx7034

Exhibit 226 to Reilly Declaration -
Summary of Revisions of M-M-R®II Label
(MRK-CHA00137876-7) ....................................................... Appx7039

Exhibit 227 to Reilly Declaration -
Protocol 006 Clinical Study Report Synopsis,
dated August 16, 2004 (MRK-CHA01580213-19) ................ Appx7042

Exhibit 228 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449029-40) ........................ Appx7050

Exhibit 229 to Reilly Declaration -
Description of ProQuad® (MRK-CHA00177125-36) .......... Appx7063

Exhibit 230 to Reilly Declaration -
ProQuad® Label (MRK-CHA01449181-2) .......................... Appx7076

Exhibit 231 to Reilly Declaration -
Current ProQuad Label (last revised: 09/2019),
downloaded on October 22, 2019 .......................................... Appx7079

Exhibit 232 to Reilly Declaration -
Excerpts from Merck's Responses and Objections to Relators'
First Set of Interrogatories, dated April 9, 2015 .................... Appx7105

Exhibit 233 to Reilly Declaration -
Expert Report of Yonatan Grad, M.D., Ph.D.,
dated June 12, 2018 ............................................................... Appx7114

Exhibit 234 to Reilly Declaration -
Excerpts from "Summary of Notifiable Diseases-United
States, 2006," *MMWR*, 2008:55(53) ...................................... Appx7169

**Table of Contents**
**(Continued)**

Exhibit 235 to Reilly Declaration -
Excerpts from "Summary of Notifiable Diseases-United
States, 2009," *MMWR*, 2009:58(53) ..................................... Appx7173

Exhibit 236 to Reilly Declaration -
Excerpts from a "Summary of Notifiable Diseases-United
States, 2010," *MMWR*, 2012:59(53) ..................................... Appx7177

Exhibit 237 to Reilly Declaration -
Excerpts from "Summary of Notifiable Diseases-United
States, 2012," *MMWR*, 2014:61(53) ..................................... Appx7181

Exhibit 238 to Reilly Declaration -
Excerpts from "Summary of Notifiable Infectious
Diseases and Conditions-United States, 2013,"
*MMWR*, 2015:62(53) ........................................................... Appx7185

Exhibit 239 to Reilly Declaration -
Excerpts from "Summary of Notifiable Infectious
Diseases and Conditions-United States, 2014,"
*MMWR*, 2016:63(54) ........................................................... Appx7189

Exhibit 240 to Reilly Declaration -
Excerpts from "Summary of Notifiable Infectious
Diseases and Conditions-United States, 2015,"
*MMWR*, 2017:64(53) ........................................................... Appx7194

Exhibit 241 to Reilly Declaration -
National Notifiable Infectious Diseases and Conditions:
United States TABLE 2j. Reported cases of notifiable
diseases, by region and reporting area-United States and
U.S. territories, 2016 ........................................................... Appx7199

Exhibit 242 to Reilly Declaration -
National Notifiable Infectious Diseases and Conditions:
United States TABLE 2j. Reported cases of notifiable
diseases, by region and reporting area-United States and
U.S. territories, 2017 ........................................................... Appx7202

**Table of Contents**
(Continued)

**Page**

Exhibit 243 to Reilly Declaration -
Nationally Notifiable Infectious Diseases and Conditions,
United States: Weekly Tables; TABLE 1y. Weekly cases of
notifiable diseases, United States, U.S. Territories, and
Non-U.S. Residents weeks ending September 14, 2019
(week 37) ............................................................................. Appx7205

Exhibit 244 to Reilly Declaration -
"Decreased humoral immunity to mumps in young adults
immunized with MMR vaccine in childhood," Rasheed, *et al.*,
PNAS, dated September 17, 2019 116 (38) ........................... Appx7209

Exhibit 245 to Reilly Declaration -
Deposition Testimony of William L. Atkinson, M.D., MPH,
taken January 30, 2019 ........................................................ Appx7216

Exhibit 246 to Reilly Declaration -
Email from Don Latner to William Bellini,
dated July 29, 2010 (BIAOHE000446-53) ............................ Appx7270

Exhibit 247 to Reilly Declaration -
Deposition Testimony of Yonatan Grad, M.D., Ph.D.,
taken October 30, 2018 ........................................................ Appx7279

Exhibit 248 to Reilly Declaration -
Press Briefing Transcripts from CDC,
dated April 19, 2006 ............................................................ Appx7342

Exhibit 249 to Reilly Declaration -
Deposition Testimony of Alan W. Sims,
taken October 12, 2017 ........................................................ Appx7349

Exhibit 250 to Reilly Declaration -
Deposition Testimony of Katalin Abraham,
taken May 18, 2017 ............................................................. Appx7403
***(Cont'd in Vol XVIII)***

**Table of Contents**
**(Continued)**

**Volume XVIII**
**(Filed Under Seal)**

Exhibit 251 to Reilly Declaration -
Email from Eric T. Skjeveland to Christopher J. Petroski,
dated June 7, 2012 (MRK-CHA00955961) ........................... Appx7504

Exhibit 252 to Reilly Declaration -
Expert Report of Jonathan Temte, M.D., Ph.D.,
dated June 12, 2018 ............................................... Appx7506

Exhibit 253 to Reilly Declaration -
M-M-R®II Label (MRK-CHA01449243-53) ....................... Appx7556

Exhibit 254 to Reilly Declaration -
Transcription of an MVX (voice mail) from Manal A. Morsy
to Henrietta Ukwu and Keith D. Chirgwin
(MRK-CHA00020421-2) ...................................... Appx7568

Exhibit 255 to Reilly Declaration -
CDC Presentation, "Mumps-What Happened in 2006?
National Perspective," by Gustavo Dayan,
dated March 5, 2007
(MRK-CHA01372603-33) .................................... Appx7571

Exhibit 256 to Reilly Declaration -
"Commentary: Mumps Vaccines: Do We Need A New One?"
by Stanely A. Plotkin, M.D., accepted for publication
December 4, 2012 ................................................ Appx7603

Exhibit 257 to Reilly Declaration -
"Mumps: A Pain in the Neck," by Stanley A. Plotkin, M.D.,
accepted for publication April 19, 2018 ................................ Appx7606

Exhibit 258 to Reilly Declaration -
"Emerging Mumps Infection," by Rubin, *et al.*,
accepted for publication April 12, 2016 ................................ Appx7609

**Table of Contents**
(Continued)

Exhibit 259 to Reilly Declaration -
"Measles and mumps outbreaks in the United States: Think
globally, vaccinate locally," by Jennifer A. Whitaker,
*Vaccine* 32 (2014) ................................................................. Appx7613

Exhibit 260 to Reilly Declaration -
"Remembering Mumps," by Latner, *et al.*, *PLOS Pathogens*,
published May 7, 2015 ........................................................... Appx7616

Exhibit 261 to Reilly Declaration -
"The resurgence of mumps and pertussis," by Martine Sabbe
and Corinne Vandermeulen accepted for publication
October 22, 2015 ................................................................... Appx7621

Exhibit 262 to Reilly Declaration -
"Mumps Outbreaks in Vaccinated Populations: Are Available
Mumps Vaccines Effective Enough to Prevent Outbreaks?"
by Dayan, *et al.*, accepted for publication May 20, 2008 ...... Appx7631

Exhibit 263 to Reilly Declaration -
Shapiro Deposition Exhibit 25, Program Announcement for
the Department of Defense's Defense Health Program for
Funding Opportunity No. W81XWH-17-PRMRP-CTA ........ Appx7642

Exhibit 264 to Reilly Declaration -
Excerpts from Notice of Grant Award, issued May 7, 2012
(RELATOR_00004392-478) .................................................. Appx7712

Exhibit 265 to Reilly Declaration -
Expert Report of William P. Nichols, dated June 12, 2018 .... Appx7743

Exhibit 266 to Reilly Declaration -
Solicitation Number 2003-N-00734,
issued December 19, 2002 by the CDC ................................. Appx7779

Exhibit 267 to Reilly Declaration -
Solicitation Number 2005-N-01706,
issued January 4, 2005 by the CDC ...................................... Appx7826

**Table of Contents**
**(Continued)**

**Page**

Exhibit 268 to Reilly Declaration -
Solicitation Number 2007-N-09211,
issued January 23, 2007 by the CDC ..................................... Appx7872

Exhibit 269 to Reilly Declaration -
Solicitation Number 2010-N-11873,
issued January 26, 2010 by the CDC ..................................... Appx7923

Exhibit 270 to Reilly Declaration -
Solicitation Number 2011-N-13043,
issued December 21, 2010 by the CDC ................................. Appx7956

Exhibit 271 to Reilly Declaration -
Solicitation Number 2012-N-14228,
issued December 13, 2011 by the CDC ................................. Appx7987
*(Cont'd in Vol XIX)*

**Volume XIX**
**(Filed Under Seal)**

Exhibit 272 to Reilly Declaration -
Solicitation Number 2013-N-14972,
issued January 22, 2013 by the CDC ..................................... Appx8013

Exhibit 273 to Reilly Declaration -
Solicitation Number 2014-N-15784,
issued January 24, 2014 by the CDC ..................................... Appx8040

Exhibit 274 to Reilly Declaration -
Solicitation Number 2015-N-16850,
issued January 16, 2015 by the CDC ..................................... Appx8067

Exhibit 275 to Reilly Declaration -
Solicitation Number 2016-N-17693,
issued January, 4, 2015 by the CDC ..................................... Appx8098

Exhibit 276 to Reilly Declaration -
Solicitation Number 2017-N-18099,
issued January 21, 2017 by the CDC ..................................... Appx8127

**Table of Contents**
(Continued)

Page

Exhibit 277 to Reilly Declaration -
Solicitation Number 2018-N-67769,
issued January 10, 2018 by the CDC ..................................... Appx8156

Exhibit 278 to Reilly Declaration -
Solicitation Number 75D301-19-R-67848,
issued January 7, 2019 by the CDC ...................................... Appx8183

Exhibit 279 to Reilly Declaration -
Summary of GSK-CDC MMR/V Vaccine Meeting
(GSK-MMR-0030570-2) ........................................................ Appx8212

Exhibit 280 to Reilly Declaration -
Charter of the Advisory Committee on Immunization
Practices, filed April 1, 2018 .................................................. Appx8216

Exhibit 281 to Reilly Declaration -
Relators' Expert Report of Dr. Thomas McGuire,
dated March 13, 2018 ........................................................... Appx8222

Exhibit 282 to Reilly Declaration - [1]
Transactional data, "1998 Lot Assignment.xlsx"
(MRK-CHA02143443) ........................................................... Appx8369

Exhibit 283 to Reilly Declaration -
Transactional data, "1999 Lot Assignment.xlsx"
(MRK-CHA02143444) ........................................................... Appx8371

Exhibit 284 to Reilly Declaration -
Transactional data, "2000 Lot Assignment.xlsx"
(MRK-CHA02143445) ........................................................... Appx8373

Exhibit 285 to Reilly Declaration -
Transactional data, "2001 Lot Assignment.xlsx"
(MRK-CHA02143446) ........................................................... Appx8375

---

[1] Exhibits 282 through 299 to the Reilly Declaration have been omitted by consent of the parties.

**Table of Contents**
**(Continued)**

Exhibit 286 to Reilly Declaration -
Transactional data, "2002 Lot Assignment.xlsx"
(MRK-CHA02143447) ......................................................... Appx8377

Exhibit 287 to Reilly Declaration -
Transactional data, "2003 Lot Assignment.xlsx"
(MRK-CHA02143448) ......................................................... Appx8379

Exhibit 288 to Reilly Declaration -
Transactional data, "2004 Lot Assignment.xlsx"
(MRK-CHA02143449) ......................................................... Appx8381

Exhibit 289 to Reilly Declaration -
Transactional data, "2005 Lot Assignment.xlsx"
(MRK-CHA02143450) ......................................................... Appx8383

Exhibit 290 to Reilly Declaration -
Transactional data, "2006 Lot Assignment.xlsx"
(MRK-CHA02143451) ......................................................... Appx8385

Exhibit 291 to Reilly Declaration -
Transactional data, "2007 Lot Assignment.xlsx"
(MRK-CHA02143452) . ......................................................... Appx8387

Exhibit 292 to Reilly Declaration -
Transactional data, "2008 Lot Assignment.xlsx"
(MRK-CHA02143453) ......................................................... Appx8389

Exhibit 293 to Reilly Declaration -
Transactional data, "2009 Lot Assignment.xlsx"
(MRK-CHA02143454) ......................................................... Appx8391

Exhibit 294 to Reilly Declaration -
Transactional data, "2010 Lot Assignment.xlsx"
(MRK-CHA02143455) ......................................................... Appx8393

Exhibit 295 to Reilly Declaration -
Transactional data, "2011 Lot Assignment.xlsx"
(MRK-CHA02143456) ......................................................... Appx8395

**Table of Contents**
**(Continued)**

**Page**

Exhibit 296 to Reilly Declaration -
Transactional data, "2012 Lot Assignment.xlsx"
(MRK-CHA02143457) .......................................................... Appx8397

Exhibit 297 to Reilly Declaration -
Transactional data, "2013 Lot Assignment.xlsx"
(MRK-CHA02143458) .......................................................... Appx8399

Exhibit 298 to Reilly Declaration -
Transactional data, "2014 Lot Assignment.xlsx"
(MRK-CHA02143459) .......................................................... Appx8401

Exhibit 299 to Reilly Declaration -
Transactional data, "2015 Lot Assignment.xlsx"
(MRK-CHA02143460) .......................................................... Appx8403

Exhibit 300 to Reilly Declaration -
Letter from Lisa C. Dykstra to Counsel,
dated April 17, 2017 .............................................................. Appx8405

Exhibit 301 to Reilly Declaration -
Letter from Stan Bernard, M.D., M.B.A. to Kim Haupt,
dated November 9, 2008 (MRK-CHA02063339-45) ............ Appx8407

Exhibit 302 to Reilly Declaration -
Merck's 2004 Vaccine for Children Contract with the CDC
(MRK-CHA01371280-310) .................................................... Appx8415

Exhibit 303 to Reilly Declaration -
Merck's 2003 Vaccine for Children Contract with the CDC
(MRK-CHA01371311-40) ...................................................... Appx8447

Exhibit 304 to Reilly Declaration -
Merck's 2005 Vaccine for Children Contract with the CDC
(MRK-CHA01371341-72) ...................................................... Appx8478
*(Cont'd in Vol XX)*

**Table of Contents**
**(Continued)**

**Volume XX**
**(Filed Under Seal)**

Exhibit 305 to Reilly Declaration -
Merck's 2010 Vaccine for Children Contract with the CDC
(MRK-CHA01371373-97) .................................................... Appx8511

Exhibit 306 to Reilly Declaration -
Merck's 2012 Vaccine for Children Contract with the CDC
(MRK-CHA01371398-421) .................................................... Appx8537

Exhibit 307 to Reilly Declaration -
Merck's 2013 Vaccine for Children Contract with the CDC
(MRK-CHA01371422-44) .................................................... Appx8562

Exhibit 308 to Reilly Declaration -
Merck's 2014 Vaccine for Adults Contract with the CDC
(MRK-CHA01371445-72) .................................................... Appx8586

Exhibit 309 to Reilly Declaration -
Merck's 2014 Vaccine for Children Contract with the CDC
(MRK-CHA01371473-96) .................................................... Appx8615

Exhibit 310 to Reilly Declaration -
Merck's 2011 Vaccine for Children Contract with the CDC
(MRK-CHA01371497-518) .................................................... Appx8640

Exhibit 311 to Reilly Declaration -
Merck's 2011 Vaccine for Adults Contract with the CDC
(MRK-CHA01371519-47) .................................................... Appx8663

Exhibit 312 to Reilly Declaration -
Merck's 2013 Vaccine for Adults Contract with the CDC
(MRK-CHA01371548-71) .................................................... Appx8693

Exhibit 313 to Reilly Declaration -
Merck's 2012 Vaccine for Adults Contract with the CDC
(MRK-CHA01371572-603) .................................................... Appx8718

**Table of Contents**
**(Continued)**

**Page**

Exhibit 314 to Reilly Declaration -
Merck's 2007 Vaccine for Children Contract with the CDC
(MRK-CHA01371604-23) ..................................................... Appx8751

Exhibit 315 to Reilly Declaration -
Merck's 2006 Vaccine for Children Contract with the CDC
(MRK-CHA01371624-55) ..................................................... Appx8772

Exhibit 316 to Reilly Declaration -
Merck's 2001 Vaccine for Children Contract with the CDC
(MRK-CHA01371656-92) ..................................................... Appx8805

Exhibit 317 to Reilly Declaration -
Merck's 2000 Vaccine for Children Contract with the CDC
(MRK-CHA01371693-727) ................................................... Appx8843

Exhibit 318 to Reilly Declaration -
Merck's 1998 Vaccine for Children Contract with the CDC
(MRK-CHA01371728-50) ..................................................... Appx8879

Exhibit 319 to Reilly Declaration -
Merck's 1999 Vaccine for Children Contract with the CDC
(MRK-CHA01371751-84) ..................................................... Appx8903

Exhibit 320 to Reilly Declaration -
Merck's 2002 Vaccine for Children Contract with the CDC
(MRK-CHA01371785-816) ................................................... Appx8938

Exhibit 321 to Reilly Declaration -
Merck's 2008 Vaccine for Children Contract with the CDC
(MRK-CHA01371817-840) ................................................... Appx8971

Exhibit 322 to Reilly Declaration -
Merck's 2009 Vaccine for Adults Contract with the CDC
(MRK-CHA01371841-879) ................................................... Appx8996
*(Cont'd in Vol XXI)*

**Table of Contents**
**(Continued)**

**Page**

**Volume XXI**
**(Filed Under Seal)**

Exhibit 323 to Reilly Declaration -
Merck's 2009 Vaccine for Children Contract with the CDC
(MRK-CHA01371880-1900) ................................................. Appx9036

Exhibit 324 to Reilly Declaration -
Merck's 2010 Vaccine for Adults Contract with the CDC
(MRK-CHA01371901-33) ..................................................... Appx9058

Exhibit 325 to Reilly Declaration -
Merck's 2015 Vaccine for Adults Contract with the CDC
(MRK-CHA01371934-61) ..................................................... Appx9092

Exhibit 326 to Reilly Declaration -
Merck's 2016 Vaccine for Children Contract with the CDC
(MRK-CHA01371962-89) ..................................................... Appx9121

Exhibit 327 to Reilly Declaration -
Merck's 2010 Vaccine for Adults Contract with the CDC
(MRK-CHA01371990-2020) ................................................. Appx9150

Exhibit 328 to Reilly Declaration -
Merck's 2016 Vaccine for Adults Contract with the CDC
(MRK-CHA01372021-44) ..................................................... Appx9182

Exhibit 329 to Reilly Declaration -
Merck's 2015 Vaccine for Children Contract with the CDC
(MRK-CHA01372045-72) ..................................................... Appx9207

Exhibit 330 to Reilly Declaration -
Invoice, dated March 14, 2012 (MRK-CHA01371253) ........ Appx9236

Exhibit 331 to Reilly Declaration -
Invoice, dated January 3, 2011(MRK-CHA01371256) ......... Appx9238

Exhibit 332 to Reilly Declaration -
Invoice, dated January 6, 2014 (MRK-CHA01371258) ........ Appx9240

**Table of Contents**
**(Continued)**

Exhibit 333 to Reilly Declaration -
Invoice, dated May 20, 2010 (MRK-CHA01371259) ........... Appx9242

Exhibit 334 to Reilly Declaration -
Invoice, dated January 14, 2013 (MRK-CHA01371261) ...... Appx9244

Exhibit 335 to Reilly Declaration -
Invoice, dated February 2, 2011 (MRK-CHA01371262) ...... Appx9246

Exhibit 336 to Reilly Declaration -
Invoice, dated November 17, 2010 (MRK-CHA01371263) . Appx9248

Exhibit 337 to Reilly Declaration -
Invoice, dated November 28, 2012 (MRK-CHA01371264) . Appx9250

Exhibit 338 to Reilly Declaration -
Invoice, dated March 20, 2013 (MRK-CHA01371268-69) ... Appx9252

Exhibit 339 to Reilly Declaration -
Invoice, dated January 22, 2016 (MRK-CHA01371274) ...... Appx9255

Exhibit 340 to Reilly Declaration -
Invoice, dated February 26, 2014 (MRK-CHA01371278) .... Appx9257

Exhibit 341 to Reilly Declaration -
Invoice, dated February 4, 2015 (MRK-CHA01371279) ...... Appx9259

Exhibit 342 to Reilly Declaration -
FDA webpage, "National Drug Code Directory," accessible
online at https://www.fda.gov/drugs/drug-approvals-and-
databases/national-drug-code-directory, last accessed
October 1, 2019 ................................................................. Appx9261

Exhibit 343 to Reilly Declaration -
Email from Jonathan Hartzel to Joseph M. Antonello,
dated October 18, 2005 (MRK-CHA00759061-4) ................ Appx9268

**Table of Contents**
(Continued)

Page

Exhibit 344 to Reilly Declaration -
Email from Joseph M. Antonello to Timothy L. Shofield,
dated May 5, 2005 (MRK-CHA00649638-40) ...................... Appx9273

Exhibit 345 to Reilly Declaration -
Letter from Lisa C. Dykstra to Counsel,
dated September 13, 2018 ..................................................... Appx9277

Exhibit 346 to Reilly Declaration -
Letter from Lisa C. Dykstra to the Honorable
Lynne A. Sitarski, dated June 15, 2015 .................................. Appx9289

Exhibit 347 to Reilly Declaration -
Deposition Testimony of Peter Calcott, Ph.D.,
taken September 7, 2018 ....................................................... Appx9307

Exhibit 348 to Reilly Declaration -
Email from Mandie Lyon, dated May 5, 2006
(MRK-CHA00069026-36) ..................................................... Appx9385

Exhibit 349 to Reilly Declaration -
Presentation, M-M-R II End Expiry, produced as "12-14
CDOC presentation.ppt" (MRK-CHA00021319) ................. Appx9397

Exhibit 350 to Reilly Declaration -
Department of Justice Press Release, dated May 13, 2013 .... Appx9410

Exhibit 351 to Reilly Declaration -
Department of Justice Press Release,
dated October 26, 2010 ........................................................ Appx9414

Exhibit 352 to Reilly Declaration -
Department of Justice Press Release,
dated January 12, 2017 ........................................................ Appx9417

Exhibit 353 to Reilly Declaration -
Department of Justice Press Release,
dated September 24, 2014 ..................................................... Appx9420

**Table of Contents**
**(Continued)**

**Page**

Exhibit 354 to Reilly Declaration -
Department of Justice Press Release, dated April 15, 2009 ... Appx9423

Exhibit 355 to Reilly Declaration -
Rule 30(b)(6) Deposition topics, dated December 13, 2016
(Stannard Ex. 3) .................................................................... Appx9426

Exhibit 356 to Reilly Declaration -
Department of Justice Press Release,
dated August 8, 2014 ............................................................ Appx9443

Exhibit 357 to Reilly Declaration -
FDA Form 483, dated August 6, 2001
(MRK-CHA00000547) .......................................................... Appx9446

Exhibit 358 to Reilly Declaration -
Deposition Testimony of Robert Malone, M.D.,
taken September 14, 2018 ..................................................... Appx9448
*(Cont'd in Vol XXII)*

**Volume XXII**
**(Filed Under Seal)**

Exhibit 359 to Reilly Declaration -
Deposition Testimony of Dr. Manal Morsy,
taken August 5, 2016 ............................................................ Appx9511

Exhibit 360 to Reilly Declaration -
Atkinson Deposition Exhibit 6, "Recommendations of
the Immunization Practices Advisory Committee Measles
Prevention: Supplementary Statement,"
dated January 13, 1989 ......................................................... Appx9621

Declaration of Lisa C. Dykstra in Support of
    Defendant's Motions for Summary Judgment,
    executed October 25, 2019 (Doc. 295) .................................. Appx9625

Exhibit 1 to Dykstra Declaration -
Stephen A. Krahling's Resume (MRK-KRA00331426-7) .... Appx9656

# Table of Contents
## (Continued)

Exhibit 2 to Dykstra Declaration -
Excerpts from Deposition Testimony of Stephen Krahling,
taken May 2, 2017 ................................................................ Appx9659

Exhibit 3 to Dykstra Declaration -
Merck Employee Initialization Form for Stephen Krahling
(MRK-KRA00582401) .......................................................... Appx9680

Exhibit 4 to Dykstra Declaration -
Stephen Krahling's November 30, 2001 Separation Agreement
(MRK-KRA00582394-7) ........................................................ Appx9682

Exhibit 5 to Dykstra Declaration -
Excerpts from Relator Stephen A. Krahling's Responses
and Objections to Merck's First Set of Interrogatories,
dated January 28, 2015 ......................................................... Appx9687

Exhibit 6 to Dykstra Declaration -
Excerpts from Relator Stephen A. Krahling's Responses
and Objections to Merck's Revised First Set of Interrogatories,
dated May 18, 2015 .............................................................. Appx9716

Exhibit 7 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Stephen Krahling, taken May 3, 2017 ................................... Appx9783

Exhibit 8 to Dykstra Declaration -
Stephen Krahling's handwritten notes,
dated October 1, 2001 (RELATOR_00001044-5) ................. Appx9792

Exhibit 9 to Dykstra Declaration -
FDA's Summary of Findings, dated August 6, 2001
(RELATOR_00004086-94) ................................................... Appx9795

Exhibit 10 to Dykstra Declaration -
Merck FDA Inspection Records, dated August 6, 2001
(MRK-KRA01631009-254) ................................................... Appx9805
*(Cont'd in Vol XXIII)*

**Table of Contents**
**(Continued)**

**Page**

**Volume XXIII**
**(Filed Under Seal)**

Exhibit 11 to Dykstra Declaration -
Excerpts from the Expert Report of
D. Bruce Burlington M.D.  ................................................... Appx10052

Exhibit 12 to Dykstra Declaration -
Merck's Virus and Cell Biology Organization Chart
(RELATOR_00000902-3) ................................................... Appx10070

Exhibit 13 to Dykstra Declaration -
Excerpts from Relator Stephen A. Krahling's Responses
and Objections to Defendant Merck's Requests for
Admission, dated April 4, 2016  ........................................... Appx10073

Exhibit 14 to Dykstra Declaration -
FDA Form 483 Frequently Asked Questions ....................... Appx10101

Exhibit 15 to Dykstra Declaration -
FDA Re-Inspection Memorandum, dated August 10, 2001
(MRK-KRA00071241-5) ..................................................... Appx10104

Exhibit 16 to Dykstra Declaration -
CBER Merck Communications Mumps Expiry,
dated August 8, 2002 (MRK-KRA00623049-51) ................ Appx10110

Exhibit 17 to Dykstra Declaration -
Email Communication with Attachments regarding FDA
Inspection-IND 1016, dated September 14, 2001
(MRK-KRA00063885-8) ..................................................... Appx10114

Exhibit 18 to Dykstra Declaration -
FDA Telephone Conversation Memorandum,
dated September 17, 2001 (MRK-KRA00019107) ............. Appx10119

Exhibit 19 to Dykstra Declaration -
FDA Teleconference-IND 1016 Inspection Follow up,
dated September 25, 2001 (MRK-KRA00071300-1) .......... Appx10121

**Table of Contents**
**(Continued)**

Page

Exhibit 20 to Dykstra Declaration -
CBER December 7, 2001 Teleconference: Mumps Inspection
results and discussions, dated December 13, 2001
(MRK-KRA00019640-6) ..................................................... Appx10124

Exhibit 21 to Dykstra Declaration -
General Correspondence to FDA in response to CBER
Comments, dated February 4, 2002
(MRK-KRA00025847-916) ................................................. Appx10132

Exhibit 22 to Dykstra Declaration -
General Correspondence to FDA regarding April 18, 2002
Teleconference, dated April 2002
(MRK-KRA00337265-72) .................................................. Appx10203

Exhibit 23 to Dykstra Declaration -
BB-IND 1016 Memorandum regarding Summary of
Discussion with CBER on March 22, 2002 regarding
acceptability of mumps PRN assay data,
dated March 23, 2002 (MRK-KRA00009042) .................... Appx10212

Exhibit 24 to Dykstra Declaration -
Offer Letter to Stephen A. Krahling, dated October 24, 2000
(RELATOR_00001058-60) .................................................. Appx10214

Exhibit 25 to Dykstra Declaration -
Correspondence from Stephen A. Krahling to
Emilio A. Emini, Ph.D., dated April 8, 2001
(RELATOR_00000328-31) .................................................. Appx10218

Exhibit 26 to Dykstra Declaration -
Email communication from Stephen Krahling to
Alan Shaw, dated July 17, 2001 (MRK-KRA00002243) .... Appx10223

Exhibit 27 to Dykstra Declaration -
Email communication from Stephen Krahling to Alan Shaw,
dated September 25, 2001 (RELATOR_00000745) ............ Appx10225

**Table of Contents**
**(Continued)**

**Page**

Exhibit 28 to Dykstra Declaration -
Email communications between Stephen Krahling and
Alan Shaw, dated September 27-28, 2001
(RELATOR_00000747) ...................................................... Appx10227

Exhibit 29 to Dykstra Declaration -
Letter from Emilio A. Emini, Ph.D. to Stephen Krahling,
dated October 15, 2001, (RELATOR_00001100-3) ............ Appx10229

Exhibit 30 to Dykstra Declaration -
Letter from Tonia Torquato to Alexis Pinto,
dated October 22, 2001 (MRK-KRA00002033-5) .............. Appx10234

Exhibit 31 to Dykstra Declaration -
Letter from Alexis Pinto to Tonia Torquato,
dated October 19, 2001 (MRK-KRA00002036-9) .............. Appx10238

Exhibit 32 to Dykstra Declaration -
Letter from Tonia Torquato to Alexis Pinto,
dated October 26, 2001 (MRK-KRA00002028-9) .............. Appx10243

Exhibit 33 to Dykstra Declaration -
Letter from Alexis Pinto to Tonia Torquato,
dated October 26, 2001 (MRK-KRA00002017-25) ............ Appx10246

Exhibit 34 to Dykstra Declaration -
Letter from Tonia Torquato to Alexis Pinto,
dated October 29, 2001 (MRK-KRA00002013-16) ............ Appx10256

Exhibit 35 to Dykstra Declaration -
Letter from Axel Johnson to Tonia Torquato,
dated November 26, 2001 (RELATOR_00001086) ............ Appx10261

Exhibit 36 to Dykstra Declaration -
Stephen Krahling Pay Stubs (RELATOR_00001061-7) ...... Appx10263

Exhibit 37 to Dykstra Declaration -
Letter from Axel Johnson to Tonia Torquato,
dated December 20, 2001 (RELATOR_00001090) ............. Appx10271

**Table of Contents**
**(Continued)**

Exhibit 38 to Dykstra Declaration -
CDC Vaccines for Children Program web page
"About VFC," last reviewed on February 18, 2016 ............. Appx10273

Exhibit 39 to Dykstra Declaration -
Advisory Committee on Immunization Practices Charter
approved March 27, 2018 .................................................... Appx10277

Exhibit 40 to Dykstra Declaration -
Excerpts from Expert Report of William P. Nichols ............ Appx10283

Exhibit 41 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Mark Pallansch,
Ph.D., taken October 13, 2017 ............................................ Appx10292

Exhibit 42 to Dykstra Declaration -
1971 MMR Product License (MRK-KRA01972538) ......... Appx10307

Exhibit 43 to Dykstra Declaration -
1995 MMR Product License (MRK-KRA01676252) ......... Appx10309

Exhibit 44 to Dykstra Declaration -
Merck's Establishment License (MRK-KRA01676250) ..... Appx10311

Exhibit 45 to Dykstra Declaration -
Advisory Committee on Immunization Practices Vaccines for
Children Program-Resolution No. 10/17-3, Vaccines to
Prevent Measles, Mumps, Rubella and Varicella,
dated October 25, 2017 ....................................................... Appx10313

Exhibit 46 to Dykstra Declaration -
Vaccines for Children Program-Resolution No. 6/06-1,
Vaccines included in the VFC Program,
dated June 29, 2006 ............................................................ Appx10317

Exhibit 47 to Dykstra Declaration -
Advisory Committee on Immunization Practices, Policies
and Procedures, dated December 2018 ................................ Appx10319

**Table of Contents**
**(Continued)**

Exhibit 48 to Dykstra Declaration -
"Recommendation of the Advisory Committee on
Immunization Practices for Use of a Third Dose of Mumps
Virus Containing Vaccine in Persons at Increased Risk for
Mumps During Outbreak," *MMWR*,
dated January 12, 2018 ........................................................ Appx10345

Exhibit 49 to Dykstra Declaration -
Excerpts from the Expert Report of
William L. Atkinson M.D., MPH, dated June 12, 2018 ....... Appx10355

Exhibit 50 to Dykstra Declaration -
National Center for Immunization and Respiratory Diseases
(CVG) Fact Sheet ............................................................... Appx10365

Exhibit 51 to Dykstra Declaration -
"Prevention of Measles, Rubella, Congenital Rubella
Syndrome, and Mumps," *MMWR*, dated June 14, 2013 ...... Appx10380

Exhibit 52 to Dykstra Declaration -
CDC's "Measles, Mumps, and Rubella (MMR) Vaccination:
What Everyone Should Know," last reviewed
March 28, 2019 .................................................................. Appx10421

Exhibit 53 to Dykstra Declaration -
"Measles, Mumps and Rubella-Vaccine Use and Strategies for
Elimination of Measles, Rubella and Congenital Rubella
Syndrome and Control of Mumps: Recommendations of the
Advisory Committee on Immunization Practices,"
*MMWR*, dated May 22, 1998 ............................................... Appx10428

Exhibit 54 to Dykstra Declaration -
Merck's 1998 Vaccine for Children Contract with the CDC
(MRK-KRA01371728-50) ................................................... Appx10473

Exhibit 55 to Dykstra Declaration -
Merck's 1999 Vaccine for Children Contract with the CDC
(MRK-KRA01371751-84) ................................................... Appx10497
*(Cont'd in Vol XXIV)*

**Table of Contents**
**(Continued)**

**Volume XXIV**
**(Filed Under Seal)**

Exhibit 56 to Dykstra Declaration -
Merck's 2000 Vaccine for Children Contract with the CDC
(MRK-KRA01371693-1727) ............................................... Appx10532

Exhibit 57 to Dykstra Declaration -
Merck's 2001 Vaccine for Children Contract with the CDC
(MRK-KRA01371656-92) ................................................... Appx10568

Exhibit 58 to Dykstra Declaration -
Merck's 2002 Vaccine for Children Contract with the CDC
(MRK-KRA01371785-816) ................................................. Appx10606

Exhibit 59 to Dykstra Declaration -
Merck's 2003 Vaccine for Children Contract with the CDC
(MRK-KRA01371311-340) ................................................. Appx10639

Exhibit 60 to Dykstra Declaration -
Merck's 2004 Vaccine for Children Contract with the CDC
(MRK-KRA01371280-310) ................................................. Appx10670

Exhibit 61 to Dykstra Declaration -
Merck's 2005 Vaccine for Children Contract with the CDC
(MRK-KRA01371341-72) ................................................... Appx10702

Exhibit 62 to Dykstra Declaration -
Merck's 2006 Vaccine for Children Contract with the CDC
(MRK-KRA01371624-55) ................................................... Appx10735

Exhibit 63 to Dykstra Declaration -
Merck's 2007 Vaccine for Children Contract with the CDC
(MRK-KRA01371604-23) ................................................... Appx10768

Exhibit 64 to Dykstra Declaration -
Merck's 2008 Vaccine for Children Contract with the CDC
(MRK-KRA01371817-40) ................................................... Appx10789

**Table of Contents**
**(Continued)**

**Page**

Exhibit 65 to Dykstra Declaration -
Merck's 2009 Vaccine for Children Contract with the CDC
(MRK-KRA01371880-1900) ................................................ Appx10814

Exhibit 66 to Dykstra Declaration -
Merck's 2010 Vaccine for Children Contract with the CDC
(MRK-KRA01371373-97) .................................................... Appx10836

Exhibit 67 to Dykstra Declaration -
Merck's 2011 Vaccine for Children Contract with the CDC
(MRK-KRA01371497-518) .................................................. Appx10862

Exhibit 68 to Dykstra Declaration -
Merck's 2012 Vaccine for Children Contract with the CDC
(MRK-KRA01371398-421) .................................................. Appx10885

Exhibit 69 to Dykstra Declaration -
Merck's 2013 Vaccine for Children Contract with the CDC
(MRK-KRA01371422-44) .................................................... Appx10910

Exhibit 70 to Dykstra Declaration -
Merck's 2014 Vaccine for Children Contract with the CDC
(MRK-KRA01371473-96) .................................................... Appx10934

Exhibit 71 to Dykstra Declaration -
Merck's 2015 Vaccine for Children Contract with the CDC
(MRK-KRA01372045-72) .................................................... Appx10959

Exhibit 72 to Dykstra Declaration -
Merck's 2016 Vaccine for Children Contract with the CDC
(MRK-KRA01371962-89) .................................................... Appx10988
*(Cont'd in Vol XXV)*

**Volume XXV**
**(Filed Under Seal)**

Exhibit 73 to Dykstra Declaration -
CDC Vaccine Price List for Vaccines for Children Program
as of April 6, 2001 ............................................................. Appx11017

**Table of Contents**
**(Continued)**

Exhibit 74 to Dykstra Declaration -
Letter from Katherine Norris to Lisa C. Dykstra, dated
November 24, 2015 (MRK-KRA01373392-1373393) ........ Appx11022

Exhibit 75 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Alan Sims,
taken October 12, 2017 ........................................ Appx11025

Exhibit 76 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Michele Taylor,
taken May 9, 2017 ................................................ Appx11045

Exhibit 77 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Colleen Duffy,
taken December 12, 2016 .................................... Appx11052

Exhibit 78 to Dykstra Declaration -
Letter from Lisa Dykstra to CDC regarding FOIA
request, dated May 18, 2015 ................................ Appx11058

Exhibit 79 to Dykstra Declaration -
ACIP's Vaccine Recommendations and Guidelines-MMR
Vaccine Recommendations, last reviewed
November 21, 2014 ............................................. Appx11067

Exhibit 80 to Dykstra Declaration -
FDA's Vaccines Licensed for Use in the United States ....... Appx11069

Exhibit 81 to Dykstra Declaration -
CDC's Mumps Vaccination, last reviewed
March 8, 2019 .................................................... Appx11077

Exhibit 82 to Dykstra Declaration -
Excerpts from the Expert Report of
Thomas G. McGuire Ph.D., dated March 13, 2018 ............. Appx11081

Exhibit 83 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Thomas G. McGuire, taken July 2, 2018 ........................... Appx11086

**Table of Contents**
(Continued)

Page

Exhibit 84 to Dykstra Declaration -
Relator Joan Wlochowski's Responses and Objections
to Merck's Revised First Set of Interrogatories,
dated May 20, 2015 ............................................................. Appx11091

Exhibit 85 to Dykstra Declaration -
Relator Joan Wlochowski's Responses and Objections
to Defendant Merck's Request for Admission,
dated April 6, 2016 ............................................................. Appx11116

Exhibit 86 to Dykstra Declaration -
"Live, Attenuated Mumps-Virus Vaccine," *New England
Journal of Medicine*, by R. Weibel, *et al.*,
dated February 2, 1967 ............................................................. Appx11144

Exhibit 87 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to Alison Fisher, Ph.D.,
dated October 17, 2005 (MRK-KRA00000479-80) ............. Appx11152

Exhibit 88 to Dykstra Declaration -
Response to FDA Request for Information,
dated November 15, 2006 (MRK-KRA00000393-409) ....... Appx11155

Exhibit 89 to Dykstra Declaration -
Email from Zak Johns to Marlene Koury,
dated February 23, 2017 ........................................................ Appx11173

Exhibit 90 to Dykstra Declaration -
Excerpts from the Expert Report of
Ann M. Arvin, M.D., dated June 11, 2018 ........................... Appx11176

Exhibit 91 to Dykstra Declaration -
Excerpts from the Expert Report of
Dipti Gulati, M.S., D. Phil. .................................................. Appx11183

Exhibit 92 to Dykstra Declaration -
Excerpts from the Expert Report of Anna Durbin, M.D.,
dated June 14, 2018 ............................................................. Appx11194

**Table of Contents**
**(Continued)**

Exhibit 93 to Dykstra Declaration -
FDA's Guidance for Industry for the Evaluation of
Combination Vaccines for Preventable Diseases: Production,
Testing and Clinical Studies, dated April 1997 ................... Appx11210

Exhibit 94 to Dykstra Declaration -
CDC's How Flu Vaccine Effectiveness and Efficacy is
Measured, last reviewed January 29, 2016 ......................... Appx11234

Exhibit 95 to Dykstra Declaration -
Excerpts from the CDC's Manual for the Surveillance of
Vaccine-Preventable Diseases ............................................. Appx11243

Exhibit 96 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Joseph Antonello, taken August 3, 2017 ............................ Appx11253

Exhibit 97 to Dykstra Declaration -
"Summary of Notifiable Diseases-United States," 2005,
*MMWR*, dated March 30, 2007 .......................................... Appx11258

Exhibit 98 to Dykstra Declaration -
CDC's Mumps Cases and Outbreaks, last reviewed
September 17, 2019 ........................................................... Appx11361

Exhibit 99 to Dykstra Declaration -
CDC's Mumps: For Healthcare Providers, last reviewed
March 15, 2019 ................................................................. Appx11364

Exhibit 100 to Dykstra Declaration -
CDC's Principles of Epidemiology in Public Health Practice,
Third Edition: An Introduction to Applied Epidemiology
and Biostatistics, last reviewed May 18, 2012 .................... Appx11369

Exhibit 101 to Dykstra Declaration -
CDC's Flu Vaccine Effectiveness: Questions and Answers for
Health Professionals, last updated November 27, 2013 ...... Appx11373

**Table of Contents**
**(Continued)**

<div align="right">

**Page**

</div>

Exhibit 102 to Dykstra Declaration -
"Mumps Virus," by Cherry, *et al.*, *Viral Infections*,
(7th Edition, Chapter 180) .................................................... Appx11383

Exhibit 103 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
David Kessler, M.D., taken September 28, 2018 ................ Appx11399

Exhibit 104 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Anna Durbin, M.D., taken October 8, 2018 ........................ Appx11402

Exhibit 105 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Emilio Emini, Ph.D., taken June 6, 2017 ............................ Appx11406

Exhibit 106 to Dykstra Declaration -
January 1998 *Curriculum Vitae* of David L. Krah, M.D.
(MRK-KRA00000695-702) ................................................. Appx11415

Exhibit 107 to Dykstra Declaration -
Excerpts from the Expert Report of
David A. Kessler, M.D. ....................................................... Appx11424

Exhibit 108 to Dykstra Declaration -
FDA Lot Release ................................................................. Appx11429

Exhibit 109 to Dykstra Declaration -
Drugs@FDA Instructions: Health Information ................... Appx11434

Exhibit 110 to Dykstra Declaration -
FDA's Vaccine Safety Questions and Answers ................... Appx11440

Exhibit 111 to Dykstra Declaration -
Excerpts from the Expert Report of
Gary Freed M.D., MPH ...................................................... Appx11447

**Table of Contents**
**(Continued)**

**Page**

Exhibit 112 to Dykstra Declaration -
"Vaccine Manufacturing," by Philip Gomez
and James Robinson ........................................................... Appx11450

Exhibit 113 to Dykstra Declaration -
Informational Amendment: Clinical, dated September 15, 2011
(GSK-MMR-IND-0022162-3) ............................................. Appx11461

Exhibit 114 to Dykstra Declaration -
Mumps Serology Strategy in Support of Phase III
Development of Priorix®
(GSK-MMR-IND-0022180-6) ............................................. Appx11464

Exhibit 115 to Dykstra Declaration -
Fax from Yolanda Stewart to Donna Boyce,
dated April 25, 2012 (GSK-MMR-IND-0029256-63) ......... Appx11472

Exhibit 116 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Dipti Gulati, M.S., D. Phil., taken December 5, 2018 ......... Appx11481

Exhibit 117 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Amy Keegan,
taken February 9, 2018 ....................................................... Appx11485

Exhibit 118 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
David Krah, M.D., taken July 11, 2017 ............................... Appx11488

Exhibit 119 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
David Krah, M.D., taken July 12, 2017 ............................... Appx11493

Exhibit 120 to Dykstra Declaration -
Excerpts from the Expert Report of
Marcela Pasetti, Ph.D. ........................................................ Appx11497
*(Cont'd in Vol XXVI)*

**Table of Contents**
**(Continued)**

**Page**

**Volume XXVI**
**(Filed Under Seal)**

Exhibit 121 to Dykstra Declaration -
M-M-R®II Current Label .................................................... Appx11507

Exhibit 122 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Cynthia Morrisey, taken July 27, 2017 ............................... Appx11519

Exhibit 123 to Dykstra Declaration -
Supplemental Biologics License Application,
dated January 29, 2004 (MRK-KRA00000032-139) ........... Appx11522

Exhibit 124 to Dykstra Declaration -
Amendment to Supplemental Biologics License
Application Response to FDA Request for Information,
dated June 5, 2007, with Attachments
(MRK-KRA00000368-82) .................................................. Appx11631

Exhibit 125 to Dykstra Declaration -
Approval Letter, dated December 8, 2007
(MRK-KRA00000383-4) .................................................... Appx11647

Exhibit 126 to Dykstra Declaration -
Letter from Paul Richman, Ph.D. to Alison Fisher, Ph.D.,
dated May 18, 2007 (MRK-KRA00000385-6) .................... Appx11650

Exhibit 127 to Dykstra Declaration -
Response to Form FDA 483, dated August 20, 2001
(MRK-KRA00000481-539) ................................................ Appx11653

Exhibit 128 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
teleconference regarding clarification of CBER's comments on
the Mumps Expiry trial, dated November 10, 1998
(MRK-KRA00001215-7) .................................................... Appx11713

**Table of Contents**
(Continued)

Page

Exhibit 129 to Dykstra Declaration -
Memo re: Mumps End Expiry trial; November 29th, 2000
CBER teleconference, dated November 29, 2000
(MRK-KRA00001218-21) .................................................... Appx11717

Exhibit 130 to Dykstra Declaration -
Letter from Manal Morsy, M.D., Ph.D., to Luba Vujcic,
dated December 1, 1999 (MRK-KRA00001222-30) ........... Appx11722

Exhibit 131 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to
Manal Morsy, M.D., Ph.D., dated October 27, 2000
(MRK-KRA00001231-6) .................................................... Appx11732

Exhibit 132 to Dykstra Declaration -
General Correspondence to FDA, dated November 16, 2000
(MRK-KRA00001237-48) .................................................... Appx11739

Exhibit 133 to Dykstra Declaration -
Memo re: MMRV (BB-IND 7068): Summary of Pre-Phase III
teleconference discussion on 01/31/00 with CBER,
dated January 31, 2000 (MRK-KRA00001249-52) ............. Appx11752

Exhibit 134 to Dykstra Declaration -
Teleconference Minutes with CBER, dated February 19, 1999
(MRK-KRA00001253-4) .................................................... Appx11757

Exhibit 135 to Dykstra Declaration -
Memo re: BB-IND 1016: Summary of discussion with Dr.
Kathryn Carbone and Ms. Luba Vujcic (CBER) regarding the
Mumps neutralization assay, dated February 8, 2000
(MRK-KRA00001255-57) .................................................... Appx11760

Exhibit 136 to Dykstra Declaration -
Meeting Minutes, dated March 14, 2000
(MRK-KRA00001258-61) .................................................... Appx11764

**Table of Contents**
**(Continued)**

**Page**

Exhibit 137 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II) and BB-IND 7068
(MMRV); Summary of face-to-face meeting discussion
(3/13/00) with CBER regarding wild type mumps
neutralization and ELISA assays, dated March 13, 2000
(MRK-KRA00001262-5) ..................................................... Appx11768

Exhibit 138 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to Keith Chirgwin, M.D.,
dated August 30, 1999 (MRK-KRA00001266-9) ................ Appx11773

Exhibit 139 to Dykstra Declaration -
Letter from M. Carolyn Hardegree, M.D. to
Keith Chirgwin, M.D., dated September 8, 1998
(MRK-KRA00001467-9) ..................................................... Appx11778

Exhibit 140 to Dykstra Declaration -
Response to FDA Request for Information,
dated December 30, 1999 (MRK-KRA00001470-1924) ..... Appx11782
*(Cont'd in Vol XXVII)*

**Volume XXVII**
**(Filed Under Seal)**

Exhibit 141 to Dykstra Declaration -
Letter from Loris McVittie, Ph.D. to
Roberta L. McKee, Ph.D., dated August 20, 1999
(MRK-KRA00018614-9) ..................................................... Appx12238

Exhibit 142 to Dykstra Declaration -
Memo re: Teleconference with CBER: Mumps End
Expiry trial-BB IND 1016, dated November 8, 2000
(MRK-KRA00025161-2) ..................................................... Appx12245

Exhibit 143 to Dykstra Declaration -
FDA Warning Letter, dated February 9, 2001
(PUBLIC0000666-670) ....................................................... Appx12248

**Table of Contents**
**(Continued)**

Exhibit 144 to Dykstra Declaration -
Memo re: M-M-R®II (BB-IND 1016); Summary of telephone
discussions on 11/23/99 and 12-06-99 with Ms. Luba Vujcic
(CBER) regarding the neutralization assay results and impact
on Equivalence Margin and lower bound criterion of the
M-M-R®II End Expiry Study hypothesis,
dated December 23, 1999 (MRK-KRA00025713-24) ......... Appx12254

Exhibit 145 to Dykstra Declaration -
Memo re: BB-IND 1016: Summary of discussion with
Ms. Luba Vujcic (CBER) regarding the Mumps neutralization
assay, dated January 5, 2000 (MRK-KRA00048855) ......... Appx12267

Exhibit 146 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
teleconference on methods used for the plaque reduction
neutralization assay, dated February 22, 2019
(MRK-KRA00062710-3) .................................................... Appx12269

Exhibit 147 to Dykstra Declaration -
Meeting Minutes with CBER, dated March 13, 2000
(MRK-KRA00062845-53) ................................................... Appx12274

Exhibit 148 to Dykstra Declaration -
Email from David M. Wonnacott to Roberta L. McKee, Ph.D.,
dated May 12, 1999 (MRK-KRA00094960) ....................... Appx12284

Exhibit 149 to Dykstra Declaration -
Email from Katalin G. Abraham to Joye L. Bramble,
dated December 3, 1998 (MRK-KRA00095063) ................ Appx12286

Exhibit 150 to Dykstra Declaration -
Memo re: Teleconference with Dr. Norman Baylor, CBER,
Regarding Meeting on Expiry Titers for M-M-R®II,
dated December 3, 1998 (MRK-KRA00095064) ................ Appx12288

**Table of Contents**
**(Continued)**

Exhibit 151 to Dykstra Declaration -
Memo re: Teleconference with Norman Baylor, CBER,
on 11/16/98, Regarding VARIVAX® and M-M-R®II,
dated November 16, 1998 (MRK-KRA00095065) ............. Appx12290

Exhibit 152 to Dykstra Declaration -
Email from Katalin G. Abraham to Keith Chirgwin, M.D.,
dated October 5, 1998 (MRK-KRA00095142) ................... Appx12292

Exhibit 153 to Dykstra Declaration -
ProQuad™ Original Application, dated August 3, 2004
(MRK-KRA00158320-526) ................................................ Appx12294
*(Cont'd in Vol XXVIII)*

**Volume XXVIII**
**(Filed Under Seal)**

Exhibit 154 to Dykstra Declaration -
Memo re: CBER teleconference (October 16, 2001): Measles,
Mumps and Rubella ELISAs, dated October 19, 2001
(MRK-KRA00201389-91) ................................................ Appx12502

Exhibit 155 to Dykstra Declaration -
Clinical Study Report for the Protocol 007 Study
(MRK-KRA00224982-6529) ............................................ Appx12506
*(Cont'd in Vols XXIX, XXX, and XXXI)*

**Volume XXXI**
**(Filed Under Seal)**

Exhibit 156 to Dykstra Declaration -
Memo re: Supporting Documents for Stephen Krahling,
dated October 10, 2000 (MRK-KRA00331424-33) ............ Appx14055

Exhibit 157 to Dykstra Declaration -
Neutralization Assay Draft faxed on February 19, 1999
(MRK-KRA00336634-6) ................................................... Appx14066

**Table of Contents**
**(Continued)**

**Page**

Exhibit 158 to Dykstra Declaration -
Letter from Paul G. Richman, Ph.D. to Alison Fisher, Ph.D.,
dated May 18, 2007 (MRK-KRA00570703-5) .................... Appx14070

Exhibit 159 to Dykstra Declaration -
Response to FDA Request for Information,
dated February 2, 2001 (MRK-KRA00622078-273) ........... Appx14074

Exhibit 160 to Dykstra Declaration -
Response to FDA Request for Information,
dated August 1, 2002 (MRK-KRA00624279-87) ................ Appx14271

Exhibit 161 to Dykstra Declaration -
General Correspondence to FDA, dated June 23, 1998
(MRK-KRA00624345-4446) ............................................... Appx14281

Exhibit 162 to Dykstra Declaration -
Response to FDA Request for Information,
dated February 5, 1999 (MRK-KRA00624448-4589) ......... Appx14384
***(Cont'd in Vol XXXII)***

**Volume XXXII**
**(Filed Under Seal)**

Exhibit 163 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II); Summary of CBER
telephone conversations on 9/24/98 regarding the revised
M-M-R®II draft label and on 9/29/98 regarding the mumps
expiry protocol, dated September 29, 1998
(MRK-KRA00636592-3) .................................................... Appx14527

Exhibit 164 to Dykstra Declaration -
Biological Product Deviation Report Form,
dated April 20, 2001 (MRK-KRA00754233-8) ................... Appx14530

Exhibit 165 to Dykstra Declaration -
M-M-R®II Label (March 1995)
(MRK-KRA00757060-3) .................................................... Appx14537

**Table of Contents**
**(Continued)**

**Page**

Exhibit 166 to Dykstra Declaration -
M-M-R®II Label (April 1999)
(MRK-KRA00757072-6) .................................................... Appx14542

Exhibit 167 to Dykstra Declaration -
M-M-R®II Label (2004) (MRK-KRA00757100-3) ............ Appx14548

Exhibit 168 to Dykstra Declaration -
Response to FDA Request for Information,
dated November 17, 2004 (MRK-KRA00761530-8) .......... Appx14553

Exhibit 169 to Dykstra Declaration -
Response to CBER Comments, dated June 10, 2002
(MRK-KRA00761628-702) ................................................ Appx14563

Exhibit 170 to Dykstra Declaration -
Email from Charlotte Shay to Michael L. Dekleva,
dated June 30, 2004 (MRK-KRA00791508-10) .................. Appx14639

Exhibit 171 to Dykstra Declaration -
Meeting Minutes from a MMRV Pre-Phase III meeting
with CBER, dated February 16, 2000
(MRK-KRA00821856-61) ................................................. Appx14643

Exhibit 172 to Dykstra Declaration -
Approval Letter, dated September 6, 2005
(MRK-KRA00821906-9) .................................................... Appx14650

Exhibit 173 to Dykstra Declaration -
Regulatory Liaison FDA Conversation Record,
dated October 5, 2004 (MRK-KRA00846405-15) .............. Appx14655

Exhibit 174 to Dykstra Declaration -
CBER's Clinical Review of Studies submitted in support of
Licensure of ProQuad™ (MRK-KRA01285010-272) ........ Appx14667

Exhibit 175 to Dykstra Declaration -
FDA report on the release of MMR,
dated February 23, 2016 (MRK-KRA01447562) ................ Appx14931

**Table of Contents**
**(Continued)**

Exhibit 176 to Dykstra Declaration -
Standard Operating Procedure-Preparation, Review and
Shipment of Biological Product Protocols and Samples to
CBER, dated September 23, 2015
(MRK-KRA01448181-207) ................................................. Appx14933

Exhibit 177 to Dykstra Declaration -
Letter from Roberta L. McKee, Ph.D. to Steven Masiello,
dated March 8, 2001 (MRK-KRA01537603-11) ................. Appx14961

Exhibit 178 to Dykstra Declaration -
Letter from Roberta L. McKee, Ph.D. regarding a proposal for
changes to release specifications, dated December 10, 1998
(MRK-KRA01622125) ........................................................ Appx14971

Exhibit 179 to Dykstra Declaration -
Prior Approval Supplement from Roberta L. McKee, Ph.D.
to William Egan, Ph.D., dated June 18, 1999
(MRK-KRA01622463-5) ..................................................... Appx14973

Exhibit 180 to Dykstra Declaration -
Minutes from a December 8, 1998 Meeting,
dated January 8, 1999 (MRK-KRA01622468-72) ............... Appx14977

Exhibit 181 to Dykstra Declaration -
Letter from Katalin Abraham to Dr. Suresh Rastogi
(MRK-KRA01622552) ........................................................ Appx14983

Exhibit 182 to Dykstra Declaration -
Letter from David Wonnacott Ph.D. to Dr. Suresh Rastogi,
dated December 16, 1998 (MRK-KRA01622600-1) ........... Appx14985

Exhibit 183 to Dykstra Declaration -
Prior Approval Supplement from Roberta L. McKee, Ph.D. to
William Egan, Ph.D., dated September 15, 1999
(MRK-KRA01622711-2) ..................................................... Appx14988

**Table of Contents**
**(Continued)**

**Page**

Exhibit 184 to Dykstra Declaration -
Attachment 4 to the Prior Approval Supplement from
Roberta L. McKee, Ph.D. to William Egan, Ph.D.,
dated September 15, 1999 (MRK-KRA01622778-9) .......... Appx14991

Exhibit 185 to Dykstra Declaration -
Letter from William Egan, Ph.D. to Roberta L. McKee, Ph.D.,
dated August 20, 1999 (MRK-KRA01624909-10) .............. Appx14994

Exhibit 186 to Dykstra Declaration -
Letter from Barry D. Garfinkle, Ph.D. to Carolyn Hardegree,
M.D., dated January 28, 1998
(MRK-KRA01625508-5639) ............................................. Appx14997
*(Cont'd in Vol XXXIII)*

**Volume XXXIII**
**(Filed Under Seal)**

Exhibit 187 to Dykstra Declaration -
Letter from Peter Patriarca, M.D. to Roberta L. McKee, Ph.D.,
dated February 11, 2000 (MRK-KRA0187091-2) ............... Appx15130

Exhibit 188 to Dykstra Declaration -
MMR Statistical Analysis of Potency on Stability,
dated October 24, 2000 (MRK-KRA01897103-7271) ........ Appx15133

Exhibit 189 to Dykstra Declaration -
Letter from David Wonnacott, Ph.D. to Carolyn Hardegree,
M.D., dated December 5, 1997 (MRK-KRA01972451) ..... Appx15303

Exhibit 190 to Dykstra Declaration -
Various Correspondence between the FDA and Merck,
dated 1969 to 1994 (MRK-KRA01972464-546) ................. Appx15305

Exhibit 191 to Dykstra Declaration -
Various Email Correspondence in 1997
(MRK-KRA01972735-58) ................................................... Appx15389

**Table of Contents**
**(Continued)**

Exhibit 192 to Dykstra Declaration -
Vaccine & Biological Stability Protocol,
dated September 6, 2016 (MRK-KRA02139917-25) .......... Appx15414

Exhibit 193 to Dykstra Declaration -
Chapter "Mumps Vaccine," by Steven Rubin and
Stanley Plotkin .................................................. Appx15424

Exhibit 194 to Dykstra Declaration -
Stephen Krahling's 2001 Correspondence
(RELATOR_00000736-66) ................................... Appx15453

Exhibit 195 to Dykstra Declaration -
Letter from Axel Johnson to Tonia Torquato,
dated November 30, 2001 (RELATOR_00001036-43) ....... Appx15485

Exhibit 196 to Dykstra Declaration -
Stephen Krahling's 2001 Correspondence and Papers
(RELATOR_00001071-90) ................................... Appx15494
***(Cont'd in Vol XXXIV)***

**Volume XXXIV**
**(Filed Under Seal)**

Exhibit 197 to Dykstra Declaration -
Chapter "Mumps Vaccine," by Steven Rubin,
in Plotkin's Vaccines, 7th edition (2018) ............................ Appx15515

Exhibit 198 to Dykstra Declaration -
Letter from Kevin Malone to Kathleen Hardway,
dated July 31, 2018 ............................................ Appx15548

Exhibit 199 to Dykstra Declaration -
"Live, Attenuated Mumps Virus Vaccine," *New England
Journal of Medicine*, by R. Weibel, *et al.*,
dated February 2, 1967 ....................................... Appx15556

**Table of Contents**
**(Continued)**

Exhibit 200 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Luwy Musey, M.D., taken October 7, 2016 ......................... Appx15565

Exhibit 201 to Dykstra Declaration -
Rule 30(b)(6) Deposition Topics, dated December 13, 2016
(Stannard Ex. 3) ................................................................. Appx15569

Exhibit 202 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Mark Stannard,
taken December 13, 2016 .................................................... Appx15585

Exhibit 203 to Dykstra Declaration -
*Curriculum Vitae* of Joan L. Wlochowski ........................... Appx15595

Exhibit 204 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Joan L. Wlochowski, taken June 13, 2017 ........................... Appx15597

Exhibit 205 to Dykstra Declaration -
FDA/CDC Submission, dated October 23, 2019 ................. Appx15603

Exhibit 206 to Dykstra Declaration -
Excerpts of Defendant Merck's Responses and Objections to
Relators' Third Set of Requests for Admission,
dated August 16, 2017 ........................................................ Appx15719

Exhibit 207 to Dykstra Declaration -
"Vaccine Impact: Benefits for human health,"
by M. Doherty *et al.*, in *Vaccine* 34 (2016) ........................... Appx15722

Exhibit 208 to Dykstra Declaration -
FDA Prescription Drug Labeling Resources ........................ Appx15731

Exhibit 209 to Dykstra Declaration -
ACIP Committee Members .................................................. Appx15738

**Table of Contents**
**(Continued)**

Exhibit 210 to Dykstra Declaration -
"Notice to Readers: Updated Recommendations of the
ACIP for the Control and Elimination of Mumps," *MMWR*,
June 9, 2006/55(22); 629-630 ............................................... Appx15743

Exhibit 211 to Dykstra Declaration -
"Measles Prevention: Recommendations of the ACIP,"
*MMWR*, December 28, 1989 38(S-9); 1-18 ......................... Appx15749

Exhibit 212 to Dykstra Declaration -
"FDA in Brief: FDA reiterates the importance of vaccines
such as MMR vaccine," dated September 6, 2019 .............. Appx15766

Exhibit 213 to Dykstra Declaration -
"Recommendations of the ACIP Mumps Prevention,"
*MMWR*, June 9, 1989/38(22) ............................................... Appx15769

Exhibit 214 to Dykstra Declaration -
"Recommendation of the ACIP Mumps Vaccine,"
*MMWR*, November 26, 1982; 31(46) .................................. Appx15777

Exhibit 215 to Dykstra Declaration -
Statement by Peter Marks M.D., Ph.D., FDA, on FDA's
continued confidence in the safety and effectiveness
of the MMR vaccine, dated April 22, 2019 ......................... Appx15783

Exhibit 216 to Dykstra Declaration -
About CBER ...................................................................... Appx15788

Exhibit 217 to Dykstra Declaration -
Excerpt from FDA's Website on Warning Letters ................ Appx15791

Exhibit 218 to Dykstra Declaration -
Excerpt of FDA's Website with an Index to Warning
Letters for 'M' Companies ................................................... Appx15794

**Table of Contents**
**(Continued)**

**Page**

Exhibit 219 to Dykstra Declaration -
"The Immunological Basis for Immunization Series, Module
16: Mumps," by McLean, *et al.*, *Immunization, Vaccines and
Biologicals-World Health Organization* (2010) ................... Appx15817

Exhibit 220 to Dykstra Declaration -
Email from Sue Manoff to Mark Paponia,
dated February 25, 2000 (MRK-KRA00091399-405) ......... Appx15862

Exhibit 221 to Dykstra Declaration -
Memo re: Teleconference with Norman Baylor, CBER, on
11/16/98, Regarding VARIVAX® and M-M-R®II
(MRK-KRA00095065) ....................................................... Appx15870

Exhibit 222 to Dykstra Declaration -
M-M-R®II Label (MRK-KRA00757064-7) ....................... Appx15872

Exhibit 223 to Dykstra Declaration -
M-M-R®II Label (February 2001)
(MRK-KRA00757068-71) .................................................. Appx15877

Exhibit 224 to Dykstra Declaration -
M-M-R®II Label (August 2001)
(MRK-KRA00757077-80) .................................................. Appx15882

Exhibit 225 to Dykstra Declaration -
M-M-R®II Label (February 2006)
(MRK-KRA00757081-4) .................................................... Appx15887

Exhibit 226 to Dykstra Declaration -
M-M-R®II Label (March 1995)
(MRK-KRA00757085-8) .................................................... Appx15892

Exhibit 227 to Dykstra Declaration -
M-M-R®II Label (March 1995)
(MRK-KRA00757089-91) .................................................. Appx15897

**Table of Contents**
**(Continued)**

**Page**

Exhibit 228 to Dykstra Declaration -
M-M-R®II Label (October 2003)
(MRK-KRA00757092-5) ...................................................... Appx15901

Exhibit 229 to Dykstra Declaration -
M-M-R®II Label (September 2002)
(MRK-KRA00757096-9) ...................................................... Appx15906

Exhibit 230 to Dykstra Declaration -
M-M-R®II Label (February 2007)
(MRK-KRA00757104-7) ...................................................... Appx15911

Exhibit 231 to Dykstra Declaration -
M-M-R®II Label (February 2007)
(MRK-KRA00757108-11) ...................................................... Appx15916

Exhibit 232 to Dykstra Declaration -
M-M-R®II Label (April 19999)
(MRK-KRA01449029-40) ...................................................... Appx15921

Exhibit 233 to Dykstra Declaration -
M-M-R®II Label (February 2014)
(MRK-KRA01449226-36) ...................................................... Appx15934

Exhibit 234 to Dykstra Declaration -
M-M-R®II Label (June 2014)
(MRK-KRA01449243-53) ...................................................... Appx15946

Exhibit 235 to Dykstra Declaration -
M-M-R®II Label (October 2015)
(MRK-KRA01449260-70) ...................................................... Appx15958

Exhibit 236 to Dykstra Declaration -
M-M-R®II Label (February 2000)
(MRK-KRA01449271-5) ...................................................... Appx15970

Exhibit 237 to Dykstra Declaration -
M-M-R®II Label (March 2010)
(MRK-KRA01449276-83) ...................................................... Appx15976

**Table of Contents**
**(Continued)**

**Page**

Exhibit 238 to Dykstra Declaration -
M-M-R®II Label (December 2010)
(MRK-KRA01449284-91) ................................................... Appx15985

Exhibit 239 to Dykstra Declaration -
M-M-R®II Label (September 2009)
(MRK-KRA01449292-99) ................................................... Appx15994
*(Cont'd in Vol XXXV)*

**Volume XXXV**
**(Filed Under Seal)**

Exhibit 240 to Dykstra Declaration -
Attachment 1 to Letter from Barry D. Garfinkle, Ph.D.
to Carolyn Hardegree, M.D., dated January 28, 1998
(MRK-KRA01625510-639) ................................................ Appx16003

Exhibit 241 to Dykstra Declaration -
Memo re: BB-IND 1016 (M-M-R®II) and BB-IND 7068
(MMRV); Summary of Face-to face meeting discussion
(3/13/00) with CBER regarding wild type mumps
neutralization and ELISA assays, dated March 13, 2000
(MRK-KRA00019855-7) .................................................... Appx16134

Exhibit 242 to Dykstra Declaration -
PowerPoint Presentation entitled Immunogenicity
Mumps-Containing Vaccines (MRK-KRA00091408) ........ Appx16138

Exhibit 243 to Dykstra Declaration -
Letter from David M. Wommacott, Ph.D. to
Suresh C. Rastogi, Ph.D., dated December 16, 1998
(MRK-KRA01629294-1629295) ........................................ Appx16152

Exhibit 244 to Dykstra Declaration -
Response to the FDA Form 483, dated October 24, 2000
(MRK-KRA01649535-1649551) ........................................ Appx16155

Exhibit 245 to Dykstra Declaration -
Warning Letters from FDA Website ................................... Appx16173

**Table of Contents**
**(Continued)**

**Page**

Exhibit 246 to Dykstra Declaration -
MMD Quality Manual Glossary, dated October 5, 2016
(MRK-KRA01679618-1679772) ........................................ Appx16176

Exhibit 247 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Eric Metzger,
taken June 11, 2015 ............................................. Appx16332

Exhibit 248 to Dykstra Declaration -
Federal Register Vol. 58 No. 137, July 20, 1993 ................. Appx16336

Exhibit 249 to Dykstra Declaration -
FDA Review of Vaccine Labeling Requirements for
Warnings, Use Instructions, and Precautionary
Information, dated October 2004 ........................................ Appx16342

Defendant Merck's Response to Relators' Statement of
    Material Facts, dated November 26, 2019 (Doc. 299) .......... Appx16345

**Volume XXXVI**
**(Filed Under Seal)**

Declaration of Lisa C. Dykstra, for Merck, in Support of
    Response to Relators' Statement of Material Facts,
    executed November 26, 2019 (Doc. 299) ............................ Appx16501

Exhibit 250 to Dykstra Declaration -
"Mumps Complications and Effects of Mumps Vaccination,
England and Wales, 2002-2006," by Yung, Chee-Fu, *et al.*,
*Emerging Infectious Diseases*, (2011) 17(4):661-667 ......... Appx16513

Exhibit 251 to Dykstra Declaration -
Excerpts from the Deposition Testimony of April Cohen,
taken January 4, 2018 ....................................... Appx16521

**Table of Contents**
**(Continued)**

**Page**

Exhibit 252 to Dykstra Declaration -
"Mumps Virus-Specific Antibody Titers from Pre-Vaccine
Era Sera: Comparison of the Plaque Reduction Neutralization
Assay Enzyme Immunoassays," by Mauldin, Jeremy, *et al.*,
*Journal of Clinical Microbiology*, 2005:43(9):4847-4851  .. Appx16525

Exhibit 253 to Dykstra Declaration -
"Correlates of Protection," by Plotkin and Gilbert,
2018:35-40 ........................................................................ Appx16531

Exhibit 254 to Dykstra Declaration -
FDA, Guidance for Industry: FDA Review of Vaccine
Labeling Requirements for Warnings, Use Instructions, and
Precautionary Information, dated September 2004  ............. Appx16538

Exhibit 255 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Roberta L. McKee, Ph.D., taken March 30, 2017  ............... Appx16547

Exhibit 256 to Dykstra Declaration -
Excerpts from the Expert Report of
Dipti Gulati, MS, D. Phil.  .................................................... Appx16551

Exhibit 257 to Dykstra Declaration -
Biological Product Deviation Report Form
submitted by Merck to the FDA, dated March 5, 2001
(MRK-KRA00754239-44) .................................................... Appx16556

Exhibit 258 to Dykstra Declaration -
"Jeryl Lynn Strain Live Attenuated Mumps Virus Vaccine
-Influence of Age, Virus Dose, Lot, and-Globulin
Administration on Response," by Buynak, Eugene, *et al.*,
*Journal of the American Medical Association* (1968)
203(1):63-67 ...................................................................... Appx16563

Exhibit 259 to Dykstra Declaration -
2003 Annual Stability Report for M-M-R®II
(MRK-KRA01632888-945) ................................................. Appx16569

**Table of Contents**
(Continued)

Exhibit 260 to Dykstra Declaration -
"Sensitive Neutralization Test for virus antibody,"
by Sato *et al.*, *Archives of Virology*, (1978) 58:301-311 ...... Appx16628

Exhibit 261 to Dykstra Declaration -
Letter from Karen Goldenthal, M.D. to Alison Fisher, Ph.D.,
dated December 3, 2004 (MRK-KRA00000361-5) ............. Appx16640

Exhibit 262 to Dykstra Declaration -
Fax from Luba Vujcic to Alison Fisher, Ph.D.,
dated July 20, 2007 (MRK-KRA00141957-8) ................... Appx16646

Exhibit 263 to Dykstra Declaration -
Submission, dated August 8, 2007
(MRK-KRA00000140-225) ................................................ Appx16649

Exhibit 264 to Dykstra Declaration -
Submission, dated December 3, 2007
(MKR-KRA00000226-300) ................................................ Appx16736

Exhibit 265 to Dykstra Declaration -
"Long-Term Persistence of Mumps Antibody after Receipt of 2
Measles-Mumps-Rubella (MMR) Vaccinations and Antibody
Response after a Third MMR Vaccination among a University
Population," by Date, Anand, *et al.*, *Journal of Infectious
Diseases*, (2008) 197:1662-1668 ........................................ Appx16812

Exhibit 266 to Dykstra Declaration -
"Mumps Antibody Levels Among Students Before a Mumps
Outbreak: In Search of a Correlate of Immunity,"
by Cortese, *et al.*, *Journal of Infectious Diseases*, (2011)
204:1413-1422 ................................................................. Appx16820

**Table of Contents**
**(Continued)**

Exhibit 267 to Dykstra Declaration -
"Immunogenicity and Safety of Two Tetravalent (Measles,
Mumps, Rubella, Varicella) Vaccines Coadministered With
Hepatitis A and Pneumococcal Conjugate Vaccines to Children
Twelve to Fourteen Months of Age," by Blatter, *et al.*,
*The Pediatric Infectious Disease Journal,*
(2012) 31:e133-e140 ........................................................... Appx16831

Exhibit 268 to Dykstra Declaration -
Analytical Validation Protocol
(MRK-KRA00337307-18) .................................................... Appx16840

Exhibit 269 to Dykstra Declaration -
Expert Report of Robert Platt, Ph.D.,
dated June 14, 2018 ............................................................ Appx16853

Exhibit 270 to Dykstra Declaration -
Excerpts from the Deposition Testimony of Amy Keegan,
taken April 27, 2017 ............................................................ Appx16992

Exhibit 271 to Dykstra Declaration -
Documentation of Work Activities
(RELATOR_00000272-3) .................................................... Appx16995

Exhibit 272 to Dykstra Declaration -
Work Summary Document (RELATOR_00000274-6) ........ Appx16998
*(Cont'd in Vol XXXVII)*

**Volume XXXVII**
**(Filed Under Seal)**

Exhibit 273 to Dykstra Declaration -
Submission, dated May 5, 2005
(MRK-KRA00176342-176654) ........................................... Appx17002

Exhibit 274 to Dykstra Declaration -
Submission, dated June 30, 2004
(MKR-KRA00137854-55 and 8137-72) ............................. Appx17316

**Table of Contents**
**(Continued)**

Exhibit 275 to Dykstra Declaration -
"Safety and Immunogenicity of Human Serum Albumin-Free
MMR Vaccine in US Children Aged 12-15 months,"
by Mufson, *et al.*, *Journal of Pediatric Infectious Diseases
Society*, (2014) 4:339-348 .................................................. Appx17355

Exhibit 276 to Dykstra Declaration -
Letter from Jerry P. Weir, Ph.D. to Alison Fisher, Ph.D.,
dated December 30, 2004 (MRK-KRA00141670-2) ........... Appx17366

Exhibit 277 to Dykstra Declaration -
Submission, dated February 28, 2005
(MRK-KRA00141676-729) ................................................ Appx17370

Exhibit 278 to Dykstra Declaration -
Submission, dated July 13, 2005
(MRK-KRA00141789-906) ................................................ Appx17425
*(Cont'd in Vol XXXVIII)*

**Volume XXXVIII**
**(Filed Under Seal)**

Exhibit 279 to Dykstra Declaration -
"Summary of Notifiable Diseases-United States 2012,"
*MMWR*, 2014:61(53):1-121 ................................................ Appx17544

Exhibit 280 to Dykstra Declaration -
CDC Publication "Mumps Outbreak-Related Questions
and Answers for Patients," last reviewed March 15, 2019 .. Appx17669

Exhibit 281 to Dykstra Declaration -
CDC Publication "Nationally Notifiable Infectious Diseases
and Conditions, United States: Annual Tables" ................... Appx17672

Exhibit 282 to Dykstra Declaration -
"Characteristics of Large Mumps Outbreaks in the United
States during July 2010-December 2015," by Clemmons,
Nakia *et al.*, *Clinical Infectious Diseases*, (2019) ............... Appx17676

**Table of Contents**
**(Continued)**

Exhibit 283 to Dykstra Declaration -
CDC Publication "Healthy People 2010 Final Review" ...... Appx17684
***(Cont'd in Vol XXXIX)***

**Volume XXXIX**
**(Filed Under Seal)**

Exhibit 284 to Dykstra Declaration -
CDC Publication "Healthy People 2020 Immunization and
Infectious Diseases Objectives" .......................................... Appx18245

Exhibit 285 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.2
Cases of Hib Data" .............................................................. Appx18278

Exhibit 286 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.4
U.S.-acquired cases of Measles Data" ................................. Appx18280

Exhibit 287 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.5
U.S.-acquired cases of Mumps Data" .................................. Appx18282

Exhibit 288 to Dykstra Declaration -
CDC Publication "Healthy People 2020 IID-1.9
 U.S.-acquired cases of Rubella Data" ................................ Appx18284

Exhibit 289 to Dykstra Declaration -
CDC Webpage "National Center for Immunization
and Respiratory Diseases" ................................................... Appx18286

Exhibit 290 to Dykstra Declaration -
"Mumps vaccination coverage and vaccine effectiveness in a
large outbreak among college students-Iowa, 2006,"
by Marin, Mona *et al.*, *Vaccine*, (2008) 26:3601-3607 ........ Appx18301

**Table of Contents**
**(Continued)**

Exhibit 291 to Dykstra Declaration -
"Mumps Outbreak in Orthodox Jewish Communities in the
United States," Barskey, Albert, *et al.*, *New England Journal
of Medicine*, (2012) 367(18):1704-1713 .............................. Appx18309

Exhibit 292 to Dykstra Declaration -
"Impact of a Third Dose of Measles-Mumps-Rubella Vaccine
on a Mumps Outbreak," by Ogbuanu, Ikechukwu, *et al.*,
*Pediatrics*, (2012) 130(6):1-8 ............................................. Appx18320

Exhibit 293 to Dykstra Declaration -
"Epidemiology of a Mumps Outbreak in a Highly Vaccinated
Island Population and Use of a Third Dose of Measles-
Mumps-Rubella Vaccine for Outbreak Control—Guam 2009
to 2010," by Nelson, George, *et al.*, *Pediatric Infectious
Disease Journal*, (2013) 32(4):374-380 .............................. Appx18330

Exhibit 294 to Dykstra Declaration -
"Effectiveness of a Third Dose of MMR Vaccine for Mumps
Outbreak Control," by Cardemil, Cristina, *et al.*, *New England
Journal of Medicine*, (2017) 377(10):947-956 ................... Appx18338

Exhibit 295 to Dykstra Declaration -
"Mumps in a highly vaccinated Marshallese community in
Arkansas, USA: an outbreak report," by Fields, Virgie, *et al.*,
*Lancet Infectious Diseases*,
(Published online January 8, 2019) 1-8 .............................. Appx18349

Exhibit 296 to Dykstra Declaration -
"Antibody Induced by Immunization with the Jeryl Lynn
Mumps Vaccine Strain Effectively Neutralizes a Heterologous
Wild-Type Mumps Virus Associated with a Large Outbreak,"
by Rubin, Steven, *et al.*, *Journal of Infectious Diseases*, (2008)
198:508-515 ....................................................................... Appx18358

Exhibit 297 to Dykstra Declaration -
"Vaccine waning and mumps-re-emergence in the United
States," by Lewnard, Joseph and Grad, Yonatan, *Science
Translational Medicine*, (2018) 10(433):1-10 .................... Appx18367

**Table of Contents**
**(Continued)**

Exhibit 298 to Dykstra Declaration -
"Comment: The changing epidemiology of mumps in a high
vaccination era," by Marshall, Helen and Plotkin, Stanley,
*Lancet Infectious Diseases*, (2019) 19:118-119 ................... Appx18379

Exhibit 299 to Dykstra Declaration -
"Successes and challenges for preventing measles, mumps and
rubella by vaccination," by Bankamp, Bettina, *et al.*, *Current
Opinion in Virology*, (2019) 34:110-116 ............................. Appx18382

Exhibit 300 to Dykstra Declaration -
"Mumps Vaccines Do We Need a New One?," by Rubin,
Steven and Beeler, Judy, *Pediatric Infectious Disease Journal*,
(2013) 32(10):1156-1157 .................................................... Appx18390

Exhibit 301 to Dykstra Declaration -
CDC website listing Measles-related *MMWR* Articles ........ Appx18393

Exhibit 302 to Dykstra Declaration -
CDC website listing Pertussis (Whooping Cough)
Publications ........................................................................ Appx18399

Exhibit 303 to Dykstra Declaration -
CDC website listing Chickenpox (Varicella) References and
Resources ........................................................................... Appx18407

Exhibit 304 to Dykstra Declaration -
CDC webpage: Glossary ..................................................... Appx18411

Exhibit 305 to Dykstra Declaration -
Email from Jeanne Santoli to Eric Skjeveland,
dated June 12, 2012 (MRK-KRA00122172-3) .................... Appx18425

Exhibit 306 to Dykstra Declaration -
CDC webpage, ACIP Workgroups, last reviewed
May 30, 2019 .................................................................... Appx18428

**Table of Contents**
**(Continued)**

                                                                    **Page**

Exhibit 307 to Dykstra Declaration -
"Recommendations of the Advisory Committee on
Immunization Practices for Use of Hepatitis A Vaccine
for Persons Experiencing Homelessness,"
*MMWR* 2019:68(6):153-56 ................................................. Appx18435

Exhibit 308 to Dykstra Declaration -
"Human Papillomavirus Vaccination for Adults: Updated
Recommendations of the Advisory Committee on
Immunization Practices," *MMWR* 2019:68(3):698-702 ...... Appx18440

Exhibit 309 to Dykstra Declaration -
"Prevention and Control of Seasonal Influenza with
Vaccines: Recommendations of the Advisory Committee
on Immunization Practices-United States, 2019-20
Influenza Season," *MMWR* 2019:69(3):1-21 ....................... Appx18446

Exhibit 310 to Dykstra Declaration -
"Japanese Encephalitis Vaccine: Recommendations of the
Advisory Committee on Immunization Practices,"
*MMWR* 2019:68(2);1-33 .................................................... Appx18475
***(Cont'd in Vol XL)***

**Volume XL**
**(Filed Under Seal)**

Exhibit 311 to Dykstra Declaration -
"Prevention of Pertussis, Tetanus, and Diphtheria with
Vaccines in the United States: Recommendations of the
Advisory Committee on Immunization Practices,"
*MMWR* 2018:67(2):1-44 .................................................... Appx18516

Exhibit 312 to Dykstra Declaration -
"Updated Recommendations for Use of Tetanus Toxoid,
Reduced Diphtheria Toxoid and Acellular Pertussis Vaccine
(Tdap) in Pregnant Women and Persons Who Have or
Anticipate Having Close Contact with an Infant Aged <12
Months-Advisory Committee on Immunization Practices
(ACIP), 2011," *MMWR* 2011:60(41):1424-1426 ................. Appx18565

**Table of Contents**
**(Continued)**

**Page**

Exhibit 313 to Dykstra Declaration -
"Updated Recommendations for the Use of Tetanus Toxoid,
Reduced Diphtheria Toxoid, and Acellular Pertussis Vaccine
(Tdap) in Pregnant Women-Advisory Committee on
Immunization Practices (ACIP), 2012," *MMWR*
2013:62(7):131-135 ............................................................ Appx18569

Exhibit 314 to Dykstra Declaration -
"Immunization in the United States (Chapter 73),"
by Cohn, *et al.*, *Vaccines* 1421-1440 ................................... Appx18575

Exhibit 315 to Dykstra Declaration -
Excerpts from the Expert Report of
Daniel Salmon, Ph.D., MPH ................................................ Appx18596

Exhibit 316 to Dykstra Declaration -
Excerpts from Merck's Supplemental Responses and
Objections to Relators' First Set of Interrogatories,
dated December 12, 2016 .................................................... Appx18608

Exhibit 317 to Dykstra Declaration -
"The Pertussis Problem," by Plotkin, Stanley, *Clinical
Infectious Diseases*, (2014) 58(6): 830-833 ......................... Appx18618

Exhibit 318 to Dykstra Declaration -
"Establishing a Global Vaccine-Development Fund,"
by Plotkin, Stanley, *et al.*, *New England Journal of Medicine*,
(2015) 373:297-300 ........................................................... Appx18623

Exhibit 319 to Dykstra Declaration -
Chapter 11 "Anthrax Vaccines," by Friedlander, Arthur, *et al.*,
*Vaccines* (2018) ................................................................ Appx18628

Exhibit 320 to Dykstra Declaration -
Chapter 38 "Meningococcal Capsular Group A, C, W, and Y
Conjugate Vaccines," by Harrison, Lee, *et al.*,
*Vaccines* (2018) ................................................................ Appx18646

**Table of Contents**
(Continued)

Exhibit 321 to Dykstra Declaration -
Chapter 52 "Rotavirus Vaccines," by Parashar, Umesh, *et al.*,
*Vaccines* (2018) ................................................................. Appx18673

Exhibit 322 to Dykstra Declaration -
Chapter 60 "Tuberculosis Vaccines," by Hanekom, Willem,
*et al.*, *Vaccines* (2018) ......................................................... Appx18694

Exhibit 323 to Dykstra Declaration -
Excerpts from Expert Report of
Gary L. Freed, M.D., MPH .................................................. Appx18714

Exhibit 324 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Gary L. Freed, M.D., MPH, taken October 18, 2018 .......... Appx18718

Exhibit 325 to Dykstra Declaration -
Excerpts from "2012 CDC Summary of
Notifiable Diseases" ........................................................... Appx18721

Exhibit 326 to Dykstra Declaration -
Excerpts from "1977 Annual Summary,"
*MMWR*, Vol. 26, No. 53, September 1978 .......................... Appx18729

Exhibit 327 to Dykstra Declaration -
Excerpts from "1980 Annual Summary,"
*MMWR*, Vol. 29, No. 54, September 1981 .......................... Appx18734

Exhibit 328 to Dykstra Declaration -
Excerpts from "2013 CDC Summary of
Notifiable Diseases" ........................................................... Appx18742

Exhibit 329 to Dykstra Declaration -
Excerpts from "2014 CDC Summary of
Notifiable Diseases" ........................................................... Appx18747

**Table of Contents**
**(Continued)**

Relators' Responses to Merck's Statements of Material Facts in
    Support of Its First and Fourth Summary Judgment Motions
    and Their Corresponding Additional Statement of Material
    Facts, dated November 26, 2019 (Doc. 300) ........................ Appx18751

Declaration of Gary Reilly in Support of Relators' Oppositions to
    Merck's Four Motions for Summary Judgment,
    executed November 26, 2019 (Doc. 300) ............................ Appx18984

    Exhibit 361 to Reilly Declaration -
    Deposition Testimony of Amy Keegan,
    taken April 27, 2017 ............................................................ Appx18996
    *(Cont'd in XLI)*

**Volume XLI**
**(Filed Under Seal)**

    Exhibit 362 to Reilly Declaration -
    Memorandum titled "Delay of Filing for Optimized
    GOS/HAS-free Diluent for M-M-R®II" with Attachment,
    dated August 28, 2000 (MRK-CHA01593194-9) ................ Appx19070

    Exhibit 363 to Reilly Declaration -
    The Current Manufacturing Target Titer for the Mumps
    Component of Measles, Mumps, and Rubella Virus Vaccine
    Live M-M-R®II (MRK-CHA00576983-93) ....................... Appx19077

    Exhibit 364 to Reilly Declaration -
    Letter from Robert L. McKee, Ph.D. to Carolyn Hardegree,
    M.D., dated December 10, 1998, with Attachment
    (MRK-CHA00756233-55) .................................................. Appx19089

    Exhibit 365 to Reilly Declaration -
    Excerpts from Clinical and Regulatory Review Committee
    Critical Activities, issued August 15, 2001
    (MRK-CHA01724860-25029) ............................................ Appx19113

**Table of Contents**
**(Continued)**

Page

Exhibit 366 to Reilly Declaration -
Excerpts from Clinical and Regulatory Review Committee
Critical Activities, issued March 17, 1999
(MRK-CHA01717354-7508) ............................................... Appx19123

Exhibit 367 to Reilly Declaration -
Table (MRK-CHA00280517) ............................................... Appx19142

Exhibit 368 to Reilly Declaration -
Project Management Regulatory Submissions
Schedule for "All Products," from 01-AUG-2002
(MRK-CHA01726084-7) .................................................... Appx19144

Exhibit 369 to Reilly Declaration -
Email from Hentrietta Ukwu to David W. Blois,
dated October 6, 1998, with Attachment
(MRK-CHA00625837-9) .................................................... Appx19149

Exhibit 370 to Reilly Declaration -
Justification of Mumps Component Frequency
(MRK-CHA00032404-7) .................................................... Appx19153

Exhibit 371 to Reilly Declaration -
Email from Alison L. Fisher, Ph.D. to Mark S. Galinski,
dated March 28, 2005 (MRK-CHA00560317-9) ................ Appx19158

Exhibit 372 to Reilly Declaration -
Email from Bonita M. Stankunas to Amy Keegan,
dated October 1, 2010 (MRK-CHA01470854-6) ............... Appx19162

Exhibit 373 to Reilly Declaration -
Presentation titled M-M-R®II
(MRK-CHA00021133-67) ................................................... Appx19166

Exhibit 374 to Reilly Declaration -
Excerpts from Pediatric Measles, Mumps, Rubella &
Varicella-containing Franchise: Integrated Vaccine T-PAC
Review, dated October 28, 2002
(MRK-CHA00233586-3623) ............................................... Appx19202

**Table of Contents**
(Continued)

Exhibit 375 to Reilly Declaration -
Deposition Testimony of April D. Cohen,
taken January 4, 2018 ......................................................... Appx19211

Exhibit 376 to Reilly Declaration -
Minutes of October 6, 1999 Project Team Meeting,
dated October 8, 1999 (MRK-CHA01899074-86) .............. Appx19276

Exhibit 377 to Reilly Declaration -
Draft Memo re: Clinical and Regulator Review Committee
Meeting Summary-October 8, 2002, dated October 11, 2002
(MRK-CHA01728735-8) .................................................... Appx19290

Exhibit 378 to Reilly Declaration -
Pediatric Live Virus Vaccine Franchise Review,
dated October 28, 2002 (MRK-CHA00207636-83) ............ Appx19295

Exhibit 379 to Reilly Declaration -
Presentation, produced as "M-M-R II and Priorix Profiles
8_19_11F.ppt" (MRK-CHA00955777) ............................... Appx19344

Exhibit 380 to Reilly Declaration -
Deposition Testimony of Tim Schofield,
taken March 20, 2017 ......................................................... Appx19347

Exhibit 381 to Reilly Declaration -
Memo re: Mumps Stability and Potency Estimations,
dated February 27, 2001 (MRK-CHA01896072-3) ............. Appx19449

Exhibit 382 to Reilly Declaration -
Email from Philip S. Bennett to Cynthia Morrisey,
dated January 18, 2002 (MRK-CHA00094849-50) ............. Appx19452

Exhibit 383 to Reilly Declaration -
*Curriculum Vitae* of Manal Anwar Morsy, M.D., Ph.D., MBA
(MORSY00001-10) ............................................................ Appx19455

**Table of Contents**
(Continued)

                                                                    **Page**

Exhibit 384 to Reilly Declaration -
*Curriculum Vitae* of Cynthia F. Morrisey
(MORRISEY_00000001-6) ................................................. Appx19466

Exhibit 385 to Reilly Declaration -
Memo re: Determination of Minimum Release
Specifications for Mumps and Rubella in M-M-R®II,
dated February 9, 2004 (MRK-CHA00722641-2) ............... Appx19473

Exhibit 386 to Reilly Declaration -
Memo re: Determination of Minimum Release Specifications
for Mumps in M-M-R®II, dated November 4, 2004
(MRK-CHA00722667-8) .................................................... Appx19476

Exhibit 387 to Reilly Declaration -
Email from Philip S. Bennett with attachments,
dated December 4, 2012
(MRK-CHA01580006-15) .................................................. Appx19479

Exhibit 388 to Reilly Declaration -
Email from Kimberly A. Duffy to Amy Keegan,
dated December 5, 2012 (MRK-CHA01579943-5) ............. Appx19490

Exhibit 389 to Reilly Declaration -
*Curriculum Vitae* of Amy Keegan
(MRK-CHA02009507-9) .................................................... Appx19494

Exhibit 390 to Reilly Declaration -
Presentation, MMRII Protocol #007 - Mumps End Expiry
study: AIGENT Assay Issues and Impact on Study Criteria,
produced as "6-30 pm Draft 10-04-02 for CRRC-10-08-02
slides.ppt" (MRK-CHA00025831) ..................................... Appx19498
*(Cont'd in Vol LXII)*

**Table of Contents**
**(Continued)**

**Page**

**Volume LXII**
**(Filed Under Seal)**

Exhibit 391 to Reilly Declaration -
Gulati Deposition Exhibit 14, Select Pages of Supplemental
Biologics License Application, dated June 30, 2004
(MRK-CHA00137854-55 and
MRK-CHA00138585-708) ................................................. Appx19533

Exhibit 392 to Reilly Declaration -
Regulatory Liaison FDA Conversation Record,
dated May 27, 2005 (MRK-CHA00793082-3) .................... Appx19539

Exhibit 393 to Reilly Declaration -
Submission, dated July 13, 2005
(MRK-CHA00141789-906) ................................................. Appx19542

Exhibit 394 to Reilly Declaration -
Deposition Testimony of Dipti Gulati, M.S., D. Phil.,
taken December 5, 2018  ...................................................... Appx19550

Exhibit 395 to Reilly Declaration -
Merck's Biological Stability Program 2001 Annual Stability
Report for M-M-R®II (MRK-CHA01632745-51) .............. Appx19661

Exhibit 396 to Reilly Declaration -
Biological Stability Program 2004 Annual Stability
Report for M-M-R®II (MRK-CHA01632833-8) ................ Appx19669

Exhibit 397 to Reilly Declaration -
Biological Stability Program 2005 Annual Stability
Report for M-M-R®II (MRK-CHA01634117-22) .............. Appx19676

Exhibit 398 to Reilly Declaration -
Biological Stability Program 2008 Annual Stability
Report for M-M-R®II (MRK-CHA01633948-59) .............. Appx19683

**Table of Contents**
**(Continued)**

Exhibit 399 to Reilly Declaration -
Response to FDA Request for Information,
dated February 28, 2005 (MRK-CHA02078926-7) ............. Appx19696

Exhibit 400 to Reilly Declaration -
Excerpts from Biological Stability Program 2010
Annual Stability Report for M-M-R®II
(MRK-CHA01458201-6) ...................................................... Appx19699

Exhibit 401 to Reilly Declaration -
CDC "Mumps Cases and Outbreaks" webpage,
last accessed November 25, 2019 ........................................ Appx19706

Exhibit 402 to Reilly Declaration -
CDC "Mumps Vaccination" webpage, last reviewed
March 28, 2019 ................................................................... Appx19709

Exhibit 403 to Reilly Declaration -
CDC "Mumps Vaccination" webpage, archived as of
May 30, 2012 ...................................................................... Appx19711

Exhibit 404 to Reilly Declaration -
CDC "Mumps Vaccination" webpage, archived as of
December 8, 2009 ............................................................... Appx19714

Exhibit 405 to Reilly Declaration -
Email from Janet Ernst-Gerner to Alan Modlinger,
dated September 23, 2016 (MRK-CHA02008691-4) .......... Appx19717

Exhibit 406 to Reilly Declaration -
Marked M-M-R®II (Measles, Mumps, and Rubella Virus
Vaccine Live) Literature (MRK-CHA02008695-705) ......... Appx19722

Exhibit 407 to Reilly Declaration -
Email from Mark Papania to Barbara Kuter,
dated February 12, 2010 (MRK-CHA00351988-90) ........... Appx19734

**Table of Contents**
**(Continued)**

Exhibit 408 to Reilly Declaration -
Email from Chester J. Kitchen, dated February 25, 2010
(MRK-CHA00790153-4) ..................................................... Appx19738

Exhibit 409 to Reilly Declaration -
Email from Chester J. Kitchen to Scott Porreca,
dated February 26, 2010 (MRK-CHA00791347) ................ Appx19741

Exhibit 410 to Reilly Declaration -
FDA Conversation re; PRIOrix™, measles, mumps &
rubella live, attenuated, viral vaccine BB-IND-7229,
dated December 18, 1997 (GSK-MMR-IND-0047687-9) ... Appx19743

Exhibit 411 to Reilly Declaration -
FDA Conversation re: PRIOrix IND submission,
Clinical Hold, dated October 16, 1997
(GSK-MMR-IND-0047654-6) ............................................. Appx19747

Exhibit 412 to Reilly Declaration -
Extra CDAB Meeting Abstract, dated August 1, 2011
(GSK-MMR-019819-42) ..................................................... Appx19751

Exhibit 413 to Reilly Declaration -
Memo re: Minutes of Meeting with CBER on 4/4/01,
dated April 9, 2001 (MRK-CHA00049238-40) ................... Appx19776

Exhibit 414 to Reilly Declaration -
Email from Sally S. Wong to Cathy Hoath,
dated February 26, 2013 (MRK-CHA01556424-8) ............. Appx19780

Exhibit 415 to Reilly Declaration -
Email from Joseph D. Bernardo to Mark J. Stannard,
dated November 30, 2016 (MRK-CHA02101841) ............. Appx19786

Exhibit 416 to Reilly Declaration -
Deposition Testimony of Roberta L. McKee, Ph.D.,
taken March 30, 2017 ......................................................... Appx19788

**Table of Contents**
**(Continued)**

**Page**

Exhibit 417 to Reilly Declaration -
Vaccine & Biological Stability Protocol for M-M-R®II
(MRK-CHA01714300-8) ................................................... Appx19870

Exhibit 418 to Reilly Declaration -
Excerpts from Biological Stability Program 2000
Annual Stability Report for M-M-R®II
(MRK-CHA01633601-6) ................................................... Appx19880

Exhibit 419 to Reilly Declaration -
Excerpts from Biological Stability Program 2002
Annual Stability Report for M-M-R®II
(MRK-CHA01633529-39) ................................................... Appx19887

Exhibit 420 to Reilly Declaration -
Excerpts from Biological Stability Program 2003
Annual Stability Report for M-M-R®II
(MRK-CHA01632888-95) ................................................... Appx19899

Exhibit 421 to Reilly Declaration -
SOP Active Stability Monitoring of Live Virus Vaccine
Potency Results, effective November 10, 2000
(MRK-CHA00049165-73) ................................................... Appx19908

Exhibit 422 to Reilly Declaration -
SOP Real Time Stability Trend Monitoring, effective
September 21, 2016 (MRK-CHA01714343-54) .................. Appx19918

Exhibit 423 to Reilly Declaration -
Label Claim Compliance of M-M-R®II
(MRK-CHA00322066-73) ................................................... Appx19931

Exhibit 424 to Reilly Declaration -
Proposed New Stabilizer for M-M-R®II,
dated July 12, 2002 (MRK-CHA00239179-99) .................. Appx19940

**Table of Contents**
**(Continued)**

**Page**

Exhibit 425 to Reilly Declaration -
Clinical and Regulatory Review Committee Agenda,
dated October 8, 2002 (MRK-CHA00780210-65) .............. Appx19962
***(Cont'd in Vol XLIII)***

**Volume XLIII**
**(Filed Under Seal)**

Exhibit 426 to Reilly Declaration -
Analytical Approach for MMR in Japan
(MRK-CHA00719989-20008) ............................................ Appx20019

Exhibit 427 to Reilly Declaration -
Excerpts from Memo re: Mumps neutralizing antibody test vs.
efficacy and effectiveness, dated September 10, 1999
(MRK-CHA00061698-703) ................................................ Appx20040

Exhibit 428 to Reilly Declaration -
Atkinson Deposition Exhibit 2, Letter from Kevin Malone
to Kathleen Hardway, dated July 31, 2018,
and Letter from Robert Redfield to Kathleen Hardway,
dated May 24, 2018 ............................................................ Appx20047

Exhibit 429 to Reilly Declaration -
CDC Publication, Ensuring the Safety of Vaccines in the
United States, last updated July 2011 ................................. Appx20055

Exhibit 430 to Reilly Declaration -
Email from Colleen M. Duffy to Diana DeLong,
dated December 14, 2005 (MRK-CHA00942187-8) ........... Appx20058

Exhibit 431 to Reilly Declaration -
Email from Kevin Agnew to Diana DeLong,
dated March 14, 2014 (MRK-CHA01673057-9) ................. Appx20061

Exhibit 432 to Reilly Declaration -
Letter to CDC Request for Final Proposal to RFP 2014-N-
15784 Consolidated Vaccines for Children Contact,
dated March 7, 2014 (MRK-CHA01655048-93) ................. Appx20065

**Table of Contents**
(Continued)

Exhibit 433 to Reilly Declaration -
Email from Diana DeLong to Cindy Rivera,
dated March 13, 2014 (MRK-CHA01656202-3) ................. Appx20112

Exhibit 434 to Reilly Declaration -
FDA Comments on PRN Assay, dated May 9, 2007
(GSK-MMR-IND-0015993-4) ............................................ Appx20115

Exhibit 435 to Reilly Declaration -
Excerpts from Merck Presentation, dated November 10, 2011
(MRK-CHA0002441-681) ................................................... Appx20118

Exhibit 436 to Reilly Declaration -
Letter from Lisa C. Dykstra to CDC and Office of General
Counsel for Department of Health and Human Services,
dated May 18, 2015 (MRK-CHA01374713-20) .................. Appx20121

Exhibit 437 to Reilly Declaration -
Summary of GSK Vaccines development pipeline meeting
with CDC March 8, 2016 (GSK-MMR-0062025-30) ......... Appx20130

Exhibit 438 to Reilly Declaration -
Email from Ouzama Nicholson to Donna Boyce,
dated May 27, 2010 (GSK-MMR-0058532) ....................... Appx20137

Exhibit 439 to Reilly Declaration -
Memo re: Supporting Documents for Stephen Krahling,
dated October 10, 2000 (MRK-CHA00447565-74) ............ Appx20139

Exhibit 440 to Reilly Declaration -
Excerpts from journal of David Krah, M.D.
(MRK-CHA00490081-591) ................................................ Appx20150

Exhibit 441 to Reilly Declaration -
Minutes of August 8, 2001 Project Team Meeting
(MRK-CHA00209441-53) .................................................. Appx20176

**Table of Contents**
**(Continued)**

**Page**

Exhibit 442 to Reilly Declaration -
Deposition Testimony of  Thomas McGuire, Ph.D.,
taken July 2, 2018 ............................................................ Appx20190

Exhibit 443 to Reilly Declaration -
National Vaccine Advisory Committee Report,
The National Vaccine Program 2008 State of the
Program Report, dated February 2009.................................. Appx20274

Exhibit 444 to Reilly Declaration -
"National, State, and Local Area Vaccination Coverage
Among Children Aged 19–35 Months — United States, 2012,"
*MMWR* 2013; 62:733-755, dated September 13, 2013 ........ Appx20289

Exhibit 445 to Reilly Declaration -
"Financing Immunizations in the United States," Hinman
*et al.*, *Clinical Infectious Diseases* 2004; 38:1440-6 ........... Appx20314

Exhibit 446 to Reilly Declaration -
"Program Review, National Immunization Survey (NIS) and
State and Local Area Integrated Telephone Survey (SLAITS),"
dated November 27-28, 2007 .............................................. Appx20322

Exhibit 447 to Reilly Declaration -
"About VFC" webpage ....................................................... Appx20344

Exhibit 448 to Reilly Declaration -
"Medicaid Program; Charges for Vaccine Administration
Under the Vaccines for Children Program,"
Federal Register Volume 59, Issue 190
(October 3, 1994) ............................................................. Appx20347

Exhibit 449 to Reilly Declaration -
Deposition Testimony of Michele Taylor,
taken May 9, 2017 ............................................................ Appx20360

**Table of Contents**
**(Continued)**

**Page**

Defendant Merck's Response to Relators' Additional Statement of
     Material Facts in Connection with Defendant's First and Fourth
     Summary Judgment Motions, dated December 20, 2019
     (Doc. 311) ........................................................................... Appx20427

Defendant Merck's Response to Relators' Additional Statement of
     Material Facts in Connection with Defendant's First and Fourth
     Summary Judgment Motions, dated December 20, 2019
     (Doc. 314) ........................................................................... Appx20486
     *(Cont'd in Vol XLIV)*

**Volume XLIV**
**(Filed Under Seal)**

Declaration of Lisa C. Dykstra in Support of Defendant's
     Replies and Response to Motions for Summary Judgment,
     executed December 20, 2019 (Doc. 315) ............................. Appx20545

     Exhibit 330 to Dykstra Declaration -
     Excerpts from the Deposition Testimony of Amy Keegan,
     taken February 9, 2018 ....................................................... Appx20552

     Exhibit 331 to Dykstra Declaration -
     Email from Paul Lanzetta to Thomas Romanus
     and John Comonitski, dated August 19, 2011
     (MRK-KRA00955764-955765) ........................................... Appx20555

     Exhibit 332 to Dykstra Declaration -
     Excerpts from Deposition Testimony of Cynthia Morrisey,
     taken July 27, 2017 ............................................................. Appx20558

     Exhibit 333 to Dykstra Declaration -
     Table of Contents for Information Submitted with Merck's
     BLA for the replacement of Human Serum Albumin with
     Recombinant Albumin (MRK-KRA00137827-137828) ..... Appx20562

     Exhibit 334 to Dykstra Declaration -
     FDA's Draft Guidance for Industry Stability Testing of
     Drug Substances and Drug Products (June 8, 1998) ............ Appx20565

**Table of Contents**
**(Continued)**

**Page**

Exhibit 335 to Dykstra Declaration -
WHO's Draft Guidelines on Stability Evaluation of
Vaccines, Expert Committee on Biological Standardization
(October 23-27, 2006) ......................................................... Appx20662

Exhibit 336 to Dykstra Declaration -
Biological Stability Program 1999 Annual Stability
Report for M-M-R®II (MRK-KRA01632656-86) .............. Appx20691

Exhibit 337 to Dykstra Declaration -
Biological Stability Program 2000 Annual Stability
Report for M-M-R®II (MRK-KRA01633601-29) .............. Appx20723

Exhibit 338 to Dykstra Declaration -
Biological Stability Program 2001 Annual Stability
Report for M-M-R®II (MRK-KRA01632745-822) ............ Appx20753

Exhibit 339 to Dykstra Declaration -
Biological Stability Program 2002 Annual Stability
Report for M-M-R®II (MRK-KRA01633529-600) ............ Appx20832

Exhibit 340 to Dykstra Declaration -
Biological Stability Program Annual 2003 Stability
Report for M-M-R®II (MRK-KRA01632888-945) ............ Appx20905

Exhibit 341 to Dykstra Declaration -
Biological Stability Program 2004 Annual Stability
Report for M-M-R®II (MRK-KRA01632833-68) .............. Appx20964

**Volume XLV**
**(Filed Under Seal)**

Exhibit 342 to Dykstra Declaration -
Biological Stability Program 2005 Annual Stability
Report for M-M-R®II (MRK-KRA01633267-99) .............. Appx21001

Exhibit 343 to Dykstra Declaration -
M-M-R®II Stability Data Summary for the 2006
Annual Stability Report (MRK-KRA0163946-83) ............ Appx21035

**Table of Contents**
(Continued)

Exhibit 344 to Dykstra Declaration -
M-M-R®II Stability Data Summary for the 2007
Annual Stability Report (MRK-KRA01633723-31) ........... Appx21074

Exhibit 345 to Dykstra Declaration -
CDC's Nationally Notifiable Infectious Diseases and
Conditions, United States: Weekly Tables, Table 1y
(October 2019) .................................................... Appx21084

Exhibit 346 to Dykstra Declaration -
CDC's Nationally Notifiable Infectious Diseases and
Conditions, United States: Weekly Tables, Table 1z
(October 2019) .................................................... Appx21088

Exhibit 347 to Dykstra Declaration -
CDC's Nationally Notifiable Infectious Diseases and
Conditions, United States: Weekly Tables, Table 1kk
(October 2019) .................................................... Appx21092

Exhibit 348 to Dykstra Declaration -
"An Assessment of Mumps Vaccine Effectiveness by Dose
during an Outbreak in Canada," by Deeks, Shelley, *et al.*,
*CMAJ*, 183(9) (June 14, 2011) ............................................ Appx21096

Exhibit 349 to Dykstra Declaration -
"Mumps Vaccine Effectiveness and Risk Factors for Disease
in Households during an Outbreak in New York City,"
by Livingston, Kara, *et al.*, Vaccine 32; 369-374 (2014) ..... Appx21104

Exhibit 350 to Dykstra Declaration -
"A Large Outbreak of Mumps in the Postvaccine Era,"
by Wharton, Melinda, *et al.*, *Journal of Infectious Diseases*,
Vol. 158, No. 6 (December 1988) .........................................Appx21111

Exhibit 351 to Dykstra Declaration -
"Persistence of Mumps Antibodies after 2 Doses of
Measles-Mumps-Rubella Vaccine," by LeBaron, Charles,
*et al.*, *Journal of Infectious Diseases*, 2009:199
(February 15, 2009) ........................................... Appx21120

**Table of Contents**
(Continued)

Page

Exhibit 352 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Keith Chirgwin, M.D., taken January 26, 2017 ................... Appx21130

Exhibit 353 to Dykstra Declaration -
Excerpts from the Deposition Testimony of
Barbara Kuter, Ph.D., taken December 14, 2016 ................. Appx21137

Exhibit 354 to Dykstra Declaration -
Letter from Manal Morsy, M.D., Ph.D. to Luba Vujcic,
dated March 9, 2000 (MRK-KRA00020409-20410) ........... Appx21141

Exhibit 355 to Dykstra Declaration -
Memorandum from R. Wolchko with the subject "Bridging
Study of the Mumps Legacy ELISA" and "Mumps
'Wild Type' IgG ELISA," dated February 23, 2001
(MRK-KRA00561875-561885) ........................................... Appx21144

Exhibit 356 to Dykstra Declaration -
*Curriculum Vitae* of Emilio Emini, Ph.D. (January 2016)
(EMINI 00001-22) .............................................................. Appx21156

Exhibit 357 to Dykstra Declaration -
General Correspondence to FDA, dated April 23, 2002
(MRK-KRA00000548-553) ................................................. Appx21179

Exhibit 358 to Dykstra Declaration -
"Mumps Epidemiology and Immunity-The Anatomy of a
Modern Epidemic," by Anderson, Larry, *et al.*,
*Pediatric Infectious Disease Journal*, Vol. 27, No. 10
(October 2008) .................................................................... Appx21186

Exhibit 359 to Dykstra Declaration -
IID-1.5 "Reduce cases of mumps (U.S. acquired cases),"
Healthy People 2020 .......................................................... Appx21192

**Table of Contents**
**(Continued)**

**Page**

Defendant's Response to the United States' Statement of
    Interest in Response to the Parties' Summary Judgment
    Briefing, dated January 18, 2021 (Doc. 323)...................... Appx21194

Defendant Merck's Reply to Relators' Response Regarding
    the United States' Statement of Interest (Doc. 328) .......... Appx21206

Page 14

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2      A.    No, I was not involved in the
3  end expiry trial.
4      Q.    What would that -- do you
5  recall what those expiry dating efforts
6  entailed?
7      A.    I served as a scribe for
8  preparation of slides for CBER.
9      Q.    Slides for meetings with CBER
10 or presentations to CBER?
11     A.    It was a presentation to CBER.
12     Q.    Do you recall what that
13 presentation was about?
14     A.    I believe that it was
15 presenting stability data to the agency.
16     Q.    Continuing in that same bullet,
17 you represented "...Laboratory Operations/MMD
18 Quality at the M-M-RTM II Project Team and
19 Process Analytical Formulations Subteams."
20 The MMR II Project Team, can you describe the
21 function of that team generally?
22     A.    Yes, generally that was just a
23 forum where people would exchange information,
24 talk about current projects and the status of
25 current projects supporting that project.

Page 15

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2      Q.    So would that be an
3  interdisciplinary team from both MRL and MMD?
4      A.    I don't recall for certain if
5  that particular team was cross functional or
6  manufacturing specific.
7      Q.    And cross functional, is that
8  the term you would generally use if it would
9  involve both MRL, MMD, possibly MVD?
10     A.    That is correct.
11     Q.    Can you describe what is the
12 Process Analytical Formulation Sub-Team?
13     A.    The Process Analytical
14 Formulation Sub-Team is a team that includes
15 process engineers, analytical scientists.
16 Formulation is typically in the drug product
17 space, whereas the process is in the drug
18 substance space.  And that is where, again,
19 you exchange information and data, review the
20 process in the analytics that are needed to
21 support that process.
22     Q.    Going back to something you
23 just said about drug substance versus drug
24 product.  I know there's a lot of things that
25 are probably second nature to you having

Page 16

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2  worked for however many years, but, you know,
3  to us nonscientists it might be a little
4  tricky just to get the words right.  What is
5  the difference between the drug product and
6  the drug substance?
7      A.    Drug substance is in the
8  pharmaceutical world more commonly referred to
9  as API.  So it's the active ingredient.  We
10 typically say drug substance in the vaccine
11 space.  Drug product is the formulated vaccine
12 that is the vial that the patient will be
13 administered.
14     Q.    So is the -- the drug
15 substance, is that more the raw materials
16 going in or the --
17     A.    So it is not the starting
18 materials, which is what we would call raw
19 materials.  It is the active substance that is
20 formulated into the drug product.
21     Q.    The final bullet there, "Teamed
22 with scientists at the CDC, Paul Ehrlich
23 Institute, and NIBSC to perform an MMR Potency
24 Assay Harmonization Study."  There's a lot in
25 there.  What is the Paul Ehrlich Institute?

Page 17

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2      A.    The Paul Ehrlich Institute is a
3  German regulatory agency.  They serve as a
4  testing laboratory and perform European batch
5  release functions for products that are
6  distributed in Europe.
7      Q.    Would it be analogous to the
8  FDA or CBER in the US?
9      A.    Yes.
10     Q.    And the NIBSC, what does that
11 stand for?
12     A.    I'm going to try to remember
13 the acronym.
14     Q.    Sure.
15     A.    It's the -- it's essentially
16 the same as Paul Ehrlich Institute but for the
17 United Kingdom.  So National Institute for
18 Biological something and Controls.  I don't
19 remember what the S is.
20     Q.    So that's the UK --
21     A.    The UK --
22     Q.    -- equivalent?
23     A.    -- equivalent of the Paul
24 Ehrlich Institute.  Correct.
25     Q.    What is or what was the MMR

5 (Pages 14 - 17)

Appx19001

Page 18

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2   potency assay harmonization study?
3      A.     My recollection from that time,
4   it was some time ago, is that this was a study
5   which was requested to be performed at the --
6   from the EDQM which is the European
7   Directorate of Quality Medicines, I think.  So
8   they're kind of an overarching, they're
9   part -- European wide as opposed to a national
10   agency.  They wanted to understand how
11   different laboratories recorded out results
12   using all of the same reagents and the same
13   test protocols.
14      Q.     I'm going to turn to page 2.
15   The next, I guess, section, April 9, 1998 to
16   July 2002 - Project Scientists, Bioanalytical
17   Development/Laboratory Technical Support, MMD.
18   Did you ever work in MRL?
19      A.     I did work in MRL.  I am
20   currently in the research division.  And from
21   September of 1994 until March of 1997 I was in
22   the research division.
23      Q.     The first bullet point:
24   "Provided troubleshooting, optimization,
25   method development and deviation/out-of

Page 19

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2   specification investigation for cell-based
3   potency, adventitious agent and residual
4   infectivity methods."
5         The deviation/out-of
6   specification investigation, would that
7   include BPDRs?
8      A.     No, I was not involved in
9   preparation -- I can never say it, biological
10   deviation process report.  Other way around.
11   BPDR.
12      Q.     What is a different -- what is
13   a deviation/out-of-spec investigation?
14      A.     Deviation or an
15   out-of-specification investigation is a local
16   investigation in which either you're
17   investigating any typical event that occurred
18   during testing in the laboratories or you're
19   investigating a result that does not meet the
20   specifications as stated for the quality
21   standard of that product.
22      Q.     Would that be something that
23   occurs prior to -- is it related to a BPDR?
24      A.     So, no, because this would be a
25   local investigation that would be used to

Page 20

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2   determine lot disposition.
3      Q.     Lot disposition meaning where a
4   lot has ended up?
5      A.     No, it is prior to any material
6   leaving Merck's control.
7      Q.     What triggers a deviation or
8   out-of-specification investigation?
9      A.     An out-of-specification
10   investigation is very specific in that it's
11   once the testing has been completed for a
12   certain method that's required per the quality
13   standard for that product.  The result is
14   compared to the specifications that are
15   approved for that product.  If the result does
16   not meet those specifications, an
17   investigation must be conducted to understand
18   if the testing was, one, valid; and if valid,
19   then to be used in the lot disposition
20   discussions.
21      Q.     Going on to the next bullet,
22   "Partnered with Vaccine Biometrics to develop
23   a statistical tool to perform real-time assay
24   tracking and trending for measles, mumps and
25   rubella potency assays in response to an FDA

Page 21

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2   483 inspection observation."
3         What is Vaccine Biometrics?
4      A.     Vaccine Biometrics is a
5   statistical support service group that was in
6   the research laboratories.
7      Q.     You were not part of that, you
8   just worked with them for this function?
9      A.     That is correct.
10      Q.     Do you know who was in charge
11   of Vaccine Biometrics?
12      A.     I do not --
13      Q.     If there was someone?
14      A.     -- who the functional head was.
15      Q.     What is an FDA 483 inspection?
16      A.     When the FDA performs general
17   GMP inspections of all manufacturing sites,
18   when they arrive on site, they present you
19   with a form.  When they leave site after
20   completing their inspection, the 483 is a
21   written document which details their
22   observations.
23      Q.     Do you -- is it a major event?
24   Is it pretty serious?
25         MS. SCHMIDT:  Objection.

6 (Pages 18 - 21)

Page 22

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2        THE WITNESS:  No.  They're
3    categorized as to whether they are
4    minor, major or critical.  So not all
5    observations are necessarily major.
6    BY MS. ZINSER:
7        Q.    And is that what the
8    categorizations are called, minor, major,
9    critical, is that the formal term for them?
10       A.    I do believe that that's correct.
11       Q.    Do you remember this particular
12   483 inspection?
13       A.    So I don't remember the
14   specific inspection.  I do not believe I was
15   part of this inspection.  I participated in
16   the activities to address this observation.
17       Q.    Do you recall what those
18   activities were?
19       A.    Yes, I do.
20       Q.    Could you describe generally
21   what those activities were?
22       A.    Sure.  So as stated, it was to
23   develop a statistical tool to perform realtime
24   assay trending for the measles, mumps and
25   rubella infectivity assays in particular.  So

Page 23

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    those are the assays that are used to measure
3    the infectivity or potency of the drug
4    product.  The observation was we were, I
5    believe, doing this for varicella, and the
6    inspector said, oh, that would be a good thing
7    to do for measles, mumps and rubella, so
8    please implement.  Subsequently the tool was
9    developed and proceduralized into a standard
10   operating procedure.
11       Q.    So it was -- was this tracking
12   the performance of those assays rather than a
13   change to the assays themselves?  Was it an
14   analysis of the assays and how they were
15   performing?
16           MS. SCHMIDT:  Objection.
17           THE WITNESS:  No.  It was just
18       trending the output of the house
19       standards which were used in the assays.
20   BY MS. ZINSER:
21       Q.    I'm going to go down a little
22   bit further.  I believe it's the eighth
23   bullet.  "Executed Competitive Intelligence
24   Studies.  Performed..." -- do you see where I
25   am?

Page 24

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2        A.    I do, thank you.
3        Q.    "Performed experiments to
4    characterize potency and matrix characteristics
5    of competitor's varicella vaccine, and to
6    compare thermal stability profiles of Merck
7    and competitor's measles, mumps, and rubella
8    vaccines."
9            Do you recall these competitive
10   intelligence studies?
11       A.    I do.
12       Q.    You do.  Can you describe them?
13       A.    It was I performed potency
14   testing for varicella to understand the
15   potency in the vial of the competitor's
16   vaccine.  And the thermal stability was what
17   is referred to commonly as like European
18   thermal stability testing in which vaccine
19   product is artificially degraded at 37 degrees
20   and tested before and after that treatment.
21       Q.    And who was the competitor
22   whose vaccines you were examining?
23       A.    They were both GSK.
24       Q.    They were both GSK.  So you
25   were performing this as for the varicella

Page 25

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    vaccine as well as the measles, mumps and
3    rubella vaccines.  Correct?
4        A.    That is correct.
5            MS. SCHMIDT:  Objection.
6    BY MS. ZINSER:
7        Q.    At this time, was there a
8    competitor on the market with a varicella
9    vaccine in the US?
10           MS. SCHMIDT:  Objection.
11           THE WITNESS:  Not in the US,
12   no.
13   BY MS. ZINSER:
14       Q.    Was there a competitor on the
15   market in the US for MMR?
16       A.    No.
17           MS. SCHMIDT:  Objection.
18   BY MS. ZINSER:
19       Q.    What were the results of these
20   experiments, if you recall?
21       A.    I don't recall the specific
22   results.  They were just potency outputs.
23       Q.    Who made the decision to --
24   that these competitive intelligence studies
25   were needed?

7 (Pages 22 - 25)

Appx19003

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2         MS. SCHMIDT:  Objection.
3         THE WITNESS:  I don't recall
4    specifically.
5    BY MS. ZINSER:
6         Q.    Was this part of a decision
7    that the Project Team would make, the MMR II
8    Project Team?
9         MS. SCHMIDT:  Objection.
10        THE WITNESS:  I recall that it
11        was a project that was being tracked by
12        the Project Team.
13   BY MS. ZINSER:
14        Q.    You said that there was no
15   competitor on the US market for varicella or
16   for measles, mumps and rubella at this time.
17   I'm looking up, it's 1998 to 2002.  Do you
18   recall there being a concern or belief within
19   Merck that a competitor would be coming to
20   market soon?
21        MS. SCHMIDT:  Objection.
22        THE WITNESS:  Not at this time.
23   BY MS. ZINSER:
24        Q.    Not at this time.  Do you
25   recall if there was a concern at any other

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    time that a competitor would be coming to
3    market?
4         MS. SCHMIDT:  Objection.
5         THE WITNESS:  Not a concern.
6         Of course, strategically Merck is a
7         business and we need to keep track our
8         competitors.
9    BY MS. ZINSER:
10        Q.    Or a belief that there would
11   be -- do you recall any other time a belief
12   that a competitor would be coming to market
13   soon?
14        MS. SCHMIDT:  Objection.
15        THE WITNESS:  Merck has
16        understood for many years that GSK has
17        been planning to enter the market with
18        those vaccines.
19   BY MS. ZINSER:
20        Q.    Do you recall or do you have
21   any knowledge of when Merck first had that
22   understanding?
23        A.    No, I do not.
24        MS. SCHMIDT:  Objection.
25   BY MS. ZINSER:

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2         Q.    Going up the page to July 2002
3    to November 2005, "Senior Project Scientist
4    Laboratory Technical Support MMD."  Senior
5    project scientist, were you -- does that mean
6    that you were in charge, the, you know,
7    senior, does that mean that you were in charge
8    of the laboratory technical support?
9         A.    No, I was not.
10        Q.    Do you recall who was -- who
11   did you report to at that time?
12        A.    In that time frame I reported
13   to most likely Marcie Armstrong.
14        Q.    And what was her position?
15        A.    She would have been --
16        The title would have been
17   either senior scientist or manager.
18        Q.    Since I probably should have
19   done this earlier, if you could just quickly
20   go down to the other points.  April '98 to
21   2000 -- July 2002, do you recall who you
22   reported to at that time?
23        A.    1998 to 2002 I reported to
24   Dr. Don Lineberger.
25        Q.    And just for sake of being

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    complete, March '97 to April '98, who did you
3    report to then?
4         A.    Dr. Don Lineberger.
5         Q.    Back up to July 2002 to
6    November 2005, the fifth bullet, "Analytical
7    Representative to ProQuadTM Technical Transfer
8    Team.  Supported the vaccine filling model
9    development, process validation, matrix
10   characterization, clinical titer
11   recalibration, and assay standard
12   calibration."
13        What does that mean, that you
14   supported those different activities?
15        A.    I was the analytical
16   representative to that team, which means I
17   ensured that samples that the Process
18   Development Team needed to be tested were
19   tested, coordinated consolidating the results
20   for them into a report or presentation format
21   and issued reports as needed to serve as
22   source documents to update our manufacturing
23   documents.
24        Q.    On the first page, "November 2005
25   to Present, Manager, GVTE -Bioanalytical

8 (Pages 26 - 29)

Appx19004

Page 30

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    (formerly RAS-BAS)," a lot of acronyms there.
3        What does GVTE stand for?
4        A.    GVTE is Global Vaccine
5    Technology and Engineering.
6        Q.    And formerly RAS/BAS?
7        A.    Regulatory and Analytical
8    Sciences/Bioanalytical Sciences.
9        Q.    Going up to the first section
10    which says, "September 2009 to present -
11    Associate Director, Vaccines CMC." [As read.]
12    Is CMC Chemistry Manufacturing and Control?
13        A.    That is correct.  And I do need
14    to -- actually I misspoke earlier.  This is
15    not the most version of my CV.
16        Q.    Okay.  Can you explain what the
17    difference would be?
18        A.    The difference is I held that
19    position of associate director from September
20    2009 to November of 2015.  In November of 2015
21    I was promoted to director.  However, my
22    responsibilities remained essentially the
23    same.
24        Q.    And that's where you are
25    presently, director?

Page 31

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2        A.    Correct.  I do apologize.
3        Q.    Do you know if you gave a more
4    recent version of your CV to your attorneys?
5        A.    I don't recall.
6        Q.    You don't recall.  I think we
7    can put that one aside for now.
8        MS. ZINSER:  I'm going to mark
9    this as Keegan-2.
10        - - -
11        (Exhibit Keegan-2, List of
12    committees, was marked for identification.)
13        - - -
14    BY MS. ZINSER:
15        Q.    It's pretty bulky, but we're
16    only going to use a few pages of it.  Keegan-2
17    which has also been marked Metzger-5, this was
18    provided to us at the 30(b)(6) deposition two
19    years ago now.  It's a list of the different
20    committees, some of the different committees
21    at Merck and their membership.  We're only
22    going to look at a few of these so if I could
23    direct you to page 23.
24        A.    Okay.
25        Q.    And I see towards the bottom

Page 32

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    Amy Romanowski, so you were a member of the
3    MMR Project Team as you indicated on your CV.
4    Correct?
5        A.    That is correct.
6        Q.    I just want to go through some
7    of the names in this.  Katalin Abraham, do you
8    know who that is?
9        A.    Katalin Abraham, she goes by
10    Kati.
11        Q.    Kati.  What was her role, if
12    you recall?
13        A.    At that time Kati was in
14    biolicensing, which was a regulatory group.
15        Q.    Going down a little bit, Phil
16    Bennett, do you know Phil Bennett?
17        A.    Yes, I do.
18        Q.    What was his role?
19        A.    At that time, Phil was a
20    stability analyst.
21        Q.    Was he within MMD?
22        MS. SCHMIDT:  Objection.
23        THE WITNESS:  Yes, he was
24    within MMD.
25    BY MS. ZINSER:

Page 33

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2        Q.    Going down, Mark Galinski, do
3    you know who that is?
4        A.    I do know Mark Galinski.
5        Q.    What was his role?
6        A.    At that time, I believe Mark
7    was in process technology.
8        Q.    And going down a little bit,
9    David Krah, do you know David Krah?
10        A.    Yes, I do know David Krah.
11        Q.    What was his role?
12        A.    He was in the research
13    laboratories.
14        Q.    Do you know what his function
15    was in the research laboratories?
16        A.    Dave was analytical development.
17        Q.    If we could turn to page 31.
18    And the committee listed there is the
19    "MMR II/Varivax/ProQuad PDT."  Does PDT stand
20    for Project Development Team?
21        A.    No, it stands for Product
22    Development Team.
23        Q.    What is the difference -- is
24    this a single team that was responsible for
25    all three products?

9 (Pages 30 - 33)

Page 34

1         AMY KEEGAN - HIGHLY CONFIDENTIAL
2    A.    Given the title, yes.
3    Q.    So they weren't separate
4    functions within the team?
5         MS. SCHMIDT:  Objection.
6         THE WITNESS:  I was not a
7    member of this team, I don't think.
8    BY MS. ZINSER:
9    Q.    I see towards the bottom that
10   you were or you're listed as a member of this
11   team?
12   A.    At that time?  Okay.
13   Q.    Do you -- what is the
14   difference between a Project Team and a
15   Product Development Team?
16   A.    Product Development Team, and
17   the functions have changed over time, but that
18   team was specific, I believe, for bringing
19   products to market and their life cycle
20   development with -- for clinical safety and
21   other issues.  A Project Team was very
22   specific to what it says, projects.
23   Q.    ProQuad was approved in 2005.
24   Correct?
25        MS. SCHMIDT:  Objection.

Page 35

1         AMY KEEGAN - HIGHLY CONFIDENTIAL
2         THE WITNESS:  I don't have the
3    date in front of me.  I believe that is
4    correct.
5    BY MS. ZINSER:
6    Q.    And this is from 2010.  Can you
7    tell me what role does a Product Development
8    Team play after a product is approved?
9         MS. SCHMIDT:  Objection.  To
10   the extent you know.
11        THE WITNESS:  The Product
12   Development Team evaluates the life
13   cycle of the product when new
14   manufacturing or formulation changes
15   are introduced.  They would be the team
16   that has responsibility and oversight
17   for management of any clinical studies.
18   Any new registrations for that product
19   would fall under the umbrella of that
20   team as well.
21   BY MS. ZINSER:
22   Q.    So new registrations, does that
23   mean if it was registered in a different
24   market, in a different country?
25   A.    Correct.  Introduction and

Page 36

1         AMY KEEGAN - HIGHLY CONFIDENTIAL
2    registration in a new market outside of the
3    US.
4    Q.    You can put that one to the
5    side as well.
6         I'm marking for identification
7    this as Keegan-3.  I'm sorry.
8         MR. KODROFF:  I was always told
9    to wait for after it was marked to hand
10   it out.  Following what I was told.
11             - - -
12        (Exhibit Keegan-3, 2/16/15
13   E-mail with attachment, MRK-KRA00618327
14   - 00618334, was marked for identification.)
15             - - -
16   BY MS. ZINSER:
17   Q.    This is an e-mail with a
18   starting Bates number 618327.  It's an e-mail
19   dated Monday, February 16, 2015, from a Stacey
20   Traina to a number of recipients including
21   yourself.  Do you know who Stacey Traina is?
22   A.    Yes.  Stacey Traina was for
23   some time the regulatory submission manager
24   commonly referred to as RSM.  And they are
25   responsible for coordinating both the SPMT,

Page 37

1         AMY KEEGAN - HIGHLY CONFIDENTIAL
2    which is Submissions Planning Management Team,
3    as well as serving as the administrator for
4    GRT, which is the Global Regulatory Team.
5    Q.    Now, reading the e-mail, do you
6    recall receiving this particular e-mail?
7    A.    I'd like to take a moment to
8    review.
9    Q.    Sure.
10   A.    I don't recall this specific
11   meeting.
12   Q.    Do you recall meetings of the
13   Submission Planning Management Team?
14   A.    Yes.
15        MS. SCHMIDT:  Objection.
16   BY MS. ZINSER:
17   Q.    Was the Submission Planning
18   Management Team, did that have a -- strike
19   that.
20        Was the Submission Planning
21   Management Team regulatory in function?
22        MS. SCHMIDT:  Objection.
23        THE WITNESS:  The Submission
24   Planning Management Team is a team that
25   is within the regulatory but it is

10 (Pages 34 - 37)

Appx19006

Page 38

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    tactical. So it is just to track the
3    status of where submissions are in
4    terms of readiness and preparation,
5    submission to the agency and approval.
6    BY MS. ZINSER:
7        Q.    Were the members of this team
8    responsible for drafting submissions in any
9    way?
10       A.    Yes. Members of this team
11   would draft submissions.
12           MS. SCHMIDT: Objection.
13   BY MS. ZINSER:
14       Q.    Direct you to the page -- page
15   6, it ends in 8333. Under "Team Membership"
16   your name is listed. The function area/role
17   is "CMC - V205C (core)." What does V205C
18   refer to?
19       A.    V205C is the product code for
20   MMR.
21       Q.    Is that a product code that's
22   used in submissions to the FDA?
23       A.    FDA?
24           MS. SCHMIDT: Objection.
25           THE WITNESS: We would use that

Page 39

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    product code as metadata in our
3    submissions to the FDA.
4    BY MS. ZINSER:
5        Q.    In parentheses it says, "core."
6    What does that mean?
7            MS. SCHMIDT: Objection.
8            THE WITNESS: That means that
9        anyone who is indicated as core is a
10       standing team member and attends
11       regardless of the agenda.
12   BY MS. ZINSER:
13       Q.    We can put that one aside.
14           MS. ZINSER: I'm marking this
15       next as Keegan-4. This is another
16       e-mail dated December 9, 2013.
17           - - -
18       (Exhibit Keegan-4, 12/9/13
19   E-mail with attachment, MRK-KRA01355908
20   - 01355910, was marked for identification.)
21           - - -
22   BY MS. ZINSER:
23       Q.    This is another e-mail from
24   Stacey Traina to a number of recipients
25   including yourself. It reads: "Attached

Page 40

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    please find the agenda for tomorrow's SPMT
3    meeting." Do you recall receiving this
4    e-mail?
5        A.    No, I do not.
6        Q.    Turn to the last page. Number
7    6 of the agenda reads: "Risk Management
8    Issues." Do you know what risk management
9    issues the SPMT would have been addressing?
10           MS. SCHMIDT: Objection.
11           THE WITNESS: No, I have no
12       knowledge of a specific risk.
13   BY MS. ZINSER:
14       Q.    The second bullet says,
15   "Significant changes to the existing risk
16   management plan." Were you aware of a risk
17   management plan?
18       A.    Yes, I am aware that a risk
19   management plan exists for MMR.
20       Q.    Can you describe the risk
21   management plan?
22           MS. SCHMIDT: Objection.
23           THE WITNESS: I have never read
24       it.
25   BY MS. ZINSER:

Page 41

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2        Q.    Do you have any understanding
3    of -- without having read the actual plan, do
4    you have any understanding of what the risk
5    management plan would cover?
6        A.    I do not.
7        Q.    Did you ever talk with anyone
8    about risk management issues?
9        A.    No, I have not.
10           MS. SCHMIDT: Objection.
11   BY MS. ZINSER:
12       Q.    Did you ever talk with anyone
13   about the risk management plan?
14           MS. SCHMIDT: Objection.
15           THE WITNESS: Yes, I have more
16       recently.
17   BY MS. ZINSER:
18       Q.    More recently. What did those --
19   what kind of issues were brought up in
20   discussing the risk management plan?
21           MS. SCHMIDT: Objection.
22           THE WITNESS: There were no
23       issues. It was simply a life cycle
24       update that was required to support
25       registration in new markets.

11 (Pages 38 - 41)

Appx19007

Page 42

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2  BY MS. ZINSER:
3      Q.    Who did you speak to about the
4  risk management plan?
5      A.    Amit Shah.
6      Q.    How do you spell that?  Is it
7  A-M-I-T?
8      A.    A-M-I-T is correct, and Shah is
9  S-H-A-H.  Among others.
10      Q.    If you wanted to find the
11  actual risk management plan and read it, who
12  would -- how would you go about doing that?
13      MS. SCHMIDT:  Objection.
14      THE WITNESS:  I would reach out
15      to the CSRM, the clinical safety and
16      risk management member of the Product
17      Development Team who is responsible for
18      the specific product.
19  BY MS. ZINSER:
20      Q.    We can put that one aside as
21  well.
22      MS. ZINSER:  I'm marking this
23      next exhibit as Keegan-5.
24               - - -
25      (Exhibit Keegan-5, Series of

Page 43

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2      e-mails with attachments, MRK-KRA01556156 -
3      01556183, was marked for identification.)
4               - - -
5  BY MS. ZINSER:
6      Q.    This exhibit is an e-mail dated
7  Friday, March 23, 2014, with starting Bates
8  number 1556156, and it's a series of e-mails
9  with a number of attachments.
10      A.    May I take a moment to --
11      Q.    Certainly.
12      A.    Thank you.
13      Q.    I'm first going to direct your
14  attention to the page ending in 6165.
15      A.    Okay.
16      Q.    The e-mail is dated February 28,
17  2014, from Emily Lee in Hong Kong to a Karen
18  Fisher Kowalchuk and Heather Jones.  Do you
19  know Emily Lee?
20      A.    I do not know her personally.
21  She's in Hong Kong.
22      Q.    Do you know Karen Fisher
23  Kowalchuk?
24      A.    The name looks familiar.
25      Q.    Do you know Heather Jones?

Page 44

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2      A.    Yes, I do know Heather.
3      Q.    Who is Heather Jones?
4      A.    Heather Jones was, she still
5  is, the regulatory affairs international
6  liaison for MMR vaccine.
7      Q.    I'm going to the body of the
8  e-mail, "Dear Karen and Heather,
9      "During the review of HKPC to
10  prepare for the safety update of ADEM, I am
11  aware of a discrepancy in the quantity of
12  mumps virus registered in HK and US/EU."
13      Do you know what HKPC stands
14  for?
15      MS. SCHMIDT:  Objection.
16      THE WITNESS:  I do not.
17  BY MS. ZINSER:
18      Q.    Do you know what ADEM stands
19  for?
20      MS. SCHMIDT:  Objection.
21      THE WITNESS:  I do not.
22  BY MS. ZINSER:
23      Q.    Below the chart the e-mail goes
24  on, "I believe the formulation of MMR II
25  should be the same in worldwide, please

Page 45

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2  correct me if my assumption is wrong.  Would
3  you please confirm which is the correct
4  quantity of mumps virus (12,500 TCID50 or
5  20,000 TCID50)?"
6      Does 12,500, is that -- can you
7  also say 4.1 log?
8      A.    That is correct.
9      Q.    And 20,000 could also be 4.3
10  log?
11      A.    Correct.
12      Q.    So if we use those interchangeably,
13  we are in agreement of what they mean.  Right?
14      A.    Yes.
15      Q.    Turning to page 6164.  The
16  response from Heather Jones says, "Dear Emily,
17      "Thanks for your note.  We have
18  not fully harmonized the mumps end expiry
19  specification in all markets.  The mumps end
20  expiry specification has evolved over time."
21      Do you know what that means,
22  that we have not fully harmonized the
23  specification?
24      MS. SCHMIDT:  Objection.
25      THE WITNESS:  I did not write

12 (Pages 42 - 45)

Page 46

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2  this e-mail. I can't speculate as to
3  what Heather meant.
4  BY MS. ZINSER:
5    Q.   Have you ever heard that term,
6  "fully harmonized specification" before?
7    A.   No, I have not.
8    Q.   Going up to the e-mail above
9  that, from Emily Lee to Heather Jones and
10 Karen Fisher Kowalchuk. It says, "You
11 mentioned 'We have not fully harmonized the
12 mumps end expiry specification in all
13 markets', then do you mean some countries like
14 Hong Kong still registered mumps end-expiry
15 potency 4.3 log...per dose...while some
16 countries have changed to 4.1 log...per
17 dose...?"
18       Was this your understanding,
19 that some countries had registered at 4.1 end
20 expiry and others were registered at 4.3?
21       MS. SCHMIDT: Objection.
22       THE WITNESS: That is my
23 understanding, yes.
24 BY MS. ZINSER:
25    Q.   It goes on, Then would you

Page 47

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2  please confirm the supply of MMR II to Hong
3  Kong is identical to the supply to US/EU which
4  contains 20,000 TCID of mumps in the vial of
5  vaccine but in documentation, US/EU registered
6  "not less than" 12,000 -- 12,500 TCID?
7        Do you know, is the supply of
8  vaccine the same throughout the world?
9    A.   Yes, there is one MMR vaccine
10 that is manufactured and distributed
11 worldwide.
12    Q.   I'm now going to page ending in
13 6162, the e-mail that begins on that page and
14 goes over to the next page. The e-mail, the
15 second paragraph from Emily Lee to Heather
16 Jones reads: "Would you please clarify if the
17 .5 millimeter dose of MMR II that currently
18 supplying to EU, US and Hong Kong contain not
19 less than 20,000 TCID of mumps virus although
20 the registered specification in the US is
21 12,500." [As read.]
22       So you said that it is the same
23 product that's supplied worldwide. Correct?
24    A.   That is correct.
25       MS. SCHMIDT: Objection to the

Page 48

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2  preamble from the document. The
3  question is confusing.
4  BY MS. ZINSER:
5    Q.   So as we established in the
6  earlier e-mail, there are different
7  specifications in different countries. Correct?
8        MS. SCHMIDT: Objection.
9        THE WITNESS: That is correct.
10 BY MS. ZINSER:
11    Q.   Some are registered at 4.1 for
12 end expiry and some are registered at 4.3?
13    A.   That is correct.
14    Q.   Sp if it's the same product and
15 it is registered as 4.1 in the US and the EU,
16 how can they be sure it will meet 4.3
17 elsewhere?
18       MS. SCHMIDT: Objection.
19       Objection to the whole line of
20       questioning because we're really asking
21       about product distribution in Hong Kong
22       which is --
23       MS. ZINSER: Her understanding
24       of the product.
25       MS. SCHMIDT: But it's

Page 49

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2  distribution of the product abroad,
3  which is not an issue in this case.
4  BY MS. ZINSER:
5    Q.   To the extent you can answer
6  it.
7    A.   Could you repeat the question?
8    Q.   If it's the same product, which
9  you already established, if the specification
10 is 4.1 in the US and the EU, how can you be
11 sure it will meet 4.3 elsewhere?
12    A.   The stability specification and
13 MMR quality standard remains at 4.3 recognizing
14 not all markets have approved the 4.1 yet.
15    Q.   On the page ending 6160 there's
16 an e-mail from Emily Lee to you and Heather
17 Jones asking: "Following are the documents
18 required as according to regulatory guideline,
19 please arrange and let me know if you have
20 difficulty to get any one of them." And
21 there's a list of seven documents that are
22 requested.
23       Do you recall receiving this
24 e-mail?
25    A.   It looks familiar.

13 (Pages 46 - 49)

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    Q.    On page ending in 6157 there is
3  an e-mail from you responding to Emily Lee.
4  It says, Please review the attached documents
5  from HQ -- requested from HQ for items 1
6  through 7 on your list. We will take a look
7  at -- do you recall sending documents in
8  response to this request?
9    A.    Yes, it seems familiar.
10    Q.    All right. So next we're going
11  to take a look at some of those documents that
12  are attached. All right. The document ending
13  in 1556169.
14        MS. SCHMIDT: I'm sorry, could
15    you repeat that?
16        MS. ZINSER: Sure. It's ending
17    in -- it's 1556169.
18        THE WITNESS: May I take a
19    moment to review?
20  BY MS. ZINSER:
21    Q.    Sure.
22    A.    Thank you.
23    Q.    This declaration is dated
24  May 23, 2014, and it's signed by you. Correct?
25    A.    That is correct.

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    Q.    Reading the beginning, "The US
3  FDA/CBER approved the application by Merck,
4  Sharp & Dohme Corp. (Merck) to revise the
5  mumps end expiry specification for M-M-RTMII
6  from 4.3...TCID...to 4.1...TCID...on 8
7  December 2007." [As read.]
8        So up until then every vial
9  that went out had to have 4.3 end expiry.
10  Correct?
11        MS. SCHMIDT: Objection.
12        THE WITNESS: That is my
13    understanding.
14  BY MS. ZINSER:
15    Q.    And end expiry was after
16  24-month shelf life. Correct?
17        MS. SCHMIDT: Objection.
18        THE WITNESS: Correct.
19  BY MS. ZINSER:
20    Q.    It goes on to read: While the
21  application to revise the mumps end expiry
22  specification was under review with the US
23  FDA/CBER, Merck also submitted the application
24  to replace human serum albumin (HSA) with
25  recombinant human serum albumin (rHA) in the

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2  manufacture of the measles, mumps and rubella
3  drug substances used to formulate M-M-RTMII to
4  health authorities worldwide. Since the
5  revision to the mumps end expiry specification
6  was not yet approved, it was not included in
7  the M-M-R II rHA dossier.
8        But it was included in the rHA
9  submission, wasn't it?
10        MS. SCHMIDT: Objection.
11        THE WITNESS: Could you clarify
12    which rHA submission?
13        MS. ZINSER: Okay. All right.
14    I am going to mark the next exhibit as
15    Keegan-6. I'm marking as Exhibit
16    Keegan-6 a document with Bates number
17    141789.
18        - - -
19    (Exhibit Keegan-6, 7/13/05
20    Letter, MRK-KRA00141789 & 00141790, was
21    marked for identification.)
22        - - -
23        THE WITNESS: Give me a moment,
24    please.
25  BY MS. ZINSER:

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    Q.    Sure.
3    A.    Okay. Thank you.
4    Q.    So this document is dated
5  July 13, 2005. It's a letter from Alison
6  Fisher at Merck to Norman Baylor at CBER. Do
7  you know Alison Fisher?
8    A.    I do know Alison Fisher.
9    Q.    Do you know what -- strike
10  that.
11        The third paragraph down it
12  reads: "In these sections, the mumps end
13  expiry potency has changed from 4.1 log...to
14  4.3 log...because the Mumps End Expiry
15  File...," and it gives the STN submission
16  tracking number?
17    A.    That is correct.
18    Q.    "...10176/5061) has not been
19  approved." Does that refresh your memory
20  about 4.1 not having not been approved?
21        MS. SCHMIDT: Objection.
22  Foundation.
23        MS. ZINSER: The next one,
24    Keegan-7. This is a document ending in
25    Bates number 256875.

14 (Pages 50 - 53)

Appx19010

Page 54

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2          - - -
3       (Exhibit Keegan-7, Two e-mails,
4    MRK-KRA00256875, was marked for
5    identification.)
6          - - -
7    BY MS. ZINSER:
8       Q.    So this document is two
9    e-mails, but I'm going to direct you to the
10   second e-mail or the earlier e-mail from
11   Heather Lynn Sinsel to, I guess, Heather Lynn
12   Sinsel, I guess it was a distribution list.
13   And the date of the e-mail is Monday, June 13,
14   2005.  The first paragraph reads -- oh, first
15   of all, do you know who Heather Lynn Sinsel
16   is?
17      A.    The name seems familiar, but I
18   couldn't --
19      Q.    The first paragraph reads:
20   Emerging issue - Alison Fisher recalled --
21   received a call from Daryl Miller (FDA) on
22   Friday, June 10th.  Do you know who Daryl
23   Miller is?
24      A.    I do not.
25      Q.    "Daryl Miller mentioned that in

Page 55

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    order to approve the rHA file, the Mumps End
3    Expiry potency in the label needs to be moved
4    from log10 4.1 TCID50 to log10 4.3 TCID50
5    because the Mumps End Expiry file is not yet
6    approved."
7          So going back to exhibit --
8    what exhibit were we on here?  The declaration,
9    Exhibit 5.
10      A.    Uh-huh.
11      Q.    To the paragraph of the
12   declaration that you signed, it reads: "Since
13   the revision to the mumps end expiry
14   specification was not yet approved, it was not
15   included in the M-M-R II rHA dossier."  But
16   according to Exhibit 7 it was included in the
17   rHA dossier.  Correct?
18      MS. SCHMIDT:  Objection.
19      THE WITNESS:  So it is not
20      clear to me whether -- I believe that
21      this document, the declaration in front
22      of me is referring to the Hong Kong
23      dossier, not to the USFDA dossier.
24   BY MS. ZINSER:
25      Q.    Well, earlier in that paragraph

Page 56

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    it's referring to the application for the
3    USFDA to revise the mumps end expiry, and
4    there's no mention of Hong Kong in here.
5    Correct?
6      MS. SCHMIDT:  Objection.
7      THE WITNESS:  I agree that
8      there's no mention of Hong Kong.
9    BY MS. ZINSER:
10      Q.    From documents from Exhibit 6
11   and 7, would you agree that 4.1 was initially
12   included in the rHA file?
13      MS. SCHMIDT:  Objection.
14      There's no foundation to establish that
15      she has any knowledge about what was in
16      the file because we haven't established
17      that she worked on the submission.
18      MS. ZINSER:  Well, she's
19      established -- she's stating that the
20      end expiry specification was not
21      included in the MMR II rHA dossier.
22      She signed this declaration.
23      MS. SCHMIDT:  But I think she
24      just explained that her understanding
25      was that it was a Hong Kong filing, not

Page 57

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    a US filing.
3    BY MS. ZINSER:
4      Q.    Moving on to the page ending in
5    6179.  This is another declaration dated
6    May 23, 2014, signed by you.
7      A.    May I take a moment to read it?
8      Q.    Sure.
9      A.    Thank you.  Thank you.
10      Q.    Reading the beginning of the
11   paragraph, The mumps component of measles,
12   mumps and rubella vaccine live (M-M-RTMII) had
13   initially been -- had been initially
14   registered and approved worldwide with a mumps
15   end expiry of either 5,000 or 20,000
16   TCID50/dose, which translates to a log scale
17   of 3.7 or 4.3 TCID50/dose, respectively.
18      The difference -- because we're
19   dealing with log scale, the difference between
20   3.7 and 4.3 is large, isn't it?
21      MS. SCHMIDT:  Objection.
22      THE WITNESS:  I don't know what
23      you mean by "large."
24   BY MS. ZINSER:
25      Q.    Well, it's a fourfold

15 (Pages 54 - 57)

1     AMY KEEGAN - HIGHLY CONFIDENTIAL
2  difference.  Correct?
3         MS. SCHMIDT:  Objection.
4         THE WITNESS:  I would have to
5     do the math, and I'm not good at doing
6     math in my head.
7  BY MS. ZINSER:
8     Q.    Well, I mean --
9     A.    So dividing 20,000 by 5,000,
10 yes.
11    Q.    Is four.  Okay.
12        So it was initially registered
13 and approved worldwide with an end expiry of
14 either 5,000 or 20,000 which translates to 3.7
15 or 4.3.  What studies supported the efficacy
16 at 3.7?
17        MS. SCHMIDT:  Objection.
18        THE WITNESS:  3.7 was a
19    specification.  It was actually written
20    as 5,000 in the various compendia at
21    the time that MMR II was either
22    introduced or early in its marketing
23    history.
24 BY MS. ZINSER:
25    Q.    What compendia are those?

1     AMY KEEGAN - HIGHLY CONFIDENTIAL
2     A.    Specifically the European
3  pharmacopeia.
4     Q.    Were there studies to support
5  it being listed as 3.7 in the compendia?
6     A.    I have no knowledge of that.
7     Q.    The end of that paragraph, the
8  last sentence, Additionally, potency values at
9  the end of shelf-life were derived differently
10 in the past for M-M-RTMII as they are at the
11 current time.
12        How are potency values derived
13 at the current time?
14        MS. SCHMIDT:  Objection.
15 BY MS. ZINSER:
16    Q.    To the extent you know.
17    A.    At the current --
18        MS. SCHMIDT:  Just to be clear,
19    at the time of the -- in 2014?
20 BY MS. ZINSER:
21    Q.    Fair enough.  2014.
22    A.    In 2014 the end of shelf-life
23 potencies were derived by clinical studies.
24    Q.    And which clinical studies were
25 those?

1     AMY KEEGAN - HIGHLY CONFIDENTIAL
2     A.    My understanding is that that
3  would be Protocol 007.
4     Q.    And they were derived differently
5  in the past.  Do you know how they were
6  derived in the past?
7     A.    As stated in this declaration
8  and referring to the 3.7, they were mandated
9  by the compendia.
10        MS. SCHMIDT:  Objection to the
11    last question.
12 BY MS. ZINSER:
13    Q.    The last paragraph of the
14 second -- the last sentence of the second
15 paragraph reads:  Please note that there --
16 that no change in the manufacturing or
17 formulation of the product was required to
18 meet the proposed end-expiry specification of
19 12,500 TCID.
20        Do you know what the
21 manufacturing target was at the time that you
22 wrote this declaration?
23    A.    My recollection is that it was
24 a 5.2 TCID50 target.
25    Q.    Do you know when the 5.2 target

1     AMY KEEGAN - HIGHLY CONFIDENTIAL
2  was implemented?
3     A.    My recollection is that was in
4  1999.
5     Q.    And going to the declaration on
6  the page ending in 6183, it's the last page.
7     A.    Thank you.
8     Q.    And it's a short one.  It
9  reads: "Merck, Sharp & Dohme Corp. (Merck)
10 manufactures one measles, mumps and rubella
11 virus vaccine, live (M-M-RTMII).  The same
12 M-M-RTMII vaccine is distributed world-wide."
13        Is that what you -- when you
14 said earlier that it's the same product
15 manufacturer, there are no changes in the
16 composition of the product distributed
17 worldwide?
18        MS. SCHMIDT:  Objection.
19        THE WITNESS:  There are no
20    differences in the composition of the
21    product distributed in the US or
22    worldwide.
23 BY MS. ZINSER:
24    Q.    So if there is a change to the
25 composition of the product in the US, the

16 (Pages 58 - 61)

Appx19012

Page 62

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    product that is sold here, that would be the
3    same -- the same changes would be in the
4    product distributed to other markets as well?
5        A.    That is correct.
6        Q.    Do you recall creating these
7    declarations?
8        A.    Yes, I do.  It seems familiar.
9        Q.    Do you recall where you got the
10   information to put in these declarations?
11       A.    Yes.  I would have reviewed the
12   approval letters and the cover letters and the
13   justification and rationale portions of the
14   filings that were required to support the end
15   expiry as well as the change from human serum
16   albumin to recombinant human albumin.
17       Q.    And that would have been the
18   change -- the filing for the change of -- from
19   HSA to rHA in the United States.  Correct?
20       A.    That is correct.
21       MS. SCHMIDT:  If you're
22   switching documents, would it be okay
23   if we took a break?
24       MS. ZINSER:  Sure.
25       VIDEOGRAPHER:  Off the record

Page 63

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    at 10:09.  This will end disc number
3    one.
4            - - -
5        (A recess was taken.)
6            - - -
7        VIDEOGRAPHER:  Back on the
8    record at 10:28.  Beginning of disc
9    number two.
10       MS. ZINSER:  I'm marking this
11   next document as Keegan-8.
12
13       (Exhibit Keegan-8, 9/30/20
14   E-mail with attachment, MRK-KRA01593726
15   - 01593737, was marked for identification.)
16            - - -
17   BY MS. ZINSER:
18       Q.    Keegan-8 is an e-mail with
19   Bates number starting 1593726.
20       A.    May I take a moment?
21       Q.    Sure.
22       A.    Thank you.
23       Q.    Did you review the document or
24   did you read the whole thing?
25       A.    I did read through the entire

Page 64

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    document.  Thank you.
3        Q.    So this document is an e-mail
4    dated September 30, 2010, from a Bonita
5    Stankunas to you with some attachments.
6    Reading from the first paragraph, "I have been
7    trying to piece together the past history with
8    what might have happened in UAE...."
9            Do you know what UAE stands
10   for?
11       A.    In this context it's United
12   Arab Emirates.
13       Q.    "...but of course I can't find
14   anything!  I'll look through my paper files
15   tomorrow.  I don't believe I would have sent
16   them a US CPP with a mumps potency of 5000 on
17   it."  What is CPP?
18       A.    CPP is -- I can't recall the
19   specific meaning of the acronym.  It's a
20   pharmaceutical certificate.  It lists the
21   composition of the product and certifies that
22   that is the approved product in the country of
23   issue.  In this case since it's indicated as
24   US, it would have been a United States
25   document.

Page 65

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2        Q.    So is this a document that is
3    used in other countries --
4        MS. SCHMIDT:  Objection.
5    BY MS. ZINSER:
6        Q.    -- when the product is marketed
7    in other countries?
8        MS. SCHMIDT:  Objection.  To
9    the extent you know.
10       THE WITNESS:  This document is
11       provided to the local offices as well
12       as to local regulatory authorities to
13       demonstrate that the product has been
14       approved by the USFDA.
15   BY MS. ZINSER:
16       Q.    When you say local agencies,
17   you mean the ones in other markets.  Correct?
18       A.    Yes.  Local means our offices
19   or regulatory authorities in countries outside
20   of the US.
21       Q.    In the next paragraph, "I
22   wonder if it is technically correct to say we
23   tightened the mumps expiry spec due to changes
24   in the potency model?  I know it's a different
25   submission but prior to the switch to rHA we

17 (Pages 62 - 65)

Appx19013

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2  also submitted a worldwide filing to change
3  the MEE to 12,500 from 20,000 or 5,000 -
4  depending on what the markets had registered.
5  Remember that one?  Here's the document Kati
6  put together.  Maybe you even helped with this
7  back in the day so may know more than I do."
8          What is a worldwide filing?
9          MS. SCHMIDT:  Objection.
10         THE WITNESS:  A worldwide
11     filing in this context, I didn't write
12     this e-mail, but to me worldwide filing
13     means a postapproval change that would
14     be supplied to any health authority
15     outside the United States which
16     requires recording of that change.
17 BY MS. ZINSER:
18     Q.    So has there been a worldwide
19 filing -- MEE is mumps end expiry?
20     A.    Yes.  MEE means mumps end
21 expiry.
22     Q.    To your knowledge, has there
23 been a worldwide filing to change the mumps
24 end expiry to 12,500 or 4.1?
25     A.    Yes, there has.

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2      Q.    Has been.  Do you know when
3  that worldwide filing happened?
4      A.    So it would have happened in
5  two stages, from my knowledge, from 2009
6  onward in CMC.  Prior to that, I have no
7  specific knowledge.  So from 2009 onward, the
8  dossier, that registration document which is
9  supplied worldwide to register in markets
10 outside of the US would have included the
11 update to the -- from -- to the 4.1 end
12 expiry.  And then subsequently, more recently
13 in the last two years, there was a specific
14 filing for those markets which had originally
15 approved the end expiry as 4.3 to update their
16 approved end expiry to 4.1.
17     Q.    So would this worldwide filing
18 be a -- you said dossier, would it be a master
19 document that would then be filed in
20 individual market's regulatory agencies, it
21 would be the same document?
22     MS. SCHMIDT:  Objection.
23     THE WITNESS:  Not necessarily.
24     Different markets have different
25     requirements so the documents may

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2      differ from market to market that are
3      included for that filing.
4  BY MS. ZINSER:
5      Q.    But the -- would the substance,
6  meaning the specifications, would be the same,
7  the specifications of the product?
8          MS. SCHMIDT:  Objection.
9          THE WITNESS:  Yes, that is
10     correct.
11 BY MS. ZINSER:
12     Q.    Do you know who would be
13 responsible for creating the worldwide filing,
14 for drafting it?
15     A.    From 2009 onward it would have
16 been what we referred to as an emerging
17 marketing team within CMC that was responsible
18 for registering new markets as directed by
19 global marketing.  And also then there was a
20 specific CMC scientist who did that work more
21 recently in the past two years.
22     Q.    Do you know who that specific
23 scientist was?
24     A.    Yes, it was Adriana Acosta.
25     Q.    And do you know who was on this

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2  emerging market team?
3      A.    Yes, I do.
4      Q.    And who was on it?
5      A.    Mick McGoldrick in CMC.  The
6  staff had changed over time and they no longer
7  exist.  But there were a few other folks.  I'm
8  trying to remember.  Brenda Lacotta, Sue
9  Hendracz, Lisa O'Brien.  And those are the
10 names that I recall.
11     Q.    Who is Bonita Stankunas?
12     A.    Bonnie Stankunas, at this time,
13 she was -- she still is in regulatory affairs
14 international.
15     Q.    In the e-mails she refers to a
16 document that Kati put together.  Is that
17 Kati, Kati Abraham?
18         MS. SCHMIDT:  Objection.
19         THE WITNESS:  I can't know
20     because I didn't write this document,
21     but Kati is generally Kati Abraham,
22     yes.
23 BY MS. ZINSER:
24     Q.    Do you know any other Katis at
25 Merck?

18 (Pages 66 - 69)

**Appx19014**

Page 70

1     AMY KEEGAN - HIGHLY CONFIDENTIAL
2     A.    I do not.
3     Q.    Turning to the document with
4  the Bates number 1593727 titled: "The Current
5  Manufacturing Target Titer for the Mumps
6  Component of Measles, Mumps, and Rubella Virus
7  Vaccine Live M-M-R®II."
8           Are you familiar with this
9  document?
10    A.    It looks familiar, yes.
11    Q.    Looks familiar.  Reading the
12 first paragraph, In discussion with the US and
13 EU release authorities in the mid-1990s, it
14 was identified that there was a difference
15 between Merck & Co., Inc.'s understanding and
16 the release authorities' interpretation of the
17 potency claims made for Measles, Mumps, and
18 Rubella Virus Vaccine Live, M-M-R®II.
19 Although Merck & Co., Inc. had viewed the
20 titers of 20,000 TCID for mumps as the minimum
21 potencies present at manufacture and release,
22 we were informed by the authorities that they
23 viewed the label claims as the minimum titers
24 at the end of shelf life for the product.
25           Were you aware of a difference

Page 71

1     AMY KEEGAN - HIGHLY CONFIDENTIAL
2  in interpretation of the potencies on the
3  label between Merck and the release
4  authorities?
5           MS. SCHMIDT:  Objection.
6           THE WITNESS:  No, I was not.
7  BY MS. ZINSER:
8     Q.    Going down that paragraph, it's
9  kind of hard to see with all the redactions,
10 but the sentence starting The US FDA?
11    A.    Does that sentence continue on
12 Center for Biologics?
13    Q.    Yes.  Yes.
14    A.    Thank you.
15    Q.    "The U.S. FDA's Center for
16 Biologics Evaluation and Research (CBER)
17 required that a clinical trial be performed to
18 support this lower mumps titer.  That trial
19 has completed enrollment and the sera are
20 being evaluated."
21           When they say "this lower mumps
22 titer," was that in order to change from 4.3
23 to 4.1?
24           MS. SCHMIDT:  Objection.
25           THE WITNESS:  I have no

Page 72

1     AMY KEEGAN - HIGHLY CONFIDENTIAL
2  knowledge, and I did not write this
3  document.
4  BY MS. ZINSER:
5     Q.    We'll go up further and read
6  the rest of the paragraph.  Beginning with the
7  sentence "In some countries...."
8     A.    Okay.
9     Q.    "In some countries, including
10 the U.S., end expiry titers of 20,000
11 TCID.. for mumps...were accepted, while in
12 others, the European Pharmacopeia monograph
13 specified titers of 5000 TCID.. for
14 mumps...were in effect.  Once those
15 discrepancies were understood, further
16 discussions ensued in an effort to harmonize
17 the specifications among all the countries to
18 be 5000 TCID.../dose for mumps."
19           So 5 -- as we established
20 before 5,000 equals 3.7 log?
21    A.    Yes.
22           MS. SCHMIDT:  Objection to the
23 framework before that.
24 BY MS. ZINSER:
25    Q.    And continuing with the

Page 73

1     AMY KEEGAN - HIGHLY CONFIDENTIAL
2  sentence we had read earlier, "The U.S.
3  FDA's...(CBER) required that a clinical trial
4  be performed to support this lower mumps
5  titer."  This lower mumps titer being 5,000 or
6  3.7?
7           MS. SCHMIDT:  Objection.
8  BY MS. ZINSER:
9     Q.    That's what we just read.  Correct?
10    A.    It's not clear to me --
11           MS. SCHMIDT:  Objection.
12           THE WITNESS:  -- from reading
13 this document.
14 BY MS. ZINSER:
15    Q.    Do you know if that clinical
16 trial that's being referred to there, was that
17 007?
18    A.    Since it's not stated, I can't
19 be for -- I can't...
20    Q.    After that redaction, "To
21 achieve this titer at release with assay
22 variability, M-M-R®II is currently (since
23 September 1999) formulated to a target mumps
24 titer of 5.2 log....  This titer is within our
25 historical experience and meets or exceeds the

19 (Pages 70 - 73)

Appx19015

Page 74

1     AMY KEEGAN - HIGHLY CONFIDENTIAL
2 registered minimum specification for all
3 countries.  Implementation of this
4 manufacturing target titer is an interim
5 measure that will be re-evaluated once the
6 results of the current expiry trial become
7 available."
8          Do you know if the product is
9 still being filled to a target of 5.2?
10     A.    To my knowledge, the product is
11 still being filled to a target of 5.2.
12     Q.    So it hasn't -- so it wasn't an
13 interim measure?
14          MS. SCHMIDT:  Objection.
15          THE WITNESS:  I didn't write
16     this document, so I can't speculate as
17     to what the author meant.
18 BY MS. ZINSER:
19     Q.    Do you know if that has been
20 reevaluated?
21     A.    I have no knowledge.
22          MS. SCHMIDT:  Objection.
23 BY MS. ZINSER:
24     Q.    So this document was sent by
25 Bonita, Bonnie?  Is it Bonnie?

Page 75

1     AMY KEEGAN - HIGHLY CONFIDENTIAL
2     A.    She does go by Bonnie.
3     Q.    I just want to make sure.  By
4 Bonnie Stankunas to you.  Correct?
5     A.    I can't verify that this was
6 the attachment that was provided with this
7 e-mail.
8     Q.    I can represent to you that it
9 was produced to us as the attachment to this
10 e-mail.  Do you typically read attachments or
11 e-mails that are sent to you?
12     A.    Yes, I do.
13     Q.    And you said that you were --
14 after reviewing or reading this document in
15 its entirety, it was familiar to you.  Correct?
16     A.    Yes.
17     Q.    Did you understand the meaning
18 of this document at the time?
19          MS. SCHMIDT:  Objection.
20          THE WITNESS:  I believe I did.
21 BY MS. ZINSER:
22     Q.    Did you ask any questions about
23 it, about what the different numbers referred
24 to?
25     A.    I can't recall.

Page 76

1     AMY KEEGAN - HIGHLY CONFIDENTIAL
2     Q.    Turning to the page, the next
3 page.
4     A.    Ending 729?
5     Q.    Yes.
6     A.    Thank you.
7     Q.    In the third line of the first
8 paragraph, In February 1998, using the
9 averaged measured release potencies of all
10 M-M-R®II batches for the 48 month period, 1993
11 to 1996, the mean manufacturing titers were
12 formalized as target manufacturing titers by
13 the inclusion in the SOP that details the
14 filling model used to formulate the product.
15 These target titers were 4.9 TCID for mumps.
16          Was it your understanding at
17 the time in February 1998 that the target
18 manufacture was 4.9?
19          MS. SCHMIDT:  Objection.
20          THE WITNESS:  In 1998, I
21     would -- I had no knowledge of this.  I
22     received this document in 2010.
23 BY MS. ZINSER:
24     Q.    The next paragraph, "Discussions
25 were held with CBER in 1998 and 1999 that

Page 77

1     AMY KEEGAN - HIGHLY CONFIDENTIAL
2 address the difference in interpretation of
3 the label potency claims for M-M-R®II."
4          Were you aware of discussions
5 between CBER and Merck about the difference in
6 interpretation of mumps label potency claims?
7          MS. SCHMIDT:  Objection.
8          THE WITNESS:  Not that I recall.
9 BY MS. ZINSER:
10     Q.    A little bit further down, "In
11 August 1999, CBER specified that the mumps
12 release titer for the mumps-containing live
13 virus vaccines be set at 5.0...."
14          Were you aware of CBER
15 insisting that the release be at 4. -- 5.0?
16          MS. SCHMIDT:  Objection.
17          THE WITNESS:  Not at that time.
18     I was not involved in regulatory in
19     1999.
20          MS. ZINSER:  I'm marking this
21     next exhibit as Keegan-9.
22               - - -
23          (Exhibit Keegan-9, 4/8/11 Memo,
24     MRK-KRA01456760, was marked for
25     identification.)

20 (Pages 74 - 77)

Appx19016

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2         - - -
3    BY MS. ZINSER:
4        Q.    This is a memo from you dated
5    April 8, 2011, Bates number 1456760.
6         Have you -- do you recall this
7    document?
8        A.    Yes, I do.
9        Q.    Did you -- do you recall that
10    you drafted this document?
11        A.    Yes, I did.
12        Q.    The first sentence, "In 1990,
13    the mumps virus end-expiry potency for
14    M-M-RTMII was established as 4.3 log...."
15         Did you -- was it your
16    understanding that the end expiry potency was
17    established as 4.3 in 1990?
18         MS. SCHMIDT: Objection. I
19    want to note for the record that
20    Amy's -- Amy prepared this memo at the
21    request of counsel.  There are versions
22    of it that were produced because they
23    were business communications.  So you
24    have them.  For the memo, I'm going to
25    assert a privilege over questions about

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    why she prepared it or how she prepared
3    it, but allow her to answer questions
4    about her interpretation or her
5    understanding what she wrote at the
6    time, what she meant to convey.  But I
7    just -- we're doing that not waiving a
8    privilege objection over why she
9    prepared the memo.
10         MR. KODROFF:  One second,
11    please.
12         - - -
13         (A discussion off the record
14    occurred.)
15         - - -
16    BY MS. ZINSER:
17        Q.    Do you know who Annie Sturgess
18    is, the recipient of this memo?
19        A.    Yes, I do.
20        Q.    Who is she?
21        A.    At the time, Annie Sturgess was
22    the functional head of vaccine CMC.
23        Q.    Who is Kimberly Duffy?
24        A.    Kimberly Duffy was my manager
25    in vaccine CMC at the time I authored this

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    memo.
3        Q.    Do you recall who asked you to
4    prepare this memo?
5         MS. SCHMIDT:  Objection.  I'm
6    going to instruct you not to answer.
7         MS. ZINSER:  I don't see how --
8    on what basis?
9         MS. SCHMIDT:  To the extent it
10    would reveal a privileged communication.
11         MS. ZINSER:  I think who asked
12    her to prepare it is not privileged.
13         MS. SCHMIDT:  Does it matter
14    who -- if it was a lawyer, it was a
15    lawyer at the company?
16    BY MS. ZINSER:
17        Q.    Was it a lawyer who asked you
18    to prepare this?
19        A.    I was asked to prepare this
20    memo at the request of Merck counsel.
21        Q.    I'm sorry, you were requested
22    to prepare it by Merck's internal counsel?
23        A.    Yes.  I was requested to
24    prepare the memo by Merck internal counsel.
25        Q.    Do you recall when you were

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    asked to prepare this?
3        A.    I don't recall the specific
4    date.
5         MR. KODROFF:  Off the record.
6         MS. SCHMIDT:  Do you need us to
7    step out?
8         VIDEOGRAPHER:  Off the record
9    at 10:53.
10         - - -
11         (A discussion off the record
12    occurred.)
13         - - -
14         VIDEOGRAPHER:  Back on the
15    record 10:55.
16    BY MS. ZINSER:
17        Q.    I'd like to go back to -- if we
18    can have both Keegan-8 and Keegan-9 on the
19    ready.  In Keegan-8, on the page ending in
20    3729, the paragraph under the heading "Mumps
21    Manufacturing Target Potency Change," the
22    first sentence, "Discussions were held with
23    CBER in 1998 and 1999 that addressed the
24    difference in interpretation of the label
25    potency claims for M-M-R®II.  Although the

21 (Pages 78 - 81)

Appx19017

Page 82

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2 Company had viewed the mumps titer of 4.3...as
3 the minimum potency to be present at release,
4 CBER indicated that they viewed this label
5 claim as the minimum titer to be present at
6 the end of the shelf life for the product."
7      Going back to Keegan-9, the
8 first sentence of the first paragraph, "In
9 1990, the mumps virus end-expiry potency for
10 M-M-RTMII was established as 4.3 log...."
11      When you drafted this document,
12 was it your understanding that 4.3 was
13 established as the end expiry in 1990?
14      MS. SCHMIDT: Objection.
15      THE WITNESS: So I have no
16      knowledge of 1990, I was not employed
17      by the company. My interpretation of a
18      CBER approval letter that I read stated
19      minimum potency as 4.3. I interpreted
20      that to mean mumps end expiry.
21 BY MS. ZINSER:
22    Q.    The date of Keegan-9 is
23 April 2011. Correct?
24    A.    Correct, that's the date.
25    Q.    So you drafted it sometime

Page 83

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2 after September 2010 when you had received
3 this e-mail and attachment?
4    A.    Yes, I agree that's the timing.
5    Q.    At the time you drafted
6 Keegan-9, did you know that discussions were
7 held with CBER in 1998 and 1999 about the
8 difference in interpretation of labeled mumps
9 potency?
10      MS. SCHMIDT: Objection.
11      THE WITNESS: I did not consult
12      that document in order to prepare this
13      memo.
14 BY MS. ZINSER:
15    Q.    The first -- again, I'm sorry.
16 On Keegan-9, the first sentence of the second
17 paragraph, "In September 1999, the mumps virus
18 potency formulation target was revised from
19 4.9...to 5.2...."
20      The last sentence, These
21 documents -- you know, I'll go a sentence
22 above that, "To confirm this statement, a
23 review of all US CMC regulatory supplements
24 and M-M-RTMII targeting procedures was
25 completed. These documents validated that

Page 84

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2 M-M-RTMII has been formulated to a.. mumps
3 virus potency of 5.2...since 1999?"
4      So this wasn't an interim
5 measure, was it, formulating to 5.2?
6      MS. SCHMIDT: Objection.
7      THE WITNESS: I don't
8      understand what you mean by that
9      question.
10 BY MS. ZINSER:
11    Q.    The attachment in Keegan-8,
12 I'll direct you to the page ending in 3727.
13 The end of the first paragraph. So at the end
14 of the -- so at the end of that paragraph,
15 sorry, again on Keegan-8, "Implementation of
16 this manufacturing target titer is an interim
17 measure that will be re-evaluated once the
18 results of the current expiry trial become
19 available."
20      In Keegan-9 from 2011, says,
21 "...that M-M-RTMII has been formulated to a
22 target mumps virus potency of 5.2...since
23 1999."
24      So that wasn't an interim
25 measure. If it's been manufactured to that

Page 85

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2 target potency since 1999, and this document
3 is from 2011, is it still ongoing?
4      MS. SCHMIDT: Objection.
5      THE WITNESS: I have no
6      knowledge of what Kati meant when she
7      wrote this memo.
8 BY MS. ZINSER:
9    Q.    Did you receive -- after
10 sending this memo, Keegan-9, to Annie Sturgess
11 and cc'd to Kimberly Duffy, did you receive
12 any response from either of them?
13      MS. SCHMIDT: Objection. You
14      can answer to the extent it doesn't
15      reveal any communications with counsel.
16      THE WITNESS: I can't recall if
17      I did receive feedback, but I would --
18      I did provide it to Annie for review.
19 BY MS. ZINSER:
20    Q.    Without revealing the content
21 of any requests from counsel, was this the
22 first time that you had been requested to
23 prepare something by Merck counsel?
24    A.    Yes.
25    Q.    Did you do any independent

22 (Pages 82 - 85)

Page 86

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2  research to determine the facts in Keegan-9?
3          MS. SCHMIDT: Objection.
4          THE WITNESS: Yes.
5  BY MS. ZINSER:
6      Q.   What documents as part of your
7  independent research did you look at?
8          MS. SCHMIDT: Objection. You
9      can answer the sources that you would
10     go to to answer questions about the
11     formulation targets. But because you
12     were answering question on behalf of
13     counsel, you can't answer as to the
14     steps you took to prepare the memo.
15     I'm going to instruct you not to
16     answer.
17         MS. ZINSER: I'm sorry, could
18     you -- can you read back the objection
19     from the beginning?
20                 - - -
21         (The court reporter read the
22     pertinent part of the record.)
23                 - - -
24  BY MS. ZINSER:
25     Q.   Can you answer as to the

Page 87

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2  sources that you looked at?
3          MS. SCHMIDT: Again, just to be
4      clear, I'm going to instruct you not to
5      answer the source, the specific steps
6      you took to prepare this memo. But to
7      the extent that there are sources that
8      you would go to to answer these types
9      of questions, you can answer questions.
10         MS. ZINSER: Okay. That's --
11     Yes, that's what I meant.
12         THE WITNESS: Could you restate
13     the question?
14         MS. ZINSER: Could you read
15     back the...
16                 - - -
17         (The court reporter read the
18     pertinent part of the record.)
19                 - - -
20  BY MS. ZINSER:
21     Q.   Without revealing the steps
22  that you took.
23     A.   Yes. As stated in the memo, I
24  looked at regulatory filings and I looked at
25  the manufacturing and standard operating

Page 88

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2  procedure.
3      Q.   Okay. Put Keegan-9 aside for
4  now and go back to Keegan-8. I'm going to ask
5  you to turn to page ending in 3730. In the
6  paragraph under the heading "Clinical Data
7  Available at the Current Mumps Potency," "This
8  titer of 5.2 log...is within our manufacturing
9  experience."
10         Do you have an understanding of
11  what that means, what manufacturing experience
12  means?
13     A.   I did not write --
14         MS. SCHMIDT: Objection.
15         THE WITNESS: I did not write
16     this memo. I don't know what Kati
17     meant.
18  BY MS. ZINSER:
19     Q.   Having read it -- having
20  received it and read it, presumably read it at
21  the time that you received it and then read it
22  again today, what is your understanding of
23  manufacturing experience?
24         MS. SCHMIDT: Objection.
25         THE WITNESS: That 5.2, just as

Page 89

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2  it says, is within the manufacturing
3  experience for the MMR II product. It
4  had been manufactured to 5.2.
5  BY MS. ZINSER:
6      Q.   Okay. Let's read the "Higher
7  titered batches (approximately 5.5 log...)
8  have been manufactured in the past in order to
9  support countries that required demonstration
10  of thermal stability as part of batch release.
11  In addition, higher titered batchers (5.3
12  log...) have been used in some clinical
13  trials.... No clinical trials were therefore
14  performed prior to effecting the current
15  change."
16         Have there been, to your
17  knowledge, any clinical trials to determine
18  the safety of titered -- batches titered at
19  5.2 and above?
20         MS. SCHMIDT: Objection.
21         THE WITNESS: I have no
22     knowledge of the clinical studies.
23  BY MS. ZINSER:
24     Q.   The next paragraph, "The
25  effected change is within our historical

23 (Pages 86 - 89)

Appx19019

1       AMY KEEGAN - HIGHLY CONFIDENTIAL
2   experience.  However, the revision of the
3   defined target titer for mumps in
4   September 1999 has resulted in a higher
5   percentage of batches on the market with this
6   higher potency.  The effect of these batches
7   on the passively reported adverse experiences
8   was reviewed.  An evaluation of the adverse
9   experiences reported to the Company through
10  analysis of Merck & Company, Inc.'s WAES,
11  (Worldwide Adverse Event Reporting System)
12  database indicates that the current product
13  has not resulted in a significant change in
14  the pattern, type or frequency of the adverse
15  experiences reported."  [As read.]
16      Do you have any understanding
17  of what the Worldwide Adverse Event Reporting
18  System is?
19      MS. SCHMIDT:  Objection.
20      THE WITNESS:  I am not a
21      medical doctor and I am not in a
22      clinical safety risk management or
23      pharmacovigilance.  My understanding is
24      only very general.
25  BY MS. ZINSER:

1       AMY KEEGAN - HIGHLY CONFIDENTIAL
2       Q.   Could you give me your general
3   understanding?
4       A.   My general understanding of
5   this is that as reports come from the field,
6   from the physicians or users of Merck
7   products, that they are assessed through this
8   database and reported to the agency.
9       Q.   And that sentence, "passively
10  reported," that means that patients or parents
11  of patients, since it's little kids getting
12  the vaccines, they report adverse events on
13  their own initiative.  Correct?
14      MS. SCHMIDT:  Objection.  If
15      you know.
16      THE WITNESS:  I don't
17      specifically know what the term
18      passively means in the context of this.
19      MS. ZINSER:  I'm marking this
20      as Keegan-10.
21           - - -
22      (Exhibit Keegan-10, E-mail
23      chain, MRK-KRA01470854 - 01470858, was
24      marked for identification.)
25           - - -

1       AMY KEEGAN - HIGHLY CONFIDENTIAL
2   BY MS. ZINSER:
3       Q.   Keegan-10 is an e-mail chain
4   starting with the Bates number 1470854.
5       A.   If I could have a moment to
6   review, please?
7       Q.   Sure.  If you're going to read
8   the whole thing, I think we should go off the
9   record.
10      A.   Yeah, I'm going to just scan --
11      Q.   Okay.  That's fine.
12      A.   These couple pages that I
13  haven't seen.  Thank you.
14      Q.   Did you skim it or did you read
15  the whole thing?
16      A.   I did read through it.
17      Q.   Do you have any recollection of
18  this e-mail thread or chain?
19      A.   Yes, it seems familiar to me.
20      Q.   Turning to the page ending in
21  0856, you can see that that is the same e-mail
22  from Bonnie Stankunas as was in Keegan-8.
23  Correct?
24      A.   Could I --
25      Q.   Sure.

1       AMY KEEGAN - HIGHLY CONFIDENTIAL
2       A.   Yes, I agree they're the same.
3       Q.   Again, just from -- to read
4   from Ms. Stankunas' e-mail, the second
5   paragraph, "I wonder if it is technically
6   correct to say we tightened the mumps expiry
7   spec due to changes in the potency model?"
8       Did you have an understanding
9   of what tightened -- what it means to tighten
10  the mumps expiry spec?
11      MS. SCHMIDT:  Objection.
12      THE WITNESS:  I did not write
13      this e-mail.  I don't know what Bonnie
14      meant.
15  BY MS. ZINSER:
16      Q.   If you didn't know what she
17  meant, would you have asked her what she
18  meant?
19      A.   Unlikely since the subject of
20  this e-mail train is to resolve the registered
21  expiry specification in UAE.
22      Q.   Turning to the page ending in
23  0855, this is your response to Bonnie
24  Stankunas.
25      The second paragraph reads, "I

24 (Pages 90 - 93)

Appx19020

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2   spent some time plowing through files
3   yesterday and found very limited info. The
4   MEE status is really confusing, and it's very
5   hard to piece together.  EU, NZ and Aus...,"
6   which I'm assuming that's European Union, New
7   Zealand and Australia?
8      A.    That is correct.
9      Q.    ...are clear because rHA was
10  filed with the 4.1 (12,500) expiry spec.  US
11  was originally filed with the 4.1 (12,500),
12  withdrawn/refiled with 4.3 (2,000) [sic];
13  there the paper trail stops within CMC.
14      Do you know why the US was --
15  the US rHA file was withdrawn and re-filed
16  with 4.3?
17      MS. SCHMIDT:  Objection.
18      THE WITNESS:  Yes, I do.
19  BY MS. ZINSER:
20      Q.    Could you explain why?
21      A.    Yes.  We looked at a document
22  earlier which was communications that Alison
23  Fisher had with USFDA CBER and as stated,
24  because the mumps and the expiry filing had
25  not yet been approved and the rHA and mumps

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2   end expiry filings were being reviewed by the
3   agency simultaneously, they requested that the
4   rHA filing go to the currently approved
5   specification.
6      Q.    Jumping ahead to the fourth
7   paragraph of your e-mail, "I was involved in
8   the mumps end expiry trial activities
9   (including the switch to 1x6 and eventually
10  calibration), but the CMC side was hazy to me
11  back then."
12      Does the mumps end expiry trial
13  activities, does that refer to Protocol 007?
14      A.    It's not stated here, but
15  generally that would be my understanding.
16      Q.    How are you involved in the
17  mumps end expiry trial activities?
18      MS. SCHMIDT:  Objection.
19      THE WITNESS:  So as stated, I
20      was part of the laboratory
21      implementation of pulling together the
22      change in the assay format to 1x6, and
23      calibration to the reference standard.
24  BY MS. ZINSER:
25      Q.    What does 1x6 mean for the

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2   assay format?
3      A.    A 1x6 means that one vial of a
4   particular batch of MMR vaccine product would
5   be tested in six replicates of the mumps
6   potency assay, meaning the infectivity assay
7   that is used to assign potency to batches.
8      Q.    So they would test the same
9   batch or the same sample six times?
10      A.    Not the same sample.  Vials
11  from the same batch.
12      Q.    So vials from the same batch.
13  So they would test six vials from one batch,
14  is that -- I'm sorry, I'm just wondering where
15  the 1 and 6 and --
16      A.    Yes.  The number --
17      MS. SCHMIDT:  Objection.
18      THE WITNESS:  The number 1
19      refers to how many vials are tested in
20      each replicate.  And since there are
21      six replicates, that's the second
22      number, six vials are tested in total.
23  BY MS. ZINSER:
24      Q.    I guess maybe a better question
25  is, what is a replicate?

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2      A.    A replicate is defined in the
3   context of the mumps infectivity assay as one
4   vial and an individual preparation of Vero
5   cell suspension which is used to measure the
6   infectivity.
7      Q.    That paragraph goes on, "I
8   recall we ran a clinical trial to support the
9   mumps expiry claims.  Expiry specifications
10  are, in my experience, solely based on minimum
11  efficacious dose proven in the clinic.  If the
12  minimum dose was raised that would cause a
13  change in target/model, not the other way
14  around."
15      What did you mean by that, that
16  last sentence?
17      A.    Looking back on it, I don't
18  know what my intent was in 2010.
19      Q.    So reading that sentence again,
20  If the minimum dose was raised, that would
21  cause a change in the target/model, not the
22  other way around.
23      Does that mean that the target
24  or model is result based?
25      MS. SCHMIDT:  Objection.

25 (Pages 94 - 97)

Appx19021

1       AMY KEEGAN - HIGHLY CONFIDENTIAL
2       THE WITNESS:  Could you repeat
3  the question, please?
4  BY MS. ZINSER:
5     Q.   Again, the sentence, if the
6  minimum dose was raised, that would cause a
7  change in the target/model, not the other way
8  around.  Does that mean -- okay.  So here, if
9  the minimum dose was lowered as it was as a
10  result of the label change, it was lowered
11  from 4.3 to 4.1.  Correct?
12    A.   Yes.
13    Q.   That would cause a change in
14  the target/model, not the other way around.
15  Does that mean that the target/model is based
16  on the results that you want to get?
17      MS. SCHMIDT: Objection.
18      THE WITNESS:  I don't think you
19  stated that as per the discussion in
20  this e-mail.  It is actually the
21  inverse.  So if you -- Bonnie made the
22  statement trying to ascribe some
23  meaning to, the second paragraph, "I
24  wonder if it is technically correct to
25  say we tightened...due to changes in

1       AMY KEEGAN - HIGHLY CONFIDENTIAL
2  the potency model?"  And I'm saying the
3  opposite.
4  BY MS. ZINSER:
5    Q.   You can put that one aside.
6      MS. ZINSER:  I'm marking this
7  as Keegan-11.
8          - - -
9      (Exhibit Keegan-11, Series of
10  e-mails, MRK-KRA01364795 - 01364798,
11  was marked for identification.)
12          - - -
13  BY MS. ZINSER:
14    Q.   Keegan-11 is a series of
15  e-mails dated August 2012 with the Bates
16  numbers 1364795.
17    A.   I'd like to take a moment to
18  review.
19    Q.   Again, I mean, it's, you know,
20  three or four pages of e-mails.  If you want
21  to read the whole thing, can we go off the
22  record?
23      MS. SCHMIDT: I think it
24  probably depends on what you want to
25  do.  If you have a point that you want

1       AMY KEEGAN - HIGHLY CONFIDENTIAL
2  to direct her to, maybe she can refresh
3  or review it.
4      MS. ZINSER:  Okay.
5      MS. SCHMIDT:  But if you do
6  want her to read them all --
7      MS. ZINSER:  No.  I mean, I can
8  point to the parts that, you know, I
9  have questions about.
10      MS. SCHMIDT:  Do you need a
11  minute to review?
12      THE WITNESS:  I would like to
13  take a minute to review.
14      MS. ZINSER:  Then I'd like to
15  go off the record just so she can take
16  time to review.
17      VIDEOGRAPHER:  Off the video?
18  Off the record at 11:21.
19          - - -
20      (A recess was taken.)
21          - - -
22      VIDEOGRAPHER:  Back on the
23  record 11:23.
24  BY MS. ZINSER:
25    Q.   I'm going to direct you to the

1       AMY KEEGAN - HIGHLY CONFIDENTIAL
2  first e-mail in the chain on the page ending
3  in 4797.
4    A.   Yes.
5    Q.   It's an e-mail from Markella
6  Saliaris to you and Donna Zacholski.
7    A.   Zacholski.
8    Q.   The subject is "URGENT LEAD
9  review requested for M-M-R II -- Due by 9 AM
10  Friday the 31st of August."
11      Who is Markella Saliaris?
12    A.   Markella was an employee in the
13  worldwide product labeling group.
14    Q.   And what is the world -- do you
15  know what the worldwide product labeling
16  group, what their function was?
17    A.   I know very generally.  I was
18  never in product labeling.
19    Q.   Sure.
20    A.   Is to maintain and revise the
21  product label as required.
22    Q.   And who is Donna Zacholski?
23    A.   At the time of this e-mail,
24  Donna Zacholski was the regulatory liaison for
25  MMR II.

26 (Pages 98 - 101)

Appx19022

Page 102

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2         Q.    The e-mail reads, "Dear Donna
3    and Amy,
4              "...please find the PC and PPI
5    for M-M-R II for Brazil requiring your urgent
6    review and approval."
7              What is the PC?
8         A.    I don't recall what the PC is.
9    Oh, product circular.
10        Q.    Product circular, okay.  And
11   the PPI?
12        A.    I believe that the PPI is the
13   prescribing information.
14        Q.    Is the circular, is that
15   another word for the label?
16             MS. SCHMIDT:  Objection.
17             THE WITNESS:  Yes, we do use
18        the term product circular and label
19        interchangeably.
20   BY MS. ZINSER:
21        Q.    And prescribing information, is
22   that another component of the label or the
23   insert?
24        A.    Yes.
25             MS. SCHMIDT:  Objection.

Page 103

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2             THE WITNESS:  It's considered a
3        product label.
4    BY MS. ZINSER:
5         Q.    And what would your role be in
6    reviewing and approving the PC and PPI?
7         A.    As a CMC, I would be
8    responsible for reviewing the portions of that
9    label that are specific to manufacture and
10   quality or control.  For example, the
11   composition that is stated in the label, I
12   would verify that against our register
13   documents.
14        Q.    Would that include potency?
15        A.    Yes, that would include potency.
16        Q.    Going up to the e-mail above
17   that which the heading starts on an earlier
18   page, it's from you back to Markella Saliaris
19   and to Donna Zacholski.  And the second
20   paragraph, "Note, resolution of the mumps end
21   expiry potency may not be able to be
22   specifically resolved today.  In principle, I
23   do not agree with listing the MEE potency as
24   5000 since our stability and targeting practices
25   do not necessarily support the 5000."

Page 104

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2             What did you mean by that?
3         A.    As we reviewed earlier, the
4    5,000 was specifically set as mandated by the
5    European Pharmacopeia, and as the basis for
6    potency as measured in BFC-1 cells.  Since
7    that was not the measure of potency, it was my
8    opinion that that was not appropriate to put
9    in the label.
10        Q.    So even though the European
11   Pharmacopeia compendia lists 3.7, there's
12   nothing beyond the pharmacopeia that supports
13   3.7.  Correct?
14             MS. SCHMIDT:  Objection.
15             THE WITNESS:  I do need to
16        clarify that that was the European
17        Pharmacopeia at very early time.  The
18        pharmacopeia today does not include
19        that.  It includes the statement where
20        otherwise authorized or justified,
21        meaning if approved in the market.
22   BY MS. ZINSER:
23        Q.    So setting aside the
24   pharmacopeia -- I don't know why I have such a
25   hard time saying it.  Setting that aside, do

Page 105

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    you -- are you aware of any other studies
3    supporting 3.7?
4             MS. SCHMIDT:  Objection.
5             THE WITNESS:  No, I'm not aware
6        of any studies.
7    BY MS. ZINSER:
8         Q.    I'm going to bring you to the
9    first page, the e-mail that is from you dated
10   August 31, 2012, to Donna Zacholski, Markella
11   Saliaris and Bonnie Stankunas.
12        A.    I'm sorry, that is the first
13   page?
14        Q.    The first page, yes.
15        A.    Thank you.
16        Q.    It says, Please wait.  I
17   started reviewing the Brazil documents and
18   formulating specific responses regarding the
19   registration.  I was planning to copy Bonnie
20   on the replies, as well.  I am finding there
21   is quite a bit of inconsistency among the
22   documents we provided.
23             "Note, this discussion has been
24   on-going since 2010.
25             "I agree we release higher to

27 (Pages 102 - 105)

Page 106
1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2  meet higher expectations, BUT we continually
3  perpetrate errors with this product for the
4  sake of expediency, which creates more work
5  and confusion in the end."
6        What did you mean by that?
7        MS. SCHMIDT: Objection. You
8    can answer.
9  BY MS. ZINSER:
10   Q.   You can answer.
11   A.   Which specific --
12   Q.   I'm sorry, your -- fair enough.
13       The last paragraph beginning "I
14  agree we release higher to meet higher
15  expectations...," that entire sentence.
16   A.   So the statement "I agree we
17  release higher to meet higher expectations,"
18  refers to the difference between 5,000 and
19  12,500 which is today's expectation, and was
20  the expectation in 2012. When I say
21  continually perpetrate errors, that is
22  specific to the documentation involved. If
23  you refer back to Markella's original, she's
24  requesting an urgent review, and to include
25  the 5,000 as a matter of expediency to resolve

Page 107
1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2  request from the subsidiary, which I do not
3  agree with in my opinion.
4    Q.   So the higher expectations was
5  the 4.1 or the 4.3 as opposed to the 3.7?
6        MS. SCHMIDT: Objection.
7        THE WITNESS: Correct.
8  BY MS. ZINSER:
9    Q.   You would need to release the
10  product at a higher potency in order to meet
11  that higher potency at end expiry. Correct?
12       MS. SCHMIDT: Objection.
13       THE WITNESS: No, the product
14   is still released at the same level.
15       MS. ZINSER: I'm going to mark
16   this next exhibit as Keegan-12.
17        - - -
18    (Exhibit Keegan-12, Series of
19    e-mails, MRK-KRA01580006 - 01580015,
20    was marked for identification.)
21        - - -
22       THE WITNESS: Can I take a
23   moment?
24  BY MS. ZINSER:
25    Q.   Sure. Are you going to review

Page 108
1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2  the whole thing?
3    A.   Yes.
4        MS. ZINSER: Can we go off the
5    record?
6        VIDEOGRAPHER: Off the record
7    at 11:31.
8        - - -
9        (A recess was taken.)
10        - - -
11       VIDEOGRAPHER: Back on the
12   record 11:34.
13  BY MS. ZINSER:
14    Q.   So Keegan-12 is a series of
15  e-mails with some attachments beginning with
16  Bates number 1580006. I'm going to direct you
17  to the first e-mail on the chain, the page
18  ending in 0007 from Keith Bailey to Hesham
19  Mohamed Fahmy and Dana Metzger. Do you know
20  who any of those people are?
21    A.   Yes, I know both Hesham and
22  Dana.
23    Q.   Who is Hesham?
24    A.   Hesham is a statistician for
25  Merck.

Page 109
1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    Q.   Who is Dana or Dana?
3    A.   It's Dana.
4    Q.   Dana, okay.
5    A.   At the time of this communication,
6  Dana was the area head for potency testing in
7  the quality control laboratories.
8    Q.   Do you know who Keith Bailey
9  is?
10    A.   I do.
11    Q.   Who is Keith Bailey?
12    A.   At the time of this communication,
13  Keith Bailey was in MMR technology.
14    Q.   The e-mail says, "Kick off
15  meeting to develop specification for min-max
16  range for MMR potency. We need to develop
17  these range specifications ASAP."
18        Were you aware of a meeting or
19  a need at this time in December of 2012 to
20  develop specifications for a min-max range for
21  MMR potency?
22        MS. SCHMIDT: Objection.
23        THE WITNESS: So reading the
24   entirety of this e-mail chain, it is
25   clear to me that this is to develop

1       AMY KEEGAN - HIGHLY CONFIDENTIAL
2    acceptance criteria for performance
3    qualification of technical transfer of
4       MMR II to the Durham facility.
5    BY MS. ZINSER:
6       Q.    What indicates that to you,
7    that that's the context?
8       A.    On the first page, not the
9    first communication, the one from Amy to
10   Hesham, Kim Duffy, Colleen Godshall, Phil
11   Bennett, et al., where it starts, "I am in
12   Maryland...."
13         One, two, three, the third
14   paragraph, "...worth through Colleen as the
15   Durham tech transfer lead."
16      Q.    So Keith's e-mail on the
17   previous page, this was not developing
18   specifications for a min-max range for MMR
19   potency for the product?
20         MS. SCHMIDT: Objection.
21         THE WITNESS: My understanding
22      of this communication and remembrance
23      of this communication, it is not the
24      min-max range for the product in the
25      quality standard specifically to

1       AMY KEEGAN - HIGHLY CONFIDENTIAL
2      develop acceptance criteria for the
3      performance qualification of the
4      product at Durham.
5    BY MS. ZINSER:
6       Q.    Can you define acceptance
7    criteria --
8       A.    Yes. It's a --
9       Q.    -- for a layman?
10      A.    For a scientist at Merck,
11   specifications and acceptance criteria have
12   very specific meanings. The specification is
13   the quality standard requirements, those were
14   specifications which must be met in order to
15   release and distribute product to the market.
16   Performance qualification has many -- much
17   more testing to demonstrate consistency of the
18   lyophilization cabinet, the consistency
19   cabinet to cabinet and other parameters that
20   must be measured to satisfy agency
21   requirements to demonstrate the consistency of
22   the product in those cabinets and on that
23   site.
24      Q.    So there are various acceptance
25   criteria that will be established for each of

1       AMY KEEGAN - HIGHLY CONFIDENTIAL
2    those parts, you know, for different parts of
3    the -- or different processes?
4       MS. SCHMIDT: Objection.
5         THE WITNESS: There are more
6      parameters that are evaluated during
7      performance qualification that need to
8      be defined.
9    BY MS. ZINSER:
10      Q.    So next I'll direct you to some
11   of the attachments to this -- let's just --
12   I'll go back.
13         The first e-mail on the first
14   page is from Phil Bennett to you, Hesham,
15   Kimberly Duffy and Colleen Godshall. He's
16   forwarding several attachments that says are 8
17   to 10 years old. Who is Phil Bennett?
18      A.    Phil Bennett is a statistician
19   at Merck.
20      Q.    I think we went over that.
21         All right. Going to the first
22   attachment which begins the page ending in
23   0008. This is a memo from Phil Bennett to
24   Mark Galinski, dated February 9, 2004. Who is
25   Mark Galinski?

1       AMY KEEGAN - HIGHLY CONFIDENTIAL
2       A.    Mark Galinski, at the time that
3    this memo was authored, would have been a
4    scientist within biolicensing or a CMC group.
5       Q.    And after the redacted portion
6    in the body of the memo under "SUMMARY," "The
7    above referenced memos report the stability
8    and minimum release specifications for mumps
9    and rubella components of M-M-R®II. This
10   report uses the same stability determinations
11   with slightly different shelf life storage
12   conditions, a reduced minimum expiry of
13   4.1...per dose for mumps, and 1x12 release
14   assay testing to calculate the required
15   minimum release specifications for mumps and
16   rubella."
17         And then in the chart you'll
18   see in the last row of the chart the
19   "Calculated Minimum Release Spec" for mumps is
20   5.0.
21         Do you know why they were using
22   a minimum -- a reduced minimum expiry of 4.1
23   at this time?
24         MS. SCHMIDT: Objection.
25         THE WITNESS: I did not

29 (Pages 110 - 113)

Appx19025

Page 114

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    write or receive this memo, so I --
3    BY MS. ZINSER:
4        Q.    I understand.  But do you have
5    an independent understanding of why they would
6    be using 4.1 at this time?
7            MS. SCHMIDT:  Objection.
8            THE WITNESS:  I would only --
9        my opinion would be given the date of
10       this memo at 2004, mumps end expiry of
11       4.1 had not yet been approved by USFDA.
12   BY MS. ZINSER:
13       Q.    Turning the page to 0009.  The
14   first paragraph reads, "The loss estimates and
15   standard errors that are used to determine the
16   minimum release potency specification limits
17   needed to ensure with 95 percent probability
18   that.. minimum expiry potency would be met at
19   the end of...shelf life are listed below."
20   [As read.]
21           And then below the chart the
22   paragraph starting, "The minimum release
23   potency is calculated...."
24           "The minimum release potency is
25   calculated using the minimum potency at expiry

Page 115

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    (4.1 log.../dose per Mumps...) and adding the
3    total loss plus a factor of 1.65 times the
4    square root of the total variance.  This gives
5    the minimum release potency that will provide
6    95 percent probability of meeting the expiry
7    limit." [As read.]
8            And below that there is a
9    formula.  Is this the stability model --
10           MS. SCHMIDT:  Objection.
11   BY MS. ZINSER:
12       Q.    -- for the MMR II product?
13           MS. SCHMIDT:  Objection.
14           THE WITNESS:  This does not --
15       I don't understand, can you define what
16       you mean by "stability model"?
17   BY MS. ZINSER:
18       Q.    Is it -- have you heard the
19   term "stability model" be used before in your
20   work at Merck?
21           MS. SCHMIDT:  Objection.
22           THE WITNESS:  It's not a term
23       that I commonly use, no.
24   BY MS. ZINSER:
25       Q.    Have you heard the term "fill

Page 116

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    model"?
3        A.    Yes, fill model is familiar to
4    me.
5        Q.    What is a fill model?
6            MS. SCHMIDT:  Objection.
7            THE WITNESS:  The fill model is
8        a calculation that considers what the
9        minimum expiry for the product is,
10       accounts for the variability in the
11       testing, in the variability in
12       stability loss estimates which are used
13       to back calculate what the minimum
14       release potency must be to assure that
15       the product will meet minimum potency
16       at the end of shelf life.
17   BY MS. ZINSER:
18       Q.    So you start with what you know
19   what the minimum expiry has to be because it's
20   on the label as what was approved by CBER and
21   you do the calculations and that tells you
22   what you need to release the product, what
23   potency you need to release the product in
24   order to reach that?
25           MS. SCHMIDT:  Objection.

Page 117

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    BY MS. ZINSER:
3        Q.    In order to ensure that you
4    will have that at end expiry.  Correct?
5        A.    That is my understanding.
6        Q.    So in this particular model,
7    you're using end expiry of 4.1 for mumps.  And
8    if you look in the chart, there is the "Room
9    Temperature (Sealing/Inspection/Packaging)" of
10   40 hours.  Do you see that?
11       A.    Yes, I do.
12       Q.    And the calculations in the box
13   at the bottom brings to a "Minimum Release" of
14   4.92 which they say they conservatively
15   rounded up to 5.0?
16           MS. SCHMIDT:  Objection.
17   BY MS. ZINSER:
18       Q.    Is that correct?  Did I read
19   that correctly?
20       A.    I agree that the memo states
21   that.
22       Q.    Do you know what the -- going
23   back to the first page, just to clarify some
24   terms.  The first page of that memo, yeah, not
25   the e-mail.  In the chart it says, "TOR

30 (Pages 114 - 117)

Page 118

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2 (Packaging Operations) 40 hours." Do you know
3 what TOR stands for?
4      A.   I do.
5      Q.   What does it stand for?
6      A.   Time out of refrigeration.
7      Q.   Time out of refrigeration. And
8 that accounts for, like it says on the next
9 page, "Sealing/Inspection/Packaging"?
10      MS. SCHMIDT: Objection.
11      THE WITNESS: I'm sorry, could
12    you direct me to where you see that?
13 BY MS. ZINSER:
14      Q.   In the chart under "Room
15 Temperature."
16      A.   Yes, I believe so.
17      Q.   So based on a minimum expiry of
18 4.1, the time out of -- they're using a time
19 out of 40 hours, as indicated by the earlier
20 page?
21      MS. SCHMIDT: Objection.
22      THE WITNESS: 40 hours for that
23    specific parameter, yes.
24 BY MS. ZINSER:
25      Q.   And that gives us a minimum

Page 119

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2 release of 5.0. Do you know what the 1.65
3 factor is?
4      MS. SCHMIDT: Objection.
5 BY MS. ZINSER:
6      Q.   Do you know what that refers
7 to?
8      A.   So I'm not a statistician --
9      Q.   Sure.
10      A.   -- but that is the factor that
11 is used in the statistical equations to
12 approximate 95 percent confidence intervals.
13      Q.   Isn't 1.65 the factor that's
14 used for 90 percent probability?
15      MS. SCHMIDT: Objection.
16      THE WITNESS: I'm not a
17    statistician, I don't know.
18 BY MS. ZINSER:
19      Q.   I'm going to direct you to the
20 next memo which starts on the page ending
21 0010. It is another memo from Phil Bennett to
22 Mark Galinski, but dated March 29, 2004. It
23 says, "The above referenced memo reports the
24 stability and minimum release specifications
25 for mumps components of M-M-R®II. This report

Page 120

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2 uses the same stability determinations with
3 different shelf life storage...and a lower
4 minimum expiry specification...to calculate
5 the required minimum release specification."
6      If you see in that chart, the
7 time out of refrigeration is 35 hours. Correct?
8      A.   I agree that's what it --
9      MS. SCHMIDT: Objection.
10      THE WITNESS: I agree that's
11    what the chart states.
12 BY MS. ZINSER:
13      Q.   Turning to the next page, 0011.
14 If you look at the box at the bottom which has
15 the calculation, starting with a minimum
16 expiry of 4.1 and then doing the calculation
17 of the total loss and the factor, that brings
18 us to a minimum release of 4.9 as opposed to
19 the minimum release from the earlier memo
20 which was 5.0. Do you know what the
21 difference was between the two models?
22      MS. SCHMIDT: Objection.
23      THE WITNESS: So one, I'm going
24    to clarify that the two boxes that
25    correspond to each other are 4.90 and

Page 121

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2 4.92.
3 BY MS. ZINSER:
4      Q.   Sure. But in the first one
5 they rounded up to 5.0 for release. Correct?
6      A.   That's what the memo states.
7      Q.   Do you know what accounts for
8 the difference between the 4.92 and the 4.90?
9      MS. SCHMIDT: Objection.
10      THE WITNESS: I do not. I
11    would have to review with the
12    statistician what different parameters
13    he used.
14 BY MS. ZINSER:
15      Q.   We can look -- I mean, we can
16 look at the numbers to compare. And the only
17 number that's different -- the minus 20 degree
18 storage numbers are the same for the loss and
19 the variants. The 2 to 8 degrees loss and
20 variance numbers are the same. The only
21 number different is TOR or the room
22 temperature, they use 34 hour -- 35 hours in
23 the second model as opposed to 40 hours. Do
24 you see that?
25      A.   I do.

31 (Pages 118 - 121)

Page 122

AMY KEEGAN - HIGHLY CONFIDENTIAL

1    
2    Q.    Do you know why they changed
3    that?
4            MS. SCHMIDT: Objection.
5            THE WITNESS: It's not stated
6        in the memo, and I did not remember
7        receiving this memo other than in the
8        context of receiving it from Phil.
9    BY MS. ZINSER:
10    Q.    So you don't know if it was
11    changed, if the TOR was lowered to try to
12    reach a lower minimum release?
13            MS. SCHMIDT: Objection.
14            THE WITNESS: I have no
15        knowledge that it was lowered. As Phil
16        specifically says, "scenarios."
17    BY MS. ZINSER:
18    Q.    All right. And then I'm going
19    to bring to you the third memo which is on
20    page 0012. It's a memo from Phil Bennett to
21    Mary Macchi. Is it Macchi?
22    A.    Macchi.
23    Q.    Macchi, okay. Does she get
24    that a lot?
25            Dated November 4, 2004. Who is

Page 123

AMY KEEGAN - HIGHLY CONFIDENTIAL

1    
2    Mary Macchi?
3    A.    At the time of this memo, I
4    believe Mary Macchi was the product lead for
5    MMR II within the CMC regulatory group.
6    Q.    Now, this -- on the first page,
7    this in -- this first sentence is the same as
8    the other two so I'll just move to the second
9    sentence. "This report uses the same
10    stability determinations with different
11    scenarios for shelf life storage (18 and
12    24 months) and TOR (35 and 40 hours) with a
13    minimum expiry specification of 4.3...."
14            Now, that's different from the
15    earlier two memos. Correct?
16            MS. SCHMIDT: Objection.
17            THE WITNESS: I agree that the
18        earlier two memos referenced a 4.1.
19    BY MS. ZINSER:
20    Q.    Do you know why it was changed?
21            MS. SCHMIDT: Objection.
22            THE WITNESS: I have no
23        knowledge of what Phil's intentions
24        were for these memos.
25    BY MS. ZINSER:

Page 124

AMY KEEGAN - HIGHLY CONFIDENTIAL

1    
2    Q.    Was there a -- do you know if
3    there was a concern that CBER wouldn't approve
4    4.1?
5            MS. SCHMIDT: Objection.
6            THE WITNESS: I have no
7        knowledge of that.
8    BY MS. ZINSER:
9    Q.    Or that 007, were there
10    concerns that 007 didn't support 4.1?
11            MS. SCHMIDT: Objection.
12            THE WITNESS: I have no
13        knowledge of that.
14    BY MS. ZINSER:
15    Q.    They also have calculations for
16    both 18 months and 24 months. Was there a
17    concern that there would be a label change in
18    shelf life?
19            MS. SCHMIDT: Objection.
20            THE WITNESS: I have no
21        knowledge of that.
22    BY MS. ZINSER:
23    Q.    So turning to page 0013 or the
24    page ending in 0013, at the bottom in the box
25    starting with a minimum expiry of 4.3 and

Page 125

AMY KEEGAN - HIGHLY CONFIDENTIAL

1    
2    using the total loss and the calculation with
3    the factor and the square root of the total
4    variance brings to a minimum release of 5.1.
5    There's -- as you can see in the chart, they
6    have it at 35 hours, 40 hours, 18 months and
7    24 months.
8            Do you know why they were
9    calculating using different TORs and different
10    shelf lives?
11            MS. SCHMIDT: Objection.
12            THE WITNESS: I have no
13        knowledge why they did that.
14    BY MS. ZINSER:
15    Q.    Did you -- I know that you
16    didn't write these memos, but did you work on
17    these fill models at all?
18    A.    No, I'm not a process engineer.
19    Q.    Put that aside.
20            MS. ZINSER: This next one is
21        going to be Keegan-13.
22            - - -
23            (Exhibit Keegan-13, Series of
24        e-mails, MRK-KRA01579964 - 01579966,
25        was marked for identification.)

32 (Pages 122 - 125)

1       AMY KEEGAN - HIGHLY CONFIDENTIAL
2               - - -
3    BY MS. ZINSER:
4       Q.    Keegan-13 is a series of
5    e-mails with the Bates number 1579964.
6       A.    I need to take a moment to
7    review.
8            MS. ZINSER:  Sure.  Again, your
9        counsel's instruction, the only thing
10       I'm going to ask about is the first
11       page.  So the first -- the first
12       e-mail.
13           THE WITNESS:  I'll review that
14       page then.
15   BY MS. ZINSER:
16      Q.    Have you reviewed?
17      A.    I did, yes, thank you.
18      Q.    Do you see that this is
19   continuation of the e-mails in Keegan-12, of
20   the same e-mail thread?
21      A.    It appears to be, yes.
22      Q.    The first e-mail from you to
23   Colleen Godshall reads:  Recollection -- first
24   of all, I'm sorry.  Who is Colleen Godshall?
25      A.    Colleen Godshall was, as I

1       AMY KEEGAN - HIGHLY CONFIDENTIAL
2    earlier stated to you, is the ad tech transfer
3    lead within CMC for Durham.
4       Q.    You did say that.  My
5    apologies.
6            Your memo reads, "Recollection
7    of many hours spent with Phil and Tim
8    Schofield in Roberta's conference room
9    preparing the analytic/stats for those filings
10   in the late '90s.  God I feel old."
11           So is Phil, Phil Bennett?
12      A.    I presume that I meant Phil
13   Bennett.
14      Q.    And Tim Schofield, is he also a
15   statistician?
16      A.    Tim Schofield was a statistician
17   for Merck.
18      Q.    And Roberta, is that Roberta
19   McKee?
20      A.    I believe that's who I meant,
21   yes.
22      Q.    And Roberta McKee was in MMD at
23   the time?
24      A.    In the '90s, yes, Roberta McKee
25   was in MMD.

1       AMY KEEGAN - HIGHLY CONFIDENTIAL
2       Q.    Do you recall preparing the
3    analytics and stats for these filings in the
4    '90s?
5       A.    So I did not prepare the
6    analytics or the stats.  I prepared slides for
7    which Phil and Tim prepared analytics.
8       Q.    Were these slides for meetings
9    with CBER?
10      A.    Yes, those were prepared for
11   meetings with CBER.
12      Q.    Do you recall -- and I know
13   it's the '90s, so, you know, 20 years ago.  Do
14   you recall generally -- were there a lot of
15   meetings with CBER that you prepared slides
16   for?
17           MS. SCHMIDT:  Objection.
18           THE WITNESS:  I recall
19       preparing slides for a single meeting.
20   BY MS. ZINSER:
21      Q.    When was that meeting generally?
22      A.    I believe that was December of
23   1998.
24      Q.    Do you recall generally the
25   substance of those slides?

1       AMY KEEGAN - HIGHLY CONFIDENTIAL
2            MS. SCHMIDT:  Objection.
3            THE WITNESS:  My memory is that
4        it contains stability data and
5        analyses.
6    BY MS. ZINSER:
7       Q.    I think we talked about that in
8    the context of your CV perhaps.  I think so.
9       A.    Maybe.
10      Q.    And do you know what the
11   purpose of the meeting with CBER was, of this
12   particular meeting with CBER?
13      A.    My portion of that was just
14   helping to prepare the stability.  I don't
15   know that there was an additional context.
16      Q.    Were you present at the meeting
17   or did you just prepare the slides?
18      A.    I just prepared the slides.  I
19   was not present or participated in the
20   meetings.
21      Q.    Do you happen to know who was?
22      A.    I would have to -- I don't.
23           MS. ZINSER:  This is going to
24       be Keegan-14.
25               - - -

33 (Pages 126 - 129)

Appx19029

Page 130

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2        (Exhibit Keegan-14, Series of
3    e-mails, MRK-KRA01579943 - 01579945,
4    was marked for identification.)
5            - - -
6    BY MS. ZINSER:
7        Q.   Keegan-14 another series of
8    e-mails, Bates number 1579943.  The only
9    question that I really have is for the first
10   e-mail, you can see that this is another
11   offshoot of the initial e-mail thread.  Do you
12   agree?
13       A.   Yes, it appears to be, yes.
14       Q.   And the first e-mail is from
15   Kimberly Duffy to you, Phil Bennett, Hesham,
16   Fahmy, Colleen Godshall and it reads:  "Please
17   take the remainder of this conversation
18   off-line.  This is not appropriate use of
19   e-mail."
20            Do you remember receiving this
21   e-mail?
22       A.   I don't specifically.
23       Q.   Do you have any idea why this
24   would not be appropriate use of e-mail?
25            MS. SCHMIDT:  Objection.

Page 131

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2            THE WITNESS:  I did not write
3        this e-mail.
4    BY MS. ZINSER:
5        Q.   Sure, but were there certain
6    guidelines for what was appropriate use of
7    e-mail to your understanding?
8        A.   I did not author this e-mail.
9    I don't know what Kim meant.
10           MS. SCHMIDT:  Are we at a spot
11       that you would want to break for lunch
12       purposes or do you want to keep -- I
13       don't want to interrupt you.
14           MS. ZINSER:  Just this one
15       document, it's not going to be very
16       long.  1559118.
17           I'm marking this Exhibit
18       Keegan-15.  It is a series of e-mails
19       with Bates number 1559118.
20            - - -
21       (Exhibit Keegan-15, Series of
22       e-mails, MRK-KRA01559118 & 01559119,
23       was marked for identification.)
24            - - -
25    BY MS. ZINSER:

Page 132

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2        Q.   I have a few questions for
3    each, so if you want to take the time to read
4    it, that's fine.
5        A.   Thank you.  Okay.
6        Q.   The first e-mail from Robert
7    Evans to you and Bret Phillips, the subject is
8    "Historical mumps data and fill model."  Who
9    is Robert Evans?
10       A.   Robert Evans was a formulation
11   scientist in the research laboratories.
12       Q.   And who is Bret Phillips?
13       A.   At the time of this communication,
14   Bret Phillips was a formulation scientist in
15   the MMD.
16       Q.   Okay.  The beginning of the
17   e-mail reads:  "Hi Brett [sic] Amy, the
18   latest stability data analysis from Phil...,"
19   I assume that's Phil Bennett?
20       A.   Since he's included, I would
21   presume as well.
22       Q.   "...shows that the mumps
23   stability is trending toward a little higher
24   losses in the reduced sorbitol formulation."
25            What is a -- do you know what

Page 133

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    the reduced sorbitol formulation is?
3        A.   I do.
4        Q.   What is it?
5        A.   So the reduced sorbitol
6    formulation is specifically in reference to an
7    experimental ProQuad formulation which was not
8    advanced forward.
9        Q.   Did sorbitol, was that in
10   reference to a stabilizer?  Was that a
11   stabilizer in that formulation?
12           MS. SCHMIDT:  Objection.
13   BY MS. ZINSER:
14       Q.   Or is it just another substance
15   in that?
16       A.   Sorbitol is part of the
17   composition of the ProQuad product.
18       Q.   Okay.  The second paragraph, "I
19   would like to know if the mumps fill model can
20   accommodate a slightly larger loss of mumps
21   potency during storage?  I presume that would
22   mean a small increase in the minimum potency
23   at release."
24            And I think we established
25   before, but the fill model, that refers to the

34 (Pages 130 - 133)

Appx19030

Page 134

1     AMY KEEGAN - HIGHLY CONFIDENTIAL
2  models we looked at in the earlier -- in the
3  earlier exhibit?
4       MS. SCHMIDT: Objection.
5       THE WITNESS: I didn't write
6    this e-mail so I don't know what Robert
7    meant at the time.
8  BY MS. ZINSER:
9    Q.   Do you know why Robert would be
10  sending this to you?
11    A.   Yes, I do.
12    Q.   Why do you think he would be
13  sending it to you?
14    A.   Based on the distribution list
15  and the carbon copy list, this appears to be a
16  communication that was under the umbrella of
17  ProQuad IDST, the Integrated Development and
18  Supply Team.
19    Q.   Do you recall receiving this?
20    A.   I don't recall receiving this
21  specific memo.
22    Q.   And the next e-mail on the
23  first page is from Phil Bennett to Robert
24  Evans, you, and Bret Phillips. And he's
25  referring to graphs that I can represent to

Page 135

1     AMY KEEGAN - HIGHLY CONFIDENTIAL
2  you were not produced with this e-mail, but he
3  says, "Sorry, but I had the wrong cell
4  reference and error bars on my mumps 2 to 8C
5  graphs." [As read.] That's 2 to 8 degrees,
6  correct?
7       MS. SCHMIDT: Objection.
8  BY MS. ZINSER:
9    Q.   For storage?
10    A.   I presume so. Although it's
11  missing the degree mark.
12    Q.   "With the correct values, there
13  is a different story if outliers are excluded
14  rather than included. Although the CP test
15  for extravariability does not apply to these
16  samples, all 6 of the excluded values would
17  fail the requirement for release testing and
18  prompt an investigation. Also, all of these 6
19  are 3 to plus 6 plus sigma from the average
20  for the remaining loss values. Consequently,
21  I would like to use the graph without the
22  atypicals." [As read.]
23       I'll bring you up to the
24  next -- the first e-mail in the group from
25  Robert Evans back to Phil Bennett, you, and

Page 136

1     AMY KEEGAN - HIGHLY CONFIDENTIAL
2  Bret Phillips. He says right after the
3  redacted block, "As far as the mumps data go I
4  agree that removing the atypicals is something
5  we would want to do to get the best estimates
6  of the true loss rates...."
7       Do you know what atypicals
8  refers to here? I know you didn't draft -- I
9  know this isn't your e-mail, but is atypicals
10  a term that's used commonly?
11       MS. SCHMIDT: Objection.
12       THE WITNESS: From reading this
13    e-mail, my interpretation is that they
14    are -- that Robert is referring to
15    outliers in the data.
16  BY MS. ZINSER:
17    Q.   He goes on to say, ...but I
18  would like to see all the data in the graphs
19  included in the backgrounder. Personally I
20  think it is a better strategy for us to
21  provide CBER with all the data and see if --
22  and if they question the high variability we
23  can provide them with the results with the
24  atypicals removed.
25       Then the last sentence in that

Page 137

1     AMY KEEGAN - HIGHLY CONFIDENTIAL
2  paragraph is: "However, I admit that I don't
3  know what the common practice is....if we
4  commonly provide stability data to CBER with
5  atypicals removed by this method then I am
6  fine with doing it here."
7       Do you know if in submissions
8  to CBER stability data, did you typically
9  remove outliers?
10       MS. SCHMIDT: Objection.
11       THE WITNESS: I'm not a
12    stability analyst, so I don't generate
13    those data myself.
14  BY MS. ZINSER:
15    Q.   Do you know if there's an
16  obligation to give CBER the complete set of
17  stability data?
18       MS. SCHMIDT: Objection.
19       THE WITNESS: Can you define
20    stability data?
21  BY MS. ZINSER:
22    Q.   Well, I mean, it's here in the
23  e-mail so I'm assuming it means like results
24  of stability testing.
25    A.   I don't understand what you

35 (Pages 134 - 137)

Appx19031

Page 138

1        AMY KEEGAN - HIGHLY CONFIDENTIAL
2    mean by "stability data." That can have many
3    meanings.
4        Q.    In general, do you think that
5    there is an obligation to give CBER complete
6    data?
7            MS. SCHMIDT: Objection.
8            THE WITNESS: In general, yes.
9    BY MS. ZINSER:
10        Q.    Just to put it in context, to
11    bring it back down to the e-mail from Phil
12    Bennett?
13        A.    Yes.
14        Q.    Where he says, "Although the CP
15    test for extravariability does not apply to
16    these samples, all 6 of the excluded
17    values...," which I've taken to mean the
18    outliers just from the context, "...would fail
19    the requirement for release testing and prompt
20    an investigation." If the values would affect
21    the requirement for release testing, do you
22    think those would be important to give CBER?
23            MS. SCHMIDT: Objection.
24            THE WITNESS: I don't agree
25        that that's what the statement says.

Page 139

1        AMY KEEGAN - HIGHLY CONFIDENTIAL
2    BY MS. ZINSER:
3        Q.    What do you believe it says?
4        A.    From my knowledge working in
5    the laboratory, the CP refers to the control
6    procedure test. And in the approved
7    procedure, approved by the agency, there is a
8    test for extra variability in which you
9    compare the minimum and the maximum for a
10    predetermine -- against a predetermined limit
11    and if replicates do not meet that, they may
12    be excluded per procedure from the analysis.
13        Q.    Would you indicate to CBER that
14    the extra variability or the outliers had been
15    removed from the analysis?
16            MS. SCHMIDT: Objection.
17            THE WITNESS: No, because it's
18        per the approved procedure.
19    BY MS. ZINSER:
20        Q.    And CBER has approved the
21    procedure?
22        A.    Per the license, yes.
23            MS. ZINSER: I think that's --
24        it's a good time to take a break.
25            VIDEOGRAPHER: Off the record

Page 140

1        AMY KEEGAN - HIGHLY CONFIDENTIAL
2    at 12:07. This will end disc number
3    two.
4            - - -
5        (A recess was taken.)
6            - - -
7            VIDEOGRAPHER: Back on the
8    record at 1:16. Beginning of disc
9    number three.
10    BY MS. ZINSER:
11        Q.    Ms. Keegan, I have some
12    questions on a few of the earlier exhibits we
13    already looked at. If I could direct your
14    attention back to Keegan-11.
15        A.    Okay.
16        Q.    On the last page ending 4797,
17    the e-mail that you wrote at the top of the
18    page, middle paragraph, "Note, resolution of
19    the mumps end expiry potency may not be able
20    to be specifically resolved today. In
21    principle, I do not agree with listing the MEE
22    potency as 5000, since our stability and
23    targeting practices do not necessarily support
24    the 5000."
25            When we spoke about this

Page 141

1        AMY KEEGAN - HIGHLY CONFIDENTIAL
2    document earlier, you said that you did not
3    think it was appropriate to put 5,000 on the
4    label. Do you recall saying that?
5        A.    Yes, I do.
6        Q.    Why did you not think it was
7    appropriate?
8        A.    Because the approved
9    specification, depending on the market, was
10    12,500 or 20,000.
11        Q.    You thought it was not
12    appropriate even though 5,000 was still in the
13    pharmacopeia?
14        A.    As I said earlier, I believe
15    that that had been removed from the
16    pharmacopeia.
17        Q.    Did you -- besides the people
18    in this e-mail, did you discuss that with
19    anyone?
20        A.    No, I don't believe so.
21        Q.    Had you discussed with anyone
22    that there was a newer version of the
23    pharmacopeia where 5,000 was taken out?
24        A.    No, I did not.
25        Q.    Do you recall when you learned

36 (Pages 138 - 141)

Appx19032

Page 142

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2  that, that it was changed?
3        MS. SCHMIDT:  Objection.
4        THE WITNESS:  No, I couldn't
5  say.
6  BY MS. ZINSER:
7    Q.   Put that aside.  If we can go
8  back to Keegan-9.  In drafting this memo, did
9  you -- were there any initial drafts of this
10 memo that you created before the final version?
11   A.   So one, since this is not
12 signed and I don't have other versions in
13 front of me, I can't state that this is the
14 final version.
15   Q.   Fair enough.  Do you recall
16 drafting multiple versions?
17   A.   I do recall that there was at
18 least one other version that is not this one.
19   Q.   Do you recall -- after reading
20 this, do you recall any differences or what
21 the differences between that version and this
22 version are?
23       MS. SCHMIDT:  Objection.
24       THE WITNESS:  No, I can't
25 recall.

Page 143

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2  BY MS. ZINSER:
3    Q.   Did you make edits whether --
4  again, whether this is the final or -- did you
5  make edits to -- between one version and the
6  next?
7        MS. SCHMIDT:  Objection.
8  BY MS. ZINSER:
9    Q.   You personally?
10   A.   I am the author of this memo
11 and any edits between versions would have been
12 done, completed by me.
13   Q.   Did you discuss edits or changes
14 with anyone?
15       MS. SCHMIDT:  Objection.
16       THE WITNESS:  I can't recall.
17 BY MS. ZINSER:
18   Q.   Did you discuss the document
19 with Annie Sturgess after it was given to her?
20   A.   I don't recall.
21   Q.   Did you discuss it with
22 Kimberly Duffy?
23   A.   I don't recall.
24   Q.   Do you recall discussing it
25 with anyone?

Page 144

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2        MS. SCHMIDT:  Objection.
3        THE WITNESS:  I don't recall
4  what discussions were had around this
5  document.  It's been several years.
6  BY MS. ZINSER:
7    Q.   Sure.  It's been several years,
8  but I think you said before that this is the
9  only time you've been asked by Merck counsel
10 to prepare a document.  So it didn't -- strike
11 that.
12       Since it was an unusual case
13 being asked by Merck counsel to draft a
14 document, do you remember any more details
15 about your basis for stating that 4.3 was
16 established as the end expiry in 1990?
17       MS. SCHMIDT:  Objection.
18       THE WITNESS:  As I've explained,
19 the basis of that statement was my
20 interpretation of a review of an
21 approval document from 1990.
22 BY MS. ZINSER:
23   Q.   Do you remember what kind of --
24 I know that approvals and the FDA, the CBER
25 documents, there's different versions.  Do you

Page 145

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2  remember which approval document that was?
3    A.   I couldn't speak to the
4  specific document.  It was dated 1990.
5    Q.   You can put that aside, too.
6  Are --
7        MS. ZINSER:  This will be
8  marked as Keegan-16.
9             - - -
10       (Exhibit Keegan-16, Series of
11 e-mails, MRK-KRA01556705 - 01556708,
12 was marked for identification.)
13             - - -
14       MS. ZINSER:  You know what, let
15 me get the other ones out for Keegan-17
16 just so we have them.
17       VIDEOGRAPHER:  Off the record
18 at 1:22.
19             - - -
20       (A recess was taken.)
21             - - -
22       VIDEOGRAPHER:  Back on the
23 record at 1:24.
24 BY MS. ZINSER:
25   Q.   I'm going to -- I already

37 (Pages 142 - 145)

Page 146

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2  handed you 16. Right?
3      A.    Correct.
4          MS. ZINSER: Mark this next one
5  as Keegan-17.
6          - - -
7          (Exhibit Keegan-17, 1/19/05
8  Letter, MRK-KRA01972632, was marked for
9  identification.)
10         - - -
11         MS. ZINSER: And Keegan-18.
12         - - -
13         (Exhibit Keegan-18, 2/2/05
14  Letter, MRK-KRA01971200 & 01971201, was
15  marked for identification.)
16         - - -
17         MS. ZINSER: 19.
18         - - -
19         (Exhibit Keegan-19, 3/10/05
20  Regulatory Conversation,
21  MRK-KRA01971023, was marked for
22  identification.)
23         - - -
24         MS. ZINSER: 20.
25         - - -

Page 147

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2         (Exhibit Keegan-20, 3/23/05
3  Regulatory Conversation,
4  MRK-KRA01971197 & 01971198, was marked
5  for identification.)
6          - - -
7          MS. ZINSER: And 21.
8          - - -
9          (Exhibit Keegan-21, 5/24/05
10  Letter, MRK-KRA01971196, was marked for
11  identification.)
12         - - -
13  BY MS. ZINSER:
14      Q.    All right. Keegan-16 is a
15  series of e-mails with the Bates number
16  1556705. And the e-mail on the first page is
17  sent from you to Michele Bornstein. Do you
18  know who Michele Bornstein is?
19      A.    I do.
20      Q.    Who is she?
21      A.    Michele currently in the office
22  of ethics.
23      Q.    Office of ethics, okay.
24          The beginning of the e-mail
25  reads: "The history of the potency assay

Page 148

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2  changes is provided below, along with the
3  approval letters for each." And in the
4  subpart A below it reads -- well, actually to
5  go back to the earlier paragraph, "Some
6  additional info...I thought might help you in
7  your investigation is also included about how
8  we report potency data to CBER (A)...?"
9          Part A says, "In CBER release
10  protocols, we actually report each replicate
11  to the agency, both uncalibrated and
12  calibrated, along with the average potency.
13  We would in fact explicitly report data to
14  CBER for an individual vial (i.e. replicate)
15  that did not meet spec. I would bet that this
16  does happen on occasion."
17         When you wrote that, you bet
18  that what happens on occasion?
19      A.    That there are individual
20  replicates that do not meet spec and are
21  included in the CBER protocol.
22      Q.    Do you recall what potency
23  assay changes this refers to?
24      A.    Yes.
25      Q.    Do you recall why you were

Page 149

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2  sending them to her?
3      A.    Michele Bornstein contacted me
4  to help her collect information for an
5  investigation that she was doing for the
6  Office of Ethics.
7      Q.    Turning to Keegan-17, it's
8  Bates number 1972632. This is a letter from
9  Mark Rosolowsky to Dr. Norman Baylor. Who is
10  Mark Rosolowsky?
11      A.    At the time of this letter,
12  Mark Rosolowsky was the functional head of CMC
13  regulatory which was for vaccines at this
14  time.
15      Q.    At the top of the document it
16  says, "Changes Being Effected -- 30 Days." Is
17  that often abbreviated as CBE-30?
18      A.    Yes.
19      Q.    What is a CBE-30 submission?
20      A.    A CBE-30 is a report, wait
21  30 days and implement.
22      Q.    So is it just sort of a
23  notification to CBER of something that Merck
24  is going to do?
25      A.    It's a supplement that is -- it

38 (Pages 146 - 149)

Appx19034

Page 150

1        AMY KEEGAN - HIGHLY CONFIDENTIAL
2   requires approval at the end of the six-month
3   time period, but Merck is free to implement
4   after 30 days as long as the agency does not
5   upgrade that supplement to a prior approval.
6        Q.    In the body of the letter, the
7   second paragraph reads: "This supplement
8   proposes a product potency format assay change
9   for the mumps component.  The following change
10  is proposed.
11        "• Employ a two-tiered potency
12  testing scheme using expanded testing in the
13  assignment of release and stability potencies
14  for mumps, with measured initial results that
15  are at or below the release specifications."
16        What is a two-tiered potency
17  testing scheme?
18        MS. SCHMIDT: Objection.
19        THE WITNESS:  In this context --
20  BY MS. ZINSER:
21        Q.    Yes.
22        A.    -- it is you complete the first
23  set of testing, compare it to the criteria
24  that are appropriate for that first tier.  If
25  it passes, then you have completed your

Page 151

1        AMY KEEGAN - HIGHLY CONFIDENTIAL
2   testing.  If it does not meet those
3   requirements, you move to the second tier of
4   testing and compare it to the specifications
5   which are employed for that second tier.
6        Q.    The specifications, is that
7   what's in the quality standards?
8        A.    The quality standards, correct.
9        Q.    Prior to this, two-tier potency
10  testing was not being performed for mumps?
11        MS. SCHMIDT: Objection.
12        THE WITNESS:  I could not speak
13  to that.  I can't recall.
14  BY MS. ZINSER:
15        Q.    Going on to expanded testing,
16  is that just another description of this
17  two-tiered where it's tested and if it doesn't
18  meet, it's tested again?
19        MS. SCHMIDT: Objection.
20        THE WITNESS:  My -- from
21  reading this document, my
22  interpretation is yes.
23  BY MS. ZINSER:
24        Q.    Do you have any understanding
25  why Merck was proposing a change in the assay

Page 152

1        AMY KEEGAN - HIGHLY CONFIDENTIAL
2   format for mumps?
3        A.    Yes, I do.
4        Q.    What was your understanding?
5        A.    The change in the testing
6   format was to provide enhanced -- enhancements
7   to the variability of the method.
8        Q.    What kind of enhancements?
9        A.    To reduce the variability of
10  the method.
11        Q.    Was Merck seeing an increase in
12  the variability of the method?
13        MS. SCHMIDT: Objection.
14        THE WITNESS:  No.  There was no
15  increase in the variability of the
16  method that I'm aware of.
17  BY MS. ZINSER:
18        Q.    Do you have any idea why the
19  change was being made at that time?
20        MS. SCHMIDT: Objection.
21  BY MS. ZINSER:
22        Q.    At this time, January 2005?
23        A.    As stated in the memo, it says
24  to support potency for a 24-month expiry
25  dating.

Page 153

1        AMY KEEGAN - HIGHLY CONFIDENTIAL
2        Q.    Turning to Keegan-18, which is
3   Bates number 1971200.  This is a response from
4   Loris McVittie at CBER to Dr. Rosolowsky,
5   dated February 2005.  And the middle of the
6   first page states:  "We disagree with your
7   assessment that this is a 'Supplement--Changes
8   Being Effected in 30 Days.'  The proposed
9   changes as described do not mean the
10  conditions described under 21 CFC 601.12(c).
11  This is considered to be a Prior Approval
12  Supplement...and requires CBER approval prior
13  to distribution of product made using the
14  change."
15        Do you know what the difference
16  is between a CBE-30 and a prior approval
17  supplement change?
18        A.    I do.
19        Q.    What is the difference?
20        MS. SCHMIDT: Objection.
21        THE WITNESS:  A CBE-30, changes
22  being effected in 30 days, as I
23  previously stated, you submit that
24  supplement to the agency.  After
25  30 days, if they do not upgrade that to

39 (Pages 150 - 153)

**Appx19035**

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    a PAS, you are free to distribute
3    product to the market.  A prior
4    approval supplement requires explicit
5    approval from the agency prior to
6    distribution of that -- of product
7    manufactured under that change to the
8    market.
9    BY MS. ZINSER:
10    Q.    Would you say that a prior
11    approval supplement is a more stringent -- or
12    is examined more stringently by CBER?
13        MS. SCHMIDT:  Objection.
14        THE WITNESS:  No.  In my
15    experience, CBER weights their review
16    of all submissions to them equally.
17    BY MS. ZINSER:
18    Q.    Do you know why they disagreed
19    with Merck's initial assessment as it being a
20    CBE-30 submission?
21        MS. SCHMIDT:  Objection.
22        THE WITNESS:  No, I do not.  I
23    did not write this document.
24    BY MS. ZINSER:
25    Q.    Turning to Keegan-19, Bates

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    number 1971023, this is a record of a
3    regulatory conversation between Mark
4    Rosolowsky and Dr. Loris McVittie of CBER.  It
5    reads: "Dr. McVittie returned
6    Dr. Rosolowsky's call with respect to the
7    above supplements which related to mumps and
8    the rubella potency assay format changes...."
9    And I'll just indicate under the product and
10    project the submission tracking number
11    101069/5083 is the one that corresponds to
12    your initial -- that's the submission tracking
13    number from your initial e-mail, the last page
14    of your initial e-mail, which is Keegan-16.
15    A.    Per bullet point 3 on the last
16    page.
17    Q.    Yes.
18    A.    Correct.
19    Q.    Yes.  Okay.  Just so we're on
20    the same submission.
21        The second paragraph reads:
22    "Dr. Rosolowsky sought clarification of why
23    CBER had disagreed with our regulatory
24    assessment of a CBE-30 and assigned a Prior
25    Approved Supplement status for these

1    supplements."
2        Going down a few lines, "Loris
3    responded that she had spoken to Dr. Baylor at
4    CBER later about these submissions and he had
5    expressed concern that a careful review be
6    conducted due to the historical issues with
7    measles, mumps, and rubella potencies.  CBER
8    then concluded that a PAS was warranted."
9        What were the historical issues
10    with measles -- with mumps potencies that
11    they're referring to here?
12        MS. SCHMIDT:  Objection.
13        THE WITNESS:  I can't say.  I
14    didn't write this document.
15    BY MS. ZINSER:
16    Q.    Were you aware of any
17    historical issues with mumps potencies around
18    the time of this?
19        MS. SCHMIDT:  Objection.
20        THE WITNESS:  No, I was not.
21    BY MS. ZINSER:
22    Q.    Do you have any understanding
23    why Dr. McVittie -- or rather Dr. Baylor would
24    express concern that a careful review was

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    required?
3        MS. SCHMIDT:  Objection.
4        THE WITNESS:  I did not write
5    this document nor speak to Dr. Baylor.
6    I could not say.
7    BY MS. ZINSER:
8    Q.    Moving on to Keegan-20, Bates
9    number 1971197.  This is another regulatory
10    conversation regarding the same submission
11    101069/5083.  Correct?
12    A.    Yes.
13    Q.    Regarding the mumps potency
14    assay format change, the submission reads:
15    Dr. Steve Rubin and Ms. Luba Vujcic of CBER
16    contacted Dr. Rosolowsky regarding a question
17    about STN, submission tracking number.  Is
18    that correct?
19    A.    That is correct.
20    Q.    "...which is a supplement for
21    'Potency assay format change for mumps.'
22        "Dr. Rubin stated that in this
23    supplement Merck & Co., Inc. had
24    indicated...the test format for mumps
25    potency...would be expanded to a second 1x6

40 (Pages 154 - 157)

Appx19036

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2    assay if the original test result was at or
3    below 5.2 log...and that these results would
4    be calibrated to the reference standard."
5         So before this assay format
6    change was taking place, was the format just a
7    single 1x6 assay?
8         MS. SCHMIDT: Objection.
9         THE WITNESS: I can't recall
10        specifically.
11   BY MS. ZINSER:
12        Q.   Were you working with MMR II at
13   this time?
14        A.   In 2005, yes.
15        Q.   Do you have any independent
16   recollection of the format of the mumps assay
17   at this time?
18        A.   An older format was 3x1.
19        Q.   3x1.  It says, "...if the
20   original test result...," they would employ
21   what you described before as the two-tiered
22   testing.  "...if the original test result was
23   at or below 5.2 log...," so this was a test of
24   the manufactured -- the target potency?
25        MS. SCHMIDT: Objection.

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2         THE WITNESS: I can't determine
3        that from this document.
4    BY MS. ZINSER:
5         Q.   But we know that 5.2 has been
6    the target manufacture potency since
7    September 1999.  Correct?
8         A.   Yes, that's correct.
9         Q.   And "...these results would be
10   calibrated to the reference standard."  What
11   does that mean --
12        MS. SCHMIDT: Objection.
13   BY MS. ZINSER:
14        Q.   -- based on your knowledge?
15        A.   From my knowledge of working in
16   the laboratories, calibration to the house
17   standard is normalizing the assay results to
18   the performance of the house standard in a
19   given replicate.
20        Q.   House standard and reference
21   standard, those can be used interchangeably?
22        A.   Yes, they can.
23        Q.   Going down to below the heading
24   "Mumps potency test results."
25        "Dr. Rubin then followed up on

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2    internal CBER investigations of low mumps
3    potency results in their laboratories."
4         Were you aware at the time of
5    CBER performing any internal investigations of
6    low mumps potency results?
7         MS. SCHMIDT: Objection.
8         THE WITNESS: I was not
9        employed by CBER, so I have no
10        knowledge.
11   BY MS. ZINSER:
12        Q.   But a lot of times are you
13   aware of the activities that CBER has for a
14   product that you're working on?
15        MS. SCHMIDT: Objection.
16        THE WITNESS: At this time I
17        was not in regulatory, so I would have
18        no cause to be having conversations
19        with the agency.
20   BY MS. ZINSER:
21        Q.   Even if you were -- not a
22   direct conversation, but if you were aware of
23   going -- something related to a certain
24   product that you were working on, would that
25   be something that you and your co-workers

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2    would discuss, hey, this is going on with
3    CBER, anything informal like that?
4         MS. SCHMIDT: Objection.
5         THE WITNESS: Only if
6        specifically pulled into the
7        conversation.
8    BY MS. ZINSER:
9         Q.   The low potency results, "These
10   low...potency results has led CBER's release
11   group to request Merck's WPPR group to
12   withdraw lots from consideration for batch
13   release."
14        What is the WPPR group?
15        MS. SCHMIDT: Objection.
16        THE WITNESS: WPPR stands for
17        West Point product release.
18   BY MS. ZINSER:
19        Q.   And West Point is where MMR II
20   is manufactured at this time?
21        A.   In 2005, correct.
22        Q.   And that's where the product
23   release testing was performed at that time?
24        A.   Correct.
25        Q.   Do you know if -- do you know

41 (Pages 158 - 161)

Appx19037

Page 162

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2   if CBER did indeed request Merck's WPPR group
3   to withdraw lots from consideration for batch
4   release?
5           MS. SCHMIDT: Objection.
6           THE WITNESS: I have no
7       knowledge.
8   BY MS. ZINSER:
9       Q.   Are you aware generally of any
10  lots being withdrawn due to low potency?
11          MS. SCHMIDT: Objection.
12          THE WITNESS: I have no
13      knowledge.
14  BY MS. ZINSER:
15      Q.   Continuing on in that
16  paragraph, "In reviewing historical mumps
17  potency data provided through Merck's release
18  protocols and CBER's test results, he...,"
19  referring back to Dr. Rubin, ".. noticed that
20  there was a slight trend up for Merck's mumps
21  potency release test results but a slight
22  trend down for CBER's laboratory results."
23          Were you aware of any
24  difference between trends in Merck's testing
25  results and CBER's testing results?

Page 163

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2           MS. SCHMIDT: Objection.
3           THE WITNESS: No, I would have
4       no visibility to CBER's results.
5   BY MS. ZINSER:
6       Q.   And then it says, "In both
7   cases, the mumps house standard potency was
8   flat indicating that it was not and assay
9   artifact."
10          Generally what does it mean if
11  a house standard potency is flat?
12          MS. SCHMIDT: Objection.
13          THE WITNESS: That means that
14      there's -- it's performing at the same
15      level at that time.
16  BY MS. ZINSER:
17      Q.   On the next page, 1198, "The
18  time period of the evaluation was January 2004
19  through January 2005. Dr. Rubin asked whether
20  the filling model at Merck had changed and
21  Drs. Rosolowsky and Galinski responded that
22  they were not aware of any changes but would
23  follow-up."
24          Do you know if the filling
25  model had changed at that time?

Page 164

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2           MS. SCHMIDT: Objection.
3           THE WITNESS: I was not in the
4       filling group, so I have no knowledge
5       of that.
6   BY MS. ZINSER:
7       Q.   And moving on to Keegan-21,
8   which is Bates-numbered 1971196. And this is
9   a letter from CBER, from Phil Krause at CBER
10  to Mark Rosolowsky, it's referring to
11  submission tracking number 101069/5083. And
12  it says, "The Supplements to your Biological
13  License Application...to include mumps potency
14  assay format changes, have been approved."
15          Do you remember this particular
16  assay format change being approved?
17          MS. SCHMIDT: Objection.
18          THE WITNESS: I was not in
19      regulatory at that time so I have no
20      specific knowledge.
21  BY MS. ZINSER:
22      Q.   Going back to Keegan-16, you
23  said that you were sending this to Michele
24  Bornstein to aid her in an investigation she
25  was performing. What was her position again?

Page 165

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2       A.   Michele Bornstein is, as
3   stated, an ethics officer in the Office of
4   Ethics.
5       Q.   Does the office of -- is it
6   Office of Ethics, department of ethics?
7       A.   Office of Ethics.
8       Q.   Does the Office of Ethics
9   typically investigate approved potency assay
10  changes?
11          MS. SCHMIDT: Objection.
12          THE WITNESS: I have no
13      knowledge of that. These kind of
14      investigations are confidential, so
15      Michele reached out to me for some
16      specific information. I provided it.
17  BY MS. ZINSER:
18      Q.   Were you aware of the results
19  of this investigation?
20      A.   I am not.
21          MS. SCHMIDT: Objection. Form.
22  BY MS. ZINSER:
23      Q.   Did Michele ask you directly --
24  I'm sorry. Yes, Michele Bornstein, did she
25  ask you directly for information for this

42 (Pages 162 - 165)

Page 166

1     AMY KEEGAN - HIGHLY CONFIDENTIAL
2    investigation?
3     A.   Yes, Michele called me.
4     Q.   Did you discuss that with
5    anyone else?
6     A.   I probably discussed it with my
7    direct manager, yes.
8     Q.   Who was your direct manager at
9    this time?
10     A.   I was in regulatory and it was
11    Kim Duffy.
12     Q.   Kim Duffy, okay.
13          The information that you
14    forwarded to her, is this something that you
15    had, that you had on hand or did you have to
16    ask someone for it?
17     A.   I produced this information
18    from our regulatory files.
19     Q.   Your regulatory files.  And the
20    regulatory files, is that for the department?
21     A.   For the department, correct.
22     Q.   Are the -- the regulatory
23    files, is that something that everyone in the
24    department has access to?
25     A.   Yes, everyone in CMC.

Page 167

1     AMY KEEGAN - HIGHLY CONFIDENTIAL
2     Q.   Do you recall if you had ever
3    been asked to help in an ethics investigation
4    before?
5     A.   I do not believe so.
6     Q.   You can put those aside for
7    now.
8          MS. ZINSER:  Marking this next,
9    Exhibit Keegan-22.
10          - - -
11          (Exhibit Keegan-22, Series of
12    documents, MRK-KRA01895955 - 01895961,
13    was marked for identification.)
14          - - -
15    BY MS. ZINSER:
16     Q.   Keegan-22 is a series of
17    different documents starting with Bates number
18    1895955.  As I said, it's a series of
19    different documents, but I can represent that
20    this is how they were produced to us in this
21    order.
22          If you look on the first page
23    on this chart in the upper left-hand corner,
24    if you, you know, turn it, it says, "Fill
25    0627847."  Is fill another -- is fill used

Page 168

1     AMY KEEGAN - HIGHLY CONFIDENTIAL
2    interchangeably with lot?
3     A.   Yes, fill is typically used
4    interchangeably with lot.
5     Q.   On the next page ending 5956,
6    there is an e-mail meeting request from Lily
7    Mo to a number of recipients including you.
8    The subject is "Mumps Potency Failure for MMR
9    lot 0627847 at 6 Months and Active stability
10    monitoring."
11          It says, "Please attend this
12    meeting to discuss the path forward to handle
13    the Mumps potency failure for MMR lot 0627847
14    at 6 months.
15          "Also needs to be discussed is
16    the path forward for active stability
17    monitoring:  where we stand, what we need to
18    do, when we need to do, etc..."  [As read.]
19          Who is Lily Mo?
20     A.   At the time of this memo, Lily
21    Mo was a stability analyst in the quality
22    control labs.
23     Q.   And the people who this was
24    sent to, yourself included, looking at the
25    names, was this a formal group, a formal team

Page 169

1     AMY KEEGAN - HIGHLY CONFIDENTIAL
2    within -- do you recognize these names?
3          MS. SCHMIDT:  Objection.
4          THE WITNESS:  I recognize all
5    of these names.
6    BY MS. ZINSER:
7     Q.   Who is Robyne Kelemen?
8     A.   Robyne Kelemen was the head of
9    the stability group at that time.
10     Q.   And who is Taryn
11    Rogalski-Salter?
12     A.   Taryn Rogalski-Salter was the
13    head of he -- it was, I guess, called
14    bioanalytical development then.  So the
15    technical support for the laboratories.
16     Q.   Who is Mark Varilla?
17     A.   Mark Varilla at the time of
18    this memo would have been a scientist in that
19    bioanalytical development group.
20     Q.   Do you remember attending a
21    meeting related to the potency failure of
22    mumps for this lot?
23     A.   I don't recall.
24     Q.   Do you recall receiving this
25    e-mail?

43 (Pages 166 - 169)

Appx19039

Page 170
1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2        A.    No, I don't.
3        Q.    What is active stability
4    monitoring?
5            MS. SCHMIDT:  Objection.
6            THE WITNESS:  So I did not
7        write this memo, so I don't know what
8        Lily meant by that.
9    BY MS. ZINSER:
10       Q.    Have you heard that term,
11   "active stability monitoring" before?
12       A.    Yes, I have.
13       Q.    What's your understanding of
14   what it means outside of the context of this
15   e-mail?
16       A.    So I'm not -- I was never in
17   the stability unit, but there is a stability
18   program for all of our products at Merck.
19       Q.    And do you have a -- what's
20   your general understanding of that stability
21   program?
22       A.    There are lots which are
23   selected to be placed on stability.  They are
24   tested at the required intervals and compared
25   to specifications that are in place for the

Page 171
1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    product.
3        Q.    Is this -- is that also known
4    as realtime stability --
5            MS. SCHMIDT:  Objection.
6    BY MS. ZINSER:
7        Q.    -- monitoring where it's
8    measured at certain intervals?
9        A.    Realtime stability has a
10   meaning for me in regulatory, but I don't know
11   what the meaning is...
12       Q.    Do you know who was involved
13   with the active stability monitoring at this
14   time?
15           MS. SCHMIDT:  Objection.
16           THE WITNESS:  I don't know what
17       that's specifically referring to.
18   BY MS. ZINSER:
19       Q.    Do you know who was involved
20   with the stability monitoring at certain
21   intervals -- you know, at specific intervals?
22       A.    I don't know about specific
23   intervals.
24       Q.    I think you said that at
25   certain periods of time -- do you know who

Page 172
1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    would have been responsible for stability
3    monitoring?
4        A.    The stability monitoring, the
5    stability group.
6        Q.    Going back to what you said
7    about regulatory, what does realtime stability
8    mean in the regulatory context?
9        A.    To me in the regulatory context
10   realtime stability is used to distinguish from
11   accelerated stability which is at a forced
12   condition, one that the product will not see
13   under normal operations.
14       Q.    What kind of forced condition
15   would that be?
16       A.    Typically at higher temperatures
17   than the product will see.
18       Q.    Why is that sort of stability
19   performed at a higher temperature than the
20   product would see?
21           MS. SCHMIDT:  Objection.
22           THE WITNESS:  In my experience
23       in regulatory, stability and
24       accelerated stability are considered
25       important characterization tools to the

Page 173
1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    agency.
3    BY MS. ZINSER:
4        Q.    I know you said you didn't
5    recall this particular meeting.  Do you recall
6    there being other meetings for failures of
7    potency for particular lots?
8        A.    No, I do not.
9            MS. SCHMIDT:  Objection.
10   BY MS. ZINSER:
11       Q.    If you turn back to the first
12   page where the chart is there.  This is,
13   again, related to lot 0627847.  And you see
14   the first, the -- I guess the fourth column
15   over which is labeled "Potency," and it has
16   "Time Release."
17           Do you see that?
18       A.    I do see that column.
19       Q.    Going down to where it says, 3
20   months, and if you look over to the "Average,"
21   that's the one, two, three, four, five, six,
22   seven, the seventh column over, the house --
23   hs adjusted, is that house standard adjusted,
24   the column next to it?
25           MS. SCHMIDT:  Objection.

44 (Pages 170 - 173)

Appx19040

Page 174

1  AMY KEEGAN - HIGHLY CONFIDENTIAL
2      THE WITNESS:  I did not prepare
3  this document and that's not my
4  handwriting.
5  BY MS. ZINSER:
6  Q.  Is house standard typically
7  abbreviated as HS?
8      MS. SCHMIDT:  Objection.
9      THE WITNESS:  I agree that HS
10  is -- it could stand for house
11  standard, but I'm not sure in this
12  context.  I did not prepare this
13  document.
14  BY MS. ZINSER:
15  Q.  You see the value under
16  "Average" and house standard adj, which is
17  house standard adjusted for three months is
18  3.7.  Do you agree that that is below the
19  mumps end expiry at this time?
20      MS. SCHMIDT:  Objection.
21      THE WITNESS:  No, there's no
22  specifications on this page.
23  BY MS. ZINSER:
24  Q.  Well, "Stability Date" at the
25  top is June 15, 1998.  Do you see that?

Page 175

1  AMY KEEGAN - HIGHLY CONFIDENTIAL
2  A.  Yes, I do.
3  Q.  At that time would 3.7 have
4  been below end expiry?
5      MS. SCHMIDT:  Objection.
6      THE WITNESS:  I don't have
7  knowledge of the specifications that
8  were applied to this document.
9  BY MS. ZINSER:
10  Q.  Do you know what the mumps end
11  expiry was, the specification in June of 1998?
12      MS. SCHMIDT:  Objection.
13      THE WITNESS:  I can't recall.
14  I don't have that quality standard in
15  front of me.
16      MS. SCHMIDT:  Do you want me to
17  pull out a particular exhibit?
18      MS. ZINSER:  I'm sorry?
19      MS. SCHMIDT:  Do you want me to
20  pull out a particular exhibit?
21      MS. ZINSER:  Oh, no, no, I have
22  it.
23  BY MS. ZINSER:
24  Q.  Going back to Keegan-9.  The
25  first sentence saying, In 1990, the mumps

Page 176

1  AMY KEEGAN - HIGHLY CONFIDENTIAL
2  virus end-expiry potency for M-M-RTMII was
3  established at 4.3 log....  So at 3.7 in 1990
4  would be below the end expiry of 4.3 that was
5  established in 1980.  Correct?
6      MS. SCHMIDT:  Objection.
7      THE WITNESS:  So I clarified
8  earlier that this sentence was my
9  interpretation of a document from 1990
10  in 2011.
11  BY MS. ZINSER:
12  Q.  Do you have any reason to
13  believe that this interpretation of the
14  document from 1990 was wrong?
15      MS. SCHMIDT:  Objection.
16      THE WITNESS:  It was my
17  interpretation of the document dated
18  1990 when I reviewed it in 2011.
19  BY MS. ZINSER:
20  Q.  When you drafted this and sent
21  it to Annie Sturgess and Kimberly Duffy, did
22  either of them say, no, you're wrong, this was
23  not the end expiry in 1990?
24  A.  I don't recall.
25      MS. ZINSER:  I'm going to mark

Page 177

1  AMY KEEGAN - HIGHLY CONFIDENTIAL
2  this next one Keegan-23.
3      - - -
4      (Exhibit Keegan-23, Series of
5  e-mails MRK-KRA01895942 - 01895951, was
6  marked for identification.)
7      - - -
8  BY MS. ZINSER:
9  Q.  Keegan-23 starts with Bates
10  number 1895942.  This is another -- this one
11  is a series of e-mails beginning with this
12  chart on the front.
13      Looking at the first page,
14  "Fill," the fill number 0627847, do you agree
15  that's the same lot number that we were
16  discussing in the previous document?  You
17  can --
18  A.  You want me to check?
19  Q.  Go right ahead.
20  A.  Yes, those lot numbers are the
21  same.
22  Q.  And looking at the -- below
23  that, the -- under the three-month range, the
24  potency is at 3.7.  Correct?
25      MS. SCHMIDT:  Sorry, where are

45 (Pages 174 - 177)

Appx19041

Page 178

1        AMY KEEGAN - HIGHLY CONFIDENTIAL
2   you?
3        THE WITNESS: Which?
4        MS. SCHMIDT: Oh, I see.
5        MS. ZINSER: Right below. Yes.
6        THE WITNESS: So the -- not the
7  first but the second? Am I --
8  BY MS. ZINSER:
9    Q.   Right. Below -- right there.
10   A.   Thank you. Can you repeat the
11  question?
12    Q.   Do you see that at three months
13  the potency is 3.7?
14       MS. SCHMIDT: Objection.
15       THE WITNESS: There is a number
16    there, but there is a heading, and I
17    don't know what that heading means at
18    this time.
19  BY MS. ZINSER:
20    Q.   We'll look at the next page.
21  This is a memo from Lily Mo to those listed,
22  dated 4 -- dated April 12, 1999. On April 9,
23  1999 a meeting was held to discuss mumps
24  potency out of release specification for --
25  result for MMR II lot 0627847. Do you see

Page 179

1        AMY KEEGAN - HIGHLY CONFIDENTIAL
2  that?
3    A.   I do.
4    Q.   Attendees included R. Kelemen,
5  L. Mo, M. Macchi, M. Varilla, T. Schofield,
6  P. Bennett, C. Holliday, A. Romanowski, T.
7  Hennessey and B. Werner. Correct?
8    A.   Yes.
9    Q.   Do you recall this meeting?
10   A.   No, I do not.
11    Q.   After reading this meeting that
12  was held to discuss mumps potency of lot
13  0627847, can you agree that the numbers on the
14  previous page relate to the potency of
15  mumps --
16       MS. SCHMIDT: Objection.
17  BY MS. ZINSER:
18    Q.   -- at three, six and
19  nine months?
20   A.   I can't tell that this
21  document, the first page, is specifically
22  related to this other than that the lot
23  numbers are the same.
24    Q.   Well, I'll represent to you
25  that they were produced in this order to us as

Page 180

1        AMY KEEGAN - HIGHLY CONFIDENTIAL
2  part of the same document.
3       The middle of the second
4  paragraph, "L. Mo also informed the group that
5  the 9 month mumps potency result came out low
6  at average for 3.4 Log...per 0.1 milliliter."
7  [As read.]
8       Going back to the first page,
9  to nine months, can you agree that 3.4 or 3.8
10  here refers to mumps potency at that time?
11       MS. SCHMIDT: Objection.
12       THE WITNESS: I'll just take a
13    minute to read the document.
14  BY MS. ZINSER:
15    Q.   Sure.
16   A.   It's difficult for me to tell
17  from this document since there's no heading on
18  the table that you're referencing that
19  references potency specifically.
20    Q.   The third paragraph, "R.
21  Kelemen asked whether this lot is typical. P.
22  Bennett updated the group that based on the
23  statistical analysis; this lot demonstrated a
24  higher mumps loss rate (0.5 log and 0.6 log
25  loss respectively from release to 6 months and

Page 181

1        AMY KEEGAN - HIGHLY CONFIDENTIAL
2  release to 9 months). The historical mumps
3  log loss from release to 6 months is 0.25 log,
4  and the log loss from release to 9 months is
5  0.30 log. Due to a wide span of the data, the
6  mumps loss rate for this lot 0627847 is still
7  within the two standard deviations of the
8  historical mumps log loss. Therefore, this
9  lot is still being considered 'typical.'"
10       Do you recall a discussion of
11  this lot at all?
12   A.   No, I do not. That was
13  20 years ago.
14    Q.   Skipping to the paragraph to
15  the one that starts, "M. Varilla...,"
16  "M. Varilla informed the group that
17  D. Wonnacott...." Who is D. Wonnacott, if you
18  know?
19   A.   That's Dave Wonnacott, and he
20  was in the biolicensing group.
21    Q.   What does the biolicensing
22  group do?
23   A.   Biolicensing group is
24  essentially the same as what the CMC
25  functional group is now.

46 (Pages 178 - 181)

Appx19042

Page 182

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2      Q.    So informed D. Wonnacott --
3    "...D. Wonnacott has been informed about this
4    lot 0627847.  He will let the group know what
5    the regulatory strategy would be on this
6    issue."
7            Do you recall what the
8    regulatory strategy was?
9            MS. SCHMIDT:  Objection.
10           THE WITNESS:  I don't recall
11      this meeting, so I could not speculate.
12   BY MS. ZINSER:
13      Q.    The next paragraph, "P. Bennett
14   also updated the group that this lot would not
15   be expected to stay within specification limit
16   for the 24-month shelf life, base on our
17   current algorithm of the active stability
18   monitoring, if the 3.6 Log...per 0.1
19   milliliter is the specification limit."  [As
20   read.]
21           What would happen to a lot that
22   was not expected to stay within specification
23   limit?
24           MS. SCHMIDT:  Objection.
25           THE WITNESS:  So I was not in

Page 183

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2    the stability unit so I don't have a
3    specific firsthand knowledge of their
4    procedures.
5    BY MS. ZINSER:
6      Q.    The next paragraph, "Also, the
7    group discussed the TFI procedures."  Do you
8    know what TFI refers to?
9      A.    Test failure investigation.
10     Q.    "R. Kelemen indicated the
11   Stability Unit is requesting a TFI from the
12   Testing Lab."  Do you -- were you involved
13   with test failure investigations?
14     A.    Yes, I partnered with the
15   laboratories to complete those investigations.
16     Q.    What would a test failure
17   investigation entail?
18     A.    A test failure investigation,
19   you review all of the paperwork for the
20   testing, you review the controls and the
21   reference standard values that were obtained
22   on that test to see if they were within their
23   acceptance criteria.  That was my role in it.
24   That's what I would speak to.
25     Q.    I'm sorry, who did you say you

Page 184

1    would work with on that?
2      A.    I would partner with whoever my
3    counterpart was at the time in the
4    laboratories.
5      Q.    Do you recall who your partner
6    in the -- your counterpart in the laboratories
7    was at this time?
8      A.    At this time I cannot remember
9    who was the supervisor in the MMR potency lab.
10     Q.    Once you completed a test
11   failure investigation, who would that be
12   submitted to?
13     A.    I can't remember.
14           MS. SCHMIDT:  Objection.
15           THE WITNESS:  I can't remember
16      where they went specifically and who
17      they were addressed to.
18   BY MS. ZINSER:
19     Q.    Do you remember the general
20   group they would be submitted to?
21     A.    They had to be approved by the
22   next level management.
23     Q.    What were possible outcomes
24   from a test failure investigation?

Page 185

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2      A.    A test failure investigation,
3    if the results were that the testing was valid
4    and the results did not meet specification,
5    then the lot would be quarantined and the
6    release group would determine the disposition
7    of that lot.
8      Q.    Disposition of the lot, would
9    the lot be destroyed?
10           MS. SCHMIDT:  Objection.
11           THE WITNESS:  I have no
12      knowledge of what happened to that lot.
13   BY MS. ZINSER:
14     Q.    Not that particular lot, but
15   just lots in general.  If a test failure
16   investigation has been submitted and it's
17   determined that the test did not meet the
18   specifications, what are the possible outcomes
19   for a lot?
20           MS. SCHMIDT:  Objection.
21           THE WITNESS:  So I was not ever
22      in the release group so I don't have
23      knowledge of their specific procedures.
24   BY MS. ZINSER:
25     Q.    If you wanted to know what

47 (Pages 182 - 185)

Page 186

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2   happened to a particular lot that you had
3   performed a test -- or were you involved with
4   the test failure investigation for, who would
5   you talk to in the case where, hey, whatever
6   happened to that lot, who would you ask about
7   that?
8      A.   I would ask the release group.
9      Q.   And do you know who was in the
10  release group at this time?
11     A.   It was a very large organization,
12  so there would have been a lot of people in
13  one group.
14     Q.   Release, that would have been
15  part of MMD at West Point?
16     A.   Correct.
17     Q.   The next page under "Assignments."
18        "L. Mo is to make a request to
19  BTL and BAD to have a TFI written."  What is
20  BTL?
21     A.   BTL was biological testing
22  laboratories.
23     Q.   And BAD, I know we've gone over
24  that one.
25     A.   Bioanalytical development.

Page 187

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2      Q.   "L. Mo will also write the
3   STI...."  Do you know what STI is?
4      MS. SCHMIDT:  Objection.
5      THE WITNESS:  Stability test
6      investigation.
7   BY MS. ZINSER:
8      Q.   Is that different from a test
9   failure investigation?
10     A.   Yes.
11     Q.   How -- what does a stability
12  test investigation involve?
13     MS. SCHMIDT:  Objection.
14     THE WITNESS:  I don't know.  I
15     was not in the stability unit and had
16     no responsibility for authoring those
17     documents.
18  BY MS. ZINSER:
19     Q.   So "L. Mo will write the STI
20  notification for this lot 0627847.
21  A. Romanowski is to write a TFI in conjunction
22  with BTL...," the biotesting labs.  But you
23  have no recollection of writing a TFI for this
24  lot?
25     MS. SCHMIDT:  Objection.

Page 188

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2      THE WITNESS:  No, I do not.
3   BY MS. ZINSER:
4      Q.   Underneath that, "A. Romanowski
5   is to pull the House standard information for
6   MUMPSVAX lot 1187E and trend the assay."  What
7   does it mean to trend the assay?
8      MS. SCHMIDT:  Objection.
9      THE WITNESS:  To trend the
10     assay in reference to the house
11     standard is to analyze its performance
12     over time.
13  BY MS. ZINSER:
14     Q.   And the last line of that
15  section, "M. Varilla will check with D.
16  Wonnacott whether a broader investigation is
17  needed."
18        And you don't recall whether
19  there was a broader investigation of this
20  particular lot?
21     A.   No, I do not recall.
22     MS. ZINSER:  I'm marking this
23     next exhibit as Keegan-24.
24          - - -
25     (Exhibit Keegan-24, Series of

Page 189

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2   slides, MRK-KRA01537297 - 01537307, was
3   marked for identification.)
4          - - -
5   BY MS. ZINSER:
6      Q.   Keegan-24 starts with 1537297.
7   It appears to be a series of slides.  There's
8   some handwriting at the top.  Do you recognize
9   that handwriting?
10     A.   Yes, that's my handwriting.
11     Q.   That was your handwriting.
12  Okay.  It's dated 4/15/99.  Do you recall
13  receiving these slides?
14     A.   It was 20 years ago, I can't
15  recall.
16     Q.   The first slide is "Low Mumps
17  Stability Potency Investigation."
18        "• Analysis Performed --
19  percentile Determination of Lot 0627847 by
20  Slope Analysis."
21        Do you agree that this is
22  related to the lot that we've been discussing?
23     A.   May I just double check the
24  numbers?
25     Q.   Absolutely.

48 (Pages 186 - 189)

Page 190

1        AMY KEEGAN - HIGHLY CONFIDENTIAL
2        A.    The lot numbers are the same.
3        Q.    The next page reads: Stability
4    Data for MMR Lot II -- M-M-R®II Lot 0627847.
5            And on the following page it
6    has the data. If you look at the column for
7    three months, and if you go over to the right
8    it says 3.7 average unadjusted and 3.7 for
9    average adjusted. Would you agree that those
10   are the potency measurements at three
11   months --
12           MS. SCHMIDT: Objection.
13   BY MS. ZINSER:
14       Q.    -- for this lot?
15           MS. SCHMIDT: Objection.
16           THE WITNESS: I agree that
17       that's what the document says.
18   BY MS. ZINSER:
19       Q.    At six months the potency
20   measurements are 3.5 and 3.5 unadjusted and
21   adjusted. Correct?
22           MS. SCHMIDT: Objection.
23           THE WITNESS: Yes, I agree
24       that's what the document says.
25   BY MS. ZINSER:

Page 191

1        AMY KEEGAN - HIGHLY CONFIDENTIAL
2        Q.    At nine months the potency
3    measurements were 3.4 and 3.3 unadjusted and
4    adjusted. Correct?
5        A.    Correct. Yes, I agree.
6        Q.    Go to the page ending in 7305.
7    The second bullet point says, "• Percentile
8    Determination of lot 0627847 by Slope
9    Analysis," and the sub-bullet "-- With HS...,"
10   house -- or would that stand for house
11   standard?
12           MS. SCHMIDT: Objection.
13           THE WITNESS: I believe so in
14       this document.
15   BY MS. ZINSER:
16       Q.    " -- With House Standard
17   adjustment, the loss rate at 9 months is
18   considered atypical (greater than 5 percent)."
19   [As read.]
20           Going back -- going back to
21   Keegan-23, Phil Bennett said that the loss
22   rate was still being considered typical --
23           MS. SCHMIDT: Objection.
24   BY MS. ZINSER:
25       Q.    -- on page ending 5943 of

Page 192

1        AMY KEEGAN - HIGHLY CONFIDENTIAL
2    Keegan-23.
3        A.    943?
4        Q.    Yes.
5        A.    Could you repeat the question?
6        Q.    First, you do see where it says
7    typical there and atypical in Exhibit 24.
8    Correct?
9            MS. SCHMIDT: Objection.
10           THE WITNESS: Yes, I see that.
11   BY MS. ZINSER:
12       Q.    Do you know why there would be
13   a change from the lot being considered typical
14   at nine months and then later being considered
15   atypical at nine months?
16           MS. SCHMIDT: Objection.
17           THE WITNESS: I did not perform
18       these analyses. I couldn't say.
19   BY MS. ZINSER:
20       Q.    Generally do you understand why
21   a lot would be considered typical, the potency
22   would be considered typical at a given time
23   and then later considered atypical at a given
24   time?
25           MS. SCHMIDT: Objection.

Page 193

1        AMY KEEGAN - HIGHLY CONFIDENTIAL
2            THE WITNESS: I could not
3        answer that without context for a
4        specific investigation.
5    BY MS. ZINSER:
6        Q.    Back to Keegan-24, on page
7    ending in 7306. Under "Conclusions," it says,
8    "• Absolute Potency Analysis Comparison."
9    What does absolute potency mean?
10           MS. SCHMIDT: Objection.
11           THE WITNESS: I did not prepare
12       these slides nor do the analysis, I
13       don't know what was intended.
14   BY MS. ZINSER:
15       Q.    Have you ever heard the term
16   "absolute potency" before?
17       A.    Yes, I have. I don't know if
18   it's in this context, though.
19       Q.    What's been your understanding
20   of how it's been used in other contexts?
21       A.    In my experience, absolute
22   potency typically refers to unadjusted
23   potency.
24       Q.    Meaning unadjusted to the house
25   standard?

49 (Pages 190 - 193)

Page 194

1     AMY KEEGAN - HIGHLY CONFIDENTIAL
2      A.    I believe so.
3      Q.    So going on, "-- At 6 month and
4   9 month intervals, the absolute months
5   potencies for lot 0627847 are considered
6   atypical, compared to the historical stability
7   data collected on mumps-containing lots."
8           So this page is saying absolute
9   potency, the lot is being considered atypical.
10  And the previous page, when it's adjusted for
11  the house standard, it's also being considered
12  atypical.  Do you agree?
13          MS. SCHMIDT:  Objection.
14          THE WITNESS:  I agree that's
15      what these slides state.
16  BY MS. ZINSER:
17      Q.    And the next page ending in
18  7307, more "Conclusions."  This lot was tested
19  between April 2, 1999 and August 21, 1998 --
20  and August 21, 1998.  Do you see that?
21      A.    I do see that.
22      Q.    Do you -- and you have no
23  record -- you've already said you have no
24  recollection of this lot?
25      A.    It's 20 years ago.

Page 195

1     AMY KEEGAN - HIGHLY CONFIDENTIAL
2      Q.    You don't know whether it was
3   recalled?
4      A.    No, I have no knowledge of the
5   lot disposition.
6          MS. ZINSER:  Marking this next
7      exhibit as Keegan-25.
8              - - -
9      (Exhibit Keegan-25, Meeting
10      Agenda, MRK-KRA00285466 & 00285467, was
11      marked for identification.)
12              - - -
13  BY MS. ZINSER:
14      Q.    Meeting agenda, the Bates
15  number is 285466.  The subject matter was
16  "Aging of Clinical Material for MMR®II Expiry
17  Trial."  Is that the Protocol 007 trial?
18          MS. SCHMIDT:  Objection.
19          THE WITNESS:  I can't tell from
20      this document.
21  BY MS. ZINSER:
22      Q.    Under the list of invitees, you
23  are listed on the second line.  Do you see
24  that?
25      A.    Yes, I do.

Page 196

1     AMY KEEGAN - HIGHLY CONFIDENTIAL
2      Q.    Do you have any recollection of
3   this meeting?
4      A.    It was 20 years ago.  I can't
5   remember if I attended this meeting.
6      Q.    Sure.  Item Number 1 under the
7   "Agenda," "If we utilize Lot 0627847, given
8   its 'irregularities.'
9          "• What are the implications
10  for MMD.
11          "• What message does this send
12  to CBER."
13          This is the same lot that we've
14  been discussing.  Correct?  You can absolutely
15  take your time to check, sure.
16      A.    I agree that that lot number is
17  the same.
18      Q.    Do you know if lot -- strike
19  that.
20          Do the irregularities refer to
21  the low potency measurements of this lot that
22  we've been discussing?
23          MS. SCHMIDT:  Objection.
24          THE WITNESS:  I did not prepare
25      this agenda.  I don't know what the

Page 197

1     AMY KEEGAN - HIGHLY CONFIDENTIAL
2      author meant.
3   BY MS. ZINSER:
4      Q.    Do you know anything about what
5   irregularities means in this context?
6          MS. SCHMIDT:  Objection.
7          THE WITNESS:  I have no
8      knowledge of what was meant.  I don't
9      remember.
10  BY MS. ZINSER:
11      Q.    Do you recall irregularities
12  being used in the context of any lots?
13          MS. SCHMIDT:  Objection.
14  BY MS. ZINSER:
15      Q.    In the discussion of any lots,
16  discussing a lot's irregularities?
17      A.    It's not a term that I would
18  see typically, no.
19      Q.    Do you know if this lot was
20  utilized in the MMR II expiry trial?
21          MS. SCHMIDT:  Objection.
22          THE WITNESS:  I was not a
23      clinical scientist and had no
24      responsibilities for selecting clinical
25      trial material.

50 (Pages 194 - 197)

Appx19046

Page 198

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    BY MS. ZINSER:
3        Q.    What was your role again in the
4    end expiry trial?  I know you were in
5    clinical, but what was your work again for the
6    trial?
7        A.    Mine was -- my work was after
8    the trial.  And that was, again, specifically
9    to implement that 1x6 testing format as well
10   as the house standard calibration.
11       MS. ZINSER:  I think we'll take
12   a break for right now.
13       VIDEOGRAPHER:  Off the record
14   at 2:22.  This will end disc number
15   three.
16           - - -
17       (A recess was taken.)
18           - - -
19       VIDEOGRAPHER:  The time now is
20   2:39.  Back on the record.  Beginning
21   disc number four.
22           - - -
23       (Exhibit Keegan-26, Response to
24   Form FDA for Merck Biological Manufacturing
25   Facility, West Point, MRK-KRA00784030 -

Page 199

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    00784046, was marked for identification.)
3           - - -
4    By MS. ZINSER:
5        Q.    The next document I'm going
6    show you we've marked as Keegan-26.  Keegan-26
7    is a document beginning with Bates number
8    784030.  The label at the top is "Response to
9    Form FDA 483 for Merck Biological
10   Manufacturing Facility, West Point," and the
11   date is October 24, 2000.  Have you seen this
12   document before?
13       A.    I can't recall if I have.
14       Q.    Did you help or aid in
15   preparing responses to Form 483 reports?
16       MS. SCHMIDT:  Objection.
17       THE WITNESS:  In my experience
18   in laboratories, on occasion I did
19   assist in preparing responses.
20   BY MS. ZINSER:
21       Q.    In what time frame were you
22   assisting to preparing responses to 483s?
23       MS. SCHMIDT:  Objection.
24       THE WITNESS:  So I was in the
25   quality control laboratories from 1996

Page 200

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    to 2005.  So in the course of that time
3    frame, I may have had occasion to
4    prepare responses.
5    BY MS. ZINSER:
6        Q.    Were you involved with preparing
7    this response to a 483?
8        MS. SCHMIDT:  Objection.
9        THE WITNESS:  I don't recall if
10   I was or not.
11   BY MS. ZINSER:
12       Q.    Turning to the second page of
13   Keegan-26, under "Observation #3," it says,
14   "Error and Accident Reports have not been
15   submitted to CBER for the following product
16   stability failures."
17       Part (c) is "M-M-R II, lot
18   0627847, failed mumps potency at 6 months, 9
19   months, 12 months, 18 months, and
20   24 months...."  Is this the lot that we've
21   been talking about?
22       MS. SCHMIDT:  Objection.
23       THE WITNESS:  May I check the
24   number?
25   BY MS. ZINSER:

Page 201

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2        Q.    Yes.
3        A.    That was point (c)?
4        Q.    Yes.
5        A.    Thank you.  Yes, that number is
6    the same.
7        Q.    Going back to Keegan-1, your
8    CV.
9        A.    Yes.  May I look at the
10   document?
11       Q.    You can refer to those
12   absolutely.
13       A.    Thank you.
14       Q.    If you look at page 2 of your
15   CV under April '98 to July 2002, the second
16   bullet point down, "Partnered with Vaccine
17   Biometrics to develop a statistical tool to
18   perform real-time assay tracking and trending
19   for measles, mumps and rubella potency assays
20   in response to an FDA 483 inspection
21   observation."
22       Was this the response to the
23   FDA 483 inspection observation that you worked
24   on?
25       A.    Which response, please?

51 (Pages 198 - 201)

Page 202

1     AMY KEEGAN - HIGHLY CONFIDENTIAL
2         MS. SCHMIDT: Objection.
3    BY MS. ZINSER:
4         Q.    This response, Keegan-26.
5         A.    The whole document?
6         Q.    Did you respond, did you work
7    on the responses to any parts of this
8    document?
9         MS. SCHMIDT: Objection.
10        THE WITNESS: I can't say for
11   certain without reviewing this
12   document.
13   BY MS. ZINSER:
14        Q.    Go ahead.  You can review it.
15        A.    Okay.  I will, thank you.
16   Okay.  Thank you.
17        Q.    So is this the response to a
18   483 that you helped in preparing?
19        MS. SCHMIDT: Objection.
20        THE WITNESS: So I did not
21   help -- I do not recall that I helped
22   prepare these responses.  I worked on
23   the remediation activity.
24   BY MS. ZINSER:
25        Q.    The remediation.  What was the

Page 203

1     AMY KEEGAN - HIGHLY CONFIDENTIAL
2    remediation activity?
3         A.    I helped Vaccine Biometrics
4    develop the statistical tool for trending
5    house standard performance.
6         Q.    That was in response to this
7    particular observation?
8         MS. SCHMIDT: Objection.
9    BY MS. ZINSER:
10        Q.    The observation number 3
11   related to certain lots being low potency?
12        MS. SCHMIDT: Objection.
13        THE WITNESS: No, those would
14   be unrelated.
15   BY MS. ZINSER:
16        Q.    So which part of this 483 was
17   your remediation activities related to?
18        MS. SCHMIDT: Objection.
19        THE WITNESS: Give me a moment
20   to review to see if it actually is
21   included.  I actually don't see in this
22   document, in Number 26 that there is an
23   observation that relates to that bullet
24   point on my CV.
25   BY MS. ZINSER:

Page 204

1     AMY KEEGAN - HIGHLY CONFIDENTIAL
2         Q.    So the date of this response,
3    of Keegan-26 is October 24, 2000.  Correct?
4         MS. SCHMIDT: Objection.
5         THE WITNESS: Yes, the document
6    is dated that October 24th.
7    BY MS. ZINSER:
8         Q.    During the period of April '98
9    to 2002, were you involved with -- how many
10   FDA 483 inspections were you involved with
11   responding to?
12        A.    I don't know for sure.
13        Q.    Was it more than one?
14        A.    More than one.
15        Q.    It was more than one.  Okay.
16   What are the details of the other 483
17   inspection?  What were the findings of the
18   inspection?
19        MS. SCHMIDT: Objection.
20        THE WITNESS: So I don't ever
21   see actually the 483 form or the
22   complete observations.  You work on
23   your specific one that you're assigned.
24   BY MS. ZINSER:
25        Q.    Do you ever see the full

Page 205

1     AMY KEEGAN - HIGHLY CONFIDENTIAL
2    response?
3         A.    As I stated, no, I do not.
4         Q.    But I misunderstood.  Do you
5    see the full observation report from the FDA?
6         A.    No, I usually do not.
7         Q.    If you wanted to see the full
8    report, who would you ask for that?
9         A.    The compliance organization
10   maintains those records.
11        Q.    Who is in the compliance
12   organization?
13        A.    So it's part of the quality
14   organization.  I don't -- there's many --
15   there's hundreds of people.
16        Q.    Going back to Keegan-26 on the
17   page ending in 4032.  In the second paragraph
18   in italics under "Merck's Response to
19   Observation #3," the middle of the -- or the
20   beginning of the paragraph, towards the
21   beginning, it says, "In teleconferences with
22   CBER in 1996 and 1997, the need to define the
23   label claims for measles, mumps and rubella
24   potency in terms of the minimum acceptable
25   titers at expiry became evident."  Is this

52 (Pages 202 - 205)

Appx19048

Page 206

AMY KEEGAN - HIGHLY CONFIDENTIAL
1
2  correct?
3       MS. SCHMIDT:  Objection.
4       THE WITNESS:  I'm sorry, I'm
5  not sure where you were.
6  BY MS. ZINSER:
7       Q.   The second paragraph in italics.
8       A.   Thank you.
9       Q.   Yes.  The second -- beginning
10 with the second sentence of that paragraph.
11      A.   Thank you.
12      MS. SCHMIDT:  Could you repeat
13      the question?
14 BY MS. ZINSER:
15      Q.   That sentence, is that correct,
16 "In teleconferences with CBER in 1996 and
17 1997, the need to define the label claims for
18 measles, mumps and rubella potency in terms of
19 the minimum acceptable titers at expiry became
20 evident."
21      MS. SCHMIDT:  Objection.
22 BY MS. ZINSER:
23      Q.   Is that correct?
24      A.   I was not a participant in any
25 of those teleconferences so I cannot say.

Page 207

AMY KEEGAN - HIGHLY CONFIDENTIAL
1
2       Q.   Were you aware of the statement
3  in Keegan-26 when you were drafting Keegan-9?
4       MS. SCHMIDT:  Objection.
5       THE WITNESS:  What was
6       Keegan-29, I'm sorry?
7  BY MS. ZINSER:
8       Q.   I'm sorry, Keegan-26, the one
9  we're looking at, and Keegan-9.
10      A.   Oh, Keegan-9.  Thank you.
11 Since I don't believe that I have seen this
12 document which is Keegan-26, no, I did not
13 consult this document.
14      Q.   Sitting here today, how do you
15 reconcile those two statements about when the
16 mumps end expiry was established?
17      MS. SCHMIDT:  Objection.
18      THE WITNESS:  I don't know what
19      two statements you're referring to.
20      Could you clarify, please?
21 BY MS. ZINSER:
22      Q.   The statement in Keegan-9 where
23 it says, "In 1990 the mumps virus end-expiry
24 potency for M-M-RTMII was established as
25 4.3...."

Page 208

AMY KEEGAN - HIGHLY CONFIDENTIAL
1
2       Then in Keegan-26 the sentence
3  that we were looking at, "In teleconferences
4  with CBER in 1996 and 1997, the need to define
5  label claims for measles, mumps and rubella
6  potency in terms of the minimum acceptable
7  titers at expiry became evident."
8       A.   I don't see how these two
9  relate.  I'm sorry.  Can you repeat the
10 question?
11      Q.   I'll go on in Exhibit 26.
12 "Merck considered the specifications described
13 on the package circulars 20,000 TCID.../dose
14 for mumps as minimum release specifications,
15 and did not consider them expiry
16 specifications.  Communications beginning in
17 1997 focused on defining the expiry
18 specifications for the product."
19      My question is, how do you
20 resolve that, the communications beginning in
21 1997 focusing on defining the expiry
22 specification, how do you reconcile that with
23 the statement in Keegan-9 that as of 1990 the
24 mumps end expiry potency had been established
25 at 4.3?

Page 209

AMY KEEGAN - HIGHLY CONFIDENTIAL
1
2       MS. SCHMIDT:  Objection.
3       THE WITNESS:  As I stated, I
4       have never seen Document 26 so I have
5       no knowledge of those teleconferences.
6       And as stated previously for Document
7       Number 9, I wrote this document in 2011
8       reviewing a document dated 1990.  And
9       it was my interpretation of that
10      document dated 1990, when I reviewed it
11      in 2011, that was my interpretation of
12      the statement in the document.
13 BY MS. ZINSER:
14      Q.   Sitting here today, do you
15 believe, do you still believe the statement in
16 Keegan-9 is correct?
17      MS. SCHMIDT:  Objection.
18      THE WITNESS:  That was my
19      interpretation at the time.
20 BY MS. ZINSER:
21      Q.   And what is your understanding
22 today?
23      A.   I actually don't have an
24 understanding of the documents.
25      Q.   So is it still -- do you still

53 (Pages 206 - 209)

Page 210

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2  believe that the mumps end expiry potency was
3  established in 1990 as 4.3?
4          MS. SCHMIDT: Objection.
5          THE WITNESS: Again, as I
6      stated, when I reviewed -- when I
7      prepared this document, it was my
8      interpretation of a statement in a
9      regulatory approval.
10 BY MS. ZINSER:
11     Q.    And no one ever told you that
12 this was wrong or that they disagreed with
13 that interpretation?
14         MS. SCHMIDT: Objection.
15         THE WITNESS: I do not recall
16     having had that conversation with
17     anyone, no.
18         MS. ZINSER: I'm going to go on
19     to a handwritten one. The next
20     document will be Keegan-27.
21             - - -
22     (Exhibit Keegan-27, Handwritten
23     notes, MRK-KRA01537292 - 01537296, was
24     marked for identification.)
25             - - -

Page 211

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2  BY MS. ZINSER:
3      Q.    Keegan-27 begins with Bates
4  number 1537292, and it's a -- several pages of
5  handwritten notes. Do you recognize this
6  handwriting?
7      A.    I do. It's mine.
8      Q.    If we go to the page ending in
9  7295, at the top of the page it says TFI, I
10 believe that's required April 9, 1999 by S.U.
11 Is SU the stability unit?
12     A.    I couldn't say. I don't
13 remember this particular document.
14     Q.    Did you typically use that
15 abbreviation for stability unit?
16         MS. SCHMIDT: Objection.
17         THE WITNESS: I couldn't say.
18     I don't recall this document.
19 BY MS. ZINSER:
20     Q.    Right below that line there is
21 a number 0627847. Is that the lot number that
22 we've been discussing?
23         MS. SCHMIDT: Objection.
24 BY MS. ZINSER:
25     Q.    Absolutely.

Page 212

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2      A.    Yes, it is the same number.
3      Q.    Does this mean that a TFI was
4  required for that particular lot?
5      A.    I don't know if it's required
6  or requested, but...
7      Q.    Was it either required or
8  requested a TFI for this particular lot, do
9  you agree that that's what this means?
10         MS. SCHMIDT: Objection.
11         THE WITNESS: As I stated, I
12     don't know if that's requested or
13     required there.
14 BY MS. ZINSER:
15     Q.    But in relation to that
16 particular lot.
17     A.    I'll reference the other
18 document previously --
19     Q.    Yes.
20     A.    -- that said that I was
21 assigned to generate a TFI, yes.
22     Q.    And the first line again, next
23 to where it says "S.U.," it says, "TFI
24 99-069."
25         Do you see that?

Page 213

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2      A.    I do.
3      Q.    Do you know if that's typically
4  how TFIs were referenced?
5          MS. SCHMIDT: Objection.
6          THE WITNESS: So my recollection
7      from that time is that that looks
8      typical. There's a year and then a
9      sequential designation assigned to it.
10     So that the first number is 9, 99 the
11     year and then 069 is a sequential
12     number.
13 BY MS. ZINSER:
14     Q.    So if you were to look up a
15 TFI, specific TFI, is that the number -- first
16 of all, where would you look for the TFI, if
17 you wanted to find one?
18     A.    The quality organization, I
19 believe, maintains those records.
20     Q.    The quality organization?
21     A.    Yes.
22     Q.    Is there some sort of
23 departmental file where those investigations
24 would be maintained?
25         MS. SCHMIDT: Objection.

54 (Pages 210 - 213)

Appx19050

Page 214

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2        THE WITNESS: I was never in
3    that particular part of the
4    organization so I'm not aware.
5    BY MS. ZINSER:
6        Q.    You said that you did not know
7    what the result of this particular TFI was
8    performed for this lot. Correct?
9        MS. SCHMIDT: Objection.
10        THE WITNESS: Can you explain
11    what you mean by "result"?
12    BY MS. ZINSER:
13        Q.    Go back to where it says that a
14    TFI was requested. Going back to Keegan-23.
15        A.    Give me a moment. Okay. I got
16    it. Thank you.
17        Q.    The page ending in 5944.
18        A.    Okay.
19        Q.    Under "Assignments," L. Mo will
20    write the STI and notification for this lot
21    0627847. A. Romanowski is to write a TFI in
22    conjunction with BLT. Is that correct?
23        A.    I agree, that's what that
24    document says.
25        Q.    Do you know what happens after

Page 215

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    completing that TFI?
3        A.    I don't. My role in this was
4    to complete the TFI.
5        MS. ZINSER: The next document
6    is Keegan-28 starts with Bates number
7    1632656. And this is an annual
8    stability report from the biological
9    stability program.
10        - - -
11        (Exhibit Keegan-28, Biological
12    Stability Program Annual Stability
13    Report, MRK-KRA01632656 - 01632686, was
14    marked for identification.)
15        - - -
16    BY MS. ZINSER:
17        Q.    Have you seen this document
18    before? I'm only going to direct you to a few
19    pages.
20        A.    It doesn't look familiar to me,
21    no.
22        Q.    Have you seen any annual
23    stability reports before?
24        A.    In my current function in CMC
25    the annual stability reports are delivered to

Page 216

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    me for just documentation purposes.
3        Q.    Do you typically read them?
4        A.    I do scan them, yes.
5        Q.    Turning to the second page
6    which ends in 2657.
7        A.    Okay.
8        Q.    In the chart, the third line up
9    from the bottom is the lot 0627847. And,
10    again, can we agree that that's the lot we've
11    been talking about? You can check if you
12    want.
13        A.    I do remember the lot now.
14        MS. SCHMIDT: Object.
15    BY MS. ZINSER:
16        Q.    Under "Purpose," if you go
17    along to the right, it's "Clinical Mumps
18    Expiry Trial Study."
19        Do you see that?
20        A.    I do see that, yes.
21        Q.    Do you -- does this refresh
22    your memory that this lot -- whether this lot
23    was used in the clinical mumps expiry trial
24    study?
25        MS. SCHMIDT: Objection.

Page 217

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2        THE WITNESS: No, I have no
3    knowledge of the protocol design or the
4    lots that were used in that study.
5    BY MS. ZINSER:
6        Q.    Do you have any reason to
7    believe that this would be in -- that this
8    annual stability report would be incorrect?
9        MS. SCHMIDT: Objection.
10        THE WITNESS: I have no reason
11    to believe that, no.
12    BY MS. ZINSER:
13        Q.    Looking down at the bottom of
14    the same page under "Mumps Potency," the last
15    entry, "Lot 0627487: Mumps potency results at
16    the 6 and 9 months time intervals were below
17    the specification limit. The below
18    specification limit results for both time
19    intervals can be attributed to the lower than
20    average release potency along with the higher
21    than average loss rate...."
22        At this time in 1999 do you
23    recall what the release potency was, the
24    release potency spec for mumps?
25        MS. SCHMIDT: Objection.

55 (Pages 214 - 217)

Appx19051

Page 218

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2        THE WITNESS:  No, I don't.  I
3    don't recall specifically.  I would
4    need to consult the quality standard in
5    place at that time.
6    BY MS. ZINSER:
7        Q.    If we go back, then, to
8    Keegan-9, the last, very last sentence says,
9    "These documents validated that M-M-RTMII has
10   been formulated to a target mump virus potency
11   of 5.2 lots...since 1999."
12       Does that refresh your memory
13   that that's what the release -- sorry, the
14   formulation target was in 1999?
15       MS. SCHMIDT:  Objection.
16       THE WITNESS:  So can you
17   clarify because I'm confused?  The one
18   document you asked me about, release
19   specification and this one is
20   targeting.  So I don't understand what
21   you're asking.
22   BY MS. ZINSER:
23       Q.    You're correct.
24       Going back to the first line of
25   that entry, mumps potency results at 6.9 month

Page 219

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    time intervals were below the specification
3    limit, and earlier exhibits saying that this
4    lot was atypical and that there were
5    irregularities, would a lot with irregularities
6    be used -- do you think a lot with
7    irregularities or potency below the
8    specification for a given time should be used
9    in the clinical study?
10       MS. SCHMIDT:  Objection.
11       THE WITNESS:  I have no
12   knowledge of what the intended purpose
13   of the reference clinical study was so
14   I can't speculate and that's outside of
15   my area of expertise.
16   BY MS. ZINSER:
17       Q.    Do you agree that the clinical
18   mumps expiry study referenced in the chart
19   above is the mumps end expiry study 007?
20       MS. SCHMIDT:  Objection.  And
21   asked and answered.
22       THE WITNESS:  No, I can't agree
23   to that because Protocol 007 is not
24   referenced here.
25   BY MS. ZINSER:

Page 220

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2        Q.    Are you aware of any other
3    clinical mumps expiry trial studies?
4        MS. SCHMIDT:  Objection.
5        THE WITNESS:  I have not ever
6    been a member of the Clinical Study
7    Team.  It's outside of my area of
8    expertise, I have no familiarity.
9    BY MS. ZINSER:
10       Q.    But you did work with potency,
11   correct, that was -- measuring potency and the
12   assays from mumps.  Correct?
13       MS. SCHMIDT:  Objection.
14       THE WITNESS:  From mumps
15   potency for infectivity tests for the
16   purposes of lot release, yes.
17   BY MS. ZINSER:
18       Q.    As we saw from the documents, I
19   know you didn't recall them since they were a
20   while ago, but your name was on a lot of these
21   documents having to do with the result of this
22   particular lot.  Correct?
23       MS. SCHMIDT:  Objection.
24   BY MS. ZINSER:
25       Q.    And how they were atypical?

Page 221

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2        MS. SCHMIDT:  Objection.
3        THE WITNESS:  Which question
4    should I answer?
5    BY MS. ZINSER:
6        Q.    You were on these documents
7    related to this lot?
8        A.    I agree that my name is on
9    these documents.  Not this document but those
10   previous documents.
11       Q.    Sure.  If you were aware that
12   this particular lot was irregular or below
13   spec, should you have told someone that maybe
14   it shouldn't have been used in the trial?
15       MS. SCHMIDT:  Objection.
16       THE WITNESS:  As I stated, I
17   had no responsible or functional role
18   in clinical, and it's outside of my
19   area of expertise.  I can't determine
20   what was appropriate use in a clinical
21   trial.
22   BY MS. ZINSER:
23       Q.    I understand, you know, it's
24   not your official responsibility, but we've
25   looked at maybe four or five documents related

56 (Pages 218 - 221)

Appx19052

Page 222

1           AMY KEEGAN - HIGHLY CONFIDENTIAL
2    to this particular lot all of which said that
3    this lot is irregular or out of specification.
4    Aside from a formal responsibility, do you
5    think you just had a general responsibility to
6    tell someone that this lot may not be
7    appropriate to use in a clinical study?
8           MS. SCHMIDT:  Objection.
9           THE WITNESS:  No, I don't think
10   that I had that responsibility.
11          MS. ZINSER:  This next document
12   will be marked as Keegan-29.
13                - - -
14          (Exhibit Keegan-29, Potency
15   Standard Historical Review, MRK-KRA01543545 -
16   01543585, was marked for identification.)
17                - - -
18   BY MS. ZINSER:
19      Q.    Keegan-29 is entitled, "Potency
20   Standard Historical Review" beginning with the
21   Bates number 1543545.  Do you recognize this
22   document?
23      A.    Yes, I do.
24      Q.    Did you prepare this document?
25      A.    Yes, I did.

Page 223

1           AMY KEEGAN - HIGHLY CONFIDENTIAL
2      Q.    Do you recall who instructed
3    you to prepare this document?
4      A.    No, I can't recall why I
5    prepared this document.
6      Q.    At this time, who did you
7    report to in October of 2008?
8      A.    October 2008 I report to
9    Gabriel Bikah.
10     Q.    And what was Gabriel --
11     A.    Gabriel, yeah.
12     Q.    What was Gabriel Bikah's
13   position?
14     A.    He was head of an organization,
15   well, called RAS/BAS, regulatory analytical
16   sciences/bioanalytical sciences.
17     Q.    But you don't have any
18   recollection if he instructed you to prepare
19   this document?
20     A.    No, I can't remember.
21     Q.    Do you know if you worked with
22   anyone else on this document?
23     A.    I can't remember.
24     Q.    Going to page 3, ending in
25   3547, the heading is "Control Limits."  The

Page 224

1           AMY KEEGAN - HIGHLY CONFIDENTIAL
2    fourth bullet down says, Continuous
3    reevaluation is not recommended.  Does that
4    refer to continuous reevaluation of the
5    standard?
6           MS. SCHMIDT:  Objection.
7           THE WITNESS:  No.  That has a
8    different meaning in this document.
9    BY MS. ZINSER:
10     Q.    What does it mean in here?
11     A.    In the '80s it was common, this
12   is, again, from reviewing historical
13   documents, I have no firsthand knowledge of
14   this, based on the actual performance observed
15   for the standard in a given time frame, the
16   house standard potency was reassigned.
17     Q.    What was the performance that
18   caused it to be reassigned?
19     A.    So just the assay, the output,
20   the result for the house standard could move
21   up or down based on the sensitivity of the
22   assay during that given time frame so they
23   would just reassign the value to match that
24   performance.
25     Q.    And this is what they would do

Page 225

1           AMY KEEGAN - HIGHLY CONFIDENTIAL
2    historically?  I'm sorry.
3      A.    Yes, as stated it was in common
4    practice in the '80s.
5           MS. SCHMIDT:  Objection.
6    BY MS. ZINSER:
7      Q.    Okay.  In the '80s.  Okay.
8           When it was abandoned in the
9    '90s as scientifically unsound and a
10   compliance concern, what does that mean,
11   scientific unsound?
12          MS. SCHMIDT:  Objection.
13          THE WITNESS:  So to me and
14   looking back on this document, it meant
15   that you should not adjust your
16   results, you should have predetermined
17   criteria that you use to evaluate.  You
18   should not be changing those criteria
19   over time.
20   BY MS. ZINSER:
21     Q.    Going back just to the first
22   page, the title is historical review, "Potency
23   Standard Historical Review."  Do you know why
24   a historical review was being performed at
25   this time of the potency standard?

57 (Pages 222 - 225)

Page 226

1          AMY KEEGAN - HIGHLY CONFIDENTIAL
2          A.    So this document does not
3    represent a historical review.  It's a slide
4    deck to educate others.
5          Q.    Do you know who was the
6    audience for this -- for the slide deck?
7          A.    If memory serves correctly, it
8    was for the technology group who asked for a
9    basic understanding of how we use our potency
10   assays and evaluate the standard over time.
11         Q.    But you wouldn't refer to this
12   as a historical review?
13         A.    It's a historical review of
14   practices over time.  It is not a historical
15   review of the data, nor is it intended to be
16   that.
17         Q.    Fair enough.  I understand.
18   Going back to the page that we were on, 3547,
19   under that same bullet, the second sub-bullet,
20   I guess, reads, "A shift in observed potency
21   suggests a shift in the assay system
22   sensitivity or a system out of control."
23         What do you mean by "a system
24   out of control"?
25         A.    So in the context of this

Page 227

1          AMY KEEGAN - HIGHLY CONFIDENTIAL
2    particular statement which is specifically in
3    reference to the house standard.  As I stated
4    earlier, you should have predesignated
5    criteria to evaluate that standard against.
6    If you continually move your criteria, then
7    the system is out of control.  You have no
8    baseline.
9          Q.    So when you say a shift in
10   observed potency, you mean a shift in the
11   assigned value of the house standard?
12         MS. SCHMIDT:  Objection.
13         THE WITNESS:  The observed
14   potency is the output of the data
15   without adjustment.  The house standard
16   is always raw data of the unadjusted --
17   BY MS. ZINSER:
18         Q.    Of the observed -- I'm sorry,
19   go ahead.
20         A.    No.  Unadjusted data.
21         Q.    So the shift in the observed
22   potency, the observed potency of a sample that
23   you're testing?
24         A.    No.  As stated the control
25   limits apply specifically to the house

Page 228

1          AMY KEEGAN - HIGHLY CONFIDENTIAL
2    standard, not to samples.
3          Q.    Going to I guess it's slide
4    number 12 with a Bates number ending in 3556,
5    the heading "Assigned Potency."
6          A.    Yes.
7          Q.    The second bullet says,
8    "Initial standard lot observed equals
9    assigned."  [As read.]
10         What does that mean?
11         A.    In previous practices the
12   observed number was always the assigned
13   number.  It did not relate to an adjustment to
14   a previous standard.
15         Q.    So that means in the second or
16   the bullet after that, "Successive standard
17   assignment is relative to the previous
18   standard/MRS."
19         So each subsequent house
20   standard would be calibrated based on the
21   previous or would it be calibrated based on
22   the initial house standard?
23         MS. SCHMIDT:  Objection.
24         THE WITNESS:  So in my
25   experience from the time the testing

Page 229

1          AMY KEEGAN - HIGHLY CONFIDENTIAL
2    laboratories, you would run the two
3    standards in parallel and use their
4    relative potency to assign the potency
5    of the next standard.
6    BY MS. ZINSER:
7          Q.    Going down a couple of bullets,
8    "Once assigned, do not reassign."  Did Merck
9    ever reassign the house standard?
10         MS. SCHMIDT:  Objection.
11         THE WITNESS:  Can you clarify
12   which house standard?
13   BY MS. ZINSER:
14         Q.    For mumps.
15         MS. SCHMIDT:  Objection.
16         THE WITNESS:  I don't -- yes, I
17   think we did.
18   BY MS. ZINSER:
19         Q.    Do you recall when that was?
20         A.    No, I can't recall specifically.
21         Q.    Do you recall generally if it
22   was before this document, prior to 2008?
23         A.    Yes, it would have been prior
24   to this document, I think.  I think.
25         Q.    Were you involved at all with

58 (Pages 226 - 229)

Appx19054

Page 230

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2 the reassignment of the house standard?
3      A.   No. I believe statistics did
4 that evaluation.
5      Q.   Do you know who would have been
6 involved with that?
7          MS. SCHMIDT: Objection.
8 BY MS. ZINSER:
9      Q.   Who was in statistics?
10      A.   I can't remember which
11 statistician did it.
12      Q.   Is that the only time of a
13 reassignment of a house standard for mumps
14 that you're aware of?
15      A.   So my time frame in the
16 laboratories, I was only using I think mumps
17 standard lot eight. It was used the entire
18 time. So that is the only one that I'm aware
19 of.
20      Q.   Do you know if they're still
21 using lot eight now?
22          MS. SCHMIDT: Objection.
23          THE WITNESS: From my
24      experience not in the laboratories but
25      my experience in regulatory, no, it has

Page 231

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2      been replaced.
3 BY MS. ZINSER:
4      Q.   Is it lot nine or is it one
5 later than that?
6      A.   I believe it's lot nine.
7      Q.   Slide 26, the page ending 3570.
8      A.   Okay.
9      Q.   The heading is "MMR Standard
10 History"?
11      A.   Yes.
12      Q.   And the first bullet, "Historically
13 no standard or sample calibration performed."
14 The second bullet, "More recently Calibration
15 established as best practice."
16      More recently? Do you know
17 when that occurred, that calibration started
18 to be performed?
19      A.   My recollection is that there
20 was a series of regulatory filings in the
21 early 2000s which established that in addition
22 to the 1x6 format.
23      Q.   Would that have been filed in,
24 I guess, the BLA for each product for MMR II
25 for Mumpsvax when it was still on the market

Page 232

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2 or would it be filed in the BLA for one
3 particular product?
4          MS. SCHMIDT: Objection.
5          THE WITNESS: So can you
6      clarify, what do you mean by what?
7 BY MS. ZINSER:
8      Q.   You said that there were
9 filings in the early 2000s when Merck began to
10 establish calibration to the house standard as
11 a best practice. Correct?
12      A.   Correct.
13      Q.   Where would those filings have
14 been? Would they have been part of the BLA?
15      A.   So changes are --
16          MS. SCHMIDT: Objection.
17          THE WITNESS: -- filed to the
18      BLA.
19 BY MS. ZINSER:
20      Q.   That was a clearer way than I
21 was saying it.
22      Would it have been a change to
23 the BLA for Mumpsvax?
24          MS. SCHMIDT: Objection.
25          THE WITNESS: So I would need

Page 233

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2      to see the document and which STN
3      numbers and BLA numbers were included.
4      I did not perform those filings. I
5      only have historical reference to them.
6 BY MS. ZINSER:
7      Q.   Slide 31 ending in 3575.
8      A.   Okay.
9      Q.   Heading "ProQuad Standard History."
10 The "Original clinical lots assigned potency
11 versus monovalent M, U, R and V standards."
12 [As read.] Does M. U. R and V stand for
13 measles, mumps, rubella and varicella?
14      A.   That is correct.
15      Q.   Below the redacted block,
16 "Implications of ACF." What is ACF?
17      A.   Antiserum correction factor.
18      Q.   What is that, the antiserum
19 correction factor?
20      A.   So this is specific to ProQuad
21 which has -- is a different vaccine than MMR
22 and has additional antiserum that are needed
23 to neutralize out the other three components
24 of the vaccine so you may study the specific
25 virus of target.

59 (Pages 230 - 233)

Appx19055

Page 234

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    Q.    The implications of this --
3    what is an antiserum?
4    A.    Antiserum is -- serum is a
5    blood by-product and it contains antibodies.
6    So it is -- generally antiserum will have an
7    antibody in it that binds to a specific
8    protein.
9    Q.    So it's a serum with the
10   antibodies in it?
11   A.    Yes.
12   Q.    Nice shorthand for it.  Okay.
13   So under "Implications of ACF"
14   "Can not change/reevaluate assigned potency
15   for PQ standards...," ProQuad standards
16   "...because would break link to clinical
17   efficacy."  [As read.]
18   What does breaking the link to
19   clinical efficacy mean?
20   MS. SCHMIDT:  Objection.
21   THE WITNESS:  So in the
22   regulations it does require that you
23   tie your reference standards to
24   clinical material.  And if in a best
25   situation, that you actually use your

Page 235

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    clinical material as your reference
3    standard.  My recollection of ProQuad
4    is that it was one of the consistency
5    series that was selected for the
6    reference standard.
7    BY MS. ZINSER:
8    Q.    I'm sorry, one of the
9    consistency series?
10   A.    Yeah, one of the clinical lots
11   that was used in a clinical trial.
12   Q.    So that means that the assigned
13   potency for ProQuad standards was based on
14   those lots, it was based on the potencies in
15   the clinical -- in the lots that were used in
16   the clinical studies prior to approval?
17   MS. SCHMIDT:  Objection.
18   THE WITNESS:  So it was not
19   those specific lots.  It was related to
20   those lots.
21   BY MS. ZINSER:
22   Q.    Related to those lots.  Okay.
23   Was ProQuad approved based on
24   the clinical efficacy of its components?
25   A.    I have no knowledge of the

Page 236

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    clinical studies.  It's outside my experience.
3    Q.    But in your general understanding,
4    when ProQuad was approved, were clinical --
5    were there clinical studies done as to the
6    efficacy of the components?
7    MS. SCHMIDT:  Objection.
8    THE WITNESS:  I'm not a
9    clinical scientist.  It's outside my
10   area of expertise.  I don't know what
11   the intended purpose of those clinical
12   studies were.
13   BY MS. ZINSER:
14   Q.    I mean, I'm not -- obviously
15   I'm not asking for your expertise, but if you
16   were just generally aware of whether there
17   were any studies performed?
18   MS. SCHMIDT:  Objection.
19   THE WITNESS:  There were
20   ProQuad studies performed, I don't know
21   what their intended purpose was.
22   MS. SCHMIDT:  The next document
23   is going to be Keegan-30.
24   - - -
25   (Exhibit Keegan-30, 1/27/03

Page 237

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    Memo, MRK-KRA01543655 - 01543677, was
3    marked for identification.)
4    - - -
5    BY MS. ZINSER:
6    Q.    It is a memo with the Bates
7    number beginning 1543655.  Do you recognize
8    this document?
9    A.    It looks familiar.  Looks
10   familiar.
11   Q.    What is the BPC?
12   A.    That acronym stands for
13   Biological Process Council.
14   Q.    What is the function of the
15   Biological Process Council?
16   A.    The function of that council
17   was to provide technical guidance and
18   decision-making to program teams.
19   Q.    Do you know who was on the
20   Biologic Process Council at this time?
21   A.    In 2003, I don't remember.
22   Q.    And the ProQuad Tech Transfer
23   Team, you worked -- were you a part of the
24   Tech Transfer Team?
25   A.    Off and on.  Not continuously

60 (Pages 234 - 237)

Page 238
1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    through the life cycle of that team.
3    Q.    At this time, the time of the
4    document, were you a member of the team?
5    A.    I don't know if specifically
6    during 2003 I was.
7    Q.    Looking at page, the page
8    ending 3657, Table 1 is titled, "Proposed
9    Specifications for ProQuad®FROZEN."  The maximum
10   release is less than or equal to 5.38.
11        Are you aware of whether any
12   studies were done on the safety of mumps at
13   5.38?
14        MS. SCHMIDT:  Objection.
15        THE WITNESS:  I have no
16   knowledge of the clinical trials.
17   BY MS. ZINSER:
18   Q.    Going to page 11 which ends in
19   3665.
20   A.    Okay.
21   Q.    And under the section entitled:
22   "BACKGROUND Basis of Current Release
23   Specifications for Potency," it says, "The
24   current potency specifications for ProQuad
25   Frozen were approved in September, 2002...."

Page 239
1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    This memo defines potencies for end-expiry,
3    minimum potency at release, and maximum
4    potency at release for each of the four
5    viruses in the product.  End-expiry
6    specifications for measles, mumps and rubella
7    are identical to the expiry specifications
8    defined in the package circular for M-M-R®II."
9        Was it identical because
10   ProQuad was approved based on the clinical
11   experience of MMR II?
12        MS. SCHMIDT:  Objection.
13        THE WITNESS:  No, I have no
14   knowledge of the basis of those
15   clinical trials or their results.
16   BY MS. ZINSER:
17   Q.    The next paragraph, "Minimum
18   potency at release values are calculated based
19   on the end-expiry potency, the storage
20   conditions of the product after release
21   testing is completed, and the stability of
22   each of the viral components under storage
23   conditions."
24        Do you know whether the fill
25   model for ProQuad with respect to the three,

Page 240
1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    measles, mumps and rubella components, was it
3    the same as the fill model used for MMR II?
4        MS. SCHMIDT:  Objection.
5        THE WITNESS:  I could not state
6    that.  I would have to see them in
7    front of me to verify.
8    BY MS. ZINSER:
9    Q.    On the next page ending in
10   3666.  The second paragraph, "The maximum
11   potency at release for measles, mumps and
12   rubella for M-M-R®II were defined as the
13   maximum potency of each virus that was
14   released in the U.S. as a commercial lot
15   during the period from September 1999 through
16   December 2001...."
17        And in the chart, again, it
18   says that the maximum release was less than or
19   equal to 5.38 for mumps.  Were you aware of
20   whether commercial lots of MMR II were
21   released at 5.38?
22        MS. SCHMIDT:  Objection.
23        THE WITNESS:  I don't know.
24   BY MS. ZINSER:
25   Q.    At this time the manufacturing

Page 241
1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    target was at 5.2.  Correct?
3        MS. SCHMIDT:  Objection.
4        THE WITNESS:  So I want to
5    be -- so the -- can you clarify for
6    what product?
7    BY MS. ZINSER:
8    Q.    For the -- for MMR II the
9    manufacturing target for mumps was 5.2.
10   A.    The manufacturing target was
11   5.2, yes.
12        MS. SCHMIDT:  Objection.
13   BY MS. ZINSER:
14   Q.    Yes.  But there were commercial
15   lots released at 5.38 for mumps?
16        MS. SCHMIDT:  Objection.
17        THE WITNESS:  I have no
18   knowledge of the specific release
19   potencies of batches.
20   BY MS. ZINSER:
21   Q.    Going to page 17 ending in 3671.
22   A.    Okay.
23   Q.    In this memo do you know who
24   Roberta McKee is?
25   A.    Yes, I do.

61 (Pages 238 - 241)

Appx19057

Page 242

1          AMY KEEGAN - HIGHLY CONFIDENTIAL
2      Q.    And who is Roberta McKee?
3      A.    Roberta McKee, I don't know in
4   2002 what her position was.  I knew her and
5   she was head of the quality laboratories, and
6   then subsequently head of West Point quality,
7   I believe.
8      Q.    And Florian Schödel, do you
9   know who that is?
10     A.    I do know Florian.
11     Q.    Who is he?
12     A.    My knowledge of Florian was he
13  was a clinical scientist in the Merck Research
14  Laboratories.
15     Q.    Keith Chirgwin, do you know who
16  he was?
17     A.    I do know Keith Chirgwin.  I
18  knew Keith.  He was in the regulatory group,
19  the regulatory liaison group.
20     Q.    And who is Joe Heyse?
21     A.    Joe Heyse was functional head
22  of statistical group.
23     Q.    The first paragraph reads:
24  "The potency specification ranges for each of
25  the virus components for ProQuad®FROZEN have

Page 243

1          AMY KEEGAN - HIGHLY CONFIDENTIAL
2   been established based on use of precedent
3   data from clinical and/or commercial use of
4   MMR®II and ProQuad®FROZEN."
5          Does that refresh your
6   recollection that MMR II, the specifications
7   were based on -- for the specifications for
8   ProQuadFROZEN were based on MMR II?
9          MS. SCHMIDT:  Objection.
10  BY MS. ZINSER:
11     Q.    On the clinical data?
12     A.    I did not write this document.
13  It did not -- I'm not on the distribution
14  list.  I don't know what they intended by this
15  statement.
16     Q.    But is that your understanding,
17  that the specifications for ProQuadFROZEN were
18  based on clinical and commercial use of MMR
19  II?
20          MS. SCHMIDT:  Objection.  I
21      think that's asked and answered.
22  BY MS. ZINSER:
23     Q.    Okay.  Going back to -- and I
24  don't think we need to look, but you were a
25  member of the MMR II, Varivax and ProQuad

Page 244

1          AMY KEEGAN - HIGHLY CONFIDENTIAL
2   Product Development Team.  Correct?
3      A.    Yes.
4      Q.    Were the specifications and the
5   derivation of the specifications something
6   that you would have discussed as a member of
7   the Product Development Team?
8      A.    I can't recall specifically.
9      Q.    Well, generally, is that
10  something that you would have discussed?
11     A.    That's a topic that the team
12  probably would have discussed, yes.
13     Q.    Would you have discussed the
14  basis for the specifications and whether they
15  were based on clinical data for MMR II?
16     A.    I can't recall conversation, so
17  I can't speak to that.
18     Q.    Going to the last paragraph on
19  that page.
20     A.    Can you please clarify which
21  page?
22     Q.    I'm sorry.  Of the page we were
23  just on, 3672.
24     A.    3672.
25     Q.    I guess we have to turn, sorry

Page 245

1          AMY KEEGAN - HIGHLY CONFIDENTIAL
2   about that.
3      A.    Thank you.
4      Q.    "The initial end-expiry and
5   maximum potency at release specifications...."
6          MS. SCHMIDT:  The bottom.
7   BY MS. ZINSER:
8      Q.    I'm sorry, the last paragraph.
9      A.    Thank you.
10     Q.    .. for measles, mumps and
11  rubella and ProQuad®FROZEN are based on the
12  precedents of MMR®II.  However, the use of
13  calibrated potency assays for the three
14  viruses in ProQuad®FROZEN, which differs from
15  the historical practices of MMR®II, and the
16  evolving self-sufficiency of the clinical
17  profiles for ProQuad®FROZEN, as opposed to that
18  for MMR®II, provide a sound basis for
19  uncoupling the specifications for these
20  products....
21          Do you know how the potency
22  assays, do you know whether the potency assays
23  for ProQuadFROZEN differed from the MMR II
24  assays?
25     A.    Can you define what you mean by

62 (Pages 242 - 245)

Page 246

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    differ?
3    Q.    I mean, you're the one
4    performing the assays.  So I mean, can you
5    tell me if they differed in any way, the
6    assays for -- that -- the assays that you
7    would use to measure potency?
8        MS. SCHMIDT:  Objection.
9        THE WITNESS:  So in my opinion,
10    in my experience, those assays are
11    essentially identical.  The only
12    difference is that, one, you need the
13    antiserum we talked about earlier, has
14    to be different because there's a
15    varicella component, and you use the
16    product specific house standard.
17    BY MS. ZINSER:
18    Q.    You said because of the
19    addition of the varicella.  What is the role
20    or what effect does the addition of the
21    varicella have on the other three components,
22    the MMR II components?
23    A.    What do you mean by that?
24    Q.    You said that the antiserum
25    needed to be added because of the addition --

Page 247

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2        MS. ZINSER:  Could you read
3    back what she said?  I think she said
4    the...
5        - - -
6    (The court reporter read the
7    pertinent part of the record.)
8        - - -
9    BY MS. ZINSER:
10    Q.    Why does the antiserum have to
11    be different because of the varicella
12    component?
13        MS. SCHMIDT:  Objection.
14        THE WITNESS:  If I could
15    clarify, it's the addition of the
16    antivaricella test -- antiserum that is
17    not needed for MMR II because varicella
18    is not present.  They're different
19    vaccines.
20    BY MS. ZINSER:
21    Q.    So is -- ProQuad, is it just
22    the addition of varicella or the Varivax
23    vaccine to the MMR II vaccine?
24        MS. SCHMIDT:  Objection.
25        THE WITNESS:  I don't know.  I

Page 248

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    don't have the specific formulation in
3    front of me.  I couldn't speak of --
4    BY MS. ZINSER:
5    Q.    Do you know whether the
6    addition of varicella had any effect on the
7    any of the components in MMR II?
8        MS. SCHMIDT:  Objection.
9        THE WITNESS:  In effect in what
10    regard?
11    BY MS. ZINSER:
12    Q.    Any sort of impact on the shelf
13    life, on the potency of any of the -- those
14    components?
15        MS. SCHMIDT:  Objection.
16        THE WITNESS:  I have no
17    knowledge of that.
18        MS. ZINSER:  This is going to
19    be -- I'm not sure what we're on.  31.
20    This will be marked as Keegan-31.
21        - - -
22    (Exhibit Keegan-31, David Krah
23    journal excerpt, MRK-KRA00490011 - 0023,
24    was marked for identification.)
25        - - -

Page 249

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    BY MS. ZINSER:
3    Q.    Keegan-31 is a document starting
4    with Bates number 490011.  Have you seen this
5    document before?
6    A.    This document does not look
7    familiar to me.
8    Q.    This document is an excerpt of
9    a journal from David Krah.  Do you recall who
10    David Krah is?
11    A.    Yes, I know who David Krah is.
12    Q.    And what is his role at Merck?
13    A.    So when I knew David Krah, he
14    was in the research laboratories and did
15    analytical development.
16    Q.    And when did you know David
17    Krah?
18    A.    I can't recall when we first
19    met.  I believe that I did not meet him until
20    after I had come to the quality control
21    laboratories.
22    Q.    And can you give me a general
23    time of when that would have been?
24    A.    Sometime after 1997.
25    Q.    Did you know him or have any

63 (Pages 246 - 249)

Appx19059

Page 250

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    interaction with him in 2007?
3         A.    I couldn't -- I don't know.  I
4    don't remember.
5         Q.    I'm going to turn to the page
6    ending in 0018.
7         A.    Okay.
8         Q.    About halfway down, "Note:
9    review sonicator operation with Bob Lowe."
10   What is a sonicator?
11        MS. SCHMIDT:  Objection.
12   BY MS. ZINSER:
13        Q.    If you know.
14        A.    So it's a piece of equipment
15   that is commonly used to break open cells.
16        Q.    Do you know who Bob Lowe is?
17        A.    I do know Bob Lowe.
18        Q.    Who is Bob Lowe?
19        A.    I knew Bob Lowe, he worked in
20   the quality control laboratories with me and
21   then subsequently was a peer of mine in the
22   RAS/BAS organization.
23        Q.    Around what time period were
24   you working with him?
25        A.    I worked with Bob in 2001 in

Page 251

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    the quality control laboratories.  And then in
3    2005, that's when the RAS/BAS organization was
4    created.
5         Q.    The next line, "Bob mentioned...
6    when he told Amy Keegan that he was working
7    with us for the mumps ag study, she said that
8    'he should be very careful working with me as
9    I had been caught falsifying data.'
10        "Consider bringing this
11   incorrect...," and there are typos in here but
12   I think we can agree that what it says,
13   "Consider bringing this incorrect statement to
14   Gabriel Bikah's attention."
15        You had said earlier that at
16   some point Gabriel Bikah was your supervisor
17   or you reported to him rather?
18        A.    Yes, I did.
19        Q.    "This is not only inaccurate,
20   but it is not clear whether this was stated
21   only to Bob or in a more public forum and
22   would be considered disparaging."
23        Did you say that?  Do you
24   recall saying that?
25        A.    I have no memory of making that

Page 252

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    statement.
3         Q.    Do you recall ever thinking
4    that?
5         A.    No, I do not.
6         Q.    Did anyone ever raise this
7    issue with you?
8         A.    No, it was not raised to me.
9         Q.    Had you ever heard anything
10   about -- from anyone else about David Krah
11   falsifying data?
12        A.    Not that I recall.
13        Q.    Are you aware of the allegations
14   in this case?
15        A.    Only in a very general sense.
16        Q.    What's your general understanding
17   of the allegations?
18        A.    My understanding of the
19   allegations is that former Merck employees
20   have alleged that there was some data
21   falsification that was performed.  I don't
22   know exactly the specifics.
23        Q.    Have you -- and we can go to
24   the top, the date of this entry appears to be
25   October 15, 2007.  Have you had any interactions

Page 253

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    with David Krah since that time?
3         MS. SCHMIDT:  Objection.
4         THE WITNESS:  I believe I have.
5    BY MS. ZINSER:
6         Q.    In what context would you have
7    interacted with him?
8         A.    I used to use Dave Krah, he's a
9    long time virologist, for advice for virology
10   assays.
11        Q.    And you said that you worked
12   with, you had worked with Bob Lowe as well.
13   Correct?
14        A.    Yes.
15        Q.    Is Bob Lowe wrong --
16        MS. SCHMIDT:  Objection.
17   BY MS. ZINSER:
18        Q.    -- in mentioning this to David
19   Krah?
20        A.    I have no recollection of ever
21   making this statement.
22        Q.    But do you have any -- why do
23   you think that Bob Lowe would say this to
24   David Krah?
25        MS. SCHMIDT:  Objection.

64 (Pages 250 - 253)

Page 254

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2        THE WITNESS:  I can't speculate
3    what Bob was -- or if this is even
4    accurate.  This is not my document.
5        MS. ZINSER:  I'm just trying to
6    figure out what I want to do.  Hang on.
7        This document will be marked as
8    Keegan-32.
9        - - -
10        (Exhibit Keegan-32, Series of
11    e-mails, MRK-KRA01561959 - 01561963,
12    was marked for identification.)
13        - - -
14    BY MS. ZINSER:
15        Q.    Keegan-32 is a series of
16    e-mails starting with the Bates number
17    15615 -- 1959.  I'm going to direct you to the
18    page ending in 1961 on the bottom of the page.
19        A.    Okay.
20        Q.    This is an e-mail from Matthew
21    Contanzer.  Do you know who Matthew Contanzer
22    is?
23        A.    I do know Matt, yes.
24        Q.    Who is he?
25        A.    Matt Contanzer is a scientist

Page 255

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    in -- they changed their names so many times.
3    It's like an analytical development group.
4        Q.    And the subject of this e-mail
5    is "MMR Durham Transfer Acceptance Criteria."
6    Do you know what that refers to?
7        A.    Yes, I do.
8        Q.    What does that refer to?
9        A.    This is for the transfer of the
10    MMR potency assay from the West Point
11    laboratories to the Durham laboratories.
12        Q.    The e-mail says, "Attached
13    below you'll find the variability estimates
14    and acceptance criteria assessment Jing (CMS)
15    drafted to support Durham transfer for MMR.
16    Mumps have a high (likely unacceptable)
17    producer's risk as," I think that's been
18    redacted, but the next sentence begins, "It
19    was very difficult to..."  Actually, you know
20    what, we'll end at that sentence, "Mumps have
21    a high (likely unacceptable) producer's
22    risk...."  And there are several charts below.
23        Do you know what producer's
24    risk refers to?
25        MS. SCHMIDT:  Objection.

Page 256

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2        THE WITNESS:  Yes, I do.
3    BY MS. ZINSER:
4        Q.    What is producer's risk?
5        A.    Producer's risk is the risk of
6    having a false out-of-specification result
7    obtained such that you would discard perfectly
8    good material.
9        Q.    And how does the acceptance
10    criteria relate to that?
11        A.    The acceptance criteria for the
12    transfer?
13        Q.    Yes.
14        A.    So when you set criteria for an
15    analytical transfer, you have to set a
16    tolerance as to what difference you will
17    accept between the results obtained from the
18    two laboratories.  You do a sensitivity
19    analysis around that to be sure that you set
20    the criteria stringently enough so that you
21    shall not cause any patient risk and then you
22    also from a manufacturing standpoint, assure
23    that you will not have that producer's risk
24    that we just talked about.
25        Q.    On the next page, the first

Page 257

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    chart is the "Summary of Assessment," and
3    there's producer's risk and patient's risk.
4    What is patient's risk?
5        A.    Patient's risk is the inverse
6    of producer's risk.  It is that you will have
7    an OOS that goes undetected.  So you must
8    assure that you will not have an undetected
9    OOS when you transfer the assay.
10        Q.    So since those are the
11    producer's risk and the patient's risk is
12    listed in percentage, so is that a .95 percent
13    risk for the current producer's risk?
14        MS. SCHMIDT:  Objection.
15    BY MS. ZINSER:
16        Q.    Just to make sure I'm
17    reading -- if that's how reading the --
18        A.    I'll take a moment to review.
19        Yes, it does appear that's
20    a .95 percent.
21        Q.    And the current patient's risk
22    is 0 percent approximately.  Is that correct?
23        A.    That is what that says, yes.
24        Q.    So there is -- that's saying
25    there is no chance that you'll have an

Veritext Legal Solutions
212-279-9424          www.veritext.com          212-490-3430

Appx19061

Page 258

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2  undetected out-of-specification lot?
3       A.    That is what this document
4  says.
5       Q.    Do you believe that that's
6  true?
7            MS. SCHMIDT:  Objection.
8            THE WITNESS:  I do.
9  BY MS. ZINSER:
10       Q.    What is the shift from the
11  current to -- the current to bias (.2 shift)
12  that goes from .95 percent producer's risk to
13  a 30 percent producer's risk?  What does that
14  indicate to you?
15            MS. SCHMIDT:  Objection.
16            THE WITNESS:  I spoke earlier
17       to that tolerance that you will allow.
18       A .2 shift in this case is a
19       theoretical difference between the
20       results obtained at West Point and the
21       results that could be obtained at a
22       different site.
23  BY MS. ZINSER:
24       Q.    What is the .2 measuring?  What
25  is that a measure of?

Page 259

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2       A.    This is not a measurement.
3       Q.    Oh, it's not a measurement.
4  Okay.  So what is it?
5       A.    In very practical terms it is
6  saying that -- the West Point is the current
7  release laboratory for MMR, and it's saying
8  that if you tested a sample at West Point and
9  it was a nominal value of 1, that if there was
10  a shift in -- it would be 1.2, you would get a
11  result that's .2 different from the result at
12  the transferring lab.  Again, this is
13  theoretical.
14       Q.    If you go to -- just barely
15  starts on page ending in 1960, it's an e-mail
16  from you to a group, and it starts with, "Hi
17  Matt, Some thoughts...."  And then you can go
18  to the next page for the substance of it.
19            "The manufacturer's risk is
20  probably unacceptably high and perhaps needs a
21  wider audience than this to agree to it.  If
22  our false OOS...," out-of-spec, ".. rate
23  increases significantly, this is a
24  business/quality decision, not a technical
25  one."

Page 260

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2            When you're talking about the
3  unacceptably high, that is with the .2 shift.
4  Correct?
5            MS. SCHMIDT:  Objection.
6            THE WITNESS:  The theoretical.
7  BY MS. ZINSER:
8       Q.    Theoretical, yes.
9       A.    Theoretical .2 shift.  Correct.
10       Q.    The last paragraph in your same
11  e-mail, "It's not clear to me, given what may
12  be unacceptable risk for both Merck in false
13  out of specific/discard and patient in
14  unidentified out of spec, what the technical
15  recommendation is."  [As read.]
16            If you look back at the
17       patient's risk in both the current and the
18       theoretical, it says 0 percent risk.  I could
19       see how -- how is that an unacceptable risk
20       for an unidentified out of spec?
21            MS. SCHMIDT:  Objection.
22            THE WITNESS:  So my recollection
23       from this document is that I was making
24       a general statement around any changes.
25  BY MS. ZINSER:

Page 261

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2       Q.    Going back to the page ending
3  in 1960, there's an e-mail at the top from
4  Joseph Bernardo to the larger group.  Who is
5  Joseph Bernardo?
6       A.    Joe Bernardo is a scientist in
7  the quality control laboratories.
8       Q.    The first paragraph of his
9  e-mail, "I am questioning why we are
10  re-evaluating assay variability when we
11  already have method variability in place.  We
12  have historically used 0.2 for analytical
13  transfer acceptance criteria and equivalencies
14  and have not had issues with this."
15            Is that true, that you had
16  historically used .2 for acceptance criteria?
17            MS. SCHMIDT:  Objection.
18            THE WITNESS:  We have never, to
19       my knowledge, transferred this assay to
20       a group -- another testing laboratory.
21  BY MS. ZINSER:
22       Q.    So is he incorrect?
23            MS. SCHMIDT:  Objection.
24            THE WITNESS:  I can't say
25       whether he is incorrect or not.  I

66 (Pages 258 - 261)

Appx19062

Page 262

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2     would need to know what specific
3     studies he's referencing.
4  BY MS. ZINSER:
5     Q.   Have you used historically .2
6  for analytical transfer acceptance criteria
7  for other assays?
8      MS. SCHMIDT: Objection.
9      THE WITNESS: I couldn't state
10     what the specific criteria was for
11     other assays. They would have to be
12     developed on the basis of that assay in
13     particular.
14  BY MS. ZINSER:
15     Q.   Do you know if .2 is a standard
16  that's used for acceptance criteria for
17  analytical transfer acceptance criteria?
18      MS. SCHMIDT: Objection.
19      THE WITNESS: I would say that
20     it is not standard.
21  BY MS. ZINSER:
22     Q.   Do you have any understanding
23  of a standard that might be used?
24      MS. SCHMIDT: Objection.
25      THE WITNESS: Could I clarify

Page 263

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2     that, one, this is a .2, it's on a
3     log-based assay specific to MMR. Other
4     assays you would have to develop the
5     assay specific acceptance criteria.
6  BY MS. ZINSER:
7     Q.   Since .2, since that's on a log
8  scale as you said, is that two-thirds more,
9  two-thirds different?
10     A.   God, I'm so bad at math, so --
11      MS. SCHMIDT: Objection.
12      THE WITNESS: -- I'd have to do
13     the math if we could -- if you could
14     show me the math, I could verify that.
15     I'm not good at doing those log
16     transformations in my head.
17  BY MS. ZINSER:
18     Q.   Back on page 1961, the first
19  paragraph of your e-mail, the paragraph ends,
20  "We might need to develop some sort of more
21  specific business/financial statement here.
22  This might meet discussion at TPC and/or
23  VCMT."
24      What did you mean by that, a
25  "more specific business/financial statement"?

Page 264

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2     A.   Because there is just a
3  theoretical percentage, my intention was that
4  needs to be translated into a number of
5  batches or, like I said, financial, what is
6  the lost revenue.
7     Q.   When you talked earlier than
8  that about needing a wider audience to agree
9  to this, who would that wider audience consist
10  of?
11     A.   As indicated, I suggested TPC
12  or VCMT.
13     Q.   What is TPC?
14     A.   TPC is Technical Product Council.
15     Q.   And VCMT, I think we've done
16  that one, but I don't remember.
17     A.   I don't, yeah, either. It's
18  Value Chain Management Team.
19     Q.   On the first page there is
20  another e-mail to you Joseph Bernardo --
21  responding to Joseph Bernardo's concerns and
22  the rest of the group. The second paragraph,
23  "We have had some significant issues with the
24  0.2 log acceptance criteria recently."
25      Do you recall having issues

Page 265

1      AMY KEEGAN - HIGHLY CONFIDENTIAL
2  with the .2 log acceptance criteria?
3     A.   Yes, in one specific case.
4     Q.   Was that with the Biomek 3000?
5     A.   Correct.
6     Q.   What is the Biomek 3000?
7     A.   Biomeks are automated liquid
8  handlers. They distribute liquid to multi-well
9  cell obliques.
10     Q.   So it goes on, "This criteria
11  and the study size used failed to identify a
12  difference between the 2000 and 3000 stations."
13  Is it the 2000 was the predecessor to the
14  3000?
15     A.   Yes, that's my recollection.
16     Q.   "Implementation of the 3000
17  resulted in a shift for all three antigens."
18  What kind of shift was that?
19     A.   I don't remember the specific
20  numerical value but there was a difference in
21  the reported potency for each house standard
22  before and after the implementation.
23     Q.   Did this have -- did this
24  shift, the difference in house standard
25  potency have an effect on lots that were being

67 (Pages 262 - 265)

Appx19063

Page 266

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    tested?
3         MS. SCHMIDT: Objection.
4         THE WITNESS: No, it did not.
5    BY MS. ZINSER:
6         Q.   So even though there was a
7    difference in the reported house standard
8    potency as a result of the new Biomek station,
9    this didn't result in any confusion about the
10   reported assay results?
11        MS. SCHMIDT: Objection.
12        THE WITNESS: No, it did not.
13   BY MS. ZINSER:
14        Q.   The e-mail goes on, "Val and
15   I...," who is Val?
16        A.   I believe that's Valerie
17   DiPasquale.
18        Q.   "Val and I keenly remember Phil
19   Krause asking us if we could sleep at night
20   during that most awesome TC."
21        Is TC teleconference?
22        A.   Yes, it's teleconference.
23        Q.   And Phil Krause is with CBER.
24   Correct?
25        A.   Yes, he is.

Page 267

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2         Q.   Do you recall him asking if you
3    could sleep at night?
4         A.   Yes, I do.
5         Q.   Do you know what he meant by
6    that?
7         A.   Yes, he was referring to his
8    review of the supplement for the measles lot
9    1012. I can't remember which lot it was.
10   There was a supplement at that time.
11        Q.   Why was he asking if you could
12   sleep at night?
13        A.   Because at that time the
14   supplement did not include information to
15   demonstrate that there was no impact on
16   product potency.
17        MS. SCHMIDT: Objection. For
18   the measles?
19        THE WITNESS: For measles, yes.
20   For measles.
21   BY MS. ZINSER:
22        Q.   Was he asking that in an
23   accusatory manner --
24        MS. SCHMIDT: Objection.
25   BY MS. ZINSER:

Page 268

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2         Q.   -- how could you sleep at
3    night?
4         A.   No, he was not.
5         Q.   How would you interpret it
6    then?
7         A.   So we interact very often with
8    Dr. Krause and we have a congenial relationship
9    with him. He was remarking on what was a
10   shift in the data that had not been explained
11   in the supplement.
12        Q.   So what was your response to
13   Phil Krause?
14        A.   We agreed on what analyses Mark
15   could perform to provide him assurance that
16   there was no impact on the product potency.
17   We provided those additional analyses and the
18   supplement was approved.
19        Q.   Were you ever requested to
20   provide additional analyses with respect to
21   mumps?
22        A.   Not during this time frame.
23        Q.   How about during any other time
24   frame?
25        MS. SCHMIDT: Objection.

Page 269

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2         THE WITNESS: So learning from
3    the measles experience, we provided
4    those analyses up front when we filed
5    subsequently a new mumps house standard
6    after this time frame.
7    BY MS. ZINSER:
8         Q.   Do you recall generally when
9    that time frame was?
10        A.   Generally in the 2011 or 2012
11   time frame. And that is for mumps.
12        Q.   And that is for mumps.
13        End result is -- we're going
14   back to reading.
15        End result is CBER has now been
16   routinely upgrading all of our ref, is it
17   reference standard?
18        A.   Yes.
19        Q.   .. reference standard
20   supplements up to PAS from CBE-30....
21        Is that your experience, have
22   they been -- were they routinely upgrading all
23   the supplement, the reference standard
24   supplements?
25        MS. SCHMIDT: Objection.

68 (Pages 266 - 269)

Appx19064

Page 270

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2        THE WITNESS:  Yes.  Reference
3    standard were upgraded to PAS or we
4    filed them as PASs from day one.
5  BY MS. ZINSER:
6    Q.    Is that because they needed a
7  more stringent review?
8        MS. SCHMIDT:  Objection.
9        THE WITNESS:  No.  As I've
10    explained, a PAS requires approval
11    before you can distribute product.
12    That's all that it implies.
13  BY MS. ZINSER:
14    Q.    I guess, then, why was that the
15  end result?  What is the connection between
16  that conversation with Phil Krause and the end
17  result of CBER now requiring a prior approval
18  supplement for all reference standard
19  supplements?
20    A.    Again, it's the material control
21  and the implications of a PAS versus the
22  CBE-30 that allows distribution of material
23  after 30 days.
24    Q.    So did they want assurance of
25  the material and processes before it was

Page 271

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2  implemented?
3        MS. SCHMIDT:  Objection.
4        THE WITNESS:  A PAS means that
5    CBER must approve those changes prior
6    to distributing material manufactured
7    under those changes.
8        MS. ZINSER:  This one is
9    Keegan-33.
10        - - -
11        (Exhibit Keegan-33, Series of
12    e-mails, MRK-KRA01567693 - 01567696,
13    was marked for identification.)
14        - - -
15  BY MS. ZINSER:
16    Q.    Keegan-33 is another series of
17  e-mails with the Bates number starting
18  1567693.
19        Do you recognize these e-mails?
20    A.    Can I take a moment to review?
21    Q.    Sure.
22    A.    Thank you.  I don't remember
23  this specific e-mail chain, though.
24    Q.    Let me direct you to page
25  ending in 7695.

Page 272

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    A.    Okay.
3    Q.    And there is an e-mail from
4  Joann Chandler to Mark Waskiewicz.
5    A.    You did good, though.
6  Waskiewicz.
7    Q.    I'm Polish, I should probably
8  do better.  Waskiewicz.
9        Do you know Joann Chandler?
10    A.    I don't believe I know Joann.
11    Q.    How about Mark?
12    A.    I know Mark.
13    Q.    Who is Mark?
14    A.    At the time of this e-mail
15  chain Mark was a scientist in the CMC
16  department.
17    Q.    The subject is "Level 3 Adverse
18  Investigations."
19        "Good afternoon, Mark.
20        "As a part of a regulatory
21  commitment, we are now performing monthly
22  adverse event reporting rate analyses per
23  product."
24        Were you aware of these monthly
25  adverse event reporting rate analyses?

Page 273

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    A.    No.  My functional responsibilities
3  had no responsibility for adverse event
4  reporting or investigation.
5    Q.    Were you aware that they were
6  occurring?
7    A.    No, I was not.
8    Q.    Were you aware that there was a
9  regulatory commitment to perform them?
10    A.    No, I was not.
11    Q.    It goes on at the end of that
12  paragraph, "The following two issues were
13  identified and as a result, Level 3
14  investigations were initiated."
15        The first one is "M-M-R -
16  November 2009 - Mumps outbreak (lack of
17  effect) primarily in the US, Canada also
18  affected...," and then the second one is
19  redacted.
20        Do you know what a level 3
21  investigation is?
22    A.    No, I do not.
23    Q.    The description of the first
24  one there, "Mumps outbreak...," and then in
25  parentheses "lack of effect," does that mean

69 (Pages 270 - 273)

Appx19065

Page 274

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2  that the mumps outbreak is due to a lack of
3  effect in the product?
4        MS. SCHMIDT: Objection.
5        THE WITNESS: I have no
6  knowledge of what that means.
7  BY MS. ZINSER:
8     Q.    Reading this, is that your
9  understanding?
10       MS. SCHMIDT: Objection.
11       THE WITNESS: I don't know what
12  this means.
13  BY MS. ZINSER:
14    Q.    The next paragraph, "As part of
15  the investigation process, I would like to
16  gather some source information from the
17  licenses for these products, such as 1) the
18  potency limits (specifically the lower potency
19  limits because these are lack of effect
20  issues); and 2) tech descriptions of the
21  manufacturing processes...."
22       Now, you work a lot with -- or
23  at the time you were working a lot with the
24  potency of -- the potency assays for these
25  vaccines. Correct?

Page 275

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2        MS. SCHMIDT: Objection.
3        THE WITNESS: That's incorrect.
4  This is 2013.
5  BY MS. ZINSER:
6     Q.    2013. Earlier -- I'm sorry.
7  Earlier in your career you were working with
8  the potency assays for the vaccines. Correct?
9     A.    Earlier in my career, correct.
10    Q.    Do you understand lower potency
11  limits to be a lack of effect issue for
12  vaccines?
13       MS. SCHMIDT: Objection.
14       THE WITNESS: No, I don't know
15  what meaning Joann meant there.
16  BY MS. ZINSER:
17    Q.    The e-mail is forwarded on to
18  several people, and I'm on the page ending
19  7694, Kimberly Duffy forwards it to you,
20  Charles Kline and Kimberly Hassis. Who is
21  Charles Kline?
22    A.    Charles Kline is a scientist in
23  the CMC group.
24    Q.    And Kimberly Hassis?
25    A.    Kim is also a scientist in the

Page 276

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2  CMC group.
3     Q.    And she is asking -- she's
4  specifically asking Kimberly, but sent to you
5  as well, to coordinate and send the requested
6  items to Joann by next Friday. The e-mail
7  above that Joann is checking in and would like
8  to clarify the scope of the investigation
9  covers the years from 1987 through 2009 due to
10  the ages of the patients in the group most
11  affected by the mumps outbreak.
12       Do you know at what age children
13  are vaccinated with MMR II or ProQuad?
14       MS. SCHMIDT: Objection.
15       THE WITNESS: No, I would need
16  to consult the ACIP schedule.
17  BY MS. ZINSER:
18    Q.    Were you aware of an outbreak
19  of mumps in 2009?
20    A.    From this e-mail, yes, I was.
21    Q.    Independently of this e-mail,
22  were you aware?
23    A.    I don't think so.
24    Q.    Are you aware of any other
25  mumps outbreaks?

Page 277

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2     A.    Yes.
3     Q.    Which other mumps outbreaks are
4  you aware of?
5     A.    I do recall that there was an
6  outbreak in 2006 and there are outbreaks
7  ongoing currently.
8     Q.    Have you -- the outbreaks in
9  2006, did you discuss those with anyone?
10    A.    No, I did not.
11    Q.    The current outbreaks, have you
12  discussed those with anyone?
13    A.    Yes, I have.
14    Q.    Who have you discussed those
15  with?
16    A.    I've discussed those at the
17  PDT, Product Development Team specifically.
18    Q.    What was the content of those
19  discussions?
20    A.    It was a general understanding
21  and info session.
22    Q.    Were you providing info or were
23  you asking for info or a combination of both?
24    A.    I was not providing any
25  information. It was -- we requested

70 (Pages 274 - 277)

Appx19066

Page 278

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2  information from the PDT.
3      Q.   Do you know who -- what
4  specific information regarding the outbreaks
5  did you request?
6      A.   Just a general update on the
7  outbreaks.
8      Q.   I mean generally, numbers,
9  location, anything --
10     A.   I was not specific in my
11 request.  It was can someone provide an update
12 on the mumps outbreaks.
13     Q.   And did you receive information
14 in response to those requests?
15     A.   Yes, I did.
16     Q.   What kind of information did
17 you receive?
18     A.   An individual provided some
19 voice-over information as to what information
20 she had.
21     Q.   And who was that individual?
22     A.   Barb Kuter.
23     Q.   Did anyone else provide any
24 information to the PDT?
25     A.   No.  It was Barb.

Page 279

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2      Q.   You said that she, you know,
3  provided voice over of the information she
4  had.  What were some of the types -- the
5  pieces of information that she related to the
6  PDT?
7      A.   My recollection is that it was
8  states which were affected, the numbers of
9  cases and the incidents rate compared to
10 previous incidence rates.
11     Q.   Do you recall which states were
12 affected?
13     A.   My recollection is specifically
14 Arkansas and Washington State.
15     Q.   Do you recall the numbers of
16 cases that were discussed?
17     A.   No, I can't recall the specific
18 numbers.
19     Q.   When was this discussion or
20 presentation to the PDT?
21         MS. SCHMIDT:  Objection.
22         THE WITNESS:  My memory is that
23     it was February of this year.
24 BY MS. ZINSER:
25     Q.   February of this year.  Have

Page 280

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2  there been any other discussions with the PDT
3  of the mumps outbreaks that you recall?
4      A.   No, not with the PDT.
5      Q.   How about aside from the PDT?
6      A.   At the Risk Management Sub-Team.
7      Q.   Risk Management Sub-Team.  What
8  did the Risk Management Sub-Team discuss with
9  respect to the mumps outbreaks?
10     A.   I was not present at any of
11 those meetings.  I know it was an agenda item.
12     Q.   Did you receive any materials,
13 either a backgrounder before the meeting,
14 materials, you know, for the meeting even if
15 you didn't attend?
16         MS. SCHMIDT:  Objection.
17         THE WITNESS:  No, there were no
18     materials.
19 BY MS. ZINSER:
20     Q.   Who else is part of the Risk
21 Management Sub-Team?
22     A.   I don't know the -- all of the
23 attendees.  But certainly the regular liaison,
24 the clinical monitor, the CMC person.  Just
25 the general functions, and I could ascribe

Page 281

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2  names to those.
3      Q.   If you have names, if you could
4  give names to those.
5      A.   I think we mentioned him
6  earlier, Amit Shah.
7      Q.   Who else?
8      A.   Jim Comar.  I don't know who
9  was at the specific meeting so this is just --
10     Q.   Part of the team.  Yeah.
11         What did you do with the info
12 that you received at the PDT meeting
13 discussing the outbreaks?
14     A.   I did nothing with that
15 information.
16     Q.   So you requested info about the
17 outbreaks but you didn't do anything as a
18 result of receiving information?
19     A.   No, I was just curious to
20 receive information.
21     Q.   What is Merck doing to
22 investigate the outbreaks?
23         MS. SCHMIDT:  Objection.
24         THE WITNESS:  I have no
25     knowledge of any activities.

71 (Pages 278 - 281)

Appx19067

Page 282

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    BY MS. ZINSER:
3        Q.    Does the Risk Management
4    Sub-Team meet regularly?
5        A.    Yes, it does.
6            MS. ZINSER:  I think we can go
7    break for a little built.
8            VIDEOGRAPHER:  Off the record
9    at 4:11.  This will end disc number
10   four.
11               - - -
12           (A recess was taken.)
13               - - -
14           VIDEOGRAPHER:  The time now is
15   4:24.  Back on the record.  Beginning
16   of disc number five.
17           MS. ZINSER:  Ms. Keegan, I have
18   no further questions.
19           THE WITNESS:  Okay.
20           MS. SCHMIDT:  We're done.  I
21   have no questions.
22           VIDEOGRAPHER:  No questions?
23   Conclude?
24           MS. SCHMIDT:  Yes.
25           VIDEOGRAPHER:  The time now is

Page 283

1    AMY KEEGAN - HIGHLY CONFIDENTIAL
2    4:24.  This concludes the deposition.
3    End of disc five of five.
4               - - -
5           (Witness excused.)
6               - - -
7           (Deposition concluded at
8    4:24 p m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 284

1
2        C E R T I F I C A T E
3
4
     I do hereby certify that I am a Notary
5    Public in good standing, that the aforesaid
     testimony was taken before me, pursuant to
6    notice, at the time and place indicated; that
     said deponent was by me duly sworn to tell the
7    truth, the whole truth, and nothing but the
     truth; that the testimony of said deponent was
8    correctly recorded in machine shorthand by me
     and thereafter transcribed under my
9    supervision with computer-aided transcription;
     that the deposition is a true and correct
10   record of the testimony given by the witness;
     and that I am neither of counsel nor kin to
11   any party in said action, nor interested in
     the outcome thereof.
12
     WITNESS my hand and official seal this
13   8th day of May, 2017.
14
15
16
                Linda Rossi Rios, RPR, CSR
17              Notary Public
18
19
20
21
22
23
24
25

Page 285

1
2        INSTRUCTIONS TO WITNESS
3        Please read your deposition over
4    carefully and make any necessary corrections.
5    You should state the reason in the appropriate
6    space on the errata sheet for any corrections
7    that are made.
8        After doing so, please sign the errata
9    sheet and date it.
10       You are signing same subject to the
11   changes you have noted on the errata sheet,
12   which will be attached to your deposition.
13       It is imperative that you return the
14   original errata sheet to the deposing attorney
15   within thirty (30) days of receipt of the
16   deposition transcript by you.  If you fail to
17   do so, the deposition transcript may be deemed
18   to be accurate and may be used in court.
19
20
21
22
23
24
25

72 (Pages 282 - 285)

Appx19068

Page 286

```
1              ACKNOWLEDGMENT OF DEPONENT
2
3        I have read the foregoing transcript of
4    my deposition and except for any corrections or
5    changes noted on the errata sheet, I hereby
6    subscribe to the transcript as an accurate record
7    of the statements made by me.
8
9        _____
10             AMY KEEGAN
11
12       SUBSCRIBED AND SWORN before and to me
13   this ____ day of _____, 20___.
14
15
16       _____
17             NOTARY PUBLIC
18
19
20   My Commission expires:
21
22
23
24
25
```

Page 287

```
1         E R R A T A   S H E E T
2    IN RE:  USA ex rel. vs. MERCK
3    DATE:  4/27/2017
4    PAGE   LINE          CORRECTION AND REASON
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23
24   _____ _____
25   (DATE)          AMY KEEGAN
```

73 (Pages 286 - 287)

Appx19069

11/26/2019
Declaration of G. Reilly
EXHIBIT 362

TO:        TPAC

FROM:      Joye L. Bramble

DATE:      August 28, 2000

SUBJECT:   Delay of Filing for Optimized GOS/HSA-free Diluent for M-M-R®II

---

**Executive Summary**

The OGOS/HSA-Free Diluent team has successfully completed all contract items and we have been ready to file the sPLA for this process change with Regulatory Agencies since July 1999. The team reviewed the drivers for filing the sPLA with TPAC in August 1999 to confirm the need to file this process change. Due to concerns with supply issues for M-M-R®II as a result of SmithKline Beecham's lack of entry into the US market with a measles/mumps/rubella vaccine and the lack of a clear regulatory driver, a decision was made to delay the file until 18 months of stability data were available. A new contract date of July 2000 was agreed upon at TPAC for the sPLA filing. Based upon continued delays in competition entering the US market and lack of a clear regulatory need for the new formulation, the team is requesting approval from TPAC to put the sPLA file for OGOS on hold until a driver for implementing this program is available. BPC has reviewed the technical, regulatory and supply issues and supports placing the file on hold.

**Background**

The Optimized GOS (OGOS) program was initiated in 1996 in response to the inclusion of a requirement for thermal stability in the European Pharmacopoeia (EP) monograph for combined measles, mumps, and rubella vaccines. The purpose of the project was to meet thermal stability requirements for lots of M-M-R®II supplied to the European market. The project plans and tentative filing dates of 1999 were presented to the release authorities of the Member States of the EU in 1996 and 1997. As an interim measure, Merck was able to negotiate an alternative interpretation of acceptable thermal stability (an interim agreement) while improvements to the stabilizer were being aggressively pursued. This interim agreement allowed Merck to continue to supply M-M-R®II to the EU.

In 1997, CBER requested that Merck pursue efforts to remove Human Serum Albumin (HSA) from M-M-R®II. Due to delays in the rHA program, the OGOS team evaluated the potential to remove HSA from the diluents used to formulate M-M-R®II while still pursuing rHA as a replacement for HSA in viral growth media. Upon receipt of acceptable laboratory scale data, a program was then initiated to combine removal of HSA in the diluents with the OGOS program. Demonstration of OGOS/HSA-Free Diluents were successfully completed in 1998 with real-time stability studies on-going.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA01593194
MRK-CHA01593194

Data from the demonstration lots have met the key program technical goals for log loss at 37°C of [REDACTED] 0.8, [REDACTED] for measles, mumps, and rubella, respectively. The sPLA file for OGOS/HSA-Free Diluents has been completed and is ready to file in the U.S.

**Impact of Program Implementation**

As noted in earlier program reviews at TPAC, implementation of the OGOS formulation has an impact on product cost and lyophilization capacity due to the increased lyophilization cycle time. The product cost will increase by $0.05 and the lyophilization capacity will be reduced by 6 million doses/year. The reduction in lyophilization capacity has the potential to impact MVD's ability to respond to tender offers and to support any unexpected sales demands. This is particularly important now as a competitive measles/mumps/rubella product has not been approved in the U.S. as initially anticipated in 1998 and 1999.

**Current Situation**

Several issues have changed since TPAC approval of the OGOS program, thus altering the risks associated with this program. This has resulted in a re-review of the drivers for implementation of the OGOS stabilizer. Following a evaluation by MMD, a memo was provided to BPC in July 2000 describing the current regulatory and supply issues associated with this program and the impact of implementation (see Attachment 1). Below is a summary of the previous drivers and the current status:

- **Impact on Passing EU Thermal Stability Testing:** Currently, NIBSC has been subcontracted for thermal stability batch release all lots of M-M-R®II for sale in the EU for thermal stability. As they use a different test method (plaque assay vs. $TCID_{50}$), they have been able to successfully pass all lots for thermal stability. NIBSC has previously expressed concerns with testing for Merck as they saw this in part as a conflict of interest, however, as long as they continue to test, we will continue to be able to meet thermal stability requirements for the EU. The current contract with NIBSC lasts until the end of 2000. Based upon our ability to pass for thermal stability through the use of NIBSC, the urgency to file in Europe is perceived by JV to be diminished – however, the uncertainty of the renewal of the arrangement with NIBSC exists. If the contract is not renewed, sufficient time would be available to file and approve OGOS if required.
- **Impact on Mumps Expiry Trial:** The materials utilized in the expiry trial for M-M-R®II contain the OGOS formulation. CBER has verbally communicated that they are expecting the sPLA file for OGOS given that the expiry lots contain this material. They implied to Merck that if we do not plan to file OGOS, then we may need to repeat the expiry trial with GOS material. Plans are currently uncertain as to whether we will want or will be able to file the mumps expiry trial data to support reduction in the mumps expiry titer. Manufacturing has committed to manufacture at

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA01593195
MRK-CHA01593195

the higher mumps titers and no real driver exists to file this label change at this time, although CBER has verbally expressed that they feel the higher mumps titer is a temporary solution, pending the results of the mumps expiry clinical trial.

- **Impact on Implementation of HSA-free Diluent:**  Implementation of HSA-free diluents was linked to the OGOS program.  However, as we continue to delay implementation of OGOS and accelerate implementation of the rHA program (which will utilize HSA-free diluents), we now plan to implement the removal of HSA from the diluents in the rHA program for M-M-R®II in GOS stabilizer, which we are targeting to file in 2002.

**Decisions Requested**

Taking the risks and benefits into account, the team is requesting approval from TPAC to put the sPLA file for OGOS on hold until a strong driver for implementing this program becomes available.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

# Attachment 1

# Memo to BPC

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA01593197
MRK-CHA01593197

TO:         BPC                                                              07/06/00

FROM:     Natalie Gerdt Lotier
            Roberta McKee

SUBJECT:  Delay of Filing for Optimized GOS/HSA-free Diluent for M-M-R®II

cc:         Henrietta Ukwu

## Summary

The capacity assessment for implementation of Optimized GOS assumed that there would be competition in the market, an assumption that has not been realized. Therefore, Vaccine Planning and Scheduling requests a delay in the filing of the BLA supplement for Optimized GOS/HSA-free diluent. Vaccine and Sterile Quality Operations identifies no regulatory need to file at this time, given the assumptions described below. Worldwide Regulatory Liaison concurs.

Whether there continues to be a regulatory need to file Optimized GOS at all and the impact that not filing would have on the timing for other programs will be evaluated. This will, if needed, be the subject of a separate memo.

## Background

### Manufacturing

Vaccine Planning and Scheduling requests a delay in the filing of Optimized GOS to fulfill increased market demand for M-M-R®II.

MMD's filling plan for 2000 was set at 27.9 MM doses based upon MVD sales requirements of 25.5 MM doses: 14MM U.S. (assuming no domestic competition), 6 MM Europe and 5.5 MM MVI. However, MVD estimates a potential upside of greater than 4 MM doses in 2000 due to withdrawal of Urabe-containing mumps vaccines in multiple markets and lyo cabinet problems affecting Aventis Pasteur vaccine production. In 2001, MVD estimates potential upsides of greater than 3 MM doses.

[REDACTED – OMP] and M-M-R®II share filling and lyophilization capacity. At 100% of available lyo cabinet capacity, MMD can produce [REDACTED – OMP] 28 MM doses of M-M-R®II. Due to the longer lyo cycle required for Optimized GOS, at 100% of available lyo capacity, MMD can produce [REDACTED – OMP] and only 24 MM doses of Optimized GOS stabilized M-M-R®II.

There are plans to increase lyo capacity through the licensure of additional lyo cabinets. MMD will have five operational cabinets in 2001. If Optimized GOS is implemented, total capacity will be reduced by 6 MM doses. MMD will have six operational cabinets in 2002/2003 yielding an increase of roughly 9 MM doses of current M-M-R®II, however, only 6 MM doses of Optimized GOS, or gaining back the 6 MM doses lost in 2001.

The filing for Optimized GOS should be delayed as long as possible to enable the increased capacity of additional cabinets in 2002 to offset O-GOS capacity losses particularly in the "no domestic competition" scenario.

### Regulatory

Due to the inability to assure consistent supply to the European market of product with acceptable thermal stability results, development of an enhanced stabilizer, Optimized GOS, was initiated. During the period of development of this stabilizer a revision to the acceptance criteria for adequate thermal stability was

successfully negotiated. This revision became effective January 1999. In addition, in late 1998, the use of a contract facility for performance of the thermal stability test was implemented. To date, 100% of lots tested meet the revised criteria. The combination of these two events has provided a means to successfully manage supply of thermally stable M-M-R®II to Europe during the stabilizer development effort.

The testing contract is due for renewal at the end of 2000. Should the contract not be renewed for any reason, the ability to supply product with acceptable thermal stability results for GOS stabilized M-M-R®II may be affected. Implementation of Optimized GOS is expected to increase the passing rate in MMD, although there is little full-scale manufacturing experience with Optimized GOS's effect on thermal stability testing results. It should be noted that the developmental, validation and demonstration runs of Optimized GOS, 19 runs in all, performed over a period of more than two years, yielded satisfactory results. When other laboratories (in Europe and Australia) have tested Optimized GOS, they have not consistently observed an enhancement in thermal stability as compared to current stabilizer product.

Regulatory bodies in the U.S. and in Europe are aware of Merck's stabilizer development. Although the changing target dates for filing were included in a number of informational regulatory communications, no commitment for filing was made to any licensing authority. Use of Optimized GOS has been coupled with the use of HSA-free diluents during formulation of the product. Elimination of the addition of HSA during the formulation step reduces the entry points for HSA in the process, reducing the Company's risk, however, since it does not eliminate HSA from manufacturing, it does not provide a regulatory advantage.

In the U.S., there is no requirement for demonstration of acceptable thermal stability. However, Optimized GOS stabilized vaccine was used in the mumps expiry clinical trial. In September 1999, CBER questioned the use of an experimental formulation in this clinical trial. In December 1999, a response was provided. The response explained that 1) Optimized GOS did not introduce any new components to the vaccine formulation, 2) since the vaccine studied in the expiry trial was stored frozen, the component concentration changes of Optimized GOS would not affect the outcome of the trial, and 3) since Merck expected to be formulating with Optimized GOS when the outcome of the trial was available (Optimized GOS filing "mid-year 2000"), its use in the study seemed practical. To date, CBER has not commented in writing on the responses provided in the December letter, however the repeated verbal feedback has been that CBER still questions the use of Optimized GOS in the expiry trial and that a bridging trial (Optimized GOS to GOS) may be required. If CBER does not change their position, this requirement for clinical bridging is likely to apply to the Optimized GOS filing itself, not just to the expiry trial. The utility and timing of the Optimized GOS file will need to be reconsidered if clinical data are required. However, if clinical bridging data are not necessary for Optimized GOS then the timing for the Optimized GOS file and the mumps expiry trial study report are in alignment with the target filing date for rHA.

Should CBER respond with an expectation of an earlier filing for Optimized GOS or the current situation regarding availability of lots with passing thermal stability change, the need for filing Optimized GOS must be reconsidered. Currently, there is no regulatory necessity to file Optimized GOS.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

**MRK-KRA01593199**
**MRK-CHA01593199**

11/26/2019
Declaration of G. Reilly
EXHIBIT 363

Appx19077

The Current Manufacturing Target Titer for the Mumps Component
of
Measles, Mumps, and Rubella Virus Vaccine Live
M-M-R®II

## Summary

In discussions with U.S. and EU release authorities in the mid-1990s, it was identified that there was a difference between Merck & Co., Inc.'s understanding and the release authorities' interpretation of the potency claims made for Measles, Mumps, and Rubella Virus Vaccine Live, M-M-R®II. Although Merck & Co., Inc. had viewed the titers of [REDACTED –] for measles, 20,000 $TCID_{50}$/dose for mumps and [REDACTED – OMP] for rubella as the minimum potencies present at manufacture and release, we were informed by the authorities that they viewed the label claims as the minimum titers at the end of shelf life for the product. In some countries, including the U.S., end expiry titers of [REDACTED – OMP] for measles, 20,000 $TCID_{50}$/dose for mumps and [REDACTED –] for rubella were accepted, while in others, the European Pharmacopoeia monograph specified titers of [REDACTED –] for measles, 5000 $TCID_{50}$/dose for mumps and [REDACTED –] for rubella were in effect. Once these discrepancies were understood, further discussions ensued in an effort to harmonize the specifications among all the countries to be [REDACTED – OMP] for measles, 5000 $TCID_{50}$/dose for mumps and [REDACTED] for rubella. The U.S. FDA's Center for Biologics Evaluation and Research (CBER) required that a clinical trial be performed to support this lower mumps titer. That trial has completed enrollment and the sera are being evaluated. Until those data become available, CBER has set a release titer specification of 5.0 $\log_{10}$ (100,000) $TCID_{50}$/dose for the mumps component, in order to support the current end expiry titer of 4.3 $\log_{10}$ (20,000) $TCID_{50}$/dose. To achieve this titer at release with assay variability, M-M-R®II is currently (since September 1999) formulated to a target mumps titer of 5.2 $\log_{10}$ (160,000) $TCID_{50}$/dose. This titer is within our historical experience and meets or exceeds the registered minimum specification for all countries. Implementation of this manufacturing target titer is an interim measure that will be re-evaluated once the results of the current expiry trial become available. The conclusions of the clinical trial and the resultant changes in manufacturing target titers will be the subject of a future regulatory submission.

[REDACTED – OMP]

Furthermore, this change does not affect the chemical composition of the final product. M-M-R®II composition continues to be the same 67.5% stabilizer, 7.5% buffer and 25% bulk measles, mumps and rubella vaccine virus and their diluents. No change in composition or concentration of the stabilizer for the product occurred.

## Background

As is common with live attenuated virus vaccines, the potency for the product decreases over its defined shelf life when it is stored at the recommended temperatures. Historically, Merck & Co., Inc. manufactured M-M-R®II at titers higher than the label claims, intended to meet or exceed these titers at release, with normal assay variability. No specific target titer was formalized. For mumps, product was manufactured to a titer intended to meet or exceed 4.3 $\log_{10}$ (20,000) $TCID_{50}$/dose at release. In the release assay format used by the Company until September 1999[2], the 99% confidence interval was ±0.6 $\log_{10}$ $TCID_{50}$. Therefore, the batches were filled to a target

---

[1]The terms, $TCID_{50}$ and $CCID_{50}$, are interchangeable. For consistency, $TCID_{50}$ will be used in this document.

[2]In September 1999, with *no changes in the assay method*, the assay variability was halved by testing more vials at release. Previously three vials were tested in one assay (3x1 format). Since September 1999, a total of six vials are tested, one vial in each of six separate assays (1x6 format).

CONFIDENTIAL

MRK-KRA00576984
MRK-CHA00576984

manufacturing titer at least $0.6 \log_{10}$ TCID$_{50}$ above $4.3 \log_{10}$ TCID$_{50}$. This assured that even with normal assay variability, at the time of release testing, the potency measurements would be acceptable. In February 1998, using the averaged measured release potencies of all M-M-R®II batches for the 48 month period, 1993-1996, the mean manufacturing titers were formalized as target manufacturing titers by inclusion in the Standard Operating Procedure (SOP) that details the filling model used to formulate the product. These target titers were **REDACTED – REDACTED – OMP** for measles, $4.9 \log_{10}$ (80,000) TCID$_{50}$/dose for mumps and **REDACTED – OMP** for rubella.[3]

## Mumps Manufacturing Target Potency Change

Discussions were held with CBER in 1998 and 1999 that addressed the difference in interpretation of the label potency claims for M-M-R®II. Although the Company had viewed the mumps titer of $4.3 \log_{10}$ (20,000) TCID$_{50}$/dose as the minimum potency to be present at release, CBER indicated that they viewed this label claim as the minimum titer to be present at the end of shelf life for the product. In August 1999, CBER specified that the mumps release titer for the mumps-containing live virus vaccines be set at $5.0 \log_{10}$ (100,000) TCID$_{50}$/dose. This release titer acknowledged the end expiry titer of $4.3 \log_{10}$ (20,000) TCID$_{50}$/dose and the average loss in potency over the twenty-four month shelf life of $0.55 \log_{10}$ TCID$_{50}$. The release titer calculation also included a factor to address the variability of the mumps potency assay at CBER. Merck & Co., Inc. was informed that this titer must be met for all batches submitted for release as of November 8, 1999. Batches manufactured as of September 13, 1999 are formulated to contain $5.2 \log_{10}$ (160,000) TCID$_{50}$/dose in order to assure meeting the minimum release specification with normal assay variability. Implementation of this target manufacturing titer is an interim measure. The target titer will be re-evaluated when the data from the current clinical trial to support an end expiry mumps titer of $3.7 \log_{10}$ (5000) TCID$_{50}$/dose become available.

Titers in this range are within our manufacturing history and clinical experience. The graphs in Attachment 1 depict the mumps release potencies by batch from April 1994 to September 2000. The table below summarizes the data:

**Mumps Release Potency**
**April 1, 1994 to September 5, 2000**

| Year | Mean Potency ($\log_{10}$ TCID$_{50}$/dose) | Minimum Potency ($\log_{10}$ TCID$_{50}$/dose) | Maximum Potency ($\log_{10}$ TCID$_{50}$/dose) |
|---|---|---|---|
| April 1, 1994 - March 31, 1995 | 4.9 | 4.4 | 5.5 |
| April 1, 1995 - March 31, 1996 | 4.9 | 4.3 | 5.3 |
| April 1, 1996 - March 31, 1997 | 4.9 | 4.5 | 5.3 |
| April 1, 1997 - March 31, 1998 | 5.1 | 4.6 | 5.4 |
| April 1, 1998 - March 31, 1999 | 4.9 | 4.3 | 5.3 |
| April 1, 1999 - September 12, 1999 | 5.0 | 4.4 | 5.4 |
| Sept. 13, 1999[a] - Sept. 5, 2000 | 5.2 | 5.0 | 5.7[b] |

[a]Date that the target manufacturing titer of $5.2 \log_{13}$ (160,000) TCID$_{50}$/dose was implemented.
[b]Two batches were greater than $5.5 \log_{10}$ TCID$_{50}$/dose. One measured $5.6 \log_{10}$ TCID$_{50}$/dose, the other $5.7 \log_{10}$ TCID$_{50}$/dose (see graph).

---

[3]Analysis of the stability performance of over 100 batches of product manufactured over a period of 10 years determined the average potency losses over twenty-four months of storage at 2-8°C (recommended storage conditions) to be **REDACTED** for measles, $0.55 \log_{11}$ TCID$_{50}$ for mumps and **REDACTED** for rubella. **REDACTED – OMP** **REDACTED – OMP** These release titers were implemented for all batches concomitantly with the release titer for mumps.

**The Chemical Composition of the Final Formulation is Unchanged**

The change in mumps target potency did not affect the chemical composition of the final formulation for M-M-R®II. The formulation is depicted in the pie chart in Attachment 2. Stabilizer and buffer comprise 75% of the final formulation. The remaining 25% of the formulation have been and continue to be the vaccine viruses and their diluents.

The potency of harvested vaccine virus bulk varies from batch to batch. In order to achieve the titer of the final product, a volume of harvested bulk measles, mumps and rubella virus is added. The quantity added is dependent upon the potency of the specific harvested bulk virus. As a result, the volumes of the viruses added may differ among batches. In order to assure consistent chemical composition from batch to batch, these volume differences are corrected to 25% of the final formulation by the addition of the appropriate volumes of diluents equivalent in composition to the media used in bulk vaccine preparation. Therefore, the chemical composition of the final container vaccine is not affected by this mumps potency change. More importantly, the composition and concentration of the product's stabilizer remains the same.

**Clinical Data Available at the Current Mumps Potency**

This titer of 5.2 $\log_{10}$ TCID$_{50}$/dose is within our manufacturing experience. Higher titered batches (approximately 5.5 $\log_{10}$ TCID$_{50}$/dose) have been manufactured in the past in order to support countries that required demonstration of thermal stability as part of batch release. In addition, higher titered batches (5.3 $\log_{10}$ TCID$_{50}$/dose of mumps) have been used in some clinical trials (Attachment 3). No clinical trials were therefore performed prior to effecting the current change.

The effected change is within our historical experience. However, the revision of the defined target titer for mumps in September 1999 has resulted in a higher percentage of batches on the market with this higher potency. The effect of these batches on the passively reported adverse experiences was reviewed. An evaluation of the adverse experiences reported to the Company through analysis of Merck & Co., Inc.'s WAES (Worldwide Adverse Event Reporting System) database indicates that the current product has not resulted in a significant change in the pattern, type or frequency of the adverse experiences reported (Attachment 4).

The implementation of the Standard Operating Procedure defining the target manufacturing potency targets in February 1998 formalized Merck & Co., Inc.'s manufacturing the same product for all markets. The change effected on September 13, 1999 for the U.S. market was implemented for all markets.

**Planned Harmonization**

Following the resolution of the difference in interpretation of the label claims for M-M-R®II, the registered potency specifications for the product were either confirmed or changed in each country. Some countries, including the U.S., specify the end expiry titers of REDACTED – OMP for measles, 4.3 $\log_{10}$ (20,000) TCID$_{50}$/dose for mumps and REDACTED – OMP for rubella. Others require titers aligned with the European Pharmacopoeia specifications of REDACT REDACTED – OMP , 3.7 $\log_{10}$ (5000) TCID$_{50}$/dose for mumps and REDACTED – OMP REDACTED – OMP In addition, some countries also define the minimum titers present at the release of the product in addition to the end expiry titers. These titers also vary among countries. One product, manufactured to the same target potencies, is supplied to all countries. It is Merck & Co., Inc.'s plan to harmonize the registered specifications for the product among all of the

CONFIDENTIAL

countries where M-M-R®II is supplied. In order to accomplish this, the Company is currently performing a clinical trial (Attachment 5) to provide additional supporting data in order to harmonize the specifications to those defined by the European Pharmacopoeia. The trial has completed enrollment and all sera have been collected. The sera must be tested and the results analyzed. It is anticipated that the analysis of the data will be completed by the end of 2001. When these data are available, the target manufacturing potency for mumps will be re-evaluated. The target potencies will be defined based upon the stability profile for the product and the clinically supported end expiry titers. Using these data, the necessary filings will be submitted to harmonize the release and expiry specifications in all countries.

### Conclusion

As described above, the change in mumps target manufacturing titer is within our historical experience. It is acceptable clinically. The change does not affect the final chemical composition of M-M-R®II. This is a temporary modification within the manufacturing process. The target manufacturing titer will be re-evaluated after the data from the current clinical trial have been evaluated. These data will be filed in support of a harmonized end expiry potency claim for the product.

**CONFIDENTIAL**

**Attachment 1**

CONFIDENTIAL

MRK-KRA00576988
MRK-CHA00576988

Attachment 3

**Clinical Analysis of Data Available Prior to the Increase in Mumps Target Potency**

Clinical data have been collected from Merck & Co., Inc.'s clinical trials database that provide support for the use of M-M-R®II at this mumps potency. The data support the increase in mumps target manufacturing titer.

Four clinical trials in the Company's database utilized M-M-R®II vaccine with a mumps release potency of 5.3 $\log_{10}$ $TCID_{50}$/dose; three studies were in the context of the measles, mumps, rubella, varicella (MMRV) quadrivalent vaccine program and one trial was in the context of the varicella vaccine (VARIVAX®) program. The primary objective of these studies was to evaluate concomitant use of M-M-R®II or quadrivalent MMRV with other vaccines such as PedvaxHIB® or DTP. The studies were not specifically designed to evaluate the effect of high mumps potency. The table below shows the protocol number, the number of subjects receiving M-M-R ®II vaccine with an elevated mumps potency, and the rates of several adverse experiences. In the studies, no cases of parotitis, orchitis or aseptic meningitis were observed during the 42 day active follow up period. Other common adverse experiences, such as fever and injection site reaction, occurred at rates that appeared generally similar to what has been observed in other studies (see table below).

**Table**
**Rate of Selected Adverse Experiences in Merck & Co., Inc. Studies with 5.3 $\log_{10}$ $TCID_{50}$/dose Mumps Potency**

| Protocol | Subjects N* | Fever (day 0-42) (≥102°F) | Injection Site Reaction | Aseptic Meningitis | Parotitis | Orchitis |
|----------|-------------|---------------------------|-------------------------|--------------------|-----------|----------|
| MMRV 004 | 227 | 22.1% | 12.3% | 0 | 0 | 0 |
| MMRV 005 | 154 | 23.8% | 15.6% | 0 | 0 | 0 |
| MMRV 007 | 148 | 26.4% | 23.0% | 0 | 0 | 0 |
| REDACTED – OMP | | | | | | |

*Number (N) of subjects exposed to high titered M-M-R®II

**Summary**

In summary, these analyses of the data from clinical trials support an increase in the mumps target fill potency.

MRK-KRA00576989
MRK-CHA00576989

**Attachment 4**

**High Mumps Potency Target Comparison with Historical Fill for M-M-R® II**

Since February 2000, all batches of M-M-R®II vaccine released by Merck & Co., Inc. have had a higher mumps target titer in contrast to historical precedent.  This analysis was undertaken to compare reported adverse experiences in patients who received the higher mumps titer M-M-R®II vaccine with reported adverse experiences in patients who received the historical fill mumps titer M-M-R®II.  Between January 1, 1999 and August 31, 1999, approximately 9 million doses of M-M-R®II were distributed in the U.S.  During the same time period in 2000, the same amount of vaccine was distributed in the U.S.

Merck & Co., Inc.'s WAES (Worldwide Adverse Experience System) database is a passive reporting system similar to the U.S. Centers for Disease Control and Prevention VAERS (Vaccine Adverse Event Reporting System) database.  WAES was searched for all serious or selected, biologically plausible Adverse Events (AEs) (see Appendix 1) with batch numbers reported following the administration of M-M-R®II vaccine for the period, February 1 through August 31, 2000, as well as for a comparable period during 1999.  Since both target manufacturing potencies would have been represented in the period analyzed for 2000, only those reports were evaluated for which batch numbers were available.  The batch numbers were used to confirm the release potency for each batch.

The search identified 23 WAES reports with batch numbers from 1999, a period during which M-M-R®II manufactured to a target mumps potency of 4.9 $\log_{10}$ TCID$_{50}$/dose was released, and 23 reports with batch numbers from the year 2000, during which M-M-R®II manufactured to a target mumps potency of 5.2 $\log_{10}$ TCID$_{50}$/dose was released.  Please note that in the year 2000, batches with either target potency would have been in distribution.  The adverse experience reporting rate was approximately 2.6 per million doses distributed in both time periods.  Fourteen of the 23 reports identified in 2000 had batch numbers that were associated with higher mumps potency vaccine.

The table below displays the list of AEs reported in the 14 WAES reports after administration of the higher target potency vaccine.  Note that, except for injection site reactions that are common AEs following vaccination, there were no biologically plausible AEs that might be associated with high mumps titer virus vaccine.  The reported AEs following high titer mumps virus M-M-R®II vaccine are similar to the type of AE following the use of the historical fill mumps titer M-M-R®II vaccine.

MRK-KRA00576990
MRK-CHA00576990

Table

**All Serious AE WAES Reports or Reports of Selected Biologically Plausible AEs As Defined in Appendix I Reported After Administration of Higher Target Potency Mumps-Containing M-M-R®II**
**(The Six Reports Containing Even One Serious AE Shown in Bold)**

| WAES # | Batch # | Age | Sex | AEs |
|---|---|---|---|---|
| **00040445** | **1713J** | 1 | F | **anaphylaxis** |
| **00040819** | **1711J** | 1 | M | **fever** |
| 00042186 | 1714J | 4 | M | abnormal feeling<br>injection site reaction |
| **00050302** | **1711J** | 1 | M | **fever**<br>**irritability**<br>**nasal secretion** |
| 00052487 | 1713J | 5 | M | injection site reaction |
| **00060459** | **1714J** | 1 | F | **fever**<br>**exanthem**<br>**intoxicated feeling**<br>**tic** |
| **00064685*** | **1712J** | 42 | F | **asthma**<br>**CVA**<br>**myocardial infarction**<br>**paralysis**<br>**vaccine reaction** |
| 00081640 | 0400K | 1 | M | injection site wheal |
| 00082071 | 0400K | 11 | M | injection site wheal |
| 00082072 | 0400K | 10 | M | injection site wheal |
| 00082073 | 0772K | 1 | M | injection site wheal |
| **00042121** | **1713J** | 1 | F | **febrile seizure**<br>**otitis** |
| 00081868 | 0583K | 9 | F | injection site erythema |
| 00070387 | 0259K | 35 | F | rash<br>injection site reaction<br>skin erythema<br>skin warm to touch |

* WAES # 00064685 describes a 42 year old female on venlafaxine (Effexor) for mild depression who developed an asthma attack shortly after receiving her second dose of M-M-R®II vaccine. Three days later she developed chest pain with partial intermittent paralysis and a myocardial infarction. Five days later she was reported to have developed a stroke while in physical therapy. Her primary care physician did not feel that her illness were due to her recent vaccination. No additional information is available.

## Conclusion

The low number of total reports (23 in each time period), the approximately equal reporting rate in both the historical fill and higher target potency fill time periods (2.6 AE reports per million doses distributed), and the kinds of adverse experience reports associated with the higher target potency vaccine suggest that the safety profile for the higher target potency vaccine is comparable to that of the historical fill titer product.

**Appendix 1**

**Selected, Biologically Plausible AEs**
**(from a terms list of all AEs reported with M-M-R® and M-M-R®II vaccine for all time)**

injection site burning
injection site ecchymosis
injection site erythema
injection site erythema wider than 2 inches
injection site induration
injection site induration wider than 1 inch
injection site infection
injection site inflammation
injection site mass
injection site pain
injection site pruritus
injection site rash
injection site reaction
injection site swelling
injection site vesicle
injection site warmth
injection site wheal
mumps
pancreatitis
parotiditis
parotitis
salivary gland pain
salivary gland swelling
sialadenitis
diabetes mellitus
diabetic ketoacidosis
orchitis
testicular disorder
testicular pain

MRK-KRA00576992
MRK-CHA00576992

**Attachment 5**

**Background and Rationale for Mumps Expiry Clinical Trial of M-M-R®II**

In an ongoing effort to document that M-M-R®II is immunogenic at its expiry potency, Merck & Co., Inc. designed a clinical trial to specifically study the immunogenicity of M-M-R®II with reduced potency. In the clinical trial, healthy children 12-18 months of age were randomized to receive either control M-M-R®II (sublot #1) or experimental M-M-R®II that has been aged at room temperature to either ≤4.0 (sublot #2) or ≤3.7 (sublot #3) $\log_{10}$ TCID$_{50}$/dose of mumps. Each subject received a single subcutaneous dose of M-M-R®II from one of the three sublots and a single subcutaneous dose of VARIVAX® concomitantly, since this is standard practice in many areas. Subjects were followed for safety for 42 days following vaccination. Blood samples were taken at day 0 (immediately prior to vaccination), at approximately 6 weeks post vaccination, and approximately one year post vaccination. The primary hypotheses of the trial required both that (1) the control (release potency) and expiry groups attained similar seroconversion rates by mumps neutralizing antibody and that (2) the expiry group attained an adequate mumps neutralization seroconversion rate. For the purpose of the analysis, similarity required not more than a 5 percentage point difference (lower bound of the confidence limit) between control and expiry. An adequate response required a minimum of 90% seroconversion rate in the expiry group (lower bound of the confidence interval).

The primary measurement of mumps immunogenicity for the trial is a plaque reduction neutralization (PRN) assay that has been developed and validated at Merck Research Laboratories (MRL). This assay measures the ability of serum neutralizing antibody to block infection of Vero cells with the target mumps strain and thereby inhibit plaque formation. Because inhibition of infection by wild type mumps is thought to be a good correlate of protection from wild type mumps, the PRN assay has been engineered with a low passage Jeryl Lynn™ wild type mumps strain. Measles, mumps and rubella immunogenicity will also be measured using ELISA assays developed at MRL. The clinical study was initiated in the U.S. in February 1999 at ~20 clinical sites. Enrollment was completed in June 2000 (n=1998). Analyses of the sera for mumps neutralizing antibody are pending.

<u>Summary</u>

In summary, although M-M-R®II has been demonstrated to be highly immunogenic and efficacious, no specific studies of M-M-R®II have been performed at its expiry potencies. A mumps expiry potency of ~3.7 $\log_{10}$ TCID$_{50}$/dose has been selected for clinical testing. These data will provide additional information to harmonize the specifications required by CBER with those defined in the European Pharmacopoeia.

11/26/2019
Declaration of G. Reilly
EXHIBIT 364

Roberta L. McKee, Ph.D.
Executive Director, Bio/Sterile Quality Operations
WP36M-5
Telephone: (215) 652-5603  Fax: (215) 993-3400

Merck & Co., Inc.
P.O. Box 4
West Point PA 19486-0004



December 10, 1998

M. Carolyn Hardegree, M.D., Director
Office of Vaccines Research and Review (HFM-400)
c/o Food and Drug Administration
Center for Biologics Evaluation and Research
Document Control Center (HFM-99)
Woodmont Office Center, Suite 200N
1401 Rockville Pike
Rockville, MD  20852-1448

Dear Dr. Hardegree:

Enclosed is a proposal for changes to the release specification for the mumps component and to the procedure for potency assignment for the measles and mumps components of Measles, Mumps, and Rubella Virus Vaccine Live and associated live virus vaccines.  The attached document also describes the stability data analysis used to determine the proposed release titer for mumps.

This document is provided for CBER's review prior to the meeting scheduled with Merck on December 18, 1998.  Six copies of this letter and attachment will also be hand delivered to Dr. Norman Baylor, at his request, on December 11, 1998.

Please contact me at (215) 652-5603 or, in my absence, Dr. David M. Wonnacott at (215) 652-3700 if we can provide any additional information.

Sincerely,

Roberta L. McKee

Roberta L. McKee, Ph.D.

cc: Dr. Norman Baylor

Attachment

(CBER8213)ka
aud:rlm

**CONFIDENTIAL**

**MRK-KRA00756233**
**MRK-CHA00756233**

TABLE OF CONTENTS

I. INTRODUCTION................................................................................1

II. PROPOSAL ....................................................................................3

III. LABEL CLAIM FOR M-M-R®II ..................................................4

IV. PROCEDURE FOR POTENCY ASSIGNMENT FOR THE MEASLES AND MUMPS COMPONENTS................................................................4

V. MUMPS RELEASE SPECIFICATION..........................................5

VI. IMPLEMENTATION TIMING .....................................................6

VII. CHANGE TO BE IMPLEMENTED FOR DOMESTIC LOTS ...........6

VIII. INTERIM PROCEDURE ...........................................................7

APPENDIX A........................................................................................8

APPENDIX B........................................................................................13

i

CONFIDENTIAL

MRK-KRA00756234
MRK-CHA00756234

Appx19091

## I.  INTRODUCTION

M-M-R®II is currently manufactured at or above the minimum titers of 1000 (3.0 $\log_{10}$), 20,000 (4.3 $\log_{10}$) and 1000 (3.0 $\log_{10}$) TCID$_{50}$/dose for the measles, mumps and rubella components, respectively.  In 1997 in communications with CBER, the need to clarify the label claims for potency of M-M-R®II and to define them in terms of the minimum titers present at expiry was conveyed to Merck.  Merck has undertaken a clinical study to evaluate the immunogenicity of mumps when administered to children at a targeted expiry titer of 3.7 $\log_{10}$ TCID$_{50}$/dose. Vaccine is now available and the clinical study will begin in January.  An interim report, based on initial immunogenicity data, will be available 3Q99.  The clinical study report will be completed 1Q00.

Until this clinical study has been completed, the end-expiry titers for product in the US will be REDACTED REDACTED – OMP 4.3 $\log_{10}$ TCID$_{50}$/dose for mumps REDACTED – OMP REDACTED – OMP  This will be effected by raising the release titer for mumps to accommodate our average projected potency losses over time and by improving the confidence in the release titer assignments.  The latter will be accomplished by modifying current testing and release procedures to reduce assay variability.  The goal is to provide a high level of assurance that the minimum titers are maintained through expiry.

This document provides the proposal to:

- Change the procedure for potency assignment for M-M-R®II by using a less variable TCID$_{50}$ assay format;
- Raise the release specification for the mumps component of the product;
- Allow expanded testing in the assignment of release potency for lots with initially low assay values;
- Modify how product dating is assigned, with reference to the nonlinear kinetics of potency degradation over time; and describes
- The stability data analysis used to determine the proposed release titer.

Since gaining approval for the above changes in all countries where this product is licensed would involve significant delay in implementation of this change, likely until after the clinical data become available to support a lower expiry titer of 3.7 $\log_{10}$ TCID$_{50}$/dose (initial data anticipated

1

CONFIDENTIAL

MRK-KRA00756235
MRK-CHA00756235

Appx19092

3Q99 with the completed clinical study report 1Q00), we propose to implement this interim change for the US alone. We are comfortable with this proposal, given the excellent field experience for M-M-R®II under current conditions and given the short interval before formal clinical study data begin to become available. We therefore request CBER's guidance and assistance to develop a mechanism whereby international shipments of M-M-R®II would continue without change in the current release procedures.

In order to implement this plan for manufacturing, internal documentation regarding manufacture, testing and release must be modified. The expected timing for implementation of manufacturing and testing in accordance with this proposal is 1Q99. Implementation for lot release will occur after CBER approval is obtained for the necessary Prior Approval Supplement describing the potency assignment changes.

This proposal is an interim plan for product release and expiry dating. When the results of the end-expiry clinical trial are available, the release and dating proposal will be re-evaluated and the appropriate actions taken with CBER concurrence.

2

**CONFIDENTIAL**

## II. PROPOSAL

A. Change the procedure for potency assignment for the measles and mumps components.
- Test one vial in each of six assays, to reduce variability.
- Adjust the individual values to the house standard to increase accuracy.
- Assign lot potency using averaged house standard-adjusted potency measurements.

B. Increase the release specification.

C. Modify the assignment of dating.
- Assign twenty-four month dating at 2-8°C for a lot measuring 4.9 $\log_{10}$ TCID$_{50}$/dose or greater for mumps.
- Assign eighteen months for a lot measuring 4.8 $\log_{10}$ TCID$_{50}$/dose.
- Assign twelve months for a lot measuring 4.7 $\log_{10}$ TCID$_{50}$/dose.

D. Employ a defined expanded testing plan to obtain additional measurements to evaluate values below 4.7 $\log_{10}$ TCID$_{50}$/dose.

E. Implement these changes for domestic lots. International lots will continue to be manufactured and released per current procedures.

F. Implement these changes in manufacturing after internal documentation and logistics have been addressed (1Q99) and for release after CBER approval has been received for the Prior Approval Supplement describing the potency assignment changes.
- Product manufactured prior to implementation of this proposal will be released in accordance with the practices currently in place.

G. Implement these changes as an interim measure until the conclusions derived from the results of the end-expiry clinical trial have been approved by CBER.

3

CONFIDENTIAL

MRK-KRA00756237
MRK-CHA00756237

Appx19094

## III.  LABEL CLAIM FOR M-M-R®II

Until the clinical study to evaluate the immunogenicity of mumps at a targeted end-expiry titer of 3.7 log$_{10}$ TCID$_{50}$/dose has been completed, the end-expiry titers of M-M-R®II will be [REDACTED – OMP] [REDACTED – OMP] 4.3 log$_{10}$ TCID$_{50}$/dose for mumps [REDACTED – OMP] [REDACTED –] Immunogenicity data are available from prior clinical studies to support these targets.

## IV.  PROCEDURE FOR POTENCY ASSIGNMENT FOR THE MEASLES AND MUMPS COMPONENTS.

### A.  Change in Testing Format

The random variability in the live virus vaccine potency assays can be improved through modification to the testing plan.  The margin of error of the estimated potency from a sample can be significantly reduced through a change from a 3 x 1 (three vials tested in a single potency assay) assay format, to a 1 x 6 (a single vial tested in each of six independent potency assays) format.  It is believed that the relatively broad distributions of potency values currently observed for production lot release and in stability testing can both be accounted for by the 3 x 1 assay variability.  The assay and the format change are described in Appendix A, Sections A and B.

### B.  Adjustment to the House Standard

A systematic shift in potency of the house standard control has been observed in the measles and the mumps potency assays.  This has been identified to be associated in part with the range of Vero cell passage levels used in the assay.  There is a trend for increased potency with an increase in cell passage level.  This could have a profound impact on the assignment of potencies for product release and the interpretation of stability study results.  In order to ameliorate this systematic effect, potency results for stability and release samples will be adjusted to the concurrently run assay of the house standard.  This adjustment will be enacted through a standard calibration equation, similar to that currently utilized in the varicella potency assay.  Adjustment of potency values to the house standard is addressed in Appendix A, Section C.

4

CONFIDENTIAL

MRK-KRA00756238
MRK-CHA00756238

Appx19095

## V. MUMPS RELEASE SPECIFICATION

A comprehensive evaluation of the live virus vaccine stability database has defined the stability profile for mumps and has yielded an estimate of potency loss through twenty-four months dating at 2-8°C of mumps containing vaccines. Nonlinear kinetics have been observed in live virus vaccine stability both for measles and for mumps: the first portion of the potency loss curve is steeper than the latter portion of the curve (Appendix B). In order to determine the potency loss through twenty-four months, both portions of the kinetics curve are taken into consideration.

Based on measurements from sixty lots of mumps containing vaccines, the average loss of mumps potency from release through 24 months is 0.6 $\log_{10}$ $TCID_{50}$: 0.4 $\log_{10}$ $TCID_{50}$ occurs in the first twelve months of dating. In order to evaluate stability performance at later shelf life timepoints, data from the second phase of this curve, i.e., data from testing of samples from 6 months through at least 18 months of storage at 2-8°C, were evaluated (see Appendix B). The average decrease in mumps potency in the latter phase of the kinetics curve is 0.1 $\log_{10}$ $TCID_{50}$ per 6 months. Based on these kinetics and premised on the assumption that the variability of release potency values among lots of mumps containing vaccines is due primarily to assay variability, we propose the following interim dating:

| Minimum Potency at Release ($\log_{10}$ $TCID_{50}$/dose) | Proposed Dating |
|---|---|
| 4.9 | 24 months |
| 4.8 | 18 months |
| 4.7 | 12 months |

Thus a lot of vaccine yielding an average release potency (average of vials) greater than or equal to 4.9 $\log_{10}$ $TCID_{50}$/dose will be assigned twenty-four month dating; a lot with an average release potency of 4.8 $\log_{10}$ $TCID_{50}$/dose will receive eighteen month dating; and a lot of vaccine yielding an average release potency of 4.7 $\log_{10}$ $TCID_{50}$/dose will receive twelve month dating.

5

CONFIDENTIAL

MRK-KRA00756239
MRK-CHA00756239

Appx19096

Any lot of vaccine yielding an average release potency less than $4.7 \log_{10} TCID_{50}$/dose will be further tested in an additional 1 x 6 assay regimen. The same minimum potency requirements described above will be used to define the disposition of the lot from the average of the 12 measurements obtained from the first and second series of assays.


## VI. IMPLEMENTATION TIMING

In order to implement these changes, modifications must be made to both manufacturing and testing documents and to the computer programs used in the testing laboratories for result reporting. The documents governing the expanded testing protocol must be developed and implemented. These modifications will be given the highest priority; it is anticipated that the necessary modifications will be in place in order to begin manufacturing and testing in accordance with this proposal in 1Q99.

Product manufactured prior to the implementation of these changes will continue to be tested and released in accordance with the practices currently in place.

A Prior Approval Supplement describing and supporting the changes to the testing procedures and potency assignments must be approved by CBER prior to implementation of this proposal in the release of lots. We request CBER's consideration of expedited approval for these changes.


## VII. CHANGE TO BE IMPLEMENTED FOR DOMESTIC LOTS

M-M-R®II and the associated monovalent and bivalent vaccines are licensed in over seventy countries worldwide. We do not feel that it is necessary to modify the release titers for these markets. Gaining approval for the changes described in this proposal in all countries would delay implementation significantly, very likely until after the data from the end-expiry clinical study became available. We propose to implement the testing, release and dating changes for domestic product alone. There would be no change for lots for international markets. We request CBER's help and guidance to develop a mechanism to permit uninterrupted supply with no changes for

6

CONFIDENTIAL

MRK-KRA00756240
MRK-CHA00756240

Appx19097

international shipments. We are confident that there is no reason to make changes for international markets at this time. The epidemiological data from countries where M-M-R®II is broadly used indicate its effectiveness at immunizing children at the current potencies.

## VIII. INTERIM PROCEDURE

This proposal is intended as an interim measure to be in effect until the results of the end-expiry clinical trial become available. An interim report, based on initial immunogenicity data, will be available 3Q99. The clinical study report will be completed 1Q00. Based on the study's outcome, the approach for release and dating will be re-evaluated. The conclusions of that evaluation will be discussed with CBER and the approach for release and dating redefined with CBER's concurrence.

CONFIDENTIAL

MRK-KRA00756241
MRK-CHA00756241

Appx19098

# APPENDIX A

## ASSAY METHOD, ASSAY FORMAT AND ADJUSTMENT OF POTENCY VALUES

Summary

- The $TCID_{50}$ assay has high variability which can be partially compensated for by the number of assays performed for each sample.
- The existing data for release of lots and the majority of the stability is based primarily upon a 3 x 1 assay format, which has inherently high variability.
- Change to a 1 x 6 assay format will reduce variability.
- Adjustment of test potencies to the house standard will reduce systematic assay variability.

This appendix describes the potency assay and the advantage to changing the assay format from 3 x 1 to 1 x 6. This change in assay configuration was implemented for stability studies in October 1997. This appendix also discusses the advantage of adjustment of potency measurements to the house standard. This improves assay accuracy by reducing the effects of systematic assay shifts on the potency assignment. As part of this proposal, this adjustment would be implemented for both stability studies and for assignment of release potency to lots.

### A.  Potency Assay Description

The potency of measles, mumps and rubella viruses is measured by a $TCID_{50}$ assay. The potency is determined by calculating the $\log_{10} TCID_{50}$ dilution endpoint using the Spearman-Karber method.

Duplicate tests from each of two vials from the house standard, an internal reference standard, are performed in every potency assay, together with the sample testing. An assay is considered valid when the average of these four house standard test results falls within the predetermined control limits and the potency range among them does not exceed $1.0 \log_{10} TCID_{50}$. House standard is currently used as a quality control for the potency assay; the potency results of the samples are

8

CONFIDENTIAL

MRK-KRA00756242
MRK-CHA00756242

Appx19099

currently not adjusted to the house standard value. House standards are established from monovalent regular production and CBER-released lots of REDACTED – OMP MUMPSVAX® REDACTED – OMP A portion of a released lot is specifically labeled on the production line as a house standard lot. The lot is transferred to the laboratory and stored at -20°C. After qualification testing has been completed and control limits assigned, use of the house standard is implemented.

The control limits for the house standard are determined using two standard deviations about the average result obtained from approximately 150 potency assay measurements.

### B.  Testing Format

The margin of error (one-sided, 1.65 standard deviations) reduction associated with changing the assay format from 3 x 1 to 1 x 6 is depicted in Table 1 below. These estimates were obtained from the history of house standards results for each virus.

Table 1
Calculated One-Sided Margin of Error for Potency Measured in Two Assay Formats



| Virus | Testing Format | |
| --- | --- | --- |
| | 3 x 1 | 1 x 6 |
| REDACTED – OMP | | |
| mumps | $\pm0.24 \log_{10} TCID_{50}$ | $\pm0.14 \log_{10} TCID_{50}$ |

### C.  Adjustment to the House Standard

The variability inherent to the $TCID_{50}$ assay for determination of measles and mumps potency is demonstrated in Figures 1 and 2. Within the same house standard lot and when considering individual testing sets of assays, a range in assigned potency values REDACTED – OMP REDACTED – OMP of 0.5-0.6 $\log_{10} TCID_{50}$ for mumps, even with a 1 x 6 assay format. A component of this additional variability is felt to be systematic in nature.

9

**CONFIDENTIAL**

MRK-KRA00756243
MRK-CHA00756243

Appx19100



REDACTED – OMP

**Figure 2**
**Mumps Potency Considered in a 1 x 6 Assay Format over Time for 2 House Standard Lots**



Systematic trends, e.g., the downward trend from 1996-1998 for measles and the upward trend from 1996-1998 for mumps, have been observed, both for measles and for mumps potency assays. The large inherent assay variability within an individual testing format compounded by

10

CONFIDENTIAL

the systematic shifts in the potency assays over time has a profound impact on assignment of potencies for product release and for stability study samples. In particular, systematic fluctuations have the potential to impact comparisons of stability among lots put on station across the ten-year period.

Although some factors contributing to this systematic variability can be identified, the impact of their contribution can only be reduced, not eliminated. For example, one potential factor contributing to this systemic variability is the age of the Vero cells used in the potency assay. Recent investigations have shown for both measles and mumps that the age of the Vero cells affect the potency measurements: the higher the passage level of the Vero cells, the higher the observed potency values for the same sample. Limiting the acceptable passage level range for the Vero cells used in the assay can reduce the contribution of this factor to assay variability, but may not be practicable from an operations perspective.

Correction for these systematic errors can be effected by adjustment to the house standard. This approach is commonly used in complex biological assays to adjust for known and unknown co-variants.

The method of adjustment is summarized in the following formula:

Adjusted Potency = Measured Potency + (Assigned HS Potency – Measured HS Potency)

where "Measured Potency" is the test sample potency obtained in a single run of the assay, "Measured HS Potency" is the potency of the concurrently tested house standard, and "Assigned HS Potency" is the value assigned to the house standard, from historical testing in the assay. The adjustment to the house standard is conceptually the same as an adjustment for differential sensitivity in the assay. Therefore, house standard adjustment will be included in the calculations for potency. Table 2 shows the reduction in margin of error achievable when the change in assay format is coupled with adjustment to the house standard.

11

**CONFIDENTIAL**

MRK-KRA00756245
MRK-CHA00756245

Table 2
Calculated One-Sided Margin of Error of Potency Determined Using Different Testing Formats
With and Without House Standard Adjustment

| Virus | Testing Format | Without House Standard Adjustment | With House Standard Adjustment |
|---|---|---|---|
| REDACTED – OMP | | | |
| | | | |
| mumps | 3 x 1 | (used currently for release) $\pm 0.24$ $\log_{10}$ TCID$_{50}$ | $\pm 0.23$ $\log_{10}$ TCID$_{50}$ |
| | 1 x 6 | $\pm 0.14$ $\log_{10}$ TCID$_{50}$ | (proposed) $\pm 0.14$ $\log_{10}$ TCID$_{50}$ |

## D. Conclusion

Changing the release testing format from 3 x 1 to 1 x 6, coupled with adjustment to the house standard reduces assay variability, providing a higher degree of confidence to the titer assigned to each lot of product.

12

CONFIDENTIAL

## APPENDIX B

## STATISTICAL ANALYSIS OF STABILITY DATA

### Manufacturing Experience Spanning 1987-1998

Summary

- Mumps potency loss over time is nonlinear.
- This nonlinear behavior is best analyzed by a two-phase linear kinetics model.
- This two-phase approach is used to evaluate the stability profile of manufactured lots placed on formal stability protocols between 1987 and 1998.

### A.  Rationale for Statistical Approach

Stability data are typically modeled assuming first order kinetics, utilizing a linear equation relating log potency to time: $\log(P) = \alpha + \beta \cdot t$. It is well known, however, that the stability kinetics of most live virus vaccines are nonlinear, displaying an initial rapid loss in potency, followed by a more gradual decrease. Stability data of mumps virus at temperatures higher than 2-8°C indicate nonlinear (non-first-order) deactivation kinetics. Best seen at room temperature (Figure 1), the virus potency decays much faster at the early stage than at the later stage of the stability study:

13

MRK-KRA00756247
MRK-CHA00756247

Appx19104

Figure 1

Mumps Nonlinear Stability Kinetics

Illustrated at Room Temperature



Bi-phasic kinetics can be modeled various ways, depending upon the statistical features of the data as well as the intended use of the model. The statistical features that impact the fit of a nonlinear kinetics model are the number and range of stability time points and the underlying variability of the measurements.

Various statistical approaches have been considered to model the stability loss for mumps in light of the observed nonlinear (non-first order) kinetics. These approaches are:

   a)  ignore the nonlinear kinetics and fit all available data with a linear kinetics model;
   b)  fit each stability profile using a nonlinear kinetics equation; or
   c)  fit the first and second phases separately with a linear model.

Each approach is considered below as it relates to the two goals of the evaluation: 1) to study and compare the kinetics of potency loss for mumps containing vaccines made over our manufacturing history; and 2) to estimate the loss of mumps potency in these products over the course of shelf-life.

14

CONFIDENTIAL

MRK-KRA00756248
MRK-CHA00756248

Appx19105

a) Linear Kinetics Model. This approach is fundamentally flawed and might yield conclusions that are spurious and inaccurate. Specifically, since there are different histories (i.e., potency data points at various times) for the different stability lots, those lots with a short history (i.e., shorter time in stability testing) will appear more unstable than lots with a longer history (i.e., longer time on test) or a late history (i.e., data points primarily taken at later time points). This is likely to affect the comparison of the stability of lots over our manufacturing history, since recent lots have a shorter history than older stability material.

b) Nonlinear Kinetics Model. This approach, while fundamentally accurate, cannot be implemented because many lots in our database have inadequate data to fit the more complex multi-parameter model. Also, as with the first approach, lots with a shorter history will not have data to support estimation of the second phase of the kinetics behavior, while lots without early history will not have data to support estimation of the first phase. The nonlinear approach, combined with mixed effects modeling is ultimately favored. A nonlinear mixed effects approach will be evaluated after a sufficient database in the new assay and stability format has been achieved.

c) Fit Linear Model to First and Second Phases Separately. This is a commonly accepted practice for fitting bi-phasic kinetics data. This approach has been selected for the evaluation of the stability database, because it is less likely to give misleading evidence of a change in stability over our manufacturing history, while it can be used to estimate potency as well as potency loss for a range of proposed dating. For each lot, a separate linear model is utilized to estimate the rate of loss in potency from early measurements (1st slope, using 0 to 18 month data) and from late measurements (2nd slope, using 6 to 30 month data) respectively.

15

CONFIDENTIAL

MRK-KRA00756249
MRK-CHA00756249

Appx19106

To confirm the bi-phasic kinetics at 2-8°C, the following steps were taken to analyze the mumps stability data at 2-8°C:

1. Stability data from 0 to 30 months for each lot within the database were divided into two portions (for instance, 0-6 months vs. 6-30 months).
2. For each of the two portions, data for all lots were pooled together and fitted with a first-order kinetic model.
3. The deactivation rate constants (slopes) of the pooled portions were estimated, together with the corresponding confidence bounds.

The analysis was performed on mumps stability data portioned in four different manners: (1) 0-6 months vs. 6-30 months; (2) 0-12 months vs. 12-30 months; (3) 0-15 months vs. 15-30 months; and (4) 0-18 months vs. 18-30 months. Regardless of where the data were divided, the 1st slopes are always larger than the 2nd slopes (approximately 2 to 3 fold) (Figure 2). This analysis confirms the bi-phasic kinetics of mumps potency decay at 2-8°C.

### Figure 2
**Bi-Phasic Kinetics for Mumps Showing the Steep Early Kinetics (Gray Bars) v. The Shallow Late Kinetics (Open Bars)**



CONFIDENTIAL

MRK-KRA00756250
MRK-CHA00756250

Appx19107

## B.  Stability History of Mumps Lots Studied 1987-1998

- **The Mumps Stability Database**

The mumps stability database used for subsequent analyses is comprised of seventy-four lots of mumps containing vaccines, each with varying amounts of measurements depending upon the lot's progress in the study. Lots were selected for the 1st phase and the 2nd phase analyses in order to guarantee the reliability of their estimates. In particular, fifty-four lots were selected out of the seventy-four lots, that fulfilled the first phase criteria: a) the lot must have an initial measurement between 0 and 4 months; b) the last measurement for the lot must fall between 10 and 19 months; and c) there must be at least three stability measurements for the lot. Out of the seventy-four lots, sixty were selected that fulfilled the 2nd phase criteria: a) the lot has at least eighteen months of stability data; and b) only data from six months forward were utilized for the analysis.

- **Analysis Using First Order Kinetic Model**

As a first step, an analysis was undertaken to bridge back to prior analyses, which had assumed first order kinetics throughout the duration of stability testing. These were the analyses provided attached to the letter, Garfinkle to Hardegree, dated January 28, 1998.

Product stability, defined as the predicted potency loss over 24 months for each individual stability lot, was plotted as a function of manufacturing date (i.e., date of filling), as shown in Figure 3. This graph can be used to assess whether product stability has changed over time. This assessment shows that there is no significant trend or shift in product stability between 1987-1995. For lots manufactured after 1995, although there appears to be a slight downward trend, this can be attributed to the limitations of using a first-order linear model for the bi-phasic stability data at 2-8°C. Use of a first order linear model is necessitated by the limited amount of data available over time for these lots.

17

MRK-KRA00756251
MRK-CHA00756251

Appx19108

Figure 3

**Mumps Stability History by Filled Date Showing Earlier Stability (Lots with >24 Month Data) versus Recent Stability (Lots with <24-Month Data)**



- **Analysis Using 1st and 2nd Slope Approach**

In order to overcome the limitations of the linear first-order kinetic model, an assessment of our stability history was performed using the two slope approach, with separate analyses of the early fast decay and the later slow decay. Note that not all lots included in the databases were used; some restrictions were necessary to ensure that only those lots with an adequate number/distribution of data points were included in the analysis.

**a) Interpretation of 1st Slope Analysis Results**

This measure of the stability is the most comprehensive means of studying changes in lot stability over time, since many current lots of the product have not completed their stability testing span out to 30 months and provide no data to support an evaluation of the later kinetics. The range of time intervals used to model the early kinetics was 0 to 18 months. This range was selected because it embraces the early kinetics for every lot and provides an adequate number and range of stability time points to formulate a reliable slope. The predicted loss over 24 months was plotted against the filling date of each lot over time

18

CONFIDENTIAL

MRK-KRA00756252
MRK-CHA00756252

Appx19109

(Figure 4). These data clearly indicate no significant trend or shift in early kinetics in product stability between 1987-1996.

**Figure 4**
**Mumps Stability over Time Showing Constant Early (0-18 Month) Kinetics**



The graphical analysis cannot truly reflect the actual trend in stability since sufficient data points have not been collected to represent both phases of the stability profile.

### b) Interpretation of 2nd Slope Analysis Results

The 2nd slope analysis was also used to explore changes in the stability of mumps over our manufacturing history. In addition, second phase kinetics can be utilized to estimate the potency of each lot of vaccine for a range of proposed datings. The range of time intervals used to model the late kinetics is 6 to 30 months. This range was selected because it embraces the later kinetics for every lot and provides an adequate number and range of stability measurements to formulate a reliable regression. Lots were selected that had measurements at and beyond 18 months in order to provide a reliable estimate of potency through this time interval. Simple linear regression was performed on data for lots that fulfilled these selection criteria. The loss per 24 months was plotted against the filling date of each lot over time (Figure 5).

CONFIDENTIAL

MRK-KRA00756253
MRK-CHA00756253

Appx19110



**Figure 5**
**Mumps Stability over Time Showing (6-36 Month) Kinetics**

In addition, the regression estimates from each lot (the estimated intercept and slope for the $i^{th}$ lot, $\hat{\alpha}_i$ and $\hat{\beta}_i$, respectively) were utilized to predict the potency at various points of time in their stability history, and this was used to estimate the total loss from release:

$$P_{it} = \text{Potency for the } i^{th} \text{ lot at time } t = \hat{\alpha}_i + \hat{\beta}_i \cdot t$$
$$\text{Total Loss} = \text{Release Potency} - \text{Potency at time } t = R_i - P_{it}$$

These total losses estimated for the individual lots are used below to establish the release specification.

20

CONFIDENTIAL

MRK-KRA00756254
MRK-CHA00756254

**Appx19111**

- **Determination of the Potency Loss From Release to Expiry**

In order to estimate the end-expiry potencies at 24 months, an analysis of the lots used in the 2nd slope analysis described above were used, since these had measurements at and beyond 18 months and provided a reliable estimate of potency through this time interval. The total loss was estimated using each lot's release potency and the estimated potency value at 25 months, as determined by the 2nd slope analysis of the later time points. The variability of this estimate is the composite of release potency assay variability (from a 3 x 1 assay format for these lots) and the variability of potency values estimated from the simple linear regression (2nd slope) used to evaluate the kinetics of potency loss at later timepoints for each lot.

The average potency loss from release over 24 months is 0.55 (0.6) $\log_{10}$ $TCID_{50}$. The average loss in the second phase of the kinetics is approximately 0.1 $\log_{10}$ $TCID_{50}/6$ months.

In order to determine the expected variability of lots which will now be released using a 1 x 6 assay format, the predicted variability from a 3 x 1 assay was subtracted from the variability of the observed losses, then the expected variability of the 1 x 6 assay format was reintroduced.

21

**CONFIDENTIAL**

**MRK-KRA00756255**
**MRK-CHA00756255**

11/26/2019
Declaration of G. Reilly
EXHIBIT 365

## HUMAN - BIOLOGICALS

MRL/PASTEUR MERIEUX (PM-MSD) - AR2I (HEXAVAC) (Act HIB/ RECOMBIVAX HB/DTPac/ Inactivated Polio)........................3
MMRII..........................................................................................................................................................................7
MMRII - Japan (Kaketsuken)......................................................................................................................................13
Pedvax HIB (Liquid)...................................................................................................................................................14
PedvaxHIB/ RECOMBIVAX HB - Combination Vaccine (Comvax (7.5mcg/5mcg))....................................................16
PNEUMOVAX 23.........................................................................................................................................................19
RECOMBIVAX HB (Current Process)..........................................................................................................................24
RECOMBIVAX HB (Upgrade in BTMC)........................................................................................................................30
VAQTA (Hepatitis A Vaccine Inactivated)....................................................................................................................32
Varicella-Containing Vaccines Project Team...............................................................................................................39
Varicella Containing Vaccines - PHN ((Post Herpetic Neuralgia) Vaccine)..............................................................41
Varicella Containing Vaccines - Quadrivalent (Measles Mumps Rubella Varicella)..................................................43
Varicella Containing Vaccines - VARIVAX...................................................................................................................49
Varicella Containing Vaccines - VARIVAX III...............................................................................................................50

## HUMAN - CARDIOVASCULAR PROJECTS

AGGRASTAT (Platelet Glycoprotein IIb/IIIa Inhibitor (MK-0383))...............................................................................54
COZAAR (losartan) (Heart Failure Program)...............................................................................................................60
COZAAR (losartan) (Hypertension-Pediatric)..............................................................................................................62
COZAAR (losartan) (Hypertension)..............................................................................................................................64
COZAAR (losartan) (Post-MI)......................................................................................................................................68
COZAAR (losartan) (Renal Program)..........................................................................................................................69
COZAAR (losartan) (100mg ex-US).............................................................................................................................70
NU-LOTAN (COZAAR) - Japan ((Losartan) CHF).......................................................................................................71
NU-LOTAN (COZAAR) - Japan ((Losartan) Diabetic Nephropathy - NIDDM)............................................................72
HYZAAR 100/25 (MK-0954/HCTZ Combination)..........................................................................................................73
HYZAAR 50/12.5 (MK-0954/HCTZ Combination)........................................................................................................74
HYZAAR First Line in Severe Hypertension (MK-0954/HCTZ Combination)..............................................................75
HYZAAR First Line in Diabetic Hypertensive Patients   (MK-0954/HCTZ Combination)............................................76
HYZAAR Hypertension - Japan (MK-0954/HCTZ Combination)..................................................................................77
Losartan/Enalapril Combination (Heart Failure)..........................................................................................................79
PRINIVIL (Lisinopril) (Pediatric)..................................................................................................................................80

## HUMAN - INFECTIOUS DISEASES

CANCIDAS ((MK-0991) Project Team)..........................................................................................................................83
CANCIDAS ((MK-0991) Aspergillus).............................................................................................................................86
CANCIDAS ((MK-0991) Candida)................................................................................................................................91
CANCIDAS ((MK-0991) Empiric Therapy)....................................................................................................................94
CANCIDAS ((MK-0991) Pediatric)...............................................................................................................................95
INVANZ  (MK-0826) (Carbapenem/Once-A-Day).........................................................................................................96
Efavirenz (STOCRIN; DMP-266) (Reverse Transcriptase Inhibitor)..........................................................................110
CRIXIVAN (Indinavir) (HIV-1 Protease Inhibitor - Adults)..........................................................................................116
CRIXIVAN (Indinavir) (HIV-1 Protease Inhibitor - Pediatrics).....................................................................................127
STROMECTOL - Japan (Ivermectin )..........................................................................................................................130

## HUMAN - NEUROSCIENCES

MK-0462 - Japan (5HT1D Agonist)..............................................................................................................................131
MAXALT (MK-0462 5HT1D Agonist).............................................................................................................................132
MAXALT - Pediatric (MK-0462 5HT1D Agonist)...........................................................................................................137
MK-0869 - Japan (Substance P Antagonist)................................................................................................................139
L-758,298 (Substance P Antagonist iv Prodrug Form of MK-0869)............................................................................140
MK-0869  CINV (Substance P Antagonist)...................................................................................................................141
MK-0869  Depression (Substance P Antagonist).........................................................................................................150


Restricted
Confidential
limited access

CONFIDENTIAL

MRK-KRA01724860
MRK-CHA01724860

**Appx19114**

**HUMAN - OPHTHALMIC PROJECTS**
COSOPT (MK-0507A)..................................................................................................................155
Ocumeter Plus..........................................................................................................................157
TRUSOPT (MK-0507)...............................................................................................................159

**HUMAN - RESPIRATORY/ALLERGY/IMMUNOLOGY/ANTI-INFLAMMATORY**
VIOXX (MK-0966 Cyclooxygenase-2 Inhibitor) (Rheumatoid Arthritis)...................................162
VIOXX (MK-0966 Cyclooxygenase-2 Inhibitor) (Neurosciences)...........................................168

**HUMAN - GASTROINTESTINAL**
PEPCID Rx (Pediatric)..............................................................................................................170
PEPCID Rx.................................................................................................................................171

**OTC PROJECTS - JJ-MCPC**
FLEXERIL OTC..........................................................................................................................172
Ibuprofen Lysine Intl OTC.........................................................................................................173
Ivermectin OTC..........................................................................................................................174
MEVACOR OTC.........................................................................................................................177
PEPCID AC Extra Strength........................................................................................................179
PEPCID/Antacid Combination....................................................................................................180

**CONFIDENTIAL**

MRK-KRA01724861
MRK-CHA01724861

**Appx19115**

<div align="center">CRRC CRITICAL ACTIVITIES</div>

**HUMAN - BIOLOGICALS**
**Phase V**

CRRC Meeting: 08/22/2001
Issued: 08/15/2001

| DEPARTMENT | ACTIVITY | TARGET DATE | COMMENT/ISSUE |
|---|---|---|---|
| **MMRII** | | | |
| | **KEY ISSUES** | | * On 06-Aug-01, the FDA conducted an unannounced inspection and facility audit of the V&CB lab that has developed and performed the mumps neutralization assay for the mumps end-expiry clinical trial. Four observations focusing on operations, procedures, and systems were received.  MRL is preparing a response for submission (Target 20-Aug-01).  Impact on the trial has not been determined. |
| | | | * rHA Demonstration:  There have been a series of management reviews regarding the occasional (primarily equipment related) atypical events that have occurred during the bulk demonstration. The decision has been made to manufacture three additional rubella bulk lots (Target Oct 01-Feb 02), one additional mumps pool (completed), and one additional measles pool (Target Oct-01).   Filling of the three final container lots will be delayed to Mar-Apr02.  The revised rHA contract and demonstration plan was reviewed at BPC on 09-Aug-01.  The clinical lot was filled on 09-Jul-01.  The clinical study start remains on target. |
| MRL Laboratory Objectives | FPI  M-M-R®II/rHA Trial. | 4Q2001 | **2001 MRL LABORATORY OBJECTIVE.  On Target.** |
| BPC Contract | WG Chicken BPC Contract Milestones. | | The updated contract was approved by BPC in Feb01.  The only major change in the contract was a delay in the filing date for a new embryo source to T-1Q02 in order not to conflict with other higher priority filings in 2001. |
| BPC Contract | Initiate Me and Mu Product Stability. | **8/2001** | The fill for the final container stability lot initially targeted for May-02 was delayed to Aug-01 due to low inventories for M-M-RII and the need to use the existing lyophilization capacity for the marketed product.  **Update:  The final container stability lot will be filled 22-Aug-01.** |
| BPC Contract | CBER sBLA Submission for WG. | 2/15/2002 | This contract item was approved at the 15Feb01 BPC meeting.  **Update: The WG file has been delayed to 1Q02 due to a shift of priorites as requested by Senior Management.** |
| BPC Contract | rHA- Milestones. | | ---- |
| BPC Contract | Initiate Equivalency Final Container Stability Study with New rHA Mat'l for Me/Mu/Ru. | A-4/2000 | Additional laboratory scale lots were manufactured using GOS stabilizer in July00.  Update:  **Nine** months of stability data are available and all data is comparable between the rHA and HSA arms. |
| BPC Contract | Initiate Final Container Stability using bulks containing rHA. | 7/2001 |  REDACTED – OMP  Update:  A decision has been made to re-manufacture three lots of rubella and make an additional mumps pool.  Three filled container lots will be made in Mar-Apr 02. |
| BPC Contract | Complete Sample Qualifications. | **8/2001** | ---- |
| BPC Contract | Product QS Approved. | **8/2001** | ---- |
| BPC Contract | Initiate M-M-R®II trial with rHA. | 10/2001 | **2001 MRL Laboratory Objective.  Status:  On target pending release of clinical lot** |

Prepared: 8/15/01



**CONFIDENTIAL**

MRK-KRA01724865
MRK-CHA01724865

**Appx19116**

## CRRC CRITICAL ACTIVITIES

**HUMAN - BIOLOGICALS**
**Phase V**

CRRC Meeting: 08/22/2001
Issued: 08/15/2001

| DEPARTMENT | ACTIVITY | TARGET DATE | COMMENT/ISSUE |
|---|---|---|---|

**MMRII**

Vaccine T-PAC Contract  Initiate rHA Demonstration.    A-1/4/2001



The rHA demonstration was initiated 04Jan01. **REDACTED – OMP**
**REDACTED – OMP**

REDACT **MUMPS** - The mumps portion of the demo was completed. However, the second mumps pool had a temperature deviation due to an equipment problem in the first shell freezer run. A decision has been made to manufacture one additional mumps pool. **The 4th mumps pool has been completed. REDACTED – OMP**
**REDACTED – OMP**

**UPDATE: Filling of the three final container lots will be delayed to Mar/Apr02. The revised rHA contract and demonstration plan was reviewed at BPC on 09-Aug-01. The clinical lot was filled 09-Jul-01.**

Pharm R&D    Gelatin Task Force - Risk Assessment.    A-5/2001

At the Feb01 BPC meeting, a Gelatin Task Force was created with David Volkin as the team leader. BPC requested that the team return to BPC in May01 with a risk assessment completed for the use of gelatin in Live Virus Vaccines. A team charter was prepared for distribution to BPC in Mar01 and team members identified. The team presented to BPC on 1Jun 01. The primary risk identified for use of gelatin were cGMP issues with the spray dry vendor. It was recommended by the team that this cGMP issue continue to be addressed by MMD as a functional issue and that a small exploratory research program in Pharm R&D be initiated to evaluate possible gelatin replacement options.



**CONFIDENTIAL**

**MRK-KRA01724866**
**MRK-CHA01724866**

**Appx19117**

**HUMAN - BIOLOGICALS**                                                                    CRRC Meeting: 08/22/2001
**Phase V**                                                                                Issued: 08/15/2001

| DEPARTMENT | ACTIVITY | TARGET DATE | COMMENT/ISSUE |
|---|---|---|---|

## MMRII

**MMD** — Warning Letter - Mumps Stability. — A-3/2001

A warning letter was received from the FDA on 14Feb01 following the TeamBio inspections in 2000. One of the observations in the letter requested that Merck provide an analysis of the projected mumps stability for M-M-RII lots that are remaining in the market that were produced prior to February 2000 (when our mumps release titer was increased at the request of the FDA) and provide a summary of available efficacy data at the lower end of the potency range for these lots.   A response to these questions has been developed by the Clinical, Regulatory, and BARDS for submission to the FDA.  Included in this response is data from a subset analysis of the Mumps Expiry trial which shows good efficacy [93.3% SCR (88.6%, 96.5% 95% CI)] at expiry titers as low as 4.0 logTCID50/dose.  A presentation was provided to TPAC on the FDA warning letter on the mumps stability issue on 23Mar01.  Agreement was reached that there is no impact on marketed product which still meets our efficacy claims. Update:  A meeting with CBER was held on 4April01 to discuss the mumps stability issue with the Office of Vaccines.   The objectives of the meeting were to review Merck's stability program and gain concurrence on the program elements including active stability monitoring, use of models for bi-phasic kinetics, and adjustment to house standard.  A key outcome of the meeting was that CBER had no issues with product distribution at this time.  Additional outcomes for the stability program included the following:

1.  CBER stated that placing one lot per year on stability for a given image, dose, and product was insufficient to support consistency of lot manufacture.  They requested that Merck re-evaluate this practice and propose a new approach.  This approach would include adding more lots on stability each year based upon the number of lots manufactured in a given year.
2.  CBER wanted documented assurance that the choice for lots placed on stability are not biased.
3.  CBER was not supportive of bi-phasic kinetics from the data presented to date.   They requested that further analyses be performed with more recent stability data (1994-98) and with the 16 lot dataset previously analyzed by Dr. Suresh Rastogi (CBER).  They requested that the data be analyzed by different statistical methods including linear regression, bi-phasic kinetics, and spline.
4.  CBER was not receptive to house standard (HS) adjustment at this time as they felt that HS adjustment provides minimal improvement in intra-laboratory variability.  CBER also requested more data demonstrating that samples track with the HS in the same assay.

Additional meetings will be required with the FDA to further discuss the results from the additional analyses requested and to further discuss our stability program based upon the comments noted above.

**Clinical Research** — Initiate head-to-head studies with SB's trivalent vaccine in Germany (prot #006). — A-10/1998

**Objective**:  An exploratory study to investigate the breadth of mumps neutralizing antibody induced by M-M-R®II vs. Priorix. Multiple field isolates will be obtained and mumps neutralization titers determined by using a plaque reduction assay.
(Secondary Objectives: To compare the S/T of M-M-R®II and Priorix; to summarize the geometric mean titers for measles and rubella for both M-M-R®II and Priorix; to compare the mumps neutralization titers induced by M-M-R®II and Priorix.
**Study Status:** FPI 10/22/98. N=169. LPO 3/29/99.  Final CSR on-hold awaiting transfer of additional clade data to the clinical database.
**Results**:  The M-M-R®II vaccinees trended higher than Priorix in all categories, but were not statistically significant.  Subsequently, endpoints were run on those sera that were >64 (majority of sera in M-M-R®II groups) and a subset of JL2 sera that were not evaluated during the first round.


Restricted
Confidential
limited access

**CONFIDENTIAL**

**Appx19118**

**CRRC CRITICAL ACTIVITIES**

**HUMAN - BIOLOGICALS**                                                 CRRC Meeting: 08/22/2001
**Phase V**                                                             Issued: 08/15/2001

| DEPARTMENT | ACTIVITY | TARGET DATE | COMMENT/ISSUE |
|---|---|---|---|

**MMRII**

Clinical Research — LPO Expiry Titer Study (prot #007). — A-6/28/2001 —

**Objective:** Provide clinical data in support of M-M-R®II at expiry. Proposed Hypothesis: Seropositivity rate for measles, mumps, and rubella will be similar to that observed with M-M-RII at expiry. Primary Hypothesis: The proportion of subjects who develop mumps neutralizing antibody after receiving expiry potency mumps vaccine (3.7 log10 TCID50) will be similar to the proportion who develop neutralizing antibody after receiving release potency mumps vaccine (4.97 log10 TCID50). Secondary Hypothesis:

REDACTED – OMP

**Study design:** Mumps both at 4.0 and 3.7 log10 TCID50. Clinical material for the 4.0/dose 95% upper bound and 4.0/dose 99% upper bound targets and the 3.7/dose 95% upper bound and 3.7 99% upper bound targets were removed from room temperature aging and placed in Clinical Lock-up.
**Study status:** FPI 2/26/99. LPI 6/28/00. N=1998.
**Preliminary Results:** The following results on mumps seroconversion rates are now available from the Plaque Reduction Neutralization (PRN) assay:
94.1% SCR (89.4%, 97.1%; 95% CI) at a dose of ~4.9 log10TCID50.
93.3% SCR (88.6%, 96.5% 95% CI) at a dose of ≤4.0 log10TCID50.
88.2% SCR (82.3%, 92.6%; 95% CI) at a dose of ≤3.7 log10TCID50.
Based upon this subset analysis, a mumps expiry titer of 4.0 log10TCID50/dose can be supported. A subset of this sera (56 initially seronegative subjects with titers <256) were evaluated in a Wild-type Mumps ELISA. The ELISA results confirmed the conclusions from the PRN results. Submission of the mumps neutralization validation package was provided to CBER on 12Mar01.
**Update:** The pre and post neutralization results are projected to be completed by Sept01. All Pre and Post sera will be tested in V&CB. Persistence samples will be tested at a contract lab. All WT-Mu and measles ELISA testing has been completed. Varicella & rubella pending. Efforts are ongoing to clean/screen data so that investigators can be notified of subjects to be revaccinated. **Clean File T-11/01, Approved CSR T-3/02. On 06-Aug-01, the FDA conducted an unannounced inspection and facility audit of the V&CB lab that has developed and performed the mumps neutralization assay. Impact on the trial has not been determined.**

Restricted
Confidential
limited access

**CONFIDENTIAL**

**MRK-KRA01724868**
**MRK-CHA01724868**

**Appx19119**

## CRRC CRITICAL ACTIVITIES

**HUMAN - BIOLOGICALS**
**Phase V**

CRRC Meeting: 08/22/2001
Issued: 08/15/2001

| DEPARTMENT | ACTIVITY | TARGET DATE | COMMENT/ISSUE |
|---|---|---|---|

**MMRII**

| | | | |
|---|---|---|---|
| Clinical Research | FPI rHA<br>Safety/Immunogenicity Trial. | 10/2001 | **2001 MRL Laboratory Objective.**<br>**Study Objectives:** To demonstrate similar immune responses to measles, mumps, and rubella (as measured by SCR by ELISA) following vaccination with M-M-R®II manufactured with rHA or M-M-R®II manufactured with HSA. To demonstrate that M-M-R®II with rHA is generally safe and well tolerated. Secondary objective: Summarize the incidence of antibodies to rHA (as requested by the EMEA).<br>**Study Design:** Randomized, double-blind (with in-house blinding), multi-center study in healthy children age 12 to 15 months. Children will be randomized to receive a single dose of M-M-R®II manufactured with rHA or M-M-R®II manufactured with HSA. Target Enrollment N=1210 (605 per group).<br>**Status:** The protocol concept was approved at management DRC on 31Oct00. Plans for the development of an rHA antibody assay were discussed at the CAS on 07Feb01. A protocol synopsis and a proposal for investigating AEs potentially related to rHA antibodies were presented at Management DRC on 27Mar01. Additionally, a study synopsis was provided to CBER on 17Apr01. CBER contacted Merck on 27Apr01 to inform us that they had received the rHA clinical trial protocol synopsis and that CBER was requesting that Merck open a new IND for this study. Following several discussions, it was clarified the request for a new IND has no bearing on the filing strategy. CBER confirmed that the agreed upon PAS would be sufficient for licensure of rHA in M-M-RII. After review of the study synopsis, CBER contacted Merck on 30May01 to request that the differences in measured immune response between the two arms of the study do not exceed 5% (we proposed 10%). This change would impact the study size, increasing total enrollment from 750 to 1210 (605 per group). A teleconference with CBER will be scheduled for mid-Jun01 for further discussion. CBER also requested that IgE levels against rHA be measured, in addition to IgG, which is already planned. The new IND and completed protocol are targeted for submission to CBER Sept 01. GMP Compliance is reviewing the process validation deviation (temperature excursion during cell expansion) for the rubella bulk lot to be used in the clinical study to determine if it is suitable for a clinical lot. The atypical investigation has already been signed off by VTE and MMD quality organizations as not having any quality impact. A teleconference was held with CBER to discuss their request that the differences in measured immune response between the two arms of the study do not exceed 5%. Merck agreed to the change and the clinical protocol will be revised. The clinical protocol was approved at CRRC on 6/20/01. The trial is on target for FPI 4Q01. The clinical lot was filled on 09Jul01. **Update: The Investigator Meeting has been scheduled for Oct 18-19, 2001.** |



**CONFIDENTIAL**

MRK-KRA01724869
MRK-CHA01724869

**Appx19120**

<div align="center"><u>CRRC CRITICAL ACTIVITIES</u></div>

**HUMAN - BIOLOGICALS**
**Phase V**

<div align="right">CRRC Meeting: 08/22/2001<br>Issued: 08/15/2001</div>

| DEPARTMENT | ACTIVITY | TARGET DATE | COMMENT/ISSUE |
|---|---|---|---|

**MMRII**

Clinical Research



REDACTED – OMP

Regulatory Affairs    rHA PAS/WMA.    2Q2003    The 1st Planning meeting was held using the new MRL CMC preparation process. Regulatory Affairs and Biologics Licensing reviewed a draft table of contents for the US and EU files. Authors and reviewers were identified for the program. Source documents were identified and authors assigned. Training was provided to the team on the new CMC preparation process and expected roles and responsibilities.

Restricted
Confidential
limited access

**CONFIDENTIAL**

**MRK-KRA01724870**
**MRK-CHA01724870**

**Appx19121**

CRRC CRITICAL ACTIVITIES

**HUMAN - BIOLOGICALS**
**Phase V**

CRRC Meeting: 08/22/2001
Issued: 08/15/2001

| DEPARTMENT | ACTIVITY | TARGET DATE | COMMENT/ISSUE |
|---|---|---|---|

**MMRII - Japan**
**(Kaketsuken)**

JNDA (w/Phase III Trial) - 1Q2001

Regulatory Affairs — File for Licensure of M-M-R®II in Japan. — 12/2001

**Phase III Clinical Trial:** Randomized, Double-blind, Multi-center Comparative Study of the Immunogenicity, Tolerability and Safety of KM-248 (M-M-R®II) and Takeda Monovalent Measles Vaccine in Healthy Japanese Children age 12-90 months.
**Study Status:** FPI 9/14/00. LPO 3/31/01. N= 316/300. As of 10May01, eight SAEs have been reported (three subjects with febrile seizure, one with transient liver dysfunction, one with pharyngitis, stomatitis, one with subglottic laryngitis, one with otitis media, and one with asthmatic bronchitis). Of the three subjects with febrile seizures, two received M-M-RII and one received Takeda Monovalent Measles vaccine. Treatment group assignments for the remaining subjects with SAEs are not yet available.

**JNDA Status:** Clinical reports were provided to Kaketsuken May01. The reports included: 1) dose justification (clinical data supporting minimum claimed potency), 2) Field effectiveness summary (incl control of spread from imported Japanese cases), 3) DTH summary, 4) Post-marketing safety (including anaphylaxis/gelatin) and 5) Concomitant use trials. The JNDA filing has been delayed to Dec 2001. Timelines have been established for completion, translation, and review of the JNDA components. We are negotiating with Kaketsuken to file the JNDA with preliminary data to support the 4.0 mumps expiry titer, as the final CSR with complete data may not be available until 1Q02. The translated Phase II clinical study reports have been provided by Kaketsuken and distributed for initial review in May-01. A meeting with Kaketsuken was held on June 18-19, 2001 to review the completed Phase III clinical study results. A summary of the unblinded data were presented (75% of the study has been unblinded to date). SCR for measles are comparable between the M-M-R®II and control arms. Attributable fever rates were slightly higher in the MMRII arm but the difference is not statistically significant. Rash rates were significantly higher in the M-M-R®II arm (44.9% in the M-M-R®II arm vs 23% in the control monovalent measles arm). The Phase II clinical study report was reviewed. **Update: Translation of the JNDA components has been delayed to 16-Nov-01. Thus, submission of the JNDA will likely be delayed to Jan-02. The requirements for content and format will not be impacted by this delay. (The requirement for the CTD format will be implemented 2Q02.) A meeting with Kaketsuken will be scheduled for Jan-02.**

Restricted
Confidential
limited access

**CONFIDENTIAL**

**MRK-KRA01724871**
**MRK-CHA01724871**

**Appx19122**

11/26/2019
Declaration of G. Reilly
EXHIBIT 366

## HUMAN - BIOLOGICALS
MRL/CSL (Australia) - Pentavax & Quadrivax ((PedvaxHIB/ RECOMBIVAX HB/DTPwc) or (RECOMBIVAX HB/ DTPwc))..............3
MRL/PASTEUR MERIEUX (PM-MSD) - AR2I (Act HIB/ RECOMBIVAX HB/DTPac/ Inactivated Polio).....................5
MMRII...............9
MMRII - Japan (Kaketsuken)...............23
Pedvax HIB (Liquid)...............24
PedvaxHIB/ RECOMBIVAX HB - Combination Vaccine (Comvax (7.5mcg/5mcg))...............27
PNEUMOVAX 23...............29
RECOMBIVAX HB (current process)...............32
RECOMBIVAX HB (Upgrade in BTMC)...............35
VAQTA (Hepatitis A Vaccine Inactivated)...............38
Varicella-Containing Vaccines Project Team...............45
Varicella Containing Vaccines - PHN ((Post Herpetic Neuralgia) Vaccine)...............47
Varicella Containing Vaccines - Quadrivalent (Measles Mumps Rubella Varicella)...............48
Varicella Containing Vaccines - VARIVAX...............50
Varicella Containing Vaccines - VARIVAX IIA (6-3-3-3 Process)...............54
Varicella Containing Vaccines - VARIVAX IIC (Process Upgrade)...............55
Varicella Containing Vaccines - VARIVAX III...............56

## HUMAN - CARDIOVASCULAR PROJECTS
MK-0383 - Japan (Platelet Glycoprotein IIb/IIIa Inhibitor)...............57
AGGRASTAT (Platelet Glycoprotein IIb/IIIa Inhibitor (MK-0383))...............59
COZAAR (losartan) (Heart Failure Program)...............64
COZAAR (losartan) (Hypertension)...............65
COZAAR (losartan) (Post-MI)...............68
COZAAR (losartan) (Renal Program)...............69
COZAAR ((losartan)100mg Tablet)...............70
NU-LOTAN (COZAAR) - Japan ((Losartan) CHF)...............71
NU-LOTAN (COZAAR) - Japan ((Losartan) Diabetic Nephropathy - NIDDM)...............72
HYZAAR 100/25 (MK-0954/HCTZ Combination)...............73
Losartan/Enalapril Combination (Heart Failure)...............75
RENIVACE RPD - Japan (Enalapril)...............76
VASOTEC RPD/ RENITEC RPD (Hypertension)...............77
ENALAPRIL HCTZ 20/6 (Hypertension)...............78
PRINIVIL (lisinopril)...............79
Pediatric Program - PRINIVIL (lisinopril)...............80
Pediatric Program - VASOTEC (enalapril)...............82

## HUMAN - INFECTIOUS DISEASES
CANCIDAS ((MK-0991) Antifungal)...............84
MK-0826 (Carbapenem/Once-A-Day)...............92
Efavirenz (STOCRIN; DMP-266) (Reverse Transcriptase Inhibitor)...............104
CRIXIVAN (Indinavir) (HIV-1 Protease Inhibitor - Adults)...............106
CRIXIVAN (Indinavir) (HIV-1 Protease Inhibitor - Pediatrics)...............116
MK-0933 - Japan (Ivermectin )...............118
MK-0933 - MECTIZAN Donation Program (Ivermectin)...............119
MK-0933 - STROMECTOL for Strongyloidiasis/Onchocerciasis (Ivermectin)...............120

## HUMAN - NEUROSCIENCES
MK-0462 - Japan (5HT1D Agonist)...............121
MAXALT (MK-0462 5HT1D Agonist)...............124
MK-0869 - Japan (Substance P Antagonist)...............131
L-758,298 (Substance P Antagonist iv Prodrug Form of MK-0869)...............132
MK-0869 (Substance P Antagonist)...............133

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA01717354
MRK-CHA01717354

Appx19124

**HUMAN - OPHTHALMIC PROJECTS**
COSOPT (MK-0507A)..................................................................140
Ocumeter Plus.........................................................................141
Unit Dose Program....................................................................142
TIMOPTIC-XE............................................................................143
TIMOPTOL XE - Japan................................................................144
TRUSOPT - Japan (MK-0507).....................................................145
TRUSOPT (MK-0507).................................................................146

**HUMAN - GASTROINTESTINAL**
PEPCID Rx (PEPCID RPD)...........................................................147
PEPCID Rx (Pediatric Program)..................................................148

**OTC PROJECTS - JJ-MCPC**
Famotidine OTC........................................................................149
FLEXERIL OTC..........................................................................150
Ibuprofen Lysine Intl OTC........................................................151
Ivermectin OTC........................................................................152
MEVACOR OTC..........................................................................154
PEPCID  Chewable Tab (CCT)......................................................156
PEPCID AC Extra Strength.........................................................157
PEPCID AC Gelcap....................................................................158
PEPCID/Antacid Combination.....................................................159

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA01717355
MRK-CHA01717355

Appx19125

**HUMAN - BIOLOGICALS**
**Phase V**

CDOC Meeting: 3/24/99
Issued: 3/17/99

| DEPARTMENT | ACTIVITY | TARGET DATE | COMMENT/ISSUE |
|---|---|---|---|

**MMRII**

| | KEY ISSUES | | Italy has refused to accept new lots of M-M-R®II that contain MBPI albumin. MMD is currently demonstrating Grifols albumin and will be making lots to supply Italy from that demonstration. The team will be presenting a Technical Review of the albumin issues to the TPAC on March 29. |
|---|---|---|---|
| | | | RIVM has contacted Merck and has requested to purchase 55,000 doses on a quarterly basis of M-M-R®II. It was communicated verbally that RIVM was having difficulties with albumin (purchased from Swiss Red Cross). SB also purchases their albumin from Swiss Red Cross. MVD representatives will try to determine whether SB is having shortages in supply. |
| | | | The Mumps expiry trial has been initiated; FPI 2/26/99. Interim data by 9/99. |
| | | | The DDMAC informed MVD that they will act on SB for circulating "Home-Made" promotional literature which promotes the better tolerability, immunogenicity, and AE profile of Priorix. |
| | | | The revised label for M-M-R®II has been submitted to CBER. |
| | | | A team from MRL and MMD will be visiting the Canadian Provinces at the end of the month to combat SB's campaign to promote the better tolerability of Priorix before the Federal Tender is declared in April. |
| Project Team | Recombinant Human Albumin (rHA) Milestones.<br><br>3 Potential Uses:<br>· Diluent Replacement<br>· Virus Growth<br>· Gelatin Replacement | Ongoing | New Commercial Issues SubTeam was chartered at the Tactical PAC to pursue the replacement of HSA and possibly hydrolyzed gelatin with rHA in the manufacture of measles, mumps, rubella and varicella vaccines thus reducing the regulatory concerns and supply issues associated with HSA and the use of gelatin. VZV.<br>**Background:** Centeon conducted a safety trial with rHA in which adverse reactions were observed in 6 adult volunteers that received 4 weekly 200mg injections of by either the SC or IM route. As the reactions resembled those typical of a delayed hypersensitivity, excipient and potential impurities such as process contaminants were reviewed in a Due Diligence audit which was conducted in November. Assays which evaluated the concentrations of contaminants/residuals such as Yeast antigen, Blue dye and Antifoam agents were reviewed and were found to be appropriate and sensitive methods. Those concentrations will be confirmed by MRL. The existence of heavy metals such as copper and nickel were also investigated and inquires were forwarded to Delta Biotec (Centeon) concerning their passivation methods.<br><br>MRL representatives have collected and evaluated all available safety data from the Centeon trial. Process opportunities have been identified which could reduce or eliminate excipients/contaminants/process residuals. Preliminary evaluation of T- cell proliferation and IFN- levels from the safety trial subjects indicate the only reactions observed are directed to yeast. The levels of heavy metals continue to be explored. Passivation experts from MMD are working with Centeon to determine the cause of elevated levels of Nickel, Cobalt and Lead. **Process Update: Centeon/Delta's new rHA process has achieved the goal of reducing levels of yeast antigens, mannosylated-rHAS and nickel ions by 10%. Additionally, the potential for the production of a rHA-*ADH* fusion protein has been eliminated. A guinea pig Passive Cutaneous Anaphylaxis study using serum from animals sensitized to a yeast extract indicated a significant improvement over the former rHA product. In order to maximise productivity of the CAPP facility and to conform with standard European formulations for HSA, the formulation of Recombumin has been changed from 25% to 20%. The nominal concentrations of excipients are unchanged except for octanoate (concentration relative to rHA unchanged). On track for an 8/99 clinical trial start with 20% material (Centeon/Delta Sponsored).**. |
| Project Team | 1. Goals - Meet EP requirement for thermal stability. | | The Optimized GOS stabilizer will enable M-M-R® II to consistency pass the EP thermal stability requirement. |

Prepared: 3/16/99

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA01717362
MRK-CHA01717362

**Appx19126**

CDOC CRITICAL ACTIVITIES

**HUMAN - BIOLOGICALS**
**Phase V**

CDOC Meeting: 3/24/99
Issued: 3/17/99

| DEPARTMENT | ACTIVITY | TARGET DATE | COMMENT/ISSUE |
|---|---|---|---|

**MMRII**

Project Team | 2. Goals – Understand M-M-R® II stability. | Ongoing | Background: A Task Force was formed to investigate whether the stability of Me and Mu changed, and if so determine the causes and ways to improve the vaccine's performance. The results of the stability investigation were presented at the Technical Review on 6/5/98. Conclusions from that investigation include 1) Me and Mu kinetics are bi-phasic and therefore a single first-order model is not adequate to evaluate losses in stability and REDACTED – OMP
REDACTED – OMP
REDACTED – OMP there is no apparent trend in Mumps stability. Additional statistical analysis are being performed to determine if the bulk manufacture date correlates with the stability slope.
Status: The team recommends adjusting Me and Mu potencies to a House Standard. REDACTED – OMP
REDACTED – OMP
REDACTED – OMP The Mumps potency assay is not as variable and the assay has a smaller downward/upward shift over the years but would use House Standard adjustment for consistency. The potency of the end-expiry clinical lots will be assigned using House Standard adjustment. The conclusions of the stability investigation were presented at the BPC on December 15.

**Update: Although CBER verbally agreed MMD's proposal to overfill Mu to achieve the label expiry dose and to maintain our 24month shelf-life in the U.S they have not formally reponded to our written proposal. MMD has decided to implement the terms of the prior approval supplement when the OGOS is licensed.** |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA01717363
MRK-CHA01717363

**Appx19127**

**CDOC CRITICAL ACTIVITIES**

**HUMAN - BIOLOGICALS**
**Phase V**

CDOC Meeting: 3/24/99
Issued: 3/17/99

| DEPARTMENT | ACTIVITY | TARGET DATE | COMMENT/ISSUE |
|---|---|---|---|

**MMRII**

| | | | |
|---|---|---|---|
| Project Team | 3. Goals - Address end-expiry label requirements. | Ongoing | Background:  A meeting with CBER regarding the issue of expiry titers took place on 12/16/97.  MMD presented the existing 2-8°C stability data from 1994 to present which demonstrated a downward trend in log loss. Based on linear regression modified by a new model, the proposed expiry titers are **RE**, 5000 and **REDACTED** respectively for Me, Mu and Ru. A clinical protocol was submitted for CBER review to address expiry efficacy. Clinical supplies have been aging at room temperature to reach the target expiry for Mumps. Issues with the potency of the house standard for Me is under investigation and the Team is recommending HS adjustment in the future. Target for completion of investigation by 12/98.  CBER had suggested that modifying our current label with the release specifications might be acceptable in the interim, but they also suggested that short-dating might be required.  MMD has now been informed that CBER has scheduled a meeting with Merck on December 18 to discuss the ramifications of this non-compliance issue.  MMD will argue that available stability data will support the current label.  Other possibilities include overfilling by 0.1 -0.2 log and/or graded expiry dating based on release potencies. |

Status: A meeting with CBER was held on 12/18 to resolve potency claim and shelf-dating issue. During the 12/18 meeting CBER accepted a Merck proposal to: 1) increase the target fill potency by 0.3 log TCID50 to target 5.2; 2) increase the minimum release potency to 4.9 log TCID50; and 3) ensure a minimum claimed potency of 4.3 log TCID50 as long as it was supported by the stability data.  The following points were made during that meeting regarding a mumps release specification of 4.9 log10 TCID50/dose: 1) the proposed lower limit of 4.9 log10 TCID50/dose would be an interim specification until acceptable clinical data were available for titers below 4.3 ;  2) targeted Mumps titers of 5.2 log10 TCID50/dose are within manufacturing experience and are considered safe; 3) data used to calculate the proposed release specification are based on Merck assay results therefore any bias between Merck and CBER assays may need an adjustment in order for this proposal to work;  4) It is likely that lots of 4.8 log10 TCID50/dose or lower would be manufactured and therefore we proposed a "sliding"shelf life depending on the release titer and 5) the new release specification would only apply to the US market.   A formal written proposal, including the raw stability data which supported our minimum release and expiry titer proposals, was submitted to CBER on January 8. It is anticipated that CBER will most likely agree with a 24-month shelf-life if the above changes in target and release potencies are implemented. The label has been revised as well to specify a minimum claimed potency for mumps through shelf life rather than potency at release.  **The sPLA for license amendments to include the proposed/accepted changes (new assay format, house standard adjustment, etc.) will be submitted to CBER by the end of March and changes will be included in the OGOS/HSA-free diluent supplement targeted for filing in May.**

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA01717364
MRK-CHA01717364

**Appx19128**

CDOC CRITICAL ACTIVITIES

**HUMAN - BIOLOGICALS**
**Phase V**

CDOC Meeting: 3/24/99
Issued: 3/17/99

| DEPARTMENT | ACTIVITY | TARGET DATE | COMMENT/ISSUE |
|---|---|---|---|

**MMRII**

| | | | |
|---|---|---|---|
| Project Team | 3. Goals - Address end-expiry label requirements (cont'd). | Ongoing | Although CBER has agreed with the proposed approach of utilizing material which has undergone "accelerated" aging in support of the end-expiry trial, they have questioned the "clinical relevance" of the serological cutoff to determine a positive response. They want us to re-estimate the sample size if the observed seroconversion rate with the new neutralization assay differs from the assumed SCR. Since these data would not be available in the near future, the mumps expiry trial will most likely begin with the caveat that the sample size may need to be adjusted if the estimates derived from either old sera or ongoing trials differs from the 96% rate proposed as the criteria for success in the clinical trial. The subteam has performed an extensive investigation to support the time to age vaccine to hit the target potency. <br><br>A CBER teleconference to discuss outstanding issues concerning the clinical protocol and data analysis plan was held on 11/9. REDACTED – OMP <br><br>REDACTED – OMP    2) We will provide a detailed statistical report to help CBER understand how we are going to assign a potency to the clinical lots, 3) we will obtain the WT Mumps strain that CBER uses in their assays for our Plaque Reduction Assay, and 4) we will provide CBER with the assay correlation protocol for their review when we submit the expiry protocol. **Update: A letter was prepared and submitted to CBER (2/5) which provided them with 2) a detailed statistical report explaining how we will assign the release potency to our expiry lots, and 3) the assay SOPs. Although the Tennessee strain was the initial WT virus of choice for the expiry trial, additional experiments using a panel of sera from Protocol 045 indicated a lack of reproducibility and irratic results between two runs. The WT virus that was identified by CBER (LOI), and had been obtained and grown-up in V&CB was evaluated against a panel of adult sera. The titers were reproducible between the two runs and were within 2-fold of the titers obtained using the House Standard (Jeryl Lynn™). The same Protocol 045 (12-15mo children) sera will be evaluated against LOI and pending satisfactory reproducibility will be chosen as the end-expiry trial WT strain.** |
| Project Team | BSE risk-assessment. | Ongoing | The Project Team is committed to a plan to the eventual removal of animal and human-sourced materials from all Live Virus Vaccines. These include Albumin, Cholesterol, Choline Chloride, Gelatin, Serum, and Trypsin, non-porcine trypsin in Me, Mu and Ru. A serum-free media development team was formed in 1Q98. <br><br>Serum Free Media: Preliminary experiments using Medi-Cult Serum-Free medium demonstrated that Rubella grown in HSA + Rencyte produced the same potency result as the control (virus grown in HSA + standard medium). Rencyte is a mammalian cell culture media that 1) uses components that are less than 10Kb, 2) uses recombinant insulin, and 3) uses cholesterol sourced from sheep lanolin. The manufacturer is currently working on replacing the source of the cholesterol. This experiment will be repeated using rHA. **Update: Two contractors have been contacted to develop serum-free media. The BPC contract for the LVV team will be updated at the BPC meeting in June.** |
| Project Team | Optimized GOS BPC/TPAC Contract 1998 Milestones. | A-2/9/98 | An optimized GOS 33 has been developed which will meet the EP requirements for thermal stability. Approval of the new stabilizer in Europe T-4Q00. |
| Project Team | Review results of consistency lots/ issue development and demonstration reports. | A-7/98 | Demonstration report issued in 6/98, Development report issued 7/98. Reports will support future filing to government agency. |

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA01717365
MRK-CHA01717365

**Appx19129**

**CDOC CRITICAL ACTIVITIES**

**HUMAN - BIOLOGICALS**
**Phase V**

CDOC Meeting: 3/24/99
Issued: 3/17/99

| DEPARTMENT | ACTIVITY | TARGET DATE | COMMENT/ISSUE |
|---|---|---|---|
| **MMRII** | | | |
| Project Team | Manufacture Low Phosphate OGOS/HSA-Free Clinical lot. | A-11/98 | Objective: Evaluate the tolerability of low-phosphate lots of M-M-R® II in the clinic. Status: Four lots of vaccine were filled on 11/18 - 11/19 for possible evaluation in the clinic. Optimized GOS with 15mM phosphate (pH 7.0), Optimized GOS with 75mM Phosphate (pH 6.6), Optimized GOS with 15 mM Phosphate + 60mM NaCl (pH 6.6) and an Optimized GOS control will be evaluated for a number of stability parameters to choose the lots which will be evaluated in the clinic. The clinical trial is targeted to begin in April. **Update: One of the OGOS lots (15mM Phosphate + 60mM NaCl) was eliminated as a possible clinical lot due to a high failure rate for lyo cake appearance (pH 6.6 + NaCl). Release testing on the other two lots of low phosphate (pH7.0, pH 6.6) has been completed.** |
| Project Team | Submit 25yr safety and efficacy of M-M-R®II for publication. | 12/98 | **CBER representatives at the January 19 meeting urged Merck to publish the safety data and on February 11 MRL and MVD representatives met with the Massachusetts Department of Health and they have also urged Merck to publish the safety data base. The paper is currently undergoing extensive revisions prior to submission to manuscript review (4/99).** |
| Project Team | Initiate Clinical Evaluation of Low Phosphate OGOS/HSA Free Lots. | 5/99 | **Tentative plans were to test three experimental formulations and one control in the clinic in April but one lot has been eliminated during preliminary testing. This study will be conducted in two phases, first phase would go into college age patients, with a primary end point of pain, utilizing the modified BPI scale and second phase into 4-6 yr olds with primary end point of immunogenicity. The clinical protocol was presented and approved at CDOC with modifications. The saline control was eliminated which resulted in the trial only requiring one injection. The trial start-up will be delayed until the pain scale has been validated in the MMRV tolerability study which is enrolling now. Data from that trial is expected in mid-April.** |

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA01717366
MRK-CHA01717366

**Appx19130**

**CDOC CRITICAL ACTIVITIES**

**HUMAN - BIOLOGICALS**
**Phase V**

CDOC Meeting: 3/24/99
Issued: 3/17/99

| DEPARTMENT | ACTIVITY | TARGET DATE | COMMENT/ISSUE |
|---|---|---|---|

**MMRII**

Project Team | Finalize and publish characterization of Jeryl Lynn. | 8/99 | Genetic characterization of Jeryl Lynn™ by MRL and MMD has determined that the published sequence of JL-2 & JL-5 was incorrect. The significance of these errors is that JL-5 is identical to JL-1, the reportedly unique variant identified in the SB patent. Additionally the ratios observed between JL5 and JL2 were erroneously reversed. This explains the reason that MRL could not identify JL5 when they performed limiting dilution sequencing. Therefore Jeryl Lynn™ does contains JL5 and JL2 and what SB plaque purified and patented was not JL1 but JL5. The 1980 mumps stock seed and one mumps bulk (pooled from eight individual harvest lots) have been analyzed at Lark to determine the proportions of JL5 and JL2 using the SH gene. The stock seed showed approximately 50:50 proportion of JL5 to JL2 and the pooled bulk showed approximately 75:25 proportion of JL-5 to JL-2. In addition to the SH gene, the P genes were also analyzed. While the pooled bulk material was in agreement with the SH gene data (76:24), the stock seed material did not (86:14). Analysis of the P-clones indicated that substrains were evident in the population. While JL-2 and JL-5 were the two major populations, an additional number of JL-2 substrains (15 of the 26 JL-2 clones) were observed in the pooled bulk product. These clones appeared to be "JL-2 like" (i.e. contained all of the JL-2 specific differences) but differed in sequence at several additional positions. Despite the variance in clonal distribution, the data does appear to indicate that Mumps consists of only two major populations and that additional sub-populations were identifiable. Results of the genetic characterization work to date for both Jeryl Lynn™ and Priorix were presented and enthusiastically received at the Technical Review on 6/5/98.

**REDACTED – PRIVILEGED**

Planned and In-Progress studies include 1) Development of QRT-PCR for analysis of JL-strain diversity, 2) Analysis of individual harvest lots, 3) molecular analysis of F and HN genes and 4) isolation and characterization of JL-2 and JL-5 viruses. Lark has generated sequence data from molecular clones to approximately 80-90 F and HN plasmids. The data indicates that only JL-2 and JL-5 are present however the relative ratio (10:90) differs from that observed for the SH gene (24:76). In addition, JL-2 clones appear to have undergone a recombination during their generation in that sequences for these clones are composites between JL-2 and JL-5 sequences at various locations. The F and HN gene consensus sequencing of the mumps component in Priorix is identical to the JL-5 consensus in Jeryl Lynn™. **Update: There is currently a combined MMD/MRL initiative to publish the characterization of Jeryl Lynn™. Additional experiments were performed to confirm the sequence of JL2 (multiple clone sequencing of the F gene). A draft of the paper will be available by the end of March for review. The paper will be submitted to VACCINE.**

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA01717367
MRK-CHA01717367

**Appx19131**

**HUMAN - BIOLOGICALS**
**Phase V**

| DEPARTMENT | ACTIVITY | TARGET DATE | COMMENT/ISSUE |
|---|---|---|---|

## MMRII

| Project Team | Goal: Protect and defend the M-M-R®II franchise. | Ongoing | |

*1999 MRL Laboratory Objective*
Write and Submit a Backgrounder to CBER Describing the Molecular Characterization of JL, the Safety of our Embryo Source Assuring a CAV-free Vaccine, the on-going experiments to reduce the ALV contaminant (WG chickens) and the overall safety and efficacy of the vaccine 1Q99.   *ACCOMPLISHED 1/99*

*Priorix tolerability claims*
We have received a reply from the DDMAC concerning our complaint that SB sales representatives were handing out "Home-Made" literature for their clinical trials after being warned by the DDMAC to stop. MVD has requested, through Freedom of Information, all communications between the DDMAC and SB as well as SB and the DDMAC as they relate to SB's repeated illegal promotional claims about tolerability.

A letter has been drafted for submission to Pediatric Infectious Diseases Journal to rebut the Usonis paper on the Reactogenicity and Immunogenicity of Priorix published in February. That letter is currently in review.
*China*
China has banned the import of trivalent vaccines until further notice until regulations can be drafted for their use. One lot of M-M-R®II that was shipped into the country before the import ban will have to be "replaced". Low Rubella and Mumps potencies and high moisture values were reported for that lot by the Chinese testing regulators. Although samples of the same lot were returned from China and tested satisfactorily in the BTL, the lot was withdrawn when it was found that two temperature indicators had signalled exposure to higher temperatures. 100,000 doses will be shipped to China from Australia next week to replace the lot.  MVD has also learned that SB got vaccine into the country without an import permit. We will be attempting to purchase Priorix to prove to the Chinese authorities that SB has violated their import laws.
*Canada*
Canada has reversed their federal tender position to a "winner take all" stance based totally on price. Representatives from Clinical Research and MRL will be going to the Canadian provinces in two weeks to give the CBER / Massachussets Dept of Health talk mainly focusing on safety, label comparisons, and future product improvements. Since Priorix cannot be used concomittantly with VARIVAX®, the talk will also cover the convenience of the M-M-R®II dosing schedule to both Doctors and Parents.
*RIVM*
On March 3rd Haarlem was contacted by RIVM regarding the purchase of approx 55,000 doses on a quarterly basis of M-M-R®II, single dose vials. It was communicated verbally that RIVM was having *difficulties with albumin*. Haarlem immediately contacted PM-MSD.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA01717368
MRK-CHA01717368

**Appx19132**

CDOC CRITICAL ACTIVITIES

**HUMAN - BIOLOGICALS**
**Phase V**

CDOC Meeting: 3/24/99
Issued: 3/17/99

| DEPARTMENT | ACTIVITY | TARGET DATE | COMMENT/ISSUE |
|---|---|---|---|

**MMRII**

| | | | |
|---|---|---|---|
| Project Team | Obtain and initiate characterization of SBs trivalent vaccine. | | PRIORIX appears to be stabilized by ~129mg/ml of sugars (Mannitol, Sorbitol and Lactose) and 1mg/mL HSA. M-M-RII contains 4 times less sugar and only 300mcg/mL of HSA. The osmolarity of PRIORIX is 490mOsm compared to our 540 mOsm. Purified RNA was sent to Lark for molecular sequencing. Results have now been received from the Lark evaluation of Priorix. Molecular cloning shows no evidence of any population but JL-5. Since SB was awarded a patent because they claimed they isolated a "Unique JL1" strain, the CDTF is determining whether this information would be useful in fighting SB in Germany. QRT-PCR was performed on M-M-RII, Priorix and Trivivac. M-M-RII contained both JL-5 and JL-2 while Priorix and Trivivac contained only JL-5. JL-2 clones have been isolated and will be used in characterization studies to determine whether any biological benefit can be obtained by having a heterogeneous vaccine population. These studies will focus on the immunological important proteins F and HN and their ability to induce a broader antibody response than a plaque-purified virus vaccine. In a paper published in 1996, Minor et al. reported a murine JL-2 monoclonal which did not cross-react with a murine JL-5 suggesting that there may be epitope differences between the JL-strains.<br>**Update: Priorix was assayed for the presence of UREA and was negative. UREA is what is being used to stabilize our MMRV vaccine.** |
| BPC Contract | WG Chicken BPC Contract | | **The new WG contract was presented to the BPC on March 9. The team was congratulated for its excellent technical work and was requested to modify the new contract to separate WG embryo qualifications from cell banking. There will be a GO/NO GO decision in July on going forward with the WG embryo qualification and demonstration. Cell banks will be considered separately with a GO/NO GO for their further development in 8/99.** |
| BPC Contract | 1. Initiate routine serology testing on WG chickens. | A-8/97 | **Update: The Merck WG chickens are currently housed in two separate facilities; the Greenbelt Research Farm in Ottawa, and Charles River Breeding Laboratories, Kingston, NY. There are 5 egg producing flocks in Ottawa totaling 291 birds. All of these birds have remained negative for the complete SPF panel of agents, including CAV. Negotiations have begun with CFAR to extend the current leasing contract through December 31, 2000. The working contract expires June 30, 1999. In Kingston, there are 113 birds housed in 4 isolators which hatched on 10/7/98. These birds have tested negative for CAV at 13 and 18 weeks of age. Two years remain on the current contract with a renewal option.** |
| BPC Contract | 5. Demonstrate Me/Mu growth and comparable protein profiles from WG chickens. | A-1/98 | **Objective:** Compare the virus growth in Merck embryos to the growth in WG embryos.<br>Initially two experiments were conducted utilizing eggs from either Merck, WG and/or SPAFAS. Poor cell yields and contamination resulted in the experiment being aborted for Measles while comparable titers were observed for Mumps between the three egg sources. Potency on Me and Mu from the second experiment which utilized Merck and WG embryos is now available and comparable titers were demonstrated. A fourth experiment in WG embryo cells resulted in REDACTED – OMP lower than expected Mumps potency as compared to Merck. Repeat experiments for mumps viral growth were run with the following changes; a new stock seed, use of Hatch 1 hen eggs and two different culture medias (Med R and Med T). None of the changes improved the Mu titers. Glucose depletion by the WG CWE cells was confirmed. The day after infection, glucose was below detectable limit in the WG cell culture. A new experiment will be run to re-feed the WG cells with media every day to replenish the glucose. The third experiment confirmed that glucose was being depleted and daily refeeds of the media resulted in a WG growth profile that was the same as Merck CWE. |

Prepared: 3/16/99

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA01717369
MRK-CHA01717369

**Appx19133**

**HUMAN - BIOLOGICALS**
**Phase V**

CDOC Meeting: 3/24/99
Issued: 3/17/99

| DEPARTMENT | ACTIVITY | TARGET DATE | COMMENT/ISSUE |
|---|---|---|---|

**MMRII**

| BPC Contract | 7. Complete RT/EAV evaluation. | A-10/98 | |

Extensive adventitious agent testing is being performed prior to using the WG embryos to produce M-M-RII. Testing has confirmed that the embryos are ALV negative by Southern Blot and that the RT levels are 10-fold less from primary chick cells and 100-fold less after multiple passages. The WG RT is 100% particle associated. Evaluation of the levels of RT over time in conditioned media from cells in culture has also been performed using PERT. Under similar conditions used to manufacture vaccine the RT activity of WG is about 10 fold lower relative to MMD chicken cells. When the cells were passaged the RT activity found in conditioned media drops somewhat for Merck and SPAFAS cells while the WG line falls an additional two orders of magnitude relative to the primary WG cells.

Dissection and cultivation of organ and body (fibroblasts), followed by RT analysis revealed that organ cultures of primary cells had about 10 times the RT activity of fibroblast cultures, thus much of the RT activity in primary cultures is likely due to non-fibroblastic cells. Passage of these cultures resulted in a drop of RT activity to about the same level for both types of cultures likely due to selection of fibroblasts with passage, thus there is no advantage in the generation of fibroblast only cell banks. Status of experiments: 1) Northern blot analysis (RNA analysis) of the WG cells complete 2). Library has been constructed and screened, clones have been picked and analyzed and 3) EM analysis of particles completed.

Evaluation by PCR of the entire MMD flock for about 24 different EV retroelements (ALV like retrovirus) has determined that the EV1, EV3 and EV4 retroelements found in the Merck flock are hererozygous and therefore can be bred out of the flock. Using the same technology WG is negative for all of these retroelements as expected. The EAV (ancient retroviruses) retroelements have been determined to be present in at least 15 copies in both MMD and WG, are probably homozygous in most cases, and therefore cannot be bred out.

**Update: Preliminary RT-activity data obtained from analysis of individual birds suggests that there may be a bird to bird variability in this activity. Confirmation of this observation is important if breeding to further reduce the RT-activity in the WG flock is pursued. In this regard, limited WG breeding between high and low RT-expressing birds to assess the potential to further reduce RT-activity are in progress. This effort will be a joint activity of Jan Gavora and V&CB.**

On January 19 a summary of our RT experience was presented to CBER. This was an update of previously reported data. Of particular interest was the fact that we have determined the genetic makeup of RT elements for the entire flock of WG and MMD chickens. Although the CBER presentation was geared to "raise the bar" on other vaccine manufacturers, Merck may have already achieved that goal when it comes to RT evaluation. In December CBER issued a letter to vaccine manufacturers indicating that PERT testing would be required for all viral vaccines produced in mammalian or avian cell substrates. The letter indicated that both cell substrates and viral seeds would need to be qualified and the information would have to be submitted to CBER at specific points in development. We have evaluated our CWE cells (Measles & Mumps) and MRC-5 cells (Varicella) but have not evaluated WI-38 (Rubella) or any of the viral seeds for MMRV. **Update: The logistics and timing for such tests are being developed in V&CB. The team will present their plans to the BPC within the next few months.**

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

**MRK-KRA01717370**
**MRK-CHA01717370**

**Appx19134**

## CDOC CRITICAL ACTIVITIES

**HUMAN - BIOLOGICALS**
**Phase V**

CDOC Meeting: 3/24/99
Issued: 3/17/99

| DEPARTMENT | ACTIVITY | TARGET DATE | COMMENT/ISSUE |
|---|---|---|---|
| **MMRII** | | | |
| BPC Contract | Complete Lab Scale mumps Productivity Studies | 6/99 | **Lab scale experiments will be completed to determine whether an increase in mumps productivity in both WG and MMD CWE cells can be accomplished by introducing a refeed to the process. Studies are in progress to further define the timing/scheduling of refeeds to maximize virus productivity in both cell substrates. These studies are focused on virus growth, and any further virus characterization will be performed using reagents and protocols already in place.** |
| BPC Contract | 8. Initiate Mumps WG Engineering Harvest Lots. | A-10/98 | **Extensive studies focusing on characterization of experimentally-derived measles and mumps virus products, prepared using WG eggs, have indicated that both virus products are comparable to that produced in MMD CWE cells. However, the productivity of mumps virus (but not measles) in WG CWE cells is reduced approximately 0.3-0.7 Log10 TCID50 /0.1mL. A similar reduction was also observed at full-scale in manufacturing (three harvest lots), and it is believed to represent cellular metabolic differences (i.e. strain differences in glucose utilization, lactate production) between the two flocks.** |
| | | | **The decline in productivity poses significant financial issues associated with the "dilutability" of the mumps product which could impede further implementation and qualification of the WG flock. Previous laboratory-scale studies have indicated that daily re-feeding of mumps infected cells CWE cells (WG or MD) eliminated any reduction in productivity in WG CWE cells, and in fact, increased mumps productivity in both WG and MMD CWE cells. Thus a likely corrective action that could be implemented would be the introduction of a refeed(s) at some point post-infection during mumps manufacturing. Whether this strategy should be pursued is the focus of several experimental studies. Future implementation of any refeed step into the current manufacturing process would most likely require increased mumps productivity in both MMD and WG CWE cells.** |
| BPC Contract | 9. Initiate Co-Cultivation Studies | 9/99 | **Pending a GO decision to pursue the demonstration of the WG chickens, co-cultivation experiments with indicator cell lines followed by PERT assays for RT activity will be performed as part of the qualification demonstration the flock for vaccine manufacturing. Similar characterization studies are also being performed on banked and passaged CWE cells.** |
| BPC Contract | 10. Initiate WG Demonstration Lots | 9/99 | **Resolution of the mumps growth issue in WG CWE cells had previously delayed the start of the Demonstration Lots. Pending a GO in August, a full demonstration of the WG embryos will be initiated.** |
| Vaccine T-PAC Contract | Recombinant Human Albumin | | — |
| Vaccine T-PAC Contract | Update. | | **rHA Project Team presented to the BPC on 10/12/98 and provided an update on the overall program and received approval for updated contract.** |
| Vaccine T-PAC Contract | Initiate HSA-free Diluent Engineering Run. | A-5/98 | The albumin-free diluent data from the engineering run was acceptable. |
| Vaccine T-PAC Contract | Initiate Consistency Series of HSA-Free Diluent Runs. | A-7/98 | **Consistency lots completed.** |
| Vaccine T-PAC Contract | Initiate Stability of M-M-R®II in HSA-free Diluent. | A-9/98 | Stability on 3 fills and 1 control have been initiated. |
| Vaccine T-PAC Contract | Initiate 3 replicate runs of Me with Final Formulation to test proof of concept | **3/99** | **Three runs will be performed with 20% rHA when available. Experiments will be performed both in MMD and MRL.** |

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA01717371
MRK-CHA01717371

**Appx19135**

## CDOC CRITICAL ACTIVITIES

**HUMAN - BIOLOGICALS**
**Phase V**

CDOC Meeting: 3/24/99
Issued: 3/17/99

| DEPARTMENT | ACTIVITY | TARGET DATE | COMMENT/ISSUE |
|---|---|---|---|
| **MMRII** | | | |
| Vaccine T-PAC Contract | Prepare Backgrounder for CBER Discussion of HSA-Free Diluent Vaccine. | A-3/99 | The HSA-free diluent concept and tentative timing for sPLA filing was both discussed in the CBER backgrounder and presented to CBER on January 19. |
| Vaccine T-PAC Contract | Completion of "Albumin-Free" Diluent Demonstration Including 6mos of Stability. | A-3/99 | Albumin-free diluent demonstration has been completed sucessfully and all lots have been released. Stability data for the OGOS lots has been completed and validated. OGOS/ HSA-free diluent stability will be evaluated using both methods of House Standard adjustment (CBER & MMD). An analysis will be performed when the 6-month data are available to determine whether OGOS stability is equivalent to OGOS/HSA-free diluent stability. |
| Vaccine T-PAC Contract | HSA-Free Diluent 6mo Stability Timepoint. | 3/99 | The 6-month data will be available for analysis the end of March. |
| Vaccine T-PAC Contract | File Licensure Supplement of OGOS/HSA-free Diluent. | 5/99 | Optimized GOS and HSA-Free Diluent will be filed together in 2Q99 in the U.S. and 4Q99 in the EU. |
| Vaccine T-PAC Contract | Initiate 5 Replicate Runs of Me/Mu/Ru with Final rHA Formulation. | 8/99 | Five replicate runs will be performed in MMD at scale using manufacturing equipment to eliminate variables at laboratory scale when the 20% rHA material becomes available. |
| Vaccine T-PAC Contract | Initiate rHA Clinical Trial. | 8/99 | The probe rHA safety trial will be initiated in 8/99. CENTEON's discussions with CBER in December were well received and agreement of Clinical Development Plan was obtained. Delta has started to manufacture the clinical lot. |
| Vaccine T-PAC Contract | Initiate characterization of viral products and infection process using final formulation candidate. | On-going | Viral characterization will be required to confirm that viruses grown in rHA are the same as those grown in HSA. Status: REDACTED – OMP REDACTED – OMP REDACTED – OMP Update: Viral characterization studies will be repeated with final formulation of rHA (new process/new yeast/20%) when available. |
| Bioprocess & Bioanalytical Research | 1. Minimize and Control Heavy Metals. | A-7/99 | Delta Biotech has shown that the nickel is picked up throughout the process by the albumin (it has a specific metal binding site near the N-terminus), and that the nickel levels can be reduced by an acid diafiltration step at lower pH applied at the end of the process. Status: In-process samples of rHA from different chromatographic steps were submitted by Centeon-Delta for evaluation in MRL. Results show the ratio of nickel to rHA remains essentially constant across the purification process. Samples of culture media used in the purification of rHA were also evaluated. The results showed that the water used in manufacturing is essentially nickel free but one of the raw materials (phosphoric acid) used in the manufacture of the phosphate buffer did contain nickel. **Update: The goal of reducing Nickel content by 10-fold in the final process has been achieved,** |
| Bioprocess & Bioanalytical Research | 2. Minimize and Control Residual Yeast Proteins and Carbohydrates. | A-7/99 | The process has been modified to provide an improved product which meets the MRL Process goal of reducing yeasts antigens and mannosylated-rHA by 10-fold as well as eliminating the potential for production of a rHA-*ADH* fusion protein. To achieve these goals the former host strain was modified by disruption of the PMT1 gene which reduced the amount of mannosylated-rHA by ~5 fold. Extra stop codons were introduced and the ADH coding sequence was removed resulting in an improved production organism. The pH of the fermentation was also changed which improved centrate quality. Operating conditions for PBA have been altered to provide a significantly greater removal of yeast antigens. Two new chromatography steps have been added that reduces the amount of mannosylated-rHA, clears and removes yeast antigens. |

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA01717372
MRK-CHA01717372

**Appx19136**

**CDOC CRITICAL ACTIVITIES**

<u>HUMAN - BIOLOGICALS</u>
<u>Phase V</u>

CDOC Meeting: 3/24/99
Issued: 3/17/99

| DEPARTMENT | ACTIVITY | TARGET DATE | COMMENT/ISSUE |
|---|---|---|---|

<u>MMRII</u>

| | | | |
|---|---|---|---|
| Bioprocess & Bioanalytical Research | 3. Detect and Identify "Fusion" Proteins. | Ongoing | Immunoassays were developed to detect the minor fraction of C- or N-terminal "fusion" proteins which could then be tracked through the process. Status: A new Master Seed containing the triple-stop sequence is being made by Delta ; the plasmid and host remain otherwise unchanged. MRL has immunized rabbits with peptides to both C- and N- terminal extensions conjugated to OMPC. C- and N- terminal extension anti-sera have been made and shared with Delta to show that with the old construction, a small but measurable amount of C- terminal extension material is measured. The triple stop removes this material. No N- terminal extensions detected. The new seed is made and performs as expected. **Update: The potential for the production of a rHA-ADH fusion protein has been eliminated by the construction of an improved production organism.** |
| Bioprocess & Bioanalytical Research | Process Development/Centeon Delta. | Ongoing | Merck and Centeon Delta continue to collaborate on improving the process/product with the goal of eliminating sources of potential adverse reactions.  Collaborations have gone well and it is the consensus of both Merck and Centeon-Delta scientists that the process improvements that have been made are comprehensive and that testing the optimized rHA product in a clinical tolerability study will determine the critical go/no go decision for the program. **Update: The Supply Agreement will be signed on April 15 with modifications to the "failure to supply" clause and the price of the rHA.** |
| Virus & Cell Biology | Goal: To repopulate the MMD chicken flock after outbreaks of Chicken Anemia Virus (CAV). | Ongoing | **The chicken re-population program at Merck has provided a current inventory of 300 chickens spread across five flocks. All five flocks at West Point continue to be monitored monthly, and all have remained negative for the complete SPF panel of agents, including CAV. Thus, there have been no CAV positive chickens at West Point since July 1997. These new flocks have provided sufficient eggs to support M-M-R®II bulk manufacturing since July 1998.** |
| | | | **In addition to the West Point flocks, an off-site facility has been established to maintain a foundation flock by partnering with an independent outside company.  The foundation stock is housed inside isolators, within a barrier facility, providing two-tiered biosecurity for the flock.  In addition to the foundation flock, another small flock of mature chickens (30 hens and 10 roosters) has also been established at an off site facility inside a barrier. This flock will serve as an interim backup until our foundation flock is mature and can provide eggs regularly. All of these birds have remained negative for the complete SPF panel of agents, including CAV. Repopulations plans to save the MMD flock are in place.   Breeding birds are laying eggs which have been incubated and hatched at the West Point hatching facility. Currently MMD and WG flocks remain CAV-free. MMD egg productivity is sufficient to allow manufacturing of 1 lot/wk mumps and 1 lot/3wk measles .** |
| Clinical Research | Initiate head-to-head studies with SB's trivalent vaccine in Germany. | A-10/98 | Primary Objective: An exploratory study to investigate the breadth of mumps neutralizing antibody induced by M-M-RII vs. PRIORIX. Multiple field isolates will be obtained and mumps neutralization titers determined by using a plaque reduction assay. (Secondary Objectives: To compare the S/T of M-M-RII and PRIORIX; to summarize the geometric mean titers for measles and rubella for both M-M-RII and PRIORIX; to compare the mumps neutralization titers induced by M-M-RII and PRIORIX. **Update: FPI occurred on 10/22/98, as of 2/03/99, 169 out of 150 patients have been enrolled. LPO by mid-March. The sera (Pre and Post) from seven vaccinees have been evaluated in the PRN assay.  All pre-sera were negative (<1:2) and all post-sera were positive ( 1:2 or >) against Jeryl Lynn.  The same panel was tested against two Swiss isolates from 1997-98 outbreaks.  The results for Swiss#4 were erratic and not reproducible.  The team will start evaluations of the comparison sera against JL2 and the House Standard (JL5 & JL2) while continuing the search of a WT panel.** |

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA01717373
MRK-CHA01717373

**Appx19137**

CDOC CRITICAL ACTIVITIES

**HUMAN - BIOLOGICALS**
**Phase V**

CDOC Meeting: 3/24/99
Issued: 3/17/99

| DEPARTMENT | ACTIVITY | TARGET DATE | COMMENT/ISSUE |
|---|---|---|---|

**MMRII**

| Clinical Research | Initiate expiry titer study. | A-3/99 | Purpose: Provide clinical data in support of M-M-RII at expiry. Proposed Hypothesis: Seropositivity rate for measles, mumps, and rubella will be similar to that observed with respect to M-M-RII at expiry. Primary Hypothesis: The proportion of subject who develop mumps neutralizing antibody after receiving expiry potency mumps vaccine (3.7 log10 TCID50) will be similar to the proportion who develop neutralizing antibody after receiving release potency mumps vaccine (4.97 log10 TCID50). Secondary Hypothesis: REDACTED – OMP REDACTED – OMP REDACTED – OMP The study design will look at Mumps both at 4.0 and 3.7 log10 TCID50. Clinical material for the 4.0/dose 95% upper bound and 4.0/dose 99% upper bound targets and the 3.7/dose 95% upper bound and 3.7 99% upper bound targets were removed from room temperature aging and placed in Clinical Lock-up. Protocol approved at CDOC. CMC amendment filed 2/22. **Update: FPI 2/26/99. An investigators meeting will be held the week of March 15. LPO 4Q99.** |
| Clinical Research | Initiate Low-Phosphate Clinical Trial | 5/99 | Primary Objective: The design of this trial is being finalized with a plan to present the protocol at the 2/99 CDOC meeting. Based on a review of the literature, it is not certain that children 4-6 years of age will comprehend a linear scale to measure/assess pain. A "Faces" scale would need to be used. However, this scale may not be able to distinguish modest degrees of pain. Therefore, the trial will be conducted in college-aged adults. A follow-up study with the optimal formulation could then be conducted in children comparing it to Priorix. **Update: Release testing on the lots has been completed. The protocol was presented to CDOC and approved with modifications.** |

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA01717374
MRK-CHA01717374

**Appx19138**

## CDOC CRITICAL ACTIVITIES

<u>HUMAN - BIOLOGICALS</u>
<u>Phase V</u>

CDOC Meeting: 3/24/99
Issued: 3/17/99

| DEPARTMENT | ACTIVITY | TARGET DATE | COMMENT/ISSUE |
|---|---|---|---|
| <u>MMRII - Japan</u><br>(Kaketsuken) | <u>JNDA (w/o Phase III Trial) - 4Q98</u><br><u>JNDA (w/ Phase III Trial) - 4Q00-01</u> | | |
| | **KEY ISSUES** | | **Milestones:**<br>**1) Complete clinical trials, 2) Complete manufacturing requirements, 3) Update safety and concomitant use data base and 4) Update C&MC.** |
| Project Team | Sequence measles, mumps and rubella. | A-4/98 | As a condition to licensure in Japan, consensus sequencing of the vaccine strains (original stock seeds) was completed. Kaketsuken has now requested sequencing of the current Rubella stock seed. This will be completed by Lark Technologies. |
| Clinical Research | File for Licensure of M-M-R®II in Japan. | Ongoing | Phase III: The protocol "Randomized, Single-Blind, Multi-center Comparative Study of the Immunogenicity, Tolerability and Safety of KM-248 (M-M-R®II) and Takeda Monovalent Measles Vaccine in Healthy Japanese Children" has been approved pending completion of assignments. CDOC acknowledged the study risks (e.g., fever rate calculations for Takeda vaccine based upon combination M-Mr vaccine). Agreement has been met on sample size (N=323) and a Sodan to discuss the trial with Kikoh is scheduled for March.<br>**Update: A decision has been made to use vaccine made with Grifols albumin for this trial. As Clinical material would not be available until the end of this year and the considering the possibility that the low phosphate lots will be successful in reducing sting and prove stable, the team was asked to consider making two lots for the Japanese trial.** |
| Clinical Research | File for Licensure of M-M-R®II in Japan. (cont'd) | Ongoing | **Remaining Manufacturing Issues: 1) Gelatin: Kaketsuken currently performing animal studies with Sol-U-Pro to address anaphylaxis concerns; 2) Markers of Attenuation: Provided consensus sequencing of all stock seeds except the one currently being used for Rubella production. That seed will be submitted to Lark Technologies for sequencing ; 3) Diluent: MMD is investigating whether the diluent for M-M-R®II can be manufactured to meet WFI standards; 4) . Alien substance testing: Alien Substances: Samples from 3 lots of OGOS have been sent for evaluation by Kaketsuken. MMD has now been informed that Kaketsuken wants to do dose-escalating safety testing in dogs. The requirement for the general pharmacology test in Japan is currently being discussed. Kaketsuken believes that this preclinical test is a pre-phase III requirement in Japan but Merck sees no scientific rationale in doing this test.** |

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA01717375
MRK-CHA01717375

**Appx19139**

CDOC CRITICAL ACTIVITIES

**HUMAN - BIOLOGICALS**
**Phase V**

CDOC Meeting: 3/24/99
Issued: 3/17/99

| DEPARTMENT | ACTIVITY | TARGET DATE | COMMENT/ISSUE |
|---|---|---|---|
| **Varicella Containing Vaccines - Quadrivalent (Measles Mumps Rubella Varicella)** | **PLA Submission - 4Q01 MAA Submission - 4Q01** | | |
| | **KEY ISSUES** | | The MMRV Dose-ranging lots, although released, appear to be losing potency at -15C and were out of specification at the 1 month stability timepoint. The 3-month data is now available and all of the lots are within specification. Two of the lots were assayed, with a -20C control, at the 4.5mo timepoint. Values assayed by BBR are similar to the release potencies of the lots assayed by the BTL. MVD has successfully negotiated an agreement with PMC for the use of Urea to stabilize MMRV. |
| Project Team | Stage 2A TPAC/BPC Quadrivalent Vaccine Contract. | 12/97 | ---- |
| Project Team | Initiate Quadrivalent Feasibility Trial. | A-3/98 |  REDACTED – OMP |
| Project Team | Complete Demonstration of bulk Process Upgrade Consistency lots for -15C vaccine. | A-5/98 | The Process Upgrade bulk demonstration was completed successfully. |
| Project Team | Complete Analytical Qualifications and Validations. | A-10/98 | Process validation data required to assure demonstration of a consistency series is complete. |
| Project Team | Initiate Quadrivalent Dose-Selection Trial. | 2/99 | Although the Quadrivalent dose-ranging lots have been released, the 1-month potency of 2/3 lots stored at -15C was out of specification. Results from the 3-month timepoint are showing slightly higher potencies which put the lots within specification. The IND amendment has been completed. The stability specifications on these lots will be changed to FYI since they are expiry lots. If all issues are resolved and the amendment submitted the week of 3/15, the trial should be able to have FPI the week of March 22. |
| Pharm R&D | Goal: Develop a stabilizer that will allow refrigerated storage of the Quadrivalent vaccine. | Ongoing | The final stabilizer for the Quadrivalent vaccine will be determined based on 1) stabilizer candidate stability, 2) tolerability, 3) the interim analysis of the dose-ranging study (to estimate the end-expiry titer) and 4) whether the vaccine is a 1 or 2 dose regimen. The team will present the business strategy to the TPAC in 7/99. |
| Pharm R&D | Demonstration of 4C Quadrivalent consistency lots. | TBD | Although GOS/UREA based stabilizers have been identified and placed on stability to select the final formulation, the lyo performance of these stabilizer candidates will need to be improved. A high rate of lyo cake collapse has been observed and full-scale developmental runs will be needed before consistency lots can be made. The OGOS subteam has now taken on the responsibility of preparing for the Quadrivalent demonstration tentatively scheduled to start in 4Q. |
| Clinical Research | Initiate Feasibility study using Process Upgrade Varicella. Protocol 009. | A-3/98 |  REDACTED – OMP |

Prepared: 3/16/99

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA01717400
MRK-CHA01717400

**Appx19140**

CDOC CRITICAL ACTIVITIES

**HUMAN - BIOLOGICALS**
**Phase V**

CDOC Meeting: 3/24/99
Issued: 3/17/99

| DEPARTMENT | ACTIVITY | TARGET DATE | COMMENT/ISSUE |
|---|---|---|---|
| **Varicella Containing Vaccines - Quadrivalent (Measles Mumps Rubella Varicella)** | **PLA Submission - 4Q01 MAA Submission - 4Q01** | | |
| Clinical Research | Initiate Candidate Stabilizer Tolerability study in Adults. | A-1/99 | **Objective:** Determine the tolerability of candidate stabilizers to help select the optimum stabilizer based on tolerability and stability. **Update: Vaccination has begun at all 3 sites; 91/240 subjects have been enrolled. Preliminary data expected by late April.** |
| Clinical Research | Initiate Dose-Selection Trial. | **3/99** (2/99) | REDACTED – OMP |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA01717401
MRK-CHA01717401

Appx19141

11/26/2019
Declaration of G. Reilly
EXHIBIT 367

Appx19142

| Review | Project Parameter | Target | Variance |
|---|---|---|---|
| PAC | **Develop pre-launch strategy** | **DEC2003** | **+ 2months** |
| VMC | Complete/obtain approval of MVD pre-launch marketing strategy document | DEC2002 | +/- 2 months |
| DMC | Convene a pre-BLA meeting with CBER | DEC2003 | +/- 2 months |
| | | | |
| PAC | **Demonstrate manufacturing consistency** | **APR 2004** | **+ 1 month** |
| BPC | Manufacturing Demonstration Complete | 18DEC2002 | +/- 1 week |
| DMC | LPO for Consistency Lots Study | 30OCT2003 | +/- 1 week |
| DMC | CSR for Consistency Lots Study | 15APR2004 | +/- 1 week |
| | | | |
| PAC | **Demonstration of safety and efficacy** | **MAY2004** | **+ 1 month** |
| DMC | LPO for Dose Confirmation Efficacy Study (Protocol 007) | 30JUN2003 | +/- 2 weeks |
| DMC | CSR for Dose Confirmation Efficacy Study (Protocol 007) | 28FEB2004 | +/- 2 weeks |
| DMC | LPO for Large-Scale Safety and Efficacy Trial (Protocol 006) | 30SEP2003 | +/- 2 weeks |
| DMC | CSR for Large-Scale Safety and Efficacy Trial (Protocol 006) | 15MAY2004 | None |
| PAC | **Complete Stage 2 Review** | **MAY2004** | **+/- 1 month** |

CONFIDENTIAL

11/26/2019
Declaration of G. Reilly
EXHIBIT 368

 **MERCK**
Research Laboratories



Project Management Regulatory Submissions Schedule for "All Products", From
01-AUG-2002

 Restricted
**R** Confidential
limited access

| Sub Date | Date Status | Product ID | Project | CARDID | Project description | App Type | Qualifier | Comments |
|---|---|---|---|---|---|---|---|---|
| REDACTED – OMP | | | | | | | | |
| | | | | | | | | |
| 28-Apr-2003 | Official Target Date | V221 | **PROQUAD** | 2000-02011 | Children (Frozen Vaccine) | BLA | (Not determined) | |
| REDACTED – OMP | | | | | | | | |
| | | | | | | | | |
| | | | Jun, 2003 | | | | | |
| 15-Jun-2003 | Official Target Date | V221 | **PROQUAD** | 2002-07009 | Children (Frozen Vaccine) | IMA | (Not determined) | |
| 2Q03 | Under Team Assessment | **V205C** | **M-M-R II** | 2001-10014 | MMRII Mumps End-Expiry | sBLA | Efficacy Supplement | Protocol #007: Mumps End Expiry study. |
| REDACTED – OMP | | | | | | | | |

Page 6         Project Management Regulatory Submissions Schedule         23-Oct-2002 10:29 AM

**CONFIDENTIAL**

**MRK-KRA01726084**
**MRK-CHA01726084**

**Appx19145**

 

**Project Management Regulatory Submissions Schedule for "All Products", From 01-AUG-2002**



| Sub Date | Date Status | Product ID | Project | CARDID | Project description | App Type | Qualifier | Comments |
|---|---|---|---|---|---|---|---|---|
| REDACTED – OMP | | | | | | | | |
| | | | | | Aug, 2003 | | | |
| Aug, 2003 | Unofficial Target Date | V205C | M-M-R II | 2001-10013 | MMRII manufactured with rHA | sBLA | Efficacy Supplement | Will be filed as manufacturing supplement with clinical data from bioequivalence study (Ptcl #009). |
| REDACTED – OMP | | | | | | | | |
| | | | | | Sep, 2003 | | | |
| REDACTED – OMP | | | | | | | | |
| 3Q03 | Under Team Assessment | V205C | M-M-R II | 2001-10015 | MMRII Mumps End-Expiry | Variation | Type II - Labeling Update | Protocol #007: Mumps End Expiry study. |
| REDACTED – OMP | | | | | | | | |
| | | | | | Nov, 2003 | | | |

Page 7      Project Management Regulatory Submissions Schedule      23-Oct-2002 10:29 AM

**CONFIDENTIAL**

**MRK-KRA01726085**
**MRK-CHA01726085**

**Appx19146**

  

**Project Management Regulatory Submissions Schedule for "All Products", From 01-AUG-2002**



| Sub Date | Date Status | Product ID | Project | CARDID | Project description | App Type | Qualifier | Comments |
|---|---|---|---|---|---|---|---|---|
| REDACTED – OMP | | | | | | | | |
| 4Q03 | Under Team Assessment | V205C | M-M-R II | 2001-10012 | MMRII manufactured with rHA | IMA | EU | Original IMA for EU submission. Clinical Study: Ptcl #009 rHA Bioequivalence |
| REDACTED – OMP | | | | | | | | |
| | | | | Dec, 2003 | | | | |
| REDACTED – OMP | | | | | | | | |

Page 8 · Project Management Regulatory Submissions Schedule · 23-Oct-2002 10:29 AM

CONFIDENTIAL

MRK-KRA01726086
MRK-CHA01726086

Appx19147

 

**Project Management Regulatory Submissions Schedule for "All Products", From 01-AUG-2002**



| Sub Date | Date Status | Product ID | Project | CARDID | Project description | App Type | Qualifier | Comments |
|---|---|---|---|---|---|---|---|---|
| REDACTED – OMP | | | | | | | | |
| | | | | | | | | |
| Jun, 2004 | | | | | | | | |
| 30-Jun-2004 | Official Target Date | V221 | PROQUAD | 1999-01139 | Children, 4C stable vaccine | sBLA | (Not determined) | |
| REDACTED – OMP | | | | | | | | |



Page 9                    Project Management Regulatory Submissions Schedule                    23-Oct-2002 10:29 AM

CONFIDENTIAL

MRK-KRA01726087
MRK-CHA01726087

Appx19148

11/26/2019
Declaration of G. Reilly
EXHIBIT 369

## James, Maria

| | |
|---|---|
| **From:** | Ukwu, Henrietta |
| **Sent:** | Tuesday, October 06, 1998 12:29 PM |
| **To:** | Blois, David W.; Buckland, Barry; Garfinkle,  Barry D.; King, Michael L.; Margolskee, Dorothy |
| **Cc:** | Ukwu, Henrietta; Abraham, Katalin G.; Bramble, Joye L.; Heyse, Joseph F.; Kniskern, Peter; Krah, David; Long, William; Matthews, Holly; Olsen, Stephanie P.; Rich, Beverly; Sadoff, Jerald C.; Shaw, Alan; Staub, Joan M.; Thaler, Scott; Varilla, Mark F.; Yagodich, Mary; Yin, Fang; Schofield, Timothy L. |
| **Subject:** | FW: Mumps expiry; summary of prep meeting on 9/30 for CBER telecon |

Please note the summary, from Dr. Chirgwin, attached--which describes current status of activities for measles/mumps assays; development and issues we are preparing for discussion with CBER in light of their recent comments on the mumps end expiring study.

I would like us to have a firm plan for our assay development and validation prior to their use in any clinical studies to support registration/claim.  Our recent experience with CBER on the PHN program using invalidated assays clearly demonstrates how CBER views these issues and exposes our data to much scrutiny.  I would like to suggest that the MMRII team/serology subgroup prepare to present to BPC the plans to develop and validate the assays, technical issues/limitations and timeline for completing.

The key members of the team are copied on this memo and if you agree maybe Pat can give us a BPC date.

HU

----------
From: Chirgwin, Keith D.
To: Ukwu, Henrietta; Abraham, Katalin G.; Adams-Muhler, Lisa; Bennett, Philip S.; Bramble, Joye L.; Heyse, Joseph F.; Howe, Judy; Kniskern, Peter; Krah, David; Lenz, Susan; Long, William; Margolskee, Dorothy; Matthews, Holly; Olsen, Stephanie P.; Rich, Beverly; Sadoff, Jerald C.; Shaw, Alan; Staub, Joan M.; Thaler, Scott; Varilla, Mark F.; Yagodich, Mary; Yin, Fang; Schofield, Timothy L.
Cc: Blois, David W.; Buckland, Barry; Garfinkle, Barry D.
Subject: Mumps expiry; summary of prep meeting on 9/30 for CBER telecon
Date: Tuesday, October 06, 1998 10:03AM

Attached please find a summary of the meeting last week to discuss the evaluation of immunogenicity in the Mumps Expiry Protocol.  Please review carefully the timing for the completion of the assay validation/correlation and determination of the actual seroconversion rate with the new neutralizing assay as this is one of the key issues to be discussed with CBER.

Keith Chirgwin



MUMPSEX1.DOC

**CONFIDENTIAL**

MRK-KRA00625837
MRK-CHA00625837

**Appx19150**



**MERCK**
Research Laboratories

**M E M O**                                          DATE:    October 2, 1998

**TO:**        K. Abraham, J. Bramble, J. Heyse, P. Kniskern, D. Krah, B. Long, H.
               Matthews, D. Margolskee, S. Olsen, B. Rich, J. Sadoff, T. Schofield, A. Shaw,
               J. Staub, S. Thaler, H. Ukwu, M. Varilla, M. Yagodich, F. Yin

**CC:**        D. Blois, B. Garfinkle, B. Buckland

**FROM:**      K. Chirgwin

**SUBJECT:**   Summary of the preparatory meeting (9/30/98) for the CBER teleconference
               to discuss evaluation of immunogenicity in the Mumps Expiry Protocol

A letter from CBER providing feedback on the mumps expiry protocol was received on September 17.
Several of CBER's comments may require clarification and further discussion. A preparatory meeting to
discuss our responses was held on 9/30.

The following issues were discussed during this preparatory meeting:

1) **The status of the neutralization assays:**
   Mumps assay: CBER previously requested (last December) that a neutralizing antibody assay be used
   in the expiry trial. In response, a neutralizing assay has been developed in DHVS. The validation
   package is complete and will undergo further analysis in VBR (Biometrics). However, to date the
   validation has involved a limited number of sera (N=4) and therefore the observed seroconversion rate
   with this assay is unknown. Unfortunately, banked sera from previous trials involving M-M-R®$_{\text{II}}$ have
   been contaminated and therefore new sera will need to be obtained prior to correlating this assay with
   the current standard (ELISA). Possibilities for such sera include the Priorix comparative trial or the
   ongoing trials within the MMRV or VARIVAX® program in which M-M-R®$_{\text{II}}$ is administered
   concomitantly (the latter studies may be preferable for logistic and other reasons).

   Measles assay: 
   REDACTED – OMP
   REDACTED – OMP

2) **Criteria for defining seroconversion:**
   CBER has repeatedly requested that there be some "clinically valid justification" for serologic
   criteria. Unfortunately, there has been no bridge between the different assays used over the years
   which would permit a correlation between current serologic endpoints and clinical endpoints from an

C:\TEMP\MUMPSEX1.DOC                                                                              1

**CONFIDENTIAL**                                            MRK-KRA00625838
                                                            MRK-CHA00625838

era in which there was a measurable mumps attack rate. In the absence of such data, a population-based justification based on the demonstrated field effectiveness of M-M-R®$_{\text{II}}$ might be one approach. Since mumps has been controlled on a population basis with this vaccine, the serologic response of the population as a whole should correlate with protection. If the cutoff for seroconversion is at or above the level reached by the majority of vaccinees, this cutoff, by inference, should correlate with protective efficacy. The cutoff for the current ELISA was briefly discussed in this context. The ELISA cutoff is dependent on the values obtained with the concurrent control sera, but typically this is in the range of 2 U, with GMTs in the range of 70-100 U. It was proposed that results with this assay be re-examined to confirm the relationship of the cutoff to the entire distribution of titers.

The current ELISA assay has been in use only since 1992, a period during which the attack rate of natural mumps infection has been extremely low. With minimal exposure to disease, it may be difficult to defend a population-based response from this era as protective. The population based surrogate marker argument may depend on the assumption that since the manufacturing process has remained constant, the currently observed immunogenicity can be extrapolated to the earlier era when mumps was endemic. In any case, given the uncertainty regarding attack rates, it may be problematic to defend a specific cutoff as protective. The issue will be reviewed by BARDS, Biometrics and Clinical.

3) **Sample size as function of estimated SCR:**
CBER had several comments relating to sample size and power, including re-estimation of sample size if the observed SCR with the new neutralizing assay differed from the assumed SCR. A more precise estimate of the SCR and the correlation of the neutralizing assay with the current assay will be obtained utilizing sera from ongoing studies. These data are not anticipated to be available until 1-2Q99 and the mumps expiry study will likely begin prior to this. Since there are no data with the new assay, for now the proposed sample size must be based on estimates derived from the older assays. It will be proposed to CBER that the trial begin in 1Q99 with a sample size estimate based on the assumed SCR from the available data, with a plan to re-estimate the sample size after the trial has begun based on data with new assay which are expected by 2Q99.

**Action Plan/Assignments:**
1) Assemble SOPs for the new neutralizing assay including validation methods (**B. Long**)
2) Determine timing for completing development and validation of the measles neutralizing assay (**B. Long**)
3) Determine availability and timing of obtaining an estimate of the SCR with the new neutralizing assay and correlating neutralizing and ELISA assays (**T. Schofield**)
4) Explore the feasibility of using a population based surrogate marker approach to defend a specific cutoff as protective (**S. Olsen, J. Heyse**)

K.D.C.
Phone: (610) 397-2558
Fax:    (610) 397-2962

cc:     distribution, file, chron

C:\TEMP\MUMPSEX1.DOC

2

**CONFIDENTIAL**

**MRK-KRA00625839**
**MRK-CHA00625839**

11/26/2019
Declaration of G. Reilly
EXHIBIT 370

*4. Please justify how a mumps component potency of 12,500 TCID50 (4.1 $log_{10}$ $TCID_{50}$) per dose can be guaranteed to be clinically efficacious in light of the calculated $\pm 0.3$ confidence interval for the mumps house standard and the clinically inferior immunogenic response observed with a vaccine with a mumps potency of 3.8 $log_{10}$ $TCID_{50}$.*

The mumps house standard has an assigned potency of 4.3 $log_{10}$ $TCID_{50}$/0.1 mL with control limits defined as $\pm 2$ standard deviations ($\pm 0.3$). The control limits represents inter-assay variability and they are used as validity criteria for determining whether a potency assay is considered valid or invalid.

The assigned potencies for thee mumps house standard was determined using 3,200 assay runs (four replicates per assay) over the several years the standard was in use. The control limits, which were established using only 150 assay runs, remained unchanged if all data (3,200 runs) were used. Because of the extended testing, these values are likely to be the most accurate determination of the reference standard potency and variability that can be obtained.

The confidence interval (estimator) does not imply that the mean (measured parameter) has a Gaussian distribution with similar variance.

The assignment of virus potency for any mumps containing M-M-R™II lots uses the average (point estimate) of six valid assays, and the potency must be at or above the minimum release specification. For the purposes of the Mumps End-Expiry Study, the assigned potency for the clinical test lots were established so that the estimated value would have a 95% chance to be below the targeted potency of 4.1 or 3.8 $log_{10}$ $TCID_{50}$ per dose for the 2 candidate mumps end-expiry potencies, respectively. Therefore, statistical estimates were included in the assignment of the final mumps potency for the 2 candidate expiry potencies.

The vaccine vials used for this clinical trial originated from a single vaccine lot. Clinical materials had been stored at -20°C immediately following the fill process and were placed into the incubator with a controlled room temperature (68 to 77°F [20 to 25°C]). A portion of these vials underwent incubation for ~7 weeks until the Mumps Virus Potency of no more than 4.1 $log_{10}$ $TCID_{50}$ per dose was reached. The remaining vials underwent incubation for ~12 weeks during the clinical vaccine aging stage until the desired Mumps Virus Potency of no more than 3.8 $log_{10}$ $TCID_{50}$ per dose was reached. Following the ~7-week and ~12-week incubation periods, the respective vials were removed and placed at 13.8°F (-20°C) to halt the aging process. Additionally, several thousand vials were maintained at 13.8°F (-20°C) throughout to serve as control vaccine vials (at current release potency 4.8 $log_{10}$ $TCID_{50}$ per dose). These vials did not undergo incubation at room temperature.

The clinical efficacy of the vaccine containing the candidate mumps end-expiry potencies were to be based on a laboratory assay [Plaque Reduction Neutralizing (PRN) assay] widely accepted as a surrogate marker for vaccine efficacy. Pre-specified statistical

CONFIDENTIAL

criteria for non-inferiority comparison and acceptability of immune responses between the test and control groups were defined in agreement with FDA/CBER (United States regulatory agency) and were based on the historical performance of the vaccine, known to induce mumps-specific antibody responses in approximately 90% of vaccines. These criteria were met for subjects immunized with M-M-R™II containing mumps virus potency of 4.1 $\log_{10}$ $TCID_{50}$ per dose but were not met for subjects immunized with M-M-R™II containing mumps virus potency of 3.8 $\log_{10}$ $TCID_{50}$ per dose.

Acceptability of the mumps-specific immune responses required that the lower bound of the 95% confidence interval on the observed proportion of subjects who developed neutralizing antibodies to mumps 6 weeks postvaccination to be $\geq$ 90%. It is well known that levels of acceptability for antibody responses to a given antigen may vary based on the assay used, the risk-benefit ratio for a given population in the absence of an equal or better alernative. It is therefore conceivable that the suboptimal immune responses observed in subjects receiving M-M-R™II with mumps virus potency of 3.8 $\log_{10}$ $TCID_{50}$ per dose could be found acceptable in areas with high incidence of mumps and low vaccine coverage rate.

The difference in seroconversion rates measured by PRN assay between subjects immunized with M-M-R™II containing mumps virus potency of 3.8 $\log_{10}$ $TCID_{50}$ per dose and controls immunized with M-M-R™II containing mumps virus potency of 4.8 $\log_{10}$ $TCID_{50}$ per dose was estimated to be −2.9 percentage points (90% CI [-6.1, 0.3]). Since the lower bound of the 90% CI did not exclude a decrease of 5 percentage points or more and the corresponding p-value for the test of similarity (non-inferiority) was 0.140, there was insufficient evidence to conclude similarity between the 2 groups based on the pre-specified statistical criteria. Also, the lower bound (86.1%) of the 95% confidence interval on the observed proportion of subjects who developed neutralizing antibodies to mumps 6 weeks postvaccination was below 90%, there was insufficient evidence to conclude that the 3.8 $\log_{10}$ $TCID_{50}$ mumps virus potency provided an acceptable immune response.

CONFIDENTIAL

The proportion of subjects who developed neutralizing antibodies to mumps 6 weeks postvaccination was estimated to be 89.4% for the 3.8 $\log_{10}$ TCID$_{50}$ Mumps Virus Potency treatment group and 92.2% for 4.8 $\log_{10}$ TCID$_{50}$ Mumps Virus Potency control group, based on a statistical model adjusting for study center. For the comparison between the 2 groups, the difference in proportions between the 2 treatment groups (Treatment Group – Control Group) was estimated to be –2.9 percentage points (90% CI [-6.1, 0.3]). Since the lower bound of the 90% CI did not exclude a decrease of 5 percentage points or more and the corresponding p-value for the test of similarity (non-inferiority) was 0.140, there was insufficient evidence to conclude that the 3.8 $\log_{10}$ TCID$_{50}$ Mumps Virus Potency treatment group was similar (non-inferior) to the 4.8 $\log_{10}$ TCID$_{50}$ Mumps Virus Potency control group with respect to the proportion of subjects who developed neutralizing antibodies to mumps 6 weeks postvaccination.

The observed proportion of subjects who developed neutralizing antibodies to mumps 6 weeks postvaccination for the 3.8 $\log_{10}$ TCID$_{50}$ Mumps Virus Potency group was 89.3%. Since the lower bound (86.1%) of the 95% confidence interval on the observed proportion of subjects who developed neutralizing antibodies to mumps 6 weeks postvaccination was below 90%, there was insufficient evidence to conclude that the 3.8 $\log_{10}$ TCID$_{50}$ mumps virus potency provided an acceptable immune response.

Since neither similarity (non-inferiority) to the 4.8 $\log_{10}$ TCID$_{50}$ mumps virus potency was established (primary hypothesis 3), nor an acceptable immune response to mumps shown (primary hypothesis 4), it was concluded that the 3.8 $\log_{10}$ TCID$_{50}$ mumps virus potency was an unacceptable expiry potency for mumps.

The immune responses to measles and rubella as measured by ELISA for the 3.8 $\log_{10}$ TCID$_{50}$ Mumps Virus Potency treatment group were declared similar to the immune response to measles for the 4.8 $\log_{10}$ TCID$_{50}$ Mumps Virus Potency treatment group since the p-value were <0.05 (corresponding to the lower bound of the CI for the difference excluding a decrease of 5 percentage points or more).

For mumps, the estimated SCRs for the 3.8 $\log_{10}$ TCID$_{50}$ Mumps Virus Potency treatment group and the 4.8 $\log_{10}$ TCID$_{50}$ Mumps Virus Potency treatment group were 94.1% and 98.0%, respectively, with an estimated difference of –3.8 percentage points (90% CI [-5.9, -2.0]) and a one-sided p-value of 0.166 for the non-inferiority test. Since the p-value was >0.05, there was insufficient evidence to declare the immune response to mumps for the 3.8 $\log_{10}$ TCID$_{50}$ Mumps Virus Potency treatment group similar to the immune response to mumps for the 4.8 $\log_{10}$ TCID$_{50}$ Mumps Virus Potency treatment group.

Since the 3.8 $\log_{10}$ TCID$_{50}$ Mumps Virus Potency treatment group was not found to be similar to the 4.8 $\log_{10}$ TCID$_{50}$ Mumps Virus Potency treatment group for all 3 antigens (by ELISA) in the secondary hypothesis 2, it was concluded that the 3.8 $\log_{10}$ TCID$_{50}$ mumps virus potency was not a satisfactory expiry potency with respect to SCRs as measured by ELISA.

MRK-KRA00032406
MRK-CHA00032406

Although M-M-R$^\circledR_{II}$ with a mumps potency of 3.8 $\log_{10}$ TCID$_{50}$ did not meet pre-specified immunogenicity criteria, no sharp dose response in immunogenicity results was observed when comparing results between subjects immunized with M-M-R$^\circledR_{II}$ with a mumps potency of 3.8 $\log_{10}$ TCID$_{50}$ and those immunized with M-M-R$^\circledR_{II}$ with a mumps potency of 4.1 $\log_{10}$ TCID$_{50}$. Therefore, the mumps end-expiry potency in M-M-R$^\circledR_{II}$ should be no less than 4.1 $\log_{10}$ TCID$_{50}$ per dose.

CONFIDENTIAL

11/26/2019
Declaration of G. Reilly
EXHIBIT 371

Appx19158

**To:** Galinski, Mark S.[mark_galinski@merck.com]; Rosolowsky, Mark[mark_rosolowsky@merck.com]; Chirgwin, Keith D.[keith_chirgwin@merck.com]
**Cc:** Macchi, Mary Josephine[mary_macchi@merck.com]; Atillasoy, Ercem[ercem_atillasoy@merck.com]; Bramble, Joye L.[joye_bramble@merck.com]
**From:** Fisher, Alison L
**Sent:** Mon 3/28/2005 3:15:13 PM
**Importance:** Normal
**Subject:** MEE Q1

Mark,

Here is my attempt at answering question #1 for Mumps end expiry file question #1 given our conversations last week. Correspondence cited will be useful for our discussion with Norman Baylor. Please provide your edits as soon as possible.

**1. Please describe the purpose and underlying rationale for proposing a reduction in potency of the mumps component of the approved product, M-M-R®II.**

Correspondence submitted to CBER between 1997 and 2002 describes the underlying purpose and rationale for proposing a reduction in the potency of the mumps component of M-M-R®II. This correspondence is summarized (below) starting with the submission of a PAS in 1999 and culminating in this supplemental file (BL 101069/5061).

The PAS was required by CBER to increase in the minimum mumps release potency of our mumps vaccines to assure that labeled potency, 4.3 $\log_{10}$ $TCID_{50}$, is consistent with potency through the end of the shelf-life. In conjunction to the PAS, CBER acknowledged to Merck on several occasions (below) that when data of a mumps end expiry trial becomes available, the mumps end expiry potency claim will be reassessed.

The end expiry trial was initiated to confirm that a potency of mumps below 4.3 $\log_{10}$ $TCID_{50}$ is sufficiently immunogenic to support a change to the labeled potency for mumps. The mumps end expiry file (BL 101069/5061) supports an end expiry label claim of $\geq 4.1$ $\log_{10}$ $TCID_{50}$. through 24-months shelf life at 2-8C. Based on the clinical data, this efficacy supplement does not support and end expiry label claim 3.7 $\log_{10}$ $TCID_{50}$. This application does not propose any change in the indications or dosing schedule for the otherwise previously licensed M-M-R®II manufactured with HSA product.

Correspondence between CBER and Merck supporting purpose and rationale of a reduction in potency of the mumps component of the approved product, M-M-R®II

1) PAS, Aug 20 1999 HFM-475 (Dr. McVittie to Dr. McKee).
This letter is to confirm telephone conversations held on Aug 10 1999 and Aug 16 1999 between Merck and CBER (Dr. Baylor , Dr. S. Rastogi and Ms. Luba Vujcic) and discuss increasing the minimum release titer for the mumps component of Merks' mumps containing vaccine to 5.0 $\log_{10}$ $TCID_{50}$. It was pointed out that the variability of the mumps potency test at CBER is 0.226 log $\log_{10}$ $TCID_{50}$ and that the average loss in potency of the mumps component is 0.55 log $\log_{10}$ $TCID_{50}$ per two years, therefore based CBERs calculations, the average titer of six independent and valid potency assays must be at least 5.0 $\log_{10}$ $TCID_{50}$ at the time of release in order to be

95% confident that the lot will maintain a potency of at least 4.3 $\log_{10}$ TCID$_{50}$ for two years. The PAS was filed (Oct 20 1999) and approved (Feb 11, 2000: Dr. P. Patriarca to Dr. R. McKee ) describing filling to a target mumps potency of 5.2 $\log_{10}$ TCID$_{50}$ with minimum release potency specification of 5.0 $\log_{10}$ TCID$_{50}$ based on the assumption of a 0.7 $\log_{10}$ TCID$_{50}$ log loss in potency over 24 months for the mumps component of M-M-R®II. It was also pointed out that CBER understands that Merck will formulate all mumps containing vaccine lots manufactured on and after Sept 1999 to contain at least 5.2 $\log_{10}$ TCID$_{50}$. These lots will be released by CBER with a dating period of 24 months.

2) Early discussions of the mumps end expiry clinical trial.

a) In correspondence to CBER June 18 1999 ( Dr. R. McKee to Mr. Egan) it was explained that Merck had undertaken a clinical study, initiated in February 1999, to evaluate the immunogenicity of mumps when administered to children at a targeted expiry titer of 5000 (3.7 $\log_{10}$ TCID$_{50}$) and that once these clinical studies were to be completed the label claim would be re-evaluated and any proposed change will be submitted for CBER review and approval.

b) June 23 1998 Ser# 024 BBIND 1016 (Dr. Chirgwin to Dr. Zoon). In this general correspondence it was explained that on Dec 16 1997 CBER requested a draft of the clinical trial protocol designed to support the end of shelf life titer claim for mumps. In response to this request, a draft protocol for a clinical trial to support an Expiry Potency for the mumps component of M-M-R®II was submitted to BBIND 1016 for CBER's assesment.

Summary

 The purpose and underlying rationale for proposing a reduction in potency of the mumps component of the approved product, M-M-R®II was historically to 1) evaluate the immunogenicity of mumps when administered to children at a targeted expiry titer of 5000 (3.7 $\log_{10}$ TCID$_{50}$) and titers above this, and submit any proposed change in end expiry potency in the label to CBER for review and approval and based on the current data to 2) provide evidence that a mumps end expiry potency of 12 500 TCID in M-M-R® II at the end of its shelf life is not statistically different to that of the product at release [based on Mumps Plaque Reduction Neutralization (PRN) assay used as a surrogate marker for vaccine efficacy].

Minimum Release Specification. The minimum release specification will remain at 5.0 $\log_{10}$ TCID$_{50}$. The minimum release could drop 0.1 log to 4.9 $\log_{10}$ TCID$_{50}$ if TOC is reduced from 40 hours to 36 hours, however, there is no plan at current time to change the minimum release potency of the mumps component of M-M-R®II. This stability model builds in the maximum amount of variability and is a highly conservative estimate of loss over shelf life.  Real-time stability data supports that after two years mumps potency is $\geq$ 4.3 $\log_{10}$ TCID$_{50}$.

**CONFIDENTIAL**

**COMMENT ONLY concerning change in Stability Model. Since that time of the MEE file** (BL 101069/5061) **, the stability model has been refined (0.7 log loss is now estimated to be 0.9 log loss). The refined stability model supports a minimum release specification of 5.0** $\log_{10}$ TCID$_{50}$ **to support an expiry claim claim of 4.1 log** $\log_{10}$ TCID$_{50}$**/dose over 24-month shelf life at 2-8C. This stability model has been filed to CBER as part of the M-M-R II rHA file (July 2004 (BL 101069/5068, Module 3 3.2. P. 8.3). This stability model builds in the maximum amount of variability and is a highly conservative estimate of loss over shelf life. Real-time stability data supports that after two years mumps potency is $\geq 4.3$ $\log_{10}$ TCID$_{50}$.**

**CONFIDENTIAL**

MRK-KRA00560319
MRK-CHA00560319

11/26/2019
Declaration of G. Reilly
EXHIBIT 372

**From:** Stankunas, Bonita M.
**Sent:** Friday, October 01, 2010 10:23 AM
**To:** Keegan, Amy
**Subject:** RE: UAE

**Attachments:** FDA Conversation Memo 052705 rHA FINAL.doc

Here's a little something else. It's an FDA phone record about the mumps potency for rHA. We filed with 12,500 but CBER made us revise it to 20,000 until the MEE supplement was approved.



FDA Conversation
Memo 052705 r...

What a tangled mess!

*Bonnie*

**Tel: (267) 305-6763**
**Fax: (267) 305-6407**
**UG2C-50**

---

**From:** Keegan, Amy
**Sent:** Friday, October 01, 2010 10:11 AM
**To:** Stankunas, Bonita M.
**Subject:** RE: UAE

Was the CPP definitely a US CPP? I turned up something interesting in the 2008 UAE renewal file that could explain at least how the error was perpetuated... UAE renewal form (signed by Haarlem) stated a formulation change as removal human serum albumin from DP formulation diluents (no mention rHA) and provided the expiry specs as 5000.

Yes, let's talk to Tamara on Monday. I'll think about drafting a declaration to support tender... also, accelerating queries to the reg managers to document the filing requirements from rHA on. If we can jam something through in Saudi, maybe can clear up part of the mess more quickly. The way I understand it, registration in one local market required to support the tender as a whole. But I could be mistaken...

---

**From:** Stankunas, Bonita M.
**Sent:** Friday, October 01, 2010 10:00 AM
**To:** Keegan, Amy
**Subject:** RE: UAE

Okay, thanks Amy. I finally managed to make it in over the 113 bridge in Rahns! All the others are closed. Hopefully I'll be able to make it home later! :-O

I'll keep looking too. It is not clear if UAE has been actively marketing MMR II so it's possible variations were not sent to them or sent but not filed.

**CONFIDENTIAL**

**MRK-KRA01470854**
**MRK-CHA01470854**

As far as I my documentation shows I NEVER sent them a CPP with 5000 in it for mumps.  It is inconceivable that I would even done that on a bad day! Anyway I think (but I can't prove it) that since the CPP in question was submitted as part of a renewal in 2008 the CPP was requested and sent through our friends in WRC so I never saw it.  We had a problem in the past where they just sort of customized the dose composition page because they thought it followed HSA product and I caught one of those.  This could be one that got past me. I always insist on submitting the dose composition page with my requests for CPPs to avoid this very problem!

I will arrange for a telecon with Tamara on Monday if that's okay with you or do you want me to wait and see what you come up with later today?

Thanks,

*Bonnie*

**Tel: (267) 305-6763**
**Fax: (267) 305-6407**
**UG2C-50**

---

| | |
|---|---|
| **From:** | Keegan, Amy |
| **Sent:** | Friday, October 01, 2010 9:51 AM |
| **To:** | Stankunas, Bonita M. |
| **Subject:** | RE: UAE |

Hi Bonnie,

I was hoping to talk via tele, but I'm stuck at home waiting for the roads around my house to drain/clear.  Drawback to living more/less along the canal/river is the every few year flood issues. Might make it in later, but can certainly call you from here if needed or TC with Tamara.  I would suggest we align between us and TC with Tamara Monday?  I did let Kim know yesterday there was some heat happening around the tender and the registration issues.

I spent some time plowing through files yesterday and found very limited info.  The MEE status is really confusing, and it's very hard to piece together.  EU, NZ and Aus are clear b/c rHA was filed with the 4.1 (12, 500) expiry spec.  US was originally filed with the 4.1 (12,500), withdrawn/refiled with 4.3 (20,000); there the paper trail stops within CMC.  ROW was filed as 4.3 (20,000).  I went through ORION, and basically the registration records match the rHA file, exception US which is in ORION as 4.1 (12,500).  And don't you know, the QS matches the rHA filings, EU/NZ/Aus stability spec 4.1 (12,500) and US/ROW 4.3 (20,000).

I'll look again through the official library for the MEE variation and approvals, to be sure I'm not missing anything.

I was involved in the mumps end expiry trial activities (including the switch to 1x6 and eventually calibration), but the CMC side was hazy to me back then ;-).  I recall we ran a clinical trial to support the mumps expiry claims.  Expiry specifications are, in my experience, solely based on minimum efficacious dose proven in the clinic.  If the minimum dose was raised that would cause a change in target/model, not the other way around.  Make sense?

Now that I'm thinking hard, I remember actually making the slides for Roberta to go talk to CBER about this... old age is a b**tch.

Found some very limited info also on ME/Gulf State registrations.  Will put that in reply to other

**CONFIDENTIAL**                                                                                   **MRK-KRA01470855**
                                                                                                    **MRK-CHA01470855**

email to keep the trains concise.

Tx,
AK

_____

**From:**      Stankunas, Bonita M.
**Sent:**      Thursday, September 30, 2010 5:03 PM
**To:**        Keegan, Amy
**Subject:**   UAE

Hi Amy,

I have been trying to piece together the past history with what might have happened in UAE but of course I can't find anything! I'll look through my paper files tomorrow.   I don't believe I would have sent them a US CPP with a mumps potency of 5000 on it. I keep all my CPP requests and I can't find any request from 2008 nor do I believe I could have done that. The WRC group handles renewals if this was in support of a renewal.  Anyway, I guess we can't go back but instead try to move forward and resolve this thing.  What do you think would be best path forward - schedule a telecon with Tamara to try to determine what her agency might accept?

I wonder if it is technically correct to say we tightened the mumps expiry spec due to changes in the potency model? I know it's a different submission but prior to the switch to rHA we also submitted a worldwide filing to change the MEE to 12,500 from 20,000 or 5000 - depending on what the markets had registered.  Remember that one? Here's the document Kati pout together. Maybe you even helped with this back in the day so may know more than I do.

 << File: Mumps Mfg Potency Target.doc >>
I'll need to reply to the emails to try to defuse this thing but I don't want to do that until we sort this out a little on our end.  I could reply with saying that we will be meeting on our end to try to determine best path forward and will be scheduling a telecon with Tamara to discuss.

What do you think?

*Bonnie*
**Tel:  (267) 305-6763**
**Fax: (267) 305-6407**
**UG2C-50**

**CONFIDENTIAL**

**MRK-KRA01470856**
**MRK-CHA01470856**

11/26/2019
Declaration of G. Reilly
EXHIBIT 373

**1**

# M-M-R®II

CRRC
October 08, 2002

CONFIDENTIAL

2

# M-M-R®II

## CRRC - Oct. 08, 2002

## Agenda:

» **Background**

» **Mumps End Expiry Clinical Trial : current status**

» Statistical evaluation for study success

» Impact of mumps end expiry study outcome
  » Regulatory compliance
  » Filing in Japan

» Options under evaluation for short-term fixes

» Decision requested

CONFIDENTIAL

MRK-KRA00021134
MRK-CHA00021134

3

# Mumps End Expiry Study (#007): Background

- In the 1980's, the M-M-R®$_{II}$ label was revised from 5000 TCID$_{50}$ (3.7 log) to 20,000 TCID$_{50}$ (4.3 log) of mumps per 0.5 mL dose due to assay modifications

- In 1996-98, CBER disagreed with Merck's proposal that the specifications noted in our label were the minimum release potencies for M☐M☐R®$_{II}$.  Instead, they defined these specifications as end-expiry potencies, since the language in the label stated "… each 0.5 ml dose contains not less than…".

CONFIDENTIAL

MRK-KRA00021135
MRK-CHA00021135

Appx19169

4

# Mumps End Expiry Study (#007): Background

- In 1998, CBER specified that the mumps minimum release potency be set at 5.0 log $TCID_{50}$/dose to support an end expiry claim of 4.3 log $TCID_{50}$/dose.

- Merck committed to a clinical study to evaluate lower end expiry potencies.

CONFIDENTIAL

MRK-KRA00021136
MRK-CHA00021136

Appx19170

5

# Mumps End Expiry Study (#007): Background

- The CBER specified mumps minimum release potency to support an end expiry claim of 4.3 log $TCID_{50}$/dose was following CBER's evaluation of our product stability profile and potency assay variability for mumps.

- The release potency recommended by CBER, however, was low, in having neglected to include all the elements associated with post-release potency losses, as well as an invalid calculation leading to underestimation of release assay variability.

CONFIDENTIAL

MRK-KRA00021137
MRK-CHA00021137

Appx19171

6

# Mumps End Expiry Study (#007): Background

Multiple regulatory interactions ensued since the declaration of tentative release potencies for mumps. Which led to, at CBER's recommendation, and due to potency losses after release and release assay variabilities, Merck's commitment to design a stability study with lots manufactured to the new mumps target and promised to set permanent release specifications with the data obtained from that study.

Recent calculations show that the manufacturing target of 5.2 log $TCID_{50}$/dose and associated release potency of 5.0 log $TCID_{50}$/dose can support an end of expiry claim of 4.0 log $TCID_{50}$/dose (at 24 months dating), the intermediate dose used in the mumps end-expiry trial – **but not an end expiry of 4.3 log $TCID_{50}$/dose .**

**CONFIDENTIAL**

**MRK-KRA00021138**
**MRK-CHA00021138**

7

# Mumps End Expiry:
# Clinical Study (#007)

- Comparison of the immunogenicity of M-M-R®$_{II}$ with reduced end expiry potencies (3.7 & 4.0 log $TCID_{50}$) to M-M-R®$_{II}$ with a standard release end expiry potency (4.9 log $TCID_{50}$)

- Vaccination Group Number of Subjects
  - » M-M-R®$_{II}$ (4.9 log $TCID_{50}$) - 590
  - » M-M-R®$_{II}$ (4.0 log $TCID_{50}$) - 590
  - » M-M-R®$_{II}$ (3.7 log $TCID_{50}$) - 590

- Blood samples at Day 1 and 42 (+ 1yr persistence)

- Enrollment complete.  FPI:  Feb99; LPO (day 42):  Sept00

CONFIDENTIAL

8

# Mumps End Expiry Study (#007): Issues

- AIGENT Assay (PRN)

  » New functional antibody assay developed at the request of CBER

  » CBER Inspection of serology laboratory resulted in concerns over GMP issues (i.e. data handling, spreadsheet validation, etc.) in August 2001

  » Invalid samples identified for retesting –  samples storage exceeds 1 year time limit specified by SOP; issue communicated to CBER

  » CBER requested that a pre/post retest analysis be performed on subset of samples in April 2002

CONFIDENTIAL

MRK-KRA00021140
MRK-CHA00021140

Appx19174

9

# Mumps End Expiry Study (#007): Issues

◻ AIGENT Assay (PRN) - Cont'd

» GMP issues resolved May 2002

» Samples retested in June –July 2002

» Change in immunogenicity identified with post retest samples in August 2002

CONFIDENTIAL

MRK-KRA00021141
MRK-CHA00021141

**10**

# Mumps End-Expiry Trial: Timeline



**February 1999**: First Patient In (FPI)

REDACTED – OMP

**September 2000**: Last Patient Out (LPO)

**December 2000**: Start of Mumps PRN testing

**August 2001**: - End of Mumps PRN testing (Primary testing period)
- CBER inspection – resolution in May 2002

**June-August 2002** : Retest of Invalid assays by PRN (Second testing period)

**CONFIDENTIAL**

11

# Mumps End Expiry Study (#007): Status

□ CBER Communication

» Background Document to CBER - September 20

» Obtain concurrence on invalidating retest results from 2002 and testing of available frozen retains from this subset

CONFIDENTIAL

MRK-KRA00021143
MRK-CHA00021143

**12**

# M-M-R(R)II

## CRRC  - Oct. 08, 2002

### Agenda:

» Background

» Mumps End Expiry Clinical Trial : current status

» **Statistical evaluation for study success**

» Impact of mumps end expiry study outcome
  » Regulatory compliance
  » Filing in Japan

» Options under evaluation for short-term fixes

» Decision requested

**CONFIDENTIAL**

13

# Criteria for Acceptable Mumps End Expiry Dose

- Primary endpoint based on a mumps neutralization assay

- End expiry dose must be similar (non-inferior) to the release dose
  - » 5 percentage point equivalence margin
  - » One-sided alpha of 0.05

- End expiry dose must have an acceptable antibody response
  - » Lower bound of the 95% two-sided confidence interval >90%.

CONFIDENTIAL

MRK-KRA00021145
MRK-CHA00021145

14

# TABLE 1.  M-M-R®II Protocol 007: Mumps End Expiry

Interim Summary of the Percent of Subjects Who Develop Neutralizing Antibodies to Mumps[†],
Geometric Mean Titers (GMTs), and Median Titers 6 Weeks Postvaccination
and Associated 95% Confidence Intervals in Initially Seronegative Subjects[‡]

| | Treatment Group | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | $-4.9 \log_{10} TCID_{50}$ Mumps Potency (N = 186) | | | $\leq 4.0 \log_{10} TCID_{50}$ Mumps Potency (N = 196) | | | $\leq 3.7 \log_{10} TCID_{50}$ Mumps Potency (N = 183) | | |
| Parameter | n | Observed Response | 95% CI | n | Observed Response | 95% CI | n | Observed Response | 95% CI |
| SCR | 168 | 94.6% (159/168) | (90.1%, 97.5%) | 175 | 93.1% (163/175) | (88.3%, 96.4%) | 167 | 88.0% (147/167) | (82.1%, 92.5%) |
| GMT | 168 | 1290.2 (31.5%)[ǀ] | (1054.9, 1577.9) | 175 | 1361.9 (34.9%)[ǀ] | (1102.5, 1682.4) | 167 | 1028.3 (31.7%)[ǀ] | (791.2, 1336.4) |
| Median Titer | 168 | 2048.0 | (1591.3, 2635.8) | 175 | 2048.0 | (1571.5, 2668.9) | 167 | 2048.0 | (1474.5, 2844.5) |

[†] >4-fold rise in antibody titer, i.e., 1:16 to 1:64 where 1:16 is assigned to titers below 1:32, the limit of detection.

[‡] Regardless of protocol violations or day ranges.

[ǀ] Percentage of subjects with 6-week titer >4096

N = Number of subjects vaccinated in each treatment group.

n = Number of initially seronegative subjects in each treatment group with postvaccination serology.

CI = Confidence Interval.

**CONFIDENTIAL**

MRK-KRA00021146
MRK-CHA00021146

**15**

# Interim Analysis Conclusions

- The responses for all three groups were lower than expected.

- The 3.7 End Expiry potency would not meet the success
criteria for the study.

- Given these results, the probability of meeting the acceptability criterion for the 4.0 End Expiry potency was estimated to be approximately 70%.

CONFIDENTIAL

MRK-KRA00021147
MRK-CHA00021147

Appx19181

**16**

# Decreased Power for Primary Hypotheses

- Loss of ~300 paired samples due to testing outside of assay SOP 1-year window.

- Higher pre-positive rate (14%) than originally anticipated (5%).

- Anticipate only 430 subjects per group, instead of 502 per group.

- Potentially lower response rate in the Release group (94.6%) than originally anticipated (95%).

**CONFIDENTIAL**

MRK-KRA00021148
MRK-CHA00021148

17

# Overall (Blinded) Seroconversion Rate Estimates

| Timepoint | Overall SCR |
|---|---|
| Interim Analysis (modified SOP) | 92.0% (469/510) |
| Interim Analysis (original SOP) | 93.0% (409/440) |
| Complete Data (excluding ~300 paired samples tested outside the assay SOP 1-year window) | 91.9% (1208/1315) |

CONFIDENTIAL

MRK-KRA00021149
MRK-CHA00021149

18

# Required SCR for Success

Assuming 430 subjects per group and a 95% SCR in the Release group, the observed SCR in the 4.0 Expiry group must be:

☐ Acceptability: $\geq$93.3%
☐ Similarity (non-inferiority): $\geq$ 93.0%

Note: Observed 93.1% SCR in the interim analysis for the 4.0 Expiry group.

**CONFIDENTIAL**

**MRK-KRA00021150**
**MRK-CHA00021150**

**Appx19184**

**19**

# Power to Rule Out a Difference of 5.0 Percentage Points and a Lower Bound of 90% with 430 Evaluable Subjects Per Group

| Expected True Rate | True Decrease Between Control and Mumps Expiry Group | | |
|---|---|---|---|
| in Control Group | 0.0 Percentage Points | 1.0 Percentage Points | 2.0 Percentage Points |
| 96% | 97.1% | 83.6% | 51.9% |
| 95% | **92.5%** | 67.5% | 30.9% |
| 94% | 77.0% | 41.4% | 13.5% |
| 93% | 48.5% | 18.4% | 4.4% |
| 92% | 22.0% | 6.1% | 1.1% |

Based on 502 evaluable subjects in the original protocol, the power was 96.1%.

**CONFIDENTIAL**

**MRK-KRA00021151**
**MRK-CHA00021151**

**Appx19185**

**20**

# M-M-R®ΙΙ

## CRRC  - Oct. 08, 2002

### Agenda:

» Background

» Mumps End Expiry Clinical Trial : current status

» Statistical evaluation for study success

» Impact of mumps end expiry study outcome
  » Regulatory compliance
  » Filing in Japan

» Decision requested

» Options under evaluation for short-term fixes

**CONFIDENTIAL**

MRK-KRA00021152
MRK-CHA00021152

**Appx19186**

21

# Mumps End Expiry Study (#007): Regulatory Implications

- Recent calculations using the new stability monitoring model show that the current manufacturing target of 5.2 log $TCID_{50}$/dose and associated release potency of 5.0 log $TCID_{50}$/dose can support an end of expiry claim of 4.0 log $TCID_{50}$/dose (at 24 months dating), the intermediate dose used in the mumps end-expiry trial – **but not an end expiry of 4.3 log $TCID_{50}$/dose .**

CONFIDENTIAL

MRK-KRA00021153
MRK-CHA00021153

Appx19187

22

# Mumps End Expiry Study (#007): Regulatory Implications

Recent calculations using the new stability monitoring model estimate that the current manufacturing target of 5.2 log $TCID_{50}$/dose and associated release potency of 5.0 log $TCID_{50}$/dose can support an end of expiry claim of 4.3 log $TCID_{50}$/dose with a shelf life of <u>< 12 month, a potentially non-marketable shelf life</u>

CONFIDENTIAL

23

# Mumps End Expiry Study (#007): Regulatory Implications

- Label claims:

|  | mumps end expiry | shelf-life |
|---|---|---|
| » US: | 4.3 log $TCID_{50}$/dose | 24 month |
| » EU & ROW | 3.7/4.3 log $TCID_{50}$/dose * | 24/18 month* |

*local agency requirements

CONFIDENTIAL

24

# JNDA for M-M-R®₍₎:
# Background

- Program Objective:  Expand the M-M-R®₍₎ market into Japan to increase vaccine revenues (~$8MM annually by 2009)

- Entered into formal agreement with Kaketsuken in 1993

- Phase II and III clinical studies performed 1994-2001

- License will be held by Kaketsuken not Merck

CONFIDENTIAL

25

# JNDA
# M-M-R®II / Japan Dossier Status

|                                              | Target        |
|----------------------------------------------|---------------|
| JNDA has completed 1st round of review June 02 |         |
|                                              |               |
| Final review  (Aug – Sept 02)                | Oct 02        |
|                                              |               |
| Critical path:                               |               |
|    Resolution of mumps end expiry            |               |
|                                              |               |
| Filing of JNDA (End Sept 02)                 | Dec 02        |
|                                              |               |
| Review (15-24 month) - Approval              | 2Q02 - 4Q04   |

CONFIDENTIAL

**26**                    M-M-R⑱ǁ

## CRRC - Oct. 08, 2002

## Agenda:

   » Background

   » Mumps End Expiry Clinical Trial : current status

   » Statistical evaluation for study success

   » Impact of mumps end expiry study outcome
      » Regulatory compliance
      » Filing in Japan

   » **Options under evaluation for short-term fixes**

   » Decision requested

**CONFIDENTIAL**                                    **MRK-KRA00021158**
                                                      **MRK-CHA00021158**

**Appx19192**

**27**

# Options under evaluation for short-term fixes

The team is evaluating options to be considered as short term fixes:

- Maintaining 4.3 log TCID50/dose expiry potency specification

- Change label to reflect lower than 96% protection

- Repeat Mumps End Expiry Study

- Increase overfill level of mumps

The team will report to CRRC upon conclusion of evaluation and determination of feasible options

**CONFIDENTIAL**

**MRK-KRA00021159**
**MRK-CHA00021159**

**Appx19193**

28

# Options under evaluation for short-term fixes

## Maintaining 4.3 log TCID50/dose expiry potency specification:

» Using new stability monitoring model, current estimate for shelf-life is < 12 month

» Evaluation underway to define conditions to achieve a shelf-life of 18 months if possible (such as reduction of TOR or time post reconstitution, etc.)

» Label compliance and harmonization

» Impact on marketing*:
  – 18 month Scenario  - assuming a loss of 15% in market share in international markets (Europe and ROW) projects to a revenue impact of $212 million for the LROP period.
  – 12 month scenario - assuming a loss of 35% in market share in international markets (Europe and ROW) projects to a revenue impact of $496 million through the LROP time frame.

*based on calculations using baseline LROP 2003 to 2011

**CONFIDENTIAL**

**MRK-KRA00021160**
**MRK-CHA00021160**

29

# Options under evaluation for short-term fixes

## Change label to reflect lower than 96% protection

» If study is failed by a slight margin (~1%), this would require negotiating with CBER to relax the criteria of success

» However, if study is failed by a wider margin (2-3%), negotiating with CBER and succeeding to relax the criteria of success would potentially lower the bar for the competition

**CONFIDENTIAL**

**MRK-KRA00021161**
**MRK-CHA00021161**

**Appx19195**

30

# Options under evaluation for short-term fixes

## Repeat Mumps End Expiry Study

&raquo; Issues for repeating the study include:

- Technical feasibility

- Time to completion (at least 3 years – short term fixes are still required)

- No assurance that we would succeed the second time

- Completing the study and filing would potentially consume the same timeframe required to correct the stability problem by accelerating the new stabilizer program.

CONFIDENTIAL

MRK-KRA00021162
MRK-CHA00021162

**31**

# Options under evaluation for short-term fixes

⬜ <u>Increase overfill level of mumps</u>

&raquo; Issues include:

&ndash; manufacturing capacity limitations

&ndash; lack of adequate safety data to support overfill

&ndash; Upper release spec requirement which may result in an increase in rejection of M-M-R®$_{II}$ lots

**CONFIDENTIAL**

**MRK-KRA00021163**
**MRK-CHA00021163**

**Appx19197**

32

# M-M-R®ॐII

## CRRC  - Oct. 08, 2002

### Agenda:

» Background

» Mumps End Expiry Clinical Trial : current status

» Statistical evaluation for study success

» Impact of mumps end expiry study outcome
  » Regulatory compliance
  » Filing in Japan

» Options under evaluation for short-term fixes

» **Decision requested**

**CONFIDENTIAL**

MRK-KRA00021164
MRK-CHA00021164

**Appx19198**

33

# New Stabilizer for M-M-R®<sub>II</sub>:

Decision requested:

» Accelerate the new stabilizer program for M-M-R®<sub>II</sub> in order to improve the stability and the tolerability of the vaccine.

» If program is initiated in 1Q03:
  – timing of file without clinical trial / cross referencing ProQuad refrigerated would be 3-4Q05
  – timing of file with clinical trial would be 1-2Q06

CONFIDENTIAL

MRK-KRA00021165
MRK-CHA00021165

Appx19199

34

# New Stabilizer for M-M-R® $_{II}$:

- Program Objective:  To change from the use of the current stabilizer to a urea-containing stabilizer

- The new stabilizer will provide an opportunity to:
  - » Improve the product stability profile
  - » Comply with minimum potency requirements through product expiry
  - » Improve adherence to EU thermal stability test requirements
  - » Address perceived product tolerability issue

- Program was presented at Vaccine T-PAC Aug02 and awaiting decision at MRL Interface Meeting on program prioritization with other in-line products

CONFIDENTIAL

MRK-KRA00021166
MRK-CHA00021166

Appx19200

35

**Back-ups**

CONFIDENTIAL

MRK-KRA00021167
MRK-CHA00021167

11/26/2019
Declaration of G. Reilly
EXHIBIT 374

Restricted
R ❖ Confidential
limited access

# Pediatric Measles, Mumps, Rubella & Varicella-containing Vaccines Franchise: Integrated Vaccine T-PAC Review

## October 28, 2002

## Background Package

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



# Pediatric Measles, Mumps, Rubella & Varicella-containing Vaccines Franchise: Integrated T-PAC Review

## Table of Contents

|                                                                                    | Page(s)  |
|------------------------------------------------------------------------------------|----------|
| **I. Executive Summary**                                                           | **3- 12**|
|   A. Commercial Perspective                                              | 3 - 4    |
|   B. Recombinant Human Albumin Program                                   | 5 - 7    |
|   C. New Stabilizer for M-M-R® II                                        | 7 - 8    |
|   D. ProQuad®                                                            | 9 - 12   |
|   E. Other Activities To Maintain The Franchise                          | 12       |
|                                                                                    |          |
| **II. Market Overview**                                                            | **13-17**|
|   A. Market Descriptions                                                 | 13-14    |
|   B. Competitive Environment                                             | 14-17    |
|                                                                                    |          |
| **III. Regulatory**                                                                | **18**   |
|                                                                                    |          |
| **IV. Inventory Management**                                                       | **19**   |
|                                                                                    |          |
| **Appendices**                                                                     |          |
|   Appendix I:  2002 LROP Forecast, Market size and Marketing strategy    | **20**   |
|   Appendix II:  Regulatory Strategy                                      | **25**   |
|   Appendix III:  Inventory Management                                    | **31**   |

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA00233587
MRK-CHA00233587

Appx19204

## I.  Executive Summary

### A.  Commercial Perspective

Measles, mumps, rubella and varicella are four prominent childhood diseases with significant morbidity and mortality rates.  Merck currently markets M-M-R® $_{II}$ (measles-mumps-rubella vaccine) and VARIVAX® [varicella virus vaccine live (Oka/Merck)].  Utilization of M-M-R® $_{II}$ has lead to significant reductions in natural measles, mumps and rubella disease.  As an example, both the US and Finland have seen reported cases of all three diseases decline by >99% as compared with the maximum number of reported annual cases prior to the vaccine being introduced.  REDACTED – OMP

REDACTED – OMP

REDACTED – OMP                                                                                                    A

quadrivalent vaccine containing measles, mumps, rubella and varicella is desirable for healthy children and is currently being developed by Merck and Glaxo Smith Kline (GSK).  With the number of required/recommended pediatric vaccines continually increasing, there is heightened interest among the medical community to develop combination vaccines to reduce the number of injections and increase overall vaccine coverage rates.  The availability of a safe and effective combined measles, mumps, rubella and varicella vaccine that is refrigerator stable (ProQuad® $_{refrigerated}$) would facilitate universal immunization of children against these four diseases thus decreasing the likelihood of contracting these natural viral diseases.

There are two major objectives of the Merck Measles, Mumps, Rubella and Varicella-Containing Vaccines Franchise.  First, help fulfill the medical needs that still exist for prevention of measles, mumps, rubella and varicella diseases.  In the US, there is still a need to increase varicella immunization rates (76% for 19-35 month olds in 2001) and maintain the high level of immunization rates (>90% in 2001) against measles, mumps, and rubella.  In international markets, there is a need to expand the use of safer and more effective measles-, mumps- and rubella- containing vaccines as well as significantly increase adoption of varicella-containing vaccines.  Second, to defend and grow Merck's $600+ million in revenue from this vaccine franchise in the presence of significant competitive activity mainly from GSK.  Sixty percent (60%) of MVD's revenue currently comes from these vaccines.

Strategic priorities for the Measles, Mumps, Rubella and Varicella-Containing Vaccines Franchise have been identified.  These are:

1) Develop and launch ProQuad® $_{refrigerated}$.
2) Support M-M-R® $_{II}$ as the "gold standard" for measles-containing vaccines and the sole product available in the US by ensuring consistent ongoing supply and pro-active regulatory compliance.

REDACTED – OMP

♦  ProQuad® $_{refrigerated}$ provides an opportunity to gain increased compliance and new adoption of vaccination against mumps, rubella, and varicella for 12-23 month olds by leveraging the measles component, which is the cornerstone of this combination vaccine.   In addition,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00233588
MRK-CHA00233588

Appx19205

R ⊛ Confidential
limited access

storage of this vaccine in the refrigerator allows Merck to effectively compete with GSK's quadrivalent product that can also be stored in the refrigerator. The strategic rationale for the development of ProQuad® $_{frozen}$ in addition to the refrigerator stable formulation of ProQuad® was historically based on minimizing erosion of M-M-R®$_{II}$ in the US market due to the introduction of GSK's Priorix as well as the uncertainty of technical success with ProQuad® $_{refrigerated}$. Today, pursuing ProQuad® $_{frozen}$ allows Merck to get to market 9-12 months sooner with ProQuad® $_{refrigerated}$ and, in the interim, generate significant sales in the US while awaiting licensure of ProQuad® $_{refrigerated}$. ProQuad® is anticipated to achieve peak sales of $219 million worldwide and the project has an NPV of $158 million ($145 million risk adjusted assuming a 95% POS). GSK would capture all of the projected revenue for measles, mumps, rubella, and varicella-containing vaccines (a loss of $219million in peak sales from the overall $600 million measles, mumps, rubella, and varicella-containing vaccines market) if Merck is unsuccessful in developing ProQuad® and GSK is successful in developing a quadrivalent vaccine.

♦ M-M-R®$_{II}$ is expected to continue to be a significant revenue producer for Merck through the LROP with worldwide sales ranging from $274-$311 million. The second dose of measles, mumps and rubella is expected to be given as a trivalent vaccine because it is not expected that a second dose of varicella will be required/recommended for children under the age of 13. M-M-R®$_{II}$ will also continue to be used for the first dose in many international countries. To ensure ongoing supply and regulatory compliance for the product, the team is recommending that recombinant human albumin (rHA) and a new stabilizer be incorporated into the product.



REDACTED – OMP

Achievement of these three priorities will provide Merck with a portfolio of measles, mumps, rubella and varicella-containing vaccines that meet the needs of broad age ranges (12 months and older) and broad geographic requirements. Based on meeting these market needs, Merck will sustain approximately $600 million in annual sales through the LROP period, providing a solid foundation for revenue and income growth for Merck. Since vaccines have product life cycles that can last decades, there is no end in sight to the significant revenue stream generated from this Pediatric Measles, Mumps, Rubella and Varicella-Containing Vaccines Franchise.

A number of interim steps must be accomplished in order to achieve these noteworthy priorities. The franchise strategies and integration of programs in the Pediatric Measles, Mumps, Rubella and Varicella-Containing Vaccines Franchise are outlined below and will include the rationale and summary for the following programs: rHA replacement of HSA, New Stabilizer development for M-M-R®$_{II}$, and ProQuad® (frozen and refrigerated).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                MRK-KRA00233589
MRK-CHA00233589

Appx19206

## B. Recombinant Human Albumin (rHA) Program

### A. Program Rationale

Human serum albumin (HSA) is used in the manufacturing of measles, mumps and rubella bulk vaccines during the viral infection stage; HSA is not a component of the current stabilizer (GOS: gelatin, media O, and sorbitol). Thus, the final marketed product contains less than 0.3mg HSA/dose. Since HSA is derived from human serum, the presence of HSA in the M-M-R® II family of vaccines poses several risks to Merck's measles, mumps and rubella franchise that include:

- **Supply disruptions due to increase HSA product recall activity**
  "All major blood fractionators in the U.S. are either the recipients of warning letters, are operating under consent decree, or have experienced recent recalls of human albumin."[1]  In fact, two suppliers of HSA to Merck had HSA withdrawals in 1996, which affected two lots of HSA in Merck inventories that luckily we were able to return prior to use!  With an increase in the lookback period to ≥ 10 years, our risk for the use of HSA extends well beyond the normal use period of the vaccine.
- **Increasing concerns with the use of blood products due to BSE/TSE and other adventitious agents by regulatory authorities**
  "Both CBER and European regulatory agency officials have requested and recommended the removal of HSA derived from plasma in the manufacture of M-M-R® II."[1].  This is of particular concern where M-M-R® II is mandated by the government for vaccination of all children since the vaccine is a prophylactic product given to healthy infants.
- **Public concerns regarding safety of product containing HSA**

Given these program drivers, a program to replace HSA with rHA was chartered in January 1997. Due to chronic issues with HSA suppliers, the team presented to VPAC four times between January 1997 to February 1998 to ensure the program was on track and to facilitate resolution of evolving issues.  While awaiting completion of this program, MMD has been managing the HSA risks by purchasing and manufacturing vaccine using the fewest possible unique HSA lots. Additionally, MMD is constantly monitoring withdrawal activities of HSA suppliers and inspection status.

### B. Program Status and Integration

- **Regulatory strategy for licensure of M-M-R® II manufactured with rHA**:
  – Demonstration of bulk vaccine manufacture.
  – Analytical stability testing of final container vaccine.
  – Clinical Bioequivalence study comparing safety, tolerability and immunogenicity of M-M-R® II manufactured with rHA vs. current product.

---

[1] Background package for the Vaccine T-PAC presentation Update on Human Serum Albumin: "Global Strategy for Supply of HSA used in the Manufacture of M-M-R®II",  March, 1999.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA00233590
MRK-CHA00233590

Appx19207

♦ **Manufacturing Demonstration Completed:** Currently, the bulk and final container demonstration for measles, mumps, and rubella has been completed. The final container stability lots have been manufactured and stability studies (analytical and potency testing) have been initiated.

♦ **LPI Achieved for Bioequivalence Clinical Study:** FPI-December 2001, LPI-October 2002. An interim analysis with 90% of the serology data completed (Me, Mu, Ru ELISA) is targeted for January 2003. CSR complete T-July 2003.

♦ **Regulatory Filings on Target:** MMD (<u>not MRL</u>) is preparing the Chemistry, Manufacturing Controls (CMC) sections of the regulatory dossiers for the US (T-3Q2003, sBLA manufacturing supplement with clinical data) and EU (T-4Q2003, MAA, Centralized Procedure). This section will be based on the CMC section prepared for the ProQuad® frozen submission, thus the MMD resources required to support preparation of the document will be limited. MRL is responsible for providing a single CSR (and a Clinical Summary) to the submissions.

♦ **rHA Integration for ProQuad®refrigerated:** The plans are to incorporate rHA into the ProQuad®refrigerated product following licensure of ProQuad®refrigerated containing HSA. The strategy requires only an analytical bridge (a simple stability study focused on potency effects) for ProQuad®refrigerated with rHA. Additional clinical data will not be required, as the safety of an rHA containing product will already have been demonstrated in the MMRII/rHA clinical bioequivalence study. The file will cross-reference the M-M-R® II rHA file for issues related to rHA safety and impact of rHA on bulk manufacture (albumin not used in varicella manufacture.

### C. Impact of Not Completing the Program

To facilitate senior management discussions on program prioritization, the PDT for M-M-R® II has evaluated the impact of halting the rHA replacement program. Halting the program will adversely impact several areas immediately:

♦ **Manufacturing Issues**
  1. **Substantial Inventory Write-off** - $29.16MM in vaccine bulks and an additional $5.82MM in rHA bulks (with commitments to purchase additional lots of rHA up to $3.5MM in 2002). **Total = $34.98MM to $38.48MM.** Canceling the program would require that this inventory be written off.
  2. **Loss of rHA Supplier** - Negotiations with Delta/Aventis Behring on rHA procurement are on-going at this time. Any signal that we are looking to cancel or even delay this program would seriously jeopardize these discussions and can result in the company going out of business as we are their major client utilizing over 80% of their plant capacity.

♦ **Regulatory Issues**
  1. As stated earlier, "Both CBER and European regulatory agency officials have requested and recommended the removal of HSA derived from plasma in the manufacture of M-M-R® II."[1]. Halting the replacement of HSA with rHA could significantly impact our credibility with regulatory agencies as they are working very closely with Merck to facilitate completion of this program, particularly CBER.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA00233591
MRK-CHA00233591

Appx19208

2. Due to the supply and regulatory issues noted above with the currently available HSA suppliers (Note: Only two suppliers in the world can meet the requirements for HSA use in M-M-R® II and of these, one is questionable.), maintaining the use of HSA puts the entire product line at risk.

♦ **Revenue Impact -** Removal of HSA is expected to yield an additional $16MM during the LROP timeframe for the Merck Vaccine International (MVI) markets.  This is based on the assumption of modest market share increase and a heightened probability of tender success. "

## C. New Stabilizer for M-M-R® II (Program not yet chartered)

The ultimate goal of the new stabilizer for M-M-R®II is to improve the product stability profile and to comply better with minimum potency requirements throughout shelf-life (typical shelf-life of 24 months).  Additionally, utilizing a lower concentration of phosphate buffer (a characteristic of the proposed new stabilizer) is anticipated to improve local tolerability.  This can offset a major competitive difference and the platform positioning for GSK's Priorix vaccine worldwide.  The proposed New Stabilizer program will entail changing from the current M-M-R® II stabilizer (GOS - gelatin, Medium O, and sorbitol) to a urea-containing stabilizer (V300 or V404, ProQuad® refrigerated formulation).  Based on knowledge gained from previous formulation development efforts with V300 and V404, the technical feasibility has been established to support development of a new stabilizer.  In addition, discussions are ongoing internally to develop a plan for licensure of urea from Aventis Pasteur for use in M-M-R® II.

### A. Program Rationale

♦ **Label out of Compliance:** Recent evaluations of M-M-R® II show that the current end expiry potency claims for measles and mumps at 24 months will not be met with the current release potency targets.  By current calculation models, the end-expiry potency claims would justify a shelf life of less than 12 months, a potentially non-marketable product profile.  The recent Prior Approval Supplement (PAS) for the measles component provided a partial remedy to this compliance issue, but at the cost of using approximately 20% more measles bulk to make a lot of vaccine and creating a narrower potency window to target during manufacture.  We will be at our maximum manufacturable window will no room for additional process/assay variability.  A mumps end expiry study was conducted to support lowering the mumps end expiry potency to 4.0 log $TCID_{50}$ in the package circular to address this concern.  Recently, has been concern that the study has the potential to fail the pre-established immunogenicity criteria due to the decrease in evaluable sample size and the uncertainty in the mumps Plaque Reduction Neutralization (PRN) assay performance.  To address this issue the team is considering several short-term options to address mumps expiry potency in the package circular.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00233592
MRK-CHA00233592

Appx19209

| Short Term Option | Status |
|---|---|
| Maintaining 4.3 log $TCID_{50}$/dose expiry potency specification (achieve by reducing Time Out of Refrigeration (TOR), and reduce reconstitution time). | It is likely that shelf life greater than 18 months will not be met. Option is not ideal from the marketing perspective especially in Europe. In addition, reduction of TOR will negatively impact process efficiencies in manufacturing. |
| Increase overfill of mumps component of vaccine (to ~5.1 log $TCID_{50}$). | Currently evaluating WAES data to determine clinical safety at this higher dose. |
| Negotiating with the regulatory agency to accept the clinical data supporting 4.0 log $TCID_{50}$ and change package circular to reflect lower than 96% neutralizing antibody protection against mumps. | Background document provided to CBER September 20, 2002 to facilitate initiation of these discussions. |

♦ **Perceived Tolerability Issue:** Competitively, GSK exploits the perceived tolerability advantage of Priorix versus M-M-R® $_{II}$. This positioning has had an impact on market share and is expected to intensify. Since the proposed new stabilizer formulations should demonstrate improved tolerability; the new stabilizer should serve to neutralize the competitive advantage.

Based upon these concerns, from a regulatory compliance perspective, the PDT for M-M-R® $_{II}$ recommends moving forward with a new stabilizer for M-M-R® $_{II}$ as the long-term solution to ensure adequate stability assurance throughout the shelf–life of the product (24 months). Relative priority and timing for development of the new stabilizer for M-M-R® II depends on the outcome of discussions with CBER regarding measles and mumps potency issues.

*B. Regulatory strategy*

♦ Regulatory strategy: In order to maintain consistency and integrate with the ProQuad® program, plans are to try to utilize the same stabilizer for M-M-R®$_{II}$ as that used in ProQuad®$_{refrigerated,}$ (formulation V404). A backup stabilizer will also be evaluated, V300. If V404 is selected, no clinical study will be performed for M-M-R®$_{II}$ as data on the impact of this formulation will be available from the ProQuad®$_{refrigerated}$ clinical bridging study that is ongoing. The regulatory strategy to license M-M-R® $_{II}$ (V404) is to include: Analytical stability testing of final container vaccine and reference to the ProQuad® $_{refrigerated}$ dossier for issues related to safety and immunogenicity of the formulation.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA00233593
MRK-CHA00233593

Appx19210

11/26/2019
Declaration of G. Reilly
EXHIBIT 375

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



2 (Pages 2 - 5)

Appx19213

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



3 (Pages 6 - 9)

Appx19214



4 (Pages 10 - 13)

Appx19215

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



5 (Pages 14 - 17)

Appx19216

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions
www.veritext.com
212-279-9424                                                        212-490-3430

**Appx19217**



Veritext Legal Solutions
212-279-9424          www.veritext.com          212-490-3430

Appx19218

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



8 (Pages 26 - 29)

Appx19219

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions
212-279-9424                    www.veritext.com                    212-490-3430

Appx19221

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



12 (Pages 42 - 45)

Appx19223

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



13 (Pages 46 - 49)

Appx19224

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



14 (Pages 50 - 53)

Appx19225

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



15 (Pages 54 - 57)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



16 (Pages 58 - 61)

Appx19227

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



17 (Pages 62 - 65)

Appx19228

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Appx19229



**Appx19230**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



20 (Pages 74 - 77)

Appx19231

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



21 (Pages 78 - 81)

Appx19232

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions
www.veritext.com
212-279-9424                    212-490-3430



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



23 (Pages 86 - 89)

Appx19234

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions
www.veritext.com
212-279-9424                                                           212-490-3430

Appx19235

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



26 (Pages 98 - 101)

Appx19237

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



27 (Pages 102 - 105)



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Veritext Legal Solutions
212-279-9424          www.veritext.com          212-490-3430

Appx19239



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions
www.veritext.com
212-279-9424                                    212-490-3430

Appx19240

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



30 (Pages 114 - 117)

Appx19241

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



32 (Pages 122 - 125)

Appx19243

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



33 (Pages 126 - 129)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions
212-279-9424          www.veritext.com          212-490-3430

Appx19245

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



35 (Pages 134 - 137)



Veritext Legal Solutions
www.veritext.com
212-279-9424                                          212-490-3430

Appx19247

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



37 (Pages 142 - 145)

Appx19248

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



38 (Pages 146 - 149)

Appx19249

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions
212-279-9424          www.veritext.com          212-490-3430

Appx19250

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



40 (Pages 154 - 157)

Appx19251

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



41 (Pages 158 - 161)

Appx19252

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



42 (Pages 162 - 165)

Appx19253

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



43 (Pages 166 - 169)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



44 (Pages 170 - 173)

**Appx19255**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



45 (Pages 174 - 177)

Appx19256

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



46 (Pages 178 - 181)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



47 (Pages 182 - 185)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



48 (Pages 186 - 189)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions
212-279-9424                www.veritext.com                212-490-3430

Appx19260

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



50 (Pages 194 - 197)

Appx19261



51 (Pages 198 - 201)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



52 (Pages 202 - 205)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



53 (Pages 206 - 209)



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions
www.veritext.com

212-279-9424                                    212-490-3430

Appx19265

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Appx19266

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



56 (Pages 218 - 221)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



57 (Pages 222 - 225)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



58 (Pages 226 - 229)

Appx19269

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



59 (Pages 230 - 233)

Appx19270

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



60 (Pages 234 - 237)

Appx19271

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext Legal Solutions
212-279-9424                                    www.veritext.com                                    212-490-3430

**Appx19272**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



62 (Pages 242 - 245)

Veritext Legal Solutions
212-279-9424     www.veritext.com     212-490-3430

Appx19273



63 (Pages 246 - 249)

Appx19274

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



64 (Pages 250 - 253)

11/26/2019
Declaration of G. Reilly
EXHIBIT 376

Appx19276

TO:        PROJECT TEAM FOR M-M-R®II                           10/08/99

FROM:       Bonnie Stankunas

SUBJECT:    Minutes, October 6, 1999 Project Team Meeting

NEXT MEETING: November 4, 1999              9:30 A.M. to 11:30 A.M.      WP 46-1003

---

## I.   EXECUTIVE SUMMARY

- The CWE Cell Banking Contract will be approved by the BPC after additional items (plan to address CWE cell bank stability, definition of virus equivalency, and further development of a clinical/regulatory strategy )have been added.

- The September 22 presentation to Dr. Susan Hurley of Commonwealth Serum Laboratories (CSL) Business Development, Australia was well received. Based on this positive outcome MVD is planning technical presentations for both M-M-R®II and VVARIVAX® in Australia.

- Total sales for the month of September were $22 million. To date sales for the year are 121% of plan.

- SB presented the results of a Head to Head trial with M-M-R®II at ICAAC. The results showed similar seroconversion rates and no significant difference in pain experienced by subjects receiving either vaccine. Slightly lower geometric mean titers (GMTs) were observed for Priorix.

- Plaque Neutralization Assays using JL, JL2, and LO1 are being performed on the Head to Head sera. Results will be audited before an unblinded analysis is performed. The results will help determine the whether the 75% seroconversion rate observed with LO1 is an assay sensitivity issue or vaccine related.

- A Merck task force has been assembled to address the CJD label warning recommended by CBER. The team has prepared a draft response that is currently circulating for internal review and approval. Comments are due to CBER by 10/18/99. Revisions to the labeling will be submitted in draft to CBER no later than 2/00.

- Vendor selection for pre-filled diluent syringes is underway. A decision is expected within the next two weeks. The likely vendor does not have stability data to support the expiry dating required for Sterile Diluent, therefore, Merck will go forward with closure integrity validation of the syringes to support the three dating.

- The lot of M-M-R®II planned for use in the Japanese Phase III clinical trial will contain measles, mumps and rubella bulks manufactured with Grifols HSA lot 2. The lot is tentatively scheduled for filling the first week in November. Grifols HSA has been successfully demonstrated in measles and mumps. Three of the four lots (lots 1, 3 and 4) demonstrated with rubella have displayed lower than average potency. Preliminary laboratory data confirm that the demonstration virus propagation media causes poor cell retention in early harvests, which is likely responsible for the low potency results. Experiments continue in VTE to investigate both the HSA and the culture media components to determine the root cause of the poor cell retention.

**CONFIDENTIAL**

**MRK-KRA01899074**
**MRK-CHA01899074**

Appx19277

## II.    MEETING PROCEEDINGS

### A.    Team Issues

1.  WG Cell Bank – Outcome of September BPC Presentation                    Galinski

- The CWE Cell Banking Program was reviewed September 9, 1999.  At this time the BPC committee recommended the approval of the contract with the following requirements:

    - The team should develop a plan to address the stability of the CWE cell banks and criteria for determining viral equivalency.

    - The team should further develop the clinical/regulatory strategy including plans to communicate them to the regulatory agencies.

    - The team should provide an update to BPC in February 2000 including the clinical/regulatory strategy and to discuss the go/no go decision to proceed.

    - Product stability studies in the final container should be added to the contract.

- The issues associated with the CWE cell bank stability, definition of virus equivalency, and further development of a clinical/regulatory strategy will be addressed within the WG Chicken Subteam and presented as an Update to the BPC members at the February BPC Meeting.

2.  Outcome of Presentation to Dr. Susan Hurley (CSL)                    Shaw

- The September 22 presentation to Dr. Susan Hurley of Commonwealth Serum Laboratories (CSL) Business Development, Australia was well received.    Based on this positive outcome MVD is planning technical presentations for both M-M-R®II and VARIVAX® in Australia.  Tentative dates have been set.

3.  Outcome of VMC Interface Meeting                    Staub

- Clinical trials and funding were reviewed by the VMC prior to presentation to TPAC on October 12.

### B.    Competitive Issues

1.  U. S./International Sales/ Marketing Strategy                    Esposito

- Total sales for the month of September were $22 million.  To date sales for the year are 121% of plan.

2.  ICAAC Presentation on Priorix                    Esposito

- At the September 1999 ICAAC Meeting in San Francisco, SB presented a poster entitled, "Safety and Immunogenicity of a New, Live, Attenuated Combined Measles, Mumps and Rubella Vaccine in Healthy U.S. Children 12 to 18 Months of Age."  The poster referred to a clinical study performed by SB that compared the safety, immunogenicity and consistency of Priorix to that of M-M-R®II.  In the study 961 U.S. children, 12 to 18 months of age, received Priorix and 323 received M-M-R®II.  The results showed: similar seroconversion rates for both vaccines and slightly lower geometric mean titers (GMTs) for Priorix. Additionally, there was no significant difference in pain experienced by subjects receiving either vaccine: 14.5% for Priorix versus 16.2% for M-M-R®II.

3.  Vaccine New Letter                    Esposito

- MVD publishes a quarterly newsletter entitled, "Vaccinations."  The 4Q99 issue will feature the Competitive Defense Task Force and their initiatives in defense of M-M-R®II.

1

C.     Mumps Expiry Trial

    1.   Update on Enrollment                                         Thaler

- As of 10/6/99, 816 subjects have been enrolled into the study.

    2.   Expiry Lot Potency Determinations                          Schofield/Abraham

- Katalin Abraham, Biologics Licensing, will pursue resolution of house standard adjusted versus non-adjusted potency titers. House standard adjustment was used to assign the potency of mumps lots used for the expiry trial and also in the evaluation of stability data presented to CBER. CBER has not been receptive to the concept of house standard adjustment for release titers.

    3.   Preliminary Results – Plaque Reduction Neutralization Assay           Krah

- Testing has been completed on sera from 169 vaccinees from the competitive trial between M-M-R®II and Priorix. These sera samples were run in the plaque reduction assay against Jeryl Lynn, JL-2 and a LO-1 wild type virus.

    4.   Mumps Potency Submission                             Abraham/Chirgwin

- Implications for Stopping Mumps Expiry Trial

  - Approximately 70% neutralization titers have been achieved to date for the control group with the wild type mumps strains in the plaque reduction assays. With this seroconversion rate (SCR), in order to maintain the power with the equivalence margin that CBER has requested (5%), the number of subjects enrolled in the study would have to be increased to approximately 2300. This would add significant time and cost to the ongoing study. The current plan is to: 1) obtain the results from the Priorix trial; 2) make a decision as to whether the lower than expected seroconversion rate should be discussed with CBER at this juncture; 3) if a decision is made to proceed with a discussion with CBER, then the following proposal will be made: a) the appropriate test antigen to use is Jeryl Lynn (90% SCR) rather than a wild type (WT) (70% SCR); b) if CBER rejects this, then we will propose that this surrogate marker obviously does not fully capture the protective efficacy of the vaccine and the equivalence margin should be reduced because the SCR is lower than anticipated.

  - If a decision is made not to discuss the serologic results, then the trial should be stopped. If the trial is halted the titer would have to be maintained at 20,000 $TCID_{50}$/dose through expiry and manufacturing will have to continue to fill at the higher titer recently mandated by CBER. The availability of chick eggs may be a limiting factor.

- Implication for Label

  - If the expiry titer claim remains 20,000 $TCID_{50}$/dose no label change is needed. Depending on the outcome of the discussions described above, CBER may require that the seroconversion rate of 96% for mumps be changed to reflect this assay's results, although there are reasonable arguments that can be made that this is unnecessary.

    5.   QPA – Possible Alternative for MMRV Surrogate                   Long

- The feasibility of replacing the existing plaque reduction assay with a quantitative PCR assay (QPA) is under evaluation.

CONFIDENTIAL

MRK-KRA01899076
MRK-CHA01899076

Appx19279

Minutes, October 6, 1999 Project Team Meeting

6.  Timing for PRN Data Availability

- Last Data to QA                                                                                          Krah

  All test data are planned for submission to Worldwide GMP Quality Assurance for auditing by
  10/12/99 and the assay validation data for LO-1 by 10/15/99.  The validation data for JL-2 and Jeryl
  Lynn have been audited and have been summarized in a statistical evaluation package drafted by
  Biometrics Research.  The LO-1 statistical evaluation will be prepared separately and appended to the
  statistical evaluation package containing the data for Jeryl Lynn and JL-2.

- Data to CBARDS                                                                                 Wadsworth

  All audited test data along with the audited statistical evaluation package are planned to be submitted
  to CBARDS by the end of October.

- Unblinded Analysis                                                                                   Olsen

  The unblinded analysis of the data is planned to be completed by early November.  This is contingent
  upon receiving audited data by the end of October.

D.    Regulatory/Filing Issues

1.  PDUFA Update                                                                                   Chirgwin

- In 1992 Congress passed The Prescription Drug User Fee Act I (PDUFA I).  This law mandated
  that manufacturers would pay certain fees when submitting Product License Applications or
  amendments.  The funds were to be used by CBER for additional resources to implement various
  project management initiatives with the goal of significantly reducing review time for
  submissions.  It expired 9/30/97.

- The FDA Modernization Act of 1997 amended PDUFA (PDUFA II) extending PDUFA through
  9/30/02 (Attachment 1).  CBER has incorporated quantitative performance targets into its
  managed review process which include:
  - Merging of the Product License Application (PLA) and  Establishment License Application
    (ELA) into a Biologics License Application (BLA)
  - Defined review cycles with more clearly defined goals than PDUFA I
  - More efficient meeting management with more selective scheduling as per a new CBER
    guideline, requirements for meeting backgrounders and minutes prepared by CBER
  - Move toward electronic submissions

2.  CJD Warning in Label – Response to CBER                                             Abraham/Marron

- The Merck task force has been assembled to address this issue.  The team has prepared a draft response
  that is currently circulating for internal review and approval.  Comments are due to CBER by 10/18/99.
  Revisions to the labeling will be submitted in draft to CBER no later than 2/00.

3.  Update on Pre-Filled Diluent Syringes                                               Abraham/Esposito

- Addition of diluent in syringe domestically is planned as a CBE-30 filing to the PLAs for the vaccines
  that will be using the syringes.  Vendor selection of the pre-filled diluent syringes is underway.  A
  decision is expected within the next two weeks.   The likely vendor does not have stability data to
  support the expiry dating required for Sterile Diluent, therefore, Merck will go forward with closure
  integrity validation of the syringes to support the three dating.

4.  Update on Grifols Investigation

- Timing for Release of Japanese Licensure Lot                                          Dezura/Carson

  - Grifols HSA has been demonstrated in measles and mumps with satisfactory potency results.

3

CONFIDENTIAL                                                                       MRK-KRA01899077
                                                                                   MRK-CHA01899077

Appx19280

- **REDACTED – OMP**

- Preliminary laboratory data confirm that the demonstration virus propagation media causes poor cell retention in early harvests, which is likely responsible for the low potency results. Media was prepared by VTE using raw materials from Department 207 (culture media manufacturing). The sharp decline in the confluency of the cell sheets was not apparent in cultures fed with the lab-made media.

- Experiments continue in VTE to investigate both the HSA and the culture media components to determine the root cause of the poor cell retention.

- A lot of M-M-R®II containing rubella Lot 2, the lot with typical potency results, has been filled and will be placed on accelerated stability in support of the Grifols demonstration.

- The lot of M-M-R®II scheduled for use in the Japanese Phase III clinical trial is planned to contain rubella Lot 2 combined with measles and mumps bulks manufactured with the same lot of Grifols HSA. It will be formulated with optimized GOS HSA-free diluent. The lot is tentatively scheduled for filling the first week in November.

E.    rHA/Serum Free Media Development

    1.    Status of Centeon Consistency Lots                    Shaw

- Centeon has completed manufacture of the rHA lots required for the safety trial.

    2.    Manufacture of Clinical Material without Virus          Shaw

- Work is in-progress.

    3.    Centeon Safety Trial                      Thaler

- Centeon is on target to begin their Swedish safety trial in early November.

F.    WG Chicken SubTeam

    1.    Initiation of WG Demonstration Lots                  Galinski

- Three Mumps Harvest lots including a culture medium refeed of MMD (eggs) CWE cells are in progress in manufacturing. During the manufacturing of these lots, two Unipro tanks will be processed using the current manufacturing protocol (no refeed) and one tank will be refed at 48 hr post-infection (Day 5 in the process). Productivity will be assessed to demonstrate that the refeed step has no deleterious effects on virus productivity in MMD CWE cells.

- Following completion of the three MMD refeed lots (and two additional inventory lots), the WG Egg Qualification Demonstration will be initiated (early November).

4

MRK-KRA01899078
MRK-CHA01899078

Appx19281

Minutes, October 6, 1999 Project Team Meeting

### III. ATTACHMENTS

Attachment 1.  PDUFA Update
Attachment 2.  Grifols HSA Investigation

5

MRK-KRA01899079
MRK-CHA01899079

Appx19282

Attachment 1

# Prescription Drug User Fee Act (PDUFA)

- **PDUFA - 1992**
  - User fees implemented
  - Provided FDA more resources to review applications
  - FDA had to adhere to timelines
  - Expired Sept. 30, 1997
  —

- **FDA Modernization Act of 1997 amended PDUFA (PDUFA II)**
  - Extended through Sept. 30, 2002.
  - Tighter timelines for the FDA
  - Greater expectations from industry

6

CONFIDENTIAL

MRK-KRA01899080
MRK-CHA01899080

**Appx19283**

# Impact on Project Team Activities

- BLA instead of both a PLA & ELA

- FDA has defined review cycles

- Meeting Management
  - Meetings scheduled as per guideline
  - Backgrounders required for all meetings
  - CBER minutes provided for all meetings

- FDA moving towards electronic submissions

7

MRK-KRA01899081
MRK-CHA01899081

Appx19284

# Comparison of Goals at the End of PDUFA I and PDUFA II

| Goal | PDUFA I | PDUFA II |
|---|---|---|
| Complete review of priority original new drug applications and efficacy supplements | 90% in 6 months | 90% in 6 months |
| Complete review of standard original new drug applications and efficacy supplements | 90% in 12 months | 90% in 10 months |
| Complete review of manufacturing supplements | 90% in 6 months | 90% in 4 months if prior approval needed |
| Complete review of resubmitted new drug applications | 90% in 6 months | 90% of class 1 in 2 months and 90% of class 2 in 6 months |
| Respond to industry requests for meetings | No Goal | 90% within 14 days |
| Meet with industry within set times | No Goal | 90% within 30, 60, or 75 days, depending on type of meeting |
| Provide industry with meeting minutes | No Goal | 90% within 30 days |
| Communicate results of review of complete industry responses to FDA clinical holds | No Goal | 90% within 30 days |
| Resolve major disputes appealed by industry | No Goal | 90% within 30 days |
| Complete review of special protocols | No Goal | 90% within 45 days |
| Electronic application receipt and review | No Goal | In place by 2002 |

8

CONFIDENTIAL

MRK-KRA01899082
MRK-CHA01899082

Appx19285

# Application Fees for 1999

- $256,338 for new applications with clinical data

- $128,169 for new applications without clinical data

- $128,169 for supplements requiring clinical data

- No charge for supplements that do not require clinical data

- Refund of 75% if a Refusal to File is issued

- No refund if a submission is rejected

- Fees are recalculated annually

9

CONFIDENTIAL

Minutes, October 6, 1999 Project Team Meeting

Attachment 2

## RUBELLA POTENCY RESULTS



CONFIDENTIAL

MRK-KRA01899084
MRK-CHA01899084

Appx19287

Minutes, October 6, 1999 Project Team Meeting

Attachment 2 (cont.)

# UPCOMING LAB STUDIES

Investigate the Following Areas:

- **Grifols 20% HSA**
    - Increased Stabilizer Concentration in Media
    - Aging of Media ⟶ Oxidation of Fatty Acids?
    - Presence of Excipients (e.g. Metals)
- **Culture Media**
    - MEM Raw Material Lot
    - Water Source

11

**MRK-KRA01899085**
**MRK-CHA01899085**

**Appx19288**

## Morsy, Manal A.

| | |
|---|---|
| **From:** | Staub, Joan M. |
| **Sent:** | Monday, October 18, 1999 2:05 PM |
| **To:** | Abraham, Katalin; Adamson, Marilyn; Arena, Deitra; Baronowski, Loretta; Beck, Gerald; Bennett, Philip; Bergey, Paige; Bhattacharyya, Lokesh; Bramble, Joye; Breyer, Cyndi; Burke, Carl; Carfagno, Patricia; Carson, Peggy; Chiacchierini, Lisa; Chirgwin, Keith; Cumpstone, John; Deimeyer, Frances; Dezura, Kimberly; Doshi, Kundan; Fahnestock, Peggy; Freas, Cynthia; Frye, Bernadette; Galinski, Mark; Graham, Leighann; Grossman, Karol Su; Hartman, Jeffrey; Hastings, Jeff; Hunsberger, Kay; Keller, Paul; Kimble, Walter; Kniskern, Peter; Koser, Paul; Krah, David; Kuykens, Luc; Lee, Gwo-Hwa; Lewis, John; Lineberger, Don; Long, Jerry; Manno, Patricia; Mathews, C. Thomas; Minervini, Gianmaria; Morsy, Manal; Obara, Tim; Olsen, Stephanie P.; PRTM, MVD; Rand, Alice; Rauch, Edwin; Rich, Beverly; Rogalski-Salter, Taryn; Sadoff, Jerald; Schofield, Timothy; Shaw, Alan; Sheu, Su-Pi; Sitrin, Robert; Slotter, Rosemary; Spring, Nick; Stankunas, Bonita; Staub, Joan; Stockett, Kara; Thaler, Scott; Thompson, Barbara; Tocco, Tina; Varilla, Mark; Volkin, David; Wang, Ping; Wilson, Kenneth; Xin, Sue; Yin, Fang |
| **Cc:** | Blois, David; Coplan, Paul; Dingerdissen, John; Fanelli, Barbara; Gardner, Colin; Garfinkle, Barry; Guess, Harry; Heyse, Joseph; Laser, James; Lukacs, Linda; Mahmoud, Adel; Mathews, Robert; Matthews, Holly; McKee, Roberta; Nies, Alan; Samant, Vijay; Scolnick, Edward; Shapiro, Bennett; Sildve, Mark; Slater, Eve; Stauffer, Susan; Ukwu, Henrietta; Wenick, Barry; Williams, George (U.S.); Wonnacott, David; Zaber, Beverly |
| **Subject:** | M-M-R®II PROJECT TEAM MINUTES |
| **Importance:** | High |


EXEC10_99.DOC


10-99PTMIN-1.doc

Attached are the Executive Summary and Detailed Proceedings from the October 6 M-M-R®II Project Team Meeting.


*Joan M. Staub*
*Senior Project Manager*
*M-M-R®II & Varicella-Containing Vaccines*
*Project Planning & Management*
*Un-214*
*610-397-2365*

CONFIDENTIAL

MRK-KRA01899086
MRK-CHA01899086

Appx19289

11/26/2019
Declaration of G. Reilly
EXHIBIT 377




**MERCK**
Research Laboratories

# DRAFT

TO:          **DISTRIBUTION**                                  **10/11/02**

FROM:     **M. McNamara / M. Buckley**

SUBJECT:  **CLINICAL and REGULATORY REVIEW COMMITTEE MEETING
              SUMMARY - October 8, 2002**

Attached is a draft summary of the 10/08/02 CRRC meeting.  Please note that though distributed
electronically, this is a *RESTRICTED DOCUMENT and the property of Merck & Co., Inc.
Distribute and disclose on a need to know basis only.  Please shred before recycling.*

**NEUROSCIENCE - MK-869**



**CONFIDENTIAL**



**VACCINE - MMRII**

MMRII Protocol #007, Mumps End Expiry Study: Assay impact on study criteria and path forward.
*Drs. Morsy, Manal, and Jon Hartzel*

**Discussion**

- The team provided an update on the status of this clinical trial and estimated risk of failing. The study was completed in September 2000. A CBER inspection in 2001 resulted in a request for re-analysis of samples (in 2002).
- Objective of the study was a comparison of the immunogenicity of MMRII at potencies (3.7 & 4.0 log $TCID_{50}$) below claimed end expiry (4.3 log $TCID_{50}$) to MMRII with a standard release potency (4.9 log $TCID_{50}$).
- Interim analysis results (prior to CBER inspection) indicate serum conversion rates (SCR) for the three groups (MMRII mumps potency 4.9 log $TCID_{50}$, MMRII mumps potency 4.0 log $TCID_{50}$, and MMRII mumps potency 3.7 log $TCID_{50}$) ranged from 94.6 to 88.0%. The conclusion from the interim analysis is that all three groups were lower than the expected 95% SCR.
- The team discussed the following options: 1) manufacture with an overfill; 2) implement a new stabilizer program; 3) put $\leq$ 96% SCR in label; 4) repeat mumps end expiry study, which is estimated to take 3 years. CRRC recommended that these options be evaluated at VPAC.
- The team estimated there was a 50% chance that we will not achieve the endpoint in this study. The team plans to obtain feedback from CBER on the preliminary study data.
- The Japan approval of MMRII is on hold until the end expiry issue is resolved. The file can be delayed until the short-term fixes are complete, or the file can be submitted with a minimum mumps potency and attempt to change it later, but it will be very difficult to do. CRRC recommended that these options be evaluated at VPAC.

**Decision**

CRRC agreed with the Team's estimation of a 50% chance of not achieving the endpoint in this study. If endpoint is missed, it becomes a business issue on how to resolve, i.e., manufacture with an overfill; or implement a new stabilizer; and/or development of a response to MMRII being at a competitive disadvantage in the marketplace (i.e. if $\leq$ 96% SCR is put in label). CRRC advised that these options

MRK-KRA01728736
MRK-CHA01728736

**Appx19292**



should be evaluated at VPAC after feedback from CBER is received. Likewise, the decision to support acceleration of a new stabilizer program for MMRII should be discussed at VPAC.

**Assignment**
- Team - After feedback from CBER is received, review the options and the plan for a new stabilizer program at VPAC.

**DIABETES - MK-767**



*Critical Activities – Atherosclerosis*

CONFIDENTIAL

MRK-KRA01728737
MRK-CHA01728737

Appx19293



**REDACTED – OMP**

*Critical Activities – Respiratory/Allergy*

**REDACTED – OMP**

*Critical Activities – Arthritis/Immunology*

There was no update.

*Critical Activities – Osteoporosis*

**REDACTED – OMP**

*Critical Activities – Endocrine/Other*

**REDACTED – OMP**

*WPS&E Safety Update*

There was no update.

MRK-KRA01728738
MRK-CHA01728738

Appx19294

11/26/2019
Declaration of G. Reilly
EXHIBIT 378

# Pediatric Live Virus Vaccine
# Franchise Review

October 28, 2002

DRAFT--24Oct02

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207636
MRK-CHA00207636

Appx19296

# Pediatric Live Virus Vaccine Review

**Decision Requested**

**Concurrence with the strategies and recommendations made by the PDTs for M-M-R®II and ProQuad®.**

2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Placeholder for MVD slides**

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA00207638
MRK-CHA00207638

**Appx19298**

## Pediatric Live Virus Vaccine Review

Agenda

Integrated review of pediatric measles,
mumps, rubella, varicella-containing vaccines

Commercial perspective - M. Lombardo

Product rollout/ dependencies - K. Chirgwin

Key programs/ issues - K. Chirgwin

rHA Program

New Stabilizer for M-M-R® II

ProQuad®

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207639
MRK-CHA00207639

Appx19299



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207640
MRK-CHA00207640

**Appx19300**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207641
MRK-CHA00207641

**Appx19301**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207642
MRK-CHA00207642

**Appx19302**



Pediatric Live Virus Vaccines
Scenario - no rHA replacement
M-M-R® II HSA
Clinical Study (STI)
ProQuad® frozen HSA
Clinical Study (STI)
Clinical Study (STI)
M-M-R® II rHA
ProQuad® refrigerated HSA (V404)
No clinical study
Cross Reference New Stabilizer Safety & Immunogenicity data
M-M-R® II rHA - New Stabilizer (V404)*
ProQuad® refrigerated rHA (V404)
NOTE: Analytical testing (Complete Stability test) including Potency assay is conducted for all new products
STI = Safety, Tolerability, Immunogenicity
* New Stabilizer for M-M-R®II not officially chartered

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207644
MRK-CHA00207644

**Appx19304**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207645
MRK-CHA00207645

**Appx19305**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207646
MRK-CHA00207646

Appx19306



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207647
MRK-CHA00207647

**Appx19307**

## Pediatric Live Virus Vaccine Review

Agenda

   Integrated review of pediatric measles,
   mumps, rubella, varicella-containing vaccines

Commercial perspective - M. Lombardo

Product rollout/ dependencies- K. Chirgwin

Key programs/ issues - K. Chirgwin

rHA Program

New Stabilizer for M-M-R® II

ProQuad®

13

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207648
MRK-CHA00207648

Appx19308

## rHA Program

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207649
MRK-CHA00207649

Appx19309

# rHA Program: M-M-R®II

Drivers:

- Supply disruptions due to increased HSA withdrawal activity
    - In 1996 two HSA suppliers had withdrawals that affected two lots in Merck inventories, luckily they were returned prior to use.
    - MMD currently managing risks
        - use fewest possible unique lots
        - constantly monitor withdrawal activities and facility inspection status

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207650
MRK-CHA00207650

Appx19310

# rHA Program: M-M-R®II

Drivers:

Increasing concerns from regulatory authorities regarding use of blood products due to adventitious agents

"All major blood fractionators in the U.S. are either the recipients of warning letters, are operating under consent decree, or have experienced recent recalls of human albumin."*

"Both CBER and European regulatory agency officials have requested and recommended the

*Background package for the Vaccine T/P VP presentation Update on Human Serum Albumin...1999.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207651
MRK-CHA00207651

# rHA Program: M-M-R®II

Program Objective:

Use rHA as a replacement for HSA in virus growth
medium for manufacture of bulk measles, mumps, and
rubella

17

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207653
MRK-CHA00207653

**Appx19313**

## rHA Program: M-M-R®II

Status:

Demonstration of bulk manufacture for measles, mumps and rubella completed.

Final container stability studies (analytical and potency testing) ongoing.

Clinical bioequivalence study comparing safety, tolerability and immunogenicity of M-M-R®II manufactured with rHA vs. current product

LPI complete.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

# rHA Program: M-M-R®II

Regulatory submission components:

- CMC section (MMD coordinate preparation)
  - Demonstration of bulk vaccine manufacture using rHA.
  - Analytical stability testing of final container.
- Clinical Bioequivalence CSR

Submission timing:

- Aug 2003 US
- Oct 2003  EU

20

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207655
MRK-CHA00207655

Appx19315

Manal Morsy:
modified

# rHA Program: M-M-R®II

### Advantages of maintaining current program:

- Inventory:  Substantial Investment already made
    - Vaccine rHA containing bulks ($29MM)
    - rHA inventory ($5 - 9MM)
- Will prevent loss of rHA procurement (Delta/Aventis Behring)
- Will maintain credibility with Regulatory agencies
- Eliminate risk of supply interruptions due to HSA withdrawal activity
- Revenue gained:  $16MM in International Markets (MVI)
    - Increased success with tenders and market expansion

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207656
MRK-CHA00207656

Appx19316



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207657
MRK-CHA00207657

**Appx19317**

# New Stabilizer for M-M-R®II

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207658
MRK-CHA00207658

# M-M-R®II:  New Stabilizer

Program Rationale:
- Improve stability profile
- Comply with minimum potency requirements through product expiry
- Address perceived product tolerability issue

24

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207659
MRK-CHA00207659

**Appx19319**

REDACTED – OMP

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207660
MRK-CHA00207660

# M-M-R®II:  New Stabilizer

Label Compliance:  End Expiry Potency Claims

Mumps

- Clinical Solution:
  - Clinical study to support lowering expiry potency
- Issues
  - Agency expectations to lower release specification
  - Clinical study:  Potential for failure due to decrease in number of evaluable subjects

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207661
MRK-CHA00207661

Appx19321

Manal Morsy:
modified

# M-M-R®II:  New Stabilizer

**Short term options under consideration if the clinical study is not successful:**

**Manufacturing options**

**Maintain 4.3 log TCID50/dose expiry potency**

**Reduction in shelf-life**

**Lower Time Out of Refrigeration (TOR):  40h --> 15h**

**Reduce vaccine reconstitution time:  8h --> 2h**

**Increase overfill of mumps component of vaccine:  to 5.1 log TCID50/dose)**

**Options are under evaluations, some may not be technically feasible.**

27

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207662
MRK-CHA00207662

Appx19322

| Manal Morsy: | |
|---|---|
| delete | |

# M-M-R®II:  New Stabilizer

Short term options under consideration if the clinical study is not successful (cont.):

Regulatory options
- Change label to reflect reduced % neutralizing antibody protection against mumps (current label = 96%)

28

MRK-KRA00207663
MRK-CHA00207663

Appx19323

Manal Morsy:
modified

## M-M-R®II:  New Stabilizer

- The current options (reduced shelf-life, TOR, etc.) to address mumps expiry will impact package circular and could put the product at a competitive disadvantage.

- Measles, and mumps will continue to be constrained between release and end expiry with no room for additional process, assay, and stability profile variability.

Previously implemented options were "transparent" to the end user.

29

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207664
MRK-CHA00207664

Appx19324

# M-M-R®II: New Stabilizer

Stabilizer Formulations

- Current: GOS (gelatin, medium O, sorbitol)
- Proposed New Stabilizers
  - V404 (PGS based and same formulation as ProQuad®$_{refrigerated}$)
  - V300 Backup formulation (GWS33/urea = gelatin, water, sorbitol, and additional 3% sucrose and 3% sorbitol)

Formulation technical feasibility confirmed

- Available 2-8°C stability data (pilot and full scale)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207665
MRK-CHA00207665

Appx19325



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207666
MRK-CHA00207666

**Appx19326**

Manal Morsy:
modified

# M-M-R®II:  New Stabilizer

Data driven key decision points:

- Assessment of mumps end expiry study results:  1Q03
- REDACTED – OMP
- Stability profile (12mos data) of ProQuad ® refrigerated formulation:  Apr03

**Priority and timing for development of the new stabilizer contingent on key decision points.**

**Earliest opportunity to charter activities is 1-2Q03**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207667
MRK-CHA00207667

Appx19327

**ProQuad®**

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA00207668
MRK-CHA00207668

**Appx19328**

Manal Morsy:
modified

# Pediatric Live Virus Vaccines:
# Decisions Requested

Concurrence with the strategies and recommendations made by the PDTs for M-M-R®II and ProQuad®:

rHA Program:  Proceed with filings to support M-M-R®II

New Stabilizer M-M-R®II:  Reassess timing/priority for program in 1-2Q03.

ProQuad®:  When technical feasibility of refrigerated product is confirmed, reassess program timelines and filing strategy.

34

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207669
MRK-CHA00207669

Appx19329

**Back-ups**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207670
MRK-CHA00207670

**Appx19330**

## Pediatric LVV Family:  Key Programs

- ProQuad ®
- Frozen Formulation
- Refrigerator-Stable Formulation
- ProQuad® refrigerated with rHA
- M-M-R® II
- Replacement of HSA with rHA
- New Stabilizer
- REDACTED – OMP
- Maintenance Initiatives
- REDACTED – OMP

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207671
MRK-CHA00207671

Appx19331

## Mumps End Expiry:
## Clinical Study (#007)

- Objective:
- Comparison of the immunogenicity of M-M-R®II at potencies (3.7 & 4.0 log TCID50) below claimed end expiry (4.3 log TCID50 ) to M-M-R®II with a standard release potency (4.9 log TCID50 )

- Vaccination Group/ Number of Subjects
- M-M-R®II (mumps potency 4.9 log TCID50) - 590
- M-M-R®II (mumps potency 4.0 log TCID50) - 590
- M-M-R®II (mumps potency 3.7 log TCID50) - 590
- Blood samples at Day 1 and 42 (~ 1yr persistence)
- Enrollment complete. FPI: Feb99; LPO (day 42): Sept00

37

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207672
MRK-CHA00207672

Appx19332

## Mumps End Expiry Study (#007):  Issues

- AIGENT Assay (PRN)
  - New functional antibody assay developed at the request of CBER

  - – CBER Inspection of serology laboratory resulted in concerns over GMP issues (i.e. data handling, spreadsheet validation, etc.) in August 2001

  - – Invalid samples identified for retesting – sample storage exceeds 1 year time limit specified by SOP; issue communicated to CBER

  - – CBER requested that a retest analysis be performed on subset of samples in April 2002 (to compare original and retest results)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207673
MRK-CHA00207673

Appx19333

## Criteria for Acceptable Mumps End Expiry Dose

- Primary endpoint based on a mumps neutralization assay
- End expiry dose must be similar (non-inferior) to the release dose
    - 5 percentage point non-inferiority margin
    - One-sided alpha of 0.05
- End expiry dose must have an acceptable antibody response
    - Lower bound of the 95% two-sided confidence interval >90%.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

MRK-KRA00207674
MRK-CHA00207674

**Appx19334**

# Interim Analysis Conclusions

- The responses for all three groups were lower than the expected 95%.

- The 3.7 End Expiry potency had a very low chance of meeting the success criteria for the study.

- Given these results, the probability of meeting the acceptability criterion for the 4.0 End Expiry potency was estimated to be approximately 70%.

40

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207675
MRK-CHA00207675

## Decreased Power for Primary Hypotheses

- Loss of ~300 paired samples due to testing outside of assay SOP 1-year window.

- Higher pre-positive rate (14%) than originally anticipated (5%).

- Anticipate only 430 subjects per group, instead of 502 per group.

- Potentially lower response rate in the Release group (94.6%) than originally anticipated (95%).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207676
MRK-CHA00207676

Appx19336

# Required SCR for Success

- Assuming 430 subjects per group and a 95% SCR in the Release group, the observed SCR in the 4.0 Expiry group must be:

  – Acceptability: ≥93.3%
  – Similarity (non-inferiority): ≥ 93.0%

- Note: Observed 93.1% SCR in the interim analysis for the 4.0 Expiry group.

42

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207677
MRK-CHA00207677

Appx19337

# M-M-R®II:  New Stabilizer

## Program timeline

- Formulation and Lyophilization Development    1Q03-4Q03
- Formulation Go Decision    4Q03
- Manufacture Engineering and Validation Lots    4Q03-1Q04
- Clinical Trial (if required)    2Q04-2Q05
- 12 months of final product stability data    1Q05
- File License in US and EU    2Q05, 3Q05
- *(assuming ProQuad 4C [V404] file under agency review)*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207678
MRK-CHA00207678

Appx19338

# M-M-R®II:  New Stabilizer

Resources

- Over the next 18 months
  - No clinical study:  Incremental FTEs required of 4.2 in PRD in 2003 to support development and scale-up.
  - If clinical study required:  Incremental FTEs required of 7.2 in PRD in 2003 to support development, scale-up, and preparation of clinical supplies.

- Reassessment of resources required at formulation selection decision (V404 vs. V300) in 4Q03.
- BWO costs:

44

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207679
MRK-CHA00207679

Appx19339

**REDACTED – OMP**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207680
MRK-CHA00207680

REDACTED – OMP

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

MRK-KRA00207681
MRK-CHA00207681

REDACTED – OMP

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

REDACTED – OMP

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

11/26/2019
Declaration of G. Reilly
EXHIBIT 379

| | M-M-R®ₐ |
|---|---|
| **Product** | • Measles, Mumps, and Rubella Virus Vaccine Live Lyophilized powder preparation |
| **Indications & Strains** | • Indicated for simultaneous vaccination against measles, mumps, and rubella in individuals 12 months of age or older.<br>  – Measles virus, strain – Enders' attenuated Edmonston<br>  – Mumps virus, strain – Jeryl Lynn<br>  – Rubella virus, strain – Wistar RA 27/3 |
| **Efficacy Profile** | • Single dose seroconversion rates:<br>  – Measles 95%<br>  – Mumps 96%<br>  – Rubella 99% |
| **Safety & Tolerability** | • Safety and tolerability similar to all other pediatric vaccines |
| **Product Presentation & Dosing** | • Single-dose vial of lyophilized vaccine with single-dose vial of diluent, 0.5-mL dose for subcutaneous injection only<br>• The first dose is usually administered at 12 to 15 months of age, a second dose, if needed, is usually administered at 4 to 6 years of age |
| **Storage & Shelf Life** | • The lyophilized vaccine should be stored in a refrigerator at 4°C.<br>• Shelf Life: 24 months |
| **Warnings & Precautions** | • Warning and precaution similar to all other standard pediatric vaccines |
| **ACIP Recommendations** | • Routine 1ˢᵗ dose at 12-15 months of age<br>• Routine 2ⁿᵈ dose at 4-6 years of age<br>• Catch-up: For persons aged 7 -18 years of age without evidence of immunity |

1

CONFIDENTIAL

MRK-CHA00955777

**Appx19345**

| | PRODUCT X |
|---|---|
| Product | • Measles, Mumps, and Rubella Virus Vaccine Live Lyophilized powder preparation |
| Indications & Strains | • Indicated for simultaneous vaccination against measles, mumps, and rubella in individuals 12 months of age or older.<br>  – Measles virus, strain – attenuated Schwarz<br>  – Mumps virus, strain – RIT 4385 (derivative of Jeryl Lynn)<br>  – Rubella virus, strain – Wistar RA 27/3 |
| Efficacy Profile | • Single dose seroconversion rates:<br>  – Measles 98.6%<br>  – Mumps 90.3%<br>  – Rubella 98.3% |
| Safety & Tolerability | • Safety and tolerability similar to all other pediatric vaccines |
| Product Presentation & Dosing | • A single dose is recommended routinely for children on, or as soon as practicable after, their first birthday. Older children who have no documented evidence of having received the vaccine should also be vaccinated.<br>• A second dose of MMR is recommended at least 1 month after the first dose, for the purpose of better measles protection. For convenience, options include giving it with the next scheduled vaccination at 18 months of age or with school entry (4-6 years) vaccinations (depending on the provincial/territorial policy), or at any intervening age that is practicable. |
| Storage & Shelf Life | • The lyophilized vaccine should be stored in a refrigerator at 4°C.<br>• Shelf Life: 24 months |
| Warnings & Precautions | • Warning and precaution similar to all other standard pediatric vaccines |
| ACIP Recommendations | • Routine 1st dose at 12-15 months of age<br>• Routine 2nd dose at 4-6 years of age<br>• Catch-up:  For persons aged 7 -18 years of age without evidence of immunity |

CONFIDENTIAL

MRK-CHA00955777

Appx19346

11/26/2019
Declaration of G. Reilly
EXHIBIT 380

Appx19347

HIGHLY CONFIDENTIAL

Page 1

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

      - - - - - - - - - -x
3     UNITED STATES OF        :
      AMERICA, ex rel.,
4     STEPHEN A. KRAHLING     :
      and JOAN A.                 Civil Action No.
5     WLOCHOWSKI,             :
                                  2:10-04374 (CDJ)
6        Plaintiffs,          :
7     vs.                     :
8     MERCK & CO., INC.,      :
9        Defendant.           :
      - - - - - - - - - -x
10    IN RE: MERCK MUMPS      :
      VACCINE ANTITRUST
11    LITIGATION              :   Master File No.
12    THIS DOCUMENT           :   2:12-cv-03555 (CDJ)
      RELATES TO:
13    ALL ACTIONS             :
14    - - - - - - - - - -x
                                  March 20, 2017
15                                Washington, D.C.
16    Highly Confidential Videotaped Deposition of:
17                   TIM SCHOFIELD,
18    called for oral examination by counsel for the
19    Plaintiffs, pursuant to notice, at the law offices
20    of Venable, LLP, 600 Massachusetts Avenue,
21    Northwest, Washington, D.C. 20001, before
22    Christina S. Hotsko, RPR, of Veritext, a Notary
23    Public in and for the District of Columbia,
24    beginning at 9:11 a.m., when were present on
25    behalf of the respective parties:

Appx19348

HIGHLY CONFIDENTIAL

Page 2

1    A P P E A R A N C E S
2
     On behalf of Plaintiffs:
3    JOHN A. MACORETTA, ESQUIRE
     DIANA J ZINSER, ESQUIRE (Via Telephone)
4    Spector, Roseman, Kodroff & Willis, PC
     1818 Market Street, Suite 2500
5    Philadelphia, Pennsylvania 19103
     (215) 496-0300
6
     GARY REILLY, ESQUIRE
7    MARLENE KOURY, ESQUIRE (Via Telephone)
     DANIEL VITELLI, ESQUIRE (Via Telephone)
8    Constantine Cannon, LLP
     335 Madison Avenue
9    New York, New York 10017
     (212) 350-2796
10
11   KELLIE LERNER, ESQUIRE (Via Telephone)
     Robins Kaplan, LLP
12   601 Lexington Avenue, Suite 3400
     New York, New York 10022
13   (212) 980-7400
14
15   On behalf of Defendant:
     KATHLEEN S HARDWAY, ESQUIRE
16   MICHAELA F ROBERTS, ESQUIRE
     Venable, LLP
17   750 East Pratt Street, Suite 900
     Baltimore, Maryland 21202
18   (410) 528-2842
19
     On behalf of GlaxoSmithKline:
20   BETH L WEISSER, ESQUIRE, ESQUIRE
     Fox Rothschild, LLP
21   2000 Market Street, Suite 2000
     Philadelphia, Pennsylvania 19103
22   (215) 299-2892
23
24
25

Page 4

1    C O N T E N T S
2
3    EXAMINATION BY:                    PAGE
4    Counsel for the Plaintiffs        7
5
6
7    SCHOFIELD DEPOSITION EXHIBITS: *       PAGE

Exhibit 1    Schofield CV              11
8    Exhibit 2    PowerPoint Presentation    30
Exhibit 3    E-mail                    41
9    Exhibit 4    Index GSK FDA Regulatory Filings 49
Exhibit 5    Documents from Schofield Computer 63
10   Exhibit 6    Summary for GW            63
Exhibit 7    E-mail                    129
11   Exhibit 8    Paul-Ehrlich-Institut      181
Exhibit 9    E-mail                    181
12   Exhibit 10   E-mail                    198
Exhibit 11   Document                  198
13   Exhibit 12   E-mail                    245
Exhibit 13   Table 3 2 P 8 3            256
14   Exhibit 14   Table                     257
Exhibit 15   Memo                      265
15   Exhibit 16   E-mail                    288
Exhibit 17   FDA Form 483              297
16   Exhibit 18   Meeting Minutes           300
Exhibit 19   Meeting Minutes           300
17   Exhibit 20   Memo                      317
Exhibit 21   Memo                      323
18   Exhibit 22   Memo                      324
Exhibit 23   E-mail                    327
19   Exhibit 24   Memo                      340
Exhibit 25   E-mail                    345
20   Exhibit 26   E-mail                    349
Exhibit 27   E-mail                    376
21   Exhibit 28   E-mail                    383
Exhibit 29   E-mail                    387
22   Exhibit 30   E-mail Attachment          387
23
24   *  (Exhibits attached to transcript )
25

Page 3

1    A P P E A R A N C E S  C O N T I N U E D
2
3    On behalf of Merck:
     MARGARET RODGERS SCHMIDT, ESQUIRE
4    Morgan, Lewis & Bockius, LLP
     1701 Market Street
5    Philadelphia, Pennsylvania 19103-2921
     (215) 963-5163
6
7    Also Present:
     Stephen Krahling
8    Tim Howard, In-House Counsel, Merck
     Jason Levin, Video Technician
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1    P R O C E E D I N G S
2        VIDEO TECHNICIAN:  We are now on the
3    record.  Please note that the microphones are
4    sensitive and may pick up whispering and private
5    conversations.  Turn off all cell phones or place
6    them away from the microphones, as they can
7    interfere with the deposition audio.
8        Recording will continue until all parties
9    agree to go off the record.
10       My name is Jason Levin, representing
11   Veritext.  The date today is March 20, 2017.  The
12   time is approximately 9:11 a.m.
13       This deposition is being held at Venable
14   located at 600 Massachusetts Ave. Northwest,
15   Washington, D.C.  The abbreviated caption of the
16   case is USA, et al, versus Merck.  This case is
17   filed in the United States District Court, Eastern
18   District of Pennsylvania.  The name of the witness
19   is Tim Schofield.
20       At this time the attorneys present will
21   please identify themselves and the parties they
22   represent.
23       MR. MACORETTA:  Good morning.  John
24   Macoretta from Spector, Roseman, Kodroff & Willis
25   here for the plaintiffs.

2 (Pages 2 - 5)

Appx19349

HIGHLY CONFIDENTIAL

Page 6

1     MR. REILLY:  Gary Reilly from Constantine
2 Cannon.
3     MR. MACORETTA:  And with us is Steve
4 Krahling, who is the relator plaintiff.
5     MS. HARDWAY:  Kathleen Hardway from
6 Venable for Merck and Mr. Schofield.
7     MS. WEISSER:  Beth Weisser from
8 Fox Rothschild on behalf of GlaxoSmithKline and
9 also on behalf of Mr. Schofield.
10     MS. ROBERTS:  Michaela Roberts from
11 Venable on behalf of Merck and Mr. Schofield.
12     MS. SCHMIDT:  Margaret Rodgers Schmidt
13 from Morgan Lewis on behalf of Merck and Tim
14 Schofield.
15     MR. HOWARD:  Tim Howard, in-house counsel
16 at Merck.
17     VIDEO TECHNICIAN:  And on the telephone?
18     MR. VITELLI:  Daniel Vitelli from
19 Constantine Cannon for relator.
20     MS. ZINSER:  Diana Zinser, Spector,
21 Roseman, Kodroff & Willis for private plaintiff.
22     VIDEO TECHNICIAN:  Will the court
23 reporter please swear in the witness.
24
25

Page 7

1 Whereupon,
2     TIM SCHOFIELD,
3 being first duly sworn or affirmed to testify to
4 the truth, the whole truth, and nothing but the
5 truth, was examined and testified as follows:
6     EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
7 BY MR. MACORETTA:
8     Q. All right.  Mr. Schofield, good morning.
9     A. Good morning.
10     Q. We met a few minutes ago.  My name is
11 John Macoretta.  I represent the plaintiffs in
12 this action.  I'm going to be asking you some
13 questions today.
14     Have you ever been deposed before?
15     A. No, I haven't.
16     Q. Okay.  So I'm sure your lawyers have
17 talked to you about it.  I'm just going to remind
18 you of a couple of tings.  First of all, while
19 we're all here in the room and we can see you nod
20 your head, the court reporter can't take that
21 down.  So you have to say your answer.  You have
22 to say "yes" or "no" or whatever you're going to
23 say.
24     All right?
25     A. All right.

Page 8

1     Q. Great.  If you need a break at any time,
2 just tell us and we'll take a break.  It's not a
3 test of wills here.
4     Although, if we're in the middle of a
5 question, I'm going to ask you to answer it before
6 we take a break.  All right?
7     A. All right.
8     Q. You understand that you're under oath,
9 the same as if you were testifying in court with
10 the same consequences for not testifying
11 truthfully, correct?
12     A. Correct.
13     Q. Great.  If you don't -- if you give me an
14 answer and I don't understand that, I'm going to
15 ask you to explain it.  So can we agree today that
16 if I ask a question and you don't understand it,
17 you'll just tell me and I'll try to explain it
18 differently?
19     All right?
20     A. I agree.
21     Q. Great.  Okay.
22     Mr. Schofield, you currently work at GSK,
23 correct?
24     A. Correct.
25     Q. How long have you been there in your

Page 9

1 current role?
2     A. Nearly a year.
3     Q. And before that you were with GSK for a
4 few years as well, right?
5     A. Yes, I was.
6     Q. When did you start working at Merck?
7     A. 1976.
8     Q. All right.  You know what, let me show
9 you -- well, let me get to that in a minute.
10     In advance of your deposition today --
11 well, first of all, who do you understand are the
12 lawyers representing you today?
13     A. The lawyers for Merck and the lawyers for
14 GSK.
15     Q. So both of them?
16     A. Yes.
17     Q. Okay.  And you're here today because you
18 received a subpoena, right?
19     A. Correct.
20     Q. Okay.  And in response to that subpoena,
21 you searched for and produced some documents to
22 us, right?
23     A. Correct.
24     Q. Okay.  I want to talk about that document
25 production and what you looked for for a second.

3 (Pages 6 - 9)

Page 10

1    First of all, when did you first search
2 any of your personal files relating to this case?
3    A. When I received the subpoena.
4    Q. So prior to receiving the subpoena, did
5 you have any communications with any lawyers for
6 Merck or GSK?
7    A. No, I didn't.
8    Q. Okay. And that would have been sometime
9 in January or February of this year, right?
10    A. Probably, yes.
11    Q. Within the last few months?
12    A. Yes.
13    Q. And what files did you -- what did you
14 search? What did you do to search?
15    A. I had two subdirectories on my computer,
16 one of which contained preprints or predocuments
17 to a publication that was going to -- that we had
18 authored, which was the subject of the litigation.
19 So I had those which were kept from the point I
20 think I received them in mid-2000.
21    The second was a file folder containing
22 work that I had done also consistent with the --
23 what I understand to be the context of the claim,
24 which I kept because there were -- there was
25 discussion about a further publication that was

Page 11

1 the source of those documents.
2    We had published on what was called a
3 spilling monitoring program. There was a lot of
4 work done in the stats department subsequent to
5 that that we thought would be valuable to publish
6 for -- for understanding by the stability
7 community.
8    So I kept that second folder with those
9 documents in it.
10    Q. And other than those two subdirectories
11 on your computer, did you have any paper files?
12    A. No. I don't keep paper files.
13    Q. Okay. When you -- when you left Merck,
14 were you subject to any kind of confidentiality or
15 non-compete clause?
16    A. Not to the best of my knowledge.
17    Q. Okay. Fair enough.
18    Let me show you what we're going to mark
19 as Schofield Exhibit 1, which is your --
20    (Schofield Deposition Exhibit 1 marked
21    for identification and attached to the
22    transcript.)
23 BY MR. MACORETTA:
24    Q. Well, you tell me. That's your CV, isn't
25 it?

Page 12

1    A. That is.
2    Q. Mr. Schofield, did you -- did you create
3 this in response to the subpoena, or you had it?
4    A. No. This has been a long-standing resume
5 that I've been filling out, you know, over time as
6 I publish or present and/or change positions.
7    Q. Got you. And I'm going to -- I want to
8 talk to you about a couple of things on here. I'm
9 going to start with your employment history on
10 page 1.
11    In your current role as senior advisor,
12 do you have any involvement with GSK's
13 measles-mumps-rubella vaccine?
14    A. Yes, I do.
15    Q. What kind of involvement did you have
16 with that?
17    MS. WEISSER: Objection.
18    MS. HARDWAY: Object to form.
19 BY MR. MACORETTA:
20    Q. You can answer.
21    MS. WEISSER: No.
22    MR. MACORETTA: Why not?
23    MS. WEISSER: This is not a deposition of
24 a GSK witness. His work at GSK is not relevant to
25 the issues in the litigation. We will let some --

Page 13

1 we will allow some basic questions --
2    MR. MACORETTA: Beth, you can't object to
3 relevance at a deposition. It's not an
4 appropriate reason to instruct a witness not to
5 answer at a deposition. You know that. Are you
6 asserting a privilege?
7    MS. WEISSER: He is a third-party
8 witness.
9    MR. MACORETTA: I agree.
10    MS. WEISSER: You would not otherwise be
11 entitled to get this information were it not also
12 for his employment at Merck. We've made our
13 position clear. This is not going to be an
14 attempt to circumvent the discovery process that
15 plaintiffs and GSK are engaged in.
16    MR. MACORETTA: So the basis of your
17 objection is that it's not relevant?
18    MS. WEISSER: It's not relevant. It's
19 potentially confidential.
20    MR. MACORETTA: We have a confidentiality
21 order. I mean, everything we talk about -- I'm
22 sure everyone is going to get to designate this
23 confidential.
24    MS. WEISSER: I don't think that I've
25 seen it or signed it or GSK has seen it or signed

4 (Pages 10 - 13)

Appx19351

HIGHLY CONFIDENTIAL

Page 14

1  it.  We're not going to delve into --
2       MR. MACORETTA:  We are.  But, okay,
3  that's fine.
4       MS. WEISSER:  That's fine.  We can -- you
5  can file a motion after the deposition.
6       MR. MACORETTA:  You know what, I'd like
7  to call the Magistrate.  At the break, we'll call
8  the Magistrate.
9       MS. WEISSER:  Okay.
10       MR. MACORETTA:  Because I don't
11  understand how you can tell the witness who's here
12  under subpoena not to answer questions because you
13  think they're not relevant.  If you're asserting a
14  privilege, that's one thing.  But it sounds like
15  you're not.  Okay.
16       MS. WEISSER:  Okay.
17       MR. MACORETTA:  Can you read that
18  question again.
19       (The reporter read the record as
20       requested.)
21       MR. MACORETTA:  And you're instructing
22  the witness?
23       MS. WEISSER:  Yes, we are.
24  BY MR. MACORETTA:
25       Q.  Are you going to follow your lawyer's

Page 15

1  instruction?
2       A.  Yes, I am.
3       Q.  Well, what do you do as a senior advisor
4  at GSK?
5       A.  Provide advice.
6       Q.  To who?
7       A.  To the technical research and development
8  department who developed the manufacturing
9  processes and the quality control tests for GSK
10  vaccines.
11       Q.  What -- I mean, what -- statistical
12  advice?  What kind of advice do you provide?
13       MS. HARDWAY:  Object to form.
14       THE WITNESS:  My background is in
15  statistics, so certainly I have the capacity to
16  offer statistical advice.  But I work with the
17  entire organization to -- to mold our development
18  strategy.
19  BY MR. MACORETTA:
20       Q.  Okay.  And your molding of the
21  development strategy, does that include GSK's MMR
22  product?
23       MS. WEISSER:  Objection.  Already asked
24  and answered if he worked on it.  We allowed an
25  answer to that question.

Page 16

1       MR. MACORETTA:  You're instructing him
2  not to answer?
3       MS. WEISSER:  Yes.
4       MR. MACORETTA:  I'm going to do this for
5  every question.
6       MS. WEISSER:  Okay.
7       MR. MACORETTA:  That's fine.
8  BY MR. MACORETTA:
9       Q.  Okay.  Let's turn to the next page of
10  your resume, Mr. Schofield.
11       From July of '09 to November of 2011, it
12  says you're the director in U.S. Regulatory
13  Affairs, right?
14       A.  Yes.
15       Q.  Okay.  Were you involved with GSK's MMR
16  product at that time?
17       A.  Yes.
18       Q.  What was your involvement then?
19       MS. WEISSER:  Same objection.  Same
20  instruction not to answer.
21  BY MR. MACORETTA:
22       Q.  During the time you were the director of
23  U.S. Regulatory Affairs, did you sign any letters
24  to the FDA?
25       A.  No.

Page 17

1       Q.  Were you involved in commenting or
2  drafting any letters to the FDA?
3       A.  Yes.
4       Q.  For GSK's MMR product, who would have
5  been the signer of those letters to the FDA?
6       A.  I can't say specifically.
7       Q.  Somebody --
8       A.  Somebody in a higher level than myself to
9  the person that is responsible for direct
10  communications with the agency.
11       Q.  Okay.  As we sit here today, what do you
12  understand the status of GSK's MMR product?
13       MS. WEISSER:  Objection.
14       THE WITNESS:  I'm unable to answer.
15       MR. MACORETTA:  Okay.  You've got to
16  state your objection, Beth.  I mean, if it's to
17  form, he can answer it.  If you're going to tell
18  him not to answer, then you got to tell him so.
19       MS. WEISSER:  If you have an
20  understanding as to the status, you can provide
21  that.
22       THE WITNESS:  It's in development.
23  BY MR. MACORETTA:
24       Q.  Okay.  I understand that.  That means
25  it's somewhere in the FDA approval process, right?

5 (Pages 14 - 17)

Appx19352

Page 18

1    A. It is in an IND, I believe. I don't know
2 where it is in relation to the subsequent BLA.
3    Q. What do you mean "the subsequent BLA"?
4    A. The BLA is the end of the development
5 process where we communicate all the development
6 experience to the FDA.
7    Q. Okay. But when you say subsequent, it's
8 not like there was an earlier BLA?
9    A. No. The process is an IND holds the
10 development information, which is finally filed
11 and complete as a BLA, a biological license
12 application.
13    Q. Have Phase 3 trials been completed?
14    MS. WEISSER: Objection. I'm instructing
15 him not to answer.
16    MR. MACORETTA: The basis for that
17 instruction?
18    MS. WEISSER: It's the same basis.
19    MR. MACORETTA: I want you to state it,
20 Beth. Because I want to make very clear why we're
21 doing this when we get the Magistrate on --
22    MS. WEISSER: That's fine. GSK has
23 agreed that you will have a 30(b)(6) deposition of
24 GSK. This is not that deposition. This is a
25 deposition of an individual who happens to be a

Page 19

1 GSK employee, who is being deposed primarily
2 because he is a -- he was a long-time and former
3 Merck employee.
4    We're not going to allow this deposition
5 of a current GSK employee to circumvent the
6 third-party discovery process that is well
7 underway between plaintiffs and GSK. And all of
8 these questions will be appropriate for a 30(b)(6)
9 witness of GSK, assuming they are listed in the
10 deposition topics, which I'm certain they will be.
11    MR. MACORETTA: Is that the full basis of
12 your objection?
13    MS. WEISSER: Yes.
14    MR. MACORETTA: Thank you.
15 BY MR. MACORETTA:
16    Q. When you were director of U.S. Regulatory
17 Affairs, what was your involvement with the MMR
18 product?
19    MS. WEISSER: Objection. Same objection.
20 Same instruction.
21 BY MR. MACORETTA:
22    Q. Is Merck contemplating -- is GSK
23 contemplating launching an MMR product in the
24 United States or an MMR/V product?
25    MS. WEISSER: Same objection.

Page 20

1    MR. MACORETTA: You're instructing him
2 not to answer that one as well?
3    MS. WEISSER: Yes.
4 BY MR. MACORETTA:
5    Q. When you were director at U.S. Regulatory
6 Affairs, what percentage of your time generally
7 was involved with MMR product as opposed to
8 something else?
9    A. I would say 10 percent of my time.
10    Q. When you -- I'm going to go back a little
11 further in your resume now. I'm on, I guess,
12 page 3 of your resume, where it says you're at
13 Merck a senior director of non-clinical studies
14 from '05 to '08.
15    Do you see that?
16    A. Statistics. Yes.
17    Q. Non-clinical statistics. I'm sorry.
18 Yes.
19    It says -- in the middle of that
20 description it says, "Interacted with regulatory
21 agencies and industry groups." Do you see that?
22    A. Yes.
23    Q. What was your interaction with regulatory
24 agencies then?
25    MS. HARDWAY: Object to form.

Page 21

1 BY MR. MACORETTA:
2    Q. You can answer that one.
3    A. My interactions were usually in the
4 capacity of being a part of a team that interacted
5 with the agency on subjects that were of interest
6 to the agency.
7    Q. Okay. Meaning you weren't the only
8 person on a specific issue?
9    A. No. That's not how we work. We work
10 through our regulatory affairs Department, who as
11 a team works with the team at the agency to
12 discuss development.
13    Q. So on occasion you would go to meetings
14 or be involved in discussion with the group of
15 folks from the FDA?
16    A. I would go with my team to meetings with
17 the FDA.
18    Q. Okay. You do the same thing when you
19 were at regulatory affairs at GSK?
20    A. Yes.
21    Q. Do the same thing when you were at
22 regulatory affairs at GSK concerning the MMR
23 product?
24    A. I'm only aware of one teleconference
25 where that was a -- where I had participated as a

6 (Pages 18 - 21)

HIGHLY CONFIDENTIAL

Page 22

1 direct participant.
2    Q. What was the subject matter of that?
3        MS. WEISSER: Objection.
4        MR. MACORETTA: Are you telling him not
5 to answer?
6        MS. WEISSER: Instruct not to answer,
7 yes.
8 BY MR. MACORETTA:
9    Q. Who else was on that teleconference from
10 GSK?
11        MS. WEISSER: To the extent you can
12 recall.
13        THE WITNESS: Barbara Howe, Donna Boyce,
14 others. I can't possibly remember everybody who
15 was there.
16 BY MR. MACORETTA:
17    Q. Don't expect you to -- you only remember
18 what you remember. I understand that. I don't
19 expect you to remember everybody. I'm just asking
20 for your best recollection.
21        So Barbara Howe and Donna Boyce.
22        What do they do at GSK?
23    A. Donna Boyce was my direct supervisor.
24 And Barbara Howe was her level above her.
25    Q. So your boss and your boss' boss?

Page 23

1    A. Yes.
2    Q. Would one of them have had the primary
3 responsibility for the -- for GSK's MMR
4 filings?
5        MS. WEISSER: Objection.
6        MR. MACORETTA: What's your objection to
7 that?
8        MS. WEISSER: To the extent that you
9 know.
10        THE WITNESS: I don't know.
11 BY MR. MACORETTA:
12    Q. You don't remember who had the primary
13 responsibility for those filings?
14    A. No, I don't.
15    Q. Okay.
16    A. The company.
17    Q. Well, I understand it's the company. But
18 we're going to look at some -- okay, that's fine.
19        I'm looking again at your senior director
20 and non-clinical statistics description here. A
21 little further down it says you managed the
22 department of 20 professional statisticians.
23        Do you see that?
24    A. Yes, I do.
25    Q. What depart -- what was that called at

Page 24

1 Merck?
2    A. Non-clinical statistics. It's in the
3 title.
4    Q. Is that different than BARDS?
5    A. It's part of BARDS.
6    Q. Part of BARDS. Okay.
7        And there's also something at Merck
8 called the Center for Mathematical Sciences. Have
9 you ever heard that?
10    A. I'm aware of it. I wasn't sure what it
11 was named.
12    Q. What is that and how does it relate to
13 BARDS? What was that or is that?
14    A. Well, this is -- I am not sure because,
15 again, I don't know what the name was associated
16 with, whether it was within BARDS or outside
17 BARDS. The name suggests something, but I would
18 only be speculating what it was.
19    Q. Is BARDS part of MRL or Merck
20 manufacturing?
21    A. MRL.
22    Q. Was that Center for Mathematical Sciences
23 in MRL or manufacturing?
24    A. To the best of my judgment, it's likely
25 to have been in MRL.

Page 25

1    Q. Was there some other team of
2 statisticians in manufacturing doing similar work
3 to the kind of thing your folks were doing at MRL?
4    A. They were doing statistics work but
5 sometimes quite different.
6    Q. Okay. So who would be -- who are the
7 statisticians when you were there on the
8 manufacturing side? Who is in charge of them?
9    A. A woman by the name of Lori Faylor.
10    Q. Okay. And who are some of the
11 statisticians in that?
12    A. I didn't know many of them personally.
13    Q. So you didn't have much interaction with
14 the manufacturing statisticians?
15    A. We had whatever interaction was
16 necessary, but not at my level. I would have
17 interacted with Lori as head of the department.
18 But I can't say what my group's interactions were
19 specifically.
20    Q. Okay. So after it says you were -- you
21 managed the department of 20 statisticians. And
22 you said that was only part of BARDS, right?
23    A. Yes.
24    Q. Were you the -- at this time were you the
25 senior statistician on the -- in BARDS?

7 (Pages 22 - 25)

Appx19354

HIGHLY CONFIDENTIAL

Page 26

1  A. I was a senior statistician in BARDS
2 responsible for non-clinical or CNC statistics.
3  Q. Okay. And is that -- then below that
4 you -- it talks about the various functions,
5 including manufacturing and quality control.
6  Do you see that?
7  A. Uh-huh.
8  Q. So you were responsible for statistics
9 in -- for manufacturing as well?
10  A. To the extent that the processes that are
11 built during development by our department are
12 transferred at the manufacturing and quality
13 control department.
14  Q. Would that include stability analysis?
15  A. Yes, it would. Because, again, we own --
16 or I should say MRL owns the development stability
17 studies up to the point of the licensure of the
18 product.
19  Q. Who owns them after the licensure of the
20 product?
21  A. They're transferred to the manufacturing
22 unit as a record of the information and as a
23 repository of information that they can use during
24 their -- their ownership of the product.
25  Q. So once the -- once the product is on the

Page 27

1 market, or even a little before that, I guess, all
2 that stability information is transferred from MRL
3 to MMD, right?
4  A. Yes.
5  Q. Does that mean MMD is then responsible
6 for anything relating to stability after the
7 product is on the market?
8  MS. HARDWAY: Object to form.
9  THE WITNESS: It means that they take
10 ownership and work sometimes collaboratively with
11 MRL to -- to address stability or stability
12 issues.
13 BY MR. MACORETTA:
14  Q. Okay. So the MMR vaccine obviously was
15 on the market in the late '60s, right?
16  A. Uh-huh.
17  Q. You have to say "yes" or "no."
18  A. Yes.
19  Q. Okay. And by '05, by May of '05, when
20 you became a senior director here, did you still
21 have involvement with MMR?
22  A. Yes.
23  Q. What was your involvement then?
24  A. It was with other studies, development
25 studies, that were being performed with the

Page 28

1 vaccine. It was in the context of other
2 combination vaccines that were being developed by
3 Merck and Company. And it was in support, again,
4 of manufacturing NQC as questions arose, where we
5 had the different skills than the quality control
6 statistics department had to work with
7 manufacturing to develop control processes.
8  Q. We're going to look later at some manual
9 stability reports where there are going to be some
10 mention of whether or not a certain sample was out
11 of trend or something like that.
12  If that happened in '05 to '08, would
13 that have been something you would have been
14 involved or would that have been manufacturing?
15  A. That would have been manufacturing.
16  Q. Okay. So let me ask you the same
17 question. I'm going to go a little back --
18 further back in your resume when you were the
19 director of vaccine biometrics research from '99
20 to '05.
21  For lots that were out of trend on -- in
22 any stability program, was that something you
23 would have been involved in?
24  A. I would never have been involved in
25 manufacturing stability studies as it relates to

Page 29

1 out-of-trend or out-of-specification observations.
2  Q. But if something was out of trend or some
3 discussion about why it's out of trend and what do
4 we do about it, right?
5  MS. HARDWAY: Object to form.
6  THE WITNESS: Could you repeat the
7 question.
8 BY MR. MACORETTA:
9  Q. Sure. When a product shows up as out of
10 trend or out of specification, there's some
11 discussion internally at Merck about what do we do
12 about this result, what does it mean, right?
13  MS. HARDWAY: Object to form.
14 BY MR. MACORETTA:
15  Q. You can answer that.
16  A. To the best of my knowledge, that was
17 handled by the stability unit in MMD, unless there
18 was some extreme circumstance that involved not
19 only my department but perhaps some of the rest of
20 the research scientists who were trying to
21 understand the assay or the statistics and so
22 forth.
23  Q. You -- do you remember those extreme --
24 any such extreme circumstances when you were --
25  A. No. I'm simply reciting my role in such

8 (Pages 26 - 29)

Appx19355

HIGHLY CONFIDENTIAL

Page 30

1  cases. I would not deny our services to help them
2  understand some of the things that were perhaps in
3  our development experience or otherwise that could
4  help them understand the out-of-specification
5  result.
6      Q. Okay. But do you remember any such
7  discussions happening at that time?
8      MS. HARDWAY: Object to form.
9      THE WITNESS: Not specifically. I said
10  this my -- this was our role.
11  BY MR. MACORETTA:
12     Q. Sure.
13     MR. MACORETTA: You know what, can we go
14  off the record for one minute?
15     VIDEO TECHNICIAN: We're going off the
16  record at 9:34 a.m.
17     (A recess was taken.)
18     VIDEO TECHNICIAN: Back on the record at
19  9:35 a.m.
20     (Schofield Deposition Exhibit 2 marked
21     for identification and attached to the
22     transcript.)
23  BY MR. MACORETTA:
24     Q. Mr. Schofield, let me show you Schofield
25  Exhibit 2.

Page 31

1      What I've given -- take a look at that
2  for a minute. What I've given you Mr. Schofield
3  is a PowerPoint presentation. On the first page
4  it says GSK and then Dr. Moncef Slaoui, vaccine
5  business overview, 6 May 2015.
6      I'm not going to ask you about every
7  slide in here, but let me know when you're ready
8  to chat about it.
9      A. Okay.
10     Q. First of all, who is Dr. Slaoui?
11     A. Dr. Slaoui is a retiring head of vaccine.
12     Q. Was he your superior then at some level?
13     A. At several levels above.
14     Q. Okay, but you were within vaccines at
15  GSK?
16     A. Yes.
17     Q. Okay. I'm going to look at the third
18  page, where it says, "Vaccines is an attractive
19  business."
20     Do you see the second bullet point, it
21  says, "Few global players"?
22     A. Yes.
23     Q. Do you agree with that, there are few
24  global players in the vaccine business?
25     A. Global players, I can say yes. There are

Page 32

1  many players, however.
2      Q. Let's go to -- I'm going to go back a few
3  more pages. These slides somehow start at number
4  13. I'm going to go to the page that has a little
5  18 at the bottom. It says, "Broadest vaccine
6  portfolio offering worldwide, pre-transaction."
7      Do you see that?
8      A. Yes, I do.
9      Q. Okay. And if you go down under the
10  pediatric, four from the bottles [sic], it says,
11  "Measles, mumps, rubella, and varicella. Do you
12  see that?
13     A. I see that.
14     Q. And then it has a GSK U.S., says, "Pay
15  and a GSK check."
16     First of all, the check, that means GSK
17  sells measles-mumps-rubella-varicella vaccine in
18  other parts of the world?
19     A. Yes.
20     Q. Okay. And the "P" at the bottom says,
21  "Project and late-stage pipeline." Do you see
22  that?
23     A. Yes, I do.
24     Q. Is that right? That that product is in
25  the late-stage pipeline?

Page 33

1      A. Yes.
2      MS. WEISSER: Objection. To the extent
3  you know.
4      THE WITNESS: To the extent I know, I'm
5  working on it, as it were, in the late-stage
6  pipeline.
7  BY MR. MACORETTA:
8      Q. What's the late-stage pipeline?
9      A. Close to filing a regulatory dossier.
10     Q. Does that mean a BLA?
11     A. A BLA. Yes.
12     Q. What's the earliest it gets in the
13  late-stage pipeline? I mean, is there a defined
14  point where --
15     MS. WEISSER: Objection to form.
16     But you can answer.
17  BY MR. MACORETTA:
18     Q. Okay. Let me try it this way.
19     Is there some definition or understanding
20  of what's the late stage pipeline at GSK?
21     A. It can vary from company to company. But
22  in a general sense it's usually considered Phase
23  3.
24     Q. In Phase 3 or finished Phase 3?
25     A. In Phase 3.

9 (Pages 30 - 33)

Appx19356

HIGHLY CONFIDENTIAL

Page 34

1    Q.  Okay.  So is that the sense at GSK as
2    well?
3    A.  I can't say for the author of the slide.
4    But, as I say, that's the general sense of
5    late-phase pipeline.
6    Q.  Okay.  Well, is MMR/V finished Phase 3 in
7    the U.S.?
8        MS. WEISSER:  Objection.  He's not going
9    to answer that.
10    BY MR. MACORETTA:
11    Q.  If you could take a look, I'm going to go
12    back a few pages to page 23.  It says, "Novartis
13    integration."
14        Do you see that?
15    A.  Yes, I do.
16    Q.  So that means that GSK bought Novartis,
17    right?
18    A.  Yes.
19        MS. WEISSER:  Objection.  To the
20    extent -- I mean, that this witness knows.
21        MR. MACORETTA:  Okay.
22    BY MR. MACORETTA:
23    Q.  Did Novartis have any vaccine business?
24        MS. WEISSER:  Same objection.
25

Page 35

1    BY MR. MACORETTA:
2    Q.  Every question is to the extent you know.
3    I mean, I'm not asking you to -- but okay.
4    A.  Yes.
5        MS. WEISSER:  We don't -- I mean, you
6    haven't laid any basis for what this document is,
7    where it's from.  You haven't asked him if he's
8    ever seen it before.  So we're in a bit of, you
9    know, asking questions in a bit of abstract here
10    without any foundation.
11    BY MR. MACORETTA:
12    Q.  Let me go back to the beginning, Mr.
13    Schofield.  We agreed that if I ask a question and
14    you don't understand, you're going to tell me,
15    right?
16    A.  Yes, I did.
17    Q.  Great.  Okay.
18        When Novartis was integrated in GSK, did
19    Novartis bring any vaccine knowledge or portfolio?
20    A.  Yes.
21    Q.  Did Novartis have any MMR product?
22    A.  No.
23    Q.  Okay.  Now let's turn -- I'm going to go
24    a couple further pages back to page 27.  It says,
25    "Key growth drivers: New products, 2017, 2018.

Page 36

1    Expected launches."  And it says "MMR U.S."
2        Do you see that?
3    A.  I see that.
4    Q.  Is it your understanding that GSK expects
5    to launch an MMR product in the U.S. in 27 [sic]
6    or 2018?
7    A.  I don't know when they expect -- I
8    personally do not know when they expect to launch.
9    Q.  Is there a timetable at GSK for planning
10    purposes?
11        MS. WEISSER:  Objection.  He just said he
12    doesn't know when they expect to launch.
13        MR. MACORETTA:  I know what he said.
14    Okay.
15    BY MR. MACORETTA:
16    Q.  Well, so let me try that.  So for a
17    product like MMR, is there some time table or
18    projection internally at GSK?
19        MS. WEISSER:  Same objection.  Asked and
20    answered.
21    BY MR. MACORETTA:
22    Q.  You can answer that.
23    A.  There may be, but I'm not familiar with
24    it.
25    Q.  Okay.  What is your understanding of when

Page 37

1    MMR will launch in the U.S.?
2        MS. WEISSER:  Same objection.  Asked and
3    answered.
4        THE WITNESS:  I have no understanding.
5    BY MR. MACORETTA:
6    Q.  So you're not involved in projecting that
7    or discussing the hurdles that have to be overcome
8    to launch in the U.S.?
9    A.  That's not my job.
10    Q.  Do you have any reason to think Dr.
11    Slaoui was wrong here when he projected it to be a
12    new product in 27 [sic] or 2018?
13    A.  I have no reason to understand what Dr.
14    Slaoui thought or knew.
15    Q.  So after Phase 3 trials are complete,
16    what else needs to happen before a product
17    launches in the U.S.?
18        MS. WEISSER:  Objection.  Do you mean at
19    GSK or general?
20    BY MR. MACORETTA:
21    Q.  Well, the answer shouldn't be different
22    at GSK than any other pharmaceutical company,
23    should it?
24    A.  No, it shouldn't.
25    Q.  Okay.  So after Phase 3 trials, what else

10 (Pages 34 - 37)

Appx19357

HIGHLY CONFIDENTIAL

Page 38

1 needs to happen?
2    A. During Phase 3 trials, both the CMC and
3 the clinical programs are compiled, written into a
4 regulatory filing, and filed to the regulatory
5 authority.
6    Q. That's during a Phase 3 trials?
7    A. That's as Phase 3 trials are ongoing,
8 there are two major sections of the dossier. One
9 is the manufacturing and control, the other is the
10 clinical trials. So they are compiling
11 information, putting it into the appropriate
12 common technical document sections of the BLA and
13 preparing to file it with the regulatory
14 authority.
15    Q. Okay. And then when the -- when the
16 Phase 3 clinical trial ends, there's some report
17 of that that also goes into that draft BLA, right?
18    A. Yes.
19    Q. Okay. And then after the Phase 3 trial
20 ends and the CMC section is done, is there
21 anything else that needs to happen before that BLA
22 is submitted to the FDA?
23    A. Not -- nothing -- there's, to the best of
24 my understanding, labeling negotiations and other
25 activities that go on in parallel with the -- the

Page 39

1 formulation of the regulatory license.
2    Q. Okay. Has a BLA been filed by GSK for
3 its MMR product?
4    MS. WEISSER: Objection. Same objection.
5 Same instruction.
6 BY MR. MACORETTA:
7    Q. Are you going to listen to that
8 instruction?
9    A. Yes.
10    Q. Okay. Have the Phase 3 trials been
11 completed for the MMR product?
12    MS. WEISSER: Objection. Same
13 instruction.
14 BY MR. MACORETTA:
15    Q. What exactly is your involvement with MMR
16 now?
17    A. I don't think I can go into the details.
18    Q. If the lawyer doesn't object, you got to
19 answer it.
20    MS. WEISSER: John, same objection. Same
21 instruction. If you want to call --
22    MR. MACORETTA: Why can't --
23    MS. WEISSER: -- if you want to the
24 Magistrate, we'll call the Magistrate. We don't
25 need to go into these -- we'll resolve it with the

Page 40

1 Magistrate.
2    MR. MACORETTA: All right. I'll do it
3 the way I want to do it. I want to lay the
4 foundation to get the scope of what you're
5 instructing him from answering.
6    MS. WEISSER: Okay.
7 BY MR. MACORETTA:
8    Q. Okay. Have you ever heard of something
9 called the late-stage committee at GSK?
10    A. No.
11    Q. How about Codev, C-o-d-e-v?
12    A. No.
13    Q. Somewhere at GSK a decision is made
14 whether or not to pursue licensing for a certain
15 product, right?
16    A. I presume.
17    Q. Okay. Who makes that discussion?
18    A. I don't know.
19    Q. Is there some senior management
20 committee?
21    MS. WEISSER: Objection. He just said he
22 doesn't know. Asked and answered.
23    MR. MACORETTA: You know what, he can
24 answer.
25    THE WITNESS: I don't know.

Page 41

1 BY MR. MACORETTA:
2    Q. Okay. Let's take a look at what we're
3 going to mark as Exhibit 3.
4    (Schofield Deposition Exhibit 3 marked
5     for identification and attached to the
6     transcript.)
7 BY MR. MACORETTA:
8    Q. Exhibit 3, I'm pretty sure you haven't
9 seen before, Mr. Schofield. This is an e-mail
10 exchange between Michelle Zolnoski, who is one of
11 the lawyers on my side of the case, and
12 Ms. Weisser.
13    I'm really -- you can read the whole
14 thing if you want, but I'm really interested in
15 the list of names at the bottom of the first page
16 for now.
17    I'm going to ask you who these people
18 are. If you know them, tell me what their role is
19 at GSK.
20    So April Cohen, do you know her?
21    MS. WEISSER: No. You can -- I'll allow
22 him to answer whether or not he knows them. But
23 we're not going to have him characterize each of
24 their roles at GSK.
25    MR. MACORETTA: Why is that objectionable

11 (Pages 38 - 41)

Appx19358

HIGHLY CONFIDENTIAL

Page 42

1 and worthy of him not answering about? He knows
2 people. I'm allowed to ask him who the people at
3 the company are.
4      MS. WEISSER: That's fine -- we'll take
5 it on an individual basis.
6 BY MR. MACORETTA:
7    Q. April Cohen. Do you know her?
8    A. No.
9    Q. Okay. Ouzama Henry.
10    A. Yes.
11    Q. Do you know her?
12 what is her role at GSK?
13    A. I can't say. I don't know.
14    Q. You know her but you don't know what she
15 does?
16    A. I know she's in medical.
17    Q. Okay. But you don't know exactly what
18 she does?
19    A. What she does for the Merck vaccine --
20 I'm sorry -- for the GSK vaccine.
21    Q. Okay. Derrick Sim?
22    A. No.
23    Q. Giri Krishnamoorthy.
24    A. No.
25    Q. Remon Abu-Elyazeed?

Page 43

1    A. Yes.
2    Q. What does Remon do?
3    A. He's in medical as well. Don't know what
4 he does specifically.
5    Q. What does "medical" mean?
6    A. He's involved in clinical trials.
7    Q. So these are -- these folks, if they had
8 any knowledge at MMR, it would be related to
9 clinical trial issues?
10    A. Yes.
11    Q. Okay. Anne Simmons. Do you know her?
12    A. No.
13    Q. Mary Beth Lewis?
14    A. No.
15    Q. Mirta Grifman?
16    A. No.
17    Q. Angela Juul?
18    A. No.
19    Q. Barbara Howe?
20    A. Yes.
21    Q. What does she do at GSK?
22    A. I don't know her current position. When
23 I was there, she was head of clinical and
24 regulatory affairs, when I was there the first
25 time.

Page 44

1    Q. So she was one of your superiors?
2    A. I told you. And Donna Boyce --
3    Q. Yeah. Okay.
4      Bill Darnall?
5    A. No.
6    Q. Ralf Clemens?
7    A. No.
8    Q. Katalin Abraham? Katalin.
9    A. Yes.
10    Q. What does -- what did she do at GSK?
11    A. She was in regulatory affairs with me.
12    Q. She -- your superior? Same level?
13    A. Same level.
14    Q. Was she involved in the MMR product?
15    A. I don't recall.
16    Q. Clare Kahn?
17    A. Yes.
18    Q. What did she do at GSK?
19    A. She pre-dated Barbara Howe as head of
20 regulatory affairs.
21    Q. Is Ms. Howe still at GSK?
22    A. No.
23    Q. Who's the head of regulatory affairs now?
24    A. Amy Scott Bromine.
25    Q. When did Ms. Howe leave?

Page 45

1    A. Ms. Howe is in a different position at
2 GSK.
3    Q. Oh, so she's still at GSK?
4    A. Yeah.
5    Q. Okay. When did she cease being the head
6 of regulatory affairs?
7    A. I don't know. I wasn't there.
8    Q. So between your first stay and your --
9 between your first employment and your second?
10    A. Apparently.
11    Q. Okay. And the current you said is Amy
12 Scott Bromine, is current head of regulatory
13 affairs?
14    A. Yes.
15    Q. How long has she that job?
16    A. I don't know.
17    Q. Bruce Innis, do you know him?
18    A. Yes.
19    Q. What does he do?
20    A. Also in medical.
21    Q. Okay. If you wanted -- if you, today,
22 wanted to learn the status of GSK's FDA approval
23 for its MMR vaccine, who would you ask?
24      MS. WEISSER: Objection. Instruction.
25 Same instruction.

12 (Pages 42 - 45)

Appx19359

HIGHLY CONFIDENTIAL

Page 46

1    THE WITNESS: I don't know which same
2 instruction.
3    MR. MACORETTA: Neither do I. Neither do
4 I.
5    MS. WEISSER: That's fine. My apologies,
6 Mr. Schofield.
7    Instruction not to answer. Same
8 instruction not to answer.
9    MR. MACORETTA: How does that -- okay.
10 That's fine. We'll save it for the Magistrate.
11    MS. WEISSER: That's fine.
12 BY MR. MACORETTA:
13    Q. If you go back a few pages in this e-mail
14 chain, go to the following page.
15    If you go to the last page of this e-mail
16 chain, there's a -- it discusses some of these
17 committees and it mentions a U.S. core team for
18 MMR.
19    Do you see that? Look at Anne Simmons
20 line, for example.
21    MS. WEISSER: Could you tell us just
22 which page we're on, John?
23    MR. MACORETTA: Last one, 6.
24    MS. WEISSER: 6, okay.
25    THE WITNESS: Yes, I see it.

Page 47

1 BY MR. MACORETTA:
2    Q. What's the U.S. core team for MMR?
3    A. I don't know.
4    Q. Does that -- does the fact that you don't
5 know mean it's likely not a regulatory team?
6    A. The fact that I don't know is that I
7 don't know what it is.
8    Q. Okay. Is this a term you've heard in
9 regulatory affairs?
10    A. I don't know.
11    Q. When you were at GSK or Merck, you spent
12 some time in some discussion trying to figure out
13 when GSK was going to come to the market, right?
14    MS. HARDWAY: Objection to form.
15 Overbroad.
16    THE WITNESS: I may have been in meetings
17 where these things were discussed. They were not
18 of interest to me usually.
19 BY MR. MACORETTA:
20    Q. Well, you were on the competitive defense
21 task force, weren't you?
22    A. I was on the competitive defense task
23 force, as I recall it, as a technical expert.
24    Q. Okay. And you were on the product
25 development team for MMR, right?

Page 48

1    A. I don't recall.
2    Q. Okay. Do you ever recall being involved
3 in discussions of competing products at Merck?
4    A. Not --
5    MS. HARDWAY: Object to form.
6    THE WITNESS: Not myself personally.
7 BY MR. MACORETTA:
8    Q. You ever involved -- ever analyzed any
9 competitors' test results?
10    MS. HARDWAY: Object to form. Overbroad.
11    THE WITNESS: Analyzed? I would not have
12 access to competitors' data.
13 BY MR. MACORETTA:
14    Q. Well, when a competitor reports a
15 clinical study of, say, PRIOrix versus MMR, were
16 you involved in any analysis or discussion of
17 those results?
18    MS. HARDWAY: Object to form.
19 BY MR. MACORETTA:
20    Q. Or whatever is published publicly?
21    THE WITNESS: I was not -- I was not
22 involved in clinical statistics.
23 BY MR. MACORETTA:
24    Q. I understand. But do you ever recollect
25 the time where you looked at some report of a

Page 49

1 study conducted by an MMR competitor?
2    MS. HARDWAY: Object to form. Overbroad.
3    THE WITNESS: I don't recall.
4 BY MR. MACORETTA:
5    Q. Okay.
6    MR. MACORETTA: You know what, why don't
7 we take a break for a few minutes. Let's see if
8 we can -- let's go off the record.
9    VIDEO TECHNICIAN: Going off the record
10 at 9:53 a.m.
11    (A recess was taken.)
12    VIDEO TECHNICIAN: We are back on the
13 record at 10:14 a.m.
14 BY MR. MACORETTA:
15    Q. All right. Mr. Schofield, we are back on
16 the record. I'm going to show you what we've
17 marked as Exhibit 4.
18    (Schofield Deposition Exhibit 4 marked
19    for identification and attached to the
20    transcript.)
21 BY MR. MACORETTA:
22    Q. Which is an index of GSK FDA regulatory
23 filings that was given to me by GSK's counsel.
24 Given to us by GSK's counsel.
25    I'm not going to ask you at all to talk

13 (Pages 46 - 49)

Appx19360

HIGHLY CONFIDENTIAL

Page 50

1 about all of them. I'm going to ask you about a
2 few specific entries and the general nature of
3 things.
4      So at GSK, when you were in regulatory
5 affairs, is there some file containing all the
6 communications between the FDA and GSK over --
7 broken down by product?
8    A. I don't know.
9    Q. Well, did you have some understanding --
10 when there's an interaction with the FDA or
11 correspondence back and forth with the FDA, did
12 you have some understanding that that was supposed
13 to go in a file or be maintained?
14    A. I'm sure it would have to be kept as a
15 record for the company as a requirement of that --
16 those communications. Yes.
17    Q. So it was a requirement that the company
18 is supposed to keep a record of those
19 communications?
20      MS. WEISSER: Objection.
21      You can answer.
22      THE WITNESS: I'm answering it on the
23 level that it's good business. I don't know what
24 the requirements are.
25

Page 51

1 BY MR. MACORETTA:
2    Q. When you were in regulatory affairs, you
3 didn't know what the requirement was?
4    A. I had a role in regulatory affairs which
5 was somewhat unique. MMR was the only program
6 that I worked on as a development program. The
7 rest of my job was what we call life cycle
8 management, which was answering questions related
9 to already licensed vaccines.
10      Another part of my job was much like the
11 job I have right now, which was developing
12 internal strategies. So I did not know all of the
13 ins and outs of the regulatory systems. That was
14 carried out by other people in the department.
15      MS. WEISSER: John, can we -- someone
16 just joined the call.
17      MR. MACORETTA: Sure. Who just joined
18 the call?
19      MS. ZINSER: Sorry, this is Diana.
20      MR. MACORETTA: Zinser, that's Diana
21 Zinser from my office.
22      Right?
23      MS. ZINSER: Yes, sorry.
24      MR. MACORETTA: All right.
25

Page 52

1 BY MR. MACORETTA:
2    Q. So are you aware then whether or not GSK
3 keeps such a file of communications with the FDA?
4      MS. WEISSER: Objection. He's asked and
5 answered.
6 BY MR. MACORETTA:
7    Q. You can answer.
8    A. I answered. I don't know.
9    Q. Okay. Well, when you were in regulatory
10 affairs, if you wanted to see prior communications
11 with the FDA over MMR, where would you look?
12    A. I would ask somebody to help me find it.
13    Q. You didn't have any access to that
14 yourself?
15    A. I didn't -- I did not choose to get the
16 access. I asked somebody who was knowledgeable to
17 help me find it.
18    Q. Okay. And you were in regulatory affairs
19 starting in July of '09, right?
20    A. That sounds right.
21    Q. Okay. I want to talk to you about a
22 couple specific entries in there, then.
23      If you could go to page 34.
24      MS. WEISSER: John, you can -- you're
25 welcome to ask the question. But any questions

Page 53

1 delving into specific entries or information on
2 the regulatory file, we're going to have same
3 objection and same -- excuse me -- same objection,
4 same instruction to the witness not to answer.
5      MR. MACORETTA: So this is an index you
6 gave me. We designated certain documents, and
7 you're not going to let him tell me what the
8 documents are?
9      MS. WEISSER: You can ask GSK's 30(b)(6)
10 witness about any of the entries on the regulatory
11 file.
12      MR. MACORETTA: How could that possibly
13 help discovery, Beth? You haven't given us a
14 single thing yet. I'm entitled to ask him --
15 maybe I won't want it if he tells me it's no good.
16      MS. WEISSER: John, I've made my
17 objection. Again the instruction --
18      MR. MACORETTA: Okay. We'll save it for
19 the Magistrate. We're going to ask anyway.
20 BY MR. MACORETTA:
21    Q. Take a look at page 34, Mr. Schofield,
22 third item down, ███████. Then it's
23 got -- after the parenthetical, it says, "
████████████████████"
25      Do you see that, ████?

14 (Pages 50 - 53)

**Appx19361**

HIGHLY CONFIDENTIAL



Page 54

1   A. I see it.
2   Q. Okay. That's the one that's highlighted.
3   First of all, ███████████████████
████████, right?
5   A. To the best of my knowledge.
6   Q. Okay. And it says a ██████████. Do
7   you see that?
8   A. Yes.
9   Q. Do you know what that is?
10      MS. WEISSER: Same objection. Same
11  instruction. We're not going to go any further.
12  BY MR. MACORETTA:
13      Q. Do you know what this meeting was about?
14      MS. WEISSER: Same objection. Same
15  instruction.
16  BY MR. MACORETTA:
17      Q. During the time you were in regulatory
18  affairs at GSK, were you ever involved in a
19  conversation with anybody at the FDA about MMR?
20      MS. WEISSER: I think this was asked and
21  answered. But the witness can answer again.
22      THE WITNESS: I answered that I was once
23  in a meeting with Barbara Howe and Donna Boyce and
24  FDA over MMR.
25

Page 55

1   BY MR. MACORETTA:
2       Q. Okay. And what subject on MMR?
3       MS. WEISSER: Objection. Same objection.
4   Same instruction.
5   BY MR. MACORETTA:
6       Q. When was that meeting?
7       A. I don't have a recollection.
8       Q. Okay. Was this an in-person meeting or
9   teleconference?
10      A. Teleconference.
11      Q. If you go up to page 32, third entry down
12  dated ████████████, it says, "███████████
██████████████████████████████████████
███████████████████████."
15      Do you see that?
16      A. I'm sorry, which? Where --
17      Q. I'm on page 32.
18      A. Yes.
19      Q. It's the third entry down. It's the
20  second highlighted entry.
21      A. Yes.
22      Q. Okay. Was that the meeting you were in?
23      A. I can't be sure. I can't tell.
24      Q. Okay. Prior to your meeting or
25  teleconference, were you involved in sending any

Page 56

1   briefing documents to the FDA for the meeting?
2       A. The company would have sent briefing
3   documents to the FDA. That's the custom.
4       Q. Were you involved in writing them or
5   creating any part of them?
6       A. I don't recall.
7       Q. Go to page 31, if you could, the first
8   highlighted entry dated ████████████. It
9   says, "████████████████████." Do you see
10  that?
11      A. Uh-huh.
12      Q. What's a CSR?
13      A. Clinical study report.
14      Q. That means it's ████████████
█████████████, right?
16      A. Uh-huh.
17      Q. Do you know ████████████████████
████████████████?
19      MS. WEISSER: Objection.
20      THE WITNESS: No, I don't.
21  BY MR. MACORETTA:
22      Q. Okay. Are you aware of the result --
23  when you were in regulatory affairs, were you
24  involved in the looking at or creating CSRs for
25  any MMR studies?

Page 57

1   A. I didn't work on clinicals.
2   Q. So that's a no?
3   A. That's a no.
4   Q. Okay. Did you review any CSRs?
5   A. No.
6   Q. If we go down a little further down that
7   page, there's a -- well, the last highlighted
8   entry of ████████, it says, "████████████████
████████"
10      Do you know -- that's the same thing we
11  looked at a page earlier. You don't know if that
12  was the meeting you were at?
13      A. No, I don't.
14      Q. Okay. If you go to page 27, top entry,
15  ████████████. It says, "████████████████████
████████████."
17      Do you see that?
18      A. Yes, I do.
19      Q. Do you know what ████████████ that
20  refers to?
21      A. No, I don't.
22      Q. Were you involved in any ████████████████
████████████████?
24      A. I don't recall.
25      Q. So you might have been?

15 (Pages 54 - 57)

**Appx19362**

Page 58

1    A. I don't recall.
2    Q. Do you know ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮
4    A. I don't recall.
5    Q. Do you know what a Type C meeting is
6 generally?
7    A. It's a meeting that's requested with the
8 agency that has a time -- has expectations and a
9 time frame.
10    Q. What's the time frame?
11    A. Well, to the best of my knowledge, we
12 have to get questions in by a certain period of
13 time. They have to agree to wish to meet or to
14 receive a briefing document for those questions.
15 Then there's a timing period for them to review
16 the briefing document before the Type C meeting.
17    Q. So is this time frame for Type C longer
18 than for a Type A or Type B meeting?
19    A. I honestly don't know.
20    Q. Okay. If you could go to page 25, the
21 first highlighted entry, ▮▮▮▮▮▮▮▮▮▮.
22    It says, "▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮." Do you see that?
24    A. I see that.
25    Q. Okay. You know what a ▮▮▮▮ is,

Page 59

1 right?
2    A. Yes, I do.
3    Q. Do you know what ▮▮▮▮▮▮▮▮▮▮
4 this is referring to?
5    MS. WEISSER: Objection. I'm going to
6 instruct him not to answer.
7 BY MR. MACORETTA:
8    Q. Were you involved at all in developing or
9 analyzing any PRN assay for mumps GSK use?
10    MS. WEISSER: Same objection. Same
11 instruction.
12 BY MR. MACORETTA:
13    Q. Were you involved at all in creating --
14 SOP means standard operating procedure, generally?
15    A. Yes.
16    Q. Okay. Were you involved at all in
17 creating the SOPs for PRN assay Merck used for
18 mumps -- excuse me, GSK used for mumps?
19    MS. WEISSER: Excuse me. Same objections
20 and instructions.
21 BY MR. MACORETTA:
22    Q. If you could go to page 23. By the way,
23 when did you leave regulatory affairs?
24    A. Sometime in 2012.
25    Q. Okay. So if you go to 23, the bottom

Page 60

1 entry. It says, "▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮."
3    Do you see that?
4    A. I see that.
5    Q. Is it your understanding that ▮▮
▮▮▮▮▮▮▮▮▮▮t?
8    A. I don't -- I don't know.
9    Q. Well, do you know where it was in Phase 3
10 studies at that time?
11    A. No.
12    Q. And you came back in April of 2016?
13    A. Yes.
14    Q. Okay. What caused you to leave?
15    A. GSK?
16    Q. GSK. Yes.
17    A. Another opportunity.
18    Q. At Metamune -- I'm sorry, at Orlenda?
19    A. Yes.
20    Q. Okay. What caused you to come back to
21 GSK?
22    A. My passion for developing vaccines and my
23 positive associations with vaccines developers.
24    Q. What caused you to leave Merck?
25    A. Financial reasons.

Page 61

1    Q. Does that mean you were offered more
2 money somewhere else?
3    A. No. It means that there was a change in
4 the pension algorithm that would have caused me to
5 work for four years for free.
6    Q. Fair enough. Okay.
7    If you could go to page 3. And I'm going
8 to look at that -- one, two, three -- third
9 highlighted entry, ▮▮▮▮▮▮▮▮▮▮.
10    It says, ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮."
13    Do you see that?
14    A. Uh-huh.
15    Q. Do you know what that refers to?
16    A. GCP?
17    Q. Well, yes, let's start with that. What
18 does G --
19    A. Good clinical practices.
20    Q. Okay. Do you know what investigation of
21 good clinical practice issues --
22    A. No, I don't.
23    Q. Okay. And then if we go two down,
24 there's a clinical site compliance issue. Do you
25 see that?

16 (Pages 58 - 61)

Appx19363

HIGHLY CONFIDENTIAL

Page 62

1    A.  Yes.
2    Q.  Do you know what that refers to?
3    A.  No, I don't.
4    Q.  If we go to page 2 -- one, two -- third
5  highlighted entry down, it says, "████████████
████████████████████."
7         Do you see that one?
8    A.  I see it.
9    Q.  Were you involved at all in this
10  discussion?
11    A.  It's in the ████, it would appear,
████████? No.
13    Q.  You're doing that by the time, not --
14    A.  No, I don't --
15    Q.  -- because you don't remember?
16    A.  Well, I don't remember.  But, also I was
17  noting whether we were still in the sequence of
18  when I was in regulatory affairs versus currently
19    Q.  But by May 2016, you're back in your
20  current role as senior advisor?
21    A.  Senior advisor in a different area, yes.
22  Not regulatory affairs.
23    Q.  Okay.  But you still have some
24  involvement with the MMR product, you said?
25    A.  At the technical level, yes.

Page 63

1    Q.  Okay.  And so whatever ████████████
2  they're talking about here, you don't know what it
3  is?
4    A.  No.
5    Q.  Okay.  Let me show you a couple of
6  documents I'm going to mark as Exhibits 5 and 6.
7  That one is Exhibit 5.
8         (Schofield Deposition Exhibits 5 and 6
9         marked for identification and attached to
10         the transcript.)
11  BY MR. MACORETTA:
12    Q.  Mr. Schofield, these documents were
13  produced to us in the last week.
14         Were these documents that you found on
15  your computer, your home -- your personal
16  computer?
17    A.  If they were produced in the last week
18  from documents from my personal computer, I guess
19  so.  I don't know what documents were produced to
20  you and when.
21    Q.  Fair enough.  You're right.  Fair enough.
22  Let me start again.
23         These two documents, Schofield 5 and 6,
24  were these documents on your personal computer?
25    A.  I can't say without my personal computer.

Page 64

1    Q.  Well, of the things that you found and
2  turned over to your counsel -- we talked earlier
3  that after the subpoena you searched your records,
4  right?
5    A.  I searched my records for file folders
6  that contained documents that were about MMR.
7    Q.  Okay.  And you found a few, right?
8    A.  Yes.
9    Q.  Okay.  Were these among the ones you
10  found?
11    A.  I didn't search the documents.  I simply
12  handed over the file folder.  I had not -- I had
13  not touched that file folder since leaving GSK
14  because I was not -- I had not returned to the
15  original reason for keeping the file folder, which
16  was to go into the documents and select those that
17  would be useful for a subsequent publication on
18  the stability monitoring program.
19         So I can't tell you whether they were --
20  these were there or not because I never looked at
21  the documents except to turn them over for this --
22  for this testimony.
23    Q.  So you turned over everything in those
24  filed folders?
25    A.  I did, because I recognized them as

Page 65

1  being, according to the subpoena, pertinent to the
2  development of the -- of the mumps vaccine.
3    Q.  Did you search on your file folder for
4  any GSK documents, any documents you had from GSK
5  relating to mumps vaccine?
6    A.  After that, I did.  And I did not have
7  any GSK documents.
8    Q.  Okay.
9    A.  This --
10    Q.  I'm sorry, go ahead.
11    A.  If I may qualify.
12    Q.  Absolutely.
13    A.  I kept that file folder specifically
14  for -- to retain the calculations that were done
15  that might go into a subsequent -- a subsequent
16  publication.  And these other documents were in
17  the same file folder.
18    Q.  Okay.  So these documents are certainly
19  created from your time at Merck, right?
20         MS. HARDWAY:  Object to form and
21  foundation.
22         THE WITNESS:  I -- I would say that
23  having collected documents into this file folder
24  when I was at Merck, these are likely files that
25  were created while I was at Merck.  There was no

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL

Page 66

1 communication between me and Merck after I left
2 concerning mumps.
3 BY MR. MACORETTA:
4    Q. Okay. So looking at Exhibit 5, on the
5 first page, talking about a shelf life loss and
6 giving dates of '86 to '93 to '98, that would have
7 all been during your time at Merck, right?
8    MS. HARDWAY: Object to form.
9    THE WITNESS: My time at Merck ended in
10 2008. And, therefore, this -- this spans that
11 period of time.
12 BY MR. MACORETTA:
13    Q. Okay. And I will tell you that the
14 metadata for these files say that they were
15 created, last saved and last printed in
16 12/12/2000. So it sounds like it could be right
17 to you?
18    MS. HARDWAY: Object to form.
19    THE WITNESS: I don't have the
20 information to say that they that they were
21 created then. But if the metadata said so.
22 BY MR. MACORETTA:
23    Q. Okay. And you don't have any
24 recollection of creating these documents?
25    MS. HARDWAY: Object to form and

Page 67

1 foundation.
2 BY MR. MACORETTA:
3    Q. You've got to answer that.
4    A. I have no recollection of creating these
5 documents.
6    Q. Okay. And certainly, when you look at
7 Exhibit 6, it's talking about reporting to CBER
8 1/98. Do you see that?
9    A. Yes, I do.
10    Q. In 1/98 you were working at Merck, right?
11    A. Yes, I was.
12    Q. Okay. And as part of your job at Merck
13 in January of '98, would you have been involved in
14 discussions about what to say to CBER concerning
15 mumps stability?
16    MS. HARDWAY: Object to form.
17    THE WITNESS: We were involved in a
18 number of discussions with CBER about mumps
19 stability.
20 BY MR. MACORETTA:
21    Q. Okay. Do you know how many documents
22 were in the file folder you turned over to your
23 counsel?
24    A. I didn't check. I simply followed the
25 subpoena and turned over the files in the file

Page 68

1 folder.
2    Q. Okay. So when you left Merck, these
3 documents were on your computer, presumably,
4 right?
5    A. Uh-huh.
6    Q. Right? You have to say "yes" or "no."
7    A. Yes.
8    Q. Okay. When you left Merck, did you tell
9 anybody at Merck you were taking these with you?
10    A. I didn't say I was taking these specific
11 files with me. I said I was taking information
12 that might be useful to collaborate with people at
13 Merck or who had already left on a subsequent
14 publication to the first publication on stability
15 monitoring program.
16    Q. Did somebody at Merck give you permission
17 to take these?
18    MS. HARDWAY: Object to form.
19    THE WITNESS: I was not -- I don't recall
20 if somebody gave me permission to take them.
21 BY MR. MACORETTA:
22    Q. Did you feel like you were authorized to
23 take these documents with you?
24    MS. HARDWAY: Object to form.
25    THE WITNESS: I saw it as an

Page 69

1 opportunity -- not these documents, per se, but
2 the documents that were going to be interesting to
3 me, to have those documents which were simply
4 calculations. They were, if you like, documents
5 in principle not specifically about mumps, about
6 how you should monitor live virus vaccine
7 stability post licensure.
8 BY MR. MACORETTA:
9    Q. But that's not what these are, right, 5
10 and 6? These are not simply calculations.
11    A. No. These were in the same file folder.
12    Q. Okay. So these were created when you
13 were at Merck, and you took them when you left
14 Merck. And nobody at Merck said it was okay to
15 take these, right?
16    MS. HARDWAY: Object to form and
17 foundation. I don't think -- your questions
18 implies that he's drafted them, and I don't know
19 that you've established that yet.
20    MR. MACORETTA: It doesn't imply that he
21 drafted them. But okay, I'll ask that.
22 BY MR. MACORETTA:
23    Q. Did you draft these documents?
24    A. I can't tell.
25    Q. Do you have any -- is it possible you

18 (Pages 66 - 69)

Appx19365

HIGHLY CONFIDENTIAL

Page 70

1 drafted them?
2    A. It's possible, but I can't tell.
3    Q. Okay. But they -- but they were in your
4 possession, right?
5    A. Yes.
6    Q. Okay. So when you left Merck, they were
7 in your possession, and nobody at Merck gave you
8 authorization to take them, right?
9        MS. HARDWAY: Object to form.
10 BY MR. MACORETTA:
11    Q. You can answer it.
12    A. I didn't take the time to request
13 authorization to take them. I took them because
14 they were in a file folder that -- where I was
15 collecting the information I needed to continue
16 the publication. I didn't screen the file folder
17 for additional documents. These came along with
18 it. And I never touched the file folder until I
19 was subpoenaed to give up materials for --
20 relevant to this case.
21    Q. Okay. But at the time, you didn't feel
22 like you were stealing this information from
23 Merck, did you?
24        MS. HARDWAY: Object to form.
25

Page 71

1 BY MR. MACORETTA:
2    Q. You can answer.
3    A. I was taking them as intellectual
4 property that I could use and work together with
5 Merck on a publication that might benefit the
6 evaluation of stability data.
7 BY MR. MACORETTA:
8    Q. But isn't the deal at Merck that any
9 intellectual property you create while an employee
10 at Merck is Merck's?
11        MS. HARDWAY: Object to form. Overbroad.
12 BY MR. MACORETTA:
13    Q. You can that.
14    A. Could you restate the question?
15    Q. Sure. Was it your understanding when you
16 worked at Merck that any intellectual property you
17 developed as a Merck employee belonged to Merck as
18 opposed to you?
19        MS. HARDWAY: Object to form.
20        THE WITNESS: I don't recall. I don't
21 recall what discussions were had at the time that
22 I departed Merck.
23 BY MR. MACORETTA:
24    Q. So whatever -- whatever else you may have
25 looked at in your file folder, you don't remember

Page 72

1 looking at these documents from the time you left
2 Merck until you searched for stuff for a subpoena
3 a couple months ago?
4    A. I didn't look at any of the documents in
5 the file folder until I was requested to give up
6 these documents.
7    Q. Sure. So whatever article you were
8 thinking about writing when you left Merck didn't
9 happen? Or --
10    A. There was not time for it to happen. I
11 went on to other activities. And, nevertheless,
12 there's always an opportunity to come back and
13 publish good work.
14    Q. Okay. Let's take a look at this. I want
15 to talk for a minute about Merck 5 -- or Schofield
16 5. I'm sorry.
17        By the way, do you know if copies of
18 these documents were still in -- were left with
19 Merck as well?
20    A. I would have no reason -- basis for
21 knowing.
22    Q. Okay. Well, when you left Merck,
23 whatever files existed, what happened to them? Do
24 you know?
25        MS. HARDWAY: Object to form. Overbroad.

Page 73

1        THE WITNESS: I don't know what the
2 mechanisms are in Merck for retaining files and --
3 and -- well, retaining files.
4 BY MR. MACORETTA:
5    Q. Okay. I can tell you that copies of
6 these files were produced to us by Merck from
7 their data for which they said you were the
8 custodian. So I don't know if that helps you or
9 not. But if that gives you any further guidance
10 as to whether or not copies of these were at
11 Merck.
12        MS. HARDWAY: Object to form. Asked and
13 answered.
14 BY MR. MACORETTA:
15    Q. You can answer.
16        Okay. Let's -- let's take a look at
17 Merck 5 -- or Schofield 5. Mumps stability
18 summary.
19        Around 2000, was part of your job at
20 Merck looking at stability issues surrounding the
21 mumps vaccine?
22    A. Part of the job of my department was to
23 look at stability issues as relates to mumps
24 vaccines.
25    Q. And in 2000, were you in charge of your

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL

Page 74

1 department?
2    A.  Yes.
3    Q.  So Phil Bennett, did he report to you?
4    A.  Yes.
5    Q.  Joe Antonello?
6    A.  Yes.  If I may qualify that, there was a
7 time when Phil Bennett was redirected to report to
8 somebody else who reported to me.  I don't know
9 when that happened.
10    Q.  Who was that person?
11    A.  James Claire.
12    Q.  What's --
13    A.  James Claire.
14    Q.  Claire?  Okay.
15        I wanted to talk about -- I wanted to
16 look at the second and third pages of Schofield 5.
17 It says, "Setting an expiry date based on the FDA
18 method and working backward from the FDA method to
19 set a release spec."
20        Do you see those two?
21    A.  Yes.
22    Q.  What is the difference between those two?
23    A.  One is a shelf-life determination
24 calculation and the other is a release-limit
25 calculation.

Page 75

1    Q.  So once you know what the shelf life
2 is -- is the idea that once you figure out what
3 the shelf life is, you can figure out how much
4 product needs to be in it at release?
5        MS. HARDWAY:  Object to form.
6 BY MR. MACORETTA:
7    Q.  You can answer that.
8    A.  It's a more complete -- I can give you a
9 more complete answer.
10    Q.  Please.
11    A.  The shelf-life determination is done by a
12 method that was set out originally by the FDA and
13 originally codified in the ICH guidances.
14        It addresses the question from
15 development experience, what should the shelf life
16 of the product be.
17        The release-limit calculation does a
18 similar type of calculation, but it answers the
19 question what is a future manufactured lot need to
20 be -- to be released to the market to maintain its
21 shelf life, a prescribed shelf life like 24
22 months.
23    Q.  And when we talk about shelf life here,
24 the idea is that at the end of whatever time
25 period is listed as a shelf life, there's a

Page 76

1 certain amount of virus in the product, right?
2    A.  At the time of shelf life, yes.
3    Q.  Okay.
4    A.  Throughout its shelf life, yes.
5    Q.  Okay.  And for our purposes, for MMR, at
6 Merck, the shelf life was always 24 months, right?
7    A.  To the best of my knowledge, but I can't
8 say for sure.
9    Q.  No, I understand.
10        So when you're talking about shelf life,
11 the analysis is how much virus is left in that
12 product at 24 months, right?
13    A.  That's not the question -- as I say, the
14 usual way that a release limit is calculated as
15 you prescribe the shelf life, you say how long
16 it's going to take to manufacture, test, have
17 regulatory authorities test, release, and get
18 material to the patient.  So if that's 24 months,
19 you say, I want a 24-month shelf life.  Then the
20 release limit is calculated to say what do we
21 release at to ensure that particular shelf life.
22    Q.  And that particular shelf life means how
23 much virus product is in the product -- is in the
24 vaccine at the end of 24 months?
25    A.  The shelf life limit is.  Yes.

Page 77

1    Q.  Okay.  And that -- and what that number
2 of virus particles is is on the label, right?
3        MS. HARDWAY:  Object to form.
4        THE WITNESS:  I can't tell.  I don't know
5 what is on the label.  I don't deal with
6 labeling -- labeling.
7 BY MR. MACORETTA:
8    Q.  Okay.  So the first page of Schofield 5
9 says, "Current expiry specification 4.3."  That
10 means that at 24 months it needs to have 4.3,
11 right?
12    A.  That's as written is what it says.
13    Q.  Was that your understanding as well?
14    A.  Well, that as written is what it said.
15 My understanding changed over the course of work
16 that had been done on the month stability.  There
17 was a long, long period of time in which there was
18 not certainty what the end-of-shelf-life limit
19 should be.  So if this is saying that the current
20 belief at that -- at the point of time of writing
21 this document was that, then that's so.
22    Q.  Okay.  And for -- there was only one
23 quantification of virus on the label, right?
24        MS. HARDWAY:  Object to form.
25        THE WITNESS:  I don't know -- I don't

20 (Pages 74 - 77)

Appx19367

HIGHLY CONFIDENTIAL

Page 78

1 know what's on the label.
2 BY MR. MACORETTA:
3    Q. Okay. Can you go to the fourth page of
4 this that says "calculating release specs."
5       So if I understand -- I'm going to look
6 at the first dash under the first bullet point.
7 It says, "5.3 for 0.6 shelf life loss."
8       Do you see that?
9    A. Yes, I see it.
10    Q. First of all, all of these numbers are
11 logs, right?
12    A. Yes, they are.
13    Q. And if I have my log math correct,
14 when the log increases .1, that means there's
15 about 25 percent more product, right?
16    A. I can't tell you unless I got -- I do my
17 log math.
18    Q. Okay. Well, we may do that a little
19 later.
20       Okay. So in this dash in number 1, the
21 idea is if it's released at 5.3, then over its
22 shelf life it will lose .6 log? Is that what this
23 is contemplating?
24       MS. HARDWAY: Object to form.
25       THE WITNESS: I can only read the

Page 79

1 statement and say that it says "5.3 for .6 shelf
2 life loss." I can't interpret it.
3 BY MR. MACORETTA:
4    Q. Okay. Then if you go further back, one,
5 two, three, the sixth page says, "Path forward
6 options."
7       Do you see that?
8    A. I see that, yes.
9    Q. And then it says, "Mumps expiry trial,
10 18-month dating and increased manufacturing
11 targets and release specs even more."
12       Do you see that?
13    A. Yes.
14    Q. Do you recollect around 2000 discussing
15 these as various options for the mumps vaccine?
16       MS. HARDWAY: Object to form and
17 foundation.
18       THE WITNESS: I'm sorry, was there a
19 date?
20 BY MR. MACORETTA:
21    Q. Well, the metadata of this is December of
22 2000.
23    A. The metadata of this. Oh, off of the
24 computer file?
25    Q. Yes. This was last -- this was created,

Page 80

1 last saved and last printed December 12, 2000.
2    A. I had outside understanding that these
3 were options that were being considered.
4    Q. What is "outside understanding"?
5    A. As a -- as a -- as a manager of the
6 people who were doing this work, I learned through
7 them these are the kinds of things that were being
8 considered.
9    Q. And who exactly were the people who were
10 doing this work?
11    A. The team of people.
12    Q. Who would that be? Who would that
13 include?
14    A. Well, it would include -- and the only
15 one I can speak for specifically is Phil Bennett.
16    Q. Okay. Would there have been other
17 statisticians on the team?
18    A. To the best of my knowledge, no.
19    Q. Okay. Do you remember discussing
20 18-month dating for mumps?
21       MS. HARDWAY: Object to form. Asked and
22 answered.
23 BY MR. MACORETTA:
24    Q. You can answer.
25    A. I don't know.

Page 81

1    Q. Do you remember discussing whether you
2 should increase the manufacturing targets and
3 release specs even further?
4       MS. HARDWAY: Object to form. Asked and
5 answered.
6 BY MR. MACORETTA:
7    Q. You can answer that.
8    A. I don't recall exactly.
9    Q. If you go back to page 4, under that
10 calculating release specs, do you recall that in
11 the late '90s, the release specification of mumps
12 was increased?
13    A. I recall that it was increased. I don't
14 recall when it was increased.
15    Q. Okay. So this bullet point at the bottom
16 of page 4, "Release spec of 5.0 is based on a
17 compromise between stability and safety."
18       Do you see that?
19    A. Yes, I do.
20    Q. Do you know what that refers to?
21       MS. HARDWAY: Object to form and
22 foundation.
23       THE WITNESS: No, I don't.
24 BY MR. MACORETTA:
25    Q. Who at Merck at the time would have made

21 (Pages 78 - 81)

Appx19368

HIGHLY CONFIDENTIAL

Page 82

1 the decision to make a compromise between
2 stability and safety?
3        MS. HARDWAY:  Object to form and
4 foundation.
5        THE WITNESS:  I have no idea.
6 BY MR. MACORETTA:
7    Q.  It wouldn't have been you?
8    A.  No.
9    Q.  Okay.  And at this time, in 2000, Merck
10 was doing its own internal calculations of
11 stability of mumps vaccine, right?
12    A.  To the best of my knowledge, yes.  Again,
13 probably Phil Bennett, who I -- because he was an
14 expert in stability evaluation, was doing this.
15    Q.  Well, you're kind of an expert in
16 stability as well, right?
17    A.  Right.  But I'm also a manager of a group
18 of 20 people.
19    Q.  Okay.
20    A.  I'll -- I will step in at times when the
21 -- when work needs to be supported, but it's not
22 my primary function at that time.
23    Q.  Okay.  And above that, on page 4, this
24 calculating release specs, at the bullet of the
25 first bullet it says, "Without ensuring that

Page 83

1 individual time point results would be above
2 expiry spec."
3        Do you see that?
4    A.  Yes, I do.
5    Q.  Do you know what that relates to?
6        MS. HARDWAY:  Object to form and
7 foundation.
8        THE WITNESS:  I can't tell, not having
9 been an author of this.
10 BY MR. MACORETTA:
11    Q.  Okay.  Let's take a look at Schofield
12 Exhibit 6.
13        Do you -- do you know if you were an
14 author of this document?
15    A.  I don't know.
16    Q.  I can tell you that the metadata for this
17 says it was created, last saved, and last printed
18 November 16 of 2000.
19        Well, do you recollect being involved in
20 a discussion about reporting to CBER in January of
21 '98 a stability analysis?
22    A.  I can't say for the -- speak for the
23 exact date.  But, as I said, we were having
24 frequent communications back and forth with the
25 agency about calculations that they were

Page 84

1 performing and that we were performing.
2    Q.  When it says "recommended ASM," is that
3 active stability monitoring?
4    A.  Yes.
5    Q.  What is that?
6    A.  It's the program that I said that we were
7 working on that I -- we may have published further
8 on, which was a program to use the commercial
9 stability data to monitor the product stability
10 profile.
11    Q.  What's the commercial stability data?
12    A.  It's data that's collected on -- is set
13 routinely at least one lot of manufacture material
14 a year to monitor the stability characteristic of
15 the product.
16    Q.  But when you say -- I'm trying to
17 understand why it's commercial stability data as
18 opposed to something else.
19    A.  It's on a commercial lot of material.
20    Q.  As opposed to?
21    A.  Development.
22    Q.  A developmental lot?
23    A.  Yes.
24    Q.  Okay.  Were you still making
25 developmental lots of mumps vaccine in 1998?

Page 85

1    A.  No.
2    Q.  Okay.  So they're all commercial lots?
3    A.  After 1998.  But commercial -- you know,
4 again, this kicks in at the point that it becomes
5 commercial.  So there's development stability,
6 which is usually done to assess shelf life and/or
7 determine release limits.  And then there's a
8 monitoring program that follows on to that that
9 manages or maintains vigilance of the stability of
10 the product.
11    Q.  So there's some to figure out with the
12 limits should be, and then there's some later to
13 make sure that the product is complying with those
14 limits, right?
15    A.  Yes.
16    Q.  Fair enough.
17        Okay.  And then -- it says, "Launched
18 expiry trial 4.3/3.7."
19        Do you understand that that's the 007
20 trial?
21    A.  I know that those are -- well, expiry
22 trial says to me the 007 trial.
23    Q.  Okay.  Above that it says "23 lots."  Do
24 you see that?
25    A.  Uh-huh.

22 (Pages 82 - 85)

Appx19369

HIGHLY CONFIDENTIAL

Page 86

1    Q.  What's a lot?
2    A.  It's a batch of manufacturing material.
3    Q.  So it's in vials?
4    A.  It's in batch of manufacturing material
5  in vials or syringes.
6    Q.  Okay.  It's not in one big barrel or
7  something?
8    A.  No.  It's -- you know, otherwise packaged
9  and stored, distributed and used by the customer.
10    Q.  And how many vials in a lot or syringes
11  in a lot?
12    A.  I don't know that information.
13    Q.  Other people have said anywhere from 30-
14  to 40,0000.  Does that sounds reasonable?
15    A.  I have no --
16      MS. HARDWAY:  Object to form.
17      THE WITNESS:  I have no basis for
18  knowing.
19  BY MR. MACORETTA:
20    Q.  Okay.  And then that says, "Marketing
21  stability analysis."  What is that?
22      MS. HARDWAY:  Object to form and
23  foundation.
24  BY MR. MACORETTA:
25    Q.  If you know.

Page 87

1    A.  It was a term that was being used at the
2  time to look at different ways of evaluating
3  stability data.  As we were putting together the
4  annual stability program, we were looking at all
5  opportunities to monitor product that was on the
6  market.
7    Q.  So before this, there wasn't an annual
8  stability program?
9    A.  There was.  But it wasn't done using a
10  what's called statistical design and analysis and
11  acceptance criteria.  It was just lots put on
12  stability that were tested at usually what we call
13  ICH time points and look at those results as they
14  came off.
15    Q.  And if a lot was -- well, there's two
16  things, right?  A lot could be below the minimum
17  4. -- which was then 4.3, right?
18      MS. HARDWAY:  Object to form and
19  foundation.
20  BY MR. MACORETTA:
21    Q.  Let me -- a lot could be -- strike that.
22      A lot could either be out of
23  specification, which means it was below the
24  specifications on the label; or it could be out of
25  trend, right?

Page 88

1    A.  I don't know what you mean that a lot
2  could be --
3    Q.  Okay.  Let's try this:  So there's a
4  stability program and occasional you test vials
5  from whatever lot is on stability, right?
6    A.  Uh-huh.  Yes.
7    Q.  Okay.  What happens if that lot you
8  test -- and you have some number that lot is
9  supposed to be at, right, that test result is
10  supposed to happen, right?
11    A.  Right.
12    Q.  Okay.  What happens if it's below that
13  number?
14      MS. HARDWAY:  Object to form.  Overbroad.
15      THE WITNESS:  If the lot -- and by the
16  lot we mean a statistical evaluation of the data
17  for that lot -- is below, then there is a
18  statistical probability that it is below the spec.
19  But if by a lot you mean a measurement on that
20  lot, that does not say that the lot is below the
21  limit.  That is only a measurement on that lot.
22  BY MR. MACORETTA:
23    Q.  And you're not measuring the whole lot
24  when you do this stability; you're measuring a few
25  vials from a lot, right?

Page 89

1    A.  As you do when you release the product,
2  it's a sampling.  Yes.
3    Q.  So when we talk about lots on stability,
4  does that mean the whole lot is on stability and
5  you take a few vials at a time whenever you do the
6  measurements?
7    A.  The lot number is on stability.  And
8  there are vials put aside in a -- what's called
9  the stability unit to do testing on samplings from
10  that lot at multiple time points.
11    Q.  Does that mean every vial on the lot is
12  stability?
13    A.  No.
14    Q.  Some of them are released for sale,
15  presumably?
16    A.  Well, yes.
17    Q.  I'm just trying -- honestly, I'm trying
18  to understand.  When we talk about a lot on
19  stability, we don't mean all 10, 10,000, 30,000
20  vials in that lot, right?
21    A.  No.  It's like the tests that you perform
22  when you release a lot, it is a subsampling of the
23  lot that's put aside, put in a stability chamber,
24  and tested in order to assess the stability or
25  predict the stability of that lot that's out in

23 (Pages 86 - 89)

Appx19370

HIGHLY CONFIDENTIAL

Page 90

1  the market.
2    Q.  Got you.
3    MR. MACORETTA:  Okay.  We're going to
4  have to call the Court in a few minutes, so this
5  is a good time for a break.  Thank you.
6    VIDEO TECHNICIAN:  Off the record at
7  10:56 a.m.
8    (A recess was taken.)
9    THE CLERK:  I'll get the judge on the
10  line.  Who do we have for United States?
11    MR. MACORETTA:  Nobody is here -- well,
12  I'm sorry.  Gary Reilly from Constantine Cannon
13  for the relator.  There's nobody from the U.S.
14  Attorney's office.
15    THE CLERK:  Let's go down.  Do we have
16  Mr. Vitelli on the line?
17    MR. VITELLI:  Yes, I'm here.
18    THE CLERK:  Okay.  How about
19  Mr. Sullivan?  Mr. Sweet?
20    MR. MACORETTA:  No.  Nobody from the DOJ.
21    THE CLERK:  Okay.  Mr. Allanoff?
22    MR. MACORETTA:  You know what, it's a
23  long line.  I can tell you, the only lawyer on the
24  plaintiff's side is John Macoretta.
25    MS. LERNER:  No, that's not right.

Page 91

1    MR. MACORETTA:  Oh, I'm sorry.
2    MS. LERNER:  Wait.  I'm Kellie Lerner
3  from Robins Kaplan also on behalf of plaintiff.
4    THE CLERK:  Hold on.  The female attorney
5  that spoke, what is your name again?
6    MS LERNER:  Kellie Lerner.
7    THE CLERK:  Kellie Lerner.  Okay.  I've
8  got to flip through pages here.  Hang on.  And
9  you're for plaintiff.  Kellie Lerner, got you.
10  Okay.
11    Who else is on for plaintiff?
12    MS. KOURY:  Marlene Koury for relator
13  side is on.
14    THE CLERK:  Hang on one second.  Marlene
15  Koury?  Got you.  Okay.
16    Anybody else from that side?
17    (No response.)
18    THE CLERK:  No.  So let's move on.  Who's
19  on the line from Merck?
20    MS. HARDWAY:  Kathleen Hardway from
21  Venable for Merck and also Mr. Schofield in his
22  capacity as a Merck employee.
23    THE CLERK:  Okay.  I don't see you on the
24  docket.  Who are you here for?
25    MR. MACORETTA:  You just entered like a

Page 92

1  couple of weeks ago, right?
2    MS. HARDWAY:  Like more than that.
3    MR. MACORETTA:  Ms. Hardway file her pro
4  hac, which was granted a month ago or something
5  like that.
6    THE CLERK:  Wow.  Okay.  I don't see you
7  on the docket.  Okay.  Hang on.  Let me flip
8  through it again.  I'm filling in for Regina, so
9  give me a second.
10    Okay.  We are talking about 104374,
11  correct, docket number?
12    MR. MACORETTA:  Or the 12 case.  There's
13  also a 2012 case there.  They're related.
14    THE CLERK:  Okay.  That therein lies --
15  let's have that 2012 number, please.
16    MR. MACORETTA:  Somebody who's not me.
17  Kellie?  Marlene?  Caption?
18    MS. WEISSER:  I've got it.
19    MR. MACORETTA:  You've got it.  There you
20  go.  Okay.
21    THE CLERK:  No.  Docket number.  Docket
22  number, please.
23    MS. WEISSER:  12 -- is it 03555?
24    THE CLERK:  Let's see if that does it.
25  That does it.  Let me just print that.  Hang on

Page 93

1  one second.
2    So what we are going to do to make this
3  very, very easy, I am going to grab a piece of
4  paper here.  For United States, ex rel, we've got
5  Daniel Vitelli, plaintiff.  We've got --
6    Did you say Mr. Macoretta is on the line?
7    MR. MACORETTA:  I am.  I'm for the
8  private plaintiffs, not the ex rel.
9    THE CLERK:  That's okay.  I'm just
10  getting plaintiff's side on the line as a cheat
11  sheet for the judge.
12    MR. MACORETTA:  Sure.  I suspect I'll be
13  doing most of the talking for us, John Macoretta.
14    THE CLERK:  If you can just announce who
15  is talking before you start, that would be great.
16    Okay.  Now, for defense --
17    MS. HARDWAY:  It's Kathleen Hardway.
18    THE CLERK:  One at a time.  I'm just
19  going to write your names down.  Go ahead.
20    MS. HARDWAY:  Kathleen Hardway from
21  Venable for Merck.
22    THE CLERK:  Can you spell your last name,
23  please.
24    MS. HARDWAY:  Sure.  H-A-R-D-W-A-Y.
25    THE CLERK:  And next?

24 (Pages 90 - 93)

Appx19371

HIGHLY CONFIDENTIAL

Page 94

1    MS. HARDWAY: Just to be clear, I'm
2 representing both Merck and the witness in his
3 capacity as a Merck employee for this deposition.
4    THE CLERK: Okay. Counsel, if you'll
5 hold on, I'll get the judge.
6    MS. WEISSER: Wait, wait. Hold on.
7 Sorry. Sorry. Somebody else. My name is Beth
8 Weisser, W-E-I-S-S-E-R, from Fox Rothschild.
9    THE CLERK: For?
10    MS. WEISSER: Non-party GlaxoSmithKline.
11 And --
12    THE CLERK: Hang on one second. Wait a
13 minute. Okay, go ahead.
14    MS. WEISSER: Also for the witness to the
15 extent it relates to his employment at
16 GlaxoSmithKline.
17    THE CLERK: That's okay. Anybody else?
18 All right. Counsel, please hold.
19    MS. WEISSER: Thank you.
20    THE MAGISTRATE: Good morning, Counsel.
21    MR. MACORETTA: Good morning, Your Honor.
22    MS. WEISSER: Good morning, Your Honor.
23    THE MAGISTRATE: Are we on the record?
24    MR. MACORETTA: We are, Your Honor. Our
25 court reporter is sitting here next to me. This

Page 95

1 is John Macoretta speaking.
2    THE MAGISTRATE: Okay. Let's go ahead
3 and have a quick roll call. I know my secretary
4 already got the names, but let's see if we can do
5 voice exemplars here.
6    MR. MACORETTA: John Macoretta here for
7 the plaintiffs.
8    THE MAGISTRATE: Okay.
9    MR. REILLY: Gary Riley for --
10    MS. LERNER: Kellie Lerner --
11    THE MAGISTRATE: Please try that again.
12    MR. VITELLI: This is Dan Vitelli, Your
13 Honor, Constantine Cannon for relators.
14    MS. KOURY: Sorry. Marlene Koury is also
15 here for relators.
16    MR. REILLY: Gary Riley here for relator.
17    THE MAGISTRATE: Okay.
18    MS. LERNER: On the phone is Kellie
19 Lerner from Robins Kaplan on behalf of private
20 plaintiffs.
21    THE MAGISTRATE: Okay.
22    MR. MACORETTA: That's our side.
23    MS. HARDWAY: Your Honor, it's Kathleen
24 Hardway from Venable for Merck and also for the
25 witness, Mr. Schofield, in his capacity as a

Page 96

1 former Merck employee.
2    THE MAGISTRATE: Okay.
3    MS. WEISSER: Your Honor, good morning.
4 This is Beth Weisser from Fox Rothschild. I'm
5 here today on behalf of non-party GlaxoSmithKline
6 and on behalf of the witness, Mr. Schofield, in
7 his capacity as a GSK employee.
8    THE MAGISTRATE: Okay. All right. Thank
9 you, Counsel.
10    Go ahead. Who's got the motion here?
11    MR. MACORETTA: I guess it's me, Your
12 Honor, John Macoretta.
13    We're sitting here in Washington at the
14 deposition of Tim Schofield. For a long time he
15 was a Merck employee. You'll recollect our
16 lawsuit is against Merck over its mumps vaccine.
17    In 2007, he leaves Merck and goes to
18 GlaxoSmithKline, GSK. He's there for a while and
19 he comes back --
20    THE MAGISTRATE: Hold on a minute. Did
21 you say 2007?
22    MR. MACORETTA: Yes, I did. Didn't I?
23 2009. I misspoke. 2009. I apologize.
24    2009, he leaves Merck, after a couple
25 stops goes to GSK. He's there for a while. By

Page 97

1 his own admission today is involved in the
2 competing product at GSK, their MMR vaccine.
3    He goes a couple others places. Now he's
4 back at GSK.
5    You'll also recollect that the plaintiffs
6 served a subpoena on GSK looking for documents
7 partly because GSK is the most likely competitor
8 and the company that most likely would have gone
9 on the market with a competing vaccine had Merck
10 not done the bad acts we allege. And, of course,
11 we have an antitrust case saying the bad acts
12 stopped competition.
13    So what GSK was going to do and why
14 they're doing it is relevant and I don't think
15 anybody disputes that, generally.
16    The interesting twist today is that we
17 wanted -- we want to question Mr. Schofield both
18 in his role at Merck and in his subsequent role at
19 GSK because he seems to have some knowledge about
20 what's going on with GSK.
21    I should say the GSK's vaccine is not on
22 the market. But from some public statements, it
23 seems like it will be soon.
24    So we subpoena Mr. Schofield. And we
25 sent you some documents earlier. February 23rd I

25 (Pages 94 - 97)

Appx19372

Page 98

1 sent an e-mail to GSK and Merck's lawyers.  It
2 says, we want to subpoena Mr. Schofield, who is
3 representing him?
4        Dino Sangiamo from Venable, one of
5 Merck's lawyers, says, "I am representing him and
6 I'll accept the subpoena."  Great, we send him the
7 subpoena.
8        February 9, Venable files objections.
9 Okay.  We talk about them.  We schedule the
10 deposition for today.
11        We never hear a word from GSK's lawyers
12 that they want to have some opinion.  Remember,
13 GSK is a non-party to the case.
14        Last week, on the 14th, Merck and GSK for
15 the first time file more objections to the
16 subpoena, for the first time saying, "We're not
17 giving any documents for Mr. Schofield's time at
18 GSK."
19        Okay.  We don't like it.  We have a phone
20 call on Friday.  We say, "We're reserving our
21 right to fight about that, we're entitled to them.
22 But, nonetheless, he's going to be deposed Monday.
23 We expect him to answer every question."
24        I hang up that call.  And GSK's lawyer
25 says, "Yes, I will be there Monday, but I will let

Page 99

1 him answer questions."
2        GSK never files a motion to quash, never
3 objects to anything, until last week.
4        So whatever they file we would say is
5 untimely.
6        This morning we get here.  We ask
7 Mr. Schofield questions.  "What is your
8 understanding of the current status of GSK's MMR
9 product?"
10        "Objection.  He's not going to answer
11 that."
12        We go through a series of questions.
13 Mr. Schofield clearly has some involvement or
14 knowledge with what GSK is doing.  Won't answer
15 any of those questions.
16        You'll recall that part of our discovery
17 dispute with GSK is to try to narrow the scope of
18 what we need from GSK to understand when they're
19 coming to the market and why they didn't come to
20 the market earlier.  We asked Mr. Schofield
21 questions to try to understand that.  He's not
22 going to answer them.
23        We show Mr. Schofield an index produced
24 by GSK of all their regulatory communications with
25 the FDA.

Page 100

1        You'll recall in our motion to compel
2 that's one of the things we've wanted for months
3 that GSK hadn't given -- given to us.
4        So I asked Mr. Schofield about specific
5 entries on that index.  "Here's a document --
6 here's a correspondence when you were there at
7 GSK.  Do you know what this relates to?"
8        He's not going to answer that, objection.
9        Now, that's what causes us to call you.
10        Now, I understand the document
11 objections, and we can fight about them later.
12 But the fact is, Mr. Schofield is here pursuant to
13 a valid subpoena that his lawyers knew about for
14 months.  They can't just simply come in and tell
15 him not to answer questions because they think we
16 should get all the discovery from GSK in some
17 other way.
18        That is our position.  That's why we had
19 to invoke you, I guess, or ask you to become
20 involved, to see if you can resolve this issue.
21 And we would say, instruct Mr. Schofield to answer
22 the questions.
23        Finally, I should point out that the
24 whole thing is under a protective order.  And if
25 this is some issue of GSK not wanting to tell the

Page 101

1 competitors what they're up to, there's
2 attorneys-eyes only provision that would protect
3 them in that regard as well.
4        So that is our position.
5        THE MAGISTRATE:  Okay.  Who would like to
6 speak next?
7        MS. WEISSER:  Your Honor, this is Beth
8 Weisser on behalf of GSK.  I'd like to speak next
9 if that's okay.
10        THE MAGISTRATE:  Sure.
11        MS. WEISSER:  So just to clarify a couple
12 of things, there has not been a blanket refusal to
13 answer questions or instruction not to answer on
14 behalf of GSK.  Instead, I have attempted to take
15 it on a question-by-question basis, as I advised
16 Mr. Macoretta this past Friday that I would be
17 doing.
18        In fact, as it pertains to the regulatory
19 file index that he mentioned at the end of his
20 presentation, there were certain isolated
21 instructions not to answer, but there were far
22 more questions that I allowed Mr. Schofield to
23 answer pertaining to the regulatory file index.
24        So it has not been an across-the-board
25 refusal to answer questions pertaining to his work

26 (Pages 98 - 101)

Page 102

1 at GSK.
2        And I think, you know, as Mr. Macoretta
3 began his presentation by saying, you know, what's
4 relevant here -- and, you know, remembering that
5 GSK is a non-party to this litigation. So what's
6 relevant here is GSK's decision to enter the
7 market or not.
8        And it's GSK's position that the witness'
9 other work at GSK, whether it's related to this
10 vaccine at issue or other vaccines, should be off
11 limits. And if Mr. Macoretta would like to ask
12 the witness does he have an understanding about
13 GSK's decision to enter the market or not, then I
14 think that's a fair question, and I would not
15 object, and I would allow the witness to answer
16 that.
17        But the deposition should not be used as
18 a vehicle to gain other insight as to GSK's
19 process or products.
20        And I would say that there's really no
21 harm here because GSK will undoubtedly be
22 providing a 30(b)(6) deposition, in addition to
23 documents, where Mr. Macoretta will be able to ask
24 these questions and other questions of a GSK
25 witness who can actually bind the company. We

Page 103

1 just don't believe that it is this witness today.
2 And that his role and his testimony as it pertains
3 to his work at GSK is very limited.
4        It's not just a case where you're asking
5 a witness about his employment history or his
6 other work. That employer is the subject of a
7 third-party subpoena and will be the subject of a
8 30(b)(6) deposition.
9        THE MAGISTRATE: I'm trying to understand
10 where the line is getting drawn with the
11 questions. If you could explain that to me again,
12 that would be helpful.
13        MS. WEISSER: I understand. And it's
14 really -- as I said, we're trying to take it on a
15 question-by-question basis.
16        So some, you know, general questions
17 about process or, you know, procedures.
18 Personnel, we allowed Mr. Macoretta to walk
19 through a list of GSK personnel who have been
20 proposed as custodians for the document
21 production. We allowed him to ask the witness
22 about all of those custodians and whether or not
23 he recognized those custodians and what their role
24 was.
25        But when it goes beyond sort of

Page 104

1 superficial questions about GSK's decision or, you
2 know, who worked on it or what stage is something
3 at, and it delves more into the -- the GSK's work to
4 develop the vaccine or GSK's -- you know, the
5 science behind it, the marketing behind it, the
6 business behind it, anything along those lines we
7 feel is off limits.
8        And we think this strikes the appropriate
9 balance, given this witness' role and level of
10 knowledge and the fact that there will be a
11 forthcoming deposition of GSK.
12        THE MAGISTRATE: Which raises -- which
13 gets to my other question: We kind of glossed
14 over exactly what Mr. Schofield's position is, and
15 we also glossed over his comings and goings at
16 Merck. Is that something I need to know to
17 address this question?
18        MR. MACORETTA: Judge --
19        MS. WEISSER: I mean, his time at GSK, I
20 think he spent a total of three years, maybe, at
21 GSK, from April of 2016 to the present. And then
22 his earlier time was between 2009 and 2011.
23        So it's very limited as compared to his
24 time at Merck, Your Honor.
25        MR. MACORETTA: Well, Judge, it's John

Page 105

1 Macoretta. Look, I asked Mr. Schofield, "When you
2 were at GSK, were you involved in getting
3 regulatory approval for their MMR vaccine?"
4        "Yes."
5        "What was your involvement?"
6        "He's not answering that question, I
7 object."
8        "What is your knowledge of the current
9 state of GSK's approval of the vaccine?"
10        "He's not answering that question."
11        So the line, essentially, to answer your
12 earlier question, was drawn at any substance. We
13 can't ask him anything about what he did at GSK
14 regarding this competing vaccine or what he knows
15 about where GSK is with this competing vaccine.
16        We even showed Mr. Schofield a public
17 document from the head of vaccines that said, "Our
18 product is likely going to be on the market in 27
19 [sic] or 2018." And I asked him about that, and
20 Ms. Weisser wouldn't let him answer any detailed
21 questions about that either.
22        So wherever the line is, it's essentially
23 at all the substance.
24        I'd like to respond to a few of
25 Ms. Weisser's others points, if that's okay.

27 (Pages 102 - 105)

Page 106

1    THE MAGISTRATE: Sure.
2    MR. MACORETTA: Okay.
3    So the idea that this is not relevant is
4 simply not true. When -- when GSK is going to
5 come on the market and why they haven't come on
6 the market sooner are highly relevant. Unless,
7 however, Merck wants to say that they're not.
8 Which I suspect they will not because Merck will
9 defend the case in part by saying, "Even if we did
10 everything you say, no competitors would have come
11 on the market."
12    So this is highly relevant and I don't
13 think they really dispute that.
14    The idea that somehow we have to -- we
15 are limited in our discovery from GSK to the
16 subpoena we served on the company -- and I think
17 Ms. Weisser said this is vehicle to gain other
18 insight, that's perfectly allowed under the rules.
19 We can take discovery in whatever form and
20 whatever order we want.
21    Just because we ask -- just because we
22 serve the company with a subpoena -- which, by the
23 way, is the subject to a motion to compel, as you
24 know, because we haven't gotten anything from them
25 yet, and the discovery deadline is approaching --

Page 107

1 that doesn't stop us from seeking other sources of
2 discovery.
3    So that goes to Ms. Weisser's third
4 point, oh, there's no harm. Whatever you might
5 learn from this guy you'll learn from somebody
6 else.
7    Well, maybe. I mean, we haven't gotten
8 anything from GSK yet. There will be a 30(b)(6)
9 deposition. When that is or what that person
10 says, I don't know.
11    Also, I keep emphasizing this point to
12 Ms. Weisser. It's possible that Mr. Schofield
13 will tell us some things that will allow us to
14 narrow our discovery fight with GSK. If
15 Mr. Schofield explains what's really going on at
16 GSK to the best of his knowledge, we may be able
17 to withdraw a request for certain information,
18 because a lot of the fight with GSK is that
19 whatever we're asking for is too broad. So here's
20 a guy who can narrow it, but they won't let him
21 answer any of the questions to narrow.
22    I'm done.
23    THE MAGISTRATE: Okay. Ms. Weisser?
24    MS. WEISSER: Your Honor, I don't -- I
25 disagree that Mr. Schofield is going to be in a

Page 108

1 position to narrow the discovery. I think the
2 attorneys are working hard to narrow the discovery
3 themselves, and I think that process is well
4 underway. So I disagree that Mr. Schofield is the
5 person to narrow the discovery.
6    And, you know, as I said earlier, I think
7 we have provided -- it has not been a blanket
8 objection. There just has to be limits. This is
9 third-party discovery. You know, instructions not
10 to answer are appropriate when discovery is sought
11 in bad faith or when it's oppressive or burdensome
12 or harassing to a party. And here we're talking
13 about a non-party.
14    MR. MACORETTA: Well --
15    MS. WEISSER: And Mr. Macoretta
16 speculates that maybe he'll get this from a
17 30(b)(6), maybe not. Well, the plaintiffs are in
18 control of the topics that they identify for the
19 30(b)(6) deposition. And GSK -- not to state the
20 obvious, Your Honor, but GSK is obligated to
21 present a witness that is prepared or
22 knowledgeable on the topics that plaintiffs
23 identify, which we intend to do.
24    So it is not mere speculation that they
25 might get this information from a 30(b)(6)

Page 109

1 witness. That's the reason there's a corporate
2 designee provision in the federal rules.
3    MR. MACORETTA: Judge, if I might. First
4 of all, this is the first time anybody said
5 anything about bad faith here. Coming from GSK's
6 counsel, I mean, we served them a subpoena in
7 August. We had to file a motion to compel this
8 month because they haven't given us a single piece
9 of paper. So I'm going to -- that's enough said
10 on bad faith.
11    Having said that, let me highlight again
12 the timing, Judge. GSK's lawyer knew we were
13 going to subpoena this guy January 23rd. We gave
14 her the opportunity to represent him.
15    THE MAGISTRATE: Hold on, hold on, hold
16 on, Mr. Macoretta. Mr. Macoretta, I'm not
17 compelled by that issue. If you could speak to
18 the substance of it, I think that's more helpful.
19 I'm not compelled by the fact that in your view
20 they should have spoken up earlier. I don't find
21 that very helpful.
22    So why don't you address the substance.
23    MR. MACORETTA: Fair enough. Ms. Weisser
24 can disagree on whether or not Mr. Schofield is
25 going to give us any useful information. But that

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL

Page 110

1 doesn't matter. He's hitting here under a
2 subpoena. Maybe I will waste half an hour of the
3 deposition asking him questions to which he says
4 "I don't know." But that's my right to ask the
5 question.
6        Her representation that she doesn't think
7 he's going to say anything helpful does not give
8 us the information we need or solve the problem.
9        And her belief that he's not going to say
10 anything helpful is not a valid basis to tell a
11 witness not to answer a question. I mean, she
12 hasn't said anything about anything this guy is
13 going to say is being privileged or some kind of
14 trade secret or any of the usual reasons for
15 instructing a witness at a deposition not to
16 answer.
17        MS. WEISSER: And, Your Honor, my only
18 comment is what is relevant here in terms of GSK's
19 role is GSK's decision to enter the market or not.
20 That's not even my characterization of it. That's
21 the plaintiff's characterization of it; although I
22 agree.
23        And if Mr. Macoretta wants to ask the
24 witness, "Do you know anything about GSK's
25 decision to enter the market or not," he is

Page 111

1 welcome to do that. And I will not object and I
2 will not instruct the witness not to answer.
3        But if the witness' answer is "no," I
4 think it's pretty clear that delving further into
5 the development, the business, the science, the
6 research, everything else behind it, is just not
7 fair game for a non-party.
8        MR. MACORETTA: Judge, it's John
9 Macoretta. This is the case in every deposition.
10 The person asking the questions is not limited to
11 the ultimate question. What Ms. Weisser proposes
12 is the same as me asking a Merck witness, "Did you
13 violate the antitrust laws?" Then when they say
14 "no," saying, "That's it, you don't need to answer
15 anything else."
16        If Mr. Schofield says "no," I'm entitled
17 to probe what he really does know about that.
18        THE MAGISTRATE: Okay. And you guys have
19 exhausted your presentations?
20        MR. MACORETTA: I believe we -- I'm done,
21 Your Honor.
22        MS. WEISSER: Yes, Your Honor. I believe
23 we have.
24        THE MAGISTRATE: Ms. Hardway, I guess
25 you're relying on what Ms. Weisser said?

Page 112

1        MS. HARDWAY: Your Honor, we're just not
2 taking a position one way or the other because we
3 represent Mr. Schofield only in his capacity as a
4 Merck employee. So when the questions were asked,
5 we did not object, and we're not going to pick
6 sides here one way or the other.
7        MR. MACORETTA: Although Merck did pick
8 sides last week when they filed supplemental
9 objections objecting to him producing any
10 documents relating to his GSK employment.
11        THE MAGISTRATE: Mr. Macoretta, that's
12 just not compelling, so --
13        MR. MACORETTA: Okay. Then I guess we're
14 done. I'm looking at the table here. I think
15 we've all said our peace, Your Honor.
16        THE MAGISTRATE: Can somebody please tell
17 me what Mr. Schofield's position is and was during
18 his various periods of employment?
19        MR. MACORETTA: Sure. So he's a
20 statistician, Your Honor. At Merck, he was a
21 biostatistician and he was in charge of a group of
22 other statisticians.
23        At GSK, he was in regulatory affairs in
24 various -- doing various statistical stuff. I
25 don't know how to describe -- as you can imagine

Page 113

1 it, these regulatory filings have a lot of
2 biostatistics in them.
3        So that's a -- that's what he did when he
4 was at GSK in regulatory affairs. Now he's back,
5 his title is senior advisor, global vaccines,
6 technical R&D.
7        THE MAGISTRATE: Okay. I should have
8 asked this at the beginning: Is the witness in
9 the room now?
10        MR. MACORETTA: He is not.
11        THE MAGISTRATE: Okay. Mr. Macoretta,
12 I'm going to give you a little leeway to ask the
13 questions, but it's not going to be unlimited.
14 It's very difficult to parachute in, as I'm doing
15 here, and try to give you the right, you know,
16 guidelines.
17        So, Ms. Weisser, the witness should
18 answer some of these questions that go beyond the
19 question of GSK's decision to enter the market or
20 not.
21        But, Mr. Macoretta, I want you to hear me
22 well, sir, this is not going to be unlimited. And
23 I don't need to commentate the role of this
24 witness versus the role of the 30(b)(6). And to
25 the extent you go into the area of wasting time

29 (Pages 110 - 113)

Appx19376

HIGHLY CONFIDENTIAL



Page 114

1 and harassing the witness, I'll just mention to
2 you all that I'll be here today, and you should
3 call me back right away.
4         MR. MACORETTA:  Understood.
5         THE MAGISTRATE:  Because it's not
6 unlimited.  Please be judicious in your
7 questioning.  If it's necessary and appropriate
8 for me to sit on the line, I can do that.  If it's
9 necessary and appropriate in the future to convene
10 the depositions here in the courthouse, we can
11 consider that.  But I'm going to tell you right
12 now, that's going to be at my convenience, not
13 yours or the witness' or anybody else's.
14         So I'm going to ask you to all continue
15 with the deposition.  Hopefully you won't need to
16 call me again.  But if you do, I'll be here.
17         MS. WEISSER:  Understood, Your Honor.
18         THE MAGISTRATE:  Okay?  Thank you.
19 Goodbye.
20         MR. MACORETTA:  Thank you.
21         MS. HARDWAY:  Thank you.
22         (Discussion off the record.)
23         VIDEO TECHNICIAN:  We are going back on
24 the record at 11:49 a.m.  This is start of Media
25 Unit 2 in the deposition of Tim Schofield.

Page 115

1 BY MR. MACORETTA:
2     Q.  All right.  Mr. Schofield, hello again.
3 I'm going to ask you a few questions I asked
4 earlier.

Page 116

23     Q.  And this was the same -- you had similar
24 discussions at Merck concerning Merck's MMR
25 vaccine, right?

Page 117

1     A.  I believe so, yes.  I'm almost certain
2 because that's the areas that we contribute in.

17     Q.  And same was true at Merck, right?  It
18 was one assay that you used for stability and
19 release?
20     A.  Yes.
21     Q.  Okay.  This assay we're talking about, is
22 this a PRN assay or an ELISA type assay?
23     A.  It's more of what you -- I'm not sure
24 which version they actually use.  But it's a
25 plaque assay that counts plaques as a function of

30 (Pages 114 - 117)

Appx19377

HIGHLY CONFIDENTIAL

Page 118

1 the amount of virus that's put on a plate.  So
2 it's not a clinical assay to measure plaques, but
3 it's a plaque assay to measure the content of
4 virus in the product.
5        There's that version, which is counting
6 plaques.  There's another called a TCID50 assay,
7 which is related to a plaque assay, it looks at
8 the same event.  It looks at the infection of a
9 cell culture by a virus but by a different
10 readout.

[remainder of page redacted]

Page 119

[page redacted]

Page 120

1    Q.  I mean, at Merck we can look at various
2 committees, right?  There is a product -- there
3 was a product development team, or we're going to
4 look at something from a CRRC.
5    A.  Uh-huh.
6    Q.  Do you remember -- do those sound
7 familiar to you?
8    A.  No, they don't.
9    Q.  Okay.  Well, I could ask you the same
10 question at Merck.  Who had the overall
11 responsibility for the mumps vaccine when you were
12 there?
13        MS. HARDWAY:  Object to form.  Overbroad.
14 During what time period?  And what responsibility
15 are you referring to?
16 BY MR. MACORETTA:
17    Q.  Sure.  Well, that's -- during the time
18 you were at Merck, let's say from '98 to when you
19 left, was there a person or committee who had
20 overall responsibility for monitoring the mumps
21 vaccine dealing with any problems?
22        MS. HARDWAY:  Object to form.
23        THE WITNESS:  Are you asking me a Merck
24 question now?
25

Page 121

1 BY MR. MACORETTA:
2    Q.  I am.  I am.
3    A.  Okay.  Again, I can't say for sure who
4 was the highest level committee overseeing the
5 activities.
6    Q.  What were some of the some of the
7 committees overseeing these activities?
8        MS. HARDWAY:  Objection to form.
9 Overbroad.
10        THE WITNESS:  I don't have a
11 recollection.
12 BY MR. MACORETTA:

[remainder of page redacted]

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL



Veritext Legal Solutions
212-279-9424          www.veritext.com          212-490-3430

Appx19379

HIGHLY CONFIDENTIAL



Page 126

[text redacted]

17        MR. MACORETTA: We're going to -- I'm
18  done with the GSK questions for now.
19        MS. HARDWAY: Okay.
20        MR. MACORETTA: Now probably means, like,
21  till after lunch, if that helps you.
22        MS. WEISSER: Okay.
23        MR. MACORETTA: I'll make it till after
24  lunch so you don't have to sit waiting for, you
25  know, the nod outside, if that helps you.  I'm

Page 128

1  trying to help you.
2        MS. WEISSER:  Thank you.  I appreciate
3  that.
4  BY MR. MACORETTA:
5        Q.  I'm going to go back to Exhibit 6,
6  Mr. Schofield, which happens to be on top there.
7        I can tell you that when this was
8  produced to us, the Merck version, the file name
9  was Summary for GW.pPT.
10        In November of 2000, who would GW have
11  been?
12        A.  George Williams.
13        Q.  Was that your boss at the time?
14        A.  My boss' boss.
15        Q.  Your boss' boss.  Okay.
16        Was he a statistician as well, then?
17  Mr. Williams?
18        A.  Yes.
19        Q.  And he's an MRL, right?
20        A.  He was.
21        Q.  Let me show you what we're going to mark
22  as Exhibit 7 -- well, before -- Exhibit 6, the
23  fact it's called Summary for GW, does that give
24  you any indication or refresh your memory at all
25  as to whether or not you wrote this as opposed to

Page 129

1  somebody else?
2        A.  It could have been myself or somebody
3  else who had this information.
4        Q.  Okay.
5        A.  Working more directly on the project.
6        Q.  Sure.  Let me show you what we're going
7  to mark as Number 7.  Wait a minute.
8        A.  Do you want me to hold onto this?
9        Q.  Yeah, just put it in the pile there, is
10  probably the best thing.
11        (Schofield Deposition Exhibit 7 marked
12        for identification and attached to the
13        transcript.)
14  BY MR. MACORETTA:
15        Q.  I'm going -- take a minute to look at
16  this.  We're going to talk about a few things in
17  this.
18        The "from" is you, right?
19        A.  Yes.
20        Q.  Okay.  And is this something you did
21  monthly at that time, this vaccine biometrics
22  research highlights?
23        A.  This is all -- what all the senior
24  managers did as part of their job is to inform
25  upper management of the highlights of activities

33 (Pages 126 - 129)

Page 130

1 in designated period.
2    Q. Okay? And I want to talk to the cc's --
3 about the cc's on here. Who are these people?
4    A. L. Banion is Linda Banion. George
5 Williams admin. George Hayes was my boss. Keith
6 Soper was a peer that worked mainly in the
7 pre-clinical area. And Anita Wise, I believe, was
8 a project manager for the department.
9    Q. And VBR means vaccine --
10    A. Biometrics research, yeah.
11    Q. That's your group?
12    A. Yes.
13    Q. So, I'm sorry, were you in charge of that
14 group?
15    A. Yes.
16    Q. Okay. So then what was -- what was
17 Mr. Williams in charge of, then? BARDS or --
18    A. BARDS.
19    Q. Okay. At the first -- so the idea of
20 this is this is what you're working on, right?
21    A. Right.
22    Q. Okay. And the first headline is
23 "Measles, mumps, and rubella vaccines," right?
24    A. Uh-huh.
25    Q. And the first sentence talks about

Page 131

1 stability declines Efron '87 to 2000. Do you see
2 that?
3    A. Uh-huh.
4    Q. Or decrease, I should say.
5    A. I see that.
6    Q. Okay. Do you recollect discussing a
7 decrease in the stability of mumps vaccine?
8    MS. HARDWAY: Object to form. Overbroad.
9 BY MR. MACORETTA:
10    Q. You can answer.
11    A. Discuss or it's in the memo? Discuss?
12    Q. Well, I see there's -- well, the memo is
13 what you're working on, right? Were you working
14 on stability decline from the mumps vaccine?
15    MS. HARDWAY: Object to form.
16    THE WITNESS: My group was working
17 perhaps on stability to decline. Not myself
18 personally.
19 BY MR. MACORETTA:
20    Q. Okay. And then I want to talk about the
21 last sentence in that paragraph. "This may result
22 in product on the market with potency below the
23 label claim. Requirements for additional overfill
24 or need to short date and withdraw from some
25 international markets."

Page 132

1    Do you see that?
2    A. Yes, I do.
3    Q. Okay. That's a serious thing, isn't it?
4 If there's product on the market with potency
5 below the label claim?
6    MS. HARDWAY: Object to form.
7    THE WITNESS: The stability data are one
8 aspect of what we do to monitor our vaccines.
9 This says that further exploration would be needed
10 to see if there was any cause for alarm. But it
11 doesn't say that product on the market is not --
12 not suitable.
13 BY MR. MACORETTA:
14    Q. I understand. And by "not suitable" you
15 mean below the label claim, right?
16    A. Below the minimum requirement.
17    Q. Is that different than the label claim?
18    A. I don't know what the label claim is. I
19 think you've asked me before.
20    Q. Well, what did you mean when you wrote it
21 here?
22    A. Okay. Then I guess at that point we'd
23 had established label claim versus minimum
24 requirement.
25    Q. As two different things or the same

Page 133

1 thing?
2    A. As the same thing at that point.
3    Q. Okay. So let me try again: If there was
4 product on the market with potency below the label
5 claim, would you have considered that to be a
6 serious issue?
7    MS. HARDWAY: Object to form. Asked and
8 answered.
9 BY MR. MACORETTA:
10    Q. You can answer.
11    A. I've answered.
12    Q. You don't get to say that. I understand
13 your lawyer's objection, but that doesn't stop you
14 from answering. I don't think -- I don't think
15 you did --
16    A. I'll go back to my original response:
17 That doesn't mean that product on the market is
18 below the label claim. It means this is an
19 observation that we need to pay attention to
20 escalate, perhaps, discussion either within the
21 company or together with the agency regarding --
22 regarding the observation.
23    Q. Okay. And now I'm going to ask the
24 hypothetical question. I understand this says
25 "maybe." If you had actually determined there was

34 (Pages 130 - 133)

HIGHLY CONFIDENTIAL

Page 134

1 product on the market below the label claim, would
2 you have considered that to be a serious issue?
3        MS. HARDWAY:  Object to form.
4 BY MR. MACORETTA:
5     Q.  You can answer that:
6     A.  I'm not sure how I would know that
7 product on the market was below the label claim
8 based on just this statement.
9     Q.  I'm not asking you about the statement
10 anymore.  I'm asking you a hypothetical -- okay.
11 Let's do this way.  Here's a statement that says
12 it may result in product in the market below the
13 label claim.
14        Then you talk about several things you're
15 going to do to figure out whether it is below the
16 label claim or not, right?  That's what the rest
17 of this discussion is, right?
18     A.  Uh-huh.
19     Q.  Okay.  If you do those things and it
20 turns out that you decide that the product really
21 is on the market with potency below the label
22 claim, would you then have considered that to be a
23 serious issue?
24        MS. HARDWAY:  Object to form.
25        THE WITNESS:  Actually, as you say this,

Page 135

1 I'm reflecting back on an answer I gave about
2 label claim and minimum requirement.  I'm looking
3 at the date now.  And there were discussions about
4 what the minimum requirement were from a clinical
5 point of view in the label claim.
6        So I'd like to reflect back on that
7 question and perhaps correct myself, if I'm
8 allowed to, to say there were, again, a lot of
9 moving -- moving wheels going on through this
10 period of time, some of which were what is the
11 minimum -- actual clinical minimum requirement and
12 what's on the label.
13        So perhaps some of my answers are from
14 the point of view of there being more information
15 than just what's in this memo that had been going
16 on at the time.
17     Q.  So can we agree the label claim at this
18 time was 4.3 log?
19        MS. HARDWAY:  Objection.  Asked and
20 answered.
21 BY MR. MACORETTA:
22     Q.  Log 10 TCID50.
23     A.  I don't know what it is.  It's not on
24 this memo.  And I think I reflected before, I
25 didn't know what the specific label claim was at

Page 136

1 points in time.
2     Q.  Okay.  So if the label claim was one
3 number, is it your position that some analysis of
4 what the real minimum effective dose is is
5 relevant?
6        MS. HARDWAY:  Object to form.
7        THE WITNESS:  What the minimum effective
8 dose is is relevant?  Yes.  I mean, it's relevant
9 to the quality of the product.
10 BY MR. MACORETTA:
11     Q.  But doesn't the product always have to
12 comply with what it says on the label?
13        MS. HARDWAY:  Object to form.
14        THE WITNESS:  As I said I think before,
15 there was some confusion in industry and between
16 regulators about what is said on a label and what
17 the promise to the customer is.
18        There are, you know, still some
19 misunderstandings, to the best of my knowledge,
20 about label and -- and what the, if you will,
21 guarantee to the customer is.
22 BY MR. MACORETTA:
23     Q.  Well, what's the guarantee to the
24 customer, then?
25     A.  Safe and effective product.

Page 137

1     Q.  Regardless of what the label says?
2        MS. HARDWAY:  Object to form.
3        THE WITNESS:  The label has some
4 associations when the science has been done to
5 link the -- what's on the label to what -- what it
6 means to patient outcome.  And at that time, I
7 believe there was a lot of work being done and a
8 lot of good thinking about paying good attention
9 to that.  And that's some of the work that I'm
10 familiar with that had been done at Merck in the
11 period that we're discussing, is the good work in
12 the clinical labs and the clinical affairs group,
13 the regulatory affairs group, us, together is
14 CBER, to resolve what had been potentially
15 misunderstanding about what -- how -- what was on
16 the label related to the promise to the customer
17 and ultimately to the safety and efficacy of the
18 product to the patient.
19 BY MR. MACORETTA:
20     Q.  What exactly was that misunderstanding
21 between Merck and CBER?
22     A.  I can't say what the exact
23 misunderstanding was.  It was resolved by
24 collecting the data necessary to have a refined
25 definition of how the label related to those

35 (Pages 134 - 137)

Appx19382

HIGHLY CONFIDENTIAL

Page 138

1 things. But what it was before was potentially
2 just that the number on the label was something
3 that was released to.
4    Q. But by 19 -- but by 2000, Merck and CBER
5 had agreed that that number on the label was not a
6 release potency; it was an expiry potency, right?
7    A. I don't know. I don't know what we knew
8 in the year 2000.
9    Q. Prior to this time, had CBER done its own
10 calculations of stability to figure out what the
11 appropriate release potency was?
12    A. I don't know whether they had or not
13 prior to this date.
14    Q. Okay. Well, at some point they did,
15 right?
16       MS. HARDWAY: Object to form.
17       THE WITNESS: I have evidence that they
18 had done calculations. I have recollections that
19 they had done calculations. But when it was, I
20 don't know in relation to the observations we were
21 making.
22 BY MR. MACORETTA:
23    Q. Do you remember reviewing CBER's
24 calculations?
25       MS. HARDWAY: Object to form.

Page 139

1       THE WITNESS: I don't believe I reviewed
2 anything in detail. I'm simply aware that they
3 had done calculations, and we had worked to --
4 together with CBER, perhaps, to understand those
5 calculations and have some scientific dialogue
6 about them.
7 BY MR. MACORETTA:
8    Q. So let me just make sure I understand
9 your earlier answer. Is it your position that if
10 the label says one number and the actual potency
11 of the product -- at one number at end expiry, and
12 the actual potency of the product is below that
13 number, that's okay as long as you have clinical
14 data to show that lower number is still effective?
15       MS. HARDWAY: Object to form. That's not
16 what he said.
17       THE WITNESS: Repeat it. I have to
18 understand what you're saying in relation to what
19 I said.
20 BY MR. MACORETTA:
21    Q. Sure. I just said -- is it your position
22 that if the label has a certain number for end
23 expiry and the product actually has a lower
24 potency at end expiry than what the label says,
25 that is okay as long as you have data showing that

Page 140

1 that lower number is still effective?
2       MS. HARDWAY: I'm going to repeat my
3 objections.
4       THE WITNESS: Lower than what was on the
5 label?
6 BY MR. MACORETTA:
7    Q. Yes.
8    A. At that point in time? Is that what
9 you're asking me? At the point in time of the
10 document that we're reviewing here, did I know
11 that?
12    Q. No, no, no. I'm asking you for your
13 general understanding of whether or not that's an
14 acceptable thing.
15       MS. HARDWAY: Object to form.
16       THE WITNESS: There will be mechanisms
17 within the company which are outside my
18 responsibility to rectify those various factors.
19 BY MR. MACORETTA:
20    Q. I got that. But I'm asking if you
21 thought it was acceptable, whether or not it's
22 somebody else's job to fix it or not?
23       MS. HARDWAY: Object to form.
24       THE WITNESS: I don't honestly think it's
25 my job to decide that this is good or this is bad.

Page 141

1 There's a lot of factors. There's a lot of
2 decisions that need to be made in relation to
3 that.
4       So I'm trying to understand. I know
5 technically. I can answer your questions
6 technically. I can't answer them from the point
7 of view of what I think about them from a -- at
8 this point in time, a regulatory point of view or
9 a scientific point of view.
10 BY MR. MACORETTA:
11    Q. I'm not asking about point in time. I
12 mean, you could turn this exhibit over if you
13 want.
14       I'm asking you as a general principle, as
15 somebody who's spent his career in the
16 pharmaceutical industry, including regulatory
17 affairs, if you believe it's appropriate for a
18 company to have a product below the label end
19 expiry, as long as the company has data showing
20 it's clinically effective at that lower potency.
21       MS. HARDWAY: Object to form.
22       THE WITNESS: I am honestly a little
23 confused by having clinical data that's below the
24 label claim. The right action would be to work
25 with the agency, to take that data below the label

36 (Pages 138 - 141)

Appx19383

HIGHLY CONFIDENTIAL

Page 142

1  claim, and think about what you're going to do
2  about the label.
3      So it's a confusing scenario to me, in
4  the terms of what you're asking me that I think
5  how things should be aligned. If there's clinical
6  data below the label claim, my judgment would be
7  the company would possibly explore, together with
8  the agency, changing the label or taking some
9  other action, like lengthening the shelf life.
10      Whatever is to the benefit of the
11  patient, depending upon what are the problems with
12  this vaccine in relation to getting it to the
13  patient, they may take multiple actions. If the
14  shelf life is too short and we're ending up
15  throwing away good vaccine, they might lengthen
16  the shelf life in accord with that.
17      But there's so many scenarios, when you
18  ask "is this okay," with the data that you just
19  gave me in that statement, there's many things you
20  could do, depending upon what is the best --
21  what's best for the patient.
22  BY MR. MACORETTA:
23      Q.  That's always your guiding principle
24  here?
25      A.  Absolutely.

Page 143

1      Q.  Okay.  So I'm looking at the second
2  paragraph of Exhibit 7 here.  And it says -- I'm
3  going to read the second sentence.  "Attention has
4  been focused on the mumps component, since that is
5  the virus most likely to fail potency with the
6  current fill target and expiry limits."
7      Do you see that?
8      A.  I'm sorry, where on the --
9      Q.  I'm right here, in the middle, second
10  paragraph, second sentence.
11      A.  Okay.
12      Q.  All right.  So that sentence suggests
13  that there were indeed, in November 2000, fill
14  target and expiry limits for mumps, right?
15      MS. HARDWAY:  Object to form.  The
16  document speaks for itself.
17  BY MR. MACORETTA:
18      Q.  You can answer.
19      A.  Document speaks for itself?
20      Q.  Were there fill -- you think that's
21  funny, but it's not going to help the deposition,
22  Mr. Schofield.
23      A.  No.  I understand.
24      Q.  Were there fill limits and expiry targets
25  for mumps in November of 2000?

Page 144

1      A.  I don't know.  It's not my job to
2  administer that.
3      Q.  Well, but you wrote here that there are,
4  right?  You wrote "current fill target and expiry
5  limits."  What did you mean by that?
6      A.  I wrote notes on behalf of the people
7  that were working this particular area.  I may
8  know some things firsthand or I may be getting
9  information from the people that I'm working with
10  so that I can give George Williams a clear and
11  honest understanding of what was going on.
12      I don't know if I knew that there were
13  fill targets or I was told that there were fill
14  targets.
15      So I'm simply communicating, perhaps as a
16  third party, to my senior management what my staff
17  is doing in order that he be aware of what's going
18  on in this particular activity.
19      Q.  So who gave you this particular
20  information on fill targets and expiry limits?
21      A.  I would have to say any number of people.
22  The most direct would have come from my -- my
23  direct report, Phil Bennett, or through Jim Claire
24  from Phil Bennett.
25      Q.  So your position is you sent a memo to

Page 145

1  your boss discussing current fill targets and
2  expiry limits, but you don't know if there were
3  fill targets and expiry limits?
4      MS. HARDWAY:  Object to form.  That's not
5  what he said.
6      THE WITNESS:  I trust the information I
7  received from my people to put together
8  information like this.  I can't be everywhere;
9  and, therefore, I put trust in the employees that
10  work for me and work together and work together
11  with their associates, their colleagues in the
12  areas that do these kinds of things.
13  BY MR. MACORETTA:
14      Q.  Let's go to the next page of this
15  document.  I'm going to look at the first full
16  paragraph that starts with "vaccine biometrics
17  research."
18      The second sentence, four lines down, "A
19  high proportion of recent lots, approximately 50
20  percent, have been observed by team biologics as
21  having one or more time points below the mumps
22  potency specification, (4.3 log 10 TCID50/ML)."
23      Do you see that?
24      A.  Uh-huh.
25      Q.  Okay.  First of all, does that give --

37 (Pages 142 - 145)

Appx19384

Page 146

1 does that refresh your recollection as to what the
2 mumps potency specification was at the time?
3     A. Yes, it does.
4     Q. Okay. Can we agree it was 4.3?
5     A. At the time.
6     Q. Great.
7         Do you remember it ever being anything
8 different?
9     A. I don't know what was done with clinical
10 trials that explored lower limits. But I do know
11 other limits were explored.
12     Q. Yeah, but was it ever changed? Was
13 the --
14     A. I don't know if it was changed. Again,
15 that was not generally my part of the
16 collaboration.
17     Q. Then a little -- it says, "A high
18 proportion of recent lots had time points below
19 the potency specification."
20         So in this analysis, 50 percent of the
21 lots having time points below the potency
22 specification you would consider a high
23 proportion, right?
24     A. It's a high proportion.
25     Q. Would this be a cause of concern for you?

Page 147

1 Would this have been a cause for concern for you?
2     A. No.
3         MS. HARDWAY: Object to form.
4 BY MR. MACORETTA:
5     Q. You wouldn't have been concerned that
6 50 percent of the lots had time points below the
7 potency specification?
8         MS. HARDWAY: Object to form.
9         THE WITNESS: Let me explain. Looking at
10 individual measurements in a highly variable assay
11 is a tricky business. It's not the right way to
12 do stability evaluation. However, it was the
13 practice of the day to make measurements as we
14 evolved to do modeling. But at the time, looking
15 at individual stability measurements for a product
16 that is inherently unstable and has a highly
17 variable assay, seeing that high proportion of OOS
18 results is not at all unusual.
19         In fact, I believe you might have seen a
20 graph in a previous document which was a testimony
21 to the fact that when you look at individual
22 results after you set a release or
23 end-of-shelf-life limit, there's a calculated
24 probability, high probability, of seeing one or
25 more out-of-specification results.

Page 148

1 BY MR. MACORETTA:
2     Q. One or more. But 50 percent?
3         MS. HARDWAY: Objection.
4 BY MR. MACORETTA:
5     Q. You weren't concerned that 50 percent of
6 them were showing out of specification? You
7 thought that was all variability?
8         MS. HARDWAY: Object to form. Asked and
9 answered.
10         THE WITNESS: Knowing what we know about
11 the what I'll call inappropriate assessment of
12 individual stability time points, any number would
13 not surprise me, because it's not the right way to
14 look at data. It may be higher for products that
15 have more variable assays and more variability
16 stability profiles, but it doesn't surprise me.
17 No. And it simply requires that we look a little
18 more deeply by doing statistical modeling,
19 perhaps. But that number alone does not surprise
20 me.
21 BY MR. MACORETTA:
22     Q. But it's very possible that some of these
23 50 percent lots actually were below 4.3, right?
24         MS. HARDWAY: Object to form and calls
25 for speculation.

Page 149

1         THE WITNESS: It's unknowable to me.
2 BY MR. MACORETTA:
3     Q. So it's at least possible?
4         MS. HARDWAY: Object to form. Calls for
5 speculation.
6         THE WITNESS: It's unknowable. I
7 can't -- I can't gauge it on a possibility or
8 probability scale.
9 BY MR. MACORETTA:
10     Q. You just think the test result's wrong?
11         MS. HARDWAY: Object to form. That's not
12 what he said.
13         THE WITNESS: No. I said the use of this
14 test to look at individual stability time point
15 measurements is an incorrect interpretation of the
16 possibility that a lot is below its minimum
17 requirement.
18         I can't tell you what it truly is, and I
19 can't tell you it's either all lots, all
20 50 percent lots below, or all 50 or above. I
21 can't tell you anything from this kind of
22 statistic because it's an inappropriate way to
23 look at stability data.
24 BY MR. MACORETTA:
25     Q. You can't tell me anything so that you

38 (Pages 146 - 149)

Appx19385

HIGHLY CONFIDENTIAL

Page 150

1 can't remove the possibility that some of the lots
2 were actually below the 4.3?
3     MS. HARDWAY: Object to form and it calls
4 for speculation.
5     THE WITNESS: I can't speculate what --
6 BY MR. MACORETTA:
7     Q. You just told me that -- so certain tests
8 showed up as below 4.3. 50 percent of them, in
9 fact. And you told me you're not concerned about
10 that because you didn't believe the individual
11 time points accurately represented it, right?
12     A. It is a fact. It's associated with a
13 fact that that number is associated with the wrong
14 interpretation of stability data.
15     I can't make -- take that, having said
16 myself that it's a meaningless way to look at data
17 and a number that can be anywhere and make any
18 kind of a judgment about it.
19     I can, however, say that's not the way we
20 should be looking at stability data. We should be
21 looking at it more seriously, the way, you know,
22 the company had moved towards, I believe.
23     Q. And if it was meaningless, why were you
24 using it?
25     MS. HARDWAY: Object to form.

Page 151

1     THE WITNESS: What was -- using what?
2 BY MR. MACORETTA:
3     Q. You just called this way of looking at
4 stability data meaningless. Then why are we
5 talking about it?
6     A. It was because it was the practice at the
7 time. It's the practice throughout the industry.
8     Q. Including the FDA's practice at the time?
9     A. At the time this observation -- well, I
10 don't know about at the time this observation was
11 made.
12     I know that subsequent observations made
13 together with the agency was, this is not a good
14 practice to just look at individual stability time
15 point results.
16     Q. In 2000, do you think this was a good
17 practice or did you think it was meaningless?
18     MS. HARDWAY: Object to form.
19     THE WITNESS: In 2000?
20 BY MR. MACORETTA:
21     Q. The day you wrote this.
22     A. It's been one of my goals in my career at
23 Merck -- and I don't know when it started -- to
24 try to rectify this practice. So I don't know if
25 before this memo came out I had started to have

Page 152

1 discussions throughout industry and with
2 regulatory authorities about this practice or
3 after this time.
4     But as a practicing statistician, having
5 worked occasionally with agencies to discuss this
6 practice, I was committed in my career to abuse
7 this practice -- disabuse this of this practice.
8 Because, again, it was not scientifically sound
9 and leads to an overinterpretation of what -- the
10 disposition to the vaccine.
11     Q. Then if it's meaningless, why was Merck
12 using it in November of 2000?
13     MS. HARDWAY: Object to form. He's
14 answered it.
15     THE WITNESS: Because it was the
16 expectation from regulatory authorities that we
17 report these results or log these results and do
18 something about it.
19 BY MR. MACORETTA:
20     Q. Okay. And did you send a letter to the
21 regulatory authority saying "this is meaningless"?
22     MS. HARDWAY: Object to form.
23     THE WITNESS: No.
24 BY MR. MACORETTA:
25     Q. Okay. And if I go back to your CV and we

Page 153

1 look at your many publications, are any of them
2 explaining why this practice is meaningless?
3     A. Many of them do, yes.
4     Q. Okay. Could you point some of them out
5 to me? Let's go back to Schofield Exhibit 1 and
6 show me the ones that say this is --
7     A. Well, you actually opened one.
8     Q. Pardon?
9     A. You opened one. You opened a key figure
10 in one of the documents, which is an illustration
11 of the -- I'll interpret this for you in words.
12     Q. Which one are you on?
13     A. I'm on 5, I think.
14     Q. 5? Okay.
15     A. This graph tells you -- and the way I
16 presented it in many of my presentations -- that
17 if I take a lot and I establish the shelf life for
18 the product using statistical methods, which are
19 very similar to setting release limits. And that
20 is by determining whether the lower confidence
21 bound intersects the minimum requirement.
22     And I take that same log and I put it on
23 annual stability and start looking at the
24 individual measurements, there's upwards of -- for
25 this particular scenario, a 30 percent chance

39 (Pages 150 - 153)

Appx19386

HIGHLY CONFIDENTIAL

Page 154

1 you're going to get one or more individual
2 stability measurements at a specification for a
3 lot that was used to set a 24-month shelf life.
4 That's a contradiction.
5    Q. It is.
6    A. It's a very -- it's a very -- a very
7 important contradiction, because we've got two
8 interpretations:  One in the ICH guidances, which
9 is the way to set shelf life, and one the way we
10 look at post-marketing annual stability data.  The
11 same lot would have had a 30 percent chance of
12 saying we have failed before 24 months of the lot
13 being on the market.
14    Q. So looking at the chart you have here,
15 these X's are individual test results, right, time
16 points?
17    A. Yes.
18    Q. Okay.  You just don't know if these -- if
19 each of these results are right?
20       MS. HARDWAY:  Object to form.
21 BY MR. MACORETTA:
22    Q. Right?
23    A. What do you mean by "right"?
24    Q. Well, so the time point at 12 month --
25 the X at 12 months says whatever it says, 4. --

Page 155

1 somewhere between 3 and 6, let's call it four and
2 a half there.  Do you see that?
3    A. Yes.
4    Q. You don't know if that's -- how much
5 virus was actually in that sample vial, right?  Is
6 that your position?
7    A. We don't.  We measure it.
8    Q. You measure it, but you would say, "It's
9 so variable we can't be sure"?
10    A. Exactly.
11    Q. Okay.  Even though half the lots are
12 below spec, you're still not sure that there's a
13 problem, right, as we looked at your monthly
14 report here?
15       MS. HARDWAY:  Object to form.  Asked and
16 answered.
17       THE WITNESS:  I'm still not sure that's a
18 problem.  Because I know of the -- if you will,
19 the properties of the thing that's being described
20 there.
21 BY MR. MACORETTA:
22    Q. Further down in this paragraph there's a
23 discussion of Dr. Fairweather.  You see that?
24    A. Uh-huh.
25    Q. Who's Dr. Fairweather?

Page 156

1    A. Dr. Fairweather was once chief of the
2 nonclinical statistics unit at the FDA.
3    Q. And Merck hired him as a consultant to
4 talk about some of these stability issues, right?
5    A. We did.  Actually, to work with us on the
6 analysis that we had promised the FDA or I should
7 say the program we had promised the FDA to monitor
8 mumps stability.
9    Q. Okay.  And team -- I'm going back up to
10 the first sentence we talked about.  Team
11 biologics is the FDA, right?
12    A. Yes.  I think it's a unit of the
13 inspection unit at the FDA.
14    Q. Okay.  So whether you thought it was a
15 good idea or not, you were supposed to report
16 recent lots -- or lots below the potency spec,
17 right?
18       MS. HARDWAY:  Object to form.
19       THE WITNESS:  I'm looking for where
20 you're taking me.
21 BY MR. MACORETTA:
22    Q. I'm asking you generally.  Team biologics
23 observed that one or more time points were below
24 the mumps potency specification?
25    A. Is it just an observation or --

Page 157

1    Q. I don't know.
2    A. -- that we reported them or not?
3    Q. Okay.  Let me try this.  If a lot shows
4 up below the potency specification, what was Merck
5 supposed to do?
6       MS. HARDWAY:  Object to form.
7       THE WITNESS:  My more recent understand
8 is we're supposed to file a BPDR.
9 BY MR. MACORETTA:
10    Q. Okay.
11    A. That's when -- I learned that only when I
12 got into regulatory affairs.
13    Q. You weren't involved in any discussions
14 at Merck as to we have a lot that's below the
15 potency spec, what are we supposed to do here?
16    A. No.  This is in a different unit.  This
17 is an MMD unit of the company.
18    Q. So and then you have -- I'm sorry, that
19 was MMD's responsibility to deal with that issue?
20    A. It's a commercial product.  Yeah.  It's
21 managed by the commercial unit.
22    Q. Then you have, "Dr. Fairweather agreed
23 that the spirit of the FDA guidelines for the
24 establishment of shelf life for pharmaceutical and
25 biological products is directed towards the mean

40 (Pages 154 - 157)

Appx19387

HIGHLY CONFIDENTIAL

Page 158

1 potency of the lot. But recognized the office of
2 compliance is mandated to interpret individual
3 stability time points."
4      Do you see that?
5      A. Uh-huh.
6      Q. Is that an argument that you made to the
7 FDA that the real spirit of the guidelines is
8 towards mean potency?
9          MS. HARDWAY: Object to form. That he
10 himself made?
11          MR. MACORETTA: That somebody at Merck
12 made to the FDA.
13          MS. HARDWAY: Are you asking him to speak
14 for --
15 BY MR. MACORETTA:
16      Q. I'll do it both.
17      Is that an argument you ever made to the
18 FDA?
19      A. Not to the FDA, but it was a discussion
20 ongoing during the time that we were, you know,
21 trying to find the best way to manage the
22 stability of the product to ensure shelf life and
23 patient safety and efficacy.
24      Q. What do you mean by "manage the stability
25 of the product"?

Page 159

1      A. I mean have tools and practices in place
2 that respond to the information.
3      Q. The information meaning how it --
4      A. Measurements, analysis, et cetera. We
5 call it today the control strategy.
6      Q. And if we go back to Schofield Exhibit 6,
7 take a look a the second page under "current
8 consequences." The first dash says, "Team
9 biologics noted stability failures approximately
10 50 percent."
11      Do you see that?
12      A. Uh-huh.
13      Q. So that's the same thing you're talking
14 about here on page 2 of your monthly report,
15 right?
16          MS. HARDWAY: Object to form and
17 foundation.
18 BY MR. MACORETTA:
19      Q. Or is it?
20      A. The numbers are reasonably close.
21      Q. Okay. And below that, under the dash,
22 "stability decline reestablish," do you know what
23 that means?
24      A. I can't be absolutely sure. It could be
25 that analyses were performed to -- to look at the

Page 160

1 mumps stability at the time.
2      Q. Okay. Because in the first page of your
3 monthly report here you're talking about a
4 stability decrease, right, in the first sentence?
5      A. Yes.
6      Q. And you don't know if that's the same
7 thing you're talking about in Exhibit 6 -- or
8 Exhibit 6 is talking about?
9          MS. HARDWAY: Object to form.
10          THE WITNESS: I don't know for sure.
11 BY MR. MACORETTA:
12      Q. Okay. Exhibit 6 it says loss
13 estimates -- the second bullet point. "Loss
14 estimates higher than used in CBER calculation."
15      Do you see that?
16      A. Yes, I do.
17      Q. What does that refer to?
18      A. I can't say for sure at this point in
19 time.
20      Q. Do you ever remember reviewing a loss
21 calculation from CBER?
22      A. Again, I remember some interactions with
23 CBER. I didn't deal with them directly. Phil
24 Bennett did.
25      Q. Do you remember having any discussions

Page 161

1 about whether the calculation -- the loss
2 calculations used by CBER were wrong?
3      A. I do have recollection of observing that
4 they weren't using the industry standard for these
5 kinds of -- not loss calculations, but more
6 specifically release calculations.
7      Q. What was the industry standard at the
8 time?
9      A. It was a -- it was used -- it was a
10 standard that was published perhaps in the '80s,
11 early '90s, authors are Allen and Dukes, is my
12 recollection, which is a statistics paper on the
13 calculation of internal release limits for
14 pharmaceutical products, actually, not necessarily
15 vaccines, but was -- came out of the small
16 molecule arena.
17      Q. So that paper is what you're calling the
18 industry standard, right?
19      A. Yes. And it's discussed such, you know,
20 more broadly in -- in conferences and such.
21      Q. So you just said you remember discussing
22 whether CBER was not using the industry standard.
23 Did you have a discussion of whether some actual
24 calculation by CBER was wrong?
25      A. I said they were not using the industry

41 (Pages 158 - 161)

Appx19388

HIGHLY CONFIDENTIAL

Page 162

1 standard. They were using a different
2 calculation.
3     Q. Okay. And it was your understanding that
4 the calculation CBER used created less loss?
5         MS. HARDWAY: Object to form.
6         THE WITNESS: I can only read what's on
7 the page. And, you know, I can't say I recollect
8 exactly.
9         May I get a point of clarification?
10 BY MR. MACORETTA:
11     Q. Absolutely.
12     A. You keep referring to loss, and I keep
13 reverting in my mind to release limit, and I don't
14 know what we're talking about.
15     Q. Well, let's define it. The release limit
16 is how much of the vaccine you can have in there
17 when it's released, right?
18     A. A calculated value of what the value
19 should be at release to -- there or above to have
20 a high level of confidence that will maintain
21 potency through its shelf life.
22     Q. It's calculated, but it becomes an actual
23 number, right, of whatever it is, 5.0 or 5.2 or
24 whatever, right?
25     A. Sure.

Page 163

1         MS. HARDWAY: Object to form.
2 BY MR. MACORETTA:
3     Q. So --
4     A. It becomes a number, a result or an
5 outcome.
6     Q. And that number is generated through some
7 calculations of what the release limit should be?
8     A. From the -- in the case that I'm speaking
9 of, the industry standard for doing that
10 calculation.
11     Q. Uh-huh. And that, if we look at
12 Exhibit 5, is part of what we're talking about on
13 page 3 here, right?
14     A. In part.
15     Q. Okay. And when I say "loss," what I am
16 referring to is the loss of potency over some
17 amount of time. Do you understand that to be the
18 case?
19     A. Sure.
20     Q. Because that's really what we're trying
21 to measure here, right? How much less vaccine
22 there is at a later point than there was an
23 earlier -- at an earlier point, right?
24     A. Yes.
25     Q. Okay. And if you look at the first page

Page 164

1 of Schofield 7, your monthly report, the last
2 bullet point, the first line says, "Since
3 September '99, when a higher mumps fill target was
4 established."
5         Do you see that?
6     A. Uh-huh.
7     Q. Do you understand that some higher mumps
8 fill target was established by Merck in
9 September of 1999?
10     A. I'm not personally familiar with that,
11 but this must have been some information that was
12 passed along to me to share with George Williams.
13     Q. You don't have any reason to think that's
14 wrong, do you?
15     A. No, I don't.
16     Q. Okay. So I'm going to go back to the
17 second page of your monthly report here, and the
18 paragraph that starts with "Dr. Fairweather
19 proposed."
20         And he proposes two possible solutions to
21 mitigate the effects of the compliance office's
22 interpretation.
23         And the compliance office's
24 interpretation he's talking about here is you have
25 individual time points below the minimum potency

Page 165

1 specification, right?
2     A. Yes.
3     Q. Okay. So to deal with that, you could,
4 first, lower the stability potency limits, or you
5 could define in the stability protocol method of
6 estimating the time point potency, that is a
7 better reflection of the true potency at that
8 interval, right?
9     A. Yes.
10     Q. So I don't understand what that means,
11 that second one: A method of estimating the time
12 point potency that is a better reflection of the
13 true potency at that interval.
14         Does that mean a better assay?
15     A. No. It means doing the statistical
16 evaluation rather than looking at the individual
17 values.
18     Q. Okay. Your other option is just to lower
19 the limit, too, right? That's number one.
20     A. Well, that seems, if I may, to be a
21 misspecification. We would raise the limit for
22 potency because what we are doing, if we look at
23 the individual values, is needing to accommodate
24 the variability in the individual values.
25     Q. When you say "raise the limit," you're

42 (Pages 162 - 165)

Appx19389

HIGHLY CONFIDENTIAL

Page 166

1 talking about raising the release limit, not the
2 end expiry limit, right?
3     A.  No, we don't such the end of expiry
4 limit.
5     Q.  Okay.  But you could -- isn't that what
6 he's proposing here to lower the stability
7 potency -- when he says lower --
8     A.  I corrected that.  That you would raise
9 it to accommodate -- this may have been a
10 misrepresentation on my part.
11         The -- it should be raised, the potency
12 limit, to account for the statistical properties
13 of individual measurements.  The individual
14 measurements have more variability than the
15 regression analysis has.  So you would need to
16 raise it to make sure that individual measurements
17 didn't fall below the minimum requirement.  If you
18 take the plot I showed you, if these numbers are
19 falling below the limit, you would have to raise
20 it to avoid having those numbers fall below the
21 limit.
22     Q.  Or you could alternatively lower the
23 limit, right?  That would also prevent numbers
24 from falling below it.
25         MS. HARDWAY:  Object to form.

Page 167

1         THE WITNESS:  The practice would not to
2 have been to lower the limit unless it could be
3 justified by data that supports that that limit
4 can be lowered.
5 BY MR. MACORETTA:
6     Q.  And by data that supports that the limit
7 could be lowered, you mean some clinical trial?
8     A.  Is one avenue, yes.
9     Q.  Okay.  What are the others?
10     A.  That's one avenue.  I can't recite the
11 others.
12     Q.  Okay.  And you can't -- using your
13 statement that you would raise the release limit,
14 there's some limit.  You can't just keep raising
15 the release limit forever, right?  I mean --
16     A.  Sure.  No.  If there's an upper boundary
17 on the product, then you would eventually have no,
18 what we call, manufacturing window.
19     Q.  Okay.  Then later in that paragraph we
20 were just looking at, it says the latter -- "This
21 latter solution is the approach used in the active
22 stability monitoring protocol that was developed
23 between VBR and the stability unit."
24         Do you see that?
25     A.  Yes.

Page 168

1     Q.  You're VBR, right?
2     A.  Yes.
3     Q.  Or you worked in VBR?
4     A.  Yes.
5     Q.  What's the stability unit?
6     A.  They were the unit in quality control
7 that was responsible for designing and monitoring
8 the product stability.
9     Q.  And that's quality controls and
10 manufacturing, right?
11     A.  Yes.
12     Q.  Who was in that unit?
13     A.  Who was in that unit at that time?
14     Q.  Well, yeah, who are the people in the
15 stability unit that developed this with VBR?
16     A.  The specific coauthor on the paper was
17 Cindy Morrisey.
18     Q.  Okay.  And she was a statistician?
19     A.  No.  She was the head of the stability
20 unit.  So we had a team of people who are in
21 charge of the stability in the statistical
22 community to come up with a plan for monitoring a
23 vaccine stability.
24     Q.  Do you know who else was in the stability
25 unit then?

Page 169

1     A.  No, I don't.
2     Q.  Do you know who the statistician over --
3 they would have had a statistician over there,
4 right, in the stability unit?
5     A.  They had a statistician in MMD, but they
6 were relying upon us, since this was a novel
7 approach, which is usually done in the development
8 area, the quality unit is usually restricted to
9 the standard quality control type of procedures.
10 If you're looking at some kind of unique or novel
11 approach, you would usually go to the development
12 statistical group.
13     Q.  And by "novel approach" you mean coming
14 up with a different way to monitor stability after
15 the product's been launched?
16     A.  Yes.
17     Q.  Okay.  And the active stability
18 monitoring protocol, that was something you
19 created, right?
20     A.  Yes.
21     Q.  And the idea of that is we're going to
22 monitor product that's released on the market or
23 lots released and see how they do, right?
24     A.  See how they do in relation to what our
25 expectations are.  Yes.

43 (Pages 166 - 169)

HIGHLY CONFIDENTIAL

Page 170

1    Q.  Okay.  The last sentence of this
2  paragraph, "We are continuing to collaborate with
3  Dr. Fairweather, working towards a means of
4  communicating the issues and our solutions to the
5  FDA."
6        Do you see that?
7    A.  Uh-huh.
8    Q.  So did you do that?  Did you develop a
9  means of communicating the issues and your
10 solutions to the FDA?
11       MS. HARDWAY:  Did Mr. Schofield himself?
12 BY MR. MACORETTA:
13   Q.  Well, whoever the "we" is in that
14 sentence.  You wrote it, so I assume you're within
15 we.
16   A.  The team worked with Dr. Fairweather, as
17 he was a team member, a consultant, to formulate
18 this in a way that could be communicated and
19 discussed with the FDA.
20   Q.  So what was the end product of that?
21       MS. HARDWAY:  Object to form.
22       THE WITNESS:  I don't recall.
23 BY MR. MACORETTA:
24   Q.  Well, was there some end product?
25       MS. HARDWAY:  Object to form.

Page 171

1        THE WITNESS:  Well, there was a
2  publication.  I can't say much beyond that what --
3  or recall much beyond that what was done.
4  BY MR. MACORETTA:
5    Q.  So there was a publication, meaning a
6  scholarly article?
7    A.  A journal -- an article submitted to a
8  journal.
9    Q.  Other than that journal article, was
10 there something else that was communicating --
11 communicated the issues in your solutions to the
12 FDA?
13   A.  Again, I don't recall what happened after
14 that.  This was near a time when there were some
15 transitions in management within the company, and
16 I -- vaccine biometrics research played a
17 secondary part once the, if you'd like, approach
18 was developed.
19       After the approach was developed, it
20 became, then, MMD's, the manufacturing units',
21 role to implement that, communicate it to the FDA
22 and implement it.
23   Q.  So the approach -- what was the approach
24 that was developed?  Was that the active stability
25 monitoring protocol?

Page 172

1    A.  Yes.
2    Q.  Was that still being used when you left
3  Merck?
4    A.  Again, not having been a part of what was
5  communicated to the FDA and therefore then part of
6  the license, I don't know.
7    Q.  Okay.  Let me talk about the next subject
8  in this monthly report.  The mumps WT ELISA and
9  PRN.  Do you see that?
10   A.  Uh-hum.
11   Q.  WT means wild type, right?
12   A.  Yes.
13   Q.  Okay.  Were you involved in some analysis
14 of the wild type ELISA and PRN for mumps?
15   A.  Peripherally.
16   Q.  It says, "In response to a CAS inquiry."
17       What's CAS?
18   A.  I believe that meant clinical assay
19 subcommittee.
20   Q.  Were you on that?
21   A.  I don't recall.  I at times were on
22 committees like this, at times was not.  But I
23 don't recall this specific committee.
24   Q.  And it says, "The possibility of lowering
25 the zero status cutoff in the mumps WT ELISA are

Page 173

1  from the proposed 10 AB to 5 AB units was
2  investigated."
3        Do you see that?
4    A.  Uh-huh.
5    Q.  Were you involved in that analysis?
6    A.  No.  I had a different section of my
7  department that was directly involved, together
8  with the laboratories on matters like this.
9    Q.  So who are the people from your
10 department that would have been involved in this?
11   A.  The head was Joe Antonello.
12   Q.  Joe Antonello, he reported to you as
13 well?
14   A.  Yeah.
15   Q.  So you don't know any of the details of
16 what analysis of zero status cutoff was done with
17 this ELISA test?
18   A.  This, again, might have been a case where
19 I took, you know, notes that were forwarded up to
20 me to communicate ultimately with George Williams.
21   Q.  So I want to go to the next page, the
22 last part of that paragraph.  And the three lines
23 down it's talking about regarding the mumps and
24 expiry trial.
25       That's the -- well, that's 007, right?

44 (Pages 170 - 173)

Page 174

1    A.  Yes.
2    Q.  Okay.  And in 007, they were using both a
3  PRN and an ELISA assay, right?
4    A.  To my limited understanding.
5    Q.  Fair enough.
6        Were you ever involved in discussions of
7  how to bridge or compare those assays?
8    A.  Only as let's call it an internal
9  consultant, being a -- somebody who's worked on
10  those kinds of problems.
11    Q.  So did they have any external consultants
12  working on those --
13    A.  I said internal consultant in the sense
14  that I had knowledge about how to do it and worked
15  with my team to formulate the way they were going
16  to bridge.  Or I should say communicate through
17  Joe Antonello to the team what the best bridging
18  strategy was.  But not directly involved.  No.
19    Q.  Joe Antonello would have been the guy
20  working on your team with this bridging issues?
21    A.  With the team on the bridging exercise.
22    Q.  Anybody else from your team?
23    A.  Not my direct team.  Again, maybe on
24  Joe's team.  Joe had -- Joe had a small group of
25  people reporting to him.

Page 175

1    Q.  But he was part of your team, right?
2    A.  Yes.
3    Q.  So wouldn't the people reporting to him
4  be reporting to you as well?
5    A.  I'm simply stating I didn't have anybody
6  independent of Joe's unit working on this.  Only
7  Joe and the people that reported to him.
8    Q.  Fair enough.  Do you know who -- which of
9  Joe's people were working on that?
10    A.  Not specifically.
11    Q.  And then the last sentence, "A validation
12  protocol is being prepared for the 'enhanced'
13  mumps plaque neutralization assay."
14        So why is -- what does "enhanced" mean
15  there and why is it in quotes?
16    A.  I understand that the labs were looking
17  at the assay from the point of view of getting the
18  best biological signal, the one that might most
19  directly relate to clinical response.
20        My -- my limited understanding of what
21  enhanced means and from my understanding of PRN
22  assays is that some immune response are mediated
23  by other factors.  And I believe they were looking
24  at opportunities to mimic better the antibody
25  content and thereby virus neutralization through

Page 176

1  looking at these other mechanisms, other than just
2  antibody alone for neutralizing the virus.
3    Q.  And when it says a validation protocol is
4  being prepared, what's a validation protocol?
5    A.  It's a protocol-driven study to evaluate
6  the operating characteristics of the assay.
7    Q.  That means to figure out whether or not
8  it's a good assay, right?
9        MS. HARDWAY:  Object to form.
10        THE WITNESS:  To -- in the parlance to
11  ICH to show that it's -- or to demonstrate it's
12  fit for use.
13  BY MR. MACORETTA:
14    Q.  Okay.  So if the validation protocol is
15  being prepared in November of 2000, does that mean
16  it hasn't yet been validated?
17        MS. HARDWAY:  Object to form.
18        THE WITNESS:  I can't speak to the
19  sequence of events, if that's where -- what you're
20  asking me.  I can say that I reported, or Joe
21  reported to me, and I passed along to George
22  Williams simply that a validation protocol was
23  being prepared.  If there's nothing else about the
24  validation, I can't speak to the -- to other
25  things.

Page 177

1  BY MR. MACORETTA:
2    Q.  But the validation protocol is what
3  determines whether it's -- whatever IH -- whatever
4  ICH --
5    A.  Fit for use.
6    Q.  Fit for use.  Right?
7        So do we do tests to figure out -- we do
8  some tests pursuant to the validation protocol to
9  see if the assay is fit for use, right?
10    A.  That's what the purpose is.  Yeah.
11    Q.  Okay.  So if you're preparing the
12  protocol -- you prepare the protocol before you do
13  the test, right?
14        MS. HARDWAY:  Object to form.
15        THE WITNESS:  You prepare the protocol to
16  prepare the protocol.  I, again, can't speak to
17  what sequence might be used.  There are scenarios
18  where you have different sequences in order to
19  accomplish a goal.
20  BY MR. MACORETTA:
21    Q.  So you would do the testing before you
22  prepared the protocol?
23    A.  I'm not saying you would, no.  I'm
24  saying, though, there's -- there are other
25  scenarios where the protocol fits into the

45 (Pages 174 - 177)

Page 178

1 overall, if you will, development use of the
2 assay.
3     Q. Typically, in a clinical study, does the
4 FDA approve the validation protocol before you
5 conduct a study?
6     MS. HARDWAY: Object to form.
7     THE WITNESS: I can't -- typically, in
8 certain circumstances for certain protocols that
9 are, you know, conducted mainly, in my mind, in
10 Phase 3, where you're -- you have an obligation to
11 show, for instance, that a manufacturing process
12 operates to the standard that you say you will
13 write a protocol and the FDA will review and give
14 you feedback on the protocol for that
15 demonstration.
16     I don't know that it's done -- let's call
17 it globally over all kinds of assays and/or
18 studies that are performed within the industry,
19 but there are some that do require -- clinical
20 protocols possibly the most -- the most -- the
21 highest level protocol that usually is reviewed
22 and negotiated with the FDA.
23 BY MR. MACORETTA:
24     Q. So when we talk about the 007 trial,
25 that's not a Phase 3 trial, right? The product is

Page 179

1 already in the market?
2     A. No, it would be a post-marketing study.
3     Q. Okay. So for a post-marketing study like
4 007, is it your understanding that the FDA would
5 approve the validation protocol before you start
6 the trial?
7     MS. HARDWAY: Object to form.
8     THE WITNESS: I never worked on Phase 4
9 studies, so I don't know what the expectation was
10 for Phase 4 studies or post-marketing studies.
11 BY MR. MACORETTA:
12     Q. Because there's a risk that the FDA could
13 say that's not a good protocol after you've done a
14 bunch of the trial, right?
15     MS. HARDWAY: Object to form.
16     THE WITNESS: There's a risk to whom?
17 BY MR. MACORETTA:
18     Q. To whoever is conducting the trial that
19 you did at -- you did a bunch of -- you put a
20 bunch of kids through the trial and the protocol
21 you used was rejected?
22     MS. HARDWAY: Object to form.
23     THE WITNESS: I'm not sure what the -- if
24 you don't mind my trying to get a little clarity
25 on what the question is.

Page 180

1 BY MR. MACORETTA:
2     Q. Sure.
3     A. Conducting the trial and testing, sir,
4 are all part of the process of getting the
5 information. But, again, I believe that the
6 conduct of the trial is done under medical
7 attention. And, again, there's also agreements to
8 use measurements that come from the trial
9 afterwards to make decisions or assessments.
10     But the trial might be conducted while
11 all this other work is ongoing to prepare for
12 eventually the acquisition of the samples that
13 will need to be tested in order to support
14 whatever the goals were of the trial.
15     It would not stop the trial if that's
16 what I understand you're saying.
17     Q. All right. That's fine. We'll come back
18 to that.
19     The next heading is "ProQuad, combined
20 MMR 2 varicella vaccines."
21     What was your role in ProQuad
22 development?
23     A. Similar as all development programs. I
24 headed a group that supported the ProQuad program
25 as it did the post-marketing activities that were

Page 181

1 relinquished at MRL, as well as several other
2 vaccines that were in the pipeline at this time.
3     Q. And it's the same mumps vaccine in
4 ProQuad that it is in MMR, right?
5     A. To the best of my knowledge, yes.
6     Q. All right.
7     MS. HARDWAY: If you're done with that,
8 John, it might be a good breaking point for lunch.
9     MR. MACORETTA: Fair enough.
10     VIDEO TECHNICIAN: We're going off the
11 record at 12:56 p.m.
12     (A recess was taken.)
13     VIDEO TECHNICIAN: We're going back on
14 the record at 1:50 p.m. This is the start of
15 Media Unit Number 3 in the deposition of Tim
16 Schofield.
17 BY MR. MACORETTA:
18     Q. All right. Mr. Schofield, we're back
19 after lunch. You're looking at what's been marked
20 as Exhibits 8 and 9.
21     (Schofield Deposition Exhibits 8 and 9
22     marked for identification and attached to
23     the transcript.)
24 BY MR. MACORETTA:
25     Q. Exhibit 8 is a from the

46 (Pages 178 - 181)

Appx19393

HIGHLY CONFIDENTIAL

Page 182

1 Paul-Erlich-Institut in Germany. Have you seen
2 this before?
3     A. Not to the best of my knowledge.
4     Q. Exhibit 9 is an e-mail chain, including a
5 couple of e-mails from you, discussing that
6 letter. Do you recollect these e-mails at all?
7     A. Not at the moment.
8     Q. Okay. So the Paul-Erlich letter from
9 December of 1997 says that "in Germany, the shelf
10 life of mumps-containing vaccines of Merck has
11 been reduced from 24 to 18 months."
12     Do you see that in Exhibit 8?
13     A. Yes.
14     Q. Okay. Do you recollect having a
15 discussion about this issue?
16     A. Not -- no, I don't.
17     Q. Do you know why you would have been
18 involved in a subsequent discussion or you would
19 have had an opinion on this letter?
20     A. Not without further, you know, further
21 information concerning the letter.
22     Q. Well, what kind of information would you
23 like?
24     A. Was it statistical in nature? Was there
25 the need to have a look at it from a statistics

Page 183

1 point of view?
2     Q. Well, you have an opinion -- your e-mail,
3 if you go to the number 9, the first e-mail in the
4 chain is from you to a bunch of people, including
5 Katalin Abraham.
6     A. You mean the second? I'm seeing John
7 Rose up at the top.
8     Q. No, no, no. With e-mail chains, we
9 always start at the back.
10     A. Oh, that's right.
11     Q. E-mail starts on page ending Bates number
12 51.
13     A. Okay.
14     Q. From Tim Schofield to several people,
15 December 20, and you're giving an opinion on some
16 of the issues in this letter; are you not?
17     A. Uh-huh.
18     Q. Okay. And you don't know why you were
19 doing that?
20     A. I assume, to the point I made, that I was
21 evaluating the statistical statements that were
22 made.
23     Q. Was that your job, to have an opinion on
24 these kind of statistical statements from a
25 marketed product?

Page 184

1     MS. HARDWAY: Object to form.
2     THE WITNESS: They used whatever
3 resources they could to, you know, better
4 understand and respond to regulatory
5 communications.
6 BY MR. MACORETTA:
7     Q. And here, the German authority -- well,
8 Paul-Erlich Institut says, "We're reducing the
9 shelf life from 18 to 24 months because the
10 minimum titer stated on the label, 4.3, was not
11 met at 24 months," right?
12     MS. HARDWAY: So you're back to
13 Exhibit 8?
14     MR. MACORETTA: I'm back to Exhibit 8.
15     MS. HARDWAY: Can you just refer him to
16 where you're reading again?
17     MR. MACORETTA: I'm looking at the bottom
18 of the first page.
19     THE WITNESS: Oh, I'm looking at the
20 graphs. I'm just assuming, again, they've
21 performed an analysis similar to what I showed you
22 with the confidence bound.
23 BY MR. MACORETTA:
24     Q. Sure. Well, if we look at this graph,
25 the way they do it, the minimum -- the end expiry

Page 185

1 has to be 18 months, right, because that's when it
2 falls below the lower specification limit.
3     A. According to what I described to you this
4 morning, yes.
5     Q. And according to this graph on the second
6 side of the letter?
7     A. Yes.
8     Q. Okay. So here, at least, the people at
9 the Paul-Erlich-Institut are interpreting the 4.3
10 on the label to be an end expiry specification,
11 right?
12     A. To do such a calculation, yes.
13     Q. Okay. And in your response, your
14 responsive e-mail, you don't suggest that they're
15 wrong for calling it an end expiry specification,
16 right?
17     MS. HARDWAY: Object to form.
18     THE WITNESS: Can you again help me
19 get to the essence of --
20 BY MR. MACORETTA:
21     Q. Well, so I would look at paragraph -- or
22 number 4 in your e-mail response. You're saying
23 that they shouldn't do the calculations the way
24 they did them, which I think is the issue we
25 talked about this morning, but you're not saying

47 (Pages 182 - 185)

Appx19394

Page 186

1  they're wrong that 24 months is the end expiry,
2  right?
3      MS. HARDWAY:  Can you just give him a
4  minute to read that?
5      MR. MACORETTA:  Sure.
6      THE WITNESS:  Apparently, there was a
7  more detailed analysis that I'm aware of that --
8  this speaks to the discussion we had earlier about
9  individual values.
10  BY MR. MACORETTA:
11     Q.  Yes.
12     A.  And I'm not -- again, putting two and two
13  together, I don't see anything here that indicates
14  they'd done their analysis with individual values.
15  But this -- I'm responding, apparently, to the
16  appropriateness of the analysis as it refers to
17  performance on individual measurements.
18     Q.  Yes, I understand.  I think you're
19  answering a question different than I asked.
20      Let me try it this way:  This morning, we
21  talked about whether or not that 4.3 on the label
22  was some kind of release potency or expiry
23  potency, right?
24     A.  Yes, we were.
25     Q.  Okay.  Paul-Ehrlich clearly interprets it

Page 187

1  as an expiry potency, right, because they say
2  you're below 4.3 at 18 months so we're taking the
3  shelf life to 18 months.
4      A.  It seems so.
5      Q.  Okay.  And when you analyzed what they
6  did wrong or what you disagreed with, individual
7  analysis versus regression, nowhere in there do
8  you say that 4.3 is not an expiry potency.
9      MS. HARDWAY:  Object to form.
10      THE WITNESS:  I don't speak to it
11  specifically as an expiry potency.  I'm simply
12  commenting on the assumptions they made that it
13  was an expiry potency and, therefore, commented on
14  the calculations they did assuming that.
15  BY MR. MACORETTA:
16     Q.  Yes, sir.  But you're not disagreeing
17  with their assumption that it was an expiry
18  potency?
19     A.  I have no basis --
20      MS. HARDWAY:  Object to form.
21      THE WITNESS:  I have no basis for
22  agreeing or disagreeing.  I'm simply commenting on
23  the calculations, assuming that they're right that
24  the 4.3 is an expiry potency.
25

Page 188

1  BY MR. MACORETTA:
2      Q.  Okay.  And as we sit here today, you
3  don't have any reason to think they're wrong, do
4  you, that it was an expiry potency?
5      MS. HARDWAY:  Object to form.
6  BY MR. MACORETTA:
7      Q.  You can answer.
8      A.  I have no reason to believe one way or
9  the other.
10     Q.  Okay.  And, indeed, if we look at number
11  5 of your e-mail, the last sentence, the lower
12  one -- and this is -- let me qualify that.  Above
13  number 5, you're proposing language to give to
14  Paul-Ehrlich, right?  Here's -- with that
15  paragraph that says, "Here's one we can use"?
16     A.  Uh-huh.
17     Q.  Okay.  And the last sentence says, "The
18  lower one cited 95 percent confidence bound with a
19  potency at 24 months from a linear mixed effects
20  analysis of the stability data for 46 different
21  lots is equal to 4.3?"
22      That's what it says, right?
23     A.  Yes.
24     Q.  And you're talking about an actual
25  analysis that Merck did of 46 different lots,

Page 189

1  right?
2      MS. HARDWAY:  Object to form.
3      THE WITNESS:  I can't tell whether the
4  analysis was done or not.  I can only say that
5  this is one thing that we could explore, it seems.
6  BY MR. MACORETTA:
7      Q.  Well, how would you know what the result
8  of the analysis was if you hadn't done it?
9      A.  Do you see the question mark?
10     Q.  Yep, I do.  So you were hoping?
11     A.  No, I'm not hoping.  I'm coaching.  I'm
12  asking a question.  Do the analysis, let's see
13  what we get, and see if the conclusion is equal to
14  4.3 or some other number.
15      It's to the point I made this morning.
16  Again, I give advice on what's an approach you can
17  take to evaluate these interactions with other
18  statisticians or regulatory authorities or even
19  internally.
20     Q.  Sure.  Although let's go up to an earlier
21  e-mail you wrote on the second page of this from
22  Schofield to Katalin Abraham and several other
23  people, Tuesday, December 30, '97, 9:43 a.m.
24      The last sentence:  "Again, using all the
25  data, we can claim 24-month dating based on an

48 (Pages 186 - 189)

HIGHLY CONFIDENTIAL

Page 190

1 analysis of time to 4.3 log TDIC50."
2      Do you see that?
3   A. Yes, I do.
4   Q. Yeah, that's no -- there's no question
5 mark there, right?
6      MS. HARDWAY: Object to form.
7      THE WITNESS: There isn't.
8 BY MR. MACORETTA:
9   Q. Okay. So do you have any reason to think
10 that wasn't actually your view of what the data
11 showed?
12   A. Again, I can't tell what the data showed
13 if you're asking me to reflect back on the
14 original e-mail versus what I said then. This is
15 ten days later.
16   Q. Okay. So ten days later, did you mean it
17 when you said, "using all the data, we can claim
18 24-month dating"?
19      MS. HARDWAY: Object to form.
20      THE WITNESS: Again, I can't tell, again,
21 whether the change without the question mark means
22 that it's a fact at this point in time or not.
23 There's not enough information.
24      Again, this is a series of e-mails that
25 are, again, communications within the team to see

Page 191

1 how we want to respond to the
2 Paul-Ehrlich-Institut request.
3 BY MR. MACORETTA:
4   Q. Well, at the time, the dating for mumps
5 was 24 months, and there was an end expiry on the
6 label of 4.3 log, right?
7      MS. HARDWAY: Object to form.
8      THE WITNESS: I assume there was.
9 BY MR. MACORETTA:
10   Q. Okay. So, presumably, you had some data
11 to support that, right?
12      MS. HARDWAY: Object to form.
13      THE WITNESS: I personally did not. My
14 team and the team they were working with possibly
15 had it. But, again, this was an internal
16 discussion in a few e-mails, not the actual work
17 that was done to speak to how we were trying to
18 address this.
19 BY MR. MACORETTA:
20   Q. The people in the -- the people that --
21 the "To" in the cc line on this December 30
22 e-mail, which one of them are on your team?
23   A. Well, they're both, in the sense of
24 they're the regulatory representatives.
25   Q. But that's not this team of statisticians

Page 192

1 looking at data to figure out stability, right?
2   A. Teams are not just statisticians. Teams
3 are all of subject matter experts and stakeholders
4 who are working on the problem.
5   Q. Who are the other statisticians on this
6 e-mail?
7   A. Phil Bennett.
8   Q. Okay.
9   A. And Jen Teyral -- Teyral, Jennifer L.
10 Teyral.
11   Q. Is she working for you as well?
12   A. She worked through, again, my group, yes.
13   Q. Okay. So when we go to the last e-mail
14 and you say -- I'm on the last page -- "Here's one
15 we can use as long as we're willing to share the
16 analysis from all lots of mumps-containing
17 vaccines." And then in your number 5, you say,
18 "46 different lots." Was that all lots of
19 mumps-containing vaccines?
20   A. I can't tell at this time.
21   Q. I'm going to go to the first page of
22 Schofield Number 9. There's an e-mail from you to
23 Barry Garfinkle and others.
24      Do you see that?
25   A. Yes.

Page 193

1   Q. Do you -- who is Mr. Garfinkle?
2   A. Dr. Garfinkle was senior vice president
3 of technical -- manufacturing technical services.
4   Q. So he was one of your superiors?
5   A. No. He was in MMD.
6   Q. He was in MMD, okay.
7      And then you say, "A marketing stability
8 analysis of all the single-dose mumps-containing
9 lots." And, again, what's a marketing stability
10 analysis?
11   A. It's an analysis that takes a large body
12 of data and analyzes it using a specific
13 statistical model called a mixed effects model
14 rather than, for lack of better term, simple
15 linear regression.
16   Q. What's the difference between a mixed
17 effects and a simple linear regression?
18   A. It incorporates additional information
19 from the data.
20   Q. Like what?
21   A. You know, supposing it was done as I am
22 guessing, and I am possibly wrong in guessing,
23 although I see an author of an article in this
24 other page, it incorporates variability in the
25 slopes among the 46 lots.

49 (Pages 190 - 193)

HIGHLY CONFIDENTIAL

Page 194

1    Q. So not only do we do a regression line
2 based on the actual data points, then we do
3 something else to figure out variability of that
4 regression line?
5    A. We do an additional thing to determine a
6 variability among slopes.
7    Q. Is that the regression of a regression?
8    A. No.
9    Q. And by the way, when we talk about data
10 points, when we look at whatever -- well, okay,
11 you know what? We'll get back to that another
12 time.
13    So you tell Dr. Garfinkle that -- and by
14 -- that's a reliable analysis, a marketing
15 stability analysis?
16    A. Yes.
17    Q. That's the way you think it should be
18 done?
19    A. That's a way of doing it.
20    Q. Okay. But earlier, you thought the way
21 the FDA wanted to do it was meaningless so I'm
22 asking if a marketing stability analysis is an
23 okay way of doing it.
24    MS. HARDWAY: Object to form. That's not
25 what he testified to earlier.

Page 195

1    THE WITNESS: There are many ways of
2 analyzing the stability data, like looking at
3 individual time points.
4 BY MR. MACORETTA:
5    Q. Yep.
6    A. Looking at the -- or analyzing it the way
7 the FDA did, the article that I mentioned to you,
8 Allen and Dukes, and there's marketing stability
9 analysis.
10    There are yet maybe half a dozen other
11 ways of analyzing stability data. The one that --
12 they all address different questions. And
13 depending upon what the question is, we might
14 employ one over another as ideal or optimal way to
15 analyze the stability data.
16 BY MR. MACORETTA:
17    Q. So did you believe that, when you're
18 talking to Dr. Garfinkle, that a marketing
19 stability analysis was an appropriate way to
20 analyze the data for the question you're
21 addressing here?
22    A. In discussing it with the
23 Paul-Ehrlich-Institut, we tried this analysis.
24 This was actually -- I'm not sure when the
25 publication is dated, '95 versus when this is

Page 196

1 happening, but this was a novel way of looking at
2 stability data.
3    And I think, as I answered when I
4 answered the question what a marketing stability
5 analysis was this morning, proposed for small
6 molecule products.
7    Q. I understand. But did you -- since
8 you're responding to Dr. Garfinkle, presumably you
9 thought it was an appropriate way to do the
10 analysis, right?
11    MS. HARDWAY: Object to form.
12    THE WITNESS: I simply gave him the
13 facts. I didn't say appropriate, inappropriate,
14 or the right way. We give the results of a
15 marketing stability analysis.
16 BY MR. MACORETTA:
17    Q. Well, but if you thought you shouldn't be
18 doing a marketing stability analysis or it was
19 wrong, you would have said that to Dr. Garfinkle,
20 wouldn't you?
21    MS. HARDWAY: Object to form.
22    THE WITNESS: I wouldn't have said it one
23 way or the other. We simply report what we do so
24 that they understand what the form of the analysis
25 was.

Page 197

1 BY MR. MACORETTA:
2    Q. Then why did you do a marketing stability
3 analysis?
4    A. I can't tell at this point in time.
5    Q. Okay. And then in your e-mail, on the
6 second page where it says, "Using all the data, we
7 can claim 24-month dating based on an analysis of
8 time to log -- 4.3 log," is that a marketing
9 stability analysis?
10    A. Which? Is this another e-mail?
11    Q. On the second page. No, the one we
12 looked at before, December 30, 9:43 a.m.
13    A. December. Oh, the middle one.
14    Q. Yeah.
15    A. Again, without cross-referencing, and if
16 there were any data specific to the reference to
17 marketing stability analysis, perhaps, but I don't
18 have the connected information. These are just
19 communications that lack the substance to be able
20 to answer the question.
21    Q. Let me show you what we're going to mark
22 as Schofield 10.
23    (Schofield Deposition Exhibits 10 and 11
24    marked for identification and attached to
25    the transcript.)

50 (Pages 194 - 197)

HIGHLY CONFIDENTIAL

Page 198

1 BY MR. MACORETTA:
2    Q. All right. Mr. Schofield, Schofield 11
3 came from your personal computer files.
4       Schofield 10 came from Merck, and I note
5 that Schofield 10 is an e-mail exchange in which
6 you're cc'd discussing a draft CRRC document for
7 review in September of 2002.
8       Do you see that?
9    A. Yes, I do.
10    Q. Okay. Do you -- what's the CRRC?
11    A. I don't recollect.
12    Q. How about Clinical Regulatory Review
13 Committee. Does that sound familiar to you?
14    A. It would match the acronym. I, however,
15 don't know exactly.
16    Q. Okay. Do you recollect reviewing or
17 having opinion on any presentations to the CRRC?
18    A. I may have reviewed presentations for the
19 -- from or for the input that I was responsible
20 for or had some knowledge about.
21    Q. Okay. And according to the metadata,
22 Schofield 11 was last saved by you October 3rd,
23 2002. Let's take a look at Schofield 11. You'll
24 see at certain points -- for example, on page 3 --
25 there's a comment from you.

Page 199

1       Do you see that?
2    A. Yes, I do.
3    Q. Does this refresh your recollection as to
4 whether or not you reviewed this?
5    A. Well, it does show that I reviewed this,
6 yes.
7    Q. I agree.
8       And, presumably, when you reviewed it,
9 you reviewed the whole thing, right?
10    MS. HARDWAY: Object to form.
11    THE WITNESS: I should wait to see, but
12 there are parts, perhaps, that I had no knowledge
13 of and wouldn't -- I would review it, but I
14 certainly wouldn't comment on things unless I
15 thought they were worthy of attention.
16 BY MR. MACORETTA:
17    Q. Okay. But you would have looked at the
18 whole thing?
19    A. I believe so.
20    Q. Okay. And if you go to slides 1, 2, 3,
21 4, and 5, slide number 4 has a Tim Schofield box
22 at the top that says bullet 2 of the next slide.
23       Do you see that?
24    A. Yes, I do.
25    Q. Okay. So, presumably, you commented on

Page 200

1 whatever you thought was appropriate to comment on
2 in these two pages, right?
3    MS. HARDWAY: Object to form.
4    THE WITNESS: I comment on things that I
5 see might help to make the presentation clear --
6 BY MR. MACORETTA:
7    Q. Okay.
8    A. -- as well as content.
9    Q. So the first bullet point on number 4, "A
10 '98 CBER specified that the mumps minimum release
11 potency be set at 5 to support an end expiry claim
12 of 4.3 log TCID50 per dose."
13       Do you see that?
14    A. Yes, I do.
15    Q. If you thought that was wrong, you would
16 have made a comment, wouldn't you?
17    MS. HARDWAY: Object to form.
18    THE WITNESS: I don't know whether I
19 would have or not. It depends upon how it was
20 expressed.
21 BY MR. MACORETTA:
22    Q. Do you have any reason to think that's
23 wrong?
24    A. No.
25    Q. Okay. And on both of these pages, you

Page 201

1 talk about moving around a couple -- or changing
2 some of the bullet points.
3       And on slide 5, the first bullet point
4 said, "The CBER specified minimum release potency
5 was to support an end expiry claim of 4.3 was
6 following CBER's evaluation of our product
7 stability profile and potency assay variability
8 for mumps," right?
9    A. Right.
10    Q. Do you see that? Okay. And that's what
11 we talked about earlier, right? CBER said set the
12 minimum release at 5 because there was an end
13 expiry of 4.3 and it looked at product stability
14 and assay variability to back into that 5, right?
15 Is that correct?
16    A. To the best of my knowledge yes.
17    Q. Okay. In the next bullet point, you say,
18 "The release potency was low -- recommended by
19 CBER was low in having neglected to include all
20 the elements associated with release potency
21 losses, as well as an invalid calculation leading
22 to underestimation of release assay variability."
23       Do you see that?
24    MS. HARDWAY: Just to be clear, I think
25 you just said "you said." You started off --

51 (Pages 198 - 201)

HIGHLY CONFIDENTIAL

Page 202

1 BY MR. MACORETTA:
2    Q. Well, okay. That's what it says here.
3 That's right. That's what the slide says, right?
4      Do you have any reason to believe that
5 bullet point's incorrect?
6    A. I have no reason to believe it's correct
7 or incorrect.
8    Q. Well, you made a comment to it, right, if
9 we look at the top of the box?
10    A. Oh, yes.
11    Q. You don't take out the first sentence.
12 You suggest simply to take out the language after
13 "as well as."
14      Okay. And then what's your -- then
15 what's your -- and then the last thing in your
16 comment is "the bottom line is they used the wrong
17 model." Do you see that?
18    A. Uh-huh.
19    Q. So that was your belief, that CBER used
20 wrong model to calculate the minimum release
21 potency?
22    A. Yes. In the sense that given what they
23 said they were doing. And as I said, you perform
24 an analysis appropriate to the question you're
25 trying to answer. It was my belief they had

Page 203

1 performed the wrong calculation or used the wrong
2 model to do the calculation.
3    Q. Did you tell CBER that?
4    A. It's --
5      MS. HARDWAY: Object to form.
6      THE WITNESS: It's not my position in the
7 company or in the team to communicate it to CBER.
8 BY MR. MACORETTA:
9    Q. Did you tell somebody in the company you
10 should communicate this to CBER?
11    A. It's not my position or authority to tell
12 somebody to report it to CBER.
13    Q. So you found the regulators were
14 operating under the wrong model, and you didn't
15 think you had any obligation to tell them that?
16      MS. HARDWAY: Object to form. Asked and
17 answered.
18      THE WITNESS: This is not how we interact
19 with the agency, for an individual to call the
20 agency and say they have done something wrong.
21 BY MR. MACORETTA:
22    Q. I understand, but did you call whoever
23 the individual at Merck who should be making that
24 call is and tell them you need to tell CBER this
25 is wrong?

Page 204

1      MS. HARDWAY: Object to form. Asked and
2 answered.
3      THE WITNESS: The people who are likely
4 to have been the ones to call CBER were possibly,
5 probably among the people reviewing these kinds of
6 communications. It would have been their choice.
7 BY MR. MACORETTA:
8    Q. So you didn't feel that you had any
9 personal responsibility to do that?
10      MS. HARDWAY: Object to form.
11      THE WITNESS: My personal responsibility
12 is to share facts and let the team and the
13 appropriate people in the team take action.
14 BY MR. MACORETTA:
15    Q. Okay. And when did you share this fact
16 with the rest of the team, that they used the
17 wrong model?
18    A. It's hard to say because this is simply a
19 summary at a point in time. I don't know when or
20 how if otherwise we communicated things.
21    Q. So you don't know if anybody ever told
22 CBER, by the way, you're using the wrong model?
23    A. I have no basis for knowing whether they
24 did or not. I --
25    Q. Who would be the person who would make

Page 205

1 that communication?
2    A. I do not know who was communicating these
3 kinds of things to CBER at the time.
4    Q. Well, would that ever been Alison Fisher?
5    A. She was in regulatory affairs. It may
6 have been.
7    Q. Okay. So you were in regulatory affairs
8 at another company at another time. Was it the
9 responsibility of regulatory affairs to tell CBER
10 they were operating under a wrong assumption?
11      MS. HARDWAY: Object to form.
12 BY MR. MACORETTA:
13    Q. You can answer that.
14    A. There are two divisions in Merck we're
15 discussing from here. One is the Merck
16 Manufacturing Division, who is responsible for
17 this kind of information and managing it within
18 Merck Manufacturing.
19      And then Alison Fisher, it's my
20 recollection, was an MRL. I don't know who was
21 the key communicator with the agency over
22 discussions like this.
23 BY MR. MACORETTA:
24    Q. Who was the person at MMD who was the key
25 communicator?

52 (Pages 202 - 205)

Appx19399

HIGHLY CONFIDENTIAL

Page 206

1    A.  The top person at the time, I believe,
2  was Roberta McKee or Barry Garfinkle.  Again, they
3  took somewhat equal roles in working with the
4  agency when we're developing changes to the
5  control strategy.
6    Q.  So CBER's miscalculation resulted in a
7  release potency that was low, according to this
8  bullet point, right?
9    A.  That's what it says.
10    Q.  Okay.  So the release potency, which,
11  according to the page before, was set by CBER at
12  5, should have been higher if the correct
13  calculation was used, right?
14    A.  If another calculation was used, I am
15  saying -- or this is saying that it would have
16  been higher, yes.
17    Q.  Okay.  And because they used the wrong
18  calculation, setting the release potency at 5
19  means the end expiry potency is going to be below
20  4.3?
21        MS. HARDWAY:  Object to form.
22  BY MR. MACORETTA:
23    Q.  Right?
24    A.  If you -- the simple math says yes, and
25  that's all I can respond to.

Page 207

1    Q.  Okay.  So then that means, when using the
2  correct math, Merck was releasing a product at
3  this time at 5.0 that was going to end up before
4  -- below 4.3, according to the release model,
5  right?
6        MS. HARDWAY:  Object to form.
7        THE WITNESS:  When using a model that
8  Merck uses, it would have been different than the
9  model that CBER used.
10  BY MR. MACORETTA:
11    Q.  And it would have -- the model Merck used
12  would have shown a bigger loss, right?
13        MS. HARDWAY:  Object to form.
14        THE WITNESS:  This is the question of the
15  use of word "loss."  The loss is the same.  It's
16  the matter, I believe, of the components of the
17  calculation.  Models have components of the
18  calculation.
19  BY MR. MACORETTA:
20    Q.  Okay.  Well, the model Merck used would
21  have shown there's less product or it's less
22  potent at 24 months than the model CBER used,
23  right?
24        MS. HARDWAY:  Object to form.
25        THE WITNESS:  The model is a model.  It

Page 208

1  doesn't say what the actual disposition of the
2  product is.  It's a prediction.
3  BY MR. MACORETTA:
4    Q.  The prediction -- we'll go to prediction.
5  CBER calculates -- specified that the mumps
6  minimum potency be set at 5.0, and they did that
7  because they had a model or a prediction that said
8  that was okay to set it at if you wanted to hit an
9  end expiry claim of 4.3, right?
10    A.  That's what they told us.
11    Q.  Okay.  But the model prediction Merck had
12  said if you want to hit 4.3, you need to set it
13  higher than 5.0, right?
14        MS. HARDWAY:  Object to form.
15        THE WITNESS:  The calculations we did
16  said that if you used our calculations, you would
17  get a different number.
18  BY MR. MACORETTA:
19    Q.  You would get a higher vary -- a higher
20  number of the different -- well, what are we
21  calling that middle number, the model or the
22  prediction?  What do you want to call that number,
23  the prediction?
24    A.  The result.  The result of the
25  calculation, yes.

Page 209

1    Q.  The result, okay.  The result of Merck's
2  calculation was a bigger number than the result of
3  CBER's calculation, right?
4        MS. HARDWAY:  Object to form.
5        THE WITNESS:  The numbers were different
6  and higher, according to the way this is
7  expressed.
8  BY MR. MACORETTA:
9    Q.  Okay.  So if you released it at 5.0,
10  according to Merck's calculation, there would be
11  less than 4.3 at the end of 24 months, right?
12        MS. HARDWAY:  Object to form.
13        THE WITNESS:  The result or the
14  calculation for the data at the time -- and
15  there's other complications which I'm, you know,
16  not able to go into because I don't have before me
17  the context or the basis for these calculations --
18  is given the calculations from these numbers, yes,
19  it would -- it gives you a number that gives
20  either a higher release or, if you start with the
21  release, would predict a lower value at the end of
22  expiry.
23  BY MR. MACORETTA:
24    Q.  Okay.  So if the lower value is below the
25  labeled potency, doesn't that take it out of

53 (Pages 206 - 209)

Appx19400

Page 210

1 specification?
2      MS. HARDWAY: Object to form. That's not
3 what he testified.
4      MR. MACORETTA: I know it's not what he
5 testified. That's what I'm asking him.
6      THE WITNESS: A calculation is not out of
7 specification. Product is or is out of
8 specification. So the context of that
9 specification has nothing to do with these
10 calculations.
11 BY MR. MACORETTA:
12    Q. You're right. The purpose of this
13 calculation is to figure out how much you have to
14 put in to start to make sure you have enough at
15 the end of shelf life, right?
16    A. One of the outcomes.
17    Q. What are the other outcomes?
18    A. The release limit. Then you put in more.
19    Q. Okay.
20    A. You put in, you said, what you have to
21 put in.
22    Q. Okay. Let's go to the next page, slide
23 6. On the first bullet point, you have a comment
24 that says, "huh."
25      Do you see that?

Page 211

1    A. Yes, I do.
2    Q. Okay. The next bullet point -- well, you
3 can -- I'll read it. "Recent calculations show
4 that manufacturing target of 5.2 log and
5 associated release of 5.0 can support an end
6 expiry claim of 4.0 log, the intermediate dose
7 used in the mumps end expiry trial, but not an end
8 expiry of 4.3 log."
9      Do you see that?
10    A. Yes, I do.
11    Q. Okay. You have no reason to think that's
12 wrong, right?
13      MS. HARDWAY: Object to form and
14 foundation.
15      THE WITNESS: I have no reason to see it
16 as wrong or right. Again, it's due -- there's
17 context associated with this.
18 BY MR. MACORETTA:
19    Q. But at the time, you didn't make some
20 comment that says, "This is not right," correct?
21      MS. HARDWAY: Object to form.
22      THE WITNESS: Well, I wish I knew what I
23 meant by "huh." But, you know, that's lost to
24 history as well. It could be "where are we going
25 with this?"

Page 212

1 BY MR. MACORETTA:
2    Q. Do you know what recent calculations this
3 bullet point talks about?
4    A. No, I'm not familiar with the specific
5 calculations.
6    Q. Would you or your group have been the
7 people doing those calculations?
8    A. They would have been working with the
9 team to perform the calculations that involves
10 obtaining data and doing calculations.
11    Q. Okay. So if these calculations, these
12 recent calculations showing that the release
13 potency of 5 could support an end expiry claim of
14 4 but not 4.3, then you would be releasing at a
15 level that would take you out of compliance with
16 the label, wouldn't you, which said 4.3?
17      MS. HARDWAY: Object to form.
18      THE WITNESS: Releasing when, what,
19 where? This, again, was a campaign to improve the
20 control strategy of the mumps-containing vaccines.
21      Each of these are points in time. So,
22 again, you don't turn on a dime, if I may use the
23 expression, and suddenly change the way vaccines
24 are controlled by using release limits, which was
25 an innovation, and have the supporting data to do

Page 213

1 so.
2      So all I am seeing is communications
3 where we are informing ourselves the direction
4 that we might take in the -- in moving towards a
5 different way of looking at a vaccine release.
6 BY MR. MACORETTA:
7    Q. In October -- in October -- on October 8,
8 2002, did Merck think anything other than a
9 release at 5.0 could not support an end expiry
10 claim of 4.3 log?
11      MS. HARDWAY: Object to form. Now you're
12 asking him to speak for the whole company, which
13 he can't do.
14      Can you restate the question?
15 BY MR. MACORETTA:
16    Q. As far as you know, in October 8th, 2002,
17 was there any belief at Merck that a release
18 calculation of 5 -- a release potency of 5.0 could
19 not support an end expiry claim of 4.3 log?
20      MS. HARDWAY: Objection. Overbroad.
21 BY MR. MACORETTA:
22    Q. You can answer.
23    A. Restate the question so that --
24    Q. Sure. This says, "Recent calculations
25 show that an end --" well, at the time, there was

54 (Pages 210 - 213)

Appx19401

HIGHLY CONFIDENTIAL

Page 214

1 a release potency of 5.0, right?
2     A.  At the time, the agency had asked us to
3 release a 5.0.
4     Q.  And that's what you were doing, right?
5     A.  I presume so, but I'm not in that
6 department to say.
7     Q.  Okay.  And so if you're releasing at 5.0,
8 it says, "Recent calculations show that a release
9 of 5.0 can support an end expiry claim of 4.0 but
10 not 4.3."
11        Do you have -- are you aware of other
12 data in Merck that you were relying on to reach
13 some different conclusion?
14        MS. HARDWAY:  Object to form and
15 foundation.
16        THE WITNESS:  I would neither know that
17 there's other data or that there's other
18 calculations.
19        As I said, this is a statement of a fact
20 in a point in time.  What was done in terms of
21 release, what was done in terms of follow-up is
22 outside the scope of my knowledge, at least for
23 the moment.
24 BY MR. MACORETTA:
25     Q.  So you have no idea whether the product

Page 215

1 you were releasing on October 8, 2002, could
2 support a label end expiry of 4.3 lot?
3        MS. HARDWAY:  Object to form.  He wasn't
4 releasing it.  He can't speak for the entire
5 company.
6 BY MR. MACORETTA:
7     Q.  I'm not asking -- I am never, ever in
8 this deposition asking you to speak for the entire
9 company.
10        And I understand that you're not the guy
11 cooking up this stuff.  I got that.  Nevertheless,
12 as far as you know, was the product being released
13 by Merck in October 2002 compliant with its end
14 expiry dosage of 4.3 log?
15        MS. HARDWAY:  I'm going to object to the
16 preamble of that question.  I'd ask you to refrain
17 from using phrases like "cooking up."
18        MR. MACORETTA:  Whatever.
19        MS. HARDWAY:  It will make the questions
20 less objectionable.
21 BY MR. MACORETTA:
22     Q.  You can answer.  You can answer.
23        MS. HARDWAY:  If you understand the
24 question.
25        THE WITNESS:  I actually also was taken

Page 216

1 aback by "cooking up this stuff."
2        We had done a noble effort to work
3 together with the agency.  I actually take, you
4 know, personal umbrage to saying "cooking up this
5 stuff."
6 BY MR. MACORETTA:
7     Q.  You know what?  That's fine.  I'll
8 withdraw the question.  I apologize if I caused
9 you any umbrage.
10        As far as you know, is the product Merck
11 was releasing in October 2002 compliant with its
12 label specification of an end point 4.3?
13     A.  I don't know --
14        MS. HARDWAY:  Object to form.
15        THE WITNESS:  I don't know what the rules
16 were at the time that this memo was written, so I
17 can't -- rules being agreements with regulatory
18 authorities, internal work, and communications
19 with regulatory authorities.
20 BY MR. MACORETTA:
21     Q.  As far as you know, in October 2002, did
22 Merck's internal calculations indicate that the
23 mumps vaccine would have at least 4.3 log at the
24 end of its 24-month shelf life?
25        MS. HARDWAY:  Object to form.

Page 217

1        THE WITNESS:  This statement says that.
2 I can't personally say anything other than what I
3 read out of this statement.
4 BY MR. MACORETTA:
5     Q.  Well, this statement doesn't say it would
6 have 4.3.  It would have 4.0, right?
7     A.  Well, part of it does.
8     Q.  Which part says it would have 4.3 at 24
9 months?
10     A.  Well, I'm sorry, 4.0.  In a
11 calculation -- again, it's simply a calculation.
12 It informs this, it informs, apparently, the mumps
13 expiry trial in the sense that it shows that
14 there's a connection between the calculation and
15 the mumps expiry trial which, again, is part of
16 what I consider the good science we did, which was
17 marry the introduction of a way of controlling the
18 vaccine that had never been used before in the
19 company together with good clinical science.
20        So all I can do is answer what I say and
21 what I knew was happening at the time.
22     Q.  Okay.  And this good science you're
23 talking about, is that the 007 trial?
24     A.  It's the whole -- the experience and
25 exploring the mumps component of our

55 (Pages 214 - 217)

Appx19402

HIGHLY CONFIDENTIAL

Page 218

1  mumps-containing vaccines, which is the control
2  strategy, building a sound and -- statistically
3  sound and scientifically sound control strategy,
4  together with the supporting data that comes out
5  of clinical trials.
6      Q. Okay.
7      A. A couple of things that are not done,
8  typically, in clinical and non-clinical
9  development.
10     Q. You said it's only a calculation. At
11 this time, in October of 2002, are you aware of
12 any other calculation anybody -- Merck was relying
13 on to determine whether the product was going to
14 meet its end expiry?
15     MS. HARDWAY: Object to form.
16     THE WITNESS: None is mentioned here so I
17 can't say I do or I don't know any other
18 calculations.
19 BY MR. MACORETTA:
20     Q. Well, you don't know any because you
21 can't tell me any others, right, today?
22     A. From this document, I can't tell you any
23 others today, nor can I recall any because I was
24 not personally involved in the calculations.
25     Q. Well, you had an opinion on them.

Page 219

1      MS. HARDWAY: Object to form.
2      THE WITNESS: I had an opinion -- sorry.
3 BY MR. MACORETTA:
4      Q. Go ahead.
5      A. I had an opinion on the way the
6  information was being delivered to the CRRC.
7      Q. Uh-huh.
8      A. Which I took -- I helped to craft, if you
9  will, the sequence of information and didn't
10 comment necessarily on this particular phrase but
11 thought that, you know, since I didn't comment on
12 it, it wasn't worthy of comment.
13     There might have been other calculations.
14 This would have been a very long presentation if
15 we said everything that we were doing at the time.
16     Q. I agree. But you had no opinion on
17 whether or not somebody should tell CBER that
18 their calculation was wrong, right?
19     MS. HARDWAY: Object to form. Asked and
20 answered.
21     THE WITNESS: It's not my position to
22 inform CBER of this calculation.
23 BY MR. MACORETTA:
24     Q. Do you think CBER would want to know if
25 its calculation was wrong?

Page 220

1      MS. HARDWAY: Object to form. It calls
2  for speculation.
3 BY MR. MACORETTA:
4      Q. You can answer.
5      A. I can't speak for CBER.
6      Q. You have no opinion as to whether or not
7  they would want to know that the calculation they
8  were using was wrong?
9      MS. HARDWAY: Object to form. Asked and
10 answered and calls for speculation.
11 BY MR. MACORETTA:
12     Q. You can answer.
13     A. I can't speak for CBER.
14     Q. Okay. Slide 22, that has a comment from
15 you at the top that says, "Calculations are not
16 audited."
17     Okay. So this says, "Recent calculations
18 using the new stability monitoring model." What's
19 that?
20     A. It's -- how was it expressed in a
21 previous document -- the model that we worked on
22 together with Bill Fairweather, and I'm blanking
23 on the formal title we gave it.
24     Q. Is that some kind of ASM or -- I don't
25 remember. There are several of these.

Page 221

1      A. Yeah, annual stability model.
2      Q. Okay. Was that the model that Merck was
3  relying on --
4      MS. HARDWAY: Object to form.
5 BY MR. MACORETTA:
6      Q. -- to analyze stability of the product?
7      A. No. This was a model that was being put
8  forward at the request of the agency to
9  incorporate an active monitoring tool for annual
10 lots of mumps vaccines.
11     Q. Okay. So that model that you worked on
12 with Bill Fairweather, according to this, says
13 that "At the current release potency of 5.0, you
14 can support an end expiry claim of 4.3 log with a
15 shelf life of less than 12 months."
16     Do you see that?
17     A. Uh-huh.
18     Q. Okay. And does that -- do you have any
19 reason to think that statement's wrong, that
20 that's not what the model showed?
21     MS. HARDWAY: Object to form.
22     THE WITNESS: I have no reason to believe
23 or not believe. I didn't do the work.
24 BY MR. MACORETTA:
25     Q. Okay. But you didn't say anything here

56 (Pages 218 - 221)

Appx19403

HIGHLY CONFIDENTIAL

Page 222

1 that's wrong. You just said it's not audited,
2 right?
3     MS. HARDWAY: Object to form.
4     THE WITNESS: I -- you know, I have no
5 reason to believe it's not wrong or wrong. Again,
6 people were doing the calculations.
7     Yes, I simply stated calculations are not
8 audited because I'd been informed that there was
9 still a process that needed to take place to be
10 able to make these data credible.
11     But whether the calculations are right or
12 wrong was being, you know, monitored by someone
13 other than myself.
14 BY MR. MACORETTA:
15     Q. And then it says, "Less than 12 months of
16 potentially non-marketable shelf life."
17     Do you see that?
18     A. Uh-huh.
19     Q. What do you understand that to mean?
20     A. Well, it means the calculations expressed
21 in this particular slide predict that maybe
22 there's a less than 12-month shelf life, given the
23 current -- given the release limit that the agency
24 had sent us.
25     Q. And at a less than 12-month shelf life

Page 223

1 would be potentially non-marketable?
2     MS. HARDWAY: Object to form and
3 foundation.
4 BY MR. MACORETTA:
5     Q. Was that your understanding at the time?
6     A. I only see what I see on this page.
7     Q. Okay. Were you involved in discussions
8 that shortening the shelf life of MMR would have
9 been a marketing problem?
10     MS. HARDWAY: Object to form and
11 foundation.
12     THE WITNESS: I don't know that I would
13 say that it was a problem. I know the teams were
14 exploring options until we received the results of
15 the clinical study.
16 BY MR. MACORETTA:
17     Q. Yep. Were -- let me not take back
18 "problem." That it was a concern, that lower --
19 that shortening the shelf life of the product was
20 a concern?
21     MS. HARDWAY: Object to form.
22 BY MR. MACORETTA:
23     Q. You were involved in those discussions?
24     MS. HARDWAY: Object to form and
25 foundation.

Page 224

1     THE WITNESS: I'm not familiar at all
2 with that being a problem or a concern. My --
3 well, leave it at that.
4 BY MR. MACORETTA:
5     Q. Okay. Let's go back a few more pages to
6 slide 27, Options under evaluation for short-term
7 fixes. It says, "The team is evaluating options
8 to be considered short-term fixes."
9     Were you part of the team?
10     A. Again, I didn't write this slide. I
11 don't know what team this is referring to.
12     Q. Sure.
13     A. I may have, I may have not been part of
14 the team. Mostly, I was probably aware and not
15 part of the direct discussions.
16     Q. Okay. But you were enough on the team
17 that you had opinions on the slides, right? I
18 mean, throughout the slide deck.
19     A. Yes. I don't see any here.
20     Q. On this particular slide, okay.
21     And then one option discussed is change
22 the label to reflect lower than 96 percent
23 protection.
24     Do you see that?
25     A. Yes.

Page 225

1     Q. Were you involved in discussions about
2 that at all?
3     A. I have absolutely no -- I have no
4 recollection of that.
5     Q. The next says, "repeat the mumps end
6 expiry study."
7     Do you see that?
8     A. Yes, I do.
9     Q. Okay. Were you involved in discussions
10 about that?
11     A. No.
12     Q. Okay. Were you involved in the
13 discussions at the time about how the mumps end
14 expiry study was doing, what the likely possible
15 results were?
16     A. No.
17     Q. Let's go back a little bit to slide 16
18 and 17 -- 15 and 16. Actually, we can start on
19 slide 14.
20     Slides 14, 15, 16, and 17 all discuss the
21 end expiry study, correct?
22     A. Part of the title I can see, yes.
23     Q. Okay. And you have comments on all of
24 them, right, on all four of these slides?
25     A. It looks, again, like it's a matter of

57 (Pages 222 - 225)

Appx19404

Page 226

1 simplification.
2    Q. Well, not on slide 16, right?  There you
3 have "decreased power is not the only issue."
4    A. Right.
5    Q. That's more of a substantive comment,
6 isn't it, than just a simplification?
7    A. Right.
8    Q. What was your basis for having that
9 substantive comment?
10    A. My recollections of discussions
11 concerning storage of samples.
12    Q. So you did have some discussion or
13 involvement in the 007 results?
14        MS. HARDWAY:  Object to form.  Overbroad.
15        THE WITNESS:  Many people in the
16 organization had one level or another of
17 association with the whole program, not just the
18 007 results.
19        But again, you know, if I heard and I
20 felt it would benefit the team to be thorough in
21 their outline to this committee CRRC, I added a
22 comment for their consideration.  That was my goal
23 in reviewing these slides was to offer what I knew
24 for the things that I was directly involved in but
25 also to remind members on the direct team what

Page 227

1 they might reflect on.
2 BY MR. MACORETTA:
3    Q. So let me go back, then, to where I was,
4 which was short-term fixes.
5        MS. HARDWAY:  Can you give me a page
6 again?
7        MR. MACORETTA:  Sure.  27.
8 BY MR. MACORETTA:
9    Q. At the bottom of that, it says, "The team
10 will report to CRRC upon conclusion of evaluation
11 and determination of feasible options."
12        So were you involved in the team that
13 evaluated and determined feasible options?
14    A. I -- no.  I -- again, I'm not -- you
15 know, I was or I wasn't.  I honestly don't know
16 whether I was on the team at the level of having
17 the detailed discussions about these options.  I
18 don't recall.
19    Q. Okay.  One option you were considering as
20 well was an increase in the overfill level, right?
21 Do you see that?
22        MS. HARDWAY:  Objection.  Form and
23 foundation.
24        THE WITNESS:  What Merck was considering
25 was a potential overfill.

Page 228

1 BY MR. MACORETTA:
2    Q. Okay.  If we go to slide 28, the first
3 sub-bullet point, "Using new stability monitoring
4 model, current estimate for shelf life is less
5 than 12 months."
6        Now, that new stability monitoring model,
7 you were involved with Dr. Fairweather in creating
8 that, right?
9    A. Yes.
10    Q. Okay.  So that model then showed the
11 shelf life is less than 12 months, right?  That's
12 what that says?
13        MS. HARDWAY:  Object to form.
14        THE WITNESS:  May I make a statement?
15 BY MR. MACORETTA:
16    Q. Sure.
17    A. Now that I look at this, and I wondered
18 it when we were looking at it the last time, the
19 stability monitoring model does not -- is not a
20 basis for determining the shelf life estimate.
21 You know, to the point that I was commenting on
22 these, I must have missed a point that those two
23 things are independent.  Those calculations are
24 independent.
25        So if I may correct myself or at least

Page 229

1 indicate that that first bullet does not make
2 sense to me.
3    Q. But you didn't put that in there at the
4 time?
5    A. Beg your pardon?
6    Q. You didn't comment at the time that this
7 was wrong?
8    A. I said that I missed that apparently in
9 going through and commenting on the document.  So
10 I'm just trying to clarify what the basis of the
11 less than 12 months was.
12    Q. Well, I don't know.  If it's -- somebody
13 told the CRRC, apparently, that it was the new
14 stability monitoring model.
15        Do you remember having a discussion that
16 some model at Merck is estimating a shelf life of
17 less than 12 months?
18    A. Well, knowing what the outcome of the
19 calculation was, it was likely more like the
20 release limit calculation.
21    Q. Meaning the model was used to figure the
22 release limit?
23    A. The same model that was used to release
24 -- to determine the release limit.
25    Q. But the -- but we can use that model to

58 (Pages 226 - 229)

HIGHLY CONFIDENTIAL

Page 230

1 make the same kind of regression curve over time,
2 right?
3      MS. HARDWAY: Object to form.
4      MR. MACORETTA: Strike that. Never mind.
5 BY MR. MACORETTA:
6      Q. It says, "Evaluation under way to define
7 conditions to achieve a shelf life of 18 months if
8 possible."
9      Do you see that?
10     A. Yes, I do.
11     Q. Were you involved in any of that
12 evaluation or discussion?
13     A. No, not directly.
14     Q. Do you recollect that such an evaluation
15 took place?
16     A. I do not recall, no.
17     Q. Now, if there would have been an estimate
18 at Merck that the shelf life was less than
19 12 months, that would have been a big issue,
20 wouldn't it?
21     MS. HARDWAY: Object to form and
22 foundation.
23     THE WITNESS: Again, it depends upon the
24 communications going on within the company and
25 together with the agency.

Page 231

1 BY MR. MACORETTA:
2      Q. Well, if you had -- if the model in Merck
3 suggested that the shelf life was less than
4 12 months, you would have had to change the label,
5 wouldn't you?
6      MS. HARDWAY: Object to form and
7 foundation.
8      THE WITNESS: I had no basis for knowing
9 whether the label would be changing or not. I do
10 not know anything about the label.
11 BY MR. MACORETTA:
12     Q. Well, if the label said 24 months and
13 Merck's internal calculation said the shelf life
14 is less than 12 months, you should have -- you
15 would have had to change the label, wouldn't you?
16     MS. HARDWAY: Object to form and
17 foundation, and asked and answered.
18     THE WITNESS: I think I'll fall back on a
19 previous response, which is there are a number of
20 things being done to align everything; many, many
21 things going on to try to get things aligned so
22 that we could incorporate a release model and
23 support it by clinical data.
24     I don't know what this information means
25 in terms of the succession of pieces of

Page 232

1 information that were being gotten for the team
2 and together with the agency.
3 BY MR. MACORETTA:
4      Q. What do you mean by "align things" in
5 that answer?
6      A. I mean -- and I said it before -- come up
7 with a control strategy that ensures a potency
8 through the end of shelf life and have supporting
9 clinical data -- have data to support that.
10     Q. What's a control strategy?
11     A. It's the way the company controls the
12 product through its manufacture and through its
13 testing.
14     Q. So make the product differently is one
15 possibility there?
16     MS. HARDWAY: Object to form. Overbroad.
17 BY MR. MACORETTA:
18     Q. Right?
19     A. I can't say. I -- again, you could --
20 no, I can't say.
21     Q. You just said the control strategy was
22 either manufacturing or testing.
23     A. Well, it's a description of the process
24 as it is. It's testing. And I'm not even sure
25 what the question is, to be quite honest with you.

Page 233

1      There is -- there's a large barrier to
2 changing the manufacturing process. And I don't
3 think you would change the manufacturing process
4 because it was an old process that was working.
5 It was delivering good vaccine. The things they
6 might more likely change are the ways to look at
7 the process; the testing, for instance.
8      Q. Let's back up. If the -- if Merck's
9 internal monitoring shows that the product falls
10 below its end expiry potency at a certain number
11 of months, the label's not supposed to give it a
12 shelf life longer than that number of months, is
13 it?
14     MS. HARDWAY: Object to form and
15 foundation.
16     THE WITNESS: Can I correct a statement
17 you made? It's not the monitoring.
18 BY MR. MACORETTA:
19     Q. Sure.
20     A. The calculation.
21     Q. Fair enough. If Merck's internal
22 calculation shows that the product, as currently
23 released, is going to fall below its end expiry
24 potency at a certain number of months, the label
25 is not supposed to give an end expiry date more

59 (Pages 230 - 233)

Appx19406

Page 234

1 than those numbers of months, right?
2      MS. HARDAWAY: Object to form and
3 foundation.
4      THE WITNESS: There again, it's a
5 sequence of events or understandings that happened
6 over the years, as I understand it. Take, for
7 example, the release limit up and to the point
8 that these conversations started with the agency
9 was 4.3.
10      So there was a long succession of
11 conversations with the agency and work done by
12 Merck to refine the way they thought about
13 controlling the vaccine and what data they needed
14 to support the control of the vaccine.
15      So a point in time when this statement is
16 made is made in view of, at one time, the release
17 limit was 4.3.
18 BY MR. MACORETTA:
19      Q. But that was long done by 2002, right? I
20 mean, according to earlier in the slide deck, the
21 release limit had been moved up to 5.0. The
22 release limit had been moved to 5.0, right?
23      A. Well, I think of it in terms of what the
24 value of the vaccine was before and after. The
25 vaccine, per se, was fine before we changed the

Page 235

1 control strategy. The vaccine, to the best of my
2 knowledge, was working in the clinical population.
3 It practically eradicated mumps.
4      And so all we're doing is refining the
5 bases for controlling the product by doing
6 clinical studies that support what really happens
7 at low potencies for the product and putting
8 mechanisms in place -- I call it, generally, the
9 control strategy -- to make sure the product is
10 safe and effective.
11      Q. You're aware that there have been recent
12 mumps outbreaks, right?
13      A. I've heard there are outbreaks.
14      Q. Some of them are at colleges, right?
15      MS. HARDAWAY: Object to form.
16 Foundation.
17 BY MR. MACORETTA:
18      Q. You've heard there have been outbreaks at
19 Harvard and other universities?
20      A. I don't know where specifically. I've
21 just heard there are outbreaks.
22      Q. When you were at Merck, were you ever
23 involved in discussing any outbreaks or the cause
24 of them?
25      A. No.

Page 236

1      Q. Okay. So when you say that the vaccine
2 works fine, don't you think that the recent
3 outbreaks call that question -- that statement
4 into question?
5      MS. HARDAWAY: Object to form and
6 foundation.
7      THE WITNESS: From what I know of the
8 possibility or the, let's call it, assignable
9 causes for outbreaks, stability is one of a dozen
10 different reasons you can get an outbreak.
11      Outbreaks occur because populations of
12 parents refuse to vaccinate their children. There
13 are clinical problems such as waning immunity. I
14 don't know -- you know, when I hear of an
15 outbreak, I recognize how complex it is to
16 maintain, if you like, the herd immunity of the
17 product.
18 BY MR. MACORETTA:
19      Q. When you were at Merck, did Merck ever
20 evaluate whether any of the outbreaks that existed
21 were caused by kids getting vaccine below the 4.3
22 potency listed on the label?
23      MS. HARDAWAY: Object to form.
24      THE WITNESS: It wasn't my area of
25 expertise or of evaluation.

Page 237

1 BY MR. MACORETTA:
2      Q. So you don't know?
3      A. I don't know. I have no --
4      Q. Okay.
5      A. I wouldn't know where to go to find out.
6      Q. Okay. Ever discuss this at GSK?
7      MR. MACORETTA: No, I'll ask that when
8 Beth comes back. I take that back. We'll get to
9 that when GSK's counsel comes back.
10 BY MR. MACORETTA:
11      Q. So let me try that question again. Is it
12 your understanding -- I thought this was a yes or
13 no question. If Merck's internal release
14 calculations for whatever models it's using show
15 that the product will fall below its labeled
16 expiry potency at a certain number of months, can
17 the shelf life of that product be longer than that
18 number of months?
19      MS. HARDAWAY: Object to form.
20      THE WITNESS: In the context of the time
21 in which the company was adopting these particular
22 kinds of calculations and approaches, I don't
23 know, because it was a transition from a way of
24 controlling the vaccine and supporting the
25 clinical -- I'm sorry, supporting the limits were

60 (Pages 234 - 237)

HIGHLY CONFIDENTIAL

Page 238

1 in transition at the time.
2 BY MR. MACORETTA:
3    Q. Transition from what to what?
4    A. From an approach where we were releasing
5 lots -- the release limit was 4.3 to working
6 together with the agency to better understand what
7 the release -- I'm sorry, what the end of shelf
8 life limit should be and doing the work to support
9 that.
10    Q. Did Merck ever tell -- as far as you
11 know, did Merck ever tell the FDA that its new
12 stability monitoring model had an estimate for
13 shelf life of less than 12 months?
14       MS. HARDWAY: Object to form.
15 Foundation.
16       THE WITNESS: Are we on the same page?
17 BY MR. MACORETTA:
18    Q. Yes, 28.
19    A. I am hearing the same question again.
20 I'm trying to resolve the nuance or distinction in
21 the question.
22    Q. Well, let me try -- I didn't think I -- I
23 didn't think I asked this one before, but there
24 are phrases in here that says models at Merck
25 suggest that the shelf life is less than 12

Page 239

1 months.
2       Did Merck ever communicate those models
3 to CBER?
4       MS. HARDWAY: Object to form.
5 Foundation.
6       THE WITNESS: Seeing the rest of this
7 document, seeing that they were -- the document is
8 stating facts. And then it's -- then like a
9 document or maybe to the committee that we were
10 reporting this to, lining up solutions is what I
11 understand to be the purpose of this document, not
12 to say that it may be reported to the agency.
13 BY MR. MACORETTA:
14    Q. If you have a fact that the shelf life is
15 a lot less than what the label says, you don't
16 have to report that to the agency immediately? Is
17 that your understanding?
18       MS. HARDWAY: Object to form and
19 foundation.
20       THE WITNESS: Going back to what I said
21 before, at a point in time, I can't say. At the
22 beginning and the end, where 4.3 was the -- was
23 the release limit, the vaccine was working in the
24 field. And at the end of time, we had completed
25 our discussions with the agency about what we

Page 240

1 would do about the redefinitions of certain
2 aspects of the control of the product.
3 BY MR. MACORETTA:
4    Q. All right. So in 2002, that issue had
5 been resolved and Merck had agreed with the FDA
6 that the release potency was going to be 5.0 and
7 the end expiry was going to be 4.3, right?
8       MS. HARDWAY: Object to form.
9       THE WITNESS: Off of this document?
10 BY MR. MACORETTA:
11    Q. Off of your knowledge.
12    A. I can't say.
13    Q. Okay. Off of this document, then.
14    A. I can't say either because this is simply
15 a discussion within Merck.
16    Q. Okay. Let's assume those facts to be
17 true, that by 1998 or 1999, Merck and the FDA had
18 agreed that the release limit would 5.0 and the
19 end expiry would be 4.3.
20       If Merck had a -- if Merck, then, in 2002
21 had a stability monitoring model showing a shelf
22 life of less than 12 months, did Merck have an
23 obligation to tell that to the FDA?
24       MS. HARDWAY: Object to form.
25       THE WITNESS: First of all, had used the

Page 241

1 same model that was used to determine release
2 limits, not the stability monitoring model. Now,
3 please --
4 BY MR. MACORETTA:
5    Q. Yeah.
6    A. -- I was distracted by the need to
7 correct the way you were saying it. Could you ask
8 the question again, please?
9    Q. Sure. Well, so there's release models
10 and stability models, right?
11    A. There are release models, there are
12 stability monitoring, and perhaps others that are
13 an aspect of this discussion.
14    Q. Okay.
15    A. But I'm trying to be precise with the
16 language.
17    Q. I understand. And back on slide number
18 4, when you say, "the bottom line is they used the
19 wrong model," you're talking about a release model
20 there, right?
21    A. I'm talking about their basis for
22 calculating a release limit.
23    Q. So the model is a release model, right?
24    A. I called it a model, yes.
25    Q. Yes. Okay. And that's a model to figure

61 (Pages 238 - 241)

HIGHLY CONFIDENTIAL

Page 242

1  out what the release limit is, right?
2      A.  It's a way of calculating the release
3  limit, yes.
4      Q.  Okay.  And then on slide 28, you say,
5  "using the new stability --" or this document
6  says, "using new stability monitoring model."
7      A.  Yes.  And --
8      Q.  So that's a model to model the stability
9  of the product that's out there already, right?
10     A.  Which slide was that again, please?
11     Q.  28.
12     A.  And I already said that this was stated
13  incorrectly.  The new stability monitoring model,
14  the one that we worked on with Bill Fairweather,
15  had a different objective.  And I'm simply, if it
16  will help you with the question, clarifying that
17  it's the same kind of calculation that's done for
18  the release limit.
19     Q.  So you could use the stability
20  modelling -- the new stability model -- monitoring
21  model to go back and recalculate release limit?
22     A.  No, it's not the purpose of that
23  stability monitoring model.  It's to alert the
24  company that the stability has changed.
25     Q.  Okay.  And in this case, it's saying that

Page 243

1  new stability monitoring model is alerting the
2  company that the stability has changed and the
3  shelf life is now less than 12 months?
4      A.  That's what the statement is saying.  I'm
5  saying the statement is in error, because what I
6  know of the stability monitoring model and what I
7  know is the basis for determining that the shelf
8  life might be 12 months are inconsistent.
9      Q.  What do you know of the stability -- of
10  the shelf life being 12 months?  I don't
11  understand.
12     MS. HARDWAY:  Object to form.
13     MR. MACORETTA:  All right.  That's fine.
14  We'll come back.
15     THE WITNESS:  Was that a question?
16     MR. MACORETTA:  I'll withdraw that
17  question.
18  BY MR. MACORETTA:
19     Q.  You said you were never involved in any
20  evaluation to define the conditions to achieve a
21  shelf life of 18 months, if possible?
22     A.  No.
23     Q.  Okay.  Do you know what label compliance
24  and harmonization refers to on slide 28?
25     A.  I have no idea.

Page 244

1      Q.  Slide 29, options under evaluation,
2  "Change label to reflect lower than 96 percent
3  protection."  That's talking about the efficacy or
4  effectiveness of the vaccine, right?
5      A.  Yes.
6      MS. HARDWAY:  Object to form.  Sorry.
7      THE WITNESS:  I'm sorry.
8  BY MR. MACORETTA:
9      Q.  Okay.  And then it says it's a
10  competitive disadvantage.  Why would that be a
11  competitive disadvantage?
12     A.  I can't speak to that.  I don't work in
13  that area.
14     Q.  The study fail -- then it says study, and
15  this is talking about 007, right?
16     MS. HARDWAY:  Object to form and
17  foundation.
18  BY MR. MACORETTA:
19     Q.  You can answer that.
20     A.  "The study has failed."  I can't say.  I
21  don't know what study they're referring to.
22     Q.  Did you ever have any discussion about
23  what happens if the 007 fails by a slight or wider
24  margin?
25     A.  No.

Page 245

1      MS. HARDWAY:  John, if you're between
2  documents, if we could take a break.
3      MR. MACORETTA:  That's fine.
4      VIDEO TECHNICIAN:  Going off the record
5  at 2:58 p.m.
6      (A recess was taken.)
7      VIDEO TECHNICIAN:  Back on the record.
8  This is start of Media Unit Number 4 in the
9  deposition of Tim Schofield.
10     (Schofield Deposition Exhibit 12 marked
11       for identification and attached to the
12       transcript.)
13  BY MR. MACORETTA:
14     Q.  All right.  Mr. Schofield, we're showing
15  you what's been marked as Schofield 12, which is
16  an e-mail from Keiko Simon and a couple of
17  attached slides that, at least according to
18  Ms. Simon, were created by you or you presented.
19     Who is Ms. Simon?
20     A.  Keiko, I am trying to remember what her
21  role was.  It was, I think, in project management.
22     Q.  Okay.
23     A.  I can't be sure, but I seem to believe
24  that was her role at the time.
25     Q.  Okay.  And she says here that "Attached

62 (Pages 242 - 245)

Appx19409

Page 246

1 is a file that T. Schofield presented at the
2 Friday morning meeting with MMD regarding the
3 technical options to address mumps expiry."
4     Do you recollect such a meeting?
5    A. No.
6    Q. Do you have any reason to believe it
7 didn't happen?
8    A. No.
9    Q. Okay. Have any reason to believe that
10 you did not present -- and I should note that at
11 the top of the two PowerPoint slides, that
12 handwriting was not in the original. That's ours
13 so you can ignore that.
14    A. Uh-huh.
15    Q. Do you have any reason that you did not
16 present the two slides attached here?
17    A. I have no reason to believe I did not.
18    Q. Okay. And these slides are doing a --
19 well, this is essentially a stability calculation,
20 right? The loss -- amount of loss over time,
21 isn't it?
22     MS. HARDWAY: Object to form. What are
23 you looking at?
24     MR. MACORETTA: I'm looking at number
25 1105. It says short-term scenarios with some

Page 247

1 data.
2     THE WITNESS: It's --
3     MS. HARDWAY: I'm sorry. Can you repeat
4 your question, John?
5     MR. MACORETTA: Sure.
6 BY MR. MACORETTA:
7    Q. The page we're looking at, the short-term
8 scenario, and it has scenarios 1, 2, 3, 4, and 5
9 with different data calculations, this is
10 essentially a stability model, isn't it?
11    A. It's a stability calculation or series of
12 calculations, yes.
13    Q. Okay. And so to figure out the amount of
14 loss over time, you're taking in several factors
15 or different conditions plus the standard error,
16 right?
17     MS. HARDWAY: Object to form.
18     THE WITNESS: I see a standard deviation
19 associated with an assay format, but I don't see
20 specifically a standard error. But that's --
21 BY MR. MACORETTA:
22    Q. Okay.
23    A. Oh, wait. I see assay standard error is
24 how it was referenced, yes.
25    Q. Okay. And different scenarios -- these

Page 248

1 different scenarios have different expiries, some
2 of them, right?
3    A. Different shelf lives, yeah.
4    Q. Different shelf lives, that's right.
5    A. It says expiry; but yes, just to put it
6 in the vernacular we've been using.
7    Q. And I want to look at scenario number 2,
8 which says that if you have a 24-month expiry, the
9 total loss would be .788 log, and then there's a
10 pooled standard error and a 95 percent bound,
11 right?
12    A. Correct.
13    Q. And then it says minimum release 4.94,
14 minimum expiry 4.0, right?
15    A. Right.
16    Q. So that means that at 24 months, you're
17 going to lose .949 log, right?
18     MS. HARDWAY: Object to form.
19     THE WITNESS: .788. And the additional
20 pooled standard error creates a bound.
21 BY MR. MACORETTA:
22    Q. Okay. So you're going to lose .788, but
23 because that's variable and there's some standard
24 error, we're going to calculate a loss of .949,
25 right?

Page 249

1     MS. HARDWAY: Object to form.
2     THE WITNESS: There's terminology we
3 might use differently, but I can leave it at that.
4 BY MR. MACORETTA:
5    Q. Okay. So if you release at 4.94 at 24
6 months, you can have a minimum expiry of 4.0?
7    A. Correct.
8    Q. Okay. Do you have any reason to believe
9 you were not making these calculations or
10 discussing this at the time?
11     MS. HARDWAY: Object to form. Compound.
12     MR. MACORETTA: You know what? That's
13 fine. Let me strike that.
14 BY MR. MACORETTA:
15    Q. Do you know why you were making these
16 calculations or doing these?
17    A. I have no recollection.
18    Q. Okay. And if you flip over to page 2 of
19 this, it talks about scenario 1 as a ten-month
20 shelf life. And at scenario 2, it says 4.0 log
21 mumps expiry trial. Do you see that?
22    A. Yes, I do.
23    Q. Okay. Scenario 3 is a 4.3 log with a
24 release increased. Scenario 4 is label changes,
25 and these label changes are that post-package

63 (Pages 246 - 249)

Page 250

1 release/15-hour TOR, that means time out of
2 refrigeration, right?
3     A. Yes.
4     Q. And an 18-month shelf life. And scenario
5 5 says retain 24-month dating in scenario 4 with
6 an extra -- with a 0.1 log overfill, right?
7     A. Right.
8     Q. Okay. So -- and you don't recollect at
9 the time why you were doing this, right?
10     A. Not specifically.
11     Q. And scenario 1 says if you start with a
12 minimum release of 4.993, at ten months, including
13 the errors, you'll have a minimum expiry of 4.3,
14 right?
15     MS. HARDWAY: Object to form.
16     THE WITNESS: Could you repeat the
17 question, please?
18 BY MR. MACORETTA:
19     Q. Sure. Scenario 1 says if you release at
20 4.993.
21     A. Yes.
22     Q. -- and you have a shelf life of ten
23 months or an expiry of 12 months, at the end of
24 that time, your loss plus your error will give you
25 a minimum expiry of 4.3, right?

Page 251

1     MS. HARDWAY: Object to form.
2     THE WITNESS: What I see is that we did
3 the calculation, this scenario, looking at what
4 the relationship between a minimum release and
5 minimum expiry would be, the numbers above, of
6 course, being the components of the calculation.
7 BY MR. MACORETTA:
8     Q. Uh-huh. And for the minimum release of
9 4.993, this scenario shows -- your model here
10 shows that after ten months, there will be 4.3
11 left, right?
12     MS. HARDWAY: Object to form.
13     THE WITNESS: There's a prediction
14 that -- uncertainty that there would be 4.3
15 potency in the product.
16 BY MR. MACORETTA:
17     Q. Would uncertainty -- that's the
18 95 percent bound you're talking about?
19     A. That's part of it, yes.
20     Q. Okay. And what is that below -- the two
21 lines below it? It says target and percent pass,
22 max 5.4, what does that refer to?
23     A. Well, these may be associated targets for
24 those to --
25     Q. Or is that a minimum release target --

Page 252

1     A. No.
2     Q. -- with a minimum release of 4.9?
3     A. No. I think this is the -- well, I'm
4 only going to speculate without, you know, having
5 a deep recollection.
6     Q. If you don't know, just say you don't
7 know.
8     A. It's not part of the normal -- yes, thank
9 you.
10     Q. All right. And these factors that are in
11 this model, the assay format, the average loss of
12 2 to 8 degrees, the time out of refrigeration, and
13 minus 20 degree loss and the reconstituted hours,
14 are these all the factors that went into the
15 various release models that Merck was using?
16     MS. HARDWAY: Object to form. Overbroad.
17     THE WITNESS: This was the calculation
18 that was done here.
19 BY MR. MACORETTA:
20     Q. Do you recollect that different factors
21 were used in the models at Merck?
22     MS. HARDWAY: Object to form. Overbroad.
23     THE WITNESS: That's the calculation that
24 was done here is all I can say. It's not a
25 function of what Merck did. It's a function of

Page 253

1 the calculations that were performed for this
2 discussion.
3 BY MR. MACORETTA:
4     Q. Do you have any reason to think that
5 these factors are wrong or that something's
6 missing?
7     MS. HARDWAY: Object to form. With
8 regard to this calculation or --
9     MR. MACORETTA: With regard to this
10 calculation, yeah.
11     THE WITNESS: There's nothing wrong with
12 having them in the calculation.
13 BY MR. MACORETTA:
14     Q. Okay. So it's not -- okay. Fair enough.
15     Do you know if these calculations -- I'm
16 going to talk about scenario 2 right now. If the
17 calculations in scenario 2, everything that adds
18 up to total loss plus the pooled standard error,
19 if these were the same figures used in either the
20 release or stability model being used by Merck at
21 that time?
22     MS. HARDWAY: Object to form and
23 foundation.
24     THE WITNESS: I can't tell. This is a
25 point in time.

64 (Pages 250 - 253)

Appx19411

HIGHLY CONFIDENTIAL

Page 254

1 BY MR. MACORETTA:
2    Q. Well, if you were having a meeting with
3 MMD regarding technical options to address mumps
4 expiry, can you think of any reason why you
5 wouldn't use the same calculations in the models
6 Merck was relying on at that time?
7    MS. HARDWAY: Object to form and
8 foundation.
9    THE WITNESS: If you like, it's the
10 calculation that was done at the time at the
11 request of MMD.
12 BY MR. MACORETTA:
13    Q. Well, you wouldn't have done some
14 different calculation of, for example, average
15 loss of 2 to 8 degrees because you're doing this
16 for MMD, as opposed to some other calculation,
17 would you?
18    MS. HARDWAY: Are you asking him about
19 another calculation that he did, or are you asking
20 him about this calculation?
21    MR. MACORETTA: I'm asking about this
22 one.
23    THE WITNESS: No. Today, it would be
24 calculated the same way as it was in the other
25 release models we've been cal -- we've been

Page 255

1 discussing.
2 BY MR. MACORETTA:
3    Q. Okay. And the assay format is whatever
4 you're doing, right? If it's 1 by 6, that's what
5 would have been in there?
6    A. Right. You can predict the uncertainty.
7    Q. Okay. And the assay standard error would
8 not have changed if you would have done the
9 calculations for somebody else, right?
10    A. It's the same -- well, yes. It's a
11 function of the format.
12    Q. Okay. Because when you go to 1 by 12,
13 the assay standard error goes down?
14    A. Right. It's arithmetic.
15    Q. And the time out of release calculation,
16 loss per 40 hours, would not have changed,
17 depending on who you were doing the model for,
18 right?
19    A. Time out of refrigeration. But if people
20 were using that in the calculation, it would be
21 the same.
22    Q. Okay. And would the standard error for
23 40 hours be the same?
24    A. Yes. It just comes from the data.
25    Q. That's a function of math. Nobody has an

Page 256

1 opinion that .04 is the standard error for that
2 0.1?
3    A. No. It's just arithmetic.
4    Q. Okay. The same question for the 20
5 degree loss. It's the arithmetic between the
6 standard -- the minus 20 degree loss. It's the
7 same arithmetic for the standard error, right?
8    A. Yes.
9    Q. Okay. And the pooled standard error
10 below is all those other standard errors added up,
11 right?
12    A. Yes.
13    Q. Okay. Let me show you -- let me show you
14 what we're going to mark as Exhibit 13.
15    (Schofield Deposition Exhibit 13 marked
16    for identification and attached to the
17    transcript.)
18 BY MR. MACORETTA:
19    Q. The first question is going to be, is
20 that your handwriting, Mr. Schofield?
21    A. No, it isn't.
22    Q. Okay. And this appears to be for
23 submission in an FDA file. That's what that Table
24 3.2.P.8.3 is.
25    Do you recollect doing any calculation

Page 257

1 like this for any FDA filings?
2    MS. HARDWAY: I'm just going to object to
3 the preamble, to the extent that you haven't
4 established a foundation for that statement.
5    MR. MACORETTA: Okay. We'll establish a
6 foundation. That's fine.
7    Let me mark Exhibit 14.
8    (Schofield Deposition Exhibit 14 marked
9    for identification and attached to the
10    transcript.)
11 BY MR. MACORETTA:
12    Q. I'm not going to make you look at the
13 whole thing, Mr. Schofield. If you could turn in
14 Exhibit 14 to page 123.
15    A. Are these MRK numbers?
16    Q. That's the little number at the top
17 right. If you want to use the MRK number, it's
18 885.
19    A. Okay.
20    Q. Okay. Do you see that table?
21    A. Yes, I do.
22    Q. Appear to be the same table in Schofield
23 13, your memo to Mary Macchi?
24    A. It does.
25    Q. Okay. So this is a -- and if we look at

65 (Pages 254 - 257)

HIGHLY CONFIDENTIAL

Page 258

1 the front page of Number 14, it's a July 13, 2005,
2 amendment to the SBLA, right?
3    A. Uh-huh.
4    Q. Okay.
5    A. Yes.
6    Q. And here you're telling the FDA that the
7 end expiry potency has changed from 4.1 to 4.3
8 because the end expiry file has not been approved,
9 right? Do you see that? I'm at the one, two --
10 third paragraph here.
11   A. This document is saying, yes.
12   Q. Yes, okay. And indeed, you're submitting
13 here's a table for the minimum release potency on
14 mumps, right? That's the page we're just looking
15 at in the middle?
16   A. Uh-huh.
17   Q. If we look at the bottom of the page, in
18 bold it says, "Minimum release potency equals
19 minimum expiry plus total loss plus a variance"?
20   A. Uh-huh. It's the same as this. Do I
21 have to keep flipping --
22   Q. It doesn't -- well, you know, you don't
23 have to, no. And that's fine. We'll work off
24 Exhibit 13, since we all agree it's the same.
25   A. Okay.

Page 259

1    Q. And that's the formula we talked about,
2 right? We figure out minimum release by taking
3 the end expiry, adding the loss and adding a
4 variance, right?
5    A. True.
6    Q. Okay. Would you call that the industry
7 standard way to do it?
8    A. This is a way of doing it. It included
9 some additional components.
10   Q. Like what?
11   A. The calculations I'm aware of otherwise
12 use storage at 2 to 8 and release assay
13 variability.
14   Q. Well, you put them in there because they
15 needed to be in there, right, to make the
16 calculation correct?
17   A. I can't recall specifically why this
18 calculation was done this way versus what I just
19 recited to you as the one that comes out in
20 specifically the Allen and Dukes article.
21   Q. But this, number 13, was the release
22 model Merck was using at this time in June 2005,
23 right?
24      MS. HARDWAY: Object to form.
25      THE WITNESS: It's the one that appears

Page 260

1 in this particular document so I would have to
2 assume that this is the model that was being
3 adopted and sent to the agency.
4 BY MR. MACORETTA:
5    Q. But if Merck was using some other model,
6 you should be telling the agency that, right?
7      MS. HARDWAY: Object to form and
8 foundation.
9      THE WITNESS: I only have this in front
10 of me.
11 BY MR. MACORETTA:
12   Q. Well, you have the filing as well.
13   A. Yeah, yeah, yeah. No, no. I mean I'm
14 equating the fact that the calculation in this
15 memo was the same as the one that was filed and,
16 therefore, the one that was used and promoted the
17 release limit for the mumps-containing vaccine in
18 this filing.
19   Q. Okay. And then I do want to go to the
20 FDA filing. The last statement on that page, 885,
21 says, "The minimum release potency for mumps of
22 5.0 log TCID50 per dose ensures with 95 percent
23 confidence that the vaccine will meet or exceed
24 the end expiry dose at the end of the 24-month
25 shelf life."

Page 261

1      Do you see that?
2    A. Yes, I do.
3    Q. And that's true, right? That's what this
4 calculation is designed to show?
5      MS. HARDWAY: Object to form.
6      THE WITNESS: That's what the calculation
7 gives us.
8 BY MR. MACORETTA:
9    Q. Yes, okay. And all of the factors in
10 this calculation, the loss rate at storage of 23
11 to 27, the storage at 2 to 8, all these, these
12 were calculated internally at Merck based on some
13 studies?
14   A. Likely. I can't say for sure, but this
15 is where we usually acquired our data for these
16 calculations.
17   Q. Okay. And the standard error, like you
18 said, is simply a mathematical calculation from
19 the loss rate?
20   A. It goes together with the loss rate as
21 its measure of uncertainty.
22   Q. Okay. Prior to 2000 -- June 2005, did
23 whatever release model Merck was using have the
24 same factors or issue -- factors as this model,
25 meaning storage at 23, storage at minus 20,

66 (Pages 258 - 261)

HIGHLY CONFIDENTIAL

Page 262

1 storage to 2 to 8, storage at 2 to 8 following
2 reconstitution?
3     MS. HARDWAY: Object to form and
4 foundation.
5     THE WITNESS: I can't say one way or the
6 other. This is all that I have before me.
7 BY MR. MACORETTA:
8   Q. Okay. And, of course, if you thought
9 there was some other factor, you would have put it
10 in the model, right?
11     MS. HARDWAY: Object to form.
12     THE WITNESS: We would put in the model
13 or the calculation, if you like, whatever was
14 prescribed or discussed perhaps with the agency.
15 I don't -- I can't say that this was necessarily
16 strictly a Merck calculation. But lacking any
17 other information, I can only answer best what
18 this is.
19 BY MR. MACORETTA:
20   Q. Okay. Did you have internal discussions
21 at Merck before giving this to the FDA as to
22 whether or not this was the appropriate
23 calculation?
24     MS. HARDWAY: Object to form.
25     THE WITNESS: Discussions, perhaps. But

Page 263

1 the fact that it made into a major submission,
2 certainly so.
3 BY MR. MACORETTA:
4   Q. People at Merck tell you that they
5 thought this was too conservative, meaning it
6 predicted too much loss?
7   A. Not to my face, no.
8   Q. You don't remember having a discussion
9 with anybody or a heated exchange with someone
10 that these calculations were too conservative?
11   A. No, I don't recall.
12   Q. Okay.
13   A. I've heard it before, but I don't recall
14 it at Merck.
15   Q. You don't recall it with Alison Fisher or
16 Joye Bramble?
17   A. Not specifically.
18   Q. Okay. I'm going to look at the first
19 page of Exhibit 14, the letter to the FDA from
20 Alison Fisher.
21     So in that third paragraph, it said, "In
22 these sections, the mumps end expiry has changed
23 from 4.1 log to 4.3 log, 12,500 to 20,000 because
24 the end expiry file," which is I guess a separate
25 number, "has not been approved."

Page 264

1   Q. Do you see that?
2   A. I see it.
3   Q. So how can the end expiry potency change
4 simply because a file has or hasn't been approved?
5     MS. HARDWAY: Object to form and
6 foundation.
7     THE WITNESS: Do you mind again repeating
8 the question?
9 BY MR. MACORETTA:
10   Q. The end expiry potency as cal -- is
11 calculated -- how can the end expiry potency
12 change simply because a file has or has not been
13 approved?
14     MS. HARDWAY: Object to form and
15 foundation.
16     THE WITNESS: I can't say for sure.
17 BY MR. MACORETTA:
18   Q. Okay.
19   A. I can't interpret that.
20   Q. Because the calculations in Exhibit 13
21 are not dependent on some file being approved by
22 the FDA changing an end expiry potency, right?
23     MS. HARDWAY: Object to form and
24 foundation.
25     THE WITNESS: That's too broad for me to

Page 265

1 be able to answer.
2 BY MR. MACORETTA:
3   Q. Well, let me say it this way: So in the
4 calculation on number 13, you have the total loss
5 as .5941. Do you see that?
6   A. Uh-huh.
7   Q. That total loss would not change if the
8 end expiry potency were 4.3 or 4.1, right?
9     MS. HARDWAY: Object to form.
10     THE WITNESS: The calculation would be
11 the same.
12 BY MR. MACORETTA:
13   Q. The calculation of total loss and the
14 variability would be the same.
15     MS. HARDWAY: Object to form.
16 BY MR. MACORETTA:
17   Q. Right?
18   A. All of these are independent of the
19 number 4.3 or 4.1.
20   Q. Okay. Thank you.
21     (Schofield Deposition Exhibit 15 marked
22       for identification and attached to the
23       transcript.)
24 BY MR. MACORETTA:
25   Q. So if you could take -- so Exhibit 15 is

67 (Pages 262 - 265)

Appx19414

HIGHLY CONFIDENTIAL

Page 266

1 a memo from Mary Macchi to Phil Bennett in which
2 you're copied, right?
3    A. From Phil Bennett to Mary Macchi.
4    Q. I'm sorry, you're right. And this is
5 November 24, where Mr. Bennett is attempting to do
6 a minimum release specification determination,
7 right? I'm looking at the second page.
8    A. It appears so.
9    Q. Okay. And so I'm trying to compare
10 Mr. Bennett's calculation on page 2 to the
11 calculation on Schofield 13.
12    A. Yes.
13    Q. And the release potency assay is the
14 same; variability is the same, right, .06?
15    A. I don't see the release assay.
16    Q. It's number 1 on Mr. Bennett's memo on
17 page 2 and it's the bottom item --
18    A. Page 2, yes.
19    Q. It's the bottom on Schofield 13.
20       And the storage -- the next to room
21 temperature sealing inspection and packaging. And
22 he's got, depending whether or not it's 35 or
23 40 hours, .08 or 0.1.
24       Do you see that?
25    A. Yes, I do.

Page 267

1    Q. Okay. What does that -- what does that
2 calculation relate to on Bennett 13?
3       MS. HARDWAY: Object to form and
4 foundation.
5       THE WITNESS: It's difficult to say. I
6 don't fully understand the reference. It's a
7 room -- it's apparently speaking to the first
8 phrase, room temperature.
9 BY MR. MACORETTA:
10    Q. Okay. All right. And in Mr. Bennett's
11 calculation here, at minus 20 degrees, he's got
12 a negative loss.
13       Do you see that?
14    A. Yes, I do.
15    Q. How is that possible?
16    A. Statistically, you can get an estimate
17 that shows a number that falls below zero or above
18 zero if the kinetics profiles with their
19 variability are -- again, with uncertainty, going
20 above or below the zero value. It's not
21 physically that, but it's a statistical
22 aberration, if I can call it that.
23    Q. Because we don't really believe that
24 there's actually more virus in the vial after it
25 stays at minus 20 degrees for a year, right?

Page 268

1    A. Right.
2       MS. HARDWAY: Object to form.
3 BY MR. MACORETTA:
4    Q. Okay. So in Schofield 13, we take that
5 to zero, right?
6    A. The convention is to assign it to zero
7 because it's not a realistic number.
8    Q. Okay, great. And Mr. Bennett has a bunch
9 of calculations of -- well, he's got the same
10 number. His reconstituted storage by physician is
11 .5272. That's the same, right? The storage at 2
12 to 8 following reconstitution?
13    A. Uh-huh.
14    Q. And then he's got storage at 2 to 8
15 degrees for 24 months, he has a .543. Do you see
16 that?
17    A. Say again, please.
18    Q. Look at Mr. Bennett's 2 to 8 degrees
19 storage.
20    A. Okay.
21    Q. That's for 24 months, he says the loss
22 estimate is .54338.
23       Do you see that?
24    A. Yes, I do.
25    Q. Okay. But if we look at Schofield 13,

Page 269

1 the storage at 2 to 8 degrees for 24 months
2 is .439.
3       Do you see that?
4    A. I do.
5    Q. Do you know why that number would have
6 changed in a --
7    A. Not for certain, but this memo was a year
8 preceding the calculation that was made and went
9 into the regulatory dossier. So perhaps the
10 stability evaluation was updated.
11    Q. Okay. Would we -- how would we know
12 that? Would there be some document saying we're
13 evalu -- we're updating this or changing this?
14    A. I can't say for sure.
15    Q. And his -- okay. So on the first page of
16 Mr. Bennett's memo, I'm trying to understand what
17 this calculation means. He's got storage at
18 different times, 18 months, 12 months. This is
19 just the different factors he's using?
20    A. A combination --
21       MS. HARDWAY: Object to form and
22 foundation.
23 BY MR. MACORETTA:
24    Q. If you know.
25    A. Well, I'm looking at the back of the

68 (Pages 266 - 269)

Appx19415

HIGHLY CONFIDENTIAL

Page 270

1  memo.
2      Q.  Oh, I'm sorry.  Oh, I see.  I see.
3      So -- I see.  So if we look at
4  Mr. Bennett's memo, the first page, column on the
5  right has 24 months of shelf life, minus 20 for
6  12 months, times out of packaging is 40 hours.
7  And if you look, those factors are the same as
8  what's on Schofield 13, right?  The same
9  durations?
10     A.  Sure.
11     Q.  And he's got the same eight hours for
12 storage following reconstitution, and he's using
13 the same 1.12 assay as Bennett 13?
14     A.  Yes.
15     Q.  He gets a calculated minimum release
16 specification of 5.2.
17     A.  And I think -- is there a question?
18     Q.  How is it that Mr. Bennett has a release
19 specification of 5.2 when less than a year later
20 you're telling the FDA, using the same factors,
21 it's 5.0?
22     A.  As I explained, there was a duration of
23 time in which more stability data was likely
24 collected for the mumps-containing vaccines lots
25 at one or another of the storage conditions put

Page 271

1  into the calculations.
2      Q.  So does that mean that as part of your
3  stability analysis, somebody is actually measuring
4  the potency loss at these various time points?
5      A.  In practice, I can't say for sure.  There
6  are ongoing and completed studies that contribute
7  to these.  Those that are at minus 20 and 2 to 8
8  are likely ongoing studies where data are
9  continuing to be collected.
10     Those that are shorter duration, like at
11 room temperature and otherwise, may be completed.
12 Therefore, you'll see similar numbers for the two
13 calculations for the higher temperatures,
14 different numbers for the ones that -- for which
15 there may have been a different data set.
16     Q.  So when we -- so we identified that one
17 of the here is that Mr. Bennett has a higher loss
18 during 2 to 8 degree storage for 24 months than
19 Schofield 13.
20     So I don't understand.  At that time, at
21 Merck, was somebody just measuring 2 to 8 degree
22 storage for 18 to 24 months and recalculating that
23 loss rate?
24     MS. HARDWAY:  Object to form and
25 foundation.

Page 272

1      THE WITNESS:  Again, if I'm looking at
2  the numbers that you're referring to, I said that
3  there are likely different data sets that had been
4  analyzed.  That is, there were additional data
5  being analyzed because of the difference in times.
6  BY MR. MACORETTA:
7      Q.  So let me try it this way:  Looking at
8  Schofield 13, storage at 2 to 8 degrees, loss
9  rate, .43973 for 24 months.
10     Do you see that?
11     A.  Uh-huh.
12     Q.  Where'd that data come from?
13     A.  Lots that were stored at 2 to 8 C.
14     Q.  Okay.  And then so the data that
15 Mr. Bennett used for his lots there were stored to
16 8 C had a different number, and that's because
17 you're telling -- and your explanation for that is
18 because there was some additional data or some
19 different calculation?
20     A.  Not a different calculation.  As the
21 long-term studies go on, they accrue more data.
22 That is, we've got -- if we'd had only 12 months
23 for one lot, 18 for another, by three or six
24 months you'll have additional data supporting the
25 calculation of the loss rates for those lots.

Page 273

1      Q.  So you had data -- so between November of
2  '04 and June of '05, you had some additional data
3  showing there was less loss storing it at 2 to 8
4  degrees for 24 months?
5      A.  The estimate would -- or if you like, the
6  numbers will be different.  Less loss or more loss
7  depends upon the data.
8      Q.  Well, in this case, it's less, right?
9      A.  Less or more, depending upon the data.
10     Q.  Mr. Bennett uses data that says .543.
11 And in Schofield 13, you're using data that
12 says .439.  That's less loss, isn't it?
13     A.  The numbers are different by being less
14 estimated loss based on the data set that he was
15 using versus the data set that was used in 2005.
16     Q.  Okay.  And the data set used in 2005, did
17 that come from one of the active stability
18 monitoring models or something else?  Where did
19 that data come from?
20     A.  From the conventional, long-term
21 stability programs which accrue data according to
22 a schedule for the protocols that run those
23 studies.
24     Q.  And the conventional, long-term stability
25 program is we store it and we measure it every so

69 (Pages 270 - 273)

Page 274

1 often, right?
2    A. Right.
3    Q. Okay. And that data keeps changing?
4    A. It keeps accruing.
5    Q. Okay. It keeps accruing. I mean, that's
6 a pretty big change, isn't it, within a year, .54
7 to .43?
8       MS. HARDWAY: Object to form.
9 BY MR. MACORETTA:
10    Q. Did anybody investigate whether -- what
11 caused this significant lower loss within a
12 six-month time period?
13       MS. HARDWAY: Object to form. Overbroad.
14       THE WITNESS: There's no reason to do so.
15 And I -- again, it's, in my estimation, not that
16 big a difference.
17 BY MR. MACORETTA:
18    Q. Okay.
19    A. It's what you get in statistics.
20    Q. How about the storage at 2 to 8 degrees
21 following reconstitution. You have a slightly
22 lower number in 13 than Mr. Bennett had.
23       Were people reconstituting samples and
24 measuring them as well? Was this part of the
25 stability program?

Page 275

1    A. It's -- it again may be due to different
2 data sets or adding data sets to previously
3 acquired data sets. When you're collecting
4 stability data, long-term or short-term, you
5 support the previous collection with additional
6 data so you have more certainty as to what the
7 true loss rate is. Sort of like a release
8 potency, the more runs you make, the more precise
9 and accurate results you get.
10       So between 2004 and 2005, we were using
11 additional data, perhaps, to get a more accurate
12 and precise estimate of the loss rates, which
13 is --
14    Q. I got that. And I understand for the
15 stuff that's stored -- for product that's stored
16 at 2 to 8 degrees. I understand that was part of
17 the standard stability analysis and you measure it
18 so often.
19    A. Right.
20    Q. But I'm asking, was there a program to,
21 at regular intervals, take product out and
22 reconstitute it and store it at 2 to 8 degrees for
23 eight hours and measure potency?
24    A. There's no way for me to know.
25    Q. Okay. I mean, how far back did this data

Page 276

1 go that Mr. Bennett was using in 2004?
2    A. There's no way for me to know.
3    Q. But it certainly would have gone back
4 number of years, right?
5       MS. HARDWAY: Object to form. Asked and
6 answered.
7       THE WITNESS: I have way of knowing.
8 BY MR. MACORETTA:
9    Q. Well, when did you first start doing
10 stability monitoring?
11    A. It's not --
12       MS. HARDWAY: Object to form.
13       THE WITNESS: Again, I have to correct.
14 It's not stability monitoring. There is data
15 that's being collected. The stability monitoring
16 -- I'm being precise in the language -- is a
17 different exercise. If you mean by collecting
18 stability data, since the inception of the
19 product.
20 BY MR. MACORETTA:
21    Q. So how would we know -- how could we
22 figure out whether the data Mr. Bennett uses at 2
23 to 8 degrees and the data -- where the data Mr.
24 Bennett used at 2 to 8 degrees and where the data
25 Schofield 13 uses at 2 to 8 degrees came from.

Page 277

1       MS. HARDWAY: Object to form.
2       THE WITNESS: I have no way of knowing.
3 The systems that were in place included quality
4 assurance of the data collected. We analyzed only
5 data that was obtained in a GMP laboratory and
6 analyzed that data.
7 BY MR. MACORETTA:
8    Q. Okay. Was there a database of this data
9 that came from?
10       MS. HARDWAY: Object to form.
11       THE WITNESS: I have no knowledge of the
12 database. It was usually supplied to the
13 statistics unit in the form of a transfer of the
14 data after a QA audit.
15 BY MR. MACORETTA:
16    Q. You ever heard of LIMS?
17    A. I know what LIMS are. It's a generic
18 term for any pharmaceutical company's Laboratory
19 Information Management System.
20    Q. Well, Merck they had a LIMS system as
21 well, right?
22    A. Most, if not all, companies do in one
23 form or another.
24    Q. And when some technician actually
25 measures a vials and gets a result as a part of

70 (Pages 274 - 277)

HIGHLY CONFIDENTIAL

Page 278

1 whatever stability testing there is, that data
2 point is put into some LIMS database, right?
3     MS. HARDWAY: Object to form.
4 Foundation.
5     THE WITNESS: I have no basis for knowing
6 what they do in the quality control unit.
7 BY MR. MACORETTA:
8     Q. Okay. Well, all those data -- at some
9 point, however those data points get wherever they
10 are, they're plugged into whatever model you're
11 using at the time, right?
12     MS. HARDWAY: Object to form.
13 Foundation.
14     MR. MACORETTA: That's fine. Let me do
15 it this way.
16 BY MR. MACORETTA:
17     Q. Schofield 5, let's do that, which is what
18 you were using before. And I want to talk about
19 the calculating release spec page. I'm going to
20 use this as an example.
21     A. Okay. I don't have it memorized but I
22 can --
23     Q. And the chart here -- if you want, you
24 can look at mine -- has various data points and
25 then they're turned into a regression line, right?

Page 279

1     A. Correct, yes.
2     Q. What turns these data points into a
3 regression line? Is there some formula at Merck
4 that would do that automatically?
5     MS. HARDWAY: Object to form.
6 BY MR. MACORETTA:
7     Q. Go ahead.
8     A. There are computer programs that do that.
9     Q. Okay. And you don't know how the data
10 points get into the computer program?
11     A. I know there's a process of the data
12 being transferred, being made available to the
13 statistician, usually audited because it was our
14 procedures in biometrics research to have them
15 audited to be sure we were doing a calculation on
16 audited data, and then analyzed through a standard
17 industry package called SAS, which is a
18 statistical evaluation package, which is validated
19 and used also by the FDA to do their calculations.
20     Q. So the program is something -- the
21 computer program is something developed by
22 statisticians at Merck, or it's out of the box
23 from SAS?
24     A. The SAS Institute.
25     MS. HARDWAY: Object to form.

Page 280

1     THE WITNESS: The SAS Institute.
2 BY MR. MACORETTA:
3     Q. Okay.
4     A. Not -- may I correct myself?
5     Q. Please.
6     A. The software modules that allow you to do
7 the calculations within Merck are offered or sold
8 by the SAS Institute. This is a -- I think they
9 call it a high-level programming language. If you
10 want to do regression analysis, you pick the
11 regression tool.
12     So, again, the statistician picks the
13 regression analysis tool to do the calculations
14 from the data that have been acquired -- audited
15 and acquired from the LIMS system, perhaps.
16     Q. So let me try it this way. We talked
17 about how a certain data point would be either out
18 of trend or out of specification, right?
19     A. Uh-huh.
20     Q. Is there some software that looks at that
21 data point and runs it through something that says
22 this is -- and then determines it's either in
23 trend or out of trend?
24     MS. HARDWAY: Object to form and
25 foundation.

Page 281

1 BY MR. MACORETTA:
2     Q. How do we know if a certain data point is
3 outside of trend or outside of specification? Let
4 me try it that way.
5     A. I'll say there are many ways of
6 determining that. The laboratory has done that
7 and offered data that they have already looked at
8 in that regard, or a good statistician would look
9 at the data for what I think you're describing as
10 outliers.
11     Q. Okay. Was that somebody's job, some
12 statistician's job to regularly look at data?
13     MS. HARDWAY: Object to form.
14     THE WITNESS: I can't speak to that.
15 BY MR. MACORETTA:
16     Q. It wasn't yours or anybody in your
17 group's?
18     A. No, we don't maintain the data.
19     Q. That would be MMD?
20     A. Yes.
21     Q. Okay. So I'd have to ask somebody at MMD
22 how exactly they know when something is out of
23 trend or out of specification?
24     A. Yes.
25     Q. Okay. And somewhere in that software is

71 (Pages 278 - 281)

Appx19418

HIGHLY CONFIDENTIAL

Page 282

1  whatever the calculation is to do the regression
2  to figure out what the trend is, right?
3      MS. HARDWAY:  Object to form and
4  foundation.
5  BY MR. MACORETTA:
6      Q.  When you talk -- let me try that again.
7  When we look at things like Schofield 5, there's a
8  line, there's a regression line but it's really
9  not just one point, right?  There's a little range
10  of the trend?
11      A.  Which is the dashed line.
12      Q.  Yes, okay.  So somewhere the computer is
13  cal -- some computer program is calculating the
14  dashed line, right?
15      A.  A computer program can do that, yes.
16      Q.  Okay.  And the computer program doing
17  that is something that's -- not something that
18  Merck wrote internally?
19      A.  No.  There's many commercially available
20  packages for doing that.
21      Q.  Okay.  Let me go back to Schofield 13,
22  for example, the calculations of the overall
23  stability profile using the comprehensive
24  statistical release model.  And this is --
25  presumably, this is what you were using at the

Page 283

1  time, right, the comprehensive statistical release
2  model?
3      A.  Is it listed as such?
4      Q.  Well, that's what it says under the
5  table, using the comprehensive statistic -- above
6  the table itself.
7      Do you see that?
8      A.  Right.  It's labeled that way.
9      Q.  Does that sound like a term you used at
10  Merck?
11      A.  Not necessarily.
12      Q.  Okay.  Whatever this model is, whether we
13  call it the comprehensive statistical release
14  model or something else, was there more than one
15  such model being used at the same time at Merck to
16  determine a calculation of the overall stability
17  profile?
18      MS. HARDWAY:  Objection.  Overbroad and
19  foundation.
20      THE WITNESS:  I can't tell.  In the
21  groups that I support, they know to use particular
22  types of calculations, but I can't speak for the
23  entire company.
24  BY MR. MACORETTA:
25      Q.  Okay.  So this -- since it says here the

Page 284

1  comprehensive statistical model, let's call it
2  that for now.  I understand you don't remember
3  that term.
4      This model -- and we talked about how
5  when you get more data at various temperatures and
6  time points, the data set, wherever it is, is
7  updated right?
8      A.  The data set is, yes.
9      Q.  Yes.  So is that -- is the model
10  constantly updated with new data?
11      MS. HARDWAY:  Object to form.
12  BY MR. MACORETTA:
13      Q.  Or was it in 2005?
14      A.  The model is a formula.
15      Q.  Yep.
16      A.  Only the data changes, okay?
17      Q.  Uh-huh.
18      A.  And for that matter, the software doesn't
19  change either.  So the -- whichever we call this
20  calculation would have been done the same with
21  different data in 2004 and 2005.
22      Q.  I understand that.  I'm asking you -- and
23  we said one reason it's different is because there
24  was different data, right?
25      A.  More data.

Page 285

1      Q.  Okay, more data.  So when there's even
2  more data, is this program automatically run again
3  with the new data to reach a new conclusion?
4      MS. HARDWAY:  By "program," do you mean
5  the calculation?
6      MR. MACORETTA:  By -- I thought I did,
7  yes, this calculation.
8  BY MR. MACORETTA:
9      Q.  This formula is what you just called it.
10      A.  This formula or this calculation is
11  performed again, yes.
12      Q.  Okay.  Now, is that something that
13  happens automatically and you get updated on it at
14  the time?
15      A.  I can speak for these two calculations.
16  No.  These are done in MRL.  We don't -- we don't
17  do
18  these --
19      Q.  (Coughing).  I'm sorry.
20      A.  We do them at the request of the
21  organization and, in some cases, to finally
22  support a regulatory submission.  Other times to
23  do internal explorations of approaches that can be
24  taken to help ensure the adequate potency at the
25  end of shelf life.

72 (Pages 282 - 285)

Appx19419

Page 286

1  Q.  So do you know if somebody outside of
2  MRL, such as MMD, is receiving some regular update
3  of this formula with the newer data?
4     A.  That would have been, in the time I was
5  at Merck, the purpose of the stability monitoring
6  program, which was a different system for taking
7  new data that was coming in and not perpetually
8  updating this but verifying that things had not
9  changed dramatically such that something needed to
10 be done.
11    Q.  Okay.
12    A.  So this is a one-time calculation.  The
13 process you described was the goal of the
14 stability monitoring program.
15    Q.  So because this storage at 2 to 8 degree
16 number changed from .54 to .439, if that had been
17 sufficiently large a change, that's something the
18 stability monitoring program would have noticed or
19 picked up on, right?
20    MS. HARDWAY:  Object to form and
21 foundation.
22    THE WITNESS:  It was built in a different
23 way than -- specifically than this.  I can say it
24 wasn't specifically looking for those changes in
25 those numbers.

Page 287

1        I didn't answer before, but the reason I
2  said I don't consider those numbers to be much
3  different is because they're multiplied up by 24.
4  When you take small numbers, small losses per
5  month and you multiply them up by 24, you get
6  apparent differences like this.
7        The stability monitoring program, on the
8  other hand, is expected to, you know, to discover
9  trends in a direction, either it's becoming more
10 stable or less stable so the company can act.
11 BY MR. MACORETTA:
12    Q.  Well, a trend from .54 to .39 would be --
13 small or not -- a trend towards being more stable,
14 right?  It's a lower loss.
15    A.  It's a calculation.  So again, it's an
16 estimate with uncertainty.  So I'm trying to have
17 you understand that these are calculations that
18 when you do them two times because of different
19 data sets or more data, you'll get different
20 results.
21        The monitoring program is equally
22 knowledgeable of the fact that you're going to get
23 either statistically significant or meaningful
24 differences in the results.  That's the purpose of
25 the monitoring program.

Page 288

1  Q.  Okay.  Let me show you what we're going
2  to mark as Exhibit 16.
3     (Schofield Deposition Exhibit 16 marked
4      for identification and attached to the
5      transcript.)
6  BY MR. MACORETTA:
7     Q.  Mr. Schofield, it's an e-mail between
8  you, Robin Mogg, and a few other people.
9        Who's Robin Mogg?
10    A.  She was another person in my
11 organization.
12    Q.  Did she work for you at this time,
13 January of '03?
14    A.  She reported directly to Joe Antonello.
15    Q.  Okay.  Who worked for you?
16    A.  Yes.
17    Q.  Okay.  And how about the rest of the
18 people in this?  We know Mr. Fairweather -- I'm
19 looking at the ccs of the first e-mail, which is
20 from, I guess -- it says Phil Bennett at the top
21 but then it says from Robin Mogg.  Mr. Fairweather
22 we know about.  Mr. Bennett we know about.  Who is
23 Henrietta Gross?
24    A.  My recollection, she worked with Cindy
25 Morrissey in the stability area.

Page 289

1  Q.  And Cindy Morrissey, she's an MMD
2  stability person?
3     A.  Yes.
4     Q.  Okay.  Then, as always, we go from the
5  back.  The first e-mail from you, January 4th,
6  you're talking about a stability meeting.  And
7  then in the second paragraph, the end of the first
8  line, beginning of the second, "Specifically, I
9  took data from the higher titer mumps stability
10 study and modelled the data similarly as we might
11 in an FDA analysis."
12        I'm trying to understand what that means.
13 What's the high titer mumps stability study?
14    A.  I can't recall.
15    Q.  And what does it mean that you modelled
16 it similarly as we might in an FDA analysis?
17    A.  Well, the term FDA analysis, if I have no
18 other context, is a term I would use for shelf
19 life determination.
20    Q.  Okay.  Then you explain how you did a
21 couple of things.  Then it says, "I then used this
22 combined analysis to determine a lower confidence
23 bound on the lowest level lot."
24        What's the lowest level lot?
25    A.  The best I can judge is the lowest

73 (Pages 286 - 289)

HIGHLY CONFIDENTIAL

Page 290

1 potency lot.
2    Q. But a whole lot doesn't have the same
3 potency, right?
4    A. Beg your pardon?
5    Q. The whole lot does not have the same
6 potency?
7    A. Lots are described by their average
8 potency.
9    Q. Okay. Or the average potency of those
10 vials you've sampled from the lot?
11    A. True.
12    Q. Okay. Then in the next paragraph, you
13 say, "Now, this is, in a sense, what we're trying
14 to do with our index method."
15       What's the index method?
16    A. It was the term that Bill Fairweather
17 used to define the methodology he was sharing with
18 us as a tool for monitoring stability. He called
19 it the stability index.
20    Q. Is that a model or method that Merck ever
21 used or applied?
22    A. Not before Bill Fairweather introduced
23 the concept.
24    Q. Well, but after he introduced the
25 concept?

Page 291

1    A. I can't say for sure. We developed a
2 method. It was passed to MMD, and their
3 application of it is outside my...
4    Q. So this is a method to -- and it says
5 predict the average potency at 24 months.
6    A. Yes.
7    Q. And you don't know if MMD actually used
8 that?
9    A. We turned it over to them. We had
10 discussions about it. But I think I told you that
11 there was a change in management in which -- at
12 which time we -- well, transferred the whole
13 stability monitoring program to them to engage in
14 and administer.
15    Q. Okay. And then you ask -- then you say,
16 "the question is should we be modelling data" and
17 then VIZ "looking to see if the worst case lot
18 will fall below expiry."
19       Do you see that?
20    A. Yes.
21    Q. What's the worst case lot?
22    A. It would be a lot that would be first
23 predicted to fall below expiry.
24    Q. Okay. Well, why are you interested in
25 looking at that?

Page 292

1    A. I can't tell at this point in time.
2    Q. Was that part of your observation, to
3 figure out if individual lots were going to fall
4 below expiry?
5    A. No.
6       MS. HARDWAY: His personal obligation?
7       MR. MACORETTA: Merck's obligation.
8       MS. HARDWAY: Object to form and
9 foundation.
10       THE WITNESS: We weren't instructed to do
11 so. We were exploring the model and trying to
12 understand it.
13 BY MR. MACORETTA:
14    Q. And then there's an e-mail from Ms. Mogg,
15 and then there's an e-mail back from you. In
16 bold, it says, "Remind me, though. Doesn't our
17 approach claim to keep the distribution of
18 materials on the market above minimum potency?"
19       Do you see that?
20    A. Yes, I do.
21    Q. I don't understand what that means. How
22 would your approach claim to keep the minimum
23 distribution of materials on the market above
24 minimum potency?
25    A. I think, again, this was a part of the

Page 293

1 discussions about how the stability monitoring
2 program was supposed to work. There are -- and
3 the best word I can use for it are philosophies
4 for looking at large stability data sets. And we
5 were looking at it as the -- as a kind of a
6 profile of the product's potency throughout its
7 shelf life, which we'd learned from individual
8 lots or measurements on individual lots.
9       So the philosophy was to look at that
10 average stability profile for the product because
11 we were measuring the changes or the change in
12 stability of the product away from a philosophy
13 that looks at individual lots.
14    Q. So what does "the distribution of
15 materials" mean in that sentence?
16    A. It means likely high, low, medium
17 materials that are out in the market.
18    Q. So we could read that as the range,
19 right?
20       MS. HARDWAY: Object to form.
21 BY MR. MACORETTA:
22    Q. You can answer.
23    A. Distribution is a formal statistical term
24 that speaks to a statistical hypothesized
25 distribution. Range is the simplest, say, form of

74 (Pages 290 - 293)

Appx19421

HIGHLY CONFIDENTIAL

Page 294

1 that.
2    Q. Okay. So your approach claims to keep
3 the distribution or range of materials that are on
4 the market above the minimum potency?
5      How can any approach you take keep
6 materials above the minimum potency? I mean,
7 either they are or aren't, right?
8      MS. HARDWAY: I'm just going to object to
9 the preamble. Again, you're saying "our," and I'm
10 not sure it's clear from your question if you're
11 referring to Mr. Schofield's or Merck or somebody
12 else.
13 BY MR. MACORETTA:
14    Q. How can any approach -- well, what did
15 you mean by "our" in that sentence, Mr. Schofield?
16 You personally -- you personally didn't have an
17 approach to keep the distribution of materials on
18 the market above minimum potency, did you?
19    A. We were doing things at the request of
20 the FDA. So the approach, which is the one we
21 were working on, might be called our approach.
22    Q. But "our" doesn't mean Tim Schofield and
23 a couple other guys. "Our" means Merck's, right?
24    A. It means the team that had hired Bill
25 Fairweather to work with them were working towards

Page 295

1 an approach.
2    Q. And so how would any approach the team
3 took keep the distribution of materials on the
4 market above a certain minimum potency? I mean,
5 either they were above minimum potency or they
6 weren't, weren't they?
7    A. Well, that's, I think --
8      MS. HARDWAY: Object to form.
9      THE WITNESS: I think that's -- you know,
10 this is a, if you will, a semantics problem. We
11 don't, of course, a model does not imbue stability
12 on the product. However, a tool that monitors the
13 stability of the product is meant to manage to
14 that goal of keeping the potency above the minimum
15 requirement by the end of shelf life.
16 BY MR. MACORETTA:
17    Q. Okay.
18    A. The company will, of course, do something
19 if the tool shows that that's not the case.
20    Q. Okay. And, indeed, above, Ms. Mogg, in
21 response to you, says, "I recall that we set the
22 criterion on the index such that we were able to
23 guarantee that 95 percent of the material was
24 above expiry potency at 24 months."
25      Do you see that?

Page 296

1    A. Yes.
2    Q. Well, as you said, there's nothing you
3 can do statistically to guarantee that 95 percent
4 of the material is or is not above an expiry
5 potency. Either it is or it isn't, right?
6    A. You can guarantee with 95 percent
7 confidence when you use statistics, yes.
8    Q. Okay.
9    A. That is the basis of the statistical
10 approach is you can --
11    Q. Uh-huh.
12    A. You can set the risk.
13    Q. So why would you set the criterion such
14 that you could guarantee that 95 percent was above
15 expiry potency?
16      MS. HARDWAY: Object to form.
17 BY MR. MACORETTA:
18    Q. Shouldn't the criteria be set
19 objectively?
20    A. Well, it was. It was set based on the
21 ICH guidance for stability evaluation. The
22 picture that we've looked at several times uses a
23 95 percent confidence interval, so the implied
24 risk or confidence is 95 percent. So we simply
25 utilized, as I think the Allen and Dukes paper

Page 297

1 does, using the industry agreed-upon level of
2 confidence or risk.
3    Q. And I'm sorry. Ms. Mogg again worked for
4 somebody on your team, right?
5    A. Joe Antonello, yes.
6      MS. HARDWAY: John, are we at the point
7 where we could take another quick break?
8      MR. MACORETTA: Sure.
9      VIDEO TECHNICIAN: We're going off the
10 record at 4:20 p.m.
11    (A recess was taken.)
12      VIDEO TECHNICIAN: We are going back on
13 the record at 4:37 p.m. This is the start of
14 Media Unit 5 in the deposition of Tim Schofield.
15      (Schofield Deposition Exhibit 17 marked
16      for identification and attached to the
17      transcript.)
18 BY MR. MACORETTA:
19    Q. Mr. Schofield, what we've labeled as
20 Schofield Exhibit 17 is apparently a draft
21 response to an FDA Form 483 dated October 2000.
22      And if you go to the second page, we see
23 that one of the FDA's observations was that error
24 and accident reports have not been submitted to
25 CBER for the following product stability failures.

75 (Pages 294 - 297)

HIGHLY CONFIDENTIAL

Page 298

1 I'm interested especially in lot -- in number C,
2 Lot 627847.
3        Do you see that?
4        A. Yes, I do.
5        Q. It says it failed potency at 6, 9, 12,
6 18, and 24 months. It also failed measles potency
7 a couple of times.
8        Do you recollect having specific
9 discussions about this lot?
10       A. No.
11       Q. If a lot fails potency at 6 and 9 months,
12 does that mean it's out of specification?
13       MS. HARDWAY: Object to form.
14       THE WITNESS: It depends upon the rules
15 the stability unit is operating under at the time.
16 BY MR. MACORETTA:
17       Q. Well, okay. So take a look at Merck's
18 response to observation number 3, the draft.
19       A. Is that --
20       Q. And I'm going to go the next page, the
21 second page of it, which is the Bates numbered
22 page ending in 33.
23       A. Okay.
24       Q. And then the second paragraph there says,
25 "The specific lots noted were placed on stability

Page 299

1 prior to implementation of the process change."
2        Then after the redaction, it says,
3 "Statistical analyses of these results showed that
4 although individual data points were below the
5 values, the stability profile of each lot
6 investigated was within the expected range based
7 on historical trends. Therefore, there was no
8 further action taken."
9        Do you see that?
10       A. Yes, I do.
11       Q. Okay. How is it that a lot can be below
12 potency at 6, 9, 12, 18, and 24 months and still
13 be within the expected range based on historical
14 trends?
15       MS. HARDWAY: Object to form and
16 foundation.
17       THE WITNESS: I don't know what the
18 statement "within expected range based on
19 historical trends" means.
20 BY MR. MACORETTA:
21       Q. Well, neither do I. That's why I'm
22 asking. So you don't know what that means?
23       A. No, I don't.
24       Q. Okay. All right. We can put Schofield
25 Number 17 away.

Page 300

1        Let me show you what we're going to mark
2 as Schofield 18 and, at the same time, Schofield
3 19.
4        (Schofield Deposition Exhibits 18 and 19
5        marked for identification and attached to
6        the transcript.)
7 BY MR. MACORETTA:
8        Q. Okay. So Schofield 18 is a meeting to
9 which you were invited called by Scott Thaler in
10 September 1998.
11       Agenda item number 1 is, "If we adjust
12 Lot 0627847, given its irregularities, what are
13 the implications for MMD? What message does this
14 send to CBER?"
15       Do you see that?
16       A. Yes, I do.
17       Q. Utilized that lot for what?
18       MS. HARDWAY: Object to form and
19 foundation.
20       THE WITNESS: I don't know what.
21 BY MR. MACORETTA:
22       Q. You designed -- were involved in creating
23 the aging study for lots for the 007 protocol,
24 right?
25       A. I supported Phil on his work in that,

Page 301

1 yes.
2        Q. Okay. Do you understand that this lot
3 was one of the lots in that aging study?
4        A. I don't understand that, but it may be.
5        Q. Okay. You don't ever recollect having a
6 meeting about a specific lot of mumps product,
7 right?
8        MS. HARDWAY: Object to form.
9        THE WITNESS: No, I don't.
10 BY MR. MACORETTA:
11       Q. Okay. Take a look as Exhibit Schofield
12 19. The second page is a meeting in which you
13 apparently attended discussing this lot.
14       I want to follow up on something from
15 before. The fact that you're testing samples of
16 this lot and it's showing up out of specification,
17 that doesn't mean the whole lot is still at Merck,
18 right? Most of it is out somewhere in the world,
19 right?
20       A. I wouldn't know.
21       Q. Well, we're sure -- when we talk about a
22 lot and specifications, it doesn't mean the whole
23 lot's sitting at Merck, right?
24       A. It depends upon the distribution of that
25 lot. I don't know their commercial procedures for

76 (Pages 298 - 301)

Appx19423

HIGHLY CONFIDENTIAL

Page 302

1 distributing lots.
2    Q. Okay.  So here -- so it could be.  You
3 just don't know if somebody is getting a dose from
4 that --
5    A. I don't know.
6    Q. -- lot that day?
7    A. No, I don't know.
8    Q. Okay.  So here we're talking about how,
9 in page 2 of Schofield 19, we're talking about how
10 Lot 847, the second paragraph says, "It was out of
11 specification at six months, and then L. Moe
12 informed the group that the nine-month potency
13 result came out low at 3.4 log per 1mL."
14    Do you see that?
15    A. Yes, I do.
16    Q. So this doesn't mean out of trend.  That
17 says out of specification, right?
18    MS. HARDWAY:  Object to form and
19 foundation.
20    THE WITNESS:  Does it say that?  I'm
21 sorry, I --
22 BY MR. MACORETTA:
23    Q. Well, it says out of specification,
24 right?
25    A. Okay.  I can only, you know, read what I

Page 303

1 read.
2    Q. Okay.  What was your understanding of
3 what was supposed to happen when a lot showed up
4 out of specification?
5    MS. HARDWAY:  Object to form.
6 Foundation.  And I think asked and answered.
7    THE WITNESS:  It was outside of my
8 authority to either understand or do anything
9 that -- for a stability lot that was out of
10 specification.
11 BY MR. MACORETTA:
12    Q. Then why were you at the meeting?
13    A. If it was in the context of using the lot
14 for the expiry study, I was there perhaps to be
15 informed about things related to the expiry study.
16    Q. Okay.  Then in the next paragraph,
17 R. Kelleman -- do you know who that is?
18    A. Yes.
19    Q. Who's that?
20    A. She was at the time the head of the
21 stability unit.
22    Q. Okay.  How about Lily Moe?
23    A. Worked for Robin.
24    Q. Okay.  Asked whether this lot is typical.
25 And then Phil Bennett gives an answer that says,

Page 304

1 "Because it's within two standard deviations of
2 the historical mumps log loss, it's still being
3 considered typical."
4    Do you see that?
5    A. Yes.
6    Q. Is that the right answer there, that
7 within two standard deviations is still considered
8 typical?
9    MS. HARDWAY:  Object to form and
10 foundation.
11    THE WITNESS:  I don't have their protocol
12 for --
13 BY MR. MACORETTA:
14    Q. Well, Phil Bennett worked for you, right?
15    A. Phil Bennett transitioned to me after he
16 got his Master's degree in statistics.  He was in
17 the stability unit for the time previous to that.
18 I don't know when Phil was hired by vaccine
19 biometrics research from the stability unit.
20    Q. So you don't know if he worked for you at
21 this time?
22    A. I don't know at this time, no.
23    Q. Okay.  And you don't know what -- whether
24 two standard deviations -- being within two
25 standard deviations of the loss rate makes it

Page 305

1 being typical or not, right?
2    MS. HARDWAY:  Object to form.
3    THE WITNESS:  I do know it's a standard
4 rule to be within plus or minus two standard
5 deviations is typical.
6 BY MR. MACORETTA:
7    Q. Okay.
8    A. It's called a two-sigma rule.
9    Q. If you go down a couple paragraphs, "P.
10 Bennett also updated the group that this lot would
11 not be expected to stay within specification limit
12 for the 24-month shelf life based on our current
13 algorithm of active stability monitoring if the
14 3.6 log --" and I'll get to that in a second.
15    What in 19 -- in April of 1999 was the
16 current algorithm of active stability modelling --
17 monitoring?
18    A. This was in the MMD unit so I don't know
19 what their algorithm was.
20    Q. Who would know the answer to that?  Phil
21 Bennett?
22    A. I would judge so, yes.
23    Q. Okay.  And, by the way, this says 3.6 log
24 per .1mL.  When we convert that up to a dose,
25 which is .5mL, we have to increase that by .6 log,

HIGHLY CONFIDENTIAL

Page 306

1 right?
2    A. Uh-huh.
3    Q. Okay. And then the next paragraph says,
4 "Also, the group discussed the TFI procedures."
5 Do you know what that is?
6    A. No, I don't.
7    Q. The next says, "T. Hennessey indicated
8 all stability results should be reported as PV."
9 Do you know what that is?
10    A. No, I don't.
11    Q. Okay. And then a little lower, it says,
12 "L. Moe indicated that the 3.6 log specification
13 limit was in the supplement sent to CBER on
14 March 12; therefore, we should use this number,
15 3.6, until a lower specification limit is
16 established through clinical trial. Data will be
17 available by September 1999."
18       Do you see that?
19    A. Yes, I see it.
20    Q. Okay. So if the number you're supposed
21 to use is 3.6, and Phil Bennett updated the group
22 that the lot would not be expected to stay within
23 specification if 3.6 was the specification limit,
24 wasn't Merck then obligated to tell the FDA that
25 this lot was out of specification?

Page 307

1       MS. HARDWAY: Object to form.
2 Foundation.
3       THE WITNESS: I am not in a position to
4 know what the, if you would like, rules and
5 processes are in MMD.
6 BY MR. MACORETTA:
7    Q. Were you personally concerned that you
8 needed to tell somebody if the lot is below
9 specification?
10       MS. HARDWAY: Object to form.
11 Foundation.
12       THE WITNESS: At the time?
13 BY MR. MACORETTA:
14    Q. At the time of this meeting, yes.
15    A. No. I -- again, there were still
16 questions about what the true end of expiry
17 potency was so I was not concerned.
18    Q. And the questions about true end of
19 expiry potency removed Merck's obligations to
20 report things that are below whatever the label
21 is?
22       MS. HARDWAY: Object to form.
23 BY MR. MACORETTA:
24    Q. Is that your position?
25    A. I'm not in a position to be able to judge

Page 308

1 what the procedures and communications were with
2 the FDA coming out of MMD.
3    Q. Not asking you that. I'm asking if,
4 based on your many years of experience in the
5 pharmaceutical industry, you understand it's okay
6 to not report a product below its labeled potency
7 because there was some question as to whether or
8 not it was effective at a lower potency.
9       MS. HARDWAY: Object to form.
10 Foundation.
11       THE WITNESS: Today, that might be the
12 interpretation. In 1999, I don't know what the
13 expectations were.
14 BY MR. MACORETTA:
15    Q. What might be the interpretation? That
16 you can't do it?
17    A. That there are rules in place that the
18 expiry potency is a truly clinically
19 derived limit. It can't speak to product because
20 there's not enough information about these rules
21 to know what these types of valuations and rules
22 mean in terms of product.
23    Q. I don't understand what that means. Let
24 me try this way: If the label has an end expiry
25 potency and Merck believes it's going to be -- a

Page 309

1 certain lot is going to be out of specification,
2 meaning it's going to fall below the labeled end
3 expiry potency, does Merck have an obligation to
4 report that fact to the FDA?
5       MS. HARDWAY: Object to form and
6 foundation.
7       THE WITNESS: I don't know if there was
8 such a term even as end-of-expiry potency in 1999.
9 The discussions started perhaps then, perhaps
10 later. But you're asking me questions which are
11 contemporary to today, not to what, you know, what
12 might have been the understandings in 1999.
13 BY MR. MACORETTA:
14    Q. Okay. Then let's ask it contemporary
15 today. If, today, Merck internally calculated
16 that a lot was going to fall out of specification,
17 meaning below the end expiry potency, does Merck
18 have an obligation to report that fact to the FDA?
19       MS. HARDWAY: Object to form and
20 foundation.
21       THE WITNESS: I don't work for Merck
22 today.
23 BY MR. MACORETTA:
24    Q. Well, Merck's obligation would be no
25 different than any other pharmaceutical company,

78 (Pages 306 - 309)

Appx19425

Page 310

1 right, as concerns the FDA?
2     A. I don't work for Merck. I don't know
3 what their processes are today. I don't know what
4 they would do today.
5     Q. Okay. I'm not asking you that question.
6 I'll ask it more broadly. Does any -- if any
7 pharmaceutical company had a product which is
8 internally determined was going to fall out of
9 specification and below the end expiry potency,
10 does it have an obligation to report that fact to
11 the FDA?
12     A. That depends upon its agreement with the
13 FDA.
14     Q. You think there can be an agreement to
15 not report out-of-specification products?
16     A. I think it depends upon the agreement
17 with the FDA.
18     Q. Are you aware of Merck ever making such
19 an agreement?
20     A. It was not my job to make the agreements.
21 I do know that the filings include the agreements
22 and the control strategies that are being used for
23 the product. It's part of the license.
24     Q. Are you aware of any pharmaceutical
25 company ever making an agreement with the FDA that

Page 311

1 says we don't have to report when the product is
2 out of specification?
3     MS. HARDWAY: Object to form. Overbroad.
4 BY MR. MACORETTA:
5     Q. You can answer.
6     A. I do -- I have no knowledge one way or
7 the other.
8     Q. Okay. So these agreements that you're
9 talking about, you can't point to any specific
10 examples?
11     A. No.
12     Q. Okay.
13     A. I'm speaking in the hypothetical.
14     Q. Okay. Were you ever involved in a
15 discussion at Merck that said we don't have to
16 report an out-of-specification lot because we're
17 not sure what the clinical effectiveness is?
18     MS. HARDWAY: Object to form and
19 foundation.
20     THE WITNESS: I don't recall. I have no
21 basis for knowing if I ever made such a statement.
22     MR. MACORETTA: You know what? Steve,
23 can you step outside again for a minute?
24 BY MR. MACORETTA:
25     Q. Apparently, for this lot, the subsequent

Page 312

1 failures at potency were not reported to the FDA,
2 according to CBER's observation number 3 in
3 Exhibit 17, right?
4     MS. HARDWAY: Can you give him a page,
5 please?
6 BY MR. MACORETTA:
7     Q. The second page. What we looked at
8 before.
9     (The reporter read the record as
10     requested.)
11 BY MR. MACORETTA:
12     Q. Right?
13     MS. HARDWAY: Are you asking him what the
14 document says?
15     MR. MACORETTA: I'm asking him what his
16 understanding is.
17     THE WITNESS: I don't have a basis for
18 understanding.
19 BY MR. MACORETTA:
20     Q. Okay. Do you have any reason to think
21 CBER's wrong when it says, "Our report -- accident
22 reports have not been submitted to CBER for the
23 following product stability failure, C, Lot 847"?
24     A. I have no reason to believe that they're
25 wrong.

Page 313

1     Q. Okay. Did anybody at Merck ever contact
2 anybody who got part of Lot 847 and say, "Hey,
3 you've got a lot that failed mumps potency"?
4     MS. HARDWAY: Objection to form.
5 Foundation and overbroad. He can't speak for
6 everyone at Merck. He would have no way of
7 knowing that.
8 BY MR. MACORETTA:
9     Q. As far as you know?
10     A. I have no knowledge of that.
11     Q. Okay. Did you ever have any discussion
12 of we need to tell the people who got this lot
13 that the mumps potency their kids got was --
14 failed our potency test?
15     A. No.
16     MS. HARDWAY: Object to form and
17 foundation. Overbroad. He can't -- again, he
18 can't speak for everyone --
19     MR. MACORETTA: I just asked him who he
20 spoke to.
21     THE WITNESS: I spoke to no one about
22 this.
23 BY MR. MACORETTA:
24     Q. Okay. Because you weren't concerned
25 about it?

79 (Pages 310 - 313)

HIGHLY CONFIDENTIAL

Page 314

1      MS. HARDWAY: Object to form.
2      THE WITNESS: I was not involved in the
3 483.
4 BY MR. MACORETTA:
5   Q. Well, now that you see the result, do you
6 think somebody at Merck should have contacted
7 people, since this lot failed at 6, 9, 12, 18, and
8 24 months?
9      MS. HARDWAY: Object to form and
10 foundation.
11      MR. MACORETTA: You can answer.
12      What's your objection to the form of that
13 question?
14      MS. HARDWAY: First of all, the
15 implication is that no one, in fact, did contact
16 anyone. So the basis of the question is implying
17 something that --
18      MR. MACORETTA: No. I already asked him
19 the question, and he said he didn't know. I'm
20 asking if he thought they should have.
21      But okay. So any other objection to that
22 one?
23      MS. HARDWAY: No.
24      MR. MACORETTA: You can read it back.
25      You can answer that one.

Page 315

1      THE WITNESS: Is that directed to me?
2      MR. MACORETTA: I'm going to ask the
3 court reporter to read it back, and then I think
4 you can answer that question, unless your lawyer
5 tells you to do otherwise.
6      (The reporter read the record as
7      requested.)
8      MS. HARDWAY: I'm going to stand by my
9 objections.
10      THE WITNESS: Am I being directed to not
11 answer?
12      MS. HARDWAY: No. You can answer, if you
13 understand what the question is asking.
14      THE WITNESS: Yes. I have no knowledge
15 what was done with the results for those lots and,
16 therefore, can't comment on whether they should
17 have or were reported to the agency.
18 BY MR. MACORETTA:
19   Q. Well, I understand that you don't know
20 what actually happened. I'm asking if you think
21 it should have been reported, whether it was or
22 not?
23      MS. HARDWAY: Object to form and
24 foundation.
25      THE WITNESS: It's not my job to decide,

Page 316

1 not knowing what the rules were in MMD or the
2 discussions were, what the agreements were with
3 the agency, to have a position on that particular
4 point.
5 BY MR. MACORETTA:
6   Q. I understand it wasn't your job, but I'm
7 asking you to take a position now as a human being
8 and somebody who works at a pharmaceutical
9 company.
10      MS. HARDWAY: Objection.
11 BY MR. MACORETTA:
12   Q. Or several pharmaceutical companies.
13      MS. HARDWAY: Object to form and
14 foundation.
15      THE WITNESS: I would, given the
16 opportunity, because it's my job to do so, do the
17 right thing. It's not my job to make decisions
18 for the stability unit and MMD, not knowing what
19 the agreements were with the agency.
20 BY MR. MACORETTA:
21   Q. So if Merck had not told anybody who got
22 part of this lot that it failed these potency
23 tests, you think Merck did the right thing?
24      MS. HARDWAY: Object to form.
25 Foundation.

Page 317

1 BY MR. MACORETTA:
2   Q. You can answer.
3   A. I have no, again, basis for answering
4 because I don't know what Merck did.
5   Q. And I just said, hypothetically, let's
6 assume Merck did not do that, did not tell
7 anybody. Do you think they did the right thing in
8 not telling anybody?
9      MS. HARDWAY: Object to form. Foundation
10 and overbroad.
11      THE WITNESS: I don't know what Merck
12 did. I can't comment whether I think they should
13 have done it or not. I don't know all the facts.
14 BY MR. MACORETTA:
15   Q. Okay. Let me show you what we're going
16 to mark as number 19 -- 20. 20.
17      (Schofield Deposition Exhibit 20 marked
18      for identification and attached to the
19      transcript.)
20 BY MR. MACORETTA:
21   Q. Mr. Schofield, Number 20 is a memo from
22 somebody named DMC to the product development team
23 for MMR II. You were on the product development
24 team in August of '02, right?
25   A. According to one of the pages of the

80 (Pages 314 - 317)

Appx19427

HIGHLY CONFIDENTIAL

Page 318

1 document, yes.
2    Q.  Yes.  Well, do you recollect being on the
3 product development team?
4    A.  Not directly.
5    Q.  Okay.  And one of the items on here is --
6 well, right at the beginning, I'm going to go to
7 background, second sentence.  "MMR II has been
8 threatened on a series of fronts, including
9 regulatory compliance and competition with GSK for
10 this lucrative business."
11    Do you see that?
12    A.  Yes, I do.
13    Q.  What was the threat of MMR II from
14 regulatory compliance in August of 2002?
15    MS. HARDWAY:  Object to form and
16 foundation.
17    THE WITNESS:  I don't recall.
18 BY MR. MACORETTA:
19    Q.  What was the threat to MMR II from
20 competition with GSK?
21    MS. HARDWAY:  Object to form and
22 foundation.
23    MR. MACORETTA:  What's your objection to
24 the form of that question?
25    MS. HARDWAY:  The fact that GSK -- first

Page 319

1 of all, you haven't established a foundation for
2 this document at all.  You're asking the question
3 as if to imply that this is, in fact, something
4 that he's written or that he has knowledge of.
5    MR. MACORETTA:  I'm not asking that at
6 all.  I established he's on the PDT, and this is
7 sent to the PDT.  It's from the PDT.
8    MS. HARDWAY:  You're asking about the
9 veracity of the statement and what's behind the
10 statement that --
11    MR. MACORETTA:  I am.
12    MS. HARDWAY:  -- you haven't established
13 he's had any part in drafting.
14    MR. MACORETTA:  That's fine, if that's
15 your form objection.
16 BY MR. MACORETTA:
17    Q.  What's your understanding of the
18 competitive threat from GSK?
19    A.  I had no understanding.  As a member of
20 the PDT, I wasn't on the PDT to represent that.
21    Q.  Did you ever have an understanding that
22 GSK was developing a competing product when you
23 were at Merck?
24    A.  I understood that they had a competing
25 product.  I didn't know if they were developing

Page 320

1 one for the U.S.
2    Q.  You understood that GSK was trying to
3 have that competing product introduced into the
4 U.S., right?
5    A.  No.
6    Q.  Really?
7    A.  Yes.
8    Q.  Never had any discussion about that?
9    A.  No.
10    MS. HARDWAY:  Object to form.  Asked and
11 answered.
12 BY MR. MACORETTA:
13    Q.  Just making sure.
14    A.  Not personally.
15    Q.  Okay.  So take a look at the top of
16 page -- what I guess is page 2 of the text, under
17 heading number 2 on page 1, defense of expiry
18 dose.  I'm going took look at the end of that
19 paragraph.  It says, "An interim analysis was
20 performed in '01, and the data suggested only the
21 dose of 4.0 log was comparable to a dose of 4.9.
22 Filing for a change to the label claim for mumps
23 minimum potency at end of shelf life from 4.3 to
24 4.0 in MMR II is expected in 2Q 2003."
25    Do you see that?

Page 321

1    A.  Yes, I do.
2    Q.  Okay.  Were you involved in any
3 discussions about filing to change the label for
4 an end of shelf life from 4.3 to 4.0?
5    A.  I don't recall the discussions.
6    Q.  If such a filing is made, that would have
7 likely required statistical data, wouldn't it?
8    MS. HARDWAY:  Object to form.
9 BY MR. MACORETTA:
10    Q.  You can answer.
11    A.  The statistical data appropriate to this
12 would be the clinical data.
13    Q.  Okay.  Why was Merck contemplating
14 changing the shelf life from 4.3 to 4.0?
15    MS. HARDWAY:  Object to foundation.
16    THE WITNESS:  The end of expiry?
17 BY MR. MACORETTA:
18    Q.  The end expiry, yes.
19    A.  Repeat the question.
20    Q.  Sure.  Why was Merck contemplating
21 changing the label claim for mumps minimum potency
22 at end of shelf life from 4.3 to 4.0?
23    MS. HARDWAY:  Same objection.
24    THE WITNESS:  What was the objection?
25    MS. HARDWAY:  Foundation.

81 (Pages 318 - 321)

Appx19428

HIGHLY CONFIDENTIAL

Page 322

THE WITNESS: I don't know the basis for their wanting to do so, except that there were results that supported a clinical effectiveness at 4.0.
BY MR. MACORETTA:
Q. Okay. Was part of the basis for wanting to do that was that there were stability models that suggest it couldn't have a 24-month shelf life at 4.3?
MS. HARDWAY: Object to form and foundation.
THE WITNESS: I don't know what the motivation was. That's the basis of the question?
BY MR. MACORETTA:
Q. Well, at this time, in August of '02, there were, indeed, stability calculations at Merck that showed you couldn't have a 24-month shelf life with a 4.3 expiry, right?
MS. HARDWAY: Object to form. Foundation.
THE WITNESS: If we're discussing previous information, there were ongoing analyses and studies done to complete the package of putting together a control strategy that both was state of the art for the time and supported by

Page 323

clinical trials data.
BY MR. MACORETTA:
Q. Let me try again. At the time, in August of 2002, were there stability studies at Merck that suggested you could not have a shelf life of 4.3 at 24 months?
MS. HARDWAY: Object to foundation. Sorry.
THE WITNESS: Maybe this is the answer. I can't align the dates with this particular document.
BY MR. MACORETTA:
Q. I'm showing you what we're going to mark as Schofield 21.
(Schofield Deposition Exhibit 21 marked for identification and attached to the transcript.)
BY MR. MACORETTA:
Q. All right. Number 21 is a 2000 memo from Joan Staub to a bunch of people, including you. It says TPAC backgrounder. What's the TPAC?
A. I don't recall.
Q. Were you on it?
A. Not to the best of my knowledge.
Q. Okay. But you were on the Competitive

Page 324

Defense Task Force, right?
A. I'm not sure what that is. Is that listed here? Is there a page?
Q. If you look at the executive summary, it says the cross-functional defense of MMR II was created in 1996 when the Competitive Defense Task Force was chartered by TPAC.
A. And I'm sorry. Where is my name listed as --
Q. I'm asking if you're on it.
A. I don't recall.
Q. Then do you know why Ms. Staub would be sending this to you?
A. For information as a party who is, you know, working in this space, a member of the PDT.
Q. Okay. Never mind.
Let me show you what we're going to mark as Exhibit 22.
(Schofield Deposition Exhibit 22 marked for identification and attached to the transcript.)
BY MR. MACORETTA:
Q. All right. Number 22, Mr. Schofield, is a memo from Keith Chirgwin to several people, including you, talking about planning for a CBER

Page 325

discussion on mumps stability.
Do you see that?
A. Yes, I do.
Q. Do you recollect this at all?
A. Not besides what I see on this memo.
Q. You don't remember being assigned to deal with potential improvements to the stability program, house standard -- HS adjustment to reduce variability?
A. I recall it in general but not in the context of this memo.
Q. Were you involved in calculating or adjusting the house standard for mumps?
A. I'm familiar with the discussions, and I am not 100 percent sure what was done. But, yes, there were efforts to try to reduce the variability.
Q. Topic 2 says, "If CBER proposes short-dating of product in order to address label compliance issue."
Do you see that?
A. Yes.
Q. Did CBER actually propose short-dating of the product in order to address label compliance issue?

HIGHLY CONFIDENTIAL

Page 326

1    A. It says if CBER proposes.
2    Q. I know. I'm asking you if they
3 ultimately did.
4    A. I don't know.
5    Q. Okay. Topic Number 3A talks about
6 calibrate the ELISA cut-off to the neut cut-off.
7        Do you see that?
8    A. Yes, I do.
9    Q. Were you ever involved in any discussions
10 about that?
11    A. Only at a high level in understanding
12 what work the Joe Antonello's group was doing.
13    Q. Well, it was assigned to you, right?
14 Feasibility -- if you turn the page, "Feasibility
15 evaluation of this approach in terms of
16 calibration of the ELISA to the neutralization
17 assignment, T. Schofield."
18    A. Yes.
19    Q. Okay. So what was your evaluation of the
20 feasibility of this approach?
21    A. That I would assign it to Joe Antonello,
22 likely.
23    Q. And did he do it?
24    A. I can't say.
25    Q. Do you know what the ultimate result was?

Page 327

1    A. No, I don't. I don't recall.
2    Q. So you personally were not involved
3 yourself in any discussions of whether or not this
4 could be calibrated or how, the neutralization for
5 the ELISA cut-off?
6    A. I don't recall.
7    Q. Would that be something that's within
8 your area of expertise?
9    A. It's something that I've done work in,
10 yes.
11    Q. You don't recall any discussions as to
12 what the appropriate cut-off level should be?
13    A. No.
14    Q. Do you remember actually going to a
15 meeting or being involved in a meeting with CBER
16 about these issues in March or April of 2001?
17    A. I don't recall.
18    Q. Okay. Let me show you what we're going
19 to mark Schofield 23.
20        (Schofield Deposition Exhibit 23 marked
21        for identification and attached to the
22        transcript.)
23 BY MR. MACORETTA:
24    Q. All right. Exhibit 23 is a cover e-mail
25 to a bunch of people, including you, that says,

Page 328

1 "Attached are minutes from the 4401 meeting with
2 CBER on mumps. The stability slides prepared for
3 that meeting are also attached."
4        And if we look, we have slides -- the
5 second slide has an agenda, and it has your name
6 next to two topics on the agenda, mumps kinetics
7 and adjustments to a house standard.
8        Do you see that?
9    A. Yes, I do.
10    Q. Were you at a meeting with CBER to
11 discuss mumps kinetics and an adjustment to house
12 standard?
13    A. This would say I was.
14    Q. Okay. Do you remember it?
15    A. Not -- not vividly.
16    Q. At all?
17    A. Probably not at all.
18    Q. Okay. The next slide talks about -- I'm
19 sorry, two slides down talks about product
20 stability lifecycle.
21        Do you see that?
22    A. Yes, I see it.
23    Q. And these are the different types of
24 stability studies that Merck might undertake,
25 right?

Page 329

1    A. The four bullets?
2    Q. I'm on this one with the chart.
3    A. Oh.
4    Q. I'm sorry.
5    A. This appears to be a lifecycle list, yes.
6    Q. So at this time, in 2001, you were past
7 the formulation and clinical pilot and launch
8 studies, at least for mumps, right?
9    A. Say again? I'm sorry.
10    Q. At this time, in 2001, mumps had been on
11 the market for a while so you weren't doing
12 formulation clinical/pilot or launch studies
13 anymore, right?
14    A. I don't know when this is in relation to
15 the mumps expiry trial, but it was -- if there was
16 stability supporting the mumps expiry trial, I
17 don't suppose so.
18    Q. Okay. But there were annual stability
19 studies going on, right?
20    A. As a licensed product, yes.
21    Q. Okay. And it says representative
22 production lots is the material. So what does
23 that mean? You pick a few lots for an annual
24 study?
25    A. That was the process, yes.

83 (Pages 326 - 329)

Appx19430

HIGHLY CONFIDENTIAL

Page 330

1  Q. How were those lots chosen?
2  A. I am not in a position to be able to
3 answer. Again, this was done in the production
4 area.
5  Q. Who would know that?
6  A. I don't know. I can't say, not knowing
7 what the processes were for that lot selection.
8  Q. And the last row in that chart says
9 special production scale lots.
10      At this time, was Merck doing any special
11 production -- product stability analyses?
12  A. I think there's a list of lifecycle
13 approach. This is in this position and case.
14 Again, a change has been made that requires a
15 special stability study to evaluate the impact of
16 the change on stability. I was not aware of any,
17 again because I wasn't in production to be able to
18 know which changes might have needed such a study.
19  Q. And if we down a couple of pages, number
20 of annual and special studies in 2000 by product
21 family.
22      Do you see that?
23  A. Yes.
24  Q. It says MMR II family. It says total
25 number of ongoing stability lots, 28. Total

Page 331

1 number of lots produced, 269.
2      Do you see that?
3  A. Yes, I do.
4  Q. And do you understand that to be forever
5 269 lots, or total number of lots produced over
6 what time period?
7      MS. HARDWAY: Object to form and
8 foundation.
9      THE WITNESS: I can't say.
10 BY MR. MACORETTA:
11  Q. Okay. And you don't know how many vials
12 are in a lot, right?
13  A. No, I didn't. I answered before I don't.
14  Q. Okay. And then if we go back, I'm going
15 to go back a few more pages. These pages are not
16 numbered so I'm going to look at the page ending
17 in Bates number 89, the data analysis annual
18 studies.
19      And is this, indeed, what Merck's annual
20 studies for mumps did, a historical comparison of
21 loss estimates?
22  A. I can't say that because I wasn't in the
23 stability unit performing these studies.
24  Q. Well, what did you understand that the
25 annual studies did?

Page 332

1      MS. HARDWAY: Object to form and
2 foundation.
3      THE WITNESS: The best I knew is they
4 were collecting data.
5 BY MR. MACORETTA:
6  Q. Well, were they -- do you have any reason
7 to think this is wrong?
8  A. No.
9      MS. HARDWAY: Object to form. Go ahead.
10      THE WITNESS: I have no reason to believe
11 it wrong or right. It's a schematic showing, you
12 know --
13 BY MR. MACORETTA:
14  Q. I don't mean the charts. I mean the
15 text.
16  A. No, I have no reason to know.
17  Q. Okay. If we go two pages further, it
18 says, active stability monitoring program. This
19 is something you were involved in, right?
20  A. As long as there wasn't an overlap in the
21 way that the terminology they used for theirs.
22  Q. For "theirs"?
23  A. Their previous stability monitoring
24 program versus the one that we developed together
25 with Bill Fairweather. The word "active" leads me

Page 333

1 to believe that it's the Bill Fairweather plan.
2  Q. Okay. And did the Bill Fairweather plan
3 do this comparison to historical data after each
4 interview [sic] as an early warning identification
5 that helps to address assay variability?
6  A. Interview?
7      MS. HARDWAY: Interval.
8      THE WITNESS: Interval, okay.
9      MR. MACORETTA: What did I --
10      MS. HARDWAY: You said interview.
11      MR. MACORETTA: Oh, I'm sorry. Interval.
12      THE WITNESS: Yes, it did. It was
13 dynamic in the sense that as data were accrued, it
14 did a recalculation.
15 BY MR. MACORETTA:
16  Q. Okay. And so how would that early
17 warning come up? I mean, I don't under -- get
18 some message on your computer or something or --
19      MS. HARDWAY: Object to form.
20      THE WITNESS: I was not involved in the
21 implementation. I was only involved in the, if
22 you like, algorithm that could be employed either
23 by computer, manually, whatever mechanism they
24 chose to use.
25

84 (Pages 330 - 333)

Appx19431

HIGHLY CONFIDENTIAL

Page 334

1 BY MR. MACORETTA:
2    Q. Okay. And you don't even know if it was
3 used?
4    A. I don't. As I say, there was -- there
5 were changes in management that were -- it became
6 a hand-off from us.
7    Q. Okay. If you go back a few more pages to
8 the page ending in 94, it says MMR II stability
9 monitoring. The second bullet point is an annual
10 study. That was being done, right?
11    A. Yes.
12    Q. A special study increased mumps three
13 lots.
14       Do you know if that was being done or
15 what that refers to?
16    A. I don't know what it refers to.
17    Q. Okay. And at this time, there was ICH
18 guidance that said the test intervals should be a
19 certain number of months?
20    A. These are the what are called ICH
21 intervals, yes.
22    Q. Okay. What's ICH mean?
23    A. International Conference of
24 Harmonisation -- on Harmonisation.
25    Q. I want to go back a little further to the

Page 335

1 page ending in 99. It says, mumps stability
2 profile.
3       First bullet point says, "House standard
4 adjusted data used to calculate loss estimates."
5       Do you see that?
6    A. Yes, I do.
7    Q. What does that mean?
8    A. That the data were reported as a relative
9 potency rather than as a potency.
10    Q. Relative to what?
11    A. A reference material.
12    Q. So meaning whatever the actual test
13 result said could move when it was compared to a
14 reference material?
15       MS. HARDWAY: Object to form.
16       THE WITNESS: It was adjusted to the
17 reference material, which reflects the
18 fluctuations in the biological system.
19 BY MR. MACORETTA:
20    Q. I don't understand what that means. So
21 if I take a sample and I conduct the assay for
22 some lot at a certain time point, how does the
23 house standard come into play then?
24       MS. HARDWAY: Object to form.
25       THE WITNESS: I'm going to have to use my

Page 336

1 hands now.
2 BY MR. MACORETTA:
3    Q. Okay.
4    A. Okay. The way the assay behaves is what
5 was one time a control and a test sample are
6 performed in the assay.
7    Q. The control is the house standard?
8    A. Let's call it the control before it
9 became called the house standard.
10    Q. Okay.
11    A. And what was observed is that as the
12 assay -- as the test changed, the control changed
13 in the same amount, okay?
14       This is a feature that a statistician or
15 a good bioassay laboratory would take to say that
16 control shouldn't be a control. It should be
17 something that can be used to adjust the
18 measurement so that there's less variability.
19       So here's the test material doing this.
20 But when you adjust to the house standard, you get
21 a better opportunity to see what the potency is.
22       There's more to it than that. They link
23 this through what's called calibration from
24 standard to standard so that it's in the scale,
25 let's say the scale of 4.3 so, again, it was all

Page 337

1 linked together so that it was linked to a
2 specification and, therefore, we've reduced the
3 variability and kept it in the scale of the
4 specification 4.3.
5       Now, that's about six slides of a
6 presentation --
7    Q. I don't understand the scale of 4.3.
8    A. The word "scale" is maybe not an industry
9 term. It's the one I use. It's the scale of the
10 specification.
11       What you want to do is that if you have a
12 specification, you want to link your assay to that
13 scale, to that specification scale so when you get
14 a 4.4, you know it's above 4.3; or if you get a
15 4.2, you know it's below a true 4.3.
16       So the assay can be through the
17 assignment of the house standard -- now I'll call
18 it, rather than control sample -- value can be
19 linked to that. When it measures 4.3, the
20 adjustment is to that 4.3. So all you get is less
21 variability around 4.3.
22       It's called relative potency measurement.
23 It's a common tool used in biopharmaceutical and
24 vaccines industries.
25    Q. Okay. And it was used for mumps,

85 (Pages 334 - 337)

Appx19432

HIGHLY CONFIDENTIAL

Page 338

1 apparently, in 2001, right?
2    A. When looking at the opportunities to get
3 better estimates of stability and of release of
4 the product because we knew one of the undermining
5 forces was the variability of the assay, we chose
6 to go to a better tool for measuring the potency
7 of the assay, both to assess stability and release
8 of lots.
9    Q. So what we looked at earlier in the FDA
10 filing of the various factors in the release
11 calculation still had a variability factor in
12 them, right?
13    A. Yes.
14    Q. And that was after applying the house
15 standard, right?
16    A. I don't know.  I can't say for sure at
17 what point the adjustment to the house standard
18 was employed to come up with the numbers that
19 we've seen in some of the documents that you
20 shared with me.
21    Q. Is that house standard employed when we
22 measure release potency as well?
23    A. Once it's put into place and the assay is
24 redefined as a relative potency assay rather than
25 as an absolutely potency assay, yes.  It moves

Page 339

1 from being a control to being a calibration
2 instrument.
3       And all assays use this, by the way,
4 including chemical assays.  They don't measure the
5 actual amount of a small molecule.  They have a
6 calibrator that measures the, let's call it, the
7 signal that the chemical gives and translates it
8 into an amount.  So it's a conventional tool for
9 measuring in the pharmaceutical industry.
10    Q. So let's go two pages -- let's go to the
11 next page that ends in Bates number 200, mumps
12 stability profile.  And this seems to suggest --
13 well, you're talking about shelf life loss
14 calculated as per different time periods.
15       Is this calculated with or without the
16 house standard adjustment?
17    A. I can't tell.
18    Q. Okay.  And under the October 2000
19 analysis, what is that plus or minus figure for?
20    A. Again, without a notation to say what it
21 represents, I can't tell specifically.
22    Q. Okay.  Then if we look to the next page,
23 it has a mumps stability profile, mumps potency
24 loss from release to 24 months.
25       Do you see that?

Page 340

1    A. Yes, I do.
2    Q. Okay.  And, again, it has a couple of
3 mumps lots here that suggest they actually had a
4 gain, right?
5    A. You will see gains, you'll see losses,
6 depending upon the relative stability of a
7 product.
8    Q. But it's not possible to have a gain,
9 right?
10    A. No.  You can get a statistical estimate
11 that is as a positive change.  But no, it's not
12 physically possible to get a -- have a gain.
13    Q. Okay.  Let me show you what I'm going to
14 mark as Number 24.
15       (Schofield Deposition Exhibit 24 marked
16       for identification and attached to the
17       transcript.)
18 BY MR. MACORETTA:
19    Q. Okay.  Number 24 is a memo from Phil
20 Bennett to a couple of people.  You're copied.
21       Do you see that?
22    A. Yes, I do.
23    Q. Okay.  And here Mr. Bennett is doing two
24 analyses of stability data in response to a
25 request from CBER, right?

Page 341

1    A. Correct.
2    Q. Do you know if these analyses were
3 ultimately given to CBER?
4    A. I do not know.  I'm not -- again, we do
5 the analysis and then the team carries it forward.
6    Q. Okay.  So I'm going to talk about the
7 second analysis, which is on the back side, first.
8       Mr. Bennett says for product manufactured
9 on or after 9/13/99, the minimum release
10 specification is for mumps 5.0 log 10.
11       Do you see that?
12    A. Yes, I do.
13    Q. Do you have any reason to think he's
14 wrong when he says that?
15    A. No.
16    Q. Okay.  And then he does an analysis to
17 estimate the lower 95 percent confidence bound on
18 product currently being manufactured with a fill
19 of 5.0 and released based on a 1 by 6 assay.
20       So the expected average loss remains
21 .703, which is the calculation he does on the
22 first side for the average loss of products
23 manufactured at a lower potency, right?
24    A. Yes.
25    Q. Okay.  By the way, if there's more

86 (Pages 338 - 341)

Appx19433

Page 342

1 product in it, shouldn't we have a higher average
2 loss?
3    A. No.
4    Q. So the average loss is going to remain
5 the same whether there's 4.3 or 5.0 in the
6 product?
7    A. There's a kinetics principle called
8 first-order kinetics which says that it behaves
9 linearly and in parallel in the log. So the
10 first-order kinetics is a -- I don't know if you
11 want a description of what it is, but it's a
12 kinetics principle that says that things change
13 according to the concentration.
14       When you take the log of the data, which
15 is the scale of this assay, it's linear in the log
16 and you'll get the same kinds of changes
17 regardless of the concentration.
18    Q. So the fact that there are more viruses
19 in it doesn't mean more are going to be lost over
20 time?
21       MS. HARDWAY: Object to form. Asked and
22 answered.
23       THE WITNESS: The same proportion will
24 change over time.
25

Page 343

1 BY MR. MACORETTA:
2    Q. But this isn't the same proportion. This
3 is in the same number.
4    A. This is in the log. The log is in a
5 scale of -- is in scale of a proportion.
6    Q. Okay. But there would actually be more
7 viruses loss?
8       MS. HARDWAY: Object to form.
9 BY MR. MACORETTA:
10    Q. Virus particles?
11    A. It depends on the level.
12    Q. Okay. And here Mr. Bennett says at the
13 bottom, "Given our current minimum release
14 specification of 5.0, we have 95 percent
15 confidence that each lot released will be at or
16 above 4.0 through expiry."
17       Do you see that?
18    A. Yes, I do.
19    Q. That's based on his calculation that 7.03
20 plus the other variability factors gives a total
21 loss of 1.2, right?
22    A. Uh-huh.
23    Q. So 5.0 minus 1.2 is really 3.98, but 4 is
24 what he's doing here, right?
25    A. Uh-huh.

Page 344

1    Q. Okay. And does that mean that if you
2 release at 5.0, you're not going to have an expiry
3 of 4.3 and above?
4       MS. HARDWAY: Object to form.
5       THE WITNESS: We're not going to get a
6 measurement at 4.0 or above.
7 BY MR. MACORETTA:
8    Q. 4.3 is what I --
9    A. 4.3, yes, I'm sorry.
10    Q. Okay. So this model -- these
11 calculations would not justify a release potency
12 of 5.0 at an end expiry at 24 months and 4.3?
13       MS. HARDWAY: Object to form.
14 BY MR. MACORETTA:
15    Q. Right?
16    A. If it I do the arithmetic, no.
17    Q. Okay. Thank you.
18       MS. HARDWAY: Since you're between
19 documents, could we take a break?
20       MR. MACORETTA: Sure.
21       VIDEO TECHNICIAN: Off the record at
22 5:35 p.m.
23       (A recess was taken.)
24       VIDEO TECHNICIAN: We are going back on
25 the record at 5:58 p.m. This is the start of

Page 345

1 Media Unit 6 in the deposition of Tim Schofield.
2       (Schofield Deposition Exhibit 25 marked
3       for identification and attached to the
4       transcript.)
5 BY MR. MACORETTA:
6    Q. All right. Mr. Schofield, I'm showing
7 you what we've marked as Exhibit 25, which is an
8 e-mail from Keith Chirgwin below an e-mail from
9 Phil Bennett to a whole lot of people, including
10 you.
11       This is dated March 14, '01, which is a
12 couple weeks after Exhibit 24, which is
13 Mr. Bennett's memo on mumps stability and potency
14 estimations, right?
15    A. Uh-huh.
16    Q. So my question is, do you have any reason
17 to disagree with Mr. Bennett's conclusion here
18 that in -- I'm reading from the top e-mail, second
19 sentence -- "our expiry dating needs to be 12
20 months in order to provide a 95 percent confidence
21 that a lot released at 5 will be above 4.3 at
22 expiry"?
23       MS. HARDWAY: Object to form and
24 foundation.
25

87 (Pages 342 - 345)

HIGHLY CONFIDENTIAL

Page 346

1 BY MR. MACORETTA:
2    Q.  You can answer.
3    A.  Well, there's a broader context to this.
4 This is, again, a calculation -- like I'd answered
5 the last time -- but it's a model for what the
6 shelf life might be at the point of time of the
7 analysis.  So I -- I'm not sure that it's any more
8 than the result of a calculation, which is a
9 prediction and no more than that.
10    Q.  It is a prediction.  Did you think it was
11 wrong or Merck shouldn't use this or should use
12 some other prediction?
13        MS. HARDWAY:  Object to form.
14 Foundation.
15        THE WITNESS:  Well, I think there's --
16 again, there's -- there's lots to be considered
17 about the calculation, and it -- I think Merck was
18 taking it responsibly from some other documents
19 that you'd shown of me.
20        But it's to me, again, a -- an empirical
21 prediction based on the data that was in hand at
22 the time and -- and no more than that.
23 BY MR. MACORETTA:
24    Q.  Did you write to Mr. Bennett and say this
25 is not the right calculation or you got something

Page 347

1 wrong here?
2        MS. HARDWAY:  Object to form.
3 BY MR. MACORETTA:
4    Q.  Do you recollect doing that?
5        MS. HARDWAY:  Object to form.
6        THE WITNESS:  It's not a matter of that
7 it's the wrong calculation to do, and it's not
8 something that I would discourage him from doing
9 as a matter of information to help the agency and
10 to the agency better understand the properties of
11 the mumps vaccine.  But it is just a calculation.
12 BY MR. MACORETTA:
13    Q.  Okay.  I understand.
14        Well, at this time, in March of '01, was
15 there some other calculation that Merck was using?
16    A.  Not to the best of my knowledge.
17    Q.  Did you reveal this calculation to
18 CBER --
19    A.  Well, there was one that they were aware
20 of that, which was the agencies.
21    Q.  What is the agencies?  Oh, the CBER
22 analysis?
23    A.  Yeah.
24    Q.  Okay.  But when Merck makes an internal
25 decision as to what the shelf life -- or the end

Page 348

1 expiry needs to be, was it using anything other
2 than Mr. Bennett's calculation?
3        MS. HARDWAY:  Object to form.
4 Foundation.
5        THE WITNESS:  Again, I -- in the -- as
6 we've been discussing, not knowing where these
7 calculations were done in the context of
8 discussions internally or together with the agency
9 and knowing that they are simply predictions, you
10 know, I don't know how to -- you know, to comment.
11 BY MR. MACORETTA:
12    Q.  Well, if you think that Mr. Bennett
13 didn't do the calculation wrong, when you saw
14 this, do you recollect any discussion of, hey, we
15 might need to change our shelf life or our label?
16        MS. HARDWAY:  Object to form and
17 foundation.
18        THE WITNESS:  Not a matter for Phil or
19 myself to decide.
20 BY MR. MACORETTA:
21    Q.  I understand that you couldn't decide it.
22 But were you involved in any discussions about it?
23    A.  Not -- I wasn't personally, no.
24    Q.  Okay.  Let me show you what we're going
25 to mark as 26.  This is an unstapled two-pager

Page 349

1 because we didn't have a stapler.
2        (Schofield Deposition Exhibit 26 marked
3        for identification and attached to the
4        transcript.)
5        MR. MACORETTA:  Do you have your copy?
6        MS. HARDWAY:  Yes.
7 BY MR. MACORETTA:
8    Q.  While you're looking at it I'll say again
9 that the handwriting on the second page is ours
10 and it's not the way we got it from Merck.
11    A.  Uh-huh.
12    Q.  So this one's from you to Joye Bramble,
13 right?  The e-mail attaching this document?
14    A.  Yes.
15    Q.  Okay.  And it says, "Joye, I've assembled
16 my recollections about MMR stability from the last
17 several years to focus our conversation about your
18 background."
19        What conversation about Joye's
20 background?
21    A.  I do not know what that means.
22    Q.  Okay.  And then you ask Phil, presumably
23 Phil Bennett, "Are there any main issues I've
24 omitted," right?
25    A.  Yes.

88 (Pages 346 - 349)

Appx19435

HIGHLY CONFIDENTIAL

Page 350

1    Q.   Okay.  So then if we go to the second
2    page, there's a discussion -- there is a listing
3    of bullet points about stability issues.
4        Do you recollect writing this?
5    A.   No, I don't --
6    Q.   Do you have --
7    A.   -- specifically --
8    Q.   -- any reason to think you didn't write
9    it?
10   A.   No.
11   Q.   Okay.  Third bullet point:  "Merck
12   devises active stability monitoring program and
13   seeks feedback from CBER.  None given."
14       Do you see that?
15   A.   Yes, I do.
16   Q.   And the active stability monitoring
17   program we've talked about before is what exactly?
18   A.   I'll -- I'll call it the Bill Fairweather
19   work.
20   Q.   Okay.  And that's a -- that's a -- that's
21   a program to monitor lots that are -- have already
22   been released, right?
23   A.   A lot or a sampling of lots that have
24   been released.  Yes.
25   Q.   Okay.  And -- and the purpose of that

Page 351

1    program is -- is to look for different trends or
2    to look for lots that are actually out of
3    specification or both?
4    A.   To look for product trends.
5    Q.   Okay.  And I'm going to go down a few
6    bullet points to the one that says, "First team
7    biologics visit uncovers history of individual
8    stability failures."
9        Do you see that?
10   A.   Um --
11   Q.   About halfway down the page.
12   A.   Okay.  Immediately prior -- or --
13   Q.   The one below that.
14   A.   Okay.  Okay.  Yes.
15   Q.   "First team biologics visit uncovers
16   history of individual stability failures."
17       "Uncovers" means they didn't know about
18   it before, right?
19       MS. HARDWAY:  Object to form.
20       THE WITNESS:  Whose -- who doesn't know
21   about it?
22   BY MR. MACORETTA:
23   Q.   First team biologics.
24   A.   Didn't --
25   Q.   Team biologics.

Page 352

1        Well, what did you mean by the word
2    "uncovered" in that sentence?  Let me try it that
3    way.
4    A.   Found and issued a 483.
5    Q.   Okay.  Then it says, "Asked Merck to
6    perform an analysis to see if there's a trend of
7    more failures more recently than in the past.
8    Merck does analysis to show that there's a trend
9    in all three components," right?  Do you see that?
10   A.   Yes, I do.
11   Q.   Okay.  Did you tell that to CBER, that
12   there was a trend in all three components?
13       MS. HARDWAY:  Object to form.
14       THE WITNESS:  I don't know.
15   BY MR. MACORETTA:
16   Q.   And then the next it says, "CBER meeting
17   3 to share ASM."
18       That's active stability monitoring,
19   right?
20   A.   Yes.
21   Q.   "Negotiate non-linear kinetics and
22   adjustment to HS."
23       Do you see that?
24   A.   I do.
25   Q.   What were you going to negotiate with the

Page 353

1    non-linear kinetics?
2    A.   A better word would be "discuss."  But
3    negotiate is perhaps a proper term because we had
4    to discuss it with them and come to a resolution
5    about the non-linear kinetics and the adjustment.
6    Q.   And it says, according to this, they
7    disagreed with the lot -- non -- non-linear
8    kinetics adjustment for mumps, right?  The next
9    sentence?
10   A.   That's what it says.
11   Q.   Yes.  What were you looking for them to
12   agree to concerning non-linear kinetics?
13   A.   I don't recall.
14   Q.   Well, non-linear kinetics means that the
15   slope of the decline is not constant over the
16   whole time period, right?
17   A.   Yes.
18   Q.   Okay.  Was the fact that it changed over
19   time something that you had to get CBER to agree
20   to, or were you trying to do something in response
21   to that fact that you wanted to get CBER to agree
22   to?
23   A.   I don't recall.
24       MS. HARDWAY:  Object to form.
25

89 (Pages 350 - 353)

HIGHLY CONFIDENTIAL

Page 354

1 BY MR. MACORETTA:
2     Q. Then it says, "Asked Merck to develop an
3 annual plan that will predict product that falls
4 below spec at expiry."
5         Do you see that?
6     A. Again, in the same bullet?
7     Q. Yes.
8     A. Yes, I do.
9     Q. Did you do that? Did Merck do that?
10    A. That was the enhanced stability program.
11    Q. Okay. And so Merck -- so the next bullet
12 says, "Merck undertakes development of an enhanced
13 stability program."
14        And the idea of that plan would be to
15 predict product that fall below -- that falls
16 below spec at expiry?
17    A. The basic premise was to predict that the
18 product was moving towards material that may
19 fall -- and again, it's a model -- may fall below
20 minimum requirement at the end of shelf life.
21    Q. And what happens if it predicts that?
22    MS. HARDWAY: Object to form.
23        THE WITNESS: The -- the plan was, if put
24 in place, I don't know; and if it was put in
25 place, I don't know what rules were applied from

Page 355

1 the proposed plan.
2 BY MR. MACORETTA:
3     Q. So you don't know if it was ever put in
4 place?
5     A. I think we established that before. Yes.
6     Q. Okay. The next bullet point, "CBER
7 questions mumps expiry serum neutralization
8 titers."
9         Is that talking about samples from the
10 007 protocol there?
11    A. Those are the serum neutralization titers
12 I'm aware of in the context of this.
13    Q. Okay. Then it says, "Merck suggests a
14 resolution of the expiry potency is important to
15 the stability program and accuracy of the label."
16        Do you see that?
17    A. Yes.
18    Q. Why is a resolution of the expiry potency
19 important to the stability program?
20    A. It would bring everything together to --
21 as, again, we've discussed or at least I've
22 answered, that we would have then -- we would have
23 all the components in place. A
24 statistically-defined release limit, an annual
25 stability program, and we would have support of

Page 356

1 the end-of-shelf-life limit.
2     Q. Well, you would have a stability program
3 whether this expiry potency issue was resolved or
4 not, right?
5     A. We always did.
6     Q. Yes. So why was the resolution of expiry
7 potency important to it if you already had it?
8     A. It's a -- it's a complete package. As I
9 may have said and if I didn't I'll say it now, the
10 exercises, as I understood it, were not -- were
11 not just, you know, one exercise independent of
12 the second, independent of the third.
13        The work together with the agency was to
14 bring these all together so that we could provide
15 the agency comfort that we're -- that we're
16 monitoring our mumps stability accurately, we're
17 releasing lots accurately, and that there's
18 assurance that the product will be efficacious or
19 effective at the end of its shelf life.
20        So these don't come -- these don't stand
21 by themselves separately because they're numbers
22 in the abstract. You need the data to support the
23 numbers.
24    Q. And at this time in May of '02, was Merck
25 using the active stability monitoring program?

Page 357

1     A. I've answered before I do not know.
2 Because whenever the active stability program
3 development was completed, it was a change of
4 management where we handed off and the management
5 took over.
6     Q. So at the time you wrote this in May of
7 '02, what stability -- there was an annual
8 stability program, right?
9     A. There was up until the point that there
10 was an exchange to a different program, if that --
11 if that occurred.
12    Q. At the time you wrote this in '02, what
13 programs that you're -- stability programs that
14 you were aware of was Merck using?
15    A. To the best of my knowledge, the one that
16 it -- they'd been using up to the development of
17 the annual stability program.
18    Q. Which was what, the simple we measure it
19 at increments program?
20    A. They were --
21    MS. HARDWAY: Object to form.
22 BY MR. MACORETTA:
23    Q. Go ahead. You can answer.
24    A. That we measure as usual and we -- we
25 report when we get an out-of-specification result.

Veritext Legal Solutions
212-279-9424          www.veritext.com          212-490-3430

Appx19437

HIGHLY CONFIDENTIAL

Page 358

1    Q.  Okay.  And so we don't know if the active
2  stability monitoring program was in place in May
3  of '02?
4    A.  I don't know when in -- it was put in
5  place.
6    Q.  But it was at some point?
7    A.  I don't know.
8    Q.  Okay.  And same -- you also don't know in
9  the enhanced stability program was --
10    A.  Oh, wait --
11    Q.  -- ever put in place?
12    A.  -- wait, wait, wait, wait.  Was the
13  active stability program?  Do you mean the
14  reporting?
15    Q.  Was Merck using the active -- the active
16  stability program is the one you said
17  Dr. Fairweather helped develop, right?
18    A.  No.  The enhanced stability monitoring
19  program is the one that Dr. Fairweather helped
20  to --
21    Q.  Okay.  And you don't know if that was
22  ever used?
23    A.  As I said, there was a change in
24  management, we developed the program, we handed it
25  off to the appropriate department, we gave them

Page 359

1  some advice on it.  And where -- what was done
2  thereafter was up to the department who owned it
3  at that point.
4    Q.  So you don't know if it was ever used?
5    A.  I don't know if it was ever used.
6    Q.  Okay.  And the active stability
7  monitoring program that we talked about -- that
8  you talk about in bullet 3 here, in May of '02,
9  was that being employed by Merck?
10    A.  To the best of my knowledge.
11    Q.  It was?
12    A.  Are you asking --
13    Q.  Well, I'm just -- you said "the best of
14  my knowledge."  I was waiting for you to say it
15  was or wasn't at the end.
16    A.  To the best of my knowledge, it was.
17    Q.  Okay.  So in May of '02, the active
18  stability monitoring program was being employed by
19  Merck, and there was still an annual stability
20  program, right?
21    A.  They're the same as you're using the
22  terminology.  Active and annual are just -- are
23  collecting data and reporting when there's a
24  BPD -- when there's an out-of-specification
25  result.  The only --

Page 360

1    Q.  Okay.
2    A.  The exclusion to that is the enhanced
3  stability monitoring program.
4    Q.  Which we don't know -- which you don't
5  know it was ever used?
6    A.  I don't know.
7    Q.  So what -- so let me try this way:  In
8  May of '02 -- I'm trying to get a handle on all of
9  the stability programs Merck was using.
10    And what you know, that there was the
11  active stability monitoring program being used
12  then, right?
13    A.  Uh-huh.
14    Q.  That's what you just said?
15    A.  Uh-huh.
16    Q.  What else was there, if anything, that
17  you know of?
18    A.  None -- nothing that I know of.  Not my
19  department.
20    Q.  Okay.  And have you ever heard of
21  something called statistical process control
22  monitoring?
23    A.  SPC?  Yes.
24    Q.  What is that?
25    A.  It's a basis for monitoring the behavior

Page 361

1  of a manufacturing or other processes.
2    Q.  And was that something Merck was
3  employing concerning stability at -- in 2002?
4    A.  I don't know.
5    Q.  And I'm back to that third bullet point
6  from the bottom, where you say that "resolution of
7  expiry potency is important to the stability
8  program."
9    And the stability program at that time
10  was just the active stability monitoring program,
11  as far as you know?
12    A.  No.  The stability program that was
13  ongoing was an assessment of what the
14  end-of-shelf-life limit was and, in accord, what
15  the appropriate release limit should be.
16    It was more than the annual stability
17  program.  It was an ongoing evaluation that
18  started with the memo that you had showed me from
19  Phil Bennett, was the beginning of looking at --
20  deeply at the data that we had in hand up to, I
21  think, some of the resources that you showed me
22  early on where, with the -- with more data and
23  therefore more accurate assessments of the
24  stability, what the stability of the
25  mumps-containing vaccine was through 200 -- 2005,

91 (Pages 358 - 361)

Appx19438

HIGHLY CONFIDENTIAL

Page 362

1 2006 I think is what you showed me.
2       So again, Phil's initial evaluation was
3 the beginning to engage in one of three arms at
4 least of improving the -- the -- control
5 strategy of mumps.  And one of those three arms
6 was looking at what is current state from the
7 mumps vaccine from the data that we have.
8    Q.  Okay.  So in -- when we looked at the '05
9 calculation that made it into the SBLA, I said is
10 this calculation constantly revised when new data
11 is received, and I think you said it's not
12 regularly reported, right?
13    A.  No.  It's done in the form of a formal
14 proposal to the agency for a change in the control
15 strategy for the product.
16    Q.  Okay.  Let me try this way:  When we
17 looked at Mr. Bennett's memo, 24, where he comes
18 up with a loss of 7. -- of .073.
19    A.  Yes.
20    Q.  That's based on -- on the data he had at
21 the time, right?
22    A.  To the best of my knowledge.
23    Q.  And the data would be those endpoints we
24 -- those inputs we looked at before, how much is
25 lost at 2.8 degrees, how much is lost at minus 20,

Page 363

1 et cetera, right?
2    A.  Yes.
3       Can I make a qualifying point?
4    Q.  Sure.
5    A.  The data that he had at the time, I don't
6 know whether this is data that the agency gleaned
7 and used and therefore then we supported or it was
8 data coming out of MMD.
9       So because it was being done in -- it
10 appears to be in correspondence with some
11 calculations that CBER made, I don't know the true
12 source of the data at that time.
13    Q.  Well, how would CBER get all this data on
14 how much mumps potency is lost over time except
15 for Merck?
16    A.  They do annual -- we -- I believe -- I
17 think companies report the data from their
18 stability programs as part of an annual review.
19    Q.  And the data from your stability program
20 would have given the component data to -- in that
21 chart we looked at, it would have give -- I
22 thought that data just said these lots are out of
23 trend.  It didn't say this is how much we lose on
24 average at 2 to 8 degrees.
25    A.  No.  I'm talking about a calculation that

Page 364

1 the agency did.  And I'm not sure of the source of
2 the data from the calculation, whether it was data
3 that was gleaned out of their own databases
4 for the -- from the annual reviews or whether
5 Merck had provided them data for doing
6 calculations.
7    Q.  Okay.  Let me go back to this third
8 bullet point from the end.  "Merck suggests a
9 resolution of the expiry potency is important."
10 And then the second point is "to accuracy of the
11 label."
12       Why is that -- why is the resolution of
13 the expiry potency important to the accuracy of
14 the -- accuracy of label?
15    A.  Again, if -- there are these three
16 components of work that were done in collaboration
17 with the agency.  They were, A, to come up with a
18 release potency that would ensure adequate
19 end-of-expiry potency for the product based on the
20 best data that we had and the best -- or a model
21 for calculating the release limit.
22       The second was the promise of an annual
23 -- a more rigorous annual stability program where
24 we're not simply reacting to out-of-specification
25 results but we're monitoring the product to see if

Page 365

1 there's any changes in the stability profile of
2 the product.
3    Q.  Uh-huh.
4    A.  And the third and possibly the most
5 important part was the expiry trial, which would
6 support both of the former -- because we can't
7 tell when the product is good or bad or that we're
8 monitoring it to an adequate degree of quality
9 unless we know what the clinically-based end of --
10 end-of-shelf life potency should be.
11    Q.  But at this time you had a -- you had an
12 end-of-shelf-life potency on the label, right?
13    A.  We had a number on the label.  Throughout
14 the discussions with the agency, it was -- it was
15 not regarded as an end-of-shelf-life potency from
16 the beginnings of the discussion.  It was at some
17 time during discussion with the agency that they
18 -- they interpreted the number on the label as
19 being an end-of-shelf-life potency.
20       So up till then, the agency and the --
21 and Merck believed it to be a release potency.
22 And I have to believe so because they release our
23 lots as well.
24    Q.  So you're saying that somehow the FDA
25 affirmatively said we're interpreting that as a

92 (Pages 362 - 365)

Appx19439

HIGHLY CONFIDENTIAL

Page 366

1 release potency?
2     A.  No.  I'm interpreting.  They -- they
3 actually test our lots against the -- the -- the
4 -- the limit on potency themselves.  So they were
5 using the same limit as we were.  So --
6     Q.  So --
7     A.  -- we were coming to grips with what --
8 the testing they were doing and the testing we
9 were doing in relation to what the number that was
10 put on the label.
11     Q.  So if the 4.3 on the label was treated as
12 a release potency up to some point in time, during
13 that time what did you think the index -- what did
14 Merck think the index prepotency was?
15     MS. HARDWAY:  Object to form.  He can't
16 speak for the whole company.
17 BY MR. MACORETTA:
18     Q.  You can answer that.
19     MS. HARDWAY:  If you know.
20     THE WITNESS:  I can answer what I think
21 it was.
22 BY MR. MACORETTA:
23     Q.  Well --
24     A.  There was a study performed by Maurice
25 Hilleman in the early days of the MMR vaccine in

Page 367

1 which he got adequate clinical response at
2 potencies that were close to two logs lower than
3 the -- the potency put on the label.
4     So I personally was confident in both
5 Maurice Hilleman's work and the fact that we had
6 demonstrated already that it was adequately potent
7 or immunogenic in -- clinical trials.
8     We strove to discover the relationship
9 between that study and the overage that he elected
10 to put into the vaccine because he knew that the
11 components were unstable and that we were using a
12 variable assay, but we never found the formal
13 documentation to link that.  So we were left with
14 the potencies that were on the labels as a point
15 to begin with.
16     Q.  So if the label said -- let's take 1997
17 as a date where this issue of whether the 4.3
18 means -- at rerelease is still unresolved.
19     A.  Uh-huh.
20     Q.  And you're telling me that in 1997, Merck
21 interpreted as a release potency.
22     A.  Yes.
23     Q.  4.3.
24     A.  It was a compendial limit and -- in the
25 EU.  And we were using the compendial limit in the

Page 368

1 EU, which is meant as a release limit.
2     Q.  Okay.  That's in 1997.  So then in 1997
3 you were doing annual stability studies, right?
4     A.  We were doing them throughout the history
5 of the vaccine.
6     Q.  Okay.  At what number -- what was out of
7 specification on those annual stability studies in
8 1997?
9     A.  I can't say.
10     Q.  Well, would it have been the -- the
11 whatever number you just referenced at 3.1 or
12 whatever it was?
13     MS. HARDWAY:  Object to form.  Asked and
14 answered.
15     THE WITNESS:  I can't answer.
16 BY MR. MACORETTA:
17     Q.  Well, where would we find the answer to
18 that?
19     A.  I don't know.  I was not working in the
20 Merck manufacturing division to make those
21 assessments.
22     Q.  So let me try it again:  Why was
23 resolving the expiry potency an issue of accuracy
24 of the label?  Was the label not accurate if this
25 was not resolved?

Page 369

1     A.  No.  No.  We were working towards -- and
2 again, three efforts to make the label accurate.
3     Q.  But what -- but that implies that the
4 label wasn't accurate at the time.  So was it?
5     MS. HARDWAY:  Object to form.  He's
6 already answered that.
7 BY MR. MACORETTA:
8     Q.  Well, you said accuracy, to resolve
9 accuracy of the label.  What did you mean
10 "accuracy of label"?
11     A.  It means that we can stand behind it with
12 good scientific data and a good control strategy
13 from some point forward.
14     Q.  Okay.  And according to this, you told
15 the FDA that a resolution of the expiry potency is
16 important to accuracy of the label, right?
17     A.  Three -- three pillars.  Our three
18 pillars.
19     Q.  That's right.  But if you need resolution
20 of the expiry potency for label accuracy, does
21 that mean that the label is not accurate without
22 resolution of the potency?
23     MS. HARDWAY:  He's already answered this
24 now a couple of times.
25     MR. MACORETTA:  Granted, I've asked it a

93 (Pages 366 - 369)

Appx19440

HIGHLY CONFIDENTIAL

Page 370

1 couple times. But okay.
2 BY MR. MACORETTA:
3   Q. You can answer.
4       MS. HARDWAY: Can you please read back
5 the question?
6       MR. MACORETTA: Go ahead.
7       (The reporter read the record as
8       requested.)
9       MS. HARDWAY: He's already answered that
10 question about --
11       THE WITNESS: I'll answer it as I've
12 tried to answer before. I don't know what the
13 label potency meant at that point in time, so I
14 can't speak to the accuracy of the label at that
15 point in time.
16 BY MR. MACORETTA:
17   Q. If --
18   A. Because there were ongoing discussions
19 with the agency about this and -- and again, three
20 approaches to -- to improve our understanding of
21 how the label related to the science.
22   Q. So it's your testimony today that, in
23 2002, Merck and the FDA had not reached agreement
24 on what the 4.3 on the label meant?
25       MS. HARDWAY: Object to form. That's not

Page 371

1 what he said.
2       THE WITNESS: I don't know is what I
3 said. This was a work that didn't happen
4 immediately.
5 BY MR. MACORETTA:
6   Q. The next-to-last bullet point: "Merck
7 considers upper release limits for measles, mumps,
8 and rubella. Limits based on product in field."
9       What does that mean that the limits are
10 based on products in the field?
11   A. That may be misrepresented. You asked me
12 about SPC. There was an upper limit set for the
13 product -- and because potency can't increase over
14 time -- to control the upper limit of potency that
15 could be -- could be released to the market.
16       SPC, statistical process control, is the
17 method for determining both a lower and upper
18 limit, but in this case supported the upper limit.
19   Q. So what is "based on product and field"
20 mean?
21   A. Product released is the more accurate
22 assessment because product in field is released
23 and maybe decreases in potency. But if we put an
24 upper limit, it's product at release.
25   Q. I don't understand. So you're

Page 372

1 considering upper release limits, and it says
2 limits are based on product -- I'll use your
3 word -- released.
4       What does it mean that the limits are
5 based on product released? Does that mean you're
6 not doing a clinical test?
7       MS. HARDWAY: Object to form.
8       THE WITNESS: This was the agreement with
9 the agency, to the best of my knowledge.
10       I do believe that Merck did undertake
11 passive surveillance investigations to see if
12 product in the market had any trends with
13 differences in potency on the market. So it was
14 supported by not a clinical trial but by passive
15 surveillance, which is data collected by the --
16 the FDA.
17 BY MR. MACORETTA:
18   Q. So that's what you mean by product in
19 field?
20   A. No, I don't --
21   Q. Passive surveillance?
22   A. -- mean a by product in field. I'm
23 answering your question about, you know, is there
24 a safety concern with the product.
25   Q. That was not my question.

Page 373

1   A. Well, then --
2   Q. My question is, what do you mean by
3 product in field?
4       MS. HARDWAY: Sir. Were you -- let me
5 just -- were you done with your answer? Because I
6 think -- my impression was that you were not.
7 BY MR. MACORETTA:
8   Q. I apologize if you were not. I didn't
9 mean to cut you off.
10   A. Well, I would like to hear the question
11 again so that I can better try --
12   Q. Let me --
13   A. -- to understand your question.
14   Q. -- try it again.
15       What does it mean that limits based on
16 product in field? What does "products in field"
17 mean in that sentence?
18   A. Product that had been released to the
19 market.
20   Q. Okay. So what did you do with product
21 that had been released to the market to consider
22 upper release limits?
23   A. We calculated the release distributions
24 for the product and performed an SPC analysis to
25 determine what the distribution of product

94 (Pages 370 - 373)

Appx19441

HIGHLY CONFIDENTIAL

Page 374

1 released was; most importantly, what was the
2 highest level of potency of product released to
3 the field.
4      Q.  Why did you need to know that?  Didn't
5 you measure release potency at this time?
6          MS. HARDWAY:  Object to form.  And
7 foundation.
8          THE WITNESS:  The data -- yes, yes.  We
9 have the release potencies of the product.  You
10 have a hundred numbers for a hundred release lots,
11 and you calculate, then, what is the distri --
12 from that hundred lots or more, what is the
13 distribution of those hundred lots that were
14 released to the market.
15          The upper release limit, which was at the
16 advice of the agency, the upper three-sigma limit
17 of the manufactured distribution for the
18 product -- I refer back to SPC.  An upper
19 three-sigma limit is a standard SPC rule to
20 control release of manufactured product.
21 BY MR. MACORETTA:
22      Q.  I don't under -- let me try this again.
23 If you released 100 lots and the highest release
24 potency of any lot is -- I'm going to make up a
25 number -- 5.4.  Okay.  That's the distribution

Page 375

1 you're talking about, right?  We look at the
2 actual measured release potency of those hundred
3 lots?
4      A.  Yes.
5      Q.  Okay.  The highest of any of them is a
6 hun -- is 5.4.  How does that impact -- are you
7 then using that to consider some release -- upper
8 release limit above 5.4?
9          MS. HARDWAY:  Object to form.
10         THE WITNESS:  The statistical calculation
11 advised by the agency was to calculate a
12 three-sigma interval.
13 BY MR. MACORETTA:
14      Q.  Does that mean three standard deviations
15 above the highest number you had?
16      A.  Above the mean of the distribution of the
17 lot.
18      Q.  Above the mean of the distribution of
19 all?  Okay.
20      A.  Yeah.
21      Q.  Okay.  There we go.  Even if you had
22 never released the lot at that potency?  That
23 actual potency?
24      A.  That's how it's usually done.
25      Q.  Okay.

Page 376

1      A.  And that's how we were advised to do it.
2      Q.  Let me show you what we're going to mark
3 as 27.
4          (Schofield Deposition Exhibit 27 marked
5           for identification and attached to the
6           transcript.)
7 BY MR. MACORETTA:
8      Q.  Okay.  27.  And I'm trying to understand
9 the minutes from MMR II end-expiry analysis
10 meeting held 8/26/98.  And you're cc'd on this,
11 right?  Or I'm sorry, you're on -- you're on the
12 "to" line of this, right?
13      A.  Uh-huh.
14      Q.  So were you involved in discussing the
15 method of analysis to be performed by biometrics
16 research for the results of the preliminary MMR
17 end expiry experiment?  Well, first of all, let me
18 back up.
19          What is the preliminary MMR II end -- or
20 expiry experiment (stability study)?
21      A.  I don't know.  I don't recall.
22      Q.  Okay.  And then it says "results are
23 analyzed."  And it says, "Standard operating
24 procedures dictate if the house standard is out of
25 the acceptable range the potency results are not

Page 377

1 read."
2          Do you see that?
3      A.  Yes, I do.
4      Q.  Is that standard operating procedure for
5 just that study, or is that kind of generally the
6 standard operating procedure?
7      A.  It's a --
8          MS. HARDWAY:  Object to form.
9          THE WITNESS:  It's a system suitability
10 test that -- that invalidates the results from
11 the -- from the testing.
12 BY MR. MACORETTA:
13      Q.  Okay.  So if the house standard is out of
14 its acceptable range, that means the test is not
15 accurate for -- or that indicates to you that the
16 test naught accurate?
17      A.  It indicates the test may be behaving out
18 of control for that particular run.
19      Q.  Okay.
20      A.  SPC.
21      Q.  Uh-huh.
22          However, it says here, "Biometrics
23 research feels that for this experiment, all of
24 the results should be read regardless of the house
25 standard being out of range."

95 (Pages 374 - 377)

Appx19442

HIGHLY CONFIDENTIAL

Page 378

1        Why is that?
2        MS. HARDWAY: Object to form and
3 foundation.
4        THE WITNESS: I don't know.
5 BY MR. MACORETTA:
6        Q. I mean, isn't the whole point of
7 having -- using one of the points of having the
8 house standard to act as a control?
9        MS. HARDWAY: Object to form and
10 foundation.
11        THE WITNESS: You use the house standard
12 to control results that may be used to make a
13 decision for that particular test. There are
14 reasons sometimes for looking at all the data. In
15 fact, there are circumstances where the agency
16 will ask us to look at all the data even though
17 the -- some -- some of the data have tags on them
18 that say that these are invalid because they'd
19 like a better assessment of the -- the whole
20 picture.
21 BY MR. MACORETTA:
22        Q. But you're not suggesting that's what
23 happened here, right? You decided --
24        A. I don't --
25        MS. HARDWAY: I'm --

Page 379

1        THE WITNESS: I'm simply giving you a --
2        MS. HARDWAY: I'm sorry, let me just make
3 sure. When you say "you're not suggesting that's
4 what happened here," are you talking about the
5 memo?
6 BY MR. MACORETTA:
7        Q. This memo says that -- well, you're
8 biometrics research, right? That was you? That
9 was your group?
10        A. I was head of biometrics research.
11        Q. Okay. So biometric research feels that,
12 for this experiment, all the results should be
13 read regardless of the house standard being out of
14 range, right? Do you see that?
15        A. Yes.
16        Q. And you're not suggesting -- or are you
17 saying today that the reason biometrics research
18 felt that way is because the agency said read it
19 all anyway?
20        A. No, no --
21        MS. HARDWAY: Object to form.
22 BY MR. MACORETTA:
23        Q. No?
24        A. No, I'm not saying that. I'm saying -- I
25 was giving you an example of where it might be --

Page 380

1 there are experiences where you might like to look
2 at all the data if it's not in the context of
3 releasing a lot.
4        Q. And then below, the last paragraph says,
5 "Since this preliminary experiment will be used to
6 determine the time points at which the material
7 for use in the clinic will reach certain
8 potencies, it is very important that we are
9 confident in the results."
10        Do you see that?
11        A. Yes, I do.
12        Q. So is this talking about the aging study
13 now?
14        A. If by aging study you mean vaccine aging
15 study, I -- it seems to be.
16        Q. Okay. And you agree that it was very
17 important that you're confident in the results?
18        A. We needed to have a result that we were
19 confident in as a basis for declaring the
20 end-of-shelf-life limit. So statistically, the
21 more data you have, the better an estimate you'll
22 have of the end-of-shelf-life limit that you're
23 going to be using.
24        Q. Even if that data is outside the
25 acceptable range?

Page 381

1        A. The accept --
2        MS. HARDWAY: Object to form.
3        THE WITNESS: The acceptable range is
4 therefore protection of the release of -- of
5 commercial material. It's not there for studies
6 that are performed for other purposes.
7 BY MR. MACORETTA:
8        Q. Well, then what's the point of applying
9 to the house standards to this study, then, if
10 you're going to -- if you're going to take things
11 outside the acceptable range?
12        MS. HARDWAY: Object to form.
13        THE WITNESS: The use of the house
14 standard and the SPC rule for the house standard
15 is used specifically for the release of materials
16 through a release test. When you use the assay
17 for other purposes, there are extenuating
18 circumstances that may -- may require you to
19 consider alternative ways of -- of collecting the
20 data and using the data.
21 BY MR. MACORETTA:
22        Q. And you don't know what the extenuating
23 circumstances are here, right?
24        A. It's very important we have a confidence
25 in the results. That's the extenuating

96 (Pages 378 - 381)

Appx19443

Page 382

1 circumstance.
2    Q. So you would have more confidence in the
3 results if you used data that was outside the
4 house standard acceptable range?
5       MS. HARDWAY: Object to form.
6       THE WITNESS: For the purpose of
7 determining the end of shelf life -- or I should
8 say the expiry potency value for the lot that was
9 being aged, it was deemed important that we have
10 all the data.
11 BY MR. MACORETTA:
12    Q. Deemed by who? Biologics research --
13 biometrics research?
14    A. The team. This was --
15    Q. Of which you were a member.
16    A. Not just a vaccine biometrics research.
17 We're making a recommendation and making the case
18 for that how important it is to get a number that
19 we're -- that's we're -- that's accurate and
20 precise for the end of shelf -- end-of-shelf-life
21 lot.
22    Q. And how -- and I don't understand how
23 that number would be more accurate and precise if
24 you used data that was outside your own acceptable
25 range. That's what I'm trying to understand.

Page 383

1    A. Because numbers, when calculated through
2 statistical eval -- evaluation, if you like, iron
3 out the rare aberrations that happen that you want
4 to protect against when you're releasing material
5 to the commercial market.
6       There's a different standard you might
7 hold the measurement results to when you have an
8 aggregate of numbers you're collecting for a lot
9 over a course of an accelerated aging of a lot.
10 More numbers overrides the rules that are used for
11 another decision, which is releasing lots to the
12 market, which don't receive so large a number of
13 numbers.
14       MR. MACORETTA: Hold on one second.
15       (Discussion off the record.)
16 BY MR. MACORETTA:
17    Q. Okay. Let me show you what we're going
18 to mark as Schofield 28.
19       (Schofield Deposition Exhibit 28 marked
20       for identification and attached to the
21       transcript.)
22 BY MR. MACORETTA:
23    Q. Let me know when you've had a chance to
24 look at Schofield 28.
25       All right. I'm interested in the e-mail

Page 384

1 at the top that's from you, Mr. Schofield.
2    A. Uh-huh.
3    Q. It says, "There's a misconception that
4 calibration necessarily improves assay
5 variability."
6       And you're talking about house standard
7 calibration, right?
8    A. Yes.
9    Q. Then you say, "In fact, if the assay is
10 in perfect control, calibration increases
11 variability."
12       Is that true?
13    A. That's true.
14    Q. Okay. So then -- well, what does assay
15 in perfect control mean in that sentence?
16    A. That the variability of the uncalibrated
17 results are precise. Not in the sense of perhaps
18 the control you -- we were talking about
19 previously.
20    Q. And was it the case that you didn't think
21 the mumps assay was in perfect control?
22       MS. HARDWAY: Object to form.
23       THE WITNESS: The mumps assay was in
24 control according to the procedures that were in
25 place for the mumps assay.

Page 385

1 BY MR. MACORETTA:
2    Q. Then why did you need a house standard?
3 Wouldn't that have increased variability?
4       MS. HARDWAY: Object to form.
5       THE WITNESS: The premise is there -- you
6 have to evaluate whether you improve the precision
7 with adjustments of the house standard or not.
8 And evaluations can be done to show the relative
9 precisions of the two procedures, unadjusted and
10 adjusted.
11 BY MR. MACORETTA:
12    Q. So was that done for mumps?
13    A. I have --
14    Q. The evaluation.
15    A. I have no basis for -- from this memo
16 knowing whether it was done or not.
17    Q. Well, from anything. And put aside this
18 memo. Do you know if it was done or not?
19    A. I don't know for certain.
20    Q. If it was done, is that something your
21 group would have done?
22    A. Likely our group would have done it
23 together with the testing laboratory.
24    Q. Okay. In the last sentence of that first
25 paragraph, "Thus calibration would help in the

97 (Pages 382 - 385)

HIGHLY CONFIDENTIAL

Page 386

1 case of a .1 log shift in the assay -- that, or
2 put .1 log more in the vaccine to protect the
3 vaccinee against the potential shift."
4     Do you see that?
5     A. Uh-huh.
6     Q. But calibration wouldn't actually put
7 more vaccine -- it wouldn't put more product in
8 the vaccine, right?
9     A. No. It would improve the precision.
10    Q. Okay. So what does it mean that it would
11 put .1 log more in the vaccine to protect the
12 vaccinee?
13    A. I'm not absolutely sure what I meant in
14 interpreting that. But it has -- to your original
15 question -- nothing to do with putting more virus
16 in the vaccine. It's a matter of the -- the use
17 of the assay and the precision.
18    Q. Okay. So it's not -- so the house
19 standard is not actually protecting the vaccinee
20 in any way, right?
21    A. The measurement of test lots is a matter
22 -- a closer matter to protecting the vaccinee.
23    Q. Okay.
24       MR. MACORETTA: I'm going to show you
25 what we're going to mark as 29 and 30. That's 30.

Page 387

1     29, I'm giving Mr. Schofield my only
2 other copy of it. So it's a one pager. You can
3 look over his shoulder or whatever you want to do,
4 but that's what I have for now.
5     But 30, I have copies for everybody.
6       (Schofield Deposition Exhibits 29 and 30
7       marked for identification and attached to
8       the transcript.)
9 BY MR. MACORETTA:
10    Q. 29 is an e-mail from you to Dorothy
11 Margolskee, right, Mr. Schofield?
12    A. Yes, it is.
13    Q. And mister -- Ms. Margolskee is in
14 manufacturing?
15    A. Dorothy Margolskee was vice-president and
16 head of vaccines.
17    Q. So --
18    A. In MRL.
19    Q. In MRL?
20    A. Yes.
21    Q. Okay. And the sent -- the subject is
22 "Low Mumps Target Lots Within Expiry."
23       What does that mean?
24       MS. HARDWAY: Object to form.
25 Foundation.

Page 388

1       THE WITNESS: I have no idea.
2 BY MR. MACORETTA:
3     Q. Okay. And indeed, if we look at the
4 attachment, which is Exhibit 30, it says "Total
5 Doses on Low Mumps Titer Lots Within Expiry."
6       Do you recollect creating this
7 spreadsheet?
8     A. No, I don't.
9     Q. So you don't know what that title means?
10    A. Well, it contains -- no, I don't know
11 what the title means.
12    Q. Okay. We're going to look at the content
13 in a second.
14       Then it says here, "Dorothy, here's the
15 spreadsheet I was working on. A couple of ideas.
16 Number one," it says, "I spoke with Joe Antonello,
17 who's doing the evaluation of the validation data,
18 and he suggested we look at the dilution response
19 profiles to see if the negatives were marginal or
20 strictly flat."
21       Do you know what he's talking about --
22 what you're talking about there?
23    A. No, I don't recall.
24    Q. And what does it mean -- you say, "In
25 addition, it could be interesting to see what the

Page 389

1 rates would be at 40 percent neutralization."
2       Do you see that? Do you know what that
3 relates to?
4     A. Neutralization means -- the only thing I
5 can suspect is the mumps neutralization assay.
6     Q. So if we're -- because to me, it does not
7 seem that your .1 here relates to the spreadsheet
8 that's attached, which doesn't relate to the
9 neutralization assay, right? It has a list of a
10 bunch of mumps lots and their potency.
11    A. True.
12    Q. Okay. So do you see a connection between
13 the attached spreadsheet and your point number
14 one?
15    A. No.
16    Q. Okay. Same -- I'm going to ask the same
17 question for point number two about a better
18 probability of success and retesting the failures.
19       So do you understand what that point
20 number two is in relation to the spreadsheet?
21    A. They're talking about wild type newt.
22 This is talking about manufactured material.
23    Q. So point number two doesn't seem to
24 relate to whatever's on the spreadsheet, right?
25    A. Right.

98 (Pages 386 - 389)

Appx19445

HIGHLY CONFIDENTIAL

Page 390

1  Q. Okay. And in number 2, you're retesting
2 the failures and some marginal positives in the
3 wild type newt.
4    Are you talking about the 007 protocol
5 samples here?
6  A. I can't tell for sure. There's nothing
7 mentioned about the 007.
8  Q. Sure. "This is an alternative
9 customarily used in the serology laboratory to
10 holding ourselves to a fold-rise criterion."
11    Do you see that?
12  A. Yes, I do.
13  Q. So retesting is an alternative to the
14 fold-rise criterion. Is that what you mean there?
15  A. I can't say for sure.
16  Q. Okay. And "the strategy is a
17 best-out-of-three rule." Do you know what that
18 is?
19  A. I can't say for sure.
20  Q. Okay. So I'm going to look at number 30,
21 which is your spreadsheet.
22  A. I --
23  Q. Which is the spreadsheet that's attached.
24  A. Yes. I was -- yes.
25  Q. Okay. And you're -- so these are the

Page 391

1 released potencies, right? Is that your
2 understanding of per mL and per dose?
3    MS. HARDWAY: I'm going to object to
4 foundation. I think the -- the e-mail to Dorothy
5 Margolskee says that "here's the spreadsheet I was
6 working from." I don't know that it's -- I don't
7 know that you've asked him. But I certainly don't
8 think it's clear that he's authored this
9 Exhibit 30.
10 BY MR. MACORETTA:
11  Q. Well, do you have any reason to believe
12 this is not the spreadsheet you were working from?
13  A. Yes.
14  Q. You do have a reason to believe that? Or
15 you --
16  A. Yes. It's not the spreadsheet I was
17 working from.
18  Q. Okay. What -- how do you know that?
19  A. This is manufacturing data, this is
20 talking about apparently PRN data.
21  Q. Okay.
22  A. And I've never seen such a spreadsheet.
23 This is a commercial product or commercial vehicle
24 for looking at...
25  Q. Okay. So you just don't know what this

Page 392

1 spreadsheet's about?
2  A. I don't see these kinds of
3 spreadsheets in -- or we didn't see these kinds of
4 spreadsheets in our jobs.
5  Q. So you wouldn't know why you would have
6 it?
7    MS. HARDWAY: Object to form.
8 BY MR. MACORETTA:
9  Q. If, indeed, you did have it.
10  A. I don't know why I would have it -- have
11 it if, indeed, I did have it.
12  Q. Okay.
13    MR. MACORETTA: You know what? Why don't
14 you give us a couple minutes, Kathy. We're
15 probably close to the end here, I just want to see
16 what else.
17    MS. HARDWAY: Okay.
18    MR. MACORETTA: All right?
19    VIDEO TECHNICIAN: Off the record at 6:50
20 p m.
21    (A recess was taken.)
22    VIDEO TECHNICIAN: We are going back on
23 the record at 7:13 p m.
24 BY MR. MACORETTA:
25  Q. All right. Mr. Schofield, we're back on

Page 393

1 the record. In addition to the stability models
2 we've talked about before, Merck has produced
3 documents related to something called the realtime
4 stability monitoring program.
5    Do you know what that is?
6  A. Not offhand, no.
7  Q. Is that something you've heard of before?
8  A. I've heard it, but I can't place it.
9  Q. Was it something you worked on?
10  A. Something I've heard of. I'm not sure
11 whether I worked on it or not.
12  Q. Okay.
13    MR. MACORETTA: I'm going to talk about
14 GSK issues for a few minutes, and then I think
15 we're going to be done.
16 BY MR. MACORETTA:


99 (Pages 390 - 393)

HIGHLY CONFIDENTIAL



Page 394

1

14 BY MR. MACORETTA:
15    Q. She objected to the form. But you can
16 answer it.
17    A. Please repeat the question.
18    Q. Sure. Let me break it down.
19       We had some discussions today about
20 different stability models used by Merck, right?
21    A. Uh-huh.

Page 395

1    Q. Okay. We had some discussions today
2 about whether or not Merck may or may not have
3 been out of label compliance at certain times,
4 right?
5       MS. HARDWAY: Object to form.
6 BY MR. MACORETTA:
7    Q. I'm not saying that you admitted that
8 they were, I'm saying we talked about whether or
9 not they were.
10    A. We talked about it.

Page 396

3    Q. Okay.
4       MR. MACORETTA: That's all the questions
5 I have today. Thank you.
6       MS. HARDWAY: We're just going to
7 actually take a couple-minute break. And we may
8 have a couple of questions for the witness.
9       MR. MACORETTA: Sure.
10       MS. HARDWAY: And we'll let you know
11 definitively one way or the other.
12       MR. MACORETTA: Sure.
13       MS. HARDWAY: But they won't have
14 anything to do with GSK.
15       MS. WEISSER: Okay.
16       MR. HARDWAY: I can represent that,
17 anyway.
18       MR. MACORETTA: And I'll be limited to
19 asking you about what they ask, so I'm sure I
20 won't have anymore GSKs either.
21       MS. WEISSER: All right.
22       VIDEO TECHNICIAN: Going off the record
23 at 7:16 p.m.
24       (A recess was taken.)
25       VIDEO TECHNICIAN: We're going back on

Page 397

1 the record at 7:29 p.m.
2       MS. HARDWAY: We don't have any questions
3 for the witness.
4       MR. MACORETTA: Okay. Thank you,
5 Mr. Schofield. We appreciate your cooperation
6 today. Thank you.
7       MS. HARDWAY: Thank you.
8       THE WITNESS: Thank you.
9       VIDEO TECHNICIAN: We're going off the
10 record at 7:29 p.m.
11       (Whereupon, at 7:29 p.m., the highly
12       confidential videotaped deposition of TIM
13       SCHOFIELD was concluded.)
14
15
16
17
18
19
20
21
22
23
24
25

100 (Pages 394 - 397)

Appx19447

HIGHLY CONFIDENTIAL

Page 398

```
1        ACKNOWLEDGMENT OF DEPONENT
2        I, TIM SCHOFIELD, do hereby certify
3   that I have read the foregoing transcript of my
4   testimony taken on 3/20/17, and further certify
5   that it is a true and accurate record of my
6   testimony (with the exception of the corrections
7   listed below):
8   Page   Line         Correction
9   ____|____|_____|_____
10  ____|____|_____|_____
11  ____|____|_____|_____
12  ____|____|_____|_____
13  ____|____|_____|_____
14  ____|____|_____|_____
15  ____|____|_____|_____
16  ____|____|_____|_____
17  ____|____|_____|_____
18  ____|____|_____|_____
19  ____|____|_____|_____
20  ____|____|_____|_____
21       _____
           TIM SCHOFIELD
22
    SUBSCRIBED AND SWORN TO BEFORE ME
23  THIS _____ DAY OF _____, 20___.
24
    _____    _____
25  (NOTARY PUBLIC)    MY COMMISSION EXPIRES:
```

Page 399

```
1        CERTIFICATE OF NOTARY PUBLIC
2        I, CHRISTINA S. HOTSKO, the officer before
3   whom the foregoing deposition was taken, do hereby
4   certify that the witness whose testimony appears in
5   the foregoing deposition was duly sworn by me; that
6   the testimony of said witness was taken by me in
7   stenotypy and thereafter reduced to typewriting under
8   my direction; that said statement is a true record of
9   the proceedings; that I am neither counsel for,
10  related to, nor employed by any of the parties to the
11  action in which this statement was taken; and,
12  further, that I am not a relative or employee of any
13  counsel or attorney employed by the parties hereto,
14  nor financially or otherwise interested in the
15  outcome of this action.
16
17
18       CHRISTINA S. HOTSKO
19       Notary Public in and for the
20            District of Columbia
21  My commission expires:
22  November 14, 2021
23
24
25
```

101 (Pages 398 - 399)

Appx19448

11/26/2019
Declaration of G. Reilly
EXHIBIT 381

 **MERCK**

Vaccine Biometrics Research

February 27, 2001

| | | |
|---|---|---|
| TO: | KEITH CHIRGWIN | BL A-34 |
| | ROBERTA McKEE | WP 36M-5 |
| FROM: | Philip S. Bennett | WP37C-305 |
| SUBJECT: | Mumps Stability and Potency Estimations | |
| cc: | K. Abraham, J. Clair, J. Heyse, C. Morrisey, M. Morsy, M. Rosolowsky, T. Schofield, PF, RIWP, BR, STATFILE | |

Two analyses of the mumps stability data has been performed in response to a request by CBER. The first looks at a hypothetical lot with a known potency equal to the minimum release specification; the second evaluates our current production practices.

**Expiry Potency Estimation for Product at the Minimum Release Titer** (For lots made prior to 9/13/99, the minimum release specification was 4.3 $\log_{10}$ TCID$_{50}$ per 0.5 mL dose.)

The estimated average potency ($\log_{10}$ TCID$_{50}$ per 0.5 mL dose) at expiry is estimated to be 3.6 (95% lower confidence bound = 3.3) for product made with an initial titer of 4.3.

This estimate is based on the data and summary statistical analyses previously provided to CBER. The following mumps stability estimates are given in the submission of October 24, 2000, on page 104:

| Date of Manufacture | | Shelf Life Loss |
|---|---|---|
| 1/95 to 5/98 | average | 0.703 |
| | no. of lots | 20 |
| | std dev | 0.222 |

Thus, for product with an initial potency of 4.3, the expected potency at expiry is simply:

$$4.3 - 0.7 = 3.6.$$

The lower 95% confidence bound is calculated by including a factor accounting for the variability (uncertainty) of this estimate. Since the observed standard deviation of 0.222 reported above includes variability due to the release potency assay (std dev of 3x1 assay = 0.14), a revised value for the variability of the loss estimate is calculated as follows:

$$\text{Std Dev}_{(Loss)} = \sqrt{(\text{Std Dev}_{(Total)})^2 - (\text{Std Dev}_{(3x1\,assay)})^2}$$

Philip S. Bennett
652-5936
u\word\lvv\mmr\m010204 mumps

p. 1 of 2

CONFIDENTIAL

$$= \sqrt{(0.222)^2 - (0.14)^2}$$

$$= 0.172$$

From these values, the lower 95% confidence bound at expiry for product with an initial mumps potency of 4.3 is calculated as:

$$4.3 - 0.703 - (1.645 \times 0.172) = 3.3.$$

**Current Product** (For product manufactured on and after 9/13/99, the minimum release specificaiton for mumps is 5.0 $\log_{10}$ $TCID_{50}$ per 0.5 mL dose.)

A similar analysis can be performed to estimate the lower 95% confidence bound on product currently being manufactured with a target fill of 5.2 $\log_{10}$ $TCID_{50}$ per 0.5 mL dose and released based on a 1x6 assay. The expected average loss remains 0.703. However, the total variability must include a factor for the uncertainty in the release potency estimate. The standard deviation of the mumps 1x6 assay is 0.09. Combining this with the variability calculated above for the loss yields:

$$\text{Std Dev}_{(Total)} = \sqrt{(\text{Std Dev}_{(Loss)})^2 + (\text{Std Dev}_{(1x6\ assay)})^2}$$

$$= \sqrt{(0.172)^2 + (0.09)^2}$$

$$= 0.194$$

From these values, the lower 95% confidence bound for the loss from release through expiry for mumps is calculated as:

$$0.703 + (1.645 \times 0.194) = 1.02.$$

Given our current minimum release specification limit of 5.0, we have 95% confidence that each lot released will be at or above 4.0 through expiry.

Please call with any questions.

**CONFIDENTIAL**

MRK-KRA01896073
MRK-CHA01896073

Appx19451

11/26/2019
Declaration of G. Reilly
EXHIBIT 382

**To:** Morrisey, Cynthia F[cynthia_morrisey@merck.com]
**Cc:** Rosolowsky, Mark[mark_rosolowsky@merck.com]; Schofield, Timothy L[timothy_schofield@merck.com]; Petroski, Christopher J.[christopher_petroski@merck.com]; Wong, Sally S[sally_wong@merck.com]; Chirgwin, Keith D.[keith_chirgwin@merck.com]
**From:** Bennett, Philip S.
**Sent:** Fri 1/18/2002 9:54:11 AM
**Importance:** Normal
**Subject:** RE: Mumps End Expiry

You are correct. The picture does not look good if we must short date Mumps to assure 3.6 (4.3 per dose) at expiry with 95% confidence for release at 5.0.
With some creative math and the updated stability data for fills made 1995-1999, the shelf life is about 15-16 months.
The early loss of the newer lots (high liter) appears steeper. In the graphs below, we remain above 3.6 beyond 18 months (548 days), but these weren't released at 5.0. There were 9 lots with an average of 5.3, range 5.1 to 5.7.
For lots released at 5.0, we can loose no more than 0.7 log. This happened in 1 lot at 1 year and in 2 other lots at 18 months.





-----Original Message-----

CONFIDENTIAL

MRK-KRA00094849
MRK-CHA00094849

Appx19453

**From:**    Morrisey, Cynthia F
**Sent:**    Thursday, January 17, 2002 5:51 PM
**To:**    Bennett, Philip S.
**Cc:**    Rosolowsky, Mark; Schofield, Timothy L; Petroski, Christopher J.;
Wong, Sally S; Chirgwin, Keith D.
**Subject:**    Mumps End Expiry

Phil-

Keith called me this afternoon, and would like to put together some key points regarding a back up plan if reduction of end expiry to 4.0 gets further delayed. As it is, it would be a minimum of about 1 1/2 years until 4.0 would be approved.

One of the back up plans that we have already discussed is short dating. Keith's question to me was: what is the expiry period that is supported, with 95% confidence, by our current product which is released at 5.0? My recollection is 13.6 months, but I was not positive that 5.0 release was used for this calculation. Even if it was, we have more recent data for "high mumps" lots that we could use in this calculation.

Would it be possible to re-calculate the short dating shelf life, just so that we are all on the same page in any further discussion of this option? Let Sally know if you need any additional stability data from us for this. Thanks!!!

*Cindy Morrisey*
*Vaccine Regulatory and Analytical Sciences*

**CONFIDENTIAL**

11/26/2019
Declaration of G. Reilly
EXHIBIT 383

CURRICULUM VITAE

**Manal Anwar Morsy, M.D., Ph.D., MBA**

ADDRESS:        189 Canterbury lane, Blue Bell, PA, 19422        email: morsym@gmail.com
                Mobile (215) 688-0060    Home (610) 239-7025    Fax.(610) 239-7025

RESIDENT STATUS:    U.S. Citizen

**EXPERIENCE / POSTS:**

2013-present    Vice President, Head Global Regulatory Affairs, Athersys, Inc. Cleveland, OH
                Cell Therapy, Oncology / Graft versus Host Disease,  Solid Organ transplant, Cardiovascular,
                Neurology, Ophthalmology, Digestive System/Ulcerative Colitis, Immunology, Peripheral Vascular
                Disease and Rare (Orphan) Disorders.
                Executive Management Team Member

2007–2012       Vice President, Head Global Regulatory Affairs – PTC Therapeutics, Inc., South Plainfield, NJ
                Neurology, Pulmonary, Hematology, Oncology, Metabolic and Rare (Orphan) Disorders
                Executive Management Team Member

2004 –2007      Senior Director, Global Regulatory Affairs – Virology and Anti-infectives Franchise
                Tibotec Inc. - Johnson & Johnson, Yardley, Pennsylvania (2004-2007)
                Global Regulatory Leader - Pediatric development across all products – Virology Franchise (2006-2007)
                Global Regulatory Leader – HIV PREZISTA™ Program (2006-2007)
                Global Regulatory Leader –TB Orphan Drug Development and HIV Programs (2004-2007)
                Licensing Lead (Business Development) on HCV and HBV in-licensing opportunities, including Tibotec -
                Vertix partnership (2005-2007)
                US Regulatory Leader – HIV PREZISTA™ Program (2004-2006)
                Tibotec Leadership Team Member – US Management – Tibotec, Yardley, PA (2004-2007)

1995 - 2004     Director, Worldwide Regulatory Affairs - Vaccines and Biologics. Merck Research Laboratories, Blue Bell,
                Pennsylvania, focused on development of MMR®II (measles, mumps and rubella), ProQuad® (measles,
                mumps, rubella and varicella), RotaTeq® (rotavirus), cancer, and HIV vaccines (2002-2004)
                Associate Director, Worldwide Regulatory Affairs (1999-2002)
                Associate Director, Gene Therapy - Adenoviral platform, Virus and Cell Biology Division, Merck Research
                Laboratories, West Point, Pennsylvania (1997-1999)
                Research Fellow, Gene Therapy, Department of Human Genetics, Merck Research Laboratories, West
                Point, Pennsylvania (1995-1997)

1994-1995       Assistant Professor, Department of Molecular and Human Genetics, Baylor College of Medicine,
                Houston, Texas.

1991–1994       Postdoctoral Fellow (Gene Therapy), Institute for Molecular Genetics, Baylor College of Medicine.
                Mentor: Thomas C. Caskey, M.D.

1992–1993       Postdoctoral Fellow (Diagnostics), Human Genetics Department, Baylor College of Medicine
1986 –1988      Postdoctoral Fellow, Eastern Virginia Medical School, Human Genetics Dept. Mentor: Jack Rary, M.D.
1985 –1986      Instructor / Residency (Pediatric), Human Genetics Department, National Research Center, Cairo, Egypt ,
                Department Head: Samia El Temtamy, M.D., Ph.D.
1984 –1985      House Officer, Alexandria University Hospitals, Alexandria, Egypt

**EDUCATION / DEGREES / CERTIFICATES:**

2003– 2005      Wharton's Certificate of Professional Development (CPD).  University of Pennsylvania –Wharton
2000–2002       MBA – *Beta Gamma Sigma*, Executive MBA – Drexel University, LeBow College of Business
1988–1991       Ph.D. – *Biological Sciences and Molecular Biology*
                Thesis title: *"Pre-clinical models for human pre-embryo biopsy and genetic diagnosis: Mouse model of X-
                linked ornithine transcarbamylase deficiency."*  Old Dominion University/Eastern Virginia Medical School
                Joint Biomedical Sciences Graduate Program. The Jones Institute for Reproductive Medicine.  Advisor:
                Gary Hodgen, Ph.D.
                (Recipient of American Human Genetics Society Award for "Outstanding Research" - 1990)
1977–1984       M.D. (M.B. Ch.B) *Medicine & Surgery*
                Alexandria University, Faculty of Medicine, Alexandria, Egypt
                (Top 1% - Class of 1983 - appointed to National Research Center for Residency – Pediatric/Genetics)
2005            • Wharton School Executive Education – "Building Relationships That Work" June, 2005 towards
                Wharton School Executive Education Certificate of Professional Development.

MORSY 00001

Continue: EDUCATION / DEGREES / CERTIFICATES:

| | |
|---|---|
| 2004 | • Wharton School Executive Education – "Critical Thinking: Real-World, Real-Time Decisions" April, 2004 towards Wharton School Executive Education Certificate of Professional Development. |
| 2003 | • Wharton School Executive Education – "Wharton / Windhover Program for Pharmaceutical and Biotech Executives" May 11-16, 2003 towards Wharton School Executive Education Certificate of Professional Development. |
| | • Wharton School Executive Education - "The Leadership Journey: Creating and Developing Your Leadership" October 19-24, 2003 towards Wharton School Executive Education Certificate of Professional Development. |
| | • American College of Physicians – Continued Medical Education – Update in Internal Medicine Using the MKSAP Program April 8, 2003 and April 15, 2003, 11 credit hours toward AMA Physician's Recognition Award |
| 2001 | • U.S. Regulation of Biologics - CBER Policies and Expectations, Center for Continuous Education, San Diego, CA, June 4 – 6, 2001 |
| | • Executive Leadership: Substance and Style, November 14, 2001, Philadelphia |
| 2000 | • Scientific Writing & Editing for Product Development, Blue Bell, May 14-15. |
| 1999 | • Worldwide Corporate Training & Development Program, November 2-4 1999, |
| | • Immunology Course – April 1999, |
| | • Business / Financial Management – July 1999, |
| | • Crisp Basic Workstation Training – August 1999, |
| | • Clinical Statistics Course – November 1999, |
| | • Facilitating for Results – December 1999 |
| | • Continuing Medical Education - 23.5 credit hours, The American Society of Gene Therapy, 2nd Annual Meeting - June 9-13, 1999, Washington, DC. |
| 1998 | • Continuing Medical Education - 23.5 credit hours, The American Society of Gene Therapy, 1st Annual Meeting, 1998, Seattle, Washington. |
| 1993 | • Genetics Board Review Course, Baylor College of Medicine, May 14-16, 24 credit hours. |
| 1991–1993 | • Molecular Genetics Training program, Baylor College of Medicine - Board eligible. |
| 1990 | • Short Course in Medical and Experimental Mammalian Genetics (Jackson Laboratory / Johns Hopkins University - Jackson Laboratory, Bar Harbor, Maine, July 16-27, 72 credit hours) |
| 1982 | • Exchange student (summer training) Hospital Rounds, Madrid, Spain (International Training Program - Alexandria University, Faculty of Medicine) |

HONORS AND AWARDS:

| | |
|---|---|
| 2007 | J&J *Encore* Bronze Award – Social Responsibility accomplishments |
| 2006 | J&J *Encore* Platinum Award – TMC207 Regulatory accomplishments |
| 2006 | **"Crossing the Finish Line: Boot Camp for Multicultural Women Who Want to Get to the Top"** Leadership Workshop - chosen by Senior Management among a select 35 finalist high-performing women of color / multicultural women participants from across all of J&J company-wide |
| 2006 | The Drexel University's LeBow college of Business Executive MBA Distinguished Alumni Award for – Services to Profession |
| 2004 | *Division / Staff Area Award* |
| | Recognizes employees whose strategic contributions have broad effects on division / staff area and Company performance - Merck Research Laboratories – Worldwide Regulatory Affairs Vaccines and Biologics |
| 2003 | *Award for Excellence* |
| | Recognizes unique / excellent performance beyond what is expected on the job - Merck Research Laboratories – Worldwide Regulatory Affairs Vaccines and Biologics |
| 2002 | *Award for Excellence* |
| | Recognizes unique / excellent performance beyond what is expected on the job - Merck Research Laboratories – Worldwide Regulatory Affairs Vaccines and Biologics |
| 2002 | *Beta Gamma Sigma,* |
| | Business Honor Society serving business programs accredited by the Association to Advance Collegiate Schools of Business (AACSB) International (in recognition of 4.0 GPA – Executive MBA program) |
| 1994 | Grant Award *$100,000* |
| | "Ornithine Transcarbamylase Gene Therapy" 2 year Research Grant - ARCO Foundation |
| 1994 | Henry Christian, Trainee Investigator Award for "*Excellence in Research*", American Federation for Clinical Research, Clinical Research Meeting 1994, Baltimore, MD. |
| 1993 | The American Society of Human Genetics 1993 Finalist and recipient of the "*Outstanding Research*" Award in the pre-doctoral clinical category |
| 1991 | The American Fertility Society, Runner-Up *Poster Prize Winner*, Annual meeting, October 19-24 (1991), Orlando, Florida |
| 1990 | The American Society of Human Genetics 1990 Award for "*Outstanding Research*" in the Pre-doctoral Clinical Category |
| 1990–1991 | *Pre-doctoral Fellowship Award*, 1990-1991, Graduate Biomedical Program, Eastern Virginia Medical School |
| 1989–1990 | *Pre-doctoral Fellowship Award*, 1989-1990, Graduate Biomedical Program, Eastern Virginia Medical School |

MORSY 00002

PROFESSIONAL AND HONOR SOCIETIES / MEMBERSHIPS:

Executive MBA Alum Board Member - Drexel University - LeBow Business School
Pharmaceutical Management Advisory Council Member - Drexel University - LeBow Business School
Member of the Business Honor Society *Beta Gamma Sigma*
Member of the American Federation for Clinical Research
Member of the American Association of Advancement of Science
Member of the American Academy of Pharmaceutical Physicians
Member of the Alliance for Regenerative Medicine

ATHERSYS INC. EXPERIENCE / RESPONSIBILITIES:

2013–present    Head of Global Regulatory Affairs and member of the Executive Management. Responsible for building a Global Regulatory Affairs Department (transforming an initial junior staff / with extensive outsourced activities to a capable, BLA/NDA/MAA/JNDA/WMA eCTD submission competent, experienced, expanded professional staff. Leading the organization as it develops it's portfolio in Stem Cell Therapy from early and mid-phase development into late and registration enabled phase of development. Transitioned the Company from a paper based to an electronic submission (eCTD) based company including creating a Regulatory Operations and Document Management group within the Global Regulatory Affairs Department. Established and continue to establish relationships with strategic partners and consultants based on prior relationships to help Athersys expand knowledge and expertise base in regulatory related and sometimes business development related fronts. Responsible for establishing a strategic partnership with a key consultant in Japan which was key in facilitating accelerated clinical development path in Japan and establishment of key strategic connections within PMDA, MHLW and KOLs. Product development areas of focus in Stem Cell Therapy currently include clinical and research stage development in Oncology / Immunology (Graft versus Host Disease – Orphan disease), Neurology (Ischemic Stroke), Cardiology (Acute Myocardial Infarction, Peripheral Vascular Disease, Wound Healing), Respiratory Distress Syndrome, Ophthalmology, Digestive System / Immunology (Ulcerative Colitis and Crohn's disease), Orthopedic (Joint and Tendon Injury Healing) and Veterinary Equine product development (Horse Tendon Injury healing). Very strong internal and external regulatory agencies' negotiation and influencing skills.

US: Successful IND opening within the 30 day review period (with or without a pre-IND meeting).
Successful achievement of multiple Orphan designations
Successful achievement of Fast track designations
Successful achievement of SPA agreement for pivotal registration single phase 2/3 adaptive design, placebo controlled GvHD prevention study

EU: Successful opening of multiple CTAs within allocated timelines per country.
Successful achievement of multiple Orphan designations
Successful achievement of Positive CHMP opinion for pivotal registration single phase 2/3 adaptive design, placebo controlled GvHD prevention study
Successful organization and conduct of Key Clinical Opinion Leaders Workshop for development path and pivotal study design for a key MultiStem indication program

Japan: Successful preparation and leading of multiple pre-consultation and formal consultation preclinical (safety), quality (CMC) and clinical meetings with PMDA and also discussions with MHLW. Successful chairing of partnership leadership teams and guidance of development activities and regulatory strategy, package preparations and agency discussions/communications.

PTC THERAPEUTICS INC. EXPERIENCE / RESPONSIBILITIES:

2007–2012    Head of Global Regulatory Affairs and member of the Executive Management and Senior Team. Regulatory departmental multimillion dollars budgetary responsibilities. Responsibility for building a Global Regulatory Affairs Department (transforming an initial junior staff / with extensive outsourced activities to a capable, NDA/MAA eCTD submission competent, experienced, expanded professional staff. Led the organization as it prepared for its first NDA. Transitioned the Company from a paper based to an electronic submission (eCTD) based company including building and implementing an electronic database management system (EDMS) and creating a Regulatory Operations and Document Management group within the newly created Regulatory Affairs Department which also included, global regulatory liaisons, regulatory CMC liaisons, regulatory coordinators and labeling. Drug development areas of focus at PTC: Orphan drug indications in areas of Neurology (DMD and BMD), Respiratory (CF), Metabolic (MMA), Hematology (factor VIII and factor IX), and Oncology (anti-VEGF treatment for solid tumors, breast cancer, Kaposi sarcoma, head and neck tumors, neurofibroma and pediatric tumors). Oversight of quality assurance and compliance (QA/QC). Very strong internal and external regulatory agencies' negotiation and influencing skills.

US: Successful special protocol assessments – nonclinical and clinical (SPA), INDs, Orphan applications/designations, PDUFA type B milestone and type A meetings and White / position paper negotiations. Successful negotiation with the FDA Neurology Division to file an NDA for a first in class small molecule, first in indication, with successful orphan designation and priority review, fast track, and rolling submission supported by a single phase 2B pivotal study.

EU: Successful Pediatric Investigational Plans (PIP) including successful oral re-examination with positive opinion achievements, Scientific Advices, Orphan applications/designations.
EU Road show (for selection for rapporteur and co-rapporteur, prior to MAA submission), successful

MORSY 00003

Appx19458

Continue PTC THERAPEUTICS INC. EXPERIENCE / RESPONSIBILITIES:

negotiation, filing and conditional approval of MAA based on a single phase 2B study
Successful NDA Conditional Approval (based on a single phase 2B pivotal clinical study) **first ever** product registration approval for PTC and **first ever** approved product for the DMD indication

**Canada**: negotiations for NDS and NOC/c filings

**Global clinical studies**: Successful CTA regulatory support for early phase I and II and late pivotal phases IIB and III studies: North America, EU, AP, and MEA regions.

JOHNSON & JOHNSON CORPORATE EXPERIENCE / RESPONSIBILITIES:

| | |
|---|---|
| 2007 | Pediatric development – Global regulatory lead – strategy and implementation across all programs |
| 2006–2007 | Licensing and Acquisitions / Business Development Special assignment (HCV, HBV and HIV programs / opportunities) |
| 2004–2007 | TB (TMC207) program: Global Regulatory Lead IND and **CTA** submissions (**NA, EU, MEA, LA, AP** regions and **WHO** interactions) |
| 2004–2007 | HIV (TMC114 / PREZISTA™) program: supervisory and mentoring role for US liaison on program with review and approval responsibilities. |
| 2005–2006 | In charge of and leading activities for preparing Tibotec Inc. for first **FDA Advisory meeting** 2Q06. Regulatory budgetary oversight. |

Key filings / Regulatory activities and Key Licensing activities:

| | |
|---|---|
| 2007 | Successful global WMA (**NDA, MAA and JNDA**) filings (US, EU, Japan) |
| 2006 | Successful submission and approval of Phase IIB (TB program) Initial IND in the **US**. |
| 2006 | Successful FDA face to face meeting pre-phase II development discussion (TB program – Reg Lead) |
| 2006 | Successful execution of Vertex – J&J HCV product license partnership |
| 2005 | Successful evaluations of markets, compounds and companies including leading due diligence activities for HIV, HBV and HCV potential licensing opportunities |
| 2004–2005 | Successful application and designation of Orphan Drug status for treatment of active TB in EU and US |
| 2004 | US Pre-IND meeting and successful negotiation of all proposed planned activities |

Presenter at:

| | |
|---|---|
| 2007 | *DMC*: TMC114 Global Pediatric Development/ Exclusivity Strategy |
| 2005 | Global Regulatory Strategy review |
| 2004 | Orphan Drug Strategy review |

Team member of:

| | |
|---|---|
| 2006 | TAOC Licensing Sub-team |
| 2004–2007 | TMC207 Compound Development Team Member (CDT) |
| | TMC207 Regulatory Sub-team Chair |
| | TMC207 Clinical Team Member |
| | TMC207 Project Management Team Member |
| | TMC207 Commercialization Team Member |

Non – product related team/task member of:

| | |
|---|---|
| 2005–2007 | Member of J&J Women's Leadership Initiative / Women of Color sub-team member |
| | Regulatory and Clinical - Operations Task Force |
| | Harmonization of Advertisement & Promotion Review Process Stream Team |
| | Leader / Responsible for preparing company for **FDA Advisory Board meeting** |

MERCK CORPORATE EXPERIENCE / RESPONSIBILITIES:

Led research activities of:

The Gene Therapy Adenoviral program for first generation and helper dependent Adenoviral vectors (which were used as basis for the HIV program):
-Leptin Gene Therapy pilot program (Obesity Program) in the mouse and primate models - Published Information (*Pb.Info*)
-Ornithine Transcarbamylase Deficiency Gene Therapy pilot program (Liver Metabolic disorders) in the mouse model -Pb.info

Presenter at:

| | |
|---|---|
| RCC: | Adenovirus vector technology and clinical models - *Pb.Info* |
| RMC: | Gene Therapy Program Review – Clinical Targets |
| Consultant Meeting: | Gene Therapy Program Review |
| RMC: | Research Program Review for Vaccines and Gene Therapy - for obesity and hemophilia (factor VIII) – Helper Dependent Adenoviral vector - *Pb.Info* |
| SARC: | Comprehensive review of the potential use of Helper Dependant Adenoviruses as gene delivery vectors in consideration of treatment of factor VIII deficiency |

MORSY 00004

Member of:

Published Information Resources Advisory Committee (P.I.R-A.C)
Gene Therapy Task Force
DNA Task Force
Gene Therapy Review and Licensing Committee (G.T-R.L.C )
Genome Sciences Review and Licensing Committee (G.S-R.L.C)
Diabetes, Obesity and Atherosclerosis Review and Licensing Committee (D.O.A-R.L.C)
Institutional Animal Care and Use Committee ( I.A.C.U.C.)

1996-2000    Active Member, Peer Review Board, Telethon (Combatti La Distrfia Muscolare e Le Altre Malattie Genetiche)

REGULATORY - 1999- 2004:

Regulatory Liaison Responsible for:
1999- 2000    Worldwide regulatory responsibilities for MMRV (LVV program)
1999- 2004    Worldwide regulatory responsibilities for MMR®II / rHA (LVV program) – Regulatory Lead (commercial MMR®II, Measles, Mumps and Rubella Franchise and development activities)
2001 - 2003    Worldwide regulatory responsibilities for Cancer Vaccine (Gene Therapy program)
2002 - 2003    Worldwide regulatory responsibilities for HIV – Adenoviral Vectors Prophylactic and Therapeutic programs (HIV program) - Pb. Info
2003 - 2004    International regulatory responsibilities for RotaTeq®
2003 - 2004    International regulatory responsibilities for ProQuad® (LVV program)

Key filings / Regulatory activities:
2000    Pre-phase III MMRV FDA meeting
2001    MMRV CMC phase III FDA meeting
2001    MMR®II w/recombinant human albumin IND filing in the US
2002    Mumps master seed position paper filing to CPMP / Europe (successful exclusion of mumps Master seed from EU TSE / BSE related issues/guidelines)
2003    HIV Trivalent vaccine IND filing in the US - Pb.Info
2003    MMR®II original JNDA filing in Japan
2003    Preparation, submission and award of successful approval for regulatory request for exclusion of TSE testing of mumps stock seed from the US, EU, CA, AU and NZ regulatory agencies
2003    Preparation and submission of background documents for EMEA and road show meetings with the European Regulatory agencies.  Leading and conducting successful meetings with the EMEA and the EU agencies and gaining concurrence on all proposed issues for agreement
2003    Representing Merck and leading discussion at the PAHO vaccine meeting in Mexico (Nov 24) with special presentation of the Rotavirus and HBV programs
2004    WMA Global filing in the US (BLA), Canada, Australia, New Zealand including through the EMEA Centralized Procedure in Europe (MAA) and role out Globally to rest of the world.

Team member of: (Pb.Info programs are left identified)
1999 - 2004    MMR®II Product Development Team (PDT)
    MMR®II Joint Project Team (JPT)
    MMR®II Project Team
    MMR®II and Varicella Commercialization Sub-Team
    Rotavirus Tech Transfer Team
    Rotavirus Development Team
    Co-Chair MMR®II Clinical / Regulatory Sub-team
    Mumps Stock Seed Tech Transfer Team
    Live Virus Vaccine Regulatory Sub-Team
    ProQuad® (MMRV) Vaccines Product Development Team (PDT)
    MMR®II and ProQuad® Joint Project Team (JPT)
    MMR®II and ProQuad® Vaccines Tech Transfer Team
    MMR®II and ProQuad® Vaccines Regulatory/Clinical Sub-Team
    MMR®II and ProQuad® DMT/CST
    Worldwide Product Circular Review Committee Task Force
2000 – 2002    Cancer Vaccine Project Team
2002 – 2003    HIV Adenovirus Tech Transfer Team
    HIV Clinical Assay Sub-Team
    HIV Clinical / Regulatory Strategy team
    HIV Clinical Supply Team
    HIV Regulatory Tracking team
    HIV Process / Analytical / Formulation Sub-Team
    HIV DMT / CSR sub-team
    HIV Working group: Phase II/III International program
2003 – 2004    RotaTeq™ Product Development Team (PDT)
    RotaTeq™ Joint Project Team (JPT)
    RotaTeq™ Developing World Sub-team
    RotaTeq™ Mexico Initiative Sub-team
    RotaTeq™ Clinical Assay Sub-Team

MORSY 00005

**Appx19460**

Continue MERCK CORPORATE EXPERIENCE / RESPONSIBILITIES:

RotaTeq™ Clinical / Regulatory Strategy team
RotaTeq™ Clinical Supply Team

NON – PRODUCT RELATED TEAM/TASK MEMBER OF:
| | |
|---|---|
| 2001 – 2004 | LVV cell substrate Task Force |
| 2003 | Geographic Re-Alignment Team (Task completed) |
| | Regulatory OE Initiative Focus Group (Task Completed) |
| | EU Clinical Trial Directive Headquarters Implementation Team (members of the CSA and the AEs sub-teams) (Task Completed) |
| 2004 – 2004 | EU Clinical Trial Directive PDT Training and Implementation Team |
| | Process Optimization Task Force |

EX-MERCK / EX-J&J ACTIVITIES:
| | |
|---|---|
| 2006 – present | Member of Drexel University - LeBow Business School Pharmaceutical Management Advisory Council |
| 2002 – present | Member Drexel University, LeBow College of Business Executive MBA Alum Advisory Board |
| 2003 – 2005 | Founder and President of Finer Trades Inc. (Internet-based Market outlet) |
| 2003 – 2004 | Organizer for the Workshop on Long-Term Follow Up of Participants in Human Gene Transfer Research / Pharma – representative – American Society of Gene Therapy Annual Meeting – Minnesota – May 2004 |

PATENTS: (issued)
1- U.S. Patent No.: 6,001,816, Case No.: 19738PV: Gene Therapy Delivering a Peptide Hormone
2- U.S. Patent No.: WO 200004185-20000127, Case No.: 20280PV: Adenoviral Based Promoter
3- U.S. Patent No.: 20030215423 / 6630346: Gene Therapy for Obesity
4- U.S. Patent No: 20040185555: Adenovirus Serotype 24- Vectors, Nucleic Acids and Virus Produced Thereby
5- U.S. Patent No: 6395473: Adenoviral Based Promoter Assay
6- U.S. Patent No: 6001816: Gene Therapy for Leptin Deficiency

PATENTS: (pending)
1- Case 19725PV: Gene Therapy Using the Leptin Gene.
2- Case 19737PV: Gene Therapy Using the Leptin Receptor Gene.
3- Case 20250PV: Novel Adenoviral Vectors for Gene Therapy.

TRAINEES AND DIRECT REPORTS:
Wide range of direct reports from highly experienced graduate degree qualified doctorate level to Junior entry level reports (Senior Directors to entry level regulatory associates), number of direct reports ranged up to 25+. Experienced with flat and multilevel organizational reporting structure. Enjoy and thrive on mentoring, and career development of direct reports and trainees.

INVITED SPEAKER:
- 1st Annual Rare Diseases/Orphan Products Summit, Washington, DC, October 11-13, 2011 BIO International Convention, Washington, DC, June 27-30, 2011
- PAHO organized Vaccine meeting in Mexico (Nov. 24, 2003)
- Middlebury College – Spring 2002 seminar series: Presentation "A New Gene Therapy
- Vehicle: AD Vectors Devoid of Viral Protein Coding Sequences", Middlebury, VT, 2002
- Jackson Laboratory Discovery Strategies Conference – Symposium "Novel Mechanisms for Regulating Gene Expression in vivo", Portland, ME, August 27-29, 2001
- International Conferences on Gene Therapy and Molecular Biology & Medicine, Corfu, Greece, August 25-31, 2001
- University of the Sciences in Philadelphia: Presentation "A New Gene Therapy Vehicle", Philadelphia, PA, April 26, 2001. Canisius College Buffalo, NY, September 10, 1999.
- Co-chair: Adenoviral & AAV gene delivery / Gene Therapy International Conference, International Society of Gene Therapy & Molecular Biology & Medicine. Crete Island, Greece, August 6- 16, 1999.
- NIH : National Heart, Lung, and Blood Institute (NHLBI) Workshop : " Novel Vector Systems for Functional Genomic Applications", July 15, 1999
- Cornell University, NY, Bio-Engineering Program, May 6, 1999.
- Thomas Jefferson University, Department of Physiology, April 27, 1999.
- University of Pennsylvania, School of Arts and Sciences
- Biological Chemistry Seminar series, April 22, 1999.
- University of North Carolina, Chapel Hill, Pulmonary Medicine Department, March 18, 1999.

MORSY 00006

Continue INVITED SPEAKER:

- University of Virginia, Charlottesville, Biomedical Engineering Department, March 12, 1999.
- Hemophilia Foundation: Workshop. San Diego, CA, November 12-13, 1998
- NMHCC (Bio/Technology International Conference): Drug Activation Systems, Chairperson: Gene Therapy and Delivery. San Diego, La Jolla, CA, Nov. 2-3, 1998
- ACRP (Association of Clinical Research Professionals): 22nd Annual meeting. Presentation: " The Future of Gene Therapy". Anaheim, CA, April 22-24, 1998
- NMHCC (Bio/Technology International Conference): Viral & Non-Viral Mediated Gene Delivery, San Diego, La Jolla, CA April 16-17, 1998
- 6th Pacific Rim Biotechnology Conference and Bio-Expo ' 98, Hong Kong, China, 3-5 June 1998 Keynote Speaker, Merck Frost Retreat, Canada, Jan. 1997
- Biometrics Departmental Retreat (West Point, Merck), Nov. 1996
- Cold Spring Harbor "Gene Therapy Meeting"
- Cold Spring Harbor Laboratory, New York, Sept. 25-29, 1996
- Canadian Genetic Society Symposium on " Gene Therapy", Winnipeg, Canada, June 12 - 15, 1996
- International Symposium on "Gene Therapy", Valencia, Spain, November 28 - 30, 1994
- The University of Texas, Medical School, Department of Internal Medicine, Division of Cardiology, Vascular Biology Seminar series, May, 1994.
- International Symposium on Cirrhosis, Hyper-ammonemia and Hepatic Encephalopathy. Valencia, Spain, January 24 - 27, 1994.
- Pediatric GI Research Workshop. Baylor College of Medicine, October 1993.
- Keystone Symposium: Genetically Targeted Research and Therapeutics: Antisense and Gene Therapy, April 1993.

PUBLICATIONS:

1- Beebe SJ, M Morsy, K Takeuchi, GD Hodgen. Pre-embryo genetic diagnosis. *Clin Consult Obstet Gynecol* 1990; 2: p 205.

2- Morsy M, K Takeuchi, R Kaufmann, L Veeck, GD Hodgen and SJ Beebe. Pre-clinical models for human pre-embryo biopsy and genetic diagnosis: II. PCR amplification of DNA from single lymphoblasts and blastomeres with mutation detection. *Fertility and Sterility* 1992 Feb.; 57(2): pp 431-8.

3- Takeuchi K, B Sandow, M Morsy, R Kaufmann, SJ Beebe and GD Hodgen. Pre-clinical models for human pre-embryo biopsy and genetic diagnosis: I. Efficiency and normalcy of mouse pre-embryo development after different biopsy techniques. *Fertility and Sterility* 1992 Feb.; 57(2): pp 425-30.

4- Kaufmann RA, M Morsy, K Takeuchi, GD Hodgen. Preimplantation genetic analysis. *Journal of Reproductive Medicine*, 1992 May; 37(5): pp 428-36.

5- Morsy M, E Alford, A Bett, F Graham and CT Caskey. Efficient adenoviral-mediated OTC expression in deficient mouse and human hepatocytes. *J Clin Invest*. 1993; 92: pp 1580-1586.

6- Morsy M, K Mitani, P Clemens and CT Caskey. Progress toward human gene therapy. (Review) *JAMA* 1993; 270(19): pp 2338- 2345.

7- Morsy MA and CT Caskey, Ornithine Transcarbamylase Deficiency: A Model for Gene Therapy. In: *Hepatic Encephalopathy Hyperammonemia and Ammonia Toxicity, Series Advances in Experimental Medicine and Biology* (Editors S.Grisola and V.Felipo) 1994; Plenum Press: New York. pp. 145-154.

8- Morsy MA, J. Zhao, TT. Ngo, WE. O'Brien, FL. Graham, CT Caskey. Patient Selection May Affect Gene Therapy Success: Dominant Negative Mechanism Observed for OTC. *J Clin Invest.* 1996 Feb.; 97(3): pp 826-832.

9- Manal A. Morsy and C. Thomas Caskey, Safe Gene Vectors made Simpler. *Nature Biotech.* 1997 Jan.; 15 (1): p 17.

10- Manal A. Morsy, MingCheng Gu, Jing Z. Zhao, Daniel J. Holder, Irene T. Rogers, Walter J. Pouch, Sherri L. Motzel, Hilton J. Klein, Sunil K. Gupta, Xiaoping Liang, Michael R. Tota, Charles I. Rosenblum, C. Thomas Caskey. Leptin Gene Therapy and Daily Protein Administration: A Comparative Study in the ob/ob Mouse. *Gene Therapy*, 1998; 5: pp 8-18.

11- Qingyun Liu, Chang Bai, Fang Chen, Terry MacDonald, Ruiping Wang, Qing Zhang, Manal A.Morsy, and C.Thomas Caskey. Uncoupling Protein-3: A Muscle-Specific Gene Upregulated by Leptin in ob/ob Mice. *Gene*, 1998; 207: pp 1-5.

12- Manal A.Morsy, MingCheng Gu, Sherri Motzel, Jing Zhao, Laura Franlin, Jing Lin, Robin J.Parks, Stefan Kochanek, Andrew J.Bett, Frank L.Graham, and C.Thomas Caskey. An Adenoviral Vector Deleted In All Viral Coding Sequences Extends Leptin Gene Therapy In Vivo. *Proc.Natl.Acad.Sci.*1998 July; 95 (14): pp 7866-7871.

MORSY 00007

Continue PUBLICATIONS:

13- C.I. Rosenblum, A.Vongs, M.R. Tota, J.P. Varnerin, E. Frazier, D. F. Cully, M. A. Morsy, and L.H.T. Van der Ploeg. A rapid, quantitative, functional assay for measuring leptin. *Mol. Cell. Endocrinol.*, 1998 Aug 25;143(1-2): pp 117-23.

14- Manal A. Morsy and C.T.Caskey. Helper Dependent Adenoviral Vectors - Improved Safety and Expression. *Biogenic Amines* (Gene Therapy Issue). (Review)1998 Sept.; 14 (5): pp 433-449.

15- Morsy, M.A. and C.T.Caskey. Expanded Capacity Adenoviral Vectors. *Molecular Medicine Today*. (Review), 1999 Jan.; 5 (1)

16- Morsy, M.A., D. Harvey, D. and C.T.Caskey. Helper-Dependent (Gutless) Adenoviral Vectors as Gene Delivery / Gene Regulation Vehicles. *Gene Therapy & Molecular Biology*, 1999; 3: pp 223 –232.

17- MA Morsy, and Ling Chen (2000). Helper-Dependent Adenoviral Vectors: A New Generation Of Gene Delivery Vehicles. In: *Biotechniques Books - Viral Vectors: Basic Science and Gene Therapy* (Editors Angel Cid-Arregui, and Alejandro Garcia Carranca);  Eaton Publishing: MA.,Chapter 8.

18- Morsy MA and CT Caskey (2000). Helper Dependent Adenoviral Vectors: Improved Safety and Expression. In: *Progress in Gene Therapy – basic and clinical frontiers* (Editors R.Bertolotti, S.H.Parvez and T.Nagatsu); /// VSP /// International Science Publishers: The Netherlands. pp 67-84.

19- B. Wong, K.Bushby, A.Reha, G.L.Elfring, L.L.Miller, J.Babiak, M.A.Morsy, S.W.Peltz, Ellen Welch, L.Atkinson. Results of a Phase 2b, dose-ranging study of ataluren (PTC124®) in nonsense mutation Duchenne/Becker muscular dystrophy (nmDBMD). *Neuromuscular Disorders* – 2010, 20 (9), 656-657.

20- R. Finkel, B. Wong, K. Bushby, T. Voit, M. Morsy, G.L. Elfring, J. Barth, S.W. Peltz. The relationship of ataluren plasma concentration and response across clinical studies in nonsense mutation dystrophinopathy. *Neuromuscular Disorders* – 2011; 21 (9-10), 707

21- Stuart W Peltz, Manal Morsy, Ellen M Welch and Allan Jacobson. Ataluren as an Agent for Therapeutic Nonsense Suppression. *Annual Review of Medicine* – 2013; 64; 407-425.

22- Gil Van Bokkelen, PhD, Manal Morsy, MD, PhD. Toshi-hiro Kobayashi, PhD. Demographic Transition, Healthcare Challenges and the Impact of Emerging International Regulatory Trends with Relevance to Regenerative Medicine. *Current Stem Cell Reports* 2015; 10.1007/s40778-015-0013-5; online ISSN 2198-7866

ABSTRACTS:

1- Anderson TL, M Morsy, and KD Somers. Evidence for a retrovirus similar to ERV-3 identified in term placenta from the non-human primate (Macaca Fascicularis). Society for Gynecological Investigation, 36th Annual Meeting. San Diego, CA. March, 1989.

2- Morsy M, ED Wimberly, SJ Beebe, and TL Anderson. Effect of estradiol, progesterone, and cAMP on expression of the endogenous retrovirus ERV-3 in MCF-7 human breast cancer cells. The Endocrine Society Annual Meeting, Seattle, WA, June 1989.

3- Morsy M, GD Hodgen, and SJ Beebe. Development of a rapid diagnostic procedure for genetic diseases from single cells. American Society of Human Genetics Annual Meeting, Baltimore, MD, November, 1989.

4- Beebe SJ, M Morsy, and GD Hodgen. Amplification of genomic DNA from single cells by the polymerase chain reaction for the diagnosis of genetic disorders. Society for Gynecological Investigation Annual Meeting, St. Louis, MO, March 1990.

5- Morsy M, K Takeuchi, GD Hodgen, and SJ Beebe. Models for pre-embryo genetic diagnosis. the ornithine transcarbamylase/sparse fur (OTC) mouse model and polymerase chain reaction genetic analysis of the OTC gene, sickle cell and Tay-Sachs. First International Symposium on Pre-implantation Genetics, Chicago, Illinois, September 1990.

6- Takeuchi K, M Morsy, SJ Beebe, GD Hodgen. Mouse pre-embryo survival after using different biopsy techniques: Models for pre-embryo genetic diagnosis. First International Symposium on Pre-implantation Genetics, Chicago, Illinois, September 1990

7- Morsy M, K Takeuchi, D Fulgham, and SJ Beebe. PCR amplification of the ornithine transcarbamylase gene from single mou blastomeres – a model for pre-embryo genetic diagnosis. The American Fertility Society, 46th Annual Meeting, Washington, DC, October, 1990.

8- Beebe SJ, M Morsy, K Takeuchi, and GD Hodgen. Use of the polymerase chain reaction to prevent genetic diseases through pre-embryo genetic diagnosis. The American Fertility Society, 46th Annual Meeting, Washington, DC, October, 1990.

9- Morsy M, K Takeuchi, GD Hodgen and SJ Beebe. The ornithine transcarbamylase mouse model for pre-embryo genetic diagnosis. The American Society of Human Genetics, 41st Annual Meeting, Cincinnati, OH, October 1990.

10- Kaufmann RA, K Takeuchi, M Morsy, GD Hodgen, and SJ Beebe. Simultaneous PCR amplification using the same primer pair for the sex-determining region of the Y chromosomes in the mouse, monkey and human: Models for pre-embryo genetic analysis. Society for Gynecological Investigation Annual Meeting, 1991.

Continue ABSTRACTS:

11- Takeuchi K, RA Kaufmann, M Morsy, RF Williams, SJ Beebe and GD Hodgen. Monkey Pre-Embryo Biopsy and Polymerase Chain Reaction (PCR) Amplification From Single Blastomeres for Pre-Embryo Genetic Diagnosis. Society for Gynecological Investigation Annual Meeting, 1991.

12- Kaufmann RA, K Takeuchi, M Morsy, GD Hodgen. Preimplantation embryo development. Serono Symposia, Bos, MA, Aug '91.

13- Kaufmann RA, K Takeuchi, M Morsy, SJ Beebe, GD Hodgen. PCR amplification for the sex-determining region of the Y-chromosome from single-cells in mouse and human. American Fertility Society, 47th Annual Meeting, Bona Vista, Florida, October 19-24, 1991.

14- Kaufmann RA, Veeck LL, K Takeuchi, M Morsy, Coddington CC. Micromanipulation of mouse preembryo using the YAG laser. American Fertility Society, 47th Annual Meeting, Bona Vista, Florida, October 19-24, 1991.

15- Caskey CT, K Mitani, AM Moseley, M Morsy, and F Faustinella. Gene therapy in man. The Royal Society, Genome transformations and inherited modifications in animals, London England July 1-2, 1992.

16- Morsy M, F Graham and CT Caskey. Adenoviral-transduced high levels of human ornithine transcarbamylase activity in spf primary hepatocytes cultures. The American Society of Human Genetics, 42nd Annual Meeting, San Francisco, CA, Nov. '92.

17- Morsy M, E Alford, A Bett, F Graham and CT Caskey . Efficient adenoviral gene transduction in human and mouse hepatocytes in vitro and in mouse liver in vivo. Keystone symposium, Gene Therapy, April 12-18, 1993; Keystone, Colorado.

18- Clemens PR, KE Korb, M Morsy, TT Ngo, F Graham and CT Caskey. Adenoviral vector mediated gene transfer of ß-galactosidase into human myoblasts and myotubes in culture. The American Society of Human Genetics, 43rd Annual Meeting, 1993, New Orleans.

19- S.Richards, M.Morsy, P.Ward, P.Watson, S.Smith, and C.T.Caskey. Diagnosis of Duchenne and Becker Muscular Dystrophy by PCR Multiplex Analysis. The American Society of Human Genetics, 43rd Annual Meeting, 1993, New Orleans.

20- Morsy M, TT Ngo, F Graham, CT Caskey. In vivo correction of OTC deficiency: A model for gene therapy. The American Society of Human Genetics, 43rd Annual Meeting, 1993, New Orleans.

21- M.A. Morsy, T.T. Ngo, W.E. O'Brien, F.L. Graham, C.T. Caskey. OrnithineTranscarbamylase Gene Transfer with Correction of the spf ash Mouse Deficiencies. Cold Spring Harbor Laboratory, Gene Therapy Meeting, September 21-25, 1994, New York.

22- Manal A. Morsy, Tam T. Ngo, William E. O'Brien, Frank L. Graham, C. Thomas Caskey. Ornithine Transcarbamylase Gene Transfer with Correction of the spf ash mouse deficiencies. Princess Liliane Cardiology Foundation Symposium, Belgium, October 24th and 25th, 1994.

23- C.T.Caskey, M.Morsy, S.Kochanek. From Mouse to Clinic for OTC-A Urea Cycle Defect. Engineering Foundation, Cell Culture Engineering V, January 28-February 2, 1996, San Diego, California.

24- M. Morsy, M. Gu, J. Zhao, D. Holder, I. Rogers, W. Pouch, S.Motzel, H. Klein, M. Tota, S.Gupta, X. Liang and C. T. Caskey, Satiety and Weight Loss Maximal in Ob/Ob and Lean Mice with In Vivo Synthesis of Leptin. Cold Spring Harbor Laboratory, Gene Therapy Meeting, September 25-29, 1996, Cold Spring Harbor, New York.

25- M. Morsy, M. Gu, J. Zhao, D. Holder, I. Rogers, W. Pouch, H. Klein, M. Tota and C. T. Caskey. Satiety and Weight Loss in ob/ob and Lean Mice with In Vivo Synthesis of Leptin Exceeds Leptin Protein Administration. Fourth Meeting of the European Working Group on Human Gene Transfer and Gene Therapy, November 14-17, 1996 Leiden, Netherlands.

26- M. Morsy, M. Gu, J. Zhao, D. Holder, M. Tota, C. Rosenblum and C.T. Caskey. Leptin Gene Delivery Corrects ob/ob Deficiencies. Keystone Symposia on Molecular & Cellular Biology. April 13-19, 1997 Snowbird, Utah.

27- M. Morsy and C.T. Caskey. Deleted Adenoviral Vectors - A Safe and Effective Delivery System. Transient Gene Expression in Animal Cells, Island of Jersey, May 11-14, 1997.

28- S L. Motzel, C. Fioravanti, K.H. Wright, M.A. Morsy and H.J. Klein. Simultaneous Scanning of Multiple Mice to Accomplish Dual-Energy X-ray Absorptiometry Total Body Composition Analysis. 48th AALAS National Meeting. Anaheim, CA, Nov 1997.

29- M.A.Morsy, M.Gu, J.Zhao, L.Franlin, J.Lin and C.T. Caskey. A New Gene Therapy Vehicle: Ad Vectors Devoid of Viral Protein Coding Sequences Efficiently Deliver and Sustain Leptin Gene Expression InVivo. The American Society of Human Genetics, 47th Annual Meeting, 1997, Baltimore, Maryland.

30- M.A.Morsy, M.Gu, J.Zhao, L.Franlin, J.Lin and C.T. Caskey. The American Society of Gene Therapy, 1st Annual Meeting, 1998, Seattle, Washington.

31- K.M. Richards, J. Zhao, V. Sandig, M.A. Morsy and T.H. Rushmore. Recombinant Adenovirus: A Tool for Studying the Regulatory Sequences of Drug Metabolizing Enzymes. 12th International Symposium (ISDMO), 20-24 July 1998

32- Karen M. Richards, Jing Zhao, Jing Lin, Volker Sandig, Manal A. Morsy, and Thomas H. Rushmore. Recombinant adenovirus: A tool for studying the regulatory sequences of drug metabolizing enzymes. ISDMO '98.

MORSY 00009

Continue ABSTRACTS:

33- S.L. Motzel, C. Fioravanti, K.H. Wright, M.A. Morsy and H.J. Klein. Simultaneous Scanning of Multiple Mice to Accomplish Dual-Energy X-ray Absorptiometry Total Body Composition Analysis. AALAS '98.

34- M.Morsy. Adenoviral Vectors: The Next Generation. Jackson Laboratory Discovery Strategies Conference - Symposium "Novel Mechanisms for Regulating Gene Expression *in vivo*", Portland, ME, August 27-29, 2001.

35- J Barth, RJ Spiegel, A.Reha, GL Elfring, M Morsy, SW Peltz. Outcome Measures in the First Registration-Directed Clinical Trial in Duchenne/Becker Muscular Dystrophy (DBMD). TREAT-NMD, Annual Meeting, Nov, 2011.

36- R Finkel, B Wong, K Bushby, T Voit, KM Flanigan, M Morsy, GL Elfring, J Barth, SW Peltz for the Ataluren DBMD Study Group. The Relationship of Ataluren (PTC124®) Plasma Concentration and Response across Clinical and Nonclinical Studies in Nonsense Mutation Dystrophinopathy. World Muscle Society meeting (Oct 18-22), 2011.

37- Russman BS, Mathews KD, Sampson JB, Renfroe JB[4] Morsy MA, Elfring GL, Barth JA, Peltz SW for the Ataluren DBMD Study Group. Improvements in Muscle Function and Accidental Falling in Ataluren-Treated Patients with Nonsense Mutation Dystrophinopathy (Duchenne/Becker Muscular Dystrophy – nmDBMD). Child Neurology Society Congress (Oct 26-29), 2011.

11/26/2019
Declaration of G. Reilly
EXHIBIT 384

Appx19466

CYNTHIA F. MORRISEY
1021 Tyler Drive
Newtown Square, Pennsylvania 19073
Home: 484-574-8806    Work: 215-898-0571    Cell: 215-872-8566    Email:    ecmorrisey@comcast.net

## SUMMARY

I am an energetic, highly strategic leader with outstanding management, analytical, business, quality, collaboration, and communication skills.  My 20+ years working in positions of greatly increasing responsibility and scope in the health care industry show diversity and breadth of experience in Operations, Quality, Regulatory, Research and Development, Project Management, and Strategic Planning.

I am Black Belt certified in Six Sigma, Lean, and Change Management with a proven record of developing and leading highly complex projects and transformational change initiatives within Diagnostic Product Development, Vaccine Research and Manufacturing, Clinical Trial Research, and Academic Medicine.

## PROFESSIONAL EXPERIENCE

**University of Pennsylvania Health System**
**Philadelphia, Pennsylvania**

**As Chief Operating Officer, Department of Dermatology, May 2013 to Present (as of 2015)**

I have successfully led the oldest and most highly-ranked Department of Dermatology through a period of unprecedented growth:
- Expanded Mohs surgery capacity within the Perelman Center for Advanced Medicine, opening 15 new procedure rooms and a large state-of-the-art histotechnology lab.
- Opened 3 community clinics to serve patients in the PA and NJ suburbs, including an 8500 $ft^2$ clinic with phototherapy, Mohs surgery, and 14 exam rooms in a newly constructed facility.
- Recruited 13 new faculty members and approximately 30 clinical/technical and administrative support staff, including acquisition of a private practice.  I currently oversee 50 faculty and approx. 200 staff.

I developed a 5 year strategic plan for the Department, and formed an Operations and Finance Committee to ensure continued financial success and support growth in the face of research funding and reimbursement cuts. We significantly exceeded budget in FY14, achieving over $1M in operating margin; FY15 forecast is nearly $2M.

Our Department continues to excel in ensuring patient satisfaction and access, as measured by Press Ganey surveys.  Our FY15 score is 96.0% for Likelihood to Recommend and 89.7% for Access, which is 99th percentile as compared to other academic medical centers.  We have won numerous team and individual contributor awards from the Health System for Quality and Safety, Innovation and Process Improvement, as well as Nursing and Service Excellence

In just over 1 year, I earned a strong reputation as being a highly collaborative and effective leader within the Health System, and now serve in several key roles outside the Department:
- I was appointed Co-Chair of the Access Committee to evaluate and improve patient access across the Health System.
- I serve on the Clinical Practice Finance Committee, which monitors and guides the financial performance of the 21 clinical departments within the Health System.
- I lead an informal mentoring group for new COOs to share advice and problem-solving ideas.

**Vaccines and Biologics Laboratory, LLC**
**Owned by Pharmaceutical Product Development, Inc. (PPD) since Jan 2009**
**Previously owned by Merck & Co., Inc.**
**Wayne, Pennsylvania**

**As Executive Director, Site Head, and General Manager, June 2010 to May 2013:**

MORRISEY_00000001

Appx19467

I led a successful and complex technical business to provide custom assay development, validation and testing services to pharmaceutical, government, and biotech clients, supporting over 20 vaccine programs and delivering nearly 2 million test results each year. I led development of a full service Biorepository with capacity for 10 million clinical specimens.
- My team was comprised of 150 BS/MS/PhD scientists and technical/business professionals
- I maintained full P&L responsibility for a rapidly growing business; new sales increased more than 4-fold since PPD's acquisition in 2009.

My team consistently achieved the top quality and customer satisfaction ratings for technically complex projects within a highly regulated environment: all metrics, dashboards, Key Performance Indicators, and internal/external audits demonstrated "excellent" or "outstanding" quality.

I led efforts to dramatically grow our business by increasing efficiency, developing new capabilities and service offerings, and expanding capacity:
- Reduced molecular testing run time by 4-fold and increased serology testing throughput by 3-fold
- Increased overall laboratory capacity by 3-fold from 2009 to 2012, with only a 10% increase in costs
- Developed new bacterial and viral functional assay capabilities
- Launched our Biorepository as a new revenue-generating business, and immediately secured a multi-million dollar government contract

**As Operations Director, Business Director, and Director of Quality Operations, Feb 2007 to June 2010:**

I led efforts to plan and implement the divestiture/acquisition of the Vaccines and Biologics Laboratory from a department within Merck to a stand-alone business within Pharmaceutical Product Development, Inc. (PPD), a leading Contract Research Organization (CRO).

I developed strategic models to forecast workload, optimize resources, and create flexible capacity to transition from supporting one internal customer to multiple external customers, and expanded site operations with over 40,000 ft$^2$ of laboratory renovations.

I developed financial models to understand costs and set prices for our tests and scientific services, and performed market research across potential clients and competitors to plan new technologies, capabilities, and functional support needs. I developed annual financial plans and implemented marketing and business development programs to generate new sales and revenue.

I collaborated with PPD corporate to integrate the Vaccines and Biologics Laboratory into PPD, establishing remote or local site support for the following functional areas:
- Quality Assurance, Regulatory Affairs, Statistics, Project and Data Management
- Information Technology, Finance, Facilities and Engineering, Legal, and Procurement
- Human Resources, Investigator Site Support, Employee & Environmental Health and Safety
- Marketing, Business Development and Sales

I led efforts to recruit and train staff, and develop business processes and systems for the functional areas above, and implemented a customized Laboratory Information Management System (LIMS) to replace the Merck system.

In parallel, I made significant contributions to other PPD Laboratory Businesses by leading efforts to improve quality and patient safety for the Global Central Laboratories, and by leading cost savings initiatives across 9 PPD laboratory sites in 5 countries and the Phase I Clinic.

The Vaccines and Biologics Laboratory was the first biomedical laboratory to achieve OSHA VPP Star Certification, a prestigious recognition of safety from the US government; we maintained ratings in the highest category each year since our initial certification in 2007.

During the divestiture/acquisition and subsequent integration into PPD, our laboratory business maintained consistently high quality and never missed a single program deadline or contract deliverable. I employed extensive change leadership to ensure high communication, morale, and employee retention.

**PPD Professional Awards:** Wildcat Initiative (2011), Bottom Line Top of Mind Initiative (2010)

MORRISEY_00000002

Merck & Co., Inc.
West Point, Pennsylvania

**As Manager, Vaccine and Sterile Quality Operations, Nov 2004 to Feb 2007:**

I led a major strategic initiative to improve the Vaccine and Sterile supply chain, by developing new business processes, a custom IT system to improve communication, operational metrics, and an innovative training program for over 700 employees.
- We increased due date performance from 25% to over 80%, and decreased testing and release cycle times for all Vaccine and Sterile products by more than one third.
- We successfully launched four new vaccine products in one year. Vaccine and Sterile sales increases of $700M were achieved in 2006 while maintaining customer service levels and decreasing inventory.

I led a Six Sigma project to improve cycle time performance in the Vaccine and Sterile laboratories. My project significantly exceeded all goals by reducing cycle time defects from over 90% to less than 2%, with a decrease in turnaround time from 20 days past the target to 10 days below the target. These record-breaking changes resulted in inventory savings of over $10M per year.

I was invited to join a Merck executive team chartered with developing a comprehensive strategic plan for the future state of the entire Vaccine and Sterile manufacturing and testing operation, including technical and business process improvement initiatives, a portfolio management process, and risk mitigation plans.

**As Manager, Vaccine Regulatory and Analytical Sciences, July 1999 to Nov 2004:**

I collaborated with Statistics to develop a novel stability monitoring program for products with variable changes over shelf life. I educated thought leaders throughout industry on the new program via presentations at PhRMA meetings, conferences/workshops, and in collaborative meetings with the FDA.

I authored analytical and stability sections of BLA, sBLA, and CBE-30 filings and participated in over 20 regulatory agency inspections by the FDA, EMEA, and other world-wide regulatory agencies.

I collaborated with IT to implement a customized Laboratory Information Management System (LIMS), and formed a statistical analysis group to monitor stability data and initiate/support analytical investigations, including statistical design of experiments (DOE).

**As Stability Coordinator, Bioprocess and Bioanalytical Research, May 1998 to July 1999:**

I created a research stability program from the ground floor for Vaccine and Sterile products, including selection and validation of controlled temperature storage units, installation of a Stability LIMS, development of a clinical expiry dating website, staff recruiting, training, and supervision, and authoring a functional area guidebook as well as departmental policies, guidelines, and standard operating procedures.

**Merck Professional Awards:** Divisional Award for Six Sigma Leadership (2008), Corporate Award for Safety Leadership and Commitment (2008), Chairman's Award for Site Safety (2007), Award of Excellence for Global Operating Strategy (2007), Divisional Award for Gardasil® Capacity Expansion (2007), Award of Excellence for Business Process Improvement (2007), Corporate Stock Option Grant for Strategic Initiatives (2007), Award of Excellence for Technology Transfer Design (2002), Special Achievement Award for Product Launch (2001), Corporate Stock Option Grant for Technical Investigation (2001)

Abbott Laboratories, Diagnostics Division
Abbott Park, Illinois

**As Strategic Technical Product Development Manager, Operations, Apr 1996 to May 1998:**

I piloted the formation of a new department to lead technology transfer of analytical methods and manufacturing processes from basic research to manufacturing for LCR and PCR based LCx® Probe Diagnostic products. This

MORRISEY_00000003

Appx19469

included the development and validation of analytical methods and specifications, process scale up and validation, authoring manufacturing and testing documentation, validating facilities, equipment, components, and cleaning procedures, and performing rare reagent and final product stability studies.

I authored numerous divisional policies and standard operating procedures for validation, change control, training, and certification.

**As Project Manager, R&D, May 1995 to April 1996:**

I led large cross functional project teams for the successful launch of three LCx® Probe Diagnostic products according to extremely aggressive timelines. I coordinated completion of 510K and PMA regulatory submissions, labeling, manufacturing and testing documentation, design for Six Sigma documentation, software, packaging, commodities, clinical and marketing studies, validations, and manufacturing of launch inventory.

**As Product Quality Team Leader, Quality, Jan 1994 to May 1995:**

I coordinated pre-production quality assurance and design control processes for assay, software, and hardware/instrument system project teams.

I developed procedures for customer complaints and training programs for manufacturing, quality control, engineering, and R&D.

I reviewed regulatory submissions, marketing literature, product labeling, manufacturing and testing documents, atypical investigations, and design control documentation as the Quality approver, and served as departmental representative for ISO9001 certification and cGMP compliance.

**As Rare Reagent Development Team Leader, R&D, Apr 1990 to Jan 1994:**

I developed native and recombinant enzyme and antigen expression and purification procedures, as well as enzyme activity assays and quantitative ELISA methods.

I led a process scale-up and product improvement project for the purification of rubella virus, allowing the rubella antibody diagnostic assay product to be re-introduced to the market.

**As Scientific Technician, R&D, Sept 1987 to Apr 1990:**

I developed protein purification procedures and optimized analytical characterization methods for recombinant HIV and HCV antigens.

I authored manufacturing documents and rare reagent sections of 510K and IND regulatory submissions.

I contributed to the development of a rapid ELISA commercial assay kit for detection of HIV-1 and 2 antibodies.

**Abbott Professional Awards:** Chairman's Award for Product Launch (1996), Chairman's Award for Product Improvement (1992), Prometheus Award for Rare Reagent Development (1989), Technical Excellence Award for Scientific Innovation (1988)

**University of Illinois at Chicago, Department of Physiology and Biophysics**
**Chicago, Illinois**

**Research Specialist, Mar 1986 to Sept 1987:**

I purified actin and myosin from chicken gizzards and protein kinase C from rabbit brains, and performed phosphorylation assays to study protein kinase regulation of smooth muscle.

**EDUCATION AND PROFESSIONAL TRAINING**

**Six Sigma Black Belt Certification**
Green Belt Certified 2006, Black Belt Certified 2008
Six Sigma, Lean, and Change Leadership

**Loyola University of Chicago**
Bachelor of Science, *Cum Laude*, 1986
University and Departmental Honors
Loyola University Academic Scholarship, 1982-1986
Illinois State Scholar Academic Scholarship, 1982-1986
Major: Biology    Minor: Chemistry

## INVITED PRESENTATIONS

Conference chair, host, and introductory speaker for the Seventh Annual Scientific Meeting of the Laboratory Robotics Interest Group, Wayne, PA (2012) "Biobanking and CROs in Drug Development"

Session chair and host for the 2011 face to face meeting of the Vaccine Clinical Assay Working Group, a consortium of lead scientists, statisticians, and regulatory professionals from the top 5 pharmaceutical companies, FDA, EMEA, and USP

Invited speaker at Developing and Deploying Lean Six Sigma Practices in the Life Science Industry, Philadelphia, PA (2007) "Using Six Sigma Tools for Supply Chain Optimization"

Invited workshop leader at Laboratory Controls and Compliance, Amsterdam, The Netherlands, (2004) "Developing a Compliant Stability Program to Ensure Continued Product Quality"

Invited speaker at 1st Annual Stability Testing Conference, Philadelphia, PA, (2003) "An Alternative Approach to Stability Monitoring"

Invited workshop leader at 5th Annual Stability Testing Forum, Philadelphia, PA, (2003) "Use Statistics to Design Stability Studies and Interpret Results"

Invited speaker at 4th Annual International Stability Programs Conference, Philadelphia, PA, (2002) "Design, Develop and Implement Standard Operating Procedures for a Compliant Stability Program"

Invited workshop/panel discussion leader at 3rd Annual International Stability Programs Conference, Philadelphia, PA, (2001) "Statistical Tools and Strategies for Design of Stability Studies and Interpretation of Stability Results"

Invited workshop leader at 2nd Annual Stability Data Management Conference, Philadelphia, PA, (2001) "Utilize Statistical Tools for Stability Data Management to Measure Potency and Quality Control"

Invited workshop leader at 3rd Annual Program on Preparing for Changing Paradigms in Global Stability Programs, Philadelphia, PA, (2000) "Statistical Strategies for Investigating Out of Specification Stability Results"

## PUBLICATIONS AND ABSTRACTS

E. Kaercher, J. Kessler, and C. Morrisey (2008) The Role of the Pharmaceutical Biorepository Manager. International Society for Biological and Environmental Repositories Annual Meeting, Bethesda, Maryland.

W. Fairweather, R. Mogg, P. Bennett, J. Zhong, C. Morrisey, and T. Schofield (2003) Monitoring the Stability of Human Vaccines. Journal of Biopharmaceutical Statistics 13:3:395-413.

K. Rote, R. Holzman, G. Robey, B. Braun, S. Knicker, J. Severin, C. Testa, and B. Evans (1989) Characterization of full-length recombinant HIV-1 p41 and p24 for use in the Improved Abbott HIV-1 enzyme immunoassay. Fifth International Conference on AIDS, Montreal, Canada.

MORRISEY_00000005

Appx19471

M. Pope, K. Knigge, R. Weiss, C. Testa, L. Prozorovsky, J. Staller, and R. Pennington (1988) Rapid recombinant enzyme immunoassay for detecting antibodies to HIV. Fourth International Conference on AIDS, Stockholm, Sweden.

D. Castignetti, C. Forgue, and L. Sclafani (1986) Pathway of oxidation of pyruvic oxime by a heterotrophic nitrifier of the genus *Alcaligenes*; evidence against nitroethane as an intermediate. Archives of Biochemistry and Biophysics 250:228-232.

**REFERENCES AVAILABLE UPON REQUEST**

MORRISEY_00000006

11/26/2019
Declaration of G. Reilly
EXHIBIT 385

Appx19473





Restricted
R ◇Confidential
limited access

January 28, 2004 (original)
February 9, 2004 (revised)

TO:     **MARK GALINSKI**                                    **WP37A-104**

FROM:   Philip S. Bennett                                    WP37C-305

SUBJECT: Determination of Minimum Release Specifications for Mumps and Rubella in
M-M-R®II

REF:   1) REDACTED – OMP

       2) Memo Bennett to Morrisey "Stability of Mumps Virus Vaccine at 2-8°C
          Lyophilized and Reconstituted and Determination of Minimum Release
          Specification" January 2, 2003

cc:    **J. Clair, J. Heyse, M. Macchi, C. Morrisey, T. Schofield, PF, RIWP, BR,
       STATFILE**

REDACTED – OMP

## SUMMARY

The above referenced memos report the stability and minimum release specifications for mumps
and rubella components of M-M-R®II. This report uses the same stability determinations with
slightly different shelf life storage conditions, a reduced minimum expiry of 4.1 $\log_{10}$ TCID$_{50}$ per
dose for mumps, and 1x12 release assay testing to calculate the required minimum release
specifications for mumps and rubella.

| Storage | Maximum | |
|---|---|---|
| 2-8°C Shelf Life | 24 months | |
| -20°C Storage (Pre-Packaging) | 12 months | |
| TOR (Packaging Operations) | 40 hours | |
| Reconstituted (End User) | 8 hours | |
| Calculated Minimum Release Spec | Mumps: | 5.0 |
| ($\log_{10}$ TCID$_{50}$ per Dose) | Rubella: | REDA |

Philip S. Bennett
652-5936
u:\word\lvv\mmr\M040105b Mumps Rubella Release

**FILES:**
Data are located in u:\excel\lvv\mmr\active stability\2004\MMR Stability Models for MG 14 jan 04.xls

p. 1 of 2

MRK-KRA00722641
MRK-CHA00722641

Appx19474



Restricted
R ◇ Confidential
limited access

## MINIMUM RELEASE SPECIFICATION DETERMINATION:

The loss estimates and standard errors that are used to determine the minimum release potency specification limits needed to ensure with 95% probability that the minimum expiry potency would be met at the end of the shelf life are listed below. The calculations are summarized in the following tables, and described below:

| Storage | Loss Estimate | Std Error | Duration | Mumps Loss[1] | Var[2] | Rubella |
|---|---|---|---|---|---|---|
| | | | | | | REDACTED – OMP |
| **Release Potency Assay Variability[3]** | | | | | | |
| Mumps | | 0.060 | | | 0.00356 | |
| Rubella | REDACTED – OMP | | | | | |
| **Room Temperature (Sealing/Inspection/Packaging)** | | | | | | |
| Mumps | 0.10163 / 40 Hr | 0.04244 | 40 Hrs | 0.10163 | 0.00180 | |
| Rubella | REDACTED – OMP | | | | | |
| **-20°C Storage** | | | | | | |
| Mumps | -0.01493 / Yr[4] | 0.01325 | 1 Yr | -0.01493 | 0.00018 | |
| Rubella | REDACTED – OMP | | | | | |
| **2-8°C Storage** | | | | | | |
| Mumps | 0.54338 / 2 Yrs | 0.02671 | 2 Yrs | 0.54338 | 0.00071 | |
| Rubella | REDACTED – OMP | | | | | |
| **Reconstituted storage by physician** | | | | | | |
| Mumps | 0.05272 / 8 Hr | 0.01411 | 8 Hrs | 0.05272 | 0.00020 | |
| Rubella | REDACTED – OMP | | | | | |
| | | | **Total :** | **0.6828** | **0.00645** | |

1. Loss is the loss estimate for the duration at each step in the product profile.
2. Var (variance) is the square of the duration x the standard error per time:

$$Variance = (std\ err * duration)^2$$

3. The values for the release assay variability represent the standard error of a 1x12 assay (one vial assayed in each of 12 independent tests calibrated to the concurrently tested house standard).
4. A negative loss estimate for -20°C storage reflects the observed increase in the data.

The minimum release potency is calculated using the minimum potency at expiry (4.1 $\log_{10}$ $TCID_{50}$ / dose for Mumps, REDACTED – OMP ) and adding the total loss plus a factor of 1.65 times the square root of the total variance. This gives the minimum release potency that will provide 95% probability of meeting the expiry limit.

| | Minimum Expiry | + | Total Loss | + | 1.65 x | $\sqrt{TotalVariance}$ | = | Minimum Release |
|---|---|---|---|---|---|---|---|---|
| Mumps | 4.1 $\log_{10}TCID_{50}$ | + | 0.6828 | + | 1.65 x | 0.0803 | = | 4.92 $\log_{10}TCID_{50}$ |
| Rubella | REDACTED – OMP | | | | | | | |

Potency units are per 0.5 mL dose.

Since release potency determinations are reported to 0.1 $\log_{10}$, the minimum release estimates are conservatively rounded up to provide the proposed minimum release specifications of 5.0 $\log_{10}$ $TCID_{50}$ / dose for mumps REDACTED – OMP .

CONFIDENTIAL

MRK-KRA00722642
MRK-CHA00722642

Appx19475

11/26/2019
Declaration of G. Reilly
EXHIBIT 386



November 4, 2004

TO:   **MARY MACCHI**                                    **WP35-245**

FROM:   Philip S. Bennett                                **WP37C-305**

SUBJECT:   Determination of Minimum Release Specification for Mumps in M-M-R®II

REF:   1) Memo Bennett to Galinski "Determination of Minimum Release Specification for Mumps in M-M-R®II" March 29, 2004

cc:   **J. Clair, J. Heyse, M. Macchi, C. Morrisey, T. Schofield, PF, RIWP, BR, STATFILE**

## SUMMARY

The above referenced memo reports the stability and minimum release specifications for mumps components of M-M-R®II. This report uses the same stability determinations with different scenarios for shelf life storage (18 and 24 months) and TOR (35 and 40 hours) with a minimum expiry specification of 4.3 $\log_{10}$ TCID$_{50}$ per dose to calculate the required minimum release specification.

| Storage | | | | |
|---|---|---|---|---|
| 2-8°C Shelf Life | 18 months | 18 months | 24 months | 24 months |
| -20°C Storage (Pre-Packaging) | 12 months | 12 months | 12 months | 12 months |
| TOR (Packaging Operations) | 35 hours | 40 hours | 35 hours | 40 hours |
| Reconstituted (End User) | 8 hours | 8 hours | 8 hours | 8 hours |
| Release Assay Format | 1 x 12 | 1 x 12 | 1 x 12 | 1 x 12 |
| Calculated Minimum Release Spec: ($\log_{10}$ TCID$_{50}$ per Dose) | 5.1 | 5.1 | 5.1 | 5.2 |

Philip S. Bennett
652-5936
u:\word\lvv\mmr\M041101 Mumps Release

**FILES:**

Data are located in u:\excel\lvv\mmr\active stability\2004\MMR Stability Models for MG 14 jan 04.xls

p. 1 of 2

CONFIDENTIAL

MRK-KRA00722667
MRK-CHA00722667

Appx19477



**R** Restricted ◈ Confidential limited access

**MINIMUM RELEASE SPECIFICATION DETERMINATION:**

The loss estimates and standard errors that are used to determine the minimum release potency specification limits needed to ensure with 95% probability that the minimum expiry potency would be met at the end of the shelf life are listed below.  The calculations are summarized in the following table, and described below:

| Storage | Loss Estimate | Std Error | Mumps Duration | Loss[1] | Var[2] |
|---|---|---|---|---|---|
| **Release Potency Assay Variability** [3] | | | | | |
| | 0.060 | | | | 0.00356 |
| **Room Temperature (Sealing/Inspection/Packaging)** | | | | | |
| | 0.08892 / 35 Hr | 0.03713 | 35 Hrs | 0.08892 | 0.00138 |
| | 0.10163 / 40 Hr | 0.04244 | 40 Hrs | 0.10163 | 0.00180 |
| **-20°C Storage** | | | | | |
| | -0.01493 / Yr [4] | 0.01325 | 1 Yr | -0.01493 | 0.00018 |
| **2-8°C Storage** | | | | | |
| | 0.46382 / 18 Mos | 0.02280 | 18 Mos | 0.46382 | 0.00052 |
| | 0.54338 / 24 Mos | 0.02671 | 24 Mos | 0.54338 | 0.00071 |
| **Reconstituted storage by physician** | | | | | |
| | 0.05272 / 8 Hr | 0.01411 | 8 Hrs | 0.05272 | 0.00020 |
| **Totals :** | **35 Hrs TOR + 18 Mos at 2-8°C** | | | **0.5905** | **0.00584** |
| | **40 Hrs TOR + 18 Mos at 2-8°C** | | | **0.6032** | **0.00626** |
| | **35 Hrs TOR + 24 Mos at 2-8°C** | | | **0.6701** | **0.00603** |
| | **40 Hrs TOR + 24 Mos at 2-8°C** | | | **0.6828** | **0.00645** |

1. Loss is the loss estimate for the duration at each step in the product profile.
2. Var (variance) is the square of the duration x the standard error per time:
$$Variance - (std\ err * duration)^2$$
3. The values for the release assay variability represent the standard error of a 1x12 assay (one vial assayed in each of 12 independent tests calibrated to the concurrently tested house standard value).
4. A negative loss estimate for -20°C storage reflects the observed increase in the data.

The minimum release potency is calculated using the minimum potency at expiry (4.3 $log_{10}$ $TCID_{50}$ / dose for Mumps) and adding the total loss plus a factor of 1.65 times the square root of the total variance.  This gives the minimum release potency that will provide 95% probability of meeting the expiry limit.

For example, for 35 Hours TOR and 24 Months at 2-8°C:

| Minimum Expiry + Total Loss + 1.65 x $\sqrt{Total Variance}$ | = | Minimum Release |
|---|---|---|
| Mumps :  4.3 $log_{10}TCID_{50}$    +    0.6701+    1.65    x    0.0777 | = | 5.1 $log_{10}TCID_{50}$ |

Potency units are per dose.

**CONFIDENTIAL**

MRK-KRA00722668
MRK-CHA00722668

Appx19478

11/26/2019
Declaration of G. Reilly
EXHIBIT 387

Appx19479

**To:**      Keegan, Amy[amy_romanowski@merck.com]; Fahmy, Hesham
Mohamed[hesham_fahmy@merck.com]; Duffy, Kimberly A.[kimberly_duffy@merck.com]; Godshall,
Colleen E.[colleen_godshall@merck.com]
**Cc:**      Metzger, Dana L[dana_metzger@merck.com]; Bailey, Keith M.[keith_bailey@merck.com];
Miller, Chuck (CMS)[charles_miller3@merck.com]
**From:**    Bennett, Philip S.
**Sent:**    Tue 12/4/2012 11:05:56 AM
**Importance:**        Normal
**Subject:**   RE: Specification for MMR Range
Measles 5C and Release Spec m020803a.doc
m041101 Mumps Release Calc Scenarios for MM.doc
m040303 Mumps Release Calc.doc
Mumps Release Calc Background for BSEC.doc
m040105b Mumps Rubella Release.doc

All I have is 8-10 years old.

---

**From:** Keegan, Amy
**Sent:** Tuesday, December 04, 2012 10:29 AM
**To:** Fahmy, Hesham Mohamed; Duffy, Kimberly A.; Godshall, Colleen E.; Bennett, Philip S.
**Cc:** Metzger, Dana L; Bailey, Keith M.; Miller, Chuck (CMS)
**Subject:** RE: Specification for MMR Range
**Importance:** High

I am in Maryland and not back in the office until tomorrow.  I think Phil was involved in the various
specification setting that was associated with both mumps end expiry and 1x6 calibration.

Phil, can you help?

Also, we should not shotgun these requests around, rather, worth through Colleen as the Durham tech
transfer lead.  No one has the time/resources to be duplicating work.

Tx,
AK

---

| | |
|---|---|
| **From:** | Fahmy, Hesham Mohamed |
| **Sent:** | Tuesday, December 04, 2012 9:20 AM |
| **To:** | Keegan, Amy |
| **Cc:** | Metzger, Dana L; Bailey, Keith M.; Miller, Chuck (CMS) |
| **Subject:** | RE: Specification for MMR Range |
| **Importance:** | High |

Hi Amy - do you have the stat report for the current specs of the MMR max/min? we need it urgently
today.

Thanks,

Hesham

---

| | |
|---|---|
| **From:** | Metzger, Dana L |
| **Sent:** | Tuesday, December 04, 2012 7:01 AM |
| **To:** | Bailey, Keith M. |

CONFIDENTIAL

| | |
|---|---|
| **Cc:** | Fahmy, Hesham Mohamed |
| **Subject:** | RE: Specification for MMR Range |

I don't have a stat report for the current specs (ask Amy K?) but I can work on getting the current %RSD.

---

| | |
|---|---|
| **From:** | Bailey, Keith M. |
| **Sent:** | Monday, December 03, 2012 8:42 PM |
| **To:** | Metzger, Dana L |
| **Cc:** | Fahmy, Hesham Mohamed |
| **Subject:** | RE: Specification for MMR Range |

Dana -

Do you have the info that Hesham is requesting?  (I don't)  If you don't have it, do you know who might ?

Thanks, Keith

---

| | |
|---|---|
| **From:** | Fahmy, Hesham Mohamed |
| **Sent:** | Monday, December 03, 2012 5:41 PM |
| **To:** | Bailey, Keith M.; Metzger, Dana L |
| **Subject:** | RE: Specification for MMR Range |

Keith/Dana - It'd be helpful if you send me the current assay precision and the stat report of the current specs.

Thanks,

Hesham

---

| | |
|---|---|
| **From:** | Bailey, Keith M. |
| **Sent:** | Monday, December 03, 2012 5:31 PM |
| **To:** | Fahmy, Hesham Mohamed; Metzger, Dana L |
| **Subject:** | Specification for MMR Range |
| **When:** | Tuesday, December 04, 2012 11:00 AM-12:00 PM (GMT-05:00) Eastern Time (US & Canada). |
| **Where:** | Keith's Office (B62-2338) |

Kick off meeting to develop specification for min - max range for MMR potency.  We need to develop these range specifications ASAP.

- Keith

**CONFIDENTIAL**





Restricted
**R** ◈ Confidential
limited access

**January 28, 2004** (original)
**February 9, 2004** (revised)

| | | |
|---|---|---|
| **TO:** | **MARK GALINSKI** | **WP37A-104** |
| **FROM:** | Philip S. Bennett | WP37C-305 |

**SUBJECT:** Determination of Minimum Release Specifications for Mumps and Rubella in M-M-R®II

**REF:** REDACTED – OMP

2) Memo Bennett to Morrisey "Stability of Mumps Virus Vaccine at 2-8°C Lyophilized and Reconstituted and Determination of Minimum Release Specification" January 2, 2003

**cc:** J. Clair, J. Heyse, M. Macchi, C. Morrisey, T. Schofield, PF, RIWP, BR, STATFILE

REDACTED – OMP

## SUMMARY

The above referenced memos report the stability and minimum release specifications for mumps and rubella components of M-M-R®II. This report uses the same stability determinations with slightly different shelf life storage conditions, a reduced minimum expiry of 4.1 $\log_{10}$ TCID$_{50}$ per dose for mumps, and 1x12 release assay testing to calculate the required minimum release specifications for mumps and rubella.

| Storage | Maximum | |
|---|---|---|
| 2-8°C Shelf Life | 24 months | |
| -20°C Storage (Pre-Packaging) | 12 months | |
| TOR (Packaging Operations) | 40 hours | |
| Reconstituted (End User) | 8 hours | |
| Calculated Minimum Release Spec | Mumps: | 5.0 |
| ($\log_{10}$ TCID$_{50}$ per Dose) | Rubella: | RED |

Philip S. Bennett
652-5936
u:\word\lvv\mmr\M040105b Mumps Rubella Release

**FILES:**
Data are located in u:\excel\lvv\mmr\active stability\2004\MMR Stability Models for MG 14 jan 04.xls

p. 1 of 2

**CONFIDENTIAL**



R  Restricted
◈ Confidential
limited access

## MINIMUM RELEASE SPECIFICATION DETERMINATION:

The loss estimates and standard errors that are used to determine the minimum release potency specification limits needed to ensure with 95% probability that the minimum expiry potency would be met at the end of the shelf life are listed below. The calculations are summarized in the following tables, and described below:

| Storage | Loss Estimate | Std Error | Duration | Mumps Loss[1] | Var[2] | Rubella REDACTED – OMP |
|---|---|---|---|---|---|---|
| **Release Potency Assay Variability[3]** | | | | | | |
| Mumps | | 0.060 | | | 0.00356 | |
| Rubella | REDACTED – OMP | | | | | |
| **Room Temperature (Sealing/Inspection/Packaging)** | | | | | | |
| Mumps | 0.10163 / 40 Hr | 0.04244 | 40 Hrs | 0.10163 | 0.00180 | |
| Rubella | REDACTED – OMP | | | | | |
| **-20°C Storage** | | | | | | |
| Mumps | -0.01493 / Yr[4] | 0.01325 | 1 Yr | -0.01493 | 0.00018 | |
| Rubella | REDACTED – OMP | | | | | |
| **2-8°C Storage** | | | | | | |
| Mumps | 0.54338 / 2 Yrs | 0.02671 | 2 Yrs | 0.54338 | 0.00071 | |
| Rubella | REDACTED – OMP | | | | | |
| **Reconstituted storage by physician** | | | | | | |
| Mumps | 0.05272 / 8 Hr | 0.01411 | 8 Hrs | 0.05272 | 0.00020 | |
| Rubella | REDACTED – OMP | | | | | |
| | | | **Total :** | **0.6828** | **0.00645** | |

1. Loss is the loss estimate for the duration at each step in the product profile.
2. Var (variance) is the square of the duration x the standard error per time:
$$Variance = (std\ err * duration)^2$$
3. The values for the release assay variability represent the standard error of a 1x12 assay (one vial assayed in each of 12 independent tests calibrated to the concurrently tested house standard).
4. A negative loss estimate for -20°C storage reflects the observed increase in the data.

The minimum release potency is calculated using the minimum potency at expiry (4.1 $\log_{10}$ $TCID_{50}$ / dose for Mumps, REDACTED – OMP for Rubella) and adding the total loss plus a factor of 1.65 times the square root of the total variance. This gives the minimum release potency that will provide 95% probability of meeting the expiry limit.

| | Minimum Expiry | + | Total Loss | + | 1.65 | x | $\sqrt{TotalVariance}$ | = | Minimum Release |
|---|---|---|---|---|---|---|---|---|---|
| Mumps | 4.1 $\log_{10}TCID_{50}$ | + | 0.6828 | + | 1.65 | x | 0.0803 | = | 4.92 $\log_{10}TCID_{50}$ |
| Rubella | REDACTED – OMP | | | | | | | | |

Potency units are per 0.5 mL dose.

Since release potency determinations are reported to 0.1 $\log_{10}$, the minimum release estimates are conservatively rounded up to provide the proposed minimum release specifications of 5.0 $\log_{10}$ $TCID_{50}$ / dose for mumps and REDACTED – OMP for rubella.

p.2 of 2

MRK-KRA01580009
MRK-CHA01580009

**Appx19483**



Restricted
R ◇ Confidential
limited access

**March 29, 2004**

| | | |
|---|---|---|
| **TO:** | **MARK GALINSKI** | **WP37A-104** |
| **FROM:** | Philip S. Bennett | WP37C-305 |

**SUBJECT:** Determination of Minimum Release Specification for Mumps in M-M-R®II

**REF:** 1) Memo Bennett to Morrisey "Stability of Mumps Virus Vaccine at 2-8°C Lyophilized and Reconstituted and Determination of Minimum Release Specification" January 2, 2003

**cc:** J. Clair, J. Heyse, M. Macchi, C. Morrisey, T. Schofield, PF, RIWP, BR, **STATFILE**

---

## SUMMARY

The above referenced memo reports the stability and minimum release specifications for mumps components of M-M-R®II. This report uses the same stability determinations with different shelf life storage (24 mos. v. 18 mos.) and a lower minimum expiry specification (4.1 $\log_{10}$ TCID$_{50}$ per dose v. 4.3) to calculate the required minimum release specification.

| Storage | Maximum |
|---|---|
| 2-8°C Shelf Life | 24 months |
| -20°C Storage (Pre-Packaging) | 12 months |
| TOR (Packaging Operations) | 35 hours |
| Reconstituted (End User) | 8 hours |
| Minimum Expiry Specification: | 4.1 |
| Calculated Minimum Release Spec: ($\log_{10}$ TCID$_{50}$ per Dose) | 4.9 |

Philip S. Bennett
652-5936
u\word\lvv\mmr\M040303 Mumps Release

**FILES:**
Data are located in u:\excel\lvv\mmr\active stability\2004\MMR Stability Models for MG 14 jan 04.xls

CONFIDENTIAL

MRK-KRA01580010
MRK-CHA01580010

Appx19484



## MINIMUM RELEASE SPECIFICATION DETERMINATION:

The loss estimates and standard errors that are used to determine the minimum release potency specification limits needed to ensure with 95% probability that the minimum expiry potency would be met at the end of the shelf life are listed below.  The calculations are summarized in the following tables, and described below:

| Storage | Loss Estimate | Std Error | Duration | Mumps Loss[1] | Var[2] |
|---------|---------------|-----------|----------|-------|-----|
| **Release Potency Assay Variability**[3] | | 0.060 | | | 0.00356 |
| **Room Temperature (Sealing/Inspection/Packaging)** | | | | | |
| | 0.10163 / 40 Hr | 0.04244 | 35 Hrs | 0.08892 | 0.00138 |
| **-20°C Storage** | | | | | |
| | -0.01493 / Yr[4] | 0.01325 | 1 Yr | -0.01493 | 0.00018 |
| **2-8°C Storage** | | | | | |
| | 0.54338 / 2 Yrs | 0.02671 | 2 Yrs | 0.54338 | 0.00071 |
| **Reconstituted storage by physician** | | | | | |
| | 0.05272 / 8 Hr | 0.01411 | 8 Hrs | 0.05272 | 0.00020 |
| | | | **Total :** | **0.6701** | **0.00603** |

1. Loss is the loss estimate for the duration at each step in the product profile.
2. Var (variance) is the square of the duration x the standard error per time:
$$Variance = (std\ err * duration)^2$$
3. The values for the release assay variability represent the standard error of a 1x12 assay (one vial assayed in each of 12 independent tests calibrated to the concurrently tested house standard value).
4. A negative loss estimate for -20°C storage reflects the observed increase in the data.

The minimum release potency is calculated using the minimum potency at expiry (4.1 $\log_{10}$ $TCID_{50}$ / dose for Mumps) and adding the total loss plus a factor of 1.65 times the square root of the total variance.  This gives the minimum release potency that will provide 95% probability of meeting the expiry limit.

| Minimum Expiry | + | Total Loss | + | 1.65 | x | $\sqrt{TotalVariance}$ | = | Minimum Release |
|---|---|---|---|---|---|---|---|---|
| Mumps : 4.1 $\log_{10}TCID_{50}$ | + | 0.6701+ | | 1.65 | x | 0.0777 | = | 4.90 $\log_{10}TCID_{50}$ |

Potency units are per dose.

CONFIDENTIAL

MRK-KRA01580011
MRK-CHA01580011

Appx19485




Restricted
R ◈ Confidential
limited access

**November 4, 2004**

TO: **MARY MACCHI**                          **WP35-245**

FROM:  Philip S. Bennett                      WP37C-305

SUBJECT:  Determination of Minimum Release Specification for Mumps in M-M-R®II

REF:  1) Memo Bennett to Galinski "Determination of Minimum Release Specification for Mumps in M-M-R®II" March 29, 2004

cc:  **J. Clair, J. Heyse, M. Macchi, C. Morrisey, T. Schofield, PF, RIWP, BR, STATFILE**

## SUMMARY

The above referenced memo reports the stability and minimum release specifications for mumps components of M-M-R®II.  This report uses the same stability determinations with different scenarios for shelf life storage (18 and 24 months) and TOR (35 and 40 hours) with a minimum expiry specification of 4.3 $\log_{10}$ TCID$_{50}$ per dose to calculate the required minimum release specification.

| Storage | | | | |
|---|---|---|---|---|
| 2-8°C Shelf Life | 18 months | 18 months | 24 months | 24 months |
| -20°C Storage (Pre-Packaging) | 12 months | 12 months | 12 months | 12 months |
| TOR (Packaging Operations) | 35 hours | 40 hours | 35 hours | 40 hours |
| Reconstituted (End User) | 8 hours | 8 hours | 8 hours | 8 hours |
| Release Assay Format | 1 x 12 | 1 x 12 | 1 x 12 | 1 x 12 |
| Calculated Minimum Release Spec: ($\log_{10}$ TCID$_{50}$ per Dose) | 5.1 | 5.1 | 5.1 | 5.2 |

Philip S. Bennett
652-5936
u:\word\lvv\mmr\M041101 Mumps Release

**FILES:**
Data are located in u:\excel\lvv\mmr\active stability\2004\MMR Stability Models for MG 14 jan 04.xls

CONFIDENTIAL

MRK-KRA01580012
MRK-CHA01580012

Appx19486



**R** **Restricted** ◇ **Confidential** *limited access*

**MINIMUM RELEASE SPECIFICATION DETERMINATION:**

The loss estimates and standard errors that are used to determine the minimum release potency specification limits needed to ensure with 95% probability that the minimum expiry potency would be met at the end of the shelf life are listed below. The calculations are summarized in the following table, and described below:

| Storage | Loss Estimate | Std Error | Mumps Duration | Mumps Loss[1] | Mumps Var[2] |
|---|---|---|---|---|---|
| **Release Potency Assay Variability** [3] | | | | | |
| | 0.060 | | | | 0.00356 |
| **Room Temperature (Sealing/Inspection/Packaging)** | | | | | |
| | 0.08892 / 35 Hr | 0.03713 | 35 Hrs | 0.08892 | 0.00138 |
| | 0.10163 / 40 Hr | 0.04244 | 40 Hrs | 0.10163 | 0.00180 |
| **-20°C Storage** | | | | | |
| | -0.01493 / Yr [4] | 0.01325 | 1 Yr | -0.01493 | 0.00018 |
| **2-8°C Storage** | | | | | |
| | 0.46382 / 18 Mos | 0.02280 | 18 Mos | 0.46382 | 0.00052 |
| | 0.54338 / 24 Mos | 0.02671 | 24 Mos | 0.54338 | 0.00071 |
| **Reconstituted storage by physician** | | | | | |
| | 0.05272 / 8 Hr | 0.01411 | 8 Hrs | 0.05272 | 0.00020 |
| **Totals :** | **35 Hrs TOR + 18 Mos at 2-8°C** | | | **0.5905** | **0.00584** |
| | **40 Hrs TOR + 18 Mos at 2-8°C** | | | **0.6032** | **0.00626** |
| | **35 Hrs TOR + 24 Mos at 2-8°C** | | | **0.6701** | **0.00603** |
| | **40 Hrs TOR + 24 Mos at 2-8°C** | | | **0.6828** | **0.00645** |

1. Loss is the loss estimate for the duration at each step in the product profile.
2. Var (variance) is the square of the duration x the standard error per time:
$$Variance - (std\ err * duration)^2$$
3. The values for the release assay variability represent the standard error of a 1x12 assay (one vial assayed in each of 12 independent tests calibrated to the concurrently tested house standard value).
4. A negative loss estimate for -20°C storage reflects the observed increase in the data.

The minimum release potency is calculated using the minimum potency at expiry (4.3 $\log_{10}$ $TCID_{50}$ / dose for Mumps) and adding the total loss plus a factor of 1.65 times the square root of the total variance. This gives the minimum release potency that will provide 95% probability of meeting the expiry limit.

For example, for 35 Hours TOR and 24 Months at 2-8°C:

| Minimum Expiry | + Total Loss | + 1.65 x $\sqrt{TotalVariance}$ | = | Minimum Release |
|---|---|---|---|---|
| Mumps : 4.3 $\log_{10}TCID_{50}$ | + 0.6701+ | 1.65 x 0.0777 | = | 5.1 $\log_{10}TCID_{50}$ |

Potency units are per dose.

**CONFIDENTIAL**

MRK-KRA01580013
MRK-CHA01580013

Appx19487

## Minimum Release Potency Specification for Mumps Virus

**DECISION REQUESTED:**

BSEC is being asked to approve the change in the minimum release specification for Mumps virus in M-M-R®II family vaccines from 5.0 to 4.9 $\log_{10}$ TCID$_{50}$ per 0.5 mL dose. This requires a reduction in the allowable TOR (time out of refrigeration) for sealing, inspection, packaging, and warehouse operations from the current maximum of 40 hours to 35 hours.

**BACKGROUND:**

The current minimum release specification for Mumps is 5.0 $\log_{10}$ TCID$_{50}$ per 0.5 mL dose. This was established based on a minimum expiry potency of 4.3 $\log_{10}$ TCID$_{50}$ per 0.5 mL dose and without proper consideration of the release assay variability, stability loss estimates, and error in the loss estimates.

<u>MINIMUM EXPIRY POTENCY:</u>  The recently concluded Mumps end expiry clinical trial supports a minimum expiry potency of 4.1 $\log_{10}$ TCID$_{50}$ per 0.5 mL dose, when measured relative to the current house standard lot with an assigned potency of 4.3 $\log_{10}$ TCID$_{50}$ per 0.1 mL. The minimum release potency should be based on this value.

<u>MODEL FOR DETERMINING THE MINIMUM RELEASE SPECIFICATION:</u>  The accepted model for calculating the minimum release specification incorporates the total loss estimates from the maximum allowed storage times at each storage condition and the total error in the loss and release estimates. For Mumps, the minimum release is calculated using stability estimates for -20°C (up to 1 year), 25°C (up to 35 hours), 2-8°C (up to 24 months), and reconstituted (up to 8 hours) and a factor of 1.65 times the square root of the total variance. This gives the minimum release potency that will provide 95% probability of meeting the expiry limit.

<u>ANALYSES FOR MUMPS:</u>  Stability data were compiled and analyzed to provide loss estimates and standard errors at the various storage conditions. Assay variability was determined from house standard data and based on a 1x12 test format.

The calculations are summarized in the following table, and described below:



p. 1 of 2

MRK-KRA01580014
MRK-CHA01580014

Appx19488



| Storage | Loss Estimate | Std Error | Duration | Loss[1] | Var[2] |
|---|---|---|---|---|---|
| **Release Potency Assay Variability** [3] | | 0.060 | | | 0.00356 |
| **Room Temperature (Sealing/Inspection/Packaging)** | | | | | |
| | 0.10163 / 40 Hr | 0.04244 | 35 Hrs | 0.08892 | 0.00138 |
| **-20°C Storage** | | | | | |
| | -0.01493 / Yr [4] | 0.01325 | 1 Yr | -0.01493 | 0.00018 |
| **2-8°C Storage** | | | | | |
| | 0.54338 / 2 Yrs | 0.02671 | 2 Yrs | 0.54338 | 0.00071 |
| **Reconstituted storage by physician** | | | | | |
| | 0.05272 / 8 Hr | 0.01411 | 8 Hrs | 0.05272 | 0.00020 |
| | | | **Total :** | **0.6701** | **0.00603** |

1. Loss is the loss estimate for the duration at each step in the product profile.
2. Var (variance) is the square of the duration x the standard error per time:

$$Variance = (std\ err * duration)^2$$

3. The value for the release assay variability represent the standard error of a 1x12 assay (one vial assayed in each of 12 independent tests calibrated to the concurrently tested house standard value).
4. A negative loss estimate for -20°C storage reflects the observed increase in the data.

The minimum release potency is calculated using the minimum potency at expiry (4.1 $\log_{10}$ $TCID_{50}$ / dose for Mumps) and adding the total loss plus a factor of 1.65 times the square root of the total variance. This gives the minimum release potency that will provide 95% probability of meeting the expiry limit.

| Minimum Expiry | + | Total Loss | + 1.65 x | $\sqrt{TotalVariance}$ | = | Minimum Release |
|---|---|---|---|---|---|---|
| 4.1 $\log_{10}TCID_{50}$ | + | 0.6701 | + 1.65 | x      0.0777 | | 4.90 $\log_{10}TCID_{50}$ |
| | | | | = | | |

Potency units are per dose

CONFIDENTIAL

MRK-KRA01580015
MRK-CHA01580015

Appx19489

11/26/2019
Declaration of G. Reilly
EXHIBIT 388

**To:**      Keegan, Amy[amy_romanowski@merck.com]; Bennett, Philip S.[philip_bennett@merck.com];
Fahmy, Hesham Mohamed[hesham_fahmy@merck.com]; Godshall, Colleen
E.[colleen_godshall@merck.com]
**Cc:**      Metzger, Dana L[dana_metzger@merck.com]; Bailey, Keith M.[keith_bailey@merck.com];
Miller, Chuck (CMS)[charles_miller3@merck.com]; Atlee, Rachael[rachael_atlee@merck.com]
**From:**    Duffy, Kimberly A.
**Sent:**    Wed 12/5/2012 10:17:14 AM
**Importance:**        Normal
**Subject:**  RE: Specification for MMR Range

Please take the remainder of this conversation off-line.  This is not appropriate use of e-
mail.

Thank you.
Kim

Kimberly Duffy
Merck Sharp and Dohme Corp.
Director, Global Regulatory Affairs, Vaccines CMC
WP 37A-104
phone:  215-652-0262
mobile:  267-644-5929
fax:  215-993-4796
kimberly.duffy@merck.com

---

**From:**    Keegan, Amy
**Sent:**    Tuesday, December 04, 2012 11:27 AM
**To:**      Bennett, Philip S.; Fahmy, Hesham Mohamed; Duffy, Kimberly
             A.; Godshall, Colleen E.
**Cc:**      Metzger, Dana L; Bailey, Keith M.; Miller, Chuck (CMS)
**Subject:**  RE: Specification for MMR Range

Thanks, Phil!  Even though old, these are the ones I believe this group needs.  You rock.

---

**From:**    Bennett, Philip S.
**Sent:**    Tuesday, December 04, 2012 11:06 AM
**To:**      Keegan, Amy; Fahmy, Hesham Mohamed; Duffy, Kimberly A.;
             Godshall, Colleen E.
**Cc:**      Metzger, Dana L; Bailey, Keith M.; Miller, Chuck (CMS)
**Subject:**  RE: Specification for MMR Range

All I have is 8-10 years old.
 << File: Measles 5C and Release Spec m020803a.doc >>  << File:
m041101 Mumps Release Calc Scenarios for MM.doc >>  << File: m040303
Mumps Release Calc.doc >>  << File: Mumps Release Calc Background for
BSEC.doc >>  << File: m040105b Mumps Rubella Release.doc >>

---

CONFIDENTIAL

**From:** Keegan, Amy
**Sent:** Tuesday, December 04, 2012 10:29 AM
**To:** Fahmy, Hesham Mohamed; Duffy, Kimberly A.; Godshall, Colleen E.; Bennett, Philip S.
**Cc:** Metzger, Dana L; Bailey, Keith M.; Miller, Chuck (CMS)
**Subject:** RE: Specification for MMR Range
**Importance:** High

I am in Maryland and not back in the office until tomorrow. I think Phil was involved in the various specification setting that was associated with both mumps end expiry and 1x6 calibration.

Phil, can you help?

Also, we should not shotgun these requests around, rather, worth through Colleen as the Durham tech transfer lead. No one has the time/resources to be duplicating work.

Tx,
AK

---

**From:**      Fahmy, Hesham Mohamed
**Sent:**       Tuesday, December 04, 2012 9:20 AM
**To:**          Keegan, Amy
**Cc:**          Metzger, Dana L; Bailey, Keith M.; Miller, Chuck (CMS)
**Subject:**   RE: Specification for MMR Range
**Importance:**    High

Hi Amy - do you have the stat report for the current specs of the MMR max/min? we need it urgently today.

Thanks,

Hesham

---

**From:**      Metzger, Dana L
**Sent:**       Tuesday, December 04, 2012 7:01 AM
**To:**          Bailey, Keith M.
**Cc:**          Fahmy, Hesham Mohamed
**Subject:**   RE: Specification for MMR Range

I don't have a stat report for the current specs (ask Amy K?) but I can work on getting the current %RSD.

---

**From:**      Bailey, Keith M.
**Sent:**       Monday, December 03, 2012 8:42 PM
**To:**          Metzger, Dana L
**Cc:**          Fahmy, Hesham Mohamed
**Subject:**   RE: Specification for MMR Range

CONFIDENTIAL

MRK-KRA01579944
MRK-CHA01579944

Appx19492

Dana -

Do you have the info that Hesham is requesting? (I don't) If you don't have it, do you know who might ?

Thanks, Keith

---

**From:** Fahmy, Hesham Mohamed
**Sent:** Monday, December 03, 2012 5:41 PM
**To:** Bailey, Keith M.; Metzger, Dana L
**Subject:** RE: Specification for MMR Range

Keith/Dana - It'd be helpful if you send me the current assay precision and the stat report of the current specs.

Thanks,

Hesham

---

**From:** Bailey, Keith M.
**Sent:** Monday, December 03, 2012 5:31 PM
**To:** Fahmy, Hesham Mohamed; Metzger, Dana L
**Subject:** Specification for MMR Range
**When:** Tuesday, December 04, 2012 11:00 AM-12:00 PM (GMT-05:00) Eastern Time (US & Canada).
**Where:** Keith's Office (B62-2338)

Kick off meeting to develop specification for min - max range for MMR potency. We need to develop these range specifications ASAP.

- Keith

CONFIDENTIAL

11/26/2019
Declaration of G. Reilly
EXHIBIT 389

Appx19494

**CURRICULUM VITAE**
**Amy Keegan**

## I. EDUCATION

Georgetown University, Washington D.C.
1990-1994
B.S., Biology  3.14/4.00

Thomas Jefferson University, Philadelphia PA
1999-present
M.S., Microbiology  (in progress) 3.75/4.00

## II. MERCK EMPLOYMENT HISTORY

September 2009 to present – Assoc. Director, Vaccines CMC,

- Managed a team of three CMC scientists supporting live virus vaccines, ANTIVENIN, V212 and sterile diluent. Directed CMC Regulatory activities, including: global regulatory supplement authoring, review, submission and approval management; regulatory strategy development for new vaccine products or optimized vaccine manufacturing processes; and required compliance activities (product annual reports, renewals and commitments).
- Served as adventitious agent subject matter expert within Vaccines CMC. Provided responses to agency inquiries related to porcine circovirus in live virus vaccines. Coordinated responses to CBER's "Dear Vaccine Manufacturer Letter," outlining Merck's current regimen and future plans for adventitious agent detection/reduction in raw materials and vaccine intermediates. Partnered with MRL and VMSC to create live virus vaccine adventitious agent risk assessments and establish a real-time surveillance system to proactively identify and respond to emerging adventitious agent concerns.
- Acted as CMC product lead for V212, providing regulatory strategy and requirements for the new product filing world-wide. Prepared briefing packages for and led successful Type C discussions with CBER for V212 commercialization strategy. Served as CMC representative to the V212 IDST and GRT.
- Served as CMC world-wide product lead for M-M-R™ II, completing: new market registrations, global product renewals, post-approval change variations, responses to questions and compliance-related activities. Provided regulatory guidance as the CMC representative to the M-M-R™ II IDST supporting new bulk platform development, custom diluent formulation and rubella optimized process demonstration. Acted as CMC representative to the M-M-R™ II/ProQuad™ VCMT. Managed regulatory activities to register M-M-R™ II in Japan in collaboration with an external business partner.
- Represented Vaccines CMC at the Varicella Enhanced Potency (VEP) Bulk Process IDST. Prepared Type C briefing package to gain CBER feedback on the process development, analytical characterization and clinical development plans for VEP.
- Lead regulatory activities to develop filing requirements and strategy for gaining world-wide approval for the Durham, NC, site as a release testing site for varicella bulk, M-M-R™ II, VARIVAX™ and ZOSTAVAX™. Authored variations for and gained approval for the site in USA, EMA and Canada.
- Facilitated the Specification Committee for approval of product specifications for vaccines and biologics from Phase 0 Safety Assessment through Post-Approval Changes.
- Represented Regulatory CMC to Product Development and Joint Product (external partner) Teams providing guidance on regulatory strategy for both new and mature vaccine products.

November 2005 to Present – Manager, GVTE-Bioanalytical (formerly RAS-BAS)

- Managed and developed analytical scientists supporting method development and validation, critical reagent qualifications, analytical transfers, and product, process and method investigations.
- MMD analytical representative to the Varicella Franchise Alignment Team investigating varicella bulk low potency and antigen results. Lead analytical team performing critical data analyses to understand method contributions to low potency. Established and coordinated orthogonal $TCID_{50}$ potency testing of experimental samples at a contract facility.
- Supported regulatory and prior approval inspections of West Point Site. Authored inspection observation responses.
- Authored analytical sections of the ZOSTAVAX™ BLA. Provided annual varicella potency standard analyses to EMA.
- Investigated and responded to CBER queries regarding VARIVAX™ house standard assignment resulting in approval for new standard.
- Completed matrix qualifications and developed clinical release strategies in support of HT-VZV clinical studies.
- Established proof of concept, initial design and method validation for an automated varicella potency assay method.

CONFIDENTIAL

MRK-KRA02009507
MRK-CHA02009507

Appx19495

**CURRICULUM VITAE**
**Amy Keegan**

- Served as ProQuad™/Concentrated Varicella HVF Analytical Subteam Leader and IDST Analytical Representative. Developed stability and qualification strategies for new product formulations.
- Developed initial analytical strategy for B29 Absence of Product initiative to fulfill regulatory commitments.
- Managed varicella potency testing capacity and scheduling, resolving backlog of experimental sample testing.

July 2002 to November 2005 – Senior Project Scientist, Laboratory Technical Support, MMD

- Managed and trained scientists supporting method troubleshooting, product and test investigations, and critical reagent qualifications for adventitious agent detection, infectivity and other cell-based and immunological test methods.
- Mentored Summer Intern to develop QPCR methods for high-throughput screening of immunological reagents for use in adventitious agent detection testing and an influenza A virus positive control for hemadsorption testing.
- Transferred analytical methods to MSD Haarlem and NVI in support of VARIVAX™ EU launch. Trained analysts to perform assays. Designed laboratory equivalency studies to ensure site-to-site consistency of results.
- Initiated developmental activities in support of replacing mycoplasma detection assays with PCR-based methodology. Optimized PCR chemistry and sampling procedures for commercially available test kit.
- Analytical Representative to ProQuad™ Technical Transfer Team. Supported vaccine filling model development, process validation, matrix characterization, clinical titer recalibration, and assay standard calibration.
- Quality Representative to HIV-1 Ad5 Technical Transfer Team. Responsible for Quality and Regulatory oversight of transfer activities. Developed Quality Systems Philosophy to support product launch from the Biologics Pilot Plant. Accomplished Concept Scope and divisional QA review of bulk facility design and operating philosophy.
- Manufactured and/or qualified assay controls and critical reagents to ensure uninterrupted supply to the laboratories.

April 1998 to July 2002 – Project Scientist, Bioanalytical Development / Laboratory Technical Support, MMD

- Provided troubleshooting, optimization, method development and deviation/out-of specification investigation for cell-based potency, adventitious agent and residual infectivity methods.
- Partnered with Vaccine Biometrics to develop a statistical tool to perform real-time assay tracking and trending for measles, mumps and rubella potency assays in response to an FDA 483 inspection observation.
- Developed and implemented a FITC method for varicella virus identity testing for varicella seed products.
- Provided training and technical assistance to the Canadian BBR and Australian TGAL representatives to perform varicella potency testing in support of international vaccine launch and release.
- Partnered with Technology & Engineering to enhance varicella Stock Seed potency assignment, correlating virus propagation curves with potency assignment to enhance bulk potency output.
- Analytical representative to Measles Low Potency Investigation Team. Performed experiments to assign cause to lower than expected filled container potency, implemented analytical corrective actions, and championed implementation of new assay format to increase accuracy of potency assignments.
- Analytical representative to VARIVAX™ Low Potency Task Force. Coordinated multi-laboratory studies to validate lower than expected filled container potencies. Performed laboratory scale experiments to elucidate formulation step yields/losses and matrix characterization.
- Executed Competitive Intelligence Studies. Performed experiments to characterize potency and matrix characteristics of competitor's varicella vaccine, and to compare thermal stability profiles of Merck and competitor's measles, mumps, and rubella vaccines.
- Teamed with Vaccine Biometrics Research and Sterile Process Technology to develop and implement manufacturing and calibration strategies for varicella-containing vaccine standards, including creation of a master reference standard program for v-containing vaccines. Completed standard calibration and matrix qualification studies for VARIVAX™ Upgrade and VARIVAX™ III.
- Partnered with scientists at NIBSC to accomplish a collaborative study resolving observed measles, mumps, and rubella vaccine thermal stability differences between laboratories, ensuring continued release of vaccine to EU markets.
- Developed, manufactured, and qualified analytical reagents in support of continuous laboratory operation.

March 1997 to April 1998 – Scientist, Bioanalytical Development, MMD

2

CONFIDENTIAL

MRK-KRA02009508
MRK-CHA02009508

Appx19496

**CURRICULUM VITAE**
**Amy Keegan**

- Completed retrospective validation and optimization of viral adventitious agent detection analytical methods.
- Supported technical transfer and demonstration activities for 2nd Generation and Process Upgrade VARIVAX™ bulk processes. Performed matrix qualifications in all release methods; served as analytical representative to Varicella Project Team, Analytical Subteam, and QC/QA Subteam.
- Administered stability programs in support of ProQuad™ dose-ranging clinical trials.
- Participated in technical transfer of Optimized GOS bulk process. Administered OG4 stabilizer stability study, supported M-M-R™ II expiry dating efforts, and represented Laboratory Operations/MMD Quality at the M-M-R™ II Project Team and Process Analytical Formulation Subteams.
- Teamed with scientists at the CDC, Paul Ehrlich Institute, and NIBSC to perform an MMR Potency Assay Harmonization Study.

March 1996 to March 1997 – Chemist, Bioprocess & Bioanalytical Development, MRL
- Validated and optimized virological and immunological analytical methods for potency, safety and adventitious agent detection.
- Performed matrix qualification and characterization studies for VZV-containing and multivalent pediatric vaccine candidates.
- Administered release and stability programs for multivalent pediatric vaccines in clinic.

**IV. NON-MERCK EMPLOYMENT HISTORY**
September 1994 to March 1996 - Bioprocess and Bioanalytical Research, MRL, Contract through Scientific Staffing
- Directed daily operations of potency assay group supporting varicella-containing vaccine process development. Responsible for test scheduling, data analysis and data reporting to customers in accord with project timelines.
- Trained new technicians to perform potency assay testing and data analysis.
- Assisted in developing an RT-PCR assay for Hepatitis A potency. Contributor on poster presentation for ABRF '96: Biomolecular Techniques Symposium.
- Performed quantitation of BSA by EIA for varicella, measles, mumps and rubella bulk vaccines.
- Accomplished release testing of inactivated bulk Hepatitis A vaccine in support of product launch.

Summer 1991 to Winter 1994 (seasonal) - Anatomical Pathology, SmithKline Beecham Clinical Laboratories
- Provided customer service response, maintained patient history files and reported test results for cytopathology laboratory

**V. ACADEMIC EXPERIENCE**
Spring 1994 - Teaching Assistantship – Invertebrate Zoology, Dept. of Biology, Georgetown University
- Prepared laboratory specimens/experiments, conducted exam review/tutorials, graded exams and laboratory practicals.

Fall 1992 to Summer 1994 – Research Fellowship, Dept. of Biochemistry and Molecular Biology, Georgetown University
- Explored signal transduction, cellular proliferation, and apoptosis induced by sphingomyelin metabolites.
- Performed lipid radio-labeling, extraction, and thin-layer liquid chromatography. Conducted chemoinvasion assays with Collagen IV and synthetic membranes. Executed cellular proliferation experiments. including FACS analysis and [$^3$H] thymidine labeling.

**VI. PUBLICATIONS**
A. Olivera, **A. Romanowski**, C.S. Rani, S. Spiegel. *Differential effect of sphingomyelinase and cell-permeable ceramide*
*analogs on proliferation of Swiss 3T3 fibroblasts.* Biochemica and Biophysica Acta 1997, Oct 18; 1348(3):311-23.

3

**CONFIDENTIAL**

**MRK-KRA02009509**
**MRK-CHA02009509**

**Appx19497**

11/26/2019
Declaration of G. Reilly
EXHIBIT 390

# M-M-R®II

## Protocol #007 - Mumps End Expiry study:
## AIGENT Assay Issues and Impact on Study Criteria

Presenters:
Manal Morsy
Jonathan Hartzel

CRRC
October 08, 2002

MRK-CHA00025831

CONFIDENTIAL

MRK-CHA0002583l

# M-M-R®<sub>II</sub>

## Presentation Goals/ Decisions Requested

**Purpose:**

- **Update CRRC on:**

  » **Status of Mumps End Expiry study #007**

  » **Estimated risk of failing study criteria of success**

- **Review options under evaluation to support the current mumps expiry titer (4.3 log TCID50) through end of shelf-life**

- **Request CRRC support to accelerate the M-M-R®II New Stabilizer program (long-term fix for maintaining stability through product shelf-life)**

MRK-CHA00025831_00002

CONFIDENTIAL